# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| ) | |
| ) | |
| In re ) | Chapter 11 |
| ) | Case No. 08-13141 (KJC) |
| TRIBUNE COMPANY, *et al.*, ) | Jointly Administered |
| ) | |
| ) | |
| Debtors. ) | |
| ) | |

# POST-TRIAL BRIEF OF THE
## NOTEHOLDER PLAN PROPONENTS (PART I)

AKIN GUMP STRAUSS HAUER & FELD LLP
Daniel H. Golden
David Zensky
Philip C. Dublin
Abid Qureshi
Mitchell P. Hurley
One Bryant Park
New York, NY 10036
212-872-1000

ASHBY & GEDDES, P.A.
William P. Bowden (I.D. No. 2553)
Amanda M. Winfree (I.D. No. 4615)
500 Delaware Avenue, P.O. Box 1150
Wilmington, DE 19899
302- 654-1888

*Counsel for Aurelius Capital Management, LP*

McCARTER & ENGLISH, LLP
David J. Adler
245 Park Avenue
New York, NY 10167
212-609-6800

McCARTER & ENGLISH, LLP
Katharine L. Mayer (I.D. No. 3758)
Renaissance Centre
405 N. King Street
Wilmington, DE 19801
302-984-6300

*Counsel for Deutsche Bank Trust Company Americas, solely in its capacity as successor Indenture Trustee for certain series of Senior Notes*

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
David S. Rosner
1633 Broadway
New York, New York 10019
212-506-1700

BIFFERATO GENTILOTTI LLC
Garvan F. McDaniel (I.D. No. 4167)
800 N. King Street, Plaza Level
Wilmington, Delaware 19801
302- 429-1900

*Counsel for Law Debenture Trust Company of New York, solely in its capacity as successor Indenture Trustee for certain series of Senior Notes*

BROWN RUDNICK LLP
Robert J. Stark
Martin S. Siegel
Gordon Z. Novod
Seven Times Square
New York, NY 10036
212-209-4800

SULLIVAN HAZELTINE ALLINSON LLC
William D. Sullivan (I.D. No. 2820)
Elihu E. Allinson, III (I.D. No. 3476)
901 N. Market St., Suite 1300
Wilmington, DE 19801
302-428-8191

*Counsel for Wilmington Trust Company, solely in its capacity as successor Indenture Trustee for the PHONES Notes*

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT......................................................................................1

ARGUMENT ................................................................................................................4

I.     THE NPP PLAN SHOULD BE CONFIRMED ...................................................4

II.    CLAIMS AGAINST THE LBO LENDERS HAVE A HIGH PROBABILITY OF SUCCESS ..............................................................................................................8

        A.    THE DEBTORS' PROJECTIONS AT STEPS ONE AND TWO SHOULD NOT HAVE BEEN RELIED UPON AT THE TIME OF THE LBO AND CANNOT BE RELIED UPON NOW TO ASSESS SOLVENCY ..........................9

        B.    INTENTIONAL FRAUDULENT CONVEYANCES...........................................17

        C.    CONSTRUCTIVE FRAUDULENT TRANSFER AT STEP ONE ......................22

        D.    CONSTRUCTIVE FRAUDULENT TRANSFER AT STEP TWO .....................39

        E.    THE EXAMINER'S ANALYSIS OF STEP ONE WAS INCOMPLETE............42

        F.    THE DCL PLAN PROPONENTS' PURPORTED "MARKET EVIDENCE" DOES NOT REBUT THE CLEAR EVIDENCE THAT THE COMPANY WAS INSOLVENT, INADEQUATELY CAPITALIZED, AND UNABLE TO MEET ITS DEBTS AS THEY CAME DUE AT STEP ONE AND STEP TWO........................................................................................45

        G.    THE LBO LENDERS DO NOT HAVE A GOOD FAITH DEFENSE .................53

III.    THE DCL PLAN CANNOT BE CONFIRMED BECAUSE NON-LBO CREDITORS WOULD RECEIVE FAR GREATER RECOVERIES IF THE CLAIMS WERE LITIGATED ............................................................................56

        A.    THERE ARE NUMEROUS LITIGATION OUTCOMES THAT WOULD RESULT IN NON-LBO CREDITOR RECOVERIES FAR IN EXCESS OF THE PROPOSED SETTLEMENT .................................................................56

        4.    EQUITABLE SUBORDINATION, DISALLOWANCE, AND AIDING AND ABETTING ....................................................................................62

        B.    DECISION-TREE ANALYSIS OF THE EXAMINER'S FINDINGS ESTABLISHES THAT THE PROPOSED SETTLEMENT CONSIDERATION IS "NOT EVEN CLOSE" TO REASONABLE ...................63

        C.    BLACK'S LIMITED REBUTTAL OF BERON'S ANALYSIS IS BASELESS ...............................................................................................68

        D.    BLACK'S AFFIRMATIVE OPINIONS AND TESTIMONY SHOULD ALSO BE COMPLETELY DISREGARDED.......................................................76

IV.    THE BAR ORDER IS INEQUITABLE AND UNSUPPORTED BY THE RECORD ...........................................................................................................77

V.      THE POTENTIAL FOR LITIGATION TRUST PROCEEDS DOES NOT CURE
        THE INADEQUACY OF THE PROPOSED DCL SETTLEMENT ...............................81

VI.     THE DEBTORS' ARTIFICIALLY LOW DEV OF $6.75 BILLION FURTHER
        ACCENTUATES THE UNREASONABLENESS OF THE PROPOSED
        SETTLEMENT.....................................................................................................84

        A.      LAZARD CONCEDED THAT THE DEBTORS' DEV IS HIGHER
                THAN $6.75 BILLION ...........................................................................85

        B.      UPDATING LAZARD'S VALUATION BASED ON CURRENT
                FINANCIAL AND MARKET DATA RESULTS IN A DEV OF $7.541
                BILLION.................................................................................................88

        C.      LAZARD'S VALUATION CONTAINS NUMEROUS
                METHODOLOGICAL FLAWS AND ERRORS THAT FURTHER
                DEPRESSED PLAN VALUE...................................................................89

VII.    THE PROPOSED SETTLEMENT IS THE RESULT OF A TAINTED PROCESS.........91

        A.      THE DEBTORS, WITH THEIR CONFLICTED MANAGEMENT AND
                COUNSEL, FAILED TO MAXIMIZE THE SETTLEMENT VALUE OF
                THE CLAIMS AGAINST THE LBO LENDERS.................................92

        B.      THE CREDITORS' COMMITTEE FAILED TO DISCHARGE ITS
                DUTY TO THE PRE-LBO NOTEHOLDERS....................................104

        C.      THE SETTLEMENT PROCESS, MARKED BY A LACK OF ARMS'
                LENGTH BARGAINING  AND EXCLUSION OF THE PRE-LBO
                NOTEHOLDERS, RESULTED IN A SETTLEMENT THAT CANNOT
                BE APPROVED.....................................................................................107

        D.      THE DEEPLY FLAWED PROCESS RESULTED IN A DEEPLY
                FLAWED SETTLEMENT ...................................................................111

CONCLUSION.......................................................................................................................114

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abbots Dairies of Penn., Inc. v. Cumberland Farms Dairy, Inc.*,
   788 F.2d 143 (3d Cir. 1986)..................................................................91

*Bankruptcy Serv., Inc. v. Ernst & Young (In re CBI Holding Co.)*,
   No. 96-9143A, slip op. (Bankr. S.D.N.Y. Oct. 23, 2000) (Lifland, J.)...................77

*Berckeley Inv. Grp. v. Colkitt*,
   455 F.3d 195 (3d Cir. 2006)..................................................................77

*Boyer v. Crown Stock Distribution, Inc.*,
   587 F.3d 787 (7th Cir. 2009) ...............................................................73

*Brooks v. Outboard Marine Corp.*,
   234 F.3d 89 (2d Cir. 2000)...................................................................69

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993)..........................................................................77

*Eichenholtz v. Brennan*,
   52 F.3d 478 (3d Cir. 1995)...............................................................79, 80

*Fisher v. Sellis (In re Lake States Commodities, Inc.)*,
   253 B.R. 866 (Bankr. N.D. Ill. 2000) ..................................................17, 72

*Geltzer v. Artists Mktg. Corp.*
   *(In re Cassandra Grp.)*, 338 B.R. 583 (Bankr. S.D.N.Y. 2006)............................17

*Graves v. United States*,
   150 U.S. 118, 14 S.Ct. 40, 37 L.Ed. 1021 (1983)..........................................15

*In re Carla Leather, Inc.*,
   44 B.R. 457 (Bankr. S.D.N.Y. 1984)........................................................92

*In re Continental Airlines*,
   203 F.3d 203 (3d Cir. 2000)..................................................................78

*In re Exide Techs.*,
   303 B.R. 48 (Bankr. D. Del. 2003) ......................................................78, 91

*In re Fibermark, Inc.*,
339 B.R. 321 (D. Vt. 2006)..........................................................................................65

*In re Fleming Packaging Corp.*,
No. 03–82408, 2007 WL 4556981 (Bankr. C.D. Ill. Dec. 20, 2007) ......................................84

*In re General Motors Corp. Engine Interchange Litigation*,
594 F.2d 1106 (7th Cir. 1979) ....................................................................................92

*In re Genesis Health Ventures, Inc.*,
266 B.R. 591 (Bankr. D. Del. 2001) ..............................................................................78

*In re Hanover Direct, Inc. S'holders Litig.*,
Nos. 1969-CC, 3047-CC, 3291-CC, 2010 WL 3959399 (Del. Ch. Sept. 24, 2010)................69

*In re HealthCo Int'l II*,
208 B.R. 288 (Bankr. D. Mass. 1997) ............................................................................62

*In re Jiffy Lube Sec. Litig.*,
927 F.2d 155 (4th Cir. 1991) ......................................................................................79

*In re Manhattan Inv. Fund Ltd.*,
397 B.R. 1 (S.D.N.Y. 2007).................................................................................17, 72

*In re Mirant Corp.*,
334 B.R. 800 (Bankr. N.D. Tex. 2005)............................................................................88

*In re Nutraquest, Inc*,
434 F.3d 639 (3d Cir. 2006)........................................................................................80

*In re O'Day*,
126 B.R. 370 (Bankr. D. Mass. 1991) ............................................................................62

*In re PPI Enterprises (U.S.), Inc.*,
324 F.3d 197 (3d Cir. 2003)........................................................................................61

*In re SemCrude*,
Nos. 08-11525, 09-50189 (BLS), 2010 WL 4814377 (Bankr. D. Del. Nov. 19, 2010) ....79, 80

*In re Spansion. Inc.*,
No. 09-10690 (KJC), 2009 WL 1531788 (Bankr. D Del. June 2, 2009).............................1, 9

*In re Texaco*,
84 B.R. 893 (Bankr. S.D.N.Y. 1988) ...............................................................................1

*In re Trans World Airlines, Inc.*,
134 F.3d 188 (3d Cir. 1998).......................................................................................31

*In re Vadnais Lumber Supply, Inc.*,
    100 B.R. 127 (Bankr. D. Mass. 1989) ...................................................................73

*In re Washington Mut., Inc.*,
    442 B.R. 314 (Bankr. D. Del. 2011) ....................................................................61

*In re Washington Mut., Inc.*,
    No. 08-1229, 2011 WL 57111 (Bankr. D. Del. Jan. 7, 2011)................................84

*In re Yellowstone Mountain Club, LLC*,
    No. 08-61570-11, 2009 WL 3094930 (Bankr. D. Mont. May 12, 2009) ...............62

*In re Young Broadcasting Inc.*,
    430 B.R. 99 (Bankr. S.D.N.Y. 2010)....................................................................81

*Key3Media Group, Inc. v. Pulver.com Inc. (In re Key3Media Group Inc.)*,
    336 B.R. 87 (Bankr. D. Del. 2005) .......................................................................84

*Liquidation Trust of Hechinger Inv. Co. of Del. Inc. v. Fleet Retail Fin. Grp.*
    (*In re Hechinger Co. of Del.*), 327 B.R. 537, 546 (Bankr. D. Del 2005) ...................23, 26, 72

*Mervyn's Holdings, LLC v. Lupert-Adler Grp. IV, LLC*
    (*In re Mervyn's Holdings, LLC*), 426 B.R. 488 (Bankr. D. Del. 2010)............................23, 26

*MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Services Co.*,
    910 F. Supp. 913, 943-945 (S.D.N.Y. 1995) .......................................................73

*Moody v. Sec. Pac. Bus. Credit, Inc.*,
    127 B.R. 958, 990 (Bankr. W.D. Pa. 1991), *aff'd*, 971 F.2d 1056 (3d Cir. 1992)..................72

*Munford v. Munford, Inc. (In re Munford, Inc.)*,
    97 F.3d 449 (3d Cir. 1996)....................................................................................80

*Myers. v. Martin (In re Martin)*,
    91 F.3d 389 (3d Cir. 1996).......................................................................................8

*Oddi v. Ford Motor Co.*,
    234 F.3d 136 (3d Cir. 2000)..................................................................................77

*Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp.*
    *v. Chinery*, 330 F.3d 548 (3d Cir. 2003).........................................................93, 98

*Official Comm. of Unsecured Creditors v. Fleet Retail Finance Grp.*
    (*In re Hechinger Inv. Co.*), 274 B.R. 71 (Bankr. D. Del. 2002) .............................62

*Orr v. Kinderhill Corp.*,
    991 F.2d 31 (2d Cir. 1993).....................................................................................23

*Phar-Mor, Inc. Sec. Litig.*,
    900 F. Supp 784 (W.D. Pa. 1995) ....................................................................84

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
    390 U.S. 414 (1968) ...........................................................................................1

*Schubert v. Lucent Tech. (In re Winstar Commc'ns, Inc.),*
    554 F.3d 382 (3d Cir. 2009) ...........................................................................62

*United States v. Am. Radiator & Standard Sanitary Corp.*,
    433 F.2d 174 (3d Cir. 1970) ...........................................................................15

*United States v. Tabor Court Realty Corp.*,
    803 F.2d 1288 (3d Cir. 1986) ...........................................................17, 23, 26

## STATUTES

11 U.S.C. § 548 ........................................................................................ *passim*

11 U.S.C. § 1122 ..................................................................................................8

11 U.S.C. § 1129 ..................................................................................... *passim*

## RULES

FED. R. EVID. 702 ..............................................................................................77

FED. R. CIV. P. 703 ...........................................................................................67

FED. R. BANKR. 9019 .........................................................................1, 8, 84, 91

The Noteholder Plan Proponents,[1] by and through their undersigned counsel, respectfully submit this post-trial brief in opposition to confirmation of the DCL Plan and in support of confirmation of the NPP Plan and represent as follows:

## PRELIMINARY STATEMENT

In order to obtain confirmation of their proposed plan, the DCL Plan Proponents have the burden of establishing, *inter alia*, that the Proposed Settlement of the LBO Claims against the LBO Lenders and the associated terms and provisions of their plan satisfy both the requirements of Bankruptcy Code section 1129(a) and Bankruptcy Rule 9019.[2] In applying the well-known *Martin* and *Texaco* factors, the Proposed Settlement must be considered from the perspective of the parties who are adversely affected by and oppose it, here the Senior Noteholders and holders of PHONES Notes (the "Pre-LBO Noteholders").[3]

The DCL Plan Proponents do not come close to meeting their burden. To the contrary, the evidence at trial clearly established that the Proposed Settlement (i) pales in comparison to the likely outcome of litigation,[4] (ii) is not fair and equitable or in the best interest of creditors,[5] and (iii) was not negotiated at arms' length in the sense contemplated by the relevant cases and sound fiduciary practices.[6]

First, the factual record and the "battle of the experts" showed that the Company was indeed rendered insolvent by the LBO both at Step One and Step Two. *See infra* at II.F. In fact,

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Amended Objection of the Noteholder Plan Proponents to Confirmation of the Debtor/Committee/Lender Plan of Reorganization [ECF No. 8025] (the "NPP Objection").

[2] *See e.g., In re Spansion. Inc.,* No. 09-10690 (KJC), 2009 WL 1531788, at *4 (Bankr. D Del. June 2, 2009). The Noteholder Plan Proponents hereby incorporate their Third Amended Noteholder Plan, dated April 25, 2011 [ECF No. 8755] (the "Noteholder Plan" or the "NPP Plan") and NPP Objection.

[3] *Id.* at *3.

[4] *See e.g., Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-425 (1968)

[5] *Id.*

[6] *See e.g., In re Texaco*, 84 B.R. 893, 901 (Bankr. S.D.N.Y. 1988).

the evidence that the Company engaged in an intentional fraudulent transfer, at both steps is equally compelling. *See infra* at II.F. Astonishingly, the DCL Plan Proponents failed to call a single live witness to attempt to validate the Company's projections supplied to VRC for its solvency opinions in June and December 2007, despite overwhelming evidence that they were knowingly inflated and unreasonable, or to explain the rationale for saddling a drowning company (already tracking its worst downside projections) operating in a declining industry with over $13 billion of debt it could neither service nor repay.

Significantly, the likely outcome of litigation against the LBO Lenders would vastly exceed the Proposed Settlement, even if the result is not full avoidance at Step One and Step Two. *See infra* at III.A. When the differing potential outcomes of the litigation against the LBO Lenders are probability weighted based on the Examiner's conclusions, as opposed to the views of the parties, the record shows that (1) the Expected Value of such claims ranges from $1.51 billion to $1.83 billion[7], and (2) the Pre-LBO Noteholders stand a 74% chance of receiving greater recoveries than those proposed by the DCL Plan. *See infra* at III.A. The gross disparity between the Proposed Settlement and the value of the LBO Claims is starkly illustrated by the party line vote on the DCL Plan: virtually all of the LBO Lenders voted in favor of the DCL Plan, hoping to receive releases on the cheap, while the Pre-LBO Noteholders overwhelmingly voted for the Noteholder Plan and rejected the DCL Plan (along with the distributions it offers) , reflecting the view that the claims against the LBO Lenders are far more valuable if pursued outside of bankruptcy, by a vigorous, conflict free litigation trustee.

The expected values and probabilities discussed above are before consideration of the Debtors' true DEV, which the Noteholder Plan Proponents established is up to $1.5 billion greater than the artificially low $6.75 billion upon which the DCL Plan is premised. *See infra* at

---

[7] NPP 2476 (Beron Rpt.) at 3; 3/17/11 Trial Tr. 144:12-16, 167:25-168:20 (Beron).

VI. Though the DCL Plan now provides the Senior Noteholders with a strip of consideration, the Debtors' DEV remains a key issue because at higher values the Proposed Settlement becomes even more unreasonable than it is at $6.75 billion.

Recognizing that the meager consideration offered for the proposed release of claims against the LBO Lenders is inadequate, the DCL Plan Proponents lean heavily on the potential for future recoveries to the Non-LBO Creditors via the Litigation Trust. But even assuming, *arguendo*, that potential future recoveries from other parties is relevant in determining whether the Debtors may release the LBO Lenders (a point the Noteholder Plan Proponents dispute), the DCL Plan Proponents failed to submit *any* evidence on which the Court could base any finding as to the likely amount of proceeds that will flow into the Litigation Trust. *See infra* at V. This evidentiary gap is exacerbated by the DCL Plan's proposed Bar Order (itself unsupportable), which is designed to reduce or eliminate recoveries to the Litigation Trust, but something which no DCL Plan Proponent witness ever assessed or modeled as to its likely actual impact. *See infra* at IV. Further, there is enormous inequity, irony and risk in allowing the LBO Lenders to divert Litigation Trust recoveries back to themselves when the underlying Litigation Trust Claims rest on the fact that ***their*** loans rendered the Company insolvent.[8]

The patent unreasonableness of the Proposed Settlement is the result of a deeply flawed negotiation, beset by numerous conflicts of interest. None of the Debtors, the Debtors' Special Committee, the Creditors' Committee, or any of their respective professionals, were motivated or willing to proceed aggressively against the LBO Lenders to maximize recoveries for all creditors harmed by the LBO, but instead were all too willing to exclude Aurelius from the process (and gear up for the confirmation fight they knew was coming as a result) and accept settlement terms

---

[8] Indeed, the DCL Plan posits that the LBO Lenders should ultimately pay even less than has been proposed to settle the LBO Claims given that their proposed receipt of Litigation Trust recoveries will reduce the cost of the settlement.

that prejudiced primarily the Pre-LBO Noteholders, and not other creditor constituencies. While the Court is surely accustomed to self-motivated behavior in the course of a restructuring, the process giving rise to this Proposed Settlement was qualitatively different and clearly removes a source of comfort that the Court might otherwise be able to rely on in assessing whether the Proposed Settlement of a complex series of claims should be approved. *See infra* at VII.

Fortunately, the DCL Plan Proponents' failure to prove that their plan may be confirmed does not consign the Debtors to remain in bankruptcy. The NPP Plan meets all of the requirements for confirmation, will undeniably provide greater recoveries to the Non-LBO Creditors as a whole, and has several other advantages over the DCL Plan. *See infra* at I.

Rather than letting Oaktree fulfill its single-minded objective to set an example for the dismal treatment of junior creditors in future chapter 11 cases[9], it is this Court that should set an example respecting the proper application of the Bankruptcy Code's fraudulent transfer and other equitable remedial provisions in the wake of a ruinous, irresponsible LBO, and respecting the process it expects from estate fiduciaries in settlement and plan negotiations. The Court should confirm the NPP Plan and deny confirmation of the DCL Plan.

## ARGUMENT

## I.     THE NPP PLAN[10] SHOULD BE CONFIRMED

The DCL Plan[11] and the NPP Plan are substantially similar in many ways.[12] The two plans are premised on the same capital structure, corporate structure and allocation of value among the Reorganized Debtors.[13] In fact, both plans contemplate that, upon the Debtors'

---

[9] NPP 870 (10/13/10 email between H. Marks and B. Karsh); 3/8/11 Trial Tr. 127:6-128:12 (Kurtz).
[10] Third Amended Noteholder Plan, dated April 25, 2011 [ECF No. 8755] (the "Noteholder Plan" or the "NPP Plan").
[11] Second Amended DCL Plan, dated April 26, 2011 [ECF No. 8769] (the "DCL Plan").
[12] *See, e.g.*, NPP 2224 (Gropper Declaration) ¶ 42.
[13] *See id.*

emergence from chapter 11, litigation and creditors' trusts will prosecute certain of the causes of action that arose out of the ill-fated LBO.[14]

Where the plans diverge, however, is how the most valuable causes of action—the causes of action against the LBO Lenders—will be addressed.[15]  While the DCL Plan is premised on a settlement of these claims for a fraction of any amount that might be considered reasonable, the NPP Plan preserves these causes of action for the benefit of creditors.[16]  Indeed, given the unreasonableness of the Proposed Settlement, the overly broad, unjustified releases contained in the DCL Plan and other legally unsupportable provisions in the DCL Plan, the NPP Plan is the preferred and only viable means for the Debtors to emerge expeditiously from chapter 11.

As set forth in the Noteholder Confirmation Brief[17] and the Gropper Declaration, and as supported by the evidence now in the record, the NPP Plan satisfies each of the conditions for confirmation required under the Bankruptcy Code.  In addition, the uncontroverted evidence demonstrates that the NPP Plan has several significant and distinct advantages.

First, unlike the DCL Plan, which is utterly incompatible with the Examiner's conclusions and the strength of the LBO Claims against the LBO Lenders, as established at trial, the NPP Plan provides that all LBO-related litigation will be preserved and prosecuted vigorously after the Effective Date by unconflicted fiduciaries and without the overhang of the bankruptcy, acute conflicts or personal or professional ties.[18]  As a result, the LBO Lenders will be motivated to engage in true, arms' length settlement negotiations with proper fiduciaries,

---

[14] See NPP 2525 (NPP Plan) §§ 5.17, 5.18; DCL 1586 (DCL Plan) at Art. 13, Art. 14.
[15] See, e.g., 3/16/11 Trial Tr. 13:8-13 (Gropper) ("[O]ur plan is as true to the DCL plan in every respect possible with one very important difference.  We don't settle the most valuable causes of action for a fraction of their net – of their worth.  We allow them to be adjudicated on a post-effective date basis with the trust.").
[16] See 3/16/11 Trial Tr. 13:8-13 (Gropper).
[17] Noteholder Confirmation Brief [ECF No. 8171].
[18] See, e.g., 3/16/11 Trial Tr. 12:26:13-6 (Gropper).

resulting in settlements that will produce higher recoveries for all Non-LBO Creditors.[19]  The

Noteholder Plan Proponents' confidence in the strength in the LBO Claims and the certainty of

better recoveries under the NPP Plan is evidenced by their willingness to forego hundreds of

millions of dollars in immediate consideration provided for under the DCL Plan.[20]

Second, at the same time that the NPP Plan preserves all LBO Claims, the NPP Plan

enables the Debtors to reorganize successfully and accomplish the objectives of chapter 11.[21]

Pursuant to the NPP Plan, the great majority of the equity in Reorganized Tribune will be

distributed to the Senior Lenders as of the Effective Date with the expectation that the remaining

DEV (consisting of Cash, New Senior Secured Term Loan and New Warrants) held in the

Distribution Trust will be distributed shortly thereafter.[22]

In fact, the NPP Plan is strikingly similar to the "purity" plan that the Debtors seriously

considered and which the Debtors' lead financial advisor admitted would have worked with the

---

[19] *See, e.g.*, *id.* at 14:8-20 (Gropper) ( "I think that if the LBO lenders were on the other side of a truly independent litigation trustee, that there will be an arm's length negotiation.  And it's actually my expectation that many of the claims under our plan will settle rather than be litigated because I don't think the LBO lenders will want to put to the test the litigation, particularly a number of conclusions that the examiner found would be favorable to the pre-LBO Lenders. Q: So do you agree with the criticism of the DCL Group that the Noteholder Plan will lead to years and years of litigation?  A: Not at all."), 149:10-13 (Gropper).

[20] *See id.* at 13:17-14:2 (Gropper) ("Q: Okay. Now if the DCL plan were to be confirmed, how much money would Aurelius stand to receive upon consummation?  A: We would receive over $200 million in cash.  Q: And yet Aurelius is opposed to that plan?  A: We are opposed to that plan. There is no question in my mind that if our plan were confirmed, the pre-LBO creditors would receive significantly greater amount of money under our plan construct. And I've never been more certain about a conclusion like that in my sixteen years in the business.").

[21] *See, e.g.*, NPP 2224 (Gropper Declaration) ¶ 30.

[22] *See, e.g.*, NPP 2527 (NPP Resolicitation Motion) Ex. A at 10-14; *see also* 3/16/11 Trial Tr. 153:8-16 (Gropper) ("I don't think that there will be that much of the DEV tied up for long because I think once the creditors on the other side of the litigation are actually forced to be in a position where they have to deal with these claims on an arm's length basis, . . . there will be resolution of these claims in a prompt matter that will allow allocable value to be distributed to all the creditors."); 3/16/11 Trial Tr. 153:22-154:2 (Gropper) (same).

> To address objections of the DCL Plan Proponents, the Noteholder Plan Proponents modified the Noteholder Plan to increase materially the amount of equity distributed to creditors as of the Effective Date.  As a result of these modifications, the Noteholder Plan provides for between 70.5% and 79.8% (assuming a DEV of $6.75 billion) of the equity value of Reorganized Tribune to be distributed to Creditors as of the Effective Date.  Given that the DEV is significantly higher, *see infra* at VI, the amount of equity to be distributed will be even greater.  The foregoing modifications have obviated the corporate governance concerns raised by Black.  DCL 1113 (Black Rebuttal Rpt.) 5-8, 72-81.

consent of the Senior Lenders.[23]  The DCL Plan Proponents have, at a minimum, always considered the "purity" plan a viable back-up plan.[24]  Indeed, even Oaktree and Angelo Gordon, previously promoted a chapter 11 plan that is substantially similar to the NPP Plan.[25]

Third, holders of non-LBO debt securities (the "Pre-LBO Noteholders")—who hold the claims that were most harmed by the LBO, yet benefit the least from the Proposed Settlement— overwhelmingly voted, with over 90% in dollar amount of the Senior Noteholder Claims and PHONES Notes Claims voting, to accept the NPP Plan and reject the DCL Plan.[26]  Calculated by aggregate dollar amount, the overwhelming majority of all Non-LBO Creditors, whether holding funded debt or not, voted to accept the NPP Plan and to reject the DCL Plan.[27]  Accordingly, it is the NPP Plan, not the DCL Plan, that is in the "paramount interest of creditors."[28]

Fourth, the NPP Plan can go effective expeditiously and with fewer conditions than the DCL Plan.  For example, confirmation and effectiveness of the NPP Plan are not conditioned upon the Bankruptcy Court, among other things (i) reaching a particular conclusion on certain aspects of the causes of action arising from the LBO, (ii) approving a settlement that was not negotiated at arms' length and in good faith or (iii) granting sweeping and unjustified releases,

---

[23] *See* 3/8/11 Trial Tr. 73:11-16 (Kurtz) ("Q: Did you come to a conclusion as to whether Mr. Whitman's [purity] plan would work and, you know, you've heard what you testified to at your deposition. Is that still your position? A: Well, the Whitman plan could work if the lenders accepted it."); *see also* NPP 836 (9/23/10 email from D. Liebentritt to J. Berg) at 3 ("If we get signals that, even after a failed mediation, Carey may not be inclined to take the claims in part, we may need to consider seriously a "purer purity" approach.").

[24] *See* 3/15/11 Trial Tr. 183:3-16 (Wilderotter) (Q: Okay. Does this refresh your recollection as to whether that he was considering as a concept a purity plan as of September 2010? A: Yes. We always looked at a purity plan as an option. We just didn't think it was the top option we should pursue.").

[25] *See* NPP 1989 (Credit Agreement Lenders' Settlement Statement) at 10-11 (". . . the Credit Agreement Lenders may propose a plan for all the Tribune Debtors that would … preserve and transfer to a litigation trust ***all causes of action*** available to Tribune Company.") (emphasis added).

[26] *See* Final Voting Tabulation Report, Ex. A-1 at 1 [ECF No. 7918].

[27] *See* NPP 2224 (Gropper Declaration) ¶ 41.

[28] *See* NPP 2474 (NPP Objection) at 47.

exculpations and indemnification to parties that materially and adversely harmed the Debtors' Estates and their Creditors, including innocent Pre-LBO Noteholders.[29]

Only the NPP Plan strikes the proper balance between the Debtors' ability to emerge from chapter 11 with a restructured, viable capital structure, and the mandate of chapter 11 that creditors receive the recoveries for which they are justly, legally and equitably entitled – not fractions of their legal entitlements, as contemplated by the DCL Plan.[30]  Despite the "purity" of the NPP Plan, the DCL Plan Proponents continue to assert a limited number of objections:  (i) compliance with Bankruptcy Code section 1129(a)(10); (ii) the release of the LBO Lenders' guaranty claims against the Guarantor Non-Debtors; (iii) the classification of the Swap Claim at Tribune;[31] (iv) the form of consideration to be received by the Senior Lenders and Swap Claims Holder in respect of their Initial Distributions; and (v) corporate governance for Reorganized Tribune.  None of these objections have merit or impede confirmation of the NPP Plan, and, to the extent necessary, these arguments will be addressed in detail in the Noteholder Plan Proponents' response to the DCL Plan Proponents' post-trial brief.  In sum, the NPP Plan satisfies each of the requirements for confirmation and should be confirmed.

## II.     CLAIMS AGAINST THE LBO LENDERS HAVE A HIGH PROBABILITY OF SUCCESS

The first factor considered by courts in the Third Circuit when evaluating proposed settlements under Bankruptcy Rule 9019 is the probability of success in litigation.[32]  In assessing

---

[29] *See, e.g*, NPP 2224 (Gropper Declaration) ¶ 41.

[30] *See, e.g., id.* at ¶¶ 11, 30; 3/16/11 Trial Tr. 13:10-13, 145:8-18 (Gropper).

[31] While the Noteholder Plan has been amended to separately classify the Swap Claim at Tribune (the "Swap Parent Claim") from Step One Senior Loan Claims and leave the determination of whether such claim is entitled to the benefit of subordination of the PHONES Notes and EGI-TRB LLC Notes, the DCL Plan continues to violate Bankruptcy Code section 1122(a) and applicable law because (i) the Swap Claim is still classified together with Other Parent Claims and (ii) the Swap Parent Claim and Other Parent Claims improperly benefit from the subordination provisions in the PHONES Notes Indenture and the EGI-TRB LLC Notes.  *See* NPP 2474 (NPP Objection) at 209-214; 4/14/11 Trial Tr. 109:21-115:22 (Golden).

[32] *Myers. v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996).

this factor, courts are instructed to "canvass the issues to see whether the settlement falls below the lowest point in the range of reasonableness."[33] Here, there should be little doubt that the Proposed Settlement does not meet this standard. The great weight of the evidence in the record shows that the LBO Lenders' Claims arising from both steps of the LBO should be avoided as intentional and constructive fraudulent conveyances, and that, even if they are not fully avoided, meritorious claims for equitable subordination, equitable disallowance, and aiding or abetting breach of fiduciary duty exist against the LBO Lenders. As such, if the LBO Claims are litigated, the Non-LBO Creditors will recover **in full**, including post-petition interest, for a recovery estimated at $2.7 to $3.3 billion (including post-petition interests at the contractual rate through December 8, 2012). Given this overwhelming evidence, the Proposed Settlement, which proposes to pay a mere $369 million to the Senior Noteholders, and nothing to the PHONES Notes, falls well outside the bounds of reasonableness and cannot be confirmed.[34]

### A. The Debtors' Projections At Steps One And Two Should Not Have Been Relied Upon At The Time Of The LBO And Cannot Be Relied Upon Now To Assess Solvency

Any analysis of whether Step One and Step Two of the LBO constituted an intentional or constructive fraudulent conveyance must start with an analysis of whether the Debtors' projections at the time of the Step One and Step Two closings (the "February Projections" and "October Projections," respectively) were reasonable, and whether they should be used now to assess the Debtors' financial condition at those times.[35] The overwhelming weight of the evidence shows that a Court would answer these questions in the negative.

---

[33] *In re Spansion, Inc.*, 2009 WL 1531788, at *7.
[34] NPP 2474 (NPP Objection) at 43-47.
[35] The case law respecting projections is discussed in NPP 2474 (NPP Objection) at 73-83.

### 1. The Publishing Industry Was In The Midst Of A Deep Secular Decline At The Time Of The LBO

In 2006, newspaper publishing constituted 68% of the Company's consolidated operating cash flow.[36]  As testified by Ralph Tuliano, who was qualified by this Court as an expert on matters of solvency, valuation, and financial forensics and has over 20 years of experience evaluating financial projections,[37] at the time of the LBO, the newspaper publishing business was in the midst of a severe secular decline.[38]  Indeed, when asked about the prospects for the newspaper business in the beginning of 2007, Robert Bellack, the Chief Financial Officer for the Los Angeles Times, during the time of the LBO, testified "what I can say unequivocally is traditional print newspaper advertising revenue was expected to decline indefinitely."[39]  And Professor Bernard Black, the DCL Plan Proponents' expert, admitted at trial that "the newspaper business was known in 2007 to be in a long term decline."[40]

The secular challenges facing newspaper publishing in 2007 were also well known to the LBO Lenders.  For example, in October 2006, Merrill Lynch Managing Director Michael Costa referred to newspaper publishing as an "industry on its back."[41]  And Julie Persily, a Managing Director in the Leveraged Finance group at Citigroup, testified at her deposition that when Citigroup became involved in the LBO, "readership of newspapers was projected to decline, and we were always concerned about that."[42]  Similarly, Bank of America Senior Vice President Daniel Petrik testified at his deposition that, prior to committing to the LBO, Bank of America

---

[36] 3/18/11 Trial Tr. 27:12-28:17 (Tuliano); NPP 944 (Tuliano Rpt.) at 59.
[37] *Id.* at 18:13-18, 17:14-22 (Tuliano).
[38] *Id.* at 28:22-29:3, 29:18-30:23, 31:3-32:7 (Tuliano); NPP 944 (Tuliano Rpt.) at 25-31; NPP 2478 (Tuliano Trial Demonstratives) at 7.
[39] Deposition of Robert Bellack dated March 10, 2011 ("Bellack Dep. Tr.") 35:11-22.
[40] 3/9/11 Trial Tr. 271:24-272:3 (Black).
[41] NPP 1016 (10/22/06 email between D. Weil and M. Costa) at ML-TRIB-0596999.
[42] Deposition of Julie Persily dated February 1, 2011 ("Persily Dep. Tr.") 26:12-14.

discussed "what is currently going on in the publishing industry and that the trends were not favorable, which we all knew."[43]

The consensus among analysts, market participants, and ratings agencies is in line with this evidence, showing that the market perception in early 2007 was that the challenges facing newspaper publishing were structural—not cyclical—and that the declines in circulation levels and advertising revenues were not likely to abate.[44]  For example, on March 15, 2007, the Morton-Groves Newspaper Newsletter—a leading industry newsletter that had been in operation for over 20 years—noted that the "business environment faced by publishers and media companies today has changed forever.  Instead of an industry cycle with advertising recovering as the economy recovers, we have a secular shift…."[45]  Similarly, on March 23, 2007, Morgan Stanley observed that "February will likely go on record as one of the worst months for the newspaper industry in recent years," and stated that "it appears rather clear to us that new revenue streams are simply not enough to offset the secular shift of print to online."[46]

### 2.     The February Projections Were Unrealistically Optimistic

The Company's operating performance in 2004 and 2005 was not only consistent with the declining industry trend, but was actually below industry averages in the years and months leading up to the LBO.[47]  For example, as noted in The Publishing Handbook issued by Morgan Stanley in March 2007, daily circulation for the Company's seven largest newspapers in September 2006 decreased by 4.9% from September 2005, as compared to the industry average

---

[43] Deposition of Daniel Petrik dated February 4, 2011 ("Petrik Dep. Tr.") 66:21-24.
[44] 3/18/11 Trial Tr. 31:20-32:7, 30:24-32:7, 32:8-23 (Tuliano).
[45] NPP 239 (3/15/07 Morton-Groves Newspaper Newsletter) at 8.
[46] NPP 258 (3/23/07 Morgan Stanley, "The Publishing Handbook") at 91; NPP 271 (3/27/07 Deutsche Bank "State of the Newspaper Industry: A Wall Street Perspective") at 9; NPP 267 (3/26/07 NYT "Drop in Ad Revenue Raises Tough Question for Newspapers") at 1.
[47] NPP 944 (Tuliano Rpt.) at 26.

decrease of 4.0% for the same period.[48]  As William Stinehart Jr., the Trustee for the Chandler Trusts, one of Tribune's largest shareholders, and a then-member of Tribune's Board of Directors (the "Board"), commented in June 2006:

> Over the past two years, Tribune has significantly underperformed industry averages and there is scant evidence to suggest the next two years will be any different.[49]

Nevertheless, the February Projections predicted that Tribune's operating cash flow would actually *increase* by $134 million between 2007 and 2008, and would continue increasing over the course of the next several years.[50]  The February Projections were also back-end loaded for 2007, meaning that the Company set a relatively low bar for its performance in the first quarter of 2007, but increased its performance expectation for the second half of the year. Specifically, while the first quarter of the year called for Tribune's Publishing segment to lag its 2006 performance by negative 14.7%, and the second quarter called for Tribune's Publishing segment to trail its 2006 performance by negative 7.2%, the latter half of the year required Tribune's Publishing segment to exceed its 2006 performance by 2.4%.[51]

The Company's actual operating performance in the months leading up to the LBO failed to meet even the relatively modest projections set forth in the February Projections for early 2007.[52]  As of May 2007, right before Step One closed, year-to-date operating cash flow for the publishing segment was 11.5% lower than projected, and 21.5% lower than the 2006 actual results.[53]  And the Company's six largest newspapers, which were responsible for 91% of the operating cash flow generated by the Company's publishing segment, were faring even worse.

---

[48] NPP 144 (3/23/07 Morgan Stanley "The Publishing Handbook") at 116-118.
[49] NPP 136 (6/13/06 Chandler Trusts letter).
[50] 3/18/11 Trial Tr. 33:6-23 (Tuliano); NPP 944 (Tuliano Rpt.) at 65.
[51] NPP 944 (Tuliano Rpt.) at 64-65.
[52] *See* NPP 944 (Tuliano Rpt.), Figs. 8 & 9 at 61-62.
[53] NPP 944 (Tuliano Rpt.) at 65-66.

Operating cash flow for these newspapers was nearly 14% off of the 2007 business plan as of May 2007, and 23.6% off of their 2006 results.[54]

The negative variances to management's projections and 2006 actual performance were not only of great magnitude, they were also recurring every month.[55] Moreover, Black stated in an affidavit submitted prior to the Step One close (and confirmed at trial) that the Company's performance in the first three months of the year was "substantially below" the February Projections, and closer to the Company's "Downside Case B"—which predicted a 3% annual decline in publishing segment advertising revenue and a 1% annual decline in operating cash flow for the broadcasting segment—and that the Company "continued to decline in April."[56]

During this time frame—prior to the close of Step One—the Company's management and advisors, as well as the LBO Lenders, were rightly alarmed by the Company's deteriorating performance in light of the planned LBO. As early as February 21, 2007, Daniel Kazan, Vice President of Corporate Development at the time, noted that "we are already halfway towards not being able to meet that [solvency] covenant."[57] Christina Mohr, a Managing Director at Citigroup noted that Tribune's then Chief Executive Officer was becoming "nervous . . . given the weakness in the business (down 5% in February, and 9% in January)," and that "certain members of publishing management were concerned that they could have covenant issues later in the year if the current business trajectory continues."[58] Persily of Citibank echoed this concern, stating "[d]eclining ebitda is scary . . . *I'm very concerned.*"[59] And at Merrill Lynch,

---

[54] *Id.* at Fig. 13 at 66.
[55] *Id.* at 71.
[56] NPP 2314 (5/10/07 Black Declaration) at 15, n.22; NPP 944 (Tuliano Rpt.) at 115. 3/9/11 Trial Tr. 272:20-24, 273:24-274:7 (Black).
[57] NPP 204 (2/21/07 email between D. Kazan (Tribune) and C. Bigelow (Tribune)) at TRB0047811.
[58] NPP 225 (3/5/07 email between T. Whayne (Morgan Stanley) and P. Taubman (Morgan Stanley)) at MS_148413.
[59] NPP 1232 (3/22/07 email between J. Persily (Citi) and C. Mohr (Citi)) at CITI-TRIB-CC 00026917.

Michael Costa stated in early March that "in light of recent operating performance" there was "*no comfort inputting the kind of leverage necessary for Zell proposal to work. . .*"[60]

      **3.**     **Given The Publishing Industry's Secular Decline And The Company's Performance, The February Projections Could Not Be Reasonably Relied Upon At The Step One Close**

Given the long-term secular decline that the publishing industry was experiencing in 2007 and the Company's performance in the first five months of the year, the February Projections could no longer be relied upon by the time of the Step One close. In order to meet the 2007 results set forth in the February Projections, the Company would have had to not only significantly exceed its 2006 performance in the latter half of the year, but also to recoup the prior deficiencies in its performance.[61] This was virtually impossible. The Company's six largest newspapers were performing so poorly during the first five months of 2007 that during the remaining seven months they would have had to achieve a staggering ***44.5% increase*** in average weekly cash flow in order to meet the 2007 plan, with the Orlando Sentinel—which was responsible for 10% of the Company's operating cash flow in 2006—needing to achieve as much as a ***73.4% increase*** in weekly cash flow.[62]

As Tuliano testified, "there was absolutely no basis whatsoever to support that magnitude of an increase. . . . You were looking at the Mount Everest climb, if you will, in terms of being able to achieve the 2007 plan as we approached Step One. . . ."[63] Indeed, evidence shows that the LBO Lenders themselves did not believe that the February Projections were reasonable, with

---

[60] NPP 236 (3/10/07 email between M. Costa (Merrill Lynch) and P. Taubman (Morgan Stanley)) at ML-TRIB-0605960.
[61] 3/18/11 Trial Tr. 36:7-13 (Tuliano).
[62] *Id.* at 38:10-24, 40:8-25 (Tuliano); NPP 2478 (Tuliano Trial Demonstratives) at 11-12.
[63] *Id.* at 38:25-41:9 (Tuliano).

Persily of Citigroup testifying "throughout this, no matter what time, we didn't believe the Company's projections were achievable."[64]

Additionally, "[t]he rule, even in criminal cases, is that, if a party has it particularly within its power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable."[65] Here, the DCL Plan Proponents did not present any evidence at trial showing that the February Projections could reasonably be relied upon at Step One. Indeed, the Company failed to present a *single witness* to testify to the reasonableness of the February Projections. Fischel also declined to opine in support of the February Projections, testifying that he "ha[s] no expertise in the reasonableness of management's projections."[66] Black also lacks the expertise necessary to offer an opinion on the reasonableness (or lack thereof) of the February Projections,[67] but even he acknowledged that it "would be a challenge in the near term for Tribune to meet its own projections," stating only that "it still might be reasonable to rely on . . . the consensus of analysis estimates, which was below Tribune's own plan. . . ."[68]

### 4. The October Projections Could Not Be Relied Upon At The Step Two Close

There is overwhelming, unrebutted evidence in the record that the October Projections were patently unreasonable and could not be relied upon at the time of the Step Two close. To make up for the materially lower 2007 base-year performance, the October Projections

---

[64] Persily Dep. Tr. 92:10-17; Sarnobat Dep. Tr. 140:16-141:12.

[65] *Graves v. United States*, 150 U.S. 118, 14 S.Ct. 40, 37 L.Ed. 1021 (1983) (cited with approval in *United States v. Am. Radiator & Standard Sanitary Corp.*, 433 F.2d 174, 206 (3d Cir. 1970)).

[66] 3/10/11 Trial Tr. 146:13-17, 165:6-12 (Fischel).

[67] Black does not have any degrees in finance or accounting, has never acted as a financial consultant or advisor, has no accounting or valuation credentials, has never been qualified by a court as an expert in valuation, and testified that preparing a valuation would be "beyond [his] comfort zone." 4/12/11 Trial Tr. 118:10-122:9 (Black). Indeed, this Court denied the DCL Plan Proponents' request that Black be qualified as an expert on valuation and solvency. 4/12/11 Trial Tr. 123:12-22 (Black).

[68] 3/10/11 Trial Tr. 46:17-21 (Black).

significantly and unrealistically increased the compound annual growth rate embedded in the plan.[69] Specifically, the October Projections erroneously assumed that the consolidated growth rate of 2.4% from 2011 to 2012 — a year in which advertising revenues were forecast to spike due to the presidential election — would be replicated each and every year from 2013 through 2017.[70] This election-year-inspired extrapolation resulted in growth rates that were projected to be *five times greater* than the growth rate projected by management just eight months earlier.[71] As Tuliano concluded, there was absolutely "no basis for that increase in growth rate."[72] Similarly, the Examiner found that the growth rate assumption was not only "unjustifiable,"[73] but bore the hallmark of a "conscious effort to counterbalance the decline in Tribune's 2007 financial performance and other negative trends in Tribune's business, in order to furnish a (very significant) source [$613 million] of additional value to support a solvency conclusion."[74]

Further, the Examiner and Tuliano both found that Tribune's expectations regarding the growth of its interactive business were particularly questionable.[75] As noted by Stinehart of the Chandler Trusts in 2006, the Company's expectation of "growth through Internet initiatives . . . ha[d] little credibility . . ."[76] Additionally, Timothy Landon, ***the head of the Company's interactive division at the time of the LBO***, told the Examiner that he "would have expected the October forecast [for interactive] to be flat or lower" than the February Projections, and "expressed surprise when the Examiner pointed out that Tribune's October forecast assumed

---

[69] 3/18/11 Trial Tr. 48:9-23 (Tuliano).
[70] NPP 782 (Exam'rs Rpt.), Vol. II at 54.
[71] *Id.* at Vol. II at 55.
[72] 3/18/11 Trial Tr. 48:9-23 (Tuliano).
[73] NPP 782 (Exam'rs Rpt.), Vol. II at 54.
[74] *Id.* at Vol. II at 54-55.
[75] *Id.* at Vol. II at 59-61.
[76] NPP 136 (6/13/06 Chandler Trusts letter).

significant increases in growth in interactive after 2009 ahead of what was projected in February."[77]

The DCL Plan Proponents failed to provide any fact or expert testimony showing why it was reasonable for the Company to believe that its growth prospects were materially more favorable in October 2007 than they were in February 2007, or to explain the basis for its significantly increased optimism for the interactive segment.

### B. Intentional Fraudulent Conveyances

In assessing whether a transferor acted with "actual intent to hinder, delay, or defraud" under Bankruptcy Code section 548, courts look for various "badges of fraud" that include: (1) the relationship between the parties to the transaction; (2) consideration for the conveyance; (3) insolvency or indebtedness of the debtor; (4) how much of the debtor's estate was transferred; (5) reservation of benefits, control or dominion by the debtor; and (6) secrecy or concealment of the transaction.[78] No one badge of fraud is required to establish an intentional fraudulent transfer.[79] In addition, in the context of leveraged buyouts, the "badges of fraud" analysis is supplemented with a determination of the "natural consequence" of the debtor's actions.[80] If the "natural consequence" of the debtor's actions is that its creditors will be hindered, delayed, or defrauded, a court is more likely to find that an intentional fraudulent transfer occurred.[81]

---

[77] NPP 782 (Exam'rs Rpt.), Vol. II at 59-60.

[78] *See Geltzer v. Artists Mktg. Corp. (In re Cassandra Grp.*), 338 B.R. 583, 598 (Bankr. S.D.N.Y. 2006); *see also* NPP 2474 (NPP Objection) at 63-65 (summarizing legal standards for intentional fraudulent conveyance claims). Bankruptcy Code section 548 provides that a transfer can be avoided if the transferor "made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became . . . indebted . . . ." 11 U.S.C. § 548 (a)(1)(A).

[79] *See* NPP 2474 (NPP Objection) at 65; *In re Manhattan Inv. Fund Ltd.*, 397 B.R. 1, 10 n.13 (S.D.N.Y. 2007) ("'badges of fraud are not a prerequisite to a finding of actual fraudulent intent'") (quoting *In re Actrade Financial Technologies Ltd.*, 337 B.R. 791, 809 (Bankr. S.D.N.Y. 2005)); *see also Fisher v. Sellis (In re Lake States Commodities, Inc.)*, 253 B.R. 866, 871 (Bankr. N.D. Ill. 2000) ("The focus in the inquiry into actual intent is on the state of mind of the debtor. Neither malice nor insolvency are required.").

[80] *See United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1305 (3d Cir. 1986).

[81] *See, e.g., id.*

## 1.    The Company Engaged In Intentional Fraud At Step One

There is now considerable evidence in the record of multiple badges of fraud supporting a finding that Step One was an intentional fraudulent conveyance.  As described in more detail in below, the evidence clearly demonstrates that the Company received less than reasonably equivalent value in connection with Step One of the LBO and could not satisfy any of the financial condition tests provided in Section 548(a)(1)(B)(ii).  This not only constitutes an important badge of fraud, but also makes evident that the "natural consequence" of Step One was to render the Company insolvent.  Indeed, presentations prepared by Citigroup and Morgan Stanley in their capacity as advisors to the Company and the 2007 Special Committee of the Board of Directors, respectively, showed that the Company's implied total enterprise value following Step One would be approximately $1 billion less than the total debt the Company was expected to have following consummation of the LBO.[82]

In addition, the evidence shows that the LBO was founded on misleading financial projections which the Company knowingly prepared and continued to rely upon to procure solvency opinion from its advisor, Valuation Research Corporation ("VRC"), which was a condition to closing.  The Company's failure to update the February Projections in advance of the Step One closing is a particularly striking example of intentional misconduct.  As discussed in Section II(A), above, the Company was indisputably aware that its 2007 performance was lagging far behind the February Projections well in advance of the Step One closing.  Moreover, according to the Company's newly appointed CEO, Eddie Hartenstein, the "responsible way to forecast" —and the Company's ordinary practice—is to update financial projections based upon

---

[82] NPP 1296 (4/1/07 Draft Presentation to the Board) at MS 00014, 15, 34; NPP 318 (3/30/07 Board Presentation prepared by Merrill Lynch and Citi) at ML-TRIB-0386903; NPP 2474 (NPP Objection) at 67-68.

"the most recent information available" as soon as such information becomes available.[83]

Making matters worse, the evidence suggests that the Company did downwardly revise its projections internally even before the close of Step One, but chose not to disclose these revisions. E-mails from April 12, 2007 between Amsden and another Company employee reference "new 'projections' which are a new look at the full year numbers,"[84] but indicate that Amsden was reluctant to disclose them because of "potential legal concerns with doing that."[85]

Additionally, evidence shows that Company management knew the February Projections were fraudulently inflated even before the Company's material underperformance. For example, the projections assumed that the Company would receive cash income from its joint ventures, notwithstanding that, historically, this was not the case. Indeed, in an email with the subject line "Joint Venture Cash Distributions," Peter Knapp, the Company's publishing group controller, wrote "we need to start having the cash generated at our joint ventures come back to us because that is what we are assuming in the model."[86] Landon, of Tribune Interactive, responded shortly thereafter, remarking that such an assumption was "unrealistic" and inconsistent with the Company's actual intention:

> Not sure our other partners will be supportive of this. Certainly management will not be. This is a really tricky conversation **and it would seem we have set very unrealistic expectations.**[87]

Landon stated further that "the first time I was aware that we were expected to take cash distributions for [sic] the ventures [was] in the last month," and remarked that the assumption was "pretty inconsistent with the conversations [the Company] was having" with one of its joint

---

[83] 3/14/11 Trial Tr. 150:4-8, 149:1-150:3 (Hartenstein) (testifying that "the responsible way to forecast" is to ensure that projections are updated promptly, and observing that Debtors updated their 2011 business plan in January 2010 within one week of receiving information indicating that the Company's operating performance was deviating from forecasts in the plan).

[84] NPP 373 (4/12/07 email between M. Sotir (EGI) and N. Larsen (EGI)) at EGI-LAW 00063610.

[85] NPP 372 (4/12/07 email between H. Amsden (Tribune) and M. Sotir (EGI)) at EGI-LAW 00063609.

[86] NPP 1522 (8/23/07 email between P. Knapp and C. Bigelow) at TRB0198692.

[87] NPP 1532 (9/1/07 email between D. Kazan and T. Landon *et al.*) at TRB0200824 (emphasis added).

venture partners.[88]

The Company also appears to have massaged its expense data. For example, in December 2006, Kazan questioned the capital expenditure forecast contained in the February Projections:

> On the capex, we don't really have an explanation for the $35 million reduction (which, by the way, was spread over Pub, Broadcasting and Corporate), so I wouldn't highlight this – just begs someone to ask why and we don't really have an answer.[89]

In addition to management knowing full-well that the February Projections were unfounded, the evidence shows that they were also aware that the LBO would leave the Company with no equity cushion. A March 24, 2007 internal email to the Company's then Chief Financial Officer, Chandler Bigelow, questioned whether this could be the case, stating:

> [W]e have a pretty narrow band for success under the ESOP – i.e. if we are off plan by 2% we have no value in the ESOP for 5 years. Are there other dynamics at work I don't understand?[90]

Bigelow acknowledged that the assessment was correct, answering "if we hit the down 2 case there is no equity value in the first 5 yrs."[91] Incredibly, at the time of Step One, the Company was performing materially worse than the "down 2 case," and yet the Company still proceeded with the LBO.[92]

## 2. The Company Engaged In Intentional Fraud At Step Two

There is overwhelming evidence that the Company's senior financial management intentionally concealed the Company's true financial condition in the months leading up to Step Two, and made knowing misrepresentations regarding the Company's ability to refinance its

---

[88] *Id.* at TRB0200823.
[89] NPP 1045 (12/1/06 email between D. Kazan and R. Kurmaniak) at CITI-TRIB-CC 00059764.
[90] NPP 259 (3/24/07 email between J. King and C. Bigelow).
[91] NPP 259 (3/24/07 email between J. King and C. Bigelow); NPP 944 (Tuliano Rpt.) at 116.
[92] NPP 2314 (5/10/07 Black Declaration) at 15, n.22.

debt, all as part of a fraudulent scheme to procure the solvency opinion that was a fundamental condition of the Step Two closing.[93] As the Examiner concluded, it is simply "implausible that members of Tribune's senior financial management believed in good faith that the out-year growth assumption contained in the October 2007 forecast (or the related Tribune representation letter) represented a reasonable estimate of Tribune's future performance."[94]

Even the patently unreasonable October Projections, however, showed that the Company would face significant cash shortfalls in 2014 and 2015 unless it could refinance its debt.[95] VRC was deeply "concerned about refinancing risk" and sought a representation that Morgan Stanley, the financial advisor to the Company's Special Committee purportedly overseeing the LBO, concurred that "it is reasonable to assume that we will be able to refinance the new debt in 2014 even in the downside."[96] When Morgan Stanley refused to provide the representation, the Company's senior management simply lied.[97]

For example, Bigelow and Grenesko misrepresented to both VRC and the LBO Lenders that Morgan Stanley agreed that the Company could refinance its debt in a downside scenario, and delivered a final refinancing letter that stated that management's belief that the refinancing assumption was reasonable was "[b]ased on . . . [its] recent discussions with Morgan Stanley. . . ."[98] In fact, however, representatives of Morgan Stanley have stated that they told the Company

---

[93] As with Step One, it is clear that there was "a close relationship" among the parties to Step Two, that the Debtors did not receive reasonably equivalent value in Step Two in exchange for the obligations incurred and payments made, and that Step Two rendered the company insolvent. These facts constitute three important badges of fraud, and also show that the natural consequence of Step Two was to hinder, delay or defraud the Company's pre-LBO creditors.

[94] NPP 782 (Exam'rs Rpt.), Vol. II at 63.

[95] NPP 944 (Tuliano Rpt.) at 49.

[96] NPP 614 (12/2/07 email between C. Kenney (Tribune) and D. Grenesko (Tribune)) at TRB0448465); NPP 944 (Tuliano Rpt.) at 50.

[97] *Id.* at TRB0448465-66); NPP 944 (Tuliano Rpt.) at 50; NPP 782 (Exam'rs Rpt.), Vol. II at 42-43.

[98] NPP 611 (12/7/07 Browning Memorandum) at TRB0398562; Exam'rs Sworn Interview of Mose Rucker and Bryan Browning, dated June 30, 2010, at 214:10-215:13; NPP 782 (Exam'rs Rpt.), Vol. I at 585-86 (citing handwritten Notes of representatives of Murray Devine and the LBO Lenders); NPP 1052 at JPM_00499993-96

explicitly that it could not rely on Morgan Stanley in making a refinancing assumption, did not know that the Company was representing that it had relied on Morgan Stanley for this purpose, and did not know that the Step Two refinancing representation letter would refer to Morgan Stanley.[99] As the Examiner concluded, this and other evidence of management's misconduct in the months leading up to the Step Two close fit within the "general rubric of secrecy, concealment, or dishonesty," show that the procurement of the Step Two solvency opinion was "marred by dishonesty and lack of candor," and "support the conclusion that the Step Two Transactions were intentionally fraudulent transfers."[100]

### C. Constructive Fraudulent Transfer At Step One

Transfers and obligations are constructively fraudulent under Bankruptcy Code section 548 if the debtor received less than reasonably equivalent value, and any one of the financial condition tests are satisfied. Here, the evidence shows that, as the Examiner discussed at length, the Company did not receive reasonably equivalent value for the transfers made and the obligations incurred at Step One and Step Two,[101] and that at each of these steps, the Company was balance sheet insolvent, inadequately capitalized and unable to pay its debts as they became due at each of Step One and Step Two.[102]

---

(JPM Handwritten Notes); NPP 1855 (Tribune Board Presentation) at ML-TRIB-0009950; NPP 782 (Exam'rs Rpt.), Vol. I at 511-12, 588; NPP 1841 (Handwritten Notes of T. Kenny) at MD 000550A.

[99] Exam'rs Sworn Interview of Thomas Whayne, dated July 2, 2010, at 140:1-8 (Thomas Whayne, a Managing Director at Morgan Stanley, stated that if he had known, he would have told the Company to "take our name out."); NPP 782 (Exam'rs Rpt.), Vol. I at 578.

[100] NPP 782 (Exam'rs Rpt.), Vol. I at 10, Vol. II at 35-36.

[101] NPP 782 (Exam'rs Rpt.), Vol. II at 90-127.

[102] 11 U.S.C. § 548(a)(1)(B); see NPP 2474 (NPP Objection) at ¶¶ 146-204.

1. **The Evidence Shows That A Court Would Consider The Step Two Debt When Analyzing The Company's Financial Condition At Step One**

   a. **The Step Two Debt Should Be Considered In A Step One Balance Sheet Test**

As discussed in greater detail in the NPP Objection,[103] "[t]he Third Circuit has recognized that multi-step transactions . . . can be collapsed when the steps of the Transaction are 'part of one integrated transaction.'"[104] As noted by the Examiner, when assessing whether to collapse a transaction, a court should "look beneath a transaction's surface until the substance is reached."[105] Thus, in assessing balance sheet solvency, rather than analyzing pieces of an integrated transaction individually, courts consider the totality of the obligations incurred and the overall financial consequences those transactions have on creditors, even in instances where separate steps of the transactions are separated by many months.[106] Factors that this Court has considered in determining whether to analyze separate steps of a transaction together are: (i) whether all of the parties involved had knowledge of the multiple transactions; (ii) whether each transaction would have occurred on its own; and (iii) whether each transaction was dependent or conditioned on other transactions.[107]

It is undisputed that the parties "had knowledge" of Step One and Step Two from their inception. Moreover, a panoply of evidence shows that the market accurately viewed Step One and Step Two as part of a single, integrated transaction, designed to allow the Company to

---

[103] NPP 2474 (NPP Objection) at 83-91.
[104] *Liquidation Trust of Hechinger Inv. Co. of Del. Inc. v. Fleet Retail Fin. Grp.* (*In re Hechinger Co. of Del.*), 327 B.R. 537, 546 (Bankr. D. Del. 2005) (quoting *Tabor Court*, 803 F.2d at 1302).
[105] NPP 782 (Exam'rs Rpt.), Vol. II at 173.
[106] *See Mervyn's Holdings, LLC v. Lupert-Adler Grp. IV, LLC* (*In re Mervyn's Holdings, LLC*), 426 B.R. 488, 497 (Bankr. D. Del. 2010) (in fraudulent transfer action, collapsing various transactions integral to LBO of parent corporation's former subsidiary that had "devastating" financial consequences on creditors); *Orr v. Kinderhill Corp.*, 991 F.2d 31, 35-36 (2d Cir. 1993) (combining sale of properties made over the course of nine months with subsequent distribution to shareholders).
[107] *Id.* at 497-98; *Hechinger*, 327 B.R. at 546-47.

become a privately held company that could reap the tax benefits afforded to an S Corporation wholly-owned by an employee stock benefits plan ("S Corp/ESOP").[108]  For example, an internal Bank of America "Deal Screen Memorandum" dated March 5, 2007 listed the tax benefits and potential reduction in capital gains taxes from future asset sales resulting from the Company's S Corp/ESOP structure, none of which would occur until the close of Step Two, as the first items in the "Transaction Rationale" for the LBO.[109]  In addition, Moody's Investors Service called the S-Corp election "a critical component of the company's plan," noting that "[t]he tax-free status and the effective elimination of the significant amount of deferred tax liabilities . . . is a critical mitigating factor to the minimal amount of equity and is thus a key assumption factored into" Moody's rating.[110]

Moreover, the primary reason that the transaction was consummated in two steps was because Tribune's large shareholders would not agree to vote in favor of the LBO unless it provided an upfront payment to shareholders that was not delayed by the regulatory approval necessary to complete the transaction.[111]  As the Examiner noted, "had there been a way to structure the transactions so that only one giant step were necessary, the transaction would have been structured accordingly."[112]  Thus, the evidence shows that neither of the two steps was intended to occur on its own, and each was designed to be dependent on the other.  For example, it cannot be disputed that:

---

[108] NPP 228 (3/5/07 Deal Screen Memorandum) at 3; NPP 245 (3/20/07 email between D. Kazan (Tribune) and D. Grenesko (Tribune)); NPP 303 (3/29/07 letter between J. Puchalla (Moody's) and D. Grenesko (Tribune)) at 2.
[109] *Id.* at 3.
[110] NPP 303 (3/29/07 letter between J. Puchalla (Moody's) and D. Grenesko (Tribune)) at 2.
[111] NPP 392 (4/26/07 JPM Lenders' Meeting Transcript) at JPM_00052672-73; NPP 399 (5/3/07 BOA Credit Approval Report) at BOA-TRB-0013039; NPP 782 (Exam'rs Rpt.), Vol. II at 174.
[112] NPP 782 (Exam'rs Rpt.), Vol. II at 174.

- the Step One Commitment Letter and the Step Two Commitment Letter were executed at the same time and *obligated* the parties to provide the requisite financing to permit Step Two to occur;[113]

- the Merger Agreement, executed at Step One, required the Company to exercise reasonable best efforts to effect both Step One and Step Two of the LBO;[114]

- the Board approved both Steps One and Two at the same time, indicating that the Board intended both steps to be part of one integrated transaction;[115]

- the Step One Commitment Letter and the Step Two Commitment Letter cross-referenced each other, and the Step One Commitment Letter made the execution and delivery of the Merger Agreement without waiver, amendment or modification a condition precedent to the initial borrowing under each of the Step One Financing Documents (as defined in the Commitment Letters);[116]

- the Step One Commitment Letter, Step Two Commitment Letter, and Senior Loan Agreement explicitly conditioned the borrowing under these facilities on the continued existence of the financing commitments (for both Step One and Step Two) set out in the Merger Agreement;[117]

- the fairness opinions on shareholder consideration issued by Merrill Lynch and Morgan Stanley, on which the Board relied in approving the LBO in April 2007, evaluated and referred to the Merger Agreement as the governing document and considered share acquisitions at Step One and Step Two together;[118] and

- the Company's press release announcing the deal prior to the close of Step One referred to the LBO as a "two-stage transaction," and explained that, "[u]pon completion of the transaction, the company will be privately held, with an Employee Stock Ownership Plan (ESOP) holding all of Tribune's then-outstanding common stock."[119]

The LBO Lenders' documents and communications are in line with this evidence. For example, all of the LBO Lenders analyzed the LBO, which they referred to as a "two-step transaction," as one transaction, and sought internal approval to participate in both steps in

---

[113] *Id.* at Vol. I at 134 & Vol. II at 171.
[114] *Id.* at Vol. I at 139 & Vol. II at 168.
[115] *Id.* at Vol. I at 134 & Vol. II at 168.
[116] NPP 1335 (4/5/07 Amended & Restated First Step Commitment Letter); NPP 1336 (4/5/07 Amended & Restated Second Step Commitment Letter).
[117] NPP 1332 (4/5/07 Amended & Restated First Step Fee Letter) at ML-TRIB-0000851.
[118] DCL 757 (4/1/07 Morgan Stanley Opinion Letter).
[119] NPP 782 (Exam'rs Rpt.), Vol. I at 135 & Vol. II at 168-69; *see also* NPP 215 (3/1/07 Project Tower Presentation) at 37.

advance of Step One.[120]  Moreover, a senior member of the Merrill Lynch team commented that

the ratings agencies would "immediately rate Tribune for the entirety of the buyout transaction

when the purchase agreement is signed," noting that JPMorgan, Citigroup and Merrill Lynch

"would commit to both steps in order to ensure financing for the whole transaction."[121]

The Examiner concluded that "although the question admittedly is close . . . a court is

somewhat unlikely to collapse Step One and Step Two for [a balance sheet] solvency

analysis."[122]  This conclusion is based primarily on the Examiner's assessment that although the

first two factors of the three-prong test developed in *Mervyn's* are satisfied, the third factor—

whether the two steps were mutually dependent or conditioned on one another—is not, because

there were limited outs to closing Step Two.[123]  The Noteholder Plan Proponents posit, however,

that the Examiner erred in finding that the existence of the limited conditions to closing Step

Two would cause a court to conclude that collapsing is not warranted.  While the cases

addressing collapsing make clear that courts will consider all three of the factors established in

*Mervyns*, none hold that each must be satisfied in order for collapsing to be appropriate.[124]

>   **b.    The Step Two Debt Should Be Considered In Assessing The
>            Company's Capital Adequacy And Ability To Pay At Step One**

The Step Two debt should also be considered in assessing the Company's capital

adequacy at Step One, given that, as the Examiner noted, a capital adequacy assessment requires

a forward-looking analysis.  At the time of Step One, Step Two was at a minimum "highly

---

[120] NPP 218 (3/1/07 Tribune Rating Agency Presentation) at MS 48333; NPP 399 (BOA Credit Approval Report) at 5-7; NPP 435 (5/17/07 Leveraged Finance Final Approval Memorandum) at 2, 5-6; NPP 451 (JPM Tribune Transaction Proposal) at 4-6, 12-16; NPP 1256 (3/28/07 Citigroup Leveraged Finance Final Approval Memo Update) at 2-3; NPP 1387 (5/3/07 BAS Credit Approval Report) at 5-7; NPP 1534 (Tribune Problem Exposure Report) at ML-TRIB-0216120-21; NPP 782 (Exam'rs Rpt.), Vol. II at 178.

[121] NPP 1166 (3/6/07 email between T. Kaplan and C. Kim) at 1.

[122] NPP 782 (Exam'rs Rpt.), Vol. II at 182.

[123] *Id.* at Vol. II at 173.

[124] *Mervyn's Holdings*, 426 B.R. at 497 (citing *Hechinger*, 327 B.R. at 546-47)).  *See Tabor Court Realty Corp.*, 803 F.2d at 1302 (concluding that two loans should be treated as "one integrated transaction" by focusing on the knowledge and expectations of the lender, not on whether the loans were dependent or conditioned on one another).

likely" to occur.[125]  Thus, as the Examiner found, the Step Two debt must be included when analyzing whether the Company would be able to service its liabilities at Step One.[126]

The Step Two debt should also be included in assessing the Company's ability to pay its debts as they become due at Step One, which is, once again, consistent with the Examiner's conclusions.[127] The plain language of Bankruptcy Code section 548(a)(2)(B)(iii) explicitly requires consideration of obligations that the debtor "[i]ntended to incur, or believed [it] would incur."[128] Thus, "it is necessary to consider . . . the Step Two Debt" when conducting this analysis.[129]

### 2. The Company Was Balance Sheet Insolvent At Step One

The extensive analysis conducted by Tuliano, who holds credentials in public accounting, valuation analysis and financial forensics, and has been involved in approximately 100 fraudulent conveyance cases,[130] shows that when the Step Two debt is considered, a court would find that the Company was balance sheet insolvent at Step One, even if management's unreasonable February Projections are used to perform the analysis.  Tuliano's application of widely-accepted valuation techniques shows that the Company's debt exceeded the fair market value of its assets as of June 4, 2007 by $2.3 billion, when using the February Projections.[131]  To reach this conclusion, Tuliano used both a discounted cash flow ("DCF") approach, to which he

---

[125] NPP 782 (Exam'rs Rpt.), Vol. II at 184; NPP 782 (Exam'rs Rpt.), Vol. I at 285; NPP 1284 (3/30/07 Special Committee Meeting Minutes) at 1-2; Persily Dep. Tr. 268:2-17.
[126] The Examiner concluded that "a court is highly likely to consider all obligations that were reasonably foreseeable at the time of Step One, including those caused by Step Two." *Id.* at Vol. II at 183.
[127] *Id.* at Vol. II at 187.
[128] 11 U.S.C. § 548(a)(2)(B)(iii).
[129] NPP 782 (Exam'rs Rpt.), Vol. II at 184.
[130] 3/18/11 Trial Tr. 17:12-20:4 (Tuliano).
[131] NPP 944 (Tuliano Rpt.) at 8; 3/18/11 Trial Tr. 66:3-16 (Tuliano).

applied a 67% weighting, and a comparable company, or market, approach, to which he applied a 33% weighting.[132]

Given the unreasonableness of the February Projections, Tuliano also conducted a balance sheet solvency analysis using projections that were adjusted to reflect information known to Company management prior to the Step One close (the "Step One Adjusted Projections").  Tuliano adjusted management's projections by using actual results through May 2007, and then applying the cumulative month-over-month growth rates set forth in the 2007 plan for the remainder of the year.  As Tuliano noted, "[t]his is the type of analysis that could have been done very easily by the company."[133]  Moreover, despite the fact that the growth rates embedded in the February Projections were highly optimistic, Tuliano gave management "the benefit of the doubt with respect to those growth rates," by adopting them in his Step One Adjusted Projections.[134]  When the Step One Adjusted Projections are used, Tuliano's analysis shows that the Company was insolvent at Step One by $3.0 billion.[135]

Tuliano also conducted a separate balance sheet solvency analysis of Tribune's subsidiaries at Step One using both the February Projections and the Step One Adjusted Projections.[136]  In so doing, Tuliano corrected the Examiner's mistake of including the Chicago Cubs as a parent asset, by attributing the value of that asset to Tribune's subsidiaries.[137]  Based on this analysis, Tuliano concluded that Tribune's subsidiaries were insolvent by $206 million

---

[132] Tuliano underweighted the market approach because – as recognized by the Examiner – the trading multiples of the Company's comparable companies at the time were inflated.  3/18/11 Trial Tr. 55:17-56:20 (Tuliano). Nevertheless, Tuliano used the median EBITDA multiple of the comparable companies analysis, notwithstanding that the multiples were inflated, and that the Company underperformed most of them.  3/18/11 Trial Tr. 63:8-64:4 (Tuliano).

[133] 3/18/11 Trial Tr. 44:15-45:7 (Tuliano).

[134] *Id.* at 45:15-21 (Tuliano).

[135] NPP 944 (Tuliano Rpt.) at 8.

[136] To determine the value of Tribune's subsidiaries, Tuliano began with his value conclusion for the consolidated Company, and then deducted the fair market value of the assets belonging solely to the Tribune parent company, as well as the debt for which only the parent company was liable.  3/18/11 Trial Tr. 66:17-67:3 (Tuliano).

[137] *Id.* at 67:8-12 (Tuliano).

when the February Projections were used, and by $949 million when the Step One Adjusted

Projections were used.[138]

### 3. The DCL Plan Proponents Have Not Rebutted The Evidence Showing Balance Sheet Insolvency At Step One

Fischel testified that the Company was balance sheet solvent at Step One. In order to

reach this conclusion, however, he deviated significantly from well-accepted valuation

methodology, employing techniques that Tuliano, in his more than 20 years as a valuation

professional, has never before seen.[139] Thus, Fischel's analysis disregards many of the standards

by which the valuation community abides, and appears particularly result-oriented.

Perhaps the most egregious of Fischel's errors is his application of "real economic value"

to assess the Company's balance sheet solvency, and his decision to include within "real

economic value" the tax benefits arising from the Company's conversion to an S Corp/ESOP.[140]

Widely-recognized principles of solvency and valuation recognize that "fair market value"

(which is also referred to as "fair value") should be used to assess balance sheet solvency,[141] and

that tax benefits associated with an S Corp/ESOP structure should not be included within a

balance sheet solvency analysis:

> the definition of fair market value, when considered with respect to the S Corporation ESOP, does not confer value from the ESOP tax structure on the value of the subject stock. While it is true that the ESOP receives an economic advantage that translates to additional value for the participants, this economic benefit does not confer additional value on the stock itself. Only another special-purpose buyer (e.g. another S Corporation ESOP)

---

[138]*Id.* at 66:17-67:6 (Tuliano); NPP 944 (Tuliano Rpt.) at Ex. III.
[139] DCL 1106 (Fischel Rpt.) at Ex. O.
[140] 3/10/11 Trial Tr. 115:6-117:4, 138:5-139:3 (Fischel).
[141] 3/18/11 Trial Tr. 51:2-16 (Tuliano); NPP 955 (Tuliano Rebuttal Rpt.) at 12; *see also* 3/18/11 Trial Tr. 86:20-89:5 (Tuliano).

could enjoy the same economic advantage. Therefore, the economic benefit is not part of the fair market value of the subject stock.[142]

Here, VRC's engagement letter required a specific modification of the definition of "fair value" in order to enable VRC to include in its solvency assessment value arising from the S Corp/ESOP structure.[143] Bryan Browning, a managing director at VRC who has worked on 400 to 500 solvency opinions (including the Company's opinions), does not believe he had ever worked on a solvency opinion that modified the definition of fair value in that fashion.[144]

Similarly, Thomas Kenny, who has been performing valuation work for more than 20 years and is a senior vice president at Murray Devine, the solvency firm hired by the LBO Lenders in advance of Step Two, testified that, prior to reviewing VRC's solvency opinion in the Tribune matter, he had *never seen a fair value determination that included value resulting from unique aspects of a buyer*. Kenny also testified that he "would probably say it's *not* appropriate" to include such value.[145] Kenny testified further that a balance sheet solvency test should assume a hypothetical buyer, and that *an S Corp is not a hypothetical buyer*.[146] Fischel's inappropriate inclusion of value arising from the Company's S Corp/ESOP tax status in his balance sheet solvency test increased his value conclusion at Step One by approximately $1.0 billion.[147]

Fischel's balance sheet solvency test is also fundamentally flawed because he miscalculated the amount of the Company's PHONES Notes by ascribing a value of $663 million, rather than the $1.256 billion face amount of the notes (less the value of the Time

---

[142] NPP 782 (Exam'rs Rpt.), Vol. II at 27-28, n.87 (citing Ackerman and Gould, S Corporation ESOP Valuation Issues (Chapter 6) in THE HANDBOOK OF BUSINESS VALUATION AND INTELLECTUAL PROPERTY ANALYSIS at 148-49 (Robert F. Reilly and Robert P. Schweihs, eds., 2004)).

[143] *Id.* at Vol. I at 225 (citing NPP 1349 (4/11/07 VRC Solvency Engagement Letter)).

[144] *Id.* at (Exam'rs Rpt.), Vol. I at 226.

[145] Deposition of Thomas Kenny dated February 24, 2011 ("Kenny Dep. Tr.") 13:16-23, 81:13-19, 111:7-23 (emphasis added).

[146] *Id.* at 185:8-186:2 (emphasis added).

[147] NPP 955 (Tuliano Rebuttal Rpt.) at 26.

Warner shares that could be netted against the liability upon redemption).[148] Fischel derived his number from the Company's financial statements, which calculate the PHONES Notes using a mix of book and fair values pursuant to Financial Accounting Standard FAS No. 133.[149]

There is no dispute, however, that the Company was required to pay the face amount of the PHONES Notes (less the value of the Time Warner shares) upon maturity.[150] Moreover, the Third Circuit has held that debt should be calculated at face value for purposes of performing a balance sheet solvency test.[151] Indeed, Fischel himself testified that he cannot recall ever valuing debt in the way that he valued the PHONES Notes before.[152] And Kenney testified that Murray Devine generally uses the contractual rate (*i.e.* face value) to calculate debt in a balance sheet solvency test.[153]

Additionally, both JPMorgan and Merrill Lynch used the face value of the PHONES Notes (minus the value of the Time Warner shares) in the solvency analyses that they prepared prior to Step Two, as did Blackstone, the financial advisor to the McCormick Foundation, a large Tribune shareholder.[154] VRC valued the PHONES Notes at face value (minus the value of the Time Warner shares) in its Step One solvency opinion, as well as in the initial version of its Step Two Solvency Opinion, and adjusted the number to accounting value only at the last minute.[155] Furthermore, the Company itself considered the PHONES Notes at face value in the Statement

---

[148] *Id.* at 13-14; 3/10/11 Trial Tr. 165:16-25 (Fischel).
[149] NPP 672 (12/30/07 Tribune 10-K) at 43, n.10.
[150] 3/10/11 Trial Tr. 166:1-21 (Fischel).
[151] *In re Trans World Airlines, Inc.*, 134 F.3d 188, 196-7 (3d Cir. 1998)
[152] 3/10/11 Trial Tr. 166:16-21 (Fischel).
[153] Kenny Dep. Tr. 138:11-20.
[154] *See* NPP 625 (12/10/07 JPM Tribune Valuation Update) at JPM_00108127; NPP 634 (12/12/07 JPM Tribune Valuation Update) at JPM_00108134; NPP 642 (12/13/07 JPM Tribune Valuation Update) at JPM_00156034; NPP 658 (12/18/07 JPM Tribune Valuation Update) at JPM_00155179; NPP 1830 (12/16/07 Merrill Lynch Valuation Analysis of Tribune) at ML-TRIB-0009936; NPP 1831 (12/16/07 Merrill Lynch Valuation Analysis) at ML-TRIB-0009936; NPP 446 (5/23/07 Blackstone Project Spice Presentation) at BLACKSTONE051304.
[155] *Compare* NPP 1741 (12/3/07 VRC Preliminary Solvency Analysis) at VRC0060988 and NPP 1745 (12/4/07 VRC Preliminary Solvency Analysis) at TRB0272813 (using face value to calculate PHONES Notes) *against* NPP 1878 (12/18/07 VRC Preliminary Solvency Presentation) at VRC0109244-45 (using accounting value to calculate PHONES Notes).

of Facts submitted in these cases, as well as the ratings agency presentations it prepared in March and October 2007.[156] Fischel's miscalculation of the PHONES Notes increased his value conclusion at Step One by $593 million.[157]

Professor Fischel also erred by calculating the Company's terminal value by choosing an exit multiple from a selection of purportedly "comparable" companies, and multiplying that multiple by the Company's average projected EBITDA for the years 2007-2010.[158] This is problematic for two reasons. First, the comparable companies used by Fischel, which were selected solely because contemporaneous financial advisors used such companies in their analyses (and not because Fischel did any analysis to determine that they are comparable),[159] include companies that, unlike the Company, are not diversified media companies, and that consistently traded at higher multiples than the Company.[160]

Second, as Tuliano testified, authoritative valuation literature shows that the use of an exit multiple to calculate a terminal value results in an improper blending of the income and market approaches.[161] The LBO Lenders' solvency expert from the time of the LBO, Kenny, acknowledged this fact, testifying that the Gordon Growth Model used by Tuliano is a preferable

---

[156] NPP 767 (Leveraged ESOP Statement of Facts) at 12; NPP 218 (3/07 Tribune Rating Agency Presentation) at MS 48361; NPP 580 (10/1/07 Tribune Rating Agency Presentation) at ML-TRIB-0032747.
[157] NPP 955 (Tuliano Rebuttal Rpt.) at 14.
[158] 3/18/11 Trial Tr. 60:15 (Tuliano); NPP 944 (Tuliano Rpt.) at 93; 3/10/11 Trial Tr. 100:20-102:4 (Fischel).
[159] Professor Fischel gave no consideration to how these financial advisors applied these multiples in their analyses. Many of these advisors treated the Publishing and Broadcasting companies differently either by comparing the specific industry multiples to the portion of earnings derived by the Tribune's Publishing or Broadcasting division or by weighting the selected multiple in line with the percentage of Tribune's Publishing or Broadcasting earnings. NPP 955 (Tuliano Rebuttal Rpt.) at 20, n.76.
[160] 3/10/11 Trial Tr. 101:25-102:4 (Fischel); 3/18/11 Trial Tr. 92:9-11, 93:5-94:25 (Tuliano). Fischel's inclusion of companies that are not diversified media companies in his collection of comparable companies also increased the value conclusion of his comparable company analysis, which increased his overall value conclusion at Step One by approximately $1.2 billion to $1.3 billion. NPP 955 (Tuliano Rebuttal Rpt.) at 21.
[161] NPP 88 (VALUING A BUSINESS, Shannon Pratt) at 251; 3/18/11 Trial Tr. 60:15-19, 91:20 -92:6 (Tuliano).

and more common approach to calculate a terminal value when valuing a business as a going concern, and is the method that is generally used by his firm.[162]

Moreover, "the greater the impact of the terminal value on the total present value, the more important this distinction becomes, and the more the method will be seen as a market versus income method."[163]  Given that the terminal value constitutes the vast majority of Fischel's DCF value, his flawed market approach is the dominant driver of his DCF analysis.[164]

Other fundamental errors committed by Fischel in his Step One balance sheet solvency test include:[165]

- His decision to include within his assessment of the Company's value 401(k) and stock-based compensation cost savings that the Company expected to realize as a result of its conversion to an S Corp/ESOP.[166]  This violates the fair market value standard by including benefits that arise only as a result of the unique attributes of a specific buyer, and unrealistically assumes that the Company could simply eliminate these costs without providing other forms of competitive compensation to its employees;[167]

- His decision to rely upon the February Projections without applying any critical analysis;[168]

- His use of an overly aggressive long term growth rate, which is higher than the growth rates applied contemporaneously by the Company, Duff & Phelps (the financial advisor to the ESOP trustee), JPMorgan, and Morgan Stanley.[169]

- His decision to calculate the weighted average cost of capital ("WACC") in his DCF analysis using a Company-specific, rather than industry average, capital

---

[162] Kenny Dep. Tr. 78:7-82:22 ("If you don't have good comparables, your market multiple method is probably not that reliable.  And then if you're taking that information and then also using it in your discounted cash flow, that's going to make that potentially less reliable as well . . . So you could compound your problem there.").
[163] NPP 88 (VALUING A BUSINESS, Shannon Pratt) at 251.
[164] 3/18/11 Trial Tr. 91:23-92:6 (Tuliano).
[165] A more detailed discussion of the errors made by Fischel in his balance sheet solvency analysis, and the dollar impact of those errors, is set forth in NPP 955 (Tuliano Rebuttal Rpt.) at pages 11-26.  Correcting all of Fischel's errors results in a finding that the Company was insolvent as of June 4, 2007.
[166] NPP 955 (Tuliano Rebuttal Rpt.) at 14-15.
[167] 3/18/11 Trial Tr. 88:23-90:14; 218:25-219:7; 220:6-13 (Tuliano); NPP 955 (Tuliano Rebuttal Rpt.) at 14-15.
[168] 3/10/11 Trial Tr. 146:13-17, 165:10-12 (Fischel); *see also* 3/18/11 Trial Tr. 89:5-16 (Tuliano).
[169] NPP 488 (7/13/07 Tribune Co. Proxy Statement); NPP 293 (3/29/07 Duff & Phelps Tribune Valuation Analysis); NPP 365 (4/5/07 JPM Tribune Credit Analysis).

structure.[170]  This significantly decreased the discount on value imposed by the WACC, as debt carries a lower discount than equity, and the Company's capital structure at Step One (as applied by Fischel) was approximately 75-85% debt, compared to the industry average of approximately 30% debt;[171] and

- His decision to include in his company comparable analysis "pure play" broadcasting and newspaper companies that are not comparable to the Company on a consolidated basis materially inflated his results.[172]

When the errors in Fischel's balance sheet solvency analyses are corrected, the analysis show that the Company was insolvent at Step One by as much as $ 3.144 billion.[173]

The unreliable and inflated nature of Fischel's balance sheet insolvency analysis is well illustrated by the share prices implied by his valuation conclusions.[174]  As Tuliano explained at trial, an implied share price can be derived by deducting $5 billion of pre-Step One debt from the total enterprise values arrived at by Fischel, and then dividing those numbers by the 241 million shares of the Company's stock that were then outstanding.[175]  This exercise shows that Fischel asks this Court to believe that, at the time of Step One, *the value of the Company's shares could have been as high as $68 per share, and was no lower than $36 per share*.[176]  No one was placing anywhere near that kind of value on the Company at that time.[177]  Indeed, in a May 20,

---

[170] 3/10/11 Trial Tr. 102:8-103:1, 161:9-14 (Fischel).  Widely-accepted valuation literature instructs that an industry average should be used where, as here, a controlling interest is being valued, because a "control buyer would have the power to change the capital structure and the industry average capital structure could represent the most likely result."  NPP 88 (VALUING A BUSINESS, Shannon Pratt) at 218-19; NPP 955 (Tuliano Rebuttal Rpt.) at 18.  In apparent recognition of this principle, Fischel testified at trial that "the conclusion doesn't change if I use the industry average debt ration."  3/10/11 Trial Tr. 118:18-20 (Fischel).  This is the case, however, only because Fischel committed the aforementioned error of using a terminal multiple rather than the Gordon Growth Model to calculate his terminal value, which "significantly diminishes the impact of the WACC."  NPP 955 (Tuliano Rebuttal Rpt.) at 17.

[171] 3/18/11 Trial Tr. 62:4-5 (Tuliano); NPP 955 (Tuliano Rebuttal Rpt.) at 18-19.

[172] *Id.* at 63:8-18; 93:5-94:25 (Tuliano); NPP 955 (Tuliano Rebuttal Rpt.) at 21.  Indeed, the LBO Lenders' solvency expert from the time of the LBO once again disagrees with Professor Fischel's approach, and testified that, when conducting a comparable company analysis of the Company, the weight afforded to multiples derived from pure play broadcasting companies should be adjusted based on the amount of business coming from Tribune's broadcasting segment (which in this case was only approximately 32%).  Kenny Dep. Tr. 120:2-122:10.

[173] NPP 955 (Tuliano Rebuttal Rpt.) at 25.

[174] 3/18/11 Trial Tr. 108:8-109:2 (Tuliano); NPP 2478 (Tuliano Trial Demonstratives) at 50.

[175] *Id.* at 108:15-19 (Tuliano); NPP 2478 (Tuliano Trial Demonstratives) at 50.

[176] NPP 2478 (Tuliano Trial Demonstratives) at 50.

[177] 3/18/11 Trial Tr. 108:20-109:2 (Tuliano).

2007 declaration submitted on the Company's behalf, Black declared that the stand alone value of the Company's shares, absent the overhang of the LBO, was likely "***well below $32***" a share, and Black acknowledged at trial that it could have been "***$29" a share***".[178]  This is entirely in keeping with Tuliano's analysis, which found that the implied share price of Tribune's stock at Step One was approximately $28 per share using the February Projections, and approximately $25 per share when the February Projections are appropriately adjusted to incorporate information known at that time.[179]

4.     **The Company Was Inadequately Capitalized And Unable To Pay Its Debts As They Became Due At Step One**

The evidence also shows that the Company was inadequately capitalized and unable to pay their debts as they became due at Step One.  Tuliano assessed the Company's capital adequacy and ability to pay using widely-accepted techniques that he has routinely employed in performing valuation and solvency work.[180]  In conducting this analysis, Tuliano performed detailed analyses of the Company's leverage and liquidity before and after the LBO, and its ability to service its debt from operating cash flow and/or other sources of cash.[181]

With respect to the Company's leverage and liquidity, Tuliano compared the Company's debt to EBITDA ratios with those of its competitor companies for the periods before and after Step One.[182]  This showed that the Company was highly leveraged in comparison to its competitors even before the LBO, and that its debt to EBITDA ratio skyrocketed to more than 6

---

[178] NPP 2314 (5/10/07 Black Declaration) at 6, n.7; 3/9/11 Trial Tr. 274:23-25 (Black).
[179] 3/18/11 Trial Tr. 107:13-108:7 (Tuliano); DCL 2008 (Revised Tuliano Trial Demonstratives).
[180] *Id.* at 67:22-68:7 (Tuliano).
[181] NPP 944 (Tuliano Rpt.) at 100; 3/18/11 Trial Tr. 68:8-25 (Tuliano).
[182] 3/18/11 Trial Tr. 69:1-70:2 (Tuliano); NPP 2478 (Tuliano Trial Demonstratives) at 29; NPP 944 (Tuliano Rpt.) at 103-104.

times that of its most highly-leveraged competitor following Step One, and more than 8 times that of the industry average.[183]

In analyzing whether the Company could service the significant amount of leverage imposed by the LBO, Tuliano also reviewed the Company's interest coverage ratios.[184] This analysis showed that following Step One, the Company had the lowest coverage ratio among its comparable companies and that, based on its twelve-month trailing EBITDA, it was likely that the Company would not be able to cover its interest expense even without taking into account reasonably foreseeable contingencies.[185]

Tuliano also considered the Company's ability to service its debt with cash from operations following Step One based on projections for the period 2007 – 2011. Tuliano performed this analysis using not only the February Projections and Step One Adjusted Projections, but also four downside cases: the Step One Adjusted Projections with a 15% downside sensitivity, Wall Street low estimates, an S&P sensitivity case that was prepared by the Company during its discussions with the rating agencies in advance of Step One, and management's Downside Case B1, which was similar to management's Downside Case B but held the Broadcasting Segment's operating cash flow flat instead of projecting a 1% decline.[186]

Notably, the evidence shows that the Downside Case B1, which would have left the Company with less cumulative EBITDA over the five-year period than the Wall Street Low estimates or the Step One Adjusted Projections with the 15% downside sensitivity, was more akin to a base case than a downside case. As discussed above, Black testified at trial that the

---

[183] NPP 2478 (Tuliano Trial Demonstratives) at 29; NPP 944 (Tuliano Rpt.) at 103-104.
[184] 3/18/11 Trial Tr. 70:3-16 (Tuliano).
[185] NPP 944 (Tuliano Rpt.) at 109-110; 3/18/11 Trial Tr. 70:6-71:4 (Tuliano).
[186] 3/18/11 Trial Tr. 71:11-72:22 (Tuliano). Fischel and the Examiner also utilized downside cases in their capital adequacy analyses, *see* DCL 1106 *(Fischel Rpt.)* ¶¶ 68, 93, 94, and Fischel acknowledged at trial that a capital adequacy test should be performed using downside projections.

Company's performance in the first five months of the year was already tracking the Company's Downside Case B.[187]  Tuliano's analysis conclusively shows that following Step One, the Company's operating cash flows were insufficient to meet its debt service obligations in all four downside cases, as well as under the February Projections and the Step One Adjusted Projections.[188]

In light of the Company's inability to service its debt obligations through operations under even the February Projections, Tuliano next analyzed whether the Company would be able to generate sufficient capital to service its debt in a downside scenario when additional sources of cash, such as its revolving line of credit, asset sales and equity investments, were considered.[189]  Additionally, Tuliano assumed that, as a result of its S Corp/ESOP status, the Company would not have to pay 401(k) or stock based compensation expenses.[190]  Even after giving the Company the benefit of all these assumptions, however, the analysis still shows that the Company would be unable to service its debt and lacked adequate liquidity following Step One under the downside projections.[191]

5. **The DCL Plan Proponents Have Not Rebutted The Evidence Showing That The Company Was Left With Inadequate Capital And Unable To Pay Its Debts As They Came Due At Step One**

The DCL Plan Proponents have not rebutted the evidence showing that the Company was left with inadequate capital and unable to pay its debts as they came due at Step One.  Indeed, *Fischel's own analysis shows that Tribune did not have adequate capital to pay its debts as they came due at Step One*.  Specifically, Fischel's Step One capital adequacy and ability to pay analysis shows that, using the average of downside case projections prepared before June 4, 2007

---

[187] NPP 2314 (Black *Garamella* Declaration) at 15 n.22; NPP 944 (Tuliano Rpt.) at 116; 3/9/11 Trial Tr. 272:23-24, 273:24-274:4 (Black).
[188] 3/18/11 Trial Tr. 74:9-21, 77:6-13 (Tuliano).
[189] *Id.* at 76:10-14; 15-22, 76:23-77:5; 77:20-78:1(Tuliano); NPP 944 (Tuliano Rpt.) at 122.
[190] *Id.* at 78:6-10 (Tuliano).
[191] *Id.* at 77:6-16 (Tuliano); NPP 2478 (Tuliano Trial Demonstratives) at 34.

and considering the Step Two debt anticipated by the Company, the Company would have ***negative*** $79 million in 2009, ***negative*** $45 million in 2010, and a mere $9 million in 2011.[192] As Fischel testified, "in 2010 and 2011, the revolver numbers turn negative, meaning that in those years, the Tribune does not have enough liquidity in order to meet its mandatory obligations."[193]

Fischel tried to explain away the results of his own analysis by testifying that that he could have used a higher number for cash proceeds from asset sales, and that "[although] "this" analysis produced a result that was close to the line . . . there would be steps that could be taken to create a bigger cushion than is reflected on this exhibit."[194] Yet these arguments are unavailing. To begin with, a company with $5 billion of debt should not take on $8 billion more when its solvency is "close to the line."[195] Fraudulent transfer law should deter companies and lenders from such reckless risk taking where, as here, a company already has substantial pre-existing debt.

Moreover, Fischel did not conduct any analysis to determine whether the Company could in fact have taken steps to generate additional cash, or how much cash it could have generated by doing so.[196] It is not appropriate to disregard the results of a capital adequacy test by simply assuming that any company can take generic steps to cure a cash deficit. Indeed, if such an assumption was appropriate, no company would ever fail a capital adequacy test. Moreover, this assumption is particularly misplaced here, given that the Company had already implemented several cost-cutting measures prior to Step One, and thus had limited flexibility in excising

---

[192] DCL 1106 (Fischel Rpt.) at Ex. Q.
[193] 3/10/11 Trial Tr. 123:3-7 (Fischel).
[194] *Id.* at 123:14-125:3 (Fischel).
[195] *Id.* at 124:22-125:3 (Fischel).
[196] *Id.* at 207:9-15 (Fischel).

additional costs.[197]

Fischel's proceeds from asset sales argument also fails, as Tuliano's review of the downside cases utilized by Fischel showed that certain of the projections understated the Company's expenses and/or overstated its income. For example, the "Citi Downside Case" does not appear to include expenditures for investments in acquisitions, but also projected that the Company would receive income from future acquisitions.[198] Fischel conducted no substantive analysis of the downside projections utilized in his analysis, however, and thus made no adjustments to account for such mistakes.[199] Fischel cannot turn the negative numbers generated by his analysis into positives by retroactively cherry picking the portions of the projections he wishes to adjust.

### D. Constructive Fraudulent Transfer At Step Two

#### 1. The Company Fails All Three Solvency Tests at Step Two

Applying the same widely-accepted valuation techniques utilized at Step One, Tuliano concluded that the Company was also balance sheet insolvent, inadequately capitalized and unable to pay its debts as they came due at Step Two.[200] Tuliano's conclusions are consistent with the Examiner's conclusions that it was "highly likely" that the Company was insolvent and inadequately capitalized at Step Two. Indeed, even Fischel conceded that the Company was "very borderline solvent" at Step Two, and that the Company's solvency at Step Two was a "very close call."[201]

---

[197] 3/18/11 Trial Tr. 95:23-96:23 (Tuliano).
[198] *Id.* at 95:11-15 (Tuliano).
[199] DCL 1106 (Fischel Rpt.) at 23.
[200] 3/18/11 Trial Tr. 22:24-23:12, 64:25-65:1 (Tuliano).
[201] 3/10/11 Trial Tr. 92:11-12, 200:8-9 (Fischel).

### a. The Company Was Balance Sheet Insolvent At Step Two

Tuliano's balance sheet solvency analysis shows that the Company's debt exceeded the fair market value of its assets as of December 20, 2007 by $2.9 billion when using the October Projections.[202] Additionally, because Tuliano and the Examiner both concluded that the October Projections could not be relied upon, Tuliano conducted a DCF analysis using adjusted projections (the "Step Two Adjusted Projections"), which utilized the Company's actual results through November 2007, and then applied the year-over-year growth rates embedded in the February Projections. Notably, these Step Two Adjusted Projections are almost identical to the average third-party base case projections compiled by Fischel (the "Average Third Party Base Case Projections").[203] When these Step Two Adjusted Projections, rather than the unrealistically optimistic October Projections are used, Tuliano's analysis shows that the Company was insolvent at Step Two by $3.3 billion.[204] Tuliano also conducted a balance sheet solvency analysis of Tribune's subsidiaries, which shows that the liabilities of Tribune's subsidiaries exceeded their assets by $848 million at Step Two.[205]

Fischel's analysis of the Company's balance sheet solvency at Step Two suffers from the same deficiencies as his Step One analysis. Nevertheless, even Fischel admitted that the Company was "borderline solvent in December."[206] When Fischel's mistakes are corrected at Step Two, the Company is balance sheet insolvent by approximately $3.1 billion using management's projections, and by approximately $3.2 billion using Average Third Party Base Case Projections.[207]

---

[202] 3/18/11 Trial Tr. 66:3-16 (Tuliano); NPP 944 (Tuliano Rpt.) at Ex. 7-B.
[203] *Id.* at 49:18-22 (Tuliano).
[204] NPP 944 (Tuliano Rpt.) at 131.
[205] 3/18/11 Trial Tr. 66:17-67:6 (Tuliano); NPP 944 (Tuliano Rpt.) at Ex. 8.
[206] 3/10/11 Trial Tr. 129:7-8 (Fischel); DCL 1106 (Fischel Rpt.) at Ex. W.
[207] NPP 955 (Tuliano Rebuttal Rpt.) at 25.

### b. The Evidence Shows That The Company Was Inadequately Capitalized And Unable To Pay Its Debts As They Came Due At Step Two

There can be little doubt that, as of December 20, 2007, the Company was left with unreasonably small assets or capital to operate its business, and had incurred debts beyond its ability to pay as they matured. Tuliano's analysis shows that, following Step Two, the Company was excessively leveraged compared to its peers, including a debt-to-EBITDA ratio that was nearly double that of the Company's closest peer company and ***more than eight times*** higher than the average of the comparable companies.[208] Additionally, following consummation of Step Two, the Company was the only one of its peers that had a ***negative*** debt-to-equity ratio, and also had the ***lowest*** interest coverage ratio among its peers, regardless of whether capital expenditures were included in the calculation.[209]

As with his capital adequacy analysis at Step One, Tuliano considered four downside cases in his capital adequacy analysis at Step Two, all four of which were higher than several other contemporaneous downside cases prepared by the Company's advisors and market participants.[210] His analysis shows that the Company's operating cash flows were insufficient to meet its debt service obligations in all four downside cases, even after considering available liquidity, proceeds from asset sales, and cash received from equity investments.[211] Thus, there simply was "not [ ] sufficient capital within the business to be able to ultimately deal with a downturn."[212]

Tuliano's analysis also demonstrates that non-operating sources of cash would not rescue the Company from its insolvency at Step Two because, as at Step One, (1) the S Corp/ESOP tax

---

[208] NPP 944 (Tuliano Rpt.) at 141-42.
[209] *Id.* at 143-48.
[210] 3/18/11 Trial Tr. 80:8-10 (Tuliano); NPP 944 (Tuliano Rpt.) at 157; 3/18/11 Trial Tr. 79:18-23 (Tuliano).
[211] *Id.* at 80:15-81:24 (Tuliano).
[212] *Id.* at 81:20-24 (Tuliano).

structure would limit the Company's ability to divest assets to raise cash, and (2) as a minority equity investor, the Company had no ability to control the distribution of cash by the equity investment entities, which was confirmed by the Company's prior experience.[213]

Fischel's capital adequacy/ability to pay analysis also shows that the Company was inadequately capitalized and unable to pay its debts as due at Step Two. Specifically, Fischel concluded that, based on an average of contemporaneous downside projections prepared as of December 20, 2007, the Company was projected to have *negative* $5 million in liquidity by 2012.[214] Nevertheless, as at Step One, Fischel concludes that "[t]o the extent Tribune were to be able to further reduce capital expenditures, reduce operating expenses, eliminate public company-related expenses, sell some assets, and/or use a portion of its pension overfunding, it could meet its obligations without fully drawing the revolver by 2012."[215] Once again, however, Fischel conducted no analysis to determine whether any of these steps could actually be taken.

### E. The Examiner's Analysis Of Step One Was Incomplete

While it cannot be disputed that the Examiner conducted a comprehensive and thoughtful analysis of the LBO Claims that materially advanced a thorough understanding of the LBO, the Noteholder Plan Proponents believe the Examiner erred in concluding that "a court would likely conclude that it would be inappropriate to revise the February [Projections] based on declines in performance in April and May."[216] This results from the Examiner's failure to recognize the disparity not only between the Company's operating performance and February Projections for the first five months of the year, but also between the actual operating performance for those

---

[213] NPP 955 (Tuliano Rebuttal Rpt.) at 29.
[214] DCL 1106 (Fischel Rpt.) at Ex. Z.
[215] *Id.* at 32.
[216] NPP 782 (Exam'rs Rpt.), Vol. II at 213.

months and the same five months of 2006.[217]  The Examiner also appears to have overlooked that

the February Projections were significantly back-end loaded, and that the out years of the

February Projections were premised on compliance with the 2007 plan, all of which made the

likelihood that the Company would be able to meet the February Projections notwithstanding its

dismal performance through May 2007 highly unrealistic.[218]  As Tuliano testified:

> I believe the examiner missed the fact that the company's deteriorating
> performance relative to 2006 for the entirety of that five-month period
> prior to the close of the step one and how the plan ramped up very
> significantly relative to 2006 for the remainder of the year.  I think had the
> examiner looked at that and drilled down into the various newspapers he
> might have reached a different conclusion.[219]

Additionally, although the Examiner noted that "management's projected 2007 revenue

and EBITDA generally was consistent with analyst expectation at the time,"[220] in fact, Wall

Street consensus estimates in March 2007 predicted decreasing EBITDA over the projection

period, and were meaningfully below the upward trend predicted by the February Projections.[221]

Moreover, the Average Third Party Base Case Projections compiled by Fischel show that

projections prepared by parties involved in the LBO were also significantly below those of

Company management.  Prior to Step One, the adjusted EBITDA projected in the February

Projections exceeded the average adjusted EBITDA projected by Merrill Lynch, Citigroup, Bank

of America, JPMorgan (all LBO Lenders), and Blackstone (the advisor to the McCormick

Foundation, one of Tribune's largest shareholders) by at least $29 million in 2007, at least $137

million in 2008, at least $161 million in 2009, at least $192 million in 2010, at least $202 million

in 2011, and at least $214 million in 2012.[222]

---

[217] 3/18/11 Trial Tr. 85:10-86:6 (Tuliano).
[218] NPP 782 (Exam'rs Rpt.), Vol. II at 212.
[219] 3/18/11 Trial Tr. 85:14-21 (Tuliano).
[220] NPP 782 (Exam'rs Rpt.), Vol. II at 213.
[221] NPP 944 (Tuliano Rpt.) at 37, 74.
[222] *Compare* Appendix H, p. 2 of DCL 1106 (Fischel Rpt.) *against* Appendix E, p. 3 of DCL 1106.

The Examiner's failure to conduct a detailed analysis of the February Projections led him to also overlook the strong evidence of intentional fraud at Step One. Because the Examiner did not recognize the surge in performance that the Company would have had to achieve in order to meet its 2007 projections and, by extension, its projections for the out years, the Examiner failed to appreciate that management's decision to continue to rely on those projections is highly suggestive of intentional fraud. Additionally, it appears that the Examiner was unaware of the Company's acknowledgment, ***prior to Step One***, that it was tracking its ***lowest*** downside projections, which sheds light on Bigelow's admission, also ***prior to Step One***, that even if the Company performed in accordance with a more optimistic downside case, it would have ***no equity value*** for the five years following the LBO.[223]

The Examiner's analysis of the Company's financial condition at Step One was also incomplete, and once again affected by the Examiner's assessment of the February Projections. To begin with, the Examiner did not perform a balance sheet solvency test at Step One, and relied on management's wholly unreliable February Projections in evaluating the Company's capital adequacy and ability to pay its debts.[224] Additionally, the Examiner improperly assumed that the Company would be able to refinance its debt.[225] Additionally, the Examiner made a mathematical error in his capital adequacy assessment, by ***adding*** cash tax expense to cash flows rather than ***deducting*** it, which erroneously increased the projected amount of the Company's cash flows from $245 to $353 million.[226] Correcting these errors in the Examiner's analysis

---

[223] NPP 2314 (5/10/07 Black Declaration) at 15 n.22; NPP 259 (3/24/07 email between J. King and C. Bigelow).
[224] 3/18/11 Trial Tr. 86:11-16 (Tuliano).
[225] NPP 782 (Exam'rs Rpt.), Vol. II at 214; 3/18/11 Trial Tr. 83:16-84:5, 85:10-86:6 (Tuliano); NPP 944 (Tuliano Rpt.) at 10-13, 162-165.
[226] 3/18/11 Trial Tr. 84:6-25 (Tuliano); NPP 944 (Tuliano Rpt.) at 10-13, 162-165.

would result in the conclusion that the Company was inadequately capitalized as of June 4, 2007 in six out of the seven capital adequacy tests presented by the Examiner in his report.[227]

F.     **The DCL Plan Proponents' Purported "Market Evidence" Does Not Rebut The Clear Evidence That The Company Was Insolvent, Inadequately Capitalized, And Unable To Meet Its Debts As They Came Due At Step One And Step Two**

Fischel testified that "in all [his] work as an expert witness," he "always emphasize[s] the role of market evidence and the value of market evidence," which he believes is entitled to "particular deference" when performing a solvency analysis.[228]  As set forth in great detail in Tuliano's expert report, however, there is substantial evidence showing that sophisticated market participants perceived the Company to be excessively leveraged and at significant risk of being unable to pay its debts as due at both steps of the LBO.[229]  The purported "market evidence" cited by Fischel is entirely consistent with (rather than contradictory to) Tuliano's testimony and reports.

*Sam Zell's "Investment"*

Fischel cited "the investment by Zell and his entity" as evidence of the Company's solvency at Step One and Step Two.[230]  Yet even Black admitted that "the fact that Zell may have a reputation as a smart investor . . . doesn't preclude in any way the possibility that he overpaid" for Tribune.[231]  Moreover, the $315 million of total capital Zell contributed to the Company in the LBO was dwarfed by the $7.9 billion of incremental debt amassed by the Company in the transaction, bringing the Company's total debt to more than $13 billion.  Several contemporaneous market participants commented on the negligible amount of equity contributed

---

[227] *Id.* at 84:23-85:4 (Tuliano).
[228] 3/10/11 Trial Tr. 94:21-95:10 (Fischel).
[229] NPP 944 (Tuliano Rpt.) at 111-115, 149-150.
[230] 3/10/11 Trial Tr. 95:23-24, 126:17-20, 199:6-17 (Fischel).
[231] 3/9/11 Trial Tr. 201:24-202:3 (Black).

by Zell. For example, on May 11, 2007, Peter Cohen, a Managing Director at JPMorgan, notified JPMorgan Chief Executive Officer Jamie Dimon and other members of JPMorgan's executive management that the Tribune deal was "struggle[ing] in the market," and cited the "low equity check from Sam" as one of the "investor concerns."[232] Additionally, Moody's stated on March 29, 2007 that the "negligible amount of equity invested" was a key driver of the credit downgrade, and would "weakly position the company."[233] As one Morgan Stanley banker viewed it after concluding that the Company would have "negative equity value" following the LBO:

> I was explaining why the ev would be negative . . but as a secret . . you should know this deal is happening because zell is soo f-n rich . . he's putting in $65 mm to get 40% of a multi-billion dollar co[234]

Indeed, by July 2007, JPMorgan had determined that the deal would fail if Zell did not contribute additional equity. In an internal JPMorgan email, banker J.P. Casey emailed his colleagues that the bank needed to ask Zell for

> 1)   More equity
> 2)   Even more equity
> 3)   More rate[235]

Casey stated further "He [Zell] needs to hear unequivocally [sic] that this deal will fail without a lot more help from Zell. We don't need to market it to know that – we know it now."[236] Nevertheless, Zell did not contribute any additional equity to the transaction.

### The Ratings Agencies Downgrades

Fischel also cited the ratings agency downgrades that took place in advance of Step One and Step Two as "highly relevant market evidence on the issue of solvency," opining that "[t]he

---

[232] NPP 416 (5/11/07 email between P. Cohen and J. Dimon); *see also* NPP 191 (2/6/07 email from J. Persily to D. Wirnam).
[233] NPP 303 (3/29/07 Moody's Investor Service Letter) at TRB0098756, 0098757.
[234] NPP 1619 (10/9/07 email between I. Novoselsky and D. Schuster) at MS_104984.
[235] NPP 511 (7/26/07 email between J.P. Casey and A. O'Brien).
[236] *Id.*

ratings assigned to Tribune around the time of April 2, 2007 and as of June 4, 2007 are indicative of a highly leveraged company but not one that is insolvent." [237] As Tuliano testified, however, ratings issued by ratings agencies are not intended to be proxies for solvency.[238] Nevertheless, the downgrades do indicate the ratings agencies' beliefs that the Company was at a heightened risk of default at both Step One and Step Two, and thus support, rather than contradict, Tuliano's findings. Specifically, in advance of ***Step One***:

- Standard & Poor's ("S&P") downgraded the Company to a BB- from a BB+, noting that the "rating would reflect the company's highly leveraged capital structure, weakened credit metrics, and reduced cash flow-generating capability as a result of its LBO."[239] Pursuant to S&P's rating definitions, companies with a BB or B rating "may be vulnerable to default even during benign conditions because of sector-specific or issuer-specific characteristics and events."[240]

- Moody's downgraded the Company's Corporate Family Rating to a Ba3 from a Ba1, downgraded the Senior Notes to a B2 from a Ba1, and downgraded the PHONES Notes to a B2 from a Ba2, noting that the "the increase in leverage is occurring at a time of pressure on Tribune's advertising revenue and operating margins."[241]

- Fitch Ratings ("Fitch") downgraded the Company to a BB- from a BB+ on April 2, 2007, noting that the "action reflects the significant debt burden the announced transaction would place on the company's balance sheet as its revenue and cash flow have been declining." Fitch further downgraded the Company to a B+ on May 3, 2007.[242]

Additionally, S&P cautioned that a more prolonged sector downturn would subject the Company to a payment default in 2009, and found that in that event the Company's assets would not be sufficient to cover the Senior Notes or the PHONES Notes:

> [g]iven the amount of priority debt ahead of [the Senior Notes], upon close of the proposed bank transaction, Standard & Poor's will assign them a

---

[237]DCL 1106 (Fischel Rpt.) at ¶¶ 24-28.
[238] 3/18/11 Trial Tr. 98:18-20 (Tuliano).
[239] NPP 944 (Tuliano Rpt.) at 40, 111, 150; NPP 1317 (4/2/07 S&P Research Report).
[240] NPP 730 (6/3/09 S&P, "Understanding Standard & Poor's Rating Definitions").
[241] NPP 944 (Tuliano Rpt.) at 40, 111, 150; NPP 303 (3/29/07 Moody's Investor Service Letter).
[242] *Id.* at 40, 111, 150; DCL 769 (Fitch Downgrades for Tribune's IDR).

recovery rating of '5', indicating the expectation for negligible (0%-25%) recovery of principal in the event of a payment default.[243]

In advance of or at Step Two, all three ratings agencies issued further downgrades, indicating an even greater risk of default.[244]  Fischel's assertion that these downgrades are evidence of the Company's **solvency** is not credible.

### The Yields to Maturity On The Company's Bonds and Credit Default Swaps

Fischel also testified that the yield to maturity on the Company's bonds in advance of Step One demonstrates that the Company was solvent at that time, stating that if "investors in the marketplace consider the new entity . . . a sufficiently riskier venture . . . they would demand a much higher rate of return, which would manifest itself in much higher yields."[245]  In support of this assertion, Fischel cited to a chart comparing the yield to maturity on the Company's debt against those of comparable companies and rating indices.[246]  Yet, as the chart demonstrates, the yield to maturity on three of the five Tribune bond issuances is higher than all of the other yields shown, with the exception of rating indices for (i) companies in distress, (ii) companies having a rating of Ca to D, and (iii) companies having a rating of CCC or lower.[247]  These indices include companies that have defaulted or are in bankruptcy.[248]

Moreover, Tuliano testified that the Tribune bonds were highly illiquid, trading between only one and seven times a day.[249]  Conversely, the Company's credit default swaps ("CDS"), which is essentially insurance against the risk of default, could be purchased in a far more liquid

---

[243] 3/18/11 Trial Tr. 98:14-17 (Tuliano); NPP 944 (Tuliano Rpt.) at 111; NPP 302 (3/29/07 S&P Letter); NPP 378 (S&P Tribune Research Update) at JPM_00148673.
[244] NPP 944 (Tuliano Rpt.) at 112; NPP 528 (8/20/07 S&P Rating Action Update); NPP 668 (12/20/07 S&P Tribune Research Update); NPP 605 (11/29/07 Moody's Rating Action); NPP 667 (12/20/07 Fitch Ratings Action); NPP 782 (Exam'rs Rpt.), Vol. I at 462-464, n.2139, n.2142; NPP 531 (8/20/07 S&P Recovery Report) at JPM_00107629.
[245] 3/10/11 Trial Tr. 96:12-23, 197:2-15 (Fischel); DCL 1106 (Fischel Rpt.) ¶¶ 29-31.
[246] *Id.* at 197:2-15 (Fischel); DCL 1106 (Fischel Rpt.) at Ex. A.
[247] DCL 1106 (Fischel Rpt.) at Ex. A.
[248] 3/10/11 Trial Tr. 197:16-198:11 (Fischel).
[249] 3/18/11 Trial Tr. 100:3-8 (Tuliano)

market. Thus, CDS offered a cheaper and easier way for a creditor to protect against loss on its bond than selling the bond, and is a more accurate market indicator of the Company's solvency than the yields to maturity on the illiquid bonds.[250]

The spread on the Company's CDS increased significantly in April 2007, the month in which the LBO was announced, and continued to rise steadily thereafter.[251] Additionally, there was a substantial spike in the CDS spread in July. This coincided with (i) the disclosure that cash flow at the Los Angeles Times, the Company's largest newspaper, fell 27% in the second quarter, marking, in the words of the newspaper's publisher, "one of the worst quarters [the newspaper had] ever experienced,"[252] and (ii) the Company's decision to revise downward the projections for 2007 to reflect the Company's deteriorating performance through the second quarter.[253] According to an article published by Bloomberg, the Company's CDS prices implied that "investors consider[ed] the company the fourth-riskiest debt issuer among" a group of almost 1,200 worldwide.[254] Similarly, Merrill Lynch observed that the cost of the Company's CDS as of July 20, 2007 indicated "a 49 percent risk of default."[255]

The vast majority of the information regarding the Company's performance through the second quarter of 2007, including operating results for January through April and information regarding advertising revenue and circulation for May, was readily available to Company management at the Step One close.[256] Accordingly, as discussed above, the Company could have, and should have, revised the projections then. As Tuliano testified, had they done so, it is

---

[250] 3/18/11 Trial Tr. 99:4-100:24 (Tuliano).
[251] *Id.* at 101:1-6 (Tuliano); NPP 944 (Tuliano Rpt.) at 151.
[252] NPP 502 (7/20/07 Bloomberg Article) at 1.
[253] 3/18/11 Trial Tr. 101:6-23 (Tuliano); NPP 501 (7/20/07 Merrill Lynch Problem Exposure Report); NPP 944 (Tuliano Rpt.) at 114-115.
[254] 3/18/11 Trial Tr. 102:9-14 (Tuliano); NPP 944 (Tuliano Rpt.) at 114.
[255] NPP 944 (Tuliano Rpt.) at 114(quoting NPP 501 (7/20/07 Merrill Lynch Problem Exposure Report)).
[256] NPP 782 (Exam'rs Rpt.), Vol. I at 94, n.251.

likely the CDS spreads would have been even higher prior to Step One.[257]

The CDS spreads also spiked just prior to Step Two, providing yet another market indicator of the Company's deepening insolvency. Indeed, the Examiner found that the "significant" increase in pricing in the Company's CDS, as well as the discounts to par at which Tribune's bonds and bank debt were trading, contradicts a finding that the Company was solvent at Step Two.[258]

### The LBO Lenders' Internal Analyses and Decision to Fund

Fischel testified that the Company's solvency at Step One and Step Two is also evidenced by the LBO Lenders' "internal analysis of value" and "their decision to fund" the LBO.[259] But, as Black admitted, "banks do finance deals and lend to companies where there is a likelihood of insolvency."[260] And the record is replete with documents showing that here, the LBO Lenders decided to participate in and proceed with the LBO for reasons that were wholly unrelated to a belief that the Company was solvent. For example, contemporaneous communications show the LBO Lenders were highly motivated by fees, with JPMorgan commenting "ka-ching!" and "wooooo hoooo!" over its $75 million payday, and Persily citing "big fees" as a reason she was warming to the deal.[261] Additionally, on March 28, 2007, four days before the LBO Lenders committed to fund Steps One and Two, Jeffrey Sell, the former head of the Special Credits Group at JPMorgan, wrote to his supervisor that he had "told the team I'm not comfortable approving

---

[257] 3/18/11 Trial Tr. 101:24-102:19 (Tuliano).
[258] NPP 782 (Exam'rs Rpt.), Vol. I at 552-557.
[259] 3/10/11 Trial Tr. 95:25-96:7 (Fischel); DCL 1106 (Fischel Rpt.) at 6-8.
[260] 3/9/11 Trial Tr. 202:8-13 (Black).
[261] NPP 1263 (3/29/07 Cohen email) at JPM_00284644; NPP 193 (2/8/07 email from J. Persily to R. Zogheb); NPP 782 (Exam'rs Rpt.), Vol. I at 265; *see also* NPP 1322 (4/5/07 email between P. Cohen and K. Parkhill). Documents also show that in advance of Step One, Merrill Lynch was also very focused on the fees it would reap from the LBO. NPP 1175 (3/11/07 email between M. Costa and T. Kaplan) at ML-TRIB-0385024-25; NPP 1141 (2/24/07 email between M. Costa and C. Kenney) at ML-TRIB-1075295.

the new structure [of the LBO] for the reasons cited but would understand if Senor [sic]

Mangemnt [sic] wanted to do this to further the Zell relationship."[262]

Moreover, in an email dated March 29, 2007, Persily wrote that Chad Leat, her boss's

boss, did not want to commit to "this highly leveraged deal," because he was "scared that the

co[mpany] [would] deteriorate[]."[263]  Persily's emails show that the head of Citigroup's Mergers

& Acquisitions group pressured Persily and Leat to commit to the transaction, because he and his

colleagues were "very afraid that Morgan Stanley (advisor to the special committee)" would use

the fact that "Citi drop[ped] at the last minute" against Citigroup "in marketing all the time."[264]

Persily wrote:

> Chad feels pressure to move forward. (I do also at this late date) owing to
> franchise risk.  Firm is sensitive to point that morgan stanley is advisor to
> special committee and will trash us in the mkt if we back away now.[265]

Fischel's reliance on the LBO Lenders' decision to fund is also undermined by the fact

that the LBO Lenders attempted to minimize their exposure by syndicating the overwhelming

majority of their LBO debt.  Citigroup, for example, sought to syndicate the entirety of its more

than $3.1 billion term loan commitment.[266]  And Bank of America underwrote $112.5 million of

the Company's $750 million revolving credit facility (the "Revolver"), but targeted to reduce its

holding to as little as $35 million as Step One approached.[267]  Likewise, Merrill Lynch

committed to funding $207.9 million of the Revolver and $78.9 million of the Delayed Draw

Term Loan, but subsequently targeted to hold only $50 million of that exposure on its books.[268]

---

[262] NPP 289 (3/28/07 email between J. Sell and B. Sankey) at JPM_00353677.
[263] NPP 296 (3/28/07 emails between J. Persily and J. Fishlow Minter).
[264] NPP 284 (3/28/07 email between J. Persily and C. Leat).
[265] NPP 297 (3/29/07 email between J. Persily and J. Purcell); *see also* NPP 296 (3/29/07 email between J. Persily and J. Fishlow Minter) (Ms. Persily writes: "Christina afraid that Morgan Stanley (special advisor to the board) will trash us in the market place.  That's what got me on Board! [sic]").
[266] NPP 435 (5/17/07 Citi Leveraged Finance Final Approval Memorandum) at 3.
[267] NPP 399 (BOA Credit Approval Report) at 4.
[268] NPP 501(7/20/07 Merrill Lynch Problem Exposure Report) at ML-TRIB-0211277, 0211283.

With respect to Step Two, as described *infra*, contrary to Fischel's assertion, the LBO Lenders moved forward with the LBO **not** because of a belief that the Company was solvent, but because they determined that they were contractually bound to do so, **notwithstanding** their knowledge that the Company was insolvent.[269]

### Other Contemporaneous Market Participants

An abundance of additional evidence also shows that other contemporaneous market participants believed that the Company could not handle the heavy debt burden imposed by the LBO. Potential investors demonstrated their skepticism of this transaction and wariness of the Company's financial condition through a lack of interest in the transaction. On May 10, 2007, for example, Todd Kaplan, Merrill Lynch's Chairman of Global Leveraged Finance, wrote that he had "misjudged [the] level that investors would require here," noting that the "major pushback has been on [the] newspaper business," and attributing the difficulties in syndicating not to market conditions generally, but to "this deal" specifically.[270] And JPMorgan's head of global credit agreed with Merrill Lynch that the syndication problems were "deal specific."[271] In a draft email to JPMorgan CEO Jamie Dimon, a managing director wrote that "investor concerns include total leverage (8.9x EBITDA), continuing deterioration of newspaper industry fundamentals, price and overhang from the expected Second step of the transaction…", and suggested that JPMorgan increase the interest rate on the debt and attempt to sell it at a discount to par.[272] Ultimately, Sell, the head of JPMorgan's Special Credits Group, concluded that "us[ing] fees to increase yield to investor" was "the right approach."[273] Bank of America also concluded that the only way to convince investors to take up some of its Revolver exposure was

---

[269] *See infra* at II.G.
[270] NPP 414 (5/10/07 email between T. Kaplan and V. Nesi) at ML-TRIB-0390795.
[271] NPP 1409 (5/11/07 email between C. Linneman and D. McCree) at JPM_00351771.
[272] NPP 416 (5/11/07 email between P. Cohen and J. Dimon).
[273] NPP 424 (5/12/2007 email between J. Sell and B. Sankey) at JPM_00353687.

to reserve more than $2.6 million in fees to cover losses from selling a portion of its exposure at a discount to par.[274]

Moreover, Houlihan Lokey, which was contacted by the Company in late March regarding a possible solvency retention, declined the engagement, noting that it "may be tough" to conclude that the company was solvent.[275]  Houlihan affirmed this opinion in mid-December, when it was contacted by Citigroup to challenge VRC's solvency opinion, concluding "if we end up where I think we all know we would end up with our analysis, we may be the ones to 'kill the deal' so to speak . . ."[276]  Ben Buettell, a Managing Director at Houlihan Lokey, remarked on December 7, 2007 that the "company was insolvent in [M]ay and more so now."[277]

### G.    The LBO Lenders Do Not Have A Good Faith Defense

The LBO Lenders cannot maintain any "good faith" defenses under Bankruptcy Code section 548(c).  As discussed *supra*, the evidence shows that the LBO Lenders committed to the "highly leveraged" LBO notwithstanding a heightened awareness that it burdened the Company with an enormous debt load it could not sustain.[278]  The evidence also shows that, by the fall of 2007, they knew that completing Step Two would render the Company insolvent.  In a memo marked "Highly Confidential, Internal Distribution Only," JPMorgan wrote:

> JPMorgan deal team's DCF and sum of the parts analysis based on revised July projection indicate that the current valuation of Tribune is approximately $[10] to $[13] billion, ***potentially failing the solvency tests (i.e., debt amount exceeds value of Borrower)***.[279]

---

[274] NPP 462 (6/5/07 BOA Modification to Credit Approval Report) at 4.
[275] NPP 275 (3/28/07 email between B. Buettell and A. Stull).
[276] NPP 632 (12/12/07 email from B. Buettell to J. Werbalowsky, et al.).
[277] NPP 2451 (12/7/07 email between B. Buettell and S. Reynolds).
[278] *See* Section II.F.
[279] NPP 544 (9/10/07 JPM Memo) [in original].

Similarly, Todd Kaplan of Merrill Lynch informed the Zell entity on August 20, 2007 that it was "highly unlikely that [the Company's solvency firm] can get there."[280]  Daniel Petrik of Bank of America echoed this sentiment on September 10, 2007, stating "I think the solvency opinion might be difficult, in my opinion."[281]

Moreover, solvency analyses prepared by each of JPMorgan, Merrill Lynch and Citigroup in the days leading up to the Step Two close concluded that the Company was insolvent under various scenarios.[282]  Specifically:

- Solvency analyses prepared by Citigroup using Citigroup valuation parameters (rather than VRC's) and "Citigroup Projections" show that the Company was **insolvent by more than $1.4 billion**.[283]  Notably, Ms. Persily testified that Citigroup "didn't believe the Company's projections were achievable" and "created [its] own set."[284]

- Solvency analyses prepared by Merrill Lynch show that the Company was **insolvent by more than $1.5 billion** in the "low" cases, and **by at least $287 million** in the "mid" cases.[285]

- Solvency analyses prepared by JPMorgan on December 13 and December 18, 2007 show that Tribune was **insolvent** in certain "low" and "stress" cases.[286]

The evidence also shows that the LBO Lenders did not want to go forward with Step Two, but believed they were contractually obligated to do so.  In an email regarding a July 3, 2007 call with the Company, Persily stated "I expect a real problem.  Let's hope that it is so bad that they trip the 9x covenant that they have to meet to close Step 2."[287]  Persily reiterated this sentiment on July 20, 2007, stating:

---

[280] NPP 1513 (8/20/07 email between B. Pate and N. Larsen).
[281] NPP 543 (9/10/07 email from D. Petrik to S. Seaton).
[282] Bank of America does not appear to have conducted its own solvency analyses prior to Step Two.
[283] NPP 20 (Project Tower Materials).
[284] Persily Dep. Tr. 92:14-17.
[285] NPP 1830 (12/16/07 Tribune Valuation Analysis); NPP 1831 (12/16/07 Tribune Valuation Analysis); NPP 1832 (12/16/07 Tribune Valuation Analysis) (emphasis added).
[286] NPP 640 (12/13/07 JPM Tribune Valuation Update) at JPM_00156022; NPP 658 (12/18/07 JPM Tribune Valuation Update) at JPM_00155179 (emphasis added).
[287] NPP 482 (6/29/07 email between J. Persily and T. Dilworth).

I'm told there are only 3 ways that the deal won't close:
-they miss the 9x gteed debt covenant
-they don't get a solvency opinion
-whatever the FCC determines causes a MAC in the broadcasting
business.
I'm hoping for one of the first two.[288]

In the days preceding the Step Two close, the LBO Lenders weighed their belief that the

Company was insolvent against this perceived contractual obligation to fund.[289]  Notes from a

December 14, 2007 meeting taken by Petrik of Bank of America reflect these deliberations:[290]

JPM - Not 100% final but leaning
Going ahead and funding
Risk greater if do not fund

MRL - Not 100% but leaning to not fund
- Reasonable that not a solvent company
- Not planning on being lone wolf

Citi - Numerous and not significant to not fund
- More risk if end up in bk
- Focus on understanding risk of not funding

- Not yet landed

. . . if in good faith—good defense[291]

Not surprisingly, JPMorgan. Citigroup and Bank of America each referred the LBO debt to their

distressed groups *prior* to the Step Two close.[292]  And JPMorgan downgraded its Tribune credit

(following a series of prior downgrades) *the day after Step Two closed*.[293]

[288] NPP 497 (7/20/07 email between J. Persily and T. Dilworth).
[289] *See, e.g.*, Persily Dep. Tr. at 224:11-15, 225:6-12, 230:8-25.
[290] NPP 1821 (12/14/07 Petrik Handwritten Notes); Petrik Dep. Tr. 204:13-205:4, 211:6-17, 230:11-231:7 (testifying that the notes accurately reflect portions of the December 14, 2007 call with LBO Lenders).
[291] *Id.*
[292] Persily Dep. Tr. 161:12-162:11 (testifying that Tribune was placed on Citi's Enhanced Monitoring list in August 2007); Petrik Dep. Tr. 158:15- 160:6 (testifying that Tribune was referred in August 2007 to Bank of America's Special Asset Group, for credits going through difficult situations); 3/9/11 Trial Tr. 45:17-22 (Kulnis video) (Kulnis Dep. Tr. 34:24-35:11).
[293] NPP 670 (12/21/07 email from J. Kowalczuk to M. Kulnis) at 00572350.

## III. THE DCL PLAN CANNOT BE CONFIRMED BECAUSE NON-LBO CREDITORS WOULD RECEIVE FAR GREATER RECOVERIES IF THE CLAIMS WERE LITIGATED

### A. There Are Numerous Litigation Outcomes That Would Result In Non-LBO Creditor Recoveries Far In Excess Of The Proposed Settlement

The DCL Plan Proponents' contention that the Proposed Settlement is fair and reasonable depends on their assumption that only one litigation outcome against the LBO Lenders could result in greater recoveries for the Non-LBO Creditors—full avoidance of the obligations incurred at both Step One and Step Two.[294] The DCL Plan Proponents concede that, were the claims to be litigated, full avoidance would result in all Non-LBO Creditors receiving full payment of their respective claims against the Debtors' estates.[295] Nevertheless, the DCL Plan Proponents contend that the Proposed Settlement is generous because a court or jury is unlikely to find Step One avoidable, and therefore the chances of full avoidance are low.[296] The DCL Plan Proponents are wrong.

First, as explained above, the facts demonstrate that the claims seeking to avoid, subordinate or disallow both the Step One and Step Two debt stand a strong chance of prevailing.[297] On this basis alone, the Proposed Settlement is inadequate. Second, full avoidance is **not** the only litigation outcome that would result in the Non-LBO Creditors recovering more than the paltry consideration offered in the Proposed Settlement. Rather, the record establishes that there are several other probable, if not highly probable, litigation outcomes vis-à-vis the

---

[294] *See* 3/7/11 Trial Tr. 44:11-22 (Opening Statement); 3/8/11 Trial Tr. 93:20-94:6 (Kurtz); 3/9/11 Trial Tr. 113:5-114:5 (Black); DCL Confirmation Brief at 29-30, 34-35, 37 [ECF No. 8173].

[295] *Id.* at 44:19-22 (Opening Statement) ("This is the home run litigation scenario . . . [i]f step one is avoided in its entirety, it's a complete win for the notes, for the PHONES, for the parent general unsecureds."); *see also* 3/9/11 Trial Tr. 113:5-114:5, 170:21-171:5 (Black).

[296] *See* 3/7/11 Trial Tr. 44:23-45:16 (Opening Statement); 3/9/11 Trial Tr. 170:21-171:5 (Black); DCL Confirmation Brief at 29-31 [ECF No. 8173].

[297] *See supra* at II.

LBO Lenders that would result in litigation proceeds that dwarf the Proposed Settlement. For this reason, the Proposed Settlement cannot be deemed reasonable.

### 1. Step Two Avoidance, With WEAR, Provides A Full Recovery To The Senior Notes And A Substantial Recovery To The PHONES Notes

One of the litigation outcomes that the DCL Plan Proponents (intentionally) ignore is the scenario where Step One debt is allowed and Step Two debt is avoided, but the Step One Lenders are not permitted to participate in any of the resulting disgorgement or the distributions that otherwise would have gone to the holders of Step Two debt. As detailed above,[298] a determination that the Company was rendered insolvent by Step Two is all but a foregone conclusion, irrespective of the likely outcome respecting Step One. The DCL Plan Proponents and their witnesses concede as much.[299]

Nevertheless, the DCL Plan Proponents contend that the avoidance of the Step Two obligations will not result in significant recoveries for the Non-LBO Creditors because the Step One Lenders would swallow up most of the value that otherwise would have gone to the Step Two Lenders, and most of the disgorged payments recovered as a result of the avoidance of the Step Two debt.[300] While the Step One Lenders would recover approximately 75.7% of their allowed claims if the Step Two obligations are *not* avoided, under the DCL Plan Proponents' theory, the Step One Lenders would recover 100% of their allowed claim if Step Two *is* avoided.[301] Therefore, if the DCL Plan Proponents were correct, the Step One Lenders would actually *gain* from the avoidance of Step Two debt.

---

[298] *See supra* at II.F.
[299] *See* 3/9/11 Trial Tr. 108:1-12 (Black).
[300] *See* DCL Confirmation Brief at 31-32, 34 [ECF No. 8173]; 3/7/11 Trial Tr. 46:1-13 (Opening Statement); 3/9/11 Trial Tr. 38:11-19 (Kulnis).
[301] *See* NPP 2473 (NPP Opening Demonstrative) at 1; *see also* DCL 329 (NPP Specific Disclosure Statement) at 37 (estimating 100% of recovery for Step One claims if the Step Two debt is avoided and Step One Lenders are entitled to benefit therefrom, and 75.6% recovery for Step One if the LBO Debt is not avoided).

Equity, settled legal doctrine and the facts of this case preclude such a result. As discussed in detail in the NPP Objection, doctrines of waiver, equitable estoppel, and assumption of the risk (collectively referred to as "WEAR") work on parallel tracks to prevent the facilitators of, and willing participants in, a transaction from benefiting from that transaction's avoidance or undoing at least until those innocent parties who did not participate in and were harmed by the transaction are made whole.[302]

The WEAR doctrine directly applies to the facts of this case. The record establishes that the Step One Lenders willingly participated in the Step Two financing. Indeed, the original Step One lenders and the Step Two lenders were one and the same.[303] In addition, these lenders conceived of Step One and Step Two as part of a single transaction, and always assumed that both steps would take place. They planned and analyzed the steps simultaneously,[304] committed to them together on the same day,[305] and marketed them "concurrently."[306] Furthermore, the Step One Lenders structured the financing of both steps to be interlocking by entering into a loss-sharing provision that made the Step One and Step Two debt fungible.[307] They also negotiated and obtained enhanced pricing and fees for their Step One debt based on the assumption that Step Two would close.[308] Finally, as detailed above, the Step One Lenders also come to the table with "unclean hands." The evidence demonstrates that the LBO Lenders were more concerned by their own franchise risk and the lure of large fees than they were with the wisdom of the

---

[302] *See* NPP 2474 (NPP Objection) at 116-128.

[303] As noted in the Examiners' Report, the lenders who participated in Step One are "the same creditors (or their successors) who . . . participated in, funded, and made possible the Step Two Transactions." NPP 782 (Exam'rs Rpt.), Vol. II at 301.

[304] *See e.g.*, NPP 451 (5/29/07 JPM Tribune Transaction Proposal); NPP 435 (5/17/2007 Citi Leveraged Finance Final Approval Memorandum); NPP 399 (5/3/2007 BOA Credit Approval Report).

[305] *See* NPP 1335 (4/5/07 Amended & Restated First Step Commitment Letter); NPP 1336 (4/5/07 Amended & Restated Second Step Commitment Letter).

[306] *See* NPP 342 (Tribune Confidential Information Memorandum) at 28.

[307] NPP 1899 (Senior Unsecured Interim Loan Agreement) §§ 2.13, 2.15.

[308] NPP 1420 (Executed Copy of Credit Agreement) at 2-3.

transaction, and marched headlong into Step Two with the full knowledge that the Company was insolvent, but with the comfort of the "equity cushion" provided by its existing debt.[309]

If, under the WEAR principles, the Step One Lenders are barred from participating in the value created by the avoidance of the Step Two obligations—and, with these facts, they clearly should be—then the avoidance of Step Two would produce a **full** recovery to Senior Noteholders and very substantial payment to the holders of the PHONES Notes.[310]  Specifically, there would be about $1.6 billion of value available from the avoidance of the Step Two obligations[311] and $318 million (before prejudgment interest) from the disgorgement of Step Two fees and payments.  There is simply no justification to disregard this scenario in assessing the reasonableness of the Proposed Settlement.

Incredibly, while the DCL Plan Proponents pretend that this possible litigation scenario does not exist, ***the pending Creditors' Committee Complaint against the LBO Lenders asserts multiple claims based on WEAR seeking this very relief***.  Count Four alleges that the Step One Lenders should be estopped from sharing in any value resulting from an avoidance of Step Two because they planned and participated in Step Two and knowingly and intentionally assumed the risk that the Company would be rendered insolvent.[312]  Similarly, Count Five seeks to estop the LBO Lenders from benefitting from the avoidance and recovery of Step Two as intentionally fraudulent transfers.[313]  And Count Seven also seeks similar relief under the theory of unjust enrichment, arguing that if Step One is permitted to benefit from an avoidance of Step Two, the LBO Lenders will receive a greater distribution in the event that the Step Two obligations are

---

[309] *See supra* at II.G.
[310] *See* 3/15/11 Trial Tr. 241:9-242:10 (Gropper).
[311] $2.1 billion of Step Two debt claims, at the artificially low $6.75 billion DEV, would produce approximately $1.6 billion in recovery.  3/15/11 Trial Tr. 241:9-13 (Gropper).
[312] NPP 2203 (UCC First Amended Complaint against JPM) at 53-55.  Black admitted that he failed to review this complaint against the LBO Lenders before performing his opinion that the proposed DCL settlement was fair.  *See* 3/9/11 Trial Tr. 197:16-199:9 (Black).
[313] NPP 2203 (UCC First Amended Complaint against JPM) at 55-57.

avoided and recovered.[314]  Both the Creditors' Committee Complaint and the Examiner's Report recognize that claims based on the doctrines incorporated in the WEAR theory are totally independent and distinct from equitable subordination and equitable estoppel, as a legal matter, such that WEAR might well apply even if full equitable estoppel does not.[315]  The strong probability that a court would apply WEAR to prevent Step One Lenders from sharing in the proceeds of Step Two avoidance and disgorgement, establishes that the Proposed Settlement is patently unreasonable and cannot be approved.

> ### 2.  Step Two Avoidance Even Without WEAR Provides Nearly Full Recovery To The Senior Notes, General Unsecured Creditors And PHONES Notes With A DEV Higher Than $6.75 Billion

The Non-LBO Creditors can also achieve near full recoveries with the avoidance of just the Step Two obligations even if WEAR does not apply.  If the Court determines that the Debtors' DEV is higher than the $6.75 billion contemplated in the DCL Plan—and there is significant evidence that it is[316]—then a finding of fraudulent conveyance at Step Two together with a determination not to allow the Step One Lenders to collect post-petition interest would bring far greater recoveries to the Senior Notes, General Unsecured Creditors, and PHONES Notes.[317]  In fact, Black conceded that "as you … raise the value … knocking out step two only [ ] starts to become an important source of recovery for the notes."[318]

The DCL Plan Proponents conveniently ignore this litigation outcome in arguing the reasonableness of the Proposed Settlement.  Without entitlement to post-petition interest, the

---

[314] NPP 2203 (UCC First Amended Complaint against JPM) at 60-62.
[315] *Compare* NPP 2203 (UCC First Amended Complaint against JPM) at 65-67 (Count 9 alleging claims based on equitable subordination and equitable disallowance), *with id.* 53-57 (Counts Four and Five alleging claims based on WEAR); *compare* NPP 782 (Exam'rs Rpt.), Vol. II at 332, 339 (presenting the Examiner's conclusions regarding claims based on equitable subordination and equitable disallowance), *with id.* at 298, 301-303, Annex B (discussing the possibility that the doctrine of equitable estoppel could prevent Step One from recovering value accruing from an avoidance of Step Two, even if the standards governing equitable subordination are not satisfied).
[316] *See supra* at VI.
[317] *See* 3/15/11 Trial Tr. 297:3-298:17 (Gropper).
[318] 3/9/11 Trial Tr. 162:3-5 (Black); *see id.* 162:6-15, 165:13-166:5 (Black).

Step One Lenders cannot recover more than $6.47 billion, the amount of their allowed claims. Thus, assuming that only Step Two is avoided, at a $7.5 billion DEV, nearly $1.2 billion dollars in value would flow directly to Non-LBO Creditors because the Step One Lenders will have been paid in full.[319] The DCL Plan Proponents cannot contest that this litigation outcome would produce significant recoveries for the Non-LBO Creditors.

Instead, the DCL Plan Proponents argue that, before any value can flow to Tribune's creditors, the Step One Lenders must be paid post-petition interest.[320] However, before the Step One Lenders can be entitled to receive post-petition interest, the pre-petition intercompany claims of Tribune against the Guarantor Debtors have to be paid in full. Because there is insufficient value at the Guarantor Debtors to satisfy all of their liabilities (including the intercompany claims), post-petition interest cannot be paid to the Step One Lenders under any circumstance. Moreover, in order for the Step One Lenders to be paid post-petition interest from the Guarantor Debtors, at least one of the Guarantor Debtors must be solvent.[321] Based on the valuation analyses conducted by both Lazard and Raymond James, none of the Guarantor Debtors will be solvent. Accordingly, the Step One Lenders would not be entitled to post-petition interest, and so this scenario would lead to significant recoveries for the Non-LBO Creditors.

### 3. Avoidance Of Both Steps At The Parent Level Alone Would Provide The Non-LBO Creditors With Full Recovery

Another litigation scenario which undermines the Proposed Settlement involves avoidance at both Step One and Step Two, but only at the parent level (or avoidance of the LBO

---

[319] *See* 3/15/11 Trial Tr. 297:3-298:17 (Gropper); 3/9/11 Trial Tr. 161:20-162:15 (Black).

[320] *See* DCL Confirmation Brief at 61-62 [ECF No. 8173].

[321] *See In re PPI Enterprises (U.S.), Inc.*, 324 F.3d 197 (3d Cir. 2003) (holding that a solvent debtor must pay postpetition, pre-confirmation interest on a claim to render such claim unimpaired); *In re Washington Mut., Inc.*, 442 B.R. 314, 356 (Bankr. D. Del. 2011) (internal citations omitted).

debt at the parent level and subsidiaries, but the value at the subsidiaries remains "trapped"). Under these scenarios, the Senior Notes, other Parent Claims and PHONES Notes would receive a full recovery. Specifically, an avoidance of parent-level debt would lead to the disgorgement of about $1.87 billion in payments at Step One and $318 million in payments at Step Two.[322] The Step One and Step Two disgorgement, combined with the approximately $564 million of value at the Tribune level,[323] would provide a recovery of $2.75 billion dollars for the Non-LBO-Creditors at the parent—more than enough to pay those creditors in full.

### 4. Equitable Subordination, Disallowance, And Aiding And Abetting

The LBO Lenders' decision to move forward with Step Two of the LBO for their own business and pecuniary interests, notwithstanding their knowledge that it would render the Debtors insolvent and significantly prejudice the Pre-LBO Noteholders, also supports several meritorious claims against the LBO Lenders, including claims for equitable subordination, equitable disallowance, and aiding and abetting the Debtors' breaches of fiduciary duties. In the LBO context, these claims may be independently maintained where, as here, a lender, motivated by greed, knowingly and recklessly facilitates an LBO transaction despite its knowledge of insolvency.[324] All of these claims, if successful, would yield a full recovery for Non-LBO Creditors (plus post-petition interest).

---

[322] A schedule of the pre-petition payments made by Tribune to the LBO Lenders is available in the Examiner's Report, Volume II Annex C. *See* NPP 782 (Exam'r Rpt.), Vol. II at Annex C; *id.* Vol. I at 207-210, 461-62.

[323] The DCL Plan uses a DEV of $6.75 billion with 8.4% (or $564 million) allocated to Tribune and 91.6% (or $6.19 billion) allocated to the Subsidiary Debtors (on a consolidated basis). DCL 1039 (Exhibits to DCL Joint Disclosure Statement) at Ex. F.

[324] *See* NPP 2474 (NPP Objection) at 137-45; *see, e.g., Schubert v. Lucent Tech. (In re Winstar Commc'ns, Inc.),* 554 F.3d 382, 411 (3d Cir. 2009); *In re O'Day,* 126 B.R. 370, 412 (Bankr. D. Mass. 1991); *In re Yellowstone Mountain Club, LLC,* No. 08-61570-11, 2009 WL 3094930, at *9 (Bankr. D. Mont. May 12, 2009); *In re HealthCo Int'l II,* 208 B.R. 288, 301, 309 (Bankr. D. Mass. 1997); *In re OODC, 321 B.R. at 144-45; Official Comm. of Unsecured Creditors v. Fleet Retail Finance Grp. (In re Hechinger Inv. Co.),* 274 B.R. 71, 94 (Bankr. D. Del. 2002).

## B. Decision-Tree Analysis Of The Examiner's Findings Establishes That The Proposed Settlement Consideration Is "Not Even Close" To Reasonable

The Proposed Settlement should also be rejected because the settlement consideration is unreasonable given the Examiner's findings. The parties offered competing expert witnesses at trial on this specific issue. On the one hand, the Noteholder Plan Proponents presented Dr. Bruce Beron—an expert with over 20 years of experience analyzing the reasonableness of settlements using expected value and decision-tree analysis.[325] Accepted by the Court as an expert in his field, Beron relied exclusively on the Examiner's conclusions to undertake a methodical and comprehensive analysis of the LBO Claims against the LBO Lenders.[326] Based on that analysis, Beron testified that (i) these claims have an expected value of $1.51 to $1.83 billion, (ii) they have a high chance of producing a recovery far in excess of the consideration offered in the Proposed Settlement[327] and (iii) therefore, the Proposed Settlement is "not even close" to reasonable.[328] His trial testimony fully substantiated these opinions, and his initial and rebuttal expert reports were admitted at trial in full.[329]

In contrast, the DCL Plan Proponents' proffered witness, Black, did not perform anything remotely approaching the rigor and objectiveness of Beron's analysis. Instead, he relied on a totally subjective approach, and gave opinions that relied on decision-trees he calculated "in his

---

[325] NPP 2476 (Beron Rpt.) at 1; 3/17/11 Trial Tr. 104:5-106:5 (Beron).

[326] *Id.* at 2-3; 3/17/11 Trial Tr. 115:17-116:3, 160:18-161:6 (Beron); *see also id.* 120:8-25 (Beron) (accepting Beron as an expert witness).

[327] *See id.* at 3, 5, 16, 17; *see also* 3/17/11 Trial Tr. 144:12-16, 167:5-19, 167:25-168:20 (Beron).

[328] 3/17/11 Trial Tr. 170:4-11 (Beron); *see also* NPP 2474 (NPP Objection) at 49-50, 59-60 (cases cited therein where courts rejected settlements because they were less than the expected value of the litigation or the litigation had better than 50% chance of success).

[329] *See id.* 145:12-20, 165:6-18, 250:16-257:16 (Beron) (admitting into evidence NPP 2476 (Beron Rpt.) and NPP 957 (Beron Rebuttal Rpt.); *see also* 3/17/11 Trial Tr. 120:8-25 (Beron) (accepting Beron as an expert witness). Beron's qualifications and extensive experience in decision-tree and expected value analysis are well established. Beron began his career at the Stanford Research Institute, or SRI, where the modern technique of decision-tree analysis was developed and promulgated. He has since spent over 20 years as a litigation risk consultant, advising scores of Fortune 500 clients about the reasonableness of settlements using expected value and decision-tree analysis. *See* 3/17/11 Trial Tr. 103:11-18, 104:5-20, 105:3-106:5, 106:20-108:13 (Beron); NPP 2476 (Beron Rpt.) at 1.

head"—and that he later had to correct.[330]  He also ignored the Examiner's findings and reached his own conclusions of law and fact, even though he admitted he is not a bankruptcy law expert and he never conducted his own factual investigation.[331]

Beron modeled virtually every conceivable litigation outcome for the fraudulent conveyance claims in six sets of complex decision trees to determine the probabilities of various recovery outcomes and to compute the expected value of the claims.[332]  These decision trees lay out the potential outcomes associated with the elements needed to establish and defend against the fraudulent conveyance claims, and map how those outcomes lead to a variety of different recovery amounts for the Non-LBO Creditors based on conclusions assigned by the Examiner.[333]

As Beron explained at trial, decision-tree and expected value analysis is a common and well-accepted technique often used to assess the reasonableness of settlements.[334]  Indeed, the DCL Plan Proponents did not even bother to try to refute the legitimacy of this methodology at trial and Liebentritt, the Debtors' Chief Restructuring Officer, acknowledged in his deposition that he has relied on decision-tree analysis in the past to evaluate appropriate settlement value of claims.[335]

In performing his analysis, Beron relied exclusively on the Examiner's conclusions, which are well-suited for the decision-tree analysis he performed.[336]  A court-appointed examiner is an "objective nonadversarial party," whose report should act as a "resource containing

---

[330] 3/9/11 Trial Tr. 230:5-231:2 (Black).

[331] DCL 1484 (Amended Black Rpt.) at 3, 17-18, 23-24; 3/9/11 Trial Tr. 194:22-196:22, 197:16-199:9 (Black).

[332] *See* 3/17/11 Trial Tr. 127:3-128:12, 136:15-17 (Beron); NPP 2476 (Beron Rpt.) at 7.

[333] *See* 3/17/11 Trial Tr. 108:20-109:9, 127:3-128:12, 136:15-17 (Beron); NPP 2476 (Beron Rpt.) at 19-20; NPP 957 (Beron Rebuttal Rpt.) at 11, 15.

[334] *See* 3/17/11 Trial Tr. 106:2-5, 106:20-24 (Beron); NPP 957 (Beron Rebuttal Rpt.) at 11; NPP 2474 (NPP Objection) at 48-50 (cases and articles cited therein).

[335] *See* Liebentritt Dep. Tr. 78:3-79:21.

[336] *See* NPP 2476 (Beron Rpt.) at 2-3; 3/17/11 Trial Tr. 115:17-116:3, 160:18-161:6 (Beron).

information and observations of an independent expert."[337]  There is no dispute that the

Examiner fits that description.  His investigation is by far the most comprehensive factual and

legal review of the LBO Claims and, as the only truly independent party to undertake that

review, he was in the best position to provide the most neutral assessments of those claims—

points the Debtors and their experts have repeatedly conceded.[338]

In constructing his decision trees, Beron relied on the Examiner's specific, "bottom-line"

conclusions, based on what was known to the Examiner at the time of his investigation, for each

element, defense and important issue relating to the fraudulent conveyance claims at Step One

and Step Two.[339]  The Examiner "frame[d]" those "conclusions … in a uniform fashion" along a

"continuum" of seven, verbal descriptors.[340]  Because the Examiner did not attribute a numerical

probability to these conclusions, Beron determined probability percentages for each, which are

comparable to the ranges assigned by Black to those same phrases:[341]

---

[337] *In re Fibermark, Inc.*, 339 B.R. 321, 325 (D. Vt. 2006) ("The record compiled by the examiner is meant to be a source of information that assists parties in identifying assets of the estate, evaluating a plan of reorganization, or describing likely and legitimate areas for recovery.").

[338] *See* NPP 2186 (DCL Solicitation Motion) at ¶ 69 ("Accordingly, the exhaustive investigations already conducted and the extensive record already developed should guide the structure of the confirmation process relating to the LBO-Related Causes of Action. Indeed, the Court previously has noted as much, explaining that the Examiner's Report would 'probably inform not just the parties, but the Court about the scope … of the Confirmation Hearing.'"); 3/8/11 Trial Tr. 138:14-16 (Kurtz) (conceding Examiner is "formidable academic in the bankruptcy arena"); 3/9/11 Trial Tr. 201:10-13 (Black) (conceding Examiner is "independent in the sense that he had no bias against any of the parties").

[339] NPP 782 (Exam'rs Rpt.), Vol. I at 4; NPP 2476 (Beron Rpt.) at 19-20; 3/17/11 Trial Tr. 121:3-122:8 (Beron).

[340] *Id.* at Vol. I at 6; *see also* 3/17/11 Trial Tr. 122:9-123:3 (Beron).

[341] *See* NPP 2476 (Beron Rpt.) at 6; DCL 1484 (Amended Black Rpt.) at 13; NPP 957 (Beron Rebuttal Rpt.) at 2-3; NPP 2519 (NPP Beron Demonstrative) at 26.  These percentages are the "base set" of percentages Beron assigned to the Examiner's conclusions.  For purposes of running a sensitivity analysis on these percentage determinations, Beron also performed his calculations using a "contracted set" and "spread set" of percentages. Because the "contracted" and "spread" set percentages did not have a material effect on his analysis, his conclusions are based on the "base set."  *See* NPP 2476 (Beron Rpt.) at 6-7.  Although Black assigned ranges of percentages to the Examiner's conclusions (instead of a singular percentage for each of the seven descriptors as Beron did), the mid-point of Black's ranges were essentially the same as the base set of percentages used by Beron.

| Examiner's Seven Sets of Conclusions | Probability Percentages Assigned by Beron | Probability Ranges Assigned by Black |
|---|---|---|
| Highly Likely | 85% | ≥ 85% |
| Reasonably Likely | 70% | 70-85% |
| Somewhat Likely | 60% | 55-70% |
| Equipoise | 50% | 45-55% |
| Somewhat Unlikely | 40% | 30-45% |
| Reasonably Unlikely | 30% | 15-30% |
| Highly Unlikely | 15% | ≤ 15% |

For example, because the Examiner concluded that it was "somewhat likely" that a court would find that the Step Two financing was an intentional fraudulent conveyance,[342] Beron assigned a 60% probability to this conclusion in his trees.[343]

These probabilities were inputted into two decision trees Beron created for the fraudulent conveyance claims against the LBO Lenders for the Step One and Step Two financings.[344] These two trees yielded a total of 104 fraudulent transfer outcomes.[345] After combining these outcomes into a third tree to map the potential litigation outcomes for both Step One and Step Two,[346] Beron organized the outcomes from this tree into seven "branches," so that he could combine like outcomes and differentiate between (i) those outcomes that did not result in an avoidance of any of the LBO debt, (ii) those that involved the avoidance of the Step One debt, the Step Two debt or both, (iii) those that involved different outcomes at the parent and subsidiary levels, and (iv) those where the intentional fraudulent conveyance claims succeeded at either step (because these claims are not subject to a section 546(e) defense).[347]

---

[342] NPP 782 (Exam'rs Rpt.), Vol. II at 32.
[343] *See* NPP 2476 (Beron Rpt.) at 28.5, 38; 3/17/11 Trial Tr. 124:2-16 (Beron).
[344] *See* 3/17/11 Trial Tr. 129:4-135:12 (Beron); NPP 2476 (Beron Rpt.) at 27.5, 28.5.
[345] *See id.* at 130:10-15, 136:3-17 (Beron); NPP 2476 (Beron Rpt.) at 27.5, 28.5.
[346] *See id.* at 135:13-139:1 (Beron); NPP 2476 (Beron Rpt.) at 29.5.
[347] *See id.* at 137:2-139:1 (Beron); NPP 2476 (Beron Rpt.) at 29.5.

Beron inputted these seven branches of outcomes into a fourth decision tree that implemented the Examiner's conclusions regarding various statutory and equitable defenses and remedies (which were modeled by two other sets of decision trees created by Beron).[348] This recovery tree then used a waterfall recovery model produced by Aurelius to identify the potential recoveries to the Non-LBO Creditors for each outcome in this tree.[349] Inputting the recovery amounts generated by that waterfall model, Beron computed specific recoveries for each outcome in his recovery tree, which he in turn used to calculate the expected value of the fraudulent conveyance claims against the LBO Lenders.[350]

In developing the decision trees for his analysis, Beron made a number of conservative assumptions. Each one of these assumptions led to a lower expected value determination for the LBO Claims.[351] For example, Beron's analysis did not include any recoveries for the Non-LBO Creditors in scenarios involving a "partial avoidance"—where there is a finding of avoidance at the parent level but not at the subsidiary level, or vice versa.[352] Also, because the Examiner never addressed the issue, to the extent Step Two debt was not considered for the "capital

---

[348] *See* NPP 2476 (Beron Rpt.) at 31.5, 33.5, 35.5; 3/17/11 Trial Tr. 141:19-142:10 (Beron). Specifically, based on the Examiner's conclusions, this tree modeled whether: (i) the section 546(e) defense could apply to outcomes involving a finding of constructive fraudulent transfer; (ii) parent creditors could recover value from subsidiary estates when both the parent and subsidiary levels of LBO Lender debt are avoided; (iii) equitable disallowance or subordination would apply; and (iv) the Step One Lenders could participate in recoveries and distributions from the avoidance of Step Two debt. *See id.*

[349] *See* 3/17/11 Trial Tr. 143:20-144:16 (Beron); NPP 31 (Aurelius Waterfall Recovery Model); *see also* 3/16/11 Trial Tr. 22:12-24:10 (Gropper); Over the DCL Plan Proponents' objection, the Court held that Beron's reliance on the Aurelius waterfall model was appropriate under FRCP, 703, which permits experts to base their opinions on information "reasonably relied upon by experts in the particular field." 3/17/11 Trial Tr. 257:15-16. As the Court implicitly held, it was perfectly reasonable for Beron to rely on the Aurelius waterfall model, an excel spreadsheet that simply performs mathematical recovery calculations based on uncontroversial facts concerning the Debtors' capital structure and creditor priorities, and the litigation outcome probabilities provided to Aurelius by Beron from his decision trees. 3/16/11 Trial Tr. 23:25-24:10.

[350] *See* 3/17/11 Trial Tr. 140:17-144:11 (Beron); NPP 2476 (Beron Rpt.) at 33.5.

[351] *See id.* at 145:23-151:17 (Beron); NPP 2476 (Beron Rpt.) at 23-24.

[352] *See id.* at 148:5-149:3 (Beron). For instance, one scenario ("scenario 8") involved an outcome resulting in a constructive fraudulent conveyance for Step One at the parent level, but not at the subsidiary level. Because this scenario was grouped into a branch of outcomes that do not give credit for fraudulent conveyance at Step One, this scenario did not contribute to any recoveries for Non-LBO Creditors under Beron's analysis. *See* NPP 2476 (Beron Rpt.) at 29.5; 3/17/11 Trial Tr. 138:8-139:1 (Beron).

adequacy" or "ability to pay" financial condition tests, the trees modeled the tests as if they were satisfied in favor of the LBO Lenders so there was no chance of a finding of constructive fraud at Step One in those scenarios.[353] Beron made similarly conservative assumptions with respect to equitable disallowance and subordination, and the section 548(c) lender good faith defense.[354] In total, Beron assumed 100% LBO Lender success on 17 different nodes in his decision trees.[355]

Based on this thorough analysis, and his 20-plus years of experience of assessing the reasonableness of settlements with decision-tree and expected value techniques, Beron concluded that the Proposed Settlement was "not even close" to reasonable.[356] His computations showed that the expected value of litigating the LBO Claims against the LBO Lenders was $1.57 billion to $1.79 billion.[357] In addition, Beron determined that there was a 74% chance that the recovery for the Non-LBO Creditors in litigation would *exceed* the Proposed Settlement, and a 57% chance that they would recover *in full* if the litigation was pursued.[358] Therefore, the DCL Plan Proponents are asking the Court to approve a settlement that is roughly *one-third* of the expected value of the litigation and that would release claims that have a significant chance of prevailing.

### C.    Black's Limited Rebuttal Of Beron's Analysis Is Baseless

Faced with this comprehensive analysis grounded on a methodology they could not and did not challenge, the DCL Plan Proponents attempted to discredit Beron with the opinions and testimony of Black. Essentially, Black offered largely legal opinions masqueraded as expert analysis, which were aimed more at the Examiner and his findings than at Beron. In any event,

---

[353] *See id.* at 146:14-148:4 (Beron); NPP 2476 (Beron Rpt.) at 23-24.
[354] *See id.* at 149:4-151:17 (Beron); NPP 2476 (Beron Rpt.) at 24.
[355] *See id.* at 146:14-151:17 (Beron); NPP 2476 (Beron Rpt.) at 24; NPP 2519 (Beron Trial Demonstrative) at 21-24.
[356] *See id.* at 170:4-11 (Beron).
[357] *See id.* at 144:12-16, 169:21-170:3 (Beron). The expected value of $1.57 billion is for the "low PHONES scenario." If the PHONES Notes claim amount is assumed higher (the "high PHONES scenario"), then the expected value is $1.79 billion. *See* NPP 2476 (Beron Rpt.) at 4.
[358] NPP 2476 (Beron Rpt.) at 16; 3/17/11 Trial Tr. 166:21-167:19 (Beron).

on rebuttal, the Court refused to permit Black to testify as a decision-tree expert or to provide decision-tree analysis,[359] and the few limited points he was allowed to address are, as discussed below, without factual or legal basis.[360]

### 1. Beron Properly Relied On The Examiner's "Bottom-Line" Conclusions

Unhappy with the Examiner's conclusions, Black contended on rebuttal that Beron took those conclusions out of context.[361] For example, Black suggested that when the Examiner concluded that it was "reasonably unlikely" for a court to conclude that there was an intentional fraudulent conveyance at Step One,[362] the Examiner must have meant that there was actually *no* likelihood of such a finding because the Examiner stated elsewhere in his report that he "did not find credible evidence" that there was an actual intent to defraud creditors at Step One.[363]

In conducting his analysis, however, Beron did exactly what the Examiner instructed the readers of the Examiner's Report to do—looked at the opening conclusion of each section analyzing the issues regarding the fraudulent conveyance claims against the LBO Lenders.[364] Specifically, the Examiner stated up front that his Report was organized to allow a reader to quickly find the Examiner's "bottom-line" conclusions on every issue at the "outset" of each "subsection" in Volume II of his report:

---

[359] *See* 4/12/11 Trial Tr. 123:16-22, 124:21-125:3 (Black).

[360] *See id.* at 141:13-147:8. *See also, e.g., Brooks v. Outboard Marine Corp.*, 234 F.3d 89, 92 (2d Cir. 2000) (granting summary judgment where plaintiff's expert had been excluded and thus plaintiff had no evidence in the record to support a claim for design defect). *Cf. In re Hanover Direct, Inc. S'holders Litig.*, Nos. 1969-CC, 3047-CC, 3291-CC, 2010 WL 3959399, *1-2 (Del. Ch. Sept. 24, 2010) (accepting respondent's position regarding valuation in shareholder appraisal action after rejecting petitioner's valuation expert trial testimony and assigning full weight to testimony of respondent's expert).

[361] *See* 4/12/11 Trial Tr. 141:13-143:3, 180:12-25 (Black) (Black testifying that Beron wrongly assumed "it doesn't matter what else the examiner said about the particular situation"); *id.* at 180:24-25 (Black) (Black testifying he thinks "the examiner does not restrict himself to the seven main categories").

[362] NPP 782 (Exam'rs Rpt.), Vol. II at 22.

[363] 4/12/11 Trial Tr. 142:15-21 (Black) The statement focused on by Black is contained in a completely separate volume of the Examiner's multi-volume Report from where he stated his "bottom-line" conclusion regarding intentional fraudulent conveyance at Step One. *Compare* NPP 782 (Exam'rs Rpt.), Vol. I at 7 *with* NPP 782, Vol. II at 22.

[364] *See* NPP 2476 (Beron Rpt.) at 3; 3/17/11 Trial Tr. 121:3-122:8 (Beron).

The Examiner has organized this portion of the Report (as well as Volume Three) ***to enable the reader to obtain, in a relatively quick fashion, the Examiner's "bottom line"*** regarding the issues presented. To accomplish this objective, the Report sets forth the Examiner's conclusions regarding the principal issues addressed in ***each subsection at the outset of that subsection, followed immediately by the Examiner's factual and legal analysis***.[365]

Thus, the Examiner provided expressly that his "bottom line" conclusions reflect and are informed by all of the detailed analysis found in other related sections of the Examiner's Report. Black's attempt to contradict the Examiner's conclusion based on a single phrase plucked out of the Examiner's discussion – in a separate Volume of the Report – flouts the carefully designed structure of the Examiner's Report.

Thus, Beron was correct to rely on the conclusion found at the "outset" of the Examiner's discussion that an intentional fraudulent transfer was "reasonably unlikely," and to populate the corresponding node in his decision tree with the percentage associated with that phrase.[366] Finally, Beron was consistent in his approach, and also did not consider statements in the Examiner's Report that were favorable to the Non-LBO Creditors if those statements were not part of the Examiner's "bottom-line" conclusions—a fact Black conveniently ignores.[367]

---

[365] NPP 782 (Exam'rs Rpt.), Vol. I at 4 (emphasis added).

[366] NPP 2476 (Beron Rpt.) at 7-8; 3/17/11 Trial Tr. 123:4-124:1 (Beron). Notably, the Examiner did not assign his lowest probability phrase – highly unlikely – to the issue of intentional fraud at Step One. NPP 782 (Exam'rs Rpt.), Vol. I at 6; *id.* Vol. II at 22; 3/17/11 Trial Tr. 123:4-124:1 (Beron); *see also* DCL 1484 (Amended Black Rpt.) at 14, 42-43.

[367] For example, for each of Step One and Step Two, the Examiner determined in Volume II that it was "highly likely" (that is, an 85% chance using Beron's probabilities) that a court would find that reasonably equivalent value was not exchanged. NPP 782 (Exam'rs Rpt.), Vol. II at 90. But the Examiner also concluded flat out in Volume I that "the Tribune Entities did not receive reasonably equivalent value" for the LBO Transaction as a whole. NPP 782 (Exam'rs Rpt.), Vol. I at 19. If Beron did as Black suggested, he could have ascribed a 100% chance that these findings would be made.

## 2. That Beron Did Not Make Certain Findings Contingent Upon Or Correlated With Others Is Not A Flaw And, In Any Event, Has No Material Effect On His Analysis

Black also claimed on rebuttal that Beron's analysis should have correlated certain elements of the fraudulent conveyance claims and remedies.[368]  For example, Black argued that the Examiner's conclusions regarding intentional fraudulent conveyance must be read as duplicative of his conclusions as to constructive fraudulent conveyance—and thus add nothing to the expected value of the litigation—because a finding of the former cannot happen without a finding of the latter.[369]  He also contended that the Examiner's conclusions regarding the three financial condition tests for constructive fraudulent transfer must be correlated.[370]

Black is wrong for several reasons.  First, Beron modeled the Examiner's Report, and when the Examiner concluded that specific aspects of the fraudulent conveyance claims were related in some way, he explicitly stated so.[371]  For example, the Examiner conditioned his findings on balance-sheet insolvency at Step One on his conclusion as to whether Step Two debt should be included with the Step One debt.[372]  The Examiner also expressly conditioned his conclusions regarding the financial condition test of the intent to incur debts beyond the ability to pay and the test for good faith for a section 548(c) defense on his conclusion as to whether those tests should be subjective or objective.[373]  In contrast, the Examiner did not conclude that a finding of intentional fraud is contingent upon a finding of any of the elements of constructive

---

[368] *See* 4/12/11 Trial Tr. 143:4-144:18 (Black).
[369] *See id.* at 143:7-144:5 (Black); *see also* 3/17/11 Trial Tr. 203:19-25 (Beron).
[370] *See id.* at 143:13-144:18 (Black); *see also* 3/17/11 Trial Tr. 229:8-233:12 (Beron).
[371] 3/17/11 Trial Tr. 203:19-25, 229:19-21, 236:2-7 (Beron).
[372] *See* NPP 782 (Exam'rs Rpt.), Vol. II at 77; 3/17/11 Trial Tr. 133:4-22, 135:1-6, 146:14-147:9 (Beron).
[373] *See id.* at Vol. II at 239-240; 3/17/11 Trial Tr. 204:5-12 (Beron).

fraud, nor that the three financial condition tests under 548(a)(1)(B) should really be treated as just one test.[374]

Second, Black's position is not only inconsistent with the Examiner's Report, it directly contradicts the evidence and the law. Some "badges of fraud" used to establish a intentional fraudulent transfer—like insolvency or lack of value—are also elements needed to establish a constructive fraudulent transfer.[375] However, the law is clear that a party does not need to prove any particular badge of fraud to prevail on a claim for intentional fraudulent transfer.[376] In this case the record compiled by the Examiner reveals multiple badges of fraud which would sustain a finding of intentional fraudulent conveyance independent of his findings of insolvency and lack of reasonably equivalent value.[377] For example, the Examiner found evidence of "secrecy, concealment, or dishonesty" at Step Two, a badge of fraud that supports a finding of an intentional fraudulent conveyance regardless of whether or not the elements of constructive fraud are also present.[378] That claims for intentional fraudulent and constructive fraudulent conveyance require different and independent forms of proof is also not subject to debate. In addressing the fraudulent transfer claims asserted against the Tribune shareholders, the Creditors' Committee itself told this Court that "[w]hile the respective causes of action may implicate

---

[374] *See* 3/17/11 Tr. 203:19-25, 229-:19-21, 236:2-7 (Beron); 3/9/11 Trial Tr. 241:17-18 (Black); 4/12/11 Trial Tr. 182:3-10 (Black).

[375] *See Liquidation Trust of Hechinger Inv. Co. v. Fleet Retail Fin. Group (In re Hechinger Inv. Co.)*, 327 B.R. 537, 550-51 (D. Del. 2005) (citing authorities), *aff'd*, 278 F. App'x 125 (3d Cir. 2008); *Moody v. Sec. Pac. Bus. Credit, Inc.*, 127 B.R. 958, 990 (Bankr. W.D. Pa. 1991), *aff'd*, 971 F.2d 1056 (3d Cir. 1992).

[376] *See In re Manhattan Inv. Fund Ltd.*, 397 B.R. at 8 ("'badges of fraud are not a prerequisite to a finding of actual fraudulent intent'") (quoting *In re Actrade Financial Technologies Ltd.*, 337 B.R. 791, 791 (Bankr. S.D.N.Y. 2005)); *see also Fisher v. Sellis (In re Lake States Commodities, Inc.)*, 253 B.R. 866, 871 (Bankr. N.D. Ill. 2000) .

[377] NPP 782 (Exam'rs Rpt.) Vol. II at 22-77; *see also supra* at II.B.

[378] *Id.* at Vol. II at 35-36; *see also In re Lake States Commodities*, 253 B.R. at 871 ("The focus in the inquiry into actual intent is on the state of mind of the debtor. Neither malice nor insolvency are required.").

similar operative facts, it cannot be disputed that [] the *prima facie* elements of (and the required evidence to support) the different claims … are ***demonstrably different***."[379]

Likewise, with respect to the three financial condition tests for constructive fraudulent transfer, the Bankruptcy Code states the tests in the disjunctive, and does not provide that a finding of one is conditioned upon the finding of another.[380]  Indeed, the test for balance sheet solvency is clearly independent from the other two tests for adequacy of capital and ability to pay—a company may be balance sheet solvent but have inadequate capital or be unable to pay its debts as they become due.[381]  Therefore, the Examiner's Report is consistent with prevailing law, and Beron correctly modeled the three tests as unrelated.

Third, Black admitted on cross-examination that if one were to revise Beron's decision trees and probabilities to reflect any alleged correlation between various conclusions of the Examiner (as Black argued for), to be consistent any revision would also have to include changes that increased, as well as decreased, his expected value conclusion.[382]  Black further admitted that there would in fact be several potential revisions to Beron's decision trees that would

---

[379] Creditors' Committee Statement in Support of Aurelius's State Law Actions Motion at ¶¶ 8-9 [ECF No. 8396] (emphasis added); *see also* NPP 2532 (3/22/11 Hr'g Tr.) at 58:20-23 (counsel for Creditors' Committee explaining: "[T]he two claims really are not the same.  There are different pleading elements, different burdens of proof, different recoveries, and of course, most notably different defenses.").
[380] *See, e.g.*, *In re Vadnais Lumber Supply, Inc.*, 100 B.R. 127, 133-137 (Bankr. D. Mass. 1989) ("Because the statute is in the disjunctive, we deal only with the issue of unreasonably small capital, finding and ruling that this element has been established… Unreasonably small capitalization is not the equivalent of insolvency in either the bankruptcy or equity sense.").
[381] *See id.*; *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Services Co.*, 910 F. Supp. 913, 943-945 (S.D.N.Y. 1995) ("A transfer may be set aside as fraudulent if the transferor, though its assets exceed its liabilities, is rendered unable to pay its debts as they come due.") (*citing Crowthers McCall*, 129 B.R. at 997); *Boyer v. Crown Stock Distribution, Inc.*, 587 F.3d 787, 794-95 (7th Cir. 2009).  ("The difference between insolvency and "unreasonably small" assets in the LBO context is the difference between being bankrupt on the day the LBO is consummated and having at that moment such meager assets that bankruptcy is a consequence both likely and foreseeable…. Focusing on the second question avoids haggling over whether at the moment of the transfer the corporation became 'technically' insolvent, a question that only accountants could relish having to answer.'").
[382] 4/12/11 Trial Tr. 183-191 (Black).

increase Beron's conclusions as to the probability of success of the LBO Claims against the LBO Lenders and their overall expected value.[383]

Finally, Black never attempted in his rebuttal testimony to quantify in any way what the impact would be on the value of the litigation if Beron had modeled the Examiner's conclusions as Black claimed they should be. Beron, on the other hand, did run sensitivities and testified about them at trial. Specifically, he adjusted the decision trees so that (i) a finding of the ability to pay debts could not be made if there was not first a finding of inadequate capital, and (ii) a finding of equitable subordination could not be made if there was not first a finding of equitable disallowance.[384] Beron also adjusted the way in which his recovery decision-tree modeled whether Step One Lenders could participate in the recovery of disgorgements and distributions to the extent Step Two debt was avoided.[385] Making these adjustments, the expected value of the fraudulent conveyance claims against the LBO Lenders under Beron's analysis would still be at least $1.3 billion—2.3 times higher than the consideration being offered to Non-LBO Creditors in the Proposed Settlement.[386] Therefore, even if one were to accept, *arguendo*, that some of the Examiner's findings on fraudulent transfer are correlated, Beron's analysis would still show that the Proposed Settlement is far from reasonable.

### 3. Beron Was Correct Not To Include Potential Litigation Trust Recoveries In Analyzing The Fairness Of The Proposed Settlement

Black also testified that he thought Beron's analysis was incomplete because it did not examine the potential recoveries from the Litigation Trust proposed under the DCL Plan.[387] As discussed in more detail below, the Litigation Trust recoveries are both unsupported and

---

[383] *Id.* at 183-191 (Black) (admitting intentional fraudulent transfer and constructive fraudulent transfer would almost certainly be found at Step Two if it was first found at Step One; admitting that an adverse ruling on certain defenses would be dispositive of or materially reduce the LBO Lenders' chances of prevailing on other defenses).
[384] *See* 3/17/11 Trial Tr. 246:20-250:3 (Beron).
[385] *See id.* at 173:9-176:8 (Beron).
[386] *See id.* at 248:1-12 (Beron).
[387] *See* 3/9/11 Trial Tr. 146:16-147:16 (Black).

irrelevant to an assessment of the reasonableness of the Proposed Settlement.[388]  The purpose of

Beron's analysis was to determine the expected value of the LBO Claims actually being settled

in the Proposed Settlement—namely, the fraudulent transfer claims against the LBO Lenders.

Therefore, his $1.57 billion expected value figure is directly comparable to the approximately

$557 million in consideration offered to the Non-LBO Creditors under the DCL Plan.[389]

### 4. There Is No Reason To Discount The Expected Value Of The LBO Claims For The "Time Value Of Money"

Black also contended in his rebuttal testimony that Beron should have discounted his

expected value determination for the time value of money.[390]  Again, this is less an attack of

Beron than it is a complaint about the Examiner, who did not take into account the time value of

money in calculating example recovery cases for the LBO Claims.[391]  In lodging this criticism,

Black failed to take into account pre-judgment interest, which would more than offset any

discount that might reasonably apply for the time value of money.  As Beron testified, it is not his

practice to discount the time value of money in an expected value analysis precisely because of

this pre-judgment interest offset.[392]

Therefore, this Court should disregard Black's attempts on rebuttal to critique Beron's

comprehensive analysis.  Instead, it should rely on Beron's conclusions finding the Proposed

Settlement to be far from reasonable, based on the Examiner's neutral determinations and

Beron's 20-plus years of decision-tree and expected value analysis.

---

[388] *See infra* at V.
[389] *See* NPP 2476 (Beron Rpt.) at 3; 3/17/11 Trial Tr. 165:20-166:20 (Beron).  Recoveries for the Non-LBO Creditors under the DCL Plan are estimated to be $557 million (excluding recoveries for the Swap Claim). *See* DCL 1429 (DCL Specific Disclosure Statement) at 13-16; DCL 376 (General Joint Disclosure Statement) at 24.
[390] 4/12/11 Trial Tr. 146:4-17 (Black).
[391] 3/17/11 Trial Tr. 236:21-237:6, 237:16-238:5 (Beron); NPP 782 (Exam'rs Rpt., Vol. II at (Annex B).
[392] *Id.* at 237:1-10 (Beron).

### D. Black's Affirmative Opinions and Testimony Should Also Be Completely Disregarded

The affirmative testimony of Black deserves little, if any, evidentiary weight. Instead of performing the robust decision-tree and expected value analysis that Beron undertook, Black conceded he did his analysis "in [his] head."[393] This back-of-the-envelope analysis resulted in Black having to amend his report in order to change 37 separate probabilities in his tables, all of which were based on his subjective judgment.[394] His approach was also incomplete, omitting 36% of the total probabilities of fraudulent conveyance litigation scenarios[395]—omissions Black conceded necessarily impacts the expected value calculation.[396]

In addition, rather than rely on the Examiner's exhaustive investigation, Black attempted to second-guess the Examiner's factual and legal conclusions.[397] Yet Black conceded he is "not an expert in bankruptcy law."[398] His review of the underlying facts was similarly inadequate. He did not review the complaint asserting the causes of action he was supposed to assess, or the transcripts of the depositions and interviews of the witnesses knowledgeable of the LBO and critical to some of the LBO Lenders' defenses.[399] Black also did not develop any part of his analysis on his own. Instead, he relied on significant input from the Debtors' counsel on the probabilities he used.[400]

---

[393] 3/9/11 Trial Tr. 230:5-231:2 (Black).

[394] *Id.* at 260:13-261:1 (Black); NPP 2465 (page from Black's work papers used to develop Table 3 at Black Report 26, annotated to show changes); *see generally* 3/9/11 Trial Tr. 251:22-261:1 (Black); DCL 1484 (Amended Black Rpt.) at 25, Table 3; NPP 2367 (Black's working spreadsheets); NPP 2465 (comparison of Black work papers); 3/9/11 Trial Tr. 220:13-222:2 (Black).

[395] *See* NPP 957 (Beron Rebuttal Rpt.) at 17-19; 3/17/11 Trial Tr. 164:4-20 (Beron).

[396] *See* 3/9/2011 Trial Tr. 206:18-25 (Black).

[397] NPP 957 (Beron Rebuttal Rpt.) at 5-10; DCL 1484 (Amended Black Rpt.) at 3, 17-18, 23-24.

[398] DCL 1484 (Amended Black Rpt.) at 3, 17; 3/9/11 Trial Tr. 180:12-181:2 (Black).

[399] *See* 3/9/11 Trial Tr. 194:22-196:22, 197:16-199:9 (Black).

[400] *See id.* at 188:19-23 ("So I didn't develop the probabilities in Table 3 entirely on my own. I developed them in consultation with Sidley as to, you know, the likely success of different claims in the bankruptcy court."), 185:17-189:4.

Black also skewed his analysis. For 18 of the 22 critical legal issues that he re-examined, Black reached conclusions that were significantly less favorable to the Non-LBO Creditors than the Examiner's conclusions.[401] Of course, that is not surprising since Black had already given the Debtors "real time" advice in support of their DCL Plan before he ever issued his report.[402] The Court therefore should disregard the biased and pre-determined opinions Black offered in his affirmative testimony and initial report, because they are based on unscientific judgments about legal and factual issues for which he has no expertise or familiarity.[403]

## IV. THE BAR ORDER IS INEQUITABLE AND UNSUPPORTED BY THE RECORD

In addition to the proposed estate and creditor releases of all LBO Claims against the LBO Lenders, the DCL Plan Proponents are asking this Court to prospectively (a) bar all contribution and non-contractual indemnity claims to be asserted by the non-settling defendants against the LBO Lenders, and (b) impose **proportionate** judgment reduction in respect of all remaining LBO Claims, including State Law Avoidance Claims (the "Preserved Claims").[404] It is undisputed that this provision has the potential to materially reduce, or even eliminate, additional future recoveries, and was neither negotiated by nor consented to by the Non-LBO Creditors whose recoveries are at stake.

Under the proposed Bar Order, the non-settling defendants' liability and, therefore, the recoveries with respect to the Preserved Claims, will be reduced by the proportionate fault of the

---

[401] *See* NPP 957 (Beron Rebuttal Rpt.) at 8; 3/17/11 Trial Tr. 159:7-160:7 (Beron).

[402] 3/9/11 Trial Tr. 190:19-192:9 (Black).

[403] *See, e.g., Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 580 (1993) (expert must be qualified to give opinion testimony under FED. R. EVID. 702); *Bankruptcy Serv., Inc. v. Ernst & Young (In re CBI Holding Co.),* No. 96-9143A, slip op. at 17-18 (Bankr. S.D.N.Y. Oct. 23, 2000) (Lifland, J.) (excluding testimony of proffered expert in bench trial because expert was conflicted); *Berckeley Inv. Grp. v. Colkitt,* 455 F.3d 195, 217 (3d Cir. 2006) ("expert witness is prohibited from rendering a legal opinion"); *Oddi v. Ford Motor Co.,* 234 F.3d 136, 156, 158-9 (3d Cir. 2000) (expert opinion properly disregarded because it was based on "little, if any, methodology beyond his own intuition" and on "haphazard, intuitive inquiry" that could not be tested, submitted to peer review or assessed by court).

[404] *See* DCL 1586 (DCL Plan) § 11.3.

settling defendants (via contribution), or eliminated all together (via common law indemnification).[405]  The Bar Order therefore constitutes an unjustifiable third-party release of claims, since it would prevent Preserved Claims beneficiaries from recovering their full value.[406]

Moreover, independent of the material affect it may have at trial, proportionate judgment reduction will hand the non-settling defendants an enormous weapon in settlement negotiations, enabling them to maintain that even if they are found liable to the Litigation Trust (or directly to the individual creditors), most or all of the fault should be shifted onto the settling defendants and they will therefore face little, if any, exposure.  Armed with another defense, the non-settling defendants will have little incentive to offer anything beyond a token settlement.

The Bar Order simply may not be approved on the record developed here.  The DCL Plan Proponents have offered no evidence regarding what affect the Bar Order will have on recoveries in respect of the Preserved Claims, or that the consideration to be provided by the LBO Lenders, together with the Bar Order, constitutes reasonable consideration for the underlying releases.[407]  Nor have they offered any evidence of the LBO Lenders' comparative fault vis-à-vis the non-settling defendants.  Without such findings the "hallmarks of permissible non-consensual releases—fairness, necessity to the reorganization, and specific factual finding to support these conclusion—"cannot be deemed present."[408]  On top of these critical gaps in the record, the DCL

---

[405] *Id.* at §11.3.  The Noteholder Plan Proponents do not concede in any respect that contribution or indemnity would have been available to the non-settling defendants, or that judgment reduction will apply (assuming of course the DCL Plan is confirmed).  The LBO Lenders and the non-settling defendants, however, maintain that the non-settling defendants would in fact be entitled to claim over against the arranger banks and LBO Lenders in the absence of a bar order, and, therefore, that they will be entitled to judgment reduction in respect of the Preserved Claims.  *See* 4/13/11 Trial Tr. 121:5-8, 123:1-4, 127:6-12 (McCambridge) (discussing contribution/indemnity claims of D&O defendants); DCL Confirmation Brief at 112-13, 120 [ECF No. 8173].

[406] This Court has recognized the inequity of releasing creditor claims against third parties without consent.  *See In re Exide Techs.*, 303 B.R. 48, 72, 75 (Bankr. D. Del. 2003).  Similarly, in *In re Continental Airlines*, 203 F.3d 203, 214-215 (3d Cir. 2000), the Third Circuit rejected a reorganization plan that released lawsuits against certain non-debtor officers and directors without a sufficient evidentiary and legal basis.  *See also In re Genesis Health Ventures, Inc.*, 266 B.R. 591 (Bankr. D. Del. 2001).

[407] *See* 3/15/11 Trial Tr. 299:3-25 (Gropper); 3/8/11 Trial Tr. 156:22-157:5 (Kurtz).

[408] *In re Continental Airlines*, 203 F.3d at 214.

Plan Proponents offered no evidence that the Bar Order is not severable, or that the LBO Lenders would not have entered into the Proposed Settlement unless the Bar Order was included.

Contrary to the DCL Plan Proponents' assertions, the Bar Order is not at all similar to those approved by other courts.[409]  In each of those cases, the plaintiff made a calculated agreement to potentially limit its own future recoveries against the non-settling defendants based on the amount being paid by the settling defendant(s) and its view of relative fault, and the party objecting to the Bar Order was not the plaintiff but was the non-settling party.[410]

Here, however, the creditors who stand to have their Preserved Claim recoveries limited by the Bar Order, were *not* involved in the negotiation of the settlement,[411] have not consented to the very real risk posed by the Bar Order, and dispute that the meager settlement proposed here is proportionate to the fault that a jury might ascribe to the settling defendants.  While Creditors' Committee's counsel apparently agreed to the Bar Order, that does not bring the proposed Bar Order within the ambit of the cases on which the DCL Plan Proponents rely.  All of the Creditors' Committee members (save one) who voted to approve the Proposed Settlement have no interest in the Litigation Trust because their claims are being paid in full or their contracts are being assumed under the DCL Plan.  ***Hence, these members face none of the risks associated with the Bar Order, yet were eager to impose it on Pre-LBO Noteholders in exchange for their own***

---

[409] *See* DCL Confirmation Brief at 111-14 [ECF No. 8173].

[410] For example, in *In re SemCrude*, the bar order at issue was not opposed by the litigation trustee, who negotiated and agreed to the settlement, or the trust board.  *See In re SemCrude*, Nos. 08-11525, 09-50189 (BLS), 2010 WL 4814377, at *3 (Bankr. D. Del. Nov. 19, 2010) ("The Settlement is also unanimously supported by the governing board of the Litigation Trust, which is comprised of representatives of the Debtors' unsecured and lender creditors.").  The same was true in *Eichenholtz*, where the Third Circuit noted that "[t]he risk of a 'bad' settlement falls on the plaintiffs, who have a financial incentive to make certain that each defendant bears its share of the damages."  *Eichenholtz v. Brennan*, 52 F.3d 478, 487 (3d Cir. 1995).

[411] This problem is present even where plaintiff input is sought, as has been noted by the Fourth Circuit.  *See In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 161 n.3 (4th Cir. 1991) ("the final determination of the amount of setoff is necessarily delayed, making it difficult to frame a notice to the plaintiff class that fairly presents the merits of the proposed settlement." ).

**plan treatment.**[412]  Thus, unlike the facts in the DCL Plan Proponents' line of cases, the parties

put at risk by the judgment reduction clause did not negotiate or agree to the Bar Order and, as a

result, such Bar Order should not be permitted.

The DCL Plan Proponents' case law also is inapposite here—this Court has never

determined, and the DCL Plan Proponents have never argued, the relative fault of the LBO

Lenders.  In the absence of any findings apportioning fault, circuit courts have rejected bar

orders even with judgment reduction.[413]  And the Third Circuit has approved of bar orders only

after determining that the underlying settlement is generous in light of the merit of the

contribution claims being eliminated.[414]

Finally, the Bar Order inappropriately shifts the burden of proving damage allocation

from the non-settling defendants onto the Litigation Trust or individual creditors.  Instead of the

defendants exhausting resources to determine who must contribute to a judgment, the Litigation

Trust (on behalf of Non-LBO Creditors) will be forced to argue in each action that the Debtors'

advisors, directors, officers, and pre-LBO shareholders should be held entirely responsible for

the disastrous LBO and *not* the LBO Lenders, who are barred from contribution or

indemnification.

For the reasons set forth above, based on the record of these cases and under applicable

legal precedent, the Bar Order cannot be approved.

---

[412] *See* DCL 1586 (DCL Plan) at Ex. A, §§ 3.3.5 (Classes 2E through 111E – General Unsecured Claims), 6.5 (Compensation and Benefit Programs); *see also* NPP 2223 (NPP Confirmation Brief) ¶ 11; NPP 2474 (NPP Objection) ¶ 53; *see infra* Section VII(B).
[413] *See Eichenholtz*, 52 F.3d at 487 n.17 (quoting *TBG, Inc. v. Bendis*, 36 F.3d 916, 923 (10th Cir. 1994) ("Since the court did not decide the settling defendants' proportional fault and order a credit in that amount, the court had no power to bar the non-settling defendants' contribution claim.")).
[414] *See In re Nutraquest, Inc*, 434 F.3d 639, 649 (3d Cir. 2006) (also cited by the DCL Plan Proponents, where the Third Circuit noted that the District Court approving the underlying settlement did so based on "the relative weakness of the claims, as shown by plaintiffs' well-researched decision not to sue" the settling defendants) (citing *Johnson v. United Airlines*, 784 N.E.2d 812, 818 (2003)); *see also SemCrude*, 2010 WL 4814377, at *3 (noting "the uncertainty of the Trustee's success on the merits."); *Munford v. Munford, Inc. (In re Munford, Inc.)*, 97 F.3d 449, 456 (3d Cir. 1996) (approving bar order challenged by non-settling defendants upon determination that contribution or indemnity claims were unlikely to prevail and litigating them would deplete any remaining assets of the debtor).

## V. THE POTENTIAL FOR LITIGATION TRUST PROCEEDS DOES NOT CURE THE INADEQUACY OF THE PROPOSED DCL SETTLEMENT

The DCL Plan Proponents contend that the preservation of the Litigation Trust Claims under the DCL Plan adds meaningful additional settlement consideration and supports the overall "reasonableness" of the Proposed Settlement.[415]

This argument fails for several fundamental reasons. First, the DCL Plan Proponents have the burden of proving the value of the alleged consideration being provided under the DCL Plan to settle the claims against the LBO Lenders, and have utterly failed to do so.[416] Despite the DCL Plan Proponents' promise during opening arguments to present evidence showing that the Litigation Trust Claims have "very substantial value" and add significant additional consideration for release of the claims against the LBO Lenders, they produced no evidence on this point at all at trial.[417] Indeed, the Debtors admitted they have no idea what the Litigation Trust Claims are worth, if anything, and were not aware of any DCL Plan Proponent—or anyone else, for that matter—attempting to determine the value of the Litigation Trust Claims.[418]

Instead, the DCL Plan Proponents opted to rely on Black's speculation – which he described as a mere "illustrative assessment"—that the Litigation Trust Claims may be worth as much as $300 million.[419] Black's testimony is neither competent nor credible, and should be given no weight.[420] Black undertook no meaningful analysis of the Litigation Trust Claims, and based his testimony only on a series of dubious assumptions and his "professional judgment."

---

[415] *See* DCL 1586 (DCL Plan) Notice of Filing at 5; 4/14/11 Trial Tr. 150:3-9, 13-21 (Johnston).

[416] *See In re Young Broadcasting Inc.*, 430 B.R. 99, 128 (Bankr. S.D.N.Y. 2010) ("The proponent of a proposed plan bears the burden of proving essential elements of confirmation by a preponderance of the evidence.")

[417] *See* 3/7/11 Trial Tr. 38:17-23 (Sottile); 4/14/11 Trial Tr. 150:13-16 (Johnston).

[418] *See* 3/8/11 Trial Tr. 156:8-18 (Kurtz) ("Q: Now, to your knowledge, the debtor has never attempted to value the claims being preserved for the trust, have they? A: The debtor has never done a valuation, that I am aware of, of the claims that are going into the trust. That's true. Q: Okay. And to your knowledge, no one else has attempted to value those claims, have they? A: Done a valuation on the claims? Q: Yes A: Not that I'm aware of."); *See* Liebentritt Dep. Tr. at 276:22-25:14 (Q: [Y]ou don't know whether the interest in the litigation trusts are worth more or less than $30 million; correct? A: No, does Aurelius?").

[419] 3/9/11 Trial Tr. 147:19-152:2 (Black).

[420] *See id.* at 149:23 (Black).

For example, fully 2/3 of the value Black assigns to the Litigation Trust supposedly comes from the claims against the Company's directors and officers, and Black's wild speculation about what might happen in future settlement negotiations with the Company's D&O insurers concerning those claims. Even though he does not appear to have reviewed the policies at issue, or considered any of the potential defenses or other issues that inevitably arise in coverage litigation, Black states flatly that the insurers would agree to pay 100% of their $200 million in policy limits.[421] This type of back-of-the-envelope supposition cannot possibly satisfy the Debtors' burden of proving that the Litigation Trusts Claims have sufficient value to render the Proposed Settlement reasonable.

Moreover, Blacks' assessment is contrary to his other testimony, which was dismissive of the merits of many of the principal Litigation Trust Claims. Indeed, regarding the D&O claims upon which Blacks' assessment primarily relies, Black testified: "I personally . . . I don't think these claims are very good."[422] Black also testified that VRC, which he described as "the principle [sic] financial advisor here," may not have liability insurance, and therefore may be judgment-proof.[423] In fact, Black's $300 million "assessment" does not actually reflect his *own* view of the value of the Litigation Trust Claims at all; rather, Black is merely speculating about the value that one *might* be ascribed to the Litigation Trust Claims if one makes assumptions about the merits of those claims *that Black himself expressly rejects*.[424] This is not evidence at

---

[421] *Id.* 148:14-17; NPP 2216 (Black Rpt.) at 9-12 (insurance policies not among the documents Black claims to have specifically reviewed).
[422] *See* 3/9/11 Trial Tr. 148:9-12 (Black).
[423] *See id.* at 149:17-22 (Black); Black also indicated his skepticism with respect to other Litigation Trust Claims, testifying that the claims against the shareholders are basically worthless, and asserting that no one has ever "chased shareholders successfully" in connection with a fraudulent conveyance case. *See* 3/9/11 Trial Tr. 150:24-25 (Black) (denying "there's value in the claims at step one"); *id.* 151:10-13 (claiming Step Two claims are a "long shot").
[424] 3/9/11 Trial Tr. 148:9-11 (Black).

all, much less the proof of "substantial value" the DCL Plan Proponents promised to deliver in their opening statement.[425]

The asserted value of these claims is a red herring in any case, since the Litigation Trust Claims will be available to the estates whether or not the DCL Plan is approved, and their preservation under the DCL Plan does not and could not constitute additional consideration to the Non-LBO Creditors no matter what their value.[426] While the DCL Plan Proponents make much of their proposed allocation of a larger share of the Litigation Trust proceeds to the Non-LBO Creditors, once again they offered absolutely no evidence as to the value of that reallocation.

Moreover, the DCL Plan Proponents' argument is based on the assumption that the LBO Lenders—who consented to and actively participated in the fraudulent LBO—would be permitted to receive *any* proceeds from claims arising out of the LBO, much less the "lion's share" of the proceeds that they claim they would be entitled to absent the reallocation provided under the DCL Plan.[427] In fact, the Litigation Trust arguably could be precluded from pursuing the Litigation Trust Claims if the LBO Lenders stand to benefit from those claims. Indeed, JPMorgan has asserted this very point in moving to dismiss claims asserted by the *Lyondell*

---

[425] At trial, DCL Plan Proponent witness Miriam Kulnis claimed that Aurelius "put a lot of value" on the Litigation Trust Claims. 3/9/11 Trial Tr. 78:7-15 (Kulnis). Kulnis is incorrect. In fact, Aurelius and Beron determined the value of the claims against the LBO Lenders that the DCL Plan purports to release, *not* the preserved Litigation Trust Claims, which—as Black himself recognized—are subject to defenses, collectability problems and other obstacles to recovery from which the claims against the LBO Lenders are free. *See* 4/12/11 Trial Tr. 135:17-136:2 (Black). Thus, contrary to Kulnis's claim, there is no evidence in the record from either side establishing the value of the Litigation Trust Claims.

[426] *See* 3/8/11 Trial Tr. 156:8-21 (Kurtz).

[427] *See* 3/9/11 Trial Tr. 115:5-7. While the LBO Lenders will receive Distribution Trust Interests (and Creditors' Trust Interests) under the Noteholder Plan, the priority of such interests will be determined by the courts adjudicating the applicable causes of action. The Noteholder Plan Proponents do not expect that courts with jurisdiction over the LBO Claims and the State Law Avoidance Claims will permit the LBO Lenders to share in any litigation proceeds unless and until the Non-LBO Creditors are paid in full (inclusive of postpetition interest).

litigation trustee (e.g., that amounts due to the LBO Lenders cannot be pursued).[428]  If JPMorgan

is correct, and the LBO Lenders have no right to share in proceeds from LBO Claims at all, their

proposed reallocation of interests in the Litigation Trust could not possibly constitute additional

consideration supporting the Proposed Settlement.[429]

Finally, as a matter of law, any recoveries that may one day be realized from the

Litigation Trust Claims cannot be considered by the Court in making its Rule 9019

determination.  In *Martin*, the Third Circuit opined that to determine the reasonableness of a

settlement, courts should "assess and balance the value of the claim that is being compromised

against the value to the estate of the acceptance of the compromise proposal."[430]  Future

recoveries that *may* result from the prosecution of claims against other parties, however, should

not be considered.  Instead, courts should evaluate the merits of each specific cause of action to

be settled, the relative exposure of the involved parties and the consideration to be paid to settle

the subject claims.[431]  In short, potential recoveries from third parties are not equivalent to

consideration provided by the LBO Lenders and therefore do not impact the value of

consideration offered in connection with the Proposed Settlement.

## VI.    THE DEBTORS' ARTIFICIALLY LOW DEV OF $6.75 BILLION FURTHER ACCENTUATES THE UNREASONABLENESS OF THE PROPOSED SETTLEMENT

[428] NPP 2520 (*Lyondell* Motion to Dismiss) at 44-47 (citing, *In re Refco, Inc. Sec. Litig.*, 2009 WL 7242548, *11 (S.D.N.Y. Nov. 13, 2009).

[429] *See, e.g., Phar-Mor, Inc. Sec. Litig.*, 900 F. Supp 784 (W.D. Pa. 1995) (holding that the trustee of a litigation trust may recover against a third party where the beneficiaries of the trust did not include the culpable parties and therefore the equitable principles of tort liability did not require imputation).  During oral argument, the DCL Plan Proponents asserted that the above precedent was inapposite because the LBO Lenders' bad acts were merely "unproven allegations."  4/14/11 Trial Tr. 152:11-19.  But success on many of the Litigation Trust Claims presupposes that the culpability/liability of the LBO Lenders has been established.

[430] 91 F.3d at 393; *see also Key3Media Group, Inc. v. Pulver.com Inc. (In re Key3Media Group Inc.)*, 336 B.R. 87, 93 (Bankr. D. Del. 2005) (internal citations omitted) (same).

[431] *See In re Washington Mut., Inc.*, No. 08-1229, 2011 WL 57111, *7-8 (Bankr. D. Del. Jan. 7, 2011) (declining to adopt the plan proponents' "holistic approach" and finding that "each part of the settlement must be evaluated to determine whether the settlement as a whole is reasonable"); *In re Fleming Packaging Corp.*, No. 03–82408, 2007 WL 4556981, at *2 (Bankr. C.D. Ill. Dec. 20, 2007) (finding that "[t]he consideration that the estate is receiving must be reasonably equivalent to the value of the disputed claim").

The DCL Plan is predicated on a DEV of $6.75 billion, with 8.4% (or $564 million) allocated to Tribune and 91.6% (or $6.19 billion) allocated to the Subsidiary Debtors (on a consolidated basis).[432] The evidence presented at trial makes clear that this valuation is out of date and depressed, and that the Debtors' true DEV is approximately $1.5 billion higher, thereby further compounding the patent unfairness of the Proposed Settlement. For example, based on this more accurate DEV, the Senior Noteholders could be **paid in full** if just the Step Two debt is avoided, and the holders of PHONES Notes would recover approximately 70% on their claims.[433]

### A.    Lazard Conceded That The Debtors' DEV Is Higher Than $6.75 Billion

The Debtors' financial advisors at Lazard prepared a series of valuation reports in connection with their engagement, each one resulting in a valuation estimate higher than the last. Yet at trial, Lazard stubbornly clung to an earlier, out-of-date, and lower valuation.

In March 2010, Lazard prepared a valuation in connection with the Debtors' June 2, 2010 Disclosure Statement (the "March Valuation Report"), and arrived at a valuation estimate of $6.1 billion—a valuation which certain of the DCL Plan Proponents recognized was "conservative," "likely inaccurate," and inconsistent with trading prices for Tribune debt which indicated that "the market places a much higher value on Tribune."[434] In July 2010, Lazard increased its valuation to about $6.5 billion.[435] Lazard next prepared an October valuation (the "October Valuation Report") which resulted in a valuation estimate of $6.75 billion.[436] The October Valuation Report was an update to, and incorporated the same approach and methodologies as,

[432] *See* DCL 376 (General Joint Disclosure Statement) at Ex. F.
[433] 3/15/11 Trial Tr. 296:23-298:17 (Gropper).
[434] 3/11/11 Trial Tr. 20:9-12, 81:10-15 (Mandava); NPP 1989 (Credit Agreement Lenders' Settlement Statement) at n.4.
[435] *Id.* at 81:16-20 (Mandava).
[436] *Id.* at 81:21-24 (Mandava).

the March Valuation Report.[437]  Three months later, Lazard prepared a further update (the

"January Valuation Report") which resulted in a midpoint valuation estimate of $7.019 billion.[438]

The January Valuation Report was prepared "at the request of Sidley Austin LLP . . . to

summarize Lazard's conclusions as to the total distributable value of the Debtors' consolidated

estates based on the most recently available information."[439]

The January Valuation Report incorporated updated trading multiples and discount rates

based on market data available as of January 19, 2011, and up-to-date performance numbers for

2010 and 2011 projections based on a preliminary version of the 2011 budget (the "Preliminary

2011 Plan").[440]  The Preliminary 2011 Plan was presented to the Board in December 2010, and

was the result of a ground-up process which began in October 2010.[441]  It incorporated month-

end results through November 2010, which were available in the first week of December.[442]

Mandava testified that he agreed with the methodologies, calculations, and results of the

January Valuation Report, including the conclusion of a midpoint valuation estimate of $7.019

billion, and that the valuation work performed in January was accurate.[443]  Likewise, Chachas

testified that, as of February 8, 2011, the January Valuation Report contained Lazard's "most

current estimate" of the Debtors' DEV.[444]  Thus, there can be no dispute that the January

---

[437] 3/11/11 Trial Tr. 81:25-82:5 (Mandava).

[438] *Id.* at 82:12-25 (Mandava).

[439] NPP 2284 (Lazard Valuation Supplement) at 1.
    Although the Lazard Expert Report was signed by two purported valuation experts – David Kurtz and Suneel
Mandava –Kurtz did not provide any testimony at the Confirmation Hearing in support of the DCL Plan DEV; did
not have any expert opinions as to the enterprise value of the Debtors; and did not have an opinion as to whether
DCF, comparable company or precedent transactions analyses contained in the Lazard  Expert Report were accurate
or done correctly.  3/11/11 Trial Tr. 83:13-86:7 (Mandava).

[440] 3/11/11 Trial Tr. 70:18-71:15, 87:19-22 (Mandava).

[441] 3/14/11 Trial Tr. 124:19-125:1, 143:18-144:16 (Hartenstein).

[442] *Id.* at 146:19-147:5 (Hartenstein).

[443] 3/11/11 Trial Tr. 82:19-25, 88:6-12 (Mandava).

[444] *Id.* at 208:16-25 (Chachas)  ("Q:  And as of the February 8th date of the expert report that you submitted, isn't the
January supplement the most current – the most current estimate that Lazard had prepared of Tribune's distributable
enterprise value?  A:  Yes, it was.").

Valuation Report contains a better and more current estimate of the Debtors' DEV than either Lazard's October or March valuation reports.

Incredibly, the Lazard Expert Report submitted on February 8, 2011[445] relies on the $6.75 DEV conclusion from the October Valuation Report—not the January Valuation Report—even though the October Valuation Report was four months old at the time, was based on stale stock prices as of October 4, 2010, and used stale inputs in the DCF such as, the risk-free rate and risk premiums.[446]  Indeed, the January Valuation Report was not even disclosed in the Lazard Expert Report, unlike the March and October valuation reports which were attached, nor was a single reference made to the $7.019 billion valuation conclusion reached by Lazard just weeks earlier.[447]

The DCL Plan Proponents' attempt to depress DEV and bury their own experts' most recent valuation conclusion is understandable, given the impact that the Debtors' true DEV has on the reasonableness of the settlement.  A higher DEV results in a higher recovery for the Senior Lenders, and should also result in the Senior Lenders giving up a greater percentage of their recovery to settle the LBO Claims.[448]  At Lazard's January DEV conclusion of $7.019 billion, the Step One Lenders (and General Unsecured Creditors at the Subsidiary Debtors) would be paid in full under a waterfall plan if only the Step Two debt is avoided (and no post-petition interest is allowed), leaving enough value to pay the Senior Noteholders well in excess of the Proposed Settlement.[449]  As previously explained, and according to the Examiner's Report, the avoidance of Step Two is a virtual certainty if the claims are litigated.  Further, recoveries to Pre-LBO

---

[445] The Companion Expert Report of John G. Chachas is wholly duplicative and provides no additional expert opinions.  *See* 3/11/11 Trial Tr. 193:24-194:5 (Chachas).

[446] 3/14/11 Trial Tr. 187:9-11, 189:1-3 (Hartenstein); DCL 1104 (Chachas Rpt.) Ex. 2 at 1 ("The present estimate of tribune's Total Distributable Value was prepared in October 2010 as an update to Lazard's March 2010 estimate."); *id.* at 6-11, 23, 28, 34.

[447] DCL 1104 (Chachas Rpt.) Ex. 2.

[448] 3/15/11 Trial Tr. 297:19-24 (Gropper).

[449] *Id.* at 296:23-298:17 (Gropper).

Noteholders that would follow from the avoidance of Step Two and the application of WEAR would also materially increase with higher DEV thus, higher DEV directly impacts the settlement value of the LBO Claims against the LBO Lenders. Finally, the expected value of the LBO Claims against the LBO Lenders, as calculated by Beron, would also increase as DEV exceeds $6.75 billion.

Despite their efforts to downplay Lazard's January Valuation Report, the DCL Plan Proponents and their experts were unable to offer any credible evidence showing why the October Valuation Report would provide a better estimate of the Debtors' DEV at the expected June 30, 2011 emergence date than the January Valuation Report. Moreover, the evidence presented at the Confirmation Hearing renders any defense of the $6.75 billion October valuation untenable. Indeed, the use of stale data is contrary to accepted valuation practice, and every valuation expert who testified at the Confirmation Hearing—including the DCL Plan Proponents' two testifying valuation experts—confirmed that it is critical to use the most up-to-date available information in conducting a valuation.[450] Lazard's failure to do so renders the Lazard Report unreliable.

### B. Updating Lazard's Valuation Based On Current Financial And Market Data Results In A DEV Of $7.541 Billion

Lazard's January Valuation Report, while far more current than the October Valuation Report, was still stale as of the date of the Lazard Expert Report. The Noteholder Plan Proponents' valuation expert, Raj Singh, brought Lazard's valuation up-to-date as of the date of

---

[450] 3/14/11 Trial Tr. 188:1-3 (Singh); 3/11/11 Trial Tr. 86:23-87:5 (Mandava), 208:11-15 (Chachas) ("[E]very valuation expert in doing a valuation should rely upon the most up-to-date information available."); *see also, e.g., In re Mirant Corp.,* 334 B.R. 800, 824 (Bankr. N.D. Tex. 2005) (holding that the Court could not "accept unchanged any of the values for Mirant Group that [had] been placed in evidence," because much of data relied on "was stale by the time of the Valuation Hearing.").

his rebuttal report by using current financial and market data available as of February 21, 2011.[451]

Singh also used Tribune's revised 2010A and 2011E EBITDA metrics available as of the Debtors' February 2011 forecast, and the long-term projections prepared by the Debtors in October 2010.[452]  Notably, Singh used management's most current projections without adjustment even though on the eve of the Confirmation Hearing, management conveniently predicted sharp declines in publishing revenue despite "stellar" performance in 2010.[453]

In updating this data, Singh used a quantitative approach designed to update Lazard's valuation solely for the impact of the updated market data.[454]  This alone resulted in an increase of $839 million over the DCL Plan value,[455] a valuation at which the Senior Noteholders' recovery would exceed $1 billion if Step Two debt is avoided (and if Step One is allowed but post-petition interest is not).[456]

### C. Lazard's Valuation Contains Numerous Methodological Flaws And Errors That Further Depressed Plan Value

As described below and in the Rebuttal Report and testimony of Singh, Raymond James corrected numerous methodological flaws and errors in Lazard's valuation, which resulted in further increasing Lazard's DEV estimate by $750 million:[457]

- **Lazard overweighted the publishing DCF:**  The DCF analysis was based on projections that predicted a steep continuing decline in the publishing business to the point that there would soon be no free cash flow at all.[458]  These projections are dramatically more negative

---

[451] NPP 2469 (Revised & Amended Singh Rpt.) at 17.

[452] NPP 2469 (Revised & Amended Singh Rpt.) at 21.

[453] 3/14/11 Trial Tr. 138:11-141:19 (Hartenstein); 191:7-194:14 (Singh); 3/11/11 Trial Tr. 96:19-23, 101:11-13 (Mandava); 205:11-14 (Chachas).

[454] 3/14/11 Trial Tr. 189:4-17, 199:8-12 (Singh).

[455] 3/14/11 Trial Tr. 186:13-18 (Singh).

[456] 3/15/11 Trial Tr. 296:23-298:17 (Gropper); 3/9/11 Trial Tr. 162:10-22 (Black).

[457] NPP 2470 (Singh Trial Demonstratives) at 9.

[458] 3/14/11 Trial Tr. 194:6-12 (Singh); 3/11/11 Trial Tr. 108:16-109:7, 35:17-21, 101:4-10(Mandava).  In preparing these projections, management unrealistically assumed that while EBITDA was projected to fall by more than half over the projection period, capital expenditures would nonetheless remain flat. 3/11/11 Trial Tr. 105:22-107:2 (Mandava).  Indeed, the Company outperformed its publishing forecasts throughout 2010, revised its 2010

than the forecasts of the Company's peers and other newspaper and publishing companies that have recently emerged from bankruptcy, inconsistent with broader industry forecasts which have predicted a revitalization of the publishing industry relative to recent lows, and at odds with the Company's own improving performance throughout 2010.[459] The Company performed so well in November and December 2010 that their fourth quarter operating cash flow ended up $20 million ahead of plan, and Mandava testified that if management were to reforecast 2012 to 2015 EBITDA as of February 2011, the projections would go up.[460] Implicitly recognizing the highly conservative nature of the Company's projections – which drive the DCF calculation – Lazard included a scenario in its January Valuation Report which gave no weight to the publishing DCF analysis (versus the 30% weighting attributed to the publishing DCF analysis in the Lazard Expert Report), and which resulted in a midpoint DEV of $7.258 billion.[461] Singh concluded that it was more appropriate to apply a 10% weighting to the publishing DCF, which reflected "serious consideration" but not great reliance on this methodology.[462]

- **Lazard overweighted the broadcasting DCF:** As with publishing, Lazard placed undue weight on the broadcasting DCF analysis in light of the Company's conservative projections and performance against plan.[463] Singh weighted the broadcasting DCF and comparable companies analyses equally, noting that it was inappropriate to underweight the comparable companies analysis given that the TV Station comparable company peer group is directly in line with the Company's broadcasting operations.[464]

- **Lazard's Valuation of the Company's Noncontrolled Interests was flawed:** Singh corrected certain clear errors in Lazard's valuation of the Company's non-controlled interests, including Lazard's valuation of the Company's interest in Food Network,[465] Classified Ventures,[466] and CareerBuilder.[467]

---

projections in October 2010 (the "October 2010 Projections") in light of "stellar" year to date performance, and then outperformed even those revised projections by year end. 3/11/11 Trial Tr. 97:6-15 (Mandava); 3/14/11 Trial Tr. 139:1-23 (Hartenstein), 190:11-191:6 (Singh). Inexplicably, despite the Company's improved performance, and despite significant increases in online advertising revenue, the October 2010 Projections for the publishing segment predicted greater declines in growth in each year of the projection period than the earlier March 2010 projections. 3/11/11 Trial Tr. 98:16-99:8 (Mandava). Mandava acknowledged that investors assessing the value of the Company at emergence "would take a point of view more similar or more akin to the way the capital markets are currently valuing publishing companies" than the outlook of the Company's management. 3/11/11 Trial Tr. 35:21-36:3 (Mandava).

[459] 3/11/11 Trial Tr. 103:3-105:6, 107:16-108:5, (Mandava); 3/14/11 Trial Tr. 192:5-25 (Singh).

[460] 3/11/11 Trial Tr. 126:15-21 (Mandava); 3/14/11 Trial Tr. 139:6-23 (Hartenstein). In addition, despite the Debtors' claim that they have been "hampered and hobbled by the fact that we're still in bankruptcy," the October 2010 Projections did not account for any benefits of the Debtors' future emergence from bankruptcy. 3/14/11 Trial Tr. 109:25-110:8, 142:2-143:5 (Hartenstein).

[461] NPP 2284 (Lazard Valuation Supplement) at 6.

[462] 3/14/11 Trial Tr. 195:14-16 (Singh). Although Mandava criticized this weighting by claiming that "[u]sing 10 present [sic] is akin to just saying I'm not giving any consideration or any weight to it," he later defended Lazard's application of a 10% weighing in their valuation of Tribune Media Services by claiming that this weighting reflected "serious consideration" of the data that "we couldn't ignore." 3/11/11 Trial Tr. 36:4-10, 51:4-24 (Mandava).

[463] 3/14/11 Trial Tr. 200:6-21; NPP 2469 (Revised & Amended Singh Rpt.) at 10, 42.

[464] Id.

[465] Lazard did not account for Food Network's 2010 actual results or updated 2011 projections (both of which exceeded prior projections) in conducting a DCF analysis of Food Network, and in fact did not include a DCF analysis for Food Network in their expert report at all, despite having done one. 3/11/11 Trial Tr. 62:8-63:12; 116:5-

- **Additional Errors in Lazard's Valuation:**  Finally, Singh addressed certain flaws in Lazard's treatment of the Company's non-cash pension expense, Lazard's treatment of distributable cash, and Lazard's valuation of Tribune Media Services.[468]

Collectively, correcting these errors and updating the financial and market data used in the Lazard Expert Report resulted in an estimated DEV of $8.291 billion, a ***$1.589 billion*** increase to Lazard's midpoint, and a valuation at which the Proposed Settlement is entirely indefensible.[469]

## VII.   THE PROPOSED SETTLEMENT IS THE RESULT OF A TAINTED PROCESS

The integrity of the process from which a proposed settlement arises is a significant consideration in the court's evaluation of the Rule 9019 and Bankruptcy Code section 1129 standards.[470]  Evidence of vigorous, arms'-length bargaining among properly motivated parties may provide reassurance to the court that the proposed settlement at least might be reasonable. On the other hand, a process marked by negotiations among insiders, professionals with divided

---

118:12 (Mandava); 3 /14/11 Trial Tr. 205:22-206:17 (Singh).  Had Lazard conducted a DCF valuation using these updated numbers, its valuation would have increased.  3/11/11 Trial Tr. 119:6-13 (Mandava).  Instead, Lazard relied on only one comparable company (Food Network's parent company Scripps Network) and on only one precedent transaction (the acquisition of Travel Channel).  3/14/11 Trial Tr. 207:8-210:14 (Singh).  Lazard also failed to account for the fact that Food Network significantly outperforms its parent Scripps.  3/14/11 Trial Tr. 208:2-209:6 (Singh).  In fact, Lazard actually applied a discount to the Scripps multiple in its comparable company analysis, even though Food Network's EBITDA margins and revenue growth significantly exceed those of Scripps as a whole, and those of Scripps excluding Food Network.  3/11/11 Trial Tr. 58:10-20 (Mandava); 3/14/11 Trial Tr. 206:19-209:6 (Singh).  Compounding this error, Lazard applied a 70% weighting to its comparable company analysis.  3/11/11 Trial Tr. 64:8-10 (Mandava).  Singh corrected these errors by adding Discovery Communications as a comparable company, adding the sale of Weather Channel as a precedent transaction, using updated 2010E EBITDA numbers, and weighting the comparable companies and precedent transactions analysis equally.  3/14/11 Trial Tr. 207:5-211:13 (Singh).

[466] Lazard identified four comparable companies, but only relied on one of them – Internet Brands.  3/14/11 Trial Tr. 214:12-15 (Singh).  However, Internet Brands was no longer a comparable company at the time of the Lazard Expert Report because it had been sold.  Singh appropriately utilized Internet Brands as a precedent transaction, as well as the other three companies identified by Lazard.  3/14/11 Trial Tr. 214:14-20 (Singh).

[467] Singh corrected several errors in Lazard's valuation of CareerBuilder, including Lazard's failure to conduct a precedent transaction analysis despite Gannett's recent acquisition of a 10% stake in CareerBuilder (an indisputably relevant precedent transaction), and Lazard's improper consideration of Manpower as a comparable company for CareerBuilder, even though Manpower is in a completely different line of business than CareerBuilder.  3/14/11 Trial Tr. 211:14-213:5 (Singh).

[468] 3/14/11 Trial Tr. 216;2-218:20; 219:1-220:10; 222:10-223:20 (Singh).  Correcting these errors resulted in a $346 million increase in value.  NPP 2470 (Singh Trial Demonstratives) at 9.

[469] NPP 2469 (Revised and Amended Singh Rpt.) at 7.

[470] *Exide*, 303 B.R. at 67-68, 71; *see also Abbots Dairies of Penn., Inc. v. Cumberland Farms Dairy, Inc.*, 788 F.2d 143, 150 n.5 (3d Cir. 1986) (holding that 1129(a)(3) requires court to ensure plan is product of good faith in order to prevent the debtor "from effectively abrogating the creditor protections of Chapter 11).

loyalties, and fiduciaries whose parochial interests are not aligned with the interests of their constituencies, is far more likely to yield a settlement proposal that is unfair, and that does not reflect the true value of the claims being settled.[471]

The inadequate settlement proposal before the Court is the product of such a flawed process. The negotiations were tarnished from beginning to end by fundamental, unresolved conflicts implicating the parties and professionals who negotiated the proposed deal, a Creditors' Committee controlled by a voting majority of members with no incentive to maximize the value of the settlement for Non-LBO Creditors, and by the exclusion from the bargaining table of Aurelius and the other creditors holding the largest economic stake in the outcome of the claims being settled. As a result, the consideration flowing to the Non-LBO Creditors actually **declined** after release of the Examiner's Report, even though the Report demonstrated that the LBO Claims were even more valuable than the Debtors and others previously had admitted.

Indeed, the otherwise inexplicable downward trajectory of the settlement despite mounting and overwhelming evidence that the Senior Lenders were party to a massive fraudulent transfer can be understood only against the backdrop of the flawed process from which it arose, and the myriad and manifest conflicts of interest of those by whom it was negotiated.

### A. The Debtors, With Their Conflicted Management And Counsel, Failed To Maximize The Settlement Value Of The Claims Against The LBO Lenders

The Debtors have been and remain represented by the same counsel, and dominated by many of the same directors and management—including Sam Zell—who designed the disastrous transaction that gave rise to the LBO Claims in the first place.[472]

---

[471] *In re General Motors Corp. Engine Interchange Litigation*, 594 F.2d 1106, 1125 (7th Cir. 1979) (holding that integrity of negotiations critical in assessing class action settlement under FRCP 23); *In re Carla Leather, Inc.*, 44 B.R. 457, 466 (Bankr. S.D.N.Y. 1984) (holding that 9019 inquiry should parallel inquiry under FRCP 23).

Management was further conflicted by the Senior Lenders' clumsy attempts during the settlement process to "curry favor with management in order to push company positions for their benefit."[473] Indeed, Randy Michaels actively lobbied the Senior Lenders to retain him as CEO after the company exited bankruptcy, and testified that at least one of the Senior Lenders—Oaktree—expressly tied its "support" for management to improved treatment of the Senior Lenders under any plan of reorganization.[474] The Debtors and their management revealed unmistakably that they were primarily interested in "saving their own skin," and were never going to argue vigorously that the LBO gave rise to compelling claims against its principal architects.[475] Indeed, their stewardship of the LBO Claims was like the "fox guarding the henhouse,"[476] and just as the Third Circuit warned in *Cybergenics*—the "real losers, [were] the [Noteholders and other] unsecured creditors" with the actual economic stake in the claims.[477]

This dangerous dynamic manifested itself immediately when the Debtors decided to entrust the LBO Claims investigation and settlement to Don Liebentritt and Sidley Austin, both of whom were potential defendants in connection with the LBO, and otherwise manifestly unsuited to their assigned role as "honest broker" regarding the LBO Claims. By forming the Special Committee of supposedly independent directors in August 2010, the Debtors belatedly acknowledged these problems but did not fix them, as the Special Committee members

---

[472] Until the belated formation of a Special Committee of supposedly independent directors in August 2010, the Board had "primary decision-making authority" with respect to the LBO Claims and all other matters relating to the Chapter 11 Cases. *See* Debtors' Reply to Jones Day Retention Application ¶ 2 [ECF No. 5665]; *see also* NPP 2087; Deposition of Randy Michaels dated March 14, 2011 ("Michaels Dep. Tr.") 53:11-25; Deposition of Mark Shapiro dated February 28, 2011 ("Shapiro Dep. II Tr.") 49:6-20.

[473] NPP 2088 (8/21/10 email from D. Liebentritt to F. Wood).

[474] Michaels Dep. Tr. 58:11-59:4; *see also* Deposition of Don Liebentritt dated February 22, 2011 ("Liebentritt Dep. Tr.") 181:5-82:4 (acknowledging concern that management could be perceived as "courting an Oaktree, or a JPMorgan or an Angelo Gordon or vice versa").

[475] *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003).

[476] *Id.*

[477] *Id.*

themselves were conflicted and simply rubber-stamped the proposal negotiated and recommended by Liebentritt and Sidley without any meaningful independent review.

### 1. Liebentritt's Deep And Abiding Conflicts Precluded Him From Credibly Playing His Assigned Role Of "Honest Broker"

According to the unanimous evidence, Liebentritt was and remained the Debtors' point person in the investigation of the LBO Claims, and negotiation of all iterations of the Proposed Settlement and DCL Plan, even after formation of the supposedly independent Special Committee.[478] Yet Liebentritt himself was a Step Two Selling Shareholder, and thus had a direct legal and financial interest in any settlement of the LBO Claims.[479] In addition, for more than 30 years Liebentritt has been a close advisor, associate and business partner of Sam Zell, the architect of the LBO, and one of the primary defendants in connection with the LBO Claims.[480] Indeed, so close was Liebentritt's affiliation with Zell that at least one member of the Board labeled him "Sam's guy."[481]

---

[478] 3/08/11 Trial Tr. 111:6-11 (Kurtz); Liebentritt Dep. Tr. 177:12-17 (Liebentritt principal Debtor representative); 3/15/11 Trial Tr. 150:1-10 (Shapiro video) (agreeing); 3/15/11 Trial Tr. 182:5-14 (Wilderotter video) (Liebentritt would take lead on any settlement); 2/18/10 Trial Tr. 56:9 (Kurtz) (stating he reports to Liebentritt on settlement issues); *see also* NPP 2523 (2/18/10 Hr'g Tr.) at 56:1-9 (Kurtz testifying that he reported to Liebentritt in connection with the investigation).

[479] Liebentritt Dep. Tr. 206:22-208:5.

[480] 3/08/11 Trial Tr. 116:1-16 (Kurtz). Among many other ties to Zell, Liebentritt is the president of the trust that manages all Zell family assets, has between $10 million and $15 million invested in Zell entities, receives a $300,000 annual salary from Zell entities and, until recently, was the President of EGI TRB, another Zell entity, which currently owes Liebentritt some $3 million in deferred compensation. NPP 810 (8/21/10 email from M. Shapiro to M. Wilderotter).

[481] *See* Letter from M. Hurley to J. Carey, Ex. 6 [ECF No. 7718]. The Debtors elected not to tell Aurelius about any of Liebentritt's ties to Zell, 3/15/11 Trial Tr. 262:2-8 (Gropper), even though the Debtors recognized from the beginning that Liebentritt might not be able to discharge his role as an "honest broker" as a result of those ties. 3/8/11 Trial Tr. 118:1-6 (Kurtz); *see also* NPP 2091 (8/23/10 email from M. Wilderotter to S. Dietze) at 1; NPP 2103 (8/31/10 email from M. Shapiro to D. Liebentritt). The Debtors ultimately accepted Liebentritt's *ipse dixit* assurance that he would not let his conflicts interfere with his duties to the estates, and let him continue as the Debtors' point person regarding the LBO Claims on that basis. Shapiro Dep. II Tr. 50:4-51:3 (Shapiro persuaded by Liebentritt in meeting to report directly to Special Committee). Although the Debtors were always aware of Liebentritt's ties to Zell, Liebentritt apparently failed to disclose, at least to Lazard and the Special Committee, that he also had a direct interest in the LBO Claims as a Step Two Selling Shareholder. Shapiro Dep. II Tr. 259:10-20; 3/08/11 Trial Tr. 117:17-20 (Kurtz).

Liebentritt's natural bias impacted the process in a variety of ways. For example, the first settlement Liebentritt recommended to the Debtors in April would have released all claims against Liebentritt's wholly owned investment company, as well as all claims against Sam Zell and the rest of conflicted management, even though none of these parties were to provide *any* consideration for the releases.[482] Later, Liebentritt suggested that if the Senior Lenders refused to pay for a release of the Step One claims, the Debtors should consider going to the Court for a declaration that the Step One claims were meritless as their "Plan B."[483] Liebentritt's proposed "back up" plan if the Senior Lenders remained unwilling to pay fair consideration could hardly have been an effective bargaining tactic, and is particularly outrageous given the Senior Lenders' agreement just weeks later to pay hundreds of millions of dollars to settle those very claims.[484]

Also telling was Liebentritt's reaction to the Examiner's findings in July 2010 that Step Two of the transaction was somewhat likely to have been the product of intentional fraud. Rather than seizing the opportunity to extract additional settlement value for the Non-LBO Creditors, Liebentritt circled the wagons around legacy management, claiming that the Examiner's conclusion regarding intentional fraud was just plain wrong, and was a "problem [he] had to deal with."[485] Liebentritt also sought to convince members of the Special Committee—who, by this time, were supposed to be impartially evaluating the claims and the Proposed Settlement—that the Examiner's Report was unreliable.[486] For example, at a meeting in August 2010, Liebentritt told the Special Committee that the Examiner's Report was

---

[482] *See* NPP 1970 (Email from D. Liebentritt to D. Schaible, et al., re: Plan Support Press Release dated April 8, 2010) (settlement support agreement is "a proposed settlement that we all hope and expect to get approval as part of a confirmed plan"); NPP 24 (Executed Settlement Support Agreement dated April 8, 2010).
[483] Liebentritt Dep. Tr. 225:7-14, 227:9-21, 234:7-18; NPP 836 (Email from D. Liebentritt to J. Berg re: Pure Purity dated September 23, 2010).
[484] NPP 12 (Term Sheet for Joint Plan) at 1. Moreover, there can be no serious doubt that the Step One claims accounted for a substantial portion of the consideration to be paid under the previously negotiated April deal, even though the April Plan did not specifically allocate consideration among the various claims.
[485] Liebentritt Dep. Tr. 162:4-14.
[486] 3/15/11 Trial Tr. 165:1-167:7 (Shapiro).

95

"irresponsible," was not the product of "thorough reporting and investigating," had "holes in it," and lacked "depth."[487] Liebentritt's attacks on the Examiner were without substance,[488] but he still managed to convince Mark Shapiro, the Chairman of the Special Committee, that the Examiner's Report was not reliable.[489] Shapiro's false impression may help explain the Special Committee's subsequent approval of the Proposed Settlement, which is so at odds with the spirit of the Examiner's Report.

Liebentritt's bias also was exposed by his unwarranted and overt hostility to Aurelius. For example, in an email to members of the Special Committee after Aurelius acquired Centerbridge's position in the Senior Notes, Liebentritt disparaged Aurelius as a "terrorist" and claimed that "no one holds out any hope of achieving a settlement with Aurelius."[490] Again, Liebentritt had no basis for his reckless accusations,[491] but they appear to have hit their mark with the Special Committee anyway. For example, Shapiro had never even heard of Aurelius until it bought Centerbridge's position in the Senior Notes.[492] Yet, on September 28, 2010—just five days after Liebentritt sent his anti-Aurelius memo and 14 days before the Second Mediation Term Sheet upon which the DCL Plan is based, was announced—Shapiro advised other members

---

[487] 3/15/11 Trial Tr. 165:1-167:18 (Shapiro).
[488] At his deposition, Liebentritt was unable to identify a single flaw in the approach taken by the Examiner to the investigation. 3/15/11 Trial Tr. 167:12-24; Liebentritt Dep. Tr. 63:12-64:6. Moreover, the DCL Plan Proponents themselves argued that the Examiner's investigation and Report was so thorough and "exhaustive" that any discovery regarding the LBO Claims in connection with this dispute would be merely cumulative. NPP 2186 (DCL Resolicitation Motion) at 41.
[489] 3/15/11 Trial Tr. 165:1-6 (Shapiro) ("Q: Is it your understanding that Mr. Klee undertook an exhaustive analysis of the LBO claims?" A: That's purported you know. From talking to [Liebentritt], there were a lot of questions that weren't asked and sources that weren't interviewed.").
[490] NPP 836 (9/23/10 email from D. Liebentritt to J. Berg).
[491] While Liebentritt claims his "terrorist" email reflected conversations with Messrs. Kurtz and others involved in these cases, Kurtz testified that his dealings with Aurelius were always "completely cordial," that Liebentritt's characterization to the contrary was "unfair," and that he never said anything to Liebentritt that would support such an accusation. 3/8/11 Trial Tr. 74:6-10, 152:19-153:2 (Kurtz). In fact, not one witness corroborated Liebentritt's version of events, not even Baiera (Angelo Gordon) who was another alleged source for the slander. Deposition of Gavin Baiera dated March 1, 2010 ("Baiera Dep. Tr.") 105:14-106:6.
[492] Deposition of Mark Shapiro dated October 13, 2010 ("Shapiro Dep. I Tr.") 78:3-8 (as of September 13, Shapiro had never heard of Aurelius).

of the Special Committee that the strategy "all ha[d] to do with how to defend against Aurelius. That's what this is about."[493]

## 2. Sidley Austin Represented The Company In The LBO, Had Close Ties To Legacy Management And Was Otherwise Deeply Conflicted

In addition to its regular representation of various Senior Lenders in other matters,[494] Sidley Austin's capacity to impartially evaluate the LBO and related claims was crippled by an even more obvious, immediate and debilitating conflict of interest: Sidley Austin itself helped structure the LBO on behalf of the Company, and is a potential defendant in connection with the very claims it was tasked with investigating.[495]

The Debtors were well aware of this glaring conflict of interest and even considered hiring conflicts counsel to investigate and evaluate the LBO Claims in lieu of Sidley back in late 2009 or early 2010 when the investigation was just getting underway.[496] Instead, for reasons unknown, the Debtors anointed Sidley as the sole law firm responsible for exploring the merits of the claims, a process which it largely completed long before the Special Committee was formed and retained counsel.[497] Although Lazard was involved in the investigation, Lazard did not itself seek to identify relevant evidence, but instead relied on Sidley to direct it to the documents and 2004 deposition testimony that Sidley deemed material to the claims.[498]

Predictably, the investigation performed by Sidley under Liebentritt's management was far from the vigorous and searching undertaking one would expect from conflict-free fiduciaries

---

[493] NPP 841 (9/23/10 email from M. Shapiro to F. Woods).
[494] 3/08/11 Trial Tr. 120:15-20 (Kurtz); Liebentritt Dep. Tr. 38:25-40:12.
[495] Liebentritt Dep. Tr. 37:21-38:15; 3/8/11 Trial Tr. 119:14-120:8 (Kurtz).
[496] *Id.* at 38:10-24.
[497] 3/8/11 Trial Tr. 119:1-10 (Kurtz) (Sidley conducted the investigation, which was "pretty much complete" by the time Jones Day was hired by the Special Committee in the fall of 2010); NPP 2523 (2/18/10 Hr'g Tr.) at 58:11-21 (investigation led by Sidley); Liebentritt Dep. Tr. 173:13-22 (Jones Day did not conduct an investigation of the LBO Claims and did not have its own financial advisor).
[498] 3/8/11 Trial Tr. 106:20-108:25 (Kurtz). The activities of Sidley and Kurtz were "directed" by the Company through Liebentritt. Liebentritt Dep. Tr. 36:21-37:5; *see also* 3/8/11 Trial Tr. 111:6-11 (Kurtz); NPP 2523 (2/18/10 Hr'g Tr.) at 56:1-9 (Kurtz).

seeking to maximize value for the estates.[499]  On the contrary, Sidley treated the investigation

largely as a formality, reflecting the fact that the Debtors never seriously considered actually

asserting the LBO Claims.[500]  Incredibly, Sidley never even caused the Debtors to evaluate

whether the Company was insolvent when Step One closed on June 4, 2007, or when Step Two

closed on December 20, 2007 (or at any other time for that matter), an extraordinary omission in

light of the nature of the claims at issue.[501]  In contrast, after the Examiner found that it was

reasonably likely that the Debtors' management engaged in intentional misconduct with respect

to Step Two of the LBO, Sidley wasted no time preparing a presentation to the Board ***seeking to

refute*** the Examiner's conclusions.[502]  Given the Debtors' tepid approach to exploring and

pressing the LBO Claims, the Senior Lenders could not have viewed the Debtors as a serious

adversary, either in court or in negotiations.[503]

### 3.    The Debtors' Appointment Of The Special Committee Was A Non-Event

The Debtors' belated appointment of the Special Committee in August 2010 in an effort

to restore confidence in the settlement process turned out to be an expensive charade.  The

Special Committee was allegedly "deemed necessary" by the Debtors in the wake of the release

of the Examiner's Report on July 26, 2010.[504]  The Special Committee was supposed to become

---

[499] *See e.g., Cybergenics*, 330 F.3d at 568 (holding that paramount duty of debtor in possession is to maximize value of estates for benefit of creditors, including by identifying and pursuing all available avoidance actions).
[500] NPP 2523 (2/18/10 Hr'g Tr.) at 51:22-52:5 (Kurtz).
[501] 3/08/11 Trial Tr. 105:25-106:2 (Kurtz).
[502] NPP 2148 (9/30/10 Board Presentation); Shapiro Dep. II Tr. 149:3-151:15; NPP 2394 (1/18/11 Special Committee Privilege Log) at Item 216 (identifying Sidley as the author of the presentation).  The Debtors redacted the entirety of the Sidley board presentation except its title, and invoked the privilege with respect to deposition questions regarding its contents, except to allow Wilderotter to testify that she concluded management "did nothing wrong" based in part on the Sidley presentation.  Shapiro Dep. II Tr. 151:10-152:2; Wilderotter Dep. I Tr. 152:15-153:11; *see also* NPP 782 (Exam'rs Rpt.), Vol. I at 31 (noting that in their submissions to the Examiner the parties raised "just about every conceivable claim or defense that could be imagined, lest the Examiner not consider it").
[503] As discussed in Section VII.B. below, the Creditors' Committee was suffering from its own conflicts of interest, and was unable or unwilling to aggressively champion the LBO Claims.
[504] NPP 2109 (Special Committee Statement in Support of Jones Day Retention Application) ¶ 2; 3/8/11 Trial Tr. 285:10-23 (Salganik).

"well and independently informed," so that it could determin[e] [an] appropriate restructuring

plan for the company" that took "*into consideration, among other things, the conclusions*

*reached by the examiner in his report.*"[505]  Its members and activities were meant to be entirely

"independent" of Sam Zell and the rest of the conflicted board and management, in order to

"insulate the Debtors from any accusation that restructuring decisions were made by Board

members who were not fully disinterested."[506]

The Debtors also emphasized the importance of the Special Committee relying on its own

Special Counsel in lieu of Sidley, which was perceived as "represent[ing] management of the

Debtors."[507]  In a separate submission, the Special Committee was even more blunt, claiming

that it "*would undermine the entire purpose of the Special Committee*" for the Special Committee

"*to use counsel who reports to the company and directors who others could assert are not*

*disinterested in these matters.*"[508]

Unfortunately, the Special Committee abandoned all of the safeguards that it and the

Debtors previously told this Court were necessary to restore confidence in the settlement process.

For example, despite initial misgivings, the Special Committee allowed Liebentritt—Zell's right

hand man—to remain firmly in charge of the negotiations throughout.[509]  Moreover, Shapiro, the

---

[505] Notice of Jones Day Retention Application ¶ 6 [ECF No. 5562]; NPP 2109 (Special Committee Statement in Support of Jones Day Retention Application) ¶¶ 2, 4.

[506] Debtors Reply in Support of Jones Day Retention Application ¶ 2 [ECF No. 5665]; Notice of Jones Day Retention Application ¶ 6 [ECF No. 5562]; Shapiro Dep. II Tr. 38:10-23 (identifying criteria for membership on Special Committee as "no bias, prejudice or ties to Sam Zell"); Shapiro Dep. I Tr. 93:11-17 (testifying that the Special Committee was intended to exclude from the process anyone "that worked for Mr. Zell previously or was paid by Mr. Zell or contributed to the ESOP or whatever."); Shapiro Dep. II Tr. 55:21-56:8 (emphasizing importance of "really establish[ing] and maintain[ing] that independence" from Zell).

[507] NPP 2086 (8/21/10 email from M. Wilderotter to D. Liebentritt).

[508] NPP 2109 (Special Committee Statement in Support of Jones Day Retention Application) ¶ 4; *see also* Shapiro Dep. II Tr. 63:25-64:14 (relating his understanding that Sidley "wasn't able to represent the Special Committee," in order for the Special Committee to maintain its "independence").

[509] Shapiro Dep. II Tr. 50:18-51:3; NPP 2103 (8/31/10 email from M. Shapiro to D. Liebentritt); Shapiro Dep. II Tr. 123:5-16; *see also* Deposition of Maggie Wilderotter dated October 13, 2010 ("Wilderotter Dep. I Tr.") 24:16-23 (relating Special Committee's discussion of concerns that Liebentritt's relationship with Zell "could have an impact on the negotiations and the discussions").

Chairman of the Special Committee, was himself financially and professionally intertwined with Zell. Shapiro owes his membership on the Board—for which he is paid a stipend of $125,000 per year—to Zell and serves on the board of another Zell company—for which he receives $50,000 per year and was offered the job of interim CEO of Tribune by Zell just when the Special Committee was supposed to be impartially considering proposed settlement terms.[510]

Other Special Committee members likewise had close ties to Zell and the Senior Lenders. For instance, Wilderotter's company relied on JPMorgan to underwrite a $3 billion debt offering in 2005. Wilderotter is a friend of Jimmy Lee's, the JPMorgan Vice Chairman and long-time associate of Sam Zell who was involved in the LBO and bankruptcy.[511] Among other things, she sees Lee several times and attends an annual Christmas party at Lee's house.[512] In a February 2010 email to Lee regarding Tribune matters, Wilderotter signed off with the telling valediction *"your friend who is always looking out for JPM!"*[513] Wilderotter's ties to Zell are just as troubling, and antithetical to the Special Committee's mandate to demonstrate "pure independence" from Zell. Like Shapiro, Wilderotter owed her place on the Board to Zell, has served on the boards of several other Zell companies, and apparently was Zell's top choice for CEO of Tribune as early as February 2007.[514] Wilderotter did not know that Zell was supposed

---

[510] Shapiro Dep. II Tr. 247:10-248:11 (Tribune board membership); 3/15/11 Trial Tr. 151:9-152:3 (Shapiro) (second Zell board membership); 3/15/11 Trial Tr. 154:1-21 (Shapiro) (Zell offered to make Shapiro CEO). In addition to his entanglements with Zell, Shapiro also had important relationships and actual and prospective business dealings with certain of the Senior Lenders. In the summer of 2010, for example, Shapiro traveled to California to meet with principals of Oaktree. According to Shapiro, he knew that Oaktree had "a lot of money to put to work," and he wanted to explore the possibility of a business relationship between Oaktree and Shapiro's company, Dick Clarke Productions ("DCP"). 3/15/11 Trial Tr. 159:10-19 (Shapiro video).

[511] NPP 392 at 1 (4/26/07 JPM Meeting Transcript) (Lee states he has known Zell "virtually my entire adult life"); Lee Dep. Tr. 73:10-20 ("relationship" role in Tribune).

[512] Wilderotter Dep. II Tr. 187:11-190:20; NPP 757 (2/11/10 email from M. Wilderotter to J. Lee).

[513] NPP 757 (2/11/10 email from M. Wilderotter to J. Lee).

[514] Wilderotter Dep. I Tr. 146:13-47:20; Trial Tr. 204:17-205:2 (Lee video) (quoting NPP 2326 (2/22/07 email from J. Lee to J. Dimon)).

to be excluded from settlement negotiations, and admitted to discussing Special Committee business with Zell, on at least one occasion.[515]

And Zell clearly did ***not*** remove himself from the settlement process after release of the Examiner's Report and appointment of the Special Committee. For example, in an August 22, 2010 email from Bruce Karsh of Oaktree to his partner Howard Marks, Karsh wrote:

> I've talked with Sam Zell almost 5 times in the last week trying to maneuver the company to do what's best for us. He keeps telling me all the right things, but hasn't forced the company to file a plan I like as yet. I think he will.[516]

Barely three weeks later, Zell's board-appointee Mark Shapiro committed to supporting a plan crafted by Oaktree and Angelo Gordon that, if approved, would have extinguished the estates' claims with respect to the Step One debt in exchange for no consideration.[517] Whether or not there was any connection between Zell's conversations with Karsh and Shapiro's sudden endorsement of Oaktree's preferred plan a few weeks later, one thing is crystal clear: the Debtors' attempt to insulate the settlement process from Zell by formation of the Special Committee was an abject failure.

Similarly, retention of Jones Day to represent the Special Committee in no way changed or reduced Sidley's role or limited its influence over settlement negotiations and the terms of the ultimate proposed plan. Indeed, despite the Special Committee's admission that it would "undermine the very purpose of the Special Committee" were it to "use counsel who reports to the company and directors," that is exactly what the Special Committee did. Incredibly, when the members of the Special Committee first met as a group, Liebentritt arranged for Larry

---

[515] 3/15/11 Trial Tr. 161:9-24 (Wilderotter video); Wilderotter Dep. II Tr. 301:19-302:3; Wilderotter Dep. I Tr. 149:13-23.
[516] NPP 812 (Email from B. Karsh to H. Marks re: Oaktree News dated August 22, 2010).
[517] Shapiro Dep. II Tr. 268:4-18; 3/15/11 Trial Tr. 161:9-24 (Shapiro) (promising Oaktree and Angelo Gordon that the Debtors would issue a press release publicly supporting their plan).

Barden of Sidley Austin to join the meeting and explain the role of the Special Committee "from a corporate governance perspective;" apparently Liebentritt neglected to mention that Barden was one of two lawyers who led Sidley's representation of the Company in connection with the LBO the Special Committee was supposed to be evaluating.[518] Not that this news would necessarily have troubled the Special Committee; for his part, Shapiro did not remember Barden, but testified that he would be "fine with a person who is the architect of the LBO transaction giving advice to the Special Committee."[519]

And indeed, the Special Committee placed virtually all of its substantive reliance upon Sidley, rather than Jones Day. Wilderotter, who did not even know Sidley had any conflicts, testified that Sidley was "the legal firm that the company hired to give us advice and counsel with regard to the bankruptcy in the proceedings."[520] Wilderotter also confirmed that Sidley led the settlement negotiations, gave the Special Committee legal advice concerning the first and second mediation term sheets and, together with Liebentritt, presented the final settlement to the Special Committee for its approval.[521] In short, Sidley occupied precisely the same role in advising the Special Committee as it occupied in advising the conflicted board and management.

In any case, the Special Committee was wholly disengaged and ineffective, and its members did not even appear to understand their role. For example, Shapiro believed the Special Committee's job was to "motivate all the parties to get to the table," rather than to deal

---

[518] Wilderotter Dep. II Tr. 276:14-77:4; NPP 807 (Liebentritt email setting up Barden meeting). NPP 1436 (June 1, 2007 Tribune Schedule 13E-3) at 208.
[519] 3/15/11 Trial Tr. 145:22-46:8 (Shapiro).
[520] Wilderotter Dep. I Tr. 123:23-124:7.
[521] Wilderotter Dep. I Tr. 123:23-124:15, 34:13-35:20, 55:15-56:20. While Jones Day attended Special Committee meetings and appeared at some of the mediation sessions, it conducted a comparatively superficial review of the merits of the claims—mainly by reviewing Sidley work product and reviewing materials identified for it by Sidley—and attended none of the pre-mediation negotiation sessions. *See* Liebentritt Dep. Tr. 173:2-9 (Jones Day did not conduct own investigation); Shapiro Dep. II Tr. 126:21-127:4 (Jones Day's role was to report on negotiations rather than participate), 143:5-12 (Jones Day not at all mediation sessions); NPP 27 (Debtors' Responses to Interrogatories), identifying lawyers from Sidley, but not Jones Day, as persons with knowledge regarding the Proposed Settlement, Settlement Process or Settlement Analysis).

with the "fairness" of the numbers.[522]  Shapiro added that he (i) "didn't really understand the process" by which the litigation trust would handle the Step Two claims, (ii) believed that developing even a primitive understanding of the operative facts and issues was "above [his] pay grade," and (iii) was unfamiliar with basic facts from the Examiner's Report and that other portions were beyond his comprehension.[523]

Wilderotter also confessed that her understanding of critical issues relating to the LBO Claims and the terms of the Proposed Settlement was scant to nonexistent.[524]  Neither the Special Committee as a group, nor its members individually, had any role in negotiating the contents of the term sheet the Special Committee approved on October 11, 2010.[525]  In fact, Shapiro testified that he had never seen the Second Mediation Term Sheet before his deposition.[526]  Moreover, neither Shapiro nor anyone else on the Special Committee thought it was necessary to stay informed on the Debtors' negotiations with Oaktree, Angelo Gordon, JPMorgan, or the Creditors' Committee.[527]

Rather than delaying consideration of the Proposed Settlement until they could become "well and independently informed" regarding the LBO Claims, the negotiations, and the positions of the parties-in-interest, Shapiro, Wilderotter and the other members proceeded to cast their votes to approve the settlement in the dark.  Both Shapiro and Wilderotter sought to justify

---

[522] Shapiro Dep. I Tr. 30:21-31:1, 32:16-19.  Even if this were the mandate of the Special Committee— and as discussed above, the Debtors claim to have created the Special Committee to independently evaluate any proposed deal, not act as quasi-mediators – it still would have failed.  Although Shapiro talked regularly with Oaktree and the other banks, he admits that neither he nor the Special Committee ever spoke to Aurelius or any of the other Pre-LBO Noteholders.

[523] Shapiro Dep. I Tr. 160:23-24 ("pay grade"), 34:12-24 ("didn't really understand"), 45:9-20 ("half of it would go right over my head."  While he originally believed that he had read the Examiner's Report, at his deposition Shapiro realized that what he actually read was the just the 30 page redacted version of the Report; when reminded that the full report was more than 1,000 pages he said "no, I skipped that one.")  3/15/2010 Trial Tr. 164:5.

[524] Wilderotter Dep. I Tr. 31:2-9 (unsure whether plan settled bridge claims, disgorgement), 64:3-66:12 (could not remember terms of retiree settlement or Step Two disgorgement settlement), 33:5-23 (unsure what new claims were being released in exchange for $120 million).

[525] Shapiro Dep. I Tr. 13:3-14:15.

[526] Shapiro Dep. I Tr. 12:22-13:2.

[527] Shapiro Dep. I Tr. at 25:21-26:7.

their conduct by claiming that they relied on "advisors," but the conflicts of these very same advisors were among the reasons the Special Committee was formed in the first place.[528] Wilderotter and Shapiro also relied on their understanding that an "outside expert" in bankruptcy settlements—Black—had confirmed the "fairness" of the settlement.[529] The Special Committee never actually met with Black, however, and his alleged "fairness opinion" was instead relayed to the Special Committee by "our financial advisors and our lawyers . . . Lazard and Sidley."[530] In fact, Black was not independent—he had been advising the Company in connection with the LBO for years—was not an expert in bankruptcy law or bankruptcy settlements, and never opined as to the fairness of the proposed settlement prior to its approval by the Special Committee.[531]

In short, the Special Committee undertook no meaningful evaluation of the proposed settlement, was neither independent nor well-informed, and failed utterly to perform the "honest broker" function for which it purportedly was created.

### B. The Creditors' Committee Failed To Discharge Its Duty To The Pre-LBO Noteholders

The very composition of the Creditors' Committee crippled its ability to discharge its duties to the Pre-LBO Noteholders, since a majority of the Creditors' Committee's members were content with the terms of the deal negotiated in April, and had no incentive to extract the true settlement value of the LBO Claims as reflected in the Examiner's Report that came out in July.

---

[528] NPP 2086 (Email from M. Wilderotter to D. Liebentritt dated August 21, 2010); *see supra* at VII.A.
[529] Wilderotter Dep. I Tr. 91:21-92:13; 97:5-14, 99:25-100:9.
[530] Wilderotter Dep. I Tr. at 98:18-24.
[531] Liebentritt Dep. Tr. 85:16-86:5, 87:2-18 (testifying that Black never issued a fairness opinion, and that if anyone told the Special Committee he did "it wouldn't be true").

Under the settlement proposed in April, (1) Warner Bros. Television and (2) Buena Vista Television got full payment in cash as subsidiary unsecured creditors,[532] (3) the Washington-Baltimore Newspaper Guild got all of their collective bargaining agreements assumed by the Debtors,[533] (4) PBGC was satisfied in full by the Debtors' agreement to maintain their underfunded pension plans,[534] and (5) William Niese got a 35.18% recovery on behalf of the retirees, which he was contractually required to accept in any subsequent plan regardless of the merits of the LBO Claims.[535]  In short, because a voting majority of Creditors' Committee members had their parochial interests satisfied in full under the earlier deal, they had little need for or interest in pursuing an aggressive course of action.

In fact, the Creditors' Committee never evinced any particular enthusiasm for investigating or pursuing the LBO Claims, which primarily would benefit the Pre-LBO Noteholders.  Even the Examiner noted his "surprise" that "notwithstanding the . . . wide-ranging and factually-intensive allegations concerning, among other things, intentional fraudulent transfer, bad faith, breach of fiduciary duty, and aiding and abetting fiduciary duty breaches . . . only seven Rule 2004 examinations relating to the [LBO] had been conducted" by the Creditors' Committee.[536]  Indeed, the Creditors' Committee apparently never even undertook to determine whether the Company was solvent in connection with the LBO.[537]

---

[532] *See* NPP 2170 (Mediator's Second Report) Ex. A at 2.

[533] *See* 3/8/11 Trial Tr. 257:6-10 (Salganik).

[534] *See* Deposition of Craig Yamaoka dated March 3, 2011 ("Yamaoka Dep. Tr.") 149:3-7 ("Q:  And what's your understanding of what would happen to the pension plans under Term Sheet 2?  A:  The pension plans would be maintained.").

[535] *See* NPP 2170 (Mediator's Second Report, Ex. A-Settlement Term Sheet) at 2.

[536] NPP 782 (Exam'rs Rpt.), Vol. I at 32.

[537] 3/15/11 Trial Tr. 194:2-15.  The Senior Noteholders were thus justifiably concerned that the Creditors' Committee would undercut their negotiating leverage even in connection with first round of negotiations in early 2010.  *See* 3/15/11 Trial Tr. 230:12-17 (Gropper) ("[W]hat Centerbridge expressed to me was that [the settlement that became the April Plan] was a lower settlement than they thought was appropriate.  But they were very concerned that the creditors' committee was going to undercut them in the negotiations, and because of that they were forced to agree to a – to agree to a suboptimal deal."); *see also* Deposition of Thayne Carlston dated February 16, 2011 ("Carlston Dep. Tr.") 28:24-29:14.

Coincidentally or not, the Creditors' Committee's principal counsel, Chadbourne & Parke LLP ("Chadbourne"), was operating under a serious conflict of interest throughout the process because it represents many of the Senior Lenders in other matters.[538] The Creditors' Committee's attempt to alleviate the Chadbourne conflicts by hiring Zuckerman Spaeder as special counsel to handle the litigation and potential settlement of the LBO Claims was ineffective since Chadbourne continued as the Creditors' Committee's primary negotiator even after Zuckerman was retained.[539] In that capacity, Chadbourne wound up giving the Senior Lenders a roadmap to gaining the Creditors' Committee's consent on the cheap,[540] and squandered the considerable leverage the Creditors' Committee should have gained from the issuance of the Examiner's Report by failing to demand improved terms for the Pre-LBO Noteholders, even as an "opening bid."[541] In short, the Creditors' Committee conducted the negotiations in a manner that practically guaranteed the Pre-LBO Noteholders' recovery would be less than or equal to the value provided under the April Plan.

---

[538] See Lemay Affidavits in Connection with the Retention of Chadbourne [ECF Nos. 243, 395, 3045, 5430, 7082, 8029]. Thus, just like Sidley Austin, Chadbourne was precluded from bringing suit against any of these defendants and potential defendants in connection with the LBO. See 3/8/11 Trial Tr. 203:16-23 (Salganik).

[539] Deposition of Kenneth Liang dated February 16, 2011("Liang Dep. Tr.") 83:15-85:4, 205:12-16, 207:10-17 (identifying Chadbourne lawyer Howard Seife as the Senior Lenders contact with the Creditors' Committee throughout the settlement negotiations); 3/8/11 Trial Tr. 258:7-10 (Salganik) (admitting he had no personal knowledge as to which firm actually negotiated on behalf of the Creditors' Committee but that he "believe[d] that Zuckerman and Chadbourne did that together."). The significant legal issues presented by Chadbourne's conflicts of interest have been extensively briefed in prior pleadings, which are incorporated herein by reference, and those conflicts persisted unabated throughout the settlement process. See Aurelius Motion to Disqualify Chadbourne [ECF No. 5669]; NPP 2132 (Aurelius Reply in Support of Disqualification Motion).

[540] See, e.g., Liang Dep. Tr. 214:17-22 (Q: And did Howard Seife ever tell you in words or substance that because the Committee was dominated by trade creditors, to get the Committee's support you had to pay off the trade creditors in full? A: I believe that they said that the trade creditors have to be treated well in the plan. Yes.) (emphasis added).

[541] See 3/8/11 Trial Tr. 264:6-14 (Salganik) (never directed Creditors' Committee's counsel to ask for more than the $450 million provided to Senior Notes under April Plan); 3/15/2011 Trial Tr. 189:2-7; 3/8/11 Trial. Tr. 158:3-14 (Kurtz) (admitting he never heard any Creditors' Committee representative argue that the Examiner's Report strengthened the LBO Claims in any way, and never heard the Creditors' Committee make a demand in excess of $420 million); Carlston Dep. Tr. 115:24-16:24 (no recollection of Creditors' Committee representatives arguing to Senior Lenders that Examiner's Report strengthened Pre-LBO Noteholders' hand in negotiations), 99:4-22 (couldn't recall Creditors' Committee representatives seeking to maximize Pre-LBO Noteholder recoveries); 3/9/11 Trial Tr. 57:17-23 (Kulnis) (admitting that throughout the negotiations the Creditors' Committee never even told her its view of the merits of the LBO Claims).

**The Settlement Process, Marked By A Lack Of Arms' Length Bargaining And Exclusion Of The Pre-LBO Noteholders, Resulted In A Settlement That Cannot Be Approved**

Efforts to settle the LBO Claims kicked-off in January 2010, and the first proposed settlement of the claims was submitted to the Court in the form of a Settlement Support Agreement dated April 8, 2010 (the "April Settlement"). Unlike the Proposed Settlement, the April Plan negotiations included representatives of one of the largest Senior Noteholders, Centerbridge.[542]

Despite Aurelius's exclusion from the process, and although Aurelius believed that the April Settlement materially undervalued the LBO Claims, Aurelius elected not to object to the deal,[543] in part because Centerbridge's involvement meant that "there was a principal bondholder [Centerbridge] at the table negotiating the settlement" and keeping the Senior Lenders and other parties honest.[544] Indeed, the fact that a large Senior Noteholder was directly involved in the negotiations leading to the April Settlement provided reassurance to other parties in interest as well, and influenced their decision to support the April Plan. For example, Salganik testified that he viewed Centerbridge's active negotiation of the April Plan as "confirmation and validation" of the fairness of that deal.[545]

---

[542] 3/15/11 Trial Tr. 230:7-20 (Gropper).

[543] *Id.* at 230:21-231:13 (Gropper); 3/8/11 Trial Tr. 131:4-20 (Kurtz).

[544] During the period when the April settlement was negotiated, Aurelius held approximately $100 million worth of Senior Notes, but still was unable to participate directly in the process because the Debtors refused, without explanation, to permit Aurelius access to information material to the claims. NPP 2371 (3/3/10 e-mail from D. Gropper to D. Kurtz) (Aurelius's counsel protesting the Debtors' unexplained rejection of Aurelius's February 12, 2010 request to be made a party to the Depository Order); 3/15/11 Trial Tr. 228:25-230:6 (Gropper); 3/8/11 Trial Tr. 43:19-44:9 (Kurtz) (acknowledging that it was impossible to "engage in meaningful settlement discussions" without access to "the relevant data" available in the document depository); 3/15/11 Trial Tr. 230:21-231:9; 279:10-280:12 (Gropper); 3/8/11 Trial Tr. 131:21-24 (Kurtz).

[545] 3/8/11 Trial Tr. 265:10-20 (Salganik); *see also* Deposition of Wayne Smith dated February 16, 2011 ("Smith Dep. Tr.") 55:25-56:25 (acknowledging the Creditors' Committee evaluated Centerbridge's input in concluding the April Plan was fair); 3/8/11 Trial Tr. 51:12-52:8 (Kurtz) (emphasizing that the April Plan "enjoyed the support of . . . Centerbridge, the largest noteholder as we indicated here holding approximately 37 percent of the notes"). 3/8/11 Trial Tr. 124:1-18 (Kurtz) (testifying that Centerbridge's involvement in negotiations leading to the April Plan gave

On July 26, 2010, the Examiner released a thorough, meticulously documented report of more than 1,000 pages (excluding tables and exhibits) demonstrating convincingly that the April Plan greatly undervalued the claims against the LBO Lenders.[546]  Indeed, based solely on the Examiner's conclusions, Aurelius estimated that the expected value of the claims was at least $1.8 billion.[547]  Aurelius therefore sought meetings with the Debtors and Senior Lenders in order to try to negotiate a settlement more consistent with the conclusions of the Examiner's Report than reflected in the April Plan.[548]

Following release of the Examiner's Report, Debtors, Oaktree, Angelo Gordon, JPMorgan and the Committee remained in nearly constant touch regarding potential settlement, but deliberately excluded Aurelius from their negotiations.  As a consequence, the Pre-LBO Noteholders had no meaningful input in shaping the deal, and the Senior Lenders faced no true adversary in the negotiations, because the Debtors and Creditors' Committee were unable or unwilling to vigorously press the LBO Claims for the reasons discussed above.

Kurtz later attempted to justify Aurelius's exclusion by claiming that Aurelius had refused to accept anything short of payment in full on the Senior Notes.[549]  In reality, Aurelius sharply

---

the Debtors' "comfort in the outcome" and was "incredibly important" in the Debtors' decision to support the April Plan).

[546] The Examiner's investigative methods, and his credentials as an expert in bankruptcy law are unimpeachable.  He has taught bankruptcy at UCLA law school since 1979, served as Associate Counsel to the Committee on Judiciary, U.S. House of Representatives, was one of the principal authors of the 1978 Bankruptcy Code, is founding partner of a thriving bankruptcy law firm, and practices regularly in bankruptcy courts around the country.  NPP 2233 (Biography of Kenneth N. Klee).  Indeed, even the DCL Plan Proponents concede that the Examiner was eminently qualified to conduct the examination.  3/9/11 Trial Tr. 200:21-201:9 (Black) (describing the Examiner as a "practitioner academic" and expert in bankruptcy law); 3/8/11 Trial Tr. 138:10-13 (Kurtz) (admitting the Examiner was "certainly competent to undertake the assignment he was given" and a "formidable academic in the bankruptcy arena").  In the DCL Plan Proponents' own words, "[o]ver the course of three months, and at a cost of over $12 million, [the Examiner] reviewed hundreds of pages of briefing submitted by the parties, as well as tens of thousands of pages of documents, and also conducted 38 witness interviews and a number of informal exchanges."  NPP 2186 (DCL Resolicitation Motion) at 41, ¶ 66; see also NPP 782 (Exam'rs Rpt.), Vol. I at 28-38.  There can be no serious dispute that the Examiner's investigation of the LBO Claims was far more searching and impartial than that conducted by Sidley, and spoon fed to the Debtors' expert, Black.

[547] 3/15/11 Trial Tr. 249:19-250:1 (Gropper).

[548] 3/15/11 Trial Tr. 261:11-24, 263:15-264:3 (Gropper).

[549] 3/8/11 Trial Tr. 65:21-66:17 (Kurtz).

disagreed with the Senior Lenders' view of the merits of the claims, but never suggested it was unwilling to compromise.[550]  In any case, instead of working to narrow the gap between Aurelius and the Senior Lenders, Kurtz simply "gave up," and decided to complete the negotiations without input from the Senior Noteholders.[551]  Still eager to engage in compromise negotiations, Aurelius continued to reach out to the Debtors to try to advance the settlement process, sharing Aurelius's Examiner model with representatives from Lazard and requesting meetings to discuss settlement options,[552] but the Debtors never provided any feedback with respect to the Aurelius model, nor did they share with Aurelius any models or settlement analyses of their own, or ever try to discuss any views regarding a potential settlement with Aurelius.[553]

Meanwhile, the DCL Plan Proponents were meeting amongst themselves to reach a deal without having to confront Aurelius's evidence that the LBO Claims were worth billions, not millions, of dollars.  For instance, just two days after refusing Aurelius's request to arrange a meeting with the Senior Lenders, the Debtors entered a conclave with the Senior Lenders and the Creditors' Committee to discuss settlement without Aurelius, despite the fact that Aurelius was then the second-largest holder of the Senior Notes.[554]  It is undisputed that Aurelius was not informed of, much less invited to, the meeting.[555]  Aurelius also was excluded from the third and penultimate mediation session attended by the DCL Plan Proponents on October 8, 2010, despite its repeatedly expressed desire to be involved in all mediation sessions and other settlement

---

[550] 3/8/11 Trial Tr. 141:22-142:16 (Kurtz); 3/15/11 Trial Tr. 261:2-6 (Gropper).

[551] Kurtz's dismissal of Aurelius was in stark contrast to the way he handled members of the DCL Plan Proponent group when they appeared to be at an impasse, with whom he claims to have had "more than a thousand" conversations in connection with the plan negotiations.  *See* 3/8/11 Trial Tr. 123:10-22 (Kurtz). In contrast, Kurtz spoke with Aurelius just twice after release of the Examiner Report and outside of the mediation, even though, by September, Aurelius was the single largest Pre-LBO Noteholders in the case.  *See* 3/15/11 Trial Tr. 259:23-260:2, 261:7-17 (Gropper).

[552] *See* 3/15/11 Trial Tr. 251:7-253:3 (Gropper).

[553] *See id.* at 255:5-14, 259:12-16, 273:2-21 (Gropper).

[554] *See* 3/8/11 Trial Tr. 60:22-61:7 (Kurtz); 3/15/11 Trial Tr. 266:20-267:9 (Gropper).

[555] 3/15/11 Trial Tr. 266:20-267:4 (Gropper).

negotiations.[556]  Aurelius was not notified of the terms under discussion during the mediations, and learned that the DCL Plan Proponents had struck a deal only when it was publicly announced as a *fait accompli* on October 12, 2010.[557]  Kurtz finally explained the Debtors' decision to exclude Aurelius from substantive involvement in settlement discussion when, in October 2010 – after the DCL deal was inked – he told Gropper that the Debtors "were going to try and get this done in court and if they couldn't get it through, then they would negotiate" with Aurelius.[558]

The Creditors' Committee was similarly uninterested in discussions with Aurelius on the topic of settlement.  Again, while the DCL Plan Proponents have attempted to portray Aurelius as an unreasonable negotiating partner, Aurelius never suggested to the Creditors' Committee that it was unwilling to make a reasonable compromise; instead, during its first post-Examiner's Report audience with the Creditors' Committee—an August 17, 2010 conference call—Aurelius merely explained its preliminary view that the Examiner's Report justified full payment to the Senior Noteholders.[559]  As it turns out, the Creditors' Committee met with the DCL Plan Proponents just hours after its call with Aurelius, but did not bother to inform Aurelius of the meeting or its outcome.[560]  When Aurelius finally arranged a face-to-face meeting with the Creditors' Committee on October 7, 2010 to discuss settlement alternatives and explain how it had calculated the expected value of the claims at $1.8 billion or more based on the Examiner's Report, the Creditors' Committee did not ask any questions or share any of its own analysis

---

[556] *See* 3/16/11 Trial Tr. 176:4-10 (Gropper).
[557] *See* 3/15/11 Trial Tr. 276:20-277:4 (Gropper) ("Q: Now, the record is clear there came a time when two term sheets were released during the course of the mediation.  Gropper, you're familiar with that?  A: Yes.  Q: Okay. Were you aware in any respect of any of the terms of those before they were released?  A: No.  Q: Okay.  Did you have any idea that they were under discussion?  A: No.").
[558] 3/15/11 Trial Tr. 287:12-288:7 (Gropper).
[559] *See* 3/15/11 Trial Tr. 268:5-15 (Gropper); 3/8/11 Trial Tr. 283:25-284:17 (Salganik).
[560] 3/16/11 Trial Tr. 172:9-173:1 (Gropper).

regarding the claims.[561]  Later that day, Creditors' Committee counsel assured Aurelius that the

Creditors' Committee would work with Aurelius "collaboratively and cooperatively" going

forward.[562]  Incredibly, the ***next day*** Creditors' Committee counsel attended the October 8, 2010

mediation session at which the Creditors' Committee agreed to a deal, without so much as

notifying Aurelius the meeting was taking place, much less seeking Aurelius's input on

settlement terms.[563]  The Creditors' Committee ignored Aurelius's requests to meet following the

release of the second term sheet in October 2010 entirely.[564]

### D.      The Deeply Flawed Process Resulted in a Deeply Flawed Settlement

As a consequence of the DCL Plan Proponents' exclusion of Aurelius from the settlement

negotiations—and the manifold conflicts and other problems with the process described above—

the Proposed Settlement before the Court lacks the presumption of fairness that otherwise might

be associated with a deal actively negotiated and agreed to by the Pre-LBO Noteholders.[565]

Indeed, the one-sided terms of the proposed settlement only can be explained as a product of the

flawed process from which it arose.

The DCL Plan calls for an initial distribution to the Senior Noteholders of ***less*** than they

would have gotten under the settlement agreed to before the Examiner's Report was released,

despite the fact that the Creditors' Committee, the Debtors—and even Oaktree—admitted that

---

[561] *See* 3/8/11 Trial Tr. 286:13-17 (Salganik) ("Q: When Aurelius was at the meeting, was there any discussion by committee members or committee representatives concerning assumptions or procedures built into the model?  A: I – I don't believe we asked any questions at that meeting."); DCL 87 (10/7/10 Creditors' Committee Meeting Minutes).

[562] 3/16/11 Trial Tr. 123:11-15 (Gropper).

[563] See 3/8/11 Trial Tr. 241:13-16 (Salganik) ("Q: And your counsel reported to you and advisors reported to you on the mediation session that occurred on October 8th?  A: Yes."); 3/16/11 Trial Tr. 176:4-10 (Gropper) ("Q: Okay. Did you have the slightest idea that there was a mediation session scheduled for twelve hours following your meeting with Mr. Seife?  A: No.  Q: Did he tell you anything to lead you to believe that the committee was in the process of finalizing a deal?  A: No.").

[564] *See* 3/15/11 Trial Tr. 288:8-289:1 (Gropper).

[565] 3/8/11 Trial Tr. 265:21-266:4 (Salganik) (agreeing "that in connection with the settlement ultimately supported by the committee in this case there is no such confirmation or validation in the form of a noteholder that played the role that Centerbridge played in the April settlement").

the Examiner's Report was favorable to the Noteholders and other Pre-LBO Noteholders.[566]

Under the terms of the April Plan, the Senior Noteholders were to receive $391 million of

settlement consideration, the DCL Plan as originally negotiated provided just $369 million to the

Senior Notes.[567]  Expressed in terms of percent of the face amount of their respective claims, the

Senior Noteholders recovery dropped from a strip of consideration worth 35.18% of their total

claim, to a distribution equivalent to just 33.59% of their claim.[568]  Meanwhile, the Senior

Lenders' recovery increased dramatically under the DCL Plan.  Based on a $6.75 billion DEV,

the Senior Lenders will recover 71.1% of the face amount of their debt compared to the 62.85%

contemplated in April.[569]  If, as the evidence indicates, the Debtors' DEV is actually around $8

billion, the Senior Lenders will recover more than 85% of the value of their claims.[570]

A claim-by-claim examination of the consideration being provided by the Senior Lenders

also illustrates the insufficiency of the DCL Plan.  The proposed settlement contemplates the

release of more than $6.4 billion in Step One disallowance claims in exchange for payment by

the Senior Lenders of just $322 million, while $1.8 billion of Step One disgorgement claims

against the Senior Lenders (before pre-judgment interest) would be released for ***nothing***.  To be

sure, the Examiner's concluded that Step One was less likely to be deemed a fraudulent

---

[566] 3/8/11 Trial Tr. 285:16-23 (Salganik); 3/15/11 Trial Tr. 264:4-10 (Gropper); NPP 812 (8/22/10 email from B. Karsh to H. Marks) (predicting collapse of the April Plan in the wake of the Examiner's Report was probably "good for the bonds"); NPP 2033 (7/27/10 email from A. Goldman to S. Shapiro) (Angelo Gordon attorney noting that the Examiner's Report was "interesting" "though not unexpected," and that they "assume bonds are up" on the news).
[567] 3/15/11 Trial Tr. 292:14-294:3 (Gropper); *see also* NPP 2473 (Trial Demonstrative); NPP 2170 (Mediator's Second Report) Ex. A; NPP 24 (4/8/10 Executed Settlement Support Agreement).
[568] The DCL Plan Proponents argue that the shareholder and other claims they propose to put in a litigation trust increase the value of the settlement consideration, but have never even said what they believe those claims are worth, much less offered any evidence of that alleged value.  Moreover, the DCL Plan Proponents forget that the Litigation Trust Claims will be available to the estates whether or not the DCL Plan is approved.  Similarly, while the DCL Plan Proponents make much of their proposal to allocate some of their interest in those claims to Non-LBO Creditors, they ignore the fact that equitable principles could well prevent them from retaining any interest in any LBO Claims, including in the Litigation Trust.  *See also* Section V above.
[569] 3/15/11 Trial Tr. 292:14-294:3 (Gropper); *see also* NPP 2473 (Trial Demonstrative); NPP 2170 (Second Mediator's Report), Ex. A); NPP 24 (4/8/10 Executed Settlement Support Agreement).
[570] *Id.* at 292:14-294:3 (Gropper).

conveyance than Step Two, but he still projected that such an outcome was "reasonably unlikely."[571]  Even using the midpoint of the probability range assigned by the Debtors' own expert to the phrase "reasonably unlikely"–22.5%—it is clear that the Step One avoidance claim alone is worth substantially more than $322 million, and that release of the Step One disgorgement claim for nothing is completely unjustified.[572]  In addition, the settlement would allow the Senior Lenders to escape a near certain $318 million worth of Step Two disgorgement claims (before pre-judgment interest) for payment of just $120 million, and pay precisely *nothing* to the Pre-LBO Noteholders in exchange for the release of $1.9 billion of Step Two avoidance claims.[573]  Finally, the DCL Plan would release more than $1.6 billion in claims against the Bridge Lenders for $13 million.[574]

The last thing one would have expected in the wake of the Examiner's Report are these massively improved recoveries to the Senior Lenders at the expense of the Pre-LBO Noteholders, whose position should have been greatly improved by the Examiner's Report.[575] The Alice-in-Wonderland outcome conjured by the Senior Lenders can be explained only by the flawed and unfair process from which it arose, and the self-interest animating the parties by whom it was negotiated.  The DCL Plan should be rejected accordingly.

[571] NPP 782 (Exam'rs Rpt.), Vol. II at 22.

[572] Significantly, the Examiner did not assign his lowest probability rating—"highly unlikely"—to a finding of Step One intentional fraud, indicating his disagreement with the DCL Plan Proponents' dim view of the merits of the Step One claims.

[573] The Senior Lenders added approximately $74 million in consideration for release of the Step Two avoidance claim, but none of that value goes to the Pre-LBO Noteholders, the largest beneficiaries of the claim being released. 3/9/11 Trial Tr. 76:20-77:6 (Kulnis).  Instead most of the value will be paid to unsecured creditors who just happen to be a part of the voting majority that caused the Creditors' Committee to support the plan, while the remaining $14 million will be paid to Oaktree, itself a Senior Lender!

[574] The support of Oaktree and Angelo Gordon for all these free releases is in marked contrast to the position they took regarding the proposed release of shareholders, directors and officers for free in connection with the April Plan. Back then, Oaktree and Angelo Gordon took the position that "***people can't just be handed releases***" for free. NPP 1989 (4/12/10 Credit Agreement Lenders' Settlement Statement) at 7.  What a difference a year makes.

[575] *See* 3/15/11 Trial Tr. 292:4-294:6 (Gropper) (explaining the differences between the recoveries under the April Settlement and the DCL Settlement and that "in light of the examiner report…this progression of events" "made no sense to [him] whatsoever."); *see also* 3/15/11 Trial Tr. 264:4-10 (Gropper) ("[Kurtz] said that in light of the examiner report, the banks were crazy to walk away from the April deal.").

## CONCLUSION

As demonstrated by the foregoing, the evidence presented at trial and in the record show that the DCL Plan cannot be confirmed, and that the Court should confirm the NPP Plan.

Dated: May 11, 2011

AKIN GUMP STRAUSS HAUER & FELD LLP
Daniel H. Golden
David Zensky
Philip C. Dublin
Abid Qureshi
Mitchell P. Hurley
One Bryant Park
New York, NY 10036
(212) 872-1000

*Counsel for Aurelius Capital Management, LP*

ASHBY & GEDDES, P.A.

William P. Bowden (I.D. No. 2553)
Amanda M. Winfree (I.D. No. 4615)
500 Delaware Avenue, P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888

McCARTER & ENGLISH, LLP
David J. Adler
245 Park Avenue
New York, NY 10167
212-609-6800

McCARTER & ENGLISH, LLP

Katharine L. Mayer (I.D. No. 3758)
Renaissance Centre
405 N. King Street
Wilmington, DE 19801
302-984-6300

*Counsel for Deutsche Bank Trust Company Americas, solely in its capacity as successor Indenture Trustee for certain series of Senior Notes*

KASOWITZ, BENSON, TORRES &
FRIEDMAN LLP
David S. Rosner
Andrew K. Glenn
Sheron Korpus
Christine A. Montenegro
Matthew B. Stein
1633 Broadway
New York, New York 10019
Tel: (212) 506-1700
Fax: (212) 506-1800

BIFFERATO GENTILOTTI LLC

Garvan F. McDaniel (I.D. No. 4167)
800 N. King Street, Plaza Level
Wilmington, Delaware 19801
Tel: (302) 429-1900
Fax: (302) 429-8600

*Counsel for Law Debenture Trust Company of New York, solely in its capacity as successor Indenture Trustee for certain series of Senior Notes*

BROWN RUDNICK LLP
Robert J. Stark
Martin S. Siegel
Gordon Z. Novod
Seven Times Square
New York, NY 10036
212-209-4800

SULLIVAN HAZELTINE ALLINSON LLC

William D. Sullivan (I.D. No. 2820)
Elihu E. Allinson, III (I.D. No. 3476)
901 N. Market St., Suite 1300
Wilmington, DE 19801
302-428-8191

*Counsel for Wilmington Trust Company, solely in its capacity as successor Indenture Trustee for the PHONES Notes*