IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re<br><br>TRIBUNE COMPANY, *et al.*,<br><br>Debtors. | Chapter 11<br>Case No. 08-13141 (KJC)<br>Jointly Administered |

## POST-TRIAL BRIEF OF THE NOTEHOLDER PLAN PROPONENTS
### (PART II – FCC SUPPLEMENT)

LERMAN SENTER PLLC
Meredith S. Senter, Jr.
Sally A. Buckman
2000 K Street NW, Suite 600
Washington, DC 20006
(202) 429-8970

*Counsel for Aurelius Capital Management, LP*

FRIEDMAN KAPLAN SEILER & ADELMAN LLP
Edward A. Friedman
Robert J. Lack
Kizzy L. Jarashow
7 Times Square
New York, NY 10036-6516
(212) 833-1100

*Counsel for Aurelius Capital Management, LP as to matters concerning JPMorgan and Angelo Gordon, but not Oaktree*

McCARTER & ENGLISH, LLP
David J. Adler
245 Park Avenue
New York, NY 10167
212-609-6800

ASHBY & GEDDES, P.A.
William P. Bowden (I.D. No. 2553)
Amanda M. Winfree (I.D. No. 4615)
500 Delaware Avenue, P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888

McCARTER & ENGLISH, LLP
Katharine L. Mayer (I.D. No. 3758)
Renaissance Centre
405 N. King Street
Wilmington, DE 19801
302-984-6300

*Counsel for Deutsche Bank Trust Company Americas, solely in its capacity as successor Indenture Trustee for certain series of Senior Notes*

BIFFERATO GENTILOTTI LLC
Garvan F. McDaniel (I.D. No. 4167)
800 N. King Street, Plaza Level
Wilmington, Delaware 19801
302-429-1900

*Counsel for Law Debenture Trust Company of New York, solely in its capacity as successor Indenture Trustee for certain series of Senior Notes*

BROWN RUDNICK LLP
Robert J. Stark
Martin S. Siegel
Gordon Z. Novod
Seven Times Square
New York, NY 10036
212-209-4800

SULLIVAN HAZELTINE ALLINSON LLC
William D. Sullivan (I.D. No. 2820)
Elihu E. Allinson, III (I.D. No. 3476)
901 N. Market St., Suite 1300
Wilmington, DE 19801
302-428-8191

*Counsel for Wilmington Trust Company, solely in its capacity as successor Indenture Trustee for the PHONES Notes*

## ARGUMENT

## THE DCL PLAN CREATES ISSUES THAT WILL IMPEDE FCC APPROVAL

The DCL Plan[1] should not be confirmed, because the ownership interests and director-designation rights that it confers on JPMorgan, Angelo Gordon and Oaktree would result in multiple violations of Federal Communications Commission ("FCC") rules. These proponents have interests in other media companies that operate in the same markets as the Company, which, coupled with the interests in Reorganized Tribune that the proponents stand to receive under the DCL Plan, will violate FCC media ownership rules. Even if eventually resolved though curative action by the proponents, these violations will delay and impede FCC approval of the DCL Plan, preventing it from satisfying Section 1129(a)(11)'s feasibility requirement and weighing strongly against confirmation.

A.  **Relevant FCC Process and FCC Rules**

The Debtors own broadcast stations across the country. The FCC must therefore approve any plan of reorganization. In ruling on any such plan, the FCC must first assess whether the reorganized entity will comply with FCC rules.[2]

Of primary significance in this case are the following ownership rules: (i) the newspaper/broadcast cross-ownership rule ("NBCO Rule"), which prohibits common ownership of a <u>daily newspaper</u> and a <u>broadcast station</u> in the same market; (ii) the local television ownership rule, which prohibits common ownership of <u>two television stations</u> in the same market, with certain exceptions; and (iii) the local radio ownership rule, which limits the <u>number of radio stations</u> that may be commonly owned in the same market.[3] Common ownership is

---

[1] All capitalized terms herein have the meanings set forth in Part I of the Post-Trial Brief of the Noteholder Plan Proponents (the "NPP Trial Brief").

[2] *See* NPP FCC 65 (Prak Expert Rpt.) at 18; 3/17/11 Trial Tr. 27:8-28:5 (Prak); *Applications of Comcast Corp.*, FCC 11-4, ¶¶ 22, 258 (2011) ("NBCU/Comcast").

[3] *See* 47 C.F.R. § 73.3555(a), (b), (d).

deemed to exist if a person holds an attributable interest in two media properties in the same market.[4] Attributable interests are "interests or relationships ... that confer on their holders a degree of influence or control such that the holders have a realistic potential to affect the programming decisions ... or other core operating functions" of an FCC licensee.[5] For example, a 5% or greater voting stock interest is generally attributable, as is a director position or the right to designate a director.[6]

### B. The DCL Plan Proponents' Existing Media Interests, Coupled with Their Proposed Interests in Reorganized Tribune, Would Violate FCC Rules

There is no dispute that the DCL Plan would give JPMorgan, Angelo Gordon and Oaktree attributable interests in Reorganized Tribune and that they would not have attributable interests under the Noteholder Plan.[7] There also is no dispute that these proponents all have substantial existing ownership interests in other media companies, many of which operate in the Debtors' markets.[8] Accordingly, before the FCC could approve the transfer of the Debtors' licenses under the DCL Plan, it must evaluate whether the attributable interests to be acquired by JPMorgan, Angelo Gordon and Oaktree, coupled with their existing media interests, violate FCC rules.[9] To the extent that they do, curative action would have to be taken.

Set forth below are attributable interests that JPMorgan and Angelo Gordon currently hold and the FCC rule violations that would be created under the DCL Plan.

**Gannett:** JPMorgan has an attributable 10% ownership interest in Gannett

---

[4] See 47 C.F.R. § 73.3555, Note 2 (setting forth attribution rules).
[5] Review of the Commission's Regulations Governing Attribution of Broadcast and Cable/MDS Interests, 14 FCC Rcd 12559, 12560 (1999) ("1999 Order"), 47 C.F.R. § 73.3555, Note 2 (setting forth attribution rules).
[6] See 47 C.F.R. § 73.3555, Note 2; Telemundo Commc'ns Group, Inc., 17 FCC Rcd 6958, 6973 (2002).
[7] See NPP FCC 35 (Tribune FCC Applications, Comprehensive Exhibit to FCC Form 314, filed August 2010) at 4-5 (noting that each "will be deemed to hold attributable interests in Reorganized Tribune" under the DCL Plan); 4/12/11 Trial Tr. 61:3-9 (Rosenstein).
[8] See id. at Attachments C, D and E.
[9] See NBCU/Comcast ¶¶ 22, 258.

2

Company, Inc. ("Gannett").[10] The combination of the Gannett interest with the proposed Reorganized Tribune interest would violate FCC ownership rules, because Gannett owns daily newspapers and television stations in some of the same markets as the Debtors.[11]

JPMorgan contends that its interest in Gannett is not attributable, invoking a higher (20%) attribution threshold applicable to "passive investors" such as mutual funds.[12] However, the FCC has specifically ruled that investment advisors are subject to the 5% threshold for attribution.[13] Although JPMorgan has so far failed to disclose it to the FCC, a JPMorgan affiliate acts as the investment advisor or manager to such mutual funds, has the power to vote the Gannett shares and thus exerts precisely the type of control and involvement about which the FCC is concerned.[14] Therefore, JPMorgan is a non-passive investor subject to the 5% rather than the 20% passive-investor threshold.[15]

**Freedom:** JPMorgan ▓▓▓▓▓ and Angelo Gordon owns 18-25% ▓▓▓▓▓ ▓▓▓▓▓ and each has an attributable interest in, Freedom Communications Holdings, Inc. ("Freedom").[16] The combination of the Freedom interests with the proposed Reorganized Tribune interests would violate FCC ownership rules because Freedom owns daily newspapers

---

[10] *See* NPP FCC 44 (JPMorgan Chase Bank, N.A., Media Ownership Certification, dated January 14, 2011) at 5 ("[A]s of May 27, 2010, JPM held 25,657,691 shares (or 10.8459%) of Gannett's outstanding common stock."); NPP FCC 30 (Tribune FCC Applications, Supplement to Exhibit 12 of FCC Form 314, filed June 2010) at 1-2.

[11] *See* NPP FCC 44 at 5 n.4; NPP FCC 30 at 1 n.2; NPP FCC 65 at Ex. 4.

[12] NPP FCC 30 at 1.

[13] *See* 3/17/11 Trial Tr. 50:16-52:19 (Prak); *Pinelands, Inc.*, 7 FCC Rcd 6058, 6059 n.5 (1992); *Mario J. Gabelli*, 7 FCC Rcd 5594 (1992); 1999 Order (rejecting same argument made by the DCL Plan Proponents).

[14] *Compare* NPP FCC 44 at 5-6 *and* NPP FCC 33 (JPMorgan Value Opportunities Fund, Annual Report, dated June 30, 2010) at 22; NPP FCC 38 (J.P. Morgan U.S. Equity Funds, SAI) at Parts I-4, I-28-29, II-80-83; NPP FCC 39 (JPMorgan Funds, SAI) at 34-35. *See* NPP FCC 118 (SEC Schedule 13G of Gannett Co., Inc., dated April 30, 2010) at 2.

[15] Indeed, JPMorgan itself has recognized that its interest in Gannett may result in a violation of FCC rules. In a filing with the FCC, JPMorgan has committed that, if the FCC concludes that the interest in Gannett is attributable, JPMorgan will either restructure its Gannett ownership or eliminate its attributable interest in Reorganized Tribune. NPP FCC 30 at 2 n.8. Yet JPMorgan has not disclosed its investment advisor relationship to the FCC, and this disclosure will further delay the FCC's evaluation of the DCL Plan. 3/17/11 Trial Tr. 64:6-13 (Prak).

[16] ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Deposition of Gavin Baiera dated March 1, 2011 ("Baiera Dep. Tr.") 326:5-327:2.

3

or television stations in several of the Debtors' markets.[17]

In testifying to the contrary, DCL Plan Proponents' FCC expert, Mace Rosenstein, ignored the fact that pursuant to Freedom's April 2010 Plan of Reorganization, JPMorgan was a member of a "Steering Committee" that had director-designation rights,[18] notwithstanding that Mr. Rosenstein also testified that each member of a group with director-designation rights is deemed to have an attributable interest.[19] He also down-played Angelo Gordon's right to a Freedom board observer,[20] which the FCC considers to be an attributable interest.[21]

**Journal Register:** JPMorgan ▮▮▮▮▮▮▮▮▮▮ and has an attributable interest in Journal Register Company ("Journal Register"), because JPMorgan is a member of a group of "Consenting Lenders" that had director-designation rights.[22] The combination of the Journal Register interest with the proposed interest in Reorganized Tribune would violate FCC ownership rules in the Hartford and Philadelphia markets where Journal Register owns the *New Haven Register* and the *Trentonian*, respectively.[23]

**NBC Universal:** JPMorgan director Stephen Burke is CEO of NBC Universal, Inc. ("NBC Universal"), which, among other things, owns numerous broadcast television

---

[17] *See* NPP FCC 65 at Ex. 8; NPP FCC 120 (Prak Demonstratives (JPMorgan and Angelo Gordon)) at 6.
[18] *See* NPP FCC 106 (Joint Plan of Reorganization under Chapter 11, Title 11, United States Code of Freedom Communications Holdings, Inc., et al.) at 16, 32.
[19] *See* 4/12/11 Trial Tr. 46:25-47:24, 73:23-74:18; 83:3-14; 89:16-90:25; 98:22-99:7 (Rosenstein).
[20] *See* NPP FCC 105 (Freedom Communications Holdings, Inc. Stockholders Agreement, dated March, 2010) at 13-14, § 8(a), (d); Baiera Dep. Tr. 327:6-328:8.
[21] *See Una Vez Mas Texas Holdings, LLC*, DA 10-1811, 2010 WL 3738771, *7; *see also* 3/17/11 Trial Tr. 46:25-47:24 (Prak); *Paxson Mgmt. Corp.*, 22 FCC Rcd 22224, 22226-27; 4/12/11 Trial Tr. 74:7-18; 89:22-90:25 (Rosenstein) (FCC application requires disclosure of board observer rights). ▮▮▮▮▮▮▮▮▮▮ *See* NPP FCC 19 at 1.
[22] *See* NPP FCC 99 (Plan Support Agreement by and among Journal Register Company and the Consenting Lenders, dated February 20, 2009) at PDF pp. 9, 41; *see also* NPP FCC 100 (Disclosure Statement with Respect to Amended Joint Chapter 11 Plan of Reorganization for Journal Register Company and Its Affiliated Debtors, dated May 6, 2009) at PDF p. 97.
[23] *See* NPP FCC 74 (Journal Register, Our Products, dated February 22, 2011); NPP FCC 65 at Ex. 5.

4

stations.[24] Unless JPMorgan can demonstrate to the FCC's satisfaction that Mr. Burke's interest in JPMorgan qualifies for an exemption to the attribution rules, his interests in NBC Universal and JPMorgan would result in violations of FCC ownership rules.[25]

**NextMedia:** Angelo Gordon owns 42.6% of the equity of, and has attributable director-designation rights in, NextMedia Group, Inc. ("NextMedia").[26] The combination of this interest with the proposed interest in Reorganized Tribune would violate the FCC local radio ownership rule.[27]

Mr. Rosenstein based his testimony that Angelo Gordon does not have an attributable interest in NextMedia on his belief that Angelo Gordon has no board-designation right.[28] But this ignores the provision in NextMedia's Supplement to Plan Supplement stating that "[t]he final member of the New Board [of NextMedia] will be designated by Angelo, Gordon and disclosed at or before the Confirmation Hearing."[29] Mr. Rosenstein also incorrectly concluded that Angelo Gordon does not have continuing board-designation rights, but mere nomination rights.[30] This ignores the plain language of the NextMedia Stockholders Agreement, which *requires* NextMedia Shareholders to vote in favor of Angelo Gordon's "nominees."[31]

C. <u>Addressing These Violations Will Impede Performance of the DCL Plan</u>

As detailed in the NPP Trial Brief, a bankruptcy plan of reorganization cannot be

---

[24] *See* NPP FCC 35 at 20; NPP FCC 41 (Comcast Press Release: Comcast and GE Name Steve Burke Chief Executive Officer of NBC Universal, dated January 12, 2011); *Comcast/NBCU* ¶ 18, Appendix D; NPP FCC 65 at Ex. 6.

[25] *See* DCL 1456 (Rosenstein Expert Rpt.) at 23-24; NPP FCC 65 at 24-25, 33-34.

[26] *See* NPP FCC 21 (NM Licensing LLC FCC Applications, Comprehensive Exhibit to FCC Form 314 (as amended), filed April 2010) at 3 n.8.

[27] *See* NPP FCC 120 at 6-7.

[28] 4/12/11 Trial Tr. 47:9-18; *but see* 76:11-77:10 (Rosenstein).

[29] NPP FCC 20 at PDF p. 560.

[30] 4/12/11 Trial Tr. 79:10-80:18 (Rosenstein).

[31] *See* NPP FCC 80 (NextMedia Group, Inc., Stockholders Agreement) at 10, § 2.1(c), 9-11, § 2.1(a) ("Each Stockholder hereby agrees that . . . such Stockholder shall vote all of the Voting Common Stock . . . so as to elect [the CEO Designee]"); *see also* 3/17/11 Trial Tr. 43:3-18 (Prak) ("[W]hile [under the NextMedia Stockholders Agreement] they are nominally referred to as nomination rights, if you look at them, there is no way, once you interpret the agreement, that anyone . . . other than the persons selected by Angelo Gordon, either to be the CEO or the replacement alternate director, is likely to end up being selected.").

5

confirmed unless it satisfies the Code's "feasibility" requirement. Among other things, a Court must consider any impediments to necessary regulatory approvals.[32] An inability to obtain such approvals in a timely manner weighs against confirmation.[33]

Recognizing the strong possibility that some of the proponents' existing media interests would create FCC rule violations, the DCL Plan provides that if any of these interests stands in the way of FCC approval as to any of the proponents:

> then such Creditor Proponent(s) shall within 60 days of such determination take such action as is necessary or appropriate to enable the Debtors and the Creditor Proponents to obtain such FCC approval. Such action may include, *at the sole discretion of such Creditor Proponent(s)*, without limitation, (i) altering or divesting an investment or other interest held by such Creditor Proponent(s) in any entity, (ii) relinquishing its Designation Rights, or (iii) making any commitment or explanatory filing to the FCC to permit the FCC approval to be obtained . . . .[34]

The DCL Plan Proponents contend that the availability of these remedies means that any FCC rule violations can and will be cured definitively and promptly.[35] To the contrary, these "cure" provisions provide for solutions that will take a great deal of time to implement and are not certain to be effective.[36] The process does not begin until the DCL Plan Proponents receive comments from the FCC.[37] The relevant proponents must then "reasonably determine" to take action based on those comments, and then determine in their "sole discretion" what action to take.[38] They then have sixty days to take such action,[39] and the DCL Plan provides for a number

---

[32] *See, e.g., In re TCI2 Holdings, LLC*, 428 B.R. 117, 154 (Bankr. D.N.J. 2010) (plan proponents required to "show that the new owners of the Reorganized Debtors will not face material hurdles to achieve the necessary regulatory approvals from the New Jersey Casino Control Commission").

[33] *See In re Granite Broad. Corp.*, 369 B.R. 120, 145-46 (Bankr. S.D.N.Y. 2007) (denying confirmation of preferred shareholder plan based on feasibility where plan contained time-sensitive FCC-approval condition precedent and such approval was likely to take months to obtain); *In re Sound Radio, Inc.*, 93 B.R. 849, 857 (Bankr. D.N.J. 1988) (court evaluated whether necessary FCC approvals could be timely obtained); *In re Cajun Elec. Power Coop.*, 230 B.R. 715, 747 (Bankr. M.D. La. 1999) (same with respect to FERC approvals).

[34] DCL 1441 at 50-51, § 5.3.2 (emphasis added).

[35] *See* 4/12/11 Trial Tr. 43:4-44:4 (Rosenstein).

[36] *See* 3/17/11 Trial Tr. 60:24-61:8 (Prak).

[37] *See* DCL 1441 at 50-51, § 5.3.2.

[38] *See id.*

[39] *Id.* at 50.

of possible actions, each of which would take substantial time to develop and implement, further delaying and impeding performance of the DCL Plan.[40] Most importantly, by leaving the choice of action to the relevant proponent's "sole discretion," the DCL Plan does not require that such action be the quickest, most efficient or even the most effective means to eliminate obstacles to FCC approval. For example, as noted above, the DCL Plan provides that the action may be limited to an "explanatory filing." As a result, the DCL Plan presents a serious risk that the plan proponents will have, and take, multiple chances to eliminate those obstacles, potentially delaying FCC approval (and therefore effectiveness of the plan) repeatedly and indefinitely.

Moreover, this "fix-it-later" strategy cannot begin to be implemented until the FCC has been apprised of all relevant facts. The DCL Plan Proponents, however, have withheld key facts from the FCC – e.g., that JPMorgan director Burke is CEO of NBC Universal.[41] Similarly, while recognizing that its Gannett interest is problematic by committing to restructure if the FCC finds the interest to be attributable,[42] JPMorgan has not yet disclosed to the FCC the full scope of that interest – that its affiliate is the investment advisor to the mutual funds in which JPMorgan contends its interest is merely passive. Even more egregiously, Angelo Gordon and JPMorgan have not disclosed anything to the FCC about their respective interests in Freedom, NextMedia and Journal Register. The DCL Plan Proponents' failure to disclose these interests will only add to the delays at the FCC.

### D. The DCL Plan Proponents' Other Media Interests Also Will Delay or Adversely Affect the Company's Waiver Requests

JPMorgan's, Angelo Gordon's and Oaktree's ownership of other media interests, even if not attributable, will complicate and adversely affect the waivers that Reorganized

---

[40] *See* 3/17/11 Trial Tr. 60:24-63:5 (Prak).
[41] *See* NPP FCC 65 at 33-34.
[42] *See* NPP FCC 30 at 2.

7

Tribune will require to retain its existing non-compliant combinations.[43] The FCC approval process will be complex enough because of Reorganized Tribune's need for waivers of FCC ownership rules in some of its most important and valuable markets.[44]

The DCL Plan Proponents' FCC expert has argued that, in evaluating these waiver requests, the FCC will only consider other media interests to the extent that they are attributable.[45] But that is not the law. While the FCC only considers "attributable" interests in determining whether its ownership rules would be violated, in evaluating rule waiver requests it is not similarly constrained.[46] The FCC's decision will be informed by a "deeply rooted preference for preserving and enhancing competition" and "ensuring a diversity of information sources and services to the public."[47] In assessing the effect of a proposed waiver on market concentration, one key factor that the FCC must consider is the effect of a proposed transaction on the level of market concentration.[48] The FCC has stated that it will "not employ any single metric . . . because as the Commission has learned from experience, there are too many qualitative and quantitative variables in evaluating different markets and combinations to reduce the task at hand to a precise mathematical formula."[49]

It is implausible that the FCC, in considering the rule waiver requests, would ignore the significant and arguably anticompetitive interests of the three controlling principals under the DCL Plan. Moreover, under the FCC's new NBCO rule, which the FCC modified

---

[43] See 3/17/11 Trial Tr. 52:15-53:25 (Prak).
[44] Recognizing this complexity, both plans provide that no new shareholder may hold an attributable interest that would require a waiver of the FCC's rules. See DCL 1441 at 54, § 5.4.2(d); NPP 2517 at 77, § 5.4.2(d).
[45] See 4/12/11 Trial Tr. 40:13-19 (Rosenstein).
[46] Although the case did not involve the NBCO Rule, in *NBCU/Comcast*, the FCC primarily focused on the effect of the transaction on competition, diversity, and localism – and imposed a number of conditions on the new company – notwithstanding that the transaction did not create any violations of the FCC's ownership rules. *See NBCU/Comcast* ¶¶ 3-5, 27-202. See 3/17/11 Trial Tr. 53:7-25 (Prak) ("Waiver requests allow one to look at the entire field.").
[47] *NBCU/Comcast* ¶ 23.
[48] See 47 C.F.R. § 73.3555(d)(5).
[49] *2006 Quadrennial Regulatory Review*, 23 FCC Rcd 2010, 2052, ¶ 73 (2008).

after it approved the LBO,[50] there is a presumption *against* a waiver in at least two of the Debtors' key markets: Chicago and Hartford.[51] In these markets, the Company must "demonstrate by clear and convincing evidence" that the requested waivers "will increase the diversity of independent news outlets . . . and increase competition among independent news sources in the relevant market."[52] In Hartford, JPMorgan ▓▓▓ an interest in the second largest daily newspaper, the *New Haven Register*. Yet, the Debtors' pending waiver request touts competition from this newspaper as a basis for granting a waiver.[53] And in Chicago, Angelo Gordon (through NextMedia) owns a significant interest in eight radio stations.[54] Moreover, in Los Angeles, JPMorgan, Angelo Gordon and/or Oaktree own interests in the second largest daily newspaper, the *Orange County Register* (through Freedom), one television and seven radio stations (through Liberman Broadcasting)[55] and two television stations (through NBC Universal), and in Miami, JPMorgan and Angelo Gordon will also own significant interests in a television station (through Freedom).

In sum, the DCL Plan introduces a complex web of interests, ownership-rule violations and substantial equity and debt stakes in major media companies. The interlocking interests that results from the attributable interests conferred by the DCL Plan will result in substantial additional delays, by at least six to eight months, to a process that already will take an inordinate amount of time because of the transaction's size and the waivers already required.[56]

---

[50] *Id.*
[51] *See* 47 C.F.R. § 73.3555(d)(2); NPP FCC 65 at 21; 3/17/11 Trial Tr. 56:10-19 (Prak).
[52] *2006 Quadrennial Regulatory Review*, 23 FCC Rcd at 2049, ¶ 68.
[53] *See* NPP FCC 25 at 50, 60-61; 3/17/11 Trial Tr. 56:22-59:4 (Prak).
[54] *See* NPP FCC 120 at 6; NPP FCC 62 (BIA MEDIA Access Pro Database Report, Radio Stations Listed by Owner, NextMedia, dated February 11, 2011).
[55] NPP FCC 119 (Prak Demonstratives (Oaktree)).
[56] NPP FCC 65 at 40; 3/17/11 Trial Tr. 63:17-64:16 (Prak).

## CONCLUSION

As demonstrated by the foregoing, the evidence presented at trial and in the record show that the DCL Plan cannot be confirmed, and that the Court should confirm the Noteholder Plan.

Dated: May 11, 2011

ASHBY & GEDDES, P.A.

*/s/ Amanda Winfree*

William P. Bowden (I.D. No. 2553)
Amanda M. Winfree (I.D. No. 4615)
500 Delaware Avenue, P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888

- and -

LERMAN SENTER PLLC
Meredith S. Senter, Jr.
Sally A. Buckman
2000 K Street NW, Suite 600
Washington, DC 20006
(202) 429-8970

*Counsel for Aurelius Capital Management, LP*

- and -

FRIEDMAN KAPLAN SEILER &
  ADELMAN LLP
Edward A. Friedman
Robert J. Lack
Kizzy L. Jarashow
7 Times Square
New York, NY 10036-6516
(212) 833-1100

*Counsel for Aurelius Capital Management, LP as to matters concerning JPMorgan and Angelo Gordon, but not Oaktree*

- and -

McCARTER & ENGLISH, LLP

Katharine L. Mayer (I.D. No. 3758)
Renaissance Centre
405 N. King Street
Wilmington, DE 19801
302-984-6300
- and -

McCARTER & ENGLISH, LLP
David J. Adler
245 Park Avenue
New York, NY 10167
212-609-6800

*Counsel for Deutsche Bank Trust Company Americas, solely in its capacity as successor Indenture Trustee for certain series of Senior Notes*

- and -

11

BIFFERATO GENTILOTTI LLC

/s/ G. McD.

Garvan F. McDaniel (I.D. No. 4167)
800 N. King Street, Plaza Level
Wilmington, Delaware 19801
Tel: (302) 429-1900
Fax: (302) 429-8600

*Counsel for Law Debenture Trust Company of New York, solely in its capacity as successor Indenture Trustee for certain series of Senior Notes*

- and -

SULLIVAN HAZELTINE ALLINSON LLC

*[signature]*

William D. Sullivan (I.D. No. 2820)
Elihu E. Allinson, III (I.D. No. 3476)
901 N. Market St., Suite 1300
Wilmington, DE 19801
302-428-8191

- and -

BROWN RUDNICK LLP
Robert J. Stark
Martin S. Siegel
Gordon Z. Novod
Seven Times Square
New York, NY 10036
212-209-4800

*Counsel for Wilmington Trust Company, solely in its capacity as successor Indenture Trustee for the PHONES Notes*