# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 08-13141 (KJC) |
| TRIBUNE COMPANY, et al.,[1] | Jointly Administered |
|            Debtors. | |

## POST-TRIAL REPLY BRIEF IN SUPPORT OF CONFIRMATION OF SECOND AMENDED JOINT PLAN OF REORGANIZATION FOR TRIBUNE COMPANY AND ITS SUBSIDIARIES PROPOSED BY THE DEBTORS, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, OAKTREE CAPITAL MANAGEMENT, L.P., ANGELO, GORDON & CO., L.P., AND JPMORGAN CHASE BANK, N.A. (AS MODIFIED APRIL 26, 2011)

SIDLEY AUSTIN LLP
James F. Conlan
Bryan Krakauer
Kevin T. Lantry
Jessica C.K. Boelter
One South Dearborn Street
Chicago, Illinois 60603
Telecopier: (312) 853-7036

COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telecopier: (302) 652-3117

*Counsel for Debtors and Debtors in Possession and Certain Non-Debtor Affiliates*

CHADBOURNE & PARKE LLP
Howard Seife
David M. LeMay
30 Rockefeller Plaza
New York, New York 10112
Telecopier: (212) 541-5369

LANDIS RATH & COBB LLP
Adam G. Landis (No. 3407)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telecopier: (302) 467-4450

ZUCKERMAN SPAEDER LLP
Graeme W. Bush
James Sottile
1800 M Street, N.W., Suite 1000
Washington, D.C. 20036
Telecopier: (202) 822-8106

*Counsel for the Official Committee of Unsecured Creditors*

DEWEY & LEBOEUF LLP
Bruce Bennett
James O. Johnston
Joshua M. Mester
333 South Grand Avenue, Suite 2600
Los Angeles, California 90071
Telecopier: (213) 621-6100

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Robert S. Brady (No. 2847)
M. Blake Cleary (No. 3614)
The Brandywine Building – 17th Floor
1000 West Street, Post Office Box 391
Wilmington, Delaware 19899 0391
Telecopier: (302) 571-1253

*Counsel for Oaktree Capital Management, L.P. and Angelo, Gordon & Co., L.P.*

WILMER CUTLER PICKERING HALE & DORR LLP
Andrew Goldman
399 Park Avenue
New York, New York 10022
Telecopier: (212) 230-8888

*Co-Counsel for Angelo, Gordon & Co, L.P.*

DAVIS POLK & WARDWELL LLP
Donald S. Bernstein
Damian S. Schaible
Elliot Moskowitz
450 Lexington Avenue
New York, New York 10017
Telecopier: (212) 701-5800

RICHARDS LAYTON & FINGER
Mark Collins (No. 2981)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telecopier: (302) 651-7701

*Counsel for JPMorgan Chase Bank, N.A.*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are listed on the next page.

Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc., f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); and WLVI Inc. (8074); WPIX, Inc. (0191). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 6061

## TABLE OF CONTENTS

I. THE NOTEHOLDERS HAVE ABANDONED THE EXAMINER AND THE TRIAL RECORD. .................................................................. 1

II. THE NOTEHOLDERS' STEP ONE ARGUMENTS ARE UNSUPPORTED BY EVIDENCE AND CONTRADICT THE EXAMINER. .................... 4

    A. Collapse ................................................................................. 4

    B. Tribune Solvency ................................................................. 6

    C. Guarantor Subsidiary Solvency ....................................... 10

    D. Ability To Pay Debts And Capital Adequacy .................. 10

    E. Lender Good Faith ............................................................. 11

    F. Intentional Fraudulent Transfer .................................... 12

III. THE NOTEHOLDERS' OTHER PATHWAYS TO SUCCESS ARE ILLUSORY. .................................................................................... 13

IV. THE EXAMINER'S FINDINGS SUPPORT THE REASONABLENESS OF THE DCL PLAN SETTLEMENT. .................................................. 17

    A. Recoveries Under The DCL Plan Settlement Are At The High End Of The Range Of Reasonableness Based On The Examiner's Findings ... 17

    B. Beron's Analysis Distorts And Contradicts The Examiner. ........... 19

    C. The Litigation And Creditors' Trusts Provide Real Value. ........... 21

    D. The Bar Order Is Both Necessary And Appropriate. ................. 23

V. LAZARD'S VALUATION IS ACCURATE. ........................................ 25

VI. THE DCL PLAN SETTLEMENT IS THE PRODUCT OF A RIGOROUS AND OPEN PROCESS. ................................................................... 27

VII. THE DCL PLAN PROPERLY ENFORCES PHONES SUBORDINATION. .......... 32

VIII. FCC ISSUES DO NOT IMPAIR THE FEASIBILITY OF THE DCL PLAN. .......... 35

IX. THE NOTEHOLDER PLAN IS FATALLY FLAWED. ...................... 37

X. CONCLUSION .............................................................................. 39

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

ACF-Brill Motors Co. v. Comm'r,
189 F.2d 704 (3d Cir. 1951).................................................................................5

Begier v. I.R.S.,
496 U.S. 53 (1990)...........................................................................34

Eichenholz v. Brennan,
52 F.3d 478 (3d Cir. 1995).........................................................24

In re Appleseed's Intermediate Holdings LLC,
No. 11-10160 (KG), slip op. (Bankr. D. Del. Apr. 14, 2011)...................................23

In re Cajun Elec. Power Coop., Inc.,
230 B.R. 715 (Bankr. M.D. La. 1999) ........................................36

In re Dow Corning Corp.,
237 B.R. 380 (Bankr. E.D. Mich. 1999) .....................................33

In re DVI, Inc.,
306 B.R. 496 (Bankr. D. Del. 2004) ...........................................34

EBC I, Inc. v. America Online, Inc. (In re EBC I, Inc.),
356 B.R. 631 (Bankr. D. Del. 2006)............................................34

In re Exide Techs.,
303 B.R. 48 (Bankr. D. Del. 2003) ...............................................9

In re Granite Broad. Corp.,
369 B.R. 120 (Bankr. S.D.N.Y. 2007).........................................36

In re Great Bay Hotel & Casino, Inc.,
251 B.R. 213 (Bankr. D.N.J. 2000) .............................................32

In re Owens Corning,
419 F.3d 195 (3d Cir. 2005)........................................................15

In re Sound Radio Inc.,
93 B.R. 849 (Bankr. D.N.J. 1988) ...............................................36

In re TCI 2 Holdings, LLC,
428 B.R. 117 (Bankr. D.N.J. 2010) .............................................36

In re Washington Mut., Inc.,
442 B.R. 314 (Bankr. D. Del. 2011) .......................................30, 33

Johnson v. United Airlines,
    784 N.E.2d 812 (Ill. 2003) ................................................................................24

Liquidation Trust of Hechinger Inv. Co. v. Fleet Retail Fin. Grp. (In re Hechinger Inv. Co.),
    327 B.R. 537 (D. Del. 2005) ...............................................................................6

Mervyn's, LLC v. Lubert-Adler Group IV, LLC (In re Mervyn's Holdings, LLC),
    426 B.R. 488 (Bankr. D. Del. 2010) ...................................................................5

MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.,
    910 F. Supp. 913 (S.D.N.Y. 1995) ...................................................................20

Moody v. Sec. Pac. Bus. Credit, Inc.,
    971 F.2d 1056 (3d Cir. 1992) ...........................................................................20

Mullins v. Burtch (In re Paul J. Paradise & Assocs.),
    249 B.R. 360 (D. Del. 2000) .............................................................................34

Munford v. Munford (In re Munford, Inc.),
    97 F.3d 449 (11th Cir. 1996) ...........................................................................24

Official Comm. of Unsecured Creditors of Nat'l Forge Co. v. Clark (In re Nat'l Forge Co.),
    344 B.R. 340 (W.D. Pa. 2006) ...........................................................................5

Official Comm. of Unsecured Creditors v. Credit Suisse (In re Champion Enterprises, Inc.),
    2010 Bankr. LEXIS 2720 (Bankr. D. Del. Sept. 1, 2010) ...............................15

Paloian v. LaSalle Bank, N.A.,
    619 F.3d 688 (7th Cir. 2010) .............................................................................8

TBG, Inc. v. Bendis,
    36 F.3d 916 (10th Cir. 1994) ...........................................................................24

United States v. Tabor Court Realty Corp.,
    803 F.2d 1288 (3d Cir. 1986) .............................................................................6

Voest-Alpine Trading USA Corp. v. Vantage Steel Corp.,
    919 F.2d 206 (3d Cir. 1990) ...............................................................................5

Will v. Northwestern (In re Nutraquest, Inc.),
    434 F.3d 639 (3d Cir. 2006) ............................................................................24

## STATUTES

Del. Code Ann. tit. 10, §§ 6301, 6304 ....................................................................24

740 ILCS 100/2 .......................................................................................................24

11 U.S.C. § 541(a)(3) ...................................................................................34

11 U.S.C. § 548(a)(1)(B) ...............................................................................4

11 U.S.C. § 1129(a)(10) ...............................................................................37

11 U.S.C. § 1129 (a)(11) ..............................................................................37

N.Y. C.P.L.R. § 1401 ...................................................................................23

N.Y. Gen. Oblig. § 15-108 ...........................................................................23

Cal. Civ. Proc. Code §§ 875, 877 .................................................................23

Mass. Gen. Laws ch. 231B, § 1 ....................................................................23

## OTHER AUTHORITIES

5 COLLIER ON BANKRUPTCY ¶ 550.02[3][a] (16th ed. 2009) ..........................34

http://articles.latimes.com/2010/sep/26/business/la-fi-tribune-20100926 ......29

http://www.reuters.com/article/2010/10/22/tribune-idUSN2216255020101022 .........29

http://www.upi.com/Business_News/2010/09/26/
    Hedge-fund-is-new-factor-in-Tribune-case/UPI-91191285521014/ ............29

Rev. Rul. 59-60; 1959-1 C.B. 237 ..................................................................8

Shannon P. Pratt, VALUING A BUSINESS (5th ed. 2007) ...............................8, 9

## I. THE NOTEHOLDERS HAVE ABANDONED THE EXAMINER AND THE TRIAL RECORD.[2]

The Noteholders have written a brief that might follow a trial on the merits of the settled claims. They present one side of the case – their side – without any acknowledgment that there is another side to each legal and factual argument they raise. The result is a brief that is of little assistance to this Court in assessing the reasonableness of the DCL Plan settlement. In contrast, the DCL Proponents' brief does not simply present the "other side" of the potential litigation. That is, in part, because the proponents of the DCL Plan comprise a diverse group approaching the potential litigation from different perspectives and with different viewpoints as to the likely outcome.[3] It is also the result of the fact that the issue before the Court is not whether one side or another in the potential litigation can write an argumentative brief, but whether the DCL Plan settlement adequately reflects the risk and uncertainty of the potential litigation and is fair, equitable, and in the best interests of the Estates and creditors. For all the reasons shown at trial and in the DCL Proponents' briefs, the settlement meets each of these criteria.

Tellingly, in their latest submission, the Noteholders have dramatically changed course from the case they made at trial. The Noteholders now disregard much of the evidence actually presented at trial and point almost exclusively to snippets of non-testimonial evidence they claim support the avoidance of Step One Claims, with their "other pathways" to recovery taking a conspicuous backseat. This is a tacit acknowledgment that, as demonstrated in the DCL Proponents' briefs and shown at trial, the attack on the DCL Plan settlement stands or falls on the prospect of avoidance of the Step One Claims. Absent that "home run" scenario, the Noteholders and all Non-LBO Creditors fare far better under the DCL Plan than under any litigated outcome.

---

[2] Defined terms and citation formats follow the methodology set forth in the DCL Proponents' Post-Trial Brief In Support Of Confirmation Of Second Amended Joint Plan Of Reorganization For Tribune Company And Its Subsidiaries [Docket No. 8897] (the "DCL Brief") at 1 n.2. The terms "NPP Brief" and "NPP FCC Brief" refer to Parts I and II of the Post-Trial Brief Of The Noteholder Plan Proponents [Docket Nos. 8932 and 8933], respectively.

[3] While the DCL Proponents each fully support the settlement, they have differing views on the strengths and weaknesses of the claims to be settled. Accordingly, each of the DCL Proponents reserves all of its rights in respect of the LBO-Related Causes of Action in the event the Court determines not to approve the settlement, and nothing in this brief is or should be taken as an admission by any of the DCL Proponents as to the merits of the claims or the significance of particular evidence or testimony in a litigation on the merits.

Ironically, the Noteholders' belated recognition that their case turns on full avoidance forces them to repeatedly challenge the Examiner's findings and conclusions, which they previously trumpeted as supporting their aggressive demands for payment in full. The Noteholders still acknowledge, as they must, that the Examiner's "investigation is by far the most comprehensive factual and legal review of the LBO Claims and, as the only truly independent party to undertake that review, he was in the best position to provide the most neutral assessments of those claims."[4] Yet, in the next breath, they accuse the Examiner of numerous errors regarding nearly every material finding and conclusion as to Step One avoidance:

- The Examiner found no "credible evidence" of intentional fraudulent transfer at Step One.[5] Citing no evidence that was not available to the Examiner, the Noteholders nonetheless claim that the Examiner "*overlook[ed]* the strong evidence of intentional fraud at Step One."[6]

- The Examiner found that a court likely would conclude it would be inappropriate to revise the Debtors' February 2007 projections and that those projections could be relied upon to evaluate Step One solvency.[7] The Noteholders, however, argue that the Examiner's Step One solvency analysis was "*incomplete*," that the Examiner "*fail[ed] to recognize*" alleged disparities in operating performance, and that the Examiner "*overlooked*" the alleged "back-end loaded" nature of the projections.[8]

- The Examiner found it is "somewhat unlikely" that a court would collapse Step One and Step Two and that, in order to collapse, "a court would not just have to expand on the existing law" but also that doing so "would entail disregarding . . . , in a very tangible way, substantive aspects of the Leveraged ESOP Transactions."[9] The Noteholders now claim that the "Examiner *erred* in finding that . . . a court [would] conclude collapsing is not warranted."[10]

- The Examiner found that even in a collapse scenario it is "somewhat unlikely" that the Tribune Entities were rendered insolvent at Step One.[11] The Noteholders assert that the

---

[4] NPP Brief at 65.

[5] Examiner Report, Vol. 2 at 26, 28.

[6] NPP Brief at 44 (emphasis added).

[7] Examiner Report, Vol. 2 at 213.

[8] NPP Brief at 42-43 (emphases added).

[9] Examiner Report, Vol. 2 at 181-82.

[10] NPP Brief at 26 (emphasis added).

[11] Examiner Report, Vol. 2 at 206.

Examiner was *wrong* and argue that the Tribune Entities were insolvent upon consummation of the Step One tender offer.[12]

- The Examiner found that it is "reasonably likely" that a court would conclude that Tribune was adequately capitalized and able to pay its debts as they became due after Step One.[13] The Noteholders again claim that the Examiner's analysis was *"incomplete"* and that Tribune was inadequately capitalized as a result of Step One.[14]

- Even though he mistakenly attributed the value of the Chicago Cubs and Classified Ventures to Tribune, the Examiner still found that a court would be "reasonably likely" to conclude that the Guarantor Subsidiaries were adequately capitalized and able to pay their debts as they became due at Step One.[15] The Noteholders now claim that the Examiner was *wrong* and that the Guarantor Subsidiaries were inadequately capitalized and unable to pay their debts even after properly accounting for the Cubs as a guarantor asset.[16]

- The Examiner found that the amount of the PHONES liability for purposes of a solvency determination is $663 million.[17] The Noteholders now claim that the Examiner was *wrong* and that, for purposes of determining solvency, the PHONES liability should be almost double that calculated by the Examiner – $1.256 billion.[18]

- The Examiner found no reasonable basis to conclude that the Senior Lenders acted in bad faith at Step One.[19] The Noteholders argue that the Examiner was *wrong* and that the Senior Lenders "do not have a good faith defense."[20]

That the Noteholders have found it necessary to focus on evidence not presented at trial, and to depart from the Examiner in so many fundamental ways, demonstrates that a fair reading of the Examiner Report does not support the Noteholders' extreme position. Rather, the evidence and the Examiner Report, each taken as a whole, shows that the DCL Plan settlement is reasonable, fair, and equitable.[21] The settlement appropriately reflects the Examiner's core findings, which

---

[12] NPP Brief at 22.

[13] Examiner Report, Vol. 2 at 211, 219-20.

[14] NPP Brief at 35, 42 (emphasis added).

[15] Examiner Report, Vol. 2 at 211, 219-20; DCL Brief at 39.

[16] NPP Brief at 28-29.

[17] Examiner Report, Vol. 2 at 210.

[18] NPP Brief at 30-31.

[19] Examiner Report, Vol. 2 at 264-88.

[20] NPP Brief at 53.

[21] The Noteholders also repeatedly contend that the DCL Proponents did not present evidence on particular points (*e.g.*, that the February projections were reasonable). In each case, however, the DCL Proponents' position is supported by the facts described and determinations reached by the Examiner, virtually all of which have been stipulated to by the Noteholders themselves. Moreover, the DCL Proponents understood that this was not a trial on the merits. Focusing on the actual issue currently before the Court, the DCL Proponents showed that the settlement is in the range of reasonableness given the positions that would be taken if the claims were to be litigated.

were borne out at trial: Step Two avoidance, even if likely, provides little incremental recovery for the Noteholders, while Step One avoidance, which is necessary to produce a full recovery, is unlikely. The DCL Plan should be confirmed and the Noteholder Plan should be rejected.

## II. THE NOTEHOLDERS' STEP ONE ARGUMENTS ARE UNSUPPORTED BY EVIDENCE AND CONTRADICT THE EXAMINER.

The Noteholders make a series of arguments in support of their assertion that *all* of the Step One Claims – against both Tribune *and* the Guarantor Subsidiaries – are virtually certain to be avoided if the case were to be litigated. In this, the Noteholders cannot surmount the clear evidence and the Examiner's numerous conclusions to the contrary.

### A. Collapse

The Noteholders' efforts to demonstrate insolvency at Step One hinge entirely on the argument that loans anticipated to be incurred in connection with the Step Two Transactions should be treated as though they actually had been incurred at Step One.[22] This is the "collapse" or "step integration" theory. To succeed, the Noteholders must challenge both the Examiner's conclusion and the testimony of their own solvency witness, who agreed with all of the facts underlying the Examiner's conclusion.[23] Confronted with this reality, the Noteholders now cite a hodgepodge of irrelevant facts and resort to misstatement of other facts and the applicable law.

First, the Noteholders argue that collapse should follow from the Lenders' commitment in April 2007 to fund both Step One and Step Two and their analysis of the financings as a whole.[24] This misses the mark entirely. The most important question is the *debtor's* obligation to borrow, not the *lender's* commitment to fund, as it is the debtor's solvency and financial condition that is at issue.[25] In this, the facts are clear. As the Examiner concluded, "the Credit Agreement did not obligate Tribune to obtain the Step Two Financing and did not make

---

[22] See DCL Brief at 35-36.
[23] See Examiner Report, Vol. 2 at 181-82; DCL Brief at 35-38.
[24] NPP Brief at 24-26.
[25] See 11 U.S.C. § 548(a)(1)(B).

Tribune's failure to obtain that financing an event of default."[26] Moreover, as the Examiner also noted, references in the deal documents to "a transaction" are not dispositive or even relevant.[27]

Second, the Noteholders incorrectly argue that Tribune's insistence on an up-front payment to shareholders (Step One) shows that "neither of the two steps" would have occurred on its own and that "each was . . . dependent on the other."[28] The Examiner reached the *opposite* conclusion. That Step One could proceed without the regulatory approvals required for Step Two was, for the Examiner, a clear indication that Step One was *not dependent* on consummation of Step Two. In fact, Tribune insisted on a tender offer (Step One) up-front so that, whether or not the merger (Step Two) happened, value would have been distributed to shareholders.[29] In the words of the Examiner, "although in theory all of the transactions could have been held in abeyance pending satisfaction of all conditions to the Merger, by design that is not how the transaction was structured."[30]

Ultimately, the Noteholders are left to argue that "the Examiner erred" in his application of the law by requiring that "the two steps [be] mutually dependent or conditioned on one another."[31] This argument fails because the Examiner's conclusion is consistent with well-established Third Circuit law.[32] In fact, the Noteholders do not cite a single case where a court has collapsed an

---

[26] Examiner Report, Vol. 2 at 174. Even the Lenders' commitment to finance the Step Two Transactions was subject to separate conditions, including receipt of a solvency certificate. See id. at 176.

[27] Examiner Report, Vol. 2 at 161 n.474 ("If the law governing collapse means anything, it is that labels mean nothing.").

[28] NPP Brief at 24.

[29] Tr. 3/9 at 141:11-20 (Black).

[30] Examiner Report, Vol. 2 at 167-68. The Examiner observed that Tribune may "have proceeded with a transaction similar to Step One had the Leveraged ESOP Transactions not been proposed." Id. at 167. In fact, Tribune had planned a major cash distribution to shareholders of $17.50 per share before Zell made his proposal. Tr. 3/9 at 141:11-20 (Black).

[31] NPP Brief at 26.

[32] See, e.g., Mervyn's, LLC v. Lubert-Adler Group IV, LLC (In re Mervyn's Holdings, LLC), 426 B.R. 488, 498 (Bankr. D. Del. 2010) (collapsing where steps "were each dependent on the others"); Voest-Alpine Trading USA Corp. v. Vantage Steel Corp., 919 F.2d 206, 212 (3d Cir. 1990) (collapsing where "each portion . . . was dependent upon the occurrence of the other"); ACF-Brill Motors Co. v. Comm'r, 189 F.2d 704, 707 (3d Cir. 1951) (upholding refusal to collapse because steps were not "so interdependent that the . . . one transaction would have been fruitless without the completion of the series"); Official Comm. of Unsecured Creditors of Nat'l Forge Co. v. Clark (In re Nat'l Forge Co.), 344 B.R. 340, 348 (W.D. Pa. 2006) (courts focus on "whether each step depended upon the occurrence of the additional steps"); Liquidation Trust of Hechinger Inv. Co. v. Fleet Retail Fin. Grp. (In re Hechinger Inv. Co.), 327 B.R. 537, 547 (D. Del. 2005) (collapsing where each step "relied on additional steps").

LBO transaction after finding that the steps of the transaction lacked mutual dependence.[33] The Noteholders also ignore the Examiner's findings regarding the conditional nature of the Step Two merger, which could not go forward without (among other things) the approval of the FCC, the consent of Major League Baseball, and the receipt of an independent certification of solvency.[34]

**B.     Tribune Solvency**

Even in the unlikely "collapse" scenario, the Examiner concluded that it is "somewhat unlikely" but "a very close call" that "a court would conclude that Tribune was rendered insolvent at Step One."[35] Here again the Noteholders disagree with the Examiner, criticizing the Examiner's analysis as "incomplete" and "affected by the Examiner's assessment of the February Projections."[36]

The Noteholders argue at length that the Examiner got it all wrong and that the February projections were "unrealistically optimistic" and should have been redone.[37] However, these very same arguments were considered and rejected by the Examiner, who found that "a court would likely conclude that it would be inappropriate to revise the February 2007 projections based on declines in performance in April and May."[38] As the Examiner explained, the 2007 operating plan covered "a much longer horizon" and full May information would not have been available by the time of the June 4 Step One closing.[39] The Examiner's conclusion is also consistent with the strong deference courts give to contemporaneous management projections.[40]

---

[33] Perplexingly, the Noteholders cite <u>United States v. Tabor Court Realty Corp.</u>, 803 F.2d 1288, 1302 (3d Cir. 1986), for its purported "focus[] on the knowledge and expectations" of the parties rather than on whether the transactions "were dependent or conditioned on one another." NPP Br. at 26 n.124. In fact, as the Examiner noted, "<u>Tabor Court</u> affirmed the lower court's findings regarding collapse of the transaction at issue because it was integrated and ***mutually dependent*** . . . ." Examiner Report, Vol. 2 at 87 (emphasis added).

[34] Examiner Report, Vol. 1 at 139-40.

[35] Examiner Report, Vol. 2 at 206.

[36] NPP Brief at 42-45.

[37] NPP Brief at 9-15.

[38] Examiner Report, Vol. 2 at 213.

[39] Examiner Report, Vol. 2 at 212-13. Tribune's longer-range projections were in line with analyst estimates. <u>See</u> DCL Ex 791 at 94-96; DCL Ex. 2001 at 38. A thoughtful reforecast could not have been completed in the short time frame from May 17 to June 4, but was undertaken before Step Two.

[40] <u>See</u> DCL Brief at 70.

In any event, the Noteholders' arguments are insufficient to disregard the Examiner's solvency conclusion because that conclusion was not based solely, or even primarily, on management's projections. Rather, the Examiner looked at contemporaneous valuations of Tribune by third parties who, as the Noteholders recognize, used more conservative projections than management.[41] Moreover, like Fischel, the Examiner gave particular weight to the market evidence, concluding that "the bonds certainly did not trade at levels that would be associated with Tribune insolvency" and that "market-based information tends to support a conclusion that Tribune was nonetheless still solvent at Step One."[42]

As is evident from the Noteholders' own discussion, the challenges facing the publishing industry were well known to "analysts, market participants, and rating agencies."[43] Tribune had disclosed to the markets, in connection with the tender offer, company-specific information, including its projections, its "Downside Case B," and analyses of its advisers, Merrill Lynch and Morgan Stanley.[44] Yet, despite the Noteholders' arguments that operating results for the first three months of 2007 were "'substantially below' the February Projections, and closer to the Company's 'Downside Case B,'"[45] the Examiner noted that there was "little change" in the price of Tribune's bonds.[46] That remained the case even after Tribune's May 2007 operating results became known in June.[47] In addition, not a single holder of the PHONES attempted to put them back to Tribune at the time of Step One or at any time until shortly before Tribune filed for bankruptcy.[48] In fact, as shown in the DCL Proponents' opening brief, there is an abundance of contemporaneous market data – including the very credit default swap spreads that the

---

[41] Examiner Report, Vol. 2 at 202-203; NPP Brief at 43.

[42] Examiner Report, Vol. 2 at 206; Tr. 3/10 at 94:17-97:12 (Fischel).

[43] NPP Brief at 10-11.

[44] Tr. 3/18 at 124:16-20, 132:22-134:15, 142:11-19 (Tuliano).

[45] NPP Brief at 13.

[46] See Examiner Report, Vol. 2 at 194-95; DCL Ex. 1115 at 2 and Ex. BA.

[47] DCL Ex. 1115 at Ex. BA; DCL Ex. 1381.

[48] Tr. 3/18 125:3-6 (Tuliano); DCL Ex. 1484 at 133.

Noteholders claim to be critical – demonstrating that market participants believed Tribune was solvent before, during, and well after Step One.[49]

The Noteholders' attacks on Fischel – who agreed in large part with the Examiner's conclusions as to Step One solvency – are similarly unavailing. The Noteholders' argument that Fischel disregarded conventions for valuing closely-held corporations[50] ignores Third Circuit case law highlighting the importance of evidence from public equity and debt markets in assessing solvency.[51] Fischel's recognition of the value of the S Corp tax savings in his balance sheet test is also consistent with the Examiner's conclusions that (1) the tax savings provided real cash flows that should be included in the capital adequacy analysis and (2) the "bond market invariably recognized the contemplated" tax savings.[52] The bond market's recognition of the value of the contemplated tax savings overrides any contrary conventions developed for valuing closely held (typically much smaller) companies where there are no active equity or debt markets, because market prices "best reflect the consensus of the investing public as to what the future holds for the corporations and industries represented."[53] Moreover, the argument that the tax savings should be disregarded for solvency purposes because it "does not confer additional value on the stock itself" was rejected by the Seventh Circuit in Paloian v. LaSalle Bank, N.A., 619 F.3d 688, 694-95 (7th Cir. 2010), a case decided after the Examiner issued his report.

The Noteholders' other criticisms of Fischel's solvency analysis[54] are likewise based on rejections of the Examiner's findings and/or are unsupported by the evidence:

- Valuation of the PHONES that reflects their debt and derivative components is consistent with the Examiner's conclusion and applicable case law.[55]

---

[49] DCL Brief at 66-69.

[50] NPP Brief at 29-30.

[51] DCL Brief at 69.

[52] Examiner Report, Vol. 2 at 115, 117, 206, and 232; DCL Ex. 1106 at 24-25; see also DCL Ex. 740; DCL Ex. 749 at 21, 50; DCL Ex. 1106 at 5-6 and Ex. L (tax savings recognized by contemporaneous market participants).

[53] See DCL Ex. 1329 (IRS Revenue Ruling 59-60) at § 3.03; Tr. 3/18 at 238:16-22 (Tuliano). See also Shannon P. Pratt, VALUING A BUSINESS (5th ed. 2007) at 43, quoted at Tr. 3/18 at 244:4-7 (Tuliano) (whether value determined by DCF method represents fair market value "depends on whether the assumptions used would be accepted by a consensus of market participants").

[54] NPP Brief at 29-35.

- Fischel's use of an exit multiple to determine the terminal value in his discounted cash flow valuation is well supported.[56]

- Fischel's recognition of the value of 401(k) cost savings reflects the reality that those savings were to be realized irrespective of whether Step Two occurred and that the alternative cash balance plan would have had no immediate cash cost to Tribune.[57]

- Fischel's recognition of stock-based compensation savings reflects the fact that the alternative "Phantom" Management Equity Incentive Plan would have had no immediate cash expense.[58]

- Fischel's use of management's February projections is consistent with the Examiner's conclusions. Moreover, Fischel used the average contemporaneous projections of third parties as a check.[59]

- Fischel did not "use" long term growth rates to determine terminal value, as the Noteholders incorrectly state.[60] The implied growth rates from the exit multiples Fischel used compare favorably with those used contemporaneously by market participants.[61]

- Fischel's use of a Tribune-specific weighted average cost of capital ("WACC") recognizes the value created by the interest tax shield available to any C corporation.[62]

- Fischel's use of comparable companies identified by contemporaneous market participants is appropriate. In addition, Fischel showed that using Tuliano's comparable companies would not change his solvency conclusion.[63]

- Fischel's valuation ranges include S Corp tax savings not available to public shareholders so a comparison to Tribune share prices in early 2007 is inapposite, but his

---

[55] Examiner Report, Vol. 1 at 509 n.2273; see DCL Brief at 73-74. Moreover, even if the PHONES were treated as simple debt (as opposed to a debt and a derivative), it would be wrong to assess solvency using the face amount of the PHONES because of their below-market 2% interest rate. When notes bear a lower interest rate when made than the market interest rate for notes of comparable risk, their present value is less than their face amount. See Pratt, VALUING A BUSINESS at 522; Tr. 3/18 at 199:1-5 (Tuliano). It follows that a buyer would pay more for the equity of a company with $1.2 billion below-market interest rate notes than for the equity of an identical company with $1.2 billion notes at market interest rates. Greater market value of equity means greater solvency.

[56] Thomas Kenny Dep. at 187:25-188:2. For example, both valuation experts in In re Exide Technologies, 303 B.R. 48, 64-65 (Bankr. D. Del. 2003), used exit multiples in determining terminal value. Moreover, Dr. Pratt has indicated that the implied exit multiple should be used to "check [the] reasonableness" of a terminal growth rate. DCL Brief at 73 n.272.

[57] DCL Ex. 1106 at Ex. C; Tr. 3/18 at 213:16-225:15 (Tuliano).

[58] DCL Ex. 1106 at Ex. C; Tr. 3/18 at 213:16-225:15 (Tuliano). In addition, stock-based compensation is a non-cash expense. Tr. 3/18 at 222:8-10 (Tuliano).

[59] DCL Ex. 1115 at 3-4 and Ex. BB.

[60] NPP Brief at 33.

[61] DCL Brief at 72 n.268.

[62] DCL Brief at 72 n.266.

[63] DCL Ex. 1115 at 6 and Ex. BB.

solvency conclusion is consistent with the $34 share price offered by EGI-TRB and counter-bid by Broad/Burkle.[64]

## C.     Guarantor Subsidiary Solvency

Proving insolvency of the Guarantor Subsidiaries presents an even greater challenge for the Noteholders. Indeed, to set aside the Examiner's conclusions as to solvency of the Guarantor Subsidiaries at Step One,[65] the Noteholders not only must disregard the Examiner's solvency conclusions, but they must also ask the Court to accept Tuliano's opinion that Tribune's insolvency was so massive that it rendered the subsidiaries (with $2 billion less debt than Tribune) insolvent as well.[66] This opinion, however, is contradicted by the market evidence and is the result of numerous methodological flaws.[67]

## D.     Ability To Pay Debts And Capital Adequacy

The Noteholders' analysis of Tribune's ability to pay debts and capital adequacy upon consummation of Step One is also deeply flawed[68] and provides no basis to reject the Examiner's contrary finding of reasonable likelihood that Tribune and its Guarantor Subsidiaries "were left with adequate capital after giving effect to the Step One Transactions."[69] Tellingly, the Noteholders make no argument that the Guarantor Subsidiaries themselves lacked the ability to meet their obligations as they became due or were inadequately capitalized[70] and their arguments as to the Tribune parent are unavailing.[71]

---

[64] DCL Ex. 1106 at 5-6. The Noteholders disingenuously suggest that Fischel valued Tribune's shares "as high as $68 per share." NPP Brief at 34. But Fischel did not conclude on a specific value and the $68 is taken from the comparable transaction valuation he regarded as "less reliable." Tr. 3/10 at 175:20-25 (Fischel); compare DCL Ex. 1106 at ¶ 66 with DCL Ex. 1106 at Ex. O.

[65] Examiner Report, Vol. 2 at 207-11.

[66] DCL Brief at 75-76.

[67] DCL Brief at 65-76.

[68] See DCL Brief at 74-75.

[69] Examiner Report, Vol. 2 at 211-20.

[70] Tuliano devotes a single sentence to the issue in his report, contending that Guarantor Subsidiary capital inadequacy follows from Tribune capital inadequacy. NPP Ex. 944 at 165. But his conclusion does not logically follow because "the collective indebtedness of [the Guarantor Subsidiaries] is less than the Tribune-only indebtedness" and "Tribune held few cash generating assets." Examiner Report, Vol. 2 at 220.

[71] NPP Brief at 35-39, 44-45.

- Correcting the mathematical error in the Examiner's analysis with respect to 2007 cash tax expense would not affect the Examiner's conclusion, and the Examiner's view as to refinancing is consistent with the market view that Tribune would meet its obligations without default.[72]

- The Noteholders' leverage comparisons are inapposite because the companies they seek to compare were not ESOP-owned S corporations and thus did not have the benefit of exemption from federal taxation.[73]

- The Noteholders criticize Fischel for relying on unproven, "generic steps" to address a projected future cash deficit when, in fact, Fischel explained that Tribune could address the deficit by selling specific assets at specific values that had been accepted by both the Examiner and Tuliano.[74]

- The Noteholders' contention that the "Citi Downside Case" used by Fischel "does not appear to include expenditures for investments in acquisitions" is simply wrong.[75]

### E.    Lender Good Faith

The Noteholders did not, as they said they would, introduce at trial "new evidence not before the Examiner" that would justify dismissing the Examiner's conclusion that JPMorgan as Senior Loan Agent acted in good faith at Step One.[76]  Instead, they merely parade the same sound-bites rejected by the Examiner as supposedly showing that the Lenders put at risk $8 billion without a genuine belief in Tribune's solvency out of a desire to earn $121 million in fees or to curry favor with Sam Zell.  After hearing the same arguments and considering the same documents, the Examiner concluded that, "contrary to certain Parties' contentions, the contemporaneous e-mails and analyses generated by JPM personnel do not support the inference that these people knew or reasonably believed that the Step One Transactions would render the Tribune Entities insolvent, nor is there credible evidence that JPMCB improperly was motivated

---

[72] DCL Brief at 65 n.236.

[73] Tr. 3/18 at 212:11-213:9 (Tuliano).  Moody's, for example, noted that the ESOP-owned S corporation savings were "a critical mitigating factor" to the high leverage.  See NPP Brief at 24.

[74] NPP Brief at 38; Tr. 3/10 at 122:3-124:14 (Fischel).

[75] NPP Brief at 39; DCL Ex. 1106 Appendix H at 5 (acquisitions and investments of $50 million in 2007, $225 million in 2008, and $50 million annually in 2009-2012).

[76] Noteholder Obj. ¶¶ 258-59; Examiner Report, Vol. 2 at 264-65.

by fee generation or its relationship with Samuel Zell."[77] Likewise, the Examiner concluded that

Merrill Lynch and Citigroup extended the Step One financing in good faith.[78]

Similarly, syndication does not show bad faith. Syndication could not occur unless third-party lenders were willing to finance the recapitalization and believed that Tribune was solvent.[79] Thus, as Fischel observed, to argue that the Lenders were confident in their plans to syndicate the loans is to argue that they were confident in Tribune.[80] And while the Step One financing was syndicated at a discount, the Noteholders presented no evidence suggesting that increasing yield by a few percentage points would induce third parties to buy debt of a company they viewed as insolvent, let alone massively so.[81]

## F.   Intentional Fraudulent Transfer

Finally, the Noteholders now claim there is a strong case for intentional fraud at Step One, notwithstanding that the Examiner found no "credible evidence" in support of such a claim.[82] This argument is unfounded. The Noteholders point to no evidence as to most of the badges of fraud, and, as explained above, the Examiner found that insolvency at Step One is unlikely.[83] Further, the Noteholders have not identified any case in which a court found an intentional fraudulent transfer

---

[77]  Examiner Report, Vol. 2 at 264; see also Examiner Report, Vol. 1 at 265 ("nor is there any credible evidence that JPMCB was improperly motivated in its Tribune credit decisions"). The March 28 email quoted by the Noteholders, NPP Brief at 50-51, related to a particular modification in the collateral structure that occurred over the preceding weekend and reflected, in the Examiner's view, "comments . . . of a credit officer concerned with receiving the best possible security for the funds JPMCB was considering lending." Examiner Report, Vol. 1 at 264.

[78]  Examiner Report, Vol. 2 at 280-81 (no basis to suggest that Merrill Lynch or Citigroup Entities "had any motive other than to generate profit in their capacities as lenders to Tribune"). The Noteholders mischaracterize certain April 2007 Morgan Stanley and Citigroup/Merrill Lynch analyses as showing insolvency at Step Two. NPP Brief at 18 & n.82. The Noteholders ignore value-increasing merger benefits these analyses included (see NPP Ex. 1296 at MS 00008; NPP Ex. 318 at ML-TRIB-0386912) as well as the fact that the analyses were publicly filed on April 25, 2007 as exhibits to Tribune's Schedule TO (DCL Ex. 2000 at 18).

[79]  See DCL Brief at 66 n.239; Tr. 3/10 at 183:21-184:14 (Fischel).

[80]  Tr. 3/10 at 184:1-14 (Fischel).

[81]  See, e.g., NPP Ex. 424 (discussing selling debt at 1% discount to par).

[82]  NPP Brief at 9, 18-20; Examiner Report, Vol. 1 at 7; Examiner Report, Vol. 2 at 26, 28.

[83]  The Noteholders cite no evidence as to five of the six "badges of fraud" they identify. NPP Brief at 17. This leaves just one previously-recognized "badge" that possibly could be present: insolvency or indebtedness of the debtor, the presence or absence of which, standing on its own, is not sufficient to establish an intentional fraudulent transfer. See Examiner Report, Vol. 2 at 35-36. The Noteholders seek to overcome this deficiency by suggesting, without citing any authority, that reliance by management on allegedly overly-optimistic projections could amount to a badge of fraud, but the Examiner did not find that argument to be compelling in this case. Examiner Report, Vol. 2 at 25, 58.

where (as here) the price of the transaction was determined in an open and very public auction. The Noteholders do not dispute that the transaction entered into by Tribune and the Zell entities in March 2007 followed a competitive bidding process (in which other bidders participated to the end), was extensively reported in the media, and was disclosed in proxy materials.[84] Indeed, the first filed litigation over the transactions (the <u>Garamella</u> litigation) was based on the assertion that the $34 per share purchase price was too *low*.[85]

Without any new evidence to support their claim, the Noteholders rehash stale arguments regarding the February 2007 projections[86] – projections upon which, as explained above, the Examiner concluded Tribune's management reasonably could rely.[87] Substantial evidence supports the Examiner's conclusion that Tribune management did not act unreasonably in adhering to the February projections. Those projections were the product of a long-established "bottoms up" process and were in line with other forecasts at the time they were made.[88] Further, the problems that Tribune's publishing business experienced in the Spring of 2007 were fully disclosed, yet the contemporaneous market data does not support the conclusion that Tribune was viewed as unable to overcome those issues.[89] The Examiner's conclusions are supported by the evidence. The February projections are simply not the foundation for a credible case of intentional fraudulent transfer at Step One.[90]

## III.  THE NOTEHOLDERS' OTHER PATHWAYS TO SUCCESS ARE ILLUSORY.

The Noteholders also contend that the DCL Plan settlement is unreasonable because there are litigation outcomes not requiring full avoidance "that would result in the Non-LBO Creditors recovering more" than the consideration offered in the DCL Plan settlement.[91] In constructing

---

[84] See, e.g., DCL Exs. 791 and 2000; see also Examiner Report, Vol. 1 at 105-33.

[85] DCL Ex. 1143 at 1.

[86] NPP Brief at 18, 42-44.

[87] Examiner Report, Vol. 2 at 25, 58.

[88] DCL Ex. 791 at 32, 35; DCL Ex. 2001 at 32

[89] See, e.g., DCL Ex. 791 at 96; DCL Exs. 980 and 1389; see also DCL Ex. 793 at TRB0138020-21; DCL Ex. 801 at TRB0414376.

[90] Examiner Report, Vol. 2 at 212-13.

[91] NPP Brief at 56.

these alternative theories, the Noteholders assume their conclusion and ignore whatever stands in their way, be it settled precedent or undisputed facts that are inconsistent with that conclusion. These alternative theories do nothing to undermine the reasonableness of the DCL Plan settlement.

*First,* the Noteholders argue that their novel "WEAR" theory is a "settled legal doctrine" and that they have a "strong probability" of prevailing on it.[92] To be clear, WEAR is not a "doctrine" at all. It is a slogan, created by Aurelius to obscure the reality that avoidance is the only remedy available in respect of a fraudulent transfer. If a court determines that the Step Two Claims are voidable, that is the entirety of the relief to which the Debtors' Estates are entitled. There is no applicable law or doctrine that would partially void, disallow, or subordinate debt found to be valid and non-voidable (Step One Claims) upon avoidance of other debt (Step Two Claims).

The Noteholders do not cite a single case in defense of their WEAR slogan. Instead, they merely identify several putative facts that they contend support its application.[93] Those assertions – which are hotly disputed – do nothing to support the unprecedented relief the Noteholders seek. Even if a court found that the Senior Lenders had egregiously "misbehaved" in connection with Step Two, as the Noteholders allege, the remedy would be to equitably subordinate or disallow the Step Two Claims, not to craft from whole cloth a turnover obligation in favor of a preferred set of some (but not all) other creditors, as the Noteholders desire.[94]

The Noteholders argue that "[b]oth the Creditors' Committee and the Examiner Report recognize that claims based on the doctrines incorporated in the WEAR theory are totally independent and distinct from equitable subordination and equitable estoppel . . . ."[95] The Examiner in fact concluded precisely the opposite, noting that, "barring equitable subordination, disallowance, or principles of unjust enrichment, if the Step Two Debt but not the Step One Debt is [avoided], the Step One Debt would be entitled to participate in distributions from the estates

---

[92] NPP Brief at 58, 60.
[93] NPP Brief at 58-59.
[94] Tr. 3/9 at 177:6-12 (Black).
[95] NPP Brief at 60.

in accordance with their nonbankruptcy priorities."[96] Further, the fact that the Committee asserted claims based on theories of estoppel and unjust enrichment says nothing about the likelihood of success on those claims or the reasonableness of the settlement.

The DCL Proponents also demonstrated that application of the unsupported WEAR theory in its most aggressive form – i.e., barring the Senior Lenders from benefitting on account of their allowed Step One Claims not just from disgorgement recoveries but also from avoidance of the Step Two Loans – would result in recoveries to the Senior Noteholders of only about $500 million, an amount not materially greater than guaranteed Senior Noteholder recoveries under the DCL Plan.[97] The Noteholders do not dispute this. Previously, the Noteholders had attempted to overcome this result by concocting yet another, even more outlandish, remedy to be combined with the "WEAR" theory, called "upstreaming." Pursuant to this theory, the "value liberated by the avoidance of Step Two should be upstreamed to Tribune for distribution to Tribune's Non-LBO Creditors" notwithstanding that allowed claims against the Guarantor Debtors from which such "value" arises are not paid in full.[98] The Noteholders make no mention of "upstreaming" in the NPP Brief, apparently conceding that it is contrary to well-established law,[99] and yet fail to acknowledge that, without "upstreaming," even a victory on their WEAR theory, however unlikely, gets them little.

**Second,** the Noteholders reprise their argument that *if* the Step Two Loans are avoided *and* the Debtors' distributable enterprise value ("DEV") is higher than $7.5 billion *and* the allowed Step One Claims are denied postpetition interest, they could obtain a full recovery by accessing the value of the Guarantor Subsidiaries. As set forth in Part V below, Lazard's valuation is the only valuation in evidence and is soundly based. Regardless, the Noteholders have not demonstrated that allowed Step One Claims would not be entitled to postpetition interest if the Step Two Loans were avoided. Rather, the Noteholders simply assume that this would be the

---

[96] Examiner Report, Vol. 2 at 301.

[97] Tr. 3/9 at 176:7-11 (Black).

[98] Noteholder Obj. ¶¶ 234, 237.

[99] See In re Owens Corning, 419 F.3d 195, 211-15 (3d Cir. 2005); Official Comm. of Unsecured Creditors v. Credit Suisse (In re Champion Enterprises, Inc.), 2010 Bankr. LEXIS 2720 (Bankr. D. Del. Sept. 1, 2010).

case, asserting (without citation to any evidence or authority) that "before the Step One Lenders can be entitled to receive post-petition interest, the pre-petition intercompany claims of Tribune against the Guarantor Debtors have to be paid in full."[100] As explained in the DCL Proponents' opening brief, that proposition is not correct.[101] Further, in arguing that this outcome would generate a full recovery, the Noteholders ignore the fact that more than 80% of the value of the Guarantor Subsidiaries resides at entities that *do not have* material intercompany liabilities owing to Tribune,[102] such as the non-debtor subsidiary Tribune (FN) Cable Ventures, Inc. Because these entities have sufficient value to cover all postpetition interest on allowed Step One Claims, the intercompany claims would be irrelevant.[103] In sum, the Noteholders advance no persuasive argument that the value of the Guarantor Debtors can be "upstreamed" to pay claims against the Tribune parent before allowed claims against the Guarantor Debtors are paid postpetition interest.

*Third,* the Noteholders argue that avoidance of the Step One claims at the Tribune parent alone would provide Non-LBO Creditors with a full recovery as a result of disgorgement recoveries. In addition to being predicated on an unlikely finding of Step One insolvency, the Noteholders' argument assumes that *none* of the Step One Loans would be preserved on account of reasonably equivalent value provided to the Debtors (notwithstanding the Examiner's conclusion to the contrary) *and* that the Guarantor Debtors' allowed claims against the Tribune parent (the validity of which the Noteholders have conceded through their adoption of the Intercompany Claims Settlement) somehow would not be honored. As set forth in the DCL Proponents' opening brief, the Noteholders have failed to make any showing that they would prevail on either of these assumed issues, let alone both.[104] In fact, the evidence demonstrates that, when the preserved claims and intercompany liabilities are considered, avoidance of all

---

[100] NPP Brief at 61.
[101] DCL Brief at 54-56.
[102] DCL Brief at 55.
[103] DCL Brief at 55-56.
[104] DCL Brief at 44-46.

Senior Loan Claims at the Tribune parent would result only in an initial recovery of $286 million to Senior Noteholders, far less than the distributions provided under the DCL Plan.[105]

*Finally*, the Noteholders argue that they would assert claims against the Senior Lenders for equitable subordination, disallowance, and aiding and abetting with respect to alleged conduct *at Step Two*.[106] Far from undermining the reasonableness of the DCL Plan settlement, these putative claims support it. It is simply not the case that the Noteholders could recover more if they were to prevail on these theories than if they were to prevail on a fraudulent transfer theory at Step Two. Initial distributions under the DCL Plan settlement *exceed* what the Noteholders could realistically recover under any of their Step Two theories.[107]

## IV.  THE EXAMINER'S FINDINGS SUPPORT THE REASONABLENESS OF THE DCL PLAN SETTLEMENT.

### A.  Recoveries Under The DCL Plan Settlement Are At The High End Of The Range Of Reasonableness Based On The Examiner's Findings.

As explained above and in the DCL Proponents' opening brief, the Examiner Report makes clear that avoidance of the Step One Loans, the total victory scenario on which the Noteholders now principally rely, is unlikely. In the absence of such success, the Noteholders have no chance of obtaining recoveries even close to the distributions offered under the DCL Plan settlement.[108]

Under the six litigation outcome scenarios analyzed by the Examiner, only the full avoidance case (Case 6 – avoidance of both Step One and Step Two at both Tribune and the Guarantor Subsidiaries) produces recoveries for Non-LBO Creditors greater than recoveries under the DCL Plan. The other five cases produce litigation recoveries of $0 to $244 million, less than half of the settlement consideration provided by the DCL Plan.[109] Black testified that distributions to Senior Noteholders and other Non-LBO Creditors under the DCL Plan settlement are substantially higher than expected recoveries when calculated from the Examiner's viewpoint, or

---

[105]  DCL Brief at 46 (citing Tr. 3/9 at 113:9; 172:14-23 (Black); DCL Ex. 1484 at 23).

[106]  NPP Brief at 62. ("The LBO Lenders' decision to move forward *with Step Two* . . . .") (emphasis added).

[107]  See DCL Brief at 21.

[108]  DCL Brief at 16-17, 21-22.

[109]  DCL Brief at 16-17 & n.52.

even from a viewpoint *more favorable* to the Noteholders than the Examiner (the "High Settlement" Case).[110]

The Noteholders are unable to grapple substantively with the Examiner's conclusions or Black's analysis and therefore resort to lobbing rhetorical challenges that lack evidentiary support. They repeatedly insist that the Examiner "erred" (as discussed above) and then launch an attack on a peripheral aspect of Black's methodology. The Noteholders' chief complaint as to Black appears to be that he did not construct his own formal decision tree in the same manner as Beron.[111] But unlike Beron – who conceded that he was unqualified to make any qualitative judgments about the relevant issues and that his models were not designed to "reflect reality"[112]– Black looked to decision-tree analysis only as a secondary tool with which to test the strength of his conclusions about the reasonableness of the settlement.[113] Moreover, Black's conclusions were informed by a comprehensive analysis of the Examiner Report (unlike Beron's selective, limited review) and his own judgments about the likely litigation outcomes, taking into account the Examiner Report, among other things.

The Noteholders' other criticisms of Black are equally baseless. Beron and the Noteholders incorrectly assert that Black omitted from his analysis a number of probable litigation outcomes,[114] when in fact Black testified that factors such as equitable subordination and statutory defenses are reflected in his analysis.[115] The Noteholders also fault Black for relying on Debtors' counsel to assist in explaining the legal issues in the case and imply that counsel, not Black, generated the probabilities that drive Black's analysis.[116] This simply misconstrues Black's

---

[110] Tr. 3/9 at 146:21-147:16 (Black); DCL Brief at 24-25.

[111] NPP Brief at 76.

[112] Tr. 3/17 at 160:18-161:6 (Beron).

[113] Tr. 4/12 at 113:1-8 (Black). Black's use of multiple modes of analysis to arrive at his ultimate conclusions stands in stark contrast to Beron. Beron relied exclusively on decision-tree analysis even though he had never applied decision trees to fraudulent transfer claims and could not point to other fraudulent transfer cases in which such analysis had been used. Tr. 3/17 at 245:13-246:1 (Beron).

[114] NPP Brief at 76.

[115] Tr. 3/9 at 109:6-110:8 (Black).

[116] NPP Brief at 76.

testimony, which was that although he "worked with Sidley in understanding the legal claims . . . my job was to assign my own probabilities."[117] In fact, it is ***Beron*** who admitted that he revised his probabilities at the direction of Aurelius's counsel (always in ways favorable to the Noteholders) without even considering the merits of what he was told to do.[118]

### B.    Beron's Analysis Distorts And Contradicts The Examiner.

The Noteholders ask the Court to give substantial weight to the decision-tree analysis that Beron performed on selective snippets of the Examiner Report. They claim that the DCL Proponents "did not even bother to try to refute the legitimacy of this methodology at trial" and that Beron performed a "comprehensive analysis grounded on a methodology [the DCL Proponents] could not and did not challenge."[119] In so arguing, however, the Noteholders ignore the obvious deficiencies in Beron's analysis that were exposed during cross-examination, when Beron freely admitted that he (1) knew nothing about the fraudulent transfer claims he was supposedly valuing; (2) relied solely on the Examiner's headline conclusions and ignored the Examiner's hundreds of pages of explanations; (3) treated issues significant to his expected value calculation as independent variables even where the Examiner's explanations, consistent with well-established law, recognized linkages and correlations among those issues; and (4) abandoned his own reading of the Examiner's conclusions when so instructed by Aurelius's counsel.[120]

As to a central flaw in his analysis, the Noteholders contend that Beron was right to model the conclusions about several critical issues without regard to the Examiner's statements regarding the interdependence of those findings.[121] This contention is indefensible. For example, in one of the "explanation" sections that Beron ignored, the Examiner Report recognized that conclusions about the different solvency tests rested on the same evidence, indicating a strong

---

[117] Tr. 3/9 at 187:11-17 (Black). Black further explained that, while Debtors' counsel provided him with background memos explaining certain legal issues, Black then conducted his own extensive research and reviewed case law, treatises, the briefing filed in this case, and the Examiner Report. Tr. 3/9 at 97:12-98:25 (Black).
[118] Tr. 3/17 at 173:16-180:19 (Beron).
[119] NPP Brief at 64, 68.
[120] DCL Brief at 57-64.
[121] NPP Brief at 71.

correlation in the likelihood of success on any one of the three tests.[122] Because Beron ignored the Examiner's discussion of this critical issue, his modeling of the solvency tests for a constructive fraudulent transfer as independent is flatly inconsistent with the Examiner Report and contrary to courts' recognition that the tests rely on many of the same factual elements.[123]

The Noteholders attempt to defend Beron by asserting that he made "conservative assumptions" that make up for the obvious deficiencies in his methodology and analysis.[124] The Noteholders do not present any evidence quantifying the impact of Beron's so-called "conservative assumptions."[125] But regardless of impact, it is absurd to call Beron's assumptions "conservative." For example, Beron ascribed no value to subsidiary insolvency at Step One in cases where the Tribune parent was solvent, a circumstance *impossible* under the Examiner's findings but 39% likely to occur under Beron's tortured analysis.[126] This is not a conservative assumption, but rather an attempt to conceal a glaring methodological flaw. Similarly, Beron's conclusion that Tribune was solvent at Step One under the capital adequacy and ability to pay tests if the Transactions are not collapsed is not a "conservative assumption" – no party involved in this case, including the Noteholders' solvency expert and the Examiner, has suggested that Tribune was insolvent at Step One based on Step One debt alone.

Finally, Beron inexplicably failed to consider and take account of the entirety of the Examiner Report. The Examiner noted at the outset of his report that "[s]ome of the issues

---

[122] Examiner Report, Vol. 2 at 76-77, 239.

[123] See, e.g., Moody v. Sec. Pac. Bus. Credit, Inc., 971 F.2d 1056, 1071, 1076 (3d Cir. 1992) (inadequate capital and ability to pay are "distinct but related concepts"; upholding district court finding of solvency under Pennsylvania UFCA where solvency under "inability to pay" test "follows from the district court's finding that Jeannette was not left with an unreasonably small capital"); MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co., 910 F. Supp. 913, 943-44 (S.D.N.Y. 1995) (court must examine reasonableness of company's projections for both "ability to pay" and "inadequate capital" solvency tests).

[124] NPP Brief at 67-68.

[125] Beron testified about the impact on "expected value" of three of his errors, but did not calculate the impact of at least six of the other fundamental errors discussed at pages 59 through 62 of the DCL Brief: (1) mistreatment of Step One intentional fraud, (2) ignoring the Examiner Report correlation between intentional and constructive fraud, (3) ignoring correlation among three solvency tests, (4) altered probability of Step One participation in Step Two distributions, (5) mistreatment of subsidiary standing conclusion, and (6) ignoring the Examiner's conclusion regarding PHONES subordination.

[126] Tr. 3/17 at 217:14-218:20 (Beron).

discussed in the Report . ... are difficult, nuanced, and not conducive to summary treatment."[127]

Yet the Noteholders purposefully discouraged Beron from attempting to develop a comprehensive understanding of the Examiner's analysis. The Noteholders do not explain why they directed Beron to give the Examiner Report only a cursory review, nor is it apparent why an expert witness would blindly follow that directive. What is clear is that by doing so, Beron gave summary treatment to difficult and nuanced issues, creating significant errors in his expected value computation and rendering his opinion useless in evaluating the reasonableness of the DCL Plan settlement.

## C.     The Litigation And Creditors' Trusts Provide Real Value.

After devoting much of their post-trial brief to trumpeting the strength of the evidence that the Debtors' officers and directors perpetrated an intentional fraudulent transfer at both Step One and Step Two,[128] the Noteholders do an about-face when it comes to valuing the potential Litigation and Creditors' Trust recoveries arising from that same alleged misconduct. Indeed, the Noteholders go so far as to complain that the claims to be held by the Trusts – which include claims to recover as intentional fraudulent transfers more than $8 billion in payments to Tribune shareholders and claims against the Debtors' officers, directors, and professionals for breaches of fiduciary duty – have little value and therefore fail to "add significant additional consideration" for the Noteholders under the DCL Plan settlement.[129]

---

[127] Examiner Report, Vol. 1 at 5.

[128] NPP Brief at 1-2 ("In fact, the evidence that the Company engaged in an intentional fraudulent transfer, at both steps is equally compelling."), 2 (arguing that there is "overwhelming evidence" that Tribune's financial projections "were knowingly inflated and unreasonable"), 9 ("The great weight of the evidence in the record shows that the LBO Lenders' Claims arising from both steps of the LBO should be avoided as intentional and constructive fraudulent conveyances . . . ."), 18 ("The Company's failure to update the February Projections in advance of the Step One closing is a particularly striking example of intentional misconduct."), 19 ("[e]vidence shows that Company management knew the February Projections were fraudulently inflated . . . ."), 20 ("There is overwhelming evidence that the Company's senior financial management intentionally concealed the Company's true financial condition in the months leading up to Step Two. . . ."), 21 ("[T]he Company's senior management simply lied.").

[129] NPP Brief at 3, 81-84. It is also hard to reconcile this position with the positions set forth in the Noteholders' Letter Brief of May 20, 2011 discussing the claims against Zell and EGI-TRB. Reply To Third Party Letter Confirmation Objections To The Noteholder Plan Filed By Aurelius Capital Management, LP at 1-5. [Docket No. 8960]. In addition, this position contradicts Aurelius's own prior statements acknowledging the substantial potential value of the Preserved Causes of Action. Brodsky Dep. at 302:11-17 ("I believe the April settlement gave releases – released very valuable causes of action for free. That included causes of action against officers and directors as well as Mr. Zell's entity that the [E]xaminer found to be meritorious."); DCL Ex. 987 at AUR0000020 (July 30, 2010 e-mail from Mr. Prieto to Mr. Gropper) ("[T]he Examiner found it somewhat likely that the Step 2 transaction is an

The Noteholders cannot have it both ways. Applying Beron's methodology (which the Noteholders presumably view as valid) to value the Preserved Causes of Action would yield an expected value of hundreds of millions, if not billions, of dollars in recoveries for the Litigation Trust.[130] Further, if the Noteholders genuinely believe that this case involves intentional fraudulent transfers, then "the most valuable causes of action" (to use the Noteholders' words) would be the claims against the Tribune shareholders – recipients of payments of $8 billion in respect of common stock, who did not give any value, and who would not benefit from any safe harbor or defense. All of these claims are preserved under the DCL Plan as further sources of value for the Noteholders and other Non-LBO Creditors.

Even if the Noteholders' internal inconsistencies are excused, there are more than adequate evidentiary grounds for the Court to find that the DCL Plan settlement's assignment of the lion's share of the Trusts' recoveries to the Senior Noteholders provides significant additional consideration. Black opined that $300 million would be a "conservative" estimate of potential recoveries to the Litigation Trust.[131] After conducting its own extensive legal and factual investigation and procuring the advice of its counsel and financial advisors concerning the merits and potential value of the claims to be held by the Trusts,[132] the Committee concluded that the DCL Plan settlement was fair to the Senior Noteholders and indeed better for them than

---

intentional fraudulent transfer. . . . Thus, the $4bn of payments made to shareholders in Step 2 would be subject to claw back.").

[130] For example, applying Beron's methodology to the Examiner's conclusion that it is "somewhat likely" that a court would find that Step Two constituted an intentional fraudulent transfer could generate an expected value of more than $2 billion for intentional fraudulent transfer claims asserted against shareholders in connection with Step Two. See Tr. 3/16 at 155:2-157:4 (Gropper).

[131] Tr. 3/9 at 114:6-116:1, 147:19-152:2 (Black). Far from "wild speculation," as the Noteholders assert (NPP Brief at 82), this aggregate figure was derived from Black's analysis of the potential recoveries from a number of possible claims, including claims against the Debtors' directors and officers (who are covered by a $200 million D&O insurance policy), claims to avoid payments made to "Tribune insiders," and claims against the Debtors' advisors. Tr. 3/9 at 147:19-152:2 (Black). Black's estimate omitted potential recoveries from certain of the Preserved Causes of Action, including the potentially substantial recoveries from Tribune's shareholders who received more than $8 billion in the Leveraged ESOP Transactions. Id.

[132] Tr. 3/8 at 206:21-207:25, 245:15-246:3, 275:13-14, 278:4-5, 291:16-20 (Salganik); Smith Dep. at 265:10-266:15.

either the April Plan settlement or the September Settlement, in part because "there was substantial value in the litigation trust and . . . the [N]oteholders got the lion's share of that value."[133]

Finally, the Noteholders incorrectly argue that, even if there is substantial value in the Senior Noteholders' disproportionate share of the Trusts, that value should be disregarded, because "potential recoveries from third parties are not equivalent to consideration provided by the LBO Lenders and therefore do not impact the value of [the settlement] consideration."[134] That argument conveniently ignores that, on the basis of their allowed claims, the Senior Lenders and Bridge Lenders would be entitled to recover upwards of 85% of any litigation recoveries. In negotiating the DCL Plan settlement, the Senior Lenders and Bridge Lenders agreed to forgo their *pro rata* interests in the claims to be held by the Trusts, granting Senior Noteholders and other Non-LBO Creditors a beneficial disproportionate share of the Trusts' recoveries.[135] That bargained-for allocation in favor of the Non-LBO Creditors further enhances the reasonableness of the DCL Plan settlement.

### D. The Bar Order Is Both Necessary And Appropriate.

The Bar Order is a standard and essential element of the DCL Plan that ensures that the settling defendants get the full benefit of their bargain, i.e., that they cannot be held liable a second time on account of settled liability.[136] Bar orders routinely are approved in the Third Circuit, including in the bankruptcy confirmation context, and courts have endorsed the use of bar orders in complex, multi-party litigation as necessary to facilitate and foster settlement.[137]

---

[133] Tr. 3/8 at 244:22-247:23 (Salganik); see also Smith Dep. at 227:9-12, 264:14-16.

[134] NPP Brief at 84.

[135] Tr. 3/8 at 234:18-236:25, 247:2-9 (Salganik); Tr. 3/9 at 32:2-10, 34:17-35:2, 37:2-37:17 (Kulnis); Baiera Dep. at 335:10-336:7, 338:3-339:6; DCL Brief at 7-8.

[136] See DCL Reply at 111-12.

[137] See DCL Reply at 112 (collecting cases); see also In re Appleseed's Intermediate Holdings LLC, No. 11-10160 (KG), slip op. at 54-55 (Bankr. D. Del. Apr. 14, 2011). Indeed, state law contribution statutes – many of which are modeled after the Uniform Contribution Among Tortfeasors Act – contain contribution bar and judgment reduction provisions that are substantively similar to the Bar Order in the DCL Plan. See, e.g., 740 ILCS 100/2; Del. Code Ann. tit. 10, §§ 6301, 6304; N.Y. C.P.L.R. § 1401; N.Y. Gen. Oblig. § 15-108; Cal. Civ. Proc. Code §§ 875, 877; Mass. Gen. Laws ch. 231B, § 1. There is nothing unusual about this commonplace relief.

The Noteholders' objections to the Bar Order amount to nothing more than a collateral attack on the settlement as a whole. The Noteholders' argument sums up as follows: the settlement is unreasonable, and therefore the proportionate reduction provision contained in the Bar Order is unreasonable.[138] The opposite is true. Because the settlement amount paid by the settling defendants is fair and reasonable, it is unquestionably fair and reasonable to reduce any subsequent litigation judgment against non-settling defendants by the proportionate fault of the settling defendants.[139] To do otherwise would be to allow the Noteholders (and other creditors who benefit from the settlement) to recover a second time on account of the same settled liability, resulting in an impermissible and unjust double recovery.

Unable to distinguish this Bar Order from similar bar orders approved by numerous courts, the Noteholders instead resort to mischaracterization of both the law[140] and the factual record in an effort to create controversy where none exists.[141] Furthermore, the Noteholders

[138] See NPP Brief at 78-79 (alleging "no evidence" that the "consideration" provided by LBO Lenders is "reasonable consideration" and that it is a "meager settlement").

[139] See Eichenholz v. Brennan, 52 F.3d 478, 486-86 (3d Cir. 1995).

[140] For example, the Noteholders incorrectly assert that circuit courts reject bar orders with judgment reduction provisions in the absence of a finding of proportional fault, misleadingly quoting from a snippet of TBG, Inc. v. Bendis, 36 F.3d 916 (10th Cir. 1994), that was included in the Third Circuit's decision in Eichenholtz. NPP Brief at 80 & n.413. In fact, the TBG court held (and Eichenholtz quoted this language as well) that "orders barring contribution claims are permissible only because a court or jury has *or will have* properly determined proportionate fault and awarded the equivalent of a contribution claim." 36 F.3d at 923 (emphasis added). Because the language of the Bar Order assures that such proportionate fault *will* be so properly determined by the litigation court (or jury), DCL Plan § 11.3, the provision does not run afoul of TBG.

Similarly, the Noteholders wrongly assert that the Third Circuit only approves bar orders after a determination that the underlying settlement is "generous in light of the merit of the contribution claims being eliminated." NPP Brief at 80 & n.414. In fact, the Court in In re Munford, Inc. made no mention of the merits of the contribution claims at issue when analyzing the appropriateness of the bar order before it; rather, the Court used broad language explaining that "bar orders play an integral role in facilitating settlement." 97 F.3d 449, 455 (11th Cir. 1996) (quotation omitted). The Noteholders' reliance on In re Nutraquest, Inc. is similarly misplaced. 434 F.3d 639, 649 (3d Cir. 2006) (noting that in Johnson v. United Airlines, 784 N.E.2d 812, 823 (Ill. 2003), "[t]he court found the *nominal settlement* sound given the *relative weakness* of the claims" (emphases added)).

[141] The Noteholders suggest that the DCL Proponents concede that non-settling defendants are entitled to contribution or indemnity claims against the arranger banks and Senior Lenders in the absence of the Bar Order. NPP Brief at 78 n.405. Far from conceding this, the sections of the DCL Reply cited by the Noteholders merely state that courts in the Third Circuit require bar orders to incorporate judgment reduction provisions and note that the parties have whatever rights they may have. See DCL Reply at 112-13, 120. In fact, the DCL Proponents stated at oral argument, in no uncertain terms, that they do not believe that shareholders have any rights to contribution or indemnity on account of fraudulent conveyance liability. Tr. 4/14 at 89:7-23 ("[l]et me be crystal clear on what our position. We agreed with the debtors that the better interpretation of the law is that there is no such thing as a contribution claim by shareholders on account of fraudulent conveyance liability"); see also Tr. 4/13 at 159:21-160:22; 161:7-162:20.

continue to demonstrate their misunderstanding of the operation of the Bar Order by claiming that it is an impermissible third-party release when it plainly is not.[142] Finally, there is no merit to the Noteholders' assertion that they should not be subject to the terms of the Bar Order because Aurelius itself did not negotiate or agree to the settlement.[143]

## V. LAZARD'S VALUATION IS ACCURATE.

Having failed to perform their own valuation, the Noteholders still maintain that Lazard's valuation of Tribune was "artificially low" and that the Debtors should be valued approximately $1.5 billion higher.[144] They are wrong. There is only one valuation before the Court – the valuation performed by Lazard. Using standard valuation methodologies in a straightforward manner, Lazard determined that the range of value for the Debtors as of the expected date of emergence of June 30, 2011 was between $6.299 billion and $7.104 billion.[145] In January, Lazard, along with industry valuation expert Chachas, refreshed the valuation. Both Lazard and Chachas agreed that the January refresh validated the reasonableness of Lazard's expected valuation of the Debtors as of the date of emergence.[146]

The Noteholders misstate the record when they assert that Lazard "conceded that the "Debtors' DEV is higher" than that in the October valuation and that the Debtors offered no "credible evidence showing why the October Valuation Report would provide a better estimate of the Debtors' DEV at the expected June 30, 2011 emergence date than the January Valuation Report."[147] As both Lazard and Chachas explained, the apparent increase in the Debtors' value

---

[142] See Reply To Third Party Letter Briefs at 6 [Docket No. 8963]; DCL Reply at 111-12. Even were the Court to apply the test for third-party releases, the Bar Order would pass muster because, as discussed above, the settling defendants have provided fair and sufficient settlement consideration for the protections in the DCL Plan such as the Bar Order, the Bar Order is an integral component of the settlement underlying the DCL Plan, and the Bar Order is consistent with otherwise applicable non-bankruptcy law.

[143] NPP Brief at 79. The settlement was negotiated and agreed to by the Committee – an estate fiduciary and the only party authorized (with the support of the Noteholders) to assert the settled claims – on behalf of and for the benefit of all creditors, including the Noteholders.

[144] NPP Brief at 84-85.

[145] DCL Ex. 1104 at ¶ 17; id. at Ex. 2 p. 13.

[146] Tr. 3/11 at 20:13-21:12 (Mandava); id. at 147:22-148:6 (Chachas).

[147] NPP Brief at 85, 88.

between October and January is not attributable to the Debtors' core business – the value of which actually declined – but rather came from the Debtors' minority interests in non-controlled investments (TV Food, CareerBuilder, and Classified Ventures).[148] Because the value of those minority interests already had been given a "very full valuation," and because Lazard had not applied a "minority discount[] [or a] lack-of-marketability discount[]," a further upward adjustment of the Debtors' overall valuation was not viewed as appropriate.[149]

The Noteholders also badly mischaracterize the work performed by their valuation witness, Singh. Singh did not perform a valuation of the Debtors and certainly did not use a "quantitative approach . . . to update Lazard's valuation solely for the impact of the updated market data."[150] Instead, Singh guessed as to what Lazard's methodologies were and then indexed his guesses based on changes in the market price of a variety of companies, many of which Lazard did not rely upon and which Singh conceded should not be included in the sum-of-the-parts valuation used here.[151] The end result is not a "quantitative approach" – it is just nonsense wrapped in math.

Moreover, while the Noteholders criticize Lazard's January refresh as "stale" because the market prices of comparable companies had changed between January and the March hearing,[152] Singh agreed that most of the "uplift" in stock prices in his report had disappeared by the time of the hearing.[153] This confirms Lazard's explanation that the October valuation represents the "most reasonable estimate of this company's valuation at emergence, because the midpoint best takes into consideration the chance or risk or opportunity of the valuation either improving between now and then, or going down between now and then."[154] The market in fact has borne

---

[148] Tr. 3/11 at 75:15-76:18 (Mandava); Tr. 3/11 at 191:2-192:6 (Chachas).

[149] Tr. 3/11 at 76:9-18 (Mandava). Indeed, it was pointed out that if a minority discount comparable to the one advocated by the Noteholders' other valuation expert (Tuliano) were applied, the Debtors' DEV would be essentially unchanged. Tr. 3/11 at 192:7-14 (Chachas).

[150] Tr. 3/15 at 14:9-13 (Singh); NPP Brief at 89.

[151] Tr. 3/15 at 25:24-27:21, 34:3-10; 116:23-118:12 (Singh); see also DCL Brief at 78.

[152] NPP Brief at 88.

[153] Tr. 3/15 at 40:1-5 (Singh).

[154] Tr. 3/11at 78:1-12 (Mandava); see also id. at 209:21-24 (Chachas).

out Lazard's reasoning. Not only did the stock prices for nearly all of the comparable companies decrease from February to March,[155] but that trend has continued to this day. Finally, as more fully explained in DCL Proponents' opening brief, the Noteholders' other criticisms of the Lazard valuation are simply baseless.[156]

## VI.    THE DCL PLAN SETTLEMENT IS THE PRODUCT OF A RIGOROUS AND OPEN PROCESS.

Further evidencing their desperation, and contrary to the Court's explicit direction, the Noteholders return to their theory that anyone who disagrees with them is acting in bad faith, proceeding to devote more than 20 pages to regurgitating their wholly unjustified attack on the conduct of the Debtors, the Committee, and their respective counsel.[157] Not only are the allegations devoid of merit, the Noteholders ignore that the DCL Plan settlement is the product of a Court-directed mediation process supervised by a sitting federal bankruptcy judge. Surely, if the negotiation dynamics were as the Noteholders contend, Judge Gross would have taken note of such conduct. He did not and in fact endorsed the settlement.[158]

The mediator's endorsement was well-earned. As the DCL Proponents explained in their opening brief, the settlement was the result of vigorous negotiation dating back to the commencement of these proceedings.[159] Since early 2009, the Debtors and the Committee each have spent countless hours first investigating the LBO-Related Causes of Action and then seeking to broker a settlement. The negotiations were often contentious, and both Senior Lenders and Non-LBO Creditors frequently expressed their displeasure that either the Debtors

---

[155] Tr. 3/15 at 40:11-22 (Singh).

[156] DCL Brief at 76-85. The Noteholders' contention that "Mandava testified that if management were to reforecast 2012 to 2015 EBITDA as of February 2011, the projections would go up" is incorrect. NPP Br. at 90. Mandava actually testified that the Debtors' management told him that the projections for the publishing business "were reliable and that [management] wouldn't change them: that you can't just look at revenue; you have to look at expenses and CAPEX" to arrive at EBITDA. Tr. 3/11 at 127:22-128:3 (Mandava).

[157] NPP Brief at 91-113.

[158] DCL Exs. 383-385.

[159] DCL Brief at 10-16.

and/or the Committee would not simply acquiesce to a particular position.[160] At no time, however, did the Debtors or the Committee succumb to such pressures.[161]

In their brief, the Noteholders criticize Don Liebentritt's leadership of the Debtors' efforts to forge a settlement and go so far as to suggest – without pointing to any specific evidence – that Liebentritt was seeking to steer the negotiations in a manner favorable to the interests of Zell or to himself, a view contrary to basic reason given that neither are released under the DCL Plan.[162] As Kurtz made clear on a number of occasions, neither Liebentritt nor anyone else at the Debtors has done anything to try to influence the proceedings in the manner suggested.[163] Rather, the evidence shows that Liebentritt worked diligently, under difficult circumstances, to persuade the parties to compromise.[164] Nor is there any merit to the claims that Liebentritt favored Oaktree's proposed plan or that he was predisposed to reject Aurelius's arguments.[165] To the contrary, the evidence demonstrates that Liebentritt resisted endorsing the Oaktree proposal and supported investigating all alternatives.[166] Liebentritt's description of Aurelius as a "terrorist," while colorful, was simply meant to reflect the fact that Aurelius's business model contemplates using litigation as a tool to extract concessions and profit in chapter 11 cases[167] – a reality that Aurelius cannot credibly deny and that is widely

---

[160] DCL Brief at 10-16; Tr. 3/8 at 47:14-48:16 (Kurtz).

[161] In assessing the Noteholders' allegations, it is important to note that Aurelius is a relative newcomer to the negotiations, having acquired the bulk of its holdings shortly before the start of the mediation. Tr. 3/8 at 142:17-22 (Kurtz). Further, Aurelius's dissatisfaction with the negotiations is not, as it contends, the result of being frozen out of the negotiations: it is undisputed that Aurelius was an active participant in the mediation. DCL Ex. 382; DCL Brief at 14 & n.37. Rather, it is a reflection of the extreme position that Aurelius has consistently advocated. Demanding a settlement payment well in excess of that which Aurelius and other Noteholders had previously accepted does not facilitate discussion; it leads to impasse.

[162] NPP Brief at 94-97. Likewise deficient are the claims that the Debtors somehow failed to disclose Liebentritt's relationship with Zell or the fact that he had a small interest in the EGI-TRB investment in Tribune. NPP Brief at 94 n.481. Both are a matter of public record. See, e.g., TOWER DL, L.L.C. Proof of Claim [Claim Register No. 6398]; DCL Ex. 1582 (DCL Plan Exs. 5.3.2(1), 5.3.3); NPP Ex. 2523 at 57:12-22.

[163] Tr. 3/8 at 177:12-21 (Kurtz); NPP Ex. 2523 at 83:22-84:2. Moreover, while the record is devoid of any evidence that the Senior Lenders attempted to influence management decisions, the evidence does show that Liebentritt took steps to eliminate the possibility of such interactions. See NPP Ex. 2088.

[164] See, e.g., DCL Exs. 610, 612, 615, 618, 621, 646, 655, 666, 1018.

[165] NPP Brief at 93, 96-97.

[166] See NPP Ex. 836.

[167] Liebentritt Dep. at 243:4-244:11.

-28-

acknowledged in the financial press.[168] Finally, the fact that Liebentritt does not agree with every aspect of the Examiner Report is hardly surprising.[169] As evidenced by the Noteholders' brief, no party does.[170] Regardless, there is no evidence that Liebentritt's views regarding either the Examiner or Aurelius had any effect on the settlement negotiations.

The Noteholders' claims regarding Sidley Austin are similarly misguided.[171] As more fully discussed in the DCL Reply, Sidley's relationships with certain of the Senior Lenders were fully disclosed, and the fact it was involved in the 2007 LBO was well known.[172] Further, there is no evidence that Sidley interfered with the investigation of the LBO-Related Causes of Action or the negotiations of a potential settlement. To the contrary, Sidley worked hard to support the process: it fully investigated the claims,[173] it fully cooperated with the Examiner and his investigation,[174] and it was fully engaged in the negotiation process.[175] The claim regarding Mr. Barden's actions in advising the Special Committee regarding corporate governance issues is particularly puzzling given that the Noteholders do not take issue with anything that Barden advised the Special Committee.[176]

The Noteholders' allegations regarding the role of the Debtors' Special Committee are also misdirected.[177] At their depositions, both Mark Shapiro and Maggie Wilderotter acknowledged

---

[168] See http://www.reuters.com/article/2010/10/22/tribune-idUSN2216255020101022 (Aurelius has "a reputation for aggressive legal tactics"); http://articles.latimes.com/2010/sep/26/business/la-fi-tribune-20100926 (Aurelius "is well known in the bankruptcy world for its litigious, fight-for-every-dime style of money-making"); http://www.upi.com/Business_News/2010/09/26/Hedge-fund-is-new-factor-in-Tribune-case/UPI-91191285521014/ ("Aurelius has a history of purchasing the unsecured junior bonds of a bankrupt company at cents on the dollar and employing aggressive legal tactics to boost the bonds' returns as the case is resolved").

[169] NPP Brief at 95-96.

[170] The Debtors have made no secret that they disagree with the Examiner's findings regarding an intentional fraudulent transfer at Step Two. See, e.g., Debtors' Objection to the Motion of Aurelius Capital Management, LP, for the Appointment of a Chapter 11 Trustee at ¶¶ 33-39 [Docket No. 5980]; Debtors' Response to Examiner's Motion for Discharge at ¶ 6 [Docket No. 5382].

[171] NPP Brief at 97-98, 101-02.

[172] DCL Reply at 73-74.

[173] NPP Exs. 2316, 2355-2365.

[174] Examiner Report, Vol. 1 at 7.

[175] See, e.g., DCL Exs. 264, 466, 471-472, 529, 531, 535, 546, 552.

[176] NPP Brief at 101-02. In fact, the evidence shows that the advice provided to the Special Committee included, among other things, its need for independent counsel – hardly the counsel of a lawyer seeking to improperly "influence" the process. Tr. 3/8 at 64:14-18 (Kurtz).

[177] NPP Brief at 98-104.

-29-

that they were not in a position to conduct a detailed investigation of the LBO-Related Causes of Action.[178] But that was not their role. The Special Committee already had the benefit of the Examiner Report as well as the work of the other parties. Accordingly, the most productive thing that the Special Committee could do was to get the parties back to the negotiating table, support the mediation process, encourage as broad a settlement as possible, and ensure that there were no insupportable releases.[179] That is exactly what was done to the benefit of the Estates.[180]

There also is no merit to the Noteholders' attacks on the Committee and its counsel. Despite all the mudslinging, the Noteholders have failed to produce one shred of evidence that the Committee or its counsel acted in bad faith or in dereliction of their duties.[181] Instead, the "evolution" of the Noteholders' story reveals their desperation to propound the myth that the settlement process was tainted. Their first theory was that the Committee members were induced to support the DCL Plan in return for higher individual recoveries to themselves.[182] The DCL Proponents countered by pointing out that four of the five Committee members who were attacked would receive equivalent or similar treatment under either plan (and the fifth is *pari passu* with the Noteholders).[183] With their "corrupt bargain" theory discredited, the Noteholders have been forced to fabricate a new theory.

Now, the Noteholders allege that the Committee members were satisfied with the deal negotiated in April 2010, so they had no incentive to pursue a better deal for the Noteholders

---

[178] Shapiro Dep. (10/13/10) at 137:9-20; Wilderotter Dep. (10/13/10) at 45:15-22.

[179] Shapiro Dep. (2/28/11) at 22:3-13.

[180] While the Noteholders imply that Zell may have directly caused the Special Committee to join with Oaktree and Angelo Gordon in supporting the nascent DCL Plan settlement, they admit they have no evidence to support such a claim. NPP Brief at 101 ("[w]hether or not there was any connection. . ."). The Noteholders also cannot explain why the Special Committee should be faulted for seeking Zell's assistance in encouraging parties to return to the negotiation table.

[181] In the absence of any evidence even suggesting that the decisions of the Committee were in fact tainted by improper bias or self-interest, the Noteholders' "innuendo and speculation" does not suffice "to establish a lack of good faith." See In re Washington Mut., Inc., 442 B.R. 314, 364 (Bankr. D. Del. 2011).

[182] See Noteholders' Responsive Statement dated November 9, 2010 [Docket No. 6293] ("Most of the Committee members effectively had their votes bought by the LBO Lenders in return for an increased or full recovery . . . ."); Noteholder Obj. at ¶¶ 310-11.

[183] These four Committee members' claims arise principally or exclusively under contract or other obligations that would be assumed under either plan. See DCL Reply at 75-77.

after the April deal fell apart. The record is flatly to the contrary.[184] The Committee's decision to support the DCL Plan was an informed one reached after months of contentious negotiations, meetings with practically every major creditor constituency (including Aurelius), careful consideration of all relevant materials (including the Examiner Report and the Aurelius probability model), and active participation at the Court-ordered mediation before Judge Gross.[185] The Noteholders' new theory also blatantly ignores the fact that the Committee rejected the plan agreed to at the first mediation by the Debtors, Oaktree, and Angelo Gordon,[186] and thereafter negotiated a better deal for all unsecured creditors, including the Noteholders. In short, the evidence reflects that the Committee was informed about the claims and vigorously advocated for the best possible settlement on behalf of all its constituents before ultimately voting, after substantial consideration, to approve the DCL Plan.

Finally, the Committee's approval of the DCL Plan does not demonstrate bias; it reflects the Committee's balancing of the considerations – a balancing that takes into account all creditor interests and that has been vindicated by the overwhelming acceptance of the DCL Plan. This is confirmed by the fact that 125 of 128 voting classes – including classes of both defendants and beneficiaries of the LBO-Related Causes of Action – accepted the DCL Plan. Indeed, the fact that 70% by number of the Senior Noteholder class itself voted for the DCL Plan debunks any claim that the Committee was not acting in the best interest of its constituency or that the DCL Plan settlement does not fairly balance the risks and benefits of the various claims that are subject to compromise.[187]

---

[184] Tr. 3/8 at 190:8-10, 252:1-23, 278:6-10, 282:17-21 (Salganik); Smith Dep. at 122:5-12, 218:12-21, 264:23-24. Other witnesses also testified to the tenacity of the Committee's settlement efforts. See, e.g., Tr. 3/9 at 60:12-15 (Kulnis: "I certainly considered [the Committee] adverse to [JPMorgan and the LBO Lenders]. They were trying to get more for the unsecured creditors including the noteholders. . . . They were trying to get more money from the banks."); Liang Dep. at 84:24-85:11 ("This is going to sound like a broken record, but [the Committee demanded] more money."), 237:20-24 ("[The Committee] always want[ed] more money. You give money; they want more money.").

[185] Tr. 3/8 at 244:24-247:23, 251:12-17 (Salganik); Smith Dep. at 227:6-228:12.

[186] See DCL Ex. 273.

[187] DCL Brief at 8; Epiq Voting Declaration, Docket No. 8882 at Ex. 3. The Noteholders have also attempted to breathe life into old, stale attacks directed at Committee counsel, Chadbourne & Parke, and special counsel, Zuckerman Spaeder. Rather than address these points yet again, we respectfully refer to the DCL Reply at pages 78-79, which points out that these matters have already been raised, re-raised, pursued, and dismissed *with prejudice*.

## VII. THE DCL PLAN PROPERLY ENFORCES PHONES SUBORDINATION.

Wilmington Trust has filed a separate post-trial brief challenging the DCL Plan's treatment of the PHONES. Each of Wilmington Trust's arguments lacks merit.

*First*, Wilmington Trust argues that the DCL Plan misapplies the PHONES Indenture's subordination provisions as to Other Parent Claims.[188] To the contrary, as demonstrated during the confirmation hearing and in the DCL Brief, the Other Parent Claims are generally entitled to the benefit of the PHONES subordination.[189] Recognizing this, Wilmington Trust is forced to make the new argument that the Swap Claim (which constitutes roughly 57% of the Other Parent Claims in question) is not indebtedness and, thus, is not entitled to the benefit of the PHONES subordination.[190] However, Wilmington Trust has already explicitly argued that the Swap Claim *is* entitled to the benefit of the PHONES subordination,[191] a contradiction it fails to explain.

*Second,* as set forth in great detail during the confirmation hearing and in the DCL Brief, there is no merit to Wilmington Trust's discrimination claims. Discrimination cannot be "unfair" unless it is material in amount.[192] Indeed, a plan will not be denied on those grounds unless it provides for "grossly disparate" treatment of similarly situated creditors.[193] Neither the Noteholders collectively nor Wilmington Trust individually has even attempted to demonstrate that the DCL Plan materially discriminates against any party.

*Third*, Wilmington Trust asserts that the DCL Plan fails the best interest of creditors test because it leaves the PHONES further out-of-the-money than they would be in a chapter 7 liquidation.[194] However, the truth, as acknowledged by counsel for the PHONES holders themselves, is that the PHONES are unlikely to receive a recovery under any circumstances: they

---

[188] See Post-Confirmation Hearing Brief of Wilmington Trust Company, as Successor Indenture Trustee for the PHONES, [Docket No. 8900] (the "Wilmington Trust Post-Trial Brief") at 2-7

[189] DCL Brief at 90-92; see also DCL Ex. 668 §14.01; Tr. 4/14 at 131:16-133:19.

[190] Wilmington Trust Post-Trial Brief at 5-6.

[191] See Noteholder Obj. at ¶ 396.

[192] Tr. 4/14 at 134:11-135:2; DCL Brief at 90-95.

[193] In re Greate Bay Hotel & Casino, Inc., 251 B.R. 213, 231 (Bankr. D.N.J. 2000).

[194] Wilmington Trust Post-Trial Brief at 6.

are contractually subordinate to, at the very least, more than $11 billion of debt.[195] Consequently, the fact that Wilmington Trust's preferred reading of the PHONES subordination provision would get the PHONES closer to, although still distant from, a recovery under any reasonably possible litigation outcome is of no moment.[196] Indeed, Wilmington Trust's argument rests on the unspoken premise that a settlement can never be approved over the objections of an out-of-the-money creditor if there exists any possibility, no matter how remote, that the a creditor could recover under a "home run" litigation outcome. To state such a proposition is to refute it.

*Fourth*, during the confirmation hearing, Wilmington Trust raised for the first time an argument that both the settlement consideration paid by the Senior Lenders and any proceeds of fraudulent transfer and preference claims prosecuted by the Litigation Trust should be apportioned *pro rata* to all unsecured creditors, without regard to the contractual subordination of the PHONES. Although Wilmington Trust neglected to timely brief these issues (waiting instead until the post-trial brief), it now claims that the PHONES are not subordinated with respect to these distributions because the PHONES are only subordinate with respect to "distributions of assets of the Company," and somehow neither the effective date distributions nor the Litigation Trust recoveries are "assets of the Company."[197]

This is nonsense. It is beyond dispute that Tribune's Estate is the successor-in-interest to Tribune, and that the Litigation Trust, should the DCL Plan be confirmed, would enjoy a similar position. Under the Bankruptcy Code, property recovered through section 550, including from

---

[195] Transcript of January 24, 2011 Hearing at 30:7-8.

[196] Not surprisingly, Wilmington Trust has failed to identify any authority holding that a creditor is better off for purposes of the best interests test if it would be less-out-of-the-money under a chapter 7 liquidation. In contrast, at least one court has held that "[w]hen employing the best-interest-of-creditors test, *courts look at the dividend* the creditor would receive from the chapter 7 trustee – *and only that amount* – for comparison with the dividend available under the plan." In re Dow Corning Corp., 237 B.R. 380, 411 (Bankr. E.D. Mich. 1999) (emphasis added). In the recent Washington Mutual case, Judge Walrath took a somewhat more expansive view, finding that "where claims are being released under the chapter 11 plan but would be available for recovery in a chapter 7 case, the released claims must be considered as part of the analysis in deciding whether creditors fare at least as well under the chapter 11 plan as they would in a chapter 7 liquidation." Washington Mut., 442 B.R. 314, 359-360 (Bankr. D. Del. 2011). Neither formulation of the test supports Wilmington Trust's argument concerning the supposed benefit to the PHONES of being less out-of-the-money in a liquidation.

[197] Post-Trial Brief of Wilmington Trust at 8 (quoting DCL Ex. 668 (PHONES Indenture) § 14.02).

avoidance actions under section 544, 547, or 548, becomes property of the Estate.[198] Thus, all property recovered by the Litigation Trust is, for the purposes of the PHONES Indenture, "company" property that must be turned over to Senior indebtedness.

Likewise unavailing is Wilmington Trust's claim that, if it had sued the LBO Lenders on a fraudulent transfer theory outside of bankruptcy, it would not have been required to share or turn over its recoveries.[199] Once the Debtors filed for bankruptcy, their Estates were vested with the exclusive right to prosecute avoidance actions and thereby recover property that rightfully belonged to the Debtors prepetition, with all such recovered property becoming *property of the Estates*.[200] Any consideration provided to settle such claims similarly becomes property of the Estates and as such is subject to the PHONES subordination provisions. Moreover, the purpose of avoiding a transfer is to return all parties to their *pre-transfer positions*.[201] It would be contrary to this basic principle for the PHONES to recover *pari passu* on property recovered through avoidance actions where they would not share *pari passu* in such property if an avoidable transfer never occurred. Such a result would be at odds with the fundamental purpose of avoidance actions and therefore must be rejected.[202]

---

[198] See 11 U.S.C. § 541(a)(3). This Court has made clear that "property of the estate includes 'any property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings.'" EBC I, Inc. v. America Online, Inc. (In re EBC I, Inc.), 356 B.R. 631, 639 (Bankr. D. Del. 2006) (quoting Begier v. I.R.S., 496 U.S. 53, 58-59 (1990)).

[199] Post-Trial Brief of Wilmington Trust at 9.

[200] See In re DVI, Inc., 306 B.R. 496, 502 n.5 (Bankr. D. Del. 2004); Mullins v. Burtch (In re Paul J. Paradise & Assocs.), 249 B.R. 360, 367 n.37 (D. Del. 2000). Moreover, Wilmington Trust's argument that its complaint against certain Senior Lenders for equitable disallowance, equitable subordination, and imposition of a constructive trust is "effectively mooted" by the distributions under the DCL Plan continues to miss the mark. See Post-Trial Brief of Wilmington Trust at 16-18. Indeed, as previously addressed, the DCL Plan does not release any direct claims held by Wilmington Trust. DCL Brief at 96; Tr. 4/13 at 180:8-24. To the extent that any of the claims in Wilmington Trust's complaint are personal to it, Wilmington Trust is free to pursue them. Further, although the Examiner concluded that it was unlikely that Wilmington Trust would be held in contempt of court for violating the automatic stay, see Examiner Report, Vol. 1 at 25-26, he also properly recognized that a Court is likely to find that Wilmington Trust's claims are based on "general harm" and that the "recognition of an unqualified right by creditors to assert equitable subordination claims premised on allegation of 'general' harm may greatly interfere with the ability of the trustee or debtor in possession to resolve and settle other valuable causes of action on behalf of the estate." Examiner Report, Vol. 3 at 21-23. That is precisely the situation here – Wilmington Trust improperly seeks to time trap Tribune in bankruptcy in order to coerce a hold-up settlement.

[201] See 5 COLLIER ON BANKRUPTCY ¶ 550.02[3][a] (Alan N. Resnick et al. eds., 16th ed. 2009).

[202] Similarly misplaced is the claim that the Senior Lenders should not benefit from the subordination provision because of a lack of good faith. See Post-Trial Brief of Wilmington Trust at 10-11. In fact, the PHONES Indenture

## VIII. FCC ISSUES DO NOT IMPAIR THE FEASIBILITY OF THE DCL PLAN.

The Noteholders argue that the Court should not confirm the DCL Plan on feasibility grounds, asserting that the Federal Communications Commission ("FCC") will not approve the DCL Plan due to supposed "violations" of FCC rules and that, in any event, the FCC review process will delay consummation by six to eight months. These contentions are baseless.

The Noteholders first argue that the "attributable" interests in Reorganized Tribune to be held by JPMorgan, Angelo Gordon, and Oaktree, combined with interests these parties have in other media companies, would "violate FCC rules" and require "curative action."[203] As summarized in Appendix A, however, the interests that JPMorgan, Angelo Gordon, and Oaktree hold in other media entities either are not attributable or already have been addressed in pending applications before the FCC. Moreover, even if the FCC were to raise concerns about those interests, the DCL Plan would remain eminently feasible because it contains provisions (Sections 5.4.2(d) and 5.3.2) that convert any interest that the FCC finds problematic into a non-attributable interest. Both FCC experts agreed that these are standard provisions used in media transactions to resolve potential ownership issues.[204]

Confronted with this reality, the Noteholders hypothesize that those provisions "will take a great deal of time to implement and are not certain to be effective."[205] The very provision cited by the Noteholders, however, specifically requires JPMorgan, Angelo Gordon, and/or Oaktree to "immediately . . . relinquish" board-related rights if corrective steps are not successful within 60 days, hardly a "great deal of time."[206] The Noteholders' suggestion that JPMorgan, Angelo Gordon, and Oaktree would delay consummation of the Plan that they themselves sponsor, and

---

expressly provides that a creditor's alleged "failure to act, in good faith" shall *not* impair the creditor's right to seniority under the Indenture. DCL Reply at 172-73. In any event, to the extent that a claim is allowed and is not subordinated on equitable grounds, there is no basis for failing to enforce the contractual subordination provision. In fact, the Examiner concluded that it was only "reasonably unlikely" that the Lenders would be able to enforce the PHONES subordination provision *even if their claims were avoided.* Examiner Report, Vol. 2 at 303-07.

[203] NPP FCC Brief at 2.

[204] Tr. 4/12 at 26:24-27:14, 35:12-38:19, 43:3-44:4 (Rosenstein); Tr. 3/17 at 73:24-77:5, 78:16-79:2 (Prak).

[205] NPP FCC Brief at 6.

[206] DCL Plan § 5.4.2(d).

thus delay their own recoveries, is simply not credible.[207] Such conjecture comes nowhere close to meeting the standard for establishing that the DCL Plan is infeasible.[208]

The Noteholders also baldly and irresponsibly assert that the Debtors have withheld relevant facts from the FCC.[209] For example, the Noteholders cite the fact that JPMorgan director Stephen Burke is also CEO of NBC Universal. This is a matter of public record, and Burke's position with JPMorgan is disclosed in the Tribune FCC applications, together with a statement that his duties for JPMorgan will be wholly unrelated to Reorganized Tribune.[210] The other "examples" cited by the Noteholders disingenuously ignore the critical distinction between attributable interests (which the FCC considers) and non-attributable interests (which it does not).[211]

As a last ditch effort, the Noteholders argue that, even if the other media interests of JPMorgan, Angelo Gordon, and Oaktree are not attributable, they somehow will "complicate" and adversely affect the waivers that Reorganized Tribune will require, which will delay the FCC's process by "at least six to eight months."[212] As support, the Noteholders cite an FCC statement that it will not employ any single metric in waiver proceedings.[213] As Rosenstein testified, however, the FCC has not considered non-attributable interests in evaluating prior waiver requests.[214] Further, the premise of the Noteholders' claim of delay is that the Senior

---

[207] In fact, the only *evidence* bearing on this issue flatly refutes the Noteholders' theory. When JPMorgan identified a potentially attributable interest in a company owning media outlets in markets served by the Debtors, JPMorgan resolved the issue within *less than a week.* Tr. 4/12 at 54:18-55:18 (Rosenstein); DCL Ex. 1570; see also Tr. 4/12 97:17-98:10 (Rosenstein).

[208] See In re TCI 2 Holdings, LLC, 428 B.R. 117, 154-55 (Bankr. D.N.J. 2010) (proponents must show no "material hurdles to" regulatory approval and confirming plan where there was a "reasonable prospect of" obtaining such approval); In re Cajun Elec. Power Coop., Inc., 230 B.R. 715, 747 (Bankr. M.D. La. 1999) ("the [bankruptcy] court need not require a guarantee of success") (citations omitted); In re Sound Radio Inc., 93 B.R. 849, 857 (Bankr. D.N.J. 1988) (confirming plan where "about the only thing that could delay [FCC] approval within the time set forth in the plan would be some inappropriate action by" the proponent of a competing plan); see also In re Granite Broad. Corp., 369 B.R. 120, 145-46 (Bankr. S.D.N.Y. 2007) (plan not feasible where, among other factors, it required FCC approval by August 31, 2007, and evidence showed that approval not likely until December 2007).

[209] NPP FCC Brief at 7.

[210] DCL Ex. 1456 at 23-24. Burke's other media interests are therefore irrelevant. Id.

[211] See Tr. 4/12 at 40:6-19 (Rosenstein); DCL Ex. 1456 at 3-4, 16-24.

[212] NPP FCC Brief at 7-9.

[213] NPP FCC Brief at 7-9.

[214] Tr. 4/12 at 41:8-43:2, 88:21-89:11 (Rosenstein); DCL Ex. 1456 at 6, 15.

-36-

Lenders' media interests will create complications even if those interests are *not* attributable.[215] If that assertion were true, which it is not, any complications created by those interests would impact equally the Noteholder Plan.[216] Furthermore, Prak's "opinion" regarding an eight month delay is entirely speculative, as Prak himself admitted.[217]

In sum, the Noteholders are essentially asking this Court to prejudge, second guess, and, in some cases, rewrite the FCC's own rules, procedures, and determinations. There is nothing in section 1129(a)(11) of the Bankruptcy Code that requires or even authorizes the Court to do so, and the Noteholders' objection in this regard is entirely unfounded.

## IX. THE NOTEHOLDER PLAN IS FATALLY FLAWED.

Out of 125 pages of post-trial briefing, the Noteholders devote a scant four pages to supporting their plan, tellingly focusing not on what the Noteholder Plan *will* do, but on what it will not do: it will not resolve any of the disputes that have plagued these chapter 11 cases. Because of this focus, it also will not give the Debtors a fresh start, it will not provide workable governance upon emergence, and it will not provide for a true reorganization. Amazingly, the Noteholders entirely ignore the most fundamental defect in their plan: its failure to win the acceptance of a single impaired class of creditors at 109 of the 111 Debtors and its resulting inability to satisfy section 1129(a)(10) of the Bankruptcy Code.[218]

This brief responds only to the few points the Noteholders do raise regarding their plan,[219] each of which relates to the core flaw that the Noteholder Plan is not a means of reorganizing the Debtors; rather, it is only a means of prolonging litigation and postponing

---

[215] NPP FCC Brief at 7-8.

[216] Tr. 4/12 at 27:16-21, 44:22-46:18 (Rosenstein). The Noteholders assert that there is "no dispute" that JPMorgan, Angelo Gordon, and Oaktree "would not have attributable interests under the Noteholder Plan," as if this would resolve all FCC issues regarding their own plan. NPP FCC Brief at 2. This assertion is, at best, misleading. Rosenstein pointed out potential attribution issues created by the Distribution Trust in the Noteholder Plan, as well as the likelihood that Aurelius – which has not yet disclosed anything about itself, including possible other media interests, to the FCC – would hold an attributable interest in Tribune post-emergence. DCL Ex. 1456 at 28-29.

[217] Tr. 3/17 at 83:14-23 (Prak).

[218] See DCL Obj. at 3-9; DCL Brief at 103-107.

[219] The DCL Proponents' prior objections catalogue the Noteholder Plan's numerous other fatal legal and practical deficiencies in more detail. See generally DCL Obj., Supplement to the DCL Obj. [Docket No. 8581]; see also DCL Brief at 102-114.

essential determinations. Under the DCL Plan, creditors will be paid, entitlements determined, and value maximized. Under the Noteholder Plan, creditors would continue to fight over who gets how much of the pie with no clear entitlements, no clear rules, and no end in sight.

The Noteholders' assertion that their efforts to reduce the amount of Reorganized Tribune's equity held in reserve at emergence "obviate" all of the governance concerns raised by the DCL Proponents ignores several glaring issues.[220] Most notably, the Distribution Trustee would still appoint two of seven board members of Reorganized Tribune and retain the ability to vote separately on, and thus veto, certain strategic transactions *for the life of the Distribution Trust, even if the Distribution Trust held no equity at all.*[221]

Citing only the testimony of an Aurelius representative, the Noteholders assert that they "expect" the Noteholder Plan's multi-billion dollar reserve would be distributed "shortly" after effectiveness of their plan.[222] As previously noted,[223] however, without a plan process to bind dissenters, the Litigation Trustee would be forced either to litigate all the LBO Related Causes of Action to conclusion or to negotiate settlements individually with each Senior Lender and each Bridge Lender in order to permit distribution of the massive reserve – hardly a landscape conducive to quick and easy compromise. Further, the very fact that Aurelius has tried to justify its offer to pay general unsecured creditors a fraction of their recoveries under the DCL Plan on the grounds that it allows those creditors to avoid risk and delay calls into question the credibility of its speculation as to when any such distribution might be made. In any event, that speculation certainly does not provide a basis on which the Court can reasonably rely, particularly in light of the overwhelming evidence that the Noteholder Plan would impede speedy distribution of the Estates' value.

The Noteholders go to great lengths to present their plan as "substantially similar" to the DCL Plan in order to bolster its *bona fides*, presenting their failure to resolve the claims against

---

[220] NPP Brief at 6 n.22.

[221] See Noteholder Plan § 1.1.174.

[222] NPP Brief at 6.

[223] See, e.g., DCL Obj. at 31-32; DCL Brief at 113-14.

-38-

the Senior Lenders and Bridge Lenders as their plan's key difference and virtue.[224] The failure to resolve the allowance of more than $10 billion in claims (over 75% of Tribune's total indebtedness), however, is a flaw that makes it impossible to determine any constituency's entitlements and necessitates an unprecedented multi-billion dollar reserve. Incredibly, the Noteholders ask the Court to decide today that a plan that delays all real determinations to a distant tomorrow somehow satisfies the rigorous cramdown standards for the 253 of 256 voting classes that rejected the Noteholder Plan and is preferable to a plan supported by all but 3 of the 128 classes voting on the DCL Plan – including classes of creditors consisting of the defendants in respect of the settled LBO-Related Causes of Action *and* classes consisting of those who would benefit from the successful prosecution of such claims.[225] The Noteholder Plan is designed to facilitate the litigation and not the Debtors' reorganization; it in no way "accomplishes the objectives of chapter 11," as the Noteholders claim.[226] Aurelius may be willing to forgo the settlement consideration offered by the DCL Plan and endlessly prolong the Debtors' bankruptcy, but other creditors clearly and overwhelmingly are not, and they should not be dragged along on Aurelius's risky experiment.

In sum, the Noteholders have failed to offer any cogent defense of their plan. It does not satisfy the most basic requirements of the Bankruptcy Code and it cannot be confirmed.

## X.     CONCLUSION

For these reasons and as otherwise set forth in the DCL Proponents' previous briefs and in the record developed at trial, the DCL Plan should be confirmed and the Noteholder Plan should be rejected.

---

[224] NPP Brief at 4-5.

[225] See Epiq Voting Declaration, Docket No. 8882.

[226] NPP Brief at 6.

Dated: Wilmington, Delaware
May 27, 2011

Respectfully submitted,
SIDLEY AUSTIN LLP
James F. Conlan
Bryan Krakauer
Kevin T. Lantry
Jessica C.K. Boelter
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
-and-
COLE, SCHOTZ, MEISEL, FORMAN &
LEONARD, P.A.

*/s/ Norman L. Pernick*
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
*Counsel for Debtors and Debtors in Possession and Certain
Non-Debtor Affiliates*

CHADBOURNE & PARKE LLP
Howard Seife
David M. LeMay
30 Rockefeller Plaza
New York, New York 10112
Telecopier: (212) 541-5369
-and-
LANDIS RATH & COBB LLP

*/s/ Adam G. Landis*
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telecopier: (302) 467-4450

-and-

ZUCKERMAN SPAEDER LLP
Graeme W. Bush
James Sottile
1800 M Street, N.W., Suite 1000
Washington, D.C. 20036
Telecopier: (202) 822-8106
*Counsel for the Official Committee of Unsecured Creditors*

DEWEY & LEBOEUF LLP
Bruce Bennett
James O. Johnston
Joshua M. Mester
333 South Grand Avenue, Suite 2600
Los Angeles, California 90071
Telecopier: (213) 621-6100

    -and-

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

*/s/ Robert S. Brady*
Robert S. Brady (No. 2847)
M. Blake Cleary (No. 3614)
The Brandywine Building – 17th Floor
1000 West Street, Post Office Box 391
Wilmington, Delaware 19899 0391
Telecopier: (302) 571-1253
*Counsel For Oaktree Capital Management, L.P. and Angelo,
Gordon & Co., L.P.*


WILMER CUTLER PICKERING HALE &
DORR LLP
Andrew Goldman
399 Park Avenue
New York, New York 10022
Telecopier: (212) 230-8888
*Co-Counsel For Angelo, Gordon & Co, L.P.*


DAVIS POLK & WARDWELL LLP
Donald S. Bernstein
Benjamin S. Kaminetzky
Damian S. Schaible
Elliot Moskowitz
450 Lexington Avenue
New York, New York 10017
Telecopier: (212) 701 5800

    -and-

RICHARDS LAYTON & FINGER

*/s/ Drew G. Sloan*
Mark D. Collins (No. 2981)
Robert J. Stearn, Jr. (No. 2915)
Drew G. Sloan (No. 5069)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telecopier: (302) 651-7701
*Counsel For JPMorgan Chase Bank, N.A.*

# APPENDIX A

## Alleged Problematic Interests

| COMPANY | ALLEGED ATTRIBUTABLE INTEREST | RECORD EVIDENCE |
|---|---|---|
| Gannett | JPM 10% ownership interest as investment advisor or manager | FCC has held that, where an investment advisor's interest arises from its management of an entity that qualifies for "passive investor" treatment (i.e., application of 20% attribution threshold), the advisor will also be deemed to be subject to the higher threshold. Tr. 4/12 at 50:21-52:17, 86:11-24; DCL Ex. 1456 at 18-20. Accordingly, JPM's 10% interest is not attributable. |
| Freedom Communications | Angelo Gordon board observer rights | Under FCC precedent, director nomination and board observer rights are not attributable interests; the Debtors' FCC expert (Rosenstein) has structured transactions with board observer rights that the FCC has treated as non-attributable. Tr. 4/12 at 50:3-50:20, 91:6-93:13; DCL Ex. 1456 at 21 & n.3.[1] |
| Freedom Communications | JPM member of a "Steering Committee" with input on members of the initial board of directors | JPM rights do not constitute an attributable interest. Tr. 4/12 at 82:10-83:14.[2] |
| Journal Register | JPM member of group with input on members of the initial board of directors | JPM rights do not constitute an attributable interest. Tr. 4/12 at 82:10-83:14 and n.2, below. |
| NBC Universal | JPM director is CEO of NBC Universal | Not an attributable interest pursuant to a recognized exemption given JPM's statement (in Tribune's FCC applications) that the director has duties wholly unrelated to Reorganized Tribune. DCL Ex. 1456 at 23-24. |
| Next Media | Angelo Gordon has director designation rights | Next Media Plan as confirmed and approved by FCC contains non-attributable board nomination rights and does not contain director designation rights. Tr. 4/12 at 47:6-49:25, 93:14-95:13; DCL Ex. 1456 at 17-189; DCL Ex. 1556 at Sect. 6.3(m).[3] |

---

[1] The Noteholders also refer to Angelo Gordon's equity interest in Freedom, NPP FCC Brief at 3, but Angelo Gordon's interest in Freedom clearly falls below the attribution threshold. DCL Ex. 1456 at 21.

[2] The Noteholders' FCC expert *never addressed* JPMorgan's alleged director-designation rights in Freedom or Journal Register. Accordingly, the Court sustained an objection to the Noteholders' cross-examination of the DCL Plan Proponents' FCC expert on these topics beyond three preliminary questions, the responses to which establish that such rights are not attributable interests. Tr. 4/12 at 82:10-84:8 (Rosenstein). The Noteholders also refer to JPMorgan's equity holdings in Freedom and Journal Register, NPP FCC Brief at 3-4, but those holdings fall well below the attribution threshold. DCL Ex. 1456 at 16, 20-21.

[3] The Noteholders also refer to Angelo Gordon's equity interest in Next Media, NPP FCC Brief at 5, but such holding falls below the attribution threshold. DCL Ex. 1456 at 17.