# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) ) ) Chapter 11 |
| | ) Case No. 08-13141 (KJC) |
| TRIBUNE COMPANY, *et al.*, | ) Jointly Administered |
| | ) |
| | ) **Related to ECF No. 8897** |
| Debtors. | ) |
| | ) |

## POST-TRIAL REPLY BRIEF OF THE
## NOTEHOLDER PLAN PROPONENTS

AKIN GUMP STRAUSS HAUER & FELD LLP
Daniel H. Golden
David Zensky
Philip C. Dublin
Abid Qureshi
Mitchell P. Hurley
One Bryant Park
New York, NY 10036
212-872-1000

*Counsel for Aurelius Capital Management, LP*

ASHBY & GEDDES, P.A.
William P. Bowden (I.D. No. 2553)
Amanda M. Winfree (I.D. No. 4615)
500 Delaware Avenue, P.O. Box 1150
Wilmington, DE 19899
302-654-1888

McCARTER & ENGLISH, LLP
David J. Adler
245 Park Avenue
New York, NY 10167
212-609-6800

McCARTER & ENGLISH, LLP
Katharine L. Mayer (I.D. No. 3758)
Renaissance Centre
405 N. King Street
Wilmington, DE 19801
302-984-6300

*Counsel for Deutsche Bank Trust Company Americas, solely in its capacity as successor Indenture Trustee for certain series of Senior Notes*

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
David S. Rosner
1633 Broadway
New York, New York 10019
212-506-1700

BIFFERATO GENTILOTTI LLC
Garvan F. McDaniel (I.D. No. 4167)
800 N. King Street, Plaza Level
Wilmington, Delaware 19801
302- 429-1900

*Counsel for Law Debenture Trust Company of New York, solely in its capacity as successor Indenture Trustee for certain series of Senior Notes*

BROWN RUDNICK LLP
Robert J. Stark
Martin S. Siegel
Gordon Z. Novod
Seven Times Square
New York, NY 10036
212-209-4800

SULLIVAN HAZELTINE ALLINSON LLC
William D. Sullivan (I.D. No. 2820)
Elihu E. Allinson, III (I.D. No. 3476)
901 N. Market St., Suite 1300
Wilmington, DE 19801
302-428-8191

*Counsel for Wilmington Trust Company, solely in its capacity as successor Indenture Trustee for the PHONES Notes*

FREIDMAN KAPLAN SEILER & ADELMAN LLP
Edward A. Freidman
Robert J. Lack
Kizzy L. Jarashow
7 Times Square
New York, NY 10036-6516
(212) 833-1100

*Counsel for Aurelius Capital Management, LP, as to matters concerning JPMorgan and Angelo Gordon, but not Oaktree*

LERMAN SENTER PLLC
Meredith S. Senter, Jr.
Sally A. Buckman
2000 K Street NW, Suite 600
Washington, DC 20006
(202) 429-8970

*Counsel for Aurelius Capital Management, LP, as to FCC matters*

# TABLE OF CONTENTS

ARGUMENT ........................................................................................................................1

I.  THE VOTING RESULTS DO NOT SUPPORT THE REASONABLENESS OF
    THE PROPOSED SETTLEMENT ..............................................................................1

II. THE PROPOSED SETTLEMENT IS NOT REASONABLE ..........................................2

    A.  A Court Would Find That The Transfers Made And Obligations Incurred
        At Both Steps Of The LBO Should Be Avoided........................................................3

    B.  A Court Would Find That If Only Step Two Is Avoided, Equitable
        Remedies Such As "WEAR" Will Apply...................................................................7

    C.  A DEV Of $6.9 Billion Results In Greater Recoveries For Non-LBO
        Creditors Than The Proposed Settlement ............................................................10

    D.  There Is A Strong Argument For Equitable Subordination Of The Step One
        Lenders' Claims, Resulting In Full Recovery For Non-LBO Creditors ...............13

    E.  Even If The LBO Debt Is Avoided Only At The Parent Level, The Non-
        LBO Creditors Fare Better Under The NPP Plan Than The Proposed
        Settlement ...............................................................................................................15

III. THIS COURT SHOULD DISREGARD BLACK'S OPINIONS AND INSTEAD
     LOOK TO BERON'S COMPREHENSIVE EXPECTED VALUE ANALYSIS..............16

IV. THE DCL PLAN PROPONENTS' OBJECTIONS LACK MERIT AND THE
    NPP PLAN SHOULD BE CONFIRMED....................................................................23

    A.  The NPP Plan Satisfies Bankruptcy Code Section 1129(a)(10) ...........................23

    B.  Guarantor Non-Debtor Releases Under the NPP Plan Are Appropriate ...............24

        1.  The Guarantor Non-Debtor Releases Are Not "Third Party"
            Releases............................................................................................................24

        2.  The Guarantor Non-Debtor Releases Should Be Approved ......................26

    C.  The NPP Plan Does Not Have Problematic Tax Consequences ...........................29

    D.  The NPP Plan Does Not Unfairly Discriminate Against The Senior
        Lenders.....................................................................................................................30

    E.  The NPP Plan Allows The Litigation Trustee To Settle LBO Claims ..................32

    F.  The DCL Plan Improperly Gives Effect to Subordination Provisions....................33

V.  THE NPP PLAN SHOULD BE CONFIRMED OVER THE DCL PLAN ......................36

CONCLUSION....................................................................................................................38

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alumax Inc. v. Comm'r,*
109 T.C. No. 8, 109 T.C. 133 (T.C. 1997).............................................................18

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship,*
526 U.S. 434 (1999)...........................................................................................36

*Bankr. Serv., Inc. v. Ernst & Young (In re CBI Holding Co.),*
No. 96-9143A, slip op. (Bankr. S.D.N.Y. Oct. 23, 2000).....................................20

*Benjamin v. Diamond (In re Mobile Steel Co.),*
563 F.2d 692 (5th Cir. 1977) ................................................................................14

*Berckeley Inv. Grp. v. Colkitt,*
455 F.3d 195 (3d Cir. 2006)..................................................................................18

*Bridgeport Holdings Inc. Liquidating Trust v. CDW Corp. (In re Bridgeport Holdings, Inc.),*
No. 05-50507 (Bankr. D. Del. Jan. 10, 2007) .......................................................18

*Calhoun v. Honda Motor Co., Ltd.,*
738 F.2d 126 (6th Cir. 1984) ................................................................................20

*Calhoun v. Yamaha Motor Corp.,*
350 F.3d 316 (3d Cir. 2003)............................................................................17, 18

*Calpine Corp. v. Rosetta Res. (In re Calpine Corp.),*
377 B.R. 808 (Bankr. S.D.N.Y. 2007)..............................................................10, 11

*Cames v. Joiner (In re Joiner),*
319 B.R. 903 (Bankr. M.D. Ga. 2004)....................................................................2

*Caminetti v. U.S.,*
242 U.S. 470 (1917).............................................................................................23

*Cantor v. Perelman,*
No. Civ. A. 97-586 KAJ, 2006 WL 3462596 (D. Del. Nov. 30, 2006)...................18

*Daubert v. Merrell Dow Pharm., Inc.,*
509 U.S. 579 (1993)........................................................................................17, 18

*Enron Corp. v. Ave. Special Situation Fund II, LP, et al. (In re Enron Corp.),*
333 B.R. 205 (Bankr. S.D.N.Y. 2005)..............................................................14, 15

*First Trust and Deposit Co. v. Receiver of Salt Springs Nat'l Bank (In re Onondaga Litholite Co.),*
218 F.2d 671 (2d Cir. 1955)................................................................................8

*Gillman v. Cont'l Airlines (In re Cont'l Airlines),*
203 F.3d 203 (3d. Cir. 2000)........................................................................24, 26

*Harris v. Huff (In re Huff),*
160 B.R. 256 (Bankr. M.D. Ga. 1993)..................................................................9

*In re Adelphia Commc'ns Corp.,*
327 B.R. 143 (Bankr. S.D.N.Y. 2005)..................................................................1

*In re Bayou Grp., LLC,*
372 B.R. 661 (Bankr. S.D.N.Y. 2007)..................................................................9

*In re Bridge Info Sys.,*
311 B.R. at 781 (Bankr. E. D. Mo. 2004)..............................................................6

*In re Capmark Fin. Grp. Inc.,*
438 B.R. 471 (Bankr. D. Del. 2010)....................................................................33

*In re Congoleum Corp.,*
362 B.R. 167 (Bankr. D.N.J. 2007)......................................................................26

*In re Drexel Burnham Lambert Grp., Inc.,*
960 F.2d 285 (2d Cir. 1992)...............................................................................25

*In re Eddington Thread Mfg. Co.,*
181 B.R. 826 (Bankr. E.D. Pa. 1995)..................................................................38

*In re Goss,*
43 F.2d 746 (N.D. Ga. 1930)..............................................................................10

*In re Greate Bay Hotel & Casino, Inc.,*
251 B.R. 213 (Bankr. D.N.J. 2000) ............................................................. passim

*In re Hawaiian Telecom Commc'ns, Inc.,*
430 B.R. 564 (Bankr. D. Haw. 2009)..................................................................31

*In re Hayes Lemmerz Int'l, Inc.,*
2009 WL 7698522 ........................................................................................26, 27

*In re Holly Garden Apartments., Ltd.,*
238 B.R. 488 (Bankr. M.D. Fla. 1999) ...........................................................36, 38

*In re Iridium Operating LLC*,
   478 F.3d 452 (2d Cir. 2007)..................................................................................35

*In re Metromedia Fiber Network, Inc.*,
   416 F.3d 136 (2d Cir. 2005)..................................................................................26

*In re Nellson Nutraceutical, Inc.*,
   356 B.R. 364 (Bankr. D. Del. 2006) ......................................................................18

*In re Nellson Nutraceutical, Inc.*,
   No. 06-10072, 2007 WL 201134 (Bankr. D.Del. Jan. 18, 2007)............................6

*In re PWS Holding Corp.*,
   228 F.3d 224 (3d Cir. 2000)....................................................................................9

*In re River Village Assocs.*,
   181 B.R. 795 (E.D. Pa. 1995) ....................................................................36, 37, 38

*In re Solutia, Inc.*,
   379 B.R. 473 (Bankr. S.D.N.Y. 2007) ....................................................................6

*In re Spansion, Inc.*,
   426 B.R. 114 (Bankr. D. Del. 2010) ......................................................................26

*In re Spansion, Inc., et al.*,
   No. 09-10690, 2009 WL 1531788 (Bankr. D. Del. 2009) .......................................1

*In re TCI 2 Holdings, LLC*,
   428 B.R. 117 (Bankr. D.N.J. 2010) ................................................................36, 38

*In re Trans World Airlines, Inc.*,
   134 F.3d 188 (3d Cir. 1998).....................................................................................6

*In re Washington Mutual, Inc.*,
   442 B.R. 314 (Bankr. D. Del. 2011) ......................................................................26

*Menard-Sanford v. Mabey (In re A.H. Robins Co.)*,
   880 F.2d 694 (4th Cir. 1989) .................................................................................25

*Morin v. OYO Instruments, L.P. (In re Labelon Corp.)*,
   No. 02-22582, 2006 WL 2516386 (Bankr. W.D.N.Y. Aug. 28, 2006) ...................8

*Oddi v. Ford Motor Co.*,
   234 F.3d 136 (3d Cir. 2000)...................................................................................18

*Paloian v. LaSalle Bank, N.A.*,
   619 F.3d 688 (7th Cir. 2010) ...............................................................................5, 6

*Shearson Lehman Bros. v. Munford, Inc. (In re Munford, Inc.),*
   97 F.3d 449 (11th Cir. 1996) .................................................................25

*Shubert v. Lucent Techs. (In re Winstar Commc'ns),*
   348 B.R. 234 (Bankr. D. Del. 2005) ........................................................6

*Thrifty Oil Co. v. Bank of Am. Nat'l. Trust & Sav. Ass'n,*
   322 F.3d 1039 (9th Cir. 2003) ................................................................34

STATUTES

11 U.S.C. § 548(c) ....................................................................................20

11 U.S.C. § 1129(a)(10) ......................................................................23, 24

11 U.S.C. § 1129(b) ............................................................................31, 32

11 U.S.C. § 1129(c) ..................................................................................36

Treas. Reg. section 1.671-4(a) .................................................................29

Treas. Reg. section 1.468B-9 ..............................................................29, 30

Treas. Reg. section 301.7701-4(d) ...........................................................29

Rev. Proc. 94-45, 1994-2 C.B. 684 .....................................................29, 30

RULES

Fed. R. Evid. 702 ....................................................................................18

Fed. R. Evid. 704 ....................................................................................18

Fed. R. Bankr. 2004 ...........................................................................19, 20

Fed. R. Bankr. 9019 ...........................................................................18, 19

SECONDARY SOURCES

Simon Friedman & Russell Kestenbaum, *Fixed and Contingent Claims in Bankruptcy—
   Liquidating Trusts and Partnerships*, 101 TAX Notes 1317 (2003) .......................30

Vol. C. COLLIER ON BANKRUPTCY App. Pt. 4(d)(i)(15th ed. rev.) .............................35

<u>**ARGUMENT**</u>[1]

**I. THE VOTING RESULTS DO NOT SUPPORT THE REASONABLENESS OF THE PROPOSED SETTLEMENT**

Although the DCL Plan Proponents tout the "views of creditors" as the "most important of all considerations" when evaluating the appropriateness of a settlement, the voting results cited by the DCL Plan Proponents neither reflect the unanimous support of creditors for the Proposed Settlement nor offer support for its reasonableness.[2]  When analyzing whether a settlement is fair and equitable, courts view the fairness of the settlement "to the other persons, *i.e.*, **the parties who did not settle**."[3]  Consideration of voting results should thus be more than a mere "counting exercise" where votes of the settling and non-settling parties are given equal weight.[4]  Indeed, votes "must be considered in light of the **reasons for any opposition**, and the more fundamental factors—such as benefits of settlement, likely rewards of litigation, costs of litigation and downside risk."[5]

While more Classes voted in favor of the DCL Plan[6] than the NPP Plan, this is only indicative of the fact that the Proposed Settlement the DCL Plan embodies has the overwhelming support of creditors who are either receiving a sweetheart release (*i.e.*, LBO Lenders and Retirees, who are contractually obligated to support the DCL Plan) or a disproportionate share of the settlement consideration (*i.e.*, Subsidiary General Unsecured Creditors).  Additionally, a closer look at the holders of Other Parent Claims—the allegedly impartial class that voted to accept the DCL Plan by "enormous margins"—reveals that their votes do not hold the persuasive

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to them in the Post-Trial Brief of the Noteholder Plan Proponents [ECF No. 8898] (the "NPP Post-Trial Brief").

[2] Post-Trial Brief of the DCL Plan Proponents at 8 [ECF No. 8897] (the "DCL Post-Trial Brief").

[3] *In re Spansion, Inc., et al.*, No. 09-10690, 2009 WL 1531788, at *3 (Bankr. D. Del. 2009) (citing *Will v. N.W. Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 645 (3d Cir. 2006)).

[4] *See In re Adelphia Commc'ns Corp.*, 327 B.R. 143, 165 (Bankr. S.D.N.Y. 2005).

[5] *See id.* (emphasis added).

[6] Second Amended DCL Plan, dated April 26, 2011 [ECF No. 8769] (the "DCL Plan").

weight claimed by the DCL Plan Proponents.[7]  A whopping 57% of the Other Parent Claims consists of the improperly classified Swap Claim,[8] which is held by Oaktree and will receive a 100% recovery under the DCL Plan.[9]  Another 40% of the Other Parent Claims (which, together with the Swap Claim, account for **97%** of the Other Parent Claims) consists of Retiree Claims held by a group of creditors who are contractually bound to approve the DCL Plan and will obtain a full release from all estate causes of action if the DCL Plan is confirmed.[10]  In these circumstances, the analysis of the voting results should heavily weigh the votes of the Pre-LBO Noteholders, who were most harmed by the LBO yet benefit the least from the Proposed Settlement—not the Other Parent Claim holders, the vast majority of whom are either (i) contractually bound to support the DCL Plan or (ii) will be paid in full thereunder.[11]  The Pre-LBO Noteholders overwhelmingly voted to *accept* the NPP Plan and *reject* the DCL Plan, evidencing that the Proposed Settlement is *not* fair and equitable and the NPP Plan should be confirmed.[12]

## II.    THE PROPOSED SETTLEMENT IS NOT REASONABLE

As demonstrated by the Examiner's analysis of the many litigation outcomes that could lead to substantial recoveries to the Non-LBO Creditors, the value of the LBO Claims against the Senior Lenders is vastly greater than the consideration contemplated under the Proposed Settlement.  In an effort to escape this reality, the DCL Plan Proponents ignore the myriad litigation outcomes that would provide superior value to Non-LBO Creditors, stubbornly arguing

---

[7] DCL Post-Trial Br. at 9.
[8] DCL Post-Trial Br. at 91.
[9] *See* NPP 2474 (NPP Confirmation Objection) at 210; DCL Plan §§ 3.2; 3.3.
[10] DCL Post-Trial Br. at 92; DCL Plan, Ex. 5.15.4 (Retiree Claims Settlement); DCL Plan § 3.2.6.
[11] *See Cames v. Joiner (In re Joiner)*, 319 B.R. 903 (Bankr. M.D. Ga. 2004) (rejecting 9019 settlement that would have paid creditors approximately 40% of their claims but would have paid them in full if the litigation succeeded; court weighed heavily the opposition of creditors holding 61% of unsecured claims affected by settlement, who were willing to forego the settlement and pursue litigation).
[12] Over 90% in dollar amount of the Senior Noteholder Claims and PHONES Notes Claims voted to accept the NPP Plan.  Final Voting Tabulation Report, Ex. A-1 at 1 [ECF No. 7918]; NPP 2224 (Gropper Declaration) ¶ 41.

that only a litigation "home run," which they define as avoidance of both Step One and Step Two at all Debtors, will result in improved recoveries to Non-LBO Creditors.   The DCL Plan Proponents' argument is misguided for several reasons.  First, one cannot assess the value of the LBO Claims against the LBO Lenders without considering the likelihood and value of all possible litigation outcomes.  The DCL Plan Proponents' focus on only one of those outcomes is thus inherently unreliable.  Second, the DCL Plan Proponents materially underestimate the likelihood of their "home run" scenario, given that they have effectively conceded avoidance of Step Two,[13] and grossly underestimate the likelihood of avoidance at Step One.  And third, there are a number of scenarios that would result in far greater recoveries to Non-LBO Creditors than the Proposed Settlement.  For example, Non-LBO Creditors will receive superior recoveries if (i) only Step Two is avoided and (a) equitable principles such as waiver, estoppel and assumption of risk preclude the Step One Lenders from sharing in the benefit of Step Two avoidance, (b) DEV is equal to or higher than $6.9 billion, or (c) the Step One Lenders' claims are equitably subordinated,[14] or if (ii) all LBO debt is avoided only at Tribune.  The DCL Plan Proponents' efforts to show that these scenarios are unlikely, or that they will not result in superior recoveries for Non-LBO Creditors, cannot survive scrutiny.

A.      A Court Would Find That The Transfers Made And Obligations Incurred At Both Steps Of The LBO Should Be Avoided

The DCL Plan Proponents concede that avoidance of both the Step One and Step Two debt yields a recovery for Non-LBO Creditors that is significantly greater than the consideration

---

[13] The DCL Plan Proponents' own experts admitted that Step Two solvency is "a very close call," 3/10/11 Trial Tr. 92:7-12 (Fischel), and that "Tribune Balance Sheet Solvency at Step 2 [i]s unlikely . . ." DCL 1484 (Amended Black Rpt.) at 127.
[14] In the interest of space, other equitable remedies and common law claims against the LBO Lenders that also result in material recoveries for Non-LBO Creditors, such as equitable disallowance, aiding and abetting a breach of fiduciary duty, and unjust enrichment, are not discussed in this brief.  A detailed discussion of these claims and remedies can be found at pages 137-45 of the NPP Confirmation Objection (NPP 2474)

provided for by the Proposed Settlement.[15]  The DCL Plan Proponents argue that this outcome should be discounted, however, because "there are substantial hurdles" to avoiding the Step One debt.[16]  The DCL Plan Proponents materially understate the likelihood of full avoidance.

For example, the DCL Plan Proponents' discussion of the Examiner's conclusions regarding whether the Step Two debt should be considered in a Step One solvency analysis is incomplete.  While the DCL Plan Proponents state repeatedly that "the Examiner concluded that a finding that Step One and Step Two should be collapsed was 'somewhat unlikely[],'"[17] they neglect to note that this finding was limited to the balance sheet solvency test.  With respect to the other two financial condition tests, capital adequacy and ability to pay, the Examiner concluded that "a court is ***highly likely*** to consider all obligations that were reasonably foreseeable at the time of Step One, ***including those caused by Step Two***."[18]  Fischel performed two Step One capital adequacy and ability to pay analyses – one that included the Step Two debt, and one that did not.  ***Fischel's analysis*** (let alone Tuliano's) shows that, when the Step Two debt is considered (as the Examiner found it should be), the Company ***did not have adequate capital to pay its debts as they came due at Step One***.[19]

Additionally, the DCL Plan Proponents rely on inapposite cases to bolster Fischel's and Black's erroneous decisions to include S Corp/ESOP tax benefits in their balance sheet solvency

---

[15] *See* DCL Post-Trial Br. at 21.

[16] *See* DCL Post-Trial Br. at 35.

[17] DCL Post-Trial Br. at 23-4, 36.  The DCL Plan Proponents go on to note that "for his part, Black opined that the likelihood of the Noteholders' prevailing on this point was even more remote."  Given that Black is not an expert in bankruptcy law, valuation, or solvency, his opinion on this issue should be afforded no weight.  *See* DCL 1484 (Amended Black Rpt.) at 3, 17; 3/9/11 Trial Tr. 180:12-181:2 (Black); 3/10/11 Trial Tr. 50:23-51:4 (Black); 4/12/11 Trial Tr. 118:10-122:9, 123:12-22 (Black).

[18] NPP 782 (Exam'rs Rpt.), Vol. II at 183, 187-88.  Additionally, the Examiner found that the questions of whether Step Two would be included in a Step One balance sheet test, and whether the Company was solvent at Step One were "admittedly . . . close," and "very close," respectively.  *Id.* at 182, 206.

[19] DCL 1106 (Fischel Rpt.) at Ex. Q; 3/10/11 Trial Tr. 123:3-7 (Fischel).

analyses.[20]  As the Examiner noted, however, the "question before the[] courts" in the cited tax

cases "was whether to value the stock in the heir's hands ***recognizing that the heir would enjoy***

***the same tax advantage as its predecessor.***"[21]  Thus, as the Examiner concluded, these cases

"furnish no justification" for the assertion that unique tax benefits of an S Corp/ESOP structure

should be included in the Company's balance sheet solvency analysis, given that the Company's

"hypothetical, average buyers" would not be able to enjoy such benefits.[22]  The *Paloian* case is

also distinguishable, as it involved the valuation of a hospital whose pool of likely buyers

comprised "nonprofit organizations that do not pay income tax," and who would thus "not reduce

their bids [for the hospital] on account of income taxes" they would not have to pay.[23]  Moreover,

JPMorgan's notes from a conference call among the LBO Lenders in the days leading up to Step

Two show that the LBO Lenders did not agree that tax benefits of the S Corp/ESOP structure

should be included in a solvency analysis, noting "S Corp savings WRONG but still +hv

PHONES."[24]

   The DCL Plan Proponents also criticize Tuliano's decision to value the PHONES Notes

at face, rather than accounting, value, arguing that this decision is inconsistent with the rulings in

---

[20] *See* DCL Post-Trial Br. at 71; The DCL Plan Proponents' reliance on Black for the notion that the Examiner failed to include sources of tax value arising from the Company's S Corp/ESOP structure in his balance sheet solvency analysis because he "misunderstood" them is highly specious, given Black's lack of expertise as noted above.  DCL Post-Trial Br. at 40; DCL 1484 (Amended Black Rpt.) at 3, 17; 3/9/11 Trial Tr. 180:12-181:2 (Black); 3/10/11 Trial Tr. 50:23-51:4 (Black); 4/12/11 Trial Tr. 118:10-122:9, 123:12-22 (Black).

[21] NPP 782 (Exam'rs Rpt.), Vol. II at 27 n.87 (emphasis added) (citing *Gross v. Comm'r*, 272 F.3d 333, 342 (6th Cir. 2001); *Dallas v. Comm'r*, No. 7493-04, 2006 WL 2792684 (T.C. Sept. 28, 2006); *Estate of Adams v. Comm'r*, No. 14698-99, 2002 WL 467235 (T.C. Mar. 28, 2002); *In re Estate of Heck v. Comm'r*, No. 11619-99, 2002 WL 180879 (T.C. Feb. 5, 2002) ; *Wall v. Comm'r*, Nos. 1590-98, 1850-98, 2001 WL 335845 (T.C. Mar. 27, 2001)).

[22] NPP 782 (Exam'rs Rpt.), Vol. II at 27 n.87; *see also* 3/18/11 Trial Tr. 253:8-23 (Tuliano); NPP 955 (Tuliano Rebuttal Rpt.) at 12.

[23] *Paloian v. LaSalle Bank, N.A.*, 619 F.3d 688, 694 (7th Cir. 2010).  Indeed, Black also noted that *Paloian* may be distinguished on this basis.  DCL 1484 (Amended Black Rpt.) at 69 n.134.

[24] NPP 1052 (Handwritten JPM Notes from a 12/17/07 conference call among the LBO Lenders) at JPM_00499997).  The evidence also shows that the LBO Lenders knew that the Company would not be able to obtain a solvency opinion from VRC if the value of the S Corp/ESOP tax benefits were not included.  *See, e.g.,* NPP 628 (LBO Lender Step 2 Solvency Valuation Questions) at VRC0070618 (asking VRC to "confirm [the LBO Lenders'] understanding that the [Company's] ranges of equity cushions would be unacceptable for opinion purposes but for the value ascribed to the S-Corp ESOP tax savings").

*In re Solutia, Inc.* and *In re Bridge Info Sys.*[25] Yet neither of these cases addresses the question of how liabilities should be valued for purposes of assessing solvency.[26] Conversely, the Third Circuit squarely addressed this issue in *In re Trans World Airlines*, and concluded that, when analyzing solvency, "***liabilities should be measured at face value***."[27]

Additionally, the DCL Plan Proponents mistakenly assert that Tuliano's comparable company analysis establishes that the Guarantor Subsidiaries were balance sheet solvent at Step One.[28] As Tuliano testified, however, he applied only a 33% weighting to his Step One comparable company analysis because the trading multiples of the comparable companies at the time were likely inflated.[29] As such, Tuliano's comparable company analysis, ***standing alone***, is not an accurate measure of the Guarantor Subsidiaries' solvency, and the correct conclusion is that the subsidiaries were insolvent by $949 million.[30] Indeed, the Examiner also concluded that

---

[25] 379 B.R. 473, 477 (Bankr. S.D.N.Y. 2007); 311 B.R. 781, 792 (Bankr. E.D. Mo. 2004); DCL Post-Trial Br. at 73. The DCL Plan Proponents refer, without citation, to the "Examiner's analysis" of the appropriate way to value the PHONES Notes. *Id.* However the Examiner did not address how to value the PHONES Notes, and simply adopted VRC's December 20, 2007 solvency analysis number. *See* NPP 782 (Exam'rs Rpt.), Annex A at 70.

[26] *See In re Solutia, Inc.*, 379 B.R. at 477 (addressing the amount of an allowable claim arising from a bond issuance, where the bonds were issued with original issue discount, or "OID"); *In re Bridge Info Sys.*, 311 B.R. at 792 (addressing the value of a transfer made from the debtor to a preference defendant in exchange for the preference defendant's transfer of "new value" to the debtor). In citing to *Solutia*, the DCL Plan Proponents appear to suggest that the PHONES Notes were issued with original issue discount, or "OID," meaning that the face amount of the notes is not equivalent to the amount received by Tribune when the PHONES Notes were issued. *See* DCL Post-Trial Br. at 73-74. Under the Bankruptcy Code, claims for unaccrued OID are not allowed. *See In re Solutia, Inc.*, 379 B.R. at 486. The face amount of the PHONES Notes, however, is the exact same amount that was loaned to Tribune when the notes were issued, and Black conceded that this is the amount Tribune would have had to pay in a liquidation. *See* 3/18/11 Trial Tr. 57:16-19 (Tuliano); 3/10/11 Trial Tr. 37:16-24 (Black).

[27] *In re Trans World Airlines, Inc.*, 134 F.3d 188, 196-7 (3d Cir. 1998) (emphasis added); *see also Shubert v. Lucent Techs. (In re Winstar Commc'ns)*, 348 B.R. 234, 278 (Bankr. D. Del. 2005) ("Absent some unusual circumstances not applicable here, the insolvency test anticipates that ***liabilities will be valued at their face value***.") (emphasis added). Incredibly, the DCL Plan Proponents erroneously assert that these cases support the valuation of liabilities at "book," rather than face, value notwithstanding the express language of the decisions. *See* DCL Post-Trial Br. at 74 n. 278.

[28] *See* DCL Post-Trial Br. at 75.

[29] 3/18/11 Trial Tr. 55:17-56:20 (Tuliano); NPP 944 (Tuliano Rpt.) at 98. It is "standard valuation practice" to calculate value using different accepted methodologies, and to then "reach an ultimate opinion by assigning a weight to the value associated with each method, based on the methods' suitability to the case at hand." *In re Nellson Nutraceutical, Inc.*, No. 06-10072, 2007 WL 201134, at *20 (Bankr. D.Del. Jan. 18, 2007).

[30] 3/18/11 Trial Tr. at 66:17-67:6 (Tuliano); NPP 944 (Tuliano Rpt.) at Ex. III.

the trading multiples of the comparable companies were inflated, and afforded the comparable company analysis no weight in assessing the Company's solvency.[31]

Finally, the DCL Plan Proponents' assertion that it is "simply not plausible" that a court would find intentional fraud at Step One is wrong.[32] The record is replete with evidence to the contrary, including documents and testimony showing that (i) the February Projections were unrealistic from their inception and could not reasonably be relied upon by the time of the Step One close, (ii) the Company violated its ordinary practice by failing to update them, and (iii) the Company knew, in advance of Step One, that the LBO would leave it with no equity cushion.[33]

## B.    A Court Would Find That If Only Step Two Is Avoided, Equitable Remedies Such As "WEAR" Will Apply

Non-LBO Creditors also stand to receive far greater recoveries than those provided for under the Proposed Settlement if only the Step Two obligations and transfers are avoided and the LBO Lenders are precluded from benefitting from the resulting avoidance and disgorgement under theories of waiver, estoppel, or assumption of risk, *i.e.* "WEAR."

Relying on the limited recovery scenarios annexed to the Examiner's Report, the DCL Plan Proponents incorrectly assert that the Examiner found that even if Step Two is avoided (but Step Ones is not), the maximum recoveries that could be distributed to Non-LBO Creditors if Step One is not avoided is between "$320 and $328 million."[34] This is not an accurate interpretation of the recovery scenarios in the Examiner's Report. The recovery scenarios do not, and were not intended to, reflect every possible outcome of the LBO litigation, or the Examiner's opinion of the amounts Non-LBO Creditors will receive if only Step Two is avoided. Indeed, although the Examiner left in "equipoise" whether the Step One Lenders will be able to

---

[31] NPP 782 (Exam'rs Rpt.), Annex A at A-1 - A-4.
[32] *See* DCL Post-Trial Br. at 41.
[33] *See* NPP Post-Trial Br. at 18-20.
[34] *See* DCL Post-Trial Br. at 19.

"benefit from avoidance of payments made and obligations incurred in the Step Two LBO transactions,"[35] and found that it is only "somewhat unlikely" that the LBO Lenders' claims would be equitably subordinated (and that "further investigation" is warranted),[36] he explicitly stated the "Recovery Scenarios ***do not take into account*** the potential effect on recoveries resulting from these possible remedies, claims and causes of action."[37]

Moreover, contrary to the DCL Plan Proponents' assertion, WEAR has been adopted by courts as a means of precluding creditors from benefitting from the avoidance of debt they consented to and benefitted from.[38]  For example, in *In re Labelon Corp.*, the court held that it would not allow Congress, acting in its capacity as a creditor of the debtor, to benefit from an action for fraudulent conveyance, where Congress had "knowingly and actively participated in and benefitted from" the challenged transaction.[39]  Similarly, in *In re Huff,* the trustee was estopped from challenging a fraudulent conveyance, where the beneficiary creditor had

---

[35] NPP 782 (Exam'rs Rpt.), Vol. II at 301, 303.

[36] NPP 782 (Exam'rs Rpt.) at 332-7.

[37] NPP 782 (Exam'rs Rpt.), Annex B at B-1 (emphasis added).  The only equitable remedy modeled in the Examiner's recovery scenarios is the remedy of precluding the LBO Lenders from sharing in Step Two disgorgement recoveries.  *See id.* at B-8, B-38, B-41.  Additionally, the Examiner's recovery scenarios are premised on a DEV of $6.1 billion.  *See id.* at B-1.  Adjusting the DEV to the $6.75 billion on which the DCL Plan is premised would increase the recoveries to Non-LBO Creditors shown by the recovery scenarios.

[38] *See* NPP 2474 (NPP Confirmation Objection) at 120-128; NPP Post-Trial Br. at 57-60.  The DCL Plan Proponents do not even attempt to distinguish the cases cited in the NPP Confirmation Objection.  Rather, the DCL Plan Proponents rely on *First Trust and Deposit Co. v. Receiver of Salt Springs Nat'l Bank (In re Onondaga Litholite Co.)*, 218 F.2d 671 (2d Cir. 1955) to argue that "absent . . . equitable subordination, a court would not have the power to . . . subordinat[e] some creditors at the Tribune parent level in favor of other Tribune parent-level creditors." DCL Post-Trial Br. at 48, n.167.   To the contrary, however, the *First Trust* Court found only that "in the circumstances of th[at] case," where a creditor had improperly purchased the debtor's property for less than fair market value pre-petition but later paid the estate the difference in value after a successful claim for illegal preference or fraudulent conveyance was brought against it, the creditor could not be precluded from sharing in distributions that arose from its payment to the debtor.  *First Trust*, 218 F.2d at 673.  Those circumstances are substantially different from this case, given that the creditor there was able to remedy the entirety of the harm it had inflicted on the debtor and its other creditors, and the creditor's underlying claim was "free from equitable infirmities."  *Id.* Conversely, here, assuming, *arguendo*, that a court found that the LBO Lenders' Step One claims were not subject to avoidance or equitable subordination, the LBO Lenders' Step Two claims are nevertheless riddled with equitable infirmities, and the LBO Lenders cannot remedy the harm inflicted on Non-LBO Creditors by Step Two until Non-LBO Creditors are paid in full.  Moreover, the creditor's claim in *First Trust* was unrelated to the conduct giving rise to the preference and fraudulent conveyance claims against it, whereas here, the Step One and Step Two debt was part of one integrated transaction.  *See id.*

[39] *Morin v. OYO Instruments, L.P. (In re Labelon Corp.)*, No. 02-22582, 2006 WL 2516386, at *4 (Bankr. W.D.N.Y. Aug. 28, 2006).

consented to the transfer.[40]  Indeed, JPMorgan has invoked this argument, on which WEAR is

partly based, in moving to dismiss claims asserted against it by the *Lyondell* litigation trustee.[41]

The DCL Plan Proponents selectively quote the Examiner's Report to assert that the

Examiner came to the "unequivocal conclusion" that, absent certain equitable doctrines (which

are applicable here), "a straightforward application of the relevant Bankruptcy Code provisions

makes it abundantly clear that . . . the Step One Debt would be entitled to participate" in the

distributions arising from Step Two avoidance.[42]  Yet the Examiner goes on to state that "***an***

***argument nevertheless may be advanced***" that, because the Step One Lenders "are the same

creditors (or their successors) who . . . participated in, funded, and made possible the Step Two

Transactions," it would be:

> inequitable for those entities to benefit from avoidance of ***payments made and***
> ***obligations incurred*** in the Step Two Transactions while non-LBO Creditors
> holding claims against the same estates remain unpaid.[43]

Indeed, the Examiner noted that "[t]he doctrine of equitable estoppel . . . may furnish" the basis

for such an argument "even if the standards governing equitable subordination are not otherwise

met," and left in "equipoise" whether such an argument would succeed.[44]

The DCL Plan Proponents assert that this argument has little value to Non-LBO Creditors

because, even if the Step One Lenders are estopped from sharing in Step Two avoidance and

disgorgement, that value cannot be "upstreamed to Tribune" for its creditors.[45]  This assertion is

---

[40] *Harris v. Huff (In re Huff)*, 160 B.R. 256 (Bankr. M.D. Ga. 1993); *also In re PWS Holding Corp.*, 228 F.3d 224, 229, 239-40 (3d Cir. 2000).

[41] NPP 2520 (*Lyondell* Motion to Dismiss) at 44-47.

[42] DCL Post-Trial Br. at 48 (citing NPP 782 (Exam'rs Rpt.), Vol. II at 301).

[43] NPP 782 (Exam'rs Rpt.), Vol. II at 301.

[44] *Id.* at 302-303.  The DCL Plan Proponents erroneously assert that the Examiner's equipoise conclusion applies only to the question of whether Step One Lenders whose Step Two Claims are avoided may share in the Step Two disgorgement recoveries, and that the Examiner "unequivocal[ly]" concluded that such Step One Lenders may share in distributions arising out of Step Two avoidance.  DCL Post-Trial Br. at 47-48.  The Examiner's Report does not support such an interpretation.  NPP 782 (Exam'rs Rpt.), Vol. II at 301-303.

[45] DCL Post-Trial Br. at 49-50 (emphasis omitted).

wrong.[46]  It is not plausible that a court would preclude the Step One Lenders from sharing in the benefit of Step Two avoidance, only to effectively reverse that decision by finding that such value cannot inure to the benefit of Non-LBO Creditors at Tribune.  Such a result is at direct odds with the Examiner's observation that equitable remedies may preclude Step One Lenders from benefitting from Step Two avoidance while Non-LBO Creditors remain unpaid.[47]

The DCL Plan Proponents' argument that WEAR "would provide the Noteholders with a windfall by putting them in a better position than if Step Two had never occurred" is also unavailing.[48]  Quite the opposite, in the unlikely event that a court finds that the Company was solvent at Step One, WEAR would remedy the harm to innocent Pre-LBO Noteholders that was inflicted when the Step Two debt left the Company unable to satisfy its pre-LBO obligations.

### C.  A DEV Of $6.9 Billion Results In Greater Recoveries For Non-LBO Creditors Than The Proposed Settlement

If the Court determines that the Step Two debt should be avoided and DEV is higher than $6.9 billion, Non-LBO Creditors will receive greater recoveries than provided for under the Proposed Settlement *even if* the Step One Lenders are permitted to share in the benefit of Step Two avoidance.[49]  In an effort to refute this point, the DCL Plan Proponents claim that DEV is

---

[46] *See id.*; NPP 2474 (NPP Confirmation Objection) at 119-121 (citing *In re Kraft, LLC*, 429 B.R. 637, 667-68 (Bankr. N.D. Ind. 2010) (holding that equity could receive surplus if creditors are paid in full); *In re Goss*, 43 F.2d 746, 747-48 (N.D. Ga. 1930) (holding that where a transferee has engaged in the fraud and comes to the court with unclean hands, the debtor is permitted to keep a surplus in recoveries.); *In re Bayou Grp., LLC*, 372 B.R. 661, 664 (Bankr. S.D.N.Y. 2007) (holding that it "is not clear that fraudulent conveyance claims can never be brought in whole or in part to benefit equity . . . ."); *Calpine Corp. v. Rosetta Res. (In re Calpine Corp.)*, 377 B.R. 808, 813 n.3 (Bankr. S.D.N.Y. 2007).

[47] NPP 782 (Exam'rs Rpt.), Vol. II at 301.  The Examiner reached a similar conclusion with respect to full avoidance at both steps, stating that a court is "reasonably likely" to find that if the LBO debt is avoided at the Guarantor Subsidiaries, the value resulting from such avoidance is not limited to satisfying creditor claims solely at those entities, and may be used to satisfy creditors at Tribune.  The Examiner went on to note that would be "implausible" for a court to find that avoidance of the LBO debt is required, only to "reverse that avoidance" to allow the LBO Lenders to recover the value derived from that avoided debt.  *Id.* at 289-294.

[48] DCL Post-Trial Br. at 51.

[49] Whereas the DCL Plan provides a mere $431 million to the Senior Noteholders, if Step Two is avoided and the Step One Lenders do not receive postpetition interest, the Senior Noteholders would recover (in approximate numbers) $481 million at a DEV of 6.9 billion, $593 million at a DEV of $7.019 (the DEV conclusion reached by Lazard in January), more than a billion dollars at a DEV of $7.5 billion, and a full recovery at a DEV of $7.8 billion.

{00521149;v1}

only $6.75 billion, and attack Singh's expert opinions on the primary grounds that he has no industry expertise and made unwarranted adjustments to the Lazard valuation. Alternatively, the DCL Plan Proponents allege that even if DEV is higher, the Step One Lenders must be paid postpetition interest.[50] These arguments are unavailing.

Singh is an experienced investment banker who has worked on hundreds of valuations across multiple industries.[51] Singh's opinions are derived from fundamental and well-accepted principles of general valuation theory, the proper application of which do not require publishing or broadcasting industry expertise.[52] Indeed, in overruling the DCL Plan Proponents' objection to Singh's qualification as an expert at trial, the Court noted that "it's not unusual to have an expert testify in an industry . . . which he has not encountered before."[53]

Moreover, Singh appropriately updated Lazard's outdated valuation to account for current financial and market data. The DCL Plan Proponents do not dispute that it is critical to use the most up-to-date information in conducting a valuation; that Lazard's January Valuation was more current than the October Valuation Report on which the DCL Plan is based; or that it was appropriate to further update the DEV estimate based upon current information available as of the date expert reports were filed.[54] Instead, the DCL Plan Proponents criticize the manner in which Singh updated the Lazard DEV estimate. In performing the update, however, Singh was careful not to substitute his subjective judgment for Lazard's, instead objectively indexing the mean multiples of the comparable companies in the Lazard Report to account for the increase in

---

[50] See DCL Post-Trial Br. at 52-56.
[51] 3/14/11 Trial Tr. 163:14-164:3; 175:13-24 (Singh).
[52] 3/14/11 Trial Tr. 174:16-175:24. Two of the most significant drivers of the higher DEV conclusion of Singh, for example, are the application of the most up-to-date market and financial information available, and an adjustment to the weighting attributed by Lazard to its publishing DCF conclusion given projections trending rapidly toward zero free cash flow. Singh's expert opinion that these adjustments to the Lazard Report are appropriate does not require industry-specific expertise.
[53] 3/14/11 Trial Tr. 179:1-3.
[54] Deposition of Thane Carlston dated February 16, 2011, 166:5-20.

market prices between October 2010 and February 2011.[55]  Although the DCL Plan Proponents now argue that Lazard did not actually use all of the companies identified in the Lazard Report, they do not dispute that the stock prices of all the listed comparable companies generally moved in lock step, that there was significant improvement in those prices between October 2010 and February 2011, or that simply updating market data leads to a significant increase in the DEV estimate as of the time of trial.[56]

The DCL Plan Proponents also attempt to criticize Singh's adjustments to Lazard's valuation, and in particular his valuation of TV Food.  These arguments are spurious.  For example, the DCL Plan Proponents' argument that Singh should have applied a discount to the Scripps multiple in his TV Food comparable company analysis is nonsensical in light of undisputed evidence that TV Food is, by far, the most attractive asset in the Scripps Portfolio, and that it is reasonable to apply a higher multiple to the best asset in a portfolio of assets.[57]

The DCL Plan Proponents next argue that even if DEV is higher than $6.75 billion and Step Two is avoided, the Step One Lenders must be paid postpetition interest before any value flows to the Pre-LBO Noteholders.  This argument is premised on the assumption that "more than 80% of the value of the Guarantor Debtors resides at Debtors that do not have material intercompany liabilities owing to Tribune . . ."[58]  The argument fails because it disregards both

---

[55] 3/14/11 Trial Tr. 178:13-22.

[56] 3/14/11 Trial Tr. 199:1-200:5.  Incredibly, the DCL Plan Proponents criticize Singh's use of both pure play and diversified companies in this analysis, even though Lazard itself used both pure play and diversified comparable companies.  *See* 3/11/11 Trial Tr. 29:11-13; 31:1-9 (Mandava).  In addition, the DCL Plan Proponents' argument that Singh "improbably valued Tribune's publishing assets as more valuable than the New York Times' assets" is simply false. See NPP 2469 (Revised & Amended Singh Rpt.) at 21, 48 (showing that the value of Tribune's publishing assets is more than 30% lower than the New York Times).

[57] NPP Post-Trial Br. at 90-91, n.465.  The DCL Plan Proponents also criticize Singh's use of the Weather Channel acquisition in his precedent transaction analysis for TV Food.  Yet Singh's use of this transaction reflects conservatism (and had the effect of depressing his valuation conclusion) because the multiples derived from the Weather Channel transaction are lower than the multiples derived from the Travel Channel precedent transaction used by Lazard. NPP 2469 (Revised & Amended Singh Rpt.) at 53 n.4.

[58] DCL Post-Trial Br. at 55. The DCL Plan Proponents also assert that "even under the Noteholders' construct, the Senior Lenders would be entitled to first recover the principle amount of their claims against all of the Guarantor

the way in which the Intercompany Claims Settlement has been incorporated into the NPP Plan, and the extent of Intercompany Claims assertable *between* the Guarantor Debtors that must also be satisfied before Step One Lenders could recover postpetition interest.[59]  Section 5.19 of the NPP Plan incorporates the Intercompany Claims Settlement subject to the proviso that, "before any holder of an unsecured Claim against Tribune or a Guarantor Debtor receives Postpetition Interest on account of such Claim…the prepetition Intercompany Claims against the relevant Debtor *must receive payment in full*."[60]  Even a cursory review of the Intercompany Claims Settlement reveals that multiple Guarantor Debtors who have no obligations to Tribune owe substantial amounts to other Guarantors Debtors which, under the NPP Plan, must be (but will not be) paid in full before Step One Lenders could claim an entitlement to postpetition interest.[61]

### D.     There Is A Strong Argument For Equitable Subordination Of The Step One Lenders' Claims, Resulting In Full Recovery For Non-LBO Creditors

A strong argument also exists that the Step One claims should be equitably subordinated if only the Step Two debt is avoided, which would result in a full recovery for Non-LBO Creditors.  The DCL Plan Proponents mistakenly assert that if a court determines that the Company was solvent at Step One, it will also necessarily find that the LBO Lenders did not engage in inequitable conduct at Step One, and thus their Step One claims cannot be equitably subordinated.[62]  This argument misses the mark.  "Equitable subordination is not limited to only

---

Debtors that *do* have intercompany liabilities and then recover the balance of their claim, including full post-petition interest, from those that do not."  DCL Post-Trial Br. at 109-10 (emphasis in original).  However, they cite to no case law to support this quasi-marshalling construct.

[59] Step One Lenders would also have no entitlement to postpetition interest because none of the Guarantor Debtors are solvent.  *See* discussion in NPP Post-Trial Br. at 60-61.

[60] NPP Plan § 5.19 (emphasis added).

[61] NPP 1108 (Intercompany Claims Settlement), Schedule III (indicating, by way of just one example, that Tribune License, Inc. is owed in excess of $1 billion by other Guarantor Subsidiaries).

[62] DCL Post-Trial Br. at 41.

those claims related to the inequitable conduct."[63]  As Judge Gonzalez explained in *Enron*, such a

limitation would "frustrate the court's ability to ensure a just and fair distribution of the

bankruptcy estate" and:

> unnecessarily deprive the aggrieved creditors of the full benefit of the remedy of
> equitable subordination, when the uncompensated injury caused by such claimant
> exceeds the amount of those claims [which are tied to the creditors' inequitable
> conduct].[64]

Thus, under *Enron*, equitable subordination of the Step One claims is warranted by the

mountain of evidence showing the LBO Lenders knew, prior to Step Two, that consummating

Step Two would drive the Company into bankruptcy, and proceeded anyway because of their

own pecuniary interests.[65]  The Examiner acknowledged this possibility, stating that:

> if the evidence showed that the Lead Banks knew that Step Two would render
> Tribune insolvent, but they proceeded to fund anyway, a case could be made for
> equitable subordination (and possibly equitable disallowance) ***not just of the Step
> Two Debt but, possibly, some or all of the remainder of the LBO Lender Debt***."[66]

---

[63] *Enron Corp. v. Ave. Special Situation Fund II, LP, et al. (In re Enron Corp.)*, 333 B.R. 205, 220 (Bankr. S.D.N.Y. 2005); *see also Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 700 (5th Cir. 1977).

[64] *In re Enron Corp.*, 333 B.R. at 221.

[65] *See* NPP Post-Trial Br. at 53-55.

[66] NPP 782 (Exam'rs Rpt.), Vol. II at 332-7.  Full litigation discovery would likely yield even more support for equitable subordination.  The Examiner noted that his investigation was hampered by the LBO Lenders' attempts to shield information through dubious claims of privilege, witness testimony that the Examiner viewed "with a healthy dose of skepticism" and implausible failures of memory concerning momentous events with which the bank witnesses were indisputably involved.  NPP 782 (Exam'rs Rpt.), Vol. II at 332-7.  The banks' obfuscation continued in the instant dispute, descending into near parody at the deposition of JPMorgan's Vice Chairman, Jimmy Lee.  Confronted with his own emails and other contemporaneous documents revealing, among other things, that Lee is a lifelong friend of Zell's, encouraged JPMorgan's involvement in the LBO, was regularly updated on syndication and other problems with the LBO, intervened personally with and on behalf of Zell concerning the LBO, questioned Tribune's solvency the night before Step Two closed, and remained involved with Tribune post-petition, Lee claimed to remember effectively nothing about the LBO and its aftermath.  *Compare* NPP 392 (4/26/07 JPM Lender Call Transcript), NPP 2317 (4/26/07 email from Lee to Zell), NPP 2339 (12/18/07 email from Lee to D. McCree) *with* Lee Dep. Tr. 19:7-17; NPP 2324 (2/20/07 email from Lee to J. Nason, J. Dimon) *with* Lee Dep. Tr. 37:12-17; NPP 308 at JPM00206980 (3/30/07 email from Lee to O'Brien) *with* Lee Trial Tr. 67:17-68:25; NPP 2332 (4/1/10 email from Lee to Kulnis re: meeting with Zell) *with* Lee Dep. Tr. 77:14-78:17; NPP 2334 (9/19/07 email from P. Cohen to Lee) *with* Lee Dep. Tr. 80:14-81:3; NPP 2247 (memo to Lee re: 9/25 Zell meeting agenda) *with* Lee Dep. Tr. 84:11-85:11; NPP 2339 (12/19/07 email from Lee to S. Dean) *with* Lee Dep. Tr. 97:18-98:8.  Incredibly, Lee testified that he had no memory of anyone at "JP Morgan expressing any concerns to [him] regarding [the Tribune] transaction and JP Morgan's involvement in that transaction" before Step Two closed. Trial. Tr. 219:2-220:13; *see also* Persily Dep. Tr 25:20-26:2, 43:22-44:2, 55:20-56:2, 73:16-20, 82:3-24, 88:24-89:10, 105:6-16, 111:7-16; 123:23-125:10; 151:3-10.

{00521149;v1}

Under these circumstances, allowing the LBO Lenders to subsume the value of the estates through their Step One claims and limit the Pre-LBO Noteholders to a parent-level recovery only would clearly "frustrate . . . a just and fair distribution of the bankruptcy estate."[67]

### E. Even If The LBO Debt Is Avoided Only At The Parent Level, The Non-LBO Creditors Fare Better Under The NPP Plan Than The Proposed Settlement

The Non-LBO Creditors can also receive a better recovery under the NPP Plan if there is avoidance of the LBO debt at just the parent level, which would lead to $1.87 billion in Step One disgorgements and $318 million in Step Two disgorgements ($2.19 billion in total, prior to pre-judgment interest). These disgorgements, along with the $564 million in distributable value at Tribune, would yield $2.75 billion of value for Non-LBO Creditors at Tribune—more than enough to satisfy their claims in full (without postpetition interest).[68]

The DCL Plan Proponents argue that little of this value would flow to Tribune Non-LBO Creditors because it would be swallowed by "$6.9 billion in Guarantor Debtor claims against the Tribune parent pursuant to the Intercompany Claim Settlement."[69] But, as noted above, the NPP Plan adopts the Intercompany Claims Settlement with the qualification set forth in Section 5.19, which makes clear that Intercompany Claims only receive a recovery **after** allowed third party claims are paid in full, less postpetition interest. Therefore, the Non-LBO Creditors at Tribune would be paid in full (less postpetition interest) **before** any payments would be made to the subsidiaries on account of Intercompany Claims.[70] As a result, Tribune's putative $6.9 billion Intercompany Claim does not have the impact the DCL Plan Proponents suggest.[71]

---

[67] *In re Enron Corp.*, 333 B.R. 205 at 221.
[68] *See* NPP Post-Trial Br. at 61-62.
[69] DCL Post-Trial Br. at 45.
[70] NPP Plan § 5.19.
[71] Even if the putative $6.9 billion Intercompany Claim was relevant, a court would likely equitably subordinate the claim to the payment in full of the Tribune Non-LBO Creditors. To permit Intercompany Claims against Tribune to share *pro rata* with innocent Non-LBO Creditors would render the avoidance of the LBO Debt at Tribune a nullity

{00521149;v1}

The DCL Plan Proponents also argue that, even without this Intercompany Claim, "a very high percentage" of Tribune value would be payable to the LBO Lenders because "$2.8 billion in Step One Claims" is "protected debt" and "would be preserved and allowed."[72] But even if the Step One Lenders could make the good faith showing needed to preserve part of their claims, this $2.8 billion of protected debt is just 38% of the $7.4 billion in original face amount of the funded Step One debt. Therefore, 62% of the Step One Lender Claims would remain unprotected, and so 62% of the $1.87 billion of Step One fees, principal and interest (or $1.17 billion) would still be disgorged. This would leave about $2.0 billion available to Tribune's creditors ($1.17 billion in Step One disgorgements, $318 million in Step Two disgorgements and $564 million in distributable value). Distributing this value through the waterfall of remaining allowed claims, and taking into account the PHONES Notes subordination, would provide $716 million for Non-LBO Creditors—far in excess of what the Proposed Settlement offers them.

## III. THIS COURT SHOULD DISREGARD BLACK'S OPINIONS AND INSTEAD LOOK TO BERON'S COMPREHENSIVE EXPECTED VALUE ANALYSIS

The DCL Plan Proponents continue to rely on Black's opinions in support of their Proposed Settlement.[73] But his opinions deserve little, if any, weight. Black used probability percentages and litigation "scenarios" to calculate creditor recoveries in six separate "cases," including an "Examiner's Case" and a "Black's Case."[74] According to the DCL Plan Proponents, this analysis "establish[es] the range of reasonable expected recoveries by the Non-LBO Creditors"—in other words, Black attempted to compute the expected value of the LBO Claims

---

because the LBO Lenders would reap the benefits of Tribune's value through their guaranty claims at the Guarantor Subsidiaries. Such a result would be counter to the policy of fraudulent conveyance law.

[72] DCL Post-Trial Br. at 44-45.

[73] *See id.* at 20-25.

[74] *Id.*; DCL 1484 (Amended Black Rpt.) at 19-21, 28-29; 3/9/11 Trial Tr. 105:20-106:14, 111:11-112:22; 116:2-118:11 (Black).

{00521149;v1}

just as Beron had done.[75]  The Court should instead rely on Beron's analysis—the expert who is

actually qualified to undertake and testify about that kind of analysis.[76]

First, there is no reason for the Court to consider Black's failed attempts to do this

complex analysis because, at the rebuttal stage of the trial, the Court found Black to be

unqualified as an expert in the field of expected value and decision-tree analysis.[77]  Moreover,

Black admitted he did his analysis all "***in my head***."[78]  He did not perform anything like the

robust decision-tree and expected value analysis that Beron undertook, and the DCL Plan

Proponents never offered analysis like that from any trial witness.  Instead, Black made wholly

subjective assessments of the more than one hundred sub-issues that drove his ultimate

outcomes, used probabilities he "nudged" as he saw fit, and then tried to pull it all together "in

his head" or with his "trusty old HP 12C calculator."[79]  As a result, his opinions are not readily

verifiable or testable, and thus are exactly the kind of opinions courts routinely disregard.[80]

---

[75] DCL Post-Trial Br. at 21, 24-25, Tables 1, 2.

[76] In their brief, the DCL Plan Proponents insist that "Aurelius . . . believed that the Examiner's conclusions would reduce, rather than increase, the expected recovery for Senior Noteholders," despite the Debtors' express admission at trial that Aurelius sincerely believed the Examiner's Report would increase recoveries, and Aurelius testimony to the same effect.  *Compare* 3/8/11 Trial Tr. 139:8-140:3 (Kurtz), *with* DCL Post-Trial Br. at 34.  *See also* 3/15/11 Trial Tr. 232:16-233:22 (Gropper).  The DCL Plan Proponents base their assertion on revisions to a draft model that a junior research analyst pieced together on his "own initiative" and tinkered with but never finished.  Brodsky Dep. at 215:3-5; 280:14-22; *see* Prieto Dep. at 116:20-117:14.  That junior analyst has no legal training, and made revisions with no guidance from Aurelius's senior managers, who testified that the model did not represent Aurelius's views of the Examiner's Report at any time.  *See* Brodsky Dep. at 239:16-19; 275:23-276:12; 286:6-287:22 (testifying that the draft model did not "comport with" nor does it represent Aurelius's view of the Examiner's Report).  Similarly, there is no evidence that Aurelius adopted or agreed with the negative views of the Examiner's Report that were expressed in a third-party newsletter that was circulating at the time, and overwhelming evidence that Aurelius rejected those views, including but not limited to Aurelius's decision to substantially increase its position in the Senior Notes after release of the Examiner's Report and based on the conclusions of the Examiner's Report.  *See* DCL Post-Trial Brief at 34 n.109 (citing DCL 435 (*Credit Sights* article); Brodsky Dep. at 55:2-13; 3/15/11 Trial Tr. 232:16-233:22 (Gropper) (identifying Examiner's Report as "a complete game changer")).

[77] *See* 4/12/11 Trial Tr. 123:16-22, 124:21-125:3 (Black); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 580 (1993) (expert must be qualified to offer opinion under FED. R. EVID. 702); *Calhoun v. Yamaha Motor Corp.*, 350 F.3d 316, 321 (3d Cir. 2003) (similar).

[78] 3/9/11 Trial Tr. 230:5-231:2 (Black) (emphasis added).

[79] *See* 3/9/11 Trial Tr. 229:12-16, 230:5-231:2, 239:24-241:8 (Black); *see also* 3/10/11 Trial Tr. 75:20-76:13 (Black).  Not surprisingly, Black ended up having to change 37 different computations in his tables after he issued his initial report and was confronted with errors in its logic at his deposition.  *See* 3/9/11 Trial Tr. 260:13-261:1 (Black); NPP 2465 (page from Black workpapers used to develop Table 3 at Black Report 26, annotated to show

{00521149;v1}

Second, rather than offering expert opinions that he was actually qualified to give, Black instead attempted to take on the role of both the Court and its appointed Examiner.[81] In fact, throughout their Post-Trial Brief, the DCL Plan Proponents rely on Black's opinions regarding the very same conclusions the Examiner assessed and that this Court must reach in adjudicating the Proposed Settlement under Rule 9019, including the likelihood of success of the LBO Claims and the defenses against them.[82] These issues have been and should be argued and briefed by the parties, and then determined by the Court, not Black.[83] As this Court recognized before trial, it is "pretty well able during testimony and afterwards to filter out" "an expert's opinion . . . on a legal conclusion," because it is the Court's role "to decide what the law is."[84]

Black's conclusions of law, which form the basis of much of his analysis, should also be disregarded because he has no expertise to give them.[85] By his own admission, he is "not an

---

changes); *see generally* 3/9/11 Trial Tr. 251:22-261:1 (Black). In fact, some of these adjustments were substantial—decreasing the probability of one outcome from 25% to 3% and another from 17% to 5%. *See id.*

[80] *See, e.g., Oddi v. Ford Motor Co.*, 234 F.3d 136, 156, 158-9 (3d Cir. 2000) (affirming grant of summary judgment because plaintiff's expert's opinion was based on "little, if any, methodology beyond his own intuition" and on "haphazard, intuitive inquiry" that could not be tested, submitted to peer review or assessed by court); *In re Nellson Nutraceutical, Inc.*, 356 B.R. 364, 366, 369, 374-76 (Bankr. D. Del. 2006) (after finding expert to be qualified following extensive *voir dire*, and after conclusion of trial, determining that expert's testimony must be excluded because expert's methodology was unreliable).

[81] *See* 3/9/11 Trial Tr. 226:10-227:2, 229:12-16, 230:5-231:2, 239:24-241:8 (Black); *see also* 3/10/11 Trial Tr. 75:20-76:13 (Black: "my analysis is centrally about making judgments" and "my report is full of judgments"); *see also* 3/17/11 Trial Tr. 162:1-163:10 (Beron) (Black performed an "expected value calculation … in a piecemeal … and not very consistent fashion"); *see also* FED. R. EVID. 702, 704; *Berckeley Inv. Grp. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006) ("expert witness is prohibited from rendering a legal opinion"); *Bridgeport Holdings Inc. Liquidating Trust v. CDW Corp. (In re Bridgeport Holdings, Inc.)*, No. 05-50507, at 11 (Bankr. D. Del. Jan. 10, 2007) ("Rule 704 does not allow an expert merely to tell the Court what result it should reach."); *Alumax Inc. v. Comm'r*, 109 T.C. No. 8, 109 T.C. 133 (T.C. 1997) (striking Black's report opining about various legal issues).

[82] *See, e.g.,* DCL Post-Trial Brief at 23-24, 48, 50 (bullet-point list of legal opinions Black rendered, relying on Black's "explanations" of whether a court would conclude a fraudulent transfer occurred, Step One and Two debt should be collapsed, or "WEAR" should apply); *see also, e.g.,* DCL 1484 (Revised Black Rpt.) at 17 (Black: his assignment "require[d] … legal expertise, to assess the likelihood of different legal outcomes"); 31-32, 36 (Black opinions #1, #2, #3, #13, #14, #15 that are conclusions of law); NPP *Daubert* motion, at 3-5 [ECF No. 8099].

[83] *Cf. Cantor v. Perelman*, No. Civ. A. 97-586 KAJ, 2006 WL 3462596, at *1 (D. Del. Nov. 30, 2006) (excluding expert testimony of legal opinions because "I will not be assisted in my role as fact finder in this bench trial by hearing the law explained from the witness stand. The able attorneys on both sides of this case can articulate the law in their arguments and post-trial briefing.").

[84] 3/2/11 Hr'g Tr. at 27:4-13 (Carey, J.).

[85] *See Daubert*, 509 U.S. at 580; *Calhoun*, 350 F.3d at 321.

{00521149;v1}

expert in bankruptcy law."[86]  In fact, Black could not even write his report without the help of "between fifteen and twenty different substantive memos" written by Debtors' counsel to address the complex legal issues presented in these bankruptcy proceedings, including the "Settlement Standards" under Rule 9019.[87]  Also, to complete his report, Black had to conduct basic legal research to understand some of the more fundamental bankruptcy and fraudulent conveyance issues presented here.[88]  There is no reason this Court should give weight to the legal opinions of someone, like Black, who concedes he is not even familiar with the underlying applicable law.

Third, Black's opinions should be given little weight because his analysis omitted significant litigation recovery scenarios.  As Beron testified—without *any* challenge on cross-examination or response on rebuttal—36% of the total probabilities of litigation scenarios against the LBO Lenders are *ignored* in Black's analysis.[89]  Black himself conceded that these omissions impact his attempted expected value calculations for the LBO Claims.[90]  These calculations, therefore, cannot be accurate.[91]

Fourth, the Court should ignore Black's conclusions because, unlike Beron, he presented himself as an arbiter of the ultimate success of the LBO Claims, yet Black never sufficiently familiarized himself with the operative facts underlying those claims to form the opinions he

---

[86] DCL 1484 (Revised Black Rpt.) at 3, 17; 3/9/11 Trial Tr. 180:12-181:2 (Black).

[87] *See* 3/9/11 Trial Tr. 183:19-184:16, 193:18-24 (Black); NPP 2316 (Sidley Memorandum dated March 8, 2010); NPP 2349 (Sidley Memorandum dated March 8, 2010), 2355- 2364 (various Sidley Memoranda).

[88] 3/9/11 Trial Tr. 181:24-183:2 (Black).  For instance, Black had to research:  the section 546(e) defense, "the availability of post-filing interest," "what constitutes property or value conferred for purposes of [section] 548(c)," "the case law interpreting unreasonably small capital," "the availability of what [Black] called the statutory bank defenses," and "the issues of formal integration and informal integration" of the Step Two debt at Step One.  In addition, at trial, Black revealed his ignorance of bankruptcy proceedings with his confusion about Rule 2004, the most basic of discovery devices in bankruptcy proceedings.  *See id.* 195:11-18 (Black).

[89] *See* NPP 957 (Beron Rebuttal Rpt.) at 17-19; 3/17/11 Trial Tr. 164:4-20 (Beron).

[90] *See* 3/9/2011 Trial Tr. 206:18-25 (Black).

[91] *See* 3/17/11 Trial Tr. 164:14-20 (Beron) ("[t]here's no way to make an accurate determination of expected value" if scenarios are omitted).

{00521149;v1}

gave.[92]  For example, he did not review the complaint filed against the LBO Lenders by the

Creditors' Committee in November 2010, even though this pleading alleges the very claims he

was supposed to assess and explicitly asserts WEAR, equitable subordination and other claims

against the Step One Lenders he argued had no basis.[93]  Black also opined about lender good

faith under section 548(c), but never reviewed the transcripts of the Rule 2004 depositions or

Examiner interviews of the LBO Lender representatives.[94]  He also did not review the deposition

transcripts of Company witnesses, yet still attempted to predict whether their conduct could lead

to a finding that the Company intentionally defrauded its creditors.[95]

Fifth, Black is a biased witness and thus was incapable of offering neutral testimony that

this Court can rely on.[96]  Black depended on input from Zell and his advisors, as well as Debtors'

counsel, who helped him fix the probabilities Black used for various litigation outcomes in his

analysis.[97]  Black also is a repeat expert for the Company—having first served as the Company's

expert in the 2007 *Garamella* shareholder action challenging the LBO.[98]  And in 2010, he did

"significant work toward a report on the April plan," advised as to the reasonableness of the First

Mediation Term Sheet in September, and then told the Debtors he would ultimately support their

---

[92] *See, e.g., Calhoun v. Honda Motor Co., Ltd.*, 738 F.2d 126, 131-132 (6th Cir. 1984) (affirming judgment against plaintiff because plaintiff's expert did not know key facts rendering expert's testimony in realm of "guesswork and speculation") (citation omitted).
[93] *See* 3/9/11 Trial Tr. 197:16-199:9 (Black); DCL 1484 (Amended Black Rpt.) at 31-32; DCL Post-Trial Br. at 23-24, 48-52.
[94] *See* 3/9/11 Trial Tr. 194:22-196:22 (Black); DCL 1484 (Amended Black Rpt.) at 74-77, 146-50; DCL Post Trial Brief at 23.
[95] *See* 3/9/11 Trial Tr. 194:22-196:22 (Black); DCL 1484 (Amended Black Rpt.) at 43; DCL Post-Trial Br. at 23.
[96] *See, e.g., Bankr. Serv., Inc. v. Ernst & Young (In re CBI Holding Co.)*, No. 96-9143A, slip op. at 17-18 (Bankr. S.D.N.Y. Oct. 23, 2000) (excluding testimony of proffered expert in bench trial because expert was conflicted).
[97] *See* 3/9/11 Trial Tr. 188:7-189:4, 199:12-200:20 (Black).  Knowing full well that Nils Larsen had been "heavily involved" in the LBO Transaction and was Zell's friend, Black relied on his input, as well as insight from Zell's own lawyers, to develop Black's position on "Asset Disposition Tax Value," which he considered "an important component" of the balance sheet valuation he used to assess the fraudulent conveyance claims challenging the LBO Transaction.  *See id.*; DCL 1484 (Amended Black Rpt.) at 33-34.
[98] *See* 3/9/11 Trial Tr. 270:19-271:5 (Black); NPP 2315 (Deposition of Bernard S. Black in *Garamella v. Fitzsimons*); NPP 2314 (Declaration of Bernard S. Black in *Garamella v. Fitzsimons*).

settlement ***before*** they even agreed to it.[99]  Having already given this assurance, it was impossible for him to impartially assess the Proposed Settlement.

Finally, Black's opinions deserve little weight because he abandoned the Examiner's independent findings in favor of his own conclusions.  The DCL Plan Proponents characterize Black's analysis as "much like the Examiner," but that is simply not true.[100]  The Examiner and his team conducted an exhaustive investigation of the LBO Transaction, interviewing 38 case-critical witnesses and reviewing more than 3 million pages of documents before issuing a 1,200-plus page report.[101]  Black himself acknowledged that the Examiner "is an expert in bankruptcy law," and that the Examiner and his team logged about 22,000 hours in conducting their investigation.[102]  In stark contrast, Black is admittedly not a bankruptcy expert, did not interview a single witness, spent only about 700 hours on his analysis, and cursorily reviewed, if at all, the complaints asserting the LBO Claims.[103]

Black's conclusions also deviate wildly from the Examiner's conclusions.  For 18 of the 22 critical legal issues Black re-examined in his "Black Case," he reached conclusions significantly ***different*** from the Examiner, and all to the detriment of the Non-LBO Creditors.[104]  As just one example, Black ascribed only a 1% to 2% chance that an intentional fraudulent transfer occurred at both steps of the LBO, even though he thought the Examiner concluded there was a 15-30% chance that a court would find intentional fraud at Step One (based on the Examiner's conclusion that such a finding was "reasonably unlikely" at that step) and a 55-70% chance that a court would make that finding at Step Two (based on the Examiner's conclusion

---

[99] 3/9/11 Trial Tr. 190:19-192:9 (Black).
[100] DCL Post-Trial Br. at 20-21.
[101] *See* NPP 782 (Examiner's Rpt.), Vol. I at 29, 33.
[102] 3/9/11 Trial Tr. 197:11-15, 201:6-9 (Black).
[103] *See* 3/9/11 Trial Tr. 180:12-181:2, 193:5-11, 197:23-198:5 (Black); DCL 1484 (Amended Black Rpt.) at 3, 10-12.
[104] *See* NPP 957 (Beron Rebuttal Rpt.) at 8; 3/17/11 Trial Tr. 159:7-160:7 (Beron).

that such a finding was "somewhat likely" at that step).[105] And in Black's "Examiner Case"—which was actually supposed to model the Examiner's conclusions—Black made significant assumptions about whether elements needed to establish a fraudulent conveyance claim were contingent on each other, even though he recognized the Examiner never stated his conclusions should be treated that way, and that the Bankruptcy Code does not provide that the tests are correlated.[106]

In stark contrast to Black, Beron was qualified to give his opinions about the expected value of the LBO Claims and did not try to re-do the Examiner's Report. The DCL Plan Proponents, however, contend Beron's decision-tree analysis is "inappropriate" because the Examiner's Report "is not susceptible" to this kind of analysis.[107] They have absolutely no basis to make that claim. Indeed, their own witness attempted to offer expert testimony about just such an analysis but was barred from doing so based on his lack of qualifications.[108] On the other hand, Beron was accepted by the Court as an expert in that field, and based on that expertise, concluded the Examiner's Report was well-suited for his analysis.[109] The DCL Plan Proponents also contend Beron's credibility was somehow undermined because he took direction from Aurelius's counsel on just one of the dozens of decision-points in his trees.[110] But to the extent Beron did rely on Akin Gump for that limited purpose, they have little room to complain. Black relied on input from others to a far greater extent.[111]

The DCL Plan Proponents also point to four "important correlations" they say Beron

---

[105] *See* 3/9/11 Trial Tr. 239:24-241:8 (Black); DCL 1484 (Amended Black Rpt.) at 13, 36, 42-43; NPP 782 (Examiner's Rpt.), Vol. II at 22, 32.
[106] *See* DCL 1484 (Amended Black Rpt.) at 115-17, 135-36; 3/9/11 Trial Tr. 237:4-238:11, 238:22-239:8, 237:4-18; 239:24-241:8 (Black); DCL 1484 (Amended Black Rpt.) at 13, 36, 42-43.
[107] DCL Post-Trial Br. at 58.
[108] 4/12/11 Trial Tr. 123:16-22, 124:21-125:3 (Black) (barring Black as expert in the field of decision-tree analysis).
[109] *See* NPP 2476 (Beron Rpt.) at 3, 19-23; 3/17/11 Trial Tr. 120:8-25 (Beron) (accepting Beron as an expert witness); *see also e.g.*, *id.* at 115:23-116:3, 121:8-19, 125:8-18, 161:16-25.
[110] *See* DCL Post-Trial Br. at 61-62.
[111] *See* 3/9/11 Trial Tr. 188:19-23; 185:17-189:4 (Black); *see also id.* 183:19-184:12, 193:18-24 (Black).

"ignored."[112] But as they know, Beron conducted sensitivity analyses on two of these correlations—the alleged connection between the three financial condition tests, and equitable subordination and disallowance—and determined they had *no* material impact on his conclusions.[113] For the third alleged correlation, they claim Beron's trees include scenarios of avoidance at the subsidiaries even when there is no avoidance at the parent. Yet they also concede (in a footnote) that Beron did not include those scenarios in his trees.[114] And with respect to the alleged fourth correlation—that a finding of insolvency or other element of a constructive fraudulent transfer must be found before there can be an intentional fraudulent transfer—their premise that these claims are correlated is both legally and factually wrong.[115]

## IV. THE DCL PLAN PROPONENTS' OBJECTIONS LACK MERIT AND THE NPP PLAN SHOULD BE CONFIRMED

### A. The NPP Plan Satisfies Bankruptcy Code Section 1129(a)(10)

Bankruptcy Code section 1129(a)(10) is satisfied where, "[i]f a class of claims is impaired under *the plan*, at least one class of claims that is impaired under *the plan* has accepted *the plan*."[116] Notwithstanding the statute's plain meaning,[117] the DCL Plan Proponents argue that section 1129(a)(10) imposes a *per debtor* requirement and that the NPP Plan cannot be confirmed because it does not have an impaired accepting class at *each Debtor*.[118] This argument is contrary to every reported decision to have critically analyzed section 1129(a)(10)

---

[112] *See* DCL Post-Trial Br. at 60-61. The DCL Plan Proponents also claim Beron "ignored" parts of the Examiner's Report in his analysis. *Id.* at 59. But, as discussed in the NPP Post-Trial Brief, Beron correctly followed the Examiner's explicit guidance and analyzed just his "bottom-line" conclusions. NPP Post-Trial Br. at 69-70.
[113] *See* NPP Post-Trial Br. at 74; 3/17/11 Trial Tr. 173:9-176:8, 246:20-250:3 (Beron). Beron also conducted a sensitivity analysis on WEAR-related issues. *See id.*
[114] DCL Post-Trial Br. at 61, n.217; *see also* NPP Post-Trial Br. at 67 (Beron's analysis did not include any recoveries in scenarios involving "partial avoidance," where there are different findings at the parent and subsidiary level for constructive fraudulent transfer); 3/17/11 Trial Tr. 148:5-149:3 (Beron).
[115] *See* NPP Post-Trial Br. at 72-73.
[116] 11 U.S.C. § 1129(a)(10) (emphasis added).
[117] *Caminetti v. U.S.*, 242 U.S. 470, 485 (1917) (holding that a statute is to be enforced "according to its terms.").
[118] *See, e.g.,* NPP 2219 (DCL Confirmation Objection) at 3-9; 4/14/11 Trial Tr. 166:2-178:18 (Lemay); DCL Post-Trial Br. at 103-107.

{00521149;v1}

and, if adopted by this Court, would likewise defeat confirmation of the DCL Plan.[119] Thus, the

Court should apply the plain meaning of section 1129(a)(10) as a *per plan* requirement.

### B. Guarantor Non-Debtor Releases Under the NPP Plan Are Appropriate

The DCL Plan Proponents object to sections 5.9 and 11.1 of the NPP Plan, pursuant to

which all Senior Loan Guaranty Claims, Swap Guaranty Claims and Bridge Loan Guaranty

Claims (collectively, the "Guaranty Claims") against Guarantor Non-Debtors[120] are released and

discharged (collectively, the "Guarantor Non-Debtor Releases"), on the grounds that such

provisions constitute impermissible third party releases that cannot be approved absent the

consent of the LBO Lenders.[121] This objection should be overruled on either of two alternative

grounds: (i) the Guarantor Non-Debtor Releases are not the type of third party releases generally

proscribed by courts in the context of a plan of reorganization; or (ii) even if the Court finds the

Guarantor Non-Debtor Releases to be "true" third party releases, based on the circumstances of

these cases, the Guarantor Non-Debtor Releases should nevertheless be approved.[122]

### 1. The Guarantor Non-Debtor Releases Are Not "Third Party" Releases

Each Guarantor Non-Debtor is a signatory to the Senior Loan Guaranty Agreement and

Bridge Loan Guaranty Agreement and, therefore, liable on the same $10 billion in LBO debt as

the Guarantor Debtors. Notwithstanding these substantial debt obligations, the Debtors

determined not to commence chapter 11 cases for the Guarantor Non-Debtors because "[f]or the

---

[119] *See* NPP 2223 (NPP Confirmation Brief) at 78-84; 4/14/11 Trial Tr. 155:3-161:5 (Dublin). The DCL Plan Proponents attempt to navigate this minefield by labeling the 37 Debtors for which they lack an impaired accepting class as "almost exclusively non-operating shell companies, where no one bothered to vote." 4/14/11 Trial Tr. 167:16-17 (Lemay). The DCL Plan Proponents similarly argue in their Post-Trial Brief that "[a]pathy of creditors of the Debtors holding *de minimis* claims is not cause to derail the DCL Plan." DCL Post-Trial Br. at 107. The DCL Plan Proponents cannot have it both ways such that 1129(a)(10) is a per debtor requirement to defeat confirmation of the NPP Plan, but a per plan requirement for purposes of the DCL Plan.
[120] The Guarantor Non-Debtors consist of four subsidiaries of Tribune: Tribune (FN) Cable Ventures, Inc. ("TCV"); Tribune Interactive, Inc.; Tribune ND, Inc.; and Tribune National Marketing.
[121] *See, e.g.,* NPP 2219 (DCL Confirmation Objection) at 38-40; DCL Post-Trial Br. at 107-108.
[122] *See, e.g., Gillman v. Cont'l Airlines (In re Cont'l Airlines)*, 203 F.3d 203, 212 (3d. Cir. 2000) (Non-consensual releases by a non-debtor or other non-debtor third parties are to be granted only in "extraordinary cases.").

{00521149;v1}

most part . . . [they] are either (i) associated with business operations that are co-owned with third parties, (ii) foreign corporations, (iii) businesses subject to disposition . . . or (iv) entities for which a bankruptcy filing is not suitable."[123]  The DCL Plan, however, provides for the Guaranty Claims to be released primarily because the Guarantor Non-Debtors have substantial value that will inure to the benefit of the LBO Lenders.[124]  Despite trumpeting identical releases under the DCL Plan, the DCL Plan Proponents oppose the Guarantor Non-Debtor Releases under the NPP Plan, arguing that such releases constitute illegal non-consensual third party releases.

Even a cursory review of Third Circuit law, however, demonstrates that the Guarantor Non-Debtor Releases bear no resemblance to the kind of third party releases disfavored in this Circuit.  A "third party" release typically consists of a non-consensual release granted by a creditor for the benefit of the debtor's professionals, employees, insurers and/or other creditors.[125]  Here, by contrast, the Guarantor Non-Debtor Releases apply only to LBO debt-related claims against four of the ***Debtors' affiliates*** that the Debtors, and presumably the LBO Lenders themselves, determined not to file for chapter 11 because to do so would impair the value of such entities to the detriment of creditor recoveries.  As the Guarantor Non-Debtor Releases are not true "third party" releases, such releases should be approved.

---

[123] *See* Affidavit of Chandler Bigelow at 6 n.4 [ECF No. 3].

[124] *See* DCL Plan §§ 11.1.1; 11.2.5.  The DCL Plan Proponents make a self-defeating argument—while they challenge the propriety of the Guarantor Non-Debtor Releases under the NPP Plan, the DCL Plan contains identical releases for approximately $620 million in Senior Guaranty Claims that did not agree to such releases.  Section 11.2.5 of the DCL Plan provides that "[a]ll Holders of Loan Guaranty Claims against Guarantor Non-Debtors shall be deemed . . . to have granted the Guarantor Non-Debtor Release."  DCL Plan § 11.2.5 (emphasis added).  Based on the DCL Plan Proponents' objections to the NPP Plan, this provision cannot be approved with respect to any Senior Lenders that did not vote in favor of, or did not vote at all on, the DCL Plan as such provision would be an improper non-consensual third party release as to such Senior Lenders.  *See* Final Voting Tabulation Report, Ex. A-1 [ECF No. 7918] (indicating that holders of approximately $8.25 billion out of $8.87 billion in Senior Guaranty Claims voted to accept the DCL Plan).

[125] *See, e.g., Shearson Lehman Bros. v. Munford, Inc. (In re Munford, Inc.),* 97 F.3d 449, 452 (11th Cir. 1996); *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 293 (2d Cir. 1992); *Menard-Sanford v. Mabey (In re A.H. Robins Co.)*, 880 F.2d 694, 700 (4th Cir. 1989).

{00521149;v1}

## 2. The Guarantor Non-Debtor Releases Should Be Approved

If the Court determines the Guarantor-Non-Debtor Releases should be analyzed as "third party" releases, they should be approved based on the facts and circumstances of these cases. While courts are generally reluctant to approve non-consensual third party releases because they are often used (and abused) as a device to shield third parties from liability to other third parties,[126] Third Circuit courts hold that such releases are permissible in "unusual circumstances."[127]

*In re Hayes Lemmerz International, Inc.* is particularly instructive.[128] In *Hayes*, the debtors excluded certain affiliates, who were guarantors under the debtors' prepetition credit facility, from the chapter 11 filing due to "business and legal risks."[129] The debtors then proposed a chapter 11 plan which sought to release the non-debtor guarantor affiliates.[130] Certain secured lenders who held guaranty claims against the non-debtor guarantor affiliates objected to the releases.[131] In response, the debtors argued that, under the unusual facts of their chapter 11 cases, the proposed releases were appropriate because there was a clear identity of interest between the debtors and their non-debtor affiliates.[132] Indeed, the non-debtor affiliates generated substantially all of the debtors' enterprise value. Therefore, allowing the guaranty

---

[126] *See, e.g., In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005) ("In form, it is a release; in effect, it may operate as a bankruptcy discharge arranged without a filing and without the safeguards of the Code."); *In re Congoleum Corp.*, 362 B.R. 167, 194 (Bankr. D.N.J. 2007) (it is "bad public policy to allow Chapter 11 to be used to insulate corporate directors or their professionals from the consequences of their actions" and "a non-debtor release is a device that lends itself to abuse.").

[127] *See, e.g., In re Cont'l Airlines*, 203 F.3d at 213-214; *In re Washington Mutual, Inc.*, 442 B.R. 314, 352 (Bankr. D. Del. 2011) ("[w]hile the Third Circuit has not barred third party releases, it has recognized that they are the exception . . . in extraordinary cases."); *In re Spansion, Inc.*, 426 B.R. 114, 144 (Bankr. D. Del. 2010).

[128] No. 09–11655, 2009 WL 7698522 at *8 (Bankr. D. Del. Nov. 3, 2009).

[129] *Id.* at *8.

[130] *See id.*

[131] *See* Objection of Mercator CLO III Limited to First Amended Joint Plan of Reorganization of Hayes Lemmerz International, Inc. and Its Affiliated Debtors and Debtors in Possession, Oct. 6, 2009, No. 09-11655 (Bankr. D. Del.) [ECF No. 674].

[132] *See* Debtors' Memorandum of Law (i) In Support of Confirmation of the First Amended Join Plan of Reorganization of Hayes Lemmerz International, Inc. and its Affiliated Debtors and Debtors-In-Possession and (ii) In Response to Objections Thereto at 84-85, Oct. 19, 2009, No. 09-11655 (Bankr. D. Del.) [ECF No. 742].

{00521149;v1}

claims against any of the non-debtor affiliates to survive would have substantially impaired the value of the debtors' business and potentially defeated the debtors' post-emergence reorganization efforts.[133] The debtors also argued that the non-debtor affiliates were providing valuable consideration to the secured lenders in exchange for the releases because the new equity distributed to the lenders under the plan was derived primarily from the enterprise value of the non-debtor affiliates.[134] The Court confirmed the plan, finding the circumstances sufficiently "extraordinary" to justify the releases and that the releases were an "an integral component of *any* reorganization of the Debtors," in part because the non-debtor guarantor affiliates' value was being distributed to creditors, substantially improving their recoveries.[135]

The circumstances present in these Chapter 11 Cases are strikingly similar to *Hayes* and sufficiently "extraordinary" to warrant the Guarantor Non-Debtor Releases.

- First, absent the extraordinary circumstances associated with the Guarantor Non-Debtors, they would have commenced chapter 11 cases and the LBO Lenders would have received the same exact consideration under the NPP Plan (or the DCL Plan) as they are currently contemplated to receive even if such filings had occurred.[136]

- Second, there is a significant identity of interest between the Debtors and the Guarantor Non-Debtors—the Guaranty Claims arise out of the same guaranty agreement under which the LBO Lenders' claims against the affiliated Guarantor Debtors arise.[137]

- Third, the Guarantor Non-Debtors generate substantial value for the Debtors.[138]

- Fourth, with the Senior Lenders and Swap Claims holder projected to receive up to approximately 80% of the equity in Reorganized Tribune (even at a low $6.75 billion DEV) as of the Effective Date, valuable consideration is being provided to the LBO

---

[133] *Id*. at 84-85.

[134] *Id.* at 85. The objections of Mercator CLO III Limited were eventually resolved pursuant to a stipulation between, among others, the debtors and Mercator. *See* Notice of Filing Executed Settlement Stipulation by and among Debtors, DIP Agent, Mercator CLO III Limited and New Amsterdam Capital Management LLP Resolving Objection to Confirmation and Any and All Claims, Nov. 3, 2009, No. 09-11655 (Bankr. D. Del) [ECF NO. 829].

[135] *In re Hayes Lemmerz Int'l, Inc.,* 2009 WL 7698522, at *8 (emphasis added) (considering whether the releases were (i) fair, (ii) necessary to the reorganization and (iii) supported by adequate consideration).

[136] *See* Affidavit of Chandler Bigelow at 6 [ECF No. 3]; DCL Plan § 3.4.3; NPP Plan § 3.5.3.

[137] *See generally* DCL 823 (Senior Loan Guaranty Agreement).

[138] Indeed, TCV, which is a partner in the TV Food Network, has material value ascribed to it by both the DCL Plan Proponents and the Noteholder Plan Proponents. *See* NPP 2284 (Lazard Valuation Supplement) at 24; NPP 2469 (Amended Raymond James Report) at 26.

{00521149;v1}

Lenders because the New Common Stock will be greatly enhanced by the value of the Guarantor Non-Debtors.[139]

- Fifth, the DCL Plan Proponents, including LBO Lenders, never intended that the Guaranty Claims would remain in place upon the Debtors' emergence from chapter 11.[140] Indeed, the DCL Plan itself expressly provides for the release of the Guaranty Claims.[141]

- Sixth, the Debtors' and Senior Lenders' conduct during the pendency of these cases evidences that such parties treat the Debtors and Guarantor Non-Debtors identically, warranting approval of the Guarantor Non-Debtor Releases. For example, the Debtors obtained approval for TCV to make a $52 million capital contribution to the TV Food Network Partnership based on, among other things, the representation that the failure to make such contribution would "negatively impact the distributable value available for creditor constituencies in these chapter 11 cases."[142] In addition, the LBO Lenders have received over $20 million in payments from TCV for the LBO Lenders' fees and expenses incurred during the pendency of these Chapter 11 Cases.[143] Finally, Lazard's DEV conclusions in the General Disclosure Statement contemplate that the Guaranty Claims would be released in connection with the Debtors' emergence from chapter 11.[144]

The Guarantor Non-Debtors did not file for chapter 11 solely to preserve value for the Debtors' creditors (primarily the LBO Lenders). To now permit the LBO Lenders to retain the Guaranty Claims as a sword to defeat the NPP Plan should not be countenanced by this Court.

Even if the Court does not authorize the Guarantor Non-Debtor Releases, the NPP Plan can and should still be confirmed with a reduction in the DEV based on the value of the Guarantor Non-Debtors. In such circumstances (i.e., the low $6.75 billion DEV), the percentage of equity value distributed to the LBO Lenders as of the Effective Date will be reduced from between 69.5% and 78.8% to between 62.7% and 76.2.[145] There will be no impact on the LBO Lenders, however, as all of the value associated with the Guarantor Non-Debtors will still flow to the LBO Lenders on account of their continuing Guaranty Claims.

---

[139] *See* NPP 2527 (Resolicitation Motion), Notice of Filing of Third Amended NPP Plan, Ex. A at 12-13.
[140] *See, e.g.,* NPP 2524 (TV Food Capital Contribution Motion) ¶ 11.
[141] *See* DCL Plan § 11.1.1, 11.2.5.
[142] NPP 2524 (TV Food Capital Contribution Motion) ¶ 11.
[143] *See* Debtors' Response to Motion of Law Debenture to Terminate Debtor Affiliates' Undisclosed Payment of LBO Lenders' Fees at 9 [ECF No. 2603].
[144] *See* NPP 2524 (TV Food Capital Contribution Motion) ¶ 11; NPP 2208 (Gen. Disclosure Statement, Ex. F) at 6.
[145] The PHONES Notes Claims Resolution will determine whether the higher or lower percentage will be distributed.

### C. The NPP Plan Does Not Have Problematic Tax Consequences

Contrary to the DCL Plan Proponents' assertion, the Distribution Trust will qualify as a liquidating trust and not a "disputed ownership fund" ("DOF") taxable at corporate rates.[146] A trust is considered a liquidating trust "if it is organized for the primary purpose of liquidating and distributing the assets transferred to it, and if its activities are all reasonably necessary to, and consistent with, the accomplishment of that purpose."[147] The Distribution Trust formed under the NPP Plan will indisputably be organized to liquidate and distribute the assets it receives.

Although the Distribution Trust is eligible to be treated as a DOF, the Treasury Regulations provide that a liquidating trust established pursuant to a bankruptcy plan is not a DOF unless the trustee *elects* to treat the trust as a DOF.[148] Moreover, the DCL Plan Proponents' claim that the Distribution Trust cannot be a liquidating trust is erroneous. Revenue Procedure 94-45, 1994-2 C.B. 684 ("Rev. Proc. 94-45"), merely sets forth a list of conditions that must be satisfied in order for the IRS to issue a private letter ruling that the trust qualifies as a liquidating trust, and is *not* a statement of substantive law.[149] The Treasury Regulation controls the definition of a liquidating trust, and the Distribution Trust satisfies that definition. The Distribution Trust is a grantor trust pursuant to Treasury Regulation section 1.671-4(a) as "items of income, deduction, and credit attributable to any portion of a trust . . . [are] treated as owned by the grantor or another person" under the Distribution Trust Agreement.[150]

Although the DCL Plan Proponents assert that the NPP Plan does not have an appropriate method under Rev. Proc. 94-45 to determine the allocation of the items of income to trust

---

[146] DCL Post-Trial Br. at 110.
[147] Treas. Reg. section 301.7701-4(d).
[148] Treas. Reg. sections 1.468B-9(b)(1)(iv); 1.468B-9(c)(2)(ii).
[149] The DCL Plan Proponents also express concern about the Noteholder Plan Proponents' lack of a ruling. A favorable ruling from the IRS is not necessary to ensure that the Distribution Trust qualifies as a liquidating trust. The Distribution Trust clearly meets the requirements of a liquidating trust under Treasury Regulation section 301.7701-4(d). Obtaining a ruling on liquidating trust status is a lengthy process that is unnecessary in this case.
[150] Rev. Proc. 94-45, 1994-2 C.B. 684.

beneficiaries because legal entitlement to the income remains in dispute,[151] the method of

allocating income among beneficiaries will be determined in conjunction with implementation of

the NPP Plan, and the Distribution Trust's income will be treated as subject to tax on a current

basis as required by section 468B(g) of the IRC, section 3.05 of Rev. Proc. 94-45, and item 10 of

the Rev. Proc. 94-45 checklist.  The specifics regarding how income will be allocated and who

will be responsible for payment of tax due will be determined by the Distribution Trustee.[152]

This structure is common to trusts and other situations where identification of the ultimate

recipients of value held in reserve is contingent upon the outcome of litigation or claims

reconciliation.[153]

D.       **The NPP Plan Does Not Unfairly Discriminate Against The Senior Lenders**

In their initial objection to the NPP Plan and at trial, the DCL Plan Proponents asserted

that the NPP Plan was not proposed in good faith because it reserved too much equity of

Reorganized Tribune, which would have the effect of reducing the Debtors' value and limiting

the Reorganized Debtors' ability to operate in the ordinary course.[154]  To address this objection,

the Noteholder Plan Proponents modified the NPP Plan to materially increase the amount of

equity distributed as of the Effective Date to between 70.5% and 79.8% (assuming a low $6.75

billion DEV) of the equity value of Reorganized Tribune. [155]

---

[151] DCL Post-Trial Br. at 111.

[152] *See* Plan Supplement, Ex. K (NPP Distribution Trust Agreement) § 4.2 [ECF No. 7802].

[153] Simon Friedman & Russell Kestenbaum, *Fixed and Contingent Claims in Bankruptcy—Liquidating Trusts and Partnerships*, 101 TAX Notes 1317, 1332-1333 (2003).  As with many trusts with contingent entitlements to value, creditors face limited risk of recognizing a small gain or small loss upon the initial allocation of value, and then later recognizing a slight correction of gain or loss depending on who is ultimately entitled to the value held in trust. *Id.*

[154] *See* NPP 2219 (DCL Confirmation Objection) at 22-23; April 12, 2011 Trial Tr. 134:6-136:5 (Black).  Ironically, the DCL Plan Proponents now argue that the Noteholder Plan Proponents offer "no basis" for the modifications described herein when they themselves demanded the release of more equity in connection with Initial Distributions. DCL Post-Trial Br. at 112.

[155] The DCL Plan Proponents assert, without any record citations, that even the reduced equity value held by the Distribution Trust "could harm enterprise value by hindering strategic mergers, joint ventures, and many other partnerships . . .," and "could jeopardize the Reorganized Debtors' ability to recruit senior managers and directors." DCL Post-Trial Br. at 121.  It is highly specious that senior managers and directors will hesitate to join the

{00521149;v1}

Despite making these modifications at their behest,[156] the DCL Plan Proponents now assert that the NPP Plan discriminates unfairly against the Senior Lenders by giving them ***too much*** equity,[157] forcing them to bear the "burden" of an all equity distribution—a "burden" that is not similarly borne by Senior Noteholders and therefore constitutes unfair discrimination.[158] This latest objection does not withstand scrutiny.

Courts have held that creditors need not receive the same form of consideration for a plan to comply with section 1129(b).[159] In *Greate Bay*, a noteholder class, similarly situated to general unsecured claims, was to receive a package of securities largely consisting of equity, and general unsecured claims were to receive cash. After determining that there was no meaningful disparity in recovery values to be received by each class under the proposed plan, the *Greate Bay* Court considered whether "the allocation of equity proposed by the [plan] . . . impose[d] a materially greater risk to the dissenting class" and concluded there was no such risk.[160] The DCL Plan Proponents attempt to distinguish *Greate Bay* on the basis that the *Greate Bay* Court considered the risk tolerance associated with trade creditors (who typically prefer a cash recovery) as compared to noteholders (who are typically long term investors and for whom an equity recovery is therefore often more appropriate) when evaluating whether the treatment afforded the two classes was discriminatory. The Senior Lenders concede, however, that they are

---

Reorganized Debtors over a fear that the Distribution Trust will sell a controlling interest in the company, given that the DCL Plan Proponents' corporate governance expert could not state any instance where a 29.5% equity interest represented control. *See* 4/12/11 Trial Tr. 153:3-25 (Black). Moreover, Rock testified that the DCL Plan Proponents' concerns regarding potential business relationships are "really a stretch," even if the Distribution Trust holds more than double the equity currently contemplated by the NPP Plan. 3/16/11 Trial Tr. 205:15-207:5 (Rock). Indeed, even Black conceded that each of these concerns is "attenuated." 4/12/11 Trial Tr. 152:10-25 (Black).

[156] *See* NPP 2219 (DCL Confirmation Objection) at 22 (arguing for the NPP Plan to distribute "as much equity in reorganized Tribune as possible and fund[] the reserve with alternative currency…").

[157] Supplemental DCL Objection at 4 [ECF No. 8581]; 4/12/11 Trial Tr. 134:6-136:5 (Black); DCL Post-Trial Br. at 112-113.

[158] *See* April 14, 2011 Trial Tr. 184:4-190:14 (Johnston).

[159] *See generally In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213 (Bankr. D.N.J. 2000); *In re Hawaiian Telecom Commc'ns, Inc.*, 430 B.R. 564, 605 (Bankr. D. Haw. 2009).

[160] 251 B.R. at 232; *see also In re Hawaiian Telecom Comm'ns, Inc.*, 430 B.R. at 605.

{00521149;v1}

long term investors.[161]  Accordingly, under *Greate Bay*, the NPP Plan's treatment of Senior

Lender Claims is consistent with the Senior Lenders' risk tolerance and, thus, appropriate.

The absurdity of the Senior Lenders' "disparate treatment" argument is also demonstrated

by positions taken by the DCL Plan Proponents themselves.[162]  The DCL Plan Proponents

conceded that a dollar of cash is equal to a dollar of equity in their recent motion to approve

resolicitation of the DCL Plan.  In the context of explaining why the new "strip" alternative (i.e.,

cash, equity and term loan) to be provided to Senior Noteholders under the DCL Plan is

appropriate, the DCL Plan Proponents state that "the proposed 'strip' distributions under the

[DCL] Plan as modified are ***equal in value*** to the cash distributions that were provided for under

the December 2010 DCL Plan . . . ."[163]  In sum, the value of the Senior Lenders' recovery has not

changed—only the form in which the value is to be distributed has changed, and thus the NPP

Plan does not discriminate unfairly against the Senior Lenders.[164]

E.      **The NPP Plan Allows The Litigation Trustee To Settle LBO Claims**

The DCL Plan Proponents continue to allege that the NPP Plan lacks a "collective action

mechanism" that would allow the Litigation Trustee to bind all Senior Lenders to a negotiated

settlement.[165]  The Noteholder Plan Proponents refuted this response in the NPP Confirmation

Brief, presenting this Court with a recent Judge Sontchi decision where a debtor negotiated a

settlement with an ad hoc group of prepetition lenders and those lenders who were not party to

the settlement agreement were given the ability to opt out of the settlement and engage in

---

[161] DCL Post-Trial Br. at 113.
[162] The Senior Lenders should not be permitted to complain that they are now receiving too much New Common Stock under the NPP Plan when they were seeking to preserve all of the New Common Stock for themselves under prior iterations of the DCL Plan and at least 93% under the current version of the DCL Plan.
[163] *See* NPP 2186 at 9 (DCL Resolicitation Motion) (emphasis added).
[164] The DCL Plan Proponents' objection that the NPP Plan violates section 1129(b) because it contemplated a flat 8% recovery for all holders of Guarantor Subsidiary Debtor Claims has been mooted by modifications to provide such holders with an Initial Distribution equal to their "natural" recovery.  *See* NPP Plan at 9 n.18.
[165] DCL Post-Trial Br. at 113-114; *see also* NPP 2219 (DCL Confirmation Objection) at 31-32.

{00521149;v1}

separate negotiations with the debtor.[166]  The DCL Plan Proponents dispute the viability of this construct relying on the single, nonsensical illustrative example where every lender opts out of a settlement negotiated by the Litigation Trustee, forcing the Litigation Trustee to negotiate allowance of the claims on a "creditor-by-creditor" basis.[167]  This example is impossible, however, as the Litigation Trustee would not be proposing a settlement with the lenders unless it had reached a settlement with one or more significant LBO Lenders.

Moreover, the DCL Plan, like every other plan with a litigation trust, shares a similar "deficiency" in that the Litigation Trustee appointed thereunder does not have the authority to bind to a settlement every one of the thousands of defendants in the Preserved Causes of Action. For example, under the DCL Plan, the Litigation Trustee is tasked with prosecuting and/or settling the Litigation Trust Assets which, as defined under the DCL Plan, include claims against more than 30,000 selling stockholders.[168]  Under the DCL Plan Proponents' theory, the DCL Plan has no "mechanism" that would allow the Litigation Trustee to bind every single Step One and Step Two stockholder to a settlement of the intentional fraud claims.  This objection is just another example of the lengths to which the DCL Plan Proponents will go to seek to block confirmation of the NPP Plan even when the DCL Plan suffers from the same alleged infirmities.

### F. The DCL Plan Improperly Gives Effect to Subordination Provisions

The DCL Plan continues to discriminate unfairly against the Senior Noteholders by wrongly giving the Swap Claim and Other Parent Claims the benefit of the subordination provisions in the PHONES Notes Indenture and the EGI-TRB LLC Notes.  In their Post-Trial Brief, the DCL Plan Proponents argue at length that (i) the Other Parent Claims (including the Swap Claim) are legally entitled to benefit from subordination and (ii) even if these claims are

---

[166] *See In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 507-508 (Bankr. D. Del. 2010).
[167] DCL Post-Trial Br. at 114.
[168] *See* DCL Plan §§ 1.1.131, 13.3.8.

not entitled to benefit from subordination, the total "harm" inflicted upon Senior Noteholders is "an immaterial $100,000."[169]  The DCL Plan Proponents are wrong on all fronts.

First, the DCL Plan Proponents' interpretation of the subordination provisions in the PHONES Notes Indenture does not withstand scrutiny.  The PHONES Notes Indenture provides that the PHONES Notes shall be subordinate to "Senior Indebtedness."[170]  "Senior Indebtedness" is defined in relevant part as "the principal of (and premium, if any) and interest on…and other amounts due on or in connection with any Indebtedness of the Company . . . ."  "Indebtedness" is defined in relevant part as "(i) all obligations represented by notes, bonds, debentures or similar evidences of indebtedness; (ii) all indebtedness for borrowed money . . .; (iii) all rental obligations…; and (iv) all Indebtedness of others for the payment of which such Person is responsible or liable as obligor or guarantor."[171]  The Swap Claim clearly does not fit into categories (i), (iii) or (iv) of "Indebtedness," leaving only the question of whether the Swap Claim is "indebtedness for borrowed money"—a question as to which no dispute exists between the parties.  As stated by Oaktree's counsel during oral argument, "the [S]wap [C]laim is not for money loaned."[172]  Thus, by the Swap Claim holder's ***own admission***, the Swap Claim is not entitled to benefit from the subordination provisions of the PHONES Notes Indenture, and the DCL Plan should not be confirmed on that basis alone.[173]

The DCL Plan Proponents' assertion that Retiree Claims benefit from PHONES subordination likewise fails.  The DCL Plan Proponents take the novel position that the Retiree

---

[169] DCL Post-Trial Br. at 90.

[170] NPP 963 (PHONES Notes Indenture) at Article 14.01.

[171] *Id.*

[172] 4/14/11 Trial Tr. 117:14-17 (Johnston).  Mr. Johnston also cited the Ninth Circuit's decision in *Thrifty Oil*, in which the Ninth Circuit held that "[a] fundamental characteristic of an interest rate swap is that the counterparties never actually loan or advance the notional amount."  *Thrifty Oil Co. v. Bank of Am. Nat'l. & Sav. Ass'n*, 322 F.3d 1039, 1048 (9th Cir. 2003).  *See also* DCL Post-Trial Br. at 95.

[173] The DCL Plan Proponents make no attempt to substantiate the reallocation of consideration to trade claims at Tribune, because the PHONES Notes Indenture makes clear that such claims are not "Senior Indebtedness."  *Id.*

Claims are "indebtedness for . . . the deferred purchase price of . . . services"—a position that strains credulity.[174] Subsection (ii) of "Indebtedness" under the PHONES Notes Indenture provides: "all indebtedness for borrowed money or for the deferred purchase price of property or services other than, in the case of any such deferred purchase price, on **normal trade terms**."[175] No reasonable reading of subsection (ii) could possibly implicate the Retiree Claims.

Second, the DCL Plan Proponents' analysis of the impact of subordination on creditor recoveries is wrong and blatantly misleading. The entirety of the DCL Plan Proponents' response relates to the reallocation of only **natural recoveries** flowing to creditors of Tribune—an issue that the DCL Plan Proponents would have this Court disregard because it does not have a "material impact" on Senior Noteholder recoveries. The DCL Plan Proponents are silent, however, with respect to the impact of the proposed reallocation of settlement consideration and allocation of Litigation Trust proceeds based on their flawed interpretation of the subordination provisions. Notwithstanding the DCL Plan Proponents' diversionary tactics, assuming *arguendo* the Proposed Settlement passes muster (which it does not), it must still "conform to the absolute priority rule."[176] Under the logic espoused by the Supreme Court, a settlement embodied under a plan likewise cannot discriminate unfairly among similarly situated creditors—a mandate that requires the proper enforcement of subordination provisions.[177]

The implications of the DCL Plan's "immaterial" misapplication of the subordination provisions are staggering. For example, if the Other Parent Claims (excluding the Swap Claim)

---

[174] *Id.* at 92.

[175] NPP 963 (PHONES Notes Indenture) § 14.01 (emphasis added).

[176] *In re Iridium Operating LLC*, 478 F.3d 452, 463 (2d Cir. 2007) (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) ("[A] settlement presented for approval as part of a plan of reorganization, because is constitutes part of the plan, may only be approved it if, too, is 'fair and equitable' in the sense of conforming to the absolute priority rule.").

[177] The legislative history regarding the requirement that a plan not discriminate unfairly emphasizes that the proper enforcement of subordination provisions is critical to a finding that the plan does not discriminate unfairly. Vol. C. COLLIER ON BANKRUPTCY App. Pt. 4(d)(i)(15th ed. rev.); *see also* Amendment to Objection of Brigade Capital Management to DCL Plan [ECF No. 8324].

are $154.1 million and the Swap Claim is $150.9 million, giving such claims the benefit of subordination strips Senior Noteholders by as much as ***$50 million*** in "settlement consideration" alone.[178] By any metric, the improper diversion of $50 million from Senior Noteholders is material and unfairly discriminatory, rendering the DCL Plan unconfirmable.

## V.    THE NPP PLAN SHOULD BE CONFIRMED OVER THE DCL PLAN

In the event this Court finds both Competing Plans to be confirmable, the NPP Plan is superior to the DCL Plan and should be confirmed. When assessing which of two confirmable plans should be confirmed under Bankruptcy Code 1129(c), courts have identified four pertinent factors,[179] the analysis of which weighs in favor of confirming the NPP Plan.

The first factor courts consider is whether the plan contemplates a reorganization or liquidation. The law is well-settled that reorganization is preferable to liquidation because successful reorganization furthers the objectives of "preserving going concerns and maximizing property available to satisfy creditors."[180] The DCL Plan Proponents contend that only the DCL Plan provides for a "true reorganization" and, in so doing, fundamentally misconstrue the nature of the NPP Plan.[181] As detailed in the NPP Post-Trial Brief, the Competing Plans are substantially similar in many ways, and both enable the Debtors to reorganize successfully.[182]

---

[178] The $50 million figure assumes the PHONES Notes are allowed in the amount of $1.197 billion (high PHONES) and takes into account the misallocation of natural recoveries and settlement consideration. See Exhibit A for supporting calculations. Exhibit A calculates the impact of the misapplication of the PHONES and EGI-TRB LLC Note subordination provisions by allocating settlement consideration in two different scenarios: (i) neither the Swap Claim nor the Other Parent Claims benefit from EGI-TRB LLC Notes subordination and (ii) the Swap Claim but not the Other Parent Claims benefit from EGI-TRB LLC Notes subordination and neither the Swap Claim nor the Other Parent Claims benefit from PHONES subordination and comparing these scenarios to the DCL Plan. As illustrated in Exhibit A hereto, even if the Swap Claim was to benefit from the subordination provisions in the EGI-TRB LLC Notes, the Senior Noteholders would still be stripped of approximately $46 million in settlement consideration.

[179] *See e.g. In re River Village Assocs.*, 181 B.R. 795, 807 (E.D. Pa. 1995); *In re Greate Bay*, 251 B.R. at 245.

[180] *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999); *see also In re Holly Garden Apartments*, *Ltd.*, 238 B.R. 488, 495 (Bankr. M.D. Fla. 1999) (finding that reorganizing plans are preferable to liquidating plans in the context of section 1129(c)).

[181] *See* DCL Post-Trial Br. at 122; *see also In re TCI 2 Holdings, LLC*, 428 B.R. 117, 182 (Bankr. D.N.J. 2010) (rejecting characterization of only one of the competing plans as a "true reorganization").

[182] NPP 2224 (Gropper Declaration) ¶ 42; 3/16/11 Trial Tr. 13:8-10 (Gropper).

{00521149;v1}

The second factor courts consider is the treatment of creditors.[183] With respect to relative creditor recoveries under each plan, the DCL Plan Proponents focus exclusively on the certainty and timing of distributions rather than the metric this Court should focus on—ensuring that creditors receive the recoveries to which they are legally entitled.[184] None of the cases cited by the DCL Plan Proponents are analogous to the facts here: a plan that offers an immediate, albeit artificially low, lump-sum payment to creditors in settlement of claims worth billions of dollars *as compared to* a plan that preserves valuable claims that will result in far greater creditor recoveries.[185] Accordingly, consideration of creditor treatment favors the NPP Plan.

The third factor is the feasibility of the competing plans.[186] The DCL Plan Proponents allege that the DCL Plan is more feasible than the NPP Plan because it will be "substantially consummated" more promptly.[187] This assertion is inaccurate. For example, the DCL Plan Proponents argue that the NPP Plan is not feasible because, among other reasons, the "large amount of equity value to be held in the Distribution Trust . . . could raise novel FCC issues that are bound to complicate, delay or prevent consummation of the Noteholder Plan."[188] The DCL Plan Proponents' FCC expert testified, however, that he does ***not*** believe that the NPP Plan "would be subject to substantial delay in connection with its review by the FCC."[189] Unlike the DCL Plan, the NPP Plan does not introduce additional media interests that will complicate, delay or adversely affect the FCC approval process. Aurelius, for example, has no media interests,

---

[183] *See, e.g., In re Greate Bay*, 251 B.R. at 266 (analyzing which plan provided better treatment).
[184] DCL Post-Trial Br. at 117.
[185] *See* 3/16/11 Trial Tr. 13:17-14:2 (Gropper).
[186] *See In re River Village Assocs.*, 181 B.R. at 807; *In re Greate Bay*, 251 at 245 (Bankr. D.N.J. 2000).
[187] DCL Post-Trial Br. at 118.
[188] DCL Post-Trial Br. at 119. Akin Gump takes no position on FCC matters. Friedman Kaplan Seiler & Adelman LLP and Lerman Senter PLLC are counsel to Aurelius in connection with these matters and have signed the reply brief in that regard.
[189] 4/12/11 Trial Tr. 57:20-58:3 (Rosenstein).

much less other attributable media interests.[190]  The Court should thus confirm the NPP Plan, which the DCL Plan Proponents admit "would not be subject to substantial delay" before the FCC, in contrast to the DCL Plan, which adopts a "fix-it-later" strategy with inherent substantial delay.[191]  The DCL Plan Proponents' additional "feasibility" objections also lack merit.[192]  The NPP Plan is feasible, will be consummated more quickly than the DCL Plan and will provide Non-LBO Creditors with greater recoveries than the DCL Plan.[193]

The last factor courts consider when evaluating competing plans is creditor preference, as evidenced by voting results.[194]  As noted above in section I, *supra*, such preferences are neither dispositive nor binding and "may be interpreted to favor each proponent in various ways."[195] The analysis applied above in respect of the Proposed Settlement applies equally to viewing creditor votes on the DCL Plan.  Accordingly, this factor strongly supports the NPP Plan.

## CONCLUSION

As demonstrated by the foregoing and the NPP Post-Trial Brief, the evidence shows that

---

[190] 3/15/11 Trial Tr. 1968:25-1969:4 (Gropper) (testifying that Aurelius does not hold interests in any media companies other than the Company).  In addition, as a consequence of Rosenstein's testimony, the Noteholder Plan Proponents did not seek to bring out on cross-examination of Rosenstein the following facts that had previously been introduced into evidence: (1) under the NPP Plan, the Distribution Trust will hold a minority of the equity value (all in the form of New Warrants) of Reorganized Tribune; (2) the Noteholder Plan Proponents have vetted the parties who will hold attributable interests in Reorganized Tribune through the Distribution Trust and they hold no other media interests, NPP Ex. 2224 (Gropper Declaration) at 23, NPP FCC 109 (Quest, the Distribution Trustee), 110 (Brodsky), 111 (Schacht), 112 (Lukomnik), 114 (Berman), 115 (Cellar), 116 (Handel) (media ownership certifications for such persons); and (3) the FCC routinely and expeditiously approves transfers of control of broadcast licenses to work-out or bankruptcy trusts, NPP FCC 104, 122, 123, 124, 125, 126, 127, 128, 129 (FCC grants and underlying applications involving trusts).
[191] The DCL Plan, by its terms, builds in a period of delay before addressing FCC concerns and then allows the creditors, not the Company, to determine the appropriate response.  Moreover, in citing *In re TCI 2 Holdings, LLC*, 428 B.R. 117 (Bankr. D.N.J. 2010), the DCL Plan Proponents neglect to point out that as to one of the competing plans, the bankruptcy court found that though there was a "reasonable prospect of success," the regulatory licensure process "would likely be delayed by a CCC hearing on undue economic concentration that would at a minimum take several months to complete."  *Id.* at 177.  The court ultimately favored the plan for which the "prospect of prompt regulatory approval [was] stronger."  *Id.* at 183.
[192] *See supra* section IV.B. (addressing the appropriateness of the Guarantor Non-Debtor Releases); section IV.C. (explaining that the Distribution Trust contemplated by the NPP Plan does not expose beneficiary recoveries to higher rates of taxation than would be imposed by the DCL Plan).
[193] *See In re Eddington Thread Mfg. Co.*, 181 B.R. 826, 833 (Bankr. E.D. Pa. 1995).
[194] *See e.g. In re Greate Bay*, 251 B.R. at 245; *In re Holly Garden Apartments, Ltd.*, 238 B.R. at 496.
[195] *See In re Greate Bay*, 251 B.R. at 266.

the DCL Plan cannot be confirmed, and the Court should confirm the NPP Plan.

Dated:  May 27, 2011

| | |
|---|---|
| AKIN GUMP STRAUSS HAUER & FELD LLP | ASHBY & GEDDES, P.A. |
| Daniel H. Golden | |
| David Zensky | /s/ Leigh-Anne M. Raport |
| Philip C. Dublin | William P. Bowden (I.D. No. 2553) |
| Abid Qureshi | Amanda M. Winfree (I.D. No. 4615) |
| Mitchell P. Hurley | Leigh-Anne M. Raport (I.D. No. 5055) |
| One Bryant Park | 500 Delaware Avenue, P.O. Box 1150 |
| New York, NY  10036 | Wilmington, DE  19899 |
| (212) 872-1000 | (302) 654-1888 |
| *Counsel for Aurelius Capital Management, LP* | |

FREIDMAN KAPLAN SEILER &
ADELMAN, LLP
Edward A. Freidman
Robert J. Lack
Kizzy L. Jarashow
7 Times Square
New York, NY 10036-6516
212-883-1100

*Counsel for Aurelius Capital Management, LP, as to matters concerning JPMorgan and Angelo Gordon, but not Oaktree*

LERMAN SENTER PLLC
Meredith S. Senter, Jr.
Sally A. Buckman
2000 K Street NW, Suite 600
Washington, DC 20006
202- 429-8970

*Counsel for Aurelius Capital Management, LP, as to FCC matters*

| | |
|---|---|
| McCARTER & ENGLISH, LLP | McCARTER & ENGLISH, LLP |
| David J. Adler | |
| 245 Park Avenue | /s/ Katharine L. Mayer |
| New York, NY 10167 | Katharine L. Mayer (I.D. No. 3758) |
| 212-609-6800 | Renaissance Centre |
| | 405 N. King Street |
| | Wilmington, DE 19801 |
| | 302-984-6300 |

*Counsel for Deutsche Bank Trust Company Americas, solely in its capacity as successor Indenture Trustee for certain series of Senior Notes*

{00521149;v1}

KASOWITZ, BENSON, TORRES &
FRIEDMAN LLP
David S. Rosner
Sheron Korpus
1633 Broadway
New York, New York 10019
Tel:  (212) 506-1700
Fax:  (212) 506-1800

BIFFERATO GENTILOTTI LLC

/s/ Garvan F. McDaniel
Garvan F. McDaniel (I.D. No. 4167)
800 N. King Street, Plaza Level
Wilmington, Delaware 19801
Tel:  (302) 429-1900
Fax:  (302) 429-8600

*Counsel for Law Debenture Trust Company of New York, solely in its capacity as successor
Indenture Trustee for certain series of Senior Notes*

BROWN RUDNICK LLP
Robert J. Stark
Martin S. Siegel
Gordon Z. Novod
Seven Times Square
New York, NY 10036
212-209-4800

SULLIVAN HAZELTINE ALLINSON LLC

/s/ William D. Sullivan
William D. Sullivan (I.D. No. 2820)
Elihu E. Allinson, III (I.D. No. 3476)
901 N. Market Street, Suite 1300
Wilmington, DE 19801
302-428-8191

*Counsel for Wilmington Trust Company, solely in its capacity as successor Indenture Trustee for
the PHONES Notes*