# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

TRIBUNE COMPANY, et al.,[1]

Debtors.

Chapter 11

Case No. 08-13141 (KJC)

Jointly Administered

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF CONFIRMATION OF SECOND AMENDED JOINT PLAN OF REORGANIZATION FOR TRIBUNE COMPANY AND ITS SUBSIDIARIES PROPOSED BY THE DEBTORS, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, OAKTREE CAPITAL MANAGEMENT, L.P., ANGELO, GORDON & CO., L.P., AND JPMORGAN CHASE BANK, N.A.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc., f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); and WLVI Inc. (8074); WPIX, Inc. (0191). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

# TABLE OF CONTENTS

Page

I. JURISDICTIONAL AND RELATED CONSIDERATIONS ........................................... 1
   A. Jurisdiction And Venue ......................................................... 1
   B. Judicial Notice. ................................................................ 2
   C. Burden Of Proof. ............................................................... 2

II. PROCEDURAL HISTORY ................................................................ 3

III. BACKGROUND REGARDING THE DEBTORS, THE 2007 LEVERAGED
   ESOP TRANSACTIONS, THE LBO-RELATED CAUSES OF ACTION AND
   THE PARTIES' EFFORTS TO RESOLVE THOSE CLAIMS ................................. 11
   A. The Debtors And Their Business, Operations And Investments. ................... 12
   B. The Company's Pre-Leveraged ESOP Transactions Debt Structure ................. 15
   C. The Leveraged ESOP Transactions. ............................................. 17
   D. Debtors' Capital Structure Following The Leveraged ESOP Transactions .......... 19
   E. Process Undertaken To Seek Resolution Of The LBO-Related Causes Of
      Action. ...................................................................... 21
      1. Major Participants In The Process. ........................................ 21
      2. Due Diligence Investigations. ............................................. 23
      3. April Settlement. ......................................................... 24
      4. Appointment Of The Examiner And Issuance Of The Examiner
         Report. .................................................................. 25
      5. Termination Of The April Settlement. ...................................... 28
      6. Mediation And The Resulting Settlement Embodied In The DCL
         Plan. .................................................................... 30

IV. THE DCL AND NOTEHOLDER PLANS ................................................... 32
   A. Key Terms Of The DCL Plan Relating To The Leveraged ESOP
      Transactions. ................................................................ 32
      1. Settlement Of Certain LBO-Related Causes Of Action. ...................... 32
      2. Establishment Of Litigation And Creditors' Trusts. ....................... 34
   B. Key Terms Of The Noteholder Plan. ............................................ 36
   C. Creditor Voting On The DCL And Noteholder Plans. ............................. 37
      1. Solicitation Of The DCL Plan And Noteholder Plan And Notice. ............. 37
      2. Publication Notice. ....................................................... 38
      3. Adequacy Of Notice. ...................................................... 38
      4. Voting Declarations. ...................................................... 39
      5. Good Faith Solicitation, No Requirement For Resolicitation ............... 41

V. THE DCL PLAN SETTLEMENT IS REASONABLE AND IN THE BEST
   INTERESTS OF CREDITORS ............................................................ 42
   A. The Martin Factors. .......................................................... 42

B.     The DCL Plan Settlement Results In Recoveries Well Within The Range Of Reasonableness. .................................................................................. 43

        1.     The Examiner Report Supports The Reasonableness Of The DCL Plan Settlement. ..................................................................... 44

        2.     The Evidence Shows That The DCL Plan Settlement Falls Within The Upper End Of The Range Of Reasonableness. ................................... 47

        3.     Challenges To Prevailing On A Claim For Full Avoidance. .................. 52

        4.     The Other Pathways To Success Suggested By The Noteholder Proponents Do Not Establish That The DCL Plan Settlement Falls Outside The Range Of Reasonableness. .................................................... 56

        5.     The Litigation Trust Provides Valuable Settlement Consideration. ......... 62

C.     The Reasonableness Of The DCL Plan Settlement Also Is Supported By Likely Difficulties In Collection. ............................................................. 62

D.     The Complexity, Expense, And Delay Of Litigation Also Supports The DCL Plan Settlement. .......................................................................... 63

E.     The DCL Plan Settlement Is In The Paramount Interest Of Creditors. ............... 64

VI.     THE DCL PLAN SETTLEMENT IS THE PRODUCT OF GOOD FAITH NEGOTIATION AND EXTENSIVE MEDIATION ................................................ 66

VII.     THE OTHER SETTLEMENTS IMPLEMENTED IN THE DCL PLAN ARE FAIR AND EQUITABLE ......................................................................... 68

A.     The Intercompany Claims Settlement. ...................................................... 68

B.     The Retiree Settlement. ....................................................................... 70

VIII.     THE RELEASE, EXCULPATION, INJUNCTION, INDEMNIFICATION AND BAR ORDER PROVISIONS OF THE DCL PLAN ARE A VALID EXERCISE OF THE DEBTORS' BUSINESS JUDGMENT AND APPROPRIATE IN THE CHAPTER 11 CASES .......................................................................... 72

A.     The Direct Releases By The Debtors Are Appropriate. .............................. 72

        1.     Senior Lenders, Bridge Lenders, Senior Loan Agent, Bridge Loan Agent And Settling Step Two Payees (The "Lender Parties"). ................ 75

        2.     Released Stockholder Parties, 401(k) Participants And Current Employees. ...................................................................... 76

        3.     Debtors' Related Persons. ................................................... 78

B.     The Holder Releases Are Consensual. ...................................................... 80

C.     The Release Of Guarantor Non-Debtors From The Senior Guaranty Claims And Bridge Guaranty Claim Is Appropriate. ....................................... 81

D.     The Exculpation Provisions Are Appropriate. ............................................ 81

E.     The Objections To The Bar Order Set Forth In The DCL Plan Are Overruled. ................................................................................... 83

F.     The Indemnification Provisions Are Appropriate. ...................................... 88

IX.    DISTRIBUTABLE ENTERPRISE VALUE. ...................................................... 89

**X.    FCC ISSUES DO NOT IMPAIR THE FEASIBILITY OF THE DCL PLAN OR PROVIDE A BASIS TO PREFER THE NOTEHOLDER PLAN.** .................................. 97

XI.    THE DCL PLAN COMPLIES WITH THE REQUIREMENTS OF SECTION 1129 OF THE CODE. ................................................................................ 100

    A.    Section 1129(a)(1) – Compliance With Applicable Provisions Of The Bankruptcy Code. ...................................................................... 100

        1.    Sections 1122 And 1123(a)(1)-(4) – Classification And Treatment Of Claims And Interests. ........................................................ 100

        2.    Section 1123(a)(5) – Adequate Means For Implementation Of The DCL Plan. ...................................................................... 108

        3.    Section 1123(a)(6) – Prohibition Against The Issuance Of Nonvoting Equity Securities And Appropriate Distribution Of Voting Power Among Classes Of Securities. ......................... 110

        4.    Section 1123(a)(7) – Selection Of Directors And Officers In A Manner Consistent With The Interests Of Creditors And Equity Security Holders And Public Policy. ................................. 110

        5.    Section 1123(b)(1) – Impairment Of Claims And Interests. ........ 111

        6.    Section 1123(b)(2) Assumption, Assumption And Assignment, Or Rejection Of Executory Contracts And Unexpired Leases. ............. 111

        7.    Section 1123(b)(3) – Retention, Enforcement And Settlement Of Claims Held By The Debtors. .................................................. 111

        8.    Section 1123(b)(6) — Other Provisions Not Inconsistent With Applicable Provisions Of The Bankruptcy Code. .................... 112

        9.    Section 1123(d) — Cure Of Defaults. ..................................... 113

        10.    Bankruptcy Rule 3016. ....................................................... 113

    B.    Section 1129(a)(2) — Compliance With Applicable Provisions Of The Bankruptcy Code. ...................................................................... 114

    C.    Section 1129(a)(3) — Proposal Of The DCL Plan Is In Good Faith. ........... 114

    D.    Section 1129(a)(4) — Court Approval Of Certain Payments As Reasonable. ...................................................................... 115

    E.    Section 1129(a)(5) — Disclosure Of Identity Of The Proposed Management, Compensation Of Insiders And Consistency Of Management Proposals With The Interests Of Creditors And Public Policy. ...................................................................... 115

    F.    Section 1129(a)(6) — Approval Of Rate Changes. ........................... 116

    G.    Section 1129(a)(7) — Best Interests Of Holders Of Claims And Interests. ........ 116

    H.    Section 1129(a)(8) — Acceptance Of The DCL Plan. ......................... 118

    I.    Section 1129(a)(9) — Treatment Of Claims Entitled To Priority Pursuant To Section 507(a) Of The Bankruptcy Code. ................................. 119

    J.    Section 1129(a)(10) — Acceptance By At Least One Impaired, Non-Insider Class. ...................................................................... 120

    K.    Section 1129(a)(11) — Feasibility Of The DCL Plan. ....................... 121

iii

L.      Section 1129(a)(12) — Payment Of Bankruptcy Fees. ...................... 121
M.      Section 1129(a)(13) — Retiree Benefits........................................ 122
N.      Sections 1129(a)(14)-(a)(16) — Miscellaneous Provisions. ............ 122
O.      Section 1129(b) — Rejecting Voting Classes. ............................. 122
P.      Section 1129(d) — Purpose Of DCL Plan...................................... 125
Q.      Other Provisions Of The DCL Plan Are Also Consistent With The
        Bankruptcy Code. ................................................................... 126
        1.      Exemptions From Taxation...................................... 126
        2.      Exemptions From Securities Laws. ........................... 126
        3.      Assumption And/Or Assignment Of Executory Contracts And
                Unexpired Leases. ............................................... 127
        4.      Termination Of ESOP............................................ 127
        5.      Propriety Of Various Agreements And DCL Plan Related
                Documents. ........................................................ 128
R.      Resolution Of Objections.......................................................... 129
S.      Comprehensive Settlement of Claims and Controversies................... 132

XII.    THE NOTEHOLDER PLAN DOES NOT SATISFY THE BANKRUPTCY
        CODE'S REQUIREMENTS FOR CONFIRMATION............................... 133
A.      The Noteholder Plan Does Not Comply With Section 1129(a)(10). ....... 133
B.      The Noteholder Plan Does Not Comply With Section 1123(a)(5) Of The
        Bankruptcy Code. ................................................................... 135
C.      The Noteholder Plan Does Not Comply With Section 1123(a)(3). ........ 136
D.      The Noteholder Plan Does Not Comply with Section 1129(a)(8). ........ 137
E.      The Noteholder Plan Does Not Comply With Section 1129(b). ........... 138
F.      The Noteholder Plan Is Not In The Paramount Interest Of Creditors. ...... 138
        1.      The Noteholder Plan Creates Tax Risk. ..................... 139
        2.      The Noteholder Plan Has No Mechanism To Resolve Post-
                Confirmation Allowance Of Senior Loan Claims And Bridge Loan
                Claims. .............................................................. 139

XIII.   SECTION 1129(C) OF THE BANKRUPTCY CODE FAVORS
        CONFIRMATION OF THE DCL PLAN........................................... 140
A.      The DCL Plan Is Preferred By Creditors. ................................... 141
B.      The DCL Plan Provides Better Treatment To Creditors.................... 141
C.      The DCL Plan Has Fewer Risks Than The Noteholder Plan.............. 142
D.      The DCL Plan Is More Focused On Reorganizing The Debtors Than The
        Noteholder Plan. .................................................................... 143

XIV.    CONCLUSION....................................................................... 144

Tribune Company ("Tribune") and certain of its subsidiaries (collectively, the "Debtors" or the "Company"), the Official Committee of Unsecured Creditors (the "Creditors' Committee"), Oaktree Capital Management, L.P. ("Oaktree"), Angelo, Gordon & Co., L.P. ("Angelo Gordon"), and JPMorgan Chase Bank, N.A. ("JPMorgan") (collectively, the "DCL Proponents") hereby submit the following proposed findings of fact and conclusions of law in support of an order confirming the Second Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P. and JPMorgan Chase Bank, N.A. (as modified April 26, 2011)[2] (as such has been or may be further amended, modified or supplemented from time to time, the "DCL Plan") pursuant to section 1129 of title 11 of the United States Code (the "Bankruptcy Code").[3]

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

**I.     JURISDICTIONAL AND RELATED CONSIDERATIONS**

**A.     Jurisdiction And Venue.**

1.     The Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on December 8, 2008.  An additional Debtor, Tribune CNLBC, LLC (formerly known as Chicago National League Baseball Club, LLC) filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on October 12, 2009.[4]

---

[2]     Docket No. 8769.

[3]     Capitalized terms and phrases used but not otherwise defined herein have the meaning assigned to such terms in the DCL Plan or the DCL Disclosure Statement (as defined herein), as applicable; provided, however, that capitalized terms used when referring to the terms of the Noteholder Plan (as defined herein) but not otherwise defined herein have the meaning assigned to such term in the Noteholder Plan.  In addition, any term used herein that is not defined in the DCL Plan or, if applicable, the Noteholder Plan, but that is used in the Bankruptcy Code or the Bankruptcy Rules, has the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

[4]     As used herein, the term Petition Date means (i) for Tribune and for all Debtors listed on Appendix A to the DCL Plan other than Tribune CNLBC, LLC, December 8, 2008 and (ii) for Tribune CNLBC, LLC, October 12, 2009.

2.     The Debtors commenced the above-captioned chapter 11 cases (the "Chapter 11 Cases") in good faith.  Each Debtor was and is qualified to be a debtor under section 109 of the Bankruptcy Code.  The Court has jurisdiction over the Chapter 11 Cases pursuant to 28 U.S.C. § 1334.  Confirmation of a plan of reorganization with respect to the Chapter 11 Cases is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L).  The Court has subject matter jurisdiction over the Chapter 11 Cases pursuant to 28 U.S.C. §§ 157(b)(1) and 1334, and the Court has exclusive jurisdiction to determine whether the DCL Plan and the Noteholder Plan comply with the applicable provisions of the Bankruptcy Code and should be confirmed.  Venue was proper as of the Petition Date and continues to be proper before this Court as of the date hereof pursuant to 28 U.S.C. §§ 1408 and 1409.

**B.     Judicial Notice.**

3.     The Court takes judicial notice of the docket of the Chapter 11 Cases maintained by the Clerk of the Court and/or his duly-appointed agent, including, without limitation, all pleadings and other documents filed, all orders entered, and all evidence and arguments made, proffered or adduced at the hearings held before the Court during the Chapter 11 Cases.

**C.     Burden Of Proof.**

4.     The DCL Proponents, as proponents of the DCL Plan, have the burden of proving the elements of subsections 1129(a) and (b) of the Bankruptcy Code with respect to confirmation of the DCL Plan by a preponderance of the evidence.  The DCL Proponents have met that burden as further found and determined herein.  The Noteholder Proponents (as defined herein), as proponents of the Noteholder Plan, have the same burden with respect to the Noteholder Plan.  The Noteholder Proponents have not met that burden as further found and determined herein.

## II.    PROCEDURAL HISTORY

5.    On December 18, 2008, the Office of the United States Trustee (the "U.S. Trustee") appointed the Creditors' Committee in the Chapter 11 Cases.

6.    On October 22, 2010, the DCL Proponents filed the Joint Plan of Reorganization for Tribune Company and Its Subsidiaries.[5]  On December 10, 2010, the DCL Proponents filed the First Amended Joint Plan of Reorganization for Tribune Company and its Subsidiaries.[6]  On February 4, 2011, the DCL Proponents filed the Second Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries,[7] to which the DCL Proponents filed modifications on April 5, 2011[8] and April 26, 2011.[9]  On December 9, 2010 Aurelius Capital Management, LP ("Aurelius"), on behalf of its managed entities, Deutsche Bank Trust Company Americas ("Deutsche Bank"), in its capacity as Successor Indenture Trustee for certain series of Senior Notes, Law Debenture Trust Company of New York ("Law Debenture"), in its capacity as Successor Indenture Trustee for certain series of Senior Notes and Wilmington Trust Company ("Wilmington Trust"), in its capacity as Successor Indenture for the PHONES Notes (collectively, the "Noteholder Proponents") filed the Joint Plan of Reorganization for Tribune Company and Its Subsidiaries (the "Initial Noteholder Plan").[10]  The Initial Noteholder Plan was amended on February 25, 2011,[11] March 28, 2011,[12] and April 25, 2011[13] (as the same has been

---

[5]    Docket No. 6089.

[6]    Docket No. 7136.

[7]    Docket No. 7801.

[8]    Docket No. 8580.

[9]    Docket No. 8769.

[10]    Docket No. 7127.

[11]    Docket No. 8169.

[12]    Docket No. 8509.

[13]    Docket No. 8755.

or may be further amended, modified or supplemented from time to time, the "Noteholder Plan").

7.     On December 9, 2010, the Court entered the Order: (I) Approving General Disclosure Statement and Specific Disclosure Statements; (II) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Plans of Reorganization; (III) Approving Forms of Ballots, Master Ballots and Related Instructions; (IV) Approving Solicitation Package Contents and Authorizing Distribution of Solicitation and Notice Materials; (V) Fixing Voting Record Date; (VI) Establishing Notice and Objection Procedures in Respect of Confirmation; (VII) Setting Confirmation Schedule and Establishing Parameters on Confirmation-Related Discovery; (VIII) Establishing New Deadline for Return of Media Ownership Certifications; (IX) Authorizing Expansion of Balloting and Tabulation Agents Retention and Allocation of Costs of Same; and (X) Granting Related Relief (as subsequently amended, the "Solicitation Order").[14] Pursuant to the Solicitation Order, the Court, among other things, (i) approved the "Joint Disclosure Statement," including the General Disclosure Statement,[15] the Specific Disclosure Statement Relating to the DCL Plan (the "DCL Disclosure Statement"),[16] and the Specific Disclosure Statement Relating to the Noteholder Plan (the "Noteholder Disclosure Statement"); [17] (ii) established procedures for the solicitation and tabulation of votes to accept or reject the DCL Plan and the Noteholder Plan; and (iii) scheduled a hearing commencing on March 7, 2011 (the "Confirmation Hearing") to consider confirmation of the DCL Plan and the Noteholder Plan.

---

[14]   Docket Nos. 7126, 7215, and 7999.

[15]   See Docket No. 7134 at 4-84, amended at Docket No. 7232.

[16]   Docket No. 7135.

[17]   Docket No. 7128.

8.      On January 31, 2011, the DCL Proponents filed with the Court a supplement to the DCL Plan (as amended, modified or supplemented from time to time, the "DCL Plan Supplement") which consisted of the following Exhibits to the DCL Plan: (i) Exhibit 1.1.122 (Terms of Intercompany Claims Settlement Agreement); (ii) Exhibit 1.1.154 (Terms of New Warrant Agreement); (iii) Exhibit 1.1.192 (Individuals Excluded From Released Step Two Stockholder Parties); (iv) Exhibit 5.2 (Restructuring Transactions); (v) Exhibit 5.3.1(1) (Certificate of Incorporation of Reorganized Tribune); (vi) Exhibit 5.3.1(2) (By-Laws of Reorganized Tribune); (vii) Exhibit 5.6 (Terms of New Senior Secured Term Loan); (vii) Exhibit 5.10 (Terms of Exit Facility); (viii) Exhibit 5.13 (Terms of Trusts' Loan Agreement); (ix) Exhibit 6.3 (Rejected Executory Contracts and Unexpired Leases); (x) Exhibit 13.1 (Litigation Trust Agreement); and (xi) Exhibit 14.1 (Creditors' Trust Agreement).[18] The DCL Proponents subsequently filed Exhibit 5.3.2(1) (Initial Officers of Reorganized Tribune), Exhibit 5.3.2(2) (Initial Directors of Reorganized Tribune), and Exhibit 5.3.3 (Initial Directors & Officers of Reorganized Debtors Other Than Reorganized Tribune) with the Court on March 2, 2011,[19] and also filed Exhibit 5.3.1(3) (Registration Rights Agreement) to the DCL Plan with the Court on March 7, 2011[20] (Exhibits 5.3.2(1), 5.3.2(2), 5.3.3 and 5.3.1(3) to the DCL Plan collectively with the DCL Plan Supplement, the "DCL Plan Supplements"). Affidavits of service were executed by the Voting Agent with respect to the DCL Plan Supplements on February 4, 2011[21] and June 2, 2011[22] (collectively, the "DCL Plan Supplement AOS").

---

[18]   Docket No. 7701.

[19]   Docket No. 8231.

[20]   Docket No. 8283.

[21]   Docket No. 7780.

[22]   Docket Nos. 9054 and 9055.

9.    On February 4, 2011, the Noteholder Proponents filed with the Court a supplement to the Noteholder Plan (as amended, modified or supplemented from time to time, the "Noteholder Plan Supplement") which consisted of the following Exhibits to the Noteholder Plan: (i) Exhibit 1.1.27 (Claims Purchase Agreement), (ii) Exhibit 1.1.142 (Non-Exclusive List of the LBO-Related Causes of Action & Defendants), (iii) Exhibit 1.1.170 (Terms of New Warrant Agreement), (iv) Exhibit 5.2 (Restructuring Transactions), (v) Exhibit 5.3.1(1) (Certificate of Incorporation of Reorganized Tribune), (vi) Exhibit 5.3.1(2) (By-Laws of Reorganized Tribune), (vii) Exhibit 5.6 (Terms of New Senior Secured Term Loan); (viii) Exhibit 5.10 (Terms of Exit Facility), (ix) Exhibit 5.17.1 (Litigation Trust Agreement), (x) Exhibit 5.18.1 (Creditors' Trust Agreement), and (xi) Exhibit 7.16.1 (Distribution Trust Agreement).[23] Further, the Noteholder Proponents filed addenda to the Noteholder Plan Supplement on (i) March 2, 2011,[24] which consisted of the following Exhibits to the Noteholder Plan: (a) Exhibit 5.3.2(1) (List of Initial Officers of Reorganized Tribune), (b) Exhibit 5.3.2(2) (List of Initial Directors of Reorganized Tribune), and (c) Exhibit 5.3.3 (List of Directors, Managers and Officers for Debtors Other Than Reorganized Tribune) and (ii) March 7, 2011, which consisted of Exhibit 5.3.1(3) (Registration Rights Agreement) to the Noteholder Plan.[25]

10.    An affidavit of service was executed by Stephenie Kjontvedt of Epiq Bankruptcy Solutions, LLC, the Claims and Noticing Agent in the Chapter 11 Cases (the "Voting Agent"), with respect to the mailing of the notice of the Confirmation Hearing (the "Confirmation Hearing Notice") and solicitation materials in respect of, among other things, the DCL Plan and the Noteholder Plan in accordance with the Solicitation Order (the "Initial Solicitation") and

---

[23]    Docket No. 7802.
[24]    Docket No. 8225.
[25]    Docket No. 8286.

filed with the Court on February 7, 2011 (the "Solicitation and Confirmation AOS").[26] An affidavit with respect to the publication of the Confirmation Hearing Notice in (i) the Chicago Tribune was executed by Jodi Schneider, Inbound Sales Team Lead at Chicago Tribune, on January 7, 2011, (ii) the Los Angeles Times was executed by Angelina de Cordova, Principal Clerk of the Printers and Publishers of the Los Angeles Times, on January 9, 2011, (iii) the Wall Street Journal was executed by Albert Fox, Advertising Clerk of the Publisher of Wall Street Journal, on January 7, 2011, and (iv) the New York Times was executed by Alice Weber, Principal Clerk of the Publisher of The New York Times, on January 9, 2011. Each of the aforementioned affidavits was filed with the Court on January 26, 2011 (the "Publication AOS").[27]

11.     On February 11, 2011, Stephenie Kjontvedt of the Voting Agent executed the Declaration of Stephenie Kjontvedt on Behalf of Epiq Bankruptcy Solutions, LLC Regarding Voting and Tabulation of Ballots Accepting and Rejecting the Joint Plans of Reorganization Proposed for Tribune Company and its Subsidiaries (as subsequently supplemented, the "Voting Declaration").[28]

12.     On May 17, 2011, the Court entered an Order Approving (I) Form, Scope and Procedures to (A) Provide Holders of Senior Loan Claims and Senior Guaranty Claims with Opportunity to Change Votes on DCL Plan; (B) Allow Holders of Senior Noteholder Claims and Other Parent Claims to Make New Treatment Elections; (C) Allow Holders of Claims that Previously Granted Certain Releases to Make Elections Concerning Such Releases as Modified; and (D) Allow Holders of Claims Against Tribune Company to Opt Out of Transfer of

---

[26]   Docket No. 7813.

[27]   Docket No. 7639.

[28]   Docket Nos. 7918, 8114, and 8882.

Disclaimed State Law Avoidance Claims to Creditors Trust Under DCL Plan; and (II) Supplement to Disclosure Statement and Explanatory Statement and Distribution of Same (the "Supplemental Solicitation Order" and, together with the Solicitation Order, the "Solicitation Orders").[29] Pursuant to the Supplemental Solicitation Order, the Court, among other things, (i) approved a supplement to the DCL Disclosure Statement, (ii) established June 10, 2011 as the deadline by which the Holders of Senior Loan Claims and Senior Guaranty Claims were authorized to change the votes previously cast on the DCL Plan, and (iii) established June 30, 2011 as the deadline by which (a) the Holders of Senior Noteholder Claims and Other Parent Claims were authorized to make the alternative treatment elections provided for in Sections 3.2.5 and 3.2.6 of the DCL Plan, (b) Holders of Claims were authorized to modify certain previously granted third-party releases under the DCL Plan, and (c) Holders of Claims against Tribune were further authorized to make certain opt-out elections with respect to the transfer of Disclaimed State Law Avoidance Claims.

13.     An affidavit of service was executed by [●] of the Voting Agent with respect to the solicitation materials in respect of the DCL Plan in accordance with the Supplemental Solicitation Order (the "Supplemental Solicitation") and filed with the Court on [●], 2011[30] (the "Supplemental Solicitation AOS" and together with the Solicitation and Confirmation AOS, the Publication AOS, and the DCL Plan Supplement AOS, the "Affidavits of Service"). On [●], 2011 [●] of the Voting Agent executed the Declaration of [●] (the "Supplemental Voting Declaration" and, together with the Voting Declaration, the "Voting Declarations") with respect to such solicitation.[31]

---

[29] Docket No. 8926.

[30] Docket No. [●].

[31] Docket No. [●].

14. Multiple objections were filed to the DCL Plan (the "DCL Plan Objections").[32] On February 26, 2011, the DCL Proponents filed a memorandum of law in support of confirmation of the DCL Plan (the "DCL Memorandum").[33] The Noteholder Proponents filed a memorandum of law in support of confirmation of the Noteholder Plan (the "Noteholder Memorandum") on February 25, 2011.[34]

15. Beginning on March 7, 2011, the Court conducted an eleven (11) day Confirmation Hearing with respect to the DCL Plan and the Noteholder Plan. The following witnesses were presented by the DCL Proponents during the Confirmation Hearing: (i) David Kurtz, Managing Director and Global Co-Head of Restructuring of Lazard Frères & Co. LLC ("Lazard"); (ii) William Salganik, Creditors' Committee Member (Representative of the Washington-Baltimore Newspaper Guild); (iii) Miriam Kulnis, Executive Director of Special Credits Group, JPMorgan; (iv) Professor Bernard Black, Northwestern University, Law School and Kellogg School of Management; (v) Professor Daniel Fischel, University of Chicago Law School and Northwestern Law School, Kellogg School of Management; (vi) Suneel Mandava, Director, Financial Restructuring Group of Lazard; (vii) John Chachas, Principal of Methuselah Advisors; (viii) Brian Whittman, Managing Director, Alvarez & Marsal North America, LLC ("Alvarez & Marsal"); and (ix) Eddy Hartenstein, President and Chief Executive Officer of Tribune Company and Publisher and Chief Executive Officer of the Los Angeles Times. The Noteholder Proponents presented the following witnesses during the Confirmation Hearing: (i)

---

[32] Docket Nos. 6110, 7550, 7733, 7909, 7913, 7956, 7959, 7960, 7961, 7963, 7966, 7968, 7970, 7972, 7973, 7975, 7977, 7978, 7979, 7981, 7987, 7991, 7986, 8016, 7982, 7983, 7988, 7984, 7990, 7993, 7995, 7996, 8024, 8001, and 8013. Multiple objections were also filed to the Noteholder Plan. Docket Nos. 7731, 7910, 7914, 7956, 7963, 7960, 7964, 7966, 7971, 7968, 7971, 7972, 7975, 7977, 7978, 7979, 7981, 7982, 7983, 7984, 7986, 7987, 7988, 7991, 7994, 7995, 8002, 8011, 8016, and 8019.

[33] Docket Nos. 8173 and 8315.

[34] Docket No. 8171.

9

Rajinder Singh, Managing Director, Raymond James & Associates; (ii) Daniel Gropper, Managing Director, Aurelius Capital Management; (iii) Professor Edward B. Rock, University of Pennsylvania Law School and Wharton Business School; (iv) Mark J. Prak, Brooks, Pierce McLendon, Humphrey & Leonard; (v) Dr. Bruce L. Beron; and (vi) Ralph Tuliano, President and Executive Managing Director of Mesirow Financial Consulting. The DCL Proponents also presented rebuttal testimony by (i) Mace Rosenstein, Partner, Covington & Burling L.L.P. and (ii) Professor Black. In addition, testimony was submitted by the DCL Proponents and the Noteholder Proponents by proffer, affidavit, and deposition designations. Exhibits were also entered into evidence by both the DCL Proponents and the Noteholder Proponents.

16.    A hearing to consider unresolved legal objections to the DCL Plan and the Noteholder Plan by parties other than the DCL Proponents and the Noteholder Proponents was held on April 13, 2011. A hearing to consider certain legal objections to the DCL Plan and the Noteholder Plan raised by the Noteholder Proponents and the DCL Proponents, respectively, was held on April 14, 2011.

17.    On May 11, 2011, the DCL Proponents filed a post-Confirmation Hearing brief in support of Confirmation of the DCL Plan (the "DCL Post-Trial Brief").[35] On that same date, the Noteholder Proponents filed a post-Confirmation Hearing brief in support of the Noteholder Plan (the "Noteholder Post-Trial Brief").[36] Also on that date, Wilmington Trust filed a brief in support of the Noteholder Plan and in opposition to the DCL Plan (the "WT Post-Trial Brief" and, together with the Noteholder Post-Trial Brief and the DCL Post-Trial Brief, the "Post-Trial

---

[35]    Docket No. 8897.

[36]    Docket Nos. 8898 and 8899.

Briefs").[37] Certain additional parties also filed letter briefs respecting confirmation of the DCL Plan and the Noteholder Plan (the "Letter Briefs").[38]

18.    On May 20, 2011, the DCL Proponents and the Noteholder Proponents submitted responses to the Letter Briefs.[39]  On May 27, 2011, rebuttal briefs with respect to the Post-Trial Briefs were filed by the DCL Proponents and the Noteholder Proponents (the "DCL Post-Trial Reply Brief" and the "Noteholder Post-Trial Reply Brief," respectively).[40]  On June 3, 2011, proposed findings of fact and conclusions of law in support of confirmation of the DCL Plan and the Noteholder Plan were filed by the DCL Proponents and the Noteholder Proponents, respectively.  Wilmington Trust, as Successor Indenture Trustee for the PHONES Notes and one of the Noteholder Proponents filed a supplemental proposed findings of fact and conclusions of law.  Closing arguments with respect to the DCL Plan and the Noteholder Plan were held on June 14, 2011.

## III.    BACKGROUND REGARDING THE DEBTORS, THE 2007 LEVERAGED ESOP TRANSACTIONS, THE LBO-RELATED CAUSES OF ACTION AND THE PARTIES' EFFORTS TO RESOLVE THOSE CLAIMS

19.    The parties reached a Stipulation concerning the use of the Report of Kenneth N. Klee, As Examiner (the "Examiner Report")[41] at the Confirmation Hearing, which was so ordered by the Court.[42]  The Stipulation provides, among other things, that certain statements of historical fact contained in Volume I of the Examiner Report are to be accepted as true for

---

[37]    Docket No. 8900.

[38]    Docket Nos. 8884, 8885, 8888, 8889, 8890 (corrected at 8910), and 8895.

[39]    Docket Nos. 8963 and 8960, respectively.  Part II of the Noteholder Post-Trial Brief is referred to herein at the "Noteholder FCC Brief."

[40]    Docket Nos. 9021 and 9022, respectively.

[41]    See Docket Nos. 5130-5133.

[42]    Docket No. 7790.

purposes of the Confirmation Hearing.  Where relied upon below, these statements of historical fact are acknowledged through the phrase "(as stipulated)."

### A.     The Debtors And Their Business, Operations And Investments.

20.     Tribune is a Delaware corporation with its principal place of business in Chicago, Illinois.[43]  Tribune directly or indirectly owns all (or substantially all) of the equity in 128 subsidiaries (Tribune and its subsidiaries collectively, the "Tribune Entities"), of which 110 are Debtors.[44]  The Tribune Entities together comprise a leading media and entertainment enterprise reaching more than 80% of households in the United States through its newspapers, other publications and websites, its television and radio stations, its "Superstation" WGN America, and its other news and entertainment offerings.[45]

21.     The Tribune Entities' operations are divided into two primary industry segments: (a) publishing (the "Publishing Segment") and (b) broadcasting (the "Broadcasting Segment"). These segments operate almost completely in the United States.[46]

22.     The Publishing Segment, which accounted for 70% of the Tribune Entities' consolidated revenues in 2009, currently operates eight major-market daily newspapers, distributes preprinted insert advertisements, provides commercial printing and delivery services to third-parties, and distributes entertainment listings and syndicated content through its Tribune Media Services business unit.[47]  The Tribune Entities' newspapers collectively have paid circulation of approximately 2 million copies daily and 3.1 million copies on Sundays.  In addition, the Tribune Entities publish over 100 "niche" publications that target various

---

[43]     DCL Ex. 376, General Disclosure Statement dated December 15, 2010 at 7-8 [Docket No. 7232].

[44]     Id.

[45]     Id.

[46]     Id. at 8.

[47]     Id.

geographic, ethnographic and demographic audiences.[48]  The Publishing Segment also manages

the websites of the Tribune Entities' daily newspapers, television stations, and other branded

products that target specific areas of interest.[49]  The Publishing Segment employed

approximately 10,300 full-time equivalent employees in the fourth quarter of 2009.[50]

23.    The Broadcasting Segment, which accounted for 30% of the Tribune Entities'

consolidated operating revenues in 2009, includes 23 television stations in 19 markets, of which

seven stations are in the top ten markets in the United States.[51]  The Broadcasting Segment

employed approximately 2,750 full-time equivalent employees in the fourth quarter of 2009.[52]

24.    Various Tribune Entities (including non-Debtors) have investments (typically

minority equity interests) in private corporations, limited liability companies and partnerships

that are not Debtors in the Chapter 11 Cases.[53]  The Tribune Entities' significant investments as

of the Petition Date were as follows:[54]

---

[48]  Id.
[49]  Id.
[50]  Id. at 9.
[51]  Id. at 13.
[52]  Id.
[53]  Id. at 15.
[54]  Id. at 15-16.

| Investment | Description | Tribune Entities' Ownership | Other Investors[55] |
|---|---|---|---|
| Television Food Network | Lifestyle cable networks "Food Network" and "The Cooking Channel" and related websites with a focus on food and entertaining | 31.3% | Scripps Networks Interactive Inc. |
| CareerBuilder | Online recruitment company that connects job seekers and employers | 32.1%[56] | Gannett Co., Inc. The McClatchy Company |
| Classified Ventures | A network of automotive and real estate classified advertising websites, including cars.com, apartments.com and homegain.com | 27.8% | The McClatchy Company Gannett Co., Inc. The Washington Post Company A.H. Belo Corporation |
| Homefinder | An online real estate company that connects home buyers, sellers and real estate professionals | 33.3% | The McClatchy Company Gannett Co., Inc. |
| Topix | Provider of news and community information on the web, connecting people to the information and discussions that matter to them in every U.S. town and city | 33.7% | Gannett Co., Inc. The McClatchy Company Former and Current Management |
| quadrantONE | National premium advertising network of websites of the leading media companies in the U.S. | 25.0% | The New York Times Company Hearst Corporation Gannett Co., Inc. |
| Legacy.com | Provider of online obituaries | 48.3% | Individual Investors |
| Metromix | National network of local entertainment websites | 48.9% | Gannett Co., Inc. |
| Newsday Holdings LLC | Parent company of the entity that owns and operates Newsday, the leading daily newspaper in Long Island, and its related websites and other media properties | 2.8% | Cablevision Systems Corp. |
| Chicago Baseball Holdings, LLC | Owns and operates the Chicago Cubs Major League Baseball franchise and related businesses | 5.0% | Ricketts Acquisition LLC |

[55]   As used in this summary table, the term "Other Investors" refers to the parent company of each partner or in the case of an LLC, the parent company of each member.  Actual legal partners, or, in the case of LLCs, members, may be affiliates of such parent companies.

[56]   On February 28, 2011, CareerBuilder, utilizing available cash, redeemed certain membership interests totaling 4% of CareerBuilder's total membership interests. As a result, the Company's ownership interest in CareerBuilder increased to 32.1% effective beginning in Period 3, 2011.

### B. The Company's Pre-Leveraged ESOP Transactions Debt Structure.

25.     <u>The Senior Notes</u>.  Pursuant to Indentures entered into between 1992 and 1997, Tribune was obligated on ten series of senior notes (the "<u>Senior Notes</u>").[57]  Each outstanding series and the approximate principal amounts owing on the Senior Notes as of the Petition Date are as follows:[58]

| Indenture | Interest Rate | Maturity Date | Outstanding Amount as of the Petition Date |
|---|---|---|---|
| 1992 | 6.25% | November 10, 2026 | $.120 million |
| 1995 | 7.25% | March 1, 2013 | $82.083 million |
| 1995 | 7.5% | July 1, 2023 | $98.750 million |
| 1996 | 6.61% | September 15, 2027 | $84.960 million |
| 1996 | 7.25% | November 15, 2096 | $148.000 million |
| 1997 | 4.875% | August 15, 2010 | $450.000 million |
| 1997 | 5.25% | August 15, 2015 | $330.000 million |
| 1997 | 5.67% | December 8, 2008 | $69.550 million |
| 1997 | 6.35% | February 1, 2008 | $0 |
| 1997 | 5.50% | October 6, 2008 | $0 |
| Total | | | $1.263 billion |

26.     The Senior Notes are secured by the Stock Pledge on a <u>pari passu</u> basis with the indebtedness under the Senior Loan Agreement.[59]  However, the Senior Notes are not guaranteed by Tribune's subsidiaries.[60]

27.     <u>The PHONES Notes</u>.  In April 1999, Tribune issued eight million Exchangeable Subordinated Debentures due 2029 (the "<u>PHONES Notes</u>") having an aggregate original principal amount of $1.256 billion.[61]  The PHONES Notes are unsecured obligations of

---

[57]    Examiner Report, Vol. 1 at 58-63 (as stipulated).

[58]    <u>Id.</u> at 62-63 (as stipulated).

[59]    <u>Id.</u> at 58 (as stipulated); DCL Ex. 822, Pledge Agreement dated June 4, 2007, JPM_501799-815.

[60]    Examiner Report, Vol. 1 at 57 (as stipulated).

[61]    DCL Ex. 1400, Tribune Company Form 10-K for the fiscal year ended December 30, 2007, at http://www.sec.gov/Archives/edgar/data/726513/000110465908018845/a08-2334_110k.htm, at 115.

Tribune, which are not guaranteed by Tribune's subsidiaries.[62] The PHONES Notes are

contractually subordinated to certain indebtedness of Tribune.[63]

28.     The principal amount of one PHONES Note is related to the value of a

"Reference Share," originally one share of common stock of America Online ("AOL")

outstanding as of the date of the issuance of the PHONES Note and subject to adjustment for

any splits, combination, sub-division, exchange, conversion, liquidation, or other changes to the

Reference Share.[64] The PHONES Notes were issued with an original principal amount of

$157.00 per PHONES Note, which represented the closing price of one Reference Share on

April 7, 1999, and which would be reduced upon payment of any dividends or other cash or

property distributed to the holder of the Reference Shares with respect to the Reference

Shares.[65]

29.     2006 Credit Agreement.  On June 19, 2006, the Company entered into a Credit

Agreement and a 364-Day Bridge Credit Agreement (collectively, the "2006 Financing").[66]

The 2006 Financing provided for a $1.5 billion unsecured term facility, of which $250 million

was available and used to refinance the medium-term notes that matured on Nov. 1, 2006, a

$750 million unsecured revolving facility and a $2.15 billion unsecured bridge facility.[67] As of

April 22, 2007, the Company had outstanding borrowings of $1.5 billion under the term facility

---

[62]   DCL Ex. 677, Tribune Company Prospectus Supplement (To Prospectus dated March 31, 1999), at
http://www.sec.gov/Archives/edgar/data/726513/0000950131-99-002188.txt, at S-10.

[63]   DCL Ex. 376, General Disclosure Statement dated December 15, 2010 at 21 [Docket No. 7232].

[64]   Examiner Report, Vol. 1 at 63 (as stipulated); DCL Ex. 667, Tribune Company Prospectus Supplement (To
Prospectus dated March 31, 1999), at http://www.sec.gov/Archives/edgar/data/726513/0000950131-99-002188.txt,
at S-1.

[65]   Id.

[66]   Examiner Report, Vol. 1 at 68-69 (as stipulated); DCL Ex. 674, Credit Agreement dated June 19, 2006, ML-
TRIB-0037348-423.

[67]   DCL Ex. 673, Bridge Credit Agreement dated June 19, 2006, ML-TRIB-0037424-85.

and $1.325 billion under the bridge facility for a total of $2.825 billion outstanding under the 2006 Financing.[68]

## C. The Leveraged ESOP Transactions.

30.     In late 2006, Tribune commenced a process to explore strategic business initiatives, including transactions with strategic financial partners and "self-help" transactions, such as a recapitalization and/or leveraged spin-off of its broadcasting segment.[69] This process took place over six months and produced bids from a number of sophisticated investors, not only including Sam Zell but also a partnership of Eli Broad and Ron Burkle, the Carlyle Group and the Chandler Trusts.[70]

31.     The Leveraged ESOP Transactions were consummated in two principal steps, commonly called the "Step One Transactions" and "Step Two Transactions" or simply "Step One" and "Step Two." In Step One, consummated in June 2007, a newly formed Tribune employee stock ownership plan (the "ESOP") purchased shares of Tribune common stock and Tribune completed a cash tender offer (at a price of $34 per share) for approximately 50% of its outstanding common stock.[71] To finance the tender offer, Tribune entered into the $8.028 billion Senior Loan Agreement and a number of Tribune's domestic subsidiaries (the "Guarantor Subsidiaries") provided unsecured guarantees of Tribune's obligations.[72]

---

[68]    DCL Ex. 138, Tribune Company Form 10-Q filed May 9, 2007, TRB0430819-67 at TRB0430836.

[69]    Examiner Report, Vol. 1 at 101, 105 (as stipulated); DCL Ex. 677, Tribune Board Meeting Minutes dated September 21, 2006, TRB-UR-0434048-56; DCL Ex. 683, Tribune Board Meeting Minutes dated October 18, 2006, TRB0434065-70; DCL Ex. 696, Presentation of the Committee of Independent Directors of the Board of Directors of Tribune dated January 12, 2007, MS-64248-300; DCL Ex. 697, Special Committee Meeting Minutes dated January 12, 2007, TRIB-G0007799-800.

[70]    Examiner Report, Vol. I at 101-36 (as stipulated).

[71]    Id. at 194-95, 205-06 (as stipulated).

[72]    Id. at 171-178 (as stipulated) (describing terms of the Step One financing).

32.     In Step Two, consummated in December 2007, Tribune merged with a Delaware corporation wholly owned by the ESOP, with Tribune surviving the merger.[73] Upon completion of the merger, all issued and outstanding shares of Tribune's common stock (other than shares held by Tribune or the ESOP) were cancelled and Tribune became wholly owned by the ESOP.[74] The merger was financed through additional borrowings of $2.1 billion under the Senior Loan Agreement (the so-called "Incremental" loans) and $1.6 billion under the Bridge Loan Agreement.[75] The proceeds of the additional borrowings were used for, among other things, the consummation of the merger and the payment redemption of outstanding Tribune shares not held by the ESOP at $34 per share.[76]

33.     Consummation of the Step Two merger was subject to several conditions precedent, including stockholder approval, approval of the Federal Communications Commission (the "FCC"), the consent of Major League Baseball, and Tribune's receipt of an opinion from Valuation Research Corporation ("VRC") or another nationally recognized valuation firm that Tribune was and would be solvent after giving effect to the Step Two merger.[77] In recognition of the possibility that the conditions to the Step Two merger ultimately would not be satisfied, the Step One tender offer, once completed, could stand alone and would not be rescinded or modified in the event that the Step Two merger did not occur.[78] Participants in the financial markets appear to have recognized that the Step Two merger was conditional, as

---

[73]   Id. at 138, 458 (as stipulated).

[74]   Id. (as stipulated).

[75]   Id. at 168, 460 (as stipulated).

[76]   Id. at 167, 460-62 (as stipulated).

[77]   DCL Ex. 748, Agreement and Plan of Merger dated April 1, 2007, TRB0521347-435 at TRB0521397-99; see also Examiner Report, Vol. 1 at 139-140.

[78]   Examiner Report, Vol. 2 at 173; DCL Ex. 748, Agreement and Plan of Merger dated April 1, 2007, TRB0521347-435 at TRB0521389-90; DCL Ex. 807, Credit Agreement dated May 17, 2007, TRB0520774-997 at TRB0520833-35.

the price of Tribune's common stock traded well below the $34 per share price at which shares would be acquired in the Step Two merger – to as low as $26 per share – in the six months between the closing of the Step One tender offer and the Step Two merger.[79]

**D. Debtors' Capital Structure Following The Leveraged ESOP Transactions.**

34. <u>Senior Loan Agreement and Bridge Debt</u>. On May 17, 2007, Tribune entered into a $8.028 billion senior secured credit agreement (as amended on June 4, 2007, the "<u>Senior Loan Agreement</u>") with JPMorgan as Administrative Agent, Merrill Lynch Capital Corporation ("<u>Merrill Lynch</u>"), as Syndication Agent, Citicorp North America, Inc. ("<u>Citicorp</u>"), Bank of America, N.A. ("<u>Bank of America</u>") and Barclays Bank PLC as Co-Documentation Agents, and the Initial Lenders named therein.[80]

35. The Senior Loan Agreement consisted of the following facilities: (a) a $1.5 billion Senior Tranche X Term Loan Facility, (b) a $5.515 billion Senior Tranche B Term Loan Facility (the "<u>Tranche B Facility</u>"), (c) a $263 million Delayed Draw Senior Tranche B Term Loan Facility and (d) a $750 million Revolving Credit Facility, which included a letter of credit subfacility in an amount up to $250 million and a swing line facility in an amount up to $100 million.[81] The Senior Loan Agreement also provided a commitment for an additional $2.105 billion in new incremental term loans under or <u>pari passu</u> with the Tranche B Facility (the "<u>Incremental Facility</u>"). The Senior Loan Agreement and related facilities described above (other than the Incremental Facility) are referred to below as the "Step One Financing."[82]

36. The Step One Financing was secured by a pledge ("<u>Stock Pledge</u>") of the equity interests of Debtors Tribune Finance, LLC and Tribune Broadcasting Holdco, LLC, both of

---

[79] <u>See</u> Tr. 3/10 93:15-94:16 (Fischel); DCL Ex. 1106, Expert Report of Dan Fischel at 10-12 & Ex. B.

[80] DCL Ex. 807, Credit Agreement dated May 17, 2007, TRB0520774-997.

[81] DCL Ex. 376, General Disclosure Statement dated December 15, 2010 at 22 and n.21 [Docket No. 7232].

[82] DCL Ex. 807, Credit Agreement dated May 17, 2007, TRB0520774-997.

which were formed on May 16, 2007 as direct subsidiaries of Tribune.[83] This indebtedness was guaranteed, on a senior priority and unsecured basis, by Guarantor Subsidiaries (the "Step One Guarantees").[84]

37. On December 20, 2007, Tribune entered into (i) a $1.6 billion Senior Unsecured Interim Loan Agreement (the "Bridge Loan Agreement") with Merrill Lynch as Administrative Agent, JPMorgan as Syndication Agent, Citicorp and Bank of America as Co-Documentation Agents, and the Initial Lenders named therein,[85] and (ii) a number of increase joinders pursuant to which lenders made additional term loans to Tribune under the Incremental Facility, which term loans became a part of the Tranche B Facility under the Senior Loan Agreement.[86] Accordingly, the Incremental Facility loan was accorded the priority of the Tranche B Facility and was covered by the Step One Guarantees.

38. Pursuant to the Bridge Loan Agreement, Tribune borrowed $1.6 billion (a reduction from the $2.1 billion provided for in the commitment letter) under a bridge facility based on extension beyond one year (the "Bridge Facility").[87] The Bridge Facility indebtedness is unsecured but is guaranteed, on a senior subordinated basis,[88] by the Guarantor Subsidiaries (the "Step Two Guarantees").[89] The Bridge Facility and additional loans under the Incremental Facility are referred to as the "Step Two Financing."

---

[83] DCL Ex. 822, Pledge Agreement dated June 4, 2007, JPM_501799-815.

[84] DCL Ex. 823, Guarantee Agreement dated June 4, 2007, TRB0521001-16.

[85] DCL Ex. 899, Senior Unsecured Interim Loan Agreement dated December 20, 2007, TRB0516972-7067; TRB0517069-87; TRB0517089-242 (includes schedules and exhibits thereto).

[86] DCL Ex. 1142, Increase Joinders, TRB0520652-707.

[87] DCL Ex. 376, General Disclosure Statement dated December 15, 2010 at 23 [Docket No. 7232].

[88] The guaranty by the Guarantor Subsidiaries of the Bridge Facility indebtedness is subordinate to the guaranty of the Credit Agreement indebtedness.

[89] DCL Ex. 894, Guarantee Agreement, dated December 20, 2007, TRB0517244-69; TRB0520722-26; TRB0520728-30 (includes supplement and notice of release of guarantor).

### E. Process Undertaken To Seek Resolution Of The LBO-Related Causes Of Action.

39. From the outset of these cases, it was apparent that the investigation and resolution of potential LBO-Related Causes of Action would be a central issue in the formulation of any plan of reorganization.[90] The principal causes of action include claims for intentional fraudulent conveyance and constructive fraudulent conveyance to avoid the Senior Loan obligations incurred in connection with the Step One and Step Two Financings and payments made in connection therewith.[91]

40. Other potential LBO-Related Causes of Action include claims for equitable subordination, equitable disallowance, breach of fiduciary duty, aiding and abetting, illegal stock redemption and dividend payments, and unjust enrichment.[92] The potential targets of one or more of these causes of action include the Senior Lenders, the Advisors, Tribune's directors and officers, shareholders whose shares were purchased in the Transactions and Samuel Zell (as well as entities affiliated with him).

### 1. Major Participants In The Process.

41. The Debtors were represented in the process undertaken to try and resolve the LBO-Related Causes of Action by their legal advisors, Sidley Austin LLP, and their financial advisors, Lazard and Alvarez & Marsal.[93]

42. The Creditors' Committee consists of JPMorgan (in its capacity as lender),[94] Buena Vista Television, Washington-Baltimore Newspaper Guild, Deutsche Bank (in its

---

[90]  Tr. 3/8 at 23:10-15 (Kurtz); DCL Ex. 1491, Kurtz Demonstratives dated March 8, 2011 at 1.

[91]  See, e.g. DCL Ex. 389, Creditors' Committee Complaint and Objection to Claims Against Lenders.

[92]  See Examiner Report, Vol. 2 at 1-6, 339-346; Tr. 3/8 at 35:7-37:21 (Kurtz); DCL Ex. 1491, Kurtz Demonstratives dated March 8, 2011 at 5.

[93]  See, e.g., Tr. 3/8 at 111:6-11 (Kurtz); Liebentritt Dep. Tr. at 177:12-17; DCL Ex. 420, Approved Disclosure Statement Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries dated June 4, 2010 at 52-53 [Docket No. 4744].

capacity as indenture trustee for certain series of Senior Notes), William Niese, Wilmington

Trust (in its capacity as successor indenture trustee for the PHONES Notes), Warner Brothers

Television, and the Pension Benefit Guaranty Corporation.[95] The legal advisors to the

Creditors' Committee during the process were the Committee's primary bankruptcy counsel,

Chadbourne & Parke LLP and, from and after August 2009, special litigation counsel,

Zuckerman Spaeder LLP, and Delaware counsel, Landis Rath & Cobb LLP.[96]

43.     The Senior Lenders who participated in the process included certain investment

funds and accounts managed by Angelo Gordon and/or certain of its affiliates, certain

investment funds and accounts managed by Oaktree and/or its affiliates and JPMorgan and

certain of its affiliates, as Senior Loan Agent and holder of substantial Senior Loan Claims.[97]

44.     In the period from the Petition Date through September 2010, the largest single

holder of Senior Note Claims were funds managed by Centerbridge Credit Partners, L.P.

("Centerbridge"), which owned approximately 37% of the outstanding Senior Notes.[98] The

legal advisors to Centerbridge during the process were Akin Gump Straus Hauer & Feld LLP

("Akin Gump").[99] In September 2010, the funds managed by Centerbridge sold the entirety of

their position in the Senior Notes to funds managed by Aurelius, which prior to the sale already

---

[94]     JPMorgan voluntarily recused itself from all Creditors' Committee discussions and deliberations concerning the LBO-Related Causes of Action. Tr. 3/9 at 16:7-17:2 (Kulnis).

[95]     See Docket No. 1238, Second Amended Notice of Appointment of Committee of Unsecured Creditors dated May 26, 2009; DCL Ex. 2, Bylaws of Official Committee of Unsecured Creditors of Tribune Co. dated January 26, 2009, Schedule I.

[96]     See Docket No. 243 (Chadbourne & Parke Retention Application dated January 16, 2009); Docket No. 1953 (Zuckerman Spaeder Retention Application dated August 12, 2009); Docket No. 242, (Landis Roth & Cobb Retention Application dated January 16, 2009).

[97]     See DCL Ex. 396, Settlement Support Agreement dated April 12, 2010 [Docket No. 4013]; DCL Ex. 383, Mediator's Report dated September 28, 2010 [Docket No. 5831]; DCL Ex. 384, Mediator's Second Report dated October 12, 2010 [Docket No. 5936]; DCL Ex. 385, Mediator's Third Report dated January 28, 2011 [Docket No. 7656].

[98]     See Docket No. 3407 (Centerbridge's joinder to Creditors' Committee's standing motion) at ¶ 1.

[99]     See DCL Ex. 396, Settlement Support Agreement dated April 12, 2010 [Docket No. 4013].

held approximately $200 million in principal face amount of the outstanding Senior Notes, so that the funds managed by Aurelius became the single largest holder of Senior Note Claims.[100] Shortly after the Centerbridge-managed funds sold their position in the Senior Notes to the funds managed by Aurelius, Akin Gump became a legal advisor to Aurelius.[101]

### 2. Due Diligence Investigations.

45. Upon formation, the Creditors' Committee directed counsel and financial advisors first to conduct a legal analysis of possible claims arising out of the Leveraged ESOP Transactions and then to conduct a full factual investigation.[102] In the first phase of the process, the Creditors' Committee requested documents from more than 30 entities involved in the Leveraged ESOP Transactions, ultimately reviewed more than 4 million pages of documents, and deposed a number of key participants.[103]

46. The Debtors cooperated extensively with the Creditors' Committee in its investigation and also undertook their own substantial efforts to review and analyze the LBO-Related Causes of Action.[104] The Debtors also sought to facilitate the access of all material stakeholders to the discovery material provided to the Creditors' Committee by establishing a centralized document depository so that each stakeholder could make its own evaluation of the LBO-Related Causes of Action.[105]

47. In the fall of 2009, the Debtors and their advisors met individually with key stakeholders, including the Creditors' Committee, certain Senior Lenders and Centerbridge,

---

[100] See Tr. 3/15 227:21-228:18; 272-273:1 (Gropper).

[101] See Docket No. 6433 (Motion to Disqualify Akin Gump Strauss Hauer & Feld LLP from Representing Aurelius Capital Management LP) at 6.

[102] Tr. 3/8 at 203:11-18, 205:11, 208:4-11 (Salganik).

[103] Tr. 3/8 at 206:21-207:25 (Salganik).

[104] Tr. 3/8 at 37:22-42:6 (Kurtz).

[105] See DCL Ex. 1161 Order Authorizing Document Depository dated December 15, 2009 [Docket No. 2858].

each of which presented their views on the merits of potential claims.[106] In early January 2010,

the key stakeholders met jointly, with representatives of each advocating their positions.[107]

Negotiations continued throughout January, February and March of 2010.[108]

### 3. April Settlement.

48. Those negotiations eventually led to a plan of reorganization that included a

proposed "Global Settlement" of certain of the LBO-Related Causes of Action. The Global

Settlement was first embodied in a Settlement Support Agreement dated April 9, 2010, entered

into by Angelo Gordon, Centerbridge, Law Debenture, and JPMorgan,[109] and then in the Joint

Plan of Reorganization for Tribune and Its Subsidiaries (the "April Plan") filed by the Debtors

with the support of the Creditors' Committee.[110] The core of the Global Settlement was the

allocation of a "strip" of cash, equity, and debt in the Reorganized Debtors representing 7.4% of

the total Distributable Enterprise Value ("DEV"), which, at that time, was estimated to be $6.1

billion.[111] At that DEV, the Senior Noteholders would receive consideration worth

approximately $450 million which would increase or decrease depending on the Debtors' DEV

at any given point in time.[112] Confirmation of the April Plan was uncertain because, among

other things, Oaktree and certain other holders of Senior Loan Claims indicated that they would

attempt to block the plan due to their belief that the settlement was too generous to the so-called

---

[106] Tr. 3/8 at 43:13-22, 44:20-45:6 (Kurtz).

[107] Tr. 3/8 at 45:7-46:24 (Kurtz); see also Tr. 3/9 at 18:20-19:16 (Kulnis).

[108] Tr. 3/8 at 46:25-49:15 (Kurtz); Tr. 3/9 at 19:19 – 20:1 (Kulnis); Tr. 3/8 at 210:5 – 213:7, 218:4-13 (Salganik); DCL Exs. 5, 29, 182.

[109] DCL Ex. 396, Settlement Support Agreement dated April 12, 2010 [Docket No. 4013]; Tr. 3/8 at 49:1-2; 49:18-22 (Kurtz).

[110] See DCL Ex. 395, Ex. A, Joint Plan of Reorganization for Tribune Company and Its Subsidiaries dated April 12, 2010 [Docket No. 4008].

[111] Tr. 3/8 at 51:12-52:8 (Kurtz); DCL Ex. 396, Settlement Support Agreement dated April 12, 2010 [Docket No. 4013].

[112] Id.

"Non-LBO Creditors" (creditors not holding Senior Loan Claims, Bridge Loan Claims or EGI-TRB LLC Notes Claims) and was unfairly funded entirely by Senior Lenders and not by other potentially-liable parties who were to receive releases of all liability in connection with the Transactions.[113] The April Plan was also opposed by Wilmington Trust as indenture trustee for the PHONES.

### 4. Appointment Of The Examiner And Issuance Of The Examiner Report.

49. On April 20, 2010, the Court issued an order directing the appointment of the Examiner and instructing the Examiner to evaluate, among other things, "whether there are potential claims and causes of action held by the Debtors' estates in connection with the leveraged buy-out of Tribune that occurred in 2007."[114] The major stakeholders were given the opportunity to supply the Examiner with briefs and record evidence,[115] and the Examiner and his advisors were given access to the discovery materials compiled by the parties during their investigations and the Examiner independently requested additional documents and interviewed 38 witnesses.[116]

50. On July 26, 2010, the Examiner filed a four volume report detailing the results of his investigation.[117] The first two volumes, which concern the background to and evaluation of the potential LBO-Related Causes of Action, are over 1,100 pages and are supported by

---

[113] See Docket No. 3999, Credit Agreement Lenders' (A) Statement Regarding Purported "Settlement" of "LBO-Related Causes of Action"; and (B) Request for Termination of Plan Exclusivity; Docket No. 4376 Credit Agreement Lenders' Objection to Disclosure Statement and Motion for Approval of Plan Solicitation Procedures.

[114] See Docket No. 4120, Agreed Order Directing the Appointment of an Examiner at ¶ 2; Docket No. 4320, Order Approving Appointment of Examiner.

[115] See, e.g., DCL Exs. 1540-47, Briefs to the Examiner submitted by Law Debenture, Wilmington Trust, and Creditors' Committee.

[116] Examiner Report, Vol. 1 at 30, 32-38.

[117] Docket Nos. 5130-5133.

approximately 1,200 exhibits.[118]  In his Report, the Examiner established a range of potential

conclusions relating to the Leveraged ESOP Transactions.  The conclusions most relevant to

assessing the reasonableness of the DCL Plan Settlement are summarized below.

### a.  Claim Of Intentional Fraudulent Conveyance At Step One.

51.    The Examiner found that a court would be reasonably likely to conclude that the

Step One Transactions did not constitute an intentional fraudulent transfer.[119]  Among other

things, "the Examiner did not find credible evidence" that the Tribune Entities structured the

Leveraged ESOP Transactions to hinder or delay their creditors.[120]  The Examiner also stated

that he had found no direct or "smoking gun" evidence that the Tribune Entities had entered into

the Step One Transactions with intent to hinder, delay or defraud creditors nor sufficient

indirect evidence of such intent in the form of sufficiently probative badges of fraud at Step

One.[121]

### b.  Claim Of Constructive Fraudulent Conveyance At Step One.

52.    With respect to potential claims of constructive fraudulent transfer, the Examiner

reached several related conclusions.  First, the Examiner determined that, if only the Step One

Financing were to be considered, it was "highly likely" that the Debtors and the Guarantor

Subsidiaries were solvent at and after the Step One Transactions.[122]  Second, the Examiner

concluded that it was "somewhat unlikely" that a court would collapse Step One and Step Two

together for purposes of analyzing the balance sheet solvency of the Debtors at the time of Step

---

[118]  On July 29, 2010, the full unredacted Examiner Report, setting forth the Examiner's assessment of these issues was made available to the core parties in interest, and on August 3, 2010 the Examiner Report was made publicly available.  Docket Nos. 5247, 5248, 5249, 5250, 5437, 5438, 5439, 5441, 5442, 5444, 5445, 5447, 5449, 5451, 5453, 5454, 5455, 5456, 5458, 5461, 5462, 5464, 5466, 5467, 5468, 5469, 5480.

[119]  Examiner Report, Vol. 1 at 7.

[120]  Examiner Report, Vol. 2 at 28.

[121]  Examiner Report, Vol. 2 at 23.

[122]  Examiner Report, Vol. 2 at 32, 187, 207.

One[123] but "highly likely" that, in assessing the Debtors' capital adequacy and intention to incur debts beyond their ability to pay at Step One, a court would consider the Step Two Financing reasonably expected to be incurred at the time of the Step One Transactions.[124] Third, the Examiner determined that, even if a court were to collapse Step One and Step Two together or treat the Step Two Financing as a liability for purposes of analyzing the Debtors' financial condition at Step One, it was "somewhat likely (although a very close call)" that a court would conclude that the Debtors were solvent on a balance sheet basis,[125] "reasonably likely" that a court would conclude that the Debtors were left with adequate capital,[126] and "reasonably unlikely" that a court would conclude that the Debtors had intended to incur debts beyond their reasonable ability to pay in that scenario.[127] With respect to the Guarantor Subsidiaries, the Examiner noted that the collective indebtedness of those entities was more than $2 billion less than the Tribune-only indebtedness, thereby making a finding of insolvency, capital inadequacy or inability to pay debts as they became due even less likely than at the Tribune level.[128] The Examiner reached this conclusion notwithstanding the fact that he underestimated the amount of assets owned by the Guarantor Subsidiaries by erroneously attributing ownership of certain assets held by the Guarantor Subsidiaries to Tribune.[129]

---

[123] Examiner Report, Vol. 2 at 160.

[124] Examiner Report, Vol. 2 at 183, 187.

[125] Examiner Report, Vol. 2 at 188.

[126] Examiner Report, Vol. 2 at 219.

[127] Examiner Report, Vol. 2 at 239.

[128] Examiner Report, Vol. 2 at 207- 211, 236-38, 239.

[129] See DCL Ex. 1106, ¶ 80; NPP Ex. 944, Ex. III at 3; Tr. 3/10 at 57:22-58:2 (Black); Tr. 3/18 at 67:8-12 (Tuliano); Tr. 3/10 at 129:22-130:1 (Fischel); Tr. 3/11 at 57:22-58:2 (Fischel).

### c. Claims Of Intentional And Constructive Fraudulent Conveyance At Step Two.

53. The Examiner concluded that it was "highly likely" a court would find that Tribune was rendered insolvent, left without adequate capital and, under an objective test, intended to incur debts beyond its reasonable ability to pay following Step Two, and "somewhat likely" that Tribune intended to incur debts beyond its ability to pay under a subjective test.[130] The Examiner also determined that it was "reasonably likely" that a court would find that the Guarantor Subsidiaries were rendered insolvent, left without adequate capital and, under an objective test, intended to incur debts beyond their reasonable ability to pay following Step Two, and "somewhat likely" that the Guarantor Subsidiaries intended to incur debts beyond their ability to pay under a subjective test.[131] In addition, the Examiner concluded that a court was "somewhat likely" to find that the Tribune Entities incurred the obligations and made the transfers in the Step Two Transactions with actual intent to hinder, delay, or defraud creditors.[132]

### 5. Termination Of The April Settlement.

54. After the issuance of the Examiner Report, the parties to the Global Settlement embodied in the April Plan independently reviewed the Examiner's findings and conclusions and assessed the implications of the Examiner Report on their respective claims and on the Global Settlement as a whole.[133] Oaktree and other Senior Lenders who had opposed the April Plan insisted that the Examiner Report vindicated their position that the April Plan was too rich for Non-LBO Creditors and that the avoidance claims asserted in respect of the Step One

---

[130] Examiner Report, Vol. 2 at 220, 226, 229, 240.

[131] Examiner Report, Vol. 2 at 226, 229, 240.

[132] Examiner Report, Vol. 2 at 32.

[133] Tr. 3/8 at 54:21-56:18 (Kurtz).

Financing were weak.[134] Further, many Senior Lenders, including JPMorgan, "viewed [the Examiner's] findings with respect to Step One as sort of a vindication that Step One was good and, therefore, the [April] settlement was too high."[135] Consequently, the Debtors and other supporters of the April Plan were concerned that the Senior Lender class would not vote to accept the April Plan.[136]

55.     Following the issuance of the Examiner Report, the major Senior Noteholders were willing to proceed with the April Settlement. Centerbridge "wanted the [April Plan settlement] to go forward" with respect to the Senior Lenders and modified only by a provision for a litigation trust containing claims arising out of Step Two against parties other than the Senior Lenders.[137] Aurelius did not "take any steps that caused [the April Plan settlement] to come apart."[138]

56.     On August 9, 2010, the Global Settlement was terminated.[139] Thereafter, the Debtors and all major stakeholders negotiated to achieve a new compromise that would reflect the parties' assessment of the Examiner Report and his findings and achieve broad support.[140] When these efforts to craft a new compromise proved unsuccessful, the Debtors requested that the Court appoint a mediator to assist with negotiations.[141] At or about the same time, Tribune created a Special Committee of its Board of Directors to oversee the Debtors' participation in

---

[134]   Liang Dep. at 221:11-23; Baiera Dep. at 41:9-16.

[135]   Tr. 3/9 at 23:25-24:5, 24:18-20 (Kulnis); Tr. 3/8 at 55:6-13 (Kurtz).

[136]   Tr. 3/9 at 23:25-24:5, 24:18-20 (Kulnis); Tr. 3/8 at 55:6-13 (Kurtz).

[137]   Tr. 3/9 at 24:24-26:14 (Kulnis).

[138]   Tr. 3/15 at 242:23-25 (Gropper).

[139]   Tr. 3/8 at 56:19-58:21, 136:3-5 (Kurtz).

[140]   Tr. 3/8 at 60:13-61:17 (Kurtz).

[141]   Tr. 3/8 at 60:13-61:25 (Kurtz); see also DCL Ex. 382, Order Appointing Mediator dated September 1, 2010 [Docket No. 5591].

the reorganization process, thereby formalizing the Board's prior practice of having only its independent directors consider and vote upon matters relating to the reorganization.[142]

### 6. Mediation And The Resulting Settlement Embodied In The DCL Plan.

57. On September 1, 2010, the Court appointed the Honorable Kevin Gross, United States Bankruptcy Judge, as mediator (the "Mediator").[143] After submitting mediation briefs, mediation began on September 26, 2010.[144] All material stakeholders were parties to the mediation, including the Debtors, the Creditors' Committee, JPMorgan, Angelo Gordon, Oaktree, a group of "Step One Credit Agreement Lenders," Wells Fargo Bank, N.A. (the Bridge Loan Agent), EGI-TRB LLC, three separate Senior Noteholder representatives (Aurelius, Law Debenture, and Deutsche Bank) and a representative of the PHONES Notes (Wilmington Trust).[145]

58. On September 28, 2010, with the assistance of Judge Gross, the Debtors, Angelo Gordon, and Oaktree agreed to the terms of a proposed compromise (the "September Settlement").[146] Neither the Creditors' Committee nor JPMorgan supported the September Settlement, however, and the Creditors' Committee issued a press release indicating that, in its view, the September Settlement did not provide fair value to all creditors.[147]

---

[142] Tr. 3/8 at 62:19 (Kurtz); Liebentritt Dep. at 170:11 – 173:9, 179:10-19, 186:2-188:25.

[143] DCL Ex. 382, Order Appointing Mediator dated September 1, 2010 [Docket No. 5591]; Tr. 3/8 at 61:8-25 (Kurtz).

[144] Tr. 3/8 at 75:9-13 (Kurtz); DCL Ex. 383, Mediator's Report dated September 28, 2010 [Docket No. 5831].

[145] DCL Ex. 382, Order Appointing Mediator dated September 1, 2010 [Docket No. 5591]. Centerbridge, although named as a Mediation Party, did not participate in the mediation, having sold its entire position to Aurelius prior to the commencement of mediation. Tr. 3/8 at 142:17-22 (Kurtz).

[146] DCL Ex. 383 Mediator's Report dated September 28, 2010 [Docket No. 5831]; Tr. 3/8 at 75:14-77:17 (Kurtz).

[147] Tr. 3/8 at 235:15-236:25 (Salganik); DCL Ex. 273, Creditors' Committee Press Release.

59. Subsequent to the September Settlement, the Debtors resumed discussions with stakeholders in an effort to forge a more broadly supported compromise.[148] On October 12, 2010, under the continued auspices of Judge Gross, the Debtors, Creditors' Committee, Oaktree, Angelo Gordon, and JPMorgan reached a new settlement (the "October Settlement") that provided additional settlement consideration to Non-LBO Creditors as well as an improved split of litigation trust recoveries in favor of the Senior Noteholders.[149]

60. The Creditors' Committee concluded that the October Settlement was fair for unsecured creditors based on, among other things, the review of "several hundred" memoranda and other written reports or analyses from its legal and financial advisors that it had received since the Creditors' Committee's formation;[150] consideration of other potential dissenting views, including those of its members Deutsche Bank and Wilmington Trust;[151] and analysis and discussion of Aurelius's model of settlement values for the LBO-Related Causes of Action.[152] Starting in August 2010, the Creditors' Committee held 21 meetings before voting to support the DCL Plan Settlement, including two special weekend meetings that encompassed a detailed review of Aurelius's model.[153]

---

[148] Tr. 3/8 at 81:17-82:10 (Kurtz).

[149] DCL Ex. 384, Mediator's Second Report dated October 12, 2010 [Docket No. 5936]; Tr. 3/8 at 82:11-87:8 (Kurtz); Tr. 3/8 at 244:4-247:11 (Salganik).

[150] Tr. 3/8 197:7-17 (Salganik); DCL Exs. 185-209, Moelis weekly industry updates from Dec. 2009 to Oct. 2010), DCL Exs. 210-255 (AlixPartners weekly financial reports from Dec. 2009 to Oct. 2010).

[151] Tr. 3/8 at 252:24-253:6 (Salganik); DCL Ex. 76, Supplement A to Sept. 16, 2010 Creditors' Committee Meeting Minutes.

[152] Tr. 3/8 at 241:4-244:18 (Salganik); DCL Ex. 87, Supplement B to Oct. 7, 2010 Creditors' Committee Meeting Minutes; DCL Ex. 88, Oct. 9, 2010 Creditors' Committee Meeting Minutes; DCL Ex. 89, Oct. 10, 2010 Creditors' Committee Meeting Minutes.

[153] Tr. 3/8 at 241:4-244:18 (Salganik); DCL Exs. 58-89 (Committee minutes from Aug. 2, 2010 to Oct. 10, 2010). These meetings represent only a fraction of the work performed by the Committee, which held 53 meetings in the 10-month period following the entry of the Depository Order. See DCL Exs. 3-95 (Committee minutes from Dec.17, 2009 to Oct. 21, 2010), 96-131 (Committee agendas dated from Dec. 17, 2009 to Oct. 21, 2010).

61. Thereafter, parties continued to mediate, and on January 28, 2011, with the continued oversight of Judge Gross, also reached a settlement with the Bridge Lenders, generating still more settlement consideration for Non-LBO Creditors.[154]

## IV. THE DCL AND NOTEHOLDER PLANS

### A. Key Terms Of The DCL Plan Relating To The Leveraged ESOP Transactions.

#### 1. Settlement Of Certain LBO-Related Causes Of Action.

62. The terms of the settlement reached in mediation are embodied in the DCL Plan (the "DCL Plan Settlement"). Specifically, the DCL Plan provides for the settlement of certain avoidance and other LBO-Related Causes of Action against the Senior Lenders, the Senior Loan Agent, the Senior Loan Arrangers, the Bridge Lenders and the Bridge Loan Agents.[155] It also includes a settlement of claims for disgorgement of prepetition payments made by Tribune on account of the Step Two Financing against parties who elect to participate in the settlement, with a backstop feature that ensures that the Estates will receive a guaranteed minimum in settlement of such claims.[156] Virtually all other LBO-Related Causes of Action will be transferred to either a Litigation Trust or a Creditors' Trust (collectively, the "Trusts") formed pursuant to the DCL Plan for pursuit after the Effective Date.[157] Pursuant to the settlement, (i) Senior Lenders will relinquish approximately $401 million in consideration to which they would be entitled if the Senior Loan Claims were allowed in full,[158] (ii) Bridge Lenders will relinquish $13.319 million in consideration which they otherwise would be entitled if the Bridge

---

[154] DCL Ex. 385, Mediator's Third Report dated January 28, 2011 [Docket No. 7656]; Tr. 3/8 at 247:12-23 (Salganik).

[155] DCL Plan §§ 5.15.2, 1.1.199, 1.1.200.

[156] DCL Plan §§ 5.15.1; DCL Plan Exs. 5.15(1), 5.15(2).

[157] DCL Plan §§ 1 .1.60, 1.1.80, 1.1.136, 1.1.188, 13.2, 14.3.1.

[158] DCL Ex. 1429, DCL Disclosure Statement, Section II.A at 4 [Docket No. 7135].

Loan Claims were allowed in full,[159] (iii) Senior Lenders and Bridge Lenders who received principal, interest, and fee payments on account of the Step Two Financing will contribute $120 million in cash, backstopped by the Step Two Arrangers,[160] (iv) Non-LBO Creditors of Tribune will receive the first $90 million of distributable value from the Trusts,[161] (v) Reorganized Tribune will make a $20 million loan to fund the Trusts,[162] and (vi) Non-LBO Creditors of Tribune will receive 65% of the distributable value from the Trusts after distribution of the first $90 million of distributable value and repayment of the loan to the Trusts.[163]

63.     In return for the settlement consideration, the DCL Plan allows the claims of the Senior Lenders and Bridge Lenders based on their Step One and Step Two Debt.[164] In addition, the DCL Plan provides releases to the Senior Lenders and Bridge Lenders for the settled claims.[165] As described in detail below, those releases are narrowly drawn and, as outlined above, supported by the settlement contributions made.[166] In all cases, claims against the released parties in their capacities (if any) as Selling Stockholders (other than certain claims against Tribune 401(k) plan participants, current employees and retirees) or as Advisors are not

---

[159] DCL Ex. 385, Mediator's Third Report dated January 28, 2011 at ¶ 1 [Docket No. 7656].

[160] DCL Ex. 1429, DCL Disclosure Statement, Section II.D at 19-20 [Docket No. 7135].

[161] Id. at 5-6.

[162] DCL Plan § 5.13.

[163] DCL Ex. 1429, DCL Disclosure Statement, Section II.A at 4 [Docket No. 7135]. Holders of Allowed PHONES Notes Claims and EGI-TRB LLC Notes Claims will participate in the Trust proceeds subject to enforcement of applicable subordination turnover provisions. As part of the Proposed Settlement, however, the Senior Lenders and Bridge Lenders have agreed to waive enforcement of those turnover provisions and will share only in the remaining 35% of the Trusts' distributable recoveries. Id.

[164] DCL Plan §§ 3.2.3, 3.2.4, 3.3.3, 3.3.4.

[165] DCL Plan § 11.2.

[166] See Section VIII.A.1, infra.

released.[167] In addition, the DCL Plan contains a "Bar Order," intended to ensure that settling defendants cannot be held liable on account of the settled claims beyond the consideration that was already paid pursuant to the settlement. Specifically, the Bar Order prohibits a Barred Person, such as a Non-Settling Defendant, from asserting claims sounding in contribution or non-contractual indemnity against a Released Party arising out of or reasonably flowing from the Leveraged ESOP Transactions.[168] In exchange, if a LBO-related litigation is brought against a Barred Person, and the Barred Person has a valid claim for contribution or non-contractual indemnity against a Released Party, then the Bar Order provides for the reduction of any judgment against the Barred Person by the Released Party's proportionate share of fault, as determined by the litigation court.[169] The Bar Order thus seeks to protect the Released Parties from indirect liability on claims for which the Released Parties have provided significant consideration to settle.

## 2. Establishment Of Litigation And Creditors' Trusts.

64. As noted above, the DCL Plan provides for the creation of the Trusts to pursue the unsettled LBO-Related Causes of Action and certain other claims. The "Preserved Causes of Action" that may be pursued by the Litigation Trust include:

- Claims to recover payments made to stockholders in connection with the Step One and Two Transactions.

- Claims against the Debtors' officers, and directors for breach of fiduciary duty.

- Claims against EGI-TRB LLC and Sam Zell.

- Claims against Potential Step Two Disgorgement Defendants who have not agreed to the Step Two/Disgorgement Settlement.

---

[167] See DCL Plan §§ 1.1.200, 1.1.201.

[168] DCL Plan § 11.3.

[169] Id.

- Claims against the Advisors, including Merrill Lynch, Citigroup Global Markets, Inc., VRC, and other professionals employed in connection with the Transactions.

- The Morgan Stanley Claims.[170]

The Creditors' Trust may pursue certain "Transferred State Law Avoidance Claims" that individual creditors otherwise could and would have pursued on their own but have instead opted to assign to the Creditors' Trust.[171]

65. The Senior Lenders and Bridge Lenders have agreed to forgo pro rata participation in recoveries on the Preserved Causes of Action and the Transferred State Law Avoidance Claims as part of the settlement consideration. Under normal rules of priority, Senior Lenders and Bridge Lenders would be entitled to more than 87% of any amounts distributed by the Trusts in respect of the foregoing claims if all Senior Loan Claims and Bridge Loan Claims were allowed.[172] As a result of the settlement, however, Non-LBO Creditors of Tribune are entitled to receive 100% of the first $90 million in net recoveries by the Litigation Trust.[173] In addition, after the next $20 million in net recoveries has been used to repay the $20 million loan extended by Tribune to fund the Trusts, the "Non-LBO Claims" (claims other than Senior Loan Claims, Bridge Loan Claims, and EGI-TRB LLC Notes Claims) are entitled to

---

[170] DCL Plan § 1.1.188. The Morgan Stanley Claims include rights, claims and actions arising from or related to (a) the acquisition, sale or disposition of any notes, bonds or other indebtedness held by MSCS, (b) the interest rate swap transaction executed pursuant to the ISDA Master Agreement dated as of August 5, 1994 (as subsequently amended and together with any schedules, exhibits and confirmations) between The Times Mirror Company and MSCS and any set-offs of claims arising from such interest rate swap transaction, and (c) any advisory engagement or potential advisory engagement of, and/or advice given by, or information analyses withheld, MSCS, including but not limited to (i) services provided by MSCS as an Advisor, and (ii) the agreement between Tribune and MSCS dated as of November 30, 2008, regardless of whether such rights, claims and actions may be asserted pursuant to the Bankruptcy Code or any other applicable law.

[171] DCL Plan § 14.3.1.

[172] DCL Ex. 1110 at 22 (Chart 8).

[173] DCL Ex. 1429, DCL Disclosure Statement, Section II.A at 5-6 [Docket No. 7135].

receive 65% of all other net recoveries by the Litigation Trust (i.e., 65% of net recoveries over $110 million).[174]

**B.    Key Terms Of The Noteholder Plan.**

66.    The Noteholder Plan provides that between 45.3% and 51.2% of the Debtors' DEV would be distributed to creditors upon the Debtors' emergence from chapter 11, with ultimate recoveries to be determined based on the final resolution of the Trust Causes of Action (as defined in the Noteholder Plan).[175] Initial Distributions proposed for each Class of Claims generally represent a recovery that assumes that the resolution of all Trust Causes of Action will have the least favorable outcome vis-à-vis such Class.[176]

67.    The Noteholder Plan provides that all LBO-Related Causes of Action would be preserved and prosecuted through a multi-trust structure comprised of a Litigation Trust, a Distribution Trust, and a Creditors' Trust.[177] The Noteholder Plan provides that as of the effective date, all Litigation Trust Causes of Action (as defined in the Noteholder Plan) would be transferred from the Estates to the Litigation Trust.[178] The Distribution Trust would hold consideration for ultimate distribution to creditors based on the outcome of the prosecution of the Litigation Trust Causes of Action.[179] The Creditors' Trust would be created to function as a litigation trust with respect to the State Law Avoidance Claims and to make distributions of the

---

[174]    Id.

[175]    See Noteholder Plan at 2-3.

[176]    Id. at 4.

[177]    Id. at 4-5; see also Noteholder Plan §§ 1.1.157 (definition of Litigation Trust Causes of Action), 5.17, 5.18, and 7.16.

[178]    Id. at 4.

[179]    Id. at 4-5.

proceeds recovered in connection with the State Law Avoidance Claims to Holders of Creditors' Trust Interests.[180]

68.     Each Trust would be governed by a three-member advisory board and managed by a trustee, with advisory board members and trustees to be appointed by the Noteholder Proponents.[181] The initial funding for the Distribution Trust would be obtained through a contribution from the Estates of $40 million in cash.[182]

## C.     Creditor Voting On The DCL And Noteholder Plans.

### 1.     Solicitation Of The DCL Plan And Noteholder Plan And Notice.

69.     As evidenced by the Affidavits of Service, on December 23, 2010, the Voting Agent distributed the DCL Plan, the Noteholder Plan, the General Disclosure Statement, the DCL Disclosure Statement, the Noteholder Disclosure Statement, the Ballots, and all related materials (collectively, the "Solicitation Packages") to Holders of Claims entitled to vote to accept or reject the DCL Plan and the Noteholder Plan.[183] Pursuant to the terms of the DCL Plan, Solicitation Packages were transmitted in respect of the DCL Plan to the following Holders of Impaired Claims: (i) Senior Loan Claims (Class 1C); (ii) Bridge Loan Claims (Class 1D); (iii) Senior Noteholder Claims (Class 1E); (iv) Other Parent Claims (Class 1F); (v) EGI-TRB LLC Notes Claims (Class 1I); (vi) PHONES Notes Claims (Class 1J); (vii) Senior Guaranty Claims (Classes 50C-111C); and (viii) General Unsecured Claims (Classes 2E-111E).[184] Pursuant to the terms of the Noteholder Plan, Solicitation Packages were transmitted in respect of the Noteholder Plan to the following Holders of Impaired Claims: (i) Step One

---

[180]    Id. at 5.

[181]    Id.

[182]    Id. at 6.

[183]    Solicitation and Confirmation AOS at 8-12.

[184]    Id.

Senior Loan Claims (Class 1C); (ii) Step One Senior Loan Guaranty Claims (Classes 50C-111C); (iii) Step Two Senior Loan Claims (Class 1D); (iv) Step Two Senior Loan Guaranty Claims (Classes 50D-111D); (v) Bridge Loan Claims (Class 1E); (vi) Bridge Loan Guaranty Claims (Classes 50E-111E); (vii) Senior Noteholder Claims (Class 1F); (viii) Other Parent Claims (Class 1G); (ix) Other Guarantor Debtor Claims (Classes 50G-111G); (x) EGI-TRB LLC Notes Claims (Class 1H); (xi) PHONES Notes Claims (Class 1I); and (xii) Subordinated Securities Claims (Class 1K).[185]

### 2. Publication Notice.

70. In accordance with Bankruptcy Rules 2002(1) and 3017(d) and the Solicitation Order, and as evidenced by the Publication AOS, the DCL Proponents published a form of the Confirmation Hearing Notice once each in the (i) the <u>Chicago Tribune</u>, on January 7, 2011, (ii) the <u>Los Angeles Times</u> on January 9, 2011, (iii) the <u>Wall Street Journal</u> on January 7, 2011, and (iv) the <u>New York Times,</u> on January 9, 2011.[186]

### 3. Adequacy Of Notice.

71. The DCL Disclosure Statement, the Noteholder Disclosure Statement, the DCL Plan, the Noteholder Plan, the Ballots and the Confirmation Hearing Notice were transmitted and served in compliance with the Solicitation Order and the Bankruptcy Rules and such transmittal and service constituted adequate and sufficient notice for the Confirmation Hearing. Furthermore, as evidenced by the DCL Plan Supplement AOS, the DCL Plan Supplements were filed and served in compliance with the Bankruptcy Rules.[187] All parties in interest had a full

---

[185] <u>Id.</u>

[186] Publication AOS at 2.

[187] <u>See</u> DCL Plan Supplement AOS.

and fair opportunity to appear and be heard at the Confirmation Hearing and no other or further notice is or shall be required.

### 4. Voting Declarations.

72. As evidenced in the Voting Declarations, all procedures used to distribute the Solicitation Packages to the Holders of applicable Claims and Interests and to tabulate the Ballots were fair and conducted in accordance with the Solicitation Order, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules of the United States Bankruptcy Court for the District of Delaware, and all other applicable rules, laws and regulations.[188]

### a. Initial Solicitation.

73. As demonstrated in the Voting Declaration, Impaired Classes of Claims entitled to vote to accept or reject the DCL Plan and the Noteholder Plan voted in connection with the Initial Solicitation as follows:

| DCL PLAN ACCEPTING CLASSES[189] | |
|---|---|
| **Class Description** | **Class Designation** |
| Senior Loan Claims | Class 1C |
| Bridge Loan Claims | Class 1D |
| Other Parent Claims | Class 1F |
| Senior Guaranty Claims | Classes 50C-111C |
| Certain General Unsecured Claims against the Filed Subsidiary Debtors | Classes 3E, 8E, 9E, 11E, 16E, 17E, 21E, 39E, 41E, 44E, 45E, 50E, 51E, 52E, 53E, 54E, 55E, 56E, 57E, 59E, 61E, 62E, 63E, 65E, 66E, 68E, 69E, 70E, 71E, 72E, 73E, 74E, 75E, 76E, 77E, 78E, 80E, 81E, 82E, 83E, 84E, 88E, 89E, 90E, 93E, 94E, 95E, 97E, 99E, 100E, 101E, 103E, 104E, 105E, 106E, 107E, 108E, 109E, 110E, and 111E |
| DCL PLAN REJECTING CLASSES[190] | |
| **Class Description** | **Class Designation** |
| Senior Noteholder Claims | Class 1E |
| EGI-TRB LLC Notes Claims | Class 1I |
| PHONES Notes Claims | Class 1J |

---

[188]  Voting Declaration, Docket No. 7918 at 2-5.

[189]  Voting Declaration, Docket No. 8882 at Exs. 1-2.

[190]  Id. at Exs. 1 and 3.

| NOTEHOLDER PLAN ACCEPTING CLASSES[191] | |
|---|---|
| **Class Description** | **Class Designation** |
| Senior Noteholder Claims | Class 1F |
| Other Guarantor Claims | Classes 93G[192] |
| PHONES Notes Claims (Tribune) | Class 1I |
| NOTEHOLDER PLAN REJECTING CLASSES[193] | |
| **Class Description** | **Class Designation** |
| Step One Senior Loan Claims | Class 1C |
| Step One Senior Loan Guaranty Claims | Classes 50C-111C |
| Step Two Senior Loan Claims | Class 1D |
| Step Two Senior Loan Guaranty Claims | Classes 50D-111D |
| Bridge Loan Claims | Class 1E |
| Bridge Loan Guaranty Claims | Classes 50E-111E |
| Other Parent Claims | Class 1G |
| Other Guarantor Debtor Claims | Classes 50G-57G, 59G, 61G-63G, 65G-66G, 68G-78G, 80G-84G, 88G-90G, 94G-95G, 97G, 99G-101G and 103G-111G |
| EGI-TRB LLC Notes Claims | Class 1H |
| Subordinated Securities Claims | Class 1K |

74.     Creditors who were (i) entitled to vote on both the DCL Plan and the Noteholder Plan and (ii) voted to accept more than one plan were permitted to indicate a preference on their Ballot for the Noteholder Plan or the DCL Plan.[194] After aggregating multiple ballots received by individual creditors, approximately (i) four Holders of Other Parent Claims indicated a preference, with all four preferring the DCL Plan; (ii) 57 Holders of General Unsecured Claims against the Filed Subsidiary Debtors indicated a preference, with 47 of such Holders preferring the DCL Plan and 10 of such Holders preferring the Noteholder Plan; and (iii) 78 Senior Noteholders indicated a preference, with 30 Senior Noteholders preferring the DCL Plan and 48 Senior Noteholders preferring the Noteholder Plan.[195]

---

[191]  Voting Declaration, Docket No. 7918 at Exs. B-2(a) and B-2(b).

[192]  Id. at Ex. B-2(a).

[193]  Id. at Ex. B-2(a) and B-2(b).

[194]  Solicitation Order ¶ 19.

[195]  See Voting Declaration, Docket No. 7918 at Ex. B-1(a) and B-1(b); Docket No. 8882 at Exs. 2 and 3.

75.     The Voting Declaration further evidences that (i) no votes to accept or reject the

DCL Plan were cast by Holders of Impaired General Unsecured Claims in the following

Classes: 2E, 4E through 7E, 10E, 12E through 15E, 18E through 20E, 22E through 38E, 40E,

42E, 43E, 46E through 49E, 58E, 60E, 64E, 67E, 79E, 85E through 87E, 91E, 92E, 96E, 98E,

and 102E (the "DCL Non-Voting Classes")[196] and (ii) no votes to accept or reject the

Noteholder Plan were cast by Other Guarantor Debtor Claims in the following Classes: 58G,

60G, 64G, 67G, 79G, 85G, 86G, 87G, 91G, 92G, 96G, 98G, and 102G.[197]

### b.      Supplemental Solicitation.

76.     As set forth in the Supplemental Solicitation Order, a Supplemental Solicitation

occurred pursuant to which the Holders of Senior Loan Claims (Class 1C) and Senior Guaranty

Claims (Classes 2C through 111C) were provided an opportunity to change votes to accept or

reject the DCL Plan.[198]   As evidenced by the Supplemental Voting Declaration, the Classes of

Senior Loan Claims and Senior Guaranty Claims voted to [●] the DCL Plan in connection with

the Supplemental Solicitation.[199]

### 5.      Good Faith Solicitation, No Requirement For Resolicitation.

77.     Votes for acceptance and rejection of the DCL Plan were solicited in good faith

and in compliance with sections 1125 and 1126 of the Bankruptcy Code, Bankruptcy Rules

3017 and 3018, the General Disclosure Statement, the DCL Disclosure Statement, the

Solicitation Orders, all other applicable provisions of the Bankruptcy Code and all other

applicable rules, laws and regulations.[200]

---

[196]   Voting Declaration, Docket No. 8882 at Ex. 1.

[197]   Voting Declaration, Docket No. 7918 at Ex. B-1.

[198]   Supplemental Solicitation Order at 3-4.

[199]   Supplemental Voting Declaration at [●].

[200]   See generally, Voting Declaration and Affidavits of Service.

78.     The Court finds that the DCL Proponents and each of their Related Persons have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code and Bankruptcy Rules in compliance with all of their respective activities relating to the solicitation of acceptances to the DCL Plan and their participation in the activities described in section 1125 of the Bankruptcy Code.  Accordingly, such parties are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and the exculpation provisions set forth in Article XI of the DCL Plan.

79.     In addition, based on the Court's review of the amendments and modifications embodied in the DCL Plan, no further solicitation or resolicitation of any Holders of Claims or Interests is necessary.

## V.     THE DCL PLAN SETTLEMENT IS REASONABLE AND IN THE BEST INTERESTS OF CREDITORS

### A.     The <u>Martin</u> Factors.

80.     A plan may include a provision that settles or adjusts any claim belonging to the debtor or the estate.  11 U.S.C. § 1123(b)(3)(A).  "Compromises are a normal part of the process of reorganization," <u>Protective Comm. For Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson</u>, 390 U.S. 414, 424 (1968), and indeed are "favored."  <u>Will v. Northwestern Univ. (In re Nutraquest, Inc.)</u>, 434 F.3d 639, 644 (3d Cir. 2006).

81.     The Third Circuit has set forth four factors for the Court to consider in analyzing whether a proposed settlement is fair and equitable:  (1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; and (4) the paramount interest of creditors.  <u>Myers v. Martin (In re Martin)</u>, 91 F.3d 389, 393 (3d. Cir. 1996); <u>Nutraquest</u> 434 F.3d at 644.

82.     Because all of the LBO-Related Causes of Action subject to the DCL Plan

Settlement arise from the same operative set of facts, are asserted against the same group of

defendants, and are in the nature of avoidance or related causes of action, it is appropriate to

consider the reasonableness of the DCL Plan Settlement as a whole and not to attempt to assign

a value to each of the constituent parts or claims subject to the settlement.  See In re

Washington Mut., Inc., 442 B.R. 314, 329-45 (Bankr. D. Del. 2011).

### B.     The DCL Plan Settlement Results In Recoveries Well Within The Range Of Reasonableness.

83.     In considering the first Martin factor – the probability of success in litigation –

the Court does not have to be convinced that the settlement is the best possible compromise in

order to approve it.  In re New Century Holdings, Inc., 390 B.R. 140, 168 (Bankr. D. Del.

2008), rev'd on other grounds, 407 B.R. 576 (D. Del. 2009); In re Sea Containers Ltd., No. 06-

11156 (KJC), 2008 WL 4296562 at *5 (Bankr. D. Del. Sept. 19, 2008); In re Coram Healthcare

Corp., 315 B.R. 321, 329-30 (Bankr. D. Del. 2004).  Rather, the Court must only conclude that

the compromise or settlement "falls within the reasonable range of litigation possibilities" and is

"above 'the lowest point in the range of reasonableness.'"  Sea Containers, 2008 WL 4296562

at *5 (quoting Coram Healthcare, 315 B.R. at 330 (citation omitted)).  In making that

determination, "the Court's task is not to decide the numerous questions of law and fact raised

by objections but rather to canvass the issues to see whether the settlement falls below the

lowest point in the range of reasonableness."  In re Exide Techs., 303 B.R. 48, 68 (Bankr. D.

Del. 2003) (internal quotation marks and alterations omitted).

84.     For the reasons set forth below, the Court finds and concludes that the DCL Plan

Settlement falls well within the reasonable range of likely litigation outcomes and that, as a

consequence, the first <u>Martin</u> factor strongly weighs in favor of approval of the proposed compromise.

###   1. The Examiner Report Supports The Reasonableness Of The DCL Plan Settlement.

85.    The Examiner Report was prepared by an independent and highly regarded bankruptcy expert aided by well-qualified counsel and financial advisors. The Report is comprehensive and presents a well-reasoned and reasonable view of the range of possible outcomes that might occur if the LBO-Related Causes of Action were litigated to judgment.

86.    Among other things, the Examiner analyzed the recoveries that Non-LBO Creditors might receive in six different potential litigation outcomes, ranging from total victory for the Senior Lender and Bridge Lender defendants in respect of the LBO-Related Causes of Action (no avoidance of Senior Loan Claims and Bridge Loan Claims) to total victory for the Estates (full avoidance of Senior Loan Claims and Bridge Loan Claims).[201] Although there are other potential litigation outcomes that the Examiner did not model, the Examiner's six scenarios illustrate the main possible outcomes and the range of recoveries.[202]

87.    The Examiner's analysis strongly supports the reasonableness of the DCL Plan Settlement. In five of the six scenarios analyzed by the Examiner, incremental recoveries to Non-LBO Creditors (<u>i.e.</u>, recoveries in excess of the "natural recoveries" such creditors would receive if all Senior Loan Claims and Bridge Loan Claims were allowed in full) on account of the LBO-Related Causes of Action range from $0 in the no avoidance scenario to a range of approximately $205 million to $244 million in the scenario involving avoidance of all Senior

---

[201]    Examiner Report, Vol. 2, Annex B at B-7-B-9. The Examiner also analyzed two additional scenarios that include proceeds from actions against Step Two Selling Stockholders. <u>Id.</u> Those additional scenarios are not relevant to the reasonableness of the DCL Plan Settlement because causes of action against Step Two Selling Stockholders are not settled under the DCL Plan and instead are included among the Preserved Causes of Action to be pursued after emergence by the Litigation Trust.

[202]    Tr. 3/9 at 105-06 (Black).

Loan and Bridge Loan Claims against Tribune and avoidance of all Step Two Senior Loan Claims and Bridge Loan Claims against the Guarantor Subsidiaries.[203] Even at the very high end, those recoveries are less than half of the approximately $535 million in guaranteed Effective Date settlement consideration provided by Senior Lenders ($401 million), Bridge Lenders ($13.3 million), and Settling Step Two Payees ($120 million) and received by non-LBO Creditors pursuant to the DCL Plan Settlement.[204]

88. Only one of the six scenarios analyzed by the Examiner results in incremental recoveries to Non-LBO Creditors in amounts greater than the settlement consideration provided pursuant to the DCL Plan Settlement. That scenario involves full avoidance of all Senior Loan Claims and Bridge Loan Claims against both Tribune and all of the Guarantor Subsidiaries.[205] It represents the "best case" or "total victory" for the Estates, in which Non-LBO Creditors would be paid in full.

89. The Examiner identified a number of challenges to achieving a full avoidance ("total victory") litigation outcome. For example, the Examiner found that there was no "credible evidence" that the Tribune Entities structured the Step One Transactions in order to hinder, delay, or defraud creditors and concluded that it was "reasonably unlikely" that a court would avoid the Step One Transactions as an intentional fraudulent transfer.[206]

---

[203] These recovery amounts are derived from the Examiner's Recovery Scenarios, taking Case 5 (Step One fraudulent transfer at Tribune and Step Two fraudulent transfer at Tribune and Guarantor Subsidiaries) less the "natural recoveries" in Case 1 (base case) and using assumed high and low intercompany balances from an intercompany claims settlement. See Examiner Report, Vol. 2, Annex B (the "Recovery Scenarios"). The Examiner's Recovery Scenarios assume an initial distributable value of $6.1 billion. See id. at B-1. Although the recoveries would be somewhat higher had the Examiner assumed an initial distributable value of $6.75 billion, the initial settlement consideration of $535 million still would be twice as high as the recoveries in these five scenarios. See DCL Ex. 1484, Black Expert Report (revised) dated March 8, 2011 at 17, 22-23 (modeling similar scenarios but assuming an initial distributable value of $6.75 billion).

[204] See DCL Ex. 1429, DCL Disclosure Statement, Section II.A at 4 [Docket No. 7135].

[205] Examiner Report, Vol. 2, Annex B at B-30-B-33.

[206] Examiner Report, Vol. 2 at 22-23, 28.

90.     The Examiner also concluded that it was "highly likely" that a court would find the Debtors to have been solvent upon consummation of the Step One Transactions if the indebtedness later incurred in connection with the Step Two Transactions was not taken into account (i.e., if the Step One and Step Two Transactions were not "collapsed" together for purposes of the balance sheet solvency analysis).[207] The Examiner further concluded that it was "somewhat unlikely" that a court would "collapse" the Transactions for purposes of determining balance sheet solvency and that, in order to collapse, "[a] court would not just have to expand on the existing law" but would also need to "disregard[] . . . , in a very tangible way, substantive aspects of the Leveraged ESOP transactions."[208]

91.     The Examiner also found that, even if the Transactions were collapsed for purposes of determining solvency, it was "somewhat likely (although a very close call)" that a court would find that Tribune was balance sheet solvent upon consummation of the Step One Transactions.[209] The Examiner further concluded that the Guarantor Subsidiaries and the Guarantor Non-Debtors – which collectively hold the vast majority of the Debtors' assets but had over $2 billion less debt than Tribune – were more likely than Tribune to be found balance sheet solvent.[210]

---

[207]    Examiner Report, Vol. 2 at 187.

[208]    Examiner Report, Vol. 2 at 181-82.

[209]    Examiner Report, Vol. 2 at 187-88.

[210]    Examiner Report, Vol. 2 at 210-211; DCL Ex. 1104 at Ex. 2, Lazard Expert Report at 93 (reflecting allocation of value as between the Guarantor Subsidiaries, non-guarantor subsidiaries, and Tribune); see also Sections III.B. and III.D, supra, describing allocation of indebtedness of the Tribune Entities). The Court notes that the Examiner reached this conclusion regarding solvency of the Guarantor Subsidiaries despite mistakenly assuming that $603 million in value attributable to the Chicago Cubs property and 50% of the Debtors' interest in Classified Ventures were assets of Tribune instead of the Guarantor Subsidiaries. See id. at 209, 220; see also DCL Ex. 1531 (Tribune's interest in Classified Ventures equally split between Tribune Company and Tribune National Marketing Company); DCL Ex. 809 (Tribune National Marketing Company is a Guarantor Debtor). The Examiner's conclusions with respect to the solvency of the Guarantor Subsidiaries presumably would have been even more forceful had the Examiner apprehended these errors.

92.     The Examiner found that it was "highly likely" that, in assessing the Debtors'

capital adequacy and intention to incur debts beyond their ability to pay at Step One, a court

would consider the Step Two Debt reasonably expected to be incurred at the time of Step

One.[211] Nevertheless, the Examiner found that (i) it was "reasonably likely" that a court would

find that each of Tribune and the Guarantor Subsidiaries were left with adequate capital after

giving effect to the Step One Transactions[212] and (ii) a court would be "reasonably unlikely" to

conclude that Tribune or the Guarantor Subsidiaries entered into the Step One Transactions

intending to incur debts beyond their reasonable ability to pay.[213]

93.     Taken together, the Examiner's conclusions demonstrate that the Examiner

believed that the case for full avoidance of all Senior Loan Claims and Bridge Loan Claims was

risky and uncertain and faced substantial challenges.  The Examiner's determinations in this

regard weigh strongly in favor of the DCL Plan Settlement, which reflects the risks that all

parties would face in litigation and strikes a reasonable balance between scenarios the Examiner

found more probable, which would result in recoveries substantially lower than those provided

by the DCL Plan Settlement, and the "home run" full avoidance scenario that the Examiner

found to be subject to substantial challenge and uncertainty.

### 2.      The Evidence Shows That The DCL Plan Settlement Falls Within The Upper End Of The Range Of Reasonableness.

94.     In addition to the Examiner Report, the DCL Proponents presented the testimony

of Bernard Black, Professor of Law at Northwestern University School of Law and Professor of

Finance at the Northwestern University Kellogg School of Management,[214] in support of the

---

[211]   Examiner Report, Vol. 2 at 183, 187.

[212]   Examiner Report, Vol. 2 at 211.

[213]   Examiner Report, Vol. 2 at 118.

[214]   Tr. 3/9 at 91:4-9 (Black).

reasonableness of the settlement. The Court found Black qualified as an expert to testify as to

his opinions on the reasonableness of the settlement of the LBO-Related Causes of Action

embodied in the DCL Plan.[215] Black assessed the reasonableness of the DCL Plan Settlement

and determined that the settlement consideration substantially exceeds the range of recoveries

that Non-LBO Creditors reasonably could expect to receive in litigation of the LBO-Related

Causes of Action to be settled. Like the Examiner, Black modeled six primary "Scenarios"

representing the potential litigation outcomes on such claims and concluded that only the full

avoidance "total victory" scenario would produce greater recoveries for Non-LBO Creditors

than the recoveries provided under the DCL Plan Settlement.[216] Black opined that, in all other

plausible litigation scenarios, Senior Noteholders would recover at least $300 million less than

the recoveries provided under the DCL Plan.[217]

95.     To determine a reasonable settlement range for the LBO-Related Causes of

Action subject to the DCL Plan Settlement, Black developed six hypothetical "Cases" that he

assigned to each litigation outcome, ranging from a "Low Settlement Case," in which

probabilities were assigned in a manner strongly favorable to the Senior Lenders, to a "High

Settlement Case," in which the assigned probabilities strongly favor the Non-LBO Creditors.[218]

He also developed "Cases" intended to reflect the views of the Examiner and of Black

himself.[219] Based on that analysis, Black concluded that, when potential recoveries from third

parties on non-settled Preserved Causes of Action are taken into account, distributions under the

---

[215]   Tr. 3/9 at 100:17-101:3 (Black).

[216]   Tr. 3/9 at 105:20-109:13; 114:25-116:1 (Black).

[217]   DCL Ex. 1484 at 22-23; DCL Ex. 1492 at 3.

[218]   Tr. 3/9 at 116:6-9 (Black); DCL Ex. 1484 at 23.

[219]   Tr. 3/9 at 116:6-118:11 (Black). Black also included a "Low-Mid Settlement Case," with probabilities moderately favorable to the Senior Lenders, and a "High-Mid Settlement Case," with probabilities moderately favorable to the Senior Noteholders. Id.

DCL Plan exceed all potential recoveries Non-LBO Creditors would receive under any of the six hypothetical Cases, including the "Examiner Case" and the "High Settlement Case."[220]

96.     Black also confirmed his conclusions by running a number of "sensitivity tests" that analyzed what the range of reasonable recoveries would be in the event of adjustment of: (i) the probabilities associated with each Case; (ii) the amount of recoveries from third parties; (iii) the Debtors' distributable enterprise value; (iv) the prospect of the Senior Lenders' entitlement to postpetition interest; (v) the prospect of inclusion of tax savings resulting from Tribune's status as an ESOP-owned S corporation in the balance sheet solvency analysis; (vi) the valuation/amount of PHONES debt in connection with the solvency analysis; and (vii) the possibility that Senior Lenders would be prohibited (through equitable subordination or otherwise) from participating in disgorgement recoveries in respect of the Step Two Transactions.[221] Black testified that these analyses showed that the DCL Plan Settlement distributions consistently remained either above the resulting settlement range or at the top end of the range.[222]

97.     The Noteholder Proponents attack Black's qualifications and raise a number of challenges to his analysis. The Court does not find that the attacks on Black's qualifications are merited. As to Black's analysis, the Noteholder Proponents' principal criticism appears to be that Black came to his own conclusions regarding the likelihood of potential litigation outcomes (the "Black Case").[223] This criticism ignores that Black modeled five other scenarios, including a scenario from a viewpoint *more favorable* to the Noteholder Proponents than the Examiner (the

---

[220]   DCL Ex. 1484 at 28-29; DCL Ex. 1492 at 9.

[221]   Tr. 3/9 at 155:11-168:18 (Black).

[222]   Tr. 3/9 at 168:23-170:1 (Black). Adjusting the sensitivities had a minimal impact on the upper end of the settlement range, although it did have an impact on the lower end of the range. See Tr. 3/9 at 168:23-169:7 (Black).

[223]   See Noteholder Post-Trial Reply Brief at 16-22.

"High Settlement" Case).[224] Further, the Court notes that Black performed an extensive analysis of the issues, which the Court finds credible. In this regard, the Court notes that the differences between Black's assessment and the Examiner's assessment arise principally from three sources – the probability of collapse, Tribune's intent to incur debts beyond its reasonable ability to pay at Step One assuming collapse, and whether a court would include certain tax savings in assessing Tribune's balance sheet solvency.[225] The Court finds that Black's testimony supports the reasonableness of the DCL Plan Settlement.[226]

98.     On this same point, the Noteholder Proponents presented the testimony of Dr. Bruce Beron, sole principal and founder of Litigation Risk Management Institute.[227] The Court found Beron qualified as an expert in decision tree analysis.[228] Beron attempted to perform a decision tree analysis of the Examiner Report by assigning fixed numerical probabilities to the seven explanatory phrases given by the Examiner to his assessments of various issues (ranging from 15% for outcomes labeled "highly unlikely" to 85% for "highly likely") and aggregating those assigned probabilities into decision trees, generating percentages for forty-eight potential litigation outcomes and then multiplying each by a recovery amount provided to Beron by Aurelius for that particular outcome.[229] Beron added those probability-weighted recoveries to arrive at a single "expected value" of $1.57 billion for the LBO-Related Causes of Action subject to the DCL Plan Settlement.[230]

---

[224]   Tr. 3/9 at 146:21-147:16 (Black); DCL Post-Trial Brief at 24-25.

[225]   DCL Ex. 1484 at 25.

[226]   See also DCL Post-Trial Brief at 20-26; DCL Post-Trial Reply Brief at 17-19.

[227]   Tr. 3/17 at 104:7-16 (Beron).

[228]   Tr. 3/17 at 120:8-25 (Beron).

[229]   Tr. 3/17 at 213:22-214:8 (Beron).

[230]   Tr. 3/17 at 214:9-12 (Beron).

99.    The Courts finds that Beron's analysis has numerous flaws and is not reliable.

Among other things:

- Beron did not understand the legal or factual bases of the fraudulent transfer claims he was attempting to value.[231]

- Beron relied solely on the Examiner's headline conclusions without consideration of the hundreds of pages of explanatory text.[232] As a result, he reached conclusions that do not reflect the substance of the Examiner Report. For example, Beron set the chance of prevailing on a claim for intentional fraudulent transfer at Step One at 30%,[233] even though the Examiner found no "credible evidence" to support such a claim.[234]

- Beron treated issues significant to his expected value calculation as independent variables even where the Examiner's explanations recognized linkages and correlations among those issues.[235]

- Beron disregarded his independent interpretation of the Examiner's conclusions when so instructed by Aurelius's counsel.[236] For example, the Examiner stated in his conclusions that if only Step Two was avoided, it was "reasonably likely that . . . absent an otherwise applicable basis to subordinate or disallow" participation of Step One Lenders, the Step One debt would participate in Step Two distributions.[237] Consistent with that "reasonably likely" conclusion, Beron initially modeled a 70% chance of Step One participation.[238] However, counsel for Aurelius instructed Beron to treat the Step One debt's participation in distributions as in "equipoise."[239] Beron complied with this instruction and modeled Step One debt's participation in distributions at 50%, increasing expected value.[240]

100.    The Court finds that Beron's analysis does not undermine the conclusion that the

DCL Plan Settlement falls within the range of reasonableness.

---

[231]  Tr. 3/17 at 255:3-19 (Beron).

[232]  Tr. 3/17 at 200:2-10 (Beron); see also DCL Post-Trial Brief at 58-59; DCL Post-Trial Reply Brief at 19-21.

[233]  NPP Ex. 2476 at 8; Tr. 3/17 at 131:18-132:13 (Beron).

[234]  Examiner Report, Vol. 2 at 22, 28; Tr. 3/17 at 200:25-201:17 (Beron).

[235]  See DCL Post-Trial Brief at 59-61; DCL Post-Trial Reply Brief at 19.

[236]  See DCL Post-Trial Brief at 61-62; DCL Post-Trial Reply Brief at 19.

[237]  Examiner Report, Vol. 2 at 298, 304.

[238]  Tr. 3/17 at 173:16-175:7 (Beron); see also NPP Ex. 2476 at 6.

[239]  Tr. 3/17 at 175:12-180:19 (Beron).

[240]  See also DCL Post-Trial Brief at 62; DCL Post-Trial Reply Brief at 19-21.

### 3. Challenges To Prevailing On A Claim For Full Avoidance.

101. All of the parties recognize the significance of a potential claim for full avoidance of the Senior Loan Claims when assessing the reasonableness of the DCL Plan Settlement. This is because, as noted above, the DCL Plan Settlement provides settlement consideration above that which reasonably could be expected in all litigation outcomes other than the full avoidance scenario. The parties also recognize that, in order to prevail on a claim for full avoidance, it would be necessary to show that both the Tribune parent and the Guarantor Subsidiaries were insolvent at Step One.

102. The DCL Proponents take the position that there are substantial hurdles to prevailing on a claim that both the Tribune parent and the Guarantor Subsidiaries were insolvent at Step One and point to the conclusions from the Examiner Report described in paragraphs 90 through 93 above.[241]

103. In further support of their view, the DCL Proponents also presented the testimony of Daniel Fischel, Professor of Law and Business at Northwestern University School of Law and Kellogg School of Management.[242] Fischel was qualified by the Court as an expert in financial markets, valuation, and solvency.[243] Fischel emphasized the importance of contemporaneous market evidence and opined that such evidence demonstrates that Tribune and the Guarantor Subsidiaries were solvent as of the consummation of the Step One Transactions.[244] Fischel also performed valuations employing the traditional methodologies of discounted cash flow, comparable companies, and comparable transactions, and concluded that Tribune and the Guarantor Subsidiaries were balance sheet solvent at the time of the Step One

---

[241] See DCL Post-Trial Brief at 35-42.

[242] Tr. 3/10 at 82:15-24 (Fischel).

[243] Tr. 3/10 at 88:25-89:4 (Fischel).

[244] DCL Ex. 1106 at ¶ 13; Tr. 3/10 at 91:11-25, 94:17-97:12 (Fischel).

Transactions, whether or not the indebtedness later incurred in connection with the Step Two Transactions is considered for purposes of the balance sheet solvency analysis.[245] Using management's base case projections and an average of "downside" projections prepared by third party analysts and other contemporaneous market participants, Fischel determined that Tribune and the Guarantor Subsidiaries had the ability to pay debts as they became due and had adequate capital upon consummation of the Step One Transactions, even taking into account the indebtedness anticipated to be incurred in connection with the subsequently-consummated Step Two Transactions.[246] Fischel's conclusions were consistent with the Examiner's findings regarding Step One, and he was critical of Ralph Tuliano, the Noteholder Proponents' expert.[247]

104.     The Noteholder Proponents presented Tuliano's testimony. Tuliano was qualified as an expert in solvency, valuation, and financial forensics.[248] Tuliano took issue with many of the Examiner's and Fischel's findings regarding Step One.[249] While Tuliano did not dispute that Tribune would be solvent as of Step One if the Step One financing obligations were considered on a stand-alone basis, he effectively ignored that possibility and assumed that Step One and Step Two would be collapsed.[250] Tuliano further opined that Tribune was grossly insolvent as of the consummation of Step One (specifically, that Tribune's liabilities exceeded its assets at fair market value by $3 billion[251]), notwithstanding the overwhelming market evidence to the contrary.[252]

---

[245]   Tr. 3/10 at 95:6-13, 97:13-21, 154:5-9 (Fischel).

[246]   Tr. 3/10 at 122:13-125:3 (Fischel); DCL Ex. 1106 ¶ 67, Ex. P; see also DCL Post-Trial Brief at 36, 40.

[247]   Tr. 3/10 at 131:14-24 (Fischel).

[248]   Tr. 3/18 at 18:13-18 (Tuliano).

[249]   See, e.g., Tr. 3/18 at 42:11-24, 59:18-25, 83:16-109:3, 139:20-23 (Tuliano).

[250]   Tr. 3/18 at 109:20-110:22, 143:11-14 (Tuliano).

[251]   Tr. 3/18 at 143:2-4 (Tuliano).

[252]   See DCL Post-Trial Brief at 37-38, 66-69.

105.    Based on the evidence and expert testimony presented, the Court finds and concludes that the case for full avoidance of all Senior Loan Claims and Bridge Loan Claims faces substantial risk and uncertainty, including the following:

a.    The evidence presented did not cause the Court to question the Examiner's determination that no "credible evidence" supports a finding that the Debtors entered into the Step One Transactions with intent to hinder, delay, or defraud creditors or the Examiner's conclusion that "a court is reasonably likely to conclude that the Step One Transactions did not constitute an intentional fraudulent transfer."[253]

b.    The experts agree that Tribune and the Guarantor Subsidiaries were balance sheet solvent upon consummation of the Step One Transactions if the indebtedness anticipated to be incurred in connection with the subsequent Step Two Transactions is not considered in the analysis. The case for "collapsing" the two sets of Transactions is risky and uncertain, as evidenced by the Examiner's conclusion that "a court would be somewhat unlikely to conclude that the prerequisites established under the applicable law for collapse of Step One and Step Two are met here."[254] In this regard, the Court notes the undisputed evidence that Tribune remained a public company following the close of Step One; that Tribune was not obligated under the Senior Loan Agreement to incur the Step Two Financing; that the transaction documents provided for the eventuality that Step Two would not occur; that there was a six month "time lag" between the Step One and Step Two Transactions; and that the closing of the Step Two Transactions was subject to a number of conditions, including receipt of waivers and approvals from the FCC, approval of Major League Baseball, and receipt of a solvency

---

[253]    Examiner Report, Vol. 1 at 7, Vol. 2 at 28.

[254]    Examiner Report, Vol. 2 at 180-81.

opinion and solvency certificate.[255] These conditions created genuine uncertainty about whether the Step Two Transactions in fact would occur, as reflected in fluctuations in the market price for Tribune stock during the period between the closing of Step One and Step Two.[256]

c. As demonstrated by the Examiner's conclusions and the conflicting opinions of Fischel and Tuliano, there is substantial risk and uncertainty associated with proving Tribune's insolvency, inability to pay debts, and capital inadequacy at the time of the Step One Transactions, even if the case for "collapse" is made.[257] That risk and uncertainty is amplified with respect to the Guarantor Subsidiaries, who had over $2 billion less face value of debt than Tribune yet held more than 80% of Tribune's assets and value.[258]

d. The case for full avoidance is further complicated and made risky by potential defenses that, if successful, would preclude avoidance in whole or in part.[259] While the Examiner did not believe it was likely that the Senior Lenders would prevail on certain of their

---

[255] Examiner Report, Vol. 2 at 173-77; see also Tr. 3/18 at 114:10-115:20, 117:14-25, 144:6-146:2, 149:2-150:5 (Tuliano).

[256] See Tr. 3/18 at 149:2-150:5 (Tuliano).

[257] See ¶¶ 90-92, 103-104, above.

[258] See Examiner Report, Vol. 2 at 210-211; DCL Ex. 1104 at Ex. 2, Lazard Expert Report at 93 (reflecting allocation of value as between the Guarantor Subsidiaries, non-guarantor subsidiaries, and Tribune); see also Sections III.B. and III.D, supra, describing allocation of indebtedness of the Tribune Entities.

[259] For example, the Examiner noted that the Senior Lenders would argue that the extension of the Senior Loans constituted consideration or value given to the Debtors in exchange for the incurrence of the loan obligations, rendering a constructive fraudulent transfer claim impossible. Examiner Report Vol. 2 at 86. The Examiner further observed that the Senior Lenders would contend that section 546(e) of the Bankruptcy Code presents a complete bar to avoidance of the Senior Loans. See id. at 241. The Examiner also noted that the Senior Lenders would argue that, even if it were determined that the guarantees executed by the Guarantor Subsidiaries constituted intentional or constructive fraudulent transfers, the available remedy would be to avoid the guarantees to the extent necessary to satisfy the claims of existing creditors of those Guarantor Subsidiaries, with all remaining value going to satisfy the guaranteed liability before any dividend of value could be made to Tribune for satisfaction of claims against Tribune. Examiner Report, Vol. 1 at 20-21; Vol. 2 at 241-55.

defenses,[260] the very fact that he recognized some possibility that they might so prevail is significant in that it demonstrates the existence of additional obstacles to achieving full avoidance.

e. Finally, there is substantial risk and uncertainty associated with the case for equitable subordination or disallowance of the Senior Loan Claims and Bridge Loan Claims in the event that the case for full avoidance of the Senior Loan Claims and Bridge Loan Claims is not established. In considering such claims, the Examiner concluded that there was not "sufficient evidence to support a finding that the Lead Banks engaged in the kind of egregious behavior that would justify equitable subordination or equitable disallowance" and that it therefore was "somewhat unlikely" a court would impose such a remedy.[261] The evidence presented at the hearing does not cause the Court to question the Examiner's conclusions in that regard.

### 4. The Other Pathways To Success Suggested By The Noteholder Proponents Do Not Establish That The DCL Plan Settlement Falls Outside The Range Of Reasonableness.

106. The Court also finds and concludes that the other "pathways" posited by the Noteholder Proponents to recoveries greater than those provided by the DCL Plan Settlement are subject to similar, if not greater, risks and uncertainties, including the following:

a. There are substantial hurdles that make it unlikely that Non-LBO Creditors would prevail on the so-called "WEAR" theory ("waiver, estoppel, assumption of risk"), which contemplates that, even if only Step Two were avoided, Senior Lenders would not be permitted to recover the full entitlement of their allowed Step One Claims; instead, any

---

[260] Examiner Report, Vol. 1 at 89, 241, 253-54 (concluding that the latter two defenses were "reasonably unlikely" to succeed and that it was "highly likely" a court would view the loans and the distributions to shareholders as one transaction).

[261] Examiner Report, Vol. 2 at 332-33, 336.

recoveries that would have been allocated to the Step Two Lenders would be turned over to Non-LBO Creditors.[262] The Examiner considered the ability of Senior Lenders to receive a *pro rata* share of *disgorgement* recoveries in respect of prepetition payments on avoided Step Two Senior Loans and Bridge Loans and concluded that, "[a]bsent a basis to equitably subordinate the Step One Debt consistent with the standard governing equitable subordination . . . it is difficult to find a doctrinal basis that would support barring the debt from participating in avoidance recoveries."[263] However, because the Examiner found that "the law is not clear" on this point, he left in "equipoise" the question of whether such a remedy exists as to disgorgement recoveries.[264] In contrast, the Examiner rejected a more expansive form of the WEAR theory, which was posited to bar Senior Lenders from receiving any distributions from the estates on account of their allowed Step One Senior Loan Claims, noting that "[a] straightforward application of the relevant Bankruptcy Code provisions makes it abundantly clear that barring equitable subordination, disallowance, or principles of unjust enrichment, if the Step Two Debt but not the Step One Debt is [avoided], the Step One Debt would be entitled to participate in distributions from the estates in accordance with their nonbankruptcy priorities."[265] Moreover, the undisputed evidence indicates that, even applying one or both of these two forms of WEAR would not substantially increase recoveries for the Non-LBO Creditors, as it appears that a total win on the WEAR theory would result in

---

[262] Tr. 3/7 at 58:19-59:18 (Noteholder Proponents' opening statement).

[263] Examiner Report, Vol. 2 at 301-02.

[264] Examiner Report, Vol. 2 at 302-03.

[265] Examiner Report, Vol. 2 at 301 (emphasis added).

recoveries to Senior Noteholders of approximately $500 million, less than the settlement consideration provided to such creditors pursuant to the DCL Plan.[266]

b. Substantial hurdles also exist with respect to a further WEAR theory posited by the Noteholder Proponents under which the "value liberated by the avoidance of Step Two [at the Guarantor Subsidiaries] would be upstreamed to Tribune for distribution to Tribune's Non-LBO Creditors" notwithstanding that allowed claims against those same Guarantor Subsidiaries (allowed Step One Senior Loan Claims) are not paid in full.[267] This theory – which requires application of WEAR combined with "upstreaming" – appears contrary to Third Circuit law respecting entity separateness, as well as section 510(c) of the Bankruptcy Code.[268] Under Third Circuit law, corporate boundaries must be respected.[269] The Noteholder Proponents' "upstreaming" theory is inconsistent with this basic tenet by suggesting the Guarantor Subsidiaries' value should be distributed to Tribune's creditors before the Guarantor Subsidiaries' own creditors have been satisfied.[270] Moreover, section 510(c) of the Bankruptcy Code provides that under principles of equitable subordination, a court may "subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest."[271] However, the law cited to this Court suggests that a court may not subordinate an allowed claim to an

---

[266] Tr. 3/9 at 176:7-11 (Black).

[267] See Docket No. 8026, Noteholder Objection to DCL Plan (hereinafter, "Noteholder Obj.") ¶¶ 234, 237.

[268] See In re Owens Corning, 419 F.3d 195, 211-15 (3d Cir. 2005); 11 U.S.C. § 510(c).

[269] See Owens Corning, 419 F.3d at 211, 215.

[270] Noteholder Obj. ¶¶ 234, 237; Noteholder Post-Trial Reply Brief at 9-10.

[271] 11 U.S.C. § 510(c).

allowed interest.[272] The Noteholder Proponents' "upstreaming" theory requires exactly

that – subordination of the allowed Step One Senior Loan Claims against a Guarantor

Debtor to Tribune's equity interest in that same Guarantor Debtor. The Noteholder

Proponents cited no authority supporting such a theory, which would put Non-LBO

Creditors in a better position than they would have been in had the Step Two Loans

never been made.[273]

c. Substantial hurdles also exist with respect to the Noteholder Proponents' claim that Non-

LBO Creditors would receive greater recoveries than under the DCL Plan if the Step

Two Senior Loan Claims and Bridge Loan Claims were avoided and Tribune's DEV

was determined to be substantially higher than the $6.75 billion value set forth in the

Disclosure Statement with respect to the DCL Plan.[274] For one thing, as set forth in

Section IX, <u>infra</u>, the Court concludes that $6.75 billion is a reasonable approximation of

DEV. For another thing, even if DEV were substantially higher, recoveries to Non-LBO

Creditors would not exceed recoveries under the DCL Plan (even upon avoidance of all

Step Two Financing) unless allowed Step One Senior Loan Claims against the

Guarantor Subsidiaries were denied postpetition interest.[275] The Noteholder Proponents

---

[272] See <u>id.</u>; <u>Official Comm. of Unsecured Creditors v. Credit Suisse (In re Champion Enters., Inc.)</u>, 2010 Bankr. LEXIS 2720 (Bankr. D. Del. Sept. 1, 2010).

[273] Although the Examiner did not explicitly address the Noteholder Proponents' "upstreaming" theory, he recognized that equitable remedies would be applied on an entity-by-entity basis, noting that because the Step One Lenders participated in the Step Two Transactions, an argument may be advanced that it would be inequitable for those parties "to benefit from avoidance of payments made and obligations incurred in the Step Two Transactions while Non-LBO Creditors *holding claims against those same estates* remain unpaid." Examiner Report, Vol. 2 at 301 (emphasis added). Moreover, the Examiner's views on whether full avoidance of both Step One and Step Two Claims against the Subsidiary Guarantors may benefit equity holders do not provide insight into what the Examiner's views would be on the Noteholder Proponents' "upstreaming" theory – in the latter scenario, unlike the former, equity holders would benefit even though allowed claims at those same Debtors have not been satisfied.

[274] Tr. 3/7 at 63:13-64:1 (Noteholder Proponents' opening statement); see also Noteholder Obj. at ¶¶ 122-23.

[275] See Noteholder Obj. at ¶ 122-23, n.33 (recoveries assume no postpetition interest).

have not cited persuasive authority for denying postpetition interest.[276]  Further, it is likely that the Senior Lenders would be entitled to recover their full pro rata share from Tribune and each Guarantor (based upon their Petition Date claim amount against the Debtors, consistent with section 502(b)(2) of the Bankruptcy Code) until they reach an aggregate recovery equal to the full amount owed under the Credit Agreement, including postpetition interest.[277]  In addition, it appears unlikely that the Guarantor Subsidiaries and/or the Guarantor Non-Debtors could make a dividend of value to Tribune, as urged by the Noteholder Proponents, before satisfying all of their liabilities (including postpetition interest).[278]  The existence of intercompany liabilities at certain Guarantor Subsidiaries does not affect this postpetition interest analysis.  Moreover, even if it did, the Guarantor Subsidiaries that do not have intercompany liabilities to Tribune appear to have distributable value that is more than sufficient to cover the postpetition interest on the Step One Senior Loan Claims.[279]  Consequently, it is likely that the Senior Lenders could recover postpetition interest from those entities while collecting the principal

---

[276]  In their Post-Trial Reply Brief, the Noteholder Proponents point out that the Noteholder Plan contains a proviso preventing the payment of postpetition interest until all Intercompany Claims against a given Debtor are paid in full.  See Noteholder Post-Trial Reply Brief at 12-13.  The provisions in the Noteholder Plan, however, are not relevant to the question of whether the Senior Lenders would be entitled to postpetition interest as a matter of law if the claims against them were to be litigated to judgment.  Further, as noted below, the existence of valuable Guarantor Subsidiaries that do not have material intercompany liabilities means that this provision in the Noteholder Plan would not prevent the Senior Lenders from recovering postpetition interest.

[277]  See, e.g., Bd. of Comm'rs of Shawnee County v. Hurley, 169 F. 92, 97 (8th Cir. 1909) ("The obligee in a bond, or the holder of a claim, upon which several parties are personally liable, may prove his claim against the estates of those who become bankrupt and may at the same time pursue the others at law, and, notwithstanding partial payments after the bankruptcy by other obligors or their estates, he may recover dividends from each estate in the full amount of his claim at the time the petition in bankruptcy was filed therein until from all sources he has received full payment of his claim, but no longer."); Ivanhoe Bldg. & Loan Ass'n of Newark, N.J., 295 U.S. 243, 245-46 (1935); In re Sacred Heart Hosp. of Norristown, 182 B.R. 413, 417 (Bankr. E.D. Pa. 1995) ("a creditor can seek to prove its entire claim in the bankrupt's case notwithstanding the existence of third party collateral or guarantees of payment so long as the claimant does not seek to recover more than one full payment of its claim from whatever source").

[278]  11 U.S.C. § 726(a)(5), 1129(a)(7) ("best interests of creditors test"), 1129(b) (absolute priority rule).

[279]  See DCL Post-Trial Brief at 55-56.

amount of their claims against the other Guarantor Subsidiaries even if it was determined that postpetition interest could not be collected from Guarantor Subsidiaries with unpaid intercompany liabilities.[280]

d. Substantial hurdles also exist with respect to the Noteholder Proponents' claim that Non-LBO Creditors would receive greater recoveries than under the DCL Plan if all Senior Loan and Bridge Loan Claims against Tribune (but not the Guarantor Subsidiaries) were avoided and Tribune's Estate was able to recover $2.2 billion in prepetition principal, interest, and fee payments made in respect of the Senior Loans and Bridge Loans.[281] As an initial matter, this argument would require successful avoidance of the Step One Claims, the difficulty of which is discussed in Section V.B.3 herein. It should also be noted that the Examiner concluded it was "highly likely" that at least $2.8 billion in Step One Senior Loan Claims would be preserved, allowed, and able to share in distributions from Tribune's Estate.[282] Moreover, pursuant to the Intercompany Claims Settlement (which has been endorsed and adopted by the Noteholder Proponents themselves), there are $6.9 billion in intercompany claims of the Guarantor Subsidiaries against Tribune which also would be entitled to share in distributions from Tribune's Estate, substantially diminishing recoveries of Non-LBO Creditors even in the circumstances hypothesized by the Noteholder Proponents.[283] Indeed, in modeling potential recoveries

---

[280] See DCL Post-Trial Brief at 52-57; DCL Post-Trial Reply Brief at 15-16.

[281] Tr. 3/7 at 57:22-58:8 (Noteholder Proponents' opening statement).

[282] Examiner Report, Vol. 2 at 92-93, 97.

[283] See DCL Post-Trial Brief at 45-46.

under this type of claim, the Examiner found recoveries that would be substantially less than the amounts under the DCL Plan.[284]

The other pathways posited by the Noteholder Proponents do not undermine the reasonableness of the DCL Plan Settlement.

### 5. The Litigation Trust Provides Valuable Settlement Consideration.

107. The Court finds and concludes that, in addition to the initial guaranteed distributions provided to Non-LBO Creditors as settlement consideration under the DCL Plan, valuable additional settlement consideration is provided through the agreed-upon allocation of future recoveries by the Litigation Trust. Specifically, the DCL Plan entitles Non-LBO Creditors to 100% of the first $90 million in net recoveries by the Trusts, plus 65% of all future net recoveries once the Trusts' $20 million Loan is repaid.[285] In contrast, a pure pro rata allocation of recoveries based upon the ratio of allowed claims against Tribune would entitle Non-LBO Creditors to less than 13% and the Senior Lenders and Bridge Lenders to a little more than 87% of every dollar distributed from the Trusts.[286] The reallocation of proceeds thus provides the prospect of substantial additional settlement consideration.[287]

### C. The Reasonableness Of The DCL Plan Settlement Also Is Supported By Likely Difficulties In Collection.

108. The second Martin factor also weighs in favor of the DCL Plan Settlement. Although the Noteholder Proponents assert that there are no difficulties in collection because "distributions of the reorganized Debtors' cash, debt, and equity can be held in reserve"

---

[284] See Examiner Report, Vol. 2, Annex B at B-26-B-29. For further discussion of this issue, see DCL Post-Trial Brief at 44-46 and DCL Post-Trial Reply Brief at 16-17.

[285] DCL Ex. 1429, DCL Disclosure Statement, Section II.A at 5-6 [Docket No. 7135].

[286] DCL Ex. 1110 at 22 (Chart 8).

[287] See DCL Post-Trial Reply Brief at 21-23.

awaiting a judgment on the avoidance claims,[288] this statement ignores the impact on Tribune

and its subsidiaries of having their assets (or, under the Noteholder Plan, their equity) tied up,

possibly for years. The evidence shows that the Debtors would be significantly constrained in

their ability to sell assets, buy assets, participate in joint ventures, or make acquisitions as a

consequence of such a reserve.[289] This continued lack of flexibility would have a negative

impact on Tribune given the rapid changes in the newspaper publishing and broadcasting

businesses.[290] In addition, the disgorgement claims pose potential collection challenges; indeed,

the Examiner applied a 10% discount to any disgorgement recoveries "due to potential

collectability issues" and the costs of collection.[291]

### D. The Complexity, Expense, And Delay Of Litigation Also Supports The DCL Plan Settlement.

109.    The third <u>Martin</u> factor also weighs in favor of the DCL Plan Settlement. The

Court finds that it is possible that litigation of the settled LBO-Related Causes of Action could

take a number of years and substantially increase professional fees. Such delay and expense

would have a negative impact both on unsecured creditors, who may not have the resources,

risk tolerance, or desire to wait years for an uncertain recovery, and on the Debtors themselves,

whose ability to operate their businesses, raise new capital, and enter into strategic deals could

be impaired while their assets remain tied up in bankruptcy.[292]

110.    In addition, the litigation at issue is highly complex. The Examiner repeatedly

commented on the number and complexity of the issues raised by the potential LBO-Related

---

[288]    Noteholder Obj. at ¶ 48.

[289]    Tr. 3/14 at 115-117 (Hartenstein).

[290]    Tr. 3/14 at 110-112 (Hartenstein).

[291]    Examiner Report, Vol. 2, Annex B at B-2; <u>see also</u> DCL Post-Trial Reply Brief at 65-66.

[292]    <u>See</u> Tr. 3/14 at 110-112, 115-117 (Hartenstein).

Causes of Action.[293]  Indeed, in the absence of a settlement, the Court would be forced to decide

all of the complicated issues described above, and many more.  To list a few:

- whether any of the loans made by the Senior Lenders can be "collapsed" with the payout to Tribune's shareholders;

- whether, in considering solvency, the Step One and Step Two Transactions should be analyzed as separate transactions or a single transaction;

- whether, even if the Step One and Step Two Transactions are treated as a single transaction, the Debtors were rendered insolvent by the Transactions;

- whether the Guarantor Subsidiaries were rendered insolvent by the Guarantees;

- whether the Guarantees can be challenged or avoided for the benefit of the Guarantor Subsidiaries' shareholders or Tribune's creditors;

- whether the recently-amended section 546(e) of the Bankruptcy Code presents a complete bar to recovery; and

- whether, even if the Estates prevailed on the LBO-Related Causes of Action, the appropriate remedy would leave the Lenders with unsecured claims that are pari passu with the other unsecured creditors of Tribune.

111.    The Court finds that there will be significant time and cost savings as a result of

the DCL Plan Settlement.

**E.      The DCL Plan Settlement Is In The Paramount Interest Of Creditors.**

112.    Finally, the fourth Martin factor supports the reasonableness of the DCL Plan

Settlement.

113.    The DCL Plan Settlement was negotiated and is supported by the Creditors'

Committee.[294]  The Creditors' Committee includes representatives from a wide cross-section of

---

[293]   See, e.g., Examiner Report, Vol. 1 at 5 ("Some of the issues discussed in this Report, moreover, are difficult, nuanced, and not conducive to summary treatment."); id. at 17 n.9 (noting that the questions of solvency and capital adequacy are "dense and highly technical"); id. at 29 ("The investigation relates to a series of transactions involving billions of dollars, potential claims against numerous parties, intricate financial analyses and other factual matters as to which the Parties had substantial disagreements, and a lengthy list of wide-ranging legal claims, defenses, and issues under state and federal law."); id. at 31 ("The Parties raised dozens of claims and defenses, each with sub-issues and special complexities that required the Examiner's careful evaluation.").)  Indeed, in the time period allotted to him, the Examiner was unable to "reach definitive conclusions regarding certain of the issues considered in the Report, because, as noted, certain issues presented are difficult and nuanced."  See id. at 5.

creditor groups, including trade creditors, retirees, PBGC, one of the Debtors' unions, Senior

Noteholders, and PHONES Notes,[295] and is the entity with standing to pursue, and that has filed

an adversary proceeding asserting the LBO-Related Causes of Action against the Senior

Lenders.[296]

114.    In addition, creditors across the Debtors' capital structure voted strongly in favor

of the DCL Plan.  2,300 out of the 2,520 conforming ballots received (91.27%) voted to accept

the DCL Plan, with $10,309,165,026 out of $12,871,132,865 in claims represented by those

ballots (80.10%) accepting.[297]  The class of Other Parent Claims – unsecured trade and other

Non-LBO Claims similarly situated to the Senior Noteholders and which are to receive virtually

the same treatment as Senior Noteholders under the DCL Plan – supported the DCL Plan, with

226 out of 237 voting creditors (95.36%), holding 94.71% by dollar amount of the claims voted,

choosing to accept the DCL Plan.[298]  While the Senior Noteholder class failed to receive the

two-thirds by claim amount of votes necessary for class acceptance, the Court finds it

significant that almost 70% of the Senior Noteholders that cast ballots voted to accept the DCL

Plan, with 38% of the Senior Noteholders who stated a preference indicating that they preferred

the DCL Plan over the Noteholder Plan.[299]  Having considered these results, the Court believes

---

[294]    See Section III.E.6, above.

[295]    See Section III.E.1, above.

[296]    Tr. 3/8 at 208:12-210:1 (Salganik).

[297]    See Voting Declaration, Docket No. 8882 at Ex. 1.

[298]    Id.  Even excluding the Swap Claim, the class of Other Parent Claims strongly accepted the DCL Plan, with 220 out of 231 voting creditors (95.24%), holding 88.02% by dollar amount of the voting Other Parent Claims, accepting.

[299]    See Voting Declaration, Docket No. 8882 at Ex. 3.

the Noteholder Proponents should not have a veto over a proposed settlement that the Court determines to be in the best interest of all creditors.[300]

115. The Court finds and concludes that the balloting results confirm the conclusion that the DCL Plan Settlement is in the best interest of creditors.[301]

## VI. THE DCL PLAN SETTLEMENT IS THE PRODUCT OF GOOD FAITH NEGOTIATION AND EXTENSIVE MEDIATION

116. Although "the important point of inquiry is the plan itself" rather than the process by which it was negotiated, drafted, and proposed, In re AbitibiBowater Inc., 2010 Bankr. LEXIS 3987, at *14 (Bankr. D. Del. Nov. 22, 2010) (quotation marks omitted), this Court (as well as other bankruptcy courts) has considered the extent to which the settlement was reached as the result of arms-length bargaining when evaluating the reasonableness of a settlement. See, e.g., In re Exide, 303 B.R. at 68 (citing In re Texaco, 84 B.R. at 902); In re Adelphia Commc'ns Corp., 327 B.R. 143, 159 (Bankr. S.D.N.Y. 2005).

---

[300] See In re Capmark Fin. Group, Inc., 438 B.R. 471, 519 (Bankr. D. Del. 2010) (approving settlement over objection of unsecured creditors: "There is no per se rule that the views of a committee or other creditors are dispositive on the reasonableness of a settlement. A per se rule would unduly expose the Debtors to the demands of creditors preferring to risk estate assets in a litigation lottery or litigate under blackmail or strong-arm strategies."); Sea Containers, 2008 WL 4296562, at *11 (approving settlement over objection of creditors most impacted by settlement where creditors failed to convince court "the [s]ettlement so affects their position as to be unfair"); Key3Media Group., Inc. v Pulver.com (In re Key3Media Group, Inc.), 336 B.R. 87, 97 (D. Del. 2005) (approving settlement of avoidance claims by debtor over objection of largest creditors and noting that their objections "cannot be permitted to predominate over the best interests of the estate as a whole"); see also In re Adelphia Commc'ns Corp., 327 B.R. 143, 165 (Bankr. S.D.N.Y. 2005) ("[A]pproval of a settlement cannot be regarded as a counting exercise. Rather, it must be considered in light of the reasons for any opposition, and the more fundamental factors – such as benefits of settlement, likely rewards of litigation, costs of litigation and downside risk . . . .").

[301] In assessing the reasonableness of a proposed settlement, this Court has also considered a seven-factor test set forth in In re Texaco, Inc., 84 B.R. 893, 902 (Bankr. S.D.N.Y. 1988). Consideration of the Texaco factors supports the reasonableness of the DCL Plan Settlement. For the most part, the Texaco factors overlap the Third Circuit's four-factor Martin test. New Century TRS Holdings, 390 B.R. at 167 n.33. The non-overlapping factors also support the conclusion that the settlement is reasonable. As discussed in Section VI herein, the DCL Plan Settlement is the product of arms-length negotiations among multiple parties and the releases provided by the DCL Plan are appropriate and comport with Third Circuit requirements. Additionally, all parties were represented by competent and experienced counsel.

117.     Having considered the evidence offered by both Plan Proponent groups,

including the testimony of Messrs. Kurtz and Salganik and Ms. Kulnis for the DCL Proponents

and Mr. Gropper for the Noteholder Proponents, as well as the parties' written submissions, the

Court finds and concludes that the DCL Plan Settlement was negotiated in good faith.  The

events the Noteholder Proponents point to in their briefs and the inferences Aurelius seeks to

draw therefrom do not demonstrate or persuade the Court otherwise.[302]

118.     Most important, the evidence presented at the Confirmation Hearing

demonstrates that the settlement was forged through extensive and often contentious, arms-

length negotiations and bargaining, two years of analysis by stakeholders, an exhaustive

investigation by the Examiner, and a Court-directed mediation process supervised by a sitting

federal bankruptcy judge who endorsed the settlement.[303]

119.     Further, the evidence does not support the contention that the Debtors or their

counsel tried to steer negotiations in favor of the Senior Lenders or that the Debtors' Special

Committee acted improperly.  Rather, as was clear from the testimony of Mr. Kurtz, the Debtors

and their advisors (including counsel) worked hard both to investigate the LBO-Related Causes

of Action and to support the settlement negotiation process.[304]  In addition, the Special

Committee's decision to focus its efforts on facilitating the negotiation of as broad a settlement

as possible while protecting against unsupportable releases was both reasonable and beneficial

to the Estates.[305]

---

[302]  See Noteholder Post-Trial Brief at 91-113.

[303]  See DCL Post-Trial Reply Brief at  10-16.

[304]  See id. at 28-29.

[305]  See id. at 29-30.

120.     The evidence also does not support the contention that the Creditors' Committee or its counsel acted in bad faith or in dereliction of their duties.[306] To the contrary, the Creditors' Committee's decision to support the DCL Plan was an informed one reached after an extensive legal and factual investigation; meetings with major creditor constituencies (including Aurelius); consideration of relevant materials (including the Examiner Report and the Aurelius probability model); and based on the advice of counsel and financial advisors regarding the merits and potential value of the LBO-Related Causes of Action.[307]

121.     Finally, the record does not show that either Aurelius or any other Senior Noteholder was frozen out of the negotiation process. Aurelius did not acquire the bulk of its holdings until after the Examiner Report was released,[308] and thereafter was actively involved in the mediation process. Prior to that time, Centerbridge, which was then the largest Senior Noteholder, actively participated in the negotiations leading to the April Plan settlement and was actively engaged in discussions up until the time it sold its interest to Aurelius.[309]

## VII.     THE OTHER SETTLEMENTS IMPLEMENTED IN THE DCL PLAN ARE FAIR AND EQUITABLE

### A.     The Intercompany Claims Settlement.

122.     The DCL Plan incorporates a settlement of all intercompany claims between and among the Debtors and various non-Debtor affiliates (the "Intercompany Claims Settlement").[310] The terms of the Intercompany Claims Settlement were recommended to the

---

[306] In the absence of evidence suggesting that the decisions of the Committee were tainted by improper bias or self-interest, the Noteholder Proponents' "innuendo and speculation" does not suffice "to establish a lack of good faith." See In re Washington Mut. Inc., 442 B.R. 314, 364 (Bankr. D. Del. 2011).

[307] See DCL Brief at 30-31.

[308] DCL Ex. 382; Tr. 3/8 at 142:17-22 (Kurtz).

[309] See, e.g., Tr. 3/8 at 43:13-22, 44:20-45:6, 65:25-67:5 (Kurtz); 211:4-213:7, 218:4-13 (Salganik); DCL Exs. 5, 29, 182.

[310] DCL Plan § 5.15.3; DCL Plan Ex. 1.1.122.

Debtors by Mr. Brian Whittman, Managing Director in the Commercial Restructuring practice of Alvarez & Marsal. Whittman's expert report (the "I/C Report") discusses in detail the analysis he performed of intercompany account balances.[311]

123. As set forth in the I/C Report, after analyzing the intercompany claims in detail and taking into account relevant legal standards provided by the Debtors' counsel, Whittman categorized the various intercompany transactions into groups that share similar characteristics (subject to separate analysis of certain material unique transactions).[312] Whittman then analyzed each such group to determine the reasonable likelihood of allowance on a category-by-category basis.[313] The Intercompany Claims Settlement implements a compromise of Intercompany Claims based on Whittman's conclusions regarding the reasonable likelihood of allowance of the various Intercompany Claims.

124. The Court finds and concludes that the Intercompany Claims Settlement satisfies each of the four Martin factors. In evaluating the first Martin factor, the Court finds that the analysis conducted by Whittman to estimate the likelihood of allowance of a given Intercompany Claim and to discount the face amount of such Claim accordingly reasonably weighs and reflects the probability of success in litigating the Intercompany Claims and, accordingly, satisfies the first Martin factor.[314] In evaluating the remaining three Martin factors, the Court is persuaded that litigation of the Intercompany Claims would likely be complex, costly and inherently uncertain in light of the magnitude of claims and related factual and legal issues. The Court is also mindful of the support for the DCL Plan by numerous Classes of

---

[311] See DCL Ex 1108, Whittman Expert Report – Intercompany Claims.

[312] Id. at 4.

[313] Id. at 4.

[314] Id. at 2-5.

creditors of each of the Debtors, which the Court finds to serve as further evidence that the

Intercompany Settlement is in the paramount interest of creditors. In light of the foregoing, the

Court finds and concludes that the Intercompany Claims Settlement is fair and equitable and

within the range of reasonableness. This conclusion applies only to the Intercompany Claims

Settlement as incorporated into the DCL Plan. For the reasons set forth in Section XII.B below,

no evidence supports the reasonableness of an intercompany claims resolution as proposed by

the Noteholder Proponents in connection with the Noteholder Plan.

**B.      The Retiree Settlement.**

125.      The DCL Plan implements a settlement (the "Retiree Settlement") of certain

Claims arising under Non-Qualified Former Employee Benefit Plans (the "Retiree Claims") in

accordance with the terms set forth in Exhibit 5.15.4 to the DCL Plan (the "Retiree Claims

Settlement Agreement").[315]

126.      A dispute as to the appropriate amount and treatment of the Retiree Claims arose

as a result of differences between the scheduled amounts of such Retiree Claims and the

amounts claimed in the individual proofs of claim filed by the Retiree Claimants.[316] The

Debtors scheduled the Retiree Claims at approximately $82 million in the aggregate, but the

proofs of claim filed by the Retiree Claimants aggregate to approximately $113 million.[317] The

$31 million difference between the claimed and scheduled amounts stemmed from disputes

regarding, among other things, (i) the discount rates and mortality tables most appropriately

applied to those Retiree Claims that are based in whole or in part on future annuity payments,

(ii) whether Retiree Claims for deferred compensation are entitled to interest for the prepetition

---

[315] See DCL Plan § 5.15.4; Ex. 5.15.4.

[316] See DCL Plan Ex. 5.15.4, ¶ E.

[317] See DCL Plan Ex. 5.15.4, ¶ D.

period of the 2008 calendar year, and (iii) with respect to some of the Retiree Claims, the factual basis for such claims.[318]

127.    Following negotiations between the Retiree Claimants and the Debtors, and in consultation with the Creditors' Committee, the parties entered into the Retiree Claims Settlement Agreement on May 18, 2010.[319] Pursuant to the Retiree Settlement, the Retiree Claims are allowed in the aggregate amount of approximately $103 million, contingent upon, among other things, the Retiree Claims receiving treatment consistent with that proposed in the April Plan.[320] To implement the Retiree Settlement, the DCL Plan provides the Retiree Claimants with treatment that is consistent to that proposed in the April Plan.[321]

128.    The Court has considered the terms of the Retiree Settlement and finds that the settlement satisfies the four Martin factors. In evaluating the first Martin factor, the Court is satisfied that  the probability of success on the merits if the Debtors were to litigate each of the Retiree Claims is uncertain due to the varying health, age and physical conditions of the individual Retiree Claimants, arguments over which mortality scale to apply, which discount rate to use, what lookback period to reference, and all the actuarial details that are central for calculating the net present value of a pension claim. The Court finds that the uncertainty of the likelihood of success weighs in favor or the Retiree Settlement, and, accordingly, the Retiree

---

[318]    See DCL Plan Ex. 5.15.4, ¶ E.

[319]    See DCL Plan Ex. 5.15.4.

[320]    The April Plan provided that Retiree Claimants would receive 35.18% of the amount of their Allowed Claims paid in Cash. See April Plan § 3.2.5 [Docket No. 4008, Ex. A].

[321]    See DCL Plan § 3.2.6(c). The Retiree Claims are classified as "Other Parent Claims" against Tribune Company in Class 1F, and the DCL Plan provides that Holders of Other Parent Claims may elect to receive one of four treatment options, including an option of receiving 35.18% of the amount of their Allowed Claims paid in Cash. The other options include an option to receive 35.18% of the amount of the Allowed Claim in the form of a strip of consideration (which is a combination of cash, New Common Stock and New Senior Secured Term Loan) or options to receive a slightly decreased initial distribution (32.73% of the Holder's Allowed Other Parent Claim), either in the form of cash or a strip of consideration, in exchange for participation in the Litigation and Creditors' Trust.

Settlement satisfies the first <u>Martin</u> factor. For similar reasons, the Court is persuaded that litigating each of the Retiree Claims would likely be complex and costly in light of the number of claims and factors that must de determined to calculate the net present value of a pension claim. The Court notes that by settling the amounts of the Retiree Claims, the Debtors have reduced the aggregate claim amount of the Retiree Claims asserted against their estates by $10 million, and thus the settlement is beneficial to the Debtors' Estates. The Court further notes the support for the DCL Plan by numerous Classes of creditors of the Debtors, which the Court finds to serve as further evidence that the Retiree Settlement is in the paramount interest of creditors. Based on the foregoing considerations, the Court finds and concludes that the Retiree Settlement is fair and equitable and within the range of reasonableness.

## VIII. THE RELEASE, EXCULPATION, INJUNCTION, INDEMNIFICATION AND BAR ORDER PROVISIONS OF THE DCL PLAN ARE A VALID EXERCISE OF THE DEBTORS' BUSINESS JUDGMENT AND APPROPRIATE IN THE CHAPTER 11 CASES

### A. The Direct Releases By The Debtors Are Appropriate.

129. Section 11.2.1 of the DCL Plan provides for releases of certain Estate claims and causes of action (the "Debtor Releases"). The Court finds and concludes that the Debtor Releases are appropriate under section 1123(b)(3)(A) of the Bankruptcy Code and the applicable standards established in this Circuit. Courts in this Circuit recognize that Debtors are permitted to release claims pursuant to section 1123(b)(3)(A) of the Bankruptcy Code "if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate." See <u>U.S. Bank Nat'l Ass'n. v. Wilmington Trust Co. (In re Spansion)</u>, 426 B.R. 114, 143 (Bankr. D. Del. 2010) (citing <u>In re DBSD N. Am., Inc.</u>, 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009)). More specifically, courts in this Circuit assess the propriety of releases by a debtor of claims against non-debtor third parties based on the "specific facts and

equities of each case," usually through an analysis of the following five factors: (i) an identity

of interest between the debtor and the third party, such that a suit against the non-debtor is, in

essence, a suit against the debtor or will deplete assets of the estate; (ii) substantial contribution

by the non-debtor of assets to the reorganization; (iii) the essential nature of the injunction to the

reorganization to the extent that, without the injunction, there is little likelihood of success; (iv)

an agreement by a substantial majority of creditors to support the injunction, specifically if the

impacted class or classes "overwhelmingly" votes to accept the plan; and (v) provision in the

plan for payment of all or substantially all of the claims of the class or classes affected by the

injunction. See In re Zenith Elecs. Corp., 241 B.R. 92, 110 (Bankr. D. Del. 1999) (applying the

factors identified in In re Master Mortgage, 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994)).

130.    While the above "Zenith" factors guide the examination of debtor releases for

courts in this jurisdiction, they are recognized as neither exclusive nor conjunctive, but rather,

as helpful in weighing the equities of a particular case after a fact-specific review. See Exide,

303 B.R. at 72; Spansion, 426 B.R. at 142-43 (citing Zenith, 241 B.R. at 110). Thus, courts in

this jurisdiction rely on some, all, or a combination of the factors to ultimately decide whether

direct debtor releases are appropriate. See, e.g., Exide , 303 B.R. at 72 (clarifying that the

factors are not a list of requirements but are helpful in weighing the equities of the particular

case after a fact-specific review) (citing Master Mortgage, 168 B.R. at 935-97); Washington

Mut., 442 B.R. at 346 (noting that these factors "simply provide guidance in the Court's

determination of fairness" and that "due consideration" is to be given to other factors that may

be relevant in a particular case) (citing Master Mortgage, 168 B.R. at 935)[322]; Gillman v.

---

[322] Although the Noteholder Proponents have cited the Washington Mutual decision as a guidepost for reviewing the Debtor Releases, the Court notes that there was no significant business going forward post-emergence in that case and, therefore, this Court's consideration and weighing of the equities and factors in the current matter are distinguishable from the bankruptcy court's analysis in Washington Mutual. See 4/14 Tr. 41:30-42:2, 45:23-46:10;

Continental Airlines (In re Continental Airlines), 203 F.3d 203, 217 n.17 (3d Cir. 2000) (referring to the Zenith/Master Mortgage factors as "key considerations" to be reviewed along with facts in evidence for purposes of determining the propriety of a permanent injunction).

131. In finding and concluding that the Debtor Releases are a valid and proper exercise of the Debtors' business judgment, the Court considered and specifically notes the following: (1) the Debtor Releases have been narrowly tailored, particularly in light of the modifications to the DCL Plan,[323] to achieve the settlements embodied in the DCL Plan and the successful reorganization of the Debtors under the DCL Plan; (2) the essential nature of the Debtor Releases to the DCL Plan as a whole, without which the DCL Plan would not have received the necessary support of parties who relied on such protections to work in good faith towards the Debtors' successful reorganization;[324] (3) strong creditor acceptance and endorsement of the DCL Plan and the settlements embodied therein as set forth in the Voting Declarations;[325] and (4) the significant payments and concessions made under the DCL Plan to Holders of Claims potentially affected by the Debtor Releases.[326]

---

Washington Mut., 442 B.R. at 350 ("Nor is there any evidence that any of the legends of directors, officers, or professionals covered by the Debtors are necessary for the reorganization (which may be limited to the run off of WMMRC's insurance business)." (emphasis added)); Tr. 107:21-113:9 (Hartenstein) (generally describing the Debtors' three main business divisions, each of which will continue operating post-emergence)

[323] In response to objections lodged by the Noteholder Proponents, Brigade Capital Management and the United States Trustee, the DCL Proponents narrowed the scope of the Debtor Releases in a number of respects. See Docket No. 8607 (Chart of Resolved and Unresolved Objections); Docket No. 8769, Attachment 3 (Cumulative Black Line Comparison of DCL Plan to Plan dated 12.8.10) DCL Plan §§ 1.1.196, 1.1.200, 11.2.1. These modifications included (a) clarifying that the Debtor Releases did not apply to Disclaimed State Law Avoidance Claims or Related Person Preference Actions, (b) removing the release of "Step One" Selling Stockholders from the Debtor Releases, (c) removing the current and former members of the Creditors' Committee from the Debtor Releases and (d) narrowing the definition of "Related Persons" to exclude from the benefit of the Debtor Releases the members, partners, shareholders, equity holders, trustees, trust beneficiaries, other representatives, nominees or investment managers of Released Parties.

[324] See, e.g., Sections IV.A.1 and VI, supra.

[325] See Docket Nos. 7918, 8114, 8882.

[326] See Section IV.A.1.

132. In addition, as described below, the Court separately considered relevant factors in connection with specific categories of Released Parties in approving the Debtor Releases as a valid exercise of the Debtors' business judgment and as fair, reasonable and in the best interests of their Estates:

1. **Senior Lenders, Bridge Lenders, Senior Loan Agent, Bridge Loan Agent And Settling Step Two Payees (The "Lender Parties").**

133. First, there is an identity of interest between the Debtors and the Lender Parties because, based upon the record before this Court, it is likely that these third parties would assert that they have contractual indemnification claims against the Debtors.[327] Second, and more fundamentally, as described in Section IV.A.1 above, these parties provided consideration in settlement of claims the Debtors may have against them, which is at the core of the settlement embodied in the DCL Plan and the foundation upon which the DCL Plan has been constructed. Third, in addition to the economic contributions of the Lender Parties, these non-debtor third parties worked with the Debtors and the Creditors' Committee in good faith to ultimately reach the settlement embodied in the DCL Plan.[328] Fourth the releases of the "Related Persons" and participants of the Lender Parties are narrowly tailored and an essential element of the DCL Plan Settlement. "Related Persons" are released only "to the extent a claim arises from actions taken by such Related Person in its capacity as a Related Person of [a lender]."[329] The release, in other words, covers only claims arising from the very transactions for which the Lender Parties are providing settlement consideration. The release for participants of Senior Lenders

---

[327] See DCL Ex. 674 at § 8.04(b), DCL Ex. 673 at § 8.04(b); In re W. Coast Video Enters., Inc., 174 B.R. 906, 911 (Bankr. E.D. Pa. 1994) (in referring to what would later become the first Zenith factor, stating that "[t]here is an identity of interest between the debtor and the third party, usually an indemnity relationship"); see also DCL Post-Trial Reply Brief at 91-92.

[328] See Sections III.E.6, VI, supra.; see also Tr. 3/8 75:14-87:2 (Kurtz) (generally describing negotiations after April Plan was abandoned), Tr. 3/9 27:4-39:4 (Kulnis) (describing negotiations after April Plan was abandoned and throughout the Mediation), Tr. 3/9 41:19-42:16 (Kulnis) (describing negotiations generally).

[329] DCL Plan § 1.1.200.

(i.e., those who have purchased an interest in Senior Loan Claims held by a Senior Lender) is similarly appropriate, as it ensures that Senior Lenders' counterparties are not exposed to liability for which they would attempt to seek contribution or indemnity from the Senior Lenders.[330] Both releases simply ensure that settling parties are not indirectly exposed to liability on claims they have paid significant consideration to settle.[331]

### 2. Released Stockholder Parties, 401(k) Participants And Current Employees.

134. The release of the Released Stockholder Parties under the DCL Plan applies only to claims relating to payments made to shareholders who (a) are Retiree Claimants or hold Claims arising from Non-Qualified Former Employee Benefit Plans, (b) sold their shares through the Tribune 401(k) plan, or (c) are current employees who remain employed through the DCL Plan Effective Date, and, as to current employees of the Debtors and certain of the Retiree Claimants, only for the first $100,000 in payments received.[332] The Court finds and concludes that the limited release of the Released Stockholder Parties is appropriate for the reasons set forth below.

### a. Retiree Claimants.

135. The Court finds and concludes that the proposed release of shareholder-based claims against the Retiree Claimants is a valid exercise of the Debtors' business judgment and is appropriate under the Zenith factors. The Retiree Claimants filed proofs of claim against the Tribune parent in an aggregate amount of approximately $113 million.[333] After lengthy

---

[330] See DCL Post-Trial Brief at 97.

[331] The Noteholder Proponents' citation to Washington Mutual is distinguishable. There, a proposed release of "related persons" was disapproved because, "under a plain reading of the Plan definitions, it could be argued that an affiliate (or even a former affiliate) of a creditor is releasing all claims it may have against [such settling party] and any affiliate of [such settling party]." Washington Mut., 442 B.R. at 354. The release was, in other words, of claims that had nothing to do with what had been settled, unlike the releases of the DCL Plan.

[332] See DCL Plan §§ 1.1.200, 1.1.201.

[333] See DCL Plan, Ex. 5.15.4 [Docket No. 7136].

negotiations, the Retiree Claimants and the Debtors entered into the Retiree Claims Settlement Agreement, which, among other things, allows the claims of Retiree Claimants in an aggregate amount of approximately $103 million.[334] The Court finds and concludes that the Retiree Claimants made a substantial contribution to the DCL Plan by agreeing to reduce the aggregate amount of their claims by $10 million, which has the effect of increasing distributions to other creditors of the Tribune parent.

**b.    Limited Release Of Other Released Stockholder Parties.**

136.    Similarly, the release of shareholders who sold or redeemed shares through Tribune's 401(k) plan and current employees for amounts up to $100,000 also is appropriate.

137.    The DCL Proponents have cited authority in support of the proposition that it is highly unlikely that any avoidance action exists in respect of payments made on account of stock held through the Tribune 401(k) Plan.[335] The Noteholder Proponents have not challenged the authority cited by the DCL Proponents in this regard, and the Court therefore finds and concludes that the release of such claims arguably is not a release of any claim of value.

138.    The Court further finds and concludes that the limited release in respect of current employees is also appropriate because it only benefits those parties that have in fact contributed to the Debtors' reorganization. The uncontroverted testimony of Tribune's Chief

---

[334] Id.; see also Section VII.B, supra.

[335] See Guidry v. Sheet Metal Workers Nat'l Pension Fund, 493 U.S. 365, 376 (1990)(holding that a judgment creditor was precluded from imposing a constructive trust on the defendant's qualified pension plan account as a means to recover on its fraud claims); Patterson v. Shumate, 504 U.S. 753, 764 (1992) ("Declining to recognize any exceptions to [the anti-alienation] provision within the bankruptcy context minimizes the possibility that creditors will engage in strategic manipulation of the bankruptcy laws in order to gain access to otherwise inaccessible funds."); Martorana v. Bd. of Trs. of Steamfitters Local Union 420 Health, Welfare and Pension Fund, 404 F.3d 797, 803 (3d Cir. 2005) (following "Guidry's "cautionary advice" in reversing an order allowing equitable set-off of an award of attorney's fees against the pension benefits of a participant who brought suit against the plan); In re Handel, 301 B.R. 421, 433-34 (Bankr. S.D.N.Y. 2003) (rejecting a third party creditor's attempt to challenge the ERISA anti-alienation provision where it was alleged that the plan fiduciaries had violated ERISA); Butler v. Becton, Dickinson and Co. (In re Loomer), 198 B.R. 755, 759-62 (Bankr D. Neb. 1996) (holding that a chapter 7 trustee could not recover funds held by an ERISA-qualified plan, even though such funds were otherwise avoidable as intentional fraudulent transfers, because ERISA's restriction on alienation controlled).

Executive Officer, Eddy Hartenstein, was clear that this release has a direct, positive impact on the morale of the Debtors' current employees.[336] Because this release is limited to current employees, the employees who will benefit from this release is limited to those that are critical and loyal contributors to the Debtors' reorganization efforts. The damage to employee morale that would result from the pursuit of collection activities against current employees on account of amounts received for Tribune common stock likely would be detrimental to the Debtors' reorganization efforts.[337] Moreover, given the cost-benefit analysis of pursuing collections from current employees who received $100,000 or less, both the Creditors' Committee and the Debtors concluded that the release was appropriate and would not materially affect the ability to recover sufficient amounts to pay the claims of impaired creditors under the DCL Plan.[338]

139. Finally, the Court notes that the persons identified on Exhibit 1.1.192 to the DCL Plan, who are the current and former officer and director defendants named in the Amended Complaint, dated December 7, 2010, filed by the Creditors' Committee, are excluded from all such releases in the event there is a judicial determination that any such person engaged in intentional fraud, willful misconduct or other misconduct or breach of fiduciary duty in connection with the transactions.[339] This safeguard ensures that the releases are limited solely to those persons who have not been found to have committed wrongdoing.

### 3. Debtors' Related Persons.

140. The Court finds and concludes, for the reasons set forth below, that the DCL Plan's releases with respect to the Debtors' Related Persons are limited in scope, a reasonable

---

[336] See Tr. 3/14 at 118:21-119:10 (Hartenstein).

[337] See Tr. 3/14 at 118:21-119:10 (Hartenstein) (stating that the limited release is important for employee morale), 114:1-13 (Hartenstein) (noting that it has been difficult for the Company to attract and retain talent during the bankruptcy case).

[338] See Tr. 4/14 at 73:1-75:20 (colloquy).

[339] DCL Plan, Ex. 1.1.192 [Docket No. 7701].

exercise of the Debtors' business judgment and fair and reasonable. First, the Debtors' Related

Persons are not being released from (a) any LBO-Related Causes of Action (unless such Person

otherwise qualifies for the limited release of Released Stockholder Parties), (b) any liability for

actions or omissions constituting willful misconduct or gross negligence as determined by Final

Order, (c) any obligations of the Debtors' officers or directors to repay loans or advances of

money or other property contractually owed to the Debtors or their Estates, (d) any defenses,

claims, causes of action, or other rights with respect to the interpretation, application or

enforcement of any Employee Benefit Plan or the payment of any Employee Benefit Claim, and

(e) any preference actions. Second, there is an alignment of interest between the Debtors and

these parties. For example, by virtue of the Debtors' charter and bylaws as well as under

Delaware law, the Debtors are generally obligated to indemnify current and former directors

and officers,[340] and with respect to the Debtors' professionals, most will have indemnification

claims based on the terms of their respective retention.[341]

141. Third, the Debtors' professionals, directors and officers have expended

substantial efforts in designing, negotiating and implementing the operational and financial

restructuring of the Company. Finally, notwithstanding extensive diligence, no actual claims

against these parties, other than those that are preserved under the DCL Plan, have been

identified such that the Debtor Release of these parties is likely not a release of any claims of

value.[342]

---

[340] Indeed, several former directors and officers have recently asserted indemnification claims against the Debtors based on, among other things, the Debtors' charter and by-laws. See, e.g., Docket Nos. 8594-8597, 8853-8858. See also Tr. 4/14 42:20-25 (Golden).

[341] See, e.g., Amended Letter of Agreement between Tribune Company and Edelman [Docket No. 146]; Letter Agreement between Tribune Company and Lazard Frères & Co. LLC [Docket No. 147].

[342] Tr. 4/14 67:14-68:2; Spansion, 426 B.R. at 143 (finding that it was not unreasonable for the Debtors to provide a broad release pursuant to section 1123(b)(3)(A) of the Bankruptcy Code even where there was no evidence of any potential claims.).

## B.    The Holder Releases Are Consensual.

142.    Section 11.2.2 of the DCL Plan provides for voluntary releases by Holders of

Claims and Interests on the DCL Plan of the Released Parties from claims and causes of action

that such Holders of Claims or Interests may have against the Released Parties that are related to

the Debtors, the Chapter 11 Cases or the Plan, Disclosure Statement or Restructuring

Transactions (the "Holder Releases"). The Holder Releases apply to any Person:

    a.    that has voted to accept the DCL Plan and has not opted out from granting the releases in Section 11.2.2;

    b.    that has voted to reject the DCL Plan but has opted to grant the releases set forth in Section 11.2.2;

    c.    that is deemed to accept the DCL Plan and has been provided an opportunity but has not opted out of granting the releases in Section 11.2.2;[343]

    d.    or who otherwise agrees to provide the releases set forth in Section 11.2.2.

143.    The Holder Releases will not apply to any Person:

    a.    that has voted to accept the DCL Plan and has opted out from granting the releases set forth in Section 11.2.2;

    b.    that has voted to reject the DCL Plan and did not opt to grant the releases set forth in Section 11.2.2;

    c.    that has been deemed to accept the DCL Plan and has not been provided with an opportunity to opt out of granting the releases in Section 11.2.2;

    d.    that is in a deemed rejecting class; or who is not a claimant of the Debtors or is a claimant but whose Claim is not classified.

144.    The mechanics by which creditors were able to consent to the Holder Releases

were built into the ballots and the solicitation procedures, which this Court approved after full

notice to creditors and a hearing. In accordance with established legal precedent in this circuit,

the Holder Releases are limited to consensual third-party releases supported by the affirmative

agreement of the affected creditor. See Zenith, 241 B.R. at 111; Coram Healthcare, 315 B.R. at

---

[343]    Holders of Convenience Claims in Class 1G received an election form by which such Holders were given the ability to opt out of the Holder Releases. No other class that was deemed to accept the DCL Plan received an opt-out election form and, thus, Holders of Claims in such other Classes shall not be deemed to have granted the Holder Releases.

335-337.[344] Accordingly, the Court hereby finds and concludes that the Holder Releases are consensual and are hereby approved.

### C. The Release Of Guarantor Non-Debtors From The Senior Guaranty Claims And Bridge Guaranty Claim Is Appropriate.

145.     Section 11.2.5 of the DCL Plan provides for the release of non-Debtor entities (FN) Cable Ventures, Inc., Tribune Interactive, Inc., Tribune ND, Inc., and Tribune National Marketing Inc. from Senior Guaranty Claims and Bridge Loan Guaranty Claims (the "Guarantor Non-Debtor Release").  The Guarantor Non-Debtor Release frees entities directly or indirectly owned by Tribune of their debt obligations to all of the Senior and Bridge Lenders. As evidenced by the Voting Declarations, the Senior and Bridge Lender Classes, which are the impacted creditors, have voted overwhelmingly for this provision.[345]  In addition, no Holder of a Senior Loan Guaranty Claim or any Bridge Loan Guaranty Claim after notice thereof have objected to such release.  As a result, and considering the circumstances surrounding the Chapter 11 Cases, the Court finds that the Guarantor Non-Debtor Release is reasonable and appropriate given all of the other terms of the DCL Plan.[346]

### D. The Exculpation Provisions Are Appropriate.

146.     Section 11.5 of the DCL Plan contains exculpation provisions which, with certain limitations, protect the DCL Proponents, including present or former members of the Creditors' Committee (in their capacity as members of the Creditors' Committee), and their

---

[344]   The consensual nature of the Holder Releases in Section 11.2.2 is further evidenced by the release election process recently approved by this Court, see Docket No. 8926, whereby the Debtors' are providing the Holders of Claims that have previously granted the releases in Section 11.2.2 with an opportunity to reconsider their release elections solely to the extent the scope of those releases changed as a result of modifications to the DCL Plan; i.e., to include the Bridge Loan Agent and the Bridge Lenders as Released Parties and the clarification that Disclaimed State Law Avoidance Claims against Released Stockholder Parties fall within the scope of Holders Released Claims.

[345]   See Voting Declaration, Docket No. 8882 at Ex. 1; Supplemental Voting Declaration, Exs. [●]

[346]   See Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.), 280 F.3d 648, 658 (6th Cir. 2002) (plan may release dissenting creditors' claims against non-debtors only if, among other things, the "impacted class, or classes, has overwhelmingly voted to accept the plan").

Related Persons, from liability in connection with postpetition actions relating to the reorganization of the Debtors. Section 11.5 of the DCL Plan excludes from the benefit of the exculpation any liability that results from willful misconduct or gross negligence as determined by a Final Order, and the DCL Proponents have amended Section 11.5 to clarify that it also excludes any act or omission occurring before the Petition Date. The exculpation provisions do not affect the liability of third parties; rather they specifically set a standard of care of gross negligence or willful misconduct in future litigation by a party against an exculpated party for acts arising out of the Debtors' restructuring. See In re PWS Holding Corp., 228 F.3d 224, 245 (3d Cir. 2000) (holding that an exculpation provision "is apparently a commonplace provision in chapter 11 plans, [and] does not affect the liability of these parties, but rather states the standard of liability under the Code.").

147. As such, the exculpation flows inevitably from several different findings a bankruptcy court must reach in confirming a plan, such as the good faith of its proponents, which are core matters. See 28 U.S.C. § 157(b)(2)(L). Courts in this Circuit have customarily approved exculpations to prevent future collateral attacks against parties that have contributed in good faith to a debtor's reorganization in large chapter 11 cases based on the particular circumstances of a case. Such authorization has not been limited to estate fiduciaries, but has included other parties who have been instrumental to the debtors' reorganization efforts.[347] In

---

[347] See, e.g., In re Crdentia Corp., No. 10-10926(BLS), 2010 WL 3313383, at *6 (Bankr. D. Del. May 26, 2010) (granting exculpation for the secured lender and DIP lender); In re NexPak Corp., No. 09-11244(PJW), 2010 WL 5053973, at *8 (Bankr. D. Del. May 18, 2010) (granting exculpation for the pre-petition lenders); In re PCAA Parent, LLC, No. 10-10250(MFW), 2010 WL 2745980, at *15 (Bankr. D. Del. May 17, 2010) (granting exculpation for various lender parties and agents); In re Aleris Int'l, Inc., No. 09-10478(BLS), 2010 WL 3492664, at *44 (Bankr. D. Del. May 13, 2010) (granting exculpation for various agent banks and indenture trustees); In re NextMedia Group, Inc., No. 09-14463(PJW), 2010 WL 2745970, at *21 (Bankr. D. Del. March 22, 2010) (granting exculpation for the disbursing agent, DIP lenders, various agents and pre-petition lenders); In re EBHI Holdings, Inc., No. 09-12099(MFW), 2010 WL 3493027, at *20-21 (Bankr. D. Del. March 18, 2010) (granting exculpation for the pre-petition term agent and lenders, and the indenture trustee); In re Natural Prods. Group, LLC, No. 10-10239(BLS), 2010 WL 2745983, at *19 (Bankr. D. Del. Feb. 22, 2010) (granting exculpation for various lender

such cases, granting exculpation for parties beyond estate fiduciaries was considered fair, reasonable, necessary to the reorganization and in the best interests of all parties in interest.

148. Here, the DCL Proponents worked hard to formulate and negotiate the DCL Plan in good faith.[348] As described elsewhere, the extensive efforts that resulted in the DCL Plan Settlement were essential to the Debtors' reorganization. Under these circumstances, it is appropriate to offer protection to precisely those parties who were integral to the restructuring process in the form of an exculpation. See In re Worldcom, Inc., 2003 WL 23861928, at *28 (Bankr. S.D.N.Y. Oct. 31, 2003). Accordingly, the Court hereby finds and concludes that the exculpation provision in the DCL Plan, as modified, is fair and reasonable.

### E. The Objections To The Bar Order Set Forth In The DCL Plan Are Overruled.

149. The Bar Order in Section 11.3 of the DCL Plan bars non-settling defendants from asserting a claim for contribution or non-contractual indemnity against a Released Party relating to the LBO-Related Causes of Action[349] and, in exchange, provides such defendants with a proportionate fault judgment reduction to the extent they have valid contribution or non-contractual indemnity claims against a Released Party.[350] The Noteholder Proponents, certain current and former directors and officers of the Debtors ("D&Os") and EGI-TRB, LLC, joined

---

and agent parties); In re Teton Energy Corp., No. 09-13946(PJW), 2010 WL 2822056, at *18 (Bankr. D. Del. Jan. 20, 2010) (granting exculpation for the indenture trustee, debenture holders and various lender and agent parties).

[348] See Section VI, supra.

[349] Section 11.3 specifically provides that all "Barred Persons" (including non-settling defendants) are "hereby permanently barred...from...asserting...any claim for non-contractual indemnity or contribution against any Released Party (including any other non-contractual claim...where the injury to the Barred Person is the liability of the Barred Person to the Plaintiff...) arising out of or reasonably flowing from the claims or allegations in any of the Released Claims, the Preserved Causes of Actions, or the Disclaimed State Law Avoidance Claims...". DCL Plan § 11.3, 1st paragraph.

[350] In particular, Section 11.3 provides that, to the extent a Barred Person has a valid contribution claim, the litigation court "shall reduce any Judgment against such Barred Person in an amount equal to (a) the amount of the Judgment...times (b) the aggregate proportionate share of fault (expressed as a percentage) of the Released Party or Parties that would have been liable on a Barred Claim in the absence of this Bar Order." DCL Plan § 11.3, 2nd paragraph.

by Samuel Zell, have objected to the fairness and reasonableness of the Bar Order set forth in Section 11.3.

150.    At the outset, the Court notes that bar orders are a common and essential element of partial settlements in multi-party federal litigation and have been routinely approved by the Third Circuit and other courts.[351] As several federal courts have found, bar orders facilitate settlements by assuring settling defendants that the consideration they pay on account of the settled claims is the only consideration they will be required to pay on account of such claims.[352]

151.    Here, as noted above, the Court has determined that the partial settlement of the LBO-Related Causes of Action embedded in the DCL Plan is fair and reasonable, and that the settling defendants have provided fair and reasonable settlement consideration to the Debtors' Estates. See Section V.B.2, supra. In light of that determination, the Court finds that the Bar Order is an appropriate and reasonable provision designed to ensure that the settling defendants who are resolving claims for valuable consideration cannot be made to pay twice on account of that same liability through a claim for contribution or indemnity brought by non-setting

---

[351] See, e.g., Nutraquest, 434 F.3d at 649-50 (holding that the district court properly approved a settlement agreement which barred contribution claims); Eichenholtz v. Brennan, 52 F.3d 478, 486-87 (3d Cir. 1995) (approving a bar order and noting that "modern settlements increasingly incorporate settlement bar orders into partial settlements"); Whyte v. Kivisto (In re SemCrude, L.P.), No. 08-11525 (BLS), 2010 Bankr. LEXIS 4160, at *17 (Bankr. D. Del. Nov. 19, 2010) (approving a bar order and acknowledging that "[c]ourts in similar proceedings routinely approve contribution bars"); In re Appleseed's Intermediate Holdings LLC, No. 11-10160 (KG), slip op.  . at 54-55 (Bankr. D. Del. Apr. 14, 2011) (confirming plan of reorganization that included a bar order); Official Comm. of Unsecured Creditors v. Citibank, N.A. (In re Lyondell Chem. Corp.), Adv. Pro. No. 09-01375 (REG) at 8-10 [Docket No. 371] (Bankr. S.D.N.Y. Mar. 11, 2010) (approving a settlement agreement that included a bar order).

[352] See, e.g., Munford v. Munford Inc. (In re Munford, Inc.), 97 F.3d 449, 455 (11th Cir. 1996) ("[B]ar orders play an integral role in facilitating settlement…because defendants buy little peace through settlement unless they are assured that they will be protected against codefendants' efforts to shift their losses through cross-claims for indemnity, contribution, and other causes related to the underlying litigation." (citation and internal marks omitted)); In re Masters Mates & Pilots Pension Plan, 957 F.2d 1020, 1028 (2d Cir. 1992) ("If a nonsettling defendant…were allowed to seek payment from a defendant who had settled, then settlement would not bring the latter much peace of mind."); In re Worldcom Inc., ERISA Litig., 339 F.Supp. 2d 561, 568 (S.D.N.Y. 2004) ("Without the ability to limit the liability of settling defendants through bar orders it is likely that no settlements could be reached." (citation and internal marks omitted)).

defendants based upon the Leveraged ESOP Transactions. Consistent with other contribution bars, the Bar Order establishes a mechanism for providing any non-settling defendants fair compensation on account of any contribution or non-contractual indemnity claims they may have, by off-setting any judgment against the non-settling defendants by an amount equal to the "proportionate share of fault" of the settling defendants, which, in turn, is reasonably equivalent to the value of the barred claims of the non-settling defendants.[353] This proportionate judgment reduction formula has been described by the Third Circuit as "the fairest method" for judgment reduction in a bar order.[354] Moreover, the Court finds that the Bar Order is limited in scope and, by its terms, does not "prejudice or operate to preclude the rights of any Barred Person to assert claims or causes of action (including, without limitation, any direct or personal causes of action)" other than the barred contribution or non-contractual indemnity claims.[355]

152. The objecting parties contend variously that the Bar Order constitutes an impermissible third-party release or that it lacks certain procedural protections. For the reasons set forth below, each of the objections to the Bar Order is hereby overruled.

---

[353] See DCL Plan § 11.3, 2nd paragraph. This result is generally consistent with state law contribution statutes—many of which are modeled after the Uniform Contribution Among Tortfeasors Act (proposed in 1939) or revised Uniform Contribution Among Tortfeasors Act (proposed in 1954) – which contain contribution bar and judgment reduction provisions that are substantively similar to the Bar Order in the DCL Plan. See, e.g., 740 ILCS 100/2 (Illinois); 10 Del Ch. §§ 6301, 6304 (Delaware); CPLR § 1401, N.Y. Gen. Obl. 15-108 (New York); Cal. Civ. Proc. Code §§ 875, 877 (California); Mass. G.L. c. 231B, § 1 (Massachusetts).

[354] Eichenholtz, 52 F.3d at 486-487; McDermott, Inc. v. AmClyde and River Don Castings Ltd., 511 U.S. 202, 208, 217 (1994) (explaining that "[i]t is generally agreed that when a plaintiff settles with one of several joint tortfeasors, the nonsettling defendants are entitled to a credit for that settlement" and concluding that "the proportionate share approach is [the] superior" approach); cf. SemCrude, 2010 Bankr. LEXIS 4160 at *19-20 (approving bar order as fair because judgment reduction provision preserved setoff rights); In re Munford, Inc., 172 B.R. 404, 411 (Bankr. N.D. Ga. 1993), aff'd, 188 B.R. 860 (N.D. Ga. 1994), aff'd, 97 F.3d 449 (11th Cir. 1996) ("Judgment reduction provisions serve as an alternative to contribution after entry of a bar order and provide a means for fairly compensating non-settling defendants for the loss of contribution or indemnity claims.").

[355] See DCL Plan § 11.3, 3rd paragraph. In addition, the Bar Order expressly provides that it shall not apply "to (i) any contractual indemnity; (ii) any claim for which a court determines joint liability does not exist as a matter of law; or (iii) any claims for non-contractual indemnity or contribution that are asserted with respect to claims or causes of action that are brought by any Person other than [any Person asserting a claim on behalf of the Debtors' estates, a Preserved Cause of Action or a Disclaimed State Law Avoidance Claims]." Id.

153.     The objecting parties first argue that the Bar Order constitutes an impermissible

third-party release under the tests set forth in Continental Airlines and Spansion, neither of

which involved a contribution bar.  The Court is not persuaded by this argument.  To the

contrary, the Court finds that the Bar Order is fundamentally different from a non-consensual

third party release in that it does not release third parties from "any and all claims," Continental

Airlines, 203 F.3d at 206; Spansion, 426 B.R. at 143, but instead only bars non-settling

defendants from seeking recovery against settling defendants in respect of claims they have

already paid valuable consideration to settle.  The Bar Order thus fits squarely within the

mainstream of the federal cases approving bar orders to ensure that settling defendants do not

pay again on account of settled liability.[356]

154.     The Noteholder Proponents also argue that because they did not participate in the

negotiation of the DCL Plan Settlement, the instant case is different from other cases in which

contribution bars have been approved.  The Court views this argument as nothing more than an

attack on the adequacy of the settlement consideration itself.  Because the Court has already

found that the DCL Plan Settlement is fair and reasonable to the Noteholder Proponents, the

Court also finds that the reduction of any subsequent LBO-related litigation judgment against

the non-settling defendants by the "proportionate share of fault" of the setting defendants is also

fair and reasonable to the Noteholder Proponents (and all other creditors of the Debtors'

Estates).  To find otherwise would be to allow the Noteholder Proponents (and other creditors)

to recover a second time on account of the same settled liability, resulting in an impermissible

and unjust double recovery.  Moreover, the DCL Plan Settlement was negotiated and agreed to

by the Creditors' Committee – an estate fiduciary and the only party authorized (with the

---

[356]  See supra n.351.

support of the Noteholder Proponents) to assert the settled claims – on behalf of and for the

benefit of all creditors, including the Noteholder Proponents.

155.    Finally, the D&Os have expressed the concern that the Bar Order does not

account for the possibility that another court will disregard the judgment reduction provision of

the Bar Order, and otherwise does not comport with due process.  These concerns are

unfounded.  As an initial matter, to accept the D&Os' argument would be to call into question

the validity of contribution bars everywhere.  Moreover, the terms and conditions of

Section 11.3 are entirely consistent with due process.  For example, the Bar Order requires that

any plaintiffs asserting LBO-Related Causes of Action against any of the non-settling

defendants must raise the Bar Order with the litigation court prior to entry of any judgment.[357]

The DCL Plan, the Litigation Trust Agreement and the Creditors' Trust Agreement also

specifically require the Litigation Trustee and Creditors' Trustee to honor the terms of the Bar

Order.[358]  In addition, the Court is mindful that, as with any federal court, its final orders

confirming the DCL Plan are entitled to full faith and credit under well-established law.[359]

Moreover, the Court will retain jurisdiction with respect to all matters concerning the Bar Order,

thereby providing that the non-settling defendants may seek relief even if a subsequent court

were to fail to honor the judgment reduction provision of the Bar Order.[360]  When viewed as a

---

[357]   See DCL Plan § 11.3, 2nd paragraph.

[358]   See DCL Plan §§ 13.3.3, 14.4.3; DCL Plan Ex. 13.1, Section 3.3(b); Ex. 14.1, Section 3.3(b).

[359]   See, e.g., Celotex Corp. v. Edwards, 514 U.S. 300, 313 (1995) (explaining that valid orders of bankruptcy courts are to be "respected," and cannot be collaterally attacked, in other courts); Del. Valley Citizen's Council for Clean Air v. Pa., 755 F.2d 38, 43-44 (3d Cir. 1985) (state courts must give full faith and credit to proceedings of federal courts); In re McGhan, 288 F.3d 1172, 1179,80 (9th Cir. 2002) ("[S]tate courts should not intrude upon the plenary power of the federal courts in administering bankruptcy cases by attempting to modify or extinguish federal court orders").

[360]   See DCL Plan § 11.3, 5th paragraph; see also Travelers Indem. Co. v. Bailey, 129 S. Ct. 2195, 2205 (2009) (approving a bankruptcy court's decision to enjoin state court lawsuits filed ten years after the approval of a plan of reorganization in light of settlement orders associated with the reorganization plan and holding that a bankruptcy

whole, these and the other provisions in Section 11.3 provide sufficient procedural protection and safeguards to the non-settling defendants and other parties in interest with respect to the Bar Order.[361] For the foregoing reasons, and based upon the record evidence in these proceedings, the Court hereby finds and concludes that the inclusion of the Bar Order in Section 11.3 of the DCL Plan is fair and reasonable to all parties and is consistent with the provisions of the Bankruptcy Code, and that all remaining objections to the Bar Order are hereby overruled.

**F.    The Indemnification Provisions Are Appropriate.**

156.    The Court finds that the continuation of the Debtors' indemnification obligations as provided in Section 11.6.1 of the DCL Plan is fair and is a reasonable exercise of the Debtors' business judgment. The continuation of these obligations in the manner set forth in Section 11.6.1 is both beneficial and necessary to the Debtors, their estates and their creditors by ensuring that management and personnel critical to the Debtors' reorganization efforts and future successes remain part of the Company.

157.    Furthermore, the Court finds that continuation of indemnification obligations pursuant to Section 11.6.1 of the DCL Plan is appropriately limited in scope, as the Debtors have declined to continue any indemnification or reimbursement obligation related to, based

---

court "plainly had jurisdiction to enforce its own prior orders," especially when the bankruptcy court "explicitly retained jurisdiction to enforce [the settlement order]").

[361] Brigade did not submit a pleading with respect to the Bar Order, but suggested at oral argument that the Bar Order should not apply to an action asserting state law constructive fraudulent transfer claims that have reverted from the Estate to individual creditors (the so-called Disclaimed State Law Avoidance Claims). Tr. 4/13 at 131:14-138:7 (Pachulski). This argument is without merit. As an initial matter, because fraudulent conveyance actions are not tort-based claims, claims for contribution in such actions generally do not exist under state laws. See, e.g., In re Amp'd Mobile, Inc., 404 B.R. 118, 125 (Bankr. D. Del. 2009); Weiboldt Stores v. Schottenstein, 111 B.R. 162, 169 (N.D. Ill. 1990); see also Tr. 4/13 at 159:21-160:22 (Steen); Tr. 4/14 at 89:7-23 (Moskowitz). Nonetheless, the Bar Order explicitly bars contribution claims against the Released Parties asserted with respect to the Disclaimed State Law Avoidance Claims, while noting that "Barred Claims shall not include any claim for non-contractual indemnity or contribution against any Released Party solely in its capacity, if any, as a Selling Shareholder." DCL Plan § 11.3, 2nd paragraph. The Bar Order thus does not apply to the narrow set of contribution claims against Released Parties in their capacity as Selling Shareholders that may be asserted with respect to the Disclaimed State Law Avoidance Claims that have not already been brought by the Estate on behalf of all creditors. Accordingly, Brigade's objection is overruled.

upon, or in connection with any LBO-Related Causes of Action.[362] The Court finds that the

Debtors' certificate of incorporation and bylaws are not executory contracts with the

Company's directors and officers and are not subject to section 365 of the Bankruptcy Code,

and thereby overrules the objection of Mr. Zell to this decision not to provide indemnification

for LBO-Related Causes of Action.[363] After the Effective Date, the Debtors need not continue

any indemnification or reimbursement obligation related to, based upon or in connection with

any LBO-Related Causes of Action, and any indemnification claim related thereto shall be

treated as a prepetition claim pursuant to the applicable provisions of the Bankruptcy Code.[364]

## IX.    DISTRIBUTABLE ENTERPRISE VALUE.

158.    In support of the distributable enterprise value (DEV) on which their plan is

based, the DCL Proponents offered the testimony of Suneel Mandava and John Chachas. The

Court found Mandava qualified as an expert in valuation and reorganization[365] and found

Chachas qualified as an expert in valuing, publishing and broadcasting companies.[366] Based on

work performed by Lazard, Mandava opined that the Debtors' enterprise value will be in the

range of $6.3 billion to $7.1 billion as of the emergence date, depending on market conditions,

with a midpoint of $6.75 billion.[367] Chachas concluded that the valuation provided by Lazard

---

[362] See DCL Plan § 11.6.1.

[363] See In re Baldwin-United Corp., 43 B.R. 443, 459-60 (S.D. Ohio 1984) (rejecting argument that bylaws constituted executory contract to indemnify directors and officers); In re THC Fin. Corp., 446 F. Supp. 1329, 1331 (D. Haw. 1977) (finding, under the Bankruptcy Act, that indemnification provisions in articles of incorporation were not executory contracts).

[364] See In re Summit Metals, Inc., 379 B.R. 40, 56 (Bankr. D. Del 2007) ("[A]n indemnification claim based upon pre-petition services or conduct...is a form of prepetition compensation for serves that is not entitled to administrative expense priority."); In re Consol. Oil & Gas, Inc., 110 B.R. 535, 538-539 (Bankr. D. Col. 1990) (rejecting directors' and officers' argument that the debtor was required to honor indemnification obligations to the extent provided under state law).

[365] Tr. 3/11 at 19:3-7 (Mandava).

[366] Tr. 3/11 at 146:11-16 (Chachas).

[367] Tr. 3/11 at 77:18-78:12 (Mandava); DCL Ex. 1104 at Ex. 2, p. 13.

was appropriate.[368] For the reasons set forth below, the Court finds and concludes that Lazard's valuation is accurate and reliable.

159. In valuing Tribune's core businesses, its broadcasting and publishing businesses, Lazard used standard valuation methodologies – comparable company analysis and discounted cash flow ("DCF") analysis.[369] Lazard also considered the precedent transaction methodology for these core businesses, but determined that there were no relevant and timely precedent transactions.[370]

160. In performing its comparable company analysis, Lazard used its extensive knowledge of Tribune and the media industry to determine which companies were most similar to Tribune. Lazard used those companies to select the appropriate comparable company multiples. Thus, for Tribune's publishing business, Lazard based its high end of the multiple range on multiples of McClatchy and New York Times and took a "half turn" discount for the low end of the range to reflect the fact that McClatchy and New York Times, while comparable to Tribune's publishing business, were higher margin businesses.[371] For Tribune's broadcasting business, again basing its selection on the companies that were most comparable to Tribune, Lazard chose the midpoint of the "pure play" broadcasting companies as the high end of the multiple range and established the low end by applying a discount to reflect the fact that Tribune's affiliate mix is not as valuable as those "pure play" companies.[372]

161. In its DCF analysis for the publishing side of Tribune's business, Lazard used the Gordon Growth Model, which assesses the value of the terminal year based on a discount rate

---

[368] Tr. 3/11 at 148:4-6 (Chachas).

[369] Tr. 3/11 at 37:25-38:1 (Mandava).

[370] Tr. 3/11 at 38:2-7, 48:6-9 (Mandava); id. at 167:1-18 (Chachas).

[371] Tr. 3/11 at 29:21-31:22 (Mandava).

[372] Tr. 3/11 at 40:14-41:9 (Mandava).

and growth assumption.[373] Lazard used the Gordon Growth Model based on its reasoned judgment that the financial profile of the publishing business in 2015 would be markedly different than it is in 2011.[374] Lazard assigned a 70% weighting for the comparable company approach and 30% weighting for the DCF.[375] The comparable company approach was consistent with the market outlook that the industry will be able to revitalize itself, while the DCF approach assumed the industry will continue to decline. Lazard determined that it was inappropriate to weight the DCF approach less than 30% given that it reflects a valid view of the industry and incorporates management's best insight into its specific business.[376]

162.    In its DCF of the broadcasting business, Lazard used a terminal multiple value instead of Gordon Growth because the financial profile for that business in the outer years is expected to be much more similar to what it is near term.[377] Lazard weighted the DCF 60% and the comparable company approach 40% to take into consideration the differences between Tribune's television operations and the comparable companies in terms of market size and ratings.[378]

163.    Lazard also valued Tribune's non-controlled investments, TV Food Network ("TV Food"), Classified Ventures, and CareerBuilder.[379] Tribune has a 31% minority interest in TV Food, which is controlled and majority owned by Scripps Network.[380] Lazard used the comparable company and precedent transactions approaches to value TV Food, using a discount

---

[373]    Tr. 3/11 at 33:6-9 (Mandava).

[374]    Tr. 3/11 at 33:16-34:8 (Mandava).

[375]    Tr. 3/11 at 34:24-35:5 (Mandava).

[376]    Tr. 3/11 at 35:6-37:3 (Mandava).

[377]    Tr. 3/11 at 46:6-46:16 (Mandava).

[378]    Tr. 3/11 at 47:4-48:5 (Mandava).

[379]    Tr. 3/11 at 55:9-17 (Mandava).

[380]    Tr. 3/11 at 55:24-56:1 (Mandava).

to the Scripps multiple for its comparable company analysis and Scripps's acquisition of the Travel Channel for its precedent transaction analysis.[381] Lazard did not apply a minority discount or discount for lack of marketability to its valuation of Tribune's interest in TV Food in order to "err on the side of giving a very full valuation of this asset."[382] Because there were no reliable precedent transactions and Lazard did not have access to long-range projections, Lazard used a comparable companies approach to value CareerBuilder.[383] For Classified Ventures, Lazard used a hybrid methodology, but the valuation also was informed by a precedent transaction involving Internet Brands.[384] In neither instance did Lazard apply any discounts to these valuations.[385]

164.    In January 2011, shortly before the confirmation hearing, Lazard undertook to validate the reasonableness of its valuation, which had been performed in October 2010.[386] The January "refresh" of the earlier Lazard valuation confirmed the continuing reliability of Lazard's value range.[387] While the Debtors' DEV had, as a result of market changes, increased somewhat, the midpoint value was still well within Lazard's original value range.[388] Lazard concluded that the January work, which took into consideration all of the current market

---

[381]    Tr. 3/11 at 56:20-60:8 (Mandava).  Lazard also performed a DCF analysis of TV Food but did not include that analysis in its report due to confidentiality restrictions.  The DCF valuation was consistent with the comparable company valuation.  Id. at 63:7-23 (Mandava).

[382]    Tr. 3/11 at 66:11-67:12 (Mandava).

[383]    Tr. 3/11 at 67:17-68:4 (Mandava).

[384]    Tr. 3/11 at 68:17-69:3 (Mandava).

[385]    Tr. 3/11 at 68:17-69:6 (Mandava).

[386]    Tr. 3/11 at 20:22-21:12 (Mandava).

[387]    Tr. 3/11 at 20:13-21:12 (Mandava); id. at 147:22-148:6 (Chachas).

[388]    Tr. 3/11 at 77:9-17 (Mandava).

information and current company financial information, validated the reasonableness of Lazard's expected valuation of the Debtors as of the date of emergence.[389]

165.     To further validate Lazard's earlier analysis, the Debtors retained Chachas, who has 24 years of investment banking, valuation, and reorganization experience in the publishing and broadcasting industries.[390] Chachas performed his own comparable company and DCF analyses, performed diligence with corporate management in Chicago and Los Angeles, spoke at length with people in the publishing and broadcasting industries, and tested many of Lazard's analyses to reach a conclusion regarding DEV.[391]

166.     As noted above, Chachas concluded that the valuation provided in the Lazard October valuation was still valid.[392] Although the value had risen $269 million between October and January, Chachas opined that the $6.75 billion midpoint remained reasonable because all of the increase came from Tribune's non-controlled investments – primarily TV Food – while the value of its core businesses actually declined.[393] Chachas further noted that applying just a 10% discount to the non-controlled investments, which Chachas opined would be extremely conservative, would wipe out the increase almost entirely.[394] Notably, the Noteholder Proponents' solvency expert, Tuliano, applied discounts higher than 10% to Tribune's non-controlled investments.[395]

---

[389]   Tr. 3/11 at 21:6-12 (Mandava).

[390]   Tr. 3/11 at 147:22-148:3 (Chachas).

[391]   Tr. 3/11 at 148:7-149:10 (Chachas).

[392]   Tr. 3/11 at 148:4-6 (Chachas).

[393]   Tr. 3/11 at 191:2-192:6 (Chachas).  Chachas has a longstanding relationship with Scripps, the managing partner of TV Food.  Tr. 3/11 at 178:16-179:7 (Chachas).

[394]   Tr. 3/11 at 192:7-192:25 (Chachas).

[395]   See, e.g., NPP Ex. 944 at Ex. I-4-B, p. 2 of 5 (applying discount for lack of control of 16.7% to value of TV Food).

167.     The Noteholder Proponents offered the testimony of Rajinder Singh of Raymond James on the issue of valuation.  The Court found Singh qualified as an expert in valuation.[396] However, at the hearing, the Court noted that it would take into account certain facts in weighing Singh's testimony, including that he had never before been qualified as an expert in valuation or submitted a valuation report;[397] had no experience in the publishing or broadcasting businesses;[398] had little knowledge of Tribune or the companies that he deemed comparable to Tribune;[399] had not consulted anyone regarding such matters;[400] and spent only two and half weeks on this assignment before issuing his report.[401]

168.     In concluding that the DEV of the Reorganized Debtors at June 30, 2011 would be between $7.959 billion and $8.703 billion,[402] Singh did not perform a bottoms-up valuation of the Debtors' businesses.[403]  Instead, Singh critiqued the work performed by Lazard and made adjustments to Lazard's valuation.  The Court finds that Singh's critiques of Lazard are flawed and that Singh's DEV estimates are not reliable.

169.     Singh's principal criticism of Lazard's comparable company analysis was that it was not updated based on the most recently available financial market information.[404]  The record reflects, however, that Lazard used current information when it did its work in October

---

[396]  Tr. 3/14 at 179:1-8 (Singh).

[397]  Tr. 3/14 at 169:3-6 (Singh).

[398]  Tr. 3/14 at 165:17-167:4, 172:10-12 (Singh).

[399]  Tr. 3/15 at 30:3-31:21 (Singh).

[400]  Tr. 3/14 at 166:7-10 (Singh).

[401]  Tr. 3/14 at 172:13-19 (Singh); see also DCL Post Trial Brief at 76-77.

[402]  Tr. 3/14 at 223:23-224:2 (Singh).

[403]  Tr. 3/15 at 14:9-10 (Singh).

[404]  Tr. 3/15 at 21:14-23 (Singh).

and again in January.[405] As both Mandava and Chachas explained, and as discussed above, the increase in the Debtors' value between October and January did not come from the Debtors' core businesses – the value of which actually declined – but rather came from a purported increase in the Debtors' minority interests in its non-controlled investments (TV Food, Classified Ventures, and CareerBuilder).[406] Because those minority interests already had been given a "very full valuation," in that Lazard did not apply a "minority discount [or a] lack-of-marketability discount[],"[407] Chachas opined that a further upward adjustment of the Debtors' overall valuation on the basis of the increase in the market price of the minority interests in non-controlled investments was not appropriate.[408]

170.    Further, between the January report and the time of trial, the market prices of the comparable companies declined and almost all of the stock price gains reflected in Singh's February report evaporated.[409] The Court notes that from March to May that trend has continued.  As Mandava testified, the estimated enterprise value range of $6.3 billion to $7.1 billion represented a reasonable estimate of the company's value at emergence, "tak[ing] into consideration the chance or risk or opportunity of the valuation either improving between now and then, or going down between now and then."[410]

171.    The Court finds Singh's other adjustments to Lazard's valuation unreliable. Among other things:

---

[405]    Tr. 3/15 at 21:24-22:7 (Singh).

[406]    Tr. 3/11 at 75:19-76:9 (Mandava); Tr. 3/11 at 191:2-192:6 (Chachas).

[407]    Tr. 3/11 at 76:9-18 (Mandava).  Indeed, it was pointed out that if a minority discount comparable to the one advocated by the Noteholder Proponents' other valuation expert were applied, the Debtors' DEV would be essentially unchanged.  Tr. 3/11 at 192 at 7-14 (Chachas).

[408]    Tr. 3/11 at 191:2-192:25 (Chachas); see also DCL Post Trial Brief at 78-79; DCL Post Trial Reply Brief at 25-26.

[409]    Tr. 3/15 at 40:11-22 (Singh); see also DCL Post-Trial Brief at 78-79; DCL Post-Trial Reply Brief at 26-27.

[410]    Tr. 3/11 at 77:20-78:7 (Mandava).

- Singh did not use a standard comparable company analysis. Instead, he guessed what multiples Lazard used and then "indexed" those multiples to reflect an increase in market prices from October 2010 to February 2011.[411] Moreover, his guesses were not accurate. For example, Singh incorrectly guessed that Lazard had used both pure play and diversified companies in selecting multiples and then indexed the mean of both pure play and diversified companies, while conceding that diversified companies should not be included in a sum-of-the-parts valuation here.[412]

- Singh used both 2010 and 2011 financial information to value the publishing business. Because Tribune's publishing business has experienced secular declines year over year, including financial results from the prior year (2010) served to improperly increase the purported value.[413]

- Singh substantially increased the purported value of Tribune by changing Lazard's weighting of the DCF and comparable company analysis for both the broadcasting and publishing businesses. There was no reasonable basis for those changes in the weightings.[414]

- The majority of the increase in Singh's valuation of Tribune as compared to Lazard's valuation results from Singh's increases in the value of Tribune's non-controlled assets, primarily TV Food, CareerBuilder, and Classified Ventures, with most of the increase coming from TV Food. In valuing these assets, among other errors, Singh failed to make any adjustment to reflect the fact that Tribune owns non-controlling, minority interests.[415]

- Singh created additional "value" from an accounting methodology referred to as "Fresh Start Accounting." In Fresh Start Accounting, Tribune's entire set of financial statements will be reviewed and revalued based on current market value as of the time of its exit from bankruptcy. Certain Fresh Start Accounting adjustments may result in increases in Tribune's EBITDA, while others may result in decreases in EBITDA.[416] Without doing any analysis to determine the effect of other potential adjustments, Singh selected only one such adjustment (for pensions) and added $182 million of "value" on the basis of it.[417] This value is not relevant for purposes of DEV, however, because Tribune will still have a

---

[411] Tr. 3/15 at 116:23-118:12 (Singh).

[412] Tr. 3/15 at 25:24-27:8, 34:3-18 (Singh); see also DCL Post-Trial Brief at 77-78.

[413] See DCL Post Trial Brief at 79.

[414] See DCL Post-Trial Brief at 80-81.

[415] See DCL Post-Trial Brief at 81-84.

[416] Tr. 3/15 at 81:3-11 (Singh).

[417] Tr. 3/15 at 80:8-81:23 (Singh).

$198 million unfunded pension liability notwithstanding the Fresh Start adjustment. Accounting revisions do not change the actual value of Tribune.[418]

- Singh increased the value of Tribune by adding $157 million to reflect an expected accumulation of cash between January and an emergence date of June 30, 2011.[419] The cash for the first six months of 2011, however, was already included in both the DCF and in the 2011 EBITDA metric used in the comparable company multiple methodology,[420] which is based on the next year's cash flows as reflected in Tribune's EBITDA. Because the EBITDA for 2011 already includes the next six months of cash flows, adding the same cash back under another methodology is double counting.[421]

## X. FCC ISSUES DO NOT IMPAIR THE FEASIBILITY OF THE DCL PLAN OR PROVIDE A BASIS TO PREFER THE NOTEHOLDER PLAN.

172. The Noteholder Proponents also contend that the DCL Plan is not "feasible" within the meaning of section 1129(a)(11) of the Bankruptcy Code. The "feasibility" requirement of section 1129 does not require "that success be guaranteed, but only that the plan present a workable scheme of organization and operation" supporting a "reasonable expectation of success." CoreStates Bank, N.A. v. United Chem. Techs., 202 B.R. 33, 45-46 (E.D. Pa. 1996) (quoting 5 Collier on Bankruptcy ¶ 1129.02[11] (15th Ed. 1991)).

173. The Communications Act vests the Federal Communications Commission (the "FCC") with exclusive jurisdiction to evaluate Tribune's pending applications[422] for approval of its post-emergence ownership structure. See 47 U.S.C. § 310(d). The issue before the Court is not to pass on the merits of Tribune's FCC applications, but whether the DCL Proponents have shown a "reasonable prospect" that the required FCC approvals will be granted and whether the Noteholder Proponents have demonstrated that the DCL Plan would be subject to significant

---

[418] See DCL Post Trial Brief at 84.

[419] Tr. 3/15 at 90:13-91:1 (Singh).

[420] Tr. 3/15 at 97:16-98:12 (Singh).

[421] See DCL Post Trial Brief at 84-85.

[422] FCC File Nos. BALCDT-20100428ADP, et al. (Filed Apr. 28, 2010, as amended June 10, 2010, June 25, 2010, Aug. 25, 2010, and Aug. 30, 2010)

regulatory delay. See, e.g., In re TCI 2 Holdings, LLC, 428 B.R. 117, 154-55 (Bankr. D.N.J. 2010); In re Reading Broad., Inc., 386 B.R. 562, 574-74 (Bankr. E.D. Pa. 2008).[423]

174.    The parties presented conflicting testimony and arguments regarding whether certain interests in other media companies held by JPMorgan, Angelo Gordon, and Oaktree would preclude or delay FCC approval of Tribune as reorganized under the DCL Plan. Mark Prak, the Noteholder Proponents' FCC expert, opined that these interests were "attributable" and thus would pose an obstacle to FCC approval,[424] while Mace Rosenstein, the DCL Proponents' FCC expert, opined that the interests are not attributable (and therefore are irrelevant) or already have been addressed in the pending applications and will not result in FCC rule violations or delay.[425]

175.    Whether such interests are in fact "attributable" is not dispositive of this Court's feasibility inquiry because the DCL Plan contains provisions intended to prevent any media interests of JPMorgan, Angelo Gordon, and Oaktree from hindering FCC approval. First, the Debtors may issue Class B Stock to a Claim Holder eligible to receive more than 5% of Tribune's equity if that Holder's other media interests would "impair the ability of Reorganized Tribune to comply with the Communications Act or the FCC's rules."[426] Second, the DCL Plan requires each of the Lender co-proponents to surrender its rights to designate members to the Board of Directors of Reorganized Tribune should such designation rights pose an obstacle to

---

[423]    Indeed, In re TCI 2 Holdings LLC found that the "feasibility factor clearly weigh[ed] in favor of" a plan under which "there w[ould] be a delay of several months." In re TCI 2 Holdings LLC, 428 B.R. at 182-83. Although the court ultimately confirmed the plan that had a stronger "prospect of prompt regulatory approval," it did so based not on feasibility concerns but because it had greater support from creditors. Id. at 183.

[424]    Tr. 3/17 at 37:7-14, 37:22-52:14 (Prak); NPP FCC Ex. 65 at 22-31.

[425]    Tr. 4/12 at 46:19-53:22 (Rosenstein); DCL Ex. 1456 at 16-24.

[426]    DCL Plan § 5.4.2(d).

FCC Approval.[427] Both Mr. Prak and Mr. Rosenstein testified that such mechanisms are commonly used to render media interests non-attributable and thereby resolve potential issues arising from ownership of competing media interests,[428] and the Noteholder Proponents failed to demonstrate that the use of such standard mechanisms, assuming the need to invoke them, would cause any significant regulatory delay.[429]

176.    The parties also presented conflicting testimony and argument regarding whether certain media interests held by JPMorgan, Angelo Gordon and Oaktree would (even if not attributable) delay the FCC approval process or impede Tribune's ability to obtain the waivers that it has requested in the FCC applications.  The Noteholder Proponents, however, failed to identify any case in which the FCC has considered non-attributable interests in evaluating a waiver request, and Mr. Rosenstein testified that the FCC has not, in fact, done so.[430]  Further, Mr. Prak acknowledged that his opinion regarding an eight-month delay is speculative.[431]  In any event, if the Noteholder Proponents were correct that the FCC will consider non-attributable interests, then any complications created by the other media interests of JPMorgan, Angelo Gordon and Oaktree would be equally likely to impact the Noteholder Plan.[432]  In addition, Mr. Rosenstein credibly testified that the same was true as to the remaining factors that the

---

[427]  DCL Plan § 5.3.2.

[428]  Tr. 4/12 at 26:24-27:14, 35:12-38:19, 43:3-44:4 (Rosenstein); Tr. 3/17 at 73:24-77:5 (Prak)

[429]  Although the Noteholder Proponents contend that surrender of director designation rights could involve a 60-day delay under DCL Plan § 5.3.2, the DCL Plan specifically requires "immediate[] . . . relinquish[ment]" of board-related rights if corrective steps are not successful within 60 days, and Mr. Rosenstein testified that the allowed 60-day timeframe is an outside limit.  Tr. 4/12 at 97:17-98:10 (Rosenstein).

[430]  Tr. 4/12 at 41:8, 43:2, 88:21-89:11 (Rosenstein).

[431]  Tr. 3/17 at 83:14-23 (Prak).

[432]  Tr. 4/12 at 27:22-28:3, 46:4-18 (Rosenstein).