# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>TRIBUNE COMPANY, *et al.*,<br><br><br>Debtors. | Chapter 11<br>Case No. 08-13141 (KJC)<br>Jointly Administered |

## THE NOTEHOLDER PLAN PROPONENTS'
## <u>PROPOSED FINDINGS OF FACT</u>

AKIN GUMP STRAUSS HAUER & FELD LLP
Daniel H. Golden
David Zensky
Philip C. Dublin
Abid Qureshi
Mitchell P. Hurley
One Bryant Park
New York, NY 10036
212-872-1000

ASHBY & GEDDES, P.A.
William P. Bowden (I.D. No. 2553)
Amanda M. Winfree (I.D. No. 4615)
500 Delaware Avenue, P.O. Box 1150
Wilmington, DE 19899
302- 654-1888

*Counsel for Aurelius Capital Management, LP*

McCARTER & ENGLISH, LLP
David J. Adler
245 Park Avenue
New York, NY 10167
212-609-6800

McCARTER & ENGLISH, LLP
Katharine L. Mayer (I.D. No. 3758)
Renaissance Centre
405 N. King Street
Wilmington, DE 19801
302-984-6300

*Counsel for Deutsche Bank Trust Company Americas, solely in its capacity as successor Indenture Trustee for certain series of Senior Notes*

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
David S. Rosner
1633 Broadway
New York, New York 10019
212-506-1700

BIFFERATO GENTILOTTI LLC
Garvan F. McDaniel (I.D. No. 4167)
800 N. King Street, Plaza Level
Wilmington, Delaware 19801
302- 429-1900

*Counsel for Law Debenture Trust Company of New York, solely in its capacity as successor Indenture Trustee for certain series of Senior Notes*

BROWN RUDNICK LLP
Robert J. Stark
Martin S. Siegel
Gordon Z. Novod
Seven Times Square
New York, NY 10036
212-209-4800

SULLIVAN HAZELTINE ALLINSON LLC
William D. Sullivan (I.D. No. 2820)
Elihu E. Allinson, III (I.D. No. 3476)
901 N. Market St., Suite 1300
Wilmington, DE 19801
302-428-8191

*Counsel for Wilmington Trust Company, solely in its capacity as successor Indenture Trustee for the PHONES Notes*

# TABLE OF CONTENTS

I.  THE COMPANY AND SUMMARY OF PROPOSED SETTLEMENT ......................... 6

II. THE STRENGTH OF THE LBO CLAIMS ..................................................... 19

    **A.**    The Publishing Industry Was In The Midst Of A Deep Secular Decline At The Time Of The LBO ........................................................................ 20

    **B.**    It Was Well Known At The Time Of The LBO That Newspaper Publishing Was In Secular Decline ..................................................... 21

    **C.**    Tribune Considers Strategic Options, Including The Zell Proposal ................... 23

        **1.**    The Board Retains Financial Advisors And Begins Exploring Potential Transactions ............................................................... 23

        **2.**    What The Company's Advisors, Investors, Rating Agencies And The Public Thought About The Transaction Prior To The Close Of Step One ........................................................................... 30

        **3.**    The Company's Projections Raised Red Flags ............................ 32

        **4.**    Tribune Retains VRC To Issue A Solvency Opinion After Houlihan Lokey Voices Concerns Over The LBO ................................. 35

    **D.**    Events Between April 2007 And The Step One Closing On June 4, 2007 .......... 36

        **1.**    Ratings Agencies Downgraded Tribune's Debt And Wall Street Analysts Reacted Negatively To The Approval Of Step One ................. 36

        **2.**    Negative Perceptions Of The LBO Hampered The LBO Lenders' Efforts To Syndicate The LBO Debt Even Before Step One Of The LBO Closed ....................................................................... 38

        **3.**    Step One Closes On June 4, 2007 ........................................... 40

        **4.**    The Step One And Step Two Lenders Share An Identity Of Interests ....................................................................... 40

    **E.**    The Noteholder Plan Proponents Offered Substantial Evidence That The February 2007 Projections Were Overly Optimistic, Unreasonable And Could Not Be Relied Upon At Step One Of The LBO ......................... 41

        **1.**    The February 2007 Projections Were Unreasonable Given The Newspaper Industry's Long-Term Secular Decline ................ 41

    **F.**    The Company Engaged In Intentional Fraud At Step One ................... 49

    **G.**    Step One Of The LBO Left The Company (1) Balance Sheet Insolvent; (2) With Unreasonably Small Capital; And (3) Unable To Pay Its Debts As They Came Due ....................................................................... 52

        **1.**    The Company Was Balance Sheet Insolvent At Step One ................ 53

|   |   | a. | The Step Two Financing Should Be Considered In The Step One Balance Sheet, Capital Adequacy And Ability To Pay Tests ................................................................ 53 |
|---|---|---|---|
|   |   | b. | The Noteholder Plan Proponents' Expert Conducted A Credible And Methodologically Sound Balance Sheet Solvency Analysis ......................................................... 57 |
|   |   | c. | The Balance Sheet Solvency Analysis Conducted By The DCL Plan Proponents' Expert Was Fundamentally Flawed ......... 68 |
|   |   | d. | Fischel's Market Approach Was Also Fundamentally Flawed ............................................................................... 74 |
|   |   | e. | Implied Share Price ................................................................ 75 |
|   | **2.** | | Step One Left The Company With Unreasonably Small Capital And Unable To Pay Its Debts As They Matured ...................................... 76 |
|   |   | a. | The Noteholder Plan Proponents' Expert Conducted A Credible And Methodologically Sound Analysis Of The Company's Capital Adequacy And Ability To Pay Its Debts As They Came Due At Step One ....................................... 76 |
|   |   | b. | The DCL Plan Proponents' Expert Reached Unsupportable Conclusions Respecting The Company's Capital Adequacy And Ability To Pay Its Debts As They Came Due At Step One ....................................................................................... 80 |
|   | **3.** | | The Examiner's Analysis Of Step One Was Incomplete ......................... 90 |
|   | **4.** | | Step One Conclusion ...................................................................... 93 |
| **H.** | | | Events Between Step One Closing On June 4, 2007 And Step Two Closing On December 20, 2007 ...................................................................... 93 |
|   | **1.** | | There Is Substantial Evidence That The State Of The Publishing Industry And The Company's Performance In The Months Leading Up To The Close Of Step Two Did Not Improve, And Instead Continued To Deteriorate ........................................................... 93 |
|   |   | a. | Industry Analysts, Rating Agencies And The LBO Lenders Recognized That The Publishing Industry Continued Its Secular Decline Between The Close Of Step One And Step Two, And Questioned Whether Step Two Should Close As Planned ....................................................................................... 93 |
|   |   | b. | There Is Substantial Evidence That The Company Was Well-Aware Of Its Deteriorating Performance Before The Close Of Step Two ................................................................... 98 |
|   | **2.** | | Tribune Is Downgraded Again Amid Continued Deteriorating Performance ............................................................................... 100 |

I.      The Evidence Shows That Management Was Incentivized To Close Step Two ..................................................................................................... 101

J.      There Is Significant Evidence To Support A Finding That Revised Projections Prepared By The Company In October 2007 Were Unreasonable.................................................................................. 102

K.     The Evidence Supports A Finding That The LBO Lenders Knew That Step Two Would Render The Company Insolvent ............................. 109

      1.     VRC Was Concerned About The Company's Ability To Refinance Existing Debt Before The Close Of Step Two....................................... 110

      2.     The LBO Lenders Questioned VRC's Solvency Opinion And Sought Alternative Solvency Analysis For Step Two Transaction ....... 115

      3.     The LBO Lenders Contemplated Whether Or Not To Finance Step Two ..................................................................................... 119

L.      Step Two Closes On December 20, 2007 .......................................... 120

M.    Step Two Rendered The Company Balance Sheet Insolvent As Of December 20, 2007 ....................................................................... 123

      1.     Base Case Projections For Assessing Solvency As Of December 20, 2007........................................................................ 123

      2.     Balance Sheet Solvency ........................................................ 124

N.     The Evidence Supports A Finding That The Company Was Left With Unreasonably Small Capital And Assets To Fund Its Business And Was Left Unable To Pay Its Debts As Due As Of December 20, 2007 ..................... 127

      1.     Market Evidence Supports A Finding That The Company Was Left With Unreasonably Small Capital And Assets To Fund Its Business And Was Left Unable To Pay Its Debts As Due As Of December 20, 2007 ................................................................. 132

      2.     Fischel's Analysis Supports A Finding That The Company Was Left With Unreasonably Small Capital And Assets To Fund Its Business And Was Left Unable To Pay its Debts As Due As of December 20, 2007 ................................................................. 134

O.     Step Two Conclusion........................................................................ 134

III.   A ROBUST INVESTIGATION OF THE LBO CLAIMS WAS NOT UNDERTAKEN UNTIL APPOINTMENT OF THE EXAMINER, AND CRUCIAL SETTLEMENT NEGOTIATIONS WERE CONDUCTED WITHOUT THE PARTICIPATION OF THE PARTIES WITH THE LARGEST ECONOMIC INTEREST IN THE LBO CLAIMS ...................................... 135

A.     **Debtors And Their Representatives Misunderstood Their Role In The Settlement Negotiations And Were Hobbled By Conflicting Interests With Respect To The Investigation And Pursuit Of The LBO Claims** ....... 136

      1.     Don Liebentritt.......................................................................... 139

| | 2. | Sidley Austin | 142 |

| | 3. | Formation Of The Plan Special Committee In August 2010 Was Not An Effective Response To The Debtors' Conflicts | 146 |

| B. | | The Creditors' Committee Did Not Vigorously Pursue The LBO Claims For the Benefit Of The Pre-LBO Noteholders | 152 |

| | 1. | A Voting Majority Of The Creditors' Committee Was Satisfied With A Settlement Reflecting Less Than Full Value Of The Claims Against The LBO Lenders And The Creditors' Committee Was Advised By Conflicted Counsel | 152 |

| | 2. | The Creditors' Committee's Investigation And Advocacy Of The LBO Claims Was Insufficient | 153 |

| C. | | The Creditors With The Greatest Economic Interest In The LBO Claims Were Excluded From The Key Negotiations | 156 |

| | 1. | The Pre-LBO Noteholders Should Have Been Represented In The Negotiations | 156 |

| | 2. | Aurelius And The Other Pre-LBO Noteholders Were Systematically Excluded From The Settlement Process | 157 |

| D. | | The Flawed Process Engendered By The DCL Plan Proponents Results In Settlement Value Declining In The Wake Of The Examiner's Report | 162 |

| | 1. | The Examiner Conducted His Investigation And Analysis Thoroughly And Skillfully | 163 |

| | 2. | The Examiner's Report Was Favorable To Non-LBO Creditors | 164 |

| | 3. | Recoveries To The Pre-LBO Noteholders *Decline* In The Wake Of The Examiner's Report And *Increase* For The Senior Lenders | 168 |

| | 4. | The Pre-LBO Noteholders Stand To Gain Substantially More Litigating The LBO Claims Released Under The Proposed Settlement | 169 |

| IV. | | THE EVIDENCE SUPPORTS A FINDING THAT DEV IS $8.291 BILLION | 171 |

| A. | | The DCL Plan Proponents' Suggested DEV Of $6.75 Billion Is An Out-Of-Date, Stale Valuation | 172 |

| B. | | The True DEV Of The Debtors Is $8.291 Billion | 175 |

| C. | | The Noteholder Plan Proponents Presented Substantial Evidence That The Step One Lenders Are Not Entitled To Postpetition Interest | 182 |

| V. | | THE NOTEHOLDER PLAN PROPONENTS' EXPERT, DR. BRUCE BERON, DEMONSTRATED AT TRIAL THAT THE PROPOSED SETTLEMENT IS NOT REASONABLE | 184 |

| A. | | Beron's Decision-Tree Analysis Of The Examiner's Findings Establishes That The Proposed Settlement Consideration Is "Not Even Close" To Reasonable | 184 |

|  |  | 1. | Beron's Extensive Background................................................ 184 |
|--|--|----|------|
|  |  | 2. | Beron's Reliance On The Examiner's Conclusions............................ 185 |
|  |  | 3. | Beron's Decision Trees.................................................... 187 |
|  |  | 4. | Aurelius's Waterfall Model ............................................... 190 |
|  |  | 5. | Beron's Independence...................................................... 191 |
|  |  | 6. | Beron's Conservative Assumptions......................................... 192 |
|  |  | 7. | Beron's Conclusions ...................................................... 192 |

**B.**    Black's Limited Rebuttal Of Beron's Analysis Is Baseless................................. 194

     1.   Beron Properly Relied On The Examiner's "Bottom-Line" Conclusions........................................................................ 196

     2.   That Beron Did Not Make Certain Findings Contingent Upon Or Correlated With Others Is Not A Flaw And, In Any Event, Does Not Have A Material Effect On His Analysis .......................... 197

     3.   Beron Was Correct Not To Include Potential Litigation Trust Recoveries In Analyzing The Fairness Of The Proposed Settlement..... 199

     4.   There Is No Reason To Discount The Expected Value Of The LBO Claims For The "Time Value Of Money" ............................... 200

**C.**    Black's Affirmative Opinions And Testimony Should Also Be Disregarded ................................................................... 201

     1.   Black Did His Computations "In His Head" ......................... 201

     2.   Black Attempted To Replace Both The Examiner And The Bankruptcy Court............................................................. 202

     3.   Black Ignored Valuable Litigation Scenarios ........................ 203

     4.   Black Has Little Familiarity With The Underlying Facts...................... 205

     5.   Black Is A Conflicted Witness................................................... 207

     6.   Black Second-Guessed The Examiner.................................... 208

**VI.**   THE BAR ORDER IS INEQUITABLE AND UNSUPPORTED BY THE RECORD ....................................................................... 209

**VII.**   THE POTENTIAL FOR LITIGATION TRUST PROCEEDS DOES NOT CURE THE INADEQUACY OF THE PROPOSED SETTLEMENT .................... 211

**VIII.**   THE DCL PLAN PROPONENTS' FACT BASED OBJECTIONS TO THE NOTEHOLDER PLAN DO NOT HAVE MERIT........................................ 212

**THE NOTEHOLDER PLAN PROPONENTS'
PROPOSED FINDINGS OF FACT**

Aurelius Capital Management, LP, on behalf of its managed entities ("Aurelius"),

Deutsche Bank Trust Company Americas, in its capacity as successor Indenture Trustee for

certain series of Senior Notes ("Deutsche Bank"), Law Debenture Trust Company of New York,

in its capacity as successor Indenture Trustee for certain series of Senior Notes ("Law

Debenture"), and Wilmington Trust Company, in its capacity as successor Indenture Trustee for

the PHONES Notes ("Wilmington Trust" and, together with Aurelius, Deutsche Bank and Law

Debenture, the "Noteholder Plan Proponents"), each by and through its undersigned counsel,

respectfully submit these proposed findings of fact (the "Findings of Fact"):[1]

## I.     THE COMPANY AND SUMMARY OF PROPOSED SETTLEMENT

1.      Tribune and its direct and indirect subsidiaries (the "Company") was founded in

1847 and incorporated in 1861.  Through its many subsidiaries, Tribune is invested in newspaper

publishing, radio and television broadcasting, and other entertainment ventures.  Throughout the

1980s and 1990s, the Company grew rapidly through a series of acquisitions and combinations,

the last of which was a merger with the Times Mirror Company in 2000.[2]

2.      The Company's publishing segment consists of its newspapers and a network of

news and television websites managed by the "Interactive" business division, which also

operates community-specific websites that are not affiliated with a particular newspaper or

station.[3]  In 2006, the Company's major newspapers were the *Chicago Tribune*, *Los Angeles

Times*, *Newsday*, the *South Florida Sun-Sentinel*, the *Orlando Sentinel*, *The Sun*, the *Hartford*

---

[1] Terms not otherwise defined herein shall have the meanings ascribed to such terms in the glossary attached hereto as Appendix A.
[2] NPP 782 (Exam'rs Rpt.), Vol. I, at 43.
[3] NPP 170 (Tribune 2006 Form 10-K) at 6.

*Courant*, the *Morning Call*, the *Daily Press*, *The Advocate* and the *Greenwich Time*.[4]  The

Company's three largest newspapers (the *Chicago Tribune*, *L.A. Times*, and *Newsday*) accounted

for two-thirds of total publishing revenues.[5]  Revenue in the publishing business is primarily

driven by advertising, with only 20% coming from circulation and syndication sales.[6]  In its

financial statements for 2006, the year immediately preceding the LBO, the Company reported

that its publishing segment accounted for 74% of consolidated operating revenue (and 68% of

the Company's consolidated operating cash flow excluding corporate expenses).[7]

      3.      The Company's broadcasting segment includes its television and radio operations,

which in 2006 accounted for a quarter of the Company's consolidated revenue.[8]  In addition to

traditional news media, Tribune distributed entertainment listings and syndicated media content

through Tribune Media Services, and managed CLTV, Chicago's only 24-hour cable news

channel.[9]  The lion's share (83%) of broadcasting income was derived from television, while

radio and entertainment, which includes revenue derived from the Chicago Cubs baseball team

and the broadcast of its games, accounted for the rest.[10]

      4.      On December 8, 2008 (the "Petition Date"), Tribune Company ("Tribune") and

certain of its subsidiaries (collectively with Tribune, the "Debtors") filed voluntary petitions for

relief (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States

Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of

Delaware (the "Bankruptcy Court").  An additional Debtor, Tribune CNLBC, LLC (f/k/a

Chicago National League Ball Club, LLC) ("Tribune CNLBC"), Tribune's subsidiary that held

---

[4] NPP 170 (Tribune 2006 Form 10-K) at 6.
[5] NPP 170 (Tribune 2006 Form 10-K) at 6, 32.
[6] NPP 944 (Tuliano Rpt.) at 25; NPP 170 (Tribune 2006 Form 10-K) at 5-6, 32.
[7] NPP 944 (Tuliano Rpt.) at 4; NPP 170 (Tribune 2006 Form 10-K) at 6, 32.
[8] NPP 944 (Tuliano Rpt.) at 25; NPP 170 (Tribune 2006 Form 10-K) at 11, 33.
[9] NPP 170 (Tribune 2006 Form 10-K) at 11.
[10] NPP 170 (Tribune 2006 Form 10-K) at 11-12.

the majority of the assets related to the business of the Chicago Cubs Major League Baseball franchise (the "Chicago Cubs"), commenced a Chapter 11 Case on October 12, 2009. In all, the Debtors comprise 111 entities.[11]

5. The filing of the Chapter 11 Cases was a direct result of the Company's 2007 leveraged buyout (the "LBO"), which left the Debtors with more than $13 billion of debt. The LBO was the culmination of Tribune's efforts, at the behest of its largest shareholders, to effectuate a strategic alternative that would allow shareholders to extract an immediate payment from the Company, notwithstanding the declining publishing industry.[12] As the Examiner determined, two steps were necessary for this cash-out because regulatory approval was required before the LBO could be fully consummated, but large shareholders, including Board members, did not want to wait until such approvals were obtained before beginning to receive their money.[13]

6. In the first step of the LBO ("Step One"), Tribune's employee stock ownership plan, or "ESOP," purchased shares of Tribune's common stock and Tribune made a tender offer for nearly 52% of Tribune's outstanding common stock. In the second step of the transaction ("Step Two"), following certain regulatory approvals, Tribune cashed out its remaining stockholders and merged with a Delaware corporation that was wholly-owned by the ESOP, with Tribune as the surviving entity of the merger.[14]

---

[11] DCL 376 (Joint Disclosure Statement) at 1.
[12] NPP 136 (6/13/06 Chandler Trusts Letter); NPP 1038 (Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Preliminary Injunction and Supporting Declarations of William A. Osborn, Michael Costa, Donald C. Grenesko, and Bernard Black) at 20; *see also id.* at 21 (Osborn (a member of the Board) stating that "[w]e wanted ourselves to get more money up front, . . ."); NPP 1038 (Corrected Memorandum in Support of Plaintiff's Motion for Preliminary Injunction) at 19 ("The [Tender Offer] states that the only reason for the Proposed Acquisition's structure is to provide faster liquidity to shareholders. Baron Decl., Ex. Vat 3-4 (stating that 'we . . . negotiated for a first-step cash tender offer . . . as a means of delivering a portion of the Merger price to our stockholders more quickly'")).
[13] NPP 782 (Exam'rs Rpt.), Vol. I at 262; NPP 782 (Exam'rs Rpt.), Vol. II at 174.
[14] DCL 376 (Joint Disclosure Statement) at 58-61.

7.      Immediately prior to the LBO, the Company's funded debt totaled approximately

$5.63 billion in principal amount, as follows:[15]

| Debt Instrument | Approximate Principal Amount Outstanding as of the LBO |
|---|---|
| 2006 Credit Agreement (term loan) | $1.5 billion |
| 2006 Bridge Credit Agreement | $1.325 billion |
| Senior Notes[16] | $1.263 billion |
| PHONES Notes[17] | $1.456 billion |
| Property financing obligation | $51.0 million |
| Other notes and obligations | $16.4 million |
| Interest rate swap | $23.5 million |
| **Total** | **$5.63 billion** |

8.      Certain subsidiaries of Tribune also owed approximately $3.98 billion in

intercompany notes (the "LATI Notes") to Los Angeles Times International, Ltd. ("LATI")

immediately prior to the LBO.[18] Payments on the LATI Notes were accomplished pursuant to a

reverse three-step transaction, whereby (1) Tribune made a capital contribution to the subsidiary,

(2) the subsidiary paid a like amount to LATI, and (3) LATI thereupon remitted the same amount

of capital to Tribune.[19]  These circular transactions were apparently accomplished for state tax

purpose, and after 2006 were accomplished via accounting entries rather than with actual cash

payments.

---

[15] NPP 343 (Tribune 4/1/2007 Form 10-Q) at Note 11.
[16] The "Senior Notes" are the eight series of notes issued and outstanding under the Senior Notes Indentures.  *See* Noteholder Plan, § 1.1.255.
[17] The "PHONES Notes" are the Exchangeable Subordinated Debentures due 2029  issued and outstanding under that certain Indenture dated as of April 1, 1999 between Tribune and Wilmington Trust Company (as current successor indenture trustee to Bank of Montreal Trust Company), as indenture trustee.
[18] NPP 782 (Exam'r Rpt.), Vol. I at pp. 191.
[19] NPP 782 (Exam'r Rpt.), Vol. I at pp. 192.

9.     JPMorgan Chase Bank, N.A. ("JPMorgan") and Bank of America, N.A. ("Bank of America"), and two entities affiliated with Tribune's financial advisors, Merrill Lynch Capital Corporation and Citigroup Inc. (collectively, the "Arrangers") committed to provide up to $12.2 billion to finance the LBO, of which $11.2 was ultimately borrowed.[20]  The Arrangers required that the LBO Debt be guaranteed by Tribune's subsidiaries, which gave the LBO lenders structural priority over Tribune's existing debt.[21]

10.     The LBO Debt was incurred primarily pursuant to the Senior Loan Agreement and the Bridge Loan Agreement.  On May 17, 2007, Tribune entered into the $8.028 billion Senior Loan Agreement.  The Senior Loan Agreement consists of the following loan facilities: (a) a $1.5 billion Senior Tranche X Term Facility; (b) a $5.515 billion Senior Tranche B Term Facility; (c) a $263 million Delayed Draw Senior Tranche B Term Facility; (d) a $750 million Revolving Credit Facility ((a)-(d), the ("Step One Debt")); and (e) $2.105 billion in new incremental term loans under the Tranche B Term Facility (the "Incremental Facility").  On December 27, 2007, Tribune entered into a number of increase joinders pursuant to which the Incremental Facility became a part of the Tranche B Term Facility under the Senior Loan Agreement.  Thus, from the outset, a single loan agreement was executed in order to finance both steps of the LBO.[22]

11.     Step One closed on June 4, 2007 ("Step One Closing Date"), with Tribune purchasing and retiring 126 million shares of its common stock for approximately $4.3 billion and the LBO Lenders disbursing over $7 billion to finance that purchase and pay, among other

---

[20] NPP 782 (Exam'rs Rpt.), Vol. II at pp. 97-98.  The $12.2 billion in funds committed to finance the LBO includes $2.1 billion under the Bridge Loan Agreement.  The principal amount of the Bridge Loan Agreement was subsequently reduced to $1.6 billion.  *See* NPP 782 (Exam'rs Rpt.), Vol. I p 444, n. 2029.  The LBO Debt also includes $225 million in aggregate principal amount owed under the EGI-TRB LLC Notes.  *See* DCL 376 (Joint Disclosure Statement) at 24.
[21] DCL 376 (Joint Disclosure Statement) at 20-22.
[22] DCL 376 (Joint Disclosure Statement) at 22.

things, associated fees and expenses aggregating approximately $150 million.[23]  On the Step One Closing Date, Tribune also satisfied the LATI Notes, but did so via accounting entries rather than with actual cash payments.[24]  Step Two of the LBO closed on December 20, 2007 (the "Step Two Closing Date").

12.     As part of this second step of the LBO, Tribune purchased the remaining 117 million outstanding shares of its common stock for approximately $3.982 billion, and borrowed an additional approximately $3.7 billion from the LBO Lenders, of which $1.6 billion was borrowed pursuant to the Bridge Loan Agreement (the "Bridge Loan Financing") and $2.1 billion was borrowed under the Incremental Facility ("Step Two Debt" and collectively with the Bridge Loan Financing, the "Step Two Financing").[25]

13.     The Senior Loan Agreement indebtedness and the Bridge Loan Financing constitute unsecured obligations of those Tribune subsidiaries identified in the Joint Disclosure Statement (collectively, the "Guarantor Subsidiaries"), which have guaranteed (a) the Senior Loan Agreement indebtedness on a senior priority basis, and (b) the Bridge Loan Financing on a subordinate basis to the Senior Loan Agreement indebtedness.  None of the Senior Notes, PHONES Notes, or the EGI-TRB LLC Notes[26] are guaranteed by Tribune's subsidiaries.[27]

14.     The Company incurred more than $10.7 billion in loan obligations to the LBO Lenders and immediately paid out no less than $8.3 billion of those funds to the shareholders,

---

[23] DCL 376 (Joint Disclosure Statement) at 19-20, 59-60.
[24] NPP 782 (Exam'rs Rpt.), Vol. I pp. 193-94.
[25] DCL 376 (Joint Disclosure Statement) at 22-23, 58-61.
[26] The "EGI-TRB LLC Notes" are those certain promissory notes in the aggregate principal amount of $225 million issued by Tribune in favor of EGI-TRB, LLC and certain direct and indirect assignees of EGI-TRB, LLC.
[27] DCL 376 (Joint Disclosure Statement) at 21-22, n. 19.

and nearly $300 million in fees.[28] The diagrams below set forth the sources and uses of cash in the LBO:[29]



**Sources & Uses – Step One ($ in millions)[30,31]**

| STEP I - SOURCES & USES | |
|---|---|
| **Sources** | **Amount** |
| A Tranche B Term Loan | $5,515.0 |
| Tranche X Term Loan | 1,500.0 |
| Delayed Draw Tranche B Term Loan ($263 capacity) | 0.0 |
| Revolving Credit Facility ($750 capacity) | 0.0 |
| B EGI-TRB Equity Investment (1.47 million shares @ $34) | 50.0 |
| Exchangeable EGI-TRB Note | 200.0 |
| **Total Sources** | **$7,265.0** |
| | |
| **Uses** | **Amount** |
| C Repay Bridge Credit Agreement (a)(b) | $1,325.0 |
| Repay Term Loan (b) | 1,500.0 |
| D TRB repurchases 126 million shares @ $34 | 4,284.0 |
| Bank Fees | 134.1 |
| Other Fees | 21.9 |
| **Total Uses** | **$7,265.0** |

---

[28] NPP 782 (Exam'rs Rpt.), Vol. I at 124-125.

[29] DCL 376 (Joint Disclosure Statement) at 60-61.

[30] Source: DCL 376 (Joint Disclosure Statement) at 60.

[31] Notes: ESOP's $250 million purchase of Tribune equity is not shown because this transaction did not involve the actual transfer of any cash. Part B of the transaction was completed on April 23, 2007. Parts A, C and D were completed on June 4, 2007.

(a) Repayment of Amended and Restated Bridge Credit Agreement dated as of June 27, 2006 (as subsequently amended, the "Old Bridge Credit Agreement"). This repayment includes $300 million that was paid between April 23, 2007 and June 3, 2007.

(b) In addition to payment of principal, interest expense of $3.1 million and $6.3 million was paid on the Old Bridge Credit Agreement and old term loan, respectively.

## Sources & Uses – Step Two ($ in millions)[32,33]



| STEP II - SOURCES & USES | |
|---|---|
| **Sources** | **Amount** |
| Cash from Balance Sheet | $582.9 |
| **E** Tranche B Term Loan | 2,105.0 |
| Bridge Facility | 1,600.0 |
| **F** EGI-TRB Net Cash Payment | 56.1 |
| **Total Sources** | **$4,344.0** |
| | |
| **Uses** | **Amount** |
| **G** Cash Settlement of Stock Based Awards | $134.9 |
| **H** TRB repurchases 117.1 million shares @ $34 | 3,981.9 |
| Cash Distribution triggered by Change of Control (a) | 104.0 |
| Bank Fees | 73.4 |
| Other Fees | 49.7 |
| **Total Uses** | **$4,344.0** |
| | |
| **MEMO: Details to Step F** | |
| Subordinated EGI-TRB Note Investment | $225.0 |
| EGI-TRB Warrant | 90.0 |
| Credit for TRB Shares | (50.0) |
| Credit for Exchangeable EGI-TRB Note | (200.0) |
| **Subtotal** | **65.0** |
| | |
| Credit for PIK Interest on Exchangeable EGI-TRB Note | (6.4) |
| Credit for Reimbursed Legal Fees | (2.5) |
| **Total Net Cash To Be Invested by EGI-TRB** | **$56.1** |

15.     The amount of the LBO Debt greatly exceeded the value of the Company.  As a result, the Company was unable to service the LBO Debt and the Debtors commenced the Chapter 11 Cases on December 8, 2008, less than one year after the close of Step Two.

---

[32] Source: DCL 376 (Joint Disclosure Statement) at 61.
[33] Note:  Schedule details payments made on December 20, 2007 or shortly thereafter.
   (a)  Includes payments related to deferred compensation, non-qualified retirement and transitional compensation plans.

16.     As of the Petition Date, the Debtors' funded debt totaled approximately $12.706 billion in principal amount, as follows:[34]

| Debt Instrument | Approximate Principal Amount Outstanding as of the Petition Date |
| --- | --- |
| Senior Loan Agreement | $8.622 billion[35] |
| Bridge Loan Agreement | $1.600 billion |
| Senior Notes | $1.263 billion |
| PHONES Notes | $0.761 billion - $1.197 billion[36] |
| EGI-TRB LLC Notes | $0.235 billion |
| Receivables Facility | $0.225 billion |
| **Total** | **$12.706 billion - $13.142 billion** |

17.     On October 27, 2010, the Bankruptcy Court granted the Creditors' Committee's motion to pursue claims against the LBO Lenders.[37]  The pending Creditors' Committee First Amended Complaint against the LBO Lenders, captioned *Official Comm. of Unsecured Creditors v. JPMorgan Chase Bank, N.A. (In re Tribune Co.)*, Adv. No. 10-53963 [ECF No. 6] (KJC) (Bankr. D. Del. Dec. 7, 2010) (the "Creditors' Committee Complaint"), asserts the following LBO Claims:

- Constructive fraud and actual fraud to avoid the LBO obligations, equity transfers, and LBO fees and repayments stemming from the Senior Loan Agreement and Bridge Loan Agreement (Counts 1 and 2).

- Actual fraud to avoid Step Two notes, guarantees, equity transfers, and LBO fees and repayments (Count 3).

---

[34] DCL 376 (Joint Disclosure Statement) at 21.
[35] As of the Petition Date, the principal amount outstanding under the Senior Loan Agreement consisted of approximately (i) $6.388 billion of Step One Debt, (ii) $2.084 billion of Step Two Debt and (iii) $150.9 million of claims asserted against Tribune under the Swap Agreement.  *See* DCL 376 (Joint Disclosure Statement) at 22; *see also* NPP 1432 (Noteholder Specific Disclosure Statement) at 30 (summarizing estimated claims against LBO Lenders as of the Petition Date).
[36] The amount of PHONES Notes outstanding is the subject of a pending dispute before the Bankruptcy Court for the reasons set forth in Wilmington Trust Company's Motion for (I) Estimation of the PHONES Claims and (II) Classification of PHONES Claims Pursuant to Bankruptcy Rule 3013 [ECF No. 7352].
[37] 10/27/10 Order Granting Standing Motions [ECF No. 6150].

- WEAR-based principles to prevent the LBO Lenders from benefitting from avoidance of Step One and Step Two obligations, transfers, or fraudulent transfers (Counts 4 and 5).

- Unjust enrichment to recover LBO fees and repayments, and to prevent a windfall from avoidance of Step One and Step Two obligations, fees and repayments (Counts 6 and 7).

- Avoidance of LBO preferences (Count 8).

- Equitable subordination and disallowance (Count 9).

- Constructive fraud to avoid the 2006 bank debt repayment (Count 10).

- Claim disallowance (Count 11).

- Aiding and abetting breaches of fiduciary duty (Count 12).

- Constructive fraud and professional malpractice against CGMI and Merrill Lynch to recover advisory fees (Counts 13 and 14).

18.     On or about December 8, 2010, the DCL Plan Proponents filed their First Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A. [ECF No. 7136] (as subsequently amended, the "DCL Plan").[38]

19.     The centerpiece of the DCL Plan is a series of settlements (collectively, the "Proposed Settlement") to resolve all LBO Claims against, among others, the LBO Lenders other than certain preserved causes of action specifically enumerated in the DCL Plan.[39]

20.     Specifically, pursuant to the DCL Plan, all of the LBO Claims are released as against the LBO Lenders and Arrangers, in their capacities as such.

21.     Under the Proposed Settlement, the following causes of LBO Claims are settled as set forth below:[40]

---

[38] The most recent version of the DCL Plan was filed on April 26, 2011 [ECF No. 8769].
[39] *See* DCL Plan, § 5.15, 5.16.

(a) all claims to avoid the $6.470 billion of Step One Debt (the "Step One Avoidance Claims") are settled for $322 million (5.0% of the Step One Avoidance Claims);[41]

(b) all claims to disgorge the $1.868 billion of principal, interest and/or fees (prior to pre-judgment interest) paid to the Step One Lenders on account of the Step One Debt (the "Step One Disgorgement Claims") are settled for $0;[42]

(c) all claims to avoid the $2.101 billion of Step Two Debt (the "Step Two Avoidance Claims") are settled for $70 million (3.3% of the Step Two Avoidance Claims);[43]

(d) all claims to disgorge the $318 million of principal, interest and/or fees (prior to pre-judgment interest) paid to the Step Two Lenders/Bridge Lenders on account of the Step Two Financing (the "Step Two Disgorgement Claims") are settled for $120 million (37.7% of the Step Two Disgorgement Claims);[44]

(e) all claims to avoid the $1.620 billion of Bridge Loan Financing (the "Bridge Loan Avoidance Claims") are settled for $13 million (0.8% of the Bridge Loan Avoidance Claims);[45] and

(f) all claims to avoid an unknown and undisclosed amount of claims (other than Disclaimed State Law Avoidance Claims) against the Released Stockholder Parties are settled for $0.[46]

22. In total, the estates are abandoning in excess of $12 billion of claims in exchange for consideration of only $ 488 million.

---

[40] The amount of settlement consideration described herein is premised on the $6.75 billion DEV upon which the DCL Plan is based (with 8.4% of the DEV allocated to Tribune and 91.6% of the DEV allocated to its subsidiaries (on a consolidated basis)) and on the assumption that the PHONES Notes Claims are allowed in the amount of $761 million (as opposed to $1.197 billion). The ultimate determination of the amount of DEV as well as the allocation of such DEV as between Tribune and its subsidiaries will be made by the Bankruptcy Court. Recoveries by Creditors of Tribune and its subsidiaries will depend on these determinations as well as the PHONES Notes Claims Resolution. The Noteholder Plan Proponents believe the actual DEV is materially higher than $6.75 billion and, in that regard, have submitted the Rebuttal Report to Expert Valuation Report Submitted by Lazard Frères & Co. LLC prepared by Raymond James, asserting that the Debtors' actual DEV is $8.219 billion.

[41] See 3/15/11 Trial Tr. 294:16 – 295:3 (Gropper). The DCL Plan Proponents have taken the position that the settlement of Step One Avoidance Claims was also designed to settle $1.868 billion (prior to pre-judgment interest) of Step One Disgorgement Claims. See, e.g., DCL Post Trial Brief at 31-32 [ECF No. 8897]. If so, then the DCL Plan seeks to settle $6.470 billion of Step One Avoidance Claims and $1.868 billion of Step One Disgorgement Claims (prior to pre-judgment interest) for $322 million (only 3.86% of such claims).

[42] See 3/15/11 Trial Tr. 295: 3-5 (Gropper).

[43] See 3/15/11 Trial Tr. 296: 13-16 (Gropper).

[44] See 3/15/11 Trial Tr. 296: 8-13 (Gropper); DCL 1429 (Specific Disclosure Statement Relating to First Amended Joint Plan of Reorganization for Tribune Company and its Subsidiaries proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A., dated December 8, 2010) at pp. 4-5, 19-20.

[45] See DCL 385 (Mediator's Third Report) ¶1; DCL Plan §§ 1.1.200(e)(iii); 1.1.201, 11.2.

[46] See NPP 2170 (Mediator's Second Report), Ex. A at p. 5.

23.     As a result of the Proposed Settlement, holders of Senior Notes would receive the following consideration if the DCL Plan is confirmed:[47] (a) $238 million resulting from the settlement of the Step One Avoidance Claims;[48] (b) $0 resulting from the settlement of Step One Disgorgement Claims;[49] (c) $0 consideration resulting from the settlement of Step Two Avoidance Claims;[50] (d) $120 million resulting from the settlement of Step Two Disgorgement Claims;[51] (e) $11 million resulting from the settlement of Bridge Loan Avoidance Claims;[52] and (f) $0 resulting from the settlement of all LBO Claims (other than Disclaimed State Law Avoidance Claims) against the Released Stockholder Parties.[53]  In addition, if the DCL Plan is confirmed, holders of Senior Notes will receive their pro rata share of trusts interests in (i) the Creditors' Trust established under the DCL Plan (such trust, the "DCL Creditors' Trust" and the interests therein, the "Creditors' Trust Interests"), unless a holder has elected to opt out of receiving such Creditors' Trust Interests and (ii) the Litigation Trust established under the DCL Plan (such trust, the "DCL Litigation Trust" and the interests therein, the "Litigation Trust Interests").[54]  If the DCL Plan is confirmed, holders of PHONES Notes will receive no settlement consideration other than their pro rata share of (x) Creditors' Trust Interests, unless a holder has elected to opt out of receiving such Creditors' Trust Interests and (y) Litigation Trust Interests.[55]

24.     In contrast to the treatment afforded to holders of Senior Notes and PHONES Notes, other unsecured creditors receive far more favorable treatment under the DCL Plan.  For

---

[47] See supra n. 37.
[48] See 3/15/11 Trial Tr. 283:13 – 284:1; 295:8-18 (Gropper).
[49] See 3/15/11 Trial Tr. 295: 3-5 (Gropper).
[50] See 3/15/11 Trial Tr. 296: 13-16 (Gropper).
[51] See 3/15/11 Trial Tr. 296: 8-18 (Gropper).
[52] See DCL 385 (Mediator's Third Report), Ex. A at ¶1.
[53] See NPP 2170 (Mediator's Second Report), Ex. A at p. 5.
[54] DCL Plan, § 3.2.5.
[55] DCL Plan, § 3.2.9.

example, the holder of the Swap Claims (an affiliate of Oaktree, a DCL Plan Proponent and one of the largest holders of Senior Loan Claims) and the holders of General Unsecured Claims against the Filed Subsidiary Debtors will each receive a 100% recovery on their prepetition claims if the DCL Plan is confirmed.[56] In addition, four members of the Creditors' Committee— i.e., Warner Brothers Television, Buena Vista Television, Pension Benefit Guaranty Corporation and the Washington-Baltimore Newspaper Guild, Local 32035—will either have their prepetition claims paid in full or reinstated if the DCL Plan is confirmed.[57]

25.    In addition to the Proposed Settlement, the DCL Plan contains two additional features that directly relate to the settlement of the LBO Claims.  First, the DCL Plan provides for a "Bar Order," which if approved by the Bankruptcy Court, would prospectively (a) bar all contribution and non-contractual indemnity claims to be asserted by the non-settling defendants against the LBO Lenders and (b) impose proportionate judgment reduction in respect of all remaining LBO Claims, including Disclaimed State Law Avoidance Claims.  As a result, the Bar Order would have the effect of reducing the recoveries of holders of Creditors' Trust Interests and Litigation Trust Interests.[58]

26.    Second, holders of Senior Loan Claims and Bridge Loan Claims will receive Litigation Trust Interests and Creditors' Trust Interests under the DCL Plan.[59] These Litigation Trust Interests and Creditors' Trust Interests will entitle holders of Senior Loan Claims and Bridge Loan Claims to 35% of any proceeds recovered by the DCL Litigation Trust or the DCL Creditors' Trust, respectively, after (i) holders of allowed Senior Noteholder Claims, EGI-TRB LLC Notes Claims, PHONES Claims, and those allowed Other Parent Claims (who elect to

---

[56] DCL Plan, §§ 1.1.214, 3.2.6, 3.3.3, 3.3.5.
[57] DCL Plan, at Art VI.
[58] DCL Plan, § 11.3.
[59] DCL Plan, at Art. III.

receive Creditors' Trust Interests) receive the Parent GUC Trust Preference (defined as $90 million in the aggregate from the DCL Litigation Trust and/or the DCL Creditors' Trust, *excluding* proceeds paid to the Step Two Arrangers pursuant to the Step Two Arranger Litigation Trust Preference) and (ii) the Trusts' Loan has been repaid.[60]

## II.     THE STRENGTH OF THE LBO CLAIMS

27.     A leveraged buyout is a transaction in which shares in a corporation are purchased with money raised by the issuance of debt. The effect of a leveraged buyout is to encumber the assets of the target corporation with debt that benefits not the corporation itself, but its buyer and former shareholders, and to substitute a significant amount of debt in the place of equity in the corporation's capital structure. As described below, the Company's newspaper publishing business—which accounted for approximately 75% of the Company's revenues[61]—was in the midst of a severe secular decline at the time of planning for and execution of the LBO, and the Company was performing so poorly that there could have been no reasonable expectation that the Company would be able to satisfy the crippling debt incurred as a result of the transaction. Consummation of the LBO in the face of the Company's sharply deteriorating performance and the publishing industry's secular decline resulted in what the New York Times referred to as "one of the most absurd deals ever. . . ."[62]

---

[60] DCL Plan, at Art. I. In addition, the LBO Lenders have "agreed" not to benefit from the subordination provisions contained in the PHONES Notes Indenture and the EGI-TRB LLC Notes with respect to their recovery of proceeds from the DCL Litigation Trust and DCL Creditors' Trust. *Id.*

[61] NPP 944 (Tuliano Rpt.) at 4; NPP 170 (Tribune 2006 Form 10-K) at 6, 32.

[62] NPP 367 (4/6/07 The New York Times article "This Deal Is Encouraging and Absurd").

## A. The Publishing Industry Was In The Midst Of A Deep Secular Decline At The Time Of The LBO

28.     As noted, at the time of the LBO, the newspaper publishing industry in the United States was in the midst of a severe secular decline.[63] The newspaper publishing industry had experienced declines in circulation for almost two decades and by 2006 had regressed to levels the industry had not experienced since 1948.[64] In fact, the rate of decline in circulation levels was accelerating, and the Company's declining circulation levels were even worse than those of the overall industry. For example, daily circulation for the Company's seven largest newspapers in September 2006 decreased by 4.9% from September 2005, as compared to the industry average decrease of 4.0% for the same period.[65] The trustee for one of Tribune's largest shareholders, who was also a member of the Board, noted that "[o]ver the past two years, Tribune has significantly underperformed industry averages and there is scant evidence to suggest the next two years will be any different."[66] To make matters worse, advertising revenue had been shifting from newspapers to other media for almost ten years.[67] As of May 2007, the newspaper publishing industry was expected to have lost nearly 10% of the U.S. advertising market between 1998 and 2008.[68]

29.     These changes were structural, not cyclical, and represented a fundamental shift of advertising away from print media. The Company's major shareholders recognized that the Company's potential value would likely only deteriorate as prospects continued to go from bad

---

[63] 3/18/11 Trial Tr. 28:22-29:3, 29:18-30:23, 31:3-32:7 (Tuliano); NPP 944 (Tuliano Rpt.) at 25-31; NPP 2478 (Tuliano Trial Demonstratives) at 7-8; 3/9/11 Trial Tr. 271:24-272:3 (Black).

[64] NPP 944 (Tuliano Rpt.) at 25; NPP 53 (Newspaper Association of America Online Database); NPP 453 (5/29/07 JPMorgan Tribune Company Credit Analysis) at 32, 83.

[65] NPP 144 (3/23/07 Morgan Stanley "The Publishing Handbook") at 116-118; NPP 944 (Tuliano Rpt.) at 27.

[66] NPP 136 (6/13/06 Chandler Trusts letter) at 1.

[67] NPP 944 (Tuliano Rpt.) at 25-30; NPP 53 (Newspaper Association of America Online Database); NPP 453 (5/29/07 JPMorgan Tribune Company Credit Analysis) at 32, 83; NPP 271 (3/27/07 Deutsche Bank "State of the Newspaper Industry: A Wall Street Perspective") at 12-13; NPP 422 (5/11/07 Morgan Stanley, "The Publishing Handbook") at 12-13, 25-26; NPP 258 (3/23/07 Morgan Stanley, "The Publishing Handbook") at 102-03, 116-17.

[68] NPP 944 (Tuliano Rpt.) at 28; NPP 422 (5/11/07 Morgan Stanley, "The Publishing Handbook") at 12-13.

to worse in its publishing segment.  Accordingly, the Company's major shareholders demanded

that the Company pursue strategic alternatives on an expedited basis.[69]

### B.  It Was Well Known At The Time Of The LBO That Newspaper Publishing Was In Secular Decline

30.  The Company's executives knew at the time of the LBO that the newspaper

publishing industry was in secular decline.  When asked about the prospects for the newspaper

business in the beginning of 2007, for example, Robert Bellack, the Chief Financial Officer for

the *Los Angeles Times*, testified "what I can say unequivocally is traditional print newspaper

advertising revenue was expected to decline indefinitely."[70]  Indeed, this long-term secular

decline was of great concern to the newspaper industry as a whole, and, unsurprisingly, was

widely reported on and discussed in various high profile traditional media outlets during the

period leading up to the LBO.[71]  In addition, one of Tribune's largest shareholders wrote the

Board a detailed letter nearly a year before Step One of the LBO closed, sounding the alarm

regarding the Company's declining performance and dubious financial outlook, and noting that

"Tribune has significantly underperformed industry averages" and that "analyst estimates for the

next two years indicate that they expect the same bleak picture."[72]  In short, the evidence

strongly suggests that prior to Step One of the LBO, the Company's senior management,

shareholders, executives and Board all were very much aware not only of the Company's own

woes, but also of the crisis facing the entire publishing industry.

---

[69] NPP 136 (6/13/06 Chandler Trusts Letter).

[70] Deposition of Robert Bellack dated March 10, 2011 ("Bellack Dep. Tr.") 35:11-22.

[71] *E.g.*, 4/23/07 The New York Times article "More Staff Cuts Expected at Chicago Tribune and Los Angeles Times," http://www.nytimes.com/2007/04/23/business/media/23paper.html (discussing decline of newspaper industry); 12/4/06 The New York Times article "In Tough Times, a Redesigned Journal" http://www.nytimes.com/2006/12/04/business/media/04journal.html (describing cost-cutting efforts at the Wall Street Journal in the context of a long "decline in circulation across the industry since the 1980s").

[72] NPP 136 (6/13/06 Chandler Trusts Letter) at 1, 4; *see also* NPP 782 (Exam'rs Rpt.), Vol. I at 378 n. 1699 (Chandler Trust representative advising the Examiner that pre-LBO it viewed Tribune as being on "a four-star black-diamond run headed straight downhill.  Cost-cutting gets you nowhere, and the chair lift's broken").

31.     Even the DCL Plan Proponents' own expert, Bernard Black, conceded that problems in the newspaper industry were common knowledge before the LBO, testifying at trial that "the newspaper business was known in 2007 to be in a long term decline."[73]

32.     The secular challenges facing newspaper publishing in 2007 were also well known to the LBO Lenders.  For example, in October 2006, Merrill Lynch Managing Director Michael Costa referred to newspaper publishing as an "industry on its back."[74]  And Julie Persily, a Managing Director in the Leveraged Finance group at Citigroup, testified at her deposition that when Citigroup became involved in the LBO, "readership of newspapers was projected to decline, and we were always concerned about that."[75]  Similarly, Bank of America Senior Vice President Daniel Petrik testified at his deposition that, prior to committing to the LBO, Bank of America discussed "what is currently going on in the publishing industry and that the trends were not favorable, which we all knew."[76]

33.     The consensus among analysts, market participants, and ratings agencies is in line with this evidence, showing that the market perception in early 2007 was that the challenges facing newspaper publishing were structural—not cyclical—and that the declines in circulation levels and advertising revenues were not likely to abate.[77]  For example, on March 15, 2007, the Morton-Groves Newspaper Newsletter—a leading industry newsletter that had been in operation for over 20 years—noted that the "business environment faced by publishers and media companies today has changed forever.  Instead of an industry cycle with advertising recovering

---

[73] 3/9/11 Trial Tr. 271:24-272:3 (Black).  *See also Garamella v. FitzSimons, et al.*, No. BC 362110 (Cal. Sup. 2007).
[74] NPP 1016 (10/22/06 email between D. Weil and M. Costa) at ML-TRIB-0596999.
[75] Deposition of Julie Persily dated February 1, 2011 ("Persily Dep. Tr.") 26:12-14.
[76] Deposition of Daniel Petrik dated February 4, 2011 ("Petrik Dep. Tr.") 66:21-24.
[77] 3/18/11 Trial Tr. 30:24-32:23 (Tuliano); NPP 258 (3/23/07 Morgan Stanley, "The Publishing Handbook") at 91; NPP 179 (1/18/07 Fitch Ratings, "U.S. Newspapers and TV Broadcasting Outlooks Remain Negative in 2007") at 1; NPP 267 (3/26/07 News Analysis, "Drop in Ad Revenue Raises Tough Questions for Newspapers"); NPP 239 (3/15/07 Morton-Groves Newspaper Newsletter) at 8.

as the economy recovers, we have a secular shift. . . .[78] Similarly, on March 23, 2007, Morgan Stanley observed that "February will likely go on record as one of the worst months for the newspaper industry in recent years," and stated that "it appears rather clear to us that new revenue streams are simply not enough to offset the secular shift of print to online."[79]

34.     The Noteholder Plan Proponents' expert in solvency, valuation and financial forensics Ralph Tuliano testified at trial that "the market evidence was overwhelmingly consistent with the secular decline" in the newspaper industry in 2007.[80]  Tuliano's testimony relating to the state of the newspaper industry in 2007 is considerably more credible than the testimony of Daniel Fischel, the DCL Plan Proponents' expert, who testified that, in his opinion, there was not a "consensus that the industry was in long-term decline."[81]  The overwhelming evidence presented at trial, however, demonstrates that the secular decline facing the publishing industry was widespread, and was well-known by Company management and the LBO Lenders. Fischel's opinion is entirely unsupported.

**C.      Tribune Considers Strategic Options, Including The Zell Proposal**

**1.      The Board Retains Financial Advisors And Begins Exploring Potential Transactions**

35.     As a result of this downturn in performance, in 2005, the Company retained Merrill Lynch to complete an analysis of strategic options for the Company and its business segments.  During a presentation by Merrill Lynch to the Board in December 2005, the Board, Company management and Merrill Lynch discussed a variety of options for creating additional shareholder value, including: (i)  multiple structures for separating the broadcasting segment; (ii) a strategic combination with another media company; (iii) an acquisition of the Company by a

---

[78] NPP 239 (3/15/07 Morton-Groves Newspaper Newsletter) at 8.
[79] NPP 258 (3/23/07 Morgan Stanley, "The Publishing Handbook") at 91.
[80] 3/18/11 Trial Tr. 18:13-18; 17:14-22; 32:22-23 (Tuliano).
[81] 3/10/11 Trial Tr. 147:23-25 (Fischel).

third party through a leveraged buyout; and (iv) an increase in the Tribune's stock repurchase authority. The Board agreed to prepare for a possible spin-off of the broadcasting segment by restructuring TMCT, LLC, a limited liability company owned by Tribune and the Chandler Trusts, one of the largest shareholders of Tribune. The Board also increased Tribune's stock repurchase authority.[82]

36.     On May 30, 2006, Tribune announced that it would execute a leveraged recapitalization transaction via a modified "Dutch auction"[83] tender offer. The Company also announced a plan for $200 million in annual cost savings and $500 million in proceeds from asset sales. On June 27, 2006, Tribune announced it had repurchased 55 million shares at a purchase price of $32.50 per share.[84]

37.     The Chandler Trusts, which had three directors appointed to the Board, disagreed with the Board's decision not to unwind TMCT, LLC as part of the announced recapitalization. On June 13, 2006, the Chandler Trusts notified the Board of their intent not to tender any shares as part of the tender offer and their assessment of the issues facing the Company.[85]

38.     The Chandler Trusts also criticized the process by which the 2006 tender offer was presented and considered by the Board as "fundamentally flawed," and noted in a June 2006 letter that the offer failed to address "the real business issues facing Tribune," including the Company's significant underperformance relative to industry averages, and a fundamental erosion in the Company's core businesses:

> The Trusts believe that the process by which the offer was presented and considered by the Tribune Board was fundamentally flawed, and that the offer is a purely financial device that fails altogether to address the real business

---

[82] NPP 488 (7/13/07 Tribune Schedule 14a) at 17.
[83] An auction method used in which the security's price is gradually lowered until it meets an acceptable bid and is sold.
[84] NPP 488 (7/13/07 Tribune Schedule 14a) at 18.
[85] NPP 136 (6/13/06 Chandler Trusts Letter).

issues facing Tribune. Prompt and meaningful strategic action is required to preserve the premium value of the company's franchises.

Over the past two years, Tribune has significantly underperformed industry averages and there is scant evidence to suggest the next two years will be any different.

In addition to the failure of its primary strategy, the company is confronted with a fundamental erosion in both of its core businesses and the consequences of failing to invest aggressively in growing new businesses.

Since 2003, Tribunes' revenue and EBITDA have underperformed its peers, and, unfortunately, analyst estimates for the next two years indicate that they expect the same bleak picture.

Not only has Tribune underperformed the industry averages, but the company has lagged business segment performance for *each* of the companies in the comparable list over the last two years. . . . This trend is only expected to continue for the next two years.

Management has already revised estimates down since December 2005, suggesting the likely direction of future changes. With the current plan in place, we believe the risk of further deterioration in print and broadcast outweighs the projected growth in interactive, a segment that, while growing, still makes up less than 9% of revenues (including joint ventures). Since analysts do not share management's outlook, we believe Tribune should disclose both the projections and the related downside analysis presented to the board, so that investors can evaluate them independently and make their own informed decision.

As noted above, we call upon the Board to promptly appoint a committee of independent directors to oversee a thorough review of the issues facing Tribune and to take prompt decisive action to enhance stockholder value.[86]

39.    On September 21, 2006, the Board formed a special committee to explore strategic alternatives to increase value for shareholders (the "Pre-LBO Special Committee"). This Pre-LBO Special Committee was created to oversee the process independent of any potential conflicts of interest.[87]  On October 6, 2006, the Pre-LBO Special Committee appointed Morgan Stanley as the committee's financial advisor in connection with its review of the Company's strategic alternatives.[88]

---

[86] NPP 136 (6/13/06 Chandler Trusts Letter) at 1-2, 4, 6, 9, 11.
[87] NPP 488 (7/13/07 Tribune Schedule 14a) at 3, 19.
[88] NPP 147 (10/6/06 Pre-LBO Special Committee Minutes).

40.     After Morgan Stanley's appointment, the Pre-LBO Special Committee directed the Company's financial advisors, Merrill Lynch and Citigroup, to solicit strategic bids for the Company from private equity firms and other potential buyers.  There were 31 potential buyers who signed confidentiality agreements and conducted some due diligence on the Company.[89]  By December, only five interested parties were still considering purchasing the entire Company and seven interested parties were only interested in purchasing discrete assets.[90]  Of these twelve parties, only three—the Chandler Trusts, the Carlyle Group, and Broad/Yucaipa—submitted formal proposals.[91]  Along with these proposals, the Pre-LBO Special Committee considered "self-help" alternatives including (1) whole company recapitalization, (2) whole company recapitalization with the sale of broadcasting, and (3) a spin-off of broadcasting.[92]

41.     In late January, the Chandler Trusts submitted a revised bid to the Pre-LBO Special Committee that maintained the same proposed structure as its first bid, but revised the consideration paid to non-Chandler Trusts stockholders to $24.55.[93]  In his interview with the Examiner, Stinehart, the trustee for the Chandler Trusts, noted that the Company released its 2006 financial results at roughly the same time as its first proposal and that the Company had "drastic[ly] missed projections."  As a result, Stinehart stated that although the Chandler Trusts "had been thinking about improving our floor bid, [we] decided not to and even dampened it a bit."[94]

42.     Sam Zell, chairman of Equity Group Investments, LLC ("EGI"), expressed interest in buying Tribune in November 2006.  Zell had a long-standing relationship with

---

[89] NPP 389 (4/25/07 Tender Offer) at 18.
[90] NPP 159 (12/12/06 Confidential Discussion Materials Prepared for Tribune Committee) at 2-3.
[91] NPP 181 (1/20/07 Pre-LBO Special Committee Meeting Minutes).
[92] NPP 185 (1/27/07 Confidential Discussion Materials Prepared for Tribune Committee) at 4-5.
[93] NPP 184 (1/26/07 revised Chandler Trusts Proposal).
[94] NPP 782 (Exam'rs Rpt.), Vol. I at 372.

JPMorgan Vice Chairman James Lee, who testified that he has known Zell his "entire adult life," and Zell soon reached out to JPMorgan to participate in the transaction.[95]  On February 15, 2007, Bill Pate of EGI contacted JPMorgan regarding the potential Tribune transaction, and, after just five days of diligence, JPMorgan reported back to the Zell entity that "JPM is there for [you] on [your] big project."[96]  Zell ultimately awarded JPMorgan an M&A mandate on the transaction, and engaged JPMorgan as a lead arranger of the financings.[97]

43.  In February 2007, Zell submitted a single step proposal outlining a leveraged buyout of Tribune pursuant to which the shares of outstanding common stock would be acquired at $33 per share via an employee stock ownership plan structure with Zell investing only $225 million in Tribune.  In March 2007, at the request of the Pre-LBO Special Committee, the proposal was revised to be consummated in two-steps, in response to demands by the Company's largest shareholders.  The only reason for the LBO's two-step structure was that large shareholders, including Board members, insisted upon receiving payments without having to wait for the regulatory approvals required for a full consummation of the buyout.[98]  Pursuant to

---

[95] Lee Dep. Tr. 16:14-17, 19:7-13; NPP 392 (4/26/07 JPMorgan Lender's Meeting Transcript) at 2.  In an email dated April 26, 2007, Lee described Zell as a "rock star" and "my friend."  NPP 2317 (4/26/07 email from J. Lee to S. Zell).  In connection with a *New Yorker* profile of Zell, Lee spoke glowingly of Zell, and told a reporter that "if Sam said he needed $10 billion, I'd lend it to him, on the wire."  NPP 2336 (10/29/07 email from K. Lemakau to J. Lee).  Indeed, Lee was close enough to Zell that he was aware as early as February 2007 that Zell hoped to make Maggie Wilderotter the new CEO of Tribune, a fact Lee shared with JPMorgan CEO Jamie Dimon, with the caution to "keep this to yourself partner."  NPP 2326 (2/22/07 email from J. Lee (JPMorgan) to J. Dimon (JPMorgan)).  The record suggests that JPMorgan may have been more deferential to Zell than an ordinary client, and that JPMorgan's conduct in the face of mounting evidence that the LBO was unsound may have been influenced by Zell's relationships with Lee and other members of JPMorgan's senior management.  JPMorgan's Peter Cohen acknowledged this special relationship in an email to Lee in September 2007 regarding meetings to take place at JPMorgan regarding the troubled deal, in order to give Lee a chance to "weigh in, if necessary, on behalf of Sam so that short term decisions don't have negative impact on the broader relationship with Sam and Trib.  Linneman, casey et al. [JPMorgan bankers] don't have yours and Jamie [Dimon's] and Brit's [Bartter, the JPMorgan banker who led the Zell engagement] long term relationship with Sam . . . .  I am sure you are in the middle of a ton of this stuff but it strikes me that *Sam is different*."  NPP 2334 (9/20/07 email from B. Bartter to P. Cohen).
[96] NPP 782 (Exam'rs Rpt.), Vol. I at 259-260.
[97] NPP 398 (5/2007 Confidential Information Memorandum for Public Siders); NPP 1333 (4/5/07 Amended and Restated First Step Fee Letter, Engagement Letter and Commitment Letter); NPP 1327 (4/5/07 Amended and Restated Second Step Commitment Letter, Engagement Letter and Fee Letter).
[98] NPP 782 (Exam'rs Rpt.), Vol. I at 262.

the proposal, Tribune would be privately held and primarily owned by the employee stock ownership plan following the buyout, with the Zell entity owning a warrant to purchase approximately 40% of Tribune's fully diluted equity.[99]

44.     On March 30, 2007, in response to pressure by the Chandler Trusts and the McCormick Tribune Foundation (the "McCormick Foundation"), Zell revised its proposal slightly to increase the stated per share consideration to $33.50, but was met with a demand for 50 cents more per share.  At about 6:00 p.m. on March 30, Zell reached out directly to Jimmy Lee looking for help to "finance the bump."  Lee passed the request along to Dimon, and asked Dimon to call Zell personally.[100]  The issue was then surfaced with a more junior member of the JPMorgan deal team, Andrew O'Brien, who wrote Lee that any help to Zell probably would have "to come as equity as we have already screened rating agencies and are right on the edge of minimum corp rtgs of B2, so probably tough to add much more if any debt."[101]  In his email back to O'Brien (copied to Dimon and JPMorgan banker Patricia Deans), Lee instructed him to "be as helpful as we can."[102]  Deans replied to O'Brien an hour later, noting that "[i]ts [*sic*] not a lot of money but we had to beg sp [Standard & Poors] not to give us a neg. Outlook [*sic*]."[103]

45.     On March 31, 2007, Zell revised his proposal up to $34.00 per share, and the Chandler Trusts agreed to support the revised proposal based on the increased price and improvements in the proposal's financial terms.[104]

---

[99] NPP 389 (4/25/07 Tender Offer) at 1-2, 22-23, 25.
[100] NPP 308 (3/30/07 email from R. Kapadia to B. Bartter re: Zell).
[101] NPP 308 (3/30/07 email from R. Kapadia to B. Bartter re: Zell).
[102] NPP 308 (3/30/07 email from R. Kapadia to B. Bartter re: Zell).
[103] Lee Dep. Tr. 68:3-21 (quoting JPM 291324-25 (3/30/07 email from P. Deans to A. O'Brien)).
[104] During a Pre-LBO Special Committee meeting on March 30, 2007, Dennis FitzSimons, Tribune's then CEO, announced that Tribune management was changing its recommendation and would support the Zell proposal.  NPP 782 (Exam'rs Rpt.), Vol. I at 131-32.  The next morning, Lee wrote a revealing email to Dimon:  "Dimon winds up ... takes  the shot ... woa baby ... Dimon ... kicksave  and a beauty ... the cagey vet, Jamie Dimon  reaches deep and saves the game for the home  team … well done boss.  Jimmy."  Lee reviewed the message at his deposition but,

46.     On April 1, 2007, the Board, at the recommendation of the Pre-LBO Special Committee, approved Zell's proposed leveraged buyout of Tribune at $34 per share and entered into an Agreement and Plan of Merger (the "Merger Agreement"). The LBO would be executed by the newly-formed ESOP, the Zell entity and Zell.[105] Pursuant to the terms of the Merger Agreement, the ESOP purchased 8,928,571 shares of the Company's common stock from the Company at $28 per share. The ESOP paid for these shares with a $250 million promissory note. Upon completion of the LBO, the 8,928,571 shares of Tribune's common stock held by the ESOP would be converted into 56,521,739 shares of common stock, and these shares would represent the only outstanding shares of capital stock of Tribune.[106]

47.     On April 23, 2007 the Zell entity made an initial investment of $250 million in the Company in exchange for (a) 1,470,588 shares of Tribune's common stock at a price of $34 per share and (b) a $200 million unsecured subordinated exchangeable promissory note of Tribune, which was redeemed by the Tribune for the same amount that the Zell entity would have received if it had been exchanged for stock and then cashed out at $34 per share as a part of the completion of the LBO. Zell was also appointed as a member of the Board on May 9, 2007, prior to the closing of Step One of the LBO.[107]

48.     On April 25, 2007, Tribune commenced a tender offer to repurchase up to 126 million shares of its outstanding common stock at $34 per share.[108]

---

claimed he did not "remember the email," and did not "remember the situation." Lee Dep. Tr. 63:5-64:21; NPP 2329 (3/30/07 email from J. Dimon (JPMorgan) to N. Durden (JPMorgan)).

[105] NPP 672 (Tribune 2007 Form 10-K) at 1-2.
[106] NPP 672 (Tribune 2007 Form 10-K) at 2.
[107] NPP 672 (Tribune 2007 Form 10-K) at 2.
[108] NPP 672 (Tribune 2007 Form 10-K) at 2.

2. **What The Company's Advisors, Investors, Rating Agencies And The Public Thought About The Transaction Prior To The Close Of Step One**

49.     On February 6, 2007, the Company's financial advisor, Citigroup, reacted to Zell's proposal:

> I spoke to ML [Merrill Lynch]. They are on board with this silly [ESOP] structure. Note: the cap table isn't showing the [ESOP] debt correctly. Its actually just more hy [high yield] debt for a total of 3.425bn. . . . I am unequivocally not on board. Yet. But ML explained why they think it works. . . . ML is Sam's bank. They'll do anything for him. (They would not do this for KKR.)[109]

50.     On March 1, 2007, the McCormick Foundation wrote a letter to the Pre-LBO Special Committee expressing "important concerns regarding the ESOP Proposal and whether it should be pursued for the reasons that follow, namely, Price, Timing and Execution Risk in comparison to the self-help proposal presently under consideration."[110]

51.     With the transaction hanging in the balance in early March, Zell's long-time banker Lee appeared to encourage JPMorgan personnel to use their personal relationships with the head of the Pre-LBO Special Committee to influence the outcome on Zell's behalf, although JPMorgan's own analysts would question the wisdom of the transaction, particularly with regard to Step Two, just days later.[111]

---

[109] NPP 191 (2/7/07 email from J. Persily (Citi) to M. Canmann (Citi), *et al.*).

[110] NPP 220 (3/1/07 McCormick Foundation Letter) at 2.

[111] NPP 2328 (3/1/07 email from B. Bartter (JPMorgan) to J. Lee (JPMorgan)). On March 1, 2007, in response to news from Brit Bartter that Zell viewed his chances of approval of the deal at just 65%, Lee reminded Bartter that "some of our folks have close relationships with the head of the Special Committee," and Bartter responded "Sam knows [William] Osborne [Chair of Pre-LBO Special Committee (LBO)] too, and I do also." As he did with virtually all of the other emails and Tribune matters discussed at his deposition, Lee denied any recollection of this email and its subject matter. As a consequence of Lee's lack of recall, the Bankruptcy Court must accept the natural meaning of Lee's emails at face value, without benefit of any further explanation from Lee himself.

52.     Sell (then head of JPMorgan's Special Credits Unit) indicated in a March 28, 2007 email that was "not concerned in the short term [*i.e.*, the Step One Financing]," but he had concerns with "the second stage a year down the road."[112]

53.     By March 10, 2007, the Pre-LBO Special Committee had become uncomfortable with the EGI proposal and engaged the Chandler Trusts and the McCormick Foundation in discussions concerning a revised self-help proposal with a reduced dividend to Tribune's stockholders.[113]  At the same time, the Chandler Trusts were considering selling their Tribune common stock to the McCormick Foundation.[114]  When the Examiner questioned Stinehart as to why the Chandler Trusts were considering this sale, he explained:

> [W]hat the [Chandler] Trusts saw was a four-star black-diamond run headed straight downhill. Costcutting gets you nowhere, and the chair lift's broken.[115]

54.     On March 11, 2007, Nils Larsen (EGI) sent an email to bankers at JPMorgan informing them that "as of late Friday night Tribune signaled to us that they had decided not to pursue either deal. The reasons given are a bit skimpy and I am not sure if this will stick but for now we are in limbo."[116]  When Britt Bartter, the leader of JPMorgan's Tribune team, asked why, Larsen responded that Tribune's Chief Executive Officer Dennis FitzSimons "spent three days with the [Company's] publishers and got cold feet on the leverage."[117]

55.     Various analysts also expressed their uneasiness over the transaction.  On March 16, 2007, Lehman Brothers produced an equity research report that stated the following regarding the proposed Zell leveraged buyout: "In our opinion, this is way too high a portion of debt, especially given the secular pressures on the newspaper and TV station operations, with or

---

[112] NPP 289 (3/28/07 email from J. Sell (JPMorgan) to B. Sankey (JPMorgan)).
[113] NPP 389 (4/25/07 Tender Offer) at 23.
[114] NPP 782 (Exam'rs Rpt.), Vol. I at 378.
[115] NPP 782 (Exam'rs Rpt.), Vol. I at 378 n. 1699.
[116] NPP 237 (3/11/07 email from B. Bartter (JPMorgan) to P. Cohen (JPMorgan)).
[117] NPP 237 (3/11/07 email from B. Bartter (JPMorgan) to P. Cohen (JPMorgan)).

without the ESOP tax benefits in our opinion (which are relatively small)." The report continued, "We think putting this much debt on Tribune's newspapers and TV stations is way too risky and makes it very possible to put the company into bankruptcy somewhere down the road, especially if the economy slows, with or without the added tax savings from the ESOP financing."[118]

56.     In late March 2007, the credit rating agencies communicated the possible ramifications of the proposed Zell leveraged buyout. In a letter to Bigelow (Tribune) on March 29, 2007, Standard & Poor's ("S&P") stated that if the Zell leveraged buyout moved forward, "the company is expected to default in 2009 when its cash flow and revolving credit capacity are unable to cover its interest expense, capital expenditures, and working capital needs."[119]

57.     Moody's Investors Service ("Moody's") also expressed concern over the Zell leveraged buyout. In a letter to Don Grenesko (Tribune) dated March 29, 2007, Moody's stated, "We are concerned that the significant amount of leverage is occurring at a time of pressure on the company's advertising revenue and operating margins from online and cross media competition and cyclical fluctuations in the U.S. economy."[120]

### 3.     The Company's Projections Raised Red Flags

58.     At the same time that Tribune faced questions and apprehensions about the Zell proposal, concerns were also raised over the Company's optimistic projections in light of analysts' views of the declining publishing industry. Merrill Lynch and Citigroup commented that the "current Tribune Management Projections [were] generally more aggressive than Wall

---

[118] NPP 242 (3/16/07 Lehman Brothers Equity Research Report) at 3.
[119] NPP 304 (3/29/07 letter from S&P's Rating Evaluation Services to C. Bigelow (Tribune)) at ML-TRIB-0386933.
[120] NPP 303 (3/29/07 letter from J. Puchalla (Moody's) to D. Grenesko (Tribune)) at TRB0098756.

Street research" were "[a]bove consensus for Revenues and EBITDA through 2008," and that "2008 [was] considerably higher than even most aggressive Wall Street estimate."[121]

59.    In February 2007, the Company management prepared a revised set of long-term projections (the "February 2007 Projections").[122]  This was the fourth set of long-term projections issued by the Company in less than a year.  Although the February 2007 Projections were prepared in response to deteriorating performance in January 2007, the February 2007 Projections projected significant improvement over the course of the year and in the out years.[123]

60.    Tribune's Vice President of Corporate Development, Daniel Kazan, recognized in a February 21, 2007 email that the projections were problematic:

> If I'm reading this correctly, our plan has us being $47 million below 2006 for the first half. I don't know what the bankers will base their threshold number on, but it suggests we really need to get to the bottom of that. Otherwise, we are already halfway towards not being able to meet that covenant (which enables us to do the spin).[124]

61.    On March 5, 2007, Thomas Whayne, a Managing Director at Morgan Stanley, also highlighted concerns regarding the projections:

> Spoke with Christina [Mohr, Citigroup]. According to her, Dennis [FitzSimons, Tribune] is becoming more nervous about the $20 recap given the weakness in the business (down 5% in February, and 9% in January), and is considering recommending a lower amount (and potentially much lower) to the board. I asked her if they were going to modify their management plan for the second time in a month, and she said that they were not, but had less confidence in the plan at present. Said that certain members of publishing management were concerned that they could have covenant issues later in the year if the current business trajectory continues…[125]

62.    Following the release of the February 2007 Projections, the Company's declining financial performance also caused Tribune to second guess its decision to proceed with the Zell

[121] NPP 175 (1/12/07 Merrill and Citigroup Confidential Discussion Materials Prepared for Board) at 7.
[122] NPP 1099 (2/8/07 ESOP Transaction Model - Revised Operating Plan Case).
[123] NPP 944 (Tuliano Rpt.) at 37-38, 58-77; NPP 782 (Exam'rs Rpt.), Vol. I at 73-95.
[124] NPP 204 (2/21/07 email from D. Kazan (Tribune) to C. Bigelow (Tribune) *et al.*) at TRB0047811.
[125] NPP 225 (3/5/07 email from T. Whayne (Morgan Stanley) to J. Fincher (Morgan Stanley), *et al.*).

proposal.[126]  For example, on March 10, 2007, Michael Costa, a Managing Director at Merrill

Lynch (advisors to the Company), stated:

> Short answer is in light of recent operating performance no comfort in
> putting the kind of leverage necessary for Zell proposal to work and have
> board get comfortable with employees owning the equity. Also numerous
> issues in the Zell proposal we could not solve.[127]

63.     And Persily, a Managing Director at Citigroup (advisors to the Company), stated

the following on March 22, 2007:

> Having seen the book I am still extremely uncomfortable with Zell. No
> matter the rating. Deal creep brings debt high than the deal we approved
> for him which was 9.6bn new raise (7.1x thru the new money). Declining
> EBITDA is scary. Until yesterday I did not know that Q1 cash flow was
> down 20 from last year. All I heard was that pub was 6mm off plan and
> broadcast was 5mm higher. I'm very concerned.[128]

64.     Despite the Company's declining performance and the industry's continuing

negative outlook, the Company did not update the February 2007 Projections—at least for

circulation outside the Company.  Management was aware of the implications of updating the

February 2007 Projections, as noted in an email from Peter Knapp, the Publishing Group

Controller for Tribune, on April 30, 2007:

> Brian [Litman] and Chandler [Bigelow]:  You guys need to help get with
> Don [Liebentritt] and Crane [Kenney] to figure out whether or not we are
> doing an updated projection next week knowing that if we do, we may end
> up with some consistency issues to the recent document disclosures. Harry
> [Amsden] is insisting that we HAVE to and I told him I thought the 6th
> floor was thinking we weren't and he should get to Don [Liebentritt] and
> figure it out.[129]

65.     Based on contemporaneous emails between Company management and EGI,

however, it appears that the Company may have *internally* downwardly revised its February

2007 Projections weeks prior to the Step One close, but decided not to distribute the revised

---

[126] NPP 237 (3/11/07 email from B. Bartter (JPMorgan) to P. Cohen (JPMorgan))
[127] NPP 236 (3/10/07 email from M. Costa (Merrill Lynch) to P. Taubman (Morgan Stanley), *et al.*).
[128] NPP 1232 (3/22/07 email from J. Persily (Citi) to C. Mohr (Citi)).
[129] NPP 397 (4/30/07 email from P. Knapp (Tribune) to B. Litman (Tribune), *et al.*).

numbers externally due to "legal" concerns. Emails from April 12, 2007 between Amsden and another Company employee reference "new 'projections' which are a new look at the full year numbers,"[130] but indicate that Amsden was reluctant to disclose them because of "potential legal concerns with doing that."[131]

### 4. Tribune Retains VRC To Issue A Solvency Opinion After Houlihan Lokey Voices Concerns Over The LBO

66.     Between March 21, 2007 and March 30, 2007, representatives of Tribune, EGI, and the ESOP, including the Pre-LBO Special Committee's financial and legal advisors, negotiated various terms and conditions of the various agreements relating to the potential ESOP transaction.[132]  Specifically, Tribune's obligation to consummate the LBO was subject to the satisfaction or waiver of certain of conditions, including the receipt of an opinion from a nationally recognized firm as to the Company's "solvency" after giving effect to the transactions contemplated by the Merger Agreement.[133]  On or about March 28, 2007, Tribune approached Houlihan Lokey ("Houlihan") to provide the required solvency opinion.  Houlihan representative Ben Buettell testified, however, that Houlihan had doubts about whether it could opine that the Company would be solvent:

> …if we were asked to say, hey, do we think we can deliver a solvency opinion, it may have been hard for us to say yes based on this preliminary information we had.
>
> ….you have face value of debt being greater than the enterprise value, at least as calculated by us in this sheet, and that seems a little challenging – that seemed a little challenging from my perspective at the time.[134]

67.     After Houlihan expressed its discomfort and turned down the engagement, Tribune turned to another solvency firm, Valuation Research Corporation ("VRC").  VRC's

---

[130] NPP 373 (4/12/07 email between M. Sotir (EGI) and B. Pate (EGI) *et al.*).
[131] NPP 372 (4/12/07 email between H. Amsden (Tribune) and B. Pate (EGI) *et al.*).
[132] NPP 782 (Exam'rs Rpt.), Vol. I at 128.
[133] NPP 782 (Exam'rs Rpt.), Vol. I at 140.
[134] Deposition of Ben Buettell, December 2, 2009 ("Buettell Dep. Tr.") 72:18-21, 73:18-22.

initial reaction was that the proposed transaction was "[h]ighly [u]nusual (because of S-Corp ESOP tax benefits) and highly leveraged," and that the Company consisted of "good, stable but deteriorating businesses."[135]  One VRC executive wrote: "This may be just acceptable risk levels, but we will need to be compensated.  My fee estimate would be $600-700k. . . ." Another VRC executive responded: "I would say at least $750[K] and maybe significantly more depending on levels and if they need bringdowns, etc."[136]  On April 11, 2007, Tribune formally engaged VRC to provide the Board the solvency opinion.[137]  Ultimately, VRC charged $1.5 million, the highest fee it had ever charged for a solvency opinion.[138]

68.     Additionally, VRC's engagement letter required a specific modification of the definition of "fair value" in order to enable VRC to include in its solvency assessment value arising from the S Corporation wholly-owned by an employee stock benefits plan ("S Corp/ESOP") structure.[139]  Bryan Browning, a managing director at VRC who has worked on 400 to 500 solvency opinions (including the Company's opinions), does not believe he had ever worked on a solvency opinion that modified the definition of fair value in that fashion.[140]

**D.     Events Between April 2007 And The Step One Closing On June 4, 2007**

**1.      Ratings Agencies Downgraded Tribune's Debt And Wall Street Analysts Reacted Negatively To The Approval Of Step One**

69.     On April 2, 2007, two of the three major credit rating agencies, Fitch and S&P, downgraded Tribune's debt in response to the approval of Step One.

S&P stated:

---

[135] NPP 301 (3/29/07 email from B. Browning (VRC) to B. Hughes (VRC)); NPP 311 (3/30/07 email from S. Gruskin (VRC) to G. Barber (VRC), *et al.*).
[136] NPP 311 (3/30/07 email from S. Gruskin (VRC) to G. Barber (VRC), *et al.*).
[137] NPP 1349 (4/11/07 VRC Solvency Engagement Letter).
[138] Deposition of Mose Rucker III, dated December 3, 2009 ("Rucker Dep. Tr.") 44:14-45:21.
[139] NPP 782 (Exam'rs Rpt.) Vol. I at 225 (citing NPP 1349 (4/11/07 VRC Solvency Engagement Letter).
[140] *Id.* at (Exam'rs Rpt.), Vol. I at 226.

...based on our analysis of the proposed capital structure, we have determined that if shareholders approve the transaction as outlined, we would lower the corporate credit rating to 'B', with a stable outlook.

The expected 'B' rating would reflect the company's highly leveraged capital structure, weakened credit measures, and reduced cash flow-generating capability as a result of its LBO and associated heavy interest burden. The rating would also underscore Tribune's exposure to the very challenging revenue climates and competitive market conditions affecting its newspaper and broadcasting operations, and its aggressive financial policy.[141]

Similarly, Fitch stated:

Fitch's rating action reflects the significant debt burden the announced transajction [sic] would place on the company's balance sheet while its revenue and cash flow have been declining.[142]

Moody's subsequently downgraded Tribune on April 23, 2007, stating:

The rating actions reflect the significant increase in leverage that will result from Tribune's repurchase of approximately $4.2 billion of common stock through tender offer in the first step of its plan to go private[143]

The Wall Street analysts' responses were consistent with the rating agency downgrades and concerns over the transaction.

70.    Numerous analysis also reacted negatively to the approval of Step One of the LBO.  For example, on April 2, 2007, Barclays Capital stated:

We think it ijs [sic] possible that TRB is leveraged higher than the total asset value of the company (after taxes), which makes recovery valuations difficult if the economy and/or advertising market slows.[144]

On April 3, 2007, Barry L. Lucas of Gabelli & Co. stated:

I certjainly [sic] hope no one else is thinking of doing what Tribune has done. It's a mess.[145]

The next day, The Wall Street Journal reported:

---

[141] NPP 352 (4/2/07 Standard & Poor's Ratings Services, "Tribune Co. Rating Lowered To 'BB-' After LBO Announcement; Still Watch Negative").
[142] DCL 769 (4/2/07 Fitch Ratings, "Fitch Downgrades Tribune's IDR to 'BB-;' Watch Negative").
[143] NPP 386 (4/23/07 Moody's Investors Service, "Moody's Downgrades Tribune (CFR to Ba3), Assigns Ba2 to New Credit Facility Approximately $9.4 Billion of Debt Instruments Affected") at 1-2.
[144] NPP 350 (4/2/07 Barclays Capital, "Tribune – Ownership Stays in Chicago") at 2.
[145] NPP 356 (4/3/07 The Wall Street Journal, "Zell Wins Tribune In Bid to Revive A Media Empire; Budget Cuts Are Likely As Developer Takes Helm; Debt, ESOP Sew Up Deal") at 1.

The big question hanging over Tribune's $8.2 billion buyout deal unveiled Monday is this: How do they plan to do that [re-pay its debt], given that the newspaper industry faces uncertain prospects? Financed almost entirely by debt, the buyout will leave the newspaper and TV concern staggering under more than $12 billion in debt when existing borrowings are included. That is about 10 times Tribune's annual cash flow, a ratio several times higher than typically carried by most media businesses.[146]

71.     In an article on April 6, 2007, The New York Times referred to the LBO as "one of the most absurd deals ever. . . . ."[147]

### 2. Negative Perceptions Of The LBO Hampered The LBO Lenders' Efforts To Syndicate The LBO Debt Even Before Step One Of The LBO Closed

72.     By May 2007 it was apparent that the LBO Lenders' plans to syndicate the Step One financing would be difficult.[148] The market's negative perception of the LBO became evident, and certain Merrill Lynch personnel expressed concern that the LBO Debt syndication would be undersubscribed "on an allocable demand basis by a material amount." Canmann, a Managing Director at Citigroup, commented on May 10, 2007—just one day after Zell was elected to the Board—that "[e]veryone should be aware that the bank syndication is struggling."[149]

73.     Internal communications among Merrill Lynch personnel attributed the syndication problem to the market's uneasiness with the deal itself rather than with market conditions generally. When asked if the problems were "[s]omething about this deal or the mkt," Kaplan (Merrill) responded:

---

[146] NPP 359 (4/4/07 The Wall Street Journal "How Will Tribune Pay Its Debts?").

[147] NPP 367 (4/6/07 The New York Times, "This Deal Is Encouraging and Absurd").

[148] NPP 414 (5/10/07 email from T. Kaplan (Merrill Lynch) to V. Nesi (Merrill Lynch)); NPP 415 (5/11/07 email from P. Cohen (JPMorgan) to A. O'Brien (JPMorgan), *et al.*); NPP 424 (5/12/07 email from Sell (JPMorgan) to B. Sankey (JPMorgan)).

[149] NPP 429 (5/14/07 email from C. Mohr (Citigroup)).

[The issue is] [t]his deal – market is busy, but fine. Misjudged level that investors would require here. Working people through the structure has been a challenge, but major pushback has been on newspaper business.[150]

Similarly, on May 11, 2007, Cohen (JPMorgan) reported internally:

Since we launched two weeks ago, the deal has struggled in the market. Investor concerns include total leverage (8.9x EBITDA), low equity check from Sam [Zell], continuing deterioration of newspaper industry fundamentals, price and overhang from expected Second step of the transaction which will occur later this year. We have been working hard to come up with both pricing and structural adjustments.[151]

74. As the lenders were facing difficulties syndicating the LBO Debt, Tribune announced the Company's results for April 2007, which showed that the Company's consolidated revenues for April were down 3.6 percent from the prior year, publishing revenues were down 8.6 percent, and advertising revenues were down 10.3 percent.[152]

75. As a result of problems completing the syndication, the LBO Lenders contacted Tribune to request that the debt be restructured to make it more marketable:

Sell (JPMorgan):

[Kapadia] said bank loan phase 1 bank commitments came in a 3.5!B [*sic*] vs. 5.9 ask. Team was meeting with Zell's team to discuss reducing bank loan by 1.0 to 1.5 B by adding asset sale bridge. Also we will ask for more coupon and will be offering paper at .99 reducing our fees to increase yield to investor. This was tough deal from start and has been negatively impacted by negative publicity regarding newspapers and their declining role in advertising . . . Not good news on bank loan syndication front but we are proactively restructuring syndication to move paper.[153]

76. On May 17, 2007, Citigroup updated an earlier loan approval memo noting that loan syndication was expected to be difficult, and citing "ESOP ownership structure, high leverage, and a lack of hard asset collateral for the bank debt" as "the biggest risks."[154]

---

[150] NPP 414 (5/10/07 email from T. Kaplan (Merrill Lynch) to V. Nesi (Merrill Lynch)).

[151] NPP 416 (5/11/07 email from P. Cohen (JPMorgan) to J. Dimon (JPMorgan), *et al.*).

[152] NPP 430 (5/14/07 Tribune Press Release, "Tribune Revenues Down 3.6% in April").

[153] NPP 424 (5/12/07 email from J. Sell (JPMorgan) to B. Sankey (JPMorgan)).

[154] NPP 435 (5/17/07 Citigroup, "Leveraged Finance Final Approval Memorandum – UPDATE").

### 3. Step One Closes On June 4, 2007

77.     On May 17, 2007, Tribune entered into the $8 billion Senior Loan Agreement, which was subsequently amended on June 4, 2007.  The Senior Loan Agreement included a $5.515 billion Senior Tranche B Term Facility, a $1.5 billion Tranche X Term Facility, a $263 million Delayed Draw Senior Tranche B Facility, and a $750 million Revolving Credit Facility. The Senior Loan Agreement also included an additional $2.105 billion new Incremental Facility to be used in Step Two of the LBO.[155]

78.     On June 4, 2007, the Company consummated Step One of the LBO, and Tribune repurchased and retired 126 million shares of common stock at a purchase price of $34 per share using proceeds from the Senior Loan Agreement.  Tribune used the remainder of the Step One proceeds to refinance existing bank debt and commercial paper totaling approximately $2.8 billion and to pay transaction fees.[156]

### 4. The Step One And Step Two Lenders Share An Identity Of Interests

79.     As the Examiner noted, the lenders who participated in Step One are "the same creditors (or their successors) who . . . participated in, funded, and made possible the Step Two Transactions."[157]  Accordingly, the record establishes that the Step One Lenders willingly participated in and benefitted from the Step Two Financing.[158]

80.     Additionally, these LBO Lenders acknowledged that Step One and Step Two were part of a single transaction, and always assumed that both steps would take place.  They planned and analyzed the steps simultaneously,[159] committed to them together on the same

---

[155] NPP 672 (Tribune 2007 Form 10-K) at 3.
[156] NPP 672 (Tribune 2007 Form 10-K) at 2-4.
[157] NPP 782 (Exam'rs Rpt.), Vol. II at 301.
[158] NPP 782 (Exam'rs Rpt.), Vol. II at 301.
[159] *See e.g.*, NPP 451 (5/29/07 JPM Tribune Transaction Proposal); NPP 435 (5/17/2007 Citi Leveraged Finance Final Approval Memorandum); NPP 399 (5/3/2007 BofA Credit Approval Report).

day,[160] and marketed them "concurrently."[161] The Arrangers structured the financing of both steps to be interlocking by entering into a loss-sharing provision that made the Step One and Step Two debt fungible by allowing the Step One and Step Two Lenders to share in distributions on a *pro-rata* basis.[162] They also negotiated and obtained enhanced pricing and fees for their Step One debt based on the assumption that Step Two would close.[163] Moreover, the evidence demonstrates that the Arrangers were more concerned by their own franchise risk and the lure of large fees than they were with the wisdom of the transaction, and continued with Step Two of the transaction with the full knowledge that the Company was insolvent, but with the comfort of the "equity cushion" provided by its Pre-LBO Noteholders.[164]

### E. The Noteholder Plan Proponents Offered Substantial Evidence That The February 2007 Projections Were Overly Optimistic, Unreasonable And Could Not Be Relied Upon At Step One Of The LBO

81. Based on evidence presented at trial and in the record, there is a strong argument that a court would find the projections prepared by management in February 2007 and then used by VRC to issue its solvency opinions to have been unreasonable and inappropriate to rely upon at Step One of the LBO.

#### 1. The February 2007 Projections Were Unreasonable Given The Newspaper Industry's Long-Term Secular Decline

82. The evidence presented at trial illustrated a number of reasons why the February 2007 Projections could not be relied upon at Step One of the LBO. First, as described in more detail in Section II.A, *supra*, the projections were prepared in the midst of a severe, long-term,

---

[160] *See* NPP 1335 (4/5/07 Amended & Restated First Step Commitment Letter); NPP 1336 (4/5/07 Amended & Restated Second Step Commitment Letter).
[161] *See* NPP 342 (Tribune Confidential Information Memorandum) at 28.
[162] NPP 1899 (Senior Loan Agreement) §§ 2.13, 2.15.
[163] NPP 1420 (Executed Copy of Credit Agreement) at 2-3.
[164] *See infra* at II.G.

secular decline in the publishing industry.[165]  This was problematic because the Company's publishing business segment made up approximately three-quarters of its revenues.[166]

83.     Moreover, the Company's publishing assets, which accounted for some three-quarters of the Company's overall revenues, were performing poorly at the time of the LBO even by the standards of the troubled publishing industry.  Six newspapers accounting for more than 91% of the Company's publishing business—the *Los Angeles Times*, *Chicago Tribune*, *South Florida Sun-Sentinel, Orlando Sentinel, Newsday,* and *Baltimore Sun*—were performing poorly in 2007.  As of May 2007, operating cash flow for these newspapers was 24% off of their 2006 results and 14% off of the 2007 business plan.  Additionally, the Company's publishing segment as a whole was 22% off of its 2006 results, and 12% off of the 2007 plan on which the February 2007 Projections were based.[167]

84.     In the five years preceding the LBO, the Company experienced significant declines in its circulation levels that were more severe than the overall industry.  In an industry report dated March 2007, Deutsche Bank noted that the Company, as a national newspaper publisher, was experiencing greater circulation losses than local newspapers.[168]  The Morgan Stanley Publishing Handbook reported that the March 2007 daily circulation of the Company's newspapers decreased by 4.1% over March 2006 as compared to the industry average decrease of 2.7% over the same period.[169]

85.     As reported in the Morgan Stanley Publishing Handbook, a secular shift was occurring in the distribution of advertising dollars across alternative advertising media.  The

---

[165] *See* NPP 944 (Tuliano Rpt.) at 25-31.
[166] NPP 944 (Tuliano Rpt.) at 4, 24; NPP 170 (Tribune 2006 Form 10-K) at 6.
[167] *See* NPP 944 (Tuliano Rpt.) at 63-66, Fig. 13 V-3 at 12; NPP 427 (Tribune Brown Book, Period 4); NPP 465 (Tribune Brown Book, Period 5); DCL 1372 (Tribune Brown Books, 2007).
[168] NPP 944 (Tuliano Rpt.) at 26-27; NPP 271 (3/27/07 Deutsche Bank, "State of the Newspaper Industry: A Wall Street Perspective") at 12-13.
[169] NPP 944 (Tuliano Rpt.) at 26-27; NPP 422 (5/11/07 Morgan Stanley, "The Publishing Handbook") at 26-27.

newspaper publishing industry was facing the largest decline in advertising revenue and was expected to have lost 9.8% of the U.S. advertising market over the 10-year period from 1998 to 2008.[170] Conversely, the internet was expected to increase its market share by 9.7% over the same period.[171] In addition, the growth rate in quarterly newspaper advertising expenditures began to decrease from the fourth quarter of 2004 and turned negative in the second quarter of 2006.[172] By the second quarter of 2007, the quarterly rate of decline was over 10% on a year over year basis.[173] Classified advertising represented over 28% of the publishing segment's total 2006 revenue.[174] The Company's loss in classified advertising revenues in the first quarter of 2007 was greater than the industry average loss across all major categories, as reported in the Morgan Stanley Publishing Handbook.[175]

86. Notwithstanding this declining performance, the February 2007 Projections predicted that the Company would materially outperform 2006 in the latter half of the year. Specifically, as indicated by the chart below, although the projections set a relatively low bar for performance in the first quarter of 2007, the performance expectation increased for the second half of the year, requiring the Company's publishing segment to exceed its 2006 performance by 2.4%.[176]

---

[170] NPP 944 (Tuliano Rpt.) at 27; NPP 422 (5/11/07 Morgan Stanley, "The Publishing Handbook") at 12-13.
[171] NPP 944 (Tuliano Rpt.) at 27; NPP 422 (5/11/07 Morgan Stanley, "The Publishing Handbook") at 12-13.
[172] NPP 944 (Tuliano Rpt.) at 28; NPP 422 (5/11/07 Morgan Stanley, "The Publishing Handbook") at 12-13.
[173] NPP 944 (Tuliano Rpt.) at 28; NPP 422 (5/11/07 Morgan Stanley, "The Publishing Handbook") at 12-13.
[174] NPP 944 (Tuliano Rpt.) at 29-30; NPP 422 (5/11/07 Morgan Stanley, "The Publishing Handbook") at 16-25.
[175] NPP 944 (Tuliano Rpt.) at 29-30; NPP 422 (5/11/07 Morgan Stanley, "The Publishing Handbook") at 16-25.
[176] NPP 944 (Tuliano Rpt.) at 64-65, Fig. 12, Exhibit V-3 at 11; NPP 427 (Tribune Brown Book, Period 4); NPP 465 (Tribune Brown Book, Period 5); DCL 1372 (Tribune Brown Books, 2007).



**Tribune – Publishing Segment 2007 Plan Operating Cash Flow**
*Measured as a % of 2006 Actual*

87. The Company's actual operating performance in the months leading up to Step One failed to meet even the relatively modest projections set forth in the February 2007 Projections for early 2007.[177] As of May 2007, right before Step One closed, year-to-date operating cash flow for the publishing segment was 11.5% lower than projected and 21.5% lower than the 2006 actual results.[178] And the Company's six largest newspapers, which were responsible for 91% of the operating cash flow generated by the Company's publishing segment, were faring even worse. Operating cash flow for these newspapers was nearly 14% off of the 2007 business plan as of May 2007 and 23.6% off of their 2006 results.[179]

---

[177] *See* NPP 944 (Tuliano Rpt.) at Figs. 8 & 9 at 61-62, Exhibit V-3 at 11; NPP 427 (Tribune Brown Book, Period 4); NPP 465 (Tribune Brown Book, Period 5); DCL 1372 (Tribune Brown Books, 2007).
[178] NPP 944 (Tuliano Rpt.) at 65-66, Fig. 13, Exhibit V-3 at 11; NPP 427 (Tribune Brown Book, Period 4); NPP 465 (Tribune Brown Book, Period 5); DCL 1372 (Tribune Brown Books, 2007).
[179] NPP 944 (Tuliano Rpt.) at 66, Fig. 13, Exhibit V-3 at 12; NPP 427 (Tribune Brown Book, Period 4); NPP 465 (Tribune Brown Book, Period 5); DCL 1372 (Tribune Brown Books, 2007).

88.     The negative variances to management's projections and 2006 actual performance were not only of great magnitude, they were also recurring every month.[180]  Moreover, Black, the DCL Plan Proponents' expert, stated in an affidavit submitted prior to the Step One close (and confirmed at trial) that the Company's performance in the first three months of the year was "substantially below" the February 2007 Projections, and closest to the Company's "Downside Case B"—which predicted a 3% annual decline in publishing segment advertising revenue and a 1% annual decline in operating cash flow for the broadcasting segment—and that the Company's performance "dropped off even more rapidly in April."[181]

89.     The Company's actual operating cash flows through May 2007 severely undermined the optimism in the February 2007 Projections.  As of May 2007, the Company's publishing segment would have had to achieve an increase of 38% in weekly operating cash flow (versus its performance through May) for the remaining seven months of 2007 in order to eliminate the plan deficit as of May 2007 and achieve the February 2007 Projections.[182]  This is because, by May 2007—just before Step One closed—the Company was significantly behind on its 2007 business plan (upon which the February 2007 Projections were based).  In 2006, the operating cash flow for the last seven months of that year were just 2% lower than they were for the first five months, but the February 2007 Projections predicted that cash flow would somehow increase during the last seven months of 2007 by almost 15%, compared to the first six months of the year.[183]

---

[180] NPP 944 (Tuliano Rpt.) at 71, Exhibit V-3 at 11-12; NPP 427 (Tribune Brown Book, Period 4); NPP 465 (Tribune Brown Book, Period 5); DCL 1372 (Tribune Brown Books, 2007).
[181] NPP 2314 (5/10/07 Black Declaration) at 15, n. 22; NPP 944 (Tuliano Rpt.) at 115; NPP 389 (4/25/07 Tender Offer) at 32; 3/9/11 Trial Tr. 272:20-24, 273:24-274:7 (Black).
[182] NPP 944 (Tuliano Rpt.) at 72, Table 5, Exhibit V-3 at 11; NPP 427 (Tribune Brown Book, Period 4); NPP 465 (Tribune Brown Book, Period 5); DCL 1372 (Tribune Brown Books, 2007).
[183] See NPP 944 (Tuliano Rpt.) at 71-72, Table 5, Exhibit V-3 at 11.

90.     As a simple indication of how overly optimistic these projections were, by May 2007, the Company's six largest newspapers would have needed to increase their average weekly cash flow by 44.5% (versus its performance through May) to meet the 2007 plan, with the Orlando Sentinel—which was responsible for 10% of the Company's operating cash flow in 2006—needing to achieve as much as a 73.4% increase in weekly cash flow.[184] The Noteholder Plan Proponents presented a substantial amount of evidence showing that, at the time Step One closed, it was highly implausible that the Company would achieve the necessary improvement to its performance in the second half of the year, and that the parties involved in the transaction either did realize, or should have realized as much.[185] Additionally, because the Company's out year projections were premised on its 2007 performance, its drastic underperformance in the first half of 2007 rendered these out year projections patently unreasonable.

91.     The Noteholder Plan Proponents also presented evidence showing that the Company's assumptions about its small interactive business, which the February 2007 Projections used to offset the problems faced by the much larger and more important publishing segment, were speculative and overly optimistic.[186] The interactive business was a small internet-based division that accounted for just 4% of the Company's revenues in 2006. Yet, the February 2007 Projections forecasted that this division would somehow double its growth during the 2007-2011 projection period.[187]

---

[184] NPP 944 (Tuliano Rpt.) at 72, Table 6, Exhibit V-3 at 12; NPP 427 (Tribune Brown Book, Period 4); NPP 465 (Tribune Brown Book, Period 5); DCL 1372 (Tribune Brown Books, 2007).
[185] 3/18/11 Trial Tr. 34:1-16 (Tuliano).
[186] *See* NPP 944 (Tuliano Rpt.) at 58-59; 73-74.
[187] *See* NPP 944 (Tuliano Rpt.) at 73; NPP 71 (Tribune Interactive 2006-2012 Projections); NPP 154 (11/2006 Tribune Management Presentation) at TRB0480948-70; NPP 218 (3/2007 Tribune Rating Agency Presentation) at MS 48358, MS 48360; NPP 580 (10/2007 Tribune Rating Agency Presentation) at ML-TRIB-0032713-14.

92.     Contemporaneous projections for the Company generated by third parties were not consistent with the February 2007 Projections.  For instance, Wall Street consensus estimates prepared in March 2007 predicted decreasing EBITDA over the projection period.

93.     As it turned out, and as should have been reasonably expected at the time, in the two years following the LBO, the Company's financial performance fell well short of management's projections for each of those years.  In fact, the Company's performance deteriorated during the second half of 2007, which is the exact opposite of what the February 2007 Projections predicted. [188]

94.     Nevertheless, Company management did not publicly update its projections until after the closing of Step One and *after* VRC had already relied upon the stale February 2007 Projections in rendering its solvency opinion.[189]

95.     During this time frame—prior to the close of Step One—the Company's management and advisors, as well as the Arrangers, were rightly alarmed by the Company's deteriorating performance in light of the planned LBO.  As early as February 21, 2007, Daniel Kazan, Vice President of Corporate Development at the time, noted that "we are already half-way towards not being able to meet that [solvency] covenant."[190]

96.     Christina Mohr, a Managing Director at Citigroup, noted that Tribune's then Chief Executive Officer was becoming "more nervous . . . given the weakness in the business (down 5% in February, and 9% in January)," and that "certain members of publishing

---

[188]  NPP 944 (Tuliano Rpt.) at 43-47; NPP 465 (Tribune Brown Book, Period 5); NPP 508 (7/25/07 Tribune Form 8-K); DCL 1372 (Tribune Brown Books, 2007); NPP 506 (7/25/07 Barrington Research, Tribune Co. (TRB-NYSE), Tough Quarter for Publishing Profits); NPP 525 (8/14/07 Lehman Change of Earnings Forecast).
[189]  NPP 944 (Tuliano Rpt.) at 47-48; NPP 508 (7/25/07 Tribune Form 8-K); NPP 511 (7/26/07 email from J. Casey (JPMorgan) to A. O'Brien (JPMorgan), *et al.*); NPP 373 (4/12/07 email from M. Sotir (EGI) to N. Larsen (EGI)); NPP 372 (4/12/07 email from H. Amsden (Tribune) to M. Sotir (EGI)); NPP 397 (4/30/07 email from P. Knapp (Tribune) to B. Litman (Tribune), *et al.*); NPP 464 (6/8/07 email from M. Sotir (EGI) to B. Pate (EGI), *et al.*).
  NPP 204 (2/21/07 email between D. Kazan (Tribune) and C. Bigelow (Tribune)) at TRB0047811.
[190] NPP 204 (2/21/07 email between D. Kazan (Tribune) and C. Bigelow (Tribune)) at TRB0047811.

management were concerned that they could have covenant issues later in the year if the current business trajectory continues."[191]  Persily of Citibank echoed this concern, stating "[d]eclining ebitda is scary . . . *I'm very concerned*."[192]  Persily further testified that "throughout this, no matter what time, we didn't believe the Company's projections were achievable."[193]  And at Merrill Lynch, Michael Costa stated in early March that "in light of recent operating performance" there was "*no comfort inputting the kind of leverage necessary for Zell proposal to work*. . . ."[194]

97.     Given the long-term secular decline that the publishing industry was experiencing in 2007 and the Company's performance in the first five months of the year, the February 2007 Projections could no longer be relied upon by the time of the Step One close.  As Tuliano testified, "there was absolutely no basis whatsoever to support" those projections, especially "[g]iven that the industry was in secular decline [and] given that the business was deteriorating."[195]

98.     The DCL Plan Proponents did not present any evidence at trial showing that the February 2007 Projections could reasonably be relied upon at Step One.  Indeed, the DCL Plan Proponents failed to present a *single fact witness* to justify the Company's reliance on the February 2007 Projections, and not even the DCL Plan Proponents' testifying experts asserted the February 2007 Projections were reasonable.  Fischel disclaimed any "expertise in the reasonableness of management's projections,"[196] and Black admitted that "it would be a

---

[191] NPP 225 (3/5/07 email between T. Whayne (Morgan Stanley) and J. Fincher (Morgan Stanley)).
[192] NPP 1232 (3/22/07 email between J. Persily (Citi) and C. Mohr (Citi)).
[193] Persily Dep. Tr. 92:10-17; Sarnobat Dep. Tr. 140:16-141:12.
[194] NPP 236 (3/10/07 email between M. Costa (Merrill Lynch) and P. Taubman (Morgan Stanley)) (empahsis added).
[195] 3/18/11 Trial Tr. 37:14-41:9 (Tuliano).
[196] 3/10/11 Trial Tr. 146:13-17, 165:6-12 (Fischel).

challenge in the near term for Tribune to meet its own projections."[197]   Indeed, the Company's

management itself formally rejected the 2007 portion of the projections in July 2007 and the

entirety of the projections in September 2007.

### F.    The Company Engaged In Intentional Fraud At Step One

99.     The Company's failure to update the February 2007 Projections in advance of the

Step One closing is evidence of intentional fraud.  The evidence shows that the LBO was

founded on misleading financial projections that the Company knowingly prepared and

continued to rely upon to procure a solvency opinion from its advisor, VRC, which was a

condition to closing.  The evidence also shows that management knew full well that the LBO

would leave the Company insolvent.[198]

100.     As discussed in Section II.C.3., above, the Company was indisputably aware that

its 2007 performance was lagging far behind the February 2007 Projections well in advance of

the Step One closing, and yet chose to not publicly update its forecast.  This is directly contrary

to the Company's regular practice.  As testified to by the Company's newly appointed CEO,

Eddy Hartenstein, the "responsible way to forecast"—and the Company's ordinary practice—is

to update financial projections based upon "the most recent information available" as soon as

such information becomes available.[199]   Making matters worse, as discussed in more detail in

Section II.C.3. *supra*, the evidence shows that the Company did downwardly revise its

projections internally even before the close of Step One, but chose not to disclose these

revisions.

---

[197] 3/10/11 Trial Tr. 46:17-19 (Black).
[198] NPP 259 (3/24/07 email between J. King and C. Bigelow); NPP 944 (Tuliano Rpt.) at 116.
[199] 3/14/11 Trial Tr. 150:4-8, 149:1-150:3 (Hartenstein) (testifying that "the responsible way to forecast" is to ensure that projections are updated promptly, and observing that Debtors updated their 2011 business plan in January 2010 within one week of receiving information indicating that the Company's operating performance was deviating from forecasts in the plan).

101.    Additionally, the evidence shows that the Company's management knew the February 2007 Projections were fraudulently inflated even before the Company's material underperformance.  For example, the projections assumed that the Company would receive cash income from its joint ventures, notwithstanding that, historically, this was not the case.  Indeed, Peter Knapp, the Company's publishing group controller, authored an email between Step One and Step Two with the subject line "Joint Venture Cash Distributions," in which he wrote "we need to start having the cash generated at our joint ventures come back to us because that is what we are assuming in the model."[200]  Landon, the head of Tribune Interactive, responded shortly thereafter, remarking that such an assumption was "unrealistic" and inconsistent with the Company's actual intention.[201]

102.    Landon stated further that "the first time I was aware that we were expected to take cash distributions for [sic] the ventures [was] in the last month," and remarked that the assumption was "pretty inconsistent with the conversations [the Company] was having" with one of its joint venture partners.[202]

103.    The Company also appears to have massaged its expense data.  For example, in December 2006, Kazan questioned the capital expenditure forecast contained in the February 2007 Projections, stating "we don't really have an explanation for [a $35 million reduction]".[203]

104.    Additionally, the contemporaneous valuations of the Company's own advisors show that the Company's advisors knew, or certainly should have known, that the LBO would render the Company insolvent.  A March 30, 2007 presentation by Merrill Lynch and Citigroup, both of whom served as advisors to the Company and Arrangers in the LBO, demonstrates that a

---

[200] NPP 1522 (8/23/07 email between P. Knapp and C. Bigelow) at TRB0198692.
[201] NPP 1532 (9/1/07 email between D. Kazan and T. Landon *et al.*) at TRB0200824 (emphasis added).
[202] NPP 1532 (9/1/07 email between D. Kazan and T. Landon *et al.*) at TRB0200823.
[203] NPP 1045 (12/1/06 email between D. Kazan and R. Kurmaniak) at CITI-TRIB-CC 00059764.

few simple calculations would have shown the banks and the Company that the Company would be rendered insolvent as a result of the LBO. Specifically, the presentation shows that the average value of Company equity using discounted cash flow ("DCF"), sum of the parts, and market approach analyses was between $26.58 and $33.00 per share.[204] Multiplying the midpoint of this range ($29.79) by the amount of Tribune's outstanding shares at the time (242.4) results in an implied equity value of $7.222 billion. Adding the Company's net debt at the time ($5.085 billion) yields an implied total enterprise value of $12.307—*$1.424 billion less* than the $13.730 billion of total debt the Company was expected to have following consummation of the LBO.

105.     An April 1, 2007 presentation prepared by Morgan Stanley, advisor to the Pre-LBO Special Committee overseeing the auction process, leads to the same conclusion.[205] Applying DCF, precedent transaction, and market approach analyses, Morgan Stanley calculated Tribune's average per-share value to be between $28.73 and $34.91, which has a midpoint value of $31.82. Multiplying this midpoint value by the amount of Tribune's outstanding shares at the time results in an implied equity value of $7.713 billion, which yields an implied total enterprise value of $12.798 billion—*$932 million less* than the Company's pro forma debt following the LBO.

106.     These presentations also show that Merrill Lynch, Citigroup and Morgan Stanley, knew, or certainly should have known, that the values used by VRC in its Step One solvency opinion were grossly inflated. Unlike the Company's other advisors, VRC valued the Company on a total enterprise, rather than a per-share, basis, and stated that, using DCF, precedent transaction, sum of the parts, and market approach analyses, the midpoint of Tribune's average

---

[204] DCL 745 (3/30/07 Confidential Discussion Materials Prepared for the Pre-LBO Special Committee) at 14.
[205] DCL 758 (4/1/07 Presentation to the Pre-LBO Special Committee) at MS 00014, 15, 34.

total equity value was $15,147 billion.[206]  Subtracting the Company's net debt from this number

yields an implied equity value of $10.062 billion, which, when divided by the number of

outstanding shares, results in an implied per-share value of $41.51—***approximately $10.00 more***

per share than the midpoint of the values calculated by Merrill Lynch, Citibank and Morgan

Stanley for the exact same time frame.

107.    The Noteholder Plan Proponents also presented evidence showing that

management knew that the LBO would leave the Company with no equity cushion.  A March 24,

2007 internal email to the Tribune's then-Treasurer, Chandler Bigelow, questioned whether this

could be the case, stating:

> [W]e have a pretty narrow band for success under the ESOP – i.e. if we are off plan by
> 2% we have no value in the ESOP for 5 years.  Are there other dynamics at work I don't
> understand?[207]

108.    Bigelow acknowledged that the assessment was correct, answering "if we hit the

down 2 case there is no equity value in the first 5 yrs."[208]  The Company nevertheless proceeded

with the LBO, despite the fact that the Company was materially underperforming against 2006

actual results and the 2007 plan just prior to the close of Step One.[209]

**G.    Step One Of The LBO Left The Company (1) Balance Sheet
        Insolvent; (2) With Unreasonably Small Capital; And (3) Unable To
        Pay Its Debts As They Came Due**

109.    The testimony of Ralph Tuliano, an expert witness offered by the Noteholder Plan

Proponents, was cogent and credible, and supplied ample basis for a finding of insolvency at

Step One.  Tuliano is highly qualified in the fields of solvency, valuation and financial

forensics.[210]  He is the President and Executive Managing Director of Mesirow Financial

---

[206] NPP 1405 (5/9/07 Tribune Company Solvency Opinion Analysis) at 10.
[207] NPP 259 (3/24/07 email between J. King and C. Bigelow).
[208] NPP 259 (3/24/07 email between J. King and C. Bigelow).
[209] NPP 944 (Tuliano Rpt.) at 5-7, 59-62.
[210] 3/18/11 Trial Tr. 15:12-18:19 (Tuliano).

Consulting, LLC ("Mesirow"), a leading provider of financial advisory services.[211]  Tuliano has

more than 20 years of professional experience providing restructuring, litigation support,

valuation, forensic accounting, audit and related services.[212]  He is also a Certified Public

Accountant, a Certified Insolvency and Restructuring Advisor, and a member of the American

Bankruptcy Institute.[213]  Tuliano is an insolvency specialist who has been involved in

approximately 100 fraudulent conveyance cases, a number of which have involved leveraged

buy-outs.[214]  Additionally, in conducting his solvency analysis of the Company, Tuliano was

assisted by other senior financial advisors from Mesirow having extensive expertise in valuation,

structured finance, and the newspaper and broadcasting industries.[215]

    1. **The Company Was Balance Sheet Insolvent At Step One**

        a. **The Step Two Financing Should Be Considered In The Step One Balance Sheet, Capital Adequacy And Ability To Pay Tests**

110.    The Noteholder Plan Proponents presented a substantial amount of evidence

showing that the Step Two Financing should be considered in the Step One balance sheet

solvency test and capital adequacy and ability to pay analyses under the test set forth in *Mervyn's*

*Holdings, LLC v. Lupert-Adler Grp. IV, LLC (In re Mervyn's Holdings, LLC)*, 426 B.R. 488, 497

(Bankr. D. Del. 2010).[216]

111.    It is undisputed that the parties "had knowledge" of Step One and Step Two from

their inception.  Moreover, a panoply of evidence shows that the market accurately viewed Step

One and Step Two as part of a single, integrated transaction, designed to allow Tribune to

---

[211] NPP 944 (Tuliano Rpt.) at 15.
[212] NPP 944 (Tuliano Rpt.) at 16.
[213] NPP 944 (Tuliano Rpt.) at 16.
[214] 3/18/11 Trial Tr. 17:12-20:4 (Tuliano).
[215] 3/18/11 Trial Tr. 15:23-17:11 (Tuliano).
[216] The legal standard for collapsing and combining transactions is discussed in more detail in the sections addressing the Noteholder Plan Proponents' Proposed Conclusions of Law.

become a privately held company that could reap the tax benefits afforded to an S Corp/ESOP.[217] For example, an internal Bank of America "Deal Screen Memorandum" dated March 5, 2007 listed the tax benefits and potential reduction in capital gains taxes from future asset sales resulting from the Company's S Corp/ESOP structure, none of which would occur until the close of Step Two, as the first items in the "Transaction Rationale" for the LBO.[218] In addition, Moody's Investors Service called the S Corp election "a critical component of the company's plan," noting that "[t]he tax-free status and the effective elimination of the significant amount of deferred tax liabilities . . . is a critical mitigating factor to the minimal amount of equity and is thus a key assumption factored into" Moody's rating.[219]

112. Moreover, as noted *supra* at section II.C.1. the primary reason that the transaction was consummated in two steps was because Tribune's largest shareholders would not agree to vote in favor of the LBO unless it provided an upfront payment to shareholders that was not delayed by the regulatory approval necessary to complete the transaction.[220] Had there been a way to structure the transactions so that only one step were necessary, the transaction would have been structured accordingly.[221] Thus, the evidence shows that neither of the two steps was intended to occur on its own, and each was designed to be dependent on the other. For example:

- the Step One Commitment Letter and the Step Two Commitment Letter were executed at the same time and *obligated* the parties to provide the requisite financing to permit Step Two to occur;[222]

---

[217] NPP 228 (3/5/07 Deal Screen Memorandum) at 3; NPP 245 (3/20/07 email between D. Kazan (Tribune) and D. Grenesko (Tribune)); NPP 303 (3/29/07 letter between J. Puchalla (Moody's) and D. Grenesko (Tribune)) at 2.
[218] *Id.* at 3.
[219] NPP 303 (3/29/07 letter between J. Puchalla (Moody's) and D. Grenesko (Tribune)) at 2.
[220] NPP 392 (4/26/07 JPM Lenders' Meeting Transcript) at JPM_00052672-73; NPP 399 (5/3/07 BOA Credit Approval Report) at BOA-TRB-0013039; NPP 782 (Exam'rs Rpt.), Vol. II at 174; NPP 389 (4/25/07 Tender Offer) at 22-23; NPP 782 (Exam'rs Rpt.), Vol. I at 120-121, 262.
[221] NPP 782 (Exam'rs Rpt.), Vol I. at 120-121, 350 and Vol. II at 174.
[222] NPP 782 (Exam'rs Rpt.), Vol. I at 134 and Vol. II at 171; NPP 1332 (4/5/07 Amended and Restated First Step Commitment Letter) at ML-TRIB-0000832-33 (defining financing), ML-TRIB-0000853-54 (defining incremental facility), ML-TRIB-0000864-65 (defining post acquisition financial covenants to be set forth in credit agreement); NPP 1327 (4/5/07 Amended and Restated Second Step Commitment Letter) at BOA-TRB-0004729-30 (defining

- the Senior Loan Agreement entered into at Step One provided for the secured financing for both Steps One and Two;

- the Merger Agreement, executed at Step One, required the Company to exercise reasonable best efforts to effect both Step One and Step Two of the LBO;[223]

- the Board approved both Step One and Step Two at the same time, indicating that the Board intended both steps to be part of one integrated transaction;[224]

- the Step One Commitment Letter and the Step Two Commitment Letter cross-referenced each other, and the Step One Commitment Letter made the execution and delivery of the Merger Agreement without waiver, amendment or modification a condition precedent to the initial borrowing under each of the Step One Financing Documents (as defined in the Commitment Letters);[225]

- the Step One Commitment Letter, Step Two Commitment Letter, and Senior Loan Agreement explicitly conditioned the borrowing under these facilities on the continued existence of the financing commitments (for both Step One and Step Two) set out in the Merger Agreement;[226]

- the fairness opinions on shareholder consideration issued by Merrill Lynch and Morgan Stanley, on which the Board relied in approving the LBO in April 2007, evaluated and referred to the Merger Agreement as the governing document and considered share acquisitions at Step One and Step Two together;[227] and

- the Company's press release announcing the deal prior to the close of Step One referred to the LBO as a "two-stage transaction," and explained that, "[u]pon completion of the transaction, the company will be privately held, with an Employee Stock Ownership Plan (ESOP) holding all of Tribune's then-outstanding common stock."[228]

113.    The LBO Lenders' documents and communications confirm this evidence.  For example, all of the Arrangers analyzed the LBO, which they referred to as a "two-step

---

financing), BOA-TRB-0004750-52 (defining incremental facility); NPP 1417 (5/17/07 Credit Agreement) at 82 (defining post acquisition financial convenants).

[223] NPP 782 (Exam'rs Rpt.), Vol. I at 139 and Vol. II at 168; NPP 336 (4/1/07 Agreement and Plan of Merger) at 39-42.

[224] NPP 782 (Exam'rs Rpt.), Vol. I at 134 and Vol. II at 168.

[225] NPP 1332 (4/5/07 Amended & Restated First Step Commitment Letter) at ML-TRIB-0000850-51; NPP 1327 (4/5/07 Amended & Restated Second Step Commitment Letter) at BOA-TRB-0004747-49.

[226] NPP 1332 (4/5/07 Amended & Restated First Step Fee Letter) at ML-TRIB-0000839, ML-TRIB-0000850-51; NPP 1327 (4/5/07 Amended & Restated Second Step Commitment Letter) at BOA-TRB-0004732-33, BOA-TRB-0004736-37, BOA-TRB-0004747-49.

[227] DCL 757 (4/1/07 Morgan Stanley Opinion Letter).

[228] NPP 782 (Exam'rs Rpt.), Vol. I at 135 and Vol. II at 168-69; *see also* NPP 215 (3/1/07 Project Tower Presentation) at 35, 37 (describing Zell's proposal as involving "two broad steps").

transaction," as one transaction, and sought internal approval to participate in both steps in advance of Step One.[229] Moreover, a senior member of the Merrill Lynch team commented that the ratings agencies would "immediately rate Tribune for the entirety of the buyout transaction when the purchase agreement is signed," noting that JPMorgan, Citigroup and Merrill Lynch "would commit to both steps in order to ensure financing for the whole transaction."[230]

114.     Additionally, at the time of Step One, Step Two was at a minimum "highly likely" to occur.[231] First, the parties to the Merger Agreement had strong motivations to see that Step Two would happen.[232] Among other things, the potential tax benefits from the S Corporation/ESOP structure could only be achieved if both Step One and Step Two were completed.[233] Completion of only Step One would have left Tribune's equity in public hands and left the Company's earnings subject to federal tax absent the implementation of some other transaction or structure.[234]

115.     Second, the Step Two Commitment Letter was procured and obtained contemporaneously with the Step One Commitment Letter.[235] The Senior Loan Agreement, entered into at Step One, obligated the Step Two Lenders to advance funds under the Senior Loan Agreement if requested by Tribune at the time of Step Two.[236]

---

[229] NPP 218 (3/1/07 Tribune Rating Agency Presentation) at MS 48333; NPP 399 (BOA Credit Approval Report) at 5-7; NPP 435 (5/17/07 Leveraged Finance Final Approval Memorandum) at 2, 5-6; NPP 451 (JPM Tribune Transaction Proposal) at 4-6, 12-16; NPP 1256 (3/28/07 Citigroup Leveraged Finance Final Approval Memo Update) at 2-3; NPP 1387 (5/3/07 BAS Credit Approval Report) at 5-7; NPP 1534 (Tribune Problem Exposure Report) at ML-TRIB-0216120-21; NPP 782 (Exam'rs Rpt.), Vol. II at 178.
[230] NPP 1166 (3/6/07 email between T. Kaplan and C. Kim) at 1.
[231] NPP 782 (Exam'rs Rpt.), Vol. II at 184; NPP 782 (Exam'rs Rpt.), Vol. I at 285; NPP 1284 (3/30/07 Pre-LBO Special Committee Meeting Minutes) at 1-2; Persily Dep. Tr. 268:2-17.
[232] NPP 782 (Exam'rs Rpt.), Vol. II at 169; *see also* NPP 507 (7/25/07 email from B. Pate (EGI) to N. Larsen (EGI) at EGI-LAW 00114072) (expressing EGI's desire to close Step Two because "the majority of our return is generated from the second phase").
[233] NPP 782 (Exam'rs Rpt.), Vol. II at 169.
[234] NPP 782 (Exam'rs Rpt.), Vol. II at 169.
[235] NPP 782 (Exam'rs Rpt.), Vol. II at 170.
[236] NPP 782 (Exam'rs Rpt.), Vol. II at 171.

116.     Third, the above-noted Commitment Letters (as well as the Senior Loan Agreement) contained an extremely limited material adverse event "out" clause.[237]

117.     Fourth, if Tribune presented the requisite solvency certificate, the Arrangers would face difficulties were they to refuse to fund at Step Two.  The record shows that the Arrangers were aware of these dynamics as Step Two approached.[238]

> **b.     The Noteholder Plan Proponents' Expert Conducted A Credible And Methodologically Sound Balance Sheet Solvency Analysis**

118.     The Noteholder Plan Proponents presented convincing evidence that a court would find that the Company was balance sheet insolvent at Step One.

119.     In analyzing the Company's balance sheet solvency, Tuliano used a "Fair Market Value" standard of value, which is defined as the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts.[239]  Unlike the "investment value" standard of value, the fair market value standard does not permit value to be attributed to costs or benefits that are specific to a certain buyer (*e.g.*, tax or cost savings unique to a specific buyer).[240]  The fair market value standard is the appropriate standard of value to use when assessing balance sheet solvency in the fraudulent transfer context.[241]

120.     Conversely, the DCL Plan Proponents' expert on solvency, Daniel Fischel, purported to use a "real economic value" standard of value.  Yet, the Noteholder Plan Proponents presented convincing evidence that "real economic value" is not a proper standard of value to

---

[237] NPP 782 (Exam'rs Rpt.), Vol. II at 171.
[238] NPP 782 (Exam'rs Rpt.), Vol. II at 172.
[239] NPP 944 (Tuliano Rpt.) at 90.
[240] NPP 944 (Tuliano Rpt.) at 90.
[241] See NPP 955 (Tuliano Rebuttal Rpt.) at 12, NPP 88 (VALUING A BUSINESS, Shannon Pratt); *see* Rev. Rul. 59-60, 1959-1 CB 237.

apply when valuing a company in a fraudulent transfer context.[242]  Indeed, Fischel conceded at trial that he could not cite any academic authority supporting the use of "real economic value" as a standard of value in the fraudulent transfer context.[243]

121.    Using the fair market value standard, Tuliano conducted a balance sheet solvency analysis by comparing the value of the Company's assets with its total debt liabilities as of Step One.[244]  To determine the solvency of the Company under the balance sheet test, he subtracted the Company's total debt liabilities from the fair market value of the Company's assets.[245]  The resulting surplus or deficit is a measure of the Company's solvency under the balance sheet test.[246]

122.    Tuliano's Step One balance sheet analysis shows that when the Step Two Financing is considered, a court would find that the Company was balance sheet insolvent at Step One, even if management's unreasonable February 2007 Projections are used to perform the analysis.[247]  As indicated in the chart below, Tuliano's application of widely-accepted valuation techniques shows that the Company's debt exceeded the fair market value of its assets as of June 4, 2007 by $2.3 billion, when using the February 2007 Projections.[248]

123.    To reach this conclusion, Tuliano used both a discounted cash flow, or income approach, to which he applied a 67% weighting, and a comparable company, or market, approach, to which he applied a 33% weighting.[249]  Tuliano appropriately underweighted the market approach because—as recognized by the Examiner—the trading multiples of the

---

[242] 3/10/11 Trial Tr. 133:13-139:12 (Fischel).
[243] 3/10/11 Trial Tr. 139:4-12 (Fischel).
[244] NPP 944 (Tuliano Rpt.) at 91.
[245] NPP 944 (Tuliano Rpt.) at 91.
[246] NPP 944 (Tuliano Rpt.) at 91.
[247] NPP 944 (Tuliano Rpt.) at 92.
[248] NPP 944 (Tuliano Rpt.) at 8; 3/18/11 Trial Tr. 66:3-16 (Tuliano).
[249] 3/18/11 Trial Tr. 55:17-56:20 (Tuliano).

Company's comparable companies at the time were inflated.[250]  Nevertheless, Tuliano

conservatively used the median EBITDA multiple of the comparable companies analysis,

notwithstanding that the multiples were inflated, and that the Company underperformed most of

them.[251]

**Summary of Balance Sheet Test as of June 4, 2007**
**February 2007 Projections**
($ in Millions)

| Approach | Indicated Value of Invested Capital | Weighting | Weighted Value |
|---|---|---|---|
| *Income Approach* | | | |
| Discounted Cash Flow Method | $   10,930 | 67% | $  7,287 |
| | | | |
| *Market Approach* | | | |
| Guideline Publicly Traded Company Method | 13,330 | 33% | 4,443 |
| Fair Market Value of Invested Capital - Conclusion | | | $ 11,730 |
| Less: Debt & Contingent Liabilities | | | (14,030) |
| Fair Market Value Surplus / (Deficit)  - Conclusion | | | ($2,300) |
| Balance Sheet Test - Result | | | FAIL |

124.    Given the unreasonableness of the February 2007 Projections, Tuliano also

conducted a balance sheet solvency analysis using projections that were adjusted to reflect

information known to Company management prior to the Step One close (the "Step One

Adjusted Projections").

125.    Tuliano adjusted management's projections by using actual results through May

2007, and then applying the cumulative month-over-month growth rates set forth in the 2007

plan for the remainder of the year.  As Tuliano credibly testified at trial, this type of analysis

---

[250] *Id.*
[251] 3/18/11 Trial Tr. 63:8-64:4 (Tuliano).

could have been done very easily by the Company, but was not.[252]  Moreover, despite the fact

that the growth rates embedded in the February 2007 Projections were highly optimistic, Tuliano

gave management the benefit of the doubt with respect to those growth rates, by adopting them

in his Step One Adjusted Projections.[253]  As indicated in the chart below, when the Step One

Adjusted Projections are used, Tuliano's analysis shows that the Company was insolvent at the

closing of Step One by $3.0 billion.[254]

### Summary of Balance Sheet Test as of June 4, 2007
($ in Millions)

| Approach | Indicated Value of Invested Capital | Weighting | Weighted Value |
|---|---|---|---|
| *Income Approach* | | | |
| Discounted Cash Flow Method | $ 10,090 | 67% | $ 6,727 |
| *Market Approach* | | | |
| Guideline Publicly Traded Company Method | 12,780 | 33% | 4,260 |
| Fair Market Value of Invested Capital - Conclusion | | | $ 10,987 |
| Less: Debt & Contingent Liabilities | | | (14,030) |
| Fair Market Value Surplus / (Deficit)  - Conclusion | | | ($3,043) |
| Balance Sheet Test - Result | | | FAIL |

126.     Tuliano also conducted a separate balance sheet solvency analysis of Tribune's

subsidiaries at Step One using both the February 2007 Projections and the Step One Adjusted

Projections.[255]  In so doing, Tuliano corrected the Examiner's mistake of including the Chicago

Cubs as a parent asset, by attributing the value of that asset to Tribune's subsidiaries.[256]  To

determine the value of Tribune's subsidiaries, Tuliano began with his value conclusion for the

---

[252] 3/18/11 Trial Tr. 44:15-45:7 (Tuliano).
[253] 3/18/11 Trial Tr. 45:15-21 (Tuliano).
[254] NPP 944 (Tuliano Rpt.) at 8.
[255] 3/18/11 Trial Tr. 66:17-67:3 (Tuliano).
[256] 3/18/11 Trial Tr. 67:8-12 (Tuliano).

consolidated Company, and then deducted the fair market value of the assets belonging solely to Tribune, as well as the debt for which only Tribune was liable.[257]  Based on this analysis, Tuliano reasonably concluded that Tribune's subsidiaries were insolvent by $206 million when the February 2007 Projections were used, and by $949 million when the Step One Adjusted Projections were used.[258]

### (i)　　Tuliano's Discounted Cash Flow Analysis

127.　　Tuliano used the widely-accepted "income approach" in his balance sheet solvency analysis.[259]  The income approach indicates the fair market value of a business based on the present value of the cash flows the business is expected to generate in the future.[260]  The income approach is considered to be the core of valuation theory and is commonly applied using the DCF method.[261]

128.　　The DCF Method, as applicable here, is composed of four steps: (1) estimating future cash flows for a certain discrete projection period; (2) discounting those cash flows to present value at a rate of return that considers the relative risk of the investment and the time value of money; (3) estimating the residual value of cash flows subsequent to the discrete projection period; and (4) combining the present value of the residual cash flows with the present value of the discrete projection period cash flows to indicate the fair market value of a marketable, controlling interest in the business.[262]

---

[257] 3/18/11 Trial Tr. 66:17-67:3 (Tuliano).
[258] 3/18/11 Trial Tr. 66:17-67:6 (Tuliano); NPP 944 (Tuliano Rpt.) at Ex. III.
[259] NPP 944 (Tuliano Rpt.) at 92.
[260] NPP 944 (Tuliano Rpt.) at 92.
[261] NPP 944 (Tuliano Rpt.) at 92.
[262] NPP 944 (Tuliano Rpt.) at 92.

129.    As indicated in the chart below, Tuliano's DCF analysis demonstrates accurately that the market value of the Company's assets was approximately $4 billion less than the Company's total debt liabilities as of the closing of Step One.[263]

**Market Value of Invested Capital Using Income Approach: Discounted Cash Flow Method as of June 4, 2007**
($ in Millions)

| | |
|---|---|
| Discount Rate | 9.0% |
| Residual Growth Rate | 1.25% |
| Indicated MVIC | $10,090 |
| Less: Debt | ($14,030) |
| Indicated Net Deficit | ($3,940) |

**(a)    Calculation Of Discount Rate, Or "WACC"**

130.    When applying the income approach, the cash flows expected to be generated by a business are discounted to their present value equivalent using a rate of return that reflects the relative risk of the investment, as well as the time value of money.[264]

131.    For this rate of return or discount rate, Tuliano calculated and applied a weighted average cost of capital ("WACC"), which is an overall rate based upon the individual rates of return for invested capital (equity and interest-bearing debt).[265]  The WACC is calculated by weighting the required returns on interest-bearing debt and common equity capital in proportion to their estimated percentages in a then-existing industry capital structure.[266]

132.    Tuliano determined the required return on equity by applying the Capital Asset Pricing Model ("CAPM") which is one of the most widely used models for estimating the cost of

---

[263] NPP 944 (Tuliano Rpt.) at 94.
[264] NPP 944 (Tuliano Rpt.) at 92.
[265] NPP 944 (Tuliano Rpt.) at 92.
[266] NPP 944 (Tuliano Rpt.) at 93.

equity capital, especially for larger companies.[267]  Using these methods, Tuliano reasonably calculated and applied a 9.0% WACC for the Company as of the closing of Step One.[268]

<b>(b)</b>    <b>Calculation Of Residual (Or Terminal) Value</b>

133.    The present value of the residual value represents the amount an investor would pay today for the rights to the cash flows of the business for years subsequent to the discrete projection period.[269]  Tuliano calculated the residual value (also known as the "terminal value") by applying a cash flow capitalization rate to his estimate of the normalized available cash flow in the residual year.[270]  This widely accepted formula for calculating the residual value is commonly known as the Gordon Growth Model.[271]

134.    In calculating the residual value using the Gordon Growth Model, Tuliano calculated a normalized available cash flow by applying the residual growth rate to the forecasted fiscal year 2011 cash flow.[272]  This normalized available cash flow was then capitalized using a rate calculated by subtracting the residual growth rate from the overall WACC estimated previously.[273]  The present value factor from the last year of the forecast horizon was then applied to estimate the present value of the residual cash flows.[274]

135.    In his calculation of the residual value using the Gordon Growth Model, Tuliano reasonably estimated the residual growth rate to be 1.25% for the Company as of the closing of Step One.  The present value of the residual and the present value of available cash flows for the discrete projection period were then summed to arrive at the indicated value of total invested capital on a marketable, controlling basis.

---

[267] NPP 944 (Tuliano Rpt.) at 93.
[268] NPP 944 (Tuliano Rpt.) at 93.
[269] NPP 944 (Tuliano Rpt.) at 93.
[270] NPP 944 (Tuliano Rpt.) at 93.
[271] NPP 944 (Tuliano Rpt.) at 93.
[272] NPP 944 (Tuliano Rpt.) at 93.
[273] NPP 944 (Tuliano Rpt.) at 93.
[274] NPP 944 (Tuliano Rpt.) at 93.

### (c) Debt And Contingent Liabilities

136.     Assuming that the Step Two Financing is properly included for purposes of assessing balance sheet solvency at Step One, Tuliano calculated correctly the total debt liabilities and any contingent liabilities of the Company to be $14.0 billion as of the closing of Step One.[275]

### (ii) Tuliano's Guideline Publicly Traded Company Analysis

137.     Tuliano also conducted a credible analysis using the widely accepted "market approach" in his balance sheet solvency analysis.[276] The market approach indicates the fair market value of the business based on a comparison of the subject business to comparable publicly traded companies with similar characteristics.[277]

138.     The valuation process using the market approach is essentially that of comparison and correlation between the subject business and the guideline companies.[278] Once the guideline companies are identified, market multiples of the publicly traded companies are then calculated.[279] These market multiples are then applied to the company's operating results to indicate the value on a marketable, minority basis.[280] A control premium may be applied, to the extent warranted, to arrive at the fair market value of the business on a marketable, controlling basis.[281]

---

[275] NPP 944 (Tuliano Rpt.) at 94.
[276] NPP 944 (Tuliano Rpt.) at 94.
[277] NPP 944 (Tuliano Rpt.) at 94.
[278] NPP 944 (Tuliano Rpt.) at 94.
[279] NPP 944 (Tuliano Rpt.) at 94.
[280] NPP 944 (Tuliano Rpt.) at 94.
[281] NPP 944 (Tuliano Rpt.) at 94-95.

139.    Tuliano's market analysis demonstrates that the market value of the Company's assets was approximately $1.25 billion less than the Company's liabilities as of the closing of Step One.[282]

### (a)    Selection Of Guideline Companies

140.    The first step in the application of the market approach is the selection of guideline publicly traded companies.  Tuliano considered publicly traded companies with similar lines of business and basis of competition to the Company.[283]  Accordingly, his selected guideline companies consist of media companies operating newspaper, broadcasting and interactive businesses where, like the Company, the newspaper segment comprises the majority of business operations.[284]

### (b)    Market Multiples

141.    Tuliano's Guideline Publicly Traded Company analysis consists of the calculation of valuation multiples based on publicly traded guideline companies that are then applied to the subject company's operating results.[285]  For the basis of his analysis, Tuliano relied on ratios of total enterprise value ("TEV") to EBITDA using historical and projected performance.[286]

142.    After calculating the multiples for the guideline companies, Tuliano evaluated appropriate multiples based on the growth and profitability of the Company relative to the guideline companies.[287]  He performed a benchmarking analysis as of the closing of Step One comparing the Company's historical and projected growth and profitability to that of the

---

[282] NPP 944 (Tuliano Rpt.) at 96-97.
[283] NPP 944 (Tuliano Rpt.) at 95.
[284] NPP 944 (Tuliano Rpt.) at 95.
[285] NPP 944 (Tuliano Rpt.) at 95.
[286] NPP 944 (Tuliano Rpt.) at 95.
[287] NPP 944 (Tuliano Rpt.) at 95.

guideline companies.[288]  This comparison indicated that the Company's performance was consistently below the average/median of the guideline companies with respect to growth and profitability, thus warranting the selection of a multiple lower than the average/median multiple of the guideline company set.[289]  Although such reduction was warranted, Tuliano conservatively selected the median multiple for purposes of his Guideline Publicly Traded Company analysis.[290]

### (c)    Estimation Of Value

143.    Once Tuliano devised the median multiples, he applied them to the Company's historical and projected operating results.  Then, cash and equity investments, such as the Company's investments in CareerBuilder, LLC, TV Food Network and Classified Ventures, LLC, were added to arrive at the market value of the Company's invested capital on a marketable, minority basis.[291]  Tuliano determined that no control premium was applicable for the Company given (1) that the Company operated in an industry that was in a secular decline, and (2) the likelihood of synergies as well as the Company's future prospects.[292]

144.    Tuliano concluded that the Company warranted the selection of a TEV to EBITDA multiple below the median multiple of the guideline companies, thus his selection of the median multiple from the guideline company set would account for any potential control premium.[293] Further, contemporaneous valuations of the Company prepared by various financial advisors, including Blackstone, Duff & Phelps, JPMorgan, Citigroup, and Morgan Stanley, did not apply a control premium for the Company in the application of the Guideline Publicly Traded Company analysis.[294]

---

[288] NPP 944 (Tuliano Rpt.) at 95.
[289] NPP 944 (Tuliano Rpt.) at 95.
[290] NPP 944 (Tuliano Rpt.) at 95.
[291] NPP 944 (Tuliano Rpt.) at 95.
[292] NPP 944 (Tuliano Rpt.) at 96.
[293] NPP 944 (Tuliano Rpt.) at 96.
[294] NPP 944 (Tuliano Rpt.) at 96.

   **(iii)**  **Competing Proposals Offered By Third Parties And Other Contemporaneous Evidence Support The Conclusion That The Company Was Balance Sheet Insolvent At Step One**

  145. To confirm that his conclusions respecting the Company's balance sheet insolvency were correct, Tuliano also examined competing proposals offered by third parties during the Company's sale process. During the Company's sale process, which started on September 21, 2006 and concluded on April 2, 2007 with the acceptance of the Zell proposal, the Company received final formal competing proposals from three other parties: (1) The Broad Investment Company, Inc. and The Yucaipa Companies, LLC, (2) The Carlyle Group, and (3) The Chandler Trusts.[295] In addition, Tribune management proposed a "self-help" plan involving a recapitalization of the Company's businesses and a spin-off of the broadcasting segment.[296] Tuliano reviewed the terms of these proposals and various valuations of these proposals performed by Morgan Stanley, Merrill Lynch, and Citigroup. Based on his review and analysis, Tuliano reasonably determined that the value of the Company's assets implied by these proposals was less than the $14.0 billion in total liabilities incurred by the Company as a result of the LBO.[297] Tuliano used this analysis only to corroborate his overall conclusion of insolvency.[298]

  146. In addition, Houlihan, which had been contacted by the Company in late March regarding a possible solvency retention, but declined the engagement on the ground that it "may be tough" to conclude that the Company was solvent, affirmed this opinion in mid-December,

---

[295] NPP 944 (Tuliano Rpt.) at 97; NPP 185 (1/27/07 Confidential Discussion Materials Prepared for Pre-LBO Special Committee) at 1-2, 8.
[296] NPP 944 (Tuliano Rpt.) at 97; NPP 185 (1/27/07 Confidential Discussion Materials Prepared for Pre-LBO Special Committee) at 4-8.
[297] NPP 944 (Tuliano Rpt.) at 97; 3/18/07 Tr. Transcript 253:10-17 (Tuliano).
[298] NPP 944 (Tuliano Rpt.) at 97.

when it was contacted by Citigroup about a potential challenge to VRC's solvency opinion.[299]

Houlihan concluded "if we end up where I think we all know we would end up with our analysis, we may be the ones to 'kill the deal' so to speak . . . ."[300] Ben Buettell, a Managing Director at Houlihan, remarked on December 7, 2007 that the "company was insolvent in [M]ay and more so now."[301]

### (iv) Conclusion Respecting Tuliano's Balance Sheet Solvency Analysis

147.    Overall, Tuliano's balance sheet solvency analysis is reasonable and methodologically sound and is more credible than the analysis conducted by the DCL Plan Proponents' expert, Daniel Fischel. Some of the weaknesses in Fischel's analysis are described below.

### c. The Balance Sheet Solvency Analysis Conducted By The DCL Plan Proponents' Expert Was Fundamentally Flawed

148.    Fischel testified that the Company was balance sheet solvent at the closing of Step One. In order to reach this conclusion, however, he deviated significantly from well-accepted valuation methodology. Fischel's analysis disregards many of the standards by which the valuation community abides, and appears particularly result-oriented.

### (i) Standard Of Value

149.    The most egregious of Fischel's errors is his application of "real economic value" to assess the Company's balance sheet solvency, and his decision to include within "real economic value" the tax benefits arising from the Company's conversion to an S Corp/ESOP.[302] Widely-recognized principles of solvency and valuation recognize that "fair market value"

---

[299] NPP 275 (3/28/07 email between B. Buettell and A. Stull).
[300] NPP 632 (12/12/07 email from B. Buettell to J. Werbalowsky, *et al.*).
[301] NPP 2451 (12/7/07 email between B. Buettell and S. Reynolds).
[302] 3/10/11 Trial Tr. 115:6-117:4, 138:5-139:3 (Fischel).

(which is also referred to as "fair value") should be used to assess balance sheet solvency,[303] and that tax benefits associated with an S Corp/ESOP structure should not be included within a balance sheet solvency analysis.[304]

150.    In fact, VRC's engagement letter required a specific modification of the definition of "fair value" in order to enable VRC to include in its solvency assessment value arising from the S Corp/ESOP structure.[305]  One of VRC's managing directors, who has worked on 400 to 500 solvency opinions (including the Company's opinions), does not believe he had ever worked on a solvency opinion that modified the definition of fair value in that fashion.[306]

151.    Similarly, Thomas Kenny, who has been performing valuation work for more than 20 years and is a senior vice president at Murray Devine, the solvency firm hired by the Arrangers in advance of Step Two, testified that, prior to reviewing VRC's solvency opinion in the Tribune matter, he had never seen a fair value determination that included value resulting from unique aspects of a buyer.  Kenny also testified that he "would probably say it's not appropriate" to include such value.[307]  Kenny testified further that a balance sheet solvency test should assume a hypothetical buyer, and that an S Corp is not a hypothetical buyer.[308]

152.    Fischel's inappropriate inclusion of value arising from the Company's S Corp/ESOP tax status in his balance sheet solvency test increased his value conclusion at the closing of Step One by approximately $1.0 billion.[309]

---

[303] 3/18/11 Trial Tr. 51:2-16 (Tuliano); NPP 955 (Tuliano Rebuttal Rpt.) at 12; *see also* 3/18/11 Trial Tr. 86:20-89:5 (Tuliano).
[304] NPP 782 (Exam'rs Rpt.), Vol. II at 27-28, n.87 (citing Ackerman and Gould, S Corporation ESOP Valuation Issues (Chapter 6) in THE HANDBOOK OF BUSINESS VALUATION AND INTELLECTUAL PROPERTY ANALYSIS at 148-49 (Robert F. Reilly and Robert P. Schweihs, eds., 2004)).
[305] NPP 782 (Exam'rs Rpt*.),* Vol. I at 225 (citing NPP 1349 (4/11/07 VRC Solvency Engagement Letter)).
[306] NPP 782 (Exam'rs Rpt.), Vol. I at 226.
[307] Deposition of Thomas Kenny dated February 24, 2011 ("Kenny Dep. Tr.") 13:16-23, 81:13-19, 111:7-23 (emphasis added).
[308] Kenny Dep. Tr. 185:8-186:2 (emphasis added).
[309] NPP 955 (Tuliano Rebuttal Rpt.) at 26.

(ii)     **Valuation Of PHONES Notes**

153.    Fischel's balance sheet solvency test is also flawed because he miscalculated the amount of the PHONES Notes by ascribing a value of $663 million, rather than the $1.256 billion face amount of the notes.[310]

154.    Tribune was required to pay the face amount of the PHONES Notes (less the value of the Time Warner shares) upon maturity.[311]  The Third Circuit has held that debt should be calculated at face value for purposes of performing a balance sheet solvency test.[312]  Indeed, Fischel himself testified that he cannot recall ever valuing debt in the way that he valued the PHONES Notes before.[313]  And Kenney testified that Murray Devine generally uses the contractual rate (*i.e.* face value) to calculate debt in a balance sheet solvency test.[314]

155.    Additionally, both JPMorgan and Merrill Lynch used the face value of the PHONES Notes (minus the value of the Time Warner shares) in the solvency analyses that they prepared prior to the closing of Step Two, as did Blackstone, the financial advisor to the McCormick Foundation, a large Tribune shareholder.[315]  VRC valued the PHONES Notes at face value (minus the value of the Time Warner shares) in its Step One solvency opinion, as well as in the initial version of its Step Two Solvency Opinion, and adjusted the number to accounting value only at the last minute.[316]  Furthermore, Tribune itself considered the PHONES Notes at

---

[310] NPP 955 (Tuliano Rebuttal Rpt.) at 13-14; 3/10/11 Trial Tr. 165:16-25 (Fischel).  This number does not subtract the value of the Time Warner shares that could be netted against the liability upon redemption.
[311] 3/10/11 Trial Tr. 166:1-21 (Fischel).
[312] *Travelers Int'l AG v. Transworld Airlines, Inc. (In re Trans World Airlines, Inc.)*, 134 F.3d 188, 196-7 (3d Cir. 1998).
[313] 3/10/11 Trial Tr. 166:16-21 (Fischel).
[314] Kenny Dep. Tr. 138:11-20.
[315] *See* NPP 625 (12/10/07 JPM Tribune Valuation Update) at JPM_00108127; NPP 634 (12/12/07 JPM Tribune Valuation Update) at JPM_00108134; NPP 642 (12/13/07 JPM Tribune Valuation Update) at JPM_00156034; NPP 658 (12/18/07 JPM Tribune Valuation Update) at JPM_00155179; NPP 1830 (12/16/07 Merrill Lynch Valuation Analysis of Tribune) at ML-TRIB-0009936; NPP 1831 (12/16/07 Merrill Lynch Valuation Analysis) at ML-TRIB-0009936; NPP 446 (5/23/07 Blackstone Project Spice Presentation) at BLACKSTONE051304.
[316] *Compare* NPP 1741 (12/3/07 VRC Preliminary Solvency Analysis) at VRC0060988 and NPP 1745 (12/4/07 VRC Preliminary Solvency Analysis) at TRB0272813 (using face value to calculate PHONES Notes) *against* NPP

face value in the Statement of Facts submitted in these cases, as well as the ratings agency presentations it prepared in March and October 2007.[317]  Fischel's miscalculation of the PHONES Notes increased his value conclusion at Step One close by $593 million.[318]

### (iii) Value Of 401(k) And Stock-Based Compensation

156.    Fischel also included within his assessment of the Company's value 401(k) and stock-based compensation cost savings that the Company expected to realize as a result of its conversion to an S Corp/ESOP.[319]  Fischel's approach is not consistent with the fair market value standard because it includes benefits that arise only as a result of the unique attributes of a specific buyer, and unrealistically assumes that the Company could simply eliminate these costs without providing other forms of competitive compensation to its employees.[320]

157.    When these errors in Fischel's balance sheet solvency analyses are corrected, the analysis shows that the Company was insolvent at Step One close by as much as $ 3.1 billion.[321]

### (iv) Other Errors In Fischel's Balance Sheet Analysis

158.    Other errors in Fischel's balance sheet solvency analysis also render his conclusions unreliable.  First, in contrast to Tuliano, Fischel chose to rely entirely on the February 2007 Projections in conducting his balance sheet solvency analysis.[322]  Fischel's failure to critically analyze the February 2007 Projections calls into question the credibility of his balance sheet solvency analysis.

---

1878 (12/18/07 VRC Preliminary Solvency Presentation) at VRC0109244-45 (using accounting value to calculate PHONES Notes).
[317] NPP 767 (Leveraged ESOP Statement of Facts) at 12; NPP 218 (3/07 Tribune Rating Agency Presentation) at MS 48361; NPP 580 (10/1/07 Tribune Rating Agency Presentation) at ML-TRIB-0032747.
[318] NPP 955 (Tuliano Rebuttal Rpt.) at 14.
[319] NPP 955 (Tuliano Rebuttal Rpt.) at 14-15.
[320] 3/18/11 Trial Tr. 88:23-90:14; 218:25-219:7; 220:6-13 (Tuliano); NPP 955 (Tuliano Rebuttal Rpt.) at 14-15.
[321] NPP 955 (Tuliano Rebuttal Rpt.) at 25.
[322] 3/10/11 Trial Tr. 146:13-17, 165:10-12 (Fischel); *see also* 3/18/11 Trial Tr. 89:5-16 (Tuliano).

159.    Second, Tuliano's discount rate is more reasonable and credible than the WACC calculated by Fischel. In contrast to Tuliano, Fischel calculated his discount rate using a Company-specific, rather than industry average, capital structure.[323] Widely-accepted valuation literature instructs that an industry average should be used where, as here, a controlling interest is being valued, because a "control buyer would have the power to change the capital structure and the industry average capital structure could represent the most likely result."[324] This significantly decreased the discount on value imposed by the WACC, as debt carries a lower discount than equity, and the Company's capital structure at Step One close (as applied by Fischel) was approximately 75-85% debt, compared to the industry average of approximately 30% debt.[325] In apparent recognition of this principle, Fischel testified at trial that "the conclusion doesn't change if I use the industry average debt ratio."[326] This is the case, however, only because Fischel erred by using a terminal multiple rather than the Gordon Growth Model to calculate his terminal value, which "significantly diminishes the impact of the WACC."[327]

160.    Fischel also erred in calculating the Company's terminal value by choosing an exit multiple from a selection of purportedly "comparable" companies, and multiplying that multiple by the Company's average projected EBITDA for the years 2007-2010.[328] This is problematic for two reasons. First, as explained in more detail below, the comparable companies used by Fischel were selected solely because contemporaneous financial advisors used such companies in their analyses, and include companies that, unlike the Company, are not diversified

---

[323] 3/10/11 Trial Tr. 102:8-103:1, 161:9-14 (Fischel).
[324] NPP 88 (VALUING A BUSINESS, Shannon Pratt) at 218-19; NPP 955 (Tuliano Rebuttal Rpt.) at 18.
[325] 3/18/11 Trial Tr. 62:4-5 (Tuliano); NPP 955 (Tuliano Rebuttal Rpt.) at 18-19.
[326] 3/10/11 Trial Tr. 118:18-20 (Fischel).
[327] NPP 955 (Tuliano Rebuttal Rpt.) at 17.
[328] 3/18/11 Trial Tr. 60:15 (Tuliano); NPP 944 (Tuliano Rpt.) at 93; 3/10/11 Trial Tr. 100:20-102:4 (Fischel).

media companies, and that consistently traded at higher multiples than the Company.[329] Fischel gave no consideration to how the contemporaneous financial advisors applied these multiples in their analyses, and ignored that many of the advisors treated the Publishing and Broadcasting companies differently, either by comparing the specific industry multiples to the portion of earnings derived by the Company's Publishing or Broadcasting division or by weighting the selected multiple in line with the percentage of the Company's Publishing or Broadcasting earnings.[330]

161.    Additionally, the long term growth rate implied by Fischel's terminal value shows that Fischel's DCF analysis is inappropriately aggressive, as the implied growth rate is higher than the growth rates applied or implied by contemporaneous analyses prepared by Tribune, Duff & Phelps (the financial advisor to the ESOP trustee), JPMorgan, and Morgan Stanley.[331]

162.    In addition, the Noteholder Plan Proponents presented convincing evidence showing that using an exit multiple to calculate a terminal value results in an improper blending of the income and market approaches.[332]  The LBO Lenders' solvency expert from the time of the LBO, Kenny, acknowledged this fact, testifying that the Gordon Growth Model used by Tuliano is a preferable and more common approach to calculate a terminal value when valuing a business as a going concern, and is the method that is generally used by his firm.[333]  Moreover, because he chose to use an exit multiple to calculate the Company's terminal value, Fischel's

---

[329] 3/10/11 Trial Tr. 101:25-102:4 (Fischel); 3/18/11 Trial Tr. 92:9-11, 93:5-94:25 (Tuliano).  Fischel's inclusion of companies that are not diversified media companies in his collection of comparable companies also increased the value conclusion of his comparable company analysis, which increased his overall value conclusion at Step One by approximately $1.2 billion to $1.3 billion.  NPP 955 (Tuliano Rebuttal Rpt.) at 21.
[330] NPP 955 (Tuliano Rebuttal Rpt.) at 20, n.76.
[331] NPP 488 (7/13/07 Tribune Co. Proxy Statement); NPP 293 (3/29/07 Duff & Phelps Tribune Valuation Analysis); NPP 365 (4/5/07 JPM Tribune Credit Analysis).
[332] NPP 88 (VALUING A BUSINESS, Shannon Pratt) at 251; 3/18/11 Trial Tr. 60:15-19, 91:20 -92:6 (Tuliano).
[333] Kenny Dep. Tr. 78:7-82:22 ("If you don't have good comparables, your market multiple method is probably not that reliable.  And then if you're taking that information and then also using it in your discounted cash flow, that's going to make that potentially less reliable as well . . . So you could compound your problem there.").

poor choice of comparable companies compounded the errors in his discounted cash flow

analysis. Kenny confirmed this conclusion, testifying that "[i]f you don't have good

comparables, your market multiple method is probably not that reliable. And then if you're

taking that information and then also using it in your discounted cash flow, that's going to make

that potentially less reliable as well . . . So you could compound your problem there."[334]

163.    Given that the terminal value constitutes the vast majority of Fischel's DCF value,

his flawed market approach is the dominant driver of his DCF analysis, which drives his flawed

analysis of the Company's value at the closing of Steps One and Two.[335]

### d.    Fischel's Market Approach Was Also Fundamentally Flawed

164.    As noted, Fischel's selected comparable companies were not as appropriate as

Tuliano's because Fischel included "pure play" broadcasting and newspaper companies that are

not comparable to the Company on a consolidated basis.[336] As Tuliano credibly testified, pure

play broadcasting companies are simply "not comparable to a company that is seventy-five

percent newspapers."[337] The Arrangers' solvency expert from the time of the LBO disagreed

with Fischel's approach, and testified that, when conducting a comparable company analysis of

the Company, the weight afforded to multiples derived from pure play broadcasting companies

should be adjusted based on the amount of business coming from the Company's broadcasting

segment (which in this case was only approximately 32%).[338] Fischel's decision to use pure play

broadcasting and newspaper companies as comparable companies materially inflated his value

---

[334] Kenny Dep. Tr. 78:7-82:22.

[335] 3/18/11 Trial Tr. 91:23-92:6 (Tuliano).

[336] 3/18/11 Trial Tr. 63:8-18; 93:5-94:25 (Tuliano); NPP 955 (Tuliano Rebuttal Rpt.) at 21. Indeed, the Arrangers' solvency expert from the time of the LBO once again disagrees with Professor Fischel's approach, and testified that, when conducting a comparable company analysis of the Company, the weight afforded to multiples derived from pure play broadcasting companies should be adjusted based on the amount of business coming from the Company's Broadcasting segment (which in this case was only approximately 32%). Kenny Dep. Tr. 120:2-122:10.

[337] 3/18/11 Trial Tr. 93:14-15 (Tuliano).

[338] Kenny Dep. Tr. 120:2-122:10.

conclusion of his comparable company analysis, which increased his overall value conclusion at

Step One by approximately $1.2 billion to $1.3 billion.[339]

165.    Additionally, Fischel's method of choosing "comparable companies" was not as

reliable as Tuliano's, as Fischel chose the companies simply by looking at contemporaneous

analyses conducted by various banks and advisors to see how often those analysts counted a

company as "comparable" to Tribune.[340]  With one exception, if a company was listed as

"comparable" five or more times by those banks and advisors, Fischel used that company as a

"comp" in his analysis, without investigating whether that company was a "pure play"

broadcasting company or a "pure play" publishing company, and without determining how the

advisor used the company in its analysis.[341]

### e.    Implied Share Price

166.    The unreliable and inflated nature of Fischel's balance sheet insolvency analysis

is well illustrated by the share prices implied by his valuation conclusions.[342]  As Tuliano

explained at trial, an implied share price can be derived by deducting $5 billion of pre-Step One

debt from the total enterprise value arrived at by Fischel, and then dividing those numbers by the

241 million shares of the Tribune's common stock that were then outstanding.[343]  This exercise

shows that at the time of Step One, Fischel believes that *the value of the Tribune's common*

*stock could have been as high as $68 per share, and was no lower than $36 per share.*[344]  No

one was placing anywhere near that kind of value on Tribune's stock at that time.[345]  Indeed, in a

May 20, 2007 declaration submitted on the Company's behalf, one of the DCL Plan Proponents'

---

[339] NPP 955 (Tuliano Rebuttal Rpt.) at 21.
[340] 3/11/11 Trial Tr. 170:2 – 171:16 (Fischel).
[341] 3/11/11 Trial Tr. 170:2 – 171:16 (Fischel).
[342] 3/18/11 Trial Tr. 108:8-109:2 (Tuliano); NPP 2478 (Tuliano Trial Demonstratives) at 50.
[343] 3/18/11 Trial Tr. 108:15-19 (Tuliano); NPP 2478 (Tuliano Trial Demonstratives) at 50.
[344] NPP 2478 (Tuliano Trial Demonstratives) at 50.
[345] 3/18/11 Trial Tr. 108:20-109:2 (Tuliano).

other experts, Black, declared that the stand alone value of the Tribune's shares, absent the overhang of the LBO, was likely "***well below $32***" a share, and Black acknowledged at trial that it could have been "***$29" a share***".[346] This is entirely in keeping with Tuliano's analysis, which found that the implied share price of Tribune's stock at Step One close was approximately $28 per share using the February 2007 Projections, and approximately $25 per share when the February 2007 Projections are appropriately adjusted to incorporate information known at that time.[347]

> **2.  Step One Left The Company With Unreasonably Small Capital And Unable To Pay Its Debts As They Matured**

167.    The Noteholder Plan Proponents presented substantial evidence showing that a court would find that the Company was inadequately capitalized and unable to pay its debts as they became due as of Step One. Tuliano conducted a substantially more credible analysis than Fischel.

> **a.  The Noteholder Plan Proponents' Expert Conducted A Credible And Methodologically Sound Analysis Of The Company's Capital Adequacy And Ability To Pay Its Debts As They Came Due At Step One**

168.    Tuliano assessed the Company's capital adequacy and ability to pay using widely-accepted techniques, including detailed analyses of the Company's leverage and liquidity before and after the LBO, and its ability to service its debt from operating cash flow and/or other sources of cash.[348]

---

[346] NPP 2314 (5/10/07 Black Declaration) at 6, n.7; 3/9/11 Trial Tr. 274:23-25 (Black); NPP 1038 (5/22/07 Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Preliminary Injunction and Supporting Declarations of W. Osborn, M. Costa, D. Grenesko and B. Black) at 28.

[347] 3/18/11 Trial Tr. 107:13-108:7 (Tuliano); DCL 2008 (Revised Tuliano Trial Demonstratives).

[348] NPP 944 (Tuliano Rpt.) at 100; 3/18/11 Trial Tr. 68:8-25 (Tuliano). Like his balance sheet analysis, Tuliano also properly considered the Company's Step Two Financing in his Step One capital adequacy/ability to pay debts analysis.

169.    Tuliano credibly demonstrated that the Company's debt-to-EBITDA ratio was considerably higher than those of its competitor companies for the periods before and after Step One.[349]  In other words, the Company was highly leveraged in comparison to its competitors even before the LBO, and its debt-to-EBITDA ratio skyrocketed to more than six times that of its most highly-leveraged competitor following Step One, and more than eight times that of the industry average.[350]

170.    Moreover, the Company's interest coverage ratios showed that the Company would not be able to service the significant amount of leverage imposed by the LBO.[351]  Following Step One, the Company had the lowest coverage ratio among its comparable companies.  Yet Tuliano credibly concluded that, following the LBO, based on its 12-month trailing EBITDA, the Company would likely not be able to cover its interest expense even without taking into account reasonably foreseeable contingencies.[352]

171.    The evidence further shows that the Company would not be able to service its debt obligations with cash from operations following Step One based on projections for the period 2007-2011.  Tuliano performed this analysis using not only the February 2007 Projections and Step One Adjusted Projections, but also four downside cases:  the Step One Adjusted Projections with a 15% downside sensitivity, Wall Street low estimates, an S&P sensitivity case that was prepared by the Company during its discussions with the rating agencies in advance of Step One, and management's "Downside Case B1."[353]  Tuliano, Fischel and the Examiner all

---

[349] 3/18/11 Trial Tr. 69:1-70:2 (Tuliano); NPP 2478 (Tuliano Trial Demonstratives) at 29; NPP 944 (Tuliano Rpt.) at 103-104.
[350] NPP 2478 (Tuliano Trial Demonstratives) at 29; NPP 944 (Tuliano Rpt.) at 103-104.
[351] 3/18/11 Trial Tr. 70:3-16 (Tuliano).
[352] NPP 944 (Tuliano Rpt.) at 109-110; 3/18/11 Trial Tr. 70:6-71:4 (Tuliano).
[353] 3/18/11 Trial Tr. 71:11-72:22 (Tuliano).  "Downside Case B1" was similar to management's Downside Case B but held the Broadcasting Segment's operating cash flow flat instead of projecting a 1% decline.

used downside cases in their capital adequacy analyses.[354] As Fischel confirmed at trial, the use of downside cases is appropriate for a capital adequacy analysis.[355]

172.    Management's Downside Case B1 left the Company with less cumulative EBITDA over the five-year period than the Wall Street low estimates or the Step One Adjusted Projections with the 15% downside sensitivity. Downside Case B1 was more akin to a base case than a downside case. In fact, the DCL Plan Proponents' own expert, Black, testified at trial that the Company's performance in the first five months of the year was already tracking the Company's Downside Case B, which was more of a downside case than "Downside Case B1."[356]

173.    Tuliano's analysis supports the conclusion that following Step One, the Company's operating cash flows were insufficient to meet its debt service obligations in all four downside cases, as well as under the February 2007 Projections and the Step One Adjusted Projections.[357]

(i)    The Company Did Not Have Access To Sufficient Alternative Sources Of Cash

174.    In light of the Company's inability to service its debt obligations through operations under even the February 2007 Projections, Tuliano analyzed whether the Company would be able to generate sufficient capital to service its debt in a downside scenario when additional sources of cash, such as its revolving line of credit, asset sales and equity investments, were considered.[358] Additionally, Tuliano assumed that, as a result of its S Corp/ESOP status, the

---

[354] DCL 1106 (Fischel Rpt.) ¶¶ 68, 93, 94, Exs. K and Q; 3/10/11 Trial Tr. 110:9-112:3 (Fischel); NPP 944 (Tuliano Rpt.) at 122-124, 154-157; NPP 2478 (Tuliano Trial Demonstratives) at 31-37; NPP 782 (Exam'rs Rpt.), Vol. II at 214-215, 232-235.

[355] 3/10/11 Trial Tr. 110:9-112:3 (Fischel).

[356] NPP 2314 (Black *Garamella* Declaration) at 15 n.22; NPP 944 (Tuliano Rpt.) at 116; 3/9/11 Trial Tr. 272:23-24, 273:24-274:4 (Black).

[357] 3/18/11 Trial Tr. 74:9-21, 77:6-13 (Tuliano).

[358] 3/18/11 Trial Tr. 76:10-14; 15-22, 76:23-77:5, 77:20-78:1(Tuliano); NPP 944 (Tuliano Rpt.) at 122.

Company would not have to pay 401(k) or stock based compensation expenses.[359]  Even after

giving the Company the benefit of these assumptions, however, Tuliano's analysis still shows

that the Company would be unable to service its debt and lacked adequate liquidity following

Step One under the downside projections.[360]  In fact, the Company's available liquidity relative

to its debt levels as of the close of the LBO was a mere fraction of both the Company's pre-LBO

liquidity level and the liquidity level of the Company's guideline companies.[361]

> **(ii)   Available Market Evidence Supports The Conclusion That The Company Was Inadequately Capitalized And Unable To Pay Its Debts As They Came Due**

175.    The available market evidence confirms that the Company was inadequately

capitalized and unable to pay its debts as they matured at Step One close.  For example, S&P

cautioned that a more prolonged sector downturn would subject the Company to a payment

default in 2009, and found in that event that the Company's assets would not be sufficient to

cover the Senior Notes and the PHONES Notes.[362]

176.    The evidence also shows that potential investors demonstrated their skepticism of

the LBO and wariness of the Company's financial condition through a lack of interest in the

LBO.  On May 10, 2007, for example, Todd Kaplan, Merrill Lynch's Chairman of Global

Leveraged Finance, wrote that he had "misjudged [the] level that investors would require here,"

noting that the "major pushback has been on [the] newspaper business," and attributing the

difficulties in syndicating not to market conditions generally, but to "this deal" specifically.[363]

---

[359] 3/18/11 Trial Tr. 78:6-10 (Tuliano).
[360] 3/18/11 Trial Tr. 77:6-16 (Tuliano); NPP 2478 (Tuliano Trial Demonstratives) at 34.
[361] NPP 944 (Tuliano Rpt.) at 118-19.
[362] 3/18/11 Trial Tr. 98:14-17 (Tuliano); NPP 944 (Tuliano Rpt.) at 111; NPP 302 (3/29/07 S&P Letter); NPP 378 (S&P Tribune Research Update) at JPM_00148673.
[363] NPP 414 (5/10/07 email between T. Kaplan and V. Nesi) at ML-TRIB-0390795.

177. JPMorgan's head of global credit agreed with Merrill Lynch that the syndication problems were "deal specific."[364] In an email to JPMorgan CEO Jamie Dimon, a managing director wrote that "investor concerns include total leverage (8.9x EBITDA), low equity check from Sam continuing deterioration of newspaper industry fundamentals, price and overhang from the expected Second step of the transaction…", and suggested that JPMorgan increase the interest rate on the debt and attempt to sell it at a discount to par.[365] Ultimately, Sell, the head of JPMorgan's Special Credits Group, concluded that "us[ing] fees to increase yield to investor" was "the right approach."[366] Bank of America also concluded that the only way to convince investors to purchase its revolver exposure was to reserve more than $2.6 million in fees to cover losses from selling a portion of its exposure at a discount to par.[367]

   b.   **The DCL Plan Proponents' Expert Reached Unsupportable Conclusions Respecting The Company's Capital Adequacy And Ability To Pay Its Debts As They Came Due At Step One**

178. The DCL Plan Proponents have not submitted evidence showing that the LBO Lenders would be able to show in a trial that the Company had adequate capital and was able to pay its debts as they came due following Step One close. Indeed, ***Fischel's own analysis shows that the Company did not have adequate capital to pay its debts as they came due at Step One*** and he admitted as much at trial, stating that "in 2010 and 2011, the revolver numbers turn negative, meaning that in those years, the Tribune does not have enough liquidity in order to meet its mandatory obligations."[368]

179. Specifically, Fischel's Step One capital adequacy and ability to pay analysis shows that, using the average of downside case projections prepared before June 4, 2007 and

---

[364] NPP 1409 (5/11/07 email between C. Linneman and D. McCree) at JPM_00351771.
[365] NPP 416 (5/11/07 email between P. Cohen and J. Dimon).
[366] NPP 424 (5/12/2007 email between J. Sell and B. Sankey) at JPM_00353687.
[367] NPP 462 (6/5/07 BOA Modification to Credit Approval Report) at 4.
[368] 3/10/11 Trial Tr. 123:3-6 (Fischel).

considering the Step Two Financing anticipated by the Company, the Company would have **negative** $79 million in 2009, **negative** $45 million in 2010, and a mere $9 million in 2011.[369] At trial, Fischel confirmed that these negative numbers meant that "in those years, the Tribune does not have enough liquidity in order to meet its mandatory obligations."[370]

180.    In addition, the downside cases Fischel used in his analysis show that certain of the projections understated the Company's expenses and/or overstated its income.  Fischel conducted no substantive analysis of the downside projections utilized in his analysis, however, and thus made no adjustments to account for such mistakes.[371]

181.    Nevertheless, Fischel tried to explain away the results of his own analysis by testifying that that he could have used a higher number for cash proceeds from asset sales, and that "[although] "this" analysis produced a result that was close to the line . . . there would be steps that could be taken to create a bigger cushion than is reflected on this exhibit."[372]  Yet Fischel admitted that he did not conduct any analysis to determine whether the Company could in fact have taken steps to generate additional cash, or how much cash it could have generated by doing so.[373]  It is not appropriate to disregard the results of a capital adequacy test by simply assuming that any company can take generic steps to cure a cash deficit.  Indeed, if such an assumption was appropriate, no company would ever fail a capital adequacy test.  Moreover, this assumption is particularly misplaced here, given that the Company had already implemented several cost-cutting measures prior to Step One, and thus had limited flexibility in excising additional costs.[374]

---

[369] DCL 1106 (Fischel Rpt.) at Ex. Q.
[370] 3/10/11 Trial Tr. 123:3-7 (Fischel)
[371] DCL 1106 (Fischel Rpt.) at 23.
[372] *Id.* at 123:14-125:3 (Fischel).
[373] 3/10/11 Trial Tr. 206:20 – 207:15 (Fischel).
[374] 3/18/11 Trial Tr. 95:23-96:23 (Tuliano).

### (i)    Asset Sales Would Not Cure The Company's Insolvency

182.    Fischel's assertion that he could have used a higher number for cash proceeds from asset sales is not persuasive.[375]  The Noteholder Plan Proponents presented convincing evidence at trial showing that the Company would not be able to cure its inadequate capitalization and insolvency through asset sales.

183.    First, the Noteholder Plan Proponents presented evidence that the Company would have been discouraged from selling assets in the wake of the LBO because the Company's ESOP S-Corp tax structure after the LBO inhibited asset sales for purposes of meeting debt requirements or mitigating variances from plan.[376]  This is due to the low tax basis the Company had in most of its businesses (assets) and the requisite immediate recognition of a tax liability for any sale of assets within ten years of conversion from C Corp to S Corp.[377]  The evidence also shows that Zell was aware of the tax implications of asset sales and indicated that additional asset sales, beyond the Chicago Cubs and Comcast Sports, would necessarily be limited.[378]

184.    Second, putting aside the tenuous nature of the asset sales, even if they were available to provide liquidity in the short term, they would have served only to deepen the Company's insolvency due to the related tax obligations incurred which would result in a significant portion of any proceeds being paid as taxes.  As a result, for every dollar of assets being sold, only the after-tax proceeds would be available for debt service.[379]

185.    Third, the provisions of the Senior Loan Agreement required that guaranteed debt be repaid with 100% of net cash proceeds from asset sales.  Asset sales would immediately

---

[375] 3/10/11 Trial Tr. 123:14-125:3 (Fischel).
[376] NPP 944 (Tuliano Rpt.) at 128.
[377] NPP 769 (Presentation to Examiner's Financial Advisors prepared by The Blackstone Group and FTI Consulting, May 24, 2010) at 25; NPP 39 ("Managing the S Corporation Built-In Gains Tax," Entrepreneur, dated November 2003).
[378] NPP 782 (Exam'rs Rpt.), Vol. I at 169.
[379] NPP 944 (Tuliano Rpt.) at 129.

subject the Company to an equal and offsetting repayment obligation.  As such, asset sales would not be a reliable source of cash for repayment of mandatory debt obligations or to fund operating needs.[380]

**(ii)    The Company Would Have Faced Substantial Difficulty
Refinancing Its Debts Before They Came Due**

186.    The Company's purported ability to refinance its debts was a cornerstone of Fischel's solvency conclusion, given that the Company had $2.4 billion in debt maturing within the first three years after the LBO and a $9.0 billion balloon payment due in 2014.[381]  However, the DCL Plan Proponents did not present any persuasive evidence that the Company would be able to refinance its debts before they came due.  On the contrary, the evidence supports the conclusion that the Company would have run into substantial difficulty doing so.[382]

187.    For example, Tuliano's analysis of a number of downside sensitivity cases demonstrates that the Company would be unable to meet its obligations in the first three years following the LBO.[383]  The cash flows being generated by the Company to meet these debt obligations were increasingly dependent on speculative growth in unproven businesses and equity investments which the Company did not control.[384]

188.    In addition, management's February 2007 Projections and other contemporaneous projections show that the Company's leverage was anticipated to remain excessive and significantly above industry levels throughout the projection period.[385]

189.    The Company's inability to reduce its leverage significantly from historic highs are strong indicators that the Company had far exceeded reasonable measures of debt capacity

---

[380] NPP 944 (Tuliano Rpt.) at 129.
[381] 3/10/11 Trial Tr. 201:7-20; 205:16-206:11 (Fischel); DCL 1106 (Fischel Rpt.) at 48-50, 83.
[382] 3/18/11 Trial Tr. 102:9-14 (Tuliano); NPP 944 (Tuliano Rpt.) at 114.
[383] NPP 944 (Tuliano Rpt.) at 126.
[384] NPP 944 (Tuliano Rpt.) at 126.
[385] NPP 944 (Tuliano Rpt.) at 126.

and thus would not be able to reasonably refinance its maturing long-term debt obligations on an arms' length basis over the course of the projection period.[386]  Refinancing would also be highly unlikely given that the Company was rendered balance sheet insolvent as a result of the LBO, with such insolvency deepening over time due to the continued decline of the business.[387]

190.    Contemporaneous statements made by the Arrangers support the conclusion that the Company would have been unable to refinance its debts before they came due.  For example, in a September 6, 2007 internal JPMorgan email, Darryl Jacobson wrote to Raj Kapadia that if JPMorgan "fund[ed] the second step commitments, one would reasonably have to assume that that the company would not have access to capital markets to refinance," and asked Kapadia if they could "contact solvency firm to let them know that they should not be assuming markets would be open to Trib to refi their maturities."[388]

191.    The Pre-LBO Special Committee also harbored doubts about the Company's ability to refinance its debts before they came due.  Although these concerns were related to the Step Two Financing, they merit consideration for purposes of capital adequacy and ability to pay debts as due at June 4, 2007, as it was reasonably foreseeable that the Company would incur these obligations.[389]

### (iii)    The Company Could Not Become Solvent By Raising Additional Equity Capital

192.    Fischel also concluded that the Company could cure its inadequate capitalization by raising additional equity capital.[390]  The Noteholder Plan Proponents presented convincing evidence at trial that, given the Company's highly leveraged post-LBO capital structure, there is

---

[386] NPP 944 (Tuliano Rpt.) at 127.
[387] NPP 944 (Tuliano Rpt.) at 127.
[388] NPP 540 (9/6/2007 emails from D. Jacobson (JPMorgan) to R. Kapadia (JPMorgan), *et al.* (JPM_00335870)).
[389] NPP 944 (Tuliano Rpt.) at 128.
[390] 3/10/11 Trial Tr. 110:9-112:3 (Fischel).

no reasonable expectation that the Company would be able to raise additional equity capital, including additional equity financing from Zell. In fact, as a result of the LBO, there was no equity in the business to be monetized for any purpose. JPMorgan recognized in July 2007 that "the deal is now underequitized and underpriced,"[391] while Citigroup referred to Tribune's existing debt as equity, stating "PHONES and existing notes act as equity cushion."[392] Those closest to the LBO recognized that the Company would be operating without any equity cushion and expressed the need for Zell to put in more equity, which Zell declined to do.[393]

193.　　Raising additional equity financing for an already underequitized company operating in a secular declining industry was not a reasonable expectation at the time of the LBO. Furthermore, given that Tribune was wholly-owned by an ESOP and Zell had a warrant to acquire 40% of Tribune's equity, it is not reasonable to assume that the Company could have raised additional equity financing from any source.

### (iv)　The LBO Lenders' Willingness To Lend At Step One Is Not Evidence of Solvency

194.　　Fischel's claim that the LBO Lenders' willingness to lend at Steps One and Two was evidence of solvency is unpersuasive.[394] If Fischel is correct, no completed LBO would ever constitute a fraudulent transfer. Moreover, one of the DCL Plan Proponents' other experts, Black, directly undermined Fischel's conclusion, testifying that "banks do finance deals and lend to companies where there is a likelihood of insolvency."[395]

195.　　In addition, the record is replete with documents showing that the LBO Lenders decided to participate in and proceed with the LBO for reasons that were wholly unrelated to a

[391] NPP 513 (7/26/2007 email from R. Kapadia (JPMorgan) to D. Jacobson (JPMorgan), *et al.* (JPM_00269776-78)).
[392] NPP 202 (2/20/2007 email from J. Persily (Citi) to C. Mohr (Citi) (CITI-TRIB-CC 00033822)).
[393] NPP 511 (7/26/2007 email from J. P. Casey (JPMorgan) to A. O'Brien (JPMorgan), *et al.* (JPM_00292612)).
[394] 3/10/11 Trial Tr. 95:25-96:7 (Fischel); DCL 1106 (Fischel Rpt.) at 6-8.
[395] 3/9/11 Trial Tr. 202:8-13 (Black).

belief that the Company was solvent.[396]  For example, contemporaneous communications show the LBO Lenders were highly motivated by fees, with JPMorgan commenting "ka-ching!" and "wooooo hoooo!" over its $75 million payday, and Persily citing "big fees" as a reason she was warming to the deal.[397]  Additionally, JPMorgan's decision to proceed with its role in the LBO appears to have been made despite evidence of the Company's deteriorating financial condition, based in part on a desire to perpetuate its long-time relationship with Zell, and out of deference to the close ties of Zell to members of JPMorgan's senior management.  On March 28, 2007, four days before the LBO Lenders committed to fund Steps One and Two, Jeffrey Sell, the former head of the Special Credits Group at JPMorgan, wrote to his supervisor that he had "told the team I'm not comfortable approving the new structure [of the LBO] for the reasons cited but would understand if Senor [sic] Mangemnt [sic] wanted to do this to further the Zell relationship."[398]  Similarly, on March 30, 2007, JPMorgan Vice Chairman Jimmy Lee – a life-long friend and business associate of Zell's – asked Jamie Dimon to personally intervene in efforts to help Zell "finance the bump" in his offer from $33.50 to $34.00 per share, and urged the JPMorgan financing team to "be as helpful as we can" in extending additional financing to Zell, despite the warnings of his own team that doing so could result in a ratings downgrade.[399]

196.    Moreover, in an email dated March 29, 2007, Persily wrote that Chad Leat, her boss's boss, did not want to commit to "this highly leveraged deal," because he was "scared that

---

[396] NPP 1263 (3/29/07 Cohen email) at JPM_00284644; NPP 193 (2/8/07 email from J. Persily to R. Zogheb); NPP 782 (Exam'rs Rpt.), Vol. I at 265; *see also* NPP 1322 (4/5/07 email between P. Cohen and K. Parkhill).

[397] NPP 1263 (3/29/07 Cohen email) at JPM_00284644; NPP 193 (2/8/07 email from J. Persily to R. Zogheb); NPP 782 (Exam'rs Rpt.), Vol. I at 265; *see also* NPP 1322 (4/5/07 email between P. Cohen and K. Parkhill).  Documents also show that in advance of Step One, Merrill Lynch was also very focused on the fees it would reap from the LBO. NPP 1175 (3/11/07 email between M. Costa and T. Kaplan) at ML-TRIB-0385024-25; NPP 1141 (2/24/07 email between M. Costa and C. Kenney) at ML-TRIB-1075295.

[398] NPP 289 (3/28/07 email between J. Sell and B. Sankey) at JPM_00353677.

[399] Lee Dep. Tr. 68:3-21 (quoting JPM 291324-25 (3/30/07 email from P. Deans to A. O'Brien)).

the co[mpany] [would] deteriorate[].”[400] Persily's emails show that the head of Citigroup's

Mergers & Acquisitions group pressured Persily and Leat to commit to the transaction because

he and his colleagues were "very afraid that Morgan Stanley (advisor to the special committee)"

would use the fact that "Citi drop[ped] at the last minute" against Citigroup "in marketing all the

time."[401] Persily wrote:

> Chad feels pressure to move forward. (I do also at this late date) owing to
> franchise risk. Firm is sensitive to point that morgan stanley is advisor to
> special committee and will trash us in the mkt if we back away now.[402]
> Documents also show that in advance of Step One, Merrill Lynch was very
> focused on the fees it would reap from the LBO.[403]

197.    With respect to Step Two, as described *infra* at section II.K.2.*,* contrary to

Fischel's assertion*,* the evidence shows that the LBO Lenders moved forward with the LBO not

because of a belief that the Company was solvent, but because they determined that they were

contractually bound to do so, and in JPMorgan's case, because of close relationships among Zell

and JPMorgan senior management, notwithstanding their knowledge that the Company was

insolvent,.[404]

198.    The evidence further shows that the Arrangers tried to minimize their exposure by

syndicating the overwhelming majority of their LBO Debt. Citigroup, for example, sought to

syndicate the entirety of its more than $3.1 billion term loan commitment.[405] And Bank of

America underwrote $112.5 million of the Company's $750 million Revolving Credit Facility,

[400] NPP 296 (3/28/07 emails between J. Persily and J. Fishlow Minter).

[401] NPP 284 (3/28/07 email between J. Persily and C. Leat).

[402] NPP 297 (3/29/07 email between J. Persily and J. Purcell); *see also* NPP 296 (3/29/07 email between J. Persily and J. Fishlow Minter) (Ms. Persily writes: "Christina afraid that Morgan Stanley (special advisor to the board) will trash us in the market place. That's what got me on Board! [sic]").

[403] NPP 1175 (3/11/07 email between M. Costa and T. Kaplan) at ML-TRIB-0385024-25; NPP 1141 (2/24/07 email between M. Costa and C. Kenney) at ML-TRIB-1075295; NPP 289 (3/28/07 email between J. Sell and B. Sankey) at JPM_00353677; NPP 296 (3/28/07 emails between J. Persily and J. Fishlow Minter); NPP 284 (3/28/07 email between J. Persily and C. Leat); NPP 297 (3/29/07 email between J. Persily and J. Purcell).

[404] 3/18/11 Trial Tr. 104:22-105:5 (Tuliano).

[405] NPP 435 (5/17/07 Citi Leveraged Finance Final Approval Memorandum) at 3.

but targeted to reduce its holding to as little as $35 million as Step One approached.[406]  Likewise, Merrill Lynch committed to funding $207.9 million of the Revolving Credit Facility and $78.9 million of the Delayed Draw Senior Tranche B Term Facility, but subsequently targeted to hold only $50 million of that exposure on its books.[407]

### (v)    Zell's Investment Is Not Evidence Of Solvency

199.    Fischel also inappropriately relied on "the investment by Zell and his entity" as evidence of the Company's solvency at Step One and Step Two.[408]  Even Black admitted that "the fact that Zell may have a reputation as a smart investor . . . doesn't preclude in any way the possibility that he overpaid."[409]  Moreover, the $315 million of total capital Zell contributed in the LBO was dwarfed by the $7.9 billion of incremental debt amassed by the Company in the transaction, bringing the Company's total debt to more than $13 billion.

200.    Several contemporaneous market participants commented on the negligible amount of equity contributed by Zell.  For example, on May 11, 2007, Peter Cohen, a Managing Director at JPMorgan, notified JPMorgan Chief Executive Officer Jamie Dimon and other members of JPMorgan's executive management that the Tribune deal was "struggl[ing] in the market," and cited the "low equity check from Sam" as one of the "investor concerns."[410] Additionally, Moody's stated on March 29, 2007 that the "negligible amount of equity invested" was a key driver of the credit downgrade, and would "weakly position the company."[411] As one Morgan Stanley banker viewed it after concluding that the Company would have "negative equity value" following the LBO:

---

[406] NPP 399 (BOA Credit Approval Report) at 4.
[407] NPP 501(7/20/07 Merrill Lynch Problem Exposure Report) at ML-TRIB-0211277, 0211283.
[408] 3/10/11 Trial Tr. 95:23-24, 126:17-20, 199:6-17 (Fischel).
[409] 3/9/11 Trial Tr. 201:24-202:3 (Black).
[410] NPP 416 (5/11/07 email between P. Cohen and J. Dimon); *see also* NPP 191 (2/6/07 email from J. Persily to D. Wirnam).
[411] NPP 303 (3/29/07 Moody's Investor Service Letter) at TRB0098756, 0098757.

I was explaining why the ev would be negative . . but as a secret . . you should know this deal is happening because zell is soo f-n rich . . he's putting in $65 mm to get 40% of a multi-billion dollar co[412]

201.    Indeed, by July 2007, JPMorgan had determined that the deal would fail if Zell did not contribute additional equity.[413]  In an internal JPMorgan email, banker J.P. Casey emailed his colleagues that the bank needed to ask Zell for

1)    More equity
2)    Even more equity
3)    More rate[414]

202.    Casey stated further "He [Zell] needs to hear unequivocally [sic] that this deal will fail without a lot more help from Zell.  We don't need to market it to know that – we know it now."[415]  Nevertheless, Zell did not contribute any additional equity to the transaction.

### (vi)    The Tribune Bonds' Yields To Maturity Are Not Evidence Of Solvency

203.    Fischel's testimony that the yields to maturity of Tribune's bonds in advance of Step One are evidence of solvency is also unavailing.[416]  The yield to maturity on three of the five Tribune bond issuances is higher than all of the other yields shown in Fischel's report, with the exception of rating indices for (i) companies in distress, (ii) companies having a rating of Ca to D, and (iii) companies having a rating of CCC or lower.[417]  These indices include companies that have defaulted or are in bankruptcy.[418]

204.    Moreover, Tribune's bonds were highly illiquid, trading between only one and seven times a day.[419]  Tuliano credibly testified that the Company's credit default swaps ("CDS"), *which is insurance against the risk of default,* could be purchased in a far more liquid

---

[412] NPP 1619 (10/9/07 email between I. Novoselsky and D. Schuster) at MS_104984.
[413] NPP 511 (7/26/07 email between J.P. Casey and A. O'Brien).
[414] NPP 511 (7/26/07 email between J.P. Casey and A. O'Brien).
[415] *Id.*
[416] 3/10/11 Trial Tr. 196:21-197:15 (Fischel); DCL 1106 (Fischel Rpt.) Exhibit A at 2.
[417] DCL 1106 (Fischel Rpt.) at Ex. A.
[418] 3/10/11 Trial Tr. 197:16-198:11 (Fischel).
[419] 3/18/11 Trial Tr. 100:3-8 (Tuliano)

market. Thus, as Tuliano testified, CDS offered a cheaper and easier way for a creditor to protect against loss on its bond than selling the bond, and is a more accurate market indicator of the Company's insolvency risk than the yields to maturity on the illiquid bonds.[420]

205. The spread on the Company's CDS increased significantly in April 2007, the month in which the LBO was announced, and continued to rise steadily thereafter.[421] Additionally, there was a substantial spike in the CDS spread in July. This coincided with (i) the disclosure that cash flow at the *Los Angeles Times*, the Company's largest newspaper, fell 27% in the second quarter (two months of which were known to the Company before Step One closed), marking, in the words of the newspaper's publisher, "one of the worst quarters [the newspaper had] ever experienced,"[422] and (ii) the Company's decision to revise downward the projections for 2007 to reflect the Company's deteriorating performance through the second quarter.[423] According to an article published by Bloomberg, the Company's CDS prices implied that "investors consider[ed] the company the fourth-riskiest debt issuer among" a group of almost 1,200 worldwide.[424] Similarly, Merrill Lynch observed that the cost of the Company's CDS as of July 20, 2007 indicated "a 49 percent risk of default."[425] Had the Company's management revised its unreasonable February 2007 Projections in advance of Step One, the CDS spread at that time would have been even greater.

### 3. The Examiner's Analysis Of Step One Was Incomplete

206. While the Examiner conducted a comprehensive and thoughtful analysis of the LBO Claims, the Examiner did not recognize several facts relating to Step One.

---

[420] 3/18/11 Trial Tr. 99:4-100:24 (Tuliano).
[421] 3/18/11 Trial Tr. 101:1-6 (Tuliano); NPP 944 (Tuliano Rpt.) at 151.
[422] NPP 502 (7/20/07 Bloomberg Article) at 1.
[423] 3/18/11 Trial Tr. 101:6-23 (Tuliano); NPP 501 (7/20/07 Merrill Lynch Problem Exposure Report); NPP 944 (Tuliano Rpt.) at 114-115.
[424] 3/18/11 Trial Tr. 102:9-14 (Tuliano); NPP 944 (Tuliano Rpt.) at 114.
[425] NPP 944 (Tuliano Rpt.) at 114 (quoting NPP 501 (7/20/07 Merrill Lynch Problem Exposure Report)).

207. For example, the Examiner overlooked the disparity not only between the Company's operating performance and the February 2007 Projections for the first five months of the year, but also between the actual operating performance for those months and the same five months of 2006.[426] Additionally, the Examiner did not appreciate that the February 2007 Projections were significantly back-end loaded, and that the out years of the February 2007 Projections were premised on achieving the 2007 plan, all of which made the likelihood that the Company would be able to meet the February 2007 Projections notwithstanding its dismal performance through May 2007 highly unrealistic.[427]

208. Additionally, although the Examiner noted that "management's projected 2007 revenue and EBITDA generally was consistent with analyst expectation at the time,"[428] in fact, Wall Street consensus estimates in March 2007 predicted decreasing EBITDA over the projection period, and were meaningfully below the upward trend predicted by the February 2007 Projections.[429] Moreover, the Average Third Party Base Case Projections compiled by Fischel show that projections prepared by parties involved in the LBO were also significantly below those of the Company's management. Prior to Step One close, the adjusted EBITDA projected in the February 2007 Projections exceeded the average adjusted EBITDA projected by Merrill Lynch, Citigroup, Bank of America, JPMorgan (all LBO Lenders), and Blackstone (the advisor to the McCormick Foundation, one of Tribune's largest shareholders) by at least $29 million in 2007, at least $137 million in 2008, at least $161 million in 2009, at least $192 million in 2010, at least $202 million in 2011, and at least $214 million in 2012.[430]

---

[426] 3/18/11 Trial Tr. 85:10-86:6 (Tuliano).
[427] NPP 782 (Exam'rs Rpt.), Vol. II at 212; 3/18/11 Trial Tr. 85:14-21 (Tuliano).
[428] NPP 782 (Exam'rs Rpt.), Vol. II at 213.
[429] NPP 944 (Tuliano Rpt.) at 37, 74.
[430] *Compare* Appendix H, p. 2 of DCL 1106 (Fischel Rpt.) *against* Appendix E, p. 3 of DCL 1106.

209. Moreover, the Examiner did not conduct a detailed analysis of the February 2007 Projections, which led him to also overlook the strong evidence of intentional fraud at Step One. Because the Examiner did not recognize the surge in performance that the Company would have had to achieve in order to meet its 2007 projections and, by extension, its projections for the out years, the Examiner failed to appreciate that management's decision to continue to rely on those projections is highly suggestive of intentional fraud. Additionally, it appears that the Examiner was unaware of the Company's acknowledgment, *prior to Step One close*, that it was tracking its *lowest* downside projections, which sheds light on Bigelow's admission, also *prior to Step One close*, that even if the Company performed in accordance with a more optimistic downside case, it would have *no equity value* for the five years following the LBO.[431] The Examiner also appears to have overlooked the internal debate at Tribune as to whether to revise the Company's projection downward in advance of Step One close, as well as an internal email from Timothy Landon referring to the February 2007 Projections as "unrealistic."[432]

210. The Examiner's analysis of the Company's financial condition at Step One close was also incomplete, and once again affected by the Examiner's assessment of the February 2007 Projections. To begin with, the Examiner did not perform a balance sheet solvency test as of the closing of Step One, and relied on management's wholly unreliable February 2007 Projections in evaluating the Company's capital adequacy and ability to pay its debts.[433] Additionally, the Examiner improperly assumed that the Company would be able to refinance its debt.[434] Lastly, the Examiner also made a mathematical error in his capital adequacy assessment, by *adding* cash tax expense to cash flows rather than *deducting* it, which erroneously increased

[431] NPP 2314 (5/10/07 Black Declaration) at 15 n.22; NPP 259 (3/24/07 email between J. King and C. Bigelow).
[432] NPP 1532 (9/1/07 email between D. Kazan and T. Landon et al.) at TRB 0200824/
[433] 3/18/11 Trial Tr. 86:11-16 (Tuliano).
[434] NPP 782 (Exam'rs Rpt.), Vol. II at 214; 3/18/11 Trial Tr. 83:16-84:5, 85:10-86:6 (Tuliano); NPP 944 (Tuliano Rpt.) at 10-13, 162-165.

the projected amount of the Company's cash flows from $245 to $353 million.[435]  Correcting this

error alone in the Examiner's analysis would result in the conclusion that the Company was

inadequately capitalized as of June 4, 2007 in six out of the seven capital adequacy tests

presented by the Examiner in his report.[436]

### 4. Step One Conclusion

211.    In summary, substantial evidence was presented by the Noteholder Plan

Proponents that the Company was balance sheet insolvent, inadequately capitalized and unable

to pay its debts as they matured as of June 4, 2007.

### H. Events Between Step One Closing On June 4, 2007 And Step Two Closing On December 20, 2007

#### 1. There Is Substantial Evidence That The State Of The Publishing Industry And The Company's Performance In The Months Leading Up To The Close Of Step Two Did Not Improve, And Instead Continued To Deteriorate

212.    The evidence supports a finding that the prospects for the newspaper publishing

industry did not improve, and in fact continued to deteriorate, between the close of Step One and

Step Two.

##### a. Industry Analysts, Rating Agencies And The LBO Lenders Recognized That The Publishing Industry Continued Its Secular Decline Between The Close Of Step One And Step Two, And Questioned Whether Step Two Should Close As Planned

213.    Industry analysts fully recognized that the newspaper publishing industry

continued its secular decline in the months leading up to Step Two of the LBO.  Fitch

highlighted the negative impact of secular and structural changes on the newspaper industry in

their research report in July 2007:

---

[435] 3/18/11 Trial Tr. 84:6-25 (Tuliano); NPP 944 (Tuliano Rpt.) at 10-13, 162-165.
[436] 3/18/11 Trial Tr. at 84:23-85:4 (Tuliano).

Fitch believes newspapers will continue to face intense secular issues on the revenue side. Fitch expects national advertising and automotive classifieds to continue to be significantly pressured. Fitch believes these changes are structural, not cyclical, and does not believe the advertising lost in these categories will return to newspapers in any meaningful way in future periods. Help wanted and real estate classifieds sustained growth and profits at many newspaper companies in 2005 and the first half of 2006, but both categories have slowed significantly in recent periods. Fitch expects this trend to continue for the rest of 2007, driven by both cyclical and secular issues. – Fitch, July 2007[437]

214.    Fitch also reiterated its negative outlook for the newspaper industry, stating:

With no meaningful catalysts for the remainder of 2007 or 2008 to reverse the operational pressure and secular uncertainty facing the newspaper industry, Fitch expects the event risk environment to remain heightened for bondholders.[438]

215.    Fitch likewise noted in July 2007 that the Company continued to face

"meaningful secular headwinds," as well as challenges including declining circulation trends for

newspapers, pressures on newspaper advertising revenue streams, significant substitution risk

and competition threat from online rivals:

Fitch believes [Tribune's] newspapers and broadcast affiliates (particularly in large markets where there is more competition for advertising dollars) face meaningful secular headwinds that could lead to more cash flow volatility in the future. With fixed-charge coverage estimated to be below 1.3 times (x), there is very little room to endure a cyclical downturn. In addition, the rating continues to reflect declining circulation trends for newspapers, pressures on newspaper advertising revenue streams, significant substitution risk and competitive threat from online rivals (particularly in high-margin classified categories), volatile newsprint prices, the threat of emerging technologies on the economics of the pure-play broadcasting business and the volatility of cash flow due to cyclical and political fluctuations.[439]

Importantly, publishing sector operating profits of $102 million were well below our $145 million figure and less than half of the $209 million reported in Q2/06. This is a clear cause for concern.[440]

---

[437] NPP 491 (7/17/07 Fitch Ratings, Media & Entertainment/U.S. and Canada Credit Analysis, Tribune Co.) at 5.
[438] NPP 491 (7/17/07 Fitch Ratings, Media & Entertainment/U.S. and Canada Credit Analysis, Tribune Co.) at 5.
[439] NPP 491 (7/17/07 Fitch Ratings, Media & Entertainment/U.S. and Canada Credit Analysis, Tribune Co.) at 1.
[440] NPP 506 (7/25/07 Barrington Research, Tribune Co. (TRB-NYSE), Tough Quarter for Publishing Profits) at 1.

216.    Similarly, S&P noted the continuing secular shift in the distribution of advertising

dollars from traditional media to new media, and affirmed its negative outlook for the newspaper

publishing industry:

> Advertising and circulation revenues, the bread and butter of newspaper
> publishers, continue to grow leaner as the industry deals with a number of
> serious problems and challenges. Among publishers' hurdles are an ever-
> increasing array of new advertising media, which are cutting into
> newspapers' share of the ad pie…Newspaper publishers' share of the
> advertising market is shrinking in the United States, and we expect that
> trend to continue for the foreseeable future. . . .

> The trend in declining newspaper ad share extends back more than five
> decades . . . . We do not expect the downtrend to end within the
> foreseeable future, if at all . . . . Standard & Poor's forecasts little
> improvement for newspaper advertising in 2008. For newspaper
> advertising as a whole, we anticipate a rise in ad spending of less than
> 1.0%.[441]

217.    The evidence shows that the Company's weak financial results and the declining

publishing industry as a whole raised questions as to whether Step Two would or should close as

planned. On June 20, 2007, Deutsche Bank Securities Inc. reduced its projected target price for

Tribune's common stock after the Company announced disappointing May 2007 revenues,

announcing that "[w]e lower our price target from $34 to $32 to reflect the offer price and the

probability of the offer being lowered or the deal not closing."[442] Deutsche Bank also raised

concerns about the lenders' ability to syndicate the Step Two Financing, rising interest rates, and

widening high yield credit spreads.[443]

218.    At Merrill Lynch, a banker noted in late June 2007 that it was "too difficult to

really put a confidence level" on the likelihood of Step Two closing, in part because "the

---

[441] NPP 542 (9/6/07 Standard & Poor's, Industry Surveys, Publishing) at 1, 3 & 12.
[442] NPP 475 (6/20/07 Deutsche Bank Securities Inc. Company Alert).
[443] NPP 475 (6/20/07 Deutsche Bank Securities Inc. Company Alert).

company's fundamental performance likely needs to be better in the last half of the year than it has been in the first."[444]

219.    On July 1, 2007, Deutsche Bank issued a comprehensive ratings report on the Company that indicated significant lender concern:

> There may be some unhappy lenders in the end, but equity investors are more likely than not to get their $34 in the second tender. . . .
>
> While we believe that Tribune will exceed the minimum adjusted EBITDA threshold laid out in the merger and credit agreements, our primary concern is that none of the parties involved in this going-private transaction are highly motivated to see the deal through on its current terms.[445]

220.    On July 26, 2007, various JPMorgan bankers centrally involved in the LBO reported to JPMorgan Vice Chairman James Lee that JPMorgan was "totally underwater on this underwrite [and] the deal is now underequitized and underpriced."[446]

221.    In response to the negative perception of the LBO by the LBO Lenders and Wall Street analysts, Nils Larson, a Managing Director of EGI, suggested that EGI undertake a restructuring analysis to determine "what changes to the deal structure can be put in place that allow closing but address the capital structure," such as a combination of reducing the per share price and adding an incremental asset sale bridge for another $1.5 billion.  Larsen expressed EGI's desire to close the transaction notwithstanding the Company's deteriorating performance:

> [T]he majority of our return is generated from the second phase. So while closing a bad deal is not the way to go, not closing the deal leaves us with a series of negatives that a cumbersome and time consuming spin/liquidation may not be the right way to proceed.[447]

---

[444] NPP 481 (6/28/07 email from M. O'Grady (Merrill Lynch) to M. Abraham (Merrill Lynch), *et al.* at ML-TRIB-0580949).
[445] NPP 484 (7/1/07 Deutsche Bank Rating Upgrade) at 1 & 14.
[446] NPP 513 (7/26/07 email from R. Kapadia (JPMorgan) to D. Jacobson (JPMorgan), *et al.* at JPM_00269777).
[447] NPP 507 (7/25/07 email from B. Pate (EGI) to N. Larsen (EGI) at EGI-LAW 00114072).

222.     However, EGI continued to have doubts over Step Two of the LBO.  In a confidential memorandum to Zell, Pate (EGI) cautioned: "I also think we should review our financial forecast with a very skeptical eye and consider whether we fully support the second step of the go-private transaction in light of recent financial shortcomings."[448]

223.     On August 14, 2007, Lehman cut its earnings estimate for the Company and stated, "the likelihood [of Step Two] happening in the upcoming months is no better than 50% / 50% at this stage due to the significant pressure on revenue and EBITDA…. Tribune is significantly overlevered currently and should not be adding more debt to its capital structure given the ongoing secular decline in the fundamentals across Tribune's newspapers and TV stations," and concluded that "if the [Step Two transaction closes], *the company will not be able to cover the estimated annual interest expense from operations let alone have excess free cash flow to pay down debt each year*."[449]  Further, Lehman outlined several factors that made it less likely that Step Two would be consummated:

- "The secularly declining revenue/EBITDA at Tribune";

- "Much tighter fixed income markets over the past two to three months with no end seemingly in sight make syndicating the [Step Two Financing] very difficult";

- Lehman's belief "that the commercial banks who have committed to financing [Step Two] may be looking to exit this deal [as] $4.2 billion in debt could be sitting on their balance sheets if they cannot syndicate the loans out";

- Lehman's view that the "potential realization . . . by the parties involved in the [Step Two Financing] that the proposed leverage . . . will be much too high; . . . we are talking about Sam Zell potentially, the board of directors at Tribune, the company's own outside advisors, etc.";

- Lehman's doubts that the Company would be able to obtain the requisite independent solvency opinion; and

---

[448] NPP 521 (8/9/07 memorandum from B. Pate (EGI) to S. Zell at EGI-LAW 00178270).
[449] NPP 525 (8/14/07 Lehman Change of Earnings Forecast) at 2.

- The possible failure of the Company to meet the "secured leverage ratio test" in the Step Two Commitment Letter.[450]

224.     As early as March, one JPMorgan executive noted "I'm not comfortable approving the new structure for the reasons cited but would understand if Senior Management [sic] wanted to do this to further the Zell relationship.[sic] ***It's a question of lost income and leverage in a bankruptcy negotiation.***"[451]   Later in September, Peter Cohen wrote to Jimmy Lee about a meeting to discuss "asking/pushing for some help from Sam/Trib" but cautioned against any actions that would have a "negative impact on the broader relationship with Sam and Trib."[452]   Despite these concerns, JPMorgan pushed forward with the deal, although an agenda prepared for a September call between Lee and Zell noted that "[t]he Tribune capital structure is not saleable in today's market environment."[453]   An October email from Rajesh Kapadia to Jimmy Lee was even more ominous, noting that "we are still losing money…the [Tribune] board should want a market clearing deal and not leave a levered company with its underwriters stuffed."[454]

  **b.     There Is Substantial Evidence That The Company Was Well-Aware Of Its Deteriorating Performance Before The Close Of Step Two**

225.     In its Form 8-K filed on July 25, 2007, Tribune reported second quarter 2007 consolidated revenues for the Company of $1.3 billion, down 7% from the prior year, and a 36% comparable quarter operating profit decline of more than $100 million.[455]   On the day of the announcement of the second quarter 2007 results, Tribune released a revised annual plan for

---

[450] NPP 525 (8/14/07 Lehman Change of Earnings Forecast) at 3.
[451] NPP 289 (3/28/07 email from J. Sell to B. Sankey re: Fw: Zell) (emphasis added).
[452] NPP 2334 (9/20/07 email from B. Bartter to P. Cohen).
[453] NPP 2247 (undated letter to "Jimmy" regarding "proposed topics for your call to Sam Zell to discuss the agenda for the 2:30pm Sept 25 meeting."); *see* 3/15/11 Trial Tr. 217:19-218:5 (Lee video).
[454] NPP 2335 (10/18/07 email from R. Kapadia to J. Lee).
[455] NPP 508 (7/25/07 Tribune Form 8-K) at 2.

2007 in a meeting with the LBO Lenders. Following this meeting, JPMorgan expressed the need for Zell to put in more equity or risk failure of the deal.[456]

226.     Although the Company did not externally revise its February 2007 Projections prior to the completion of Step One, emails indicate that the Company internally revised its projections for 2007 as early as April 2007 and again around the time of the closing of Step One.[457]  In addition, these contemporaneous e-mails reflect concern over disclosing these revisions.

> Sotir (EGI) April 12, 2007:
>
>> In the email below, [Amsden, Tribune] reference new "projections" which are a new look at the full year numbers. He will send those over later.[458]
>>
>> Amsden (Tribune) later the same day emails Sotir (EGI):
>>
>> Won't have an updated projection to send you tonight or in advance of the meeting tomorrow at 2pm. Some potential legal concerns with doing that.[459]
>
> Peter Knapp (Publishing Group Controller, Tribune) April 30, 2007:
>
>> Brian and Chandler:
>>
>> You guys need to help get with Don and Crane to figure out whether or not we are doing an updated projection next week knowing that if we do, we may end up with some consistency issues to the recent document disclosures.[460]
>
> Sotir (EGI) June 8, 2007:
>
>> Can you guys meet the Trib finance team on Tuesday afternoon (June 12) to review Period 5 financials. They may show us their revised forecast, but are still discussing with lawyers what level of detail they can discuss.[461]

---

[456] NPP 511 (7/26/07 email from A. O'Brien (JPMorgan) to P. Deans (JPMorgan)) JPM_00292612.
[457] NPP 373 (4/12/07 email from M. Sotir (EGI) to B. Pate (EGI), *et al.*) at EGI-LAW 00063610.
[458] NPP 373 (4/12/07 email from M. Sotir (EGI) to B. Pate (EGI), *et al.*) at EGI-LAW 00063610.
[459] NPP 372 (4/12/07 email from M. Sotir (Tribune) to B. Pate (EGI), *et al.*).
[460] NPP 397 (4/30/07 email from P. Knapp (Tribune) to B. Litman (Tribune), *et al*).
[461] NPP 464 (6/8/07 email from M. Sotir (EGI) to B. Pate (EGI), *et al*).

227.     On August 20, 2007, S&P issued a research update, lowering Tribune's corporate credit rating to B+ from BB- citing "deterioration in expected operating performance and cash flow generation compared to our previous expectations."[462]

228.     The Company's deteriorating performance during this period was reflected in the price of Tribune's common stock, which traded as low as $25.41 during this period (a discount of more than 25% to the tender offer price), despite being informed by at least some expectation of the closing of Step Two.[463]  Tribune's bond prices also began declining in relation to par, slumping to as low as almost 50 cents on the dollar for certain tranches of Tribune's longer-term maturity bond debt.[464]

### 2.     Tribune Is Downgraded Again Amid Continued Deteriorating Performance

229.     On November 27, 2007, the Company announced results for October 2007. Consolidated revenues had declined 9.3% in that period in relation to the comparable period in the prior year.[465]  As a result, Moody's downgraded Tribune's Corporate Family Rating to B1 from Ba3.  The downgrade reflected Moody's:

> estimate that projected advertising revenue, EBITDA and cash flow generation will be lower than previously anticipated in 2008 and 2009 as a result of the ongoing challenges associated with a difficult revenue environment facing the newspaper industry. . .[466]

230.     Moody's also indicated that completion of Step Two would result in a further downgrade of Tribune's Corporate Family Rating.[467]

---

[462] NPP 528 (8/20/07 Standard & Poor's Research Update at 2, 3.
[463] NPP 782 (Exam'rs Rpt.), Vol. I at 408.
[464] NPP 782 (Exam'rs Rpt.), Vol. I at 408-09.
[465] NPP 601 (11/27/07 Tribune Press Release).
[466] NPP 605 (11/29/07 Moody's Rating Action).
[467] NPP 605 (11/29/07 Moody's Rating Action).

231.     The evidence shows that during the period between June 4, 2007 and December 20, 2007, management was aware of Tribune's stock performance, analyst expectations for, and commentary regarding, the Company, and the contraction of the credit markets.[468]

**I.      The Evidence Shows That Management Was Incentivized To Close Step Two**

232.     On July 19, 2006, the Board adopted an amended and restated a transitional compensation plan (the "Transitional Compensation Plan"), which entitled each covered employee to benefits in the event that such employee's employment was terminated (a) on, or within a specified period of time following, a change in control of Tribune (defined as (i) the acquisition of 20% or more of the outstanding Tribune common stock or voting power by a person or group of persons other than the McCormick Foundation and any employee benefit plan or trust of Tribune or its subsidiaries, (ii) the failure of individuals who were directors as of January 1, 2005 or whose election or nomination to the Board was approved by such individuals (or individuals so approved) to constitute a majority of the Board, (iii) a reorganization or merger of Tribune in which the stockholders of Tribune immediately before the consummation of the reorganization or merger did not own 50% or more of the voting power of the combined entity immediately thereafter, or (iv) a sale of all or substantially all of the assets of the Company), (b) before a change in control at the request of a third party participating in or causing the change in control, or (c) otherwise in connection with a change in control.[469]  Pursuant to the terms of the Merger Agreement, the individual participants in the Transitional Compensation Plan had the right to enforce the requirement in the Merger Agreement that the surviving corporation in the LBO "honor, fulfill and discharge the Company's obligations under the Transitional

---

[468] NPP 782 (Exam'rs Rpt.), Vol. I at 465.
[469] NPP 782 (Exam'rs Rpt.), Vol. I at 427-28.

Compensation Plan, without any amendment or change that is adverse to any beneficiary of such Transitional Compensation Plan."[470]

233. At the December 20, 2007 Board meeting held following consummation of the LBO, the Board approved a 2007 management equity incentive plan, which provides for the grant of phantom stock awards to eligible employees.[471] Company executives who received cash bonuses, equity incentives and/or accelerated restricted stock and options in connection with the LBO included Chandler Bigelow, Donald Grenesko, Dennis FitzSimons, Crane Kenny, Harry Amsden, Mark Hianik, John Reardon, Scott Smith, and Timothy Landon.[472]

### J. There Is Significant Evidence To Support A Finding That Revised Projections Prepared By The Company In October 2007 Were Unreasonable

234. In September 2007 the Company updated its financial projections for the years 2007 to 2012 to reflect the continued decline of its publishing segment, resulting in the October 2007 Projections, which supported Step Two of the LBO.[473]

235. Although the October 2007 Projections reflected a decline in the Company's expected financial performance relative to the February 2007 Projections, the October 2007 Projections were overly optimistic and presented unreasonable expectations for the Company's financial performance subsequent to the LBO as of December 20, 2007.[474] For the years 2007-2010, the February 2007 Projections included an annual growth rate of 3.9%, whereas the October 2007 Projections included an annual growth of 5.1%, a 30% increase.[475] Similarly, the

[470] NPP 782 (Exam'rs Rpt.), Vol. I at 429-30.
[471] NPP 782 (Exam'rs Rpt.), Vol. I at 433.
[472] NPP 782 (Exam'rs Rpt.), Vol. I at 435.
[473] NPP 578 (October 2007 Projections); NPP 587 (Board Meeting Minutes October 17, 2007) at 4-5.
[474] NPP 944 (Tuliano Rpt.) at 82.
[475] NPP 944 (Tuliano Rpt.) at 87.

annual growth rate for the years 2010-2012 reflected in the February 2007 Projections was zero compared to a 2.5% growth rate for the same period in the October 2007 Projections.[476]



**Tribune – Consolidated Actual and Projected EBITDA**
*Management Case Projections are Inconsistent With Oct-2007
Wall Street Consensus Estimates and the Examiner's Adjusted Base Case Projections*

*Note: Actual EBITDA adjusted to include stock based compensation; Actual 2007 EBITDA adjusted to exclude one-time special items; and Projected EBITDA adjusted to include stock-based compensation and cost savings for 2007 – 2011, and exclude Cubs and SCNI for 2008 – 2011*

*Sources: Tribune SEC Filings; Tribune Brown Books, 2007; Tribune Five-Year Financial Outlook dated October 2007; LECG Financial Model (Financial Advisor to Examiner); Reuters Mean Consensus Estimates (October 2007).*

236.    The evidence supports a finding that the higher growth rates contained in the October 2007 Projections were overly optimistic (given the negative industry outlook and the failure of the Company to achieve its prior 2007 projections) and unreasonably served to partially offset the revenue reductions in the earlier years of the projection period.[477]  The October 2007 Projections also erroneously assumed that the consolidated growth rate of 2.4% from 2011 to 2012—a year in which advertising revenues were forecast to spike due to the

---

[476] NPP 944 (Tuliano Rpt.) at 87.
[477] NPP 944 (Tuliano Rpt.) at 82-83.

presidential election—would be replicated each and every year from 2013 through 2017.[478] This election-year-inspired extrapolation resulted in growth rates that were projected to be five times greater than the growth rate projected by management just eight months earlier.[479] There was "no basis for that increase in growth rate."[480] The Examiner noted that this growth rate assumption was not only "unjustifiable,"[481] but bore the hallmark of a "conscious effort to counterbalance the decline in Tribune's 2007 financial performance and other negative trends in Tribune's business, in order to furnish a (very significant) source [$613 million] of additional value to support a solvency conclusion."[482]

237.    The October 2007 Projections were dependent upon speculative growth assumptions in the Company's Interactive business.[483]  The Company's Interactive business was a small internet-based division that had grown over ten years to approximately 4% of the Company's total operating revenues in 2006.[484]  Management increased its compound annual growth rate for the Interactive business from 16.3% in its February 2007 Projections to 22.0% in the October 2007 Projections.[485]  As noted in the assumptions supporting the October 2007 Projections, the source of the projected Interactive revenue was predicated on "aggressive product development," "rollout of other new products" and "planned interactive acquisitions."[486]

---

[478] NPP 782 (Exam'rs Rpt.), Vol. II at 54.
[479] NPP 782 (Exam'rs Rpt.), Vol. II at 55.
[480] 3/18/11 Trial Tr. 48:9-23 (Tuliano).
[481] NPP 782 (Exam'rs Rpt.), Vol. II at 54.
[482] NPP 782 (Exam'rs Rpt.), Vol. II at 63.
[483] NPP 944 (Tuliano Rpt.) at 84-86.
[484] NPP 580 (Tribune Rating Agency Presentation, October 2007 (ML-TRIB-0032691-762)).
[485] NPP 944 (Tuliano Rpt.) at 84.
[486] NPP 578 (Tribune Five-Year Financial Outlook dated October 2007) at MS 72248.



**Tribune – Interactive Revenue**

*Management Assumes Even Greater Dependence on The Interactive Business*

*Sources: Tribune Management Presentation, November 2006; Tribune Rating Agency Presentation, March 2007; Deposition of Harry Amsden, December 16, 2009, Exhibit 19.*

238.    By the end of the projection period (2012), the October 2007 Projections forecasted that the revenues of the Interactive business would more than triple and account for more than 13% of the Company's total operating revenues and 31% of projected EBITDA in 2012.[487]

---

[487] NPP 578 (October Projections) at MS 72254.



**Tribune – Cash Flow from Equity Investments and the Interactive Business**
*Management Doubles Cash Flow from Equity Investments and the Interactive Business by 2012*

| Year | October 2007 Management Projections | % of Adjusted Consolidated Operating Cash Flow |
|---|---|---|
| 2007 | $189 | 15% |
| 2008 | $224 | 17% |
| 2009 | $274 | 20% |
| 2010 | $342 | 24% |
| 2011 | $404 | 28% |
| 2012 | $467 | 31% |

*Sources: Examiner Exhibit 106; Tribune Rating Agency Presentations, March and October 2007; Tribune Co. Proxy Statement, July 13, 2007; Deposition of Harry Amsden, December 16, 2009, Exhibit 19.*

239.    This significant growth was highly speculative and reflects the extraordinarily high risk the Company assumed by excessively leveraging itself through the LBO.  As noted by Stinehart of the Chandler Trusts in 2006, the Company's expectation of "growth through Internet initiatives . . . ha[d] little credibility. . . ."[488]  Additionally, Timothy Landon, the head of the Company's Interactive division at the time of the LBO, told the Examiner that he "would have expected the October forecast [for interactive] to be flat or lower" than the February 2007 Projections, and "expressed surprise when the Examiner pointed out that Tribune's October forecast assumed significant increases in growth in interactive after 2009 ahead of what was projected in February."[489]

240.    Commenting on the speculative nature of Interactive's revenue projection, the Examiner noted in his report:

---

[488] NPP 136 (6/13/06 Chandler Trusts letter).
[489] NPP 782 (Exam'rs Rpt.), Vol. II at 59-60.

The projected revenues related to the interactive business's 'internal development' effort would only be realized in the aftermath of significant incremental capital investment and was based upon ideas and concepts that, at the time of the projections, remained unidentified in all but the most general way. Moreover, the acquisitions contemplated in the interactive business model were largely speculative in that no specific investment had been contemplated and the returns related thereto were developed on only the most generic of valuation assumptions. The speculation informing the projections developed by management is therefore substantial. As a result, the risk associated with achieving the revenue and cash flows projected by Tribune is considerably higher than the risk associated with projecting financial performance for Tribune's other, well-established business units.[490]

241.    Furthermore, the Examiner also found it:

implausible that members of Tribune's senior financial management believed in good faith that the out-year growth assumption contained in the October 2007 forecast… represented a reasonable estimate of Tribune's future performance. Rather, this assumption bears the earmarks of a conscious effort to counterbalance the decline in Tribune's 2007 financial performance and other negative trends in Tribune's business, in order to furnish a (very significant) source of additional value to support a solvency conclusion.[491]

242.    In addition to the overly aggressive assumptions in its Interactive revenue projections, the Company's management assumed significant increases in the cash distributions from its equity investments, with a compound annual growth rate of 22.0% between 2007 and 2012.[492] The premise of this increase was mainly focused on three investments; CareerBuilder, Classified Ventures and Food Network.[493] The Company's management also made the assumption that the cash received from these investments would equal its share of accounting profits (equity income from investments),[494] even though the Company had no ability to control the timing or amount of profits actually distributed as cash by those entities.[495] The evidence

[490] NPP 782 (Exam'rs Rpt.), Annex A, at A-54.
[491] NPP 782 (Exam'rs Rpt.), Vol. II at 63.
[492] NPP 944 (Tuliano Rpt.) at 85-86.
[493] NPP 944 (Tuliano Rpt.) at 85-86; NPP 388 (4/25/07 email from D. Kazan (Tribune) to A. Law (VRC).
[494] NPP 388 (4/25/07 email from D. Kazan (Tribune) to A. Law (VRC)).
[495] NPP 944 (Tuliano Rpt.) at 85-86; 3/18/11 Trial Tr. 75:13-76:7 (Tuliano); see NPP 944 (Tuliano Rpt.) at 136.

shows that this assumption was inconsistent with the Company's prior experience (cash received had been less than accounting profits) and was not a reasonable basis for forecasting cash distributions from non-controlling equity investments in assumed high-growth businesses and ventures.[496]

243.    The cash flow from the Interactive business and equity investments on a combined basis would be up to 31% of total EBITDA in 2012 as compared to 15% in 2007.[497]

244.    The inherent uncertainty associated with the Interactive business and equity investments, and the fact that up to 31% of projected EBITDA would be dependent upon these businesses, confirms the highly speculative and excessively risky nature of the Company's prospects at the time of the LBO and renders unreasonable any reliance on the October 2007 Projections.[498]

245.    A comparison of the October 2007 Projections to other contemporaneously prepared projections further supports finding that the October 2007 Projections were unreasonable at December 20, 2007.  For example, in performing their solvency analysis in November 2007, VRC prepared their own projections for the Company ("VRC Base Case Projections").[499]  The VRC Base Case Projections were lower than the October 2007 Projections during each year of the projection period.[500]  Further, certain other projections, contemporaneously prepared by the Company referred to as "downside" or "stress" cases, did not predict a reversal of the Company's financial decline but instead approximated the Wall Street Consensus Estimates for the Company's financial performance.[501]  This is consistent with

---

[496] NPP 944 (Tuliano Rpt.) at 86.
[497] NPP 944 (Tuliano Rpt.) at 86.
[498] NPP 944 (Tuliano Rpt.) at 86.
[499] NPP 589 (VRC Base Case Projections).
[500] NPP 944 (Tuliano Rpt.) at 87.
[501] NPP 944 (Tuliano Rpt.) at 87.

VRC's comments in a memorandum written in response to valuation questions with regard to its Step Two solvency opinion, that they were informed by the company "that its Downside case was based principally on Wall Street estimates after 2007."[502]

### K. The Evidence Supports A Finding That The LBO Lenders Knew That Step Two Would Render The Company Insolvent

246. The Merger Agreement and Bridge Loan Agreement contained representations providing: "As of the [Step Two] Financing Closing Date, immediately after giving effect to the [Step Two] Transactions, [the Company] is Solvent."[503] One of the conditions to closing was the accuracy of these representations and warranties. In addition, it was an event of default if any representation or warranty was not true as of the date made or deemed made.[504]

247. In connection with VRC's solvency analysis of the Company, the Arrangers prepared a series of detailed questions for which management acted as an intermediary.[505] These questions were particularly focused on VRC's valuation of the S Corp/ESOP tax savings and VRC's assumption that the Company could refinance its borrowed indebtedness in the future.[506]

248. In September 2007, JPMorgan expressed concern over the Company's solvency.

> JPMorgan deal team's DCF and sum-of-the-parts analysis based on revised July projection[s] indicate that the current valuation of Tribune is approximately $[10] to $[13] billion, potentially failing the solvency tests (i.e., debt amount exceeds the value of Borrower).[507]

249. Moreover, the evidence shows that JPMorgan continued to question the Company's solvency right up to December 19, 2007—the night before the scheduled close of Step Two—and that members of JPMorgan senior management determined to proceed with the deal based on their blind faith in Zell, not on the fundamentals of the LBO or the health of the

---

[502] NPP 66 (VRC Tribune – Step 2 Solvency Valuation Questions (VRC0037894)).
[503] NPP 782 (Exam'rs Rpt.), Vol. I at 450.
[504] NPP 782 (Exam'rs Rpt.), Vol. I at 451.
[505] NPP 782 (Exam'rs Rpt.), Vol. I at 503.
[506] NPP 782 (Exam'rs Rpt.), Vol. I at 503-04.
[507] NPP 544 (9/10/07 JPMorgan Tribune Financing Memo (JPM_00504331-32)).

Company.  For example, in a December 18, 2007 email, Jimmy Lee wrote of Zell and his claim

of solvency:  "I know this guy. . . I am 100% confident if he gives his word to me, it will be

done.  I have banked him for over 25 years and his word is gold."[508]  On December 19, 2007,

Lee reported that he "just had a long call with sam.  He could not have been any clearer and

more confident that the company is solvent, no financial issues in year 1 . . . and his reputation

being totally on the line. . . . It was the kind of call we needed to proceed given our concerns. . . .

I told him we were totally banking on him to make this work, and he said 'I don't make

commitments I can't keep."[509]  In an email later the same day to JPMorgan's CEO, Lee reiterated

his support for the LBO based on Zell's personal "commitment" to Lee, and his spin on the deal,

rather than on financial fundamentals:  "Jamie I spoke to sam [Zell] this am to get his

confirmation that the company was solvent and he was going to make good on his commitment

to me to make this deal work. . . . It was an excellent call-he said all the right things."

250.    Similarly after the October 17, 2007 Board meeting, Michael Costa of Merrill

Lynch reported internally "[s]ense mgmt gave impression closing on target mid Nov early

Dec. . . .  Not sure solvency issue got alot [sic] of focus."  The next line of Costa's email asks,

"Todd where are we in thinking thru solvency issue if company's advisor thinks solvent but we

think otherwise?"[510]

### 1.    VRC Was Concerned About The Company's Ability To Refinance Existing Debt Before The Close Of Step Two

251.    The Company's prospective ability to refinance in 2014 and 2015 approximately

$8 billion of debt arising from the LBO was one of four "key assumptions" VRC listed in its

---

[508] NPP 2339 (12/18/2007, 6:33 p.m.).
[509] NPP 2339 (12/19/2007, 10:08 a.m.).  Despite indicating in his email that he had "specific notes and quotes" from his call with Zell, and despite the obviously critical subject matter and timing of that call, Lee denied any recollection of it at his deposition, and testified that he had no memory of having "any call with Mr. Zell concerning the solvency of Tribune ever."  Lee Dep. 97:18-98:9.
[510] NPP 585 (10/17/07 email from M. Costa (Merrill Lynch) to T. Kaplan (Merrill Lynch) *et al.* (ML-TRIB 0403830)).

December 18, 2007 presentation to the Board.[511]  The issue arose because of the large principal repayments Tribune was required to make on the Tranche B Facility and under the Bridge Loan Agreement in 2014 and 2015, and neither the $750 million Revolving Credit Facility nor the cash the Company was projected to have on hand and available for debt repayments in 2014 and 2015 was sufficient to make the scheduled debt repayments.[512]  As Bryan Browning of VRC explained, the Company's ability to refinance following its assumption of the Step Two Financing was essential "in order to continue to operate in a normal fashion."[513]

252.    In its November 30, 2007 internal analysis, VRC addressed the Company's significant cash shortfalls in 2014 and 2015 by noting that: "Term Loan B and Bridge Note are assumed to be refinanced in 2014 and 2015, respectively."[514]  Since this was a critical assumption in its solvency opinion, VRC contacted Tribune for confirmation.

253.    On December 2, 2007, Bigelow sent an email to Donald Grenesko, Tribune's Senior Vice President/Finance and Administration, copying Tribune General Counsel Crane Kenney and Tribune Chief Executive Officer Dennis FitzSimons:

> I just spoke to [Mr. Rucker]. VRC has three issues/concerns that we need to resolve prior to an internal VRC committee meeting scheduled for tomorrow at 1130 am Chicago time. VRC is concerned about refinancing risk with our new debt in 2014. They want us to rep that it is reasonable to assume that we will be able to refinance the new debt in 2014 even in the downside. They would like our rep to indicate that we have conferred [*sic*] with one of our financial advisors and that our advisor concurs with this assumption. . . .
>
> For the first point, I think we need Morgan Stanley. But, to be clear, it is reasonable to assume we can refi in 2014. . . .[515]

[511] NPP 782 (Exam'rs Rpt.), Vol. I at 558.
[512] NPP 782 (Exam'rs Rpt.), Vol. I at 558.
[513] NPP 782 (Exam'rs Rpt.), Vol. I at 559.
[514] NPP 607 (11/30/07 VRC Preliminary Solvency Analysis (VRC0063418)).
[515] NPP 614 (12/2/07 email from C. Kenney (Tribune) to C. Bigelow (Tribune), *et al.*(TRB0448465-66)).

254. VRC wanted a similar representation from Morgan Stanley regarding the refinance assumption. After a telephone call between management and VRC, Bigelow sent the following email to Whayne (Managing Director, Morgan Stanley) on December 2, 2007:

> VRC additional [*sic*] has asked if Morgan Stanley would rep to our ability to refi in 2014. I said I would ask you, but that I doubted it.[516]

255. Whayne responded to Bigelow's email within minutes, writing:

> We will look for precedents, although may be difficult to pull together today. You were correct regarding our inability to rep.[517]

256. Bigelow, Grenesko, and Kenney also called Browning of VRC on December 2, 2007.[518] Browning's notes from that call indicate that: "Tribune talked to Morgan Stanley and they looked at the downside case provided to VRC. MS said that they believe it would be refinanceable at the levels outlined in the downside case and that would be before any assets sales."[519]

257. Browning explained during his sworn interview with the Examiner that: "We had discussions with management about refinancing and where the sources of refinancing would be, generally speaking. Then we also had, during those discussions, . . . I think management said, well, Morgan Stanley has told us that we can refinance at those levels even . . . under the downside scenario, they believed they still could refinance the debt. . . . And then we asked how they knew that or why they thought that, and they said Morgan Stanley has data that would support them being able to do that. And I think it was a number of comparables or a number of transactions that were out there. And we asked if they could provide that information to us, which they did. They provided a schedule of transactions that had high LBO debt."[520]

---

[516] NPP 615 (12/2/07 email from T. Whayne (Morgan Stanley) to C. Bigelow (Tribune), *et al.* (MS_97062)).
[517] NPP 615 (12/2/07 email from T. Whayne (Morgan Stanley) to C. Bigelow (Tribune), *et al.* (MS_97062)).
[518] NPP 782 (Exam'rs Rpt.), Vol. I at 568.
[519] NPP 782 (Exam'rs Rpt.), Vol. I at 569.
[520] NPP 782 (Exam'rs Rpt.), Vol. I at 570.

258. Mose Rucker of VRC also stated that he understood from management "that Morgan Stanley also believed that the debt could be refinanced."[521]

259. Representatives of Morgan Stanley denied that they ever represented that the Company would be able to refinance its debt in 2014. Thomas Whayne, for example, stated "I remember us saying that we are not going to . . . address that" and that Morgan Stanley never made any statement to management regarding the Company's ability to refinance "at any time."[522] Whayne testified that he was "crystal clear" that Morgan Stanley was not making or offering its own assessment that the Company could refinance its debt, or agreeing with the Company's assessment.[523] After conducting an in-person interview of Whayne, the Examiner concluded that he was a credible witness.[524] The Examiner also concluded that Mr. Bigelow and Mr. Grenesko made "false" statements to the Lead Banks and "pushed the envelope beyond what Morgan Stanley had said to them, in order to get past the final major hurdle standing in the way of the Step Two Closing."[525]

260. At a December 4, 2007 Board meeting, Browning, Rucker, and Hughes of VRC "made a comprehensive presentation regarding VRC's solvency analysis and the solvency opinion required to close the [M]erger."[526] As stated above, VRC's December 4, 2007 preliminary Step Two materials set out four predicate "key assumptions" on which VRC's analysis was based, including: (i) "The standards of [Fair Value and Present Fair Saleable Value] used for the solvency of the Step Two Transactions . . . *[has] been modified [to] assum[e] that the buyer would have a structure similar to the structure contemplated in the Step*

[521] NPP 782 (Exam'rs Rpt.), Vol. I at 571.
[522] Exam'rs Sworn Interview of Thomas Whayne, dated July 2, 2010, at 84:13-87:21; NPP 782 (Exam'rs Rpt.), Vol. I at 572-73.
[523] Exam'rs Sworn Interview of Thomas Whayne, dated July 2, 2010, at 94:17-96:20;NPP 782 (Exam'rs Rpt.), Vol. I at 576.
[524] NPP 782 (Exam'rs Rpt.), Vol. II at 50.
[525] NPP 782 (Exam'rs Rpt.), Vol. I at 50.
[526] NPP 782 (Exam'rs Rpt.), Vol. I at 492.

*Two Transactions (an S-Corporation, owned entirely by an ESOP, which receives federal income tax deferrals or another structure resulting in equivalent favorable federal income tax treatment to Tribune)*; (ii) VRC relied on Management's Base Case and Downside Case projections for its opinion; (iii) VRC relied upon achieving S-Corporation/ESOP tax savings for Tribune which are determined using the Base Case forecast; and (iv) *[VRC] assumes that the Company can refinance guaranteed debt after the expiration of the credit agreements.*"[527]

261.     The Company also revised the refinancing representation letter to specifically state that "management believes that it is reasonable and appropriate" for VRC to assume refinancing (whereas the original draft read only that "it is reasonable and appropriate" for VRC to assume refinancing).[528]  The Company's refinancing letter also stated that management's belief that the refinancing assumption was reasonable was "[b]ased on . . . [its] recent discussions with Morgan Stanley. . . ."[529]  Consequently, in VRC's preliminary solvency analysis presented to the Board, VRC assumed "that the Company can refinance guaranteed debt after the expiration of the credit agreements."[530]

262.     Representatives of Morgan Stanley have stated that they told the Company explicitly that it could not rely on Morgan Stanley in making a refinancing assumption, did not know that the Company was representing that it had relied on Morgan Stanley for this purpose, and did not know that the Step Two refinancing representation letter would refer to Morgan

---

[527] NPP 782 (Exam'rs Rpt.), Vol. I at 493 (emphasis added).
[528] NPP 616 (12/2/07 VRC Draft Representation Letter (VRC0179131)).
[529] NPP 611 (12/7/07 Browning Memorandum) at TRB0398562; Exam'rs Sworn Interview of Mose Rucker & Bryan Browning, dated June 30, 2010, at 214:10-215:12; NPP 782 (Exam'rs Rpt.), Vol. I at 585-86 (citing handwritten Notes of representatives of Murray Devine and the LBO Lenders); NPP 650 (JPM Handwritten Notes) at JPM_00499993-96; NPP 1855 (Board Presentation) at ML-TRIB-0009950; NPP 782 (Exam'rs Rpt.), Vol. I at 511-12, 588.
[530] NPP 621 (12/4/07 VRC Draft Preliminary Solvency Analysis).

Stanley.[531]  Whayne testified that had he seen the VRC refinancing representation letter or a draft of it, he would have said "take our name out. You're not allowed to . . . rely on anything that we said for purposes of this relationship that you have with VRC."[532]

## 2. The LBO Lenders Questioned VRC's Solvency Opinion And Sought Alternative Solvency Analysis For Step Two Transaction

263.    After the close of Step One, the LBO Lenders observed significant changes in the financial markets.  In July 2007, James Lee of JPMorgan noted, for example, that JPMorgan was "totally underwater on this underwrite [and] the deal is now underequitized and underpriced."[533] However, the LBO Lenders were contractually bound to fund the Step Two Financing, subject to the satisfaction of the closing conditions, including the solvency closing condition.[534]  As noted by the Examiner, "[g]iven the deteriorations in market conditions and Tribune's performance, and in light of the limiting language in the Credit Agreement's (with respect to the closing of the Incremental Credit Agreement Facility) and the Bridge Credit Agreement's material adverse effect clauses, the solvency requirement was the most logical point for the Arrangers to push if they were trying to avoid closing the Step Two Transactions."[535]

264.    In a September 6, 2007 email, JPMorgan also raised concerns over the Company's ability to refinance its debt maturities and noted that VRC should not be assuming that the markets would be open to the Company in their solvency opinion:

> Please ask the following…Interesting question might be the following –
> for solvevncy [*sic*] opinion, one assumption made that makes it possible to
> satisfy the test of "meeting their obligations as they become due", is that
> the company can refinance its maturities (presumably including the
> existing bonds that mature in 2008-2010.), but if we were to fund the

---

[531] Exam'rs Sworn Interview of Thomas Whayne, dated July 2, 2010, at 107:22-109:10; NPP 782 (Exam'rs Rpt.), Vol. I at 578.
[532] NPP 782 (Exam'rs Rpt.), Vol. I at 578.
[533] NPP 513 (7/26/07 email from R. Kapadia (JPMorgan) to D. Jacobson (JPMorgan), et al. at JPM_00269776; NPP 782 (Exam'rs Rpt.), Vol. I at 594.
[534] NPP 782 (Exam'rs Rpt.), Vol. I at 601.
[535] NPP 782 (Exam'rs Rpt.), Vol. I at 603.

second step commitments, one would then reasonably have to assume that the company would not have access to capital markets to refinance these, except perhaps at extreme coupons, that would likely result in the company not be[ing] able to cover the interest. Can we contact solvency firm to let them know they should not be assuming markets would be open to Trib to refi their maturities?[536]

265.     Following the December 4, 2007 Board presentation, the LBO Lenders asked why VRC assumed that the Company would be able to refinance its debt as they came due.[537] On December 7, 2007, VRC responded:

VRC has assumed that the Company will be able to refinance its debts as they become due. This assumption is based upon a review of the forecasted total debt and guaranteed debt leverage ratios at the time of the required refinancing, recent leveraged debt multiples, and representation from the Company which states that based upon recent discussions with Morgan Stanley, the Company would be able to refinance debt in its downside forecasts without the need for additional asset sales.[538]

266.     The LBO Lenders responded to VRC's December 7, 2007 memorandum with additional questions on the refinancing representation:

Reference is made to VRC's answer to Question 18 in the Response in which VRC indicates that it is relying, in part, on a representation from Tribune which states that based upon recent discussions with Morgan Stanley, the Company would be able to refinance debt in its downside forecasts without the need for additional assets sales. Did VRC meet with someone from Morgan Stanley and does VRC know whether Morgan Stanley understands that Tribune is relying upon its view? Did VRC discuss this assumption with other financial institutions? To what extent did VRC consider current market conditions relevant to this analysis?[539]

267.     Verbal responses were given during a December 17, 2007 conference call with the LBO Lenders.[540]  Contemporaneous notes taken during that call indicate that management represented that "Co. has used Morgan Stanley as solvency [advisor]. Mgt. believes company is solvent & can service debt," "…Morgan Stanley to review solvency," "'MS assumptions &

---

[536] NPP 540 (9/6/07 email from D. Jacobson (JPMorgan) to R. Kapadia (JPMorgan), *et al.* (JPM_00335870)).
[537] NPP 611 (12/7/07 memorandum from B. Browning & M. Rucker to C. Bigelow (TRB0398562)).
[538] NPP 611 (12/7/07 memorandum from B. Browning & M. Rucker to C. Bigelow (TRB0398562)).
[539] NPP 782 (Exam'rs Rpt.), Vol. I at 584.
[540] NPP 782 (Exam'rs Rpt.), Vol. I at 585.

recommendations fair & reasonable in light of fairness opinion;'" and "Fair and reasonable\—
MS believes this as well."[541]

268.     Whayne had no recollection of ever being invited to the December 17, 2007
conference call, and was not aware at that time that such a conference call or meeting was going
to take place.[542]

269.     Not satisfied by VRC's response regarding the refinance assumption, and
apprehensive about closing Step Two in light of the Company's declining performance, the LBO
Lenders also sought an alternative solvency analysis from another party in an apparent effort to
assess whether they should proceed with the LBO.[543]

270.     As explained by Crane Kenney, the General Counsel for Tribune, Tribune was
aware that the LBO Lenders were seeking an alternative solvency analysis in an effort to avoid
their commitment to provide additional funding:

> [O]nce you had the banks committed and locked up and Sam committed
> and locked up and the tender finished, from there to the finish line . . . it
> should have been procedural and would have been procedural I think until
> the banks started getting nervous about the commitments they had made. .
> . .The solvency opinion became this issue because the banks I think
> probably reviewed the credit agreement and said: "This thing's ironclad.
> The only hope we have that we don't have to fund these loans that we no
> longer want to fund . . ." [is to]  . . . take a shot at . . . solvency. . . . I think
> they were trying to get out of their obligations by trying to squeeze the
> solvency certificate.[544]

271.     In October 2007, the Arrangers jointly had engaged Murray Devine, a valuation
advisory firm, to assist in the Arrangers' due diligence concerning the Company's solvency.[545]

---

[541] NPP 782 (Exam'rs Rpt.), Vol. I at 585-86.

[542] NPP 782 (Exam'rs Rpt.), Vol. I at 586.

[543] *See* Exam'rs Sworn Interview of Crane Kenney, July 8, 2010, at 61:1-62:9.

[544] Exam'rs Sworn Interview of Crane Kenney, July 8, 2010, at 72:5-74:1.

[545] *See* NPP 1587 (Murray Devine Indemnification Agreement, dated October 1, 2007); NPP 782 (Exam'rs Rpt.),
Vol. I at 607.

272.     On December 12, 2007, Citigroup also approached Houlihan about a possible solvency-related engagement that, to at least one individual at Houlihan, "smell[ed] like divorce work."[546]  Specifically, on December 12, 2007, Ben Buettell of Houlihan sent an email stating that one of his colleagues received a telephone call from Citigroup's North American General Counsel:

> She was calling to see if we could be helpful in assessing the solvency of Tribune Company. . . . The good news is that we would not be hired to deliver a solvency opinion, but if we end up where I think we all know we would end up with our analysis, we may be the ones to "kill the deal" so to speak and not certain we want to be involved in that mess.[547]

273.     On December 13, 2007, Buettell of Houlihan sent an email to Citigroup's North American General Counsel:

> Had a brief call with a few of my senior partners. A few questions: 1) what happens if we all conclude that the company is not solvent, what does the bank group do between now and December 20th? Are all of the terms and pricing set on the loan? Do you have any sense about what the other three banks have been discussing with [Tribune]?[548]

274.     There is also substantial evidence that the LBO Lenders also generated their own valuation analyses, which in many cases showed that the Company was insolvent.  Between December 10, 2007 and December 18, 2007, for example, JPMorgan prepared valuation analyses which calculated the Company's net equity value under a range of "stress," "low," "mid," and "high" valuations, and which showed that the Company would be insolvent in a "stress" case.[549] Several of these JPMorgan valuation analyses also showed that the Company would be insolvent in a "low" case.[550]  Merrill Lynch also prepared several financial analyses, including three analyses dated December 16, 2007 which each showed insolvency in the "low" and "mid"

[546] NPP 627 (12/12/07 email from S. Beiser (Houlihan) to B. Buettell (Houlihan), *et al.* (HLHZ_Tribune001196)).
[547] NPP 632 (12/12/07 email from B. Buettell (Houlihan) to J. Werbalowsky (Houlihan), *et al.* (HLHZ_Tribune001164)).
[548] NPP 638 (12/13/07 email from B. Buettell (Houlihan) to K. Kirchen (Citi) (HLHZ_Tribune001190-91)).
[549] NPP 782 (Exam'rs Rpt.), Vol. I at 621-23.
[550] NPP 782 (Exam'rs Rpt.), Vol. I at 621-23.

cases.[551]  Similarly, Citigroup prepared several valuation analyses which showed insolvency

when using either "Citigroup Projections" (which were substantially more negative than

management's downside case projections) or the Company's management's downside

scenario.[552]

276.   In addition, the evidence shows that the LBO Lenders had great difficulty in

syndicating the Company's Step Two Financing.[553]  One potential Tribune investor went so far

as telling JPMorgan that the April 2007 syndication memorandum was "misleading" in its

description of Step Two loan funding and debt ratios.[554]

### 3.    The LBO Lenders Contemplated Whether Or Not To Finance Step Two

276.   The evidence suggests that the LBO Lenders contemplated whether or not to

proceed with Step Two, including just days before the closing.  On December 14, 2007, for

example, Bank of America banker Daniel Petrik took the following notes of the LBO Lenders'

conference call, suggesting that the lenders were questioning whether to fund Step Two:

> JPM – Not 100% final but leaning
> Going ahead and funding
> Risk greater if do not fund
>
> MRL – Not 100% but leaning to Not fund
> - Reasonable that not a solvent company
> - Not planning on being lone wolf
>
> Citi – Numerous & Not Significant to not fund
> - More risk if end up in Bk
> - Focus on understanding risk of not funding
> - Not yet landed—
>
> . . . If in good faith—good defense[555]

---

[551] NPP 782 (Exam'rs Rpt.), Vol. I at 626-27.
[552] NPP 782 (Exam'rs Rpt.), Vol. I at 630-31.
[553] NPP 782 (Exam'rs Rpt.), Vol. I at 594-95; 667-68.
[554] NPP 2340 (12/19/07 email from M. Friedland to R. Kapadia forwarding email from A. Mark).
[555] NPP 647 (Petrik Handwritten Notes dated December 14, 2007 (BOA-TRB-0001201A)).

277. Concerned about the LBO Lenders not funding Step Two, Tribune sought outside counsel regarding recourse against the LBO Lenders if they did not provide financing. According to Kenney (General Counsel, Tribune):

> I remember telling my CEO I want to hire yet another law firm specifically to make sure if [the Arrangers] breach our commitment we have recourse. That was Quinn Emanuel.[556]

278. On December 19, 2007, JPMorgan was still questioning the Company's solvency, and moved forward with the deal based on personal assurances from Zell to his long-time friends among JPMorgan senior management, rather than on a reasoned assessment of the Company's financial condition and the LBO.[557]

### L.      Step Two Closes On December 20, 2007

279. On December 20, 2007, the Company closed Step Two of the LBO and Tribune repurchased the remaining 119 million shares of its common stock outstanding at a purchase price of $34 per share.[558] Tribune took on another $3.7 billion of debt at Step Two in order to fund the repurchase.[559] As part of Step Two, EGI sold 1,470,588 shares of Tribune stock for $50 million in value, and received over $206 million in value for the initial EGI-TRB LLC Note (the "Redeemed EGI Note"). The Redeemed EGI Note was redeemed by Tribune for the same amount that EGI would have received if the Redeemed EGI Note had been exchanged for stock and then cashed out at $34/share as part of the completion of the LBO.

280. The Zell entity also purchased from the Company a $225 million subordinated note and a $90 million warrant to purchase approximately 40% of fully diluted equity of Tribune

---

[556] Exam'rs Sworn Interview of Crane Kenney, July 8, 2010, at 16:22-17:3.
[557] NPP 662 (12/19/07 email from J. Lee (JPMorgan) to J. Dimon (JPMorgan) (JPM-00499869-870)).
[558] NPP 672 (Tribune 2007 Form 10-K) at 3, 46-47.
[559] The amount of the bridge loan per the Bridge Loan Agreement was $2.1 billion. However, Tribune ultimately borrowed $1.6 billion in Bridge Loan Financing. NPP 672 (Tribune 2007 Form 10-K) at 48-49.

at a later date, bringing Zell's total investment to $315 million.[560]  The warrant was for a term of 15 years and specified a maximum purchase price of $13.80 per share.  As a result of the LBO, Tribune became a private company, wholly-owned by the ESOP.  Zell subsequently became Chairman of the Board and Tribune's President and Chief Executive Officer.

281.    For a total investment of $315 million, Zell received control of a media conglomerate with more than $5 billion in revenue, and a warrant to purchase 40% of Tribune's common stock at maximum price per share of $13.80.  Fees and expenses paid to various lenders and advisors at the closing of both Step One and Step Two amounted to approximately $281 million.[561]

282.    In connection with the Step Two closing, VRC issued a December 20, 2007 solvency opinion which concluded that "[i]mmediately after and giving effect to the consummation of the Step Two Transactions each of the Fair Value and Present Fair Saleable Value of the aggregate assets (including goodwill) of Tribune will exceed its liabilities (including Stated Liabilities, the Identified Contingent Liabilities and the New Financing); As of the date hereof, immediately after and giving effect to the consummation of the Step Two Transactions, Tribune will be able to pay its debts (including the Stated Liabilities, the Identified Contingent Liabilities and the New Financing), as such debts mature or otherwise become absolute or due; and As of the date hereof, immediately after and giving effect to the consummation of the Step Two Transactions, Tribune Does Not Have Unreasonably Small Capital."[562]  VRC's Step Two solvency opinion explicitly relied on the following representations of management:

---

[560] NPP 672 (Tribune 2007 Form 10-K) at 3.
[561] NPP 782 (Exam'rs Rpt.), Vol. I at 208-210, 461-461; NPP  739 (12/09 Lazard Discussion Materials presentation) at JPM_00511373 & JPM_00511374.
[562] NPP 782 (Exam'rs Rpt.), Vol. I at 511.

- The provided financial forecasts of Tribune, on a consolidated and pro-forma basis . . . reflect Management's best estimates of Tribune Base and Tribune Downside case forecasts. . . . While such forecasts are subject to many factors outside Management's control, in Management's view they are reasonable and attainable based on Management's involvement and understanding of the business operations, its markets, the strategic vision, the competitive landscape, and regulatory and economic trends.[563]

- [I]n Management's view the Company's annual tax savings as an S-Corp ESOP as reflected in the Base Case Forecast, the Management Five-Year Extrapolation, and VRC Extrapolation are reasonable and attainable by the Company based on Management's understanding of the existing income tax laws governing S-Corp. ESOP's, the Company's current business operations, strategic vision and competitive and regulatory landscape, and the growth rates and underlying assumptions utilized (i) by Management in developing the Base Case Forecast and the Management Five-Year Extrapolation and (ii) by VRC in developing the VRC Extrapolation.[564]

- Based upon (i) management's best understanding of the debt and loan capital markets and (ii) management's recent discussions with Morgan Stanley, management believes that it is reasonable and appropriate for VRC to assume that Tribune, in the downside forecast . . . delivered to VRC via email on November 21, 2007 ("Tribune Downside Forecast"), would be able to refinance (i) any outstanding balances of Term Loan B under the Credit Agreement dated May 17, 2007, as amended (the "Credit Agreement"), that mature in 2014 and (ii) any outstanding balances under the Senior Unsecured Interim Loan Agreement to be dated as of the closing date (or any notes issued to refinance such facility) that mature in 2015, in each case, without the need for any asset sales other than those incorporated into the Tribune Downside Forecast.[565]

- The book value of the [PHONES Notes] as reported in the Company's Form 10-Q for the quarter ended September 30, 2007 is a reasonable estimate of the Company's liability associated with the PHONES as of [December 20, 2007].[566]

283.    In connection with its December 20, 2007 analysis, VRC established a range of post-Step Two Closing Date equity values for Tribune of between $931.6 million and $2.623 billion, and concluded that just prior to the closing of Step Two, Tribune's common stock would have ranged in value between $32.60 and $46.00 per share.[567]  As noted by the Examiner, VRC, in effect, concluded that Tribune common stock would be worth more at the mid-point, $39.30 per share, than the $34 per share tender offer price, despite the secular declines in the value of

---

[563] NPP 782 (Exam'rs Rpt.), Vol. I at 509-10.
[564] NPP 782 (Exam'rs Rpt.), Vol. I at 511.
[565] NPP 782 (Exam'rs Rpt.), Vol. I at 511-12.
[566] NPP 782 (Exam'rs Rpt.), Vol. I at 512.
[567] NPP 782 (Exam'rs Rpt.), Vol. I at 513.

identified cohort companies throughout 2007.[568]  This was also well-above the trading value of Tribune's stock in the late fall of 2007 and significantly higher than contemporaneous valuations prepared by the Company's financial advisors.[569]

**M.** **Step Two Rendered The Company Balance Sheet Insolvent As Of December 20, 2007**

**1.** **Base Case Projections For Assessing Solvency As Of December 20, 2007**

284.     Tuliano concluded that the Company knew or should have known that the October 2007 Projections were unreasonable as of the close of Step Two.[570]  The projected EBITDA growth rate reflected in the October 2007 Projections (4.1% CAGR) significantly outpaced the growth rate reflected in the February 2007 Projections (2.4% CAGR), despite the fact that in late 2007, various analysts considered the Company's growth prospects to be limited.[571]

285.     The Company's management could and should have updated the October 2007 Projections to reflect actual results through November 2007 prior to the close of Step Two. Based upon actual results through November 2007, Tuliano estimated EBITDA to be approximately $1.14 billion (inclusive of the Chicago Cubs and SCNI) for the 2007 plan year.[572] Tuliano then subtracted the estimated EBITDA for 2007 related to the Chicago Cubs and SCNI and applied the annual growth rates reflected in the February 2007 Management Plan to arrive at revised projections for the years 2008-2012 (the "Step Two Adjusted Projections").[573]  The Step Two Adjusted Projections reflected a compound annual growth rate of 2.2%, as compared to the 4.1% growth rate reflected in the October 2007 Projections.

---

[568] NPP 782 (Exam'rs Rpt.), Vol. I at 513-14.
[569] NPP 782 (Exam'rs Rpt.), Vol. I at 11, 110
[570] NPP 944 (Tuliano Rpt.) at 87.
[571] NPP 944 (Tuliano Rpt.) at 87.
[572] NPP 944 (Tuliano Rpt.) at 88.
[573] NPP 944 (Tuliano Rpt.) at 88.

## 2. Balance Sheet Solvency

286. Tuliano's application of widely-accepted valuation techniques for the Company shows that the Company's total liabilities exceeded its assets as of the Step Two Closing Date, leading to a conclusion of balance sheet insolvency as of December 20, 2007.[574] This conclusion holds regardless of whether the Step Two Adjusted Projections, the Examiner Adjusted Base Case Projections or the October 2007 Projections are used.[575]

287. In conducting this analysis, Tuliano did not apply a discount to the average multiple of the guideline company set, even though the Company's performance was consistently below the average/median of the guideline companies with respect to growth and profitability.[576] Tuliano also did not apply a control premium in his application of the Guideline Publicly Traded Company Method for the Company.[577]

288. Tuliano applied a 33% weighting to the Market Approach, and a 67% weighting to the Income Approach, resulting in a conclusion that the Company's debt and contingent liabilities exceeded the fair market value of its assets by $3.320 billion.[578]

---

[574] 3/18/11 Trial Tr. 23:2-12.
[575] NPP 944 (Tuliano Rpt.) at 136-139.
[576] NPP 944 (Tuliano Rpt.) at 133-134.
[577] NPP 944 (Tuliano Rpt.) at 134.
[578] 3/18/11 Trial Tr. 55:17-56:20; 65:6-11; NPP 944 (Tuliano Rpt.) at 137.

**Summary of Balance Sheet Test as of December 20, 2007**
*($ in Millions)*

| Approach | Indicated Value of Invested Capital | Weighting | Weighted Value |
|---|---|---|---|
| *Income Approach* | | | |
| Discounted Cash Flow Method | $ 9,920 | 67% | $ 6,613 |
| | | | |
| *Market Approach* | | | |
| Guideline Publicly Traded Company Method | 11,470 | 33% | 3,823 |
| Fair Market Value of Invested Capital - Conclusion | | | $ 10,437 |
| Less: Debt & Contingent Liabilities | | | (13,757) |
| Fair Market Value Surplus / (Deficit) - Conclusion | | | ($3,320) |
| Balance Sheet Test - Result | | | FAIL |

289.    Tuliano conducted the same analysis using the Examiner Adjusted Base Case Projections and the October 2007 Projections.  His analysis using the Examiner Adjusted Base Case Projections shows that the Company was insolvent at Step Two by $3.257 billion.[579]  His analysis using the October 2007 Projections shows that the Company was insolvent at Step Two close by $2.917 billion.[580]

290.    Summary of Balance Sheet Test as of December 20, 2007

---

[579] NPP 944 (Tuliano Rpt.) at 138.
[580] 3/18/11 Trial Tr. 66:3-11; NPP 944 (Tuliano Rpt.) at 139.

| Approach | Indicated Value of Invested Capital | Weighting | Weighted Value |
|---|---|---|---|
| *Income Approach* | | | |
| Discounted Cash Flow Method | $ 10,060 | 67% | $ 6,707 |
| *Market Approach* | | | |
| Guideline Publicly Traded Company Method | 11,380 | 33% | 3,793 |
| Fair Market Value of Invested Capital - Conclusion | | | $ 10,500 |
| Less: Debt & Contingent Liabilities | | | (13,757) |
| Fair Market Value Surplus / (Deficit) - Conclusion | | | **($3,257)** |
| **Balance Sheet Test - Result** | | | **FAIL** |

Summary of Balance Sheet Test as of December 20, 2007

**October 2007 Projections**
*($ in Millions)*

| Approach | Indicated Value of Invested Capital | Weighting | Weighted Value |
|---|---|---|---|
| *Income Approach* | | | |
| Discounted Cash Flow Method | $ 10,520 | 67% | $ 7,013 |
| *Market Approach* | | | |
| Guideline Publicly Traded Company Method | 11,480 | 33% | 3,827 |
| Fair Market Value of Invested Capital - Conclusion | | | $ 10,840 |
| Less: Debt & Contingent Liabilities | | | (13,757) |
| Fair Market Value Surplus / (Deficit) - Conclusion | | | **($2,917)** |
| **Balance Sheet Test - Result** | | | **FAIL** |

291.     Finally, Tuliano also conducted a balance sheet solvency analysis of Tribune's subsidiaries, which shows that the liabilities of Tribune's subsidiaries exceeded their assets by $848 million at Step Two close.[581]

292.     Fischel admitted that the Company was "borderline solvent in December,"[582] conceding that Step Two solvency is "a very close call."[583]  Fischel's analysis shows that the Company was insolvent by as much as $82 million at the low end of his range when using the average of a compilation of third-party base cases projections at Step Two.[584]  However, Fischel's analysis of the Company's balance sheet solvency at Step Two close suffers from the same deficiencies as his Step One analysis.  When Fischel's mistakes are corrected at the closing of Step Two, the Company is balance sheet insolvent by approximately $3.1 billion using management's projections, and by approximately $3.2 billion using Average Third Party Base Case Projections.[585]

293.     The DCL Plan Proponents' other expert witness, Black, also conceded that the Company was rendered insolvent by Step Two irrespective of the likely outcome respecting Step One.[586]

**N.     The Evidence Supports A Finding That The Company Was Left With Unreasonably Small Capital And Assets To Fund Its Business And Was Left Unable To Pay Its Debts As Due As Of December 20, 2007**

294.     Tuliano also analyzed whether Step Two left the Company with unreasonably small capital (or assets) to fund its business and/or was left unable to pay its debts as due.[587]  In conducting this assessment, Tuliano performed detailed analyses of (1) the Company's capital

---

[581] 3/18/11 Trial Tr. 66:17-67:18 (Tuliano); NPP 944 (Tuliano Rpt.) at 165 and Ex. VIII.
[582] 3/10/11 Trial Tr. 91:25-92:17, 128:2-129:10 (Fischel); DCL 1106 (Fischel Rpt.) at Ex. Z.
[583] DCL 1106 (Fischel Rpt.) at  Ex. W.
[584] DCL 1106 (Fischel Rpt.) at  Ex. W.
[585] NPP 955 (Tuliano Rebuttal Rpt.) at 25.
[586] *See* 3/9/11 Trial Tr. 108:1-12 (Black); DCL 1103 (Black Rpt.) at 42, 131.
[587] 3/18/11 Trial Tr. 67:19-71-4; NPP 944 (Tuliano Rpt.) at 9, 139.

structure and liquidity before and after the LBO, (2) various Company specific financial projections, including certain stress and sensitivity cases, for reasonableness, (3) the Company's ability to service its debt from operating cash flow and/or other sources of cash, including potential refinancing, after the LBO, and (4) the Company's ability to withstand a range of reasonably foreseeable downturns, stresses and contingencies over the projection period.[588]

295.     Tuliano concluded that, as a result of the LBO, the Company was excessively leveraged, with the resulting capital structure exceeding any reasonable measure of debt capacity.[589]  Tuliano reached this conclusion by benchmarking the following ratios: (i) Debt to EBITDA; (ii) Debt to Equity (Book Value); (iii) EBITDA to Interest Expense; and (iv) EBITDA less Capital Expenditures divided by Interest Expense.[590]

296.     Tuliano's analysis showed that, following Step Two, the Company was excessively leveraged compared with its peers, including a debt-to-EBITDA ratio that was nearly double that of the Company's closest peer company and more than eight times higher than the average of companies comparable.[591]  Additionally, following consummation of Step Two, the Company was the only company among its peers that had a negative debt-to-equity ratio, and also had the lowest interest coverage ratio among its peers, regardless of whether capital expenditures were included in the calculation.[592]

297.     Tuliano also concluded that the Company's debt service and operating requirements outstripped its ability to produce sufficient cash flows generated from operations, leaving it dependent upon its credit lines and uncertain asset sales to fund its business, and that, even considering these sources of cash, the Company was left with insufficient capital resources

---

[588] *See* 3/18/11 Trial Tr. 69:7-18; NPP 944 (Tuliano Rpt.) at 9, 139.
[589] NPP 944 (Tuliano Rpt.) at 139.
[590] NPP 944 (Tuliano Rpt.) at 140-141.
[591] NPP 944 (Tuliano Rpt.) at 139-144.
[592] NPP 944 (Tuliano Rpt.) at 141-148.

to fund its operations and service its debt while maintaining an adequate cushion for reasonably foreseeable stresses, downturns and contingencies.  Tuliano also found that (i) the LBO left the Company with insufficient liquidity relative to the level of debt incurred in the LBO; (ii) the LBO was expressly dependent upon the Company's ability to meet the October 2007 Projections, which were unreasonable given information that was known or knowable at the time; and (iii) the balance sheet test, in and of itself, provides compelling evidence to conclude that the Company was inadequately capitalized as a result of the LBO, since it lacked sufficient value in its assets to satisfy its debts over the long term.[593]

298.    Tuliano considered four downside cases in his capital adequacy analysis at Step Two close:  (i) the Examiner Stress Case, (ii) the VRC Downside Case, (iii) the Citi Downside Case (a sensitivity case prepared by Citibank as part of their review of management's revised October projections), and (iv) the Step Two Adjusted Projections with a 15% downside sensitivity.[594]  These four cases were higher than several other contemporaneous downside cases prepared by the Company's advisors and market participants.[595]  Tuliano calculated free cash flow from operations available for debt service under each scenario, measuring the Company's ability to generate cash to meet its debt service obligations and reinvest in its operations.[596]  Any residual cash flow, if positive, was evaluated to assess whether or not it was sufficient to provide for other items, such as reasonably foreseeable stresses and contingencies.[597]

299.    A detailed examination of the four downside scenarios demonstrates that the Company was left with unreasonably small capital as a result of the LBO.  Tuliano's analysis

---

[593] NPP 944 (Tuliano Rpt.) at 140; NPP 2478 (Tuliano Trial Demonstratives) at 38.
[594] *See* 3/18/11 Trial Tr. 69:7-18; NPP 944 (Tuliano Rpt.) at 139.
[595] 3/18/11 Trial Tr. 79:18-23, 80:8-10 (Tuliano); NPP 944 (Tuliano Rpt.) at 157.
[596] NPP 944 (Tuliano Rpt.) at 152.
[597] NPP 944 (Tuliano Rpt.) at 152.

indicates that free cash flow from operations[598] was insufficient to meet debt service obligations in all four downside cases described above on a cumulative basis over the five year projection period as well as the October 2007 Projections, the Examiner Adjusted Base Case Projections, and the Step Two Adjusted Projections.[599]

300.    Specifically, during the period from January 1, 2008 through December 31, 2012, the October 2007 Projections resulted in $5.3 billion of free cash flow from operations before debt service.[600]  In comparison, debt service obligations[601] during this same time period totaled $6.7 billion.[602]  As such, projected free cash flow from operations over the entire time period fell short of debt service obligations by $1.4 billion.[603]

301.    Using the Step Two Adjusted Projections as a more reasonable baseline, this disparity was even wider, with free cash flow from operations falling $1.6 billion short of debt service.[604]  Using the Examiner Adjusted Base Case Projections free cash flow from operations fell short of debt service by $1.5 billion.[605]  In the four downside scenarios, the gap between free cash flow from operations and debt service grows even further, with principal and interest payments from January 1, 2008 through December 31, 2012 exceeding total free cash flow from operations by a range of $2.6 billion to $3.0 billion.[606]

302.    In addition, even including assets sales, equity investment distributions, and unused available credit lines, all of the four downside scenarios tested fail to generate sufficient

---

[598] Free cash flow from operations referenced here equals EBITDA less capital expenditures, capital investments, cash taxes and changes in working capital. Free cash flow from operations excludes income from equity investments and asset sales (non-operating items).
[599] 3/18/11 Trial Tr. 77:6-25, 80:11-81:24; NPP 944 (Tuliano Rpt.) at 155.
[600] NPP 944 (Tuliano Rpt.) at 155.
[601] Debt service obligations include: interest, principal, and other financing obligations.
[602] NPP 944 (Tuliano Rpt.) at 155.
[603] 3/18/11 Trial Tr 205:22-206:4 (Tuliano); NPP 944 (Tuliano Rpt.) at 155; NPP 2478 (Tuliano Demonstrative) at 36.
[604] See 3/18/11 Trial Tr. 80:8-81:24; NPP 944 (Tuliano Rpt.) at 155; NPP 2478 (Tuliano Demonstrative) at 36.
[605] NPP 944 (Tuliano Rpt.) at 155; NPP 2478 (Tuliano Demonstrative) at 36.
[606] NPP 944 (Tuliano Rpt.) at 155; NPP 2478 (Tuliano Demonstrative) at 37.

cash flow to service debt and adequately provide for reasonably foreseeable stresses and contingencies.[607]  Specifically, Tribune was unable to repay the $450 million in 4.875% Senior Notes due August 15, 2010 under each of the sensitivity cases tested, even assuming the sale of assets, equity investment distributions and use of the revolver.[608]  Similarly, the Company failed to generate sufficient cash flow to service debt and adequately provide for reasonably foreseeable stresses and contingencies over the five year projection period.[609]

303.    Tuliano also considered the potential for the Company to obtain other non-operating sources of cash, including refinancing, equity and asset sales.[610]  He concluded that given the Company's excessive leverage and deepening insolvency, it would not be reasonable to assume that the Company would be able to refinance its $2.4 billion[611] in debt maturing within the first three years after the LBO and the looming $9.0 billion balloon payments due in 2014, and that there is no reasonable expectation that the Company would be able to raise additional equity capital, including additional equity from Zell.[612]  Also, given that the Tribune was wholly-owned by an ESOP and Zell had a warrant to acquire 40% of Tribune's common stock, the ability of the Company to raise additional equity financing is unrealistic.[613]

304.    Tuliano also concluded the sale of non-core assets was unreliable given the Company's tax structure and provisions of the Senior Loan Agreement.[614]

---

[607] 3/18/11 Trial Tr. 68:8-17; 77:6-16; 81:12-19; 249:1-13 (Tuliano); NPP 944 (Tuliano Rpt.) at 156.
[608] NPP 944 (Tuliano Rpt.) at 156.
[609] 3/18/11 Trial Tr. 74:4-21 (Tuliano); NPP 944 (Tuliano Rpt.) at 156.
[610] 3/18/11 Trial Tr. 70:8-16 (Tuliano)NPP 944 (Tuliano Rpt.) at 159.
[611] NPP 944 (Tuliano Rpt.) at 159; 3/18/11 Trial Tr. 213:10-15 (Tuliano).  Excludes Tranche X prepayment of $100 million in June 2007 and includes $263 million Medium-Term Notes expiring 2008.
[612] NPP 944 (Tuliano Rpt.) at 159-160.  Excludes Tranche X prepayment of $100 million in June 2007 and includes $263 million Medium-Term Notes expiring 2008.
[613] NPP 944 (Tuliano Rpt.) at 160.  Excludes Tranche X prepayment of $100 million in June 2007 and includes $263 million Medium-Term Notes expiring 2008.
[614] NPP 944 (Tuliano Rpt.) at 160; 3/18/11 Trial Tr. 76:23-77:5 (Tuliano). Excludes Tranche X prepayment of $100 million in June 2007 and includes $263 million Medium-Term Notes expiring 2008.

1. **Market Evidence Supports A Finding That The Company Was Left With Unreasonably Small Capital And Assets To Fund Its Business And Was Left Unable To Pay Its Debts As Due As Of December 20, 2007**

305.     The evidence shows that, consistent with Tuliano's conclusions, the marketplace provided strong indications that it considered the Company to be overleveraged, undercapitalized and at significant risk of being unable to meet its obligations.

306.     S&P, Moody's and Fitch each downgraded Tribune's corporate credit rating immediately preceding the closing of Step Two on December 20, 2007.  All three ratings agencies cited the significant increase in leverage associated with the LBO, among other deteriorating indicators.[615]

307.     Subsequent to Step Two, S&P, Moody's and Fitch again downgraded Tribune's corporate credit rating.[616]

**Table 36: Summary of Tribune Corporate Rating**
*Tribune's Corporate Ratings Were Downgraded by Rating Agencies*

**Standard & Poor's**

| Date | Rating | Rating Classification | Action |
|---|---|---|---|
| 04/02/07 | BB- | Non-investment grade speculative | Downgrade |
| 08/20/07 | B+ | Highly speculative | Downgrade |
| 12/20/07 | B | Highly speculative | Downgrade |
| 03/17/08 | B- | Highly speculative | Downgrade |
| 11/11/08 | CCC | Substantial credit risk | Downgrade |
| 12/09/08 | D | Payment Default | Downgrade |

**Moody's**

| Date | Rating | Rating Classification | Action |
|---|---|---|---|
| 04/23/07 | Ba3 | Non-investment grade speculative | Downgrade |
| 11/29/07 | B1 | Highly speculative | Downgrade |
| 12/18/07 | B3 | Highly speculative | Downgrade |
| 07/23/08 | Caa2 | Substantial credit risk | Downgrade |
| 12/08/08 | Ca | Payment Default | Downgrade |

**Fitch**

| Date | Rating | Rating Classification | Action |
|---|---|---|---|
| 04/02/07 | BB- | Non-investment grade speculative | Downgrade |
| 05/03/07 | B+ | Highly speculative | Downgrade |
| 12/20/07 | B- | Highly speculative | Downgrade |
| 08/22/08 | CCC | Substantial credit risk | Downgrade |
| 12/08/08 | D | Payment Default | Downgrade |

*Sources: Standard & Poor's; Moody's; Fitch Ratings; Bloomberg.*

---

[615] NPP 663 (Moody's Investors Service, Credit Opinion: Tribune Company, December 19, 2007).
[616] NPP 944 (Tuliano Rpt.) at 150.

308.   These ratings downgrades by S&P, Moody's, and Fitch reflect the rating

agencies' assessment of the Company's increase in the risk of default and higher credit risk.[617]

309.   The evidence also shows that the credit concerns of the major credit rating

agencies were echoed by the broader marketplace as indicated by trading prices.[618]  The

Company's bank debt traded below par after Step One and even lower after Step Two.[619]  In

addition, the price for loan credit default swaps on the Company's debt increased significantly

after the closing of Step One and just prior to Step Two.[620]



**Figure 41: Trading Prices for Credit Default Swaps**
*Declining Trading Prices Reflected Tribune's Increased Risk of Default*

*Source: Bloomberg; Industry Composite includes E.W. Scripps Co., Belo Corp., and Gannett Company Inc.*

310.   The market prices for the Company's bank debt and related credit support

evidenced decreasing confidence in the Company's ability to support its significantly increased

[617] NPP 944 (Tuliano Rpt.) at 150.
[618] NPP 944 (Tuliano Rpt.) at 150.
[619] NPP 944 (Tuliano Rpt.) at 150.
[620] NPP 944 (Tuliano Rpt.) at 150.

debt burden.[621]  The views expressed by ratings agencies, debt holders and others in the marketplace were strongly indicative of the inherent risks created by the Company's excessive leverage and increased default risk as a result of the LBO.[622]

311.  Based on his analysis, Tuliano concluded that as a result of the LBO, as of December 20, 2007, the Company was left with unreasonably small capital (or assets) to operate its business and was left unable to pay its debts as such debts matured.[623]

> ### 2. Fischel's Analysis Supports A Finding That The Company Was Left With Unreasonably Small Capital And Assets To Fund Its Business And Was Left Unable To Pay its Debts As Due As of December 20, 2007

312.  Fischel's capital adequacy/ability to pay analysis also shows that the Company was inadequately capitalized and unable to pay its debts as due at Step Two.  Specifically, Fischel concluded that, based on an average of contemporaneous downside projections prepared as of December 20, 2007, the Company was projected to have *negative* $5 million in liquidity by 2012.[624]  However, as with his Step One analysis, Fischel assumed that the Company could nonetheless meet its debt obligations by raising liquidity and reducing expenses.[625]

## O.  Step Two Conclusion

313.  In summary, substantial evidence was presented by the Noteholder Plan Proponents that the Company was balance sheet insolvent, inadequately capitalized and unable to pay its debts as they matured as of December 20, 2007.

---

[621] NPP 944 (Tuliano Rpt.) at 151.
[622] NPP 944 (Tuliano Rpt.) at 151.
[623] 3/18/11 Trial Tr. 23:8-12; NPP 944 (Tuliano Rpt.) at 139.
[624] DCL 1106 (Fischel Rpt.) at Ex. Z.
[625] DCL 1106 (Fischel Rpt.) at 31.

## III. A ROBUST INVESTIGATION OF THE LBO CLAIMS WAS NOT UNDERTAKEN UNTIL APPOINTMENT OF THE EXAMINER, AND CRUCIAL SETTLEMENT NEGOTIATIONS WERE CONDUCTED WITHOUT THE PARTICIPATION OF THE PARTIES WITH THE LARGEST ECONOMIC INTEREST IN THE LBO CLAIMS

314. The process leading to the Proposed Settlement lacked the type of vigorous, arms-length bargaining among the major stakeholders that sometimes provides reassurance to the court that a proposed compromise is reasonable and in the best interests of the creditors. Crucially, neither the Debtors nor the Creditors' Committee—the traditional guardians of creditor rights— was ever an enthusiastic champion of the LBO Claims.[626] A robust investigation into the merits of the LBO Claims was therefore not undertaken until the Examiner was appointed on April 30, 2010, and the Examiner did not complete his investigation and release the Examiner's Report concerning the LBO Claims until July 26, 2010. As a consequence, the Senior Lenders were not required to confront the most persuasive evidence of their liability until more than 19 months into the case. By then, certain of the larger Senior Lenders had already negotiated a settlement embodied in the April Plan that would have released claims against the Senior Lenders of almost $8.4 billion at Step One,[627] and more than $2.4 billion at Step Two, plus all claims against the Company's advisors, directors and officers and shareholders,[628] in exchange for settlement consideration to the Non-LBO Creditors of just $509 million.[629]

315. The July 26, 2010 Examiner's Report led to the unraveling of the April Plan, and demonstrated that the value of the LBO Claims against the Senior Lenders was materially greater than $509 million.[630] After the April Plan was abandoned, the Senior Lenders had no interest in

---

[626] *See* Sections IV(A) & (B), *infra*.
[627] *See* 3/15/11 Trial Tr. 294:16-295:7 (Gropper) (Step One Avoidance claims with face amount of $6.5 billion, disgorgement claims of $1.9 billion prior to pre-judgment interest).
[628] *See* 3/15/11 Trial Tr. 296:8-18 (Gropper) ($2.1 billion of Step Two allowance claims, and $318 million of Step Two disgorgement claims, prior to pre-judgment interest). This excludes pre-petition interest.
[629] NPP 24 (4/8/10 Executed Settlement Support Agreement).
[630] *See* Section III.C.2., *infra*.

going back to the drawing board, and wished to avoid negotiations with the Pre-LBO Noteholders now armed with the Examiner's Report and determined to extract the full value of the LBO Claims against the Senior Lenders.[631]  In addition, the Debtors and the Creditors' Committee each had their own reasons for preferring a quick deal to hard-fought bargaining founded on the Examiner's Report.[632]  In pursuit of their respective individual agendas, the DCL Plan Proponents elected to systematically exclude Aurelius and the other Pre-LBO Noteholders—the parties with the greatest incentive to vigorously advocate for the value of the LBO Claims—from the settlement discussions that resulted in the DCL Plan.[633]  While the record reflects some bargaining took place among the DCL Plan Proponents regarding their own parochial interests, the evidence also strongly suggests that no participant in the negotiations adequately represented the interests of the Pre-LBO Noteholders, or was incentivized to maximize the settlement value of the LBO Claims.[634]  In the end, the settlement that resulted from the process did not reflect the true value of the LBO Claims.

A.      **Debtors And Their Representatives Misunderstood Their Role In The Settlement Negotiations And Were Hobbled By Conflicting Interests With Respect To The Investigation And Pursuit Of The LBO Claims**

316.      As discussed in the Noteholder Plan Proponents' Conclusions of Law, the Debtors are and were duty bound to maximize the value of the estates, including by vigorously investigating and pursuing the LBO Claims, and acting as a zealous advocate of those claims in any settlement negotiations.  Until the Creditors' Committee was granted standing to pursue the LBO Claims on October 27, 2010 – *after* the primary terms of the Proposed Settlement were already agreed to among the DCL Plan Proponents – the Debtors were the only parties with power to commence the LBO Claims, and thus the only parties able to use the threat of litigation

---

[631] *See* Section III.C.2., *infra*.
[632] *See* Sections III.A. and III.B., *infra*.
[633] *See* Section III.C.2., *infra*.
[634] *See* Section III.C.2., *infra*.

credibly to extract from the Senior Lenders the true value of the claims against them.[635]  As the

Debtors admit, however, they did not advocate for the estate-controlled LBO Claims during this

period, but instead claim to have acted as a mere "honest broker" in negotiations with the Senior

Lenders, "striving to remain neutral" and seeking to view the claims "from all perspectives."[636]

According to the Debtors, they sought to be as "objective and non-partisan as possible," listening

to "the bank's side of the story" as well as that of the claim-beneficiaries, and not "tak[ing] one

side or the other."[637]  As a consequence, the Senior Lenders lacked a true adversary in the

negotiations leading to the settlement, creating a one-sided dynamic that prevailed throughout

the process.

      317.    Moreover, even if the Debtors' role had been properly limited to acting as an

"honest broker," there is substantial evidence that the Debtors were unable to fulfill even that

role as a result of conflicts of interests of their Board, management and primary representatives

in the LBO Claims investigation and negotiations.  Throughout these cases, the Board and

executive leadership has been composed of many of the same directors and officers who

designed and approved the LBO that gave rise to the LBO Claims.[638]  Until the formation of a

special committee of directors in August 2010 (the "Plan Special Committee"), the Board had

"primary decision-making authority" with respect to the LBO claims and all other matters

relating to the Chapter 11 Cases. [639]  The Board included members designated by Sam Zell's

EGI-TRB LLC, directors that held their positions prior to and during the LBO, and Randy

---

[635] Even now, the Debtors retain settlement authority over the LBO Claims.

[636] 3/8/2011 Tr. 110:4-111:4 (Kurtz); *see also* Docket No. 3281 at 10 (criticizing Debtors for acting as an "honest broker rather than as an adversarial litigant").

[637] 3/8/2011 Tr. 44:20-45:6, 110:4-111:5 (Kurtz).

[638] NPP 2086 (8/21/10 email from M. Wilderotter to D. Liebentritt re: Counsel for the Independent Directors) (admitting that "Sidley represents management of the Debtors"); Deposition of Randy Michaels dated March 14, 2011 ("Michaels Dep. Tr.") 53:11-24 (acknowledging that members of the board, including Sam Zell and Michael Greenspun, were conflicted); Deposition of Mark Shapiro dated February 28, 2011 ("Shapiro Dep. II Tr.") 49:16-20 (testifying that "Randy was conflicted").

[639] Debtors' Reply to Jones Day Retention Application ¶ 2 [ECF No. 5665].

Michaels, Tribune's then-CEO.[640]  Members of management were also compromised; some by their participation in the LBO, and some by the Senior Lenders' suggestions that favorable settlement terms might be rewarded by continued employment for post-emergence.[641]  According to pleadings filed by the Creditors' Committee, throughout the period of the Debtors' investigation of the LBO "four of Tribune's ten directors and three members of its senior management, including its chief financial officer, were implicated in the LBO Claims."[642]

318.    In an important early misstep, the Debtors and their management elected to delegate responsibility for the investigation and settlement of the LBO Claims to Don Liebentritt—one of Sam Zell's closest business associates, who was himself a Step Two Selling stockholder—and to Sidley Austin, a law firm that was a potential defendant in connection with LBO Claims based on its role in structuring the LBO.  In addition, Sidley represented Tribune's directors and officers personally in connection with claims arising out of the LBO.[643]  Indeed, according to Liebentritt, Sidley was perceived as "representing management of the debtors" rather than the broader interests of the Debtors themselves and their estates.[644]  These conflicts, and their consequences, are discussed in more detail below.

---

[640] *See id; see also* NPP 2087; Michaels Dep. Tr. 53:11-24; Shapiro Dep. II Tr. 49:16-20.

[641] NPP 2088 (8/21/10 email from D. Liebentritt to F. Wood) (stating that "management is 'conflicted'").  For example, Michaels actively lobbied the Senior Lenders to retain him as CEO after the company exited bankruptcy, and testified that at least one of the Senior Lenders—Oaktree—expressly tied its "support" for management to improved treatment of the Senior Lenders under any plan of reorganization.  Michaels Dep. Tr. 58:11-59:4; 3/15/11 Trial Tr. 6-19 (Lee Video) (quoting NPP 2343) (Randy Michaels asking for "senior level meetings" with creditors); Liebentritt Dep. Tr. 181:5-182:4 (acknowledging concern that management could be perceived as "courting an Oaktree, or a JPMorgan or an Angelo Gordon or vice versa").  Eddy Hartenstein also sought an audience with senior JPMorgan executives through Maggie Wilderotter. See 3/15/11 Trial Tr. 207:2-208:10 (Lee video) (attempting to set up meeting with Hartenstein, Lee, and Jamie Dimon) (quoting NPP 757), 210:16-20 (Lee writing to Dimon and others "I know Eddie Hartenstein wants the job.") (quoting NPP 2342).  Hartenstein was named CEO of Tribune Co. on May 6, 2011.  See Jerry Hirsch, L.A. Times publisher Eddy Hartenstein named CEO of Tribune Co., L.A. TIMES, May 6, 2011, available at http://www.latimes.com/business/la-fiw-tribune-20110507,0,4742576.story.

[642] Supplement to UCC Standing Motion at 6 [ECF No. 5698].

[643] NPP 1038 at 30.  Defendants' Opp'n to Plaintiffs' Mot. For a Preliminary Injunction).

[644] NPP 2086 (8/10/10 email from M. Wilderotter to D. Liebentritt).

### 1. Don Liebentritt

319.    Don Liebentritt was and remained the Debtors' point person in the negotiation of all iterations of the Proposed Settlement, even after formation of the Plan Special Committee.[645] Liebentritt's interest in the LBO and extensive ties to Sam Zell made him an unfortunate choice for his assigned role.  Among other things, Liebentritt personally invested approximately $500,000 in an entity that was a Step Two at Step Two of the LBO Claims, and was thus a potential target of the LBO claims he was charged with investigating and settling.[646]  Moreover, for more than 30 years Liebentritt has been a close advisor, associate and business partner of Sam Zell.[647]  Liebentritt is the president of the trust that manages all Zell family assets, has between $10 million and $15 million invested in Zell entities, receives a $300,000 annual salary from Zell entities and, until recently, was the President of EGI, which currently owes Liebentritt some $3 million in deferred compensation.[648]  One member of the Board even labeled Liebentritt "Sam's guy" based on his close affiliation with Zell.[649]  While the Debtors recognized that Liebentritt might not be able to act as an "honest broker" in evaluating and settling the LBO Claims, they allowed him to take charge of the process based on his personal assurances that his close relationship to Zell and interest in the LBO would not affect his handling of the investigation and settlement of the LBO Claims.[650]

---

[645] 3/8/11 Trial Tr. 111:6-11 (Kurtz); Lieb. Dep Tr. 177:12-17 (Liebentritt principal debtor representative); Shapiro Dep. II Tr. 123:5-16 (agreeing); Wilderotter Dep. II Tr. 240:12-23 (Liebentritt would take lead on settlement); NPP 2523 (2/18/10 Hr'g Tr.) at 56:9 (Kurtz reports to Lieb on settlement issues).

[646] Liebentritt Dep. Tr. 206:22-208:5.

[647] 3/8/11 Trial Tr. 111:12-16, 116:1-7 (Kurtz); NPP 810 ( 8/21/10 email from M. Shapiro to M. Wilderotter).

[648] NPP 810 (8/21/10 email from M. Shapiro to M. Wilderotter).

[649] Docket No. No. 7718, Ex. 6.

[650] 3/8/11 Trial Tr. 118:1-6 (Kurtz); see also NPP 2091 (8/23/10 email from M. Wilderotter to S. Dietze); NPP 2103 (8/31/10 email from M. Shapiro to D. Liebentritt); Shapiro Dep. II Tr. 50:14-51:3.  Although the Debtors were always aware of Liebentritt's ties to Zell, Liebentritt apparently failed to disclose, at least to Lazard and the Plan Special Committee, that he also had a direct interest in the LBO Related Causes of Action as a Step Two Selling Stockholder.  Shapiro Dep. II Tr. 259:10-20; 3/8/11 Trial 117:17-20 (Kurtz).

320.     Liebentritt's actual conduct in connection with the LBO Claims did not allay the concerns that the Debtors correctly identified at the beginning of the case.  For example, in connection with the April Plan, Liebentritt signed off on provisions that would have released all Step One and Step Two Selling Stockholders and management—including Liebentritt's wholly owned investment company, as well as Sam Zell and the rest of conflicted management—even though none of these parties were to provide any consideration for these releases.[651]  After the April Plan unraveled, Liebentritt recommended that the Debtors pursue what he called "Plan B" if the Debtors' were unable to obtain support for a "consensual" settlement; under Liebentritt's Plan B, the Debtors would have advocated for a declaration from the Bankruptcy Court that the estates' claims regarding Step One of the LBO were meritless.[652]  Liebentritt's Plan B would have been costly to the Pre-LBO Creditors, since even the First Mediation Term Sheet ascribed more than $300 million to the release of the Step One claims, and no doubt a substantial amount of the consideration provided under the April Plan also was attributable to such claims.

321.     Liebentritt's reaction to the Examiner's findings that, among other things, Step Two may have been the product of intentional fraud was also troubling.  Liebentritt was vocal in his rejection the Examiner's conclusion, and testified that he looked upon that conclusion as "a problem [he] had to deal with," rather than an indication that further reflection could be called for concerning the appropriate value to be ascribed to the settlement.[653]  Liebentritt was also critical of the Examiner and his methods, without any substantial basis.[654]  For example, at a meeting in August 2010, Liebentritt told Shapiro, the Chairman of the Plan Special Committee,

---

[651] *See* NPP 1970 (4/8/10 email from D. Liebentritt to D. Schaible) (settlement support agreement is "a proposed settlement that we all hope and expect to get approval as part of a confirmed plan"); NPP 1971, 1972 (4/8/10 email from E. Vonnegut to G. Baiera attaching final executed settlement support agreement).
[652] Liebentritt Dep. Tr. 225:7-14, 227:9-21, 234:7-18; NPP 836 (9/23/10 email from D. Liebentritt to J. Berg).
[653] Liebentritt Dep. 162:4-19.
[654] 3/15/11 Trial Tr. 165:1-167:7 (Shapiro video).

that the Examiner's investigation was "irresponsible" and that Examiner's Report was not the product of "thorough reporting and investigating," had "holes in it" and lacked "depth."[655] At his deposition, however, Liebentritt was unable to substantiate his claim, which was contrary to the Debtors' own evaluation of the Examiner's investigation as "exhaustive."[656] Liebentritt's views may nevertheless have persuaded members of the Plan Special Committee to put less faith in the soundness of the Examiner's methods and conclusions than deserved.[657] Liebentritt appears to have similarly misled another Plan Special Committee member, leaving her with the impression—false, as the evidence revealed—that Aurelius would not "accept any deal that doesn't give 100 percent payment of their shares."[658]

322.     Liebentritt also exhibited hostility towards Aurelius.  For example, in an email to members of the Plan Special Committee on September 23, 2010, Liebentritt noted Aurelius's purchase of Centerbridge's position in the Senior Notes, characterized Aurelius as a "terrorist" and asserted that "no one holds out any hope of achieving a settlement with Aurelius."[659] Liebentritt said his impression of Aurelius was based on conversations he had with Kurtz and others involved in these cases.[660] However, Kurtz testified that his dealings with Aurelius were always "completely cordial," that Liebentritt's characterization to the contrary was "unfair," and that he never said anything to Liebentritt that would support it.[661] Angelo Gordon's Baiera—

---

[655] 3/15/11 Trial Tr. 165:1-167:7 (Shapiro video).
[656] 3/15/11 Trial Tr. 165:1-167:7 (Shapiro video); Liebentritt Dep. Tr. 63:12-25 (couldn't name any documents unavailable to the Examiner), 64:2-6 (same with witnesses), 61:24 (quoting Debtors' Resolicitation Motion [ECF No. 8754]).
[657] 3/15/11 Trial Tr. 165:1-6 ("Q. Is it your understanding that Klee undertook an exhaustive analysis of the LBO claims?" A. That's purported you know.  From talking to [Liebentritt], there were a lot of questions that weren't asked and sources that weren't interviewed.").
[658] Wilderotter I (Rough) Dep. Tr. at 4.
[659] NPP 836 (9/23/10 email from D. Liebentritt to J. Berg re: Pure Purity).
[660] Liebentritt Dep. Tr. 246:13-247:3.
[661] 3/8/11 Trial Tr. 74:6-10, 152:19-153:2 (Kurtz).

another alleged source—agreed with Kurtz that the term was "inappropriate."[662]  Again,

however, the record suggests that Liebentritt may have influenced the Plan Special Committee.

Shapiro, for example, had not even heard of Aurelius until shortly before he received

Liebentritt's email, and thus had no personal experience with, or knowledge of, Aurelius of any

kind.[663]  However, a few days after receiving the "terrorist" email, and just two weeks before the

First Mediation Term Sheet was filed, Shapiro wrote to other members of the Plan Special

Committee regarding proposed settlement terms, explaining that it "all ha[d] to do with how to

defend against Aurelius.  That's what this is about."[664]

### 2. Sidley Austin

323. The conflicted Board and management delegated investigation of the LBO Claims

to Sidley, rather than hiring conflicts counsel, an option the Debtors considered but rejected.

This was a poor choice.  Sidley Austin regularly represents JPMorgan and Merrill Lynch, among

other defendants and potential defendants in the LBO Claims, and therefore was precluded from

commencing any litigation against the Senior Lenders.[665]  Even more troubling, Sidley Austin,

through a team led by Sidley Chairman Thomas Cole, helped structure the LBO on behalf of

Tribune, and was recognized by the Debtors as a potential defendant in connection the LBO.[666]

Moreover, Sidley represented individual Company officers and directors—including Holden and

Osborne, who remained on the Board post-petition and during the period of Sidley's

investigation—in their defense of breach of fiduciary duty and other claims arising from the

---

[662] Baiera Dep. Tr. 105:14-106:6.
[663] Shapiro Dep. I Tr. 78:3-8 (as of September 13, Shapiro had never heard of Aurelius).
[664] NPP 841 (9/23/10 email from M. Shapiro to F. Woods).
[665] 3/8/11 Trial Tr. 120:3-20 (Kurtz); Liebentritt Dep. Tr. 40:4-14.
[666] Liebentritt Dep. Tr. 37:21-38:15; 3/15/11 Trial Tr. 144:2-145:12; NPP 1436 (6/1/07 Tribune Schedule 13E-3) at 208.

LBO.[667]  In connection with defending Holden, Osborne and Tribune in that litigation, Sidley pronounced that the transaction was "fair" and that Tribune's directors had honored their fiduciary duties in approving the LBO.[668]  In its retention application submitted to the Bankruptcy Court, however, Sidley Austin did not disclose its representation of the Company's directors and officers in that litigation, or in any other matters.[669]

324.    Moreover, Sidley's ties to Tribune long pre-date the LBO; among other things, Sidley has represented Tribune and its personnel in a wide variety of litigations since at least 1993.[670]  In addition, Sidley has acted as litigation counsel for Equity Office Properties, Inc., Zell's former company, and Zell personally, including in litigation alleging Zell committed fraud in connection with the sale of Equity Office Properties to the Blackstone Group in 2006.[671]  Sidley's common economic and legal interests with Tribune's legacy leadership may help explain Liebentritt's observation to members of the Plan Special Committee that Sidley "represent[s] management of the Debtors," and the independent directors' conclusion that the Plan Special Committee formed in August 2010 needed independent counsel.[672]  Under the

---

[667] NPP 1038 at 32 (briefing and declarations filed in *Garamella v. Fitzsimons, et al.*, No. BC 362110 (Cal. Sup. 2007)) (Tribune Opp. to Mot. for Prelim. Inj. at 1).

[668] NPP 1038 at 45-46 (Tribune Opp. to Mot. for Prelim. Inj. at 5-6).

[669] NPP 1038 at 45-46 (Tribune Opp. to Mot. for Prelim. Inj. at 30); *see also* Sidley Austin Retention Application [ECF 139].

[670] *Pugh v. Tribune Company*, 521 F.3d 686 (7th Cir. 2008) (ERISA class action); *Tribune Co. v. F.C.C.*, No. 03-1278, 2003 WL 22177192 (D.C. Cir. Sept. 15, 2003) (FCC matter); *Chicago Tribune Co. v. Board of Educ. of City of Chicago,* 332 Ill.App.3d 60, 773 N.E.2d 674 (Ill.App. 2002) (FOIA matter) *Moriarty v. Greene*, 315 Ill.App.3d 225, 732 N.E.2d 730 (Ill.App. 2000) (defamation suit); *Chicago Tribune Co. v. U.S. Dept. of Health and Human Services*, 70 F.Supp.2d 832 (N.D.Ill.,1998) (FOIA matter); *Tribune Co. v. Purcigliotti*, 869 F. Supp. 1076 (S.D.N.Y.1994) (RICO action); *Kumaran v. Brotman*, 247 Ill.App.3d 216, 617 N.E.2d 191 (Ill.App. 1993) (defamation).

[671] *Beck v. Dobrowski*, No. 06 C 6411, 2007 WL 3407132 (N.D.Ill., Nov. 17 2007) (identifying Sidley as counsel to all defendants, including Zell in litigation brought in connection with sale of Equity Office Properties); *Winstar Communications, LLC v. Equity Office Properties, Inc.,* 170 Fed.Appx. 740 (2d Cir. 2006) (Sidley counsel to Equity Office Properties in antitrust action).

[672] NPP 2086 (8/21/10 email from M. Wilderotter to D. Liebentritt); NPP 2109 (Plan Special Committee Statement in Support of Jones Day Retention Application) ¶ 4.  Unfortunately, as discussed below, retention of Special Counsel had no material impact on the dominant role played by Sidley in connection with the settlement of the LBO claims.

circumstances, the selection of Sidley to lead an investigation of the LBO and Tribune's directors and officers role in the LBO bordered on reckless.

325.    Indeed, in late 2009 or early 2010, the Debtors considered hiring conflicts counsel to evaluate the LBO Claims in lieu of Sidley, but did not.[673]  Instead, Sidley carried on as the sole law firm involved conduct the Debtors' investigation and evaluation of the LBO Claims.[674]  The investigation was largely concluded by March, 2010, long before the Plan Special Committee was appointed.[675]  Although Lazard was also involved in the investigation, Lazard did not itself seek to identify relevant evidence, but instead relied on Sidley to direct it to the documents and deposition testimony that Sidley deemed material to the claims.[676]

326.    As noted, the investigation was not as robust as it should have been.  For example, no attempt was made to determine whether the Company was insolvent when Step One closed on June 4, 2007, or when Step Two closed on December 20, 2007 (or at any other time for that matter).[677]  Since insolvency is an element of many of the LBO Claims, the Debtors' failure to conduct a solvency analysis is difficult to understand other than as a product of the conflicts of interest of the Debtors, Liebentritt and Sidley.  In fact, the Debtors appear to have viewed their investigation of the LBO Claims as a mere formality since, among other things, the Debtors conceded that they never seriously considered actually asserting the LBO Claims.[678]  As the Creditors' Committee observed over a year into the Chapter 11 Cases, "the [Bankruptcy] Court

---

[673] Liebentritt Dep. Tr. 38:16-19.
[674] 3/8/11 Trial Tr. 119:1-10 (Kurtz); NPP 2523 (2/18/10 Hr'g Tr.) at 58:11-21.
[675] 3/8/11 Trial Tr. 119:1-10 (Kurtz); NPP 2523 (2/18/10 Hr'g Tr.) at 58:11-21; Liebentritt Dep. Tr. 35:15-19; 3/8/11 Trial Tr. 119:1-10 (Kurtz) (Sidley conducted the investigation, which was "pretty much complete" by the time Jones Day was hired by the Special Committee in the fall of 2010).  By the time the Plan Special Committee finally was formed, its counsel lacked the time or resources to conduct any meaningful independent investigation of the claims, and did not do so.  Liebentritt Dep. Tr. 173:13-22 (Jones Day did not conduct an investigation of the LBO Claims and did not have its own financial advisor).
[676] 3/8/11 Trial Tr. 106:20-108:25 (Kurtz).
[677] 3/8/11 Trial Tr. 106:20-108:25 (Kurtz).
[678] NPP 2523 (2/18/10 Hr'g Tr.) at 51:22-52:5 (Kurtz).

can infer easily that the Debtors' conduct since the Petition Date demonstrates their unwillingness to take adversary action in this matter."[679]

327.    Indeed, at a hearing in a prior proceeding in these cases, the Debtors' financial advisor testified that he "could not think of any circumstances in which the Debtors would decide to pursue litigation to resolve the LBO Claims," and the Debtors never retained unconflicted counsel to commence the LBO Claims.[680]  In connection with this dispute, Kurtz asserted that the Debtors' inaction was justified because the Debtors believed another party in interest—presumably the Creditors' Committee—would commence the actual litigation. However, when the Creditors' Committee sought derivative standing to pursue the LBO Claims in February 2010—more than a year after the petition date—the Debtors opposed the motion, arguing that *no one* should commence litigation against the Senior Lenders, and insisting that the Zell-dominated Board had "no disabling conflicts" that would prevent them from impartially assessing the LBO Claims and proceeding in a manner fair to creditors.[681]

328.    In its belated motion for standing, filed on February 1, 2010, the Creditors' Committee argued explicitly that the Debtors had no interest in commencing the LBO Claims, that the Debtors had improperly failed to advocate for the interests of the Non-LBO Creditors and had "taken no steps" toward commencing the LBO claims, and that prosecuting the claims could "profound[ly]" increase the value of the estates.[682]  Nevertheless, the Creditors' Committee adjourned its motion within a few weeks, to work on a "consensual resolution."[683]  As a consequence, at the time of the negotiations leading to the April Plan, no party had yet uncovered

---

[679] NPP 1952 (Creditor Committee Standing Motion) at 10.
[680] NPP 2523 (2/18/10 Hr'g Tr.) at 59:7-9 (Kurtz).
[681] Debtors' Objection to UCC Standing Motion at 5-7, 9 [ECF No. 3371].  The Debtors finally acknowledged their conflicts—at least tacitly—when they appointed the Plan Special Committee at the end of August, 2010.  As discussed below, the Special Committee did not cure the Debtors' conflicts.
[682] Debtors' Objection to UCC Standing Motion at 8, 10 [ECF No. 3281].
[683] Supplement to UCC Standing Motion at 3 [ECF No.5698].

the most compelling evidence of LBO Lender liability.  The standing motion was not renewed by

the Creditors' Committee until September 15, 2010, and was not heard October 22, 2010, *after*

the Creditors' Committee had agreed to the Proposed Settlement.[684]  In responding to the

renewed standing motion, the Debtors did not deny allegations that their myriad conflicts had

rendered them unable to "evaluate in good faith the merits of LBO Claims" from the beginning

of the case, and that the Debtors never were prepared to "pursue . . .  claims against their own

current and former officers and directors."[685]

> ### 3. Formation Of The Plan Special Committee In August 2010 Was Not An Effective Response To The Debtors' Conflicts

329.    The Debtors formed the Plan Special Committee in August.[686]  The Plan Special

Committee was "deemed necessary" by Debtors in the wake of the release of the Examiner's

Report on July 26, 2010, and its formation was intended to restore confidence in the settlement

process and ensure that any proposed plan of reorganization would accurately reflect the

Examiner's conclusions.[687]  Its members and activities were meant to be entirely "independent"

of Sam Zell and the rest of the conflicted board and management, in order to "insulate the

Debtors from any accusation that restructuring decisions were made by Board members who

were not fully disinterested."[688]

330.    In their submissions to the Bankruptcy Court, the Debtors emphasized the

importance of the Plan Special Committee relying on its own independent counsel in lieu of

---

[684] Supplement to UCC Standing Motion at 3 [ECF No.5698].

[685] Compare Supplement to UCC Standing Motion at 6 [ECF No.5698] at 6 *with* Debtors' response, *passim*.

[686] Notice of Jones Day Retention Application, dated Aug. 30, 2010 [ECF No. 5562].

[687] NPP 2109 (Plan Special Committee Statement in Support of Jones Day Retention Application) ¶ 2; 3/8/11 Tr. 285:10-25 (Salganik).

[688] Debtors' Reply to Jones Day Retention Application ¶ 2 [ECF No. 5665]; Notice of Jones Day Retention Application, dated Aug. 30, 2010 ¶ 6 [ECF No. 5562]; Shapiro Dep. II Tr. 38:18-23 (identifying criteria for membership on Plan Special Committee as "no bias, prejudice or ties to Sam Zell"); Shapiro Dep. I Tr. 93:2-17 (testifying that the Plan Special Committee was intended to exclude from the process anyone "that worked for Mr. Zell previously or was paid by Mr. Zell or contributed to the ESOP or whatever."); Shapiro Dep. II Tr. 55:16-56:8 (emphasizing importance of "really establish and maintain that independence" from Zell).

Sidley.[689]  The Plan Special Committee was supposed to become "well and *independently*

informed," so that it could determin[e] [an] appropriate restructuring plan for the company" that

took "into consideration, among other things, the conclusions reached by the examiner in his

report."[690]  The Plan Special Committee asserted that it could not achieve these goals through

reliance on the Debtors' existing counsel, arguing that it "would undermine the entire purpose of

the Special Committee" for the Plan Special Committee "to use counsel who reports to the

company and directors who others could assert are not disinterested in these matters."[691]

      331.    In practice, however, these safeguards were largely disregarded.  First, the Plan

Special Committee was not walled off from Sam Zell.  For example, despite initial misgivings,

the Debtor Special Committee allowed Liebentritt to remain in charge of the negotiations

throughout.[692]  Moreover, Mark Shapiro, the Chair of the Plan Special Committee was

financially and professionally intertwined with Zell.  Shapiro owes his membership on the board

of Tribune—for which he is paid a stipend of $125,000 per year—to Zell.[693]  In addition, since

January, 2010, Shapiro has served as a member of the board of directors of Equity Residential,

another company controlled by Zell, from which Shapiro receives an additional $50,000 per year

for his service.[694]  In or around October 8, 2010, Zell called Shapiro and offered him the job of

acting CEO of Tribune.[695]  Plan Special Committee member Maggie Wilderotter also owes her

---

[689] NPP 2109 (Plan Special Committee Statement in Support of Jones Day Retention Application) ¶ 4.

[690] Notice of Jones Day Retention Application ¶ 6 [ECF No. 5562]; NPP 2109 (Plan Special Committee Statement in Support of Jones Day Retention Application) ¶¶ 2, 4.

[691] NPP 2109 (Plan Special Committee Statement in Support of Jones Day Retention Application) ¶ 4; *see also* Shapiro Dep. II Tr. 63:25-64:14 (relating his understanding that Sidley "wasn't able to represent the Special Committee," in order for the Plan Special Committee to maintain its "independence").

[692] Shapiro Dep. II Tr. 50:18-51:3; NPP 2103 (8/31/10 email from M. Shapiro to D. Liebentritt); Shapiro Dep. II Tr. 123:5-16; *see also* Wilderotter Dep. I Tr. 24 (relating Special Committee's discussion of concerns that Liebentritt's relationship with Zell "could have an impact on the negotiations and the discussions").

[693] Shapiro Dep. II Tr. 247:10-248:11.

[694] 3/15/11 Trial Tr. 151:9-152:3 (Shapiro video); Shapiro Dep. II Tr. 250:23-251:3.

[695] 3/15/11 Trial Tr. 154:1-21 (Shapiro video).

place on the board to Zell, whom she has known for years.[696]  In addition, Wilderotter served on the boards of several other public companies majority owned by Zell, and was Zell's top choice for the job of CEO of Tribune as far back as February of 2007.[697]  Wilderotter was apparently unaware that Zell was supposed to be excluded from settlement negotiations, believed it would be appropriate for Zell to participate in such discussions since "he is Chairman of the Board of Tribune," and discussed Plan Special Committee business, including the Proposed Settlement, with Zell on at least one occasion.[698]

332.    The evidence suggests that Zell also remained directly involved in the settlement process after release of the Examiner's Report.  For example, in an August 22, 2010 email from Bruce Karsh of Oaktree to his partner Howard Marks, Mr. Karsh wrote:

333.    I've talked with Sam Zell almost 5 times in the last week trying to maneuver the company to do what's best for us.  He keeps telling me all the right things, but hasn't forced the company to file a plan I like as yet.  I think he will.[699]

---

[696] Wilderotter Dep. I Tr. 146:13-47:20.
[697] Wilderotter Dep. I Tr. 146:13-47:20; 3/15/11 Trial Tr. 204:17-205:2 (Lee video) (quoting NPP 2326 (2/22/07 email from J. Lee to J. Dimon)).
[698] Wilderotter Dep. II Tr. 301:19-302:3; Wilderotter Dep. I Tr. 149:13-23.  In addition to their entanglements with Zell,  members of the Special Committee also had important relationships and actual and prospective business dealings with certain of the Senior Lenders.  In the summer of 2010, for example, Shapiro traveled to California to meet with principals of Oaktree on matters unrelated to Tribune.  According to Shapiro, he knew that Oaktree had "a lot of money to put to work," and he wanted to explore the possibility of doing business with Oaktree.  3/15/11 Trial Tr. 159:1-19 (Shapiro).  Although the meeting did not result in a deal, Shapiro testified that he saw Oaktree as a potential investor in his company, Dick Clarke productions.  *Id.*  In addition, Shapiro had established business ties with JPMorgan, which handled a financing for Six Flags during Shapiro's tenure as CEO with that company. Shapiro Dep. Tr. I 146:6-11.  Maggie Wilderotter likewise has longstanding relationships with JPMorgan and its senior executives.  For instance, JPMorgan acted as co-lead underwriter on a $3 billion debt offering in 2005 for the company of which Wilderotter is CEO.  Wilderotter Dep. II Tr. 188:19-189:11.  In addition, Wilderotter is friendly with JPMorgan Vice Chairman Jimmy Lee, the long-time business associate of Sam Zell's who helped lead JPM's financing of the Tribune LBO in 2007.  *Id.* at 190:7-19 (testifying that she sees Lee about four times per year and attends his annual Christmas party); NPP 757 (2/11/10 email from M. Wilderotter to J. Lee).  Tellingly, in a February, 2010 email to Lee encouraging him to consider promoting Eddy Hartenstein to CEO after the company emerged from bankruptcy, Wilderotter signed off with the valediction "your friend who is always looking out for JPM!" *Id.*  Under all these circumstances, the Special Committee could not reasonably be perceived as a credible "honest broker" in resolving a dispute where the Noteholders' interests are pitted against those of JPMorgan, Oaktree and Sam Zell, among others.
[699] NPP 812 (8/22/10 email from B. Karsh to H. Marks).

334.     Three weeks later, Mark Shapiro committed to supporting a plan crafted by Oaktree and Angelo Gordon that, if approved, would have extinguished the estates' claims with respect to the Step One debt in exchange for no consideration.[700]  While the record reveals no direct evidence of any tie between Zell's conversations with Karsh and Shapiro's endorsement of Oaktree's preferred plan, it is certainly clear that the Debtors' attempt to insulate the settlement process from Zell by formation of the Plan Special Committee was not a success.

335.     Similarly, retention of Jones Day to represent the Plan Special Committee had no apparent impact on Sidley's role or influence over the settlement negotiations.  Indeed, at least according to its members, Sidley acted as legal counsel to the Plan Special Committee as well as the Debtors.[701]  In fact, when the members of the Plan Special Committee first met as a group, they were joined by Larry Barden of Sidley, who explained the role of the Plan Special Committee "from a corporate governance perspective," despite Barden's role as one of two lawyers who led Sidley's representation of Tribune in connection with the LBO.[702]  Shapiro did not remember Barden, but was untroubled by his role, and even testified that he would be "fine with a person who is the architect of the LBO giving advice to the Special Committee."[703]

336.     The Plan Special Committee appears to have placed most of its substantive reliance upon Sidley, rather than Jones Day.  Wilderotter, who was unaware Sidley had any conflicts, testified that Sidley was "the legal firm that the company hired to give us advice and counsel with regard to the bankruptcy in the proceedings."[704]  Wilderotter also confirmed that Sidley led the settlement negotiations, gave the Plan Special Committee legal advice concerning

---

[700] Shapiro Dep. II Tr. 268:4-18; 3/15/11 Trial Tr. 161:9-24 (Shapiro) (promising Oaktree and Angelo Gordon that the Debtors would issue a press release publicly supporting their plan).
[701] Shapiro Dep. II Tr. 187:16-188:11; Wilderotter Dep. I Tr. 39:17-23; 128:23; 124:15.
[702] Wilderotter Dep. II Tr. 276:14-77:4; NPP 807 (Liebentritt email setting up Barden meeting); NPP Ex. 1436 (6/1/07 Schedule 13E-3 identifying Barden as counsel for Tribune in connection with the LBO) at 208.
[703] 3/15/11 Trial Tr. 145:22-146:8 (Shapiro).
[704] Wilderotter Dep. I Tr. 123:23-124:7.

the First and Second Mediation Term Sheets and, together with Liebentritt, presented the final settlement to the Plan Special Committee for its approval.[705]  While Jones Day attended Plan Special Committee meetings and appeared at one of the mediation sessions, it conducted a comparatively superficial review of the merits of the claims—mainly by reviewing Sidley work product and reviewing materials identified for it by Sidley—and attended only some of the pre-mediation negotiation sessions.[706]

337.    In any case, the Plan Special Committee members seem to have been remarkably disengaged from the process, and may not have understood the role they were expected to perform.  For example, Shapiro understood the Plan Special Committee's job to be more to "motivate all the parties to get to the table" than to deal with the "fairness" of the numbers.[707]  Shapiro added that he "didn't really understand the process" by which the DCL Litigation Trust would handle the Step Two claims, and that forming an understanding of critical issues relating to the LBO Claims was "above his pay grade."[708]  While Shapiro originally believed that he had read the Examiner's Report, at his deposition he realized that what he actually read was the just the 30 page summary of the Examiner's Report; when reminded that the full report was more than 1,200 pages he said "no, I skipped that one."[709]  At a deposition taken just two days after he voted to approve the Proposed Settlement, Shapiro could not explain what key terms meant, and

---

[705] Wilderotter Dep. I Tr. 123:23-124:15, 34:13-35:20, 55:15-56:20.

[706] See Liebentritt Dep. Tr. 173:2-9 (Jones Day did not conduct own investigation); Shapiro Dep. II Tr. 126:21-127:4 (Jones Day's role was to report on negotiations rather than participate), 143:5-12 (Jones Day not at all mediation sessions); NPP 27 (Debtors' Responses to Interrogatories), identifying lawyers from Sidley, but not Jones Day, as persons with knowledge regarding the Proposed Settlement, Settlement Process or Settlement Analysis.

[707] Shapiro Dep. I Tr. 30:21-31:2, 32:9-19.

[708] Shapiro Dep. I Tr. 31:4-14, 34:12-35:1,160:21-24.; id. at 44:24-45:2 (Shapiro unaware that the Examiner discussed equitable estoppel claims); id. at 45:9-20 (Shapiro was unaware that the Step Two Lenders could be precluded from sharing in the proceeds of the avoidance actions and testified that he was only capable of understanding "half" of the Examiner's Report).

[709] 3/15/2011 Trial Tr. 164:7-25 (Shapiro).

could not recall the basis for agreeing to other terms.[710]  Indeed, just a few days after approving

the Proposed Settlement, and after reviewing her contemporaneous notes, Wilderotter was

unable to recall or explain crucial aspects of the settlement.[711]

338.    The other Plan Special Committee member deposed by the Noteholder Plan

Proponents— Ms. Wilderotter—also admitted that her understanding of issues relating to the

LBO Claims and the terms of the Proposed Settlement was superficial at best.[712]  Neither the

Plan Special Committee as a group, nor its members individually, had any role in negotiating the

contents of the term sheet the Plan Special Committee approved on October 11, 2010.[713]  In fact,

Shapiro testified that he had never seen the Second Mediation Term Sheet before his

deposition.[714]  Moreover, neither Shapiro nor anyone else on the Plan Special Committee thought

it was necessary to stay informed on the Debtors' negotiations with Oaktree, Angelo Gordon,

JPMorgan, or the Creditors' Committee.[715]

339.    Both Shapiro and Wilderotter testified that they felt comfortable voting on the

Proposed Settlement despite their admitted lack of familiarity with important issues regarding the

LBO Claims and the Proposed Settlement terms because they were able to rely on their

advisors.[716]  As discussed above, however, the perception of conflicts involving the primary law

firm upon which the Plan Special Committee relied for information concerning the LBO—

Sidley—was one of the reasons the Plan Special Committee was formed in the first place.

Wilderotter and Shapiro also relied on their understanding that an "outside expert" in bankruptcy

[710] Shapiro I Dep. Tr. (rough) 31, 37-42, 49-51
[711] Wilderotter I Dep. Tr. (rough) 23-24, 82-85, 26-27, 38, 40-42, 49.
[712] Wilderotter Dep. I Tr. 31:2-9 (unsure whether plan settled bridge claims, disgorgement), 64:3-66:12 (could not remember terms of retiree settlement or Step Two disgorgement settlement), 33:5-23 (unsure what new claims were being released in exchange for $120 million).
[713] Shapiro Dep. I Tr. 13:3-14:15.
[714] Shapiro Dep. I Tr. 12:22-13:2.
[715] Shapiro Dep. I Tr. 25:21-26:7.
[716] Wilderotter Dep. I Tr. 91:23-93:4, 97:5-14.

settlements—Black—had confirmed the "fairness" of the settlement.[717]  The Plan Special

Committee never actually met with Black, however, but instead were told of his views by "our

financial advisors and our lawyers . . . Lazard and Sidley."[718]  In addition, Black was not entirely

independent, having consulted with Tribune concerning the LBO as early as 2007, does not

claim to be an expert in bankruptcy law or bankruptcy settlements, and never actually opined as

to the fairness of the Proposed Settlement prior to the Plan Special Committee voting to approve

that Proposed Settlement.[719]

> **B.  The Creditors' Committee Did Not Vigorously Pursue The LBO Claims For the Benefit Of The Pre-LBO Noteholders**
>
> > **1.  A Voting Majority Of The Creditors' Committee Was Satisfied With A Settlement Reflecting Less Than Full Value Of The Claims Against The LBO Lenders And The Creditors' Committee Was Advised By Conflicted Counsel**

340.    The composition of the Creditors' Committee interfered with its ability to

maximize the value of the LBO Claims, since a voting majority of five Committee members

were content with the terms of the deal negotiated in April 2010, and had no incentive to realize

on the increased value of the LBO Claims illustrated by the Examiner's Report.[720]  Under the

settlement proposed in the April Plan, (1) Warner Bros. Television and (2) Buena Vista

Television got full payment on their prepetition claims in cash as subsidiary unsecured

creditors,[721] (3) the Washington-Baltimore Newspaper Guild got all collective bargaining

agreements assumed by the Debtors,[722] (4) the PBGC was satisfied in full by Debtors' agreement

---

[717] Wilderotter Dep. I Tr. 91:21-92:13; 97:5-14, 99:25-100:9.

[718] Wilderotter Dep. I Tr. 98:14-24.

[719] Liebentritt Dep. Tr. 85:16-86:5, 87:2-18 (testifying that Black never issued a fairness opinion, and that if anyone told the Special Committee he did "it wouldn't be true").

[720] Carlston Dep. Tr. 99:4-22 (couldn't recall Creditors' Committee representatives seeking to maximize Pre-LBO Noteholder recoveries).

[721] *See* NPP 2170 (Mediator's Second Report) Ex. A at 2.

[722] *See* 3/8/11 Trial Tr. 257:6-10 (Salganik) ("Q:  And am I correct that in the committee's negotiations with the bank lenders, there was no great controversy over whether the collective bargaining agreement would be assumed? A:  Yes, you are correct.").

to maintain their underfunded pension plans,[723] and (5) William Niese, as a Retiree Claimant, got a 35.18% recovery on behalf of the retirees, which he was contractually required to accept in any subsequent plan regardless of the merits of the LBO Claims pursuant to the terms of the Retiree Settlement.[724] Moreover, Niese's constituency had an additional motive for accepting less than full consideration in settlement of the LBO Claims, since the Retiree Claimants will be released from claims against them under the Retiree Settlement.

341. In addition, the Creditors' Committee's principal counsel, Chadbourne & Parke LLP ("Chadbourne"), represents many of the Senior Lenders in other matters.[725] The Creditors' Committee's attempted to alleviate the Chadbourne conflicts by hiring Zuckerman Spaeder as special counsel to handle the litigation and potential settlement of the LBO Claims, but the evidence indicates that Chadbourne nevertheless continued as the Creditors' Committee's primary negotiator even after Zuckerman was retained.[726]

**2. The Creditors' Committee's Investigation And Advocacy Of The LBO Claims Was Insufficient**

342. With little incentive to develop and prosecute the LBO Claims, the Creditors' Committee's investigation does not appear to have been as robust as one would otherwise expect in light of their potential value. Indeed, the Examiner noted his "surprise" that "notwithstanding

---

[723] *See* Deposition of Craig Yamaoka dated March 3, 2011 ("Yamaoka Dep. Tr.") 149:3-7 ("Q: And what's your understanding of what would happen to the pension plans under Term Sheet 2? A: The pension plans would be maintained."); *see also* 3/8/11 Trial Tr. 257:11-13 ("Q: Was there great controversy in the negotiation with the banks concerning the treatment for the retirees? A: No.").

[724] *See* NPP 2170 (Mediator's Second Report, Ex. A-Settlement Term Sheet) at 2.

[725] *See* Lemay Affidavits in Connection with the Retention of Chadbourne [ECF Nos. 243, 395, 3045, 5430, 7082, 8029]. Thus, just like Sidley Austin, Chadbourne was precluded from bringing suit against any of these defendants and potential defendants in connection with the LBO. *See* 3/8/11 Trial Tr. 203:16-23 (Salganik).

[726] Deposition of Kenneth Liang dated February 16, 2011("Liang Dep. Tr.") 83:15-85:4, 205:12-16, 207:10-17 (identifying Chadbourne lawyer Howard Seife as the Senior Lender's contact with the Creditors' Committee throughout the settlement negotiations); 3/8/11 Trial Tr. 258:7-10 (Salganik) (admitting he had no personal knowledge as to which firm actually negotiated on behalf of the Creditors' Committee but that he "believe[d]" that "Zuckerman and Chadbourne did that together."). The significant legal issues presented by Chadbourne's conflicts of interest have been extensively briefed in prior pleadings, which are incorporated herein by reference, and those conflicts persisted unabated throughout the settlement process. *See* Aurelius Motion to Disqualify Chadbourne [ECF No. 5669]; NPP 2132 (Aurelius Reply in Support of Disqualification Motion).

the . . . wide-ranging and factually-intensive allegations concerning, among other things, intentional fraudulent transfer, bad faith, breach of fiduciary duty, and aiding and abetting fiduciary duty breaches . . . only seven Rule 2004 examinations relating to the [LBO] had been conducted" by the Creditors' Committee.[727]  In contrast, Klee interviewed and examined more than 35 witnesses in just three months.[728]  Moreover, like the Debtors, the Creditors' Committee apparently never undertook to determine whether the Company was solvent at either step of the LBO.[729]

       343.    The Creditors' Committee's conduct of the negotiations was also far less than ideal.  For example, the Creditors' Committee never directed its counsel to seek more than a $450 million recovery for the Senior Notes, and allowed for the Senior Noteholders' consideration to be changed from a "strip" of cash, debt, and equity that would appreciate as Tribune's value appreciated.[730]  The Creditors' Committee never argued to the Senior Lenders— not even as an opening bid—that settlement consideration to the Pre-LBO Noteholders should improve in the wake of the Examiner's Report, even though Creditors' Committee representatives agreed that the Examiner's Report was good for the Pre-LBO Noteholders and

---

[727] NPP 782 (Exam'rs Rpt.), Vol. I at 32.

[728] NPP 782 (Exam'rs Rpt.), Vol. I at 32.

[729] 3/15/11 Trial Tr. 194:2-15 (Carlston video) ("Q:  Did Moelis undertake any solvency analysis of Tribune?  A: No.  Q:  At any time?  A:  No.").  The Senior Noteholders were thus justifiably concerned that  the Creditors' Committee would undercut their negotiating leverage even in connection with first round of negotiations in early 2010.   See 3/15/11 Trial Tr. 230:12-17 (Gropper) ("[W]hat Centerbridge expressed to me was that [the settlement that became the April Plan] was a lower settlement than they thought was appropriate.  But they were very concerned that the creditors' committee was going to undercut them in the negotiations, and because of that they were forced to agree to a – to agree to a suboptimal deal.").

[730] See 3/8/11 Trial Tr. 264:6-14 (Salganik) (never directed Creditors' Committee's counsel to ask for more than the $450 million provided to Senior Notes under the April Plan); 3/15/2011 Trial Tr. 189:2-7 (Carlston video) (couldn't remember the Creditors' Committee  ever proposing a strip worth more than $450 million); 189:2-7 (Smith video) ("Q:  Do you have a recollection that the committee, after the examiner's report, ever proposed a strip for the senior noteholders that would have a value greater than 450 million?  A:  I don't recall that.  I'm not saying it didn't happen, but I don't have that recollection."); 3/8/11 Trial. Tr. 158:3-14 (Kurtz) (admitting he never heard any Creditors' Committee representative argue that the Examiner's Report strengthened the LBO Claims in any way, and never heard the Creditors' Committee make a demand in excess of $420 million); 279:25-281:6 (Salganik) (Creditors' Committee knew Senior Noteholders preferred a strip, knew that Tribune's value was increasing).

other Non-LBO Creditors.[731]  In fact, after the Examiner's Report was released and before the

April Plan collapsed, the Creditors' Committee resisted extending the April Plan voting deadline

to permit Pre-LBO Noteholders and others to obtain and review the unredacted version of the

Examiner's Report before voting.[732]  During a hearing on the issue, a Chadbourne lawyer made

clear on the record that the Creditors' Committee still favored the April Plan, despite the

conclusions in the Examiner's Report, a statement that would have necessarily undermined the

Creditors' Committee had they ever sought improved consideration in subsequent negotiations

with the Senior Lenders.[733]

344.    The Creditors' Committee also undermined its negotiating position by disclosing

to the Senior Lenders the key voting position occupied by trade creditors, effectively providing a

roadmap to the Senior Lenders for obtaining Creditors' Committee approval for consideration

short of the true value of the LBO Claims.[734]  In short, the Creditors' Committee was an

ineffective negotiating adversary despite the fact that it was armed with the Examiner's findings

and Aurelius's detailed model suggesting that the LBO Claims against the LBO Lenders could

---

[731] *See* 3/8/11 Trial Tr. at 465:7-466:10 (Salganik) ("Q: … 'Aurelius claimed that the examiner's report was
fundamentally good for all non-LBO lenders and a fair settlement has to reflect the risks and benefits for all parties.'
… [D]id you agree with that statement by Aurelius?  A:  Yes. … Q:  Would you agree with me that the [Aurelius]
model represented a thoughtful and thorough analysis and effort to value the claims?  A:  Yes."); 3/15/11 Trial Tr.
264:4-10 (Gropper) (Kurtz told Gropper that "in light of the examiner report, the banks were crazy to walk away
from the April deal."); 3/8/11 Trial. Tr. 158:3-14 (Kurtz); Carlston Dep. Tr. 115:24-16:24 (no recollection of
Creditors' Committee representatives arguing to Senior Lenders that Examiner's Report strengthened Pre-LBO
Noteholders' hand in negotiations); 3/9/11 Trial Tr. 57:17-23 (Kulnis) (admitting that throughout the negotiations
the Creditors' Committee never even told her its view of the merits of the LBO Claims).
[732] 7/29/10 Hr'g Tr. at 31-36 (LeMay).
[733] 7/29/10 Hr'g Tr. at 33-34 (LeMay).
[734] *See, e.g.*, Liang Dep. Tr. 214:17-22 (Q: And did Howard Seife ever tell you in words or substance that because
the Committee was dominated by trade creditors, to get the Committee's support you had to pay off the trade
creditors in full?  A: I believe that they said that the trade creditors have to be treated well in the plan.  Yes.)
(emphasis added).

result in full recovery to the Senior Noteholders and significant recoveries to the PHONES Notes.[735]

### C. The Creditors With The Greatest Economic Interest In The LBO Claims Were Excluded From The Key Negotiations

#### 1. The Pre-LBO Noteholders Should Have Been Represented In The Negotiations

345. The process would likely have been improved had Aurelius and other Pre-LBO Noteholders been allowed to participate fully, and could well have led to a much different settlement than the one embodied in the DCL Plan currently before the Bankruptcy Court. The parties' reaction to the settlement embodied in the April Plan illustrates the importance of including all major stakeholders in settlement negotiations, both to improve the quality of the terms, and to gain the confidence and support of parties-in-interest for the settlement. Unlike the Proposed Settlement negotiations, the bargaining that led to the April Plan included representatives from Centerbridge, one of the largest Senior Noteholders.[736] Although Aurelius was not included in those negotiations, and believed that the settlement embodied in the April Plan materially undervalued the LBO Claims, Aurelius elected not to object to the deal,[737] in part because Centerbridge's involvement meant that "there was a principal bondholder at the table

---

[735] *See* 3/8/11 Trial Tr. at 465:7-466:10 (Salganik) ("Q: … 'Aurelius claimed that the examiner's report was fundamentally good for all non-LBO lenders and a fair settlement has to reflect the risks and benefits for all parties.' … [D]id you agree with that statement by Aurelius? A: Yes. … Q: Would you agree with me that the [Aurelius] model represented a thoughtful and thorough analysis and effort to value the claims? A: Yes."). *See also* NPP 2145 (Email from D. Prieto to Z. Jamal, *et al.* dated September 29, 2010 and attaching Aurelius's model).

[736] During the period when the settlement embodied in the April Plan was negotiated, Aurelius held approximately $100 million worth of Senior Notes, but still was unable to participate directly in the process because Debtors refused, without explanation, to permit Aurelius access to information material to the claims. NPP 2371 (3/3/10 e-mail from D. Gropper to D. Kurtz) (Aurelius's counsel protesting the Debtors' unexplained rejection of Aurelius's February 12, 2010 request to be made a party to the Depository Order); 3/15/11 Trial Tr. 228:25-230:6, 230:21-231:9; 279:10-280:12 (Gropper); 3/8/11 Trial Tr. 43:19-44:9 (Kurtz) (acknowledging that it was impossible to "engage in meaningful settlement discussions" without access to "the relevant data" available in the document depository), 131:21-24 (Kurtz).

[737] 3/15/11 Trial Tr. 230:21-231:13 (Gropper); 3/8/11 Trial Tr. 131:4-20 (Kurtz). The terms of the April Plan, which contemplated payment to the senior bonds of approximately 35 cents on the dollar, are discussed in more detail in below.

negotiating the settlement."[738]  Other parties-in-interest also confirmed that direct participation by a large Senior Noteholder in the negotiations leading to April Plan influenced their decision to support the April Plan.  For example, the Debtors' financial advisor testified that Centerbridge's involvement was "incredibly important" to the Debtors because it provided a necessary "comfort in the outcome" of the settlement.[739]  Representatives of the Creditors' Committee also testified that Senior Noteholder participation in the April negotiations provided important validation of the fairness of the April Plan for the Creditors' Committee, and acknowledged that "no such confirmation or validation" existed for the Creditors' Committee with respect to the ultimate deal struck by the DCL Plan Proponents.[740]

> **2.      Aurelius And The Other Pre-LBO Noteholders Were Systematically Excluded From The Settlement Process**

346.      Notwithstanding this acknowledged dynamic—or perhaps because of it—the DCL Plan Proponents elected to exclude Aurelius from the negotiations that led to the Proposed Settlement.  During the first week of August, Aurelius Managing Director Dan Gropper emailed Kurtz to discuss resolution of the LBO Claims in light of the Examiner Report.  Kurtz was on vacation in Russia at the time, but called Gropper from his cell phone.  During an approximately 10 minute phone call—interrupted several times as the result of a bad connection—Gropper told Kurtz that he believed the Examiner's Report demonstrated that the LBO Claims, if litigated, would likely result in full recovery to the Senior Notes.[741]  As Kurtz now admits, however, Gropper never said that Aurelius was unwilling to compromise with the Senior Lenders.[742]  On

---

[738] 3/15/11 Trial Tr. 230:21-231:13 (Gropper).

[739] 3/8/11 Trial Tr. 124:12-18 (Kurtz).

[740] 3/8/11 Trial Tr. 221:6-17, 265:10-266:4 (Salganik); see also Deposition of Wayne Smith dated February 16, 2011 ("Smith Dep. Tr.") 55:25-56:25 (acknowledging the Creditors' Committee evaluated Centerbridge's input in concluding the April Plan was fair).

[741] 3/15/11 Trial Tr. 260:3-19 (Gropper); 3/8/11 Trial Tr. 141:22-142:7 (Kurtz).

[742] 3/8/11 Trial Tr. 142:9-16 (Kurtz).

the contrary, Gropper used the call to set up a further meeting with Debtors at Sidley's offices in New York on August 17, where he specifically:

> asked Mr. Kurtz to arrange a meeting with the banks because I thought it very important that we have face-to-face, principal-to-principal negotiations in order to resolve the case. It's my experience, you know, 16 years of doing this in dozens of cases, that that's the way cases get resolved. When principals get in the room, they have the opportunity to sit across the table, articulate their views, challenge each other's views, and I wanted to do that for two reasons. I wanted to explain my views of the case, but I also wanted to hear the other side's views of the case because, frankly, if I was looking at something wrong, I wanted to know. I wanted to understand the infirmities of my arguments, and the only way that was going to happen is by having in-person, face-to-face meetings.[743]

347.    Kurtz apparently agreed at least in general with Gropper's view that the Examiner's Report was good for the Pre-LBO Noteholders, stating that "in light of the Examiner Report, the banks were crazy to walk away from the April deal."[744]  However, according to Kurtz, the banks were being "intransigent," and it would therefore be a "waste of time" to set up the requested meeting.[745]  Kurtz never followed up with Aurelius after the August 17, 2010 meeting, nor sought out Aurelius's views on settlement.[746]

348.    Following the release of the Examiner's Report, the DCL Plan Proponents remained in nearly constant touch regarding potential settlement, but did not include Aurelius in their discussions.  At trial, Kurtz admitted as much, but claimed that the exclusion of Aurelius was justified because Aurelius would not accept any settlement short of payment in full on the bonds.[747]  As discussed above, however, Kurtz later admitted that Aurelius never said anything of the kind, but instead simply expressed a view as to the value of the claims that was sharply at odds with the view of the Senior Lenders.

---

[743] 3/15/11 Trial Tr. 263:15-264:3 (Gropper); *see also id.* 278:18-279:9.
[744] 3/15/11 Trial Tr. 264:4-10 (Gropper).
[745] 3/15/11 Trial Tr. 264:4-10 (Gropper).
[746] 3/15/11 Trial Tr. 273:2-12 (Gropper).
[747] 3/18/11 Trial Tr. 66:6-17 (Kurtz).

349.     Instead of working to narrow the gap between Aurelius and the Senior Lenders,

Kurtz simply "gave up," and decided to complete the negotiations without input from the Pre-

LBO Noteholders.[748]  Kurtz's dismissal of Aurelius was in stark contrast to the way he handled

members of the DCL Plan Proponent group when they appeared to be at an impasse.  For

instance, Kurtz recalled the Debtors and the Senior Lenders being "very far apart" at one point in

their negotiations, yet he persisted rather than concluding that there could never be a deal.[749]

Indeed, Kurtz subsequently engaged in "more than a thousand" conversations in an effort to

finalize a deal.[750]  In contrast, Kurtz spoke with Aurelius just twice after release of the Examiner

Report and outside of the mediation.[751]  Kurtz identified no conversations in which he or any

other DCL Plan Proponents sought to increase the recovery to the Pre-LBO Noteholders in the

wake of the Examiner's Report.

350.     Aurelius repeatedly sought to be included in the discussions, but was rebuffed.

For example, Aurelius shared its Examiner model with representatives from Lazard and

requested meetings to discuss settlement options, but the Debtors never provided any feedback

with respect to the Aurelius model, nor did they share with Aurelius any models or settlement

---

[748] *Id.* at 151:2-23 (Kurtz); 3/15/11 Trial Tr. 264:4-10, 265:16-266:5 (Gropper).
[749] *Id.* at 121:3-8 (Kurtz).
[750] *Id.* at 123:10-22 (Kurtz).
[751] 3/15/11 Trial Tr. 259:23-260:2 (Gropper) ("Q: What was the first thing you did?  A: Well, the first thing I did is I called Mr. Kurtz.); 261:11-13 ("Q: Okay.  Did you meet with [Kurtz] at some point shortly after the call when he was in Russia?  A: Yes."); 273:2-7 ("Q: Okay.  Now, subsequent to the meeting at Sidley Austin on August 17th you testified about and excluding any conversations you may have had at the mediation, did Mr. Kurtz ever reach out to you to discuss your views on a potential settlement?  A: No.").

analyses of their own.[752]  Neither the Debtors, nor their advisors, nor the Plan Special Committee sought to discuss any views regarding a potential settlement with Aurelius.[753]

351.     Meanwhile, the DCL Plan Proponents were meeting amongst themselves to reach a deal without having to confront Aurelius armed with the evidence from the Examiner's Report showing that the LBO Claims were worth billions, not millions, of dollars.  For instance, just two days after refusing Aurelius's request to arrange a meeting with the Senior Lenders, the Debtors met with the Senior Lenders and the Creditor's Committee to discuss settlement without Aurelius, despite the fact that Aurelius was then the second-largest holder of the Senior Notes.[754] It is undisputed that Aurelius was not informed of, much less invited to, the DCL Plan Proponent group's meeting.[755]  Aurelius also was excluded from the third and penultimate mediation session attended by the DCL Plan Proponents on October 8th, despite repeatedly expressing its desire to be involved in the negotiations at that time.[756]  Aurelius was not aware of any aspect of the terms of the settlements that resulted from the meditations nor did it have any idea that they were even under discussion at the mediations.[757]  In the end, the members of the DCL Plan Proponents group simply wanted to strike a deal that would satisfy their own parochial interests regardless of the actual value of the LBO Claims, a task made simpler by exclusion of the Pre-LBO Noteholders from the bargaining table.  Kurtz explained the Debtors' negotiation strategy

---

[752] See 3/15/11 Trial Tr. 255:5-14, 259:12-16 (Gropper); 3/16/11 Trial Tr. at 46:19-47:4 (Testimony of Dan Gropper) ("Q: Okay.  And you think that would be an appropriate thing for parties in a case like this to do in trying to come up with what's the right settlement value?  A: I do, but no one produced a model before the plans came out and shared it with us.  We asked people has anyone else produced a model and if you have produced a model, could you share it with us?  And I believe actually during – well, I want to be careful, I don't want to talk about what may have been said in a mediation.  But I can say that no other party produced a model in response to that answer.").
[753] See 3/15/11 Trial Tr. 273:2-21 (Gropper).
[754] See 3/8/11 Trial Tr. 60:22-61:7 (Kurtz); 3/15/11 Trial Tr. 266:20-267:9 (Gropper).
[755] 3/15/11 Trial Tr. 266:20-267:4 (Gropper).
[756] See 3/8/11 Trial Tr. 241:13-16 (Salganik).
[757] See 3/15/11 Trial Tr. 276:20-277:4 (Gropper) ("Q: Now, the record is clear there came a time when two term sheets were released during the course of the mediation.  Mr. Gropper, you're familiar with that?  A: Yes.  Q: Okay. Were you aware in any respect of any of the terms of those before they were released?  A: No.  Q: Okay.  Did you have any idea that they were under discussion?  A: No.").

with respect to Aurelius in October 2010, when he told Gropper that the Debtors "were going to try to get this done in court and if they couldn't get it through, then they would negotiate" with Aurelius.[758]

352.    The Creditors' Committee was similarly uninterested in discussions with Aurelius on the topic of settlement. While the DCL Plan Proponents attempted to portray Aurelius as an unreasonable negotiating partner, the evidence indicates that Aurelius did not suggest to the Creditors' Committee that it was unwilling to make a reasonable compromise; instead, during its first post-Examiner's Report audience with the Creditors' Committee—an August 17, 2010 conference call—Aurelius merely explained its preliminary view that the Examiner's Report justified full payment to the Senior Noteholders.[759] As it turns out, the Creditors' Committee met with the DCL Plan Proponents just hours after its call with Aurelius, but did not inform Aurelius of the meeting or its outcome.[760] When Aurelius finally arranged a face-to-face meeting with the Creditors' Committee on October 7, 2010 to discuss settlement alternatives and explain how it had calculated the expected value of the claims at $1.8 billion or more based on the Examiner's Report, the Creditors' Committee did not ask any questions or share any of its own analysis regarding the claims.[761] Later that day, Creditors' Committee counsel assured Aurelius that the Creditors' Committee would work with Aurelius "collaboratively and cooperatively" going forward.[762] However, the very next day Creditors' Committee counsel attended the October 8, 2010 mediation session at which the Creditors' Committee agreed to a deal, without even notifying Aurelius the meeting was taking place, much less seeking

---

[758] 3/15/11 Trial Tr. 287:12-288:7 (Gropper).
[759] *See* 3/15/11 Trial Tr. 268:5-15 (Gropper); 3/8/11 Trial Tr. 283:25-284:17 (Salganik).
[760] 3/16/11 Trial Tr. 172:9-173:1 (Gropper).
[761] *See* 3/8/11 Trial Tr. 286:13-17 (Salganik) ("Q: When Aurelius was at the meeting, was there any discussion by committee members or committee representatives concerning assumptions or procedures built into the model? A: I – I don't believe we asked any questions at that meeting."); DCL 87 (10/7/10 Creditors' Committee Meeting Minutes).
[762] 3/16/11 Trial Tr. 123:11-15 (Gropper).

Aurelius's input on settlement terms.[763]  The Creditors' Committee ignored Aurelius's requests

to meet following the release of the second term sheet in October 2010 entirely.[764]  When

Gropper asked for an explanation for the Creditors' Committee's approval of the term sheet, a

Chadbourne lawyer assured Gropper the Committee would provide its rationale to Aurelius, but

never did so.[765]

353.    The Senior Lenders also excluded Aurelius from participating in settlement

negotiations.  For example, when Aurelius approached Angelo Gordon in hopes of establishing a

settlement discussion, its principals replied flatly:  "We are not talking to you about settling this

case."[766]  Oaktree also declined to engage in negotiations with the Noteholders, determining that

"[w]e need to show others that they can't come in, buy juniors where we're senior, and get rich,"

and that it "hope[s] this sets an example."[767]

### D.    The Flawed Process Engendered By The DCL Plan Proponents Results In Settlement Value Declining In The Wake Of The Examiner's Report

354.    The release of the Examiner's Report was a watershed moment in these cases, and

indicated that the settlement in the April Plan had undervalued the LBO Claims against the

Senior Lenders.[768]  However, as an apparent consequence of the flaws in the settlement process,

recoveries to the Pre-LBO Noteholders actually *declined* in the wake of the Examiner's Report,

while recoveries to the Senior Lenders *increased* as compared to the April Plan based on the

Proposed Settlement.

---

[763] *See* 3/8/11 Trial Tr. 241:13-16 (Salganik) ("Q: And your counsel reported to you and advisors reported to you on the mediation session that occurred on October 8th?  A: Yes."); 3/16/11 Trial Tr. 176:4-10 (Gropper) ("Q: Okay. Did you have the slightest idea that there was a mediation session scheduled for twelve hours following your meeting with Mr. Seife?  A: No.  Q: Did he tell you anything to lead you to believe that the committee was in the process of finalizing a deal?  A: No.").

[764] *See* 3/15/11 Trial Tr. 288:8-289:1 (Gropper).

[765] *See* 3/15/11 Trial Tr. 288:8-289:1 (Gropper).

[766] 3/15/11 Trial Tr. 289:2-290:6 (Gropper).

[767] NPP 870 (10/13/10 email between B. Karsh and H. Marks).

[768] Liebentritt Dep. Tr. 161:9. (describing the Examiner's Report as the "death knell" of the settlement embodied in the April Plan).

1. **The Examiner Conducted His Investigation And Analysis Thoroughly And Skillfully**

355.     On April 30, 2010, the Bankruptcy Court appointed Kenneth Klee as Examiner to, among other things, investigate and evaluate the merits of the LBO Claims.  Klee's credentials as an expert in bankruptcy law and practice are unassailable.  He has taught bankruptcy at UCLA Law School since 1970, served as Associate Counsel to the Committee on the Judiciary, U.S. House of Representatives, was one of the principal authors of the 1978 bankruptcy code, is founding partner of a thriving bankruptcy law firm, and practices regularly in bankruptcy courts around the country.[769]  The DCL Plan Proponents agree that Klee was eminently qualified to conduct the examination, and that Klee's investigation, conducted with the assistance of his independent counsel and financial advisor, was "exhaustive."[770]

356.     Beginning on April 30, 2010, Klee engaged in telephone calls and in-person meetings with all of the parties in interest in order "to discuss with them his preliminary views— and in turn solicit the Parties' views—regarding the work plan for conducting the Investigation [and] the manner in which the Parties would cooperate and assist with the Investigation," among other matters.[771]  Klee encouraged the parties—including each of the DCL Plan Proponents—to identify documents they deemed material to their respective positions.  According to Klee, the parties obliged, raising "just about every conceivable claim or defense that could be imagined, lest the Examiner not consider it."[772]  Over the course of three months, and at a cost of over $12 million, Klee reviewed hundreds of pages of briefing submitted by the parties, as well as tens of

---

[769] NPP Ex. 2233 (attorney biography of Kenneth Klee).
[770] DCL Resolicitation Motion at ¶ 69 [ECF No. 8754] (arguing that the Examiner's investigation was so exhaustive and complete that the Noteholder Plan Proponents should not be permitted discovery in connection with this dispute); 3/9/11 Trial Tr. 201:4-9 (Black) (describing Klee as a "practitioner-academic" and an "expert in bankruptcy law"); 3/8/11 Trial Tr. 138:10-13 (Kurtz) (admitting Klee was "certainly competent to undertake his assignment").
[771] NPP 782 (Exam'rs Rpt.), Vol. I at 28-29.
[772] NPP 782 (Exam'rs Rpt.), Vol. I at 31.

thousands of pages of documents, and also conducted 38 witness interviews and a number of informal exchanges.[773]

357.    In connection with his investigation, the Examiner prepared a thorough, meticulously documented report of more than 1,200 pages (excluding tables and exhibits) evaluating the merits of the LBO Claims.  The Examiner assigned one of the following probability phrases to issues associated with litigation of the LBO Claims:  Highly Likely, Reasonably Likely, Somewhat Likely, Equipoise, Somewhat Unlikely, Reasonably Unlikely and Highly Unlikely.

### 2.    The Examiner's Report Was Favorable To Non-LBO Creditors

358.    Release of the Examiner's Report should have been good for the Non-LBO Creditors, as most of the parties to this action originally acknowledged.  Indeed, based on the assessment of the Examiner's Report by Gropper, Aurelius concluded that LBO Claims against the Senior Lenders would have an excellent chance of resulting in full recovery to the Senior Noteholders if they were litigated.[774]  A subsequent Aurelius decision tree model indicated that, if anything, Gropper's initial view of the Examiner's Report was conservative, and that the expected value of the LBO Claims against the Senior Lenders based on the Examiner's conclusions was more than $1.8 billion.[775]  Aurelius was not alone in its view that the Examiner's Report was a positive development for the Non-LBO Creditors.[776]  In addition, representatives of the Creditors' Committee, the Debtors—and even Oaktree—indicated their agreement that the Examiner's Report was good for the Pre-LBO Noteholders.[777]

---

[773] NPP 782 (Exam'rs Rpt.), Vol. I at 31.
[774] See 3/16/11 Trial Tr. 14:8-16 (Gropper).
[775] 3/15/2011 Trial Tr. 249:19-25 (Gropper).
[776] 3/15/11 Trial Tr. 264:9-10 (Gropper).
[777] 3/8/11 Trial Tr. 285:16-23 (Salganik); 3/15/11 Trial Tr. 264:4-10 (Gropper); NPP 812 (8/22/10 email from B. Karsh to H. Marks) (predicting that collapse of the April Plan in the wake of the Examiner Report was probably

359.     The Noteholder Plan Proponents presented convincing evidence at trial that Aurelius sincerely believed that the Examiner's Report would increase recoveries to the Pre-LBO Noteholders.[778]  Moreover, Aurelius showed the courage of its convictions by substantially increasing its position in the Pre-LBO Notes after release of the Examiner's Report and based on its conclusions.[779]  Moreover, thereafter, Aurelius has opposed the Proposed Settlement from the moment Aurelius learned of it, despite being entitled to receive an over $200 million initial recovery pursuant to its terms.[780]  Gropper testified at trial that he had "never been more certain about a conclusion like that [concerning the value of the LBO Claims] in [his] sixteen years in the business," and even the Debtors admitted that Aurelius's interpretation of the Examiner Report was sincere.[781]

360.     Nevertheless, the Debtors now insist that "Aurelius . . . believed that the Examiner's conclusions would reduce, rather than increase, the expected recovery for Senior Noteholders.[782]  The DCL Plan Proponents base their assertion on revisions to a draft model that a junior research analyst pieced together on his "own initiative" and tinkered with but never finished.[783]  That an Aurelius junior analyst has no legal training, and made revisions with no guidance from Aurelius's senior managers, who testified that the model did not represent Aurelius's views of the Examiner's Report at any time.[784]  Similarly, there is no evidence that

"good for the bonds"); NPP 2033 (7/27/10 email from A. Goldman to S. Shapiro) (Angelo Gordon attorney noting that Examiner Report "interesting" "though not unexpected," "assume bonds are up" on the news).

[778] *Compare* 3/8/11 Trial Tr. 139:8-140:3 (Kurtz), with DCL Post Trial Brief at 34 [ECF No. 8897].  *See also* 3/15/11 Trial Tr. 232:16-233:22 (Gropper).

[779] 3/15/11 Tr. 232:16-233:22 (Gropper) (identifying Examiner's Report as "a complete game changer"); Brodsky Dep. at 55:2-13; 3/15/11 (Aurelius decided to increase position in Senior Notes based in part on conclusions of Examiner).

[780] 3/16/11 Tr. 13:17-14:16 (Gropper) (walked away from DCL Plan recoveries because of belief that LBO Claims were far more valuable).

[781] 3/16/11 Tr. 13:17-14:16 (Gropper), 139:8-140:3 (Kurtz).

[782] DCL Post-Trial Br. at 34.

[783] Brodsky Dep. at 215:3-5; 280:14-22; see Prieto Dep. at 116:20-117:14.

[784] *See* Brodsky Dep. at 239:16-19; 275:23-276:12; 286:6-287:22 (testifying that the draft model did not "comport with" nor does it represent Aurelius's view of the Examiner's Report).

Aurelius adopted or agreed with the negative views of the Examiner's Report that were expressed in a third-party newsletter that was circulating at the time, and overwhelming evidence that Aurelius rejected those views, including but not limited to Aurelius's decision to substantially increase its position in the Senior Notes after release of the Examiner's Report and based on the conclusions of the Examiner's Report.[785]

361.   As discussed below, aggregating the probabilities and associated recoveries of each of the litigation scenarios contemplated by the Examiner's Report based on reasonable numerical probabilities assigned to the Examiner's conclusion suggests that the LBO Claims against the Senior Lenders have an expected value of approximately $1.8 billion.[786]  Several of the Examiner's most prominent findings help explain the initial, near uniform belief among the parties in interest that the Examiner's Report would be helpful to the Non-LBO Creditors, even without the benefit of a comprehensive decision tree analysis.

362.   Among other things, the Examiner concluded that "[a] court is somewhat likely to find that the Tribune entities [both Tribune and the Guarantor Subsidiaries] incurred the obligations and made the transfers in the Step Two Transactions with actual intent to hinder, delay, or defraud creditors."[787]  Combined with the overwhelming likelihood the Examiner ascribed to constructive fraud at Step Two, the Examiner's conclusion regarding intentional fraud suggests that avoidance of the Step Two debt at both Tribune and the Guarantor Subsidiaries is close to inevitable.  Indeed, in their Post-Trial Brief, the DCL Plan Proponents all but concede Step Two would be found to be a fraudulent conveyance, arguing only that

---

[785] See DCL Post-Trial Brief at 34 n.109 (citing DCL 435 (Credit Sights article); Brodsky Dep. at 55:2-13; 3/15/11 Trial Tr. 232:16-233:22 (Gropper) (identifying Examiner's Report as "a complete game changer")).  Of course, the Credit Sights article is also rank hearsay, and the DCL Plan Proponents' attempt to rely on it for the truth of the matter asserted is impermissible.

[786] See infra at Section V.A.  Decision tree analysis of the Examiner's Report provides a useful benchmark for comparison of the value of the LBO Claims against the Senior Lenders with the DCL Settlement consideration, and is far superior to the back-of-the-envelope alternatives advanced by some of the parties to this dispute.

[787] NPP 782 (Exam'rs Rpt.), Vol. I at 13.

avoidance of Step Two is "not a foregone conclusion."[788]  For reasons discussed below, even if only Step Two were to be avoided, there remains a substantial likelihood that the Pre-LBO Noteholders would recover value materially in excess of the recoveries contemplated under the DCL Plan.

363.    The Examiner's conclusions were somewhat less damning with respect to Step One, but the Examiner's Report still implies that the LBO Claims in respect of Step One have enormous potential value.  For example, using probabilities assigned by Dr. Bruce Beron, the Noteholder Plan Proponents' decision tree expert, to the Examiner's conclusions, the Examiner's Report suggests that the Non-LBO Creditors would have a 30% chance of succeeding on a claim of intentional fraudulent transfer against the LBO Lenders at Step One, and an even greater probability of success on a claim for constructive fraud against the LBO Lenders at Step One.[789] Thus, based solely on the Examiner's Report, the aggregate likelihood that the Non-LBO Creditors could establish either intentional or constructive fraud at Step One is substantial in its own right; when considered in light of the approximately $6.5 billion of Step One Debt subject to such avoidance plus $1.9 billion (prior to judgment interest) subject to disgorgement, the risk to the Senior Lenders—and corresponding value to the Non-LBO Creditors – associated with the Step One-related LBO Claims is enormous.  In short, the Examiner's Report made unmistakably clear that the Senior Lenders faced meritorious claims at both Step One and Step Two that imperiled over $10 billion of LBO Debt.

---

[788] DCL Opening Brief at 37.
[789] As discussed in above, the Examiner appears to have understated the likelihood of avoidance at Step One, in part because his analysis was conducted without the benefit of evidence developed in discovery by the Noteholder Plan Proponents.

### 3. Recoveries To The Pre-LBO Noteholders *Decline* In The Wake Of The Examiner's Report And *Increase* For The Senior Lenders

364. Despite the Examiner's conclusions, settlement value to the Pre-LBO Noteholders actually declined after the Examiner's Report was released. The Proposed Settlement calls for an initial cash payment to the Senior Noteholders of *less* than they would have gotten under the settlement agreed to before the Examiner's Report was released, despite the fact that the Creditors' Committee, the Debtors—and Oaktree—admitted that the Examiner's Report was favorable to the Noteholders and other Pre-LBO Lenders.[790]

365. Under the terms of the settlement embodied in the April Plan, total consideration to Non-LBO Creditors was $509 million, while the DCL Settlement provides total settlement consideration to the Non-LBO Creditors of just $488 million. The Senior Noteholders were to receive $391 million of settlement consideration under the settlement embodied in the April Plan, while the DCL Plan provides just $369 million to the Senior Notes.[791] Expressed in terms of a percentage of then total claims the Senior Noteholders' recovery dropped from 35.18% to 33.59%.[792] Meanwhile, the Senior Lenders' recovery increased dramatically under the DCL Plan. Based on the $6.75 billion DEV advocated by the DCL Plan Proponents, the Senior Lenders would recover 71.1% of the face amount of their debt compared to the 62.85%

---

[790] 3/8/11 Trial Tr. 285:16-23 (Salganik); 3/15/11 Trial Tr. 264:4-10 (Gropper); NPP 812 (8/22/10 email from B. Karsh to H. Marks) (predicting that collapse of the April Plan in the wake of the Examiner Report was probably "good for the bonds"); NPP 2033 (7/27/10 email from A. Goldman to S. Shapiro) (Angelo Gordon attorney noting that Examiner's Report "interesting" "though not unexpected," "assume bonds are up" on the news).

[791] 3/15/11 Trial Tr. 292:14-294:3 (Gropper); *see also* NPP 2473 (Trial Demonstrative); NPP 2170 (Mediator's Second Report) Ex. A; NPP 24 (4/8/10 Executed Settlement Support Agreement).

[792] The DCL Plan Proponents argue that the shareholder and other claims they propose to put in a litigation trust increase the value of the settlement consideration, but have never even said what they believe those claims are worth, much less offer any evidence of that alleged value. Moreover, the DCL Plan Proponents forget that the litigation trust claims will be available to the estates whether or not the DCL Plan is approved. Similarly, while the DCL Plan Proponents make much of their proposal to allocate some of their interest in those claims to Non-LBO Creditors, they ignore the fact that equitable principles could well prevent them from retaining any interest in LBO related claims, including in the DCL Litigation Trust. *See also* Section VII, above.

contemplated by the April Plan.[793]  Based on a DEV of $8.291 billion (see section IV), however, the Senior Lenders would recover more than 85% of the value of their claims under the DCL Plan.[794]

### 4. The Pre-LBO Noteholders Stand To Gain Substantially More Litigating The LBO Claims Released Under The Proposed Settlement

366.    A claim-by-claim examination of the consideration being provided by the Senior Lenders also illustrates the insufficiency of the DCL Plan.  The Proposed Settlement contemplates a release of more than $6.4 billion in Step One Avoidance Claims in exchange for a "reallocation" of consideration by the Senior Lenders of just $322 million, while $1.8 billion of Step One Disgorgement Claims against the Senior Lenders (excluding pre-judgment interest) would be released for *nothing*.  To be sure, the Examiner concluded that Step One was less likely to be deemed a fraudulent conveyance than Step Two, but he still projected that such an outcome was only "reasonably unlikely."[795]  According to the Noteholder Plan Proponents' decision tree expert, "reasonably unlikely" equates to a 30% chance of success,[796] and even using the midpoint of the range assigned by *the DCL Plan Proponents'* own putative expert to the phrase only "reasonably unlikely" —22.5%—it is clear that the Step One Avoidance Claims alone are worth substantially more than $322 million, and that release of the Step One Disgorgement Claims disgorgement claim for nothing is completely unjustified.[797]  In addition, the Proposed Settlement would allow the Senior Lenders to escape a near certain $318 million

---

[793] 3 /15/11 Trial Tr. 292:14-294:3 (Gropper); *see also* NPP 2473 (Trial Demonstrative); NPP 2170 (Second Mediator's Report), Ex. A; NPP 24 (4/8/10 Executed Settlement Support Agreement).

[794] 3 /15/11 Trial Tr. 292:14-294:3 (Gropper).  Even the Debtors admit that DEV has been on the rise for well more than a year; and that DEV has increased from their estimate of $6.1 billion in April to at least $6.75 billion in October, 2010.  As discussed elsewhere, the record strongly suggests that DEV is substantially in excess of the Debtors' last estimate.

[795] NPP 782 (Exam'r Rpt.), Vol. I at 22.

[796] *Infra* at § V.A.2.

[797] Significantly, the Examiner did not assign his lowest probability rating – "highly unlikely" – to a finding of Step One intentional fraud, indicating his disagreement with the DCL Plan Proponents' dim view of the merits of the Step One-related LBO Claims.

worth of Step Two Disgorgement Claims (excluding pre-judgment interest) for payment of just $120 million, and pay ***nothing*** to the Pre-LBO Noteholders in exchange for the release of $2.1 billion of Step Two Avoidance Claims.[798]  Finally, the DCL Plan would release more than $1.6 billion in claims against the Bridge Lenders for a mere $13 million.[799]

367.    Even at the DCL Plan Proponents' artificially low DEV of $6.75 billion, if only the Step Two Debt is avoided, this would generate more than $1.9 billion in distributable value for the Non-LBO Creditors (assuming WEAR applies).[800]

368.    Moreover, even if litigating the LBO Claims only resulted in avoidance at just the Tribune parent-level, there would still be substantial value for the Non-LBO Creditors that the Proposed Settlement does not take into account.  Avoidance of LBO Lender claims at Tribune would lead to the disgorgement of about $2.19 billion in total (prior to pre-judgment interest)— $1.87 billion in principal, interest and fees paid out in respect of the Step One Debt, and the disgorgement of $318 million in payments respecting the Step Two Debt.[801]  This $2.19 billion in total Step One and Step Two disgorgement, combined with the approximately $693 million of distributable value at the Tribune level, would provide a recovery of $2.88 billion dollars for

---

[798] The Senior Lenders added approximately $74 million in consideration for release of the Step Two Avoidance Claim, but none of that value goes to the Pre-LBO Noteholders, the largest single beneficiary of the claim being released.  3/9/11 Trial Tr. 76:20-77:6 (Kulnis).  Instead, most of the value will be paid to unsecured creditors who are a part of the voting majority that caused the Committee to support the plan, while the remaining $14 million will be paid to Oaktree, itself a Senior Lender.  *See* DCL Plan, §§ 5.15 and 5.16

[799] The support of Oaktree and Angelo Gordon for all these free releases is in marked contrast to the position they took regarding the proposed release of shareholders, directors and officers for free in connection with the April Plan.  At that point in time, Oaktree and Angelo Gordon took the position that "***people can't just be handed releases***" for free. NPP 1989 (4/12/10 Credit Agreement Lenders' Settlement Statement) at 7.

[800] 3/15/11 Trial Tr. 241:9-13 (Gropper).

[801] A schedule of the pre-petition payments made by Tribune to the LBO Lenders is available in the Examiner's Report, Volume II Annex C.  *See* NPP 782 (Exam'rs Rpt.), Vol. II at Annex C; *id.* Vol. I at 207-10, 461-62.

Non-LBO-Creditors holding allowed claims at the Tribune level. In such case, the Senior Notes, PHONES, Retiree Claimants, and other parent creditors would be paid in full.[802]

369.   Finally, even if the Step One Lenders were able to establish a 548(c) defense and preserve their claims on account of the repayment of $2.8 billion of debt and working capital in existence before the LBO, this "protected debt" represents just 38% of the $7.4 billion original face amount of their funded debt. As a result, 62% of the Step One Lender claims would remain unprotected, and thus 62% of the $1.87 billion of Step One fees, principal and interest (or $1.17 billion) would still have to be disgorged. This would leave about $2.18 billion ($1.17 billion in Step One disgorgements, $318 million in Step Two disgorgements and $693 million in distributable value) available to the remaining parties holding claims against Tribune.[803] Distributing this value through the waterfall of remaining allowed claims, and taking into account the PHONES Notes, would provide $761 million for Non-LBO Creditors—far in excess of what the Proposed Settlement offers them.

## IV.   THE EVIDENCE SUPPORTS A FINDING THAT DEV IS $8.291 BILLION

370.   The evidence presented by the Noteholder Plan Proponents supports a finding that the DEV is $8.291 billion.

371.   DEV directly affects the natural recovery that would flow to the Non-LBO Creditors. Assuming that only Step Two is avoided, at a $8.291 billion DEV the Step One Lenders will have been paid in full, the Senior Noteholders would be paid in full, and enough value would remain to pay the holders of PHONES Notes approximately $513 million. At a DEV as low as $6.9 billion, $597 million would flow directly to Non-LBO Creditors because the

---

[802] At an $8.291 billion DEV, $693 million (or 8.4%) is allocated to Tribune and the remainder, $7.598 billion (or 91.6%) is allocated to the Subsidiaries. Using the DCL Plan Proponent DEV of $6.75 billion, $564 million is allocated to Tribune.
[803] Under the $6.75 billion DEV espoused by the DCL Plan Proponents, there would be just over $2.0 billion available to Tribune's creditors ($1.17 billion in Step One disgorgements, $318 million in Step Two disgorgements and $564 million in distributable value).

Step One Lenders will have been paid in full. Similarly, at a $7.019 billion DEV, $716 million would flow to Non-LBO Creditors, at a $7.5 billion nearly $1.2 billion dollars in value DEV would flow to the Non-LBO Creditors, and at a $7.8 billion DEV, the Senior Noteholders would be paid in full.[804]

A. **The DCL Plan Proponents' Suggested DEV Of $6.75 Billion Is An Out-Of-Date, Stale Valuation**

372.    The Debtors' financial advisors at Lazard prepared a series of valuation reports in connection with their engagement, each one resulting in a valuation estimate which was higher than the previous one. Yet at trial, Lazard stubbornly clung to an earlier, out-of-date, and lower valuation.

373.    In March 2010, Lazard prepared a valuation in connection with the Company's June 2, 2010 Disclosure Statement (the "March Valuation Report"), and arrived at a valuation estimate of $6.1 billion.[805] Shortly thereafter, certain of the DCL Plan Proponents argued that this valuation was "conservative," "likely inaccurate," and inconsistent with trading prices for Tribune debt which indicate that "the market places a much higher value on Tribune."[806]

374.    In July 2010, Lazard increased its valuation to about $6.5 billion.[807] Lazard then prepared an October valuation (the "October Valuation Report") which resulted in a valuation estimate of $6.75 billion.[808] The October Valuation Report was an update to, and incorporated the same approach and methodologies as, the March Valuation Report.[809]

375.    Three months later, Lazard prepared a valuation report (the "January Valuation Report") which resulted in a valuation estimate of $7.019 billion. The January Valuation Report

---

[804] 3/15/11 Trial Tr. 296:23-298:17 (Gropper).
[805] 3/11/11 Trial Tr. 20:9-12, 81:10-15 (Mandava).
[806] Credit Agreement Lenders' Statement Regarding Purported "Settlement" of "LBO-Related Causes of Action" (ECF No. 3999), dated April 12, 2010, at n.4.
[807] 3/11/11 Trial Tr. 81:16-20 (Mandava).
[808] 3/11/11 Trial Tr. 81:21-24 (Mandava).
[809] 3/11/11 Trial Tr. 81:25-82:5 (Mandava).

was prepared "at the request of Sidley Austin LLP. . . to summarize Lazard's conclusions as to the total distributable value of the Debtors' consolidated estates based on the most recently available information."[810]

376.    On February 8, 2011, the Debtors submitted Lazard's final expert report (the "Lazard Expert Report"), as well as a companion expert report of John G. Chachas.

377.    Although the Lazard Expert Report was signed by two purported valuation experts—David Kurtz and Suneel Mandava—Kurtz did not provide any testimony at the confirmation hearing in support of the DCL Plan DEV; did not have any expert opinions as to the enterprise value of the Company; and did not have an opinion as to whether DCF, comparable company or precedent transactions analyses contained in the Lazard Expert Report were accurate or done correctly.[811]

378.    Chachas did not offer any expert opinion which was distinct from the opinions expressed in the Lazard Expert Report, and acknowledged that his opinions were wholly duplicative of Mandava's opinions.[812]

379.    Chachas also acknowledged that he conducted his valuation "analysis" with the assistance of Christopher Saunders, an investment banker of Citigroup, but did not disclose this fact to the Debtors or any other party, even though he was aware that Citigroup, as an Arranger and holder of Senior Loan Claims, is one of the entities that would be released under the DCL Plan.[813]  Chachas also provided misleading testimony to the Bankruptcy Court regarding the role

---

[810] NPP 2284 (Lazard Valuation Supplement) at 1.
[811] 3/11/11 Trial Tr. 83:13-86:7 (Mandava).
[812] 3/11/11 Trial Tr. 193:24-194:4 (Chachas).
[813] 3/11/11 Trial Tr. 195:17-197:3 (Chachas).

of Saunders, initially denying that Saunders spent many hours on the engagement, but ultimately conceded that he did.[814]

380. As of February 8, 2011—when Lazard submitted its expert report in this case— the January Valuation Report, while still over a month old, nonetheless represented Lazard's best and most current estimate of Tribune's DEV.[815]

381. The January Valuation Report incorporated updated trading multiples and discount rates based on market data available as of January 19, 2011, and up-to-date performance numbers for 2010 and 2011 projections based on a preliminary version of the 2011 budget (the "Preliminary 2011 Plan").[816] The Preliminary 2011 Plan was presented to the Board in December 2010, and was the result of a ground-up process which began October 2010.[817] It incorporated month-end results through November 2010, which were available in the first week of December.[818]

382. Mandava testified that he agreed with the methodologies, calculations, and results of the January Valuation Report, including the conclusion of a midpoint valuation estimate of $7.019 billion, and that the valuation work performed in January was accurate.[819] Similarly, Chachas testified that, as of February 8, 2011, the January Valuation Report contained Lazard's "most current estimate" of the Company's DEV.[820] Messrs. Mandava and Chachas, as well as

---

[814] 3/11/11 Trial Tr. 195:17-197:3 (Chachas).
[815] 3/11/11 Trial Tr. 82:19-25, 88:6-13, 208:16-20 (Chachas).
[816] 3/11/11 Trial Tr. 70:18-71:19, 87:19-22 (Mandava).
[817] 3/14/11 Trial Tr. 124:19-125:1, 143:18-144:16 (Hartenstein).
[818] 3/14/11 Trial Tr. 146:16-147:5 (Hartenstein).
[819] 3/11/11 Trial Tr. 82:19-25, 88:6-12 (Mandava).
[820] 3/11/11 Trial Tr. 208:16-20 ("Q: And as of the February 8th date of the expert report that you submitted, isn't the January supplement the most current -- the most current estimate that Lazard had prepared of Tribune's distributable enterprise value? A: Yes, it was.") (Chachas).

the Creditors' Committee's financial advisor, all confirmed that it is critical to use the most up-to-date available information in conducting a valuation.[821]

383.    The final Lazard Expert Report submitted on February 8, 2011 was based on the October Valuation Report.  At the time, the October Valuation Report was four months old, was based on stock prices as of October 4, 2010, and used outdated inputs in the DCF such as the risk-free rate and risk premiums.[822]

384.    The March and October Valuation Reports were both included in the Lazard Expert Report, but the January Valuation Report was not, and no reference was made to the $7.019 billion valuation conclusion reached by Lazard in the January Valuation Report.[823]

### B.    The True DEV Of The Debtors Is $8.291 Billion

385.    The evidence shows that the Noteholder Plan Proponents' valuation expert, Raj Singh, brought Lazard's valuation up to date as of the date of his rebuttal report by using current financial and market data available as of February 18, 2011.[824]

386.    The updated financial data used by Singh included the Company's actual 2010 performance results and revised 2011 projections which were presented to the Board  on February 2, 2011.[825]  Singh also used the long-term projections for 2012 through 2015 prepared by the Company in October 2010, which were the most current long-term projections prepared

---

[821] 3/11/11 Trial Tr. 86:23-87:4 (Mandava); 208:11-15 (Chachas) ("Every valuation expert in doing a valuation should rely upon the most up-to-date information available."); 2/16/11 Carlston Dep. Tr. 166:5-20;  *see also*, *e.g.,* In re Mirant Corp., 334 B.R. 800, 824 (Bankr. N.D. Tex. 2005) (holding that the court could not "accept unchanged any of the values for Mirant Group that [had] been placed in evidence," because much of data relied on "was stale by the time of the Valuation Hearing.").
[822] 3/14/11 Trial Tr. 187:9-11, 189:1-3 (Singh); DCL 1104 (Chachas Rpt.), Ex. 2 at 1 ("The present estimate of tribune's Total Distributable Value was prepared in October 2010 as an update to Lazard's March 2010 estimate."); *id.* at 6-11, 23, 28, 34.
[823] DCL 1104 (Chachas Rpt.), Ex. 2 at 1.
[824] NPP 2469 (Revised & Amended Raymond James Rpt.) at 17.
[825] NPP 2215 (Board of Directors 2010 Operating Performance Update); NPP 2469 (Revised & Amended Raymond James Rpt.) at 21.

by management.[826]  Singh used management's most current projections without adjustment, even though on the eve of the confirmation trial management conveniently predicted sharp declines in publishing revenue despite "stellar" performance in 2010, including a significant increase in interactive revenue in each of the first three quarters of 2010, even though industry trends in online advertising revenue that are starting to improve dramatically, and even though the projections did not take account of the positive impact of the Debtors' emergence from bankruptcy.[827]

387.    In updating this data, Singh used a quantitative approach designed to simulate Lazard's judgment, and therefore isolate the impact of the updated market data.[828]  This resulted in an increase of $839 million over the DCL Plan value.[829]

388.    Singh also corrected numerous several methodological flaws and errors in Lazard's valuation, which resulted in further increasing Lazard's Distributable Enterprise Value estimate by $750 million.[830]

389.    Among the methodological flaws in Lazard's valuation was Lazard's placement of an unreasonable amount of weight on its publishing DCF analysis, even though the DCF analysis was based on patently unreasonable and unreliable projections that predicted a steep continuing decline in the publishing business to the point that there would soon be no free cash flow at all.[831]  In preparing these projections management assumed that while EBITDA was projected to a fall my more than half over the projection period, it could not reduce capital

---

[826] NPP 2469 (Revised & Amended Raymond James Rpt.) at 57, 59-60; 3/11/11 Trial Tr. 125:13-127:17 (Mandava).
[827] NPP 2177 (10/19/10 Board meeting) at 34; 3/14/11 Trial Tr. 126:13-14 (Hartenstein); 3/14/11 Trial Tr.134:12:23 (Hartenstein).
[828] 3/14/11 Trial Tr. 189:4-17, 199:8-12 (Singh).
[829] 3/14/11 Trial Tr. 186:13-18 (Singh).
[830] NPP 2470 (Singh Trial Demonstratives) at 9.
[831] 3/14/11 Trial Tr. 194:6-12 (Singh); 3/11/11 Trial Tr. 108:16-109:7, 101:4-10, 35:6-36:3-21 (Mandava).

expenditures at all, even though no reasonable person would maintain these capital expenditure levels in the face of such declining earnings.[832]

390.    These projections were inconsistent with the far more optimistic projections of the Company's peers and other newspaper and publishing companies that have emerged from bankruptcy, inconsistent with broader industry forecasts which have predicted a revitalization of the publishing industry relative to recent lows, and inconsistent with the Company's own improving performance throughout 2010.[833]  As shown below, the Company outperformed its publishing forecasts throughout 2010, revised its 2010 projections in October 2010 (the "October 2010 Business Plan") in light of "stellar" year to date performance, and then outperformed even those revised projections by year end.[834]





Source: The Lazard Report; February 2011 Report
(1) Publishing numbers include Tribune Media Services and ForSaleByOwner.com.

---

[832] 3/11/11 Trial Tr. 105:22-107:2 (Mandava).

[833] 3/11/11 Trial Tr. 35:7-17, 107:16-108:2, 103:19-105:6  (Mandava); 3/14/11 Trial Tr. 192: 17-25 (Singh). Mandava acknowledged that investors assessing the value of the Company at emergence "would take a point of view more similar or more akin to the way the capital markets are currently valuing publishing companies" than the outlook of Tribune's management.  3/11/11Trial Tr. at 35:24-36:3 (Mandava ).

[834] 3/11/11 Trial Tr. 97:6-16, (Mandava) 139:1-3, 190:11-191:6 (Singh).

391. Despite the Company's improved performance, and despite significant increases in online advertising revenue, the October 2010 Business Plan predicted greater declines in growth in each year of the projection period than the earlier March 2010 projections.[835]

392. The October 2010 Business Plan was also stale as of the date of Lazard's Expert Report. The Debtors performed so well in November and December 2010 that that the Debtors' fourth quarter operating cash flow ended up being $20 million ahead of plan, and Mandava testified that if management were to reforecast the 2012 to 2015 projections as of February 2011, the projections would go up.[836] In addition, despite the Debtors' claim that they have been "hampered and hobbled by the fact that we're still in bankruptcy," the October 2010 Projections did not account for any benefits of the Debtors' future emergence from bankruptcy.[837]

393. Lazard included a scenario in its January Valuation Report in which in which gave no weight to the publishing DCF analysis (versus the 30% weighting attributed to the publishing DCF analysis in the Lazard Expert Report), and which resulted in a midpoint DEV of $7.258 billion.[838] Singh, however, concluded that it was more appropriate to apply a 10% weighting to the publishing DCF.[839] Although Mandava criticized this weighting by claiming that "[u]sing 10 present is akin to just saying I'm not giving any consideration or any weight to it," he later defended Lazard's application of a 10% weighing in their valuation of Tribune Media Services by claim that this weighting reflected "serious consideration" of the data that "we couldn't ignore."[840]

[835] 3/11/11 Trial Tr. 98:16-99:8 (Mandava ).
[836] Trial Tr. 126:15-21 (Mandava ); 3/14/11 Trial Tr. 139:6-23 (Hartenstein).
[837] 3/14/11 Trial Tr. 109:25-110:8, 142:2-143:5 (Hartenstein).
[838] NPP 2284 (Lazard Valuation Supplement) at 6.
[839] 3/14/11 Trial Tr.195:11-196:15 (Singh); NPP 2469 (Revised & Amended Raymond James Rpt.) at9-10.
[840] 3/11/11 Trial Tr. 36:4-10; 51:4-24  (Mandava).

394.     Similarly, whereas Lazard overweighted its broadcasting DCF analysis (despite the Company's admittedly conservative projections), Singh weighting the broadcasting DCF analysis and comparable companies analysis equally, noting that it was inappropriate to underweight to comparable companies analysis given that the TV Station comparable company peer group is directly in line with the Company's broadcasting operations.[841]

395.     Singh's two weighting adjustments described above resulted in a $216 million increase in value over Lazard's valuation.

396.     Lazard's valuation of the Company's non-controlled interests was also flawed.  In its valuation of the Company's interest in Food Network, Lazard did not account for Food Network's 2010 actual results or updated 2011 projections (both of which exceeded prior projections) in conducting a DCF analysis of Food Network, and in fact did not include a DCF analysis for Food Network in their expert report at all, despite having done one.[842]  Instead, Lazard relied on only one comparable company in their comparable company analysis (Food Network's parent company Scripps Network) and on only one transaction (the acquisition of Travel Channel) in their precedent transaction analysis.[843]

397.     Lazard also failed to account for the fact that Food Network significantly outperforms its parent Scripps.[844]  In fact, Lazard applied a discount to the Scripps multiple in its comparable company analysis, even though Food Network's EBITDA margins and revenue growth significantly exceed those of Scripps as a whole, and those of Scripps excluding Food

[841] 3/14/11 Trial Tr 200:6-203:0 (Singh).
[842] 3/11/11 Trial Tr. 116:5-118:11 (Mandava).  Had Lazard conducted a DCF valuation using these updated numbers, Lazard's DCF valuation would have substantially increased.  3/11/11 Trial Tr. 119:21-120:12 (Mandava).
[843] 3/11/11 Trial Tr. 62:8-63:12 (Mandava); 3/14/11 Trial Tr. 207:8-208:4 (Singh).
[844] 3/14/11 Trial Tr. 1688:2-14 (Singh); 3/15/11 Trial Tr. 120:18-121:2  (Singh).

Network.[845]  Lazard also applied a 70% weighting to its comparable company analysis, which had the effect of compounding this error.[846]

398.     Singh corrected these errors by adding Discovery Communications as a comparable company, adding the sale of Weather Channel as a precedent transaction, using updated 2010E EBITDA numbers, and weighting the comparable companies and precedent transactions analysis equally.

399.     With respect to Classified Ventures, Lazard identified four comparable companies, but only relied on one of them—Internet Brands.[847]  However, Internet Brands was no longer a comparable company at the time of the Lazard report because it had been sold. Singh appropriately utilized Internet Brands as a precedent transaction, as well as the other three companies identified by Lazard.[848]

400.     Singh similarly corrected several errors in Lazard's valuation of CareerBuilder, including Lazard's failure to conduct a precedent transaction analysis despite Gannet's recent acquisition of a 10% stake in CareerBuilder (clearly a relevant precedent transaction), and Lazard's improper consideration of Manpower as a comparable company for CareerBuilder, even though Manpower is in a different line of business than CareerBuilder.[849]

401.     With respect to Tribune Media Services, Lazard conducted a precedent transaction analysis based entirely on preliminary sell side bids from 2008, even though none of them resulted in a completed precedent "transaction," and even though Mandava had never in his entire career at Lazard ever seen any formal valuation that relies upon a precedent transaction

---

[845] 3/14/11 Trial Tr. 1688:2-14 (Singh); 3/15/11 Trial Tr. 120:18-121:2 (Singh).
[846] 3/11/11 Trial Tr. 64:8-10 (Mandava).
[847] 3/14/11 Trial Tr. 214:11-14 (Singh).
[848] 3/14/11 Trial Tr. 214:14-20 (Singh).
[849] Manpower is a human resources employment company, whereas CareerBuilder operates employment websites.

analysis that is based solely upon indications of interest.[850]  Singh concluded that consideration

of preliminary sell side bids as precedent transactions was wholly inappropriate, and corrected

Lazard's error by removing that methodology and weighting the comparable companies and

DCF analyses for Tribune Media Services, which resulted in a $7 million increase in value.

402.    Singh also corrected certain clear errors in Lazard's treatment of the Company's

non-cash pension expense, which failed to account for Fresh Start accounting adjustments.

403.    Finally, Singh corrected errors in Lazard's estimate of distributable cash, which

improperly projected distributable cash through December 2010 instead of through the assumed

effective date of June 30, 2011.  Lazard's estimate of distributable cash as of December 27, 2010

of $1.687 billion is also significantly lower than the Company's actual cash balance of $1.847

billion as of April 24, 2011.[851]

404.    Collectively, correcting these errors and updating the financial and market data

used in the Lazard report resulted in an estimated DEV estimate of $8.291 billion, a $1.589

billion increase to Lazard's midpoint, and a valuation at which the DCL Plan Proposed

Settlement is entirely indefensible.

405.    Applying the same parent-subsidiary allocation of value endorsed by the DCL

Plan Proponents would result in $693 million (or 8.4%) of the $8.291 billion in DEV being

allocated to Tribune; the remainder, $7.598 billion (or 91.6%), would be allocated to the

Tribune's subsidiaries.[852]

---

[850] 3/11/11 Trial Tr. 115:5-11 (Mandava).
[851] NPP 2232, Ex. 2 (Lazard Report) at 15; April Monthly Operating Report [ECF No.8984] at 3.
[852] *See* DCL 376 (Joint Disclosure Statement) at Ex. F.

406.     A higher DEV results in a higher recovery for the Senior Lenders, and should also result in the Senior Lenders giving up a greater percentage of their recovery to settle the LBO Claims.[853]

407.     Indeed, at a DEV of $6.9 billion or higher, the Step One Lenders (and general unsecured creditors at the Guarantor Debtors) would be paid in full under a waterfall plan if only the Step Two Financing is avoided (and no post-petition interest is allowed), leaving enough value to pay the Senior Noteholders well in excess of the Proposed Settlement.  As explained above, the avoidance of Step Two is a virtual certainty if the claims are litigated. Further, recoveries to Pre-LBO Noteholders that would follow from the avoidance of Step Two and the application of WEAR would also materially increase with higher a DEV.  A higher DEV thus directly impacts the settlement value of the LBO Claims against the LBO Lenders.  Finally, the expected value of the LBO Claims against the LBO Lenders, as calculated by Beron, would also increase as DEV exceeds $6.75 billion.

C.     **The Noteholder Plan Proponents Presented Substantial Evidence That The Step One Lenders Are Not Entitled To Postpetition Interest**

408.     The Noteholder Plan Proponents presented substantial evidence that the Step One Lenders are not entitled to postpetition interest assuming Step Two is avoided.  First, the Step One Lenders are not entitled to postpetition interest because the DCL Plan Proponents have not demonstrated that any of the Guarantor Debtors would be solvent and solvency is a prerequisite for postpetition interest to be paid to unsecured creditors.

409.     Second, the Step One Lenders are not entitled to postpetition interest because all Intercompany Claims have not been satisfied.  Under the Noteholder Plan, Intercompany Claims assertable between Guarantee Debtors must be satisfied before Step One Lenders could recover

---

[853] 3/15/11 Trial Tr. 297:19-24 (Gropper).

postposition interest.[854]  The Intercompany Claims Settlement establishes that multiple

Guarantor Debtors who have no obligations to Tribune owe substantial amounts to other

Guarantor Debtors that will not be paid in full.[855]  Accordingly, the Step One Lenders have no

entitlement to postpetition interest.

410.    The DCL Plan Proponents disregard both the way in which the Intercompany

Claims Settlement has been incorporated into the Noteholder Plan, and the extent of the

Intercompany Claims assertable between the Guarantor Debtors that must also be satisfied before

Step One Lenders could recover postpetition interest.  Pursuant to the terms of the Intercompany

Claims Settlement, Tribune holds more than $20 billion in potential claims against the Guarantor

Debtors, of which more than $2 billion is deemed to be allowed pursuant to the terms of the DCL

Plan and the Intercompany Claims Settlement.[856]  Section 5.19 of the Noteholder Plan

implements and incorporates the Intercompany Claims Settlement subject to the proviso that,

"before any Holder of an unsecured Claim against Tribune or a Guarantor Debtor receives

Postpetition Interest on account of such Claim…the prepetition Intercompany Claims against the

relevant Debtor must receive payment in full."[857]  The Intercompany Claims Settlement reflects

that many of the Guarantor Debtors who have no obligations to Tribune (*i.e.,* those Debtors who

allegedly comprise more than 80% of the total DEV allocable to the Guarantor Debtors) owe

substantial amounts to other Guarantor Subsidiaries—amounts which, under the Noteholder

Plan, must be satisfied in full before Step One Lenders receive postpetition interest.  The DCL

Plan Proponents have not introduced any evidence to support a finding that sufficient value

would exist to pay Step One Lenders postpetition interest after all Intercompany Claims

---

[854] Noteholder Plan at § 5.19.
[855] DCL Plan dated 2/4/11 [ECF No. 7801] at Exhibit 1.1.122 (Intercompany Claims Settlement).
[856] DCL Plan dated 2/4/11 [ECF No. 7801] at Exhibit 1.1.122 (Intercompany Claims Settlement).
[857] Noteholder Plan at § 5.19.

assertable by and against Tribune *and* by and between each Guarantor Debtor have been satisfied in full. Accordingly, the Step One Lenders would not be entitled to postpetition interest.

## V. THE NOTEHOLDER PLAN PROPONENTS' EXPERT, DR. BRUCE BERON, DEMONSTRATED AT TRIAL THAT THE PROPOSED SETTLEMENT IS NOT REASONABLE

### A. Beron's Decision-Tree Analysis Of The Examiner's Findings Establishes That The Proposed Settlement Consideration Is "Not Even Close" To Reasonable

411. At trial, the Court accepted the Noteholder Plan Proponents' proffered expert, Dr. Bruce Beron, as an expert in his field of decision-tree and expected value analysis,[858] and admitted Beron's initial and rebuttal expert reports into evidence in their entirety.[859]

412. Based on his comprehensive analysis and his extensive experience and background in assessing settlements with decision tree and expected value analysis, Beron testified that (i) litigating the LBO Claims have an expected value of $1.51 to $1.83 billion, (ii) these claims have a high chance of producing a recovery far in excess of the consideration offered in the Proposed Settlement[860] and (iii) therefore, the Proposed Settlement is "not even close" to reasonable.[861]

#### 1. Beron's Extensive Background

413. Beron has over 20 years of experience analyzing the reasonableness of settlements using expected value and decision-tree analysis.[862]

---

[858] 3/17/11 Trial Tr. 120:8-25 (Beron) (accepting Beron as an expert witness).

[859] *See* 3/17/11 Trial Tr. 145:12-20, 165:6-18, 250:16-257:16 (Beron) (admitting into evidence NPP 2476 (Beron Rpt.) and NPP 957 (Beron Rebuttal Rpt.); *see also* 3/17/11 Trial Tr. 120:8-25 (Beron) (accepting Beron as an expert witness).

[860] *See* NPP 2476 (Beron Rpt.) at 3, 5, 16, 17; *see also* 3/17/11 Trial Tr. 144:12-16, 167:5-19, 167:25-168:20 (Beron).

[861] 3/17/11 Trial Tr. 170:4-11 (Beron); *see also* NPP 2474 (NPP Objection) at 49-50, 59-60 (cases cited therein where courts rejected settlements because they were less than the expected value of the litigation or the litigation had better than 50% chance of success).

[862] NPP 2476 (Beron Rpt.) at 1; 3/17/11 Trial Tr. 104:5-106:5 (Beron).

414.     Beron began his career at the Stanford Research Institute, or SRI, where the modern technique of decision-tree analysis was developed and promulgated.  He has since spent over 20 years as a litigation risk consultant, advising scores of Fortune 500 clients about the reasonableness of settlements using expected value and decision-tree analysis.[863]

### 2.     Beron's Reliance On The Examiner's Conclusions

415.     Beron relied exclusively on the Examiner's conclusions to undertake a methodical and comprehensive analysis of the LBO Claims against the LBO Lenders.[864]

416.     In particular, Beron relied on the Examiner's specific, "bottom-line" conclusions, based on what was known to the Examiner at the time of his investigation, for each element, defense and important issue relating to the fraudulent conveyance claims at Step One and Step Two.[865]  The Examiner stated up front that his Report was organized to allow a reader to quickly find the Examiner's "bottom-line" conclusions on every issue at the "outset" of each "subsection" in Volume II of his report:

> The Examiner has organized this portion of the Report (as well as Volume Three) to enable the reader to obtain, in a relatively quick fashion, the Examiner's "bottom line" regarding the issues presented.  To accomplish this objective, the Report sets forth the Examiner's conclusions regarding the principal issues addressed in each subsection at the outset of that subsection, followed immediately by the Examiner's factual and legal analysis.[866]

417.     The Examiner "frame[d]" his "bottom-line" "conclusions … in a uniform fashion" along a "continuum" of seven, verbal descriptors, ranging from "highly likely" (the highest assessment) to "highly unlikely" (the lowest assessment):[867]

---

[863] *See* 3/17/11 Trial Tr. 103:11-18, 104:5-20, 105:3-106:5, 106:20-108:13 (Beron); NPP 2476 (Beron Rpt.) at 1.
[864] NPP 2476 (Beron Rpt.) at 2-3; 3/17/11 Trial Tr. 115:17-116:3, 160:18-161:6 (Beron); *see also id.* 120:8-25 (Beron) (accepting Beron as an expert witness).
[865] NPP 782 (Exam'rs Rpt.), Vol. I at 4; NPP 2476 (Beron Rpt.) at 19-20; 3/17/11 Trial Tr. 121:3-122:8 (Beron).
[866] NPP 782 (Exam'rs Rpt.), Vol. I at 4 (emphasis added).
[867] NPP 782 (Exam'rs Rpt.), Vol. I at 6; *see also* 3/17/11 Trial Tr. 122:9-123:3 (Beron).

| Examiner's Seven Sets of Conclusions |
| --- |
| "highly likely" |
| "reasonably likely" |
| "somewhat likely" |
| "equipoise" |
| "somewhat unlikely" |
| "reasonably unlikely" |
| "highly unlikely" |

418. In his trees, Beron modeled 45 of the Examiner's conclusions in the Examiner's Report. Each of these conclusions are listed in Appendix C of Beron's initial expert report.[868]

419. Because the Examiner did not attribute a numerical probability to these seven sets of conclusions, Beron determined probability percentages for each set, called the "base set" of probabilities.[869] For purposes of running a sensitivity analysis on his percentage determinations, Beron also performed his calculations using a "contracted set" and "spread set" of percentages.[870] Because the "contracted" and "spread" set percentages did not have a material effect on his analysis, his primary conclusions regarding the Proposed Settlement and the expected value of the LBO Claims are based on the "base set."[871] The "base set" of probability percentages that Beron assigned to the Examiner's seven sets of conclusions are as follows.[872]

---

[868] *See* NPP 2476 (Beron Rpt.) at 6-7, Appx. C.
[869] *See* NPP 2476 (Beron Rpt.) at 6; 3/17/11 Trial Tr. 125:5-126:13 (Beron).
[870] See NPP 2476 (Beron Rpt.) at 6; 3/17/11 Trial Tr. 125:5-126:24 (Beron)
[871] *See* NPP 2476 (Beron Rpt.) at 6-7; 3/17/11 Trial Tr.126:14-24 (Beron).
[872] NPP 2476 (Beron Rpt.) at 6; 3/17/11 Trial Tr. 125:5-126:13 (Beron)

| Examiner's Seven Sets of Conclusions | "Base Set" Probability Percentages |
| --- | --- |
| Highly Likely | 85% |
| Reasonably Likely | 70% |
| Somewhat Likely | 60% |
| Equipoise | 50% |
| Somewhat Unlikely | 40% |
| Reasonably Unlikely | 30% |
| Highly Unlikely | 15% |

420.     For example, because the Examiner concluded that it was "somewhat likely" that a court would find that the Step Two Financing was an intentional fraudulent conveyance,[873] Beron assigned a 60% probability to this conclusion in his trees.[874]

### 3.     Beron's Decision Trees

421.     Beron developed decision trees to compute the expected value of litigating the LBO Claims.  Decision trees graphically lay out the uncertainties associated with elements needed to establish and defend against the fraudulent conveyance claims, and map how those uncertainties lead to a variety of different recovery outcomes for the Non-LBO Creditors.[875]  In turn, expected value analysis calculates the probability-weighted expected value of litigating those claims an infinite number of times, by using the probabilities and recovery outcomes generated in the decision-tree analysis.[876]

422.     As Beron explained at trial, decision-tree and expected value analysis is a common and well-accepted technique often used to assess the reasonableness of settlements.[877] Don Liebentritt, the Debtors' Chief Restructuring Officer, acknowledged in his deposition that

---

[873] NPP 782 (Exam'rs Rpt.), Vol. II at 32.
[874] See NPP 2476 (Beron Rpt.) at 28.5, 38; 3/17/11 Trial Tr. 124:2-16 (Beron).
[875] See 3/17/11 Trial Tr. 108:20-109:9 (Beron); NPP 2476 (Beron Rpt.) at 19-20; NPP 957 (Beron Rebuttal Rpt.) at 11, 15.
[876] See 3/17/11 Trial Tr. 109:10-24 (Beron); NPP 2476 (Beron Rpt.) at 19-20
[877] See 3/17/11 Trial Tr. 106:2-5, 106:20-24 (Beron); NPP 957 (Beron Rebuttal Rpt.) at 11; NPP 2474 (NPP Objection) at 48-50 (cases and articles cited therein).

he has relied on decision-tree analysis in the past to evaluate appropriate settlement value of claims.[878]

423. Beron modeled virtually every conceivable litigation outcome for the fraudulent conveyance claims against the LBO Lenders in six sets of complex decision trees to determine the probabilities of various recovery outcomes and to compute the expected value of the claims.[879] These decision trees lay out the potential outcomes associated with the elements needed to establish and defend against the fraudulent conveyance claims, and map how those outcomes lead to a variety of different recovery amounts for the Non-LBO Creditors based on conclusions assigned by the Examiner.[880]

424. Beron created two decision trees for the fraudulent conveyance claims against the LBO Lenders for the Step One and Step Two Financings.[881] Mapping the various issues underlying these claims—such as reasonable equivalent value, the consideration of Step Two Financing at Step One and the three financial condition tests—these two trees yielded a total of 104 fraudulent transfer outcomes.[882]

425. Beron's decision trees for Step One and Step Two mapped the litigation outcomes for the fraudulent transfer claims at each of those steps, and calculated the percentage probability of each outcome, with the probabilities for each tree totaling to 100%.[883] Based on the Examiner's conclusions, Beron's trees modeled 82 different litigation outcomes for fraudulent conveyance claims at Step One and 22 different litigation outcomes at Step Two.[884] Beron

[878] *See* Liebentritt Dep. Tr. 78:3-79:21.
[879] *See* 3/17/11 Trial Tr. 127:3-128:12, 136:15-17 (Beron); NPP 2476 (Beron Rpt.) at 7.
[880] *See* 3/17/11 Trial Tr. 108:20-109:9, 127:3-128:12, 136:15-17 (Beron); NPP 2476 (Beron Rpt.) at 19-20; NPP 957 (Beron Rebuttal Rpt.) at 11, 15.
[881] *See* 3/17/11 Trial Tr. 129:4-135:12 (Beron); NPP 2476 (Beron Rpt.) at 27.5, 28.5.
[882] *See* 3/17/11 Trial Tr. 130:10-15, 136:3-17 (Beron); NPP 2476 (Beron Rpt.) at 27.5, 28.5.
[883] 3/17/11 Trial Tr. 175:3-21 (Beron).
[884] *See* NPP 2476 (Beron Report) at 27.5 (Step One), 28.5 (Step Two); 3/17/11 Trial Tr. 130:6-15 (Step One), 135:1-6 (Step Two) (Beron). Beron's decision tree for Step Two has fewer outcomes than the Step One tree because the

grouped the 82 Step One litigation outcomes and the 22 Step Two litigation outcomes into five branches of outcomes resulting in: (i) intentional fraudulent conveyance, (ii) constructive fraudulent conveyance at both the parent and subsidiary levels, (iii) constructive fraudulent conveyance at just the parent level, (iv) constructive fraudulent conveyance at just the subsidiary level, or (v) no avoidance at all.[885]

426.    These five groups of outcomes were inputted into a third decision tree Beron created for the potential litigation outcomes for both Step One and Step Two.[886]  Beron organized the outcomes from this tree into seven "branches," so that he could combine like outcomes and differentiate between (i) those outcomes that did not result in an avoidance of any of the LBO Debt, (ii) those that involved the avoidance of the Step One Debt, the Step Two Financing or both, (iii) those that involved different outcomes at the parent and subsidiary levels, and (iv) those where the intentional fraudulent conveyance claims succeeded at either step (because these claims are not subject to a section 546(e) defense).[887]

427.    Beron inputted the seven branches of outcomes into a fourth decision tree that implemented the Examiner's conclusions regarding various statutory and equitable defenses and remedies (which were modeled by two other sets of decision trees created by Beron).[888]  Specifically, based on the Examiner's conclusions, this tree modeled whether: (i) the section 546(e) defense could apply to outcomes involving a finding of constructive fraudulent transfer; (ii) parent creditors could recover value from subsidiary estates when both the parent and subsidiary levels of LBO Debt are avoided; (iii) equitable disallowance or subordination would

---

Step One tree models the Examiner's consideration of whether the Step Two Financing should be considered for *each* of the financial condition test for the constructive fraudulent conveyance claims.  The Step Two decision tree does not model this correlation because the Examiner did not (and did not need to) engage in that analysis for Step Two.  *See* 3/17/11 Trial Tr. 135:1-6 (Beron).

[885] *See* 3/17/11 Trial Tr. 135:13-139 (Beron).

[886] *See* 3/17/11 Trial Tr. 135:13-139:1 (Beron); NPP 2476 (Beron Rpt.) at 29.5.

[887] *See* 3/17/11 Trial Tr. 137:2-139:1 (Beron); NPP 2476 (Beron Rpt.) at 29.5.

[888] *See* NPP 2476 (Beron Rpt.) at 31.5, 33.5, 35.5; 3/17/11 Trial Tr. 141:19-142:10 (Beron).

apply; and (iv) the Step One Lenders could participate in recoveries and distributions from the avoidance of Step Two Financing.[889]

428.     Beron's recovery tree generated 48 potential recovery outcomes from litigating the LBO Claims against the LBO Lenders.  Beron used this tree in conjunction with a waterfall recovery model produced by Aurelius, which identifies the potential recoveries to the Non-LBO Creditors for each outcome in his tree.[890]  Inputting the recovery amounts computed by that waterfall model for each of the outcomes generated by this recovery tree, Beron used the recovery tree to calculate the expected value of the fraudulent conveyance claims against the LBO Lenders.[891]

### 4.     Aurelius's Waterfall Model

429.     Beron's recovery tree used discrete inputs from the waterfall model created by Aurelius.  That model is merely an Excel spreadsheet that computed how estate value would be distributed among creditors, based on uncontroversial facts concerning the Debtors' capital structure and creditor priorities, in the 48 litigation outcome scenarios identified by Beron.[892]  It does not reflect the opinion of anyone at Aurelius, nor does it compute or attempt to predict any probabilities of litigation outcomes regarding the LBO Claims.[893]  The model was predicated on the Examiner's assumptions and the $6.75 billion DEV assumed by the DCL Plan Proponents.[894]

430.     As Beron explained at trial, it is typical for decision tree practitioners to rely on models estimating litigation recoveries or damages which, like the Aurelius waterfall recovery

---

[889] *See* NPP 2476 (Beron Rpt.) at 31.5, 33.5, 35.5; 3/17/11 Trial Tr. 141:19-142:10 (Beron).
[890] *See* 3/17/11 Trial Tr. 143:20-144:16 (Beron); NPP 31 (waterfall recovery model); *see also* 3/16/11 Trial Tr. 22:12-24:10 (Gropper).
[891] *See* 3/17/11 Trial Tr. 140:17-144:11 (Beron); NPP 2476 (Beron Rpt.) at 33.5.
[892] *See* 3/16/11 Trial Tr. 23:25-24:13 (Gropper); 3/17/11 Trial Tr. 116:21-117:10 (Beron); NPP 31 (waterfall recovery model).
[893] *See* 3/16/11 Trial Tr. 25:1-8 (Gropper).
[894] 3/16/11 Trial Tr. 23:25-24:13 (Gropper); 3/17/11 Trial Tr. 116:21-117:10 (Beron) NPP 31 (waterfall recovery model).

model, were created by someone else (like the practitioner's client or the client's attorneys) to provide the amounts of potential damages and recovery materials.[895]  In fact, Beron explained that it was his regular practice to use recovery or damage outcome estimates that he did not compute.[896]

431.     Therefore, over the DCL Plan Proponents' objection, the Bankruptcy Court held that Beron's reliance on the Aurelius waterfall model was appropriate under FED. R. EVID. 703, which permits experts to base their opinions on information "reasonably relied upon by experts in the particular field."[897]

### 5.     Beron's Independence

432.     When Beron developed his analysis, he did not rely on any input from or communicate with Mark Brodsky or Dan Gropper, the two senior managers at Aurelius.[898] He only had one limited and brief discussion with an Aurelius junior research analyst regarding the waterfall recovery model.[899]

433.     Moreover, Beron took direction from Aurelius's counsel on just one of the over 100 decision points in his trees—the interpretation of the Examiner's conclusion with respect to the application of the "WEAR" principles in the scenario where Step Two Financing, but not Step One Debt, is avoided.[900]

---

[895] 3/17/11 Trial Tr. 118:22-25 (Beron).
[896] 3/17/11 Trial Tr. 118:5-8 (Beron).
[897] 3/17/11 Trial Tr. 257:15-16 (Proceedings).
[898] 3/16/11 Trial Tr. 23:25-24:10, 25:6-8 (Gropper); 3/17/11 Trial Tr. 116:21-117:10, 151:18-24, 152:5-153:6. (Beron).
[899] 3/16/11 Trial Tr. 23:25-24:10, 25:6-8 (Gropper); 3/17/11 Trial Tr. 116:21-117:10, 151:18-24, 152:5-153:6. (Beron).
[900] 3/17/11 Trial Tr. 171:18-172:12 (Beron),

### 6. Beron's Conservative Assumptions

434.    In developing the decision trees for his analysis, Beron made a number of conservative assumptions.  Each one of these assumptions led to a lower expected value determination for the LBO Claims against the LBO Lenders.[901]

435.    Beron's analysis did not include any recoveries for the Non-LBO Creditors in scenarios involving a "partial avoidance"—where there is a finding of avoidance at the parent level but not at the subsidiary level, or vice versa.[902]

436.    Also, because the Examiner never addressed the issue, to the extent Step Two Financing was not considered for the "capital adequacy" or "ability to pay" financial condition tests, the trees modeled the tests as if they were satisfied conclusively in favor of the LBO Lenders so there was no chance of a finding of constructive fraud at Step One in those scenarios.[903]

437.    Beron made similarly conservative assumptions with respect to equitable disallowance and subordination, and the section 548(c) good faith defense.[904]  In total, Beron assumed 100% LBO Lender success on 17 different nodes in his decision trees.[905]

### 7. Beron's Conclusions

438.    Based on this analysis, and his 20-plus years of experience of assessing the reasonableness of settlements with decision-tree and expected value techniques, Beron concluded that the Proposed Settlement was "not even close" to reasonable.[906]

---

[901] *See* 3/17/11 Trial Tr. 145:23-151:17 (Beron); NPP 2476 (Beron Rpt.) at 23-24.
[902] *See* 3/17/11 Trial Tr. 148:5-149:3 (Beron).  For instance, one scenario ("scenario 8") involved an outcome resulting in a constructive fraudulent conveyance for Step One at the parent level, but not at the subsidiary level. Because this scenario was grouped into a branch of outcomes that do not give credit for fraudulent conveyance at Step One, this scenario did not contribute to any recoveries for Non-LBO Creditors under Beron's analysis. *See* NPP 2476 (Beron Rpt.) at 29.5; 3/17/11 Trial Tr. 138:8-139:1 (Beron).
[903] *See* 3/17/11 Trial Tr. 146:14-148:4 (Beron); NPP 2476 (Beron Rpt.) at 23-24.
[904] *See* 3/17/11 Trial Tr. 149:4-151:17 (Beron); NPP 2476 (Beron Rpt.) at 24.
[905] *See* 3/17/11 Trial Tr. 146:14-151:17 (Beron); NPP 2476 (Beron Rpt.) at 24; NPP 2519 (Beron Trial Demonstrative) at 21-24.

439. With respect to the expected value of litigating the LBO Claims against the LBO Lenders, Beron calculated a range of expected values of the LBO Claims based on different assumptions about the value of the PHONES Notes amount and the probabilities assigned to the Examiner's conclusions.[907] For instance, using his "base" set of probabilities, Beron determined that the expected value was $1.57 billion for the "low PHONES scenario" and $1.79 billion for the "high PHONES scenario."[908] Overall, Beron's computations showed that the expected value of litigating the LBO Claims against the LBO Lenders was $1.51 billion to $1.83 billion:[909]



440. In addition, Beron determined the probability percentage for the litigation outcomes and recoveries for the Non-LBO Creditors. For instance, he determined that there was

[906] *See* 3/17/11 Trial Tr. 170:4-11 (Beron).
[907] *See* NPP 2476 (Beron Rpt.) at 4-5; 3/17/11 Trial Tr. 168:11-169:20 (Beron).
[908] *See* NPP 2476 (Beron Rpt.) at 4; 3/17/11 Trial Tr. 169:12-20 (Beron).
[909] *See* NPP 2476 (Beron Rpt.) at 15; 3/17/11 Trial Tr. 144:12-16, 169:21-170:3 (Beron). .

a 47% chance that both the Step One and Step Two financings would be avoided in full. His

probability determinations on the fraudulent conveyance claims are as follows:[910]

| | Intentional Fraudulent Conveyance | Constructive Fraudulent Conveyance | Probability of Any Avoidance |
|---|---|---|---|
| Step 1 | 30% | 30% | 51% |
| Step 2 | 60% | 82% | 93% |
| Probability of avoidance at all Tribune Entities at both Step 1 and Step 2 | | | 47% |

441.    Beron also determined that there was (i) a 74% chance that litigating the LBO

Claims against the LBO Lenders would generate a recovery for the Non-LBO Creditors that

would exceed the Proposed Settlement, (ii) a 57% chance that they would recover in full if the

litigation was pursued, and (iii) a 66% chance that they would recover an amount that is three

times greater than the Proposed Settlement consideration. These and other determinations are as

follows:[911]

| Litigation Recovery to Non-LBO Creditors | Probability |
|---|---|
| Probability of ≥ Natural Recovery | 100% |
| Probability of ≥ Proposed Settlement | 74% |
| Probability of ≥ $1.0 B Recovery | 67% |
| Probability of ≥ $1.5 B Recovery | 66% |
| Probability of ≥ $2.0 B Recovery | 57% |
| Probability of Full Recovery | 57% |

* Assumes, to the Non-LBO Creditors' detriment, probability-weighted average recoveries in a Low PHONES Scenario.

### B.    Black's Limited Rebuttal Of Beron's Analysis Is Baseless

442.    The DCL Plan Proponents' expert, Black, does not have any degrees in finance or

accounting, has never acted as a financial consultant or advisor, has no accounting or valuation

credentials, has never been qualified by a court as an expert in valuation, and testified that

preparing a valuation would be "beyond [his] comfort zone."[912]  For these reasons, the Court

denied the DCL Plan Proponents' request that Black be qualified as an expert on valuation,

---

[910] See NPP 2476 (Beron Rpt.) at 11.
[911] See NPP 2476 (Beron Rpt.) at 16; 3/17/11 Trial Tr. 167:5-19 (Beron).
[912] 4/12/11 Trial Tr. 121:18-122:9 (Black).

solvency, and decision-tree analysis.[913]  Black, therefore, only addressed the following few
limited points regarding Beron's opinions:[914]

443.    First, Black contended on rebuttal that Beron took the Examiner's conclusions out
of context.[915]  For example, the Examiner concluded that it was "reasonably unlikely" for a court
to conclude that there was an intentional fraudulent conveyance at Step One—a finding that was
not the lowest in the Examiner's seven-point spectrum of findings.[916] Black, however, suggested
that the Examiner must have meant that there was actually no likelihood of such a finding
because the Examiner stated elsewhere in his report that he "did not find credible evidence" that
there was an actual intent to defraud creditors at Step One.[917]

444.    Second, Black claimed on rebuttal that Beron's analysis should have correlated
certain elements of the fraudulent conveyance claims and remedies.[918]  For example, Black
argued that the Examiner's conclusions regarding intentional fraudulent conveyance must be
read as duplicative of his conclusions as to constructive fraudulent conveyance—and thus add
nothing to the expected value of the litigation—because a finding of the former cannot happen
without a finding of the latter.[919]  He also contended that the Examiner's conclusions regarding
the three financial condition tests for constructive fraudulent transfer must be correlated.[920]

---

[913] 4/12/11 Trial Tr. 123:13-22 (Black).

[914] *See* 4/12/11 Trial Tr. 141:13-147:8 (Black).

[915] *See* 4/12/11 Trial Tr. 141:13-143:3, 180:12-25 (Black) (Black testifying that Beron wrongly assumed "it doesn't matter what else the examiner said about the particular situation"); *id.* at 180:24-25 (Black)  (Black testifying he thinks "the examiner does not restrict himself to the seven main categories").

[916] NPP 782 (Exam'rs Rpt.), Vol. II at 22.

[917] 4/12/11 Trial Tr. 142:15-21 (Black).  The statement focused on by Black is contained in a completely separate volume of the Examiner's Report from where he stated his "bottom-line" conclusion regarding intentional fraudulent conveyance at Step One.  *Compare* NPP 782 (Exam'rs Rpt.), Vol. I at 7 *with* NPP 782 (Exam'rs Rpt.), Vol. II at 22.

[918] *See* 4/12/11 Trial Tr. 143:4-144:18 (Black).

[919] *See* 4/12/11 Trial Tr. 143:7-144:5 (Black); *see also* 3/17/11 Trial Tr. 203:19-25 (Beron).

[920] *See* 4/12/11 Trial Tr. 143:13-144:18 (Black); *see also* 3/17/11 Trial Tr. 229:8-233:12 (Beron).

445.     Third, Black testified that he thought Beron's analysis was incomplete because it did not examine the potential recoveries from the Litigation Trust proposed under the DCL Plan.[921]

446.     Fourth, Black contended in his rebuttal testimony that Beron should have discounted his expected value determination for the time value of money.[922]

447.     As discussed below, none of these Black rebuttal points undermine the thrust of Beron's analysis and testimony.

**1.     Beron Properly Relied On The Examiner's "Bottom-Line" Conclusions**

448.     In conducting his analysis, Beron did exactly what the Examiner instructed the readers of the Examiner's Report to do—looked at the opening conclusion of each section analyzing the issues regarding the fraudulent conveyance claims against the LBO Lenders.[923] Thus, Beron correctly relied on the conclusion found at the "outset" of the Examiner's discussion that an intentional fraudulent transfer was "reasonably unlikely," and to populate the corresponding node in his decision tree with the percentage associated with that phrase.[924]

449.     Moreover, Beron was consistent in his approach, and did not consider statements in the Examiner's Report that were favorable to the Non-LBO Creditors if those statements were not part of the Examiner's "bottom-line" conclusions.  For example, in Volume II of the Examiner's Report, the Examiner stated his "bottom-line" conclusions for each of Step One and Step Two that it was "highly likely" (that is, an 85% chance using Beron's probabilities) that a

---

[921] *See* 3/9/11 Trial Tr. 146:16-147:16 (Black).
[922] 4/12/11 Trial Tr. 146:4-17 (Black).
[923] *See* NPP 2476 (Beron Rpt.) at 3; 3/17/11 Trial Tr. 121:3-122:8 (Beron); NPP 782 (Exam'rs Rpt.), Vol. I at 4.
[924] NPP 2476 (Beron Rpt.) at 7-8; 3/17/11 Trial Tr. 123:4-124:1 (Beron).  Notably, the Examiner did not assign his lowest probability phrase – highly unlikely – to the issue of intentional fraud at Step One.  NPP 782 (Exam'rs Rpt.), Vol. I at 6; *id.* Vol. II at 22; 3/17/11 Trial Tr. 123:4-124:1 (Beron); *see also* DCL 1484 (Amended Black Rpt.) at 14, 42-43.

court would find that the Company did not receive reasonably equivalent value.[925]  But the Examiner also stated elsewhere in the Examiner's Report (in Volume I) that "the Tribune Entities did not receive reasonably equivalent value" for the LBO as a whole.[926]  If Beron did as Black suggested, he would have ascribed a 100% chance (and not an 85% chance) that a finding of no reasonably equivalent value would be made—which is not what the Examiner concluded in his "bottom-line" conclusions.

## 2. That Beron Did Not Make Certain Findings Contingent Upon Or Correlated With Others Is Not A Flaw And, In Any Event, Does Not Have A Material Effect On His Analysis

450.    Beron modeled the Examiner's Report, and when the Examiner concluded that specific aspects of the fraudulent conveyance claims against the LBO Lenders were related in some way, he explicitly stated so.[927]  For example, the Examiner conditioned his findings on balance-sheet insolvency at Step One on his conclusion as to whether the Step Two Financing should be included with the Step One Debt.[928]  The Examiner also expressly conditioned his conclusions regarding the financial condition test of the intent to incur debts beyond the ability to pay and the test for good faith for a section 548(c) defense on his conclusion as to whether those tests should be subjective or objective.[929]  In contrast, the Examiner did not conclude that a finding of intentional fraud is contingent upon a finding of any of the elements of constructive fraud, nor that the three financial condition tests under section 548(a)(1)(B) should really be treated as just one test.[930]

---

[925] NPP 782 (Exam'rs Rpt.), Vol. II at 90.
[926] NPP 782 (Exam'rs Rpt.), Vol. I at 19.
[927] 3/17/11 Trial Tr. 203:19-25, 229:19-21, 236:2-7 (Beron).
[928] *See* NPP 782 (Exam'rs Rpt.), Vol. II at 77; 3/17/11 Trial Tr. 133:4-22, 135:1-6, 146:14-147:9 (Beron).
[929] *See* NPP 782 (Exam'rs Rpt.), Vol. II at 239-240; 3/17/11 Trial Tr. 204:5-12 (Beron).
[930] *See* 3/17/11 Tr. 203:19-25, 229-:19-21, 236:2-7 (Beron); 3/9/11 Trial Tr. 241:17-18 (Black); 4/12/11 Trial Tr. 182:3-10 (Black).

451.    Moreover, in this case, the record compiled by the Examiner reveals multiple badges of fraud which would sustain a finding of intentional fraudulent conveyance independent of his findings of insolvency and lack of reasonably equivalent value.[931]  For example, the Examiner found evidence of "secrecy, concealment, or dishonesty" at Step Two.[932]

452.    In addressing the fraudulent transfer claims asserted against the Tribune shareholders, the Creditors' Committee itself told the Court that "[w]hile the respective causes of action may implicate similar operative facts, it cannot be disputed that [] the *prima facie* elements of (and the required evidence to support) the different claims … are demonstrably different."[933]

453.    In fact, the Creditors'' Committee's complaint against the Company's directors, officers and shareholders shows that a intentional fraudulent transfer claim is not dependent on proof of a constructive fraudulent transfer claim.  The count for intentional fraudulent transfer in the complaint does not rely solely on allegations of insolvency of lack of reasonably equivalent value, but also relies heavily on numerous allegations of "badges of fraud."[934]

454.    Additionally, Black admitted on cross-examination that if one were to revise Beron's decision trees and probabilities to reflect any alleged correlation between various conclusions of the Examiner (as Black argued for), to be consistent any revision would also have to include changes that increased ***and*** decreased Beron's expected value conclusion.[935]  Black further admitted that there would in fact be several potential revisions to Beron's decision trees

---

[931] NPP 782 (Exam'rs Rpt.), Vol. II at 22-77; *see also supra* at II.C.3.
[932] NPP 782 (Exam'rs Rpt.), Vol. II at 35-36; *see also Fisher*, 253 B.R. at  871  ("The focus in the inquiry into actual intent is on the state of mind of the debtor.  Neither malice nor insolvency are required.").
[933] Creditors' Committee Statement in Support of Aurelius's State Law Actions Motion at ¶¶ 8-9 [ECF No. 8396] (emphasis added); *see also* NPP 2532 (3/22/11 Hr'g Tr.) at 58:20-23 (counsel for Creditors' Committee explaining: "[T]he two claims really are not the same.  There are different pleading elements, different burdens of proof, different recoveries, and of course, most notably different defenses.").
[934] *See* NPP 2184 (Creditor's Committee Complaint) at 49-50.
[935] 4/12/11 Trial Tr. 183-191 (Black).

that would increase Beron's conclusions as to the probability of success of the LBO Claims against the LBO Lenders and their overall expected value.[936]

455.    Finally, Black did not attempt in his rebuttal testimony to quantify what the impact would be on the value of the litigation if Beron had modeled the Examiner's conclusions as Black claimed they should be.

456.    Beron, on the other hand, did run sensitivities and testified about them at trial. Specifically, he adjusted the decision trees so that (i) a finding of the inability to pay debts could not be made if there was not first a finding of inadequate capital, and (ii) a finding of equitable subordination could not be made if there was not first a finding of equitable disallowance.[937] Beron also adjusted the way in which his recovery decision-tree modeled whether Step One Lenders could participate in the recovery of disgorgements and distributions to the extent Step Two Financing was avoided.[938]

457.    Making these adjustments, the expected value of the fraudulent conveyance claims against the LBO Lenders under Beron's analysis would still be at least $1.3 billion—or 2.3 times higher than the consideration being offered to the Non-LBO Creditors in the Proposed Settlement.[939]

### 3.    Beron Was Correct Not To Include Potential Litigation Trust Recoveries In Analyzing The Fairness Of The Proposed Settlement

458.    The purpose of Beron's analysis was to determine the expected value of the claims actually being settled and released in the Proposed Settlement—namely, the LBO Claims

---

[936] 4/12/11 Trial Tr. 183-191 (Black) (admitting intentional fraudulent transfer and constructive fraudulent transfer would almost certainly be found at Step Two if it was first found at Step One; admitting that an adverse ruling on certain defenses would be dispositive of or materially reduce the LBO Lenders' chances of prevailing on other defenses).

[937] *See* 3/17/11 Trial Tr. 246:20-250:3 (Beron).

[938] *See* 3/17/11 Trial Tr. 173:9-176:8 (Beron).

[939] *See* 3/17/11 Trial Tr. 248:1-12 (Beron).  This sensitivity analysis assumed the "low PHONES" scenario.

against the LBO Lenders.[940]  Beron was not engaged to evaluate and did not opine about the probabilities of the outcomes of the claims to be litigated by the DCL Litigation Trust.  Beron also did not compute the expected value of litigating these claims.[941]  His analysis was limited only to the LBO Claims against the LBO Lenders, and cannot be used to evaluate to the DCL Litigation Trust claims.[942]  Therefore, his $1.51 to $1.83 billion range of expected value is directly comparable to the consideration offered the Non-LBO Creditors under the DCL Plan and its Proposed Settlement.[943]

459.    Moreover, as discussed below, any recoveries by the DCL Litigation Trust are both unsupported and irrelevant to an assessment of the reasonableness of the Proposed Settlement.[944]

### 4.    There Is No Reason To Discount The Expected Value Of The LBO Claims For The "Time Value Of Money"

460.    As Beron testified, it is not his practice to discount the time value of money in an expected value analysis precisely because the pre-judgment interest that would be collected for the time it takes to litigate the claims being analyzed would offset any time value of money discount on the recovery or judgment from litigating those claims.[945]

461.    The Examiner also did not take into account the time value of money in calculating example recovery cases for the LBO Claims.[946]

---

[940] *See* NPP 2476 (Beron Rpt.) at 2; 3/17/11 Trial Tr. 115:17-22, 165:6-166:20, 225:16-20 (Beron).
[941] *See* NPP 2476 (Beron Rpt.) at 2; 3/17/11 Trial Tr. 115:17-22, 165:6-166:20, 225:16-20 (Beron).
[942] *See* NPP 2476 (Beron Rpt.) at 2; 3/17/11 Trial Tr. 115:17-22, 165:6-166:20, 225:16-20 (Beron).
[943] *See* NPP 2476 (Beron Rpt.) at 3; 3/17/11 Trial Tr. 165:20-166:20 (Beron).  Recoveries for the Non-LBO Creditors under the DCL Plan are estimated to be $557 million (excluding recoveries for the Swap Claim). *See* DCL 1429 (DCL Specific Disclosure Statement) at 13-16; DCL 376 (Joint Disclosure Statement) at 24.
[944] *See infra* at § VII.
[945] 3/17/11 Trial Tr. 237:1-10 (Beron).
[946] 3/17/11 Trial Tr. 236:21-237:6, 237:16-238:5 (Beron); NPP 782 (Exam'rs Rpt., Vol. II at (Annex B).

## C. Black's Affirmative Opinions And Testimony Should Also Be Disregarded

462.     Black based his opinions regarding the Proposed Settlement on six sets of litigation scenarios for the fraudulent conveyance claims against the LBO Lenders.[947]  Black modeled the scenarios in primarily two potential recovery cases—the "Examiner Case," which was "based on [his] best understanding of the Examiner's views," and the "Black Case," which was "based on [his] own best judgment."[948]  As discussed below, there are many flaws underlying this analysis.

### 1. Black Did His Computations "In His Head"

463.     Instead of performing the robust decision-tree and expected value analysis that Beron undertook, Black conceded he did his analysis "***in my head***."[949]  Black made wholly subjective assessments of the dozens of sub-issues that drove the ultimate outcomes he was trying to predict, used probabilities he tweaked or "nudged" as he saw fit, and then tried to pull it all together "in [his] head" or with his "trusty old HP 12C calculator."[950]

464.     Not surprisingly, Black ended up having to changing 37 different computations in his tables after he issued his initial report and was confronted with errors in its logic at his deposition.[951]

465.     During the first day of his deposition after he issued his report, Black admitted he could not understand why, after almost a year working on his report with a full month to check his numbers, he had put "so much weight" on his "Examiner Case" scenarios (D and E)

---

[947] *See* DCL 1484 (Revised Black Rpt.) at 19-21.
[948] DCL 1484 (Revised Black Rpt.) at 24.
[949] 3/9/11 Trial Tr. 230:5-231:2 (Black) (emphasis added).
[950] *See* 3/9/11 Trial Tr. 226:10-227:2, 229:12-16, 230:5-231:2, 239:24-241:8 (Black); *see also* 3/10/11 Trial Tr. 75:20-76:13 (Black) (Black: "my analysis is centrally about making judgments" and "my report is full of judgments"); *see also* 3/17/11 Trial Tr. 162:1-163:10 (Beron) (Black performed an "expected value calculation . . . in a piecemeal . . . and not very consistent fashion").
[951] *See* 3/9/11 Trial Tr. 260:13-261:1 (Black); NPP 2465 (page from Black workpapers used to develop Table 3 at Black Report 26, annotated to show changes); *see generally* 3/9/11 Trial Tr. 251:22-261:1 (Black).

involving, among other outcomes, "Full Avoidance at Tribune" instead of the scenarios (B and C) involving on "Step 2 Avoidance" outcomes.[952] The next day of his deposition, Black said he needed to make changes, and then served an amended report the day before his trial testimony that made multiple and substantial changes in not just in the Examiner Case probabilities, but in all of his cases.[953]

466. Some of the adjustments Black made to the probabilities he relied on in his initial report were substantial. One change decreased the probability of one outcome from 25% to 3% and another from 17% to 5%.[954]

### 2. Black Attempted To Replace Both The Examiner And The Bankruptcy Court

467. Black based much of his analysis regarding the value of the LBO Claims on his own judgments about the very same conclusions that the Examiner already assessed and that the Court must reach in adjudicating the Proposed Settlement under Rule 9019, including the likelihood of success of the LBO Claims and the defenses against them.[955]

468. Black also admitted he is "not an expert in bankruptcy law."[956]

469. In addition, Black relied on "between fifteen and twenty different substantive memos" written by Debtors' counsel to address the complex legal issues presented in these bankruptcy proceedings.[957] He even relied on one memorandum entitled "Overview of

---

[952] 3/9/11 Trial Tr. 250:16-251:17 (Black).
[953] See generally 3/9/2011 Trial Tr. 251:22-261:1 (Black); NPP 2465. Exhibit NPP 2465 is the page bates-numbered TRB-BLACK-0000956.5 from Professor Black's workpapers used to create Table 3 in his initial expert report. It is annotated to show the changes Professor Black made in his amended report. See DCL 1484 (Revised Black Rpt.) at 25, Table 3; NPP 2367 (workpaper); NPP 2465 (annotated excerpt); 3/9/11 Trial Tr. 220:13-222:2 (Black).
[954] 3/9/11 Trial Tr. 251:22-261:1 (Black).
[955] See, e.g., DCL 1484 (Revised Black Rpt.) at 17 (Black: his assignment "require[d] … legal expertise, to assess the likelihood of different legal outcomes"); 31-32, 36 (Black opinions #1, #2, #3, #13, #14, #15 that are conclusions of law)
[956] DCL 1484 (Revised Black Rpt.) at 3, 17; 3/9/11 Trial Tr. 180:12-181:2 (Black).
[957] See 3/9/11 Trial Tr. 183:19-184:16, 193:18-24 (Black); NPP 2316 (Sidley Memorandum dated March 8, 2010); NPP 2349 (Sidley Memorandum dated March 8, 2010), 2355- 2364 (various Sidley Memoranda).

Settlement Standards" for guidance with respect to Rule 9019 and the standards governing judicial review of settlement agreements—the legal issue that is at the heart of this dispute.[958]

470.     Also, to complete his report, Black had to conduct basic legal research to understand some of the more fundamental bankruptcy issues presented here.[959]  For instance, Black had to research:  the section 546(e) defense, "the availability of post-filing interest," "what constitutes property or value conferred for purposes of [section] 548(c)," "the case law interpreting unreasonably small capital," "the availability of what [Black] called the statutory bank defenses," and "the issues of formal integration and informal integration" of the Step Two Financing at Step One.  In addition, at trial, Black revealed his ignorance of bankruptcy proceedings with his confusion about Rule 2004, the most basic of discovery devices in bankruptcy proceedings.[960]

### 3.     Black Ignored Valuable Litigation Scenarios

471.     As Beron testified—without any challenge on cross-examination or response on rebuttal—that 36% of the total probabilities of litigation scenarios against the LBO Lenders are *ignored* in Black's analysis.[961]  Black conceded at trial that these omissions necessarily impact his expected value calculation for the LBO Claims.[962]

472.     For instance, Black admits he did not include in his analysis the scenario where Step Two Financing is avoided and the Step One Lenders are not allowed to participate in the recovery of the disgorgement of payments made to the Step Two Lenders.[963]  Yet he conceded at

---

[958] *See* 3/9/11 Trial Tr. 184:13-16 (Black); NPP 2316 (Sidley memorandum).
[959] 3/9/11 Trial Tr. 181:24-183:2 (Black).
[960] *See* 3/9/11 Trial Tr. 195:11-18 (Black).
[961] *See* NPP 957 (Beron Rebuttal Rpt.) at 17-19; 3/17/11 Trial Tr. 164:4-20 (Beron).
[962] *See* 3/9/2011 Trial Tr. 206:18-25 (Black).
[963] *See* 3/9/11 Trial Tr. 209:1-211:7 (Black).

trial that by omitting this scenario, his recovery analysis ignores $150 million in potential recovery value for the Non-LBO Creditors, based on his computations.[964]

473.    Black also admitted that he does not know how the Examiner treated this issue.[965] The Examiner, in fact, reached a very different conclusion from Black.  Specifically, the Examiner concluded that "an argument nevertheless may be advanced" that, because the Step One Lenders "are the same creditors (or their successors) who ... participated in, funded, and made possible the Step Two Transactions," it would be inequitable for those entities to benefit from avoidance of payments made and obligations incurred in the Step Two Transactions while non-LBO Creditors holding claims against the same estates remain unpaid.[966]

474.    Indeed, the Examiner noted that "[t]he doctrine of equitable estoppel ... may furnish" the basis for such an argument "even if the standards governing equitable subordination are not otherwise met," and left in "equipoise" whether such an argument would succeed.[967]

475.    Black also disregarded any recoveries for the Non-LBO Creditors resulting from the scenario where the Step One Lenders are not allowed to participate in the distributions from the avoidance of the Step Two Financing.[968]  He ignored this scenario even though he acknowledged that, according to the Examiner's findings and his own probability percentages, there was a 22.5% chance that a court would prohibit the Step One Lenders from sharing in the avoided Step Two distributions.[969]

---

[964] *See* 3/9/11 Trial Tr. 209:13-18, 210:15-211:7 (Black).
[965] *See* 3/9/11 Trial Tr. 262:24-264:21 (Black).
[966] NPP 782 (Exam'rs Rpt.), Vol. II at 301.
[967] NPP 782 (Exam'rs Rpt.), Vol. II at 302-303.
[968] *See* DCL 1484 (Revised Black Rpt.) at 151-152 (disagreeing with Examiner and finding remedy of estopping Step One Lenders from sharing in Step Two disgorgements upon Step Two avoidance "remote").
[969] *See* 3/9/11 Trial Tr. 267:17-23 (Black); DCL 1484 (Revised Black Rpt.) at 44; *but see* 3/10/2011 Trial Tr. 73:20-75:15 (Black).

476.    In addition, Black did not model the scenario where the Step One Debt is avoided and the Step One Lenders do not have a section 548(c) defense.[970]  As another example, although Black fully recognized that there are two possible values for the holders of the PHONES Notes Claims, he only modeled the lower claim amount.[971]

### 4.    Black Has Little Familiarity With The Underlying Facts

477.    Although Black presented himself as an arbiter of the LBO Claims, he never bothered to familiarize himself sufficiently with the underlying facts.[972]  He decided the Creditors' Committee Complaint was not a priority, even though the **LBO Lenders** informed him that it was an important pleading, and even though the Creditors' Committee Complaint asserted the very claims he was supposed to assess.[973]

478.    The Creditors' Committee Complaint alleges intentional and constructive fraudulent transfer claims against the LBO Lenders that are being released in the Proposed Settlement.  Black nevertheless attempted to assess the value of these claims despite not having carefully reviewed the complaint.[974]

479.    Likewise, the Creditors' Committee Complaint alleges that equitable principles should bar recoveries for Step One Lenders in the event that the Step Two Financing was avoided and Step One was not (*i.e.,* WEAR).  Specifically, Count Four alleges that the Step One Lenders should be estopped from sharing in any value resulting from an avoidance of Step Two because they planned and participated in Step Two and knowingly and intentionally assumed the

---

[970] *See* 3/9/11 Trial Tr. 215:17-216:23 (Black).

[971] *See* 3/9/11 Trial Tr. 218:7-22 (Black).

[972] *See* 3/9/11 Trial Tr. 197:16-199:9 (Black); DCL 1484 (Amended Black Rpt.) at 31; Complaint, *Official Comm. of Unsecured Creditors v. JPMorgan Chase Bank, N.A. (In re Tribune Co.)*, Adv. No. 10-53963 [ECF No. 1] (KJC) (Bankr. D. Del. Nov. 1, 2010).

[973] *See* 3/9/11 Trial Tr. 198:11-199:9 (Black).

[974] *See* 3/9/11 Trial Tr. 197:16-199:9 (Black); Complaint at 41-44, 56-57, *Official Comm. of Unsecured Creditors v. JPMorgan Chase Bank, N.A. (In re Tribune Co.)*, Adv. No. 10-53963 [ECF No. 1] (KJC) (Bankr. D. Del. Nov. 1, 2010) (Counts One and Six, alleging constructive fraud); *id.* at 45-52 (Counts Two and Three alleging actual fraud); *id.* at 52-56 (Counts Four and Five alleging estoppel); *id.* at 60-62 (Count Eight alleging unjust enrichment).

risk that the Company would be rendered insolvent.[975]  Similarly, Count Five sought to estop the

LBO Lenders from benefitting from the avoidance and recovery of Step Two as intentionally

fraudulent transfers.[976]  Count Eight sought similar relief under the theory of unjust enrichment,

arguing that if Step One is permitted to benefit from an avoidance of Step Two, the LBO Lenders

would receive a greater distribution in the event that the Step Two obligations are avoided and

recovered.[977]  Black however, argued that these theories have no basis without reviewing this

pleading.[978]

480.    Black also failed to review the transcripts of the Examiner interviews or Rule

2004 depositions of the LBO Lender representatives and their advisors.[979]  Black never read the

transcripts of the Examiner's interviews of Daniel Petrik of Bank of America, Todd Kaplan of

Merrill Lynch, or Thomas Kenny of Murray Devine, the Arrangers' financial advisor.[980]  Nor did

he review the transcripts of the Rule 2004 depositions of Rajesh Kapadia or John Kowalczuk,

both of JPMorgan.[981]  Without having read most of the available testimony of the lender

representatives and advisors, Black still attempted to opine about the LBO Lenders' good faith

under section 548(c).

481.    In addition, Black did not review the interview or deposition transcripts of key

witnesses from the Company and its advisors.  Black never read the transcript of the Examiner's

interview of Tribune's General Counsel, Crane Kenney, and never reviewed the transcripts of the

depositions of Elyse Bluth of Duff and Phelps, or Bryan Browning or Mose Rucker from

---

[975] Complaint at 52-54, *Official Comm. of Unsecured Creditors v. JPMorgan Chase Bank, N.A. (In re Tribune Co.)*, Adv. No. 10-53963 [ECF No. 1] (KJC) (Bankr. D. Del. Nov. 1, 2010).
[976] Complaint at 54-56, *Official Comm. of Unsecured Creditors v. JPMorgan Chase Bank, N.A. (In re Tribune Co.)*, Adv. No. 10-53963 [ECF No. 1] (KJC) (Bankr. D. Del. Nov. 1, 2010).
[977] Complaint at 60-62, *Official Comm. of Unsecured Creditors v. JPMorgan Chase Bank, N.A. (In re Tribune Co.)*, Adv. No. 10-53963 [ECF No. 1] (KJC) (Bankr. D. Del. Nov. 1, 2010).
[978] *See* 3/9/11 Trial Tr. 197:16-199:9 (Black); DCL 1484 (Amended Black Rpt.) at 31, 44.
[979] *See* 3/9/11 Trial Tr. 194:22-196:22, 196:6-16 (Black); DCL 1484 (Amended Black Rpt.) at 74-77, 146-50.
[980] *See* 3/9/11 Trial Tr. 195:4-10 (Black); DCL 1484 (Amended Black Rpt.) at 11-12.
[981] *See* 3/9/11 Trial Tr. 195:4-10 (Black).

VRC.[982]  Black nonetheless attempted to predict the likelihood that their conduct could lead to a finding that the Company intentionally defrauded its creditors.[983]

### 5. Black Is A Conflicted Witness

482.    Black depended on input from Sam Zell and his advisors, as well as counsel for the Debtors, who adjusted the probabilities Black used to value various litigation outcomes in his analysis and who were themselves potential defendants in the LBO Claim litigation.[984]

483.    Also, knowing full well that Nils Larsen had been "heavily involved" in the LBO and was a friend of Sam Zell, Black relied on his input, as well as insight from Mr. Zell's own lawyers, to develop Black's position on "Asset Disposition Tax Value," which he considered "an important component" of the balance sheet valuation he used to assess the fraudulent conveyance claims challenging the LBO.[985]

484.    Black also is a repeat expert for the Company.  Black first served as an expert for Tribune in connection with the *Garamella* shareholder action brought in connection with the LBO he later opined about.[986]  As part of that engagement, Black offered his putative expert opinion that the Tribune shareholders would benefit from the $34 per share redemption for the LBO.[987]  He also testified that, without the LBO, Tribune's share price would have been much lower—about $29 per share.[988]

---

[982] *See* 3/9/11 Trial Tr. 195:4-196:22 (Black).
[983] *See* 3/9/11 Trial Tr. 194:22-196:22 (Black); DCL 1484 (Amended Black Rpt.) at 43, 146-54.
[984] *See* 3/9/11 Trial Tr. 188:7-189:4, 199:12-200:20 (Black).
[985] *See* 3/9/11 Trial Tr. 188:7-189:4, 199:12-200:20 (Black); DCL 1484 (Amended Black Rpt.) at 33-34.
[986] *See* 3/9/11 Trial Tr. 270:19-271:5 (Black); NPP 2315 (*Garamella* deposition); NPP 2314 (*Garamella* declaration); *see supra* at § I.G.1.(e.) (discussing implied share price of LBO).
[987]*See* NPP 2314 (Black Declaration) at 5.
[988] *See* NPP 2314 (5/10/07 Black Declaration) at 6, n.7; 3/9/11 Trial Tr. 274:23-25 (Black).

485.     Moreover, in 2010, he did "significant work toward a report on the April plan," advised as to the reasonableness of the First Mediation Term Sheet in September, and told the Debtors he would ultimately support their settlement *before* they even agreed to it.[989]

### 6.     Black Second-Guessed The Examiner

486.     Black's own conclusions deviate wildly from the Examiner's conclusions. For 18 of the 22 critical legal issues Black re-examined in his "Black Case," he reached conclusions significantly *different* from the Examiner, and all to the detriment of the Non-LBO Creditors.[990] As just one example, Black ascribed only a 1% to 2% chance that an intentional fraudulent transfer occurred at both steps of the LBO, even though he thought the Examiner concluded there was a 15-30% chance that a court would find intentional fraud at Step One (based on the Examiner's conclusion that such a finding was "reasonably unlikely" at that step) and a 55-70% chance that a court would make that finding at Step Two (based on the Examiner's conclusion that such a finding was "somewhat likely" at that step).[991]

487.     In his "Examiner Case," Black made significant assumptions about whether elements needed to establish a fraudulent conveyance claim were contingent on each other— even though he recognized the Examiner never stated his conclusions should be treated that way, and that the Bankruptcy Code does not provide that the tests are correlated.[992]

488.     In any event, Black's assignment of probability percentages to the Examiner's seven sets of conclusions in Black's "Examiner's Case" were very similar to Beron. Although Black assigned ranges of percentages to the Examiner's conclusions (instead of a singular

---

[989] 3/9/11 Trial Tr. 190:19-192:9 (Black).

[990] *See* NPP 957 (Beron Rebuttal Rpt.) at 8; 3/17/11 Trial Tr. 159:7-160:7 (Beron).

[991] *See* 3/9/11 Trial Tr. 239:24-241:8 (Black); DCL 1484 (Amended Black Rpt.) at 13, 36, 42-43; NPP 782 (Examiner's Rpt.), Vol. II at 22, 32.

[992] *See* DCL 1484 (Amended Black Rpt.) at 115-17, 135-36; 3/9/11 Trial Tr. 237:19-238:11, 238:22-239:8, 237:4-18.

percentage for each of the seven descriptors as Beron did), the mid-point of Black's ranges were essentially the same as the base set of percentages used by Beron:[993]

| Examiner's Seven Sets of Conclusions | "Base Set" Probability Percentages Assigned by Beron | Probability Ranges Assigned by Black |
|---|---|---|
| Highly Likely | 85% | $\geq 85\%$ |
| Reasonably Likely | 70% | 70-85% |
| Somewhat Likely | 60% | 55-70% |
| Equipoise | 50% | 45-55% |
| Somewhat Unlikely | 40% | 30-45% |
| Reasonably Unlikely | 30% | 15-30% |
| Highly Unlikely | 15% | $\leq 15\%$ |

489.    There is a large difference between the scope and depth of Black's and the Examiner's work product.  The Examiner and his team conducted an exhaustive investigation of the LBO, interviewing 38 case-critical witnesses and reviewing more than 3 million pages of documents before issuing a 1,200-plus page report.[994]  Black himself acknowledged that the Examiner "is an expert in bankruptcy law," and that the Examiner and his team logged about 22,000 hours in conducting their investigation.[995]

490.    In stark contrast, Black is admittedly not a bankruptcy expert, did not interview a single witness, only spent about 700 hours on his analysis, and cursorily reviewed, if at all, the complaints asserting the LBO Claims.[996]

## VI.    THE BAR ORDER IS INEQUITABLE AND UNSUPPORTED BY THE RECORD

491.    Under the DCL Plan, the proposed Bar Order would prospectively (i) bar all contribution and non-contractual indemnity claims to be asserted by the non-settling defendants

---

[993] *See* NPP 2476 (Beron Rpt.) at 6; DCL 1484 (Amended Black Rpt.) at 13; NPP 957 (Beron Rebuttal Rpt.) at 2-3; NPP 2519 (NPP Beron Demonstrative) at 26.
[994] *See* NPP 782 (Exam'r Rpt.), Vol. I at 29, 33.
[995] 3/9/11 Trial Tr. 197:11-15, 201:6-9 (Black).
[996] *See* 3/9/11 Trial Tr. 180:12-181:2, 193:5-11, 197:23-198:5 (Black); DCL 1484 (Amended Black Rpt.) at 3, 10-12.

against the LBO Lenders, and (ii) impose **proportionate** judgment reduction in respect of all non-settled LBO Claims, including the Disclaimed State Law Avoidance Claims (collectively, the "Preserved Claims").[997] It is undisputed that this provision has the potential to materially reduce, or even eliminate, additional future recoveries to Preserved Claim beneficiaries, and was neither negotiated by nor consented to by the Non-LBO Creditors whose recoveries may be affected by its terms.

492.     Certain of the non-settling defendants allege that they have indemnity and contribution claims, which would be barred under the proposed Bar Order, thus triggering the judgment reduction.[998] The DCL Plan Proponents have offered no evidence regarding what effect the Bar Order will have on recoveries in respect of the Preserved Claims, or whether the consideration provided by the LBO Lenders constitutes reasonable and sufficient consideration for the third-party releases implemented by the Bar Order.[999] On top of these critical gaps in the record, the DCL Plan Proponents offered no evidence that the LBO Lenders would not have entered into the Proposed Settlement without the protections of the Bar Order.

493.     Moreover, the proportionate judgment reduction that would potentially be imposed by the Bar Order will hand the non-settling defendants an enormous weapon in settlement negotiations, enabling them to maintain that even if they are found liable to the DCL Litigation Trust or DCL Creditors' Trust (or directly to the individual creditors), most or all of the fault should be shifted onto the settling defendants and they will therefore face little, if any, exposure. Armed with an additional defense, the non-settling defendants will have little incentive to offer anything beyond a token settlement.

---

[997] *See* DCL Plan, § 11.3.
[998] *See* 4/13/11 Trial Tr. 121:5-8, 123:1-4, 127:6-12 (McCambridge) (discussing contribution/indemnity claims of D&O defendants); DCL Confirmation Brief at 112-13, 120 [ECF No. 8173].
[999] *See* 3/15/11 Trial Tr. 299:3-25 (Gropper); 3/8/11 Trial Tr. 156:22-157:5 (Kurtz).

494. The creditors who stand to have their Preserved Claim recoveries limited by the Bar Order were **not** involved in the negotiation of the settlement, have not consented to the very real risk posed by the Bar Order, and dispute that the meager settlement proposed here is proportionate to the fault that a jury might ascribe to the settling defendants.[1000]

495. Although Creditors' Committee's counsel apparently agreed to the Bar Order, all of the Creditors' Committee members (save one) who voted to approve the Proposed Settlement have no interest in the DCL Litigation Trust because their claims are being paid in full or their contracts are being assumed under the DCL Plan.[1001] Thus, the Creditors' Committee had no incentive to oppose the Bar Order or push for a more favorable form of judgment reduction that would not adversely affect the recovery of Litigation Trust interests.

## VII. THE POTENTIAL FOR LITIGATION TRUST PROCEEDS DOES NOT CURE THE INADEQUACY OF THE PROPOSED SETTLEMENT

496. The DCL Plan Proponents have argued that the potential for DCL Litigation Trust proceeds adds significant settlement consideration,[1002] but introduced no competent evidence quantifying this value at trial.[1003] Indeed, the Debtors admitted they have no idea what the Litigation Trust Claims are worth, if anything, and were not aware of any DCL Plan

---

[1000] *See* NPP Post-Trial Br. at 79-80; 3/8/11 Trial Tr. 265:21-266:4 (Salganik) (agreeing "that in connection with the settlement ultimately supported by the committee in this case there is no such confirmation or validation in the form of a noteholder that played the role that Centerbridge played in the settlement embodied in the April Plan"); *supra* § III.C.

[1001] *See* DCL Plan, at Ex. A, §§ 3.3.5 (Classes 2E through 111E – General Unsecured Claims), 6.5 (Compensation and Benefit Programs); *see also* NPP 2223 (NPP Confirmation Brief) ¶ 11; NPP 2474 (NPP Objection) ¶ 53; *see supra* §I.

[1002] *See* DCL Plan, Notice of Filing at 5; 4/14/11 Trial Tr. 150:3-9, 13-21 (Johnston); 3/8/11 Trial Tr. 156:8-18 (Kurtz) ("Q: Now, to your knowledge, the debtor has never attempted to value the claims being preserved for the trust, have they? A: The debtor has never done a valuation, that I am aware of, of the claims that are going into the trust. That's true. Q: Okay. And to your knowledge, no one else has attempted to value those claims, have they? A: Done a valuation on the claims? Q: Yes A: Not that I'm aware of."); See Liebentritt Dep. Tr. at 276:22-25:14 (Q: [Y]ou don't know whether the interest in the litigation trusts are worth more or less than $30 million; correct? A: No, does Aurelius?").

[1003] *See* 3/7/11 Trial Tr. 38:17-23 (Sottile); 4/14/11 Trial Tr. 150:13-16 (Johnston).

Proponent—or anyone else, for that matter—attempting to determine the value of the Litigation Trust Claims.[1004]

497.    Black testified that he believes that the Litigation Trust Claims might be worth as much as $300 million, but never analyzed the claims in any systematic fashion.[1005]  Instead, he described this figure as a mere "illustrative assessment."[1006]

498.    In any event, fully two-thirds of the value Black assigns to the Litigation Trust Claims supposedly comes from the claims against the Company's directors and officers, which he believed would be paid for up to the policy limit of Tribune's D&O insurance in a settlement.[1007]  However, Black apparently did not review the policies at issue, or consider any of the potential defenses or other issues that inevitably arise in coverage litigation.[1008]  Moreover, regarding the D&O claims upon which Black's assessment primarily relies, Black testified:  "I personally . . . I don't think these claims are very good."[1009]  Black also testified that VRC, which he described as "the principle [sic] financial advisor here," may not have liability insurance, and therefore may be judgment-proof.[1010]

## VIII.    THE DCL PLAN PROPONENTS' FACT BASED OBJECTIONS TO THE NOTEHOLDER PLAN DO NOT HAVE MERIT.

499.    The primary fact based objections to the Noteholder Plan raised by the DCL Plan Proponents center on (i) the amount of equity in Reorganized Tribune held in the Distribution Trust and the resulting impact of Reorganized Tribune's post-bankruptcy corporate governance

---

[1004] See 3/8/11 Trial Tr. 156:8-18 (Kurtz).

[1005] 3/9/11 Trial Tr. 147:19-152:2, 149:23 (Black).

[1006] 3/9/11 Trial Tr. 147:19-152:2 (Black).

[1007] Id. 148:14-17; NPP 2216 (Black Rpt.) at 9-12 (insurance policies not among the documents Black claims to have specifically reviewed).

[1008] 3/9/11 Trial Tr. 148:14-17; NPP 2216 (Black Rpt.) at 9-12 (insurance policies not among the documents Black claims to have specifically reviewed).

[1009] See 3/9/11 Trial Tr. 148:9-12 (Black).

[1010] See id. at 149:17-22 (Black); Black also indicated his skepticism with respect to other Litigation Trust Claims, testifying that the claims against the shareholders are basically worthless, and asserting that no one has ever "chased shareholders successfully" in connection with a fraudulent conveyance case.  See 3/9/11 Trial Tr. 150:24-25 (Black) (denying "there's value in the claims at step one"); id. 151:10-13 (claiming Step Two claims are a "long shot").

and (ii) the Noteholder Plan Proponents' appointees to (a) the board of Reorganized Tribune and (b) trustees and advisory board members for the three trusts established under the Noteholder Plan. These objections do not have merit.

500.    The Noteholder Plan contemplates distribution of the vast majority of the equity value (in the form of New Common Stock and/or New Warrants) in Reorganized Tribune to be distributed to creditors as of the effective date of the Noteholder Plan, while at the same time holding sufficient DEV in reserve to pay Non-LBO Creditors in full, plus postpetition interest, in the event the Litigation Trust is successful in prosecuting the LBO Claims against the LBO Lenders. In fact, based on the $8.29 billion DEV, the Noteholder Plan provides for between 76.5% and 83.5%[1011] of the equity value in Reorganized Tribune to be distributed to creditors as of the effective date of the Noteholder Plan (leaving only between 16.5% and 23.5% of the equity value in the Distribution Trust Reserve). Indeed, even at the DCL Plan Proponent's proposed DEV of $6.75 billion, the Noteholder Plan would distribute between 70.5% and 79.8%[1012] of the equity value in Reorganized Tribune to creditors as of the effective date of Noteholder Plan (leaving only between 21.2% and 29.5% of the equity value in the Distribution Trust Reserve).[1013]

501.    Based on the limited amount of equity value that will be held in the Distribution Trust, there is no support in the record for the DCL Plan Proponents' allegations that

---

[1011] The outcome of the PHONES Notes Claims Resolution will determine whether the higher or lower percentage will be distributed.

[1012] The outcome of the PHONES Notes Claims Resolution will determine whether the higher or lower percentage will be distributed.

[1013] A substantial portion of the equity value of Reorganized Tribune projected to be held in reserve as of the effective date of the Noteholder Plan between 14.0% and 15.3% (at the $8.291 billion DEV) is on account of reserves in respect of the Bridge Loan Lender Claims (at the DCL Plan Proponents' proffered DEV of $6.75 billion, this reserve would be between 12.9% and 14.6%). To the extent the Senior Lenders and the Bridge Loan Lenders agree to a settlement providing for the same value recovery to the Bridge Loan Lenders under the Noteholder Plan as was contemplated by the DCL Plan (i.e., $64.5 million to $65.5 million), the amount of equity value of Reorganized Tribune held in reserve on the Effective Date will be reduced to 1.1% to 9.5% (at the $8.291 billion DEV and depending on the outcome of the PHONES Notes Claims Resolution). At the DCL Plan Proponents' $6.75 billion DEV the reserve would have been reduced 5.5% to 16.6% if such settlement was adopted.

"the…equity held by the Distribution Trust…could harm enterprise value by hindering strategic mergers, joint ventures, and many other partnerships…," or that the equity held by the Distribution Trust "could jeopardize the Reorganized Debtors' ability to recruit senior management and directors."[1014]  These allegations were refuted by Black's inability to cite any instance in which even a 29.5% equity interest (the maximum amount of equity value that would be held in the Distribution Trust even if the Court adopted the DCL Plan Proponents' low $6.75 billion DEV) represented a controlling interest.[1015]  Professor Edward Rock, the Noteholder Plan Proponents' expert on corporate governance, credibly testified that the DCL Plan Proponents' purported concerns regarding potential business relationships are "really a stretch" even if the Distribution Trust were to hold double the amount estimated to be held under the Noteholder Plan.[1016]  Black acknowledged these concerns to be attenuated by the changes that had been made to the Noteholder Plan to reduce the amount of equity value held in the Distribution Trust based on the DCL Plan Proponents' prior objections.[1017]  Accordingly, the DCL Plan Proponents' corporate governance-based objections are not persuasive.

502.    The DCL Plan Proponents also allege that the individuals proposed to be appointed to the board of directors of Reorganized Tribune by Aurelius could favor Aurelius to the detriment of the Reorganized Debtors.[1018]  The DCL Plan Proponents make similar allegations with respect to the proposed Distribution Trustee and those members of the Distribution Trust Advisory Board selected by Aurelius.[1019]  These allegations are without merit. There is no evidence to suggest that the board members selected by Aurelius "wouldn't be

---

[1014] DCL Post-Trial Brief at 121.
[1015] 4/12/11 Trial Tr. 153:3-25.
[1016] 3/16/11 Trial Tr. 205:15-207:5 (Rock).
[1017] 4/12/11 Trial Tr. 152:10-25 (Black).
[1018] 4/12/11 Trial Tr. 176:18- 177:16 (Black).
[1019] 4/12/11 Trial Tr. 175:5- 177:16 (Black)

actually independent as opposed to merely, as [Black] would suggest, formally independent."[1020]

Similarly, Rock credibly testified that the fiduciaries appointed by Aurelius (i.e., the Distribution Trust Advisory Board members and the Distribution Trustee) are "operating with fiduciary duties" and that the interests of such fiduciaries in maximizing creditor recoveries "align with those of the other shareholders."[1021]

503.     Each trust under the Noteholder Plan will be governed by a three member trust advisory board and managed by a trustee.  The Distribution Trust Advisory Board shall initially consist of the following three members:  (i) Jon Lukomnik; (ii) Kurt N. Schacht and (iii) Adam K. Berman.  Messrs. Lukomnik and Schact were appointed by but are independent of Aurelius. The PHONES Notes Indenture Trustee designated Adam K. Berman.[1022]  After reasonable

---

[1020] 3/16/11 Trial Tr. 211:7-15 (Rock).  The Noteholder Plan provides that the board of directors of Reorganized Tribune shall have seven members, one of which shall be the chief executive officer of Reorganized Tribune (to the extent the position is not vacant, and only in the event that the employment agreement with such chief executive so provides), four of which shall be designated by the Senior Lenders and two of which will initially be designated by Aurelius.  Noteholder Plan at § 5.3.2.  Those members designated by Aurelius (i) must be independent of Aurelius and (ii) until the Distribution Trust is wound down or otherwise liquidated, (a) may be replaced at any time with or without cause by the Distribution Trust, at the direction of the Distribution Trust Advisory Board, and (b) upon the expiration of their terms will have their successors selected by the Distribution Trustee, at the direction of the Distribution Trust Advisory Board.  Consistent with the foregoing, on March 2, 2011, Aurelius designated Morton Handel and Kurt Cellar to serve on the initial board of directors of Reorganized Tribune, both of whom are independent of Aurelius.  See Addendum to Plan Supplement in Support of Noteholder Plan at Exhibit 5.3.2(2) [ECF No. 8225].  On May 6, 2011, the Debtors designated Eddy Hartenstein as CEO.  See Press Release, "Tribune Names Eddy Hartenstein as President and Chief Executive Officer" issued on May 6, 2011.  Assuming Mr. Hartenstein's employment agreement so provides, Mr. Hartenstein will also serve on the board of directors of Reorganized Tribune.  On February 23, 2011, the Noteholder Plan Proponents sent a letter to the Senior Lender DCL Plan Proponents" requesting that such lenders disclose the four board member designees allotted to the Senior Lenders under the Noteholder Plan.  See Exhibit A to Addendum to Plan Supplement in Support of Noteholder Plan [ECF No. 8225].  The Senior Lender DCL Plan Proponents responded by letter dated February 25, 2011, that (i) they anticipated that current directors of Tribune would continue to serve in such capacity after confirmation, and (ii) if the Senior Lenders wished to propose different board members to take the place of those members on or before the effective date, they would identify such individuals after confirmation but prior to the effective date of the Noteholder Plan. See Exhibit B to Addendum to Plan Supplement in Support of Noteholder Plan [ECF No. 8225].  To date, the Senior Lenders have not disclosed which of the current directors of Tribune would serve as the Senior Lenders' designees post-effective date, or if the Senior Lenders will designate different board members.  To the extent such designees are not disclosed in advance of the effective date of the Noteholder Plan, Reorganized Tribune shall hold a special election to appoint such board members as soon as practicable after the effective date and the members elected to the initial board shall be deemed to be the designees of the Senior Lenders.  See Noteholder Plan at § 5.3.2.
[1021] 3/16/11 Trial Tr. 209:13-212:10 (Rock).
[1022] Noteholder Plan at § 7.16.6; Exhibit B to the Tribune Distribution Trust Agreement attached to the Noteholder Plan as Exhibit 7.16.1.

consultation with the remaining Noteholder Plan Proponents, Aurelius designated Quest

Turnaround Advisors, LLC as the Distribution Trustee, which entity is independent of

Aurelius.[1023]  The Litigation Trust Advisory Board and Creditors' Trust Advisory Board shall

initially consist of the following three members: (i) Dan Gropper; (ii) Luc Dowling and (iii)

Patrick Healy.[1024]  The Litigation Trustee and Creditors' Trustee shall be Marc S. Kirschner.[1025]

504.    Each Trust Advisory Board member and the trustees of the respective Trusts shall

owe fiduciary duties to the potential beneficiaries of their respective trusts in the same manner

that members of an official committee of creditors appointed pursuant to section 1102 of the

Bankruptcy Code have fiduciary duties to the creditor constituents represented by such

committee; *provided*, that the members of the Creditors' Trust Advisory Board and the Litigation

Trust Advisory Board, and each of their respective trustees, shall not have any fiduciary

obligation to potential trust beneficiaries who are also defendants in Litigation Trust Causes of

Action or are the subject of State Law Avoidance Claims, as applicable, in such potential trust

beneficiaries' capacity as a defendant.[1026]

505.    Through the trust structure described herein, the Noteholder Plan provides that all

LBO Claims will be adjudicated post-effective date for the benefit of holders of Litigation Trust

Interests.[1027]  All causes of action to be prosecuted by both the Litigation Trust and the Creditors'

---

[1023] Noteholder Plan at § 7.16.7; Exhibit A to the Tribune Distribution Trust Agreement attached to the Noteholder Plan as Exhibit 7.16.1.
[1024] Noteholder Plan at §§ 5.17.3, 5.18.4; Exhibit B to the Tribune Litigation Trust Agreement attached to the Noteholder Plan as Exhibit 5.17.1; Exhibit B to the Tribune Creditors' Trust Agreement attached to the Noteholder Plan as Exhibit 5.18.1.
[1025] Noteholder Plan at §§ 5.17.4, 5.18.5; Exhibit A to the Tribune Litigation Trust Agreement attached to the Noteholder Plan as Exhibit 5.17.1; Exhibit A to the Tribune Creditors' Trust Agreement attached to the Noteholder Plan as Exhibit 5.18.1.
[1026] Noteholder Plan at §§ 5.17.4; 5.18.5.
[1027] *See, e.g.*, 3/16/11 Trial Tr. 13:8-13 (Gropper) ("Our plan is as true to the DCL plan in every respect possible with one very important difference.  We don't settle the most valuable causes of action for a fraction of their net – of their worth.  We allow them to be adjudicated on a post-effective date basis with the trust.").

Trust will be pursued outside of bankruptcy by unconflicted fiduciaries.[1028]  This structure is necessary and appropriate to enable the Litigation Trustee and Creditors' Trustee the opportunity to engage in arm's length negotiations with, among others, the LBO Lenders, increasing the likelihood that many of the LBO Claims will be settled on reasonable terms and with sufficient value being obtained by Non-LBO Creditors and absent such a settlement, to prosecute the LBO Claims to ensure that all creditors of the Debtors' estates receive the recoveries for which they are justly and legally entitled.[1029]

506.    In fact, the Noteholder Plan's trust structure is similar to the "purity" plan previously considered by the Debtors in connection with the formulation of their own plan.[1030] The Debtors have also indicated that they would seriously consider a "purity" plan if the LBO Claims were not otherwise resolved through the Chapter 11 Cases.[1031]  DCL Plan Proponents Oaktree and Angelo Gordon similarly acknowledged the legitimacy of a plan that would "preserve and transfer to a litigation trust all causes of action available to Tribune Company."[1032] Accordingly, the Court finds that the trust structure contemplated by the Noteholder Plan is necessary and appropriate approves the Noteholder Plan Proponents' designees to act as trustees and advisory board members under the applicable trusts.

---

[1028] Noteholder Plan at §§ 5.17.4, 5.18.5.

[1029] *See, e.g.*, 3/16/11 Trial Tr. 14:8-20 (Gropper) ("I think that if the LBO lenders were on the other side of a truly independent litigation trustee, that there will be an arm's length negotiation.  And it's actually my expectation that may of the claims under our plan will settle rather than be litigated because I don't think the LBO lenders will want to put to the test the litigation, particularly a number of conclusions that the examiner found would be favorable to the pre-LBO lenders.").

[1030] *See* 3/8/11 Trial Tr. 73:11-16 (Kurtz) ("Q:  Did you come to a conclusion as to whether Mr. Whitman's [purity] plan would work and, you know, you've heard what you testified to at your deposition.  Is that still your position? A:  Well, the Whitman plan could work if the lenders accepted it."); *see also* NPP 836 (9/23/10 email from D. Liebentritt to J. Berg) at 3 ("If we get signals that, even after a failed mediation, Carey may not be inclined to take the claims in part, we may need to consider seriously a "purer purity" approach.").

[1031] *See* 3/15/11 Trial Tr. 183:3-16 (Wilderotter) (Q: Okay.  Does this refresh your recollection as to whether that he was considering as a concept a purity plan as of September 2010?  A:  Yes.  We always looked at a purity plan as an option.  We just didn't think it was the top option we should pursue.").

[1032] *See* NPP 1989 (Credit Agreement Lenders' Settlement Statement) at 10-11.

<u>**CONCLUSION**</u>

The Noteholder Plan Proponents respectfully requests that the Bankruptcy Court adopt the Findings of Fact and Conclusions of Law set forth above.

Dated: June 3, 2011

AKIN GUMP STRAUSS HAUER & FELD LLP
Daniel H. Golden
David Zensky
Philip C. Dublin
Abid Qureshi
Mitchell P. Hurley
One Bryant Park
New York, NY 10036
212-872-1000

*Counsel for Aurelius Capital Management, LP*

ASHBY & GEDDES, P.A.

_____/s/ William P. Bowden_____
William P. Bowden (I.D. No. 2553)
Amanda M. Winfree (I.D. No. 4615)
500 Delaware Avenue, P.O. Box 1150
Wilmington, DE 19899
302- 654-1888

McCARTER & ENGLISH, LLP
David J. Adler
245 Park Avenue
New York, NY 10167
212-609-6800

McCARTER & ENGLISH, LLP

_____/s/ Katharine L. Mayer_____
Katharine L. Mayer (I.D. No. 3758)
Renaissance Centre
405 N. King Street
Wilmington, DE 19801
302-984-6300

*Counsel for Deutsche Bank Trust Company Americas, solely in its capacity as successor Indenture Trustee for certain series of Senior Notes*

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
David S. Rosner
1633 Broadway
New York, New York 10019
212-506-1700

BIFFERATO GENTILOTTI LLC

_____/s/Garvan F. McDaniel_____
Garvan F. McDaniel (I.D. No. 4167)
800 N. King Street, Plaza Level
Wilmington, Delaware 19801
302- 429-1900

*Counsel for Law Debenture Trust Company of New York, solely in its capacity as successor Indenture Trustee for certain series of Senior Notes*

BROWN RUDNICK LLP
Robert J. Stark
Martin S. Siegel
Gordon Z. Novod
Seven Times Square
New York, NY 10036
212-209-4800

SULLIVAN HAZELTINE ALLINSON LLC

_____/s/ William D. Sullivan_____
William D. Sullivan (I.D. No. 2820)
Elihu E. Allinson, III (I.D. No. 3476)
901 N. Market St., Suite 1300
Wilmington, DE 19801
302-428-8191

*Counsel for Wilmington Trust Company, solely in its capacity as successor Indenture Trustee for the PHONES Notes*

# **APPENDIX A**

| | |
|---|---|
| ***Angelo Gordon*** | Angelo, Gordon & Co., L.P. |
| ***April Plan*** | The Joint Plan of Reorganization For Tribune Company and Its Subsidiaries filed on April 12, 2010. [ECF No. 4008]. |
| ***Arrangers*** | JPMorgan, Bank of America, Merrill Lynch Capital Corporation and Citigroup Inc. |
| ***Aurelius*** | Aurelius Capital Management, LP, on behalf of its managed entities. |
| ***Average Third Party Base Case Projections*** | Average third-party base case projections compiled by Fischel. |
| ***Bank of America*** | Bank of America, N.A. |
| ***Bar Order*** | The bar order as set forth in section 11.3 of the DCL Plan. |
| ***Board*** | The board of directors of Tribune. |
| ***Bridge Lenders*** | The current and former banks and arrangers who provided the financing for the Bridge Loan Debt. |
| ***Bridge Loan Agreement*** | That certain Senior Unsecured Interim Loan Agreement, dated as of December 20, 2007, among Tribune, the Bridge Lenders, Merrill Lynch Capital Corporation, JPMorgan, as syndication agent, and Citicorp North America, Inc. and Bank of America, as co-documentation agents, as amended, restated, supplemented or otherwise modified from time to time. |
| ***Bridge Loan Avoidance Claims*** | All claims to avoid the $1.620 billion of Bridge Loan Debt. |
| ***Bridge Loan Claims*** | As defined in the Noteholder Plan or the DCL Plan, as applicable. |
| ***Bridge Loan Debt*** | The $1.6 billion borrowed by Tribune under a 12 month bridge facility pursuant to the Bridge Loan Agreement. |
| ***Bridge Loan Guaranty Agreement*** | The Guaranty Agreement dated as of December 20, 2007 among Tribune, each of the subsidiaries of Tribune listed on Annex 1 thereto, and Wells Fargo Bank, N.A., as amended, restated, supplemented or otherwise modified from time to time. |
| ***CAPM*** | Capital Asset Pricing Model. |
| ***Centerbridge*** | Centerbridge Capital Advisors LLC and its affiliates and related persons. |
| ***Chapter 11 Cases*** | The voluntary cases commenced on the Petition Date by the Debtors in the Bankruptcy Court under chapter 11 of the Bankruptcy Code. |
| ***Company*** | Tribune and its direct and indirect subsidiaries. |
| ***Confirmation Hearing*** | The hearing held by the Bankruptcy Court on confirmation of the Noteholder Plan and DCL Plan. |
| ***Creditors' Committee*** | The official committee of unsecured creditors appointed pursuant to Bankruptcy Code section 1102(a) in the Chapter 11 Cases. |

| | |
|---|---|
| ***Creditors' Committee Complaint*** | The complaint filed in the Bankruptcy Court by the Creditors' Committee on November 1, 2010, adversary case no. 10-53963 against, among others, the LBO Lenders, as such complaint may be amended from time to time. |
| ***Creditors' Trust*** | The creditors' trust to be established pursuant to section 5.18 of the Noteholder Plan. |
| ***Creditors' Trust Advisory Board*** | As defined in the Noteholder Plan. |
| ***Creditors' Trust Agreement*** | As defined in the Noteholder Plan. |
| ***Creditors' Trust Distribution Orders*** | As defined in the Noteholder Plan. |
| ***Creditors' Trust Interests*** | Interests in the DCL Creditors' Trust or the Creditors' Trust, as applicable. |
| ***Creditors' Trustee*** | As defined in the Noteholder Plan. |
| ***DCF*** | Discounted cash flow. |
| ***DCL Creditors' Trust*** | The creditors' trust to be established pursuant to Article XIV of the DCL Plan. |
| ***DCL Litigation Trust*** | The litigation trust to be established pursuant to Article XIII of the DCL Plan. |
| ***DCL Plan*** | Unless otherwise indicated, the Second Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., and JPMorgan Chase Bank, N.A. (as modified April 26, 2011) [ECF No. 8769]. |
| ***DCL Plan Proponents*** | The Debtors, Creditors' Committee, Oaktree, Angelo Gordon and JPMorgan. |
| ***DCL Plan Supplement*** | The supplement to the DCL Plan filed with the Bankruptcy Court on January 31, 2011 as may be amended or supplemented. |
| ***Debtors*** | The debtors and debtors in possession identified in footnote 1 of the Noteholder Plan. |
| ***Deutsche Bank*** | Deutsche Bank Trust Company Americas, in its capacity as successor Indenture Trustee for certain series of Senior Notes. |
| ***DEV*** | Distributable enterprise value. |
| ***Disclaimed State Law Avoidance Claims*** | As defined in the DCL Plan. |
| ***Distributable Cash*** | As defined in the Noteholder Plan. |
| ***Distribution Trust*** | The distribution trust to be established pursuant to section 7.16 of the Noteholder Plan. |
| ***Distribution Trust Advisory Board*** | As defined in the Noteholder Plan. |
| ***Distribution Trust Agreement*** | As defined in the Noteholder Plan. |
| ***Distribution Trust Interests*** | As defined in the Noteholder Plan. |
| ***Distribution Trust Reserve*** | As defined in the Noteholder Plan. |
| ***Distribution Trustee*** | As defined in the Noteholder Plan. |

| | |
|---|---|
| ***Effective Date*** | As defined in the Noteholder Plan. |
| ***EGI*** | Equity Group Investments, LLC. |
| ***EGI-TRB LLC Notes*** | Those certain promissory notes in the aggregate principal amount of $225 million issued by Tribune in favor of EGI-TRB, LLC and certain direct and indirect assignees of EGI-TRB, LLC. |
| ***EGI-TRB LLC Notes Claims*** | As defined in the Noteholder Plan or the DCL Plan, as applicable. |
| ***EGI-TRB Purchase Agreement*** | That certain Securities Purchase Agreement, dated as of April 1, 2007 by and among Tribune, EGI-TRB, LLC and Zell. |
| ***ESOP*** | Tribune's employee stock ownership plan. |
| ***Examiner*** | Kenneth N. Klee, appointed by the Bankruptcy Court as examiner on May 11, 2010. |
| ***Examiner Adjusted Base Case Projections*** | The projections as adjusted by the Examiner in the Examiner's Report. |
| ***Examiner's Report*** | The report regarding, among other things, the LBO Claims issued by the Examiner on July 26, 2010. |
| ***February 2007 Projections*** | The revised set of long-term projections prepared by Company management in February 2007. |
| ***February 2010 Business Plan*** | The Company's 2010 projections as revised in February 2010. |
| ***First Mediation Term Sheet*** | The first mediation term sheet attached to the first Mediator's Report filed on September 28, 2010. |
| ***General Unsecured Claims*** | As defined in the Noteholder Plan or the DCL Plan, as applicable. |
| ***Guarantor Debtors*** | Those Debtors listed on Appendix A to the Noteholder Plan or DCL Plan, as applicable. |
| ***Guarantor Subsidiaries*** | Subsidiaries of Tribune identified in the Joint Disclosure Statement which guaranteed the Step One Debt, Step Two Debt and Bridge Loan Debt. |
| ***Houlihan*** | Houlihan Lokey, Inc. |
| ***Incremental Facility*** | The $2.105 billion in new incremental term loans under the Senior Loan Agreement. |
| ***Initial Distribution Date*** | As defined in the Noteholder Plan. |
| ***Initial Distributions*** | As defined in the Noteholder Plan. |
| ***Intercompany Claims*** | All prepetition claims against any of the Debtors held by another Debtor or a non-Debtor affiliate. |
| ***Intercompany Claims Settlement*** | The settlement and compromise respecting Intercompany Claims on the terms set forth in Exhibit 1.1.122 of the DCL Plan Supplement as incorporated in the Noteholder Plan or DCL Plan, as applicable. |
| ***January Valuation Report*** | The updated valuation report prepared by Lazard in January 2011 |

| | |
|---|---|
| ***Joint Disclosure Statement*** | As defined in the Noteholder Plan. |
| ***JPMorgan*** | JPMorgan Chase Bank, N.A. |
| ***LATI*** | The Los Angeles Times International, Ltd. |
| ***LATI Notes*** | The intercompany notes owed by certain Tribune subsidiaries to LATI. |
| ***Law Debenture*** | Law Debenture Trust Company of New York, in its capacity as successor Indenture Trustee for certain series of Senior Notes. |
| ***Lazard Expert Report*** | The final expert report submitted by Lazard on February 8, 2011 |
| ***LBO*** | The failed leveraged buyout transaction that took place in two stages in June and December 2007 |
| ***LBO Claims*** | Any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action, avoidance powers or rights, liabilities of any nature whatsoever, and legal and equitable remedy, against any person based upon, arising out of, or related to, the LBO or any transaction related to the LBO. |
| ***LBO Debt*** | Any and all debt of Tribune and its subsidiaries arising out of or otherwise associated with, as applicable, the Senior Loan Agreement, Swap Agreement, Bridge Loan Agreement, Senior Loan Guaranty Agreement, Bridge Loan Guaranty Agreement or EGI-TRB LLC Notes. |
| ***LBO Lenders*** | The Step One Lenders, the Step Two Lenders and the Bridge Lenders. |
| ***Litigation Distributions Orders*** | As defined in the Noteholder Plan. |
| ***Litigation Trust*** | The litigation trust to be established pursuant to section 5.17 of the Noteholder Plan. |
| ***Litigation Trust Advisory Board*** | As defined in the Noteholder Plan. |
| ***Litigation Trust Agreement*** | As defined in the Noteholder Plan. |
| ***Litigation Trust Causes of Action*** | As defined in the Noteholder Plan. |
| ***Litigation Trust Claims*** | The Litigation Trust Causes of Action as defined in the DCL Plan. |
| ***Litigation Trust Interests*** | Interests in the DCL Litigation Trust or the Noteholder Plan, as applicable. |
| ***Litigation Trustee*** | As defined in the Noteholder Plan. |
| ***March Valuation Report*** | The valuation report prepared by Lazard in March 2010 in connection with the Debtors' June 2, 2010 disclosure statement. |
| ***McCormick Foundation*** | The McCormick Tribune Foundation. |
| ***Merger Agreement*** | That certain Agreement and Plan of Merger, dated as of April 1, 2007, by and among Tribune, the Trustee, Tesop Corporation, and EGI-TRB LLC. |
| ***Mesirow*** | Mesirow Financial Consulting, LLC. |
| ***Moody's*** | Moody's Investors Service. |

| | |
|---|---|
| *Morgan Stanley Claims* | As defined in the Noteholder Plan or the DCL Plan, as applicable. |
| *New Common Stock* | As defined in the Noteholder Plan. |
| *New Senior Secured Term Loan* | As defined in the Noteholder Plan. |
| *New Warrants* | As defined in the Noteholder Plan. |
| *Non-LBO Creditors* | Those creditors of the Debtors whose claims do not arise from the LBO. |
| *Non-Settling Step Two Payees* | As defined in the DCL Plan. |
| *Noteholder Plan* | Third Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed By Aurelius, Deutsche Bank, Law Debenture and Wilmington Trust dated April 25, 2011 [ECF No. 8755]. |
| *Noteholder Plan Proponents* | Aurelius, Deutsche Bank, Law Debenture and Wilmington Trust. |
| *Oaktree* | Oaktree Capital Management, L.P. |
| *October 2007 Projections* | The projections prepared by the Company in October 2007 for the year 2010 through 2015. |
| *October 2010 Business Plan* | The Company's 2010 projections as revised in October 2010. |
| *October Valuation Report* | The updated valuation report prepared by Lazard in October 2010. |
| *Old Bridge Credit Agreement* | The Amended and Restated Bridge Credit Agreement dated as of June 27, 2006. |
| *Other Guarantor Debtor Claims* | As defined in the Noteholder Plan. |
| *Other Non-Guarantor Debtor Claims* | As defined in the Noteholder Plan. |
| *Other Parent Claims* | As defined in the Noteholder Plan or the DCL Plan, as applicable. |
| *Parent GUC Trust Preference* | As defined in the DCL Plan. |
| *Petition Date* | (i) For all Debtors other than Tribune CLNBC, LLC:  December 8, 2008 and (ii) for Tribune CNLBC, LLC:  October 12, 2009. |
| *PHONES Notes* | The exchangeable subordinated debentures due 2029 issued and outstanding under the PHONES Notes Indenture. |
| *PHONES Notes Claims* | As defined in the Noteholder Plan or DCL Plan, as applicable. |
| *PHONES Notes Claims Resolution* | As defined in the Noteholder Plan. |
| *PHONES Notes Indenture* | That certain Indenture, dated as of April 1, 1999, between Tribune and Bank of Montreal Trust Company, as indenture trustee, as amended, restated or otherwise modified from time to time. |
| *PHONES Notes Indenture Trustee* | The indenture trustee under the PHONES Notes Indenture. |
| *Plan Special Committee* | A special committee formed by the Board in August 2010. |

| | |
|---|---|
| *Pre-LBO Noteholders* | The holders of Senior Notes and holders of PHONES Notes. |
| *Pre-LBO Special Committee* | The special committee formed by the Board in September 2006. |
| *Preliminary 2011 Plan* | A preliminary version of the 2011 budget. |
| *Preserved Claims* | All remaining LBO Claims under the DCL Plan, including Disclaimed State Law Avoidance Claims. |
| *Proposed Settlement* | The series of settlements enumerated in the DCL Plan. |
| *Redeemed EGI Note* | The initial EGI-TRB LLC Note for which EGI received over $206 million in value. |
| *Released Stockholder Parties* | As defined in the DCL Plan. |
| *Reorganized Tribune* | Tribune on or after the Effective Date, after giving effect to the transactions occurring on or prior to the Effective Date in accordance with the Noteholder Plan or DCL Plan, as applicable. |
| *Retiree Claimants* | Those holders of claims under non-qualified former employee benefit plans that are parties to the Retiree Claimant Settlement Agreement (as defined in the DCL Plan). |
| *Retiree Settlement* | That certain settlement by and among Tribune and certain Retiree Claimants as set forth in the Stipulation Between Debtors and Retiree Claimants Settling and Allowing Claims attached to the DCL Plan as Exhibit 5.15.4. [ECF No. 6686]. |
| *S Corp/ESOP* | An S Corporation wholly-owned by an employee stock benefits plan. |
| *S&P* | Standard & Poors. |
| *Second Mediation Term Sheet* | The second mediation term sheet filed as an attachment to the Mediator's Second Report, dated October 12, 2010. |
| *Senior Lender DCL Plan Proponents* | Oaktree, JPMorgan and Angelo Gordon |
| *Senior Lenders* | The lenders from time to time party to the Senior Loan Agreement, including former lenders and any applicable assignees and participants thereof. |
| *Senior Loan Agreement* | Collectively, (i) that certain Credit Agreement, dated as of May 17, 2007, among Tribune, the Senior Lenders, the JPMorgan, Merrill Lynch Capital Corporation, as syndication agent, and Citicorp North America, Inc. and Bank of America, as co-documentation agents, as amended, restated, supplemented or otherwise modified from time to time and (ii) those certain Increase Joinders, dated as of December 20, 2007, among Tribune, certain of the Senior Lenders and JPMorgan, as amended, restated, supplemented or otherwise modified from time to time. |
| *Senior Loan Claims* | As defined in the Noteholder Plan or DCL Plan, as applicable. |
| *Senior Loan Guaranty Agreement* | The Guaranty Agreement, dated as of June 4, 2007, among Tribune, each of the subsidiaries of Tribune listed on Annex I thereto and JPMorgan, as amended, restated, supplemented or otherwise modified from time to time. |
| *Senior Noteholder Claims* | Aas defined in the Noteholder Plan or the DCL Plan, as applicable. |

| | |
|---|---|
| *Senior Noteholders* | Individually or collectively, the holder(s) of Senior Notes. |
| *Senior Notes* | The eight series of notes issued and outstanding under the Senior Notes Indentures. |
| *Senior Notes Indentures* | As defined in the Noteholder Plan or the DCL Plan, as applicable. |
| *State Law Avoidance Claims* | As defined in the Noteholder Plan. |
| *Step One* | The first step of the LBO that closed on the Step One Closing Date. |
| *Step One Adjusted Projections* | February 2007 Projections, as adjusted by Tuliano to reflect information known to Company management prior to the Step One close. |
| *Step One Avoidance Claims* | All claims to avoid the Step One Debt. |
| *Step One Closing Date* | June 4, 2007. |
| *Step One Commitment Letter* | That certain Amended and Restated Commitment Letter, dated as of April 5, 2007, by and among Tribune, JPMorgan, JPMCB, MLCC, CGMI, Bank of America, and BAS. |
| *Step One Debt* | (a) a $1.5 billion Senior Tranche X Term Facility; (b) a $5.515 billion Senior Tranche B Term Facility; (c) a $263 million Delayed Draw Senior Tranche B Term Facility; and (d) a $750 million Revolving Credit Facility. |
| *Step One Disgorgement Claims* | All claims to disgorge the $1.868 billion of principal, interest and/or fees paid prior to the Petition Date (excluding pre-judgment interest) on account of the Step One Debt. |
| *Step One Financing Documents* | As defined in the Step One Commitment Letter. |
| *Step One Lender Claims* | As defined in the Noteholder Plan. |
| *Step One Lenders* | The current and former holders of the Step One Debt. |
| *Step One Selling Stockholders* | As defined in the DCL Plan dated May 18, 2010. |
| *Step Two* | The second step of the LBO that closed on the Step Two Closing Date. |
| *Step Two Adjusted Projections* | October 2007 Projections, as adjusted by Tuliano to reflect information known to Company management prior to the Step Two close. |
| *Step Two Arranger Litigation Trust Preference* | As defined in the DCL Plan. |
| *Step Two Arrangers* | As defined in the DCL Plan. |
| *Step Two Avoidance Claims* | All claims to avoid the Step Two Debt. |
| *Step Two Closing Date* | December 20, 2007. |
| *Step Two Commitment Letter* | That certain Amended and Restated Commitment Letter, dated as of April 5, 2007, by and among Tribune, JPMorgan, JPMCB, MLCC, CGMI, Bank of America, Banc of America Bridge, and BAS. |
| *Step Two Debt* | The $2.105 billion in new incremental term loans under the Senior Loan Agreement. |

| | |
|---|---|
| **Step Two Disgorgement Claims** | All claims to disgorge the $318 million of principal, interest and/or fees paid prior to the Petition Date (excluding pre-judgment interest) on account of the Step Two Financing. |
| **Step Two Financing** | The Bridge Loan Debt and the Step Two Debt. |
| **Step Two Lender Claims** | As defined in the Noteholder Plan. |
| **Step Two Lenders** | The current and former holders of Step Two Debt. |
| **Step Two Selling Stockholders** | As defined in the DCL Plan dated May 18, 2010. |
| **Subordinated Securities Claims** | As defined in the Noteholder Plan. |
| **Subsidiary Debtors** | As defined in the Noteholder Plan or the DCL Plan, as applicable. |
| **Subsidiary General Unsecured Creditors** | Holders of subsidiary General Unsecured Claims. |
| **Swap Agreement** | 1992 ISDA Master Agreement, including any schedules thereto, dated as of July 2, 2007, between Barclays Bank PLC and Tribune and three accompanying interest rate swap confirmations, each dated as of July 3, 2007. |
| **Swap Claims** | The Swap Parent Claim and the Swap Guarantee Claims. |
| **Swap Guarantee Claims** | Any claims arising under the Senior Loan Guaranty Agreement in respect of the Swap Parent Claim. |
| **Swap Parent Claim** | The claim asserted against Tribune under the Swap Agreement. |
| **TEV** | Total enterprise value. |
| **Transitional Compensation Plan** | The transitional compensation plan adopted by the Board on July 19, 2006 |
| **Tribune** | Tribune Company. |
| **Tribune CNLBC** | Tribune CNLBC, LLC (f/k/a Chicago National League Ball Club). |
| **Trusts' Loan** | As defined in the DCL Plan. |
| **VRC** | Valuation Research Corporation. |
| **VRC Base Case Projections** | Projections prepared by VRC for the Company. |
| **WACC** | Weighted average cost of capital. |
| **WEAR** | The doctrines of waiver, estoppel, and assumption of the risk. |
| **Wilmington Trust** | Wilmington Trust Company, in its capacity as successor Indenture Trustee for the PHONES Notes. |