# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re

TRIBUNE COMPANY, *et al.*,

Debtors.

Chapter 11
Case No. 08-13141 (KJC)
Jointly Administered

## THE NOTEHOLDER PLAN PROPONENTS'
## PROPOSED CONCLUSIONS OF LAW

<table>
<tr>
<td>

AKIN GUMP STRAUSS HAUER & FELD LLP
Daniel H. Golden
David Zensky
Philip C. Dublin
Abid Qureshi
Mitchell P. Hurley
One Bryant Park
New York, NY 10036
212-872-1000

</td>
<td>

ASHBY & GEDDES, P.A.
William P. Bowden (I.D. No. 2553)
Amanda M. Winfree (I.D. No. 4615)
500 Delaware Avenue, P.O. Box 1150
Wilmington, DE 19899
302- 654-1888

</td>
</tr>
</table>

*Counsel for Aurelius Capital Management, LP*

<table>
<tr>
<td>

McCARTER & ENGLISH, LLP
David J. Adler
245 Park Avenue
New York, NY 10167
212-609-6800

</td>
<td>

McCARTER & ENGLISH, LLP
Katharine L. Mayer (I.D. No. 3758)
Renaissance Centre
405 N. King Street
Wilmington, DE 19801
302-984-6300

</td>
</tr>
</table>

*Counsel for Deutsche Bank Trust Company Americas, solely in its capacity as successor Indenture Trustee for certain series of Senior Notes*

<table>
<tr>
<td>

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
David S. Rosner
1633 Broadway
New York, New York 10019
212-506-1700

</td>
<td>

BIFFERATO GENTILOTTI LLC
Garvan F. McDaniel (I.D. No. 4167)
800 N. King Street, Plaza Level
Wilmington, Delaware 19801
302- 429-1900

</td>
</tr>
</table>

*Counsel for Law Debenture Trust Company of New York, solely in its capacity as successor Indenture Trustee for certain series of Senior Notes*

<table>
<tr>
<td>

BROWN RUDNICK LLP
Robert J. Stark
Martin S. Siegel
Gordon Z. Novod
Seven Times Square
New York, NY 10036
212-209-4800

</td>
<td>

SULLIVAN HAZELTINE ALLINSON LLC
William D. Sullivan (I.D. No. 2820)
Elihu E. Allinson, III (I.D. No. 3476)
901 N. Market St., Suite 1300
Wilmington, DE 19801
302-428-8191

</td>
</tr>
</table>

*Counsel for Wilmington Trust Company, solely in its capacity as successor Indenture Trustee for the PHONES Notes*

# **TABLE OF CONTENTS**

I. THE BANKRUPTCY COURT CANNOT CONFIRM THE DCL PLAN
BECAUSE ITS PROPOSED SETTLEMENT FAILS TO SATISFY
BANKRUPTCY RULE 9019 AND BANKRUPTCY CODE SECTION 1129(a) ............ 1

    A. The Proposed Settlement Releases Meritorious LBO Claims Against The
LBO Lenders For A Fraction Of Their Value ......................................................... 4

        1. Fraudulent Transfer Law Is Especially Applicable To Leveraged
Buyouts ................................................................................................. 6

        2. The Intentional Fraudulent Conveyance Claims Have A Strong
Chance of Success ................................................................................. 7

            a. The Evidence Shows That Step One Was An Intentional
Fraudulent Conveyance ............................................................ 10

            b. The Evidence Shows That Step Two Was An Intentional
Fraudulent Conveyance ............................................................ 13

        3. The Evidence Strongly Suggests That The Constructive Fraudulent
Conveyance Claims Will Succeed ....................................................... 14

            a. The Evidence Indicates That Tribune Did Not Receive
Reasonably Equivalent Value From The LBO At Either
Step One Or Step Two ............................................................... 14

            b. A Court Will Include The Debt Incurred At Step Two
When Considering The Three Financial Condition Tests At
Step One ................................................................................... 16

            c. The Company's "Base Case" Projections At Step One And
Step Two Were Not Reasonable And Should Be
Disregarded ............................................................................. 19

            d. All Three Financial Conditions Are Satisfied For Both Step
One And Step Two .................................................................... 21

        4. Full Avoidance Of The LBO Debt Would Provide Full Recoveries
To The Non-LBO Creditors ................................................................. 34

        5. The LBO Lenders' Potential Affirmative Defenses To The LBO
Have A Low Chance Of Success .......................................................... 38

            a. Section 546(e) Cannot Be Invoked ........................................... 38

            b. The LBO Lenders Do Not Have A Defense Under Section
548(c) ...................................................................................... 40

        6. The Estate Has Many Other Valuable Claims Against The LBO
Lenders That The Proposed Settlement Releases For Insufficient
Consideration ...................................................................................... 42

a.    Equitable Subordination And Equitable Disallowance ............... 42

b.    Aiding And Abetting Breaches Of Fiduciary Duty ..................... 51

c.    Unjust Enrichment ........................................................... 52

7.    Multiple Alternative Litigation Outcomes Would Result In Non-LBO Creditor Recoveries Far In Excess Of The Proposed Settlement Consideration ..................................................... 53

a.    Even If Only Step Two Financing Is Avoided, Equitable Remedies Premised On WEAR Would Lead To Substantial Recoveries For Non-LBO Creditors ............................. 54

b.    The DEV Is Much Higher Than The DCL Plan Proponents Claimed, And This Also Leads To Higher Recoveries ............... 59

c.    Other Meritorious Claims Against The LBO Lenders Would Result In Full Recovery For Non-LBO Creditors ........... 64

d.    Avoidance At Just The Parent Level Leads To Higher Recoveries Than Under The Proposed Settlement ..................... 64

8.    Claims Against Other Parties Preserved In The DCL Litigation Trust Do Not Render The Proposed Settlement Reasonable ................... 66

B.    Expected Value And Decision Tree Analysis Demonstrates That The Proposed Settlement Is "Not Even Close" To Reasonable ................... 68

1.    Beron's Analysis Shows That The LBO Claims Have A Higher Chance Of Success And Have An Expected Value Three Times Higher Than The Proposed Settlement Consideration ............................ 68

2.    The Court Should Give Little Weight To Black's Opinions Regarding The Proposed Settlement ........................................... 75

C.    The DCL Plan And Settlement Process Was Tainted By Conflicts, One-Sided Negotiations, And Other Irregularities, And The DCL Plan Proponents Cannot Demonstrate That The Proposed Settlement Is Reasonable Nor That The DCL Plan Is Proposed In Good Faith ............... 78

1.    The Debtors' Mistaken View Of Their Role, And Manifest Conflicts Of Interest, Tainted Their Investigation And Settlement Of The LBO Claims ............................................................ 80

2.    By Forming The Plan Special Committee, The Debtors Acknowledged, But Did Not Resolve, Their Debilitating Conflicts ........ 87

3.    The Creditors' Committee Failed To Maximize Value ............................ 89

4.    Pre-LBO Noteholders Were Excluded From Key Negotiations Leading To The Proposed Settlement, And There Was No Meaningful Arm's-Length Bargaining ................................. 92

D.    The Second *Martin* Factor Weighs Against Approval Of The Proposed Settlement ............................................................ 95

E.    The Third *Martin* Factor Weighs Against Approval Of The Proposed

    Settlement ............................................................................................. 95

  F.  The Fourth *Martin* Factor Is Not Satisfied Because The Proposed
     Settlement Is Not In The Paramount Interest Of Creditors .................................... 96

II.  THE DCL PLAN IS UNCONFIRMABLE AS A MATTER OF LAW ............................ 98

# TABLE OF AUTHORITIES

**CASES**       Page(s)

*Acequia, Inc v. Clinton (In re Acequia, Inc.),*
   34 F.3d 800 (9th Cir. 1994) ...................................................................35

*Acumed LLC v. Stryker Corp.,*
   551 F.3d 1323 (Fed. Cir. 2008).............................................................78

*Adelphia Recovery Trust v. Bank of America,*
   390 B.R. 80 (S.D.N.Y. 2008).................................................................35

*Algonquin Power Income Fund v. Ridgewood Heights, Inc. (In re Franklin Indus.*
   *Complex, Inc.),* No. 01-67457-59 2007 WL 2509709 (Bankr. N.D.N.Y. Aug. 20,
   2007) ......................................................................................................45

*Alumax Inc. v. Comm'r,*
   109 T.C. No. 8, 109 T.C. 133 (T.C. 1997).............................................76

*ASARCO LLC v. Ams. Mining Corp.,*
   396 B.R. 278 (S.D. Tex. 2008) ................................................................8

*Bankr. Serv., Inc. v. Ernst & Young (In re CBI Holding Co.),*
   No. 96-9143A, slip op. (Bankr. S.D.N.Y. Oct. 23, 2000) (Lifland, J.)....................78

*Bay Plastics, Inc. v. BT Commercial Corp. (In re Bay Plastics),*
   187 B.R. 315 (Bankr. C.D. Cal. 1995).....................................................7

*Benjamin v. Diamond (In re Mobile Steel Co.),*
   563 F.2d 692 (5th Cir. 1977) ..........................................................43, 50

*Berckeley Inv. Grp. v. Colkitt,*
   455 F.3d 195 (3d Cir. 2006)...................................................................76

*Blixseth v. Kirschner (In re Yellowstone Mountain Club),*
   436 B.R. 598 (Bankr. D. Mont. 2010) ...................................................20

*Boyer v. Crown Stock Distrib.,*
   587 F.3d 787 (7th Cir. 2009) ..........................................................15, 74

*Brandt v. Hicks, Muse & Co. (In re Healthco Int'l, Inc.) ("Healthco Int'l I"),*
   195 B.R. 971 (Bankr. D. Mass. 1996) ...................................................39

*Brandt v. Hicks, Muse & Co., Inc. (In re Healthco Int'l, Inc.) ("Healthco Int'l II"),*
   208 B.R. 288 (Bankr. D. Mass. 1997) ...................................................51

*Brandt v. Trivest II, Inc. (In re Plassein Int'l),*
No. 03-11489, 2008 WL 1990315 (Bankr. D. Del. May 5, 2008)..........................20

*Bridgeport Holdings Inc. Liquidating Trust v. CDW Corp. (In re Bridgeport Holdings, Inc.),* No. 05-50507, Mem. Op. (Bankr. D. Del. Jan. 10, 2007) (Walsh, J.)..........76

*Brown v. Chubb,*
31 N.E. 1030 (N.Y. 1892).....................................................................................56

*Brown v. Third Nat'l Bank (In re Sherman),*
67 F.3d 1348 (8th Cir. 1995) ...............................................................................41

*Burden v. U.S.,*
917 F.2d 115 (3d Cir. 1990)..................................................................................58

*Calhoun v. Honda Motor Co., Ltd.,*
738 F.2d 126 (6th Cir. 1984) ................................................................................77

*Calhoun v. Yamaha Motor Corp., U.S.A.,*
350 F.3d 316 (3d Cir. 2003)...........................................................................75, 77

*Cames v. Joiner (In re Joiner),*
319 B.R. 903 (Bankr. M.D. Ga. 2004)............................................................70, 96

*Cantor v. Perelman,*
No. Civ. A. 97-586 KAJ, 2006 WL 3462596 (D. Del. Nov. 30, 2006) (Jordan, J.)...............76

*Capitol Bank & Trust Co. v. 604 Columbus Ave. Realty Trust (In re 604 Columbus Ave. Realty Trust),* 968 F.2d 1332 (1st Cir. 1992)....................................................43

*Commercial Union Ins. Co. v. Seven Provinces Ins. Co.,*
217 F.3d 33 (1st Cir. 2000)...................................................................................78

*Consove v. Cohen (In re Roco Corp.),*
21 B.R. 429 (B.A.P. 1st Cir. 1982)........................................................................15

*Daubert v. Merrell Dow Pharm., Inc.,*
509 U.S. 579 (1993).......................................................................................75, 77

*Dobin v. Taiwan Mach. Trade Ctr. Corp. (In re Victor Int'l),*
97 F. App'x 365 (3d Cir. 2004) ..............................................................................9

*Doblin v. Hill (In re Hill),*
342 B.R. 183 (Bankr. D.N.J. 2006) .......................................................................40

*Doeling v. Grueneich (In re Grueneich),*
400 B.R. 688 (8th Cir. 2009) ................................................................................40

*Douglass v. Wones,*
    458 N.E.2d 514 (Ill. App. Ct. 1983) .................................................................52

*Enron Corp. v. Ave. Special Situation Fund II, LP, et al. (In re Enron Corp.),*
    333 B.R. 205 (Bankr. S.D.N.Y. 2005) .........................................................50

*Enron Corp. v. Credit Suisse First Boston Int'l (In re Enron Corp.),*
    328 B.R. 58 (Bankr. S.D.N.Y. 2005) ...........................................................38

*Feldman v. Chase Home Fin. (In re Image Masters, Inc.),*
    421 B.R. 164 (Bankr. E.D. Pa. 2009) ..........................................................40

*Ferrari v. Barclays Bus. Credit, Inc. (In re Morse Tool, Inc.),*
    148 B.R. 97 (Bankr. D. Mass. 1992) ...........................................................20

*Fin. Inst. Funding, Inc. v. Official Comm. of Unsecured Creditors of Genfarm Ltd. (In re Buncher Co.),* 229 F.3d 245 (3d Cir. 2000) ........................................16

*First Brandon Nat'l Bank v. Kerwin (In re Kerwin),*
    996 F.2d 552 (2d Cir. 1993) ........................................................................60

*First Trust and Deposit Co. v. Receiver of Salt Springs Nat'l Bank (In re Onondaga Litholite Co.),* 218 F.2d 671 (2d Cir. 1955) ........................................58, 59

*Fisher v. Sellis (In re Lake States Commodities, Inc.),*
    253 B.R. 866 (Bankr. N.D. Ill. 2000) .....................................................10, 74

*Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.),*
    283 F.3d 159 (3d Cir. 2002) ..........................................................................2

*G-I Holdings, Inc. v. Those Parties Listed on Exhibit A (In re G-I Holdings, Inc.),*
    313 B.R. 612 (Bankr. D.N.J. 2004) .............................................................56

*Geltzer v. Artists Mktg. Corp. (In re Cassandra Grp.),*
    338 B.R. 583 (Bankr. S.D.N.Y. 2006) ...........................................................9

*Graves v. United States,*
    150 U.S. 118, 14 S.Ct. 40 (1983) .................................................................12

*Hall v. Quigley (In re Hall),*
    131 B.R. 213 (Bankr. N.D. Fla. 1991) .........................................................18

*Hargreaves v. Tennis,*
    88 N.W. 486 (Neb. 1901) .............................................................................56

*Harris v. Huff (In re Huff),*
    160 B.R. 256 (Bankr. M.D. Ga. 1993) .........................................................55

*Hechinger Inv. Co. v. Fleet Retail Fin. Grp. (In re Hechinger Inv. Co.),*
    274 B.R. 71 (D. Del. 2002) ...................................................................39, 53

*Hogg v. Walker,*
    622 A.2d 648 (Del. 1993) ..................................................................53

*In re ABC Auto. Prods.,*
    210 B.R. 437 (Bankr. E.D. Pa. 1997) ...............................................89, 92

*In re ACandS, Inc.,*
    311 B.R. 36 (D. Del. 2004) ................................................................98

*In re Adelphia Commc'ns Corp.,*
    327 B.R. 143 (Bankr. S.D.N.Y. 2005) .......................................... passim

*In re Adelphia Commc'ns Corp.,*
    368 B.R. 140 (Bankr. S.D.N.Y. 2007) ............................................2, 61

*In re Adirondack Ry. Corp.,*
    95 B.R. 867 (N.D.N.Y. 1988) ...........................................................72

*In re AKF Foods, Inc.,*
    36 B.R. 288 (Bankr. E.D.N.Y. 1984) ...............................................90, 91

*In re Bayou Group, LLC,*
    372 B.R. 661 (Bankr. S.D.N.Y. 2007) .............................................37, 57

*In re Best Prods. Co.,*
    168 B.R. 35 (Bankr. S.D.N.Y. 1994) ...............................................56

*In re Calpine Corp.,*
    377 B.R. 808 (Bankr. S.D.N.Y. 2007) .............................................37, 58

*In re Carla Leather, Inc.,*
    44 B.R. 457 (Bankr. S.D.N.Y. 1984) ...............................71, 79, 93

*In re Cent. European Indus. Dev. Co.,*
    288 B.R. 572 (Bankr. N.D. Cal. 2003) .............................................60

*In re Chemtura Corp.,*
    439 B.R. 561 (Bankr. S.D.N.Y. 2010) .............................................2

*In re Commercial & Military Sys. Co., Inc.,*
    2007 WL 7027879 (Bankr. S.D. Ga. 2007) .....................................83, 86

*In re Conley,*
    159 B.R. 323 (Bankr. D. Idaho 1993) ..............................................46

iv

*In re Coram Healthcare Corp.*,
    271 B.R. 228 (Bankr. D. Del. 2001) .................................................................. passim

*In re Cybergenics Corp.*,
    226 F.3d 237 (3d Cir. 2000) ......................................................................................35

*In re Exide Techs.*,
    303 B.R. 48 (Bankr. D. Del. 2003) ...................................................................... passim

*In re Fibermark, Inc.*,
    339 B.R. 321 (D. Vt. 2006) ................................................................................70, 77

*In re Fiesta Homes of Georgia, Inc.*,
    125 B.R. 321 (Bankr. S.D. Ga. 1990) ........................................................................85

*In Re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerseon & Corey*,
    160 B.R. 882 (Bankr. S.D.N.Y. 1993) ........................................................................47

*In re Fleming Packaging Corp.*,
    No. 03–82408, 2007 WL 4556981 (Bankr. C.D. Ill. Dec. 20, 2007) .......................................67

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*,
    55 F.3d 768 (3d Cir. 1995)......................................................................................71

*In re Genesis Health Ventures, Inc.*,
    266 B.R 591 (Bankr. D. Del. 2001) ...........................................................................98

*In re Good*,
    428 B.R. 235 (Bankr. E.D. Tex. 2010) .......................................................................61

*In re Goss*,
    43 F.2d 746 (N.D. Ga. 1930) ............................................................................36, 57

*In re Great Bay Hotel & Casino, Inc.*,
    251 B.R. 213 (Bankr. D.N.J. 2000) ..........................................................................98

*In re Haiflich*,
    63 B.R. 314 (Bankr. N.D. Ind. 1986)........................................................................61

*In re J.S. II, L.L.C.*,
    389 B.R. 570 (Bankr. N.D. Ill. 2008) ....................................................................44, 45

*In re JMK Constr. Grp., LTD.*,
    441 B.R. 222 (Bankr. S.D.N.Y. 2010)........................................................................90

*In re Jones*,
    32 B.R. 951 (Bankr. D. Utah 1983) ..........................................................................60

*In re Kraft, LLC,*
    429 B.R. 637 (Bankr. N.D. Ind. 2010).................................................................36, 57

*In re Lernout & Hauspie Speech Prods. N.V.,*
    308 B.R. 672 (Bankr. D. Del. 2004)......................................................................98

*In re Lyondell Chem. Co.,*
    Case No. 09-10023 (Gerber, J.)............................................................................79

*In re Manhattan Inv. Fund Ltd.,*
    397 B.R. 1 (S.D.N.Y.2007)...................................................................................73

*In re Mirant Corp.,*
    334 B.R. 800 (Bankr. N.D. Tex. 2005)..................................................................61

*In re N. John Cunzolo Assocs., Inc.,*
    423 B.R. 735 (Bankr. W.D. Pa. 2010)...................................................................83

*In re Nationwide Sports Distribs., Inc.,*
    227 B.R. 455 (Bankr. E.D. Pa. 1998)....................................................................90

*In re Nellson Nutraceutical, Inc.,*
    356 B.R. 364 (Bankr. D. Del. 2006) (Sontchi, J.)............................................24, 76

*In re Nellson Nutraceutical, Inc.,*
    No. 06-10072, 2007 WL 201134 (Bankr. D. Del. Jan. 18, 2007) (Sontchi, J.) ...........22, 61, 62

*In re New Valley Corp.,*
    168 B.R. 73 (Bankr. D.N.J. 1994) .........................................................................98

*In re Nutritional Sourcing Corp.,*
    398 B.R. 816 (Bankr. D. Del. 2008) .......................................................................3

*In re Okura & Co.,*
    249 B.R. 596 (Bankr. S.D.N.Y. 2000)...................................................................47

*In re Par Pharm. Inc. Derivative Litig. ("Par Phar"),*
    750 F. Supp. 641 (S.D.N.Y. 1990)...................................................................88, 89

*In re Parkview Hospital-Osteopathic Medical Ctr.,*
    211 B.R. 603 (Bankr. N.D. Ohio 1996)..................................................................95

*In re Process-Manz Press, Inc.,*
    236 F. Supp. 333 (N.D. Ill. 1964)..........................................................................30

*In re Project Orange Assocs., LLC,*
    431 B.R. 363 (Bankr. S.D.N.Y. 2010)...................................................................90

*In re PWS Holding Corp.,*
    228 F.3d 224 (3d Cir. 2000) .................................................................55, 98

*In re Refco, Inc. Secs. Litig.,*
    No. 07-MDL-1902, 2009 WL 7242548 (S.D.N.Y. Nov. 13, 2009) .......................56

*In re Remsen Partners, Ltd.,*
    294 B.R. 557 (Bankr. S.D.N.Y. 2003) ......................................................95

*In re Revelle,*
    256 B.R. 905 (Bankr. W.D. Mo. 2001) ....................................................5, 71

*In re Spansion, Inc.,*
    No. 09-10690 (KJC), 2009 WL 1531788 (Bankr. D. Del. June 2, 2009) ...........2, 95, 96

*In re Texaco, Inc.,*
    84 B.R. 893 (Bankr. S.D.N.Y. 1988) .......................................................4, 5

*In re USN Commc'ns,*
    60 Fed. App'x 401 (3d Cir. 2003) ..........................................................21, 24

*In re Vitreous Steel Prods. Co.,*
    911 F.2d 1223 (7th Cir. 1990) ...............................................................43

*In re Wash. Mut., Inc.,*
    442 B.R. 314 (Bankr. D. Del. 2011) .......................................................2, 63

*In re Wash. Mut., Inc.,*
    No. 08-12229, 2011 WL 57111 (Bankr. D. Del. Jan. 7, 2011) ..........................67

*In re Yellowstone Mountain Club, LLC,*
    No. 08-61570-11, 2009 WL 3094930 (Bankr. D. Mont. May 12, 2009) ...........46, 47

*JPMorgan Chase Bank, N.A. v. Charter Comm'cns Operating, LLC (In re Charter*
    *Commc'ns),* 419 B.R. 221 (Bankr. S.D.N.Y. 2009) ......................................22

*Kakani v. Oracle Corp.,*
    No. 06-06493, 2007 WL 1793774 (N.D. Cal. June 19, 2007) ...........................94

*Key3Media Group, Inc. v. Pulver.com Inc. (In re Key3Media Group Inc.),*
    336 B.R. 87 (Bankr. D. Del. 2005) .....................................................1, 67, 79

*LaChance v. Harrington,*
    965 F. Supp. 630 (E.D. Pa. 1997) ...........................................................71

*Lids Corp. v. Marathon Inv. Partners, L.P. (In re Lids),*
    281 B.R. 535 (Bankr. D. Del. 2002) ......................................................20, 22

vii

*Liquidation Trust of Hechinger Inv. Co. v. Fleet Retail Fin. Group (In re Hechinger Inv. Co.)*, 327 B.R. 537, 550-51 (D. Del. 2005) .................................................................................. passim

*Liquidation Trust v. Fleet Retail Fin. Grp. (In re Hechinger Inv. Co.)*, 278 F. App'x 125 (3d Cir. 2008) .......................................................................................... 24

*Lobstein v. Lehn*, 12 N.E. 68 (Ill. 1887) ................................................................................................................ 56

*Loos v. Wilkinson*, 21 N.E. 392 (N.Y. 1889) .......................................................................................................... 56

*LWD Trucking v. LWD, Inc. (In re LWD, Inc.)*, 342 B.R. 514 (Bankr. W.D. Ky. 2006) ...................................................................................... 46

*Malpiede v. Townson*, 780 A.2d 1075 (Del. Supr. 2001) .................................................................................... 51

*MC Asset Recovery, LLC v. The Southern Co.*, No. 1:06-CV-0417-BBM, 2006 WL 5112612 (N.D. Ga. Dec. 11, 2006) .......................... 35

*McNamara v. PFS (In re Pers. & Bus. Ins. Agency)*, 334 F.3d 239 (3d Cir. 2003) ............................................................................................ 8

*Meadows v. Anchor Longwall & Rebuild, Inc.*, 306 Fed. App'x 781 (3d Cir. 2009) ............................................................................ 31, 34

*Mellon Bank, N.A. v. Metro Commc'ns*, 945 F.2d 635 (3d Cir. 1991) ......................................................................................... 6, 22

*Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L.)*, 92 F.3d 139 (3d Cir. 1996) ...................................................................... 15

*Mervyn's, LLC v. Lubert-Adler Grp. IV, LLC (In re Mervyn's Holdings, LLC)*, 426 B.R. 488 (Bankr. D. Del. 2010) .......................................................................... 17, 18

*MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Services Co.*, 910 F. Supp. 913, 943-945 (S.D.N.Y. 1995) ........................................................... 9, 74

*Miller v. Greenwich Capital Fin. Prods., Inc. (In re Am. Bus. Fin. Servs.)*, 361 B.R. 747 (Bankr. D. Del. 2007) .................................................................................. 51

*Moody v. Security Pac. Bus. Credit Inc.*, 971 F.2d 1056 (3d Cir. 1992) ................................................................................. passim

*Morion v. OYO Instruments, L.P. (In re Labelon Corp.)*, No. 02-02-22582, 2006 WL 2516386 (Bankr. W.D.N.Y. Aug. 28, 2006) ........................ 54, 55

*Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*,
    478 F.3d 452 (2d Cir. 2007) ........................................................................98

*Murphy v. Mentor Sav. Bank (In re O'Day Corp.)*,
    126 B.R. 370 (Bankr. D. Mass. 1991) ................................................... passim

*Myers v. Martin (In re Martin)*,
    91 F.3d 389 (3d Cir. 1996) .................................................................... 3, 67

*Nextwave Personal Commc'ns, Inc. v. Federal Commc'ns Comm'n
    (In re Nextwave Personal Commc'ns, Inc.)*, 235 B.R. 305 (Bankr. S.D.N.Y. 1999) ..............35

*Oddi v. Ford Motor Co.*,
    234 F.3d 136 (3d Cir. 2000) ........................................................................76

*Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery ("Cybergenics
    I")*, 226 F.3d 237 (3d Cir. 2000) ...........................................................65, 64, 81

*Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery ("Cybergenics
    II")*, 330 F.3d 548 (3d Cir. 2003) .................................................................81, 82

*Official Comm. of Unsecured Creditors v. Aust (In re Network Access Solutions, Corp.)*,
    330 B.R. 67 (Bankr. D. Del. 2005) ...............................................................56

*Official Comm. of Unsecured Creditors v. Austin Fin. Servs., Inc. (In re KDI Holdings,
    Inc.)*, 277 B.R. 493 (Bankr. S.D.N.Y. 1999) .....................................................44

*Official Comm. of Unsecured Creditors v. DVI Bus. Credit, Inc. (In re DVI, Inc.)*,
    326 B.R. 301 (Bankr. D. Del. 2005) ..............................................................45

*Official Comm. of Unsecured Creditors v. JPMorgan Chase Bank, N.A. (In re Tribune
    Co.)*, Adv. No. 10-53963 (KJC) (Bankr. D. Del. Dec. 7, 2010) (the "Creditors'
    Committee Complaint") ...............................................................................5

*Orr v. Kinderhill Corp.*,
    991 F.2d 31 (2d Cir. 1993) ..........................................................................17

*Ortiz v. Fibreboard Corp.*
    527 U.S. 815 (1999) .............................................................................79, 93

*Oswald v. Gen. Motors Corp. (In re Gen. Motors Corp. Engine Interchange Lit.)*,
    594 F.2d 1106 (7th Cir. 1979) .......................................................... passim

*Peck Produce, Inc. v. PPI Enters., Inc. (In re PPI Enters. (U.S.), Inc.)*,
    324 F.3d 197 (3d Cir. 2003) .......................................................................63

*Peltz v. Hatten
    (In re USN Commc'ns, Inc.)*, 60 Fed. App'x 401 (3d Cir. 2003) ...........................75

*Peltz v. Hatten,*
    279 B.R. 710 (D. Del. 2002) ........................................................................20, 21

*Pension Transfer Corp. v. Beneficiaries Under the Third Amendment to Fruehauf Trailer*
    *Corp. Ret. Plan No. 003 (In re Fruehauf Trailer Corp.)*, 444 F.3d 203 (3d Cir. 2006) ....14, 15

*Pepper v. Litton,*
    308 U.S. 295 (1939) ..................................................................................50, 51

*Phoenix Canada Oil Co. Ltd. v. Texaco Inc.,*
    560 F. Supp. 1372 (D. Del. 1983) ..................................................................52

*Plotkin v. Pomona Valley Imports, Inc. (In re Cohen),*
    199 B.R. 709 (B.A.P. 9th Cir. 1996) ..........................................................8, 10

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,*
    390 U.S. 414 (1968) ..............................................................................2, 5, 95

*Reynolds v. Beneficial Nat'l Bank,*
    288 F.3d 277 (7th Cir. 2002) ........................................................................71

*Robinson v. Wangemann,*
    75 F.2d 756 (5th Cir. 1935) ..........................................................................16

*Rosener v. Majestic Mgmt., Inc. (In re OODC, LLC),*
    321 B.R. 128 (Bankr. D. Del. 2005) ...................................................... passim

*South Pac. Transp. Co. v. Voluntary Purchasing Grps, Inc.,*
    252 B.R. 373 (E.D. Tex. 2000) ......................................................................60

*Sanchez v. United States,*
    133 Fed. App'x 747 (1st Cir. 2005) ................................................................23

*Schnelling v. Crawford (In re James River Coal Co.),*
    360 B.R. 139 (Bankr. E.D. Va. 2007) ..............................................................8

*Schubert v. Lucent Techs. Inc. (In re Winstar Commc'ns, Inc.),*
    554 F.3d 382 (3d Cir. 2009) ....................................................................42, 44

*Shubert v. Lucent Techs. Inc. (In re Winstar Commc'ns),*
    348 B.R. 234 (Bankr. D. Del. 2005) ..............................................................25

*Shubert v. Premier Paper Prods., LLC (In re Am. Tissue, Inc.),*
    No. 01-10370, 2007 WL 4178949 (Bankr. D. Del. Nov. 20, 2007) ......................42

*Sierra Indus., LLC v. SHC, Inc. (In re SHC, Inc.),*
    329 B.R. 438 (Bankr. D. Del. 2005) ..........................................................43, 46

*Simmons v. Ford Motor Co.,*
    132 Fed. App'x 950 (3d Cir. 2005).................................................32, 34

*Smithberg v. Ill. Mun. Ret. Fund,*
    735 N.E.2d 560 (Ill. 2000) ...........................................................53

*Stalnaker v. DLC, Ltd. (In re DLC, Ltd.),*
    295 B.R. 593 (B.A.P. 8th Cir. 2003), *aff'd*, 376 F.3d 819 (8th Cir. 2004)............55

*Statutory Comm. of Unsecured Creditors of Iridium Operating LLC v. Motorola, Inc.*
    *(In re Iridium Operating LLC)*, 373 B.R. 283 (Bankr. S.D.N.Y. 2007) ..................28

*Stepak v. Addison,*
    20 F.3d 398 (11th Cir. 1994) ................................................84, 85, 87, 88

*Travellers Int'l AG v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.),*
    134 F.3d 188 (3d Cir. 1998)..........................................................25

*U.S. v. Tabor Court Realty Corp.,*
    803 F.2d 1288 (3d Cir. 1986)..........................................9, 18, 30, 40

*Universal Athletic Sales Co. v. Am. Gym, Recreational and Athletic Equip. Corp., Inc.,*
    546 F.2d 530 (3d Cir. 1976)...........................................................23, 77

*Vadnais Lumber Supply, Inc. v. Byrne (In re Vadnais Lumber Supply, Inc.),*
    100 B.R. 127 (Bankr. D. Mass. 1989) ................................................74

*VFB LLC v. Campbell Soup Co.,*
    482 F.3d 624 (3d Cir. 2007).........................................................28

*Vinarov v. Motorola, Inc.,*
    No. 05-2063, 2008 WL 821880 (N.D. Ill. Mar. 26, 2008) .........................52

*Vintero Corp. v. Corporacion Venezolana de Fomento (In re Vintero Corp.),*
    735 F.2d 740 (2d Cir. 1984)..........................................................36

*Voest-Alpine Trading USA Corp. v. Vantage Steel Corp.,*
    919 F.2d 206 (3d Cir. 1990)...........................................................8

*Westmoreland Human Opportunities, Inc. v. Walsh,*
    327 B.R. 561 (W.D. Pa. 2005)........................................................91

*Whiteford Plastics Co. v. Chase Nat'l Bank,*
    179 F.2d 582 (2d Cir. 1950)..........................................................36

*Wieboldt Stores, Inc. v. Schottenstein,*
    94 B.R. 488 (N.D. Ill. 1988) .....................................................8, 15, 41

*Will v. N.W. Univ. (In re Nutraquest, Inc.)*,
  434 F.3d 639 (3d. Cir. 2006)..............................................................................2, 96

*Williams v. U.S.*,
  321 Fed. App'x 129 (3d Cir. 2009)....................................................................31, 34

*Wilson v. RHS v. Assocs. (In re Blazo Corp.)*,
  Adv. Pro. No. 93-6087, 1994 WL 92405 (Bankr. N.D. Ohio Feb. 25, 1994) ..........................9

*Yoder v. T.E.L. Leasings (In re Suburban Motor Freight, Inc.)*,
  124 B.R. 984 (Bankr. S.D. Ohio 1990)..............................................................29, 30

# THE NOTEHOLDER PLAN PROPONENTS'
## PROPOSED CONCLUSIONS OF LAW

Aurelius Capital Management, LP, on behalf of its managed entities ("Aurelius"),

Deutsche Bank Trust Company Americas, in its capacity as successor Indenture Trustee for

certain series of Senior Notes ("Deutsche Bank"), Law Debenture Trust Company of New York,

in its capacity as successor Indenture Trustee for certain series of Senior Notes ("Law

Debenture"), and Wilmington Trust Company, in its capacity as successor Indenture Trustee for

the PHONES Notes ("Wilmington Trust" and, together with Aurelius, Deutsche Bank and Law

Debenture, the "Noteholder Plan Proponents"), each by and through its undersigned counsel,

respectfully submit these proposed conclusions of law (the "Conclusions of Law"):[1]

I.  **THE BANKRUPTCY COURT CANNOT CONFIRM THE DCL PLAN BECAUSE ITS PROPOSED SETTLEMENT FAILS TO SATISFY BANKRUPTCY RULE 9019 AND BANKRUPTCY CODE SECTION 1129(a)**

1.      The Court cannot confirm the DCL Plan because the Proposed Settlement upon

which it is premised fails to satisfy Bankruptcy Rule 9019 and Bankruptcy Code section 1129(a).

Pursuant to Rule 9019, the DCL Plan Proponents bear the burden of persuading the Court that

the Proposed Settlement falls within the range of reasonableness. *Key3Media Group, Inc. v.

Pulver.com Inc. (In re Key3Media Group Inc.)*, 336 B.R. 87, 93 (Bankr. D. Del. 2005) ("While a

court generally gives deference to the Debtors' business judgment in deciding whether to settle a

matter, the Debtors have the burden of persuading the bankruptcy court that the compromise is

fair and equitable and should be approved."). In addition, the DCL Plan Proponents bear the

burden of proving that the DCL Plan was proposed in good faith, is in the best interest of the

creditors, and otherwise complies with all of the requirements of Bankruptcy Code section

---

[1]   Terms not otherwise defined herein shall have the meanings ascribed to such terms in the glossary attached as
Appendix A to the Noteholder Plan Proponents' Proposed Findings of Fact.

1129(a) for confirmation. *In re Wash. Mut., Inc.*, 442 B.R. 314, 328 (Bankr. D. Del. 2011) (citing *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 252 (Bankr. S.D.N.Y. 2007)).

2.      In deciding whether Bankruptcy Rule 9019 is satisfied, the court must determine whether "the compromise is fair, reasonable, and in the best interest of the estate." *In re Spansion, Inc.*, No. 09-10690 (KJC), 2009 WL 1531788, at *3 (Bankr. D. Del. June 2, 2009); *Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.)*, 283 F.3d 159, 165 (3d Cir. 2002) (directing district court to assess the "fairness, reasonableness and adequacy" of proposed settlement). To determine that a settlement is in the best interests of the estate, the settlement must be "fair and equitable." *In re Chemtura Corp.*, 439 B.R. 561, 593 (Bankr. S.D.N.Y. 2010) (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968)). Such a finding is to be based on "the probabilities of ultimate success should the claim be litigated," and "all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise." *Id.*

3.      The Court's task under Bankruptcy Rule 9019 is to "canvass the issues to see whether the settlement falls below the lowest point in the range of reasonableness." *In re Exide Techs.*, 303 B.R. 48, 68 (Bankr. D. Del. 2003). The debtors and other proponents of a settlement have the burden to prove that the relevant factors informing this decision are satisfied, and settlements are not a "give me," no matter how beneficial any party contends or believes the settlement is for the estate. Oct. 22, 2010 Hr'g at 31:23-32:5; *see Spansion*, 2009 WL 1531788, at *4, *7.

4.      Courts give substantial weight to whether the settlement is fair to the non-settling parties and reject settlements that are unfair to non-settling parties. *See Spansion*, 2009 WL 1531788, at *3 (citing *Will v. N.W. Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 645 (3d. Cir.

2006); *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 835-37 (Bankr. D. Del. 2008) (ruling that proposed settlement was not fair and reasonable where interests of non-settling creditors were not represented and were adversely affected by the settlement); *Exide*, 303 B.R. at 70-71 (rejecting proposed settlement and giving substantial weight to rejection of plan containing the proposed settlement by unsecured creditors who were not party to settlement agreement); *see also In re Adelphia Commc'ns Corp.*, 327 B.R. 143, 165 (Bankr. S.D.N.Y. 2005) (finding that voting results must be more than a mere "counting exercise" and votes "must be considered in light of the reasons for any opposition . . . ").

5.     In determining whether to approve a settlement under Bankruptcy Rule 9019, the Third Circuit in *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996) set forth four factors to consider: (i) the probability of success in litigation; (ii) the likely difficulties in collection; (iii) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (iv) the paramount interest of the creditors (collectively, the "*Martin* Factors").

6.     In addition, this Court has considered the following additional factors in deciding whether to approve a settlement (collectively, the "*Texaco* Factors"):

   (a)   The balance between the likelihood of plaintiff's or defendant's success should the case go to trial vis a vis the concrete present and future benefits held forth by the settlement without the expense and delay of a trial and subsequent appellate procedures;

   (b)   The prospect of complex and protracted litigation if the settlement is not approved;

   (c)   The proportion of the class of creditors who do not object or who affirmatively support the proposed settlement;

   (d)   The competency and experience of counsel who support the settlement;

   (e)   The relative benefits to be received by individuals or groups within the class;

3

(f)    The nature and breadth of releases to be obtained by the directors and officers as a result of a settlement; and

(g)    The extent to which the settlement is truly the product of "arms-length" bargaining, and not of fraud or collusion.

*See Exide*, 303 B.R. at 67-68 (citing *In re Texaco, Inc.*, 84 B.R. 893, 902 (Bankr. S.D.N.Y. 1988)). Here, not a single one of the relevant *Martin* Factors or *Texaco* Factors supports the approval of the Proposed Settlement, and the DCL Plan Proponents have failed to carry their burden under Bankruptcy Rule 9019.

7.    Moreover, "the ultimate fairness of the process in bankruptcy is a paramount principle to be protected by the Bankruptcy Court." *In re Coram Healthcare Corp.*, 271 B.R. 228, 232 (Bankr. D. Del. 2001). As discussed in § I.C, *infra*, the largely undisputed evidence adduced by the Noteholder Plan Proponents reveals a settlement and plan process that was marked by, among other things, actual and apparent conflicts of interest among the parties who negotiated and agreed to the Proposed Settlement and DCL Plan, and the exclusion of any true advocate for the LBO Claims against the LBO Lenders at crucial junctures in the settlement process. For these reasons and others, the DCL Plan Proponents did not carry their burden of demonstrating compliance with Bankruptcy Code section 1129(a)(3).

**A.    The Proposed Settlement Releases Meritorious LBO Claims Against The LBO Lenders For A Fraction Of Their Value**

8.    The Proposed Settlement fails to satisfy the first *Martin* Factor (and first *Texaco* Factor) because the overwhelming evidence shows the LBO Claims against the LBO Lenders have a very strong likelihood of successfully yielding a full recovery for Non-LBO Creditors, or one that is substantially greater than the Proposed Settlement.

9.    In addressing the first *Martin* Factor, the Court must consider the probability of success in litigating the LBO Claims that are to be settled under the Proposed Settlement. In

addressing the probability of success of the claims to be settled, the Court must familiarize itself with "all of the facts" bearing on the range of potential outcomes and likelihood of each such outcome. *TMT Trailer Ferry*, 390 U.S. at 424; *see also In re Texaco*, 84 B.R. at 893 ("Decisions as central to bankruptcy as approval of settlements . . . must issue from reason and rest upon factual undergirdings"). Where, as here, the debtors propose to release claims for a small fraction of the amount sought, the debtors must show that these claims have a low likelihood of success. *See Exide*, 303 B.R. at 48 (debtor failed to show low likelihood of success), 70 (even assuming objecting committee's projections are overly optimistic, fractional settlement unreasonably low); *In re Revelle*, 256 B.R. 905, 913 (Bankr. W.D. Mo. 2001) (finding the objecting creditors who were "prepared to walk away from as much as 69 percent payout" "should be allowed their day in court," because they had "a substantial basis" to "believe that in contested litigation they w[ould] ultimately prevail and be paid 100 percent").

10.     The Debtors propose to settle all of the LBO Claims against the LBO Lenders and Arrangers. These claims are set forth in the Creditors' Committee's First Amended Complaint against the LBO Lenders, captioned *Official Comm. of Unsecured Creditors v. JPMorgan Chase Bank, N.A. (In re Tribune Co.)*, Adv. No. 10-53963 (KJC) [ECF No. 6] (Bankr. D. Del. Dec. 7, 2010) (the "Creditors' Committee Complaint"). Under the DCL Plan, all of these LBO Claims would be released as against the LBO Lenders and Arrangers, in their capacities as such. DCL Plan at §§ 1.1.200, 11.2.

11.     It is undisputed that if just the claims seeking to avoid or disallow the debt incurred at both Step One and Step Two of the LBO were successful (*i.e.*, Counts 1 through 3 of the Creditors' Committee Complaint), Non-LBO Creditors would receive in excess of $3 billion dollars, enough to pay *all* Non-LBO Creditors in full. *See* The Noteholder Plan Proponents'

Proposed Findings of Fact ("NPP Findings of Fact") § III.D.4. That is at least $2.5 billion dollars *more* than the settlement consideration being offered by the LBO Lenders and Arrangers under the Proposed Settlement. In addition, there are a number of likely scenarios that would result in drastically greater recoveries for Non-LBO Creditors than provided for under the Proposed Settlement, even if only Step Two is avoided. *See infra* at § I.A.7.

12. Thus, under a customary Bankruptcy Rule 9019 analysis, the Proposed Settlement cannot be approved unless the DCL Plan Proponents can establish that there is no chance, or at best a *de minimis* chance, of success on the LBO Claims against the LBO Lenders. As explained below, the DCL Plan Proponents have failed in this burden, as there is a reasonable if not substantial chance of the estates obtaining a ruling that the LBO Debt should be avoided on either intentional or constructive fraudulent conveyance grounds.

### 1. Fraudulent Transfer Law Is Especially Applicable To Leveraged Buyouts

13. Before analyzing the merits of the LBO Claims, it is important to recognize that leveraged buyout transactions, like the LBO here, are inherently risky to existing creditors. As such, heavily leveraged buyouts are especially susceptible to fraudulent transfer law when the subject company is subsequently unable to satisfy its pre-existing non-leveraged buyout liabilities. As the Third Circuit explained in *Moody*:

> The stakes are higher in the typical leveraged buyout, and, at least from the perspective of unsecured creditors, the potential for abuse is great. . . . The level of risk facing the newly structured corporation rises significantly due to the increased debt to equity ratio. This added risk is borne primarily by the unsecured creditors, those who will most likely not be paid in the event of insolvency.

*Moody v. Security Pac. Bus. Credit Inc.*, 971 F.2d 1056, 1065 (3d Cir. 1992); *see also Mellon Bank, N.A. v. Metro Commc'ns*, 945 F.2d 635, 646 (3d Cir. 1991) (explaining that while "shareholders receive direct benefit in the LBO transaction as they are cashed out . . . The target

corporation, however, receives no direct benefit to offset the greater risk of now operating as a highly leveraged corporation.").  As aptly described by one district court, in a leveraged buyout, "existing unsecured creditors are vulnerable" to harm:

> From their perspective, a pledge of the company's assets as collateral to finance the purchase of the company reduces the assets to which they can look for repayment . . . .  From a creditor's point of view, an LBO is indistinguishable from a distribution or a gift to shareholders.  The harm is quite like the harm imposed on creditors by donative transfers to third parties, which is one of the most traditional kinds of fraudulent transfers.

*Bay Plastics, Inc. v. BT Commercial Corp. (In re Bay Plastics)*, 187 B.R. 315, 333-36 (Bankr. C.D. Cal. 1995).

### 2. The Intentional Fraudulent Conveyance Claims Have A Strong Chance of Success

14.    The intentional fraudulent conveyance claims against the LBO Lenders—which are to be settled by the Proposed Settlement—have a strong chance of succeeding if litigated. Section 548 of the Bankruptcy Code provides that a transfer can be avoided if the transferor "made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became . . . indebted . . . ."  11 U.S.C. § 548 (a)(1)(A). Because "[d]irect evidence of fraudulent intent . . . is often unavailable . . . courts usually rely on circumstantial evidence, including the circumstances of the transaction, to infer fraudulent intent" in evaluating the transferor's actions.  *See Liquidation Trust of Hechinger Inv. Co. of Del., Inc. v. Fleet Retail Fin. Grp. (In re Hechinger Inv. Co. of Del.)*, 327 B.R. 537, 550-51 (D. Del. 2005), *aff'd*, 278 Fed. App'x. 125 (3d Cir. 2008).   Courts look to various "badges of fraud" that include:  (1) the relationship between the debtor and the transferee; (2) consideration for conveyance; (3) insolvency or indebtedness of the debtor; (4) how much of the debtor's estate was transferred; (5) reservation of benefits, control or dominion by the debtor; and (6) secrecy or concealment of the transaction.  *Id.*  "A general scheme or plan to strip the debtor of its assets

7

without regard to the needs of its creditors can support a finding of actual intent [to hinder, delay or defraud]." *Voest-Alpine Trading USA Corp. v. Vantage Steel Corp.*, 919 F.2d 206, 213-14 (3d Cir. 1990) ("Knowing that the conveyance would make [debtor] insolvent and strand its unsecured creditors . . . frustrates any claim of good faith"); *Wieboldt Stores, Inc. v. Schottenstein*, 94 B.R. 488, 504 (N.D. Ill. 1988) (citing *Freehling v. Nielson (In re F & C Servs.)*, 44 B.R. 863, 872 (Bankr. S.D. Fla. 1984)); *see also ASARCO LLC v. Ams. Mining Corp.*, 396 B.R. 278, 370-71 (S.D. Tex. 2008) (interpreting Delaware's Uniform Fraudulent Transfer Act). As the Debtors recognized in a pleading filed with this Court, the predicate conduct for intentional fraud is broad in scope:

> Despite its title, a 'fraudulent conveyance' under Section 548(a)(1)(A) encompasses a wide variety of conduct, not all of which constitutes 'fraud' in the traditional sense . . . . The three forms of intent that a transferor may demonstrate [to prove an intentional fraudulent transfer]—hinder, delay or defraud—are disjunctive such that the satisfaction of any on is sufficient to render the transaction avoidable.

*Debtors' Memorandum of Law in Opposition to the Noteholder Plan Proponents' Motion to Compel Production of Documents and Information Based on the Crime-Fraud Exception* [ECF No. 7554] at 5 (citing NPP 782 (Exam'rs Rpt.), Vol. II at 15; 7/29/2010 Hearing Tr.[ECF No. 5241] at 51-52); *see also, e.g. Plotkin v. Pomona Valley Imports, Inc. (In re Cohen)*, 199 B.R. 709, 716 (B.A.P. 9th Cir. 1996).

15.    In determining whether a corporation had the requisite knowledge and intent, courts look to the knowledge and intent of the corporation's directors, officers, and other agents who act for the corporation. *See McNamara v. PFS (In re Pers. & Bus. Ins. Agency)*, 334 F.3d 239, 242-43 (3d Cir. 2003) (reversing the district court's dismissal of intentional fraudulent conveyance claim based on analysis of officer's conduct); *Schnelling v. Crawford (In re James River Coal Co.)*, 360 B.R. 139, 161 (Bankr. E.D. Va. 2007) (determining that the "fraudulent

8

intent of an officer or director may be imputed to [a debtor company] for purposes of recovering an intentional fraudulent transfer) (citing *Forman v. Jeffrey Matthews Fin. Group, LLC (In re Halpert & Co.)*, 254 B.R. 104, 121 (Bankr. D.N.J. 1999; *Wilson v. RHS v. Assocs. (In re Blazo Corp.)*, Adv. Pro. No. 93-6087, 1994 WL 92405, at *4 (Bankr. N.D.Ohio Feb. 25, 1994).

16. It is not necessary to prove the existence of all of the badges of fraud (or any one in particular) in order to establish fraudulent intent. *See Geltzer v. Artists Mktg. Corp. (In re Cassandra Grp.)*, 338 B.R. 583, 598 (Bankr. S.D.N.Y. 2006) (upholding an actual fraud claim under the state law based on the presence of only one badge of fraud: inadequate consideration). "Depending on the context, badges of fraud will vary in significance, though the presence of multiple indicia will increase the strength of the inference." *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 935 (S.D.N.Y. 1995); *see also Moody*, 971 F.2d at 1064; *Dobin v. Taiwan Mach. Trade Ctr. Corp. (In re Victor Int'l)*, 97 F. App'x 365, 369 (3d Cir. 2004).

17. In addition, in the leading case addressing intentional fraudulent transfer in the leveraged buyout context, the Third Circuit further supplemented the traditional "badges of fraud" analysis with a test that focused on the effect of a transfer as indicative of intent, holding that "a party is deemed to have intended the natural consequences of his acts." *U.S. v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1305 (3d Cir. 1986); *see also Moody*, 971 F.2d at 1075 ("In *Tabor Court Realty Corp.*, we relied in part on the principle that 'a party is deemed to have intended the natural consequences of his acts' in upholding the district court's finding of intentional fraud."). Thus, even absent the traditional badges of fraud, a leveraged buyout is intentionally fraudulent if the debtor was "aware of the creditors' claims and that the LBO would

leave the Debtor with too much debt, making it unable to pay those claims." *Rosener v. Majestic Mgmt., Inc. (In re OODC, LLC)*, 321 B.R. 128, 140 (Bankr. D. Del. 2005).

18.      Unlike constructive fraudulent transfers, insolvency is not a prerequisite to a finding of intentional fraud. *See Fisher v. Sellis (In re Lake States Commodities, Inc.)*, 253 B.R. 866, 871 (Bankr. N.D. Ill. 2000) ("The focus in the inquiry into actual intent is on the state of mind of the debtor. Neither malice nor insolvency are required."). Similarly, a finding of inadequate consideration is not necessary for a transfer to qualify as an intentional fraudulent transfer. "[A]ny market-price transaction with a debtor who had the requisite state of mind to hinder creditors, to delay creditors, or to defraud creditors may qualify as an actually fraudulent transfer." *In re Cohen*, 199 B.R. at 716–17.

### a.      The Evidence Shows That Step One Was An Intentional Fraudulent Conveyance

19.      The record contains substantial evidence that the Step One Debt is avoidable as an intentional fraudulent transfer. Indeed, the evidence shows no less than *five* separate badges of fraud at Step One, including (i) undisputed evidence of a close relationship between the Company and the transferees; (ii) evidence that the Company received little or no value in connection with Step One of the LBO; (iii) evidence that the Company could not satisfy any of the financial condition tests provided in Bankruptcy Code section 548(a)(1)(B)(ii); (iv) evidence that the LBO was founded on misleading and "unrealistic" financial projections which the Company knowingly prepared and continued to rely upon to procure a solvency opinion from its advisor; and (v) evidence that the Company's advisors knew that the Company's total enterprise value following the Step One closing would be significantly less than the total debt the Company was expected to have following consummation of the LBO. *See* NPP Findings of Fact § II.F. The evidence also shows that the natural consequence of Step One was to leave the Company

with too much debt, rendering it unable to pay its debts as they come due. *See* NPP Findings of Fact § II.G.2.

20.     Although the Examiner concluded that it was "reasonably unlikely" that the Company incurred the Step One obligations and made the related transfers with the actual intent to hinder, delay or defraud Non-LBO Creditors, the Examiner's analysis of intentional fraud at Step One overlooked certain facts, and was based on certain assumptions that can no longer be justified in light of the record evidence. For example, the Examiner found that the first "badge of fraud"—a close relationship between the debtor and the transferees—was negated by the fact that the Pre-LBO Special Committee "considered and approved the [LBO] . . . with the active input of the Financial Advisors." NPP 782 (Exam'rs Rpt.), Vol. II at 23. However, the evidence now shows that presentations prepared by Citigroup and Morgan Stanley in their capacity as advisors to the Company and the Pre-LBO Special Committee actually confirmed that the Company was insolvent at Step One, and showed that the Company's implied total enterprise value following Step One would be approximately $1.4 billion less than the total debt the Company was expected to have following consummation of the LBO. *See* NPP Findings of Fact § II.F.

21.     The Examiner's conclusion regarding intentional fraud at Step One was also based in part on his conclusion that it was "highly unlikely" that a court would find that Step One rendered the Company insolvent. NPP 782 (Exam'rs Rpt.), Vol. II at 23. However, as described above, this conclusion was reached without the benefit of any balance sheet solvency test at Step One. Moreover, the Examiner did not identify several key facts relating to the unreasonableness of the February 2007 Projections that were presented at trial, including the Company's acknowledgment prior to Step One that it was tracking its lowest downside projections, as well

as evidence showing an internal debate at the Company as to whether to revise the Company's projections downward and/or disclose revised projections in advance of Step One closing. NPP 782 (Exam'rs Rpt.), Vol. II at 23; *see* NPP Findings of Fact §§ II.C.3; II.F; II.G.3.

22. Despite the Examiner's findings, significant evidence was presented at trial of secrecy and concealment at Step One. Indeed, the Examiner's statement that there is no "evidence that the Tribune Entities (through management or others) withheld information underlying Tribune's projections" is no longer accurate in light of evidence showing that management, in fact, *knew* that the February 2007 Projections were "unrealistic," withheld information relating to the unreasonableness of the February 2007 Projections, and recognized that the LBO would leave the Company with no equity cushion. *See* NPP Findings of Fact §§ II.F; II.G.2.b.(iii).

23. The DCL Plan Proponents did not produce any evidence to rebut these facts, and in fact did not present a single witness to testify regarding the reasonableness of either the February 2007 Projections or the October 2007 Projections. This failure "creates a presumption that the testimony, if produced, would be unfavorable." *Graves v. United States,* 150 U.S. 118, 14 S.Ct. 40 (1983) (cited with approval in *U.S. v. Am. Radiator & Standard Sanitary Corp.,* 433 F.2d 174, 206 (3d Cir. 1970)).

24. The DCL Plan Proponents' sole argument in support of a finding that Step One did not constitute an intentional fraudulent transfer was that "it is simply not plausible that a court would determine that Tribune was solvent at Step One and then turn around and determine that Tribune had actual intent to hinder, delay or defraud creditors by consummating the Step One Transactions." DCL Br. at 41. This position contradicts both the evidence and the law. Not only is there substantial evidence of insolvency at Step One (*see* NPP Findings of Fact § II.G),

but it is also fundamental that claims for intentional fraudulent and constructive fraudulent conveyance permit different and independent forms of proof, and that insolvency is *not* required to find an intentional fraudulent conveyance. *See supra* at ¶ 18.[2]

### b. The Evidence Shows That Step Two Was An Intentional Fraudulent Conveyance

25.     There is overwhelming evidence that Step Two was an intentional fraudulent transfer, including evidence of five separate badges of fraud at Step Two, and that the natural consequence of Step One was to leave the Company with too much debt, rendering it unable to pay the claims of Non-LBO Creditors in full. *See* NPP Findings of Fact §§ II.J; II.K. As with Step One, the evidence shows (i) a close relationship between the Company and the Step Two transferees, (ii) evidence that the Company received less than reasonably equivalent value in connection with Step Two, and (iii) evidence that the Company could not satisfy any of the financial condition tests provided in Bankruptcy Code section 548(a)(1)(B)(ii). *See* NPP Findings of Fact §§ II.M; II.N; III. There is also significant evidence that the Company's senior financial management intentionally concealed the Company's true financial condition in the months leading up to the Step Two closing, and made knowing misrepresentations regarding the Company's ability to refinance its debt, all as part of a fraudulent scheme to procure the solvency opinion that was a fundamental condition of the Step Two closing. *See* NPP Findings of Fact §§ II.J; II.K. This evidence is consistent with the Examiner's Step Two analysis, in which he concluded that "a series of facts under the general rubric of secrecy, concealment, or dishonesty

---

[2]  The Creditors' Committee, one of the five DCL Plan Proponents, has conceded this point in its pleadings and arguments to this Court. *See, e.g.*, Creditors' Committee Statement in Support of Aurelius's State Law Actions Motion at ¶¶ 8-9 [ECF No. 8396] ("While the respective causes of action may implicate similar operative facts, it cannot be disputed that [] the prima facie elements of (and the required evidence to support) the different claims . . . are demonstrably different."); see also NPP 2532 (3/22/11 Hr'g Tr.) at 58:20-23 (counsel for Creditors' Committee explaining: "[T]he two claims really are not the same. There are different pleading elements, different burdens of proof, different recoveries, and of course, most notably different defenses.").

tend to support the conclusion that the Step Two Transactions were intentionally fraudulent transfers." NPP 782 (Exam'rs Rpt.), Vol. II at 36.

### 3. The Evidence Strongly Suggests That The Constructive Fraudulent Conveyance Claims Will Succeed

26. The evidence also strongly suggests that the LBO Debt and transfers made in respect thereof are avoidable as constructive fraudulent transfers. Under section 548 of the Bankruptcy Code, transfers and obligations are constructively fraudulent if they are made or incurred within two years of the petition date and (a) the debtor received "less than reasonably equivalent value in exchange" for such transfers or obligations; and (b) either (i) the debtor "was insolvent on the date th[e] transfer was made or [the] obligation was incurred," or "became insolvent as a result," (ii) the debtor was, or was about to be, engaged in a business or transaction for which the debtor's remaining property was "an unreasonably small capital," *or* (iii) the debtor actually "intended to," or merely "believed that" it would, incur debts that "would be beyond [its] ability to pay" upon maturity. 11 U.S.C. § 548(a)(1)(B).

#### a. The Evidence Indicates That Tribune Did Not Receive Reasonably Equivalent Value From The LBO At Either Step One Or Step Two

27. In determining "reasonably equivalent value," courts first look at whether the debtor received, either directly or indirectly, "any value at all" from the transfer. *Pension Transfer Corp. v. Beneficiaries Under the Third Amendment to Fruehauf Trailer Corp. Ret. Plan No. 003 (In re Fruehauf Trailer Corp.)*, 444 F.3d 203, 212 (3d Cir. 2006). Second, if the bankruptcy court initially finds that the debtor "gained at least some value as a result of the transfer," the court must evaluate "whether the debtor got roughly the value it gave." *See In re Fruehauf Trailer Corp.*, 444 F.3d at 212-13. To make this assessment, the court must look to the "totality of the circumstances," including (i) the fair market value of the benefit received by the

debtor, (ii) the existence of an arm's-length relationship between the debtor and the transferee, and (iii) the transferee's good faith. *Id.*

28.     Courts have consistently concluded that a company does not receive any benefit, let alone receive "reasonably equivalent value," from repurchasing its own stock as part of a leveraged buyout. *See, e.g., Wieboldt*, 94 B.R. at 505 (in refusing to dismiss fraudulent transfer action against controlling shareholders, officers and directors of target company, as well as lenders involved in leveraged buyout where the loan proceeds were used to pay the selling shareholders for their stock, court held that receipt of 99% of its outstanding stock from shareholders "was virtually worthless" to target company); *Boyer v. Crown Stock Distrib.*, 587 F.3d 787, 792 (7th Cir. 2009) ("the payment to the shareholders by the buyer of the corporation is deemed a fraudulent conveyance because in exchange for the money the shareholders received they provided no value to the corporation but merely increased its debt and by doing so pushed it over the brink"). Indeed, by definition, the debtor receives no consideration at all when acquiring its own stock because the debtor's own stock is considered worthless to itself. *See Consove v. Cohen (In re Roco Corp.)*, 21 B.R. 429, 434 (B.A.P. 1st Cir. 1982) ("Treasury stock is not generally considered an asset, because it is widely held that a corporation cannot own a part of itself.") (citations omitted); *see also* NPP 782 (Exam'rs Rpt.), Vol. II at 91-92 ("The debtor's stock is worthless to the debtor as a matter of law. Thus no value was conferred on any Tribune Entity for obligations incurred to the LBO Lenders to make these payments."). Value is viewed from the standpoint of the creditors, looking at what the company received and kept for ordinary corporate purposes, and redemption of stock is merely a reduction in capitalization. *See Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L.)*, 92 F.3d 139, 148-51 (3d Cir. 1996) ("the question whether the debtor *received* reasonable value

must be determined from the standpoint of the creditors") (internal quotations and citation omitted); *Fin. Inst. Funding, Inc. v. Official Comm. of Unsecured Creditors of Genfarm Ltd. (In re Buncher Co.)*, 229 F.3d 245, 252-53 (3d Cir. 2000) ("a transaction in which a corporation receives nothing but outstanding stock amounts simply to a reduction in capitalization. From the perspective of the creditors, there is ordinarily no value to the corporation in such an exchange.") (citations omitted); *Robinson v. Wangemann*, 75 F.2d 756, 757 (5th Cir. 1935) (corporation acquiring its own stock is "simply a method of distributing . . . its assets to the stockholder. The assets of a corporation are the common pledge of its creditors, and stockholders are not entitled to receive any part of them unless creditors are paid in full.").

29.     Here, it is clear that as a matter of law the Company did not receive reasonably equivalent value in connection with the LBO. The Company incurred more than $10.7 billion in loan obligations to the LBO Lenders and immediately paid out no less than $8.3 billion of loan proceeds to the shareholders, and nearly $300 million in fees. *See* NPP Findings of Fact § I. This is consistent with Examiner's finding that it was "highly likely" that a court would find that, in the aggregate, the Company did not receive reasonably equivalent value for each of Step One and Step Two. NPP 782 (Exam'rs Rpt.), Vol. II at 77, 90.

        **b.     A Court Will Include The Debt Incurred At Step Two When Considering The Three Financial Condition Tests At Step One**

30.     The Step Two Financing should be considered when analyzing the Company's balance sheet solvency at Step One. "The Third Circuit has recognized that multi-step transactions . . . can be collapsed when the steps of the Transaction are 'part of one integrated transaction.'" *Hechinger*, 327 B.R. at 546 (quoting *Tabor Court*, 803 F.2d at 1302). As noted by the Examiner, when assessing whether to collapse a transaction, a court should "look beneath a transaction's surface until the substance is reached." NPP 782 (Exam'rs Rpt.), Vol. II at 173.

Thus, in assessing balance sheet solvency, rather than analyzing pieces of an integrated transaction individually, courts consider the totality of the obligations incurred and the overall financial consequences those transactions have on creditors, even in instances where separate steps of the transactions are separated by many months. *See Mervyn's, LLC v. Lubert-Adler Grp. IV, LLC (In re Mervyn's Holdings, LLC)*, 426 B.R. 488, 497 (Bankr. D. Del. 2010) (in fraudulent transfer action, collapsing various transactions integral to leveraged buyout of parent corporation's former subsidiary that had "devastating" financial consequences on creditors); *Orr v. Kinderhill Corp.*, 991 F.2d 31, 35-36 (2d Cir. 1993) (combining sale of properties made over the course of nine months with subsequent distribution to shareholders).

31. The factors considered for collapsing are: (i) "whether all of the parties involved had knowledge of the multiple transactions"; (ii) "whether each transaction would have occurred on its own"; and (iii) "whether each transaction was dependent or conditioned on other transactions." *Mervyn's*, 426 B.R. at 497-98 (Bankr. D. Del. 2010); *Hechinger*, 327 B.R. 537, 546-47 (Bankr. D. Del. 2005).

32. It is undisputed here that the first *Mervyn's* factor is met, as the parties "had knowledge" of Step One and Step Two from their inception. A panoply of evidence shows that the market accurately viewed Step One and Step Two as part of a single, integrated transaction, designed to allow Tribune to become a privately held company that could obtain the tax benefits afforded to an S Corporation wholly-owned by an employee stock benefits plan ("S Corp/ESOP"). *See* NPP Findings of Fact § II.G.1.a.

33. The second and third *Mervyn's* factors are also clearly satisfied. The primary reason that the transaction was consummated in two steps was because Tribune's largest shareholders would not agree to vote in favor of the LBO unless it provided an upfront payment

to shareholders that was not delayed by the regulatory approval necessary to complete the transaction. *See* NPP Findings of Fact § II.G.1.a; *see also* NPP 782 (Exam'rs Rpt.), Vol. II at 174. As the Examiner noted, "had there been a way to structure the transactions so that only one giant step were necessary, the transaction would have been structured accordingly." NPP 782 (Exam'rs Rpt.), Vol. II at 174. This and other record evidence shows that neither of the two steps was intended to occur on its own, and each was designed to be dependent on the other. *See* NPP Findings of Fact § II.G.1.a.

34.     The Examiner found that, although the question is "close," a court is "somewhat unlikely" to include the Step Two Financing when assessing the Company's *balance sheet solvency* at Step One. NPP 782 (Exam'rs Rpt.), Vol. II at 160-62. This conclusion was based on the Examiner's opinion that the limited outs to closing Step Two show that the third *Mervyn's* factor is not met. *Id.* Yet the cases addressing collapsing make clear that courts will consider all three of the factors established in *Mervyn's*, and none hold that each must be satisfied in order for collapsing to be appropriate. *See Tabor Court*, 803 F.2d 1288; *Mervyn's*, 426 B.R. 488; *Hechinger*, 327 B.R. 537. The abundance of evidence presented during the confirmation hearings showing that the two steps were part of an integrated transaction, and that neither would have occurred on its own, support a finding that the steps should be collapsed when assessing balance sheet solvency at Step One. *See* NPP Findings of Fact § II.G.1.a.

35.     It is equally if not more likely that a court would include the Step Two Financing when assessing the Debtors' capital adequacy and intent to incur debts beyond their ability to pay at Step One. The tests for capital adequacy and intention to incur are forward-looking, and mandate the inclusion of those debts which the debtor "intended to incur, or believed that [it] would incur." 11 U.S.C. § 548(a)(1)(B)(ii)(III); *see also Hall v. Quigley (In re Hall)*, 131 B.R.

213, 217 (Bankr. N.D. Fla. 1991) (explaining that the Bankruptcy Code "does not require that the debtor be insolvent to maintain a fraudulent transfer action. If the transfer causes the debtor to be unable to meet all his debts at some point in the future it may be avoided."). This is consistent with the findings of the Examiner, who determined that "it is necessary to consider obligations that were reasonably foreseeable at Step One, including the Step Two Debt in conjunction with the closing of Step Two." NPP 782 (Exam'rs Rpt.), Vol. II at 187. It is undisputed that, at the time of Step One, the Company expected to incur the Step Two Financing. *See* NPP Findings of Fact § II.G.1.a.

     c.  **The Company's "Base Case" Projections At Step One And Step Two Were Not Reasonable And Should Be Disregarded**

   36.  An additional threshold question is presented with respect to the Company's projections. In this case, the parties submitted fact and expert testimony bearing on the question of whether the Company's base case projections, which VRC utilized to prepare its two solvency opinions, were reasonable and should be used by a court in assessing the three financial condition tests. Here, a court should reject the February 2007 Projections and October 2007 Projections in evaluating the Company's financial condition at the time of the LBO because they were materially more optimistic than the Company's long term and parochial performance, rendering them inherently unreasonable.

   37.  In the case of a failed leveraged buyout, it is almost a given that the company has failed to achieve its projections. The question, therefore, is whether the projections were reasonable or unreasonable at the time of the buyout based on information that was then known or knowable. *See Murphy v. Mentor Sav. Bank (In re O'Day Corp.)*, 126 B.R. 370, 406 (Bankr. D. Mass. 1991) (rejecting management projections in a fraudulent transfer case because, *inter alia*, there existed "unwarranted deviation[s] between projected data and actual historical

figures"); *Blixseth v. Kirschner (In re Yellowstone Mountain Club)*, 436 B.R. 598, 647-48

(Bankr. D. Mont. 2010) (rejecting experts' solvency, cash flow, and capitalization analyses in a

fraudulent transfer case because the analyses uncritically relied on "management's over-inflated

cash flow projections" and ignored the fact that the "[d]ebtors' actual historical financial

performance did not support [the] [d]ebtor's future projections"); *Lids Corp. v. Marathon Inv.*

*Partners, L.P. (In re Lids)*, 281 B.R. 535, 544 (Bankr. D. Del. 2002) (rejecting experts' analysis

based on management projections in a fraudulent transfer case because the debtor had

"consistently failed to meet its projections"); *Brandt v. Trivest II, Inc. (In re Plassein Int'l)*, No.

03-11489, 2008 WL 1990315, at *9-10 (Bankr. D. Del. May 5, 2008) (holding that

management's failure to update its projections between two phases of a leveraged buyout process

raised a question as to the reasonableness and prudence of the projections in assessing fraudulent

transfer claims).

38.    Moreover, courts routinely recognize that management projections tend to be

optimistic and therefore require them to be tested by an objective standard. *Moody,* 971 F.2d at

1073 ("Because projections tend to be optimistic, their reasonableness must be tested by an

objective standard anchored in the company's actual performance."); *Ferrari v. Barclays Bus.*

*Credit, Inc. (In re Morse Tool, Inc.)*, 148 B.R. 97, 133 (Bankr. D. Mass. 1992); *Peltz v. Hatten*,

279 B.R. 710, 744 (D. Del. 2002). Indeed, courts have found that management will often adhere

to unreasonably optimistic projections despite clear indications that the projections are

unreliable. *In re O'Day Corp.*, 126 B.R. at 407 (management should have known that the actual

results would be substantially below 'worst case' projections).

39.    Here, a mountain of fact evidence and expert testimony now shows that the

February 2007 Projections and October 2007 Projections were unrealistic and unreasonable, and

were prepared using a process that was infected by a biased management incentivized to inflate the Company's performance expectations. *See* NPP Findings of Fact §§ II.C.3; II.E; II.J. This evidence is also consistent with the Examiner's conclusion that the circumstances surrounding the preparation of the October 2007 Projections bore the hallmark of a "conscious effort to counterbalance the decline in Tribune's 2007 financial performance and other negative trends in Tribune's business . . . ." NPP 782 (Exam'rs Rpt.), Vol. II at 63; *see* NPP Findings of Fact § II.J.

### d. All Three Financial Conditions Are Satisfied For Both Step One And Step Two

40. The record demonstrates that constructive fraudulent transfer claims based on each of the three financial condition tests under Bankruptcy Code section 548(a)(1)(B)(ii) have merit and have a strong chance of success at both Step One and Step Two. In reaching this conclusion, substantial weight should be given to the opinions and testimony of the Noteholder Plan Proponents' expert, Ralph Tuliano. At trial, the Court admitted Tuliano—without objection from the DCL Plan Proponents—as an expert on matters of solvency, valuation, and financial forensics, and admitted his expert reports in full. *See* NPP Findings of Fact § II.B. For the reasons given below, Tuliano's conclusions regarding the three financial condition tests for constructive fraudulent transfer are compelling and persuasive in assessing the Proposed Settlement.

### i. Balance Sheet Insolvency At Step One

41. The evidence demonstrates that the Company was balance sheet insolvent at Step One if the Step Two Financing is properly included in the analysis. The Bankruptcy Code defines insolvency as a "financial condition such that the sum of [an] entity's debts is greater than all of such entity's property, at fair valuation." 11 U.S.C. § 101(32)(A); *Peltz v. Hatten*, 279 B.R. 710, 743 (D. Del. 2002), aff'd, *In re USN Commc'ns, Inc.*, 60 Fed. Appx. 402 (3d Cir.

2003). This test (commonly referred to as the "balance sheet test") requires that "[t]he debtor's assets and liabilities are tallied at fair valuation to determine whether the corporation's debts exceeded its assets." *Mellon Bank*, 945 F.2d at 648. Courts rely on a variety of accepted valuation methodologies used by experts to determine the fair value of a debtor's assets at the time of a challenged transfer, including the discounted cash flow method (commonly referred to as "DCF"), adjusted balance sheet method, market multiple method, and comparable transactions method. *See, e.g., JPMorgan Chase Bank, N.A. v. Charter Comm'cns Operating, LLC (In re Charter Commc'ns)*, 419 B.R. 221, 235 (Bankr. S.D.N.Y. 2009) (valuation methodologies include "comparable companies, precedent transactions, publicly available market data (including the views of Wall Street analysts) and [DCF]"); *Lids*, 281 B.R. at 541 (same).

42.    Here, Tuliano properly applied a fair market value standard of value in performing the balance sheet test. *See* NPP Findings of Fact § II.G.1.b. In determining the Company's fair market value, Tuliano also used the income approach, to which he applied a 67% weighting, and a market approach, to which he applied a 33% weighting. *See* NPP Findings of Fact § II.G.1.b. It is "standard valuation practice" to calculate value using different accepted methodologies, and to then "reach an ultimate opinion by assigning a weight to the value associated with each method, based on the methods' suitability to the case at hand." *In re Nellson Nutraceutical, Inc.*, No. 06-10072, 2007 WL 201134, at *20 (Bankr. D. Del. Jan. 18, 2007) (Sontchi, J.).

43.    Tuliano's analysis shows that the Company was balance sheet insolvent at Step One, irrespective of whether management's projections, or projections that are properly adjusted based on the Company's actual performance as of the Step One closing date, are used in the analysis. *See* NPP Findings of Fact § II.G.1.b. Tuliano's analysis showed that, as of June 4,

2007, based on the Step One Adjusted Projections, the Company's liabilities exceeded the fair market value of its assets by approximately $3.0 billion, and, based on the February 2007 Projections, its liabilities exceeded the fair market value of its assets by approximately $2.3 billion. *See* NPP Findings of Fact § II.G.1.b.

44.     With respect to the balance sheet solvency test, the Noteholder Plan Proponents and the DCL Plan Proponents undertook to assess the solvency of Tribune's subsidiaries on a consolidated basis separately from Tribune itself because there was more debt at Tribune than at the subsidiaries. *See* NPP Findings of Fact § II.G.1.b. Tuliano conducted a separate balance sheet solvency analyses of Tribune's subsidiaries at Step One using both the February 2007 Projections and the Step One Adjusted Projections. *See* NPP Findings of Fact § II.G.1.b. Based on this analysis, Tuliano concluded Tribune's subsidiaries were insolvent by $949 million when the Step One Adjusted Projections were used and by $206 million when the February 2007 Projections were used. *See* NPP Findings of Fact § II.G.1.b. These conclusions are persuasive.

45.     Therefore, a court would find that the Company was balance sheet insolvent at Step One, when the Step Two Financing is included in the analysis.

> (1)     *The Fair Market Value Standard Of Value Should Be Used To Assess Balance Sheet Solvency*

46.     A court should give little weight to the opinion of DCL Plan Proponents' expert, Fischel, because his analysis deviates from well-accepted valuation methodology and he lacks expertise in assessing and evaluating financial projections. *See Universal Athletic Sales Co. v. Am. Gym, Recreational and Athletic Equip. Corp., Inc.*, 546 F.2d 530, 538 (3d Cir. 1976) (finding that expert's "limited experience with the class of devices present in this litigation should have substantially circumscribed the weight accorded his testimony"); *Sanchez v. United States*, 133 Fed. App'x. 747, 753 n.12 (1st Cir. 2005) ("weight accorded to the testimony of

[expert] regarding an area outside his specialty can be adjusted accordingly"); *In re USN Commc'ns*, 60 Fed. App'x. 401, 402 (3d Cir. 2003) ("it was well within the District Court's prerogative as finder of fact to choose not to rely on the speculative testimony of appellant's experts"); *In re Nellson Nutraceutical, Inc.*, 356 B.R. 364, 366, 369, 374-76 (Bankr. D. Del. 2006) (Sontchi, J.) (excluding expert's testimony after trial because of unreliable methodology).

47.     Widely-recognized principles of solvency and valuation recognize that "fair market value" (which is also referred to as "fair value") should be used to assess balance sheet solvency. Fair market value "is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." *Liquidation Trust v. Fleet Retail Fin. Grp. (In re Hechinger Inv. Co.)*, 278 F. App'x 125, 129-30 (3d Cir. 2008) (quoting *Amerada Hess Corp. v. Comm'r*, 517 F.2d 75, 83 (3d Cir. 1975)); IRS Rev Ruling 59-60; NPP Findings of Fact §§ II.G.1.b; II.G.1.c.(i). Under the fair market value standard of value, tax benefits associated with an S Corp/ESOP structure should not be included within a balance sheet solvency analysis:

> the definition of fair market value, when considered with respect to the S Corporation ESOP, does not confer value from the ESOP tax structure on the value of the subject stock. While it is true that the ESOP receives an economic advantage that translates to additional value for the participants, this economic benefit does not confer additional value on the stock itself. Only another special-purpose buyer (e.g. another S Corporation ESOP) could enjoy the same economic advantage. Therefore, the economic benefit is not part of the fair market value of the subject stock.

NPP 782 (Exam'rs Rpt.), Vol. II at 27-28 n.87 (citing Ackerman and Gould, S Corporation ESOP Valuation Issues (Chapter 6) in THE HANDBOOK OF BUSINESS VALUATION AND INTELLECTUAL PROPERTY ANALYSIS at 148-49 (Robert F. Reilly and Robert P. Schweihs, eds., 2004)); *see* NPP Findings of Fact § II.G.1.c.(i).

48.     Fischel's balance sheet solvency analysis deviates from well-accepted valuation methodologies because, among other things, he included the potential tax benefits associated with the Company's conversion to an S Corp/ESOP in his definition of value. NPP Findings of Fact § II.G.1.c.(i). Fischel also improperly included in his assessment of the Company's value 401(k) and stock-based compensation cost savings that the Company expected to realize as a result of its conversion to an S Corp/ESOP. As discussed in the NPP Findings of Fact, evidence from the time of the LBO also supports the conclusion that these tax savings should not be included when determining value for purposes of a balance sheet solvency test. *See* NPP Findings of Fact § II.G.1.c.(i). Accordingly, Tuliano's analysis and the Examiner's conclusions that no value should be attributed to the tax savings associated with the S Corp/ESOP structure should be used in assessing the Company's solvency, because that "value is unique to the structure of ownership imposed by the [LBO], and as such does not represent a fair market value asset of Tribune." NPP 782 (Exam'rs Rpt.), Vol. II at 204; *see* NPP Findings of Fact § II.G.1.c.(i).

                        (2)     *Liabilities Should Be Measured At Face Value*

49.     Fischel deviated from well accepted valuation principles by calculating the amount of the PHONES Notes at accounting amount, rather than face value. The Third Circuit has expressly stated that "liabilities should be measured at face value." *Travellers Int'l AG v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.)*, 134 F.3d 188, 196-97 (3d Cir. 1998); *see also Shubert v. Lucent Techs. Inc. (In re Winstar Commc'ns)*, 348 B.R. 234, 278 (Bankr. D. Del. 2005) ("Absent some unusual circumstances not applicable here, the insolvency test anticipates that liabilities will be valued at their face value."). Additionally, (i) Fischel himself testified that he cannot recall ever valuing debt in the way that he valued the PHONES Notes before, (ii) Arrangers' solvency expert from the time of the LBO, Murray Devine, testified

that it generally uses the contractual rate (*i.e.* face value) to calculate debt in a balance sheet solvency test, and (iii) contemporaneous market participants, including JPMorgan and Merrill Lynch, used the face value of the PHONES Notes in the solvency analyses that they prepared prior to Step Two. *See* NPP Findings of Fact § II.G.1.c.(ii).

> (3) *The Use Of An Exit Multiple To Calculate A Terminal Value Results In An Improper Blending Of The Income And Market Approaches*

50.     Fischel erred by calculating the Company's terminal value by choosing an exit multiple from a selection of purportedly "comparable" companies, and multiplying that multiple by the Company's average projected EBITDA for the years 2007 to 2010. This is problematic because the comparable companies used by Fischel included those that, unlike the Company, are not diversified media companies, and that consistently traded at higher multiples than the Company. *See* NPP Findings of Fact § II.G.1.c.(iv). Moreover, authoritative valuation literature shows that the use of an exit multiple to calculate a terminal value results in an improper blending of the income and market approaches. NPP 955 (Tuliano Rebuttal Rpt.), at 17 n.4 (citing VALUING A BUSINESS: THE ANALYSIS AND APPRAISAL OF CLOSELY HELD COMPANIES, 5th edition, Shannon P. Pratt, at 251). The Arrangers' solvency advisor from the time of the LBO acknowledged this fact, testifying that the Gordon Growth Model used by Tuliano is a preferable and more common approach to calculate a terminal value when valuing a business as a going concern, and is the method that is generally used by his firm. *See* NPP Findings of Fact § II.G.1.c.(iv). The unreliable nature of Fischel's terminal value calculation is revealed by the growth rate implied by the terminal value, which is significantly higher than the growth rates used in or implied by valuations contemporaneous market participants. *See* NPP Findings of Fact § II.G.1.c.(iv).

*(4)    Other Errors Committed By Fischel Render His Solvency Conclusion Unreliable*

51.    Fischel committed other errors in his Step One solvency analysis. First, he failed to apply any critical analysis to the February 2007 Projections which, as discussed at length above and in the NPP Findings of Fact, could not be reasonably relied upon at Step One. *See* NPP Findings of Fact § II.G.1.c.(iv). Second, Fischel used a Company-specific—rather than industry average—capital structure to calculate the weighted average cost of capital ("WACC") in his DCF analysis. Third, he included in his comparable company analysis pure play broadcasting and publishing companies, without weighting the multiples to account for the percentage of the Company's earnings that are derived from publishing and broadcasting. *See* NPP Findings of Fact § II.G.d.

52.    The DCL Plan Proponents' expert as to the reasonableness of the Proposed Settlement, Professor Black, did not attempt to offer any definite opinions regarding the Company's solvency at the time of the LBO. To the extent such opinions had been offered, however, they would deserve no weight. Black does not have any degrees in finance or accounting, has never acted as a financial consultant or advisor, has no accounting or valuation credentials, has never been qualified by a court as an expert in valuation, and testified that preparing a valuation would be "beyond [his] comfort zone." *See* NPP Findings of Fact § V.B. Indeed, for these reasons, this Court denied the DCL Plan Proponents' request that Black be qualified as an expert on valuation, solvency, and decision-tree analysis. *See* NPP Findings of Fact § V.B.

*(5)    Market Evidence Shows That The Company Was Insolvent At Step One*

53.    Substantial market evidence shows that the Company was insolvent at Step One. This evidence includes: (i) the rating agencies' downgrade of the Company's debt; (ii) the

increased spreads on the Company's CDS during the relevant period of the LBO; (iii) the LBO Lenders' incentives to participate and proceed with the LBO for reasons that were unrelated to the Company's solvency; (iv) the LBO Lenders' knowledge that completing Step Two would render the Company insolvent; and (v) other contemporaneous market participant evidence. *See* NPP Findings of Fact § II.G.2.a.(ii).

54.     Fishel's reliance on market evidence including the yields on Tribune's publicly traded bonds to support his conclusion is misplaced. A court "is not bound to accept the value that has been ascribed to [debtors'] securities by the public markets and has the broad discretion to find that the markets somehow were distorted and did not fairly reflect the underlying enterprise value" of the debtors. *See Statutory Comm. of Unsecured Creditors of Iridium Operating LLC v. Motorola, Inc. (In re Iridium Operating LLC)*, 373 B.R. 283, 303-04 (Bankr. S.D.N.Y. 2007). Indeed, the Thrid Circuit has noted that market evidence is not an appropriate method of valuation in fraudulent transfer cases when there is a reason to "distrust" the market price of the debtors' securities. *See VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 633 (3d Cir. 2007). Here, there is substantial reason to believe that the yields on Tribune's publicly traded bonds did not fairly reflect the Company's fair market value at Step One close, including the illiquidity of Tribune's bonds. *See* NPP Findings of Fact § II.G.2.b.(vi). A more appropriate measure of default risk is the CDS market, which was extremely liquid with significant trading activity on a daily basis. *See* NPP Findings of Fact § II.G.2.b.(vi). Evidence of the Company's CDS pricing supports the conclusion that the Company was insolvent at Step One close. *See* NPP Findings of Fact § II.G.2.b.(vi).

55.    The evidence shows that the Company was left with inadequate capital and unable to pay its debts as they came due at Step One close. The "unreasonably small capital" analysis typically involves consideration of the debtor's cash flow and available operating capital. *See Yoder v. T.E.L. Leasings (In re Suburban Motor Freight, Inc.)*, 124 B.R. 984, 999 (Bankr. S.D. Ohio 1990) (assessing debtor's ability "to generate enough cash from operations and sales of assets to pay its debts and remain financially stable") (citing *Vadnais Lumber Supply, Inc. v. Byrne (In re Vadnais Lumber Supply, Inc.*, 100 B.R. 127, 137 (Bankr. D. Mass. 1989)). If management's projections of cash flows are unreasonable, they suggest the debtor's inability to generate sufficient cash flow from operations. *See Moody*, 971 F.2d at 1070. Factors considered in determining whether a business is adequately capitalized include: (i) the degree of volatility and cyclicality in the industry in which the business operates; (ii) whether the business is heading into an industry downturn or secular decline; (iii) the amount of the business's leverage; (iv) the business's credit rating; (v) the amount of capital required to operate the business; and (vi) reasonably foreseeable contingencies with which the business may be confronted. *See* NPP 944 (Tuliano Rpt.), at 19-20.

56.    The "inability to pay debts when due" test can be satisfied by showing contemporaneous communications were made evidencing a conscious awareness on the part of participants in a leveraged buyout of the substantial risk that a debtor's capital resources would be insufficient to meet their financial obligations as they matured. *See Suburban Motor*, 124 B.R. at 1001 (inferring intention to incur debts beyond ability to pay where, on several occasions preceding the challenged transfer, shareholders of the debtors "expressed serious concerns over [the debtors'] financial health" and minutes of the board of directors that were "replete with

references to [the debtors'] uncertain future viability"). Direct expression of the belief by the debtor of its future inability to pay its debts is not necessary to satisfy this financial condition test. *Id; see also In re Process-Manz Press, Inc.*, 236 F.Supp. 333, 347 (N.D. Ill. 1964) (reversed on other grounds) (finding that "depriving a financially hard pressed debtor... of working capital could have no other result than to create a belief that the debtor would incur debts beyond its ability to pay as they matured."); *see also Tabor Court*, 803 F.2d 1288 (referring to and accepting the proposition in *In re Process-Manz Press* that "a party is deemed to have intended the natural consequences of his acts.")

57.     Factors supporting findings of inadequate capital and inability to pay at Step One close are present here. Tuliano's persuasive testimony and analysis shows that, at the time of the Step One closing, the Company was excessively leveraged in relation to its peers, and its debt to EBITDA ratio was more than six times of its most highly-leveraged peer following Step One, and more than eight times that of the industry. *See NPP Findings of Fact § II.G.2.* Tuliano's analysis also shows that the Company had the lowest interest coverage ratio among its comparable companies, and that, based on the Company's twelve-month trailing EBITDA, it was likely that the Company would not be able to cover its interest expense even without taking into account reasonably foreseeable contingencies. Lastly, Tuliano's analysis shows that following Step One, the Company failed to generate sufficient cash flow to service its debt obligations in all of the downside cases used by Tuliano, as well as under the February 2007 Projections and the Step One Adjusted Projections, even when accounting for asset sales, equity investment proceeds, and unused credit lines. *See NPP Findings of Fact § II.G.2.a.(i).*

58.     The DCL Plan Proponents failed to refute Tuliano's analysis. Fischel's own Step One capital adequacy and ability to pay analysis shows that, using the average of modest

downside case projections prepared before June 4, 2007, and appropriately considering the Step Two Financing anticipated by the Company, the Company would have negative $79 million in 2009, negative $45 million in 2010, and a mere $9 million in 2011. *See* NPP Findings of Fact § II.G.2.b. As Fischel himself testified, "in 2010 and 2011, the revolver numbers turn negative, meaning that in those years, the Tribune does not have enough liquidity in order to meet its mandatory obligations." 3/10/11 Trial Tr. 123:3-6 (Fischel); *see* NPP Findings of Fact § II.G.2.b. This is a textbook case of an undercapitalized company.

59.     Fischel improperly concluded that the Company was adequately capitalized and able to pay its upcoming debts because the Company could take steps to cure these issues. A company with $5 billion of debt simply should not take on $8 billion more when its solvency is "close to the line." *See* NPP Findings of Fact § II.G.2.b. It is not appropriate to disregard the results of a capital adequacy test by simply assuming that any company can take generic steps to cure a cash deficit. If such an assumption was appropriate, no company would ever fail a capital adequacy test. Additionally, this assumption is particularly misplaced here, given that the Company had already implemented several cost-cutting measures prior to Step One, and thus had limited flexibility in excising additional costs. *See* NPP Findings of Fact § II.G.2.b.

60.     Moreover, Fischel did not conduct any analysis to determine whether the Company could actually have generated additional cash (or even how much cash it could have generated). Therefore, his conclusory opinion on this issue should be given no weight. *See Williams v. U.S.*, 321 Fed. App'x. 129, 132 (3d Cir. 2009) (testimony based on conclusory statements is inadmissible); *Meadows v. Anchor Longwall & Rebuild, Inc.*, 306 Fed. App'x. 781, 789-90 (3d Cir. 2009) (expert's testimony failed to meet reliability standard where "the analytical gap between the data and the opinion proffered is too great and is connected only by

the ipse dixit of the expert, not by any evidence"); *Simmons v. Ford Motor Co.*, 132 Fed. App'x. 950, 952-53 (3d Cir. 2005) (absent data or evidence to support expert's hypothesis, testimony properly excluded).

### iii. Balance Sheet Insolvency At Step Two

61. As with Step One, Tuliano applied well-accepted valuation methodologies to determine the fair value of the Debtors' assets at the time of the Step Two close, including the DCF method and the market approach. *See* NPP Findings of Fact § II.M.2. The evidence strongly suggests that a court would find that the Company was balance sheet insolvent by a wide margin at the closing of Step Two. Tuliano's testimony and opinions are persuasive in this regard. Tuliano concluded that, as of December 20, 2007: (i) based on the Step Two Adjusted Projections, the Company's debt liabilities exceeded the fair market value of its assets by approximately $3.3 billion; (ii) based on the Examiner Adjusted Base Case Projections, the Company's debt liabilities exceeded the fair market value of its assets by approximately $3.3 billion; and (iii) based on the October 2007 Projections, the Company's debt liabilities exceeded the fair market value of its assets by approximately $2.9 billion. *See* NPP Findings of Fact § II.M.2. Tuliano also conducted a balance sheet solvency analysis of Tribune's subsidiaries, which showed that the liabilities of the subsidiaries exceeded their assets by $848 million at Step Two close using the Step Two Adjusted Projections. *See* NPP Findings of Fact § II.M.2. This is consistent with the Examiner's conclusion at Step Two. NPP 782 (Exam'rs Rpt.), Vol. II at 220-29.

62. The DCL Proponents did not seriously dispute that the Company was insolvent at Step Two. The most they mustered in their post-trial submission is that insolvency at Step Two is not a "foregone conclusion." DCL Br. at 52. And even their own expert, Fischel, conceded that Step Two solvency is "a very close call," and Fischel's analysis shows that the Company

was *insolvent* by as much as $82 million at the low end of his range when using the average of a compilation of third-party base cases projections at Step Two. *See* NPP Findings of Fact § II.M.2. Likewise, Black concluded that the Company was rendered insolvent by Step Two. *See* NPP Findings of Fact § II.M.2.

63.     There was also substantial evidence that the participants in the LBO understood that the Company would be balance sheet insolvent following Step Two, including the LBO Lenders' own internal analyses, emails and notes showing that the LBO Lenders believed the Company was insolvent at Step Two. *See* NPP Findings of Fact § II.K. This contemporaneous evidence qualifies as admission against interest, and strongly supports the claim that the obligations incurred at Step Two constituted a constructive fraudulent conveyance. *See* FED. R. EVID. 801(d)(2).

### iv.     Inadequate Capitalization And Inability To Pay Debt At Step Two

64.     There is also substantial evidence showing that, consistent with the Examiner's conclusions, a court would find that the Company was left with unreasonably small capital and unable to pay its debts when due at Step Two close.

65.     Tuliano's analysis showed that, following Step Two, the Company was excessively leveraged compared with its peers, including a debt-to-EBITDA ratio that was nearly double that of the Company's closest peer company and *more than eight times* higher than the average of companies comparable. *See* NPP Findings of Fact § II.N. Additionally, following consummation of Step Two, the Company was the only company among its peers that had a negative debt-to-equity ratio, and also had the lowest interest coverage ratio among its peers, regardless of whether capital expenditures were included in the calculation. *See* NPP Findings of Fact § II.N. Tuliano's analysis shows further that the Company's operating cash flows were

insufficient to meet its debt service obligations in all four downside cases utilized by Tuliano, as well as using the October 2007 Projections, the Examiner's base case projections, and Step Two Adjusted Projections, even after taking into account asset sales and equity investment proceeds. *See* NPP Findings of Fact § II.N.

66. Fischel's analysis also shows that the Company was inadequately capitalized and unable to pay its debts as due at Step Two close. Specifically, he concluded that, based on an average of contemporaneous downside projections prepared as of December 20, 2007, the Company was projected to have negative $5 million in liquidity by 2012. *See* NPP Findings of Fact § II.N.2. As with his Step One analysis, Fischel assumed that the Company could nonetheless meet its debt obligations by raising liquidity and reducing expenses. *See* NPP Findings of Fact § II.N.2. But, again, this assumption is not supported by the evidence and should be disregarded. *See Williams v. U.S.*, 321 Fed. App'x. at 132; *Meadows*, 306 Fed. App'x. at 789-90; *Simmons*, 132 Fed. App'x. at 952-53.

### 4. Full Avoidance Of The LBO Debt Would Provide Full Recoveries To The Non-LBO Creditors

67. Full avoidance of the LBO Debt would provide payment in full to the Non-LBO Creditors. First and foremost, upon avoidance of the LBO Debt at Tribune, there would be sufficient value from disgorgement and the DEV at Tribune to satisfy the claims of the Senior Noteholders in full, and provide either full or near full recoveries to the holders of the PHONES Notes (depending on the amount of the PHONES Notes claims). Specifically, full avoidance at Tribune would provide $693 million in distributable value for the Non-LBO Creditors at Tribune (based on the $8.291 billion DEV), and lead to the disgorgement of $2.19 billion in principal, interest and fees paid to the LBO Lenders.

68.     In addition, the value of the Guarantor Debtors would also be available to the

Non-LBO Creditors of Tribune if the LBO Debt is avoided in full for two primary reasons.  First,

actions for the avoidance of the subsidiary guarantees may be brought regardless of whether the

value to be avoided exceeds the amount of debt at the Guarantor Debtors.  Bankruptcy Code

section 548 permits a trustee to avoid "*any* transfer . . . of an interest of the debtor in property, or

*any* obligation . . . incurred by the debtor . . . ."  11 U.S.C. § 548(a)(1) (emphasis added).  Courts

have interpreted the language in section 548 to mean that a trustee may avoid a transfer or

obligation *in its entirety*, despite the fact that such transfer or obligation may exceed the

aggregate amount of unsecured claims against a particular debtor.  *See, e.g.*, *In re Cybergenics*

*Corp.*, 226 F.3d 237, 243 (3d Cir. 2000) ("[O]nce avoidable . . ., the transfer is avoided in its

entirety for the benefit of all creditors, not just to the extent necessary to satisfy the individual

creditor actually holding the avoidance claim."); *Nextwave Personal Commc'ns, Inc. v. Federal*

*Commc'ns Comm'n (In re Nextwave Personal Commc'ns, Inc.)*, 235 B.R. 305, 307-09 (Bankr.

S.D.N.Y. 1999) ("The literal terms of Section 544 as well as 548 . . . appear to call for avoidance

of the entire obligation where the statutory criteria for avoidance are met[.]").[3]

69.     Nevertheless, some courts have held that avoidance of an entire transfer is

inappropriate where unsecured creditors have already been made whole (or will be made whole

pursuant to the terms of a plan of reorganization).  *See, e.g.*, *Adelphia Recovery Trust v. Bank of*

---

[3]  Similarly, Bankruptcy Code section 544(b) provides that "the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim . . . ." 11 U.S.C. § 544(b).  Courts have interpreted this section to mean that the presence of a "triggering" unsecured creditor who could avoid the transfer or obligation at issue under state law as of the commencement of the case is all that is needed for a trustee to avoid that transfer or obligation in its entirety. Acequia, Inc v. Clinton (In re Acequia, Inc.), 34 F.3d 800, 809-10 (9th Cir. 1994) (holding that "[a] transaction that is voidable by a single, actual unsecured debtor that is voidable under [§ 544(b)] may be avoided in its entirety, regardless of the size of the creditor's claim"); MC Asset Recovery, LLC v. The Southern Co., 2006 WL 5112612, at *4-5 (N.D. Ga. Dec. 11, 2006) (holding that a trustee who brings an avoidance action under section 544(b) may avoid a transfer in its entirety "even when the value of the transfer exceeds the value of all allowed claims of unsecured creditors").

*America,* 390 B.R. 80, 94 (S.D.N.Y. 2008); *Vintero Corp. v. Corporacion Venezolana de Fomento (In re Vintero Corp.),* 735 F.2d 740, 742 (2d Cir. 1984); *Whiteford Plastics Co. v. Chase Nat'l Bank,* 179 F.2d 582, 584 (2d Cir. 1950). These courts have read the "benefit to the estate" requirement of section 550 of the Bankruptcy Code, which applies solely to actions for the recovery of avoided claims, into section 548 of the Bankruptcy Code, which applies to actions for the avoidance of obligations. Such a limitation is inappropriate, given that the plain language of section 548, unlike section 550, does not impose such a limitation.

70.     The Examiner agrees. *See* NPP 782 (Exam'rs Rpt.), Vol. II at 294-95. The Examiner found that although the "Third Circuit Court of Appeals has not addressed directly whether avoidance under section 548 is subject to a limitation on the scope of avoidance or that any such limitation would support limiting the effect of avoidance in these circumstances[,]' . . . 'the statutory language largely answers the question posed and *does not* support the limitation advocated by certain Parties." *Id.* at 295-96 (emphasis added). In other words, as the Examiner found, there is no requirement to show a "benefit to the estate" in order to *avoid* an obligation under Bankruptcy Code section 548 and if the Subsidiary Guarantee obligations are avoidable, they should be avoided in their entirety. *Id.* at 295 ("Avoidance under section 548 is distinguished from an action to recover property transferred or its value under Bankruptcy Code section 550(a), which, by its terms, only allows for recoveries 'for the benefit of the estate.' No similar limitation is found in section 548 avoidance.").

71.     Second, equity demands that once the subsidiary guarantees are avoided in their entirety under section 548, value arising from that avoidance should flow to Tribune for distribution to its Non-LBO Creditors. *See, e.g., In re Kraft, LLC,* 429 B.R. 637, 667-68 (Bankr. N.D. Ind. 2010) (holding that equity could receive surplus if creditors are paid in full); *In re*

36

*Goss*, 43 F.2d 746, 747-48 (N.D. Ga. 1930) (holding that, while normally any surplus in recoveries over and above that which is necessary to pay creditors goes back to the fraudulent transferee, where the transferee has engaged in the fraud and comes to the court with unclean hands, the debtor is permitted to keep the surplus.); *In re Bayou Group, LLC*, 372 B.R. 661, 664 (Bankr. S.D.N.Y. 2007) (holding that it "is *not* clear that fraudulent conveyance claims can *never* be brought in whole or in part to benefit equity...."); *In re Calpine Corp.*, 377 B.R. 808, 813 n.3 (Bankr. S.D.N.Y. 2007) (quoting *Bayou*). As the court in *In re Bayou* explained:

> It is not difficult to imagine circumstances where stockholders or "equity" (such as the non-redeeming investors here) have no knowledge of, responsibility for or timely capacity to deter a fraudulent scheme by rogue management and suffer precisely the same harm as creditors of a corporate entity which has been victimized by the scheme. In such a case, permitting a debtor-in-possession or Chapter 11 or Chapter 7 trustee to assert fraudulent conveyance claims for the benefit of innocent equity investors, as well as creditors, would not offend any statutory language and would serve Bankruptcy Code objectives.

372 B.R. at 664 n.2.

72. Here, Tribune's Non-LBO Creditors are the primary victims of the Company's misguided decision to consummate the LBO. If ever there were a fact pattern that calls for a distribution of surplus to the creditors of a parent, this is it. The alternative, of allowing the value to remain at the Guarantor Debtors, for the benefit of the Arrangers and the LBO Lenders, who either orchestrated the very transaction that is being avoided, or hold the debt that is being avoided, is untenable, and in direct conflict with the purposes of the Bankruptcy Code's fraudulent conveyance statutes.

73. The Examiner's findings are in accord with this analysis. The Examiner found that it is "reasonably likely" that a court would find that "if the estate representatives for Tribune and the Guarantor [Debtors] were to successfully avoid the LBO Lender Debt [the Step One Lender Claims and the Step Two Lender Claims], the value available from avoidance at the

Guarantor [Debtor] estates would not be limited just to satisfaction of the Non-LBO Debt at those levels[,]" but also would flow up to Tribune, the parent.  NPP 782 (Exam'rs Rpt.), Vol. II at 289, 297.  The Examiner stated further that "[I]t would be implausible for a court to find that avoidance is required as to each and every Debtor, only to reverse that avoidance for a moment in time to allow the LBO Lenders to recover the value from Guarantor Debtors on account of their avoided obligations." *Id.* at 94.

### 5.  The LBO Lenders' Potential Affirmative Defenses To The LBO Have A Low Chance Of Success

74.     The value of the LBO Claims also outweighs the consideration provided under the Proposed Settlement because the LBO Lenders' affirmative defenses have a low chance of success.

### a.  Section 546(e) Cannot Be Invoked

75.     Section 546(e) of the Bankruptcy Code is not a valid defense for the LBO Lenders.  Section 546(e) exempts from avoidance certain "settlement payments" made by, to or for the benefit of "a commodity broker, forward contract merchant, stockbroker, financial institution, or securities clearing agency . . . " and was enacted primarily to protect entities in the settlement payment chain from disruptive avoidance actions when the entities merely had settled ordinary course securities transactions.  11 U.S.C. § 546(e); *see, e.g., Enron Corp. v. Credit Suisse First Boston Int'l (In re Enron Corp.),* 328 B.R. 58, 66 (Bankr. S.D.N.Y. 2005) (noting that it has been repeatedly stated that the purpose of section 546(e) is to minimize instability "caused by the reversal of settled securities transactions."); *see also* H.R. Rep. No. 97-420, at 1 (1982) (stating that the purpose of section 546(e) is not to confer advantages on particular claimants of a bankruptcy estate, but to minimize the risk that the insolvency of a securities or

commodity firm would spread and disrupt the complex system of accounts and guarantees called the "clearance and settlement system").

76.     This provision has no application to the avoidance claims against the LBO Lenders that are proposed to be settled by the Proposed Settlement. First, section 546(e) is, by its terms, inapplicable to intentional fraudulent conveyance claims, and the Debtors' estates possess substantial section 548(a)(1)(A) claims against, among others, the LBO Lenders. *See, e.g., Hechinger Inv. Co. v. Fleet Retail Fin. Grp. (In re Hechinger Inv. Co.)*, 274 B.R. 71, 75 (D. Del. 2002). Moreover, section 546(e) only shelters "transfers," not debt "obligations" like the obligations incurred by the Debtors to the LBO Lenders. *See* NPP 782 (Exam'rs Rpt.), Vol. II at 246-50 (the term "transfer" "does not encompass an 'obligation,' whether or not embodied in an instrument (e.g., promissory note or loan agreement) delivered to a 'stockbroker, financial institution [or] financial participant.'"). Specifically, section 546(e) provides, in relevant part, that "[n]otwithstanding sections 544 . . . , 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment . . . , or settlement payment, . . . or that is a transfer . . . in connection with a securities contract[.]"; *see also Brandt v. Hicks, Muse & Co. (In re Healthco Int'l, Inc.)*, 195 B.R. 971, 981 (Bankr. D. Mass. 1996) ("*Healthco Int'l I*") ("By its own terms, section 546(e) applies only to a 'transfer' made by or to one of the named entities."). In contrast, section 548 empowers the trustee to avoid both a "transfer" and an "obligation." The fact that section 546(e)—which specifically references the avoidance powers created pursuant to section 548—omits any reference to the avoidance of "obligations" compels the conclusion that this section does not protect against avoidance of the obligations incurred to the LBO Lenders.

77.     In addition, although the stock pledge may be characterized as a "transfer" (unlike the obligations incurred in connection with the Senior Loan Agreement), the avoidance of the

obligations incurred under the Senior Loan Agreement, Senior Loan Guaranty Agreement, Bridge Loan Agreement, and Bridge Loan Guaranty Agreement would render moot any application of a section 546(e) defense to the stock pledge. Indeed, as found by the Examiner, the stock pledge "only existed to secure the obligations under the Credit Agreement and is meaningless except as security for the Credit Agreement Debt. If the Credit Agreement Debt is avoided, the Stock Pledge secures nothing." NPP 782 (Exam'rs Rpt.), Vol. II at 251-52. Thus, Bankruptcy Code section 546(e) can afford "no protection for the [LBO] Debt or any security, promissory notes, or guarantees given in connection therewith." *Id.*

### b.   The LBO Lenders Do Not Have A Defense Under Section 548(c)

78.    Bankruptcy Code section 548(c) provides that a transferee or obligee may enforce a portion of an avoided or avoidable claim only if it "takes for value and in good faith" and only "to the extent that such transferee or obligee gave value to the debtor." 11 U.S.C. § 548(c). Thus, if an obligation is avoided or avoidable, the obligee may nonetheless retain a claim against the debtor for some lesser amount if the debtor actually received and retained any legally cognizable "value," and if the obligee shows that it acted in good faith. *See, e.g., Doeling v. Grueneich (In re Grueneich)*, 400 B.R. 688, 693 (8th Cir. 2009) ("For purposes of 11 U.S.C. §§ 548 and 550, the transferee of an allegedly fraudulent transfer has the burden of proving good faith."); *Feldman v. Chase Home Fin. (In re Image Masters, Inc.)*, 421 B.R. 164, 181 (Bankr. E.D. Pa. 2009) ("Defendants have the burden, of course, of proving that they received the transfers for value and in good faith as an affirmative defense."); *Doblin v. Hill (In re Hill)*, 342 B.R. 183, 202 (Bankr. D.N.J. 2006). In the leveraged finance context, the transferee must prove a lack of actual or constructive knowledge of the impairment of the debtor's financial condition to invoke this provision. *See Tabor Court*, 803 F.2d at 1296 (lenders' knowledge that debt

would render the debtor insolvent precluded finding of good faith). Where a lender knows the debt may be avoided as a fraudulent transfer, a lender is put on inquiry notice, and is held to have knowledge of the voidability of the transfer. *See Brown v. Third Nat'l Bank (In re Sherman)*, 67 F.3d 1348, 1355-56 (8th Cir. 1995) (citations omitted).

79.     Even if the LBO Lenders were able to satisfy the good faith requirement of 548(c), it would not materially impact the litigation recoveries that would follow from most avoidance scenarios. As a threshold matter, the LBO Lenders did not extend sufficient value cognizable under section 548(c) to impede Non-LBO Creditors from obtaining a full recovery. As the Examiner concluded, only a small percentage of the LBO Debt could even arguably constitute "value" under section 548(c). NPP 782 (Exam'rs Rpt.), Vol. II at 90. For example, as a matter of law, the Company did not receive any value for the $8.26 billion provided by the LBO Lenders and used to redeem the selling shareholders' common stock. NPP 782 (Exam'rs Rpt.), Vol. II at 91. *See Wieboldt*, 94 B.R. at 505 (corporation received less than reasonably equivalent value where 99% of its outstanding shares of stock was exchanged for an encumbrance on the debtors assets because "[t]his stock was virtually worthless to [the corporation]."). Similarly, the Company did not receive any value from the $3.9 billion of LATI Notes transactions effectuated at the Step One closing. *See O'Day*, 126 B.R. at 397 (cancellation of the intercompany notes did not provide fair consideration where signatories to the notes did not contemplate their repayment and where the notes appeared to have been created only for tax advantages); *see also* NPP 782 (Exam'rs Rpt.), Vol. II at 93, 96 (finding it "highly unlikely" that the LATI Notes transaction resulted in any value being conferred upon the Company).[4]

---

[4]     In fact, the Examiner concluded that "the LATI Notes do not [even] constitute debt" for purposes of Section 548(c). NPP 782 (Exam'rs Rpt.), Vol. II at 96 n. 307.

80.     In any event, the LBO Lenders have not met their burden of showing that they are entitled to a good faith defense under section 548(c). To the contrary, the evidence shows that the LBO Lenders were aware, in advance of Step One, of the high likelihood that the LBO would render the Company insolvent, and knew that this was the case in advance of Step Two close. *See* NPP Findings of Fact § II.F; II.K.2. Such evidence is sufficient to defeat any claim of good faith. *See Shubert v. Premier Paper Prods., LLC (In re Am. Tissue, Inc.)*, No. 01-10370, 2007 WL 4178949, at *9 (Bankr. D. Del. Nov. 20, 2007) ("[good faith] defense is not available if the transferee has knowledge of facts that would lead a reasonable person to believe that the property was recoverable by a debtor").

### 6.     The Estate Has Many Other Valuable Claims Against The LBO Lenders That The Proposed Settlement Releases For Insufficient Consideration

81.     In addition to the claims for avoidance, the Debtors' estates have a number of claims against the LBO Lenders—such as equitable subordination, equitable disallowance, aiding and abetting breach of fiduciary duties, and unjust enrichment—that the Proposed Settlement releases for insufficient consideration.

#### a.     Equitable Subordination And Equitable Disallowance

##### i.     Equitable Subordination

82.     Bankruptcy Code section 510(c) authorizes the subordination of claims of creditors who engaged in fraudulent or inequitable conduct to the claims of innocent creditors. The Third Circuit recognizes that equitable subordination pursuant to section 510(c) is "designed to undo or offset any inequality in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of the bankruptcy results." *Schubert v. Lucent Techs. Inc. (In re Winstar Commc'ns, Inc.)*, 554 F.3d 382, 411 (3d Cir. 2009).

83.     In considering whether to equitably subordinate a claim, courts in the Third

Circuit rely on the three-part test set forth in *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563

F.2d 692, 700 (5th Cir. 1977).  Under the *Mobile Steel* test: "(1) the claimant must have engaged

in some type of inequitable misconduct . . . ; (2) the misconduct must have resulted in injury to

the creditors of the bankrupt or conferred an unfair advantage on the claimant . . . ; and (3)

equitable subordination of the claim must not be inconsistent with the provisions of the

Bankruptcy [Code]."  563 F.2d at 700.  Misconduct warranting equitable subordination includes

unfair dealing, fraud, illegality, breach of fiduciary duties, over-reaching, and

undercapitalization.  *See OODC*, 321 B.R. at 146; *Sierra Indus., LLC v. SHC, Inc. (In re SHC,

Inc.)*, 329 B.R. 438, 447 (Bankr. D. Del. 2005).  Whether to subordinate a claim is made on a

case-by-case basis focusing on fairness to other creditors.  *See In re Vitreous Steel Prods. Co.*,

911 F.2d 1223, 1237 (7th Cir. 1990).

84.     Moreover, a claim may be equitably subordinated even when the claimant did not

intentionally commit bad acts.  *See, e.g., In re O'Day*, 126 B.R. 370, 412 (Bankr. D. Mass. 1991)

(even without intent to hinder, delay or defraud creditors, lender conduct sufficient to warrant

equitable subordination).  Although "courts have struggled to define precisely the misconduct

necessary to support equitable subordination against a creditor who is not an insider . . .

[s]omething less than actual fraud . . . will suffice," and the "minimum level of offending

conduct appears to be conduct that shocks the conscience of the court."  *Capitol Bank & Trust

Co. v. 604 Columbus Ave. Realty Trust (In re 604 Columbus Ave. Realty Trust)*, 968 F.2d 1332,

1361 (1st Cir. 1992); *see also OODC*, 321 B.R. at 146 (need "egregious misconduct").

85.     To satisfy the second *Mobile Steel* element, it need only be shown that the

"general creditors are less likely to collect their debts as a result of the allegedly inequitable

conduct." *See, e.g., Official Comm. of Unsecured Creditors v. Austin Fin. Servs., Inc. (In re KDI Holdings, Inc.)*, 277 B.R. 493, 515 (Bankr. S.D.N.Y. 1999). The subordination of an inequitable party's claim to that of an innocent party's claim itself satisfies the third *Mobile Steel* element. *See In re J.S. II, L.L.C.*, 389 B.R. 570, 581 (Bankr. N.D. Ill. 2008). The LBO Lenders' claims here easily satisfy the second and third elements of the *Mobile Steel* test. *J.S. II*, 389 B.R. at 581 (inequitable conduct "led the Debtors' descent into bankruptcy"); *In re KDI Holdings, Inc.*, 277 B.R. at 515.

86.     The Third Circuit recognizes a claim for equitable subordination even where the lender's actions may be lawful, but egregious vis-à-vis the estate's other creditors. *Schubert*, 554 F.3d at 412-13. In *Schubert*, a lender deliberately withheld the release of a refinancing notice in order to induce other creditors to provide funds to the debtor before its collapse. *Id.* at 412-13. Although the Third Circuit expressly acknowledged that the lender had the legal right to issue the refinancing notice at its sole discretion, it nonetheless affirmed the bankruptcy court's subordination of its creditor's claim. *Id.* at 412. As the bankruptcy court stated, the lender hid from other creditors what it already knew; that the debtor "was in significant financial distress and indeed . . . was insolvent . . . ; [the lender] reaped a substantial benefit but at the expense of the Debtors' other creditors"). *See* Memorandum of Decision Including Findings of Fact and Conclusions of Law, *In re Winstar Commc'ns, Inc.*, Adv. Proc. No. 01-1063 (JBR) (Bankr. D. Del. Dec. 21, 2005) [Docket No. 369].

87.     *OODC* is especially instructive. There, the court sustained an equitable subordination claim in the wake of a failed leveraged buyout. 321 B.R. at 145-46. Specifically, the *OODC* court found sufficient allegations that the banks:

> (1) knowingly facilitated the removal of at least $40 million in assets of the Debtor (by obtaining a security interest in them) at a time when the

Debtor was insolvent, (2) that they knowingly and recklessly disregarded the Debtor's insolvency, (3) that they knowingly and recklessly intended to hinder, delay or defraud the Debtor's creditors, (4) that they knowingly or recklessly disregarded the fact that the LBO would force the Debtor into bankruptcy, and (5) that they *knowingly and recklessly disregarded the impact of these transactions on the Debtor's unsecured creditors.*

*Id.* at 145 (emphasis added). The court concluded that "the Trustee has alleged sufficient facts to support claims against the Bank Group for actual and constructive fraud and aiding and abetting breach of fiduciary duty. If proven, these allegations would provide the basis for a finding of egregious misconduct which could warrant the subordination of the Bank Groups' claims under section 510(c)." *Id.* at 146.

88. The evidence shows that just as in *OODC*, the LBO Lenders in this case structured and effectuated the LBO: (i) knowing or foreseeing that the debt incurred would render the Company insolvent; (ii) in exchange for huge fees, knowing that that the Company would be unable to service its debt to the direct detriment of unsecured creditors; (iii) knowing that the projections they relied upon were false or unreliable; and (iv) knowing that the LBO would have a devastating effect on Non-LBO Creditors, especially the Pre-LBO Noteholders. *See* NPP Findings of Fact § II.G.2.(iv); II.K.2-3. A number of recent cases have permitted equitable subordination claims to proceed based on similar factual allegations. *See Official Comm. of Unsecured Creditors v. DVI Bus. Credit, Inc. (In re DVI, Inc.),* 326 B.R. 301, 311 (Bankr. D. Del. 2005) (allegations that non-insider knew or should have known that debtors' trust was insolvent at time debtors transferred funds to it, which funds were then transferred to defendants, sufficient to warrant finding of inequitable conduct); *J.S. II,* 389 B.R. 581 (claim that entities undercapitalized and grossly mismanaged debtor resulting in descent into bankruptcy sufficient to state claim for equitable subordination); *Algonquin Power Income Fund v. Ridgewood Heights, Inc. (In re Franklin Indus. Complex, Inc.),* No. 01-67457-59 2007 WL

2509709, at *2 (Bankr. N.D.N.Y. Aug. 20, 2007) (denial of motion to dismiss claim for equitable subordination based on allegation that debtor was undercapitalized at time it took on affiliate debt); *LWD Trucking v. LWD, Inc. (In re LWD, Inc.)*, 342 B.R. 514, 520 (Bankr. W.D. Ky. 2006) (denial of motion to dismiss claim for equitable subordination based on allegation that defendants acted in concert to improperly transfer or otherwise dissipate estate assets); *SHC*, 329 B.R. at 447 (claim that creditor, on eve of debtors' insolvency, collaborated with debtors to enter into assignment without any consideration given to debtors sufficient to state claim for equitable subordination); *In re Conley*, 159 B.R. 323, 325 (Bankr. D. Idaho 1993) (court denied individual creditor derivative standing to pursue §§ 547 and 548 actions, but, on same operative facts, permitted creditor to prosecute direct claim for equitable subordination).

89.     Even in the absence of a fraudulent transfer claim, courts have subordinated lender claims where, as here, the lender's conduct was motivated by making significant fees in disregard of the inability of the borrower to service its debt load. *See In re Yellowstone Mountain Club, LLC*, No. 08-61570-11, 2009 WL 3094930, at *9 (Bankr. D. Mont. May 12, 2009). *In Yellowstone*, the court subordinated a lender's claim where the lender acted with "naked greed" in "complete disregard" of the debtor's unsecured creditors. There, the majority of loan proceeds for the repayment of which the debtor would become obligated to repay were not for use by the debtor, but were to pass directly to a principal shareholder and subsidiaries for purposes outside of, and unrelated to, the debtor's business. *Id.* at *5, *9. The court found that the lender "turned a blind eye" to the debtor's financial records and that the lender could not have believed that the debtor could service such an increased debt load in light of their historical financial performance. *Id.* at *9. The court concluded that the lender, despite various "red flags" concerning the debtor's financial condition, *id.* at *5-6, granted a substantial loan because "it was

driven by the fees it was extracting from the loans it was selling, and letting the chips fall where they may." *Id.* at \*9. Because the lender "lined its pockets on the backs of the unsecured creditors," the lender's conduct was so far overreaching and self-serving that it shocked the court's conscience. *Id.* at \*8. Therefore, the court concluded that equitable subordination was the appropriate remedy. *Id.*[5]

90.     Notably, the evidence shows that, just like the lender in *Yellowstone*, the LBO Lenders here participated in the LBO notwithstanding their concern that the LBO could render the Company insolvent so that they could obtain lucrative fees. *See* NPP Findings of Fact § II.G.2.(iv).

91.     In *O'Day*, the court equitably subordinated a lender's claims arising out of a failed leveraged buyout based on lender's misconduct very similar to that which occurred here. 126 B.R. at 370. In finding that the liens the debtor incurred in connection with the financing of the leveraged buyout constituted fraudulent transfers, the *O'Day* Court found the bank's own financial projections to be unreasonable. *See id.* at 406. Specifically, the court compared the company's historical and year-to-date financial performance with the bank's projections. *Id.* at 405. The court recognized that, even the bank's "worst case" projections assumed an EBIT that was well above the five-year historical average contained in the offering memorandum and its gross revenue projections were similarly inflated over historical financial data. *Id.* The court criticized the lender for giving "little weight" to those indicators that showed the company's earnings declining in the months leading up to the leveraged buyout. *Id.* at 405-06. Indeed, the court found that the deviation between the bank's projected gross profit figures and the figures

---

[5]     Although the court in *Yellowstone* agreed, on consent of the parties, to vacate this ruling as part of a subsequent settlement, the court's analysis is instructive to equitable subordination claims against LBO Lenders, and still can be considered by this Court. *See In Re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerseon & Corey,* 160 B.R. 882, 898 (Bankr. S.D.N.Y. 1993); *In re Okura & Co.,* 249 B.R. 596, 611 n.12 (Bankr. S.D.N.Y. 2000) ("the act of vacating an opinion . . . has no effect on the persuasiveness of the decision").

available in the months preceding the close of the leveraged buyout were "irreconcilable," and that, had the actual figures been taken into account, the projections would have revealed that working capital needs could only have been met by stretching accounts payable. *Id.* The court stated that the bank had full access to the debtor's records, facilities, and management, and that the "reasonableness of the projections ... is further impugned by evidence that clearly established that [the bank was] well aware of the decrease in gross profit margin and consequent decline in EBIT prior to the LBO closing." *Id.* at 406.

92.    The *O'Day* Court also observed that there was a well-known decline in the industry in which the debtor operated and that, prior to the leveraged buyout, the company documented concerns about increasing costs having a negative impact on the company's financial health going forward. *Id.* at 380-81, 387. Notwithstanding these concerns and the debtor's declining financial performance, the bank took no steps to revise their projections. *Id.* at 381. According to the court, the lender "suffered from an overweening optimism about the debtor's financial abilities . . . permit[ting] them to disregard the cyclical nature of the Debtor's business and the industry." *Id.* at 412. The court stated that many of the debtor's problems were "readily predictable" prior to the leveraged buyout, including labor problems, material costs, and the cyclical nature of the industry. *Id.* at 407. On those facts, the court concluded that the bank's claims should be subordinated. *See id.* at 412.

93.    As in *O'Day*, here the parties to the LBO similarly ignored relevant financial information about the Company. *See* NPP Findings of Fact §§ II.C.2; II.D.1; II.G.2.(iv). Thus, like the lenders in *O'Day* and *Yellowstone*, the claims of the LBO Lenders should be equitably subordinated to the claims of the Senior Noteholders, holders of PHONES Notes and other Non-LBO Creditors.

94. The Examiner acknowledged the possibility that the LBO Lenders' claims would be equitably subordinated or disallowed, stating that:

> if the evidence showed that the Lead Banks knew that Step Two would render Tribune insolvent, but they proceeded to fund anyway, a case could be made for equitable subordination (and possibly equitable disallowance) not just of the Step Two Debt but, possibly, some or all of the remainder of the LBO Lender Debt.

NPP 782 (Exam'rs Rpt.), Vol. II at 332-37.

95. The Examiner went on to conclude that the chance that the LBO Lenders' claims will be equitably subordinated is only "somewhat unlikely," and that "[f]urther investigation" into this issue "is merited" because, among other things, the LBO Lenders attempted to shield information relating to the LBO through questionable privilege assertions, and testimony that the Examiner viewed "with a healthy dose of skepticism." NPP 782 (Exam'rs Rpt.), Vol. II at 332-37. As an example of LBO Lender non-cooperation, the Examiner cited "[o]ne [bank] witness [who] professed to remember little or nothing at all about [the LBO] . . . despite documentary evidence suggesting that this witnesses' institution had very clear views on these matters." NPP 782 (Exam'rs Rpt.), Vol. II at 332-37. The LBO Lenders' suspicious lack of recall continued at the bank depositions in the instant dispute, where representatives of the LBO Lenders were unable to recall key issues surrounding the LBO, notwithstanding documentary evidence showing their involvement therein. The LBO Lenders' uniform inability to remember details regarding the compelling evidence showing that they were aware of at least a heightened risk of insolvency in advance of Step One, and knew, in advance of Step Two, that the LBO would render the Company insolvent, would be insufficient at a trial on the merits to defeat a claim for equitable subordination or disallowance.

96. The DCL Plan Proponents argued, however, that if a court determines that the Company was solvent at Step One, it will also necessarily find that the LBO Lenders did not

engage in inequitable conduct at Step One, and thus their Step One claims cannot be equitably subordinated. DCL Br. at 41. This is wrong. As the United States Bankruptcy Court for the Southern District of New York explained in *In re Enron*, "[e]quitable subordination is not limited to only those claims [against the estate] related to the inequitable conduct." *Enron Corp. v. Ave. Special Situation Fund II, LP, et al. (In re Enron Corp.)*, 333 B.R. 205, 220 (Bankr. S.D.N.Y. 2005); *see also Mobile Steel*, 563 F.2d 692, 700. Judge Gonzales reasoned in *Enron* that such a limitation would unfairly prejudice the innocent creditors:

> Limiting subordination only to those claims related to the inequitable conduct would unnecessarily deprive the aggrieved creditors of the full benefit of the remedy of equitable subordination, when the uncompensated injury caused by such claimant exceeds the amount of those claims [and] frustrate the court's ability to ensure a just and fair distribution of the bankruptcy estate.

333 B.R. at 221.

97.    Therefore, to allow the LBO Lenders to subsume the value of the estates through their Step One claims—despite Step Two being avoided—and thus limit Tribune's Non-LBO Creditors to just a parent-level recovery would clearly "frustrate . . . a just and fair distribution of the bankruptcy estate." *Id.* at 221.

### ii.    Equitable Disallowance

98.    It is likely that a court would find that equitable disallowance is warranted in this instance as well. Equitable disallowance is an appropriate remedy where a party engages in a "planned and fraudulent scheme" that would lead to injustice without judicial intervention. *See Pepper v. Litton*, 308 U.S. 295, 304, 312 (1939) (noting that bankruptcy courts have the power to disallow claims under equitable doctrines). Where a fraudulent scheme is perpetrated in several steps, a court must look beyond such formalities. As the Supreme Court has said:

> No matter how technically legal each step in that scheme may have been, once its basic nature was uncovered it was the duty of the bankruptcy

> court in the exercise of its equity jurisdiction to undo it. Otherwise, the fiduciary duties of dominant or management stockholders would go for naught; exploitation would become a substitute for justice; and equity would be perverted as an instrument for approving what it was designed to thwart.

*Id.* at 312.

99.     Here, the evidence shows that the LBO Lenders participated in a scheme that was designed to bring them large profits and advantageous relationships, while simultaneously leaving the Company unable to satisfy its pre-LBO obligations. *See* NPP Findings of Fact § II.G.2.(iv). Given this evidence, a court would find that equitable disallowance of the LBO Lenders' claims is warranted.

### b.     Aiding And Abetting Breaches Of Fiduciary Duty

100.     The evidence also shows that the Debtors' estates have valuable claims against the LBO Lenders for aiding and abetting a breach of fiduciary duty against various parties involved in the LBO. To establish a claim for aiding and abetting a breach of fiduciary duty, the plaintiff must prove four elements: "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, . . . (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach." *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. Supr. 2001) (internal citations omitted); *see also OODC*, 321 B.R. at 144.

101.     In the leveraged buyout context, a claim for aiding and abetting a breach of fiduciary duty arises if the defendants influenced the directors or management to proceed with a wrongful leveraged buyout and knew the essential details of the leveraged buyout. *Brandt v. Hicks, Muse & Co., Inc. (In re Healthco Int'l, Inc.)*, 208 B.R. 288, 301, 309 (Bankr. D. Mass. 1997) ("*Healthco Int'l II*"). It is well established in this Circuit that lenders who aid and abet a breach of fiduciary duty are liable therefor. *See Miller v. Greenwich Capital Fin. Prods., Inc. (In re Am. Bus. Fin. Servs.)*, 361 B.R. 747, 758 (Bankr. D. Del. 2007).

102.    Substantial evidence shows that Tribune's officers and financial management breached their fiduciary duties by failing to update the Company's projections and moving forward with the LBO notwithstanding the secular decline of the publishing industry and the Company's deteriorating performance, and that these breaches resulted in significant harm to Non-LBO Creditors. *See* NPP Findings of Fact §§ II.C.3; II.F; II.J. The evidence also shows that a court would find that the LBO Lenders aided and abetted these breaches, by assisting the Company in moving forward with the LBO, notwithstanding the LBO Lenders' knowledge that doing so would render the Company unable to pay its existing debt. *See* NPP Findings of Fact § II.G.2.(iv).

### c.    Unjust Enrichment

103.    The Debtors' estates also have valuable claims for unjust enrichment against the LBO Lenders, including (i) claims for recoupment of the fees earned by the LBO Lenders in connection with the LBO, and (ii) claims for the wrongfully obtained claims the LBO Lenders now assert against the Debtors' estates, and any value the LBO Lenders would receive upon the exercise of the subsidiary guarantees.

104.    The elements of an unjust enrichment claim are an "unjust retention of a benefit, including money, by one party to the detriment of another party, against the fundamental principles of justice, equity, and good conscience." *Douglass v. Wones*, 458 N.E.2d 514, 521 (Ill. App. Ct. 1983);[6] *see also Vinarov v. Motorola, Inc.*, No. 05-2063, 2008 WL 821880, at *11 (N.D. Ill. Mar. 26, 2008) (under Illinois law, the elements of unjust enrichment claim are: (i) defendant received a benefit; (ii) defendant was aware of the benefit; and (iii) the benefit was

---

[6]    Delaware looks to the "most significant relationship" in determining which jurisdiction's law applies to an unjust enrichment claims. *See Phoenix Canada Oil Co. Ltd. v. Texaco Inc.*, 560 F. Supp. 1372, 1383 (D. Del. 1983). Here, Illinois likely has the most significant relationship to the LBO. Even if Delaware law applied, principles underlying the doctrine of unjust enrichment are the same.

accepted by the defendant under circumstances that would make the acceptance thereof inequitable).

105.     Here, the evidence shows that the LBO Lenders moved forward with the LBO notwithstanding their knowledge that it would render the Company insolvent, in order to reap enormous fees and because of their belief that their structurally superior claims against the Company that would be protected from loss by the "equity cushion" provided by the Company's non-LBO debt. *See* NPP Findings of Fact § II.G.2.(iv).  Under these circumstances, a court would find that the LBO Lenders were unjustly enriched by the fees and claims resulting from the LBO. *See OODC*, 321 B.R. at 144-45; *Hechinger Inv. Co.*, 274 B.R. at 94; *Smithberg v. Ill. Mun. Ret. Fund*, 735 N.E.2d 560, 565 (Ill. 2000); *see also Hogg v. Walker*, 622 A.2d 648, 652 (Del. 1993).

### 7.     Multiple Alternative Litigation Outcomes Would Result In Non-LBO Creditor Recoveries Far In Excess Of The Proposed Settlement Consideration

106.     In support of the Proposed Settlement, the DCL Plan Proponents contended that only the avoidance of the debt incurred at both Step One and Step Two at all Debtors would result in recoveries to Non-LBO Creditors that are greater than the Proposed Settlement consideration, but that such an outcome would be unlikely. That is not correct.  For the reasons given above, the LBO Claims respecting Step One are far stronger than the DCL Plan Proponents posit, and the strength of the Step Two Avoidance Claims is not in serious dispute. Full avoidance would lead to a full recovery for Non-LBO Creditors, and therefore is an outcome that cannot be ignored in this Court's assessment of the Proposed Settlement. *See* NPP Findings of Fact § III.D.4.

107.     Full avoidance, however, is not the only means for improved recoveries of Non-LBO Creditors over the consideration they are to receive under the Proposed Settlement.  There

are a number of other litigation scenarios that would result in greater recoveries for Non-LBO Creditors than provided for under the Proposed Settlement. For example, Non-LBO Creditors would receive superior recoveries if (i) only Step Two is avoided and (a) equitable principles premised on waiver, equitable estoppel, and assumption of risk (WEAR) preclude the Step One Lenders from sharing in the benefit of Step Two avoidance and disgorgement, (b) the DEV is equal to or higher than $6.9 billion, or (c) the Step One Lenders are subject to successful claims for equitable subordination or disallowance, aiding and abetting breach of fiduciary duty or unjust enrichment, or if (ii) all of the LBO Debt is avoided only at Tribune but not at the Guarantor Debtors.

### a. Even If Only Step Two Financing Is Avoided, Equitable Remedies Premised On WEAR Would Lead To Substantial Recoveries For Non-LBO Creditors

108. Even if only Step Two Financing is avoided, a court would apply equitable principles of WEAR to prevent the Step One Lenders from participating in disgorgement or distributions resulting from Step Two avoidance. This would provide $1.6 billion of value and $318 million in Step Two Disgorgement Claims prior to prejudgment interest for the benefit of the innocent Non-LBO Creditors. *See* NPP Findings of Fact § III.D.4.

109. Under WEAR principles, facilitators of, and willing participants in, a transaction are prohibited from benefiting from that transaction's avoidance at least until the innocent parties who did not participate in and were harmed by the transaction are made whole. This is based upon the equitable principle that a creditor cannot later reap the benefits from the harm it knowingly caused. *See, e.g., Morion v. OYO Instruments, L.P. (In re Labelon Corp.)*, No. 02-02-22582, 2006 WL 2516386, at *4 (Bankr. W.D.N.Y. Aug. 28, 2006) ("[O]n equitable grounds, this Court would not make a finding of avoidance and recovery on the proposed Section 548 and [state law] causes of action when the only entity that would benefit from that avoidance and

recovery would be [a creditor] which specifically approved the [subject] transaction in writing and significantly benefited from the transaction.").

110.    Indeed, courts have specifically recognized that equitable principles such as estoppel and assumption of risk can prohibit certain creditors from sharing in fraudulent transfer recoveries. For example, *In re PWS Holding Corp.*, the Third Circuit upheld the district court's determination that leveraged buyout lenders may be estopped from recovering on leveraged buyout-related claims, and cited with approval the court-appointed examiner's conclusion that "there was a reasonable possibility that the [leveraged buyout lenders] would be estopped from sharing in any fraudulent transfer recoveries." 228 F.3d at 229, 239-40 (3d Cir. 2000). The Third Circuit's decision in *In re PWS* applies with particular force in case like this one, where the Non-LBO Creditors were not cashed out in connection with the LBO and, thus, bore the risks of the LBO. *Id.* at 234 (citing examiner's report as stating that fraudulent transfer claims were "not promising" because, among other reasons, "the risks of the transaction were born by the acquirer . . . and not by pre-transaction creditors").

111.    Similarly, in *In re Labelon Corp.*, the court held that it would not allow Congress, acting in its capacity as a creditor of the debtor, to benefit from an action for fraudulent conveyance, where Congress had "knowingly and actively participated in and benefitted from" the challenged transaction. *See* 2006 WL 2516386, at *4. And the court in *In re Huff* held that the trustee was estopped from challenging a transfer as a fraudulent conveyance, where the creditor on whose behalf the trustee was acting had consented to the transfer. *Harris v. Huff (In re Huff)*, 160 B.R. 256 (Bankr. M.D. Ga. 1993); *see also Stalnaker v. DLC, Ltd. (In re DLC, Ltd.)*, 295 B.R. 593, 602 (B.A.P. 8th Cir. 2003) (under section 544(b), "[t]he trustee bears the burden of proving the existence of a qualified unsecured creditor, and if the creditor is estopped

or barred from recovery for some reason, so is the trustee"), *aff'd*, 376 F.3d 819 (8th Cir. 2004); *G-I Holdings, Inc. v. Those Parties Listed on Exhibit A, (In re G-I Holdings, Inc.)*, 313 B.R. 612, 633 (Bankr. D.N.J. 2004) (similar); *In re Best Prods. Co.*, 168 B.R. 35, 57 (Bankr. S.D.N.Y. 1994) ("A fraudulent transfer is not void, but voidable; thus it can be ratified by a creditor who is then estopped from seeking its avoidance."); *Official Comm. of Unsecured Creditors v. Aust (In re Network Access Solutions, Corp.)*, 330 B.R. 67, 77 (Bankr. D. Del. 2005) (holding that creditors' committee was estopped from challenging payments as fraudulent transfers where the committee had previously supported the debtor's assumption of the contracts under which the payments were made); *In re Refco, Inc. Secs. Litig.*, No. 07-MDL-1902, 2009 WL 7242548, *11 (S.D.N.Y. Nov. 13, 2009) (finding that party's "intimate involvement in the transaction" prevented such party from being a legitimate creditor for purposes of asserting avoidance action).

112. In addition, the holders of Step One Debt could also be barred from benefitting from the avoidance of Step Two if Step Two is deemed an intentional fraudulent conveyance, and the Step One Lenders are found to have acted with "unclean hands." *Loos v. Wilkinson*, 21 N.E. 392, 393 (N.Y. 1889) (lenders' right to assert a claim against the collateral void where security interest in collateral received as part of an intentionally fraudulent transfer); *see also Lobstein v. Lehn*, 12 N.E. 68, 69 (Ill. 1887); *Brown v. Chubb*, 31 N.E. 1030 (N.Y. 1892). Under the "unclean hands" doctrine, avoidance should extend beyond depriving a creditor of its guarantee, but also to preventing that creditor from asserting any rights with respect to that obligation and from sharing on equal terms with other creditors. *See Hargreaves v. Tennis*, 88 N.W. 486, 490 (Neb. 1901) ("The conveyance being of no effect as to creditors, no advantage could accrue to him as against them by reason thereof. He was bound to restore the stock or its value to the creditors, who had a charge thereon in equity to the amount of their claims . . . .").

113.    Here, WEAR principles would estop the Step One Lenders from benefitting from the avoidance of Step Two as a constructive or intentional fraudulent conveyance and the resulting disgorgement of Step Two payments.  As discussed above, the evidence in the record shows that the Step One Lenders have substantial identity with the Step Two Lenders and Bridge Lenders, and that the LBO Lenders acted in bad faith at least at Step Two, by moving forward with the LBO for their own pecuniary interests, notwithstanding their knowledge that doing so would render the Company unable to pay its existing debt.  *See* NPP Findings of Fact § II.G.2.(iv).  Applying WEAR in such circumstances would also be consistent with the Examiner's Report.  The Examiner addressed this issue and left the question "in equipoise" as to whether a court would reach such a conclusion.  NPP 782 (Exam'rs Rpt.), Vol. II at 298, 301-03, Annex B-8.  Moreover, the doctrine of "unclean hands" would be an additional bar to Step One Lender recoveries if Step Two is found to be an intentional fraudulent conveyance—a finding that is well supported by the record.  *See* NPP Findings of Fact § II.G.2.(iv).

114.    The DCL Plan Proponents argued, however, that even if the Step One Lenders are estopped from sharing in Step Two avoidance and disgorgement, that value cannot be "upstreamed" to Tribune for its creditors.  This assertion is incorrect.  A court would not bar the Step One Lenders from sharing in the benefit of Step Two avoidance, only to effectively reverse that decision by finding that such value cannot inure to the benefit of Non-LBO Creditors at Tribune.  *See, e.g., Kraft,* 429 B.R. at 667-68 (holding that equity could receive surplus if creditors are paid in full); *Goss,* 43 F.2d at 747-48 (N.D. Ga. 1930) (holding that where a transferee has engaged in the fraud and comes to the court with unclean hands, the debtor is permitted to keep a surplus in recoveries.); *Bayou,* 372 B.R. at 664 (holding that "[i]t is not clear that fraudulent conveyance claims can never be brought in whole or in part to benefit equity . . .

."); *Calpine*, 377 B.R. at 813 n.3 (denying motion to dismiss fraudulent transfer action brought by debtor where recovery could benefit creditors and equity holders).

115. The Examiner reached a similar conclusion. In the Examiner's Report, the Examiner noted that equitable remedies may bar Step One Lenders from benefitting from Step Two avoidance while Non-LBO Creditors remain unpaid. *See* NPP 782 (Exam'rs Rpt.), Vol. II at 301. The Examiner concluded that it would be "implausible" for a court to find that avoidance of the LBO Debt is required, only to "reverse that avoidance" to allow the LBO Lenders to recover the value derived from that avoided debt. *Id.* at 289, 294.

116. The DCL Plan Proponents also argued that there is no basis to bar Step One Lenders from benefitting from Step Two avoidance and disgorgement unless there are grounds to equitably subordinate the Step One Lender claims. In support, they relied on *First Trust and Deposit Co. v. Receiver of Salt Springs Nat'l Bank (In re Onondaga Litholite Co.)*, 218 F.2d 671 (2d Cir. 1955). *First Trust*, however, does not support their contention. In that case, the Second Circuit only held that, where a creditor had improperly purchased the debtor's property for less than fair market value pre-petition but later paid the estate the difference in value after a successful claim for illegal preference or fraudulent conveyance was brought against it, the creditor could not be precluded from sharing in distributions that arose from its payment to the debtor based on a claim for another debt.

117. The circumstances in *First Trust* are substantially different from those present in this case. Equitable remedies are especially fact-specific, and are applied on a case-by-case basis. Indeed, the Second Circuit in *First Trust* specifically limited its holding only to the "the circumstances of th[at] case." *Id.* at 673; *see also, e.g., Burden v. U.S.*, 917 F.2d 115, 120 (3d Cir. 1990) (in applying equitable remedies, courts must "weigh the equities on a case-by-case

58

basis") (quotations omitted). Moreover, *First Trust* is materially different from this case

because, unlike the Step One Lenders here, the creditor in *First Trust* was able to remedy the

entirety of the harm it had inflicted on the debtor and its creditors, and its underlying claim was

"free from equitable infirmities." *First Trust*, 218 F.2d at 673. Conversely, here, assuming,

*arguendo*, that a court found that the LBO Lenders' Step One claims were not subject to

avoidance or equitable subordination, the LBO Lenders' Step Two claims are nevertheless

riddled with equitable infirmities, and the LBO Lenders cannot remedy the harm inflicted on

Non-LBO Creditors by Step Two until Non-LBO Creditors are paid in full. Moreover, the

creditor's claim in *First Trust* was unrelated to the conduct giving rise to the preference and

fraudulent conveyance claims against it, whereas here, all LBO Debt is unquestionably related

and part of one integrated transaction. *Id.*

118.    Therefore, the evidence in the record strongly supports a finding that WEAR

principles and the "unclean hands" doctrine would estop the Step One Lenders from participating

in the value created by the avoidance of Step Two and the related disgorgement. Such a finding

would preserve almost $2.0 billion of value and thus allow the Senior Noteholders, the Retiree

Claimants, and subsidiary and parent general unsecured creditors to receive a full recovery with

the avoidance of just the Step Two Financing. The PHONES Notes would also receive a

significant payment in this scenario. *See* NPP Findings of Fact § III.D.4.

### b.    The DEV Is Much Higher Than The DCL Plan Proponents Claimed, And This Also Leads To Higher Recoveries

119.    The true DEV is $8.291 billion. *See* NPP Findings of Fact § IV.B. Nevertheless,

the DCL Plan Proponents unjustifiably discounted a third possible outcome that would leave the

Non-LBO Creditors with a far better recovery than contemplated under the Proposed Settlement.

In this scenario, only Step Two is avoided, WEAR does not apply, but the current value of the

Debtors exceeds the $6.75 billion value advocated by the DCL Plan Proponents. Without entitlement to postpetition interest, the Step One Lenders cannot recover more than $6.47 billion, the amount of their allowed claims. Thus, assuming that only Step Two is avoided, at an $8.291 billion DEV, the Step One Lenders will have been paid in full on their prepetition claims, the Senior Noteholders would be paid in full on their prepetition claims, and enough value would remain to pay the holders of PHONES Notes approximately $513 million. In fact, even at a DEV as low as $6.9 billion, Non-LBO Creditors would recover $597 million and the Step One Lenders will have been paid in full. Similarly, at a DEV of $7.019 billion (the midpoint of the DEV conclusion in Lazard's January 2011 valuation), $716 million would flow to Non-LBO Creditors, at an illustrative $7.5 billion DEV, nearly $1.2 billion dollars in value would flow to Tribune's Non-LBO Creditors from the Guarantor Debtors, and at only a $7.8 billion DEV, the Senior Noteholders would be paid in full. *See* NPP Findings of Fact § IV.

120.    Here, the parties disagree as to both the proper DEV and whether postpetition interest would be allowed. For confirmation purposes, the Bankruptcy Code requires valuation of a debtor's assets as of the effective date of a plan of reorganization. *See First Brandon Nat'l Bank v. Kerwin (In re Kerwin)*, 996 F.2d 552, 561 (2d Cir. 1993); *In re Cent. European Indus. Dev. Co.*, 288 B.R. 572, 577 (Bankr. N.D. Cal. 2003) ("'The effective date of the plan' is expressly designated as the critical point for the major financial standards for confirmation. See §§ 1129(a)(7), 1129(a)(9), 1129(b)); *In re Jones*, 32 B.R. 951, 959 (Bankr. D. Utah 1983) (same); *S. Pac. Transp. Co. v. Voluntary Purchasing Grps, Inc.*, 252 B.R. 373, 392 (E.D. Tex. 2000) ("[O]nly by determining when a plan's effective date occurs can a court engage in a meaningful analysis of the best interest test. . . .  Because such matters as asset valuation and the estimation of liquidation recoveries can be drastically affected by the timing of one's

calculations, a court must ensure that all financial projections incorporated into its analysis reflect the resources that are likely to be available to a debtor on a plan's effective date."); *In re Good*, 428 B.R. 235, 247-48 (Bankr. E.D. Tex. 2010) (same); *In re Haiflich*, 63 B.R. 314, 315 (Bankr. N.D. Ind. 1986) ("Under the Bankruptcy Code it is clear that the valuations which are to be used for purposes of confirmation are to represent '[v]alue, as of the effective date of the plan.'") (quoting 11 U.S.C. § 1124, 1129).[7]

121.    In valuing a debtor as of the effective date, proponents of a plan of reorganization have a duty to update their valuation to the date as near as reasonably possible to confirmation). *See, e.g., Nellson*, 2007 WL 201134, at *21-23. Indeed, as admitted by every valuation expert to testify at the Confirmation Hearing, and by the financial advisor to the Creditors' Committee, the use of stale data is antithetical to accepted valuation practice. *See* NPP Findings of Fact § IV.A. (citing testimony of John Chachas, Suneel Mandava, and Thane Carlston).

122.    Where a bankruptcy court is presented with evidence showing that a valuation is based on stale data, it cannot "accept unchanged any of the values [for the debtor] that [had previously] been placed in evidence." *In re Mirant Corp.*, 334 B.R. 800, 824 (Bankr. N.D. Tex. 2005) (holding that much of data relied on by the debtors' valuation expert "was stale by the time of the [v]aluation [h]earing."); *see also, e.g., Nellson*, 2007 WL 201134, at *123-24. (holding that the court was required to adjust the expert conclusions of the debtors' enterprise value based upon projections that were "unrealistic" and stale); *In re Adelphia Commc'ns*

---

[7]    *See* H.R.Rep. No. 95-595, 95th Cong., 1st Sess. 414-15 (1977), U.S. Code Cong. & Admin. News 1978, pp. 5787, 6370, 6371 ("Value, as of the effective date of the plan,' as used in paragraph (3) and in proposed 11 U.S.C. 1179(a)(7)(b), 1129(a)(9), 1129(b), 1172(2), 1325(a)(4), 1325(a)(5)(b), and 1328(b), indicates that the promised payment under the plan must be discounted to present value as of the effective date of the plan."); *id* at 6369 ("the court may confirm a plan over the objection of a class of secured claims if the members of that class are unimpaired or if they are to receive under the plan property of a value equal to the allowed amount of their secured claims. . . . The property is to be valued as of the effective date of the plan, thus recognizing the time-value of money.").

*Corp.*, 368 B.R. 140, 178 (Bankr. S.D.N.Y. 2007) (concluding that there was "no longer a realistic likelihood" that valuation range of debtor's valuation expert was valid based on "a number of *factors*—including, most significantly, the movement in stock valuations *since* the time the Adelphia Valuation Expert formed his views.").

123. The DCL Plan Proponents' experts failed to adhere to this most basic and universally accepted principle of valuation practice by relying on a valuation conclusion reached in October 2010, despite the fact that an updated (and upwardly revised) valuation existed as of January 2011, and despite the fact that there were substantial changes in the financial and market data used in Lazard's valuation between October 2010 and the date of the Confirmation Hearing. *See* NPP Findings of Fact § IV.A. Accordingly, the Court simply cannot accept the DEV conclusion presented by the DCL Plan Proponents.

124. A bankruptcy court is also required to address methodological errors in a valuation, either by ordering the parties to prepare a corrected valuation, or by making certain adjustments to the valuation analysis and conclusion to account for these errors. *See, e.g., Nellson,* 2007 WL 201134, at *23 (noting that "courts frequently adjust or correct expert opinion analysis in reaching their final opinion on valuation."). The evidence presented at the Confirmation Hearing demonstrates that—separate and apart from the DCL Plan Proponents' failure to update their DEV conclusion—there were several significant methodological errors in Lazard's valuation of the Debtors. The evidence also shows that these methodological errors had the effect of depressing DCL Plan value by as much as $750 million, and that the true DEV of the Debtors is $8.291 billion, not $6.75 billion as suggested by the DCL Plan Proponents. *See* NPP Findings of Fact § IV.B.

125. The DCL Plan Proponents' artificially low DEV underscores the unreasonableness of the Proposed Settlement. For example, in the very likely scenario of Step Two Financing being avoided, if the Debtors' DEV was found to be only $7.02 billion (the mid-point DEV conclusion reached by Lazard in its January Valuation Report), then Non-LBO Creditors would receive greater recoveries than those provided for under the Proposed Settlement even if the Step One Lenders are permitted to share in the benefit of Step Two avoidance, unless Step One Lenders are permitted to collected postpetition interest.

126. Additionally, assuming avoidance at Step Two, the Step One Lenders are not entitled to postpetition interest at any range advocated by the DCL Plan Proponents. First, the Step One Lenders are not entitled to postpetition interest because the DCL Plan Proponents have not demonstrated that any of the Guarantor Debtors would be solvent at such valuations. Under the law of this Circuit, a claimant is not entitled to postpetition, pre-confirmation interest unless there is a solvent debtor. *See Peck Produce, Inc. v. PPI Enters., Inc. (In re PPI Enters. (U.S.), Inc.)*, 324 F.3d 197 (3d Cir. 2003) (holding that a solvent debtor must pay postpetition, pre-confirmation interest on a claim to render such claim unimpaired); *Wash. Mut.*, 442 B.R. at 356 ("unsecured creditors are not entitled to recover post-petition interest" except "when the debtor is solvent").

127. Second, the Step One Lenders are not entitled to postpetition interest until *all* Intercompany Claims are satisfied. The DCL Plan Proponents, however, have failed to introduce any evidence to support a finding that sufficient value would exist to pay Step One Lenders postpetition interest after all Intercompany Claims assertable by and against Tribune *and* by and between each Guarantor Debtor have been satisfied in full. *See* NPP Findings of Fact § IV.C.

Accordingly, the Court finds that Step One Lenders would not be entitled to postpetition interest until Pre-LBO Noteholders are paid in full.

**c.**      **Other Meritorious Claims Against The LBO Lenders Would Result In Full Recovery For Non-LBO Creditors**

128. As discussed above, *supra* at § I.A.6, the Debtors' estates also hold strong claims against the LBO Lenders for equitable subordination, equitable disallowance, aiding and abetting breach of fiduciary duty, and unjust enrichment. All of these claims, if successful, would result in recoveries to Non-LBO Creditors that are far superior to those provided by the Proposed Settlement, and in most instances would result in a full recovery to Non-LBO Creditors.

**d.**      **Avoidance At Just The Parent Level Leads To Higher Recoveries Than Under The Proposed Settlement**

129. A fourth litigation scenario where Non-LBO Creditors may fully recover is if both Step One and Step Two are avoided but only at the parent level, which carries a greater amount of debt (and thus a greater likelihood of balance sheet insolvency) than its subsidiaries. Avoidance of parent-level debt would lead to the disgorgement of about $2.19 billion in total (prior to pre-judgment interest)—$1.87 billion in principal, interest and fees paid out in respect of the Step One Debt, and the disgorgement of $318 million in payments respecting the Step Two Financing. *See* NPP Findings of Fact § III.D.4; *Cybergenics I*, at 244 n.9 (quoting *Citicorp Acceptance Co. v. Robison (In re Sweetwater)*, 884 F.2d 1323, 1329 (10th Cir. 1989)) ("All of the avoiding powers have the policy of fair treatment among creditors at their base . . . . The theoretical underpinnings of all of them remains the equal treatment among creditors by forcing those who have received an unfair advantage to disgorge the ill gotten gains.").

130. The $2.19 billion in total Step One and Step Two disgorgement, combined with the approximately $693 million of distributable value at the Tribune level,[8] would provide a recovery of $2.88 billion dollars for Non-LBO Creditors holding allowed claims at the Tribune level. *See* NPP Findings of Fact § III.D.4. In such case, the Senior Noteholders would recover at least $709 million. *See* NPP Findings of Fact § III.D.4.

131. The DCL Plan Proponents contended that most of the $2.19 billion disgorgement paid to Tribune would somehow go *right back* to the LBO Lenders via Tribune's intercompany payable to the Guarantor Debtors (of about $6.9 billion). However, under the Noteholder Plan, the Intercompany Claims under the Intercompany Claims Settlement are only paid in full *after* allowed third party claims are satisfied. *See* NPP Findings of Fact § IV.C. Thus, Non-LBO Creditors at Tribune would have to be paid in full (less postpetition interest) before those Intercompany Claim holders can recover. If no plan is confirmed, the Intercompany Claims Settlement would not even be operable, and so the allowance of any and all Intercompany Claims would be subject to dispute and further litigation. *See* NPP Findings of Fact § IV.C. Therefore, Tribune's putative $6.9 billion Intercompany Claim obligation does not have the impact the DCL Plan Proponents suggested.

132. The DCL Plan Proponents also argued that, even without the Intercompany Claims, most of Tribune's value would be payable to the LBO Lenders because $2.8 billion of the Step One Debt was allegedly used to satisfy pre-existing debt and therefore $2.8 billion of the $7.4 billion in original face amount of the funded Step One Debt is "protected" and preserved. However, for $2.8 billion of Step One Debt to be protected as the DCL Plan Proponents suggested, the Step One Lenders would have to establish a good faith defense under

---

[8] With a $8.291 billion DEV, $693 million (or 8.4%) is allocated to Tribune and the remainder, $7.598 billion (or 91.6%) is allocated to the subsidiaries. Using the DCL Plan Proponents' DEV of $6.75 billion, $564 million is allocated to Tribune. *See* NPP Findings of Fact § II.D.4.

Bankruptcy Code section 548(c). *See* 11 U.S.C. § 548(c). As discussed above, given the

evidence in the record, the Step One Lenders would not be able to satisfy that burden. *See supra*

at ¶ 80.

133. In any event, even if the Step One Lenders were able to establish a good faith

defense and preserve $2.8 billion of initial debt, this amount represents just 38% of the $7.4

billion original face amount of their funded debt. *See* NPP Findings of Fact § III.D.4. Therefore,

62% of the Step One Lender Claims would remain unprotected, and thus 62% of the $1.87

billion of Step One fees, principal and interest (or $1.17 billion) would still have to be disgorged.

*See* NPP Findings of Fact § III.D.4. This would leave about $2.18 billion ($1.17 billion in Step

One disgorgements, $318 million in Step Two disgorgements and $693 million in distributable

value) available to the remaining parties holding claims against Tribune. *See* NPP Findings of

Fact § III.D.4.[9] Distributing this value through the waterfall of remaining allowed claims, and

taking into account the PHONES Notes subordination, would provide $761 million for Non-

LBO Creditors—still far in excess of what the Proposed Settlement offers them. *See* NPP

Findings of Fact § III.D.4.

> **8.  Claims Against Other Parties Preserved In The DCL Litigation Trust
> Do Not Render The Proposed Settlement Reasonable**

134. The DCL Plan Proponents argued that the Court should assume that Non-LBO

Creditors will recover additional proceeds as a result of the claims in the DCL Litigation Trust

and, that with such added value, the Proposed Settlement should be deemed within the range of

reasonableness and approved. Specifically, the DCL Plan Proponents asserted that preservation

---

[9]  Under the low $6.75 billion DEV espoused by the DCL Plan Proponents, there would be just over $2.0 billion
available to Tribune's creditors ($1.17 billion in Step One disgorgements, $318 million in Step Two
disgorgements and $564 million in distributable value). *See* NPP Findings of Fact § II.D.4.

of the Litigation Trust Claims under the DCL Plan adds meaningful additional consideration and supports the overall reasonableness of the Proposed Settlement. *See* NPP Findings of Fact § VII.

135. The DCL Plan Proponents' reliance on the DCL Litigation Trust is misplaced. The value associated with the third-party claims in the DCL Litigation Trust may not be considered in assessing whether the Proposed Settlement of the claims against the LBO Lenders is reasonable. In *Martin*, the Third Circuit opined that to determine the reasonableness of a settlement, courts should "assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal." 91 F.3d at 393; *see also Key3Media*, 336 B.R. at 93 (internal citations omitted) (same). Future recoveries that may result from the prosecution of claims against other parties, however, should not be considered. Instead, courts should evaluate the merits of each specific cause of action to be settled, the relative exposure of the involved parties and the consideration to be paid to settle the subject claims. *See In re Wash. Mut., Inc.*, No. 08-12229, 2011 WL 57111, at *7-8 (Bankr. D. Del. Jan. 7, 2011) (declining to adopt the plan proponents' "holistic approach" and finding that "each part of the settlement must be evaluated to determine whether the settlement as a whole is reasonable"); *In re Fleming Packaging Corp.*, No. 03-82408, 2007 WL 4556981, at *2 (Bankr. C.D. Ill. Dec. 20, 2007) (finding that "[t]he consideration that the estate is receiving must be reasonably equivalent to the value of the disputed claim"). In short, potential recoveries from third parties are not equivalent to consideration provided by the LBO Lenders and, therefore, have no impact on the value of consideration offered in connection with the Proposed Settlement or the reasonableness thereof. *See Oswald v. Gen. Motors Corp. (In re Gen. Motors Corp. Engine Interchange Lit.)*, 594 F.2d 1106, 1134-35 (7th Cir. 1979) (rejecting a proposed class

action settlement and holding that potential value arising from the class members' right to bring state law claims is not a "benefit" to the class).

136.    Moreover, the DCL Plan Proponents did not meet their burden of proving the value of the Litigation Trust Claims under the DCL Plan, even though the value of such claims are not relevant to the Court's evaluation of the Proposed Settlement.  Despite the DCL Plan Proponents' promise during opening arguments to present evidence showing that the Litigation Trust Claims under the DCL Plan have "very substantial value" and add significant additional consideration for release of the claims against the LBO Lenders, they produced no evidence on this point at all at trial.  *See* NPP Findings of Fact § VII.  Indeed, the Debtors admitted that they have no idea what the Litigation Trust Claims are worth (if anything), and opted to rely on Black's speculation that the Litigation Trust Claims may be worth as much as $300 million.  *See* NPP Findings of Fact § VII.  Black's testimony is neither competent nor credible, and should be given no weight.

### B.    Expected Value And Decision Tree Analysis Demonstrates That The Proposed Settlement Is "Not Even Close" To Reasonable

137.    The Proposed Settlement should also be rejected because the settlement consideration is unreasonable given the Examiner's findings and the testimony and opinions of Dr. Bruce Beron, the Noteholder Plan Proponents' expert in the field of decision-tree and expected value analysis.

#### 1.    Beron's Analysis Shows That The LBO Claims Have A Higher Chance Of Success And Have An Expected Value Three Times Higher Than The Proposed Settlement Consideration

138.    At trial, the Court found Beron to be qualified to offer expert testimony on the reasonableness of the Proposed Settlement based on his decision-tree and expected value analysis.  His trial testimony fully substantiated these opinions, and the Court admitted his initial

and rebuttal expert reports in full. *See* 3/17/11 Trial Tr. 120:8-25 (accepting Beron as an expert witness) 145:12-20, 165:6-18, 250:16-257:16 (admitting into evidence NPP 2476 (Beron Rpt.) and NPP 957 (Beron Rebuttal Rpt.)) (Beron).[10]

139. Based on both his analysis and his 20-plus years of experience in assessing settlements with decision-tree and expected value techniques, Beron concluded that the Proposed Settlement was "not even close" to reasonable, using the Examiner's Report to predict the outcome of the relevant issues. *See* NPP Findings of Fact § V.A. His computations showed that the expected value of litigating the LBO Claims against the LBO Lenders was $1.51 billion to $1.83 billion. *See* NPP Findings of Fact § V.A.[11] In addition, Beron determined that there was (i) a 74% chance that the recovery for Non-LBO Creditors in litigation would exceed the Proposed Settlement, (ii) a 57% chance that they would recover in full if the litigation was pursued, and (iii) a 66% chance of recovering an amount that is three times greater than the Proposed Settlement consideration. *See* NPP Findings of Fact § V.A.7.

140. As a threshold matter, the Examiner's "bottom-line" conclusions respecting the strength of the LBO Claims against the LBO Lenders, if properly analyzed, can be considered in determining whether to approve the Proposed Settlement. Beron relied on these conclusions to undertake a methodical and comprehensive analysis of the LBO Claims against the LBO Lenders. *See* NPP Findings of Fact § V.A.2. A court-appointed examiner is an "objective

---

[10] Over the DCL Plan Proponents' objection, the Court held that Beron's reliance on the Aurelius waterfall model was appropriate under Fed. R. Evid. 703, which permits experts to base their opinions on information "reasonably relied upon by experts in the particular field." 3/17/11 Trial Tr. 257:15-16 (Proceedings). It was perfectly reasonable for Beron to rely on the waterfall model, which simply performs mathematical recovery calculations. 3/16/11 Trial Tr. 23:25-24:10 (Gropper).

[11] Beron provided a range of expected values of the LBO Claims based on different assumptions about the value of the PHONES Notes claim amount and the probabilities assigned to the Examiner's conclusions. *See* NPP Findings of Fact § IV.A.7. For instance, Beron determined that the expected value was $1.57 billion for the "low PHONES scenario" using his "base" set of probabilities, and $1.79 billion for the "high PHONES scenario" using his "base" set of probabilities. *See* NPP Findings of Fact § IV.A.7.

nonadversarial party," whose report should act as a "resource containing information and observations of an independent expert." *In re Fibermark, Inc.*, 339 B.R. 321, 325 (D. Vt. 2006) ("The record compiled by the examiner is meant to be a source of information that assists parties in identifying assets of the estate, evaluating a plan of reorganization, or describing likely and legitimate areas for recovery."). Here, the Examiner conducted a thorough, unbiased review of the LBO Claims based on the materials then available to him. *See* NPP Findings of Fact § III.D.1. The parties also stipulated that the Court can rely on and consider his findings in assessing the Proposed Settlement. *See* Stip. Regarding Use of Exam'rs Rpt. at Conf. Hr'g. [ECF No. 7423].

141. In addition, it is appropriate for a court to rely on decision-tree and expected value analysis and computations to assess the reasonableness of the Proposed Settlement. Decision trees graphically lay out the uncertainties associated with elements needed to establish and defend against the legal claims at issue, and map how those uncertainties lead to a variety of different outcomes. *See* NPP Findings of Fact § V.A.3. In turn, expected value analysis calculates the probability-weighted expected value of litigating those claims, by using the probabilities and recovery outcomes generated in the decision tree analysis. *See* NPP Findings of Fact § V.A.3.[12]

142. Bankruptcy courts, for example, have rejected settlements when an expert's calculations showed that the settled claims had a better than 50% chance of success. *See Cames*

---

[12] "Developed in the 1960's for use in business education . . . [p]rofessionals in the fields of business, economics, medicine, public policy, engineering, and law all use decision trees when multiple uncertainties complicate the decision process." David P. Hoffer, Decision Analysis as a Mediator's Tool, 1 HARV. NEGOT. L. REV. 113, 134 (Spring 1996); see also Donald R. Philbin, The Value of Economic Analysis in Preparing For Mediation, 63 DRJ 49, 50 (Feb-Apr 2008) ("With the facts narrowed and the potential outcomes identified by legal analysis, it is possible to use economic analysis to graphically depict and value various scenarios in a litigated case . . . . After the potential outcomes are identified and the probabilities are assigned, we do some basic arithmetic to determine [the "net expected value," or "NEV,"] for each outcome (the product of multiplying the outcome by its probability).").

*v. Joiner (In re Joiner)*, 319 B.R. 903, 906 (Bankr. M.D. Ga. 2004) (rejecting settlement of cause of action where expert analysis of unsecured creditors opposing settlement demonstrated that cause of action "ha[d] better than a 50 percent chance of prevailing."); *Revelle*, 256 B.R. at 913 (finding the objecting creditors who were "prepared to walk away from as much as 69 percent payout" "should be allowed their day in court," because they had "a substantial basis" to "believe that in contested litigation they w[ould] ultimately prevail and be paid 100 percent").

143.     Similarly, courts have also relied on expected value analysis to reject settlements. For example, in Rule 23 class action settlement cases, courts have concluded that a "settlement for less than the net expected value of continued litigation . . . would not be adequate." *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 284-85 (7th Cir. 2002); *see also LaChance v. Harrington*, 965 F. Supp. 630, 638 (E.D. Pa. 1997) ("a settlement is fair to the plaintiffs in a substantive sense . . . if it give them the expected value of their claim if it went to trial."). In fact, the Third Circuit has expressly held that "the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement" when evaluating whether a settlement is fair, reasonable, and adequate. *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 806 (3d Cir. 1995) (explaining that likelihood-of-success inquiry under Rule 23 "attempts to measure the expected value of litigating the action rather than settling it at the current time"); *see also Reynolds v. Beneficial Nat'l Bank* 288 F.3d 277, 285 (7th Cir. 2002) (reversing district court's approval of a class settlement that was less than the net expected value of the pending litigation).[13]

---

[13]    The process of approving class-action settlements under Federal Rule of Civil Procedure 23 directly parallels the inquiry required under Bankruptcy Rule 9019. *See, e.g., In re Carla Leather, Inc.*, 44 B.R. 457, 466 (Bankr. S.D.N.Y. 1984) (recognizing that a Rule 9019 inquiry "should parallel that contemplated by Rules 23 and 23.1 of the Federal Rules of Civil Procedure, pursuant to which courts are called upon to consider settlement of a

144. Beron did not take the Examiner's conclusions out of context, as the DCL Plan Proponents contended. For example, they argued that when Beron relied on the Examiner's conclusion that it was "reasonably unlikely" for a court to conclude that there was an intentional fraudulent conveyance at Step One, Beron ignored the Examiner's statement elsewhere in the Examiner's Report that the Examiner "did not find credible evidence" that there was an actual intent to defraud creditors at Step One. In conducting his analysis, however, Beron did exactly what the Examiner instructed the readers of the Examiner's Report to do—look at the opening "bottom-line" conclusion of each section analyzing the issues regarding the fraudulent conveyance claims against the LBO Lenders. *See* NPP Findings of Fact § V.B.1.

145. In essence, what the DCL Plan Proponents really contended is that when the Examiner stated "reasonably unlikely" he must have meant something else, like "highly unlikely" or "no likelihood." There is no reason to believe that the Examiner failed to accurately record his conclusion that way. Therefore it was reasonable and appropriate for Beron to assume the Examiner meant what he wrote in his "bottom-line" conclusions. *See* NPP Findings of Fact § V.B.1.

146. It is also worth noting that Beron was consistent in his reliance on the Examiner's "bottom-line" conclusions. There are several out-of-context statements in the Examiner's Report that are *favorable* to the Non-LBO Creditors, but Dr. Beron did not consider them because they were not part of the Examiner's "bottom-line" conclusions. *See* NPP Findings of Fact § V.B.1.

147. The DCL Plan Proponents also contended that Beron's analysis was flawed because it failed to correlate certain elements of the fraudulent conveyance claims and remedies. For example, they argued that the Examiner's conclusions regarding intentional fraudulent

---

class or derivative action."); *In re Adirondack Ry. Corp.*, 95 B.R. 867, 873 (N.D.N.Y. 1988) (agreeing that the court in Carla Leather "accurately analogized the bankruptcy court's review of a settlement to court consideration of a class or derivative action pursuant to [Rules 23 and 23.1]").

conveyance must be read as duplicative of his conclusions as to constructive fraudulent conveyance—and thus add nothing to the expected value of the litigation—because a finding of the former cannot happen without a finding of the latter. They also contended that the Examiner's conclusions regarding the three financial condition tests for constructive fraudulent transfer should have been correlated in Beron's trees and analysis.

148. However, unlike Black, Beron limited his analysis to modeling the Examiner's neutral findings, and it is not clear that the Examiner did not already correlate his findings in his "bottom-line" conclusions. *See* NPP Findings of Fact § V.B.1. In fact, the Examiner explicitly conditioned a number of his findings on conclusions with respect to other issues. *See* NPP 782 (Exam'rs Rpt.), Vol. II at 77 (expressly conditioning his conclusions on balance-sheet insolvency at Step One on his conclusion as to whether Step Two Financing should be included with the Step One Debt); *id.* at Vol. II at 239-240 (expressly conditioning his conclusions regarding the financial condition test of the intent to incur debts beyond the ability to pay and the test for good faith for a section 548(c) defense on his conclusion as to whether those tests should be subjective or objective).

149. Furthermore, the DCL Plan Proponents' argument is not consistent with fraudulent conveyance law. Some "badges of fraud" used to establish a intentional fraudulent transfer—like insolvency or lack of value—are also elements needed to establish a constructive fraudulent transfer. *See Hechinger*, 327 B.R. at 550-51 (D. Del. 2005) (citing authorities), *aff'd*, 278 F. App'x 125 (3d Cir. 2008); *Moody v. Sec. Pac. Bus. Credit, Inc.*, 127 B.R. 958, 990 (Bankr. W.D. Pa. 1991), *aff'd*, 971 F.2d 1056 (3d Cir. 1992). But a party does not need to prove any particular badge of fraud in order to prevail on a claim for intentional fraudulent transfer. *See In re Manhattan Inv. Fund Ltd.*, 397 B.R. at 8 ("'badges of fraud are not a prerequisite to a

finding of actual fraudulent intent'") (quoting *In re Actrade Fin. Techs. Ltd.*, 337 B.R. 791, 791

(Bankr. S.D.N.Y. 2005)); *see also Fisher*, 253 B.R. at 871. Therefore, Beron did not need to

model the likelihood of the intentional fraudulent transfer claims succeeding only if there was

also a constructive fraudulent conveyance. In fact, the Examiner compiled evidence suggesting

multiple badges of fraud that alone would sustain a finding of intentional fraudulent conveyance

independent of his findings of insolvency and lack of reasonably equivalent value. NPP 782

(Exam'rs Rpt.) Vol. II at 22-77; *see also supra* at § I.A.2.

150.     Likewise, with respect to the three financial condition tests for constructive

fraudulent transfer, the Bankruptcy Code states the tests in the disjunctive, and does not provide

that a finding of one is conditioned upon the finding of another. *See* 11 U.S.C. § 548; *Vadnais*,

100 B.R. at 133-37 ("Because the statute is in the disjunctive, we deal only with the issue of

unreasonably small capital, finding and ruling that this element has been established . . . .

Unreasonably small capitalization is not the equivalent of insolvency in either the bankruptcy or

equity sense."). Indeed, the test for balance sheet solvency is clearly independent from the other

two tests for adequacy of capital and ability to pay—a company may be balance sheet solvent but

have inadequate capital or be unable to pay its debts as they become due. *See id.*; *Van Dusen*,

910 F. Supp. At 943-45 ("A transfer may be set aside as fraudulent if the transferor, though its

assets exceed its liabilities, is rendered unable to pay its debts as they come due.") (*citing

Crowthers McCall*, 129 B.R. at 997); *Boyer v. Crown Stock Distrib., Inc.*, 587 F.3d 787, 794-95

(7th Cir. 2009) ("The difference between insolvency and 'unreasonably small' assets in the LBO

context is the difference between being bankrupt on the day the LBO is consummated and

having at that moment such meager assets that bankruptcy is a consequence both likely and

foreseeable . . . . Focusing on the second question avoids haggling over whether at the moment

of the transfer the corporation became 'technically' insolvent, a question that only accountants could relish having to answer.'"). Therefore, Beron's models did not need to correlate all of the financial condition tests.

151. Accordingly, based on Beron's comprehensive analysis and his testimony, a court would conclude that the LBO Claims have an expected value that far exceeds the consideration being offered Non-LBO Creditors under the Proposed Settlement, and that the LBO Claims have a higher than 50% chance of providing recoveries that materially exceed the Proposed Settlement consideration. Therefore, given Beron's analysis, the Proposed Settlement cannot be considered reasonable.

### 2. The Court Should Give Little Weight To Black's Opinions Regarding The Proposed Settlement

152. For a number of reasons, Black's opinions regarding the reasonableness of the Proposed Settlement should be given no weight. First, as the Court held at the rebuttal stage of the trial, Black is not qualified in the field of expected value and decision-tree analysis. *See* 4/12/11 Trial Tr. 123:16-22, 124:21-125:3; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 580 (1993) (expert must be qualified to offer opinion under FED. R. EVID. 702); *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003) (similar).

153. Second, Black did not perform anything like the robust decision-tree and expected value analysis that Beron undertook, and the DCL Plan Proponents never offered analysis like that from any witness at trial. Instead, Black made wholly subjective assessments of the dozens of sub-issues that drove the ultimate outcomes he was trying to predict, used probabilities he tweaked or "nudged" as he saw fit, and then tried to pull it all together "in his head" or with his "trusty old HP 12C calculator." *See* NPP Findings of Fact § V.C.1. Therefore, Black's opinions are not readily verifiable or testable, and therefore cannot be relied upon. *See Peltz v. Hatten (In*

*re USN Commc'ns, Inc.)*, 60 Fed. Appx. 401, 402 (3d Cir. 2003) ("it was well within the District Court's prerogative as finder of fact to choose not to rely on the speculative testimony of appellant's experts"); *Oddi v. Ford Motor Co.*, 234 F.3d 136, 156, 158-9 (3d Cir. 2000) (affirming grant of summary judgment because plaintiff's expert's opinion was based on "little, if any, methodology beyond his own intuition" and on "haphazard, intuitive inquiry" that could not be tested, submitted to peer review or assessed by court); *Nellson*, 356 B.R. at 366, 369, 374-76 (after finding expert to be qualified following extensive *voir dire*, and after conclusion of trial, determining that expert's testimony must be excluded because expert's methodology was unreliable).

154.    Third, instead of offering expert opinions, Black offered conclusions on multiple legal issues. Those issues were already examined by the Examiner and are best left to parties' counsel to argue and to the Court to decide. *See* FED. R. EVID. 702, 704; *Berckeley Inv. Grp. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006) ("expert witness is prohibited from rendering a legal opinion"); *Bridgeport Holdings Inc. Liquidating Trust v. CDW Corp. (In re Bridgeport Holdings, Inc.)*, No. 05-50507, at 11 (Bankr. D. Del. Jan. 10, 2007) (Walsh, J.) ("Rule 704 does not allow an expert merely to tell the Court what result it should reach."); *Alumax Inc. v. Comm'r*, 109 T.C. No. 8, 109 T.C. 133 (T.C. 1997) (striking Prof. Black's report opining about various legal issues); *cf. Cantor v. Perelman*, No. Civ. A. 97-586 KAJ, 2006 WL 3462596, at *1 (D. Del. Nov. 30, 2006) (Jordan, J.) (excluding expert testimony of legal opinions because "I will not be assisted in my role as fact finder in this bench trial by hearing the law explained from the witness stand. The able attorneys on both sides of this case can articulate the law in their arguments and post-trial briefing.").[14]

---

[14]    As this Court recognized before trial, it is "pretty well able during testimony and afterwards to filter out" "an expert's opinion . . . on a legal conclusion," because it is the role of the Court "to decide what the law is." 3/2/11

155.     Fourth, by his own admission, Black is "not an expert in bankruptcy law" and had to rely on Debtors' counsel legal research memos (as well as his own research) to understand the law that governs many of the critical issues raised in these proceedings. *See* NPP Findings of Fact § V.C.2. Therefore, even if this Court were to consider Black's legal assessments, he was not qualified to give them. *See Daubert*, 509 U.S. at 580; *Calhoun*, 350 F.3d at 321.

156.     Fifth, in claiming that the Proposed Settlement is reasonable, Black offered conclusions about the LBO Claims that deviated significantly from the Examiner's conclusions. *See* NPP Findings of Fact § V.C.6. However, in stark contrast to the scope and depth of the Examiner's investigation and qualifications, Black is not a bankruptcy law expert, did not interview a single witness, spent far less time on his analysis, and cursorily reviewed, if at all, the complaints asserting the LBO Claims. *See* NPP Findings of Fact § V.C.6. Therefore, the Examiner's assessments are far more reliable than Black's conclusions. *See Fibermark*, 339 B.R. at 325; *Calhoun v. Honda Motor Co., Ltd.*, 738 F.2d 126, 131-132 (6th Cir. 1984) (affirming judgment against plaintiff because plaintiff's expert did not know key facts rendering expert's testimony in realm of "guesswork and speculation") (citation omitted).

157.     Finally, Black was too connected to the parties-in-interest and their counsel to be considered a neutral witness. Black had already given the Debtors his assurance that he would support their plan before they even finalized it, and he had received input from the very people who orchestrated the challenged transaction. *See* NPP Findings of Fact § V.C.5. Therefore, it is unlikely that Black could impartially assess the Proposed Settlement. *See Universal Athletic Sales*, 546 F.2d at 537 ("[T]he district court committed error in failing to discount the value of the testimony, given the interest in the litigation of the law firm with which [expert] was

Hr'g Tr. at 27:4-13 (Carey, J.).

associated."); *Commercial Union Ins. Co. v. Seven Provinces Ins. Co.*, 217 F.3d 33, 39 (1st Cir. 2000) (testimony properly discounted where expert "had been involved in this dispute long before it came to court and therefore might have developed a bias"); *Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1331 (Fed. Cir. 2008) (discounting testimony from biased expert); *Bankr. Serv., Inc. v. Ernst & Young (In re CBI Holding Co.)*, No. 96-9143A, slip op. at 17-18 (Bankr. S.D.N.Y. Oct. 23, 2000) (Lifland, J.) (excluding testimony of proffered expert in bench trial because expert was conflicted).

**C.**  **The DCL Plan And Settlement Process Was Tainted By Conflicts, One-Sided Negotiations, And Other Irregularities, And The DCL Plan Proponents Cannot Demonstrate That The Proposed Settlement Is Reasonable Nor That The DCL Plan Is Proposed In Good Faith**

158. The proponents of a proposed plan and settlement must show that the negotiations and other process from which the proposal emerged were conducted at arm's-length, among properly motivated parties, free from conflicts. *See Exide*, 303 B.R at 67-68. As this Court has held, "the ultimate fairness of the process in bankruptcy is a paramount principle to be protected by the Bankruptcy Court," and evidence that the process was tainted by conflicts or other irregularities justifies rejection of a proposed plan. *Coram*, 271 B.R. at 232, 238 (holding that debtors' management conflicts "tainted" the "negotiations towards a plan" and precluded the requisite finding that the plan was proposed in good faith); *see also Exide*, 303 B.R. at 67 (holding that it is the "duty of the Bankruptcy Court to determine that a proposed compromise forming part of a reorganization plan is fair and equitable" and identifying "arm's length bargaining" as a factor in the analysis).

159. In addition, because the court's review of the reasonableness of a settlement is limited to a "canvass[ing of] the issues"—as opposed to an actual determination of the merits of the claims being settled—the court's ability to evaluate whether the proposed settlement is truly

reasonable is likewise limited, and the court therefore assesses whether the process leading to the proposed settlement is of the quality that reasonably *should* lead to a fair outcome. *Key3media*, 336 B.R. at 93; *see, e.g., Exide*, 303 B.R. at 67. As the United States Supreme Court held in the analogous context of a motion for approval of a class action settlement:

> One may take a settlement amount as good evidence of the maximum available *if* one can assume that parties of equal knowledge and negotiating skill agreed upon the figure through arms-length bargaining, unhindered by any considerations tugging against the interests of the parties ostensibly represented in the negotiation.

*Ortiz v. Fibreboard Corp.* 527 U.S. 815, 829 (1999) (emphasis added) (rejecting proposed settlement where counsel was motivated to "reach any agreement in the global settlement negotiations that they thought might survive a Rule 23(e) fairness hearing, rather than the best possible arrangement" for largely absent class members); *see also Carla Leather*, 44 B.R. at 466 (holding that 9019 inquiry parallels inquiry under FRCP 23); *Oswald*, 594 F.2d at 1125 n.24, 1132 n.44 (observing that a FRCP 23 "fairness hearing is not a trial on the merits," and that the reviewing court cannot "undertake the partisan task of bargaining for better terms" and "the integrity of the negotiating process is, therefore, important.")

160.    Evidence of vigorous arm's-length bargaining involving the parties with the greatest economic interest in the claims—or at least un-conflicted proxies of those interested parties—may provide a court with comfort that a proposed compromise represents the best deal that could be reached among sophisticated commercial properties jostling for position. *In re Lyondell Chem. Co.*, Case No. 09-10023 (Gerber, J.), Jan. 7, 2010 Tr. at 14-15 (in ruling on a Bankruptcy Rule 9019 settlement, "I need to have total comfort that the settlement [of fraudulent transfer claims] was at arms' length and wasn't collusive"). In contrast, where the process is marked by conflicts of interest, exclusion from negotiations of crucial parties in interest to the claims subject to a proposed settlement, and even the perception of self-dealing, the court should

withhold its approval of the proposed plan or settlement. *Coram*, 271 B.R. at 240 (evidence of conflicts infecting plan negotiations precluded confirmation); *Exide*, 303 B.R. at 71 (absence of arm's-length bargaining contributed to rejection of the proposed settlement); *Adelphia*, 327 B.R. at 165 (in analyzing proposed settlement under Bankruptcy Rule 9019, arm's-length bargaining is a relevant consideration—one to which the court would give great weight "if [it] ever thought it had not been satisfied"); *see also Oswald*, 594 F.2d at 1126 (holding that the exclusion of representatives of important beneficiary of claims "from the settlement negotiations should weigh heavily against approval of the settlement.").

161.    Unfortunately, the process in this case was tainted with exactly the types of conflicts and other irregularities warned of in the case law, and militates strongly against confirmation of the DCL Plan and Proposed Settlement.

### 1.    The Debtors' Mistaken View Of Their Role, And Manifest Conflicts Of Interest, Tainted Their Investigation And Settlement Of The LBO Claims

162.    The Debtors did not even attempt to discharge their duty to the beneficiaries of the LBO Claims against the LBO Lenders. The Debtors admitted at trial that they sought to act solely as a "neutral" intermediary and "honest broker" with respect to the LBO Claims, including all of the claims arising against the LBO Lenders in connection with the LBO under state law and the Bankruptcy Code. According to the Debtors, they sought to be as "objective and non-partisan as possible," listening to "the bank's side of the story" as well as that of the claim-beneficiaries, and did not "take one side or the other." 3/8/2011 Trial Tr. 44:20-45:6, 110:4-111:5 (Kurtz); *see also* NPP Findings of Fact § III.A. Even had the Debtors been a successful "neutral" intermediary—and they manifestly were not successful—mere neutrality is not consistent with the fiduciary duties the Debtors owed to Non-LBO Creditors. In chapter 11 cases where no trustee is appointed, section 1107(a) of the Bankruptcy Code provides that the debtor in

possession, and in practicality the debtor in possession's management, enjoys the powers that would otherwise vest in the bankruptcy trustee. *See* 11 U.S.C. § 1107(a). However, along with those powers comes the trustee's "fiduciary duty to maximize the value of the bankruptcy estate," including by vigorously pursuing fraudulent conveyance actions. *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery,* 330 F.3d 548, 573 (3d Cir. 2003) ("*Cybergenics II*"). In other words "the debtor—really, the debtor's management—bears a *fiduciary duty* to avoid fraudulent transfers that it itself made." *Id.* (emphasis added).

163.    Moreover, the Debtors were required to investigate and prosecute the LBO Claims with the same zeal as would Non-LBO Creditors themselves had they been empowered to do so. As the Third Circuit held in *Cybergenics I*:

> The power to avoid the debtor's prepetition transfers and obligations to maximize the bankruptcy estate for the benefit of creditors has been called a "legal fiction" by one court. [Citation omitted]  It puts the debtor in possession "in the overshoes" of a creditor. This attribute is no more an asset of [the] debtor in possession than it would be a personal asset of a trustee, had one been appointed in this case. Much like a public official has certain powers upon taking office as a means to carry out the functions bestowed by virtue of the office or public trust, the debtor in possession is similarly endowed to bring certain claims on behalf of, and for the benefit of, all creditors.

*Cybergenics I*, at 244.  Because a debtor's avoidance power under Bankruptcy Code section 544(b) relates to claims that actually "belong" to the estate's creditors, a debtor in must act as a partisan advocate on behalf of those creditor-beneficiaries, not as a mere "neutral" intermediary or "honest broker" between the creditor-beneficiaries and the defendants in connection with the claims. *Id.* Here, the Debtors flatly admit they never sought to carry out this role on behalf of Non-LBO Creditors, and the terms of the Proposed Settlement reflect the Debtors' failure.

164.    In any event, the Debtors were not a credible "honest broker" with respect to the LBO Claims against the Senior Lenders, due to the manifold conflicts of the Debtors' directors

and officers, and representatives in the investigation and settlement of the LBO Claims. As the Third Circuit recognized, transactions subject to avoidance often involve or implicate the debtor's management and its pre-petition conduct, a situation that "immediately gives rise to the proverbial problem of the fox guarding the henhouse." *Cybergenics II*, at 573. It is reasonable to suspect that "if managers can devise any opportunity to avoid bringing a claim that would amount to reputational self-immolation" or result in a personal financial loss, "they will seize it." *Id.* For that reason, courts have acknowledged that the debtor in possession "'often acts under the influence of conflicts of interest.'" *Id.* (citing *Canadian Pac. Forest Prod. Ltd. v. J.D. Irving, Ltd. (In re Gibson Grp., Inc.)*, 66 F.3d 1436 (6th Cir. 1995)). Where such conflicts exist, even where there is no evidence of prejudice to the estates, the court is justified in concluding that a plan or settlement supported by conflicted management of the debtor is not proposed in good faith as required under Bankruptcy Code section 1129, and should be rejected. *Coram*, 271 B.R. at 232, 238.

165.     Here, the Debtors have expressly and tacitly admitted—and the evidence overwhelmingly demonstrates—that the Debtors' legacy board and management were tainted by conflicts or, at a minimum, the perception of conflicts. *See* NPP Findings of Fact § II.C. The evidence also suggests that these conflicts may have contributed to the Debtors' decision to entrust investigation and prosecution of the LBO Claims to Liebentritt and Sidley, parties who could not realistically be expected to assess the LBO Claims even "neutrally," much less act as advocates for the disenfranchised Non-LBO Creditors. *See* NPP Findings of Fact § III.A. Liebentritt was the very paradigm of the "fox guarding the henhouse"; not only was Liebentritt himself a potential defendant with regard to the LBO Claims, he has had a 30-plus year personal, professional, and business relationship with Zell, an architect of the LBO. *Cybergenics II*, at

573; *See* NPP Findings of Fact § II.G.2.b.(iv). The notion that Liebentritt could turn around and investigate claims against Zell, his friends at JPMorgan and the other banks—and Liebentritt himself—in good faith, rather than "seizing" any "opportunity to avoid bringing" those claims, flouts human nature, and is contradicted by the evidence in this case. *In re Commercial & Military Sys. Co., Inc.*, 2007 WL 7027879, *3 (Bankr. S.D. Ga. 2007) (holding that it "flies in the face of human nature" to assume that "debtors who have a conflict of interest . . . can really be expected to investigate potential estate causes of action when they themselves or their principals or insiders are or potentially could be the targets of those estate causes of action"); *see* NPP Findings of Fact § II.G.2.b.(iv).

166.    Sidley's role in the LBO, and its relationships with the Debtors' directors and officers and the LBO Lenders was also deeply problematic. Even though a debtors' law firm "acts as attorney for the debtor-in-possession, it also has certain fiduciary duties to the estate, including insuring that the rights of the creditors are protected." *In re N. John Cunzolo Assocs., Inc.*, 423 B.R. 735, 739 n.5 (Bankr. W.D. Pa. 2010). Among other things, a debtor's counsel is required to analyze fraudulent transfer claims and consider in good faith whether estate assets should be used to pursue those claims for the ultimate benefit of the unsecured creditors. *Id.*

167.    Under the circumstances, the decision by the Board and management to entrust investigation and prosecution of the LBO Claims to Sidley and Liebentritt was misguided. The Debtors concede that Sidley could never have actually commenced litigation of the LBO Claims, based on Sidley's ongoing representation of several of the LBO Lenders who necessarily would be named as defendants in any such action. *See* NPP Findings of Fact § III.A.2. Even more problematic is Sidley's own role in structuring the LBO, and its representation of the Debtors'

individual directors and officers in claims arising from the LBO.[15] In assessing a debtor's duties

with respect to the prosecution of fraudulent conveyance claims, the Debtors themselves have

argued that the Court should rely on Delaware law governing a corporation's obligations with

respect to derivative demands, "given that both inquiries look to whether the debtor/corporation

suffers from a conflict of interest." Debtors' Obj. to UCC Mot. for Derivative Standing, at 8 n.4

[ECF No. 3371]. Under Delaware law, a corporation commits "gross negligence" when it

entrusts the investigation of claims that are the subject of a derivative demand to a law firm that

represented the corporation's directors and officers in "proceedings involving the very subject

matter of that demand." *Stepak v. Addison*, 20 F.3d 398, 400 (11th Cir. 1994) (applying

Delaware law).

168.    As the Court of Appeals explained in *Stepak*, a corporation violates its duty to

claim beneficiaries when it delegates investigation of claims to counsel that represented alleged

wrongdoers in connection with the transaction giving rise to the claims:

> when a board chooses to entrust its investigation to a law firm . . . the
> directors must ensure that counsel is capable of independently evaluating
> the corporation's interests. Selection of a law firm that has actually
> represented the alleged wrong-doers in proceedings related to the very
> subject matter that the law firm is now asked to neutrally investigate
> reaches, in our opinion, the level of gross negligence and is incompatible

---

[15] Among other things, a team of Sidley lawyers—led by Tom Cole, the Chairman of Sidley Austin—advised the Company in connection with structuring the LBO financing at issue in this case. Moreover, before being tapped by the Board to run the investigation of the LBO Claims in these cases, Sidley represented some of those very same Board members in their personal capacities against breach of fiduciary duty and other claims arising out of the LBO in the *Garamella* litigation. NPP 1038 at 32 (*Garamella* Opp. to Prelim. Inj. dated 5/22/2007) (identifying Sidley clients as current Board members Holden and Osborne and former directors and officers FitzSimons, Hernandez, Morrison, Reyes, Taft and White). The Sidley team in *Garamella*—which featured at least one Sidley litigator closely involved in these cases as well—vigorously defended the integrity of the LBO and the process that led to the LBO, argued that the individual directors and officers had not breached any duties in connection with the LBO, and otherwise took positions that would necessarily have to come under close scrutiny and possible revision in connection with any meaningful investigation into the LBO Claims. *Id.* at 44-49 (Opp. p. 7-12). In addition to being potential defendants to the LBO Claims, Sidley's former clients were and are crucial witnesses in connection with the LBO Claims against the LBO Lenders. *See* NPP Findings of Fact § III.A.2.

with a board's fiduciary duty to inform itself "of all material information reasonably available" prior to making a business decision.

*Stepak*, 20 F.3d at 405.

169.    Moreover, *Stepak* expressly held that dual representations remain problematic whether "the two representations are undertaken successively [or] simultaneously," since

> in either case, counsel might have had to assert positions antagonistic to those dutifully urged or to be urged in defense of the individual officers. Conversely, counsel might have been deterred from aggressively representing the interests of the [demanding party] because of a lingering allegiance to these officers.
>
> * * *
>
> There is a strong possibility that a "lingering allegiance" toward the insider defendants will color or otherwise bias counsel's investigation of the allegations against its former clients, as well as any legal advice counsel provides to the corporation about the matter.

*Stepak*, 20 F.3d at 405.

170.    In short, based on its representation of the Company's directors and officers in connection with the LBO and its own role as an advisor in that transaction, Sidley was not in a position to conduct the full and fair inquiry into the LBO Claims the Debtors' creditors were entitled to expect, to prosecute the LBO Claims, or to credibly advocate for a settlement maximizing value for Non-LBO Creditors. *See, e.g., In re Fiesta Homes of Georgia, Inc.*, 125 B.R. 321, 325 (Bankr. S.D. Ga. 1990) (denying plan confirmation based on plan proponent conflicts of interest, and observing that estate representatives must provide full and fair "investigations and decisions in pursuing claims on behalf of the estate"). Sidley's manifest conflicts of interest could preclude approval of the plan even in the absence of evidence of actual prejudice. *Fiesta Homes*, 125 B.R. at 325. (holding that existence of conflicts by themselves undermined plan good faith, since "there would always be at least the appearance that the actions were not pursued as aggressively as they might otherwise be by a disinterested party"); *see also*

*Coram*, 271 B.R. at 238 (holding that the plan process is tainted even absent "fraudulent intent or harm" where "a fiduciary was serving more than one master or was subject to conflicting interests").

171.    In this case, there is substantial evidence that Sidley's investigation fell far short of that required under the Bankruptcy Code.  Indeed, the Debtors admit they *never* seriously considered bringing the LBO Claims.  At a hearing on February 18, 2010— part-way into the Sidley-led investigation of the LBO Claims, and just as the Debtors were going into settlement discussions with the Senior Lenders—a representative of the Debtors involved in the investigation testified in open court that he could not "think of any circumstances in which the Debtors would . . . decide to pursue litigation" against the LBO Lenders.  Feb. 18, 2010 Hr'g. at 52.  Notably, the Debtors made no effort to determine whether the Company was insolvent at either step of the LBO, a remarkable omission in light of the nature of certain of the LBO Claims, but entirely consistent with the acts of professionals not seriously interested in exploring and identifying the true strength of the LBO Claims before agreeing to a compromise of those claims.  In addition, the settlement embodied in the April Plan signed-off on by Sidley called for full releases of the claims against all of their former individual director and officer clients, despite the fact that none of these parties were to contribute any consideration for their releases.  *See* NPP Findings of Fact § III.A.1.  In other words, not only was the Debtors' decision to delegate the LBO Claims investigation to Sidley asking "too much of human nature" and improper as a matter of law, there is substantial evidence suggesting that Sidley's conflicts precluded a thorough investigation of the LBO Claims until after the Examiner was appointed, and influenced its treatment of the LBO Claims in settlement negotiations.  *Commercial & Military*, 2007 WL 7027879, at \*3.  As such, the DCL Plan Proponents did not carry their burden

of demonstrating that the process leading to the DCL Plan and Proposed Settlement was consistent with the good faith requirements of 1129(a).[16]

### 2. By Forming The Plan Special Committee, The Debtors Acknowledged, But Did Not Resolve, Their Debilitating Conflicts

172.     When the Debtors finally formed the Plan Special Committee in late August 2010, and sought approval from the Court to hire separate counsel to represent the Plan Special Committee, the Debtors tacitly acknowledged what they had denied for most of the case: that the Debtors' management and counsel were conflicted. *Coram*, 271 B.R. at 232 (forming special committee after court identified board conflicts); *Stepak*, 20 F.3d at 407 (holding that corporation's outside directors acknowledged conflicts when they hired independent counsel— Sidley Austin, coincidentally—to evaluate claims subject to a derivative demand). As discussed above, however, the Plan Special Committee's members themselves had significant conflicts in evaluating the LBO Claims and the Proposed Settlement, and "failed to enforce the separate boundaries" that the Debtors and the Plan Special Committee specifically claimed were necessary when they sought approval to hire counsel for the Plan Special Committee. *Coram*, 271 B.R. at 240; *see also id.* at 234, n.6 (casting doubt on independence of at least one member of the Coram special committee, who was "integral to bringing in" to Coram the officer whose conduct had created the conflicts in the first place).

---

[16] It is no answer to argue that *eventually* the Examiner conducted a more thorough investigation of the LBO Claims, or that *ultimately* Sidley's former clients did not receive releases in their capacities as directors and officers. The complexity of the LBO Claims and their importance to the estate warranted institution of an *immediate* investigation, conducted with recourse to all available discovery devices, over as long a period of time as was reasonably necessary. Appointed some 16 months after the Petition Date, the Examiner was under pressure to complete his investigation quickly. While his three month investigation and resulting report were as comprehensive as they could be under the circumstances, Klee himself complained that he would have benefited from more time, and greater ability to compel answers and information from recalcitrant bank witnesses. By failing to appoint conflicts counsel at the outset of the case, the Debtors squandered the estates' best opportunity to perform precisely the sort of investigation identified by the Examiner.

173.     The Plan Special Committee's independence was further undermined by its

decision to rely on Sidley as its primary counsel concerning the substance of the LBO Claims

and the negotiation of the Proposed Settlement. Although the Plan Special Committee was

authorized to retain independent counsel—and did so, at considerable expense to the estates—in

practice the Plan Special Committee relied on Sidley's investigation of the merits of the LBO

Claims, conduct of the settlement negotiations, and recommendation concerning an appropriate

settlement, despite the Plan Special Committee's express acknowledgment to this Court that

relying on Sidley would "undermine the entire purpose of the Special Committee." Plan Special

Committee Statement Supporting Jones Day Application ¶ 4 [ECF No. 5664]; *see* NPP Findings

of Fact § III.A, *infra*; *see also Stepak,* 20 F.3d at 407 (criticizing allegedly independent directors

for hiring conflicts counsel but then relying "heavily" upon corporation's counsel); *In re Par

Pharm. Inc. Derivative Litig.*, 750 F. Supp. 641, 647 (S.D.N.Y. 1990) ("*Par Phar*") (under both

New York and Delaware law, an effective special committee should be represented "by

independent counsel who made a thorough investigation" of derivative claims, and not by

counsel who represented "the defendant directors" in related litigation); Debtors' Reply to Jones

Day Retention Application [ECF No. 5665].  Hence, all of the issues associated with Sidley's

conflicts remained operative throughout these cases. *Par Phar*, at 657 n.12 (special committee

must hire and rely on conflicts counsel "precisely because [it] has no previous professional

relationship with either the corporate entity or its directors.  Problems of conflicting loyalties . . .

do not, therefore, arise.") In addition, Don Liebentritt acted as the point-person for the Plan

Special Committee with respect to the LBO Claims, despite Liebentritt's status as a potential

defendant in the LBO Claims, his close relationship with Zell and the legacy board and

management, and the Plan Special Committee's stated goal of maintaining "pure separation" from Zell. *See* NPP Findings of Fact § III.A.I.

174.    In any event, the Plan Special Committee was entirely passive in its approach to the LBO Claims and the Proposed Settlement, conducted no independent investigation of the LBO Claims, did not attend, and did not have its independent counsel attend, negotiating sessions, and failed to educate itself concerning the Proposed Settlement terms or merits of the claims being settled prior to approving the term sheets put before it by Sidley and Liebentritt. Apparently, the Debtors believed that the mere formation of a special committee would sanctify the Debtors' role in the settlement of the LBO Claims, even if the Plan Special Committee was manifestly ineffective. However, merely forming a special committee and hiring supposedly independent professionals will not "sprinkle holy water on the situation and make everything alright" (*Coram*, 271 B.R. at 240); the special committee and its professionals must actually intervene in a way that effectively cures the relevant conflicts of interest. *See, e.g., id.* at 234 (rejecting plan in part because special committee failed to undertake investigation of conflicts that led to formation of special committee in the first place, and did nothing to stop the conflicts or otherwise cure the problems that had led to formation of the special committee); *see also Par Phar*, at 647 (criticizing special committee failure to document any independent "procedures, reasoning or conclusions" in connection with decision not to bring derivative suit).

### 3.    The Creditors' Committee Failed To Maximize Value

175.    The Creditors' Committee did not fill the vacuum left by the Debtors' conflicts and their inadequate investigation and pursuit of the LBO Claims, and failed to carry out its duty to maximize value for the benefit of all unsecured creditors. "Creditors who serve on the committee owe a fiduciary duty to the constituents whom they represent. This duty obligates them to act with undivided loyalty for the benefit of all of the unsecured creditors." *In re ABC*

*Auto. Prods.*, 210 B.R. 437, 441 (Bankr. E.D. Pa. 1997); *see also In re Nationwide Sports Distribs., Inc.*, 227 B.R. 455, 463-64 (Bankr. E.D. Pa. 1998) (holding that committee members owe fiduciary duty to maximize value to unsecured creditors).

176. Among other things, a creditors' committee is required to provide "supervision of the debtor in possession and of the trustee, and . . . protect [the committee's] constituents' interests," acting "as a watchdog on behalf of the larger body of creditors which it represents." *Id.* (*citing* H.R.Rep. No. 595, 95th Cong., 1st Sess. 235, 401 (1978) *and In re AKF Foods, Inc.*, 36 B.R. 288, 289 (Bankr. E.D.N.Y. 1984)). In discharging its "watchdog" role, "the committee has a 'duty' rather than just the 'power' to 'use any tool available under section 1103' to accomplish its goal of acting in the best interests of the creditors," including ensuring a full investigation of claims with respect to which creditors are the beneficiaries. *Id.* (*quoting Advisory Comm. of Major Funding Corp. v. Sommers*, 109 F.3d 219, 224-25 (5th Cir. 1997)). The ultimate duty of a committee is to act in a manner calculated to maximize the dividend to be received by the creditors it represents. *See In re Nationwide Sports Distribs.*, 227 B.R. at 463-64.

177. In this case, a number of factors combined to prevent the Creditors' Committee from maximizing the value of the LBO Claims against the LBO Lenders. First, the Creditors' Committee was represented by conflicted counsel to the prejudice of Pre-LBO Noteholders. Courts have rejected settlements where, like here, the parties involved in procuring the settlement are represented by conflicted counsel. *In re JMK Constr. Grp., LTD.*, 441 B.R. 222, 238 n.5 (Bankr. S.D.N.Y. 2010) ("[c]ourt[s] will not consider approving a settlement" where parties were represented by conflicted counsel); *In re Project Orange Assocs., LLC*, 431 B.R. 363, 374 n.4 (Bankr. S.D.N.Y. 2010) (noting that court had withdrawn approval of settlement

that was negotiated and presented by conflicted law firm); *see also Coram*, 271 B.R. at 234-40 (denying confirmation based on section 1129(a)(3) after finding a lack of good faith as a result a conflict of interest).

178.     Second, a voting majority of members of the Creditors' Committee had no incentive to maximize the value of the LBO Claims against the LBO Lenders, because the voting members' own interests could be satisfied by far less consideration, without having to undertake the potentially time consuming investigation and hard-bargaining with the Senior Lenders that would have been necessary in order to champion the interests of Pre-LBO Noteholders. *See* NPP Findings of Fact § II.B.1. The members were thus easily induced into accepting a deal that placed inadequate value on the LBO Claims against the LBO Lenders. By favoring their own short-term interests, the members of the Creditors' Committee fell short of the duty owed to Pre-LBO Noteholders. *See Westmoreland Human Opportunities, Inc. v. Walsh*, 327 B.R. 561, 573 (W.D. Pa. 2005) (holding that an individual committee member may not favor its own parochial interests to the detriment of the larger body of creditors to which it owes a fiduciary duty).

179.     Moreover, the Creditors' Committee did not act as an effective "watchdog" over the Debtors, instead enabling the instant Proposed Settlement of the LBO Claims against the LBO Lenders for less than their value. *See In re AKF Foods*, 36 B.R. at 289. By February 18, 2010, if not earlier, the Creditors' Committee expressly recognized that the Debtors and their counsel and representatives were deeply conflicted, and incapable of adequately investigating and pursuing the LBO Claims. UCC Mot. for Derivative Standing, at 10 [ECF No. 3281] (identifying conflicts of Debtors and their counsel). Indeed, the Creditors' Committee expressly criticized the Debtors for their "self described" role "as an 'honest broker' rather than an adversarial litigant" and for failing to "take any steps" to move forward with the LBO Claims.

*Id.* Nevertheless, the Creditors' Committee made little effort to make up for the Debtors' failings, conducting a grand total of just seven 2004 examinations during the entirety of the case—compared to the 38 interviews and examinations conducted by the Examiner in just three months. *See* NPP Findings of Fact § III.D.2. Indeed, its criticism of the Debtors applied equally to the Creditors' Committee itself, since it also failed to act "as an adversarial litigant" with respect to the LBO Claims. UCC Mot. for Derivative Standing, at 10 [ECF No. 3281] Moreover, by electing to proceed with settlement negotiations with the Senior Lenders *before* conducting a thorough investigation of the LBO Claims and *before* obtaining derivative standing to commence litigation, the Creditors' Committee entered into negotiations with the Senior Lenders with both hands metaphorically tied behind its back. *See* NPP Findings of Fact § III.A. The Creditors' Committee did not have the discretion to forego a vigorous investigation and prosecution of the claims, particularly in light of its express recognition that the Debtors had failed to advocate for the LBO Claims. Rather, it had the "duty rather than just the power to 'use any tool available . . . to accomplish its goal of acting in the best interests of the creditors." *ABC Auto.*, 210 B.R. at 441.

4. **Pre-LBO Noteholders Were Excluded From Key Negotiations Leading To The Proposed Settlement, And There Was No Meaningful Arm's-Length Bargaining**

180. The DCL Plan Proponents' decision to exclude Aurelius from negotiations was the final nail in the coffin, since it left the Senior Lenders without any serious litigation or bargaining adversary at all. Courts in this Circuit and elsewhere recognize the importance of ensuring the integrity of the bankruptcy negotiations, and that any proposed settlement is the product of vigorous arm's-length bargaining. *See Coram*, 271 B.R. at 232, 238; *Exide*, 303 B.R at 67-68; *Adelphia*, 327 B.R. at 165 (holding that arm's-length bargaining is a consideration entitled to "great weight" under the Rule 9019 framework). The scope of review and analysis

under Rule 9019 is analogous to the review and analysis undertaken in the context of approval of a proposed class action settlement under FRCP 23. *See, e.g., Carla Leather,* 44 B.R at 466 (holding that 9019 analysis parallels FRCP 23); *see also Oswald,* 594 F.2d at 1125, n.44 (under FRCP 23, just like under Rule 9019, the court does not conduct "a trial on the merits" and its only power is to reject an unreasonable settlement; it cannot re-write the deal to make it more fair).

181. Where, as here, the interests of a primary economic stakeholder in the claims are not represented in the negotiations, the result is predictable: a settlement that releases claims for substantially less than what they are worth. *Fibreboard,* 527 U.S. 815. As discussed above, the Debtors expressly admit they did not seek to act as an advocate for the interests of Pre-LBO Noteholders, and the Creditors' Committee was disabled from doing so because of conflicts, and because a voting majority of its members were satisfied with a settlement for less than the full value of the LBO Claims. Such circumstances vitiate any presumption of fairness with respect to a proposed settlement. *Fibreboard,* 527 U.S. at 818 (rejecting settlement where putative representatives of plaintiffs were incentivized to reach a rapid agreement "that they thought might survive a Rule 23(e) fairness hearing, rather than the best possible arrangement"). *Id.*

182. In connection with the April Plan, Centerbridge's involvement gave comfort to the parties, including Aurelius, that Pre-LBO Noteholders' interests were being looked after despite the Debtors' and the Creditors' Committee's lack of enthusiasm for the LBO Claims. That check on the Senior Lenders was eliminated, however, after the Examiner Report because the DCL Plan Proponents excluded Aurelius from the process after it acquired Centerbridge's position in the Senior Notes, leaving no one motivated to press for "the best possible" settlement of the LBO Claims. *Id.* Indeed, this is why courts conduct a "searching judicial examination" of

the negotiations in evaluating a proposed settlement, and focus on identifying who the actual negotiating parties were, and whether their interests were sufficiently aligned with the economic stakeholders in the litigation. *Oswald*, 594 F.2d at 1124, 1128.

183.    Contrary to the contentions of the DCL Plan Proponents, the involvement of a mediator during the last few weeks of settlement discussions in no way indicates that the negotiations leading to the Proposed Settlement were arm's-length. Rather, a mediator's role is

> to help the immediate parties reach a deal. Mediators do not adjudicate the merits. They are masters in the art of what is negotiable. It matters little to the mediator whether a deal is collusive so long as a deal is reached. Such a mediator has no fiduciary duty to anyone, much less those not at the table.

*Kakani v. Oracle Corp.*, No. 06-06493, 2007 WL 1793774, at *11 (N.D. Cal. June 19, 2007) (refusing to approve class action settlement that emerged from mediation).[17] Indeed, this Court expressly indicated its view that the mediator's involvement in settlement discussions is of little or no relevance to the 9019 and 1129 inquiries. 1/24/2011 Hr'g Tr. 112:4-13 [ECF No. 7653] ("The fact that a settlement was reached at a mediation, it doesn't seem to me to accord it any particular weight. And that's not a criticism of the mediator and it's not any kind of view with respect to the fact the parties actually got to the settlement. I mean, the fact is there's a settlement and it's either passes the standard or it doesn't. If you're anticipating that they'll argue that well it's cleansed because it happened, you know, with one of my colleagues, I don't see how.") Finally, it would be unfair for the DCL Plan Proponents to benefit from any sort of positive inference based on the purported conduct of the parties during mediation. The Noteholder Plan Proponents sought to take discovery into the mediation, but the DCL Plan Proponents objected, and the Court sustained their objection. As a consequence, the Noteholder Plan Proponents were

---

[17]    Nevertheless, the DCL Plan Proponents invoke the mediator and the mediation process no fewer than 10 times in their Opening and Reply Post-Trial Briefs as alleged proof that the process leading to the DCL Plan must have been fair. *See* DCL Opening Post-Trial Br. at 10-11, 14, 16; DCL Reply Post-Trial Br. at 27, 28 n.161, 31.

unable to develop evidence that could very well have demonstrated that the mediation did not enhance the quality of the settlement process. The DCL Plan Proponents should not be allowed to point to the absence of any evidence at all regarding the mediation in support of their claim that the settlement process was fair.

### D. The Second *Martin* Factor Weighs Against Approval Of The Proposed Settlement

184. The DCL Plan Proponents presented no evidence that the second *Martin* Factor supports the Proposed Settlement. Nor could they, with respect to the recoveries that would result from avoidance, there is no chance that the judgment would not be collected, which weighs against approval of the Proposed Settlement. *See, e.g., In re Parkview Hospital-Osteopathic Medical Ctr.,* 211 B.R. 603, 609 (Bankr. N.D. Ohio 1996) (guarantee of collection "weighs against ... settlement."); *see also Exide,* 303 B.R. at 69-70. In the event of full avoidance, disgorgement is irrelevant, given that the amount of value freed up by the avoidance of Step One and Step Two substantially exceeds the claims of Non-LBO Creditors, including postpetition interest. *See In re Remsen Partners, Ltd.,* 294 B.R. 557 (Bankr. S.D.N.Y. 2003) (settlement rejected where there was little or no risk associated with collecting on the claims). Nevertheless, there is little risk that the claims for disgorgement of principal, interest, and fees paid to the LBO Lenders and Arrangers would not be collectable in substantial part given that the defendants are large, multinational banks. Accordingly, this *Martin* Factor weighs against approval of the settlement.

### E. The Third *Martin* Factor Weighs Against Approval Of The Proposed Settlement

185. The third *Martin* Factor (and second *Texaco* Factor) requires this Court to weigh the expense, inconvenience and delay of pursuing litigation against the probable outcome of the litigation. *See TMT Trailer/Ferry,* 390 U.S. at 434; *Spansion,* 2009 WL 1531788, at *7. Here,

approval of the Proposed Settlement in the DCL Plan will not reduce the complexity or inconvenience of the litigation because each underlying legal and factual issue will still need to be litigated for the prosecution of the remaining LBO Claims. Further, a substantial amount of the work necessary to prosecute the pending claims against the LBO Lenders has been done. Any potential detriment of litigation here is outweighed by the high likelihood of success, the enormous potential recoveries for Non-LBO Creditors, and the meager consideration provided by the Proposed Settlement. Accordingly, this factor weighs heavily against approval of the Proposed Settlement.

### F. The Fourth *Martin* Factor Is Not Satisfied Because The Proposed Settlement Is Not In The Paramount Interest Of Creditors

186.     This Court must also reject the Proposed Settlement because it is not in the "paramount interest of creditors." The fourth *Martin* Factor (which parallels the fourth *Texaco* Factor) calls for an examination into whether interested parties have supported or opposed the settlement and whether such settlement results in significant benefits for the debtor's estate. The court's inquiry should focus on whether the proposed settlement is fair "to the other persons, *i.e., the parties who did not settle.*" *Spansion*, 2009 WL 1531788, at *3 (*Nutraquest, Inc.*, 434 F.3d at 645) (emphasis added); *see also Joiner*, 319 B.R. 903 (rejecting 9019 settlement that would have paid creditors approximately 40% of their claims even though underlying litigation would have paid them in full if successful; court weighed heavily the opposition of creditors holding 61% of unsecured claims affected by settlement, who were willing to forego the settlement and pursue litigation). Consideration of voting results should thus be more than a mere "counting exercise" where votes of the settling and non-settling parties are given equal weight. *Adelphia*, 327 B.R. at 165. Indeed, votes "must be considered in light of the *reasons for any opposition,*

and the more fundamental factors—such as benefits of settlement, likely rewards of litigation, costs of litigation and downside risk." *Id.* (emphasis added).

187. While more classes voted in favor of the DCL Plan than the Noteholder Plan, this is only indicative of the fact that the Proposed Settlement embodied in the DCL Plan has the overwhelming support of creditors who are either receiving a sweetheart release and/or are contractually obligated to support the DCL Plan (*i.e.*, LBO Lenders and Retiree Claimants) or a disproportionate share of the settlement consideration (*i.e.*, Subsidiary General Unsecured Creditors). Additionally, a closer look at the holders of Other Parent Claims—the allegedly impartial class that voted to accept the DCL Plan by enormous margins—reveals that their votes do not hold the persuasive weight claimed by the DCL Plan Proponents. A whopping 57% of the Other Parent Claims consists of the improperly classified Swap Parent Claim, which is held by Oaktree and will receive a 100% recovery under the DCL Plan. Another 40% of the Other Parent Claims (which, together with the Swap Parent Claim, account for 97% of the Other Parent Claims) consists of claims held by Retiree Claimants—a group of creditors contractually bound to approve the DCL Plan and who will obtain a full release from all estate causes of action if the DCL Plan is confirmed. NPP Reply Br. at 1-2. In these circumstances, the analysis of the voting results should heavily weigh the votes of the Pre-LBO Noteholders, who hold the claims that were most harmed by the LBO yet benefit the least from the Proposed Settlement. The Pre-LBO Noteholders overwhelmingly voted to accept the Noteholder Plan and to reject the DCL Plan, which on its own evidences that the Proposed Settlement is not fair and equitable. Moreover, calculated by aggregate dollar amount, the overwhelming majority of *all Non-LBO Creditors*, whether holding funded debt or not, voted to accept the Noteholder Plan and to reject the DCL Plan. As such, and as in *Exide*, the Proposed Settlement is not in the "paramount interest of

creditors" as it offers little benefit to the creditors most harmed by the LBO as compared to potential recoveries available from litigating the LBO Claims.

## II.    THE DCL PLAN IS UNCONFIRMABLE AS A MATTER OF LAW

188.    The DCL Plan cannot be confirmed because it was not proposed in good faith as required by Bankruptcy Code section 1129(a)(3). 11 U.S.C. 1129(a)(3); *PWS Holding*, 228 F.3d at 242. Courts in the Third Circuit have found Bankruptcy Code section 1129(a)(3) is satisfied where: (i) the plan fosters a result consistent with the Bankruptcy Code's objectives, (ii) the plan has been proposed with honesty and good intentions and with a basis for expecting that reorganization can be effected, and/or (iii) there has been fundamental fairness in dealing with creditors. *See In re Lernout & Hauspie Speech Prods. N.V.*, 308 B.R. 672, 675 (Bankr. D. Del. 2004); *In re Genesis Health Ventures, Inc.*, 266 B.R 591, 609 (Bankr. D. Del. 2001); *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 237 (Bankr. D.N.J. 2000). Moreover, in making a determination of whether the good faith standard has been met, courts must consider the totality of the circumstances surrounding the plan have "considerable judicial discretion" in finding good faith. *See Coram*, 271 B.R at 234; *In re Genesis Health Ventures*, 266 B.R. at 609; *In re New Valley Corp.*, 168 B.R. 73, 81 (Bankr. D.N.J. 1994).

189.    In fact, in *In re ACandS, Inc.*, 311 B.R. 36, 42-43 (D. Del. 2004), the court rejected a proposed plan as not having been proposed in good faith as required by section 1129(a)(3) based on evidence concerning the manner in which the plan was negotiated and drafted. *See also Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 465 (2d Cir. 2007) (discussing good faith in the context of Rule 9019 analysis).

190.    The DCL Plan was not proposed in good faith and, thus, does not satisfy Bankruptcy Code section 1129(a)(3) because:

- The settlement of released LBO Claims against the LBO Lenders contained in the DCL Plan is not supported by adequate consideration and thus does not satisfy the lowest rung of reasonableness necessary for approval under Bankruptcy Rule 9019.

- The Creditors' Committee's support was secured by preferential treatment for its individual members.

- The DCL Plan's release and exculpation provisions are impermissibly broad in violation of Third Circuit law.

- The LBO Lenders will receive Litigation Trust Interests and, potentially, Creditors' Trust Interests, notwithstanding their involvement in and ratification of the fraudulent transaction that forms the basis of the LBO Claims to be pursued by the DCL Litigation Trust.

- The DCL Litigation Trust is inadequately funded.

- The Swap Claim is impermissibly classified, giving a plan proponent an inflated recovery.

191.    Overall, the DCL Plan violates both the Bankruptcy Code and its underlying policy concerns by securing preferential treatment for the LBO Lenders at the expense of innocent Non-LBO Creditors. A plan that seeks to benefit the perpetrators of a fraudulent act cannot be said to have been "proposed with honesty and good intentions." Nor can a plan that richly rewards LBO Lenders while most Non-LBO Creditors recover a fraction of the allowed amount of their claims be said to "fairly deal" with creditors. For the foregoing reasons, the DCL Plan was not proposed in good faith.

192.    For all the foregoing reasons, the DCL Plan cannot be confirmed and the Noteholder Plan should be confirmed.

## CONCLUSION

The Noteholder Plan Proponents respectfully requests that the Bankruptcy Court adopt the Conclusions of Law set forth above.

Dated: June 3, 2011

AKIN GUMP STRAUSS HAUER & FELD LLP
Daniel H. Golden
David Zensky
Philip C. Dublin
Abid Qureshi
Mitchell P. Hurley
One Bryant Park
New York, NY 10036
212-872-1000

*Counsel for Aurelius Capital Management, LP*

ASHBY & GEDDES, P.A.

*/s/ Amanda M. Winfree*
William P. Bowden (I.D. No. 2553)
Amanda M. Winfree (I.D. No. 4615)
500 Delaware Avenue, P.O. Box 1150
Wilmington, DE 19899
302- 654-1888


McCARTER & ENGLISH, LLP
David J. Adler
245 Park Avenue
New York, NY 10167
212-609-6800

McCARTER & ENGLISH, LLP

*/s/ Katharine L. Mayer*
Katharine L. Mayer (I.D. No. 3758)
Renaissance Centre
405 N. King Street
Wilmington, DE 19801
302-984-6300

*Counsel for Deutsche Bank Trust Company Americas, solely in its capacity as successor Indenture Trustee for certain series of Senior Notes*


KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
David S. Rosner
1633 Broadway
New York, New York 10019
212-506-1700

BIFFERATO GENTILOTTI LLC

*/s/ Garvan F. McDaniel*
Garvan F. McDaniel (I.D. No. 4167)
800 N. King Street, Plaza Level
Wilmington, Delaware 19801
302- 429-1900

*Counsel for Law Debenture Trust Company of New York, solely in its capacity as successor Indenture Trustee for certain series of Senior Notes*

BROWN RUDNICK LLP
Robert J. Stark
Martin S. Siegel
Gordon Z. Novod
Seven Times Square
New York, NY 10036
212-209-4800

SULLIVAN HAZELTINE ALLINSON LLC

*/s/ William D. Sullivan*
William D. Sullivan (I.D. No. 2820)
Elihu E. Allinson, III (I.D. No. 3476)
901 N. Market St., Suite 1300
Wilmington, DE 19801
302-428-8191

*Counsel for Wilmington Trust Company, solely in its capacity as successor Indenture Trustee for the PHONES Notes*