## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 |
|  | ) | Case No. 08-13141 (KJC) |
| TRIBUNE COMPANY, *et al.,* | ) | Jointly Administered |
|  | ) |  |
| Debtors | ) |  |
|  | ) |  |
|  | ) |  |

### THE NOTEHOLDER PLAN PROPONENTS'
### PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
### (FCC SUPPLEMENT)

LERMAN SENTER PLLC
Meredith S. Senter, Jr.
Sally A. Buckman
2000 K Street NW, Suite 600
Washington, DC 20006
(202) 429-8970

ASHBY & GEDDES, P.A.
William P. Bowden (I.D. No. 2553)
Amanda M. Winfree (I.D. No. 4615)
500 Delaware Avenue, P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888

*Counsel for Aurelius Capital Management, LP*

FRIEDMAN KAPLAN SEILER & ADELMAN LLP
Edward A. Friedman
Robert J. Lack
Kizzy L. Jarashow
Seven Times Square
New York, NY 10036-6516
(212) 833-1100

*Counsel for Aurelius Capital Management, LP as to matters concerning JPMorgan and Angelo Gordon, but not Oaktree*

McCARTER & ENGLISH, LLP
David J. Adler
245 Park Avenue
New York, NY 10167
212-609-6800

McCARTER & ENGLISH, LLP
Katharine L. Mayer (I.D. No. 3758)
Renaissance Centre
405 N. King Street
Wilmington, DE 19801
302-984-6300

*Counsel for Deutsche Bank Trust Company Americas, solely in its capacity as successor Indenture Trustee for certain series of Senior Notes*

BIFFERATO GENTILOTTI LLC
Garvan F. McDaniel (I.D. No. 4167)
800 N. King Street, Plaza Level
Wilmington, Delaware 19801
302-429-1900

*Counsel for Law Debenture Trust Company of New York, solely in its capacity as successor Indenture Trustee for certain series of Senior Notes*

992176.1

BROWN RUDNICK LLP
Robert J. Stark
Martin S. Siegel
Gordon Z. Novod
Seven Times Square
New York, NY 10036
212-209-4800

SULLIVAN HAZELTINE ALLINSON LLC
William D. Sullivan (I.D. No. 2820)
Elihu E. Allinson, III (I.D. No. 3476)
901 N. Market St., Suite 1300
Wilmington, DE 19801
302-428-8191

*Counsel for Wilmington Trust Company, solely in its capacity as successor Indenture Trustee for the PHONES Notes*

# TABLE OF CONTENTS

Page

I.    THE DCL PLAN CANNOT BE CONFIRMED BECAUSE APPROVAL OF THE NECESSARY FCC TRANSFER APPLICATIONS WILL BE SIGNIFICANTLY DELAYED ................................................................ 1

II.   RELEVANT FCC PROCESS AND RULES .................................................. 3

    A.    FCC Process ........................................................................................ 3

    B.    FCC Attribution Rules ....................................................................... 4

    C.    FCC Ownership Rules and Waivers of FCC Ownership Rules .......... 6

    D.    FCC Waivers of FCC Ownership Rules Required in Order for the Company to Emerge from Bankruptcy ......................... 8

    E.    Waiver Standard Applicable to Reorganized Tribune; New Negative Presumption Against Waiver in Key Markets ............... 9

III.   RELEVANT MEDIA INTERESTS ........................................................... 10

    A.    The Debtors' Media Interests .......................................................... 10

    B.    The DCL Plan Proponents' Interests in Media Companies in the Debtors' Markets ............................................................................. 11

        1.    JPMorgan's Media Interests ................................................. 11

        2.    Angelo Gordon's Media Interests ......................................... 19

        3.    Oaktree's Media Interests .................................................... 25

    C.    Interests in Reorganized Tribune Under the Proposed Plans ............... 25

        1.    The DCL Plan Proponents' Interests in Reorganized Tribune Under the DCL Plan ............................................... 25

        2.    The DCL Plan Proponents' Interests in Reorganized Tribune Under the NPP Plan ............................................... 26

        3.    Other Parties' Interests in Reorganized Tribune Under the NPP Plan ........................................................................ 27

IV.   THE DCL PLAN CREATES ISSUES THAT WILL IMPEDE FCC APPROVAL OF THE DEBTORS' FCC APPLICATIONS AND WAIVER REQUESTS ................................................................................ 27

A.  The DCL Plan Creates Violations of the FCC's Multiple
Ownership Rules ........................................................................................ 27

    1.  Rule Violations Resulting From JPMorgan's Media
Interests ........................................................................................ 28

    2.  Rule Violations Resulting From Angelo Gordon's Media
Interests ........................................................................................ 31

    3.  Rule Violations Resulting From Oaktree's Media Interests .................... 32

B.  The DCL Plan Will Delay and Adversely Affect the Company's
Waiver Requests ...................................................................................... 33

    1.  The FCC Will Consider Non-Attributable Interests in Its
Waiver Analysis ............................................................................ 33

    2.  The DCL Plan Will Change the FCC's Waiver Analysis in
Several Markets ............................................................................ 37

C.  The DCL Plan Provides an Opportunity to Cure, But
Implementing the Cure Will Result in Substantial Further Delay ..................... 42

D.  The DCL Plan Will Complicate, Adversely Affect and Delay the
FCC Approval Process ............................................................................. 45

V.  THERE WILL BE NO FCC DELAY UNDER THE NPP PLAN .................................. 49

A.  The Distribution Trust Under the NPP Plan Will Not Delay FCC
Approvals ............................................................................................... 49

B.  JPMorgan, Angelo Gordon and Oaktree Will Not Have
Attributable Interests Under the NPP Plan ................................................ 51

CONCLUSION ................................................................................................ 52

I.    **The DCL Plan Cannot Be Confirmed Because Approval of the**
      **Necessary FCC Transfer Applications Will Be Significantly Delayed**

1.    A bankruptcy plan of reorganization cannot be confirmed unless it satisfies the

Code's "feasibility" requirement.  Among other things, the feasibility analysis must consider any

impediments to obtaining necessary regulatory approvals for the reorganized debtor.  *See, e.g., In*

*re TCI 2 Holdings, LLC,* 428 B.R. 117, 154 (Bankr. D.N.J. 2010) (plan proponents required to

"show that the new owners of the Reorganized Debtors will not face material hurdles to achieve

the necessary regulatory approvals from the New Jersey Casino Control Commission").  An

inability to obtain such approvals in a timely manner weighs against confirmation.  *See In re*

*Granite Broad. Corp.*, 369 B.R. 120, 145-46 (Bankr. S.D.N.Y. 2007) (denying confirmation of

preferred shareholder plan based on lack of feasibility where plan contained FCC-approval

condition precedent and such approval was likely to take months to obtain); *In re Sound Radio,*

*Inc.,* 93 B.R. 849, 857 (Bankr. D.N.J. 1988) (court evaluated whether necessary FCC approvals

could be timely obtained); *In re Cajun Elec. Power Coop.,* 230 B.R. 715, 747 (Bankr. M.D. La.

1999) (same with respect to FERC approvals); *In re TCI 2 Holdings, LLC,* 428 B.R. at 183 (court

confirmed one plan over another because the "prospect of prompt regulatory approval [was]

stronger" under confirmed plan).

2.    With respect to this proceeding, the Court must consider, in evaluating the

feasibility of each plan, whether the plan is likely to obtain the necessary Federal

Communications Commission ("FCC") regulatory approvals.  Even if both the plans meet the

"feasibility" requirement and are confirmable, the Court may prefer the plan that will encounter

less regulatory delay.  For example, in *TCI 2 Holdings, LLC,* the court found that although there

was a "reasonable prospect of success" for both plans, the regulatory licensure process for one of

the plans "would likely be delayed by a [regulatory] hearing on undue economic concentration

that would at a minimum take several months to complete." *In re TCI 2 Holdings, LLC*, 428

B.R. at 177. The court ultimately confirmed the plan for which the "prospect of prompt

regulatory approval [was] stronger." *Id.* at 183.

3.    The ownership interests and director-designation rights in Reorganized Tribune

conferred by the DCL Plan[1] upon JPMorgan, Angelo Gordon and Oaktree will create multiple

violations of FCC rules and regulations. Such violations arise because these proponents already

have what the FCC calls "attributable interests" in various other media companies operating in

the same markets as Reorganized Tribune. Those existing media interests, coupled with the

attributable interests in Reorganized Tribune that the proponents stand to receive under the DCL

Plan, would create violations of the FCC's media ownership rules.

4.    The DCL Plan Proponents argue that any such rule violations could be cured in

accordance with provisions of the DCL Plan. However, those provisions, at best, would result in

substantial delay before JPMorgan's, Angelo Gordon's and Oaktree's attributable interests in

Reorganized Tribune and other media companies could be modified so as to comply with the

applicable FCC rules.

5.    Moreover, even if all of the JPMorgan, Angelo Gordon and Oaktree interests in

other media companies are, or become, non-attributable, they are substantial and in markets

where the Debtors also operate, and will complicate, delay and may adversely affect the Debtors'

requests for waiver of the FCC's media ownership rules in certain markets where Debtors

already hold non-compliant combinations of media interests.

6.    The NPP Plan, by contrast, triggers no such FCC rule violations or delays because

it would not give JPMorgan, Angelo Gordon or Oaktree attributable interests in Reorganized

---

[1] All capitalized terms herein shall have the meanings set forth in the Post-Trial Brief of the Noteholder Plan
Proponents.

Tribune, and these lenders' existing media interests therefore would not be relevant to the FCC's consideration of the FCC applications for approval of the NPP Plan.

## II.     Relevant FCC Process and Rules

### A.     FCC Process

7.     The FCC regulates media ownership pursuant to the Communications Act of 1934, Pub. L. No. 73-416, 48 Stat. 562 (1934) (codified as amended in scattered sections of 47 U.S.C.).[2]  FCC policy in regulating media ownership is based on the premise that diversification of media ownership serves the public interest by promoting diversity of program and service viewpoints and by preventing undue concentration of economic power.  *FCC v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775, 780 (1978).

8.     Because FCC approval is required for any change in control of an entity holding an FCC license, a debtor-in-possession must obtain FCC approval of the transfer of its FCC licenses to a reorganized entity pursuant to a bankruptcy plan of reorganization.[3]  The FCC can only approve such a transfer where the reorganized entity will comply with FCC rules.[4] *Applications of Comcast Corporation*, Memorandum Opinion and Order, 26 FCC Rcd 4238, 4247-48 (2011) ("*NBCU/Comcast*").  Since the FCC cannot approve an application for a transfer of licenses that would result in violations of its ownership rules, an applicant seeking to hold a non-compliant combination of media interests (*i.e.*, one that violates the rules) must either cure

---

[2] NPP FCC 65 (Prak Expert Rpt.) at 7-8.

[3] 47 U.S.C. § 310(d); 3/17/11 Trial Tr. 26:18-25 (Prak) ("To come out of bankruptcy, the FCC will need to approve the [R]eorganized Tribune's ownership structure . . . ."); Stephen F. Sewell, *Assignment and Transfer of Control of FCC Authorizations Under Section 310(d) of the Communications Act of 1934*, 43 Fed. Comm. L. J. 277, 373 (1991).

[4] 3/17/11 Trial Tr. 27:8-28:5 (Prak).

the violation or seek a waiver of the applicable rule.[5]

9.      In addition to determining whether a proposed transaction complies with FCC

rules, the FCC must determine whether it serves "the public interest, convenience and

necessity."[6] *NBCU/Comcast*, 26 FCC Rcd at 4240, 4247.  The parties proposing a transaction

must prove, "by a preponderance of the evidence, that the proposed transaction, on balance,

serves the public interest." *Id.* at 4247.  In making its public-interest determination, the FCC will

take into account a "deeply rooted preference for preserving and enhancing competition" and

"ensuring a diversity of information sources and services to the public." *Id.* at 4248.

### B.      FCC Attribution Rules

10.      Among other things, the FCC's rules limit who may hold multiple "attributable

interests" in media properties in a single market.[7]  Attributable interests are those "interests in or

relationships to licensees that confer on their holders a degree of influence or control such that

the holders have a realistic potential to affect the programming decisions of licensees or other

core operating functions." *Review of the Commission's Regulations Governing Attribution of

Broadcast and Cable/MDS Interests*, Report and Order, 14 FCC Rcd 12559, 12560 (1999)

("*1999 Order*").[8]

11.      The proponents of both plans agree that a 5% or greater voting stock interest is

---

[5] NPP FCC 65 at 18.

[6] 47 U.S.C. § 310(d); 3/17/11 Trial Tr. 33:8-10 (Prak) ("[A]ny time there's an application filed such as Tribune's, the Commission is required to make a public-interest judgment about the granting of the application."); 4/12/11 Trial Tr. 29:5-11 (Rosenstein) ("[T]he FCC . . . has to evaluate the qualifications of the proposed assignee, in this case, [R]eorganized Tribune and its attributable owners and determine whether approving the assignment of the licenses to that new entity would be consistent with the public interest.").

[7] 47 C.F.R. § 73.3555 (setting forth the multiple ownership rules).

[8] 47 C.F.R. § 73.3555, Note 2 (setting forth the attribution rules); 3/17/11 Trial Tr. 32:25-33:3 (Prak) ("[O]ne of the things, in looking at attribution, the Commission is concerned with is the potential for control or influence over the operations of the broadcast licensee.").

generally attributable.[9] They also agree that a position as an officer or director is attributable, as

is the right to designate a director.[10] *See Telemundo Commc'ns Group, Inc.*, 17 FCC Rcd 6958,

6973 (2002) ("A party that has the right to appoint a director to the board of an entity has the

ability to influence that entity's conduct by virtue of the director the party selects . . . .").

12.     The right to designate a board observer also can be attributable under certain

circumstances.[11] *See Paxson Mgmt. Corp.*, Memorandum Opinion and Order, 22 FCC Rcd

22224, 22226 (2007) (petitioner to deny raised an issue regarding NBC's contingent right to

appoint a board observer, and ION subsequently notified the FCC that the board observer rights

had been removed); *Una Vez Mas Texas Holdings, LLC*, DA 10-1811, 2010 WL 3738771, *7

(2010).

13.     Furthermore, the right to *nominate* a director can be attributable under certain

circumstances.  Mr. Rosenstein testified that a nomination right (in contrast to a designation

right) does not result in attribution.[12]  However, the FCC does not have such a *per se* rule on

---

[9] 47 C.F.R. § 73.3555, Note 2(a); 3/17/11 Trial Tr. 34:18-20 (Prak) ("[T]he holding of 5 percent or more of the voting stock in a corporate licensee will constitute an attributable interest."); 4/12/11 Trial Tr. 33:20-25 (Rosenstein) ("[S]ubject to exceptions, the FCC will treat a voting stock interest in a corporation of 5 percent or more as attributable.").

[10] 47 C.F.R. § 73.3555, Note 2(g) (setting forth the positional attribution rules); 3/17/11 Trial Tr. 33:3-5 (Prak) ("The Commission has held that the ability to designate a member of the board of directors of a licensee company is an attributable interest."); 4/12/11 Trial Tr. 34:2-8 (Rosenstein) ("The FCC attribution rules provide that a positional interest such as serving as a director is attributable.  And . . . the FCC has similarly concluded that having the power or the right to designate the director also will give rise to attribution.").

[11] 3/17/11 Trial Tr. 46:25-47:24 (Prak) ("[T]he staff's view is the board observer rights are going to be attributable, especially when combined with a substantial, nominally non-voting stake."); 4/12/11 Trial Tr. 74:7-18; 89:22-90:25 (Rosenstein) (acknowledging that the "worksheets that are designed to assist applicants in preparing their [FCC] applications" ask whether any non-party investor has the right to designate a board observer and ask the applicant to explain why any such right to designate a board observer does not give rise to an attributable interest); Instructions to FCC Form 315 (June 2010 edition) at Worksheet 3 p. 13, *available at* http://transition.fcc.gov/Forms/Form315/315.pdf.

[12] 4/12/11 Trial Tr. 34:8-12 (Rosenstein) ("But I do want to draw a line between the designation right on the one hand which is attributable and the nomination or recommendation right on the other which the Commission has said is not."), 70:16-73:5 ("I think I would characterize it as a hard and fast rule.").

nomination rights. *See Paxson Mgmt. Corp.*, 22 FCC Rcd at 22232-33. In *Paxson Management Corporation*, the FCC noted that, "NBC's nomination right does not *ensure* that its nominees will be elected to the board."[13] *Id.* at 22232 (emphasis added). As to those nominees, the FCC concluded that NBC's nomination of a former NBC employee to the ION board of directors did not give NBC an attributable interest in ION where the FCC was able to determine that the nominee was not an agent of NBC despite his past relationship with NBC. The FCC, however, reserved the right to revisit the question should new facts arise. *Id.* at 22233; *see also Telemundo Commc'ns Group, Inc.*, 17 FCC Rcd at 6972 (NBC's nomination of NBC employees for the Paxson board of directors, and their subsequent election, gave NBC an attributable interest in Paxson).

14.     Even if interests do not fit neatly within the FCC's black-letter attribution rules, the FCC has explicitly retained the "discretion to review individual cases on a case-by-case basis where it would serve the public interest to conduct such a review." *1999 Order*, 14 FCC Rcd at 12581, *aff'd*, *Review of the Commission's Regulations Governing Attribution of Broadcast and Cable/MDS Interests*, Memorandum Opinion and Order on Reconsideration, 16 FCC Rcd 1097, 1106 (2001); *see also 2006 Quadrennial Regulatory Review*, Report and Order and Order on Reconsideration, 23 FCC Rcd 2010, 2022-23 (2008) ("*2008 Order*").

**C.     FCC Ownership Rules and Waivers of FCC Ownership Rules**

15.     To further its policy goals of promoting diverse viewpoints and preventing undue market concentration, the FCC has established ownership rules that limit the number of broadcast stations in one service (*i.e.*, television or radio) in which an entity can hold an

---

[13] As discussed *infra* at ¶ 43, provisions in the NextMedia Stockholders Agreement "ensure" that Angelo Gordon's nominees will be elected. *See* NPP FCC 80 (NextMedia Group, Inc. Stockholders Agreement) at 10-11, § 2.1(e).

attributable interest in a single market. The FCC has also established rules that restrict the cross-ownership of television stations, radio stations and daily newspapers in the same market.[14] The following ownership rules are relevant to the Court's analysis of the DCL Plan.

- The newspaper/broadcast cross-ownership rule ("NBCO Rule") prohibits a single person or entity from owning both a <u>daily newspaper</u> and a <u>broadcast station</u> in the same market.[15]

- The local television ownership rule prohibits a single person or entity from owning <u>two television stations</u> in the same market, with certain exceptions.[16]

- The local radio ownership rule limits the number of radio stations that may be owned by a single person or entity in the same market to no more than <u>eight radio stations</u> in the largest markets.[17]

16.     At the time of the 2007 LBO, the Debtors held combinations of media interests that violated the FCC's ownership rules. *Shareholders of Tribune Co.*, 22 FCC Rcd 21266, 21273-83 (2007), *appeal pending sub. nom. Tribune Co. v. FCC*, Case No. 07-1488 (D.C. Cir.) (held in abeyance). Therefore, in order to obtain FCC approval of the LBO, the Debtors had to obtain waivers of (i) the NBCO Rule in Chicago, Hartford/New Haven, Los Angeles, Miami/Ft. Lauderdale and New York; and (ii) the local television ownership rule in Hartford/New Haven and Indianapolis.[18] *Shareholders of Tribune Co.*, 22 FCC Rcd. at 21267, 21273-79. All but one

---

[14] NPP FCC 65 at 9-15.

[15] 47 C.F.R. § 73.3555(d) (setting forth the NBCO Rule).

[16] 47 C.F.R. § 73.3555(b) (setting forth the local television ownership rule).

[17] 47 C.F.R. § 73.3555(a) (setting forth the local radio ownership rule); 3/17/11 Trial Tr. 29:3-9 (Prak) ("[F]or the purposes [of confirmation], the most relevant rules are the newspaper broadcast cross-ownership rule, because Tribune is an old lion (sic) publisher and broadcaster, the local market television rule, and the . . . local market radio ownership rule . . . .").

[18] 3/17/11 Trial Tr. 29:17-22 (Prak) ("[W]hen the control of the company transferred to Mr. Zell . . . in 2007, the Commission granted Tribune seven waivers in six markets of the various multiple-ownership rules.").

of the NBCO Rule waivers that the Debtors received in 2007 were temporary in light of a then-pending FCC rulemaking proceeding.[19]  *Id.*

**D.    FCC Waivers of FCC Ownership Rules Required
in Order for the Company to Emerge from Bankruptcy**

17.    Since the LBO, the FCC has concluded the rulemaking proceeding and has modified its ownership rules.  The Company continues to hold combinations of media interests that violate the new ownership rules, and it still requires waivers of these rules in order to emerge from bankruptcy.

18.    In connection with the filing of the Debtors' April 2010 plan of reorganization, the Debtors filed applications with the FCC (the "FCC Applications") for approval of the assignment of the FCC licenses from the Company as "debtor-in-possession" to Reorganized Tribune.[20]  Through the FCC Applications, the Company again seeks the same waivers of the FCC's ownership rules that it obtained in 2007 involving broadcast stations in Chicago, Hartford/New Haven, Indianapolis, Miami/Ft. Lauderdale, Los Angeles and New York.[21]

19.    Thus, before the Company can emerge from bankruptcy, the FCC must decide (i) whether the proposed plan will result in a violation of the FCC ownership rules and (ii) whether to grant waivers for the Company's pre-existing rule violations.[22]

---

[19] 3/17/11 Trial Tr. 29:22 (Prak) ("Those waivers are not waivers for all time.").

[20] NPP FCC 65 at 16-17; DCL 307 (DCL Revised Disclosure Statement (and Blackline)) at 37-38.

[21] NPP FCC 65 at 6; NPP FCC 22-27 (Waiver Requests).

[22] NPP FCC 65 at 18; 3/17/11 Trial Tr. 29:10-31:15, 55:22-56:19 (Prak); 4/12/11 Trial Tr. 29:11-15 (Rosenstein) ("[T]he Commission has to evaluate those [waiver] requests and make a judgment as to whether permitting those existing combinations to go forward post emergence would be in the public interest.").

E.    **Waiver Standard Applicable to Reorganized Tribune;**
       **New Negative Presumption Against Waiver in Key Markets**

20.    The Debtors' waiver requests will be decided under the new NBCO Rule adopted

in 2008.[23] *2008 Order*, 23 FCC Rcd at 2018-19, *appeal pending sub nom. Prometheus Radio*

*Project v. FCC*, Case No. 08-3078 (3d Cir.) (oral argument held February 24, 2011). "This is . . .

the first time that the Commission is considering waivers of certain of these rules under the

changes that went into effect in 2008."[24]

21.    The 2008 NBCO Rule presumes that in the 20 largest Designated Market Areas

("DMAs"), ownership of one daily newspaper and one television or radio station is consistent

with the public interest as long as the television station is not among the top four ranked stations

and at least eight independent major media voices remain in the DMA.[25] *2008 Order*, 23 FCC

Rcd at 2045-49. In all other situations, the new NBCO Rule provides for a negative presumption

against a waiver.[26] This negative presumption, which did not exist when the 2007 LBO waivers

were granted, will apply in at least two of the Debtors' key markets: Chicago and Hartford/New

Haven.[27]

22.    In all cases, regardless of whether there is a negative presumption, the FCC will

only grant a waiver if it determines that doing so would be consistent with the public interest.[28]

The factors that the FCC will consider in making this public interest determination include the

---

[23] 4/12/11 Trial Tr. 75:17-25 (Rosenstein).

[24] *Id.* at 96:20-23.

[25] NPP FCC 65 at 13; 47 C.F.R. § 73.3555(d)(3).

[26] 47 C.F.R. § 73.3555(d)(4).

[27] NPP FCC 65 at 21; 3/17/11 Trial Tr. 56:10-19 (Prak).

[28] 47 C.F.R. § 73.3555(d)(2).

level of concentration in the relevant market.[29]  Moreover, in order to overcome a negative

presumption, an applicant must "demonstrate by clear and convincing evidence" that the

requested waivers "will increase the diversity of independent news outlets . . . and increase

competition among independent news sources in the relevant market." *2008 Order*, 23 FCC Rcd

at 2049.

## III.    Relevant Media Interests

### A.    The Debtors' Media Interests

23.    The Debtors own daily newspapers, broadcast television stations and a radio

broadcast station in more than a dozen markets across the country:[30]

| City/Market | Debtors' Newspapers | Debtors' TV Stations | Debtors' Radio Station |
|---|---|---|---|
| Allentown, PA | *Morning Call* | | |
| Baltimore, MD | *Baltimore Sun* | | |
| Chicago, IL | *Chicago Tribune* | WGN-TV | WGN(AM) |
| Dallas, TX | | KDAF-TV | |
| Denver, CO | | KWGN-TV | |
| Ft. Lauderdale, FL | *Sun Sentinel* | | |
| Grand Rapids, MI | | WXMI-TV | |
| Harrisburg, PA | | WPMT-TV | |
| Hartford, CT | *Hartford Courant* | WTIC-TV, WCCT-TV | |
| Houston, TX | | KIAH-TV | |
| Indianapolis, IN | | WTTV-TV, WXIN-TV | |
| Los Angeles, CA | *Los Angeles Times* | KTLA-TV | |
| Miami, FL | | WSFL-TV | |
| New Orleans, LA | | WGNO-TV, WNOL-TV | |
| New York, NY | | WPIX-TV | |
| Newport News, VA | *Daily Press* | | |
| Orlando, FL | *Orlando Sentinel* | | |

---

[29] 47 C.F.R. § 73.3555(d)(5)(iii).

[30] NPP FCC 35 (Tribune FCC Applications, Comprehensive Exhibit to FCC Form 314, filed August 2010) at 1-3; NPP FCC 65 at 7.

| City/Market | Debtors' Newspapers | Debtors' TV Stations | Debtors' Radio Station |
|---|---|---|---|
| Philadelphia, PA | | WPHL-TV | |
| Portland, OR | | KRCW-TV | |
| Sacramento, CA | | KTXL-TV | |
| San Diego, CA | | KSBW-TV | |
| Seattle, WA | | KCPQ-TV, KZJO-TV | |
| St. Louis, MO | | KPLR-TV | |
| Washington, DC | | WDCW-TV | |

**B.      The DCL Plan Proponents' Interests in
         Media Companies in the Debtors' Markets**

24.      JPMorgan, Angelo Gordon and Oaktree each have substantial interests in other media companies, many of which operate in the same markets as the Debtors.[31]

**1.      JPMorgan's Media Interests**

         a.      *Gannett Company, Inc.*

25.      Both directly and through mutual funds that it controls, JPMorgan owns at least 10% of the voting stock of Gannett Company, Inc. ("Gannett").[32]

26.      Gannett owns daily newspapers and broadcast television stations in some of the same markets as the Debtors.[33]  Specifically, in the New York, Indianapolis and Philadelphia markets, in which Reorganized Tribune will own broadcast television stations (WPIX-TV, WTTV-TV/WXIN-TV and WPHL-TV, respectively), Gannett owns three daily newspapers

---

[31] NPP FCC 35 at Attachments C, D and E; NPP FCC 42-44 (Media Ownership Certifications of Angelo Gordon, Oaktree and JPMorgan, respectively); ███████████████████████████

[32] 3/17/11 Trial Tr. 47:25-48:18 (Prak); NPP FCC 44 at 5; NPP FCC 30 (Tribune FCC Applications, Supplement to Exhibit 12 of FCC Form 314) at 1-2.

[33] NPP FCC 44 at 5 n.4; NPP FCC 30 at 1 n.2; NPP FCC 65 at Ex. 4.

(*Journal News*, *Indianapolis Star* and *News Journal*, respectively).[34]  And in the Denver,
Sacramento and Grand Rapids markets, in which Reorganized Tribune will own broadcast
television stations (KWGN-TV, KTXL-TV and WXMI-TV, respectively), Gannett owns at least
one broadcast television station in each market (KTVD-TV/KUSA-TV, KXTV-TV and WZZM-
TV, respectively).[35]

27.     The DCL Plan Proponents argue that JPMorgan's interests in Gannett are
dispersed among some non-passive entities (subject to the 5% attribution threshold) and some
passive entities (qualifying for a more generous 20% attribution threshold) and that, if so
characterized, JPMorgan's interests in Gannett do not reach either attribution threshold and thus
are not attributable.[36]  This argument ignores relevant facts and is inconsistent with FCC
precedent.

28.     A JPMorgan affiliate, JPMorgan Investment Management, is the investment
advisor or manager to the JPMorgan mutual funds holding shares of Gannett.[37]  JPMorgan has
not disclosed this investment advisor relationship to the FCC.[38]  As investment advisor,

---

[34] NPP FCC 65 at 7, Ex. 4.

[35] *Id.*

[36] *See* NPP FCC 30 at 1-2; DCL 1456 (Rosenstein Expert Rpt.) at 18-19; 4/12/11 Trial Tr. 50:21-52:17
(Rosenstein).

[37] NPP FCC 65 at 23.

[38] NPP FCC 30 at 1-2.

JPMorgan has the power to vote the Gannett shares held by its mutual funds[39] and thus exert precisely the type of control and influence about which the FCC is concerned.[40]

29.     With respect to the shares that JPMorgan Investment Management votes, the FCC will treat JPMorgan as a "non-passive" investor subject to the 5% attribution threshold,[41] because the FCC has specifically ruled that investment advisors are subject to the normal 5% attribution threshold rather than the higher 20% threshold for passive investors.[42] *See 1999 Order*, 14 FCC Rcd at 12572-73; *Pinelands*, 7 FCC Rcd 6058, 6059 n.5 (1992); *Mario J. Gabelli*, 7 FCC Rcd 5594 (1992).

30.     Nevertheless, the DCL Proponents' FCC expert, Mr. Rosenstein, testified that the FCC has held that manager of a mutual fund "should be entitled to the same [20%] benchmark as the fund that holds the direct interest," even if that manager is an investment advisor with the power to vote the shares of the fund who would otherwise be subject to the lower 5% threshold.[43] This contention, however, is not supported by the authorities that Mr. Rosenstein cites in support of it.

31.     Mr. Rosenstein cites a footnote in a 1985 FCC decision addressing whether an individual holding stock in an insurance company, which in turn held an ownership interest in a broadcast station, could qualify for passive investor treatment under the higher (now 20%)

---

[39] NPP FCC 33 (JPMorgan Value Opportunities Fund, Annual Report) at 22; NPP FCC 38 (J.P. Morgan U.S. Equity Funds, Statement of Additional Information) at Parts I-4, I-28-29, and II-80-83; NPP FCC 39 (JPMorgan Value Opportunities Fund, Statement of Additional Information) at 34-35; NPP FCC 118 (Gannett: Schedule 13B) at 2.

[40] *See supra* note 8.

[41] *See* 47 C.F.R. § 73.3555, Note 2(a).

[42] *Id.*; NPP FCC 65 at 23-24; 3/17/11 Trial Tr. 50:16-52:14 (Prak).

[43] 4/12/11 Trial Tr. 52:3-17 (Rosenstein).

threshold.[44]  Mr. Rosenstein characterizes the footnote as a statement about the applicability of

the passive investor rule to mutual funds and investment advisors or managers more generally:

"Thus, although an investment advisor may not come within the strict definition of 'passive

investor,' where its interest arises as a result of its management of an entity that qualifies for

'passive investor' treatment, it also will be deemed to be subject to the higher benchmark."[45]

The footnote, however, contains no reference to investment advisors.  In its entirety, the footnote

reads:

> Persons holding interests qualifying for "passive investor" status are
> subject to the 10 percent [now 20%] benchmark with respect to that
> interest whether or not that person is included within the definition of a
> "passive investor."  For example, an individual holding the majority stock
> of an insurance company which in turn owns 6 percent stock in a
> broadcast station does not have a cognizable interest in that station.  *While
> the individual [holding the majority stock in an insurance company] may
> not come within the strict definition of "passive investor," his or her
> indirect ownership interest in the station is wholly the result of the
> ownership of an entity which qualifies for "passive investor" treatment.*
> As a consequence, the individual is subject to the 10 percent "passive
> investor" benchmark.  A contrary rule would produce the anomalous result
> of having the owner of a more remote interest being subject to a more
> rigorous standard than the owner of a direct interest.

*Corporate Ownership Reporting and Disclosure by Broadcast Licensees*, 58 R.R.2d 604, 622

n.81 (1985) (emphasis added).

32.    In the footnote, the FCC is discussing the treatment of ownership interests in

insurance companies that qualify for passive investor treatment.  Applied by extension to mutual

funds, the footnote would stand for the proposition that an owner of shares in a mutual fund that

qualifies for passive investor treatment would not have an indirect attributable interest in a

---

[44] *See* DCL 1456 at 19 (citing *Corporate Ownership Reporting and Disclosure by Broadcast Licensees*, Memorandum Opinion and Order, 58 R.R.2d 604, 622 n.81 (1985)).

[45] *Id.* (internal citations omitted).

broadcast station regardless of the amount of such owner's interest in the mutual fund. However, the language is inapposite to the issue at hand, which is the treatment of an investment advisor or manager to the mutual fund itself. An investment advisor, unlike a shareholder in a mutual fund, exercises control over the investments held by the fund. In adopting attribution rules, the FCC has consistently focused on "issues of influence or control" and "tailor[ing] the attribution rules to permit arrangements in which a particular ownership or positional interest involves minimal risk of influence . . . . " *1999 Order*, 14 FCC at 12562-63 (citing *Notice of Proposed Rulemaking* in MM Docket Nos. 94-150 *et al.*, 10 FCC Rcd 3606, 3610 (1995)).

33.    The FCC has specifically ruled that an investment advisor or manager to a mutual fund is *not* deemed to be a passive investor. Long after the 1985 decision that Mr. Rosenstein cites, the FCC in 1999 clarified its rule on investment advisors in a case speaking *directly* to the investment advisor question. In the 1999 decision, the FCC specifically rejected a request to allow investment advisors managing mutual funds to take advantage of the higher attribution threshold. *1999 Order*, 14 FCC Rcd at 12572-73. The FCC concluded:

> [A]n investment advisor, acting on behalf of its client, might exert the same level of influence or control as the client might exert on its own accord. Therefore, unlike the categories currently defined as passive investors, we do not find evidence of regulatory or other safeguards ensuring that the other types of investors proposed to be included will remain passive. While several commenters favored expanding the definition of the passive investor category, they did not supply persuasive evidence or analysis to support their case and, in particular, to contradict evidence that these institutional investors can be actively involved in the companies in which they invest.

*Id.* at 12573.

34.     Accordingly, because JPMorgan is the investment advisor to the mutual funds that it controls, rather than merely a shareholder in those funds, it does not qualify for the passive investor exception, and the FCC will treat its 10% interest in Gannett as an attributable interest.[46]

> b.     *Freedom Communications Holdings, Inc.*

35.     JPMorgan ███████████████ Freedom Communications Holdings, Inc. ("Freedom").[47]  Freedom owns and operates eight television stations and more than 100 publications, including 27 daily newspapers.[48]  In the Los Angeles market, in which Reorganized Tribune will own a daily newspaper and a broadcast television station (*Los Angeles Times* and KTLA-TV), Freedom owns a daily newspaper (*Orange County Register*, Freedom's flagship newspaper).[49]  In the Miami/Ft. Lauderdale market, in which Reorganized Tribune will own a daily newspaper and a broadcast television station (*Sun Sentinel* and WSFL-TV), Freedom owns a broadcast television station (WPEC-TV) that serves the same market as Tribune's Miami/Ft. Lauderdale newspaper.[50]  And in the Grand Rapids market, in which Reorganized Tribune will own a broadcast television station (WXMI-TV), Freedom owns a broadcast television station (WWMT-TV).[51]

36.     Pursuant to Freedom's April 2010 Plan of Reorganization, JPMorgan was a member of the "Steering Committee" that had director-designation rights.[52]  As discussed above,

---

[46] NPP FCC 65 at 22-24; 3/17/11 Trial Tr. 50:16-52:14 (Prak).

[47] ███████████.

[48] NPP FCC 65 at 7, Ex. 8.

[49] *Id.*

[50] *Id.*

[51] *Id.*

[52] NPP FCC 106 (Joint Plan of Reorganization of Freedom) at 16, 32.

the FCC treats anyone holding the right to designate a director as having an attributable

interest.[53] The DCL Plan Proponents' FCC expert testified that group director-designation rights

are attributable to each member of the group holding such rights.[54] Accordingly, because

JPMorgan designated directors of Freedom as part of the Steering Committee group, the FCC

will treat JPMorgan's interest in Freedom as an attributable interest.[55]

           c.    *Journal Register Company*

    37.    JPMorgan also ███████████████ Journal Register Company ("Journal

Register").[56] Journal Register owns more than 300 publications, including 22 daily

newspapers.[57] In the Hartford/New Haven market, in which Reorganized Tribune will own a

daily newspaper (*Hartford Courant*) and two broadcast television stations (WTIC-TV/WCCT-

TV), Journal Register owns a daily newspaper (*New Haven Register*).[58] And in the Philadelphia

market, in which Reorganized Tribune will own a broadcast television station (WPHL-TV),

Journal Register owns a daily newspaper (*Trentonian*).[59]

---

[53] *See supra* ¶ 11 and note 10.

[54] 4/12/11 Trial Tr. 81:5-82:9 (Rosenstein) (acknowledging that testimony provided at deposition that shared designation right would be deemed to confer an attributable interest on each entity participating in the designation remains accurate).

[55] Although the DCL Plan Proponents argue that the Noteholder Plan Proponents are asking this Court to second guess the FCC (DCL Plan Proponents' Post-Trial Reply Brief at 37), the FCC has never had occasion to rule on whether JPMorgan's interest (and, as discussed below, Angelo Gordon's interest) in Freedom is attributable. In order to expedite Freedom's emergence from bankruptcy, the stock of its subsidiary that owns the television stations was placed into a temporary trust. NPP FCC 124 (Broadcast Trust Agreement for Freedom); NPP FCC 106 at 36-37, § 5.16 (Interim Trust Control of Subsidiary Interests in Broadcast License Companies). The new owners of Freedom have never filed an application for FCC approval of the transfer of ownership that resulted from implementation of the bankruptcy plan of reorganization.

[56] ███████.

[57] NPP FCC 74 (Journal Register, "Our Products"); NPP FCC 65 at Ex. 5.

[58] NPP FCC 74; NPP FCC 65 at 7, Ex. 5.

[59] NPP FCC 74; NPP FCC 65 at 7, Ex. 5.

38.     Pursuant to Journal Register's Plan Support Agreement and Disclosure Statement,

JPMorgan was a member of a group of "Consenting Lenders" with director-designation rights.[60]

As a result, the FCC will treat JPMorgan's interest in Journal Register as an attributable

interest.[61]

        d.     *NBC Universal, Inc.*

39.     JPMorgan director Stephen Burke is the CEO of NBC Universal, Inc. ("NBC

Universal").[62]  NBC Universal controls numerous broadcast television stations, including

KNBC-TV/KVEA-TV in Los Angeles, WNBC-TV/WNJU-TV in New York, WSNS-

TV/WMAQ-TV in Chicago, WCAU-TV in Philadelphia, KXAS-TV/KXTX-TV in Dallas and

WSCV-TV/WTVJ-TV in Miami/Ft. Lauderdale.[63]

40.     Mr. Burke has attributable interests in both JPMorgan, due to his position as

director, and NBC Universal, due to his position as CEO.[64]  Accordingly, unless JPMorgan can

demonstrate to the FCC's satisfaction that Mr. Burke's interest in JPMorgan qualifies for an

---

[60] NPP FCC 99 (Plan Support Agreement by and among Journal Register Company and the Consenting Lenders) at PDF pp. 9, 41 ("The initial Board of Directors of Reorganized [Journal Register] shall consist of five members, each of which shall be selected by the Consenting Lenders, at least ten (10) days prior to the hearing to confirm the Plan"); NPP FCC 100 (Disclosure Statement with Respect to Amended Joint Chapter 11 Plan of Reorganization for Journal Register) at PDF p. 97 ("On the Effective Date, the board of directors of Reorganized [Journal Register] (the 'Reorganized Board') shall have five members, each of which shall be selected by the Consenting Lenders.").

[61] Although the DCL Plan Proponents argue that the Noteholder Plan Proponents are asking this Court to second guess the FCC (DCL Plan Proponents' Post-Trial Reply Brief at 37), because Journal Register does not own any broadcast stations, the FCC has never had occasion to rule as to whether JPMorgan's interest in Journal Register is attributable.

[62] NPP FCC 65 at 24-25; NPP FCC 41 (Comcast Press Release: Comcast and GE Name Steve Burke Chief Executive Officer of NBC Universal); NPP FCC 35 at 20.

[63] NPP FCC 65 at Ex. 6; NPP FCC 46 (BIA MEDIA Access Pro Database Report, TV Stations Listed by Owner, Comcast/NBC).

[64] NPP FCC 35 at 20; NPP FCC 41; NPP FCC 65 at 24-25, Ex. 6.

exemption to the attribution rules, the FCC will treat his interests in both JPMorgan and NBC Universal as attributable interests.[65]

### 2. Angelo Gordon's Media Interests

#### a. *NextMedia Group, Inc.*

41.    Angelo Gordon owns 42.6% of the equity of NextMedia Group, Inc. ("NextMedia").[66]  In the Chicago market, in which Reorganized Tribune will own a radio station (WGN(AM)), a broadcast television station (WGN-TV) and a daily newspaper (*Chicago Tribune*), NextMedia owns eight radio stations (WCCQ(FM), WERV-FM, WRXQ(FM), WSSR(FM), WXLC(FM), WJOL(AM), WKRS(AM) and WLIP(AM)).[67]

42.    Angelo Gordon also has director-designation and director-nomination rights in NextMedia.[68]  Specifically, NextMedia's Supplement to Plan Supplement provided that "[t]he

---

[65] NPP FCC 65 at 24-25, 33-34 ("Burke's position as a JPMorgan director is an attributable interest.  His position as CEO of Comcast-NBCU is, likewise, an attributable interest.  Accordingly, all of the television stations of Comcast-NBCU are attributable to Tribune."); DCL 1456 at 23-24 ("Pursuant to 47 C.F.R. § 73.3555, Note 2(g), an officer or director of a parent company of (or investor in) a broadcast licensee will have a cognizable interest in the licensee unless her duties and responsibilities 'are wholly unrelated to the broadcast licensee . . . and a statement properly documenting this fact is submitted to the Commission' . . . . A statement invoking the Note 2(g) attribution exemption with respect to Mr. Burke and other JP Morgan officers and directors was included in the Tribune Applications.").  In his report, Mr. Rosenstein refers to NPP FCC 35 at 20 n.14 ("Pursuant to Section 73.3555, Note 2(g) of the Commission's Rules, officers and directors of a parent company of a broadcast licensee with an attributable interest in any such subsidiary entity shall be deemed to have a cognizable interest in the subsidiary unless the duties and responsibilities of the officers or directors involved are wholly unrelated to the broadcast licensee and a statement properly documenting this fact is submitted to the Commission.").  This statement, however, merely recites the rule but does not make clear that Mr. Burke's interest in JPMorgan qualifies for an exemption to the attribution rules. *See* DCL 1456 at 24.

[66] 3/17/11 Trial Tr. 39:11-40:6 (Prak); NPP FCC 21 (NM Licensing LLC FCC Applications, Comprehensive Exhibit to FCC Form 314) at 3 n.8.

[67] NPP FCC 62 (BIA MEDIA Access Pro Database Report, Radio Stations Listed by Owner, NextMedia); 3/17/11 Trial Tr. 38:16-22 (Prak) (NextMedia "has eight radio stations that play in the Chicago market."); NPP FCC 65 at 7.

[68] NPP FCC 20 (Findings of Fact, Conclusions of Law, and Order Confirming Debtors' Modified Amended Joint Chapter 11 Plan of Reorganization, NextMedia Group, Inc.) at PDF p. 560; NPP FCC 80 at 9-10, § 2.1(a).

final member of the New Board [of NextMedia] will be designated by Angelo, Gordon and disclosed at or before the Confirmation Hearing."[69]

43.    In addition, under the NextMedia Stockholders Agreement, Angelo Gordon has continuing director-designation rights – namely, the right to nominate the successor to the director that it initially designated,[70] and a second replacement director, the "CEO Designee."[71] NextMedia Shareholders are *required* to vote in favor of electing such directors.[72]  In other words, provisions in the NextMedia Shareholders Agreement effectively "*ensure*" that Angelo Gordon's nominees will be elected.[73]  As discussed above, the FCC has stated that nomination rights are not attributable where the nomination right does not ensure that the nominee will be elected.[74]  In this case, however, Angelo Gordon's nominees *must* be elected.  "[W]hile [under the NextMedia Stockholders Agreement] they are nominally referred to as nomination rights, if you look at them, there is no way, once you interpret the agreement, that anyone . . . other than the person selected by Angelo Gordon, either to be the CEO or the replacement alternate director, is likely to end up being selected."[75]

---

[69] NPP FCC 20 at PDF p. 560.

[70] NPP FCC 80 at 10, § 2.1(e).

[71] *Id.* at 9, § 2.1(a).

[72] *Id.* at 9, § 2.1(a) ("Each Stockholder hereby agrees that . . . such Stockholder shall vote all of the Voting Common Stock . . . so as to elect [the CEO Designee]"); *Id.* at 11, § 2.1(e) (same with respect to "successor Director").

[73] *See supra* ¶ 13.

[74] *See id.*

[75] 3/17/11 Trial Tr. 43:3-18 (Prak).

44.    The DCL Plan Proponents contend that the FCC has ruled that Angelo Gordon's interest in NextMedia is non-attributable.[76] While the FCC granted the applications approving NextMedia's reorganization, and Angelo Gordon's interest in NextMedia was disclosed in the applications and described as non-attributable, the FCC had no reason to rule on this issue specifically and did not in fact rule whether it agreed with those characterizations.[77] First, Angelo Gordon's ownership interest *was* disclosed – which, in the DCL Plan Proponents' view, would not have been necessary if it were non-attributable.[78] Second, the NextMedia application contained a representation that Angelo Gordon held no other media interests in NextMedia's markets.[79] Thus, it was irrelevant to the FCC's decision whether Angelo Gordon's interest was attributable or not, and the FCC grant does not mean that the FCC has ruled that Angelo Gordon's interest in NextMedia is non-attributable.

45.    Moreover, the NextMedia application did not disclose that:  (i) Angelo Gordon designated a director in NextMedia;[80] or (ii) Angelo Gordon has nomination rights for directors that ensure that its designees will be elected.[81] The NextMedia FCC application merely stated that a fifth director would be designated by "representatives of the Class A stockholders," without disclosing that Angelo Gordon made the designation.[82]

---

[76] DCL Plan Proponents' Post-Trial Reply Brief at 35, Appendix A.

[77] NPP FCC 21 at 3, 3 n.8, 11 n.25.

[78] 4/12/11 Trial Tr. at 34:14-35:2, 40:6-19 (Rosenstein).

[79] NPP FCC 21 at 3, 6.

[80] NPP FCC 20 at PDF p. 560.

[81] *See supra* ¶ 43.

[82] NPP FCC 21 at 4 ("[A]n independent director designated by representatives of the Class A stockholders").

46.     Accordingly, the FCC will treat Angelo Gordon's director nomination and director designation rights in NextMedia as an attributable interest.

b.     *Freedom Communications*

47.     Angelo Gordon owns a 18-25% equity interest in Freedom.[83]

48.     Under Freedom's Stockholders Agreement, Angelo Gordon also has the right, as long as it holds 15% or more of Freedom's stock, to nominate directors and alternate directors to Freedom's board, and as long as it holds 7.5% or more of Freedom's stock, to designate a board observer.[84]  Angelo Gordon has exercised its right to designate a board observer.[85]

49.     The two FCC experts differ in their views as to whether the FCC will treat board observer rights as attributable.  The Noteholder Plan Proponents' FCC expert testified that the FCC has concluded in certain cases that board observer rights can provide an entity with sufficient influence to be considered attributable, and that the FCC staff has informed him that the staff believes board observer rights are attributable.[86]  *See Una Vez Mas Texas Holdings*, 2010 WL 3738771 at *7; *Paxson Mgmt. Corp.*, 22 FCC Rcd at 22226-27.  The DCL Plan Proponents assert that their FCC expert testified that "[u]nder FCC precedent director nomination and board observer rights are not attributable interests; the Debtor's FCC expert (Rosenstein) has structured transactions with board observer rights that the FCC has treated as

---

[83] G. Baiera March 1, 2011 Depo. Tr. at 326:5-327:2; ███████ 3/17/11 Trial Tr. 43:19-44:17 (Prak).

[84] *See* NPP FCC 105 (Freedom Stockholders Agreement) at 13-14, § 8(a) (Angelo Gordon has the right, so long as it holds 15% or more of Freedom's stock, to nominate directors and alternate directors to the board); *id.* at § 8(d) (Angelo Gordon has the right, so long as it holds 7.5% or more of Freedom's stock, to appoint a board observer).

[85] G. Baiera March 1, 2011 Depo. Tr. at 327:6-328:8; 3/17/11 Trial Tr. 44:18-23 (Prak).

[86] 3/17/11 Trial Tr. 43:17-47:24 (Prak); *see also supra* ¶ 12 and note 11.

non-attributable."[87]  But this mischaracterizes Mr. Rosenstein's testimony.  Mr. Rosenstein

testified that he has been involved with a company, Univision, where purportedly non-

attributable investors have board observer rights.  But he also testified that these rights have not

been disclosed to the FCC in connection with any application.[88]  They were not mentioned in the

FCC's lengthy decision granting the application, where attribution and compliance with the FCC

ownership rules were very much at issue.  *See generally Shareholders of Univision Commc'ns,*

*Inc. and Broad. Media Partners, Inc.*, Memorandum Opinion and Order, 22 FCC Rcd 5842

(2007) (NPP FCC 95).  They were not mentioned when Univision subsequently sought consent

from the FCC to restructure in order to comply with the ownership rules[89] or in the FCC's

decision approving the restructuring.  *See generally Shareholders of Univision Commc'ns Inc.*

*and Broad. Media Partners, Inc.*, 23 FCC Rcd 2548 (2008) (NPP FCC 98).  Rather, Mr.

Rosenstein testified that the board observer rights were disclosed, if at all, in submissions of the

corporate governance documents to the FCC *post-closing*.[90]  Mr. Rosenstein did not testify that

the FCC had reviewed the documents or acknowledged the existence of the board observer

rights.[91]  Moreover, the DCL Plan Proponents did not put such documents into evidence, and

they did not submit any evidence that the FCC has ever reviewed any of the documents

---

[87] DCL Plan Proponents' Post-Trial Reply Brief at Appendix A.

[88] 4/12/11 Trial Tr. at 73:23-74:18, 92:9-93:13, 98:22-99:7 (Rosenstein); *see generally* NPP FCC 94 (Univision Television Group, Inc. FCC Application FCC Form 315 and Attachments).  Any such board observer rights were not disclosed in the application for approval of the acquisition of Univision, notwithstanding that Mr. Rosenstein agreed that the FCC's application form requires the disclosure of any board observer rights.

[89] NPP FCC 97 (FCC Public Notice and Exhibits).

[90] 4/12/11 Trial Tr. at 98:22-99:7 (Rosenstein).

[91] 4/12/11 Trial Tr. at 92:9-93:13, 98:22-99:7 (Rosenstein).

submitted post-closing or is aware that such documents confer board observer rights upon investors.

50.     The expert testimony indicates that the FCC would treat an entity with board observer rights as having an attributable interest.[92]  In fact, the FCC's own application forms for assignments and transfers of control require parties to disclose any board observer rights.[93]

51.     As discussed above, the FCC has never approved Freedom's post-bankruptcy media ownership rights.[94]  In particular, neither Angelo Gordon nor Freedom has ever disclosed to the FCC that Angelo Gordon has board observer rights. ████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████[95] ██████████████████████

████████████████████████████████████████████████[96] █████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████[97]

---

[92] 3/17/11 Trial Tr. 46:25-47:24 (Prak) ("[T]he staff's view is that board observer rights are going to be attributable, especially when combined with a substantial nominally non-voting stake."); *see also supra* ¶ 12.

[93] *See, e.g.*, Instructions to FCC Form 315 (September 2004 edition) at Worksheet 3 p. 15 (The "non-party influence over transferee/applicant" worksheet inquires whether any agreements "give any non-party investor the right to attend, or appoint an observer to attend, transferee board, partnership or other management meetings"); Instructions to FCC Form 315 (June 2010 edition) at Worksheet 3 p. 13 (same); 4/12/11 Trial Tr. 73:23-74:18 (Rosenstein).

[94] *See supra* note 55.

[95] *See generally* ████████████████████████████████████████████
████████

[96] ████████

[97] ████████

52.    As a result of Angelo Gordon's board observer right, the FCC will treat Angelo Gordon's interest in Freedom as an attributable interest.

### 3.    Oaktree's Media Interests

53.    Oaktree owns 25.84% of Liberman Broadcasting ("Liberman") and has the right to designate a member to the board of directors of Liberman.[98] Oaktree has exercised this right by designating as a director Bruce Karsh, a member of Oaktree's ultimate controlling entity, to the Liberman board.[99] In the Los Angeles market, in which Reorganized Tribune will own a daily newspaper (*Los Angeles Times*) and a broadcast television station (KTLA-TV), which in and of itself requires a waiver of the NBCO Rule, Liberman owns a broadcast television station (KRCA-TV) and seven broadcast radio stations (KBUA(FM), KBUE(FM), KEBN(FM), KRQB(FM), KWIZ(FM), KHJ(AM) and KVNR(AM)).[100]

54.    Oaktree has stated that prior to the assignment of Tribune's FCC licenses to Reorganized Tribune, it will relinquish its director-designation rights for Liberman and require the current Oaktree-designated director to resign.[101]

### C.    Interests in Reorganized Tribune Under the Proposed Plans

#### 1.    The DCL Plan Proponents' Interests in Reorganized Tribune Under the DCL Plan

55.    The proponents of the two competing plans agree that under the DCL Plan, each of JPMorgan, Angelo Gordon and Oaktree would receive more than 5% of the voting equity of

---

[98] NPP FCC 35 at 39.

[99] *See id.*

[100] NPP FCC 50 (BIA MEDIA Access Pro Database Report, Radio Stations Listed by Owner, Liberman Broadcasting Inc.); NPP FCC 70 (BIA MEDIA Access Pro Database Report, TV Stations Listed by Owner, Liberman Broadcasting Inc).

[101] NPP FCC 35 at 39.

Reorganized Tribune.[102] They also agree that DCL Plan gives these entities director-designation rights.[103]

56.    As a result, the parties further agree that JPMorgan, Angelo Gordon and Oaktree each would have an attributable interest in Reorganized Tribune under the DCL Plan.[104]

### 2.    The DCL Plan Proponents' Interests in Reorganized Tribune Under the NPP Plan

57.    It is undisputed that under the NPP Plan, in contrast to the DCL Plan, JPMorgan, Angelo Gordon and Oaktree each would receive less than 5% of the voting equity in Reorganized Tribune.[105] The proponents also agree that the DCL Plan Proponents would not receive director-designation rights under the NPP Plan, because each failed to designate any directors by the specified deadline, and the Noteholder Plan Proponents decided not to permit them to exercise such rights because of the FCC issues that would be created.[106]

58.    As a result, it is undisputed that under the NPP Plan, JPMorgan, Angelo Gordon and Oaktree would *not* have attributable interests in Reorganized Tribune, and their other media

---

[102] 4/12/11 Trial Tr. 60:19-22 (Rosenstein) (the proponents would have an attributable interest "based on their receipt of 5 percent or more of the voting securities of reorganized Tribune"), 33:20-25 ("[S]ubject to exceptions, the FCC will treat a voting stock interest in a corporation of 5 percent or more as attributable.").

[103] 4/12/11 Trial Tr. 60:23-61:2 (Rosenstein) ("[T]he DCL plan proponents would also have an attributable interest in reorganized Tribune by virtue of their director designation rights"), 34:4-8 ("[T]he FCC has . . . concluded that having the power or the right to designate the director also will give rise to attribution."); DCL 1441(DCL Second Amended Joint Plain of Reorganization) at 50-51.

[104] 3/17/11 Trial Tr. 32:13-21, 34:6-20 (Prak); 4/12/11 Trial Tr. 60:11-15 (Rosenstein) ("[U]nder the DCL plan, JPMorgan, Angelo Gordon, and Oaktree have attributable interests or will have attributable interests in [R]eorganized Tribune."); NPP FCC 35 at 4-5 (JPMorgan, Angelo Gordon and Oaktree "will [each] be deemed to hold attributable interests in Reorganized Tribune" under the DCL Plan).

[105] NPP 2224 (Gropper Declaration) at 22-23; 4/12/11 Trial Tr. 61:22-62:2 (Rosenstein).

[106] NPP 2517 (Noteholders' Second Amended Joint Plan of Reorganization) at 73 (director-designations due no more than five days before confirmation hearing begins); NPP FCC 92 (Addendum to Plan Supplement in Support of Noteholder Amended Joint Plan of Reorganization) at Ex. 5.3.2(2), pp. 2-3; 4/12/11 Trial Tr. 62:3-12 (Rosenstein).

interests therefore would not be relevant to the FCC's consideration of the FCC applications for approval of the NPP Plan.[107]

### 3.    Other Parties' Interests in Reorganized Tribune Under the NPP Plan

59.    Under the NPP Plan, the Distribution Trust will hold one share of New Class C Common Stock.[108] As a holder of New Class C Common Stock, the Distribution Trustee has the right to designate two directors.[109] Under the FCC's ownership rules, the trustee of a trust and anyone who has the right to replace the trustee are deemed to have an attributable interest in the trust.[110] Therefore, the Distribution Trust, the Distribution Trustee and the members of the Distribution Trust Advisory Board will have attributable interests in Reorganized Tribune.

## IV.    The DCL Plan Creates Issues That Will Impede FCC
## Approval of the Debtors' FCC Applications and Waiver Requests

### A.    The DCL Plan Creates Violations of the FCC's Multiple Ownership Rules

60.    There is no dispute that the DCL Plan would give JPMorgan, Angelo Gordon and Oaktree attributable interests in Reorganized Tribune.[111] There also is no dispute that these proponents have substantial existing ownership interests in other media companies, many of which operate in the Debtors' markets.[112]

---

[107] 4/12/11 Trial Tr. 61:3-9 (Rosenstein).

[108] NPP 2517 (NPP Plan) at § 5.4.1 ("On the Effective Date, Reorganized Tribune shall issue one share of New Class C Common Stock to the Distribution Trust.").

[109] *Id.* ("As the sole holder of New Class C Common Stock, the Distribution Trustee, at the direction of the Distribution Trust Advisory Board, shall have the right to elect two members of the board of directors of Reorganized Tribune.").

[110] 47 C.F.R. § 73.3555, Note 2(d) (setting forth the attribution rules related to trusts).

[111] NPP FCC 35 at 4-5; *see supra* ¶ 56 and note 104.

[112] NPP FCC 35 at Attachments C, D and E.

61.    Certain of the attributable interests of JPMorgan, Angelo Gordon and Oaktree in other media companies, when combined with their interests in Reorganized Tribune under the DCL Plan, will create violations of the NBCO rule, the local television ownership rule and the local radio ownership rule.

### 1.    Rule Violations Resulting From JPMorgan's Media Interests

62.    JPMorgan's attributable interests in both Reorganized Tribune and Gannett would create violations of the NBCO Rule in the New York, Indianapolis and Philadelphia markets, in which Reorganized Tribune will own broadcast television stations (WPIX-TV, WTTV-TV/WXIN-TV and WPHL-TV, respectively),[113] and Gannett owns three daily newspapers (*Journal News*, *Indianapolis Star* and *News Journal*, respectively).[114] These interests also will cause violations of the local television ownership rule in Denver, Sacramento and Grand Rapids markets,[115] in which Reorganized Tribune will own broadcast television stations (KWGN-TV, KTXL-TV and WXMI-TV, respectively),[116] and Gannett owns at least one broadcast television station in each market (KTVD-TV/KUSA-TV, KXTV-TV and WZZM-TV, respectively).[117]

63.    JPMorgan's attributable interests in Reorganized Tribune and Freedom would create violations of the NBCO Rule in the Los Angeles and Miami/Ft. Lauderdale markets and the local television ownership rule in the Grand Rapids market.[118] The NBCO Rule violations result from the fact that Reorganized Tribune will own daily newspapers and broadcast television

---

[113] *See supra* ¶ 23 and note 30.

[114] *See supra* ¶ 26 and notes 34-35; NPP FCC 120 (Prak Demonstratives) at 6.

[115] *See* NPP FCC 120 at 6.

[116] *See supra* ¶ 23 and note 30.

[117] *See supra* ¶ 26 and notes 34-35.

[118] *See* NPP FCC 120 at 6.

stations in the Los Angeles and Miami/Ft. Lauderdale markets (*Los Angeles Times* and KTLA-TV in Los Angeles and *Sun Sentinel* and WSFL-TV in Miami/Ft. Lauderdale),[119] and Freedom owns a daily newspaper in Los Angeles (*Orange County Register*) and a broadcast television station (WPEC-TV) that serves the same market as Tribune's Miami/Ft. Lauderdale newspaper.[120] The local television ownership rule violation in the Grand Rapids market will result from the fact that Reorganized Tribune will own a broadcast television station (WXMI-TV),[121] and Freedom owns a broadcast television station (WWMT-TV).[122]

64.    JPMorgan's attributable interests in Reorganized Tribune and Journal Register would create violations of the NBCO Rule in the Hartford/New Haven and Philadelphia markets. In Hartford/New Haven, the NBCO Rule violations result from the fact that Reorganized Tribune will own a daily newspaper in Hartford (*Hartford Courant*), and two broadcast television stations (WTIC-TV and WCCT-TV),[123] and Journal Register owns a daily newspaper (*New Haven Register*).[124] In Philadelphia, Reorganized Tribune will own a broadcast television station (WPHL-TV),[125] and Journal Register owns a daily newspaper (*Trentonian*).[126]

---

[119] *See supra* ¶ 23 and note 30.  Reorganized Tribune has requested waivers of the NBCO Rule in Los Angeles and Miami/Ft. Lauderdale to retain its current holdings in those markets.

[120] *See supra* ¶ 35 and notes 49-50; *see also Shareholders of Univision Commc'ns Inc.*, 22 FCC Rcd 5842, 5846 n.29, 5848 (2007) (FCC concluded that interest in both *Orange County Register* and Univision's broadcast television stations in Los Angeles market would violate NBCO Rule and required divestiture of one of these interests).

[121] *See supra* ¶ 23 and note 30.

[122] *See supra* ¶ 35 and note 51.

[123] *See supra* ¶ 23 and note 30.

[124] *See supra* ¶ 37 and note 58.

[125] *See supra* ¶ 23 and note 30.

[126] *See supra* ¶ 37 and note 59.

65.     Unless the FCC decides that Mr. Burke's interest in JPMorgan qualifies for an exemption to the FCC's attribution rules, JPMorgan's attributable interest in Reorganized Tribune, combined with JPMorgan director Mr. Burke's attributable interests in JPMorgan and NBC Universal, would create violations of the NBCO Rule and the local television ownership rule in several markets.  Although JPMorgan seeks to have the FCC rule that Mr. Burke is exempt from attribution, JPMorgan has not disclosed to the FCC that Mr. Burke is the CEO of NBC Universal.[127]  Due to Mr. Burke's interests, NBCO Rule violations would be created in the Los Angeles, New York, Chicago, Philadelphia and Miami/Ft. Lauderdale markets where Reorganized Tribune will own a daily newspaper (*Los Angeles Times*, *Newsday*, *Chicago Tribune*, *News Journal* and *Sun Sentinel*, respectively), and NBC Universal owns broadcast television stations (KNBC-TV/KVEA-TV, WNBC-TV/WNJU-TV, WSNS-TV/WMAQ-TV, WCAU-TV, WSCV-TV/WTVJ-TV, respectively).[128]  Local television ownership rule violations would be created in the Los Angeles, New York, Chicago, Miami/Ft. Lauderdale and Dallas markets, where both Tribune and NBC Universal own television broadcast stations.[129]

66.     A summary of the violations caused by JPMorgan's interest in Reorganized Tribune under the DCL Plan is as follows:

| Market | Tribune Interests | JPMorgan Interests | Rule Violation(s) |
|---|---|---|---|
| Gannett | | | |
| New York* | *Newsday*<br>WPIX-TV | *Journal News* | NBCO Rule |
| Indianapolis* | WTTV-TV/WXIN-TV | *Indianapolis Star* | NBCO Rule |
| Philadelphia | WPHL-TV | *News Journal* | NBCO Rule |

---

[127] *See supra* note 65; FCC NPP 35 at 20 n.14; NPP FCC 65 at 33-34.

[128] NPP FCC 35 at 20 n.14; NPP FCC 65 at 33-34, Ex. 7; *see supra* ¶¶ 23, 39 and notes 30 and 63.

[129] NPP FCC 65 at Ex. 7; *see supra* ¶¶ 23, 39 and notes 30 and 63.

| Market | Tribune Interests | JPMorgan Interests | Rule Violation(s) |
|---|---|---|---|
| Denver | KWGN-TV | KTVD-TV<br>KUSA-TV | Local TV Ownership Rule |
| Sacramento | KTXL-TV | KXTV-TV | Local TV Ownership Rule |
| Grand Rapids | WMXI-TV | WZZM-TV | Local TV Ownership Rule |
| **Freedom** | | | |
| Los Angeles* | *Los Angeles Times*<br>KTLA-TV | *Orange County Register* | NBCO Rule |
| Miami/Ft. Lauderdale* | *Sun Sentinel*<br>WSFL-TV | WPEC-TV | NBCO Rule |
| Grand Rapids | WXMI-TV | WWMT-TV | Local TV Ownership Rule |
| **Journal Register** | | | |
| Hartford/New Haven* | *Hartford Courant*<br>WTIC-TV/WCCT-TV | *New Haven Register* | NBCO Rule |
| **NBC Universal** | | | |
| Los Angeles* | *Los Angeles Times*<br>KTLA-TV | KNBC-TV<br>KVEA-TV | NBCO Rule<br>Local TV Ownership Rule |
| New York* | *Newsday*<br>WPIX-TV | WNBC-TV<br>WNJU-TV | NBCO Rule<br>Local TV Ownership Rule |
| Chicago* | *Chicago Tribune*<br>WGN-TV<br>WGN(AM) | WSNS-TV<br>WMAQ-TV | NBCO Rule<br>Local TV Ownership Rule |
| Philadelphia | *News Journal*<br>WPHL-TV | WCAU-TV | NBCO Rule |
| Miami/Ft. Lauderdale* | *Sun Sentinel*<br>WSFL-TV | WSCV-TV<br>WTVJ-TV | NBCO Rule<br>Local TV Ownership Rule |
| Dallas | KDAF-TV | KXAS-TV<br>KXTX-TV | Local TV Ownership Rule |

Markets marked with an asterisk (*) are markets in which Tribune is seeking a waiver.

## 2.    Rule Violations Resulting From Angelo Gordon's Media Interests

67.    Angelo Gordon's attributable interests in Reorganized Tribune and NextMedia would create violations of the FCC's local radio ownership rule in the Chicago market. Reorganized Tribune will own a radio station in Chicago (WGN(AM)),[130] and NextMedia owns eight radio stations in Chicago (WCCQ(FM), WERV-FM, WRXQ(FM), WSSR(FM),

---

[130] *See supra* ¶ 23 and note 30.

WXLC(FM), WJOL(AM), WKRS(AM) and WLIP(AM)).[131]  Because the maximum number of

stations permitted under the rule is eight,[132] the combination of NextMedia's eight radio stations

and Reorganized Tribune's radio station would violate the rule.

68.    Angelo Gordon's attributable interests in Reorganized Tribune and Freedom

would create the same violations created by JPMorgan's attributable interests in Reorganized

Tribune and Freedom – violations of the FCC's NBCO Rule in the Los Angeles and Miami/Ft.

Lauderdale markets and the local television ownership rule in the Grand Rapids market.[133]

69.    A summary of the violations caused by Angelo Gordon's interest in Reorganized

Tribune under the DCL Plan is as follows:

| Market | Tribune Interests | Angelo Gordon Interests | Rule Violation |
|---|---|---|---|
| NextMedia | | | |
| Chicago* | *Chicago Tribune* WGN-TV WGN(AM) | 8 radio stations | Local Radio Ownership Rule |
| Freedom | | | |
| Los Angeles* | *Los Angeles Times* KTLA-TV | *Orange County Register* | NBCO Rule |
| Miami/Ft. Lauderdale* | *Sun Sentinel* WSFL-TV | WPEC-TV | NBCO Rule |
| Grand Rapids | WXMI-TV | WWMT-TV | Local TV Ownership Rule |

Markets marked with an asterisk (*) are markets in which Tribune is seeking a waiver.

### 3.    Rule Violations Resulting From Oaktree's Media Interests

70.    Oaktree's attributable interests in Reorganized Tribune and Liberman would

create violations of the FCC's NBCO Rule in the Los Angeles market.  The NBCO Rule

violation results from the fact that Reorganized Tribune will own a daily newspaper in Los

---

[131] *See supra* ¶ 41 and note 67.

[132] *See supra* ¶ 15 and note 17.

[133] *See supra* ¶ 63; *see also* NPP FCC 120 at 6.

Angeles (*Los Angeles Times*), and a broadcast television station (KTLA-TV), which in and of itself requires a waiver of the NBCO Rule.[134]  In addition, Liberman owns a broadcast television station (KRCA-TV) and seven broadcast radio stations (KBUA(FM), KBUE(FM), KEBN(FM), KRQB(FM), KWIZ(FM), KHJ(AM) and KVNR(AM)) in Los Angeles.[135]

71.    A summary of the violations caused by Oaktree's interest in Reorganized Tribune under the DCL Plan is as follows:

| Market | Tribune Interests | Oaktree Interests | Rule Violation |
|--------|-------------------|-------------------|----------------|
| Liberman | | | |
| Los Angeles | *Los Angeles Times* KTLA-TV | KRCA-TV & 7 radio stations | NBCO Rule |

Tribune is seeking a waiver in the Los Angeles market.

72.    Oaktree, unlike JPMorgan and Angelo Gordon, has committed to cure the violation by relinquishing its right to designate a member of Liberman's board of directors and by having the current Oaktree-designated director on the board resign.[136]

**B.    The DCL Plan Will Delay and Adversely Affect the Company's Waiver Requests**

**1.    The FCC Will Consider Non-Attributable Interests in Its Waiver Analysis**

73.    The Debtors have requested waivers of the NBCO Rule in five markets and waivers of the local television ownership rule in two markets:[137]

---

[134] *See supra* ¶ 53.

[135] *See supra* ¶ 53 and note 100; *see also* NPP FCC 119 (Prak Demonstratives Part II) at 1.

[136] NPP FCC 35 at 39.

[137] *See* NPP FCC 22 (Tribune FCC Applications, Bloomington/Kokomo, IN, Waiver Request); NPP FCC 23 (Tribune FCC Applications, New York Waiver Request); NPP FCC 24 (Tribune FCC Applications, Miami Waiver Request); NPP FCC 25 (Tribune FCC Applications, Hartford Waiver Requests); NPP FCC 26 (Tribune FCC Applications, Chicago Waiver Request); NPP FCC 27 (Tribune FCC Applications, Los Angeles Waiver Request).

| Market | Debtors' Properties | Requested Waiver(s) |
|---|---|---|
| Chicago, IL | *Chicago Tribune*, WGN-TV, WGN(AM) | NBCO Rule |
| Hartford/New Haven CT | *Hartford Courant*, WTIC-TV, WCCT-TV | NBCO Rule, Local TV Ownership Rule |
| Indianapolis, IN | WTTK-TV, WTTV-TV | Local TV Ownership Rule |
| Los Angeles, CA | *Los Angeles Times*, KTLA-TV | NBCO Rule |
| Miami/Ft. Lauderdale, FL | *Sun Sentinel*, WSFL-TV | NBCO Rule |
| New York, NY | *Newsday*, WPIX | NBCO Rule |

74.     Because JPMorgan, Angelo Gordon and Oaktree will have attributable interests in Reorganized Tribune,[138] the other media interests they own will be highly relevant to the FCC's evaluation of market concentration and the potential impact of the proposed transaction on competition among independent news sources in each market.[139]   In the Los Angeles waiver request, the Debtors cited the *Orange County Register* as a strong source of competition for the *Los Angeles Times*, which the Debtors own.[140]   However, the Debtors have not disclosed to the FCC the interests that two of the DCL Plan Proponents, JPMorgan and Angelo Gordon, have in the *Orange County Register*.[141]   Similarly, the Debtors argue in their Hartford/New Haven waiver request that the *New Haven Register* is a primary source of competition for their newspaper, the *Hartford Courant*,[142] but again have not disclosed that JPMorgan has an interest in the *New Haven Register*.[143]

---

[138] *See supra* ¶ 56 and note 104.

[139] *See supra* ¶ 22 and notes 28-29; 3/17/11 Trial Tr. 52:15-53:25 (Prak).

[140] NPP FCC 27 at 49, 58, and 81 ("[T]he *LA Times* faces strong competition from *The Orange County Register*[.]").

[141] *Id.*

[142] NPP FCC 25 at 50, 60-61, 84, PDF p. 139 n.6 ("[T]he *Courant* faces strong competition from the *New Haven Register* . . . "; "Tribune's *Courant* faces competition from all of the daily newspapers in the Hartford DMA, and most notably from the *New Haven Register* and the (Waterbury, CT) *Republican-American/Sunday Republican*.").

[143] *Id.*

75.    The two FCC experts differ about whether the FCC, in evaluating the Debtors'
waiver requests, will consider Angelo Gordon's, JPMorgan's and Oaktree's other media interests
if they are rendered non-attributable. Mr. Rosenstein testified that the FCC, in evaluating the
Debtors' waiver requests, will consider other media interests only if they are attributable.[144] Mr.
Prak testified that waiver requests are different from compliance with multiple ownership rules
because they allow "one to look at the entire field" and evaluate "[a]ny interest that shows a
tendency to inhibit competition or – interfere with competition or create greater consolidation or
opportunity for influence and control in markets," and that while the FCC considers only
"attributable" interests in determining whether its *ownership rules* would be violated, in
evaluating rule *waiver requests* it is not similarly constrained.[145]

76.    The FCC's reported decisions are consistent with Mr. Prak's testimony. For
example, in *Infinity Holdings Corp. of Orlando*, Memorandum Opinion and Order, 11 FCC Rcd
17813 (1996), the FCC took into consideration an applicant's non-attributable interest in a daily
newspaper in evaluating its request for a temporary waiver of the radio-television cross-
ownership rule, then known as the "one-to-a-market rule," finding that the newspaper did not
compete directly in the relevant market. *Id.* ¶¶ 15, 23; *see also Alton Rainbow Corp.*,
Memorandum Opinion and Order, 14 FCC Rcd 16764, ¶¶ 10, 26 (1999) (same); *NewCity
Commc'ns, Inc.*, Memorandum Opinion and Order, 12 FCC Rcd 3629, ¶¶ 3, 16, 30-31 (1997)
(same); *Kortes Commc'ns, Inc.*, Memorandum Opinion and Order, 15 FCC Rcd 11846, ¶ 25
(2000) (in granting waiver of the NBCO Rule, the FCC thought it "important" to consider
applicant's proposed ownership of an FM radio station located nearby, even though the

---

[144] *See* 4/12/11 Trial Tr. 40:6-19 (Rosenstein).

[145] *See* 3/17/11 Trial Tr. 53:7-25 (Prak).

ownership would not violate any rule). Similarly, in its recent decision approving the

NBCU/Comcast merger, the FCC focused primarily on the effect of the transaction on

competition, diversity and localism – and imposed a number of conditions on the new company –

notwithstanding that the transaction did not create *any* violations of the FCC's ownership rules.

*NBCU/Comcast*, 26 FCC Rcd at 4240-41, 4250-322.

77.    It also makes logical sense for the FCC to consider the other non-attributable, but

significant, media interests of a party with an attributable interest. With respect to transfer

applications generally, the FCC's decisions are informed by a "deeply rooted preference for

preserving and enhancing competition" and "ensuring a diversity of information sources and

services to the public." *Id.* at 4248.

78.    With respect to waiver of the NBCO Rule, in particular, the FCC will consider the

effect of a waiver on the level of market concentration.[146] The FCC has stated that in evaluating

waiver requests, and the level of market concentration in particular, it will "not employ any

single metric . . . because as the Commission has learned from experience, there are too many

qualitative and quantitative variables in evaluating different markets and combinations to reduce

the task at hand to a precise mathematical formula." *2008 Order*, 23 FCC Rcd at 2052.

"[P]arties are free to point to any metric of their choosing in arguing that a proposed combination

either should or should not be approved." *Id.*

79.    Mr. Prak's testimony that the FCC will factor JPMorgan's, Angelo Gordon's and

Oaktree's other media interests into its waiver calculus is consistent with FCC decisions and the

facts that will be presented in this case.[147] Accordingly, due to the attributable interests that

---

[146] *See supra* ¶ 22 and note 29.

[147] 3/17/11 Trial Tr. 55:11-59:4 (Prak).

JPMorgan, Angelo Gordon and Oaktree stand to receive in Reorganized Tribune under the DCL Plan, the FCC will likely consider JPMorgan's, Angelo Gordon's and Oaktree's other media interests in the Debtors' markets, even if the FCC ultimately concludes that such ownership interests are non-attributable.

### 2.    The DCL Plan Will Change the FCC's Waiver Analysis in Several Markets

80.    JPMorgan's, Angelo Gordon's and Oaktree's other media interests will complicate and delay and may adversely affect the FCC's consideration of the Debtors' waiver requests.  Because JPMorgan, Angelo Gordon and Oaktree will have attributable interests in Reorganized Tribune under the DCL Plan, the other media interests of JPMorgan, Angelo Gordon and Oaktree in the Debtors' markets will add another level of complexity to the FCC's analysis.[148]  In contrast, because JPMorgan, Angelo Gordon and Oaktree will *not* have attributable interests in Reorganized Tribune under the NPP Plan, the FCC would only have to consider the Debtors' *existing* media interests – which would mean the FCC would merely be considering whether to renew the existing waivers.

81.    As the Noteholder Plan Proponents' FCC expert Mr. Prak concluded:

> [T]he difficulty for the Commission will be to determine whether they want to waive their rules in order to accommodate all of this additional – these additional interests.  And in my view, based on my experience, is, that's going to be a tough sell.  I don't see that happening.  I see the Commission saying to them we're not going to waive the rules on these facts.  You're going to need to address this and resolve it.  And all of that, while possible, is going to take time, complicate, and delay the transaction at the Commission.[149]

---

[148] *Id.* at 55:11-59:4, 88:16-24 (Prak) ("The thing that's adversely affecting, in the calculus, the status quo here, is these additional interests add what I would call additional regulatory hair on the deal.  They make it different than the status quo.  They add interests that the commission is going to have to consider.").

[149] 3/17/11 Trial Tr. 69:22-70:6 (Prak).

82.    **Los Angeles:**  In the Los Angeles market, Reorganized Tribune must obtain a waiver of the NBCO Rule to retain its interest in the *Los Angeles Times* (the largest daily newspaper in the market) and broadcast television station KTLA-TV in order to emerge from bankruptcy.  The DCL Plan introduces the following additional complexity to that waiver request:  (i) JPMorgan's and Angelo Gordon's interests in the *Orange County Register* through Freedom;[150] (ii) JPMorgan director Stephen Burke's attributable interest in two broadcast television stations in the Los Angeles market (KNBC-TV and KVEA-TV) through NBC Universal;[151] and (iii) Oaktree's interests in a broadcast station (KRCA-TV) and seven radio stations (KBUA(FM), KBUE(FM), KEBN(FM), KRQB(FM), KWIZ(FM), KHJ(AM) and KVNR(AM)) through Liberman.[152]

83.    In analyzing the Los Angeles waiver request, the FCC will consider whether JPMorgan's and Angelo Gordon's interests in both the *Los Angeles Times* (through Reorganized Tribune) and in the *Orange County Register* (through Freedom) increase diversity and competition.  By the DCL Plan Proponents' own admission, the *Orange County Register* is the biggest competitor to the *Los Angeles Times*.[153]  As the Noteholder Plan Proponents' expert testified, the interests of JPMorgan, Angelo Gordon and Oaktree in numerous other media in the Los Angeles market, even if non-attributable, make the FCC's evaluation of whether Tribune's Los Angeles waiver request will serve the public interest more difficult.  These interests therefore will complicate and delay the FCC's decision.

---

[150] *See supra* ¶¶ 35, 47-48 and notes 49, 83-85.

[151] *See supra* ¶¶ 39-40 and notes 63-64.

[152] *See supra* ¶ 53 and note 100.

[153] NPP FCC 27 at 49 ("[T]he *LA Times* faces strong competition from *The Orange County Register* . . . and other daily newspapers in the market").

84.    **Hartford/New Haven:** As discussed above, the FCC will apply a negative presumption to the NBCO Rule waiver requests for the Chicago and Hartford/New Haven markets.[154] The standard to overcome this presumption is challenging: Reorganized Tribune must "demonstrate by clear and convincing evidence" that the proposed transaction "will increase the diversity of independent news outlets . . . and increase competition among independent news sources in the relevant market." *2008 Order*, 23 FCC Rcd at 2049, ¶ 68. Furthermore, the new waiver standard is untested – the FCC has not granted a single waiver under the new rule.[155]

85.    In the Hartford/New Haven market, Reorganized Tribune must obtain a waiver of both the NBCO Rule and the local television ownership rule to retain its interests in the *Hartford Courant* (the largest daily newspaper in the market) and two broadcast television stations, WTIC-TV and WCCT-TV. The DCL Plan introduces additional complexity to this waiver request due to JPMorgan's substantial interest in the second largest daily newspaper in the market (the *New Haven Register*) through Journal Register. Because of JPMorgan's interest in the two largest daily newspapers and Reorganized Tribune's ownership of two broadcast television stations in the Hartford/New Haven market, Reorganized Tribune must "demonstrate by clear and convincing evidence" that the implementation of the DCL Plan "will increase the diversity of independent news outlets . . . and increase competition among independent news sources" in the Hartford/New Haven market, which is required to overcome the negative presumption against a waiver of the NBCO Rule.[156] *2008 Order*, 23 FCC Rcd at 2049, ¶ 68.

---

[154] *See supra* ¶ 21 and note 27; *see also* NPP FCC 65 at 21.

[155] *See supra* ¶ 20 and note 24.

[156] *See supra* ¶ 21.

86.    In analyzing the Hartford/New Haven waiver request, the FCC will consider whether JPMorgan's interest in both the *Hartford Courant* (through Reorganized Tribune) and in the *New Haven Register* (through Journal Register) increases diversity and competition.[157]  By the DCL Plan Proponents' own admission, the *New Haven Register* is the biggest competitor to the *Hartford Courant*.[158]  And in granting the Company a previous, temporary waiver in the Hartford/New Haven market, the FCC has relied, among other things, upon the independence of the *New Haven Register*.  *Counterpoint Commc'ns, Inc.*, 20 FCC Rcd 8582, 8586-87 (2005) (denying the Company a permanent waiver and granting a temporary waiver subject to the Company's continuing its efforts to sell broadcast television station WTXX-TV).

87.    Under the DCL Plan, those two competing newspapers will be owned by the same entity, namely, JPMorgan.  As Mr. Prak explained, JPMorgan's interest in the *New Haven Register* through Journal Register "creates more weight, if you will, in favor of the negative presumption."[159]  *See also Astroline Commc'ns Co. Ltd. P'ship v. FCC*, 857 F.2d 1556, 1568-70 (D.C. Cir. 1988) (remanding FCC grant of radio-television cross-ownership waiver in the Hartford/New Haven market because, among other things, of the FCC's failure to define and to make findings of fact on the effect of the waiver on competition in the relevant market).  As a

---

[157] 3/17/11 Trial Tr. 56:22-59:4 (Prak) ("[I]f you just look at it from a structural standpoint, which is one of the things the FCC does, they're going to look and say, are the *Current* [sic] and the *Register* really going to be as strong of competitors when they have someone who owns a fairly substantial equity stake now in this competing paper? Are they going to be looking to do things? I don't know the answer to these questions, but the point is that the Commission's staff will be concerned about it, as a structural matter. And in a market where their new rule says there's a negative presumption, the addition of this sort of regulatory interest, when called to the attention of the Commission, is going to create more problems.").

[158] NPP FCC 25 at 60 ("Tribune's *Courant* faces competition from all of the daily newspapers in the Hartford DMA, and most notably from the *New Haven Register*[.]"); *see supra* ¶ 74 and note 142.

[159] 3/17/11 Trial Tr. 55:22-56:19 (Prak).

result, it is unlikely that the Debtors will be able to overcome the negative presumption in Hartford/New Haven under the DCL Plan.

88.    **Chicago:**  In the Chicago market, Reorganized Tribune must obtain a waiver of the NBCO Rule to retain its interest in daily newspaper the *Chicago Tribune*, broadcast television station WGN-TV and radio station WGN(AM).  The DCL Plan introduces Angelo Gordon's interest in eight radio stations (WCCQ(FM), WERV-FM, WRXQ(FM), WSSR(FM), WXLC(FM), WJOL(AM), WKRS(AM) and WLIP(AM)) through NextMedia.[160]  Regardless of whether Angelo Gordon's interests in NextMedia are attributable, they will complicate and adversely affect the Debtors' Chicago waiver application, which is necessary to retain the Debtors' (arguably most valuable) existing non-compliant combination of media properties in the Chicago market.

89.    The FCC will apply a negative presumption to the Debtors' NBCO Rule waiver request in Chicago because Tribune owns two broadcast stations in the market.[161]  Reorganized Tribune therefore would have to "demonstrate by clear and convincing evidence" that the proposed transaction "will increase the diversity of independent news outlets . . . and increase competition among independent news sources in the relevant market." *2008 Order*, 23 FCC Rcd at 2049.  Given this negative presumption, the DCL Plan can only compound the problems Reorganized Tribune is likely to have in securing the Chicago waiver due to Angelo Gordon's interest through NextMedia in eight additional Chicago radio stations.

90.    **Miami/Ft. Lauderdale:**  In the Miami/Ft. Lauderdale market, Reorganized Tribune must obtain a waiver of the NBCO Rule to retain its interest in daily newspaper the *Sun*

---

[160] *See supra* ¶ 41 and note 67.

[161] NPP FCC 65 at 21.

*Sentinel* and broadcast television station WSFL-TV. The DCL Plan introduces additional complexity to the Miami/Ft. Lauderdale waiver request due to JPMorgan's and Angelo Gordon's attributable interests through Freedom in a broadcast television station (WPEC-TV) that serves the same market as the *Sun Sentinel*.[162] The combined interests in Miami/Ft. Lauderdale, therefore would be similar to those in the Hartford/New Haven market, in which the Debtors own a daily newspaper and two broadcast television stations, and in which the FCC refused to grant Debtors a permanent waiver in 2007.

### C.    The DCL Plan Provides an Opportunity to Cure, But Implementing the Cure Will Result in Substantial Further Delay

91.    The DCL Plan, like the NPP Plan, provides that no director or shareholder of Reorganized Tribune may hold an attributable interest that would require a waiver of the FCC rules.[163] Thus, there is no dispute that any rule violations caused by the attributable interests of JPMorgan, Angelo Gordon and Oaktree under the DCL Plan will need to be cured for that plan to be consummated.

92.    The DCL Plan Proponents argue that if the FCC takes the position that any of the media interests of JPMorgan, Angelo Gordon or Oaktree would cause rule violations, the problem will be fixed without delay. However, this position is at odds with the provisions of the DCL Plan.

93.    The DCL Plan provides as follows:

> [I]n the event a Creditor Proponent and the Debtors reasonably determine, based upon comments received from the FCC, that the required approval of the FCC will not be obtained due to the designation rights afforded to such Creditor Proponent(s) in this Section 5.3.2 (the "Designation Rights"), then such Creditor

---

[162] *See supra* ¶¶ 35, 47-48.

[163] *See* DCL 1441 at 50, § 5.3.2, 54, § 5.4.2(d); NPP 2517 at 73-74, § 5.3.2, 77, § 5.4.2(d).

Proponent(s) shall within 60 days of such determination take such action as is necessary or appropriate to enable the Debtors and the Creditor Proponents to obtain such FCC approval. Such action may include, at the sole discretion of such Creditor Proponent(s), without limitation, (i) altering or divesting an investment or other interest held by such Creditor Proponent(s) in any entity, (ii) relinquishing its Designation Rights, or (iii) making any commitment or explanatory filing to the FCC to permit the FCC approval to be obtained . . . . [164]

94.      In accordance with this provision of the DCL Plan, the Debtors will not be able to control the timing or manner of dealing with FCC comments. Rather, JPMorgan, Angelo Gordon and Oaktree will be in the driver's seat, and they will have "sole discretion" to determine how they want to respond to FCC comments. So, for example, if the DCL Plan were confirmed, and the FCC were to advise Tribune that approval will not be forthcoming because of the interests of JPMorgan, Angelo Gordon and Oaktree in Reorganized Tribune and in other media companies, the Debtors could not solve the problem and avoid delay by causing these creditors to relinquish their director designation rights. Rather, it would be up to the creditors to decide whether they are willing to relinquish these rights or whether they would rather, at the cost of delay and uncertainty, engage in negotiations and filings with the FCC in order to try to retain both their interests in Reorganized Tribune and their other media interests.

95.      Although Mr. Rosenstein contends that any FCC rule violations can and will be cured definitively and promptly,[165] the DCL Plan provisions indicate that these cure provisions will take a great deal of time to implement and are not certain to be effective.[166]

---

[164] DCL 1441 at 50-51, § 5.3.2.

[165] *See* 4/12/11 Trial Tr. 43:4-44:4 (Rosenstein).

[166] *See* 3/17/11 Trial Tr. 60:24-63:5 (Prak).

96.     Under the DCL Plan, any proposed curative action would begin only *after* receiving comments by the FCC.[167]  The DCL Plan provides that the relevant proponents must then "reasonably determine" to take action based on those comments and then determine in their "sole discretion" what action to take.[168]  They then have sixty days to take such action,[169] and the DCL Plan provides for a number of possible actions, each of which would take substantial time to develop and implement, further delaying and impeding performance of the DCL Plan.[170]  Furthermore, the delay inherent in the back-and-forth negotiations between the DCL Plan Proponents and the FCC staff contemplated by the DCL Plan is independent of any additional delay that will be created in the likely event that the disclosure of the DCL Plan Proponents' other media interests will trigger further opposition by public interest groups and other parties that have already opposed the FCC Applications.  The filing of additional petitions, oppositions and replies will create additional delay.  There is no evidence on the record that supports the DCL Plan Proponents' claim that the DCL Plan's cure process will not require a great deal of time.

97.     Indeed, by leaving the choice of action to the relevant proponent's "sole discretion," the DCL Plan does not require that such action be the quickest, most efficient or even the most effective means to eliminate obstacles to FCC approval.  For example, as noted

---

[167] DCL 1441 at 50-51, § 5.3.2.

[168] *See id.*

[169] *Id.* at 50. ██████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

[170] *See* 3/17/11 Trial Tr. 60:24-63:5 (Prak).

above, the DCL Plan provides that the action may be limited to an "explanatory filing." As a result, the DCL Plan presents a serious risk that the plan proponents will have, and take, multiple chances to eliminate those obstacles, potentially delaying FCC approval (and therefore effectiveness of the plan) repeatedly and indefinitely.[171]

### D.    The DCL Plan Will Complicate, Adversely Affect and Delay the FCC Approval Process

98.    The Noteholder Plan Proponents' FCC expert, Mr. Prak, expressed the opinion that the FCC issues raised by the DCL Plan would delay the FCC approval process by an additional six to eight months from the date of full disclosure by the DCL Plan Proponents of the other media interests of JPMorgan and Angelo Gordon.[172]

99.    In cases with considerably fewer (or no) rule violations, complex media combinations such as the ones present under the DCL Plan have resulted in lengthy delays. *See, e.g., NBCU/Comcast*, 26 FCC Rcd 4238 (356 days to grant applications to transfer control of licensees from GE to Comcast); *Existing Shareholders of Clear Channel Commc'ns, Inc.*, Memorandum Opinion and Order, 23 FCC Rcd 1421 (2008) (392 days to grant applications to transfer licenses to private equity funds); *Existing Shareholders of Citadel Broad. Corp.*, Memorandum Opinion and Order and Notice of Apparent Liability, 22 FCC Rcd 7083 (2007) (388 days to grant applications to transfer control of licenses from existing Citadel and Walt

---

[171] *Id.* at 61:4-63:5, 63:17-64:16 (Prak). Even when all steps necessary to render an interest non-attributable are taken, the fact that the attributable interest exists may result in delay. The DCL Plan Proponents, in providing an example of how quickly JPMorgan could resolve an attribution issue, noted in the DCL Plan Proponents' Post-Trial Reply Brief that JPMorgan resolved an ownership issue with MediaNews Group in less than a week by filing a document with the FCC on April 11. DCL Plan Proponents' Post-Trial Reply Brief at 36 n.207 (citing DCL 1570 (Request for Confidential Treatment)). On June 1, over a month and a half later, the FCC has responded to that filing by requiring JPMorgan to make an additional filing, in this case requiring JPMorgan to make the April 11 filing public. *See* Letter from Eve Klindera Reed, Counsel for JPMorgan, to FCC (June 1, 2011), *available at* http://fjallfoss.fcc.gov/ecfs/document/view?id=7021683587. So while JPMorgan took the necessary steps to render the interest non-attributable in less than a week, the FCC may not resolve the issue as quickly, resulting in delay in what may otherwise appear to be an open-and-shut case.

[172] 3/17/11 Trial Tr. at 79:20-80:13 (Prak); NPP FCC 65 at 39-40.

Disney shareholders to a merged entity); *Shareholders of Hispanic Broad. Corp*, Memorandum Opinion and Order, 18 FCC Rcd 18834 (2003) (413 days to grant applications to transfer control of licenses to Univision); *UTV of San Francisco, Inc.*, Memorandum Opinion and Order, 16 FCC Rcd 14975 (2001) (309 days to grant applications to assign licenses to Fox); *Telemundo, Inc. v. FCC*, 802 F.2d 513 (D.C. Cir. 1986) (petitions to deny filed against purchaser out of bankruptcy; restructuring of buyer required; court approved sale on February 15, 1984; FCC approval on July 26, 1985, over one year later).

100.    Furthermore, the waiver requests that the Company filed in April 2010 have already been opposed by public interest groups that are still challenging the FCC's grant of the 2007 waivers to the Company.[173]  Given their concern with the Company's existing non-compliant combinations, these public interest groups likely will raise additional issues with the FCC because of JPMorgan, Angelo Gordon and Oaktree's other media interests.[174]

101.    The evidence demonstrates that issues raised by these public interest groups, paired with the substantial stakes in major media companies held by JPMorgan, Angelo Gordon and Oaktree will delay the FCC's review.[175]  For example, in *Applications for Assignment of Licenses WSTX(AM) and WSTX-FM*, 50 C.R. 944 (2010), a petition to deny raised, among other things, issues concerning whether the proposed purchase of stations out of bankruptcy held attributable interests in other stations in the same market that would violate the FCC's ownership rules – precisely the sort of issues raised here. *Id.* ¶¶ 36-41.  The bankruptcy court approved the

---

[173] *See generally* NPP FCC 85 (Petitions to Deny).

[174] 3/17/11 Trial Tr. 87:8-22 (Prak).

[175] *See* NPP FCC 65 at 40; *see also* 3/17/11 Trial Tr. 63:17-64:16 (Prak).

plan of reorganization on July 19, 2006. *Id.* ¶ 12.  Because of the issues raised in the petition to

deny, it was not approved by the FCC until June 1, 2010, almost three years later. *Id.*

102.    While the DCL Plan Proponents contend that the DCL Plan contains provisions

that will resolve any issues the FCC may raise, the cure provisions themselves take time to

implement and are uncertain, as discussed above.[176]  Moreover, the provisions in the DCL Plan

cannot begin to be implemented until the FCC has been apprised of all relevant facts.  For

example, the DCL Plan Proponents have not disclosed to the FCC that:

- Stephen Burke is both a director of JPMorgan and an officer of NBC Universal;[177]

- JPMorgan is the investment advisor to mutual funds for which it is claiming a "passive investor" exemption;[178]

- JPMorgan was a key participant in the creditor groups that designated the directors of Freedom Communications and Journal Register;[179]

- Angelo Gordon designated a director to the NextMedia board and has continuing board designation rights;[180]

- Angelo Gordon has a board observer at Freedom.[181]

The DCL Plan Proponents' failure to disclose these interests violates FCC rules 1.17 and 1.65

and will only add to the delays at the FCC.[182]  When the facts come to light, as this Court must

---

[176] *See supra* ¶¶ 95-97.

[177] NPP FCC 65 at 24-25; *see supra* ¶ 39 and note 62.

[178] NPP FCC 65 at 23; NPP FCC 30 at 1-2; *see supra* ¶¶ 27-28 and note 37.

[179] NPP FCC 106 at 16, 32; 4/12/11 Trial Tr. 81:5-82:9; *see supra* ¶¶ 36, 38 and notes 52, 60.

[180] NPP FCC 20 at PDF p. 560; NPP FCC 80 at 9-11, § 2.1(a), (e); *see supra* ¶¶ 42-43 and notes 68-73.

[181] NPP FCC 105 at 13-14, § 8(a), (d); G. Baiera March 1, 2011 Depo. Tr. at 327:6-328:8; 3/17/11 Trial Tr. 44:18-23 (Prak); *see supra* ¶ 48 and notes 84-85.

[182] 3/17/11 Trial Tr. 64:6-16 (Prak); *see* 47 C.F.R. § 1.17 (requiring truthful and accurate statements to the FCC: "no person subject to this rule shall . . . provide material factual information that is incorrect or omit material information that is necessary to prevent any material factual statement that is made from being incorrect or misleading without a reasonable basis for believing that any such material factual statement is correct and not

assume they will, the resulting FCC inquiry will inevitably delay and potentially prevent FCC

approval of any waiver application filed by the DCL Plan Proponents.

103.    Rather than their disclosing this information to the FCC, the DCL Plan

Proponents suggest that it is the Noteholder Plan Proponents' obligation to raise these issues with

the FCC.[183]  The appropriate time to file any such opposition with the FCC would be following

submission of the DCL Plan to the FCC, which will only occur if this Court were to confirm the

plan.

104.    One further fact could cause substantial delay at the FCC.  If JPMorgan and

Angelo Gordon relinquish their board designation rights in Reorganized Tribune in an effort to

obtain FCC approval, they would each be afforded rights to nominate one or more directors of

the initial board of Reorganized Tribune to the extent permitted to do so by the FCC.[184]  If the

FCC disapproves the nomination rights, whether because the DCL Plan provides no procedure

for electing nominees or otherwise, there would be further delay.

105.    Moreover, as the Noteholder Plan Proponents' FCC expert testified, the FCC

could require a new public notice of the FCC Applications.[185]  Under 47 C.F.R. § 73.3578(b), a

---

misleading"), § 1.65 (imposing a duty on applicants to the FCC to update information in an application within 30 days: "[e]ach applicant is responsible for the continuing accuracy and completeness of information furnished in a pending application  or in Commission proceedings involving a pending application").

[183] DCL Plan Proponents' Post-Trial Brief at 87.  Indeed, JPMorgan, Angelo Gordon and Oaktree vigorously opposed discovery related to their other media interests and only agreed to limited disclosure after extracting an agreement from the Noteholder Plan Proponents not to disclose certain information to the FCC.  *See Order Approving Stipulation Concerning Law Debenture's Motion to Compel Oaktree to Produce Documents*, dated 2/10/11 [D.I. No. 7886]; *Order Approving Stipulation Concerning Law Debenture's Motion  to Compel Angelo Gordon to Produce Documents*, dated 2/8/11 [D.I. No. 7843]; *Order Approving Stipulation Concerning Aurelius Capital Management, LP's Motion to Compel JPMorgan to Produce Documents*, dated 2/8/11 [D.I. No. 7842].

[184] DCL 1441 at 51, § 5.3.2 ("In the event Designation Rights are relinquished to obtain FCC approval, any Creditor Proponent relinquishing such rights shall be afforded rights to nominate one or more members of the initial board of Reorganized Tribune").

[185] NPP FCC 65 at 19, 40 n.19.

change in control of a broadcast licensee – from control shared by Angelo Gordon, JPMorgan

and Oaktree to control by Oaktree – would be a "major" change, which would require (i) a new

public notice under 47 C.F.R. § 73.3580(a), (ii) a new 30-day period for petitions to deny,[186] and

(iii) if petitions are filed, as they presumably would be, a new pleading cycle.

## V.    There Will Be No FCC Delay Under the NPP Plan

### A.    The Distribution Trust Under the NPP Plan Will Not Delay FCC Approvals

106.    The evidence does not support the DCL Plan Proponents' contention that the

Distribution Trust structure could raise novel FCC issues that will complicate or delay the

consummation of the NPP Plan.

107.    The Distribution Trust under the NPP Plan would primarily exist to hold DEV of

Reorganized Tribune in the form of New Warrants, New Senior Secured Term Loan and cash to

make distributions in satisfaction of Claims.[187]  Other than a single share of New Class C

Common Stock, which has very limited voting rights, the Distribution Trust would not hold

voting equity.[188]

108.    The Distribution Trust will have an attributable interest in Reorganized Tribune

only because the Class C stock conveys the right to designate two members of the Company's

---

[186] 47 U.S.C. § 309(b) ("[N]o such application . . . shall be granted by the Commission earlier than thirty days following issuance of public notice by the Commission of the acceptance for filing of such application or of *any substantial amendment thereof.*") (emphasis added); *see also* 47 C.F.R. § 73.3584(a) (procedure for filing petitions to deny).

[187] NPP 2517 at 111, § 7.16.1 (Creation and Purpose of Distribution Trust); DCL 329 (Noteholder Specific Disclosure Statement) at 8; DCL 332, Attachment K (Distribution of Trust Agreement) § 2.6 (detailing the nature and purpose of the Distribution Trust).

[188] NPP 2517 at 112, § 7.16.5 (Transfers to Distribution Trust); DCL 332, Attachment E (Certificate of Incorporation of Reorganized Tribune) at 3-4 (With limited exceptions, "the holder of the share of Class C Common Stock shall not be entitled to vote on any matter submitted to a vote of the stockholders of the Corporation").

Board of Directors.[189]  The Noteholder Plan Proponents have vetted the entities and individuals

that will have an attributable interest as a result of this designation right to ensure that they do

not have interests in media companies that would impact the FCC applications and therefore are

qualified to hold an attributable interest in Reorganized Tribune.[190]  Neither Aurelius nor the

entities or individuals that will serve as Trustee and Advisory Board Members of the Distribution

Trust holds interests in any media companies other than the Debtors.[191]  Because none of the

parties with attributable interests in Reorganized Tribune under the NPP Plan has any media

interests that overlap with the Debtors' media interests, there would be no impermissible

combinations of media interests and no rule violations under the NPP Plan.

109.    In addition, the FCC routinely reviews and approves applications that include

trusts as both direct licensees of broadcast stations and equity owners of licensees, and has

expeditiously granted numerous transfer applications involving workout or bankruptcy trusts.[192]

*See, e.g., In re ION Media Networks Liquidating Trust*, Memorandum Opinion and Order, 24

FCC Rcd 14579, 14580 (2009) (noting FCC's prior approval of transfer of new common stock to

ION trust); *In re Summit Wireless WOW, LLC*, Memorandum Opinion and Order, 19 FCC Rcd

---

[189] NPP 2517 § 1.1.174 (New Class C Common Stock); *id.* at § 5.4.1 (Issuance of New Securities).

[190] *See* NPP 2224 at 23.

[191] 3/15/11 Trial Tr. 232:16-19 (Gropper) (testifying that Aurelius does not hold interests in any media companies other than the Debtors); NPP FCC 109 (Media Ownership Certification (Quest)), NPP FCC 110 (Media Ownership Certification (Brodsky)), NPP FCC 111 (Media Ownership Certification (Schacht)), NPP FCC 112 (Media Ownership Certification (Lukomnik)), NPP FCC 114 (Media Ownership Certification (Berman)), NPP FCC 115 (Media Ownership Certification (Cellar)), NPP FCC 116 (Media Ownership Certification (Handel)).

[192] *See e.g.* NPP FCC 122 (Pegasus Communications Corporation FCC Grant and FCC Application), NPP FCC 123 (Alaska Broadcasting Company, Inc. FCC Grant and FCC Application), NPP FCC 124 (Broadcast Trust Agreement among Freedom Broadcasting of Florida, Inc., and Chapman, Trustee), NPP FCC 125 (Sun City Licenses, LLC FCC Grant and FCC Application), NPP FCC 126 (Multicultural Television Broadcasting LLC FCC Grant and FCC Application), NPP FCC 127 (Multicultural Television Broadcasting LLC FCC Grant and FCC Application), NPP FCC 128 (Mississippi Television, LLC FCC Grant and FCC Application); NPP FCC 129 (Border Media Partners, LLC FCC Grant and FCC Application).

23759, 23764 (2004) (approving assignment of PCS licenses from debtors to liquidating trust);

*In re License Renewal Application of E. Carolina Broad. Co., Inc.*, Memorandum Opinion and

Order, 6 FCC Rcd 6154, 6156 n.1 (1991) (FCC has previously approved assignment of station

licenses to liquidating trust).

### B. JPMorgan, Angelo Gordon and Oaktree Will Not Have Attributable Interests Under the NPP Plan

110.    Because JPMorgan, Angelo Gordon and Oaktree will *not* have attributable

interests in Reorganized Tribune under the NPP Plan, their attributable interests in other media

companies will not create violations of FCC ownership rules that would delay or impede

performance of the NPP Plan.[193]  As the DCL Plan Proponents' FCC expert Rosenstein

acknowledged, the NPP Plan will not lead to delay in processing of the applications by the

FCC.[194]

---

[193] *See supra* ¶ 58 and note 107.

[194] 4/12/11 Trial Tr. 58:1-3 (Rosenstein) ("I don't believe that the [N]oteholder [P]lan . . . would be subject to substantial delay in connection with its review by the FCC.").

## CONCLUSION

111.    For all the foregoing reasons, the DCL Plan cannot be confirmed, and the NPP

Plan is confirmed.

Dated:  June 3, 2011

ASHBY & GEDDES, P.A.


*/s/ Amanda M. Winfree*
William P. Bowden (I.D. No. 2553)
Amanda M. Winfree (I.D. No. 4615)
500 Delaware Avenue, P.O. Box 1150
Wilmington, DE  19899
(302) 654-1888

- and -

LERMAN SENTER PLLC
Meredith S. Senter, Jr.
Sally A. Buckman
2000 K Street NW, Suite 600
Washington, DC 20006
(202) 429-8970

*Counsel for Aurelius Capital Management, LP*

- and -

FRIEDMAN KAPLAN SEILER &
    ADELMAN LLP
Edward A. Friedman
Robert J. Lack
Kizzy L. Jarashow
Seven Times Square
New York, NY 10036-6516
(212) 833-1100

*Counsel for Aurelius Capital Management, LP
as to matters concerning JPMorgan and Angelo
Gordon, but not Oaktree*

- and -

McCARTER & ENGLISH, LLP


*/s/ Katharine L. Mayer*
Katharine L. Mayer (I.D. No. 3758)
Renaissance Centre
405 N. King Street
Wilmington, DE 19801
302-984-6300

- and -

McCARTER & ENGLISH, LLP
David J. Adler
245 Park Avenue
New York, NY 10167
212-609-6800

*Counsel for Deutsche Bank Trust Company
Americas, solely in its capacity as successor
Indenture Trustee for certain series of Senior
Notes*

- and -

BIFFERATO GENTILOTTI LLC


*/s/ Garvan F. McDaniel*
Garvan F. McDaniel (I.D. No. 4167)
800 N. King Street, Plaza Level
Wilmington, Delaware 19801
Tel:  (302) 429-1900
Fax:  (302) 429-8600

*Counsel for Law Debenture Trust Company of
New York, solely in its capacity as successor
Indenture Trustee for certain series of Senior
Notes*

- and -

SULLIVAN HAZELTINE ALLINSON LLC

*/s/ William D. Sullivan*
William D. Sullivan (I.D. No. 2820)
Elihu E. Allinson, III (I.D. No. 3476)
4 East 8th Street, Suite 400
Wilmington, DE 19801
302-428-8191

- and -

BROWN RUDNICK LLP
Robert J. Stark
Martin S. Siegel
Gordon Z. Novod
Seven Times Square
New York, NY 10036
212-209-4800

*Counsel for Wilmington Trust Company, solely
in its capacity as successor Indenture Trustee
for the PHONES Notes*