## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

——————————————————————X

In re:                                      :    Chapter 11 Cases
                                            :    Case No. 08-13141 (KJC)
TRIBUNE COMPANY, et al.,                    :    (Jointly Administered)
                                            :
                           Debtors.         :    **Related Docket No.** 9058
                                            :
——————————————————————X

### SUPPLEMENTAL PROPOSED FINDINGS OF FACT AND
### CONCLUSIONS OF LAW OF WILMINGTON TRUST
### COMPANY, AS SUCCESSOR INDENTURE TRUSTEE FOR THE
### PHONES NOTES, AND ONE OF THE NOTEHOLDER PLAN PROPONENTS

Wilmington Trust Company ("Wilmington Trust"), Successor Indenture Trustee for the

Exchangeable Subordinated Debentures due 2029 in the aggregate principal amount of

$1.2 billion (generally referred to as the "PHONES Notes") issued in April 1999 by Tribune

Company ("Tribune" and, together with its Chapter 11 affiliates, the "Debtors" or the

"Company"), by and through its undersigned counsel, and one of the Noteholder Plan

Proponents, hereby respectfully submits these Supplemental Proposed Findings of Fact and

Conclusions of Law (the "PHONES Findings"). Wilmington Trust, in its capacity as a proponent

of the Noteholder Plan, along with the other proponents of that Plan, has submitted The

Noteholder Plan Proponents' Proposed Findings of Fact and Conclusions of Law (the "NPP

Findings") and The Noteholder Plan Proponents Proposed Conclusions of Law ("NPP COL"), to

which the Court is respectfully referred. The PHONES Findings supplement the NPP Findings

and the NPP COL, and concern issues specific to the PHONES Notes. In support of the

PHONES Findings, Wilmington Trust respectfully states as follows:[1]

_____

[1]    All Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the NPP Findings
or NPP COL, but to the extent not defined therein, in the Post-Trial Brief of the Noteholder Plan Proponents

<u>**SUPPLEMENTAL PROPOSED FINDINGS OF FACT**</u>

**I.     THE PHONES INDENTURE**

1.     The rights of the PHONES Notes were established in an indenture, dated as of

April 1, 1999, issued by Tribune Company (the "PHONES Indenture").[2] Article XIV of the

PHONES Indenture, titled "Subordination," defines the rights of holders of PHONES Notes in

relation to other indebtedness incurred by Tribune Company.[3]

2.     Section 14.01 defines "Indebtedness" to be:

> (i) all obligations represented by notes, bonds, debentures or similar
> evidences of indebtedness; (ii) all indebtedness for borrowed money or for
> the deferred purchase price of property or services other than, in the case
> of any such deferred purchase price, on normal trade terms; . . . and (iv) all
> Indebtedness of others for the payment of which such Person is
> responsible or liable as obligor or guarantor.[4]

3.     Section 14.01 of the PHONES Indenture also defines what types of indebtedness

are deemed to be senior to the PHONES Notes and are defined as "Senior Indebtedness":

> [T]he principal of (and premium, if any) and interest on . . . and other
> amounts due on or in connection with any Indebtedness of [Tribune
> Company] incurred, assumed or guaranteed by [Tribune Company],
> whether outstanding on the date of this Indenture or hereafter incurred,
> assumed or guaranteed and all renewals, extensions and refunding of such
> Indebtedness of [Tribune Company]; provided, however, that the
> following will not constitute Senior Indebtedness:
>
> (A) any Indebtedness of [Tribune Company] as to which, in the instrument
> creating the same or evidencing the same or pursuant to which the same is
> outstanding, it is expressly provided that such Indebtedness of [Tribune
> Company] shall be subordinated to or pari passu with the Securities;
>
> (B) Indebtedness of [Tribune Company] in respect of the Securities;

---

[D.I. 8932] (the "Noteholder Brief"), Post-Confirmation Hearing Brief of Wilmington Trust Company, As Successor Indenture Trustee For the PHONES [D.I. 8931] ("WTC Post-Trial Brief"), or the Post-Trial Reply Brief of the Noteholder Plan Proponents [D.I. 9022] ("NPP Reply Brief").

[2]     NPP 963 (PHONES Indenture).

[3]     *Id.*

[4]     *Id.*

(C) any Indebtedness of [Tribune Company] constituting trade accounts payable arising in the ordinary course of business; and

(D) any Indebtedness of [Tribune Company] to any Subsidiary of [Tribune Company]."[5]

4.    Article XIV of the PHONES Indenture addresses the rights of holders of "Senior Indebtedness" to enforce subordination.    Section 14.09 of the PHONES Indenture requires holders of "Senior Indebtedness" to act in good faith, stating, in pertinent part:

> **No right of any present or future holder of any Senior Indebtedness to enforce subordination** as herein provided **shall at any time in any way be prejudiced . . . by any act or failure to act, in good faith, by any such holder**, or by any noncompliance by [Tribune Company] with the terms . . . regardless of any knowledge thereof any such holder may have or be otherwise charged with.[6]

5.    Article V of the PHONES Indenture, titled "Remedies," lays out the rights of the PHONES holders.[7]    Article VI of the PHONES Indenture, titled "The Trustee", contains provisions relating to the indenture trustee.[8]    Specifically, Section 6.10 provides that:

> (a) No resignation or removal of the Trustee and no appointment of a successor Trustee pursuant to this Article shall become effective until the acceptance of appointment by the successor Trustee in accordance with the applicable requirements of Section 6.11.
>
> (b) The Trustee may resign at any time with respect to the Securities of one or more series by giving written notice thereof to [Tribune Company]. If the instrument of acceptance by a successor Trustee required by Section 6.11 shall not have been delivered to the Trustee within 30 days after the giving of such notice of resignation, the resigning Trustee may petition any court of competent jurisdiction for the appointment of a successor Trustee with respect to the Securities of such series.[9]

---

[5]    *Id.*

[6]    *Id.* (emphasis added).

[7]    *Id.* at Article V.

[8]    *Id.* at Article VI.

[9]    *Id.*

## II.    CITIBANK WAS INDENTURE TRUSTEE FOR THE PHONES WHILE ITS AFFILIATE, CITIGROUP, WAS A LEAD ARRANGER OF THE INDEBTEDNESS INCURRED TO FUND THE LBO TRANSACTION

6.      Citibank, N.A. ("Citibank") was the indenture trustee for the PHONES Notes from 2002 through August 2008, including the time period before, during, and after the LBO Transaction was completed.[10]    At all relevant times, Citibank was an entity under common control with, and an affiliate of, Citicorp North America, Inc. ("Citicorp") and Citigroup Global Markets, Inc. ("Citigroup", together with Citibank and Citicorp, the "Citi Entities").[11]    Citigroup acted as financial advisor to Tribune in connection with the LBO Transaction and served as one of the Lead Arrangers for both the Senior Credit Facility and the Bridge Facility.[12]    Citicorp acted as the co-documentation agent for the Senior Credit Facility and the Bridge Facility.[13]

### A.    Citibank Was Fully Aware of the Conflicts of Interest

7.      While Citigroup and Citicorp were actively engaged in the planning and development of the LBO Transaction, on January 4, 2007, a Citibank employee in the Agency and Trust Department,[14] Robert Kirchner notified Julio Ojea-Quitana, the Tribune "relationship manager,"[15] that Citibank would tender its resignation as indenture trustee for the PHONES Notes to "avoid potential legal and relationship conflicts."[16]    Mr. Kirchner testified that he believed it was necessary for Citibank to resign as indenture trustee for the PHONES Notes "because, in the event of a default, Citi as [indenture] trustee would owe duties to the holders of

---

[10]    Tribune Co., Quarterly Report (Form 10-Q, Ex. 4.3) (Aug. 13, 2008) (resignation agreement) ("Citibank Resignation Agreement").

[11]    Deposition of Robert Kirchner ("Kirchner Dep. Tr.") 26: 2-5 ("Citibank is a subsidiary that has the banking activities.  Citigroup in the parent.").

[12]    *See* NPP 439 (Senior Credit Facility, dated May 17, 2007); NPP 666 (Bridge Facility, dated Dec. 20, 2007).

[13]    *Id.*

[14]    Kirchner Dep. Tr. 8:6-12.

[15]    *Id.* at 25:7 – 25.

[16]    NPP 2502 (Email dated Jan. 4, 2007 from R. Kirchner to J. Ojea-Quintana, *et al.*).

4

the debt securities in question that would render Citi's concurrent lending relationship a conflict."[17]

8.      Although Citibank understood that it was necessary for it to resign promptly because of the conflict of interest created by Citigroup concurrently acting, inter alia, as Lead Arranger of the LBO Transaction, Citibank did not do so because of its relationship with Tribune.  A January 8, 2007 email exchange between Mr. Kirchner and Mr. Ojea-Quintana shows that Citibank prioritized the Citi Entities' relationship with Tribune over its conflict as indenture trustee for the PHONES Notes and as an Arranger of the LBO Transaction.[18]  In that email, Mr. Ojea-Quintana writes that he would "like Eric Davis from the relationship team to join the call.  He knows Jack [Rodden of Tribune] pretty well and I believe had previous discussions with him about the issue.  *We want to make sure that any relationship impact is mitigated.*" (emphasis added).[19]

9.      On January 10, 2007, Mr. Kirchner notified Tribune employees that Citibank would be resigning as trustee for the PHONES Notes "as quickly as possible."[20]  Two weeks later, on January 24, 2007, Mr. Kirchner sent a follow up email to Tribune executives inquiring as to whether Tribune had selected a successor trustee.[21]  In reaction to Mr. Kirchner's multiple emails, Tribune executives observed that "it seems Citi is trying to accelerate the [resignation] process."[22]

---

[17]    *Id.* at 106: 5-14.

[18]    NPP 2502 (Email dated Jan. 4, 2007 from R. Kirchner to J. Ojea-Quintana, *et al.*).

[19]    *Id.*  (emphasis added).

[20]    NPP 2503 (Email dated Jan. 10, 2007 from R. Kirchner to J. Rodden).

[21]    NPP 2504 (Email dated Jan. 24, 2007 from R. Kirchner to J. Rodden).

[22]    NPP 2505 (Email dated Jan. 24, 2007 from J. Rodden to C. Bigelow).

10.    On March 8, 2007, Mr. Kirchner again asked Tribune if a successor trustee had been found for the PHONES Notes.[23]  In response, Tribune executives acknowledged that "Citi is still pushing us to eliminate them as their debt trustee."[24]  Tribune executives then decided that they would "communicate with [Citi] at a higher level that they should back off until the [LBO Transaction] is announced."[25]

11.    On March 9, 2007, Tribune's campaign to delay Citibank from resigning as Indenture Trustee for the PHONES Notes rose to the highest levels within Tribune.  At that time, Chandler Bigelow, then Tribune's treasurer, contacted Mr. Ojea-Quintana to implore Citibank to delay its resignation.[26]  Mr. Ojea-Quintana agreed to postpone Citibank's resignation until June 30, 2007, in deference to Citigroup's lending relationship with Tribune.[27]

12.    Still concerned with the conflict posed by Citibank's role as Indenture Trustee to the PHONES and Citigroup's role as Arranger to Tribune,  Mr. Ojea-Quintana wrote to Mr. Kirchner seeking guidance on whether the conflict could be resolved: "The existing bonds (where Citi acts as trustee) are and will remain unsecured, being structurally subordinated to the bank revolver lenders.  Does this new capital structure eliminates [sic] the conflict of interest and the need to resign from our trustee role?"[28] In response, Mr. Kirchner unequivocally stated that "the new capital structure *does not* eliminate the potential conflict" and that the "prudent course of action is to continue the resignation process as soon as possible."[29]

---

[23]    NPP 2491 (Email dated March 8, 2007 from R. Kirchner to J. Rodden).

[24]    NPP 2491 (Email dated March 8, 2007 from J. Rodden to C. Bigelow).

[25]    *Id.*

[26]    NPP 2493 (Email dated March 9, 2007 from C. Bigelow to J. Ojea-Quintana, *et al.*).

[27]    NPP 2493 (Email dated March 9, 2007 from J. Ojea-Quintana to C. Bigelow, *et al.*).

[28]    NPP 2484 (Email dated April 26, 2007 from J. Ojea-Quintana to R. Kirchner).

[29]    NPP 2484 (Email dated April 26, 2007 from R. Kirchner to J. Ojea-Quintana) (Emphasis added).  Even if Tribune refused to appoint a successor trustee for the PHONES Notes, Citibank had the option, pursuant to Section 6.10(b) of the PHONES Indenture, to apply to a court of competent jurisdiction for the appointment of a successor

13.    Before Step One closed, on April 9, 2007, certain holders of PHONES Notes sent a notice of default under Section 5.01(4) of the PHONES Indenture to Tribune based on the impending LBO Transaction.[30]  Notwithstanding its receipt of this notice, Citibank continued to sit silently, failing to disclose to holders of PHONES Notes the Citi Entities' conflicts of interest as a Lead Arranger of the LBO Transaction, and not taking any action to protect the PHONES or prevent the LBO Transaction from closing.[31]  Instead, Citibank made a feeble effort to resign, tendering its resignation to Tribune on May 25, 2007,[32] but remaining as trustee for the PHONES Notes until August of 2008, a year after Step One closed.[33]

### B.    Citigroup and Citicorp Were Aware of the Ruinous Impact the LBO Transaction Would Have Upon the PHONES Notes

14.    Since the inception of the LBO Transaction, the Citi Entities were aware that, even though Citibank served as a fiduciary for the PHONES Notes, Citicorp and Citigroup sought out and played active roles in orchestrating the LBO Transaction.  At the same time Citibank owed a fiduciary duty to the PHONES, Citigroup employees were expressing their concern over the viability of the LBO Transaction that would have a devastating impact on the PHONES.  Included among these voices was Julie Persily, a managing director in and co-head of

---

trustee if one had not been appointed by Tribune and accepted such responsibility within 30 days. *See* Section 6.10 PHONES Indenture ("If the instrument of acceptance by a successor Trustee required by Section 6.11 shall not have been delivered to the Trustee within 30 days after the giving of such notice of resignation, the resigning Trustee may petition any court of competent jurisdiction for the appointment of a successor Trustee with respect to the Securities of such series.").

[30]    NPP 2494 (Email dated April 25, 2007 from N. Forte to J. Cupo with cc to R. Kirchner).

[31]    Kirchner Dep. Tr. 70:16-71:2; 75:4-8; 76:15-25; NPP 2494 (Email dated April 25, 2007 from N. Forte to J. Cupo with cc to R. Kirchner); NPP 2495 (Letter dated May 2, 2007 from Tribune to Paul Silverstein with cc to Citibank, N.A. Trustee); NPP 2496 (Letter dated May 8, 2007 from P. Silverstein to Tribune with cc to Citibank Agency and Trust, attn: N. Forte).

[32]    NPP 2482 (Email dated May 25, 2007 from R. Kirchner to G. Franco with cc to J. Cupo and N. Forte) (Mr. Kirchner noted that "Tribune was considering selecting a bank with a lending relationship to replace Citibank."). In an effort to placate Tribune, Citibank considered tendering only a partial resignation and sought to bifurcate certain responsibilities with another trustee. *Id.*; NPP 2481 (Email dated May 25, 2007 from N. Forte to J. Rodden, *et al.*).

[33]    *See* Citibank Resignation Agreement.

Citigroup's Leveraged Finance Group, and also a lead Citigroup employee who structured the LBO Transaction.[34] Ms. Persily's concerns over the viability of the LBO Transaction are well-documented, and persisted throughout the course of the LBO Transaction.[35]

15.    Notwithstanding these internal concerns, Citigroup pursued an active role in financing the ill-fated transaction, taking comfort in the fact that the holders of the PHONES would bear the brunt of the risk should the LBO Transaction cause Tribune's business to fail. The views of the banks competing to finance the LBO Transaction was summarized in late January 2007 by one Merrill Lynch employee to a group of Citigroup employees, including Ms. Persily, as the "PHONEs take an important layer of risk underneath the new financing."[36] Todd Kaplan's email underscored a common conclusion among the LBO Lenders that Tribune's leverage could be increased "due to cushion provided by the PHONES."[37] Ms. Persily shared this view because "the PHONES and existing notes act as equity cushions."[38] Citigroup further recognized that the LBO Banks "effectively 'subordinate[d]' the existing bonds by denying them guarantees."[39]

16.    As the various arrangers and lenders, including Citigroup, continued to negotiate the terms of the LBO Transaction, Citigroup's concerns over the viability of the LBO transaction

---

[34]    Deposition of Julie Persily, dated Feb. 1, 2011 ("Persily Dep. Tr.") 19:3.

[35]    NPP 191 (Email dated Feb. 6, 2007 from J. Persily to D. Wirnam, *et al.*) (On Feb. 6, 2007, Ms. Persily admitted: "I spoke with ML. They are on board with this silly structure . . . I am unequivocally not on board.").

[36]    NPP 1070 (Email dated Jan. 21, 2007 from Merrill Lynch employee Todd Kaplan to Citigroup employees Michael Canmann, Robert Chen, Julie Persily and Christina Mohr).

[37]    NPP 1049 (Email dated Dec. 10, 2006 from Merrill Lynch employee T. Kaplan to colleague Michael Costa); *see also* NPP 1323 (Email dated April 4, 2007 from Merrill Lynch employee T. Kaplan to M. Marcus expressing the view that the PHONES Notes were disadvantaged by Tribune undertaking an enormous amount of new debt: "there is no uncertainty re the PHONES - they are always last in the pile.").

[38]    NPP 202 (Email dated Feb. 20, 2007 from J. Persily to C. Mohr).

[39]    NPP 1165 (Email dated March 6, 2007 between J. Persily and C. Bigelow, *et al.*).

continued unabated.[40]  On March 28, 2007, Ms. Persily forwarded an unfavorable news article concerning the LBO Transaction to a colleague, commenting that "Ugly short NY Post article today.  Headline 'Tribune Debt may sink Zell' . . . 'a debt load that is way too high for a secular-wide declining business.'  Lovely."[41]  Ms. Persily conceded that Citigroup never "thought the Company's projections were achievable" and that Citigroup created [its] own set."[42]

17.    Although Citigroup did not believe the LBO Transaction was viable, it proceeded with the transaction out of fear of "franchise risk."  This concern arose from Citigroup's employees' conclusion that, if Citigroup did not fund the LBO Transaction, it would suffer reputational harm in the market.  In a series of emails in late March of 2007, Ms. Persily explained this concern:

- "Frank is very afraid that Morgan Stanley (advisor to special committee) will use this against us in marketing all the time.  We and Morgan compete in M&A all the time to be behind Goldman.  They'd use it on financing as well.  Citi drops at the last minute . . ."[43]

- "Christina [Mohr] afraid that Morgan Stanley (special advisor to the board) will trash us in the market place.  That's what got me on Board!"[44]

- "Chad feels pressure to move forward.  (I do too at this late date) owing to franchise risk.  Firm is Sensitive to point that morgan stanley is advisor to special committee and will trash us in the mkt if we back away now."[45]

---

[40]    NPP 254 (Email dated March 22, 2007 from J. Persily to C. Mohr) ("Having seen the book I am still extremely uncomfortable with Zell. No matter the rating.  Deal creep brings debt higher than the deal we approved for him which was 9.5bn new raise. (7.1x thru the new money.).  Declining ebitda is scary.  Until yesterday I did not know that Q1 cash flow was down 20 from last year.  All I heard was that pub was 6mm off plan and broadcast was 5mm higher.  *I'm very concerned..*") (emphasis added); NPP 1246 (Email dated March 24, 2007 from M. Singh to J. Apostolides and R. Chen) ("Given that interest expense will be a lot higher, the Company may not be able to handle this much debt. (We are still debating internally if we went to do this deal even with low ratings).").

[41]    NPP 285 (Email dated March 28, 2007 from J. Perisly to T. Kaplan. D. Tulvin, M. O'Grady, M. Canmann).

[42]    Persily Dep. Tr. at 92:16-17.

[43]    NPP 284 (Email dated March 28, 2007 between J. Persily and C. Leat).

[44]    NPP 296 (Email dated March 29, 2007 between J. Persily and J. Fishlow Minter).

[45]    NPP 297 (Email dated March 29, 2007 between J. Persily and J. Purcell).

18.     Shortly after Step One closed, Citigroup employees persisted in their concern over the deals' viability, and actually hoped Tribune's performance would be "so bad" that Tribune would be unable to meet satisfy the closing conditions for Step Two, including meeting its debt covenants and obtaining a solvency opinion.[46]   As the deal progressed and Tribune's financial condition continued to deteriorate, Citigroup continued to rely on the "cushion" provided by the PHONES Notes. On July 26, 2007, Ms. Persily acknowledged that: "Business continues to do poorly but they are not likely to break 9x [covenant] because they have a pretty decent cushion."[47]   When confronted by the Examiner with Citigroup's analysis that the management downside case and Citigroup's own case had Tribune "under water when it comes to total equity value," Ms. Persily admitted that "the equity would be, Zell's investment would be under water and perhaps the value of those PHONES Notes as well."[48]

19.     To try and bolster what they recognized as an already insolvent Tribune in December 2007, Citigroup and other LBO Lenders hired yet *another* solvency expert, Murray Devine, to assess VRC's solvency opinion. Apparently, this was done in a last-ditch effort to justify going forward with Step Two. As the Examiner concluded, "the limitations imposed on Murray Devine's work has more in common with willful blindness than the kind of due diligence sufficient to meet the good faith standard."[49]

---

[46]   NPP 482 (Email dated June 29, 2007 between J. Persily and T. Dilworth); NPP 497 (Email dated July 20, 2007 between J. Persily and T. Dilworth).

[47]   NPP 1488 (Email dated July 26, 2007 between J. Persily and T. Dilworth).

[48]   NPP 782 (Exam'rs Rpt.), Vol. I at 632. *See also* NPP 482 (Email dated June 29, 2007 between J. Persily and T. Dilworth); NPP 497 (Email dated July 20, 2007 between J. Persily and T. Dilworth) (hoping that Tribune would fail to meet its debt covenants or fail to obtain a solvency opinion).

[49]   *See* NPP 782 (Exam'rs Rpt.), Vol. II at 270-72.

20.     Citigroup's concern was so acute that in mid-December 2007, Citigroup attempted to hire its own solvency expert – Houlihan Lokey – to provide support for Tribune's solvency and to justify closing Step Two.[50] Houlihan declined.[51]

21.     As Bank of America employee Daniel Petrik's notes taken during a LBO Lender conference call on December 14, 2007 establish, the LBO Lenders had grave doubts about whether to proceed with Step Two that would render Tribune insolvent.[52] Mr. Petrick's notes observe that Citigroup had "[n]ot yet landed" as to whether to close Step Two and acknowledged the proverbial guerrilla in the room that there is "[m]ore risk if end up in bankruptcy." Ms. Persily testified that Tribune's projections were not "necessarily relevant between stage one and stage two *because we had to fund the transaction.*" (emphasis added).[53] Ms. Persily also testified that Citigroup and the other LBO Lenders weighed their knowledge that Tribune was insolvent against their contractual obligation to close Step Two.[54]

22.     Despite the Citi Entities knowledge that the LBO Transaction would be ruinous for Tribune, and for the PHONES Notes in particular, Citibank did not resign as the indenture trustee for the PHONES Notes throughout the LBO Transaction, and did not resign until August 2008.

---

[50]   NPP 638 (Email dated Dec. 13, 2007 from K. Kirchen to B. Beuttell) ("[Houlihan employee] got a call from Karen Kirchen, North American General Counsel at Citigroup. She was calling to see if we could be helpful in assessing the solvency of Tribune Company."); *see* NPP 782 (Exam'rs Rpt.), Vol. I at 632.

[51]   *Id.* ("The good news is that we would not be hired to deliver a solvency opinion, but if we end up where I think we all know we would end up with our analysis, we may be the ones to 'kill the deal' so to speak and not certain we want to be involved in that mess."); *see* NPP 782 (Exam'rs Rpt.), Vol. I at 633.

[52]   *See* NPP 1821 (Handwritten Notes of Daniel Petrik, Bank of America, dated Dec. 14, 2007); NPP 19 (Excerpt from Exam'rs Rpt., Vol. I at 617 containing typed replication of the Petrik Notes); *see also* Deposition of Daniel Petrik, dated Feb. 4, 2011 ("Petrik Dep. Tr.") 204:13-205:4; 211:6-17; 230:11-231:7.

[53]   *See* Persily Dep. Tr. 268:12-14.

[54]   *See id.* at 224:11-15; 225:6-12; 230:80-25.

23.     At all relevant times during the planning and closing of the LBO Transaction, all of the LBO Lenders knew that Citigroup was a lead arranger of the LBO <u>and</u> that Citibank was the indenture trustee for the PHONES Notes, knew that Citibank was taking no action on behalf of the PHONES Notes in connection with the LBO Transaction, and they aided and abetted that breach.[55]

24.     Moreover, the evidence set forth in the NPP Findings at Sections 1(D), 1(F), 1(I) and 1(K), establishes that the LBO Lenders lacked "good faith" at <u>both</u> Step One and at Step Two.[56]

## SUPPLEMENTAL PROPOSED CONCLUSIONS OF LAW

**I.      THE DEBTORS' PLAN IS NOT CONFIRMABLE BECAUSE IT MISAPPLIES THE PHONES NOTES' SUBORDINATION.**

**A.      The PHONES Notes are Not Subordinated to the LBO Lenders at the Parent Company Level.**

1.     According to Illinois state law, the terms of the PHONES Indenture are enforced according to their plain and unambiguous terms.[57]    Section 14.09 of the PHONES Indenture

---

[55]    *See e.g.,* DCL 964 (Amended PHONES Complaint) at ¶¶ 212-217.

[56]    *See* Noteholder Brief at IIG; IIIA.4; *see also* NPP 1049 (Email dated Dec. 10, 2006 between T. Kaplan and M. Costa) (discussing ability to increase leverage "due to cushion provided by the PHONEs"); NPP 1070 (1/21/07 email from T. Kaplan to M. Canmann, *et al.*) ("PHONEs take an important layer of risk underneath the new financing"); NPP 1323 (Email dated April 4, 2007 from T. Kaplan to M. Marcus) ("PHONEs trading important, as there is no uncertainty re the PHONES - they are always last in the pile"); NPP 1320 (Email dated April 3, 2007 from P. Cohen to S. Jain,) at JPM_00286534; NPP 1347 (4/11/07 email from P. Cohen to J. Marks, *et al.*) (discussing heightened leverage due to subordination of PHONES).    The Examiner also found it "reasonably likely" that the LBO Lenders *failed* to establish the good faith defense under Bankruptcy Code Section 548 with respect to their Step Two obligations.    NPP 782 (Exam'rs Rpt.), Vol. II at 264-278.    The Examiner also concluded that the court could equitably subordinate all or part of the LBO Debt because the LBO Lenders unfairly took advantage of other creditors, including the PHONES.    *Id.* at 334.    The Examiner recognized that the LBO Lenders' knowledge that Step Two would render Tribune insolvent could result in the equitable subordination (and possibly equitable disallowance) of the Step Two Debt *and* possibly some or all of the Step One debt.    *See id.*    In drawing this conclusion, the Examiner also noted that equitable subordination might be appropriate had he applied a legal standard different than that applied to determine good faith in connection with a 548(c) defense.    *Id.* at 332.

[57]    *See City of Chicago v. Comcast Cable Holdings, L.L.C.*, 375 Ill. App. 3d 595, 600-01 (2007) ("'Illinois courts consistently hold that words used in a contract must be given their plain and ordinary meaning' and that 'clear and unambiguous contract terms control the rights of the parties.'") (*citing Johnstowne Centre P'ship v. Chin*, 99 Ill. 2d 284, 287-88 (1983)) ("a contract's meaning must be determined from the words or language used, and a court cannot

protects the PHONES Notes from actions of purportedly senior debtholders who do not act in good faith.[58]  Thus, the plain terms of the PHONES Indenture require that the subordination provisions contained in the PHONES Indenture cannot be enforced by or for the benefit of purportedly senior debt who fail to act in good faith.

2.      The DCL Plan Proponents urge a different interpretation, without benefit of supporting evidence.[59]  Without any proof, the DCL Plan Proponents argue that Section 14.09 only means that rights of holders of senior indebtedness to enforce or benefit from the PHONES' subordination are not prejudiced even if they do not act in good faith.  Such a tortured reading of the PHONES Indenture would turn the plain meaning of the bargained-for protections of the PHONES Notes on its head and is rejected.  To the extent that the DCL Plan Proponents sought to establish the parties' contrary intent, they were required to introduce parol evidence to establish that intent.  The DCL Plan Proponents offered no such evidence in support of their interpretation of the PHONES Indenture at the confirmation hearing.[60]

3.      The DCL Plan Proponents bear the burden of proof in prosecuting their plan, including establishing that they satisfied Section 510(a) of the Bankruptcy Code in order to meet their burden under Section 1129(a)(1).[61]  The DCL Proponents failed to satisfy their burden

---

place a construction on the contract which is contrary to the plain and obvious meaning of the language"); *Hunt v. Farmers Ins. Exch.*, 357 Ill. App. 3d 1076 (2005); *Golden Rule Ins. Co. v. Schwartz*, 203 Ill. 2d 456 (2003); *Srivastava v. Russell's Barbecue, Inc.*, 168 Ill. App. 3d 726 (1988).

[58]    *See supra*, PHONES Findings at ¶ 4.

[59]    *See* DCL Confirmation Brief [D.I. 8173], at 173; WTC Post-Trial Brief at 10-11.

[60]    *See Baker v. America's Mortg. Servicing, Inc.*, 58 F.3d 321, 326 (7th Cir. 1995) (contract with two reasonable and fair interpretations is clarified through judicial examination of extrinsic evidence).

[61]    *See, e.g., In re Armstrong World Indus.*, 348 B.R. 111, 120 & n. 15 (D. Del. 2006) (plan proponent must establish by preponderance of the evidence the satisfaction of requirements of both Bankruptcy Code Section 1129(a) and 1129(b)); 7 *Collier on Bankruptcy* ¶ 1129.05[1][d] (16th ed. 2009) ("At the [confirmation] hearing, the proponent bears the burdens of both introduction of evidence and persuasion that each subsection of Section 1129(a) has been satisfied…  If nonconsensual confirmation is sought, the proponent of such a plan will have to satisfy the court that the requirements of Section 1129(b) are also met.  In either situation, the plan proponent bears the burden of proof by a preponderance of the evidence.").

under Sections 510(a) and 1129(a)(1) and their interpretation of the PHONES Indenture must be rejected.[62]

4.    Consequently, the Court does not find that the LBO Lenders acted in good faith entitling them to enforce the PHONES Notes' subordination. Since the DCL Plan provides a recovery valued at roughly $85.71 million dollars in consideration to the LBO Lenders at the parent company level, it cannot be confirmed.

### B.    The PHONES Notes are Not Subordinated to the "Other Parent Claims" Class.

5.    The DCL Plan misapplies the PHONES Indenture as it concerns Class 1F Other Parent Claims under the DCL Plan. The PHONES' subordination is strictly limited pursuant to its terms. Section 14.01 of the PHONES Indenture states, that the PHONES "shall be subordinated to Senior Indebtedness" as defined in Section 14.01 to be "the principal of (and premium, if any) and interest on . . . and other amounts due on or in connection with any Indebtedness of [Tribune Company]."[63] The PHONES Indenture requires, as a gating issue, that debt qualify as "Indebtedness" in order to enjoy the benefit of subordination of the PHONES Notes. Even if debt satisfies this threshold issue, the PHONES Indenture then narrows the application of any subordination by excluding from "Senior Indebtedness" certain types of claims.

---

[62]    *See, e.g., In re TCI 2 Holdings, LLC*, 428 B.R. 117, 141 (Bankr. D.N.J. 2010) ("Section 1129(a)(1) requires a plan to conform to the provisions of Title 11, including Section 510(a), which makes subordination agreements enforceable in bankruptcy to the same extent such agreements are enforceable outside of bankruptcy.").

[63]    Section 14.01 of the PHONES Indenture defines "Indebtedness" to be: (i) all obligations represented by notes, bonds, debentures or similar evidences of indebtedness; (ii) all indebtedness for borrowed money or for the deferred purchase price of property or services other than, in the case of any such deferred purchase price, on normal trade terms; . . . and (iv) all Indebtedness of others for the payment of which such Person is responsible or liable as obligor or guarantor.

6.     Here, the DCL Plan permits certain holders of Class 1F Other Parent Claims to benefit from subordination of the PHONES Notes, notwithstanding the exclusion of those claims from the subordination provisions of the PHONES Indenture.[64]

7.     First, included in the Class 1F other Parent Claims class is the so-called "Swap Claim," held by DCL Plan Proponent Oaktree Capital Management, L.P. ("Oaktree"). Section 1.1.243 of the DCL Plan defines the "Swap Claim" as consisting of "any Claims asserted under that certain 1992 ISDA Master Agreement, dated as of July 2, 2007 between Barclays Bank PLC and Tribune."[65] This claim constitutes some 57% of the Other Parent Claims class.[66] The Swap Claim, however, does not qualify as "Indebtedness" under Section 14.01 of the PHONES Indenture. The Swap Claim arises under a contract pursuant to which parties agreed to pay certain amounts to each other under certain circumstances and represents either an asset or liability to each party, depending on the prevailing conditions of the swap. Oaktree had admitted that the Swap Claim is not an obligation for indebtedness for borrowed money represented by notes, bonds, or a debenture within the meaning of Section 14.01 of the PHONES Indenture.[67] The Swap Claim is not "similar" to debt represented by notes, bonds or debentures entitled to benefit from the PHONES Notes' subordination, despite the DCL Plan Proponents' argument to

---

[64]   See NPP Reply Brief at 33-36, which is incorporated herein.
[65]   NPP 2300 ("Swap Agreement").
[66]   See DCL Ex. 1110 at p. 15, n. 30 (Whittman Expert Report – PV Analysis (and demonstratives)); see also DCL Confirmation Brief at pg. 91
[67]   As stated by Oaktree's counsel during oral argument, "the [S]wap [C]laim is not for money loaned. It represents Tribune's liability under an interest rate agreement that was terminated as a consequence of Tribune's bankruptcy filing." 4/14/11 Trial Tr. 3755:14-17. Oaktree's counsel also cited the Ninth Circuit's decision in Thrifty Oil, in which the Ninth Circuit held that "[a] fundamental characteristic of an interest rate swap is that the counterparties never actually loan or advance the notional amount." Thrifty Oil Co. v. Bank of America Nat. Trust & Sav. Ass'n, 322 F.3d 1039, 1048 (9th Cir. 2002).

the contrary.[68]  Because the Swap Claim is not "Indebtedness," the Swap Claim, as a claim in Class 1F Other Parent Claims, is not entitled to benefit from the PHONES Notes' subordination.

8.    <u>Second</u>, another group of claims improperly included in Class 1F Other Parent Claims are trade claims (the "Trade Claims").  These claims constitute roughly 3% or $8.8 million of the total indebtedness in this class of $264.7 million.[69]  Under §14.01 of the PHONES Indenture, indebtedness "constituting trade accounts payable arising in the ordinary course of business" are explicitly excluded from "Senior Indebtedness" under the PHONES Indenture. Therefore, holders of such "Trade Claims" cannot enforce or benefit from the application of the PHONES Notes' subordination.[70]

9.    <u>Third</u>, the remaining 40% or $105 million of Class 1F Other Parent Claims are made up of "Retiree Claims."[71]  These claims plainly fall outside the definition of "Indebtedness" under the PHONES Indenture.  The DCL Plan Proponents' argument that these claims constitute "indebtedness for . . . the deferred purchase price of . . . services" is wrong and rejected.[72]  Even the DCL Plan Proponents themselves do not enthusiastically support this tortured reading of the PHONES Indenture, noting that "the issue is not entirely free from doubt."[73]  The Retiree Claims do not fall within the definition of "Indebtedness" under the PHONES Indenture since the

---

[68]   *See* DCL Post-Trial Brief at pg. 91; *Thrifty Oil*, 322 F.3d at 1048 (A fundamental characteristic of an interest rate swap is that the counterparties never actually loan or advance the notional amount.  The swap involves an exchange of periodic payments calculated by reference to interest rates and a hypothetical notional amount. Payments made under an interest rate swap cannot possibly compensate for . . . the delay and risk associated with borrowed money because no loan has taken place between the counterparties.  The damages due upon termination of the swap merely provide the replacement cost of the lost swap payments and likewise cannot represent interest, unmatured or otherwise).

[69]   DCL Ex. 1110 at 15 n. 30 (Whittman Expert Report – PV Analysis (and demonstratives)).

[70]   *See* PHONES Indenture Section 14.01 (2)(C).

[71]   DCL Plan, § 3.2.6; *see also* DCL Ex. 1110 at 15 n. 30 (Whittman Expert Report – PV Analysis (and demonstratives)); DCL Post-Trial Brief at pg. 92.

[72]   *See* DCL Post-Trial Brief at pg. 92.

[73]   *See id.*

PHONES' subordination does not apply to deferred purchases on normal trade terms.  The DCL

Plan Proponents did not offer any evidence to support their interpretation of the PHONES

Indenture or to support this provision of the DCL Plan, and it is rejected.

### C.    The Class 1J Litigation Trust Interests are Not Subordinated.

10.    The DCL Plan misapplies the subordination provisions with respect to recoveries

from the Litigation Trust established by Article XIII of the DCL Plan.[74]  Under Illinois law

applicable to the PHONES Indenture, the PHONES' subordination is strictly limited to

"distributions of assets *of the Company*" (i.e., distributions of assets of Tribune Company).[75]

Therefore, the PHONES' subordination is inapplicable to money judgments obtained by the

Litigation Trust based on causes of action that belong to the PHONES or other pre-petition

creditors.[76]    Indeed, it is well-established in this Circuit that fraudulent conveyance claims

against third-parties arising under state law constitute claims that belonged to creditors pre-

petition.[77]  It thus follows that *recoveries* by a litigation trust on fraudulent conveyance claims

are not assets of the company.

11.    Here, the PHONES' subordination does not extend to proceeds of the Litigation

Trust, because such proceeds are not and will never be the assets of the Tribune Company.

---

[74]    The Holders of PHONES Notes have consented to the treatment of the PHONES Notes under the Noteholder Plan and the conclusion with respect to the Class 1J Litigation Trust Interests do not apply to the Noteholder Plan.

[75]    *See* PHONES Indenture Section 14.02 (emphasis added).

[76]    Section 14.02 of the PHONES Indenture provides that only recoveries from the Tribune Company are to be turned over to holders of Senior Indebtedness. *See also In re Time Sales Fin. Corp.*, 491 F.2d 841 (3d Cir. 1974); *In re Bank of New England Corp.*, 2008 WL 8052903 (Bankr. D. Mass. 2008) (Expert Report of Kenneth Klee regarding interpretation of subordination provisions); *In re Ionosphere Clubs, Inc.*, 134 B.R. 528 (Bankr. S.D.N.Y. 1991).

[77]    *See Official Creditors Comm. of Unsecured Creditors v. Chinery (In re Cybergenics Corp.)*, 226 F.3d 237, 245 (3d Cir. 2000).

Accordingly, the DCL Plan errs by impermissibly extending the PHONES' subordination to recoveries from the DCL Plan's Litigation Trust.[78]

> **D.    As a Consequence of the Improper Application of the PHONES Notes' Subordination, the DCL Plan Impermissibly Provides the PHONES Notes Less than they would receive in a Chapter 7 Liquidation and unfairly discriminates against holders of PHONES Notes.**

12.    The DCL Plan may not be confirmed if the PHONES Notes are receiving less under the DCL Plan that they would receive in a Chapter 7.[79]  In order to determine whether a plan of reorganization provides all parties with the liquidation value of their claims, a court looks to each creditor's rights in a liquidation under state law.[80]  As the result of the DCL Plan's misapplication of the PHONES' subordination by incorrectly allocating recoveries due the PHONES Notes to other creditors, the DCL Plan provides the PHONES Notes with less than they would receive in a Chapter 7 liquidation or under state law.  Accordingly, the DCL Plan cannot be confirmed.

13.    Similarly, the improper and erroneous application of the PHONES' subordination results in unfair discrimination against the PHONES Notes and other creditors, violating Section 1129(b)(1).[81]  The DCL Plan Proponents have not established that they are entitled to discriminate against the PHONES Notes, rendering the DCL Plan unconfirmable under Section 1129(b)(1) of the Bankruptcy Code.

---

[78]    *See* WTC Post-Trial Brief, at 7-9.

[79]    *See* 11 U.S.C. §1129(a)(7);  *see also In re PWS Holding Corp.*, 228 F.3d 224, 230 (3d Cir. 2000) ("a court shall confirm a plan only if the debtor demonstrate[s] . . . that creditors rejecting the plan would not receive a greater recovery in Chapter 7 liquidation");  *Top Hat, Ltd. v. Aurora Foods, Inc. (In re Aurora Foods, Inc.)*, 2006 U.S. Dist. LEXIS 91659, at *24 (D. Del. 2006) (same).

[80]    *See Butner v. U.S.*, 440 U.S. 48, 54 (1979).

[81]    *See, e.g,. In re Genesis Health Ventures*, 280 B.R. 339, 346 (D. Del. 2002) ("Under the Bankruptcy Code, creditors of the same class are to be treated in the same manner, unless they consent to receive less favorable treatment.");  *In re Armstrong World Indus., Inc.*, 348 B.R. 111, 121 (D. Del. 2006) ("[t]he pertinent inquiry is not whether the plan discriminates, but whether the proposed discrimination is 'unfair' ").

## II. THE DCL PLAN IS NOT CONFIRMABLE
## BECAUSE IT MOOTS THE PHONE COMPLAINT.

14.    The DCL Plan fails to provide Wilmington Trust with due process rights with respect to claims that clearly belong to holders of the PHONES Notes.  On March 4, 2010, Wilmington Trust, as Indenture Trustee, filed the PHONES Complaint, seeking relief against the PHONES Complaint Defendants for causes of action including equitable disallowance, equitable subordination and the imposition of a constructive trust.[82]  These claims are individual claims of the holders of the PHONES Notes.  The Court adopts the Examiner's findings that the PHONES Complaint contains individual claims that belong to the holders of the PHONES Notes and are not estate claims.[83]  The DCL Plan's failure to address the PHONES Complaint and settle the claims arising thereunder with no direct consideration to the PHONES[84] is without legal basis. The DCL Plan's distribution scheme that satisfies claims of and distributes proceeds to the PHONES Complaint Defendants (i.e., the LBO Lenders) would effectively render futile several causes of action in the PHONES Complaint, including equitable disallowance and equitable subordination.[85]

15.    This attempt to "moot" the colorable claims of Wilmington Trust on behalf of the holders of the PHONES Notes is rejected.  Under Section 502(a) of the Bankruptcy Code and applicable caselaw in this Circuit, distributions to creditors are not made until the amount of

---

[82]    See Adv. No. 10-50732 [D.I. 1] at ¶ 2.

[83]    NPP 782 (Exam'rs Rpt.), Vol. I at 27.

[84]    See DCL Plan at §3.2.3 (providing substantial recoveries to the LBO Lenders, without "reduction, disallowance, subordination, set off, or counterclaim").

[85]    See, e.g., In re Levitz Furniture, Inc., 267 B.R. 516 (Bankr. D. Del. 2000) (addressing concern that confirmation of the plan of reorganization would moot the equitable relief sought by the Defendants); In re Big Wheel Holding Co., Inc., 214 B.R. 945 (D. Del. 1997) (addressing plaintiffs' concern that disbursements of monies would moot their equitable subordination action).

claims and their relative priority are fixed.[86]  Though the D/C/L Plan Proponents have attempted

to settle estate claims against the LBO Lenders, this does not entitle them to settle individual

claims against the LBO Lenders, including those held by the holders of PHONES Notes.

Therefore, the D/C/L Plan cannot be confirmed.

Date:  June 3, 2011
       Wilmington, Delaware

Respectfully submitted,
SULLIVAN • HAZELTINE • ALLINSON LLC
/s/ William D. Sullivan
William D. Sullivan (Del. Bar No. 2820)
Elihu E. Allinson (Del. Bar No. 3476)
901 Market Street, Suite 1300
Wilmington, DE 19801
Telephone:  (302) 428-8191
Facsimile: (302) 428-4195
Email: bsullivan@sha-llc.com
Email: zallinson@sha-llc.com
-and-
BROWN RUDNICK LLP
Robert J. Stark, Esq.
Martin S. Siegel, Esq.
Gordon Z. Novod, Esq.
Katherine S. Bromberg, Esq.
Seven Times Square
New York, New York 10036
Telephone:  (212) 209-4800
Facsimile:  (212) 209-4801
Email: rstark@brownrudnick.com
Email: msiegel@brownrudnick.com
Email: gnovod@brownrudnick.com
Email: kbromberg@brownrudnick.com

*Counsel to Wilmington Trust Company, as
Successor Indenture Trustee for the $1.2 Billion
Exchangeable Subordinated Debentures Due 2029,
Generally Referred to as the PHONES Notes and
one of the Noteholder Plan Proponents*

8298174

---

[86]  11 U.S.C. §502(a); *See, e.g., In re Penn Cent. Transp. Co.*, 596 F.2d 1155, 1165 (3d Cir. 1979) ("[u]ntil the validity and priority of the . . . claims were finally determined through litigation, no distributions of any kind could be made"); *see also In re Nw. Corp.*, 362 B.R. 131, 134 (D. Del. 2007) (remanding case to bankruptcy court to avoid distributions before resolution of disputed claims).