Thanks for the names of the potential successors.

Jack

-----Original Message-----
From: Kirchner, Robert T [CIB-GTS]
[mailto:robert.t.kirchner@citigroup.com]
Sent: Wednesday, January 24, 2007 12:10 PM
To: Rodden, Jack
Subject: RE: Tribune Company

Jack,

Have you selected a successor?

Bob

-----Original Message-----
From: Kirchner, Robert T [CIB-GTS]
Sent: Wednesday, January 10, 2007 10:36 AM
To: 'jrodden@tribune.com'
Cc: Cupo, Jennifer [CIB-GTS]; Forte, Nancy H [CIB-GTS];
'Irving.Apar@ThompsonHine.com'
Subject: Tribune Company

Jack,

Pursuant to our conversation please be advised that I am your primary
contact at Citibank for the resignation of the Trustee and agency
appointments for your Company's debt securities.  As we discussed, Bank of
New York, US Bank, Wells Fargo, Deutsche and Wilmington Trust are possible
successors you may consider.
Nancy Forte (212) 816-5685 is your Account Officer and will coordinate the
documentation requirements with our counsel, Irving Apar of Thompson Hine.
Please advise when you have selected a successor and we will complete the
process as quickly as possible.

Regards,

Bob
(212) 816-5698

# EXHIBIT 21

| From: | Ojea-Quintana, Julio [CIB-GBKG] <julio.ojeaquintana@citigroup.com> |
|---|---|
| Sent: | Friday, March 9, 2007 9:14 PM (GMT) |
| To: | Bigelow, Chandler <cbigelow@tribune company.com> |
| Cc: | Rodden, Jack <jrodden@tribune company.com>; Eldersveld, David <deldersveld@tribune company.com> |
| Subject: | RE: Debt Trustee |

Chandler- I spoke with my internal folks and we can delay the process. They are only asking if we can agree on some reasonable date to have the trustee change effective. Would 6/30 be ok for you? let me know. Thanks.

---

**From:** Bigelow, Chandler [mailto:CBigelow@tribune.com]
**Sent:** Friday, March 09, 2007 7:23 AM
**To:** Ojea-Quintana, Julio [CIB-GBKG]
**Cc:** Rodden, Jack; Eldersveld, David
**Subject:** Debt Trustee

Julio – Jack has been working with Bob Kirchner on moving the debt trustee business.  Given everything we are currently working on with Christina Mohr and Team, is it possible that we push this back a month or so?  Just have too much going on at the moment.  Please let me know.  Many thanks, Chandler

EXHIBIT

NPP_2493


EXHIBIT
KIRCHNER
7
KK 3/10/11

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0536333

# EXHIBIT 22

| | |
|---|---|
| **Cc:** | Kirchner, Robert T [CIB-GTS][] |
| **To:** | Cupo, Jennifer [CIB-GTS][]; Winnick, Jonathan [CIB-GCO][] |
| **From:** | Forte, Nancy H [CIB-GTS] |
| **Sent on behalf of:** | Forte, Nancy H [CIB-GTS] |
| **Sent:** | Wed 4/25/2007 2:03:40 PM |
| **Importance:** | High |
| **Sensitivity:** | None |
| **Subject:** | Tribune Company  - URGENT - |
| **Categories:** | urn:content-classes:message |

**PHONES Letter - April 9, 2007.pdf**

Hi, I wanted to forward this to you, it's a letter that Tribune received from holders of their "PHONES" looking to   declare a Notice of Default due to the sale of certain properties, etc. due to the Tribune reconstruction.  I will get the INdenture and the pertinent sections out and send them to you. Jack Rodden has asked me to get holders lists from DTC, which I am in the process of doing.   Let me know what else we should do at this time, if anything.

Regards,
Nancy Forte
Assistant Vice President
Citibank Agency and Trust
388 Greenwich Street, 14th Floor
New York, New York  10013
Phone:     (212) 816-5685
Facsimile:  (212) 816-5527
Email:  nancy.h.forte@citigroup.com

------------------------------------------------------------------------------------------

Privileged/Confidential Information may be contained in this message. If you are not the addressee indicated in this message (or responsible for delivery of the message to such person), you may not copy nor deliver this message to anyone. In such case, you should destroy this message and kindly notify the sender by reply email.  This notice is automatically appended to each e-mail.  It is the recipient's responsibility to take measures to ensure that this e-mail is virus free, and no responsibility is accepted by Citibank, N.A. for any loss or damage arising in any way from its use.  Please advise immediately if you or your employer do not consent to receiving information via internet e-mail messages.

-----Original Message-----
From: Rodden, Jack [mailto:JRodden@tribune.com]
Sent: Wednesday, April 25, 2007 9:46 AM
To: Forte, Nancy H [CIB-GTS]
Subject: PHONES

Nancy,

This is the letter I referred to on the phone.

Please call my cell at 312-731-8217.  Our first priority is to get an up to date list (and a list as of April 9, 2007 if different) of registered shareholders -- as registered shareholders are defined in the indenture.



EXHIBIT
KIRCHNER
8
KK 3/10/11

EXHIBIT
NPP_2494

CITI-TRIB-CC 00291461

Thanks,
Jack

 <<PHONES Letter - April 9, 2007.pdf>>

CONFIDENTIAL

CITI-TRIB-CC 00291462



ANDREWS
ATTORNEYS
KURTH LLP

450 Lexington Avenue
New York, NY 10017
212.850.2800 Phone
212.850.2929 Fax
andrewskurth.com

Paul N. Silverstein
212.850.2819 Phone
212.850.2929 Fax
paulsilverstein@andrewskurth.com

April 9, 2007

**VIA CERTIFIED MAIL - R.R.R.**

Tribune Company
435 North Michigan Avenue
Chicago, Illinois 60611
Attention: Secretary

> Re:  *Tribune Company ("Tribune") PHONES Exchangeable Subordinated Debentures due 2029 ("PHONES") issued pursuant to Indenture, dated as of April 1, 1999 ("Indenture") -* **NOTICE OF DEFAULT**

Gentlemen:

We represent Camden Asset Management L.P. and SuttonBrook Capital Portfolio L.P., which together hold $467,561,700 original principal amount of the PHONES, representing approximately 37% of the outstanding PHONES. Our clients have directed us to provide this letter to you on their behalf. Capitalized terms used in this letter and not defined herein shall have the meanings set forth in the Indenture.

Section 10.05 of the Indenture requires Tribune to "cause all properties used or useful in the conduct of its business ... to be maintained and kept in good condition ... ; provided, however, that nothing in this Section shall prevent the Company from discontinuing the operation and maintenance of any of such properties, or disposing of any of them, if such discontinuance or disposal is, in the judgment of the Company or of the Subsidiary concerned, desirable in the conduct of its business ... and not disadvantageous in any material respect to the Holders."

As described in Tribune's Annual Report on Form 10-K for the year ended December 31, 2006, Tribune sold numerous television stations and used the proceeds to fund stock repurchases. Tribune was at the same time actively exploring and has now entered into agreements to consummate a transaction that includes further asset sales, the issuance of over $8 billion of debt and a special dividend to stockholders equal to approximately 104% of the current market capitalization. As a consequence, Tribune has violated the provisions of Section 10.05 of the Indenture because such dispositions were materially disadvantageous to the Holders: the disposition of assets and distribution of the proceeds to stockholders raise serious questions regarding, among other things, Tribune's ability to repay the PHONES at maturity. In addition,

Austin   Beijing   Dallas   Houston   London   Los Angeles   New York   The Woodlands   Washington, DC

CONFIDENTIAL

CITI-TRIB-CC 00291463

Tribune Company
April 9, 2007
Page 2

the publicly announced intention to sell the Chicago Cubs baseball team will also violate Section 10.05 of the Indenture for similar reasons if such sale is consummated.

This letter constitutes a Notice of Default under Section 5.01(4) of the Indenture with respect to the breach of Section 10.05 of the Indenture. Tribune is hereby required to remedy such breach within 60 days after the date of this letter. Failure to do so will result in an Event of Default under the Indenture.

If you have any questions regarding the matters raised in this letter, please do not hesitate to contact us.

Sincerely,

Paul N. Silverstein

cc:     Citibank, N.A., Trustee
        111 Wall Street
        15th Floor, Zone 8
        New York, New York 10043

HOU:2680712.4

CONFIDENTIAL

CITI-TRIB-CC 00291464

# EXHIBIT 23



**ANDREWS**
ATTORNEYS **KURTH** LLP

450 Lexington Avenue
New York, NY 10017
212.850.2800 Phone
212.850.2929 Fax
andrewskurth.com

Paul N. Silverstein
212.850.2819 Phone
212.850.2929 Fax
paulsilverstein@andrewskurth.com

EXHIBIT
NPP_2496

May 8, 2007

**VIA FACSIMILE AND FEDERAL EXPRESS**



Crane H. Kenney, Esq.
Senior Vice President and General Counsel
Tribune Company
435 North Michigan Avenue
Chicago, Illinois 60611

Re:  *Tribune Company ("Tribune") PHONES Exchangeable Subordinated Debentures due 2029 ("PHONES") issued pursuant to Indenture, dated as of April 1, 1999 ("Indenture")*

Dear Mr. Kenney:

The following responds to your letter dated May 2, 2007 (the "Tribune Letter").  Our letter to you, dated April 9, 2007 (the "Notice of Default Letter"), was written on behalf of (and as duly authorized agent for) Camden Asset Management L.P. and SuttonBrook Capital Portfolio L.P., which, in the aggregate, held and continue to hold, in excess of twenty five percent (25%) of the outstanding PHONES.

We are at a loss as to why you chose to misquote our quotation of Section 10.05 of the Indenture while simultaneously omitting key language yourself - - i.e. ". . . disadvantageous in any material respect to Holders".  The Notice of Default Letter clearly and properly quotes Section 10.05 of the Indenture.  As to whether or not the Company is in default of Section 10.05 of the Indenture, we will leave that for a court of competent jurisdiction to decide - - presumably after the PHONES are accelerated pursuant to Section 5.02 of the Indenture.

Paragraph 2 of the Tribune Letter is likewise incorrect.  The Notice of Default Letter properly noticed a default pursuant Section 5.01(4) of the Indenture.  We refer to you the decision in *BearingPoint*, a copy of which is attached hereto as Exhibit A, which was recently decided by the New York Supreme Court.  After analyzing the notice provisions of the indenture and the description of "holders" in the offering memorandum (both of which have virtually identical language to the Indenture and the PHONES offering documents), the *BearingPoint* Court determined that beneficial holders had properly noticed a default.  Our clients, who are beneficial holders of PHONES, likewise have the ability to notice a default under the Indenture.  As further support of the fact that our clients are holders of PHONES, at the request of Citibank,

NYC:164060.4
Austin    Dallas    Houston    London    Los Angeles    New York    The Woodlands    Washington, DC

CITI-TRIB-CC00091993

Tribune Company
May 8, 2007
Page 2

as Indenture Trustee for the PHONES, our clients are in the process of providing Citibank with medallion-stamped brokerage statements evidencing their respective holdings as of April 9, 2007, the date of the Notice of Default Letter.

Based upon the foregoing, the Notice of Default Letter properly constitutes a "Notice of Default" under Section 5.01 of the Indenture due to Tribune's default under Section 10.05 of the Indenture. If the Tribune does not remedy the breach of Section 10.05 of the Indenture pursuant to the Notice of Default, our clients intend to accelerate the PHONES pursuant to Section 5.02 of the Indenture.

If you have any questions regarding the foregoing, please do not hesitate to contact us at your convenience.

Sincerely,

Paul N. Silverstein

cc:    Citibank Agency and Trust
       388 Greenwich Street, 14th Floor
       New York, New York  10013
       Attention: Nancy Forte, Assistant Vice President

NYC:164060.4

CITI-TRIB-CC 00091993

CITI-TRIB-CC00091994

# EXHIBIT A

CONFIDENTIAL

CITI-TRIB-CC 00091994

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK:  IAS PART 60
------------------------------------------------------------------------x

**FBEM**

THE BANK OF NEW YORK, not in its individual
capacity but solely in its capacity as Indenture Trustee on
behalf of all Holders of 2.75% Series B Convertible
Subordinated Debentures Due December 15, 2024 of
BearingPoint, Inc.,

                                                         Plaintiff,                Index No. 600169/06

               -against-

BEARINGPOINT, INC.,

                                                  Defendant.

------------------------------------------------------------------------x

**APPEARANCES:**

For Plaintiff:

Kleinberg, Kaplan, Wolff & Cohen, P.C.
LLP
551 Avenue of the Americas
New York, New York 10176
(David Parker, Edward P. Grosz, Esqs.)

Anthony, Ostlund & Baer, P.A.
90 S. 7th Street, Ste. 3600
Minneapolis, MN 55402
(Jeffrey I. Ross, Esq.)

For Defendant:

Fried, Frank, Harris, Shriver & Jacobson

One New York Plaza
New York, New York 10004-1980
(Matthew Gluck, Esq.)

**FRIED, J.:**

       Plaintiff The Bank of New York, not in its individual capacity but solely in

its capacity as Indenture Trustee on behalf of all Holders of 2.75% Series B Convertible

Subordinated Debentures Due December 15, 2024 of BearingPoint, Inc., moves, pursuant

to CPLR 3212, for an order granting summary judgment as to the first cause of action

CONFIDENTIAL

CITI-TRIB-CC00091996

asserted in the complaint.

Defendant BearingPoint, Inc. cross-moves, pursuant to CPLR 3212, for summary judgment, dismissing the complaint.

Plaintiff The Bank of New York is a New York banking corporation with its principal place of business in New York, New York. The Bank of New York is the Indenture Trustee (Indenture Trustee) under an indenture, dated as of December 22, 2004 (Indenture), between BearingPoint, Inc. (Bearingpoint) and itself as Trustee. Pursuant to the terms of the Indenture, BearingPoint issued $225 million principal amount of its 2.50% Series A Convertible Subordinated Debentures and $175 million principal amount of its 2.75% Series B Convertible Subordinate Debentures due December 15, 2024. The registered Holder of the Notes is Cede & Co., the nominee of the Depository Trust Company (DTC). Defendant BearingPoint is a publicly held global management and technology consulting firm that trades on the New York Stock Exchange. BearingPoint is incorporated under the laws of the State of Delaware, with its corporate headquarters in McLean, Virginia.

BearingPoint failed to file its required Annual Report on form 10-K for the December 31, 2004 year end, either with the SEC, with which it was due on or about March 16, 2005, or with the Indenture Trustee, with which it was due on or about April 1, 2005. BearingPoint also failed to file its required form 10-Q for the quarter ending March 31, 2005, either with the SEC, with which it was due on or about May 15, 2005, or with the Indenture Trustee, with which it was due on or about May 30, 2005. Furthermore, BearingPoint failed to file its required form 10-Q for the quarter ending June 30, 2005 either with the SEC, with which it was due on or about August 14, 2005, or with the Indenture Trustee, with which it

2

CITI-TRIB-CC 00091996

was due on or about August 29, 2005.

The complaint alleges that BearingPoint's failure to file with the Trustee copies of its annual and quarterly reports breached § 5.02 of the Indenture. In addition, plaintiff alleges that by failing to make the required filings with the SEC, BearingPoint was responsible for the failure of a condition precedent to filing such annual and quarterly reports with the Indenture Trustee, as required by § 5.02 of the Indenture.

The complaint alleges that on or about September 8, 2005, BearingPoint was provided with a Notice of Default by Holders of the Series B Debentures, notifying BearingPoint of its failure to comply with § 5.02 of the Indenture, and that an Event of Default would occur if this failure continued for 60 days. More specifically, the letter stated:

> As set forth in our letter dated August 26, 2006 (copy attached), we represent entities, which in the aggregate, own in excess of 25% of the Debentures issued by the Company pursuant to that certain Indenture dated, December 22, 2004 (the "Indenture"), by and between the Company and The Bank Of New York, as trustee. Insofar as BearingPoint, Inc. has failed to file with the SEC its form 10-K or Form 10-Q for the most recent reporting periods and has failed to provide the Trustee for this issue of securities with substantially the same information required to be contained in such filing, by this letter you are notified of a default under Sections 5.02 and 7.01 (g) of the Indenture. Pursuant to Section 7.01 of the Indenture, we hereby demand that the Company cure such default within sixty (60) days from the receipt of this Notice of Default.
>
> This letter shall serve as a "Notice of Default" pursuant to Section 7.01 of the Indenture

(Notice of Cross Motion, exhibit 6).

On or about November 17, 2005, in accordance with § 7.02 of the Indenture, BearingPoint was notified by holders of the Series B debentures that an Event of Default had occurred and was continuing and that, as a result, the principal amount of the Series B

3

CITI-TRIB-CC00091998

Debentures, the accrued and unpaid Interest, and any accrued and unpaid Liquidated Damages were due and payable immediately (the Notice of Acceleration). BearingPoint made no such payment to the holder of the Series B Debentures. Plaintiff alleges that as of the date of the filing of this complaint, BearingPoint still had not filed its 2004 10-K, or its first quarter and second quarter 2005 10-Qs with the SEC or with the Indenture Trustee and had not complied with the Notice of Acceleration.

In its first cause of action, plaintiff sues for breach of contract, alleging that, as the Indenture Trustee, it is entitled to relief since BearingPoint breached the Indenture. Plaintiff alleges that Holders of the Series B Debenture are entitled to the remedy of acceleration or, in the alternative, damages pursuant to § 7.03 of the Indenture, as well as all other appropriate relief, including an award of attorneys' fees to the Indenture Trustee in accordance with the terms of the Indenture. In its second cause of action, plaintiff alleges that, to the extent that BearingPoint did not breach an express obligation set forth under § 5.02 of the Indenture, it breached an implied obligation, i.e., the covenant of good faith and fair dealing in the Indenture, and that Holders of the Series B Debentures are entitled to the remedy of acceleration or, in the alternative, damages pursuant to § 7.03 of the Indenture, as well as all other appropriate relief, including an award of attorneys' fees to the Indenture Trustee in accordance with the terms of the Indenture.

BearingPoint cross-moves for summary judgment, pursuant to CPLR 3212, to dismiss the complaint. BearingPoint alleges that the notice of default sent by plaintiff's law firm was deficient to provide notice of default to BearingPoint, pursuant to the notification procedures enunciated in the Indenture. BearingPoint further alleges that it did

4

CITI-TRIB-CC 00091998

not violate any duties or obligations imposed by the Indenture and that, consequently, there was no defaulting event.

Section 5.02 of the Indenture, denominated "SEC and Other Reports," provides, in pertinent part:

> [T]he Company shall file with the Trustee, within 15 days after it files such annual and quarterly reports, information, documents and other reports with the SEC, copies of its annual report and of the information, documents and other reports (or copies of such portions of any of the foregoing the SEC may by rules and regulations prescribe) which the Company is required to file with the SEC pursuant to Section 13 or 15 (d) of the Exchange Act. The Company shall comply with the other provisions of TIA Section 314(a)

(Complaint, exhibit 3, at 46-47).

Thus, by reference, § 5.02 incorporates Section 13 of the Securities Exchange Act of 1934, which expressly provides that publicly held companies must file annual and quarterly reports with the SEC "as necessary or appropriate for the proper protection of investors and to insure fair dealing in the security" (15 USC § 78m [a]). Furthermore, the requirement to provide the annual and quarterly reports to the Trustee is mandated by Section 314 (a) of the Trust Indenture Act of 1939 (the TIA) (15 USC Ch 2A Subch III) which is expressly referenced in the above-quoted language.   Indeed, § 5.02 of the Indenture essentially adopts the exact language of Section 314 (a) (1) of the TIA, which obligates an issuer of bonds or notes to provide the Indenture Trustee with its quarterly and annual SEC reports (15 USC § 77nnn).

The Indenture defines a default as follows:

> Section 7.01. Events and Defaults. So long as any Securities are outstanding, each of the following shall be, with respect to each series of Securities, an "Event of Default"

5

\*\*\*

(g)  The Company fails to comply with any of the terms, agreements or covenants of the Company in the Securities or this Indenture [ ... ] and such failure continues for 60 days after receipt by the Company of a Notice of Default

(Complaint, exhibit 3, at 49-50).

The Indenture's acceleration clause states:

Section 7.02.  Acceleration.  If an Event of Default with respect to a series of Securities [ ...] occurs and is continuing (the default not having been cured or waived), the Trustee by notice to the Company, or the Holders of at least 25% in aggregate principal amount of the Securities of such series at the time outstanding by notice to the Company and the Trustee, may declare the principal amount of such series of Securities and any accrued and unpaid Interest and accrued and unpaid Liquidated Damages, if any, on all the Securities through the date of acceleration of such series to be immediately due and payable.  Upon such a declaration such accelerated amount shall be due and payable immediately

(Complaint, exhibit 13, at 52).

It is axiomatic that the movant for summary judgment must tender sufficient evidence to eliminate any material issue of fact from the case (see JMD Holding Corp. v Congress Fin. Corp., 4 NY3d 373 [2005]; Alvarez v Prospect Hosp., 68 NY2d 320 [1986]). The failure to make such a showing requires denial of the motion, regardless of the sufficiency of the opposing papers (Winegrad v New York Univ. Med. Ctr., 64 NY2d 851 [1985]). Once this showing has been made, however, the burden shifts to the party opposing the motion for summary judgment to produce evidentiary proof in admissible form sufficient to establish the existence of material issues of fact which require a trial of the action. Mere conclusions, expressions of hope, or unsubstantiated allegations or assertions are insufficient for this purpose (Zuckerman v City of New York, 49 NY2d 557 [1980]).

CONFIDENTIAL                                                      CITI-TRIB-CC 00092000

CITI-TRIB-CC00092001

In support of its motion for summary judgment, plaintiff argues that § 5.02 required BearingPoint to provide the Indenture Trustee with SEC filings, which BearingPoint failed to do, thereby breaching that section of the Indenture. BearingPoint, on the other hand, contends that its obligation to furnish the Indenture Trustee with annual and quarterly reports was dependent upon its filing those reports with the SEC. BearingPoint urges that since it did not file with the SEC, it had no obligation to provide copies of the filings with the Indenture Trustee.

In support of its cross motion, BearingPoint argues that as a threshold matter, the September 9, 2005 Notice of Default sent by the Holders' attorney was deficient for failing to comply with the Notice of Default provisions of the Indenture. In support of this contention, defendant relies upon the terms of the Indenture, which, according to BearingPoint, would designate Cede, as DTC's nominee, as the sole Holder of the Notes, since the Notes were issued as a single global security registered in Cede's name (Indenture § 2.01, at 14). Plaintiff argues that Cede's role, as registered Holder, is purely ministerial since Cede has no beneficial interest in the Notes and has no authority to act except on behalf its participants (see Offering Memorandum, at 62, affidavit of Marc R. Rosen, exhibit A). Plaintiff also contends that BearingPoint's argument that, notwithstanding Cede's purely administrative role, only Cede, rather than the beneficial Holders, was capable of proffering the Notice of Default, is contradicted by the provisions of the Offering Memorandum of the Indenture.

The Offering Memorandum describes the Indenture and Notes. It uses the term "Holder" to refer to the beneficial Holder, as distinct from the registered Holder, as

7

CITI-TRIB-CC 00092001

follows:

> A holder may own its interest in the global Debentures directly through DTC if such holder is a participant in DTC, or indirectly through organizations which are direct DTC participants if such holder is not a participant in DTC .... Holders may also beneficially own interests in the global Debentures held by DTC through certain brokers, dealers, trust companies and other parties that clear through or maintain a custodial relationship with a direct DTC participant, either directly or indirectly

(Offering Memorandum, at 61, Affidavit of Marc R. Rosen, exhibit A).

In describing the various rights of the beneficial Holders, the Offering Memorandum states that "A holder that would like to convert Debenture into share ... should contact its broker" (Offering Memorandum, at 48, Affidavit of Marc R. Rosen, exhibit A). Read in this context, beneficial Holders are then described as entitled to give the requisite Notice of Default.

The Notice of Default provisions of the Indenture reside in Section 7.01, which provides that a Notice of Default may be sent by the Trustee or by "the Holders of at least 25% in aggregate of the principal amount of the [Notes]" (Complaint, exhibit 3, at 51; affirmation of Matthew Gluck). The Indenture provides that notice can be given by an agent of a Holder in lieu of the Holder itself:

> Any request, demand, authorization, direction, notice, consent, waiver or other action provided for by this Indenture to be given or taken by Holders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Holders in person or by an agent duly appointed in writing; and [ ...] such action shall become effective when such instrument or instruments are delivered to the Trustee and [ ... ], to the Company, as described in Section 13.02. Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Indenture and conclusive in favor of the Trustee and the company, if made in the manner provided in this Section

8

CONFIDENTIAL

CITI-TRIB-CC00092003

(Indenture § 1.04 [a]).

Thus, an agent "duly appointed" by a Holder may provide notice under § 7.01 of the Indenture.  Moreover, the above-quoted language states that the notice "becomes effective at the time of delivery" to the Trustee and to BearingPoint in accordance with § 13.02, i.e., the Indenture's general "Notice" section.

On September 9, 2005, the law firm of Andrews & Kurth LLP delivered a Notice of Default to BearingPoint on behalf of "entities which in the aggregate, own[ed] in excess of 25% of the [Notes]" (Affidavit of Richard Baumfield [Baumfield affidavit], exhibit 2; Complaint, exhibit 4).  On that day, three groups of funds, Fore Research and Management LP, Linden Advisor LP and Whitebox Advisors LLC, had provided written authorization to Andrews & Karth to send the Notice of Default (Baumfield affidavit, exhibits 3, 4 5; affidavit of Robert G. Lennon, exhibit 1; affidavit of Hareesh Paranjape, exhibit 1; affidavit of Dale Willenbring, exhibit 2).  The three funds advised Andrews & Kurth of their individual holdings, which totaled $90,764 million, to wit: more than 25% of the Notes.

A few days later, on September 14, 2005, Andrews & Kurth communicated directly with BearingPoint by phone, offering to identify the Holders pursuant to a confidentiality agreement (Baumfield affidavit, ¶ 4).  BearingPoint stated that it would get back to Andrew & Kurth regarding the issues discussed, but never did (Baumfield affidavit, ¶ 4).

Two months later, on November 17, 2005, the three Holders who authorized Andrews & Kurth to send the Notice of Default on their behalf, authorized different counsel to send a Notice of Acceleration (affirmation of Edward Grosz, exhibit 6).  BearingPoint

9

CITI-TRIB-CC 00092003

CITI-TRIB-CC00092004

docs not challenge the sufficiency of the acceleration notice.

After reviewing the documents produced by defendant, I find that as a threshold matter, the September 9, 2005 Notice of Default sent by Andrews & Kurth was sufficient as a matter of law. BearingPoint's argument that only the registered Holder of the Notes has authority to send a notice of default finds no support either in the Offering Memorandum, which provides that Beneficial Holders are themselves authorized to send the Notice of Default, or in the provisions in the Indenture itself. Consistent with these provisions, after receiving the Notice of Default, BearingPoint's counsel sought to ascertain the identities of the Beneficial Holders in whose behalf the Notice of Default was sent.

Section 7.01 of the Indenture, requiring Notice by 25% of the Holders, must be read in conjunction with § 1.04 (a) of the Indenture, which provides for notice to be given by "an agent duly appointed in writing." Such notice became effective as of the date it was delivered to BearingPoint and to the Trustee (Section 1.04 [a]). The Holders appointed Andrew & Kurth as their agent in writing on September 9, and also informed Andrews & Kurth of their holdings (Baumfield affidavit ¶¶ 3-5, exhibits 3, 4, 5, 6, 7, 8). In opposition to BearingPoint's cross motion, plaintiff submits the affidavit of Richard Baumfield, who states that prior to sending the September 9, 2005 letter, his firm "requested and received from each Holder written communications confirming and representing to us their ownership of the Notes and authorizing Andrews Kurth LLP to send (the September 9, 2005 letter) on their behalf" (Baumfield Affidavit,  exhibits 3-8). In consideration of the documents submitted by plaintiffs, I find that there was full compliance with the Notice provisions in the Indenture.

CONFIDENTIAL                                                                 CITI-TRIB-CC 00092004

CITI-TRIB-CC00092005

Having communicated with Andrews & Kurth seeking identification of the beneficial Holders before discussing a possible settlement, BearingPoint should not be heard at this juncture to argue that the law firm was without authority to represent the Holders. Equitable estoppel arises when one party makes statements or engages in conduct which induces another to act to its detriment (Bender v New York City Health and Hosps. Corp., 38 NY2d 662 [1976] [party equitably estopped from asserting improper notice defense when its counsel had been aware of allegedly defective notice before litigation but acted inconsistently with that knowledge]). Defendant never questioned whether the "entities" mentioned in the September 9, 2004 letter were the beneficial Holders of the Bonds. Neither did defendant ask to confirm the status of the Holders on whose behalf notice was given as registered Holders, which it knew could have been only DTC or its nominee, Cede & Co. On the contrary, defendant sought to confirm the identity and requisite percentage ownership of the beneficial Holders. BearingPoint is, therefore, estopped from now arguing that only Cede & Co. could give notice (see Friedman v Airlift Intl., Inc., 44 AD2d 459, 461 [1st Dept 1974] [if beneficial ownership is indisputable, failure to proceed in name of nominee "is of no significance"). Notably, the filing by the beneficial Holders has now been retroactively ratified by the registered Holder (ratification letters by Cede & Co.; see Applestein v The Province of Buenos Aires, 415 F3d 242 [2d Cir 2005]; Fontana v Republic of Argentina, 415 F3d 238 [2d Cir 2005], where the Second Circuit held that an owner of a beneficial interest must receive authorization from the registered holder of the bond before it may sue, but that such authorization may be granted subsequent to the filing of a lawsuit]).

BearingPoint also contends that it did not breach the Indenture when it failed

11

CITI-TRIB-CC 00092005

to provide the Indenture Trustee with timely SEC filings, alleging that it had no independent obligation under the Indenture to make any SEC filing, at all. This argument ignores the clear import of § 5.02 of the Indenture and the TIA. Under BearingPoint's interpretation of the relevant Indenture provision, BearingPoint's obligation to provide information to the Trustee was contingent on whether or not it chose to file with the SEC. Section 5.02, however, unambiguously obligates BearingPoint to make the required SEC filings and to provide copies of them to the Trustee. The provision, which is denominated "SEC and other Reports", provides: "[T]he Company **shall** file with the Trustee ... copies of its annual report and of the information, documents and other reports ... which the Company is **required** to file with the SEC pursuant to Section 13 or 15 (d) of the Exchange Act" (emphasis provided). BearingPoint's tortured parsing of this provision to read the section as making SEC filings optional under the terms of the Indenture, vitiates the clear purpose of the Indenture to provide information to the investors so that they may protect their investment. This proposed construction would defy the clear intentions of the parties and does not comport with the straightforward and unambiguous intent of the provision.

BearingPoint's obligation to provide the Trustee with timely annual and quarterly reports is also expressly provided for by the second sentence of § 5.02 of the Indenture, which states: "The Company shall comply with the other provisions of TIA Section 314 (a)." Section 314 (a) of the TIA specifically obligates an issuer of bonds or notes, such as BearingPoint, to provide the Indenture Trustee with current SEC filings. Section 302 (a) (4) of the TIA expressly provides that:

[T]he national public interest and the interest of investors in notes, bonds,

12

debentures, evidences of indebtedness, and certificates of interest or participation therein, which are offered to the public, are adversely affected ...

(4)     when the obligor is not obligated to furnish to the trustee under the indenture and to such investors adequate current information as to its financial condition, and as to the performance of its obligations with respect to the securities outstanding under such indenture ...

(15 USC § 77bbb [b]).

To implement Section 302, TIA § 314 (a) expressly mandates that:

Each person who ... is or is to be an obligor upon the indenture securities covered thereby shall --

(1)     file with the indenture trustee copies of the annual reports and of the information, documents and other reports ... which such obligor is required to file with the Commission pursuant to section 78m or 78o (d) of this title ...

(15 USC § 77nnn [a]).

Thus, § 5.02 requires BearingPoint to provide the Indenture Trustee with copies of required SEC filings, which BearingPoint failed to do. It is apparent that the underlying purpose of § 5.02 of the Indenture was to make BearingPoint's financial information available to the Series B Debenture Holders by providing such information to the Trustee. As a memorialization of apparent commercial realities, this section expressed that which is known to the investment community, i.e. that only by guarding against incomplete information, can investors make informed decisions about their investment and guard against the risks attendant to incomplete information.

Although BearingPoint cites the Offering Memorandum in support of its position that it had no obligation to file SEC reports pursuant to the terms of the Indenture,

13

the referenced provisions of the Offering Memorandum, which, in any event would only be considered upon finding of ambiguity in the Indenture (Matter of Wallace v 600 Partners Co., 86 NY2d 543, 548 [1995]) merely refer to the timing of the SEC filings and in no way obviate BearngPoint's obligation to file with the SEC. On the contrary, the offering plan provides that:

> [I]f we do not have audited financial statement available by March 31, 2005, we will be in default under our 2004 Credit Facility (unless the delay is solely as a result of continuing work by us and/or our independent registered public accounting firm to prepare opinions or statements required or permitted by Section 404 of Sarbanes-Oxley, in which case the requirement will be extended by 30 days) and possible other agreement. A default would permit the lender under the 2004 Credit Facility to terminate the 2004 Credit Facility, accelerate any outstanding loans and proceed against their collateral

(Cross-Motion, exhibit 4, at 12-13).

Thus, the clear and unambiguous import of the Indenture is merely underscored by the language in the Offering Memorandum.

In the absence of ambiguity which obscures the intentions of the parties to a contract, the interpretation of a contract and the obligations of the parties thereto are questions of law and not of fact (R/S Assoc. v New York Job Dev. Auth., 98 NY2d 29, 32 [2002]; Bethlehem Steel Co. v Turner Constr. Co., 2 NY2d 456 [1957]). "[W]hen parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms" (W.W.W. Assoc. v Giancontieri, 77 NY2d 157, 162 [1990]). It is well settled that "extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face" (Intercontinental Planning Ltd. v Daystrom, Inc., 24 NY2d 372, 379 [1969]. Having

14

found that the terms of § 5.02 are unambiguous, Bearingpoint's attempts to modify the terms of the provisions of the Indenture by referring to the Offering Memorandum are unavailing.

Since BearingPoint argues that there was no obligation to file reports with the SEC under the Indenture, they argue that the inexorable conclusion is that there was no Default Event. On the contrary, by not filing required SEC reports, BearingPoint repudiated its obligations under the Indenture, thereby frustrating the Trustee's rights under the Indenture. A party's repudiation of its future obligations under a contract may take the form of "'a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach'" (Norcon Power Partners v Niagara Mohawk Power Corp., 92 NY2d 458, 463 [1998]). BearingPoint cannot take advantage of its failure to fulfill its obligation to file timely reports with the SEC by arguing that it has consequently not breached its obligation to provide the Trustee with copies of such reports (see In re Bankers Trust Co., 450 F3d 121 [2d Cir NY 2006]).

Consequently, the Notice of Default sent in the September letter was sufficient, and BearingPoint's cross-motion for summary judgment is unfounded in evidentiary proof sufficient to dismiss the complaint. Furthermore, plaintiff has established as a matter of law that BearingPoint defaulted under the provisions of § 5.02. Since the default mechanisms of the Indenture were fully satisfied by the September 9, 2005 Default letter and the November 17, 2005 Acceleration letter, BearingPoint was obligated to accelerate immediately all principal and accrued interest. Having failed to do so, BearingPoint breached § 7.02 of the Indenture (Complaint, exhibit 1, first cause of action,

15

¶ 21).

     Accordingly, it is hereby

     ORDERED that defendant's cross motion for summary judgment to dismiss the complaint is denied; and it is further


     ORDERED that plaintiff's motion for summary judgment on its first cause of action is granted, and defendants found liable for breach of contract with the amount of damages to be determined at trial; and it is further


     ORDERED that the remainder of the action shall continue.



Dated: _9/ 1 8 /06_

FILED

SEP 19 2006

COUNTY CLERK'S OFFICE
NEW YORK

ENTER:

_____
J.S/C.

BERNARD J. FRIED
J.S.C.

16

# EXHIBIT 24

TRB0534484

| | |
|---|---|
| **From:** | Kirchner, Robert T [CIB-GTS] <robert.t.kirchner@citigroup.com> |
| **Sent:** | Wednesday, January 10, 2007 3:36 PM (GMT) |
| **To:** | Rodden, Jack <jrodden@tribune.com> |
| **Cc:** | Cupo, Jennifer [CIB-GTS] <jennifer.cupo@citigroup.com>; Forte, Nancy H [CIB-GTS] <nancy.h.forte@citigroup.com>; Irving.Apar@ThompsonHine.com |
| **Subject:** | Tribune Company |

Jack,

Pursuant to our conversation please be advised that I am your primary contact at Citibank for the resignation of the Trustee and agency appointments for your Company's debt securities.  As we discussed, Bank of New York, US Bank, Wells Fargo, Deutsche and Wilmington Trust are possible successors you may consider.

Nancy Forte (212) 816-5685 is your Account Officer and will coordinate the documentation requirements with our counsel, Irving Apar of Thompson Hine.

Please advise when you have selected a successor and we will complete the process as quickly as possible.

Regards,

Bob
(212) 816-5698

**EXHIBIT**

**NPP_2503**

EXHIBIT
KIRCHNER
2
KC 3/10/11
depobook.com

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

# EXHIBIT 25

| | |
|---|---|
| **From:** | Kirchner, Robert T [CIB-GTS] <robert.t.kirchner@citigroup.com> |
| **Sent:** | Wednesday, January 24, 2007 6:10 PM (GMT) |
| **To:** | Rodden, Jack <jrodden@tribune.com> |
| **Subject:** | RE: Tribune Company |

Jack,

Have you selected a successor?

Bob

-----Original Message-----
From: Kirchner, Robert T [CIB-GTS]
Sent: Wednesday, January 10, 2007 10:36 AM
To: 'jrodden@tribune.com'
Cc: Cupo, Jennifer [CIB-GTS]; Forte, Nancy H [CIB-GTS];
'Irving.Apar@ThompsonHine.com'
Subject: Tribune Company

Jack,

Pursuant to our conversation please be advised that I am your primary contact at Citibank for the resignation of the Trustee and agency appointments for your Company's debt securities.  As we discussed, Bank of New York, US Bank, Wells Fargo, Deutsche and Wilmington Trust are possible successors you may consider.

Nancy Forte (212) 816-5685 is your Account Officer and will coordinate the documentation requirements with our counsel, Irving Apar of Thompson Hine.

Please advise when you have selected a successor and we will complete the process as quickly as possible.

Regards,

Bob
(212) 816-5698





**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**                                    TRB0535257

# EXHIBIT 26

| From: | Rodden, Jack |
|---|---|
| Sent: | Wednesday, January 24, 2007 6:21 PM (GMT) |
| To: | Bigelow, Chandler <CBigelow@tribune.com> |
| Cc: | Caridine, Bruno <BCaridine@tribune.com> |
| Subject: | FW: Tribune Company |

CB,

Whereas my initial conversations indicated we had a few months to switch term debt trustees, it seems like Citi is trying to accelerate the process.

Of the options below (BONY, US Bank, Wells Fargo, Deutsche Bank, and Wilmington Trust) which ones should we bring in here and ask for proposals?  I would vote that we bring in DB and BONY only, but I want to make sure that you agree.

Also, with DB, I could have Andreas arrange something.... with BONY I guess I could start with Mary Lagumina if she is still there. OK with that as a plan?

Thanks,
Jack


-----Original Message-----
From: Kirchner, Robert T [CIB-GTS]
[mailto:robert.t.kirchner@citigroup.com]
Sent: Wednesday, January 24, 2007 12:10 PM
To: Rodden, Jack
Subject: RE: Tribune Company


Jack,

Have you selected a successor?

Bob

-----Original Message-----
From: Kirchner, Robert T [CIB-GTS]
Sent: Wednesday, January 10, 2007 10:36 AM
To: 'jrodden@tribune.com'
Cc: Cupo, Jennifer [CIB-GTS]; Forte, Nancy H [CIB-GTS];
'Irving.Apar@ThompsonHine.com'
Subject: Tribune Company

EXHIBIT
KIRCHNER
4
KK 3/10/11

Jack,

Pursuant to our conversation please be advised that I am your primary contact at Citibank for the resignation of the Trustee and agency appointments for your Company's debt securities.  As we discussed, Bank of New York, US Bank, Wells Fargo, Deutsche and Wilmington Trust are possible successors you may consider.

Nancy Forte (212) 816-5685 is your Account Officer and will coordinate the documentation requirements with our counsel, Irving Apar of Thompson Hine.

EXHIBIT
NPP_2505

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0535258

Please advise when you have selected a successor and we will complete the process as quickly as possible.

Regards,

Bob
(212) 816-5698

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0535259

# EXHIBIT 27

| | |
|---|---|
| New York | Madrid |
| Menlo Park | Tokyo |
| Washington DC | Beijing |
| London | Hong Kong |
| Paris | |

# DavisPolk

**Benjamin S. Kaminetzky**

| | |
|---|---|
| Davis Polk & Wardwell LLP | 212 450 4259 tel |
| 450 Lexington Avenue | 212 701 5259 fax |
| New York, NY 10017 | ben.kaminetzky@davispolk.com |

December 17, 2010

Re:     Tribune Company, et al., Bankr. D. Del. Case No. 08-13141 (KJC) (Jointly
         Administered)

David M. Zensky
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036

Dear David:

This letter on behalf of JPMorgan Chase Bank as Administrative Agent under Tribune's senior
Credit Agreement dated May 17, 2007 is in response to your letter dated December 10, 2010 in
which you raise questions regarding certain privilege objections made in the Rule 2004
depositions of Rajesh Kapadia and John Kowalczuk taken last January and in regard to certain
documents listed on the privilege log produced on behalf of JPMorgan on June 29, 2010.

We have reviewed the document referred to on line 797 of the June 29, 2010 privilege log and
determined that it should be produced and, in fact, the same document located elsewhere in
JPMorgan's files has already been produced, and we refer you to that document. *See, e.g.,*
JPM_00154802-807. Five documents, which were apparently stapled or clipped together in the
hard copy file, were listed together on line 798 of the June 29, 2010 privilege log. We have
determined that three of these documents should be produced and, as above, other copies of
these documents have already been produced, and we refer you to those documents. *See, e.g.,*
JPM_00270408, JPM_00156224-235, and copies of VRC's December 4, 2007 presentation.
The two remaining documents are copies of privileged communications sent to the JPMorgan
legal department seeking advice of counsel concerning due diligence-related issues pertaining to
Tribune. For that reason, we have determined they are protected from discovery.

With respect to the Rule 2004 depositions, you express the view that the privilege objections
related to work performed by Murray Devine were not "properly articulated or asserted." You
also write that you are "not aware that there was litigation that was threatened or imminent at the
time of Murray Devine's retention."

We think, however, that it is well known that the credit markets had begun to tighten significantly
by the Fall of 2007 and funding commitments were being carefully scrutinized. A number of
transactions in the market ultimately were not funded and litigation to compel the funding of those
transactions quickly ensued. It was in this context, as the Arranger Banks undertook to try to

reach the correct conclusion regarding their funding obligation in a tightening market and to understand the potential consequences of an incorrect decision, that they authorized their outside counsel to retain a solvency expert to assist it in providing advice on this matter. The Arranger Banks wanted to be asking appropriate and meaningful questions in their due diligence process. The Arranger Banks believed that reaching a correct conclusion as to their obligation to fund would avoid litigation, and that an incorrect conclusion could create exposure for them. Indeed, Tribune had hired its own litigation counsel. *See, e.g.,* TRB 0287731.

For all of these reasons, the Murray Devine materials are clearly protected from discovery pursuant to the attorney-client privilege and/or work product protections.

You suggest that even if Murray Devine were retained to assist counsel in anticipation of litigation, which it was, that discovery is appropriate because it is "impracticable" to obtain the needed information by other means. In support, you cite Rule 26(b)(4)(D)(ii) of the Federal Rules of Civil Procedure, which provides that a party may discover "facts known or opinions held by an expert who has been retained or specifically employed by another party in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial" only upon a "showing [of] exceptional circumstances under which it is impracticable for the party to obtain facts or opinions on the same subject by other means." Even assuming the applicability of this provision, no "impracticability" has been shown because you have available to you already the sworn testimony of Thomas Kenny, of Murray Devine, taken by the Examiner, which discloses the "facts known or opinions held by" Murray Devine. We note that even as to testifying experts, with certain limited exceptions, communications between a party's attorney and expert witnesses are protected from discovery. Fed. R. Civ. P., Rule 26(b)(4)(C). So too are attorney-client communications.

We do not believe it is timely or beneficial at this late date, almost a year after the Rule 2004 depositions were taken and following the extensive intervening work performed by the Examiner, to revisit privilege objections asserted, without challenge, since last January. We believe the better course would be for you to pose your questions to Mr. Kapadia at his deposition, which you have indicated an interest in taking, should it be allowed. It may well be that the issues you raise will be resolved through more precise questions made with the benefit of the additional information that has since been provided by JPMorgan and Murray Devine and put in the public record by the Examiner. If that should be the case, unnecessary litigation of these issues will be avoided. Even if some disagreement between the parties on these issues remains, the issues will have been narrowed and sharpened for the court.

We are, of course, agreeable to meet and confer with you at a mutually convenient time regarding these issues.

Very truly yours,

Benjamin S. Kaminetzky

# EXHIBIT 28

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE:                                                    :

TRIBUNE COMPANY, et al.,                                  :    Chapter 11
                                                          :    Case No. 08-13141 (KJC)
                        Debtors.                          :    (Jointly Administered)
                                                          :
                                                          :
                                                          :
                                                          :
                                                          :
                                                          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


### RESPONSES AND OBJECTIONS OF JPMORGAN CHASE BANK, N.A.
### TO AURELIUS CAPITAL MANAGEMENT, LP'S
### FIRST REQUEST FOR PRODUCTION OF DOCUMENTS

JPMorgan Chase Bank, N.A. ("JPMorgan"), by its undersigned counsel, pursuant

to Rules 26 and 34 of the Federal Rules of Civil Procedure, and Rules 7026, 7034, and

9014 of the Federal Rules of Bankruptcy Procedure, hereby responds and objects to

Aurelius Capital Management, LP's ("Aurelius") First Request for Production of

Documents, dated December 9, 2010 (the "Document Requests").

### GENERAL OBJECTIONS

In addition to the grounds for objection set forth in response to each particular

request below, JPMorgan responds and objects generally with respect to each and every

request as follows:

1.        JPMorgan objects to the Document Requests (including, without

limitation, the definitions, instructions, time period of demands and documents and things

demanded) to the extent that they purport to impose obligations on JPMorgan not

required by the Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy

Procedure, the Local Rules of the United States Bankruptcy Court for the District of

Delaware, the Discovery and Scheduling Order for Plan Confirmation (Docket No. 7239)

(the "Case Management Order"), or any other applicable statute, rule or case law.

2.      JPMorgan objects to the Document Requests to the extent that they are

unduly burdensome, overbroad, oppressive or seek documents, information or things

neither relevant to the subject matter of the confirmation hearing nor reasonably

calculated to lead to the discovery of admissible evidence.

3.      JPMorgan objects to the Document Requests to the extent that they seek

documents or information protected from discovery by the attorney-client privilege, the

work-product doctrine, the joint-defense privilege, the common interest privilege and/or

any other applicable privilege, doctrine or immunity ("Privileged Material").  For

instance, the information subject to the common interest privilege includes information or

documents shared between and among: (a) JPMorgan, Angelo, Gordon & Co. L.P.,

Centerbridge Credit Partners, L.P., Centerbridge Credit Partners Master, L.P.,

Centerbridge Credit Partners, and Law Debenture Company of New York, as Successor

Indenture Trustee, or their counsel or advisors, during the time period April 8, 2010

through August 9, 2010 in their capacities as supporters of the Joint Plan of

Reorganization for Tribune Company and its Subsidiaries filed on April 12, 2010 as

subsequently amended (the "April Plan") and/or the April Proposed Settlement and

parties to the compromises embodied therein; (b) JPMorgan, the Debtors, the Official

Committee of Unsecured Creditors (the "UCC"), Angelo, Gordon & Co. L.P.,

Centerbridge Credit Partners, L.P., Centerbridge Credit Partners Master, L.P.,

Centerbridge Credit Partners, and Law Debenture Company of New York, as Successor

Indenture Trustee, or their counsel or advisors, during the time period April 12, 2010

through August 9, 2010 in their capacities as supporters of the April Plan and/or the April

Proposed Settlement; (c) JPMorgan, the Debtors, Angelo, Gordon & Co., L.P., Oaktree

Capital Management, L.P., and the UCC, or their counsel or advisors, during the time

period October 12, 2010 through the present in their capacities as proponents of the

Debtor/Committee/Lender Plan and/or settlement embodied therein; and (d) JPMorgan

and other lenders, arrangers and syndication agents under the May 17, 2007 credit

agreement including, without limitation, Angelo, Gordon & Co., L.P., Oaktree Capital

Management, L.P., Merrill Lynch Capital Corporation, Citicorp North America, Inc., and

Bank of America, N.A., or their counsels and advisors during all relevant time periods

with respect to the assertion of rights under the Credit Agreement and the response and

defense to the LBO-Related Causes of Action.  Further, information that is categorically

privileged includes, among other categories, communications between or among

JPMorgan, its counsel, its advisors, and its testifying and non-testifying experts or

representatives requesting, providing or reflecting legal advice that are not disclosed to

any third party.  JPMorgan hereby claims such privileges and objects to the provision of

information or production of any documents subject thereto.  Such documents or

information will not be produced.  To the extent that any production of documents or

information is made, any inadvertent production of any such documents or information in

response to the Document Requests would not be intended to constitute a waiver of any

applicable privilege or protection.  JPMorgan demands that Aurelius, its agents, and

attorneys notify JPMorgan of the production of any such documents immediately upon

discovery of such documents.

3

4.      Subject to ongoing meet and confer discussions between and among the

Parties, JPMorgan objects to the Document Requests to the extent that they seek

documents or information protected from discovery as Settlement Materials by the

Court's December 15, 2009 Depository Order.  The Depository Order provides that it is

"binding upon all persons and upon all parties-in-interest in connection with these cases,

whether or not such person or party-in-interest is a Negotiation Party."  The Depository

Order defines Settlement Material as follows:

> [A]ny and all communications, whether written or oral,
> occurring on or after December 7, 2009, between and
> among the Negotiating Parties, or their representatives, in
> connection with discussions of the Leveraged ESOP
> Transactions, whether (a) in connection with the discussion
> of any plan or plans of reorganization in these cases, or (b)
> in connection with a discussion among the Negotiating
> Parties regarding any legal or factual issues related to such
> plan or plans, or (c) in connection with any analysis or
> documents prepared by a Negotiating Party or their
> representatives after the Petition Date and shared on or
> after December 7, 2009, between and among the
> Negotiating Parties, which, at or prior to the time
> communicated or shared, is designated as a "Settlement
> Communication" (such communications and materials are
> referred to herein collectively as the "Settlement Material")
> shall be deemed confidential and subject to the restrictions
> contained in this Order.

Under the Depository Order, Settlement Material may not be used:

> Unless the person who originates such Settlement Material
> otherwise agrees in writing, the Settlement Material (i) may
> not be used except in connection with such settlement
> discussions; (ii) may not be disclosed other than in such
> settlement discussions except as authorized by the
> Negotiating Party originating such Settlement Material; and
> (iii) may not be introduced at any trial or hearing or
> deposition.

JPMorgan has not received authorization from any Negotiating Party who originated any

Settlement Material in JPMorgan's possession, custody, or control, to disclose this

4

material, has not been requested by any Negotiating Party to authorize the disclosure of

Settlement material it originated, and has not authorized the disclosure of the Settlement

Material it originated. JPMorgan hereby asserts the protections of the Depository Order

and objects to the provision of information or production of documents subject thereto.

5.    JPMorgan objects to the Document Requests to the extent that they are not

reasonably calculated to lead to the discovery of admissible evidence in that they seek the

disclosure of information, or the production of documents, that are inadmissible and

constitute material protected from disclosure pursuant to the Order Appointing Mediator

(Docket No. 5991) (the "Mediation Order"). The Mediation Order provides that "(a)

discussions among the Mediation parties relating to the Mediation, including discussions

with or in the presence of the Mediator, (b) Mediation Statements, Ownership Statements

and any other documents or information provided to the Mediator or the Mediation

Parties in the course of the Mediation, (c) correspondence, draft resolutions, offers, and

counteroffers produced for or as a result of the Mediation, and (d) communications

between the Mediator and the Examiner or the Examiner's Professionals are strictly

confidential and shall not be admissible for any purpose in any judicial or administrative

proceeding." JPMorgan hereby asserts such protections and objects to the provision of

information or production of documents subject thereto. Unless otherwise specifically

stated, such Mediation materials will not be produced in response to any Request.

6.    JPMorgan objects to the Document Requests to the extent that they seek

the disclosure of information, or the production of documents, that are subject to the

terms of the Order Approving Work and Expense Plan and Modifying Examiner Order

(Docket No. 4321 ) (the "Examiner Order") or the Order Approving Motion of Court-

Appointed Examiner, Kenneth N. Klee, Esq., for Order (I) Discharging Examiner; (II)

Granting Relief From Third-Party Discovery; (III) Approving the Disposition of Certain

Documents and Information; And (IV) Granting Certain Ancillary Relief (Docket No.

5541) (the "Discharge Order"). Pursuant to the Examiner Order, "requests by the Parties

or any other person or entity for [ ] discovery" that may be "propounded upon any Party

or any other person or entity to seek any communications, documents or other

information exchanged between them and the Examiner" are subject to Court approval.

Examiner Order at ¶ 9. Moreover, pursuant to the Examiner Order:

> The delivery of any documents or information by any
> Parties, or by counsel or other professionals engaged by
> any of the Parties, to the Examiner or to any Parties in
> connection with the Investigation . . . does not constitute a
> waiver of attorney-client privilege, attorney work-product
> protection, confidentiality or any other applicable privilege,
> protection, immunity or confidentiality, and the delivery of
> such documents or information to the Examiner or to any of
> the Parties shall not be the basis for any third party or any
> other Party to assert that any of the Parties or their counsel
> or other professionals have waived, in whole or in part, any
> privilege, protection, immunity, or confidentiality with
> respect to such documents or information or with respect to
> any other documents or information that may concern the
> same subject matter.

Examiner Order at ¶ 4. Pursuant to Paragraph 7 of the Discharge Order, materials

provided to or obtained by the Examiner are exempt from discovery from the Examiner.

To the extent that such materials are protected from disclosure by the Examiner,

JPMorgan objects to Aurelius's attempts to contravene the purpose of the Discharge

Order by seeking those same materials from JPMorgan. Unless otherwise specifically

stated, materials related to the Examiner will not be produced in response to any request.

    7.         JPMorgan objects to the Document Requests to the extent that they are

duplicative of requests served by other parties in the above-captioned cases to which

JPMorgan has responded.  In particular, in response to the Rule 2004 discovery requests propounded upon JPMorgan by the UCC on March 26, 2009, and amended on May 13, 2009, JPMorgan undertook a substantial and time-consuming effort to collect, review, and produce documents responsive to those requests, culminating in the production of approximately five hundred thousand pages of documents to the Document Depository. The documents are, and have been, available to Aurelius.

In response to the UCC's requests, JPMorgan collected, reviewed, and produced electronic documents from thirty-one current and former employees considered reasonably likely to have information responsive to the UCC's discovery requests, including many of JPMorgan's highest-ranking officers:

| **Custodian** | **Title/Role** |
|---|---|
| Robert Anastasio | Vice President, Syndicated & Leveraged Finance, in Telecom, Media, and Technology Group |
| Britt Bartter | Vice Chairman, J.P. Morgan Securities, Inc. |
| Steve Black | Co-Chief Executive Officer, JPMorgan Investment Bank |
| Douglas Braunstein | Head of Investment Banking |
| Scott Campbell | In-house counsel |
| Jim Casey | Managing Director and Co-Head of Syndicated & Leveraged Finance |
| Alice Chen | In-house counsel |
| Yang Chen | Analyst, Syndicated & Leveraged Finance |
| Jieun "Jayna" Choi | Analyst, Client Credit Management |
| Peter Cohen | Managing Director, Investment Bank Media Coverage Group |
| Patricia Deans | Managing Director, Capital Markets |
| Jamie Dimon | Chairman and Chief Executive Officer, JPMorgan Chase & Co. |

7

| | |
|---|---|
| Travis Epes | Co-General Counsel, Investment Bank |
| Andrew Gold | Vice President, J.P. Morgan Securities, Inc. |
| Ferdinand "Tony" Grimminck | Associate, Media Coverage Group, Investment Bank |
| Mark Guterman | Analyst, Syndicated & Leveraged Finance |
| Henry Higbie | Managing Director, Capital Structure Advisory & Solutions |
| Darryl Jacobson | Vice President, J.P. Morgan Securities, Inc. |
| Sheila Kahayaoglu | Syndicated & Leveraged Finance |
| Rajesh Kapadia | Managing Director, Syndicated & Leveraged Finance |
| Natalia Klykova | Executive Director, Syndicated & Leveraged Finance |
| John Kowalczuk | Vice President, Client Credit Management |
| James Lee | Vice Chairman, J.P. Morgan Chase |
| Chris Linneman | Co-Head of Syndicated & Leveraged Finance |
| Don McCree | Head of Global Credit Management |
| Andrew O'Brien | Co-Head of Syndicated & Leveraged Finance |
| Jeff Sell | Managing Director, Special Credits Executive |
| Tesia Sommer | Analyst, Syndicated & Leveraged Finance |
| Joachim Sonne | Vice President, Telecom, Media, and Technology Investment Banking |
| Gretchen Tonnessen | Analyst, Telecom, Media, and Technology Investment Banking |
| Christian Walsh | Credit Group |

JPMorgan applied an expansive set of more than forty search terms that were the result of discussions with counsel for the UCC. The search terms were as follows (in alphabetical order):

| Bracewell | Equity Office Properties | Navigant | TESOP |
|---|---|---|---|

8

| Cantigny | ESOP | Nils Larsen | Tower |
|---|---|---|---|
| Cantigny | First Step | Osborn*[1] | Tranche B |
| Chai Trust | FitzSimons | Sam Investment Trust | Tranche X |
| Chandler | Flaschen | S-Corp* | Trib |
| Duff & Phelps | Foundation | S Corp* | Tribune |
| D&P | Foundations | Second Step | Trb |
| EGI | GreatBanc | Step 1 | Valuation Research |
| EGI-TRB | Grenesko | Step One | VRC |
| EGII | McCormack | Step 2 | Zell |
| Equity Group Investments | McCormick | Step Two | |

JPMorgan also searched the desk files of then-current employees thought to be in possession of responsive documents.  JPMorgan ultimately produced hard copy documents from the desk files of ten then-current employees: Alice Chen, Yang Chen, Tony Grimminck, Rajesh Kapadia, Natasha Klykova, John Kowalczuk, Andrew O'Brien, Jeff Sell, Joachim Sonne, and Christian Walsh.  JPMorgan also searched and produced documents from (i) shared electronic directories maintained by the leveraged finance deal team, the media & telecom deal team, and the credit deal team; (ii) custodians' personal electronic directories, where applicable, and (iii) the bank's intranet "Dealworks" site.

In connection with this production, JPMorgan produced a detailed log of documents withheld or redacted on the basis of attorney-client privilege, work-product protection, or proprietary status/commercial sensitivity.  JPMorgan produced separate logs for emails and attachments, electronic directory documents, and hard copy desk files

---

[1] The asterix (*) represents a wildcard character, standing in the place of any string of characters, designed to create a more expansive search.

and a supplemental log relating to documents clawed back due to the inadvertent production of attorney-client privileged information or attorney work product.

Further, in connection with the April Proposed Settlement, JPMorgan produced additional documents in response to discovery requests received from Wilmington Trust Company and Wells Fargo Bank, N.A. relating to the April Proposed Settlement. These documents are responsive to a number of the Document Requests as well.

8.    JPMorgan objects to the Document Requests to the extent that they are not reasonably calculated to lead to the discovery of admissible evidence in that the information sought would not be admissible pursuant to Federal Rule of Evidence 408.

9.    JPMorgan objects to the Document Requests to the extent that they call for the document-by-document identification within thirty days of service of the Document Requests of those documents protected by the attorney-client privilege, the work-product doctrine, the joint-defense privilege, the common interest privilege and/or any other applicable privilege, doctrine or immunity as seeking to impose obligations beyond the scope of the Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure, the Local Rules of the United States Bankruptcy Court for the District of Delaware, and the Case Management Order. JPMorgan further objects to any such request as unduly burdensome.

10.    JPMorgan objects to the Document Requests to the extent that they require production of documents or information in contravention of any confidentiality agreement or obligations that would unduly violate the privacy interests of others.

11.    JPMorgan objects to the Document Requests to the extent that they are vague, ambiguous, capable of multiple interpretations, confusing, or incomprehensible

and therefore require JPMorgan to engage in conjecture as to their meaning. Nonetheless, JPMorgan will make a good faith effort to interpret and respond to the Document Requests subject to the limitations stated herein.

12.    JPMorgan objects to the Document Requests to the extent that they are interposed for improper purposes, including without limitation, undue annoyance, harassment, burden, delay, embarrassment, or to increase expense.

13.    JPMorgan objects to the Document Requests to the extent that: (a) the discovery sought by any demand is unreasonably cumulative or duplicative, or is obtainable from another source that is more convenient, less burdensome, or less expensive; (b) the requested documents were previously produced and are currently located in the Document Depository; (c) Aurelius has obtained the material sought by any request or demand in any other proceeding or pursuant to any other means; (d) the documents are a matter of public record or could be obtained from Aurelius or its counsel's files; or (e) the burden or expense of any demand outweighs its likely benefit.

14.    JPMorgan objects to the Document Requests to the extent that they purport to require the production of identical copies or drafts of the same document.

15.    JPMorgan objects to the Document Requests to the extent that they purport to require JPMorgan to produce documents or things outside its possession, custody or control.

16.    JPMorgan objects to the Document Requests to the extent that they seek documents from an unknown or unspecified time frame.

17.     JPMorgan objects to the Document Requests to the extent that they seek the production of "all" documents.  JPMorgan will produce non-duplicative, non-privileged documents that can be located with reasonable diligence.

18.     JPMorgan objects to the Document Requests to the extent that they seek to impose any continuing obligation on JPMorgan to produce documents.

19.     JPMorgan objects to the Document Requests, including but not limited to the definitions contained therein, to the extent that they assume disputed facts or legal conclusions.  JPMorgan hereby denies such disputed facts or legal conclusions to the extent assumed by any Document Request or stated definition.  Any response or objection by JPMorgan with respect to any such Document Request is without prejudice to this objection and JPMorgan's right to dispute facts and legal conclusions assumed in the Document Requests.

20.     No objection or limitation, or lack thereof, and no statement that JPMorgan will produce documents made herein shall be deemed an admission by JPMorgan as to the existence or nonexistence of documents or information.

21.     JPMorgan's Responses and Objections to the Document Requests and its production of any documents or information shall not be construed as an admission of the relevance, materiality, or admissibility of any such documents or of the subject matter of any such documents, or as a waiver or abridgement of any applicable privilege or of any applicable objection set forth above or below, or as an agreement that requests for similar documents will be treated in a similar manner.  The fact that JPMorgan responds or objects to a particular document request shall not be interpreted as implying that JPMorgan acknowledges the propriety of that request.  JPMorgan reserves the right,

12

without limitation, (a) to supplement, amend or correct all or any part of its responses or objections; and (b) to object, on any ground, to the admissibility in evidence of any part of the documents ultimately produced in response to the Document Requests or of any information contained in any such document.

## OBJECTIONS TO DEFINITIONS

1.      JPMorgan objects to each and every definition to the extent that it purports to define words in a way that is inconsistent with their generally understood meanings. JPMorgan objects to the Definitions to the extent that they purport to impose obligations on JPMorgan not required by the Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure, the Local Rules of the United States Bankruptcy Court for the District of Delaware, or any other applicable statute, rule or case law.

2.      JPMorgan objects to the definition of "Angelo" on the grounds that it is overbroad, vague, ambiguous and unduly burdensome, and that it is not possible to know all persons and entities that Aurelius purports to include within the definition.  As used in JPMorgan's responses, "Angelo" means Angelo, Gordon & Co., L.P., unless otherwise specified.

3.      JPMorgan objects to the definition of "April Proposed Settlement" on the grounds that it is vague and ambiguous.  As used in JPMorgan's responses, "April Proposed Settlement" means the settlement agreement, the terms of which are described in the Settlement Support Agreement, dated April 8, 2010, between and among Angelo, Gordon & Co., L.P., Centerbridge Special Credit Partners, L.P., Centerbridge Credit Partners Master, L.P., Centerbridge Credit Partners, JPMorgan Chase Bank N.A., and Law Debenture Company of New York, as Successor Indenture Trustee, as filed with the Court on April 12, 2010, and supported by the UCC, unless otherwise specified.

13

4.      JPMorgan objects to the definition of "Aurelius" on the grounds that it is overbroad, vague, ambiguous and unduly burdensome, and that it is not possible to know all persons and entities that Aurelius purports to include within the definition as stated. As used in JPMorgan's responses, "Aurelius" means Aurelius Capital Management, LP, unless otherwise specified.

5.      JPMorgan objects to the definition of "Bank of America" on the grounds that it is overbroad, vague, ambiguous and unduly burdensome, and that it is not possible to know all persons and entities that Aurelius purports to include within the definition as stated. As used in JPMorgan's responses, "Bank of America" means Bank of America N.A., Bank of America Bridge, and Bank of America Securities, unless otherwise specified.

6.      JPMorgan objects to the definition of "Board of Directors" on the grounds that it is overbroad, vague, ambiguous and unduly burdensome. As used in JPMorgan's responses, "Board of Directors" means the board of Directors of Tribune Company, unless otherwise specified.

7.      JPMorgan objects to the definition of "Bridge Loans" on the grounds that it is vague and ambiguous.

8.      JPMorgan objects to the definition of "Bridge Lender Plan" on the grounds that it is incomprehensible. As used in JPMorgan's responses, "Bridge Lender Plan" means the Joint Plan Of Reorganization For Tribune Company And Its Subsidiaries Proposed By King Street Acquisition Company, L.L.C., King Street Capital, L.P. And Marathon Asset Management, L.P. dated October 29, 2010, and as subsequently amended.

14

9.      JPMorgan objects to the definition of "Citicorp" on the grounds that it is overbroad, vague, ambiguous and unduly burdensome, and that it is not possible to know all persons and entities that Aurelius purports to include within the definition as stated. As used in JPMorgan's responses, "Citicorp" means Citigroup Global Markets, Inc., Citibank, N.A., Citicorp USA, Inc. and Citicorp North America, Inc., unless otherwise specified.

10.     JPMorgan objects to the definition of "Committee" on the grounds that it is overbroad, vague, ambiguous and unduly burdensome, and that it is not possible to know all persons and entities that Aurelius purports to include within the definition as stated. As used in JPMorgan's responses, "Committee" means the Official Committee of Unsecured Creditors in the chapter 11 cases of the above-captioned debtors, unless otherwise specified.

11.     JPMorgan objects to the definition of "Committee Individuals" on the grounds that it is overbroad, vague, ambiguous, unduly burdensome and incomprehensible. As used in JPMorgan's responses, "Committee Individuals" means the individual members of the Official Committee of Unsecured Creditors in the chapter 11 cases of the above-captioned debtors, unless otherwise specified.

12.     JPMorgan objects to the definition of "Communication" as overbroad, vague, ambiguous and unduly burdensome. JPMorgan further objects to the definition of "Communication" to the extent it is inconsistent with the requirements of the Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure and the Local Rules of the United States Bankruptcy Court for the District of Delaware, and imposes burdens not required by those rules.

13.    JPMorgan objects to definition of "Debtor/Committee/Lender Plan" on the grounds that it is incomprehensible.  As used in JPMorgan's responses, "Debtor/Committee/Lender Plan" means the First Amended Joint Plan Of Reorganization For Tribune Company And Its Subsidiaries Proposed By The Debtors, The Official Committee Of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., And JPMorgan Chase Bank, N.A. filed with the Court on November 23, 2010, and as subsequently amended, unless otherwise specified.

14.    JPMorgan objects to the definition of "Documents" as overbroad, vague, ambiguous and unduly burdensome.  JPMorgan further objects to the definition of "Documents" to the extent it is inconsistent with the requirements of the Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure and the Local Rules of the United States Bankruptcy Court for the District of Delaware, and imposes burdens not required by those rules.

15.    JPMorgan objects to the definition of "Examiner" as overbroad and vague.

16.    JPMorgan objects to the definition of "JPMorgan" on the grounds that is overbroad, vague, ambiguous and unduly burdensome, particularly insofar as it includes "its affiliates . . . any of its or their officers, directors, partners, employees, members or managers," "any of its or their board of directors and any committee or subcommittee of any board of directors" and "Professionals of any Person" listed.  As used in JPMorgan's responses, "JPMorgan" means JPMorgan Chase Bank, N.A.

17.    JPMorgan objects to the definition of "LBO" on the grounds that is overbroad, vague, ambiguous and unduly burdensome.  As used in JPMorgan's responses, "LBO" means the Leverage ESOP Transactions as detailed in Section VII.D

16