# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered<br>**Objection Date: July 21, 2011 at 4:00 p.m.**<br>**Hearing Date:  TBD**<br>**Related to Docket Nos. 7099, 7100, and 7871** |

## EIGHTH QUARTERLY FEE APPLICATION OF SIDLEY AUSTIN LLP FOR COMPENSATION FOR SERVICES RENDERED AND REIMBURSEMENT OF EXPENSES AS COUNSEL TO THE DEBTORS AND DEBTORS IN POSSESSION FOR THE PERIOD OF SEPTEMBER 1, 2010 THROUGH NOVEMBER 30, 2010

| | |
|---|---|
| Name of Applicant: | **Sidley Austin LLP** |
| Authorized to Provide<br>Professional Services to: | **Debtors** |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc., f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); and WPIX, Inc. (0191). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

| Date of Retention: | **February 20, 2009 (nunc pro tunc to December 8, 2008)** |
|---|---|
| Period for Which Compensation and Reimbursement is Sought: | **September 1, 2010 through November 30, 2010** |
| Amount of compensation sought as actual, reasonable and necessary: | **$7,126,734.00** |
| Amount of Expense Reimbursement sought as actual, reasonable and necessary | **$334,255.68[2]** |

This is a(n):  _____ monthly   __X__ interim   _____ final application

The total time expended for fee application preparation for the monthly and quarterly fee applications during the Eighth Interim Fee Period, including time expended for review and response to preliminary and final reports and recommendations of the Fee Examiner, is approximately 616.50 hours and the corresponding compensation requested is approximately $188,846.00.

<u>Prior Interim Applications</u>

| Quarter | Date Filed | Period Covered | Requested | | Approved | |
|---|---|---|---|---|---|---|
| | | | Fees | Expenses | Fees | Expenses |
| 1 | 4/15/09 | 12/8/08-2/28/09 | $3,897,043.25 | $165,360.71 | $3,886,289.75 | $158,441.67 |
| 2 | 7/16/09 | 3/1/09-5/31/09 | $4,209,274.75 | $105,524.36 | $4,203,235.50 | $104,118.90 |
| 3 | 10/15/09 | 6/1/09-8/31/09 | $4,513,018.00 | $99,429.34 | $4,510,127.00 | $99,253.67 |
| 4 | 1/15/10 | 9/1/09-11/30/09 | $5,292,782.75 | $221,808.01 | | |
| 5 | 4/15/10 | 12/1/09-2/28/10 | $5,426,757.50 | $205,852.05 | | |
| 6 | 12/14/10 | 3/1/10-5/31/10 | $6,581,178.43 | $425,733.29 | | |
| 7 | 5/4/11 | 6/1/10-8/30/10 | $7,081,656.37 | $310,093.90 | | |

---

[2]  As described in <u>Attachment B</u> to the Application, Sidley agreed to waive $40.00 in expenses sought in the Twenty-First Monthly Fee Application, $90.00 in expenses sought in the Twenty-Second Monthly Fee Application, and $2,310.00 in expenses sought in the Twenty-Third Monthly Fee Application at the request of the Office of the United States Trustee. <u>See</u> Certifications of Counsel at Docket No. 7349, 7346, and 8257. The total expenses sought to be reimbursed in this Eighth Quarterly Fee Application reflect reductions by those amounts.

46429/0001-7724195V1

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered<br>Objection Date: July 21, 2011 at 4:00 p.m.<br>Hearing Date: TBD<br>Related to Docket Nos. 7099, 7100, and 7871 |

### EIGHTH QUARTERLY FEE APPLICATION OF SIDLEY AUSTIN LLP FOR COMPENSATION FOR SERVICES RENDERED AND REIMBURSEMENT OF EXPENSES AS COUNSEL TO THE DEBTORS AND DEBTORS IN POSSESSION FOR THE PERIOD OF SEPTEMBER 1, 2010 THROUGH NOVEMBER 30, 2010

Sidley Austin LLP ("Sidley"), attorneys for Tribune Company and the affiliated

companies that filed voluntary petitions for relief in the above-captioned chapter 11 cases

(collectively, the "Debtors"), respectfully submits this application (the "Application") to this

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC (KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc., f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); and WPIX, Inc. (0191). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

Court, pursuant to (i) sections 327, 331, and 503 of title 11 of the United States Code (the

"Bankruptcy Code"), (ii) Rule 2016 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), (iii) Rule 2016-2 of the Local Rules of Bankruptcy Practice and Procedure

of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), (iv) the

Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of

Professionals and Committee Members Pursuant to 11 U.S.C. §§ 105(a) and 331 (Docket No.

225) (the "Interim Compensation Order"), as amended, and (v) the Order Appointing Fee

Examiner and Establishing Related Procedures for Compensation and Reimbursement of

Expenses for Professionals and Consideration of Fee Applications (Docket No. 546) (the "Fee

Examiner Order") for approval of interim compensation and reimbursement of expenses for the

eighth quarterly period from September 1, 2010 through November 30, 2010 (the "Eighth

Interim Fee Period"). In support of the Application, Sidley respectfully states as follows:

## FACTUAL BACKGROUND OF THE CASES

1.      On December 8, 2008 (the "Petition Date"), Tribune Company and certain

of its subsidiaries each filed a voluntary petition for relief under chapter 11 of the Bankruptcy

Code. An additional Debtor, Tribune CNLBC, LLC (f/k/a Chicago National League Ball Club,

LLC) ("Tribune CNLBC"), filed a voluntary petition for relief under chapter 11 of the

Bankruptcy Code on October 12, 2009.[2]  On March 22, 2010, this Court entered an order

dismissing the chapter 11 petition of New River Center Maintenance Association, Inc.  In all, the

Debtors comprise 111 entities.

---

[2] Orders of the Court applicable to this Application have subsequently been extended to Tribune CNLBC. (See Order Directing (I) Joint Administration of Chapter 11 Cases and (II) that Certain Orders and Other Pleadings Entered or Filed in the Chapter 11 Cases of Tribune Company, et al. be Made Applicable to the Chapter 11 Case of Chicago National League Ball Club, LLC (entered Oct. 14, 2009) (Docket No. 2333) (the "CNLBC Joint Administration Order").

2.     The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b).  (Docket No. 43, 2333.)

3.     The Debtors have continued in possession of their respective properties and have continued to operate and maintain their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.     On December 18, 2008, the Office of the United States Trustee appointed an official committee of unsecured creditors (the "Committee").

5.     On March 19, 2009, pursuant to Fee Examiner Order, the Court appointed Stuart Maue as fee examiner (the "Fee Examiner") to act as special consultant to the Court for professional fee and expense analysis and review, effective *nunc pro tunc* to February 20, 2009. (Docket No. 546.)

6.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief sought herein are sections 327, 331, and 503 of the Bankruptcy Code, Rule 2016 of the Bankruptcy Rules, and Rule 2016-2 of the Local Rules.

## PROCEDURAL BACKGROUND FOR THE APPLICATION

7.     The Debtors sought approval of this Court to retain Sidley as general reorganization and bankruptcy counsel, pursuant to 11 U.S.C. §§ 327(a) and 1107, by application filed on December 26, 2008.  As set forth in the application seeking such approval, Sidley's services to the Debtors encompass a wide range of legal services, focused upon restructuring and insolvency issues but also encompassing certain general corporate, litigation, tax, media law and

3

regulatory, employee-related, and real estate matters.  In particular, Sidley's retention application

sets forth the following scope of services:

<blockquote>

(a)    to provide legal advice with respect to the Debtors' powers and duties as debtors in possession in the continued operation of their business;

(b)    to take all necessary action on behalf of the Debtors to protect and preserve the Debtors' estates, including prosecuting actions on behalf of the Debtors, negotiating any and all litigation in which the Debtors are involved, and objecting to claims filed against the Debtors' estates;

(c)    to prepare on behalf of the Debtors all necessary motions, answers, orders, reports, and other legal papers in connection with the administration of the Debtors' estates;

(d)    to attend meetings and negotiate with representatives of creditors and other parties in interest, attend court hearings, and advise the Debtors on the conduct of their chapter 11 cases;

(e)    to perform any and all other legal services for the Debtors in connection with both their chapter 11 cases and with the formulation and implementation of the Debtors' plan of reorganization;

(f)    to advise and assist the Debtors regarding all aspects of the plan confirmation process, including, but not limited to, negotiating and drafting a plan of reorganization and accompanying disclosure statement, securing the approval of a disclosure statement, soliciting votes in support of plan confirmation, and securing confirmation of the plan;

(g)    to provide legal advice and representation with respect to various obligations of the Debtors and their managers and officers;

(h)    to provide legal advice and perform legal services with respect to matters involving the negotiation of the terms of and the issuance of corporate securities, matters related to corporate governance, and the interpretation, application, or amendment of the Debtors' organizational documents, including their limited liability company agreements, material contracts, and matters involving the fiduciary duties of the Debtors and their officers and managers;

(i)    to provide legal advice and perform legal services with respect to litigation, tax (state and federal income tax and local property tax assessment matters) and other general non-bankruptcy legal issues for the Debtors to the extent requested by the Debtors; and

(j)    to render such other services as may be in the best interests of the Debtors in connection with any of the foregoing and all other necessary or

</blockquote>

4

appropriate legal services in connection with these chapter 11 cases, as agreed upon by Sidley and the Debtors.

Sidley's retention, *nunc pro tunc* to the Petition Date, was approved by this Court by order dated February 20, 2009. (Docket No. 435.)

8.    The Interim Compensation Order and the Fee Examiner Order (together, the "Fee Orders") provide that all professionals retained in these cases pursuant to sections 327, 328, or 1103 of the Bankruptcy Code (the "Case Professionals") must file with the Court and provide to the Fee Examiner monthly applications for interim allowance of compensation for services rendered and reimbursement of expenses incurred, together with the applicable time entries and itemized expenses (the "Monthly Fee Application"). The notice parties specified in the Fee Orders (the "Notice Parties") have twenty (20) days after service of a Monthly Fee Application to object to such Monthly Fee Application (the "Objection Deadline"). Upon expiration of the Objection Deadline, the applicable Case Professional must certify in writing that no objection or partial objection has been filed with the Court relative to that professional's Monthly Fee Application, whereupon the Debtors are authorized to pay such professional an amount equal to the lesser of (i) 80% of the fees and 100% of the expenses requested in the Monthly Fee Application or (ii) 80% of the fees and 100% of the expenses not subject to an objection.

9.    Pursuant to the procedures set forth in the Fee Orders, Sidley prepared, filed with the Court, and served upon the Notice Parties and the Fee Examiner Monthly Fee Applications for the periods of September 2010, October 2010, and November 2010, which Monthly Fee Applications are incorporated herein by reference.[3] Sidley has accordingly

---

[3] The docket numbers of Sidley's Monthly Fee Applications for September 2010, October 2010, and November 2010 are 7099, 7100, and 7871, respectively.

submitted all of its Monthly Fee Applications for the Debtors' chapter 11 cases for the Eighth
Interim Fee Period.

          10.     In addition to the Monthly Fee Applications, beginning with the three-
month period ending February 28, 2009, and each three-month period thereafter, all Case
Professionals must file with the Court and serve on the Notice Parties interim applications for
allowance of compensation and reimbursement of expenses of the amounts sought in the
Monthly Fee Applications filed during such period (a "Quarterly Fee Application Request").
(See Interim Compensation Order at 3.) Quarterly Fee Application Requests must include a
summary of the Monthly Fee Applications that are the subject of the request and any other
information requested by the Court or required by the Local Rules.  (Id.) This Application
represents the eighth Quarterly Fee Application Request that Sidley has filed with the Court in
connection with these chapter 11 cases, and it covers the period from September 1, 2010 through
November 30, 2010, both dates inclusive.

## RELIEF REQUESTED

          11.     By this Application, Sidley respectfully requests that the Court approve
the interim allowance and award of compensation for professional services rendered and
reimbursement of actual and necessary expenses incurred by Sidley as general bankruptcy
counsel to the Debtors during the Eighth Interim Fee Period.

          12.     The amount of fees sought for services rendered during the Eighth Interim
Fee Period is $7,126,734.00, representing 11,731.50 hours in professional and paraprofessional
time for such services.  Reimbursement of actual, necessary expenses incurred by Sidley during
the Eighth Interim Fee Period in connection with these services is requested in the amount of
$334,255.68.  Sidley seeks the interim allowance of such compensation, and this Court's
authorization for payment of such amounts by the Debtors to Sidley, less amounts previously

6

paid to Sidley pursuant to the Monthly Fee Applications for the period covered by this

Application and the procedures set forth in the Fee Orders.

13.     The hourly rates charged by Sidley professionals and paraprofessionals

during the Seventh Interim Fee Period are no greater than the customary hourly rates for such

individuals both inside and outside of bankruptcy cases.  The highest billing rate charged by any

Sidley attorney for services rendered under Sidley's then-current billing rates that became

effective on January 1, 2010 and continuing until Sidley's Firm-wide rate adjustment on January

1, 2011 was $950 per hour.  (See Supplemental Affidavit (Second) of James F. Conlan in

Support of Application for an Order Authorizing the Employment and Retention of Sidley

Austin LLP as Attorneys for the Debtors and Debtors in Possession ¶ 3, Docket No. 424.)  Sidley

believes these rates are comparable to those charged by the bankruptcy and other professionals of

other firms of comparable size, stature, and experience.

14.     Sidley has received no payment and no promises for payment from any

source other than the Debtors for services rendered in these chapter 11 cases.  There is no

agreement between Sidley and any other party for the sharing of compensation to be received for

the services rendered by Sidley in these chapter 11 cases.  All professional and paraprofessional

services for which compensation is sought herein were rendered solely on behalf of the Debtors

in these cases.

## SERVICES RENDERED

15.     Sidley has rendered substantial services to the Debtors in connection with

these chapter 11 cases during the period covered by this Application, both in its capacity as

general bankruptcy counsel to the Debtors and continuing in its capacity as corporate, litigation,

and transactional counsel to the Debtors in their ordinary course of business.  The services

performed by Sidley's professionals and paraprofessionals during the period covered by this

7

Application were necessary and have directly contributed to the effective administration of the Debtors' chapter 11 cases.

16.    A breakdown of the total hours expended by each professional on all matters and a breakdown of amounts sought by each matter category covered herein are included as a part of <u>Attachment A</u> to this Application, as required by Local Rule 2016-2. A detailed description of the services provided to the Debtors is incorporated by reference to the Monthly Fee Applications previously filed by Sidley with the Court. The following is a summary of the activities performed by Sidley's professionals and paraprofessionals during the Eighth Interim Fee Period:

**A.    <u>FCC Matters (20100):    Hours: 25.80  Fees: $14,967.00</u>**[4]

17.    During the Eighth Interim Fee Period, Sidley's professionals represented the Debtors' broadcast stations on several matters as communications regulatory counsel. Specifically, Sidley's professionals and communications specialist responded to pending application matters as required by the Federal Communications Commission ("<u>FCC</u>") and researched various FCC issues relating to the Debtors' broadcast stations and to the proposed plan of reorganization.

18.    In addition, in connection with the Newspaper Crossownership matter, Sidley's professionals prepared and filed final opening and reply briefs with the Third Circuit Court of Appeals in support of petitions for review of the FCC's newspaper cross-ownership rules, the outcome of which is of substantial importance to the Debtors' broadcasting and

---

[4] Commencing in December 2009, the Debtors requested that Sidley provide separate invoices for professional fees for certain discrete FCC-related services attributable to KWGN/FCC General, KPLR-TV, Nextel Negotiations, and Newspaper Crossownership matters, on which Sidley represents the Debtors in the ordinary course of business. In accordance with this request, and after consultation with the Fee Examiner, Sidley has included such invoices within the broader category of FCC Matters for the purposes of calculating the total fees and expenses in Sidley's Monthly Fee Applications and Quarterly Fee Application Requests.

publishing operations in several key markets in which the Debtors conduct business. The Debtors, along with other media companies, challenged various FCC rules that prohibit newspapers from owning certain television or radio stations within the same markets, on constitutional and Administrative Procedure Act grounds. Sidley's professionals handled the briefing, as well as coordinated with counsel for eight other petitioners challenging these rules, and prepared and filed the joint appendix supporting the briefs. Sidley's professionals also prepared filings with the Third Circuit for entries of appearance and oral argument notices.

**B.    Fee Applications (30390):   Hours: 616.50 Fees: $188,846.00**

19.    This matter category encompasses all tasks relating to the preparation and filing of Sidley's Monthly Fee Applications and Quarterly Fee Application Requests with the Court. In this Eighth Interim Fee Period, Sidley's professionals and paraprofessionals drafted and filed Sidley's seventeenth and eighteenth Monthly Fee Applications, drafted Sidley's nineteenth, twentieth, and twenty-first Monthly Fee Applications, and reviewed and complied with the Court's Fee Orders respecting all of the foregoing. During the Eighth Interim Fee Period, Sidley also prepared portions of its Sixth Quarterly Fee Application. In addition, Sidley's professionals also responded to the Fee Examiner's Initial Report for the Third Quarterly Period and prepared for and participated in the omnibus fee hearing held on October 22, 2010.

**C.    Executory Contracts and Leases (30410):   Hours: 4.30 Fees: $1,720.00**

20.    As of the Petition Date, the Debtors in these cases were party to approximately 45,000 executory contracts and unexpired leases. During the Eighth Interim Fee Period, Sidley's professionals continued to assist the Debtors with obtaining Court approval to assume, or to assume and assign, certain executory contracts under section 365 of the Bankruptcy Code on terms favorable to the Debtors. At the request of the Debtors, Sidley's

9

professionals researched, reviewed, and evaluated certain of the Debtors' contracts and

unexpired leases, in light of applicable law regarding contract assumption or rejection. Sidley's

professionals also addressed various inquiries from executory contract and lease counterparties

concerning the status of certain contracts and leases and claims arising therefrom.

**D.    Vendor Issues (30420):    Hours: 0.90  Fees: $588.00**

21.    In this period, Sidley's professionals continued to address issues

concerning postpetition vendor performance, which has periodically required Sidley's

professionals to review existing contracts between the Debtors and relevant vendors and, in some

cases, arrange and participate in calls with the Debtors' business personnel, financial advisors at

Alvarez and Marsal North America, LLC ("A&M"), vendors, and/or vendors' counsel to ensure

or facilitate continued vendor performance.

**E.    Use/Sale/Lease of Assets (30430):    Hours: 59.00  Fees: $37,195.00**

22.    Sidley's professionals remained engaged in negotiating and documenting

transactions for the use, sale, and lease of assets on behalf of the Debtors, both in connection

with these chapter 11 cases and with Sidley's ongoing representation of the Debtors in their

ordinary course of business. During the Eighth Interim Fee Period, Sidley worked with the

Debtors' in-house counsel and management to review and analyze certain existing business

operations and proposed postpetition transactions concerning certain Debtors and non-Debtor

subsidiaries, taking into account the impact of the Bankruptcy Code on potential transactions.

23.    Much of Sidley's activities in this category related to services provided in

connection with negotiations relating to various transactions involving certain of the Debtors'

and non-Debtors' joint ventures. Specifically, Sidley's professionals and the Debtors' outside

counsel and investment bankers devoted substantial time and effort over the course of several

months to negotiate a series of transactions and agreements relating to non-Debtor Tribune (FN)

10

Cable Ventures, Inc. ("TCV")'s interests Television Food Network, G.P. ("TFN"), the general partnership that owns and operates the "Food Network".  In late August 2010, the majority partner of TFN contributed the assets comprising "The Cooking Channel" to the partnership, consistent with the partners' intention that the Food Network and The Cooking Channel would be integrated into TFN to create a unique pair of food-focused channels operating efficiently under one infrastructure.[5]  During the Eighth Interim Fee Period, Sidley's professionals undertook a review and analysis of the underlying corporate documents of the partnership and TCV, the proposed terms of the transactions to integrate The Cooking Channel into TFN, and relevant statutes and case law concerning those transactions.  In connection therewith, Sidley's professionals negotiated, reviewed, and drafted the transaction agreements and analyzed potential amendments to the corporate structure of TFN and various corporate governance provisions in the partnership agreement to accommodate the contribution.  At the conclusion of these due diligence activities and attendant negotiations with TCV's partner, the Debtors ultimately filed a motion to authorize Tribune to cause TCV to make a capital contribution of approximately $53 million to TFN to maintain its equity interest in the partnership on February 11, 2011 (Docket No. 7919).  The capital contribution was approved by the Bankruptcy Court on February 25, 2011 (Docket No. 8150).

**F.    Insurance Matters (30450):   Hours: 2.90  Fees: $1,715.00**

24.    During the Eighth Interim Fee Period, Sidley's professionals continued to work with the Debtors, their outside insurance counsel, and various insurance providers to

---

[5] The Cooking Channel was launched in May 2010.  At that time, the Debtors retained Lazard Frères & Co. LLC ("Lazard") to provide a financial analysis of the investment opportunity presented to TCV and the Debtors in connection with the launch and operation of The Cooking Channel as a flanker brand to Food Network.  (See Order Modifying the Scope of the Retention of Lazard Frères & Co. LLC to Include Investment Banking and Financial Advisory Services Relating to Certain Transactions entered on May 14, 2010 (Docket No. 4409); see also Sixth Quarterly Fee Application of Sidley Austin LLP ¶ 54.)

resolve certain insurance coverage issues, and to advise upon the impact of these chapter 11

cases on the Debtors' insurance and risk management procedures. Sidley's professionals also

reviewed and addressed various insurance-related legal issues arising in connection with

transactions that had occurred prior to the Petition Date.

**G.    Committee-Related Matters (30460):   Hours: 0.70  Fees: $520.00**

   25. Sidley's professionals continued during the Eighth Interim Fee Period to

work diligently to maintain a cooperative and responsive relationship with the Debtors' major

creditor constituencies, including the Committee. During this Eighth Interim Fee Period,

Sidley's professionals conferred with the Committee and their professionals and advisors on

pending motions and general case administration issues and participated in numerous periodic

conference calls and meetings in order to address case issues as they arose. Communications

with the Committee related to specific substantive matters, including the development of the

Debtors' plan of reorganization, disclosure statement, ongoing mediation sessions, or discovery-

related matters, are reflected in the applicable substantive matter categories.

**H.    Litigated Matters (30470):   Hours: 3,503.70  Fees: $2,121,112.07**

   26. The "Litigated Matters" category encompasses all of Sidley's activities

relating to actual and potential litigation, contested matters, and adversary proceedings, as

discussed in more detail below. Notably, this category also includes much of Sidley's activities

relating to the review and analysis of the series of transactions that returned Tribune to private

ownership in 2007 (the "Leveraged ESOP Transactions") and corresponding document discovery

and production activities, negotiations and mediation sessions with creditor constituencies, and

matters concerning the Debtors' contested plan confirmation process as it developed during this

Eighth Interim Fee Period. The resolution of potential claims and causes of action arising out of

the Leveraged ESOP Transactions (the "LBO-Related Claims")—whether through settlement or,

12

to the extent required, litigation—is a pivotal issue in these chapter 11 cases and required

substantial attention from Sidley, the Debtors' senior management, the Committee, the Debtors'

senior lenders, and other key creditor constituencies during the Eighth Interim Fee Period.

      (a)   The Examiner's Report

     27.    During the Eighth Interim Fee Period, Sidley's professionals continued to

review and analyze the factual and legal conclusions reached by the Court-appointed Examiner,

Kenneth N. Klee, in his report concerning the Leveraged ESOP Transactions and certain other

issues (the "Examiner's Report"). The Examiner's Report was filed with the Court under seal on

July 26, 2010 (Docket No. 5130-5133) and issued publicly on August 3, 2010, together with

supporting exhibits and transcripts of the interviews and depositions taken by the Examiner. The

Examiner's Report is comprised of four volumes totaling 1,425 pages and is supported by

approximately 1,100 exhibits totaling 21,290 pages and 15 transcripts of witness depositions and

interviews (including exhibits thereto) totaling 5,853 pages.[6]  (Docket No. 5247-5250.)  In sum,

the complete Examiner's Report totals over 28,500 pages of materials. The scope of the

Examiner's investigation was far-reaching, including the evaluation of: (i) potential LBO-

Related Claims, (ii) whether Wilmington Trust Company violated the automatic stay by filing,

on March 4, 2010, its Complaint for Equitable Subordination and Disallowance of Claims,

Damages, and Constructive Trust (docketed at Adv. No. 10-50732, Docket No. 1), and (iii)

assertions and defenses of the parties in connection with the Motion of JPMorgan Chase Bank,

N.A. for Sanctions Against Wilmington Trust Company for Improper Disclosure of Confidential

Information in Violation of Court Order (collectively, the "Investigation"). In the Examiner's

Report, the Examiner analyzed recoveries to the creditors of the Debtors other than the senior

---

[6] During the course of the Investigation (defined below), the Examiner and his legal and financial advisors
interviewed 38 witnesses, of which 33 interviews were conducted in person.

46429/0001-7724195V1

lenders and the Bridge Lenders in six different litigation scenarios (plus two additional scenarios

that consider disgorgement proceeds recovered from stockholders who sold their stock during

"Step Two" of the Leveraged ESOP Transactions). Following the release of the Examiner's

Report, and continuing into the Eighth Interim Fee Period, Sidley's professionals expended

considerable time and effort reviewing and analyzing the Examiner's findings and conclusions

with respect to these litigation scenarios as well as the other issues the Examiner opined on in the

Examiner's Report. Sidley's professionals spent considerable additional time and effort

analyzing the Examiner's Report as it related to the negotiating positions taken by the Debtors'

various creditor constituencies on the relative strengths of the LBO-Related Claims during the

Mediation on the Debtors' plan of reorganization, which ultimately resulted in the settlement

embodied in the DCL Plan (discussed below).

      (b)   Discovery Activities Relating to Leveraged ESOP Transactions

     28.    As discussed in Sidley's prior Quarterly Fee Application Requests, since

the spring of 2009, more than 45 individuals and entities involved with the Leveraged ESOP

Transactions collectively, the "Producing Parties"), including the Debtors, have participated in

informal (but comprehensive) discovery to facilitate the Committee's investigation of the

Leveraged ESOP Transactions and LBO-Related Claims. Since that time, these discovery

activities have expanded substantially as other of the Debtors' creditor constituencies, including

Aurelius Capital Management LP ("Aurelius"), Wilmington Trust Company ("Wilmington

Trust"), Wells Fargo Bank, N.A. ("Wells Fargo"), Law Debenture Trust Company of New York

("Law Debenture"), Centerbridge Credit Advisors LLC ("Centerbridge"), JPMorgan Chase

Bank, N.A. ("JPMorgan"), Oaktree Capital Management, L.P. ("Oaktree"), and Angelo, Gordon

& Co. ("Angelo Gordon"), have requested access to these materials from the Debtors in order to

conduct independent reviews of the Leveraged ESOP Transactions. As of the date of this

14

Quarterly Fee Application Request, the number of Producing Parties is nearly 80 individuals and entities.

29.    The discovery process that continued throughout the Eighth Interim Fee Period and thereafter has been a massive undertaking.  As of the Eighth Interim Fee Period, Sidley's team of Litigation professionals and paraprofessionals had received the equivalent of approximately 4.5 million pages of discovery documents produced by the Producing Parties in connection with the Leveraged ESOP Transactions, which are maintained in the Document Depository for production to parties in interest authorized to receive the discovery materials (the "Depository Designees").[7]  Of those, approximately 718,000 pages of documents were produced by the Debtors during or prior to the Eighth Interim Fee Period.  Many of the materials collected as part of this discovery process were ultimately used in connection with the plan confirmation process, either formally as evidentiary exhibits during the confirmation hearings on the competing plans of reorganization for the Debtors or informally by Debtors and their creditor constituencies in negotiations and the development of their positions regarding contested legal and factual confirmation issues.[8]  Throughout this process, Sidley's professionals have worked closely with the Debtors' senior management to advise on the legal issues implicated by the document production requests received by the Debtors from numerous third parties.

30.    During the Eighth Interim Fee Period, Sidley continued to receive, process, review, and analyze documents (a) submitted by the Producing Parties that were responsive to the Debtors' discovery requests and (b) collected from the Debtors that were

---

[7] The Document Depository procedures are discussed in detail in Sidley's Fifth Quarterly Fee Application Request.

[8] By way of illustration, the DCL Proponents (defined below) designated 1,587 exhibits and the Noteholder Plan Proponents (defined below) designated 2,648 exhibits for use at the contested plan confirmation hearings held in March and April 2011.

responsive to other parties' discovery requests. With respect to the Debtors' documents, Sidley's professionals collected and reviewed several hundred thousand pages of documents and electronic records for relevance and privilege, including corporate documents, financial records, board of directors' minutes and resolutions, and electronic computer files from certain of the Debtors' employees, for inclusion in the Document Depository and production to the Depository Designees. Upon completing their review of the documents received from the Debtors for production, Sidley's professionals also prepared appropriate privilege logs relating to such documents as part of the discovery process. During the Eighth Interim Fee Period Sidley's professionals also received an additional request by one of the Debtors' creditor constituencies to become a Depository Designee. Sidley's professionals prepared and disseminated the notices required by the Depository Order to (a) the existing Negotiating Parties of the Debtors' intention to designate an additional Depository Designee and (b) the Producing Parties to provide an opportunity for such Producing Parties to object to the production of their documents to the additional Depository Designee.

31.     The collection, review, and analysis of such a volume of documents in connection with the discovery efforts undertaken in these chapter 11 cases requires a team of professionals, paraprofessionals, litigation support specialists, and other personnel. Much of the collection, review, and production of discovery documents has been accomplished by means of an electronic data discovery system ("EDD") maintained by Sidley's litigation support specialists, analysts, and technicians. Sidley's litigation support specialists received and processed the raw data and physical documents provided by the Debtors into the 4.5 million-document database so that they can be reviewed by attorneys. Sidley's professionals reviewed the documents, prepared privilege logs, and prepared approved documents for production. In

16

connection with those discovery activities, Sidley's professionals and paraprofessionals coordinated with third parties the claw-back and replacement of inadvertently produced documents and resolved issues related to alleged data spoliation, preservation, and quality control.

        (c)    <u>Avoidance Actions and Related Adversary Proceedings and Tolling Agreements</u>

           (i)    *Actions Commenced or Tolled by the Debtors*

        32.    Pursuant to Bankruptcy Code section 546(a), the bar date for commencing avoidance actions in these cases, including avoidance actions pursuant to sections 547 and 548 of the Bankruptcy Code, was December 8, 2010 (the "<u>Avoidance Bar Date</u>").  During the Eighth Interim Fee Period, on behalf of the Debtors and together with the Debtors' financial advisors at A&M, Sidley undertook a comprehensive review of payments made to (a) third parties within ninety (90) days prior to the Petition Date, and (b) insiders within one (1) year prior to the Petition Date (together, the "<u>Preference Period</u>") in contemplation of commencing, or preserving by tolling agreements, actions for the avoidance of those payments prior to the Avoidance Bar Date.

        33.    The preference analysis conducted by Sidley and A&M applied both quantitative and qualitative factors in analyzing the payments to each transferee during the Preference Period, including (i) a materiality threshold; (ii) assessment of the relative cost versus benefit of pursuing avoidance of the transfer; (iii) the existence of applicable quantifiable defenses; (iv) court authorization of payment to certain vendors, customers and employees; (v) whether the payment, if not made, would give rise to a priority claim; (vi) the importance of ongoing business relationships between the Debtors and their vendors; and (vii) the probable assumption of most or all of the subsidiary Debtors' executory contracts under any

17

reorganization plan. On or prior to the Avoidance Bar Date, the Debtors commenced

approximately ninety-four (94) preference and fraudulent conveyance avoidance actions against

third parties (the "Avoidance Actions") and entered into tolling agreements with 127 third parties

to extend the applicable statutes of limitation for purposes of initiating potential avoidance

actions against parties to such tolling agreements. The Avoidance Actions commenced and

tolling agreements executed by the Debtors primarily related to transfers by the Debtors to their

vendors and suppliers, while the Committee filed complaints and negotiated tolling agreements

primarily with the Debtors' employees and professionals. Together with claims to be filed or

preserved by the Committee, causes of action respecting the avoidance of over $500 million in

face amount of payments were pursued or preserved.

        34.     The professionals in Sidley's Corporate Restructuring and Bankruptcy

practice group coordinated with the professionals in Sidley's Litigation practice group, and

others of the Debtors' law firms, to undertake the necessary preparation and due diligence related

to the commencement of the Avoidance Actions and securing tolling agreements in lieu thereof.

Specifically, Sidley's professionals negotiated tolling agreements with counsel to various

vendors, researched the potentially avoidable transfers to identify proper defendants to name in

the complaints and the proper agents for service of process, researched foreign service rules and

procedures, and jurisdictional predicates, for actions to be brought against foreign vendors, and

drafted tolling agreements, complaints, and summonses. Additionally, Sidley's professionals

participated in numerous conference calls and in-person meetings with counsel and financial

advisors for the Committee and counsel for Aurelius and Wilmington Trust with respect to the

preference analysis and preservation of estate causes of action by both the Debtors and the

Committee. For example, Sidley's professionals convened conference calls with counsel and

18

advisors to the Committee on October 28, November 3, November 4, and November 26,

conference calls with counsel to Aurelius and Wilmington Trust on October 29 and November 5,

a conference call with the Debtors' management on November 8, an in-person meeting with the

Debtors' management on November 9, and an all-day meeting in Sidley's Chicago offices on

November 11 with counsel and financial advisors for the Committee and counsel for Aurelius

and Wilmington Trust to review and discuss in detail the Debtors' and the Committee's proposed

course of action with respect to preserving the estates' avoidance causes of action.

35.     On October 28, 2010, Sidley prepared and filed a motion seeking authority

to enter into tolling agreements between Tribune and each of the filed subsidiary Debtors and

non-Debtor affiliates, to toll the statute of limitations on account of intercompany transfers

(Docket No. 6165).  The motion was approved by the Bankruptcy Court by order entered on

November 12, 2010 (Docket No. 6417) and all intercompany avoidance causes of action were

subsequently tolled.

36.     During the Eighth Interim Fee Period, Sidley's professionals also drafted a

motion, which was filed on December 3, 2010 (Docket No. 6753) (the "Stay Motion"), by which

the Debtors requested the Court to stay the further prosecution of the Avoidance Actions that

were initiated by the Debtors in order to conserve estate resources and preserve the status quo

pending the outcome of the contested plan confirmation process.  On December 14, 2010, the

Court entered an order granting the Stay Motion (Docket No. 7165), which provides for a broad

stay of the Avoidance Actions until June 30, 2011.[9]  As a result of the stay imposed by this order,

no further substantive activity has occurred with respect to the Avoidance Actions.

---

[9] The stay was subsequently extended through and including December 30, 2011 by Order dated June 24, 2011
(Docket No. 9343).

46429/0001-7724195V1

<em>(ii)    Actions Commenced or Tolled by the Committee</em>

37.    In addition to the avoidance actions commenced or tolled by the Debtors, the Court granted standing to the Committee to commence avoidance actions or enter into tolling agreements with respect to prepetition payments made to (i) JPMorgan and others of the Debtors' Senior Lenders and Bridge Lenders (approximately $231 million in face amount), (ii) certain of the Debtors' professionals (approximately $17 million in face amount), (iii) purported insiders of the Debtors (within the meaning of section 101(31) of the Bankruptcy Code) (approximately $180 million in face amount). (See Docket No. 6150, 6657, and 6658.) Sidley's professionals reviewed and prepared the Debtors' responses to the Committee's standing motions and worked with counsel and advisors to the Committee to facilitate the production of relevant information from the Debtors so that those particular actions could be commenced or tolling agreement obtained.

(d)    <u>Stay Relief Motions</u>

38.    The Debtors were involved in over one hundred active or threatened lawsuits as of the Petition Date, all of which were stayed as a result of the commencement of these chapter 11 cases. As in most chapter 11 cases, the Debtors have been the subject of numerous requests by third parties for relief from the automatic stay throughout these cases. Specifically, the Debtors have received eighteen (18) requests for relief from stay since the commencement of these cases, one of which was resolved during the Eighth Interim Fee Period. That request, filed by Ivan J. Bates on June 8, 2010 (Docket No. 4725) was opposed by the Debtors on various grounds, including that the underlying litigation was filed in violation of the automatic stay and that grounds for relief from the stay were not met. Sidley's professionals prepared and filed an objection to Mr. Bates's motion on July 7, 2010 (Docket No. 4951) and participated in an oral argument before the Court at the omnibus hearing held on September 15,

20

2010. As a result of these efforts, the Court denied the relief requested by Mr. Bates by order entered on September 20, 2010 (Docket No. 5733).

      (e)      <u>Motion to Appoint a Chapter 11 Trustee</u>

      39.      On September 13, 2010, Aurelius filed a motion requesting that the Bankruptcy Court appoint a chapter 11 trustee to administer the affairs of the Debtors and the chapter 11 cases pursuant to 11 U.S.C. § 1104 (the "<u>Trustee Motion</u>") (Docket No. 5680). In connection with the Trustee Motion, Aurelius issued subpoenas to members of the Debtors' Special Committee of the Board of Directors and took depositions of such members. Aurelius also requested an expedited hearing to consider the Trustee Motion. (Docket No. 5682). At an initial hearing held on September 15, 2010, the Court set a hearing to consider the Trustee Motion for October 22, 2010.

      40.      Sidley's professionals in the Bankruptcy and Litigation practice groups reviewed and analyzed the Trustee Motion and related pleadings, researched the allegations raised in the Trustee Motion in light of applicable case law, prepared the Debtors' objection to the Trustee Motion, attended the depositions of the members of the Special Committee, and participated in the hearings held in connection with the Trustee Motion. On October 15, 2010, Sidley filed an objection to the Trustee Motion on behalf of the Debtors (Docket No. 5980). In that objection, the Debtors argued that the appointment of a chapter 11 trustee is a rare and extraordinary remedy, and Aurelius's allegations in the Trustee Motion did not satisfy their burden in demonstrating that such remedy was appropriate or necessary. The Committee, JPMorgan, and the "Credit Agreement Lenders" also filed objections in response to the Trustee Motion. The Trustee Motion was adjourned at Aurelius's request during the October 22, 2010 hearing and further proceedings on the Trustee Motion may be held in the future at a date and time to be determined by the Court.

21

(f)    Other Pending and Potential Litigation Matters

41.    Prior to the Petition Date and since, Sidley has served the Debtors as defense counsel with respect to a number of litigation matters pending in all levels of state and federal courts, including such matters as *Neuman v. Goldstone*, a prepetition employment contract lawsuit in Los Angeles, and certain litigation matters pending in New York, including the cases styled *Schultz v. Tribune*, *Crab House of Douglaston, Inc. v. Newsday*, and *Furnell v. Tribune*. Sidley continued to represent the Debtors in connection with these litigation matters during the Eighth Interim Fee Period, to the extent such matters were not stayed by section 362(a) of the Bankruptcy Code, and also provided advice to the Debtors with connection with proofs of claim filed by the plaintiffs on account of such litigated matters.

I.    **Travel Time (30480):    Hours: 223.40  Fees: $74,038.25**

42.    During the Eighth Interim Fee Period, Sidley's professionals spent time traveling to Wilmington, Delaware to attend various hearings and formal and informal mediation sessions with the Mediator in the Debtors' cases. In addition, Sidley's professionals traveled to a variety of locations to attend meetings with the Debtors and various creditor constituencies. The hours reflect non-working travel time and the fees requested in this matter category have been reduced by 50% in accordance with Local Rule 2016-2(d)(viii).

J.    **Labor Issues (30490):    Hours: 28.80  Fees: $20,722.00**

43.    Approximately 15% of the Debtors' employees are represented by labor unions. During the Eighth Interim Fee Period, Sidley's professionals continued to address and analyze a variety of legal issues concerning the impact of these chapter 11 cases on the Debtors' collective bargaining agreements, multiemployer pension plans, and obligations thereunder.

44.    In addition, Sidley's professionals continued to work with the Debtors to respond to various bankruptcy-related issues and questions raised by the Pension Benefit

22

Guaranty Corporation ("PBGC") in connection with certain of the Debtors' labor contracts, specifically the potential withdrawal liability related to multiemployer pension plans that the Debtors might incur depending on the outcome of their chapter 11 proceedings.

**K.      Plan and Disclosure Statement (30500):    Hours: 5,559.80  Fees: $3,693,448.00**

45.     During the Eighth Interim Fee Period, Sidley's professionals spent considerable time and effort (i) negotiating the terms of a plan of reorganization and resolution of the LBO-Related Claims, (ii) drafting , together with the co-proponents of such plan , a plan of reorganization and a corresponding disclosure statement and other documents related thereto, (iii) reviewing the three competing plans of reorganization and the related disclosure statements filed by various of the Debtors' creditor constituencies, (iv) researching and analyzing the business and legal issues presented by each of the four proposed plans of reorganization, (v) preparing objections to the disclosure statements related to the three competing plans of reorganization and responding to objections asserted by the proponents of each of those plans and third-parties with respect to the plan, and (vi) preparing the necessary materials for soliciting votes to accept or reject each of the four plans of reorganization.  Each of these activities is discussed in greater detail below.

(a)     Mediation

46.     At the Debtors' request, on September 1, 2010, the Court appointed the Honorable Kevin Gross, Bankruptcy Judge for the United States Bankruptcy Court for the District of Delaware, as a mediator (the "Mediator") in the chapter 11 cases to conduct a non-binding mediation concerning the terms of a plan of reorganization, including the appropriate resolution of the LBO-Related Claims (the "Mediation").  (See Order Appointing Mediator dated September 1, 2010, Docket No. 5591.)  The Debtors and several of their creditor constituencies participated in the Mediation, including (i) the Committee, (ii) JPMorgan, (iii) Angelo Gordon,

23

(iv) a group of "Credit Agreement Lenders," which included Oaktree, (v) a group of "Step One Credit Agreement Lenders," (vi) Wells Fargo, (vii) Law Debenture, (viii) Deutsche Bank Trust Company Americas ("Deutsche Bank"), (ix) Centerbridge, (x) Aurelius, (xi) EGI-TRB LLC, and (xii) Wilmington Trust (collectively, the "Mediation Parties").

47.     On September 20, 2010, each of the Mediation Parties submitted to the Mediator a statement setting forth such Mediation Party's position respecting the structure and economic substance of an acceptable plan of reorganization.  On behalf of the Debtors, Sidley's Bankruptcy and Litigation professionals prepared a statement for the Mediator outlining the Debtors' position with respect to an appropriate plan of reorganization and resolution of the LBO-Related Claims.  Sidley's Bankruptcy and Litigation professionals, together with the Debtors' management and other professionals participated in round-the-clock Mediation sessions on behalf of the Debtors, which began on September 26, 2010 and continued through September 27, 2010.  On September 28, 2010, the Mediator filed the Mediator's Report, which, among other things, reported that the Mediation resulted in a settlement agreement between the Debtors, on the one hand, and Angelo Gordon and Oaktree, on the other hand.  (See Mediator's Report dated September 28, 2010, Docket No. 5831.)  The terms of the settlement were contained in the Term Sheet of Joint Plan of Settling Parties, attached as Exhibit A to the Mediator's Report (the "First Mediation Term Sheet").  The Mediator's Report also stated that the Mediation was not closed and that the Mediator anticipated additional constructive discussions respecting the plan of reorganization among the Debtor sand other parties.  (See Mediator's Report.)

48.     The Debtors continued discussions with stakeholders after issuance of the Mediator's Report in an effort to forge a more broadly supported compromise on a plan of reorganization.  On October 12, 2010, with the continued assistance of Judge Gross, the Debtors,

24

the Committee, Oaktree, Angelo Gordon, and JPMorgan reached a new settlement (the "October

Settlement"). The terms of the October Settlement were contained in the Term Sheet of Joint

Plan Supported by Debtors, Committee, Oaktree, Angelo Gordon, and JPMorgan and Endorsed

by the Mediator, attached as Exhibit A to the Mediator's Second Report (the "Second Mediation

Term Sheet") (Docket No. 5936). Throughout this process, Sidley's professionals analyzed and

assessed plan and settlement proposals, advised Debtors' management, and negotiated with

creditor constituencies the terms of the October Settlement and prepared the Second Mediation

Term Sheet.

(b)    The DCL Plan and the Competing Plans of Reorganization

49.    Following the filing of the Second Mediation Term Sheet on October 12,

2010, Sidley's professionals, together with counsel for the Committee, Oaktree, Angelo Gordon,

and JPMorgan (collectively, the "DCL Proponents"), worked around the clock to incorporate

terms of the October Settlement and the Second Mediation Term Sheet into a new plan of

reorganization, known as the "DCL Plan." The DCL Proponents have pursued the DCL Plan

through to confirmation hearings held in early-to-mid 2011 and have, through additional

negotiations, obtained the support of the proponents of two of the other three competing plans of

reorganization for the Debtors. Sidley's professionals in the Bankruptcy, Corporate, Tax,

Litigation and FCC regulatory practice groups worked and negotiated with representatives of the

other DCL Proponents and various third parties to formulate the specific terms and structure of

the DCL Plan, and to prepare the corresponding disclosure statement and other disclosure

documents in accordance with the directives of the Court,[10] and conducted the extensive

---

[10] At a status conference held on October 4, 2010, the Court directed the filing of a single disclosure statement for
all plans of reorganization proposed for the Debtors, comprised of a general disclosure statement based in part on the
Debtors' previously-approved disclosure statement, and specific disclosure statements with respect to each

operational, financial and legal analyses necessary to the development of such plan, disclosure statement, and additional disclosure documents.

50.    As a result of these cumulative efforts, on October 22, 2010, the DCL Proponents filed (i) the DCL Plan (Docket No. 6089); (ii) a general disclosure statement (the "General Disclosure Statement") (Docket No. 6090) describing, among other things, the Debtors' history and businesses, certain prepetition liabilities, the events leading up to the Debtors' filing for chapter 11 protection, the events during the chapter 11 cases, the claims relating to the Leveraged ESOP Transactions, projected financial information and reorganization value, and general risk factors and tax considerations relating to the confirmation of a plan of reorganization; and (iii) a specific disclosure statement relating to the DCL Plan (the "DCL Specific Disclosure Statement") (Docket No. 6091) describing, among other things, (a) the terms, provisions and implications of the DCL Plan and (b) the treatment of Claims against and Interests in the Debtors under the DCL Plan.

51.    Three competing plans of reorganization (together with the DCL Plan, the "Competing Plans"), accompanied by specific disclosure statements respecting such plans (together with the DCL Specific Disclosure Statement, the "Specific Disclosure Statements"), were filed on October 29, 2010, as follows: (i) a plan of reorganization proposed by Aurelius, Law Debenture, Deutsche Bank and Wilmington Trust (the "Noteholder Plan"), (ii) a plan of reorganization proposed by King Street Acquisition Company, L.L.C., King Street Capital, L.P.

---

competing plan. Subsequent to the October 4 status conference, the Mediation Parties held a teleconference to address outstanding procedural issues with respect to the plan process, and to facilitate an agreed-upon schedule for anticipated plan-related filings. On October 13, 2010, a telephonic status conference was held before the Court with respect to establishing procedures and deadlines in connection with the Court's consideration of the adequacy of the General Disclosure Statement and Specific Disclosure Statements. The Court entered an order on October 18, 2010 (Docket No. 6022) (the "Scheduling Order"), which established deadlines for plan-related filings and scheduled a hearing on November 29 to consider the adequacy of the General Disclosure Statement and any Specific Disclosure Statements filed in the Debtors' cases.

46429/0001-7724195V1

and Marathon Asset Management, L.P. (the "Bridge Lender Plan"), and a plan of reorganization
proposed by the Step One Credit Agreement Lenders (the "SOCAL Plan").  On November 9,
2010, in accordance with the Court's Scheduling Order, the DCL Proponents filed a Responsive
Statement with the Bankruptcy Court setting forth the DCL Proponents' respective views of the
DCL Plan compared to each of the other Competing Plans, for dissemination to creditors as part
of the solicitation of votes on the Competing Plans.  Each of the proponents of the other
Competing Plans filed statements concerning their views on the Competing Plans (collectively,
with the Responsive Statement filed by the DCL Proponents, the "Responsive Statements").

52.     Once the Competing Plans, General Disclosure Statement, Specific
Disclosure Statements, and Responsive Statements were filed, Sidley's professionals in the
Bankruptcy, Corporate, Tax, Litigation, and FCC regulatory practice groups thoroughly
reviewed and analyzed the variety of business, strategic and legal issues raised by each of the
Competing Plans, Specific Disclosure Statements, and Responsive Statements.  Sidley's
professionals, in conjunction and cooperation with the Debtors and counsel for the other DCL
Proponents, prepared objections to each of the other proponents' Specific Disclosure Statements
and Responsive Statements and prepared responses to the objections raised against the General
Disclosure Statement, the DCL Specific Disclosure Statement, and the DCL Proponents'
Responsive Statement by the proponents of the other Competing Plans and various third parties.

53.     Objections to the General Disclosure Statement, Specific Disclosure
Statements, and Responsive Statements were filed on or prior to November 16, 2010.  The DCL
Proponents received approximately 10 objections to the DCL Specific Disclosure Statement and
the DCL Proponents' Responsive Statement (collectively, the "DCL Disclosure Statement
Objections"), plus numerous other informal objections or responses thereto.  Sidley's

27

professionals reviewed and analyzed each of the DCL Disclosure Statement Objections and expended substantial time and effort to engage with each of the objecting parties, to the extent practicable, to resolve the DCL Disclosure Statement Objections consensually. Sidley's professionals also expended substantial time and effort to engage with the proponents of the other Competing Plans in an effort to resolve consensually, to the extent practicable, the DCL Proponents' objections to the Specific Disclosure Statements and Responsive Statements for the other Competing Plans. Sidley's professionals also worked extensively with the representatives of the other DCL Proponents to negotiate and revise the DCL Plan, DCL Specific Disclosure Statement and the DCL Proponents' Responsive Statement as appropriate in response to certain DCL Disclosure Statement Objections. Sidley's professionals, in conjunction and cooperation with the other DCL Proponents, prepared and filed further proposed revisions to the DCL Plan and DCL Specific Disclosure Statement on November 23, 2010 (Docket No. 6599), December 1, 2010 (Docket No. 6686), December 5, 2010 (Docket No. 6984), December 6, 2010 (Docket No. 7050), December 10, 2010 (Docket No. 7136) and December 15, 2010 (Docket No. 7198). The Court held hearings on the adequacy of the General Disclosure Statement and the Specific Disclosure Statements, as well as the proposed solicitation procedures, on November 29, 2010 and December 6, 2010 and entered an order approving the General Disclosure Statement, the Specific Disclosure Statements and solicitation procedures on December 9, 2010 (Docket No. 7126, amended at Docket Nos. 7215 and 7999).[11]

---

[11] As addressed below, the order approving the General Disclosure Statement, Specific Disclosure Statements and solicitations procedures was amended on December 16, 2010, to reflect the fact that the SOCAL Plan was withdrawn by its proponents.

46429/0001-7724195V1

(c)      Solicitation and Balloting

54.      Sidley's professionals, together with the Court-appointed claims, noticing, and balloting agent (the "Voting Agent"), began the process for soliciting of votes to accept or reject each of the Competing Plans during the Eighth Interim Fee Period, continuing into the Ninth Interim Fee Period. Sidley's professionals reviewed and analyzed each of the Competing Plans to determine (i) how holders of claims and interests were classified under each Competing Plan, (ii) which classes of creditors were eligible to vote to accept or reject each Competing Plan, and (iii) what elections, if any, creditors were able to make under the terms of each Competing Plan. Based on the analysis of each of the Competing Plans undertaken by Sidley, Sidley prepared and filed the Debtors' Motion for an Order (I) Approving General Disclosure Statement and Specific Disclosure Statements; (II) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Plans of Reorganization; (III) Approving Forms of Ballots, Master Ballots and Related Instructions; (IV) Approving Solicitation Package Contents and Authorizing Distribution of Solicitation and Notice Materials; (V) Fixing Voting Record Date; (VI) Establishing Notice and Objection Procedures in Respect of Confirmation; (VII) Setting Confirmation Schedule and Establishing Parameters on Confirmation-Related Discovery; (VIII) Establishing New Deadline for Return of Media Ownership Certifications; (IX) Authorizing Expansion of Balloting and Tabulation Agents Retention and Allocation of Costs of Same; and (X) Granting Related Relief (Docket No. 6255) (the "Disclosure Statement and Solicitation Procedures Motion"), along with ballots and election forms for each class of claims eligible to vote on one or more of the Competing Plans. Drafting the appropriate ballots and election forms relating to Competing Plans required Sidley's professionals to have considerable knowledge and understanding of the mechanics of each the four Competing Plans. Most holders of claims received a separate ballot for each of the Competing Plans, and the ballots and election forms

29

were tailored to the respective Competing Plan. Preparation and finalization of the Disclosure

Statement and Solicitation Procedures Motion also required extensive discussions with the

proponents of each of the Competing Plans, the Court-appointed Voting Agent, the Debtors'

financial advisors at A&M, and numerous other parties.

55.    The Debtors received three objections to the Debtors' proposed

solicitation procedures on November 19, 2010, and prepared and filed an omnibus reply to such

objections on November 24, 2010. The Disclosure Statement and Solicitation Procedures

Motion and various aspects of the relief sought therein were approved by the Bankruptcy Court

at hearings held on November 29, 2010 and December 6, 2010. The order approving the

Disclosure Statement and Solicitation Procedures Motion was entered by the Bankruptcy Court

on December 9, 2010 (Docket No. 7126), and was amended to reflect the withdrawal of the

SOCAL Plan on December 16, 2010 (Docket No. 7215). The solicitation of the Competing

Plans continued into the Ninth Interim Fee Period and those activities will be described in

Sidley's Ninth Quarterly Fee Application Request.

**L.    Professional Retention (30510):    Hours: 215.00  Fees: $123,110.00**

56.    The Debtors' large and diverse businesses require the employment and

retention of a variety of professionals to support these bankruptcy proceedings and to continue

managing the litigation, real estate, tax, accounting, and other needs of their business operations

in the ordinary course. During the Eighth Interim Fee Period, Sidley's professionals assisted the

Debtors with the retentions of (i) Davis Wright Tremaine LLP, as special counsel to Los Angeles

Times Communications LLC; (ii) Novack and Macey LLP, as special counsel; (iii) Levine

Sullivan Koch & Schulz, L.L.P., as special counsel for certain litigation matters; and (iv) Sitrick

and Company, as corporate communications consultant. Sidley's professionals also assisted the

Debtors with modifying the scope of the existing retentions of Dow Lohnes PLLC and Reed

30

Smith LLP in connection with additional services to be provided to the Debtors by such professionals. In each instance, Sidley's professionals consulted with the Debtors' management to determine the appropriate scope and terms of the initial or supplemental retention, and coordinated with counsel for and personnel of each such retained professional and prepared the necessary pleadings to obtain Court approval of such retention. (See Docket Nos. 5808, 5813, 5872, 5883, 5888, and 6226.) Furthermore, in each instance the proposed retention or modified retention was approved by the Bankruptcy Court. (See Docket Nos. 6062, 6079, 6081, 6087, 6552, and 7158.) Sidley's professionals also worked to resolve the objection of the U.S. Trustee to the proposed retention of Jones Day as counsel to the Special Committee of Tribune Company's Board of Directors. That objection was consensually resolved and the Order Authorizing the Retention of Jones Day as Special Counsel for the Special Committee of Tribune Company's Board of Directors Nunc Pro Tunc to August 22, 2010 was entered by the Court on September 13, 2010 (Docket No. 5665).

57.    In addition, on September 29, 2010, Sidley's professionals prepared and filed a supplement to the list of the Debtors' ordinary course professionals ("OCP") and coordinated with the Debtors' legal department and financial advisors to prepare and file monthly and quarterly reports of proposed payments to OCPs (Docket No. 5846), in each instance as required by and in accordance with the Court's OCP Order.

**M.    Tax Issues (30520):    Hours: 100.20  Fees: $61,792.18**

58.    During the Eighth Interim Fee Period, Sidley's tax professionals contributed substantially to the analysis of the tax implications of the DCL Plan and the preparation of both the General Disclosure Statement and the DCL Specific Disclosure Statement. Sidley's professionals analyzed numerous potential tax issues relating to the DCL Plan, including the impact of the DCL Plan on various holders of claims and interests and the tax

31

implications of the Debtors' proposed corporate structure as of their emergence from chapter 11. Additionally, Sidley's professionals analyzed issues relating to the Competing Plans, given their differing treatment of claims and interests.

59.    In addition, Sidley's professionals reviewed and analyzed a variety of discrete tax issues on behalf of the Debtors, both arising from and in connection with these chapter 11 cases and in connection with Sidley's representation of the Debtors in tax matters in the ordinary course of the Debtors' business.  For example, Sidley's professionals reviewed and analyzed tax-related claims and liabilities, considered the tax implications of proposed transactions, handled appeals of tax assessments, advised the Debtors with respect to potential settlements of tax claims, and communicated with taxing authorities concerning all such matters.

**N.    Claims Processing (30530):    Hours: 255.30  Fees: $129,589.00**

60.    During the Eighth Interim Fee Period, Sidley's professionals continued evaluating, researching, and analyzing the treatment of various types of claims arising in the Debtors' chapter 11 cases, covering the full spectrum of potential liabilities.  To date, over 6,768 proofs of claim have been filed in the Debtors' chapter 11 cases.  Sidley's professionals assigned to handle claims-related matters communicated regularly with the Debtors' financial advisors, A&M, in order to coordinate the processing of the proofs of claim, evaluating the legal sufficiency of the claims, and preparing objections thereto.

61.    During the Eighth Interim Fee Period, Sidley's professionals, working together with the Debtors' management, business personnel, and A&M, prepared and filed the Debtors' 36th omnibus objection to claims as well as a stand-alone notices of stipulations resolving claims.  Sidley's professionals reviewed and responded to formal and informal responses by claimants to the claims objections, and coordinated with the Debtors' personnel to negotiate the consensual resolution of objections where feasible.  During the Eighth Interim Fee

32

Period, the Bankruptcy Court entered orders sustaining, in whole or in part, the Debtors' 34th and 35th omnibus objections to claims that had previously been filed by Sidley on behalf of the Debtors (subject to the continuance of objections to certain claims of creditors who filed responses to such objections). In addition, during the Eighth Interim Fee Period, Sidley's professionals objected to a motion for certification of a purported class proof of claim (Docket No. 6204).

**O.      Business Operations (30550):   Hours: 205.30  Fees: $110,722.00**

62.      The Business Operations matter category encompasses the activities of Sidley's professionals with respect to their representation of the Debtors in corporate and transactional matters in the ordinary course of the Debtors' business, as well as other general corporate law and transactional advice, both related to the Debtors' chapter 11 cases and otherwise related to the Debtors' businesses. These services are necessary to facilitate the Debtors' efforts to stabilize and reposition their businesses through cost saving and revenue enhancing strategies, as well as to prepare the Debtors for their emergence from chapter 11.

63.      During the Eighth Interim Fee Period, Sidley's professionals in the Corporate practice group expended substantial time and effort to prepare, research, and analyze potential value maximization strategies regarding the Debtors and certain of the Debtors' properties. In addition, Sidley's professionals addressed a variety of discrete matters arising postpetition in the ordinary course of the Debtors' business, including the review of proposed transactions, contracts, leases, the potential formation of a not-for-profit entity, and general corporate governance matters.

**P.      Case Administration (30560):   Hours: 279.40  Fees: $109,588.50**

64.      During the Eighth Interim Fee Period, Sidley's professionals have engaged in various general case administration tasks, including scheduling and participating in hearings,

33

reviewing and reporting on docketed filings to the Debtors, the Committee, the United States Trustee, and other interested parties, and maintaining schedules of critical dates and deadlines. On a periodic basis during this Eighth Interim Fee Period, Sidley's professionals participated in status calls with the Debtors' senior management and financial advisors to discuss pending motions and issues and the outcome of each hearing. In addition, Sidley's paraprofessionals are responsible for monitoring the docket for all filed pleadings and preparing and distributing a daily status report to the Debtors' senior management and Sidley's professionals.

**Q.    Creditor Communications (30570):    Hours: 1.90  Fees: $1,435.00**

65.    Throughout the Eighth Interim Fee Period, Sidley's professionals have responded to numerous inquiries and communications from individual creditors as well as from representatives of larger groups of the Debtors' creditor constituencies regarding the status of these chapter 11 cases.

**R.    Bankruptcy Schedules (30580):    Hours: 0.20  Fees: $95.00**

66.    During the Eighth Interim Fee Period, Sidley's professionals continued to work in cooperation with the Debtors and their financial advisors at A&M to analyze the Debtors' schedules of assets and liabilities and statements of financial affairs, with the goal of ensuring accuracy and completeness of all financial disclosures.

**S.    Employee Issues (30590):    Hours: 646.60  Fees: $434,496.00**

67.    During the Eighth Interim Fee Period, Sidley's professionals in the Bankruptcy and Employee Benefits practice groups remained substantially engaged in assisting the Debtors with various issues pertaining to employee-related matters. As described in Sidley's Sixth and Seventh Quarterly Fee Application, during this period Sidley's professionals continued to advise the Debtors with respect to the November 10, 2010 hearing on the Debtors' proposed 2010 management incentive plan ("MIP"), which was contested by Wells Fargo and the United

34

States Trustee. Sidley's professionals prepared for the hearing with respect to the 2010 MIP,
including researching, drafting, and filing a pretrial memorandum and exhibits for the hearing
(Docket No. 6249), preparing witnesses, and planning hearing strategy, in addition to negotiating
with the Committee and the objecting parties in an effort to reach a consensual resolution among
the parties. The aforementioned negotiations culminated in the presentation and entry of an
agreed order authorizing the 2010 MIP (Docket No. 6323), by which the Bankruptcy Court
approved the substantial majority of the relief requested by the Debtors.

       68.     Sidley's professionals in the Bankruptcy and Employment practice groups
also reviewed and analyzed provisions related to employee compensation and benefits in the
DCL Plan and drafted portions of the General Disclosure Statement and DCL Specific
Disclosure Statement relating to the Debtors' employment-related policies and programs, and the
proposed treatment of claims arising thereunder as part of the DCL Plan. In addition to the
foregoing, Sidley's professionals responded to inquiries and analyzed various issues involving
the Debtors' tax-qualified pension plans, drafted and edited severance agreements and severance
plan documents, reviewed consulting contracts, responded to numerous information requests
from and/or regarding current and former employees, analyzed employee-related claims, and
handled various other issues in connection with the Debtors' employees.

**T.**     **2010 Exit Credit Facility (13700):   Hours: 1.80  Fees: $1,035.00**

       69.    During the Eighth Interim Fee Period, Sidley continued to provide
services to the Debtors relating to the evaluation, negotiation, and implementation of a post-
confirmation financing facility and related notes, documents, and agreements in connection
therewith. The DCL Plan provides that the Debtors may, but are not required to, enter into an
Exit Facility Credit Agreement that will provide a source of funding for the reorganized Debtors
upon emergence from their chapter 11 cases.

35

## EXPENSES INCURRED

70.     Sidley has incurred expenses of $334,255.68 in connection with its services rendered to the Debtors during the Eighth Interim Fee Period.  These expenses represent actual out-of-pocket costs for items incurred exclusively for the direct benefit of the Debtors, including, but not limited to, duplicating charges, document delivery and messenger services, telephone and facsimile charges, computer-assisted legal research, travel-related expenses, overtime services, in-house document production, and professional services from contract attorneys relating to discovery activities in connection with the Leveraged ESOP Transactions and the Competing Plans.  Sidley submits that all such expenses are necessary and actual expenses for the performance of its services in these cases, and further submits that many of such expenses were necessitated by the time constraints under which Sidley's professionals and staff have operated in these cases.

71.     Computer research and information retrieval services are charged on a time, item and/or search-type basis which takes advantage of certain discounts that Sidley is able to negotiate with the relevant service providers because of the Firm's size and volume of usage. The Firm's charges for computerized legal research such as Westlaw or Lexis are based on a rate that recovers no more than the Firm's costs.

72.     Sidley submits that all travel expenses incurred during the period covered by this Application were necessary, reasonable, and reflect the prevailing market rates.  In particular, Sidley submits that, to the best of its knowledge, all air travel utilized by Debtors' personnel during the period covered by this Application was at the prevailing coach-class rate for such travel less any corporate discounts received by Sidley, in accordance with Sidley's policies for business travel for bankruptcy and non-bankruptcy matters.

46429/0001-7724195V1

73.    Sidley's normal billing practices, as set forth in the pleadings supporting its retention in these chapter 11 cases, include standard secretarial services as part of normal overhead.  For certain projects involving large and/or time-sensitive administrative and logistical requirements resulting from client needs, Sidley utilizes the services of third-party providers in the place of clerical personnel on staff during normal business hours and bills those services to the client at Sidley's cost for such services.

74.    During the Eighth Interim Fee Period, Sidley charged a total of $9,768 relating to outside electronic and hard copy document production, binding, and drilling services that were billed to the Debtors at cost; that is, no markup for such services is applied by Sidley. In connection with Sidley's maintenance of the Document Depository, in which the equivalent of approximately 4.5 million pages of documents relating to the Leveraged ESOP Transactions are electronically stored, Sidley utilized the services of an outside vendor to process electronic data files for production upon request to the Depository Designees, Mediation Parties, and other creditor constituencies authorized to receive access to such documents.

75.    Sidley utilized the services of contract attorneys to supplement the Firm's Litigation professionals in the review and analysis of the substantial number documents received and produced in discovery, often under tight deadlines imposed by the parties' discovery schedule and the exigencies of the case.  During the Eighth Interim Fee Period, Sidley charged a total of $96,574.00 relating to such outside document processing and professional services (under the expense category "Professional Services/Specialists") that were billed to the Debtors at cost.  A detailed breakdown of Sidley's expenses incurred in rendering services to the Debtors during the period covered by this application is incorporated into this Application as part of Attachment B hereto.

46429/0001-7724195V1

## REVIEW OF APPLICABLE LOCAL RULE

76.     The undersigned has reviewed the requirements of Local Rule of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware 2016-2 and certifies to the best of his information, knowledge and belief that this application substantially complies with Rule 2016-2.

## NOTICE

77.     Notice of this Application has been served upon the Notice Parties specified in the Fee Orders.  In accordance with the terms of the Fee Orders, Sidley respectfully submits that no other or further notice is required.

## NO PRIOR REQUEST

78.     Other than the applicable Monthly Fee Applications, no previous application respecting the relief requested herein has been made to this or any other Court.

46429/0001-7724195V1

WHEREFORE, after appropriate notice and hearing, Sidley Austin LLP respectfully requests the Court (i) to approve, pursuant to 11 U.S.C. §§ 327, 331, and 503, interim compensation in the amount of $7,126,734.00 and reimbursement of expenses in the amount of $334,255.68, (ii) to authorize the payment of such amounts by the Debtors to Sidley, less any amounts previously paid to Sidley pursuant to the Monthly Fee Applications for the period covered by this eighth Quarterly Fee Application Request and the procedures set forth in the Interim Compensation Order and the Fee Examiner Order, and (iii) to grant such further relief as is just and proper.

Dated: July 1, 2011

Respectfully submitted,

James F. Conlan
Bryan Krakauer
Kenneth P. Kansa
Jillian K. Ludwig
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

ATTORNEYS FOR DEBTORS AND DEBTORS
IN POSSESSION

39