Robert J. Lack
Amy C. Brown
Ricardo Solano Jr.
Timothy M. Haggerty
FRIEDMAN KAPLAN SEILER & ADELMAN LLP
One Gateway Center, 25th Floor
Newark, NJ 07102-5311
(973) 877-6400
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

-------------------------------------------------------------x
                            :

| | |
|---|---|
| DEUTSCHE BANK TRUST COMPANY AMERICAS, in its capacity as successor indenture trustee for certain series of Senior Notes, *et al.*,     : | Civil Action No. 11-3148 (WJM)(JAD) |
| Plaintiffs,       : | |
| - v. -        : | **NOTICE OF PLAINTIFFS' MOTION TO STAY** |
| MERRILL LYNCH TRUST COMPANY, A DIVISION OF BANK OF AMERICA, N.A., *et al.*,     : | **Motion Day: August 1, 2011** |
| Defendants.     : | |

-------------------------------------------------------------x

       PLEASE TAKE NOTICE that on August 1, 2011, or as soon thereafter as counsel

may be heard, the undersigned attorneys for plaintiffs Deutsche Bank Trust Company Americas,

Law Debenture Trust Company of New York, and Wilmington Trust Company, in their capacity

as successor indenture trustees (collectively, "Plaintiffs"), shall move this Court for an Order

staying the time for the defendants to answer or otherwise respond to the Complaint in this action

and requiring each defendant to enter an appearance in this action.

999066.3

PLEASE TAKE FURTHER NOTICE that, in support of this motion, Plaintiffs shall rely upon the declaration of Hal Neier, dated June 30, 2011, and the accompanying memorandum of law.

WHEREFORE, Plaintiffs respectfully request that the Court enter the attached proposed order granting the following relief and all such other relief as the Court deems proper:

1.      Ordering that defendants' time to answer or otherwise respond to the Complaint in this action be stayed until the earliest of (a) October 31, 2011, (b) order by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") in *In re Tribune Co.*, No. 08-13141 (KJC), confirming a plan of reorganization, or (c) further Order of the Bankruptcy Court or this Court;

2.      Ordering that any applicable deadlines under Federal Rules of Civil Procedure 23 or 26 or Local Civil Rule 26.1 will also be held in abeyance during the pendency of the stay;

3.      Ordering that notwithstanding the pendency of the stay in this Court, (i) Plaintiffs may (a) amend the Complaint or move for leave to amend the Complaint; (b) voluntarily dismiss this action or one or more defendants pursuant to Federal Rule of Civil Procedure 41; (c) move to add or drop a party or to sever any claim against a party pursuant to Federal Rule of Civil Procedure 21; (d) move to consolidate and/or coordinate this action with any other action, without limitation, by making a motion pursuant to 28 U.S.C. § 1407 and the applicable Rules of Procedure of the U.S. Judicial Panel on Multidistrict Litigation, or any applicable state rules; (e) file a motion pursuant Federal Rule of Civil Procedure 26(d)(1) seeking preconference discovery to confirm that parties have been properly identified, named, and served in this action; and (f) file a motion seeking modification of this Order; and (ii) defendants may file responses to any motions Plaintiffs make pursuant to this provision of the Order;

4.      Ordering that notwithstanding the stay, all defendants or their counsel are required to enter an appearance in this case within 30 days after the later of entry of the Order or service of the Complaint upon the defendant, without prejudice to any defenses that defendant may have;

5.      Ordering that notwithstanding the stay, any defendant who was not provided with notice of Plaintiffs' motion prior to entry of the Order, because such defendant had not yet been served with the Complaint or appeared in the action, may move this Court at any time to vacate or modify the Order upon notice to Plaintiffs and all other defendants in this action; and

6.      Ordering that at such time as the stay is lifted or terminates, this Court shall set the schedule for answering or otherwise responding to the Complaint, unless the action has been transferred to another court for coordinated pretrial proceedings.

Dated:  Newark, New Jersey
        July 5, 2011

                            Respectfully submitted,

                            FRIEDMAN KAPLAN SEILER &
                               ADELMAN LLP


                            s/ Robert J. Lack
                            Robert J. Lack
                            Amy C. Brown
                            Ricardo Solano Jr.
                            Timothy M. Haggerty
                            One Gateway Center, 25th Floor
                            Newark, NJ 07102-5311
                            (973) 877-6400

                            *Attorneys for Plaintiffs*

TO:

Merrill Lynch Trust Company
A Division of Bank of America, N.A.
101 Hudson St., #8
Jersey City, NJ 07302

Merrill Lynch Trust Company
Trustee of Mine Scribante Crut-Sanibel Captiva
101 Hudson St., #8
Jersey City, NJ 07302

ML Equity Index Trust
101 Hudson St., # 8
Jersey City, NJ 07302

ML Large Capitalization In
101 Hudson St., # 8
Jersey City, NJ 07302

Nondima Chicago Comm. Foundation – FitzSimons
*Attn*. Stacie Morena
P.O. Box 1524
Pennington, NJ 08534-0725

Priac Funds
751 Broad Street
Newark, NJ 07102

Prudential Insurance Co. of America (PDI)
751 Broad Street
Newark, NJ 07102-3771

Prudential Insurance Co. of America (PMFIM)
751 Broad Street
Newark, NJ 07102

Prudential Investment Management Inc.
2 Gateway Center
Newark, NJ 07102

Prudential Retirement Insurance and Annuity Co.
751 Broad St.
23rd Floor
Newark, NJ 07102

Michael C. D'Agostino, Esq.
Bingham McCutchen LLP
One State Street
Hartford, CT 06103-3178
  *Attorneys for Priac Funds,*
  *Prudential Insurance Co. of America (PDI),*
  *Prudential Insurance Co. of America (PMFIM),*
  *Prudential Investment Management Inc., and*
  *Prudential Retirement Insurance and Annuity Co.*

Verizon Master Savings Trust
295 N. Maple Ave.
Bldg. 7
Basking Ridge, NJ 07920

Wilmington Fiduciary Trust Services Co.
(f/k/a UBS Fiduciary Trust Co.)
Collective Investment Trust for Employee Benefit Plans
803 Plaza Three
Jersey City, NJ 07311-1112

Robert J. Lack
Amy C. Brown
Ricardo Solano Jr.
Timothy M. Haggerty
FRIEDMAN KAPLAN SEILER & ADELMAN LLP
One Gateway Center, 25th Floor
Newark, NJ 07102-5311
(973) 877-6400
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

---------------------------------------------------------------x
                                      :

DEUTSCHE BANK TRUST COMPANY      :
AMERICAS, in its capacity as successor indenture  :
trustee for certain series of Senior Notes, *et al.*,  :
                                        :

                       Plaintiffs,    :   Civil Action No. 11-3148 (WJM)(JAD)

                                        :

     - v. -                              :

                                        :

MERRILL LYNCH TRUST COMPANY,     :
A DIVISION OF BANK OF AMERICA, N.A.,   :
*et al.*,                                     :

                                        :

                     Defendants.   :

                                        :
---------------------------------------------------------------x

### DECLARATION OF HAL NEIER
### IN SUPPORT OF PLAINTIFFS' MOTION TO STAY

     I, Hal Neier, counsel for Plaintiffs Deutsche Bank Trust Company Americas in its

capacity as successor indenture trustee for a certain series of Senior Notes ("DBTCA"), Law

Debenture Trust Company of New York, in its capacity as successor indenture trustee for a

certain series of Senior Notes ("Law Debenture"), and Wilmington Trust Company, in its

capacity as successor indenture trustee for the PHONES Notes ("Wilmington Trust" and,

999689.1

Case 08-13141-JRLS   Doc 9453-1   Filed 07/13/11   Page 2 of 17

together with DBTCA and Law Debenture, "Plaintiffs"), hereby declare under penalty of perjury as follows:

1.      I submit this declaration in support of Plaintiffs' Motion To Stay.

2.      The Tribune Company's ("Tribune") chapter 11 proceedings (the "Bankruptcy Proceeding") (*In re Tribune Co.*, No. 08-13141 (KJC) (Del. Bankr.)) are currently pending before Chief Judge Carey in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). I am familiar with the facts and issues in the Bankruptcy Proceeding, and make this declaration on the basis of my personal knowledge.

3.      The statutory period during which the Debtors had exclusive standing to bring state law constructive fraudulent conveyance claims expired on December 8, 2010 (two years after the petition date), at which time Plaintiffs, and other creditor parties, regained their ability to commence such actions on their own behalf.

4.      On February 4, 2011, Tribune and the other debtor entities, the Official Committee of Unsecured Creditors of Tribune (the "Committee"), and certain lender parties in interest filed their Second Amended Joint Plan of Reorganization for the Debtors (the "DCL Plan"). No. 08-13141 (KJC), DCL Plan, Feb. 4, 2011, ECF No. 7801. On February 25, 2011, the largest noteholder of the Debtors, and Plaintiffs herein, jointly filed a competing plan of reorganization (the "Noteholder Plan" and together with the DCL Plan, the "Competing Plans"). No. 08-13141 (KJC), Noteholder Plan, Feb. 25, 2011, ECF No. 8169.

5.      Both Competing Plans included a mechanism by which state law constructive fraudulent conveyance claims, such as those asserted in this action, could be transferred to and litigated by a Creditors' Trust, and proceeds from such actions would flow to beneficiaries according to terms of the Competing Plans.

6.     The Robert R. McCormick Tribune Foundation and the Cantigny Foundation (together, the "Plan Opponents") objected to both the Competing Plans because they claimed, among other things, that "(a) the proposed Creditors' Trust would not have standing to bring the Constructive Fraud Claims against the selling Shareholders, and (b) section 546(e)'s safe harbor provision preempts all attempts to assert the Constructive Fraud Claims." No. 08-13141 (KJC), McCormick and Cantigny Objection 9, Feb. 15, 2011, ECF No. 7972.

7.     The Plan Opponents submit that neither of the Competing Plans can be confirmed because they provide for the litigation of the Creditor SLCFC Claims, which according to the Plan Opponents violate provisions of the Bankruptcy Code. Specifically, the Plan Opponents argue that Plaintiffs lack standing to bring the Creditor SLCFC Claims because the Debtors retained the exclusive ability to attack the LBO payments to the shareholders when the Committee Action was brought on the Debtors' behalf. McCormick and Cantigny Objection 11-14. Moreover, the Plan Opponents object to the Competing Plans based on their belief that Bankruptcy Code section 546(e) bars state law causes of action to recover payments to stockholders in exchange for the transfer of securities. McCormick and Cantigny Objection 14 - 24.

8.     Beginning on March 7, 2011, the Bankruptcy Court held a two-week evidentiary trial on the Competing Plans of reorganization, and closing argument occurred on June 27, 2011.

9.     Prior to that, in order to prevent state law causes of action from potentially becoming time-barred while the litigation over the Competing Plans continued in the Bankruptcy Court, Plaintiffs filed on March 1, 2001, a motion with the Bankruptcy Court for an order (i) determining that eligible creditors regained the right to prosecute the Creditor SLCFC Claims because the statute of limitations for the Debtors to commence state law fraudulent conveyance

3

actions expired on December 8, 2010, and the Debtors' estates failed to assert such claims; (ii) determining that the automatic stay does not bar Plaintiffs from commencing the Creditor SLCFC Claims; and (iii) granting leave from a mediation order by the Bankruptcy Court to permit commencement of the Creditor SLCFC Claims (the "Standing Motion"). A true and correct copy of the Standing Motion is annexed hereto as <u>Exhibit A</u>.

      10.    On March 22, 2011, the Bankruptcy Court heard oral arguments (the "SLCFC Argument") on the Standing Motion. A true and correct excerpt from the transcript of the SLCFC Argument is annexed hereto as <u>Exhibit B</u>.

      11.    On April 25, 2011, the Bankruptcy Court granted the Standing Motion and issued an order (the "SLCFC Order") providing that sections 362(a) or 546(a) of the Bankruptcy Code do not bar Plaintiffs from commencing state law constructive fraudulent conveyance claims against former Tribune shareholders, and permitting Plaintiffs to commence state law constructive fraudulent conveyance litigations, and to pursue discovery as necessary to prevent any applicable statute of limitations or time-related defenses from barring Plaintiffs' claims — provided that Plaintiffs filed an application for a stay after the litigation commenced. A true and correct copy of the SLCFC Order is annexed hereto as <u>Exhibit C</u>.

      12.    On April 29, 2011, Plaintiffs subpoenaed the Committee to obtain access to information regarding the identities of the shareholders or other entities that received cash transfers in connection with the LBO, their locations, and the amount of the cash transfers the shareholders received. The Committee had previously collected this information by issuing over 1,600 subpoenas in November 2010 to more than 900 separate entities. No. 08-13141 (KJC), Protective Order, May 19, 2011, ECF No. 8949. A true and correct copy of the Protective Order is annexed hereto as <u>Exhibit D</u>. Plaintiffs received crucial and voluminous data from the

4

Committee regarding the LBO transfers approximately eight days before Plaintiffs were compelled to file the Creditor SLCFC Claims. The Committee is still receiving new and updated information regarding the identities of these shareholders

13.     On June 2, 2011, Plaintiffs commenced this action and are now in the process of serving Defendants with the Complaint. Plaintiffs also filed 49 substantially similar complaints, commencing suits in 21 other states (together with this action, the "SLCFC Actions"). All of the SLCFC Actions were filed in federal district courts, with the exception of ten cases filed in New York, Delaware and California state court. The litigations in the other states, like here, include constructive fraudulent conveyance claims against named defendants as well as, in some actions, class claims against a defendants' class.

14.     Because the same Plaintiffs are litigating all of the federal actions, absent consolidation and transfer, Plaintiffs will be forced to respond piecemeal to duplicative motions filed by more than 1,000 defendants in these lawsuits.

15.     On June 13, 2011, Plaintiffs moved the Bankruptcy Court for an order confirming that neither the automatic stay nor the SLCFC Order prohibit Plaintiffs from: (i) moving to consolidate and/or coordinate the lawsuits, including by filing a motion requesting that the Judicial Panel on Multidistrict Litigation transfer and consolidate this action along with the other SLCFC Actions (the "MDL Motion"); and (ii) in the event that any one or more courts or parties do not implement and/or abide by the stay mandated by the SLCFC Order, taking all appropriate actions in response to any motions, pleadings, or orders filed in the SLCFC Actions (the "Clarification Motion"). A true and correct copy of the Clarification Motion is annexed hereto as Exhibit E.

999689.1

16.     On June 28, 2011, the Bankruptcy Court granted Plaintiffs' motion to clarify that the automatic stay does not prohibit Plaintiffs from making the MDL Motion or from taking all appropriate steps to enforce the stay mandated by the SLCFC Order.  A true and correct copy of the Court's June 28, 2011 Order is annexed hereto as Exhibit F.

17.     Plaintiffs intend to file the MDL Motion to consolidate and transfer the SLCFC Actions for coordinated pretrial treatment pursuant to 28 U.S.C. § 1407.

Dated:      June 30, 2011
            New York, New York

_____
Hal Neier

999689.1

# EXHIBIT A

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 |
|  | ) |  |
| TRIBUNE COMPANY, et al.,[1] | ) | Case No. 08-13141 (KJC) |
|  | ) |  |
|  | ) | Jointly Administered |
| Debtors. | ) | **Hearing Date: March 22, 2011 at 10:00 a.m.** |
|  | ) | **Objection Deadline: March 15, 2011 at 4:00 p.m.** |

**MOTION OF AURELIUS CAPITAL MANAGEMENT, LP, ON BEHALF OF ITS MANAGED ENTITIES, DEUTSCHE BANK TRUST COMPANY AMERICAS, IN ITS CAPACITY AS SUCCESSOR INDENTURE TRUSTEE FOR CERTAIN SERIES OF SENIOR NOTES, AND LAW DEBENTURE TRUST COMPANY OF NEW YORK, IN ITS CAPACITY AS SUCCESSOR INDENTURE TRUSTEE FOR CERTAIN SERIES OF SENIOR NOTES, FOR ENTRY OF ORDER (I) DETERMINING THAT CREDITORS HAVE RETAINED THEIR STATE LAW CONSTRUCTIVE FRAUDULENT CONVEYANCE CLAIMS TO RECOVER STOCK REDEMPTION PAYMENTS MADE TO STEP ONE SHAREHOLDERS AND STEP TWO SHAREHOLDERS PURSUANT TO 11 U.S.C. § 546(A); (II) DETERMINING THAT AUTOMATIC STAY DOES NOT BAR COMMENCEMENT OF LITIGATION ON ACCOUNT OF SUCH CLAIMS AGAINST SUCH SHAREHOLDERS OR, IN THE ALTERNATIVE, GRANTING RELIEF FROM AUTOMATIC STAY TO PERMIT COMMENCEMENT OF SUCH LITIGATION; AND**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

## (III) GRANTING LEAVE FROM MEDIATION ORDER TO PERMIT COMMENCEMENT OF SUCH LITIGATION

Aurelius Capital Management, LP, on behalf of its managed entities ("Aurelius"),

Deutsche Bank Trust Company Americas, in its capacity as successor Indenture Trustee for

certain series of Senior Notes ("Deutsche Bank"), and Law Debenture Trust Company of New

York, in its capacity as successor Indenture Trustee for certain series of Senior Notes ("Law

Debenture" and, together with Deutsche Bank, the "Indenture Trustees" and, collectively with

Aurelius, the "Movants") hereby file this motion (the "Motion") for entry of an order (i)

determining that creditors have retained their state law constructive fraudulent conveyance

claims to recover stock redemption payments made to Step One Shareholders and Step Two

Shareholders (as such terms are defined below) due to the expiration of the statute of limitations

under 11 U.S.C. § 546(a); (ii) determining that the automatic stay under 11 U.S.C. § 362 does not

bar the commencement of litigation by or on behalf of creditors with respect to such claims or, in

the alternative, granting relief from the automatic stay to permit the commencement of such

litigation; and (iii) granting leave from the Mediation Order (as defined below) to permit the

commencement of such litigation.  In support of this Motion, the Movants respectfully represent

as follows:

## PRELIMINARY STATEMENT[2]

1.     By the Motion, the Movants seek entry of an order granting the following relief:

(i) determining that when the statute of limitations under Bankruptcy Code section 546(a) for a

representative of the Debtors' estates to commence state law constructive fraudulent conveyance

---

[2] Unless otherwise defined herein, capitalized terms used in this Preliminary Statement shall have the meanings ascribed to such terms subsequently in the Motion or the Noteholder Plan, as applicable.

claims against Step One Shareholders and Step Two Shareholders (collectively, the
"Shareholders") to recover stock redemption payments made to such Shareholders  (collectively,
the "Estate SLCFC Claims" or the "Estate Claims") expired on December 8, 2010 without these
Estate Claims being brought, eligible creditors regained the right to prosecute their own such
claims on their individual behalf against such Shareholders (collectively, the "Creditor SLCFC
Claims" or the "Creditor Claims"); (ii) determining that as a result of the expiration of the
section 546(a) statute of limitations, the estates have no viable Estate SLCFC Claims and, as a
consequence, the Creditor SLCFC Claims may be pursued by individual creditors without
violating the automatic stay or, in the alternative, granting relief from the automatic stay to
permit the immediate commencement of litigation on account of the Creditor SLCFC Claims;
and (iii) leave from the Mediation Order – which prohibits the prosecution of any proceeding
seeking relief in connection with LBO-related causes of action – to permit the immediate
commencement of such state court litigation.

2.      The Creditor SLCFC Claims arise out of the Debtors' ill-fated LBO in 2007,
which saddled the Debtors with more than $10.7 billion of debt and precipitated the Debtors'
plunge into bankruptcy just over a year later.  In connection with the LBO, and the subject of the
instant Motion, Step One Shareholders and Step Two Shareholders received more than *$8.2
billion in cash* in exchange for their shares of common stock in Tribune.  Accordingly, the
Creditor SLCFC Claims constitute an important source of potential recovery for eligible
creditors in these cases.

3.      Absent the relief requested herein, however, the Creditor SLCFC Claims may
very well become time-barred.  Specifically, Step One of the LBO transaction closed on June 4,
2007.  The statute of limitations for commencing a creditor's state law avoidance action is

Case 08-13141-BLS   Doc 9453-1   Filed 07/05/11   Page 6 of 347

determined by applicable state law. Several states (including, for example, Delaware (the state of incorporation of Tribune), Illinois (the Debtors' principal place of business) and Massachusetts (the state where the Step One Shareholders tendered their Tribune stock in exchange for payment)) that may be the proper jurisdiction or jurisdictions for pursuing the Creditor SLCFC Claims have a four-year statute of limitations for commencing constructive fraudulent conveyance claims. Accordingly, in order to preserve the ability to prosecute the Creditor SLCFC Claims in these states, parties must operate on the assumption that the applicable statute of limitations could be as early as June 4, 2011.[3]

4.       Given the number and nature of unresolved issues that remain pending in these cases, there can be no guarantee that the Debtors will emerge from chapter 11 by that date. Moreover, even if the many outstanding issues in these cases are consensually resolved and/or adjudicated on a timely basis in connection with confirmation, there still remains a very real possibility that the Debtors will not exit chapter 11 before June 4, 2011 due to FCC approvals that must be obtained before either of the now two Competing Plans can go effective. Indeed, as set forth in the accompanying Declaration of Meredith S. Senter, Jr. in Support of the Motion (the "Senter Declaration") being filed contemporaneously herewith, the FCC must undertake a number of different steps, some of which may take several months, before either of the Competing Plans can obtain the requisite approvals from the FCC to enable the Debtors to emerge from chapter 11.

---

[3] For the avoidance of doubt, the Movants have not determined the specific jurisdiction or jurisdictions in which to commence the Creditor SLCFC Claims. Nothing contained in this Motion or any other pleading or document related thereto shall prejudice the Movants' ability to select a venue to commence the Creditor SLCFC Claims.

5.     Pursuant to the plain meaning of section 546(a) of the Bankruptcy Code, the two-year statute of limitations for a representative of the Debtors' estates to commence the Estate SLCFC Claims lapsed on December 8, 2010. According to well-settled law, as set forth in detail below, when the section 546(a) statute of limitations expired, eligible creditors regained the right to prosecute their Creditor SLCFC Claims to the same extent as if these chapter 11 cases had not been filed. Accordingly, because the Debtors' estates no longer have the right to commence the Estate SLCFC Claims, creditors should be free to pursue their own Creditor SLCFC Claims without violating the Bankruptcy Code's automatic stay. Apparently, the proponents of the DCL Plan agree with the foregoing statements of law. See *Memorandum of Law in Support of Confirmation and Omnibus Reply to Objections to Confirmation of Second Amended Joint Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co. L.P., and JPMorgan Chase Bank, N.A.* [Dkt. No. 8173] (the "DCL Plan Confirmation Brief") at 97 ("As a matter of law, when the two-year statute of limitations expired, these constructive fraudulent transfer causes of action automatically reverted to the applicable individual creditors who can now pursue those causes of action as they see fit under applicable state law."). The Movants nonetheless file the Motion as a matter of prudence and out of an abundance of caution in order to eliminate any risk of potential violation of the automatic stay and also to obtain leave from this Court's Mediation Order, which stays the prosecution of any proceeding seeking relief in connection with LBO-related causes of action while the Court-ordered mediation is ongoing.

6.     The relief requested is not only supported by well-established law but, also, is not inconsistent with the manner in which the Creditor SLCFC Claims are treated under the DCL

Plan. Despite what the Debtors, the Creditors' Committee and the Lenders may have intended, a careful reading of the DCL Plan reveals that Creditor SLCFC Claims against Step One Shareholders are not released by the Debtors or their estates under the DCL Plan. Indeed, by the DCL Plan Confirmation Brief, the DCL Plan proponents have now conceded that "no release of the Estates' constructive fraudulent transfer claims against the Step One Selling Stockholders will occur pursuant to the Debtor/Committee/Lender Plan." DCL Plan Confirmation Brief, at 97. Rather, the Creditor SLCFC Claims are now retained by eligible individual creditors unless such Creditor Claims become time-barred under applicable state law. Thus, the relief requested in the Motion is not inconsistent with the DCL Plan's treatment of the Creditor SLCFC Claims against Step One Shareholders and also complements that treatment by ensuring that such Creditor Claims do not become time-barred.

       7.      Similarly, the Motion is not inconsistent with the DCL Plan's treatment of Creditor SLCFC Claims against Step Two Shareholders.[4] Specifically, the DCL Plan expressly provides that Creditor SLCFC Claims against Step Two Shareholders are transferred to the

---

[4] Although the DCL Plan purports to release a subset of the Step Two Shareholders – i.e., the Released Step Two Stockholder Parties (defined in the DCL Plan as set forth below) – a careful reading of the DCL Plan reveals that the Creditor SLCFC Claims against the Released Step Two Stockholder Parties are, like the Step One Shareholders, not released by the Debtors or their estates, as a result of the expiration of the section 546(a) statute of limitations. See infra, ¶¶ 37-40.

    The DCL Plan defines "Released Step Two Stockholder Parties" to mean "(a) any Person that redeemed shares of common stock of Tribune held through the Tribune Company 401(k) Savings Plan (f/k/a Tribune Company 401(k) Savings and Profit Sharing Plan) in connection with the Step Two Transactions, with the exception of those Persons, and subject to the circumstances, listed on Exhibit 1.1.192 hereto to be filed with the Plan Supplement, (b) any Person employed by the Debtors on October 22, 2010 and that remains employed by the Debtors as of the Effective Date with respect to the first $100,000 of Cash received from the redemption of common stock, stock equivalents or options of Tribune in connection with the Step Two Transactions, with the exception of those Persons, and subject to the circumstances, listed on Exhibit 1.1.192 hereto to be filed with the Plan Supplement, (c) the Retiree Claimants or other Holders of Claims arising from Non-Qualified Former Employee Benefit Plans that elect to receive the treatment set forth in Section 3.2.6(c)(i) of this Plan, and (d) the Retiree Claimants or other Holders of Claims arising from Non-Qualified Former Employee Benefit Plans that elect to receive the treatment set forth in Section 3.2.6(c)(ii) of this Plan, solely with respect to the first $100,000 of Cash received from the redemption of common stock, stock equivalents or options of Tribune in connection with the Step Two Transactions." DCL Plan, §1.1.192.

creditors' trust established under the DCL Plan only to the extent that creditors holding such

Creditor Claims do not elect to "opt out" of the creditors' trust.  The majority of the holders of

the Senior Notes and PHONES Notes (in each case, measured by dollar amounts) as well as both

of the Indenture Trustees have elected to "opt out" of the DCL Plan creditors' trust and,

therefore, such creditors' individual Creditor SLCFC Claims against Step Two Shareholders will

not be transferred to the DCL Plan creditors' trust if such plan is confirmed and goes effective.

See *Supplemental Declaration of Stephenie Kjontvedt on Behalf of Epiq Bankruptcy Solutions,*

*LLC Regarding Voting and Tabulation of Ballots Accepting and Rejecting the Joint Plans of*

*Reorganization Proposed for Tribune Company and its Subsidiaries* [Dkt. No. 8114].  Thus, the

relief requested in the Motion is required to ensure that the Creditor SLCFC Claims against Step

Two Shareholders will likewise not become time-barred.

        8.       If the Motion is granted, it is currently contemplated that either the Indenture

Trustees, Wilmington Trust Company, in its capacity as successor Indenture Trustee for the

PHONES Notes (in each of which case, as directed pursuant to the applicable Indentures)

Aurelius, and/or potentially other parties holding Creditor SLCFC Claims (collectively, the

"Original Plaintiff Group")[5] will file a complaint or complaints asserting such Creditor SLCFC

---

[5] If (i) a creditor is initially included in the Original Plaintiff Group, (ii) such creditor did not opt out of the creditors' trust under the DCL Plan, and (iii) the DCL Plan is consummated, then the Creditor SLCFC Claims held by any such creditor shall be transferred to the creditors' trust under DCL Plan upon the effective date of the DCL Plan.   The Original Plaintiff Group will not include creditors holding debt incurred in connection with the LBO (collectively, the "LBO Debtholders"), even if such LBO Debtholders have not made a Non-Contribution Election under the Noteholder Plan.  The rationale for omitting LBO Debtholders from the Original Plaintiff Group is two-fold.  As a threshold matter, the Original Plaintiff Group has no obligation (and presumably no ability) to prosecute the Creditor SLCFC Claims on behalf of LBO Debtholders.  The LBO Debtholders are not Pre-LBO Noteholders and, in any event, the Complaint will assert the Creditor SLCFC Claims on behalf of *individual creditors, not the Debtors' estates*.  Second, numerous courts have held that a transfer cannot be avoided for the benefit of a creditor that authorized or ratified such transfer.  See, e.g., In re Best Prods. Co., 168 B.R. 35, 57 (Bankr. S.D.N.Y. 1994) ("A fraudulent transfer is not void, but voidable; thus, it can be ratified by a creditor who is then estopped from seeking its avoidance.");  Harris v. Huff (In re Huff), 160 B.R. 256, 261 (Bankr. M.D. Ga. 1993) ("Thus, an election by the creditor prior to commencement of the case to treat the transfer as valid, or an admission in a proceeding prior

Claims (the "Complaint").  The Original Plaintiff Group will then seek to toll the litigation until

the Court rules on the Competing Plans.  If the Noteholder Plan is consummated, then the trustee

of the Creditors' Trust under the Noteholder Plan will (a) be substituted as the plaintiff for the

Original Plaintiff Group in the Complaint, (b) prosecute the Creditor SLCFC Claims set forth in

the Complaint on behalf of the Original Plaintiff Group and (c) make distributions in respect of

the Creditor SLCFC Claims in accordance with the terms of the orders entered by the applicable

state court in respect of such Creditor Claims and the Noteholder Plan.[6]

## JURISDICTION AND VENUE

9.       This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157

and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper pursuant to

28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are sections

105(a), 362 and 546(a) of title 11 of the United States Code (the "Bankruptcy Code").

## BACKGROUND

10.      On December 8, 2008 (the "Petition Date"), substantially all of the Debtors filed

voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  An additional Debtor,

Tribune CNLBC, LLC (f/k/a Chicago National League Ball Club, LLC), Tribune Company's

subsidiary that held the majority of the assets related to the business of the Chicago Cubs Major

---

to commencement of the case with respect to the validity of an obligation, have been held to estop the creditor and in turn the trustee claiming in his stead from asserting any rights [with respect to such allegedly fraudulent transaction]."); Reitsch v. McCarty, 35 N.D. 555, 574 (N.D. 1916) ("Where it is shown that a complainant in an action to set aside a fraudulent conveyance participated in or instigated such conveyance, the court will as a general rule leave him in the position which he was instrumental in creating, and will hold that he is estopped by his conduct from attacking the conveyance . . . . The creditor must not have participated in or assented to the conveyance of which he complains, for if he has he cannot afterwards be heard to assert that the transfer was fraudulent per se as to him.").  Here, the LBO Debtholders authorized and ratified the payments made to Step One Shareholders and Step Two Shareholders in connection with the LBO and, therefore, the LBO Debtholders are not entitled to avoid those payments.

[6] If, however, the Noteholder Plan is not consummated, then the Original Plaintiff Group will prosecute the Creditor SLCFC Claims in the Complaint, except as provided in footnote 5 above.

League Baseball franchise, commenced a voluntary chapter 11 case on October 12, 2009.

**A.      The 2007 LBO**

11.      On or about April 1, 2007, the board of directors of the Tribune Company ("Tribune") approved a leveraged buyout transaction (the "LBO"), which resulted in the transfer of ownership of Tribune and its subsidiaries to a newly formed employee stock ownership plan (the "ESOP"). The LBO was structured in two interrelated steps. "Step One" of the LBO was closed on June 4, 2007 and involved the purchase by the ESOP of shares of Tribune common stock and the consummation by Tribune of a cash tender offer for nearly 50% of its outstanding common stock. "Step Two" of the LBO transaction was completed in December 2007 and involved Tribune cashing out its remaining stockholders and merging with a Delaware corporation that was wholly-owned by the ESOP, with Tribune surviving the merger.

12.      As a result of the LBO, the Debtors incurred more than $10.7 billion of loans financed by various banking entities, including JPMorgan Chase Bank, N.A., Merrill Lynch & Co., Citicorp North America, Inc., Bank of America N.A., and Barclays Bank, PLC, pursuant to advice given by the investment banking arms of some of these same banks. These banking entities received more than $200 million in fees and expenses for arranging the LBO debt. The banks and others involved in the LBO imposed the risk of these loans on Tribune's existing bondholders (collectively, the "Pre-LBO Noteholders") who, pending avoidance of the LBO debt, are now structurally subordinated to more than $10.3 billion in senior bank debt that was guaranteed by the Debtors' operating subsidiaries, and are required to share the value of Tribune with the holders of this additional debt.

13.      In connection with Step One of the LBO transaction, shareholders of Tribune (collectively, the "Step One Shareholders") received approximately *$4.3 billion* in exchange for

their shares of Tribune common stock.  See Examiner's Report, Vol. II at p. 6.  In connection
with Step Two of the LBO transaction, shareholders of Tribune (collectively, the "Step Two
Shareholders") received approximately *$4.0 billion* in exchange for their shares of Tribune
common stock.  See id. at p. 8.

**B.      The Competing Plans**

        14.       On October 18, 2010, the Court entered its Order Scheduling a Hearing and
Establishing Certain Deadlines to Consider Approval of Certain Disclosure Document(s) [Dkt.
No. 6022] (the "Plan Scheduling Order").  Pursuant to the Scheduling Order, the Court
authorized and directed the Debtors to file a plan of reorganization on or before October 22,
2010 and for any other party or parties wishing to propose a competing plan of reorganization
(each, a "Competing Plan") to file such plan on or before October 29, 2010.

        15.       Pursuant to the Plan Scheduling Order, on October 22, 2010, the Debtors, the
official committee of unsecured creditors (the "Creditors' Committee"), Oaktree Capital
Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A. filed a plan of
reorganization [Dkt. No. 6089] (as amended, the "DCL Plan") and accompanying specific
disclosure statement [Dkt. No. 6091] (as amended, the "DCL Specific Disclosure Statement").
Also pursuant to the Plan Scheduling Order, on October 29, 2010, the Movants filed a competing
plan of reorganization [Dkt. No. 6184] (as amended, the "Noteholder Plan") and accompanying
specific disclosure statement [Dkt. No. 6182] (as amended, the "Noteholder Specific Disclosure
Statement").

**C.      The Creditors' Trusts**

        16.       The DCL Plan establishes a litigation trust and creditors' trust to prosecute certain
preserved causes of action if the DCL Plan is confirmed and consummated.  Under the DCL

10

Plan, the primary responsibility of the creditors' trust is to prosecute "<u>Disclaimed State Law</u> <u>Avoidance Claims</u>," which are defined to mean "any and all LBO-Related Causes of Action arising under state fraudulent conveyance law that the Debtors or the Debtors' Estates could assert pursuant to section 544(b) of the Bankruptcy Code against **Step Two** Selling Stockholders, solely with respect to funds received in their capacities as such." DCL Plan, § 1.1.75 (emphasis added).[7] Accordingly, by definition, Disclaimed State Law Avoidance Claims do not include Estate SLCFC Claims or Creditor SLCFC Claims against **Step One** Shareholders. Indeed, based on the expiration of the section 546(a) limitations period, there are in fact *no* claims or causes of action that fit within the definition of Disclaimed State Law Avoidance Claims under the DCL Plan.

17.     The DCL Plan provides that, upon its effective date, the Debtors are required to "disclaim" all rights to pursue the Disclaimed State Law Avoidance Claims, such that all rights to pursue Disclaimed State Law Avoidance Claims revert to those entities that could have pursued such Disclaimed State Law Avoidance Claims prior to the Petition Date. <u>See</u> DCL Plan, § 14.3. Furthermore, on the effective date of the DCL Plan, any creditor holding a Disclaimed State Law Avoidance Claim is deemed to transfer any such Disclaimed State Law Avoidance Claim that it may have to the creditors' trust established under the DCL Plan, unless such creditor has elected to "opt out" of such assignment in accordance with the procedures established in the Court's amended solicitation procedures order dated December 9, 2010 [Dkt. No. 7126] (as amended, the "<u>Solicitation Procedures Order</u>"). <u>See</u> DCL Plan, § 14.3.1.

---

[7] The DCL Plan further provides that Disclaimed State Law Avoidance Claims do not include any intentional fraudulent conveyance claims or any claims against Released Parties, including, without limitation, Released Step Two Stockholder Parties (as such terms are defined in the DCL Plan). <u>See</u> <u>id.</u>, § 1.1.75.

18.     The Noteholder Plan contains a similar (although not identical) trust structure. Specifically, the Noteholder Plan establishes three Trusts, including a Creditors' Trust. The primary responsibility of the Creditors' Trust established under the Noteholder Plan is to prosecute "State Law Avoidance Claims," which are defined to mean all "claims, causes of actions, avoidance powers or rights, and legal or equitable remedies of any Person not making the Non-Contribution Election arising under state law against shareholders in Tribune whose stock was redeemed in connection with the Leveraged ESOP Transactions including, without limitation, in respect of Abandoned Claims." See Noteholder Plan, § 1.1.248.[8]

19.     The Noteholder Plan provides that, upon its effective date, the "Abandoned Claims, to the extent commenced, shall be discontinued by the Debtors, the Creditors' Committee and/or the Estates without prejudice and the Debtors shall be deemed to have abandoned, pursuant to section 554 of the Bankruptcy Code, any and all rights to further pursue the Abandoned Claims." See Noteholder Plan, § 5.18.2.[9] Furthermore, on the effective date of the Noteholder Plan, any creditor holding a State Law Avoidance Claim is deemed to contribute any such State Law Avoidance Claim that it may have to the Creditors' Trust established under

---

[8] On February 25, 2011, the Noteholder Plan proponents made certain non-material amendments to the Noteholder Plan [Dkt. No. 8169] (as amended, the "Amended Noteholder Plan"). In the Amended Noteholder Plan, the definition of "State Law Avoidance Claims" has been revised in a non-material manner to mean "the claims, causes of action, avoidance powers or rights, and legal or equitable remedies of any Person not making the Non-Contribution Election arising under state law against shareholders in Tribune whose stock was redeemed in connection with the Leveraged ESOP Transaction, including causes of action in respect of state law avoidance claims previously commenced or that could have been commenced by or on behalf of the Debtors' Estates against such shareholders, which claims, causes of action, avoidance powers or rights, and legal or equitable remedies shall be abandoned by the Debtors' Estates upon the Effective Date."

[9] Under the Amended Noteholder Plan, the above-referenced provision has been modified in a non-material manner to provide as follows: "Any claims or causes of action under chapter 5 of the Bankruptcy Code previously commenced or that could have been commenced by or on behalf of the Debtors' Estates against shareholders arising out of the redemption of their stock in connection with the Leveraged ESOP Transaction shall, as of the Effective Date, be discontinued without prejudice, and the Debtors, the Creditors' Committee and/or the Estates shall be deemed, as of the Effective Date, to have abandoned any and all right to further pursue such claims and causes of action pursuant to section 554 of the Bankruptcy Code."

the Noteholder Plan, unless such creditor has made a Non-Contribution Election.[10]  See
Noteholder Plan, § 5.18.2.

20.     In sum, both the DCL Plan and the Noteholder Plan contemplate the
establishment of a creditors' trust to prosecute LBO-related causes of action of individual
creditors (not of the Debtors' estates) under state law against Tribune's pre-LBO shareholders.
However, the creditors' trust established under the DCL Plan is established with the intent, but
not the ability, to prosecute such claims against only certain ***Step Two Shareholders***, while the
Noteholder Plan Creditors' Trust is established with the intent and the ability to prosecute state
law constructive fraudulent conveyance claims (in addition to state law intentional fraudulent
conveyance claims) against both Step One Shareholders and Step Two Shareholders.

## RELIEF REQUESTED

21.     By the Motion, the Movants seek entry of an order substantially in the form
attached hereto as Exhibit A (a) determining that, as a result of the expiration of the section
546(a) statute of limitations, eligible creditors have regained the right to prosecute their Creditor
SLCFC Claims; (b) determining that the automatic stay of the Bankruptcy Code does not bar the
filing of the Complaint or, in the alternative, granting relief from the automatic stay solely to
permit the immediate filing of the Complaint, and (c) granting leave from the Mediation Order to
permit the immediate filing of the Complaint.

---

[10] "Non-Contribution Election" is defined in the Noteholder Plan to mean "the election presented to certain
Classes of Claims against Tribune on the applicable Noteholder Ballot whereby Creditors in such Classes can elect
not to contribute their State Law Avoidance Claims to the Creditors' Trust."  See Noteholder Plan, § 1.1.172.

Case 08-13141-BLS   Doc 9453-1   Filed 07/13/11   Page 26 of 117

## **BASIS FOR RELIEF REQUESTED**

**A.     Eligible Creditors Regained the Right to Prosecute their Creditor SLCFC Claims Upon the Expiration of the Statute of Limitations Set Forth in Section 546(a) of the Bankruptcy Code**

22.     Bankruptcy Code section 546(a) establishes a two-year statute of limitations for commencing a state law avoidance action under Bankruptcy Code section 544(b).  See 11 U.S.C. § 546(a)(1)(A).  The foregoing statute of limitations applies to both debtors in possession as well as designated estate representatives, including official creditors' committees.  See In re American Pad & Paper Co., 478 F.3d 546, 554 (3d Cir. 2007) (holding that the 1994 amendments to the Bankruptcy Code clarified that a debtor in possession has a two-year statute of limitations to bring avoidance actions under section 544(b) and applicable state law that begins running on the petition date); In re Mediators, Inc., 105 F.3d 822 (2d Cir. 1997) (holding that section 546(a)'s requirement that trustee bring avoidance proceeding within two years of trustee's "appointment" also applied to unsecured creditors' committee, suing on behalf of chapter 11 debtor in possession); see also 5 Collier on Bankruptcy ¶ 546.02[1][a-c] (Alan N. Resnick & Henry J. Sommer, 16th ed. 2010).

23.     Here, the Petition Date was December 8, 2008.  Accordingly, the Debtors and the Creditors' Committee had until December 8, 2010 to commence the Estate SLCFC Claims under Bankruptcy Code section 544(b).  None of the Debtors or the Creditors' Committee, however, commenced the Estate SLCFC Claims and, therefore, they are now permanently barred from doing so pursuant to section 546(a).[11]

---

[11] The complaint filed by the Creditors' Committee on December 7, 2010 (the "Creditors' Committee Complaint") in the adversary proceeding, styled The Offic. Comm. Of Unsecured Creditors of Tribune Company v. Fitzsimons, Case No. 10-54010 (Bankr. D. Del. Nov. 1, 2010) alleges state law *intentional* fraudulent conveyance claims against Step One Shareholders and Step Two Shareholders pursuant to section 544(b) of the Bankruptcy

24.     The law is well-settled that, once the two-year statute of limitations in section 546(a) expires, creditors regain the right to prosecute their individual state law fraudulent conveyance claims to the same extent as if the bankruptcy had never been commenced.  See, e.g., In re Integrated Agri, Inc., 313 B.R. 419, 427-428 (Bankr. C.D. Ill. 2004) ("A creditor regains standing to pursue a state law fraudulent conveyance action, in its own name and for its own benefit, once the statute of limitations expires on the bankruptcy trustee's right to bring the claim.  To that point, the bankruptcy court ordinarily would have no jurisdiction to hear the creditor's suit to recover from a third party transferee.") (citation omitted); Klingman v. Levinson, 158 B.R. 109, 113 (N.D. Ill. 1993) ("[T]he commencement of bankruptcy gives the trustee the right to pursue fraudulently conveyed assets to the exclusion of all creditors. However, the trustee does not retain this exclusive right in perpetuity.  The trustee's exclusive right to maintain a fraudulent conveyance cause of action expires and creditors may step in (or resume actions) when the trustee no longer has a viable cause of action . . . . [O]nce a trustee's statutory time period has expired, an unsecured creditor can bring an action against a fraudulent transferee under state law, provided the state statute of limitations has not yet expired.") (internal citations and quotations omitted);[12] see also DCL Plan Confirmation Brief, at 131 ("It is well-established that should the limitations period expire and the trustee has not exercised its strong-

---

Code, but appropriately does not allege any of the SLCFC Claims – i.e, state law *constructive* fraudulent conveyance claims against such parties.  See Creditors' Committee Complaint, Count 13, pp. 97-98.

[12] Accord Sparano v. Southland Corp., 94 C 2098, 1995 WL 470267, *8 (N.D. Ill. Aug. 4, 1995) ("[The Klingman court] recognized that the commencement of a bankruptcy action gives the trustee the exclusive right to pursue fraudulently conveyed assets, but observed that this right 'expires and creditors may step in (or resume actions) when the trustee no longer has a viable cause of action.'") (quoting Klingman, 158 B.R. at 113); IGF Ins. Co. v. Continental Cas. Co., No. 1:01-cv-799-RLY-KPF, 2009 WL 4016608, *44 (S.D. Ind. Oct. 19, 2009) (same); Munson v. Rinke, 919 N.E.2d 438, 442 (Ill. App. Dist. 2009) (same); see also Dixon v. Bennett, 531 A.2d 1318, 1324-1325 (Md. App. 1987) (holding that the Bankruptcy Code does not "prevent[] an unsecured creditor from bringing a state cause of action in state court once the trustee's two-year time limitation has passed . . . . [A]fter the expiration of the trustee's cause of action, a fraudulent transferee may be subject to suit by an unsecured creditor under state law as long as its statute of limitations has not yet expired.").

arm powers, the power to assert (or to continue) state law fraudulent transfer claims under the UFTA and the UFCA reverts to the creditors.").

25.    Consistent with the foregoing cases, several courts have held that, once the section 546(a) statute of limitations expires, a debtor in possession can no longer settle a state law avoidance action because it "cannot settle [a] cause of action which [it] does not own." In re Boyer, 354 B.R. 14, 31-32 (Bankr. D. Conn. 2006) ("In this case, the limitations period for the Trustee to exercise his statutory avoidance powers expired two years after the petition date . . . . As a result, the Trustee lacks standing to settle any such causes of action.") (citing In re Integrated Agri, Inc., 313 B.R. 419, 427-28 (Bankr. C.D. Ill. 2004) (trustee loses standing to prosecute such causes of action after expiration of section 546 limitations period) and In re Balonze, 336 B.R. 160, 171 n. 23 (Bankr. D. Conn. 2006) (same)).

26.    Accordingly, based on the foregoing authorities, and as now acknowledged by the DCL Plan proponents, the right of the Debtors' estates to commence (let alone settle) the Estate SLCFC Claims terminated on December 8, 2010 and, therefore, creditors immediately thereafter regained the right to prosecute their Creditor SLCFC Claims.

**B.    The Filing of the Complaint Does Not Violate the Automatic Stay of Bankruptcy Code Section 362(a)**

27.    Pursuant to section 362 of the Bankruptcy Code, the automatic stay prevents, among other things, "any act . . . to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). Upon the filing of a bankruptcy petition, the estate's property includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). The phrase "all legal or equitable interests of the debtor in property" includes "rights of action" such as claims based on state or federal law. See In re Seven Seas Petroleum, Inc., 522 F.3d 575, 584 (5th Cir. 2008). Thus, a debtor in possession's right to pursue a cause of

action under Bankruptcy Code section 544(b) is a distinct property right protected by the automatic stay.

28.     The automatic stay, however, remains in effect only "until such property is no longer property of the estate." 11 U.S.C. § 362(c)(1). Accordingly, when the section 546(a) limitation period expires, the debtor's right to commence a state law avoidance action under section 544(b) thereby terminates and ceases to be property of the estate. See In re Boyer, 354 B.R. at 32 (holding that a debtor cannot settle a state law avoidance action that it "does not own"). Under such circumstances, the automatic stay, therefore, no longer bars creditors from pursuing any such state law causes of action. See In re Transcolor Corp., 296 B.R. 343, 359 (Bankr. D. Md. 2003) ("Whether the automatic stay prevents the filing or maintenance of a cause of action outside the bankruptcy court depends upon whether the suit itself is property of the debtor or the debtor's estate. . . . [Because] the instant suit is not property of the debtor [it] therefore is not subject to the automatic stay."); but see Flores v. Hagobian, No. 1:04cv6405, 2007 WL 1792257, *3 (E.D. Cal. June 19, 2007) ("The passing of the two year statute of limitations found in 11 U.S.C. § 546(a) is not listed in 11 U.S.C. § 362(c) as one of the events that concludes an automatic stay . . . . Thus, contrary to Plaintiffs' position, the stay in this action remains in place."); Flores v. DDJ, Inc., No. CV F99-5878, 2007 WL 1521562, *2 (E.D. Cal. May 23, 2007) (same).

29.     Keeping the automatic stay in place, even after the passing of the section 546(a) statute of limitations, would create an unjustified windfall for fraudulent transferees. See Dixon v. Bennett, 531 A.2d at 1325 (explaining that prohibiting creditors from pursuing their own state law actions where the estate's action is barred under section 546(a) "would only serve to shield the recipients of fraudulent transfers at the expense of the unsecured creditor"). Specifically,

creditors' state law avoidance actions are governed by state law statutes of limitation that operate and run independent of chapter 11 proceedings.  See In re Integrated Agri, 313 B.R. at 428 (explaining that trustee's cause of action under section 544(b), albeit based on an actual creditor's rights under the UFTA "is not identical to the UFTA claim that the creditor may bring in state court," because, among other things, the applicable statutes of limitation are different).  As a result, if unsecured creditors were barred from pursuing their own state law avoidance actions even after the debtor in possession's statute of limitation had expired, then unsecured creditors could pursue such actions only in those circumstances in which a debtor emerged from chapter 11 before the state law statute of limitation expired.  Accordingly, except in those specific situations, the automatic stay and Bankruptcy Code section 546(a) would operate to protect recipients of fraudulent transfers at the expense of innocent creditors – a perverse result that is inequitable and would make the recipients of fraudulent transfers the beneficiaries of a debtor's bankruptcy filing, a result clearly at odds with the underlying principles of federal bankruptcy law.

**C.      To the Extent Applicable, the Court Should Grant Relief from the Automatic Stay**

30.      Section 362(d)(1) of the Bankruptcy Code provides that a bankruptcy court shall grant relief from the automatic stay "for cause."  11 U.S.C. § 362(d)(1).  While the Bankruptcy Code does not define "cause," courts in this and other jurisdictions (including this Court) routinely apply the following three-factor balancing test to determine whether the requisite cause exists to lift the automatic stay:

> (A) whether any great prejudice to either the bankrupt estate or the debtor will result from continuation of the civil suit;
>
> (B) whether the hardship to the non-bankrupt party by maintenance of the stay considerably outweighs the hardship to the debtor; and

(C) whether the creditor has a probability of prevailing on the merits.

See In re Tribune Co., 418 B.R. 116, 126 (Bankr. D. Del. 2009) (J. Carey) (citations omitted).

31.     Here, the equities clearly weigh in favor of lifting the stay.  With respect to the

first factor, the filing of the Complaint would not result in any "great prejudice" to the Debtors or

their estates.  To the contrary, the filing of the Complaint by the Original Plaintiff Group would

result in no prejudice to the Debtors or their estates who, as set forth above, no longer have any

interest in the Estate SLCFC Claims as a result of the expiration of the section 546(a) statute of

limitations.  See supra, ¶¶ 24-26.  Moreover, the filing of the Complaint would not implicate any

of the prejudicial considerations previously identified by this Court.  Specifically, the Complaint

would not (i) allow any creditors "to gain[] a preference for their claims against the debtor," (ii)

"deplete[] the debtor's assets due to legal costs in defending proceedings against it" or (iii)

"interfere[e] with the orderly . . . rehabilitation of the debtor " because the Debtors are not a

party to the Complaint, and the Original Plaintiff Group would seek to toll the prosecution of the

Creditor SLCFC Claims until the Court rules on the Competing Plans.  See In re Tribune

Co., 418 B.R. at 127.

32.     With respect to the second factor, the hardship to the Debtors' creditors by

maintaining the stay would certainly outweigh any hardship to the Debtors.  Lifting the stay, as

set forth above, would cause no prejudice to the Debtors or their estates.  Keeping the stay in

place, however, could render the Creditor SLCFC Claims time-barred, which would constitute a

substantial hardship on the Debtors' creditors and a perverse windfall to the recipients of

fraudulent transfers.

33.     Specifically, the presumed statute of limitations for commencing the Creditor

SLCFC Claims is June 4, 2011 – i.e., the four-year anniversary of the closing of Step One of the

LBO. See supra, at ¶ 3. A very real danger exists that the Debtors will not exit chapter 11 on or

before that date. Even assuming that the confirmation hearing concludes sometime in the middle

of March 2011, and assuming further that one of the plans is in fact confirmed at the conclusion

of that hearing, there nonetheless remains a high likelihood that neither of the Competing Plans

will be able to go effective before June 4, 2011. As set forth in the accompanying Senter

Declaration, the FCC must undertake a number of different steps, some of which may take

several months, before either of the Competing Plans can obtain the requisite approvals from the

FCC to enable the Debtors to emerge from chapter 11. See Senter Declaration, ¶¶ 3-7.

Accordingly, if the stay is not lifted to permit the filing of the Complaint, the Creditor SLCFC

Claims may very well become time-barred.

   34.  With respect to the third and final factor, this Court has previously held that,

"[e]ven a slight probability of success on the merits may be sufficient to support lifting an

automatic stay in an appropriate case." In re Tribune Co., 418 B.R. at 129 (citations omitted).

Here, the record, including the Examiner's Report, contains ample evidence to satisfy the "slight

probability of success" standard.

**D.  The Court Should Grant the Original Plaintiff Group Leave from the Mediation Order to Permit the Filing of the Complaint**

   35.  On September 1, 2010, the Court entered its Order Appointing Mediator [Dkt. No.

5591] (the "Mediation Order"). Paragraph 10 of the Mediation Order provides:

> Except for motions with respect to standing to file and prosecute LBO-Related Causes of Action, in order to facilitate the Mediation, without leave of the Court for ***good cause shown***, the Mediation Parties shall not bring any motion or proceeding during the pendency of the Mediation seeking relief in connection with the LBO-Related Causes of Action or any related causes of action, and any such motions or proceedings currently pending, including any discovery related thereto, shall be stayed sine die.

Mediation Order, ¶ 10 (emphasis added).

36.     Cause exists to grant leave from the Mediation Order.  Cf. In re Tribune Co., 418

B.R. 116, 126 (Bankr. D. Del. 2009) (J. Carey) ("Cause is a flexible concept and courts often

conduct a fact intensive, case-by-case balancing test, examining the totality of the circumstances

to determine whether sufficient cause exists to lift the stay.").  As set forth above, neither the

Debtors nor their estates will suffer any prejudice if the Complaint is filed and then tolled by the

Original Plaintiff Group.  On the other hand, if the stay imposed by the Mediation Order remains

in place, the Creditor SLCFC Claims –an important source of potential recovery to creditors –

will be at grave risk of becoming time-barred.  Under such circumstances, ample cause exists to

grant the Original Plaintiff Group leave from the Mediation Order for the limited purpose of

filing the Complaint.

**E.     Even if the DCL Plan Is Confirmed and Can Go Effective Before June 4, 2011, the Relief Requested Herein Should Be Granted**

37.     Creditor SLCFC Claims against Step One Shareholders are not released by the

Debtors or their estates under the DCL Plan – a fact now conceded by the DCL Plan proponents.

Specifically, the definition of "Debtor Released Claims" is "set forth in Section 11.2.1."  See id.,

§ 1.1.65.  In turn, section 11.2.1 (governing "Releases by Debtors and Estates") provides:

> Except for the Preserved Causes of Action, on the Effective Date . . . , ***the Reorganized Debtors on their own behalf and as representatives of their respective Estates and any Person seeking to exercise the rights of the Debtors' Estates*** (including, without limitation, any successor to the Debtors, the Litigation Trustee on behalf of the Litigation Trust or any estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code), and the Creditors' Trustee on behalf of the Creditors' Trust, release . . . the Released Parties of and from any and all claims, . . . (including, without limitation, the LBO-Related Causes of Action and those arising under the Bankruptcy Code, including any avoidance claims), . . . . (the "Debtor Released Claims").

See id., § 11.2.1 (emphasis added).  Thus, the definition of Debtor Released Claims includes

***only*** claims held by the Debtors (a) on their own behalf, (b) as representatives of their respective

estates or (c) as representatives of any entity seeking to exercise the rights of their respective estates. Since (i) the right to prosecute the Estate SLCFC Claims (against both Step One Shareholders and Step Two Shareholders) ceased to be property of the Debtors' estates upon the expiration of the section 546(a) statute of limitations on December 8, 2010, see supra, ¶ 24-26, and (ii) the Creditor SLCFC Claims are property of the individual creditors who hold those claims, not the Debtors' estates, the Debtor Released Claims, by definition, cannot include the Creditor SLCFC Claims.

38.     The foregoing construction is supported by other provisions in the DCL Plan and accompanying Specific Disclosure Statement. Section 5.15.2 ("Settlement Under the Plan") provides in pertinent part:

> [T]he provisions of the Plan constitute a good faith compromise and settlement of all **Released Claims** against the Released Parties, and the Plan constitutes a request for the Bankruptcy Court to authorize and approve such compromise and settlement, to release all of the Released Claims, including, without limitation, the **Released LBO-Related Causes of Action, belonging to the Tribune Entities, the Debtors' Estates** and any other Person that is deemed to have given a release pursuant to Section 11.2 of this Plan against each and every and all Released Parties (the "Settlement").

See id., § 5.15.2 (emphasis added). This provision likewise states that Debtor Released Claims include only claims of the Debtors or their estates – i.e. claims "belonging to the Tribune Entities [or] the Debtors' Estates." Id.[13] The DCL Specific Disclosure Statement sums up the foregoing construction perfectly when it states expressly that "the [DCL] Plan provides for certain settlements of LBO-Related Causes of Action **held by the Debtors' Estates** against [the Released Parties]." See DCL Specific Disclosure Statement, p.4 (emphasis added); see also Debtors'

---

[13] Indeed, "Released LBO-Related Causes of Action" is specifically defined to mean "all LBO-Related Causes of Action **that belong to or could be asserted by the Tribune Entities, the Debtors' Estates** or any other Person that is deemed to have given a release pursuant to Section 11.2 of this Plan against the Released Parties." See DCL Plan, § 1.1.190 (emphasis added).

Responsive Statement [Dkt. No. 7199], p. 2 (same).  Of course, the Creditor SLCFC Claims are

not "held by the Debtors' Estates," but rather by individual creditors.

39.     In sum, Creditor SLCFC Claims against Step One Shareholders and Step Two

Shareholders are treated as follows under the DCL Plan:

(A)     <u>Creditor SLCFC Claims against Step One Shareholders</u>:  Creditor SLCFC Claims
are not transferred to the creditors' trust under the DCL Plan.  Furthermore, a
careful reading of the DCL Plan reveals that the Debtors and their estates in fact
do not release and cannot release such Creditor Claims.  This fact is now
conceded by the DCL Plan proponents.  Indeed, any attempt to release the
Creditor SLCFC Claims at this stage – claims that belong to creditors, not the
Debtors' estates – would amount to an illegal third party release.  <u>See</u> <u>In re</u>
<u>Spansion Inc.</u>, 426 B.R. 114, 144 (Bankr. D. Del. 2010) (J. Carey) ("[T]hird party
release may be included in a plan if the release is consensual and binds only those
creditors voting in favor of the plan"); <u>In re Washington Mut., Inc.</u>, No. 08-12229,
2011 WL 57111, *30 (Bankr. D. Del. Jan. 7, 2011) (holding that "any [third
party] release must be based on consent of the releasing party (by contract or the
mechanism of voting in favor of the plan)") (citations omitted); <u>In re Zenith
Electronics Corp.</u>, 241 B.R. 92, 111 (Bankr. D. Del. 1999) (requiring release
provision to be modified to permit third parties' release of non-debtors only for
those creditors who voted in favor of the plan).

(B)     <u>Creditor SLCFC Claims against Step Two Shareholders</u>:  Creditor SLCFC Claims
are not released by the Debtors or their estates.  Furthermore, while the Creditor
SLCFC Claims (other than Creditor SLCFC Claims against the Released Step
Two Stockholder Parties) are purportedly transferred to the creditors' trust by
holders who do not "opt out" of that transfer, the majority of Pre-LBO
Noteholders have elected to not contribute their Creditor SLCFC Claims against
Step Two Shareholders to the DCL Plan creditors' trust.  Attempts to release the
Released Step Two Stockholder Parties for state law constructive fraudulent
transfer claims also must fail as a matter of law for the same reasons that the
release of the Step One Shareholders fails.

## NOTICE

40.     Notice of the Motion has been provided to (a) the Office of the United States

Trustee; (b) counsel to the Debtors; (c) counsel to the Creditors' Committee; (d) counsel to the

administrative agent for the Debtors' postpetition financing facility; and (e) all parties requesting

notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure and Local Rule

2002-1(b). In light of the nature of the relief requested herein, the Movants submit that no other or further notice is necessary.

## NO PRIOR REQUEST

41.    No previous request for the relief sought herein has been made by the Movants to this or any other court.

## CONCLUSION

For the foregoing reasons, the Movants request that the Court enter an order substantially in the form attached hereto as Exhibit A (a) determining that, as a result of the expiration of the section 546(a) statute of limitations, eligible creditors have regained the right to prosecute their Creditor SLCFC Claims; (b) determining that the automatic stay of Bankruptcy Code section 362(a) does not bar the filing of the Complaint or, in the alternative, granting relief from the automatic stay solely to permit the immediate filing of the Complaint; (c) granting leave from the Mediation Order to permit the immediate filing of the Complaint; and (d) granting the Movants such other relief as the Court deems just, proper and equitable.

Dated: March 1, 2011
Wilmington, Delaware

Respectfully submitted,

/s/ William P. Bowden
William P. Bowden (I.D. No. 2553)
Amanda M. Winfree (I.D. No. 4615)
ASHBY & GEDDES, P.A.
500 Delaware Avenue, 8th Floor; P.O. Box 1150
Wilmington, Delaware 19899
Telephone: (302) 654-1888

Daniel H. Golden
Philip C. Dublin
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000

24

Meredith S. Senter Jr.
LERMAN SENTER PLLC
2000 K Street NW Suite 600
Washington, D.C. 20006
Telephone:  (202) 429-8970

**COUNSEL FOR AURELIUS CAPITAL
MANAGEMENT, LP, ON BEHALF OF ITS
MANAGED ENTITIES**

/s/   Katharine L. Mayer
Katharine L. Mayer (I.D. No. 3758)
MCCARTER & ENGLISH, LLP
Renaissance Centre
405 N. King Street
Wilmington, Delaware 19801
Telephone:  (302) 984-6300

David J. Adler
MCCARTER & ENGLISH, LLP
245 Park Avenue
New York, New York 10167
Telephone: (212) 609-6800

**COUNSEL FOR DEUTSCHE BANK TRUST
COMPANY AMERICAS, SOLELY IN ITS
CAPACITY AS SUCCESSOR INDENTURE
TRUSTEE FOR CERTAIN SERIES OF
SENIOR NOTES**

/s/  Garvan F. McDaniel
Garvan F. McDaniel (I.D. No. 4167)
BIFFERATO GENTILOTTI LLC
800 N. King Street, Plaza Level
Wilmington, Delaware 19801
Telephone:  (302) 429-1900

David S. Rosner
Richard F. Casher
KASOWITZ, BENSON, TORRES & FRIEDMAN
LLP
1633 Broadway
New York, New York 10019
Telephone:  (212) 506-1700

**COUNSEL FOR LAW DEBENTURE TRUST
COMPANY OF NEW YORK, SOLELY IN ITS
CAPACITY AS SUCCESSOR INDENTURE
TRUSTEE FOR CERTAIN SERIES OF
SENIOR NOTES**

**EXHIBIT A**

**(Proposed Form of Order)**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| TRIBUNE COMPANY, et al.,[1] | ) | Case No. 08-13141 (KJC) |
| | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |

**ORDER (I) DETERMINING THAT CREDITORS HAVE RETAINED THEIR STATE LAW CONSTRUCTIVE FRAUDULENT CONVEYANCE CLAIMS TO RECOVER STOCK REDEMPTION PAYMENTS MADE TO STEP ONE SHAREHOLDERS AND STEP TWO SHAREHOLDERS PURSUANT TO 11 U.S.C. § 546(A); (II) DETERMINING THAT AUTOMATIC STAY DOES NOT BAR COMMENCEMENT OF LITIGATION ON ACCOUNT OF SUCH CLAIMS AGAINST SUCH SHAREHOLDERS OR, IN THE ALTERNATIVE, GRANTING RELIEF FROM AUTOMATIC STAY TO PERMIT COMMENCEMENT OF SUCH LITIGATION; AND (III) GRANTING LEAVE FROM MEDIATION ORDER TO PERMIT COMMENCEMENT OF SUCH LITIGATION**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

100617288 v25

Upon the motion dated March 1, 2011 of Aurelius Capital Management, LP, on behalf of its managed entities, Deutsche Bank Trust Company Americas, in its capacity as successor Indenture Trustee for certain series of Senior Notes, and Law Debenture Trust Company of New York, in its capacity as successor Indenture Trustee for certain series of Senior Notes, for entry of an order (I) determining that creditors have regained their state law constructive fraudulent conveyance claims to recover stock redemption payments made to Step One Shareholders and Step Two Shareholders due to the expiration of the statute of limitations under 11 U.S.C. § 546(a); (II) determining that the automatic stay does not bar the commencement of litigation by or on behalf of creditors with respect to such claims or, in the alternative, granting relief from the automatic stay to permit the commencement of such litigation; and (III) granting leave from the Mediation Order to permit the commencement of such litigation (the "Motion");[2] and it appearing that good and sufficient notice of the Motion was given and that no other or further notice is necessary; and the Court having considered the Motion; and after due deliberation and it appearing sufficient cause exists for granting the requested relief, it is therefore

ORDERED, ADJUDGED AND DECREED that:

1.    The Motion is GRANTED.

2.    Pursuant to Bankruptcy Code section 546(a), creditors have regained the right to prosecute their respective Creditor SLCFC Claims against Step One Shareholders and Step Two Shareholders.

3.    The right to prosecute a Creditor SLCFC Claim no longer constitutes property of the Debtors' estates.

---

[2] Each capitalized term used but not defined herein shall bear the meaning ascribed to such term in the Motion.

4.      The automatic stay of Bankruptcy Code section 362 does not bar the commencement of litigation by or on behalf of creditors on account of Creditor SLCFC Claims or, in the alternative, the automatic stay is lifted solely to permit the commencement of such litigation.

5.      The Complaint(s) may be filed by any plaintiff in the Original Plaintiff Group without violating the automatic stay of Bankruptcy Code section 362 or, in the alternative, the automatic stay is lifted solely to permit the filing of such Complaint(s).

6.      To the extent the Mediation Order stays the commencement of any Creditor SLCFC Claims, leave is hereby granted to permit the filing of the Complaint(s).

7.      This Court shall, except with respect to the prosecution of the Creditor SLCFC Claims, retain exclusive jurisdiction to hear and decide any and all disputes relating to or arising from this Order.

Dated: _____, 2011
         Wilmington, Delaware

                                         _____
                                         HONORABLE KEVIN J. CAREY
                                         Chief United States Bankruptcy Judge

# EXHIBIT B

Case 2:11-cv-03148-WJM-JAD   Document 11-5   Filed 07/13/11   Page 2 of 117 PageID: 202
Case 08-13141-BLS   Doc 9453-1   Filed 07/13/11   Page 44 of 117

2

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

IN RE:                          )   Case No. 08-13141(KJC)
                                )
                                )
TRIBUNE COMPANY                 )   Chapter 11
                                )
                                )   Courtroom 5
                                )   824 Market Street
        Debtors.                )   Wilmington, Delaware
                                )
                                )   March 22, 2011
                                )   10:00 a.m.

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JUDGE KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For Debtors:            Sidley Austin, LLP
                        BY: JAMES CONLAN, ESQ.
                        BY: KEN KANSA, ESQ.
                        BY: JESSICA BOELTER, ESQ.
                        One South Dearborn
                        Chicago, IL 60603
                        (312) 853-7000

                        Cole, Schotz, Meisel, Forman
                        & Leonard, P.A.
                        BY: NORMAN PERNICK, ESQ.
                        500 Delaware Ave., Ste. 1410
                        Wilmington, DE 19801
                        (302) 652-3131

ECRO:                   AL LUGANO

Transcription Service:  DIAZ DATA SERVICES
                        331 Schuylkill Street
                        Harrisburg, Pennsylvania 17110
                        (717) 233-6664
                        www.diazdata.com

Proceedings recorded by electronic sound recording;
transcript produced by transcription service

---

APPEARANCES:
(Continued)

For Morgan Stanley:     Barnes & Thornburg
                        BY: DAVID POWLAN, ESQ.
                        11 South Meridian Street
                        Indianapolis, IN 46204
                        (317) 727-2211

For Angelo Gordan/Oaktree/
Credit Agreement Lenders:   Young Conaway Stargatt &
                        Taylor
                        BY: BLAKE CLEARY, ESQ.
                        BY: ROBERT BRADY, ESQ.
                        The Brandywine Building
                        1000 West Street, 17th Floor
                        Wilmington, DE 19801
                        (302) 571-6600

For Merrill Lynch:      Potter Anderson & Carroon, LLP
                        BY: LAURIE SILVERSTEIN, ESQ.
                        Hercules Plaza
                        1313 North Market Street
                        6th Floor
                        Wilmington, DE 19801
                        (302) 984-6033

For Barclays:           DLA Piper
                        BY: MICHELLE MARINO, ESQ.
                        1251 Avenue of the Americas
                        New York, NY 10020-1104
                        (212) 335-4500

For JP Morgan:          Davis Polk & Wardwell
                        BY: ELLIOT MOSKOWITZ, ESQ
                        BY: DAMIEN SCHAIBLE, ESQ.
                        450 Lexington Avenue
                        New York, NY 10017
                        (212) 450-4000

                        Richards Layton & Finger
                        BY: BOB STEARN, ESQ.
                        One Rodney Square
                        920 North King Street
                        Wilmington, DE 19801
                        (302) 651-7700

---

3

APPEARANCES:
(Continued)

For Official Committee
of Unsecured Creditors:     Landis, Rath & Cobb
                        BY: DANIEL B. RATH, ESQ.
                        919 Market Street, Suite 1800
                        Wilmington, DE 19801
                        (302) 467-4400

                        Chadbourne & Parke, LLP
                        BY: DAVID LEMAY, ESQ.
                        BY: HOWARD SEIFE, ESQ.
                        30 Rockefeller Plaza
                        New York, NY 10112
                        (212) 408-5100

                        Zuckerman Spaeder
                        BY: JAMES SOTTILE, ESQ.
                        1800 M Street, NW
                        Suite 1000
                        Washington, DC 20036
                        (202) 778-1800

For Aurelius:           Akin Gump Strauss Hauer & Feld
                        BY: DANIEL GOLDEN, ESQ.
                        BY: PHIL DUBLIN, ESQ.
                        One Bryant Park
                        New York, NY 10036
                        (212) 872-1000

                        Lerman Senter, PLLC
                        BY: MEREDITH SENTER, ESQ.
                        2000 K Street, NW, Ste. 600
                        Washington, DC 20006
                        (202) 429-8970

For U. S. Trustee:      United States Trustee
                        BY: DAVID KLAUDER, ESQ.
                        844 King Street, Ste. 2207
                        Wilmington, DE 19801
                        (302) 573-6491

---

4

APPEARANCES:
(Continued)

For Software AG:        Phillips Goldman & Spence
                        BY: STEPHEN A. SPENCE, ESQ.
                        1200 Broom Street
                        Wilmington, DE 19806
                        (302) 655-4200

For DBTCA:              McCarter & English
                        BY: KATHARINE MAYER, ESQ.
                        BY: DAVID ADLER, ESQ.
                        405 N. King Street, 8th Fl.
                        Wilmington, DE 19801
                        (302) 984-6312

For Wilmington Trust:   Brown Rudnick
                        BY: MARTIN SIEGEL, ESQ.
                        185 Asylum Street
                        Hartford, CT 06103
                        (860) 509-6519

For Great Banc:         Womble Carlyle
                        BY: THOMAS M. HORAN, ESQ.
                        222 Delaware Avenue, Ste. 1501
                        Wilmington, DE 19801
                        (302) 252-4339

For Cantigny/McCormick
Foundation:             Katten Muchin Rosenman, LLP
                        BY: JOHN SIEGER, ESQ.
                        525 W. Monroe Street
                        Chicago, IL 60661-3693
                        (312) 902-5200

                        Duane Morris
                        BY: RICH RILEY, ESQ.
                        1100 N. Market St., Ste. 1200
                        Wilmington, DE 19801
                        (302) 657-4900

For Employee Compensation
Defendants Group:       Frank Gecker, LLP
                        BY: JOSEPH FRANK, ESQ.
                        325 N. LaSalle St. 625
                        Chicago, IL 60610
                        (312)276-1400

Case 08-13141-BLS   Doc 9453-1   Filed 07/13/11   Page 45 of 117
Case 2:11-cv-03148-WJM-JAD   Document 11-5   Filed 07/05/11   Page 3 of 117   PageID: 203

46

1  R. McCormick Foundation appearing pro hac vice, thank you
2  very much, Your Honor.
3          And just to be clear, although many creditors
4  file joinders to our objection, I'm here and speaking only
5  on behalf of the foundations.  We don't object that had
6  there been no claim brought to avoid these transfers by the
7  estate, then the state law constructive law claims would
8  have flown back to the individual creditors.  We think that
9  because -- I think the point that Your Honor just raised
10 albeit not in the manner I'd hoped you raise it, that these
11 very transfers are being sought to be avoided by these
12 estates and precludes individual creditors from seeking to
13 avoid them, even under a slightly different theory or even a
14 different theory.  It's the same dollars, the same
15 transfers, you know, consider it a single satisfaction issue
16 if you have to.  To the extent they go forward, they're
17 necessarily reducing the value of the claims the estate is
18 bringing because we cannot be made to pay them both.
19         So with that, I really did not mean to interrupt.
20 I only rose so that you know that there is an issue to that
21 extent.
22         THE COURT:  So it's your position basically that
23 the estate would have first call on any proceeds?
24         MR. SIEGER:  I think that's right, Your Honor.  I
25 think the case law supports that.

1          THE COURT:  Okay, thank you.
2          MR. GOLDEN:  Your Honor, what I was going to say
3  that I'm not aware of any party disputing the specific
4  question you raised which is when a state representative
5  fails to bring a timely avoidance action is there any real
6  dispute that it reverts or individual creditors retain their
7  state law rights, I didn't hear counsel suggesting that he
8  is actually disputing that.  He made the slightly subtle
9  argument that says when the estate is bringing another cause
10 of action, a similar cause of action, it should deprive the
11 individual state law creditors from having standing to
12 pursue their claim and they've cited some case law for that
13 effect or to that effect.
14         Your Honor, that doesn't go to the issue of
15 whether these claims exist and are they viable and are they
16 entitled to be brought by the individual state law
17 creditors.  That's a standing issue which I'm going to get
18 to.  The standing issue is certainly not an issue for this
19 Court to decide.
20         THE COURT:  I don't disagree with that, but let's
21 -- as much as I don't like to do this sometimes, but I think
22 it may be appropriate here, let's look down the road a
23 little bit.  The objection here is that well, look, we're
24 only going to be required to pay this one time.  So the
25 question that that raises is how should this Court, if at

47

1  all, address the potential conflict between those two sets
2  of plaintiffs.
3          MR. GOLDEN:  Okay.  Two points I'd like to make
4  with respect to that, Your Honor.
5          Number one, again, under the heading of
6  bankruptcy indeed makes strange bedfellows, despite the fact
7  that there has been tremendous contentiousness over the two
8  competing plans, there is a similarity between the two
9  competing plans and that is the establishment of a
10 creditor's trust in order to house these individual state
11 law constructive fraudulent conveyance claims.  The
12 architects of both of those claims, the debtors, the
13 creditors' committee, and the lenders on one hand, and the
14 noteholders on the other, have made an informed decision as
15 other bankruptcy plans have done to allow those claims to
16 run in parallel and to prosecute them in parallel.
17         What the foundations I'll suggest not
18 intentionally have suggested is because the creditors'
19 committee have, in fact, filed intentional, estate
20 intentional fraudulent conveyance claims against the
21 redeeming stockholders, that that should take precedence.
22 But one problem we have with that is and I think Your Honor
23 knows as having sat through two weeks of testimony is it is
24 the intention of DCL plan proponents to release the
25 intentional fraud claims asserted by the creditors'

48

1  committee against the Step 1 holders.
2          So what the foundations want is their cake and
3  eat it, too.  They want to have the DCL plan go forward.
4  They want to have the claims, the intentional fraudulent
5  conveyance claims released against the Step 1 holders, but
6  they want to run out the clock so that the individual state
7  law constructive fraudulent conveyance creditors don't have
8  the ability by the state law statute of limitations which as
9  we say in our paper, could be as early as June 4, less than
10 two and a half months away.  They won't have an effective
11 remedy at that --
12         THE COURT:  Well, let's assume that's true.  The
13 bridge lenders in their proposed form of order suggest that
14 what ought to happen is that you should be permitted to file
15 complaints, but not prosecute them until after the
16 confirmation process is complete.  Is that something that
17 you've agreed with or inclined to agree with or disagree
18 with?
19         MR. GOLDEN:  In fact, Your Honor, we said in our
20 opening brief, our opening motion, that it was the intention
21 of what we called the original plaintiff group, Aurelius,
22 the two senior indenture trustees, Wilmington Trust as
23 indenture trustee for the PHONES notes was to, in fact,
24 commence those lawsuits in order to toll the statute of
25 limitations and that we would voluntarily agree to stay

Case 2:11-cv-03143-WJM-JAD    Document 11-5    Filed 07/05/11    Page 4 of 117    PageID: 204
Case 08-13141-BLS   Doc 9453-1   Filed 07/13/11   Page 46 of 117

50

1  those actions pending the completion of the competing plan
2  process.
3          We are not looking to create chaos here.  What we
4  are trying to do is to ensure that at the end of the day in
5  a very uncertain plan process, that these state law
6  constructive fraudulent conveyance claims will survive.  Now
7  they may be dealt with one way or another depending upon
8  whether the DCL plan is confirmed, or the noteholder plan is
9  confirmed, or a third version of a plan is confirmed.  But
10 most important is the filing of those complaints so that we
11 can toll the statute of limitations.  So unless Your Honor
12 has any other questions, I'll just continue on, thank you.
13         As I said, we believe it is well settled that
14 once the estate representatives fail to bring the action
15 within two years, it reverts or the individual state law
16 creditors would gain those rights.  It's also we believe
17 clear law that once an estate representative can no longer
18 bring those claims, it has no right to settle those claims.
19 As I said, neither the debtors or the creditors' committee
20 opposes relief and is, in fact, as noted by Your Honor, the
21 creditors' committee affirmatively supports the relief in
22 order to be protective and to acquit their fiduciary, their
23 perceived fiduciary obligations to the general unsecured
24 creditors here.
25         THE COURT:  It could be the nicest thing Aurelius

---

51

1  Crane Kenny who doesn't bother to identify himself, the ever
2  present EGI- TRB and Sam Zell, Bank of America and Merrill
3  Lynch, two of the four agents and arrangers for the
4  disastrous LBO loans, Chandler Bigelow, the current Chief
5  Financial Officer, and an untimely joinder filed by 200 so
6  called TM retirees which includes William Niese, a member of
7  the official creditors' committee.  All of those parties
8  have in common one thing.  Maybe they have more than one
9  thing, but one thing they certainly have in common, they
10 have received shareholder redemption payments that they want
11 to avoid having to disgorge back to either the estate or to
12 the individual state law creditors.
13         It's worth nothing, I think that the foundations
14 raise two principal arguments, one we've discussed already
15 which is a standing argument.  And they cite a number of
16 cases that suggest when the estate is bringing a similar
17 cause of action, that the -- it deprives the individual
18 creditors from standing to bring a separate action.  And
19 we've addressed those cases in our reply and we actually
20 think the case that's most factually analogous to the
21 situation we have here is the *Baron Financial Corp, 501*
22 *F.Supp.2d, F01, District Court of Maryland.*  There in that
23 case, there was an agreement between the estate and a
24 plaintiff seeking to bring similar causes of action that the
25 estate had brought or was able to bring.  That's very

---

1  has ever said about you.
2  (Laughter)
3          UNIDENTIFIED SPEAKER:  I made a note of it.
4          MR. GOLDEN:  So I just want to make sure that the
5  Court fully appreciates the intense time pressure we are
6  working under.  You know better than anybody in this
7  courtroom where we stand on the competing plan process.  It
8  is not clear that we will have an answer by June 4.  As we
9  indicated in our pleadings, there are several likely
10 jurisdictions in which the state law claims would be
11 brought; Illinois, Delaware, Massachusetts.  All of them
12 have four year statute of limitations for claims such as
13 these.  That four year statute of limitation as it relates
14 to Step 1 expires on June 4.  And as I said, the most
15 important thing for us to do is to get those things filed.
16         Your Honor, I want to turn just for a minute to
17 the objections themselves and we've touched upon it a little
18 bit.  The McCormick Foundation and I'm going to mispronounce
19 this, the Cantigny, but I'll just call them the foundation
20 so I don't continue to muffle that name, have opposed the
21 relief.  And they have been joined in that opposition by
22 seven or eight other recipients of the shareholder
23 redemption payments.  A group of three former directors and
24 officers of the debtor, a group of seventeen current and
25 former directors, officers, and employees, a fellow named

---

52

1  analogous to the situation that we have here.
2          As I have just described to the Court, both the
3  DCL plan and the noteholder plan contemplates this very
4  arrangement.  Having the individual state law fraudulent --
5  constructive fraudulent conveyance claims housed in a
6  creditors' trust to be prosecuted on behalf of the
7  individual creditors at the same time the intentional
8  fraudulent conveyance claims are being pursued by the estate
9  under either the DCL plan or the noteholder plan.
10         Since the foundations are so concerned about the
11 issue of standing which as I'll get to a second, I think
12 really has no place here.  It is not for this Court to
13 adjudicate the standing issue if and when these claims are
14 actually brought to Trial Court under doctrines of ripeness
15 will be the correct court in our view to determine the issue
16 of standing.  But since they've raised the issue of
17 standing, I fail to understand what the standing is of the
18 foundations who as far as I know are not creditors of these
19 debtors.  Are no longer shareholders of these debtors.
20         So I don't -- I'm not sure I understand how they
21 have the right to be heard here in this court to complain
22 about this rather procedural motion that Aurelius has filed
23 along with the other noteholder proponents seeking very
24 limited relief.  A, that the filing of such lawsuits would
25 not violate the automatic stay.  And B, would not violate

1  Your Honor's mediation order.
2          Second point and I'll be brief, Your Honor.  The
3  foundations raise the 546(e) issue as to whether these type
4  -- whether that statute prohibits state law constructive
5  fraudulent conveyance claims.  They cite a lot of cases.
6  They don't cite a single case that stands for the
7  proposition when someone other than an estate representative
8  which is required under 546(e) to be applicable when someone
9  other than an estate representative brings an action, an
10 avoidance action to recover shareholder payments, there is
11 no bar as far as we know and --
12         THE COURT:  Well, the argument if I can put it in
13 my own words is that what you want is -- constitutes an end
14 run around 546(e) and that doesn't seem right to them.
15         MR. GOLDEN:  I understood the argument as well,
16 Your Honor.  That --
17 (Laughter)
18         MR. GOLDEN:  -- actually there is a case in the
19 District of Delaware.  I think it's *PHP Liquidating* that
20 does, in fact, address that issue and stands for the
21 proposition when it's not an estate representative bringing
22 that action, 546(e) loses its applicability.
23         So just to sum up, Your Honor, I think this is
24 rather mundane procedural relief we're seeking.  It's an --
25 I don't mean to minimize it, it's important to get these

1  lawsuits filed by June 4.  We don't believe that the
2  foundations have standing to oppose this relief.  And
3  frankly, even if you were to go through the issue of
4  standing which I think is a mistake as it would violative of
5  the Doctrine of Ripeness, the case law that they have
6  suggested, I don't believe supports their position.  Thank
7  you, Your Honor.
8          THE COURT:  Thank you.  Let me hear first from
9  those who are in support of the motion and then I'll hear
10 from those who are opposed.
11         MR. LEMAY:  Your Honor, excuse me, good morning.
12 David LeMay from Chadbourne & Parke for the official
13 committee of unsecured creditors.  As a preliminary matter,
14 I would not want Your Honor to become irrationally exuberant
15 about the fact that I rise in support of Aurelius' motion or
16 about the configuration of the courtroom this morning.  But
17 it is the case that we do support this motion and for the
18 reasons that Mr. Golden said which is that as a fiduciary
19 matter, it certainly seems that the motion that they've
20 filed is best calculated to maximize unsecured creditor
21 recoveries.
22         Mr. Golden has really very adequately and more
23 than adequately as he always does, summed up the argument.
24 And I think Your Honor is obviously very well seized of it.
25 The relief here is procedural and it is -- it's really very

---

55

1  limited in the ways that he described, relief from an order
2  entered by this Court and from the automatic stay.  The
3  bondholders have filed that because as Mr. Golden mentions,
4  there's a June 4 clock ticking.
5          I think Mr. Golden said that there is intense
6  time pressure.  I suppose I would observe that although June
7  4 is not an eternity away, it's not tomorrow either.  And
8  the time pressure is as I suppose not quite as intense as
9  when we dealt with some of the issues prior to the December
10 two year statute of limitations.  So there is I would say a
11 little bit more time, but here we are on the motion.
12         With respect to the objections, I think it's
13 pretty clear that the cases really do in the way that Your
14 Honor, I think prefigured, all fit together.  It's not like
15 there are two separate sets of cases that go in different
16 directions.  You've got the *Rupert* case from the Fourth
17 Circuit and its progeny and that's the famous first swing
18 case.  The Fourth Circuit said that the purpose there was to
19 assure that when the estate and individual creditors might
20 otherwise be in effect scrumming for the same causes of
21 action, the estate gets first swing.  And here -- and so
22 what that imposes is the notion that while the estate
23 fiduciary is ready and able to pursue a claim, it does get
24 that first right.  But once those claims pass out of the
25 estate's hands and here they have for the reasons that Mr.

---

56

1  Golden summarized, that I think that first swing doctrine is
2  satisfied, the first swing has in effect been had.
3          And if you want to continue with a baseball
4  metaphor, I guess what that means is the estate
5  intentionally took the pitch.  At that point, I think the
6  *Baron* case is the one that tells you what happened.  And the
7  *Baron* case says that there once the estate's first swing has
8  been had or passed, it does revert to individual creditors.
9          I think it would be a fairly serious torturing of
10 *Ruppert* and would require a serious -- fairly serious
11 torturing of *Ruppert* to suggest that the dicta in that case
12 about the objects and purposes of the two claims being the
13 same meaning that they must travel together.  I don't really
14 think that's what *Ruppert* was getting at.  *Ruppert* as I
15 mentioned was really about prioritizing of what happens when
16 the estate wants to assert the same claims.
17         Here, instead, what's being said by the
18 foundations and I think Your Honor expressed some skepticism
19 about it, quite correct skepticism is that I guess the
20 argument that's being made is that the assertion of
21 intentional fraudulent transfer claims in Federal Court in
22 effect precludes the creditors from pursuing constructive
23 fraudulent transfer claims in State Court.  And I just don't
24 think that can be the case.  And even if it were the case,
25 as we point out in our papers, the two claims really are not

1  the same.  There are different pleading elements, different
2  burdens of proof, different recoveries, and of course, most
3  notably different defenses.
4        So even if that *Ruppert* doctrine or I'm sorry
5  that *Ruppert* dicta about objects and purposes being closely
6  correlated were to apply, these are different lawsuits about
7  different things.  And for those reasons, I don't think
8  *Ruppert* would be decisive even if the objects and purposes
9  test there were applicable which I don't think it is or I'm
10 sorry, it's objects and intents is the actual terminology.
11       As to the 546(e) defense which, again, I don't --
12 I do agree with Mr. Golden is not properly before the Court
13 today.  Just a couple of things.  It's really an attempt to
14 pre-litigate a motion to dismiss.  It's an attempt to get a
15 first crack at a motion to dismiss and then presumably have
16 a second crack in State Court later.  That issue, I think as
17 Mr. Golden says would need to be litigated in the Court
18 where the litigation was brought.  Everything Mr. Golden
19 says and that we mentioned in our papers about the *PHP* case
20 is true.
21       And the final thought I thought I would leave
22 Your Honor with on -- that is it's very interesting when
23 people -- people's metaphors sometimes say a fair amount of
24 what they're really thinking.  And the metaphor that's been
25 used here is the metaphor of an end run, another sports

1  analogy.  And an interesting thing about the end run is that
2  although it can sometimes surprise people, it's a perfectly
3  legal play.  And I don't want to put too much weight on
4  metaphor, but I think it does tell us something about this
5  posture here.
6        The committee supports the relief set forth in
7  the proposed order that was submitted by Aurelius.  I
8  believe that they will have up to you, if it becomes
9  appropriate, a revised form of that order reflecting certain
10 comments we had and the committee would support the entry of
11 that revised order.  And I'm available to answer any
12 questions that the Court has.
13       THE COURT:  All right, thank you, Mr. LeMay.
14 Anyone else in favor of?
15       MR. SIEGEL:  Good morning, Your Honor.  Martin
16 Siegel from Brown Rudnick on behalf of Wilmington Trust.
17       Wilmington Trust, the indenture trustee for the
18 PHONES has joined in the motion and we adopt the arguments
19 of counsel for Aurelius and counsel for the creditors'
20 committee, but there is a couple of things I do want to
21 mention.
22       First of all, the claims in the trust at least in
23 the first instance on behalf the PHONES pursuant to
24 Section 5.05 belong to the indenture trustee to bring.  The
25 indenture trustee here does intend to bring them.  And

59

1  because of our place in the capital structure, the PHONES
2  place in the capital structure, this is particularly
3  important relief, Your Honor, and may well be a very
4  important source of recovery for the PHONES.
5        In particular, I think the debtor actually agrees
6  with us.  With regard to the creditors' trust, one of our
7  objections to the debtors' plan was that the creditors'
8  trust that the -- that's part of that, we made the argument
9  that those contractual subordination provisions do not apply
10 to the creditors' trust for at least any PHONES holders that
11 did not opt out.  And the debtor agreed with us in Page 140
12 of their confirmation brief and said they're going to be
13 amending their plan to reflect that.  We think the same
14 principle will apply to any -- the state law claims brought
15 by Aurelius, the other indenture trustees, and Wilmington
16 Trust.
17       So from our standpoint, Your Honor, in
18 particular, we strongly urge that you grant the motion,
19 thank you.
20       THE COURT:  Thank you.  I'll hear from objectors.
21       MR. SIEGER:  Good morning, again, Your Honor.
22 John Sieger for the foundations appearing pro hac vice.
23       Your Honor, I want to pick up first on a point
24 that the committee raised in terms of the timing of this and
25 it actually goes --

60

1        THE COURT:  Well let's -- why don't we talk about
2  your standing first?
3        MR. SIEGER:  A couple of points on that, Judge.
4        THE COURT:  And typically, an entity that's not a
5  creditor of the estate or not otherwise a shareholder or
6  other party and interest wouldn't have standing to complain
7  about being a defendant in an adversary or a potential
8  defendant in the lawsuit.  And why would that be different
9  here?
10       MR. SIEGER:  Well, I've got at least three
11 responses to that, Judge, and maybe a fourth.
12       The first being, I'm not aware that anybody ever
13 raised the standing issue ahead of now and I would suggest
14 that it's been waived.  But to the extent that standing is
15 always an issue in front of the Court, we did argue in
16 connection with our confirmation objection that we are a
17 party and interest, albeit not a creditor.  There's no
18 dispute.  We are not a creditor of this estate.  We do
19 believe that we need to test -- it's fully briefed there.
20 Because it was not raised in the papers today, I'm not ready
21 to cite the cases we cited there, but I think -- I don't
22 believe anybody challenged it when we filed the confirmation
23 objection, frankly.
24       Next, Your Honor, I would submit that --
25       THE COURT:  The parties have been focused on

Case 2:11-cv-03148-WJM-JAD   Document 11-5   Filed 07/05/11   Page 9 of 117   PageID: 207
Case 08-13141-BLS   Doc 9453-1   Filed 07/13/11   Page 49 of 117

62

1 other things I think.

2     MR. SIEGER:  I heard there was something going on

3 in this room.

4 (Laughter)

5     MR. SIEGER:  Your Honor, in addition to that, I

6 would suggest that there's half a dozen lawyers in this room

7 that represent creditors that joined the motion.  I think

8 the issue is before the Court whether or not it is I

9 personally that was speaking to you.  The issue is properly

10 before the Court on behalf of creditors.

11     THE COURT:  Yeah, I didn't think I was going to

12 avoid a decision based on that.

13 (Laughter)

14     MR. SIEGER:  Your Honor, I'm happy to go further

15 with that, but in the event that Your Honor wanted to enter

16 an order today that said that we have no standing here today

17 and that nothing that's happening in this order is going to

18 impact us in any way in the impending State Court cases, I

19 think I'm stuck, I would sit down.  I wouldn't be happy

20 about that, but I would have to sit down.

21     They're going further, Judge.  They're asking you

22 to make a couple of findings that I believe, although they

23 say in their motion that it's a routine motion and that

24 everything is preserved.  They're asking you to find number

25 one, that these claims are not property of the estate.  And

---

1 they're asking you, number two, to say that these claims are

2 reverted to them.  I have seen a couple of versions of the

3 order, not the one that was just referenced by committee

4 counsel.  But so far as I know, that language is survived in

5 all of the drafts of the order.

6     I think if one were to be intellectually

7 consistent with the statements that this is just a routine

8 precautionary sort of motion, what Your Honor is really

9 being asked to enter is sort of an agreed stay relief

10 motion.  That in the event these state law claims are

11 brought, the creditors' committee, the debtor, maybe the

12 U.S. Trustee is not going to allege that they violated the

13 automatic stay.

14     THE COURT:  Yeah, if it applies.

15     MR. SIEGER:  That's correct.  If, in fact, Judge,

16 that was the limit of the relief sought here today, I'd have

17 a lot less to argue about.

18     THE COURT:  What about the provision in the

19 mediation order from which relief is sought?

20     MR. SIEGER:  I don't have a position on that,

21 Judge.  If they need -- I'm not familiar with it, but if

22 they need a relief from that in order to do it, that's not

23 my concern.  But as to the timing issue, Your Honor, I --

24 can -- are you happy with that issue?

25     THE COURT:  You don't have to sit down.

---

63

1 (Laughter)

2     MR. SIEGER:  On the issue that the committee

3 raised in terms of the timing, there is a lot of overlap

4 here between the issue that we raised in our objection and

5 the issues that we and other creditor -- that we, a non-

6 creditor and other creditors raised in connection with

7 confirmation.  And I agree with the committee's sort of

8 implication that this may not be a today issue.  We're not

9 trying to -- we don't expect to run out the clock, Judge.  I

10 mean, we're talking about as to my clients $1.2 billion.

11 We're not expecting the army of lawyers that represent the

12 estate or the largest creditors to somehow let that slip

13 through the cracks or for Your Honor to allow that to

14 happen.  But I would suggest that what happens at

15 confirmation could impact us.

16     There's an allegation that was raised today that,

17 you know, we're going to get a release as to Step 1.  And

18 while aware that that is proposed in one of the plans, I,

19 unfortunately, have not heard Your Honor sign off on that.

20 So I think it is premature to base any argument on that.  I

21 would -- and only Your Honor knows what the timing is of the

22 confirmation hearing, but I would suggest that if there was

23 a ruling even in late May, they could pick up and file

24 whatever claims they need to file in order to make a June 4

25 deadline.  I really would only ask that this matter be

---

64

1 pushed over until the argument on the confirmation

2 objections which covers not only this issue, but some

3 related issues.

4     But to the extent Your Honor wants to go forward

5 today on this issue, I do have legal argument to address

6 what the Aurelius counsel suggested.

7     THE COURT:  Then proceed.

8     MR. SIEGER:  Okay.  Your Honor, it is accurate to

9 say that we raised two main objections.  And I know you've

10 read the paper so I'll just highlight them briefly.  Number

11 one is the standing issue.  And number two is sort of the

12 preemption 546(e) issue.

13     Your Honor, what we have not heard from anybody

14 here despite the fact that this is being presented to you as

15 a routine motion, nothing out of the ordinary is a single

16 citation to any case where any creditor outside of

17 Bankruptcy Court, sued to avoid the very same transfers that

18 the estate has sued to avid.  The fact that they're calling

19 them constructive fraud claims as opposed to actual fraud

20 claims, we are talking about the same as to my client's $1.2

21 billion.

22     We have cited a case law that suggests that if

23 it's in the same ballpark roughly, they're precluded from

24 doing that.  And I don't know, there really is no effort to

25 overcome that.  They suggest that the cases are different,

1    but not based on relevant points.  Nobody says here's a case
2    where this has happened and where it's appropriate.  So at
3    an absolute minimum, this is unusual relief.  I might
4    suggest this is an issue of first impression before Your
5    Honor.  It's certainly not a routine motion.
6            Again, Your Honor, in terms of the ripeness, if,
7    in fact, they were not asking you to make findings that
8    number one these claims were property -- were not property
9    of the estate, and number two, that they've somehow reverted
10   to the creditors, I -- the ripeness argument would have more
11   appeal to me.  But what they want is an order to go waive in
12   front of a State Court Judge essentially with your
13   imprimatur on it suggesting you have a claim, Mr. Creditor.
14           THE COURT:  I know that.
15           MR. SIEGER:  Okay.
16   (Laughter)
17           MR. SIEGER:  I'll move on.  Your Honor, I would
18   go further to say that even if there was some question even
19   following that comment about ripeness, you have a lot of
20   discretion here.  And the mere fact that they are seeking to
21   file claims to recover the same dollars that the estate is
22   puts it squarely before Your Honor. You're the Bankruptcy
23   Judge for this estate and they're essentially talking about
24   depleting the value of the estate claims that have already
25   been raised.

---

1            I would submit that if the creditors' committee,
2    the debtor, and Aurelius were really all arm in arm about
3    this, the easy fix would be for the committee complaint to
4    dismiss the actual fraudulent transfer claims against the
5    foundation.  That way, they're not both going after the same
6    dollars.  If, in fact, they're right, it's a lower standard
7    of proof for them.  I mean, that -- the reason that there's
8    no case law on this, Your Honor, as part of your original
9    opening remarks, I believe is that it makes no sense to
10   allow somebody to go run off in the State Court and to try
11   to challenge the very same transfers, the very same dollars
12   that are supposedly going to be administered through a
13   bankruptcy plan for the benefit of all of the creditors.
14           Judge, I hear that one of the ideas is that, you
15   know, maybe we punt this issue down the road and they go
16   file a bunch of lawsuits of various jurisdiction and then
17   everything gets stayed.  In many ways, that's the worst of
18   all situations to the foundations, Judge.  We are a
19   charitable foundation, but the lion's share, I don't know
20   the exact numbers, but certainly the bulk of the
21   foundation's assets are put at issue by the filing of these
22   complaints.
23           And again, while we do believe in the single
24   satisfaction, we have -- we would have a very different view
25   just based on the legal standards of our exposure to an

---

67

1    actual fraudulent transfer claim than we would to four or
2    five different constructive fraudulent transfer claims where
3    not only is the standard different, but you've got four,
4    five, six judges looking at it differently.
5            In a way, we would be sort of frozen as a
6    foundation.  Our charitable works could be frozen in time
7    because all of our assets now are potentially at play.  I
8    don't think it would be good results here from that
9    perspective if you just want to look at it on an equitable
10   basis, to force the foundation to essentially freeze it's
11   good works at least at this, what I believe is a premature
12   point in time prior to the confirmation issues being
13   resolved.
14           Now Judge, sort of the next point they raise is
15   they spent a lot of time trying to distinguish our case law,
16   but the point that they distinguish almost every case on is
17   this notion that in the cases we cite, there was only a
18   potential estate cause of action having to do with the same
19   issues that the creditors were going after.  And they say
20   that none exist here because the two year statute ran and,
21   therefore, they reverted back.  They sort of have already
22   presumed the reverting back issue.  It belies -- it ignores
23   our point which is that they have not reverted back
24   principally because the estate has brought these claims.  So
25   they think that that fact is affecting their favor.  I think

---

68

1    that fact is affecting my favor because it's not even a
2    potential claim, it's an actual claim that's already been
3    brought to avoid these dollars.  So at a minimum, that is
4    not a point of distinguishment in the favor of the movants
5    in my view.
6            Your Honor, the next big point they raise is the
7    *Baron* case and I suggest that if Your Honor, your clerk
8    reads that case closely, you're not going to find that it's
9    particularly helpful to the movants' position.  First of
10   all, again, it doesn't avoid these -- sort of this idea of
11   competing suits to avoid the same transfers which in our
12   view is the issue that's in front of Your Honor.
13           And secondly, that Court, the *Baron* Court held
14   that plaintiffs' claims were direct sort of unique
15   individual claims, never common general claims which
16   obviously we're talking about here fraudulent transfer
17   claims.
18           And finally, those parties, Judge, at least as
19   written up in the case, the estate parties and the creditor
20   parties worked together to make sure that there wasn't
21   overlap between the claims.  There's obviously overlap here.
22           THE COURT:  Well, the movants says both plans are
23   designed to address that issue.
24           MR. SIEGER:  That may be, Judge, but we've
25   objected to both plans on exactly this ground.  This was

1 part of the reason why I think this should be heard at a
2 later time.  I think it's great that they're all holding
3 hands and say this is a wonderful thing, but that doesn't
4 address any of our objections which have not been ruled on
5 so far as I know and --
6          THE COURT:  Not so far as I know either.
7          MR. SIEGER:  Okay.  Well you would know, Judge.
8 (Laughter)
9          MR. SIEGER:  But getting back to the *Baron* case.
10 There's I think a helpful quote in there that distinguishes
11 exactly how different that case is from this case and that's
12 at *509F.Supp 520* where the Court says "plaintiff is not
13 trying to recover assets diverted from the debtor."  That is
14 exactly what is happening here.  The plaintiff creditors,
15 the state law creditors are trying to recapture stock
16 redemption payments made by the estates or the pre-
17 bankruptcy companies to us.  So in my view, *Baron* is not
18 helpful.
19          Your Honor, they raised the same ripeness issues
20 to 546 for the reasons I've already argued on in my first
21 point.  I think the same apply there.  As to the merits, I
22 do have to agree that the *PHP* case has facial appeal and may
23 even have more than facial appeal.  It's the one case they
24 cite, frankly, that gives me pause.  But again, I suggest
25 that if Your Honor reads that closely, the ruling itself is

1 at odds with the *Hechinger* case and the other cases which
2 suggest that plain language is not the end of the analysis.
3          If, in fact, the plan language is at the end of
4 the analysis which this Court holds, the end arounds as
5 we've been referring to them that other Courts have found
6 inappropriate, would not be precluded by the language in the
7 statute.  I mean, it's the same sort of concept.  I might go
8 so far as to say that that view is dicta, the holding at *PHP*
9 because the Court went on to find that the creditors had no
10 standing in that case to bring the claims.  But I'm not
11 going to overstate that position, Judge.  That case is the
12 one case that stands for one of the propositions they are
13 suggesting.  We believe it's distinguishable for the reasons
14 I've just said, but I'm going to give credit where credit is
15 due.
16          With that exception, Judge, with the exception of
17 that case which only addresses one piece of this, we haven't
18 seen any evidence.  Any -- I'm sorry, any case law or
19 authority to support their position.  Nobody's disputing the
20 fact that had the estate not brought these claims, the state
21 law fraudulent conveyance claims would have reverted back,
22 but that is not the issue here.  We spent a lot of time
23 talking about that.  Nobody cares about that.  There is no
24 support for the idea that a creditor can independently
25 challenge in State Court the very same transfers, even under

71

1 a different theory, the very same dollar transfers that the
2 estate has.
3          THE COURT:  And what if I were to enter an order
4 that didn't dispose of that issue?
5          MR. SIEGER:  I don't know how to respond to that,
6 Judge.  You're -- I would lump it for lack of a better word.
7 You're the Judge.  I guess it would depend on what sort of
8 order you were intending to craft.
9          THE COURT:  Well, I'll probably give the parties
10 a first crack at it.
11 (Laughter)
12          MR. SIEGER:  But I would suggest that to the
13 extent you're inclined to grant this motion on some level, I
14 would suggest number one, that it should only be applicable
15 as to the movants, not to creditors as a whole.  And by the
16 way, in response to one of the issues in the reply, I did
17 not -- we did not mean when we made that comment to suggest
18 that to the extent any of the movants is a trustee for other
19 creditors, that they're prohibited from bringing that claim.
20 That's not the point.  We just don't think it's appropriate
21 for a bunch of creditors unrelated to these movants to be
22 able to bring claims on a motion that they did not bring or
23 support.
24          Number two, we don't think there should be any
25 finding at all, Judge about these claims reverting or them

72

1 not being property of the estate.  What we're talking about
2 here should be a simple you can go file these claims and
3 nobody's going to accuse you.  Or this Court is not going to
4 hold you as having violated the stay for doing so.  To me,
5 that is the absolute end of the analysis.  If, in fact, this
6 really is a simple procedural motion, there doesn't need to
7 be anymore tricks in language and stuff that they can waive
8 in front of a State Court Judge.  We should have a fair shot
9 to raise all of these defenses.
10          And I would actually ask that, Your Honor, if you
11 are going to grant this motion, would include a specific
12 finding, expressed finding or an expressed ruling that the
13 issues that we've raised in our objection, including 546
14 standing and preemption are all preserved for each of the
15 State Courts to weigh in on.  I have a concern that any
16 order from this Court is going to viewed by a State Court
17 Judge in the absence of some expressed language to the
18 contrary, as you somehow having passed on the validity of
19 these claims or the standing issue.  If, in fact, they're
20 not asking you to do that, we should make it very clear in
21 the order.  Thank you, Judge.
22          THE COURT:  Thank you.  Does anyone else wish to
23 be heard?
24          MR. BRADFORD:  Yes, Your Honor.  David Bradford
25 on behalf of EGI-TRB.

74

1  Your Honor, I'd like to address both the scope of
2  the motion as it relates EGI-TRB, as well, as the merits of
3  the motion.  This motion sought relief with respect to the
4  recovery of what I referred to as shareholder redemption
5  payments.  EGI-TRB, unlike anyone else before the Court on
6  this motion, received no cash.  It received no payments.
7  And it did not believe it was within the scope of this
8  motion as the motion was filed.  There was a footnote
9  dropped in the reply brief that was submitted by the
10 creditors' committee indicating that while Mr. Zell was not
11 a defendant in this case because, in fact, he received no
12 cash and there's no dispute about that, that EGI-TRB was
13 mistaken in its believe that it was outside the scope of
14 this motion and that it was deemed to be a Step 2 selling
15 shareholder.
16          The basis for that contention illustrates the
17 problem with the merits of this motion.  And that is -- and
18 this part of the transaction I think is undisputed, EGI-TRB
19 as part of Step 1 was obligated to purchase $50 million or
20 Tribune stock.  It was obligated to redeem that stock as
21 part of Step 2, but in the form of a credit towards the
22 purchase of its Step 2 note.
23          So EGI-TRB never got back its $50 million.  What
24 it got was a credit toward a larger investment that it was
25 obligated to make in Step 2.  And what it then received in

1  consideration for that stock was part of the funding of a
2  note which is part of a claim before this Court.  There is
3  an effort in the pending complaint to avoid that note.  To
4  now permit State Court litigation which would seek to avoid
5  the very note that is the subject of avoidance efforts
6  before this Court, illustrates precisely why no Court has
7  previously permitted the pursuit of State Court litigation
8  to essentially avoid the very transaction that is the
9  subject of avoidance complaints still pending before the
10 Bankruptcy Court.
11          We think the resolution of our predicament is
12 easier than the larger questions raised by this motion and
13 that Your Honor should make clear that whatever claims are
14 permitted here, they should not include efforts to avoid the
15 EGI-TRB second step note as long as claims are still pending
16 with respect to the avoidance of that note before this
17 Court.  And in particular, I don't believe that the issues of
18 timing are not compelling as they relate to our circumstance
19 because the only contention as it pertains to EGI-TRB or
20 relates Step 2.  So any limitation issue would not become a
21 concern until December.  There is no Step 1 issue here that
22 would compel an immediate filing of any kind of complaint.
23          We also note, that unlike the suggestion that
24 there may be a release of competing Step 1 claims, there is
25 no suggestion that the Step 2 claims that would compete for

75

1  the same recovery are going to be released.  So we are
2  clearly going to be in a situation where they same note
3  is the subject of avoidance actions not only before this
4  Court in connection with the consignments complaint, but
5  potentially before four or five other State Courts.  And
6  that again, is foreign territory where no Bankruptcy Court
7  has permitted creditors to go.  And it would be particularly
8  unreasonable and unfair in this context as it pertains to
9  the suggestion that this issue be deferred.
10          We do have confirmation objections to this very
11 aspect of the plans.  We have objections that relate to the
12 546(e) issue.  There's no reason for this Court to prejudge
13 those objections by deciding this issue now as it pertains
14 again solely to EGI-TRB because again, the issue only
15 becomes a problem for the creditors if ever as the December
16 date approaches.  And hopefully, we'll be in a position of
17 resolving these issues in the context of confirmation prior
18 to the time that we get to a limitation issue as to the Step
19 2 obligations.
20          So for that reason, we would ask the Court that
21 however you resolve the larger motion, that you make clear
22 that the unique circumstances raised by the double recovery
23 efforts against the EGI-TRB note and the $50 million of
24 stock that was credited toward the purchase of that note,
25 again not involving any cash, are not the subject of that

76

1  lifting of the stay or of that authorization.
2          I'm happy to answer any questions that the Court
3  may have.
4          THE COURT:  Well, I'll hear what the movants have
5  to say at the end in response to your particular objection,
6  but I guess the only initial thought that occurs to me is
7  what if, in connection with the trial and disposition of a
8  constructive fraudulent conveyance claim in a State Court, a
9  State Court decides that the transaction should be
10 collapsed?  Does that have any implication on your argument
11 that nobody has to worry about an expiring statute until
12 December, with respect to your claim?
13          MR. BRADFORD:  No, Your Honor, because there was
14 no consideration paid to EGI-TRB in connection with step
15 one.  So in other words, all of the claims against a step-
16 one shareholder is -- are shareholders who received cash in
17 exchange for their Tribune stock in connection with step
18 one.  EGI-TRB did nothing but put money into Tribune in
19 connection with step one.  So to review the history, at step
20 one, EGI-TRB pays Tribune $200 million for a note; it pays
21 Tribune $50 million for stock.  That's the end of it.  It
22 gets nothing back.  So if step one is avoided, there is
23 nothing to recover from EGI-TRB as it pertains to step one.
24 The only issue is whether EGI-TRB is entitled to some
25 recovery on account of the obligations owed to it by Tribune

1  as it pertains to those transactions.
2           At step two, EGI-TRB is obligated to put in
3  approximately an incremental $90 million to its investment,
4  and that new investment takes the form of a $225 million
5  note and a $90 million warrant.  Rather than put entirely an
6  additional $315 million of additional cash in, the prior
7  investment of 225 is credited toward the increased
8  investment.  So again, no cash comes back.  But all of that
9  happens in December.  So to the extent that somebody could
10 argue constructively that somehow this credit toward a
11 larger investment is somehow avoidable, that does not occur
12 until December.  And whether the transactions are collapsed
13 or not, there would be no claims pertaining to transactions
14 occurring in April or June, because again, EGI-TRB did not
15 receive anything of value in connection with the first step
16 of this transaction.  It only lost money insofar as the
17 first step of the transaction goes.
18           I would also just note, on the issue of standing,
19 that EGI-TRB contends that it has prior over any
20 distribution to the PHONES as a matter of subordination and
21 priority and therefore does have an interest in the
22 disposition of the estate proceeds in its capacity as a
23 claimant against the estate.
24           THE COURT:  Thank you.
25           MR. BRADFORD:  Thank you, Your Honor.

1           THE COURT:  Does anyone else wish to be heard?
2           MR. DOUGHERTY:  Good morning, Your Honor.  My
3  name's George Dougherty.  I'm here on behalf of certain
4  defendants.  We filed a joinder in the objection, and I just
5  want to make sure that we're here and we agree with what Mr.
6  Seiger [ph] said, especially the part about the UCC and the
7  state dismissing the intentional fraudulent conveyance
8  claims.  We'd love to have that happen.  I don't think it
9  will.
10          THE COURT:  Mr. Dougherty, who do you represent?
11          MR. DOUGHERTY:  We represent certain defendants:
12 Mr. Fitzsimmons [ph], Mr. Vanesco [ph], et cetera.
13          The other thing is, I do want to make clear that
14 the first two paragraphs in the proposal -- or what WESAU
15 [ph] yesterday, are inconsistent with the idea that they
16 just want to get these claims on file and that the new Court
17 should decide issues of standing.  Paragraphs one and two,
18 in particular, say that the claims no longer constitute
19 property of the estate.  And paragraph one says that the
20 creditors have regained their right to bring these claims.
21 We would object to those.  If there's a new order floating
22 around, I'd like to see it, to the extent you're
23 contemplating entering such an order.  Thank you.
24          THE COURT:  Thank you.
25          MR. TEITELBAUM:  Good morning, Your Honor.  Jay

---

79

1  Teitelbaum with Teitelbaum and Baskin for the TM retirees.
2  We filed a joinder to the objection, Your Honor.
3           Your Honor, while this has been characterized as
4  mundane, there are implications and ripples that affect not
5  only what is -- has happened in the case but what may happen
6  in the case.
7           We are in a somewhat unique position in that,
8  back in April, as Your Honor may recall, the TM retirees
9  entered into a settlement agreement.  That settlement
10 agreement was appended to the plan, the original plan, and
11 now the amended plan.  And essentially, what that settlement
12 agreement did was compromised and settled not only the
13 amount of the claims but set forth the methodology for
14 calculating.  And as part of that settlement, it provided
15 for releases in connection with LBO litigation.  The fact of
16 the matter is, Your Honor, the -- at that time, these
17 constructive fraud claims, and even at the time of the
18 amended plan, were property of the estate.  And it was, I
19 believe, within the contemplation of the parties that the
20 consequences of the -- of what we're here today, were not
21 even considered.
22           You know, I actually have the opportunity, now
23 that my daughter's taking business law in college, to go
24 over contracts 101.  There was no meeting of the minds at
25 this point, because no one really thought it through.  No

---

80

1  one realized what could happen in the context of what
2  happens if these claims get brought, talking not so much
3  double-recovery, because that's just not within the cards,
4  and I think we know that, but what are the implications to
5  the people who are being affected, and particularly my
6  clients and other similarly situated retirees?  We represent
7  about 200 of the 450.
8           The concept here was taking up to a 65-cent
9  haircut for peace in the valley, if you will.  And now, we
10 have to go back -- and they voted on a plan in that context.
11 If they are now being told: Guess what; you may be compelled
12 to defend -- putting aside merits, et cetera -- serious
13 litigation that could claw back up to 50 percent of that
14 which you may be given in the plan, that's not the deal they
15 bargained for.  That's not the deal they voted for.  And
16 what I'm up here to suggest that the unintended, or perhaps
17 the intended, consequences of this motion is to throw this
18 process into a bit more chaos than this Court has seen to
19 date.
20          THE COURT:  And who would've thought that were
21 possible?
22 (Laughter)
23          MR. TEITELBAUM:  Yes.  The fact of the matter is
24 that the exigency of that chaos outweighs the exigency of
25 June 4.  And what I would ask the Court is to give parties

1  who hadn't beforehand thought about what the implications
2  may be to people who voted on a plan and may now have to be
3  forced to come back to this Court and ask the Court: Wait a
4  second; we need to rethink this.
5          I'm not suggesting I have a better mousetrap or a
6  way to fix it, but I think we need time to see if we can
7  build that mousetrap, come up with a resolution that works
8  for everyone, whether it's reasonability, rational
9  thresholds for pursuing claims, whether it's just carving
10  out certain parties.  But the fact of the matter is, Your
11  Honor, there are implications here.  The PHONES stood up and
12  raised the issue of the subordination.  That's directly
13  implicated in connection with the plan.  That's an issue
14  here that would have to be fought on multiple fronts if, as,
15  and when these State Court actions were to proceed.
16          And speaking only for my clients, some of whom,
17  arguably, are more sympathetic than others in their relative
18  wealth, this is a tremendous burden for individuals.  And
19  you know, now, as a practitioner in a small firm as opposed
20  to a big firm, I see that implication to people, and I see
21  -- and I hear it on the other end when a trustee or a trust
22  says, well, you know, settle it if you don't want to incur
23  the litigation costs.  Well, that's real money to real
24  people who are -- have long since retired in this case from
25  this company, after giving 20/30-plus years and are now not

1  only faced with not having received pension benefits since
2  the filing of the case, and looking at 65 percent of their
3  retirement savings gone, faced with litigating the issue of
4  do I have to give back -- even if it's a million dollars and
5  you were 60 years old and that was your retirement.  How
6  would we deal with that, as individuals in today's world, or
7  in any world?  That's the reality of what this is.  This
8  isn't some law school exam; this is reality for people.  And
9  all I'm asking this Court for is the opportunity to sit down
10  with, hopefully, rational people and come up with a way to
11  say, you know, maybe individuals aren't the same as a
12  billion-dollar trust or other entities.  Maybe they are the
13  same, but we need to discuss it, because I don't think
14  people thought this through.
15          And so, Your Honor, I'm here to ask that the
16  Court not issue this ruling expeditiously in order to give
17  the parties an opportunity, as you have in the past, to try
18  to work through their differences.  And we've achieved
19  differing degrees -- varying degrees of success in that
20  effort, but there has been some success.  Thank you, Your
21  Honor.
22          THE COURT:  Thank you.  Excuse me.
23          MR. JACOBS:  Good morning, Your Honor.  I think
24  there's going to be two brief replies to some of the points
25  that have been made.  David Rosner, Kasowitz, Benson, Torres

83

1  & Friedman on behalf of Law Debenture Company of New York.
2  We're the indenture trustee for approximately 18 percent of
3  the senior notes, which is roughly $200/$240 million in
4  senior notes.  We're a co-movant under this motion, and
5  we're also a co-plan proponent, as your Court has -- as Your
6  Honor is probably aware.
7          I'm just going to respond to a couple of the
8  points.  Again, I think it is -- it's crystal clear that
9  nobody disputes who owns these claims at this point, and
10  nobody disputes -- well, nobody disputes that the claims of
11  constructive fraudulent conveyance is a different claim from
12  a fraudulent -- from an intentional fraudulent conveyance.
13  There is a dispute as to whether the overlap has some
14  bearing on whether Your Honor is going to allow these claims
15  to go forward or whether a statute of limitations -- an
16  actual defense -- is going to be created here today.
17          The foundations raise this issue of the ordering
18  of the prosecution before Your Honor as if that's an issue
19  that the Court need be concerned about between the estate
20  and between the creditors bringing state law claims.  I will
21  tell Your Honor that is certainly not an issue for today as
22  to how claims are prosecuted and the order in which they are
23  prosecuted.  Number one, that's a defense.  That would be a
24  defense, in any action.  That's a motion that any -- that
25  either Court would consider, based upon proceedings in

84

1  another Court, should that Court decide to stay in action,
2  should that Court decide to dismiss an action without
3  prejudice pending a determination of another Court.  And
4  I've seen those types of motions and litigated those types
5  of motions.  But again, that's a defense.  And the motion
6  said -- says it in a number of ways, and the movants have
7  said it in a number of ways, that the point is not to
8  prejudice any defense.  And so, to the extent that a
9  defendant wants to say, well, we'd like to see what happens
10  in this Court before this Court, then at least the Court
11  that has proper jurisdiction over the case would be the
12  Court that would be making that determination as to whether
13  ordering had anything to do.
14          But nevertheless, again, we do not seek to
15  prosecute these claims today.  We only seek not to hand an
16  actual $8.2 billion state-statute-of-limitations defense to
17  the defendants, which is why they're here today, because
18  they would like that defense.
19          This issue that there is a transaction that is at
20  issue in competing cases, let's say competing causes of
21  action in competing cases, that issue arises in almost every
22  single case in which there are estate trusts and creditor
23  trusts in which either the creditors have decided to convey
24  their claims to a trust, as is proposed, or as to
25  whether creditors bring their own claims.  But the idea that

1  there is a similar transaction being attacked, it's
2  happening in Lyondell right now, even as we speak, involving
3  shareholder claims.  It's happened in Revco in ten different
4  courts.  It's happening in Le Nature's, a case that I'm --
5  that's a case that I'm prosecuting where we've got
6  individual creditors prosecuting their claims.  We're
7  prosecuting the estate causes of action based upon the very
8  same transactions, the very same Ponzi scheme in that case.
9  There's no difference than a direct and a derivative
10 situation.  This happens hundreds, if not thousands, of
11 times.  The transaction at issue, different claims,
12 different plaintiffs, different forms of relief.  So I don't
13 really think that's an issue.
14          And it's certainly fine to hear, from a defendant
15 standpoint, that there's no rush and let's not hear this
16 today and why put the plaintiffs in a position where they
17 can actually preserve their statute of limitations.  We're
18 one of the parties that may ultimately be bringing that, you
19 know, assuming correct direction and indemnity, that we will
20 be bringing that cause of action, we do not think it is
21 appropriate for plaintiffs who have a cause of action to be
22 given a hurdle and to stress a looming $8.2 billion loss,
23 simply due to the passage of time.  A lot can happen.  Your
24 Honor's comments were taken into account at the conclusion
25 of the trial by the other day by a lot of people.  A lot can

1  take place between now and when the Court ultimately
2  determines or is called upon to ultimately determine.  But
3  nobody should be sitting and staring at a clock this far
4  into a statute of limitations when the risk is a loss of
5  $8.2 billion worth of claims.  There's no basis for it.  And
6  by the way, if it turns out that any objections upheld, and
7  if it turns out that a defendant, who's sitting here today,
8  there is no claim against them anymore, that, too, is a
9  defense that could be brought.  First of all, they most
10 likely wouldn't be sued; they would be dropped from the
11 complaint.  But let's say that that didn't even happen,
12 because there was some dispute as to whether they would be
13 released.  The release would be put at issue in the proper
14 Court, and that Court would determine the release as a
15 defense.
16          The idea that these claims are reverting to the
17 creditors is a nice terminology that people use, but I
18 think, as we all know, and I don't think anybody would
19 dispute, the claims don't revert to creditors.  They never
20 left the creditors.  The claims were never divested of
21 creditors, and they were never transferred to the estate.
22 All that happened was that, for two years, they couldn't
23 bring the claims.  Now, two years later, they can bring the
24 claims, because the estate no longer has any interest in it;
25 the estate's business with these claims is done.  There's no

---

1  basis to hold back the plaintiffs from bringing them.
2          The retirees, at the very end -- this is the last
3  point I'll make, and I'll hand this over to the committee.
4  That -- I didn't understand, really, the retirees' argument,
5  other than to say that they did not want to get sued.  And I
6  know nobody ever wants to get sued, but there can be no
7  point of there's a surprise here that the plans provide for
8  shareholder litigation to go forward and anybody that
9  received a payment, pursuant to the LBO, is a potential, if
10 not an actual, defendant and will be sued.  That's always
11 existed in these plans.  It's always existed in both plans.
12 It's always been before the Court, and it was certainly out
13 there when people voted.
14          So, Mr. Teitelbaum said that they didn't really
15 think about it that way, and that's not a concern for the
16 Court or for the plaintiffs as to how they decided to think
17 about it.  If it's a voting issue, they could change their
18 vote, but under no circumstances can they carve themselves
19 out as potential defendants if they actually end up getting
20 sued on the basis of the shareholder claims that are being
21 preserved.  Thank you, Your Honor.
22          THE COURT:  Thank you.
23          MR. SOTTILE:  Your Honor, James Sottile of
24 Zuckerman Spaeder, special counsel to the official committee
25 of unsecured creditors.

1          I rise, rather than Mr. LeMay solely to address a
2  factual point relating to EGI-TRB's arguments that it should
3  be treated different from all of the other shareholders and
4  that claims, if the Court grants relief in order to assert
5  state law -- constructive fraudulent conveyance claims, it
6  should not grant that relief as to EGI-TRB.
7          Your Honor, quite simply, there's no basis for
8  treating EGI-TRB any differently from any other shareholder
9  that received value in return for its shares.  While you
10 heard a very complex set of transactions described to you by
11 Mr. Bradford, the bottom line is this: EGI-TRB had $50
12 million worth of stock.  That stock was redeemed at step two
13 of the transaction.  It's true it wasn't redeemed in cash,
14 but that's not a requisite for a constructive fraudulent
15 conveyance claim.  Instead of getting cash, as Mr. Bradford
16 said, EGI-TRB got a $50 million credit against its
17 obligation to purchase a note.  If it hadn't gotten that
18 credit, if the shares hadn't been redeemed, it would've had
19 to pay $50 million in cash.  There's simply no basis for
20 treating a $50 million credit against an obligation to buy a
21 note any different from getting $50 million in cash.  And
22 the fore, Your Honor, we submit that if the Court grants the
23 relief requested, which the committee supports and believes
24 you should grant, there's no basis for treating EGI-TRB any
25 differently from any other party.

1    Now, you also heard an argument from Mr. Bradford
2  that perhaps the timing supported a different result from --
3  with respect to EGI-TRB, that because their shares were
4  redeemed at step two, there's no great rush, and you could
5  hold off.
6          Your Honor, I believe that Mr. Bradford's
7  analysis of the limitations issue is correct: that the
8  limitations, with respect to that redemption, properly
9  construed, wouldn't run before December.  However, you did
10 hear a very complex set of transactions described to you,
11 described as integrated, starting at step one, continuing
12 through step two, with respect to redemption of shares.  And
13 I don't believe that parties pursing these claims should
14 face the risk that someone later on will argue that all of
15 these transactions should somehow be collapsed together and
16 really the limitations period expired when the initial set
17 of transactions that EGI-TRB engaged in were set in motion.
18 So Your Honor, for that reason as well, we don't believe
19 there's any basis for treating EGI-TRB any differently from
20 any other shareholder, whose shares were redeemed for value,
21 as was clearly the case for EGI-TRB.  Thank you, Your Honor.
22         THE COURT:  Thank you.
23         UNKNOWN:  Your Honor, with -- oh, I'm sorry.
24         MR. GOLDEN:  Your Honor, we did circulate, last
25 night, and we thought we had gotten it to everybody who had

1  filed an objection or a joinder, a blackline form of a
2  revised order.  If you -- Your Honor, I'd like to hand that
3  up for one minute.
4          THE COURT:  If you would.
5          MR. GOLDEN:  And if anybody in the courtroom
6  needs one, Mr. Dublin can give it to you.
7          THE COURT:  Thank you.
8          MR. GOLDEN:  Your Honor, I'd just like to point
9  out a couple of points.  I'm going to be very brief.  You've
10 heard foundation's counsel suggest that paragraphs two and
11 three of the proposed form of order are not appropriate.
12 Paragraph two says:
13 "Pursuant to Bankruptcy Code Section 546(a), creditors have
14 regained the right to prosecute their respective creditors
15 SLCFC claims against step-one shareholders and step-two
16 shareholders."
17         I think that Mr. Rosner's explanation of the case
18 law is exactly on point.  Those claims never went away from
19 the creditors.  They've never been ceded to the estate.
20 They were held in abeyance during the pendency of the two
21 years -- first two years of the bankruptcy case, and once
22 that two years had expired and no cause of action had been
23 brought, the creditors were -- retained the right to
24 prosecute the claims.  I don't think anybody actually
25 disputes that.  That doesn't necessarily go to the point

91

1  that the foundations made, that because of a parallel
2  pending intentional fraudulent conveyance action, those
3  claims should -- the state law claims should not proceed.
4  That's a point that he's going to -- if we get an order,
5  he'll be able to argue to the trial court.  So I don't think
6  there's anything about the words in paragraph two that are
7  going to prejudice the foundation.
8          So too, in paragraph three, the right to
9  prosecute a creditors SLCFC claim no longer constitutes
10 property of the debtor's estate.  I don't think anybody
11 actually disputes that.  And --
12         THE COURT:  I might.  And I'll tell you why.
13         MR. GOLDEN:  Okay.
14         THE COURT:  There's a 3rd Circuit case out there
15 that arose in the 363 context, and I think the specific
16 dispute, and I forget the name of the case, centered around
17 whether these rights were transferred as part of a 363 sale.
18 The Court found they're not property of the estate, at least
19 for that purpose.  They're rights that can be asserted by
20 the estate, but I don't -- I think what the Court was
21 saying, they're not 541 rights.  Now, the effect may be the
22 same, but I -- and I'll give you some thoughts when we're
23 done, but --
24         MR. GOLDEN:  Okay.
25         THE COURT:  -- I have that concern.

92

1          MR. GOLDEN:  Okay.  And Your Honor, the only
2  other point I want to point out, which I think should
3  relieve some of the concerns by the foundations counsel, is
4  paragraph eight, where we say nothing in this order shall
5  prejudice or impair any claims or defenses of any defendant
6  in any proceeding in respect of a creditors SLCFC claim.  We
7  were not trying, by virtue of this order, to get a leg up at
8  the trial Court.  They are going to -- the foundations and
9  any other defendant is going to defendant is going to have
10 every right to assert whatever defenses they have at the
11 trial Court level, and it -- and there will be nothing about
12 this order that's going to stop them from doing that.
13         I was -- I think Mr. Sottile gave a wonderful
14 explanation of the EGI-TRB Zell position of the movants and
15 the committee.  Mr. Bradford is a very talented lawyer.  He
16 has appeared in front of you countless times with one goal
17 and one goal only: to make sure that his clients do not end
18 up on the wrong side of a V in a Tribune-related lawsuit.
19 But I don't think it's appropriate for potential defendants
20 to be able to dictate to the plaintiffs, to the estates, and
21 to the creditors who possess these claims, when these claims
22 can be brought, when they should be brought, and any
23 limitations on bringing them.  Because if that was the case,
24 every defendant would have a field day in trying to dictate
25 the contours of a potential litigation.

1    And finally, with respect to the retirees, I will
2    have to reiterate.  I don't know what was in the mind of the
3    retirees when they cut their settlement with the DCL plan
4    proponents, but what I find hard to understand or appreciate
5    is that the DCL plan always contemplated -- always
6    contemplated -- the ability of creditors to prosecute,
7    either individually or through a trust into which they would
8    put their claims, state law constructive fraudulent
9    conveyance claims.  Now, the DCL plan, I think as Your Honor
10   may recall, does have a limitation that the first $100,000
11   is protected.  But I'm just surprised that Mr. Teitelbaum
12   said that they -- he and his clients -- were unaware of the
13   fact that, once they cut their settlement, there may be a
14   possibility that some of his clients -- actually, he hasn't
15   said who -- but some of his clients may be defendants in
16   these creditor-sponsored state law constructive fraudulent
17   conveyance claims, because the DCL plan always contemplated
18   that possibility.
19          Excuse me, Your Honor.  That's all I have.
20          THE COURT:  All right.  Thank you.
21          MR. BRADFORD:  Yes, Your Honor.  Very briefly, on
22   EGI-TRB, first, to the extent there's any concern about step
23   one, we're prepared to enter into a tolling agreement to
24   address that.  Clearly, this is a step-two issue only.
25          THE COURT:  I know.  That proposal didn't work

before.
2          MR. BRADFORD:  It should work here.  Let me just
3    try to be practical about the whole set of EGI-TRB issues,
4    so that we don't have to be ever-present in these
5    proceedings and we can simply.
6          THE COURT:  Oh, I suspect you're going to be here
7    anyway.
8          MR. BRADFORD:  Well --
9    (Laughter)
10         MR. BRADFORD:  -- it's certainly not our desire,
11   Your Honor.  EGI-TRB has no assets, other than its claims
12   against this estate.  Nobody would stand to defend these
13   claims on behalf of EGI-TRB if, upon confirmation and upon
14   motion practice related to that confirmation, we had some
15   clarification as to what, first of all, the rights of EGI-
16   TRB are in connection with this plan.  But more basically --
17   and something we do intend to bring before the Court.  Most
18   recently, there was, added to a complaint, and this was the
19   subject of some of the standing litigation that we tried to
20   pursue and that was ultimately withdrawn, an allegation that
21   EGI-TRB's corporate status should be pierced and that Mr.
22   Zell should somehow be liable personally for that.  There's
23   no factual allegation for that.  It does not comply with
24   Rule 11.  It is something that we think the Court will
25   strike.  And if stricken, we could be done here.  There is

95

1    no reason for us to have to stand and defend all of this,
2    because again, the only assets are the notes that we
3    referred to previously, which are claims against the estate.
4          And so, I think that there is practical value in
5    deferring further litigation until the plan confirmation
6    issues are resolved.  And insofar as this is really a step-
7    two set of issues in any event, we don't think there's a
8    hurry, and we're prepared to give whatever comfort people
9    need to make sure that there's not a preclusive outcome to
10   being able to have that further dialogue.
11         So thank you, Your Honor.
12         THE COURT:  Thank you.
13         MR. LeMAY:  Your Honor, I might have just a few
14   sentences?
15         THE COURT:  Certainly.
16         MR. LeMAY:  Just because I wanted to get in,
17   David LeMay for the committee again, and I apologize for
18   tag-teaming with Mr. Sottile.  We have a division of labor.
19         Just two very brief thoughts, Your Honor.
20         First, to the extent the Court were inclined to
21   entertain the idea of not deciding this right now, today,
22   but instead a brief adjournment, the committee, for its
23   part, would have no problem with that.
24         Second, the proposition was raised that if relief
25   is granted from the stay today, it ought only to be in favor

96

1    of the movants, and that, I think, is probably not something
2    we could agree with.  One of the reasons we got involved in
3    this whole motion was to make sure that there was a level
4    playing field for all creditors.  And as is often the case
5    in lift/stay jurisprudence, there is a concern that you
6    don't put one person in a position that others similarly
7    situated can't take advantage of.
8          So I would urge the Court that if relief from the
9    stay is to be granted today, that it be for the benefit of
10   everyone and not just these movants, and that's the way the
11   current form of order that Mr. Golden tendered --
12         THE COURT:  I know, but --
13         MR. LeMAY:  -- reads.
14         THE COURT:  -- let me ask you this.  As a --
15   well, I'll put it in terms of the 30,000-feet view.  As a
16   prudential matter, why would a Court grant relief to parties
17   who are not asking for such relief?
18         MR. LeMAY:  A fair point, Your Honor.  I think it
19   comes back to the way Section 362 works and the way that the
20   section or the subpart of 362 on relief from the stay works,
21   and you'll see that it says that the Court may grant from --
22   relief from the stay, such as by -- and I'm doing this from
23   memory, and I apologize -- conditioning, annulling, or
24   terminating the stay.  I don't think the -- that the
25   application of the automatic stay, with respect to unsecured

98

1  creditors, is one of those things where it's only the people
2  who ask for it that can be given relief.  You may determine
3  those are the only people who should be given relief.  I
4  guess what I'd like to suggest is that you've got the power,
5  and I would suggest you should, put everybody on the same
6  footing.
7          As I say, one of the very reasons we got
8  ourselves involved, after the motion was filed, was
9  precisely to make sure that other voices not in the
10 courtroom today were put on the same footing.  And I think
11 -- I do think that the architecture of Section 362 is
12 supportive of that.
13          THE COURT:  Thank you.
14          MR. LeMAY:  Thank you.
15          THE COURT:  All right.  Last word.
16          MR. TEITELBAUM:  Thank you, Your Honor.  Just
17 very quickly, just to address the point.  The stipulation
18 that was attached to both plans that was executed by the
19 retirees in paragraph seven, says that this -- that -- and
20 I'll -- let me just quote it:
21 "The debtors agree that, in consideration of the compromises
22 set forth herein, and upon the occurrence of the condition
23 of the effectiveness hereof, any and all claims of the
24 debtors and their estates"
25          And recall, at the time this was done, these

1  constructive fraud claims were claims of the estate, and at
2  the time of the amended plan
3  "known or unknown, which may exist against any retiree
4  claimant, with respect to such claimant retiree claim,
5  including without limitation, any claim for the avoidance
6  and recovery of any pre-petition payment or transfer made on
7  account of such retiree claim shall be hereby released and
8  waived."
9          The concept of this specific stip was built into
10 the plan in the definition of retiree release claims in
11 11.1.2 and 11.2.  What I'm suggesting to you -- and maybe I
12 misstated it, and maybe I wasn't clear -- wasn't only what
13 was in the retirees' mind.  Your Honor, it was never within
14 the contemplation of the parties.  And I understand this may
15 not be before the Court today, and this is the chaos point I
16 was trying to avoid.  It may well be that it has to be teed
17 up as to whether the implications of what is being asked for
18 today was fully, fairly, adequately disclosed to people when
19 they made their vote.  And I think that circumstances, that
20 have been presented to this Court today, show that there is
21 some, at least basic, disagreement amongst some very, very
22 smart people as to the implications of the words in the
23 disclosure statement and on certain creditors who voted.
24 And that's what I'm suggesting.  I'm not suggesting it's
25 before you.  I'm suggesting I'm trying to avoid having that

99

1  be brought before you, so that we can all try to work
2  through this issue.
3          THE COURT:  All right.  Thank you.  All right.
4  Since the circumstance in which, arguably, the movants here
5  could've just went and done what they wanted to do without
6  asking the Court, but they didn't, so if I'm to enter an
7  order, my inclination is to make it sufficiently clear that
8  I'm not disposing of substantive rights.  I'm not making a
9  determination of what happens to state law fraudulent
10 conveyance claims upon the expiration of the estate's
11 ability to pursue them, but without standing in the way of
12 such actions.  So let me just, as I look over the various
13 proposed orders, tell you what I would be willing to
14 consider.  I will give counsel a chance to confer and to
15 submit, excuse me, a form of order which would address these
16 issues.  And to the extent the parties cannot agree, then
17 I'll consider competing forms of order.
18          So, not in any particular order, let me just make
19 the following comments.  And I'll work, initially, from the
20 most recently marked-up proposed form of order that Mr.
21 Golden handed me.
22          I would be willing to say something like pursuant
23 to -- well, the failure of the estate to pursue such claims,
24 that creditors have regained the right, if any, to prosecute
25 their respective creditors SLCFC claims.  And I'll stop

100

1  there to say that I'd like -- because I know these orders
2  will come up in state courts, all of the defined terms to be
3  explained in the body of the order itself so that courts
4  don't have to look elsewhere to find out what the order
5  means.
6          With respect to the -- whether a creditors SLCFC
7  claim is or was no longer property of the estate, I don't
8  want to make that declaration, because I'm not sure it ever
9  was.  but again, I'm willing to sign an order that makes it
10 clear that this Court is not standing in the way of anyone
11 who has a right to prosecute such a claim, and that the
12 estate has -- I don't know what the appropriate word is to
13 describe it -- failed to pursue, forfeited -- however
14 counsel can work that out -- the right to pursue it, here in
15 the bankruptcy court.
16          I think, with respect to the stay issue, I think
17 whatever paragraphs are built into an order -- I don't want
18 to make a declaration that 362 doesn't bar the commencement,
19 but I would be willing to say, to the extent the stay does
20 apply, it's lifted, solely to permit the commencement of
21 such litigation.  But I would like the memorialization,
22 until further order of this Court -- and I'll tell you why
23 in a moment -- that no litigation should be pursued or
24 prosecuted, because I am concerned about whether there would
25 be implications with respect to any decision I might make in

1  connection with confirmation of a plan, and I want to
2  reserve, to myself and to the parties who have objected to
3  confirmation, to make whatever arguments they have to make
4  without being hampered by an order that I'm entering here.
5  I don't mean to dispose of any of those rights.
6            The bridge lenders proposed order was more
7  specific in terms of reserving rights, specifically in their
8  proposed paragraph seven, I think you added there eight.
9  And I think that covers the extent of the relief that's been
10 requested.  And any objections that have been raised, I now
11 overrule, again subject to not impairing anybody's right to
12 assert a confirmation objection.
13           Now, are there any questions?
14 (No audible response)
15           THE COURT:  Shocking.  I haven't been that clear
16 in weeks.
17 (Laughter)
18           THE COURT:  Okay.  What I'll do, for calendar
19 purposes, is continue the hearing on this motion to the
20 April 11 date, which is the resumption of the confirmation
21 hearing, but we'll expect, in the interim, that counsels
22 should be able to confer and submit, hopefully within the
23 next week or so, a proposed form of order, with a disk,
24 please.  Any questions about that?
25           MR. ALBERTO:  Your Honor, no questions.  Thanks

1  very much.  I don't have any interest in this matter, if I
2  could be excused.
3            THE COURT:  Certainly.
4            MR. ALBERTO:  Thank you.
5            THE COURT:  Okay.  We'll take just a five-minute
6  break, and I'll -- we'll finish what's on the agenda.
7  (Recess at 12:10 p.m. to 12:17 p.m.)
8            THE CLERK:  All rise.  Please be seated.
9            THE COURT:  Did you address number 21 on the
10 agenda?
11           MR. KANSA:  Your Honor, Ken Kansa from Sidley
12 Austin.  We did skip over item 21, which was the 44th
13 omnibus objection, inadvertently.  The only matter we had,
14 going forward on that point, was a status conference with
15 respect to the claim of Ms. Carol Walker [ph].  The -- we
16 spoke with Ms. Walker on Friday, and she has agreed to
17 continue to her claim, to the best of our knowledge, or we
18 agreed to continue our objection, and she agreed to our
19 continuance.  So as a result, we are not proposing to go
20 forward with the status conference on that today.  We also
21 had a response, at the end of the day yesterday, from
22 Software AG --
23           THE COURT:  I saw it this morning.
24           MR. KANSA:  And we have agreed to continue the
25 objection with respect to that claim as well.  We will

---

103

1  submit a revised form of order under certification of
2  counsel.
3            THE COURT:  Okay.  Thank you.
4            MR. KANSA:  Thank you, Your Honor.
5            THE COURT:  Okay.  Let's turn, lastly, to the
6  debtors' motion concerning advancement of defense costs.
7  Let me ask first, though.  Is the committee still pressing
8  its position?
9            MR. SEIFE:  Good afternoon, Your Honor.  Howard
10 Seife from Chadbourne & Parke for the committee.  Pressing
11 our position on a request for an adjournment or as to the
12 merits?
13           THE COURT:  Yes.
14 (Laughter)
15           MR. SEIFE:  Yes, we are, Your Honor.
16           THE COURT:  Okay.  Okay.  Let me give you my
17 reaction here.  You know, we face these types of issues all
18 the time.  Now, I haven't read the specific policy, but if
19 what the debtor says here is true, not only is there
20 discreet side A coverage, but a provision which says who
21 gets paid first.  And if that's true, unless -- well, I
22 mean, that, 99 percent of the time, answers the question.
23 So putting aside the alleged need for further discovery,
24 because I know the debtor says why that's not necessary,
25 what's different about this situation that I'm missing here?

104

1            MR. SEIFE:  Your Honor, the line of cases, which
2  Your Honor is very familiar with -- familiar with and cited by
3  the parties, I think what's striking about them, in each
4  case, the Court had a fairly fixed and specific idea of what
5  the claims were that were going to be paid.  And if you go
6  through each of those cases, whether it's -- and from this
7  district -- Allied Digital, World Health, Downey.  If you
8  read those opinions, before the Court was a factual showing
9  of exactly what the claims were that were going to be paid.
10 And I know it's easy to dismiss the motion -- or grant the
11 motion on the basis that the proceeds are not property the
12 estate, and we don't challenge that, as a conceptual matter.
13 But the policies themselves are property of the estate.  And
14 every dollar that goes out to pay defense costs is a dollar
15 taken away from potential recoveries down the road for
16 creditors or --
17           THE COURT:  Okay.  So there's --
18           MR. SEIFE:  -- from Tribune's --
19           THE COURT:  There's a reduction in the overall
20 coverage if there's a side A payment.
21           MR. SEIFE:  Yes.
22           THE COURT:  Okay.  Even so, is there, in fact,
23 the -- you know, a priority-of-payment provision in the
24 policy?
25           MR. SEIFE:  There is a priority-of-payment

# EXHIBIT C

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re | ) Chapter 11 |
| | ) |
| TRIBUNE COMPANY, et al.,[1] | ) Case No. 08-13141 (KJC) |
| | ) |
| | ) Jointly Administered |
| Debtors. | ) |
| | ) D.I. 5591, 8201 |

## ORDER GRANTING (I) RELIEF FROM THE AUTOMATIC STAY TO THE EXTENT THE AUTOMATIC STAY BARS COMMENCEMENT BY CREDITORS OF STATE LAW CONSTRUCTIVE FRAUDULENT CONVEYANCE CLAIMS TO RECOVER STOCK REDEMPTION PAYMENTS MADE TO STEP ONE SHAREHOLDERS AND STEP TWO SHAREHOLDERS AND (II) LEAVE FROM THE MEDIATION ORDER TO PERMIT COMMENCEMENT OF LITIGATION ON ACCOUNT OF SUCH CLAIMS

Upon the motion dated March 1, 2011 of Aurelius Capital Management, LP, on behalf of its managed entities (collectively "Aurelius"), Deutsche Bank Trust Company Americas, in its capacity as successor indenture trustee for certain series of senior notes issued by Tribune Company ("Deutsche Bank"), and Law Debenture Trust Company of New York, in

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

its capacity as successor indenture trustee for certain series of senior notes issued by Tribune Company ("Law Debenture" and, collectively with Aurelius, Deutsche Bank and Wilmington Trust Company, in its capacity as successor indenture trustee for the PHONES notes issued by Tribune Company, the "Original Plaintiff Group"), for entry of an order (I) determining that creditors have regained their state law constructive fraudulent conveyance claims to recover stock redemption payments made to Step One Shareholders (as defined below) and Step Two Shareholders (as defined below) due to the expiration of the statute of limitations under 11 U.S.C. § 546(a); (II) determining that the automatic stay does not bar the commencement of litigation by or on behalf of creditors with respect to such claims or, in the alternative, granting relief from the automatic stay to permit the commencement of such litigation; and (III) granting leave from this Court's Order Appointing Mediator [*ECF No.* 5591] (the "Mediation Order") to permit the commencement of such litigation (the "Motion"); and it appearing that good and sufficient notice of the Motion was given and that no other or further notice is necessary; and the Court having considered the Motion at a hearing on March 22, 2011 (the "Hearing"); and the Court having overruled the objections to the Motion for the reasons stated at the Hearing; and after due deliberation and it appearing sufficient cause exists for granting the requested relief, it is therefore

ORDERED, ADJUDGED AND DECREED that:

1.    The Motion is GRANTED to the extent set forth herein.

2.    Because no state law constructive fraudulent conveyance claims against shareholders whose stock was redeemed or purchased in connection with the first step (such shareholders, the "Step One Shareholders") and/or the second step (such shareholders, the "Step Two Shareholders") of the 2007 leveraged buy-out of Tribune Company (the "LBO") were commenced by or on behalf of the Debtors' estates before the expiration of the applicable statute

of limitations under 11 U.S.C. § 546(a), the Debtors' creditors have regained the right, if any, to prosecute their respective state law constructive fraudulent conveyance claims against Step One Shareholders and/or Step Two Shareholders to recover stock redemption/purchase payments made to such shareholders in connection with the LBO (collectively, the "Creditor SLCFC Claims").

3.      To the extent the automatic stay of 11 U.S.C. § 362(a) stays the commencement of any Creditor SLCFC Claims, the automatic stay is hereby lifted to permit the filing of any complaint by or on behalf of creditors on account of such Creditor SLCFC Claims, including, without limitation, any complaint filed by any plaintiff in the Original Plaintiff Group.

4.      To the extent the Mediation Order stays the commencement of any Creditor SLCFC Claims, leave is hereby granted from such Mediation Order to permit the filing of the complaint(s) referenced in paragraph 3 above.

5.      To the extent that a creditor other than a member of the Original Plaintiff Group seeks to file its own complaint with respect to its Creditor SLCFC Claims, such creditor shall file a statement in this Court acknowledging that the creditor shall, except as provided in and in accordance with paragraph 6 below, stay all actions in the state court litigation and will otherwise adhere to the terms of this Order.

6.      Absent further order of this Court, litigation commenced by the filing of any complaint referenced in paragraphs 3 and 5 above shall automatically be stayed in the applicable state court(s) where such complaint(s) are filed, or if not automatic in such state court(s), then application for the stay in accordance with the provisions of this Order shall be made by the Original Plaintiff Group or any other creditor that files its own complaint; provided, however, that during such stay, any party, including any plaintiff in the Original Plaintiff Group, that files such a complaint may: (a) consistent with governing rules, amend such complaint; (b) complete

service of such complaint; and (c) take such steps, including immediately pursuing discovery, as are necessary solely for the purpose of preventing applicable statutes of limitations or other time-related defenses from barring any Creditor SLCFC Claims.

7.     Nothing in this Order shall prejudice the rights of the Official Committee of Unsecured Creditors appointed in the Debtors' chapter 11 cases (the "Creditors' Committee") or any trust established under any plan of reorganization that is confirmed in the Debtors' chapter 11 cases, including to, as the case may be, (i) pursue whatever claims are properly asserted by the Creditors' Committee or by such trusts, in any proper venue, or (ii) amend in any way the adversary complaints (Adv. Pro. Nos. 10-53963 and 10-54010) filed by the Creditors' Committee in these chapter 11 cases, or take or seek to take any other action, or assert any rights or arguments, in connection with such claims or complaints.

8.     Nothing in this Order shall prejudice or impair any claims or defenses of any defendant in any proceeding in respect of a Creditor SLCFC Claim or any objection to any plan of reorganization currently before this Court.[2]

9.     This Court shall, except with respect to the prosecution of the Creditor SLCFC Claims, retain exclusive jurisdiction to hear and decide any and all disputes relating to or arising from this Order.

Dated: _____ , 2011
       Wilmington, Delaware

                                    _____
                                    HONORABLE KEVIN J. CAREY
                                    Chief United States Bankruptcy Judge

cc: William P. Bowden, Esquire[3]

_____

[2] For the avoidance of doubt, by this Order, this Court makes no finding and issues no ruling determining the standing of the Original Plaintiff's Group (or any creditor) to assert the Creditor SLCFC Claims or whether such claims are preempted or otherwise impacted by 11 U.S.C. § 546(e).

[3] Counsel shall serve a copy of this Order on all interested parties and file a Certificate of Service with this Court.

# EXHIBIT D

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

TRIBUNE COMPANY, *et al.*,

                                        Debtors.

---

THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF TRIBUNE COMPANY, *et al.*,

                                        Plaintiff,

                    v.

DENNIS J. FITZSIMONS, *et al.*,

                                        Defendants.

Chapter 11

Cases No. 08-13141 (KJC)
Jointly Administered

Adversary Proceeding No. 10-54010 (KJC)

**Ref. Nos. 8866, 8914, 8919, 8920
and Adv. Nos. 113, 119, 120, 121**

## PROTECTIVE ORDER

Upon consideration of the motion (the "Motion") of the Official Committee of Unsecured Creditors (the "Committee") of Tribune Company and its various debtor-subsidiaries for entry of a protective order relating to the subpoena issued pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure by the Aurelius Plaintiff Group[1] seeking Tribune Company shareholder information, all written responses and objections thereto, and the hearing on the Motion held on May 17, 2011, and for good cause shown, the Court hereby enters the following order pursuant to Rule 26(c) of the Federal Rules of Civil Procedure made applicable by Rule 9014 and Rule 7026 of the Federal Rules of Bankruptcy Procedure to govern disclosure of information and documents in connection with Tribune Company shareholder information sought in connection with the above-captioned bankruptcy proceedings.

---

[1] All capitalized terms not otherwise defined herein shall have the same meaning as ascribed to them in the Motion.

It is hereby ORDERED that:

1.    The Motion is GRANTED.

2.    In connection with this Court's Order Granting (I) Relief from the Automatic Stay to the Extent the Automatic Stay Bars Commencement by Creditors of State Law Constructive Fraudulent Conveyance Claims to Recover Stock Redemption Payments Made to Step One Shareholders and Step Two Shareholders and (II) Leave from the Mediation Order to Permit Commencement of Litigation on Account of Such Claims (entered April 25, 2011) [D.I. 8740], the Committee is authorized to produce the subpoenaed information to the Aurelius Plaintiff Group and to any other party that requests such information pursuant to lawful process (each a "Requesting Party"),[2] provided that the Requesting Party executes and returns to counsel for the Committee a confidentiality agreement in the same form as that attached hereto as Exhibit A.

3.    The Court shall retain jurisdiction to interpret or enforce this Order.

Dated: _Mmy 19_, 2011
Wilmington, Delaware

The Honorable Kevin J. Carey
Chief United States Bankruptcy Judge

---

[2] The Committee has also received a request from counsel for the Retiree Claimants for the same information sought by the Aurelius Plaintiff Group.

2

# EXHIBIT A

# CONFIDENTIALITY AGREEMENT

This Confidentiality Agreement ("Agreement") is entered into as of May __, 2011 by and between Akin Gump Strauss Hauer & Feld LLP ("Akin Gump") and Friedman Kaplan Seiler & Adelman LLP ("Friedman Kaplan" and together with Akin Gump, the "Requesting Party") and Zuckerman Spaeder LLP ("Zuckerman") and Landis Rath & Cobb LLP ("Landis" and together with Zuckerman, the "Producing Party"; and the Requesting Party together with the Producing Party, the "Parties," or singly a "Party"), as co-counsel to the Official Committee of Unsecured Creditors (the "Creditors' Committee").

## WITNESSETH

WHEREAS, Landis and Zuckerman on behalf of the Creditors' Committee filed Adversary Proceeding No. 10-54010 (KJC) on November 1, 2010 (the "Adversary Proceeding") in the bankruptcy cases filed under Chapter 11 of the Bankruptcy Code by the Tribune Company and certain of its affiliates (collectively, the "Debtors") titled In re Tribune Co., et al., Case No. 08-13141 (KJC) (Jointly Administered), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, the Bankruptcy Court has granted parties represented by the Requesting Party leave to commence civil actions to assert certain claims under applicable state law (the "State-Law Actions");

WHEREAS, the Requesting Party served the Producing Party with a Subpoena with a request for documents dated April 29, 2011 (the "Subpoena"), in connection with the Adversary Proceeding and in anticipation of the State-Law Actions;

WHEREAS, in responding to the Subpoena, the Producing Party will provide the Requesting Party with documents, as that term is defined in the subpoena ("Documents"), including Documents that contain or constitute responsive, nonpublic information or confidential or proprietary business, technical or financial information, including nonpublic or confidential information provided by one or more persons or entities (each an "Originating Party") to the Producing Party in connection with the Adversary Proceeding ("Confidential Information");

WHEREAS, any Originating Party is a third-party beneficiary of the Agreement and has an interest in protecting the confidentiality of its Confidential Information.

WHEREAS, the Parties to this Agreement acknowledge the importance of preserving the confidentiality of the Confidential Information and Confidential Information that is designated by any Originating Party as "Highly Confidential—Attorneys' Eyes Only" (as defined below) and agree to abide by this Agreement with respect thereto;

NOW, THEREFORE, the Parties hereby agree as follows:

1.     The term "Confidential Information" shall also include any notes, summaries, compilations, memoranda, minutes or similar materials disclosing or discussing Confidential Information. The Confidential Information shall be furnished or otherwise disclosed or made known to the Requesting Party and its local counsel subject to the terms and conditions of this

Agreement. This Agreement and the obligations of the Requesting Party shall apply to all Confidential Information regardless of whether it is provided by the Producing Party or its counsel, consultants, accountants, experts, auditors, examiners, financial advisors or other agents or professionals (collectively, "Advisors").

2. All Documents that the Producing Party produces in response to the Subpoena, including Documents identifying parties who subsequently may be named as parties in the State-Law Actions, will be used solely in connection with the State-Law Actions and related proceedings. All Confidential Information furnished, disclosed or made known to the Requesting Party or its local counsel by the Producing Party or its Advisors after execution of this Agreement, whether tangible or intangible, and in whatever medium provided, including, but not limited to, in written form, orally, or through any electronic, facsimile or computer-related communication, whether disclosed intentionally or unintentionally, and all information generated by the Requesting Party or its local counsel or any of their Advisors that contains, reflects or is derived from the Confidential Information, shall be used by the Requesting Party and its local counsel solely and exclusively in connection with the State-Law Actions and related proceedings. The Requesting Party and its local counsel and each of their Advisors shall each carry out its obligations hereunder using a reasonable degree of care. For purposes of this Agreement, the term "related proceedings" shall refer to any action or proceeding commenced in any federal or state court or foreign tribunal (including, but not limited to, any court or tribunal to which the State-Law Actions are removed, transferred, or consolidated) for purposes of preserving or recovering assets, acquiring discovery in aid of and/or obtaining, enforcing, or collecting on a judgment in connection with the State-Law Actions.

3. The Producing Party shall produce documents with the same designations as the documents produced to it by the Originating Party. Documents designated as "Highly Confidential—Attorneys' Eyes Only" contain Confidential Information that is competitively sensitive and/or proprietary to the Producing Party, the Debtors or the Originating Party, or from which competitively sensitive or proprietary information belonging to the Producing Party, the Debtors or the Originating Party could be derived. This includes, without limitation: (a) Documents containing information relating to confidential financial and/or business operations, business ventures, strategic plans, processes, designs, applications or trade secrets; and/or (b) information required to be maintained confidential by federal, state or local laws, rules, regulations or ordinances governing or relating to privacy rights, including any and all personally identifiable financial information and nonpublic personal information of customers and consumers. In addition, the Originating Party may have designated as "Confidential" those Documents that it believes in good faith constitute or contain other categories of nonpublic information that is competitive or sensitive in nature.

4. The Requesting Party and its local counsel shall not provide Documents designated "Highly Confidential—Attorneys' Eyes Only" to any person or entity other than to: (a) attorneys, clerical, paralegal and secretarial staff employed by the Requesting Party or its local counsel, who shall be bound by this Agreement; or (b) Advisors of the Requesting Party or its local counsel who agree to be bound by this Agreement by executing the attached Exhibit A.

2

5.     Any Document produced by the Producing Party to the Requesting Party may be provided to Aurelius Capital Management, LP ("Aurelius"), provided that Aurelius agrees to be bound by this Agreement by executing the attached Exhibit A.

6.     Notwithstanding any other provision in this Agreement: (a) parties who have been identified in Documents produced in response to the Subpoena may be publicly named as parties in the State-Law Actions or related proceedings, provided, however, that any such publicly-named party shall not in any way be publicly associated, linked, or otherwise identified as having been at any point in time related to or a customer of the Originating Party; and (b) information concerning the timing and amount of payments to such parties may be included in any pleading filed by the Requesting Party or its local counsel in connection with the State-Law Actions or related proceedings, provided that the Requesting Party or its local counsel takes the necessary steps to file any such pleading under seal or otherwise prevent the public release of such information.

7.     Notwithstanding any other provision in this Agreement, nothing herein shall prevent disclosure of any information: (a) if the Requesting Party receives consent to disclose such information from either the Originating Party or the customer or client of the Originating Party; (b) that is in the public domain at the time of disclosure, was previously in the public domain, or becomes part of the public domain through no fault of the Producing Party, the Requesting Party or Originating Party; or (c) if the Requesting Party lawfully receives such information at a later date from a third party without restriction as to disclosure, provided such third party has the right to make the disclosure to the receiving party.  Upon receiving consent to disclose information pursuant to subsection (a) of this paragraph 7, the Requesting Party shall promptly notify the Producing Party and the Originating Party (if consent is provided by a customer or client of the Originating Party) and identify the information that may be disclosed.

8.     If the Requesting Party objects to the designation of any Documents as "Highly Confidential—Attorneys' Eyes Only" or "Confidential," or seeks a waiver of such designation, the Requesting Party will initially contact the Originating Party in an effort to resolve the dispute and, if that effort is unsuccessful, may apply to the Bankruptcy Court for relief.  Upon initiating contact with the Originating Party under this paragraph 8, the Requesting Party shall promptly notify the Producing Party of such contact.  Absent a written waiver or agreement from the Originating Party or an order of the Bankruptcy Court to the contrary, Documents designated "Highly Confidential—Attorneys' Eyes Only" or "Confidential" may be shown only to the Parties specified above.

9.     Should access to Documents stamped "Highly Confidential—Attorneys' Eyes Only" or "Confidential" be sought from the Requesting Party or its local counsel or any Advisor retained by any of them by any person, pursuant to subpoena or other legal process under applicable law, rule, or regulation, the Requesting Party or its local counsel, as appropriate, will, unless prohibited by applicable law or regulation: (a) promptly notify counsel to the Originating Party, and the Producing Party, in writing of the requested access; (b) prior to producing any such Documents, provide the Originating Party ten (10) business days to seek a court order preventing or limiting the production of such Documents; and (c) use best efforts to enter into a confidentiality agreement with the person seeking access to such Documents that provides the Originating Party substantially the same protections as this Confidentiality Agreement.

10. All Confidential Information, unless otherwise specified in writing, may be used as provided herein, but shall remain the property of the Originating Party. Ninety (90) days following the closing of all State-Law Actions and related proceedings, each recipient of Confidential Information who received such Confidential Information in connection with State-Law Actions and related proceedings agrees to promptly destroy all Confidential Information, including, without limitation, all documents, reports and exhibits provided by or on behalf of the Producing Party and all working papers containing any Confidential Information or extracts therefrom. In addition, and subject to the same proviso as immediately above, each recipient agrees at that time to destroy all copies of any notes, analyses, compilations, studies or other documents that it or its Advisors prepared containing or reflecting any Confidential Information. If requested by the Producing Party or the Originating Party, after destruction each recipient of Confidential Information will deliver a certificate executed by an appropriate officer of the recipient certifying that all such materials have been destroyed.

11. In order to facilitate the requirements of paragraphs 7, 8, 9, and 10 of this Agreement, the Producing Party shall provide the Requesting Party with information sufficient to specifically identify the Originating Party of any Document or information produced to the Requesting Party in response to the Subpoena.

12. The Requesting Party acknowledges that irreparable damage would occur to the Originating Party if any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached and that remedies at law for any actual or threatened breach by it of the covenants contained in this Agreement shall be inadequate and that the Originating Party will be entitled to equitable relief, including injunction and specific performance, in the event of any breach of the provisions of this Agreement, in addition to all other remedies available to the Originating Party at law or in equity. During the pendency of the State-Law Actions and related proceedings, all Parties hereto consent to the jurisdiction and venue of the Bankruptcy Court with respect to any controversy or claims arising out of or related to this Agreement or the use or disclosure or rights pertaining to Confidential Information. Upon conclusion of all State-Law Actions and related proceedings, all Parties consent to the jurisdiction and venue of the federal and state courts located in the State of Delaware with respect to any such controversy or claims. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.

13. The inadvertent production of privileged information by the Producing Party or the Originating Party shall not constitute a waiver of any applicable privilege and the Requesting Party and its local counsel will return to the Producing Party any such materials inadvertently produced.

4

14. Nothing in this Agreement serves as a waiver of any objections that an Originating Party may have in any State Law Actions or related proceedings.

Executed this ___ day of May, 2011.

AKIN GUMP STRAUSS HAUER & FELD LLP

By:_____

FRIEDMAN KAPLAN SEILER & ADELMAN LLP

By:_____

LANDIS RATH & COBB LLP

By:_____

ZUCKERMAN & SPAEDER LLP

By:_____

## EXHIBIT A

In connection with the Confidentiality Agreement (the "Agreement") dated May __, 2011 between Akin Gump Strauss Hauer & Feld LLP ("Akin Gump") and Friedman Kaplan Seiler & Adelman LLP ("Friedman Kaplan" and together with Akin Gump, the "Requesting Party") and Zuckerman Spaeder LLP ("Zuckerman") and Landis Rath & Cobb LLP ("Landis" and together with Zuckerman, the "Producing Party"; and the Requesting Party together with the Producing Party, the "Parties," or singly a "Party"), as co-counsel to the Official Committee of Unsecured Creditors (the "Creditors' Committee"), the undersigned hereby agrees as follows (capitalized terms not defined herein shall have the meanings ascribed to those terms in the Agreement):

1.      The undersigned has (i) been provided with a copy of the Agreement, (ii) read the Agreement, (iii) had an opportunity to review the Agreement with counsel, and (iv) been authorized to execute this Exhibit A to the Agreement.

2.      To the extent that the Requesting Party or its local counsel provides the undersigned with documents designated "Confidential" or "Highly Confidential—Attorneys' Eyes Only" produced pursuant to the Agreement and the Subpoena, the undersigned agrees to be bound by the Agreement and that such documents shall only be used in connection with the State-Law Actions and related proceedings and shall not be provided to anyone other than as permitted under the Agreement.

3.      Should access to Documents designated "Confidential" or "Highly Confidential—Attorneys' Eyes Only" be sought from the undersigned by any person, pursuant to subpoena or other legal process under applicable law, rule, or regulation, the undersigned agrees that, unless prohibited by applicable law or regulation, it will:  (a) promptly notify counsel to the Originating Party, and the Producing Party, in writing of the requested access; and (b) prior to producing such Documents, provide the Originating Party with a reasonable opportunity to seek a court order preventing or limiting the production of such Documents.

4.      The undersigned agrees that the inadvertent production of privileged information by the Originating Party shall not constitute a waiver of any applicable privilege and that it will return to the Originating Party any such materials inadvertently produced.

Agreed and Accepted:                    May ____, 2011

_____
(Company Name)

By:_____
     Name:
     Title:

6

Case 08-13141-BLS   Doc 9453-1   Filed 07/13/11   Page 75 of 117

# EXHIBIT E

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| TRIBUNE COMPANY, *et al.*,[1] | ) | Chapter 11 |
| | ) | Case No. 08-13141 (KJC) |
| Debtors. | ) | Jointly Administered |
| | ) | |

## MOTION BY DEUTSCHE BANK TRUST COMPANY AMERICAS, IN ITS CAPACITY AS SUCCESSOR INDENTURE TRUSTEE FOR CERTAIN SERIES OF SENIOR NOTES, LAW DEBENTURE TRUST COMPANY OF NEW YORK, IN ITS CAPACITY AS SUCCESSOR INDENTURE TRUSTEE FOR CERTAIN SERIES OF SENIOR NOTES AND WILMINGTON TRUST COMPANY IN ITS CAPACITY AS SUCCESSOR INDENTURE TRUSTEE FOR THE PHONES NOTES, TO CLARIFY, SUPPLEMENT OR MODIFY THIS COURT'S ORDER ENTERED APRIL 25, 2011 (ECF 8740) IN RESPECT TO STATE LAW CONSTRUCTIVE FRAUDULENT CONVEYANCE SUITS

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (1068); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WCCT Inc., f/k/a WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

Dated:    Wilmington, DE
          June 13, 2011


McCARTER & ENGLISH, LLP              McCARTER & ENGLISH, LLP
David J. Adler                      Katharine L. Mayer (I.D. No. 3758)
245 Park Avenue                     Renaissance Centre, 405 N. King Street
New York, NY 10167                  Wilmington, DE 19801
212-609-6800                        302-984-6300
*Counsel for Deutsche Bank Trust Company Americas, solely in its capacity as successor Indenture Trustee for certain series of Senior Notes*

KASOWITZ, BENSON, TORRES &           BIFFERATO GENTILOTTI LLC
FRIEDMAN LLP                         Garvan F. McDaniel (I.D. No. 4167)
David S. Rosner                      800 N. King Street, Plaza Level
Sheron Korpus                        Wilmington, Delaware 19801
Christine Montenegro                 (302) 429-1900
1633 Broadway
New York, New York 10019
(212) 506-1700
*Counsel for Law Debenture Trust Company of New York, solely in its capacity as successor Indenture Trustee for certain series of Senior Notes*

                                     SULLIVAN HAZELTINE ALLINSON LLC
BROWN RUDNICK LLP                    William D. Sullivan (I.D. No. 2820)
Robert J. Stark                      Elihu E. Allinson, III (I.D. No. 3476)
Martin S. Siegel                     901 N. Market Street, Suite 1300
Gordon Z. Novod                      Wilmington, DE 19801
Seven Times Square                   302-428-8191
New York, NY 10036
212-209-4800
*Counsel for Wilmington Trust Company, solely in its capacity as successor Indenture Trustee for the PHONES Notes*

2

Deutsche Bank Trust Company Americas, in its capacity as successor Indenture Trustee for certain series of Senior Notes ("Deutsche Bank"), Law Debenture Trust Company of New York, in its capacity as successor Indenture Trustee for certain series of Senior Notes ("Law Debenture") and Wilmington Trust Company in its capacity as successor Indenture Trustee for the PHONES Notes ("Wilmington Trust," and, together with Deutsche Bank and Law Debenture, the "Movants"), hereby move this Court (the "Motion"),[2] by and through their undersigned counsel, for entry of an order clarifying, supplementing and/or modifying in two respects this Court's Order Granting (I) Relief from the Automatic Stay to the Extent the Automatic Stay Bars Commencement by Creditors of State Law Constructive Fraudulent Conveyance Claims to Recover Stock Redemption Payments Made to Step One Shareholders and Step Two Shareholders and (II) Leave from the Mediation Order to Permit Commencement of Litigation of Such Claims [ECF No. 8740] April 25, 2011 (the "SLCFC Claims Order"). Specifically, Movants seek an order confirming that neither the Automatic Stay nor the stay provisions contained in paragraph 6 of the SLCFC Claims Order bar the Movants from (i) moving to consolidate and/or coordinate of the state law fraudulent conveyance suits commenced by Movants, including by moving for consolidation of such federal actions into one Multidistrict Litigation ("MDL") in accordance with 28 U.S.C. § 1407 and (ii) in the event that any one or more courts or parties do not implement and/or abide by the stay of the SLCFC Litigations (as defined below), taking all appropriate actions in response to any motions, pleadings, or orders filed in the SLCFC Litigations. In support of the Motion, the Movants submit as follows:

## BACKGROUND

1.      The state law constructive fraudulent conveyance claims (the "SLCFC Claims")

---

[2] Capitalized terms used, but not defined herein shall bear the meanings ascribed to such terms in the Noteholder Plan [Dkt. 8755] or the SLCFC Claims Motion (defined below) as applicable.

at issue arise out of the Debtors' ill-fated LBO in 2007.  In connection with the LBO and the

subject of the instant Motion, Step One Shareholders and Step Two Shareholders received

approximately $8.3 billion in cash in exchange for their shares of common stock in Tribune.

2.      On March 1, 2011, Movants filed (or subsequently joined in) the Motion Of

Aurelius Capital Management, LP, on Behalf of its Managed Entities, Deutsche Bank Trust

Company Americas, in its Capacity as Successor Indenture Trustee for Certain Series of Senior

Notes, and Law Debenture Trust Company of New York in its Capacity as Successor Indenture

Trustee for Certain Series of Senior Notes, for Entry of an Order (I) Determining that Creditors

Have Retained Their State Law Constructive Fraudulent Conveyance Claims to Recover Stock

Redemption Payments Made to Step One Shareholders and Step Two Shareholders Pursuant to

11 U.S.C. 546(a); (II) Determining that Automatic Stay Does Not Bar Commencement of

Litigation on Account of Such Claims Against Such Shareholders or, in the Alternative, Granting

Relief From Automatic Stay to Permit Commencement of Such Litigation; and (III) Granting

Leave from Mediation Order to Permit Commencement of Such Litigation (the "SLCFC Claims

Motion") [ECF No. 8201].

3.      On April 25, 2011, this Court entered the SLCFC Claims Order (i) acknowledging

that the Debtors' creditors have regained the right to prosecute their respective state law

fraudulent conveyance claims (the "SLCFC Claims"), (ii) lifting the automatic stay to the extent

necessary to permit the Debtors' creditors to cause the filing of SLCFC Claims (iii) immediately

following the filing of the SLCFC Claims in each respective jurisdiction, automatically staying

any such litigation, or requiring that the Movants apply for a stay, provided that Movants may

under all circumstances (a) make amendments to their complaints as permitted by applicable

rules, (b) complete service of their complaints and (c) immediately pursue discovery necessary to

4

prevent applicable statutes of limitation or other time-related defenses from barring any SLCFC Claims.

4.      On June 2 and June 3, 2011, Movants commenced litigation asserting the Creditor SLCFC Claims in three state courts – New York, Delaware and California (the "State Court SLCFC Litigations") – and twenty federal district courts across the country including Arizona, California, Colorado, Connecticut, the District of Columbia, Florida, Illinois, Indiana, Massachusetts, Maryland, Minnesota, North Carolina, New Jersey, Ohio, Pennsylvania, Texas, Virginia, Vermont, Washington and Wisconsin (the "Federal SLCFC Litigations" together with the State Court SLCFC Litigations, the "SLCFC Litigations").[3]

5.      Movants have begun to serve the complaints filed in the SLCFC Litigations and are preparing to file motions with each of the courts presiding over SLCFC Litigations (the "SLCFC Courts") to implement this Court's directive that the litigation be stayed pending further order of this Court.

## RELIEF REQUESTED

6.      Pursuant to 28 U.S.C. § 1407, and Bankruptcy Code sections 105(a) and 362, the Movants respectfully request that the Court enter an order confirming that neither the automatic stay of Bankruptcy Code section 362 nor the provisions of the SLCFC Claims Order prevent the Movants from (i) moving to consolidate and/or coordinate of the SLCFC Litigations, including by moving for consolidation of the Federal SLCFC Litigations into one MDL proceeding in accordance with 28 U.S.C. § 1407 and (ii) in the event any one or more SLCFC Courts or parties do not agree to stay the litigation of the SLCFC Litigations, filing all appropriate responses in connection with any motions, pleadings, or orders filed in the SLCFC Litigations.

---

[3]   In many of the above-listed jurisdictions Movants were required to file two separate (or in limited instances three or four separate) complaints through different counsel as a result of actual or potential conflicts of interest.

## BASIS FOR RELIEF

7.      As the Court is aware, multidistrict litigation involves a special legal procedure whereby multiple lawsuits filed in various federal courts across the country are consolidated and all pre-trial activity, including discovery and motion practice, is overseen and determined by a single federal court.  Cases can be consolidated under the multidistrict litigation procedure if they involve "one or more common questions of fact." 28 U.S.C. § 1407.  28 U.S.C. Section 1407 authorizes the Judicial Panel on Multidistrict Litigation (the "Panel") to order the transfer of a civil action to any district for coordinated or consolidated pretrial proceedings where the Panel determines that such a transfer (1) "will be for the convenience of the parties and witnesses" and (2) "will promote the just and efficient conduct of such actions." 28 U.S.C. § 1407.  Title 28 of the United States Code § 1407(a) provides in relevant part that:

> When civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district for coordinated or consolidated pretrial proceedings. Such transfers shall be made by the judicial panel on multidistrict litigation authorized by this section upon its determination that transfers for such proceedings will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions.

28 U.S.C. §1407.

8.      MDL consolidation promotes judicial efficiency, avoids duplicative -- and potentially inconsistent -- rulings on substantive and procedural motions, and saves courts and the parties' time by avoiding a multiplicity of pre-trial proceedings. *In re Aredia and Zometa Prods. Liab. Litig.*, 429 F. Supp. 2d 1371, 1372 (Jud. Pan. Mult. Lit. 2006) ("Centralization under Section 1407 is necessary in order to eliminate duplicative discovery; prevent inconsistent pretrial rulings; and conserve the resources of the parties, their counsel and the judiciary."); *see also* Desmond T. Barry, Jr., A Practical Guide to the Ins and Outs of Multidistrict Litigation, 64

6

Def. Couns. J. 58, 59 (1997) (noting the purpose of MDL is to "eliminate duplication in discovery, avoid conflicting rulings and schedules, reduce litigation cost, and save time and effort on the part of the parties, the attorneys, the witnesses and the courts").

9.      MDL Consolidation also helps minimize duplicative discovery demands upon the parties and third parties alike. *See e.g.*, MDL No. 2233 (*In Re: Porsche Cars North America, Inc., Plastic Coolant Tubes Products Liability Litigation*); MDL No. 2247 (*In Re: Uponor, Inc., F1807 Plumbing Fittings Products Liability Litigation*). The Movants believe that the SLCFC Litigations pending in multiple federal courts around the country are sound candidates for MDL consolidation.

10.      In order to seek consolidation of cases under the MDL procedures, a party in interest must, *inter alia*, file a motion with the Panel requesting consolidation of the related cases. 28 U.S.C. § 1407. The moving parties must show that there are common questions of fact, that transfer will serve the "convenience of parties and witnesses," and that it will "promote the just and efficient conduct" of the actions to be consolidated. *Id.* Once the motion has been filed, the Panel will determine whether consolidation of the actions into one multidistrict litigation is appropriate.

11.      The Federal SLCFC Litigations represent compelling candidates for MDL consolidation. Consolidation of the Federal SLCFC Litigations into one forum will reduce what would almost certainly amount to an enormous burden on Movants, defendants and the federal judicial system. Like the filing and service of the various SLCFC complaints, which has already been explicitly authorized by this Court, consolidation of the Federal SLCFC Litigations is just one more procedural step in initiating the SLCFC Litigations and will not involve any prosecution of the merits of the SLCFC Claims. Nor will it prevent this Court from issuing

further orders affecting the SLCFC Litigations, in conjunction with its consideration of the two proposed plans of reorganization now before it.

12.     Consolidation of the Federal SLCFC Litigations is in best the interests of the Debtors and their estates as any discovery requests that the parties will no doubt seek to serve on the Debtors in connection with the SLCFC Claims will be consolidated and emanate from one federal forum instead of twenty. Accordingly, the Movants believe that consolidation of the SLCFC Litigations pursuant to the Multidistrict Litigation procedures is appropriate and will serve to benefit all parties in interest. In addition, the Movants believe it is critical to request consolidation of the Federal SLCFC Litigations at this time to prevent a multiplicity of preliminary motions from being filed and heard separately in the twenty federal district courts where the Federal SLCFC Litigations are pending. It is well established that once these actions are transferred to a single federal district, the transferee court will have the authority to decide such preliminary motions, including motions to amend the pleadings, motions to dismiss one or more of the actions for improper service of process under Rule 4, motions to dismiss under Rule 12(b)(6) based on the complaint's failure to state a claim for relief under the applicable substantive law or for any other pleading defect, motions to determine the propriety of allowing the actions to proceed as class action suits under Rule 23, motions asserting the transferor court's lack of personal jurisdiction over the defendant or federal subject matter jurisdiction over the action, and motions for summary judgment. *See generally* Wright & Miller, 15 Fed. Prac. & Proc. Juris. § 3866 (3d ed. 2011) (collecting cases).

13.     Finally, while the Movants will seek to fully implement the stay provisions contained in paragraph 6 of the SLCFC Claims Order, it presently is unknown whether every federal district court and/or defendant will implement and/or abide by the stay provisions. In the

event any order, pleading, motion, application, or other paper is served or filed in the SLCFC Litigations that requires a response, Movants respectfully request that the Court confirm that the SLCFC Claims Order does not bar the Movants from taking all necessary responsive actions, including filing responsive papers. If the Movants are barred by the automatic stay or by this Court's order from responding to any such development in the SLCFC Litigations, the Movants will be severely prejudiced and the prosecution of the SLCFC Claims may be jeopardized.

## CONCLUSION

WHEREFORE, the Movants respectfully request that the Bankruptcy Court enter an order (1) confirming that neither the automatic stay of Bankruptcy Code section 362 nor the provisions of the SLCFC Claims Order prevent the Movants from (i) moving to consolidate and/or coordinate of the Federal SLCFC Litigations, including by moving for consolidation of the Federal SLCFC Litigations into one MDL proceeding in accordance with 28 U.S.C. § 1407 and (ii) in the event any one or more courts or parties do not implement and/or abide by the stay of the SLCFC Litigations, taking all appropriate actions in response to any order, pleading, motion, application, or other paper filed or served in the SLCFC Litigations and (2) granting the Movants any such other relief as the Court may deem just, proper and equitable.

Dated: June 13, 2011

McCARTER & ENGLISH, LLP                    McCARTER & ENGLISH, LLP
David J. Adler
245 Park Avenue
New York, NY 10167                         Katharine L. Mayer (I.D. No. 3758)
212-609-6800                               Renaissance Centre
                                           405 N. King Street
                                           Wilmington, DE 19801
                                           302-984-6300

*Counsel for Deutsche Bank Trust Company Americas, solely in its capacity as successor
Indenture Trustee for certain series of Senior Notes*

11

KASOWITZ, BENSON, TORRES &
FRIEDMAN LLP
David S. Rosner
Sheron Korpus
1633 Broadway
New York, New York 10019
Tel: (212) 506-1700
Fax: (212) 506-1800

BIFFERATO GENTILOTTI LLC

Garvan F. McDaniel (I.D. No. 4167)
800 N. King Street, Plaza Level
Wilmington, Delaware 19801
Tel: (302) 429-1900
Fax: (302) 429-8600

*Counsel for Law Debenture Trust Company of New York, solely in its capacity as successor
Indenture Trustee for certain series of Senior Notes*

BROWN RUDNICK LLP
Robert J. Stark
Martin S. Siegel
Gordon Z. Novod
Seven Times Square
New York, NY 10036
212-209-4800

SULLIVAN HAZELTINE ALLINSON LLC

William D. Sullivan (I.D. No. 2820)
Elihu E. Allinson, III (I.D. No. 3476)
901 N. Market Street, Suite 1300
Wilmington, DE 19801
302-428-8191

*Counsel for Wilmington Trust Company, solely in its capacity as successor Indenture Trustee for the PHONES Notes*

13

Case 08-13141-BLS   Doc 9453-1-9   Filed 07/03/11   Page 88 of 117

# EXHIBIT F

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| TRIBUNE COMPANY, *et al.*,[1] | ) Case No. 08-13141 (KJC) |
| | ) Jointly Administered |
| Debtors. | ) Re: Docket Nos. 9248, 9293, 9335 |
| | ) |

### ORDER GRANTING MOTION BY DEUTSCHE BANK TRUST COMPANY AMERICAS, IN ITS CAPACITY AS SUCCESSOR INDENTURE TRUSTEE FOR CERTAIN SERIES OF SENIOR NOTES, LAW DEBENTURE TRUST COMPANY OF NEW YORK, IN ITS CAPACITY AS SUCCESSOR INDENTURE TRUSTEE FOR CERTAIN SERIES OF SENIOR NOTES AND WILMINGTON TRUST COMPANY IN ITS CAPACITY AS SUCCESSOR INDENTURE TRUSTEE FOR THE PHONES NOTES, TO CLARIFY, SUPPLEMENT OR MODIFY THIS COURT'S ORDER ENTERED APRIL 25, 2011 (ECF 8740) AND CROSS-MOTION OF CERTAIN STATE LAW CONSTRUCTIVE FRAUDULENT CONVEYANCE DEFENDANTS IN RESPECT OF STATE LAWCONSTRUCTIVE FRAUDULENT CONVEYANCE SUITS

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WCCT Inc., f/k/a WTXX Inc. (1268).  The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

Upon consideration of the motion (the "Motion")[2] dated June 14, 2011 of Deutsche Bank Trust Company Americas, in its capacity as successor indenture trustee for certain series of senior notes issued by Tribune Company, Law Debenture Trust Company of New York, in its capacity as successor indenture trustee for certain series of senior notes issued by Tribune Company, and Wilmington Trust Company, in its capacity as successor indenture trustee for the PHONES notes issued by Tribune Company (collectively, the "Movants"), for entry of an order clarifying, supplementing, or modifying the Court's *Order Granting (I) Relief From the Automatic Stay to the Extent the Automatic Stay Bars Commencement By Creditors of State Law Constructive Fraudulent Conveyance Claims to Recover Stock Redemption Payments Made to Step One Shareholders and Step Two Shareholders and (II) Leave From the Mediation Order to Permit Commencement of Litigation on Account of Such Claims*, dated April 25, 2011 [Dkt. 8740] (the "SLCFC Claims Order") to confirm that neither the automatic stay of Bankruptcy Code section 362 nor the provisions of the SLCFC Claims Order prevent the Movants from (i) moving to consolidate and/or coordinate the state law constructive fraudulent conveyance actions commenced by the Movants, including, without limitation, by moving to consolidate them into one MDL proceeding pursuant to 28 U.S.C. § 1407 and (ii) in the event that any one or more SLCFC Courts or parties other than the Movants do not agree to stay the litigation of the state law constructive fraudulent conveyance actions commenced by the Movants, taking appropriate action to enforce the stay in the first instance and filing all appropriate responses in connection with any motions, pleadings, or orders filed in such actions that were not so stayed; and upon the responses to the Motion filed by certain retirees (the "Retiree Plaintiffs") of the Debtors who commenced four separate state law constructive fraudulent conveyance actions; and upon

---

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

2

consideration of the cross-motion (the "Cross-Motion") dated June 21, 2011 of JPMorgan

Securities LLC, JPMorgan Clearing Corp., JPMorgan Chase Bank, N.A., Citicorp North

America, Inc., Citigroup Global Markets Inc., Merrill Lynch Capital Corporation, Merrill Lynch,

Pierce, Fenner & Smith Incorporated, Merrill Lynch & Co. Inc. and their affiliates, Bank of

America, N.A. and Banc of America Securities LLC, for entry of an order to clarify, supplement

or modify this Court's SLCFC Claims Order to permit defendants in any litigation concerning

the SLCFC Claims (hereinafter, the "SLCFC Actions") to seek to remove those suits to federal

court; and it appearing that good and sufficient notice of the Motion and Cross-Motion was given

and that no other or further notice is necessary; and the Court having considered the Motion and

the Cross-Motion at a hearing on June 28, 2011 (the "Hearing"); and all objections having been

resolved; and after due deliberation and it appearing sufficient cause exists for granting the

requested relief, it is therefore

ORDERED, ADJUDGED AND DECREED that:

1.      The Motion and the Cross-Motion are GRANTED to the extent set forth herein.

2.      The SLCFC Claims Order is hereby supplemented to provide that (a) any plaintiff

or defendant in the SLCFC Actions is authorized to move to consolidate and/or coordinate the

SLCFC Actions, including, without limitation, by making a motion pursuant to 28 U.S.C. § 1407

and the applicable Rules of Procedure of the U.S. Judicial Panel on Multidistrict Litigation (the

"JPML Rules"), or any applicable state rules, or to move to amend or respond to such a motion;

(b) any defendant in the SLCFC Actions commenced in state court may seek to remove those

actions on any applicable ground; and (c) any party opposing such removal may file a timely

motion to remand and any party may respond to any such motion.

3.      Further, in the event that any one or more courts or parties in the SLCFC Actions do not agree to stay the litigation of the SLCFC Actions, any plaintiff or defendant in the SLCFC Actions is authorized to take all appropriate actions to enforce the stay in the first instance and to file all appropriate responses in connection with any motions, pleadings or orders filed in the SLCFC Actions that were not so stayed.

4.      Nothing in the Order shall prejudice or impair any claims or defenses of any defendant in any proceeding in respect of a SLCFC Claim or any objection to any plan of reorganization currently before this Court.[3]

5.      This Court shall, except with respect to the prosecution of the SLCFC Claims, retain exclusive jurisdiction to hear and decide any and all disputes relating to or arising from this Order.

Dated:      June 28, 2011
        Wilmington, Delaware

HONORABLE KEVIN J. CAREY
Chief United States Bankruptcy Judge

---

[3] For the avoidance of doubt, by this Order, this Court makes no finding and issues no ruling determining the standing of the Original Plaintiff's Group (or any creditor) to assert the Creditor SLCFC Claims or whether such claims are preempted or otherwise impacted by 11 U.S.C. §546(e).

4

Robert J. Lack
Amy C. Brown
Ricardo Solano Jr.
Timothy M. Haggerty
FRIEDMAN KAPLAN SEILER & ADELMAN LLP
One Gateway Center, 25th Floor
Newark, NJ 07102-5311
(973) 877-6400
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

-----------------------------------------------------------------x
                    :

DEUTSCHE BANK TRUST COMPANY     :
AMERICAS, in its capacity as successor indenture  :
trustee for certain series of Senior Notes, *et al.*,  :
                    :

          Plaintiffs,    :  Civil Action No. 11-3148 (WJM) (JAD)
                    :

     - v. -           :
                    :

MERRILL LYNCH TRUST COMPANY,    :  **Motion Day: August 1, 2011**
A DIVISION OF BANK OF AMERICA, N.A.,  :
*et al.*,                  :
                    :

         Defendants.   :
                    :
-----------------------------------------------------------------x

**MEMORANDUM OF LAW IN SUPPORT
OF PLAINTIFFS' MOTION TO STAY**

999655.2

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ..................................................................................................ii

PRELIMINARY STATEMENT ........................................................................................... 1

    A.    The Tribune Bankruptcy Proceeding and the Competing Plans of
Reorganization.............................................................................................. 5

    B.    The SLCFC Order and Commencement of Plaintiffs' 50 Actions......................... 7

ARGUMENT ................................................................................................................. 9

    A.    The Litigation Over Tribune's Plan Confirmation Substantially Impacts
This Action, and the SLCFC Order Requiring a Stay Should Be Given
Due Deference .............................................................................................. 9

    B.    The Stay Is Appropriate Given Plaintiffs' Forthcoming MDL Motion................. 11

        1.    The Stay Will Conserve Judicial Resources................................................. 11

        2.    The Balance of Harms Favors Granting the Requested Stay ..................... 13

    C.    Plaintiffs Should Be Permitted During the Stay to File a Rule 26(d)(1)
Motion Seeking Leave to Conduct Limited Discovery to Confirm That All
Proper Parties Have Been Identified, Named, and Served With Process............. 14

    D.    Should the Court Deny the Stay Motion, Plaintiffs Request That
Defendants Be Prevented From Filing Any Answers or Other Pleadings
Responsive to the Complaint Until Such Time as the Parties Have
Convened for a Case Management Conference and the Court Enters a
Case Management Order ................................................................................ 17

CONCLUSION ............................................................................................................. 17

## TABLE OF AUTHORITIES

*Page(s)*

**CASES**

*Bechtel Corp. v. Local 215, Laborers' Int'l Union,*
544 F.2d 1207 (3d Cir. 1976) ................................................................................ 9

*Cheyney State Coll. Faculty v. Hufstedler,*
703 F.2d 732 (3d Cir. 1983) ................................................................................. 14

*In re CitiFinancial Servs. Inc. Prescreened Offer Litig.,*
474 F. Supp. 2d 1359 (J.P.M.L. 2007) ................................................................. 12

*In re Ford Motor Co. Crown Victoria Police Interceptor Prods. Liab. Litig.,*
229 F. Supp. 2d 1377 (J.P.M.L. 2002) ................................................................. 12

*Good v. Prudential Ins. Co. of Am.,*
5 F. Supp. 2d 804 (N.D. Cal. 1998) ...................................................................... 11

*Hertz Corp. v. The Gator Corp.,*
250 F. Supp. 2d 421 (D.N.J. 2003) ......................................................... 9, 11, 13, 14

*In re Integrated Agri, Inc.,*
313 B.R. 419 (Bankr. C.D. Ill. 2004) ..................................................................... 6

*McDonald v. Novartis Pharmaceuticals Corp.,*
No. 07-655, 2007 WL 4191750 (D.N.J. Nov. 20, 2007) ....................................... 11

*Nielson v. Merck & Co.,*
No. C07-00076 (MJJ), 2007 WL 806510 (N.D. Cal. 2007) ................................. 13

*In re NorthStar Educ. Fin. Inc.,*
588 F. Supp. 2d 1370 (J.P.M.L. 2008) ................................................................. 12

*Resco Products, Inc. v. Bosai Miner Groups Co.,*
No. 06-235, 2010 U.S. Dist. LEXIS 54949 (W.D. Pa. June 4, 2010) ................... 14

*Rivers v. The Walt Disney Co.,*
980 F. Supp. 1358 (C.D. Cal 1997) .................................................................. 12, 13

*SmithKlineBeecham Corp. v. Apotex Corp.,*
No. 99-CV-4304, 2004 U.S. LEXIS 13904 (E.D. Pa. July 16, 2004) ................... 14

*In re Upjohn Co. Antibiotic Cleocin Prods. Liab Litig.,*
81 F.R.D. 482 (E.D. Mich. 1979) .......................................................................... 13

*Page(s)*

*VPR Int. v. Does 1-17,*
   No. 11-Civ-01494 (LB), 2011 WL 1465836 (N.D. Cal. Apr. 15, 2011)................................ 16

*Weinke v. Microsoft Corp.,*
   84 F. Supp. 2d 989 (E.D. Wis. 2000) ................................................................................ 13

*Wyeth v. Abbott Laboratories,*
   No. 09-4850 (JAP), 2011 WL 380902 (D.N.J. Feb. 1, 2011) .................................................. 9

*Yates v. Portofino Equity & Mgmt.,*
   No. 08-Civ-00324 (PAB) (MJW), 2009 WL 416441 (D. Colo. Feb. 19, 2009) .................... 16

STATUTES

11 U.S.C. § 362(a) ............................................................................................................ 3

11 U.S.C. § 546(a) ....................................................................................................... 2, 5

11 U.S.C. § 546(e) .......................................................................................................... 10

28 U.S.C. § 157 ............................................................................................................... 11

28 U.S.C. 1407 ................................................................................................................ 12

28 U.S.C. § 1334(b) ........................................................................................................ 11

OTHER AUTHORITIES

Fed. R. Civ. P. 4(d) ........................................................................................................... 8

Fed. R. Civ. P. 15 ............................................................................................................ 16

Fed. R. Civ. P. 21 ............................................................................................................ 16

Fed. R Civ. P. 26(d)(1) ................................................................................................... 16

Fed. R. Civ. P. 26(f) ........................................................................................................ 16

Fed. R. Civ. P. 41(a) ....................................................................................................... 16

As directed by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which authorized the commencement of this action, plaintiffs Deutsche Bank Trust Company Americas, Law Debenture Trust Company of New York, and Wilmington Trust Company (collectively, "Plaintiffs"), in their capacity as successor indenture trustees for certain Notes issued by Tribune Company ("Tribune"), hereby request that this Court stay the time for the defendants to answer or otherwise respond to the Complaint in this action until the earliest of (i) October 31, 2011, without prejudice to any further motion by Plaintiffs to seek a later date or otherwise extend the stay, (ii) order by the Bankruptcy Court in Tribune's chapter 11 proceedings (the "Bankruptcy Proceeding") (*In re Tribune Co.*, No. 08-13141 (KJC) (Del. Bankr.)) confirming a plan of reorganization, or (iii) further order of the Bankruptcy Court or this Court.[1]  As shown herein, the requested stay will benefit the Court and all the parties in interest to this action.

## PRELIMINARY STATEMENT

This litigation arises from the failed leveraged buyout of Tribune in 2007 (the "LBO").  Financial and industry analysts at the time described this transaction as one of the most highly leveraged and ill-advised in history.  Compl. ¶ 1.  Despite Tribune's declining business, pursuant to the LBO Tribune paid its former shareholders $8.3 billion in cash at the expense of Tribune's existing creditors, and precipitated the company's descent into bankruptcy shortly thereafter.  *Id*.  In this action, Plaintiffs assert claims that seek to avoid and recover, as constructively fraudulent conveyances, all transfers of proceeds received by each defendant in

---

[1] Plaintiffs are moving for an identical stay in the related action pending in this Court, *Deutsche Bank Trust Co. Americas v. Sumitomo Trust & Banking Co. (U.S.A.)*, No. 11-3147 (WJM) (JAD).

1

connection with the LBO (and together with the state law constructive fraudulent conveyance cases brought by Plaintiffs in 21 other states, the "Creditor SLCFC Claims").  Compl. ¶ 2.

The Honorable Kevin J. Carey, Chief Judge of the Bankruptcy Court, has presided over the Tribune Bankruptcy Proceeding since the Debtors' chapter 11 filings in 2008. On April 25, 2011, Chief Judge Carey issued an order (the "SLCFC Order") providing that sections 362(a) or 546(a) of the Bankruptcy Code do not bar Plaintiffs from *commencing* state law constructive fraudulent conveyance claims against former Tribune shareholders (SLCFC Order ¶¶ 2, 3, attached as Exhibit C to the Declaration of Hal Neier dated June 29, 2011 (the "Neier Decl.")).  The SLCFC Order also directed that, with certain exceptions, litigation of the Creditor SLCFC Claims be stayed in order for the Bankruptcy Court to address certain objections by parties in interest challenging proposed plans of reorganization.  Neier Decl. Ex. C, ¶ 6;[2] *see also* Transcript of Proceedings before Chief Judge Carey, Mar. 22, 2011, at 100-01,

---

[2] The SLCFC Order states, in part:

2.      . . . "[T]he Debtors' creditors have regained the right, if any, to prosecute their respective state law constructive fraudulent conveyance claims against Step One Shareholders and/or Step Two Shareholders to recover stock redemption/purchase payments made to such shareholders in connection with LBO (collectively, the "Creditor SLCFC Claims").

3.      To the extent the automatic stay of 11 U.S.C. § 362(a) stays the commencement of any Creditor SLCFC Claims, the automatic stay is hereby lifted to permit the filing of any complaint by or on behalf of creditors on account of such Creditor SLCFC Claims, including, without limitation, any complaint filed by any plaintiff in the Original Plaintiff Group [which includes the Plaintiffs in this action].

6.      Absent further order of this Court, litigation commenced by the filing of any complaint . . . shall automatically be stayed in the applicable state court(s) where such complaint(s) are filed, or if not automatic in such state court(s), then application for the stay in accordance with the provisions of this Order shall be made by the Original Plaintiff Group . . . ; provided, however, that during such stay, any party . . . that files such a complaint may: (a) consistent with governing rules, amend such complaint; (b) complete service of such complaint; and (c) take such steps, including immediately

relevant portion attached as Neier Decl. Ex. B.  Plaintiffs hereby request that the Court stay the

time for the defendants to respond to the Complaint until the earliest of October 31, 2011

(without prejudice to any further motion by Plaintiffs to seek a later date or otherwise extend the

stay), such time as the Bankruptcy Court confirms a plan of reorganization, or further Order of

the Bankruptcy Court or this Court.[3]  Such a stay would be an appropriate and sensible exercise

of this Court's discretion.

   *First*, the SLCFC Order requires that this litigation be temporarily stayed.  Neier

Decl. Ex. C, ¶ 6.  While Plaintiffs were permitted to initiate suit against the defendants to toll any

applicable statute of limitations, Chief Judge Carey has not yet ruled on certain objections to the

debtors' plan of reorganization that could impact the Creditor SLCFC Claims.  Rather,

recognizing that the Bankruptcy Court's confirmation of a plan of reorganization, and resolution

of objections thereto, have the possibility of affecting Plaintiffs' claims, *see* Neier Decl. Ex. B at

100-01, the Bankruptcy Court ordered that Plaintiffs' cases be stayed subsequent to their

commencement, *see* Neier Decl. Ex. C, ¶ 6.  Plaintiffs respectfully submit that this determination

should be accorded due deference by this Court.

   *Second*, Plaintiffs intend to file a motion in the next several weeks requesting that

the Judicial Panel on Multidistrict Litigation (the "MDL Panel") transfer and consolidate this

---

   pursuing discovery, as are necessary solely for the purpose of preventing applicable
   statutes of limitations or other time-related defenses from barring any Creditor SLCFC
   Claims.

     8.   Nothing in this Order shall prejudice or impair any claims or defenses of
   any defendant in any proceeding in respect of a Creditor SLCFC Claim . . . .

 [3] Plaintiffs also request that when the stay is lifted, the Court set a schedule for the
defendants to answer the Complaint or otherwise move, and for Plaintiffs to file briefs in
opposition thereto.

action along with the other Creditor SLCFC Claims Plaintiffs filed in federal courts across the country against other Tribune shareholders who received proceeds from the LBO (the "MDL Motion").[4]  Neier Decl. ¶ 17.  This Court can properly exercise its discretion to hold this action in abeyance while the MDL Motion is resolved.  Under these circumstances, the stay promotes judicial economy and efficiency, will not prejudice parties, and is moderate in duration.  Absent MDL consolidation, numerous federal district courts will need to individually adjudicate numerous duplicative motions and discovery disputes involving common questions of fact and law, all arising out of the single LBO transaction.  By temporarily staying this action, the Court can prevent unnecessary expenditure of time and resources.

While the stay will obviate the need for the defendants to answer or otherwise respond to the Complaint, or otherwise engage in any substantive litigation of the merits, Plaintiffs may require the ability during the pendency of the stay to engage in limited discovery from the defendants and third parties to ensure that former shareholders of Tribune who are subject to suit in this action are identified, properly named in the Complaint, and effectively served with process.  The SLCFC Order specifically contemplated the potential need for such discovery and provided that, notwithstanding the stay, Plaintiffs be permitted to conduct discovery limited in scope to these jurisdictional and procedural matters, as well as to amend the Complaint.  Neier Decl. Ex. C, ¶ 6.

---

[4] On June 13, 2011, Plaintiffs filed a motion before the Bankruptcy Court seeking confirmation that the stay provisions in the SLCFC Order do not prevent Plaintiffs from requesting that the MDL Panel consolidate and transfer all of Plaintiffs' federally filed cases.  Neier Decl. ¶ 15.  On June 28, 2011, the Bankruptcy Court granted Plaintiffs' motion to clarify that the automatic stay does not prohibit Plaintiffs from making the MDL Motion or from taking all appropriate steps to enforce the stay mandated by the SLCFC Order.  *Id.* ¶ 16.

Therefore, Plaintiffs request an order that expressly carves out of the stay the ability for Plaintiffs to make a future motion before the Court to seek limited early discovery pursuant to Federal Rule of Civil Procedure 26(d)(1), as well as permits Plaintiffs to amend the Complaint pursuant to Rule 15 and, if appropriate, add, drop, or sever parties or claims by use of Rules 21 or 41(a).  Plaintiffs also request that the Court, notwithstanding the stay, require that the defendants or their counsel enter an appearance in the action, so that the defendants or their counsel will be known and can readily be served with any further notices, orders, or other pleadings in the case.

In the event that the Court denies this motion, Plaintiffs respectfully request that the Court order that the time for any motions to dismiss be deferred until after the parties have convened for a case management conference and the Court has entered a case management order.  Given the complexity of this action (especially when considered along with the number of defendants, including class action defendants, in related actions nationwide), the parties and the Court would benefit from postponing motion practice in response to the Complaint until a coordinated and practical briefing schedule has been established.

## FACTUAL BACKGROUND

**A.**   **The Tribune Bankruptcy Proceeding and the Competing Plans of Reorganization**

On or about April 1, 2007, the board of directors of Tribune approved the LBO, which resulted in the transfer of ownership of Tribune and its subsidiaries to a newly formed employee stock ownership plan.  Compl. ¶ 56.  "Step One" of the LBO closed on June 4, 2007, at which time certain shareholders received approximately $4.3 billion in exchange for their shares of Tribune stock.  *Id*. ¶ 6.  "Step Two" of the LBO was completed in December 2007, at which time certain shareholders received approximately $4.0 billion in exchange for their shares of Tribune common stock.  *Id*.

999655.2

5

A year later, Tribune and many of its operating subsidiaries (collectively the "Debtors") jointly filed for bankruptcy.  *Id.* ¶ 107.  Upon the December 8, 2008 petition date, Bankruptcy Code section 546(a) afforded the Debtors' estates a two-year period in which they had the exclusive right, to the exclusion of Plaintiffs and other creditors, to commence state law fraudulent conveyance claims.  *See, e.g., In re Integrated Agri, Inc.*, 313 B.R. 419, 427-28 (Bankr. C.D. Ill. 2004).

On November 1, 2010, with leave of the Bankruptcy Court and on behalf of the Debtors' estates, the Official Committee of Unsecured Creditors (the "Committee") initiated an adversary proceeding against, *inter alia*, all of Tribune's shareholders who received proceeds from the LBO, including the defendants in the instant action, alleging that the LBO was an *intentional* fraudulent conveyance (the "Committee Action") (*Official Committee of Unsecured Creditors of Tribune Co. v. FitzSimons*, Adv. Pro. No. 10-54010 (KJC) (Del. Bankr.)).  The Committee Action does not include state law constructive fraudulent conveyance claims against shareholders to recover Step One and Step Two transfers.  The statutory period during which the Debtors had exclusive standing to bring state law constructive fraudulent conveyance claims expired on December 8, 2010 (two years after the petition date), at which time Plaintiffs, and other creditor parties, regained their ability to commence such actions on their own behalf.  Neier Decl. ¶ 3.

On February 4, 2011, the Debtors, the Committee, and certain lender parties in interest filed their Second Amended Joint Plan of Reorganization for the Debtors (the "DCL Plan").  *Id.* ¶ 4.  On February 25, 2011, the largest noteholder of the Debtors, and Plaintiffs herein, filed a competing plan of reorganization (the "Noteholder Plan" and together with the DCL Plan, the "Competing Plans").  *Id.*  Both Competing Plans included a mechanism by which

state law constructive fraudulent conveyance claims, such as those asserted in this action, could

be transferred to and litigated by a Creditors' Trust, and proceeds from such actions would flow

to beneficiaries according to terms of the Competing Plans.  *Id.* ¶ 5.  The Robert R. McCormick

Tribune Foundation and the Cantigny Foundation (together, the "Plan Opponents") objected to

both of the Competing Plans because they claimed that "(a) the proposed Creditors' Trust would

not have standing to bring the Constructive Fraud Claims against the selling Shareholders, and

(b) section 546(e)'s safe harbor provision preempts all attempts to assert the Constructive Fraud

Claims."  *Id.* ¶ 6.

      The Bankruptcy Court held a two-week trial on the Competing Plans of

reorganization, and closing argument occurred on June 27, 2011.  *Id.* ¶ 8.

**B.**      **The SLCFC Order and Commencement of Plaintiffs' 50 Actions**

      Assuming *arguendo* that Plaintiffs' Creditor SLCFC Claims are subject to a four-

year statute of limitations period applicable in certain states, the time for filing suit against

defendants who received the "Step One" transfers would arguably have expired on or shortly

after June 4, 2011.  On March 1, 2011, to prevent state law causes of action from arguably

becoming time-barred while the litigation over the Competing Plans continued in front of Chief

Judge Carey, Plaintiffs moved the Bankruptcy Court for an order (i) determining that eligible

creditors regained the right to prosecute the Creditor SLCFC Claims because the statute of

limitations for the Debtors to commence state law fraudulent conveyance actions expired on

December 8, 2010, and the Debtors' estates failed to assert such claims; (ii) determining that the

automatic stay does not bar commencement of the Creditor SLCFC Claims by Plaintiffs; and

(iii) granting leave from a mediation order by the Bankruptcy Court to permit commencement of

the Creditor SLCFC Claims (the "Standing Motion," attached as Neier Decl. Ex. A).  On April

25, 2011, the Bankruptcy Court granted the Standing Motion and issued the SLCFC Order

permitting Plaintiffs to commence state law constructive fraudulent conveyance litigations, and

pursue discovery as necessary to prevent any applicable statute of limitations or time-related

defenses from barring Plaintiffs' claims – provided that Plaintiffs filed an application for a stay

after the litigation commenced.  *See* Neier Decl. Ex. C, ¶¶ 2-4, 6.  At oral argument on the

Standing Motion, Judge Carey stated:

> I would be willing to say, to the extent the [Bankruptcy Code
> section 362 automatic] stay does apply, it's lifted, solely to permit
> the commencement of such [state law] litigation.  But I would like
> the memorialization, until further order of the Court … *that no
> litigation should be pursued or prosecuted, because I am concerned
> about whether there would be implications with respect to any
> decision I might make in connection with confirmation of a plan*,
> and I want to reserve, to myself and to the parties who have objected
> to confirmation, to make whatever arguments they have to make
> without being hampered by an order that I'm entering here.  I don't
> mean to dispose of any of those rights.

Neier Decl. Ex. B, at 100-01 (emphasis added).

On June 2, 2011, Plaintiffs commenced this action, and are now in the process of

serving the defendants with the Complaint.[5]  Neier Decl. ¶ 13.  Plaintiffs also filed

49 substantially similar complaints, commencing suits in 21 other states.  All of the lawsuits

were filed in federal district courts, with the exception of ten cases filed in New York, Delaware,

and California state court.[6]  *Id.*  The litigations in the other states, like here, include constructive

fraudulent conveyance claims against named defendants, as well as in some cases claims against

---

[5] Plaintiffs have mailed the defendants copies of the Complaint, along with requests that the
defendants waive service of the summons pursuant to Fed. R. Civ. P. 4(d).  The defendants' time
to return the waiver of service forms has not yet expired.

[6] Plaintiffs were required to file multiple suits within certain jurisdictions, including this
jurisdiction, because in some circumstances Plaintiffs' counsel were conflicted from suing
particular defendants, and it was thus necessary to initiate separate litigations prosecuted by
different counsel.

a defendant class.  Plaintiffs intend to move for transfer and consolidation of the federal cases

before the MDL Panel so they can respond in a coordinated rather than piecemeal way to what

will be numerous similar motions filed by the more than 1,000 defendants.  *Id.* ¶¶ 14-16.

## ARGUMENT

Staying defendants' time to respond to the Complaint for approximately four

months – while the Tribune Bankruptcy Proceeding concludes litigation over plan confirmation

and Plaintiffs' forthcoming MDL Motion is pending – is well within this Court's sound

discretion.  "It is well-established that 'the power to stay proceedings is incidental to the power

inherent in every court to control the disposition of the causes on its docket with economy of

time and effort for itself, for counsel, and for litigants.'"  *Wyeth v. Abbott Laboratories*, No. 09-

4850 (JAP), 2011 WL 380902, at *1 (D.N.J. Feb. 1, 2011) (quoting *Landis v. North Am. Co.*, 299

U.S. 248, 254 (1936)).  District courts have broad discretion to stay proceedings "so as to

promote fair and efficient adjudication." *Hertz Corp. v. The Gator Corp.*, 250 F. Supp. 2d 421,

425 (D.N.J. 2003) (quoting *U.S. v. Breyer*, 41 F.3d 884, 893 (3d Cir.1994) (quotations omitted)).

The requested stay is appropriate and should be granted.

A.    **The Litigation Over Tribune's Plan Confirmation Substantially Impacts This
      Action, and the SLCFC Order Requiring a Stay Should Be Given Due Deference**

Courts recognize that a stay is appropriate where, as here, another pending matter

could have a substantial impact on that litigation.  *Bechtel Corp. v. Local 215, Laborers' Int'l*

*Union*, 544 F.2d 1207, 1214 (3d Cir. 1976) ("In the exercise of sound discretion, a court may

hold one lawsuit in abeyance to abide the outcome of another which may substantially affect it or

be dispositive of the issues.").  The connection between the Bankruptcy Court's pending

determination of the Plan Opponents' objection, and the Creditor SLCFC Claims asserted here,

justifies the stay.

The Plan Opponents submit that neither of the Competing Plans can be confirmed because they provide for the litigation of the Creditor SLCFC Claims, which according to the Plan Opponents violate provisions of the Bankruptcy Code.  Neier Decl. ¶ 7.  Specifically, the Plan Opponents argue that Plaintiffs lack standing to bring the Creditor SLCFC Claims because the Debtors retained the exclusive ability to attack the LBO payments to the shareholders when the Committee Action was brought on the Debtors' behalf.  *Id.*  Moreover, the Plan Opponents object to the Competing Plans based on their belief that Bankruptcy Code section 546(e) bars state law causes of action to recover payments to stockholders in exchange for the transfer of securities.  *Id.*  Plaintiffs believe that the Plan Opponents are wrong on all counts, and have challenged the objection in the Bankruptcy Proceeding.  However, given the potential impact of the plan confirmation process on the Creditor SLCFC Claims, a stay of this action pending a determination of the Plan Opponents' objection is the most prudent course of action.

Chief Judge Carey recognized the potential for plan litigation to impact Plaintiffs' ability to successfully prosecute the Creditor SLCFC Claims. Yet, the Bankruptcy Court recognized that these causes of action should not be allowed to become time-barred during the period required for the Bankruptcy Court to confirm a plan of reorganization.  Neier Decl. Ex. C, ¶¶ 2-3; *see also* Neier Decl. Ex. B, at 100-01.  Therefore, the SLCFC Order requires that a "[State Shareholder Avoidance Action] commenced by the filing of any complaint . . . shall automatically be stayed in the applicable state court(s) where such complaint(s) are filed, or if not automatic in such state court(s), then application for the stay in accordance with the provisions of this Order shall be made by the [] Plaintiff Group or any other creditor that files its own complaint."  *See* Neier Decl. Ex. C, ¶ 6.  Plaintiffs, therefore, request that this Court recognize the SLCFC Order and defer to Chief Judge Carey's determination that this action

10

should be held in abeyance while the related litigation over the Competing Plans and the Plan

Opponents' objection is resolved.

**B.      The Stay Is Appropriate Given Plaintiffs' Forthcoming MDL Motion**

Plaintiffs intend to file their MDL Motion to consolidate and transfer the nearly

40 cases Plaintiffs commenced in numerous federal jurisdictions for coordinated pretrial

treatment pursuant to 28 U.S.C. § 1407.  Neier Decl. ¶ 17.  Federal courts routinely determine

that it is appropriate to stay preliminary pretrial proceedings while a motion to transfer is

pending before the MDL Panel.  *See Hertz Corp.*, 250 F. Supp. at 428 (granting motion to stay

proceedings pending MDL Panel's resolution of transfer motion); *Good v. Prudential Ins. Co. of

Am.*, 5 F. Supp. 2d 804, 809 (N.D. Cal. 1998) ("Courts frequently grant stays pending a decision

by the MDL Panel").  The factors relevant to deciding whether to grant a stay strongly favor

issuance of the stay here.  *See McDonald v. Novartis Pharmaceuticals Corp.*, No. 07-655, 2007

WL 4191750, at *1 (D.N.J. Nov. 20, 2007) (noting that "[a]mong the factors that courts take into

account when assessing the suitability of issuing a stay are 'whether a stay will simplify issues

and promote judicial economy, the balance of harm to the parties, and the length of the [] stay'")

(citation omitted).

**1.      The Stay Will Conserve Judicial Resources**

Entry of the stay will conserve judicial resources because Plaintiffs believe that

the MDL Motion is likely to be granted.  Thus, pre-consolidation proceedings in the coordinated

cases will be rendered duplicative and inefficient.  Plaintiffs expect the MDL Motion to be

granted because, as the MDL Panel has recognized, consolidation is appropriate where actions

"raise common factual questions" arising out of similar events.  *In re CitiFinancial Servs. Inc.

Prescreened Offer Litig.*, 474 F. Supp. 2d 1359 (J.P.M.L. 2007) (centralizing cases involving

different and non-overlapping plaintiff classes where all of the actions arose out of the same

challenged practices); *see also In re Ford Motor Co. Crown Victoria Police Interceptor Prods. Liab. Litig.,* 229 F. Supp. 2d 1377 (J.P.M.L. 2002); 28 U.S.C. § 1407 (providing for centralization of "civil actions involving one or more common questions of fact").  Here, absent centralization there will be nearly 40 actions proceeding in numerous federal district courts involving identical factual allegations and claims, and encompassing individual defendants and putative classes of similarly situated parties across the country, all of whom cashed out their Tribune stock, or otherwise received proceeds, in connection with a single LBO.

Granting the requested stay will, by definition, conserve judicial resources.  *See Rivers v. The Walt Disney Co.*, 980 F. Supp. 1358, 1361-62 (C.D. Cal 1997).  If this Court expends resources on this case while the MDL Panel is considering a transfer motion and the transfer subsequently occurs, the Court "will have needlessly expended its energies familiarizing itself with the intricacies of a case that would be heard by another judge." *Id*.  In the same vein, efforts "concerning case management will most likely have to be replicated by the [transferee] judge." *Id.*  Another strong consideration favoring centralization is the specter of conflicting decisions regarding class certification.  *See e.g., In re NorthStar Educ. Fin. Inc.*, 588 F. Supp. 2d 1370 (J.P.M.L. 2008) (consolidating actions to prevent inconsistent pretrial rulings especially because of class certification issues).  Thus, stays are frequently granted pending a decision by the MDL Panel to transfer a case not only in the interest of judicial economy, but to avoid inconsistent results.  *Hertz Corp.*, 250 F. Supp. 2d at 425; *Weinke v. Microsoft Corp.*, 84 F. Supp. 2d 989, 990 (E.D. Wis. 2000).  Therefore, where, as here, the MDL Panel is expected to rule on the transfer of actions, and the instant case is only in its very preliminary stages, judicial economy and the conservation of resources weigh overwhelmingly in favor of a stay.

2.      **The Balance of Harms Favors Granting the Requested Stay**

As courts have recognized, failure to stay one of multiple actions pending

determination of an MDL Motion imposes unnecessary burden and hardship on the party

required to litigate in multiple forums.  *See Nielson v. Merck & Co.*, No. C07-00076 (MJJ), 2007

WL 806510, at *2 (N.D. Cal. 2007) (noting prejudice to defendant "from being forced to litigate

the same jurisdictional issue in multiple forums").  These same considerations compel a stay

here.  It would impose substantial hardship on Plaintiffs to litigate motions to dismiss, motions

for class certification, and other pretrial motions in as many as 20 jurisdictions.  Moreover, the

risk of conflicting rulings on these issues could be prejudicial to Plaintiffs.

On the other hand, the defendants will not be prejudiced if this Court enters the

requested stay.  To the contrary, the defendants should have no less reason than Plaintiffs to

avoid duplicative, wasteful, and potentially conflicting pretrial proceedings.  *See In re Upjohn*

*Co. Antibiotic Cleocin Prods. Liab. Litig.*, 81 F.R.D. 482, 486-87 (E.D. Mich. 1979) (requiring

transferee court to harmonize inconsistent pretrial orders after consolidation); *Rivers*, 980 F.

Supp. at 1361 (transfer of multiple actions would potentially subject any pretrial rulings already

made in the transferor court to be reconsidered by the transferee court).  Absent a concern that a

stay would result in the dissipation of assets, loss of evidence or other similarly severe

consequences, parties should not be prejudiced by a stay of the litigation.

Moreover, the stay requested by Plaintiffs is permissible because the stay "is of

'moderate length, and not [] of indefinite duration which requires a party to take affirmative steps

for dissolution.'"  *Cheyney State Coll. Faculty v. Hufstedler*, 703 F.2d 732, 738 (3d Cir. 1983).

The stay is expected to last up to four months, until the earliest of October 31, 2011,

confirmation of a plan of reorganization by the Bankruptcy Court, or further order of the

Bankruptcy Court or this Court.[7] Stays of similar duration have been granted. *See, e.g., Hertz*

*Corp.*, 250 F. Supp. at 428 (granting stay where MDL Panel hearing was several weeks away and

decision on the MDL consolidation motion was likely months away); *Resco Products, Inc. v.*

*Bosai Miner Groups Co.*, No. 06-235, 2010 U.S. Dist. LEXIS 54949 (W.D. Pa. June 4, 2010); *cf.*

*SmithKlineBeecham Corp. v. Apotex Corp.*, No. 99-CV-4304, 2004 U.S. LEXIS 13904, at *33-

34 (E.D. Pa. July 16, 2004) (length of stay was unstated but parties agreed to submit status

reports every six months).

**C.      Plaintiffs Should Be Permitted During the Stay to File a Rule 26(d)(1)
Motion Seeking Leave to Conduct Limited Discovery to Confirm That All
Proper Parties Have Been Identified, Named, and Served With Process**

It is imperative that Plaintiffs be allowed during the pendency of the stay to

conduct limited discovery, if necessary, on the defendants and third parties, to ensure that each

shareholder subject to the Court's jurisdiction who received a cash transfer on account of the

LBO is identified, properly named in the action, and provided with effective service of process.

Therefore, if warranted, Plaintiffs intend to seek at some future date authority from the Court

under Federal Rule of Civil Procedure 26(d)(1) for such discovery to be conducted during the

stay and prior to the Rule 26(f) conference between the parties. Plaintiffs thus ask that the Court

structure the stay to provide Plaintiffs leave to file a Rule 26(d)(1) motion in order to make the

requisite showing for limited discovery at a future time if necessary. While Plaintiffs utilized the

best information available regarding the shareholder parties to the LBO in order to initiate this

---

[7] If it appears that the plan confirmation issues relating to the Creditor SLCFC Claims will
remain unresolved by the Bankruptcy Court by October 31, 2011, Plaintiffs reserve the right to
seek to extend the stay.

action, toll any applicable statute of limitations, and effectuate service, further discovery may be

required at the outset of this case to confirm that all proper parties have been accurately named

and served.  Thus, even if the stay is granted, Plaintiffs ask that the Court require the defendants

to enter an appearance in the case, such that the defendants or their counsel are known and can

be served with further notices, orders, or pleadings in this action.

As described above, on April 25, 2011, Plaintiffs received leave of the

Bankruptcy Court to assert the Creditor SLCFC Claims and confirmation that initiating this

action would not violate the automatic stay provisions under Bankruptcy Code section 362(a).

Neier Decl. Ex. C.  On April 29, 2011, Plaintiffs subpoenaed the Committee to obtain access to

information regarding the identities of the shareholders who received cash transfers pursuant to

the LBO, their locations, and the amount of the cash transfers the shareholders received.  Neier

Decl. ¶ 12.  The Committee had previously collected this information by issuing over 1,600

subpoenas in November 2010 to more than 900 separate entities.[8]  *Id.*  Plaintiffs received this

voluminous amount of data from the Committee only about eight days before the filing of the

Creditor SLCFC Claims.

Because the Committee provided the requisite information approximately one

week before Plaintiffs filed the Complaint, and Plaintiffs understand that the Committee is still

receiving new and updated information regarding the identities of these shareholders and other

relevant information, Plaintiffs may require the opportunity to conduct limited discovery of the

defendants and third parties to confirm that all shareholders, or parties who received proceeds in

---

[8] The Committee's data regarding the identities of the shareholders, their location, and the
quantum of cash transferred to each shareholder was subject to confidentiality agreements the
Committee entered into with certain shareholder parties, as well as the Protective Order entered
by the Bankruptcy Court on May 19, 2011.

the LBO, subject to suit in this action have been identified, properly named in the Complaint, and effectively provided with service of process.  *Id.*  Plaintiffs believe that such discovery should be permitted during the requested stay and is appropriate under Rule 26(d)(1), as it addresses threshold matters such as jurisdiction and proper service of process, and is not burdensome in scope.  *See* Fed. R. Civ. P. 26(d)(1) ("A party may not seek discovery from any source before the parties have conferred as required by Rule 26(f), except . . . when authorized by these rules, by stipulation, or by court order"); *see e.g., VPR Int. v. Does 1-17*, No. 11-Civ-01494 (LB), 2011 WL 1465836 (N.D. Cal. Apr. 15, 2011) (finding that plaintiff showed good cause to engage in early discovery to identify proper defendants); *Yates v. Portofino Equity & Mgmt.*, No. 08-Civ-00324 (PAB) (MJW), 2009 WL 416441 (D. Colo. Feb. 19, 2009) (granting plaintiff's Rule 26(d)(1) motion to conduct limited discovery in connection with jurisdictional issue).

The SLCFC Order expressly contemplated that Plaintiffs would engage in such discovery during the pendency of the stay, and this provision, like the other components of the SLCFC Order, should be afforded due deference.  Therefore, for the reasons stated above, Plaintiffs request that the Court grant the stay, but expressly carve out from the stay permission for Plaintiffs to file a Rule 26(d)(1) motion seeking leave of the Court to conduct early discovery limited to the topics that will be set forth in Plaintiffs' forthcoming Rule 26(d)(1) motion, as well as permission for Plaintiffs to amend the Complaint pursuant to Rule 15 and, if appropriate, add, drop, or sever parties or claims by use of Rules 21 or 41(a).

**D.**    **Should the Court Deny the Stay Motion, Plaintiffs Request That Defendants Be Prevented From Filing Any Answers or Other Pleadings Responsive to the Complaint Until Such Time as the Parties Have Convened for a Case Management Conference and the Court Enters a Case Management Order**

In the event that the Court denies Plaintiffs' request for the stay, Plaintiffs request that the Court postpone the filing of any answers or dispositive motions by the defendants until such time that a case management conference can be convened and an order granting a case management schedule entered.  In light of the complexity of the action, it would be in the best interests of the Court and the parties for briefing on dispositive motions and any other motion practice to be conducted pursuant to a case management schedule entered by this Court, as opposed to multiple motions to dismiss being litigated piecemeal and without coordination.

## CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court:

(i)    grant Plaintiffs' motion for a stay of the defendants' time to answer or otherwise respond to the Complaint in this action until the earliest of (a) October 31, 2011, (b) order of the Bankruptcy Court confirming a plan of reorganization, or (c) further Order of the Bankruptcy Court or this Court;

(ii)    order that, notwithstanding the pendency of the stay in this Court, Plaintiffs may (a) amend the Complaint or move for leave to amend the Complaint; (b) voluntarily dismiss this action or one or more defendants pursuant to Rule 41; (c) move to add or drop a party or to sever any claim against a party pursuant to Rule 21; (d) move to consolidate and/or coordinate this action with any other action, without limitation, by making a motion pursuant to 28 U.S.C. § 1407 and the applicable Rules of Procedure of the MDL Panel, or any applicable state rules; (e) file a motion pursuant Rule 26(d)(1) seeking preconference

discovery to confirm that parties have been properly identified, named, and served in this action; and (f) file a motion seeking modification of this Order; and

(iii)    require each defendant to enter an appearance in the action, so that they or their counsel are known, and to better facilitate service of further notices, orders, or pleadings upon them in the action.

In the event that the Court denies Plaintiffs' requested stay, Plaintiffs ask that, prior to any defendant being permitted to answer the Complaint or file an otherwise responsive pleading, the Court require that a case management order be entered that provides a briefing schedule.

Dated:  Newark, New Jersey
　　　　July 5, 2011

Respectfully submitted,

FRIEDMAN KAPLAN SEILER &
　ADELMAN LLP


s/ Robert J. Lack
Robert J. Lack
Amy C. Brown
Ricardo Solano Jr.
Timothy M. Haggerty
One Gateway Center, 25th Floor
Newark, NJ 07102-5311
(973) 877-6400

*Attorneys for Plaintiffs*

Robert J. Lack
Amy C. Brown
Ricardo Solano Jr.
Timothy M. Haggerty
FRIEDMAN KAPLAN SEILER & ADELMAN LLP
One Gateway Center, 25th Floor
Newark, NJ 07102-5311
(973) 877-6400
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

---------------------------------------------------------------x
                                          :
                                          :
DEUTSCHE BANK TRUST COMPANY               :
AMERICAS, in its capacity as successor indenture :
trustee for certain series of Senior Notes, *et al.*,   :     Civil Action No. 11-3148 (WJM)(JAD)
                                          :
         Plaintiffs,                      :
                                          :     **[PROPOSED] ORDER STAYING**
                                          :     **DEFENDANTS' TIME TO**
         - v. -                           :     **ANSWER OR OTHERWISE**
                                          :     **RESPOND TO THE COMPLAINT**
                                          :
MERRILL LYNCH TRUST COMPANY,              :
A DIVISION OF BANK OF AMERICA, N.A.,      :
*et al.*,                                 :
                                          :
         Defendants.                      :
                                          :
---------------------------------------------------------------x

THIS MATTER having been brought before the Court by Friedman Kaplan Seiler

& Adelman LLP, attorneys for plaintiffs Deutsche Bank Trust Company Americas, Law

Debenture Trust Company of New York, and Wilmington Trust Company, in their capacity as

successor indenture trustees (collectively, "Plaintiffs") for an order staying the time for the

defendants to answer or otherwise respond to the Complaint in this action, and the Court having

considered the supporting papers and any opposing papers, and for good cause shown,

IT IS on this _____ day of _____ 2011,

999717.2

ORDERED that defendants' time to answer or otherwise respond to the
Complaint in this action is STAYED until the earliest of (a) October 31, 2011, (b) order by the
United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") in *In re
Tribune Co.*, No. 08-13141 (KJC), confirming a plan of reorganization, or (c) further Order of
the Bankruptcy Court or this Court;

ORDERED that any applicable deadlines under Federal Rules of Civil Procedure
23 or 26 or Local Civil Rule 26.1 will also be held in abeyance during the pendency of the stay;

ORDERED that notwithstanding the pendency of the stay in this Court,
(1) Plaintiffs may (a) amend the Complaint or move for leave to amend the Complaint;
(b) voluntarily dismiss this action or one or more defendants pursuant to Federal Rule of Civil
Procedure 41; (c) move to add or drop a party or to sever any claim against a party pursuant to
Federal Rule of Civil Procedure 21; (d) move to consolidate and/or coordinate this action with
any other action, without limitation, by making a motion pursuant to 28 U.S.C. § 1407 and the
applicable Rules of Procedure of the U.S. Judicial Panel on Multidistrict Litigation, or any
applicable state rules; (e) file a motion pursuant Federal Rule of Civil Procedure 26(d)(1) seeking
preconference discovery to confirm that parties have been properly identified, named, and served
in this action; and (f) file a motion seeking modification of this Order; and (2) defendants may
file responses to any motions Plaintiffs make pursuant to this paragraph of this Order;

ORDERED that notwithstanding the stay, all defendants or their counsel are
required to enter an appearance in this case within 30 days after the later of entry of this Order or
service of the Complaint upon the defendant, without prejudice to any defenses that defendant
may have;

ORDERED that notwithstanding the stay, any defendant who was not provided with notice of Plaintiffs' motion prior to entry of this Order, because such defendant had not yet been served with the Complaint or appeared in the action, may move this Court at any time to vacate or modify this Order upon notice to Plaintiffs and all other defendants in this action; and

ORDERED that at such time as the stay is lifted or terminates, this Court shall set the schedule for answering or otherwise responding to the Complaint, unless the action has been transferred to another court for coordinated pretrial proceedings; and

ORDERED that within five days from the date of the entry of this Order, Plaintiffs shall serve a copy of this Order upon each defendant.

_____

HON. JOSEPH A. DICKSON, U.S.M.J.