## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered |

**Related to Docket Nos. 1970, 2077 and 8815**
**Hearing Date: September 14, 2011 at 2:00 p.m. ET**
**Objection Deadline: September 7, 2011 at 4:00 p.m. ET**

### DEBTORS' MOTION FOR AN ORDER PURSUANT TO SECTIONS 105(A), 362(D), AND 363 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 9019 AND 4001(A)(3) (I) AUTHORIZING DEBTORS TO ENTER INTO ERISA CLAIM SETTLEMENT AND TO PERFORM ALL OBLIGATIONS THEREUNDER, (II) MODIFYING THE AUTOMATIC STAY TO THE EXTENT NECESSARY TO ALLOW INSURERS TO PAY PORTIONS OF THE SETTLEMENT AMOUNT, AND (III) GRANTING RELATED RELIEF

The debtors and debtors in possession in the above-captioned chapter 11 cases

(each a "Debtor" and collectively, the "Debtors"), by and through their undersigned counsel,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc., f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); and WPIX, Inc. (0191). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

hereby move this Court (the "Motion") for entry of an order substantially conforming with the form of order attached hereto as Exhibit A (the "Settlement Approval Order"), pursuant to sections 105(a), 362(d) and 363 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 9019 and 4001(a)(3) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") (i) authorizing the Debtors to enter into a settlement (the "ERISA Claim Settlement") on the terms set forth in the Memorandum of Understanding ("MOU")[2] attached hereto as Exhibit B and to perform all obligations thereunder; (ii) modifying the automatic stay, to the extent applicable, to allow the Debtors' primary and excess fiduciary liability insurance providers (the "Insurers")[3] to contribute to the settlement; and (iii) granting related relief.  In support of this Motion the Debtors rely on the Declaration of Donald J. Liebentritt, Chief Restructuring Officer of Tribune Company (the "Liebentritt Declaration"), which is attached hereto as Exhibit C.  In further support of this Motion, the Debtors respectfully state as follows:

## INTRODUCTION[4]

1.      On May 2, 2011, the Court, at the Debtors' request, entered an order appointing the Honorable Kevin Gross as mediator to conduct a non-binding mediation concerning the resolution of certain claims, causes of action, and related matters arising from alleged violations of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), in connection with the Tribune Employee Stock Ownership Plan and the Tribune Employee Stock Ownership Trust (individually or collectively, the "ESOP"), an employee

---

[2]  The parties intend to execute one or more formal and binding settlement agreements substantially in conformance with the MOU.  The Debtors request that the Court's approval of the ERISA Claim Settlement and the Debtors' performance of obligations thereunder on the terms set forth in the MOU extends to any such written agreement(s).

[3]  The Insurers are comprised of Illinois National Insurance Company (Chartis), as primary fiduciary liability insurance provider, and Federal Insurance Company (Chubb), AXIS Insurance Company, U.S. Specialty Insurance Company, and St. Paul Mercury Insurance Company (Travelers) as excess providers.

[4]  Capitalized terms used but not defined in the Introduction are defined in the text below.

retirement benefit plan (the "ERISA Mediation"). (See Order Appointing Mediator for

Mediation of Certain ERISA-Related Claims, Docket No. 8815.)

       2.     The claims, which were the subject of the ERISA Mediation, include the

following:

      a)     The class action lawsuit styled Neil, et al. v. Zell, et al., Case No. 08-cv-06833 (RRP) (N.D. Ill., Sept. 16, 2008) (as amended, the "Neil Action"),[5] for alleged violations of ERISA;

      b)     Claims of GreatBanc Trust Company ("GreatBanc"), as trustee of the ESOP, against Tribune and its affiliates for contribution or indemnity arising from any determination of liability of GreatBanc in the Neil Action;

      c)     The proofs of claim asserted by the United States Department of Labor ("DOL") against the Debtors for liability under ERISA for breaching their fiduciary duty to monitor and correct the performance of GreatBanc, and for knowingly participating in the April 1, 2007 stock purchase, which the DOL contends was a prohibited transaction; and

      d)     The proofs of claim asserted by the United States Department of the Treasury ("IRS") seeking to impose an excise tax on Tribune pursuant to section 4975 of the Internal Revenue Code, which provides for a tax on the amount involved in a prohibited transaction under ERISA, and certain other IRS claims related to the ESOP

(collectively, the "ERISA-Related Claims").

       3.     As a result of mediation overseen by Judge Gross and subsequent,

extensive negotiations between the parties, Tribune, on behalf of itself and its Debtor and non-

Debtor subsidiaries (collectively, the "Tribune Entities"), the Neil Plaintiffs, the DOL,

GreatBanc, Samuel Zell, and the Insurers have entered into a settlement, embodied in the MOU

---

[5] The current complete title of the Neil Action is Dan Neil, Eric Bailey, on behalf of themselves and on behalf of all others similarly situated v. Samuel Zell, GreatBanc Trust Company, and EGI-TRB, L.L.C. The original complaint filed in the Neil Action has been amended from time to time to remove plaintiff and defendant parties and to modify the causes of action asserted therein, based in part on the Debtors' bankruptcy filing and on rulings issued by the District Court. (See First Amended Complaint, Docket No. 74 in 08-cv-6833 (RRP); Second Amended Complaint, Docket No. 102 in 08-cv-6833 (RRP); and Third Amended Complaint, Docket Nos. 204 and 403 in 08-cv-6833(RRP).)

attached hereto, that represents a resolution of all but the last of the foregoing ERISA-Related

Claims, at a fraction of their face value as to the Tribune Entities. Specifically, the ERISA Claim

Settlement resolves the Neil Action for an all-in cash settlement payment of $32 million (with

$4.45 million of that total coming from the Tribune Entities), releases the Tribune Entities from

any claims by GreatBanc for contribution or indemnity in connection with the Neil Action, and

resolves the DOL's claims by (in addition to the payments referenced above and other provisions

of the MOU) granting the DOL an allowed general unsecured claim against Tribune for $3.2

million, which is subject to a dollar-for-dollar reduction by any payment made by or on behalf of

Tribune to the IRS on account of any claims of the IRS under section 4975 of the Internal

Revenue Code relating to the ESOP, which are asserted for at least $37.5 million. The parties to

the ERISA Claim Settlement have agreed that the settlement is not considered an admission or

suggestion of liability with respect to any of the claims or causes of action compromised therein.

      4.     As set forth in more detail below, the ERISA Claim Settlement is not just

fair – it is an excellent result for the Debtors' estates. Most notably, although both the DOL and

GreatBanc claims are very much disputed and the Debtors have a very strong argument that the

DOL's claim and any indemnification claim by GreatBanc would be subordinated under section

510(b) of the Bankruptcy Code, the potential exposure is sizable. The DOL claims the entire

$250 million paid by the ESOP for Tribune stock. The Neil Plaintiffs assert a similar amount

against GreatBanc in the Neil Action, which could give rise to an indemnification claim by

GreatBanc to the Debtors and their affiliates. Consequently, a settlement payment by the

Debtors of less than 2% of this total more than reasonably accounts for the risks associated with

these claims, as well as the costs and time of protracted litigation. Accordingly, the ERISA

Claim Settlement constitutes a reasonable exercise of the Debtors' business judgment, is in the

best interests of their estates, creditors, and other parties in interest, and should be approved by

this Court. Additionally, relief from the automatic stay should be granted so that the Insurers

may participate in the settlement.

## STATUS OF THE CASE AND JURISDICTION

5.        On December 8, 2008, Tribune Company ("Tribune") and most of its

wholly-owned subsidiaries each filed a voluntary petition for relief under chapter 11 of the

Bankruptcy Code, except Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club,

LLC, which filed on October 12, 2009 (each date, as applicable, the "Petition Date"). The

Debtors' chapter 11 cases are jointly administered for procedural purposes only.

6.        The Debtors have continued in possession of their respective properties

and have continued to operate and maintain their businesses as debtors in possession pursuant to

sections 1107(a) and 1108 of the Bankruptcy Code.

7.        On December 18, 2008, the United States Trustee appointed the official

committee of unsecured creditors (the "Committee"). The Debtors have provided prior notice of

the filing of this Motion to counsel for the Committee, the Office of the United States Trustee,

and counsel for the proponents for each of the competing joint plans of reorganization proposed

for the Debtors.[6]

8.        The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this

Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief sought

---

[6] The competing plans of reorganization include: (i) the Second Amended Joint Plan Of Reorganization For Tribune Company And Its Subsidiaries (As Modified April 26, 2011) (Docket No. 8769) (the "DCL Plan") and (ii) the Third Amended Joint Plan Of Reorganization For Tribune Company And Its Subsidiaries Proposed By Aurelius Capital Management, L.P., Deutsche Bank Trust Company Americas, Law Debenture Trust Company Of New York, And Wilmington Trust Company (Docket No. 8755) (the "Noteholder Plan" and, together with the DCL Plan, the "Plans").

herein are sections 105(a), 362(d) and 363 of the Bankruptcy Code and Bankruptcy Rules 9019 and 4001(a)(3).

## FACTUAL BACKGROUND TO THE MOTION

### A.    The Tribune ESOP and Fiduciary Liability Insurance Policies

9.     Tribune established the ESOP, effective as of January 1, 2007, as an employee retirement benefit plan in connection with Tribune's efforts to return to private ownership through the Leveraged ESOP Transactions.[7]  (Liebentritt Dec. § 8.)  On April 1, 2007, Tribune and GreatBanc, as the ESOP trustee, entered into the Tribune ESOP Purchase Agreement under which the ESOP obtained 8,928,571 shares of Tribune common stock from Tribune at a price of $28 per share in exchange for a non-recourse promissory note (the "ESOP Note") in the amount of $250 million.  (Id.)

10.     After the ESOP acquired its shares, Tribune made a tender offer to repurchase 126 million shares of publicly-traded stock at $34 per share.  (Liebentritt Dec. § 9.)  Further, on December 20, 2007, a wholly-owned subsidiary of the ESOP merged with Tribune. Pursuant to the merger terms, the 118 million shares of common stock remaining after the tender offer that were not owned by Tribune or by the ESOP were redeemed for cash at a price of $34 per share.  (Id.)  After the merger, Tribune became wholly owned by the ESOP, and thereafter converted from a C-corporation to an S-corporation, effective as of the beginning of its 2008 tax year, thereby eliminating most federal corporate taxes.[8]  (Id.)

---

[7]  A detailed summary of the "Leveraged ESOP Transactions" appears in the Joint Disclosure Statement and Exhibits filed on December 17, 2010 (Docket No. 7232).

[8] Each of the competing plans or reorganization proposed for the Debtors provide that upon emergence from the Debtors' chapter 11 cases, the ESOP shall be terminated and the amount of unpaid principal and interest remaining on the ESOP Note shall be forgiven pursuant to section 6.3 of the Tribune ESOP Loan Agreement by and between Tribune and GreatBanc dated April 1, 2007.  The MOU provides, however, that the ESOP shall remain in effect solely for the purpose of receiving proceeds under the ERISA Claim Settlement for allocation to the class members' individual ESOP accounts, and, after such receipt and allocation and the distribution to 401(k) accounts described in the MOU shall occur, the ESOP will be terminated.  (See MOU § 6.)

6

11.     Tribune had purchased a primary fiduciary liability policy from Illinois National Insurance Company (the "2007 Fiduciary Liability Policy").[9] (Liebentritt Dec. § 10.) The 2007 Fiduciary Liability Policy provides $10 million of insurance coverage to the "Insureds," which include Tribune, its employee benefit plans (including the ESOP), and their respective past, present, and future directors, officers, and employees, in their capacity as fiduciaries, administrators, or trustees, for "Loss" (including Defense Costs, damages, settlements, and judgments) arising from "Wrongful Acts" allegedly committed in connection with employee benefit plans. (Id.) GreatBanc, in its capacity as trustee of the ESOP, is also an Insured under the 2007 Fiduciary Liability Policy by virtue of endorsement 19 to such policy.[10] (Id.) The 2007 Fiduciary Liability Policy is followed by "follow-form" excess fiduciary liability policies (the "Excess Policies" and together with the 2007 Fiduciary Liability Policy, the "2007 Fiduciary Liability Policies") with combined respective Limits of Liability totaling $40 million in the aggregate, for a total fiduciary liability insurance coverage in the amount of $50 million.[11] (Id.)

12.     Although Tribune is not a party to the Neil Action (as discussed in the following section), the 2007 Fiduciary Liability Policies cover it and GreatBanc for certain liabilities related to the ESOP, including the claims against GreatBanc in the Neil Action.

---

[9] Capitalized terms used but not defined in this paragraph shall have the meaning ascribed to them in the 2007 Fiduciary Liability Policy.

[10] Tribune appointed GreatBanc as trustee for the ESOP under the Trustee Engagement Agreement dated February 26, 2007. As part of that agreement, Tribune and its affiliates agreed to purchase fiduciary liability insurance coverage with limits of at least $50 million with GreatBanc, solely in its capacity as the ESOP trustee, as a Named Insured. The agreement also provided that Tribune agreed to indemnify GreatBanc and its officers, directors, and employees for "any loss, cost, expense, or other damage, including (but not limited to) attorneys' fees . . . resulting from, or incurred with respect to, any legal proceedings, actions, suits, arbitrations, and investigations related in any way to the performance of services" of the indemnified parties. (See Docket No. 7977, Ex. A, ¶ 14.)

[11] The Excess Policies that follow form to the 2007 Fiduciary Liability Policy are provided by the following insurance companies with the following Limits of Liability: Federal Insurance Company (Chubb), $10,000,000; AXIS Insurance Company, $10,000,000; U.S. Specialty Insurance Company, $10,000,000; and St. Paul Mercury Insurance Company (Travelers), $10,000,000.

B.     **The Neil Action**

13.     In September 2008, three months before the Debtors filed these chapter 11 cases, six current and former employees of Tribune commenced the Neil Action. The claims at issue in the Neil Action and the procedural history of that case are set forth in a series of reported decisions, including 677 F. Supp. 2d 1010 (N.D. Ill. 2009), 743 F. Supp. 2d 724 (N.D. Ill. 2010), 767 F. Supp. 2d 933 (N.D. Ill. 2011), and --- F.R.D. ---, 2011 WL 833350 (N.D. Ill. Mar. 4, 2011).[12] Although it is not necessary for purposes of this Motion to recount those facts in detail here, in short and as the case currently stands, the named plaintiffs in the Neil Action, on behalf of themselves and the certified class (collectively, the "Neil Plaintiffs"), alleged that GreatBanc breached its duties of loyalty and prudence under ERISA as a result of the Leveraged ESOP Transactions. The Neil Plaintiffs also alleged that GreatBanc engaged in a transaction prohibited by ERISA when it approved the ESOP's purchase of unregistered stock from Tribune at an amount less than "adequate consideration."[13] As to Tribune board member Samuel Zell and EGI-TRB, the Neil Plaintiffs alleged knowing participation in the alleged breach of fiduciary duties and alleged engaging in a transaction prohibited by ERISA.

14.     On November 9, 2010, the District Court granted partial summary judgment in favor of the Neil Plaintiffs against GreatBanc on the portion of their claim alleging that GreatBanc breached its fiduciary duties to the ESOP by approving the April 2007 stock purchase, which the District Court held was a prohibited transaction under ERISA because the stock did not meet the Tax Code's definition of a "qualifying employer securit[y]." 743 F. Supp.

---

[12] The particulars of the Neil Action are also set forth in detail in Tribune's Adversary Complaint for Declaratory Judgment and Injunctive Relief, currently pending before this Court. See Tribune Company v. Neil (In re Tribune Company), No. 09-AP-50445 (Bankr. D. Del. filed Mar. 13, 2009) (the "Neil Adversary Proceeding").

[13] Tribune originally was named as a defendant in the Neil Action, but was dismissed after it filed for bankruptcy. The Neil Plaintiffs did not file a claim against Tribune in the bankruptcy proceedings prior to the bar date. Tribune's officers and directors and Tribune's Employee Benefits Committee and its members were also initially named and then dismissed (with the exception of Zell) as defendants in the Neil Action.

2d at 734.[14]  By order dated August 9, 2010, the District Court held Zell and EGI-TRB were not

subject to monetary liability for the Neil Plaintiffs' claims and noted that developments in

Tribune's bankruptcy proceeding might moot the availability of equitable relief, at which point

Zell and EGI-TRB would be dismissed as defendants.  (See Docket No. 301 in 08-cv-6833

(RRP)).

15.    On June 8, 2010, GreatBanc filed a motion for summary judgment on

damages, arguing that the maximum amount it can be held liable for is the $2.8 million cash

principal payment made on the ESOP Note in 2008, or, alternatively, the principal and interest

paid at that time, a total of $15.3 million in cash.  (See Docket No. 239 in 08-cv-6833 (RRP).)

The District Court denied that motion.  See Neil v. Zell, 767 F. Supp. 2d 933 (N.D. Ill. 2011).

Although Judge Pallmeyer did not decide what measure of damages would be appropriate, she

suggested that "[p]laintiffs could claim that they lost the $250 million, and the earnings that

would have been generated by those funds in a wise investment, reduced by the sum of debt

forgiveness at the time the ESOP terminates."  Id. at 949, n.13.  The District Court has scheduled

a bench trial for April 30, 2012 with case dispositive motions due November 1, 2011.  (Docket

No. 442 in 08-cv-6833 (RRP).)

C.    **Claims Asserted in the Debtors' Bankruptcy Proceedings**

a)    Claims Relating to the Neil Action

16.    Potential claims arising from the Neil Action were scheduled by Tribune

as contingent, unliquidated, and disputed claims in an undetermined amount, but no proofs of

claim were filed by the Neil Plaintiffs on account thereof prior to the bar date.  Consequently,

---

[14] In that decision, the Court rejected GreatBanc's argument that Tribune was an indispensible party, stating that, "[r]elief under ERISA section 502(a)(2) is available only from a fiduciary, and Tribune is not a fiduciary." Id. at 733. GreatBanc, by entering into the ERISA Claim Settlement, is foregoing its right to appeal the District Court's decision, which GreatBanc believes misapplied ERISA in concluding a prohibited action occurred.

Tribune is not directly liable for damages to the Neil Plaintiffs on account of the Neil Action. However, GreatBanc has taken the position that it will seek indemnity from Tribune and its affiliates for any liabilities arising from the Neil Action, pursuant to the Trustee Engagement Agreement. (See Docket No. 7977). Additionally, each of the competing Plans proposed for the Debtors propose to reject the Trustee Engagement Agreement between Tribune and GreatBanc, entitling GreatBanc to file a proof of claim for rejection damages (see Docket Nos. 7701 and 8755). Indeed, GreatBanc filed a limited objection to confirmation of both Plans (the "GreatBanc Objection"), since resolved, requesting clarification that any of GreatBanc's rights of setoff or similar defenses should be preserved under the Plans and that the releases in the Plans should not preclude GreatBanc from asserting any indemnification and/or contribution claims against the Debtors, among other issues (Docket No. 7977).

> b)    The DOL Claims and Pending Plan Objections

17.    On June 2, 2009, the DOL filed an unliquidated proof of claim dated May 29, 2009 against Tribune (Claim No. 3629, amended on April 12, 2011 by Claim No. 6747), and on June 10, 2009, the DOL filed similar claims against 70 other Debtors (Claim Nos. 4205 to 4274, inclusive) (collectively the "DOL Claims") relating to possible violations of ERISA, including, but not limited to, sections 404, 405, 406, and 407, and claims for restitution of plan losses, equitable and remedial relief, and injunctive relief pursuant to ERISA sections 502(a)(2) and (5), 29 U.S.C. §§ 1132(a)(2) and (5) (the "DOL Investigation"). The DOL estimates that its claims could be valued up to $250 million. (See Objection of the Secretary of the United States Department of Labor to the Confirmation of Each of the Proposed Joint Plans of Reorganization for Tribune Company and Its Subsidiaries at 14-15, Docket No. 8910.)

18.    On February 15, 2011, the Secretary of Labor filed an objection on behalf of the DOL to each of the Plans, in which the DOL opposed the proposed subordination of the

10

DOL Claims under the Plans pursuant to section 510(b) of the Bankruptcy Code and argued that the exculpation clauses in the Plans were too broad (the "DOL Objection").[15] The DOL and the proponents of the Noteholder Plan agreed to defer resolution of the DOL Objection as to the proposed subordination of the DOL Claims under the Noteholder Plan until after confirmation.

c)    The IRS Claims

19.    The IRS has filed a proof of claim against Tribune relating to tax underpayments in the aggregate amount of $351,688,793.98 (Claim No. 6254). Of that amount, $37.5 million (plus accrued interest) is claimed as a priority unsecured claim (pursuant to section 507(a)(8) of the Bankruptcy Code) asserting liability under section 4975 of the Internal Revenue Code, which provides for an excise tax on the amount involved in a prohibited transaction under ERISA (the "IRS Claim"). The IRS has asserted additional claims related to the ESOP, including, claims for Unrelated Business Income Tax against the ESOP and claims against Tribune under section 409(l) of the Internal Revenue Code. The Debtors and the IRS remain actively engaged in the process of negotiating a resolution of the IRS Claim and all other claims by the IRS relating to the ESOP, and the ERISA Claim Settlement presently before this Court does not settle such IRS claims.

D.    **The ERISA Mediation**

20.    Over the past several months, the Debtors have participated in a vigorous mediation, with the assistance of Judge Gross, and subsequent, extensive negotiations with all parties having an interest in the ERISA-Related Claims to facilitate the resolution of certain claims, causes of action, and related matters arising from alleged violations of ERISA in connection with the ESOP. (See Order Appointing Mediator for Mediation of Certain ERISA-Related Claims, Docket No. 8815.) The parties to the ERISA Mediation were (a) the Debtors;

---

[15] See Docket Nos. 7975, 8107, 8890, and 8910.

46429/0001-7840313v1

(b) the Neil Plaintiffs; (c) the DOL; (d) the IRS; (e) GreatBanc, in its capacity as trustee for the

ESOP; and (f) the Insurers.  The disputes submitted for mediation included (i) claims and causes

of action arising from the Neil Action; (ii) any indemnification claims of GreatBanc related

thereto; (iii) the DOL Claims; and (iv) the IRS Claim.

### E.    The ERISA Claim Settlement

21.    The ERISA Claim Settlement conclusively resolves the Neil Action, any

and all claims held by GreatBanc against the Tribune Entities, and any and all claims held by the

DOL related to the ESOP.  The ERISA Claim Settlement also paves the way for a future separate

agreement resolving any and all claims asserted by the IRS relating to the ESOP.  The parties to

the ERISA Claim Settlement have agreed that the settlement is not an admission or suggestion of

liability with respect to any of the claims or causes of action compromised therein.  The MOU

states specifically that "[t]his Settlement is the result of a compromise, and shall never at any

time for any purpose be considered as an admission or evidence of liability or responsibility on

the part of the Parties or the Funding Parties."  (See MOU § 17.)

22.    At its core, the ERISA Claim Settlement provides for the following

resolution, settlement, and release of claims, as more particularly set forth in the MOU attached

hereto as Exhibit B:[16]

> a)    the claims and causes of action asserted in the Neil Action are
> settled as a non-opt-out class action settlement, for a fixed cash
> payment of $32 million, funded by the Insurers in the amount of
> $26.55 million, Tribune in the amount of $4.45 million (to be
> remitted either by Tribune itself or by one of the other Tribune
> Entities), and GreatBanc in the amount of $1 million.  As set forth
> in detail in the MOU, the $32 million settlement represents an all-
> in number (i.e., includes attorney's fees, costs of litigation, class
> representative enhancements, settlement class benefits, cost of

---

[16] The ERISA Claim Settlement terms summarized in this Motion do not in any way supersede or alter the terms of the ERISA Claim Settlement as set forth in the MOU, and in the event of any conflicts, the ERISA Claim Settlement as set forth in the MOU, as may be more particularly set forth in a formal agreement, controls.

notice, cost of the settlement administrator, and cost of the independent fiduciary (subject to Section 10 of the MOU). (See MOU § 4.) Upon final approval of the settlement (as defined in MOU § 5(g)), the settlement amount, net of fees and costs, will be transferred to the ESOP and allocated to the individual accounts of class members (and beneficiaries of deceased class members) under a formula that shall be approved by the District Court, and thereafter shall be transferred to the class members' 401(k) accounts (see MOU § 6);

b)    any claims that GreatBanc may have against the Tribune Entities arising from the Neil Action, the DOL Investigation, or otherwise relating to the ESOP, including any indemnification, reimbursement, and contribution claims, are released, as more particularly set forth in the MOU (see MOU § 16(e));

c)    any other indemnification, reimbursement, and contribution claims that any other parties may have against the Tribune Entities arising from either the Neil Action or the DOL Investigation are waived and released;

d)    the Neil Adversary Proceeding shall be dismissed;

e)    the DOL claims are resolved, based on the terms of the settlement contained in the MOU and subject to the granting to the DOL of an allowed general unsecured claim against Tribune in the amount of $3.2 million, reduced and offset dollar-for-dollar by any payment made by or on behalf of Tribune to the IRS on account of any claims of the IRS under section 4975 of the Internal Revenue Code relating to the ESOP (see MOU §§ 11 and 12);

f)    the DOL Objection shall be withdrawn;

g)    the DOL Investigation shall be terminated;

h)    the Debtors shall cause to be filed an amendment to the DCL Plan (pursuant to Section 11(e) of the MOU) providing for the treatment of the DOL Claims as disputed claims and reserving the Debtors' and DOL's rights with respect to the DOL Objection, and that such rights will not be mooted, in the event that the settlement is not consummated;

i)    all parties shall provide mutual releases (see MOU § 16). The Insurers have required that all of the defendants to the Neil Action, Tribune, and Tribune's directors and officers, including Zell, be released from the ERISA-related claims being settled as a condition for their participation in the settlement, as more particularly set forth in Section 16 of the MOU;

46429/0001-7840313v1

j)      for the avoidance of doubt, Section 16(l) of the MOU provides that the mutual releases provided by the parties in Section 16 of the MOU will not affect, impair, or release (i) any claims that, as of the date of the MOU, have been asserted by the Committee in the adversary proceedings captioned as <u>Official Committee of Unsecured Creditors of Tribune Company v. Dennis J. FitzSimons, et al.</u>, Adv. Pro. No. 10-54010 (KJC) (Bankr. D. Del. Nov. 1, 2010) and <u>Official Committee of Unsecured Creditors v. JPMorgan Chase Bank, N.A.</u>, Adv. Pro. No. 10-53963 (KJC) (Bankr. D. Del. Nov. 1, 2010), against any defendant(s) to those actions, whether such claims are brought or advanced by the Committee or any other party; (2) any claims, except with respect to the Tribune Released Matters (as defined in the MOU), that may hereafter be asserted in the adversary actions by the Committee or any other party acting as a fiduciary or in a similar capacity on behalf of the Tribune Entities or their creditors; and (iii) any direct claims asserted by creditors of the Tribune Entities[17] (<u>see</u> MOU § 16(l)(1); and

k)      the ERISA Claim Settlement will be voidable by Tribune if Tribune does not reach agreement with the IRS with respect to the IRS Claim and all other claims by the IRS relating to the ESOP, on terms acceptable to Tribune, prior to the date the District Court sets for the final approval hearing with respect to the ERISA Claim Settlement (<u>see</u> MOU § 12).

## RELIEF REQUESTED

23.     By this Motion, the Debtors respectfully request this Court enter the

Settlement Approval Order, substantially in the form attached hereto as <u>Exhibit A</u>, pursuant to

sections 105(a), 362(d), and 363(b) of the Bankruptcy Code and Bankruptcy Rules 9019 and

4001(a)(3). The ERISA Claim Settlement is expressly contingent upon approval by this Court

(<u>see</u> MOU § 9); however, the relief requested by this Motion is limited, and seeks only this

Court's authorization for (i) the Debtors to enter into the ERISA Claim Settlement in

conformance with the terms of the MOU and make a $4.45 million settlement payment and to

perform all other obligations thereunder, on the terms set forth in the MOU attached hereto as

---

[17] The MOU likewise carves out any defenses any parties to the ERISA Claim Settlement may have with respect to any of the claims referenced in sub-parts (i) through (iii), above, from the scope of the releases. (<u>See</u> MOU § 16(l)(2).)

14

<u>Exhibit B</u>, and (ii) the modification of the automatic stay, to the extent it applies, to permit the Insurers to contribute amounts toward the settlement.  In connection therewith, the Debtors also request a waiver of the 14-day stay provided for in Bankruptcy Rule 4001(a)(3) so that the ERISA Claim Settlement may become effective as soon as practicable after the entry of the Settlement Approval Order.

24.     The ERISA Claim Settlement contemplates that the District Court will adjudicate and approve the ERISA Claim Settlement under Federal Rule of Civil Procedure 23 ("<u>Rule 23</u>") to effectuate the class settlement in the Neil Action.  (<u>See</u> MOU § 9.)  The ERISA Claim Settlement also envisions that preliminary approval of the class action settlement under Rule 23 will be determined by the District Court within 10 business days after this Court rules upon the Debtors' Motion.  (<u>See</u> MOU § 5(b).)  Accordingly, by this Motion, the Debtors are not requesting this Court to adjudicate the fairness of the settlement of the Neil Action under Rule 23, but only to approve the Debtors' contribution to that settlement, the compromise of the ERISA-Related Claims against the Debtors, and the performance of the Debtors' other obligations thereunder.

## BASIS FOR RELIEF REQUESTED

25.     The Debtors believe the ERISA Claim Settlement should be approved for four principal reasons.  First, the Debtors' contribution to the settlement of the Neil Action in the amount of $4.45 million (out of a total settlement amount of $32 million) carries with it a full release of any and all indemnification claims that GreatBanc may have against the Debtors in the event that GreatBanc suffers an adverse judgment in that litigation.  The District Court has noted that the potential liability faced by GreatBanc in the Neil Action (which GreatBanc, absent settlement, would vigorously dispute) could be as much as $250 million, and GreatBanc in turn has asserted that Tribune and its subsidiaries are responsible for indemnifying GreatBanc for any

loss incurred in connection with its role as trustee of Tribune's ESOP. Because the amount in controversy greatly exceeds the available insurance coverage to the Debtors, and represents a significant potential claim against their estates, the Debtors believe that payment of $4.45 million (which is less than 2% of the total potential exposure) is justified. (Liebentritt Dec. § 17.) In connection with the ERISA Claim Settlement, the Insurers required that all settlement parties, including the Tribune Entities, provide releases to all of the defendants to the Neil Action, Tribune, and Tribune's directors and officers, including Zell, from the ERISA-related claims being settled, in order to eliminate the risk of future liability for the Insurers. This release of claims by the Debtors was necessary to enable the funding of the bulk of the ERISA Claim Settlement by the Insurers. (Id.)

26.     Second, the settlement provides for the limitation on any existing and potential allowed claims the DOL may have in the bankruptcy proceedings, including under ERISA section 502(l), 29 U.S.C. § 1132(l), to an allowed general unsecured claim against Tribune in the amount of $3.2 million, which is subject to a dollar-for-dollar reduction by any payment made by or on behalf of Tribune to the IRS on account of any claims of the IRS under section 4975 of the Internal Revenue Code relating to the ESOP, which are asserted for at least $37.5 million. The Debtors view the resolution of the IRS Claim as closely related to the ERISA Claim Settlement and expect such resolution to offset the claim granted to the DOL in its entirety. The Debtors retain the ability to void the ERISA Claim Settlement if a satisfactory resolution of the IRS Claim is not reached. (Liebentritt Dec. § 18.) The Debtors believe that this component of the settlement, which also brings closure to the DOL's pending objections to the Plans, provides a meaningful and valuable benefit to the Debtors' estates and creditors,

particularly in light of the substantial litigation costs that the Debtors and the DOL have expended to date on these disputed claims.  (Id.)

27.    Third, the ERISA Claim Settlement is a step toward resolution of the IRS Claim, asserted in the face amount of $37.5 million, which may be entitled to priority status, and any other potential tax liability of the Debtors relating to the ESOP. (Liebentritt Dec. § 19.)

28.    Fourth and finally, settlement of the ERISA-Related Claims avoids the significant costs and distraction of continuing the litigation and contested proceedings that are currently pending, plus avoids the potential subsequent litigation for indemnification, contribution, or reimbursement that could result.  (Liebentritt Dec. § 20.)

A.    **The ERISA Claim Settlement Meets Legal Standards for Approval**

29.    As a general policy, settlements and compromises are encouraged and favored by courts to efficiently resolve disputes in the bankruptcy context.  See Myers v. Martin (In re Martin), 91 F.3d 389, 394, 393 (3d Cir. 1996); In re TSIC, Inc., 393 B.R. 71, 78 (Bankr. D. Del. 2008).  In addition, there is a "strong presumption in favor of voluntary settlements" in complex litigation cases, especially in the class action context.  Ehrheart v. Verizon Wireless, 609 F.3d 590, 595 (3d Cir. 2010) ("This presumption is especially strong in 'class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation'") (quoting In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liability Litig., 55 F.3d 768, 784 (3d Cir. 1995)).

30.    The Court has discretion to approve settlements pursuant to section 105(a) of the Bankruptcy Code, which provides that "[t]he court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  The Court may also approve settlements under section 363 of the Bankruptcy Code after notice and a hearing.  See In re Martin, 91 F.3d at 394, 395 n.2.  The procedure for

17

approving a settlement in bankruptcy is set forth by Bankruptcy Rule 9019, which provides, in

relevant part:

> On motion of the trustee and after notice and a hearing, the court may
> approve a compromise or settlement.  Notice shall be given to creditors,
> the United States trustee, the debtor, and indenture trustees as provided in
> Rule 2002 and to any other entity as the court may direct.

Fed. R. Bankr. P. 9019(a).

31.    Approval of a settlement under Bankruptcy Rule 9019 is committed to the

sound discretion of the bankruptcy court.  In re Spansion, Inc., Case No. 09-10690,2009 Bankr.

LEXIS 1283, *12 (Bankr. D.Del. June 2, 2009); In re TSIC, 393 B.R. at 78; Key3Media Group,

Inc. v. Pulver.com, Inc. (In re Key3Media Group, Inc.), 336 B.R. 87, 92 (Bankr. D. Del. 2005).

32.    In determining whether to approve a settlement pursuant to section 363 of

the Bankruptcy Code and Bankruptcy Rule 9019, bankruptcy courts should consider the

following four factors:  "(1) the probability of success in the litigation; (2) the likely difficulties

in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and

delay necessarily attending it; and (4) the paramount interest of the creditors."  In re Martin, 91

F.3d at 393 (citing Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v.

Anderson, 390 U.S. 414, 424-25 (1968); In re Neshaminy Office Bldg. Assocs., 62 B.R. 798,

803 (E.D. Pa. 1986)).  See also Will v. Northwestern Univ. (In re Nutraquest, Inc.), 434 F.3d

639, 644 (3d Cir. 2006) (confirming the Martin factors as a longstanding test for approval of

settlements).  "The court must also consider 'all other factors relevant to a full and fair

assessment of the wisdom of the proposed compromise.'"  In re Marvel Entm't Group, Inc., 222

B.R. 243, 249 (D. Del. 1998) (quoting TMT Trailer, 390 U.S. at 424).  Additionally, the court

should defer to the debtor's business judgment when approving consensual settlements.  See In

re Coram Healthcare Corp., 315 B.R. 321, 330 (Bankr. D. Del. 2004).  See also In re Nashaminy

18

Office Bldg. Assocs., 62 B.R. at 803 (providing that when approving a proposed settlement, the court "does not substitute its judgment for that of the trustee").

> a)    Probability of Success in Litigation.

33.    In evaluating the first Martin factor, "the Court's task . . . is to canvass the issues to see whether the settlement fall[s] below the lowest point in the range of reasonableness." In re Exide Techs., 303 B.R. 48, 68 (Bankr. D. Del. 2003) (quoting In re Neshaminy Office Bldg. Assocs., 62 B.R. at 803). The Court need not be convinced that the settlement is the best possible compromise, just that the settlement is within the range of litigation possibilities. In re World Health Alternatives, Inc., 344 B.R. 291, 296 (Bankr D. Del. 2006); In re Coram Healthcare Corp., 315 B.R. at 330.

34.    Here, the Neil Plaintiffs and the DOL have asserted claims and causes of action against the other settling parties, including the DOL's claims against the Debtors, that have a potential value of $250 million, plus costs of litigation. In this context, the Debtors' $4.45 million portion of the cash settlement to resolve the Neil Action, which is payable by Tribune Company or one of its Debtor or non-Debtor subsidiaries, is well within the range of reasonableness. While the Debtors owe no direct liability to the Neil Plaintiffs in connection with the Neil Action, the Neil Action may give rise to substantial indemnification claims against Tribune and its Debtor and non-Debtor subsidiaries by GreatBanc.

35.    To illustrate, if GreatBanc suffered a $250 million adverse judgment in the Neil Action, the damages claims that GreatBanc might assert arising from the rejection of the indemnification agreement could total $200 million net of insurance and would be asserted against Tribune and its affiliates, including its non-Debtor affiliates. Although Tribune and its affiliates would dispute and seek to subordinate such liability, such a claim, if successful, could significantly reduce the value available to satisfy other creditor claims. The Debtors agreed to

contribute $4.45 million to the cash settlement in order to obtain the benefit of a full release of any such indemnification claims by GreatBanc, and any other indemnification, contribution, or reimbursement claims derived from the Neil Action. (Liebentritt Dec. § 17.)

36.    Similarly, with respect to the DOL Claim, the Debtors believe that the limitation on any existing and potential claims of the DOL, including under ERISA section 502(l), to a $3.2 million allowed claim against Tribune, subject to a dollar-for-dollar reduction by any payment made by or on behalf of Tribune to the IRS on account of any claims of the IRS under section 4975 of the Internal Revenue Code relating to the ESOP, which are asserted for at least $37.5 million, is reasonable given that the face amount of the offsetting asserted liability to the IRS is at least $37.5 million. (Liebentritt Dec. § 18.) Moreover, in connection with approval of the ERISA Claim Settlement, GreatBanc will withdraw its limited objection to the Plans and the Secretary of Labor will withdraw the DOL Objection, thereby resolving all outstanding objections to the Plans relating to the ESOP, the DOL Claims, and the Neil Action.

37.    Given the potential risks present in any litigated action, the ERISA Claim Settlement is fair and reasonable and satisfies the first Martin factor.

b)    Likely Difficulties in Collection.

38.    The damages claimed by the Neil Plaintiffs in the Neil Action far exceed the combined respective Limits of Liability of the 2007 Fiduciary Liability Policies, and thus could result in potentially large indemnification claims against Tribune and Tribune's direct and indirect subsidiaries, both Debtors and non-Debtors. Consequently, if either the Neil Action or the DOL Claims give rise to claims that exceed the amount of the insurance coverage, Tribune and its affiliates could be directly exposed to significant liability.

39.    The ERISA Claim Settlement avoids that possibility. The Debtors' Insurers are parties to the settlement and are paying the vast bulk of the monetary award--$26.55

20

million out of $32 million.  The contributions to the settlement to be made by the Insurers are a substantial benefit to the estates and avoid any difficulty in collection by the parties to the settlement.

c)      Complexity of the Litigation Involved.

40.      The claims and causes of action resolved by the ERISA Claim Settlement relate not to just a single litigation, but to a host of inter-related claims and causes of action being played out in two federal jurisdictions, both within and without these chapter 11 cases.  The fact that the parties have been able to resolve the pending Neil class action litigation, the related Neil Adversary Proceeding, the filed claims of the DOL and the potential claims of GreatBanc against the Debtors' estates, and the parties' objections to the Plans, is a testament to the efforts of all of the parties to settle the ERISA-Related Claims.  Class actions are notorious as complex, protracted, and expensive litigated matters involving difficult issues of law and fact, which in this case, is complicated by difficult questions under ERISA concerning the Leveraged ESOP Transactions.

41.      The Debtors recognized the value of settling the complex ERISA-Related Claims when they sought this Court's approval of the order appointing Judge Gross as mediator. The ERISA Claim Settlement, which is a product of that mediation process, reflects the parties' balancing of the costs and time of litigation with their desire to reasonably and timely resolve the ERISA-Related Claims.  The ERISA Claim Settlement avoids complicated and time-consuming litigation involving a certified ERISA class action and related DOL Claims that present the prospect of substantial potential damages and other relief.  By contrast, continued pursuit of the highly contested litigation, adversary proceedings, and plan confirmation disputes underpinning the ERISA-Related Claims would unnecessarily escalate the time, costs, and complexity in resolving the ERISA-Related Claims.

21

d)    Paramount Interest of the Creditors.

42.    The ERISA Claim Settlement settles substantial ESOP-related contingent liabilities against the Debtors, potentially worth hundreds of millions of dollars, releases the Debtors from any claims for indemnity, contribution, or reimbursement, and limits attendant litigation costs. Specifically, upon consummation of the ERISA Claim Settlement, (i) the Neil Action will be finally resolved (subject to class action settlement approval by the District Court) (ii) Tribune will dismiss the related Neil Adversary Proceedings with prejudice, (iii) the DOL will release and dismiss all claims against the Debtors, and (iv) the parties will benefit from mutual releases of claims relating to or arising under the ESOP, in exchange for the consideration and obligations embodied by the ERISA Claim Settlement. Each of the foregoing components of the ERISA Claim Settlement is in the interest of the Debtors' creditor constituencies.

43.    In the Debtors' business judgment, the resolution of the Debtors' potential liabilities for indemnification to GreatBanc on account of the Neil Action in exchange for the Debtors' contribution of $4.45 million to the settlement, the balance of which shall be paid by GreatBanc and the Debtors' Insurers, represents significant value for the benefit of the Debtors' other creditor constituencies. (Liebentritt Dec. § 17.) The Debtors and their estates and creditors benefit by capping litigation and claims exposure to the Debtors' $4.45 million contribution, in exchange for a release and discharge of all claims for relief, monetary or otherwise, that have been or could have been asserted by the parties against Tribune and its direct and indirect subsidiaries in connection with the Neil Action. (Id.)

44.    Similarly, the Debtors' creditor constituencies will benefit from the resolution of the DOL Claims, which the DOL has valued at up to $250 million. Given that the DOL Claims were filed in completely unliquidated amounts, the potential liabilities represented

22

by the DOL Claims have been a source of great uncertainty for the Debtors and their creditor constituencies.  (Liebentritt Dec. § 18.)  As this Court is aware, the Debtors and the DOL have engaged in substantial briefing and oral argument regarding the proposed subordination of the DOL Claims by the Plans.  Although the Debtors have a very strong argument that the DOL's claim should not be allowed and, in any event, would be subordinated under section 510(b) of the Bankruptcy Code, resolution of the legal issues raised by that dispute were by no means certain and the potential exposure is substantial.

45.    The Debtors further believe, in their business judgment, that granting the DOL an allowed general unsecured claim against Tribune of $3.2 million, subject to a dollar-for-dollar reduction by any payment made by or on behalf of Tribune to the IRS on account of any claims of the IRS under section 4975 of the Internal Revenue Code relating to the ESOP (which are asserted for at least $37.5 million) is a reasonable compromise of those disputes and will allow them to proceed with their reorganization process without further cost, delay, or uncertainty.  (Liebentritt Dec. § 18.)  Resolution and liquidation of these disputed litigation and related indemnification claims serves creditors' interests by limiting exposure to damages and litigation costs arising from the Neil Action and preparing the Debtors for emergence through a settlement that is well within the appropriate range of reasonableness under Bankruptcy Rule 9019.

46.    For these reasons, the ERISA Claim Settlement is fair, reasonable and adequate, and well within the range of reasonableness as a valid exercise of the Debtors' business judgment, and is in the best interests of the Debtors' estates, their creditors, and all parties in interest, with particular benefit to the Settlement Class members who will receive a

sum certain cash settlement in a timely manner without the uncertainty and costs of further litigation.

**B.      Modification of the Automatic Stay, to the Extent Applicable, for Insurers Is Justified and Should Be Granted**

47.      In the summer of 2009, Tribune negotiated the terms under which its primary fiduciary liability insurance carrier agreed to advance defense costs under the 2007 Fiduciary Liability Policy to certain director and officer Insureds named in the Neil Action. Specifically, at that time, Tribune's directors and officers named in the suit participated with the other named defendants in the briefing and argument of a motion to dismiss the Neil Action for failure to state a claim.  The advancement of defense costs was consistent with Tribune's indemnification obligations to its directors, officers, employees, and agents relating to the ESOP. On September 2, 2009, this Court entered an order granting Tribune's uncontested motion to modify the automatic stay to the extent it applied, and to authorize the payment and advancement of the insurance proceeds under Tribune's 2007 Fiduciary Liability Policies in connection with the defense of the Neil Action.  (See Docket No. 2077.)[18]

48.      The relief granted in that order is identical to the relief sought herein with respect to permitting the Insurers to contribute their respective portions of the settlement amount, and for the same reasons, there is ample cause to modify the automatic stay.  If, however, the Court concludes that the Debtors must independently demonstrate that cause exists to allow the Insurers to pay their respective portions of the settlement amount, such cause is wholly warranted.

---

[18] In addition to modifying the automatic stay, to the extent it applied, to permit the Insurers to advance defense costs to the director and officer defendants named in the Neil Action, the September 2, 2009 Order also modified the automatic stay, to the extent it applied, to permit GreatBanc to recover, in connection with the Neil Action, payment of covered defense costs, advancement of covered defense costs, or both, in the event and to the extent that Tribune's Insurers consented to make such payments.  (See Order at 2.)

49.     Allowing the Insurers to contribute to the settlement will benefit the estate. Among other things, the Debtors may have an obligation to advance or indemnify the defense expenses and settlement costs incurred to date by certain of the defendants to the Neil Action, including individual director and officer defendants and GreatBanc, in its capacity as ESOP trustee.  If the Insurers are unable to pay their respective shares of the settlement due to the enforcement of the automatic stay, the defendants may assert indemnification claims against the Debtors' bankruptcy estates for such amounts.  Accordingly, payment of the settlement due from the Insurers under the 2007 Fiduciary Liability Policies will obviate claims that any defendants could assert against the estates.  Further, the ERISA Claim Settlement resolves very significant and costly litigation against current and former management of the estate and affiliates of the estate, and will likewise resolve regulatory matters against the estate.  Finally, the ERISA Claim Settlement resolves any disputes between Tribune and GreatBanc, including any and all any claims asserted by GreatBanc against Tribune and its direct and indirect subsidiaries.

C.      **Approval of This Motion Is in the Best Interests of the Debtors' Estates**

50.     The ERISA Claim Settlement fully resolves a complex class action lawsuit and related claims, including questions of law and fact under ERISA's complex statutes and regulations that expose Tribune and its direct and indirect subsidiaries to material damages liabilities, indemnification claims, and other relief.  The ERISA Claim Settlement is the product of an intensive, good faith, arms'-length negotiations between the Debtors, the Neil Plaintiffs, Samuel Zell, the DOL, GreatBanc, and the Insurers.  The ERISA Claim Settlement provides a fair, reasonable and adequate outcome consistent with the requirements of settlements in the class action and bankruptcy contexts and should be approved.

46429/0001-7840313v1

51.     The Debtors submit for all these reasons that the ERISA Claim Settlement is appropriate and justified under the Debtors' business judgment and that ample cause exists for the relief requested in this Motion.

## NO PRIOR REQUEST

52.     No prior request for the relief sought by this Motion has been made to this or to any other Court.

## NOTICE

53.     Notice of this Motion has been provided to:  (i) the Office of the United States Trustee; (ii) counsel for the Committee; (iii) counsel to the administrative agents for Tribune's prepetition loan facilities; (iv) counsel to the administrative agent for the Debtors' post-petition loan facility; (v) the indenture trustees for Tribune's prepetition notes; (vi) Class Counsel; (vii) counsel to GreatBanc; (viii) counsel to each of the Insurers; (ix) counsel to Zell and EGI-TRB; (x) the DOL; (xi) the IRS; and (xii) all parties having requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

46429/0001-7840313v1

WHEREFORE, the Debtors respectfully request this Court enter the Settlement Approval Order, in substantially the form attached hereto as <u>Exhibit A</u>, (i) authorizing the Debtors to enter into the ERISA Claim Settlement and to perform all obligations thereunder, (ii) modifying the automatic stay, to the extent applicable, to allow the Insurers to pay their respective portions of the settlement amount, and (iii) granting such other related relief this Court may deem just and proper.

Dated: Wilmington, Delaware
      August 19, 2011

Respectfully submitted,

SIDLEY AUSTIN LLP
Bryan Krakauer
James F. Conlan
Jillian K. Ludwig
Candice L. Kline
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

-and-

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.

By: _____
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

27