## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered<br>**Related to Docket Nos. 9010, 9286, 9291** |

## DEBTOR TRIBUNE COMPANY'S REPLY TO THE RESPONSE OF DUN & BRADSTREET TO THE DEBTORS' FORTY-FIFTH OMNIBUS OBJECTION (SUBSTANTIVE) TO CERTAIN CLAIMS

Debtor Tribune Company ("Tribune"), by and through its undersigned counsel, hereby submits this reply (the "Reply") to the Response of Dun & Bradstreet [Docket Nos. 9286, 9291] (the "Response") to the Debtors' Forty-Fifth Omnibus Objection (Substantive) to Claims [Docket No. 9010] (the "Objection").[2] In the Objection, Tribune sought to reduce and allow

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc., f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); and WPIX, Inc. (0191). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Objection or the Response, as applicable.

Claim No. 6668 filed by Dun & Bradstreet ("D&B") from $195,268.79 to $73,034.16 on

substantive grounds as D&B's administrative claim exceeded both the actual value of the benefit

to Tribune's estate and Tribune's contractual liability to D&B.

## FACTS RELEVANT TO THE REPLY

1.     The facts applicable to this matter are not in dispute.  Tribune and D&B

entered into a Master Agreement on January 28, 2004 (the "Master Agreement").  A true and

accurate copy of the Master Agreement is attached to the Response as Exhibit B.  The parties

then entered into a Three Year Preferred Pricing Plan on January 1, 2006 (the "Preferred Pricing

Plan" and together with the Master Agreement, the "Contract").  A true and accurate copy of the

Preferred Pricing Plan is attached hereto as Exhibit A.  Under the Preferred Pricing Plan, Tribune

purchased an unlimited data plan for itself and certain of its subsidiaries for access to D&B's

services.  The price for unlimited usage for 2010 was $184,701.66.

2.     On April 29, 2010, Tribune filed a motion to reject the Contract (i.e., both

the Master Agreement and Preferred Pricing Plan) [Docket No. 4201] (the "Rejection Motion").

This Court entered an order approving the Rejection Motion without objection on May 14, 2010

and set June 13, 2010 as the bar date for filing proofs of claim for rejection damages [Docket No.

4412].  D&B did not file a rejection damages claim relating to the Contract.  Instead, D&B filed

an administrative priority claim on July 26, 2010, which it subsequently amended on October 29,

2010.  In its amended claim, D&B sought $195,268.79 as an administrative payment for data

allegedly used by Tribune and certain of its subsidiaries during approximately four and a half

months of 2010.  D&B's claim amount is allegedly based on "overrun" rates, which are

substantially higher than the price that Tribune historically paid under the Contract.  As a result

D&B's asserted administrative claim exceeds the Contract price for unlimited usage for all 2010 by $10,567.13.

**PRELIMINARY STATEMENT**

3.    In its Response, D&B alleges that it deserves an administrative claim valued at more than twelve months' of full services under the Contract in exchange for the four and a half months' of services provided to Tribune postpetition. D&B's sole justification for its inflated claim is that it was not paid in advance for one year's services, which D&B contends resulted in the termination of the pricing terms governing unlimited usage although not the unfavorable "overrun" provisions. In effect, D&B is arguing that it is entitled to receive, as an administrative claim, either (i) full, up-front payment for one year's worth of services in exchange for four and a half months' of actual service or (ii) the ability to charge a new, inflated rate that would exceed the value of the entire Contract. D&B cites absolutely no authority for this proposition. Moreover, D&B's assertions run contrary to (i) the relevant provisions of the Contract, (ii) applicable principles of contract law, and (iii) both the letter and spirit of the Bankruptcy Code. For all these reasons, D&B should not be awarded a windfall by this Court. Instead, D&B should receive an allowed administrative claim in the amount of $73,034.16, which represents the value actually conferred on Tribune postpetition.

**ARGUMENT**

**I.    D&B Has the Burden to Demonstrate Entitlement to an Administrative Claim**

4.    It is black letter law that a party seeking an administrative priority claim has the burden of proof as to its entitlement to administrative priority for its claim and the actual and necessary benefit conferred by it on a debtor's estate. *See Calpine Corp. v. O'Brien Environ. Energy, Inc. (In re O'Brien Environ. Energy, Inc.)*, 181 F.3d 527, 533 (3d Cir. 1999)

3

("A party seeking. . . an administrative expense must. . . carry the heavy burden of demonstrating that the costs and fees for which it seeks payment provided an actual benefit to the estate and that such costs and expenses were necessary to preserve the value of the estate assets."); *In re DBSI, Inc.*, 407 B.R. 159, 165 (Bankr. D. Del. 2009); Collier, ¶ 503.04[1][a]; *see also In re Goody's Family Clothing, Inc.*, 610 F.3d 812, 818 (3d Cir. 2010) (same). As discussed below, D&B has failed to carry its burden.

## II.  D&B's Selective Reading of the Contract Affords It an Improper Windfall

5.     Tribune and D&B agree that D&B is entitled to an administrative expense claim for the value of the services it provided to Tribune postpetition. The parties disagree, however, on whether that value should be determined by reference to the amounts Tribune historically paid under the Contract or by reference to a new, substantially higher "overrun" rate. Tribune asserts that it should be the former: a pro rata share of the annual usage rate set forth in the Contract covering the four and a half month period that Tribune used D&B's services.[3]  D&B claims that the value should be calculated at the so-called "overrun" rate.  D&B's argument, however, would afford D&B an inappropriate windfall under the guise of an administrative priority claim.  Allowing D&B to charge a substantially higher price as a result of Tribune's rejection of the Contract effectively penalizes Tribune for exercising its rights under the Bankruptcy Code by valuing D&B's administrative claim at a higher rate solely because of Tribune's rejection of the Contract.  D&B's calculation of damages frustrates the very purpose of section 365(g), which permits a debtor to jettison burdensome contracts in order to aid in restructuring its estate.

---

[3] D&B and Tribune agree that there was limited usage after the Contract was rejected. The usage was inadvertent and minor.  In the interests of keeping this dispute manageable, Tribune agrees to pay the costs assessed for such use by D&B.

46429/0001-7844378v1

6.      D&B's sole argument for why it is entitled to an inflated rate under the Contract is its allegation that full payment under the Contract was necessary for the Contract rate, i.e., unlimited usage, to be effective. In other words, D&B argues that pre-payment of a year of services was a condition precedent to application of the unlimited usage rate that it invoiced Tribune for *after* the year of services had already begun.[4] Besides its obvious logical problems, D&B's argument fails for two reasons. First, it fails to show that D&B's services were necessary and that its administrative priority claim is actually commensurate with the benefit conferred on Tribune's estate, which is the relevant question before this Court. Nothing in the record suggests that Tribune received more value from four and a half months of service in 2010 than for twelve months of the same services in 2009.

7.      Second, the contractual language pointed to by D&B is not a condition precedent, as D&B contends that it is, under basic contract law. A condition precedent is "an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due." *Restatement (Second) of Contracts* § 224 (1981); *see also Castle v. Cohen*, 840 F.2d 173, 177 (3d Cir. Pa. 1988). Conditions precedent are generally disfavored.[5] *See, e.g., Liberty Mut. Ins. Co. v. President Container, Inc.*, 297 N.J. Super. 24, 34 (App. Div. 1997) (refusing to find condition precedent when no evidence existed to indicate the parties intent to be bound by such a condition); *Marsa v. Metrobank for Savings, F.S.B.*, 825 F. Supp. 658, 664 (D. N.J. 1993) ("Thus, where the contract language is unclear, an obligation should be interpreted as a promise, rather than a condition precedent.").

---

[4] Despite making this argument now, D&B never, during the course of the parties' contractual relationship, invoiced Tribune at the inflated overrun rate nor did it advise Tribune of its belief that the overrun rate was applicable until after the Contract was rejected and its administrative claim filed. *See* Declaration of Richard Stone of Alvarez & Marsal (the "Stone Declaration"), ¶¶ 3, 5, a true and accurate copy of which is attached hereto as Exhibit B.

[5] The Contract is governed by the laws of the State of New Jersey. (Master Agmt., § 11.1.)

8.      Conditions precedent can be either express or implied.  An express condition is created by contractual language that clearly and unambiguously states that one party's performance is not necessary unless and until a certain condition is satisfied by the other party.  Normally, such conditions are set of by words that are understood to convey conditionality, for example, "if, then," "provided that," and "on condition that."  *See Innovative Comm'n Co.*, 399 B.R. at 158 (listing conditional clauses and finding that *if, then,* structure of settlement agreement made debtors' payment of settlement proceeds a condition precedent for creditor's performance of its duties); *see also Corbin on Contracts* § 35.1.  A condition precedent may also be implied when the general nature of the agreement when read as a whole indicates that the parties intended performance to be conditioned on the satisfaction of a duty or obligation.  *See Innovative Comm'n Co.*, 399 B.R. at 157 (*citing Restatement (Second) of Contracts*, § 226) ("An intention to make a duty conditional may be manifested by the general nature of an agreement, as well as by specific language.").  However, in interpreting a contract to determine whether an implied condition exists, courts should not adopt an interpretation that conflicts with or otherwise obviates the terms of the contract.  *Corbin* § 8 at ¶ 32.1 (*citing Dorn v. Stanhope Steel, Inc.*, 368 Pa. Super. 557, 534 A.2d 798 (1987)).

9.      It is clear from the Contract that neither party intended for Section 2 of the Preferred Pricing Plan or Section 6.3 of the Master Agreement to be an express or implied condition precedent.  The language highlighted by D&B conditions nothing.  It merely states the consideration for the bargain and the promises that each party agreed to perform under the Contract, i.e., Tribune to pay and D&B to provide services.  (Master Agmt., § 2 ("[i]n consideration for. . . .").)  As such, the contractual language creates mutually binding promises rather than a condition precedent.  Payment of a pro rated amount of the annual fee for unlimited

6

service is entirely consistent with this reading and is consistent with the demonstrated value of

D&B's services, given that Tribune had historically paid similar amounts to D&B for the same

services.

          10.    This interpretation of the Contract ("In consideration for. . . .") as creating

only a promise is borne out by the case law. For example, the District Court for the Southern

District of New York rejected the argument that "In consideration for the Rate" created a

condition precedent. *Powlus v. Chelsey Direct, LLC*, 2011 U.S. Dist. LEXIS 3287, *1-3

(S.D.N.Y. Jan. 1, 2011). The *Powlus* court held:

> There is no unambiguous contract language indicating that payment of the Rate
> was a condition precedent. ***The language, '[i]n consideration for the Rate' is a***
> ***mere recital supporting the existence of consideration for the plaintiffs***
> ***obligation to perform. No court applying New York law has ever construed the***
> ***commonly used phrase '[i]n consideration for' as indicating a condition***
> ***precedent.*** If the parties intended to make full payment of the Rate a condition
> precedent to the defendants' duty to perform under the contract, they could have
> expressly stated that the defendants would not become licensees until full
> payment was received or could have used unambiguous terms to indicate their
> intention to make full payment a condition precedent.

*Id.* at *15-16 (citations omitted) (emphasis added); *see also Mellon Bank, N.A. v. Aetna Business*

*Credit, Inc.*, 619 F.2d 1001, 1016 (3d Cir. 1980) (holding that contract language stating that a

party "will furnish evidence. . . at the date of funding" created a promise to furnish consideration,

not a condition precedent to performance); *Southland Corp. v. Emerald Oil Co.*, 789 F.2d 1441,

1443 (9th Cir. 1986) (finding that language stating that "Title. . . shall pass. . . upon installation"

did not create a condition precedent contingent upon installation but only a promise).

          11.    The Contract also expressly states that prepayment is not a condition

precedent for unlimited usage. The Contract states that if invoices are not paid "in accordance

with the [Preferred Pricing Plan]. . . A late payment charge of the lesser of 1½% per month or the

highest lawful rate may be applied to any outstanding balances until paid." (Master Agmt., §

6.1.) As such, payment is an obligation under the Contract the failure of which results not in the

obviation of D&B's duty to provide unlimited usage but in a late fee. Moreover, other language

in the Contract vitiates any argument that there was an implied condition precedent. For

example, the Preferred Pricing Plan states that its terms, which include unlimited access, will

begin *automatically* upon renewal on the Effective Date, *i.e.*, January 1 of each year. (Preferred

Pricing Plan, § 1.) The Preferred Pricing Plan thus does not condition the effectiveness of the

Contract upon payment of the Contract price nor could it, as the initial invoices attached to the

Response are all dated January 2.[6] (Resp., Exhs. C; D.) Payment cannot be a condition

precedent for unlimited access on the Effective Date if payment is not requested or due until after

the Effective Date. The Contract also includes a termination provision, which allows D&B to

terminate the Contract – which it did not do – in the event of a material breach. (Master Agmt.,

§ 9.1.) This termination provision, coupled with the late payment provision, dictates D&B's

rights in the event that Tribune fails to perform and is inconsistent with D&B's reading of the

Contract.

       12.     D&B's interpretation of the Contract, therefore, would create a substantive

right and remedy that conflicts with the express terms of the Contract and should be discounted.

*See, e.g., Dorn v. Stanhope Steel, Inc.*, 368 Pa. Super. 557, 534 A.2d 798 (1987) (refusing to

construe a clause as a condition precedent when the agreement otherwise included specific

grounds and methods of termination). Both the terms of the Contract and the applicable

precedent require a finding that the Contract does not contain a condition precedent.

---

[6] Despite the fact that the invoice attached as <u>Exhibit D</u> to the Response is dated January 2, 2010, it was not received by Tribune until March 17, 2010 further obviating D&B's argument that payment of the invoice was a condition precedent to unlimited usage on January 1. (Stone Decl., ¶ 6-7.) That the invoice was misdated is clear from the cover email from D&B to Tribune and the fact that it includes all three installments, which would not have been due and owing on January 2 under the terms of the Contract. In addition, D&B has historically misinvoiced Tribune, requiring D&B to issue new invoices and resulting in Tribune's payment of the Contract price to come significantly after the payment date specified in the Contract. (*Id.*, ¶ 4-5.)

### III. D&B's Administrative Claim Does Not Satisfy the Bankruptcy Code

13.    As discussed above, D&B bears the burden of proving the value of its

postpetition services to Tribune and that such services were actual and necessary. *See, e.g.,*

*O'Brien*, 181 F.3d at 533.  However, nothing in the record, nor in the Response, in any way

shows that D&B's services should be valued at the "overrun" rate.  Neither party disputes that

Tribune used D&B's services pursuant to the Contract for a number of years, during which time

Tribune paid an annual contract rate for unlimited usage.  That history, as well as the parties'

payment history, demonstrates that both Tribune and D&B believed that a fair value for one year

of D&B's services was the annual unlimited usage rate.  Tribune has used that rate – pro rated

for the time used – to value D&B's administrative claim.  D&B, however, is seeking to change

the parties' historical practice by employing the overrun rate, which is a value that (i) Tribune

has never paid for D&B's services and (ii) D&B never suggested was applicable until after the

Contract was rejected.  There is simply no basis in law, equity, or logic to suggest that the annual

usage rate, which both parties had agreed was applicable to D&B's services, should now be

disregarded in favor of an off-contract rate that grants one party a substantial windfall.

14.    Case law supports Tribune's argument that when a debtor continues to use

services postpetition under a prepetition contract[7] that a court should look to the debtor's actual

use of the services to value the administrative expense claim.  *See, e.g., In re Continental*

*Airlines, Inc.*, 148 B.R. 207, 215-16 (D. Del. 1992) (finding that a claim for back pay did not rise

to the level of an administrative expense because the employee, although entitled to back pay,

did not actually provide any service to the debtor during the postpetition period); *see also In re*

---

[7] There is no dispute that the Contract was a prepetition executory contract at the time of rejection.  It is well-settled
that a contract which renews postpetition is a prepetition executory contract so long as the renewal is automatic.  *See
In re Smith Corona Corp.*, 210 B.R. 243, 247 (Bankr. D. Del. 1997); *In re Teligent Inc.*, 324 B.R. 479 (S.D.N.Y.
2005); *In re Country Club Estates*, 227 B.R. 565, 568 (Bankr. S.D. Fla. 1998).

46429/0001-7844378v1

*Subscription Television of Greater Atlanta*, 789 F.2d 1530, 1532 (11th Cir. 1986) (finding that when debtor did not use services provided for under subscription agreement that no administrative expense arose despite contract party being obligated to provide benefit of subscription agreement).  D&B is thus entitled to an administrative expense claim only to the extent that it conferred a necessary and actual benefit on Tribune's estate and cannot recover for services it did not render.

15.    In the case at bar, D&B charged $184,701.66 under the Contract for twelve months of unlimited usage during 2010.  However, because of the rejection of the contract on May 14, 2010, Tribune did not receive the benefit of D&B's services for the full twelve months.  Therefore, D&B did not confer a benefit on Tribune under the Contract from May 14, 2010 through December 31, 2010 and is not entitled to recover under the Contract for such amounts as an administrative claim.  Tribune, in the Objection, seeks to reduce D&B's administrative claim to comply with the Bankruptcy Code and the benefits actually conferred on Tribune.  As set forth in more detail in the Stone Declaration, the Objection reduces D&B's administrative claim to a pro rata share of the Contract – reflecting the value of the Contract actually conferred on Tribune – from January 1, 2010 through May 14, 2010.  (Stone Decl., ¶ 8.)  The Objection also allows for all D&B services inadvertently used after the date of rejection to be paid at D&B's requested list prices, which recognizes that after rejection Tribune was using D&B's services without the benefit of the Contract.[8]  (*Id.*, ¶ [_].)  As such, the amount calculated by Tribune - $73,034.16 – accurately reflects the benefit that D&B conferred on Tribune's estates postpetition both during the time when the Contract was effective and after rejection.

---

[8] The majority of post-rejection use was by employees of Newsday, who were entitled to use D&B's services under the Contract.  Because Newsday is no longer a Tribune entity, it did not receive the notification to cease using D&B's services after the rejection date.

46429/0001-7844378v1

16.     D&B, however, disputes Tribune's calculation of its administrative claim and instead argues that it is entitled to an administrative claim against Tribune for all services rendered from January 1, 2010 through December 31, 2010 at the substantially higher overrun rate. Such a calculation violates both the Bankruptcy Code and general contract law. First, D&B's claim exceeds the Contract price for the full twelve months by more than $10,500 and is grossly disproportionate to the value actually conferred on Tribune. Under existing case law, when a debtor is party to a contract that requires its contract party to provide, or allow the debtor to access, services over a period of time for a set fee, the contract party is only allowed an administrative claim for the portion of the contractual period that the debtor actually used or accessed its services, not the full term. *See Subscription Television*, 789 F.2d at 1532 (finding that when debtor availed itself of subscription agreement for only seventeen days out of the sixty-day contract period that administrative expense was incurred for only those seventeen days, not full term of contract). Therefore, under the Bankruptcy Code, D&B's claim should be reduced to the value of approximately four and a half months of the Contract plus D&B's requested rates for usage after the Contract was rejected as such calculation reflects the actual value conferred by D&B. Second, D&B's damage calculations exceed the amount that would be allowed under general contract law. D&B cannot concoct a condition precedent, which if triggered would allow it to recover damages that greatly exceed the bargained for price of the contract. D&B's reading of the Contract would allow it to reap a huge windfall as a result of a default that is wholly unconnected with the damages it could have incurred. D&B should not be allowed a recovery exceeding its Contract, especially not as an administrative claim, when the recovery would have no connection to the benefit conferred on Tribune's estate. D&B should be

11

allowed only an administrative expense claim for $73,034.16, the value it conferred on Tribune's estate.

## CONCLUSION

      17.    For the reasons set forth herein, Tribune respectfully requests that the Court sustain the Objection.

Dated: Wilmington, Delaware
       August 22, 2011

Respectfully submitted,

SIDLEY AUSTIN LLP
James F. Conlan
Bryan Krakauer
Kenneth P. Kansa
Kerriann S. Mills
Gregory V. Demo
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile:  (312) 853-7036

     -and-

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.

By: _____
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Facsimile:  (302) 652-3117

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

46429/0001-7844378v1