# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered |
| | **Objection Deadline: September 20, 2011 at 4:00 p.m. (ET)**<br>**Hearing Date:  October 4, 2011 at 10:00 a.m. (ET)** |

## MOTION OF THE DEBTORS FOR AN ORDER AUTHORIZING THE DEBTORS TO IMPLEMENT A MANAGEMENT INCENTIVE PLAN FOR 2011

Tribune Company (the "Company") and most of its wholly-owned subsidiaries, each of which is a debtor and debtor in possession herein (each a "Debtor" and collectively, the "Debtors"), hereby move this Court (the "Motion") for entry of an order, in substantially the form attached hereto as Exhibit A (the "Order"), authorizing, but not directing, the Debtors

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc., f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); and WPIX, Inc. (0191).  The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

pursuant to Section 363(c) and, as applicable, Sections 363(b) and 503(c)[2] of Title 11 of the

United States Code (the "Bankruptcy Code"), to continue their self-funding annual cash

Management Incentive Plan ("MIP") as described in this Motion for 2011 for approximately 640

management employees with an aggregate payout opportunity of approximately:

(a)   $16.4 million – representing a 50%-of-target payout – if the Company achieves "threshold" performance equal to approximately 91% of its "planned" 2011 consolidated operating cash flow ("OCF") goal included in the 2011 operating plan that was approved by the Company's Board of Directors (the "Board") on February 2, 2011;

(b)   $32.4 million – representing a 100%-of-target payout – if the Company achieves "target" performance equal to approximately 106% of its "planned" 2011 consolidated OCF goal included in the 2011 operating plan that was approved by the Board on February 2, 2011; and

(c)   $42.5 million – representing a 130%-of-target payout – if the Company achieves "maximum" performance equal to approximately 141% of its "planned" 2011 consolidated OCF goal included in the 2011 operating plan that was approved by the Board on February 2, 2011.

## SUMMARY

Court Approval of Prior MIPs and the Continued Imperative for Meaningful Incentives

The Debtors seek to continue in the ordinary course for 2011 the historical MIP

that has been a key component of their incentive-based compensation structure since at least

1997.  Like the 2008, 2009 and 2010 MIP programs that were approved by this Court, the 2011

MIP has been reviewed and approved by the Compensation Committee of the Company's Board

---

[2] The Debtors are filing the instant Motion with respect to the 2011 MIP out of an abundance of caution because some participants are statutory insiders, notwithstanding the Debtors' position that Section 363(c) authorizes the continuation of that program without the need for notice and a hearing.

(the "Compensation Committee"), and was developed with and analyzed by Mercer (U.S.), Inc.

("Mercer"), an independent compensation consulting firm.  Mercer concluded that the incentive

opportunities provided under the 2011 MIP are reasonable and appropriate, and indeed result in

total cash compensation ("TCC") that is relatively competitive and total direct compensation

("TDC")[3] that is still materially below the market median.[4]  Furthermore, the anticipated

participant level (approximately 640) and aggregate payout opportunities of the 2011 MIP ($16.4

million at "threshold" performance, $32.4 million at "target" performance and $42.5 million at

"maximum" performance) are below the comparable figures for both the Court-approved 2009

and 2010 MIP programs.[5]

        The Debtors have shared information regarding the 2011 MIP with the official

committee of unsecured creditors (the "Creditors Committee"), JPMorgan Chase Bank, N.A.

("JPM"), Oaktree Capital Management, L.P. ("Oaktree") and Angelo, Gordon & Co., L.P.

("Angelo Gordon" and, together with JPM and Oaktree, the "Principal Senior Lenders"), and

their respective financial advisors and attorneys.  Based on certain creditor constituency

feedback received, the Debtors have included in the 2011 MIP various enhanced performance

requirements beyond historical MIP programs.

---

[3] TCC is comprised of base salary and short-term (e.g., annual) cash incentives.  TDC is comprised of base salary, short-term (e.g., annual) cash incentives and long-term (e.g., equity-based) incentives, if any (i.e., TDC = TCC + long-term incentive compensation).  See Ex. D (Mercer Report) at 10.

[4] A redacted copy of Mercer's August 26, 2011 report describing and analyzing the proposed 2011 MIP (the "Mercer Report") is attached as Exhibit D hereto.  Concurrently with this Motion, the Debtors are filing the Motion of the Debtors to File Under Seal an Exhibit to Motion Of The Debtors For An Order Authorizing The Debtors To Implement A 2011 Management Incentive Plan.  Pursuant to Del. Bankr. L. R. 9018-1(b), an unredacted copy of Exhibit D, the Mercer Report, will be provided to the Judge's chambers in an envelope marked "Documents To Be Kept Under Seal."

[5] The 2009 MIP had approximately 670 participants and authorized payout opportunities of approximately $17.5 million at "threshold" performance, $35.0 million at "target" performance and $45.9 million at "maximum" performance.  The 2010 MIP had approximately 660 participants and authorized payout opportunities of approximately $16.5 million at "threshold" performance, $33.0 million at "target" performance, and $42.9 million at "maximum" performance.

3

Approval of the 2011 MIP continues to be critically important to maintain proper incentives for the management team as the Company strives to sustain its strong performance despite the strains of the Chapter 11 process and the significant headwinds that the media industry still faces. At the November 10, 2010 Hearing on the 2010 MIP, then-Company Co-President, Executive Council member (now Company President and Chief Executive Officer) and Publisher and Chief Executive Officer of the *Los Angeles Times* Eddy Hartenstein testified:

> There are so many opportunities out there, which we should be acting on now, in terms of consolidation and other things that we could be doing as the economy looks like it might be turning around, we are making all the infrastructure adjustments, we are making all the client and market adjustments to prepare ourselves for that, now's not the time to take the foot off the pedal and [not] keep incentivizing these core – this core group of people here and exhorting them to continue to excel . . . . [The effect on the morale of the MIP participants of non-approval or continued uncertainty regarding the MIP] would be absolutely devastating. I can't emphasize strongly enough from my general experience in business and from my specific experience these two years and two months I've been here at Tribune, how debilitating and devastating that would be, to not come back and leave here today with an approval for the MIP.

Transcript of November 10, 2010 Hearing on 2010 MIP ("November 10, 2010 Hearing") (excerpts attached as Exhibit F hereto), at 42; id. at 34 (Mr. Hartenstein testifying that: "This was an industry in transition, a company in both transition in that industry, and in turmoil through the fact that we've been in bankruptcy since December of 2008 . . . . I have never seen a group of people, and I have personally never worked as hard in all my years in business to make this happen. I've asked people to do extraordinary things and they've responded and other business unit leaders in the company have as well."); see also Transcript of January 27, 2010 Hearing on 2009 MIP ("January 27, 2010 Hearing") (excerpts attached as Exhibit G hereto), at 15 (the Court stating that "it's undisputed that the debtor operates in a troubled industry . . . . Here the evidence demonstrated that the debtor is performing well, relative to its competitors.").

4

Consistent with Mr. Hartenstein's testimony, this Court has recognized that these MIP programs are important means of ensuring that the Debtors maintain proper incentives for their management team during the Chapter 11 process. For example, with respect to the 2010 MIP, the Court held:

> I find that the targets and the benchmarks have been appropriately fixed as incentives. They contain the necessary reach. The metrics chosen in the setting of the targets and benchmarks that is revenue and operating cash flow I think is reasonably chosen under the circumstances. There's nothing wrong with relatively simple means of determining such things. I think sometimes the parties, in requesting such relief, build frameworks that are much more complicated than they need be. The awards and potential awards under the proposed plan are meaningful but not excessive. They're within the market and the company's historical practice, arguably, below each of them.

Transcript of November 10, 2010 Hearing (Ex. F hereto), at 59-60. In approving the 2010 MIP, the Court also observed that the "MIP that's been proposed here is somewhat less generous than 2009." Transcript of November 10, 2010 Hearing (Ex. F hereto), at 59. As stated, the same is true in this case, as the 2011 MIP is lower in aggregate cost than both the 2009 and 2010 MIP programs.

The Court expressed the same sentiments in approving the 2009 MIP at the January 27, 2010 Hearing, citing the Company's evidence that:

> costs are fixed, the company is under intense revenue pressure, and it's harder to do things in a Chapter 11 . . . [and] that all eight newspapers owned by the company are cash flow positive and that the program that's proposed was approved by three independent directors. I mean, it's undisputed that the debtor operates in a troubled industry. An industry, in the Court's view anyway, that besides shedding debt has yet to find the ultimate solution for how to succeed in a changing market in the distressed economy. This is the third large media – well, this is one of three large media cases that I have. I had the first days on my most recent filing just yesterday. The industry continues to be troubled. Here the evidence demonstrated that the debtor is performing well, relative to its competitors.

5

Transcript of January 27, 2010 Hearing (Ex. G hereto), at 15; see also Transcript of January 27, 2010 Hearing (Ex. G hereto), at 13 (the Court stating that the Debtors' evidence regarding the 2009 MIP "demonstrated the need for incentives" and that the "Debtors' expert, John Dempsey [of Mercer], among other things said, 'It's a basic principle of human resources management that incentives are a tool used to both motivate people and to align the interests of people with the company.'"); Transcript of May 12, 2009 Hearing on 2008 MIP ("May 12, 2009 Hearing") (excerpts attached as Exhibit I hereto), at 52-53 (the Court stating: "You look at the industry, and considering the debtors' place in the industry in which it's trying to survive and transform itself in what are truly extraordinary times, and you compare that to what's proposed to be paid in relation to its revenue.").

Meaningful incentives are also vital given the fact that the Debtors' management are now in at least their third consecutive year of below-market compensation, as Mercer's analysis demonstrates (see infra) and as Eddy Hartenstein testified at the November 10, 2010 Hearing: "We are already operating, as I think you'll see from some of the other material here, with folks in [the] industry well below where I think the median compensation should be and I will attest to – down to a person on that list that these – this is a group that is not median or mediocre in any way in their performance and their capabilities." Transcript of November 10, 2010 Hearing (Ex. F hereto), at 41.

As detailed below, the Court's rulings approving several prior years' MIP programs fully support the current relief requested. This Court authorized the Debtors to implement the 2010 MIP and held that it met the standard under Section 503(c)(3) of the Bankruptcy Code, without regard to whether the plan should be analyzed under Section 363(b) or 363(c). See Transcript of November 10, 2010 Hearing (Ex. F hereto), at 59 ("I don't address

whether the relief should be awarded or viewed under 363(b) or (c).  No one has argued that

these are – or is not now arguing this is relief that should be applied against the standard set in

503(c)(1) or (c)(2).  So I will apply the standard provided in 503(c)(3).  And I conclude that the

debtor has met its burden for the relief that it's now requesting.").  11 U.S.C. § 503(c)(3).

This Court also authorized the Debtors to implement the 2009 MIP as an ordinary

course program under Section 363(c) of the Bankruptcy Code.  See Transcript of January 27,

2010 Hearing (Ex. G hereto), at 17-18 ("The plan that is proposed is similar enough to the 2008

and prior plans, with the evidence showed, appropriate adjustments to fit the change in the

circumstances, that it meets the [Section] 363 Ordinary Course standard.").  Additionally, this

Court approved payments under the 2008 MIP and suggested that they too may have met the

ordinary course standard, even though that standard technically did not apply because the 2008

payments largely involved pre-petition services.  Transcript of May 12, 2009 Hearing (Ex. I

hereto), at 9 ("With respect to the motion at Number 5, to make payments according to

prepetition incentive plans, it may be really – it may be the first time that it really is an ordinary

course thing and doesn't fall under the 503(c)(3) standard.").

Finally, an expeditious ruling approving the 2011 MIP is, in the Debtors' view,

vital to providing all participants with some modicum of stability and predictability given the

current posture of the Chapter 11 proceedings and the related uncertainties that the participants

face.  As this Court observed at the November 10, 2010 Hearing, "given the continuing disputes

among various constituents, which are now represented in the competing plans, and the

atmosphere that must have created, and I figure continues at the debtor in part as a result of that

anyway, I sympathize with the debtors' request for the Court t[o] act at this time."  Transcript of

November 10, 2010 (Ex. F hereto), at 18.  The Debtors further submit that the foregoing

7

considerations apply equally to all of the Debtors' management personnel, including the two

2011 MIP participants who continue to be employed by the Debtor whose payments under the

2010 MIP were not authorized for the time being by the Court. <u>See</u> <u>infra</u> Section III; Order dated

November 10, 2010 [D.I. No. 6323] (the "<u>2010 MIP Order</u>"). As a consequence, those two

individuals have been included in the 2011 MIP by the Compensation Committee. However, the

Debtors have provided that any 2011 MIP payments otherwise payable to these two individuals

would be placed in a trust pending resolution of the claims against them. <u>See</u> <u>infra</u> Section III.

<u>Consistency of the 2011 MIP with Prior Court-Approved and Historical MIPs</u>

The Debtors respectfully submit that the 2011 MIP is similar in many respects to

the 2010 MIP and 2009 MIP that this Court approved, and it continues in any event to be more

conservative than the Debtors' longstanding ordinary course MIP programs from prior years.

For example:

- The Debtors' historical practice has been to offer an annual MIP program every year since at least 1997;

- The anticipated number of 2011 MIP participants (approximately 640) is lower than for prior years' programs;

- Individual participant percentage-of-salary target bonus opportunities generally are the same as they were for 2010, other than adjustments in connection with promotions or other increased responsibilities, internal or market comparability, exceptional performance or contractual requirements;

- The OCF performance metric used in the 2011 MIP is the metric traditionally used in the MIP, including without limitation in 2008, 2009 and 2010; and

- As noted, the aggregate payout opportunities at all performance levels under the 2011 MIP are less than the corresponding payout opportunities under the 2009 MIP, the 2010 MIP, and historical MIP programs (see supra note 5).

The 2011 MIP pay-for-performance structure also is more conservative than historical MIP programs, and consistent with the Court-approved 2009 and 2010 MIP programs:

- The 2011 MIP comports with the historical payout structure of the MIP and offers a "threshold" aggregate payout opportunity of 50% of target for achieving approximately 91% of the Debtors' "planned" level of consolidated OCF. This is in line with, if not more conservative than, the Debtors' historical practice of offering a 40%-of-target MIP payout where business units achieve approximately 75% to 85% of their forecasted OCF (see infra at ¶ 14). It also is consistent with the 2009 MIP and the 2010 MIP, each of which offered an aggregate payout pool of 50% of target for achieving a certain level of "threshold" performance.[6]

- The 2011 MIP requires above-"planned" performance – in excess of the Debtors' budgeted OCF established at the February 2011 Board meeting – in order to achieve a "target" MIP pool. This is consistent with the structure of the 2009 MIP and the 2010 MIP, and more conservative than historical MIP programs, which typically only required achievement of "planned" performance to fund a target MIP pool.

- Additionally, as under the 2009 and 2010 MIPs, "maximum" performance would fund a "maximum" aggregate pro forma bonus pool that is capped for all participants at 130% of

---

[6] While the "threshold" level of performance under the 2009 and 2010 MIPs (which were approved by the Court later in the year or, in the case of the 2009 MIP, early the following year) was at or slightly above "planned" consolidated OCF, the Debtors respectfully submit that the proposed "threshold" performance level of 91% of "planned" consolidated OCF for 2011 is more consistent with the Debtors' historical practice. Indeed, this required 91%-of-plan "threshold" performance level remains more conservative than historical standards (which as noted typically range from 75% to 85% of plan depending on the business unit). Furthermore, this structure is well-justified under the facts and circumstances of this case. For example, the Debtors' "planned" consolidated OCF target is itself a stretch goal, including without limitation due to the continued contraction expected in the Debtors' industry and the difficulties that the Debtors face in Chapter 11 in competing effectively through consolidations and other similar transactions. See Transcript of November 10, 2010 Hearing (Ex. F hereto), at 34, 40-42. The enhanced "target" performance goal included by the Debtors for 2011 in response to certain creditor constituency feedback received, 106% of "planned" performance, is even more aggressive. This structure also is justified given the fact that the MIP participants are now experiencing at least their third consecutive year of significantly below-market compensation.

46429/0001-7862840V1

the target pool. This is significantly lower than the historical maximum opportunity under the MIP – 200% of target – and also is substantially lower than the maximum annual cash incentive award opportunities offered by the Debtors' peers. See infra ¶ 40.

- On top of this more conservative cap on maximum payouts, the level of performance required to qualify for a maximum-level 2011 MIP pool (approximately 141% of "planned" consolidated OCF) is slightly above the level of "maximum" performance required under historical MIP programs – traditionally 120% to 140% of "planned" OCF.

Furthermore, the 2011 MIP is even more conservative than historical MIP programs in several additional respects. As with the 2009 and 2010 MIPs, the 2011 MIP limits the Debtors' discretion to make awards when a minimum specified level of "threshold" performance is not achieved. Historically, the Debtors retained discretion to make MIP awards even when threshold-level performance was not achieved. For 2011, if the Debtors do not reach at least "threshold" consolidated OCF, no aggregate MIP pool is funded, no awards to Corporate division participants or to Publishing or Broadcasting segment group office participants may be made, and individual business units that achieve at least "threshold" performance will then be eligible only for substantially discounted partial awards. Furthermore, any discretion that is permitted will be exercised within the pay-for-performance framework of the 2011 MIP and with due regard for Company, business unit and individual performance results. The Debtors also have provided that none of the 2011 MIP participants will receive any increase to their current base salaries for the remainder of 2011, except as required by an existing contract (if any) or with the consent of the Creditors Committee and the Principal Senior Lenders.

The Market-Based Nature of the 2011 MIP Incentive Opportunities

The Debtors have taken a thoughtful and conservative approach with the 2011 MIP to ensure proper incentives, to bring the participants' compensation closer to the market

median relative to their peers, and to avoid the substantial undercompensation and dilution of incentives that otherwise would occur.  As stated, for the third year in a row, the MIP participants lack any equity-based compensation and thus are missing a core compensation component that is provided by their competitors.  As Eddy Hartenstein testified at the November 10, 2010 Hearing:

> Prior to the bankruptcy, of course, [the Debtors' historical non-sales management compensation structure was] very similar to other companies I'm familiar with, and in business as general, not just in the media business, but there are three legs to the compensation stool, if you will.  There is base compensation, there is bonus and then there is equity.  Equity is sometimes given in terms of actual stock, RSU's or options.  Of course, for us in the state of play that we're in, the equity leg of that triad is basically zero, so we're left with just the two, base and hopefully bonus.

See Transcript of November 10, 2010 Hearing (Ex. F hereto), at 40.

Mercer has confirmed that, without the 2011 MIP, TCC and TDC on average would fall substantially below the market median for the MIP participants – in the case of TDC, at *approximately one-quarter* of the applicable market median.  See Ex. D, at 4, 11. Implementing the 2011 MIP would make TCC and TDC more competitive, although TDC in particular again would be well below market at all performance and payout levels given the absence of any long-term equity-based compensation, as well as the conservative payout structure of the 2011 MIP.  Id. at 11-14; see infra ¶¶ 38-40.  It remains critically important to ensure that the Debtors have the necessary tools to appropriately compensate and attract top-tier executive and management talent, and to preserve meaningful incentives for all participants.

* * * * * * *

In sum, the Debtors believe in their reasonable business judgment that implementation of the 2011 MIP as proposed is essential to the success of both their ongoing

11

operations and their restructuring efforts. Additional facts and circumstances supporting this

Motion are set forth below and are verified in the Affidavit of Eddy Hartenstein, President and

Chief Executive Officer, in support of the Motion (the "Hartenstein Affidavit") and the Affidavit

of John Dempsey, Partner, Mercer (U.S.), Inc., in support of the Motion (the "Dempsey

Affidavit"). Copies of the Hartenstein Affidavit and the Dempsey Affidavit are attached hereto

as Exhibit B and Exhibit C, respectively. A redacted copy of the Mercer Report is designated as

Exhibit D hereto. In further support of this Motion, the Debtors respectfully represent as

follows:

## STATUS OF THE CASE AND JURISDICTION

1.      On December 8, 2008 (the "Petition Date"), Tribune and certain of its

subsidiaries each filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

An additional Debtor, Tribune CNLBC, LLC,[7] filed a voluntary petition for relief under Chapter

11 of the Bankruptcy Code on October 12, 2009. In all, the Debtors comprise 111 entities.

2.      The Debtors have continued in possession of their respective properties and

have continued to operate and maintain their businesses as debtors in possession pursuant to

Sections 1107(a) and 1108 of the Bankruptcy Code. No trustee has been appointed.

3.      The Creditors Committee was established on December 18, 2008.

4.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this

Court pursuant to 28 U.S.C. §§ 1408 and 1409. The Debtors submit that Section 363(c) of the

---

[7] Tribune CNLBC, LLC was formerly known as Chicago National League Ball Club, LLC.

46429/0001-7862840V1

Bankruptcy Code authorizes implementation of the 2011 MIP as an ordinary course program. 11

U.S.C. § 363(c). The Debtors also submit that the 2011 MIP would comport with Sections

363(b) and 503(c) of the Bankruptcy Code even if those sections are deemed applicable. 11

U.S.C. §§ 363(b), 503(c); see supra note 2.

## BACKGROUND

### The Debtors' Principal Segments and Business Units

5.      The Company is the ultimate parent company of each of the Debtors. It

reaches more than 80% of U.S. households through its newspapers and other publications, its

television and radio broadcast stations and cable channels, and its other entertainment offerings.

The Debtors' operations are conducted through two primary business segments: (i) Publishing

and (ii) Broadcasting.

6.      The Publishing segment currently operates eight (8) major-market daily

newspapers, and distributes entertainment listings and syndicated content through its Tribune

Media Services business unit. It also manages the websites of the Debtors' daily newspapers,

television stations, and other branded sites targeting specific communities of interests. As of the

Petition Date, the Publishing segment employed approximately 12,000 full-time equivalent

employees.

7.      The Broadcasting segment includes 23 television stations in 19 markets,

including seven stations in the top 10 U.S. markets and the Chicago area's first and only 24-hour

cable news channel, CLTV. It also operates the cable "Superstation" WGN America and

Chicago radio station WGN-AM. As of the Petition Date, the Broadcasting segment employed

approximately 2,600 full-time equivalent employees.

8.     The Debtors also have a Corporate division that includes the senior management team as well as other corporate-level and centralized administrative personnel, including legal, finance, accounting, technology and human resources personnel.

**Overview of the MIP and the Debtors' Historical Compensation Practices**

9.     The Debtors have paid incentive compensation as a central component of employee compensation for many years.  As part of that practice, in 1997, they implemented the MIP as part of the Tribune Company Incentive Compensation Plan (the "Incentive Plan"), a copy of which is attached hereto as Exhibit E.  The Incentive Plan authorizes the Debtors to make incentive awards to eligible participants consisting of annual cash incentive awards through the MIP.  See Ex. E (Incentive Plan) Art. VI.  The Debtors have awarded cash incentive awards under the MIP each year since 1997.

10.     Historically, most management employees across the Company's and its affiliates' operations (other than those in sales positions) with target cash incentive award opportunities of at least 15% of their base salary have participated in the annual MIP.  There were a total of approximately 1,039 participants in the MIP for 2004, 1,040 for 2005, 1,010 for 2006, 953 for 2007, 720 for 2008, 670 for 2009 (which was the approximate number of 2009 MIP participants when payouts were made in February 2010), and 660 for 2010 (the approximate number of 2010 MIP participants when payouts were made in February 2011).  As stated, the Debtors currently anticipate approximately 640 participants in the 2011 MIP (as in prior years, the actual end-of-year figure may vary including due to any newly hired, promoted or other additional employees who become eligible for the 2011 MIP, provided that the addition of any

14

such additional employees shall not increase any aggregate payout otherwise payable under the 2011 MIP).

11.    The Debtors have used a consistent methodology over the years in setting annual cash incentive award targets and in subsequently determining such awards. Each participant has an annual target award opportunity expressed as a percentage of his or her base salary. For example, a participant with a base salary of $100,000 and a 20%-of-salary cash incentive award target percentage would be eligible for a target MIP award of $20,000. The Debtors then use these individual bonus opportunities to determine target bonus pools for each business unit and segment, as well as the consolidated Company-wide target pool.[8]

12.    Within the Publishing segment, each individual newspaper is its own business unit, as is Tribune Media Services. Within the Broadcasting segment, each television and radio station is its own business unit. The Corporate division, as well as certain group offices that oversee the entire Publishing segment and Broadcasting segment, respectively, also constitute distinct business units.

13.    Starting early in the fourth quarter of each year, a budget and operating plan is developed by each business unit for the following year. These plans include forecasted income statements for each business unit, as well as other objectives such as, in the case of Broadcasting business units, market share goals. Senior management then separately meets in person with representatives of each business unit to review and discuss that business unit's

---

[8] As discussed below, the "target" annual cash incentive award opportunity of a given participant, expressed as a percentage-of-salary, is *different* in concept from the "target" level annual MIP *pool* as a whole. While individual participants' percentage-of-salary cash incentive award targets historically have varied under the MIP, they typically have been *lower* than *aggregate* cash MIP pool payouts as a percentage of the target pool. For example, even though "threshold" level Company performance typically resulted in a pro forma bonus pool equal to 40% of the target pool (see infra ¶ 14(a)), individual awards from that pool as a percentage of salary generally were significantly lower than 40% of such participants' base salaries in the aggregate.

15

individual budget and plan, in some instances resulting in changes to applicable goals.

Following that extensive process, individual business unit budgets and plans are aggregated into

a consolidated budget and operating plan for the Company as a whole, taking into account the

unique characteristics of each geographic market and business segment in which the Company's

business units operate, as well as broader industry and macroeconomic factors.  In or about the

end of the fourth quarter of such year, senior management and the Company's Board then review

and assess these consolidated and individual budgets and operating plans for the upcoming year

and make any further refinements that may be appropriate.  Following this iterative and

deliberative process, the Company then submits these consolidated and business-unit-specific

budgets and operating plans to the Company's Board for final review and approval during the

first quarter of the applicable year.  The Board-approved budgets and operating plans generally

guide the Company and its business units for that year.  As noted, the Company's 2011 budget

and operating plan were approved by the Board at its February 2, 2011 meeting.

       14.    The OCF goals established in this extensive and thorough planning process

for the business units also historically served as the primary performance target for that year's

MIP, and set the MIP participants' performance and incentive goals and expectations for that

year:

       a.    <u>Publishing</u>:  Each Publishing segment business unit's OCF forecast

historically served as its annual cash incentive award performance target as well.  Under the

Debtors' practice:

- When a Publishing business unit achieved "threshold" performance – usually in the range of 75% to 85% of its forecasted OCF – a pro forma[9] annual cash incentive bonus pool was established for that business unit at 40% of the target pool.[10]

- Historically, if the business unit met its "planned" OCF goal, a pro forma bonus pool was established at 100% of target. OCF between a minimum "threshold" and the "planned" goal historically would result in a linearly interpolated pro forma bonus pool achievement from 40% to 100% of target.

- OCF in excess of a business unit's "planned" goal historically resulted in a proportionally increased pro forma achieved pool, up to 200% of the target pool for "maximum" performance in the range of 120% to 140% of "planned" OCF depending on the business unit.

   b. <u>Broadcasting</u>:  For Broadcasting segment business units, OCF and market share goals historically have determined a majority of their achieved annual cash incentive bonus pool opportunity, with a portion being determined based on discretionary factors.  A Broadcasting business unit's achievement of "threshold," "planned" or "maximum" performance on its goals typically resulted in a pro forma MIP pool opportunity equal to 40%, 100% or 200% of its target pool, respectively.

   c. <u>Publishing and Broadcasting Group Offices</u>:  For the Publishing group office and the Broadcasting group office, their annual cash incentive bonus pool

---

[9] This and other amounts are referred to as "pro forma" because, as discussed below, the Debtors have always reserved and exercised the discretion to adjust achieved pool and payout amounts.

[10] For example, assume that a Publishing business unit's OCF target was $10 million, its threshold performance target was 85% of that amount, and its aggregate bonus pool target was $1 million (at 100% achievement of forecasted OCF).  If this business unit generated OCF of $8.5 million (85% of target), it would achieve a pro forma bonus pool of $400,000 (40% of the $1 million target pool), subject to further adjustment in the Debtors' discretion. As discussed, payout at the threshold level of 40% of the target bonus pool did *not* result in a payout at 40% of each participant's base salary.  To the contrary, while individual participants' annual cash incentive bonus targets, expressed as a percentage of base salary, vary (see <u>supra</u> ¶ 11), aggregate annual cash incentive award payouts under past years' MIP programs as a percentage of base pay have been well below 40% of the participants' aggregate base salaries.

achievement levels historically have been based, respectively, on a weighted average of the

bonus achievement levels for the various individual business units within the Publishing segment

and the Broadcasting segment.

    d. <u>Corporate Division</u>:  Historically, the Corporate division's annual

cash incentive pool opportunity has been based on a blend of the Publishing segment's

achievement, the Broadcasting segment's achievement, and individual goals including equity

investment income achievement.

   15. Given the complexity and breadth of the Debtors' organization, the

diversity of their business units, and the variety of markets in which they operate, the Debtors

traditionally have exercised discretion in adjusting actual business unit and segment annual cash

incentive pool amounts, as well as individual awards, upwards or downwards relative to

achieved pro forma amounts.  This includes making discretionary awards, where deemed

appropriate, to business units that did not meet their goals.  The Incentive Plan expressly

authorizes such exercises of discretion.  <u>See</u> Ex. E (Incentive Plan) §§ 3.2, 10.6.

   16. In addition to their annual cash incentive awards, a majority of MIP

participants historically have been eligible to receive equity-based awards to incentivize long-

term performance.  Through 2007, such equity-based awards were made as option or restricted

stock unit grants under the Incentive Plan.  Following the merger that returned the Company to

private ownership at the end of 2007, the Company began to award phantom equity to certain

management personnel through a new Management Equity Incentive Plan (this plan is being

discontinued under the Debtor/Creditors Committee/Lender Plan of Reorganization (the "<u>DCL</u>

<u>Plan</u>")).

18

17.    Under the Debtors' longstanding compensation philosophy, the TCC of key personnel (base salary and annual cash incentive award) purposefully was kept low relative to market. Equity-based compensation comprised a substantial component of their compensation to incentivize long-term performance, align managements' and the shareholders' interests, and bring the recipients' TDC (base salary, cash incentive award and long-term equity award) to market.

18.    However, the Debtors have been unable to provide equity compensation to their key personnel for several years now. In fact, no awards have been made under the Management Equity Incentive Plan since 2008. As this Court stated at the January 27, 2010 Hearing, "it's plain from the evidence that the equity has de minimis or no value and would not be an appropriate component of a bonus program." Transcript of January 27, 2010 Hearing (Ex. G hereto), at 15. As a result, the key management team has been significantly undercompensated relative to the market, as discussed above and further below.[11]

## REQUESTED RELIEF

### I.    Implementation of the 2011 Management Incentive Plan

19.    The Debtors seek approval, for the reasons stated above and below, to continue their annual cash MIP opportunity and implement the 2011 MIP as described in this Motion, including in the Mercer Report, for a lower number of participants relative to 2008, 2009 and 2010, as well as for any newly hired or promoted employees, or any other employees at

---

[11] The DCL Plan authorizes the Compensation Committee of the reorganized Debtors' Board to implement a management equity plan upon emergence providing for the grant of up to 5% of the common equity of the reorganized Company. The timing of the Debtors' emergence is uncertain, particularly given the Federal Communications Commission approval process, and could conceivably occur after 2011. The DCL Plan also currently does not specify any individual equity grants.

19

management's discretion, who in each case become eligible for the MIP (as stated, the Debtors have attached a redacted copy of the Mercer Report as <u>Exhibit D</u> hereto and are contemporaneously seeking leave to file the unredacted Mercer Report under seal).[12] <u>See generally</u> Ex. D.

20.    Applicable MIP performance levels, related payout percentages and aggregate pool amounts for the 2011 performance period are set forth in the following chart (percentages and pool amounts in between the stated reference points are determined by linear interpolation):

|  | <u>Threshold Performance</u> | <u>Planned Performance</u>[13] | <u>Target Performance</u> | <u>Maximum Performance</u> |
|---|---|---|---|---|
| Performance (approximate consolidated OCF, in $ millions) | 91% of Planned Performance ($450) | 100% of Planned Performance ($497) | 106% of Planned Performance ($525) | 141% of Planned Performance ($700) |
| Payout as a % of target | 50% | 81% | 100% | 130% |
| Aggregate Payout (approximate, in $ millions) | $16.4 | $26.4 | $32.4 | $42.5 |

Ex. D, at 5.[14]  To determine actual performance for purposes of the MIP, OCF is calculated *net* of any applicable incentive payouts, making the MIP self-funding.[15]  <u>Id.</u>

---

[12] Any increases in the number of MIP participants will not increase the aggregate ordinary course MIP payout at any given performance level. Ex. D, at 4.

[13] Payout at "Planned" Performance is shown for illustrative purposes and is based on linear interpolation between "Threshold" and "Target" performance.

[14] On May 6, 2011, the Company appointed a new President and Chief Executive Officer (the "<u>CEO</u>"). In connection with the terms of his promotion, the CEO must lead the Debtors to above-target performance for him to be eligible to receive a full target-level 2011 MIP payout. Ex. D, at 5 n.1.

21.    Once funded, management will allocate the MIP pool to business units based on a formula that includes OCF, a blend of financial and operational metrics, and some discretion based on management assessment of individual business unit performance. See Ex. D, at 6. Specifically, 50% to 60% of the MIP pool for a given business unit will be allocated based on such business unit's OCF; 20% to 25% will be allocated based on business-unit-specific financial and operational goals; and the remaining 20% to 25% will be reserved for management discretion to recognize innovation, leadership, change management, and other measures of success and value creation (as with the MIP historically, management reserves the right to award a greater discretionary percentage to any business unit or participant on a case-by-case basis, but in doing so will not exceed the aggregate Company-wide bonus pool achieved based on consolidated OCF). See Ex. D, at 6.

22.    As in prior years, the Debtors also have incorporated limitations for 2011 on their historical discretion to make annual cash incentive awards in the event that goals are not achieved. Specifically, if consolidated OCF does not reach the "threshold" level, no Company-wide aggregate MIP pool will be funded for 2011, and participants in the Corporate division, the Publishing group office and the Broadcasting group office will not receive any MIP award. Ex. D at 5, 7. Even if "threshold" consolidated OCF *is* achieved, a given business unit that does not achieve at least "threshold" OCF will not be allocated an MIP pool. Ex. D, at 5, 7. Such a business unit then will only be eligible for a partial discretionary MIP pool if that pool is paid out

---

[15] Actual consolidated OCF used to measure bonus achievement will reflect an appropriate level of MIP bonus expense, consistent with the Company's historical accounting practices. For example, achieving "target" OCF for 2011 funds an ordinary course MIP pool of $32.4 million. In this case, the achievement of "target" OCF would be determined net of a $32.4 million bonus expense (i.e., actual OCF before bonus expense must equal "target" OCF plus $32.4 million). The MIP bonus expense, or "funding" for MIP bonuses, increases up to 130% of target as the Company's actual OCF increases up to the "maximum" target. To achieve a "maximum" MIP bonus pool of $42.5 million for all participants, actual OCF before bonus expense must equal "maximum" OCF plus $42.5 million.

of one or more other business units' awards (thereby reducing those other awards), or out of "excess" aggregate MIP pool amounts that have funded (due to consolidated Company performance) but that the Company has elected not to award to other business units for performance or discretionary reasons.

23.    At the same time, the Debtors again have taken care to ensure that continued economic pressure and an inability to achieve *consolidated* operating goals do not dampen the incentives of those individual business units that remain successful in achieving their goals. Accordingly, in the event that "threshold" performance is *not* achieved on a consolidated basis, an individual business unit will remain eligible for a MIP pool if, and only if, it achieves its individual OCF goal at least at the "threshold" level. See Ex. D, at 7. Even then, however, individual business unit pools would be reduced by *60%* relative to pro forma pool amounts that potentially would have been available had consolidated performance goals been achieved.[16] Id.

24.    As with past practice, any MIP payouts earned for 2011 shall be paid within the first two-and-a-half months of 2012. A participant generally must be employed on the date of payment to receive an MIP award, except in cases of death, disability, retirement or termination without cause, which would result in a pro-rated payment based on length of service during the year. Id. at 7.

## BASIS FOR RELIEF REQUESTED

25.    Section 363(c) of the Bankruptcy Code fully authorizes the continuation in 2011 of the Debtors' ordinary course MIP program. Moreover, the 2011 MIP would meet any

---

[16] Thus, for example, if consolidated goals are not achieved but a business unit achieves "target" performance, it would be eligible for an MIP pool of 40% (calculated as 40% x 100%) of target.

and all requirements of Sections 363(b) and 503(c) of the Bankruptcy Code even if those sections are deemed applicable.

**I.      The 2011 MIP is an Ordinary Course Program Under Section 363(c).**

        26.    Under Section 363(c)(1) of the Bankruptcy Code, "[i]f the business of the debtor is authorized to be operated under … this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of the estate without notice or hearing." 11 U.S.C. § 363(c)(1).  A transaction is within the ordinary course of business if it is an ordinary transaction when looked at from the horizontal and vertical dimensions.  See In re: Roth American, Inc., 975 F.2d 949, 952 (3rd Cir. 1992).

        **A.      The 2011 MIP Satisfies the Horizontal Ordinary Course Requirement.**

        27.    From the horizontal dimension, a transaction is within the ordinary course of business if, from an industry-wide perspective, the transaction is of the sort commonly undertaken by companies in that industry.  Id. at 953.  The 2011 MIP clearly meets the horizontal standard.  As the Mercer Report reflects, and as the evidence at the November 10, 2010 Hearing, the September 25, 2009 Hearing on the 2009 MIP ("September 25, 2009 Hearing") (excerpts attached as Exhibit H hereto), and the May 12, 2009 Hearing demonstrated, it is commonplace for businesses within the Debtors' industry to provide ongoing short-term performance-based cash compensation such as the MIP, including during a Chapter 11 proceeding.  See Ex. D; Transcript of November 10, 2010 Hearing (Ex. F hereto), at 45-46; Transcript of September 25 2009 Hearing (Ex. H hereto), at 115-117, 131; Transcript of May 12, 2009 Hearing (Ex. I

23

hereto), at 40-43, 52-53.  Numerous cases also demonstrate that short-term cash incentive

programs are a common form of compensation, including for debtors in possession.  See, e.g., In

re: Dana Corporation, 358 B.R. 567 (Bankr. S.D.N.Y. 2006) (approving annual cash incentive

program); In re: Propex, Inc., No. 08-10249 (Cook, J.) (Bankr. E.D. Tenn. Apr. 9, 2008)

(approving annual cash incentive program).

### B.    The 2011 MIP Satisfies the Vertical Ordinary Course Requirement.

28.    From the vertical dimension, a transaction is within the ordinary course of

business if, from the hypothetical creditor's perspective, the transaction does not subject the

creditor to economic risk of a nature different from those accepted when it decided to extend

credit.  See In re: Roth American, Inc., 975 F.2d at 952 (noting that primary focus is on the

debtor's pre-petition business practices and conduct).  Continuation of the Debtors' historical

MIP for 2011 also easily meets this standard.  As detailed above and below, the 2011 MIP is

self-funding, is lower in cost and participant levels relative to prior years' MIP programs, and is

consistent in its payout curve and structure with, if not more conservative than, the Debtors'

historical MIP practices.  It also provides for reasonable levels of incentive compensation that,

while remedying the Debtors' compensation gap to market somewhat, still leave the participants

overall with below-median TDC.  See Ex. D, at 9-15.

29.    While this Court determined that it did not need to decide whether the 2010

MIP was an ordinary course program (given its holding that the 2010 MIP satisfied Section

503(c)(3) of the Bankruptcy Code in any event), the Court previously held that the 2009 MIP

program constituted an ordinary course program under Section 363(c) of the Bankruptcy Code.

See Transcript of January 27, 2010 Hearing (Ex. G hereto), at 17-18.  Similarly, the Court

24

observed at the May 12, 2009 Hearing that the 2008 MIP program also may have met the Section

363(c) standard (even though that issue technically was not before the Court).  See Transcript of

May 12, 2009 Hearing (Ex. I hereto), at 9 ("With respect to the motion at Number 5, to make

payments according to prepetition incentive plans, it may be really – it may be the first time that

it really is an ordinary course thing and doesn't fall under the 503(c)(3) standard.").

30.     The Debtors respectfully submit that the same is true of the 2011 MIP.  See

supra at 8-11.  For example, the annual OCF performance metric used in the 2011 MIP is

consistent with historical practice, including during 2008, 2009 and 2010, and motivates

performance towards realistic goals for which participants have a clear "line of sight."  Indeed,

MIP participants were involved in the rigorous budgeting and operating plan development

process used to determine "planned" OCF for 2011, and the resulting consolidated and business-

unit-specific OCF metrics were extensively analyzed by senior management and approved by the

Company's Board on February 2, 2011.  MIP participants have been actively working towards

these OCF goals throughout 2011, with the understanding that they also would determine their

MIP award opportunities.  Nevertheless, based on certain creditor constituency feedback, the

Debtors have further enhanced the 2011 MIP performance goals to make them even more

aggressive.

31.     Both the 100%-of-target pool size potentially payable at "target"

performance (approximately $32.4 million) and the anticipated participant level for 2011

(approximately 640) are lower than historical levels, including for 2009 and 2010 (as noted, the

"threshold" and "maximum" payout opportunities under the 2011 MIP also are lower than the

corresponding opportunities under the 2009 and 2010 MIP programs).  There were

approximately 1,039 participants in the MIP for 2004, 1,040 for 2005, 1,010 for 2006, 953 for

25

2007, 720 for 2008, 670 for 2009 (720 at the time the 2009 MIP initially was proposed) and 661

for 2010 (640 at the time the 2010 MIP initially was proposed). Additionally, aggregate target

pools over the past several years were $37.9 million for 2004, $39.3 million for 2005, $41.9

million for 2006, $39.8 million for 2007, $35.1 million for 2008, $35.0 million for 2009, and

$33.0 million for 2010. The median 2011 award for all participants at "target" performance is

$30,750.

   32. The Debtors also have made various refinements to the 2011 MIP pay-for-

performance structure that are analogous to those made in 2009 and 2010 and that continue to

make it more conservative than historical MIP programs. For example:

- The 2011 MIP funds a partial Company-wide bonus pool if the Company achieves at least a minimum "threshold" level of OCF (50%-of-target payout for achieving approximately 91% of "planned" consolidated OCF). Historically, the MIP provided for at least a 40%-of-target partial payout if a business unit achieved between 75% and 85% of its "planned" OCF. The Court-approved 2009 and 2010 MIP programs similarly provided for 50%-of-target payouts upon the achievement of a specified level of "threshold" performance.

- As with the 2009 and 2010 MIP programs, the Debtors must achieve above-"planned" performance to potentially fund a target-level pool. "Planned" performance achieves an aggregate 2011 MIP pool of only approximately 81% of the target pool. The Debtors must achieve consolidated OCF equal to approximately 106% of "planned" performance to warrant a 100%-of-target pool. By contrast, the Debtors' historical MIP programs typically permitted a 100%-of-target payout upon the achievement of "planned" performance.

- The 2011 MIP offers a "maximum"-level payout if the Company achieves approximately 141% of "planned" performance. As with the 2009 and 2010 MIP programs, this

performance requirement is more stringent than the Company's historical practice of providing a maximum payout to business units for achieving from 120% to 140% of plan.

- The 2011 MIP also caps the "maximum" aggregate bonus pool opportunity at 130% of the target pool, as did the 2009 MIP and 2010 MIP, below the historical and typical peer group maximum payouts of 200% of target.

- Also like the 2009 and 2010 MIP programs, the 2011 MIP eliminates the Debtors' historical discretion to fund an aggregate pool for below-"threshold" performance, and instead requires at least "threshold" consolidated OCF performance in order to fund a Company-wide aggregate bonus pool and to permit individual awards to any Corporate division or segment group office participants.  As in 2009 and 2010, individual business units may qualify for MIP pools only at *reduced* levels if consolidated results are *not* achieved, provided the business units themselves achieve at least "threshold" performance, to ensure that otherwise successful business units do not have their incentives diminished by an overall downturn.  The 2011 MIP again restricts the Debtors' historical discretion to allocate an MIP pool to a business unit that does not achieve at least "threshold" OCF under its individual budget, unless that pool is paid out of one or more other business units' awards (thereby reducing those other awards), or out of "excess" aggregate MIP pool amounts that have funded (due to consolidated Company performance) but that the Company has elected not to award to other business units for performance or discretionary reasons.

- Finally, the Debtors have provided that none of the 2011 MIP participants will receive any increase to their current base salaries for the remainder of 2011, except as required by an existing contract (if any) or with the consent of the Creditors Committee and the Principal Senior Lenders.[17]

---

[17] While as noted the 2011 MIP is not identical in all respects to the 2010 and 2009 MIPs (which, for example, were approved later in the year (or in the case of the 2009 MIP, early the following year) and required "planned" or above-"planned" performance to fund a 50%-of-target pool), the Debtors respectfully submit that any variations are well-justified for reasons discussed, see supra note 6, that an incentive plan need not be identical from year to year in order to constitute an ordinary course (or otherwise justified) program, and that the 2011 MIP structure is more typical both in terms of the Debtors' historical practice and market practice.  See Transcript of January 27, 2010 Hearing (Ex. G hereto), at 17-18 (this Court stating that the 2009 MIP "is similar enough to the 2008 and prior

27

33.     The Debtors respectfully submit that the 2011 MIP, with its reasonable and carefully thought-out structure, provides critically important incentives to their key management personnel while appropriately recognizing the current circumstances that the Debtors face. Accordingly, because the 2011 MIP is an ordinary course program under Section 363(c) of the Bankruptcy Code, court approval technically is not required, but the Debtors seek such approval because the 2011 MIP involves insiders, as noted.  See supra note 2.  The Debtors respectfully submit that such approval is warranted for reasons stated.

**C.     The 2011 MIP Satisfies the Business Judgment Requirement for Ordinary Course Programs.**

34.     Because continuation of the MIP program for 2011 thus falls squarely within the scope of ordinary course transactions authorized by Section 363(c) of the Bankruptcy Code, a court "will not entertain an objection to the transaction, provided that the conduct involves a business judgment made in good faith upon a reasonable basis and within the scope of authority under the Bankruptcy Code." Nellson, 369 B.R. at 799.  Meeting this standard for ordinary course programs is a "relatively light evidentiary burden . . . . " Id. at 800.

35.     The 2011 MIP clearly meets this business judgment standard given its sound objectives, its conservative cost and payout structure, and the Debtors' strong operating performance in the face of adversity when management has proper incentives.  See Transcript of

---

plans, with the evidence showed, appropriate adjustments to fit the change in the circumstances, that it meets the 363 Ordinary Course standard."); cf. Transcript of May 12, 2009 Hearing (Ex. I hereto), at 54 (this Court observing that while legal standards may not change, "circumstances change," and that in considering the appropriateness of the Debtors' proposed 2008 MIP payouts, it is important "to recognize the circumstances in which we now find ourselves in the world today."); see also In re: Nellson Nutraceutical, Inc., 369 B.R. 787, 800-01 (Bankr. D. Del. 2007) (approving ordinary course modification of incentive plan targets where payment of the bonuses "'made good business sense' notwithstanding the failure to achieve the lowest threshold for payment of bonuses under the original plan."); In re: Dana Corporation, 358 B.R. 567 (Bankr. S.D.N.Y. 2006) (approving continuation of short-term incentive program, slightly refined from the prior year, as an ordinary course transaction); In re: Buffets Holdings, Inc., No. 08-10141 (Walrath, J.) (Bankr. D. Del. May 14, 2008) (approving continuation of prepetition plan, modified due to changed circumstances, in the ordinary course of business).

28

November 10, 2010 Hearing (Ex. F hereto), at 59-60 (this Court stating that "I find that the targets and the benchmarks have been appropriately fixed as incentives. They contain the necessary reach. The metrics chosen in the setting of the targets and benchmarks that is revenue and operating cash flow I think is reasonably chosen under the circumstances. There's nothing wrong with relatively simple means of determining such things. I think sometimes the parties, in requesting such relief, build frameworks that are much more complicated than they need be. The awards and potential awards under the proposed plan are meaningful but not excessive. They're within the market and the company's historical practice, arguably, below each of them."); Transcript of January 27, 2010 Hearing (Ex. G hereto), at 15 (the Court stating that "it's undisputed that the debtor operates in a troubled industry . . . . The industry continues to be troubled. Here the evidence demonstrated that the debtor is performing well, relative to its competitors.").

36.      Additionally, Mercer has independently validated that the Debtors' key management team members would be severely undercompensated relative to their competitors without annual cash incentive opportunities. See infra. As stated, the Company (like its peers) remains under significant industry and macroeconomic pressures to transform its businesses. See supra at 4-6; Transcript of November 10, 2010 Hearing (Ex. F hereto), at 34, 42. Doing so requires a highly motivated executive and management team of the highest caliber, including the attraction of new talent where circumstances warrant, as well as maintaining a consistent drive among existing executive and management personnel despite below-market compensation and above-average daily performance demands.

37.      The Company cannot meet these challenges effectively if it cannot remain even minimally competitive with its peers in terms of compensation. Mercer has confirmed that,

without the 2011 MIP, TCC and TDC on average would fall substantially below the market median for the management team.  TCC for senior management[18] would be approximately 61% of the market median, while TDC would be only approximately 29% of the market median.[19] Ex. D, at 11.  Based on this data, Mercer's consistent market analyses of the 2009 MIP and 2010 MIP, and the similarity of the 2011 MIP to prior years' MIP plans, the other 2011 MIP participants would suffer a comparable degree of undercompensation if the 2011 MIP were not approved.  See Ex. D, at 9, 15; see supra note 19.

38.    Even with a 2011 MIP award opportunity, key management members' TCC on average would be reasonable, but their TDC would remain significantly below the market median given the absence of long-term incentives combined with the conservative payout structure of the MIP.  Mercer has confirmed the following benchmarking for senior management:

| | Benchmarking of 2011 MIP For Senior Management | | |
| --- | --- | --- | --- |
| | Threshold Performance | Target Performance | Maximum Performance |
| TCC as a % of Market Median | 90% | 118% | 96% |
| TDC as a % of Market Median | 42% | 55% | 37% |

(Ex. D, at 11-14).  While aggregate TCC for senior management at target performance is slightly above the nominal market range (typically 85% to 115% of the market median), Mercer confirms

---

[18] For 2011, the Debtors' senior management includes the following seven positions:  Chief Executive Officer; Chief Restructuring Officer; Chief Financial Officer; President/Tribune Broadcasting & Chief Investment Officer; President/Publishing; Chief Technology Officer; and General Counsel.

[19] Mercer benchmarked senior management's compensation under the 2011 MIP and evaluated the other participants' 2011 compensation opportunities based on Mercer's detailed benchmarking of several prior years' MIP programs, the similarity of the 2011 MIP to prior years' MIP plans, and the reasonableness of the 2011 compensation opportunities for senior management.  Ex. D, at 9, 15.  This methodology is consistent with market practice in Mercer's field.

that variances from this nominal range can be warranted and market-competitive in appropriate circumstances.[20] Ex. D, at 13.  In this case, Mercer has determined that this marginally higher market competitive position is reasonable and appropriate given the promotions and/or substantial additional responsibilities being undertaken by several of these executives, as well as the fact that a target payout requires performance above and beyond the Debtors' "planned" operating performance.  Id.  Indeed, at "planned" performance (resulting in an 81%-of-target pool), TCC for senior management on average would be well within the nominal market range at approximately 108% of the market median.  Id.  Mercer also has determined that such compensation is warranted given the executives' continuing critical role in leading a large and complex enterprise through a period of extraordinary change while also navigating the challenges and uncertainties inherent in a difficult restructuring process, during which there has been a prolonged absence of any long-term incentives and substantial uncertainty as to whether and when any long-term incentives will be offered.  Id.  Their TCC also remains below the market median at both threshold and maximum payout and performance levels.  Id. at 11, 12, 14.

39.    Furthermore, even with the 2011 MIP in place, the senior executives' TDC remains significantly below the market median, as the above data indicates. Ex. D, at 11-15.  In particular, the significant shortfall in aggregate TDC at maximum performance is exacerbated by the fact that the 130%-of-target cap is well below the maximum payout opportunity of 200%-of-target most commonly offered by the Company's peers as well as under the Debtors' historical MIP programs.  See Ex. D, at 4, 15; id. at 21 (showing median maximum award opportunities for

---

[20] As Mercer notes in its Report, competitive pay is generally defined as a range, not a point, due to inherent variations in market data. Ex. D, at 13.  Therefore, Mercer typically considers total compensation to be competitive if it falls within 15% of the market median.  Id.  Mercer also states that it is typical for actual pay to vary from incumbent to incumbent, and in some cases to exceed the 15% range, based on multiple factors including pay required to initially attract the candidate to the organization, prior pay, individual performance, and other factors. Id.

46429/0001-7862840V1

peer group Chief Executive Officers and Named Executive Officers of 200%-of-target each, and average maximum award opportunities of 196% and 199% of target, respectively, for such peer group populations).[21]

40.    Mercer also has determined that the 2011 MIP overall would result in reasonable compensation for the MIP participant population as a whole at all levels of performance and potential payouts.  Ex. D, at 9, 15.  Indeed, Mercer's analyses indicate that implementing the 2011 MIP would somewhat address but not eliminate the undercompensation of the other MIP participants relative to market.  Id.; see also Mercer's Supplemental Report dated July 23, 2010, attached as Exhibit A to Debtors' Notice of Revision to 2010 Management Incentive Plan [D.I. No. 5112] (determining that, with the 2010 MIP in place, TCC for all surveyed MIP participants (including but not limited to senior management) would be 93% of market at "threshold" payout, 111% of market at "target" payout, and 97% of market at "maximum" payout, and that TDC would be only 60% of market at "threshold" payout, 72% of market at "target" payout, and 52% of market at "maximum" payout).

41.    Accordingly, the Debtors respectfully submit that the 2011 MIP easily meets the Section 363(c) ordinary course standard.  See supra ¶ 26.

42.    The Debtors therefore respectfully request authorization to implement the 2011 MIP as an ordinary course program, as provided in the proposed Order attached hereto as Exhibit A.

---

[21] Indeed, maximum payouts would still be reasonable even if benchmarked against the regular (i.e., non-maximum) market median – TDC would fall only at approximately 63% of the (regular) market median.  See Ex. D, at 14.  Given that this "apples to oranges" comparison measures above-target performance against at-target compensation figures, this substantially below-regular-market TDC reinforces the reasonableness of such maximum-level payouts.  Id.

II.    **Approval of the 2011 MIP Would be Warranted Under Sections 363(b) and 503(c) of the Bankruptcy Code Even if They Are Deemed to Apply to the 2011 MIP.**

43.    While the 2011 MIP constitutes an ordinary course transaction under Section 363(c) of the Bankruptcy Code, the Debtors submit out of an abundance of caution that it would also qualify as a valid exercise of the Debtors' business judgment under Sections 363(b) and 503(c)(3) for reasons stated above and herein, if those sections are deemed applicable.  See 11 U.S.C. §363(b)(1) ("The trustee, after notice and hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."); id. § 503(c)(3) (requiring that "transfers or obligations that are outside the ordinary course of business" and for which administrative expense priority is sought be "justified by the facts and circumstances of the case").  By their express terms, neither Section 363(b) nor Section 503(c)(3) applies to payments made in the ordinary course of business (which includes the 2011 MIP).  See In re: Nellson Nutraceutical, 369 B.R. at 803-04.

44.    In determining whether to authorize the use of property pursuant to Section 363(b), the debtor need only demonstrate that a sound business purpose justifies such use.  In re: Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999); see also In re: Delaware & Hudson Railway Co., 124 B.R. 169, 176 (D. Del. 1991).  With respect to Section 503(c)(3), this Court has described the standard therein as a "heightened business judgment standard." Transcript of January 27, 2010 Hearing (Ex. G hereto), at 18; see also Transcript of May 12, 2009 Hearing (Ex. I hereto), at 52-53 (the Court characterizes the Section 503(c)(3) "justified by the facts and circumstances" standard as a "business judgment plus" standard).

45.    This Court already approved the 2008 MIP payments as transactions outside the ordinary course, and also held that the 2010 MIP and 2009 MIP programs would

33

meet a "heightened business judgment standard" under Section 503(c)(3).  Transcript of

November 10, 2010 Hearing (Ex. F hereto), at 59-60; Transcript of January 27, 2010 Hearing

(Ex. G hereto), at 18; Transcript of May 12, 2009 Hearing (Ex. I hereto), at 52-55.  These same

holdings and considerations would warrant implementation of the 2011 MIP as another valid

exercise of the Debtors' business judgment even if it were not an ordinary course program,

including without limitation under the six-factor Dana II framework cited by this Court in

approving the 2009 MIP:

(1) Reasonable Relationship Between Plan and Business Objectives:  There is a clear
relationship between the Debtors' OCF-based plan and their objective of enhancing their
chances of survival and prosperity by increasing their profitability.  The Debtors' ability
to stabilize the profitability of the Company is perhaps the best evidence that the
incentives provided under the MIP program work.  See Transcript of November 10, 2010
Hearing (Ex. F hereto), at 29 (Eddy Hartenstein testimony regarding strong 2010
performance); id. at 60 (the Court stating:  "I find that the targets and the benchmarks
have been appropriately fixed as incentives.  They contain the necessary reach.  The
metrics chosen in the setting of the targets and benchmarks that is revenue and operating
cash flow I think is reasonably chosen under the circumstances.");  Transcript of January
27, 2010 Hearing (Ex. G hereto), at 15 (the Court stating that "Here the evidence
demonstrated that the debtor is performing well, relative to its competitors.").

(2) Reasonable Cost:  The cost of the proposed self-funding 2011 MIP is reasonable in the
context of the Debtors' assets, liabilities and earning potential, including their 2010
revenues of approximately $3.2 billion.  These facts have been confirmed by Mercer and
validated by the Compensation Committee.  Furthermore, the aggregate payout
opportunities at all levels of performance under the 2011 MIP are lower than the
corresponding opportunities under the 2010, 2009 and historical MIP programs.  See
supra note 5 and ¶¶ 31-32; see also Transcript of November 10, 2010 Hearing (Ex. F
hereto), at 60 (the Court stating:  "The awards and potential awards under the proposed
[2010 MIP] plan are meaningful but not excessive.  They're within the market and the

34

company's historical practice, arguably, below each of them."); Transcript of January 27, 2010 Hearing (Ex. G hereto), at 16 (the Court stating that "[t]he cost [of the 2009 MIP] is reasonable as well."); Transcript of May 12, 2009 Hearing (Ex. I hereto), at 52-53 (this Court stating, in approving the 2008 MIP payments: "The record here amply supports the award of this relief, the grant of this relief. The plan is consistent with the company's historical practices. It's not unreasonable in any respect. Indeed, the record clearly indicates that it's below market. You look at the industry, and considering the debtors' place in the industry in which it's trying to survive and transform itself in what are truly extraordinary times, and you compare that to what's proposed to be paid in relation to its revenue.").

(3) <u>Reasonable Scope</u>: The scope of the 2011 MIP is reasonable. It covers the same management population that has historically participated in that program, and is anticipated to have a lower participation level than historical levels including for 2010 and 2009. <u>See</u> Transcript of January 27, 2010 Hearing (Ex. G hereto), at 16 (the Court stating in approving the 2009 MIP that "[t]he scope is reasonable. It covers the same management population covered in previous plans, which is a critical core group.").

(4) <u>Consistent with Industry Standards</u>: Mercer confirms, as does the other evidence presented at the hearings on the 2008, 2009 and 2010 MIP programs, that implementation of the 2011 MIP is consistent with industry standards, including for companies in Chapter 11, and the case law is in accord. <u>See</u> <u>supra</u> ¶¶ 27, 32 n.17 (cases); <u>infra</u> ¶ 46 (cases).

(5) <u>Due Diligence</u>: The proposed plan has been reviewed by Mercer, the Compensation Committee and the Debtors' management, and is informed by the extensive annual budgeting process described above. <u>See</u> Transcript of January 27, 2010 Hearing (Ex. G hereto), at 17 (this Court stating that "[t]he proposed [2009 MIP] plan was reviewed by an independent committee of the board and validated, the evidence shows, by a credible expert."). The Debtors also have shared information regarding the 2011 MIP with the Creditors Committee and the Principal Senior Lenders, and have included enhanced 2011 MIP performance goals based on certain creditor constituency feedback received. Furthermore, the 2011 MIP continues to incorporate various changes, such as limitations

on the Debtors' historical discretion to make awards in certain circumstances, that had been proposed by the Debtors' creditor constituencies in prior years' MIP programs.

(6) <u>Independent Review</u>:  The Debtors received independent counsel in performing due diligence, and in creating and authorizing the 2011 MIP.  As stated, the Compensation Committee, whom the undisputed evidence has shown is a disinterested body, reviewed and approved the proposed plan and retained Mercer, an independent compensation consultant, to assist its consideration.  Mercer independently reviewed and validated the 2011 MIP as reasonable and appropriate.  <u>See</u> Transcript of January 27, 2010 Hearing (Ex. G hereto), at 17.  Furthermore, as noted, the Debtors have increased applicable performance goals based on certain creditor constituency feedback received.

<u>In re Dana Corp.</u> ("<u>Dana II</u>"), 358 B.R. 567, 576-77 (Bkrtcy. S.D.N.Y. 2006); <u>see</u> <u>id.</u> at 581 n.20 (noting in context of analyzing incentive plan that "Under applicable case law, in this and other circuits, courts should authorize business transactions outside the ordinary course of business if the Debtors have exercised sound business judgment."); <u>see also</u> <u>In re Global Home Products, LLC</u>, 369 B.R. 778, 786 (Bankr. D. Del. 2007) (affirming plan approved by compensation committee, even though company did not retain independent counsel to review the plan).

46.    Consistent with the foregoing, since the amendments to the Bankruptcy Code went into effect in October 2005, numerous courts in addition to this Court have approved employee compensation programs outside the ordinary course of business.  <u>See e.g.</u>, <u>In re Global Home Products, LLC</u>, 369 B.R. at 784 ("The reasonable use of incentives and performance bonuses are considered the proper exercise of a debtor's business judgment.") (internal citation omitted); <u>In re: Nobex Corp.</u>, No. 05-20050, 2006 WL 4063024 (Bankr. Del. Jan. 19, 2006) (approving an incentive plan based on the gross purchase price of the sale of the company's assets); <u>In re: Sharper Image</u>, No. 08-10322 (Gross, J.) (Bankr. Del. Jun. 25, 2008) (approving an incentive plan based on successful wind down of the business); <u>In re: Semcrude, L.P.</u>, No. 08-

11525 (Shannon, J.) (Bankr. Del. Jan. 13, 2009) (approving bonus plan based on EBITDA and substantial sale of the business units).

47.    For reasons detailed above, the requested relief falls directly within the Debtors' valid business judgment, is amply "justified by the facts and circumstances," and would comport with Sections 363(b) and 503(c)(3) of the Bankruptcy Code even if those Sections are deemed applicable.[22]

48.    The Debtors therefore respectfully request authorization to implement the 2011 MIP, as provided in the proposed Order attached hereto as Exhibit A.

**III.    The 2011 MIP Properly Includes and Should be Approved For All Management Personnel, Particularly as the Debtors Have Included a Trust Provision in the Proposed MIP Order to Respond to a Potential Creditors Committee Objection.**

49.    The proposed 2011 MIP includes and should be approved for all applicable non-sales management personnel, including the two 2011 MIP participants whose payouts under the 2010 MIP were not authorized at that time by the Court.[23]  See 2010 MIP Order.  The Debtors respectfully submit that their inclusion in and timely payment under the 2011 MIP is fully justified by the facts and circumstances, and would serve both to ensure that they are properly incentivized for the benefit of the Debtors and their constituencies, and to comport with notions of fundamental fairness.  As discussed further below, the Debtors have included a trust

---

[22]The 2011 MIP does not involve "severance" or "retention" payments (whether or not to insiders), and thus Sections 503(c)(1) and (2) of the Bankruptcy Code do not apply.  See 11 U.S.C. § 503(c)(1), (2).  No party claimed at the 2010 MIP hearing that such provisions applied, and the Court also has already held that they are inapplicable to the 2009 MIP program.  See Transcript of November 10, 2010 Hearing (Ex. F hereto), at 60; Transcript of September 25, 2009 Hearing (Ex. H hereto), at 212; Transcript of January 27, 2010 Hearing (Ex. G hereto), at 18; see also In re: Nellson Nutraceutical, Inc., 369 B.R. 787, 802 (Bankr. D. Del. 2007); Global Home Products, LLC, 369 B.R. 778, 785 (Bankr. D. Del. 2007); In re: Dana Corp., 358 B.R. 567, 576 (Bankr. S.D.N.Y. 2006).

[23] Five individuals were not approved for payouts under the 2010 MIP per the Court's 2010 MIP Order.  Three of these individuals are no longer employed and, in connection with their separations, have waived participation in the 2011 MIP.  The current Motion includes the remaining two individuals who are employed with the Company.

provision in the proposed Order attached as Exhibit A hereto, applicable to any 2011 MIP

payments to these two individuals, to respond to the potential objection of the Creditors

Committee with respect to their participation.  This trust, in the form of a so-called "rabbi trust,"

would hold any 2011 MIP payments designated for these two individuals pending resolution of

the claims against them in the Creditors Committee's complaint.

50.    The Debtors initially included these individuals in the 2010 MIP, as they

had in prior years, given their value to the organization and the need to provide them, like other

management team members, with fair and market-based compensation.  Shortly before the

November 10, 2010 Hearing on the 2010 MIP, however, the Creditors Committee filed a limited

objection seeking to deny payment of 2010 MIP awards at that time to five participants,

including the two individuals at issue in this 2011 MIP Motion, because they were, in the

Creditors Committee's words, "implicated" in the Report of Kenneth N. Klee (the "Examiner's

Report") "as possibly having been involved in wrongdoing or having acted inconsistently with

their fiduciary obligations in connection with the 2007 leveraged buy-out of Tribune Company,"

and were among the defendants named in the Creditors Committee's subsequent adversary

complaint.  See Limited Objection of Official Committee of Unsecured Creditors to Motion of

the Debtors for an Order Authorizing the Debtors to Implement a Management Incentive Plan for

2010 [D.I. No. 6252] (the "Limited Objection") ¶¶ 2, 5.  The United States Trustee concurred

with the Limited Objection.

51.    The Debtors were prepared and intended to contest the Creditors

Committee's Limited Objection at the November 10, 2010 Hearing.  However, the Court

indicated at that hearing that it was receptive to the Creditors Committee's concerns.  See

Transcript of November 10, 2010 Hearing (Ex. F hereto), at 18 (the Court noting, in considering

the Creditors Committee's objection and whether to proceed with a hearing on the merits of the

2010 MIP, that "five individuals among the top management group have been named as

defendants in the long-awaited committee complaint."). The Debtors therefore withdrew their

request, without prejudice, for approval of MIP payments to the five individuals at that time, in

order to proceed as to the remaining 600-plus MIP participants. Id. at 20-21.

52.     While the Court's 2010 MIP Order did not authorize payment to the

individuals in question, that Order nevertheless did not bar the Debtors or the individuals

themselves from seeking payment of their 2010 MIP awards at any point in the future. See 2010

MIP Order (stating that "this Order is without prejudice to the Debtors' right to seek approval of

the 2010 MIP Motion as to such Deferred Participants at a future time, or to the right of any

party to raise objections to any such motion"). Nor did the 2010 MIP Order exclude them from

participating in any subsequent MIP program.

53.     Both the Compensation Committee and the Debtors' senior management

have made the business judgment that the two such individuals who continue to be employed

with the Debtors remain valuable to the organization and should be compensated fairly for their

continued services to the Debtors. To that end, they have included them in the 2011 MIP, which

provides market-based compensation to incentivize and reward for current performance. Their

inclusion in the 2011 MIP also is necessary to establish and preserve their eligibility for and the

potential amount of their respective MIP awards, so that such awards can properly be determined

and paid if and when they ultimately are authorized and become payable. Furthermore, the

Debtors maintain that it is both important to the Debtors as a business matter, and equitable, to

make timely payment to these participants of any 2011 MIP awards that become earned at the

same time as for all other management participants.

54.    Despite the foregoing considerations, the Creditors Committee informed the Debtors, as it did with the 2010 MIP, that it would again object to the two affected participants' receipt of payments under the 2011 MIP before the claims against them in the Creditors Committee's complaint have been resolved.  The Debtors continue to believe that any such objection is unwarranted and contrary to the best interests of the Debtors' estates, and that there is no sound factual or legal basis for deferring the affected participants' awards under the 2011 MIP (if otherwise earned thereunder).  As the Court cautioned at the November 10, 2010 Hearing, "they're only allegations in a complaint so far . . . ."  See Transcript of November 10, 2010 Hearing (Ex. F hereto), at 22.  Further, it is plain that the Creditors Committee, in filing its complaint, swept broadly in an effort to preserve causes of action against as many current and former officers, directors and shareholders as possible.  In these circumstances, it would be manifestly unfair for these individuals to be required again, by virtue of the fact that they happen to be actively working in the service of the Debtors, to essentially put up "collateral" out of their hard-earned wages against the potential of a judgment at some indeterminate future time.[24]

55.    Moreover, neither of the individuals in question (nor any of the three other previously excluded individuals who are no longer employed with the Debtors) has been adjudged to have engaged in any wrongdoing or breach of duty at any time, and the Examiner's

---

[24] If the individuals in question were to be excluded from receiving their 2011 MIP awards, they would receive only their base salary, whereas their counterparts at the Debtors' competitors (not to mention in other industries) typically receive a base salary, annual cash bonus award and long-term equity-based compensation.  For perspective, as discussed in Mercer's report in support of the Motion of the Debtors for an Order Authorizing the Debtors to Implement a Management Incentive Plan for 2010 [D.I. 4620] (such motion referred to as the "2010 MIP Motion" and such report referred to as the "Mercer 2010 MIP Report"), if the management team members had received only base salary during 2010 – as these individuals in fact did – their total direct compensation would have fallen to an average of approximately 28% of the market median for senior management, 42% of the market median for other key executives, 62% of the market median for other management team members analyzed, and 49% of the market median for the surveyed management team as a whole.  See Mercer 2010 MIP Report, at 13 (filed as Exhibit D to the 2010 MIP Motion).  The Mercer Report for the 2011 MIP reflects a comparable shortfall, with TCC and TDC for senior management falling on average at approximately 61% and 29%, respectively, of the market median in the absence of the 2011 MIP. Ex. D, at 11.

46429/0001-7862840V1

Report does not specifically accuse any particular member of management of wrongdoing.  To the contrary, the Examiner expressly declined to identify any specific member of what he referred to as "Senior Financial Management" as having engaged in acts of dishonesty, noting that "[g]iven the compressed time frame, the Examiner simply was not able to conduct the inquiry necessary to conclusively identify specific individuals as having engaged in dishonesty." See Examiner's Report, Vol. II, at 54; see also id. at 387 (noting that "[a]dditional investigation is warranted and would be required to determine the acts of specific members of senior financial management to determine individual culpability").  Excluding the two individuals in question from receiving payment under the MIP for another year effectively treats them as if they had been found liable, before they even receive a full and fair trial.

56.    Furthermore, as stated, no one has alleged (much less proven) any current wrongdoing by any of these individuals that, in the Debtors' view, should warrant the continued withholding of their current compensation for their current services.  All of the allegations in the Examiner's Report and the Creditors Committee's complaint relate to 2007 and bear no relation to the individuals' current efforts on the Debtors' behalf.  It also is far from a foregone conclusion that any of the individuals cited in the Examiner's Report will ever be found to have committed any wrongdoing, despite the Examiner's "reasonable likelihood" finding upon which the Creditors Committee bases its allegations.  As the Debtors have already discussed in some detail, the Examiner's Report did not result from an adversary process and interested parties were not permitted to participate in the Examiner's interviews; the Examiner's Report contains numerous statements, evidence, conclusions and, in certain instances, omissions and inconsistencies that tend to exculpate rather than incriminate the Debtors' senior management; and its suggestions regarding possible wrongdoing by senior management rest on credibility

41

determinations by the Examiner that the Debtors respectfully submit are subject to serious question particularly because such credibility determinations were wholly untested. See generally Debtors' Memorandum of Law in Opposition to the Noteholder Plan Proponents' Motion to Compel Production of Documents and Information Based on the Crime-Fraud Exception (January 19, 2011) [D.I. No. 7570], at 7-14.

57.     The Debtors included a "clawback" feature in the 2011 MIP, identical to the "clawback" in the 2010 MIP, that permits the Company to recoup any award paid to a participant, including without limitation the individuals in question, who subsequently is judicially determined to have breached his or her fiduciary duties or committed an intentional tortious wrong in connection with the 2007 leveraged buyout transaction. See Exhibit A hereto (proposed Order authorizing 2011 MIP and containing "clawback" provision identical to that contained in the Court's 2010 MIP Order). This "clawback" provision adequately and fairly addresses any concerns stemming from the as-yet-untested allegations in the Examiner's Report and the Creditors Committee's complaint.

58.     Notwithstanding the "clawback" language and the arguments set forth above, the Creditors Committee informed the Debtors that it still would object to the two individuals' receipt of payments under the 2011 MIP prior to the resolution of the claims against them in the Creditors Committee's complaint, even with the inclusion of the "clawback" provision. The Debtors continue to believe that any such objection is without merit and that deferral of another year's MIP payment is unnecessary, contrary to the best interests of the Debtors' estates, and inequitable to the affected participants. Nevertheless, the Debtors are mindful of the Court's ruling on this issue with respect to the 2010 MIP. Accordingly, to respond to the Creditors Committee's potential objection as to this issue, the Debtors have

42

included a provision in the proposed 2011 MIP Order (attached as <u>Exhibit A</u> hereto) that would allow these two affected individuals to participate in the 2011 MIP, but would provide for the placement in trust of any 2011 MIP awards otherwise payable to them pending resolution of the claims against them in the Creditors Committee's complaint.

59.    The Debtors respectfully submit that this trust provision is more than sufficient to warrant the participation of the two affected participants in the 2011 MIP.  This trust provision also is consistent with the approach taken in other bankruptcy litigation in which wrongdoing was alleged against corporate "insider" incentive plan participants.  <u>See, e.g.</u>, <u>In re: Lyondell Chemical Co.</u>, No. 09-10023 (Gerber, J.) (Bankr. S.D.N.Y. Aug. 26, 2009) (providing for placement in escrow of any payments under annual incentive plan to various executives charged with wrongdoing, including breach of fiduciary duty and mismanagement, in complaint filed by official committee of unsecured creditors).

60.    Accordingly, the Debtors respectfully submit that the Court should approve this Motion and the 2011 MIP Order as proposed.

## <u>CONCLUSION</u>

61.    For the foregoing reasons, the Debtors respectfully submit that the 2011 Management Incentive Plan is an ordinary course program (and in any event would satisfy any applicable Bankruptcy Code requirements for transactions outside the ordinary course), and that granting the relief requested herein is well within the Court's authority, is a valid exercise of the Debtors' business judgment, and thus is clearly in the best interests of the Debtors' estates and creditors.  Accordingly, the Debtors respectfully request that the Court grant the relief requested

46429/0001-7862840V1

herein and enter the proposed Order attached as <u>Exhibit A</u> hereto authorizing, but not directing, them to implement the 2011 Management Incentive Plan.

## NOTICE

62.    Notice of this Motion has been provided to:  (i) the Office of the United States Trustee; (ii) counsel for the Creditors Committee; (iii) the administrative agents for the Company's prepetition loan facilities; (iv) the administrative agent for the Debtors' post-petition loan facility; and (v) all parties having requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## NO PRIOR REQUEST

63.    The Debtors have not previously sought the relief requested herein from this or any other Court.

WHEREFORE, for the foregoing reasons, the Debtors respectfully seek entry of an Order in substantially the form of the proposed Order attached hereto as <u>Exhibit A</u>:

(1)    authorizing, but not directing, the Debtors pursuant to Section 363(c) and, as applicable, Sections 363(b) and 503(c) of the Bankruptcy Code, to implement an ordinary course Management Incentive Plan for 2011 as described in this Motion for approximately 640 management employees, with an aggregate payout opportunity of approximately:

(a) $16.4 million – representing a 50%-of-target payout – if the Company achieves "threshold" performance equal to approximately 91% of its "planned" 2011 consolidated OCF goal included in the 2011 operating plan that was approved by the Board on February 2, 2011;

(b)    $32.4 million – representing a 100%-of-target payout – if the Company achieves "target" performance equal to 106% of its "planned" 2011 consolidated OCF goal included in the 2011 operating plan that was approved by the Board on February 2, 2011; and

(c)    $42.5 million – representing a 130%-of-target payout – if the Company achieves "maximum" performance equal to approximately 141% of its "planned" 2011 consolidated OCF goal included in the 2011 operating plan that was approved by the Board on February 2, 2011; and

(2)    granting such other and further relief as the Court may deem just and proper.


Dated:    Wilmington, Delaware          Respectfully submitted,
          August 30, 2011

                                        SIDLEY AUSTIN LLP
                                        Bryan Krakauer
                                        Kevin T. Lantry
                                        Brian J. Gold
                                        Jonathan D. Lotsoff
                                        One South Dearborn Street
                                        Chicago, Illinois  60603
                                        Telephone:  (312) 853-7000
                                        Facsimile:  (312) 853-7036
                                            -and-

                                        COLE, SCHOTZ, MEISEL,
                                        FORMAN & LEONARD, P.A.

                                        By: _____
                                        Norman L. Pernick (No. 2290)
                                        J. Kate Stickles (No. 2917)
                                        500 Delaware Avenue, Suite 1410
                                        Wilmington, Delaware  19801
                                        Telephone:  (302) 652-3131
                                        Facsimile:  (302) 652-3117

                                        ATTORNEYS FOR DEBTORS AND
                                        DEBTORS IN POSSESSION