# EXHIBIT G

## Excerpts of Transcript of January 27, 2010 Hearing

```
                IN THE UNITED STATES BANKRUPTCY COURT
                    FOR THE DISTRICT OF DELAWARE


                                    )
IN RE:                              ) Chapter 11
                                    )
TRIBUNE COMPANY, et al.,            ) Case No. 08-13141 (KJC)
                                    )
                                    ) Courtroom 5
                                    ) 824 Market Street
              Debtors.              ) Wilmington, Delaware

                                      January 27, 2010
                                      10:04 a.m.

                         EXCERPT FROM
                    TRANSCRIPT OF PROCEEDINGS
               BEFORE THE HONORABLE KEVIN J. CAREY
                  UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For Debtors:               Sidley Austin LLP
                           BY:  KEVIN P. LANTRY, ESQ.
                           BY:  JONATHAN LOTSOFF, ESQ.
                           One South Dearborn
                           Chicago, IL 60603
                           (213) 896-6022

                           Cole, Schotz, Meisel, Forman &
                           Leonard, PA
                           BY:  NORMAN PERNICK, ESQ.
                           1000 North West Street
                           Suite 1200
                           Wilmington, DE 19801
                           (302) 652-3131


ECRO:                      AL LUGANO

Transcription Service:     DIAZ DATA SERVICES
                           331 Schuylkill Street
                           Harrisburg, Pennsylvania 17110
                           (717) 233-6664


Proceedings recorded by electronic sound recording; transcript
produced by transcription service
```

2

APPEARANCES:
(Continued)

| | |
|---|---|
| For Washington Baltimore Newspaper Guild: | Cross & Simon LLC<br>BY: CHRISTOPHER P. SIMON, ESQ.<br>913 North Market Street<br>11th Floor<br>Wilmington, DE 19801<br>(302) 777-4200 |
| For The Creditors Committee: | Landis Rath & Cobb<br>BY: ADAM LANDIS, ESQ.<br>919 Market Street Suite 1800<br>P.O. Box 2087<br>Wilmington, DE 19899<br>(302) 467-4400<br><br>Chadbourne & Park LLP<br>BY: DOUGLAS DEUTSCH, ESQ.<br>30 Rockefeller Plaza<br>New York, NY 10112<br>(212) 408-5100 |
| For U.S. Trustee: | Office of the U.S. Trustee<br>BY: JOSEPH J. MCMAHON, ESQ.<br>844 King Street, Suite 2207<br>Lockbox 35<br>Wilmington, DE 19801<br>(302) 573-6491 |
| For Great Banc: | Womble Carlyle Sandridge & Rice<br>BY: THOMAS M. HORAN, ESQ.<br>222 Delaware Avenue<br>Wilmington, DE 19801<br>(302) 252-4320 |
| For JP Morgan Chase: | Richards Layton & Finger<br>BY: DREW G. SLOAN, ESQ.<br>One Rodney King Square<br>920 North King Street<br>Wilmington, DE 19801<br>(302) 651-7612 |

1  submit an order that as well.

2  THE COURT: Very well. All right, let's address the
3  MIP Motion. Give me a moment to pull myself together here.
4       (Pause in proceedings)
5  THE COURT: All right. At the conclusion of the
6  September 25th hearing, on the debtors' motion to -- for
7  authority to implement a three-part 2009 plan and to pay 2008
8  management incentive plan awards, I asked the debtor whether it
9  would be willing to have the Court consider the various parts
10 separately or whether it was the debtors' position it should
11 rise or fall together.
12      The debtor followed with a letter telling me that
13 they wanted to -- the Court to consider the whole and not to
14 rule on its various parts. And as the Guild's attorney pointed
15 out in a September 29th letter, the debtors' letter that had
16 been sent to me, which is a September 28th letter, did indeed
17 inappropriately take the opportunity to order -- to offer
18 further argument. But be that as it may, I took the debtor at
19 its word and took under advisement all three parts.
20      I have not ruled so far because I had intended to
21 write an opinion resolving the dispute, but due to the press of
22 business I have not yet been able to reach it. Recently, as
23 the parties now know, the debtors changed their mind and said
24 the Court -- well, and asked the Court to consider the separate
25 components. In the order that I entered setting the matter for

1  today, I indicated it was not necessary for parties to re-file
2  any objections to the -- what's called the transition MIP or
3  the KOB components of the 2009 Plan.
4           The parties who I'll call the two remaining
5  objectors, that is the Washington Baltimore Newspaper Guild and
6  the U.S. Trustee filed supplemental papers indicating that they
7  still objected to authorization to pay bonuses under the --
8  just the MIP component of the 2009 incentive plan. I will tell
9  you, and some may have surmised from the question I asked at
10 the conclusion of the September 25th hearing, I was prepared
11 then to approve the MIP component based upon the record that
12 had been made. I guess it's a good thing for management that
13 the debtor has changed its mind. And I frankly suggest, and
14 I'll read a more detailed ruling in a moment, that it consider
15 taking the remaining two components and incorporating them into
16 a Chapter 11 Plan. And I'm assuming that the debtor is getting
17 closer to having arrived at one, but I don't know that. In any
18 event, until advised otherwise, the other two components will
19 remain in the queue for ruling and I cannot tell you when that
20 ruling will be issued.
21          But before I continue, let me ask if anyone wishes
22 to be heard? I hear no response.
23          Debtors filed a motion for authority to pay 2008 MIP
24 awards. These were previously approved by prior order after
25 the hearing without objection. The remaining request for

10

1  relief in the debtors' motion, which was heard on September
2  25th of last year, involved three components of a 2009
3  incentive plan. The first component is what the debtor
4  characterizes as a continuation of self-funding -- of a self-
5  funding ordinary course annual MIP, which covers approximately
6  720 management employees, including the debtors' top 10
7  executives, with a payout of up to $44.6 million.
8         The second component is comprised of what the debtor
9  describes as a pay-for-performance bonus opportunity for 21
10 core management individuals, including the top 10 executives,
11 plus 50 others. That's referred to as the transition MIP. The
12 third -- and that allows for payment of up to 12 million --
13 about $12 million.
14        The third component is what the debtor characterizes
15 as a pay-for-performance bonus opportunity for 23 leaders of
16 key operations of the debtor or the KOB component. The subject
17 of today's ruling, as I said previously, is only the MIP, not
18 the transition MIP and not the KOB.
19        I take a more detailed description of the proposed
20 MIP from the debtors' motion and I'll paraphrase, it consists
21 of several subparts. First, it is proposed an aggregate MIP
22 bonus pool be funded if the company achieves what's called a
23 planned operating cash flow. Second, if there's achievement of
24 100 percent of the planned 2009 consolidated operating cash
25 flow, it results in a payout of 50 percent of the target pool.

1   Payout of 100 percent of the target requires achievement of

2   what the debtor characterizes as a stretch goal, that is 142

3   percent of planned operating cash flow.  Third, there's a

4   maximum performance, 200 percent of planned operating cash

5   flow, which would fund a maximum aggregate pro-forma bonus pool

6   capped at 130 percent of the pool.

7         The debtor says in its motion that the number of

8   participants and the aggregate cost of the ordinary course MIP

9   at both planned and stretched performance levels, remain at or

10  below levels for MIPs in prior years.  And fifth, that 2009

11  management incentive plan limits the debtors' discretion to

12  make ordinary course MIP awards when goals are not achieved as

13  compared to prior years.

14        The Guild and the debtors did stipulate to certain

15  facts.  They're not extensive and I will paraphrase some of the

16  stipulated facts, which were attached to the joint pre-trial

17  memorandum which was submitted prior to the hearing -- the

18  September 25th hearing on the motion.

19        As of the filing of the petition, the debtors

20  employed approximately 15,000 employees.  They operate eight

21  major market daily newspapers and twenty-three television

22  stations.  As of November 30, 2008, approximately 10 percent of

23  the employees in the debtors' publishing segment and

24  approximately 32 percent of the employees in the debtors'

25  broadcasting and entertainment segment were represented by a

1  labor organization, hereafter union or unions, for the purposes
2  of collective bargaining and are covered by a collective
3  bargaining agreement. As of September 1, 2009 approximately 11
4  percent of the employees in the debtors' publishing segment and
5  approximately 33 percent of the employees in the debtors'
6  broadcasting and entertaining segment are represented by unions
7  for the purposes of collective bargaining and are covered by a
8  collective bargaining agreement.
9            During the pendency of the petition a number of
10 union contracts have approached their expiration dates or have
11 expired. In those instances, the debtors have engaged in
12 collective bargaining negotiations over the terms of a
13 successor collective bargaining agreement with respect to
14 negotiation of union contracts that have approached their
15 expiration dates or expired during the pendency of the
16 petition, economic contract proposals made by the debtors
17 during 2009 to these unions reflect a zero percent increase in
18 wages for calendar year 2009.
19           Except for employees of the debtors covered by an
20 individual employment agreement, the debtors, in February 2009,
21 implemented a salary freeze for all non-union employees. Since
22 the filing of the petition, the debtors eliminated 887 non-
23 management, non-supervisory positions, 23 supervisors and 104
24 managerial positions. The debtors severed almost 2,000
25 positions in 2008.

13

1              The evidence from the debtors' witnesses, especially
2    Chief Financial Officer Chandler Bigelow, demonstrated the need
3    for incentives.  Debtors' expert, John Dempsey (phonetic),
4    among other things said, "It's a basic principal of human
5    resources management that incentives are a tool used to both
6    motivate people and to align the interests of people with the
7    company."  All major constituents of the debtors supported all
8    three components of the plan.
9              The remaining objectors, the Washington Baltimore
10   Newspaper Guild, who employees -- who has 237 employees of the
11   debtor, and the U.S. Trustee objected, and the objections were
12   similar.  Among other things, the objectors argued that the
13   minimum bench marks had already been met.  I think I mentioned
14   at the time of the hearing, but I'll say again now, with
15   respect to timing, the way Chapter 11 cases, in my experience
16   have developed, especially in recent times, is there are other
17   matters which are properly, I think, of greater importance at
18   the beginning of a case, other than figuring out how to pay
19   bonuses to management employees.
20             The process here was the subject of a hearing in
21   May, again in September, the process was ongoing, it was
22   intensive, the evidence demonstrated that it involved all of
23   the major constituents of the debtor, and the fact that time
24   has passed, I don't think, should count against the debtor or
25   its -- the subjects of the proposed bonuses as a result of how

14

1   the 11 developed. I'm not saying there would never be a time
2   when it would come to be too late, but under these
3   circumstances, I determined that it's not. There was dispute
4   in the evidence about whether the debtors' expert looked at the
5   wrong peer groups, whether the sample that was discussed and
6   submitted was a representative sample of other industry
7   constituents, and of course a significant objection was that
8   the cash flow devoted -- or to be set aside for the proposed
9   bonuses -- was a much larger percentage of historic cash flow
10  from prior plans.
11          The debtor responded by arguing, in my words not
12  theirs, but that rarely is there an exact fit with respect to
13  peer groups or representative samples and that was the case
14  here. With respect to the argument that performance levels for
15  bonuses had been met -- at least the minimums had been met at
16  the time of hearing, the debtor responded, I think, in a way
17  that does gain some purchase with me, and that is they weren't
18  achieved when they were first established. And the debtor
19  argued, I think, persuasively that it would not be fair to move
20  the goal post in the middle of the performance period.
21          The expert offered by the Guild, while helpful in
22  some respects, was not a compensation expert. I did
23  incorporate, and if I didn't I do so now, the hearing record
24  from the May 12, 2009 hearing. Mr. Bigelow testified that
25  salaries are set historically low, relative to the market. One

15

1  component of the proposed plan that was the subject of some
2  dispute was that the bonuses were to be paid in cash, as
3  opposed to cash and equity, which had historically been the
4  practice of the company, but it's plain from the evidence that
5  the equity has de minimis or no value and would not be an
6  appropriate component of a bonus program.
7       He testified that costs are fixed, the company is
8  under intense revenue pressure, and it's harder to do things in
9  a Chapter 11. He testified that all eight newspapers owned by
10 the company are cash flow positive and that the program that's
11 proposed was approved by three independent directors. I mean,
12 it's undisputed that the debtor operates in a troubled
13 industry. An industry, in the Court's view anyway, that
14 besides shedding debt has yet to find the ultimate solution for
15 how to succeed in a changing market in the distressed economy.
16 This is the third large media -- well, this is one of three
17 large media cases that I have. I had the first days on my most
18 recent filing just yesterday. The industry continues to be
19 troubled.
20      Here the evidence demonstrated that the debtor is
21 performing well, relative to its competitors. So even though
22 there was some evidence that some in the industry retreated
23 with respect to their bonus programs, here I find that what's
24 been proposed is justified. In looking at the legal standard
25 to be employed in determining whether the relief requested

1  should be granted, as I said earlier, I had intended to write
2  on this topic because I have not yet done so. However, given
3  the passage of time and what I perceive as the need for a
4  ruling, at least on the component that I think is justified,
5  I'll rely at least in this case on the Dana Two (phonetic)
6  Factors.
7      And I conclude that here, the evidence shows there
8  is a reasonable relationship between the plan and its
9  objectives to enhance the company's chances of survival and
10 increased profitability. The cost is reasonable as well. The
11 scope is reasonable. It covers the same management population
12 covered in previous plans, which is a critical core group. The
13 plan was developed over time, as a result of extensive
14 negotiations by and among all of the major constituents of the
15 company and has the support of all the major constituents of
16 the company.
17      I will tell you -- he's not here today, but on this
18 topic I was struck by Mr. Lemay's closing argument, from which
19 I'll quote, not too extensively. He said, "Business people in
20 the for-profit world have an understanding about what motivates
21 management, because all business people in the for-profit world
22 are in that world themselves. And what motivates management is
23 a number of things, including pride in a job well done, but the
24 chance to make something for one's self and one's family. Our
25 clients -- my clients don't wish to find out what would happen

1   if management didn't get these awards. The suggestion has been
2   made that a company, because it's in Chapter 11, maybe
3   shouldn't pay bonuses just because it's in Chapter 11, and that
4   may be true when a company is in a life or death liquidity
5   situation, where there's simply you either pay the bonuses or
6   have to turn the lights. That's really not the case here.
7   Liquidity is obviously an issue, but it's not a life or death
8   liquidity question.
9           So the question as a business matter then becomes,
10  what's in the best interest of the business and its owners?
11  I'd like to submit that being in Chapter 11 doesn't change at
12  all what management should be doing, it just changes who
13  they're doing it for. Now ultimately they're going to be doing
14  it for the unsecured creditors. It really just goes to the
15  question of who their ultimate constituents are in this case,
16  as in so many, it is almost inevitable. Indeed, I would go so
17  far as to say inevitable that the equitable owners of the
18  business are now the creditors. The creditors have an official
19  representative. That representative is my client and that
20  client, which consists of a number of very canny business
21  people, has concluded that these incentives will ultimately put
22  more money in their pockets than the alternative."
23          The proposed plan was reviewed by an independent
24  committee of the board and validated, the evidence shows, by a
25  credible expert. The plan that is proposed is similar enough

18

1  to the 2008 and prior plans, with the evidence showed,
2  appropriate adjustments to fit the change in the circumstances,
3  that it meets the 363 Ordinary Course standard. Alternatively,
4  the evidence demonstrates that the debtor has also met the
5  503(c)(3) standard, a heightened business judgment standard,
6  and I conclude that the relief requested is justified by the
7  facts and circumstance of the case. Neither 503(c)(1), which
8  relates to primarily retention-based bonus programs, or
9  503(c)(2) regarding severance, are applicable here. The
10 objections are overruled and I'll ask the parties confer and
11 submit an order under certification.
12         Are there any questions?
13         MR. PERNICK:  No, Your Honor.
14         THE COURT:  Is there anything further for today?
15         MR. PERNICK:  No, Your Honor, not from the debtors.
16         THE COURT:  Thank you, all. That concludes this
17 hearing. Court will stand in recess.
18         MR. PERNICK:  Thank you, Your Honor.
19         (Whereupon at 10:30 a.m., the hearing was adjourned)

19

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

*Stephanie McMeel*                February 1, 2010

Stephanie McMeel

AAERT Cert. No. 452

Certified Court Transcriptionist