## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered<br>**Objection Date: October 11, 2011 at 4:00 p.m.**<br>**Hearing Date: TBD**<br>**Related to Docket Nos. 8278, 8764, and 8774** |

## NINTH QUARTERLY FEE APPLICATION OF SIDLEY AUSTIN LLP FOR COMPENSATION FOR SERVICES RENDERED AND REIMBURSEMENT OF EXPENSES AS COUNSEL TO THE DEBTORS AND DEBTORS IN POSSESSION FOR THE PERIOD OF DECEMBER 1, 2010 THROUGH FEBRUARY 28, 2011

Name of Applicant:                    **Sidley Austin LLP**

Authorized to Provide                 **Debtors**
Professional Services to:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc., f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); and WPIX, Inc. (0191). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

| Date of Retention: | **February 20, 2009 (<u>nunc pro tunc</u> to December 8, 2008)** |

| Period for Which Compensation and Reimbursement is Sought: | **December 1, 2010 through February 28, 2011** |

| Amount of compensation sought as actual, reasonable and necessary: | **$14,478,878.00[2]** |

| Amount of Expense Reimbursement sought as actual, reasonable and necessary | **$599,999.17** |

This is a(n): _____ monthly    __X__ interim    _____ final application

The total time expended for fee application preparation for the monthly and quarterly fee applications, including time expended for review and response to preliminary and final reports and recommendations of the Fee Examiner, during the Ninth Interim Fee Period is approximately 635.90 hours and the corresponding compensation requested is approximately $189,979.00.

### Prior Interim Applications

| Quarter | Date Filed | Period Covered | Requested | | Approved | |
|---|---|---|---|---|---|---|
| | | | Fees | Expenses | Fees | Expenses |
| 1 | 4/15/09 | 12/8/08-2/28/09 | $3,897,043.25 | $165,360.71 | $3,886,289.75 | $158,441.67 |
| 2 | 7/16/09 | 3/1/09-5/31/09 | $4,209,274.75 | $105,524.36 | $4,203,235.50 | $104,118.90 |
| 3 | 10/15/09 | 6/1/09-8/31/09 | $4,513,018.00 | $99,429.34 | $4,510,127.00 | $99,253.67 |
| 4 | 1/15/10 | 9/1/09-11/30/09 | $5,292,782.75 | $221,808.01 | $5,275,754.14 | $220,748.76 |
| 5 | 4/15/10 | 12/1/09-2/28/10 | $5,426,757.50 | $205,852.05 | | |
| 6 | 12/14/10 | 3/1/10-5/31/10 | $6,581,178.43 | $425,733.29 | | |
| 7 | 5/4/11 | 6/1/10-8/31/10 | $7,081,656.37 | $310,093.90 | | |
| 8 | 7/1/11 | 9/1/10-11/30/10 | $7,126,734.00 | $334,255.68 | | |

---

[2] Sidley has voluntarily waived $11,400.00 in fees sought in the Twenty-Fourth Monthly Fee Application that were billed to the Litigated Matters category. The total fees for which compensation is sought in this Ninth Quarterly Fee Application reflects a reduction by that amount.

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered<br>**Objection Date: October 11, 2011 at 4:00 p.m.**<br>**Hearing Date: TBD**<br>**Related to Docket Nos. 8278, 8764, and 8774** |

## NINTH QUARTERLY FEE APPLICATION OF SIDLEY AUSTIN LLP FOR COMPENSATION FOR SERVICES RENDERED AND REIMBURSEMENT OF EXPENSES AS COUNSEL TO THE DEBTORS AND DEBTORS IN POSSESSION FOR THE PERIOD OF DECEMBER 1, 2010 THROUGH FEBRUARY 28, 2011

Sidley Austin LLP ("Sidley"), attorneys for Tribune Company and the affiliated

companies that filed voluntary petitions for relief in the above-captioned chapter 11 cases

(collectively, the "Debtors"), respectfully submits this application (the "Application") to this

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC (KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc., f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); and WPIX, Inc. (0191). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

Court, pursuant to (i) sections 327, 331, and 503 of title 11 of the United States Code (the "Bankruptcy Code"), (ii) Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (iii) Rule 2016-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), (iv) the Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals and Committee Members Pursuant to 11 U.S.C. §§ 105(a) and 331 (Docket No. 225) (the "Interim Compensation Order"), as amended, and (v) the Order Appointing Fee Examiner and Establishing Related Procedures for Compensation and Reimbursement of Expenses for Professionals and Consideration of Fee Applications (Docket No. 546) (the "Fee Examiner Order") for approval of interim compensation and reimbursement of expenses for the ninth quarterly period from December 1, 2010 through February 28, 2011 (the "Ninth Interim Fee Period"). In support of the Application, Sidley respectfully states as follows:

## FACTUAL BACKGROUND OF THE CASES

1.      On December 8, 2008 (the "Petition Date"), Tribune Company and certain of its subsidiaries each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. An additional Debtor, Tribune CNLBC, LLC (f/k/a Chicago National League Ball Club, LLC) ("Tribune CNLBC"), filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on October 12, 2009.[2] On March 22, 2010, this Court entered an order dismissing the chapter 11 petition of New River Center Maintenance Association, Inc. In all, the Debtors comprise 111 entities.

---

[2] Orders of the Court applicable to this Application have subsequently been extended to Tribune CNLBC. (See Order Directing (I) Joint Administration of Chapter 11 Cases and (II) that Certain Orders and Other Pleadings Entered or Filed in the Chapter 11 Cases of Tribune Company, et al. be Made Applicable to the Chapter 11 Case of Chicago National League Ball Club, LLC (entered Oct. 14, 2009) (Docket No. 2333) (the "CNLBC Joint Administration Order").

2.      The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b). (Docket Nos. 43, 2333.)

3.      The Debtors have continued in possession of their respective properties and have continued to operate and maintain their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.      On December 18, 2008, the Office of the United States Trustee appointed an official committee of unsecured creditors (the "Committee").

5.      On March 19, 2009, pursuant to Fee Examiner Order, the Court appointed Stuart Maue as fee examiner (the "Fee Examiner") to act as special consultant to the Court for professional fee and expense analysis and review, effective nunc pro tunc to February 20, 2009. (Docket No. 546.)

6.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief sought herein are sections 327, 331, and 503 of the Bankruptcy Code, Rule 2016 of the Bankruptcy Rules, and Rule 2016-2 of the Local Rules.

## PROCEDURAL BACKGROUND FOR THE APPLICATION

7.      The Debtors sought approval of this Court to retain Sidley as general reorganization and bankruptcy counsel, pursuant to 11 U.S.C. §§ 327(a) and 1107, by application filed on December 26, 2008. As set forth in the application seeking such approval, Sidley's services to the Debtors encompass a wide range of legal services, focused upon restructuring and insolvency issues but also encompassing certain general corporate, litigation, tax, media law and

regulatory, employee-related, and real estate matters.  In particular, Sidley's retention application

sets forth the following scope of services:

a) to provide legal advice with respect to the Debtors' powers and duties as debtors in possession in the continued operation of their business;

b) to take all necessary action on behalf of the Debtors to protect and preserve the Debtors' estates, including prosecuting actions on behalf of the Debtors, negotiating any and all litigation in which the Debtors are involved, and objecting to claims filed against the Debtors' estates;

c) to prepare on behalf of the Debtors all necessary motions, answers, orders, reports, and other legal papers in connection with the administration of the Debtors' estates;

d) to attend meetings and negotiate with representatives of creditors and other parties in interest, attend court hearings, and advise the Debtors on the conduct of their chapter 11 cases;

e) to perform any and all other legal services for the Debtors in connection with both their chapter 11 cases and with the formulation and implementation of the Debtors' plan of reorganization;

f) to advise and assist the Debtors regarding all aspects of the plan confirmation process, including, but not limited to, negotiating and drafting a plan of reorganization and accompanying disclosure statement, securing the approval of a disclosure statement, soliciting votes in support of plan confirmation, and securing confirmation of the plan;

g) to provide legal advice and representation with respect to various obligations of the Debtors and their managers and officers;

h) to provide legal advice and perform legal services with respect to matters involving the negotiation of the terms of and the issuance of corporate securities, matters related to corporate governance, and the interpretation, application, or amendment of the Debtors' organizational documents, including their limited liability company agreements, material contracts, and matters involving the fiduciary duties of the Debtors and their officers and managers;

i) to provide legal advice and perform legal services with respect to litigation, tax (state and federal income tax and local property tax assessment matters) and other general non-bankruptcy legal issues for the Debtors to the extent requested by the Debtors; and

j) to render such other services as may be in the best interests of the Debtors in connection with any of the foregoing and all other necessary or appropriate legal

services in connection with these chapter 11 cases, as agreed upon by Sidley and the Debtors.

Sidley's retention, nunc pro tunc to the Petition Date, was approved by this Court by order dated February 20, 2009. (Docket No. 435.)

8.      The Interim Compensation Order and the Fee Examiner Order (together, the "Fee Orders") provide that all professionals retained in these cases pursuant to sections 327, 328, or 1103 of the Bankruptcy Code (the "Case Professionals") must file with the Court and provide to the Fee Examiner monthly applications for interim allowance of compensation for services rendered and reimbursement of expenses incurred, together with the applicable time entries and itemized expenses (the "Monthly Fee Application"). The notice parties specified in the Fee Orders (the "Notice Parties") have twenty (20) days after service of a Monthly Fee Application to object to such Monthly Fee Application (the "Objection Deadline"). Upon expiration of the Objection Deadline, the applicable Case Professional must certify in writing that no objection or partial objection has been filed with the Court relative to that professional's Monthly Fee Application, whereupon the Debtors are authorized to pay such professional an amount equal to the lesser of (i) 80% of the fees and 100% of the expenses requested in the Monthly Fee Application or (ii) 80% of the fees and 100% of the expenses not subject to an objection.

9.      Pursuant to the procedures set forth in the Fee Orders, Sidley prepared, filed with the Court, and served upon the Notice Parties and the Fee Examiner Monthly Fee Applications for the periods of December 2010, January 2011, and February 2011, which Monthly Fee Applications are incorporated herein by reference.[3] Sidley has accordingly

---

[3] The docket numbers of Sidley's Monthly Fee Applications for December 2010, January 2011, and February 2011 are 8278, 8764, and 8774, respectively.

submitted all of its Monthly Fee Applications for the Debtors' chapter 11 cases for the Ninth

Interim Fee Period.

10.     In addition to the Monthly Fee Applications, beginning with the three-

month period ending February 28, 2009, and each three-month period thereafter, all Case

Professionals must file with the Court and serve on the Notice Parties interim applications for

allowance of compensation and reimbursement of expenses of the amounts sought in the

Monthly Fee Applications filed during such period (a "Quarterly Fee Application Request").

(See Interim Compensation Order at 3.)  Quarterly Fee Application Requests must include a

summary of the Monthly Fee Applications that are the subject of the request and any other

information requested by the Court or required by the Local Rules.  (Id.)  This Application

represents the ninth Quarterly Fee Application Request that Sidley has filed with the Court in

connection with these chapter 11 cases, and it covers the period from December 1, 2010 through

February 28, 2011, both dates inclusive.

## RELIEF REQUESTED

11.     By this Application, Sidley respectfully requests that the Court approve

the interim allowance and award of compensation for professional services rendered and

reimbursement of actual and necessary expenses incurred by Sidley as general bankruptcy

counsel to the Debtors during the Ninth Interim Fee Period.

12.     The amount of fees sought for services rendered during the Ninth Interim

Fee Period is $14,478,878.00, representing 26,016.00 hours in professional and paraprofessional

time for such services.  Reimbursement of actual, necessary expenses incurred by Sidley during

the Ninth Interim Fee Period in connection with these services is requested in the amount of

$599,999.17.  Sidley seeks the interim allowance of such compensation, and this Court's

authorization for payment of such amounts by the Debtors to Sidley, less amounts previously

8

paid to Sidley pursuant to the Monthly Fee Applications for the period covered by this Application and the procedures set forth in the Fee Orders.

13.    The hourly rates charged by Sidley professionals and paraprofessionals during the Ninth Interim Fee Period are no greater than the customary hourly rates for such individuals both inside and outside of bankruptcy cases.  The highest billing rate charged by any Sidley attorney for services rendered under Sidley's current billing rates that became effective on January 1, 2011 and continuing until Sidley's next Firm-wide rate adjustment will be $975 per hour.  (See Supplemental Affidavit (Second) of James F. Conlan in Support of Application for an Order Authorizing the Employment and Retention of Sidley Austin LLP as Attorneys for the Debtors and Debtors in Possession at ¶ 3, Docket No. 424.)  Sidley believes these rates are comparable to those charged by the bankruptcy and other professionals of other firms of comparable size, stature, and experience.

14.    Sidley has received no payment and no promises for payment from any source other than the Debtors for services rendered in these chapter 11 cases.  There is no agreement between Sidley and any other party for the sharing of compensation to be received for the services rendered by Sidley in these chapter 11 cases.  All professional and paraprofessional services for which compensation is sought herein were rendered solely on behalf of the Debtors in these cases.

## SERVICES RENDERED

15.    Sidley has rendered substantial services to the Debtors in connection with these chapter 11 cases during the period covered by this Application, both in its capacity as general bankruptcy counsel to the Debtors and continuing in its capacity as corporate, litigation, and transactional counsel to the Debtors in their ordinary course of business.  The services performed by Sidley's professionals and paraprofessionals during the period covered by this

Application were necessary and have directly contributed to the effective administration of the Debtors' chapter 11 cases.

16.     A breakdown of the total hours expended by each professional on all matters and a breakdown of amounts sought by each matter category covered herein are included as a part of Attachment A to this Application, as required by Local Rule 2016-2. A detailed description of the services provided to the Debtors is incorporated by reference to the Monthly Fee Applications previously filed by Sidley with the Court. The following is a summary of the activities performed by Sidley's professionals and paraprofessionals during the Ninth Interim Fee Period:

## A.     FCC Matters (20100):    Hours: 127.90    Fees: $95,750.00[4]

17.     During the Ninth Interim Fee Period, Sidley's professionals continued to represent the Debtors' broadcast stations on several matters as communications regulatory counsel. A substantial amount of Sidley's efforts during this period were dedicated to preparing for, and participating in, oral argument before the U.S. Court of Appeals for the Third Circuit in support of petitions for review of the Federal Communication Commission's ("FCC") newspaper cross-ownership regulations. The FCC issued various rules that continued to prohibit newspapers from owning certain television or radio stations within the same markets. The Debtors challenged these rules on constitutional and Administrative Procedure Act grounds. The outcome of the appeal is of substantial importance to the Debtors' broadcasting and publishing operations in several key markets in which the Debtors conduct business. In addition, Sidley's

---

[4] Commencing in December 2009, the Debtors requested that Sidley provide separate invoices for professional fees for certain discrete FCC-related services attributable to KWGN/FCC General, KPLR-TV, Nextel Negotiations, and Newspaper Crossownership matters, on which Sidley represents the Debtors in the ordinary course of business. In accordance with this request, and after consultation with the Fee Examiner, Sidley has included such invoices within the broader category of FCC Matters for the purposes of calculating the total fees and expenses in Sidley's Monthly Fee Applications and Quarterly Fee Application Requests.

professionals prepared and filed supplemental briefing to the Court on discrete issues arising in

the appeal and successfully petitioned the Third Circuit to transfer part of the case to the Court of

Appeals for the District of Columbia Circuit.   Sidley's professionals also coordinated with

counsel for eight other petitioners challenging the FCC's crossownership rules.

18.    During the Ninth Interim Fee Period, on or about January 10, 2011,

Sidley's professionals received and analyzed an application for review filed at the FCC by Media

Access Project, which opposed the granting of a renewal application for the Debtors'

"superstation" WGN. Sidley's professionals advised the Debtors in connection with the

application for review and prepared an opposition on behalf of the Debtors which was submitted

to the FCC on January 25, 2011.  Media Access Project filed a reply on February 2, 2011.  The

FCC has not yet acted on these pleadings.

**B.**    **Fee Applications (30390):   Hours: 635.90   Fees: $189,979.00**

19.    This matter category encompasses all tasks relating to the preparation and

filing of Sidley's Monthly Fee Applications and Quarterly Fee Application Requests with the

Court.  In this Ninth Interim Fee Period, Sidley's professionals and paraprofessionals drafted and

filed Sidley's nineteenth, twentieth, twenty-first, twenty-second and twenty-third Monthly Fee

Applications, drafted Sidley's twenty-fourth, twenty-fifth, and twenty-sixth Monthly Fee

Applications, and reviewed and complied with the Court's Fee Orders respecting all of the

foregoing.  During the Ninth Interim Fee Period, Sidley also finalized and filed its Sixth

Quarterly Fee Application and prepared portions of its Seventh and Eighth Quarterly Fee

Applications.

**C.**    **Executory Contracts and Leases (30410):   Hours: 14.00   Fees: $7,552.00**

20.    As of the Petition Date, the Debtors in these cases were party to

approximately 45,000 executory contracts and unexpired leases.  During the Ninth Interim Fee

Period, Sidley's professionals, together with the Debtors' financial advisors at Alvarez and

Marsal, advised the Debtors with respect to the assumption, assumption and assignment, or

rejection of certain executory contracts and unexpired leases under section 365 of the

Bankruptcy Code and in accordance with the terms of the plan of reorganization proposed for the

Debtors, on terms favorable to the Debtors.

21.     Specifically, the DCL Plan (defined below) provides for the assumption of

all executory contracts and unexpired leases other than those identified on the exhibit of rejected

contracts and leases, which was filed as part of the Plan Supplement (defined below) during the

Ninth Interim Fee Period.  At the request of the Debtors, Sidley's professionals researched,

reviewed, and evaluated certain of the Debtors' contracts and unexpired leases, in light of the

provisions of the DCL Plan regarding contract assumption or rejection, and evaluated the

potential rejection of certain of the Debtors' contracts and unexpired leases.  With respect to

contracts and leases proposed to be assumed pursuant to the DCL Plan, Sidley's professionals

began researching and drafting a "Global Contract Motion" to provide procedures for the

determination of amounts required to be cured as a condition of assumption of such contracts and

leases, which motion was filed and granted subsequent to the Ninth Interim Fee Period (see

Docket Nos. 8287 and 8745).  Sidley's professionals also corresponded with various executory

contract and lease counterparties concerning the status of certain contracts and leases and cure

amounts.

**D.     Vendor Issues (30420):   Hours: 0.30   Fees: $160.50**

22.     In this period, Sidley's professionals continued to address issues

concerning the Debtors' relationships with their vendors.  Specifically, during the Ninth Interim

Fee Period, Sidley's professionals advised the personnel at Debtor WPIX Inc. in connection with

certain matters relating to continued vendor performance.

E.     Use/Sale/Lease of Assets (30430):    Hours: 42.40    Fees: $19,832.50

          23.     Sidley's professionals remained engaged in negotiating and documenting

transactions for the use, sale, and lease of assets by the Debtors, both in connection with these

chapter 11 cases and with Sidley's ongoing representation of the Debtors in their ordinary course

of business.  During the Ninth Interim Fee Period, Sidley worked with the Debtors' in-house

counsel and management to review and analyze certain existing operations and proposed

postpetition transactions concerning certain Debtors and non-Debtor subsidiaries, taking into

account the impact of the Bankruptcy Code on potential transactions.  Sidley's professionals also

assisted the Debtors in exploring strategic business opportunities related to increasing their

online presence in certain consumer-driven industries by increasing their current market share.

          24.     Much of Sidley's activities in this category during the Ninth Interim Fee

Period related to services provided in connection with the series of transactions and agreements

relating to non-Debtor Tribune (FN) Cable Ventures, Inc. ("TCV")'s interests in Television Food

Network, G.P. ("TFN"), the general partnership that owns and operates the "Food Network,"

which activities were initially described in Sidley's Eighth Quarterly Fee Application.  During

the Ninth Interim Fee Period, Sidley's professionals continued their review and analysis of the

underlying corporate documents of TFN and TCV, and the proposed terms of the transactions to

integrate "The Cooking Channel" into TFN, consistent with the TFN partners' intention that the

Food Network and The Cooking Channel would operate together under the same corporate

infrastructure.  In connection therewith, Sidley's professionals negotiated, reviewed, and drafted

the relevant transaction agreements and analyzed potential amendments to the corporate structure

of TFN and various corporate governance provisions in the partnership agreement to

accommodate the contribution of the assets comprising The Cooking Channel to the partnership.

Sidley's professionals also reviewed and analyzed the relevant statutes and case law concerning

those transactions. At the conclusion of these due diligence activities and attendant negotiations with TCV's partner, the Debtors ultimately filed a motion to authorize Tribune to cause TCV to make a capital contribution of approximately $53 million to TFN to maintain its equity interest in the partnership on February 11, 2011 (Docket No. 7919), which was granted by the Bankruptcy Court on February 25, 2011 (Docket No. 8150).

**F.    Insurance Matters (30450):    Hours: 7.70    Fees: $6,204.00**

25.    During the Ninth Interim Fee Period, Sidley's professionals continued to work with the Debtors, their outside insurance counsel, and various insurance providers to resolve certain insurance coverage issues, and to advise upon the impact of these chapter 11 cases on the Debtors' insurance and risk management procedures. Sidley's professionals also reviewed and addressed various legal issues arising in connection with the Debtors' primary and excess liability policies covering certain prepetition lawsuits pending against the Debtors and certain of their directors and officers. In particular, during the Ninth Interim Fee Period, Sidley's professionals advised the Debtors and consulted with the Debtors' outside insurance counsel on the preparation of the Debtors' motion to modify the automatic stay to permit them to advance insurance coverage to covered directors and officers in connection therewith, which was filed on March 1, 2011 (Docket No. 8208) and granted by the Bankruptcy Court on March 29, 2011 (Docket No. 8515).

**G.    Committee-Related Matters (30460):    Hours: 0.30    Fees: $148.50**

26.    Sidley's professionals continued during the Ninth Interim Fee Period to work diligently to maintain a cooperative and responsive relationship with the Debtors' major creditor constituencies, including the Committee. During this Ninth Interim Fee Period, Sidley's professionals conferred with the Committee and their professionals and advisors on a regular basis in connection with the DCL Plan (defined below), of which the Committee was a co-

14

proponent, and also on pending motions and general case administration issues as they arose in the Debtors' chapter 11 cases. Communications with the Committee related to specific substantive matters, including with respect to the Competing Plans (defined below), the disclosure statement, ongoing mediation sessions, or discovery-related matters, are reflected in the applicable substantive matter categories.

**H.      Litigated Matters (30470):   Hours: 16,735.70   Fees: $9,066,453.00[5]**

27.      The "Litigated Matters" category encompasses all of Sidley's activities relating to actual and potential litigation, contested matters, and adversary proceedings, as discussed in more detail below. Notably, this category also includes much of Sidley's activities relating to the review and analysis of the series of transactions that returned Tribune to private ownership in 2007 (the "Leveraged ESOP Transactions") and corresponding document discovery and production activities, negotiations and mediation sessions with creditor constituencies, and litigation-related matters concerning the Debtors' contested plan confirmation process as it continued to develop during this Ninth Interim Fee Period.[6] The resolution of potential claims arising out of the Leveraged ESOP Transactions (the "LBO-Related Claims")—whether through settlement or, to the extent required, litigation—is a pivotal issue in these chapter 11 cases and required substantial attention from Sidley, the Debtors' senior management, the Committee, the Debtors' senior lenders, and other key constituencies during the Ninth Interim Fee Period.

---

[5] Sidley has voluntarily waived $11,400.00 in fees sought in the Twenty-Fourth Monthly Fee Application that were billed to the Litigated Matters category. The total fees for which compensation is sought in this Ninth Quarterly Fee Application reflects a reduction by that amount.

[6] Given the contested nature of the Debtors' plan confirmation process, both the Litigated Matters category and the Plan and Disclosure Statement category include narrative descriptions and corresponding fee detail regarding Sidley's services in connection with the Debtors' plan confirmation process. As a general rule, the services performed by professionals in Sidley's Litigation practice groups in connection with the plan confirmation process appear in the Litigated Matters category.

(a)    **Document Discovery Activities Relating to Leveraged ESOP Transactions and Competing Plans**

28.    As discussed in Sidley's prior Quarterly Fee Application Requests, from the spring of 2009 through the spring of 2010, more than 45 individuals and entities involved with the Leveraged ESOP Transactions, including the Debtors (collectively, the "Producing Parties"), participated in informal but comprehensive discovery to facilitate the Committee's investigation of the Leveraged ESOP Transactions and LBO-Related Claims. That discovery process was formalized to facilitate the investigation of the Court-appointed Examiner, Kenneth N. Klee, in the spring and summer of 2010. Discovery activities in the chapter 11 cases have also been expanded as others of the Debtors' creditor constituencies have requested access to discovery materials from the Debtors and other Producing Parties in order to conduct independent reviews of the Leveraged ESOP Transactions. The other constituencies that have requested access include, among others, Aurelius Capital Management LP ("Aurelius"), Wilmington Trust Company ("Wilmington Trust"), Wells Fargo Bank, N.A. ("Wells Fargo"), Law Debenture Trust Company of New York ("Law Debenture"), Centerbridge Credit Advisors LLC ("Centerbridge"), JPMorgan Chase Bank, N.A. ("JPMorgan"), Oaktree Capital Management, L.P. ("Oaktree"), and Angelo, Gordon & Co. ("Angelo Gordon"). As of the date of this Quarterly Fee Application Request, nearly 80 individuals and entities are Producing Parties.

29.    During the Ninth Interim Fee Period and continuing into the Tenth Interim Fee Period, the focus and purpose of the parties' ongoing discovery efforts shifted toward the four (and later two) competing plans of reorganization proposed for the Debtors by the following plan proponent groups: (i) the Debtors, the Committee, Oaktree, Angelo Gordon, and JPMorgan (the "DCL Plan"); (ii) Aurelius, Law Debenture, Deutsche Bank Trust Company Americas

("Deutsche Bank") and Wilmington Trust (the "Noteholder Plan"); (iii) King Street Acquisition

Company, L.L.C., King Street Capital, L.P. and Marathon Asset Management, L.P. (the "Bridge

Lender Plan"); and (iv) the Step One Credit Agreement Lenders (the "SOCAL Plan" and,

together with the DCL Plan, the Noteholder Plan, and the Bridge Lender Plan, as applicable, the

"Competing Plans").[7] The scope of the discovery sought from the Debtors also expanded to

include not only materials relevant to the Leveraged ESOP Transactions and LBO-Related

Claims, but also the process and negotiations underpinning the development of the DCL Plan

itself.

30.    In this regard, the discovery process shifted from being informational, as

the parties sought to analyze the Leveraged ESOP Transactions and the relative strengths and

weaknesses of the various potential LBO-Related Claims, to being predominantly adversarial, as

the Plan Proponents sought to support confirmation of their own plans and defeat confirmation of

the other plans.  For example, on October 25, 2010, counsel for Aurelius issued formal

"document hold" notices on Sidley and counsel for the other DCL Proponents, directing the

retention of all documents held or produced by the firms relating to certain aspects of the

Leveraged ESOP Transactions, the LBO-Related Claims, the Examiner's Investigation, and the

development of the DCL Plan.  The Aurelius document hold affected approximately 36 discrete

matters on which Sidley has represented the Debtors and required Sidley to implement document

---

[7] The Debtors, the Committee, Oaktree, Angelo Gordon, and JPMorgan are collectively referred to herein as the "DCL Proponents"; Aurelius, Law Debenture, Deutsche Bank and Wilmington Trust are collectively referred to herein as the "Noteholder Proponents"; and King Street Acquisition Company, L.L.C., King Street Capital, L.P. and Marathon Asset Management, L.P. are collectively referred to herein as the "Bridge Proponents."  The DCL Proponents, Noteholder Proponents, Bridge Proponents, and Step One Credit Agreement Lenders are collectively referred to herein, as applicable, as the "Plan Proponents."

Time entries referencing communications and meetings with the DCL Proponents, the Noteholder Proponents, the Bridge Proponents, the Step One Credit Agreement Lenders and/or the Plan Proponents in Sidley's Monthly Fee Applications should be read to include both bankruptcy and litigation counsel, as applicable, for each of the respective Plan Proponents so referenced.

retention and collection protocols affecting numerous professionals and paraprofessionals, which remain in effect.

(i)      The Discovery and Scheduling Order for Plan Confirmation

31.      As discussed in detail in the Eighth Quarterly Fee Application, on November 8, 2010, the Debtors filed the Disclosure Statement and Solicitation Procedures Motion (Docket No. 6255),[8] seeking, in relevant part, an order establishing limitations on and a timetable for the discovery to be taken in anticipation of the confirmation hearing and certain other procedures governing pre-trial activities.  In response to the Disclosure Statement and Solicitation Procedures Motion, Aurelius, the Step One Credit Agreement Lenders, Law Debenture, Wells Fargo Bank, N.A. (as Bridge Loan agent), Wilmington Trust, Bank of America, and Merrill Lynch each filed oppositions, joinders, and/or statements regarding the requested relief as it related to discovery and pretrial matters.[9]  Sidley's professionals reviewed and considered each of the foregoing pleadings and participated in substantive negotiations with the respective objecting parties regarding acceptable terms for a proposed case management order relating to the confirmation process.  In addition, Sidley's professionals participated in two hearings concerning plan-related discovery and case management before the Bankruptcy Court, on November 29, 2010 and on December 15, 2010.  On December 17, 2010, Sidley's professionals prepared and filed a proposed plan-related discovery and case management order

---

[8] As described and defined in Sidley's Eighth Quarterly Fee Application, the Disclosure Statement and Solicitation Procedures Motion refers to the Debtors' Motion for an Order (I) Approving General Disclosure Statement and Specific Disclosure Statements; (II) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Plans of Reorganization; (III) Approving Forms of Ballots, Master Ballots and Related Instructions; (IV) Approving Solicitation Package Contents and Authorizing Distribution of Solicitation and Notice Materials; (V) Fixing Voting Record Date; (VI) Establishing Notice and Objection Procedures in Respect of Confirmation; (VII) Setting Confirmation Schedule and Establishing Parameters on Confirmation-Related Discovery; (VIII) Establishing New Deadline for Return of Media Ownership Certifications; (IX) Authorizing Expansion of Balloting and Tabulation Agents Retention and Allocation of Costs of Same; and (X) Granting Related Relief.

[9] See, e.g., Docket Nos. 6451, 6511, 6512, 6513, 6514, 6554, 6558, 6587, 6589, 6591, 6723, 6736, and 7188.

under certification of counsel (Docket No. 7235), which was entered by the Court on December

20, 2010 (Docket No. 7239) (the "Discovery and Scheduling Order").[10] The Discovery and

Scheduling Order provided, in relevant part, formalized procedures and timing for taking fact

and expert discovery, taking witness depositions, and resolving discovery disputes among the

Plan Proponents.[11] All fact and expert discovery, including the taking of depositions, were

initially scheduled to be completed by February 25, 2011 and March 3, 2011, respectively, but

were subsequently extended by orders of the Bankruptcy Court and by agreement of the Plan

Proponents. Sidley's professionals participated in negotiating and drafting the multiple

stipulations and pleadings seeking to extend pre-trial discovery. (See Docket Nos. 8036, 8047,

8085, 8086, 8141, 8178, 8180, 8202, 8210, and 8243.)

   32. The Discovery and Scheduling Order established protocols for "meet and

confer" sessions among the Plan Proponents regarding discovery disputes arising in connection

with the plan confirmation process, and authorized the Plan Proponents to submit letters to the

Court if those meet and confer sessions did not result in a resolution of such discovery disputes.

(See Discovery and Scheduling Order at ¶ 14.) In accordance with these procedures, Sidley's

professionals participated in multiple meet and confer sessions with counsel for the other Plan

Proponents in an effort to resolve discovery disputes as they arose, and reviewed each of the

parties' numerous letter submissions to the Court regarding unresolved discovery disputes[12] and

---

[10] The Discovery and Scheduling Order is also referred to alternatively as the "case management order" and the "CMO" in Sidley's Monthly Fee Applications. Time entries referencing communications and meetings with the "CMO 35" parties in Sidley's Monthly Fee Applications should be read to include counsel for each of the parties listed in paragraph 35 of the Discovery and Scheduling Order.

[11] As discussed below, the Discovery and Scheduling Order also established procedures and guidelines respecting pre-trial briefing and objections to be filed by the Plan Proponents.

[12] See, e.g., Docket Nos. 7399, 7415, 7435, 7718, 7729, 7737, 7741, 7758, 7778, 7783, 7789, 7799, 7804, 7805, 7806, 7808, 7809, 7836, 7838, 7839, 7862, 7875, 7900, 7902, 7915, 7916, 7920, 7929, 7949, 7950, 8051, 8063, 8068, 8071, 8072, 8074, 8075, 8077, 8139, 8198, 8256, 8269, 8280, 8285 and 8290.

prepared letter submissions to the Court on behalf of the Debtors, as appropriate.[13]  The Court

held telephonic hearings to adjudicate certain discovery-related disputes on January 10, 2011 and

February 25, 2011.

> (ii)    *Scope of Discovery Activities Conducted by Sidley on Behalf of the Debtors*

33.    During the Ninth Interim Fee Period, Sidley continued to receive, process,

review, and analyze documents (a) submitted by the Producing Parties that were responsive to

the Debtors' discovery requests, (b) collected from the Debtors that were potentially responsive

to other parties' discovery requests, and (c) collected from within Sidley that were potentially

responsive to Aurelius's document hold notice and the Noteholder Proponents' production

requests.

34.    The document discovery process that continued throughout the Ninth

Interim Fee Period and thereafter has been a massive undertaking.  As of the date of this

Quarterly Fee Application Request, Sidley's team of Litigation professionals and

paraprofessionals have received the equivalent of approximately 5.82 million pages of discovery

documents produced by the Producing Parties in connection with the Leveraged ESOP

Transactions and the Competing Plans, which are maintained in the Document Depository, a

clearinghouse for production of discovery materials to the 43 parties in interest who are

authorized to receive them (collectively, the "Depository Designees").[14]  Of the discovery

documents maintained in the Document Depository, approximately 928,000 pages were

---

[13] See, e.g., Docket Nos. 7449, 7726, 7752, 7787, 7907, 7927.

[14] The Document Depository procedures are discussed in detail in Sidley's Fifth Quarterly Fee Application Request. During the Ninth Interim Fee Period Sidley's professionals also received three (3) additional requests by counsel to certain of the Debtors' creditors to become a Depository Designee.  In each instance, Sidley's professionals prepared and disseminated the notices required by the Depository Order to (a) the existing Negotiating Parties of the Debtors' intention to designate additional Depository Designees and (b) the Producing Parties to provide an opportunity for such Producing Parties to object to the production of their documents to the additional Depository Designees.

produced by the Debtors during or prior to the Ninth Interim Fee Period. Many of the materials collected as part of this discovery process were ultimately used in connection with the plan confirmation process, either formally as evidentiary exhibits during the confirmation hearings on the Competing Plans or informally by Debtors and their creditor constituencies in negotiations and the development of their positions regarding contested legal and factual confirmation issues.[15]

35.     The collection, review, and analysis of such a volume of documents in connection with the discovery efforts undertaken in these chapter 11 cases has required a team of professionals, paraprofessionals, litigation support specialists, and other personnel. Much of the collection, review, and production of discovery documents has been accomplished by means of an electronic data discovery system ("EDD") maintained by Sidley's litigation support specialists, analysts, and technicians. Sidley's litigation support specialists received and processed the raw data and physical documents provided by the Debtors into the 5.82 million-document database so that they can be reviewed by attorneys and paraprofessionals.

36.     Sidley's professionals also developed discovery document "coding" protocols so that the documents could be electronically coded and then later searched and retrieved based on various attributes, including, but not limited to, the particular subject matter, date range, and persons referenced in each document. Sidley's paraprofessionals were trained to have a substantive understanding of the relevant transaction steps, parties, and individuals involved in the Leveraged ESOP Transactions so that they could tag discovery documents to

---

[15] By way of illustration, the DCL Proponents designated 1,587 exhibits and the Noteholder Plan Proponents designated 2,648 exhibits for use at the contested plan confirmation hearings held in March, April, and June 2011.

facilitate later identification of materials relevant to a particular legal or factual issue raised in the Competing Plan confirmation process.

37.    In addition, with respect to the Debtors' documents, Sidley's professionals collected and reviewed several hundred thousand pages of documents and electronic records for relevance and privilege, including corporate documents, financial records, board of directors' minutes and resolutions, and electronic computer files from certain of the Debtors' employees. Upon completing their review of the documents received from the Debtors for production, Sidley's professionals prepared appropriate privilege logs relating to such documents as part of the discovery process.  In connection with those discovery activities, Sidley's professionals and paraprofessionals also coordinated with third parties for the claw-back and replacement of inadvertently-produced documents and resolved issues related to alleged data spoliation, preservation, and quality control.  Throughout this process, Sidley's professionals have worked closely with the Debtors' senior management to advise on the legal issues implicated by the document production requests received by the Debtors from numerous third parties.

38.    The discovery sought by the Noteholder Proponents from counsel to the DCL Proponents, including Sidley, regarding the development of the DCL Plan raised a number of significant privilege issues. During the Ninth Interim Fee Period, Sidley's professionals researched and analyzed the applicability of attorney-client privilege, attorney work product, and whether the communications and documents among counsel for the DCL Proponents were covered by a joint-interest privilege, in all cases as applicable to particular situations that arose in the course of the discovery process.  Based on their analysis of these various privilege issues, Sidley's professionals contested production of certain documents where appropriate and met and conferred on multiple occasions with the Noteholder Proponents regarding the production of

materials covered by privilege. Sidley's professionals prepared and filed, on January 12, 2011, the Motion of the Debtors for Entry of an Order Pursuant to Fed. R. Evid. 502(d) (Docket No. 7479) in respect of these privilege issues. Specifically, the motion sought entry of an order that provided that a party's production of documents in discovery leading up to the confirmation hearing would not waive any claim of attorney-client privilege or work product protection. The Debtors' motion was granted on February 4, 2011 (Docket No. 7793).

**(b)** **Other Trial Preparation Activities Relating to the Contested Plan Confirmation Hearing**

39.    Beginning on March 7, 2011, the Court conducted an eleven (11) day confirmation hearing with respect to the DCL Plan and the Noteholder Plan, followed by closing arguments on June 27, 2011.[16] During the Ninth Interim Fee Period, Sidley's professionals undertook extensive trial-preparation activities, in addition to the discovery activities discussed above, leading up to the confirmation hearing.

*(i)*    *Use of the Examiner's Report during the Confirmation Hearing*

40.    In connection with the Court's consideration of the Discovery and Scheduling Order, the parties raised the issue of the use of the Report of Kenneth N. Klee, As Examiner (the "Examiner's Report") at the confirmation hearing. Sidley's professionals participated in the negotiation of a stipulation among each of the Plan Proponents concerning the use of the Examiner's Report, including the hundreds of factual determinations and opinions expressed by the Examiner therein. Following the conclusion of those negotiations, Sidley's professionals participated in drafting the stipulation and prepared and filed the Motion for an

---

[16] As discussed in more detail below, the SOCAL Plan and the Bridge Lender Plan were each withdrawn by their respective proponents prior to the start of the confirmation hearing, leaving only the DCL Plan and the Noteholder Plan as the remaining Competing Plans.

Order Approving Stipulation Regarding Use of Examiner's Report at the Confirmation Hearing (Docket No. 7423), which was so ordered by the Court on February 4, 2011 (Docket No. 7790).

(ii)    *Fact and Expert Witnesses*

41.    The Discovery and Scheduling Order required the parties to exchange preliminary lists of all fact witnesses by December 22, 2010 and all expert witnesses by January 26, 2011, so that depositions could be scheduled and taken. This expedited timetable, which was necessary in order to allow the confirmation hearing to proceed on time, required exceptional efforts on the part of Sidley's professionals. Specifically, Sidley's professionals prepared for, attended, conducted, and/or defended approximately 45 depositions of potential fact and expert witnesses in anticipation of the confirmation hearings during the Ninth Interim Fee Period and carrying over into the Tenth Interim Fee Period (in one instance on the night before the witness testified). In February 2011 alone, Sidley's professionals participated in 18 witness depositions, which were held in Connecticut, Illinois, New York and California.

42.    Of the potential fact and expert witnesses designated by the Plan Proponents, the DCL Proponents presented 10 fact and expert witnesses and the Noteholder Proponents presented 6 fact and expert witnesses at the confirmation hearing.[17] In addition to

---

[17] The following witnesses were presented by the DCL Proponents during the confirmation hearing: (i) David Kurtz, Managing Director and Global Co-Head of Restructuring of Lazard Frères & Co. LLC ("Lazard"); (ii) William Salganik, Creditors' Committee Member (Representative of the Washington-Baltimore Newspaper Guild); (iii) Miriam Kulnis, Executive Director of Special Credits Group, JPMorgan; (iv) Professor Bernard Black, Northwestern University, Law School and Kellogg School of Management; (v) Professor Daniel Fischel, University of Chicago Law School and Northwestern Law School, Kellogg School of Management; (vi) Suneel Mandava, Director, Financial Restructuring Group of Lazard; (vii) John Chachas, Principal of Methuselah Advisors; (viii) Brian Whittman, Managing Director, Alvarez & Marsal North America, LLC; and (ix) Eddy Hartenstein, President and Chief Executive Officer of Tribune Company and Publisher and Chief Executive Officer of the Los Angeles Times. The Noteholder Proponents presented the following witnesses during the confirmation hearing: (i) Rajinder Singh, Managing Director, Raymond James & Associates; (ii) Daniel Gropper, Managing Director, Aurelius Capital Management; (iii) Professor Edward B. Rock, University of Pennsylvania Law School and Wharton Business School; (iv) Mark J. Prak, Brooks, Pierce McLendon, Humphrey & Leonard; (v) Dr. Bruce L. Beron; and (vi) Ralph Tuliano, President and Executive Managing Director of Mesirow Financial Consulting. The DCL Proponents also

those witnesses that actually testified at the confirmation hearing, the DCL Proponents and the Noteholder Proponents each introduced the testimony of numerous witnesses at the confirmation hearing by affidavit, video deposition designations, and proffer.

43.    Sidley's professionals met and consulted with the expert witnesses designated by the DCL Proponents to develop testimony and expert reports in support of the DCL Plan. Each of the designated expert witnesses prepared and submitted to the Court one or more expert reports relating to the subject matter of their testimony. The DCL Proponents' expert witnesses prepared twelve such expert reports (including rebuttal reports), and the Noteholder Proponents' expert witnesses prepared four expert reports (including rebuttal reports). Each of Sidley's professionals who were responsible for the direct examination or cross-examination, as applicable, of an expert witness designated by the Plan Proponents prepared for and attended the deposition of each such expert and engaged in substantial preparations for trial testimony during the Ninth Interim Fee Period.

44.    Following the exchange of initial expert reports by the Plan Proponents, Sidley's professionals reviewed each of the Noteholder Proponents' expert reports. Sidley's professionals also reviewed and responded to *Daubert* objections and motions in limine filed by the Noteholder Proponents to the DCL Proponents' experts. Specifically, the Noteholder Proponents filed motions to exclude the expert testimony of John Chachas, David Kurtz and Suneel Mandava (filed February 22, 2011) (Docket No. 8098) and Bernard Black (filed February 22, 2011) (Docket No. 8099) and the rebuttal expert testimony of Bernard Black, Harrison Goldin, and David Praeger (filed February 25, 2011) (Docket No. 8167). The DCL Proponents

---

presented rebuttal testimony by (i) Mace Rosenstein, Partner, Covington & Burling L.L.P. and (ii) Professor Bernard Black.

filed joint objections to each of those motions. (See Docket Nos. 8192, 8194, and 8193.) The Court reserved ruling on each of the motions in limine until the confirmation hearing.[18]

45.    The combination of a highly compressed pre-trial schedule and the number of witnesses involved mandated a division of labor among the DCL Proponents generally, and Sidley's professionals in the Litigation practice group particularly, to prepare direct and cross examination of witnesses for trial, and required the involvement of a large number of professionals to ensure that all matters were addressed and all deadlines were met. Sidley's professionals in the Bankruptcy practice group also participated in the development of witness testimony based on their expertise of the contested issues of bankruptcy law presented by the Competing Plans.

### (iii)    Trial Exhibits

46.    As noted above, the DCL Proponents designated 1,587 exhibits and the Noteholder Plan Proponents designated 2,648 exhibits, of which an aggregate total of 3,485 exhibits were designated for use at the plan confirmation hearing. The parties exchanged their respective exhibit lists on February 23, 2011, with amended lists exchanged on February 28, 2011. The parties also exchanged their deposition designations and counter-designations on February 15, 2011 and February 22, 2011, respectively. In accordance with the procedures established in the Discovery and Scheduling Order, the Plan Proponents were required to meet and confer regarding any opposition to the use of designated exhibits prior to filing motions in limine to exclude exhibits. Sidley's professionals reviewed and analyzed each of the exhibits designated by the Noteholder Proponents, including deposition video and transcript designations,

---

[18] With the exception of the Noteholder Proponents' motion to exclude the Black Expert Rebuttal Report, which was sustained in part, each of the other motions in limine were resolved by the parties at or prior to the confirmation hearing.

for potential evidentiary objections. Sidley's professionals, together with counsel for the other DCL Proponents, engaged in numerous in-person and telephonic meet and confer sessions with counsel for the Noteholder Proponents regarding potential exhibit objections.

47.     The DCL Proponents utilized courtroom technology consultancy firm TrialGraphix to assist with the projection of exhibits, including video deposition designations, on video screens throughout the courtroom during the confirmation hearing. Throughout the process, Sidley's professionals coordinated and consulted with the Court's staff, TrialGraphix personnel, and the Noteholder Proponents regarding the use of courtroom technology for the display of trial exhibits. During the Ninth Interim Fee Period, Sidley's professionals and paraprofessionals prepared each exhibit for use at the confirmation hearing, including by Bates numbering and designating with exhibit numbers. In addition to source documents and deposition designations that were used as trial exhibits, Sidley's professionals also prepared a number of illustrative and large-format demonstrative exhibits for use at the confirmation hearing.

### (c) .   Avoidance Actions and Related Adversary Proceedings and Tolling Agreements

#### (i)     Actions Commenced or Tolled by the Debtors

48.     Pursuant to Bankruptcy Code section 546(a), the bar date for commencing avoidance actions in these cases, including avoidance actions pursuant to sections 547 and 548 of the Bankruptcy Code, was December 8, 2010 (the "Avoidance Bar Date"). During the Ninth Interim Fee Period, on behalf of the Debtors and together with the Debtors' financial advisors at Alvarez and Marsal, Sidley's professionals continued their review of payments made to (a) third parties within ninety (90) days prior to the Petition Date, and (b) insiders within one (1) year prior to the Petition Date (together, the "Preference Period") in contemplation of commencing, or

preserving by tolling agreements, actions for the avoidance of those payments prior to the

Avoidance Bar Date.

49.    Specifically, on or prior to the Avoidance Bar Date, the Debtors

commenced approximately 94 preference and fraudulent conveyance avoidance actions against

third parties (the "Avoidance Actions") and entered into tolling agreements with approximately

127 third parties to extend the applicable statutes of limitation for purposes of initiating potential

avoidance actions against parties to such tolling agreements. Sidley's professionals in the

Bankruptcy and Litigation practice groups prepared the substantial majority of the complaints,

exhibits, and summonses in connection with the commencement of the Avoidance Actions, and

coordinated the preparation and filing of all of the complaints with the Debtors' other counsel.

The Avoidance Actions commenced and tolling agreements executed by the Debtors primarily

related to transfers by the Debtors to their vendors and suppliers. The Committee filed several

hundred additional avoidance complaints and negotiated tolling agreements primarily with the

Debtors' insiders and professionals. Together with claims to be filed or preserved by the

Committee, causes of action respecting the potential avoidance of over $500 million in face

amount of payments were pursued or preserved.

50.    Beginning in the Eighth Interim Fee Period and carrying over to the Ninth

Interim Fee Period, Sidley's professionals also drafted a motion, which was filed on December 3,

2010 (Docket No. 6753) (the "Stay Motion"), by which the Debtors requested the Court to stay

the further prosecution of the Avoidance Actions that were initiated by the Debtors in order to

conserve estate resources and preserve the status quo pending the outcome of the contested plan

confirmation process. On December 14, 2010, the Court entered an order granting the Stay

Motion (Docket No. 7165), which provides for a broad stay of the Avoidance Actions until June

30, 2011.[19] As a result of the stay imposed by this order, no further substantive activity has

occurred with respect to the Avoidance Actions.  Sidley's professionals served the filed

complaints on the defendants named therein, and responded to numerous questions from

defendants and their counsel respecting the Avoidance Actions.

> (ii)    *Actions Commenced or Tolled by the Committee*

51.    As described in Sidley's Eighth Quarterly Fee Application, in October

2010, the Court granted standing to the Committee to pursue estate causes of action, including (i)

to prosecute certain LBO-Related Claims against JPMorgan and others of the Debtors' Senior

Lenders and Bridge Lenders, professionals, advisors, and directors and officers; and (ii) to

commence avoidance actions or enter into tolling agreements with respect to prepetition

payments made to certain of the Debtors' professionals (approximately $17 million in face

amount) and purported insiders of the Debtors (within the meaning of section 101(31) of the

Bankruptcy Code) (approximately $180 million in face amount).  (See Docket No. 6150, 6657,

and 6658.)  Pursuant to this authority, the Committee filed two adversary proceedings on

November 1, 2010, amended on December 7, 2010, asserting LBO-Related Claims in actions

captioned Official Committee Of Unsecured Creditors v. JPMorgan Chase Bank, N.A. (In re

Tribune Co.), Case No. 10-53963 (KJC), and Official Committee Of Unsecured Creditors v.

Fitzsimons (In re Tribune Co.), Case No. 10-54010 (KJC).  The Committee also commenced

filing approximately 210 adversary proceedings against individual current and former directors

and officers of the Debtors for the avoidance of allegedly preferential or fraudulent transfers.

---

[19] The stay was subsequently extended through and including December 30, 2011 by Order dated June 24, 2011 (Docket No. 9343).

52.     At the request of the Debtors, Sidley's professionals reviewed and analyzed each of the adversary proceedings commenced by the Committee, particularly with respect to any potential claims that could be asserted by the defendants in those actions against the Debtors. Sidley's professionals also engaged in numerous discussions with the Committee and with the Debtors' management regarding the scope of the Committee-filed actions and their impact on the Debtors and their personnel.

**(d)     Stay Relief Motions**

53.     The Debtors were involved in over one hundred active or threatened lawsuits as of the Petition Date, all of which have been stayed as a result of the commencement of these chapter 11 cases. As in most chapter 11 cases, the Debtors are faced with periodic requests for relief from the automatic stay. Specifically, as of the date of this Quarterly Fee Application Request, the Debtors have received twenty (20) requests for relief from stay since the commencement of these cases. During the Ninth Interim Fee Period the Debtors received a request for relief from the automatic stay from Jewel Food Stores, Inc., Albertsons, LLC, New Albertsons, Inc., and Supervalu Inc. (collectively, "Jewel"), filed on February 20, 2011, by which Jewel sought to file a third-party complaint against Tribune in the Circuit Court of Cook County, Illinois and to recover damages from Tribune to the extent of available insurance proceeds in respect of prepetition causes of action. (See Docket No. 7892.) Sidley's professionals reviewed the assertions raised in the Jewel motion, analyzed the applicable legal standards for obtaining relief from the automatic stay, and prepared the Debtors' objection to the Jewel motion, which was filed on March 18, 2011, during the Tenth Interim Fee Period.[20]

---

[20] Subsequently, following a hearing on the motion and the Debtors' objection, the Court entered an order denying Jewel's motion for relief from stay, without prejudice, on April 5, 2011 (Docket No. 8550). Jewel filed a second

(e)    **Other Pending Litigation**

54.    Prior to the Petition Date and since, Sidley has served the Debtors as defense counsel with respect to a number of litigation matters pending in all levels of state and federal courts across the country, including such matters as Neuman v. Goldstone, a prepetition employment contract lawsuit in Los Angeles, and certain litigation matters pending in New York, including the cases styled Schultz v. Tribune, Crab House of Douglaston, Inc. v. Newsday, and Furnell v. Tribune.  Sidley continued to represent the Debtors in connection with these litigation matters during the Ninth Interim Fee Period, to the extent such matters were not stayed by section 362(a) of the Bankruptcy Code, and also provided advice to the Debtors with connection with proofs of claim filed by the plaintiffs on account of such litigated matters.

I.    **Travel Time (30480):    Hours: 217.20    Fees: $75,394.00**

55.    During the Ninth Interim Fee Period, Sidley's professionals spent time traveling to Wilmington, Delaware to attend various hearings and formal and informal mediation sessions with the Mediator in the Debtors' cases.  In-person hearings were held in these chapter 11 cases on December 6, 2010, December 15, 2010, January 13, 2011, January 24, 2011, February 8, 2011, February 15, 2011, and February 22, 2011.[21]  In addition, Sidley's professionals traveled to a variety of locations to attend meetings with the Debtors and various creditor constituencies.  Sidley's professionals were also required to travel for the purpose of attending, conducting, and or defending depositions of potential lay and expert witnesses in anticipation of the confirmation hearings scheduled for March and April 2011.  In February 2011

---

motion for relief from stay on May 16, 2011 (Docket No. 8917), to which the Debtors also objected (Docket No. 9215).  The Debtors ultimately reached a consensual resolution of this motion filed by Jewel.

[21] Additionally, telephonic hearings were held on December 16, 2010, January 10, 2011, and February 25, 2011, for which no travel was required.

alone, Sidley's professionals attended 18 depositions, which were held in Connecticut, Illinois, New York and California.

56.    The hours reflect non-working travel time and the fees requested in this matter category have been reduced by 50% in accordance with Local Rule 2016-2(d)(viii).

**J.    Labor Issues (30490):    Hours: 46.00    Fees: $35,030.50**

57.    Approximately 15% of the Debtors' employees are represented by labor unions.  During the Ninth Interim Fee Period, Sidley's professionals continued to address and analyze a variety of legal issues concerning the impact of the Debtors' chapter 11 cases on the Debtors' collective bargaining agreements, multiemployer pension plans, and obligations thereunder.

58.    Sidley's professionals continued to work with the Debtors to respond to various bankruptcy-related issues and questions raised by the Pension Benefit Guaranty Corporation ("PBGC") in connection with certain of the Debtors' labor contracts.  Sidley's professionals also continued to analyze the implications of the sale of substantially all of the assets of the Chicago Sun-Times newspaper business (in connection with its chapter 11 proceedings) on the multiemployer pension plan shared between the Chicago Sun-Times and the Chicago Tribune Company, and researched and provided guidance to the Debtors regarding various tax disclosure and deferred compensation issues arising in conjunction with the plan of reorganization.

59.    In addition, Sidley's professionals provided advice to the Debtors on the potential ramifications of The American Jobs Creation Act on certain of the Debtors' deferred compensation plans.  This required a thorough understanding of the changes brought about by new Internal Revenue Code section 409(A) and substantial negotiations between Sidley's

professionals and employee representatives to negotiate plan provisions that complied in all respects with section 409(A) and were agreeable to all affected parties.

**K.**     **Plan and Disclosure Statement (30500):   Hours: 6,618.50   Fees: $4,164,623.00**

60.     During the Ninth Interim Fee Period, Sidley's professionals spent considerable time and effort (i) negotiating and finalizing the terms of the DCL Plan and the resolution of the LBO-Related Claims, including by participating in ongoing mediation with the Debtors' creditor constituencies, (ii) drafting, revising, and filing with the Court, together with the other DCL Proponents, the DCL Plan and corresponding DCL Specific Disclosure Statement, Plan Supplement, and other documents related thereto, (iii) preparing the necessary materials for soliciting votes to accept or reject each of the four Competing Plans, and (iv) preparing objections to the confirmation of the Noteholder Plan, responding to objections asserted by the Noteholder Proponents and third parties with respect to the DCL Plan, and preparing for the confirmation hearings held in March and April 2011.  Each of these activities is discussed in greater detail below.

**(a)**     **Continuing Mediation and Negotiation Efforts Regarding the Competing Plans**

61.     During the Ninth Interim Fee Period, Sidley's professionals in the Bankruptcy, Corporate, Tax, Litigation, and FCC regulatory practice groups conducted extensive ongoing negotiations on behalf of the Debtors with representatives of the other Plan Proponents and various third parties to reach consensus on the terms of the DCL Plan and treatment of claims thereunder, including the LBO-Related Claims.  The purpose of these negotiations was to obtain as broad support of the DCL Plan as possible from the Debtors' creditor constituencies. Throughout this process, Sidley's professionals analyzed and assessed plan and settlement

proposals, advised the Debtors' management, and negotiated with creditor constituencies respecting the terms of the DCL Plan.

62.     As described in Sidley's Eighth Quarterly Fee Application, on September 1, 2010, the Court appointed the Honorable Kevin Gross as a mediator (the "Mediator") to conduct a non-binding mediation concerning the terms of a plan of reorganization, including the appropriate resolution of the LBO-Related Claims (the "Mediation"). The Debtors and several of their creditor constituencies, including (i) the Committee, (ii) JPMorgan, (iii) Angelo Gordon, (iv) a group of "Credit Agreement Lenders," which included Oaktree, (v) a group of "Step One Credit Agreement Lenders," (vi) Wells Fargo, (vii) Law Debenture, (viii) Deutsche Bank, (ix) Centerbridge, (x) Aurelius, (xi) EGI-TRB LLC, and (xii) Wilmington Trust (collectively, the "Mediation Parties"), participated in initial Mediation sessions in September and October 2010 that resulted in the DCL Proponents reaching the settlement embodied in the DCL Plan. Sidley's professionals participated in further mediation sessions with Judge Gross, on behalf of the Debtors, during the Ninth Interim Fee Period, in an effort to reach agreement on a consensual plan of reorganization for the Debtors.

63.     A key result of the ongoing informal negotiations and formal mediation sessions was that the DCL Proponents obtained the support of the Step One Credit Agreement Lenders and Bridge Proponents of the DCL Plan. The SOCAL Plan was withdrawn on or about December 14, 2010 (Docket No. 7190). On January 28, 2011, Judge Gross filed the Mediator's Third Report, advising that continuing settlement discussions resulted in the Bridge Proponents' acceptance of the DCL Plan. (Docket No. 7656.) The Bridge Proponents withdrew the Bridge Lender Plan on February 7, 2011. (Docket No. 7821.) Accordingly, only the DCL Plan and the

Noteholder Plan have been pursued to confirmation by their respective proponents, while the proponents of the other two plans support the DCL Plan.

### (b)    Ongoing Development of the DCL Plan and DCL Specific Disclosure Statement

64.    Sidley's professionals in the Bankruptcy, Corporate, Tax, Litigation, and FCC regulatory practice groups continued to review and analyze thoroughly the variety of business, strategic and legal issues raised by each of the Competing Plans, Specific Disclosure Statements, and Responsive Statements.[22] During the Ninth Interim Fee Period, Sidley's professionals prepared and filed numerous proposed modifications and amendments to the DCL Plan and DCL Specific Disclosure Statement, prior to the solicitation of the DCL Plan, on December 1, 2010 (Docket No. 6686), December 5, 2010 (Docket No. 6984), December 6, 2010 (Docket No. 7050), December 10, 2010 (Docket No. 7136), and December 15, 2010 (Docket No. 7198).  Following the withdrawal of the Bridge Lender Plan, Sidley's professionals, in conjunction and cooperation with the other DCL Proponents, prepared and filed the Second Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries on February 4, 2011 (Docket No. 7801) incorporating the terms of the settlement with the Bridge Proponents. The DCL Proponents filed further modifications to the DCL Plan on April 5, 2011 (Docket No. 8580) and April 26, 2011 (Docket No. 8769).  Sidley's professionals also modified the DCL Specific Disclosure Statement, General Disclosure Statement and other disclosure documents to correspond to modifications to the DCL Plan.[23]

---

[22] The DCL Proponents and each of the proponents of the other Competing Plans filed "Responsive Statements" concerning their views on the Competing Plans.

[23] At a status conference held on October 4, 2010, the Court directed the filing of a single disclosure statement for all plans of reorganization proposed for the Debtors, comprised of a general disclosure statement based in part on the Debtors' previously-approved disclosure statement, and specific disclosure statements with respect to each competing plan.  Subsequent to the October 4 status conference, the Mediation Parties held a teleconference to

65.    The foregoing amendments and modifications to the DCL Plan were the result of considerable substantive negotiations among the DCL Proponents and with third-party creditor constituencies, and such amendments and modifications were made to expand creditor support for the DCL Plan.  The DCL Proponents pursued the DCL Plan through to an 11-day confirmation hearing held in March and April 2011.  Closing arguments in connection with the confirmation hearings were held on June 24, 2011.

### (c)    Plan Supplement and Exhibits

66.    Concurrently with the development of the DCL Plan, Sidley's professionals in the Bankruptcy, Corporate, Tax, Litigation, and FCC regulatory practice groups negotiated and drafted various exhibits to the DCL Plan, which were filed with the Court on January 31, 2011 (Docket No. 7701), March 2, 2011 (Docket No. 8231), and March 7, 2011 (Docket No. 8283) (collectively, the "Plan Supplement").  The Plan Supplement consisted of the following exhibits to the DCL Plan:

- Exhibit 1.1.122 (Terms of Intercompany Claims Settlement Agreement);
- Exhibit 1.1.154 (Terms of New Warrant Agreement);
- Exhibit 1.1.192 (Individuals Excluded From Released Step Two Stockholder Parties);
- Exhibit 5.2 (Restructuring Transactions);
- Exhibit 5.3.1(1) (Certificate of Incorporation of Reorganized Tribune);
- Exhibit 5.3.1(2) (By-Laws of Reorganized Tribune);
- Exhibit 5.3.1(3) (Registration Rights Agreement)
- Exhibit 5.3.2(1) (Initial Officers of Reorganized Tribune);

---

address outstanding procedural issues with respect to the plan process, and to facilitate an agreed-upon schedule for anticipated plan-related filings.  On October 13, 2010, a telephonic status conference was held before the Court with respect to establishing procedures and deadlines in connection with the Court's consideration of the adequacy of the General Disclosure Statement and Specific Disclosure Statements.  The Court entered an order on October 18, 2010 (Docket No. 6022) (the "Scheduling Order"), which established deadlines for plan-related filings and scheduled a hearing on November 29 to consider the adequacy of the General Disclosure Statement and any Specific Disclosure Statements filed in the Debtors' cases.

- Exhibit 5.3.2(2) (Initial Directors of Reorganized Tribune);
- Exhibit 5.3.3 (Initial Directors & Officers of Reorganized Debtors Other Than Reorganized Tribune);
- Exhibit 5.6 (Terms of New Senior Secured Term Loan);
- Exhibit 5.10 (Terms of Exit Facility);
- Exhibit 5.13 (Terms of Trusts' Loan Agreement);
- Exhibit 6.3 (Rejected Executory Contracts and Unexpired Leases);
- Exhibit 13.1 (Litigation Trust Agreement); and
- Exhibit 14.1 (Creditors' Trust Agreement).

67.     The scope and breadth of the Plan Supplement exhibits required the participation and expertise of a number of Sidley's professionals, working in collaboration with the Debtors' board of directors, senior management and personnel, counterparts at the Debtors' outside law firms, and counsel for the other DCL Proponents.

68.     During the Ninth Interim Fee Period, Sidley's professionals also reviewed the exhibits to the Noteholder Plan that were filed on February 4, 2011 (Docket No. 7802), March 2, 2011 (Docket No. 8225), and March 7, 2011 (Docket No. 8286) and analyzed those exhibits to determine how the Noteholder Plan addressed particular issues differently than the DCL Plan and its corresponding exhibits.  Sidley's professionals advised the Debtors and representatives of the other DCL Proponents with respect to the differing treatment respecting such issues and how any issues arising from such differing treatment should be addressed at the confirmation hearing and in the voluminous briefing relating to the confirmation hearing.

**(d)**    **Confirmation Briefing and Objections**

69.     The contested nature of the Debtors' plan confirmation process resulted in substantial briefing by the Plan Proponents—both in support of their own respective plans and in opposition to the other plans—and in response to the objections of third-party creditor constituencies to the Competing Plans and disclosure documents.  As discussed in detail below,

during the Ninth Interim Fee Period, Sidley's professionals continued their efforts, begun in the

Eighth Interim Fee Period, to resolve pending objections to the General Disclosure Statement,

DCL Specific Disclosure Statement, and Responsive Statements. In addition, beginning in the

Ninth Interim Fee Period and continuing into the Tenth Interim Fee Period, Sidley's

professionals participated in preparing the pre- and post-trial briefs respecting the DCL Plan,

objections to the Noteholder Plan, and responses to objections to the DCL Plan. The schedule

and procedures relating to the filing of objections to the Competing Plans and pre-trial briefs in

support of confirmation of the Competing Plans were governed by the Discovery and Scheduling

Order. (See  Discovery and Scheduling Order at ¶ 24 (establishing procedures for filing of

objections), ¶ 25 (establishing procedures for submission of briefs by Plan Proponents.) Those

procedures were negotiated by the Plan Proponents in an effort to streamline the objection and

briefing process and to ensure that each Plan Proponent group filed a single pleading in order to

avoid duplicate arguments and multiple pleadings. One practical consequence of the briefing

procedures set forth in the Discovery and Scheduling Order was to require Sidley's professionals

and counsel for the other DCL Proponents to prepare jointly each of the confirmation briefs,

objections, and responses to objections. However, given the numerous and wide-ranging issues

presented by the confirmation process, the voluminous record established in connection with the

confirmation hearing, and the minimal time available to the DCL Proponents in which to

complete the briefing process, the participation of a large number of Sidley professionals was

necessary to ensure that the various steps of the briefing process were completed on time, as

detailed more fully below.

(i)    *Objections to the Disclosure Statements and Responsive Statements*

70.    During the Ninth Interim Fee Period, Sidley's professionals, in conjunction and cooperation with the Debtors and counsel for the other DCL Proponents, continued to negotiate with counsel for each of the other Plan Proponents regarding the Debtors' objections to the other Specific Disclosure Statements and Responsive Statements, and also worked to resolve the approximately 10 objections raised by the other Plan Proponents and various third parties against the General Disclosure Statement, the DCL Specific Disclosure Statement, and the DCL Proponents' Responsive Statement, plus numerous other informal objections or responses thereto (collectively, the "DCL Disclosure Statement Objections"). Sidley's professionals reviewed and analyzed each of the DCL Disclosure Statement Objections and expended substantial time and effort to engage with each of the objecting parties, to the extent practicable, to resolve the DCL Disclosure Statement Objections consensually. Sidley's professionals also expended substantial time and effort to engage with the Plan Proponents in an effort to resolve consensually, to the extent practicable, the DCL Proponents' objections to the Specific Disclosure Statements and Responsive Statements for the other Competing Plans. Sidley's professionals also worked extensively with the representatives of the other DCL Proponents to negotiate and revise the DCL Plan, DCL Specific Disclosure Statement and the DCL Proponents' Responsive Statement, as appropriate, in response to certain DCL Disclosure Statement Objections.

71.    To those ends, Sidley's professionals, in conjunction and cooperation with the other DCL Proponents, prepared and filed further proposed revisions to the DCL Plan and DCL Specific Disclosure Statement on November 23, 2010 (Docket No. 6599), December 1, 2010 (Docket No. 6686), December 5, 2010 (Docket No. 6984), December 6, 2010 (Docket No.

7050), December 10, 2010 (Docket No. 7136) and December 15, 2010 (Docket No. 7198). The Court held hearings on the adequacy of the General Disclosure Statement and the Specific Disclosure Statements, as modified, as well as the proposed solicitation procedures, on November 29, 2010 and December 6, 2010 and entered an order approving the General Disclosure Statement, the Specific Disclosure Statements and solicitation procedures on December 9, 2010 (Docket No. 7126, amended at Docket Nos. 7215 and 7999).[24]

(ii)    *Objections to the DCL Plan and Noteholder Plan*

72.    Multiple objections were filed by the Plan Proponents and various third parties to the DCL Plan and the Noteholder Plan on or before the February 15, 2011 objection deadline.[25] Sidley's professionals reviewed and analyzed each of the objections to the DCL Plan, including those filed by the Noteholder Proponents (collectively, the "DCL Plan Objections") and expended substantial time and effort to engage with each of the objecting parties, to the extent practicable, to resolve the DCL Plan Objections consensually, prior to the commencement of the plan confirmation hearing. Sidley's professionals divided responsibility for reviewing, negotiating, and/or drafting responses to the various DCL Plan Objections, which was necessary in light of the tight briefing schedule and in order to avoid requiring professionals to spend time analyzing and briefing responses to objections that were capable of being resolved consensually. In large measure, the DCL Plan Objections raised objections to confirmation of the DCL Plan that were grounded in bankruptcy law, including the classification and treatment

---

[24] As addressed below, the order approving the General Disclosure Statement, Specific Disclosure Statements and solicitations procedures was amended on December 16, 2010, to reflect the fact that the SOCAL Plan was withdrawn by its proponents.

[25] Objections to the DCL Plan appear at Docket Nos. 6110, 7550, 7733, 7909, 7913, 7956, 7959, 7960, 7961, 7963, 7966, 7968, 7970, 7972, 7973, 7975, 7977, 7978, 7979, 7981, 7987, 7991, 7986, 8016, 7982, 7983, 7988, 7984, 7990, 7993, 7995, 7996, 8024, 8001, and 8013. Objections to the Noteholder Plan appear at Docket Nos. 7731, 7910, 7914, 7956, 7963, 7960, 7964, 7966, 7971, 7968, 7971, 7972, 7975, 7977, 7978, 7979, 7981, 7982, 7983, 7984, 7986, 7987, 7988, 7991, 7994, 7995, 8002, 8011, 8016, and 8019.

of certain objecting parties' claims.  Generally, these objections were handled by professionals in

Sidley's Bankruptcy practice group, with support as necessary from Sidley's Litigation, Tax,

Corporate, and FCC regulatory practice groups as the circumstances required.  As a result of

these cumulative efforts, on or prior to the start of the confirmation hearing, Sidley's

professionals successfully negotiated the resolution of eleven parties' objections to the DCL Plan

(in whole or in part), as follows: Ace Companies, Zurich, Travelers, California Franchise Tax

Board, Internal Revenue Service, Missouri Department of Revenue, New York State Department

of Taxation and Finance, Federal Communications Commission, Office of the United States

Trustee, United States Environmental Protection Agency, and Warren Beatty.  In addition, a

number of the DCL Plan Objections were voluntarily withdrawn by objecting parties after the

DCL Proponents agreed to make certain modifications to the DCL Plan terms.

*(iii)*    *DCL Proponents' Briefs in Support of the DCL Plan*

73.    Sidley's professionals in the Bankruptcy and Litigation practice groups

were heavily involved in drafting the memorandum of law in support of confirmation of the DCL

Plan, which totaled 242 pages, and which was filed on February 26, 2011 (Docket Nos. 8173 and

8315) (the "DCL Memorandum").[26]  Specifically, Sidley's professionals researched and briefed

legal arguments in support of: (i) the settlement of the LBO-Related Claims embodied in the

DCL Plan (as well as the intercompany claims settlement and the retiree claims settlement), (ii)

the release, exculpation, injunction, and indemnification provisions of the DCL Plan, (iii) the

terms and structure of the Creditors' Trust, (iv) the classification of claims and interests under

the DCL Plan (including the classification of the swap claim and certain claims that the Debtors

---

[26] By order dated February 8, 2011, the Bankruptcy Court waived the applicable General Chambers Procedures and Local Rules to permit the Plan Proponents to file briefs with no page limits.  (See Docket No. 7850.)  Sidley's professionals participated in the drafting of the Plan Proponents' Joint Motion (and corresponding Motion to Shorten Notice) respecting waiver of the page limitation requirements.  (See Docket Nos. 7764, 7765.)

41

proposed to subordinate under the DCL Plan), (v) the feasibility of the DCL Plan in light of the

necessary FCC approvals, (vi) the treatment of claims and interests under the DCL Plan, (vii) the

satisfaction of all applicable provisions of section 1129(a) of the Bankruptcy Code, and (viii) all

other contested legal issues concerning the confirmability of the DCL Plan. Given the size and

scope of the DCL Memorandum, Sidley's professionals sub-divided responsibility for

developing certain key legal issues, which largely corresponded to such professionals'

responsibility for witnesses and exhibits in support thereof.

74.    The Noteholder Proponents filed their memorandum of law in support of

confirmation of the Noteholder Plan (Docket No. 8171) (the "Noteholder Memorandum") on

February 25, 2011. Sidley's professionals received, reviewed, and analyzed the Noteholder

Memorandum to evaluate the legal arguments raised therein, particularly those arguments that

were responsive to the DCL Proponents' objection to the Noteholder Plan. Sidley's

professionals further worked to develop responsive arguments to address the Noteholder

Proponents' arguments, for use at the confirmation hearing.

(e)    **Solicitation and Balloting**

75.    Sidley's professionals, together with the Court-appointed claims, noticing,

and balloting agent (the "Voting Agent"), developed and implemented the process for soliciting

of votes to accept or reject each of the Competing Plans during the Eighth Interim Fee Period,

which continued into the Ninth and Tenth Interim Fee Periods. That process was a unified

process covering the solicitations of votes on all of the Competing Plans, with ballots ultimately

being distributed to allow for voting on the DCL Plan, the Noteholder Plan, and the Bridge

Lender Plan, as well as making relevant elections under each of those plans.

76.    The order approving the Disclosure Statement and Solicitation Procedures

Motion was entered by the Bankruptcy Court on December 9, 2010 (Docket No. 7126), and was

amended to reflect the withdrawal of the SOCAL Plan on December 16, 2010 (Docket No.

7215). Immediately thereafter, on or prior to December 24, 2010, the Voting Agent commenced

the mailing of ballots, election forms, and notices to the Debtors' creditors in connection with the

solicitation of votes on the Competing Plans (collectively, the "Solicitation Materials").

77.     Sidley's professionals were primarily responsible for the preparation of

the Solicitation Materials and coordination with the Court-appointed Voting Agent to

disseminate the Solicitation Materials to creditors. As described in Sidley's Eighth Quarterly

Fee Application Request, Sidley's professionals in the Bankruptcy practice group reviewed and

analyzed each of the Competing Plans to determine (i) how holders of claims and interests were

classified under each Competing Plan, (ii) which classes of creditors were eligible to vote to

accept or reject each of the four Competing Plan, and (iii) what elections, if any, creditors were

able to make under the terms of each Competing Plan. Based on the analysis of each of the

Competing Plans undertaken by Sidley during the Ninth Interim Fee Period, Sidley's

professionals revised and finalized the ballots and election forms for each class of claims eligible

to vote on one or more of the four Competing Plans.[27] Sidley's professionals also reviewed and

analyzed each amendment to the Competing Plans for any potential impact on voting and

elections and revised the proposed forms and procedures to resolve certain objections to the

Disclosure Statement and Solicitation Procedures Motion.

78.     The preparation of appropriate ballots and election forms relating to the

Competing Plans required Sidley's professionals to have considerable knowledge and

understanding of the mechanics of each the Competing Plans. Most holders of claims received a

---

[27] As noted above, the SOCAL Plan was withdrawn on December 14, 2010, on the eve of the solicitation mailing. Accordingly, although Sidley's professionals prepared, and the Voting Agent printed, ballots and elections forms for the solicitation of the SOCAL Plan, only the DCL Plan, Noteholder Plan, and Bridge Lender Plan materials were actually distributed to holders of claims eligible to vote on such plans.

separate ballot for each of the Competing Plans, and the ballots and election forms were tailored (and color-coded) to the respective Competing Plan. Preparation of the Solicitation Materials required extensive discussions with the Plan Proponents, the Voting Agent, the Debtors' financial advisors at Alvarez and Marsal, and numerous other parties. A Sidley professional also traveled to the Voting Agent's facility in Lancaster, Pennsylvania to supervise and advise on the physical production of the Solicitation Materials. Following the mailing of the Solicitation Materials, Sidley's professionals coordinated with the Voting Agent and representatives from major newspapers to publish notice of the confirmation hearing.

79.     Sidley's professionals monitored preliminary voting results on the Competing Plans as the ballots were returned to the Voting Agent. Upon the expiration of the voting deadline, Sidley consulted with the Voting Agent to tabulate all voting results and analyzed such results for each of the plan classes, for the both the DCL Plan and the Noteholder Plan. During this time, Sidley's professionals responded to numerous questions from the Debtors' creditor constituencies regarding the solicitation of the Competing Plans.

**L.    Professional Retention (30510):    Hours: 34.50    Fees: $21,642.50**

80.     The Debtors' large and diverse businesses require the employment and retention of a variety of professionals to support these bankruptcy proceedings and to continue managing the litigation, real estate, tax, accounting, and other needs of their business operations in the ordinary course. During the Ninth Interim Fee Period, Sidley's professionals advised the Debtors in connection with the retentions of (i) Sitrick and Company, as corporate communications consultant (Docket Nos. 5813 and 7145) and (ii) Campbell & Levine, LLC as special litigation counsel (Docket Nos. 7390 and 7788). Sidley's professionals also assisted the Debtors with modifying the scope of the existing retentions of (i) Novack and Macey LLP (Docket Nos. 7717, 8147, and 8088); PricewaterhouseCoopers (Docket No. 7107); and Wildman

Harrold, LLP (Docket No. 7507) in connection with additional services to be provided to the Debtors by such professionals. In each instance, Sidley's professionals consulted with the Debtors' management to determine the appropriate scope and terms of the initial or supplemental retention, and coordinated with counsel for and personnel of each such retained professional and prepared the necessary pleadings to obtain Court approval of such retention.

81.     In addition, during the Ninth Interim Fee Period, Sidley's professionals twice prepared and filed a supplements to the list of the Debtors' ordinary course professionals ("OCP") and coordinated with the Debtors' legal department and financial advisors to prepare and file monthly and quarterly reports of proposed payments to OCPs, in each instance as required by and in accordance with the Court's OCP Order. (See Docket Nos. 7545 and 7820.) Sidley's professionals also advised the Debtors and OCP firms of their obligations under the OCP Order in circumstances where an OCP exceeds the applicable "monthly cap" on allowance of fees. During the Ninth Interim Fee Period, two firms, Hunton & Williams LLP and SNR Denton US LLP, were required to prepare and file applications with the Court for allowance of fees incurred that exceeded the applicable monthly cap. Sidley's professionals reviewed the fee applications on behalf of the Debtors and advised the OCP firms of the requirements of the Local Rules and UST Guidelines for the approval and allowance of fees to professionals in chapter 11 proceedings.

**M.     Tax Issues (30520):   Hours: 172.40   Fees: $102,616.00**

82.     During the Ninth Interim Fee Period, Sidley's tax professionals contributed substantially to the analysis of the tax implications of the DCL Plan and in negotiating and responding to objections filed by state and federal taxing authorities to confirmation of the DCL Plan. Sidley's professionals analyzed numerous potential tax issues arising from modifications to the DCL Plan, including the impact on various holders of claims

45

and interests.  Additionally, Sidley's professionals analyzed and compared the relative tax

implications relating to the various Competing Plans.

83.    Sidley's professionals also reviewed and analyzed a variety of discrete tax

issues on behalf of the Debtors, both arising from and in connection with these chapter 11 cases

and in connection with Sidley's representation of the Debtors in tax matters in the ordinary

course of the Debtors' business.  For example, Sidley's professionals reviewed and analyzed tax-

related claims and liabilities, considered the tax implications of proposed transactions, handled

appeals of tax assessments, advised the Debtors with respect to potential settlements of tax

claims, and communicated with taxing authorities concerning all such matters.

**N.    Claims Processing (30530):    Hours: 312.00    Fees: $161,563.00**

84.    During the Ninth Interim Fee Period, Sidley's professionals continued

evaluating, researching, and analyzing the treatment of various types of claims arising in the

Debtors' chapter 11 cases, covering the full spectrum of potential liabilities.  To date, over 7,000

proofs of claim have been filed in these chapter 11 cases.  Sidley's professionals assigned to

handle claims-related matters participated in regular conference calls with the Debtors' financial

advisors, Alvarez and Marsal, in order to coordinate the processing of the proofs of claim,

evaluating the legal sufficiency of the claims, and preparing objections thereto.

85.    During the Ninth Interim Fee Period, Sidley's professionals, working

together with the Debtors' management, business personnel, and Alvarez and Marsal, prepared

and filed the Debtors' 37th, 38th, 39th, 40th, 41st and 42nd omnibus objections to claims.  (See

Docket Nos. 7424, 7425, 7673, 7674, 7675 and 8065.)  Sidley's professionals reviewed and

replied to formal and informal responses by claimants to the foregoing claims objections, and

coordinated with the Debtors' personnel to negotiate the consensual resolution of objections

where feasible.  During the Ninth Interim Fee Period, the Bankruptcy Court entered orders

sustaining, in whole or in part, the Debtors' 37th, 38th and 39th omnibus objections filed by

Sidley on behalf of the Debtors (subject to the continuance of objections to certain claims of

creditors who filed responses to such objections). (See Docket Nos. 7791, 7792, and 8153.)

86.    In addition, Sidley's professionals prepared and filed the First Notice of

Satisfied Claims on January 7, 2011 (Docket No. 7428) and replied to a response received by a

claimant with respect thereto. Sidley's professionals also advised the Debtors with respect to

negotiating and implementing a stipulation resolving disputed claims without need for formal

objection, in accordance with the order approving claims settlement procedures that was entered

by the Court to facilitate consensual resolution of claims. (See Docket Nos. 2657 and 7250.)[28]

O.    **Business Operations (30550):    Hours: 600.80    Fees: $314,636.50**

87.    The Business Operations matter category encompasses the activities of

Sidley's professionals with respect to their representation of the Debtors in corporate and

transactional matters in the ordinary course of the Debtors' businesses, as well as other general

corporate law and transactional advice, both related to these chapter 11 cases and otherwise

related to the Debtors' businesses. These services are necessary to facilitate the Debtors' efforts

to stabilize and reposition their businesses through cost saving and revenue enhancing strategies,

as well as to prepare the Debtors for their emergence from chapter 11.

88.    During the Ninth Interim Fee Period, Sidley's professionals in the

Corporate practice group expended substantial time and effort to prepare, research, and analyze

potential value maximization strategies regarding the Debtors' businesses and certain of the

Debtors' properties. In addition, Sidley's professionals addressed a variety of discrete matters

---

[28] The order authorizes the Debtors to settle or compromise disputed claims of less than $50,000 in their discretion, claims equal to or greater than $50,000 but less than $1,000,000 upon notice to the UST and counsel to the Committee and JPMorgan Chase Bank, N.A., and claims equal to or greater than $1,000,000 with the approval of the Court pursuant to Bankruptcy Rule 9019.

arising postpetition in the ordinary course of the Debtors' business, including the review of

proposed transactions, contracts, leases, joint venture opportunities, and general corporate

governance matters.

89.    Sidley's professionals in the Corporate practice group advised the Debtors

with respect to certain potential transactions, including the acquisition of a suburban publication

by Chicagoland Publishing Company and the acquisition of CastTV, a video search website, by

Tribune. Sidley's professional involvement entailed extensive negotiations and the preparation

of closing documentation relating to the transactions, which were both completed in December

2010. Additionally, Sidley's professionals engaged in legal due diligence and negotiations with

respect to other potential business transactions.

90.    Sidley's professionals in the Corporate practice group also reviewed and

analyzed the corporate governance structures and implications of the Competing Plans. Sidley's

professionals prepared, with the cooperation of the Debtors' management, the corporate charter

and bylaws of Reorganized Tribune and its subsidiaries (which were filed with the Court as

exhibits to the DCL Plan as part of the Plan Supplement). Concurrently, Sidley's professionals

reviewed and analyzed the proposed corporate governance documents filed by the Noteholder

Proponents, including the Litigation Trust, Distribution Trust, and Creditors' Trust documents, to

identify relevant corporate governance implications for the Debtors. This evaluation informed

certain of the DCL Proponents' objections to the Noteholder Plan and was a valuable

contribution to the plan confirmation process.

**P.    Case Administration (30560):    Hours: 201.30    Fees: $71,275.00**

91.    During the Ninth Interim Fee Period, Sidley's professionals have engaged

in various general case administration tasks, including scheduling and participating in hearings,

reviewing and reporting on docketed filings to the Debtors, the Committee, the United States

Trustee, and other interested parties, and maintaining a schedule of critical dates and deadlines. On a periodic basis during the Ninth Interim Fee Period, Sidley's professionals participated in status calls with the Debtors' senior management and financial advisors to discuss pending motions and issues and the outcome of each hearing. In addition, Sidley's paraprofessionals are responsible for monitoring the docket for all filed pleadings and preparing and distributing a daily status report to the Debtors' senior management and Sidley professionals, referred to as the "Docket Watch."

**Q.    Creditor Communications (30570):   Hours: 1.20   Fees: $942.50**

92.    Throughout the Ninth Interim Fee Period, Sidley's professionals responded to numerous inquiries and communications from individual creditors as well as from representatives of larger groups of the Debtors' creditor constituencies regarding the status of these chapter 11 cases. In connection with the solicitation of the Competing Plans, Sidley established a dedicated Tribune "hotline" designed to channel creditor inquiries. Although during the Ninth Interim Fee Period much of the plan-related creditor communications were billed to the Plan and Disclosure Statement matter category, over the successive interim fee periods, Sidley's professionals have billed such communications to the Creditor Communications matter category.

**R.    Bankruptcy Schedules (30580):   Hours: 7.30   Fees: $3,970.00**

93.    During the Ninth Interim Fee Period, Sidley's professionals reviewed and responded to a motion filed by Sprint Nextel requesting that the Schedule G for Channel 20, Inc. and Tribune Broadcast Holdings, Inc. be amended to include two lease agreements to which Sprint Nextel was a lessee. (See Docket No. 7543.) Sidley's professionals reviewed and analyzed the Debtors' existing schedules and the additional lease information provided by Sprint Nextel to determine if, in fact, the additional leases were "unexpired leases" within the meaning

49

of section 365 of the Bankruptcy Code. Following negotiations with counsel for Sprint Nextel, Sidley's professionals assisted the applicable Debtors in amending their Schedule G to include the additional lease and in turn Sprint Nextel withdrew its motion without need for a hearing on the matter. (See Docket Nos. 7671 and 7746.) In addition, Sidley's professionals advised the Debtors with respect to the filing of amendments to the schedules of Tribune Company, WGN Continental Broadcasting Company, and Tribune CNLBC, LLC. Each of the foregoing amendments were filed on January 28, 2011. (See Docket No. 7671.)

S.    **Employee Issues (30590):    Hours: 230.60    Fees: $134,143.00**

94.    During the Ninth Interim Fee Period, Sidley's professionals in the Bankruptcy and Employee Benefits practice groups advised the Debtors with respect to a range of employment-related matters, including the Debtors' employee benefits, incentive and severance plans, and provisions in the DCL Plan affecting the foregoing. Sidley further advised the Debtors on the employment law and bankruptcy law implications, as applicable, of discrete matters arising in connection with the retention and/or termination of certain of their employees. In connection with the foregoing, Sidley's professionals responded to inquiries from the Debtors and analyzed various issues involving the Debtors' tax-qualified pension plans, drafted and edited severance agreements, reviewed consulting contracts, responded to numerous information requests from and/or regarding current and former employees, analyzed employee-related claims, and handled various other issues in connection with the Debtors' employees.

95.    Additionally, Sidley's professionals began the process of formulating the 2011 management incentive plan ("MIP"), which entailed researching, editing, and advising the Debtors, in part based on the Court's decisions respecting the implementation of the 2009 and 2010 MIPs. The motion to approve the 2011 MIP was ultimately filed in September 2011.

96.     Sidley's professionals also reviewed and analyzed provisions related to employee compensation, collective bargaining agreements, health and welfare benefits, and pension benefits in the DCL Plan (and the corresponding provisions, where different, in the Noteholder Plan). In anticipation of the confirmation hearing, the Debtors retained an expert from Mercer (USA) Inc., the Debtors' compensation consultants, to testify in support of the executive retention and compensation provisions of the DCL Plan. Sidley's professionals met with the Debtors' expert and senior management to advise as necessary on the bankruptcy-related aspects of the expert opinion, which was ultimately offered by proffer. Sidley's professionals reviewed and analyzed the findings in the expert report, including all calculations and opinions therein, to ensure that the retention and compensation provisions of the DCL Plan were consistent with comparable provisions for business enterprises similar to the Debtors.

**T.     2010 Exit Credit Facility (13700):   Hours: 5.20   Fees: $3,637.50**

97.     In May 2010, Sidley commenced providing services to the Debtors relating to the evaluation, negotiation, and eventual implementation of a post-confirmation financing facility that will provide a source of funding for the reorganized Debtors upon their emergence from chapter 11. During the Ninth Interim Fee Period, the fees incurred by Sidley in connection with this matter related to certain preparatory matters required for an exit financing facility, including negotiating a term sheet that would be both beneficial to the Debtors and acceptable to the proposed post-confirmation lender(s). Sidley's professionals also advised the Debtors with respect to the preparation and filing of the term sheet for such an exit facility in connection with the Plan Supplement filed on January 31, 2011.

## EXPENSES INCURRED

98.     Sidley has incurred expenses of $599,999.17 in connection with its services rendered to the Debtors during the Ninth Interim Fee Period. These expenses represent

actual out-of-pocket costs for items incurred exclusively for the benefit of the Debtors, including, but not limited to, duplicating charges, document delivery and messenger services, telephone and facsimile charges, computer-assisted legal research, travel-related expenses, overtime services, in-house document production, professional services of contract attorneys relating to discovery activities in connection with the Leveraged ESOP Transactions and the Competing Plans, and discovery and trial support services from outside vendors. Sidley submits that all such expenses are necessary and actual expenses for the performance of its services in the Debtors' chapter 11 cases, and further submits that many of such expenses were necessitated by the time constraints under which Sidley's professionals and staff have operated.

99.    Computer research and information retrieval services are charged on a time, item and/or search-type basis which takes advantage of certain discounts that Sidley is able to negotiate with the relevant service providers because of the Firm's size and volume of usage. The Firm's charges for computerized legal research such as Westlaw or Lexis are based on a rate that recovers no more than the Firm's costs.

100.    Sidley submits that all travel expenses incurred during the period covered by this Application were necessary, reasonable, and reflect the prevailing market rates. In particular, Sidley submits that, to the best of its knowledge, all air travel utilized by Sidley's professionals during the period covered by this Application was at the prevailing coach-class rate for such travel less any corporate discounts received by Sidley, in accordance with Sidley's policies for business travel for bankruptcy and non-bankruptcy matters. In certain instances where travel was required on short notice, and at particular times, Sidley's professionals reserved fares at first-class rates if no flights were available at economy rates.

101.    Sidley's normal billing practices, as set forth in the pleadings supporting

its retention in these chapter 11 cases, include standard secretarial services as part of normal

overhead.  For certain projects involving large and/or time-sensitive administrative and logistical

requirements resulting from client needs, Sidley utilizes the services of third-party vendors in the

place of clerical personnel on staff during normal business hours and bills those services to the

client at Sidley's cost for such services.  During the Ninth Interim Fee Period, Sidley charged a

total of $4,228.14 relating to outside document production, word processing and/or document

binding/drilling services that were billed to the Debtors at cost; that is, no markup for such

services is applied by Sidley.

102.    In connection with Sidley's maintenance of the Document Depository, in

which the equivalent of approximately 5.82 million pages of documents relating to the

Leveraged ESOP Transactions are electronically stored, Sidley utilized the services of an outside

vendor to process electronic data files for production upon request to the Depository Designees.

During the Ninth Interim Fee Period, Sidley was subject to substantial time constraints imposed

by the Discovery and Scheduling Order approved by the Bankruptcy Court.  Sidley utilized the

services of contract attorneys to supplement the Firm's Litigation professionals in the review and

analysis of documents received and produced in discovery to meet the deadlines imposed by this

order.  During the Ninth Interim Fee Period, Sidley charged a total of $125,204.39 relating to

such outside document processing and professional services (under the expense category

"Professional Services/Specialists") that were billed to the Debtors at cost.  A detailed

breakdown of Sidley's expenses incurred in rendering services to the Debtors during the period

covered by this application is incorporated into this Application as part of <u>Attachment B</u> hereto.

## REVIEW OF APPLICABLE LOCAL RULE

103.    The undersigned has reviewed the requirements of Local Rule of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware 2016-2 and certifies to the best of his information, knowledge and belief that this application substantially complies with Rule 2016-2.

## NOTICE

104.    Notice of this Application has been served upon the Notice Parties specified in the Fee Orders.  In accordance with the terms of the Fee Orders, Sidley respectfully submits that no other or further notice is required.

## NO PRIOR REQUEST

105.    Other than the applicable Monthly Fee Applications, no previous application respecting the relief requested herein has been made to this or any other Court.

WHEREFORE, after appropriate notice and hearing, Sidley Austin LLP respectfully requests the Court (i) to approve, pursuant to 11 U.S.C. §§ 327, 331, and 503, interim compensation in the amount of $14,478,878.00 and reimbursement of expenses in the amount of $599,999.17, (ii) to authorize the payment of such amounts by the Debtors to Sidley, less any amounts previously paid to Sidley pursuant to the Monthly Fee Applications for the period covered by this ninth Quarterly Fee Application Request and the procedures set forth in the Interim Compensation Order and the Fee Examiner Order, and (iii) to grant such further relief as is just and proper.

Dated: September 20, 2011

Respectfully submitted,

James E. Conlan
Bryan Krakauer
Kenneth P. Kansa
Jillian K. Ludwig
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

ATTORNEYS FOR DEBTORS AND DEBTORS
IN POSSESSION