October 5, 2011


BY E-FILING AND HAND DELIVERY

The Honorable Kevin J. Carey
United States Bankruptcy Court
District of Delaware
824 North Market Street
Wilmington, DE 19801


Re:     **In re Tribune Company, No. 08-13141 (KJC)**

Dear Judge Carey:

We write on behalf of the DCL and Noteholder Plan Proponents to bring to the Court's attention the recent decision of the Third Circuit Court of Appeals in *Prometheus Radio Project v. FCC*, Case Nos. 08-3078 *et al.* (3d Cir. July 7, 2011), a copy of which is enclosed.

As Your Honor will recall from the evidence and briefing submitted by the parties, regardless of which plan is confirmed, Tribune will need to obtain waivers of the Federal Communications Commission's ("FCC's") newspaper/broadcast cross-ownership ("NBCO") rule in certain markets in order to retain its newspaper/broadcast combinations. Accordingly, the applications currently on file with the FCC request waivers of that rule in the relevant markets.

At the confirmation hearing, in the briefing and at the closing arguments, the parties presented their respective positions concerning how the FCC would be expected to respond to these waiver requests. In its July 7, 2011 decision in *Prometheus*, a panel of the Third Circuit vacated and remanded the version of the NBCO rule that the FCC had adopted in 2008 on the ground that the FCC had failed to comply with the notice and comment requirements of the Administrative Procedure Act. On September 6, 2011, the Third Circuit denied a petition for rehearing *en banc*, and the mandate was issued on September 15, 2011.

The arguments that the parties presented to this Court with respect to the waiver standard under the 2008 NBCO rule are now inapplicable due to the issuance of the mandate in the *Prometheus* case. In addition, whichever plan may be confirmed, the FCC will review the waiver requests in light of the Third Circuit's ruling. The waiver requests in the pending FCC applications address standards applicable under the prior rule in addition to the one that applied under the 2008 NBCO rule. Nevertheless, the proponents of any confirmed plan will need to address the Third Circuit's decision in amendments to the pending applications.

Each of the DCL Plan Proponents and the Noteholder Plan Proponents believes that their arguments to the Court concerning the feasibility of the Plans with respect to FCC issues continue to be valid.

The Honorable Kevin J. Carey
October 5, 2011
Page 2

Respectfully submitted,

Meredith S. Senter, Jr.
Lerman Senter PLLC
2000 K Street NW Suite 600
Washington, DC 20006
(202) 429-8970
*On behalf of the Noteholder Plan Proponents*

Eve Klindera Reed
Wiley Rein LLP
1776 K Street NW
Washington, DC 20006
(202) 719-7000
*On behalf of the DCL Plan Proponents*

cc:    Ashby & Geddes, P.A.
       Richards, Layton & Finger, P.A.

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

**Nos. 08-3078, 08-4454, 08-4455, 08-4456, 08-4457, 08-4458, 08-4459, 08-4461, 08-4462, 08-4463, 08-4464, 08-4465, 08-4467, 08-4468, 08-4470, 08-4471, 08-4472 08-4475, 08-4477, 08-4478 & 08-4652**

PROMETHEUS RADIO PROJECT

v.

FEDERAL COMMUNICATIONS COMMISSION;
UNITED STATES OF AMERICA


Prometheus Radio Project, Petitioner in Nos. 08-3078/08-4468
Media Alliance, Petitioner in No. 08-4454
Free Press, Petitioner in No. 08-4455
Newspaper Association of America, Petitioner in No. 08-4456
Fox Television Stations, Inc., Petitioner in No. 08-4457
Sinclair Broadcast Group, Inc., Petitioner in No. 08-4458
The Scranton Times, L.P., Petitioner in No. 08-4459
Cox Enterprises, Inc., Petitioner in No. 08-4461
Belo Corporation, Petitioner in No. 08-4462
Morris Communications Company, LLC, Petitioner in No. 08-4463
Gannett Company, Inc., Petitioner in No. 08-4464
CBS Corporation, Petitioner in No. 08-4465
Office of Communications of the
United Church of Christ, Inc., Petitioner in No. 08-4467
Tribune Company, Petitioner in No. 08-4470
Bonneville International Corporation, Petitioner in No. 08-4471
National Association of Broadcasters, Petitioner in No. 08-4472
Clear Channel Communications, Inc., Petitioner in No. 08-4475
CBS Broadcasting Inc., Petitioner in No. 08-4477
Media General Inc., Petitioner in No. 08-4478
Coalition of Smaller Market Television Stations;
Raycom Media Inc., Petitioner in No. 08-4652

_____

On Petition for Review of An Order of
the Federal Communications Commission
(FCC Nos. 00-244 / 01-235/317 / 02-277 / 04-228 /

1

06-121 / 07-217/294 and 73FR9481)
_____

Argued February 24, 2011

Before: SCIRICA, AMBRO and FUENTES, <u>Circuit Judges</u>

## **<u>JUDGMENT</u>**

These causes came on to be heard on the record from the Federal Communications

Commission and were argued on February 24, 2011.

On consideration whereof, IT IS ORDERED AND ADJUDGED by this Court that

that the Federal Communication Commission's Order of December 18, 2007, is hereby

vacated and remanded in part and affirmed in part.

ATTEST:


/s/ Marcia M. Waldron
Clerk


Dated: July 7, 2011

Certified as a true copy and issued in lieu
of a formal mandate on _09/15/2011_

Teste: *Marcia M. Waldron*
**Clerk, U.S. Court of Appeals for the Third Circuit**

2

OFFICE OF THE CLERK

**MARCIA M. WALDRON**
**CLERK**



Uɴɪᴛᴇᴅ Sᴛᴀᴛᴇs Cᴏᴜʀᴛ ᴏꜰ Aᴘᴘᴇᴀʟs

FOR THE THIRD CIRCUIT
21400 UNITED STATES COURTHOUSE
601 MARKET STREET
PHILADELPHIA, PA 19106-1790
Website: www.ca3.uscourts.gov

TELEPHONE
215-597-2995

September 15, 2011

Commissioners
Federal Communications Commission
Office of General Counsel
445 12th Street, S.W.
Washington, DC 20554-0000

RE: Prometheus Radio Project v. FCC
Case Number: 08-3078
Agency Case Number: 07-294
Agency Case Number: 06-121
Agency Case Number: 02-277
Agency Case Number: 01-235
Agency Case Number: 01-317
Agency Case Number: 00-244
Agency Case Number: 04-228
Agency Case Number: 07-217

Dear Sir or Madam:

Enclosed herewith is the certified judgment together with copy of the opinion in the above-captioned cases. The certified judgment or order is issued in lieu of a formal mandate and is to be treated in all respects as a mandate.

Kindly acknowledge receipt for same on the enclosed copy of this letter.

Counsel are advised of the issuance of the mandate by copy of this letter. The certified judgment or order is also enclosed showing costs taxed, if any.

Very truly yours,

*Marcia M. Waldron*

Marcia M. Waldron,
Clerk

By:
CMD, Case Manager

cc:
Marvin Ammori
Enrique Armijo
Daniel M. Armstrong III
James R. W. Bayes
Matthew Berry
Adrienne T. Biddings
Angela J. Campbell
James M. Carr
Parul Desai
P. Michele Ellison
John R. Feore Jr.
John E. Fiorini III
Nancy C. Garrison
Ian H. Gershengorn
Craig E. Gilmore
Elaine J. Goldenberg
Clifford M. Harrington
Michael D. Hayes
Michael D. Hays
Kathleen A. Kirby
Jacob M. Lewis
Robert A. Long Jr.
Jane E. Mago
Glenn B. Manishin
Andrew G. McBride
Jack McKay
Ryan C. Morris
Christopher Murray
Robert B. Nicholson
Catherine G. O'Sullivan
James C. Owens Jr.
Joseph R. Palmore
C. Grey Pash Jr.
Carter G. Phillips
Eve Reed
Kevin F. Reed
Bruce T. Reese
Kenneth E. Satten

Mark D. Schneider
Andrew J. Schwartzman
Virginia A. Seitz
M. Anne Swanson
Jerianne Timmerman
Lewis A. Tollin
R. Clark Wadlow
Helgi C. Walker
Robert J. Wiggers
Richard E. Wiley
Coriell S. Wright I
James P. Young

PRECEDENTIAL

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

**Nos. 08-3078, 08-4454, 08-4455, 08-4456, 08-4457, 08-4458, 08-4459, 08-4461, 08-4462, 08-4463, 08-4464, 08-4465, 08-4467, 08-4468, 08-4470, 08-4471, 08-4472 08-4475, 08-4477, 08-4478 & 08-4652**

PROMETHEUS RADIO PROJECT

v.

FEDERAL COMMUNICATIONS COMMISSION;
UNITED STATES OF AMERICA

Prometheus Radio Project, Petitioner in Nos. 08-3078/08-4468
Media Alliance, Petitioner in No. 08-4454
Free Press, Petitioner in No. 08-4455
Newspaper Association of America, Petitioner in No. 08-4456
Fox Television Stations, Inc., Petitioner in No. 08-4457
Sinclair Broadcast Group, Inc., Petitioner in No. 08-4458
The Scranton Times, L.P., Petitioner in No. 08-4459
Cox Enterprises, Inc., Petitioner in No. 08-4461
Belo Corporation, Petitioner in No. 08-4462
Morris Communications Company, LLC, Petitioner in No. 08-4463
Gannett Company, Inc., Petitioner in No. 08-4464
CBS Corporation, Petitioner in No. 08-4465
Office of Communications of the
United Church of Christ, Inc., Petitioner in No. 08-4467
Tribune Company, Petitioner in No. 08-4470
Bonneville International Corporation, Petitioner in No. 08-4471
National Association of Broadcasters, Petitioner in No. 08-4472
Clear Channel Communications, Inc., Petitioner in No. 08-4475
CBS Broadcasting Inc., Petitioner in No. 08-4477
Media General Inc., Petitioner in No. 08-4478
Coalition of Smaller Market Television Stations;
Raycom Media Inc., Petitioner in No. 08-4652

_____

On Petition for Review of An Order of
the Federal Communications Commission

(FCC Nos. 00-244 / 01-235/317 / 02-277 / 04-228 /
06-121 / 07-217/294 and 73FR9481)

_____

Argued February 24, 2011

Before: SCIRICA, AMBRO and FUENTES, <u>Circuit Judges</u>

(Opinion filed July 7, 2011)

Angela J. Campbell, Esquire
Adrienne T. Biddings, Esquire
Institute for Public Representation
Georgetown Law
600 New Jersey Avenue, N.W.
Washington, DC   20001
     *Counsel for Petitioners, Prometheus Radio Project;*
     *Media Alliance; Office of Communications*
     *of the United Church of Christ, Inc.*

Parul Desai, Esquire
Andrew J. Schwartzman, Esquire (Argued)
Media Access Project
1625 K Street, N.W., Suite 1000
Washington, DC   20006
     *Counsel for Petitioner, Prometheus Radio Project;*
     *Media Alliance*

Marvin Ammori, Esquire
Coriell S. Wright, I, Esquire (Argued)
Free Press
501 Third Street, N.W., Suite 875
Washington, DC   20001
     *Counsel for Petitioner, Free Press*

Clifford M. Harrington, Esquire
Jack McKay, Esquire
Paul A. Cicelski, Esquire
Pillsbury, Winthrop, Shaw & Pittman
2300 N Street, N.W.

2

Washington, DC   20037
    *Counsel for Petitioner, Sinclair Broadcast*

Bruce T. Reese, Esquire
Bonneville International Corporation
55 North 300 West
Salt Lake City, UT   84101

Lewis A. Tollin, Esquire
Craig E. Gilmore, Esquire
Kenneth E. Satten, Esquire
Wilkinson Barker Knauer
2300 N Street, N.W., Suite 700
Washington, DC   20037
    *Counsel for Petitioner, Scranton Times/Scranton Tribune;*
    *Bonneville International Corporation*

Jonathan H. Anschell, Esquire
CBS Broadcasting Inc.
4024 Radford Avenue
Studio City, CA  910604

Susanna M. Lowy, Esquire
CBS Broadcasting Inc.
51 West 52nd Street
New York, NY   10019
    *Counsel for Petitioner, CBS Broadcasting Inc.*

Jessica Marventano, Esquire
Sr. Vice President Government Affairs
Clear Channel Communications, Inc.
701 8th Street, NW, Suite 350
Washington, DC   20001
    *Counsel for Petitioner, Clear Channel Communications, Inc.*

Eve Reed, Esquire
John E. Fiorini, III, Esquire (Argued)
James R.W. Bayes, Esquire
Richard E. Wiley, Esquire
Kathleen A. Kirby, Esquire

3

Andrew G. McBride, Esquire (Argued)
Kurt A. Wimmer, Esquire
Helgi C. Walker, Esquire (Argued)
Jamie Alan Aycock, Esquire
Martha E. Heller, Esquire
Maria L. Mullarkey, Esquire
Richard J. Bodorff, Esquire
Christiane M. McKnight, Esquire
Wiley Rein LLP
1776 K Street, N.W.
Washington, DC   20006
  *Counsel for Petitioners, Newspaper Association of America;*
  *Morris Communications Company, LLC;*
  *Clear Channel Communications, Inc.;*
  *Belo Corporation; Gannett Company, Inc.;*
  *CBS Corporation; CBS Broadcasting Inc.*

Ellen S. Agress, Esquire
News Corporation
1211 Avenue of the Americas, 28th Floor
New York, NY   10036

Maureen A. O'Connell
News Corporation
444 North Capitol Street, N.W., Suite 740
Washington, DC   20001
  *Counsel for Petitioner, Fox Television Stations, Inc.*

Carter G. Phillips, Esquire
Ryan C. Morris, Esquire
James C. Owens, Jr., Esquire
Mark D. Schneider, Esquire
Virginia A. Seitz, Esquire (Argued)
Jennifer B. Tatel, Esquire
R. Clark Wadlow, Esquire
James P. Young, Esquire
Sidley Austin
1501 K Street, N.W.
Washington, DC   20005
  *Counsel for Petitioner, Tribune Company;*

4

*Fox Television Stations Inc.*

George L. Mahoney, Esquire
Media General, Inc.
333 East Franklin Street
Richmond, VA  23219
    *Counsel for Petitioner, Media General Inc.*

Michael D. Hays, Esquire (Argued)
Kevin F. Reed, Esquire
M. Anne Swanson, Esquire
John R. Feore, Jr., Esquire
Dow Lohnes
1200 New Hampshire Avenue, N.W., Suite 800
Washington, DC  20036
    *Counsel for Petitioner, Fox Television Stations, Inc.;*
    *Cox Entertainment, Inc.; Media General Inc.*

Jane E. Mago, Esquire
Jerianne Timmerman, Esquire
National Association of Broadcasters
1771 N Street, N.W.
Washington, DC  20036

Elaine J. Goldenberg, Esquire (Argued)
Joshua M. Segal, Esquire
Jenner & Block
1099 New York Avenue, Suite 900
Washington, DC  20001
    *Counsel for Petitioner, National Association*
    *of Broadcasters*

Robert A. Long, Jr. Esquire
Enrique Armijo, Esquire
Covington & Burling
1201 Pennsylvania Avenue, N.W.
Washington, DC  20004
    *Counsel for Petitioner, Coalition of Smaller*
    *Market TV Stations; Raycom Media Inc.*

5

Christopher Murray, Esquire
1101 17th Street, N.W., Suite 500
Washington, DC  20036

Glenn B. Manishin, Esquire (Argued)
Duane Morris LLP
505 9th Street, N.W., Suite 1000
Washington, DC  20004
     *Counsel for Intervenor-Petitioner,*
     *Consumer Federation of America;*
     *Consumers Union*

Austin C. Schlick
   General Counsel
Jacob M. Lewis (Argued)
   Acting Deputy General Counsel
Daniel M. Armstrong, III
   Associate General Counsel
Matthew Berry, Esquire
James M. Carr, Esquire
P. Michele Ellison, Esquire
Joseph R. Palmore, Esquire
C. Grey Pash, Jr., Esquire
Federal Communications Commission
Office of General Counsel
Room 8-A766
445 12th Street, S.W.
Washington, DC  20554

Christine A. Varney
   Assistant Attorney General
Nancy C. Garrison, Esquire
Catherine G. O'Sullivan, Esquire
Robert J. Wiggers, Esquire
Robert B. Nicholson, Esquire
United States Department of Justice
Appellate Section
950 Pennsylvania Avenue, N.W.
Washington, DC  20530
     *Counsel for Respondents, Federal Communications Commission;*

6

*United States of America*

————————

## OPINION OF THE COURT

————————

AMBRO, <u>Circuit Judge</u>

### Table of Contents

I.    Background and Procedural History .................................................................9
   A.  Our Review of the Commission's 2003 Report and Order ...........................9
       1.    Newspaper/Broadcast and Radio/Broadcast Cross-Ownership Rules...............9
       2.    Local Television Ownership Rule ..............................................................10
       3.    Local Radio Ownership Rule.....................................................................11
       4.    Dual Network Rule ....................................................................................12
       5.    Promoting Minority Ownership: Definition  of Eligible Entities in Transfer Rule and MMTC Proposals ........................................................................12
   B.  The Commission's 2006 Quadrennial Review, 2008 Order, and Diversity Order..12
       1.    Newspaper/Broadcast Cross-Ownership ("NBCO") Rule ...............................13
       2.    Radio/Broadcast Cross-Ownership Rule ...................................................14
       3.    Local Television Ownership Rule ..............................................................14
       4.    Local Radio Ownership Rule......................................................................15
       5.    Diversity Order ..........................................................................................15
       6.    Subsequent Procedural History..................................................................16
II.   Jurisdiction and Standard of Review ...........................................................17
   A.  Standard of Review under the APA ...............................................................18
   B.  Standard of Review under Subsection 202(h) ...............................................18
III.  Newspaper/Broadcast Cross-Ownership ("NBCO") Rule .......................................19
   A.  Notice and Comment Process........................................................................20
   B.  The FCC Failed to Meet the APA Notice and Comment Standard........................24
       1.    The APA Standard......................................................................................24
       2.    Analysis of Compliance with the APA Standard...........................................25
   C.  Permanent Waivers of Cross-Ownership Rule ...............................................30
IV.  Radio/Television Cross-Ownership Rule ..................................................34
V.   Local Television Ownership Rule................................................................36
   A.  Retention of the Pre-2003 Rule ...................................................................36
   B.  Retention of the "Top Four/Eight Voices" Test ...........................................38
   C.  Declining to Tighten the Television "Duopoly Rule" ....................................40
VI.  Local Radio Ownership Rule ..................................................................41

VII. Retention of the Dual Network Rule ........................................................... 43
VIII. Constitutionality of Media Ownership Rules ............................................. 44
IX. The Diversity Order and the Issue of Minority and Women Broadcast Ownership . 45
    A. *Prometheus I* Remand on Minority and Women Ownership Issues ........................ 45
    B. Rulemaking Process regarding Minority and Female Ownership Issues   during the 2006 Quadrennial Review .............................................................. 47
        1.    The FNPR in 2006 and Second FNPR in 2007 ............................... 47
    C. The Diversity Order and Third FNPR in 2008 ........................................ 49
    D. The Eligible Entity Definition is Arbitrary and Capricious .................................... 50
X.    Conclusion ............................................................................................ 54

In *Prometheus Radio Project v. F.C.C.*, 373 F.3d 372 (3d Cir. 2004) ("*Prometheus I*"), we considered revisions by the Federal Communications Commission (the "Commission" or "FCC") to its regulations governing broadcast media ownership promulgated following its 2002 Biennial Regulatory Review. *See 2002 Biennial Regulatory Review—Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996, Report and Order and Notice of Proposed Rulemaking*, 18 F.C.C.R. 13,620, 2003 WL 21511828 (July 2, 2003) (the "2003 Order"). We affirmed the Commission's authority to regulate media ownership but remanded aspects of the Commission's 2003 Order that were not adequately supported by the record, including its numerical limits for local television ownership, local radio ownership rule, rule on cross-ownership of media within local markets, and repeal of the failed station solicitation rule. *Prometheus I*, 373 F.3d at 382, 421.

In these consolidated appeals, we consider the Commission's most recent revisions to its media ownership rules. In December 2007, following its 2006 Quadrennial Regulatory Review, the Commission announced an overhaul of its newspaper/broadcast cross-ownership rule and granted permanent waivers of the rule to five specific newspaper/broadcast combinations. *2006 Quadrennial Regulatory Review—Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996, Report and Order and Order on Reconsideration*, 23 F.C.C.R. 2010, 2055-56, 2008 WL 294635 (Dec. 18, 2007) (the "2008 Order"). It chose to retain its radio/television cross-ownership rule and local television and radio ownership rules in existence prior to the 2003 Order.[1] It also retained its failed station solicitation rule, and set out a series of other measures to address broadcast ownership diversity, in a separate order. *See Promoting Diversification of Ownership in the Broadcasting Services*, *2006 Quadrennial Regulatory Review—Review of the Commission's Broadcast Ownership Rules*

---

[1] The versions of these rules in the 2003 Order never went into effect because we stayed that order pending our review and continued the stay in *Prometheus I*.

8

*and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996, Report and Order and Third Further Notice of Proposed Rulemaking*, 23 F.C.C.R. 5922, 2008 WL 612180 (Dec. 18, 2007) (the "Diversity Order").

The 2008 Order was challenged by multiple parties. In 2009, the FCC moved for voluntary remand of the 2008 Order. We denied that opposed motion.

Today we affirm the 2008 Order with the exception of the newspaper/broadcast cross-ownership rule, for which the Commission failed to meet the notice and comment requirements of the Administrative Procedure Act (the "APA"), 5 U.S.C. §§ 551 *et seq.* We also remand those provisions of the Diversity Order that rely on the revenue-based "eligible entity" definition, and the FCC's decision to defer consideration of other proposed definitions (such as for a socially and economically disadvantaged business ("SDB")), so that it may adequately justify or modify its approach to advancing broadcast ownership by minorities and women.

## I.    BACKGROUND AND PROCEDURAL HISTORY

We need not reiterate our lengthy discussion of the history and parameters of the Commission's regulatory authority contained in *Prometheus I.  See* 373 F.3d at 382-86. However, to place our decision in context, we briefly recount the Commission's 2003 modifications to its ownership rules, the resulting objections, and our decisions with respect to each rule. We also summarize the Commission's most recent modifications to its rules arising out of its 2006 Quadrennial Regulatory Review process.

### A.    Our Review of the Commission's 2003 Report and Order

In September 2002, the Commission issued a Notice of Proposed Rulemaking, announcing that it would review six of its broadcast ownership rules in its 2002 Biennial Regulatory Review. *Id.* at 386 (citing *2002 Biennial Regulatory Review—Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996, Notice of Proposed Rulemaking*, 17 F.C.C.R. 18,503, ¶ 6, 2002 WL 31108252 (2002) (the "2002 Notice")). In 2003, it issued an Order modifying the rules. *See 2003 Order.* We provide below a brief description of the rules, and the actions we took with respect to each.

### 1.    Newspaper/Broadcast and Radio/Broadcast Cross-Ownership Rules

Starting in 1975, the Commission banned common ownership of a full-service broadcast television station and a daily public newspaper. *Prometheus I*, 373 F.3d at 387 (citing *Amendment of Sections 73.35, 73.240, and 73.636 of the Commission's Rules Relating*

9

*to Multiple Ownerships of Standard, FM and Television Broadcast Stations*, 50 F.C.C.2d 1046, 1975 WL 30457 (1975)).  Prior to 2003, it also regulated common ownership of television and radio stations.  *Id.*  In its 2003 Order, the Commission determined that the existing rules were no longer in the public interest, repealed them, and replaced them with a single set of Cross-Media Limits using a methodological tool called the "Diversity Index."[2]  *Id.* at 387-88.  In *Prometheus I*, we upheld the Commission's decision that a complete ban on newspaper/broadcast cross-ownership was no longer necessary to protect diversity, but that continuing to regulate cross-ownership was in the public interest.  *Id.* at 399-400.  However, we did not uphold the Cross-Media Limits themselves because the Commission had failed to provide reasoned analysis to support them.  *Id.* at 402-12.  Specifically, we concluded that it "did not justify its choice and weight of specific media outlets . . . [selected] for inclusion in the Diversity Index," "did not justify its assumption of equal market shares . . . [for] all outlets within the same media type (that is, television stations, daily papers, or radio stations)," and "did not rationally derive its Cross-Media Limits from the Diversity Index results."  *Id.* at 404, 408, 409.

## 2.    Local Television Ownership Rule

The local television ownership rule allowed one entity to own two television stations in a market (a television duopoly) as long as at least one of the stations was not ranked among the market's four largest stations and at least eight independently owned and operated stations (called "eight voices") would remain post-merger.  *Id.* at 386.  In 2003, the Commission amended this rule to permit triopolies in markets with 18 or more stations and duopolies in markets with 17 or fewer.  *Id.* at 386-87.  The Commission also repealed its failed station solicitation rule, which required applicants seeking waivers of the local television rule to provide notice of the sale to potential out-of-market buyers before it could sell a failed, failing, or unbuilt station to an in-market buyer.  *Id.* at 420.  The failed station solicitation rule was adopted in 1999 to alleviate concerns that the FCC's decision to allow local television duopolies—hence more concentration of ownership—would undermine station ownership by minorities.  *Id.*  We upheld the retention of the ban on cross-ownership of the top four stations in a market (known as the "top four" restriction), and the relaxation of the eight voices rule, but remanded the specific numerical limits for the Commission to "support and harmonize its rationale."  *Id.* at 415-16, 420.  We also remanded its repeal of the

---

[2]  As we explained in *Prometheus I*, the Diversity Index was a "developed [by the Commission] as a measure of viewpoint diversity in local markets to identify those 'at risk' markets where consolidation would have a deleterious effect. . . . [It] is a highly modified version of the formula for measuring market concentration—the Herfindahl-Hirschman Index—applied by the Department of Justice and Federal Trade Commission to analyze mergers."  373 F.3d at 388 (internal citation omitted).

failed station solicitation rule, as the Commission had failed to consider the effect on minority ownership of the repeal despite the rule being the only existing regulation intended to promote minority television ownership. *Id.* at 421.

### 3.    Local Radio Ownership Rule

Congress established specific numerical limits on radio ownership in the Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56, 110 (1996) (codified as amended at 47 U.S.C. § 202(b)(1)) (the "1996 Telecommunications Act"). The 2003 Order retained these limits, but replaced the "contour-overlap" method[3] for determining radio markets with a geographic method and announced that the Commission would include noncommercial stations in the station count for each market. *Prometheus I*, 373 F.3d at 387. We upheld the new market definition and the inclusion of noncommercial stations but remanded the numerical limits for further consideration, including the AM "subcaps."[4] *Id.* at 423-426, 431-35.   Specifically, we held that the Commission had failed to support its proposition that the existence of five equal-sized competitors shows that local markets are sufficiently competitive (or that the Commission's limits would actually ensure five competitors) and to explain why it was necessary to impose an AM subcap at all. *Id.* at 432-35.

---

[3] As we explained in *Prometheus I*,

> to determine whether an entity may acquire a radio station under the local radio rule, the Commission first must know how many radio stations are in that station's local market (called the 'denominator' figure).  The size of the market determines which numerical limit applies.  Second, the Commission must determine how many radio stations in that market would be owned by the same entity if the entity acquired the station it proposes (called the 'numerator' figure).  If this figure is within the numerical limit, the transaction may proceed. Under the contour-overlap methodology, the Commission calculates the numerator by counting the acquiring entity's radio stations that *all* have overlapping signal contours. . . . The Commission calculates the denominator by counting all of the stations whose contours intersect with at least one (not all) of the contours of another station in the numerator.

373 F.3d at 423 (emphasis in original).

[4] "Subcaps" are ownership limits on stations within the same service—AM or FM. *See 2003 Order* ¶ 235.

### 4. Dual Network Rule

Under the dual network rule, a television station is prohibited from affiliating with more than one of the four largest networks. The top four restriction prohibits common ownership by ABC, CBS, Fox, and NBC. *Id.* at 388. We upheld the Commission's decision to retain this rule in 2003, as it was supported by ample record evidence. *Id.* at 417-18.

### 5. Promoting Minority Ownership: Definition of Eligible Entities in Transfer Rule and MMTC Proposals

In *Prometheus I* we concluded that the FCC had failed to consider proposals to promote minority broadcast ownership that the Minority Media and Telecommunications Council (the "MMTC") had submitted during the Commission's 2002 biennial review proceeding. The 2003 Order proposed a separate proceeding to address proposals for advancing minority and female ownership in broadcasting. *See 2003 Order* ¶¶ 49-50 (promising to issue a Notice of Proposed Rulemaking to address the MMTC's 13 specific proposals). We remanded this decision (in effect, to defer consideration of these proposals) and ordered the Commission to address them at the same time that it addressed the other remanded issues from the 2003 Order. *Prometheus I*, 373 F.3d at 421 n.59.

We also rejected concerns regarding the FCC's new transfer rule that prohibits "the transfer or sale of grandfathered [radio/television] combinations that violate its local ownership limits except to certain 'eligible entities' that qualify as small businesses." *Id.* at 426-427 (internal citation omitted). In upholding the transfer rule, however, we "anticipate[d] . . . that by the next quadrennial review the Commission will have the benefit of a stable definition of SDBs, as well as several years of implementation experience, to help it reevaluate whether an SDB-based waiver will better promote the Commission's diversity objectives" than the small business definition it used in the rule. *Id.* at 427-28 n.70.

### B. The Commission's 2006 Quadrennial Review, 2008 Order, and Diversity Order

In July 2006, the FCC began another quadrennial review. Marking the culmination of the review process in December 2008, the FCC issued its 2008 Order containing changes to its ownership rules made in response to our remand, and deemed necessary to the public interest in the course of its own review, offering justifications for those changes, and issuing five permanent waivers of its newspaper/broadcast cross-ownership rule. Simultaneously, the FCC issued the Diversity Order in response to our remand and to carry out its statutory duty to enhance opportunities for minorities and women in broadcast ownership.

We consider the proposed rule changes, the waivers, and the Diversity Order below.

12

The following is a brief description of the rule changes made by the Commission following its 2006 Quadrennial Review that are challenged by one or more of the parties.

### 1.    Newspaper/Broadcast Cross-Ownership ("NBCO") Rule

In its 2008 Order, the Commission abandoned the cross-media limits announced in the 2003 Order, declined to retain the ban abandoned in the 2003 Order (but still in existence due to our stay), and adopted an entirely new rule. Under the new rule, the Commission will consider newspaper/broadcast cross-ownership proposals on a case-by-case basis using a four-factor test, set forth below, guided by reversible presumptions.

In the top 20 Designated Market Areas ("DMAs"), the Commission will presume "that it is not inconsistent with the public interest for an entity to own . . . either (a) a newspaper and a television station if (1) the television station is not ranked among the top four stations in the DMA, and (2) at least eight independent 'major media voices' remain in the DMA;[5] or (b) a newspaper and a radio station." *2008 Order* ¶ 53. In all other markets, the Commission will presume "that it is inconsistent with the public interest for an entity to own newspaper and broadcast combinations." *Id.* at ¶ 63. However, the Commission will reverse that negative presumption if either (1) the proposed combination initiates at least seven hours a week of additional local news programming, or (2) the newspaper or broadcast outlet qualifies as failed or failing. *Id.* at ¶¶ 65-67.

Guided by these reversible presumptions, the Commission will consider the following four factors in determining whether to approve a proposed combination:

> (1) the extent to which cross-ownership will serve to increase the amount of local news[6] disseminated through the affected media outlets in the combination; (2) whether each affected media outlet will exercise its own independent news judgment; (3) the level of concentration in the Nielsen DMA,[7] and (4) the

---

[5] "Major media voices" are defined in the 2008 Order "as full-power commercial and noncommercial television stations and major newspapers." *2008 Order* ¶ 57. Major newspapers "are newspapers that are published at least four days a week within the DMA and have a circulation exceeding 5 percent of the households in the DMA." *Id.* at n.183.

[6] In the 2008 Order, "[t]he term 'local news' includes traditional newscasts as well as programming that addresses issues of local political interest or issues of public importance in the market." *Id.* at ¶ 70.

[7] A Nielsen DMA is a region in which residents receive the same or similar television offerings. Market concentration is not further defined in the 2008 Order, and the FCC

financial condition of the newspaper or broadcast station, and if the newspaper or broadcast station is in financial distress, the owner's commitment to invest significantly in newsroom operations.

*Id.* at ¶ 68.  However, the presumptions—negative and positive—present a "high hurdle" for opposing parties to overcome.  *Id.*

## 2. Radio/Broadcast Cross-Ownership Rule

The Commission also abandoned the cross-media limits proposed in 2003 with respect to radio/broadcast cross-ownership.  Instead, it announced that it would retain its pre-2003 rule (still in effect at that time due to our stay of the 2003 rule), which "limits the number of commercial radio and television stations an entity may own in the same market, with the degree of common ownership permitted varying depending on the size of the relevant market." *Id.* at ¶ 80.  More specifically, an entity may own up to two television stations and up to six radio stations (or one and seven) in a market where 20 independently owned media "voices" would remain post-merger, and up to two television stations and four radio stations where 10 voices would remain. *Id.* at ¶ 80 n.259.  An entity may own two television stations and one radio station regardless of the number of voices remaining in the market. *Id.*[8]

## 3. Local Television Ownership Rule

The Commission also chose to retain the pre-2003 local television ownership rule, under which an entity may own two television stations in the same DMA if (1) the station contours do not overlap; *or* (2) at least one of the stations in the combination is not ranked among the top four in terms of audience share *and* at least eight independently owned broadcast television stations would remain in the DMA after the combination. *Id.* at ¶¶ 87, 96.  It abandoned completely the relaxed numerical limits in the 2003 Order.  Additionally, the Commission reinstated the failed station solicitation rule.

---

announced that it "will not employ any single metric" in measuring concentration. *Id.* at ¶ 73.  Instead, the 2008 Order "stress[es] . . . that in future adjudicative proceedings addressing proposed combinations parties are free to point to any metric of their choosing in arguing that a proposed combination either should or should not be approved." *Id.*

[8] Note that all of these combinations must also comply with the local television and radio ownership rules. *Id.* at ¶ 80 n.259.

14

### 4.    Local Radio Ownership Rule

As it did in the 2003 Order, the Commission retained the numerical limits prescribed by Congress in the 1996 Telecommunications Act (and the revised market definition we upheld in *Prometheus I*).  *See 2008 Order* ¶¶ 110-11.  However, it offered a new justification for those limits and for the AM/FM subcaps, as we had rejected as unreasonable the rationales given in its 2003 Order.  *Id.* at ¶¶ 130-34; *Prometheus I*, 373 F.3d at 430-35.

The rule provides that

> an entity may own, operate, or control (1) up to eight commercial radio stations, not more than five of which are in the same service (*i.e.*, AM or FM), in a radio market with 45 or more full-power, commercial and non-commercial radio stations; (2) up to seven commercial stations, not more than four of which are in the same service, in a radio market with between 30 and 44 (inclusive) full-power, commercial and non-commercial radio stations;  (3) up to six commercial radio stations, not more than four of which are in the same service, in a radio market with between 15 and 29 (inclusive) full-power, commercial and non-commercial radio stations; and (4) up to five commercial radio stations, not more than three of which are in the same service, in a radio market with 14 or fewer full-power, commercial and noncommercial radio stations, except that an entity may not own, operate, or control more than 50 percent of the stations in such a market.

*2008 Order* ¶ 110.

### 5.    Diversity Order

In its separate Diversity Order, the FCC adopted, with modifications, 13 proposals submitted during the rulemaking proceeding and rejected 10 other proposals intended to increase broadcast ownership by minorities and women.  It also sought comment on nine separate proposals in the accompanying Third Further Notice of Proposed Rulemaking (the "Third FNPR").  *Diversity Order* ¶¶ 80-101.  It did not consider proposed SDB definitions.

The Diversity Order adopts a number of measures to increase ownership opportunities for "eligible entities,"[9] which are defined to include all entities that qualify as small

---

[9] The Diversity Order:

businesses under the standards of the Small Business Administration (the "SBA") for industry groupings based on revenue. Among other provisions, the Diversity Order also establishes several measures intended to eliminate fraud and discrimination in broadcast ownership.

### 6.    Subsequent Procedural History

In March 2008, Common Cause and several other groups[10] filed a Petition for Reconsideration of the Commission's 2008 Order. *See Common Cause et al., Petition for Reconsideration*, MB Docket 60-121 (Mar. 24, 2008) ("Petition for Reconsideration"). In

---

> [c]hanges [the Commission's] construction permit deadlines to allow "eligible entities" that acquire expiring construction permits additional time to build out the facility; [r]evises the Commission's equity/debt plus . . . attribution standard; [m]odifies the Commission's distress sale policy . . . ; [a]dopts an Equal Transactional Opportunity Rule that bars race or gender in broadcast transactions; [a]dopts a "zero-tolerance" policy for ownership fraud and "fast-track" ownership-fraud claims and seeks to resolve them within 90 days; [r]equires broadcasters renewing their licenses to certify that their advertising sales contracts do not discriminate on the basis of race or gender; [e]ncourages local and regional banks to participate in SBA-guaranteed loan programs . . . ; [g]ives priority to any entity financing or incubating an eligible entity in certain duopoly situations; [c]onsiders requests to extend divestiture deadlines in mergers in which applicants have actively solicited bids for divested properties from eligible entities; [c]onvenes an "Access-to-Capital" conference that will focus on the investment banking and private equity communities and opportunities to acquire financing; [a]nnounces the creation of a guidebook on diversity . . . ; and [r]evises the exception to the prohibition on the assignment or transfer of grandfathered radio station combinations.

News Release, FCC, *FCC Adopts Rules to Promote Diversification of Broadcast Ownership* (Dec. 18, 2007).

[10] Those groups included the Benton Foundation, Consumers Action, the Massachusetts Consumers' Coalition, NYC Wireless, James J. Elekes, and the National Hispanic Media Coalition.

July 2008, Citizen Petitioners[11] filed for review of that Order in our Court. Subsequently, several other petitions for review were filed before us, all of which were consolidated with that of Citizen Petitioners. In December 2008, Citizen Petitioners filed a motion to hold these cases in abeyance pending the FCC's action on the Petition for Reconsideration. We granted that motion and ordered the parties to show cause why the stay entered in 2003, and continued in *Prometheus I*, should not be lifted. On consideration of their responses, we requested that the parties file status reports regarding the pending Petition for Reconsideration and our stay. Order Requesting Status Reports, June 12, 2009. After reviewing the status reports, we requested that the Commission advise us "when it expect[ed] to issue its decision on reconsideration of the *2006 Quadrennial Regulatory Review*." Order Requesting Further Information, Nov. 4, 2009 (emphasis in original).

In response, the Commission made clear that it was "already working hard to reexamine" the issues raised in the Petition for Reconsideration. Thus, it did "not intend to issue a decision on reconsideration of the *2008 Order* until that decision [could] be made harmoniously with the current Quadrennial Regulatory Review." Memorandum from Austin C. Schlick, FCC General Counsel, to Marcia M. Waldron, Clerk, U.S. Court of Appeals for the Third Circuit 1 (Nov. 25, 2009). The Commission requested that we "continue to hold these cases in abeyance." *Id.* It asked that, in the alternative, we "remand the *2008 Order* to the Commission so that it may revisit the determinations made in that order in conjunction with" its 2010 Quadrennial Review. *Id.* at 2.[12] We declined to do either, and in March 2010 we lifted the stay and set a briefing schedule for the consolidated cases pending before us.

## II.    JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction over the rule-making portions of the FCC's 2008 Order under 47 U.S.C. § 402(a) and 28 U.S.C. § 2342(1).[13]

---

[11] As in *Prometheus I*, we use this designation to refer to those petitioners who have raised anti-deregulatory challenges to the Commission's 2008 Order. These petitioners are Free Press; Media Alliance; Office of Communication of the United Church of Christ, Inc. ("UCC"); and Prometheus Radio Project.

[12] Specifically, the FCC asked that we "treat [its] alternative request as a formal motion for voluntary remand." *Id.* at 5 n.2.

[13] Although all of the challenges to the FCC's 2008 Order were initially consolidated, we recognized that the Court of Appeals for the D.C. Circuit has exclusive jurisdiction to review FCC broadcast licensing actions under 47 U.S.C. § 402(b). Thus, we bifurcated the licensing challenges and transferred them back to the D.C. Circuit. Order Deconsolidating Licensing Appeals under § 402(b), Feb. 8, 2010.

A.    **Standard of Review under the APA**

In reviewing agency rulemaking, our standard of review is governed by the APA, 5 U.S.C. § 706.  Under this standard, we must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . [or] unsupported by substantial evidence." *Id.* § 706(2)(a).  As the Supreme Court elaborated in *Motor Vehicles Manufacturing Association of the United States v. State Farm Mutual Automobile Insurance Company* ("*State Farm*"):

> The scope of review under the arbitrary and capricious standard is narrow and a court is not to substitute its judgment for that of the agency.  Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action[,] including a rational connection between the facts found and the choices made. . . . Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

463 U.S. 29, 43 (1983) (internal quotations and citations omitted).[14]

B.    **Standard of Review under Subsection 202(h)**

Subsection 202(h) of the 1996 Telecommunications Act requires the Commission to determine whether media concentration rules are "necessary in the public interest as the result of competition" and to "repeal or modify any regulation it determines to be no longer in the public interest."  § 202(h), 110 Stat. at 111-12.[15]  In *Prometheus I*, we set out our

---

[14] Moreover, "[w]e may not supply a reasoned basis for the agency's action that the agency itself has not given. . . . We will, however, uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *Id.* at 43 (internal quotations and citations omitted).

[15] Section 202(h) of the 1996 Telecommunications Act states the following:  "*Further Commission Review*:  The Commission shall review its rules . . . and shall determine whether any of such rules are necessary in the public interest as the result of competition.  The Commission shall repeal or modify any regulation it determines no longer to be in the public

18

standard of review under § 202(h) in detail.  373 F.3d 390-97.  With no need to repeat that detail here, we note our summary of the § 202(h) standard:

> In a periodic review under § 202(h), the Commission is required to determine whether its then-extant rules remain useful in the public interest; if no longer useful, they must be repealed or modified.  Yet no matter what the Commission decides to do to any particular rule—retain, repeal, or modify (whether to make more or less stringent)—it must do so in the public interest and support its decision with a reasoned analysis.

*Id.* at 395.  As we did in *Prometheus I*, "[w]e shall evaluate each aspect of the Commission's Order accordingly."  *Id.*

## III.   NEWSPAPER/BROADCAST CROSS-OWNERSHIP ("NBCO") RULE

All sides challenge the Commission's decision to repeal its ban on newspaper/broadcast cross-ownership in favor of a case-by-case approach guided by presumptions and a four-factor test.  Citizen Petitioners argue that the FCC failed to provide adequate notice of the rule as required by the APA, that elements of the rule are unsupported by the record evidence, and that several components are too vague and ill-defined to be enforceable or to promote the public interest.  In contrast, Deregulatory Petitioners[16] contend that the FCC erred by failing to relax the rule further.  They also challenge the validity of the rule under our Constitution's First and Fifth Amendments.  Several of the Petitioners point to record evidence that they believe the FCC did not adequately consider in promulgating the new NBCO rule.  Because we conclude that the Commission did not meet the APA's notice and comment requirements for this rule, we do not reach any of these challenges to its substance.

---

interest."  *Id.*  We, along with the Court of Appeals for the D.C. Circuit, have upheld the Commission's interpretation of "necessary" to mean "convenient," "useful," or "helpful," rather than "indispensable."  *Prometheus I*, 373 F.3d at 393-94 (citing *Cellco P'ship v. FCC*, 357 F.3d 88 (D.C. Cir. 2004)).

[16] We refer to the following petitioners collectively as the "Deregulatory Petitioners":  Belo Corporation; Bonneville International Corporation; CBS Broadcasting, Inc.; CBS Corporation; Clear Channel Communications, Inc.; Coalition of Smaller Market Television Stations; Cox Enterprises, Inc.; Fox Television Stations, Inc.; Gannett Company, Inc.; Media General Inc.; Morris Communications Company, LLC; National Association of Broadcasters; Newspaper Association of America; Raycom Media Inc.; Sinclair Broadcast Group, Inc.; The Scranton Times, L.P.; and the Tribune Company.

### A.    Notice and Comment Process

In remanding the Commission's cross-media limits in *Prometheus I*, we advised that "any new 'metric' for measuring diversity and competition in a market be made subject to public notice and comment before it is incorporated into a final rule." 373 F.3d at 412. The FCC's "decision to withhold" its previous metric (the Diversity Index) from "public scrutiny was not without prejudice" to the public's ability to discuss and rebut it during comment, as evidenced by its significant flaws, and the Commission thus should have noticed the methodology publicly. *Id.* We noted that our remand would "give[] the Commission an opportunity to cure its questionable notice." *Id.* at 411.

Two years after our remand, in July 2006, the FCC issued a Further Notice of Proposed Rulemaking ("FNPR") to begin its 2006 Quadrennial Review and to request comments on how to address our remand. *2006 Quadrennial Regulatory Review—Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996, Further Notice of Proposed Rulemaking*, 21 F.C.C.R. 8834, 2006 WL 2067989 (July 24, 2006). The FNPR contained only the following paragraph directly relevant to revising the NBCO rule:

> We invite comment on all of the issues remanded by the *Prometheus* court regarding cross-ownership. Many of these issues relate to the [Diversity Index ("DI")]. In light of the court's extensive and detailed criticism of the DI, we tentatively conclude that the DI is an inaccurate tool for measuring diversity. Moreover, we recognize that some aspects of diversity may be difficult to quantify. To the extent that we will not use the DI to justify changes to the existing cross-ownership rules, we seek comment on how we should approach cross-ownership limits. *Should limits vary depending upon the characteristics of local markets? If so, what characteristics should be considered, and how should they be factored into any limits?* We seek comment on the newspaper/broadcast rule and the radio/television cross-ownership rule. Are there aspects of television and radio broadcast operations that make cross-ownership with a newspaper different for each of these media? If so, should limits on newspaper/radio combinations be different from limits on newspaper/television combinations? Lastly, are the newspaper/broadcast cross-ownership rule and the radio/television cross-ownership rule necessary in the public interest as a result of competition?

*FNPR* ¶ 32 (emphasis added).

Two commissioners dissented in part from the order adopting the FNPR, criticizing its "vague," "open-ended" nature and its failure to discuss proposals to foster minority and female ownership, among other "major flaws" and "infirmities." *Statement of Commissioner Jonathan S. Adelstein, Concurring in Part, Dissenting in Part*, 21 F.C.C.R. 8834, 8865-67, 2006 WL 2067989 (July 24, 2006). Commissioner Adelstein noted that the FNPR failed to give notice regarding any new metric for measuring diversity and that the Commission had not committed to allowing public comment before such a measuring device would be incorporated into "rules that are likely to change the media landscape for generations to come." *Id.* at 8866. Commissioner Copps similarly noted: "A transparent process is especially critical for issues of this magnitude when the Notice asks broad, general questions . . . . I do not see how we can be transparent and comply with the dictates of the Third Circuit [in *Prometheus I*] without letting the American people know about and comment on any new standards of measurement that we adopt in developing our ultimate decision." *Statement of Commissioner Michael J. Copps, Concurring in Part, Dissenting in Part*, 21 F.C.C.R. 8834, 8863, 2006 WL 2067989 (July 24, 2006).

Despite the brevity of the relevant portion of the FNPR, the FCC relied entirely on the two sentences emphasized in this single paragraph as providing adequate notice of the new NBCO rule adopted in its 2008 Order. FCC Br. 37. As its counsel reiterated at oral argument: "I want to emphasize that for APA purposes we think that Paragraph 32 of the further notice was sufficient, because all we have, all the agency is required to do is [set out] general issues." Oral Argument Transcript ("Tr.") 92; *see also* Tr. 87 ("Well[,] Paragraph 32 of the further notice . . . does have two sentences, but sentences that talk specifically to this question relevant to newspaper broadcast co-ownership."). Only when pressed at oral argument did counsel add that the 2003 Order and our decision in *Prometheus I* provided useful background for interested parties, but he stopped short of asserting that the FNPR incorporated the entire record that preceded it: "Indeed, I would say that . . . parties who are interested in any of these issues should have paid attention, not only to the Commission's 2003 order but to this court's opinion and to its instructions on remand in order to figure out what the Commission was going to deal with and had to deal with in the 2008 Order, because that was indeed in part a response to this court's order on remand." Tr. 94-95.

Following publication of the FNPR, there was an initial 90-day comment period and a further 60 days for reply comments. However, after that period, the procedures followed by the Commission were irregular. On November 22, 2006, the Commission announced that it had commissioned 10 economic studies. Both of the Commissioners who had dissented from the FNPR issued statements criticizing "the [poor] transparency of the process undertaken to develop the studies and select the authors," "the truncated period of time to complete the

studies," and the peer review process proposed. News Release, FCC, *Commissioner Adelstein's Comments on the FCC's Media Ownership Studies* (Nov. 22, 2006); News Release, FCC, *Commissioner Copps' Comments on the FCC's Media Ownership Studies* (Nov. 22, 2006).

On July 31, 2007, the FCC released the 10 studies (and large underlying data sets) and asked for comments on those studies to be filed 60 days later, with 15 additional days to submit reply comments. In a joint statement, Commissioners Copps and Adelstein criticized the short time for public comment given the volume of data released and raised questions about the peer review process.[17] In September 2007, about halfway through the comment period, the Commission released peer review analyses of the ownership studies and some additional underlying data. A few days later, Free Press, Consumer Federation of America, and Consumers Union filed a complaint with the Commission under the Data Quality Act ("DQA"), 44 U.S.C. § 3516. Free Press et al., *Complaint under the DQA and Motion for Extension of Time* (Sept. 11, 2007) ("First DQA Complaint"). It alleged that the Commission had (1) suppressed studies with results contrary to its purportedly predetermined goal of relaxing the ownership rules;[18] (2) violated the Office of Management and Budget's guidelines under the DQA, as well as the FCC's own guidelines implementing the DQA, because the FCC's peer review process was "woefully inadequate" and the results of its commissioned studies were not reproducible; and (3) failed to give peer reviewers and the public enough time to comment on the studies. *Id.* On November 1, 2007, the last day for reply comments on the studies, the FCC posted to its website several additional peer review comments, "revised" versions of four of the studies, and new peer review studies, but did not extend the time for public comment. Free Press, Consumer Federation of America, and Consumers Union responded by filing a second complaint alleging continued violations of the DQA and the APA. Free Press et al., *Second Complaint under the DQA and Motion for Extension of Time* (Nov. 9, 2007).

---

[17] "These are ten supposedly serious studies put together by teams of economists and analysts over an eight month period," the dissenting Commissioners noted, "[y]et the Commission expects the public to analyze all ten studies, and reams of underlying data, and file comments 60 days from today! This is unfair, unnecessary, and ultimately unwise . . . ." News Release, FCC, *Joint Statement of Commissioners Michael J. Copps and Jonathan S. Adelstein on Release of Media Ownership Studies* (July 31, 2007).

[18] After allegations that two studies were suppressed, the Commission authorized an Inspector General investigation and released what is purportedly "a controversial memorandum by [the] then-chief economist of the FCC that laid out a research strategy specifically designed to justify a preconceived goal—to repeal the newspaper-media cross-ownership rule." First DQA Complaint at 7.

22

Between October 2006 and November 2007, the Commission held six public hearings on media ownership in cities around the country. Citizen Petitioners object to the manner in which the final public hearing, held on November 12, 2007, was handled, as the hearing date and location (Seattle, Washington) were announced just 10 calendar days beforehand.

On November 13, 2007, then-FCC Chairman Kevin J. Martin published an Op-Ed in The New York Times unveiling his own proposal for a new NBCO rule. He simultaneously put out a Press Release (together, the "Op-Ed/Press Release") that set a 28-day deadline for the public to "comment" on his proposal. Responses were due December 11, 2007. Commissioners Copps and Adelstein objected to his decision.[19] On November 28, 2007, Chairman Martin circulated an internal draft of the Order to the other Commissioners.

The Op-Ed/Press Release generated much criticism. The Senate Committee on Commerce, Science, and Transportation, the FCC's oversight committee in the Senate, approved by unanimous consent a bill that, among other provisions, required the FCC to delay its vote on the proposal until a meaningful notice and comment period occurred for the NBCO rule. Media Ownership Act of 2007, S. 2332, 110th Cong. (2007).[20] A similar bill was introduced in the House of Representatives. Media Ownership Act of 2007, H.R. 4835,

---

[19] Their separate press release included the following statement regarding notice and comment:

> The Martin rules are clearly not ready for prime time. Under the Chairman's timetable, we count 19 working days for public comment. That is grossly insufficient. The American people should have a minimum of 90 days to comment, just as many Members of Congress have requested. . . .

> There is still time to do this the right way. Congress and the thousands of American citizens we have talked to want a thoughtful and deliberate rulemaking, not an alarming rush to judgment characterized by insultingly short notices for public hearings, inadequate time for public comment, flawed studies[,] and a tainted peer review process . . . .

News Release, FCC, *Joint Statement of Commissioners Copps and Adelstein on Chairman Martin's Cross Ownership Proposal* (Nov. 13, 2007). They also disputed Chairman Martin's characterization of his proposed rule, noting that "[t]he proposal could repeal the ban in every market in America, not just the top twenty . . . ." *Id.*

[20] S. 2332 would have required FCC publication of any proposal to modify, revise, or amend its ownership rules, followed by a 60-day comment period and 30 days for reply comments.

110th Cong. (2007) . On December 17, 2007, a bipartisan group of 25 Senators urged the FCC to delay its vote scheduled for the next day "to provide a reasonable period for comment" "that would normally accompany a rule change of this type," and threatened to revoke the new NBCO rule legislatively if the vote went ahead.[21]

The hours before the final vote were a scramble. The 2008 Order was not circulated to the Commissioners until 9:44 p.m. the night before the vote. Even that draft had sections missing. The Commissioners received a new version of the NBCO rule at 1:57 a.m. on the day of the vote. At 11:12 a.m. that same morning, another version of the NBCO rule was circulated that contained revisions to the four-factor test that would be employed in every case. Nevertheless, later that same day the Commission, by a three to two vote, adopted the 2008 Order and the Diversity Order.[22]

## B.    The FCC Failed to Meet the APA Notice and Comment Standard

### 1.    The APA Standard

The APA requires agencies to provide notice of proposed rulemaking that contains "either the terms or substance of the proposed rule or description of the subjects and issues involved." 5 U.S.C. § 553(b). Following notice, "the agency shall give interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments with or without opportunity for oral presentation." *Id.* § 553(c). As we stated in *Prometheus I*, "'the adequacy of the notice must be tested by determining whether it would fairly apprise interested persons of the 'subjects and issues' before the agency.'" 373 F.3d at 411 (citing *Am. Iron & Steel Inst. v. EPA*, 568 F.2d 284, 293 (3d Cir. 1977)).[23]

---

[21] "We believe this denies the American public any real ability for input and fails to reflect reasoned and transparent agency decision-making. Furthermore, we know you are aware that the Senate Commerce Committee has unanimously passed a piece of legislation asking you to defer action on December 18th. We believe you have shortchanged the comment process . . . ." Letter from 25 United States Senators to the FCC 1 (Dec. 14, 2007).

[22] In a nearly unanimous voice vote, the United States Senate passed a joint resolution disapproving the NBCO rule. S.J. Res. 28, 110th Cong. (2008).

[23] The FCC also points us to the logical outgrowth doctrine to assess its compliance with the APA. FCC Br. 38. Stated inversely, that doctrine asks if the "substance of an agency's final rule strays too far from the description contained in the initial notice . . . ." *Council Tree Commc'ns, Inc. v. FCC*, 619 F.3d 235, 249 (3d Cir. 2010). If so, the final rule is not a "logical outgrowth" of the rule proposed in the notice, and "the agency may have deprived interested persons of their statutory right to an opportunity to participate in the rulemaking."

24

To assess whether the public was fairly apprised of a new rule, a reviewing court asks "whether the purposes of notice and comment have been adequately served." *Am. Water Works Ass'n v. EPA*, 40 F.3d 1266, 1274 (D.C. Cir. 1994) (internal quotation and citation omitted); *see also Natural Res. Def. Council v. EPA*, 279 F.3d 1180, 1186 (9th Cir. 2002). Among the purposes of the APA's notice and comment requirements are "(1) to ensure that agency regulations are tested via exposure to diverse public comment, (2) to ensure fairness to affected parties, and (3) to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review." *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.,* 407 F.3d 1250, 1259 (D.C. Cir. 2005).  In addition, "a chance to comment . . . [enables] the agency [to] maintain[] a flexible and open-minded attitude towards its own rules.'" *McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1325 (D.C. Cir. 1988) (internal citation omitted).

To achieve those purposes,

> there must be an exchange of views, information, and criticism between interested persons and the agency. . . . Consequently, the notice required by the APA . . . must disclose in detail the thinking that has animated the form of a proposed rule and the data upon which that rule is based. . . . *[A]n agency proposing informal rulemaking has an obligation to make its views known to the public in a concrete and focused form so as to make criticism or formulation of alternatives possible.*

*Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35-36 (D.C. Cir. 1977) (emphasis added) (internal citations and footnotes omitted).

In sum, "[t]he opportunity for comment must be a meaningful opportunity." *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1101 (D.C. Cir. 2009).  That means enough time with enough information to comment and for the agency to consider and respond to the comments.

## 2.    Analysis of Compliance with the APA Standard

No party disputes that Chairman Martin's Op-Ed/Press Release did not satisfy the APA's notice requirements.  The proposal was not published in the Federal Register, the views expressed were those of one person and not the Commission, and the Commission

---

*Id*. However, the doctrine appears not to apply here because the NBCO rule in the 2008 Order is brand new.  "The logical outgrowth doctrine does not extend to a final rule that is a brand new rule, since something is not a logical outgrowth of nothing . . . ."  *Id.* at 250 (internal quotations and citations omitted).

25

voted days after substantive responses were filed, allowing little opportunity for meaningful consideration of the responses before the final rule was adopted. In effect conceding these points, the FCC states that the Op-Ed/Press Release is "immaterial" to its compliance with the APA's notice requirement. FCC Br. 38 n.10.

As noted earlier, the Commission relies on paragraph 32 of the FNPR to satisfy its notice obligations under the APA. *Id.* at 37. It argues that "[a] notice that contains no rule proposals complies with the APA so long as it is 'sufficient to fairly apprise interested parties of all significant subjects and issues involved.'" *Id.* (quoting *NVE, Inc. v. Dep't of Health & Human Servs.*, 436 F.3d 182, 191 (3d Cir. 2006)). However, an agency also "must 'describe the range of alternatives being considered with reasonable specificity. Otherwise, interested parties will not know what to comment on, and notice will not lead to better-informed agency decision-making.'" *Horsehead Res. Dev. Co., Inc. v. Browner*, 16 F.3d 1246, 1268 (D.C. Cir. 1994) (internal citations omitted).

On these facts, we cannot conclude that the Commission met this obligation, as we fail to see how the FNPR, with its two general questions related to the NBCO rule, and the irregular comment period that followed, satisfy the APA. The FNPR makes plain that the FCC was planning significant revision to the NBCO rule and looking for an alternative to the Diversity Index for measuring diversity. Paragraph 32 of the FNPR asks only whether cross-ownership limits should vary "depending upon the characteristics of local markets," and, "if so, what characteristics should be considered . . . ?"

While the new rule varies limits depending on characteristics of markets—specifically, market size and the number of media voices—it was not clear from the FNPR which characteristics the Commission was considering or why. The phrase "characteristics of markets" was too open-ended to allow for meaningful comment on the Commission's approach. In addition, many central elements of the rule are not based on "characteristics of markets" at all. For example, key aspects of the rule rely on: the amount of "local news" produced by an individual station involved in a potential merger and how that term is defined; the definition of "major media voices," including what counts as a major newspaper; how "market concentration" is measured; whether a station is "failing"; whether a station exercises "independent news judgment" and how that term is defined; and whether a case-by-case approach or a categorical approach to proposed mergers would better serve the public interest. The FNPR also did not solicit comment on the overall framework under consideration, how potential factors might operate together, or how the new approach might affect the FCC's other ownership rules. These were significant omissions.

Our dissenting colleague suggests that the FNPR subsumes the entire record surrounding the 2002 Biennial Review, including the 2002 Notice, the 2003 Order, and our decision in *Prometheus I*. As noted above, the FCC did not argue this. Rather, it contended

that "the four corners of [the FNPR were] sufficient" under the APA.  Tr. 88.  But even if the FNPR implicitly incorporated those sources, it still did not provide sufficient notice of the Commission's new approach to cross-ownership.  During the 2006 Quadrennial Review, the FCC departed entirely from its approach in the 2003 Order and adopted a rule with significant elements that were not previously noticed in 2002[24] or analyzed in the 2003 Order or our remand.  Although it was clear from those sources, taken together, that the Commission was planning to overhaul its approach to newspaper/broadcast cross-ownership, they did not contain enough information about what it was planning to do, or the options it was considering, to provide the public with a meaningful opportunity to comment.  Until Chairman Martin's November 2007 personal Op-Ed/Press Release, the public did not know even what options he was considering, let alone the Commission.

In further support of our conclusion, we note that the FNPR is sparse in comparison to the Commission's May 2010 Notice of Inquiry initiating its 2010 Quadrennial Review of the ownership rules.  *See 2010 Quadrennial Regulatory Review—Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996, Notice of Inquiry*, 25 F.C.C.R. 6086, 2010 WL 2110771 (May 25, 2010) (the "2010 NOI").  The 2010 NOI is much more specific and covers many more issues.  It contains many pages of questions regarding potential approaches to the NBCO rule, discusses data motivating the Commission's questions, and inquires into various regulatory options.  For example, it asks:

> With regard to the newspaper/broadcast cross-ownership rule, should the Commission treat newspaper-television combinations differently from newspaper-radio combinations, as we do in the 2006 presumptive standard?  Are some goals or metrics more relevant for one or the other type of combinations?  Are particular market participants more heavily affected by the rule?  Which elements of market structure are most important for measuring the effects of this rule on our policy goals?  Would relaxing the newspaper/broadcast cross-ownership rule result in economies of scale and scope that could help newspapers to survive?

---

[24] We note that the FNPR contrasts with the 2002 Notice, which "outline[d] . . . a variety of different approaches that might serve the public interest," 2002 Notice ¶ 34, and sought comment on them, while the FNPR did not present options or seek comment on different approaches.  *Compare* 2002 Notice ¶¶ 34-53 *with FNPR* ¶¶ 28-32.  Even with that, we still expressed concerns in *Prometheus I* about the 2002 Notice because of the FCC's failure to notice the methodology underlying its approach to cross-ownership in the 2003 Order.  373 F.3d at 411-12.

Alternatively, do the problems faced by newspapers result from extraneous factors that make relief in this area irrelevant? For example, statistics show that fewer people are reading newspapers and, instead, are increasingly getting news and information from nontraditional sources. Statistics also demonstrate an increase in the degree of penetration of new media, including online websites, and social media. Given the fragmentation of sources of news, would structural relief help newspapers sufficiently to result in a net gain in local news and information? Should any such relief operate via a revised rule or via a waiver standard? If the latter, what type of waiver standard should be applicable? Is the presumptive standard adopted in the *2006 Quadrennial Review Order* able to further our competition, diversity, and localism goals as well as result in economies of scale and scope that could help newspapers survive? Is a rule that relies on presumptions preferable in order to achieve our goals? What factors should a relaxed rule or waiver standard take into account? Should any relaxation of the rule continue to account for the number of voices in a community? For instance, is there a basis in the current marketplace for finding that cross-ownerships only in the largest markets would be in the public interest? Should it take into account market share of the media entities that would be combined? If the number of voices is relevant, how should voices be defined for this purpose?

2010 NOI ¶ 87; *see also id.* at ¶¶ 90-100 (detailing "structural" inquiries regarding use of "bright line rules," "case-by-case approach," "hybrid approach," and "broad cross-media approach"); *id.* at ¶¶ 101-06 (inquiring into effect of "digital contours" and "national broadband plan" on NBCO and other ownership rules).

Moreover, a comparison of the comments submitted during the official comment period (July 24, 2006 - January 16, 2007) and the responses to the Chairman's Op-Ed/Press Release (November 13, 2007 - December 11, 2007) indicates that interested parties were prejudiced by the inadequacy of the FNPR. During the official comment period, some commenters noted that their submission would be limited because the FNPR "makes no proposals and suggests no options." *Comments of UCC et al.*, MB Docket No. 06-121 at 60 (Oct. 23, 2006) ("*10/23/06 UCC Comments*"). Indeed, in an 87-page submission, there was only *one paragraph* on how a relaxed approach to cross-ownership "might work" if the FCC eliminated the existing ban, but over 11 pages discussing data on the benefits of retaining a ban and several more pages regarding closing "loopholes" in the ban. *10/23/06 UCC*

*Comments* at 61-74.  These comments, like many others, were largely limited to discussing whether the ban should be retained or eliminated.  *See, e.g.*, *Comments of Bonneville International Corp.*, MB Docket No. 06-121 at 15 (Oct. 23, 2006) (arguing that the ban should be eliminated); *Comments of Belo Corp.*, MB Docket No. 06-121 at 9-10 (Oct. 23, 2006) (same); *Comments of AFL-CIO*, MB Docket No. 06-121 at 57 (Oct. 23, 2006) (urging retention of the ban); *Comments of American Federation of Radio and Television Artists*, MB Docket No. 06-121 at 20-22 (Oct. 23, 2006) (same).  This occurred, we suspect, in large measure because a discussion of the actual issues involved—including the factors, presumptions, and exceptions the FCC was considering—was impossible based on the sparse FNPR.

In contrast, responses to Chairman Martin's Op-Ed/Press Release began to raise for the first time substantive issues with his new approach to cross-ownership.  For example, the response submitted by Consumers Union, Consumer Federation of America and Free Press on December 11, 2007 ("12/11/07 Response") began to discuss the following issues, among others, that had not been noticed in the FNPR: the eight-voices test and considerations regarding how it should be employed in a newspaper/broadcast cross-ownership rule; options for how market concentration should be measured if it is to be used as a factor in allowing mergers (which they argue is a new "metric" that had to be noticed under *Prometheus I* and was still too vague in the Op-Ed/Press Release for a meaningful response); the implications of the distinction between increased local news on a particular station (or merged entity) and increased local news production in the overall market (which they argue should be the appropriate level of analysis); and other perceived ambiguities in Chairman Martin's proposal that they argued could change the effects of the rule considerably depending on how various terms are defined and how the factors and presumptions work together.  12/11/07 Response at 12-39.  Regardless whether the FCC eventually rejected the views expressed in those responses (as it would have been free to do after considering them fully and with plausible reasoning after adequate notice), they merit consideration in a rulemaking of great public concern.

The APA requires that the public have a meaningful opportunity to submit data and written analysis regarding a proposed rulemaking.  5 U.S.C. § 553(c).  Yet, commenters did not have sufficient time to do so after the Op-Ed/Press Release.  The Chairman gave only 28 days for response, not the usual 90 days.  As Consumers Union, Consumer Federation of America, and Free Press stated, "[s]ince the time frame allowed for a response to the Chairman's off-the-cuff proposal was short, we rely primarily on the evidence already in the record."  12/11/07 Response at 17.  After the FCC began to formulate an approach to this important and complex rule, the public was entitled to "a new opportunity to comment" in which "commenters would [] have their first occasion to offer new and different criticisms which the Agency might find convincing."  *BASF Wyandotte Corp. v. Costle*, 598 F.2d 637,

642 (1st Cir. 1979); *see also Natural Res. Def. Council*, 279 F.3d at 1186.

In addition, the FCC had an obligation to remain "open-minded" about the issues raised and engage with the substantive responses submitted. *Rural Cellular Ass'n*, 588 F.3d at 1101 ("in order to satisfy [the APA], an agency must . . . remain sufficiently open-minded"); *McLouth Steel Products*, 838 F.2d at 1325. The timeline reveals, however, that the Commission could not have done so. Two weeks before the Chairman's response period closed, and before most of the responses were received, a draft of the order was circulated internally. The final vote occurred within a week of the response deadline. This is not the agency engagement the APA contemplates.

In this context, we have little choice but to conclude that the FCC did not, through the FNPR, fulfill its "obligation to make its views known to the public in a concrete and focused form so as to make criticism or formulation of alternatives possible." *Home Box Office,* 567 F.2d at 36. The two sentences in paragraph 32 of the FNPR are simply too general and open-ended to have fairly apprised the public of the Commission's new approach to cross-ownership. Criticism and the formulation of alternative options only began to be possible after the Chairman's Op-Ed/Press Release, and there is no dispute those documents did not satisfy the APA's requirements. For these reasons, we vacate and remand the NBCO rule for failure to comply with the APA's notice and comment requirements.[25] We expect the Commission to comply with this remand in the context of its ongoing 2010 Quadrennial Review.[26]

## C.    Permanent Waivers of Cross-Ownership Rule

In its 2008 Order, the FCC granted five permanent waivers of its NBCO rule—one to Gannett Company, Inc.'s newspaper/broadcast combination in Phoenix, Arizona, and four to Media General, Inc.'s combinations in Myrtle Beach-Florence, South Carolina; Columbus,

---

[25] Because we vacate the NBCO rule in the 2008 Order, the rule in existence prior to that order will remain in effect until the FCC promulgates new cross-ownership regulations. *See, e.g., Council Tree*, 619 F.3d at 258 ("vacating [an FCC] rule will mean that" the prior rule "will once again" govern the regulated activity); *Abington Mem. Hosp. v. Heckler*, 750 F.2d 242, 244 (3d Cir. 1984) ("vacating or rescinding invalidly promulgated regulations has the effect of reinstating prior regulations") (citing *Action on Smoking and Health v. CAB*, 713 F.2d 795, 797 (D.C. Cir. 1983)); *Paulsen v. Daniels*, 413 F.3d 999, 1008 (9th Cir. 2005) ("The effect of invalidating an agency rule is to reinstate the rule previously in force.").

[26] We note our dissenting colleague's concern that the 2010 Quadrennial Review be allowed "to run its course." Nothing in our decision today prevents the FCC from fulfilling its obligations on remand in the course of that ongoing review.

30

Georgia; Panama City, Florida; and in the Tri-Cities DMA in Tennessee/Virginia. *2008 Order* ¶ 77. Temporary waivers for these combinations were pending when the quadrennial review proceeding ended. The FCC justified its decision to grant these waivers on the ground that it took similar action in 1975, when it grandfathered certain combinations while imposing an outright ban. *Id.* It stated that "divestiture introduces the possibility of disruption for the industry and hardship for individual owners," and asserted that "the public interest warrants a waiver [in these cases] in light of the synergies that have already been achieved from the newspaper/broadcast station combination[s]." *Id.* (quotations and footnotes omitted).

Citizen Petitioners disagree, arguing that these waivers are unprecedented in number and scope. They also contend that the waivers are not analogous to those granted in 1975 because the combinations here were acquired in a post-regulatory world (that had been characterized by a complete ban before the mergers occurred). Although we have several concerns about these permanent waivers,[27] we conclude that we do not have jurisdiction to reach the merits of Citizen Petitioners' claims.

Under 47 U.S.C. § 405(a), a party seeking judicial review of an FCC "order, decision, report, or action" must file a petition for reconsideration if it "(1) was not a party to the proceedings resulting in such order, decision, report, or action, or (2) relies on questions of fact or law upon which the Commission . . . has been afforded no opportunity to pass." It is undisputed that Citizen Petitioners did not file a petition for reconsideration of the FCC's

---

[27]    Between 1975 (the year the newspaper/broadcast cross-ownership ban went into effect) and 2008 the FCC granted a total of four waivers. In the 2008 Order, it granted five, without articulating the standard it applied. We doubt that the Commission had the opportunity to consider fully the merits of the waivers—indeed, some of the Commissioners only had 12 hours' notice that the waivers would be included, as they were not added to the draft Order nor circulated to the full Commission until the night before the vote. This is particularly troubling because, by the FCC's own standards, the combinations are significant. Media General combined a top-four ranked network-affiliated television station and a daily newspaper in each of its four markets. As the FCC recognizes, top-four stations are "the most influential providers of local news [in a] market," and combinations involving them pose a heightened threat to diversity. *Id.* at ¶ 61. Similarly, Gannett acquired a top-ranked broadcast station and a daily newspaper.

We also have concerns about the propriety of the decision-making process. In the 10 months before the 2008 Order was adopted, representatives of Media General (which received four of the five waivers) visited or called the Commission 37 times. *See Media General Notice of Ex Parte Communication*, MB Docket Nos. 06-121 and 02-277 (Nov. 20, 2007).

grant of the waivers before seeking judicial review. Because we conclude that the FCC has not been afforded an opportunity to pass on Citizen Petitioners' objections to the permanent waivers, they have failed to meet the requirements of § 405(a)(2) and we lack jurisdiction to hear their challenge.[28]

Citizen Petitioners' arguments that the objections were before the Commission, or in the alternative that administrative exhaustion would be futile, do not persuade us otherwise. First, the Citizen Petitioners contend that, because the waivers were placed in the draft order the night before the vote, the Commission had the opportunity to consider the dissenting Commissioners' objections to granting the waivers, which are substantially similar to Citizen Petitioners' objections. Citizen Petitioners Reply Br. 23. They cite *Office of Communication of United Church of Christ v. FCC*, 465 F.2d 519 (D.C. Cir. 1972), in which judicial review was not precluded by § 405 because "the dissenting Commissioners . . . raise[d] the very argument pressed . . . by the [petitioners]," and thus the argument "was surely before the Commissioners at the time of their decision." *Id.* at 523.

We believe that case is distinguishable. Here, it is far from clear whether the full Commission considered the dissenters' arguments given the brief time for discussion between the introduction of the waivers into the Order and the vote. In addition, the two dissenting Commissioners' arguments against the waivers were short (one to two sentences each) and focused on the process by which these waivers were adopted rather than their substance. *See Dissenting Statement of Commissioner Michael J. Copps*, 23 F.C.C.R. at 2116 ; *Dissenting Statement of Commissioner Jonathan S. Adelstein*, 23 F.C.C.R. at 2124.

Second, Citizen Petitioners argue that it would be futile for them to seek reconsideration because the FCC majority has refused to address the concerns of the dissenting Commissioners and Common Cause, which filed a petition for reconsideration challenging the permanent waivers in March 2008. *See* Petition for Reconsideration. We are skeptical that the facts here establish the futility of reconsideration such that this rare exception should apply.

---

[28] The FCC and Deregulatory Petitioners argue that, if section 405(a) does not bar our review, we should construe Citizen Petitioners' challenge to the waivers as an objection to a licensing proceeding over which the D.C. Circuit Court has exclusive jurisdiction under section 402(b). Because the waivers were granted as a part of the 2008 Order, which does not grant or deny any licenses, we arguably have jurisdiction to hear Citizen Petitioners' claims. However, because they have failed to exhaust their remedies under section 405(a), we need not reach this claim.

It is true that the waiver requests had been before the FCC for some time prior to the 2008 Order. Media General and Gannett acquired the combinations at issue prior to 2001. *2008 Order* ¶ 77. They then requested temporary waivers during their license renewal proceedings. Free Press, a Citizen Petitioner, filed objections to the waiver requests. Those proceedings were still pending at the time the 2008 Order was issued. Subsequently, the FCC granted the license renewals and found that the issue of the temporary waivers had been rendered moot by the 2008 Order, which granted permanent waivers and thus effectively concluded the adjudicatory license-renewal proceedings. Free Press filed a timely petition for review of those license renewals in April 2008, which remains pending after more than three years.

Citizen Petitioners argue that the FCC is playing an administrative "shell game," and has denied Free Press's right to be heard by failing to address in the 2008 Order its licensing renewal objections when the Commission granted the waivers, and now failing to pass on Free Press's petition for review of the licenses. Citizen Petitioners Reply Br. 27. Even though the Commission failed to respond to the initial objections of Free Press, and has not acted on its petition for review of the license renewals, this is not the proceeding in which Free Press may seek relief from those decisions. Rather, it must challenge the FCC's licensing decisions in the Court of Appeals for the D.C. Circuit, which has exclusive jurisdiction over licensing proceedings under 47 U.S.C. § 402(b).

Third, that Common Cause (not a party to this action) filed a petition for reconsideration on which the FCC has yet to pass does not resolve matters. Citizen Petitioners claim that the lapse of time between that filing and this litigation (three years) demonstrates that the FCC has had the opportunity to rule on these arguments, and that further delaying judicial review is futile. Citizen Petitioners Reply Br. 23. Though a close question, we disagree. While at some time the FCC's delay in deciding Common Cause's petition would establish the futility of requiring administrative exhaustion, we do not think that time is now, as the FCC has informed us that it intends to consider Common Cause's petition "harmoniously with the [2010] Quadrennial Review." Memorandum from Austin C. Schlick, FCC General Counsel, to Marcia M. Waldron, Clerk, U.S. Court of Appeals for the Third Circuit 1 (Nov. 25, 2009).[29]

In this context, we conclude that we do not have jurisdiction to hear the Citizen Petitioner's challenge of these permanent waivers.

---

[29] Though we do not believe that enough time has elapsed for reconsideration to be rendered futile, such a time may come if, for example, the FCC fails to act by its self-imposed deadline.

33

## IV.   RADIO/TELEVISION CROSS-OWNERSHIP RULE

In the 2008 Order, the FCC retained its radio/television cross-ownership rule initially adopted in 1999.  In 2003, however, it determined that the rule was no longer necessary because the combination of the local ownership rules and the cross-media limits would provide sufficient protection of viewpoint diversity.  FCC Br. 70.  However, we invalidated the cross-media limits in *Prometheus I* because the Commission failed to "provide a reasoned analysis to support the limits that it chose."  373 F.3d at 397.  Thus, in the 2008 Order the FCC found it necessary to "adopt diversity protections to act in their place," and opted to retain the 1999 rule.  *2008 Order* ¶ 82.

That rule is that a party may: own up to two television stations and up to six radio stations, or one television station and seven radio stations, in a market where at least 20 independently owned media "voices" would remain post-merger; two television stations and up to four radio stations in a market where 10 independently owned media "voices" would remain; or two television stations and one radio station regardless of the number of media voices in the market.  *Id.* at ¶ 80 n.259.  Combinations that are otherwise permissible under this rule also may be limited by the local television and radio ownership rules.  *Id.*

Only Deregulatory Petitioners challenge the retention of this rule.  The National Association of Broadcasters ("NAB") and CBS argue that the FCC fails to provide an explanation for why the rule is necessary and sufficient to protect diversity of ownership in light of the existence of the local ownership rules that also protect diversity.  NAB Br. 60-61; CBS Br. 20-21.  We disagree, as the Commission has provided a reasoned explanation of its decision:

> The record does not indicate that local radio and television ownership limits provide sufficient protection to assure a diversity of viewpoints in those media markets.  Local service-specific limits are chiefly concerned with competition and rivalry among entities providing the same service.  In contrast, cross-ownership rules aim to maintain a vibrant marketplace of ideas to ensure a diversity of editorial content.  What the Commission said in 1999 remains true today – the fact that '[t]he public continues to rely on both radio and television for news and information' supports the conclusion that 'the two media both contribute to the 'marketplace of ideas' and compete in the same diversity market.'  Because the two media 'serve as substitutes at least to some degree for diversity purposes,' there remains a need to retain a cross-ownership rule 'to ensure that viewpoint diversity is adequately protected.'

34

*2008 Order* ¶ 84 (citations omitted).

NAB also argues that diversity of ownership does not necessarily promote viewpoint diversity—and may have the opposite effect. NAB Br. 60-61. Although the FCC does not dispute this, it notes that the record contained "evidence that commonly owned media outlets can also share (and promote) the same viewpoint." FCC Br. 71 (citing *2008 Order* ¶ 49). It noted further that the record provides examples of "existing media outlets, such as newspapers, introducing a new media outlet into the market, such as an Internet website, but using both outlets to provide the same local content for consumers." *2008 Order* ¶ 49 (citing *Comments of Consumers Union, et al.*, MB Docket No. 06-121 at 136-47 (Oct. 1, 2007); *Comments of AFL-CIO*, MB Docket No. 06-121 at 24-26, 28-29, 32 (Oct. 23, 2006) (stating that cross-owned media properties serve as cross-promotional vehicles rather than as independent editorial voices, citing examples in Austin, Texas and Los Angeles, California; *Comments of American Federation of Television and Radio Artists*, MB Docket No. 06-121 at 21-22 (Oct. 23, 2006) (stating that media conglomerates impose homogenous editorial views across commonly owned property)). We believe that, in this light, the FCC plausibly justified its position that "'diversification of ownership would enhance the possibility of achieving greater diversity of viewpoints.'" FCC Br. 71 (quoting *FCC v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775, 796 (1978) ("*NCCB*")).

CBS asserts that the rule is no longer in the public interest in light of record evidence that the media market is growing more diverse and competitive. CBS Br. 23-27. While the FCC acknowledged this trend, it found that "traditional media . . . are the most frequently used and most important sources of local and national news . . . ." *2008 Order* ¶ 57. Although CBS claims that a "revolution" has transpired "in the media marketplace," CBS Br. 21, the record supports the FCC's conclusion that new media such as the Internet and cable still do not outrank newspapers and broadcast stations as sources of local news. *2008 Order* ¶ 57 (citing Media Ownership Study No. 1 (indicating that "38.2 percent of all respondents consider broadcast television stations and 30.1 percent consider local newspapers 'the most important source of local news or local current affairs' whereas only 6.7 percent of all respondents say the same concerning the Internet")). Similarly, the FCC was justified in treating broadcasters differently than cable operators (which face no cross-ownership restrictions but must comply with local ownership rules) because "cable television is not nearly as significant a source of local news as the broadcast media," and therefore "mergers involving [those] systems do not pose a serious threat to viewpoint diversity." FCC Br. 73 (citing *2008 Order* ¶ 58; *Prometheus I*, 373 F.3d at 405).

Next, CBS analogizes this rule to a cable/broadcast cross-ownership rule invalidated by the D.C. Circuit Court in *Fox Television Stations, Inc.*, 280 F.3d 1027, 1048 (D.C. Cir. 2002). But the rule at issue in that case is distinguishable—here, the radio/broadcast rule

35

permits cross-ownership within limits; in *Fox*, cross-ownership was banned entirely. *Id.* at 1035. It was the rule's "across-the-board prohibition" that the Court found impossible to reconcile with the FCC's simultaneous finding that common ownership of two broadcast stations would not necessarily compromise diversity. *Id.* at 1052. Here there is no such conflict, and no complete ban.

Further, CBS complains that the rule "fails to meaningfully differentiate among markets" because the majority of markets have more than 20 voices. CBS Br. 22. We do not see the significance of this observation, as CBS "never explains why applying the least strict . . . limitation would be unreasonable." FCC Br. 74.

Finally, CBS objects that the rule treats radio stations as though they are equivalent to television stations in certain respects (*i.e.*, by allowing a substitution of one radio station for one television station in larger markets), while recognizing that radio stations have a lesser effect on diversity. CBS Br. 28. The FCC notes that this amounts to a challenge of the "eight outlet" ownership rule per market (see additional discussion in section V.B). FCC Br. 75. It argues that the limit on total outlets was "in keeping with its concern with the overall impact on the number of commonly-owned outlets within a local market." *Id.* The FCC also argues that it was reasonable to conclude that "broadcasters should have the flexibility to purchase an additional *radio* station instead of a second television station, since the latter would form a combination that would be[,] if anything[,] less worrisome from the standpoint of diversity." *Id.* (emphasis in original). We agree. As the Commission notes, it has "wide discretion" when making policy judgments such as this. *Id.* (citing *AT&T Corp. v. FCC*, 220 F.3d 607, 627 (D.C. Cir. 2000)).

## V.    LOCAL TELEVISION OWNERSHIP RULE

### A.    Retention of the Pre-2003 Rule

In 2003, the FCC relaxed the local television ownership rule to allow an entity to own two television stations in markets with 17 or fewer stations and three in markets with 18 or more stations (but retained the prohibition on combinations that include the top four stations in the market). In *Prometheus I*, we noted that these revised numerical limits on television station ownership assumed equal market shares among stations, which was unsupported by the record, and remanded for the Commission "to support and harmonize its rationale." 373 F.3d at 419-20.

In its 2008 Order, the FCC decided to retain the pre-2003 local television ownership rule. Under this rule,

an entity may own two television stations in the same [DMA] if:

36

> (1) the Grade B contours[30] of the stations do not overlap; or (2) at least one of the stations in the combination is not ranked among the top four stations in terms of audience share, *and* at least eight independently owned and operating commercial or non-commercial full-power broadcast television stations would remain in the DMA after the combination.

*2008 Order* ¶ 87 (emphasis in original).

As the FCC acknowledges, this decision represents a reversal from its 2003 determination that the rule was no longer necessary. Citing the explosion of media outlets since 1999, several Deregulatory Petitioners challenge the rule as overly restrictive. *See, e.g.,* Sinclair Br. 28-29; CBS Br. 33-39. Their arguments do not persuade us.

First, in the 2008 Order the FCC found that "eliminating the rule could harm competition among broadcast television stations in local markets." *2008 Order* ¶ 101. It did not ignore the "explosion" of media outlets in the industry; it simply concluded that, despite these changes, the rule remained "necessary in the public interest to protect competition for viewers and in local television advertising markets." *Id.* at ¶ 87.

Second, the FCC eliminated the rule in 2003 in part because it was "premised on the notion that only local TV stations contribute to viewpoint diversity and [did] not account for the contributions of other media . . . ." *2003 Order* ¶ 133. In 2008, the Commission clarified its rationale: while it acknowledged that "the local television ownership rule is no longer necessary to foster diversity because there are other outlets for diversity of viewpoint in local markets," it concluded that the rule was still necessary to promote competition among broadcast television stations. *2008 Order* ¶¶ 100, 101. Therefore, to the extent that the FCC decided that the rule was no longer necessary in the public interest because it was not necessary to promote diversity of viewpoint, that is no longer its justification. And, contrary to NAB's assertion that the FCC is conflating diversity and competition, the benefits of the latter are distinct—"[c]ompetition . . . provides an incentive to television stations to invest in better programming and to provide programming that is preferred by viewers," whereas the goal of diversity is to ensure that local media markets contain a variety of viewpoints. *Id.* at ¶ 97. Moreover, that the rule may advance the dual goals of competition and viewpoint diversity does not mean that the FCC's rationale—premised on competition alone—is

---

[30] A "Grade B station contour is the geographical representation of an area served by a specified television signal strength." FCC Br. 22 n.6 (citing 47 C.F.R. § 73.683). In other words, it is the radius within which the majority of people can receive the station's signal a majority of the time. *See* 47 C.F.R. § 73.684.

unreasonable.

CBS argues that the FCC acted arbitrarily and capriciously by failing to consider whether to allow triopolies (common ownership of three television stations) in large, diverse markets. CBS Br. 31. But, as the FCC points out, it is only obligated to give a rational reason for retaining existing limits as necessary in the public interest; it need not address other solutions to the same problem. FCC Br. 79 (citing *Ass'n of Public-Safety Commc'n Officials-Int'l, Inc. v. FCC* ("*APCO*"), 76 F.3d 395, 400 (D.C. Cir. 1996) ("[T]he fact that there are other solutions to a problem is irrelevant provided that the option selected is not irrational.") (quotations and citation omitted)). We believe the FCC has offered rational reasons for retaining this rule.

### B.      Retention of the "Top Four/Eight Voices" Test

As noted, the local television ownership rule specifies that an entity may own two television stations in a single market if (1) the signal contours do not overlap; *or* (2) at least one of the stations is not ranked among the top four *and* at least eight independently owned stations would remain operating in the market after the combination. *2008 Order* ¶ 87.

Several Deregulatory Petitioners challenge this part of the rule. Sinclair argues that the FCC fails to articulate why it has chosen eight voices as necessary to promote competition. Sinclair Br. 34. This is not true. The FCC explained that it chose "eight voices" to

> ensure that each market includes four stations affiliated with the four major networks in each market (*i.e.*, ABC, NBC, CBS, and Fox), plus at least an equal number of independently owned-and-operated broadcast television stations that are not affiliated with a major network. Preserving the independent ownership in each local market of four stations . . . will help to ensure that local television stations, spurred by competition, will provide dynamic and vibrant alternative fare, including local news and public affairs programming. . . . [T]he Commission . . . has found that there is generally a significant gap between the top four stations in a market and the remaining stations. In light of this concentration among the top four stations in most markets, we believe that it is prudent to require the presence of at least four (rather than two) competitors not affiliated with a major network in order to ensure vibrant competition in the local television marketplace.

38

*2008 Order* ¶ 99.   This was clearly a line-drawing exercise (which is "the agency's responsibility," *AT&T*, 220 F.3d at 627), and the FCC has reasonably explained its decision to draw the line at eight voices.

Sinclair also argues that retaining this rule violates the D.C. Circuit Court's mandate in *Sinclair Broadcast Group v. FCC*, 284 F.3d 148 (D.C. Cir. 2002).  In that case, the Court held that the FCC had "failed to demonstrate that its exclusion of non-broadcast media from the eight voices exception is 'necessary in the public interest' under § 202(h) of the 1996 [Telecommunications] Act," and rejected its diversity-of-viewpoint rationale. *Id.* at 165. Here, the FCC has offered a new and reasonable rationale for this policy choice— competition.  As it explained:

> The local television ownership rule counts only broadcast television stations as voices because the local television ownership rule is designed to preserve competition in the local television market.  The radio/television cross-ownership rule, by contrast, is designed to protect viewpoint diversity and thus takes into account a broader range of voices than does the local television rule.   Furthermore, we count more voices in the radio/television cross-ownership rule than in the newspaper/broadcast cross-ownership rule because newspapers and television station combinations involve the two most important types of sources for news and information.

*2008 Order* ¶ 80 n.259.  Contrary to NAB's claim, the FCC concluded that the rule does not depend on the effect of other video programming because the purpose of the rule is to promote competition among the stations themselves. FCC Br. 82 (citing *2008 Order* ¶ 101).

Finally, the FCC also provided rational explanations for preserving its "top four" exception.  Sinclair and CBS argue that the record lacks evidence that mergers or joint operations of top four stations harm competition (and fail to account for marketplace realities), and thus that this portion of the rule is unsupportable. Sinclair Br. 42-48; CBS Br. 39-46.  But, consistent with its 2003 Order, the FCC found that "combinations of top four stations should be prohibited because mergers of those stations would be the most deleterious to competition" that "would often result in a single firm with a significantly larger market share than the others" and "would reduce incentives to improve programming that appeals to mass audiences."  *2008 Order* ¶ 102.  It also found, as it did in its 2003 Order, that "a significant 'cushion' of audience share percentage points continues to separate the top four stations from the fifth-ranked stations."  *Id.*   We upheld the same determination in *Prometheus I*, 373 F.3d at 417-18 ( "[W]e must uphold an agency's line-drawing decision when it is supported by the evidence in the record. . . . Here there is ample evidence in the

39

record to support the Commission's restriction on combinations among the top-four stations as opposed the top-three or some other number."). We do so again here.

### C.    Declining to Tighten the Television "Duopoly Rule"

Citizen Petitioners argue that the FCC's decision not to tighten the duopoly component of the local television rule, which allows entities to own two television stations in some markets under the circumstances described above, was arbitrary and capricious. Citizen Petitioners Br. 43-47. They assert that the FCC failed to consider the effect of the transition to digital television, which allows stations to broadcast multiple streams of programming ("multicast") over a single channel (for example, a regular station and a high-definition station for the same station affiliate in a DMA) and generate new revenue without the need to purchase multiple stations in a single market. *Id.* at 45.

In its 2008 Order, the FCC rejected calls to tighten the duopoly rule, stating that "owning a second in-market station can result in substantial savings in overhead and management costs," and finding that "these potential significant benefits of duopolies . . . in markets with a plethora of diverse voices, outweigh commenters' . . . claims that duopolies harm diversity and competition." *2008 Order* ¶ 98. In its brief and at oral argument, the FCC addressed Citizen Petitioners' concerns by contending that the digital transition was not completed until June 2009, and it was reasonable to "move cautiously and not rely on an incomplete transition to a new technology as a basis for making the local television rule more restrictive." FCC Br. 84. It added that Citizen Petitioners are free to raise this issue in the 2010 Quadrennial Review. *Id.*

While it may have been preferable for the FCC to address the implications of the digital transition in the 2008 Order itself, we do not believe that its failure to do so amounts to arbitrary and capricious action. First, the digital transition was not complete at the time the 2008 Order was issued, so it is not clear that the FCC "entirely failed to consider an important aspect of the problem" as it existed during its 2006 Quadrennial Review. *State Farm,* 463 U.S. at 43. Second, the Commission based its decision to retain the rule on findings that the post-1999 rule has not been shown to harm competition among stations in local markets. Thus, the FCC did not need to promulgate a more restrictive rule just because entities may gain similar economies of scale and generate new revenue by multicasting. Finally, as mentioned by the FCC, Citizen Petitioners are free to raise this issue in the 2010 Quadrennial Review in light of the completed digital transition.[31]

---

[31] Citizen Petitioners also argue that the local television rule should be tightened because allowing duopolies has harmed minority and female ownership according to an FCC-Commissioned study. Citizen Petitioners Br. 49-50 (citing Allen S. Hammond, IV *et al.*, *The*

## VI.    LOCAL RADIO OWNERSHIP RULE

In its 2008 Order, the FCC retained its local radio ownership rule. *2008 Order* ¶ 110. That rule allows an entity to "own, operate, or control" from five to eight commercial radio stations, only three to five of which may be in the same service (AM/FM), depending on the number of full-power commercial and non-commercial stations in the market. *Id.* These limits were initially set by Congress as part of the 1996 Telecommunications Act and retained by the Commission in 2003. FCC Br. 84-85 (citing *2003 Order* ¶¶ 239, 294). In *Prometheus I*, we upheld the FCC's use of a numerical limits approach "'to guard against consolidation . . . and to ensure a market structure that fosters opportunities for new entry into radio broadcasting.'" 373 F.3d at 431-32 (citing *2003 Order* ¶ 291). However, we remanded its decision to retain the existing numerical limits because the FCC's rationale that they ensure equal-sized competitors did not adequately explain the limits chosen. *Id.* at 432-34.

In the 2008 Order, the FCC abandoned its justification from 2003. *2008 Order* ¶ 117. Instead, it "rest[ed its] decision on [the] conclusion that relaxing the rule to permit greater consolidation would be inconsistent with the Commission's public interest objectives of ensuring that the benefits of competition and diversity are realized in local radio markets," while "[m]aking the numerical limits more restrictive would be inconsistent with Congress' decision to relax the local radio ownership limits in the 1996 Telecommunications Act and would disserve the public interest by unduly disrupting the radio broadcasting industry." *Id.* To support this balancing rationale, the FCC pointed to statistics that show significant consolidation in the radio broadcast industry and an increase in advertising rates after 1996,[32] while recognizing that prior to 1996 "the local radio ownership rules did not effectively recognize that a certain level of consolidation can be efficient" and any tightening of the rules would result in widespread divestitures, "undermine settled expectations," and "thus be a significant shock to the market." *Id.* at ¶¶ 119, 120. Given these findings, and the guidance provided by Congress in the 1996 Telecommunications Act, the FCC has demonstrated that

---

*Impact of the FCC's TV Duopoly Rule Relaxation on Minority & Women Owned Broadcast Stations, 1999-2006* (June 2007) ("Media Ownership Study 8"). However, the study they cite was discounted by the FCC because a peer review concluded that it suffered from serious logical flaws. FCC Br. 102 n.32 (referring to Congressional Research Service Report, *The FCC's 10 Commissioned Economic Research Studies on Media Ownership: Policy Implications* 34 (Dec. 5, 2007) ("CRS Report")) (noting, among other factors, the failure of Media Ownership Study 8 to control for elimination of a minority tax certificate program)).

[32] For example, the number of commercial radio station owners declined 39% between 1996 and 2007, and the largest commercial firm in each market has, on average, 46% of that market's total radio advertising revenue, while the top two have 74%. *Id.* at ¶ 118.

the existing numerical limits are necessary in the public interest.

Clear Channel contends that the FCC ignored record evidence and failed to support its decision with reasoned analysis. Clear Channel Br. 17. We disagree. The Commission cited the very study Clear Channel claims it ignored (finding that consolidation has no effect on advertising prices), but it chose to credit another study in the record that reached the opposite conclusion (consolidation caused advertising prices to double). FCC Br. 87. Also, the FCC did not rely on an "irrelevant consideration" when it noted an increase in radio consolidation at the national level (as opposed to within local markets), because record evidence shows (and the Commission cited) significant consolidation in local markets as well. FCC Br. 87-88 (citing *2008 Order* ¶ 118). Also contrary to Clear Channel's contentions, the FCC was not required to demonstrate that its rule was superior to that proposed by Clear Channel, but rather that its chosen rule was based on "reasoned analysis supported by the evidence before the Commission." *APCO*, 76 F.3d at 398.

The FCC was also justified in retaining the AM/FM "subcaps." It adopted the subcaps to "'prevent one entity from putting together a powerful combination of stations in a single service that may enjoy an advantage over stations in a different service.'" FCC Br. 89 (quoting *Revision of Radio Rules and Policies*, 7 F.C.C.R. 2755, 2778, ¶ 44 (1992)). In *Prometheus I*, we upheld the subcap on FM stations but ruled that the FCC had failed to explain adequately its decision to retain the subcap on AM ownership and requested it to do so on remand. 373 F.3d at 434-35.

In the 2008 Order the FCC provided an adequate explanation. Specifically, it recognized the "significant technical and marketplace differences between AM and FM stations," and found that eliminating the subcaps "would be inconsistent with our interest in protecting competition in local radio markets." *2008 Order* ¶ 134. And, while the Commission acknowledged that "in many cases, these differences between AM and FM stations militate solely in favor of FM ownership limits due to factors such as AM stations' lesser bandwidth, inferior audio signal, and smaller radio audiences," it found that there was evidence supporting AM limits as well. *Id.* "For example, . . . AM stations are ranked number one in 11 of the [top-50 markets], and . . . seven additional top-50 markets had AM stations rated among the top three stations. Thus, in certain local markets with top-ranked AM stations," the FCC found that "the AM subcaps are necessary to prevent excessive market power from being concentrated in the hands of one station owner." *Id.* There were also comments in the record warning that "'large companies could bid up the price of AM stations and further erode th[e] abysmally low representation' of minority and female radio station owners." *Id.* at ¶ 133 n.423 (citing *10/23/06 UCC Comments* at 85). Together these findings are adequate to justify maintaining the cap on AM ownership, as there was evidence in the record that AM stations are significant radio voices in many of the top markets, and

that their further consolidation could injure the public interest, including harm to the goal of promoting minority and female ownership.

Finally, we disagree with Clear Channel's contention that the transition to digital radio will obviate any perceived differences between AM and FM stations, and therefore the need for subcaps. First, digital radio is still in its early stages. As the FCC points out, as of July 2009 only 6% of AM radio stations were authorized to transmit digital signals. FCC Br. 91 n.27. Also, its 2008 Order recognized that the digital transition may actually exacerbate the technical differences between AM and FM stations because "FM stations have rights to more spectrum and are further along in their digital transition." *2008 Order* ¶ 132 (citing *10/23/06 UCC Comments* at 84). Although the digital transition may ultimately have a significant effect on the technological and economic advantages of FM stations, it has not yet done so. Thus, the FCC was justified in declining to rely on it in evaluating this rule.

## VII.    RETENTION OF THE DUAL NETWORK RULE

In its 2008 Order, the FCC retained its dual network rule, which "permits common ownership of multiple broadcast networks, but prohibits a merger between or among the 'top four' networks." *2008 Order* ¶ 139. The FCC determined that the rule was still necessary in the public interest because the "vertical integration of each of the top four networks," and their operation as a "strategic group in the national advertising market," raise concerns that mergers would allow the merged firm to "reduce its program purchases and/or the price it pays for programming." *Id*. at ¶ 140. The FCC reasoned that "these competitive harms would reduce program output, choices, quality, and innovation to the detriment of viewers." *Id.* It also concluded that such mergers would harm localism, because it would "reduce the ability of affiliates to bargain with the network for favorable terms of affiliation, reducing affiliates' influence on network programming, and thereby diminishing the ability of the affiliates to serve their communities." *Id.*

This rule was not challenged in *Prometheus I*. Very few parties filed comments advocating for a relaxation of the rule, and but two—Fox and CBS—suggested repeal. Only CBS now challenges the rule before us by asserting that the FCC "failed to identify the characteristics that make the four named networks unique" or "why the networks' supposed 'uniqueness' should result in a regulatory disadvantage . . . ." CBS Br. 47. We disagree.

As outlined above, the FCC identified several unique features of the four networks—including their vertical integration and operation as a strategic group. *See 2008 Order* ¶ 139. In addition, it noted that the "top four networks supply their affiliated local stations with programming intended to attract mass audiences and advertisers that want to reach such a large, nationwide audience. By contrast, the emerging networks target more specialized, niche audiences similar to cable television networks." *Id.* at ¶ 139 n.439.

We also disagree with CBS that the variety of broadcast and cable networks makes the rule unnecessary. CBS Br. 49. As the FCC reasoned, "the four largest broadcast networks serve a unique role in the electronic media and . . . no other networks, cable or broadcast, reach nearly as large an audience as they do." *Id.* at ¶ 141 n.451. Therefore, even though the FCC has elsewhere described today's media marketplace as "dynamic" and "competitive," it was not inconsistent to retain the dual network rule based in part on the harm to competition that would result from mergers of the top four networks. *See id.*; CBS Br. 50; FCC Br. 96.

## VIII. CONSTITUTIONALITY OF MEDIA OWNERSHIP RULES

Deregulatory Petitioners argue that all of the FCC's media ownership rules are unconstitutional. *See* Media General Br. 40-60; Cox Br. 39-49; CBS Br. 53-59; Tribune Br. 32-33, 39-40, 47-50; NAA Br. 44; Clear Channel Br. 33-38; Sinclair Br. 49-52. Primarily, as they did in *Prometheus I*, Deregulatory Petitioners ask us to overturn the "scarcity" doctrine. That doctrine establishes that "[i]In light of [their] physical scarcity, Government allocation and regulation of broadcast frequencies are essential . . . ." *NCCB*, 436 U.S. at 799. We continue to "decline [Deregulatory Petitioners'] invitation to disregard precedent." *Prometheus I*, 373 F.3d at 401. "The abundance of non-broadcast media does not render the broadcast spectrum any less scarce." *Id.* at 402. The Supreme Court's justification for the scarcity doctrine remains as true today as it was in 2004—indeed, in 1975— "many more people would like to access the [broadcast spectrum] than can be accommodated." *Id.* (citing *NCCB*, 436 U.S. at 799).

We agree with the FCC that the rules do not violate the First Amendment because they are rationally related to substantial government interests in promoting competition and protecting viewpoint diversity. FCC Br. 97 (citing *NCCB*, 436 U.S. at 799-800 (upholding substantial government interests in promoting diversified mass communications and viewpoint diversity)). In *NCCB*, the Court said that limiting common ownership was a reasonable means of promoting these interests. *NCCB*, 436 U.S. at 796. Therefore, as we did in *Prometheus I*, we hold that the "Commission's continued regulation of the common ownership of newspapers and broadcasters does not violate the First Amendment rights of either." 373 F.3d at 402.

There is no basis for CBS and Clear Channel's First Amendment claims that the media ownership rules are impermissible attempts by the FCC to manipulate content. CBS Br. 55-56; Clear Channel Br. 36-37. These rules apply regardless of the content of programming. We also disagree with Sinclair's assertion that the local television ownership rule violates the First Amendment because it "singles out television stations." Sinclair Br. 49. The D.C. Circuit Court rejected this argument in *Sinclair*, as do we for the same reasons. 284 F.3d at 168.

44

Although we remand the NBCO rule on other grounds, we deem lacking in merit Media General and Cox's argument that the rule violates their rights to equal protection under the Fifth Amendment by treating newspapers differently from other media. Media General Br. 56-60; Cox Br. 46-49. The Supreme Court has upheld this treatment, as we recognized in *Prometheus I*, and we are bound by that precedent. 373 F.3d at 401 (citing *NCCB*, 436 U.S. at 801-02 (upholding the constitutionality of the 1975 newspaper/broadcast cross-ownership ban)). Similarly, it was not unconstitutional for the FCC to decline to regulate ownership of non-broadcast media; we still "cannot [assume] that these media outlets contribute significantly to viewpoint diversity as sources of *local* news and information." *Id.* (emphasis in original). In any event, "it is the Supreme Court's prerogative to change its own precedent." *Id.* (citations omitted).

## IX.    THE DIVERSITY ORDER AND THE ISSUE OF MINORITY AND WOMEN BROADCAST OWNERSHIP

### A.    *Prometheus I* Remand on Minority and Women Ownership Issues

In *Prometheus I* we remanded two of the Commission's decisions dealing with broadcast ownership by minorities and women, and issued a caution regarding a third. First, we held that the 2003 Order had arbitrarily repealed the Commission's only rule—the failed station solicitation rule ("FSSR")—directed at enhancing minority ownership, while also failing to consider the effects of its other rules on minority and female ownership more broadly. The FCC adopted the FSSR during its review of its local television duopoly rule "[t]o alleviate concerns that its decision to allow duopolies would undermine television station ownership by minorities." *Prometheus I*, 373 F.3d at 420. The FSSR required applicants seeking waivers of the local television rule's requirements "to provide notice of the sale to potential out-of-market buyers before it could sell the failed, failing, or unbuilt television station to an in-market buyer." *Id.* We concluded that the FCC's repeal of the FSSR in its 2003 Order was arbitrary and capricious under the APA:

> By failing to mention anything about the effect [the repeal of the FSSR] would have on potential minority station owners, the Commission has not provided "a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored." *Greater Boston TV Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970). Furthermore, while the Commission had promised in 1999 to "expand opportunities for minorities and women to enter the broadcast industry," . . . the FSSR remained its only policy specifically aimed at fostering minority television station ownership. In repealing the FSSR without any discussion of the effect of its decision on minority

> television station ownership (and without ever acknowledging
> the decline in minority station ownership notwithstanding the
> FSSR), the Commission "entirely failed to consider an important
> aspect of the problem," and this amounts to arbitrary and
> capricious rulemaking. *State Farm,* 463 U.S. at 43. . . . For
> correction of this omission, we remand.

*Id.* at 420-21 (internal footnotes and parallel citations omitted). We noted that "[r]epealing
[the Commission's] only regulatory provision that promoted minority television station
ownership without considering the repeal's effect on minority ownership is also inconsistent
with the Commission's obligation to make the broadcast spectrum available to all people
'without discrimination on the basis of race.'" *Id.* at 421, n.58 (citing 47 U.S.C. § 151).

Second, we concluded that the FCC failed to consider proposals to promote minority
broadcast ownership that the MMTC had submitted during the 2002 Biennial Review (the
"MMTC Proposals"). The 2003 Order had proposed a separate proceeding to address
proposals for advancing minority and disadvantaged businesses and promoting diversity in
broadcasting. *See* 2003 Order ¶¶ 49-50 (promising to issue a Notice of Proposed
Rulemaking to address the MMTC's 13 specific proposals). We remanded the Commission's
decision to defer consideration of these proposals and stated that it should address them at the
same time that it addressed its ownership rules remanded from the 2003 Order. *Prometheus
I*, 373 F.3d at 421, n.59.

Finally, we declined to accept Citizen Petitioners' concerns regarding the FCC's new
transfer rule that prohibited "the transfer or sale of grandfathered [radio/television]
combinations that violate its local ownership limits except to certain 'eligible entities' that
qualify as small businesses." *Id.* at 427. In upholding the transfer rule, we rejected as
premature "Citizen Petitioners' contention that the Commission should have chosen 'socially
and economically disadvantaged businesses' (SDBs) as the waiver-eligible class instead of
Small Business Administration-defined small businesses." *Id.* at 428, n.70. We reached that
conclusion because the FCC had "noted that, because of pending legislation, the definition of
SDBs is currently too uncertain to be the basis of its regulation." *Id.* However, we noted that
we expected a long-awaited SDB definition to be forthcoming:

> We anticipate, however, that by the next [2006] quadrennial
> review the Commission will have the benefit of a stable
> definition of SDBs, as well as several years of implementation
> experience, to help it reevaluate whether an SDB-based waiver
> will better promote the Commission's diversity objectives
> [compared to the revenue-based definition of eligible entities
> being used].

46

*Id.* at 428, n.70.

### B.  Rulemaking Process regarding Minority and Female Ownership Issues during the 2006 Quadrennial Review

#### 1.    The FNPR in 2006 and Second FNPR in 2007

As discussed above, the Commission issued its FNPR in 2006, approximately two years after our remand in *Prometheus I*.  The two Commissioners who dissented in part from the order adopting the FNPR lamented its failure to discuss proposals to foster minority and female ownership.[33]  Shortly thereafter, in August 2006, the Diversity and Competition Supporters ("DCS") filed a motion for withdrawal of the 2006 FNPR and issuance of a revised FNPR.  *See* DCS, *Motion for Withdrawal of the Further Notice of Proposed Rulemaking and for the Issuance of a Revised Further Notice* (Aug. 23, 2006) (the "DCS Motion").  The DCS Motion argued that, among other failings, the FNPR lacked discussion of the MMTC Proposals and the SDB definition that our *Prometheus I* decision stated the Commission should consider during the course of its next rulemaking.

One year later, the FCC issued a Second Further Notice of Proposed Rulemaking ("Second FNPR") focused on minority and female ownership issues.  *2006 Quadrennial Regulatory Review—Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996, Second Further Notice of Proposed Rulemaking*, 22 F.C.C.R. 14215, 2007 WL 2212878 (Aug. 1, 2007).  The Second FNPR acknowledged the DCS Motion and agreed to "set forth in greater detail" the MMTC Proposals.  *Id.* at ¶ 2.[34]  It also recognized the DCS's argument that "the concept of SDBs is central to most of the minority ownership initiatives proposed in the 2002 biennial review proceeding," and "without a definition for SDBs, the Commission cannot

---

[33] Commissioner Copps remarked that "if all we can do is ask a few pat questions and then sweep this issue under the rug one more time, we are not laying the groundwork for progress."  *Copps*, *Concurring in Part, Dissenting in Part*, 21 F.C.C.R. at 8864.  He noted that the FNPR would set the Commission on track to repeat the omissions that caused us to remand these same proposals in 2004:  "[T]his item fails to commit to specific efforts to advance ownership by minorities.  The Third Circuit" had remanded the Commission's earlier decision "sidelining proposals to advance minority ownership.  Despite this, all we can muster up here are a few questions about this glaring challenge."  *Id.*

[34] Specifically, it invited comment on (1) the MMTC Proposals submitted for consideration in the 2002 biennial review proceeding; (2) the MMTC Proposals listed in the 2003 Order that we instructed the Commission to address on remand; and (3) "media-related recommendations of the [FCC's advisory] Diversity Committee."  *Id.* at ¶ 10.

effectively evaluate the existing small business cluster transfer policy or its other proposals, as remanded by the *Prometheus* court." *Id.* at ¶ 7. Further, the Second FNPR noted the contention that "the SDB definition has already been fully briefed in the Commission's proceeding examining market entry barriers," in which public comment was solicited "on constitutionally permissible ways to further the [Commission's ownership-diversity related] mandates . . . ." *Id.* at ¶ 8 (citing § 257 of the 1996 Telecommunications Act and 47 U.S.C. §309(j)(3)(b)). However, it did not provide descriptions of any existing proposals for SDB definitions (as it did for the MMTC Proposals) or discuss the Commission's analysis of existing briefing on those proposals' constitutionality or efficacy. Instead, it merely called for general "comment on MMTC's proposal that the Commission define SDBs for purposes of analyzing policy initiatives in support of media ownership diversity." *Id.* at ¶ 9.[35]

Finally, the Second FNPR sought comment on "the extent to which the FSSR or another construction of the rule could promote minority and female ownership;" on how proposals regarding minority and female ownership "would satisfy constitutional standards" in light of the Supreme Court's ruling in *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200 (1995);[36] and on "the Commission's statutory authority to address issues of minority and female ownership." *Second FNPR* ¶¶ 12, 13, 14.

Several of the FCC-commissioned economic research studies on media ownership, discussed above in regard to notice of the NBCO rule, attempted to address minority and female ownership issues. However, as the Congressional Research Service ("CRS") concluded, "all the researchers (and the peer reviewers) agree that the FCC's databases on minority and female ownership are inaccurate and incomplete and their use for policy analysis would be fraught with risk." CRS Report at 54. The CRS Report noted that the FCC would have difficulty complying with our remand with its existing data. "In its *Prometheus* decision, the Third Circuit instructed the FCC to consider the impact of changes

---

[35] The Second FNPR again asked "that commenters address whether use of a proposed definition raises any constitutional concerns, practical concerns, or other considerations . . . ." *Id.* It also consolidated the docket from an earlier proceeding in which this issue had been briefed "with our review of the media ownership rules" in order "[t]o ensure full consideration of this issue." *Id.*

[36] The Commission noted that "*Adarand* requires that governmental classifications based on race must be analyzed under strict scrutiny," and that the *Adarand* standard "was reaffirmed in the Supreme Court's decision upholding student body diversity in the context of higher education." *Second FNPR* ¶ 13 (citing *Adarand*, 515 U.S. 200; *Grutter v. Bollinger*, 539 U.S. 306 (2003); *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701 (2007)).

48

in its media ownership rules on minority ownership. Without accurate data on minority (and female) ownership, it is impossible to perform such analysis." *Id.* at 55.[37]

## C.    The Diversity Order and Third FNPR in 2008

The Commission's 2008 Order reinstated the FSSR as a component of the local television rule. *2008 Order* ¶¶ 105, 109 (reinstating the rule and granting petitions for "reconsideration of our decision to eliminate the [FSSR]"). Separately, the FCC adopted the Diversity Order. That Order adopted 13 proposals submitted during the rulemaking proceeding, with modifications, and rejected 10 other proposals. *See Diversity Order* ¶¶ 10-79. It also sought comment on nine additional proposals in the attached Third FNPR. *Id.* at ¶¶ 80-101. The majority of the adopted proposals use the same "eligible entity" definition we anticipated would change in *Prometheus I*. The Commission did not consider proposed SDB definitions, but sought further comment on "whether we can or should expand" the eligible entity definition. *Id.* at ¶ 80.

Most of the proposals adopted in the Diversity Order are designed to expand opportunities for "eligible entities," as defined by the SBA standards for industry groupings based on revenue.[38] Others include a "zero tolerance" policy for ownership fraud and a ban on discrimination in broadcast transactions, the latter of which requires broadcasters to certify that they did not discriminate when selling a station. In other words, the proposals that the FCC adopted are either targeted at small businesses as such, or reinforce existing prohibitions against discrimination.

The Commission rejected 10 sets of proposals advocated by DCS and Rainbow/Push Coalition. *Id.* at ¶¶ 65-79. It did not address proposals offering race- and gender-neutral means to increase opportunities for minority and female ownership put forward by UCC and

---

[37] It also noted that "[t]he same problem arises with respect to the impact of each and every media ownership rule on minority and female ownership," which makes all of the FCC's media ownership rules vulnerable to being overturned "until the Commission has developed a minority ownership database of sufficient accuracy to allow for reliable testing of the impact of the rules on minority ownership." *Id.* (internal footnotes omitted).

[38] According to the Diversity Order, the SBA "defines as a small business a television broadcasting station that has no more than $13 million in annual receipts and a radio broadcasting entity that has no more than $6.5 million in annual receipts." *Id.* at ¶ 6. The SBA also considers revenue of parent companies, and eligible entities must satisfy "several control tests" to "ensure that ultimate control rests in an eligible entity that satisfies the revenue criteria." *Id.*

Free Press.[39]  It also did not consider multiple proposals before it that urged use of non-revenue based definitions of eligible entities, such as SDBs.  The Commission offered a constitutional avoidance rationale to justify limiting its consideration of eligible entity definitions, essentially arguing that it was sensible to avoid "constitutional difficulties that might create impediments to the timely implementation" of its new rules, even though the constitutional issue had already been the subject of two rounds of notice and comment.  *Id.* at ¶ 9.  Instead, as noted, the attached Third FNPR sought comment once again regarding these proposals.  *Id.* (seeking "comment on whether [the FCC] should adopt an alternative definition of 'eligible entity' that would specifically identify [minorities and women]").

Commissioners Copps and Adelstein both concurred in part and dissented in part from the Diversity Order.  Their dissents emphasized: (1) the poor and worsening state of minority and female ownership, Copps, *Diversity Order Dissent in Part*, 23 F.C.C.R at 5982 ("Racial and ethnic minorities make up 33 percent of our population.  They own a scant 3 percent of all full-power commercial TV stations.  And that number is plummeting."); (2) the Commission's lack of data and failure to make efforts to collect the data required for informed policy-making in this area, *id.* at 5983 ("We should have started by getting an accurate count of minority and female ownership—the one that the Congressional Research Service and the Government Accountability Office both just found that we didn't have. . . . [W]e don't even know how many minority and female owners there are . . . ."); (3) the Commission's slowness regarding the issue of diversifying broadcast ownership despite its statutory mandate to do so, Adelstein, *Diversity Order Dissent in Part*, 23 F.C.C.R at 5986; (4) its failure to consider proposals that address minority and female ownership directly (such as those using non-revenue based definitions of eligible entities), *id.* at 5986-88; (5) the unsupported "eligible entity" definition adopted, *id.* at 5987; and (6) the Commission's failure to consider the potential harms the Diversity Order might have on the groups it purports to help, *id.*

## D.    The Eligible Entity Definition is Arbitrary and Capricious

At a minimum, in adopting or modifying its rules the FCC must "examine the relevant data and articulate a satisfactory explanation for its action[,] including a 'rational connection between the facts found and the choice made.'"  *State Farm*, 463 U.S. at 43 (internal quotation omitted).  Citizen Petitioners assert that the Diversity Order does not analyze the adopted proposals' effectiveness and presents no reliable data supporting the eligible entity definition chosen to achieve the stated goal of the rulemaking exercise—increasing broadcast

---

[39] These largely called for tightening and enforcing media ownership limits, instead of relaxing them or retaining existing limits, to increase ownership opportunities for minorities and women.

ownership by minorities and women.  Citizen Petitioners Br. 53.  We agree that the Commission has not demonstrated that the eligible entity definition in the Diversity Order is based on "reasoned analysis supported by the evidence before the Commission." *APCO*, 76 F.3d at 398.

First and foremost, the Diversity Order does not explain how the eligible entity definition adopted would increase broadcast ownership by minorities and women.  In the two paragraphs that discuss the definition adopted, the Commission refers only to "small businesses," and occasionally "new entrants," as expected beneficiaries.  *Diversity Order* ¶¶ 6-7.  The remaining two paragraphs of the FCC's discussion (1) challenge the contention that ownership by minorities and women might be diminished by the chosen eligible entity definition,[40] and (2) seek comment on taking action that would "increase the ownership of broadcast stations by minorities and women specifically."  *Id.* at ¶¶ 8-9.  Nowhere in its discussion does the FCC support its conclusion that this definition "will be effective in creating new opportunities for broadcast ownership by . . . women and minorities." *Id.* at ¶ 9.

Second, it is hard to understand how measures using this definition would achieve the stated goal.  For example, by the Commission's own calculations, minorities comprise 8.5% of commercial radio station owners that qualify as small businesses, but 7.78% of the commercial radio industry as a whole—a difference of less than 1%.  *See id.* at ¶ 8.  Thus, these measures cannot be expected to have much effect on minority ownership.

Third, the Commission referenced *no* data on television ownership by minorities or women and *no* data regarding commercial radio ownership by women.  This is because, as the Commission has since conceded, it has no accurate data to cite.  In May 2009, it published a Report and Order and Fourth Further Notice of Proposed Rulemaking addressing this issue.  *See Promoting Diversification of Ownership in the Broadcasting Services*, *2006 Quadrennial Regulatory Review—Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996, Report and Order and Third Further Notice of Proposed Rulemaking*, 24 F.C.C.R. 5896, 2009 WL 1229684 (May 5, 2009) ("Fourth FNPR").  It states:

---

[40] In those two paragraphs, the Commission "disagree[d] . . . that adoption of this small business classification 'would actually be regressive and serve to *diminish* minority ownership.'"  *Id.* at ¶ 8 (emphasis in original).  It took issue with Free Press's data that "purport to show that minority owned commercial radio stations are less well represented among SBA-defined small businesses (5.88 percent) than they are in the industry as a whole (7.78 percent)."  *Id*.  It argued that the correct interpretation of that data indicates that "at least 8.5 percent, not 5.88 percent, of commercial radio stations owned by SBA-defined small businesses are minority owned."  *Id*.

51

> The Commission has long sought to promote broadcast station ownership by minorities and women in order to foster diversity in broadcasting.   Although some of the Commission's initiatives—such as the now-repealed minority tax certificate program—have had beneficial effects, the overall level of minority and female ownership in the broadcast industry remains dismal.  Unfortunately, the *Commission currently does not possess reliable data* on the precise status of minority and female ownership—data that we will need to establish and maintain effective policies over time . . . .

*Fourth FNPR* ¶ 1 (internal footnotes omitted) (emphasis added); *see also id.* at ¶ 12 ("We agree with commenters, study authors, and the [General Accounting Office] that the data we have collected in the past . . . are not sufficiently reliable and comprehensive to form the basis for effectively assessing ownership diversity and whether additional measures to promote it are necessary.").  The "Order" portion of the Fourth FNPR sets in motion a process for collecting better data as a basis for informed policy-making.  "[W]e believe that the changes we are adopting today," it states, "adequately address commenters' and the [General Accounting Office's] criticisms and will allow us to undertake studies that reliably analyze minority and female ownership." *Id.* at ¶ 12.  While this is certainly a welcome and long overdue step, it does not remedy the existing data gap in the Diversity Order.  We anticipate that it will, however, lay necessary groundwork for the Commission's actions on remand.

  In sum, the eligible entity definition adopted in the Diversity Order lacks a sufficient analytical connection to the primary issue that Order intended to address.  The Commission has offered no data attempting to show a connection between the definition chosen and the goal of the measures adopted—increasing ownership of minorities and women.  As such, the eligible entity definition adopted is arbitrary and capricious, and we remand those portions of the Diversity Order that rely on it.[41]  We conclude once more that the FCC did not provide a sufficiently reasoned basis for deferring consideration of the proposed SDB definitions and

---

[41] We uphold those measures in the Diversity Order that do not rely on the unsupported eligible entity definition.  As numbered in the Diversity Order, these are the (4) Ban on Discrimination in Broadcast Transactions; (5) "Zero Tolerance" Policy for Ownership Fraud; (6) Non-Discrimination Provisions in Advertising Sales Contracts; (7) Longitudinal Research on Minority and Women Ownership Trends; (8) Local and Regional Bank Participation in SBA Guaranteed Loan Programs; (12) "Access to Capital" Conference; and (13) Guidebook on Diversity.

remand for it to do so before it completes its 2010 Quadrennial Review.[42]

Despite our prior remand requiring the Commission to consider the effect of its rules on minority and female ownership, and anticipating a workable SDB definition well before this rulemaking was completed, the Commission has in large part punted yet again on this important issue. While the measures adopted that take a strong stance against discrimination are no doubt positive, the Commission has not shown that they will enhance significantly minority and female ownership, which was a stated goal of this rulemaking proceeding. This is troubling, as the Commission relied on the Diversity Order to justify side-stepping, for the most part, that goal in its 2008 Order.[43]

---

[42]    Stating that the task is difficult in light of *Adarand* does not constitute "considering" proposals using an SDB definition. The FCC's own failure to collect or analyze data, and lay other necessary groundwork, may help to explain, but does not excuse, its failure to consider the proposals presented over many years. If the Commission requires more and better data to complete the necessary *Adarand* studies, it must get the data and conduct up-to-date studies, as it began to do in 2000 before largely abandoning the endeavor. We are encouraged that the FCC has taken steps in this direction and we anticipate that it will act with diligence to synthesize and release existing data such that studies will be available for public review in time for the completion of the 2010 Quadrennial Review.

In addition, we note that the Supreme Court has upheld targeted FCC efforts to promote increased minority ownership. The Court has ruled that "the interest in enhancing broadcast diversity is, at the very least, an important governmental objective" that justified FCC policies designed to promote minority ownership in broadcasting. *Metro Broadcasting Inc. v. FCC*, 497 U.S. 547, 567 (1990), *overruled on other grounds in Adarand*, 515 U.S. 200 (overruling use of intermediate scrutiny). The Court upheld such policies because "the conclusion that there is a nexus between minority ownership and broadcasting diversity . . . is corroborated by a host of empirical evidence," *id.* at 580, and "both Congress and the Commission have concluded that the minority ownership programs are critical means of promoting broadcast diversity." *Id.* at 579.

[43] The primary instance in which minority ownership was mentioned in the 2008 Order was in the Commission's reinstatement of the FSSR as a component of the local television rule. *2008 Order* ¶ 105 ("To ensure that we do not negatively impact minority owners, we now reinstate [the FSSR] in the waiver standard."). In addition, in rejecting comments arguing that the FCC's presumption allowing mergers in the top 20 DMAs in its new NBCO rule would further diminish minority ownership (because those stations would become acquisition targets), the Commission argued that "although we believe that it is appropriate to adopt measures to encourage minority ownership, as we do in the *Diversity Order* that we adopt

53

Promoting broadcast ownership by minorities and women is, in the FCC's own words, "a long-standing policy goal of the Commission, and is consistent with [the Commission's] mandate under [§] 309(j) of the Act." *Fourth FNPR* ¶ 12. We recognize that there are significant challenges involved in meeting this important policy goal that is shared by Congress, the Commission, and the myriad interested parties who have participated in rulemaking proceedings toward this end. However, the Commission appears yet to have gathered the information required to address these challenges, which it needs to do in the course of its review already underway. As ownership diversity is an important aspect of the overall media ownership regulatory framework, *see Prometheus I*, 373 F.3d at 420-21, we re-emphasize that the actions required on remand should be completed within the course of the Commission's 2010 Quadrennial Review of its media ownership rules.

## X.    CONCLUSION

We vacate and remand the NBCO rule for the Commission to provide adequate notice and an opportunity to comment in the context of its 2010 Quadrennial Review. We affirm the other rules in the 2008 Order. We also vacate and remand those provisions of the Diversity Order that rely on the existing eligible entity definition, and the FCC's decision to defer consideration of proposed SDB definitions, so that it may justify or modify its approach to advancing broadcast ownership by minorities and women during its 2010 Quadrennial Review. This panel retains jurisdiction over the remanded issues.

---

today, we do not think it is appropriate to deny minority owners the opportunity to sell their stations . . . ." *Id.* at ¶ 61 n.202. In justifying retaining its AM/FM subcaps, the FCC noted that it received comments arguing that the subcaps prohibited expansion of ethnic and foreign language programming, but others arguing that they "serve[] the public interest by promoting new entry . . . particularly by small businesses, women, minorities, and entrepreneurs. . . . New entry promotes outlet diversity, which in turn enhances diversity and the public interest." *Id.* at ¶ 133. It also noted comments in the record warning that "large companies could bid up the price of AM stations and further erode th[e] abysmally low representation' of minority and female radio stations owners." *Id.* at ¶ 133 n.423. Finally, it briefly referenced comments in the record regarding the effect of consolidation of local radio ownership on minority owners. *Id.* at ¶ 128 n.403.

*Prometheus Radio Project v. Federal Communications Commission*, No. 08-3078, etc.

SCIRICA, *Circuit Judge*, concurring in part, dissenting in part.

The decision to vacate and remand the 2008 newspaper/broadcast cross-ownership rule ("NBCO rule") preserves an outdated and twice-abandoned ban,[1] adopted in 1975, on common ownership of a broadcast station and a daily newspaper in the same market. Because I believe the Federal Communications Commission provided adequate notice and opportunity to comment on the 2008 NBCO rule, I respectfully dissent from the Court's holding that the FCC failed to satisfy the Administrative Procedure Act's requirements. Moreover, because I believe potential objections to a new NBCO rule or new Diversity Order need not be reviewed by this panel, I also dissent from the decision to retain jurisdiction over parts of the ongoing 2010 Quadrennial Review. I would affirm the *2006 Quadrennial Regulatory Review*, 23 FCC Rcd. 2010 (2008) ("2008 Order"), in its entirety, permit the 2008 NBCO rule to go into effect, and allow the 2010 Quadrennial Review to run its course.

In July 2006, the FCC issued a Further Notice of Proposed Rulemaking ("2006 FNPR") stating the FCC was reconsidering the NBCO rule and seeking comment on cross-ownership limits. *See Further Notice of Proposed Rulemaking*, 21 FCC Rcd. 8834 (2006). The 2006 FNPR asked: "Should limits vary depending upon the characteristics of local markets? If so, what characteristics should be considered, and how should they be factored into any limits?" *Id*. at 8848, ¶ 32. If this were the first notice in which these issues were raised, more detail would likely have been required. But the context in which these questions were asked was clear: The FCC announced it was reconsidering its cross-ownership rules not only in the normal course of its own periodic review, but also in response to our remand, *see Prometheus Radio Project v. FCC* (*Prometheus I*), 373 F.3d 372 (3d Cir. 2004), of the FCC's cross-media limits promulgated following the 2002 Biennial Regulatory Review. *See 2006 FNPR*, 21 FCC Rcd. at 8848, ¶ 32 ("We invite comment on all of the issues remanded by the *Prometheus* court regarding cross-ownership. . . . To the extent that we will not use the [Diversity Index] to justify changes to the existing cross-ownership rules, we seek comment on how we should approach cross-ownership limits."); *see also 2002 Biennial Regulatory Review*, 18 FCC Rcd. 13620 (2003) ("2003 Order). Accordingly, and as is well known to the parties involved, the NBCO rule is not just the product of one isolated rulemaking, but is instead the outcome of an iterative and interactive process of statutorily prescribed agency review of broadcast media regulation and our judicial review of that agency action.

---

[1] The FCC first declined to retain the ban in its 2003 Order, then again in its 2008 Order.

In *Prometheus I*, we remanded the cross-media limits promulgated in the 2003 Order. The FCC had previously initiated proceedings on the NBCO rule reviewed in *Prometheus I* by issuing a Notice of Proposed Rulemaking ("2001 NPRM"). *See Cross-Ownership of Broadcast Stations and Newspapers; Newspaper/Radio Cross-Ownership Waiver Policy*, 16 FCC Rcd. 17283 (2001). It sought comment on the possibility of taking a case-by-case approach to determine whether a proposed cross-ownership combination would be in the public interest. *See 2002 Biennial Regulatory Review*, 17 FCC Rcd. 18503, 18506, ¶ 7, 18538-39, ¶¶ 106-11 (2002). Although in the 2003 Order the FCC concluded "that, on balance, the benefits of precision that case-by-case review of every transaction would provide were outweighed by the benefits of bright-line rules," *2008 Order*, 23 FCC Rcd. at 2041, ¶ 54 (citing *2003 Order*, 18 FCC Rcd. at 13645, ¶ 82), on remand the FCC "[e]stablish[ed] presumptions, as opposed to a bright line [rule,] allow[ing] for the evaluation of proposed newspaper/broadcast combinations under defined circumstances on a case-by-case basis," *id*. at 2039-40, ¶ 52.

The presumptions adopted in the 2008 Order were, in substantial part, proposed in the 2001 NPRM. The 2001 NPRM proposed an NBCO rule that would allow a newspaper/broadcast combination in circumstances in which the radio or television station was not among the top four ranked stations in the market and at least eight media voices would remain. The 2001 NPRM stated:

> Another option for modifying the newspaper/broadcast cross-ownership policies would be to combine the "market concentration" and "voice count" standards. Under this approach, a combination would be permitted so long as both parties do not have a certain market share (combined or individual), and so long as a minimum number of voices would remain in the market post-merger. This approach would be consistent with the recently revised TV duopoly rule, which permits common ownership of two TV stations within the same [Designated Market Area ("DMA")] if both are not ranked among the top four in the market, and at least eight independently owned TV stations would remain in the DMA post-merger.

*2001 NPRM*, 16 FCC Rcd. at 17300, ¶ 46. Moreover, the 2001 NPRM also discussed whether the FCC should presume it is in the public interest in certain circumstances to waive any ban on newspaper/broadcast cross-ownership, "such that combinations would be permitted if one of the parties to the combination has failed, is failing, or if the combination would result in new service." *Id*. at 17301, ¶ 49.

2

Following our decision in *Prometheus I* remanding the cross-media limits in the 2003 Order, the FCC established presumptions similar to those proposed in the 2001 NPRM.  The FCC concluded:

> [A] waiver of the cross-ownership ban is in the public interest in the following circumstances:  when a daily newspaper seeks to combine with a radio station in a top 20 DMA, or when a daily newspaper seeks to combine with a television station in a top 20 DMA and (1) the television station is not among the top four ranked stations in the market and (2) at least eight "major media voices" would remain in the DMA.

*2008 Order*, 23 FCC Rcd. at 2022-23, ¶ 20.  Moreover, for DMAs outside of the top 20, the FCC presumes that a newspaper/broadcast combination is not in the public interest unless: (1) the newspaper or broadcast station is "failed" or "failing" or (2) the proposed combination results in a new source of a significant amount of local news programming.  *Id*. at 2047-49, ¶¶ 65-67.

On the facts of this case, it is difficult to believe that Citizen Petitioners, who participated in all prior proceedings, were not fairly apprised of either "the terms or substance of the proposed rule" or "a description of the subjects and issues involved" as required by the Administrative Procedure Act ("APA").  5 U.S.C. § 553(b)(3); *see NVE, Inc. v. Dep't of Health & Human Servs.*, 436 F.3d 182, 191 (3d Cir. 2006).  Citizen Petitioners were given "fair notice," *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007), of all significant subjects and issues involved, *see Fertilizer Inst. v. Browner*, 163 F.3d 774, 779 (3d Cir. 1998).  The 2006 FNPR made clear that, on remand from *Prometheus I*, the FCC was planning a significant revision of the NBCO rule noticed by the 2001 NPRM and appearing in the 2003 Order, and was again considering tailoring cross-ownership limits to local markets.  *See 2006 FNPR*, 21 FCC Rcd. at 8848, ¶ 32.  Because the general framework of the 2008 NBCO rule was actually proposed in the 2001 NPRM of the subsequently remanded 2003 cross-ownership rules, interested parties would not have had to "divine [the FCC's] unspoken thoughts," *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1080 (D.C. Cir. 2009) (internal quotation marks omitted).  Instead, Citizen Petitioners "should have anticipated the [FCC's] final course in light of the initial notice," *Covad Commc'ns Co. v. FCC*, 450 F.3d 528, 548 (D.C. Cir. 2006) (internal quotation marks omitted), and consequently I cannot conclude the 2008 NBCO rule was not at least a "logical outgrowth of the rulemaking proposal and record," *NVE*, 436 F.3d at 191.  Accordingly, I respectfully dissent from the Court's decision to remand the NBCO rule for failure to comply with the APA's notice and comment requirements.

3

For the foregoing reasons, I would uphold the FCC's NBCO rule and allow the 2010 Quadrennial Review to proceed.  In all other respects, I concur in the majority opinion.

4