| In re | : | CHAPTER 11 |
| | : | (Jointly Administered) |
| **TRIBUNE COMPANY, *et. al*[1]** | : | |
| | : | Case No. 08-13141 (KJC) |
| Debtors | : | |

# OPINION ON CONFIRMATION[2]

## BY:  KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE

*The Scorpion and the Fox*[3]

Once, long ago, there was a vast river that had to be crossed for animals to reach food and water. One day, Fox came to the river, and, as he stood contemplating the best place to cross the river safely, Fox's bitter enemy, Scorpion, came upon Fox.

"Fox, as I was walking along the river bank looking for food, I noticed a particularly easy place to cross the river where the water is not so deep and the current not so swift.  I would like to cross over myself, but cannot swim.  If I show you this place," asked Scorpion, "would you be willing to take me across?"

"Why should I take you across?  We are enemies. How could I possibly trust that you will not sting me on the way across?" asked Fox.

"Why would I sting you?  If I stung you, it would mean you would drown; then

---

[1]The chapter 11 case filed by Tribune Media Services, Inc. (Bky. Case No. 08-13236) is being jointly administered with the Tribune Company bankruptcy case and 109 additional affiliated debtors pursuant to the Order dated December 10, 2008 (docket no. 43).  An additional debtor, Tribune CNLBC, LLC (formerly known as Chicago National League Baseball Club, LLC) filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on October 12, 2009 (Bky. Case No. 09-13496), and also is being jointly administered with the Tribune Company bankruptcy case pursuant to this Court's Order dated October 14, 2009 (docket no. 2333).

[2]This Opinion constitutes the findings of fact and conclusions of law, required by Fed.R.Bankr.P. 7052.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a).  This is a core proceeding pursuant to 28 U.S.C. 157(b)(1) and (b)(2)(L) and (O).

[3]This parable has been told through the years in many versions.  In offering my interpretation, I have borrowed freely from authors, both known and unknown.

both of us would die," replied Scorpion.

Surveying the Scorpion with a distrustful eye, Fox considered this. Then, with a hesitant resolve, Fox said, "Show me where the place is, and I will take you across."

Fox walked over to Scorpion and allowed him to climb onto his back. Scorpion showed Fox the place to cross over. Fox began swimming, but when he reached the middle of the river, Fox felt a sharp stinging sensation on his back and realized he had been stung by Scorpion.

As they both sank to the bottom of the river, Fox, now resigned to the inevitable, said to Scorpion: "You said there would be no sense in stinging me - - why did you do it?"

Scorpion replied, "It is better we should both perish rather than my enemy should live."

There is no moral to this story. Its meaning lies in the exposition of an inescapable facet of *human* character: the willingness to visit harm upon others, even at one's own peril. Our story follows.

## INTRODUCTION

On December 8, 2008 (the "Petition Date"), Tribune Company and certain of its subsidiaries (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code (11 U.S.C. §101 *et seq.*). Before the Court are two competing plans of reorganization for the Debtors: one proposed jointly by the Debtors, the Official Committee of Unsecured Creditors and certain senior lenders (referred to herein as the "Debtor/Committee/Lender Plan" or the "DCL Plan"),[4] and one proposed jointly by the holders

---

[4]The Second Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors (the "Creditors' Committee"), Oaktree Capital Management, L.P. ("Oaktree"), Angelo, Gordon & Co., L.P. ("Angelo Gordon"), and JPMorgan Chase Bank, N.A. ("JPM"), as amended (docket nos. 7136, 7701, 7801, 8231, 8259, 8580, 8769). The Debtors, Committee, Oaktree, Angelo Gordon, and JPM are referred to as the "DCL Plan

of certain bonds that were issued prior to the 2007 leveraged buyout of Tribune (referred to herein as the "Noteholder Plan").[5]

Voting on competing plans of reorganization was accomplished as directed by Court Order dated December 9, 2010, as amended, which, among other things, approved a general disclosure statement about the Debtors, approved specific disclosure statements for each plan, and established procedures for solicitation and tabulation of votes for the plans. (Docket No. 7126). A hearing to consider the confirmability of the DCL Plan and the Noteholder Plan was held over a two-week period in March 2011 and continued on April 12, 13, and 14, 2011. After post-hearing briefing, closing arguments were heard on June 27, 2011 (collectively, the "Confirmation Hearing").[6]

Although a number of parties object to the competing plans on various grounds, the main source of contention arises from the DCL Plan's proposed settlement of certain LBO-Related Causes of Action with the Senior Lenders and the Bridge Lenders, who loaned more than $10

_____

Proponents" herein.

[5]The Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by Aurelius Capital Management, L.P. on behalf of its Managed Entities ("Aurelius"), Deutsche Bank Trust Company Americas, in its Capacity as Successor Indenture Trustee for Certain Series of Senior Notes ("Deutsche Bank"), Law Debenture Trust Company of New York, in its Capacity as Successor Indenture Trustee for Certain Series of Senior Notes ("Law Debenture") and Wilmington Trust Company, in its Capacity as Successor Indenture Trustee for the PHONES Notes ("WTC"), as amended (docket nos. 7127, 7802, 8169, 8225, 8286, 8755, and 8756). Aurelius, Deutsche Bank, Law Debenture and WTC are referred to as the "Noteholder Plan Proponents" herein.

[6]The March confirmation hearing dates were March 7, 8, 9, 10, 11, 14, 15, 16, 17 and 18, 2011. To complete the record of the Confirmation Hearing, on August 24, 2011, after negotiations between the parties, the Debtors filed a motion for entry of an order authorizing (i) the implementation of proposed changes to the official confirmation trial transcript and (ii) the public release of non-confidential trial exhibits and deposition designations (docket no. 9700). The motion was heard and granted without objection by Order dated October 4, 2011 (docket no. 9881).

billion to Tribune in connection with the 2007 leveraged buy-out (or "LBO") of Tribune.[7]  The

Noteholder Plan Proponents argue that the DCL Plan's proposed settlement amount is

unreasonable considering the value of those LBO-Related Causes of Action which, if successful,

could provide substantial recoveries to pre-LBO noteholders.

In contrast, the Noteholder Plan preserves all of the LBO-Related Causes of Action and

creates two trusts to prosecute "vigorously" those claims post- confirmation.  The DCL Plan

Proponents argue that the Noteholder Plan has fundamental flaws that prevent confirmation

under Bankruptcy Code §1129(a), but, further, that the Plan is not in the best interests of

creditors, since it provides minimal distributions now, with a possibility of increased future

distributions to creditors only after protracted and risky litigation.  They contend:

> This gamble may be fine for the Noteholder Plan's sponsors, who are
> professional investors and who either bought their claims deep into the bankruptcy
> proceedings for the very purpose of making this litigation play, or are far out of
> the money and have nothing to lose.  But it hazards the fortunes of the Debtors'
> other creditors, many of whom are retirees or trade creditors, not professional

---

[7]The "LBO-Related Causes of Action" is defined in the DCL Plan as meaning "any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action, avoidance powers or rights, liabilities of any nature whatsoever, and legal or equitable remedies against any Person arising from the leveraged buy-out of Tribune that occurred in 2007, including, without limitation, the purchase by Tribune of its common stock on or about June 4, 2007, the merger and related transactions involving Tribune on or about December 20, 2007, and any financing committed to, incurred or repaid in connection with any such transaction, regardless of whether such claims, causes of action, avoidance powers or rights, or legal or equitable remedies may be asserted pursuant to the Bankruptcy Code or any other applicable law."  (DCL Plan, Section 1.1.131, docket no. 8769).

The "Senior Lenders" are those lenders from time to time party to the Senior Loan Agreement (defined in n. 13, *infra.*), including the Credit Agreement dated May 17, 2007, which provided Tribune with approximately $8.028 billion in financing at Step One of the LBO, and an additional $2.1 billion in financing, known as the Incremental Facility, at Step Two of the LBO. (DCL Plan, Section 1.1.219, docket no. 8769).  The  "Bridge Lenders" are "the lenders from time to time party to the Bridge Loan Agreement" dated December 20, 2007, defined in n. 15, *infra.*, which provided Tribune with $1.6 billion in financing at Step Two of the LBO. (DCL Plan, Section 1.1.16, docket no.  8769).

The parties use the terms "Senior Lenders" and "Senior Noteholders" (defined *infra*) and, although the terms are similar we use them for the convenience of the parties.

investors, and almost all of whom voted against the Noteholder Plan and in favor of the DCL Plan.

(DCL Brief, docket no. 8897, at 5). The DCL Plan Proponents argue that the Noteholder Plan purports to be a plan of reorganization, but is not focused on the successful reorganization and advancement of the ongoing operations of the Reorganized Debtors.

For the reasons discussed below, I conclude that neither the DCL Plan nor the Noteholder Plan meets the §1129 requirements for confirmation.

## BACKGROUND

A.     Overview of the Debtors' Business

Tribune Company is a Delaware corporation with its principal place of business in Chicago, Illinois. (Examiner's Report, Vol. I, at 43).[8] Tribune Company directly or indirectly owns all (or substantially all) of the equity in 128 subsidiaries (the "Tribune Entities"), of which 110 are Debtors. (*Id.*). The Tribune Entities are a leading media and entertainment conglomerate reaching more than eighty percent (80%) of households in the United States through their newspapers, other publications and websites, their television and radio stations, and their other

---

[8]Attached as Exhibit "A" to the Joint Pretrial Memorandum Related to the Confirmation of a Plan of Reorganization for Tribune Company and its Subsidiaries (docket no. 8187), is the Notice of Service of Designations Pursuant to Order Approving Stipulation Regarding Use of Examiner's Report at the Confirmation Hearing (docket no. 8177), filed on February 28, 2011, which references a copy of Volume I of the Report of Kenneth N. Klee, Examiner, issued on July 26, 2010, marked in colors to designate the disputed or undisputed "statements of historical fact" regarding the Debtors.

Pursuant to the Stipulation Regarding Use of Examiner's Report at the Confirmation Hearing (approved by an Order dated February 4, 2011 (docket no.7790)), the plan proponents agreed that "[t]he opinions expressed by the Examiner (the "Examiner's Opinions") regarding the law and/or the facts will be admissible by any entity in connection with the Confirmation Hearing for all purposes to the same extent as the opinions testified to by an expert witness under the Federal Rules. The Examiner's Opinions will not be binding on the Court or any entity, nor will there be any presumption of correctness attributed to such opinions. The Court may accord the Examiner's Opinions whatever weight the Court deems is appropriate." (Ex.1 (Stipulation) at ¶1, docket no. 7790).

news and entertainment offerings.  (*Id.*).

The Tribune Entities' operations are divided into two primary industry segments: the "Publishing Segment" and the "Broadcasting Segment."  (*Id.* at 44).  The Publishing Segment accounted for seventy percent (70%) of the Tribune Entities' consolidated revenues in 2009. (DCL Ex. 376, General Disclosure Statement, at 8 (docket no. 7232)(the "GDS")).  The Publishing Segment includes operation of eight major-market daily newspapers: *The Los Angeles Times, Chicago Tribune, South Florida Sun-Sentinel, Orlando Sentinel, The Sun, Hartford Courant, The Morning Call,* and *The Daily Press.*  (*Id.*).

The Broadcasting Segment accounted for thirty percent (30%) of the Tribune Entities' consolidated operating revenues in 2009 and includes 23 television stations in 19 markets. (GDS at 13).  Various Tribune entities also have investments (typically minority equity interests) in a number of private corporations, limited liability companies, and partnerships, including CareerBuilder, Classified Ventures, TV Food Network, Homefinder, Topix, quadrantONE and Metromix. (GDS at 15).

B.      Pre-Petition Debt Structure and the LBO

1.      Pre-LBO Indebtedness

Senior Notes:  Between March 1992 and August 2005, Tribune and certain of its predecessors entered into a series of indentures and supplements thereto, pursuant to which the "Senior Notes" were issued.[9]   The Senior Notes are unsubordinated obligations of Tribune.

---

[9]The DCL Plan defines the "Senior Notes" as the eight series of notes issued and outstanding under the Senior Notes Indentures.  (DCL Plan, §1.1.229, docket no. 8769).  The Senior Notes Indenture(s) are defined as meaning, individually or collectively, the following Indentures as amended, restated or otherwise modified from time to time: (a) that certain Indenture, dated as of January 1, 1997, between Tribune and Deutsche Bank, as successor indenture trustee; (b) that certain Indenture, dated as

(Examiner's Report, Vol. I, at 57). The Senior Notes Indentures contain similar covenants, including the requirement that any liens granted to secure other indebtedness of Tribune or its Subsidiaries also equally and ratably secure the Senior Notes. (*Id.*). As a result, the Senior Notes are secured by the Stock Pledge on a *pari passu* basis with the indebtedness under the Senior Loan Agreement (defined below), which was executed as part of the 2007 LBO. (*Id.*, DCL Ex. 822). However, the Senior Notes are not guaranteed by Tribune's Subsidiaries.[10] (Examiner's Report, Vol. I, at 57).

PHONES Notes: In April 1999, Tribune issued eight million Exchangeable Subordinated Debentures due 2029 (the "PHONES Notes") in an aggregate principal of $1.256 billion.[11] (GDS at 24). The PHONES Indenture provides that the PHONES Notes are

_____

of March 19, 1996, between Tribune and Law Debenture, as successor indenture trustee; (c) that certain Indenture, dated as of January 30, 1995, between Tribune and Deutsche Bank, as successor indenture trustee; and (d) that certain Indenture, dated as of March 1, 1992, between Tribune and Deutsche Bank, as successor indenture trustee. (DCL Plan, §1.1.230 (docket no. 8769), *see also* Noteholder Plan, §1.1.255 (docket no.8755).

[10]The LBO Lender Debt shares pari passu with other unsecured debt at the Tribune Parent level (except for subordinated unsecured debt, such as the PHONES Notes). However, by obtaining guarantees of the LBO Lender Debt from the Guarantor Subsidiaries (which hold most of the value available from the Debtors' estates), the Senior Lenders and the Bridge Lenders enjoy "structural seniority" over unsecured creditors with recourse against only the Tribune Parent. (Examiner's Report, Vol. II, at 3). "A majority of initial value resides at the Guarantor Subsidiaries ($5.721 billion of $6.75 billion) which is expected given (a) the requirements under the Senior Loans to have all material subsidiaries be guarantors and (b) Tribune being a holding company." DCL Ex. 1110, Computation of Parent Distributable Value and Base Creditor Recoveries, Report by Brian Whittman, managing director of Alvarez & Marsal, dated February 8, 2011.

[11]The principal amount of one PHONES Note is related to the value of a Reference Share, i.e., originally one share of common stock of AOL outstanding as of the date of the issuance of the PHONES Note, subject to adjustment for any splits, combination, sub-division, exchange, conversion, liquidation, or other changes to the Reference Share. (Examiner's Report, Vol. I, at 63). The PHONES Notes were issued with an original principal amount of $157.00 per PHONES Note. (*Id.*). As a result of a two-to-one stock split and subsequent merger of AOL and Time Warner, two shares of Time Warner common stock represent the Reference Shares for each PHONES Note. (*Id.* at 64). Before the Petition Date, the holders of PHONES Notes were contractually entitled to exchange a PHONES Note for an amount of

subordinate in right of payment to all "Senior Indebtedness" of Tribune. (Examiner's Report, Vol. I, at 64). The PHONES Notes are not guaranteed by Tribune's subsidiaries. (GDS at 24).

2006 Credit Agreement. On June 19, 2006, Tribune entered into a credit agreement with various lenders for (i) a $1.5 billion unsecured term loan facility, of which $250 million was used to refinance certain medium-term notes that matured November 1, 2006, and other term loan proceeds were used to finance a portion of Tribune's repurchase of Tribune Common Stock pursuant to the 2006 Tender Offer, and (ii) a $750 million unsecured revolving facility (the "2006 Credit Agreement").[12] (Examiner's Report, Vol. I, at 68-70). Tribune was the sole borrower under the 2006 Credit Agreement, which was neither guaranteed nor secured. (*Id.*).

2006 Bridge. At the same time as the 2006 Credit Agreement, Tribune entered into a bridge credit agreement with various lenders for a $2.15 billion unsecured bridge facility (the "2006 Bridge Credit Agreement"). (*Id.* at 71). Tribune was the sole borrower under the 2006 Bridge Credit Agreement, which was neither guaranteed nor secured. (*Id.* at 69). The proceeds of the 2006 Bridge Credit Agreement were used to finance a portion of Tribune's repurchase of Tribune Common Stock under the 2006 Tender Offer and to refinance existing indebtedness. (*Id.* at 72).

---

cash equal to ninety-five percent (95%) (or one hundred percent under certain circumstances) of the then-current market value of the Reference Shares, plus any accrued and unpaid interest on the PHONES Notes, and any dividends or other distributions that a holder of the Reference Shares would be entitled to receive. (*Id.*).

[12]At a May 26, 2006 meeting, the Tribune Board authorized a leveraged recapitalization transaction in the form of a repurchase of up to 75 million shares of Tribune Common Stock at prices not to exceed $32.50 per share (the "2006 Tender Offer"). (Examiner's Report, Vol. I, at 67). On June 30, 2006, Tribune announced that it had repurchased approximately 55 million shares of Tribune Common Stock at a price of $32.50 per share through the 2006 Tender Offer and a separate purchase agreement with the McCormack Foundation, one of Tribune's major stockholders. (*Id.* at 68).

As of April 1, 2007, Tribune had outstanding borrowings of $1.5 billion under the 2006 Credit Agreement's term facility, no borrowings under the revolving facility, and $1.325 billion under the 2006 Bridge Credit Agreement facility.  (DCL Ex. 1389, Tribune Company Form 10-Q filed May 9, 2007, TRB0430837).  Prior to the LBO, Tribune's indebtedness approximated the following:

| Debt Instrument | Approximate Outstanding Debt in April 2007 |
| --- | --- |
| Senior Notes | $ 1.456 billion |
| PHONES Notes (2% interest) | $   612 million |
| 2006 Credit Agreement | $ 1.500 billion |
| 2006 Bridge Agreement | $ 1.325 billion |
| Property financing obligation | $     51 million |
| Interest rate swap | $     23 million |
| Other notes and obligations | $     16 million |
| **Total** | **$ 4.983 billion** |

(Examiner's Report, Vol. I, at 63, NPP Ex. 343 at 24 (10-Q 4/1/2007)).

> 2.    The 2007 Leveraged Buy-Out a/k/a the "Leveraged ESOP Transactions"

In September 2006, the Tribune board of directors (the "Board") created a Special Committee to oversee a formal process of exploring strategic alternatives for Tribune, including a sale of all Tribune Entities, a leveraged recapitalization of Tribune, the sale of the Broadcasting Segment, a spin-off of the Broadcasting Segment, and a split-off of the Publishing Segment. (Examiner's Report, Vol. I, at 102, 105).   As a result of that process, on April 1, 2007, based on the recommendation of the Special Committee, the Board approved a series of transactions with a newly formed Tribune Employee Stock Ownership Plan (the "ESOP"), EGI-TRB, LLC, a

Delaware limited liability company wholly owned by Sam Investment Trust, a trust established for the benefit of Samuel Zell and his family ("EGI" or the "Zell Entity") and Samuel Zell ("Zell"). (DCL Ex. 1389, at TRB0430839). This Leveraged ESOP Transaction (also referred to as the "2007 Leveraged Buy-out" or the "LBO") was consummated in two principal steps, commonly referred to as "Step One" and Step Two".

In Step One, the newly formed ESOP purchased 8,928,571 shares of Tribune common stock at $28 per share. (*Id.*). The Zell Entity also made an initial investment of $250 million in Tribune in exchange for 1,470,588 shares of Tribune's common stock at a price of $34 per share and an unsecured subordinated exchangeable promissory note of Tribune in the principal amount of $200 million. (GDS at 19). Thereafter, Tribune commenced a cash tender offer (at a price of $34 per share) to repurchase approximately 52% of its outstanding common stock. (Examiner's Report, Vol. I, at 194, 205-06). Tribune retired the repurchased shares on June 4, 2007. (*Id.*). To finance the tender offer, Tribune entered into the $8.028 billion senior secured credit agreement (the "Senior Loan Agreement").[13] (Examiner's Report, Vol. I, at 168, 171). A number of

---

[13]The Senior Loan Agreement is defined in the DCL Plan as meaning, collectively, (a) that certain Credit Agreement dated as of May 17, 2007, among Tribune, the Senior Lenders, the Senior Loan Agent, Merrill Lynch Capital Corporation, as syndication agent, and Citicorp North America, Inc., Bank of America, N.A., and Barclays Bank PLC, as co-documentation agents, as amended, restated, supplemented or otherwise modified from time to time, and (b) those certain Increase Joinders, dated as of December 20, 2007, among Tribune, certain of the Senior Lenders and the Senior Loan Agent, as amended, restated, supplemented or otherwise modified from time to time." (DCL Plan, §1.1.221, docket no. 8769). The Senior Loan Agreement consisted of the following facilities: (a) a $1.5 billion Senior Tranche X Term Loan Facility, (b) a $5.515 billion Senior Tranche B Term Loan Facility, (c) a $263 million Delayed Draw Senior Tranche B Term Loan Facility, and (d) a $750 million Revolving Credit Facility, which included a letter of credit subfacility in an amount up to $250 million and a swing line facility in an amount up to $100 million. (GDS at 22). The Senior Loan Agreement also provided a commitment for an additional $2.105 billion in new incremental term loans under or *pari passu* with the Tranche B Facility (the "Incremental Facility"). The Senior Loan Agreement and related facilities (other than the Incremental Facility) are referred to as the "Step One Financing."

Tribune's domestic subsidiaries (the "Guarantor Subsidiaries") provided unsecured guarantees of indebtedness under the Senior Loan Agreement. (GDS at 21-22).[14] The proceeds from the Senior Loan Agreement were also used to refinance Tribune's 2006 Credit Facility and 2006 Bridge Credit Facility. (NPP Ex. 672 (Tribune Form 12/30/2007 10-K) at 4).

In Step Two, consummated in December 2007, Tribune merged with a Delaware corporation wholly owned by the ESOP, with Tribune surviving the merger. (Examiner's Report, Vol. I, at 138, 458). Upon completion of the merger, all issued and outstanding shares of Tribune's common stock (other than shares held by Tribune or the ESOP) were cancelled and Tribune became wholly owned by the ESOP. (*Id.*). The merger was financed through additional borrowings of $2.1 billion under the Senior Loan Agreement (known as the "Incremental Facility") and $1.6 billion under the Bridge Loan Agreement.[15] (*Id.* at 460). The Incremental Facility and the Bridge Loan Facility are unsecured but guaranteed by the Guarantor Subsidiaries. (*Id.* at 459, GDS at 23). The proceeds of the additional borrowings were used for, among other things, the consummation of the merger, the repurchase of outstanding Tribune shares not held by the ESOP at $34 per share, and the Step Two financing fees, costs and expenses. (Examiner's Report, Vol. I, at 460-62, GDS at 61).

As of the Petition Date, Tribune's pre-LBO indebtedness and LBO indebtedness, totaled

---

[14]A list of the Guarantor Subsidiaries is set forth in the GDS at 21, n. 19.

[15]The Bridge Loan Agreement is defined in the DCL Plan as that certain Senior Unsecured Interim Loan Agreement, dated as of December 20, 2007, among Tribune, the Bridge Lenders, the Former Bridge Loan Agent, JPMorgan Chase Bank, N.A., as syndication agent, and Citicorp North America, inc. and Bank of America, N.A., as co-documentation agents, as amended, restated, supplemented or otherwise modified from time to time (the "Bridge Facility") (DCL Plan, §1.1.18, docket no. 8769). The Bridge Facility and the Incremental Facility are referred to as the "Step Two Financing."

approximately $12.706 billion in principal amount as follows:

| Debt Instrument | Approximate Principal Amount Outstanding as of the Petition Date |
| --- | --- |
| Senior Loan Facility | $8.622 billion[16] |
| Bridge Facility | $1.600 billion |
| Senior Notes | $1.263 billion |
| EGI-TRB LLC Notes[17] | $0.225 billion |
| PHONES Notes | $0.759 billion[18] |
| Receivables Facility[19] | $0.225 billion |
| **Total** | **$12.706 billion** |

(GDS at 21-25).

---

[16]The amount outstanding on account of the Senior Loan Facility includes the Swap Claim, which is defined in the DCL Plan as the "Claims asserted under that certain 1992 ISDA Master Agreement, dated as of July 2, 2007, between Barclays Bank PLC and Tribune." (DCL Plan, §1.1.243, docket no. 8769).

[17]On December 20, 2007, Tribune executed a $225 million subordinated promissory note in favor of the Zell Entity, which thereafter assigned minority interests in such notes to certain permitted assignees (collectively, the "EGI-TRB LLC Notes"). The notes are obligations solely of Tribune and are not guaranteed by Tribune's subsidiaries. On August 11, 2010, the EGI-TRB LLC Notes filed a conditional objection to the Tribune Plan alleging, among other things, that the PHONES Notes are contractually subordinated to the EGI-TRB LLC Notes. Section 7.15 of the DCL Plan specifically provides that the issue concerning the respective priorities of the PHONES Notes and the EGI-TRB LLC Notes claims is not addressed in the DCL Plan. I agree that this priority issue need not be addressed now, but should be reserved for determination by a court of competent jurisdiction when and if it is determined that recoveries are available for these subordinated creditors.

[18]The Debtors assert that the amount of the PHONES Notes is $759 million, consisting of approximately $56 million for PHONES Notes that were submitted for exchange pre-petition, and $703 million for PHONES Notes that were not submitted for exchange pre-petition. WTC has filed a proof of claim on behalf of the holders of the PHONES Notes in the amount of approximately $1.197 billion, reflecting the position that the exercise of exchange rights has been effectively withdrawn because the Debtors never paid the Notes submitted for exchange. (*See* Wilmington Trust Company's Motion for (i) Estimation of the PHONES Claims and (ii) Classification of PHONES Claims Pursuant to Bankruptcy Rule 3013 (Docket no. 7352 filed December 30, 2010)). Further discussion regarding the amount of the PHONES Notes is found in Section A 9 of the Discussion, *infra.*

[19]In July 2008, Tribune, Tribune Receivables, LLC (a non-Debtor special purpose subsidiary of Tribune), and other Tribune subsidiaries entered into a $300 million trade receivables securitization facility. (GDS at 24).

C.     Chapter 11 Bankruptcy

On December 8, 2008, Tribune and certain of its subsidiaries filed voluntary petitions

under chapter 11 of the United States Bankruptcy Code.  On December 18, 2008, the United

States Trustee for the District of Delaware appointed an official committee of unsecured creditors

(the "Creditors' Committee") (GDS at 44).  As of the filing of the GDS, the Creditors'

Committee consisted of the following parties: (i) JP Morgan Chase Bank, N.A., (ii) Deutsche

Bank, (iii) Warner Bros. Television, (iv) Buena Vista Television, (v) William Niese, (vi) Pension

Benefit Guaranty Corporation, (vii) WTC, and (viii) Washington-Baltimore Newspaper Guild,

Local 32035.  (*Id.* at 45).

On February 1, 2010, the Creditors' Committee filed a motion seeking authority to

prosecute certain estate causes of action against the Debtors' pre-petition lenders arising out of

the LBO (the "Original Standing Motion," docket no. 3281).[20]  The Debtors opposed the relief

and the Original Standing Motion was withdrawn *sine die*, based upon an April 9, 2010

Settlement Support Agreement.  (GDS at 53).   On September 13, 2010, the Creditors'

Committee supplemented the Original Standing Motion to add new causes of action related to the

LBO, and on September 14, 2010, the Creditors' Committee filed a new standing motion seeking

authority to prosecute causes of action related to the LBO against various non-lender parties,

including officers, directors, subsidiaries, Zell, EGI and large shareholders (the "New LBO

---

[20]On March 4, 2010, WTC also filed an adversary complaint seeking equitable subordination, disallowance of claims, damages and a constructive trust against certain of the Senior Lenders based upon claims arising from the LBO.  (GDS at 51; *see also* docket no. 3683).  The Debtors filed a motion on March 18, 2010 seeking a determination that WTC's complaint violated the automatic stay. (Docket no. 3759). By order dated October 8, 2010, the WTC Adversary Proceeding has been stayed until further order.  (GDS at 51-52; *see also* docket no. 5916).

Standing Motion").  The Court approved both standing motions on October 27, 2010, and the

Creditors' Committee initiated two adversary proceedings on November 20, 2010: (i) *Official*

*Comm. Of Unsecured Creditors v. JP Morgan Chase Bank, N.A. (In re Tribune)*, Adv. No. 10-

53963, and (ii) *Official Comm. Of Unsecured Creditors v. Fitzsimons (In re Tribune)*, Adv. No.

10-54010 (collectively, the "LBO Avoidance Adversaries").  (*Id.*).  By Order dated December 14,

2010, the LBO Avoidance Adversaries were stayed.

From the outset of the bankruptcy cases, the major constituents understood that the

investigation and resolution of the LBO-Related Causes of Action would be a central issue in the

formulation of a plan of reorganization.  (*See, e.g.,* Tr. 3/1/2011 at 23:10-15 (Kurtz)).  On April

12, 2010, the Debtors filed a proposed plan (the "April 2010 Plan") that sought to implement the

terms of a settlement agreement regarding certain LBO-Related Causes of Action.  A

confirmation hearing for the April 2010 Plan was scheduled for August 16, 2010.

However, shortly after filing of the April 2010 Plan, the Bankruptcy Court entered an

Agreed Order Directing the Appointment of an Examiner (the "Examiner Order,"docket no.

4120). On May 10, 2010, the Court approved the U.S. Trustee's application appointing Kenneth

N. Klee as examiner (the "Examiner").[21]  On May 11, 2010, the Court entered an order approving

---

[21]The record did not include information on the Examiner's experience and expertise.  The
website of Klee, Turchin, Bogdanoff & Stern, LLP (of which the Court takes judicial notice) includes the
following information on Mr. Klee's background:

Kenneth N. Klee is a professor at the UCLA School of Law, where he teaches courses in
bankruptcy law and chapter 11 business reorganizations law.  He received an A.B. in Economics, with
great distinction, at Stanford University in 1971.  He earned his J.D. degree from Harvard University,
graduating cum laude, in 1974.  Mr. Klee is admitted to practice before the bars of California, the District
of Columbia and New York.

Mr. Klee was Associate Counsel, Committee on Judiciary, U.S. House of Representatives 1974-
77, where he was a principal draftsperson of the Bankruptcy Code.  Since then, he has served
periodically as a bankruptcy consultant to the House Judiciary Committee, 1977-1982, and to the United
States Department of Justice, 1983-1984.  From 1992 - 2000, he served as a member of the Advisory

the Examiner's proposed work and expense plan and modifying the Examiner Order.  The

Examiner's principal duties were to:

(1)     Evaluate the potential claims and causes of action held by the Debtors' estates that
        are asserted by the Parties (as defined in the Examiner Order) in connection with
        the leveraged buy-out of Tribune that occurred in 2007 [defined as the LBO-
        Related Causes of Action] which may be asserted against any entity which may
        bear liability, including without limitation, the Debtors, the Debtors' former
        and/or present management, former and/or present members of Tribune's board of
        directors, the Debtors' lenders and the Debtors' advisors, said potential claims and
        causes of action including, but not being limited to, claims for fraudulent
        conveyance, breach of fiduciary duty, aiding and abetting breach of fiduciary duty,
        and equitable subordination, and to evaluate the potential defenses asserted by the
        Parties to such potential claims and causes of action;

(2)     evaluate whether Wilmington Trust Company violated the automatic stay under
        11 U.S.C. §362 by its filing, on March 3, 2010, of its Complaint for Equitable
        Subordination and Disallowance of Claims, Damages, and Constructive Trust;
        and

(3)     evaluate the assertions and defenses made by certain of the Parties in connection
        with the Motion of JP Morgan Chase Bank, N.A. for Sanctions Against
        Wilmington Trust Company for Improper Disclosure of Confidential Information
        in Violation of Court Order.

The Examiner invited the parties to provide written submissions on these issues and

conducted in-person meetings with them. The Examiner was assisted by counsel and by a

financial advisor who developed a financial analysis of issues presented, including issues

concerning solvency, unreasonably small capital, the flow of funds, and matters pertaining to

Committee on Bankruptcy Rules of the United State Judicial Conference. In June, 1994, he led a mission
to China sponsored by the International Republican Institute to assist in the writing of the Chinese
Bankruptcy Laws.

        Since 1975, Mr. Klee has participated in several hundred programs for the continuing education
of the bar in the area of bankruptcy and business reorganization.  He is serving for a second time as a
Lawyer Representative to the 9th Circuit Judicial Conference.  Mr. Klee also serves as a member of The
American Law Institute and was an Advisor on its Transnational Insolvency Project.  In addition, he is a
founding member of the International Insolvency Project.

        Mr. Klee is a founding member of the firm. *See* http://www.ktbslaw.com/attorneys-29.html.

intercompany claims.

On July 26, 2010, the Examiner filed a report containing the results of his investigation. His report identified the following transfers and obligations that may be subject to avoidance and recovery:

| Obligations | |
|---|---|
| Credit Agreement Debt incurred as Step One | $  7,015,000,000 |
| Incremental Credit Agreement Debt at Step Two | $  2,105,000,000 |
| Bridge Debt at Step Two | $  1,600,000,000 |
| **Total Obligations** | **$  10,720,000,000** |
| | |
| **Payments** | |
| **Step One** | |
| Payments to Selling Stockholders - Step One | $  4,283,999,988 |
| | |
| **Step One Financing Fees, Costs, and Expenses** | |
| JPM Entities | $         35,042,750 |
| Merrill Entities | $         34,992,750 |
| Citigroup Entities | $         32,529,375 |
| BofA Entities | $         18,002,625 |
| Barclays | $           3,375,000 |
| LaSalle Bank National Association | $           2,187,500 |
| Lehman Brothers | $           2,187,500 |
| Sumitomo Mitsui Banking Corporation | $           2,187,500 |
| | |
| **Other Step One Financing Costs and Expenses** | **$           3,585,523** |
| **Total Step One Financing Fees, Costs, and Expenses** | **$         134,090,523** |
| | |
| **Step One Tender Offer/Dealer Manager Fees** | |
| Merrill Entities | $              460,000 |

| | | |
|---|---|---|
| Citigroup Entities | $ | 450,000 |
| BofA Entities | $ | 225,000 |
| JPM Entities | $ | 374,976 |
| All Other Tender Offer Fees | $ | 3,444,274 |
| **Total Step One Tender Offer/Dealer Manager Fees** | **$** | **4,954,250** |
| | | |
| **Step one Related Advisor Fees, Costs, and Expenses** | | |
| Morgan Stanley | $ | 7,667,704 |
| **Total Step One Related Advisor Fees, Costs, and Expenses** | $ | 7,667,704 |
| | | |
| **All Other Step One Related Fees, Costs, and Expenses** | **$** | **14,473,727** |
| | | |
| **Post-Step One/Pre-Step Two** | | |
| **Interest and Principal Payments** | | |
| Interest Payments on Credit Agreement Debt | $ | 197,610,456 |
| Principal Payments on Credit Agreement Debt | $ | 113,787,500 |
| **Total Interest and Principal Payments** | **$** | **311,397,956** |
| | | |
| **Step Two** | | |
| **Merger Consideration to Selling Stockholders** | $ | 3,982,119,576 |
| | | |
| **Interest and Principal Payments** | | |
| Interest Payments on Credit Agreement Debt | $ | 95,740,199 |
| | | |
| **Transactions with EGI-TRB, LLC** | | |
| Repayment of Exchangeable EGI-TRB Note | $ | 206,418,859 |
| Reimbursement of Expenses incurred by EGI-TRB | $ | 2,500,000 |
| Payment of Merger Consideration to EGI-TRB | $ | 49,999,992 |
| Issuance of EGI-TRB Note | $ | (225,000,000) |

| | | |
|---|---|---|
| Purchase by EGI-TRB of the Warrant | | (90,000,000) |
| **Net Received from EGI-TRB** | | **$ (56,081,149)** |
| | | |
| **Step Two Financing Fees, Costs, and Expenses** | | |
| JPM Entities | $ | 13,767,054 |
| Merrill Entities | $ | 37,883,125 |
| BofA Entities | $ | 6,883,527 |
| Citigroup Entities | $ | 11,472,545 |
| **Other Step Two Financing Fees, Costs, and Expenses** | **$** | **3,436,240** |
| **Total Step Two Financing Fees, Costs, and Expenses** | **$** | **73,442,490** |
| | | |
| **Step Two Related Advisor Fees, Costs, and Expenses** | | |
| CGMI | $ | 12,837,360 |
| MLPFS | $ | 12,768,422 |
| **Total Step Two Advisor Fees, Costs, and Expenses** | **$** | **25,605,782** |
| | | |
| **Other Step Two Related Fees, Costs, and Expenses** | $ | 21,577,816 |
| **Post-Step Two** | | |
| **Post-Step Two Interest and Principal Payments** | | |
| Interest Payments on Credit Agreement Debt | $ | 499,621,384 |
| Principal Payments on Credit Agreement Debt | $ | 964,387,500 |
| Interest Payments on Bridge Debt | $ | 114,529,555 |
| **Total Post-Step Two Interest and Principal Payments** | **$** | **1,578,538,439** |

(Examiner's Report, Vol. II, at 6-10, footnotes omitted).

By Order dated August 3, 2010, the Court ordered the unsealing of the Examiner's Report, with exhibits and transcripts.[22]  The Examiner did not reach definitive conclusions regarding the

---

[22]The Examiner's Report (volumes 1 through 4) were docketed as docket nos. 5247, 5248, 5249, and 5250.  The exhibits were docketed as docket nos. 5437, 5438, 5439, 5441, 5442, 5444, 5445, 5447,

issues considered in the Report, but suggested a range of potential outcomes.[23]  After the Examiner's Report was filed, the April 2010 Plan and the settlement it embodied were abandoned.

The Debtors' exclusive period within which to file a chapter 11 plan and solicit acceptances, as extended by court order, expired on August 8, 2010.  After the Examiner's Report was filed and the settlement in the April 2010 Plan was abandoned, interested parties continued to negotiate, but failed to reach any consensus.  Thereafter, the Debtors asked the Court to appoint a mediator.

On September 1, 2010, I appointed my colleague, the Honorable Kevin Gross, as a mediator (the "Mediator") to conduct non-binding mediation concerning the terms of a plan of reorganization, including appropriate resolution of the LBO-Related Causes of Action (the "Mediation").  The September 1, 2010 Order included the following parties in the Mediation: (i) the Debtors, (ii) the Creditors' Committee, (iii) Angelo Gordon, (iv) the Credit Agreement Lenders, (v) the Step One Credit Agreement Lenders, (vi) Wells Fargo Bank, N.A., (vii) Law Debenture Trust Company of New York ("Law Debenture"), (viii) Deutsche Bank Trust Company Americas, (ix) Centerbridge Credit Advisors, LLC, (x) Aurelius, (xi) EGI-TRB LLC, and (xii) Wilmington Trust Company (collectively, the "Mediation Parties," docket no. 5591).  On September 20, 2010, each of the Mediation Parties submitted to the Mediator a statement setting forth such Mediation Party's position respecting the structure and economic substance of an acceptable plan of reorganization.

The Mediation began on September 26, 2010, and the Mediation Parties continued settlement discussions on September 27, 2010.  On September 28, 2010, the Mediator filed a report which, among other things, reported a settlement agreement between the Debtors, on the one hand, and

---

5449, 5451, 5453, 5454, 5455, 5456, 5458, 5461, 5462, 5464, 5466, 5467, 5468, 5469, and 5480.

[23]Specifically, the Examiner framed his conclusions about the possible success of various claims using the following continuum: (1) highly likely, (2) reasonably likely, (3) somewhat likely, (4) equipoise, (5) somewhat unlikely, (6) reasonably unlikely, and (7) highly unlikely.

Angelo Gordon and Oaktree, on the other. The Mediator continued settlement discussions with certain parties. On October 12, 2010, the Mediator filed the Mediator's Second Report, which included the terms of an expanded settlement among the Debtors, the Committee, Oaktree, Angelo Gordon, and JP Morgan (the "October Term Sheet").

After status conferences on October 4 and 13, 2010, the Court entered an Order dated October 18, 2010 (docket no. 6022), setting deadlines for filing competing plans and disclosure statements. As a result, four competing plans of reorganization were filed: (i) the Debtor/Committee/Lender Plan, (ii) the Noteholder Plan, (iii) the Bridge Lender Plan,[24] and (iv) the Step One Credit Lender Plan.[25] The Step One Credit Lender Plan was withdrawn on December 14, 2010 (docket no. 7190). Pursuant to the procedures set forth in the Order dated December 9, 2010 (docket no. 7126), as amended by Order dated December 16, 2010 (docket no. 7215), the three competing plans were distributed for solicitation and voting. The Bridge Plan was withdrawn on February 7, 2011 (docket no. 7821).

Additional mediation sessions involving the DCL Plan Proponents and the Noteholder Plan Proponents were unsuccessful, and on March 7, 2011, the Confirmation Hearing commenced.

## DISCUSSION

A. **Valuation**

The consequence of the Court's valuation determination permeates more than one aspect of the confirmation disputes between respective plan proponents, including, for example, fairness of the settlement proposed in the DCL Plan, which the Court must resolve in the context of confirmation,

---

[24]The Bridge Lender Plan is the Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by King Street Acquisition Company, L.L.C., King Street Capital, L.P., and Marathon Asset Management, L.P. (Docket no. 7089) (as the same may be amended from time to time, the "Bridge Lender Plan").

[25]The Step One Lender Plan is the First Amended Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by Certain Holders of Step One Senior Loan Claims (Docket no. 6683).

the reasonableness of proposed releases, and certain subordination disputes in connection with the PHONES Notes.

The DCL Plan Proponents, through their experts, contend that the Debtors' Total Distributable Value is between $6.3 billion and $7.1 billion, with a mid-point of $6.75 billion. The Noteholder Plan Proponents, through their expert, contend that the Debtors' Total Enterprise Value is between $7.912 billion and $8.669 billion, with a mid-point of $8.291 billion. This leaves a staggering chasm - - measured by the distance between the competing valuation mid-points - - of $1.589 billion. For the reasons discussed below, I conclude that the Debtors' Total Distributable Value is $7.019 billion.

When considering valuation issues in the *Spansion*[26] contested plan confirmation proceeding, I noted that it has been aptly observed that "entity valuation is much like 'a guess compounded by an estimate.'" 7-1129 Collier On Bankruptcy ¶ 1129.05[3][c] (quoting Peter Coogan, *Confirmation of a Plan Under the Bankruptcy Code*, 32 Case W. Res. L. Rev.301, 313 n.62 (1982)). "Regardless of the method used, the result will rarely, if ever, be without doubt or variation. As the [United States] Supreme Court has put it:

> Since its application requires a prediction as to what will occur in the future, an estimate, as distinguished from mathematical certitude, is all that can be made. But that estimate must be based on an informed judgment which embraces all facts relevant to future earning capacity and hence to present worth, including, of course, the nature and condition of the properties, the past earnings record, and all circumstances which indicate whether or not that record is a reliable criterion of future performance."

7-1129 Collier on Bankruptcy ¶1129.05 [3][c] (quoting *Consolidated Rock Prods. Co. v. DuBois*, 312 U.S. 510, 526, 61 S.Ct. 675, 684-85, 85 L.Ed. 982, 991 (1941)).

The DCL Plan Proponents assert that the Total Distributable Value of the Debtors'

---

[26]*In re Spansion, Inc.*, 426 B.R. 114, 130 (Bankr.D.Del. 2010).

consolidated estates is between $6.3 billion and $7.1 billion, with a mid-point of $6.75 billion, based upon the analysis prepared by their investment banker, Lazard Freres & Co, LLC ("Lazard"), and described in Lazard's expert report dated February 2011 (the "Lazard Expert Report"). (DCL Ex. 1135). The Lazard Expert Report contains a valuation prepared in October 2010, which updated a previous $6.1 billion mid-point estimate of Tribune's Total Distributable Value prepared by Lazard in March 2010 for the Debtors' Disclosure Statement dated June 4, 2010. (*Id.* at 3). The October 2010 valuation relied upon revised financial projections prepared by the Debtors' management in October 2010 to incorporate the year-to-date results and revised outlook over the projection period. (*Id.*). Lazard also updated its analysis of comparable companies, discount rates, and precedent transactions to reflect current market conditions. (*Id.*). As a result, Lazard estimated the Total Enterprise Value of Tribune's core business to be between $2.9 billion to $3.4 billion, with a midpoint of $3.194 billion. (*Id.*). After adding the value of Tribune's non-controlled interests and the estimated cash balance as of December 27, 2010 to the Total Enterprise Value, Lazard arrived at the estimated Total Distributable Value with a mid-point of $6.75 billion.

The Noteholders argue that the DCL Plan Proponents have undervalued the Debtors, which provides a further basis for finding that the Settlements are unreasonable.[27]   To support their argument, the Noteholders rely upon a January 2011 report prepared by Lazard, as well as a criticism of the Lazard Expert Report prepared by the Noteholders' own expert, Rajinder Singh.

First, the Noteholders argue that the $6.75 billion value was "stale" and outdated as of the

---

[27]The Noteholders assert that a higher Total Distributable Value of the Debtors makes the Settlements less reasonable because, if the Debtor entities are worth more, then the creditors' "natural recoveries" from the estates would be higher. However, the DCL Plan Settlement is constant and doesn't provide for an increased recovery based upon the higher value.  This, in turn, provides the Senior Lenders with a better deal, since they are giving up a lower percentage of their claims in the Settlement. (Tr. 3/15/11 at 297:18- 298:9).

Confirmation Hearing as evidenced by a report prepared by Lazard in January 2011, which sets the Debtors' Total Distributable Value between $6.6 and $7.4 billion, with a mid-point of $7.019 billion. (DCL Ex. 1092 at 4-5). The January 2011 Report increased the mid-point for the Debtors' Total Distributable Value by $269 million. (*Id.*).[28] The Noteholders argue that the January 2011 report is a more reliable valuation because it was based upon market data available as of January 19, 2011, up-to-date performance numbers for 2010, and 2011 projections based on a preliminary version of the 2011 budget. (*See* Tr. 3/11/11 at 87:14 - 88:1).

The DCL Plan Proponents acknowledge that Lazard properly completed a report in January 2011 to "refresh" the October 2010 valuation, and argue that the January 2011 report validated and confirmed the value range prepared in October 2010. (Tr. 3/11/11 at 20:22- 21:12). Their expert, Suneel Mandava, noted that the January 2011 $7.019 billion mid-point fell within the high end of the range set in the October 2010 valuation ($7.1 billion). (Tr. 3/11/11 at 77:5-13). Moreover, he analyzed the composition of the $269 million increase in value and noted that the increase did not occur in Tribune's core business, including the publishing and broadcasting segments. (DCL Ex. 1092 at 5). Instead, the January 2011 report shows that the value of the publishing and broadcasting segments decreased by $42 million and $128 million, respectively, between October 2010 and January 2011 (*Id.*, Tr. 3/11/11 at 75:2-76:14). The increase in the Total Distributable Value was due, in large part, to an increase in the value of Tribune's "non-controlled investments," including TV Food Network, Classified Ventures and CareerBuilder. (*Id.*). Based on this analysis, Mandava opined

---

[28] The January 2011 report also included a valuation analysis that provided no weight to the DCF valuation of Tribune's publishing business. (DCL Ex. 1092 at 6). This resulted in a mid-point distributable value of $7.258 billion. However, one of the DCL Plan Proponent's valuation experts, John Chachas, explained that the 0% DCF weighting was run to understand the implications of entirely discarding the management team's view of the business, knowing that the projections would be questioned. (Tr. 3/11/11 at 212:9-25). However, he opined that it was inappropriate to discard wholly forecasts prepared by the people who manage the business. (*Id.* at 211:25 - 212:8).

that the January 2011 report did not provide sufficient basis for increasing Tribune's Total Distributable Value, especially because the reports had given full valuation to the investments, without applying any discount based on lack-of-marketability. (*Id.*).

The aim of the Court's exercise is to value Tribune upon emergence from bankruptcy (as of the Confirmation Hearing, the parties were using the date of June 30, 2011). Mandava testified that the mid-point from the October 2010 valuation was a reasonable estimate of the Company's valuation on that date because:

> the midpoint best takes into consideration the chance or risk or opportunity of the valuation either improving between now and then or going down between now and then. One only has to look at the stock market every day for the last two weeks to realize markets are highly volatile, and they will change. . . . It will continue to change every day between now and June 30. So $6.75 as the approximate midpoint best reflects that risk.

(Tr. 3/11/11 at 78:1-12).

This opinion was shared by the DCL Plan Proponents' second expert, John Chachas, who was retained to further validate the Lazard October 2010 Report, due to his specific experience in valuing companies in the publishing and broadcasting industries. (Tr. 3/11/11 at 146:5 - 146:9; 147:1 - 22). Chachas also opined that the increased value of the non-controlled investments did not warrant an increase in Tribune's overall value as of the emergence date of June 30, 2011. (Tr. 3/11/11 at 190:23 - 192:2). He observed that it was reasonable to discount the value of non-controlled investments in a range between 10% and 30%, and calculated that applying a more conservative 10% discount to Tribune's non-controlled investments would cancel the increase that occurred between October 2010 and January 2011. (*Id.* at 192:3-25).[29]

---

[29]The DCL Plan Proponents noted that the Noteholders' solvency expert, Tuliano, applied a "lack-of-control" discount of 16.7% when valuing Tribune's interest in the TV Food Network. (NPP Ex. 944 at Ex. I-4-B, p. 2 of 5).

In addition to arguing that the DCL Plan Proponents erred by not relying on the more up-to-date January 2011 report, the Noteholders' expert, Singh, prepared a rebuttal to the Lazard Expert Report. He used, among other things, (i) updated Tribune financial data available through February 21, 2011, (ii) updated comparable company and market data available through February 18, 2011, (iii) adjusted weighting of the discounted cash flow ("DCF") methodology in calculating the value of the publishing and broadcasting segments, and (iv) other corrections to the "deficiencies, errors and inconsistencies" in the Lazard valuation, which resulted in a depressed plan value. (NPP Ex. 2469). As a result of these changes, Singh estimated the Total Distributable Value of Tribune to be in a range of $7.912 to $8.669 billion, with a mid-point of $8.291 billion. (*Id.* at 18-19). This represents an increase of approximately $1.589 billion from the Lazard Expert Report mid-point. Singh prepared a bridge analysis demonstrating that the $1.589 billion increase consists of (i) an increase in $839 million by using updated financial and market data, (ii) an increase of $223 million by changing the weight assigned to the DCF and comparable company analyses for publishing, broadcasting, and other wholly-owned assets, and (iii) an increase of $527 million from other adjustments, including a determination of distributable cash on June 30, 2011, adding back certain non-cash pension expenses, and revising the comparable company and precedent transaction methodologies used to value Tribune's non-controlled interests. (*Id.* at 9).

The DCF Plan Proponents defend the Lazard Expert Report, arguing that Lazard used the most current information when preparing the October 2010 and January 2011 Reports. Singh's updated market price analysis caused him to estimate a large increase in the value of the non-controlled interests ($608 million), but the DCL Plan Proponents noted Singh's acknowledgment

that most of the market price increase reflected in his February 2011 Report was lost in the weeks between issuing the report and the confirmation hearing.  (Tr. 3/15/2011 at 40:1-5, *see also* DCL Ex. 1502 (Demonstrative)).

The DCL Plan Proponents point out that changes based on updated market data are hard to gauge, considering the fluctuations in the current market.  Even market information used for the January 2011 report and Singh's February 2011 rebuttal report may be outdated at this point. The DCL Plan Proponents also argue that using actual (better than expected) 2010 financial results in for the Debtors' publishing business, which is experiencing secular declines year after year, rather than less enthusiastic forward-looking forecasts, improperly raises the Debtors' purported value.  However, these arguments do not justify the use here of old data in support of an expert opinion, especially in light of more recent information.

The DCL Plan Proponents further contend that Singh's adjustments to the weighting of the DCF and comparable company analyses were flawed due to Singh's lack of knowledge and experience in the industry.  Singh's change to the weight of the publishing DCF, alone, increased the valuation by approximately $194 million.  The DCL Plan Proponents' expert explained that the comparable company analysis assumes that the publishing industry will revitalize itself, while the DCF analysis assumes the industry will continue to struggle with the secular challenges it is facing and will not be able to turn the business around.  (Tr. 3/11/11 at 35:4-36:1).  When valuing the publishing segment, Mandava applied a weighting of 30% for the DCF and 70% for the comparable company methodologies, recognizing that both viewpoints are valid and possible, but favoring the optimistic view of the future found in the comparable company analysis.  Singh, on the other hand, applied a weighting of 90% for comparable company analysis and 10% for the

DCF.  (NPP Ex. 2469 at 40).  Singh commented that Lazard ascribed too much weight to the publishing DCF value, which was based upon projections predicting steep declines in the publishing business.  He claims the projections are too dire, considering that the Company outperformed its forecasts for 2010, and are inconsistent with peer newspaper and publishing companies' forecasts.  (*Id.* at 37-38).  Mandava argued that a 10% DCF weighting is akin to giving no consideration to management's projections.  (Tr. 3/11/11 at 36:2-37:1).

Additionally, the DCL Plan Proponents dispute Singh's revisions to the valuation of certain non-controlled interests, by selecting different comparable companies, adding precedent transactions, and applying different weighting of the methodologies.  The DCL Plan Proponents argue that Singh's judgment in such matters should be given considerably less weight than that of their experts, particularly Chachas, who has over 20 years of valuation experience in the industry.  Moreover, when comparing the proffered valuations, the DCL Plan Proponents point out that Singh did not perform his own valuation analysis, but simply critiqued Lazard's valuation, by cherry-picking adjustments, substituting his uninformed judgment for Mandava and Chachas, and by guessing (incorrectly) about Lazard's computations.

The valuation record before me consists, predictably, on competing expert opinions.  As noted by Judge Peck in the *Iridium* decision, in a contested matter such as this, the hired experts often approach their valuation task from an advocate's point of view.  *Statutory Comm. Of Unsecured Creditors v. Motorola, Inc. (In re Iridium Operating LLC)*, 373 B.R. 283, 291 (Bankr.S.D.N.Y. 2007); *see also In re Mirant Corp.*, 334 B.R. 800, 814-15 (Bankr.N.D.Tex. 2005) ("That experts may be anxious to serve the interests of the parties retaining them is neither startling nor enough reason to disregard their testimony . . . .  It simply means the court must be

cautious itself, avoiding undue optimism while at the same time ensuring that assumptions and data used for valuing [the debtor] give full value to the business as rehabilitated through chapter 11.")

The DCL Plan Proponents' experts are convincing in their view that the Lazard Expert Report was reasonable and credible when completed, but I agree with the Noteholders that the October information was stale as of the confirmation hearing date. While I understand the DCL Plan Proponents' position against raising the Total Distributable Value based upon increases in value to the Debtors' non-controlled interests, the experts agreed that a valuation should be based on the most up-to-date information available. (Tr. 3/14/11 at 188:6-8, Tr. 3/11/11 at 86:19- 87:1, 208:6-10). Moreover, I agree with the Noteholders that the Lazard Expert Report failed to update the estimated distributable cash as of a date after December 27, 2010.

Still, I conclude that the DCL Plan Proponents' experts' provided rational explanations for their weighting of the comparable company and DCF methodologies in the Lazard Expert Report and, considering their experience and knowledge of the applicable industries, I find their analysis on these issues to be convincing. Throughout the confirmation hearing, all of the parties agreed that the publishing industry is in a serious decline. The Debtors' actual 2010 results in the publishing business (and broadcast business), however, were better than forecast, indicating that management's projections may have been too bleak. Yet, overall, I conclude that the DCL's experts' weighting was sound. Also, Messrs. Mandava and Chachas proved to be experienced, knowledgeable and credible in their defense of the choices made with respect to comparable company analysis and rejection of certain precedent transactions in evaluating the non-controlled interests.

On the other hand, I cannot conclude that the alternative valuation in the Noteholders' Rebuttal Report is reasonable, reliable or complete. The Rebuttal Report sets forth proposed revisions, but does not indicate how "cherry-picked" changes would impact the report as a whole.[30]   The record demonstrates that the updated market data is a moving target.  Finally, I find Lazard's and Chachas' valuation methodology and weighting of those methodologies to be more reasonable and reliable.   Relying on the most recent complete valuation presented at the confirmation hearing (that is, the January 2011 Report), I conclude that the Debtors' Total Distributable Value is the mid-point of the January 2011 Report:  $7.019 billion.

**B.      Whether the DCL Plan is Confirmable**

The DCL Plan can be confirmed only if it complies with the requirements of Bankruptcy Code §1129.  As I noted in *Exide Technologies*:

> The plan proponent bears the burden of establishing the plan's compliance with each of the requirements set forth in §1129(a), while the objecting parties bear the burden of producing evidence to support their objections. *Matter of Genesis Health Ventures, Inc.*, 266 B.R. 591, 598-99 (Bankr.D.Del. 2001); *Matter of Greate Bay Hotel & Casino, Inc.,* 251 B.R. 213, 221 (Bankr.D.N.J. 2000) (citations omitted).  In a case such as this one, in which an impaired class does not vote to accept the plan, the plan proponent must also show that the plan meets the additional requirements of §1129(b), including the requirements that the plan does not unfairly discriminate against dissenting classes and the treatment of the dissenting classes is fair and equitable.  *Id.*

*In re Exide Tech.,* 303 B.R. 48, 58 (Bankr.D.Del. 2003).   The remaining objections to confirmation of the DCL Plan include: (i) whether the proposed settlements of the LBO-Related

---

[30]For example, Singh's Rebuttal Report includes an increase in value of $182 million based upon an accounting adjustment based on unfunded pension liability.  The DCL Plan Proponents argue that the adjustment arises from using the "Fresh Start Accounting" methodology as to the unfunded pension liability, without analyzing how using the Fresh Start Accounting methodology could impact the Debtors' financial statements as a whole.  (Tr. 3/15/11 at 80:8 - 81:23).

Causes of Action meet the requirements of Bankruptcy Code §1129(a) and Fed.R.Bankr.P. 9019, (ii) whether the DCL Plan is feasible, due to applicable FCC regulations, (iii) whether the "Bar Order" set forth in Section 11.3 is an improper third party release, and whether other releases in Section 11.2.1 and 11.5 are fair, (iv) whether the DCL Plan complies with §1129(a)(10) by receiving acceptance by at least one impaired class of creditors for each debtor, (v) whether the DCL Plan's assignment of certain state law causes of action to a creditors' trust is fair and equitable, (vi) whether the Litigation Trust is fair and equitable, (vi) whether the DCL Plan properly classifies certain claims, and (vii) whether the DCL Plan's treatment of the PHONES Notes' subordination provisions is fair and equitable.[31]

Most of the evidence presented at the confirmation hearing addressed the issue of whether the proposed DCL Plan settlements are fair and equitable. The proposed settlements are the main difference between the DCL Plan and the Noteholder Plan, since the latter plan proposes to pursue "vigorously" litigation of all the LBO-Related Causes of Action.

1.    Whether the DCL Plan Settlements are Reasonable

By way of background, two components of the DCL Plan must be described to understand the Noteholder Plan Proponents' objection: the "Settlements" and the "Trusts." The

_____

[31]As a result of post-confirmation hearing mediation before the Honorable Kevin Gross, the Debtors resolved certain objections concerning claims, causes of action and related matters arising from alleged violations of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), in connection with the Tribune ESOP and the Tribune Employee Stock Ownership Trust, an employee retirement benefit plan. By order dated October 19, 2011 (docket no. 10019), the Court approved the Debtors' motion for approval of a settlement of ERISA claims (docket no. 9681), resolving, *inter alia*, plan objections by the United States Department of Labor (docket no. 7975), and GreatBanc Trust Company (docket no. 7977). Also, on October 19, 2011, the Court entered an order (docket no. 10023) approving the Debtors' motion for approval of a settlement with the Internal Revenue Service regarding pension claims (docket no. 9922), resolving, *inter alia*, plan objections by the IRS (docket no. 8001). The DCL Plan Proponents and the Noteholder Plan Proponents filed amendments to their plans on October 19 and 20, 2011, respectively, incorporating the settlements. (Docket nos. 10024, 10033).

"Settlements" consist of two settlements: (i) the settlement with current and former Senior Lenders, Bridge Lenders, and other parties[32] of certain LBO-Related Causes of Action (the "LBO Settlement"), and (ii) the settlement with current and former Senior Lenders, Bridge Lenders, or Step Two Arrangers (as defined in the DCL Plan) who received pre-petition payments from the Debtors on account of the Step Two Financing (the "Step Two Disgorgement Settlement").[33] (DCL Discl. St. at 4, DCL Plan §5.15).

The DCL Plan preserves the remaining LBO-Related Causes of Action and other claims (the "Preserved Causes of Action") for the benefit of Tribune's creditors by assigning those causes of action to the Litigation Trust. (DCL Discl. St. at 5, DCL Plan §§13, 14). The Preserved Causes of Action that may be pursued by the Litigation Trust include (i) claims to recover payments made to shareholders in connection with the LBO, (ii) claims against the Debtors' officers, directors, and professionals for breach of fiduciary duties, (iii) claims against EGI and Zell, (iv) claims against Advisors, including Merrill Lynch, Citigroup Global Markets, Inc., and Valuation Research Corporation, and (v) claims against Morgan Stanley. (DCL Discl. St. at 25). The Creditors' Trust may pursue certain "Transferred State Law Avoidance Claims" that individual creditors may opt to assign to the Creditors' Trust, rather than pursue on their

---

[32]The other parties consist of the Senior Loan Agent, the Senior Loan Arranger, the Bridge Loan Arranger, and the Released Stockholder Parties, all as defined in the DCL Plan. (DCL Ex. 1429, the Specific Disclosure Statement relating to the DCL Plan dated December 8, 2010, at 4 (Docket no. 7135)(the "DCL Discl. St.")).

[33]The Step Two Payees are the current and former Senior Lenders, Bridge Lenders or Step Two Arrangers (as defined in the DCL Plan) who received payments prior to the Petition Date on account of the Incremental Facility or Bridge Facility. (DCL Discl St. at 4). The Step Two Payees, the other parties to the Settlements as described in n. 32, *supra*., and the parties defined as the "Released Parties" in §1.1.200 of the DCL Plan are referred to herein as the "Settling Parties."

own.[34]

The DCL Plan Proponents contend that the Settlements provide the holders of Senior Noteholder Claims, Other Parent Claims, Convenience Claims, and General Unsecured Claims (the "Non-LBO Creditors") with initial distributions well in excess of the "natural recoveries" those creditors would receive from the estate, assuming the Debtors have a total distributable enterprise value (or "DEV") of $6.75 billion, if the Senior Loan Claims and Bridge Loan Claims are not avoided.[35]

| Non-LBO Creditor | Natural Recovery, assuming DEV of 6.75 billion (with no avoidance)[36] | DCL Plan Recovery |
| --- | --- | --- |
| Senior Noteholders | 4.8% | 33.6% |
| Other parent claims | 4.8% | 32-35%[37] |
| Subsidiary general unsecured claims | 2.6% | 100% |
| Subordinated PHONES & EGI Noteholders | 0% | 0% |

The initial settlement distributions are funded from three sources: (1) Senior Lenders will forgo approximately $401.5 million in recoveries to which they would otherwise be entitled upon allowance of their claims, (2) recipients of pre-petition principal, interest, and fee payments on

---

[34]*See* DCL Plan §1.1.80, §14.3.1 (docket no. 8769).

[35] "Natural recoveries" are those to which parties are entitled based upon the total distributable value of the Debtors, without adjustment for possible recoveries based upon avoidance and equitable subordination actions. The DCL Plan Proponents calculate the creditors' "natural recoveries" based upon their assertion that the Debtors' total distributable value is $6.75 billion. Valuation is discussed in Section A.1.(B) of the Discussion Section, *infra*.

[36]DCL Ex. 1110 at 20.

[37]The initial distribution changes depending on whether the other claim holders of the Tribune parent opt to receive an interest in the Trusts.

account of the Incremental Facility and the Bridge Loan Facility, provided at Step Two of the LBO, will contribute $120 million in cash,[38] and (3) the Bridge Lenders will forgo approximately $13.3. million of their natural recoveries.   (DCL Discl. St. at 4).

An additional source of consideration provided to Non-LBO Creditors under the DCL Plan Settlements is the agreement by the Senior Lenders and the Bridge Lenders to forgo *pro rata* participation in initial recoveries from the Litigation and Creditors Trusts, so that the Non-LBO Parent Creditors will receive the first $90 million in net recoveries by the Trusts, and, thereafter, 65% of all net recoveries by the Trusts, after repayment of the $20 million loan received from Reorganized Tribune to fund the Trust litigation.  (DCL Discl. St. at 19-20).

The Noteholder Plan Proponents argue that the DCL Plan Settlements are not fair and equitable to impaired classes that have not accepted the DCL Plan and, accordingly, the DCL plan cannot be confirmed.  First, the Noteholders contend that the Settlements were not made in good faith, resulting in a "sweetheart deal" for the Settling Parties, because negotiating parties either had conflicts or did not have an incentive to demand a more valuable, reasonable settlement. Next, the Noteholders contend that the Debtors' distributable enterprise value is greater than the $6.75 billion amount relied upon by the DCL Plan Proponents and, because the greater value increases the natural recoveries for the creditors, the Settlement amounts should also be increased.  Further, the Noteholders urge that the Settlement amounts are far too low,

---

[38]The Step Two Disgorgement Settlement provides potential Step Two Disgorgement Defendants with an option to participate in the settlement, although payment of cash equal to $120 million is backstopped by the Step Two Arrangers (i.e., JPMorgan, Merrill Lynch, Bank of America and Citigroup), subject to reimbursement of advances for non-participating Step Two Disgorgement Defendants from the recoveries of the Litigation Trust on related preserved causes of action.  *See* DCL Discl.St. at 19-20 and DCL Plan §5.15.1.

considering the value of the claims being released. The Noteholders argue that, if the claims were pursued vigorously, those claims would generate sufficient funds to pay the Senior Noteholders in full and provide a distribution for subordinated noteholders.

The DCL Plan Proponents deny any lack of good faith and point out that negotiation of the Settlements took place in the Mediation under the guidance of Judge Gross. The DCL Plan Proponents also rely upon their experts' reports and testimony to demonstrate that the reasonable, fair distributable enterprise value of the Debtors is $6.75 billion. Further, they assert that the Settlements with the Senior Lenders are fair because the Settlements reflect the essential determinations of the Examiner, who found substantial barriers to avoidance of Step One claims against Senior Lenders, while guaranteeing recoveries in excess of those that the Senior Noteholders would receive if only Step Two Claims were avoided. They also argue that claims against other entities are preserved. Finally, they emphasize that the DCL Plan has been overwhelmingly accepted by creditors across the capital structure of the Debtors.

(A)     Good Faith of the Negotiating Parties

A court cannot confirm a plan unless it determines that the plan is "proposed in good faith and not by any means forbidden by law." 11 U.S.C. §1129(a)(3). "The good faith standard requires that the plan be 'proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code.'" *In re Coram Healthcare Corp.*, 271 B.R. 228, 234 (Bankr.D.Del. 2001) (quoting *In re Zenith Electronics Corp.*, 241 B.R. 92, 107 (Bankr.D.Del. 1999)); *see also In re Smurfit-Stone Container Corp.*, No. 09-10235, 2010 WL 2403793, *11 (Bankr.D.Del. June 11, 2010) (in assessing good faith, the court considered whether "[c]onsistent with the overriding

purpose of chapter 11, the Plan is designed to allow each of the Debtors to reorganize on a going concern basis while maximizing recoveries to their creditors and providing the Reorganized Debtors with a capital structure that will allow the Reorganized Debtors to satisfy their obligations with sufficient liquidity and capital reserves and to fund necessary capital expenditures and otherwise conduct their business in the ordinary course.").

Moreover, in assessing the fairness of proposed settlement, a court may consider the extent that the settlement is truly the product of arms-length bargaining, and not fraud or collusion. *See In re New Century TRS Holdings, Inc.*, 390 B.R. 140, 167 n. 33 (Bankr.D.Del. 2008) *rev'd on other grounds* 407 B.R. 576 (D.Del. 2009); *Exide*, 303 B.R. at 67-68.

The Noteholders argue that the DCL Plan Settlements must be rejected because they are not the result of good-faith, arms-length negotiations. The Noteholders contend that the settlement process was tainted by conflicts of interest, one-sided negotiations, and other irregularities. These assertions are unsupported by the evidentiary record.

The plan settlement negotiations were biased, the Noteholders contend, because the Debtors' point person was Don Liebentritt, who indicated that he has worked for Zell since 1982, including time (from 1999 to 2006) as general counsel and president of EGI, and continued to be an officer or director of some EGI-related entities and had investments with them. (NPP Ex. 2088, Liebentritt Dep. 2/22/11 at 14:7- 16:4).[39]  In addition, they argue, Liebentritt had conflicts of interest because he is a potential defendant in the LBO-Related Causes of Action as a Step

---

[39]Liebentritt was the Debtors' general counsel from May 2008 until September 2010, when he became the chief restructuring officer for the Debtors. (Liebentritt Dep. 2/22/11 at 19:22 - 20:23)

Two selling shareholder.[40]  The Noteholders further claim that participation of Debtors' counsel,

Sidley Austin LLP, in any settlement negotiations was also subject to conflicts of interest due to

its role in the structuring of the LBO transaction.

Despite Liebentritt's direct participation in the negotiations, the proposed settlement does

not include any deal or arrangement regarding the claims of Zell, EGI or the Step Two

shareholders. *Cf. Coram Healthcare*, 271 B.R. at 232 (the Court denied confirmation of the

debtor's first proposed plan upon finding that the CEO had an actual conflict of interest arising

from a on-going $1 million/year consulting contract with one of the debtor's largest creditors that

had tainted the debtor's restructuring and plan negotiations).

Moreover, in August 2010, when the April 2010 Plan was no longer a feasible option and

it appeared that the reorganization was heading toward litigation rather than settlement,

Liebentritt recommended that a "special committee" of board members be established, with

separate counsel, to approve any future proposed settlement.[41]  (Liebentritt Dep. 2/22/11  at

185:12 - 187:16).  The Noteholders claim that the special committee was a sham because it did

not perform its own investigation regarding  the value of potential claims, but relied upon

Liebentritt.  The Noteholders overlook, however, that before the special committee was

established, the Examiner had completed his thorough and independent investigation of the LBO-

---

[40]The Noteholders also allege that Liebentritt is a Step 2 selling shareholder, although in his
deposition, Liebentritt explained that he invested in Tribune through a single member limited liability
corporation, known as Tower - DL, LLC ("Tower").  During the Step Two transaction, Tower's shares in
Tribune were converted to an interest in a loan and a warrant.  (Liebentritt Dep. 2/22/11 at 24:9- 25:8,
28:7-22).

[41]The Noteholders also claim that establishing the special committee failed to insulate the Board
from potential conflicts because almost all of the board members had relationships with Zell.  As stated
above, however, the DCL Plan Settlements do not include a settlement regarding the Zell or EGI claims
and, therefore, are not relevant to this analysis.

Related Causes of Action, which was available to all of the parties. The Noteholders also argue

that members of the special committee had relationships with Senior Lenders that may have

unduly influenced them.   (NPP Ex. 757).  It is unsurprising that many of the players in this

drama had business relationships based upon prior, and potentially future, deals.[42]  Indeed, based

upon my experience, I would be surprised if, in a large, complex business reorganization there

were no connections among various constituents.  The Court's focus, however, is not on the

existence of connections, but on whether such connections rise to potential or actual conflicts.

Without any tangible evidence of actual wrongdoing or harm to the Debtors, suspicion of a

potential conflict is not sufficient to demonstrate bad faith.  *In re Washington Mutual, Inc.*, 442

B.R. 314, 327 (Bankr. D.Del. 2011).

Further, the Creditor Committee's participation in the settlement negotiations is highly

relevant when considering whether the DCL Plan Settlements were negotiated in good faith.  The

Noteholders argue that the Creditors Committee's participation provides no evidence of arms-

length negotiation or good faith because the Committee failed to represent all unsecured creditors

(in particular, the Noteholders) and committee members had no incentive to maximize the value

---

[42]In support of its claim regarding conflicts of interest between members of the Special
Committee and the Senior Lenders, the Noteholders highlight an email from Maggie Wilderotter (of the
Tribune Board's Special Committee) and James Lee of JPMorgan, dated February 11, 2010, in which
Ms. Wilderotter seeks to arrange a telephone conversation between Eddy Hartenstein, the publisher and
CEO  of the LA Times (and now, President and CEO of Tribune), and Mr. Lee or others at JPMorgan.
(NPP Ex. 757).  Ms. Wilderotter ends the email with the salutation "Your friend who is always looking
out for JPM!"  In her deposition, parts of which were played at the confirmation hearing, Ms. Wilderotter
explained that the purpose of her email was to introduce Mr. Hartenstein, whom she viewed as an
important executive in the Tribune organization, to people at JPMorgan, since it was possible the lenders
remain interested in Tribune for a long-term basis.  (Tr. 3/15/2011 at 174:23 - 175:22).  The salutation's
meaning was to note that she was a friend of JPMorgan, that she had a business relationship with them.
(*Id.* at 176:25 - 177:4).  I find the explanation credible and, without further evidence, do not find this
business relationship to be evidence of bad faith by the negotiating parties.  The terms of the actual
settlement were reached with other parties, including the Creditors' Committee present.

of the Settlement. This position is not supported by the evidence. The Creditors' Committee rejected initial settlements proposals offered by the Debtors and the Senior Lenders in the fall of 2010. (DCL Ex. 273). Instead, the Committee negotiated what it believed to be a fair settlement for all unsecured creditors.[43] (Tr. 3/8/11 at 245:1 - 247:25). The record here reflects that the Committee considered all of the unsecured creditors' interests. Failure to advocate the Noteholders' position above interests of other creditor constituencies is not a breach of the Committee's fiduciary duties. The Committee argues that its position in the negotiations has been vindicated by the fact that 125 of 128 voting classes - - which include classes of both defendants and beneficiaries of the LBO-Related Causes of Action - - accepted the DCL Plan. (Epiq Voting Declaration, Docket no. 8882 at Ex. 1). Even members of the Senior Noteholder Class (70% in number, which represented, however, only 12% in claim amount) voted to accept the DCL Plan. (*Id.*)

Finally, the Senior Noteholders argue that they were unfairly excluded from early plan negotiations. *See In re Nutritional Sourcing Corp.*, 398 B.R. 816, 838 (Bankr.D.Del. 2008) (deciding that a plan settlement was not fair and equitable when certain trade creditors were not afforded "meaningful participation" in the negotiations). However, Aurelius Capital Management, L.P. was named as a "mediation party" in the September 1, 2010 Order appointing a mediator, giving the Senior Noteholders an opportunity for meaningful participation in the

---

[43]Marc Salganik, a Creditor Committee member representing the Washington Baltimore Newspaper Guild, testified that he believed the DCL Plan Settlements were "fair overall," compared to the April 2010 settlement, because "it would very likely result in a better recovery for the noteholders because I thought there was substantial value in the litigation trust and because the noteholders got the lion's share of that value. And relative to the earlier October settlement, it improved the position of the unsecured creditors at the parent and subsidiary levels." (Tr. 3/8/11 at 247:6-13).

mediation. (DCL Ex. 382). Even though the mediation failed to result in an entirely global

consensus, Aurelius' access weighs in favor of concluding that the DCL Plan Settlement was

achieved as a result of arms-length, good faith negotiations.[44] The evidentiary record reflects that

Aurelius's views were well known, but quite simply, not accepted by others.

 (B) <u>Impact of the valuation on the reasonableness of the DCL Plan Settlement</u>

 The Court's valuation conclusion affects the Court's analysis of the fairness of the DCL

Plan Settlement. The DCL Plan Settlement is based upon an assumed value of $6.75 billion

(mid-point). Is the Court's valuation determination, higher by $269 million, enough to nudge the

proposed DCL Plan Settlements below the lowest point in the range of reasonableness? The

Noteholders argue that a Total Distributable Value of $7.019 provides enough value to pay the

Step One Lenders in full under a waterfall plan, if Step Two Debt is avoided and no post-petition

interest is allowed to Senior Lenders, leaving enough value to pay Senior Noteholders well in

excess of the DCL Plan Settlement amount. (Tr. 3/15/11 at 297:13 - 299:22). This testimony by

the managing director of Aurelius is speculative and presents conclusions without adequate

explanation. The Noteholders' contend that their natural recovery under a valuation in line with

the January 2011 report would increase from approximately 4.8% to 5.0%. (*See* NPP Amended

---

[44]The DCL Plan Proponents, in support of the DCL Plan's proposed settlement, invite the Court to accord special consideration to the fact that the mediation was conducted by my colleague, Judge Gross, whose skills as a mediator are highly respected and much sought after. Mediations are confidential by custom and under local rule. (*See* Del. Bankr.L.R. 9019-5(d)). Later assessment of the quality of the mediation, by whomever conducted - - absent some identifiable impropriety (and the record here reflects none) - - is antithetical to the purpose and atmosphere intended to be created to enable parties to engage in such discussions. Parties, subject to the rules of mediation and the mediator, must be positioned to participate in settlement discussions uninhibited by the possibility that evidentiary consequences may ensue, whether mediation is wholly or partially successful, or fails to result in any settlement. In other words, the proposed settlement must stand or fall on its own merits and is not dependent upon the identity of the Mediator.

Supplemental Objection, docket no. 8635 at 7).   Even if the Noteholders' assumptions are correct and the increase of 4.8% to 5.0% accurate, it is not significant enough to upset the DCL Plan Settlement.

        (C)    <u>Reasonableness of the Settlements</u>

Bankruptcy Code §1123(b)(3)(A) provides that a plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."  11 U.S.C. §1123(b)(3)(A).  It is the "duty of a bankruptcy court to determine that a proposed compromise forming part of a reorganization plan is fair and equitable."  *Protective Comm. For Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968).

Bankruptcy courts are also tasked with approving compromises under Rule 9019 of the Federal Rules of Bankruptcy Procedure.  "Settlements are favored, but the unique nature of the bankruptcy process means that judges must carefully examine settlements before approving them."  *Will v. Northwestern Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 644 (3d Cir. 2006). "[T]he decision whether to approve a compromise under Rule 9019 is committed to the sound discretion of the Court, which must determine if the compromise is fair, reasonable, and in the interest of the estate."  *In re Louise's, Inc.*, 211 B.R. 798, 801 (D.Del. 1997).

The court should "assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal."  *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996).  In striking this balance, the court should consider: (1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily

attending it; and (4) the paramount interest of creditors. *Id.,* (citing *TMT Trailer*, 390 U.S. at 424-25, 88 S.Ct. at 1163-64). *See also Nutraquest*, 434 F.3d at 644-45 (reaffirming use of the *Martin* factors for approving settlement of claims by and against an estate); *In re Washington Mutual, Inc.*, 442 B.R. 314, 328 (Bankr.D.Del. 2011); *In re Spansion, Inc.*, 2009 WL 1531788, *4 (Bankr.D.Del. June 2, 2009).

In evaluating the fairness of a settlement, the court does not have to be convinced that the settlement is the best possible compromise, but only that the settlement falls within a reasonable range of litigation possibilities. *Washington Mutual,* 442 B.R. at 328 (citing *Coram Healthcare*, 315 B.R. at 330). Therefore, the settlement need only be above the "lowest point in the range of reasonableness." *Washington Mut.*, 442 B.R. at 328. The DCL Plan Proponents bear the burden of persuading the Court that the Settlements falls within the range of reasonableness. *Id.* (citing *Key3Media Group, Inc. v. Pulver.com, Inc. (In re Key3Media Group, Inc.)*, 336 B.R. 87, 93 (Bankr.D.Del. 2005)).

(1)    Probability of Success in Litigation

In evaluating this factor, the Court's task is not to "decide the numerous questions of law and fact raised by the [objections] but rather to canvass the issues to see whether the settlement fall[s] below the lowest point in the range of reasonableness." *Exide*, 303 B.R. at 68 (quoting *In re Neshaminy Office Bldg. Assoc.*, 62 B.R. 798, 803 (E.D.Pa. 1986)); *see also In re Cellular Information Systems, Inc.*, 171 B.R. 926, 950 (Bankr.S.D.N.Y. 1994) (The purpose in addressing the first *Martin* factor is "not to make findings of fact and conclusions of law, but to canvass the issues to assess the risks associated with prosecuting the [litigation].")

The LBO-Related Causes of Action that are being settled include claims against the

Settling Parties to avoid, subordinate, or disallow obligations arising from the financing of the LBO through the Senior Loan Agreement and the Bridge Loan Agreement (jointly, the "LBO Lender Debt"), and claims for disgorgement of payments made on the LBO Lender Debt prior to the petition date. These claims include (i) causes of action to avoid fraudulent transfers under Bankruptcy Code §§544(b) and 548, (ii) causes of action to equitably subordinate claims under Bankruptcy Code §510(c), (iii) causes of action to avoid preference payments under Bankruptcy Code §547, (iv) causes of action to disallow or subordinate claims based on theories of estoppel or unjust enrichment. (*See* Complaint, Docket no. 1, Adv. No. 10-53963). As described by the Examiner:

> Because the LBO Lender Debt dwarfs the other claims against the Tribune Entities and, owing to the Subsidiary Guarantees, occupies a structurally senior position, if this indebtedness is not avoided, subordinated, or disallowed, the holders of those claims would recover most of the value available from the Debtors' bankruptcy estates. Avoidance of the LBO Lender Debt affords the Non-LBO Creditors an opportunity to unravel its structural seniority at the Guarantor Subsidiaries level, and thereby move to the head of the line. Thus, among the . . . potential avoidances and recoveries . . ., the actions to avoid the LBO Lender Debt are the proverbial "main event."

(Examiner's Report, Vol II, at 10).

The DCL Plan Proponents argue that the Examiner's Report supports the reasonableness of the Settlements. The Examiner's duties included evaluating the estates' potential causes of action arising out of the LBO. After a comprehensive investigation, the Examiner prepared a lengthy and detailed report setting forth his conclusions. Generally, the Examiner determined that the Step Two transactions were more susceptible to avoidance than the Step One transactions. Some of his many conclusions are summarized as follows:

| Claim | Examiner's Evaluation |
|---|---|
| Intentional Fraud at Step One<br>11 U.S.C. §548(a)(1)(A)<br><br>(Examiner's Report, Vol II, at 22) | A court is ***"reasonably unlikely"*** to find that the Tribune Entities incurred obligations or made transfers in the Step One transactions with actual intent to hinder, delay or defraud any entity to which they were or became, on or after the date that such transfers were made or obligations were incurred, indebted |
| Intentional Fraud at Step Two<br>11 U.S.C. §548(a)(1)(A)<br><br>(Examiner's Report, Vol II, at 32) | A court is *"**somewhat likely**"* to find that the Tribune Entities incurred obligations or made transfers in the Step Two transactions with actual intent to hinder, delay or defraud any entity to which they were or became, on or after the date that such transfers were made or obligations were incurred, indebted |
| Constructive Fraud - Insolvency of Parent at Step One<br>11 U.S.C. §548(a)(1)(B)(ii)(I)<br><br>(Examiner's Report, Vol. II ,at 187) | A court is ***"highly likely"*** to find that the Tribune Parent was solvent as of, and after giving effect to, the Step One Transactions, if Step Two Debt is not included for purposes of that determination. If Step Two Debt is included, it is ***"somewhat likely***" (although a very close call) that a court could find Tribune was solvent. |
| Constructive Fraud - Insolvency of Guarantor Subsidiaries at Step One<br>11 U.S.C. §548(a)(1)(B)(ii)(I)<br><br>(Examiner's Report, Vol. II, at 207) | A court is ***"highly likely"*** to find that the Guarantor Subsidiaries were solvent as of, and after giving effect to, the Step One Transactions if the Step Two Debt is not included for purposes of that determination. If Step Two Debt is included, a court is "***somewhat more likely"*** to conclude that the Guarantor Subsidiaries were solvent. |
| Constructive Fraud - Insolvency of Parent at Step Two<br>11 U.S.C. §548(a)(1)(B)(ii)(I)<br><br>(Examiner's Report, Vol. II at 220) | A court is ***"highly likely"*** to conclude that the Step Two transactions rendered Tribune Parent insolvent. |

| | |
|---|---|
| Constructive Fraud - Insolvency of Guarantor Subsidiaries at Step Two 11 U.S.C. §548(a)(1)(B)(ii)(I) (Examiner's Report, Vol. II at 226) | A court is ***"reasonably likely"*** to conclude that the Guarantor Subsidiaries were rendered insolvent on a collective basis as a result of the Step Two transactions. |
| Constructive Fraud - adequate capital at Step One 11 U.S.C. §548(a)(1)(B)(ii)(II) (Examiner's Report, Vol. II, at 211) | A court is ***"reasonably likely"*** to conclude that the Tribune Parent and the Guarantor Subsidiaries were left with adequate capital after giving effect to the Step One transactions. |
| Constructive Fraud - adequate capital for Tribune Parent at Step Two 11 U.S.C. §548(a)(1)(B)(ii)(II) (Examiner's Report, Vol. II, at 229) | A court is ***"highly likely"*** to conclude that the Tribune Parent was left without adequate capital after giving effect to the Step Two transactions |
| Constructive Fraud - adequate capital for the Guarantor Subsidiaries at Step Two 11 U.S.C. §548(a)(1)(B)(ii)(II) (Examiner's Report, Vol. II, at 229) | A court is ***"reasonably likely"*** to conclude that the Guarantor Subsidiaries were left without adequate capital after giving effect to the Step Two transactions. |
| Constructive Fraud - incurring debts beyond an ability to pay at Step One 11 U.S.C. §548(a)(1)(B)(ii)(III) (Examiner's Report, Vol. II, at 239) | A court is ***"reasonably unlikely"*** to find that the Tribune Entities intended to incur or believed they would incur debts beyond their ability to pay as such debts matured at Step One |
| Constructive Fraud - incurring debts beyond an ability to pay at Step Two 11 U.S.C. §548(a)(1)(B)(ii)(III) (Examiner's Report, Vol. II, at 240) | A court would be ***"somewhat likely"*** to find that the Tribune Entities intended to incur or believed they would incur debts beyond their ability to pay as such debts matured at Step Two |

The Examiner also evaluated and quantified potential recoveries to the Debtors' estates based on recovery scenarios arising from the alleged LBO-Related Causes of Action (the "Recovery Scenarios"). (Examiner's Report, Vol. II, Annex B). When viewed in light of six

Recovery Scenarios as quantified by the Examiner,[45] only one Recovery Scenario (that is, full avoidance of the LBO Lender Debt at both Step One and Step Two) provided a better return for the Senior Noteholders than the DCL Plan Settlements.

| Examiner Scenario | Noteholders' Recovery ($million) |
|---|---|
| 1.  No Avoidance | $58 to $65 |
| 2.  Step Two avoidance at Parent | $95 to $107 |
| 3.  Step Two avoidance at Parent and Subs | $100 to $113 |
| 4.  Step One and Two avoidance at Parent | $240 to $280 |
| 5.  Step One avoidance at Parent, Step Two avoidance at Parent and Subs | $246 to $289 |
| **DCL Settlement** | **$432** |
| 6.  Full Avoidance | $1,305 |

(Examiner's Report, Vol. II, Annex B at B-10 to B-33).

The Noteholder Plan Proponents assert that the Court's evaluation of the DCL Plan Settlements should not end with findings in the Examiner's Report, arguing that (i) there is a strong possibility of prevailing on full avoidance, subordination or disallowance of the Senior Lenders' debt at both Step One and Step Two, and (ii) there are numerous other litigation outcomes that would result in far greater recoveries for Non-LBO Creditors.  Because the Examiner Report supports the Noteholders' contention that it is highly likely that a court would avoid the Step Two transactions, I will focus my analysis on the Noteholders' arguments that there is strong case for full avoidance, subordination, or disallowance of the Step One

---

[45]The DCL Plan Proponents compared the Settlements to only six of the Examiner's eight Recovery Scenarios because the Examiner's seventh and eighth Recovery Scenarios included distribution of proceeds from actions against Step Two shareholders (claims which are not settled here, but included in the Trusts).

transactions.

<u>Intentional Fraud</u>

The Noteholder Plan Proponents argue that there is considerable evidence in the record to show that the Step One transactions should be avoided because they were intentionally fraudulent. To prove intentional fraud, a plaintiff must show that the transaction was perpetrated "with actual intent to hinder, delay or defraud" creditors. 11 U.S.C. §548(a)(1)(A). Intent is often difficult to prove, and a plaintiff may meet his burden of proof by introducing evidence that supports an inference of intent. *Moody v. Sec. Pacific Bus. Credit, Inc.*, 127 B.R. 958, 990 (W.D.Pa. 1991) *aff'd* 971 F.2d 1056 (3d Cir. 1992). In deciding whether to infer actual intent, Courts traditionally have considered "badges of fraud," including (1) the relationship between the debtor and the transferee, (2) consideration for the conveyance, (3) insolvency or indebtedness of the debtors, (4) how much of the debtor's estate was transferred, (5) reservation of benefits, control or dominion by the debtor, and (6) secrecy or concealment of the transaction. *The Liquidation Trust of Hechinger Investment Co. Of Delaware, Inc. v. Fleet Retail Finance Group (In re Hechinger Investment Co. Of Delaware),* 327 B.R. 537, 551 (D.Del. 2005); *In re Fedders North America, Inc.*, 405 B.R. 527, 545 (Bankr.D.Del. 2009). "The presence or absence of any single badge of fraud is not conclusive." *Fedders*, 405 B.R. at 545 (citing *Dobin v. Hill (In re Hill)*, 342 B.R. 183, 198 (Bankr.D.N.J. 2006)). "Although the presence of a single . . .badge of fraud may cast suspicion on the transferor's intent, the confluence of several in one transaction generally provides conclusive evidence of an actual intent to defraud." *Id.*

The Noteholders contend that a number of the badges of fraud are present in the Step One transaction, including a relationship between the Debtors and certain transferees (i.e., board

members and management who sold stock or received cash bonuses), a lack of reasonably equivalent value, and insolvency. On the other hand, after his investigation, the Examiner concluded that the badges of fraud did not weigh in favor of finding an intentional fraudulent conveyance. (Examiner's Report, Vol. II., at 23-24). Although members of Tribune management and Board members were among the transferees, the Examiner found that the Special Committee and the Tribune Board entered into the LBO with active input of financial advisors. (*Id.*). Also, as is discussed in more detail later, the Examiner found it highly unlikely that a court would conclude that the Step One transactions rendered Tribune insolvent. (*Id.*). The Step One transactions were not secretive or concealed; instead, the record showed that the relevant financial information in the period leading up to the Step One transactions was regularly disclosed. (*Id.*). The DCL Plan Proponents also point out that the price for the LBO was determined in an open and public process.[46] (*See* Examiner's Report, Vol. I, at 101-113). Therefore, the only badge of fraud the Examiner identified was the lack of consideration for part of the Step One transactions.

A court may, of course, consider factors other than the traditional badges of fraud in an analysis of fraudulent intent. *Fedders*, 405 B.R. at 545 (citing *Hill*, 342 B.R. at 198-99). If the "natural consequence" of a debtor's actions is that its creditors were hindered, delayed or defrauded, a court is more likely to find that an intentional fraudulent transfer occurred. *United States v. Tabor Court Realty Corp.,* 803 F.2d 1288, 1305 (3d Cir. 1986). However, the fact that the LBO Lenders sought to obtain structural seniority for the debt through the subsidiary

[46]In fact, early litigation regarding the LBO transaction (the *Garamella* litigation) was based on the assertion that the $34/per share purchase price was too low. (DCL Ex. 1143 at 1).

guarantees is not, on its own and without further evidence, reflective of intent to hinder, delay or defraud creditors or evidence of misconduct. *See In re Owens Corning*, 419 F.3d 195, 212-13 (3d Cir. 2005) (In a different context, the Third Circuit Court of Appeals noted that a bank's efforts to obtain "structural seniority" are not out of the ordinary, writing: "To begin, the Banks did the 'deal world' equivalent of 'Lending 101.' They loaned $2 billion to [the parent] and enhanced the credit of that unsecured loan indirectly by subsidiary guarantees covering less than half the initial debt. What the Banks got in lending lingo was 'structural seniority' - - a direct claim against the guarantors (and thus against their assets levied on once a judgment is obtained) that other creditors . . . did not have. This kind of lending occurs every business day. To undo this bargain is a demanding task." )

The Noteholders contend that the LBO, as a whole, was founded on misleading and unrealistic financial projections prepared in February 2007, on which the Company continued to rely after management became aware that the Company's actual performance was materially below the projection figures. The Noteholders argue that management should have released revised projections prior to Step One, but did not based upon "potential legal concerns." (NPP Ex. 372, 4/12/07 email). Moreover, the Noteholders argue that internal emails demonstrate that Tribune's management knew that the LBO would leave the Company with no equity cushion.[47]

The DCL Plan Proponents counter that the Examiner investigated the allegations about

---

[47]*See* NPP Ex. 259 (3/24/07 email) in which the Company's then-Chief Financial Officer is questioned as follows:
> [W]e have a pretty narrow band for success under the ESOP - - i.e., if we are off plan by 2% we have no value in the ESOP for 5 years. Are there other dynamics at work I don't understand?

To which the CFO replied:
> Probably makes sense to meet on Monday to discuss. But yes if we hit the down 2 case there is no equity value in the first 5 years.

the projections and determined that the variance between the projections and the Company's actual performance during the first three months of 2007 was not significant enough to justify revisions, because the 2007 operating plan was based on a longer horizon and there was evidence that management believed that cost-cutting measures would help reverse negative variances on the revenue side of the business. (Examiner's Report, Vol. II, at 212-13). The DCL Plan Proponents also noted that the problems experienced by Tribune in the Spring of 2007 were not hidden, but fully disclosed. (DCL Ex. 980, 1389).

The Examiner undertook an extensive investigation regarding the viability of the intentionally fraudulent transfer claims at Step One and concluded that a Court was "reasonably unlikely" to find that the Tribune Entities made transfers and incurred the obligations at Step One with actual intent to hinder, delay or defraud creditors. (Examiner's Report, Vol. II, at 22). The lack of the traditional badges of fraud here, particularly in light of a showing that the price for the LBO transaction was determined as part of an open and public process, make it less likely that a plaintiff has a strong likelihood of avoiding the Step One transaction based on intentional fraud claims. It is not unreasonable for the Settling Parties to base a settlement on the notion that there was no intentional fraud in the Step One transaction.

Constructive Fraud

The constructive fraud theory does not require an actual intent to defraud. Instead, a transfer or incurred obligation is presumed to be fraudulent as to creditors once a plaintiff establishes the requisite statutory elements. *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 210 (3d Cir. 2006). Section 548(a)(1)(B) provides in pertinent part:

(a)(1)   The trustee may avoid any transfer . . . of an interest of the debtor in property, or any

49

obligation incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily - - . . . .

(B)(i)   received less than a reasonably equivalent value in exchange for such transfer or obligation; and

   (ii) (I)      was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

      (II)    was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; [or]

      (III)  intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured. . . .

11 U.S.C. §548(a)(1)(B).

The Examiner found it highly likely that a court would collapse all of the transactions within Step One and Step Two for purposes of evaluating "reasonably equivalent value."[48] (Examiner's Report, Vol. II, at 77). The Examiner evaluated each component of the consideration given and received by the participants in Step One and Step Two for the purpose of

---

[48]Courts in this Circuit have recognized that when a series of transactions are part of one integrated transaction, a court may look beyond the exchange of funds and collapse the individual transactions. *Mervyn's LLC v. Lubert-Adler Group IV, LLC (In re Mervyn's Holdings, LLC)*, 426 B.R. 488 (Bankr.D.Del. 2010) (citing *Tabor Court*, 803 F.2d at 1302). In this case, the Examiner and the parties discuss the concept of "collapse" with respect to two separate issues underlying the LBO constructive fraud analysis.

First, in evaluating whether the Debtors received reasonably equivalent value in exchange for the LBO indebtedness, a court may collapse transactions within Step One. That is, collapsing the transaction in which the Tribune Parent received monies from the Senior Lenders (the first transaction) with the one in which the Tribune Parent purchased stock from the Stockholders (the second transaction). In *Tabor Court*, the Court noted that the loan proceeds of over $4 million were immediately passed on by the borrowing companies to an affiliated company and ultimately to the selling shareholders. *Tabor Court*, 803 F.2d at 1302. The Court affirmed the district court's decision to treat the transactions as one integrated transaction, so that the loan proceeds could not be deemed consideration received by the borrowing corporation. *Id.* In this case, the parties do not dispute that a court is likely to collapse transactions in connection with a reasonable equivalent value analysis.

Second, in evaluating whether the Debtors were insolvent or had adequate capital at Step One, a court may collapse Step One and Step Two together and consider the entire LBO indebtedness. The parties vigorously contest the use of collapse in this context. This issue of "collapse" is discussed, *infra.*

assessing reasonably equivalent value under Bankruptcy Code §548(a)(1)(B) and the defenses under §548(c) (*Id.* at 90). For example, the Examiner reasoned that a court is highly likely to conclude that the LBO Lenders did not confer reasonably equivalent value on the Tribune Parent or the Guarantor Subsidiaries in the Step One or Step Two transactions for those portions of their advances used to redeem the selling stockholders' common stock. (*Id.* at 91). The Examiner also believed that a court is highly likely to conclude that the lenders under the Senior Loan Agreement conferred reasonably equivalent value to the Tribune Parent, but not to the Guarantor Subsidiaries, in Step One for amounts borrowed to repay the 2006 Bank Debt. (*Id.*).

When arguing for and against the reasonableness of the DCL Plan Settlement, the parties do not contest vigorously the Examiner's findings about the lack of reasonably equivalent value received for portions of the obligations incurred by the LBO Lenders. The parties' main dispute under the constructive fraud claims is whether the transfers made, or obligations incurred, rendered the Debtors insolvent, inadequately capitalized, or unable to pay their debts as they became due.

Insolvency[49]

The DCL Plan Proponents argue that the Debtors were not rendered insolvent as a result of the Step One transactions, relying on the Examiner's Report, and testimony of their expert, Daniel Fischel. The Noteholder Plan Proponents disagree, relying on the testimony of their own expert, Ralph Tuliano, and arguing that, to assess the Debtors' solvency at Step One properly, the impact of the entire LBO transaction must be considered.

---

[49]Insolvency is defined in the Bankruptcy Code as the "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation." 11 U.S.C. §101(32)(A).

The Examiner concluded that a court is highly likely to find that both the Tribune Parent and the Guarantor Subsidiaries were solvent as of, and after giving effect to, the Step One Transactions. (Examiner's Report, Vol. II, at 187, 207). However, the Examiner also concluded that if the effects of Step Two, including Step Two Debt, are considered in a Step One solvency analysis (i.e., if Step One and Step Two are "collapsed"), then the question is a very close call. Nonetheless, even with collapse, the Examiner concluded that a court is likely to find that the Tribune Parent was solvent, and somewhat more likely to find that the Guarantor Subsidiaries were solvent, as of the Step One closing. (*Id.*). The Noteholders disagree with the Examiner's conclusions and argue that a court would collapse Steps One and Two for the solvency analysis at Step One, making it more likely that the Step One transaction is avoidable under a constructive fraud theory.

Courts in this circuit have recognized that multi-step transactions can be collapsed when those steps are part of one integrated transaction. *Tabor Court,* 803 F.2d at 1302; *Hechinger*, 327 B.R. at 546; *Mervyn's Holdings*, 426 B.R. at 497. Instead of focusing on one of several transactions, a court should consider the overall financial consequences these transactions have on the creditors. *Mervyn's Holdings*, 426 B.R. at 497. The collapsing of multiple transactions is employed frequently in the context of leveraged buy-outs. *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635 (2d Cir. 1995) (citing *United States v. Gleneagles Investment Co.*, 565 F.Supp. 556 (M.D.Pa. 1983) *aff'd sub nom. Tabor Court*, 803 F.2d 1288); *see also Rosener v. Majestic Management, Inc. (In re OODC, LLC)*, 321 B.R. 128, 138 (Bankr.D.Del. 2005) ("In deciding whether to 'collapse' a series of transactions into one integrated transaction, the issue is . . . whether there was an overall scheme to defraud the estate and its creditors by depleting all the

assets through the use of a leveraged buyout.").

The *Mervyn's Holdings* Court determined that courts generally consider three factors when deciding whether to collapse a multi-step transaction: (i) whether all of the parties involved had knowledge of the multiple transactions, (ii) whether each transaction would have occurred on its own, and (iii) whether each transaction was dependent or conditioned on other transactions. *Mervyn's Holdings*, 426 B.R. at 497. In this case, the Examiner easily found that all parties had knowledge of the multiple transactions. (Examiner's Report, Vol. II, at 167). As to the second factor, the Examiner concluded that it was possible that the Step One stock repurchase could have occurred on its own if the Step Two merger and ESOP transactions had not been available, but "by the time the April 1, 2007 agreements were in place, Tribune had crafted a comprehensive transaction that would culminate in the Merger and the replacement of old ownership with new, and that could be fully implemented subject to satisfaction of the conditions precedent to Step Two." (*Id.* at 172-73). Under the Examiner's analysis, the first two factors fall in favor of collapsing Step One and Step Two.

The Examiner decided, however, that the third factor did not favor collapse because Step One and Step Two were not mutually dependent upon or conditioned upon one another. Although the transaction documents required the parties to use their best efforts to close the Step Two transactions, the parties structured the documents so that Step One could stand alone if necessary. (*Id.* at 174). The parties realized that requirements such as getting third party approvals of the Merger and a solvency opinion injected uncertainty into the equation. (*Id.* at 176). The Examiner looked to the following facts:

     (i)     the Credit Agreement did not obligate Tribune to obtain the Step Two financing

and did not make Tribune's failure to obtain the financing an event of default;

(ii)     the transaction documents provided a mechanism for EGI-TRB and the ESOP to sell their Tribune shares through a Tribune-sponsored registration statement if the Merger did not occur;

(iii)    Tribune's public filings disclosed that Step Two might not close;

(iv)    the Merger was conditioned upon FCC approval and Major League Baseball approval; and

(v)     the ratings agencies and market analysts recognized that the transaction would be effectuated in two steps.

(*Id.* at 174-76). The Examiner further considered whether, despite the outward appearance of the documents, the two transactions actually were reciprocally dependent. Although the Examiner said the question was close, he did not conclude that satisfaction of the conditions was a mere formality and without substance. (*Id.* at 177-79). The Examiner asserts that relevant case law would persuade a court to focus on whether the steps were actually dependent, not the probability that the steps would be completed. (*Id.* at 180). He wrote:

> [T]he reason why the Step Two Debt was not a liability of the Tribune Entities at Step One for solvency purposes does not derive from the elevation of form over substance but, rather, from the very real fact that the Tribune Entities had not, and *could not*, complete the Merger at Step One. Nor could Tribune's stockholders receive the proceeds from any Step Two advances until the Step Two conditions were met and the Merger closed. The fact that half the Tribune Common Stock remained outstanding following the close of Step One obviously was not a matter of form to those stockholders.

(*Id.* at 182).

The Noteholders argue that the Examiner erred in concluding that Step One and Step Two should not be collapsed for the purpose of determining insolvency at Step One. They claim the facts demonstrate that neither step was intended to occur on its own, but the whole LBO transaction was broken into two steps because Tribune's large shareholders would not agree to

54

vote in favor of the LBO unless it provided an up-front payment that did not have to await regulatory approval. (*Id.* at 174). The Board also approved the entire LBO (i.e., both steps) on April 1, 2007. (*Id.* at 168). Moreover, the Noteholders urge the Court to view the steps from the lenders' perspective, and note that the commitment letters for both steps were executed at the same time and obligated the parties to provide the requisite financing to permit Step Two to occur. (*Id.* at 171).

For the most part, the Noteholders' arguments support the second factor in the *Mervyn's* test because it is unlikely either step would have occurred on its own. The Noteholders argue that no court has required satisfaction of *all three* factors to collapse the steps to view the transaction as a whole. However, I am not willing to dispense with the third factor in the particular collapsing question at issue here (i.e., for purposes of determining solvency rather than reasonably equivalent value). Timing is key to this solvency issue. The debtor's assets and liabilities on a balance sheet are measured as of a particular date and, if the Step One transactions could stand on their own as of the closing of Step One, then it is not appropriate to collapse the steps for determining solvency at that time.

I also note that when considering solvency of the debtor's estate, the third factor should be viewed from the debtor's perspective (i.e., whether the debtor was obligated to incur additional borrowings) rather than the lender's perspective (i.e. whether the lender was obligated to provide additional financing). At the close of Step One, the Debtors had no obligation to the Senior Lenders for Step Two Debt. I find the Examiner's analysis on this factor particularly persuasive to the collapsing issue: i.e., focusing on what is required to happen to the debtor's estate, rather than what will probably happen. Because there was uncertainty created by the

55

conditions precedent to Step Two, the parties ensured that the Step One transaction could stand on its own.  Therefore, the Examiner concluded that it is not appropriate to collapse Step One and Step Two for determining whether the Debtors were insolvent at Step One, and nothing in the record before me suggests that this conclusion is an unreasonable basis upon which the Settling Parties may rely in reaching the proposed DCL Plan Settlement.

The Noteholders' expert opinion regarding insolvency at Step One was based upon collapsing the two steps together.  (Tr. 3/18/11 at 109:20-25, 142:21 - 143:14). While the Examiner reasoned that Steps One and Two would not be collapsed for an insolvency analysis, he nonetheless considered insolvency in light of a collapse and decided:

> [I]f the Step Two Debt is included in determining Tribune's solvency at Step One, the case for insolvency is exceedingly close, although market-based information tends to support a conclusion that Tribune was nonetheless still solvent at Step One.  On balance, the examiner finds it is somewhat unlikely (but, to emphasize, a very close call) that a court would conclude that Tribune was rendered insolvent at Step One even in a collapse scenario that includes the Step Two Debt."

(Examiner's Report, Vol. II, at 206).  The DCL Plan Proponent's expert also opined that contemporaneous market evidence refutes a finding of insolvency as of June 4, 2007, noting that rating agency actions and bond yields showed that market participants considered Tribune solvent at that time.  (*See* DCL ex. 1106, ¶¶ 24-28, ¶¶ 29-31, Tr. 3/10/11 at 95:14 - 96:23). He also noted that, although he agreed that the credit default swaps spread "spiked" after the closing of Step One, the increase was not at a level which would indicate that the market determined a significant risk of insolvency or bankruptcy in the near term.  (Tr. 3/10/11 at 96:24 - 97:12).  The DCL Plan Proponents provided evidence to demonstrate that the "spike" in credit default swap prices between Step One and Step Two was less significant when viewed in light of the prices

over a five year period prior to the Petition Date. (*See* DCL Plan Proponents' Closing Argument Demonstratives, at 13-14 "Statistical Michief," comparing DCL Ex. 2002 with NPP Ex. 944, Figure 41)

Upon review of the various arguments and evidence offered by the parties, I conclude that it is reasonable for the Settling Parties to base their settlement on the assumption that a court is unlikely to decide that the Debtors were insolvent as of Step One.

Unreasonably Small Capital and Inability to Pay Debts

In the absence of insolvency, the constructive fraud test of §548(a)(1)(B) alternatively provides for avoidance of a suspected transfer or obligation if the debtor (1) was engaged in business . . . for which any property remaining with the debtor was an unreasonably small capital, or (2) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured." 11 U.S.C. §548(a)(1)(B)(ii)(II) and (III). The Third Circuit has explained the term as follows:

> "[U]nreasonably small capital" would refer to the inability to generate sufficient profits to sustain operations. Because an inability to generate enough cash flow to sustain operations must precede an inability to pay obligations as they become due, unreasonably small capital would seem to encompass financial difficulties short of equitable [insolvency].

*Moody v. Security Pacific Bus. Credit, Inc.*, 971 F.2d 1056, 1070 (3d Cir. 1992). The Third Circuit decided that a district court did not err in considering the related concepts of "unreasonably small capital" and "inability to pay debts as they become due" together because these "distinct but related concepts furnish a standard of causation which looks for a link between the challenged conveyance and the debtor's insolvency." *Id.* at 1073.

In *Moody*, the Third Circuit held that the test for "unreasonably small capital" is

"reasonable foreseeability." *Id.* at 1073. A court should assess the objective reasonableness of the company's financial projections, as well as "all reasonably anticipated sources of operating funds, which may include new equity infusions, cash from operations, or cash from secured or unsecured loans, over the relevant time period." *Id.* at 1073, 1072 n. 24 (citing [then professor, now Bankruptcy Judge] Markell, *Toward True and Plain Dealing: A Theory of Fraudulent Transfers Involving Unreasonably Small Capital*, 21 Ind.L.Rev. 469, 496 (1988)); *see also Peltz v. Hatten*, 279 B.R. 710, (D.Del. 2002) (citing *Moody*). The *Moody* Court noted that this analysis attempts to strike the proper balance by holding participants in a leveraged buyout responsible "when it is reasonably foreseeable that an acquisition will fail, but at the same time tak[ing] into account that 'businesses fail for all sorts of reasons, and that fraudulent [transfer] laws are not a panacea for all such failures.'" *Id.* 1073 (quoting Markell, 21 Ind.L.Rev. at 506).[50]

In his report, the Examiner noted that a capital adequacy analysis entails a "forward-looking analysis" since "[s]olvency focuses on the debtor's liabilities at a given moment, whereas capital adequacy focuses on the debtor's ability to meet its obligations over time." (Examiner's Report, Vol. II, at 183-84). Having already determined that, at the time Step One took place, Step Two was highly likely to occur, the Examiner decided that the Step Two Debt must also be considered to properly analyze the Debtors' capital adequacy at Step One. (*Id.*). I agree that the Third Circuit's discussion in *Moody* regarding "reasonable foreseeability" requires consideration

---

[50]As Markell [writes]: "The unreasonably small capital examination requires that the challenger must first establish that the transfer was for less than a reasonably equivalent value. Once shown, the creditor must then show the following: the transfer was made by a person in business or for a business transaction; that non-payment of the plaintiff's claim was a reasonably foreseeable effect given the amount of the transferor's remaining and reasonably foreseeable cash resources; and that, in at least a 'but for' sense, the lack of adequate resources caused non-payment." Markell, 21 Ind.L.Rev. at 497.

of the Step Two Debt in the Step One capital adequacy analysis.

The Examiner's financial advisor performed a Step One capital adequacy analysis based upon a cash flow projection model developed by Valuation Research Corporation ("VRC"),[51] which included both a base case cash flow forecast (based on management's projections) and a stress case scenario designed to assess Tribune's ability to meet its cash requirements (both operational and financing related) while maintaining compliance with covenants. (Examiner's Report, Vol. II, at 212). The Examiner's financial advisor made certain adjustments to the VRC cash flow projection model, such as (i) including the effects of the Step Two Incremental Credit Facility and Bridge Facility, as well as the EGI-TRB Note in the analysis, (ii) revising calculations on interest expense based upon a review of the underlying credit agreements, and (iii) including the tax benefits of the S-Corp/ESOP structure, which were assumed to occur on January 1, 2008. (*Id.* at 213-14).

The Examiner's financial advisor also incorporated certain downside financial expectations prepared by advisors for other participants in the Step One transaction (including, Duff & Phelps, Blackstone, Morgan Stanley, and Standard & Poor's), which all assumed that Tribune's 2007 revenues would be lower than that assumed in VRC's base case model. (*Id.* at 215-16). The Examiner's financial advisor reported that the result of his analysis indicated only two instances in which the stress case assumptions by the financial advisors for participants in the Step One transaction resulted in covenant non-compliance and only one instance demonstrating insufficient capital, as illustrated in the following table:

---

[51]VRC was a valuation firm engaged by Tribune in April 2007 to provide the Tribune Board with a solvency opinion in connection with the LBO. (Examiner's Report, Vol. I, at 225).

| Stress Case | Negative Capital Adequacy Cushion | Covenant Violation |
|---|---|---|
| VRC | No | No |
| Duff & Phelps | No | No |
| Blackstone | No | No |
| Morgan Stanley Downside A | No | No |
| Morgan Stanley Downside B | No | Yes |
| Standard & Poor's | Yes | Yes |

(*Id.* at 218).  The Examiner noted that Standard & Poor's stress case was based on "aggressive downside assumptions." (*Id.*).  The Examiner also noted that the foregoing analysis appropriately relied  upon management's February 2007 projections, based upon what was known or ascertainable at the time of the Step One transaction.  (*Id.*).

In sum, the Examiner concluded that it is reasonably likely that a court would conclude that the Step One Transactions left Tribune with adequate capital, even factoring in the contemplated Step Two Debt.  (*Id.* at 220).  Moreover, the Examiner similarly concluded that the Guarantor Subsidiaries also were adequately capitalized after the Step One transactions, even if the expected Step Two Debt is included in the analysis.  (*Id.*).

However, the capital adequacy analysis performed by the Noteholders' expert (Tuliano) yielded different results.  Tuliano reviewed the sufficiency of Tribune's operating cash flows to service its debt based on the February 2007 Projections and certain downside projections for the period 2007-2011.  (NPP Ex. 944 at 123).[52]    Tuliano's analysis determined that, following Step

---

[52]Tuliano described the four downside case projections he used as follows:  (i) Management Downside Case B1 - similar to management downside case B but holding operating cash flow flat instead of a 1% decline, (ii) S&P Sensitivity Case - operating cash flow down 10% from management plan growth rates, (iii) Wall Street Low Estimates - most conservative analyst outlook for EBITDA for the

One, Tribune's operating cash flows were insufficient to meet its debt service obligations in all four downside cases, as well as the February 2007 Projections. (*Id.*, Tr. 3/18/11 at 74:9-21). Tuliano then included asset sales, equity investment income, and unused available credit lines in the cash flow analysis. (NPP Ex. 944 at 123-24; Tr. 3/18/11 at 77:6-78:1). He also assumed that, as a result of the S Corp/ESOP status, Tribune would not have to pay 401(k) or stock based compensation expenses. (Tr. 3/18/11 at 78:6-10). With these considerations, Tuliano's conclusion with respect to all four downside cases was that Tribune would not be able to meet debt service obligations and lacked adequate liquidity following the Step One transaction. (NPP Ex. 944 at 123-24, Tr. 3/18/11 at 77:6 - 78:19).

The Noteholders argue that the DCL Plan Proponents failed to rebut Tuliano's conclusions regarding inadequate capital, since their own expert's analysis showed that Tribune did not have adequate capital to pay its debts as they came due after the Step One transaction. (DCL Ex. 1106 at Ex. Q). The Step One capital adequacy and ability to pay analysis prepared by the DCL Plan Proponent's expert (Fischel) showed that, using an average of downside case projections prepared before June 4, 2007, and considering the anticipated Step Two Debt, Tribune would have negative $79 million in 2009, negative $45 million in 2010, and only $9 million in 2011. (*Id.*, Tr. 3/10/11 at 122:20 - 123:19). Fischel explained, however, that the numbers were fairly close and, by correcting the amount he used for the sale of certain assets to the same amount used in Tuliano's report, the amount of available cash would increase by $220 million, which would eliminate the negative numbers. (Tr. 3/10/11 at 123:2 - 124:21).

---

Company as included in the Mar-07 Wall Street Consensus Estimates, and (iv) Step One Adjusted Projections (15% Downside Sensitivity) - - case where Tuliano stressed the EBITDA assumption under the Step One Adjusted Projections by 15%. (NPP Ex. 944 at 119-20).

The record before me does not lead me to conclude that the Step One capital adequacy issue is resolved easily. To borrow a term used in the Examiner's Report, this issue remains in "equipoise." The purpose of the Court's inquiry at this point, however, is not to resolve the issues, but to canvass them. The record here does not provide sufficient evidence that would lead me to conclude that there is a strong possibility that a court would decide this issue in one way or the other. Valid arguments, supported by complex analyses - - on both sides - - provide support for approving a settlement, including the proposed DCL Plan Settlement.

Other litigation claims that could result in greater recoveries

The Noteholders argue that full avoidance of LBO transactions is not the only litigation outcome that would result in the Non-LBO Creditors recovering more than the consideration offered by the DCL Plan Settlements. For example, the Noteholders contend that they would recover significantly more than the Settlement amounts if Step Two Debt was avoided (which is "highly" or "reasonably" likely), *and* the Step One Lenders were prevented from participating in any recovery in connection with the avoided transactions based upon doctrines of waiver, equitable estoppel, and assumption of the risk.[53] The Noteholders refer to this as the "WEAR"

---

[53]Other pathways to recovery cited by the Noteholders include a theory of greater recovery if Step Two Debt is avoided *and* the Debtors' total distributable value is $7.5 billion or more. For the reasons set forth, *supra.*, I have determined that this record does not support the conclusion that the Debtors' total distributable value is that high. Further, the Noteholders suggest that their recoveries would be greater if all of the Step One obligations against the Tribune Parent were avoided as constructively fraudulent. The DCL Plan Proponents note that recovery under this scenario is unlikely because it would require determination that (i) the Tribune Parent was insolvent at Step One (which, as discussed *supra.* is unlikely without collapsing Step One and Step Two), (ii) no part of the Step One Loans would be preserved on account of reasonably equivalent value provided to the Debtors (which is inconsistent with the findings of the Examiner's Report), and (iii) the Guarantor Subsidiaries' claims against the Tribune Parent pursuant to the Intercompany Claim Settlement would not be honored (and no persuasive reason has been presented for ignoring intercompany claims). (*See* Examiner's Report, Vol. II, at 92-93, 97.)

theory of recovery and note that it is based on the similar legal theories as those raised in the Creditors' Committee Complaint against the LBO Lenders.  (*See* NPP Ex. 2203).[54]

The Examiner considered whether the holders of Step One Debt should be prohibited from sharing in any recovery of payments made in connection with the avoidance of the Step Two transactions until the Non-LBO Creditors are paid in full.  The argument against participation posits that it is inequitable for Step One Lenders to benefit from any Step Two recoveries, since the Step One Lenders are the same entities who participated in, funded, and made possible the Step Two Debt.  (*See* Examiner's Report, Vol. II at 301).  The Examiner noted that case law permits all unsecured creditors to benefit from avoidance action recoveries.  *See Buncher Co. v. Off. Comm. Of Unsecured Creditors of GenFarm Ltd. P'ship IV,* 229 F.3d 245, 250-51 (3d Cir. 2000) (citing 2 Collier Bankruptcy Manual ¶544.09[5] (Lawrence P. King, ed., 3d ed. Rev. 1999) ("When recovery is sought under section 544(b) of the Bankruptcy Code, any recovery is for the benefit of all unsecured creditors, including those who individually had no right to avoid the transfer.") (*Id.* at n.27)).  The Examiner agreed that principles of equitable subordination or equitable estoppel could be utilized in an attempt to bar the Step One Lenders from participating in any Step Two recovery.[55]   However, because the law is unclear or requires

---

[54]The Noteholders point out, for example, that Count Four of the Creditors' Committee Complaint alleges that the Step One Lenders should be estopped from sharing in any value resulting from an avoidance of Step Two because they planned and participated in Step Two and knowingly and intentionally assumed the risk that the Company would be rendered insolvent.  (NPP Ex. 2203 at 53-55).  Count Seven seeks relief under the theory of unjust enrichment, alleging that if Step One is permitted to benefit from an avoidance of Step Two, the LBO Lenders would receive a greater distribution in the event that the Step Two obligations are avoided and recovered.  (*Id.* at 60-62).

[55]A court reviewing a request for "equitable subordination" must be satisfied that three conditions are met: (i) the claimant must have engaged in some type of inequitable conduct, (ii) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant, and (iii) equitable subordination of the claim must not be inconsistent with the

specific factual findings subject to further investigation, the Examiner did not reach any conclusion regarding whether a court is likely to apply such equitable remedies here, and he left the issue in "equipoise."  (Examiner's Report, Vol II, at 303, 338).

The DCL Plan Proponents respond that the Noteholders' arguments fail to demonstrate that, even if successful, the Senior Noteholders' recoveries under the WEAR theory would be substantially in excess of that provided by the DCL Plan Settlements' initial distribution.  The Noteholders' recovery model predicts that the Senior Noteholders' recovery under WEAR would be approximately $449 million, not much more than the DCL Plan Settlements.  (*See* NPP Ex. 31 at 121).  To counter this, the Noteholders have added another step to the WEAR argument, contending that avoided Step Two Debt at the Guarantor Subsidiaries' level would be "upstreamed" to the Tribune Parent, greatly increasing the Senior Noteholders expected recovery.  (*See* NPP Ex. 31 at 89).  This theory asserts that the court should apply equitable principles to distribute the value of the Guarantor Subsidiaries to the Tribune Parent creditors, before paying

---

provisions of the Bankruptcy Code. *In re Winstar Comm., Inc.*, 554 F.3d 382, 411-12 (3d Cir. 2009). The Examiner noted that more investigation was needed to determine whether the actions of the Senior Lenders were egregious enough to support equitable subordination of non-insider claims. *See, e.g., In re Aluminum Mills Corp.,* 132 B.R. 869, 896 (Bankr.N.D.Ill. 1991) ("[M]erely alleging that [the bank] knowingly made a loan for an LBO that it knew would result in insolvency and then acted strategically after the LBO to maximize its benefits is insufficient, by itself, to show that [the bank] engaged in 'egregious misconduct.'"  However, the equitable subordination claim was not dismissed because the committee alleged that the bank assumed the power of a fiduciary, was engaged in fraud, and "used its power over the debtor to enhance its position at the expense of the debtor and the unsecured creditors.").

To establish equitable estoppel, a party must show that (i) he lacked the knowledge of the true facts or he lacked the means to obtain the truth, (ii) he relied on the conduct of the party against whom the estoppel is claimed, and (iii) he suffered a prejudicial change of position as a result of his reliance.  *In re Comm. Dynamics, Inc.,* 382 B.R. 219, 239 (Bankr.D.Del. 2008).  The Examiner wrote that "equitable estoppel is at best an imperfect fit, as that doctrine typically requires some form of representation from the party against whom estoppel is sought in favor of the party seeking estoppel, with some courts requiring a false representation."  Examiner's Report, Vol. II, at 303.  The Examiner found no representations by Senior Lenders to the Non-LBO Creditors here.  (*Id.*) The record before me reflects none.

the Step One Lender claims. I agree with the DCL Plan Proponents that "upstreaming" is an uphill battle for the Noteholders because the notion turns on uncertain theories of equitable subordination or equitable estoppel.

In addition, viability of the WEAR and upstreaming theories might depend upon establishing a basis for substantive consolidation of the Guarantor Subsidiaries and the Tribune Parent. In *Owens Corning*, the Third Circuit determined that substantive consolidation may be used as an equitable remedy, upon a showing that (i) prepetition the debtors disregarded separateness so significantly that their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (ii) postpetition the debtors' assets and liabilities are so scrambled that separating them is prohibitive and hurts creditors. *In re Owens Corning,* 419 F.3d 195, 210-11 (3d Cir. 2005). Neither prepetition disregard of corporate entity borders nor postpetition scrambling of assets and liabilities has been shown on this record, which does not support a conclusion that the Noteholders' are likely to prevail on a WEAR theory and render the proposed DCL Plan Settlements unreasonable.

Expert Testimony on Reasonableness of the Settlement.

The DCL Plan Proponents rely upon the expert testimony and analysis of Professor Bernard Black to support the reasonableness of the DCL Plan Settlements. Like the Examiner, Black identified six main "scenarios" representing the potential litigation outcomes, ranging from Scenario A (total LBO Lender victory and full allowance of LBO Lender's claims) to Scenario F (total LBO Lender loss with full avoidance of all LBO Lender's claims. (DCL Ex. 1484 at 19-21). Black then determined the likely recovery amounts for the relevant stakeholders under each Scenario and compared those recoveries to the DCL Plan Settlements. (*Id.* at 22-23). From this

perspective, Black opined that the DCL Plan Settlement provides a reasonable middle ground between the Scenarios A-E (no avoidance and partial avoidance) and Scenario F (full avoidance). (Tr. 3/9 at 115:25-116:4).

Black's analysis then focused on the likelihood or probability of achieving each Scenario, particularly the likelihood of success for Scenario F (full avoidance). ("[I]f you thought Scenario F was a slam-dunk, you wouldn't be settling for the amount in the DCL Plan. If you thought it was a long shot, then the DCL Plan is going to look a lot better." (Tr. 3/9 at 116:4-11)). So Black developed six "Cases" as sets of probabilities that he assigned to each litigation Scenario to reflect the strengths and weaknesses of each of the LBO claims and to establish settlement ranges. For example, the "Low Settlement Case" assigns probabilities in a manner strongly favorable to the LBO Lenders, and the "High Settlement Case" assigns probabilities strongly favorable to the Non-LBO Creditors. (DCL Ex. 1484 at 23-24). In evaluating the likelihood of success in each Case, Black had to identify and assess key drivers of the litigation outcomes (e.g., whether a court would "collapse" Step One and Step Two and consider both Steps when analyzing solvency at Step One; a finding that Step One and Step Two should be "collapsed" would increase the probability of Scenario F's total avoidance). (Tr. 3/9 at 120:18 - 125:20). After developing the probabilities associated with each of the litigation Scenarios in each of his Cases, Black derived expected recovery amounts for each Case. (Tr. 3/9 at 147:20-148:1). Black prepared a chart demonstrating that, after including the probabilities of success in the calculations (and assuming recoveries on the unsettled third party litigation), the DCL Plan Settlements *exceed* any potential settlement recovery amounts the Non-LBO Creditors would receive in each Case. (DCL Ex. 1484 at 29, Table 4).

66

In determining the probabilities for each "Case," Black acknowledged that he was required to use his best judgment when analyzing a number of sub-issues to make an assessment of how the Examiner might view those sub-issues that the Examiner did not explicitly decide, and then Black would "nudge" the probability percentages up or down based on those judgments, either in his head or by using a calculator. (Tr. 3/9/11 at 228:12 - 232:25, 242:1 - 244:9). Subjective judgments about the Examiner's findings and conclusions were central to Black's analysis. (Tr. 3/10/11 at 76:2-17). The Noteholders also argue that many of the judgments made by Black in assessing the probabilities related to the sub-issues are opinions regarding legal issues.

In contrast, the Noteholders' expert, Dr. Bruce Beron, performed a "decision tree risk analysis," a somewhat more "mechanical" approach to evaluation of likely litigation outcomes, to determine a reasonable settlement range for the LBO-related Causes of Action. Beron explained that he performs decision tree risk analyses to calculate the expected value on the outcome of a case for clients who were considering litigation or have been sued. (Tr. 3/17/11 at 105:8-14). The analyses help clients decide litigation strategies or provide advice for settlement negotiations. (*Id.*). In short, the decision tree requires a calculation involving the probability of a particular litigation outcome and the recovery or damage amount associated with the outcome.[56] (Tr. 3/17/11 at 110:7-114:5). Beron obtained the inputs for the probabilities and the recovery

---

[56]Appendix A to Beron's Report sets forth an instructional guide and simple example of decision-tree analysis. (NPP Ex. 2476). "Decision tree methodology" is best described (in the briefest way I am able to articulate) as an analysis that represents each "litigation event" as a "node," connected to other events by a "branch." Each branch is assigned a probability, representing a qualitative assessment of the relative likelihood of the outcome of that branch. After the nodes are connected to the appropriate branches, the resulting diagram is a "decision tree."

amounts from his client. (Id. at 114:6-22).

To determine the probability of the possible outcomes for the LBO-Related Causes of Action, Beron relied upon the conclusions in the Examiner's Report (Tr. 3/17/11 at 115:20 -116:4), but Beron's method assigns a numerical probability to each of the Examiner's seven explanatory phrases, ranging from 15% for outcomes labeled "highly unlikely" to 85% for "highly likely." (NPP Ex. 2476 at 6). Likewise, probability values are also assigned to the Examiner's conclusion relating to defenses and other clams, such as equitable disallowance or equitable subordination. (*Id.* at 12-13). Based upon the Examiner's Report, Beron constructed a decision tree which contained 48 possible litigation outcomes for the LBO-Related Causes of Action at Step One and Step Two, which led to 19 possible recovery scenarios. (Tr. 3/17/11 143:14-23). The Noteholders then determined the recovery amounts for the 19 possible scenarios. (*Id.*). Using this decision tree, Beron calculated that the expected recovery value for the Noteholders on the LBO-Related Causes of Action is $1.57 billion. (*Id.* at 144:3-17). The Noteholders rely upon Beron's testimony and methodology to support their claim that the DCL Plan Settlement is unreasonable.

Both experts possess highly impressive credentials and both were genuine in their efforts to assist their respective clients and the Court. Ultimately, however, neither expert's analysis is particularly helpful to the Court. The methods employed by each expert here involve deeply subjective judgments. Black's conclusions, as he admits, are based, in large measure, upon highly subjective assessments. Beron's conclusions, on the other hand, follow from the use of information supplied by his client in contemplation of this litigation. Neither supply a reliable basis upon which the Court could adopt either viewpoint.

Conclusion - Probability of Success on the Merits.

Consideration of the parties' arguments regarding the strengths and weaknesses of the various elements of the LBO-Related Causes of Action leads me to conclude that the outcome of such claims is uncertain.[57]  The LBO-Related Causes of Action are certainly not frivolous or inconsequential, and some elements have recognizable weight (for example, whether the Step One indebtedness left the Debtors with unreasonably small capital).  However, the proposed settlement, while not necessarily the best possible compromise, has actual value.  Overall, upon consideration of the Examiner's extensive exercise and suggested Recovery Scenarios, alternative theories of recovery, the risks of litigation, and the record made, I conclude that the DCL Plan Settlement falls above the lowest point in the range of reasonable litigation possibilities.

(2)     Difficulties of Collection

Difficulty in the collection of any judgment against the settling parties does not seem to be a concern that either supports or undermines approval of the DCL Plan Settlements.

(3)     Complexity, Expense, and Delay of Litigation

The *Nutraquest* Court observed that '[i]t is axiomatic that settlement will almost always reduce the complexity and inconvenience of litigation. . . . The balancing of the complexity and delay of litigation with the benefits of settlement is related to the likelihood of success in that litigation." *Nutraquest*, 434 F.3d at 646.  Fraudulent transfer litigation regarding LBOs are notoriously lengthy and complex.  *See, e.g., 3V Capital Master Fund Ltd. v. Off'l Comm. Of*

_____

[57]I re-emphasize that the Court's exercise here is to do no more than canvass the strengths and weaknesses of the issues underlying the fraudulent transfer claims being settled.  Nothing in this Opinion is, or is intended to be, a determination on the merits of the fraudulent transfer claims.

*Unsecured Creditors of Tousa, Inc. (In re Tousa, Inc.)*, 444 B.R. 613 (S.D.Fla. 2011). The LBO-Related Causes of Action in this matter are certainly included in the lengthy and complex category and, as the foregoing review of issues demonstrates, there is no outcome that is a "slam dunk." Neither plan is globally consensual; both plans contemplate follow-up litigation. On one level, the court is being asked to choose the lesser evil between two litigation scenarios. The DCL Plan Settlements will certainly reduce, at least partially, complex and costly litigation over the LBO-Related Claims.

    (4)    <u>Paramount Interest of Creditors</u>

The DCL Plan Proponents assert that creditors across the debtors' capital structure voted resoundingly in favor of the DCL Plan. (*See* Docket no. 7918, 8114, 8882, as supplemented, the "Epiq Voting Declaration."). In total, 2,300 out of the 2,520 conforming ballots received (91.27%) voted to accept the DCL Plan, with $10,309,165,026 out of $12,871,132,865 in claims represented by those ballots (80.10%) accepting. (*See* Epiq Voting Declaration, docket no. 8882, at Ex. 1).

In particular, the Voting Declaration shows that the DCL Plan was accepted by both LBO creditors and Non-LBO Creditors. The class of Other Parent Claims - - unsecured trade and other claims against the Tribune Parent - - supported the DCL Plan, with 226 out of 237 voting creditors (95.36%), holding 94.71% by dollar amount of the claims voted, choosing to accept the DCL Plan.[58] (*Id.*). The Senior Noteholders class, however, failed to receive the two-thirds by

---

[58]The DCL Plan Proponents assert that even if the Swap Claim, which the Noteholders argue should be classified separately, is excluded from the Other Parent Claims class, the class accepted the Plan with 220 out of 231 voting creditors (95.24%), holding 88.02% by dollar amount of the Other Parent Claims, accepting.

claim amount of votes necessary for class acceptance, which could be expected since Aurelius

holds 51% in amount of Senior Noteholder claims.  Nonetheless, the DCL Plan Proponents have

shown that the almost 70% of Senior Noteholders that cast ballots voted to accept the DCL Plan,

with 38% of Senior Noteholders stating a preference indicating that they preferred the DCL Plan

over the Noteholder Plan.  (Epiq Voting Decl., Docket no. 8882 at Ex. 3).  Thus, the DCL Plan

Proponents argue that the voting results undercut the Noteholders' assertion that the DCL Plan

fails to serve the interest of the Non-LBO Creditors.

Finally, it is also important to note that the Creditors' Committee, which has standing to

pursue the LBO-Related Causes of Action, supports the DCL Plan Settlement.  The Creditors'

Committee was actively involved in the negotiations and has not merely "rubber-stamped" this

settlement.  Its support, as well as the votes of creditors in favor of the plan, weigh heavily in

favor of approval of the settlement.

     (D)     Conclusion - Reasonableness of the DCL Plan Settlement

For the reasons discussed above, I conclude that the record before me demonstrates that

the DCL Plan Settlement: (i) falls above the lowest point in the range of reasonable litigation

possibilities, (ii) would certainly reduce cost and delay pursuing the LBO-Related Causes of

Action, and, perhaps most importantly, (iii) has been approved by creditors across the Debtors'

capital structure.  Therefore, I conclude that the DCL Plan Settlement should be approved

because it is fair, reasonable and in the best interest of the Debtors' estates and it is properly part

of the DCL Plan pursuant to Bankruptcy Code §1123(b)(3)(A).

     (E)     Reasonableness of the Bar Order

The Litigation Trust and the Creditors' Trust will pursue the LBO-Related Causes of

Action that are not settled.  Some potential defendants in those law suits may attempt to pursue

litigation against the settling parties for contribution and indemnification. The DCL Plan includes

a bar order provision (Section 11.3) (the "Bar Order") which prevents claims for non-contractual

indemnification or contribution against the "Released Parties."[59]   The DCL Plan Proponents

describe the Bar Order as a "standard and essential element of the DCL Plan that ensures that the

settling defendants get the full benefit of their bargain, *i.e.*, that they cannot be held liable on

account of settled liability." (DCL Letter Brief at 6 (docket no. 8963)) The Noteholders and

Certain Directors and Officers argue that the Bar Order is not fair and equitable.[60]

Bankruptcy courts have authority to enter settlement bar orders.  *Matter of Munford, Inc.,*

97 F.3d 449, 455 (11th Cir. 1996). Bar orders are increasingly used to encourage partial

settlement of  litigation involving multiple defendants by barring contribution claims litigation

against the settling defendants by the non-settling defendants. *Eichenholtz v. Brennan*, 52 F.3d

478, 486 (3d Cir. 1995).[61]  "Without the ability to limit the liability of settling defendants through

bar orders it is likely that no settlements could be reached."  *In re Worldcom, Inc. ERISA Litig.*,

339 F.Supp.2d 561, 568 (S.D.N.Y. 2004) (citation and internal marks omitted).  As described in

---

[59]The term "Released Parties" is set forth in Section 1.1.200 of the DCL Plan. (Docket no. 8769).

[60]A number of current and former directors and officers of the Debtors submitted an objection to both the DCL Plan and the Noteholder Plan (docket no. 7981).  The directors and officers were identified as Harry Amsden, Dennis FitzSimmons, Bob Gremillion, Don Grenesko, David Hiller, Tim Landon, Tom Leach, Luis Lewin, Mark Mallory, Dick Malone, Ruthellyn Musil, John Reardon, Scott Smith, John Vitanovec, Kathy Waltz, and David Williams (the "Certain Directors and Officers" or the "D&Os").

[61]The bar order considered by the Third Circuit in *Eichenholtz* barred only contribution claims by non-settling defendants, since the Court determined that the defendants had no indemnification claims in the securities fraud case before it.  *Eichenholtz,* 52 F.3d at 485-86.  However, other courts have enforced bar orders that prevent both contribution and indemnity claims.  *See Worldcom*, 339 F.Supp.2d at 564; *Munford*, 97 F.3d 449;*Whyte v. Kivisto (In re Semcrude, L.P.),* No. 08-11525, 2010 WL 4814377 (Bankr.D.Del. 2010).

another Second Circuit decision:

> If a nonsettling defendant against whom a judgment had been entered were allowed to seek payment from a defendant who had settled, the settlement would not bring the latter much peace of mind. He would remain potentially liable to a nonsettling defendant for an amount by which a judgment against a nonsettling defendant exceeded a nonsettling defendant's proportionate fault. This potential liability would surely diminish the incentive to settle.

*Cullen v. Riley (In re Masters Mates & Pilots Pension Plan and IRAP Litig.),* 957 F.2d 1020, 1028 (2d Cir. 1992). While a bar order encourages settlement, it must also be fair to the non-settling defendants, who are losing contribution and indemnification claims, by providing an appropriate right of set-off from any judgment imposed against them. *Worldcom*, 339 F.Supp2d at 568 (citing *In re Ivan F. Boesky Sec. Litig.*, 948 F.2d 1358-1368-69 (2d Cir. 1991)); *see also Newby v. Enron Corp. (In re Enron Corp. Securities, Derivative & ERISA Litig.)*, No. MDL-1446, 2008 WL 2566867, *8 (S.D.Tex. June 24, 2008) ("[The bar order] in return would protect non-settling defendants with a judgment credit reduction that is at least equal to the settling defendants' proven share of liability.").[62]

The Bar Order currently set forth in the DCL Plan includes a proportionate judgment reduction provision, providing, in part:

> [T]he Plaintiff shall provide notice of this Bar Order to the court or tribunal hearing the [Preserved Causes of Action]. Such court or tribunal shall determine whether the Action gives rise to Barred Claims on which Released Parties would have been liable to the Barred Persons in the absence of this Bar Order. If the court or tribunal so determines, it shall reduce any Judgment against such Barred

---

[62]The three basic methods for judgment reduction are (i) *pro rata* (which apportions an equal share of liability to each defendant, without regard to culpability), (ii) proportionate fault method (under which the jury assesses the relative culpability of both settling and non-settling defendants and the non-settling defendant pays a commensurate percentage of the judgment), and (iii) *pro tanto* (which reduces a non-settling defendants' liability for a judgment in the amount paid by a settling defendant). *Masters Mates*, 957 F.2d at 1028-29 (citing *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 160 & n.3 (4th Cir. 1991)).

> Person in an amount equal to (a) the amount of the Judgment against any such Barred Person times (b) the aggregate proportionate share of fault (expressed as a percentage) of the Released Party or Parties that would have been liable on a Barred Claim in the absence of this Bar Order

(DCL Plan, §11.3). In *Eichenholtz*, the Third Circuit determined that proportionate judgment reduction was the fairest method to ensure that non-settling defendants were not prejudiced by a bar order, writing:

> Under the proportionate judgment reduction method, the jury, in the non-settling defendants' trial will assess the relative culpability of both settling and non-settling defendants, and the non-settling defendants will pay a commensurate percentage of the judgment. The risk of a "bad" settlement falls on the plaintiffs, who have a financial incentive to make certain that each defendant bears its share of the damages. . . . The proportionate fault rule is the equivalent of a contribution claim; the non-settling defendants are only responsible for their portion of the liability.

*Eisenholtz*, 52 F.3d at 487 (citations omitted).

Both the Noteholders and the D&Os argue that the Bar Order is an improper non-consensual release of third-party claims. *See Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203, 212 (3d Cir. 2000); *Matter of Genesis Health Ventures*, 266 B.R. at 608 (discussing standards for permitting third-party releases in reorganization plans). The *Continental* Court determined that "non-consensual releases by a non-debtor of other non-debtor third parties are to be granted only in 'extraordinary cases,'" and that the "hallmarks of a permissible non-consensual release" were "fairness, necessity to the reorganization, and specific factual findings to support these conclusions." *Continental*, 203 F.3d at 212, 214. The *Genesis* Court evaluated whether a non-consensual release fit the "hallmarks" discussed in *Continental* by considering whether: (i) the non-consensual release was necessary to the success of the reorganization, (ii) the releasees have provided a critical financial contribution to the debtor's

74

plan, (iii) the releasees' financial contribution is necessary to make the plan feasible, and (iv) the release is fair to the non-consenting creditors, i.e., whether the non-consenting creditors received reasonable compensation in exchange for the release. *Genesis,* 266 B.R. at 607-08. The Noteholders and D&Os argue that the Bar Order does not meet the final *Genesis* factor.

The Noteholders claim that the proportionate judgment reduction provision works inequitably to reduce (or potentially eliminate) claim recoveries on remaining LBO Causes of Action, including the state law constructive fraudulent conveyance claims, which will be pursued by the Creditors' Trust (or possibly by individual creditors) in state court. They argue that a state court's enforcement of the Bar Order's proportionate judgment reduction provision amounts to a non-consensual release of part of those claims, since the state court plaintiffs neither negotiated nor consented to the provisions of the Bar Order.

The Bar Order does not prevent claims against the non-settling defendants. It may limit future recoveries against the non-settling defendants, but the amount of the reduction is tied to enforcement of the DCL Plan Settlement. Even though the Noteholders (or other state court plaintiffs) did not negotiate or consent to the DCL Plan Settlement, the Bar Order is fair because I have determined that the DCL Plan Settlement falls within the range of reasonableness. The Noteholders also object to the Court's approval of the Bar Order without making any findings on the apportionment of fault. They argue that the Bar Order unfairly relieves Senior Lenders from the burden of proving damage allocation. However, parties in future litigation know that any judgment will be subject to the proportionate judgment reduction provision and can plan their trial strategies accordingly. The Senior Lenders are relieved from participation in the apportionment litigation because they settled their claims. The Second Circuit Court decided that

it was not error for a trial court to leave the determination of the actual amount of the judgment credit for calculation at trial. *Gerber v. MTC Electronic Tech. Co, Ltd.,* 329 F.3d 297, 305 (2d Cir. 2003). I conclude that the Bar Order is fair with respect to the Noteholders.

While the Noteholders are concerned that another court *will* enforce the Bar Order, the D&Os' objection arises from their concern that another court *may not* enforce the Bar Order. Without enforcement, the D&Os argue that they will lose their contribution and non-contractual indemnity claims against the settling defendants, without consent, and without receiving the benefit of the proportionate judgment provision.

The Bar Order is fair to the D&Os because, as non-settling defendants, they are protected by the proportionate judgment reduction, which is the equivalent of a contribution claim. *Eichenholtz*, 52 F.3d at 487; *see also McDermott, Inc. v. AmClyde,* 511 U.S. 202, 209, 114 S.Ct. 1461, 1466, 128 L.Ed.2d 148 (1994) ("Under this [proportionate share] approach, no suits for contribution from the settling defendants are permitted, nor are they necessary, because the nonsettling defendants pay no more than their share of the judgment.").

The D&Os' concern about another court's unwillingness to enforce the Bar Order is speculative. State courts are apt to enforce a Bar Order as readily as they enforce other bankruptcy court orders. In *Bethesda Boys Ranch v. Atlantic Richfield Co.*, 208 B.R. 980 (N.D.Okla. 1997) the District Court for the Northern District of Oklahoma remanded an action against a previous debtor to state court, deciding that a state court could enforce a discharge injunction in a confirmation order, writing:

> A state court has the authority and responsibility to enforce the provisions of a final judgment entered by a United States Bankruptcy Court. The judgment is entitled to full faith and credit recognition by any court, whether state or federal.

In the event the state court would take any action which Texaco [the reorganized debtor] believes violates the Confirmation Order, Texaco can promptly petition for injunctive relief with the Bankruptcy Court for the Southern District of New York.

*Bethesda Boys Ranch*, 208 B.R. at 983-84.

However, the D&Os contend that the Bar Order unjustly places the burden of enforcement of the Bar Order on the Barred Persons, rather than the plaintiffs who have no incentive to seek application of the Bar Order. The D&Os argue that the Bar Order should include a direct injunction against the future plaintiffs, enjoining them from circumventing the proportionate judgment reduction provision of the Bar Order. I agree. The Bar Order should direct the actions of the Litigation Trustee, Creditors' Trustee and other creditors who may pursue a Preserved Cause of Action or a SLCFC (the "Potential Plaintiffs"). To protect adequately the D&Os, the Bar Order would have to be revised to include language that directly enjoins the Potential Plaintiffs from seeking relief or collecting judgments against non-settling defendants in such a manner that such efforts fail to conform to the terms of Bar Order, including the  proportionate judgment reduction provision.[63]

---

[63]The revised Bar Order provision includes language that this Court "shall retain continuing jurisdiction with respect to all matters concerning this Bar Order, including, without limitation, hearing a petition for relief by a Barred Person or any other party in interest in the event that a court or tribunal hearing the Action fails to apply the judgment reduction provisions of this Bar Order." (DCL Plan, §11.3, rev'd (docket no. 8769)). The Supreme Court has recognized that a "Bankruptcy Court plainly ha[s] jurisdiction to interpret and enforce its own prior orders." *Travelers Indemnity Co. v. Bailey,* 129 S.Ct. 2195, 2205, 174 L.Ed.2d 99 (2009).

The D&Os and other objectors argue that this Court should determine that it will continue to have jurisdiction over the Creditors' Trust. This Court has no intention to surrender any prerogative to enforce its own orders; however, it must be recognized that a confirmation order cannot confer jurisdiction upon a bankruptcy court unless jurisdiction exists pursuant to 28 U.S.C. § 1334 or 28 U.S.C. §157 at the time a dispute may arise. *In re Resorts International, Inc.,* 372 F.3d 154, 161 (3d Cir. 2004). After plan confirmation, the bankruptcy court's "related to" jurisdiction is limited to matters in which "there is a close nexus to the bankruptcy plan or a proceeding, as when a matter affects the interpretation, implementation, consummation, execution, or administration of a confirmed plan or incorporated litigation trust agreement . . . ." *Resorts,* 372 F.3d at 168-69.

Accordingly, I conclude that the Bar Order is not an improper third party release as to the D&Os because any lost contribution or non-contractual indemnification claims are replaced by the protections of the judgment reduction provision. However, to ensure fairness in the implementation of the Bar Order, its language must be revised to enjoin directly any actions by the Potential Plaintiffs that do not conform to the terms of the Bar Order.

2.    Whether a plan must be accepted by at least one impaired class for each debtor (§1129(a)(10)

Section §1129(a)(10) provides the following requirement for confirmation of a plan:

(10)    If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.

11 U.S.C. §1129(a)(10). Neither the DCL Plan nor the Noteholder Plan received the affirmative vote of an impaired class for each debtor entity included in the respective joint plans. The DCL Plan Proponents assert that §1129(a)(10) requires acceptance by one impaired class for *each debtor* in a multi-debtor plan. In other words, they contend that §1129(a)(10) is a *per debtor*, not *per plan* requirement. The Noteholders disagree with the DCL Plan Proponents' contention, but argue, in response, that the same objection must be raised with respect to the DCL Plan:

> Notably, while the DCL Plan Proponents argue that Bankruptcy Code section 1129(a)(10) imposes a per debtor impaired accepting class requirement, the Final Voting Tabulation Report reveals that the DCL Plan itself lacks an impaired accepting class of 39 of 111 Debtors. To the extent that the Noteholder Plan fails to satisfy section 1129(a)(1) with respect to the Debtors for which there is not an Impaired Accepting Class, the DCL Plan likewise fails to satisfy the statute.

(Noteholder Memo., docket no. 8171, at 79 n.49 (NPP Ex. 2223)). The DCL Plan Proponents apparently do not dispute that, but respond that the "DCL Plan received broad support and was

*accepted by an impaired class at every Debtor for which votes were cast.* (DCL Brief, docket

8897, at 106)(emphasis in original). The DCL Plan Proponents argue that their Plan is

distinguishable from the Noteholder Plan because "there is a substantial difference between

affirmative rejection of a plan and simple creditor inaction . . . Apathy of creditors . . . holding *de*

*minimus* claims is not cause to derail the DCL Plan." (*Id.* at 106-07)

The DCL Plan Proponents, citing to the Epiq Voting Declaration (docket no. 7918, Ex. B-

1), point out:

> The Noteholder Plan - - which is a joint plan for all 111 Debtors - - received the
> affirmative support of only *three* out of 256 impaired classes, yielding an
> accepting impaired class at only *two* of the 111 Debtors.  Two of these classes are
> controlled by the Noteholders themselves and in the third a single affirmative vote
> was cast in respect of a claim of $47.  All other voting classes rejected the
> Noteholder Plan, generally by margins approaching unanimity.

(DCL Brief, at 103, docket no.8897) (emphasis in original). The effect of the Noteholder Plan,

say the DCL Plan Proponents, is "to treat all impaired classes as though they were creditors of a

single entity for purposes of §1129(a)(10)," (*id.*) contrary to the "plain language" of the statute.

The Noteholder Plan Proponents, in turn, respond - - after all - - that the "plain language"

of §1129(a)(10) dictates that "when all debtor entities are the subject of the same joint plan of

reorganization, it is a per plan, not a per debtor, requirement."  (Noteholder Memo., docket no.

8171, at 79).

There exists little decisional authority on whether §1129(a)(10) is to be applied "per

debtor" or "per plan."  The earliest case cited in support of the "per plan" interpretation of

§1129(a)(10) is *In re SGPA, Inc.*, 2001 Bankr. LEXIS 2291 (Bankr.M.D.Pa. September 28,

2001), in which the Court overruled the objection of complaining creditors and confirmed a joint

plan, holding that it was unnecessary "to have an impaired class of creditors of each Debtor to vote to accept the Plan." *Id.* at *19. However, the Court found explicitly that the objecting creditors suffered no adverse effect and that the result would not have changed if the debtors had been substantively consolidated.

The Court in *In re Enron*, 2004 Bankr. LEXIS 2549 (Bankr.S.D.N.Y. July 15, 2004), in an opinion marked "Not For Publication," also considered the §1129(a)(10) issue and decided that both the plain statutory meaning and "the substantive consolidation component of the global compromise" allowed confirmation of a 177-debtor joint plan when at least one class of impaired claims voted to accept the plan. *Id.* at *234-35. The *Enron* Court relied, in part, on *SGPA*.[64]

Finally, in *JPMorgan Chase Bank, N.A. v. Charter Commc'n Operating, LLC (In re Charter Commc'n)*, 419 B.R. 221 (Bankr.S.D.N.Y. 2009), the Court overruled an objection that

---

[64]The *Enron* chapter 11 case raised numerous complex issues, including those arising from the interrelationships among the debtors and their approximately 2,400 subsidiaries. *Enron*, 2004 Bankr.LEXIS 2549 at *66. In the context of the request for approval of the Fifth Amended Plan, as modified, the *Enron* debtors also filed a motion for approval of the global compromise reached among the debtors, the creditors' committee, the court-appointed examiner for Enron North America Corp. ("ENA"), and others, which included the following elements: (a) distributions to creditors based upon a formula pursuant to which certain creditors received distributions consisting of the sum of (i) 70% of the distribution a claim holder would receive if the debtors [except "Portland Debtors" ] were not substantively consolidated, and (ii) 30% of the distribution the claim holder would receive if all the debtors' estates (except "Portland Debtors") were substantively consolidated in a hypothetical scenario, but notwithstanding this distribution formula, one-half of "Allowed Guaranty Claims" were included in the calculation, (b) resolution of inter-company claims and other inter-estate issues, (c) waiver of potential inter-debtor remedies, (d) resolution of certain asset-ownership disputes between Enron Corp. and ENA, (e) resolution of inter-estate issues regarding rights to certain claims and causes of action, and (f) creation of a "Plan Currency" - - a blend of creditor cash and equity interests in certain subsidiaries - - to pay general unsecured claims. *Id.* at *81 - *85. The *Enron* Court determined that the global compromise was fair and reasonable because, among other reasons, "the fact is that, absent the global compromise, individual Creditors would be mounting offensives to promote their individual agendas and these Chapter 11 Cases would devolve into full-scale estate-wide litigation," and result in substantially lower recoveries for virtually all creditors. *Id.* at *134. In its analysis of §1129(a)(10), the *Enron* Court noted that "by virtue of the substantive consolidation component of the global compromise, the requirements of section 1129(a)(10) are satisfied as to each of the Debtors lacking an impaired accepting class because those Debtors are part of the global compromise embodied in the Plan." *Id.* at *235.

certain classes of creditors were "artificially" impaired to meet the §1129(a)(10) requirement. The Court, in what I view as either an alternative ruling or *dicta*, went on to say that §1129(a)(10) is to be applied per plan, not per debtor, citing in support *Enron, supra.,* and *SGPA, supra.* The Court observed that the debtors were managed "on an integrated basis making it reasonable and administratively convenient to propose a joint plan. That joint plan has been accepted by numerous other impaired accepting classes, thereby satisfying the requirement of section 1129(a)(10)." *Id*. at 266. Arguably, none of the three courts considered the §1129(a)(10) issue central to its decision in the matter before it.

Other authorities cited by the parties included decisions in which §1129(a)(10) was not directly at issue or were simply stock confirmation orders (perhaps unopposed). The leading treatise on bankruptcy law, *Collier in Bankruptcy*, ¶1129.02[10][a] (16th ed. 2011), Resnick & Sommer, contains no discussion of the "per plan/per debtor" issue.

First, to consider the plain meaning of §1129(a)(10), one must start at the beginning: the Bankruptcy Code's rules of construction provide that "the singular includes the plural." §102(7). Therefore, the fact that §1129(a)(10) refers to "plan" in the singular is not a basis, alone, upon which to conclude that, in a multiple debtor case, only one debtor – or any number fewer than all debtors – must satisfy this standard. As is not uncommon, each of the proposed plans contains a provision (DCL Plan, §5.1; Noteholder Plan, §5.1) expressly stating, in primary part, that the respective Debtors' estates are *not* being substantively consolidated, that a claim against multiple Debtors will be treated as a separate claim against each, that claims are to be satisfied only from assets of the particular Debtor against which a claim is made, that obligations of any particular Debtor shall remain with that particular Debtor and no Debtor is to become liable for the

obligations of another. The practical effect of these "non-substantive consolidation" provisions, while not articulated this way in either plan, is that each joint plan actually consists of a separate plan for each Debtor. Therefore, ascribing the plural to the meaning of "plan" in §1129(a)(10) is entirely logical and consistent with such a scheme.

In the absence of substantive consolidation, entity separateness is fundamental. *See In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2007) (Absent compelling circumstances, courts respect "the general expectation of state law and of the Bankruptcy Code, and thus of commercial markets"). Neither the DCL Plan nor the Noteholder Plan proposes substantive consolidation of the Debtors.

Second, §1129(a)(10) must be read in conjunction with the other subsections of §1129(a), particularly (a)(8), when considering rights of impaired unsecured creditors. *King v. St. Vincent's Hospital*, 502 U.S. 215, 221, 112 S.Ct. 570, 116 L.Ed.2d 578 (1991) (a "cardinal rule" of statutory construction is that "a statute is to be read as a whole, since the meaning of statutory language, plain or not, depends on context") (citations omitted); *Credit Agricole Corporate and Inv. Bank v. American Home Mortg. Holdings, Inc.*, 637 F.3d 246, 255 (3d Cir. 2011) ("The Supreme Court has indicated a reluctance to declare provisions of the Bankruptcy Code ambiguous . . . courts [should] not be guided by a single sentence . . . , but look to the provision of the whole law, and to its object and policy.")

Section 1129(a)(1) provides that the "plan" (stated in the singular) must comply with the applicable provisions of the Bankruptcy Code. Section 1129(a)(3) requires that the "plan" (stated in the singular) be proposed in good faith and not by any means forbidden by law. Could either of these requirements be met if only one or more - - but fewer than all - - debtors proposing a

joint plan satisfies them? The answer is no. By way of further example, §1129(a)(7), embodying the "best interest of creditors" test, speaks of the treatment required for "each impaired class." This requirement cannot be read fairly other than as an entitlement to the prescribed treatment for every impaired class of creditors for each debtor which is part of a joint plan. By way of further comparison, §1129(a)(8) mandates one of two outcomes - - satisfaction by consent ((a)(8)(A)) or nonimpairment ((a)(8)(B)). This applies to *each* class of claims or interests. Granted, §1129(b), which permits confirmation by "cram down," relieves a plan proponent from the §1129(a)(8) requirement if all other §1129(a) requirements are met when the proposed plan "does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." Section 1129(b) does not relieve a plan proponent of the §1129(a)(10) requirement.

Third, large, complex, multiple-debtor chapter 11 proceedings are often jointly administered for the convenience of the parties and the court. Such debtors, as a matter of convenience, may file joint plans. It may be that in many cases, and as is the case here (*see* DCL Plan, §5.1, Noteholders Plan, §5.1), a single distribution scheme is proposed, in which sources of plan funding and distribution are designed without regard to where assets are found or where liabilities lie. In my experience, in most such cases, the constituents in the chapter 11 proceeding either reach this result by consensus, or, no objection is made by any creditor or party in interest. However, convenience alone is not sufficient reason to disturb the rights of impaired classes of creditors of a debtor not meeting confirmation standards.

I find nothing ambiguous in the language of §1129(a)(10), which, absent substantive consolidation or consent, must be satisfied by each debtor in a joint plan. Neither plan here

satisfies §1129(a)(10).[65]

Would "deemed acceptance" by a non-voting impaired class, in the absence of objection, constitute the necessary"consent" to a proposed "per plan" scheme?[66]  I conclude that it may. The Court in *In re Adelphia Communications Corp.*, 368 B.R. 140 (Bankr. S.D.N.Y. 2007), directly addressed the "deemed accepted" issue in which the proposed joint plan (i) adopted a presumption that when, in a class eligible to vote, no vote was cast, that class would be deemed to accept the plan; and (ii) this presumption appeared in both the plan and at two places in a supplement to the disclosure statement.  The presumption also appeared in bold text directly on the ballot.  The *Adelphia* Court concluded that the "presumption was explicit and well advertised," *Id*. at 260, and, therefore, sufficient reason to overrule an objection to treatment of non-voting classes as having been deemed to accept.  I acknowledge that the statutory analysis in *Adelphia* centered around §§ 1126(c) and (d) and Bankruptcy Rule 3018(c), but the *Adelphia* Court's reasoning is directly relevant and applicable to analysis of §1129(a)(10).  *See also, In re Ruti-Sweetwater, Inc.*, 836 F.2d 1263 (10th Cir. 1988), relied upon by Judge Gerber in *Adelphia*, and which did address directly this issue in the §1129(a)(10) context.  Alternatively, a plan proponent could, in light of objections to a proposed "per plan" scheme, drop from a proposed joint plan those debtors that do not or cannot meet the §1129(a)(10) requirement.

---

[65]*See* "The Scorpion and the Fox*," supra.*

[66]An earlier version of the Noteholder Plan, (indeed, the version that was actually the subject of vote solicitation), provided, in pertinent part, that ". . . if no Holders of Claims in a particular class vote to accept or reject the Noteholder Plan, except for such classes that are deemed to reject the Noteholder Plan, the Noteholder Plan should be deemed accepted [emphasis added] by the Holders of such Claims in such Class.  The Noteholder Plan, modified after vote solicitation, as presently proposed, now provides the opposite: that any impaired class not voting is "conclusively presumed" to have rejected the Noteholder Plan [emphasis added].  Noteholder Plan, Art. 4.5.

3.    Whether the DCL Plan is feasible (§1129(a)(11))

The Noteholder Plan Proponents question the feasibility of the DCL Plan because the

Plan provides some Senior Lenders (JP Morgan, Angelo Gordon and Oaktree, together the

"Lender Proponents") with certain ownership interests and director-designation rights in

Reorganized Tribune that the Noteholders say will "violate" Federal Communications

Commission ("FCC") rules and regulations or, in the alternative, will require the Debtors to

obtain waivers of those FCC rules and regulations which would seriously delay implementation

of the DCL Plan. The Debtors disagree with the Noteholder Plan Proponents' FCC analysis and

argue (i) the Plan does not result in any FCC issues, and (ii) if there are obstacles to obtaining

approval, the DCL Plan includes provisions to address them.

The Noteholders contend that the FCC violations arise because the Lender Proponents

already have what the FCC calls "attributable interests" in various media companies operating in

the same markets as Reorganized Tribune.[67]   The Noteholders argue that those existing media

interests, coupled with the attributable interests the Lender Proponents will receive in

---

[67]The DCL Plan Proponents' expert, Mace Rosenstein, provided the following general
explanation about the FCC attributable interest regulations:

> The FCC's substantive media ownership rules generally limit or prohibit certain types of
> multiple or cross ownership arrangements.  *See generally* 47 C.F.R. §73.3555.  The
> public policy behind those rules is to ensure diversity of media voices, while at the same
> time allowing media companies to raise capital and attract investment.  Significantly,
> therefore, not every interest in a media company is treated as a type of "ownership"
> triggering application of the substantive rules.  Rather, the FCC applies the substantive
> rules through its "attribution" regulations, which are set out in a series of detailed notes
> to the substantive rules.  The attribution regulations establish bright line standards that
> serve as proxies for the degree of influence or control that the FCC has determined
> justify limitation by the substantive rules.

DCL Ex. 1456 (Rosenstein Rebuttal Expert Report) at 4-5 citing, *inter alia, Review of the
Comm's Regulations Governing Attribution of Broadcast Interests,* Notice of Proposed
Rulemaking, 10 FCC Rcd 3606, 3609 (1995).

Reorganized Tribune under the DCL Plan, create problems under the FCC's media ownership rules.

The DCL Plan Proponents dispute whether certain media interests held by the Lender Proponents constitute "attributable interests" under the FCC regulations.[68] However, the DCL Plan Proponents argue that it does not matter whether certain Lender Proponent interests are "attributable interests," because the DCL Plan includes provisions to resolve potential FCC concerns. *See* DCL Plan §5.3.2 (providing alternatives to the Lender Proponents' officer and director designation rights in the event FCC approvals cannot be obtained), and §5.4.2(d) (providing alternatives to the Lender Proponents' receipt of New Class A Common Stock in the event any Lender Proponents' media ownership interests could impair the ability of Reorganized Tribune to comply with FCC rules or regulations). The experts for both the Noteholder Plan Proponents and the DCL Plan Proponents agreed that these provisions are standard and ordinarily used in media transactions to resolve potential FCC ownership issues. (Tr. 4/12/11 at 35:12 - 38:18, 43:3 - 44:4 (Rosenstein), Tr. 3/17/11 at 73:25- 77:6 (Prak)).

"Feasibility does not require that success be guaranteed but rather only a 'reasonable assurance of compliance with plan terms.'" *In re Washington Mutual, Inc.,* 2011 WL 4090757, *41 (Bankr.D.Del. Sept. 13, 2011) (quoting *In re Orlando Investors LP*, 103 B.R. 593, 600 (Bankr.E.D.Pa. 1989); *see also In re Briscoe Enters., Ltd., II,* 994 F.2d 1160, 1166 (5th Cir. 1993) ("[I]t is clear that there is a relatively low threshold of proof necessary to satisfy the feasibility requirement.") To demonstrate feasibility in the regulatory context, a debtor must show that the reorganized debtor will not face material hurdles to achieve the necessary

---

[68]*See* DCL Ex. 1456 at 16-24.

regulatory approvals.  *In re TCI2 Holdings, LLC,* 428 B.R. 117, 154 (Bankr.D.N.J. 2010).

The record presented by the DCL Plan Proponents on this issue satisfies me that they are not likely to encounter significant obstacles to obtaining the required FCC approvals, especially because, if any obstacles arise, the Plan includes provisions, ordinarily used in this industry, that will enable the Debtors' to take corrective action.  The Noteholder Plan Proponents' claim that the Lender Proponents' other media ownership interests will cause unreasonable delays to the FCC approval process is nothing more than speculation. The Noteholders' objection to the DCL Plan based on feasibility is overruled.[69]

4.    Whether the Release and Exculpation Provisions in Article 11 are fair and equitable

The Noteholders have objected to the Debtors' release of claims set forth in Section 11.2.1 of the DCL Plan (the "Debtors' Release") and the Exculpation provision in Section 11.5 of the Plan . The Debtors' Release, as well as the DCL Plan's definition of "Released Parties," "Released Stockholder Parties," and "Related Parties" have been modified numerous times and contain so many exceptions, attorneys are assured future employment litigating the scope of Debtors' Release.  While some of the Noteholders' objections have been addressed by modified language to the Debtors' Release, several objections remain.[70]

---

[69]By letter dated October 5, 2011, the Noteholder Plan Proponents and the DCL Plan Proponents advised the Court of the recent decision of the Third Circuit Court of Appeals in *Prometheus Radio Project v. FCC*, 652 F.3d 431 (3d Cir. 2011), in which a panel of the Third Circuit vacated and remanded the version of the newspaper/broadcast cross-ownership ("NBCO") rule that the FCC adopted in 2008. The parties assert that any waiver requests in pending FCC applications address standards applicable under the prior rule and the 2008 NBCO rule.  In the event a plan is eventually confirmed, plan proponents will need to address *Prometheus* in amendments to the pending applications.  However, the parties agreed that their plan feasibility arguments were not impacted by the *Prometheus* decision.

[70]For example, the Noteholders argue that the Debtors' Release should not release potential state law constructive fraudulent conveyance claims against certain Step One Selling Stockholders or Step Two Selling Stockholders because, the Noteholders assert, such claims no longer belong to the Debtors.

"Determining the fairness of a plan which includes the release of non-debtors requires the consideration of numerous factors and the conclusion is often dictated by the specific facts of the case." *Washington Mut.,* 442 B.R. at 345. When deciding whether a plan may include a debtor's release of non-debtor third parties, notwithstanding section 524(e), bankruptcy courts in this district have considered the following factors:

(1)    the identity of interest between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate;

(2)    substantial contribution by the non-debtor of assets to the reorganization;

(3)    the essential nature of the injunction to the reorganization to the extent that, without the injunction, there is little likelihood of success;

(4)    an agreement by a substantial majority of creditors to support the injunction, specifically if the impacted class or classes "overwhelmingly" votes to accept the plan; and

(5)    provision in the plan for payment of all or substantially all of the claims of the class or classes affected by the injunction.

*Id.* at 346 (citing In re *Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr.D.Del. 1999).[71] See also *Exide,* 303 B.R. at 72. These factors are neither exclusive nor conjunctive requirements, but simply provide guidance in the Court's determination of fairness. *Washington Mut.*, 442 B.R. at 346.

(i)    <u>Parties granting the releases under Section 11.2.1</u>

---

DCL Plan Section 11.2.1 addresses this objection by revising the Debtors' Release to add the following language: "For the avoidance of doubt, the Debtor Released Claims do not include any Disclaimed State Law Avoidance Claims."

[71]*See In re Master Mortg. Inv. Fund, Inc.,* 168 B.R. 930, 937 (Bankr. W.D.Mo. 1994)) These factors are sometimes referred to as the *Master Mortgage* standards. *See, e.g., Washington Mut.*, 442 B.R. at 347.

The language of Section 11.2.1 provides that the parties who are releasing claims are:

> the Reorganized Debtors on their own behalf and as representatives of their respective Estates and any Person seeking to exercise the rights of the Debtors' Estates (including without limitation, any successor to the Debtors, the Litigation Trustee on behalf of the Litigation Trust or any estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code), and the Creditors' Trustee on behalf of the Creditors' Trust, release unconditionally and hereby cause the subsidiary Non-Debtor to release unconditionally, and are hereby deemed to release unconditionally, each and all of the Released Parties . . .

(DCL Plan, §11.2.1, docket no. 8769). Although this Plan section, as titled, purports to describe the releases by the Debtors and the Estates, it includes non-debtor entities as releasing parties, specifically the Litigation Trustee, the Creditors' Trustee, and the Subsidiary Non-Debtors. The Litigation Trust and the Creditors' Trust are established to administer the trust assets, have advisory boards consisting of creditors, and will make distributions to creditors. (DCL Plan, Article XIII and Article XIV).

Judge Walrath decided in *Washington Mutual* that the debtors' release must be limited to the debtors, and that the plan should be modified to separately identify all third-party releasors, which are reviewed under a different standard. *Washington Mut.*, 442 B.R. at 346, n.33. *See also Exide*, 303 B.R. at 71-74. I agree. The "releasing parties" in the Debtors' Release must be limited to the Debtors.

(ii)    Senior Lenders, Bridge Lenders, Settling Step 2 Payees, and Senior Loan Agents

The Noteholders' object to including Senior Lenders, Bridge Lenders, and Senior Loan Agents (that is, the "Settling Parties") as "Released Parties," arguing that none of the *Zenith* factors are satisfied. I disagree. The record is unclear as to the extent of any identity of interest between the Debtors and the Settling Parties based upon indemnification claims. However, the

Debtors and the Settling Parties share the common goal of confirming the DCL Plan and implementing the DCL Plan Settlement. The Noteholders' argument that the Settling Parties have failed to provide adequate consideration for the Debtors' Release is a reiteration of their previous claims that the DCL Plan Settlement is unfair. Because I have already decided that the Settlement meets the standard for approval, I likewise conclude that the Settling Parties' consideration for the Debtors' Release is sufficient. Moreover, because the Debtors' Release is connected to the DCL Plan Settlement, which is integral to the DCL Plan, I conclude that the release of the Settling Parties is necessary to the Debtors' reorganization. A majority of creditors have voted in favor of the DCL Plan. (*See* Epiq Voting Declaration, docket no. 8882 at Ex. 1) (showing that 125 of 128 voting classes accepted the DCL Plan, and that even members of the Senior Noteholder Class (70% in number, which represented, however, only 12% in claim amount) voted to accept the DCL Plan).

    (iii)   <u>"Related Persons"</u>

The definition of "Released Parties," set forth in Section 1.1.200 of the DCL Plan, includes "Related Persons" of the Debtors, Senior Lenders, Bridge Lenders, Settling Step Two Payees, the Bridge Loan Agent, and Creditor Proponents.[72] The term "Related Persons" is defined to include:

> such Person's Affiliates, predecessors, successors and assigns (whether by operation of law or otherwise), and with respect to any of the foregoing their respective present and former Affiliates and each of their respective current and former officers, directors, employees, managers, attorneys, advisors and professionals, each acting in such capacity, and any Person claiming by or through them (including their respective officers, directors, managers, advisors and

---

[72]This analysis does not include the Related Persons of Released Stockholder Parties, which are discussed in the next subsection.

professionals).

(DCL Plan, §1.1.196, docket no. 8769). The Noteholders argue that the inclusion of the various "Related Persons" in the release does not pass muster under *Zenith*.

The DCL Plan Proponents reply that the release of "Related Persons" is specifically limited in the definition of "Released Parties." First, the release of the Debtors' "Related Persons" is limited "to the extent a claim arises from the Related Person's relationship to [the Debtors, non-Debtor Affiliates, including Subsidiary Non-Debtors, and the Reorganized Debtors] and is not a LBO-Related Cause of Action." There is no basis in the record to support any finding that a "substantial contribution" has been made by the Debtors' Related Persons or that a release is necessary to the reorganization.[73] Despite acceptance by a majority of creditors, I cannot conclude that the Plan's release of the Debtors' Related Persons, based on this record, would be fair. *Washington Mut.*, 442 B.R. at 349-50.

Second, the release of the Settling Parties' "Related Persons" is limited "to the extent a claim arises from actions taken by such Related Person in its capacity as a Related Person . . . and is released against the party as to which they are a Related Person." This part of the Debtors' Release is a component of the of the DCL Plan Settlement, which made a substantial contribution

---

[73]In *Spansion*, upon considering Bankruptcy Code §1123(b)(3)(A) and applicable *Zenith* factors, I determined that the debtor release in the plan was fair, reasonable and a valid exercise of the debtor's business judgment. *Spansion*, 426 B.R. at 143. *See also In re DBSD North America, Inc.,* 419 B.R. 179, 217 (Bankr.S.D.N.Y. 2009), *aff'd* 2010 WL 1223109 (S.D.N.Y. March 24, 2010), *rev'd, in part, on other grounds,* 627 F.3d 496 (2d Cir. 2010). Among the specific facts relevant to that inquiry was that the record in *Spansion* demonstrated that the debtor was not releasing any known claims or resolving any pending litigation. *Id. See also DBSD*, 419 B.R. at 217 (approving the debtor's release upon noting, among other things, that the record included credible testimony that the debtor was not releasing any known, significant claims). Although the DCL Plan Proponents argued that the narrowly tailored Debtors' Release is not releasing known, significant claims, the numerous hotly contested issues in this case and the constant threat of impending litigation prevents me from reaching a similar conclusion here.

to the estate, is a necessary piece of the reorganization, and has been accepted by creditors.   I

conclude that the Debtors' release of the Settling Parties' Related Persons meets the standard for

fairness and is allowed.

    (iv)   <u>Released Stockholder Parties</u>

The Debtors' Release also includes a release of the "Released Stockholder Parties," as

well as their Related Persons.   There are three groups of "Released Stockholder Parties" found in

its definition, which can be roughly described and summarized as follows:

> (i)    persons who sold or redeemed shares of common stock held in the Tribune
>
>         Company 401(k) Savings Plan as part of the Step One or Step Two transactions
>
>         (with specific exceptions defined in the Plan Supplement) (the "401(k)
>
>         Stockholders"),

> (ii)   persons employed by the Debtors on October 22, 2010, who remain employed as
>
>         of the Effective Date, with respect to the first $100,000 of cash received from the
>
>         sale or redemption of common stock, stock equivalents or options of Tribune in
>
>         the Step One or Step Two transactions (the "Current Employees"), and

> (iii)  the Retiree Claimants and Holders of Claims arising from Non-Qualified Former
>
>         Employee Benefit Plans that elect to receive certain treatment under the Plan, and
>
>         (for some) only with respect to the first $100,000 of cash received from the sale of
>
>         common stock, stock equivalents or options of Tribune (the "Retiree Claimants").

(DCL Plan, §1.1.201, docket no. 8769).[74]

---

[74]The Motion of the Official Committee of Unsecured Creditors for Authority To Dismiss
Certain Insider Preference Actions Pursuant to 11 U.S.C. §363(b) and Fed.R.Bankr.P. 6004 and 7041 was
approved, unopposed, by Order dated October 19, 2011 (docket no. 10025), which approved dismissal of

The DCL Plan Proponents argue that the Debtors' release of the 401(k) Stockholders and the Current Employees is a proper exercise of the Debtors' business judgment, relying on testimony that lawsuits against current employees would seriously damage employee morale. (Tr. 3/14/11 at 118:21- 119:10).[75]  The Noteholders sought information from the Debtors regarding the extent of claims that would be included in this release.  The Debtors could not provide any evidence - - even an estimate - - as to the amount of claims that would be released as a result.  They argue that a cost/benefit analysis would show that it would be a waste of resources to pursue claims for less $100,000 or less.  Despite the Debtors' laudatory goal of protecting employees from litigation, the record before me is insufficient to support a conclusion that the Debtors' Release of the 401(k) Stockholders and Current Employees meets the standard of fairness.

The Retiree Claims, however, are different.  The Retiree Claimants filed proofs of claim in the aggregate amount of approximately $113 million.  The Debtors' disputed the amount and treatment of the Retiree Claims.  After lengthy negotiations, the Retiree Claimants and the Debtors entered into a settlement agreement (attached as Exhibit 5.15.4 of the DCL Plan) which, among other things, reduced the aggregate amount of the Retiree Claims by $10 million.  The Retiree Settlement is an important piece of the reorganization.  In light of the settlement, I am satisfied that the release of the Retiree Claims is proper.

(v)     Exculpation

---

preference actions that seek recovery from current Tribune employees of transfers below $50,000.

[75]The DCL Plan Proponents also argue that ERISA anti-alienation provisions protect claims to recover payments made on account of stock held through the 401(k) Plan. 29 U.S.C. §1056(d)(1).  This argument serves to make the release unnecessary.

The Exculpation clause in the DCL Plan (Section 11.5) provides a release to Proponents and their Related Persons of any liability arising from acts or omissions taken during the chapter 11 cases, except for liability that results from willful misconduct or gross negligence. The Noteholders object to the inclusion of Creditor Proponents (i.e., Oaktree, Angelo Gordon and JPMorgan) in the Exculpation. As recognized in *Washington Mutual*, "the Third Circuit has held that a creditors' committee, its members, and estate professionals may be exculpated under a plan for their actions in the bankruptcy case except for willful misconduct or gross negligence." *Washington Mut.,* 442 B.R at 350 (citing *In re PWS Holding Corp.,* 228 F.3d 224, 246 (3d Cir. 2000)). Because an exculpation provision merely states that standard to which estate fiduciaries should be held, the *Washington Mutual* Court determined that exculpation clauses should be limited to fiduciaries who have served during the chapter 11 proceedings: estate professionals, committees and their members, and the debtors' directors and officers. *Id.* at 350-51. I agree and, therefore, Section 11.5 must exclude non-fiduciaries.

5. <u>Whether the provisions regarding prepetition indemnification and reimbursement are fair and equitable</u>

Section 11.6.1 of the DCL Plan provides, in part, that the Debtors' obligations to indemnify or reimburse directors, officers and employees will survive confirmation and not be discharged, *except* for any indemnification or reimbursement obligations related to the LBO-Related Causes of Action arising prior to the Petition Date. Zell objects to the Debtors' exclusion of  indemnification and reimbursement claims related to the LBO-Related Causes of Action from the Reorganized Debtors' continuing obligations. Zell argues that these obligations arise under the Debtors' certificates of incorporation, which are executory contracts and,

therefore, the Debtors may not partially assume the indemnification and reimbursement obligations. *See Sharon Steel Corp.v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 41 (3d Cir. 1989) (citing *In re Heafitz*, 85 B.R. 274, 283 (Bankr.S.D.N.Y. 1988) (a trustee must either reject a contract in full or assume a contract in full, which includes both benefits and burdens)).

The DCL Plan Proponents argue that articles of incorporation are not executory contracts. *See In re Baldwin-United Corp.*, 43 B.R. 443, 459 (S.D. Ohio 1984) (rejecting debtor's argument that by-laws constituted an executory contract to indemnify directors, finding a lack of mutual obligations when the directors could resign at any time). Zell argues that because he continues to serve as Tribune's Chairman, the obligations under the certificates of incorporation are ongoing. Zell, however, has provided no support for his contention that articles of incorporation are an executory contract between the Debtors and the directors and officers. On this record, I cannot conclude that the Debtors must assume (or reject) the entirety of the indemnification or reimbursement requirements.

Moreover, I do not find that the limitations contained in Section 11.6.1 are inequitable. They do not eliminate any indemnification or reimbursement obligations with respect to the LBO-Related Causes of Action, but merely restrict such obligations to pre-petition claims. Zell argues that he should not be prevented from pursuing administrative claim status for any indemnification claims based upon LBO-Related Causes of Action. However, it is unlikely that claims for contractual or common law indemnity are entitled to administrative status, since a claimant would have to prove that expense as substantially benefitted the estate. *In re Pinnacle Brands, Inc.*, 259 B.R. 46, 51-52 (Bankr.D.Del. 2001) ("Determining whether a creditor has an administrative claim is a two-prong test: the expense must have arisen from a post-petition

transaction between the creditor and the trustee (or debtor-in-possession), and the transaction must have substantially benefitted the estate."). The limitation in the indemnification and reimbursement provision is appropriate.

   6.   Whether the assignment of state law causes of action to a creditors' trust is improper

   A number of creditors have objected to the DCL Plan provision establishing the Creditors' Trust to administer the Creditor' Trust Assets and to make distributions to the Creditors' Trust Beneficiaries.[76] (DCL Plan, Art. XIV).  The "Creditors' Trust Assets" arise from the deemed transfer to the Creditors' Trust of Disclaimed State Law Avoidance Claims, unless a creditor opts out of the transfer on its ballot. (DCL Plan, §14.3).  Disclaimed State Law Avoidance Claims are defined as:

> any and all LBO-Related Causes of Action arising under state fraudulent conveyance law that existed in favor of any Holder of a Claim prior to the Petition Date against Selling Stockholders, solely in their capacities as such and solely with respect to funds received in their capacities as such, that are not released by the relevant Holder of Claim in accordance with Section 11.2.2 of this Plan, provided, however, that Disclaimed State Law Avoidance Claims shall not include (i) any claims for intentional fraudulent conveyance, (ii) any and all of the LBO-Related Causes of Action arising under state fraudulent conveyance law set forth in count eighteen of the amended complaint filed by the Creditors Committee on December 7, 2010 . . . , (iii) any Released Claims, (iv) any LBO-Related Causes of Action against any Released Parties or (v) for the avoidance of doubt, LBO-Related Causes of Action arising under state fraudulent conveyance law to which the right to pursue, prosecute, settle or release such claims has been retained by the Estates.

(DCL Plan, §1.1.80).  The Creditors' Trust will litigate the claims through a Creditors' Trustee, appointed by the Creditors' Trust Advisory Board, which consists of members of the Creditors' Committee, including Deutsche Bank and Wilmington Trust Company  (DCL Plan, §14.4).

---

[76]Objections to the Creditors' Trust were filed by the D&Os, EGI, Brigade Capital Management, LLC, ("Brigade"), and the Robert R. McCormick Tribune Foundation and the Catigny Foundation (together, the  "Foundations").

The Creditors' Trust objections raise basically the same issues: (i) that establishment of the Creditors' Trust violates the confirmation requirements of "complying with the applicable provisions of this title" (§1129(a)(1)) and "good faith" (§1129(a)(3)) because the Creditors' Trust seeks to circumvent §546(e), the Bankruptcy Code's "safe harbor" provision, which limits avoidance actions on certain transfers involving securities contracts, and (ii) that the Creditors' Trust does not have standing to assert direct claims of creditors.

By way of background, this Court has already considered similar arguments in connection with the motion filed by Aurelius, Deutsche Bank, and Law Debenture (docket no. 8201) for entry of an order (I) determining that creditors have regained their state law constructive fraudulent conveyance claims to recover stock redemption payments made to Step One Shareholders and Step Two Shareholders due to the expiration of the statute of limitations under 11 U.S.C. §546(a); (II) determining that the automatic stay does not bar the commencement of litigation by or on behalf of creditors with respect to such claims or, in the alternative, granting relief from the automatic stay to permit the commencement of such litigation; and (III) granting leave from this Court's Order Appointing a Mediator to permit the commencement of such litigation (the "SLCFC Motion").[77]  After a hearing, I overruled the objections to the SLCFC Motion and entered an order dated April 25, 2011 (docket no. 8740) (the "April 25 Order"), providing, in part, that, to the extent the automatic stay of §362 or the Mediation Order stayed creditors from commencing their SLCFC Claims, if any, such stays were lifted to permit those claims to be filed to prevent applicable statutes of limitations or other time-related defenses from

---

[77]The parties have used the abbreviation "SLCFC Claims" to refer to state law constructive fraudulent conveyance claims.

barring pursuit of the SLCFC Claims.[78]  However, in the April 25 Order  I expressly declined to determine whether any right to file SLCFC claim reverted to the creditors. All claims and defenses related to the SLCFC claims, including whether such claims are preempted or otherwise impacted by §546(e) were expressly reserved under the terms of the April 25 Order.

I reserved this issue for further consideration in connection with confirmation, but, consistent with my decision in connection with the SLCFC Motion, I conclude that issues regarding standing, preemption, and applicability of §546(e) are best left for determination by the courts hearing these claims. Because the Creditors' Trust allows the Trustee to pursue creditors' rights, if any, arising under state law, I will not conclude that the Creditors' Trust is merely a sham to circumvent the applicability of §546(e) or that Article 14 prevents the Plan from meeting the confirmation requirements of §1129(a)(1) or (3).

Further, the objecting parties argue that a plan can not assign creditor's claims to a litigation trust, such as the Creditors' Trust. *See Kipperman v. Onex Corp.,* 411 B.R. 805, 831 n.21 (N.D.Ga. 2009) (stating, in dicta, that "[l]itigation trustees do not have standing to directly pursue claims on behalf of creditors and creditors may not assign their claims to a litigation trust."); *Mukamal v. Bakes*, 383 B.R. 798, 811-14 (S.D. Fla. 2007) (holding that a litigation trust lacked standing to bring creditor claims that were expressly assigned to the trust); *Trenwick v. Am.Litig.Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 189-91 (Del. Ch. 2006) (stating that "even if the Litigation Trust Agreement or plan of reorganization did expressly assign the direct claims of [debtor's] creditors to the Litigation Trust, federal bankruptcy law is clear that litigation trusts do not have standing to pursue the direct claims of creditors.") These cases, for

_____

[78]The April 25 Order was supplemented by an Order dated June 28, 2011 (docket no. 9380).

the most part, rely upon the reasoning of *Caplin v. Marine Midland Grace Tr. Co. Of N.Y.*, 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972).   In *Caplin*, the Supreme Court decided that a trustee in a Chapter X reorganization proceeding could not sue an indenture trustee on behalf of debenture holders because: (i) the statutory duties given to the reorganization trustee did not include authority to sue on behalf of third parties, but only to pursue claims on behalf of the estate, (ii) the defendant had a possible claim of subrogation against the debtor, and (iii) the debenture holders could assert their own claims against the defendant, resulting in inconsistent judgments.  *Caplin*, 406 U.S. at 428-432.

The DCL Plan Proponents rely on decisions that distinguished *Caplin* and held that creditors may assign claims to a litigation trust created in a plan of reorganization and that the litigation trustee had authority to pursue those assigned claims.  *See Grede v. Bank of N.Y. Mellon*, 598 F.3d 899, 901-02 (7th Cir. 2010) (deciding that *Caplin* does not apply to a plan-created litigation trust, writing "[a]lthough the terms of the Bankruptcy Code govern the permissible duties of a trustee *in* bankruptcy, the terms of the plan of reorganization (and of the trust instrument) govern the permissible duties of a trustee *after* bankruptcy.") (emphasis in original);[79] *Semi-Tech Litig., LLC v. Bankers Trust Co.*, 272 F.Supp.2d 319, 323-24 (S.D.N.Y. 2003) (distinguishing *Caplin* because the creditors assigned their claims to the trust, and deciding that assignments should not be stripped of their legal effect because the assignee was "a creature of a bankruptcy.")

The DCL Plan Proponents also note that the Creditors' Trustee is *not* acting as a

---

[79]The *Grede* Court also determined that no subrogation rights were asserted, and the possibility of inconsistent dispositions or duplicative recoveries did not arise on voluntarily assigned claims.  *Id.*

representative of the estate, is not a successor to the estate, and is wholly independent from the estate.   Therefore, they argue, the concerns expressed in *Caplin* and the related cases case do not apply because the Creditors' Trustee is not acting under authority granted to estate representatives under §1123(b)(3)(B).

Upon review of the foregoing case law, I agree with *Grede's* and *Semi-Tech's* analysis and conclude that the Plan's establishment of the Creditors' Trust and procedure for assignment of creditors' claims is not inconsistent with *Caplin*.[80]   The Plan's claim assignment procedure is voluntary because it allows creditors to "opt out."   The possibility of inconsistent results is no greater than if the creditors pursued their separate claims individually.   *See Semi-Tech*, 272 F.Supp.2d at 324.   Moreover, the Creditors' Trustee is not acting as a representative of the Debtors or their estates, so the concerns for statutory trustees expressed in *Caplin* are not raised by this Plan provision.   Therefore, assuming (without deciding) that the SLCFC Claims have reverted to creditors, the DCL Plan's establishment of the Creditors' Trust is an appropriate and valid mechanism for pursuit of the SLCFC Claims.

7.    Whether the Litigation Trust is fair and equitable

In his objection, Zell asserts that both the Examiner and the DCL Plan Proponents' expert, Bernard Black, concluded that the claims against Zell had no meaningful chance of success. He argues, therefore, that the DCL Plan (and the Noteholder Plan) should not be confirmed if they contain provisions establishing litigation trusts that would pursue the "wasteful

---

[80]I decide today only that federal bankruptcy law does not stand in the way of approval of the Creditors' Trust.  I do not decide whether a creditors' assignment of a claim, if any, to the Creditors' Trust is impacted by any applicable non-bankruptcy law restricting assignment of claims.  Any such decision is left properly to determination by the court that eventually tries an SLCFC.

and baseless litigation" against him. He argues that the record demonstrates that pursuit of such claims would not be in the best interests of creditors since the cost of such litigation would waste estate assets and reduce potential distributions to creditors.

The DCL Plan Proponents respond by arguing that Zell's position is nothing more than an attempt to obtain a release of liability for his role in the 2007 LBO. They argue that the Litigation Trust is not proposed in bad faith, but is merely a structure to preserve estate claims and provide a mechanism for pursuit of those claims. The DCL Plan Proponents note that nothing in the Plan impairs any defense that Zell may have with respect to those claims.

I agree that Zell's objection does not impair the confirmability of the DCL Plan. His objection is more appropriately raised as a defense or in a motion to dismiss current or future litigation. The Litigation Trust is an appropriate structure for pursuit of estate claims. The advisory board for the Litigation Trust consists of the trust's beneficiaries. They have no rational incentive to waste trust assets, that would otherwise be distributed to them, by pursuing baseless litigation. The DCL Plan provision that provides indemnification of the Litigation Trustee (DCL Plan Section 13.3.7) does not insulate the trustee from any liability for his decision to pursue claims, as Zell alleges. Instead, the indemnification provision provides that the Trust will indemnify the Trustee for actions arising out of the Trustee's *good faith* exercise of his powers or duties, and the Trustee will not be indemnified for claims due to his own "fraud, self-dealing, intentional misrepresentation, gross negligence or willful misconduct." (DCL Plan, §13.3.7, docket no. 8769). I cannot agree that the DCL Plan's establishment of a Litigation Trust provides free rein for a Trustee to pursue frivolous litigation in violation of Rule 11.

8.    Whether the DCL Plan properly classifies the SWAP claim

The Noteholders argue that the DCL Plan improperly classifies the Swap Claim as a Class 1F "Other Parent Claim" rather than a Class 1C "Senior Loan Claim." Bankruptcy Code §1122 provides, in part, that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." Further, as discussed in *Genesis Health Ventures*:

> The concept of unfair discrimination is not defined under the Bankruptcy Code. Various standards have been developed by the courts to test whether or not a plan unfairly discriminates. *In re Dow Corning Corp.,* 244 B.R. 705, 710 (Bankr.E.D.Mich. 1999), *aff'd* 255 B.R. 445 (E.D.Mich. 2000). The hallmarks of the various tests have been whether there is a reasonable basis for the discrimination, and whether the debtor can confirm and consummate a plan without the proposed discrimination. *See, e.g., In re Ambanc La Mesa L.P.,* 115 F.3d 650, 656 (9th Cir. 1997) *cert. denied*, 522 U.S. 1110, 118 S.Ct. 1039, 140 L.Ed.2d 105 (1998).

*Genesis Health Ventures,* 266 B.R. at 611. The DCL Plan Proponents assert that there is a reasonable basis for treating the Swap Claim separately from the Senior Loan Claims.

The Swap Claim is described in the General Disclosure Statement as follows:

> Under the terms of the Senior Loan Agreement, Tribune was required to enter into hedge arrangements to offset a percentage of its interest rate exposure under the Senior Loan Agreement and other debt with respect to borrowed money. On July 2, 2007, Tribune entered into an International Swap and Derivatives Association, Inc. ("ISDA") Master Agreement, a schedule to the 1992 ISDA Master Agreement and on July 3, 2007, entered into three interest rate swap confirmations (collectively, the "Swap Documents") with Barclays. . . . The Swap Documents were terminated on the Petition Date. As of that date, Tribune's aggregate liability in connection with the Swap Documents was approximately $150.9 million, which liability is subject to the guarantee of the Senior Loan Agreement indebtedness by the Guarantor Subsidiaries on a *pari passu* basis with Tribune's Senior Loan Agreement indebtedness.

(GDS, at 22).

The DCL Plan Proponents argue that it is proper to classify separately the Swap Claim

from the Senior Loan Claims because the basic nature of the claims are different. As noted by the Ninth Circuit, "[a] fundamental characteristic of an interest rate swap is that the counter-parties never actually loan or advance the notional amount. The swap involves an exchange of periodic payments calculated by reference to interest rates and a hypothetical notional amount." *Thrifty Oil Co. v. Bank of America Nat'l Trust and Savings Assoc.,* 322 F.3d 1039, 1048 (9th Cir. 2003). The Senior Loan Claims, on the other hand, are for money loaned.

Further, the DCL Plan Proponents argue that separate classification is appropriate because the Swap Claim is governed by a different loan agreement than the Senior Loan Claims. They note that the Examiner recognized that "[t]he obligations of Tribune under the Swap Documents do not constitute Credit Agreement Debt." *See* Examiner Report, Vol. II, at B-5.

Finally, the DCL Plan Proponents also assert that there is no plausible claim for avoidance of the Swap Claim, writing:

> By definition, the interest rate swap agreement giving rise to the Swap Claim provided reasonably equivalent value to Tribune at the time it was executed - - the value derived from effectively converting a variable rate loan into one with a fixed interest rate. Section 548 of the Bankruptcy Code in fact explicitly provides that "a swap participant . . . that receives a transfer in connection with a swap agreement takes for value to the extent of such transfer." 11 U.S.C. §548(d)(2)(D); *see also Hutson v. E.I. duPont de Nemours and Co. (In re Nat'l Gas Distribs. LLC)*, 556 F.3d 247, 259 (4th Cir. 2009) (noting that section 546(g) exempts transfers made in connection with swap agreement from avoidance under section 548).

(DCL Memo., at 145 (docket no. 8173). The Noteholders argue that §546(g) does not apply to intentionally fraudulent avoidance actions. However, there is nothing in this record to support a finding of any intentional fraud in connection with the Swap Claim. Because of the protection afforded to swap claims by §546(g), there is no basis to include the Swap Claim as part of the settlement with the Senior Lenders. The DCL Plan Proponents have provided reasonable justification

for separate classification of the Swap Claim from the Senior Loan Claims. I conclude that classifying the Swap Claim with Class 1F "Other Parent Claims" is appropriate.

9.    <u>The amount of the PHONES Noteholders' Claim</u>

Tribune lists the amount of the PHONES Notes on its Amended Schedules of Assets and Liabilities, dated April 13, 2009, as $758,871,303. (Docket no. 938, Sch. F). On June 5, 2009, Wilmington Trust Company, Successor Indenture Trustee for the PHONES notes ("WTC"), filed a proof of claim on behalf of the holders of the PHONES Notes, asserting that the amount of the PHONES Notes is approximately $1.197 billion. (PHONES Motion (described below) at ¶20). On December 30, 2010, WTC filed a Motion for (i) Estimation of the PHONES Claims and (ii) Classification of PHONES Claims Pursuant to Bankruptcy Rule 3013 (the "PHONES Motion") (Docket no. 7352). By Order dated February 3, 2011, the PHONES claims were allowed solely for voting purposes in the amount of $1,196,823,429.80. (Docket no. 7777). The dispute regarding the amount of the PHONES Notes was reserved for further consideration at confirmation.

As alleged in the PHONES Motion, the PHONES dispute arises from an attempt by some Noteholders to exchange their Notes prior to the bankruptcy filing. Pursuant to the terms of the PHONES Notes, each holder has the right, at any time and from time to time, to exchange each of its PHONES Notes for an amount of cash equal to 95% (or 100% under certain circumstances) of the market value of two shares of common stock of Time Warner, Inc., as successor by merger to AOL (the "Exchange Right"). (PHONES Motion, at ¶12). To exercise the Exchange Right, a holder of PHONES Notes is required to send an "Exchange Notice" and to surrender the PHONES Notes to be exchanged to the Indenture Trustee. Then, the Indenture Trustee notifies Tribune of the exercise of the Exchange Right by delivering the Exchange Notice and acknowledging that it has taken

possession of the PHONES Notes tendered for exchange. Subsequently, Tribune must make the required cash payment to the tendering holder. (*Id.* at ¶13).

Shortly before the Petition Date, holders of 2,659,467 units of PHONES Notes (the "Tendering Holders") - - in the aggregate principal amount of $417,536,319, calculated at $157 per PHONES Note - - properly sought to exercise the Exchange Right by delivering an Exchange Notice and surrendering their PHONES Notes to then-Indenture Trustee Deutsche Bank Trust Company Americas ("DBTCA"). (*Id.* at ¶14). Tribune did not honor the Exchange Right exercised by the Tendering Holders, i.e., it did not make the exchange payments to the Tendering Holders by the Petition Date. (*Id.*).

By letter dated December 30, 2008, DBTCA informed Tribune that it had received a number of requests from PHONES Noteholders seeking to withdraw their election to exercise the Exchange Right (the "Withdrawal Requests"). (*Id.* at ¶16). In response, by letter dated January 14, 2009, Tribune advised DBTCA that it considered each election to exercise the Exchange Right to be irrevocable and was not prepared to honor the Withdrawal Requests. (*Id.* at ¶17). The Debtors' disclosure statement provides that the "approximate carrying value of PHONES Notes on the Petition Date was $759 million comprised of $703 million for PHONES Notes not submitted for exchange and $56 million for PHONES Notes exchanged that were not settled in cash. (GDS, at 24).

The responses to the PHONES Motion raise two issues. First, the Debtors argue that the election to exercise the Exchange Right is irrevocable, thereby limiting the Tendering Holders' claim amount to the cash payment amount due from the Debtors as a result of the Exchange. Second, some PHONES Noteholders who did not exercise the Exchange Rights argue that the Tendering Holders' claims should be subordinated to the other PHONES Note claims pursuant to §510(b).

The record before me is not developed enough to resolve the issue about the PHONES' claim amount. Although certain facts are not in dispute, other details (for example, the dates of the Exchange Notices and whether the Indenture Trustee cancelled Notes provided for exchange) are not provided. Establishing the amount of the PHONES claims is not essential to determination of the matters now before me. When and if confirmation is achieved, the PHONES claim amount can be determined in connection in a claims objection process.

The second issue regarding subordination, which could impact claim classification issues, however, should be addressed. Section 510(b) of the Bankruptcy Code provides, in pertinent part, that a claim "for damages arising from the purchase or sale of such a security . . . shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security." 11 U.S.C. §510(b). Some PHONES Noteholders who did not exercise Exchange Rights pre-petition argue that, under the plain language of Section 510(b), the Tendering Holders' claims for payment are subordinated to remaining PHONES Noteholder claims. The Tendering Holders argue that Section 510(b) does not apply because their claims are not for *damages* arising from the purchase of the PHONES Notes, but are claims to collect on the instrument itself.

The Bankruptcy Code defines the term "security" to include notes, stock, bonds, and debentures (11 U.S.C. §101(49)), and, thus, the PHONES Notes would fall within that definition. The Third Circuit Court of Appeals has recognized that the phrase "arising from the purchase or sale of such security" in §510(b) can be ambiguous. *Baroda Hill Inv., Ltd. v. Telegroup, Inc. (In re Telegroup, Inc.)*, 281 F.3d 133, 138 (3d Cir. 2002). The *Telegroup* Court then looked to legislative history of §510(b) and determined that

Congress enacted §510(b) to prevent disappointed shareholders from recovering their

106

investment loss by using fraud and other securities claims to bootstrap their way to parity with general unsecured creditors in a bankruptcy proceeding.

*Telegroup*, 281 F.3d at 142. The *Telegroup* Court decided that a claim for the debtor's breach of a stock purchase agreement was subordinated. *Id.* at 144. *See also In re Touch America Holdings, Inc.*, 381 B.R. 95, (Bankr.D.Del. 2008) (deciding that ERISA litigation claims seeking damages for breach of fiduciary duties due to the decision to continue a plan's investment in company stock fell within §510(b)).

The Tendering Holders argue that their claims are not for damages arising out of the purchase or sale of PHONES Notes, but are claims to collect the amount due under the terms of the Notes. In *Blondheim Real Estate, Inc.*, 91 B.R. 639 (Bankr.D.N.H. 1988), the Court determined that a noteholders' claims for the amounts owing on the debtor's notes were not claims for damages subject to §510(b), noting that "the concept of 'damages' has the connotation of some recovery *other than* the simple recovery of an unpaid debt due upon an instrument." *Id.* at 640 (emphasis in original). Upon review of §510(b)'s legislative history, the *Blondheim* Court wrote that the history is

> focused upon the question of appropriate treatment of *inferior-level* claims that arguably might be *upgraded* to a higher level by virtue of some fraud ground justifying recovery by the security holder against the debtor. There is no discussion whatsoever in the legislative history as to priority questions between "trade creditors" and "investors" who are *same-level* unsecured creditors

*Id.* at 641 (emphasis in original). Like *Blondheim*, the issue here addresses priorities between subordinated creditors on the "same level," rather than a noteholder's attempt to bootstrap its claim into a more senior class expected to receive a better recovery. I conclude that §510(b) is not applicable to the Tendering Noteholders. Their claim is not for "damages" and does not fall within the plain language of §510(b). Moreover, the Tendering Noteholders are not seeking to promote their

claim status from a subordinated level. The purpose of Section 510(b) is to prevent creditors or equity holders from upgrading their claim position, but, in this case, it is not appropriate to use §510(b) to sub-subordinate the Tendering Holders' claims to other PHONES Noteholder Claims. Whether the amount of the Tendering Holders' claim is fixed as of the date the Exchange Notices were given, or whether the Exchange Notices were revoked or never took effect for failure of the Debtors to complete the process, the PHONES Noteholder claims should be treated alike.

10. <u>Whether the DCL Plan allows other claimants to benefit unfairly from the PHONES subordination</u>

The Noteholders and WTC, argue that the DCL Plan allows other claimants to benefit unfairly from the PHONES subordination by (1) treating "Other Parent Claims" (Class 1F) as Senior Indebtedness, and (2) applying the PHONES subordination provision to distributions of non-Debtor assets made from the Litigation Trust and the Creditors' Trust. The objectors contend that the plan construction violates §1129(b)'s requirement that a plan should not discriminate unfairly with respect to impaired classes, and §510(a)'s requirement that "a subordination agreement is enforceable in a case under [title 11] to the same extent that such agreement is enforceable under applicable nonbankruptcy law." 11 U.S.C. §510(a).

By way of background, section 14.01 of the PHONES indenture states that the PHONES shall be subordinated to "Senior Indebtedness," which is defined in that same section to be "the principal of (and premium, if any) and interest on . . . and other amounts due on or in connection with any Indebtedness of the Company." (DCL Ex. 668 at §14.01(2)). Section 14.01 defines "Indebtedness" to be:

> (i) all obligations represented by notes, bonds, debentures or similar evidences of indebtedness; (ii) all indebtedness for borrowed money or for the deferred purchase price of

property or services other than, in the case of any such deferred purchase price, on normal trade terms; . . . and (iv) all Indebtedness of others for the payment of which such Person is responsible or liable as obligor or guarantor.

(*Id.* at §14.01(1)).   Further, the definitions specifically except "any Indebtedness constituting trade accounts payable arising in the ordinary course of business" from "Senior Indebtedness."  (*Id.* at §14.01(2)).

The DCL Plan provides that holders of Other Parent Claims receive the same distribution percentage as the holders of Senior Noteholder Claims.  The Noteholders and WTC argue that the holders of "Other Parent Claims" do not fall within the PHONES Indenture's definition of Senior Indebtedness.  Therefore, Senior Noteholders, who are entitled to benefit from the PHONES subordination, should receive a higher recovery.

The DCL Plan Proponents assert that the class of Other Parent Claims includes the Swap Claim (approximately 57%), Retiree Claims (approximately 40%), and Trade Claims, and that the SWAP Claim, and possibly the Retiree Claims, fall within the definition of the Senior Indebtedness. However, even if the entire class of Other Parent Claims is deemed not to be Senior Indebtedness, the DCL Plan Proponents argue that the impact on Senior Noteholders' recoveries would be $100,000, or roughly .024% of the Senior Noteholders' potential initial distributions under the DCL Plan.[81]  They argue that this immaterial difference is not "unfair discrimination."

---

[81]The DCL Plan Proponents' expert, Brian Whittman, prepared a "Base Case Recovery Summary" analyzing the allocation of the Debtors' value among the Debtor entities and, then, based on estimated allowed claims and re-allocation of value due to Intercompany Claims, how that value would be distributed among third party claimants.  (*See* DCL Ex. 1110 at 2-3).  In adjusting the recovery to claimants due to subordinated debt, the Other Parent Claims were allocated $1 million.  (*Id.* at Chart 8, p. 22).  If the figures were corrected to eliminate any allocation of subordinated debt to the Other Parent Claim, Whittman calculated that only 10% of the benefit of the correction would flow to the Senior Noteholders.  (Id. at 15-16 n.33, *See* Tr. 3/14/11 at 42:25 - 43:8).

The issue, here, arises in an unusual context, for instead of arguing that creditors should be treated equally, the Noteholders and WTC argue that the DCL Plan should treat the claimants differently, by providing a greater recovery to those claimants who should benefit from the subordination. The DCL Plan Proponents argue that even if the DCL Plan misapplies the subordination agreement, the result is not unfair because the mistake does not *materially* affect the Noteholders' recovery.

In *Armstrong World Ind., Inc.*, 348 B.R. 111 (D.Del. 2006), the Court noted that a rebuttable presumption of unfair discrimination arises when there is:

> (1) a dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments), or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution.

*Armstrong*, 348 B.R. at 121 (citing *In re Dow Corning, Corp.,* 244 B.R. 696, 702 (Bankr.E.D. Mich. 1999).[82]   Minor or immaterial differences in plan treatment do not rise to the level of *unfair* discrimination.  *See In re Unbreakable Nation Co.*, 437 B.R. 189, 203 (Bankr.E.D. Pa. 2010) (Relying, in part, on the rebuttable presumption test, the court determined that the difference between 1.5% and 1.25% in a proposed distribution to two classes was not unfair discrimination); *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 231 (Bankr.D.N.J. 2000) (deciding that the difference between an 80% and 76% distribution was not a "materially lower percentage recovery" that would constitute unfair discrimination).

---

[82]This four-factor rebuttable presumption test was first proposed in an article by then Professor, now Bankruptcy Judge, Bruce A. Markell.  Markell, *A New Perspective on Unfair Discrimination in Chapter 11*, 72 Am.Bankr.L.J. 227 (1998).  In *Exide*, I discussed but did not adopt, the Markell test. *Exide*, 303 B.R. at 78-79.

In this case, the objecting parties argue that the DCL Plan Proponents failed to discriminate properly and should have proposed a lower recovery to the Other Parent Claims. They argue that the DCL Plan Proponents' evaluation of the discrepancy is wrong because the DCL Plan Proponents only analyzed a reallocation of the *natural recoveries* flowing to creditors. There is no analysis of the impact a reallocation would have on the distribution of settlement consideration or Litigation Trust proceeds. According to the Noteholders' analysis, giving the Other Parent Claims the unwarranted benefit of the PHONES subordination could strip as much as $50 million from the Senior Noteholders' settlement consideration. (*See* Noteholders' Reply Brief, at 35-36, Ex. A, docket no.9022).

The record here is unclear, so I cannot conclude that the effect of providing subordination rights to Other Parent Claims - - even excluding the Swap Claim - - is "immaterial." Therefore, I cannot conclude that the DLC Plan's treatment is fair or appropriately enforces the terms of the subordination agreement in accordance with Bankruptcy Code §510(a).[83]

The Noteholders and WTC also argue that the PHONES Notes are entitled to receive distributions from the Litigation Trust and the Creditors' Trust without giving effect to the subordination provision, because the causes of action being pursued in those trusts belong to

---

[83]WTC also argues that the DCL Plan fails the best interest of creditors test of §1129(a)(7) because it leaves the PHONES *further* out of the money than they would be in a chapter 7 liquidation. At least one court has held, however, that "[w]hen employing the best-interest-of-creditors test, courts look at the dividend the creditor would receive from the chapter 7 trustee - - and only that amount - - for comparison with the dividend available under the plan." *Dow Corning*, 237 B.R at 411. In her recent *Washington Mutual* decision, Judge Walrath took a somewhat more expansive view, finding that "where claims are being released under the chapter 11 plan but would be available for recovery in a chapter 7 case, the released claims must be considered as part of the analysis in deciding whether creditors fare at least as well under the chapter 11 plan as they would in a chapter 7 liquidation." *Washington Mut.*, 442 B.R. at 359-60. Neither formulation of the test supports WTC's argument concerning the supposed benefit to the PHONES of being less out-of-the-money in a liquidation. WTC's objection to the DCL Plan based on §1129(a)(7) is overruled.

creditors, not the Debtors. The PHONES Indenture provides in Section 14.02 ("Payment Over of Proceeds upon Dissolution, Etc.") that the PHONES Noteholders' recovery is subordinated to Senior Indebtedness "[u]pon distribution of *assets of the Company* in the event of any . . . bankruptcy case." (emphasis added). The DCL Plan Proponents agreed to amend the DCL Plan to provide that distributions from the Creditors' Trust are not subject to the PHONES subordination. (*See* Tr. 4/13/11 at 178). However, they argue that any recoveries from pursuit of the Litigation Trust causes of action are property of the Debtors and, therefore, subject to the subordination provisions.

In *Cybergenics,* the Third Circuit Court of Appeals decided that fraudulent transfer claims, which state law provides to creditors, are not assets of the debtor, even though the Bankruptcy Code empowers a debtor to pursue those claims for the benefit of all creditors. *Off'l Comm. Of Unsecured Creditors of Cybergenics Corp. v. Scott Chinery (In re Cybergenics Corp.),* 226 F.3d 237, 245 (3d Cir. 2000). *See also In re Gentek, Inc.*, 328 B.R. 423, (Bankr.D.Del. 2005) (A debtor has the power to pursue and settle fraudulent transfer claims post-petition). The *Cybergenics* Court wrote:

> The avoidance power itself, which we have analogized to the power of a public official to carry out various responsibilities in a representative capacity, was likewise not an asset of Cybergenics, just as this authority would not have been a personal asset of a trustee, had one been appointed.

*Cybergenics*, 226 F.3d at 245. Therefore, the Third Circuit held that the fraudulent transfer claims (which arose from obligations incurred and transfers made in connection with a leveraged buy-out) were not included in an earlier sale of "all of the rights, title, and interest of Cybergenics in and to all of the assets and business as a going concern of Cybergenics." *Id.* at 239, 245.

The Litigation Trust will pursue the Preserved Causes of Action as defined in §1.1.188 of the DCL Plan. Pursuant to *Cybergenics*, causes of action that the Debtors' estate may assert under

Chapter 5 of the Bankruptcy Code are not "assets of the Company" subject to the PHONES Notes' subordination provision.[84]  However, causes of action that are based on direct claims owned by the Debtors (for example, a claim for breach of fiduciary duty by an officer or director) would be an asset of the Company and subject to the PHONES Notes' subordination provision.

11.  DCL Plan - Conclusion

For the reasons set forth above, the following objections to confirmation are overruled: (i) the objection to the reasonableness of the DCL Plan Settlement, (ii) the objection to feasibility of the DCL Plan based on FCC regulations, (iii) the objection to the Bar Order in Section 11.3 (except to the extent that the Bar Order must be revised to enjoin specifically potential plaintiffs from acting contrary to its provisions), (iv)  the objection to the DCL Plan provision regarding treatment of prepetition indemnification and reimbursement claims, (v) the objection to the DCL Plan provision providing an option to assign state law constructive fraudulent conveyance claims to the Creditors' Trust (subject to any applicable non-bankruptcy law restricting assignment of such claims), (vi) Zell and EGI's objection to the establishment of the Litigation Trust and the Creditors' Trust, (vii) the objection to equal treatment of the PHONES Noteholders who exercised exchange rights pre-petition, and (viii) the objection to classification of the SWAP claim.

However, for the reasons discussed in more detail above, I conclude that the DCL Plan does not meet the requirements for confirmation under Bankruptcy Code §1129 because, *inter alia*:

---

[84]Bankruptcy Code §541(a)(3) provides that "property of the estate" includes "any interest in property that the trustee recovers under section . . . 550."  The *Cybergenics* Court noted, however, that "property of the debtor" and "property of the estate" have different meanings, as evidenced by numerous provisions in the  Bankruptcy Code that distinguish between the concepts, or refer to one and not the other.  *Cybergenics*, 226 F.3d at 246, n.15.  While the recoveries of the Chapter 5 causes of action would be property of the estate, those recoveries do not fall within the PHONES Notes' provision which subordinates payments from a distribution of assets of the *Company.*

(i)     the DCL Plan has not been accepted by at least one impaired class for each Debtor as required by §1129(a)(10),

(ii)    the Debtors' release in DCL Plan Section 11.2.1 is too broad to be fair and equitable,[85] more specifically (a) the parties granting the release in Section 11.2.1 should be limited to the Debtors, (b) the following persons may not be released in Section 11.2.1 because the record does not establish that they provided a substantial contribution or their release is necessary for a reorganization: the Debtors' "Related Persons," "Current Employees," and "401(k) Shareholders,"

(iii)   the Exculpation provision in Section 11.5 is too broad and must be limited to estate fiduciaries, and

(iv)    the DCL Plan does not comply with Bankruptcy Code §510(b) by unfairly applying subordination provisions of the PHONES notes to all "Other Parent Claims" and to the distribution of the proceeds of Chapter 5 causes of action by the Litigation Trust

Accordingly, the request to confirm the DCL Plan in its current form is denied.


**C.      Whether the Noteholders' Plan is confirmable**

The Noteholder Plan Proponents have filed their own chapter 11 plan of reorganization as an alternative to the DCL Plan, claiming that the Noteholder Plan is the only avenue for a just and equitable recovery for the Debtors' Non-LBO creditors (i.e., consisting, for the most part, of the Senior Noteholders and the PHONES Noteholders).  The main difference between the DCL Plan and the Noteholder Plan is based upon the treatment of the LBO-Related Causes of Action.  The Noteholder Plan provides that all LBO-related litigation will be preserved and prosecuted through the

---

[85]Certain parts of the release in Section 11.2.1 are permissible third-party releases, specifically releases of Senior Lenders, Bridge Lenders, Settling Step 2 Payees, Senior Loan Agents and Retiree Shareholders.

Litigation Trust and the Creditors' Trust.[86]  The causes of action to be prosecuted by the two trusts

include litigation regarding, among other things:

(i)     the avoidability of the indebtedness incurred by the Debtors in connection with the LBO,

(ii)    whether recipients of pre-Effective Date payments on the debt incurred pursuant to the LBO will be required to disgorge such payments (together with applicable prejudgment interest),

(iii)   whether the shareholders that had their stock redeemed in connection with the LBO will be required to disgorge such payments (together with applicable prejudgment interest),

(iv)    claims against the Debtors' officers, directors, and advisors,

(v)     claims against Sam Zell and his Affiliates, and

(vi)    the applicability of the subordination provisions in the Bridge Loan Agreement.

(the "Trust Causes of Action").  Rather than including intercompany claims as one of the Trust

Causes of Action, the Noteholder Plan integrates the Intercompany Claims Settlement, as defined in

the DCL Plan, and the allocation of the Debtors distributable enterprise value ("DEV"), consistent

with the DCL Plan (i.e., 8.4% of the DEV is allocable to Tribune, and 91.6% of the DEV is allocable

to the Subsidiaries).

Despite preservation of the Trust Causes of Action, based on the DCL Plan's DEV of $6.75

billion, the Noteholder Plan provides that between 34.7% and 51.2% of the DEV will be distributed

to creditors immediately upon the Debtors' emergence from chapter 11 (the "Initial Distribution").[87]

---

[86]The Noteholder Plan also contemplates the establishment of a Distribution Trust to hold consideration for ultimate distribution to Creditors based on the outcome of the Litigation Trust Causes of Action.

[87]The percentage distribution would increase based on a finding that the Debtors' DEV is higher. For example, the proposed Initial Distribution increases to 40.5% to 57.7% assuming a DEV of $8.33

The Initial Distribution to each class generally represents a recovery that assumes the resolution of all Trust Causes of Action that has the least favorable outcome vis-a-vis such class.

With some exceptions, the classes entitled to receive Initial Distributions will receive consideration in the form of a "strip," consisting of New Common Stock (or New Warrants) to the extent the applicable Creditor so elects, New Senior Secured Term Loan, and Distributable Cash. In addition to the Initial Distributions, on the Effective Date, holders of claims will also receive (i) Distribution Trust Interests, which may entitle a creditor to distributions from the Litigation Trust or distributions of reserved DEV, and (ii) Creditors' Trust Interests, if the creditor did not opt out. The ultimate recoveries for each impaired class of claims receiving Trust interests will be based on the final resolution of the Trust Causes of Action.

The DCL Plan Proponents, as well as the D&Os, Zell, and EGI, filed objections to confirmation of the Noteholder Plan. As discussed, *supra*, I concluded that neither plan may be confirmed. (*See* discussion in section B.2, *supra.*). The D&Os and Zell objected to the establishment of the Creditors' Trust in both plans and, for the reasons set forth above, I concluded that the Creditors' Trust is not improper. (*See* discussion in section B.6., *supra.*). The remaining objections addressed solely to the Noteholders Plan are discussed below.[88]

_____

billion.

[88] The DCL Plan Proponents raised another objection to the Noteholder Plan that has little merit and is not addressed at length. The DCL Plan Proponents argue that the Noteholder Plan "lacks a collective action mechanism" that would allow the Litigation Trustee to bind all Senior Lenders in a negotiated settlement. I fail to see why the Noteholder Plan's Litigation Trust requires an additional "mechanism" that is not present in the DCL Plan's Litigation Trust or, perhaps, in any plan litigation trust. It seems to me that the Litigation Trustee will negotiate with Senior Lenders and, when enough agree, he will settle with those parties and continue litigation against hold-outs.

1.     <u>Does the Noteholder Plan improperly release non-Debtor guarantors?</u>

The DCL Plan Proponents argue that the Noteholder Plan improperly and unfairly provides for the Senior Lenders and Bridge Lenders to release their guaranty claims against non-debtor subsidiaries of Tribune (the "Non-Debtor Guarantors").   Section 11.1.1 of the Noteholder Plan provides, in part, that "confirmation of the Noteholder Plan shall, as of the Effective Date, authorize the release of the Senior Loan Guaranty Claims, Swap Guaranty Claims, and the Bridge Loan Guaranty Claims against the Guarantor Non-Debtors."  (Noteholder Plan, §11.1.1, docket no. 8755).

The Noteholders argue, in response, that the Court should approve the release of the Non-Debtor Guarantors due to the "extraordinary" circumstances of this case.  *See Continental Airlines*, 203 F.3d at 212 ("non-consensual releases by a non-debtor of other non-debtor third parties are to be granted only in 'extraordinary circumstances.'").  As discussed previously, the *Genesis* Court evaluated whether a non-consensual release fit the "hallmarks" discussed in *Continental* by considering whether: (i) the non-consensual release was necessary to the success of the reorganization, (ii) the releasees have provided a critical financial contribution to the debtor's plan, (iii) the releasees' financial contribution is necessary to make the plan feasible, and (iv) the release is fair to the non-consenting creditors, i.e., whether the non-consenting creditors received reasonable compensation in exchange for the release.  *Genesis,* 266 B.R. at 607-08.

The Noteholders argue that the release of the Non-Debtor Guarantors is warranted here because, (i) the Non-Debtor Guarantors would have filed their own bankruptcy cases, absent unusual circumstances, and the LBO Lenders' treatment would not change if those entities had filed, (ii) there is significant identity of interest between the Debtors and the Non-Debtor Guarantors, since the guaranty obligations against both Debtor Guarantors and Non-Debtor Guarantors arise from the same

documents, (iii) the Non-Debtor Guarantors generate substantial value for the Debtors and the LBO Lenders are receiving valuable consideration by receiving up to approximately 80% of the Reorganized Debtor's equity, (iv) the LBO Lenders did not intend that the Non-Debtor Guarantors' guaranties would remain in place upon the Debtors' emergence from chapter 11, (the DCL Plan also provides for a release of the Guarantor Non-Debtors), and (v) the Debtors' and Senior Lenders' conduct during the chapter 11 has treated the Debtors and Non-Debtor Guarantors identically (e.g., the DEV conclusions in the General Disclosure Statement contemplate a release of guaranty claims post-bankruptcy).

I cannot agree that the release of the Non-Debtor Guarantors meets the *Genesis* test. The Noteholders cannot compare the LBO Lenders' consensual release of Non-Debtor Guarantors' claims as part of the overall settlement in the DCL Plan, on the one hand, with the forced release presented in the Noteholders' Plan, which was soundly rejected by the LBO Lenders. Although the Non-Debtor Guarantors may provide value to the Reorganized Debtor, which is necessary for the proposed reorganization, this record does not provide a sufficient basis for concluding that substituting an equity interest in the Reorganized Debtor is reasonable compensation for the Senior Lenders' release of the Non-Debtor Guarantors, especially in light of the LBO Lenders' dissatisfaction with the Noteholder Plan provisions regarding post-bankruptcy control over the Reorganized Debtors. The Noteholder Plan's non-consensual release is not fair and equitable to the LBO Lenders.[89]

---

[89] The Noteholders point out that the DCL Plan Proponents' objection to this provision is self-defeating because the DCL Plan likewise contains a non-consensual release of Senior Guaranty Claims by Senior Lenders that did not vote in favor of, or did not vote at all, on the DCL Plan. The Supplemental Voting Declaration shows that 2.43% of Class 1C (Senior Loan claims Against Tribune Company) rejected the DCL Plan. (Docket no. 9298, Ex. 1). To the extent the DCL Lenders cannot prove that the proposed third-party release of the guaranty claims meets the *Genesis* test, the release in the DCL Plan similarly would fail.

2.    Does the Noteholder Plan destroy value with unnecessary taxation?

The DCL Plan Proponents argue that the Noteholder Plan "destroys value with unnecessary taxation" because the Distribution Trust is highly likely to be considered a "disputed ownership fund" that is taxable at corporate rates after bankruptcy.  (*See* 26 C.F.R. §1.468B-9).  The definition of a "disputed ownership fund" specifically excludes a liquidating trust under 26 C.F.R. §301.7701-4. (*See* 26 C.F.R. §1.468B-9 (b)(iv)).  The DCL Plan Proponents have not provided a sufficient basis to support a conclusion that the Distribution Trust would not qualify as a liquidating trust under 26 C.F.R. §301.7701-4.  Based upon the record before me, I cannot conclude that this objection to the Noteholder Plan has any merit.

3.    Does the Noteholder Plan unfairly discriminate against Senior Lenders?

The DCL Plan Proponents also contend that the Noteholder Plan unfairly discriminates against Senior Lenders because the Noteholder Plan proposes to pay equity to the Senior Lenders, while the Senior Noteholders and holders of Other Parent Claims will receive a "strip" of cash, new debt, and equity.  The Noteholders claim that this treatment of the Senior Lenders is not unfairly discriminatory because the DCL Plan Proponents agree that a dollar of cash is equal to a dollar of equity.[90]  Thus, the Noteholders argue that the value of the Senior Lenders' recovery has not changed, only the form in which the value is distributed.  Moreover, the Noteholders argue that their plan was modified to

---

[90]The Noteholders point out that, in connection with a motion to approve resolicitation of the DCL Plan, the DCL Plan Proponents explained that a new "strip" alternative of cash, equity and term loan to be provided to the Senior Noteholders under the DCL Plan was appropriate because the proposed "strip" distributions under the [DCL] Plan as modified are *equal in value* to the cash distributions that were provided for under the December 2010 DCL Plan. . . . " NPP Ex. 2186 at 9 (DCL Resolicitation Motion) (emphasis added).

distribute equity to Senior Lenders at the request of the DCL Plan Proponents.[91]

As discussed previously in connection with the DCL Plan, a rebuttable presumption of unfair discrimination arises when there is:

> (1) a dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments), or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution.

*Armstrong*, 348 B.R. at 121 (citing *In re Dow Corning, Corp.*, 244 B.R. 696, 702 (Bankr.E.D. Mich. 1999). In *Matter of Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213 (Bankr.D.N.J. 2000), the Court held that the distribution of equity to a deficiency claim and a distribution of cash to trade creditors was not unfair. *Id.* at 232. After reviewing the expert witness testimony on the value of the equity interest, the *Greate Bay* Court decided that the difference amounted to a 80% distribution to general unsecured claims, and a 76% distribution to the deficiency claim. *Id.* at 231. This difference was not "materially lower" and was not *unfair* discrimination. *Id.* Further, the *Greate Bay* Court decided that the allocation of equity to the deficiency claim holders did not impose a materially greater risk on those creditors, writing:

---

[91]The Noteholders assert that the form of distribution was changed in response to the DCL Plan Proponents' objection to the Noteholder Plan on the grounds that the Plan reserved too much equity of the Reorganized Tribune. In the objection, the DCL Plan Proponents argued that:

> The Noteholder Plan would leave up to 65% of the equity ownership of reorganized Tribune unresolved, held in a Distribution Trust until the resolution of complex litigation that could last years. Instead of distributing as much equity in reorganized Tribune as possible and funding the reserve with alternative currency, the Noteholder Plan would maximize the amount of equity that is *held back* by funding the reserve with a "strip" of equity, newly issued debt securities and cash. This structure would *maximize* uncertainty as to reorganized Tribune's ownership, harming Tribune and reducing value for all creditors.

(DCL Plan Confirmation Obj., at 22-23 (NPP Ex. 2219) (emphasis in original)).

The disparity of risk imposed upon equally situated creditors may be evaluated by comparing the levels of risk accepted prepetition by each creditor with the levels of risk imposed by the plan. For instance, it is generally recognized that trade creditors have short-term maturities; debenture holders have long-term expectations. Correspondingly, in this case, the trade creditors are receiving an immediate cash payout, while the Old Noteholders are receiving a package of securities that conform to prepetition long-term expectations. No "unfairness" is discerned in this necessary disparity in treatment.

*Id.* at 232 (citations omitted); *see also In re Hawaiian Telecom Commc'n, Inc.*, 430 B.R. 564, 605 (Bankr.D.Ha. 2009). The Noteholders argue that the same reasoning applies here: the Senior Lenders are long term investors and it is not inequitable for them to receive equity that conforms to their prepetition long-term expectations.

However, the disparity in the Noteholder Plan is not simply between Senior Lenders and trade creditors. The Noteholders provide no justification for discriminatory treatment between Senior Lenders and Senior Noteholders, which similarly had long-term investment expectations prepetition. Furthermore, the Noteholders do not provide evidence as to the necessity for the different treatment. Even assuming the value of the distributions is generally the same, this record does not support a finding that the discrimination in the Senior Lenders' treatment is fair.

4.    Does the Noteholder Plan Fail to Implement the Intercompany Claims Settlement?

The DCL Plan Proponents argue that the Noteholder Plan purports to "adopt" the Intercompany Claims Settlement for purposes of allocating value among individual Debtors to enable distributions, but the manner in which the Noteholder Plan implements the Intercompany Claims Settlement ultimately removes any benefit of the Intercompany Settlement. The DCL Plan Proponents assert that the Noteholder Plan has three phases of treatment of intercompany claims: (1) adoption of the Intercompany Claims Settlement solely to allocate value among Debtors, and thus

121

enable initial distributions that ignore the intercompany claims themselves; (2) litigation regarding allowance of Senior Loan Claims would be followed by distributions that, it appears, completely ignore intercompany claims, and (3) if at any point the value of the Guarantor Debtors is determined to be sufficient to pay the principal amount of allowed claims against them, intercompany claims *against* the Guarantor Debtors would be resurrected and enforced, such that the remaining value of the Guarantor Debtors would be distributed to Tribune parent creditors *before* creditors of the Guarantor Debtors could recover postpetition interest. (*See* DCL Brief, docket no. 8897, at 108-109). The DCL Plan Proponents argue that the Noteholder Plan's implementation of the Intercompany Settlement Agreement is merely an attempt to siphon value of the Guarantor Debtors to the benefit of creditors of the Tribune parent. However, the DCL Plan Proponents contend that more than 80% of the value of the Guarantor Debtors resides at Debtors that *do not have* material intercompany liabilities owing to the Tribune parent. Therefore, even if the Noteholders could selectively adopt and ignore portions of the Intercompany Settlement Agreement, the DCL Plan Proponents claim that the proposal fails.

The Noteholders continue to press their argument that the Guarantor Subsidiaries are insolvent and, therefore, the Senior Lenders are not entitled to post-petition interest on their claims.[92] The record before me does not present a clear picture of the solvency of the Guarantor Debtors or the flow

---

[92]The general rule is that unsecured creditors are not entitled to recover post-petition interest. *Washington Mut.*, 442 B.R. at 356 (citing *United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 372-73, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988)). An exception to the general rule occurs when the debtor is solvent. *Id.* In a chapter 7 liquidation, where the debtor is solvent, a creditor must receive post-petition interest on its claim before shareholders receive any distribution. 11 U.S.C. §726(a)(5). Therefore, to meet the best interests of creditors test in §1129(a)(7), the non-consenting impaired creditors must get interest on their claims before shareholders receive any recovery. *Washington Mut.*, 442 B.R. at 356 (citations omitted).

of intercompany claims between the parent and the subsidiaries.  On this record, the Noteholder

Plan's modified implementation of the Intercompany Claims Settlement cannot be approved.

5.      Noteholder Plan Conclusion

I conclude that the Noteholder Plan does not meet the requirements for confirmation under

Bankruptcy Code §1129 because, *inter alia*:

(i)      the Noteholder Plan has not been accepted by at least one impaired class for each
Debtor as required by §1129(a)(10),

(ii)     the non-consensual release of Non-Debtor Guarantors is improper,

(iii)    the Noteholder Plan unfairly discriminates in its treatment of the Senior Lenders, and

(iv)    the Noteholder Plan's modified implementation of the Intercompany Settlement
Agreement is not adequately explained to be considered fair or reasonable.

Accordingly, the request to confirm the Noteholder Plan is denied.

**D.      Competing Plans and §1129(c)**

Neither the DCL Plan nor the Noteholder Plan is confirmable. I am uncertain, at this point,

what steps the Debtors or other parties may take as a consequence of this decision. It may be that the

parties simply will try to address the issues raised in this Opinion, or that an entirely new plan or

plans will be devised.  Perhaps parties will realign.  Perhaps yet another attempt will be made to reach

consensus.[93]

I, therefore, believe it appropriate to address §1129(c) considerations to avoid wasteful efforts

by the parties.  Section 1129(c) provides that "[i]f the requirements of subsections (a) and (b) of this

section [1129] are met with respect to more than one plan, the court shall consider the preferences of

---

[93]"A chapter 11 petition is an invitation to a negotiation." Elizabeth Warren and Jay Lawrence
Westbrook, *The Law of Debtors and Creditors* 397 (Aspen, 6th ed. 2008). The parties might reconsider
this invitation.

creditors and equity security holders in determining which plan to confirm." 11 U.S.C. §1129(c). *See In re Orchards Village Investments, LLC*, No. 09-30893, 2010 WL 143706, *21 (Bankr.D.Or. Jan. 8, 2010) ("Based on the clear terms of §1129(c), I give primary consideration to the preferences of creditors and equity holders.").

The voting results reveal that creditors overwhelmingly prefer the DCL Plan over the Noteholder Plan. Out of 128 classes of claims in which creditors actually voted, 125 classes (97.66%) voted to accept the DCL Plan. (Epiq Voting Declaration, docket no. 7918 at Ex. A-1; *See also* Epiq's Third Supp. Decl., docket no. 9298, Ex. 1).[94] In contrast, out of 243 classes of claims in which creditors actually voted, only three classes (1.2%) voted to accept the Noteholder Plan. (Docket no. 7918, at Ex. B-1). Of the three accepting classes, two are the Senior Noteholders and the PHONES Notes classes, and one is a class in which a single creditor holding a claim of $47 voted in favor of both the DCL Plan and the Noteholder Plan. (*Id.*).

Creditors were also permitted to indicate a preference on their ballot among the plans they voted to accept. However, since approximately 1,340 out of 2,200 creditors that voted on both plans chose to accept only one plan, relatively few creditors expressed a preference on their ballot for either plan. Most of those preferred the DCL Plan.[95]

---

[94]By Order dated May 17, 2011 (docket no. 8926), the Court approved the Debtors' motion for approval of procedures to provide certain creditors with the opportunity to change their votes, make new elections regarding distributions, releases, and transfers of claims in connection with the DCL Plan (the "Resolicitation Motion") (docket no. 8754). On June 21, 2011, the Third Supplemental Declaration regarding voting and tabulation of ballots was filed regarding the resolicitation. (Docket no. 9298). Overall, the number of classes accepting (125) and rejecting (3) the DCL Plan did not change. (*Id*, Ex. 1).

[95]After aggregating multiple ballots received by individual creditors, approximately (a) five holders of Other Parent Claims indicated a preference, with all five preferring the DCL Plan, (b) 57 holders of General Unsecured Claims against Subsidiary Debtors indicated a preference, with 47 preferring the DCL Plan; and (c) 78 Senior Noteholders indicated a preference, with 30 preferring the

While courts are obligated to consider the preferences of the creditors and equity interests, courts also have considered other factors. *In re River Village Assocs*, 181 B.R. 795, 807 (E.D.Pa. 1995). Beyond considering the preferences of creditors and equity holders, a court may consider (1) the type of plan, (2) the treatment of creditors and equity holders; and (3) the feasibility of the plan. *TCI2 Holdings*, 428 B.R. at 182.

Although both plans claim to allow the Debtors to reorganize, the DCL Plan better supports this goal by resolving significant claims and providing the Debtors with more certainty regarding preservation of estate value and a better foundation for revitalizing business operations. The DCL Plan is feasible. The settlement of claims in the DCL Plan treats creditors fairly. That other creditors might benefit from extensive and costly litigation, as the Noteholder Plan Proponents assert, is highly speculative. The overwhelming majority of creditors have made their preference for the settlement known through the voting results.

Accordingly, assuming that both sets of plan proponents addressed only the flaws in their respective plans and both returned confirmable plans containing terms otherwise similar to those presently proposed, with similar voting results, the DCL Plan would survive the crucible of §1129(c).

In any event, the Court is of the determined view that, the Debtors must promptly find an exit door to this chapter 11 proceeding. The Court is equally resolute that, if a viable exit strategy does not present itself with alacrity, and despite any disruption to management, as well as the added cost and delay this might inevitably occasion, the Court intends to consider, on its own motion, whether a chapter 11 trustee should be appointed. Bankruptcy Code §1104; *see also In re Marvel Entertainment Group, Inc.*, 140 F.3d 463 (3d Cir. 1998).

---

DCL Plan. (*See* Epiq Voting Declaration, docket no. 8882, at Ex. 2, 3).

An appropriate order follows.

BY THE COURT:

_____
KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

Dated: October 31, 2011