IN THE UNITED STATES BANRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| TRIBUNE COMPANY, ET. AL. | ) | Case No. 08-13141 (KJC) |
| | ) | |
| DEBTORS | ) | |

**JOANN PARKER'S RESPONSE TO DEBTORS' FORTY-EIGHTH OMINIBUS(NON-SUBSTANTIVE) OBJECTION TO CLAIMS PURSUANT TO SECTION 502 (b) OF THE BANKRUPTCY CODE, BANKRUPTCY RULES 3001, 3003, AND 3007, AND LOCAL RULE 3007-1**

NOW COMES Joanne Parker, by and through counsel filing the herein Response to the Debtor's Forty-Eighth Omnibus (Non- Substantive ) Objection to Parker's proof of claim numbers 6797, 6798, and 6801. In support thereof Parker states as follows:

INTRODUCTION

Joanne Parker filed a Motion for Leave to File Late Proof of Claim with the United States Bankruptcy Court for theDistrict of Delaware. The Motion was mailed on August 29, 2011. The Motion was received and given claim numbers 6797, 6798, and 6801 on or about September 1, 2011. ( Exhibit 1, Claim No. 6797)

On or about October 21, 2011, Debtors filed the subject Objection. Paragraph (18) eighteen of the Debtor's Objection, states that the Debtors dispute the assertions made by Ms. Parker in the Parker Motion and disputes that such assertions meet the standards for "excusable neglect", as set forth in Pioneer Inv. Srvs. v. Brunswick Assoc. Ltd. , 507 U.S. 380 (1993)

Parker asserts that for reasons stated in her Motion and for reasons discussed below that the circumstances of this case meet the standards for excusable neglect, as set forth in Pioneer, and the requirements as set forth in Bankruptcy Rule 3002(c). As such, Parker requests that she be granted leave to file a late proof of claim, in accordance with Pioneer. Alternatively, that the she be granted an extension of time for filing a proof of claim to the mailing /filed date of August 29, 2011/September 1,

2011, pursuant to Bankruptcy Rule 3002(c).

The Court held in, <u>Sandoval, Debtor v. Sandoval and Rivera   Chapter 13 Trustee</u>, 327 B.R. 493 (2005) that:

" Despite the strict application of the Rule 3002 deadline for filing proofs of claim, subsection ( c)allows a bankruptcy court to grant an extension of time for filing a proof of claim in a Chapter 13 case. Rule 3002 ( c) (2) provides: In the Interest of justice and if it will not unduly delay the administration of the case, the court may extend the time for filing a proof of claim by an infant or incompetent person or the representative of either.

………………

Rule 3002 ( c) (2) requires the bankruptcy court to consider three issues: (1 ) whether the creditor was incompetent, regardless of represenation by an attorney; ( 2) whether an extension of time would be in the "interests of justice"; and (3) whether an extension "unduly delay adminstration of the case".

………………

The Bankruptcy Code and Rules contain no definition of "incompetent" as used in Rule 3002 ( c) (2).

………………

As with the meaning of incomptency, there is little case law regarding issues to be considered in determining whether an extension of time to file a proof of claim under Rule 3002 ( c) (2) would be "in the interests of justice." This is a fact-sensitive determination that is best made by the bankruptcy court on remand."<u>Sandoval, Debtor v. Sandoval and Rivera</u>, Chapter 13 Trustee, 327 B.R. 493 (2005)

## FACTS

Joanne Parker was employed by the Debtor, The Chicago Tribune Company(hereafter CTC) at 435 N. Michigan Avenue, Chicago, Illinois, from 1985 until February 6, 2009. At some time, earlier than February, 2009, and at least the time beginning in February, 2008, Parker was diagnosed with bi-polar disorder and depression. Parker was placed on medical disability leave in February, 2008, for

six (6) months due to her mental condition. Parker returned to work in August of 2008. Parker worked from August 2008 until December 8, 2008. On December 8, 2008, Parker suffered a mental/anxiety attack at work and had to be transported from the job to the hospital emergency room by the paramedic department. Plaintiff was subseqently hospitalized at a psychiatric hospital.

Coincidentally, on the same day that Parker was taken away by the paramedics, CTC filed for Chapter 11 Bankruptcy. In and about the month of February, 2009 Parker was placed on long term medical disability leave due to her mental condition. Also in and about the month of February, 2009, CTC notified Parker that her employment had been terminated.

By June 12, 2009, the first proof of claim bar date, Parker was still on long term disability due to her mental condition. By April 6, 2010, the second proof of claim bar date, Parker was still on long term disability due to her mental condition. Attached hereto is the medical report from Parker's psychiatrist, dated 02/24/2010. Of note, is that Parker's pyschiatrist indicates in the section under "Psychological Functions", among other things, that a psychological function of Parker's bi-polar disorder is that she has "difficulty focusing, concentrating, impaired reasoning". (Exhibit #2)

## PARKER'S DELAY WAS NOT WITHIN HER CONTROL DUE TO HER ONGOING MENTAL CONDITION

Counsel for the Debtors argue that Parker's delay was within her control and in support reference such matters as Parker's pro se filing of EEOC complaints and her initial pro se litigation of her lawsuit.

However, Parker's initial filing of her lawsuit was a handwritten narrative in the Illinois State Court on August 29, 2009. Counsel for the Debtors filed a Motion to Dismiss, on among other grounds that Parker's handwritten narrative complaint was "unintelligible and incomprehensible". Attached hereto is a copy of Parker's pro se initial complaint (Exhibit #3) Not only did Parker's handwritten narrative not comply with legal procedure. The Debtors specifically argued that the narrative was "unintelligible and incomprehensible". This would be consistent with Parker's

psychiatrist's diagnosis of bi-polar with "impaired reasoning". So, simply because Parker was capable of filing an "incomprehensible" complaint does not mean that Parker was functioning at a level that she was capable of reasoning that letters with a Delaware address, or any unfamiliar mail was something that she should give attention.

Even though counsel for the Debtors argues that Parker's ability to file her EEOC complaints negates excusable neglect. The record demonstrates that even though Parker was terminated in February 2009, she did not mention in either of her filings with the EEOC on May 22, 2009 and August 27, 2009 that she was terminated. This would be consistent with Parker's psychiatrist's diagnosis of bi-polar with "impaired reasoning". This "impaired reasoning", caused Parker not to be capable of reasoning the significance of advising the EEOC that she had been terminated. This same "impaired reasoning" caused Parker to not be capable of reasoning that letters with a Delaware address, or any unfamiliar mail was something that she should give attention.

Further demonstration of Parker's psychiatrist's diagnosis of bi-polar with "difficulty in focusing, concentrating, impaired reasoning", is seen in the attached excerpts from Parker's deposition, taken in March of 2011:

SEE THE FOLLOWING ATTACHED EXCERPTS

# Exhibit A

# Excerpts of Plaintiff Joann Parker's Deposition and Exhibits Thereto

**Page 33**

1  position for me while I was out on my disability
2  leave. She didn't stay long. She was briefly in,
3  and she was gone.
4  Q. If you had to guess her age at that time,
5  what would you say?
6  A. Well, I would have to go back to when she
7  came there. She got married. Then she had her
8  first child, Noah, and then the second child,
9  Areal. So she would have to be -- later on maybe
10 45 because Areal --
11 Q. So Ms. Parker you think that the day
12 Ms. Glassberg welcomed you when you returned to the
13 department she was about 45 years old?
14 A. Because at that time she already had had
15 two children.
16 Q. That's your assumption, that she was about
17 45 years old?
18 A. Yeah.
19 Q. Were you aware that Chicago Tribune filed
20 for bankruptcy on December 8, 2008?
21 A. No, I wasn't.
22 Q. Did you see it in the news?
23 A. No, I don't watch the news.
24 Q. During your time at work, did you hear

**Page 34**

1  that the company that you worked for had filed for
2  bankruptcy?
3  A. No.
4  Q. Did you receive any correspondence
5  advising you of the fact that Chicago Tribune filed
6  for bankruptcy?
7  A. Any correspondence or letters were often
8  just tossed on my dresser because they would bring
9  about anxiety for me to even try to open or read
10 anything, so I didn't read anything. I knew what a
11 Commonwealth Edison bill looked like. I knew what
12 my gas bill looked like. Anything else, I didn't
13 read it. I just through it in a pile on my dresser
14 and got back in the bed.
15 Q. So what you're telling me is that you
16 received correspondence at your house, but with the
17 exception of your gas bill and electric bill you
18 don't open any correspondence?
19 A. When you say correspondence, I wasn't
20 aware that I had what you're talking about. I said
21 I only focused on Commonwealth Edison with the red
22 and the People's Gas. Those things I knew had to
23 be paid, so they didn't cause anxiety attacks.
24 Everything else -- I mean everything else -- went

**Page 35**

1  in a pile on my dresser, and I didn't look at it.
2  Q. So you may have received correspondence
3  from the Chicago Tribune advising you of the fact
4  that the company had filed for bankruptcy, but you
5  didn't open that correspondence?
6  A. I wasn't aware that I had anything like
7  that.
8  Q. That wasn't my question. Listen to my
9  question and answer my question. My question is,
10 is it possible that you received correspondence
11 advising you of the fact that the Chicago Tribune
12 filed for bankruptcy and that you did not open the
13 correspondence? You received it, and you didn't
14 open it and it stayed unopened in your dresser?
15 A. I need to understand. Are you asking me
16 did I actually look at an envelope, know what it
17 was and just said I'm not going to open it?
18 MS. RIESCO: Could you repeat the question. I
19 want you to listen to the question.
20         (Whereupon, the record was read.)
21 THE WITNESS: I would say anything is possible
22 since I didn't read any other correspondence,
23 nothing other than gas bill, light bill.
24

**Page 36**

1         (Whereupon, Deposition
2         Exhibit No. 2 was marked for
3         identification.)
4  BY MS. RIESCO:
5  Q. Let me show you Exhibit 2. Do you
6  recognize this document?
7  A. No, I don't.
8  Q. I'm going to represent to you that this
9  document was mailed to your house in April of 2009,
10 and it advises you that the company has filed for
11 bankruptcy protection effective December 8, 2008.
12 A. That was the last day that I worked for
13 the company. I know December 8th was the last day
14 I was there of 2008; but no, I haven't seen this.
15 Q. When you received correspondence from the
16 Chicago Tribune regarding your long-term disability
17 leave or your short-term disability leave, did you
18 open that correspondence?
19 A. Then I only had just that, and it was
20 always mailed to you in like a yellow or red type
21 envelope. I would take that to my doctor, and my
22 doctor would fill that out.
23 Q. But you did receive correspondence other
24 than your ComEd bill and your People's --

**Page 37**

1  A. I would say that --
2  Q. Let me finish the question.
3  Did you receive correspondence other than
4  your ComEd bill and People's Gas bill that you in
5  fact proceeded to open and take action on?
6  A. Yeah, that would be the disability --
7  that's all you want me to say -- because that had
8  to be given to my doctor.
9  Q. So you opened some correspondence in
10  addition to your ComEd bill and the People's Gas
11  bill, is that correct?
12  A. Yeah, the yellow and red envelope.
13  Q. But for some reason you did not open
14  correspondence that I've represented to you as
15  Exhibit 2?
16  A. No, I didn't open any other
17  correspondence, none of my mail, none of it. It
18  stayed on my dresser in a pile.
19       (Whereupon, Deposition
20        Exhibit No. 3 was marked for
21        identification.)
22  BY MS. RIESCO:
23  Q. I'm going to show you what has been marked
24  as Exhibit 3. For the record, this is a Proof of

**Page 38**

1  Claim Form from the United States Bankruptcy Court
2  from the District of Delaware. Have you ever seen
3  this document before?
4  A. No, ma'am.
5  Q. Exhibit 2 says that the Chicago Tribune
6  filed for bankruptcy protection on December 8,
7  2008, and that as part of the bankruptcy process
8  they were required to give creditors the
9  opportunity to file claims for damages they believe
10  are owed to them by December 8th, 2008. Any claims
11  must be filed by June 12, 2009, which is called the
12  bar date. Do you see that paragraph at the top of
13  Exhibit 2?
14  A. Filed by June 12, 2009, which is called
15  the bar date. Yeah, I see it in this. I see it.
16  Q. You never filed a proof of claim with the
17  bankruptcy court, did you?
18  A. No, because I never saw these papers
19  before. I didn't open my mail.
20  Q. So you may have received this document.
21  You just wouldn't know because you didn't open it?
22  A. I wouldn't know because I did not open my
23  mail, no.
24  Q. Are you aware that your failure to file a

**Page 39**

1  proof of claim in Exhibit 3 means that you cannot
2  recover damages for anything that took place before
3  December 8th, 2008?
4  A. No, I'm not aware of that because the last
5  time I was there was December 8th, 2008.
6       (Whereupon, Deposition
7        Exhibit No. 4 was marked for
8        identification.)
9  BY MS. RIESCO:
10  Q. I'm showing you what's been marked as
11  Exhibit 4. Tell me once you've had a chance to
12  look at the document if you recognize it.
13  A. The words that I remember seeing and I had
14  a problem with the wording, and I was inquiring
15  what this at-will means. So there was a delay in
16  me signing this. That's why I remember this. This
17  was not mailed to my house. This was when I was
18  sitting at my desk. I'm like I want someone to
19  explain to me what this at-will means, because I've
20  never heard that term used before.
21  Q. Have you seen Exhibit 4 before today?
22  A. What I saw, like I said, was this
23  wording. I remember --
24  Q. That wasn't my question.

**Page 40**

1  A. I can't say I've seen this entire
2  document.
3  Q. Were you aware that the Chicago Tribune is
4  an equal opportunity employer?
5  A. Yes.
6  Q. Were you aware that the Chicago Tribune
7  had a harassment policy that prohibited harassment
8  in the workplace?
9  A. Yes. I would assume like most companies,
10  yes, ma'am.
11  Q. Did you ever see the Chicago Tribune
12  handbook, employee handbook?
13  A. There was something that they had in our
14  computers that was not in paper form that we had to
15  go through and read. We had never done a computer
16  thing like that where you didn't have it in
17  tangible where you can put it in your hand. That's
18  when I remember this term at-will. I was stuck on
19  that. What does at-will mean? I don't know what
20  I'm signing.
21  Q. Did you sign that document when you saw
22  it?
23  A. After me being told I can fired for not
24  signing it I had to sign it.

McCorkle Court Reporters, Inc.
Chicago, Illinois   (312) 263-0052

**Page 45**

1  been marked as Exhibit 6.
2           (Whereupon, Deposition
3           Exhibit No. 6 was marked for
4           identification.)
5       THE WITNESS: I don't know what at-will means.
6  That's what I'm asking you.
7  BY MS. RIESCO:
8       Q.  Do you recognize this document?
9       A.  This is in 1999.
10      Q.  Do you recognize the document in
11 Exhibit 6?
12      A.  I'm looking at the date, ma'am, right now
13 trying to remember something that was given to me
14 in 1999. Okay. I don't remember it because it's
15 too far back, 1999.
16      Q.  Ms. Parker, I'm trying to be very patient,
17 but I need you to wait for me to finish my question
18 so you can answer. Okay.
19          Exhibit 6, is that your signature on
20 Exhibit 6?
21      A.  Yes, ma'am.
22      Q.  So you signed Exhibit 6?
23      A.  Yes, ma'am.
24      Q.  And in Exhibit 6 you acknowledged that you

**Page 46**

1  received a copy of a Reference and Resource Guide
2  and a Tribune Employee Handbook which included
3  various policies, is that correct?
4       A.  For 1999, yes, because that's my
5  signature. I know my signature.
6       Q.  But your testimony is that you were not
7  aware in 1999 or at any point during your
8  employment that you were an at-will employee?
9       A.  No.
10      Q.  But you acknowledged that the company
11 states it's an equal opportunity employer?
12      A.  Yes. It always says that.
13      Q.  And you acknowledged that the company has
14 a harassment policy?
15      A.  Yes.
16      Q.  Were you aware that the company's
17 harassment policy requires employees to communicate
18 to management any instances of perceived
19 harassment?
20      A.  Yes.
21      Q.  Okay. You were aware of that, correct?
22      A.  About harassment?
23      Q.  Yes.
24      A.  Yes, ma'am.

**Page 47**

1       Q.  So just stepping back for a minute, you
2  began working for Chicago Tribune in 1995; correct?
3       A.  Uh-huh.
4       Q.  Now you took various leaves of absence
5  during your employment, correct?
6       A.  Yes, ma'am.
7       Q.  What was your most recent leave of
8  absence?
9       A.  The most recent would have been after
10 December of 2008, on the 8th, which was on a
11 Monday. I had an anxiety attack, and I had
12 difficulty in trying to -- I'll slow down so you
13 can write it down.
14      Q.  No, that's fine. Go ahead.
15      A.  Is it okay?
16      Q.  Yes.
17      A.  Well, I had a problem with breathing due
18 to the heightened stress that I was experiencing.
19      Q.  Before December 8, 2008, what was your
20 leave of absence before that one?
21      A.  That was for bipolar.
22      Q.  When was it?
23      A.  I came back I think on August 28th or 29th
24 of 2008. I had been off for six months leading up

**Page 48**

1  to that date, so you can just count back from that
2  time.
3       Q.  The records I have show that you were on
4  leave from February 22, 2008 to August 28, 2008 for
5  about six months. Does that sound about right to
6  you?
7       A.  The dates, I can't be for sure. I can say
8  that I was off six months prior to me returning to
9  my job.
10      Q.  You testified that you returned to work
11 August 28 or 29, 2008 thousand, correct?
12      A.  Yes, ma'am. That was on a Friday.
13      Q.  You were also on leave various other times
14 before that, right?
15      A.  Uh-huh.
16      Q.  Do you remember being on leave for about
17 six and a half months in 2007?
18      A.  You're only allowed six months so.
19      Q.  Do you remember being on leave for six
20 months in 2007?
21      A.  I remember being on leave, yes, but I
22 can't tell you the date. I just know that I was on
23 leave for my bipolar condition.
24      Q.  In 2007?

**Page 69**

1  Bill Winston, a religious show; Andy —
2  Q. Do you recognize Exhibit 7 is a Complaint
3  that your attorney filed on your behalf —
4  A. I recognize some of the work —
5  Q. Ms. Parker, I'm going to remind you for
6  one last time.
7  A. I don't know what you want me to say. I'm
8  trying to answer you.
9  Q. I appreciate that you're trying to answer
10  me. I just need you to wait until I'm done asking
11  the question so that you know what to answer.
12  Okay?
13  A. Okay.
14  Q. Do you recognize Exhibit 7 as the
15  Complaint that your attorney filed on your behalf
16  in this action?
17  A. Some of the words, yes.
18  Q. Are you aware that before filing this
19  lawsuit you filed a Charge of Discrimination with
20  the EEOC?
21  A. Yes, I'm aware of that. Yes, I am.
22  Q. You provided information to the EEOC,
23  correct?
24  A. Yes.

**Page 70**

1  Q. Were you honest with the EEOC?
2  A. Totally. When I called them, I was trying
3  to stop what was happening to me, all the
4  harassment, the discrimination, keeping the calls
5  from me. I was trying to stop them from hurting me
6  because I knew they were trying to get rid of me.
7  Q. You wanted the EEOC's help, right?
8  A. Yes. I went into the bathroom one day and
9  quietly dialed them because I couldn't take it
10  anymore. Someone followed me in the bathroom, and
11  I had to wait until Joy Harris left so I could try
12  to talk to them as quiet as I could about what was
13  happening to me. That document was mailed to my
14  home.
15  Q. You knew you had to be honest with the
16  EEOC —
17  A. Yes, ma'am.
18  Q. Ms. Parker, please let me finish.
19  MS. RIESCO: Ms. Bender, I would appreciate if
20  you could instruct your client to please attempt to
21  let me finish the question before she answers.
22  MS. BENDER: I think she's heard you. I think
23  she's trying the best she can. I'll just say that
24  this may be part of her diagnosis. So I think

**Page 71**

1  she's doing the best she can.
2  BY MS. RIESCO:
3  Q. Did you provide complete and honest
4  details to the EEOC, Ms. Parker, when you spoke to
5  them?
6  A. To the best of my ability.
7  Q. Did you at some point file a second Charge
8  with the EEOC?
9  A. Yes, ma'am.
10  (Whereupon, Deposition
11  Exhibit No. 8 was marked for
12  identification.)
13  BY MS. RIESCO:
14  Q. I'm showing you what's been marked as
15  Exhibit No. 8. Just let me know whether you
16  recognize that document.
17  A. That's my signature, yes, ma'am.
18  Q. Is this the Charge of Discrimination you
19  filed with the EEOC on May 22, 2009?
20  A. Yeah. That was the day I was planning my
21  mother's funeral, yeah.
22  Q. On May 22, 2009 you were planning your
23  mother's funeral?
24  A. Yeah, so I told them. If you don't mind

**Page 72**

1  me finishing —
2  Q. No, that's fine.
3  A. I had to get up and do what I promised my
4  mama. My mother died on May 20th, 2009. I'm
5  sorry. I can't talk about my mama.
6  MS. RIESCO: We can take a break if you'd like,
7  Ms. Parker.
8  (A short break was taken.).
9  BY MS. RIESCO:
10  Q. Ms. Parker, I'm sorry for your loss. If
11  you need to take a few minutes to compose yourself,
12  we can definitely do that.
13  A. Please.
14  MS. RIESCO: Would you like us to step out?
15  We'll step out.
16  (A short break was taken.)
17  BY MS. RIESCO:
18  Q. We're back on the record very briefly.
19  Here's what I'm going to suggest. The purpose of
20  today is for me to ask you a series of questions
21  and for you to give me the best of your
22  recollection under oath. I need you to focus and
23  listen to my questions and let me finish the
24  question and answer to the best of your

**Page 73**

1  recollection the question that I'm asking. I
2  realize that some of these topics may be difficult
3  for you, and apparently we've touched on one now.
4  So what I suggest is that we take a break for lunch
5  right now, and we can pick up back in an hour. Is
6  that fair?
7     A. Can I ask one more thing?
8     Q. Sure.
9     A. Can you at least give me a gesture that
10  it's okay for me to answer, because I'm like
11  listening to you. I really don't know when you
12  want me to say something. I'm not trying to
13  irritate you. If you would just give me a hand
14  gesture or something, that way at that point I'll
15  start talking. Otherwise, I'll just start talking
16  because I'm thinking you're done.
17     Q. I will attempt to do that.
18     A. Thank you.
19     Q. Can you attempt to try to wait and listen
20  for the question?
21     A. I'm going to listen. When you do this or
22  something, then I'm going to say something. Okay.
23     Q. Are you okay with taking a break for lunch
24  now?

**Page 74**

1     A. Yes, ma'am.
2     MS. RIESCO: The time is 12:00 o'clock. Do you
3  think 45 minutes is adequate enough time for you to
4  have lunch and compose yourself?
5     MS. BENDER: It's up to you.
6     THE WITNESS: Yeah.
7     MS. RIESCO: Let's reconvene at 12:45. I just
8  want to state for the record that, you know, to the
9  extent this continues on the track that it's been
10  going, I'm going to reserve the right to reopen
11  this deposition past the time that it takes.
12  Obviously, we have a lot of material to go through,
13  and I'm not getting responsive answers.
14     So I would advise, Ms. Bender, for you to
15  attempt to advise your client to cooperate. I
16  don't think it's in either of our interest to sit
17  here longer than we have to. Let's break for
18  lunch, and we can go off the record.
19     MS. BENDER: I'm not sure how you described it,
20  but she just started crying at some point. It's
21  not as if she's purposely delaying anything. I
22  just want the record to be clear of that.
23     MS. RIESCO: That's not what I'm suggesting.
24  I'm just suggesting that to the extent this is

**Page 75**

1  extended because of the breaks we have to take or
2  because of the witness's responsiveness to the
3  questions, that's something that we need to take
4  into account going forward. For now, let's break.
5     (A short lunch break was taken.)
6  BY MS. RIESCO:
7     Q. Ms. Parker, did you have a chance to have
8  lunch and compose yourself?
9     A. Yes, ma'am.
10     Q. Are you ready to proceed?
11     A. Yes, ma'am.
12     Q. Before the break I asked you whether you
13  had filed Exhibit No. 8 on May 22, 2009. Did you
14  do that?
15     A. Yes.
16     Q. In Exhibit 8 you alleged that you had been
17  discriminated on the basis of your race and your
18  age, is that correct?
19     A. Yes, ma'am.
20     Q. Earlier you testified that you had gone
21  into the bathroom to call the EEOC, is that
22  correct?
23     A. Yes, ma'am.
24     Q. When was that conversation in relation to

**Page 76**

1  the time when you filed the Charge with the EEOC?
2     A. That was like when it had heightened and I
3  felt like I couldn't take it anymore, so I was
4  trying to stop them from hurting me or trying to
5  fire me. It had to be after all the things with
6  the writeups and HR and the calls being rerouted.
7  By that time, we had relocated to the 2nd floor
8  from the 10th floor. This would have to be after
9  the thing where they claimed I knew of a class that
10  I didn't know about.
11     Q. Let me repeat the question. I want to
12  know when in relation to May 22, 2009 you had that
13  conversation?
14     MS. BENDER: May I make a suggestion?
15     MS. RIESCO: Sure.
16     MS. BENDER: Maybe if you say give me a date
17  and time that would be a little more specific for
18  her.
19  BY MS. RIESCO:
20     Q. Do you remember a day or a month of the
21  year?
22     A. It was in 2008.
23     Q. End of 2008?
24     A. No, it was in 2008 -- not the end of it.

19 (Pages 73 to 76)

**Page 77**

1  Q. How long before you filed Exhibit 8 do you
2  think you had that conversation with the EEOC?
3  A. Well, I got to go through it in my mind,
4  because I didn't come back to work after
5  December 8, 2008. I was placed in a psychiatric
6  hospital December 9th of 2008. I was still having
7  the anxiety attacks, and they were trying to
8  stabilize me at the hospital. It was a hospital up
9  north. I got out of the hospital. I was there for
10 seven days. I went home. That's when I was trying
11 to get strong enough to do this, find a way to do
12 it, and I knew I was running out of time. My
13 mother passed on the 20th of May. I went on to try
14 to file something before the deadline was over on
15 the 22nd of May with the EEOC before the deadline
16 had ended.
17 Q. What was your understanding of the
18 deadline?
19 A. I think it's like 90 days or something.
20 I don't know. I don't remember. I just know I had
21 to file something, and I did. That's when they
22 gave me a letter, the same day I was there. They
23 had to go discuss it amongst a panel of people, and
24 they gave me a letter with the right to sue.

**Page 78**

1        (Whereupon, Deposition
2        Exhibit No. 9 was marked for
3        identification.)
4  BY MS. RIESCO:
5  Q. I'm showing you what's been marked as
6  Exhibit No. 9. Do you recognize this document?
7  A. Yes, I do.
8  Q. Is this the second Charge you filed before
9  the EEOC?
10 A. Yes.
11 Q. And did you file this Charge on
12 August 27th, 2009?
13 A. I don't remember that. I don't remember
14 what date approximately. I don't remember the
15 date.
16 Q. Do you see at the bottom of the document
17 there's a signature and a date?
18 A. Okay. Okay.
19 Q. Do you recognize that signature?
20 A. I recognize it. Yes, I do, ma'am.
21 Q. Is that your signature?
22 A. Yes, it is.
23 Q. Did you sign this document on August 27,
24 2009?

**Page 79**

1  A. Yes, ma'am. If my signature is there,
2  yes, I did.
3  Q. In this Charge you allege disability
4  discrimination, is that right?
5  A. Yes, ma'am.
6  Q. Why did you file a separate Charge?
7  A. Because when I went in for the first time,
8  my head wasn't clear. I was still upset about the
9  loss of my mom, so I couldn't remember everything.
10 It was just too many things coming at me -- the
11 funeral home calling, my kids calling, you know,
12 I'm like, guys, please, I got to get this done
13 first. Everybody was calling me because I'm the
14 oldest daughter. I had to get there. They wanted
15 me to come there and sign some papers so they had
16 to talk to me. There was no way around it. They
17 couldn't just talk to my children. I have adult
18 children. In between all of this, calling me and
19 me calling them and them asking what is she going
20 to be wearing, I'm like you got a picture of her
21 how you want her to look. I'm trying to stay
22 focused on this stuff. I'm like -- I just put down
23 what I could come up with. I couldn't remember
24 everything. It was just too much. It was just too

**Page 80**

1  much.
2  Q. You realize that you did not include
3  disability in your first Charge, which is
4  Exhibit 8?
5  A. Yes.
6  Q. Correct?
7  A. Yes.
8  Q. And your employment had already ended by
9  the time you filed Exhibit 8 and Exhibit 9,
10 correct?
11 A. Yeah, because that was in February when I
12 got the call from Ellen.
13 Q. In Exhibit 8 you don't mention the fact
14 that you had been terminated from the Tribune, do
15 you?
16 A. No. Like I said, I couldn't remember
17 everything that was happening. It was just so
18 much. I was like, oh, God, I forgot this and I
19 forgot that. I'm trying to get something in.
20 Q. Three months later when you filed
21 Exhibit 9, you didn't include that you had been
22 terminated from the Tribune in Exhibit 9 either;
23 correct?
24 A. Right. Like I said, there was still so

McCorkle Court Reporters, Inc.
Chicago, Illinois   (312) 263-0052

**Page 81**

1  much confusion going on. I still have a problem
2  with the loss of my mother. I was just doing what
3  I could do -- what I could remember to do. I
4  couldn't even remember to put down that I was
5  terminated, even though I knew I was terminated. I
6  was still very upset about it after being with a
7  company for over 23 years.
8      Q. Between Exhibit 8 and Exhibit 9, three
9  months had gone by and you realized that you had
10 forgotten to allege disability discrimination so
11 you went back; correct?
12     A. Yes, I did.
13     Q. But you didn't include your termination?
14     A. No. I still in my mind -- I'm sorry, is
15 it okay?
16     Q. Yes.
17     A. I'm still -- being so upset -- I couldn't
18 think about the end part. I'm still at the part
19 where I was hurting. When you've been with a
20 company for that long, you kind of get a
21 relationship for people. You start to form love
22 for people. So the emotional part was still inside
23 of me trying to just get over that part. My mind
24 is not even focused on I got fired. I couldn't get

**Page 82**

1  over that I was being hurt. I was being hurt by
2  Marjorie. I saw Marjorie as my baby. She talked
3  to me at home. She was like a little kitten to
4  me. Ellen, I bought her son Noah -- I went
5  shopping all over looking for a little suit
6  jacket. Her husband, the baby shower, he thought
7  that was the best gift out of all the gifts. I
8  wanted to impress them. This is what I would have
9  bought my grandson. This is what I want yours to
10 have. It was like a little bitty tiny jacket for a
11 newborn infant, and I never saw that before. It
12 was something that was different.
13     Q. Ms. Parker, I'm going to interrupt you
14 because the question that I asked was whether you
15 had alleged your termination as part of the
16 Charge. You said no.
17     A. Right.
18     Q. But then you proceeded to tell me this
19 whole story about the baby shower and all this
20 stuff. We may get to that, but I need you to
21 answer the question that I'm asking. You can have
22 a chance to tell me all that. Can you just focus
23 on answering the question that I'm asking. You can
24 answer it with a yes or no. That's perfect. If

**Page 83**

1  you need to expand, that's fine too. The more you
2  expand unnecessarily, we're just going to be here
3  for a long time. I don't think you want to come
4  back. I certainly don't want to come back, and I
5  don't think your attorney wants to come back.
6      A. I can come back if you have to. I can
7  come back if you want me to come back.
8      Q. Going back to the EEOC Charge --
9      A. Un-huh.
10     Q. On Exhibit No. 9, did you mention that you
11 were harassed?
12     A. No, because this was an extension to what
13 I have forgotten. I said, well, my God, I've
14 forgotten this. I forgot other things too, but I
15 said I was just satisfied that at least I could
16 produce something, produced something, not just lay
17 there and don't do anything.
18     Q. So your answer is, no, you didn't allege
19 harassment as part of the second Charge?
20     A. No, I didn't. Should I answer you again?
21     Q. I think you said no.
22     A. Right. I didn't thought (sic) I was
23 supposed to.
24     Q. And after August 27, 2009 when you filed

**Page 84**

1  your second Charge, you never went back to the EEOC
2  to tell them that you had been terminated and that
3  you wanted that to be a part of your Charge;
4  correct?
5      A. No.
6      Q. You never filed an amendment to your
7  charges with the EEOC?
8      A. No. Should I expand?
9      Q. No. Let's go back to Exhibit No. 7, which
10 is your Complaint in this lawsuit. Do you have it
11 in front of you?
12     A. Okay.
13     Q. Here's what I want to do. I want to go
14 through the allegations that you have made in the
15 Complaint, and then we're going to talk about each
16 one specifically. Is that fair?
17     A. Yes.
18     Q. Why don't I tell you my understanding of
19 what your allegations are. If you have anything to
20 add in terms of what your allegations are, you can
21 tell me. Is that fair?
22     A. Yes.
23     Q. In your lawsuit you assert that you were
24 discriminated on the base of your race, on the base

## IN RE MOHR IS DISTINGUISHABLE FROM THE PARKER CASE

The Debtors cite, In re Mohr, 2005 Bankr. Lexis 1235, as factually similar to Parker. In In re Mohr, the defendant/transferee was among a number of investors who had received money from a fraudulent scheme. The matter was in the Bankruptcy Court. The defendant was sent correspondence from the bankruptcy Trustee seeking to recover sums of money. The defendant did not respond and a default judgment allowing the bankruptcy Trustee to obtain a money judgment against the defendant was entered. The defendant/transferee sought to vacate the default money judgment on the grounds that he suffered from depression and did not open his mail. Further, that he did not believe the bankruptcy case had anything to do with him and was relating to the bankruptcy case in general. The Court stated that the explanation by the defendant was not believable because he was sent a "certified letter." Further, the Court stated that "Absent medical evidence or other corroboration of diminished capacity, I cannot conclude that ... chronic condition justifies his conduct". In In re Mohr.

In the instant case, Parker acknowledges that she either did/or may have received mail that the Debtors' counsel referred to at her deposition as correspondence pertaining to CTC's bankruptcy and proof of claim. The record demonstrates that the timing of the bankruptcy and correspondence coincide with Parker's hospitalization, and suffering of bi-polar disorder which manifested in among other things "impaired reasoning." Parker testified at her deposition that she opened familiar mail, but tossed all other mail, unopened, on her dresser. Upon information and belief the correspondence that counsel for the Debtors referrenced during Parker's deposition was from a Delaware address, or an address for "Epiq". Neither of which was familiar to Parker. Consistent with Parker's bi-polar disorder with "impaired reasoning", there was nothing about the outward appearance of the envelopes that would have jolted Parker into reasoning that she should open the mail. Contrary to the defendant, in In re Mohr, Parker, upon information and belief, was not sent any correspondence pertaining to the bankruptcy and proof of claim by certified mail. Parker is further, distinguishable from In re Mohr in

that there is medical evidence and demonstrations from the record to corroborate Parker's mental impairment that caused her conduct.

Parenthecially, Debtor's counsel point to Parker's counsel failure to file a late proof of claim, after Parker's deposition, in March 2011. Parker's counsel is not licensed in the State of Delaware. Parker's counsel does not practice in the area of Bankruptcy and was uncertain as to the remedies available to Parker after expiration of the bar dates. Also Parker's counsel was under the impression that an application for pro hoc vice admission had to be entered in order to represent Parker on the bankruptcy matter. Parker's counsel was unsuccesful in efforts at locating local Delaware counsel for pro hoc vice admission, or representation of Parker. That upon seeking out consultation, Parker's counsel decided that it would be best just to prepare a Motion for Parker to file pro se, in effort to preserve any available remedy.

Finally, the Debtors' counsel refer to CTC's pending Motion For Summary Judgment. Attached hereto in further support of Parker's Response to Debtors' Objection is Parker's Response to CTC's Motion for Summary Judgment ( Exhibit # 4)

## CONCLUSION

For all of the reason stated in Parker's Motion and above, Parker requests that her proof of claim be allowed.

Respectfully submitted:

Joann Parker

By: _____
Attorney for Joann Parker

Patricia E. Bender
Attorney at Law
5415 N. Sheridan Rd.
Suite 1411
Chicago, Illinois 60640
(773) 878-7148