## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) | Case No. 08-13141 (KJC) |
|  | ) |  |
| TRIBUNE COMPANY, *et al.*, | ) | Jointly Administered |
|  | ) |  |
| Debtors. | ) | **Hearing Date: December 13, 2011 at 1:00 p.m. ET** |
|  | ) | **Response Deadline: December 9, 2011 at 4:00 p.m. ET** |

## STATEMENT OF AURELIUS CAPITAL MANAGEMENT, LP IN SUPPORT OF ITS POSITION REGARDING PROCESS <u>FOR RESOLUTION OF THE ALLOCATION DISPUTES</u>

Aurelius Capital Management, LP, on behalf of itself and its managed entities

(collectively, "<u>Aurelius</u>"),[1] by and through its undersigned counsel, respectfully submits this

statement (the "<u>Statement</u>") in support of its position for resolving the Allocation Disputes

(defined below) prior to the commencement of the solicitation and confirmation process with

respect to the *Third Amended Joint Plan of Reorganization for Tribune Company and its*

*Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree*

*Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank N.A.*, dated

November 18, 2011 [ECF No. 10273] (the "<u>DCL Plan</u>") and respectfully represents as follows:[2]

### <u>INTRODUCTION</u>

1.     During the telephonic conference held on November 29, 2011, the Court deferred

making a decision on whether resolution of the Allocation Disputes should "precede

---

[1] Entities managed by Aurelius own a substantial amount of Senior Notes and PHONES Notes.  Neither Aurelius nor any of its managed entities owe any fiduciary duties to any party in interest in these cases nor is Aurelius or any of its managed entities an insider of Tribune or any of its affiliates.

[2] Terms not otherwise defined herein shall have the meanings ascribed to such terms in the DCL Plan or the *Motion of Aurelius Capital Management, LP for Reconsideration of the Court's October 31, 2011 Decision as it Pertains to the Application of PHONES Notes Subordination*, dated November 14, 2011 [ECF No. 10226] (the "Reconsideration Motion").

confirmation or run in tandem with it." [3]  The Court requested that parties in interest make

written submissions setting forth the form of scheduling order proposed by each party and the

rationale underlying its position regarding whether resolution of the Allocation Disputes should

occur prior to, together with or subsequent to the confirmation process.[4]  For the reasons set forth

below, Aurelius submits that the Allocation Disputes should be resolved by this Court in advance

of the commencement of the confirmation process.

      A.      <u>The Allocation Disputes</u>

      2.      The Allocation Disputes consist of the following:

- Whether and to what extent the Article III Distributions[5] must be adjusted to account for the fact that all or any portion of the consideration provided in respect of the Settlement is or is not subject to the subordination provisions (collectively, the "<u>Subordination Provisions</u>") of the (i) PHONES Notes Indenture and/or (ii) the EGI-TRB LLC Note and corresponding subordination agreement (the "<u>EGI-TRB Subordination Agreement</u>");

- Whether and to what extent the priority of distributions from the Creditors' Trust and/or the Litigation Trust (together, the "<u>Trusts</u>") must be adjusted to account for the fact that all or any of the potential distributions from the Trusts are or are not subject to one or both of the Subordination Provisions;

- Whether and to what extent the Article III Distributions or the priority of distributions from the Trusts must be adjusted to account for the fact that any category of Other Parent Claims (*i.e.*, the Swap Claim, the Retiree Claims (defined below) or general unsecured trade claims) does or does not constitute "Senior Indebtedness" pursuant to the PHONES Notes Indenture or "Senior Obligations" pursuant to the EGI-TRB Subordination Agreement;

- Whether and to what extent beneficiaries of the Subordination Provisions (as determined by the Court) are entitled to receive postpetition interest prior to the Holders of PHONES Notes Claims and EGI-TRB LLC Notes Claims receiving payment on account of their claims;
- Whether the PHONES Notes are senior in right of payment to the EGI-TRB LLC Note; and

---

[3] *See* Hearing Transcript at 37:23-38:1 (Nov. 29 2011).
[4] *See* Hearing Transcript at 37:23-38:16 (Nov. 29, 2011).
[5] Defined as the distributions set forth in the DCL Plan with respect to, among others, Allowed Senior Noteholder Claims, Other Parent Claims, EGI-TRB LLC Note Claims and PHONES Notes Claims. *See* DCL Plan Ex 5.18 § 1.3.1.

{00581011;v1}

- The allowed amount of the PHONES Notes Claims.

3.        Pursuant to the DCL Plan, the Debtors have proposed that the Allocation Disputes will be resolved in accordance with the procedures established in the Allocation Dispute Protocol, annexed as Exhibit 5.18 to the DCL Plan.[6]  The proposed Allocation Dispute Protocol does not require that the Allocation Disputes be resolved prior to the hearing to consider the DCL Supplemental Disclosure Statement or confirmation of the DCL Plan.  The Allocation Dispute Protocol contemplates that if any of the Allocation Disputes are not resolved in advance of the Effective Date, the Reorganized Debtors will establish one or more reserves (the "Allocation Dispute Reserves") for the purpose of making distributions to the Holders of Allowed Senior Noteholder Claims, Other Parent Claims, EGI-TRB LLC Notes Claims and PHONES Notes Claims following resolution of the outstanding Allocation Disputes.[7]  The Allocation Dispute Protocol provides that the amount of consideration contributed to the Allocation Dispute Reserves will be (a) the sum of the Article III Distributions (excluding Creditors' Trust Interests and Litigation Trust Interests) to be provided to Holders of Allowed Senior Noteholder Claims and Other Parent Claims less (b) the sum of such consideration that Holders of Allowed Senior Noteholder Claims and Allowed Other Parent Claims would be entitled to receive if each of the outstanding Allocation Disputes was resolved by the Court in a manner adverse to such Holders (together, the "Allocation Dispute Reserve Amount").[8]  The consideration to be held in the Allocation Dispute Reserves will be in the form of an amount of "[c]ash, New Warrants, [and] New Senior Secured Term Loan in proportion to the aggregate elections made by Holders of the

---

[6] See DCL Plan Ex. 5.18.
[7] See DCL Plan Ex 5.18 § 1.3.1.
[8] See DCL Plan Ex 5.18 § 1.3.1.

{00581011;v1}

Claims pursuant to Sections 3.2.5 [Senior Noteholder Claims] and 3.2.6 [Other Parent Claims] of

the Plan *as estimated by the Debtors in their reasonable discretion*."[9]

     B.     <u>Implications of Not Resolving Allocation Disputes Prior to Commencement of the Confirmation Process</u>

     4.     The Allocation Disputes should be resolved prior to the solicitation of votes to

accept or reject the DCL Plan for the following reasons, each of which is discussed in further

detail below:

- Creditors will not be able to determine the allocation of natural recoveries and Settlement proceeds among creditor constituencies, and when such distributions will be made;

- An accurate estimate of the amount required to be held in reserve will be extremely complicated to calculate given the numerous permutations of creditor treatment elections, allowed claim amounts and Allocation Dispute resolutions;

- Creditors will not have sufficient information to make informed decisions in connection with the DCL Plan, including with respect to treatment and release elections under the DCL Plan;

- Resolution of the Allocation Disputes will impact how and when the Parent GUC Trust Preference will be distributed, and could create conflict between the Litigation Trust beneficiaries that would need to be identified and resolved in connection with the confirmation process, creating greater uncertainty regarding the confirmability of the DCL Plan;

- The class of Other Parent Claims may need to be reconstituted to the extent that certain Holders of such Claims are deemed to benefit from either or both of the Subordination Provisions while other Holders of Other Parent Claims are not;

- The Retiree Claimant Settlement Agreement may not be implemented, which may, in turn, impact the Court's views on the reasonableness of the Settlement; and

- Certain creditors may change their votes regarding the DCL Plan which could also, in turn, impact the Court's views on the reasonableness of the Settlement.

---

[9] *See* DCL Plan Ex 5.18 § 1.3.1 (emphasis added).

{00581011;v1}

C.    The Scheduling Order

5.    To completely avoid the concerns listed above, Aurelius has proposed a schedule that provides for the expeditious resolution of the Allocation Disputes while preventing undue delay of the confirmation process.  Indeed, Aurelius's proposed schedule would only delay the DCL Plan Proponents' currently proposed confirmation schedule (which is already off track) by approximately 60 days – a relatively short period of time considering that the Debtors have spent approximately three years in chapter 11.  The proposed scheduling order (the "Proposed Order") is attached hereto as Exhibit A and is summarized below for the Court's convenience.[10]

| Event | Proposed Date |
|---|---|
| **Reconsideration Motions** | |
| **Objections to the Reconsideration Motions** | December 6, 2011 at 4:00 p.m. (prevailing Eastern time) |
| **Replies to the Reconsideration Motions** | December 9, 2011 at 4:00 p.m. (prevailing Eastern time) |
| **Reconsideration Hearing** | December 14, 2011 between 3:00 p.m. and 6:00 p.m. (prevailing Eastern time) |
| **Discovery** | |
| **Service of Document Requests** | December 21, 2011 |
| **Completion of Fact Discovery**[11] | January 6, 2012 |

---

[10] All capitalized terms used and not otherwise defined in the below chart shall have the meanings ascribed to such terms in the Proposed Order.

[11] All fact discovery will be limited to the following:

- Document requests directed to the Debtors or Deutsche Bank Trust Company Americas ("Deutsche Bank"), seeking documents relating to the appropriate amount of the PHONES Notes Claims against the Debtors;
- Document requests directed to the Retiree Claimants, seeking the operative documents pursuant to which the Retiree Claims arise; and

| Event | Proposed Date |
|---|---|
| **Briefing on the Allocation Disputes** | |
| **Opening Brief** – Written statement in support of each party's position(s) on any remaining Allocation Disputes | January 13, 2012 |
| **Response Brief** – Response to Opening Briefs | January 20, 2012 |
| **Hearing on the Remaining Allocation Disputes** | Week of January 23, 2012, subject to the Court's availability |
| **DCL Plan Process**[12] | |
| **Revised Plan Documents Filed**<br>(i)      **Fourth Amended DCL Plan**<br>(ii)     **Revised DCL Supplemental Disclosure Statement** | February 13, 2012 |
| **Objections to Revised DCL Supplemental Disclosure Statement** | February 27, 2012 |
| **Replies to the Disclosure Statement Objections** | March 5, 2012 |
| **Disclosure Statement Hearing** | March 8, 2012, subject to the Court's availability |
| **Supplemental Voting Record Date** | March 8, 2012 |
| **3018 Motions** | March 22, 2012 |
| **Amended DCL Plan Supplement** (if necessary) | March 22, 2012 |

---

- Discovery related to the accuracy of the Recovery Chart, as set forth in Section D of Exhibit A (Subordination Allocation Appendix) to the *Supplemental Disclosure Document Relating to Third Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P. , and JPMorgan Chase Bank, N.A.*, dated 11/18/11 [ECF No. 10275] (the "DCL Supplemental Disclosure Statement"), and any model prepared by the Debtors, or anyone acting on their behalf, that incorporates or forms the basis for the Recovery Chart.

[12] The dates proposed in this section assume, for illustrative purposes, that the Court issues a decision regarding the remaining Allocation Disputes on February 6, 2012.

6

| Event | Proposed Date |
|---|---|
| **Supplemental Voting Deadline** | March 28, 2012 |
| **Confirmation Objections** – Objections to confirmation of the Fourth Amended DCL Plan | March 28, 2012 |
| **Vote Filing Date** – the deadline for the Voting Agent to file the results of its tabulation of votes to accept or reject the Fourth Amended DCL Plan | March 30, 2012 |
| **Confirmation Responses** – Responses to objections to confirmation of the Fourth Amended DCL Plan | April 2, 2012 |
| **Confirmation Hearing** | Commencing on April 5, 2012, subject to the Court's availability |

## ARGUMENT

6.    In the wake of the Court's *Opinion on Confirmation*, dated October 31, 2011

[ECF No. 10133] (the "<u>Decision</u>") denying confirmation of the *Second Amended Joint Plan of*

*Reorganization for Tribune Company and its Subsidiaries Proposed by the Debtors, the Official*

*Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co.,*

*L.P., and JPMorgan Chase Bank N.A. (as modified April 26, 2011)*, dated April 26, 2011 [ECF

No. 8769] (the "<u>Second Amended DCL Plan</u>") and the Noteholder Plan, and the submission by

the DCL Plan Proponents of the new DCL Plan and amended disclosure documents, the parties

in interest have endeavored to work together on a strategy for the timely resolution of the

Allocation Disputes to facilitate the Debtors' emergence from chapter 11.  There remains,

however, a fundamental disagreement between such parties as to the appropriate timeline for

resolution of the Allocation Disputes.  The DCL Plan Proponents believe that the current

iteration of the DCL Plan can and should be confirmed as soon as possible, not dependent upon

the Court's consideration of the Allocation Disputes.  The DCL Plan Proponents' proposed

{00581011;v1}

schedule is both prejudicial and not tenable because of the significant impact the resolution of

the remaining Allocation Disputes will have on distributions under the DCL Plan. The following

sections describe in detail the issues associated with the DCL Plan Proponents' proposed course

of action and the justifications for Aurelius's proposed schedule.

## I.    ALLOCATION OF PARENT SETTLEMENT CONSIDERATION

7.    The Settlement that forms the cornerstone of the DCL Plan is the mechanism by

which non-LBO creditors are to be partially compensated for the ruinous LBO that resulted in,

among other things, the filing of these Chapter 11 Cases. Before the proceeds of the Settlement

can be distributed to the intended beneficiaries, however, the Court must resolve the Allocation

Disputes. If the Allocation Disputes are not fully resolved prior to solicitation of the new DCL

Plan, it will not be possible to determine which of the non-LBO creditors are entitled to receive

the Settlement consideration, how the Settlement consideration will be allocated among those

entitled to receive it, or when the Settlement consideration will be distributed, prior to the non-

LBO creditors casting their votes on the new DCL Plan. More importantly, not requiring the

resolution of the Allocation Disputes prior to the Effective Date (thus causing approximately

50% of the Settlement consideration to be reserved) would allow *only* the Senior Lenders to

receive their full initial distributions as of the Effective Date of the DCL Plan. Such a result

would be cruelly ironic and would be inherently unfair to the Debtors' innocent pre-LBO

creditors. These pre-LBO creditors would not know what distributions they will receive under

the DCL Plan or when those distributions will be made – an especially egregious result given

that it could be entirely avoided through resolution of the Allocation Disputes pursuant to

Aurelius's proposed schedule.

{00581011;v1}

8.     The Settlement consideration, just like any distribution made pursuant to a plan, must flow through the Debtors' recovery waterfall in a manner consistent with creditors' relative priorities vis-à-vis each other.[13] A number of the Allocation Disputes implicate how value will flow through the Debtors' recovery waterfall and, thus, must be resolved before consideration allocable to Tribune's creditors can be distributed.  The following examples highlight the myriad of issues that could impact distribution of the Settlement proceeds and natural recoveries:

- **Swap Claim**:  A determination will need to be made as to whether the Swap Claim is entitled to the benefit of subordination under the PHONES Notes Indenture and/or the EGI-TRB LLC Note.

- **Retiree/Trade Claims**:  The Court will similarly need to determine, in the first instance, whether the Retiree Claimants and/or general unsecured trade claimants, as a whole, are beneficiaries of either or both of the Subordination Provisions and, in the second instance, whether the specific documents underlying each individual Retiree Claimant's or general unsecured trade claimant's respective claim mandate a different result.

- **High/Low PHONES Notes Claim Amount**:  In order to determine how much value must be initially allocated to Holders of PHONES Notes Claims (which then may or may not be reallocated to other creditor constituencies), the Court will need to determine the Allowed amount of the PHONES Notes Claims.

- **Chapter 5 Causes of Action**:  Pending this Court's rulings on the Reconsideration Motions, the Court will need to consider whether and to what extent the Settlement consideration constitutes proceeds from chapter 5 causes of action, and consequently whether Holders of PHONES Notes Claims and/or EGI-TRB LLC Notes Claims are entitled to retain any such amounts pursuant to the applicable Subordination Provisions.

## II.     ESTIMATION OF THE ALLOCATION DISPUTE RESERVES

9.     As stated above, the Debtors' proposed Allocation Dispute Protocol authorizes the Debtors, in their sole discretion, to establish reserves in an amount equal to the value of distributions to be provided to Holders of Senior Noteholder Claims and Other Parent Claims under Article III of the DCL Plan, minus the aggregate amount by which such Holders'

---

[13] *See Iridium Promotions v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 463 (2d Cir. 2007) (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) ("[A] settlement presented for approval as part of a plan of reorganization, because is constitutes part of the plan, may only be approved it if, too, is 'fair and equitable' in the sense of conforming to the absolute priority rule.").

{00581011;v1}

recoveries will be reduced if all Allocation Disputes are resolved in a manner adverse to such Holders.[14] The Allocation Dispute Protocol further provides that the Debtors will reserve sufficient Cash, New Warrants and New Senior Secured Term Loan to ensure that distributions from the reserves will be made in accordance with the elections made by Holders of Senior Noteholder Claims and Other Parent Claims.[15] Neither the DCL Plan nor the Allocation Dispute Protocol contemplates permitting Holders of PHONES Notes Claims or EGI-TRB LLC Notes Claims to elect the form of consideration (*i.e.*, Cash vs. a strip of New Warrants, New Senior Secured Term Loan and Cash) they will receive under the DCL Plan if such Holders are determined to be entitled to receive distributions of Settlement consideration. If, however, the reserves are intended to contain sufficient consideration to ensure that all creditors receive their preferred form of consideration if one or more Allocation Disputes are resolved in their favor, the reserves will almost certainly be materially larger than the DCL Plan Proponents currently contemplate in order to permit the Holders of PHONES Notes Claims and EGI-TRB LLC Notes Claims to make such elections. Modifying the DCL Plan to provide Holders of PHONES Notes Claims and EGI-TRB LLC Notes Claims with the ability to make a treatment election would give rise to numerous permutations of creditor elections and Allocation Dispute outcomes, making it extremely complicated for the Debtors to accurately estimate the amount and nature of consideration that must be reserved—another reason justifying determination of the Allocation Disputes in advance of the commencement of the solicitation process.[16]

10.    Consider the following rudimentary hypothetical:

---

[14] *See* DCL Plan Ex 5.18 § 1.3.1.

[15] *See* DCL Plan Ex 5.18 § 1.3.1 ("The consideration to be so contributed to the Allocation Dispute Reserve(s) shall be in the form of an amount of Cash, New Warrants and New Senior Secured Term Loan in *proportion to the aggregate elections made by Holders of Claims pursuant to Section 3.2.5 and 3.2.6 of the Plan as estimated by the Debtors in their reasonable discretion*") (emphasis added).

[16] For this reason, the Allocation Dispute Reserves should not be established in the Debtors' sole discretion, but rather by agreement of the parties in interest, failing which, by determination by this Court.

{00581011;v1}

*Assumptions*:

- The maximum amount of value that will be distributed upon resolution of the Allocation Disputes is approximately $215 million, as determined by the Debtors in the Tribune Company Reserve Buildup.[17]

- The realm of possible Allocation Disputes outcomes is limited to the following: (i) Holders of Senior Noteholder Claims and Other Parent Claims collectively benefit from the Subordination Provisions or (ii) Holders of PHONES Notes Claims and EGI-TRB LLC Notes Claims are entitled to retain their initial allocations. Thus, $215 million in value will be distributed *either* to the Senior Noteholder Claims and Other Parent Claims *or* to PHONES Notes Claims and EGI-TRB LLC Notes Claims.

- All Holders of Senior Noteholder Claims and Other Parent Claims elect to receive Cash.

- All Holders of PHONES Notes Claims and EGI-TRB LLC Notes Claims elect to receive a strip of consideration consisting of (i) Cash, (ii) New Warrants, and (iii) New Senior Secured Term Loan.[18]

- In order to reserve for both possible outcomes (*i.e.*, *either* the Senior Noteholder Claims/Other Parent Claims are entitled to $215 million in Cash *or* PHONES Notes Claims/EGI-TRB LLC Notes Claims are entitled to $215 million in the form of a strip of consideration), the Debtors would need to reserve *at least* approximately *$387 million*, as reflected in the charts below:

| *Form of Consideration* | *Cash Election (Senior Noteholder Claims/Other Parent Claims)* | *Strip Election (PHONES Notes Claims/EGI-TRB LLC Notes Claims)* |
|---|---|---|
| Cash | $215,150,000 | $43,128,088 |
| New Senior Secured Term Loan | $0 | $33,717,766 |
| New Warrants | $0 | $138,304,146 |

| *Form of Consideration Reserved* | *Amount Necessary to Reserve* |
|---|---|
| Cash | $215,150,000 |
| New Senior Secured Term Loan | $33,717,766 |
| New Warrants | $138,304,146 |
| **Total:** | **$387,171,912** |

| | |
|---|---|
| **Proposed Reserve Under DCL Plan:** | $215,150,000 |

| | |
|---|---|
| **Amount by which DCL Plan Under-Reserves:** | **$172,021,912** |

---

[17] *See* DCL Supplemental Disclosure Statement, Ex. A § D-3 (Tribune Company Reserve Buildup).

[18] For purposes of this hypothetical, the strip of consideration is assumed to be comprised of (i) 20% Cash, (ii) 16% New Senior Secured Term Loan, and (iii) 64% New Warrants. *See* Lazard January Report at 5.

{00581011;v1}

11.    The foregoing example illustrates the problems inherent in the Debtors' proposed reserve structure using the Debtors' *own estimates* as to (i) the amount of consideration at issue on account of the Allocation Disputes and (ii) the allowed amount of Other Parent Claims. However, these problems are further exacerbated by, among other things, the fact that the Debtors have not appropriately considered how the amount of Other Parent Claims could impact their reserve amounts. The Debtors' illustrative reserve amount (as derived from Exhibit A to the DCL Supplemental Disclosure Statement) assumes that Other Parent Claims are allowed at $40 million *less than* the Debtors' mid-point claim estimate for this class.[19] The Debtors have made no provision, however, for the possibility that Other Parent Claims could potentially be allowed in materially higher amounts. A material increase in the amount of Other Parent Claims would result in a corresponding increase in the value that would need to be reserved by virtue of the fact that additional consideration would need to be allocated across the Tribune creditor classes. The calculation of reserve amounts will become more complicated still when the DCL Plan is modified to permit Holders of PHONES Notes Claims and EGI-TRB LLC Notes Claims to make a consideration election (as it must given the possibility that Holders of PHONES Notes Claims and EGI-TRB LLC Notes Claims will be entitled to retain a recovery under the DCL Plan).

12.    Finally, the DCL Plan does not appear to reserve for disputed Other Parent Claims in a manner that properly addresses the Allocation Disputes. The DCL Plan provides that, in addition to the Allocation Dispute Reserves, the Reorganized Debtors shall also establish one or more Other Parent Claims Reserves "to make distributions to Holders of Disputed Claims that

---

[19] The high end of the Debtors' own estimates is $85 million *greater* than the assumptions made in the Tribune Company Recovery Chart, which forms the basis of the Tribune Company Reserve Buildup. *See* DCL Specific Disclosure Statement § 1.C.2; DCL Supplemental Disclosure Statement, Ex. A § D (Tribune Company Recovery Chart).

{00581011;v1}

become Allowed Other Parent Claims after the Effective Date."[20]   The DCL Plan does not

specify, however, whether the Other Parent Claims Reserves will hold sufficient value to satisfy

each disputed Other Parent Claim in full if the disputed claim is ultimately allowed and all the

Allocation Disputes are resolved in its favor, or if the amount of consideration that the Holders of

disputed Other Parent Claims may receive pursuant to the resolution of the Allocation Disputes

will be held in the Allocation Dispute Reserves.

### III.   CREDITOR ELECTIONS

13.     Virtually every creditor constituency has the ability to make one or more elections

under the DCL Plan, and virtually all of these elections will be informed by how the Allocation

Disputes are ultimately decided.  Below is a non-exhaustive list of elections afforded creditors

under the DCL Plan, and a description of how creditors will be disadvantaged in making those

elections if the Allocation Disputes are resolved after solicitation:

- **Senior Noteholder Consideration Election:**[21]  Under the DCL Plan, Holders can elect to receive either (i) Cash, or (ii) a strip of consideration consisting of Cash, New Common Stock and New Senior Secured Term Loan.[22]  All-Cash distributions will be based on a $6.75 billion DEV, whereas distributions consisting of a strip of consideration will be based on a $7.019 billion DEV.[23]  Despite the unfairness of this value discrepancy, permitting the Allocation Disputes to be resolved after the deadline for making elections will prejudice the election process.  For example, to the extent a creditor would prefer the higher valued strip of consideration, it may not want to or be able to assume the risk associated with obtaining equity at some indeterminate point in the future and, thus, forced to elect the lower valued Cash consideration because of the unknown duration of the delay in distributions that would be occasioned by a later determination of the Allocation Disputes.  Indeed, it will be difficult for the Senior Noteholders to elect the strip of consideration as they would have no ability to predict what the value of the Reorganized Debtors' equity will be at the time distributions are ultimately made from the Allocation Dispute Reserves or to sell equity that rightfully belongs to them based on changes in the market (whether for the better or worse).

---

[20] *See* DCL Plan § 7.2.1(a).
[21] The DCL Plan must be modified to provide Holders of PHONES Notes Claims with a similar election to the extent the Allocation Disputes are not resolved prior to solicitation.  The issues identified in this bullet would apply with equal force to any corresponding elections made by Holders of PHONES Notes.
[22] *See* DCL Plan § 3.2.5(c).
[23] *See* DCL Plan § 3.2.5(c); *see also* Decision at 21-22, 29 (finding that the Debtors had a total DEV of $7.09 billion as of January 19, 2011).

{00581011;v1}

This is an unfair result that would be avoided if the Allocation Disputes were resolved in advance of solicitation, which would enable the Debtors to make all distributions to Senior Noteholders on the Initial Distribution Date and the Senior Noteholders to elect their preferred form of consideration.

- **Release Election:** Creditors have the ability under the DCL Plan to opt out of granting releases in favor of the Released Parties. A creditor's determination as to whether to grant the releases may be informed by the resolution of the Allocation Disputes. A creditor may believe the releases to be appropriate if distributions are to exceed 36%, but may *not* believe the releases to be appropriate if its recoveries are reduced materially by the outcome of the Allocation Disputes.

- **Identity of Released Parties**: If the Retiree Claimant Settlement Agreement is not implemented pursuant to the DCL Plan, the Retiree Claimants will not receive a release. Thus, creditors considering whether to grant the releases will not know who they are being asked to release until the Allocation Disputes are resolved—further justification for deferring solicitation on the DCL Plan.

- **Other Parent Claims Consideration Election:** Under the DCL Plan, Holders of Other Parent Claims can elect to receive (i) a 35.18% Cash recovery, (ii) a strip of consideration equal to a 35.18% recovery, (iii) a strip of consideration equal to a 32.73% recovery plus Trust interests (to the extent Holders of Other Parent Claims determine not to opt-out of the Creditors' Trust), or (iv) a 32.73% Cash recovery plus Trust interests (to the extent Holders of Other Parent Claims determine not to opt-out of the Creditors' Trust).[24] The Other Parent Claims consideration election implicates two concerns, the first of which is set forth in more detail above in the Senior Noteholder consideration election bullet. First, Holders of Other Parent Claims should not be compelled to elect a lesser recovery (an all-Cash distribution) by virtue of the fact that the time elapsed between the Effective Date and the date distributions are made from the Allocation Dispute Reserves will have an uncertain impact on equity value. Second, Holders of Other Parent Claims will not know what their relative rights are vis-à-vis other Trust beneficiaries until after resolution of the Allocation Disputes, and thus should not be required to decide whether to receive a portion of their recovery in the form of Trust interests until after resolution of the Allocation Disputes.

## IV.    OPERATION OF THE LITIGATION TRUST

### A.    The Parent GUC Trust Preference

14.    Pursuant to the DCL Plan, Holders of Allowed Senior Noteholder Claims,

PHONES Notes Claims, EGI-TRB LLC Notes Claims and Other Parent Claims (to the extent

---

[24] *See* DCL Plan § 3.2.6 (c). Each option also includes consideration on account of the Bridge Settlement. *See id.*

{00581011;v1}

they elect to receive Litigation Trust Interests) shall receive the Parent GUC Trust Preference.[25]

The Parent GUC Trust Preference entitles each of the foregoing Holders to their pro rata share of

the first $90 million realized from either the Litigation Trust or the Creditors' Trust before the

Senior Lenders are entitled to receive any recovery on account of their Trust interests.[26]  If the

Allocation Disputes are not resolved before recoveries begin to flow into the Litigation Trust, the

Parent GUC Trust Preference will need to be held in reserve pending the Court's determination

of those Allocation Disputes relevant to the allocation of Litigation Trust recoveries.

     15.    Resolution of the Allocation Disputes prior to solicitation will also determine

whether the DCL Plan will need to be amended to address (i) the fundamental way in which

Litigation Trust causes of action are pursued and (ii) how the Parent GUC Trust Preference is to

be allocated among creditors.  While Aurelius believes that the Court should grant the relief

requested in the Reconsideration Motion, in the unlikely event that the Court affirms its earlier

ruling that proceeds of chapter 5 causes of action are not subject to subordination under the

PHONES Notes Indenture, there will be a conflict among the members of the Litigation Trust

Advisory Board as to which Litigation Trust causes of action should be pursued first.  For

example, pursuant to the terms of the proposed DCL Plan, non-LBO creditors that hold

Litigation Trust Interests are entitled to receive the first $90 million collected by the Litigation

Trust through the Parent GUC Trust Preference.  If the first $90 million is obtained through

prosecution or settlement of the Morgan Stanley Claims, the Holders of PHONES Notes Claims

will not be entitled to share in any of the first $90 million.  However, if the first $90 million is

obtained through the prosecution of chapter 5 causes of action, the Holders of PHONES Notes

would be entitled to receive and retain their pro rata share of the $90 million.  Under these facts,

---

[25] *See* DCL Plan § 1.1.180.
[26] *See* DCL Plan §§ 1.1.178-1.1.180; DCL Specific Disclosure Statement § II.A.

{00581011;v1}

Wilmington Trust Company ("Wilmington Trust"), [27] on behalf of Holders of PHONES Notes

Claims, would be incentivized to cause the Litigation Trust to pursue chapter 5 causes of action

before pursuing non-chapter 5 causes of action because Holders of PHONES Notes Claims

would retain a larger share of the proceeds of such actions.  On the other hand, Deutsche Bank

would be incentivized, on behalf of the Senior Noteholders, to cause the Litigation Trust to

pursue non-chapter 5 causes of action first so that they alone would benefit from the Parent GUC

Trust Preference.

16.     Similarly, the DCL Plan contemplates a $20 million loan to fund the prosecution

of Trust causes of action.  If the Allocation Disputes are not decided prior to the confirmation

process, Wilmington Trust will want the Litigation Trust to pursue chapter 5 causes of action

before other Litigation Trust Causes of Action based on the potential for Holders of PHONES

Notes Claims to recover from chapter 5 causes of action; however, Deutsche Bank would prefer

that the $20 million loan be used in the first instance on non-chapter 5 causes of action for which

the Senior Noteholders indisputably get the benefit of the subordination provision of the

PHONES Notes Indenture.

17.     These inherent tensions could seriously impair the Litigation Trust's ability to

prosecute Litigation Trust Causes of Action, to the ultimate detriment of all Litigation Trust

beneficiaries.  If the Allocation Disputes are resolved in such a way that the Litigation Trust's

beneficiaries are pitted against each other in a race to maximize their allocable share of the

Parent GUC Trust Preference and the use of the $20 million loan, parties in interest will likely

raise related disclosure and plan objections that would need to be addressed in connection with

confirmation.  These objections would not need to be raised, however, if the Allocation Disputes

---

[27] The DCL Plan states that the Litigation Trust Advisory Board shall consist of "members of the Creditors' Committee that are or represent beneficiaries of Litigation Trust Interests, including, without limitation, Deutsche Bank and Wilmington Trust Company but excluding the Senior Loan Agent." *See* DCL Plan § 1.1.139.

{00581011;v1}

were resolved in advance of the plan process and in such a way as to eliminate the "race to recoveries" scenario described herein.  Either way, resolving the Allocation Disputes prior to the commencement of the confirmation process would reduce the number of potential hurdles standing in the way of confirmation and emergence.

B.    Mechanics of the Litigation Trust

18.    The DCL Plan currently provides that each class of creditors entitled to Litigation Trust Interests will receive a single series of Litigation Trust Interests to be ratably distributed to Holders within each such class.[28]  To the extent that a Litigation Trust Interest recipient's ability to retain, for example, proceeds of chapter 5 causes of action remained at issue, Litigation Trust Interests distributed to such Holders would have to be carefully circumscribed to provide for either result (a staggering feat considering the multitude of outcomes).  In the alternative, the DCL Plan would have to be amended so that each class of creditors entitled to Litigation Trust Interests would receive a separate series of Litigation Trust Interests for each potential outcome that may result from the adjudication of the Allocation Disputes—an equally daunting task.  It would be far simpler for all parties in interest if the Allocation Disputes were resolved before the distribution of the Litigation Trust Interests to enable the DCL Plan Proponents to delineate the exact entitlements associated with each series of Litigation Trust Interests in the relevant plan and disclosure documents.

V.    **CLASSIFICATION OF OTHER PARENT CLAIMS**

19.    Under the new DCL Plan, Other Parent Claims (Class 1F Claims) are comprised of (i) general unsecured trade claims against Tribune, (ii) the Swap Claim[29] and (iii) all claims against Tribune arising from non-qualified former employee benefit plans relating to such

---

[28] *See* DCL Plan § 1.1.144.
[29] Defined in the DCL Plan as "any Claims asserted under that certain 1992 ISDA Master Agreement, dated as of July 2, 2007, between Barclays Bank PLC and Tribune."  DCL Plan § 1.1.250.

{00581011;v1}

employees' former employment with certain of the Debtors or their predecessors (the "Retiree Claims"). To the extent certain Holders of Other Parent Claims are entitled to benefit from either or both of the Subordination Provisions in connection with resolution of the Allocation Disputes and others are not, the classification of Other Parent Claims will need to be modified to prevent disparate treatment among creditors within the same class. Because the classification scheme cannot be modified after solicitation, the Allocation Disputes must be resolved in advance of the commencement of the confirmation process to ensure that Class 1F can be reconstituted to the extent necessary to correct any disparate treatment resulting from the outcome of the Allocation Disputes.

20.    Bankruptcy Code section 1122(a) requires claims within a single class to be "substantially similar" to one another.[30] Resolution of the Allocation Disputes could, therefore, necessitate the creation of multiple classes to replace the class of Other Parent Claims depending upon, among other things, (i) whether the Swap Claim is entitled to benefit from either or both of the Subordination Provisions, (ii) whether some or all of the Retiree Claimants are similarly determined to benefit from either or both of the Subordination Provisions and (iii) whether general unsecured trade claims are entitled to benefit from either or both of the Subordination Provisions. Moreover, resolution of the Allocation Disputes prior to solicitation is also necessary to ensure that the voting results accurately indicate whether each class of claims voted to accept or reject the new DCL Plan. Indeed, resolution of the Allocation Disputes prior to solicitation is the only way to ensure that the voting results reflect how each class (including those that may be

---

[30] 11 U.S.C. §1122(a); *see also In re Combustion Eng'g, Inc.*, 391 F.3d 190, 239 (3d Cir. 2005) ("Section 1122(a) provides that only 'substantially similar' claims may be classified together under a plan of reorganization."); *IN re Jersey City Med Ctr.*, 817 F.2d 1055, 1060 (3d Cir. 1987) ("The express language of this statute explicitly forbids a plan from placing dissimilar claims in the same class.").

{00581011;v1}

newly formed) voted in respect of the DCL Plan rather than the vote of a single, improperly

constituted class.

## VI.    RETIREE CLAIMANT SETTLEMENT AGREEMENT

21.    The Retiree Claimant Settlement Agreement, pursuant to which the Debtors

agreed to the allowance of non-qualified pension claims and deferred compensation claims

asserted by approximately 200 individuals, will be implemented under the DCL Plan to the

extent that, among other things, recoveries to Holders of Retiree Claims can equal or exceed

approximately 35.18%.[31]  As with virtually all parent creditor recoveries, however, Retiree

Claimant recoveries are contingent on resolution of the Allocation Disputes.  If it is determined

in connection with the Allocation Disputes that the Retiree Claimants are entitled to a recovery

of less than 35.18% on account of their claims, under the terms of the Retiree Claimant

Settlement, such claimants are not precluded from objecting to their treatment under the DCL

Plan and may indeed vote to reject the DCL Plan.[32]  As discussed in further detail below, the

Court ultimately determined that the Settlement satisfied the "lowest rung of reasonableness" in

part because of the widespread creditor support for the Second Amended DCL Plan.[33]  If the

Retiree Claimants no longer supported the DCL Plan, it may be appropriate for the Court to

revisit its analysis with respect to the propriety of the Settlement.

22.    In addition, resolution of the Allocation Disputes will impact whether the Retiree

Claimant Settlement is implemented *at all* pursuant to the DCL Plan.[34]  If the Retiree Claimant

---

[31] *See* DCL Plan §§ 1.1.213 (defining Retiree Claimants); 1.1.214 (defining Retiree Claimant Settlement
Agreement); 5.15.4 (Implementation of the Retiree Claimant Settlement Agreement); *see also* DCL Specific
Disclosure Statement § II.F.6 (noting that the majority of the Retiree Claims arise from non-qualified pension claims
and deferred compensation claims); Retiree Claimant Settlement Agreement, annexed as Exhibit 5.15.4 to the DCL
Plan.

[32] *See* Retiree Claimant Settlement Agreement.

[33] *See* Decision at 70-71 (noting that "the votes of creditors in favor of the plan, weigh heavily in favor of approval
of the settlement.").

[34] *See* Retiree Claimant Settlement Agreement at 5.

{00581011;v1}

Settlement is not implemented, there will be no resolution with respect to the allowed amount of

the Retiree Claims, which could, in turn, lead to additional contested disputes that would require

adjudication by the Court.  Specifically, the Retiree Claimant Settlement Agreement provides

that if the applicable conditions are not met or the Court does not approve the terms of the

agreement in connection with confirmation of the DCL Plan, the Retiree Claimants "retain the

right to assert their respective Retiree Claims in their original asserted amounts."[35]  Accordingly,

resolution of the Allocation Disputes prior to the commencement of the confirmation process

could also prevent litigation between the Debtors, the Retiree Claimants and other parties in

interest as to the allowed amount of the Retiree Claims (ultimately facilitating—not inhibiting—

the Debtors' expeditious emergence from chapter 11).

## VII.   CREDITOR SUPPORT

23.    In connection with the Second Amended DCL Plan, the DCL Plan Proponents

relied heavily on creditor support, particularly the support of Holders of Other Parent Claims, in

arguing that (i) the Settlement met the reasonableness requirement of Bankruptcy Rule 9019 and

(ii) that the Second Amended DCL Plan was preferable to the Noteholder Plan.[36]  The Court

adopted the DCL Plan Proponents' analysis in approving the Settlement.[37]  The Court also

emphasized that while the DCL Plan did not receive the requisite two-thirds by amount if the

Senior Noteholder votes, "70% of Senior Noteholders that cast ballots voted to accept the DCL

---

[35] See Retiree Claimant Settlement Agreement at 5-6.

[36] See e.g., DCL Post-Trial Brief at 9 ("Strikingly, the very creditors that, according to the Noteholders, should have reason to reject the Plan voted to accept by enormous margins. The class of Other Parent Claims – unsecured trade and other claims against Tribune offered virtually the same treatment as Senior Noteholders – emphatically supported the DCL Plan, with 226 of 237 voting creditors (95.36%), holding 94.71% by dollar amount of the claims voted, choosing to accept the DCL Plan.").

[37] Decision at 70-71 (holding that creditors' support "weigh[s] heavily in favor of approval of the settlement").

Plan, with 38% of Senior Noteholders stating a preference indicating that they preferred the DCL Plan."[38]

24.     Depending upon the outcome of the Allocation Disputes, however, Holders of Other Parent Claims may change their votes, thereby diminishing the force of the DCL Plan Proponents' argument that the Settlement is reasonable.  It is also likely that certain of the Senior Noteholders who voted in favor of Second Amended DCL Plan will change their votes if the Allocation Disputes are not resolved in their favor such that the Senior Noteholder Class will not have accepted the new DCL Plan by either amount or numerocity.  Indeed, without the vote of Holders of Other Parent Claims and certain of the Senior Noteholders, the Court may determine that the Settlement no longer falls within the "range of reasonableness" mandated by Bankruptcy Rule 9019.  Accordingly, it is necessary to resolve the Allocation Disputes in advance of solicitation to ensure that the Court preserves its ability to reconsider the propriety of the Settlement before creditors cast votes for or against the DCL Plan.

## NOTICE

25.     Notice of this Statement has been provided to: (a) the Office of the United States Trustee; (b) counsel to the Debtors; (c) counsel to the Creditors' Committee; (d) counsel to the administrative agent for the Debtors' postpetition financing facility; (e) counsel to Wilmington Trust and (f) all parties requesting notice pursuant to Bankruptcy Rule 2002 and Local Rule 2002-1(b).  In light of the nature of the relief requested herein, Aurelius submits that no other or further notice is necessary.

---

[38] Decision at 70-71.

{00581011;v1}

## CONCLUSION

While resolution of the Allocation Disputes consistent with the timeline proposed by Aurelius will briefly delay the DCL Plan Proponents' anticipated emergence from bankruptcy, when weighed against the undue prejudice to Senior Noteholders (and indeed all parent level creditors) that will result if the Allocation Disputes are not resolved prior to solicitation, such delay is entirely appropriate and justified. Practical concerns also weigh heavily in favor of resolving the Allocation Disputes before soliciting creditor votes—the outcome of many Allocation Disputes will have a meaningful impact on creditor elections and could ultimately impact whether creditors vote to accept or reject the DCL Plan. Moreover, the creation of Allocation Dispute Reserves is a nearly insurmountable task that will presumably consume vast Debtor resources that could otherwise be focused on the Debtors' emergence from chapter 11. In sum, entry of the Proposed Order will be a constructive step forward to a consensual plan process, one in which all creditors would have a clear understanding of their relatives rights and entitlements under the DCL Plan.

{00581011;v1}

**WHEREFORE**, for the foregoing reasons, Aurelius respectfully requests that the Court:
(i) enter the Proposed Order in the form attached hereto as Exhibit A, setting forth a schedule
with respect to (a) resolution of the Allocation Disputes and (b) confirmation of a proposed plan
of reorganization; and (ii) grant Aurelius such other and further relief as is just, proper and
equitable.

Dated:  December 6, 2011
      Wilmington, Delaware

AKIN GUMP STRAUSS HAUER & FELD LLP    ASHBY & GEDDES, P.A.

Daniel H. Golden                                William P. Bowden (I.D. No. 2553)
David M. Zensky                               Amanda M. Winfree (I.D. No. 4615)
Philip C. Dublin                               Leigh-Anne M. Raport (I.D. No. 5055)
One Bryant Park                              500 Delaware Avenue, P.O. Box 1150
New York, NY  10036                     Wilmington, DE  19899
(212) 872-1000                             (302) 654-1888

*Counsel for Aurelius Capital Management, LP*

{00581011;v1}