# EXHIBIT B

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re | : | CHAPTER 11 |
| | : | (Jointly Administered) |
| **TRIBUNE COMPANY,** *et. al*,[1] | : | |
| | : | Case  No. 08-13141 (KJC) |
| Debtors | : | (Re: D.I.s 10222, 10226, 10227) |

## MEMORANDUM  ON  RECONSIDERATION[2]

### BY:   KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE

On October 31, 2011, this Court issued an Opinion on Confirmation (the "Confirmation

Opinion") (D.I. 10133) and Order (D.I. 10134) denying confirmation of two competing plans of

reorganization for the Debtors because both plans failed to meet the requirements of Bankruptcy

Code §1129, as detailed in the opinion.[3]  *In re Tribune Co.,* No. 08-13141, 2011 WL 5142420

---

[1]The chapter 11 case filed by Tribune Media Services, Inc. (Bky. Case No. 08-13236) is being
jointly administered with the Tribune Company bankruptcy case and 109 additional affiliated debtors
pursuant to the Order dated December 10, 2008 (docket no. 43).  An additional debtor, Tribune CNLBC,
LLC (formerly known as Chicago National League Baseball Club, LLC) filed a voluntary petition for
relief under chapter 11 of the Bankruptcy Code on October 12, 2009 (Bky. Case No. 09-13496), and also
is being jointly administered with the Tribune Company bankruptcy case pursuant to this Court's Order
dated October 14, 2009 (docket no. 2333). The debtors in the jointly administered cases are referred to
herein as the "Debtors."

[2]This Memorandum constitutes the findings of fact and conclusions of law, required by
Fed.R.Bankr.P. 7052.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and
157(a).  This is a core proceeding pursuant to 28 U.S.C. 157(b)(1) and (b)(2)(L) and (O).

[3]The two competing plans discussed in the Confirmation Opinion are: (i) the Second Amended
Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, the
Official Committee of Unsecured Creditors (the "Creditors' Committee"), Oaktree Capital Management,
L.P. ("Oaktree"), Angelo, Gordon & Co., L.P. ("Angelo Gordon"), and JPMorgan Chase Bank, N.A.
("JPM"), as amended (the "DCL Plan"), and (ii) the Joint Plan of Reorganization for Tribune Company
and Its Subsidiaries Proposed by Aurelius Capital Management, L.P. on behalf of its Managed Entities
("Aurelius"), Deutsche Bank Trust Company Americas, in its Capacity as Successor Indenture Trustee
for Certain Series of Senior Notes ("Deutsche Bank"), Law Debenture Trust Company of New York, in
its Capacity as Successor Indenture Trustee for Certain Series of Senior Notes ("Law Debenture") and
Wilmington Trust Company, in its Capacity as Successor Indenture Trustee for the PHONES Notes
("WTC"), as amended (the "Noteholder Plan"). The Debtors, Committee, Oaktree, Angelo Gordon, and

(Bankr.D.Del. Oct. 31, 2011).  Currently before the Court are the following motions for

reconsideration of the Confirmation Opinion:

> (1)    Joint Motion of Law Debenture Trust Company of New York and Deutsche Bank Trust Company Americas Requesting Reconsideration of the Court's Confirmation Opinion with Respect to the Subordination of the PHONES (the "Law Debenture Reconsideration Motion") (D.I. 10222),[4]

> (2)    Motion of Aurelius Capital Management, LP for Reconsideration of the Court's October 31, 2011 Decision as it Pertains to the Application of the PHONES Notes Subordination (the "Aurelius Reconsideration Motion") (D.I. 10226), [5] and

> (3)    Motion of the Noteholder Plan Proponents for Reconsideration and Clarification of the Court's October 31, 2011 Decision (the "NPP Reconsideration Motion") (D.I. 10227).[6]

On December 14, 2011, the Court heard oral argument on the three motions for reconsideration.

Also before the Court are the Debtors' motion (D.I. 10274) for scheduling confirmation-

related proceedings for the Third Amended Joint Plan of Reorganization for Tribune Company

and Its Subsidiaries proposed by the Debtors, the Creditors' Committee, Oaktree, Angelo Gordon

and JPM (D.I. 10273) (the "Third Amended DCL Plan") and the parties' written submissions

proposing a process for resolution of certain so-called "allocation disputes." (D.I. 10364, 10369,

10370, 10374, 10392, 10393, 10394, 10395, 10397, and 10415).

---

JPM are referred to as the "DCL Plan Proponents."  Aurelius, Deutsche Bank, Law Debenture and WTC are referred to as the "Noteholder Plan Proponents" or the "Noteholders."  Capitalized terms not defined in this Memorandum shall have the definitions set forth in the Confirmation Opinion.

[4]Davidson Kempner Capital Management LLC, as Investment Advisor, (D.I. 10223) and Brigade Capital Management LLC (D.I. 10225) filed Joinders to the Law Debenture Reconsideration Motion.

[5]Deutsche Bank filed a Joinder to the Aurelius Reconsideration Motion (D.I. 10238).

[6] The Noteholder Plan Proponents also filed a Notice of Appeal from the Confirmation Opinion (D.I. 10276).  Pursuant to Fed.R.Bankr.P. 8002(b), the appeal is not effective until entry of an order disposing of the motions under Fed.R.Bankr.P. 9023.

The Law Debenture Reconsideration Motion and the Aurelius Reconsideration Motion (jointly, the "Subordination Reconsideration Motions") request reconsideration under Fed.R.Civ.P. 59(e), made applicable hereto pursuant to Fed.R.Bankr.P. 9023, of the portion of the Confirmation Opinion that determined that fraudulent transfer claims are not assets belonging to a debtor and, therefore, would not be "assets of the Company" subject to the subordination provisions of the PHONES Notes.[7]  EGI-TRB, LLC ("EGI") and Wilmington Trust Company filed responses opposing the relief sought in the Subordination Reconsideration Motions (D.I. 10365 and D.I. 10371, respectively).  The TM Retirees filed a response supporting the Subordination Reconsideration Motions (D.I. 10366).[8]  For the reasons discussed below, the relief requested in the Subordination Reconsideration Motions will be granted.

The NPP Reconsideration Motion raises three issues.  First, the Noteholder Plan Proponents ask the Court to clarify that the Confirmation Opinion does not make a determination regarding the value of the PHONES Notes.  Second, the Noteholder Plan Proponents ask the Court to reconsider its "apparent determination" allowing the banks, agents, and arrangers who financed and facilitated the 2007 leveraged buy-out (the "LBO") of the Tribune Company, and the holders of the LBO debt (together with the banks, agents and arrangers, the "LBO Lenders") to share in any recoveries by the litigation trust proposed in the DCL Plan (the "DCL Litigation Trust") resulting from the DCL Litigation Trust's pursuit of causes of action arising from the

---

[7] The "PHONES Notes" are those certain exchangeable Subordinated Debentures due 2029, issued pursuant to that certain Indenture dated April 1, 1999 (the "PHONES Indenture") between Tribune as issuer and Wilmington Trust Company as successor trustee (the "PHONES Trustee").

[8] The TM Retirees are "approximately 200 former employees (and beneficiaries of such former employees) of The Times Mirror Company, who were receiving or entitled to receive payments under certain non-qualified retirement plans of one or more of the Debtors."  (TM Retirees Response at 1).

3

LBO (the "Litigation Trust Causes of Action").  Third, the Noteholder Plan Proponents ask the

Court to reconsider its approval of the proportionate judgment provision in the Bar Order

proposed by the DCL Plan.

The Noteholder Plan Proponents' request for clarification is granted.  The Court did not

make any determination regarding the value of the PHONES Notes in the Confirmation Opinion.

The chart in the Background section of the Confirmation Opinion reflected that the Debtors' Pre-

LBO Indebtedness included the PHONES Notes indebtedness of $612 million as of April 2007.

These figures were taken from the Debtors' Form 10-Q dated April 1, 2007 and used in the

Confirmation Opinion for illustrative purposes only.  *See Tribune*, 2011 WL 5142420 at *4 citing

NPP Ex. 343 at 24.

For the reasons set forth herein, the Noteholder Plan Proponents' requests for

reconsideration of the two remaining issues will be denied.

## STANDARD - MOTIONS FOR RECONSIDERATION

Federal Rule of Bankruptcy Procedure 9023, which incorporates Fed.R.Civ.P. 59,

governs motions for reconsideration. Fed.R.Civ.P. 59(e).  A motion to alter or amend a judgment

under Rule 59(e) must be grounded on (1) an intervening change in controlling law; (2) the

availability of new evidence; or (3) the need to correct a clear error of law or prevent manifest

injustice.  *Max's Seafood Café v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999).  A decision

should be reconsidered when facts that would alter or impact the decision have been overlooked

or misapprehended.  *Official Comm. of Unsecured Creditors v. Catholic Diocese of Wilmington,*

*Inc. (In re Catholic Diocese of Wilmington, Inc.)*, 437 B.R. 488, 490 (Bankr. D. Del. 2010) citing

*Karr v. Castle,* 768 F.Supp. 1087, 1093 (D.Del. 1991) aff'd 22 F.3d 303 (3d Cir. 1994).  A

motion for reconsideration should not be used to reargue the facts or applicable law. *Catholic Diocese*, 437 B.R. at 490; *see also Smith v. City of Chester*, 155 F.R.D. 95, 97 (E.D. Pa. 1994) ("Parties are not free to relitigate issues that the Court has already decided, nor should parties make additional arguments which should have been made before judgment"). "Motions for reconsideration should be granted sparingly because of the interests in finality and conservation of scarce judicial resources." *Pennsylvania Ins. Guaranty Ass'n v. Trabosh*, 812 F.Supp. 522, 524 (E.D. Pa. 1992).

## DISCUSSION

I.   **The Subordination Reconsideration Motions.**

The Confirmation Opinion contains the following discussion and determination of an objection by WTC to the DCL Plan's proposed treatment of the claims of the PHONES Notes.[9]

> The Noteholders and WTC also argue that the PHONES Notes are entitled to receive distributions from the Litigation Trust and the Creditors' Trust without giving effect to the subordination provision, because the causes of action being pursued in those trusts belong to creditors, not the Debtors. The PHONES Indenture provides in Section 14.02 ("Payment Over of Proceeds upon Dissolution, Etc.") that the PHONES Noteholders' recovery is subordinated to Senior Indebtedness "[u]pon distribution of *assets of the Company* in the event of any . . . bankruptcy case." (emphasis added). The DCL Plan Proponents agreed to amend the DCL Plan to provide that distributions from the Creditors' Trust are not subject to the PHONES subordination. (*See* Tr. 4/13/11 at 178). However, they argue that any recoveries from pursuit of the Litigation Trust causes of action are property of the Debtors and, therefore, subject to the subordination provisions.

> In *Cybergenics,* the Third Circuit Court of Appeals decided that fraudulent transfer claims, which state law provides to creditors, are not assets of the debtor,

---

[9]Law Debenture, Deutsche Bank , and Aurelius (the "Movants") point out correctly that the Confirmation Opinion mistakenly states that both the Noteholders and WTC make the subordination argument. Only WTC filed this objection to the DCL Plan, and although the term "Noteholder Plan Proponents" (and the shortened version "Noteholders") as used in the Confirmation Opinion included Senior Noteholders and PHONES Noteholders, the Senior Noteholders did *not* join in the Objection.

even though the Bankruptcy Code empowers a debtor to pursue those claims for the benefit of all creditors. *Off'l Comm. Of Unsecured Creditors of Cybergenics Corp. v. Scott Chinery (In re Cybergenics Corp.),* 226 F.3d 237, 245 (3d Cir. 2000). *See also In re Gentek, Inc.*, 328 B.R. 423, (Bankr.D.Del. 2005) (A debtor has the power to pursue and settle fraudulent transfer claims post-petition). The *Cybergenics* Court wrote:

> The avoidance power itself, which we have analogized to the power of a public official to carry out various responsibilities in a representative capacity, was likewise not an asset of Cybergenics, just as this authority would not have been a personal asset of a trustee, had one been appointed.

*Cybergenics*, 226 F.3d at 245.  Therefore, the Third Circuit held that the fraudulent transfer claims (which arose from obligations incurred and transfers made in connection with a leveraged buy-out) were not included in an earlier sale of "all of the rights, title, and interest of Cybergenics in and to all of the assets and business as a going concern of Cybergenics." *Id.* at 239, 245.

The Litigation Trust will pursue the Preserved Causes of Action as defined in §1.1.188 of the DCL Plan. Pursuant to *Cybergenics*, causes of action that the Debtors' estate may assert under Chapter 5 of the Bankruptcy Code are not "assets of the Company" subject to the PHONES Notes' subordination provision. [84] However, causes of action that are based on direct claims owned by the Debtors (for example, a claim for breach of fiduciary duty by an officer or director) would be an asset of the Company and subject to the PHONES Notes' subordination provision.

[n. 84: Bankruptcy Code §541(a)(3) provides that "property of the estate" includes "any interest in property that the trustee recovers under section . . . 550." The *Cybergenics* Court noted, however, that "property of the debtor" and "property of the estate" have different meanings, as evidenced by numerous provisions in the  Bankruptcy Code that distinguish between the concepts, or refer to one and not the other.  *Cybergenics*, 226 F.3d at 246, n.15.  While the recoveries of the Chapter 5 causes of action would be property of the estate, those recoveries do not fall within the PHONES Notes' provision which subordinates payments from a distribution of assets of the *Company.*]

*Tribune*, 2011 WL 5142420 at *56-*57, slip op. at 111-113 (the "Subordination Determination").

The Movants ask the Court to reconsider the Subordination Determination based upon a reading of the PHONES Indenture as a whole, and in light of applicable state law regarding contract interpretation.  WTC objects to Court's reconsideration of the Subordination Determination,

arguing that the Movants do not meet the legal standard for reconsideration, that the Court correctly determined that the causes of action under chapter 5 of the Bankruptcy Code are not "assets of the Company," and that the plain language of the PHONES Indenture limits subordination solely to payments and distributions of "assets of the Company."[10]

Reconsideration is appropriate when there is an error of fact and, in this case, the Court erroneously said that the "Noteholders" joined in the objection to the treatment of subordinated debt with respect to distributions from the DCL Litigation Trust, although the Movants, who are Senior Noteholders, did not join in that objection. No one disputes that this statement of fact was incorrect. Further, reconsideration is appropriate when the Court has overlooked facts that might reasonably have altered or impacted the decision. *Catholic Diocese*, 437 B.R. at 490. Here, the Court's consideration of the phrase "assets of the Company" was too limited. A more complete reading of the PHONES Indenture as a whole is required. Accordingly, the Court will reconsider the Subordination Determination to determine whether the overlooked provisions of the PHONES Indenture alter or impact the prior decision.[11]

WTC objected to any subordination of its claim in the distribution of any recovery from the DCL Plan Trust's pursuit of Remaining LBO-Related Causes of Action. WTC argued that

---

[10]EGI also argues that the Court's analysis of "assets of the Company" was correct and should not be reconsidered. EGI adds that, if the Court reconsiders the Subordination Determination, it should not address the subordination agreement that applies to the EGI-TRB Notes (the "EGI Subordination Agreement"). The Confirmation Opinion did not address the issue of subordination of Litigation Trust recoveries under the EGI Subordination Agreement and I agree that it is not appropriate to do so here.

[11]I am not reconsidering the legal principle, as decided by the Third Circuit in *Cybergenics*, that fraudulent transfer claims are not assets of the debtor. *Off'l Comm. Of Unsecured Creditors of Cybergenics Corp. v. Scott Chinery (In re Cybergenics Corp.),* 226 F.3d 237, 245 (3d Cir. 2000). I am reconsidering whether the use of the phrase "assets of Company" in Article 14 of the PHONES Indenture insulates the PHONES Noteholders from application of the subordination obligations to payment or distribution of fraudulent transfer recoveries by the proposed DCL Litigation Trust.

7

Article 14 of the PHONES Indenture provides for subordination to Senior Indebtedness only "[u]pon distribution of *assets of the Company* in the event of any . . . bankruptcy case." I agreed that, under *Cybergenics*, causes of action under chapter 5 of the Bankruptcy Code, including fraudulent transfer claims, were not assets of the "Company," i.e., Tribune.

Bankruptcy Code §510(a) provides that "[a] subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable non-bankruptcy law." Article 1.12 of the PHONES Indenture provides that the Indenture "shall be governed by and construed in accordance with the laws of the State of Illinois except as may be otherwise required by mandatory provisions of law." Here, it is appropriate to construe the PHONES Indenture in accordance with Illinois law, which provides:

> The basic rules of contract interpretation are well settled. In construing a contract, the primary objective is to give effect to the intention of the parties. *Gallagher v. Lenart*, 226 Ill.2d 208, 232, 314 Ill.Dec. 133, 874 N.E.2d 43 (2007). A court will first look to the language of the contract itself to determine the parties' intent. *Id.* at 233, 314 Ill.Dec. 133, 874 N.E.2d 43. A contract must construed as a whole, viewing each provision in light of the other provisions. *Id.* The parties' intent is not determined by viewing a clause or provision in isolation, or in looking at detached portions of the contract. *Id.*

*Thompson v. Gordon*, 241 Ill.2d 428, 441, 349 Ill.Dec. 936, 944, 948 N.E.2d 39, 47 (2011). The use of the phrase "[u]pon any distribution of the assets of the Company" must be considered in light of the entirety of the PHONES Indenture, including the whole of Section 14.02, which provides:

SECTION 14.02        Payment Over of Proceeds upon Dissolution, Etc.

Upon any distribution of assets of the Company in the event of:

(1)    any insolvency or bankruptcy case or proceeding, or any receivership, liquidation, reorganization or other similar case or proceeding in connection therewith, relative to the

8

Company or to its creditors, as such, or to its assets; or

(2)    any liquidation, dissolution or other winding up of the Company, whether voluntary or involuntary and whether or not involving insolvency or bankruptcy; or

(3)    any assignment for the benefit of creditors or any other marshaling of assets and liabilities of the Company; then and in such event

> (A)    The holders of Senior Indebtedness shall be entitled to receive payment in full of all amounts due or to become due on or in respect of all Senior Indebtedness, or provision shall be made for such payment in cash, before the Holders of the Securities of any series are entitled to receive any payment on account of the principal amount, interest or such other amounts as may be provided for in Section 3.01, if any, in respect of the Securities of such series; and

> (B)    Any payment or distribution of assets of the Company of any kind or character, whether in cash, property or securities, by set-off or otherwise, to which the Holders or the Trustee would be entitled but for the provisions of this Article Fourteen, including any such payment or distribution which may be payable or deliverable by reason of the payment of any other Indebtedness of the company being subordinated to the payment of the Securities of such series, shall be paid by the liquidating trustee or agent or other Person making such payment or distribution, whether a trustee in bankruptcy, a receiver or liquidating trustee or otherwise, directly to the holders of Senior Indebtedness or their representative or representatives or to the trustee or trustees under any indenture under which any instruments evidencing any of such Senior Indebtedness may have been issued, ratably according to the aggregate amounts remaining unpaid on account of the principal of (and premium, if any) and interest on the Senior Indebtedness held or represented by each, to the extent necessary to make payment in full of all Senior Indebtedness remaining unpaid, after giving effect to any concurrent payment or distribution to the holders of such Senior Indebtedness or provision therefor.

In the event that, notwithstanding the foregoing provisions of this Section 14.02, the Trustee or the Holder of any Security of any series shall receive any payment or distribution of assets of the Company of any kind or character, whether in cash, property or securities, including any such payment or distribution which may be payable or deliverable by reason of the payment of any other Indebtedness of the Company being subordinated to the payment of the Securities of such series, before all Senior Indebtedness is paid in full or payment thereof provided for, and if such fact shall then have been made known to the Trustee as provided in Section 14.10, or, as the case may be, such Holder, then and in such event such payment or distribution shall be paid over or delivered forthwith to the trustee in bankruptcy, receiver, liquidating trustee, custodian, assignee, agent or other Person making payment or distribution of assets of the Company

for application to the payment of all Senior Indebtedness remaining unpaid, to the extent necessary to pay all Senior Indebtedness in full, after giving effect to any concurrent payment or distribution to or for the holders of Senior Indebtedness.

For purposes of this Article Fourteen only, the words "cash, property or securities," or any combination thereof, shall not be deemed to include shares of capital stock of the company as reorganized or readjusted, or securities of the Company or any other corporation provided for by a plan of reorganization or readjustment the payment of which is subordinated, at least to the extent provided in this Article Fourteen with respect to the Securities, to the payment of all Senior Indebtedness which may at the time be outstanding; provided, however, that (i) Senior Indebtedness is assumed by the new corporation, if any, resulting from any such reorganization or readjustment, and (ii) the rights of the holders of the Senior Indebtedness are not, without the consent of such holders, altered, in any manner adverse to such holders, by such reorganization or readjustment.

The consolidation of the Company with, or the merger of the Company into, another  corporation or the liquidation or dissolution of the Company following the conveyance or transfer of all or substantially all of its assets to another Person upon the terms and conditions set forth in Article Eight shall not be deemed a dissolution, winding up, liquidation, reorganization, assignment for the benefit of creditors or marshaling of assets and liabilities of the Company for the purposes of this Section 14.02 if the corporation formed by such consolidation or into which the Company is merged or the Person which acquires by conveyance or transfer all or substantially all of the assets of the Company, as the case may be, shall, as part of such consolidation, merger, conveyance or transfer, comply with the conditions set forth in Article Eight.

PHONES Indenture, at 62-64.

WTC argues that the introductory phrase "[u]pon any distribution of assets of the Company" is a condition which qualifies everything else in Section 14.02.  Fraudulent transfer claims to be pursued by the DCL Litigation Trust are not "assets of the Company" (*Cybergenics*, 226 F.3d at 245), and, therefore, WTC argues, the subordination provisions that follow the introductory phrase are not applicable to any payment or distribution of recoveries received from those fraudulent transfer claims.  WTC claims the Movants' proposed reading lifts the subordination provisions "out of context" by failing to give any effect to the introductory phrase

of Section 14.02. *See Willison v. Economy Fire & Cas. Co.*, 294 Ill.App.3d 793, 800, 690 N.E.2d

1073, 1077, 229 Ill.Dec. 26 (Ill. Ap. Ct. 1998) (a provision of an insurance contract must be read

with regard to the introductory phrase).

The Movants argue that the introductory phrase "[u]pon any distribution of assets of the

Company" is not a limitation, but, instead, is part of a general introduction of the "triggering

events" or conditions precedent to application of the subordination provisions.  Subsections (1),

(2) and (3) that follow the introductory phrase contain a detailed list to describe all types of

bankruptcy, insolvency, liquidation or similar proceedings in which the subordination provisions,

which follow, apply.  In other words, the parties' intent is clear:  *if* the assets of the Company are

distributed to creditors in any type of any bankruptcy, insolvency, liquidation or similar

proceeding, *then and in such event*:

> the holders of Senior Indebtedness shall be entitled to receive payment in full of
> all amounts due or to become due on or in respect of all Senior Indebtedness, or
> provision shall be made for such payment in cash *before the Holders of the
> [PHONES Notes] are entitled to receive any payment* on account of the principal
> amount, interest or such other amounts as may be provided for in Section 3.01, if
> any, in respect of the [PHONES Notes].

PHONES Indenture, Section 14.02(A), at 63 (emphasis added).  The language in the

subordination provision of Section 14.02(A) is unqualified.  Reading the introductory language

as limiting the unqualified subordination language in Section 14.02(A) fails to give effect to the

provision as a whole.

The phrase "assets of the Company" appears again in Section 14.02(B), which identifies

the source of any payments or distributions that must be turned over to the holders of Senior

Indebtedness:

11

(B)     any payment or distribution of assets of the Company of any kind or
character, to which the [PHONES Noteholders] would be entitled but for
the provisions of this Article Fourteen, including any such payment or
distribution which may be payable or deliverable by reason of payment of
any other Indebtedness of the Company being subordinated to the payment
of the [PHONES Notes] of such series shall be paid by the liquidating
trustee, or agent or other Person making such payment or distribution,
whether a trustee in bankruptcy, a receiver or liquidating trustee or
otherwise, directly to the holders of Senior Indebtedness . . . .

PHONES Indenture, Section 14.02(B), at 63.

        The Movants contend that the grammatical "rule of the last antecedent," which is used in

both statutory and contractual interpretation, provides that the phrase "assets of the Company" in

Section 14.02(B) modifies the term "distribution," but not "payment."    According to the "rule of

the last antecedent," a limiting clause or phrase (here, "assets of the Company") should be read

ordinarily as modifying only the noun or phrase that it immediately follows (here, "distribution").

*Barnhart v. Thomas*, 540 U.S. 20, 26, 124 S.Ct. 376, 380, 157 L.Ed.2d 333 (2003).  In *Barnhart*,

the Supreme Court also recognized that while the rule of the last antecedent "is not an absolute

and can assuredly be overcome by other indicia of meaning, we have said that construing a

statute in accord with the rule is 'quite sensible as a matter of grammar.'" *Id.* quoting *Nobelman*

*v. American Sav. Bank*, 508 U.S. 324, 330, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993).

        In a recent decision, the District Court for the Southern District of New York applied the

"rule of the last antecedent" when interpreting an indenture.  *JPMorgan Chase Bank N.A. v. The*

*Baupost Group, LLC (In re Enron Creditors Recovery Corp.)*, 380 B.R. 307, (S.D.N.Y. 2008).

In *Enron*, the indenture defined "Senior Indebtedness" as including "all indebtedness of [Enron]

. . . evidenced by notes, debentures, bonds, or other securities sold by [Enron] for money

borrowed."  *Id.* at 319-322.  The District Court held that, under the "rule of the last antecedent,"

12

the phrase "sold by [Enron] for money borrowed" modified only the immediately preceding term

("other securities"), and not the earlier term ("notes").  *Id.*

The "rule of the last antecedent" should likewise be applied in an interpretation of Section

14.02.  Construing the word "payment" broadly, and not limited by the phrase "assets of the

Company," is sensible and consistent with the entirety of Section 14.02.  First, a broad

interpretation of "payment" is consistent with the unqualified subordination language of Section

14.02(A).  Second, construing "payment" broadly is consistent with Section 14.02(B), which

recognizes that a payment subject to its provisions can be made by a "liquidating trustee or agent

or other Person," and the term "Person" is defined in the Indenture as meaning "any individual,

corporation, limited liability company, partner-ship *[sic]*, joint venture, association, joint-stock

company, *trust*, unincorporated organization or government or any agency or political

subdivision thereof."  PHONES Indenture, Section 1.01, at 5 (emphasis added).  A broad

interpretation of "payment" corresponds to the broad definition of "Person," and applies the

subordination provisions to *any* payment, including one received from a liquidating trust, such as

the DCL Litigation Trust.

Finally, the paragraph following Section 14.02(B) imposes a so-called "pay-over"

obligation: "[i]n the event that, notwithstanding the foregoing provisions" the PHONES

Noteholders receive some payment or distribution of assets of the Company  "of any kind or

character" before the Senior Indebtedness is paid in full.[12]  PHONES Indenture, Section 14.02, at

63.  If such a payment or distribution is received:

---

[12]The "rule of the last antecedent" should likewise apply to the "payment or distribution of assets of the Company" in this paragraph so that "assets of the Company" modifies only "distribution."

13

such payment or distribution shall be paid over or delivered forthwith to the trustee in bankruptcy, receiver, liquidating trustee, custodian, assignee, agent or other Person making the payment or distribution of assets of the Company for application to the payment of all Senior Indebtedness remaining unpaid, to the extent necessary to pay all Senior Indebtedness in full, after giving effect to any concurrent payment or distribution to or for the holders of Senior Indebtedness.

*Id.* Again, the subsections of Section 14.02 demonstrate the parties' intent to apply the subordination provisions to a broad array of payments.

WTC argues that other provisions of the Indenture indicate an intent to allow PHONES Noteholders to pursue and receive payments from sources *other than the Company* that are not subject to the subordination provisions in Article Fourteen. For example, Section 5.05 of the Indenture (entitled "Trustee May Enforce Claims Without Possession Of Securities") allows the PHONES Indenture Trustee to pursue causes of action for the benefit of the PHONES Noteholders and "any recovery of judgment shall . . . be for the ratable benefit of the Holders of the Securities in respect of which such judgment has been recovered." Further, WTC argues that Section 5.10 of the Indenture (entitled "Rights and Remedies Cumulative") provides that cumulative remedies are not limited to any particular causes of action and would include claims arising outside the PHONES Indenture, including chapter 5 avoidance claims. The Movants, however, point out that Section 14.07(3) specifically provides that any recovery from remedies exercised by the PHONES Trustee or PHONES Noteholders are subject to Article Fourteen's subordination provisions by stating:

The provisions of this Article Fourteen are and are intended solely for the purpose of defining the relative rights of the Holders of the Securities of any series, on the one hand, and the holders of the Senior Indebtedness, on the other hand. Nothing contained in this Article Fourteen or elsewhere in this Indenture or in the Securities of any series is intended to or shall:
. . . .

14

    (3)      prevent the Trustee of the Holder of any Security of such series from exercising all remedies otherwise permitted by applicable law upon default or an Event of Default under this Indenture, *subject to the rights, if any, under this Article Fourteen of the holders of Senior Indebtedness to receive cash, property or securities otherwise payable or deliverable to the Trustee or such Holder.*

PHONES Indenture, §14.07, at 66 (emphasis added).  Again, the parties' intent to subordinate the

PHONES Noteholders is plain.

Previously, when considering an attempt to limit the reach of the subordination

provisions of an indenture, I decided that a clause in the subordination provision:

> should not be considered based upon its grammatical structure alone, but also within the context of the entire agreement, which, here, is more reflective of the parties' intent: that except in very limited circumstances, no payment can be made to the Subordinated Noteholders until (1) the Senior Notes are paid in full, or (2) the Senior Noteholders consent. . . . . [The proposed interpretation of the clause would] eviscerate the purpose of the subordination provisions in the Subordinated Notes Indenture and expand the limited carve out beyond its intended scope.

*Kurak v. Dura Automotive Systems, Inc. (In re Dura Automotive Systems, Inc.*), 379 B.R 257,

270 (Bankr.D.Del. 2007).  *See also In re Spansion*, 426 B.R. 114, 150-51 (Bankr.D.Del. 2010).

Similar considerations are present here. The overall purpose of Article 14, in general, and Section

14.02, in particular, is to ensure that the PHONES Notes are subordinated to the Senior

Indebtedness.  As stated in Section 14.01:

> The Securities shall be subordinated to Senior Indebtedness as set forth in this Article Fourteen.  The Company covenants and agrees, and each Holder of a Security of any series by such Holder's acceptance thereof likewise covenants and agrees, that, to the extent and in the manner hereinafter set forth in this Article Fourteen, the indebtedness represented by the Securities of such series and the payment of the principal amount, interest and such other amounts as provided for in Section 3.01, if any, in respect of each and all of the Securities of such series are hereby expressly made subordinate and subject in right of payment to the prior payment in full of all Senior Indebtedness; provided, however, that no provision of this Article Fourteen shall prevent the occurrence of any default or Even of Default hereunder.

PHONES Indenture, §14.01, at 61.  Each subsection of Section 14.02 further defines and reveals

the parties' intent.  Therefore, the Section 14.02 introductory phrase "upon distribution of the

assets of the Company" must be read in light of the overall language of the Section, particularly

(i) the lengthy catalog of bankruptcy, insolvency and liquidation proceedings described in

subsections (1), (2) and (3) of Section 14.02, (ii) the unqualified subordination language of

Section 14.02(A), (iii) application of subordination provisions to all sources of "payment" in

Section 14.02(B), and (iv) the catch-all language of the pay-over obligation in the paragraph

following Section 14.02(B).

 An appropriate order will be entered granting the Subordination Reconsideration Motions

and amending the Confirmation Opinion to strike the Subordination Determination.


II. **The NPP Reconsideration Motion.**

 The NPP Reconsideration Motion contains two remaining requests for reconsideration:

(1) the Noteholder Plan Proponents ask the Court to reconsider whether the LBO Lenders are

entitled to share in any DCL Litigation Trust proceeds received from the pursuit of fraudulent

transfer claims arising from the LBO, and (2) the Noteholder Plan Proponents ask the Court to

reconsider its approval of the proportionate judgment reduction provision in the Bar Order

proposed by the DCL Plan.

 When seeking reconsideration to correct an error of law or to prevent manifest injustice, a

litigant should "evaluate whether what may seem to be a clear error of law is in fact simply a

point of disagreement between the court and the litigant." *Dodge v. Susquehanna Univ.*, 796

F.Supp. 829, 830 (M.D.Pa. 1992) quoting *Atkins v. Marathon LeTourneau Co.,* 130 F.R.D. 625,

626 (S.D.Miss. 1990).  A Rule 59(e) motion should not be used as a means to reargue matters already argued and disposed of by prior rulings, or to put forward additional arguments which a party could have made, but neglected to make, before judgment. *Dodge*, 796 F.Supp. at 830 citing *Davis v. Lukhard*, 106 F.R.D. 317, 318 (E.D. Va. 1984) *judgment vacated on other grounds* 788 F.2d 973 (4th Cir. 1986).

Neither of the Noteholder Plan Proponents' remaining requests meet the standard for reconsideration under Rule 59(e).

(A)      The LBO Lenders

The Noteholder Plan Proponents argue that "permitting the LBO Lenders to benefit from the prosecution of the DCL Litigation Trust Causes of Action, when innocent Non-LBO Creditors will not be paid in full violates principles of law and equity."  NPP Reconsideration Motion, at ¶8.   They argue that this  issue should be reconsidered because it is not addressed directly in the Confirmation Opinion.

The DCL Plan included two settlements of LBO-Related Causes of Action and established two trusts to pursue unsettled claims related to the 2007 LBO.  The settlements, defined in the Confirmation Opinion as the "LBO Settlement" and the "Step Two Disgorgement Settlement" (together, the "DCL Plan Settlement") settled the LBO-Related Causes of Action against the LBO Lenders.  *See Tribune*, 2011 WL 5142420 at *13-*14.  The DCL Plan proposed to preserve the remaining LBO-Related Causes of Action and other claims for the benefit of Tribune's creditors by assigning those causes of action to the DCL Litigation Trust. *Id.*   The DCL Plan also established a Creditors' Trust to pursue certain "Transferred State Law Avoidance Claims" that individual creditors may opt to assign to the Creditors' Trust, rather than pursue on

17

their own.  *Id.*

The DCL Plan proposed to pay Non-LBO Creditors[13]  initial settlement distributions

funded from three sources: (1) LBO Lenders will forgo approximately $401.5 million in

recoveries to which they would be entitled upon allowance of their claims, (2) recipients of pre-

petition principal, interest, and fee payments on account of certain loans provided at Step Two of

the LBO, will contribute $120 million in cash, and (3) the Bridge Lenders will forgo

approximately $13.3 million of their natural recoveries.[14]  *Id.*

The DCL Plan Settlement also included the LBO Lenders' agreement to forgo *pro rata*

participation in initial recoveries from the Litigation and Creditors Trusts, so that the Non-LBO

Parent Creditors would receive the first $90 million in net recoveries by the Trusts, and,

thereafter, 65% of all net recoveries of the Trusts, after repayment of a loan received from

Reorganized Tribune to fund the Trust Litigation.

Accordingly, the LBO Lenders' participation in the Trust recoveries is part of the DCL

Plan Settlement. The Confirmation Opinion included a discussion of the Examiner's analysis of

whether LBO Lenders should be prohibited from sharing in any recovery of payments based on

LBO-related avoidance actions, and noted  "because the law [on this issue] is unclear or requires

specific factual findings subject to further investigation, the Examiner did not reach any

---

[13]Non-LBO Creditors were defined in the Confirmation Opinion as including Senior Noteholder Claims, Other Parent Claims, Convenience Claims and General Unsecured Claims.

[14]The  "Bridge Lenders" are "the lenders from time to time party to the "Bridge Loan Agreement," which provided Tribune with $1.6 billion in financing at Step Two of the LBO.  The "Bridge Loan Agreement" is defined in the DCL Plan as that certain Senior Unsecured Interim Loan Agreement, dated as of December 20, 2007, among Tribune, the Bridge Lenders, the Former Bridge Loan Agent, JPMorgan Chase Bank, N.A., as syndication agent, and Citicorp North America, Inc. and Bank of America, N.A., as co-documentation agents, as amended, restated, supplemented or otherwise modified from time to time

conclusion regarding whether a court is likely to apply such equitable remedies here, and he left the issue in 'equipoise.'" *Tribune*, 2011 WL 5142420 at *29. I have already determined that it was appropriate for the parties to include this element as part of the DCL Plan Settlement.

At the Confirmation Hearing, the Noteholder Plan Proponents argued that the proposed DCL Plan Settlement was not fair and equitable for a number of reasons, including the LBO Lenders' participation in the Trusts' recoveries. I considered the reasonableness of the DCL Plan Settlement and, for all the reasons detailed in the Confirmation Opinion (*see Tribune*, 2011 WL 5142420 at *13 - *34), concluded that "the DCL Plan Settlement should be approved because it is fair, reasonable and in the best interest of the Debtors' estates and it is properly part of the DCL Plan pursuant to Bankruptcy Code §1123(b)(3)(A)." *Tribune,* 2011 WL 5142420 at *34.

The Noteholder Plan Proponents' request for reconsideration of the LBO Lenders' participation in the Trusts' recoveries is a renewed attack against the fairness of the DCL Plan Settlement. I have already considered the Noteholder Plan Proponents' legal arguments on this point in connection with the determination as to the reasonableness of the DCL Plan Settlement as a whole. I decline the invitation to reconsider the fairness of the DCL Plan Settlement.

(B)    The Bar Order's proportionate judgment reduction provision

The Noteholder Plan Proponents also request that the Court reconsider the portion of the Confirmation Opinion that approves the proposed Bar Order, which includes a proportionate judgment reduction provision. The Noteholder Plan Proponents argue that the proportionate judgment reduction provision results in manifest injustice due to its potential effect of reducing future judgments obtained in litigation against the non-settling defendants. The Noteholder Plan Proponents contend that a *pro tanto* judgment reduction method would be more equitable.

19

In the Confirmation Opinion, the Court recognized that there are three basic methods for judgment reduction in bar orders: (i) *pro rata* (which apportions an equal share of liability to each defendant), (ii) proportionate fault method (under which the jury assesses the relative culpability of both settling and non-settling defendants and the non-settling defendants pay a commensurate percentage of the judgment), and (iii) *pro tanto* (which reduces a non-settling defendant's liability for a judgment in the amount paid by the settling defendant(s)). *Tribune*, 2011 WL 5142420 at \*34 n. 62 citing *Cullen v. Riley (In re Masters Mates & Pilots Pension Plan and IRAP Litig.)*, 957 F.2d 1020, 1028-29 (2d Cir. 1992). After considering the competing objections to the Bar Order raised by both the Noteholder Plan Proponents and the officers and directors, I concluded, consistent with the Third Circuit's decision in *Eichenholtz v. Brennan*, 52 F.3d 478, 487 (3d Cir. 1995), that the proportionate judgment reduction provision in the proposed Bar Order was fair to both objecting parties, although I further concluded that the Bar Order's language should be revised to enjoin directly any actions by Potential Plaintiffs that do not conform to the terms of the Bar Order. *Tribune*, 2011 WL 41512420 at \*37.

The Noteholder Plan Proponents argue that it was clear error for the Court to approve a proportionate judgment reduction provision without making specific factual findings regarding the relative fault of the settling and non-settling defendants. However, as discussed in the Confirmation Opinion, other courts have determined that the trial court adjudicating the claims against the non-settling defendants may determine the actual amount of the proportionate judgment reduction. *Id.* citing *Gerber v. MTC Electronic Tech. Co., Ltd.*, 329 F.3d 297, 305 (2d

Cir. 2003).[15]

Further, the Noteholder Plan Proponents now argue that the proportionate judgment provision conflicts with certain states' own contribution bar statutes.[16]  The DCL Plan Trusts are designed to pursue the remaining LBO-Related federal and state law claims separately in a number of state and federal courts.  When discussing the adoption of a nationwide federal bar rule for cases involving federal securities law, the Third Circuit Court noted that "adopting a state's rule would lead to disparate results, because some states do not have a settlement bar rule, and other states have different types of bar rules. Finally, if we adopt state law, we would encourage forum shopping and spawn wasteful litigation over the applicable state law." *Eichenholtz*, 52 F.3d at 486 n. 14.  These considerations underscore the need for consistent application of a Bar Order in this case for pursuit of the remaining LBO-related claims.

In balancing the competing concerns of the Bar Order's effect upon the future plaintiffs and the non-settling defendants, I decided that the proportionate judgment reduction provision is, among the three alternatives, the fairest under these circumstances. The NPP Reconsideration Motion's request for reconsideration of the proportionate judgement reduction provision in the Bar Order will be denied.

---

[15]The Noteholder Plan Proponents' continued insistence upon an evidentiary hearing for determination of the relative fault of LBO Lenders for the proportionate judgment reduction provision is simply another attempt to re-litigate the fairness of the DCL Plan Settlement.

[16]*See, e.g.,* 740 Ill. Comp. Stat. §100/2 (2011), Mass. Gen. Laws ch. 231B, §4 (2011).  It appears that this argument was not raised previously and, if so, it is raised improperly for the first time by a Rule 59(e) motion.

III.    **Scheduling confirmation-related proceedings and an allocation dispute resolution process.**

The DCL Plan Proponents have now filed the Third Amended DCL Plan and have asked that the Court fix a disclosure/confirmation schedule. The parties have also expressed views about certain "allocation disputes" and when it is appropriate to resolve them, i.e., before, in conjunction with, or after confirmation.[17]

At the December 13, 2011 hearing, the Court noted that the competing allocation dispute schedules proposed by the DCL Plan Proponents, on the one hand, and Aurelius, on the other hand, were not meaningfully different. With respect to the proposed disclosure/confirmation schedules, the difference was greater. Embedded in the differing views is the issue of whether all so-called allocation issues should be resolved before voting is allowed on the Third Amended DCL Plan.

To enable the parties to better prepare for the January 11, 2012 status hearing provided in the accompanying Order:

(1)    the parties are directed to confer again in an attempt to reach agreement on scheduling with respect to allocation disputes and disclosure/confirmation, with a view toward a confirmation hearing to be held in mid- to late-May 2012; and

---

[17] *See* Motion of Debtors for Order (I) Approving Supplemental Disclosure Statement; (II) Establishing Scope, Forms, Procedures, and Deadlines for Resolicitation and Tabulation of Votes to Accept or Reject DCL Plan from Certain Classes; (III) Authorizing Tabulation of Prior Votes and Elections on DCL Plan made by Holders of Claims in Non-Resolicited Classes; (IV) Scheduling the Confirmation Hearing and Establishing Notice and Objection Procedures in respect thereof; and (V) Granting Related Relief (D.I. 10274). *See also* D.I. 10364, 10369, 10370, 10374, 10392, 10393, 10394, 10395, 10397, and 10415.

(2)    the parties are advised that, while open to a two-step process in which remaining

allocation disputes are presented to the Court for disposition prior to allowance of

voting on the Third Amended Plan, the Court reserves its discretion to determine

whether and when allocation disputes - - regardless of when actually heard - -

should be determined; in any event, any such determination(s) will be made in

accord with Fed.R.Bankr.P. 7001(8) and subject to confirmation of a plan.

An appropriate Order follows.

BY THE COURT:

_____
KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

Dated:   December 29, 2011