# **EXHIBIT A**

# **Comparsi Claim**

B 10 (Official Form 10) (12/08)

| UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE | PROOF OF CLAIM |
| --- | --- |

| Name of Debtor:<br>LOS ANGELES TIMES COMMUNICATIONS LLC | Case Number:<br>08-13185(KJC) |
| --- | --- |

*NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

| | |
| --- | --- |
| Name of Creditor (the person or other entity to whom the debtor owes money or property):<br>VINCE COMPARSI | ☐ Check this box to indicate that this claim amends a previously filed claim. |
| Name and address where notices should be sent:<br><br>VINCE COMPARSI<br>2166 W. GENERAL AVE.<br>RANCHO PALOS VERDES, CA 90275<br><br>Telephone number:<br>(310) 547-5802 | **Court Claim Number:**_____<br>*(If known)*<br><br>Filed on:_____ |
| Name and address where payment should be sent (if different from above):<br><br><br><br>Telephone number: | ☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br><br>☐ Check this box if you are the debtor or trustee in this case. |

| | |
| --- | --- |
| **1. Amount of Claim as of Date Case Filed:**   $          1,560,043.00<br><br>If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.<br><br>If all or part of your claim is entitled to priority, complete item 5.<br><br>☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges. | **5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.**<br><br>Specify the priority of the claim. |
| **2. Basis for Claim:**   SEE ATTACHED RIDER<br>(See instruction #2 on reverse side.) | ☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B). |
| **3. Last four digits of any number by which creditor identifies debtor:** _____<br><br>   **3a. Debtor may have scheduled account as:** _____<br>      (See instruction #3a on reverse side.) | ☑ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. §507 (a)(4). |
| **4. Secured Claim (See instruction #4 on reverse side.)**<br>Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.<br><br>Nature of property or right of setoff:  ☐Real Estate  ☐ Motor Vehicle  ☐ Other<br>Describe:<br><br>Value of Property:$_____  Annual Interest Rate_____%<br><br>Amount of arrearage and other charges as of time case filed included in secured claim,<br><br>if any: $_____   Basis for perfection: _____<br><br>Amount of Secured Claim: $_____   Amount Unsecured: $_____ | ☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).<br><br>☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).<br><br>☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8). |
| **6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. | ☐ Other – Specify applicable paragraph of 11 U.S.C. § 507 (a)(__). |
| **7. Documents:** Attach redacted ⌐ orders, invoices, itemized stateme⌐ You may also attach a summary. a security interest. You may also<br><br>DO NOT SEND ORIGINAL DO⌐ SCANNING.<br><br>If the documents are not available, please explain: | Filed: USBC - District of Delaware<br>Tribune Company, Et Al.<br>08-13141 (KJC)    0000003589 | ...ssory notes, purchase security agreements. rfection of ...ed" on reverse side.) ...⌐YED AFTER | **Amount entitled to priority:**<br><br>$_____<br><br>*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date... |
| Date:<br>6/1/09 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.<br><br>*(signature)*   ( VINCE COMPARSI ) | FILED/RECEIVED<br><br>JUN 05 2009<br><br>...SOLUTIONS, LLC |

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

RIDER TO PROOF OF CLAIM OF

VINCE COMPARSI

## Fact Summary

Vince Comparsi started working for the Los Angeles Times as paper distributer in 1972.    For the next 36 years he continued working for the Los Angeles Times as newspaper deliverer and later as supervisor of other newspaper deliverers.    Until 2007 he was paid directly by the Los Angeles Times.  In 2007, the Los Angeles Times executed a distribution contract with Compy Distribution Inc. ( "Compy" ) to distribute papers over the routes previously worked by Vince. From October 2007 to November, 2008,  Vince Comparsi worked for Compy supervising the deliverers working for Compy.   In November 2008,   the Los Angeles Times elected not to renew Compy's distribution contract and after 36 years Vinces Comparsi services for the Los Angeles Times terminated.     Vince is currently 64 years old

## Summary of Claim

Vince Comparsi qualified as an employee under the Los Angeles Times pension plan during his 36 years of service working for the Los Angeles Times on the Los Angeles Times' property where his work was subject to the rules and supervision imposed by Los Angeles Times.  Vince Comparsi claims that  he has been harmed by Los Angeles Times error in their failure to classify him as a employee  under the retirement plan in an amount equal to the present value of the retirement payments he would be getting under the Los Angeles Times pension plan if he had been correctly identified as an employee.   We have projected the present value of this damage based upon retirement payments of 80% of $139,000 over his life expectancy of 21 years and applying the long term federal rate of 4% as a discount rate.    The $139,000 reflects the income earned by Vince in 2002 and is the second largest income received by Vince during the period from 2002 to 2006.   The average income received by Vince from Los Angeles times from 2002 to 2006 was $119,000.

# LOS ANGELES TIMES

## DISTRIBUTOR AGREEMENT

## HOME DELIVERY

Distributor Agreement ("Agreement") dated ___October 5, 2006___ to become effective on ___October 9, 2006___ is made and entered into between the Los Angeles Times, ("the Company") and ___Vince Comparsi___, ("Distributor").

The Company is engaged in the business of printing and publishing the Los Angeles Times, a newspaper published seven days a week. The Company sells the newspaper directly to home delivery subscribers in accordance with the terms of sale established by the Company. Distributor is in the business of delivering products and possesses specialized skills and trained personnel, as well as the necessary tools, equipment and vehicles to deliver products. The Company desires to retain the services of Distributor as an independent contractor to deliver the Los Angeles Times to the Company's home delivery subscribers and targeted households as well as certain other publications or other materials. Distributor desires to render such services to the Company, in accordance with the provisions of this Agreement.

Now, therefore, the parties agree as follows:

1. **Distributor Obligations**

(a) Distributor agrees to deliver the Los Angeles Times, including all attachments and inserts, ("Newspaper") to recipients ("Subscribers") as designated by the Company in a list containing the name and address of each Subscriber and designating the type of service which each Subscriber is to receive ("Active Subscriber List"). The Company will supply Distributor with additions to, deletions from, or other changes in the Active Subscriber List ("Daily Updates") so as to keep the list current. Distributor agrees to execute all orders to stop, start or adjust deliveries on the date specified in the Daily Updates. Distributor shall notify the Company of any delivery discrepancies, such as "no such address" or "wrong apartment number" or any other correction in subscriber information in the Daily Updates promptly so Distributor and/or Company can make the appropriate correction to their records. The Company will provide Distributor with an updated Active Subscriber List every five weeks or as otherwise may be required and Distributor shall reconcile its actual delivery records and notify the Company promptly of any discrepancies so that the Company and/or Distributor can make the appropriate correction to the subscriber information.

(b) Distributor agrees to deliver Newspapers ("Bonus Day Newspapers") to recipients who are not subscribers for that delivery date, on days and in areas designated by the Company for Bonus Days.

(c) Distributor agrees to deliver the Newspaper to additional recipients and/or to deliver other products ("Other Material"), as described in Addendums to this Agreement. Company may add or delete such Addendums to this Agreement from time to time upon giving Distributor a minimum of 3 days notice.

(d) Distributor agrees to receive from Company and provide to Company subscriber information, including the Active Subscriber List, Daily Updates, and other subscriber information, in electronic form compatible with the Company's software program and to maintain a current and accurate record of all Subscribers and recipients of Other Material, including name, address, account number, material to be delivered, frequency of delivery, delivery order, and Subscriber delivery requests (the "Subscriber Records"). The Active Subscriber List, Daily Updates, and Subscriber Records will remain the exclusive property of the Company. Distributor agrees to provide a current copy of all of the Subscriber Records to the Company every 30 days or more frequently upon request through electronic transmission or computer discs in order to allow a complete reconciliation with the Company's ICIS system.

(e) Distributor agrees to prepare, assemble in the correct order, package and deliver complete copies of the Newspaper and Other Material to meet marketing or advertising specifications or reasonable requests of the Subscribers.

(f) Distributor agrees to deliver the Newspaper and Other Material in a dry and untorn condition to each designated recipient in a convenient and proper place acceptable to each recipient, by no later than 6:00 a.m. on weekdays, 7:00 a.m. on Saturdays and 8:00 a.m. on Sundays. When the Company informs Distributor prior to 10:30 a.m. on weekdays and Saturday and 11:30 a.m. on Sundays that a Newspaper or Other Material has not been delivered, or has been delivered in an unacceptable condition (a "Service Error"), Distributor will deliver a copy of the Newspaper or Other Material to any such designated recipient as soon as possible after being informed of the need for such redelivery by the Company, and in any event, within 45 minutes of being informed on weekdays and Saturdays and within 90 minutes of being informed on Sundays. Distributor must be accessible by a pager system compatible with the Company's software program. In the event of a disruption in electronic communication, it is the responsibility of Distributor to contact the Company to provide an alternative method for communication.

(g) Distributor agrees to use Distributor's best efforts to maintain the penetration of the Los Angeles Times and to promote the sale of home delivery subscriptions to the Los Angeles Times so as to increase its penetration in the delivery area. Distributor further agrees not to take any action that would adversely impact the Company's single copy sales or its relationship with subscribers, advertisers, customers or any other member of the community.

(h)    Distributor agrees to not stamp upon, insert in or attach to copies of the Newspaper or the Other Material, or their plastic bags or other wrappers, any advertising or other matter that is not furnished to Distributor by the Company, except with the prior written consent of the Company.

(i)    Distributor agrees to not impose any charge upon the home delivery subscriber or other recipient for delivery or other services rendered pursuant to this Agreement.

(j)    Distributor agrees not to receive any telephone calls directly from the Subscribers or other recipients regarding delivery complaints or other customer service matters unless authorized by the Company.

(k)    Distributor agrees to promptly respond to requests for information received from the Company regarding the performance of this Agreement.

(l)    Distributor agrees to accept delivery of Newspapers and Other Material at the delivery location set forth in Exhibit B, in a safe and accessible area to facilitate access by the delivery personnel and vehicles of the Company. Distributor is not required to rent or use a Distribution Center location that may be offered to Distributor. Distributor shall maintain the delivery location in a safe and clean condition. If the Company determines that delivery to the delivery location would not be safe, (unsafe shall include the presence of unauthorized personnel in or around the delivery zone), or in the event of a force majeure or other emergency, the Company may require Distributor to pick up the Newspapers and Other Material at an alternative delivery location.

(m)    Distributor agrees to notify the Company of any shortages, overages or damaged copies of the Newspaper or Other Material as soon as practical after delivery by the Company to Distributor, and in any event shall notify the Company of any such shortages, overages, or damaged copies or any failure to deliver by the deadlines set forth in the Company's delivery schedule in effect at the time. Distributor shall, if necessary, pick up replacement Newspapers to cover shortages or damaged copies at a designated location.

(n)    Distributor agrees to comply with all Audit Bureau of Circulations ("ABC") requirements, including security procedures and secured storage of Newspapers (including pre-printed coupons) and Distributor shall cooperate with the Company and ABC in all audit and verification procedures. Pursuant to current ABC reporting requirements, Distributor shall provide Company with hard copy delivery route list for ABC "paragraph 3" or other audited or reporting dates, such dates to be provided to Distributor by the Company from time to time. All undelivered Newspapers and preprinted coupons will be securely recycled or otherwise destroyed.

2.    **Fees**

In consideration of the delivery and other services to be provided by Distributor pursuant to this Agreement, The Company agrees to pay Distributor the fees

3

set forth in Exhibit A and any Addendums.. Fees shall be payable two weeks after the close of the period to which the fees relate.

3.    **Term of Agreement**

(a)    Unless otherwise terminated as provided herein, this Agreement shall continue in effect from the effective date and shall terminate on    October 14, 2007.

(b)    Either party may terminate this Agreement at any time by delivering not less than 30 days prior written notice to the other party.

(c)    Either party may terminate this Agreement immediately upon written notice of termination to the other party in the event of a material breach of this Agreement, including but not limited to unacceptable product packaging and delivery, the failure to timely redeliver Service Errors, or the failure of Distributor to maintain acceptable customer relations or service levels as set forth in Exhibit C.

(d)    The death or incapacity of Distributor while this Agreement is in effect shall constitute an immediate termination of this Agreement and no rights hereunder shall pass to any representative of the deceased or incapacitated Distributor or to the deceased Distributor's estate.

4.    **Delivery Area**

The area in which Distributor will render the delivery described in this Agreement ("Delivery Area") is set forth in Exhibit B. Distributor acknowledges that the Delivery Area shall be non-exclusive. Distributor hereby renounces any and all claim of property rights, proprietary rights or ownership rights of whatever nature in the Delivery Area, and any and all claim to monies or profits collected or generated from or in connection with Newspaper sales in the Delivery Area prior to, during or after the term of this Agreement. Distributor covenants not to sue the Company for any claim based upon property rights, proprietary rights or ownership rights of whatever nature in the Delivery Area.

5.    **Confidentiality**

(a)    Distributor will not exhibit the Active Subscriber List or Subscriber Records, will keep such information secure and will not disclose any information contained therein or relating to the identity or address of any person or entity who subscribes to the Newspaper or otherwise receives any Newspapers or Other Material to any person or entity other than authorized representatives of the Company or the employees or other persons engaged by Distributor who require this information in order to deliver the material or otherwise comply with this Agreement. Distributor further agrees that Distributor will not directly or indirectly use the Active Subscriber List or Subscriber Records for the delivery of any other product or material that is not provided by the Company.

4

(b)     In the event of the termination of this Agreement in any manner, Distributor agrees to promptly and prior to the effective date of termination deliver to the Company all copies of the Active Subscriber Lists and Subscriber Records and any portion thereof and deliver to the Company any other records, keys, pass-cards, code numbers, materials and information needed for adequate delivery to subscribers and the recipients of the Other Material.

(c)     Distributor will not distribute, use or disclose the contents of any Newspaper, Other Material, or any pre-printed section or advertisement prior to the scheduled delivery date.

(d)     Distributor agrees that any breach of Distributor's obligations under Paragraphs 5(a), 5(b) or 5(c) of this Agreement will result in irreparable injury to the Company and therefore consents to entry of a restraining order, injunction and/or order of replevin by any court of competent jurisdiction restraining such breach, without prejudice to any other right or remedy, including damages to which the Company may be entitled.

6.     **Independent Contractor Relationship**

(a)     Distributor is a self-employed independent contractor and not an employee of the Company. Distributor shall be treated as an independent contractor and a direct seller and not as an employee for Federal, state or local tax purposes under all applicable laws, including but not limited to 26 U.S.C. Section 3508, with respect to the services described in this Agreement. Distributor understands and agrees that Distributor shall not be entitled to any benefits under the employee benefit plans of the Los Angeles Times, regardless of any characterization or recharacterization of Distributor's status by any governmental agency or court. Distributor will have the right to operate Distributor's business as Distributor chooses. Distributor shall hire Distributor's own employees and shall have the right to engage such other personnel as Distributor may deem necessary or desirable and Distributor shall exercise the sole and exclusive control and supervision of all said persons. In addition, Distributor is free to engage in such other business activities as Distributor may desire to pursue, including delivering other publications or products, so long as any other business activities do not delay or otherwise interfere with Distributor's performance hereunder, or violate any provision of this Agreement. Distributor will be responsible for the costs of conducting and operating Distributor's business and will comply with all applicable laws, including the Immigration Reform and Control Act of 1986. The Company is interested only in the results to be obtained by Distributor as described in this Agreement, and the manner and means to be employed by Distributor are matters entirely within the authority and discretion of Distributor, over which the Company has no authority or jurisdiction.

(b)     Distributor will pay all payroll taxes and contributions for unemployment insurance and pensions or annuities and any other payment which may now or hereafter be required as measured by the wages, salaries, or other remuneration paid to employees or others engaged by Distributor in the performance of this Agreement and will file all required returns relating hereto. The fees payable to Distributor under this Agreement have been established on the basis that Distributor is

an independent contractor and is responsible for the payments of all taxes, payments or contributions described above. Distributor agrees to reimburse the Company for any and all such taxes, payments, or contributions which the Company may be required to pay by ruling, regulation, court decision or otherwise on account of any employee or others engaged by Distributor.

(c)     Distributor shall not use, as part of the name under which Distributor's business is conducted, or display on any of Distributor's vehicles, equipment or facilities, the name "Los Angeles Times" or any other trademark, trade name, service mark, or other word, mark or design which the Company may use in connection with the newspaper or in the conduct of its business or which is confusingly similar thereto, without the prior consent of the Company.

7.     **Indemnification and Insurance**

(a)     Distributor shall hold harmless, indemnify and keep indemnified, with acceptable counsel, the Company, its officers, employees, agents, successors and assigns from and against all losses, claims, demands, liabilities, damages, expenses, costs, charges, expert and attorney fees and court costs suffered, sustained or incurred by reason of or arising out of Company having entered into this Agreement with Distributor; Distributor's failure to pay when due amounts, or perform when due any of its obligations, responsibilities, or undertakings under the Agreement; and/or Distributor's performance under the Agreement, including the performance by any other person or entity retained in any fashion by Distributor to perform under this Agreement or otherwise subject to the supervision of Distributor, whether or not Distributor or such retained party is negligent or otherwise at fault. This indemnity shall extend to claims of all kinds without limitation, including but not limited to claims for injury, death, property damage, defamation, invasion of privacy, assault, battery, breach of contract, and violation or environmental and land use laws and regulations. This indemnity shall be enforceable even if the active or passive negligence or fault of Company contributes as a cause of the events out of which the claim for indemnity arises, except only where such events arise from the sole negligence or willful misconduct of Company. Distributor hereby covenants and agrees that Distributor will not file, or cause to be filed, any suit against the Company founded on any claim for damage or liability whatsoever for or on account of any such claim, loss, damage, expense or injury. Distributor shall inform Company of any claims or lawsuits filed against Distributor or its employees and/or any other person or entity retained in any fashion by Distributor to perform under this Agreement or otherwise subject to the supervision of Distributor related to the services to be provided under this Agreement, and shall provide Company copies of such claims or lawsuits and all other relevant documentation upon request.

(b)     Distributor agrees that Distributor will carry Workers' Compensation Insurance for the benefit of Distributor's employees, in accordance with the laws of the State of California, and will maintain business insurance policies with insurance carriers acceptable to the Company to cover comprehensive general and automobile liability (bodily injury and property damage, including Broad Form Contractual Liability specifying this Agreement, including defense costs), with no exclusions, protecting Distributor and the Company, including coverage for the operation of all motor vehicles

6

used by Distributor, Distributor's employees and/or any other person or entity retained in any fashion by Distributor to perform under this Agreement or otherwise subject to the supervision of Distributor. All liability insurance shall be written with a combined single limit of not less than $1,000,000 for comprehensive general and not less than $500,000 for automobile liability. Automotive liability insurance coverage must include owned, non-owned and hired automobiles. The Company (under its name: Los Angeles Times Communications, LLC) shall be named as an additional insured with a separate endorsement under said liability coverage as to any claim or claims for damage or injury to persons or property resulting from or growing out of the performance of the Agreement by Distributor, Distributor's employees or any other person or entity retained in any fashion by Distributor to perform under this Agreement or otherwise subject to the supervision of Distributor. Distributor shall provide the Company the certificates of insurance and endorsement evidencing such coverage and specifying that the insurance coverage shall not be canceled without providing a 30-day prior written notice of cancellation to the Company prior to commencing any service under this Agreement. In the event the Company receives a 30-day notice of cancellation of any of the insurance required herein, and Distributor fails to provide the Company with a new valid certificate of insurance and endorsement at least 20 days prior to the cancellation date set forth in the 30-day notice, the Company shall have the right to give Distributor notice of termination of this Agreement, with such termination date to be the cancellation date set forth in the 30-day notice.

8.  **Notices**

       All notices required by this Agreement shall be in writing. Notices from Distributor to the Company shall be delivered or mailed to Central Division Manager, 202 W. 1st Street, Los Angeles, California 90012, with a copy to the Director of Home Delivery Distribution, 202 W. 1st Street, Los Angeles, California 90012. Notices from the Company to Distributor shall be delivered or mailed to Distributor's address as it appears on the records of the Company.

9.  **No Fee**

       The Company does not charge a fee for a distributor area and Distributor has not paid any sum and has no obligation to make a payment to the Company as consideration for entering into this Agreement.

10.  **Arbitration**

       Any dispute, controversy or claim arising out of or concerning or relating to this Agreement or its breach, interpretation, performance or non-performance shall be resolved by arbitration in Los Angeles, California before a single arbitrator in accordance with the rules then in effect of the American Arbitration Association. Such arbitrator shall be a retired judge. Judgment of the award rendered, which may include an award of damages, may be entered in any court having jurisdiction.

7

11.  **Non-Waiver**.

The failure of either party at any time to require performance by the other party of any provision of this Agreement shall in no way affect the full right to require such performance at any time thereafter, nor shall the waiver by either party of a breach of any provision of this Agreement constitute a waiver of any succeeding breach of the same or any other provision nor constitute a waiver of the provision itself.

12.  **Assignability**

Distributor will not assign or otherwise transfer this Agreement or any right or interest herein without obtaining the prior written consent of the Company. Distributor acknowledges that any attempt to effect such an assignment or other transfer without the prior written consent of the Company shall be void, of no effect whatsoever and shall create no rights of any kind in the person to whom the same shall be made. Distributor may not assign any term of this Agreement for payment or other value received. Any assignment of this Agreement shall be subject to all terms and conditions hereof, including its termination provisions.

13.  **Entire Agreement**

This Agreement, including Exhibits A, B, and C and all Addendums, all of which are incorporated into this Agreement by this reference, is the entire agreement between the parties and shall supersede all previous written or oral agreements or representations. Any subsequent modification of this Agreement must in writing, signed by both parties. This Agreement shall be governed by the laws of the State of California.

IN WITNESS WHEREOF, this Agreement has been executed by Distributor and the authorized representative of the Company.

LOS ANGELES TIMES

By:_____

Brian Davis, Director
Home Delivery Distribution

DISTRIBUTOR

By:_____

Vince Comparsi

8

# Exhibit A

Fees are paid based on the following, calculated by week:

(I)   $ __.3541__ for draw levels 1 to __29,094__ of each daily (Monday through Saturday weekly total) copy of the Newspaper delivered to home delivery subscribers serviced by Distributor,

(ii)   $ __.0870__ for draw levels __29,095__ or more of each daily (Monday through Saturday weekly total) copy of the Newspaper delivered to home delivery subscribers serviced by Distributor,

(iii)   $ __.3541__ for draw levels 1 to __8,155__ of each Sunday (weekly total) copy of the Los Angeles Times delivered to home delivery subscribers serviced by Distributor, and

(iv)   $ __.0870__ for draw levels __8,156__ or more of each Sunday (weekly total) copy of the Los Angeles Times delivered to home delivery subscribers serviced by Distributor.

## Additional Fees

.2095 (i)   For the delivery of Bonus Day Newspapers, Distributor shall receive a fee of $ .2486 for each daily and Saturday Newspaper and $ __.4015__ for each Sunday Newspaper delivered.

(ii)   For the insertion of special Company-designated part(s) or advertising piece(s) ("Extra Part"), excluding Toppers or Special Handling Extra Parts, Distributor shall receive a fee of $6.00 per 1,000 of such Extra Part Insertions.

(iii)   For the placement of an Extra Part onto the top of any Newspaper ("Topper") or for special packaging or handling of an Extra Part ("Special Handling"), Distributor shall receive a fee of $10.00 per 1,000 of such Topper placements or Special Handling on daily and Saturday Newspapers and a fee of $15.00 per 1,000 such Topper placements or Special Handling on a Sunday Newspaper.

(iv)   For packaging with a band ad, Distributor shall receive a fee of $30.00 per 1,000 of such band ads.

9

**Exhibit B**

Delivery Location   5540 West Century Blvd, Unit #1, Los Angeles CA   90045

Delivery Area   #282

Distributor 282 will serve zip codes 90248, 90260, 90278 and 90504 in their entirety.

As per pages 763, 764, 732 and 733 of the Los Angeles and Orange Counties Street Guide 2006.

In the event of a zip code boundary change, we reserve the right to amend the above boundary description, upon notice.

AGREED:

Los Angeles Times

_____

Vince Comparsi

Brian Davis, Director
HD Distribution

10

# EXHIBIT C

Distributor's goals should be to minimize customer complaints.

The maximum service complaints levels for Distributor in connection with the delivery of Newspaper will be based on a Key Indicator Goal of __2.65__ for the daily Newspaper and __4.69__ for the Sunday Newspaper. The Company shall provide Distributor with Key Indicator Goal information on a weekly basis.

The maximum service complaints levels for Other Material are set forth below:

| | | |
|---|---|---|
| Weekly Variety | __1.70__ | total calls per 1000 |
| Jewish Journal | __2.00__ | total calls per 1000 |
| Investor's Business Daily | __2.00__ | total calls per 1000 |
| Los Angeles Sentinel | __3.50__ | total calls per 1000 |

11

# ADDENDUM ___1___

**Description of Other Material:** The Jewish Journal, including any special inserts to such Other Material as may be provided from time to time.

**Delivery of Other Material.** Distributor will deliver copies of Other Material to recipients designated by the Company from time to time on the days designated by the Company.

**Term of Addendum :** October 9, 2006, until terminated by the Company.

**Special Delivery Instructions:** Distributor shall complete all subscriber deliveries, enclosed in a (non Los Angeles Times) polybag by 8:00 a.m. Thursday mornings. In the event subscriber copies do not arrive by 11:00pm Wednesday, and with the Company's District Manager's authorization, Distributor shall deliver the Publication by 8:00 a.m. on Friday. Distributor agrees to redeliver any non-delivered subscriber copies on the day the non-delivery complaint is received by Publisher, providing Distributor receives the redelivery request prior to 10:30 a.m. **No redelivery shall occur on Saturday.**

**Maximum Service Complaint Level:** ___2.00 total calls per 1000___

**Delivery Fees:** The Company will pay Distributor ___.2400___ ¢ for each daily (Monday through Saturday) copy of Other Material delivered by Distributor pursuant to this Addendum ___1___ .

**Indemnification/Insurance.** Distributor shall hold harmless, indemnify, and keep indemnified The Jewish Journal its officers, employees, agents, successors and assigns from and against all losses, claims, demands, liabilities, damages, expenses, costs, charges, expert and attorney fees and court costs suffered, sustained or incurred by reason of or arising out of Distributor's performance under the Agreement, including the performance by any other person or entity retained in any fashion by Distributor to perform under this Agreement or otherwise subject to the supervision of Distributor, whether or not Distributor or such retained party is negligent or otherwise at fault. This indemnity shall extend to claims of all kinds without limitation, including but not limited to claims for injury, death, property damage, defamation, invasion of privacy, assault, battery, breach of contract, and violation or environmental and land use laws and regulations. This indemnity shall be enforceable even if the active or passive negligence or fault of The Jewish Journal contributes as a cause of the events out of which the claim for indemnity arises, except only where such events arise from the sole negligence or willful misconduct of The Jewish Journal. Distributor hereby covenants and agrees that Distributor will not file, or cause to be filed, any suit against The Jewish Journal founded on any claim for damage or liability whatsoever for or on account of any such claim, loss, damage, expense or injury. The Jewish Journal shall be named as an additional insured under the insurance for liability coverage Distributor has pursuant to the Agreement. Distributor shall provide the Company the certificates of insurance and endorsement evidencing such coverage and specifying that the insurance coverage required by this Paragraph shall not be canceled without providing a 30-day prior written notice of cancellation to the Company.

## ADDENDUM __2

**Description of Other Material:** Investor's Business Daily, including any special inserts to such Other Material as may be provided from time to time.

**Delivery of Other Material.** Distributor will deliver copies of Other Material to recipients designated by the Company from time to time on the days designated by the Company.

**Term of Addendum :** October 9, 2006, until terminated by the Company.

**Delivery By Distributor:** Distributor shall complete all subscriber deliveries by 6:00 a.m. Tuesday-Friday, and by 7:00 a.m. Saturday (Saturday delivery is for Monday editions of Publisher's newspapers). Distributor agrees to deliver the Monday editions on Saturdays, but in no event later than Distributor's normal delivery time either on Sunday or Monday. Distributor acknowledges that for some "office" deliveries, papers will have to be delivered on Monday by 6:00 a.m. In the event subscriber copies do not arrive on time for distribution on the current day, Distributor agrees to deliver said copies to subscribers on the next delivery in conjunction with its normal deliveries. In this event, Distributor will receive his or her regular per copy fee as set forth below. Distributor agrees to redeliver any non-delivered subscriber copies on the day the non-delivery complaint is received by Publisher, providing Distributor receives the redelivery request prior to 10:00 a.m.

**Special Delivery Instructions:** Investor's Business Daily, and all inserts, will be enclosed in designated plastic bags for delivery to subscribers each and every publishing day. Such bags will be supplied to the Distributor.

**Maximum Service Complaint Level:** __2.00 total calls per 1000

**Delivery Fees:** The Company will pay Distributor __.1800 ¢ for each daily (Monday through Saturday) copy of Other Material delivered by Distributor pursuant to this Addendum __2 .

**Indemnification/Insurance.** Distributor shall hold harmless, indemnify, and keep indemnified Investor's Business Daily its officers, employees, agents, successors and assigns from and against all losses, claims, demands, liabilities, damages, expenses, costs, charges, expert and attorney fees and court costs suffered, sustained or incurred by reason of or arising out of Distributor's performance under the Agreement, including the performance by any other person or entity retained in any fashion by Distributor to perform under this Agreement or otherwise subject to the supervision of Distributor, whether or not Distributor or such retained party is negligent or otherwise at fault. This indemnity shall extend to claims of all kinds without limitation, including but not limited to claims for injury, death, property damage, defamation, invasion of privacy, assault, battery, breach of contract, and violation or environmental and land use laws and regulations. This indemnity shall be enforceable even if the active or passive negligence or fault of Investor's Business Daily contributes as a cause of the events out of which the claim for indemnity arises, except only where such events arise from the sole negligence or willful misconduct of Investor's Business Daily. Distributor hereby

13

covenants and agrees that Distributor will not file, or cause to be filed, any suit against Investor's Business Daily founded on any claim for damage or liability whatsoever for or on account of any such claim, loss, damage, expense or injury. Investor's Business Daily shall be named as an additional insured under the insurance for liability coverage Distributor has pursuant to the Agreement. Distributor shall provide the Company the certificates of insurance and endorsement evidencing such coverage and specifying that the insurance coverage required by this Paragraph shall not be canceled without providing a 30-day prior written notice of cancellation to the Company.

## ADDENDUM   3

**Description of Other Material:**   The Weekly Variety, including any special inserts to such Other Material as may be provided from time to time.

**Delivery of Other Material.**   Distributor will deliver copies of Other Material to recipients designated by the Company from time to time on the days designated by the Company.

**Term of Addendum :**  October 9, 2006, until terminated by the Company.

**Special Delivery Instructions:**      Distributor shall complete all subscriber deliveries by 8:00 a.m. each Sunday morning, except for some "office" deliveries for which papers may have to be delivered on Monday by 6:00 a.m.  In the event subscriber copies do not arrive on time for distribution on the current day, and with the Company's District Manager's authorization, Distributor may deliver said copies to subscribers on the next delivery in conjunction with its normal deliveries. Distributor agrees to redeliver any non-delivered subscriber copies on the day the non-delivery complaint is received by Publisher, providing Distributor receives the redelivery request prior to 11:30 a.m. Sunday morning. Non-delivery complaints received after 11:30 a.m. may be delivered the next day.

The Weekly Variety, and all inserts, will be enclosed in a plastic bag for delivery to subscribers each and every day.

**Maximum Service Complaint Level:**       1.70 total calls per 1000

**Delivery Fees:**   The Company will pay Distributor   .2600 ¢   for each Sunday copy of Other Material delivered by Distributor pursuant to this Addendum   3 .

**Indemnification/Insurance.** Distributor shall hold harmless, indemnify, and keep indemnified The Weekly Variety its officers, employees, agents, successors and assigns from and against all losses, claims, demands, liabilities, damages, expenses, costs, charges, expert and attorney fees and court costs suffered, sustained or incurred by reason of or arising out of Distributor's performance under the Agreement, including the performance by any other person or entity retained in any fashion by Distributor to perform under this Agreement or otherwise subject to the supervision of Distributor, whether or not Distributor or such retained party is negligent or otherwise at fault. This indemnity shall extend to claims of all kinds without limitation, including but not limited to claims for injury, death, property damage, defamation, invasion of privacy, assault, battery, breach of contract, and violation or environmental and land use laws and regulations. This indemnity shall be enforceable even if the active or passive negligence or fault of The Weekly Variety contributes as a cause of the events out of which the claim for indemnity arises, except only where such events arise from the sole negligence or willful misconduct of The Weekly Variety. Distributor hereby covenants and agrees that Distributor will not file, or cause to be filed, any suit against The Weekly Variety founded on any claim for damage or liability whatsoever for or on account of any such claim, loss, damage, expense or injury. The Weekly Variety shall be named as an additional insured under the insurance for liability coverage Distributor has pursuant to the Agreement. Distributor shall provide the Company the certificates of insurance and endorsement evidencing such coverage and specifying that the insurance coverage required by this Paragraph shall not be canceled without providing a 30-day prior written notice of cancellation to the Company.

## ADDENDUM 4

**Description of Other Material:** Los Angeles Sentinel, including any special inserts to such Other Material as may be provided from time to time.

**Delivery of Other Material.** Distributor will deliver copies of Other Material to recipients designated by the Company from time to time on the days designated by the Company.

**Term of Addendum :** October 9, 2006; until terminated by the Company.

**Delivery By Distributor:** Distributor shall complete all subscriber deliveries by 10:00 a.m. Thursday. In the event subscriber copies do not arrive on time for distribution on the current day by 11:00 a.m. at the dropsite or designated drop location, Distributor agrees to deliver said copies to subscribers on the next delivery in conjunction with its normal deliveries. In this event, Distributor will receive his or her regular per copy fee as set forth below. Distributor agrees to redeliver any non-delivered subscriber copies on the day the non-delivery complaint is received by Publisher, providing Distributor receives the redelivery request prior to 10:00 a.m.

**Special Delivery Instructions:** Distributor will label and/or enclose Los Angeles Sentinel in designated plastic bags for delivery to subscribers each and every publishing day. Labeling and/or bagging requirements will be indicated through the Willowbend system. Bags will be supplied to the Distributor.

**Maximum Service Complaint Level:**    3.50 total calls per 1000

**Delivery Fees:** The Company will pay Distributor    1800  ¢ for each daily (Monday through Saturday) copy of Other Material delivered by Distributor pursuant to this Addendum  4 .

**Indemnification/Insurance.** Distributor shall hold harmless, indemnify, and keep indemnified Los Angeles Sentinel, its officers, employees, agents, successors and assigns from and against all losses, claims, demands, liabilities, damages, expenses, costs, charges, expert and attorney fees and court costs suffered, sustained or incurred by reason of or arising out of Distributor's performance under the Agreement, including the performance by any other person or entity retained in any fashion by Distributor to perform under this Agreement or otherwise subject to the supervision of Distributor, whether or not Distributor or such retained party is negligent or otherwise at fault. This indemnity shall extend to claims of all kinds without limitation, including but not limited to claims for injury, death, property damage, defamation, invasion of privacy, assault, battery, breach of contract, and violation or environmental and land use laws and regulations. This indemnity shall be enforceable even if the active or passive negligence or fault of Los Angeles Sentinel contributes as a cause of the events out of which the claim for indemnity arises, except only where such events arise from the sole negligence or willful misconduct of Los Angeles Sentinel. Distributor hereby covenants and agrees that Distributor will not file, or cause to be filed, any suit against Los Angeles Sentinel founded on any claim for damage or liability whatsoever for or on account of any such claim, loss, damage, expense or injury. Los Angeles Sentinel shall be named as an additional insured under the insurance for liability coverage Distributor has pursuant to the Agreement. Distributor shall provide the Company the certificates of insurance and endorsement evidencing such coverage and specifying that the insurance coverage required by this Paragraph shall not be canceled without providing a 30-day prior written notice of cancellation to the Company.

# SUBLEASE AGREEMENT

THIS SUBLEASE AGREEMENT (this "Sublease") is made and entered into on this __9th__ day of __October, 2006__ by and between the Los Angeles Times, 202 West 1st Street, Los Angeles, California 90012, as Sublessor (hereinafter referred to as "Sublessor") and __Vince Comparsi__, as Sublessee (hereinafter referred to as "Sublessee").

WHEREAS, Sublessor has leased certain premises located at __5540 West Century Blvd, Los Angeles CA 90045__ (the "Premises").

WHEREAS, Sublessee desires to sublease from Sublessor and Sublessor desires to sublease to Sublessee to sublease to Sublessee a portion of such premises, as described below;

NOW, THEREFORE, in consideration of the rents, covenants and agreements hereinafter set forth, the parties hereby agree as follows:

1. <u>Sublet Premises</u>

The Sublessor shall Sublease to Sublessee, and Sublessee shall Sublease from Sublessor, clean and free of debris but otherwise in its existing condition, AS-IS, WHERE-IS and with all faults and defects, and subject to the terms of the Master Lease (the "Master Lease"), for the term and upon the conditions hereinafter provided, approximately __10,579__ square feet of rentable area within the Premises, known as __Unit #1__, such area hereinafter referred to as the ("Sublet Premises"). The Sublet Premises are outlined in red (or crosshatched) on the plan attached hereto and made a part hereof as Exhibit A. The Sublet Premises shall be used and occupied only for office and the warehousing and distribution of newspapers. Sublessee hereby acknowledges that Sublessor has not made, will not make and shall not be deemed to make any warranties or representations concerning the condition of the Sublet Premises or any undertakings to improve, alter or (except as expressly provided herein) repair the Sublet Premises for Sublessee, and that the foregoing disclaimer of warranties and representations and Sublessee's agreement to accept the Sublet Premises in its existing condition as of the sublease commencement date are a material consideration to Sublessor for this Sublease.

2. <u>Term</u>

The term of this Sublease shall be for a period beginning on __October 9, 2006__ and ending on __October 14, 2007__ provided however, that this Sublease shall automatically terminate upon the termination of the Distributor Agreement between Sublessor and Sublessee dated __October 5, 2006__ (the "Distributor Agreement").

3. <u>Rental</u>

The *rent to be paid for the Premises shall be $ 7,453.00 per month, as that amount may be adjusted from time to time in accordance with the Master Lease, payable every 2 weeks. The rent and other amounts payable to Sublessor by Sublessee will automatically be deducted by Sublessor from amounts payable to Sublessee under the Distributor Agreement. *Includes CAM charges All rent or other payment to Sublessor hereunder shall be paid without deduction or offset.

1

4. <u>Security Deposit</u>

Sublessee shall deposit with Sublessor upon execution of this Sublease as security the amount of $1,500.00. If Sublessee fails to pay rent or other charges due hereunder, Sublessor may use, apply or retain all or any portion of said deposit for the payment of any rent or any other charge in default or for the payment of any other sum which the Sublessor may spend or become obligated to spend by reason of Sublessee's default, or to compensate Sublessor for any loss or damage which Sublessor may suffer thereby. If Sublessor so uses or applies all or any portion of said deposit, Sublessee shall within five (5) days after demand therefor deposit to the full amount hereinbefore stated and Sublessee's failure to do so shall be a material breach of this Sublease. Sublessor shall not be required to keep said deposit separate from its general accounts. If Sublessee performs all of Sublessee's obligations hereunder, said deposit, or so much thereof as has not been theretofore applied by Sublessor, shall be returned, without payment of interest or other increment for its use, to Sublessee at the expiration of the term hereof, and after Sublessee has vacated the Premises. No trust relationship is created herein between Sublessor and Sublessee with respect to said security deposit.

5. <u>Compliance with Law</u>

Sublessee shall comply promptly with all applicable statutes, ordinances, rules, regulations, orders, restrictions of record, and requirements in effect during the term or any part of the term hereof regulating the use by Sublessee of the Premises. Sublessee shall not use nor permit the use of the Premises in any manner that will tend to create waste or a nuisance or, shall tend to disturb other tenants.

6. <u>Payment of Utility Charges</u>

Sublessee shall pay all charges for the furnishing of gas, electricity, water, telephone service, and other public utilities to the Premises and for the removal of garbage and rubbish from the Premises. Any utility or service not separately metered or billed for the Premises will be prorated by Sublessor.

7. <u>Personal Property Taxes</u>

Sublessee shall pay all taxes, assessments, or other charges levied or imposed by any governmental entity on the furniture, trade fixtures, appliances, and other personal property placed by Sublessee in, on, or about the Sublet Premises.

8. <u>Assignment and Subletting</u>

Sublessee shall not assign or sublet the Sublease without obtaining the prior written consent of Sublessor, which consent can be withheld in Sublessor's sole and absolute discretion. In the event Sublessee either assigns or sublets the Sublet Premises without the written consent of Sublessor, such an event shall constitute an incurable breach and this Sublease shall be terminated immediately.

9. <u>Maintenance</u>

Sublessee will keep and maintain the Premises and the fixtures and equipment therein in good working condition and repair, and will maintain the Premises in a clean, safe, and sanitary manner, will take good care thereof, will suffer no waste or injury thereto, and will, at the expiration of this Sublease, surrender the same broom clean and in

2

the same order and condition in which it was on the commencement of the term of this Sublease, ordinary wear and tear excepted. Sublessee will maintain the fire extinguishers provided by Sublessor on the Sublet Premises and will insure they meet all applicable codes, laws and ordinances, including the local fire department regulations. If Sublessee fails to perform Sublessee's obligations under this Paragraph 9, Sublessor may at its option (but shall not be required to) enter upon the Premises, after (10) days' prior written notice to Sublessee, and put the same in good order, condition and repair, and the cost thereof together with interest thereon at the maximum rate permitted by law shall become due and shall be collectible as additional rental to Sublessor together with Sublessee's next rental installment.

10. Tenant Improvement

Sublessee may make alterations, installations, additions, or improvements (herein collectively called "Alterations") in or to the Sublet Premises or Premises only with Sublessor's prior written consent, which consent shall be in Sublessor's sole and absolute discretion. The cost of such Alterations shall be the responsibility of Sublessee. Upon the expiration or earlier termination of this Sublease, Sublessee shall return the Sublet Premises to Sublessor in the same condition as the Sublet Premises were delivered by Sublessor to Sublessee, reasonable wear and tear excepted. Without limiting the generality of the foregoing, and at the option of Sublessor, Sublessee shall remove all of its Alterations, improvements, trade fixtures, equipment and personal property installed or affixed on our after the Sublease commencement date and repair all damage to the Sublet Premises caused by such removal.

11. Mechanic's Lien

If any mechanic's lien is filed against the Premises, or the real property of which the Premises are a part, for the work claimed to have been done for or materials claimed to have been furnished to Sublessee, such mechanic's lien shall be discharged by Sublessee within (10) days after Sublessee receives written demand to discharge said lien from Sublessor.

12. Entry for Repairs and Inspections

Sublessee will permit Sublessor, or its representative, to enter the Premises, at all reasonable times upon notice, except in the case of exigent circumstances or emergency, in which no notice is required, without charge therefore to Sublessor and without diminution of the rent payable by Sublessee, to examine, inspect and protect the Premises and to exhibit the same to prospective tenants. Sublessor reserves the right to enter upon the Premises at any time and to make any changes or alterations which may be considered by it necessary for the protection of the Premises or to render it and its appurtenances safe or to make changes in the plumbing, electrical wiring, air conditioning or appurtenances or facilities of the Premises and to make repairs, additions, or other structural changes in the Premises and to erect and maintain for any such purpose all necessary or proper scaffolding or other structures, and the action of Lessor in so doing for any of the purposes aforesaid, shall be construed as an eviction or as a disturbance of Sublessee, or Sublessee's tenancy, nor shall Sublessee be allowed any abatement of rent or damages for any injury or inconvenience occasioned thereby. Sublessee waives the provisions of Section 1941 and 1942 of the Civil Code of the State of California and all other statutes or law permitting a lessee to make

3

repairs at the expense of the Lessor or to terminate a lease by reason of the condition of the Premises.

13.  Insurance Rating

Sublessee will not conduct or permit to be conducted any activity or place any equipment in or about the Premises, which will increase in any way the rate of fire insurance or other insurance on the property of which the Premises is a part; and if any increase in the rate of fire insurance or other insurance is stated by any insurance company or by the applicable Insurance Rating Bureau to be due to activity or equipment in or about the Premises, such statement shall be conclusive evidence that the increase in such rate is due to such activity or equipment, and, as a result thereof, Sublessee shall be liable for such increase and shall reimburse Sublessor thereof.

14.  Indemnity

Sublessee and Sublessee Parties shall, at Sublessee's and Sublessee Parties' sole expense and with counsel reasonably acceptable to Sublessor, indemnify, defend, and hold harmless Sublessor and Sublessor Parties from and against any and all claims, losses, costs, damage, expenses, liabilities, liens, actions, causes of action (whether in tort or contact, law or equity, or otherwise), charges, assessments, fines, and penalties of any kind (including consultant and expert expenses, court costs, and attorneys fees actually incurred) from any cause, arising out of or relating (directly or indirectly) to this Sublease, the tenancy created under this Sublease, or the Premises, including, but not limited to, (i) the use or occupancy, or manner of use or occupancy, of the Premises by Sublessee or any Sublessee Parties; (ii) any act, error, omission, or negligence of Sublessee or any Sublessee Parties of any invitee, guest, or licensee of Sublessee in, on, or about the Premises; (iii) Sublessee's conducting of its business; (iv) any alterations, activities, work, or things done, omitted, permitted, allowed, or suffered by Sublessee or any Sublessee Parties in, at, or about the Premises, including the violation of or failure to comply with any applicable laws in existence on the commencement date or enacted, promulgated, or issued after the date of this Sublease; (v) arising out of or resulting from the release of any Hazardous Material in or about the Premises, by Sublessee or Sublessee's agents, contractors, or invitees; or (vi) any breach or default in performance of any obligation on Sublessee's part to be performed under this Sublease, whether before or during the term of the Sublease or after its expiration or earlier termination. This indemnification shall survive the expiration or termination of this Sublease.

Sublessee on its behalf and on behalf of Sublessee's officers, directors, owners, members, partners, licensees, brokers, Invitees, attorneys, independent contractors or any other person on or about the Premises as well as to all persons and entities claiming through any of these persons or entities (collectively, the "Sublessee Parties") hereby agrees that Sublessor and the partners, venturers, trustees, and ancillary trustees of Sublessor and the respective officers, directors, shareholders, members, parents, subsidiaries, and any other affiliated entities, personal representatives, executors, heirs, successors, assigns, licensees, invitees, beneficiaries, servants, and independent contractors of these persons or entities (collectively, the "Sublessor Parties") shall not be liable to Sublessee or any Sublessee Parties for any injury to or death of any person or loss of, injury or damage to, or destruction of any tangible or intangible property, including the resulting loss of use, economic losses, and consequential or resulting damage of any kind from any cause, and Sublessee and Sublessee Parties hereby waive any and all such claims (in law, equity, or otherwise) against Sublessor

4

and Sublessor Parties, except to the extent that a final judgment of a court of competent jurisdiction establishes that the injury, loss, damage, or destruction was proximately caused by Sublessor or that Sublessor Parties' fraud, willful injury to person or property, or violation of Law.

Sublessor shall have no responsibility or liability whatsoever, and Sublessee Parties hereby agrees to indemnify, defend and hold Sublessor Parties harmless from and against any and all claims, losses, costs, damage, expenses, liabilities, liens, actions, causes of action (whether in tort or contact, law or equity, or otherwise), charges, assessments, fines, and penalties of any kind (including consultant and expert expenses, court costs, and attorneys fees actually incurred) from any cause, arising out or relating (directly or indirectly) to the sharing of the Premises. The Sublessees shall be solely responsible for coordinating the use of the Premises, and all other personal property and for all other matters relating to the Premises. Each Sublessee shall leave the Premises, and all other personal property in a pristine, ready to use condition and in working order at all times. If any dispute arises between such Sublessees, or if the Premises are not ready due to a Sublessee, or if the Premises are not ready because one Sublessee has not properly cleaned or has not left the Premises in pristine condition, or any other event has occurred relating to one of the other Sublessee, then Sublessor shall have no responsibility or liability hereunder and none of the Sublessees shall have any rights or remedies against the Sublessor and shall look solely to the Sublessee breaching his agreements with such Sublessee.

15. Insurance

Sublessee shall obtain and keep in force a Commercial General Liability Policy of Insurance protecting Sublessee and Sublessor against claims for bodily injury, personal injury, advertising injury, and property damage based upon or arising out of Sublessee's business operations, conduct, assumed liabilities, the ownership, use, occupancy or maintenance of the Premises and all areas appurtenant thereto, which shall include (i) all the coverages typically provided by the Broad Form Comprehensive General Liability Endorsement, including broad form property damage coverage (which shall include coverage for completed operations), and (ii) premises operations coverage, products completed operations coverage, owners and contractors protective coverage (when reasonably required by Sublessor), and the broadest form of contractual liability coverage. Such insurance shall be on an occurrence basis providing single limit coverage in an amount not less that $1,000,000 per occurrence with an "Additional Insured-Managers or Sublessors of Premises Endorsement" and contain the "Amendment of the Pollution Exclusion Endorsement" for damage caused by heat, smoke or fumes from a hostile fire. The Policy shall not contain any intra-insured exclusions as between insured persons or organizations, but shall include coverage for liability assumed under this Sublease as an "insured contact" for the performance of Sublessee's indemnity obligations under this Sublease. The limits of said insurance shall not, however, limit the liability of Sublessee nor relive Sublessee of any obligation hereunder. All insurance carried by Sublessee shall be primary to and not contributory with any similar insurance carried by Sublessor, whose insurance shall be considered excess insurance only.

5

16.    Damage to the Sublet Premises

If the Sublet Premises shall be damaged by fire or casualty Sublessor shall not have any obligation to repair any damage to, or to replace Sublessee's property or any other property located in the Premises. Except as otherwise provided herein, if the Premises shall be rendered untenable by reason of any such damage, the rent shall abate for such period in the proportion which the area of the part of the Sublet Premises so rendered untenable bears to the total area of the Premises. Sublessor shall not be liable for injury to Sublessee's business or any loss of income therefrom or for damage to the goods, wares, merchandise or other property of Sublessee, Sublessee's employees, invites, customers, agents, contractors or any other person of Sublessee, whether such damage or injury is caused by or results from fire, steam, electricity, gas, water or rain, or from the breakage, leakage, obstruction or other defects of the physical structure, pipes, sprinklers, wires, appliances, plumbing, air conditioning or lighting fixtures, or from any other cause, whether the said damage or injury results from conditions arising upon the Premises or upon other portions of the building of which the Premises is a part, or from other sources or places, and regardless of whether the case of such damage or injury or the means of repairing the same is inaccessible to Sublessee. Sublessor shall not be liable for any damages arising from any act or neglect of any other tenant, of the building in which the Premises is located.

17.    Default of Sublessee

If Sublessee shall fail to pay any monthly installment of rent, or shall violate or fail to perform any of the other conditions, covenants or agreements herein made by Sublessee, and such failure shall continue for a period of ten (10) days after written notice thereof to Sublessee, or any violation or failure to perform any other conditions, covenants or agreements herein shall continue for a period of ten (10) days, after written notice thereof to Sublessee by Sublessor, then and in any of said events this Sublease shall, at the option of Sublessor, cease and terminate and shall operate as a notice to quit; any notice to quit or of Sublessor's intention to re-enter being hereby expressively waived, to recover possession under and by virtue of the provisions of the laws of the State of California, or by such other proceedings, including re-entry and possession, as may be applicable. If Sublessor elects to terminate this Sublease, everything herein contained on the part of Sublessor to be done and performed shall cease without prejudice, however, to the right of Sublessor to recover from Sublessee all rental accrued up to time of termination or recovery of possession by Sublessor, whichever is later. Should this Sublease be so terminated, the Premises may be relet by Sublessor for such rent and upon such terms as are not unreasonable under the circumstances, and, if the full rental herein above provided shall not be realized by Sublessor, Sublessee shall be liable for all damages sustained by Sublessor, including, without limitation deficiency in rent, reasonable attorneys' fees, brokerage fees, and expense of placing the Premises in first class rentable condition.

18.    Hazardous Materials

(a)    Hazardous Materials Defined. As used herein the term "Hazardous Materials" shall mean (i) any hazardous or toxic wastes, materials or substances, and any other pollutants or contaminants, which are or may become regulated by an applicable local, state or federal laws, including but not limited to, 33 U.S.C. Section 1251 et seq., 42 U.S.C. Section 6901 et seq., 42 U.S.C. Section 7401 et seq., 42 U.S. Co. Section 9601 et seq., and California Health and safety Code Section 25100 et seq., and 25300 et seq., California Water

6

Code, Section 13020 et. seq., or any successor(s) thereto (collectively "Environmental Laws"); (ii) petroleum; (iii) asbestos; (iv) polychlorinated biphenyls; (v) radioactive materials and (vi) any other hazardous material, substance or waste.

(b)     Use, etc., of Hazardous Materials. Sublessee agrees that during the term of this Sublease, there shall be no use, presence, disposal, storage, generation (collectively "Hazardous Use"), or intentional Release, as defined in 42 U.S.C. Section 9601 (22), or any successor(s) thereto, or threatened Release of Hazardous Materials on, from or under the Premises except to the extent that, and in accordance with such conditions as, Sublessee may have previously approved in writing. It is further agreed that Sublessee shall be entitled to use and store only those Hazardous Materials which are necessary for Sublessee's business, provided that such usage and storage is in full compliance with Environmental Laws, and all judicial and administrative decisions pertaining thereto. Sublessee shall not be entitled to install any tanks under, on or about the Premises for the storage of Hazardous Materials without the express written consent of Sublessor, which may be given or withheld in Sublessor's sole arbitrary judgment. For the purposes of this Paragraph 18, the terms Hazardous Use and Release shall include Hazardous Use(s) or Release(s) of Hazardous Materials on, form or under the Premises by Sublessee, any Sublessee Party or any other party that uses the Premises (except Sublessor), whether known or unknown to Sublessee, and whether occurring and/or existing during or prior to the commencement of the term of this Sublease.

(c)     Indemnification. Sublessee and Sublessee Parties shall indemnify, protect, defend and hold Sublessor and Sublessor Parties and the Premises, harmless from and against any and all damages, liabilities, judgments, costs, claims, liens, expenses, penalties, loss of permits and attorneys' and consultants' fees arising out of or involving any Hazardous Materials brought onto the Premises by or for Sublessee or any Sublessee Party or by any one under Sublessee's control. Sublessee's obligation under this Paragraph 18(c) shall include, but not be limited to, the effects of any contamination or injury to person, property or the environment created or suffered by Sublessee, and the cost of investigation (including consultants' and attorneys' fees and testing), removal, remediation restoration and/or abatement thereof, or of any contamination therein involved, and shall survive the expiration or earlier termination of this Sublease. No termination cancellation or release agreement entered into by Sublessor or Sublessee shall release Sublessee from its obligations under this Sublease with respect to Hazardous Materials, unless specifically so agreed by Sublessor in writing at the time of such agreement.

19.     Waiver

No waiver by Sublessor of any breach of any covenant, condition, or agreement herein contained shall operate as a waiver of such covenant, condition, or agreement itself, or of any subsequent breach thereof.

20.     Condemnation

If the Premises or any portion thereof are taken under the power of eminent domain, or sold under the threat of the exercise of said power (all of which are herein called "condemnation"),this Sublease shall terminate as to the parts taken as of the date the condemning authority takes title or possession, whichever first occurs. Any award for the taking of all or any part of the Premises under the power shall be the property of Sublessor,

7

whether such award shall be made as compensation for diminution in value of the leasehold or for the taking of the fee, or as severance damages; provided, however, that Sublessee shall be entitled to any award for loss of or damage to Sublessee's trade fixtures and removable personal property. In the event that this sublease is not terminated by reason of such condemnation, Sublessor shall to the extent of prorated severance damages received by Sublessor in connection with such condemnation, repair any damage to the Premises caused by such condemnation except to the extent that Sublessee has been reimbursed therefor by the condemning authority.

21. Late Charges

Sublessee hereby acknowledges that late payment of Sublessee to Sublessor of rent and other sums due here under will cause Sublessor to incur costs not contemplated by this Sublease, the exact amount of which will be extremely difficult to ascertain. Accordingly, if any installment of rent or any other sum due from Sublessee shall not be received by Sublessor or Sublessor's designee within five (5) days after such amount shall be due, then, without any requirement for notice to Sublessee, Sublessee shall pay to Sublessor a late charge equal to ten percent (10%) or Five Hundred Dollars ($500), whichever amount is greater, of such overdue amount. The parties hereby agree that such late charge represents a fair and reasonable estimate of the costs Sublessor will incur by reason of late payment by Sublessee. Acceptance of such late charge by Sublessor shall in no event constitute a waiver of Sublessee's default with respect to such overdue amount, nor prevent Sublessor from exercising any of the other rights and remedies granted hereunder.

22. Subordination

This Sublease is subject and subordinate to the lien of all and any mortgages (which term "mortgages" shall include deeds of trust and similar security instruments) which may now or hereafter encumber or otherwise affect the real estate of which the Premises form a part, and to all and any renewals, extensions, modifications, recastings or refinancings thereof. In confirmation of such subordination, Sublessee shall, at Sublessor's request, promptly execute any requisite or appropriate certificate or other document.

23. No Partnership

Nothing contained in this Sublease shall be deemed or construed to create a partnership or joint venture of or between Sublessor and Sublessee, or to create any other relationship between the parties hereto other than that of Sublessor and Sublessee.

24. Brokers

Sublessor and Sublessee each represent and warrant one to another that except as hereinafter set forth neither party has employed any broker in carrying on the negotiations relating to this Sublease. Sublessee shall indemnify and hold Sublessor harmless, from and against any claim or claims for brokerage or other commission arising from or out of any breach of the foregoing representation and warranty.

25. Notices

All notices or other communications hereunder shall be in writing and shall be deemed delivered upon receipt, (i) if to Sublessor to: Home Delivery District Manager, Los Angeles Times, 202 W. First Street, Los Angeles, CA 90012, with a copy to the

8

Director of Home Delivery Distrubution, 202 W. First Street, Los Angeles, California 90012 and (ii) if to Sublessee, at the Premises.

26.  Common Areas

As used herein, "Common Areas" shall mean all areas within the building and grounds which are not specifically subleased or held for sublease by Sublessor, including, without limiting the foregoing; parking areas, driveways, sidewalks, loading areas, access and egress roads, interior or exterior corridors, landscaped and planted areas and all other improvements provided by Sublessor for the common use of Sublessees. Sublessor may from time to time change the size, location, nature, and use of any of the Common Areas including converting any portion of the Common Areas to leasable areas and increasing or decreasing common area land and/or facilities. Sublessee, its employees, agents, customers, and business invitees shall have the non-exclusive right (in common with other Sublessees and all others whom Sublessor has granted or may grant such rights) to use the Common Areas for the purposes intended, subject to such rules and regulations relating to such use as Sublessor may from time to time establish. Sublessee agrees, after notice thereof, to abide by such rules and regulations and to use as its best efforts to cause its officers, employees, agents, customers, and business invitees to conform thereto. Sublessor may at any time close any Common Areas to effect construction, repairs, or changes thereto, or to prevent the acquisition of public rights in such areas, and may do such other acts in and to the Common Areas as in its judgment may be desirable to improve the convenience thereof. Sublessee shall not at any time interfere with the rights of the Sublessor, or other Sublessees, or of any person entitled to use the Common Areas or to use any part thereof. Sublessor shall operate, manage, light, patrol, repair, replace, and maintain the Common Areas for their intended purpose in such manner as Sublessor shall in its sole discretion determine to be reasonably appropriate. Sublessee agrees that it will abide by, keep and observe all reasonable rules and regulations which Sublessor may make from time to time for the use management, safety, care, and cleanliness of the building and grounds, the parking of vehicles and the preservation of good order therein as well as for the convenience of other occupants and tenants of the building. The violation of any such rules and regulations, shall be deemed a material breach of this Sublease by Sublessee. Sublessee shall not place any sign upon the Premise or conduct any auction thereon without Sublessor's prior consent.

27.  Estoppel Certificate

Sublessee agrees, at any time and from time to time, upon not less than five (5) days prior written notice by Sublessor, to execute, acknowledge and deliver to Sublessor a statement in writing (i) certifying that this Sublease is unmodified and in full force and effect (or if there have been modifications, that the Sublease is in full force and effect as modified and stating the modifications), (ii) stating the dates to which the rent and other charges hereunder have been paid by Sublessee (iii) stating whether or not to the best knowledge of Sublessee, Sublessor is in default in the performance of any covenant, agreement or condition contained in this Sublease, and, if so, specifying each such default of which Sublessee may have knowledge, and (iv) stating the address to which notices to Sublessee should be sent.

9

28.  Holding Over

In the event that Sublessee shall not immediately surrender the Sublet Premises on the date of expiration of the term hereof, Sublessor may forthwith re-enter and take possession of the Sublet Premises without process, or by any legal process in force in the State of California.

29.  Recording

Sublessee shall not record this Sublease or a short form memorandum thereof without Sublessor's prior written consent. Sublessee shall, upon request of Sublessor, execute, acknowledge and deliver to Sublessor a short form memorandum of this Sublease for recording purposes.

30.  Enforcement Costs

Should either party institute any action or proceeding to enforce any provision of this Sublease or for damages by reason of an alleged breach of any provision hereof, the prevailing party shall be entitled to recover from the party not prevailing all costs and expenses (including reasonable attorneys' fees) incurred by such prevailing party in connection with such action or proceeding. A party entitled to recover costs and expenses under this Paragraph shall also be entitled to recover all costs and expenses (including reasonable attorneys' fees) incurred in the enforcement of any judgment or settlement obtained in such action or proceeding (and in any such judgment provision shall be made for the recovery of such post-judgment costs and expenses).

31.  Governing Law

This sublease shall be construed in accordance with and governed by the laws of the State of California.

32.  Time

Time is of the essence.

33.  Gender

Feminine of neuter pronouns shall be substituted for those of the masculine form, and the plural shall be substituted for the singular number, in any place or places herein in which the context may require such substitution or substitutions.

34.  Benefit and Burden

The provisions of this Sublease shall be binding upon and shall inure to the benefit of the parties hereto and each of their respective representatives, successors and assigns. Sublessor may freely and fully assign its interest hereunder.

35.  Entire Agreement

This Sublease, together with exhibits (including, but not limited to, the Distribution Center Safety Requirements) attached hereto and made a part hereof, contain and embody the entire agreement of the parties regarding the Premises, and no representation, inducements, or agreements, oral or otherwise between the parties not contained and embodied in said Sublease, shall be of any force or effect, and the same may

10

not be modified, changed or terminated in whole or in part in any manner other than by an agreement in writing duly signed by all parties hereto. Sublessor, in its sole and absolute discretion, may, from time to time, modify such Distribution Center Safety Requirements.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date set forth above.

SUBLESSEE:

BY:_____
        Vince Comparsi

LOS ANGELES TIMES

BY:_____
        Brian Davis, Director
        Home Delivery Distribution

11

## DISTRIBUTION CENTER SAFETY REQUIREMENTS

The following is a list of safety requirements applicable to all Distribution Center locations. These requirements are intended to protect the safety of Sublessees, their employees and visitors, and enhance the functions of the Distribution Center facility and insure the safe and expedient operation of The Times Transportation department.

1.   All Sublessees, their employees and visitors must stay clear of The Times' Transportation loading and unloading areas, as well as the thoroughfares to and from these areas.

2.   The Transportation corridor is to remain clear at all times for the use of the Times Transportation Department, including cleaning and maintenance. Use of the corridor by Sublessees or their employees is restricted to emergency use only. Access to The Times' Transportation loading and unloading dock must not be obstructed or blocked by vehicles, supplies, or waste material.

3.   Sublessees and their employees must abide by any requests from Times' Transportation employees in regards to staying clear of forklift or other delivery operations inside the Distribution Center. Only the Sublessee and his/her senior assistant will be allowed inside the marked pallet/container staging area ("hot zone").

4.   All pallets/containers and cardboard sheets to be picked up by Transportation must be placed in the designated pick-up area(s). Pallets/containers cannot be placed within two feet of any walls or any other location which may obstruct or interfere with forklift operations.

5.   Sublessees and their employees will respect the rights and responsibilities of other subtenants and their employees and will not obstruct or block the driveways or thoroughfares of other subtenants.

Nothing contained on this list shall replace or supersede any provision or requirement of the Sublease or the agent delivery agreements.

_____          _____
Date                                              Vince Comparsi
                                                     Distributor #282

12



CERTIFIED MAIL

7008 2810 0001 5155 9123

U.S. POSTAGE
SOUTH PASADENA-CA
JUN PM 09
AMOUNT
$7.68
00014354+09

10017

FROM  Rountree & Riley, LLP
Attorneys and Counselors at Law
200 East Del Mar Boulevard, Suite 304    Pasadena, California 91105

TO

Tribune Company Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
757 Third Avenue, 3rd Floor,
New York, NY 10017

RECEIVED
JUN 0 5 2009