# EXHIBIT B

## Bourgon Declaration

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered |

## DECLARATION OF MICHAEL BOURGON IN SUPPORT OF DEBTORS' OBJECTION TO CLAIM NO. 3589 OF VINCE COMPARSI

I, Michael Bourgon, declare as follows:

1.    I am Vice President, Human Resources of Tribune Company ("Tribune"), one of

the debtors and debtors in possession in the above-captioned chapter 11 cases (each a "Debtor"

and, collectively, the "Debtors"), and the ultimate parent of the other Debtors.  In this position, I

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC (KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS 1, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc., f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); and WPIX, Inc. (0191).  The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

am responsible for the implementation, management, and oversight of the Debtors' employment-related policies and programs.

2.    I have read the Debtors' Objection to Claim No. 3589 of Vince Comparsi Pursuant to Sections 502(b) and 558 of the Bankruptcy Code, Bankruptcy Rules 3001, 3003, and 3007-1, and Local Rule 3007-1 (the "Objection")[2] and am directly, or by and through the Debtors' personnel and advisors, familiar with the information contained therein. I have also read the Comparsi Claim and am familiar with the Distributor Agreement and the sublease agreement between Mr. Comparsi and Los Angeles Times Communications LLC ("LATC") appended thereto. The Debtors believe, and I agree, that the Comparsi Claim is not properly asserted against LATC for the reasons set forth in the Objection. I am authorized to submit this declaration (the "Declaration") in support of the Objection.

3.    All matters set forth in this Declaration are based on: (a) my personal knowledge, (b) my review of relevant documents, (c) my view, based on my experience and knowledge of the Debtors' operations and personnel, (d) information supplied to me by others at the Debtors' request, or (e) as to matters involving United States bankruptcy law or rules or other applicable laws, my reliance on the advice of counsel or other advisors to the Debtors. If called upon to testify, I could and would testify competently to the facts set forth herein.

4.    I am familiar with the Debtors' employee benefit plans, including the Tribune Company Cash Balance Pension Plan (the "Pension Plan").[3] The Pension Plan is sponsored by Tribune and is the primary pension plan established for the benefit of the Debtors' eligible

---

[2] All capitalized terms used but not defined herein shall have the meaning ascribed to them in the Objection.

[3] The Pension Plan was formerly known as the "Times Mirror Pension Plan." The Times Mirror Pension Plan and the Tribune Company Pension Plan merged effective December 23, 2002, and, effective January 1, 2008, the merged plan was amended, restated, and renamed the "Tribune Company Cash Balance Pension Plan." (See Tribune Company Cash Balance Plan Summary Plan Description dated January 1, 2008 ("SPD") at 1, a copy of which is appended hereto as Attachment 1.)

employees, including employees of LATC. The Pension Plan provides retirement benefits to eligible employees of LATC, in accordance with the terms of the Pension Plan and the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). The Pension Plan is a tax-qualified, noncontributory, defined benefit plan subject to ERISA, and is tax-qualified under the relevant provisions of the Internal Revenue Code.

    5.    The Tribune Company Employee Benefits Committee (the "Benefits Committee"), appointed by Tribune's board of directors, has the responsibility to administer the Pension Plan. The Benefits Committee is designated as the Plan Administrator pursuant to ERISA. (See SPD at 2.) As Plan Administrator, the Benefits Committee has the full discretion and authority to control and manage the Pension Plan's administration, including but not limited to complete and absolute discretionary authority and power to administer, interpret and construe the terms of the Pension Plan and to make determinations as to the right of any person to a benefit under the Pension Plan. The Benefits Committee, as administrator of the Pension Plan, makes all decisions concerning the benefits provided under the Pension Plan independent of control or influence of Tribune or any of its affiliates, including LATC.

    6.    The Pension Plan is funded by tax-deductible employer contributions, which are held in trust for the exclusive purpose of providing benefits to plan participants and their beneficiaries. A prior version of the Pension Plan that was in effect during the time that Mr. Comparsi was an independent contractor for LATC contained a contributory component. At no time did Mr. Comparsi make any contributions to the Pension Plan. Nor did LATC make any contributions to the Pension Plan on behalf of Mr. Comparsi at any time, consistent with the terms of the Distributor Agreement, which provided that Mr. Comparsi was an independent contractor, not an employee.

3

7.      In connection with its review and reconciliation of the Comparsi Claim, I am aware that LATC referred the Comparsi Claim to the Benefits Committee for consideration and that the Benefits Committee agreed to treat the Comparsi Claim as a claim for benefits under the Pension Plan.  In June 2011, the Benefits Committee, as administrator for the Pension Plan, sent Mr. Comparsi a letter regarding the Comparsi Claim (the "June 2011 Letter"), a copy of which is appended hereto as Attachment 2.  The June 2011 Letter notified Mr. Comparsi of the Benefits Committee's determination that the Comparsi Claim is not properly asserted against LATC, but rather should be asserted against the Pension Plan directly, in accordance with the terms of the Pension Plan and ERISA.  The Benefits Committee requested that Mr. Comparsi withdraw the Comparsi Claim as against LATC and advised Mr. Comparsi that the Benefits Committee would accept Mr. Comparsi's filings (and any additional submissions he wished to make) as a written administrative claim for benefits under the terms of the Pension Plan.  To the best of my knowledge, information, and belief, insofar as I have been able to ascertain after reasonable inquiry, Mr. Comparsi did not respond to the June 2011 Letter.

8.      Subsequently, I am aware that the Benefits Committee conducted a review of the Comparsi Claim and issued its determination denying benefits to Mr. Comparsi on December 20, 2011 (the "December 20 Letter"), a copy of which is appended hereto as Attachment 3.  As described in detail in the December 20 Letter, Mr. Comparsi retains the right to seek review of the Benefits Committee's determination, in accordance with the Pension Plan's claims procedures and ERISA, in the appropriate non-bankruptcy forum.  To the best of my knowledge, information, and belief, insofar as I have been able to ascertain after reasonable inquiry, Mr. Comparsi did not respond to the December 20 Letter.

4

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 11th day of January 2012.

By: Michael Bourgon

**Attachment 1**

**Tribune Company Cash Balance Plan Summary Plan Description**

# TRIBUNE COMPANY

# Cash Balance Pension Plan

Summary Plan Description

January 1, 2008

## INTRODUCTION TO YOUR CASH BALANCE PENSION PLAN

Tribune Company (the "Company") established the Tribune Company Cash Balance Pension Plan (the "Plan") to help meet your retirement needs in the future.

Participation in the Plan is automatic if you are eligible to participate in the Plan.

Over time, the Company merged two other pension plans with and into the Plan. Thus, the Plan consists of three Component Plans, which are listed in the Section of this booklet entitled "Overview." The historical provisions of the Component Plans have been maintained and a separate "cash balance" feature was added effective January 1, 2008. This booklet is a summary plan description ("SPD") of the Plan's cash balance feature as in effect on January 1, 2008. If you are or were eligible to receive benefits under one of the Component Plans, please refer to the separate SPD that describes the key provisions of the appropriate Component Plan.

This SPD is intended only as a general summary of the key provisions of the Plan's cash balance feature and is not a substitute for the official Plan document. The official Plan document, as may be amended from time to time, contains the complete and official terms of the Plan and legally governs the operation of the Plan. If there are any inconsistencies or conflicts between this SPD and the official Plan document, the official Plan document always governs. Nothing in this SPD or the official Plan document constitutes an expressed or implied contract of employment between you and the Company.

**The Company also reserves the right to change, amend, or terminate the Plan at any time.**

If you have any questions after you've read this SPD, call the Hewitt Retirement Center at 1-800-872-2222.

———————————

**TABLE OF CONTENTS**

Contents                                                                                    Page

OVERVIEW ........................................................................................................1

PLAN ADMINISTRATION ................................................................................2

PLAN PARTICIPATION.....................................................................................3
    Who is Eligible ..............................................................................................3
    Enrolling in the Plan .....................................................................................4
    Naming a Beneficiary ...................................................................................4

PLAN COSTS.......................................................................................................5

ACCUMULATING VALUE IN YOUR CASH BALANCE ACCOUNT ..........5
    Amount of Your Annual Employer Contribution Credits .........................5
    Amount of Your Interest Credits .................................................................6
    When Your Cash Balance Account is Updated ...........................................7

YOUR ELIGIBLE COMPENSATION UNDER THE PLAN ...........................7
    Definition of Eligible Compensation...........................................................7
    Limits on Eligible Compensation under the Plan .......................................8

PLAN ACCOUNTING.........................................................................................8

VESTING ..............................................................................................................8

WHEN YOU CAN RECEIVE YOUR CASH BALANCE ACCOUNT ...........9

PAYMENT OPTIONS FOR YOUR CASH BALANCE ACCOUNT ...............9
    Life Annuity ............................................................................................... 10
    50% Joint and Survivor Annuity................................................................ 10
    75% Joint and Survivor Annuity................................................................ 10
    100% Joint and Survivor Annuity.............................................................. 11

## TABLE OF CONTENTS
### (CONT.)

**Page**

      Period Certain and Life Annuity.............................................................11

      Lump Sum Payment.............................................................................11

TAX CONSIDERATIONS.............................................................................12

COMMENCING YOUR BENEFITS FROM THE PLAN .............................................12

LATE RETIREMENT .............................................................................13

BENEFITS IF YOU DIE BEFORE RETIREMENT .............................................13

WHAT "SERVICE" MEANS .............................................................................13

      Hours of Service .............................................................................14

      Break in Service .............................................................................15

REEMPLOYMENT.............................................................................15

SPECIAL 2% ALLOCATION .............................................................................16

SPECIAL EMPLOYEE SEPARATION PLAN BENEFITS .............................................16

OTHER PLAN PROVISIONS .............................................................................16

      Assignment of Benefit .............................................................................16

      Qualified Domestic Relations Orders (QDROs)....................................................17

      Loss of Benefits .............................................................................17

      Tax Information .............................................................................17

      Plan Termination Insurance .............................................................................18

      Accessing Information .............................................................................18

      Governmental Approval.............................................................................19

      Terms and Conditions of Employment .............................................................19

      Payments to Minors and Other Persons under Legal Disability ...........................19

      Payments to Missing Persons.............................................................................19

      Incorrect Payment of Benefits .............................................................................19

      Top-Heavy Provisions .............................................................................19

      Claims Procedures .............................................................................19

      Appealing Claim Denials.............................................................................20

      Legal Action.............................................................................20

SITUATIONS AFFECTING PLAN BENEFITS.............................................................21

      Plan Amendments or Termination .............................................................21

ADMINISTRATIVE INFORMATION .............................................................................22

      Plan Sponsor and Administrator .............................................................22

**TABLE OF CONTENTS**
**(CONT.)**

|  | **Page** |
|---|---|
| Plan Type, Plan Number and Plan Year | 22 |
| Plan Trustee | 22 |
| Agent for Service of Legal Process | 22 |
| YOUR RIGHTS UNDER ERISA | 23 |
| Receive Information About Your Plan and Benefits | 23 |
| Prudent Action by Plan Fiduciaries | 23 |
| Enforce Your Rights | 24 |
| Assistance with Your Questions | 24 |

**OVERVIEW**

In general, the Plan provides certain retirement benefits to eligible employees of the Company and certain related affiliates of the Company ("Related Companies") that adopt the Plan with the Company's consent. You may find out if your employer is a Related Company and participates in the Plan by contacting the Hewitt Retirement Center.

Prior to January 1, 2008, the Plan was known as the Tribune Company Pension Plan and consisted of the following three separate components: (1) the legacy Tribune Company Pension Plan ("Legacy Tribune Pension Plan"), (2) the legacy Times Mirror Pension Plan ("Legacy Times Mirror Pension Plan"), and (3) the Baltimore Sun Pension Plan for Guild Employees ("Guild Portion of the Plan") (These plans are referred to as the "Component Plans".) Effective January 1, 2008, the Plan was amended and restated to add a "cash balance" feature and to rename the Plan as the Tribune Company Cash Balance Pension Plan. Specifically, effective January 1, 2008, the Plan's "cash balance" feature prospectively replaced the traditional pension plan formula under the Legacy Tribune Pension Plan and the Legacy Times Mirror Pension Plan. If you are a participant in the Guild Portion of the Plan on or after January 1, 2008, you are not eligible to participate in the Plan's cash balance feature.

A "cash balance" feature is a type of alternative pension plan formula that defines your retirement benefit in terms of a hypothetical account balance – a cash balance account. As described in the Section of this SPD entitled "Accumulating Value in Your Cash Balance Account," your cash balance account accumulates pension benefits in two ways: Employer contribution credits and interest credits.

This SPD describes only those benefits earned on and after January 1, 2008 under the Plan's cash balance feature by employees who are eligible to participate in the Plan on or after that date. The benefits described in this SPD are in addition to any benefits earned before January 1, 2008 by participants in the Legacy Tribune Pension Plan or the Legacy Times Mirror Pension Plan. Thus, if you earned benefits under a Component Plan before January 1, 2008, please refer to the separate SPD that describes the key provisions of the appropriate Component Plan.

For more information about any benefits you may have earned before January 1, 2008 under the Legacy Tribune Pension Plan or the Legacy Times Mirror Pension Plan, or for information about the Guild Portion of the Plan, you should contact the Hewitt Retirement Center.

1

**PLAN ADMINISTRATION**

The Plan is administered by the Tribune Company Employee Benefits Committee (the "Committee"). The Committee has various powers and duties in administering the Plan, such as establishing and carrying out all of the rules necessary to operate the Plan, making decisions regarding the interpretation or application of Plan provisions, determining all questions as to the rights, benefits, or eligibility of employees, participants, and beneficiaries under the Plan, and appointing such agents it deems advisable in connection with administering the Plan.

The Committee has full authority to act in its discretion when carrying out the provisions of the Plan. Any decision made by the Committee is final and binding on all parties, subject only to the appeals procedure adopted by the Committee. **Benefits under the Plan will be paid only if the Committee decides, in its discretion, that the applicant is entitled to them.**

The Plan is administered on the basis of a *Plan year* which is the calendar year.

The Hewitt Retirement Center administers the day-to-day operations of the Plan on behalf of the Committee. The retirement plan website, voice response system, and Hewitt Retirement Center are available to provide you with information about your Plan benefits, including your cash balance account under the Plan. **For any questions relating to the Plan, please contact the Hewitt Retirement Center at www.yourretirementbenefits.net/tribune or by calling 1-800-872-2222. To access your information, you will need the last four digits of your social security number, your birth date and password.**

2

## PLAN PARTICIPATION

> **You automatically participate in the Plan if you are an eligible employee of the Company or a Related Company that has adopted the Plan with the Company's consent, you are at least 21 years of age, <u>and</u> you have completed at least one year of service with the Company or a Related Company.**

### Who is Eligible

You are eligible to participate in the Plan if you meet all of the following requirements:

- you are an eligible employee of the Company or of a Related Company that has adopted the Plan with the Company's consent (the "Employer"), and

- you are at least 21 years of age, and

- you have completed at least one year of service with the Employer.

In general, a year of service means the 12-consecutive month period beginning on your date of hire with the Employer in which you complete at least 1,000 hours of service. If you complete less than 1,000 hours of service during that period, you will complete a year of service at the end of the Plan year in which you complete at least 1,000 hours of service. (See the Section in this SPD below entitled "What 'Service' Means" for an explanation of what is an "hour of service.")

You are not an eligible employee of the Employer and are not eligible to participate in the Plan if:

- you are a leased employee or a non-resident alien, or

- you have a personal employment contract that prohibits your participation in the Plan, or

- you are covered by a collective bargaining agreement under which benefits were bargained in good faith and which does not require your participation in the Plan, or

- for any period for which you are a minor league baseball player, or

- you perform services for the Employer as a member of a personal service corporation, professional corporation or similar intervening corporate entity, or

- you are a member of a group of employees who has been excluded from participation in the Plan by your Employer or otherwise or you work for a Related Company that has not adopted the Plan.

3

*EXAMPLES:*

- *If you are hired on October 1, 2008 as a full-time eligible employee of a participating employer and complete at least 1,000 hours of service by September 30, 2009, you will become a participant in the Plan as of October 1, 2009.*

- *If you are hired on October 1, 2008 as a part-time eligible employee of a participating employer and do not complete at least 1,000 hours of service by September 30, 2009, you will be eligible to participate in the Plan immediately following the end of the Plan year in which you complete at least 1,000 hours of service. So, if you first complete at least 1,000 hours of service during the Plan year ending on December 31, 2010, you will become a participant in the Plan as of January 1, 2011.*

For further information about how "service" or an "hour of service" is defined, see the Section of this SPD entitled "What 'Service' Means".

**Enrolling in the Plan**

You do not need to enroll in the Plan. You are automatically enrolled in the Plan and begin earning benefits once you are eligible to participate. You remain eligible to earn benefits under the Plan so long as you remain an eligible employee of the Employer.

If you cease to remain an eligible employee while continuing in the employ of the Employer, you will no longer be considered an active participant in the Plan (and cease eligibility to earn Employer contribution credits). However, if you again become an eligible employee of the Employer, you shall again be an active participant in the Plan (and resume eligibility to earn Employer contribution credits) as of the date in which you regain your eligibility.

**Naming a Beneficiary**

If you are married on the date on which payment of your cash balance account is scheduled to begin, your spouse on that date is automatically the beneficiary of your cash balance account. If you want to name someone other than your spouse as the beneficiary of your cash balance account, you must obtain your spouse's written consent (witnessed by a notary public) on forms supplied by the Hewitt Retirement Center.

Similarly, if you are married on the date of your death and die before payment of your cash balance account is scheduled to begin, your spouse on that date is automatically the pre-retirement beneficiary of your cash balance account. If you designated a pre-retirement beneficiary other than your spouse (with spousal written consent) at any time before January 1st of the year in which you reach age 35, that beneficiary designation will become invalid on such January 1st. Thus, if you wish to continue designating someone other than your spouse as the pre-retirement beneficiary of your cash balance account, you will have to again designate a beneficiary (with spousal written consent) at any time on or after such January 1st. This election will then be in effect until the date of your death unless you make additional changes.

You should periodically review your beneficiary designation, particularly when you have a change in marital or family status, and make changes as appropriate. If you do not select a

4

beneficiary or if the person you have selected predeceases you, final payment will be made in the following order of priority:

1. Your surviving spouse, or
2. If you are not married on your date of death, your estate.

Please access www.yourretirementbenefits.net/tribune or contact the Hewitt Retirement Center at 1-800-872-2222 to designate your pre-retirement beneficiaries.

See the Section of this SPD below entitled "Payment Options for Your Cash Balance Account." If you are married at the time your benefits begin, your benefits will automatically be paid in the form of a 50% joint and survivor annuity with your spouse as co-annuitant, unless you (with spousal written consent) select another form of payment during the applicable election period.

## PLAN COSTS

The Employers pay the full cost of the Plan. The assets of the Plan are held in trust. Generally, the assets of the Plan can only be used to pay Plan benefits. However, the assets of the Plan can be used to pay certain administrative expenses of the Plan, including investment management fees, trustee fees, recordkeeping fees, government filing fees, legal fees and auditing fees. The trustee makes all payments from the Plan. For further information regarding the trustee, see the Section of this SPD entitled "Administrative Information".

## ACCUMULATING VALUE IN YOUR CASH BALANCE ACCOUNT

> **Your cash balance account accumulates value in two ways:  Employer contribution credits and interest credits.**

### Amount of Your Annual Employer Contribution Credits

If you are eligible to participate in the Plan, you will receive an annual Employer contribution credit to your cash balance account for each Plan year beginning on or after January 1, 2008 equal to three percent (3%) of your eligible "compensation" paid to you while you are a participant in the Plan during that Plan year. However, in order to receive an annual Employer contribution credit for a particular Plan year, you must have (1) completed at least 1,000 hours of service during that Plan year or (2) terminated your employment with the Employers during that Plan year either on or after attaining age 65, on or after attaining age 55 with at least 10 years of service, or due to death or becoming disabled. For such purposes, you are considered to be disabled if you are totally and permanently unable to engage in any substantial gainful activity by reason of any physical or mental condition which entitles you to Social Security disability benefits.

5

*EXAMPLE:*

*Suppose that, during 2008, you were a participant in the Plan, received $40,000 in eligible compensation, and completed at least 1,000 hours of service. Your cash balance account will be credited with an Employer contribution credit equal to 3% of your eligible compensation paid to you in 2008. Thus, the Employer contribution credit made on your behalf to your cash balance account for 2008 is equal to $1,200. In other words, 3% or .03 x $40,000 = $1,200.*

Please note that if you are otherwise eligible to receive an annual Employer contribution credit for a Plan year, but you are a newly eligible participant in that Plan year or you terminate employment with the Employer during that Plan year, your Employer contribution credit for that Plan year will be based on the eligible compensation that you received during the portion of that Plan year while you are an active participant in the Plan.

*EXAMPLE:*

*Assume that you are hired by the Company as an eligible employee on October 1, 2008 and you meet the 1,000 hour of service requirement in your first 12 months. You are then eligible to participate in the Plan as of October 1, 2009. Assuming you complete 1,000 hours of service during 2009, the Employer contribution credit that you receive for the 2009 Plan year will be based on the eligible compensation paid to you from October 1, 2009 through December 31, 2009.*

**Amount of Your Interest Credits**

In addition to the annual Employer contribution credits, your cash balance account will earn additional value through interest credits. At the end of each calendar quarter, an interest credit will be added to your cash balance account equal to the applicable interest rate multiplied by the balance of your cash balance account as of the first day of that calendar quarter. The applicable interest rate for any calendar quarter is one-fourth of the rate which, when compounded, will provide an effective rate equal to the 10-year US Treasury Rate in effect for November of the previous Plan year. Interest will continue to accrue through the last day of the calendar quarter immediately preceding benefit commencement.

*EXAMPLE:* **Assume the following to calculate the interest credit for a Plan year.**

*Account balance at the beginning of the Plan year: $5,000*
*10-year US Treasury Rate in November of previous Plan year: 4%*
*Annual interest crediting rate: 4%*
*Total annual interest credits for the Plan year = 4% (or .04) x $5,000 = $200*

6

*Quarterly interest credits for the Plan year as follows:*

|  | Quarterly Interest Credit | Cash Balance Account |
|---|---|---|
| **January 1** |  | $5,000.00 |
| **March 31** | $49.27 | $5,049.27 |
| **June 30** | $49.75 | $5,099.02 |
| **September 30** | $50.24 | $5,149.26 |
| **December 31** | $50.74 | $5,200.00 |
| **Total interest credits earned for the Plan year** | $200.00 |  |

## When Your Cash Balance Account is Updated

Employer contribution credits for a Plan year are generally credited to your cash balance account as of the last day of that Plan year. Interest credits on the balance of your cash balance account are generally credited as of the last day of each applicable calendar quarter.

If you terminate your employment with the Employer during a Plan year either on or after attaining age 65, on or after attaining age 55 with at least 10 years of service, or due to death or becoming disabled, your final Employer contribution credit will be credited to your cash balance account as soon as administratively feasible following such qualifying termination. Therefore, if you experience a qualifying termination prior to the end of the Plan year, your cash balance account will reflect your final Employer contribution credit for that Plan year prior to the last day of that Plan Year. However, if your cash balance account is distributed before the last day of the first calendar quarter following your qualifying termination, your final Employer contribution credit will not be eligible to receive an interest credit.

## YOUR ELIGIBLE COMPENSATION UNDER THE PLAN

### Definition of Eligible Compensation

Your eligible *"compensation"* for Plan purposes means your base salary, wages, and commissions received for performing services as an eligible employee of the Employer while you are a participant in the Plan, including contributions you make under a 401(k) plan maintained by the Employer and any similar contributions under a cafeteria plan or qualified transportation fringe benefit plan (as defined in Sections 125 and 132 of the Internal Revenue Code), but excluding bonuses, overtime pay, shift differential amounts, severance pay, accrued vacation paid in a lump sum after termination of employment, incentive pay or incentive

commissions, amounts attributable to the grant or exercise of stock options or restricted stock, the lapse of restrictions on restricted stock or dividends paid on restricted stock, payments from or contributions to any employee benefit plan expect as specifically provided above, deferred compensation, and special allowances (such as amounts paid during an authorized leave of absence, moving expenses, car expenses, tuition reimbursement, meal allowances, the cost of excess group life insurance includible in taxable income, and similar items).

**Limits on Eligible Compensation under the Plan**

Under federal law, there is an annual limit on the amount of eligible compensation that may be considered under the Plan. For instance, the current annual limit on eligible compensation for the Plan for 2008 is $230,000. This amount may change in future years based on changes in federal law.

## PLAN ACCOUNTING

Your cash balance account is a separate bookkeeping account maintained in your name under the Plan to reflect the Employer contribution credits and interest credits that you earn under the Plan. You may access your current cash balance account at any time at www.yourretirementbenefits.net/tribune or by contacting the Hewitt Retirement Center at 1-800-872-2222.

## VESTING

Vesting means having a non-forfeitable right to your cash balance account under the Plan.

Regardless of your years of service, you become fully vested in the value of your cash balance account when you reach age 65 while employed, become disabled while employed, or die while employed. For this purpose, you are considered to be disabled if you are totally and permanently unable to engage in any substantial gainful activity due to a physical or mental condition that entitles you to Social Security disability benefits.

Otherwise, you will become fully vested in your cash balance account according to the following schedule:

| Years of Service | Vested Percentage |
| --- | --- |
| Less than 3 years | 0% |
| 3 or more Years | 100% |

You will earn a year of service for the purposes of vesting in your cash balance account during any Plan year in which you complete at least 1,000 hours of service.

**If you terminate employment with the Company before becoming fully vested in your cash balance account, you will forfeit your cash balance account.**

8

**WHEN YOU CAN RECEIVE YOUR CASH BALANCE ACCOUNT**

Your cash balance account is portable once you are fully vested in such account. This means that you will be able to receive a distribution of your cash balance account regardless of your age when you terminate your employment with the Employer.

You may elect to receive your cash balance account immediately or you may defer payment of your cash balance account (as long as the total value of your Plan benefit is greater than $5,000) and receive payment later. You may defer payment until age 65 (or, in most instances, your actual retirement date, if later).

As indicated above, if the value of your total Plan benefit is not greater than $5,000 at any time on or after your termination of employment with the Employer, you will receive a lump sum payment equal to the value of the benefit.

If your total Plan benefit is less than $1,000 and you do not make an election within 90 days of your termination date, you will receive a lump sum payment equal to the value of your total Plan benefit. If the total value of your Plan benefit is between $1,000 and $5,000 (including $5,000) and you do not make an election within 90 days of your termination date, your total Plan benefit will be automatically rolled over into a Hewitt Financial Services individual retirement account (IRA).

**PAYMENT OPTIONS FOR YOUR CASH BALANCE ACCOUNT**

The way benefits are paid can be as important to you as the amount you receive. Because people's needs differ, the Plan allows you to choose how your vested cash balance account will be paid. There are several payment methods available to you. They include the following:

- Monthly payments (also referred to as annuity payments)

- Lump sum payment

If you are married on the date on which payment of your cash balance account is scheduled to begin, your normal payment form is a 50% joint and survivor annuity. You may elect to waive the 50% joint and survivor annuity and instead request your cash balance account to be paid in the form of a lump sum payment or another annuity option (such as a singe life annuity, a period certain and continuous annuity, or a 75% or 100% joint and survivor annuity) only if you waive the 50% joint and survivor annuity form of payment and, unless you elect a 75% or 100% joint and survivor annuity with your spouse as your designated beneficiary, your spouse consents during the applicable election period.

If you are not married on the date on which payment of your cash balance benefit is scheduled to begin, your normal payment form is a life annuity. You may elect to waive the life annuity and instead request your cash balance account to be paid in the form of a lump sum payment or another annuity option (such as a period certain and continuous annuity, or a 50%, 75% or 100%

9

joint and survivor annuity) only if you waive the life annuity form of payment during the applicable election period.

If you elect a lump sum payment, you will receive a one-time payment of the balance of your cash balance account. If you choose another form of payment, you will receive the actuarial equivalent of your cash balance account based on your age as of your benefit commencement date. If you choose a joint and survivor option, your benefit will also be determined based on the age of your beneficiary as of your benefit commencement date. Generally, the larger the monthly benefit you elect to provide to a beneficiary, the smaller the monthly benefit during your lifetime.

**Once you request your vested cash balance account to be paid, the Hewitt Retirement Center will provide you with an estimated dollar value of all of the payment options available to you to assist you in selecting the payment option that is most appropriate for you. You should select your form of benefit carefully since you are not permitted to change the payment option once your benefit payments commence.** You may choose to receive your cash balance account through one of the following payment options:

## Life Annuity
You will receive a monthly payment for your lifetime only. Payments will cease upon your death.

## 50% Joint and Survivor Annuity
You will receive a monthly payment for your lifetime. If your spouse or beneficiary survives you, he or she will receive a monthly payment for his or her lifetime equal to 50% of the monthly amount you were receiving before your death. If your spouse or beneficiary predeceases you after the commencement of your benefit, your election shall remain in effect and no benefit shall be payable to anyone after your death. When you accept this payment form, you agree to receive a reduced benefit because payments are expected to be made over two lifetimes instead of one.

## 75% Joint and Survivor Annuity
You will receive a monthly payment for your lifetime. If your spouse or beneficiary survives you, he or she will receive a monthly payment for his or her lifetime equal to 75% of the monthly amount you were receiving before your death. If your spouse or beneficiary predeceases you after the commencement of your benefit, your election shall remain in effect and no benefit shall be payable to anyone after your death. When you accept this payment form, you agree to receive a reduced benefit because payments are expected to be made over two lifetimes instead of one.

**100% Joint and Survivor Annuity**

You will receive a monthly payment for your lifetime. If your spouse or beneficiary survives you, he or she will receive a monthly payment for his or her lifetime equal to 100% of the monthly amount you were receiving before your death. If your spouse or beneficiary predeceases you after the commencement of your benefit, your election shall remain in effect and no benefit shall be payable to anyone after your death. When you accept this payment form, you agree to receive a reduced benefit because payments are expected to be made over two lifetimes instead of one.

**Period Certain and Continuous Annuity**

You will receive a monthly payment for your lifetime. You also elect to receive a guaranteed number of payments from the Plan: either sixty (60) or one hundred twenty (120) monthly payments. If you die before the total guaranteed number of monthly payments have been made (either sixty (60) or one hundred twenty (120) monthly payments, as selected by you), payments in the same amount will be paid to your beneficiary until the remaining number of guaranteed number of monthly payments that you elected to receive have been made. If your beneficiary predeceases you after the commencement of your benefits and before the guaranteed number of monthly payments have been made to you (or if you did not designate a beneficiary), the remaining number of guaranteed payments will be paid to your estate in the form of a lump sum payment after your death. If your beneficiary begins receiving the remaining number of guaranteed monthly payments after your death but dies before all of those payments have been made to him or her, any remaining number of guaranteed monthly payments will be paid to his or her estate in the form of a lump sum payment after his or her death. All payments will cease after the later of your death or after the guaranteed number of monthly payments that you elected have been paid.

*EXAMPLE:*

***If you choose 60 guaranteed monthly payments, and die after receiving 40 monthly payments, your beneficiary will continue to receive the additional 20 monthly payments (or 60 minus 40 = 20) after your death.***

**Lump Sum Payment**

You will receive a single payment equal to the balance of your cash balance account. You may elect to have your lump sum payment paid directly to you or you may elect to directly roll over the lump sum into another eligible retirement plan or IRA.

*EXAMPLE:*

Here is sample calculation of the optional forms of payment available to you under the Plan. Please remember the Hewitt Retirement Center will provide you with the estimated dollar amounts of your various payment options based on your cash balance account, your age, and your beneficiaries' age after you terminate your employment with the Employer. This is an example based on the assumptions listed below.

11

*Assume the following:*

*Your Age at Benefit Commencement = 63*
*Your Beneficiaries' Age at Benefit Commencement = 61*
*The Value of Your Vested Cash Balance Account at Benefit Commencement = $10,000*

*Payment Amounts would be as follows:*

*Lump Sum Payment = $10,000*
*Life Annuity = $65.19 per month*
*50% Joint and Survivor = $59.91 per month (Survivor Benefit = $29.96 per month)*
*75% Joint and Survivor = $57.58 per month (Survivor Benefit = $43.19 per month)*
*100% Joint and Survivor = $55.42 per month (Survivor Benefit = $55.42 per month)*
*5 Year Certain and Life = $64.61 per month (Survivor Benefit = $64.61 per month)*
*10 Year Certain and Life = $62.91 per month (Survivor Benefit = $62.91 per month)*

## TAX CONSIDERATIONS

When you receive benefits from the Plan, those benefits are considered taxable income. Federal tax law requires taxes to be automatically withheld from your benefits before they are paid to you. The amount withheld will depend on your filing status and the number of tax exemptions you claim. You may request that taxes not be withheld if you choose a monthly (annuity) form of payment. Remember, if you choose not to have taxes withheld from your benefits, you will be solely responsible for paying them when you file your tax return.

In the case of a lump sum distribution, taxes will not be withheld if you choose a direct rollover to another eligible retirement plan or IRA. Otherwise, they will be automatically withheld at a rate of 20%, subject to any future changes required by federal tax laws.

It is important to note that the above summary is intended only as a general overview of certain federal income tax rules relating to the benefits that you receive from the Plan. Tax rules are complex and change frequently and state and local tax laws vary significantly. For that reason, no representative of the Employer is authorized to advise you about your taxes. For specific tax advice about your own personal situation, you should consult with a qualified tax adviser. For questions about general tax considerations, you should review the Special Tax Notice Regarding Plan Payments available online at www.yourretirementbenefits.net/tribune or by contacting the Hewitt Retirement Center at 1-800-872-2222; this notice explains the rules (including tax implications) regarding the possible payment of your distribution as a direct rollover, the tax withholding on your distribution not paid as a direct rollover, and the opportunity for you to roll over the amount of your distribution which is paid directly to you.

## COMMENCING YOUR BENEFITS FROM THE PLAN

Contact the Hewitt Retirement Center at 1-800-872-2222 no later than 90 days prior to the date you would like payments from your vested cash balance account to begin. The Hewitt

Retirement Center will provide you with a summary of the payment options available to you and the forms required to be completed in order to commence payments from your cash balance account.

Please remember that if you are married on the date on which payment of your cash balance account is scheduled to begin, you will receive your cash balance account in the form of a 50% joint and survivor annuity unless you waive this form of payment and your spouse consents to such a waiver during the applicable election period.  The Hewitt Retirement Center will provide you with more information on the process and the forms required to be completed in order to waive this form of payment.  You may revoke the wavier at any time during the election period and a subsequent waiver may thereafter be made.  In order to be valid, any waiver, consent or revocation must be made in writing on forms provided by the Company or the Hewitt Retirement Center.  In addition, the waiver must acknowledge your spouse's consent to the effect of the waiver and must be witnessed by a notary public.

The election period shall begin 90 days prior to the date on which payment of your cash balance account is scheduled to begin and ends on the later of the date such payment is scheduled to begin or the 91st day following the date on which you are provided with a written notice explaining the terms and conditions of the automatic 50% joint and survivor form of benefit, your right to waive the automatic 50% joint and survivor form of benefit and the effect of such a waiver, the requirement that your spouse consent to the waiver, and your right to revoke such a waiver and the effect of such a revocation.

## LATE RETIREMENT

If you retire from the Employer after your normal retirement date (attainment of age 65 as defined by the Plan) and you choose one of the annuity payment options, you will receive an annuity that is the actuarial equivalent of your cash balance account.  If you choose a lump sum option, you will receive the balance of your cash balance account.  However, Federal law generally requires that after you terminate employment with the Employer, payment of your cash balance account must begin no later than April 1 following the calendar year in which you reach age 70-½ or in which you retire, whichever occurs later.

## BENEFITS IF YOU DIE BEFORE RETIREMENT

If you are vested in your cash balance account and die prior to the date on which your benefit payments begin, your pre-retirement beneficiary will be entitled to receive the value of your cash balance account.  Payment shall be made as soon as practical after your death occurs.  If your spouse is the beneficiary, he or she will receive payment in the form of a life annuity for his or her lifetime that is the actuarial equivalent of your cash balance account unless he or she chooses a lump sum or other optional form of payment.  If a lump sum option is chosen, your beneficiary will receive the balance of your cash balance account.

See the Subsection entitled "Naming a Beneficiary" under the "Plan Participation" Section of this SPD for information on how to designate a pre-retirement beneficiary.

## WHAT "SERVICE" MEANS

> **Service determines your eligibility to participate in the Plan, your eligibility for an annual Employer contribution credit, and your vested interest in your cash balance account.**

In general, "service" means the length of time you work for the Employer. But service under the Plan is used in a special way. It determines your eligibility to participate in the Plan, your eligibility for an annual Employer contribution credit, and your vested interest in your cash balance account, and is counted by "hours of service."

For purposes of determining your eligibility to participate in the Plan, you earn a year of service for a 12-consecutive month period during which you complete at least 1,000 hours of service. If you work less than 1,000 hours during the 12-consecutive month period beginning on your date of hire with the Employer, you will complete a year of service at the end of the Plan year in which you complete 1,000 hours of service. See the Section of this SPD entitled "Plan Participation" for more details.

For purposes of the annual Employer contribution credit for a particular Plan year, you will receive such contribution credit if you complete 1,000 hours of service during that Plan year. This 1,000 hours of service requirement does not apply if you terminated employment with the Employer during that Plan year either on or after attaining age 65, on or after attaining age 55 with at least 10 years of service, or due to death or becoming disabled.

For purposes of determining your vested interest in your cash balance account, you earn a year of service for each Plan year during which you complete at least 1,000 hours of service. Regardless of your years of service, you become fully vested in the value of your cash balance account when you reach age 65 while employed, become disabled while employed, or die while employed.

**Hours of Service**

An "hour of service" is an hour for which you are directly or indirectly paid or entitled to payment by the Employer, including certain periods during which no duties are performed. Hours for which you are paid at more than a regular rate (such as overtime) count only as one hour of service. An hour of service does not include any periods during which you are credited for or entitled to any payment under a plan maintained solely to comply with applicable unemployment compensation laws or which solely reimburses you for medical or medically related expenses incurred by you.

Hours of service include any back pay that you have been awarded and certain kinds of paid time off, such as vacations, holidays, and paid leaves of absence. Hours of service also includes unpaid leaves of absences due to illness or disabilities. You will receive hours of service for hours you are absent from work because of your pregnancy, the birth of your child, placement of a child with you in connection with your adoption of such child, and for time caring for your child immediately following such birth or placement. Hours of service are also credited as required by and in accordance with the provisions of the Uniformed Services Employment and

14

Reemployment Rights Act for absences due to active service in the armed forces of the United States.

The maximum number of hours you can receive during paid time off, or any other time while you are not performing duties for the Employer is 501 hours (except military service). If you are a non-exempt employee as determined in accordance with the Fair Labor Standards Act of 1938, as amended ("FLSA"), and you do not have a regular work week, your hours of service shall be based on a forty (40) hour work-week. If you are an exempt employee as determined in accordance with the FLSA, you will be credited with forty-five (45) hours of service for each calendar week during which you would otherwise have been credited with an hour of service (as described above). Please note that there are separate Plan provisions governing maximums and amount of time credited in the Plan relating to military and maternity/paternity leaves of absence.

**Break in Service**

A break in service can affect your eligibility to participate in the Plan or your right to receive your cash balance account. If you terminate employment with the Employer, you stop earning service, unless otherwise required by law. This is called a "break in service."

You will incur a "one-year break in service" for each Plan year (ending in or after the Plan year you terminate employment with the Employer) in which you earn less than 501 hours of service, except that you will not incur a one-year break in service for the Plan year in which you terminate employment with the Employer if such termination of employment was due to retirement on or after attaining age 65, death, or disability.

**REEMPLOYMENT**

If you were a participant in the Plan, but terminated your employment with the Employer and are subsequently reemployed by an Employer as an eligible employee, you will again become a Plan participant as of your reemployment date. However, if you incurred a one-year break in service and are subsequently reemployed by the Employer as an eligible employee scheduled to work fewer than 1,000 hours of service per year, you will again become a participant in the Plan (retroactive to your reemployment date) only after completing 1,000 hours of service (including any hours of service completed other than as an eligible employee) during any Plan year beginning on or after the date of your reemployment.

If you terminated your employment with the Employer prior to becoming a Plan participant and you are subsequently reemployed by the Employer as an eligible employee after incurring a one-year break in service, your eligibility to participate in the Plan will be determined according to the Section of this SPD entitled "Plan Participation."

If you terminated your employment with the Employer and are reemployed after incurring a one-year break in service, your prior years of service will be counted for vesting purposes unless (1) you do not complete at least 1,000 hours of service during the 12-consecutive month period commencing on your reemployment date or during a Plan year beginning after your reemployment date, or (2) if you had no vested interest in your Plan benefits prior to your break

15

in service, you incurred at least five-consecutive one-year breaks in service and the number of such consecutive one-year breaks in service equals or exceeds the number of years of service credited to you prior to your break in service, determined without regard to any years of service forfeited as a result of a prior break in service. If you are reemployed after incurring five-consecutive one-year breaks in service, years of service earned after your reemployment may not be used to determine the non-forfeitable portion of your cash balance account attributable to your pre-break service.

## SPECIAL 2% ALLOCATION

Certain Plan participants were eligible to have a special 2% Employer contribution credit allocated to their cash balance accounts. To be eligible for the special allocation you must have (1) been employed on December 31, 2007 by the Company or a Related Company that participated in the special 2% allocation, (2) attained age 21 and completed one year of service as of December 31, 2007, and (3) completed at least 1,000 hours of service (with certain exceptions) during 2007. If you were eligible for the special allocation, you will receive a special Employer contribution credit in an amount equal to 2% of your eligible compensation during 2007 but only for periods during which you were employed by the Company or a Related Company that participated in the special allocation. The special allocation is first eligible for interest rate credits on March 31, 2008. You may contact the Hewitt Retirement Center at 1-800-872-2222 for more information or to determine if your employer participated in the special 2% allocation.

## SPECIAL EMPLOYEE SEPARATION PLAN BENEFITS

Certain employees are eligible for an additional one-time Employer contribution credit as described in specified employee separation plans ("Separation Plans"). The Separation Plans describe the amount of such credits and the requirements for eligibility. Eligible employees are fully vested in their special Employer contribution credits, and such credits begin to earn interest rate credits as of the first day of the calendar quarter immediately following termination of employment, and such interest rate credit will be credited as of the last day of such calendar quarter (but only if the special Employer contribution credit has not been distributed as of the last day of such calendar quarter).

## OTHER PLAN PROVISIONS

### Assignment of Benefit

Except as may be permitted by applicable federal law or by a qualified domestic relations order (QDRO), your benefits under the Plan are not subject to the claims of your creditors and cannot be assigned in any way, attached, garnished, pledged, or used as collateral. This means that amounts credited to your cash balance account are available only to you or your named beneficiary under the provisions described in the Plan document and summarized in this SPD.

16

**Qualified Domestic Relations Orders (QDROs)**

If a court issues an order or renders a judgment requiring that all or part of your benefits under the Plan be paid to a spouse, or former spouse and/or your children, due to divorce or legal separation, the Committee may direct the trustee to comply with the court order or judgment, if it meets the requirements of a QDRO.   Any QDRO must meet certain requirements and cannot require that benefits be paid in any form or amount inconsistent with Plan provisions or that conflict with another existing order, if any.

The Committee has delegated responsibility to the Hewitt's Qualified Order Team for reviewing and administering QDROs.   You will be notified if the Plan receives a QDRO relating to your benefits under the Plan, and you will be provided with a copy of the Plan's QDRO procedures. Any correspondence regarding QDROs should be mailed to the Qualified Order Team.

If the Plan is on notice that your benefit may be subject to a QDRO or that a QDRO is forthcoming, a hold may be placed on your benefit under the Plan.   This means that you will not receive any distribution (including any loan, hardship withdrawal or other withdrawal) until the Plan has determined that the distributions would not be inconsistent with the QDRO or that no QDRO will be submitted.

QDROs are normally prepared by the attorney of the party representing a spouse in connection with a divorce.   The Qualified Order Team has sample QDRO language that may prove helpful in drafting a QDRO.   This language will be provided upon request from either you or the party claiming an interest in your Plan benefits.   If you anticipate that you may be a party to a QDRO, you should contact the Qualified Order Team or log onto www.qocenter.com for additional information.

**Loss of Benefits**

You may lose benefits under the Plan by forfeiting the non-vested portion of your cash balance account.   See the Section of this SPD entitled "Vesting" for more details.   However, the value of your cash balance account may also be diminished due to the operation of limitations in the Internal Revenue Code, the imposition of income, penalty and excise taxes, the application of a QDRO, or other circumstances.

**Tax Information**

You should review the Special Tax Notice Regarding Plan Payments available from the Hewitt Retirement Center which explains the rules (including tax implications) regarding the possible payment of your distribution as a direct rollover, the tax withholding on your distribution not paid as a direct rollover, and the opportunity for you to roll over the amount of your distribution which is paid directly to you.   You should consult with your personal tax advisor regarding the tax implications of any distributions that you receive.

**Plan Termination Insurance**

The benefits you will receive under this Plan will be equal to the balance of your cash balance account at the time benefits are distributed to you. They are not guaranteed in any manner by the Employer, the Plan fiduciaries, or the FDIC.

However, the Employee Retirement Income Security Act of 1974, as amended (or "ERISA"), did create a federal governmental agency called the "Pension Benefit Guaranty Corporation" (or "PBGC"), which provides plan termination insurance for certain types of retirement plans that promise a specific benefit at retirement. The Plan is considered a defined benefit pension plan and therefore ERISA does provide for benefits under this Plan to be insured by the PBGC.

If the Plan terminates (ends) without enough money to pay all benefits, the PBGC will pay pension benefits. Most people receive all of the pension benefits they would have received under the Plan, but some people may lose certain benefits.

The PBGC guarantee generally covers (1) normal and early retirement benefits, (2) disability benefits if you become disabled before the Plan terminates, and (3) certain benefits for your survivors.

The PBGC guarantee generally does not cover (1) benefits greater than the maximum guaranteed amount set by law for the year in which the Plan terminates, (2) some or all of benefit increases and new benefits based on Plan provisions that have been in place for fewer than five years at the time the Plan terminates, (3) benefits that are not vested because you have not worked long enough with the Employer, (4) benefits for which you have not met all of the requirements at the time the Plan terminates, (5) certain early retirement payments (such as supplemental benefits that stop when you become eligible for Social Security) that result in an early retirement monthly benefit greater than your monthly benefit at the Plan's normal retirement age, and (6) non-pension benefits, such as health insurance, life insurance, certain death benefits, vacation pay, and severance pay.

Even if certain of your benefits are not guaranteed, you still may receive some of those benefits from the PBGC depending on how much money the Plan has and on how much the PBGC collects from employers.

For more information about the PBGC and the benefits it guarantees, ask the Committee or contact the PBGC at P.O. Box 151750, Alexandria, VA 22315-1750 or call 1-800-400-7242 or 1-202-326-4000 (not a toll-free number). TTY/TDD users may call the federal relay service toll-free at 1-800-877-8339 and ask to be connected to 1-800-400-7242. Additional information about the PBGC's pension insurance program is available through the PBGC's website on the Internet at http://www.pbgc.gov.

**Accessing Information**

The retirement plan website, voice response system, and Hewitt Retirement Center are available to provide you with information about your cash balance account. The website can be found at www.yourretirementbenefits.net/tribune. To access the voice response system and the Hewitt

18

Retirement Center, you need to call 1-800-872-2222. To access your information, you will need the last four digits of your Social Security number, your birth date and password.

**Governmental Approval**

This Plan is intended to qualify under the requirements of the Internal Revenue Code.

**Terms and Conditions of Employment**

Neither the establishment of the Plan, nor your participation in it, will be considered a contract of employment. You remain subject to retention or discharge without reference to the existence of the Plan.

**Payments to Minors and Other Persons under Legal Disability**

Any benefit payable to a minor, an incompetent person, or other person incapable of applying for benefits will be paid to such person's guardian or to the person(s) providing for, or reasonably appearing to provide for, the care of such person, upon the decision of the Committee.

**Payments to Missing Persons**

It is your responsibility, your spouse's or beneficiary's responsibility after your death, and/or your alternate payee's responsibility under a QDRO to keep the Company fully advised as to any status change that would affect payment of benefits from the Plan. The Plan is not responsible for the failure to locate missing persons or for the payment to others of amounts that would have been paid to missing persons.

**Incorrect Payment of Benefits**

If the Committee, in its discretion, determines that the Plan made an incorrect payment of benefits, and that a correction is necessary or desirable under applicable law, the Plan may recover the amounts incorrectly paid either by requiring the payee to return the excess to the Plan, by reducing any future Plan payments to the payee, or by any other method deemed reasonable to the Committee.

**Top-Heavy Provisions**

Under current law, the Plan is required to contain top-heavy provisions that will go into effect if the Plan becomes top-heavy sometime in the future. A plan is considered top-heavy only if more than 60% of the Plan's benefits accrue in favor of key employees, as determined under the Internal Revenue Code. It is unlikely that the Plan will ever become top-heavy. A more detailed explanation of these provisions will be provided if and when the Plan becomes top-heavy.

**Claims Procedures**

You or your beneficiary may file a written claim for benefits under the Plan to the Committee. If a claim for Plan benefits is denied for any reason, you or your beneficiary will be notified in writing within 90 days after the Committee's receipt of the claim (or within 180 days if special

19

circumstances require an extension of time and you or your beneficiary are notified of the extension in writing prior to the end of the initial 90-day period).

The notification of denial will set forth: (1) the specific reasons for the denial, (2) the references to the specific Plan provisions on which the denial is based, (3) a description of any additional information necessary for the claim to be granted and an explanation of why such information is necessary, and (4) a description of the Plan's review procedures, time limits under such procedures, and a statement regarding your or your beneficiary's right to bring a civil action under Section 502(a) of ERISA following a denial on appeal.

**Appealing Claim Denials**

You or your beneficiary may file a written appeal with the Committee within 60 days after the date of denial. You or your beneficiary may submit written comments, documents, records and other information related to the claim on appeal. You or your beneficiary will also be provided, upon request and free of charge, access to and copies of all documents, records and other information relevant to the claim. The Committee must consider all comments, documents, records and other information submitted regardless of whether such information was submitted or considered in the initial claim determination.

The Committee will furnish you or your beneficiary with a written notice of its decision as to the review of the appeal within 60 days of receiving the request for review (or within 120 days if special circumstances require additional time and you or your beneficiary are notified of the extension in writing prior to the end of the initial 60-day period). The notification of denial will set forth: (1) the specific reasons for the decision, (2) the references to the specific Plan provisions on which the decision is based, (3) a statement that you or your beneficiary are entitled to receive, upon request and free of charge, access to and copies of all documents, records and other information relevant to the benefit claim, and (4) a description of any further voluntary appeal procedures offered by the Plan and your or your beneficiary's right to obtain information about such procedures as well as a statement regarding your right to bring a civil action under Section 502(a) of ERISA following a denial on appeal.

**Legal Action**

The Committee's decision will be final and binding. **If you or your beneficiary subsequently wish to file a legal action or other judicial proceeding for benefits against the Plan, such action or proceeding must commence within 90 days after the Committee's final decision with respect to you or your beneficiary's appeal of your initial claim denial (as described above).** No lawsuit or other judicial proceeding shall be brought to recover benefits under the Plan until the appeal rights described above have been exercised and the Plan benefits requested in such appeal have been denied in whole or in part. If any such lawsuit or judicial proceeding is undertaken to appeal the denial of a claim or bring any other action under ERISA other than a breach of fiduciary duty claim, the evidence presented will be strictly limited to the evidence timely presented to the Committee.

## SITUATIONS AFFECTING PLAN BENEFITS

> **Some situations could cause a loss or delay of your Plan benefits.**

The Plan is designed to help you meet your retirement needs in the future. But some situations could affect Plan benefits, including, but not limited to, the following:

- If you fail to make proper application for benefits, provide necessary information, or provide the Company with your current address, your benefits could be delayed.

- Federal law sets both the maximum annual limit on the amount of your eligible compensation that can be used to calculate your annual Employer contribution credit and the maximum amount of retirement benefits that can accrue or be paid under the Plan. These limits generally apply to higher-paid employees. You will be notified if they affect you.

- If you (or your beneficiary) are unable to care for your own affairs, any payments due may be paid to someone else (such as a relative or court-appointed guardian) for your benefit.

### Plan Amendments or Termination

The Company reserves the right to amend, modify, or terminate the Plan at any time for any reason. However, Plan assets are reserved for participants and their beneficiaries and may not revert to the Company as a result of any Plan amendment, modification, or termination. If the Plan is terminated, you will be entitled to the entire balance of your cash balance account.

## ADMINISTRATIVE INFORMATION

> **General administrative information for the Plan can be found here.**

### Plan Sponsor and Administrator

The Plan described in this SPD is sponsored by:

> Tribune Company
> 435 North Michigan Avenue
> Chicago, Illinois 60611

The Plan Administrator is the Tribune Company Employee Benefits Committee (the "Committee"). You may contact the Committee at the Company's main address (above), or by contacting the Benefits Service Center at 435 North Michigan Avenue, Chicago, Illinois 60611; telephone 1-800-872-2222. Most of your day-to-day questions will be answered by the Hewitt Retirement Center at 1-800-872-2222.

### Plan Type, Plan Number and Plan Year

Documents and reports for the Plan are filed with the Internal Revenue Service and Department of Labor under two numbers: the Company's Employer Identification Number (EIN) and the Plan Number (PN). The EIN for Tribune Company is 36-1880355. The Plan number is 007. The official Plan name is the Tribune Company Cash Balance Pension Plan. The Plan is a defined benefit plan. Plan records are kept on a Plan year basis, which is January 1 through December 31.

### Plan Trustee

The Plan is funded by Employer contributions to a trust. The official name of the trust is the Tribune Company Master Trust for Pension Plans. The current trustee of the Plan is The Northern Trust Company.

### Agent for Service of Legal Process

The agent for service of legal process is the Secretary of Tribune Company (currently, David P. Eldersveld), who may be contacted at the Company's main address. Service may also be made on the Committee at the Company's main address, or on the trustee.

## YOUR RIGHTS UNDER ERISA

> **As a participant in the Plan, you have certain rights and protections under the federal law known as the Employee Retirement Income Security Act of 1974, as amended (or "ERISA").**

ERISA provides that all Plan participants shall be entitled to:

### Receive Information About Your Plan and Benefits

- Examine, without charge, at the Company's offices and at other specified locations, such as worksites and union halls, all documents governing the Plan, including insurance contracts and collective bargaining agreements, and a copy of the latest annual report (Form 5500 Series) filed by the Plan with the U.S. Department of Labor and available at the Public Disclosure Room of the Employee Benefits Security Administration.

- Obtain, upon written request to the Plan Administrator, copies of documents governing the operation of the Plan, including insurance contracts and collective bargaining agreements, and copies of the latest annual report (Form 5500 Series), and updated summary plan description. The Plan Administrator may make a reasonable charge for the copies.

- Receive a summary of the Plan's annual financial report. The Plan Administrator is required by law to furnish you with a copy of this summary annual report.

- Obtain an annual statement of whether you have a right to receive a pension at normal retirement age (age 65) and if so, what your benefits would be at normal retirement age if you stop working under the Plan now. If you do not have a right to a pension, the statement will tell you how many more years you must work to get a right to a pension. This statement must be requested in writing and is not required to be provided more than once every 12 months. The Plan must provide the statement free of charge.

### Prudent Action by Plan Fiduciaries

In addition to creating rights for Plan participants ERISA imposes duties upon the persons who are responsible for the operation of the Plan. The persons who operate your Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other Plan participants and beneficiaries. No one, including the Employer or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a pension benefit or exercising your rights under ERISA.

23

**Enforce Your Rights**

If your claim for a pension benefit is denied or ignored, in whole or in part, you have a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules.

Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request a copy of Plan documents or the latest annual report from the Plan and do not receive them within 30 days, you may file suit in a federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the Plan Administrator. If you have a claim for benefits that is denied or ignored, in whole or in part, you may file suit in a state or federal court. In addition, if you disagree with the Plan's decision or lack thereof concerning the qualified status of a domestic relations order, you may file suit in federal court. If it should happen that Plan fiduciaries misuse the Plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor or you may file suit in a federal court. The court will decide who should pay court costs and legal fees. If you are successful, the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.

**Assistance with Your Questions**

If you have any questions about the Plan, you should contact the Plan Administrator. If you have any questions about this statement or about your rights under ERISA, or if you need assistance in obtaining documents from the Plan Administrator, you can contact the nearest office of the Employee Benefits Security Administration, U.S. Department of Labor, listed in your telephone directory, or the Division of Technical Assistance and Inquiries, Employee Benefits Security Administration, U.S. Department of Labor, 200 Constitution Avenue, N.W., Washington, D.C. 20210. You may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Employee Benefits Security Administration or visiting the Employee Benefits Security Administration's web site at http://www.dol.gov/ebsa.

CHI99 5025481-6.020336.0043

**Attachment 2**

**June 2011 Letter to Comparsi**

Tribune Company
435 North Michigan Avenue
Chicago, Illinois 60611

# TRIBUNE

312/222-9100

June 22, 2011

VIA OVERNIGHT DELIVERY

FOR SETTLEMENT PURPOSES ONLY
SUBJECT TO FEDERAL RULE OF EVIDENCE 408

Mr. Vince Comparsi
2166 West General Avenue
Rancho Palos Verdes, California  90275

Re:    Proof of Claim in Los Angeles Times Communications LLC Bankruptcy

Dear Mr. Comparsi:

On or about June 5, 2009, you filed a proof of claim in the bankruptcy proceeding of Los
Angeles Times Communications LLC ("LATC"). LATC's chapter 11 case is pending in the
United States Bankruptcy Court for the District of Delaware (the "Bankruptcy"). In brief, you
contend in your proof of claim that you should be eligible to receive retirement benefits under a
Los Angeles Times pension plan as a result of allegedly qualifying as an employee of the Los
Angeles Times beginning in 1972. Because you seek to recover benefits under an employee
pension benefit plan that is governed by the Employee Retirement Income Security Act of 1974,
as amended ("ERISA"), your proof of claim has been sent to the Tribune Company Employee
Benefits Committee (the "Committee") for review.

**Background of the Tribune Company Cash Balance Pension Plan**

The Committee is the plan administrator of the Tribune Company Cash Balance Pension Plan
(the "Tribune Plan"). Prior to 2002, the Times Mirror Pension Plan was the employee pension
benefit plan governed by ERISA that provided retirement benefits to employees of The Times
Mirror Company (which included employees of the Los Angeles Times newspaper). The Times
Mirror Pension Plan and the Tribune Company Pension Plan merged effective December 23,
2002, and effective January 1, 2008, that plan was amended, restated and renamed as the Tribune
Company Cash Balance Pension Plan. Thus, eligible claims for pension benefits based on an
employment relationship with the Los Angeles Times would be paid by the Tribune Plan.

**Your Proof of Claim Filed in the Bankruptcy is Not Proper**
**and Arises Only under the Tribune Plan**

This letter is being sent to you on behalf of the Committee in an effort to resolve your proof of
claim and redirect your claim so that it is asserted under the Tribune Plan. The debtors and the
Committee are making this effort based on their view that your claim is not properly asserted

Mr. Vince Comparsi
June 22, 2011
Page 2 of 4

against the debtors in their Bankruptcy proceedings, but rather should be asserted under the Tribune Plan directly in accordance with the procedures under the Tribune Plan and ERISA.

LATC believes that your claim is not properly asserted in the Bankruptcy and should be withdrawn or disallowed in the Bankruptcy for multiple reasons. First, your proof of claim does not seek to recover monies directly from a debtor in the Bankruptcy, but rather seeks payment of pension benefits allegedly owed to you from the Tribune Plan. The Tribune Plan is not a debtor in the Bankruptcy, and the benefits paid by the pension plan are not funded from the assets of the debtors but instead are paid through a tax qualified trust that is not under the debtors' control and whose assets are separate from the assets of the debtors. Accordingly, the filing of the Bankruptcy by Tribune Company, LATC, and their affiliates does not impose any bar on you from asserting your pension benefits claim against the Tribune Plan in accordance with the procedures prescribed by the Tribune Plan and ERISA.

Second, LATC believes that the Bankruptcy Court cannot properly adjudicate your proof of claim. Because you seek to recover retirement benefits under an ERISA-governed pension plan, you are required under federal law to exhaust the administrative claims procedures available under the Tribune Plan before the claim may be litigated in a court proceeding. It is well-settled under ERISA that a claimant seeking to recover benefits allegedly due under a pension plan must exhaust all administrative remedies available under the terms of an ERISA-covered plan before bringing suit in court. Here, you have not yet submitted a written claim for benefits under the Tribune Plan. As a result, even if you could properly submit a proof of claim in the Bankruptcy (which you cannot, because your claim is not assertable directly against LATC, as described above), you would be required to submit a claim to the Committee under the Tribune Plan before resorting to litigation.

**Your Claim for Retirement Benefits Should Be Directed to the Tribune Plan**

Although your proof of claim is not properly filed in the Bankruptcy, you retain your right to submit a written administrative claim for benefits under the Tribune Plan. The Committee is willing to accept the documentation submitted with your proof of claim as a written claim for benefits under the Tribune Plan, and commence review of your claim under the Plan's claims procedures, so that your claim can be resolved with minimal additional delay.

Attached to this letter is a proposed stipulation to withdraw your proof of claim in the Bankruptcy proceeding with prejudice. As described in this letter and in the proposed stipulation, the withdrawal of the proof of claim from the Bankruptcy shall not impair your rights to pursue your claim against the Tribune Plan, which is the proper party in interest, in accordance with the terms of the Tribune Plan and ERISA. Please review the proposed stipulation and, if you agree with it, execute the stipulation and return it to me at the address above. Upon receipt of the signed stipulation, the Committee will commence review of your pension benefit claim under the Tribune Plan, in accordance with the terms of the Plan and the proposed stipulation.

Case 08-13141-BLS    Doc 10611-3    Filed 01/13/12    Page 40 of 54

Mr. Vince Comparsi
June 22, 2011
Page 3 of 4

If you do not respond to this proposal to resolve your claim within 30 days of the date of this letter, the debtors intend to file an objection to your proof of claim in the Bankruptcy seeking to disallow your claim against LATC on the grounds outlined above, and any other applicable grounds.

**The Tribune Plan's Claims Procedures Governing Your Administrative Benefit Claim**

As discussed above, the Committee intends to review the issues raised in your proof of claim as an administrative claim for benefits under the Tribune Plan. In the event that you do not wish to proceed with an administrative benefit claim under the Tribune Plan, please send a written notice to the Committee of your intention not to submit a claim for benefits within 14 days from the date of this letter.

In the event that you agree to proceed with an administrative benefit claim under the Tribune Plan, the Committee will allow you 14 days from the date of this letter to submit any additional evidence you would like the Committee to review in support of your benefit claim. Upon receipt of any additional information in support of your claim, or after the expiration of the 14-day period for withdrawing your benefit claim or providing supplemental information, the Committee will commence review of your benefit claim. Your benefit claim will be decided and you receive notice of the decision within 90 days of the commencement of the review. If special circumstances exist, the Committee has the discretion to extend the review period by an additional 90 days. If that occurs, you will receive written notice of the extension prior to the end of the initial 90-day period.

If the Committee denies your benefit claim, you may file a written appeal with the Committee within 60 days after the date of the denial. You may submit written comments, documents, records and other information related to the claim on appeal. You will also be provided, upon request and free of charge, access to and copies of all documents, records, and other information relevant to the claim. The Committee will consider all comments, documents, records and other information submitted regardless of whether such information was submitted or considered in the initial claim determination.

The Committee will furnish you with a written notice of its decision as to the review of the appeal within 60 days of receiving the request for review (or within 120 days if special circumstances require additional time and you are notified of the extension in writing prior to the end of the initial 60-day period). The notification will set forth: (1) the specific reasons for the decision, (2) the references to the specific Plan provisions on which the decision is based and (3) a statement that you are entitled to receive, upon request and free of charge, access to and copies of all documents, records and other information relevant to your benefit claim. Also, if your claim appeal is denied, you will be notified of your right to bring a civil action under Section 502(a) of ERISA in court. Please note that if you ultimately decide to file a legal action or other judicial proceeding challenging the Committee's determination on your benefit claim, such action or proceeding must commence within 90 days after the Committee's final decision on your benefit claim.

Mr. Vince Comparsi
June 22, 2011
Page 4 of 4

If you have any questions regarding this letter or the Tribune Plan's claims procedures, please contact Kevin Dansart at 312-222-4498. We look forward to your consideration of the proposed resolution of your claim for benefits under the Tribune Plan.

Sincerely,

Michael G. Bourgon
On Behalf of the
Tribune Company Employee Benefits Committee

DM_US 28867723-2.020336.0043

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered |

## STIPULATION BETWEEN LOS ANGELES TIMES COMMUNICATIONS LLC, TRIBUNE COMPANY EMPLOYEE BENEFITS COMMITTEE, AND VINCE COMPARSI REGARDING WITHDRAWAL OF PROOF OF CLAIM NO. 3589

This stipulation between Los Angeles Times Communication LLC ("LATC" or

the "Debtor"), Tribune Company Employee Benefits Committee (the "Committee"), as the plan

administrator of the Tribune Company Cash Balance Pension Plan (the "Tribune Plan"), and

Vince Comparsi (the "Claimant" or "Mr. Comparsi") regarding the resolution of that certain

proof of claim asserted by the Claimant against LATC, which was assigned Claim No. 3589 by

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc., f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); and WPIX, Inc. (0191). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

the Bankruptcy Court-appointed claims agent, is entered into by and among LATC, the Committee, and the Claimant (the "Parties").

## RECITALS

A.    On December 8, 2008 (the "Petition Date"), Tribune Company and certain of its affiliates, including LATC (collectively, the "Debtors"), each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors' chapter 11 cases are being jointly administered under case number 08-13141.

B.    On June 5, 2009, the Claimant filed the Proof of Claim against LATC in the total amount of $1,560,043.00, based on a claim for retirement benefits arising from an alleged employment relationship with the Los Angeles Times (the "Pension Benefit Claim").

C.    LATC and the Committee have advised the Claimant that the Pension Benefit Claim is properly asserted against the Tribune Plan, an employee pension benefit plan governed by the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and not against LATC or any of the other Debtors.

D.    The Parties have reached an agreement for the withdrawal with prejudice of Claim No. 3589 as against LATC, and have agreed to enter into this stipulation (the "Stipulation") to document their agreement.

NOW, THEREFORE, THE PARTIES STIPULATE AND AGREE AS FOLLOWS:

## AGREEMENT

1.    The recitals set forth above are incorporated herein by reference.

2.    The Parties agree that, upon the execution of this Stipulation by the Parties, (i) the Committee will accept the documentation submitted by Mr. Comparsi with Claim No. 3589 as a written claim for benefits as against the Tribune Plan, and (ii) Claim No. 3589

2

shall be deemed to be withdrawn with prejudice against LATC. The Debtors and/or the Bankruptcy Court-appointed claims agent may amend the claims register to reflect that Claim No. 3589 has been withdrawn.

3.      The Parties further agree that nothing in this Stipulation, or the Debtors' chapter 11 bankruptcy cases (including, without limitation, the automatic stay provided for by section 362(a) of the Bankruptcy Code), shall impair Mr. Comparsi's ability to seek or recover any pension benefits from the Tribune Plan to which he is entitled, as determined by (i) a final decision of the Committee issued in accordance with the terms of the Tribune Plan and the procedures set forth therein, or (ii) following Mr. Comparsi's exhaustion of administrative remedies, a court of competent jurisdiction following judicial review of the Pension Benefit Claim under Section 502(a) of ERISA.

4.      The undersigned persons represent and warrant that they have full authority to execute this Stipulation on behalf of the respective Parties and that the respective Parties have full knowledge of and have consented to this Stipulation.

5.      This Stipulation may be executed in counterparts, all of which may be transmitted by facsimile or electronic mail, and each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

6.      This Stipulation may not be amended without the express written consent of all Parties hereto.

7.      This Stipulation shall be binding upon the Parties hereto and upon their affiliates, assigns and successors.

8.    The Parties acknowledge that each party has participated in and jointly consented to the drafting of this Stipulation and that any claimed ambiguity shall not be construed for or against any party on account of such drafting.

9.    All contentions made in this Stipulation are made in furtherance of a proposed settlement and neither the Claimant nor the Debtor admit or concede the validity of any claims or defenses and nothing herein shall be deemed an admission of fact or law.

10.    Each of the Debtors expressly reserves its right to object to any other claims asserted by Claimant.

[Signature Page Follows]

4

DATED: _____, 2011

LOS ANGELES TIMES
COMMUNICATIONS LLC

By:_____
Title:_____

Telephone:
Facsimile:


TRIBUNE COMPANY EMPLOYEE
BENEFITS COMMITTEE, AS THE PLAN
ADMINISTRATOR OF THE TRIBUNE
COMPANY CASH BALANCE PENSION
PLAN

By:_____
Title:_____

Telephone:
Facsimile:


_____

Vince Comparsi
2166 West General Avenue
Rancho Palos Verdes, California  90275

Telephone:
Facsimile:

5

**Attachment 3**

**December 20 Letter to Comparsi**

Tribune Company
435 North Michigan Avenue
Chicago, Illinois 60611

# TRIBUNE

Benefits Service Center
Telephone:  800/872-2222
FAX:  312/222-4644

December 20, 2011

VIA UPS OVERNIGHT
SIGNATURE REQUIRED

Mr. Vince Comparsi
2166 West General Avenue
Rancho Palos Verdes, California  90275

Re:    Claim for Benefits under
       The Tribune Company Cash Balance Pension Plan

Dear Mr. Comparsi:

The Tribune Company Employee Benefits Committee (the "Committee") has received your claim letter, in which you submit a claim for eligibility for pension benefits under the Tribune Company Cash Balance Pension Plan (the "Cash Balance Plan"). The arguments presented in support of your claim have been researched and reviewed by the Committee. After reviewing your claim, for the following reasons, the Committee regrets to inform you that your claim is denied.

## I.    Authority of the Committee to Decide Claims

Under Section 9 of the Cash Balance Plan, the Committee is responsible for the administration of the Cash Balance Plan and is designated as the Plan Administrator.  As Plan Administrator, the Committee has the full discretion and authority to control and manage the Plan's administration, including but not limited to complete and absolute discretionary authority and power to administer, interpret and construe the terms of the Cash Balance Plan and to make determinations as to the right of any person to a benefit under the Cash Balance Plan.  The Committee also has the authority to decide all questions that may arise under the Cash Balance Plan, including all claims relating to the benefits to which any individual may be entitled under the Cash Balance Plan.  Similarly, the Committee has full discretion and authority to administer, interpret and construe the terms of the Times Mirror Pension Plan, which is a predecessor plan to the Cash Balance Plan, and to decide all questions that may arise under that plan.

You initially submitted your claim to the United States Bankruptcy Court for the District of Delaware, in which the bankruptcy proceedings for the Tribune Company and related entities, including Los Angeles Times Communications LLC, the entity that publishes the Los Angeles Times ("LA Times") are pending.  In a letter to you dated June 22, 2011, you were notified that your claim for benefits should have been addressed to the Committee for review and determination, and that your proof of claim filed in the Bankruptcy Court was improperly asserted against Los Angeles Times Communications LLC, for the reasons stated in that letter.  Since you did not respond to the letter dated June 22, 2011, as you were informed in that letter, your challenges raised in your proof of claim were sent to the Committee for a determination under the Cash Balance Plan's claims procedures.

## II.    Analysis of Claim

In your claim, you contend that you should be eligible to participate in the Cash Balance Plan and receive retirement benefits as a result of allegedly qualifying as an employee of the LA Times beginning in 1972. However, as discussed below, neither Tribune Company, the LA Times nor the Cash Balance Plan ever has considered you to qualify as an "Employee" of the LA Times during your contractual relationship. Instead, as discussed below, you were considered to be an independent contractor of the LA Times, and therefore you are ineligible for participation in and for receiving benefits under the Cash Balance Plan, or any other pension plan sponsored by the Tribune Company and the LA Times.

### A.    Factual Background

You were an independent contractor distributor who operated your own profitable print media distribution company for decades. You eventually incorporated your business, which was operated as Compy Distributing, Inc., ("Compy Distributing") of which you were President. You contracted with the LA Times and your business agreement with the LA Times spanned approximately 36 years, until November 2008, when the final contract terminated. We understand that, in fulfillment of the terms of your written contracts, you or Compy Distributing employed or contracted with many individuals who performed back office support and/or newspaper delivery at your or Compy Distributing's sole direction and control.

You ran your business without any direction from the LA Times. The contract terms between you and the LA Times dictated the nature of your business relationship. The contract terms were negotiated by you in numerous negotiations with LA Times employees over the years. Not once over the 36-year period of operations under your independent contractor agreements did you claim to be an employee or suggest that you were entitled to employee benefits under any Tribune Company or LA Times benefit plan. Over the course of your career, we understand that you engaged in other work activities unrelated to your delivery business, which demonstrates your sophistication and understanding of the fundamental differences between employees and independent contractors.

### B.    Relevant Plan Provisions

Under the Cash Balance Plan, in order to be an eligible Participant entitled to pension benefits, an individual must qualify as an "Eligible Employee" under the Cash Balance Plan's terms. Under Section 1.1(n) of the Cash Balance Plan, the term "Employee" is defined as ". . . any individual who is classified by an Employer or Related Company as its common law employee for purposes of employment taxes and wage withholding for Federal income taxes. If an individual is not considered an Employee in accordance with the preceding phrase for a Plan Year, a subsequent determination by the Employer or Related Company, any governmental agency or court that the individual is a common law employee of the Employer or Related Company, even if such determination is applicable to prior years, will not have a retroactive effect for purposes of eligibility to participate in the Plan." Under Section 1.1(m), the Cash Balance Plan defines "Eligible Employee" to mean "Any Employee employed by an Employer. . . ."

The 1999 Restatement of The Times Mirror Pension Plan ("Times Mirror Plan"), which governed benefits for former LA Times Employees prior to the Cash Balance Plan, contained similar

definitions for eligibility. For example, Section 3.1 of the Times Mirror Plan states that "in order to become a Participant in the Plan, an employee must be a Covered Employee and must complete and have to his credit one (1) Year of Eligibility Service." Under Section 1.23 of the Times Mirror Plan, an "Employee" means "any individual who has the status of an employee of a Times Mirror Employer under the common law rules applicable in determining the employer-employee relationship." Under Section 1.18 of the Times Mirror Plan, a "Covered Employee" is defined as "an Employee who is employed by a Participating Company or Participating Unit," but specifically excludes an Employee who is treated as an Independent Contractor by a Participating Company or Participating Unit.

### C.    You Were an Independent Contractor, Not an Employee, for the LA Times

For purposes of your benefit claim, the question presented is whether you qualify as an Employee generally, or as an Eligible Employee (under the Cash Balance Plan) or a Covered Employee (under the Times Mirror Plan). As discussed below, we find that you were never employed by the LA Times, but were considered to be and treated as an independent contractor by the LA Times. As a result, you are ineligible for pension benefits under the Cash Balance Plan or its predecessor, the Times Mirror Plan.

The Supreme Court of the United States' decision in *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318 (1992), controls the issues raised in your claim. In *Darden*, the Court applied the common law agency factors to be considered in determining true contractor status and the service recipient party's right to control the "manner and means" by which the product or service is accomplished. *Darden* addresses the question whether a contractor seeking retirement benefits under ERISA is entitled to them as an "employee." None of the factors listed in the decision is decisive (and not all are necessarily pertinent), and they must be identified and weighed together, in relevant context. Here, all of the applicable factors lead to a single conclusion; that you were an independent contractor at all times, relating specifically to your benefit claim and otherwise.

The *Darden* factors are:

1.    the skill required;
2.    the source of the instrumentalities and tools;
3.    the location of the work;
4.    the duration of the relationship between the parties;
5.    whether the service recipient party has the right to assign additional projects to the contracted service provider party;
6.    the extent of the contracted party's discretion over when and how long to work;
7.    the method of payment;
8.    the contracted party's role in hiring and paying assistants;
9.    whether the work is part of the regular business of the service recipient;
10.    whether the service recipient is in business;
11.    the provision of employee benefits; and
12.    the tax treatment of the contractor.

*Id.* at 323-324.

These factors as applied to your claim establish that you were considered to be an independent contractor for purposes of your work with the LA Times, and not as an employee who was eligible for benefits under the Cash Balance Plan or the Times Mirror Plan. The express terms of your written contracts entered into with the LA Times, along with your lengthy course of conduct, establish and confirm your independent contractor status, which preclude entitlement to benefits under the Cash Balance Plan or the Times Mirror Plan.

The distributor agreement referenced in your claim was entitled "Los Angeles Times Distributor Agreement-Home Delivery" with an effective date of October 9, 2006 (a copy is attached as Exhibit 1),[1] The provisions of this contract unambiguously stated that you would have an independent contractor relationship with the LA Times and that you were required by its terms to own and operate an independent delivery business. The following express contract terms are illustrative:

1.  "The Company [LA Times] desires to retain the services of Distributor [you] *as an independent contractor* to deliver the Los Angeles Times to the Company's home delivery subscribers and targeted households as well as certain other publications or other materials." (Emphasis added.) *See* Ex. 1 at p. 1.

2.  You and the LA Times mutually agreed that you would not be treated as an employee, would not receive benefits currently paid to LA Times employees, and would receive as compensation only the fees set forth in the agreement:

    a.  "In consideration of the delivery and other services to be provided by the Distributor pursuant to this Agreement, The Company agrees to pay Distributor the fees set forth in Exhibit A and any addendums." *See* Ex. 1 at ¶2.

    b.  "Distributor is a self-employed independent contractor and not an employee of the Company." *See Id.* at ¶6(a).

    c.  "...Distributor shall not be entitled to any benefits under the employee benefit plans of the Los Angeles Times, regardless of any characterization or recharacterization of the Distributor's status by any governmental agency or court." *Id.*

3.  The LA Times expressly disclaimed any right to control how you operated your business: "The Company is interested only in the results to be obtained by Distributor as described in this Agreement, and the manner and means to be employed by Distributor are matters entirely within the authority and discretion of Distributor, over which the Company has no authority or jurisdiction." *See* Ex. 1 at ¶ 6(a).

4.  You were treated as an independent contractor for tax purposes.

    a.  "Distributor shall be treated as an independent contractor and a direct seller and not as an employee for Federal, state or local tax purposes under applicable law." *See* Ex. 1 at ¶ 6(a).

---

[1] You executed a subsequent agreement as the President of Compy Distributing, which was in effect through November 2008.

    b.  "The fees payable to Distributor under this Agreement have been established on the basis that Distributor is an independent contractor and is responsible for the payments of all taxes, payments or contributions described above." *Id.*

    c.  "Distributor agrees to reimburse the Company for any and all such taxes, payments, or contributions which the Company may be required to pay by ruling, regulation, court decision or otherwise on account of any employee or others engaged by Distributor." *Id.* at ¶ 6(b).

5.  You could contract with individuals as independent contractors and/or hire individuals to work for you without the knowledge, approval or consent of the LA Times.

    a.  "Distributor will have the right to operate Distributor's business as Distributor chooses. Distributor shall hire Distributor's own employees and shall have the right to engage such other personnel as Distributor may deem necessary or desirable and Distributor shall exercise the sole and exclusive control and supervision of all said persons." *See* Ex. 1 at ¶ 6(a).

    b.  "Distributor will pay all payroll taxes and contributions for unemployment insurance and pensions or annuities and any other payment which may now or hereafter be required as measured by wages, salaries, or other remuneration paid to employees or others engaged by Distributor in the performance of this Agreement and will file all required returns relating thereto." *Id.* at ¶ 6(b).

6.  Under an express indemnity provision, you agreed to hold the LA Times harmless and indemnify the LA Times for claims made against anyone subject to your supervision and control. *See* Ex. 1 at ¶ 7(a).

7.  You were contractually obligated to carry worker's compensation insurance and business insurance as required by law. *See* Ex. 1 at ¶ 7(b).

8.  You entered into your contracts with LA Times voluntarily and negotiated certain terms in each contract.

9.  The contracts were for specific terms (generally 1 year) and could be terminated by either party upon 30 days written notice. *See* Ex. 1 at ¶¶ 3(a) & (b).

We do not believe it can be disputed that you fulfilled all of the terms of your distributor agreements for decades, without any intervention or interference by the LA Times. The distribution contracts defined the deliverable and specified the result to be accomplished, which was home delivery on a daily basis and in a specified geographic area, of newspaper products in a dry, readable condition by a specified time. The manner in which this result was to be accomplished was left entirely to your discretion or those to whom you delegated your unilateral decision making.

As a third party service provider or vendor, you were paid on a piece rate basis, per newspaper, which rates were subject to negotiation. You in turn paid your delivery service providers in a manner that you or Compy Distributing determined. You received no other remuneration from the LA Times.

It was your or Compy Distributing's sole decision with whom to contract or hire in the operation of the delivery business. You alone determined who delivered newspapers on the routes for which the delivery person was responsible. The LA Times had no knowledge of and did not involve itself in your retention of service providers to fulfill contract terms or to work for or with Compy Distributing, Inc.

You also decided on your own who would deliver which routes. Route adjustments or reconfigurations of the contracted routes were your right to make, not that of the LA Times. No one from the LA Times had any role in determining the manner of delivery, methods for daily operation and contract fulfillment, or Compy Distributing's business strategies. You also retained the duty to obtain worker's compensation insurance and, so far as the LA times knew, operated your business in compliance with or consistent with applicable laws, including business related insurance appropriate for the size and nature of your company.

While the LA Times does not know all of the details of your delivery business, we understand that it was no small operation. You were contractually obligated to deliver 6,600 newspaper products on weekdays and 9,600 newspapers on Sundays on an estimated 26 routes in Los Angeles. You delivered other publications including the Weekly Variety, Jewish Journal, Investors Business Daily, Los Angeles Sentinel, Korean Daily, Korea Times, Financial Times and Wall Street Journal, among others. This volume of print media product delivery in each 24 hour period, 365 days each year, required a large service provider network. Each of these individuals was either contracted to you or your company, or hired by you or the company to support or do the delivery work. You apparently did not do the delivery work yourself especially as your operation grew.

The business was run principally out of a large warehouse rented by Compy Distributing. Here, an unknown number of individuals picked up or assembled newspapers for the daily deliveries. No one from LA Times was involved in the oversight of this operation. Only you and those who worked for you or the company were running the business. As President of Compy Distributing, you oversaw the strategic vision of your business and let others handle routine matters, such as delivery and customer complaints. You negotiated with the LA Times on the contract terms that would affect the profits of your business. You also negotiated under your contract a special piece rate supplement for delivery of Sunday products on weekdays, which other distributors did not receive. You evaluated and negotiated, among other things, the length of each of your agreements, service targets, per copy rates and complaint per thousand rates.

Based on our review of your claim, we have determined that you likely had knowledge of your status as an independent contractor of the LA Times and the legal distinctions that exist between being an employee and independent contractor. As a contractor, employee and business owner with exposure to different types and categories of workers, we believe that you had knowledge of the indicia of independent contractor status.

For the foregoing reasons, we have determined that your services performed for the LA Times were as an independent contractor and not as an employee of the LA Times, or any other entity that participates in the Cash Balance Plan or, previously the Times Mirror Plan. As a result, you do not qualify as a Participant, Covered Employee or Eligible Employee eligible to receive benefits under the Cash Balance Plan or the Times Mirror Plan. Consequently, based on the distributor agreements, plan documents and your conduct, we must deny your administrative claim for pension benefits under the Cash Balance Plan or the Times Mirror Plan.

## ERISA Rights

Under federal law governing benefits under the Cash Balance Plan, you or your duly authorized representative has the right to (1) examine pertinent plan documents and records; (2) submit written comments on the issues addressed in this letter; and (3) request a review of the denial of your claim. If you desire to request a review, you should submit a request for review in writing to the Committee within sixty (60) days after the receipt of this letter. Included with any request should be any additional information that you believe entitles you to a review of your claim.

If a timely request for review is received, the request will be responded to within sixty (60) days of the receipt of the request or, if special circumstances exist that require an extension of time for reviewing the information, you will receive notice of the extension within 60 days of the receipt of the request. If no written request for review is submitted within 60 days after receiving this letter, the decision set forth in this letter shall be deemed final. Under the terms of the Cash Balance Plan and its summary plan description, if you seek a review of the denial of your claim and the review is denied, you or your legal representative will then have the right to bring a civil lawsuit within 90 days of that decision under ERISA Section 502(a) to challenge that adverse benefit determination.

We hope you find this information helpful in addressing the issues raised in your claim letter. Please contact the Committee by letter at the above address if you have any further questions.

Sincerely,

Kevin Dansart
Director, Benefits Administration
On Behalf of the Tribune Company Employee Benefits Committee