# EXHIBIT C

## Petition for Interim Probation

IN THE SUPREME COURT OF FLORIDA

THE FLORIDA BAR,

        Complainant,        Supreme Court Case No:
                                 [TFB Case No.  2007-30,622(09C)(CES)]

v.

JACQUELYN RENEE OXENDINE,

        Respondent.

_____/

## PETITION FOR INTERIM PROBATION

      This petition of The Florida Bar seeks interim relief and requires the

immediate attention of the court pursuant to R. Regulating Fla. Bar 3-5.2. The

Florida Bar seeks that Jacquelyn Renee Oxendine be placed on interim probation

based on facts that establish clearly and convincingly that Jacquelyn Renee

Oxendine appears to be causing great public harm by behaving in a paranoid and

erratic manner indicating respondent may be suffering from severe mental health

problems that are severely impacting her ability to competently practice law as will

be shown by facts supported by the affidavits of Judge Faye Lynette Allen,

Rosalind Williams, Greg Meeks and Jan K. Wichrowski, Chief Branch Discipline

Counsel of The Florida Bar, Orlando Branch Office, attached hereto as Exhibit

"A", Exhibit "B," Exhibit "C" and Exhibit "D" respectively, as follows:

PUBLIC RECORD

Exhibit "A"

1. The filing of this Petition for Interim Probation has been authorized by the Executive Director of The Florida Bar.

2. Respondent, Jacquelyn Renee Oxendine, is and at all times hereinafter mentioned, was a member of The Florida Bar and subject to the jurisdiction and disciplinary rules of the Supreme Court of Florida.

3. Respondent is currently the subject of a bar disciplinary matter which has been assigned The Florida Bar file number 2006-32,273(09C). This matter was brought to the bar's attention by the Honorable Faye Lynette Allen, a sitting county court judge, who has observed respondent's irrational behavior in her courtroom and who received a bizarre and disturbing telephone message at home from an unidentified man at respondent's direction. Judge Allen's observations are set forth more fully in her affidavit attached as Exhibit "A."

4. In connection with The Florida Bar file number 2006-32,273(09C), on September 15, 2006, the Ninth Judicial Circuit Grievance Committee "C" directed respondent to undergo an immediate psychiatric evaluation by a Florida Lawyers Assistance, Inc., approved evaluator and to immediately provide the result of that evaluation to the committee. Respondent has refused to comply with undergoing an evaluation from Florida Lawyers Assistance, Inc. Respondent's position is that she does not need an evaluation and that Judge Allen is acting vindictively.

5.    The Bar's investigation of this matter has indicated that respondent believes she is being followed by seven Bar Staff Investigators and investigators hired by Judge Allen and that Judge Allen and a group of attorneys are involved in a conspiracy against respondent. The enclosed affidavits of Jan K. Wichrowski, Rosalind Williams, Greg Meeks, Judge Faye Lynette and Respondent's letter dated November 9, 2006 to Kenneth Lawrence Marvin, Staff Counsel, The Florida Bar, attached hereto as Exhibit "E" is used by the bar to support this Petition for Interim Probation.

WHEREFORE, based on the aforementioned affidavits, the bar asserts the respondent has caused, or is likely to cause, immediate and serious harm to her clients and/or the public and that immediate action must be taken for the protection of the respondent's clients and the public. Therefore, pursuant to Rule Regulating The Florida Bar 3-5.2, The Florida Bar respectfully requests this court to:

A.    Immediately place respondent on an indefinite period of interim probation with the following conditions:

i.    Order respondent to undergo an evaluation to determine her fitness to practice law within 30 days of the date of this Court's order.  Respondent shall be evaluated by a psychologist or psychiatrist approved by Florida Lawyers Assistance, Inc.  Florida Lawyers Assistance, Inc., shall determine the psychologist or psychiatrist. The doctor chosen by Florida Lawyers Assistance, Inc., shall

3

submit the original report to Kenneth Lawrence Marvin, Staff Counsel, The Florida Bar, as soon as possible after conducting the evaluation.

ii.    If respondent fails to comply with obtaining an evaluation within the required time period, the bar requests that she be held in contempt and suspended from the practice of law until such time as she complies and provides the bar with an evaluation from a doctor approved by Florida Lawyers Assistance, Inc., certifying that she is mentally and emotionally competent to engage in the practice of law.  Should the evaluation certify that respondent is not competent to engage in the practice of law, respondent shall be placed on the inactive list for incapacity not related to misconduct.

Respectfully submitted,

KENNETH LAWRENCE MARVIN
Staff Counsel
The Florida Bar
651 East Jefferson Street
Tallahassee, Florida 32399-2300
(850)561-5600
ATTORNEY NO. 200999

JOHN F. HARKNESS, JR.
Executive Director

4

The Florida Bar
651 East Jefferson Street
Tallahassee, Florida 32399-2300
(850)561-5600
ATTORNEY NO. 123390

and

FRANCES R. BROWN-LEWIS
Bar Counsel
The Florida Bar
1200 Edgewater Drive
Orlando, FL 32804
(407)425-5424
ATTORNEY NO. 503452

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the original of the foregoing has been furnished by regular U.S. mail to the Supreme Court of Florida, Supreme Court Building, 500 South Duval Street, Tallahassee, Florida, 32399-1925; a copy of the foregoing has been furnished by certified mail no. 7160 3901 9843 0082 1132, return receipt requested, to Jacquelyn Renee Oxendine, at Post Office Box 550928, Orlando, Florida 32855-0928; copy of the foregoing has been furnished by regular U.S. mail to Jacquelyn Renee Oxendine, respondent, at Bank of America Center, 390 North Orange Avenue, Suite 2300, Orlando, Florida 32801; and a copy of the foregoing has been furnished by regular U.S. mail to Bar Counsel, Frances R. Brown-Lewis, The Florida Bar, 1200 Edgewater Drive, Orlando, Florida, 32804-6314, this 80th day of November, 2006.

KENNETH LAWRENCE MARVIN
Staff Counsel

5

## AFFIDAVIT

STATE OF FLORIDA
COUNTY OF ORANGE

Before me this day personally appeared The Honorable Faye Lynette Allen, whose business address is Orange County Courthouse, Ninth Judicial Circuit, 425 North Orange Avenue, Suite 820, Orlando, County of Orange, State of Florida, who being duly sworn, declares:

I am a county court judge with the Ninth Judicial Circuit, Orange County, Florida. By letter and complaint dated June 20, 2006, I informed The Florida Bar of a letter dated June 5, 2006, which I had received from Jacqueline Renee Oxendine. A copy of the letter is attached hereto and incorporated herein as Exhibit 1. Based upon her letter and the events thereafter, I am extremely concerned and feel that Ms. Oxendine should undergo a psychological examination.

I met Ms. Oxendine in 2004 when I was her supervisor at the Office of the Public Defender, Juvenile Division, in Orlando, Florida. My brief interactions with her at that time led me to wonder if she possibly suffered from a mental or emotional instability. I was unable to address the concerns I had while Ms. Oxendine was employed at the Office of the Public Defender due to Ms. Oxendine's short duration under my supervision. In fact, I do not believe she was with the office for very long. I believe she left the Public Defender's office in 2004. I am not aware of the details of her departure.

After Ms. Oxendine left the Public Defender's office, I had no contact with her except when she appeared in my court on behalf of

EXHIBIT
"A"

clients.  Since these matters have arisen, I have, after discussion with the chief judge of the circuit, recused myself from any cases in which Ms. Oxendine is involved.

These matters began when I received a letter dated June 5, 2006, from Ms. Oxendine.  The letter (Exhibit 1) was quite disturbing in its tone and content.  In her letter, Ms. Oxendine made allegations concerning my alleged knowledge of, and interference with, her private affairs related to her dating relationship with a gentleman.  I was baffled by this allegation because I had no knowledge of Ms. Oxendine's private life and certainly no concern or interest in her relationship with the gentleman she named in her letter.  In addition, I had no conversation with the interpreter as referenced in her letter.  In her letter Ms. Oxendine accused me of receiving information from the interpreter about Ms. Oxendine's dating relationship, which I followed up on by contacting Ms. Oxendine's male friend.  She further accused me of "forwarding or publishing" messages I received from her male friend to others including local attorneys Greg Meeks and Rosalind Williams.

Ms. Oxendine believed I knew the gentleman referenced in her letter.  In fact, to my knowledge I have never communicated with him.  I have certainly never communicated with him about Ms. Oxendine.  Nor have I ever sought any information from him concerning his relationship with Ms. Oxendine.  I have never relayed any information concerning Ms. Oxendine's private life to any other persons nor have I engaged in any gossip concerning Ms. Oxendine.  I am not, nor have I ever been, friends with Ms. Oxendine and do not interact with her socially.  There is no reason for Ms. Oxendine to believe that I have any knowledge of her personal life or any interest in it.  It is disturbing that she has singled me out.  She uses the phraseology that I am a "lead

conspirator" in "malicious wrongdoing" against her.

In her letter of June 5, 2006, Ms. Oxendine also made reference to my having gone to great lengths in the past to cause problems for her.   She believed this occurred while she was employed by the Office of the Public Defender.   Because I was her supervisor, I had occasion to discuss Ms. Oxendine with my supervisor, staff members and judges before whom she appeared in court in connection with cases.   However, any context in which I discussed her work was directly related to my job as Division Chief and my supervision over her.

I am saddened to find that Ms. Oxendine's perception about these matters is as delusional as her letter indicates.   I was truly alarmed and concerned with Ms. Oxendine's statement in her letter that she called my home three times on May 26, 2006 because she was angry.   She admitted in her letter that a male friend of hers left me a voice mail message.   I did receive this voice mail message and, based upon the message, I immediately changed my home telephone number to an unlisted one.   Because the call preceded my receipt of Ms. Oxendine's letter, and the caller did not identify himself, I did not know who left me this message until Ms. Oxendine's letter.

In a letter to the Bar dated August 17, 2006, a copy of which is attached hereto and incorporated herein as Exhibit 2, Ms. Oxendine accused me of being "morally insane" and of using my position as a judge to "pay her back."   She accused me of directing others, including attorneys, to lie, spy and spread vicious gossip and rumors against her.   I have never done any of the things she accused me of in her letter.

I have not hired any investigators to follow Ms. Oxendine, to

tap her telephone, or to conduct any type of surveillance of her. I have been told by the Bar that Ms. Oxendine has left numerous messages for me on voice mail systems belonging to other persons with the intent that those persons pass the messages along to me. There is no reason for Ms. Oxendine to believe she should convey messages to me in this manner.

I am not involved in any type of conspiracy against Ms. Oxendine nor have I done anything that would warrant Ms. Oxendine believing I am involved in a conspiracy against her. I do not hold any type of grudge against Ms. Oxendine or feel any animosity toward her. In fact my reason for contacting the Bar was based upon my belief that she may have some emotional problem that needed to be addressed and that such could be addressed by The Florida Bar.

After the grievance was filed with the Bar, Ms. Oxendine came into my courtroom on August 15, 2006 without good cause. She was not there on behalf of a client and had no reason to be in my courtroom. She stood in the back of the courtroom and smiled at me for no apparent reason. I took this to be an attempt by her to intimidate me. I was about to begin a jury trial, so I asked the court deputy to direct Ms. Oxendine from the courtroom and she was escorted out without further incident.

I find Ms. Oxendine's ongoing course of behavior to be threatening and intimidating. I have done nothing to provoke this type of behavior nor have I done anything to encourage it. My life has changed since I received Ms. Oxendine's letter of June 8, 2006. I have had to change my telephone number because of the call from Ms. Oxendine's unknown male friend. Also, I am constantly looking over my shoulder. I do not know who the man was who called my home. Further if she can get a man to do this for her, what else is

she capable of doing? I am very alarmed by this behavior, and I believe it will continue if not dealt with by some action of the Florida Bar. The action I deem most preferable is that Ms. Oxendine undergo some psychological and/or psychiatric medical attention to address her irrational behavior.

Ms. Oxendine indicated in her August 2006 letter that if she was requested to undertake a psychiatric evaluation, she would be agreeable.  I believe Ms. Oxendine has targeted me and that she is delusional and paranoid.  I believe that Ms. Oxendine is a danger to me and that she is emotionally unstable.  I am concerned about her ability to represent clients given her apparent emotional or mental health problems.

Under penalty of perjury, I declare the foregoing facts are true, correct and complete.

_____          10-31-06
Signature                          Date

Sworn to and subscribed before me this
31st day of October , 2006

_____
Signature of Notary Public,
State of Florida

_____
Print, type or stamp commissioned name of Notary Public
My Commission Expires:

LAVETTE E. ROBINSON
MY COMMISSION # DD 538090
EXPIRES: April 12, 2010
Bonded Thru Notary Public Underwriters

_____
Commission Number

Personally Known __✓__ or Produced Identification _____
Type of identification produced _____

**AFFIDAVIT**

STATE OF FLORIDA
COUNTY OF ORANGE

Before me this day personally appeared Attorney Rosalind Williams whose business address is 1310 West Colonial Boulevard, Suite 35, Orlando, County of Orange, State of Florida, who being duly sworn, declares:

I first met Jacqueline Oxendine in June 2004 when we both started working for the Office of the Public Defender in the Ninth Judicial Circuit. During the time that we worked together, Ms. Oxendine mentioned multiple times that she believed a former boyfriend had been taping her phone calls and had her phone tapped. She even went to the extent of having her cell phone number changed. Although I thought this was kind of odd, I did not think much about it. Ms. Oxendine started leaving numerous messages for me that made me feel uncomfortable and I felt as if she was stalking me so I stopped talking to her and began avoiding her. After Ms. Oxendine was fired from the Public Defender's office in December 2004, we had no contact.

In October 2005, after going into private practice, I ran into Ms. Oxendine. Thereafter, in November or December 2005, we had lunch together several times a week. During one of my conversations with Ms. Oxendine, she told me she was on the court appointed counsel list for at least six counties in the state of Florida. During the times we had lunch together, Ms. Oxendine continued to mention this former boyfriend having her phone tapped and that he now had charges against him for intercepting her phone calls. She even went so far as to be conversing with someone on the phone, who she claimed was the prosecutor handling the case. On another occasion Ms. Oxendine called and accused me of giving someone her telephone

THE FLORIDA BAR'S

EXHIBIT

"B"

number to call her regarding handling a family law case. I don't know what this person supposedly said to her, but it apparently upset her. Ms. Oxendine sounded strange and she insisted that I was the one who gave that person her phone number and demanded I not do it again. I explained to her that I had no idea what she was talking about and asked her why would I refer a family law case to her when I did family law myself. On multiple occasions she mentioned a "clique" and she accused this "clique" of gossiping about her. Ms. Oxendine demanded that I tell her who was in the "clique" and what was being said about her. I stopped all contact with Ms, Oxendine after she accused me of being in the "clique" consisting of several attorneys and Judge Faye Allen, a sitting judge in the Ninth Judicial Circuit. Ms. Oxendine acted and sounded very strange during my last mutual contact with her.

Since our contact in November or December 2005, the only time I have seen Ms. Oxendine was in passing at the Juvenile Justice Center or downtown county courthouse in Orlando, Florida. I have had no personal contact or conversations with her. I have not provoked her in any manner. In fact, whenever I see Ms. Oxendine at the courthouse, I attempt to avoid eye contact with her.

In May or June 2006, Ms. Oxendine began to repeatedly call my cell phone and office phone. Her messages on my voice mail were strange and somewhat disturbing as she was demanding my home and cellular telephone number so she could get my telephone records to send to the Judicial Qualifications Commission and because she seemed to think people were conspiring against her. Also, my secretary advised me that Ms. Oxendine attempted to disguise her voice when she called my office asking to speak to me. Because Ms. Oxendine seemed delusional and paranoid, I was concerned for my safety and my client's safety. I contacted The Florida Bar's Attorney Consumer Assistance Program and spoke to attorney Ted Littlewood on

June 29, 2006, to see what could be done.  He gave me the telephone number for Florida Lawyer's Assistance, Inc.

I decided not to contact Florida Lawyer's Assistance, Inc., after I received a telephone call from a staff investigator with the Florida Bar inquiring about Ms. Oxendine.  I assumed the bar would be taking some action.  I continued to make it my business to avoid Ms. Oxendine whenever I saw her at the courthouse.  On October 9, 2006, I contacted the Orlando office of the Florida Bar because of several disturbing voice mails I received from Ms. Oxendine the last couple of days.

On Friday, October 6, 2006, Ms. Oxendine called my personal cell phone number at 3:02 p.m., 5:31 p.m., and at 5:32 p.m. On Saturday, October 7, 2006, Ms. Oxendine resumed calling.  Her first call at 11:29 a.m. on Saturday reflected her cell phone number.  Her other voice mails reflect a telephone number on the caller ID.  Although Ms. Oxendine blocked her telephone number during most of her recent calls and did not leave her name, I am familiar with her voice and had no problem identifying the caller as Ms. Oxendine.

In the first voice mail, Ms. Oxendine told me to make sure her message was passed to "my boy, Greg."  Ms. Oxendine apparently was referring to Greg Meeks, an attorney with whom we are both acquainted from having worked together at the Office of the Public Defender.  There is no reason for Ms. Oxendine to tell me to pass on a message to another attorney.  Further, her tone and mannerism during the message were strange.  It was as if she thought we were close friends.

In the second message, she stated that he [I think she was referring to the bar's investigator but I'm not sure] had turned off his telephone answering machine and that I should "tell [my]

girl" that Ms. Oxendine had figured out the code being used by the
people who were following her.    According to Ms. Oxendine, the
people or person following her would say on the cell phone "Is Lisa
home?" to alert the person who hired them to the fact that Ms.
Oxendine was leaving a particular location.  Ms. Oxendine sounded
amused that the people allegedly following her were so inept.  It
would seem that she should have been concerned if people were in
fact following her. Further, there was no reason for her to be
telling me this.

In another message, Ms. Oxendine stated that while she had been at
the Juvenile Justice Center, she had seen me watching the people
who were watching her.  She also said she had seen other attorneys
observing the people who were following her.  I have never seen
anyone one following or watching Ms. Oxendine.

In another message, she stated that it was "for [my] girl" and that
the investigators who were following her could not record her
private telephone line.  She mentioned that she did not intend to
give this private telephone number to Frances R. Brown-Lewis at The
Florida Bar.  She sounded as if she had succeeded in outwitting the
Bar.

In another message, Ms. Oxendine stated that I needed to tell my
"friend" that Ms. Oxendine wanted to convey her appreciation for my
"friend" having hired incompetent investigators to follow her.  She
felt my "friend" was paying these investigators too much money
because she had no problem spotting them when they were following
her.

In another message, Ms. Oxendine directed me to ask "Faye" (I
believe she was referring to Judge Allen) if this investigation of
Ms. Oxendine would have a "snowball's chance in hell" of going

somewhere.   She told me to bring the matter up next time Judge
Allen and I "huddled."  She stated that "Faye" should keep paying
the incompetent investigators.

I believe that Ms. Oxendine is going through a psychotic episode.
She has accused me of watching her at the Juvenile Justice Center
and implied that I am conspiring with Judge Allen against her.   She
also believes others are involved in this "conspiracy".  In one of
the messages which sounded as if she were on a cell phone, she said
that the people in the Durango truck next to her were following
her.

In the voice mails from Ms. Oxendine, she speaks in a rambling and
familiar manner as if we frequently converse with one another and
are good friends. More troubling is that she believes that she is
being followed by people and that I have seen these people.   I
would describe Ms. Oxendine's behavior as paranoid, delusional and
schizophrenic.   I believe that Ms. Oxendine is a danger to herself
and to others and that she is emotionally unstable.


Under penalty of perjury, I declare the foregoing facts are true,
correct and complete.

Signature _____  Date  10/11/06

Sworn to and subscribed before me this
11 day of October , 2006

_____
Signature of Notary Public
 State of Florida

**Cathy Cline**
Commission # DD413701
Expires June 14, 2009
Bonded thru Troy Fain - Insurance, Inc. 800-385-7019

_____
Print, type or stamp commissioned name of Notary Public
                    My Commission Expires:
_____
Commission Number

Personally Known _____ or Produced Identification ____
Type of identification produced  FLA. Drivers license

## AFFIDAVIT

STATE OF FLORIDA
COUNTY OF ORANGE

Before me this day personally appeared Attorney Gregory A. Meeks, II, whose business address is 37 North Orange Avenue, Suite 500, Orlando, County of Orange, State of Florida, who being duly sworn, declares:

I am an attorney with the Florida Bar. I am a solo practitioner and I met Ms. Oxendine in January 2006 when she leased office space down the hall from me on the fifth floor of 37 North Orange Avenue, Orlando, Florida, 32801. During the time she leased space in the building, I became familiar with her voice enough to recognize it over the telephone. In February or March 2006, Ms. Oxendine contacted me as she was concerned that a fellow attorney, who leased office space down the hall from us, had sneaked into her office and looked through her files. The attorney and I met with Ms. Oxendine in attempt to get to the bottom of the matter and to determine the basis of her allegations. Ms. Oxendine refused to reveal the basis of her accusations and became irate when asked if she was on any medication.

After this incident, I had little contact with her until the middle of May 2006 when Ms. Oxendine started calling my cell phone leaving me messages that I can only describe as strange. She believed that I was in a conspiracy against her with Judge Faye Allen, a sitting judge in the Ninth Circuit, Orange County, Florida and attorney Rosalind Williams. She often confronted me in the hallway at our office accusing me of conspiring with others against her. She also accused me of listening to her telephone calls through her office wall. Although she moved out of the building, she continued to leave me telephone messages, often several minutes long accusing me



THE FLORIDA BAR'S
EXHIBIT
"C"

of conspiring against her.

Of great concern are the 10 messages I received on my office voice mail system from Ms. Oxendine between October 4, 2006 and October 7, 2006. None of these messages were for me personally. They were for me to deliver to Judge Allen. Two of the messages were for investigators that Ms. Oxendine believed Judge Allen had hired to follow her and that Ms. Oxendine believed were recording her telephone calls. There is no reason for Ms. Oxendine to believe that she can communicate with Judge Allen by leaving messages on my telephone. From her phone messages, Ms. Oxendine seems abnormally fixated on Judge Allen and I am concerned for the judge's wellbeing.

In the first message, left on October 4, 2006, at 4:00 pm, Ms. Oxendine stated "If you call Faye Allen, is she the one that's paying [unclear] these investigators? She is wasting a whole lot of money. If she will continue this, let her know I said she can waste as much money as she want (sic) to on this circus. I see them clearly. I'm just watching them watching me. So since you let her listen to every single message that I leave, could you please make sure you let her listen to this one as soon as possible?" She said she heard the investigators when they "clicked" in on the line so they might be able to let her (Judge Allen) listen to the message. Ms. Oxendine said she did not care who got the message to Judge Allen, just please make sure she got the message.

On October 5, 2006, at 7:14 pm, Ms. Oxendine left another message on my voice mail telling me that either I could give "her" the message or the people she hired could give "her" the message because she had just heard "them" turn on the recorder. I understood "her" to be a reference to Judge Allen. Ms. Oxendine

stated that she was curious as to how much money "she had flushed down the toilet in this goddamn circus ass operation, she's paying for" and number two tell "her" that "I don't see nobody. I don't see nobody. I think they (sic) gone. Gone. So I don't see nobody. I don't see nobody." This last part was scary because Ms. Oxendine's voice changed and she sounded almost hysterical.

On October 6, 2006, at 5:28 pm, Ms. Oxendine left a message stating that either I could tell "her" or "her investigator can tell her because I just heard him click on his recorder." Ms. Oxendine wanted me to "tell Faye I'm watching her investigators right now. So I'll be watching them, watching me for however long she decides to pay them. It's all good. I will be watching them, watching me." Ms. Oxendine stated that she had no problem with Judge Allen paying for investigators to watch her watch them. "It's all good. I ain't got no problem with it. I'm just happy to know that she's signing the check. As long as I know she's signing the check, it's all good. It's all good. I thought that my jewels were going through this bullshit, but, now I know better. So I'll keep watching them. It's nothing. It's OK." She abruptly hung up after saying this.

On Saturday, October 7, 2006, the frequency of Ms. Oxendine's calls increased. She left a total of 7 messages between 11:15 am and 2:37 pm. Ms. Oxendine's demeanor during these messages was increasingly disjointed and at times incoherent. During the last call in particular, her manner of speech and enunciation changed and she sounded as if she was intoxicated or under the influence of some type of mood altering substance.

During her message for "Faye" at 11:15 Saturday morning, Ms. Oxendine stated that she did not care who gave Judge Allen this message as long as she got it and that she had heard the private

investigators turn on their recorder. She stated that she (Faye) did not know what to do with her money, that she (Faye) should save it and that she (Ms. Oxendine) was still watching the investigators watch her. "And you know, I really got to tell you that, how many times I got to tell you that, I am watching them, watch me. Save your money, girl. Put it in the bank. Give it to Ineka (sic) or something, but you are really wasting it. This is the worst fucking circus I have ever seen before in my whole life. Who gives a fuck if they follow me, every fucking where I go?" She concluded the message by stating "Help me." Her messages were getting more personal to Judge Allen and her language more crude and vulgar.

At 12:46 pm, Ms. Oxendine left a message for "Faye." "You know what, I am not making this up. I am still right here just looking at your P. I." Ms. Oxendine indicated that Judge Allen must have gotten the worst investigators. "These people cannot be licensed. I am just literally sitting here just looking at him, looking at me." "You can't find nothing else to do with your money. Hey Faye, I'm talking to you girl. I'm talking to you". She again stated that she heard the investigator turn on his recorder and that she did not care whether I or the investigator gave Judge Allen this message. "I am looking at these people. But it's all good. I don't care how long they stay. Long as you keep paying that check, it's all good. Long as I know that the bar ain't paying for it, I don't care how long I have to watch them." Ms. Oxendine concluded by stating that whenever she had the time, she would turn around and follow "their ass." That day, however, she did not have the time to do this but she might later on. For the time being, she was just going to watch them.

Two minutes later, at 12:48 pm, Ms. Oxendine called again. "Another thing, girl. I can't be supervising them and giving them little tips for free. So I want my cut. I'll be sending a bill for

investigators turn on their recorder. She stated that she (Faye) did not know what to do with her money, that she (Faye) should save it and that she (Ms. Oxendine) was still watching the investigators watch her. "And you know, I really got to tell you that, how many times I got to tell you that, I am watching them, watch me. Save your money, girl. Put it in the bank. Give it to Ineka (sic) or something, but you are really wasting it. This is the worst fucking circus I have ever seen before in my whole life. Who gives a fuck if they follow me, every fucking where I go?" She concluded the message by stating "Help me." Her messages were getting more personal to Judge Allen and her language more crude and vulgar.

At 12:46 pm, Ms. Oxendine left a message for "Faye." "You know what, I am not making this up. I am still right here just looking at your P. I." Ms. Oxendine indicated that Judge Allen must have gotten the worst investigators. "These people cannot be licensed. I am just literally sitting here just looking at him, looking at me." "You can't find nothing else to do with your money. Hey Faye, I'm talking to you girl. I'm talking to you" She again stated that she heard the investigator turn on his recorder and that she did not care whether I or the investigator gave Judge Allen this message. "I am looking at these people. But it's all good. I don't care how long they stay. Long as you keep paying that check, it's all good. Long as I know that the bar ain't paying for it, I don't care how long I have to watch them." Ms. Oxendine concluded by stating that whenever she had the time, she would turn around and follow "their ass." That day, however, she did not have the time to do this but she might later on. For the time being, she was just going to watch them.

Two minutes later, at 12:48 pm, Ms. Oxendine called again. "Another thing, girl. I can't be supervising them and giving them little tips for free. So I want my cut. I'll be sending a bill for

this one."

At 1:05 pm, Ms. Oxendine called.  "This is for the investigator.
Thank you, for the dumb ass comments that you consistently tell
your dumb ass people to make.  Cause that's half the shit that
keeps me ten steps ahead of you at all times. So thank you.  Thank
you, I really appreciate it."

At 2:00 pm, Ms. Oxendine left another message for the investigator
with a note that this one was for "the boss."  "No matter how much
these incompetent, amateur, circus performers get on my nerves,
once I come home and close my door, I can't see or hear them no
more.  But they still in your pocket.  Remember that."

Three minutes later, at 2:03 pm, Ms. Oxendine left a message for
the investigator who she believed was recording her calls.  The
investigator was to deliver the following message to the judge:
"Judge, I really appreciate your people letting me know that they
listening to everything that goes on in my apartment.  Cause I can
fix that now. Oh, it will be fixed.  They won't be able to report a
damn thing that is said in my apartment from this moment on.  Trust
and believe that shit."

In the message she left at 2:37, Ms. Oxendine's speech and demeanor
were markedly different and it seemed as if she might be impaired.
 In previous messages, her voice was loud and at times strident.
In this message, she was speaking quite softly, more slowly than
before with long pauses, and seemed to be making an effort to
enunciate her words.  She wanted the message to be given to Judge
Allen, regardless of who gave it to her.  She stated "Faye, you are
so stupid.  And everybody around you is equally as stupid,
including attorney Greg Meeks, attorney Rosalyn Williams and all
these so-called Pentagon P. I.'s that you paying for.  I just got

to let you know it." With this, Ms. Oxendine hung up.

In the voice mail messages I received from Ms. Oxendine, she spoke in a rambling manner and directed her messages to persons other than myself. More troubling is that she believed and continues to believe that she is being followed by people hired by Judge Faye Allen and that these people are recording the messages she leaves on my voice mail. I would describe Ms. Oxendine's behavior as paranoid, delusional and schizophrenic. I believe that Ms. Oxendine is a danger to herself and to others and that she is emotionally unstable. In the last message Ms. Oxendine left on my voice mail on Saturday October 7, 2006, she sounded as if she was intoxicated or under the influence of some type of mood altering substance.

<u>Under penalty of perjury, I declare the foregoing facts are true,</u>
<u>correct and complete.</u>

                              Signature               10/24/6
                               Signature               Date

Sworn to and subscribed before me this
25th day of October, 2006

Signature of Notary Public
State of Florida

Print, type or stamp commissioned name of Notary Public
DD500019           My Commission Expires:
Commission Number

Personally Known ___✓___ or Produced Identification _____
Type of identification produced _____

YURA KING
MY COMMISSION # DD500019
EXPIRES: Dec. 18, 2009
(407) 398-0153   Florida Notary Service.com

## AFFIDAVIT

STATE OF FLORIDA
COUNTY OF ORANGE

Before me this day personally appeared Jan K. Wichrowski, who is employed at The Florida Bar, 1200 Edgewater Drive, Orlando, County of Orange, State of Florida, who being duly sworn, declares:

I am *sui juris* and have held the position of Chief Branch Discipline Counsel of The Florida Bar, Orlando Branch, since 1994. On or about Sept 15, 2006, I received a call from the respondent, Jacquelyn Renée Oxendine, in The Florida Bar case number 2006-32,273(09C). As part of my regular duties as Chief Branch Discipline Counsel, I took the call.

The caller, hereinafter referred to as Ms. Oxendine, identified herself as Jacquelyn Oxendine. Ms. Oxendine then began speaking to me in a pressured and rushed speech. The caller described herself as being in a state of extreme agitation. She indicated that she knew that The Florida Bar was having seven Bar Staff Investigators follow her every move. She specifically stated that she had been eating lunch at Red Lobster the previous day and knew that the investigators were following her because as soon as she got up from her table, they all followed her out of the restaurant. She further indicated that she was calling me on her mobile telephone and that the investigators were following her in her car at that very moment.

As she spoke, her tone became more and more pressured and agitated. I previously worked in the Office of the Public Defender handling Baker Acted defendants. I identified her tone, speech, and allegations as being similar to many of my previous clients who suffered from mental health problems. I was personally aware that The Florida Bar absolutely had no investigators following the



EXHIBIT
"D"

respondent.

I advised Ms. Oxendine to remain as calm as possible and told her I would look into getting her some assistance as soon as possible. Thereafter, I assured that Florida Lawyers Assistance, Inc., would intervene to offer assistance to Ms. Oxendine. I specifically was concerned that Ms. Oxendine was out in public and able to practice law while apparently suffering from mental health problems.

Later that same day, I received a voice mail message from Ms. Oxendine. She indicated in the voice mail message that several Orlando attorneys and a judge were involved in a personal conspiracy against her. She further stated that she was still being followed in her automobile by investigators and that when she wrote down their license plate numbers they would back off.

Under penalty of perjury, I declare the foregoing facts are true, correct and complete.

_____
Jan K. Wichrowski
ATTY NO. 381586


Sworn to and subscribed before me this

28 day of September, 2006.

_____
Signature of Notary Public
State of Florida

**Cathy Cline**
Commission # DD413701
Expires June 14, 2009
Bonded Troy Fain - Insurance, Inc. 800-345-7019

_____
Print, type or stamp commissioned name of Notary Public


_____
Commission Number

My Commission Expires:

Personally Known _____ or Produced Identification _____

Type of Identification Produced:_____

*The Law Office of Jacqui Oxendine*
*Bank of America Center*
*390 N Orange Avenue – Suite 2300*
*Orlando, Florida 32801*
*Phone: 407-956-1075*
*Cell: 321-287-2980*
*Fax: 407-956-1005*

November 9, 2006

Ken Marvin
The Florida Bar
651 E Jefferson Street
Tallahassee, FL 32399-2300

SENT VIA FAX TO:  850-561-5665
                  407-841-5403

RE:
Florida Bar Complaint No.:  2006-32,273(09C)

Dear Mr. Marvin:

I called and spoke to you a couple of times in September, and I called Mrs. Wircowski one time in August regarding all of this.

Yesterday, I went to St. Pete to spend the night. That evening I drove to Walmart. The people that are watching and following me were there when I got there. This is the same way I was alerted to the bugs at my apartment, in my car, at my law office; and on my cell phone.



These people follow me everywhere I go. I left home this morning, headed to the Post Office on Orange Blossom Trail. I was driving south on Orange Blossom Trail, and at the intersection of 36th Street; a black female waited until my car was directly adjacent to her (she stood in the median) and gave me the sign they constantly use to anger me. When I got to the post office at Orange Blossom Trail and Gore Street; a black female, short and bald, wearing glasses, gave me the same sign as she entered the post office. When I got inside, a black male wearing a green T, with stop and shop on the sleeve; gave me the sign while he was being waited on by the clerk.

Since I know they are illegally invading my privacy to such a shameful extent, I use this opportunity to state my thoughts and feelings about the horrible gossip and rumors Allen and Lewis are using it to produce, as well as my opinion of the people responsible for this never before seen Bar Complaint.

Sincerely,

Jacqui Oxendine
Attorney at Law

CC: Francis Brown-Lewis: Bar Counsel, Orlando, Florida