# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered<br>**Objection Date: February 16, 2012 at 4:00 p.m.**<br>**Hearing Date:  TBD**<br>**Related to Docket Nos. 8802, 9018, and 9419** |

## TENTH QUARTERLY FEE APPLICATION OF SIDLEY AUSTIN LLP FOR COMPENSATION FOR SERVICES RENDERED AND REIMBURSEMENT OF EXPENSES AS COUNSEL TO THE DEBTORS AND DEBTORS IN POSSESSION FOR THE PERIOD OF MARCH 1, 2011 THROUGH MAY 31, 2011

| | |
|---|---|
| Name of Applicant: | **Sidley Austin LLP** |
| Authorized to Provide Professional Services to: | **Debtors** |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc., f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); and WPIX, Inc. (0191).  The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

Date of Retention:                                   **February 20, 2009 (nunc pro tunc to December 8, 2008)**

Period for Which Compensation            **March 1, 2011 through May 31, 2011**
and Reimbursement is Sought:

Amount of compensation sought as actual,      **$8,941,857.00**
reasonable and necessary:

Amount of Expense Reimbursement sought as    **$1,133,692.42**
actual, reasonable and necessary

This is a(n): _____ monthly      __X__ interim      _____ final application

The total time expended during the Tenth Interim Fee Period for fee application preparation for the monthly and quarterly fee applications, including time expended for review and response to preliminary and final reports and recommendations of the Fee Examiner, is approximately 843.20 hours and the corresponding compensation requested is approximately $265,511.00.

Prior Interim Applications

| Quarter | Date Filed | Period Covered | Requested | | Approved | |
|---|---|---|---|---|---|---|
| | | | Fees | Expenses | Fees | Expenses |
| 1 | 4/15/09 | 12/8/08-2/28/09 | $3,897,043.25 | $165,360.71 | $3,886,289.75 | $158,441.67 |
| 2 | 7/16/09 | 3/1/09-5/31/09 | $4,209,274.75 | $105,524.36 | $4,203,235.50 | $104,118.90 |
| 3 | 10/15/09 | 6/1/09-8/31/09 | $4,513,018.00 | $99,429.34 | $4,510,127.00 | $99,253.67 |
| 4 | 1/15/10 | 9/1/09-11/30/09 | $5,292,782.75 | $221,808.01 | $5,275,754.14 | $220,748.76 |
| 5 | 4/15/10 | 12/1/09-2/28/10 | $5,426,757.50 | $205,852.05 | $5,412,303.00 | $201,565.16 |
| 6 | 12/14/10 | 3/1/10-5/31/10 | $6,581,178.43 | $425,733.29 | $6,582,868.12 | $418,736.42 |
| 7 | 5/4/11 | 6/1/10-8/31/10 | $7,081,656.37 | $310,093.90 | | |
| 8 | 7/1/11 | 9/1/10-11/30/10 | $7,126,734.00 | $334,255.68 | | |
| 9 | 9/20/11 | 12/1/10-2/28/11 | $14,478,878.00 | $599,999.17 | | |

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>TRIBUNE COMPANY, et al.,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 08-13141 (KJC)<br><br>Jointly Administered<br>**Objection Date: February 16, 2012 at 4:00 p.m.**<br>**Hearing Date: TBD**<br>**Related to Docket Nos. 8802, 9018, and 9419** |

## TENTH QUARTERLY FEE APPLICATION OF SIDLEY AUSTIN LLP FOR COMPENSATION FOR SERVICES RENDERED AND REIMBURSEMENT OF EXPENSES AS COUNSEL TO THE DEBTORS AND DEBTORS IN POSSESSION FOR THE PERIOD OF MARCH 1, 2011 THROUGH MAY 31, 2011

Sidley Austin LLP ("Sidley"), attorneys for Tribune Company ("Tribune") and

the affiliated companies that filed voluntary petitions for relief in the above-captioned chapter 11

cases (collectively, the "Debtors"), respectfully submits this application (the "Application") to

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc., f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); and WPIX, Inc. (0191). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

this Court, pursuant to (i) sections 327, 331, and 503 of title 11 of the United States Code (the

"Bankruptcy Code"), (ii) Rule 2016 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), (iii) Rule 2016-2 of the Local Rules of Bankruptcy Practice and Procedure

of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), (iv) the

Order Establishing Procedure for Interim Compensation and Reimbursement of Expenses of

Professionals and Committee Members Pursuant to 11 U.S.C. §§ 105(a) and 331 (Docket No.

225) (the "Interim Compensation Order"), as amended, and (v) the Order Appointing Fee

Examiner and Establishing Related Procedures for Compensation and Reimbursement of

Expenses for Professionals and Consideration of Fee Applications (Docket No. 546) (the "Fee

Examiner Order") for approval of interim compensation and reimbursement of expenses for the

tenth quarterly period from March 1, 2011 through May 31, 2011 (the "Tenth Interim Fee

Period"). In support of the Application, Sidley respectfully states as follows:

## FACTUAL BACKGROUND OF THE CASES

1.     On December 8, 2008 (the "Petition Date"), Tribune and certain of its

subsidiaries each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

An additional Debtor, Tribune CNLBC, LLC (f/k/a Chicago National League Ball Club, LLC)

("Tribune CNLBC"), filed a voluntary petition for relief under chapter 11 of the Bankruptcy

Code on October 12, 2009.[2] On March 22, 2010, this Court entered an order dismissing the

chapter 11 petition of New River Center Maintenance Association, Inc. In all, the Debtors

comprise 111 entities.

---

[2] Orders of the Court applicable to this Application have subsequently been extended to Tribune CNLBC. (See Order Directing (I) Joint Administration of Chapter 11 Cases and (II) that Certain Orders and Other Pleadings Entered or Filed in the Chapter 11 Cases of Tribune Company, et al. be Made Applicable to the Chapter 11 Case of Chicago National League Ball Club, LLC (entered Oct. 14, 2009) (Docket No. 2333) (the "CNLBC Joint Administration Order").

2.      The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b). (Docket Nos. 43, 2333.)

3.      The Debtors have continued in possession of their respective properties and have continued to operate and maintain their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.      On December 18, 2008, the United States Trustee for the District of Delaware appointed an official committee of unsecured creditors (the "Committee").

5.      On March 19, 2009, pursuant to Fee Examiner Order, the Court appointed Stuart Maue as fee examiner (the "Fee Examiner") to act as special consultant to the Court for professional fee and expense analysis and review, effective _nunc pro tunc_ to February 20, 2009. (Docket No. 546.)

6.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief sought herein are sections 327, 331, and 503 of the Bankruptcy Code, Rule 2016 of the Bankruptcy Rules, and Rule 2016-2 of the Local Rules.

## PROCEDURAL BACKGROUND FOR THE APPLICATION

7.      The Debtors sought approval of this Court to retain Sidley as general reorganization and bankruptcy counsel, pursuant to 11 U.S.C. §§ 327(a) and 1107, by application filed on December 26, 2008. As set forth in the application seeking such approval, Sidley's services to the Debtors encompass a wide range of legal services, focused upon restructuring and insolvency issues but also encompassing certain general corporate, litigation, tax, media law and

regulatory, employee-related, and real estate matters.  In particular, Sidley's retention application

sets forth the following scope of services:

a) to provide legal advice with respect to the Debtors' powers and duties as debtors in possession in the continued operation of their business;

b) to take all necessary action on behalf of the Debtors to protect and preserve the Debtors' estates, including prosecuting actions on behalf of the Debtors, negotiating any and all litigation in which the Debtors are involved, and objecting to claims filed against the Debtors' estates;

c) to prepare on behalf of the Debtors all necessary motions, answers, orders, reports, and other legal papers in connection with the administration of the Debtors' estates;

d) to attend meetings and negotiate with representatives of creditors and other parties in interest, attend court hearings, and advise the Debtors on the conduct of their chapter 11 cases;

e) to perform any and all other legal services for the Debtors in connection with both their chapter 11 cases and with the formulation and implementation of the Debtors' plan of reorganization;

f) to advise and assist the Debtors regarding all aspects of the plan confirmation process, including, but not limited to, negotiating and drafting a plan of reorganization and accompanying disclosure statement, securing the approval of a disclosure statement, soliciting votes in support of plan confirmation, and securing confirmation of the plan;

g) to provide legal advice and representation with respect to various obligations of the Debtors and their managers and officers;

h) to provide legal advice and perform legal services with respect to matters involving the negotiation of the terms of and the issuance of corporate securities, matters related to corporate governance, and the interpretation, application, or amendment of the Debtors' organizational documents, including their limited liability company agreements, material contracts, and matters involving the fiduciary duties of the Debtors and their officers and managers;

i) to provide legal advice and perform legal services with respect to litigation, tax (state and federal income tax and local property tax assessment matters) and other general non-bankruptcy legal issues for the Debtors to the extent requested by the Debtors; and

j) to render such other services as may be in the best interests of the Debtors in connection with any of the foregoing and all other necessary or appropriate legal services in connection with these chapter 11 cases, as agreed upon by Sidley and the Debtors.

Sidley's retention, nunc pro tunc to the Petition Date, was approved by this Court by order dated February 20, 2009. (Docket No. 435.)

8.     The Interim Compensation Order and the Fee Examiner Order (together, the "Fee Orders") provide that all professionals retained in these cases pursuant to sections 327, 328, or 1103 of the Bankruptcy Code (the "Case Professionals") must file with the Court and provide to the Fee Examiner monthly applications for interim allowance of compensation for services rendered and reimbursement of expenses incurred, together with the applicable time entries and itemized expenses (the "Monthly Fee Application"). The notice parties specified in the Fee Orders (the "Notice Parties") have twenty (20) days after service of a Monthly Fee Application to object to such Monthly Fee Application (the "Objection Deadline"). Upon expiration of the Objection Deadline, the applicable Case Professional must certify in writing that no objection or partial objection has been filed with the Court relative to that professional's Monthly Fee Application, whereupon the Debtors are authorized to pay such professional an amount equal to the lesser of (i) 80% of the fees and 100% of the expenses requested in the Monthly Fee Application or (ii) 80% of the fees and 100% of the expenses not subject to an objection.

9.     Pursuant to the procedures set forth in the Fee Orders, Sidley prepared, filed with the Court, and served upon the Notice Parties and the Fee Examiner Monthly Fee Applications for the periods of March 2011, April 2011, and May 2011, which Monthly Fee Applications are incorporated herein by reference.[3] Sidley has accordingly submitted all of its Monthly Fee Applications for the Debtors' chapter 11 cases for the Tenth Interim Fee Period.

---

[3] The docket numbers of Sidley's Monthly Fee Applications for March 2011, April 2011, and May 2011 are 8802, 9018, and 9419, respectively.

10.    In addition to the Monthly Fee Applications, beginning with the three-month period ending February 28, 2009, and each three-month period thereafter, all Case Professionals must file with the Court and serve on the Notice Parties interim applications for allowance of compensation and reimbursement of expenses of the amounts sought in the Monthly Fee Applications filed during such period (a "Quarterly Fee Application Request"). (See Interim Compensation Order at 3.) Quarterly Fee Application Requests must include a summary of the Monthly Fee Applications that are the subject of the request and any other information requested by the Court or required by the Local Rules. (Id.) This Application represents the tenth Quarterly Fee Application Request that Sidley has filed with the Court in connection with these chapter 11 cases, and it covers the period from March 1, 2011 through May 31, 2011, both dates inclusive.

## RELIEF REQUESTED

11.    By this Application, Sidley respectfully requests that the Court approve the interim allowance and award of compensation for professional services rendered and reimbursement of actual and necessary expenses incurred by Sidley as general bankruptcy counsel to the Debtors during the Tenth Interim Fee Period.

12.    The amount of fees sought for services rendered during the Tenth Interim Fee Period is $8,941,857.00, representing 14,939.20 hours in professional and paraprofessional time for such services. Reimbursement of actual, necessary expenses incurred by Sidley during the Tenth Interim Fee Period in connection with these services is requested in the amount of $1,133,692.42. Sidley seeks the interim allowance of such compensation, and this Court's authorization for payment of such amounts by the Debtors to Sidley, less amounts previously paid to Sidley pursuant to the Monthly Fee Applications for the period covered by this Application and the procedures set forth in the Fee Orders.

13.     The hourly rates charged by Sidley professionals and paraprofessionals during the Tenth Interim Fee Period are no greater than the customary hourly rates for such individuals both inside and outside of bankruptcy cases.  The highest billing rate charged by any Sidley attorney for services rendered under Sidley's current billing rates that became effective on January 1, 2011 and continuing until Sidley's next Firm-wide rate adjustment will be $975 per hour.  (See Supplemental Affidavit (Second) of James F. Conlan in Support of Application for an Order Authorizing the Employment and Retention of Sidley Austin LLP as Attorneys for the Debtors and Debtors in Possession ¶ 3, Docket No. 424.)  Sidley believes these rates are comparable to those charged by the bankruptcy and other professionals of other firms of comparable size, stature, and experience.

14.     Sidley has received no payment and no promises for payment from any source other than the Debtors for services rendered in these chapter 11 cases.  There is no agreement between Sidley and any other party for the sharing of compensation to be received for the services rendered by Sidley in these chapter 11 cases.  All professional and paraprofessional services for which compensation is sought herein were rendered solely on behalf of the Debtors in these cases.

## SERVICES RENDERED

15.     Sidley has rendered substantial services to the Debtors in connection with these chapter 11 cases during the period covered by this Application, both in its capacity as general bankruptcy counsel to the Debtors and continuing in its capacity as corporate, litigation, and transactional counsel to the Debtors in their ordinary course of business.  The services performed by Sidley's professionals and paraprofessionals during the period covered by this Application were necessary and have directly contributed to the effective administration of the Debtors' chapter 11 cases.

7

16.     A breakdown of the total hours expended by each professional on all matters and a breakdown of amounts sought by each matter category covered herein are included as a part of Attachment A to this Application, as required by Local Rule 2016-2.  A detailed description of the services provided to the Debtors is incorporated by reference to the Monthly Fee Applications previously filed by Sidley with the Court.  The following is a summary of the activities performed by Sidley's professionals and paraprofessionals during the Tenth Interim Fee Period:

## A.     FCC Matters (20100):   Hours: 8.70   Fees: $6,022.50[4]

17.     During the Tenth Interim Fee Period, Sidley's professionals continued to represent the Debtors' broadcast stations on several matters as communications regulatory counsel.  All of the fees incurred by Sidley's professionals during the Tenth Interim Fee Period relate to the Newspaper Cross-ownership matter, which, as described in Sidley's prior Quarterly Fee Application Requests, involves petitions for review of the Federal Communication Commission's ("FCC") newspaper cross-ownership regulations pending before the U.S. Court of Appeals for the Third Circuit, with certain issues in the appeal having been transferred to the U.S. Court of Appeals for the District of Columbia Circuit.  The FCC had issued various rules that continue to prohibit newspapers from owning certain television or radio stations within the same markets.  The Debtors challenged these rules on constitutional and Administrative Procedure Act grounds. The outcome of the appeal is of substantial importance to the Debtors'

---

[4] Commencing in December 2009, the Debtors requested that Sidley provide separate invoices for professional fees for certain discrete FCC-related services attributable to KWGN/FCC General, KPLR-TV, Nextel Negotiations, and Newspaper Crossownership matters, on which Sidley represents the Debtors in the ordinary course of business.  In accordance with this request, and after consultation with the Fee Examiner, Sidley has included such invoices within the broader category of FCC Matters for the purposes of calculating the total fees and expenses in Sidley's Monthly Fee Applications and Quarterly Fee Application Requests.

broadcasting and publishing operations in several key markets in which the Debtors conduct business.

18.     During the March-May 2011 time period, Sidley's professionals with responsibility for the matter reviewed and corrected the transcript of the oral argument before the Third Circuit and, at the request of the presiding panel, assisted in the joint filing of the transcript with the court.  Sidley's professionals also analyzed various pleadings filed regarding the transfer of certain issues to the U.S. Court of Appeals for the District of Columbia Circuit, and participated in reviewing briefs that defended the transfer of the issues to the District of Columbia Circuit.

**B.     Fee Applications (30390):   Hours: 843.20   Fees: $265,511.00**

19.     This matter category encompasses all tasks relating to the preparation and filing of Sidley's Monthly Fee Applications and Quarterly Fee Application Requests with the Court.  The fees requested for such services reflect an increased volume of activity by Sidley's professionals and paraprofessionals in this matter category during the Tenth Interim Fee Period.  Specifically, Sidley's professionals and paraprofessionals drafted and filed Sidley's twenty-fourth, twenty-fifth, twenty-sixth, twenty-seventh and twenty-eighth Monthly Fee Applications, drafted and filed Sidley's Seventh Quarterly Fee Application, and reviewed and complied with the Court's Fee Orders respecting all of the foregoing.  During the Tenth Interim Fee Period, Sidley's professionals and paraprofessionals also prepared portions of its Eighth, Ninth, and Tenth Quarterly Fee Applications.  In addition, Sidley reviewed and drafted responses to the Fee Examiner's  preliminary report with respect to Sidley's Fourth Quarterly Fee Application Request.  In light of the number of monthly and quarterly fee applications prepared, in whole or in part, during this period, Sidley respectfully submits that the hours expended and fees requested are reasonable.

**C.**    **Intellectual Property Issues (30400):    Hours: 4.00    Fees: $2,050.00**

20.    During the Tenth Interim Fee Period, Sidley's professionals advised the

Debtors with respect to a discrete issue arising in connection with certain of the Debtors'

intellectual property licenses.  Sidley's professionals researched and evaluated case law with

respect to section 365(n) of the Bankruptcy Code and a licensee's ability to enforce exclusivity

provisions.

**D.**    **Executory Contracts and Leases (30410):    Hours: 108.60    Fees: $53,916.00**

21.    As of the Petition Date, the Debtors in these cases were party to

approximately 45,000 executory contracts and unexpired leases.  During the Tenth Interim Fee

Period, Sidley's professionals, together with the Debtors' financial advisors at Alvarez & Marsal,

advised the Debtors with respect to the assumption, assumption and assignment, or rejection of

certain executory contracts and unexpired leases under section 365 of the Bankruptcy Code and

in accordance with the terms of the plan of reorganization proposed for the Debtors, on terms

favorable to the Debtors.

22.    Specifically, the DCL Plan (defined below) provides for the assumption of

all executory contracts and unexpired leases other than those identified on the exhibit of rejected

contracts and leases, which was filed as part of the Plan Supplement (defined below) during the

Ninth Interim Fee Period.  At the request of the Debtors, Sidley's professionals researched,

reviewed, and evaluated certain of the Debtors' contracts and unexpired leases, in light of the

provisions of the DCL Plan regarding contract assumption or rejection, and evaluated the

potential rejection of certain of the Debtors' contracts and unexpired leases.

23.    With respect to contracts and leases proposed to be assumed pursuant to

the DCL Plan, during the Tenth Interim Fee Period, Sidley prepared and filed the Motion of the

Debtors for an Order Establishing Procedures (I) Fixing Cure Amounts and (II) Providing Notice

10

of Assumption And/Or Assignment of Certain Executory Contracts and Unexpired Leases By A

Successor Reorganized Debtor Pursuant to Sections 365, 1123 and 1129 of the Bankruptcy Code

(the "Global Contract Motion") (Docket No. 8287).  The Global Contract Motion sought to

establish procedures to (i) fix cure amounts with respect to the assumption of certain executory

contracts and unexpired leases that the Debtors anticipate assuming pursuant to the DCL Plan

upon the effective date thereof and (ii) provide notice of the proposed assumption of certain

executory contracts and unexpired leases by a successor to a Debtor, including by an affiliated

reorganized Debtor, and/or potential assignment to a successor to a Debtor, including to an

affiliated reorganized Debtor, after giving effect to the restructuring transactions that are

contemplated to occur pursuant to the DCL Plan.  Preparation of the Global Contract Motion

involved substantial efforts on the part of Sidley's professionals, along with Alvarez & Marsal

and the Debtors' management and personnel, to reconcile the contracts and leases proposed to be

assumed against their books and records and the timely-filed proofs of claim asserted against the

Debtors in order to determine the payments to counterparties that will be required to be made to

cure existing monetary defaults under the assumed contracts and leases.

24.    Sidley's professionals received and responded to five formal objections to

the Global Contract Motion.  (See Docket Nos. 8362, 8364, 8365, 8398, and 8400.)  Sidley's

professionals negotiated consensual resolutions to each of the five formal objections.

Additionally, Sidley's professionals received numerous informal inquiries from creditors and

contract-counterparties regarding the Global Contract Motion and the status of such parties'

contracts, claims, and proposed cure amounts.  The Bankruptcy Court entered an order approving

the Global Contract Motion on April 25, 2011 (Docket No. 8745) (the "Global Contract Order").

11

25.     Following entry of the Global Contract Order, and in accordance with the procedures set forth therein, Sidley's professionals continued to work with Alvarez & Marsal, the Debtors' management and personnel, and counsel for contract counterparties to reach consensual determinations of amounts required to be cured upon the assumption of executory contracts and unexpired leases.

**E.     Use/Sale/Lease of Assets (30430):    Hours: 20.60    Fees: $11,873.00**

26.     Sidley's professionals remained engaged in negotiating and documenting transactions for the use, sale, and lease of assets on behalf of the Debtors, both in connection with these chapter 11 cases and with Sidley's ongoing representation of the Debtors in their ordinary course of business.  During the Tenth Interim Fee Period, Sidley's professionals worked with the Debtors' real estate counsel and management to review and analyze proposed transactions involving certain properties owned by the Debtors and non-Debtor affiliates.

27.     Specifically, Sidley prepared and filed a motion seeking authorization for Debtor Homestead Publishing Co. to sell a parcel of real property located in Columbia, Maryland (also known as the Patuxent River property) for $3,850,000 to a third-party purchaser (Docket No. 8824).  Sidley's professionals assisted Homestead Publishing Co. in negotiating, documenting, and reviewing the proposed sale agreement for the Patuxent River property, which consisted of an office building with 29,450 square feet of commercial space and 2.18 acres of real property.  Sidley's professionals also responded to inquiries regarding the sale approval motion from counsel to Aurelius Capital Management, LP ("Aurelius"), one of Tribune Company's noteholders.  The Bankruptcy Court entered an order authorizing the sale of the Patuxent River property on May 23, 2011 (Docket No. 8972).

**F.      DIP Financing/Cash Collateral (30400):   Hours: 30.40   Fees: $16,825.00**

28.      In the Tenth Interim Fee Period, Sidley's professionals worked with the

Debtors to amend and extend the Debtors' existing letter of credit facility through and including

April 10, 2012.  The Bankruptcy Court initially approved the letter of credit facility on

December 10, 2008 (on an interim basis) and January 15, 2009 (on a final basis), and approved

previous amendments to the letter of credit facility on April 8, 2009 and March 22, 2010.  The

letter of credit facility, pursuant to an Amended Letter of Credit Agreement, was scheduled to

terminate on April 10, 2011.  The Amended Letter of Credit Agreement provides for a letter of

credit facility in an amount up to $30 million, and the letters of credit are used to support the

Debtors' insurance programs and business operations.  Sidley's professionals, on behalf of the

Debtors, prepared and filed a motion seeking authority to amend the letter of credit facility and

extend its termination date, along with related motions seeking to file the fee letter related to the

Amended Letter of Credit Agreement under seal and seeking to shorten the notice and objection

period on the motion to amend the letter of credit facility (Docket Nos. 8245, 8248 and 8251).

The Bankruptcy Court approved the shortening of notice and later entered orders approving the

amendment to the letter of credit facility and the filing of the fee letters under seal on March 21,

2011 (Docket Nos. 8456 and 8458).

**G.      Insurance Matters (30450):   Hours: 11.00   Fees: $9,780.00**

29.      During the Tenth Interim Fee Period, Sidley's professionals continued to

work with the Debtors, their outside insurance counsel, and various insurance providers to

resolve certain insurance coverage issues, and to provide advice to the Debtors concerning the

impact of the chapter 11 cases on their insurance and risk management procedures.  Specifically,

Sidley's professionals reviewed the Debtors' primary and excess liability policies covering

certain prepetition lawsuits pending against the Debtors and certain of their directors and officers

and addressed various legal issues arising in connection therewith. Sidley's professionals also evaluated insurance coverage issues pertaining to actual and threatened lawsuits against certain of the Debtors' current and former directors and officers arising from the leveraged buy-out transactions that returned Tribune to private ownership in December 2007 (the "Leveraged ESOP Transactions").

30. In addition, during the Tenth Interim Fee Period, Sidley's professionals, along with the Debtors' outside insurance counsel, prepared and filed a motion seeking an order modifying the automatic stay to allow the payment and advancement of defense costs, fees and expenses under Tribune Company's directors and officers liability insurance policies (the "D&O Insurance Motion") (Docket No. 8202). The Committee filed an objection to the D&O Insurance Motion, and Sidley, along with the Debtors' outside insurance counsel, filed a response to the objection on behalf of the Debtors (Docket Nos. 8414 and 8441). Certain directors and officers filed joinders to the Debtors' response (Docket Nos. 8447 and 8462). After a hearing before the Bankruptcy Court, Sidley negotiated with the Committee and certain of the directors and officers to reach a resolution of the matter. The Court entered an order by agreement of the parties on March 29, 2011 (Docket No. 8515).

## H.    Committee-Related Matters (30460):    Hours: 0.50    Fees: $267.50

31. Sidley's professionals continued during the Tenth Interim Fee Period to work diligently to maintain a cooperative and responsive relationship with the Debtors' major creditor constituencies, including the Committee. During the Tenth Interim Fee Period, Sidley's professionals conferred with the Committee and their professionals and advisors on a regular basis in connection with the DCL Plan (defined below), of which the Committee was a co-proponent, and also on pending motions and general case administration issues as they arose in the Debtors' chapter 11 cases. Communications with the Committee related to specific

substantive matters, including with respect to the Competing Plans (defined below), the

disclosure statement, ongoing mediation sessions, and discovery-related matters, are reflected in

the applicable substantive matter categories.

**I.      Litigated Matters (30470):    Hours: 5,651.20    Fees: $3,375,256.00**

          32.      The "Litigated Matters" category encompasses all of Sidley's activities

relating to actual and potential litigation, contested matters, and adversary proceedings, as

discussed in more detail below.  This category also includes much of Sidley's litigation-related

activities concerning the contested plan confirmation process as it developed during the Tenth

Interim Fee Period, which required substantial attention from Sidley, the Debtors' senior

management, the Committee, the Debtors' senior lenders, and other key creditor constituencies

during the Tenth Interim Fee Period.[5]

          33.      Specifically, beginning on March 7, 2011, the Court conducted a fourteen-

day[6] confirmation hearing with respect to the two competing plans of reorganization proposed

for the Debtors that were pursued by their proponents to confirmation: (i) the Second Amended

Joint Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by the Debtors,

the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo,

Gordon & Co., L.P., and JPMorgan Chase Bank, N.A. (As Modified April 26, 2011) (Docket

No. 8769) (the "DCL Plan") and (ii) the Third Amended Joint Plan Of Reorganization For

Tribune Company and its Subsidiaries Proposed by Aurelius, Deutsche Bank Trust Company

---

[5] Given the contested nature of the Debtors' plan confirmation process, both the Litigated Matters category and the Plan and Disclosure Statement category include narrative descriptions and corresponding fee detail regarding Sidley's services in connection with the Debtors' plan confirmation process.  As a general rule, the services performed by professionals in Sidley's Litigation practice group in connection with the plan confirmation process appear in the Litigated Matters category.

[6] The confirmation hearing took place on March 7, 2011 through March 18, 2011 and continued on April 12, 2011 through April 14, 2011, with closing arguments on June 27, 2011.

Americas, Law Debenture Trust Company of New York, and Wilmington Trust Company

(Docket No. 8755) (the "Noteholder Plan").[7]  Opening arguments were held on March 7, 2011,

followed by 9 days of evidentiary presentations and three days of oral arguments on contested

legal issues.  Closing arguments were held on June 27, 2011.

      34.     The principal distinction between the two Competing Plans is their

respective treatment of the potential claims and causes of action arising out of the Leveraged

ESOP Transactions that returned Tribune to private ownership in 2007 (the "LBO-Related

Claims").  The DCL Plan proposes to compromise certain of the LBO-Related Claims and

reserve other LBO-Related Claims for future litigation through a litigation trust, whereas the

Noteholder Plan proposes to transfer all LBO-Related Claims to a litigation trust for future

litigation.  The Noteholder Proponents vigorously disputed numerous elements of the settlement

embodied in the DCL Plan.  During the Tenth Interim Fee Period, Sidley's professionals in the

Bankruptcy and Litigation practice groups undertook extensive trial-related activities, directed at

securing confirmation of the DCL Plan, as described in detail below.

---

[7]  Two other plans of reorganization were proposed for the Debtors by the following plan proponent groups: (i) King Street Acquisition Company, L.L.C., King Street Capital, L.P. and Marathon Asset Management, L.P. (the "Bridge Lender Plan"); and (ii) the Step One Credit Agreement Lenders (the "SOCAL Plan" and, together with the DCL Plan, the Noteholder Plan, and the Bridge Lender Plan, as applicable, the "Competing Plans").  As described in detail in the Ninth Quarterly Fee Application, the Bridge Lender Plan and the SOCAL Plan were each withdrawn by their respective proponents during the Ninth Interim Fee Period.

The Debtors, the Committee, Oaktree, Angelo Gordon, and JPMorgan are collectively referred to herein as the "DCL Proponents"; Aurelius, Law Debenture, Deutsche Bank and Wilmington Trust are collectively referred to herein as the "Noteholder Proponents"; and King Street Acquisition Company, L.L.C., King Street Capital, L.P. and Marathon Asset Management, L.P. are collectively referred to herein as the "Bridge Proponents."  The DCL Proponents, Noteholder Proponents, Bridge Proponents, and Step One Credit Agreement Lenders are collectively referred to herein, as applicable, as the "Plan Proponents."

Time entries referencing communications and meetings with the DCL Proponents, the Noteholder Proponents, the Bridge Proponents, the Step One Credit Agreement Lenders and/or the Plan Proponents in Sidley's Monthly Fee Applications should be read to include both bankruptcy and litigation counsel, as applicable, for each of the respective Plan Proponents so referenced.

(a)     **Trial Activities Relating to the Contested Plan Confirmation Hearing**

(i)     *The Discovery and Scheduling Order for Plan Confirmation*

35.     As discussed in detail in the Ninth Quarterly Fee Application, on December 20, 2010 the Bankruptcy Court entered a discovery and case management order concerning the proceedings on the Competing Plans (Docket No. 7239) (the "Discovery and Scheduling Order").[8]  The Discovery and Scheduling Order provided, in relevant part, formalized procedures and timing for taking fact and expert discovery, taking witness depositions, and resolving discovery disputes among the Plan Proponents.[9]  All fact and expert discovery, including the taking of depositions, were initially scheduled to be completed by February 25, 2011 and March 3, 2011, respectively, but were subsequently extended by orders of the Bankruptcy Court and by agreement of the Plan Proponents to allow for additional depositions to be taken and fact discovery to be exchanged.  Sidley's professionals participated in negotiating and drafting the multiple stipulations and pleadings seeking to extend pre-trial discovery during the Ninth and Tenth Interim Fee Periods.  (See Docket Nos. 8036, 8047, 8085, 8086, 8141, 8178, 8180, 8202, 8210, and 8243.)

(ii)    *Scope of Document Discovery Activities Conducted by Sidley on Behalf of the Debtors*

36.     During the Tenth Interim Fee Period, the parties' substantial document discovery activities in connection with the Competing Plans and their respective treatment of the LBO-Related Claims largely reached a conclusion.  In the week leading up to the start of the

---

[8] The Discovery and Scheduling Order is also referred to alternatively as the "case management order" and the "CMO" in Sidley's Monthly Fee Applications.  Time entries referencing communications and meetings with the "CMO 35" parties in Sidley's Monthly Fee Applications should be read to include counsel for each of the parties listed in paragraph 35 of the Discovery and Scheduling Order.

[9] As discussed below, the Discovery and Scheduling Order also established procedures and guidelines respecting pre-trial briefing and objections to be filed by the Plan Proponents.

confirmation hearing on March 7, and periodically thereafter, Sidley's professionals continued to

receive, process, review, analyze, and/or produce additional discovery documents (a) submitted

by the individuals and entities involved with the Leveraged ESOP Transactions, including the

Debtors (collectively, the "Producing Parties")[10] that were responsive to the Debtors' discovery

requests, (b) collected from the Debtors that were potentially responsive to other parties'

discovery requests, and (c) collected from within Sidley that were potentially responsive to

Aurelius's document hold notice and the Noteholder Proponents' production requests.[11]

       37.     The ongoing document discovery conducted during the Tenth Interim Fee

Period was predominantly adversarial in nature, as the Noteholder Proponents sought to support

confirmation of their own plan and defeat confirmation of the DCL Plan.  As of the date of this

Quarterly Fee Application Request, Sidley's team of Litigation professionals and

paraprofessionals have received the equivalent of approximately 5.82 million pages of discovery

documents produced by the Producing Parties in connection with the Leveraged ESOP

Transactions and the Competing Plans, which are maintained in the Document Depository,[12] a

clearinghouse for production of discovery materials to the 43 parties in interest who are

---

[10] As of the date of this Quarterly Fee Application Request, nearly 80 individuals and entities are Producing Parties.

[11] As described in Sidley's Ninth Quarterly Fee Application, on October 25, 2010, counsel for Aurelius issued formal "document hold" notices on Sidley and counsel for the other DCL Proponents, directing the retention of all documents held or produced by the firms relating to certain aspects of the Leveraged ESOP Transactions, the LBO-Related Claims, the Examiner's Investigation, and the development of the DCL Plan.  The Aurelius document hold affected approximately 36 discrete matters on which Sidley has represented the Debtors and required Sidley to implement document retention and collection protocols affecting numerous professionals and paraprofessionals, which remain in effect.

[12] The collection, review, and analysis of such a volume of documents in connection with the discovery efforts undertaken in the Debtors' chapter 11 cases has required a team of professionals, paraprofessionals, litigation support specialists, and other personnel.  Detailed information has been provided to the Fee Examiner concerning the electronic data discovery system ("EDD") maintained by Sidley's litigation support specialists, analysts, and technicians to complete of the collection, review, and production of discovery documents.  Sidley's litigation support specialists received and processed the raw data and physical documents provided by the Debtors into the 5.82 million-document database so that they can be reviewed by attorneys and paraprofessionals.

authorized to receive them (collectively, the "Depository Designees").[13]  Of the discovery

documents maintained in the Document Depository, approximately 928,000 pages were

produced by the Debtors during or prior to the Tenth Interim Fee Period.  Many of the materials

collected as part of the discovery process were ultimately used in connection with the plan

confirmation proceedings, either formally as evidentiary exhibits during the confirmation hearing

on the Competing Plans or informally by Debtors and their creditor constituencies in

negotiations and the development of their positions regarding contested legal and factual

confirmation issues.

           *(iii)*     *Discovery Disputes Relating to the Confirmation Hearing*

        38.    The Discovery and Scheduling Order established protocols for "meet and

confer" sessions among the Plan Proponents regarding discovery disputes arising in connection

with the plan confirmation process, and authorized the Plan Proponents to submit letters to the

Court if those meet and confer sessions did not result in a resolution of such discovery disputes.

(See Discovery and Scheduling Order at ¶ 14.)  In accordance with these procedures, Sidley's

professionals participated in multiple meet and confer sessions with counsel for the Noteholder

Proponents during the Tenth Interim Fee Period in an effort to resolve discovery disputes as they

arose, and reviewed each of the parties' numerous letter submissions to the Court regarding

unresolved discovery disputes.[14]

---

[13] The Document Depository procedures are discussed in detail in Sidley's Fifth Quarterly Fee Application Request. During the Tenth Interim Fee Period Sidley's professionals also received two (2) additional requests by counsel to certain of the Debtors' creditors to become a Depository Designee.  In each instance, Sidley's professionals prepared and disseminated the notices required by the Depository Order to (a) the existing Negotiating Parties of the Debtors' intention to designate additional Depository Designees and (b) the Producing Parties to provide an opportunity for such Producing Parties to object to the production of their documents to the additional Depository Designees.  Once additional Depository Designees were duly qualified to receive documents from the Document Depository, Sidley's professionals communicated with counsel for the additional Depository Designees with respect to the production of discovery materials.

[14] For letter submissions to the Court filed in the Ninth Interim Fee Period, see Docket Nos. 7399, 7415, 7435, 7718,

39.     The discovery sought by the Noteholder Proponents from counsel to the DCL Proponents, including Sidley, regarding the development of the DCL Plan raised a number of significant privilege issues.  During the Tenth Interim Fee Period, Sidley's professionals continued to analyze documents subject to discovery requests for applicable attorney-client privilege, attorney work product, and whether the communications and documents among counsel for the DCL Proponents were covered by a joint-interest privilege, in all cases as applicable to particular situations that arose in the course of the discovery process.  Based on their analysis of these various privilege issues, Sidley's professionals contested production of certain documents where appropriate and met and conferred on multiple occasions with the Noteholder Proponents regarding the production of materials covered by privilege.

(iv)    *Fact and Expert Witness Depositions*

40.     In the Ninth and Tenth Interim Fee Periods, Sidley's professionals prepared for, attended, conducted, and/or defended approximately 45 depositions of potential fact and expert witnesses in anticipation of the confirmation hearing (in at least one instance, on the night before the witness testified at the confirmation hearing).  As noted in Sidley's Ninth Quarterly Fee Application, 18 depositions were conducted in February 2011.  An additional 25 depositions, including all of the depositions of expert witnesses, were conducted in March and April 2011, with 20 of those depositions conducted in the week of March 1-5 alone.

41.     Sidley's professionals in the Bankruptcy and Litigation practice groups spent considerable time preparing for, attending, and participating in depositions of potential witnesses, with responsibilities allocated among professionals based on the witnesses that each

---

7729, 7737, 7741, 7758, 7778, 7783, 7789, 7799, 7804, 7805, 7806, 7808, 7809, 7836, 7838, 7839, 7862, 7875, 7900, 7902, 7915, 7916, 7920, 7929, 7949, 7950, 8051, 8063, 8068, 8071, 8072, 8074, 8075, 8077, and 8139.  For letter submissions to the Court filed in the Tenth Interim Fee Period, see Docket Nos. 8198, 8256, 8269, 8280, 8285 8290, 8302.

such professional would direct or cross-examine, as applicable, during the confirmation hearing. Sidley's professionals prepared summaries of key issues raised at each deposition immediately upon their conclusion for the development of direct and cross-examination testimony.  Sidley's professionals also reviewed deposition transcripts, deposition designations, and counter-designations proposed by the DCL Proponents and Noteholder Proponents in preparation for the confirmation hearing.

(v)    *Fact and Expert Witness Testimony*

42.    Leading up to the start of the confirmation hearing and continuing throughout the proceedings, Sidley's professionals met and consulted with the fact and expert witnesses designated by the DCL Proponents to develop testimony in support of the DCL Plan. Of the potential fact and expert witnesses designated by the Plan Proponents, the DCL Proponents presented 10 fact and expert witnesses and the Noteholder Proponents presented 6 fact and expert witnesses at the confirmation hearing.[15]  In addition to those witnesses that actually testified at the confirmation hearing, the DCL Proponents and the Noteholder Proponents each introduced the testimony of numerous witnesses at the confirmation hearing by affidavit, video deposition designations, and proffer.

---

[15] The following witnesses were presented by the DCL Proponents during the confirmation hearing case-in-chief: (i) David Kurtz, Managing Director and Global Co-Head of Restructuring of Lazard Frères & Co. LLC ("Lazard"); (ii) William Salganik, Creditors' Committee Member (Representative of the Washington-Baltimore Newspaper Guild); (iii) Miriam Kulnis, Executive Director of Special Credits Group, JPMorgan; (iv) Professor Bernard Black, Northwestern University, Law School and Kellogg School of Management; (v) Professor Daniel Fischel, University of Chicago Law School and Northwestern Law School, Kellogg School of Management; (vi) Suneel Mandava, Director, Financial Restructuring Group of Lazard; (vii) John Chachas, Principal of Methuselah Advisors; (viii) Brian Whittman, Managing Director, Alvarez & Marsal North America, LLC; and (ix) Eddy Hartenstein, President and Chief Executive Officer of Tribune Company and Publisher and Chief Executive Officer of the Los Angeles Times.  The Noteholder Proponents presented the following witnesses during the confirmation hearing case-in-chief: (i) Rajinder Singh, Managing Director, Raymond James & Associates; (ii) Daniel Gropper, Managing Director, Aurelius Capital Management; (iii) Professor Edward B. Rock, University of Pennsylvania Law School and Wharton Business School; (iv) Mark J. Prak, Brooks, Pierce McLendon, Humphrey & Leonard; (v) Dr. Bruce L. Beron; and (vi) Ralph Tuliano, President and Executive Managing Director of Mesirow Financial Consulting.  The DCL Proponents also presented rebuttal testimony by (i) Mace Rosenstein, Partner, Covington & Burling L.L.P. and (ii) Professor Bernard Black.

43.     Sidley's professionals, in cooperation with counsel for the other DCL Proponents, expended substantial efforts during the Tenth Interim Fee Period preparing for the presentation of direct testimony by the DCL Proponents' witnesses and cross-examination of the Noteholder Proponents' witnesses.  Sidley's professionals spent considerable time meeting with the DCL Proponents' witnesses in preparation for the confirmation hearing and coordinating with counsel for the other DCL Proponents to develop a consistent and cohesive strategy for opening arguments, the presentation and examination of witnesses, and oral arguments with respect to third-party and non-evidentiary objections to confirmation of the DCL Plan and Noteholder Plan.

44.     Each of the designated expert witnesses prepared and submitted to the Court one or more expert reports relating to the subject matter of their testimony.  The DCL Proponents' expert witnesses prepared twelve such expert reports (including rebuttal reports), and the Noteholder Proponents' expert witnesses prepared four expert reports (including rebuttal reports).  Sidley's professionals reviewed each of the expert reports, evaluated the documents or other materials relied on by the expert, and analyzed the strengths and weaknesses of the opinions reached, as a necessary element in (i) preparing the direct or cross-examination of the expert witnesses, as applicable, and (ii) developing the DCL Proponents' arguments in support of the confirmation the DCL Plan and in opposition to the Noteholder Plan.  Sidley's professionals and the expert witnesses for the DCL Proponents attended the portions of the confirmation hearing where opposing experts testified for the purpose of evaluating the testimony of other witnesses to develop effective cross-examination and rebuttal testimony.

45.     The combination of a highly compressed pre-trial and trial schedule and the number of witnesses involved in the proceedings mandated a division of labor among the

DCL Proponents generally, and Sidley's professionals in the Litigation practice group particularly, to prepare direct and cross examination of witnesses for trial, and required the involvement of a large number of professionals to ensure that all matters were addressed and all deadlines were met. Sidley's professionals in the Bankruptcy practice group also participated in the development of witness testimony based on their expertise in addressing the contested issues of bankruptcy law presented by the Competing Plans.

*(vi)*    *Trial Exhibits*

46.    An aggregate total of 3,485 exhibits were designated for use at the confirmation hearing, with 1,587 exhibits designated by the DCL Proponents and 2,648 exhibits designated by the Noteholder Plan Proponents. In accordance with the procedures established in the Discovery and Scheduling Order, the Plan Proponents were required to meet and confer regarding any opposition to the use of designated exhibits prior to filing motions in limine to exclude exhibits. Sidley's professionals reviewed and analyzed each of the exhibits designated by the Noteholder Proponents, including deposition video and transcript designations, for potential evidentiary objections. Sidley's professionals, together with counsel for the other DCL Proponents, engaged in numerous in-person and telephonic meet and confer sessions with counsel for the Noteholder Proponents regarding potential exhibit objections, designations, and counter-designations during the Tenth Interim Fee Period.

47.    The DCL Proponents utilized courtroom technology consultancy firm TrialGraphix to assist with the projection of exhibits, including video deposition designations, on video screens throughout the courtroom during the confirmation hearing. Throughout the process, Sidley's professionals coordinated and consulted with the Court's staff, TrialGraphix personnel, and the Noteholder Proponents regarding the use of courtroom technology for the display of trial exhibits. During the Tenth Interim Fee Period, Sidley's professionals and

paraprofessionals prepared each exhibit for use at the confirmation hearing, including by Bates

numbering and designating with exhibit numbers.  In addition to source documents and

deposition designations that were used as trial exhibits, Sidley's professionals also prepared a

number of illustrative and large-format demonstrative exhibits for use at the confirmation

hearing.

   (b)  <u>**Avoidance Actions and Related Adversary Proceedings and Tolling**</u>
       <u>**Agreements**</u>

   48.  Prior to the Tenth Interim Fee Period, Sidley filed 94 Avoidance Actions,

by which the Debtors seek to avoid and recover for the benefit of their estates various transfers

of property made to certain of the Debtors' third party vendors and suppliers prior to the Petition

Date.[16]  Following the filing of the 94 Avoidance Actions in early December 2010, Sidley's

professionals in the Litigation practice group worked diligently to effectuate service of process.

However, because the actions had been stayed by order of the Court (<u>see</u> Docket No. 7165) and

the defendants therefore did not have to file appearances, there were a handful of defendants for

which Sidley was not able to verify service by the time specified in the Federal Rules of Civil

Procedure.  Accordingly, on March 4, 2011, Sidley prepared and filed a motion seeking an

extension of time to effect service of process (Docket No. 8725), which was granted by the Court

with no objection on March 21, 2011 (Docket No. 8457).  Sidley's professionals continued to

undertake efforts to verify service of process on all named defendants in the Avoidance Actions.

   49.  The Court's stay order provided for a broad stay of the Avoidance Actions

until June 30, 2011, which was also the date that the approximately 127 tolling agreements with

third party vendors and suppliers were set to expire.  Beginning in late April 2011 and continuing

---

[16] See Sidley's Ninth Quarterly Fee Application Request, at ¶¶ 48-50, for a detailed description of the Avoidance
Actions commenced by the Debtors.

through May and June, Sidley's professionals and the Debtors' financial advisors at Alvarez &

Marsal undertook the substantial logistical efforts necessary to extend the stay of the Avoidance

Actions and the expiration of the tolling agreements further, pending resolution of the Debtors'

chapter 11 cases. Sidley's professionals ultimately filed the Motion to Extend the Stay of

Avoidance Actions Commenced by the Debtors on June 10, 2011 (Docket No. 9230), which

further extended the stay of the Avoidance Actions through and including December 30, 2011.

Sidley's professionals, together with co-counsel and Alvarez & Marsal, secured amendments to

each of the outstanding tolling agreements to extend through the same date.

   (c) **ERISA Mediation**

   50. On May 2, 2011, the Court, at the Debtors' request, entered an order

appointing the Honorable Kevin Gross as mediator to conduct a non-binding mediation

concerning the resolution of certain claims, causes of action, and related matters arising from

alleged violations of the Employee Retirement Income Security Act of 1974, as amended

("ERISA"), in connection with the Tribune Employee Stock Ownership Plan and the Tribune

Employee Stock Ownership Trust (individually or collectively, the "ESOP"), an employee

retirement benefit plan sponsored by Tribune (the "ERISA Mediation"). (See Order Appointing

Mediator for Mediation of Certain ERISA-Related Claims, Docket No. 8815.) Participants to the

ERISA Mediation included the United States Department of the Treasury, Internal Revenue

Service ("IRS"), the Department of Labor ("DOL"), GreatBanc Trust Company ("GreatBanc"),

Samuel Zell, the plaintiffs to that certain class action lawsuit styled Neil, et al. v. Zell, et al., (the

"Neil Plaintiffs"), and certain of the Debtors' primary and excess fiduciary liability insurance

providers.

   51. During the Tenth Interim Fee Period, Sidley's professionals reviewed and

analyzed the factual and legal issues relating to the claims and causes of action asserted by the

IRS, the DOL, GreatBanc and the <u>Neil</u> Plaintiffs (collectively, the "<u>ERISA-Related Claims</u>") and the related objections filed against the DCL Plan by the IRS and the DOL. Based on that analysis, Sidley's professionals prepared a mediation statement outlining the Debtors' position on the ERISA-Related Claims, and attended a mediation session facilitated by Judge Gross on May 4, 2011, in an effort to reach a consensual resolution of such claims. The mediation and subsequent negotiations culminated in two settlement agreements resolving all of the ERISA-Related Claims, among (i) the Debtors and the DOL, GreatBanc, Samuel Zell and the Neil Plaintiffs, and (ii) the Debtors and the IRS. Motions for approval of the foregoing settlements were filed on August 19, and October 7, respectively, and each were set for hearing on October 19, 2011. Additional details regarding the ERISA Mediation and the settlements of the ERISA-Related Claims will be provided in subsequent Quarterly Fee Applications.

### (d)    The State Law Constructive Fraudulent Conveyance Actions

52.    On March 1, 2011, the Noteholder Proponents filed a motion with the Bankruptcy Court seeking a order that would permit them to commence state law constructive fraudulent conveyance ("<u>SLCFC</u>") actions against the shareholders who received a cash distribution on account of their shares in Tribune as part of the Leveraged ESOP Transactions (Docket No. 8201) (the "<u>Noteholder SLCFC Motion</u>").[17] The Noteholder SLCFC Motion sought a determination that neither the automatic stay nor the Order Appointing a Mediator prevented the commencement of SLCFC actions by creditors of the Debtors or, to the extent that automatic stay or the Order Appointing a Mediator did prevent the commencement of such actions, an order modifying the stay and/or the Order Appointing a Mediator, as applicable. The Noteholder

---

[17] The Noteholder SLCFC Motion was filed by Aurelius, Law Debenture, and Deutsche Bank, and was joined by Wilmington Trust.

Proponents argued that because the time period in which the Debtors could bring avoidance actions under the Bankruptcy Code and/or state law had lapsed as of December 8, 2010 and because neither Debtors, the Committee, nor any other party on behalf of the Debtors had commenced SLCFC actions against shareholders, the Debtors' creditors retained the right to commence such actions.

53.    Several objections and responses to the Noteholder SLCFC Motion were filed. (See Docket Nos. 8361, 8363, 8371, 8379, 8380, 8396, 8413, 8402, 8403.) The objections challenged, among other things, the ability of creditors to commence the SLCFC actions. A hearing was held on the Noteholder SLCFC Motion on March 22, 2011, and several parties subsequently filed competing forms of order for the Bankruptcy Court to consider. Sidley's professionals reviewed and analyzed the complex legal issues raised by the Noteholder SLCFC Motion and the objections filed thereto and provided advice to the Debtors on the relief requested in the varying proposed orders. The Bankruptcy Court entered an order approving the Noteholder SLCFC Motion, with modifications, on April 25, 2011 (Docket No. 8740).[18]

(e)    **Stay Relief Motions**

54.    The Debtors were involved in over one hundred active or threatened lawsuits as of the Petition Date, all of which have been stayed as a result of the commencement of these chapter 11 cases. As in most chapter 11 cases, the Debtors are faced with periodic requests for relief from the automatic stay. Specifically, as of the date of this Quarterly Fee

---

[18] The Noteholders commenced filing SLCFC actions in state and federal courts on June 1, 2011. The SLCFC actions and the activities of Sidley's professionals in connection therewith will be discussed in subsequent Quarterly Fee Applications.

Application Request, the Debtors have received twenty (20) requests for relief from stay since the commencement of these cases.[19]

55.    As described in Sidley's Ninth Quarterly Fee Application, Jewel Food Stores, Inc., Albertson's, LLC, New Albertson's, Inc., and SuperValu Inc. (collectively, "Jewel") filed a motion for relief from stay on February 22, 2011, seeking relief to proceed with the prosecution of a third-party complaint against Tribune in the Circuit Court of Cook County, Illinois and to recover damages from Tribune to the extent of available insurance proceeds in respect of prepetition causes of action.  On March 18, 2011, during the Tenth Interim Fee Period, Sidley prepared and filed an objection to the Jewel stay relief motion (Docket No. 8420). Following a hearing and the presentation of oral arguments on the motion and objection, the Bankruptcy Court denied the relief requested in the motion for relief from the stay on April 4, 2011, without prejudice (Docket No. 8550).  Subsequently, Jewel filed a second motion for relief from stay on May 16, 2011 (Docket No. 8917).  Sidley's professionals reviewed the assertions raised in the second Jewel motion, analyzed the applicable legal standards for obtaining relief from the automatic stay, and prepared the Debtors' objection to the second Jewel motion, which was filed on June 6, 2009 (Docket No. 9215) and was supported by the Committee (Docket No. 9216).  The Debtors ultimately reached a consensual resolution of this motion filed by Jewel.

(f)    **Other Pending Litigation**

56.    Prior to the Petition Date and since, Sidley has served the Debtors as defense counsel with respect to a number of litigation matters pending in all levels of state and federal courts across the country, including such prepetition litigation matters as Neuman v.

---

[19] This number excludes (1) motions filed by the Debtors for relief from the automatic stay with respect to the advancement of insurance proceeds and (2) the Noteholder SLCFC Motion, to the extent it requests relief from stay.

Goldstone, a prepetition employment contract lawsuit in Los Angeles, CBS Broadcasting Inc. v. Kincaid, a civil litigation suit pending in California, and certain litigation matters pending in New York, including the cases styled Schultz v. Tribune, Crab House of Douglaston, Inc. v. Newsday, and Furnell v. Tribune.  Sidley continued to represent the Debtors in connection with these litigation matters during the Tenth Interim Fee Period, to the extent such matters were not stayed by section 362(a) of the Bankruptcy Code, and also provided advice to the Debtors in connection with proofs of claim filed by the plaintiffs on account of such litigated matters. Sidley's professionals also advised the Debtors with respect to certain actual or threatened postpetition litigation.

**J.    Travel Time (30480):    Hours: 435.50    Fees: $138,084.50**

57.    During the Tenth Interim Fee Period, Sidley's professionals spent time traveling to various locations throughout the country to attend various hearings, mediation sessions, and other meetings and events in the Debtors' chapter 11 cases.  The hours reflect non-working travel time and the fees requested in this matter category have been reduced by 50% in accordance with Local Rule 2016-2(d)(viii).

58.    The confirmation hearing took place in Wilmington, Delaware from March 7, 2011 – March 18, 2011 and reconvened from April 12, 2011 – April 14, 2011.[20]  The hearing required the presence of a number of Sidley professionals from several offices who had performed significant work concerning the particular legal and factual issues addressed at the confirmation hearing, as described in detail in this Application in the Litigated Matters and Plan and Disclosure Statement sections, infra and supra and in the corresponding time detail.  Sidley's trial team comprised partners and associates principally from Sidley's Bankruptcy and Litigation

---

[20]  Closing arguments were held on June 27, 2011.

practice groups.  A partner from Sidley's Employee Benefits Group also attended the confirmation hearing in connection with certain employee compensation and benefit provisions in the DCL Plan.

59.    As discussed above, twenty-five (25) depositions of witnesses designated to provide testimony in connection with the confirmation hearing were taken during the Tenth Interim Fee Period, with twenty (20) such depositions occurring during the week of March 1-5, 2011.  Sidley's professionals taking or defending such depositions were required to travel to New York, New York and Wilmington, Delaware.

60.    In addition to the confirmation hearing, in-person omnibus hearings were held in the Debtors' chapter 11 cases on March 2, 2011, March 22, 2011, April 25, 2011, May 17, 2011, and May 25, 2011.[21]  Pre-trial matters, including discovery disputes and motions in limine were considered by the Court at the March 2, 2011 hearing.  The March 22, April 25, and May 25 hearings were regularly-scheduled omnibus hearings, at which the Court considered a number of contested matters, including objections to claims, motions of creditors to file administrative claims, the Class Certification Motion, various lift-stay motions, the Global Contract Motion, and the Noteholder SLCFC Motion, among other matters.  The Resolicitation Motion (defined below) was considered by the Court at the May 17 hearing.  Each of the foregoing hearings were attended by the Sidley professionals with responsibility for the particular matters set for hearing.

61.    In furtherance of the Debtors' goal of consensually resolving as many of the filed claims and adversary proceedings in these chapter 11 cases as possible, Sidley's

---

[21] Additionally, telephonic hearings were held on March 4, 2011, March 29, 2011, April 5, 2011 and April 21, 2011, for which no travel was required.

professionals also traveled to New York and Delaware to participate in mediation sessions regarding the Allen Class Action and the ERISA-Related Claims, respectively.  Additionally, throughout the Tenth Interim Fee Period, Sidley's professionals traveled to a variety of locations to attend meetings with the Debtors and various creditor constituencies.

**K.**     **Labor Issues (30490):   Hours: 5.00   Fees: $3,765.00**

62.     Approximately 15% of the Debtors' employees are represented by labor unions.  During the Tenth Interim Fee Period, Sidley's professionals continued to address and analyze a variety of legal issues concerning the impact of these chapter 11 cases on the Debtors' collective bargaining agreements, multiemployer pension plans, and obligations thereunder.

63.     During the Tenth Interim Fee Period, Sidley's professionals provided advice to the Debtors regarding labor-related aspects of the various tax and corporate disclosures required to be issued in conjunction with the proposed plan of reorganization for the Debtors.  In addition, Sidley's professionals advised the Debtors on the potential effects of proposed federal legislation impacting withdrawal liability for employers participating in multi-employer pension plans.  Such assistance required communications with staff of the Senate Finance Committee and review of the bill itself.

**L.**     **Plan and Disclosure Statement (30500):   Hours: 5,844.10   Fees: $3,954,700.00**

64.     A central part of Sidley's representation of the Debtors in connection with these chapter 11 cases has been the negotiation and formulation of a plan of reorganization for the Debtors.  Those efforts culminated in the fourteen (14) day contested confirmation hearing on the Competing Plans, held in Wilmington, Delaware during the Tenth Interim Fee Period. (See ¶ 33, supra.)  As discussed above in connection with the Litigated Matters category, the discovery activities, witness preparation, and briefing in connection with the confirmation hearing required substantial attention of Sidley's professionals in both the Corporate

Reorganization and Bankruptcy and Litigation practice groups, due to the contested nature of the proceedings and the number of substantive legal issues implicated by the Competing Plans.  The Plan and Disclosure Statement matter category principally reflects the services rendered by Sidley's Bankruptcy professionals in connection with the advancement of the DCL Plan.

65.    As discussed in greater detail below, during the Tenth Interim Fee Period, Sidley's professionals actively participated in the confirmation hearing to advance the Debtors' interests, and continued to analyze and assess the numerous legal and factual issues raised by the Competing Plans, objections to each of the Competing Plans and the Plan Proponents' responses thereto.  Sidley's professionals also continued to negotiate with the objecting parties to attempt to reach a consensual resolution on as many confirmation objections as possible, and with the Noteholder Proponents to minimize, where possible, the number of contested issued needing to be addressed that the confirmation hearing, and otherwise to streamline the conduct of the confirmation hearing as much as possible.  In addition, Sidley's professionals spent significant time preparing post-trial briefs and proposed findings of fact and conclusions of law which were submitted to the Bankruptcy Court following the conclusion of the confirmation hearing.  Sidley's professionals also negotiated with the other DCL Proponents regarding proposed modifications to the DCL Plan to address various objections raised by third parties, and implemented a limited supplemental solicitation to gain creditor approval of such modifications and to provide election options to creditors based on such modifications.

(a)    **Participation in the Confirmation Hearing**

66.    The confirmation hearing consisted of opening statements, nine days of testimony and presentations of witnesses, three days of oral argument on purely legal objections to the Competing Plans, and closing arguments.  The length, complexity, and scope of the confirmation hearing required the in-person participation of a number of Sidley's partners and

32

associates. Each of Sidley's partners and associates that attended the confirmation hearing, in whole or in part, did so based on, among other factors, their (i) substantive knowledge and familiarity with the DCL Plan and corresponding disclosure documents and Plan Supplement, (ii) first-hand participation in negotiating the DCL Plan, (iii) substantive knowledge and familiarity with the Noteholder Plan and corresponding disclosure documents and exhibits, (iv) substantive knowledge and familiarity with the legal objections raised by the Noteholder Proponents to the DCL Plan, (v) substantive knowledge and familiarity with the legal objections raised by the DCL Proponents to the Noteholder Plan, (vi) first-hand participation in negotiating the resolution of objections filed by third-party objectors to the DCL Plan, and familiarity with such objections, (vii) substantive knowledge and familiarity with the exhibits offered in support of the DCL Plan and/or the Noteholder Plan, as applicable, (viii) attendance at depositions of fact and expert witnesses presented in support of the DCL Plan or the Noteholder Plan, and/or (ix) first-hand participation in presenting one or more fact or expert witnesses in support of the DCL Plan, or cross-examination of the Noteholder Plan.

67.    Sidley's professionals attended and participated in the confirmation hearing each day, prepared and conducted oral arguments and witness examinations, and prepared summaries and analyses of the testimony presented each day for the benefit of the Debtors' senior management. Sidley's professionals that presented or cross-examined witnesses attended the testimony of the counterpart witnesses, in order to further develop their own direct or cross-examination, or to develop rebuttal testimony. Sidley's professionals responsible for briefing the DCL Proponents' objections to the Noteholder Plan, or defending the DCL Plan against objections from the Noteholder Proponents, as applicable, attended the confirmation hearing to understand first hand how the trial record was developed in support, or against, those

objections.  The direct participation in the confirmation hearing by such professionals greatly contributed to the efficiency of the preparation of the DCL Proponent's post-trial brief and proposed findings of fact and conclusions of law.  Outside of the courtroom, Sidley's professionals, particularly associates, researched and analyzed various legal issues that were raised and argued during the confirmation hearing involving both the DCL Plan and the Noteholder Plan and researched and assessed the strength and weaknesses of various arguments and rebuttal arguments.  In addition, Sidley's professionals attended further mediation sessions with Judge Gross on behalf of the Debtors to determine whether the DCL Proponents and Noteholder Proponents could reach an agreement on any of the issues raised at the confirmation hearing.

68.     The confirmation hearing required Sidley's professionals to address both substantive and logistical challenges.  The central legal issue underpinning the Noteholder Proponents' objections to the DCL Plan was whether the settlement of the LBO-Related Causes of Action embodied in the DCL Plan was reasonable.  This issue implicated both factual and legal arguments, including valuation, value allocation, and whether the factors supporting the settlement enunciated by the Third Circuit Court of Appeals in Myers v. Martin had been satisfied.  Much of Sidley's efforts, including the development of oral argument, witness testimony, exhibits, and briefing, centered on this issue.[22]  In addition, Sidley's professionals developed the record in support of (i) the DCL Plan's feasibility with respect to FCC approval, (ii) the classification and relative recoveries of various claimants, including the impact of contractual subordination provisions, (iii) the bar order and judgment reductions mechanisms

---

[22] In the opinion on confirmation issued by the Bankruptcy Court on October 31, 2011, the Bankruptcy Court found that the DCL Plan satisfied the Martin factors and concluded that the settlement of the LBO-Related Claims embodied in the DCL Plan was in fact reasonable.

embodied in the DCL Plan, (iv) the Retiree and Intercompany Claims settlements, (v) third-party release provisions, and (vi) post-emergence corporate governance and executive compensation provisions, among other legal issues.[23]

69.     Sidley's professionals, together with the Debtors' personnel and designated witnesses, spent considerable time preparing for the presentation of evidence and oral argument in support of the DCL Plan.  In addition, Sidley's professionals spent considerable time preparing the DCL Proponents' opposition to the Noteholder Plan, including cross-examining witnesses and presenting evidence and oral argument to rebut the Noteholder Proponents' case-in-chief.  Evidence presented by the DCL Proponents and objectors to the DCL Plan during the confirmation hearing in support of their respective views on the foregoing legal issues consisted of witness testimony and exhibits.  The Bankruptcy Court allocated each of the Plan Proponents an equal, and limited, amount of time to present their cases-in-chief.  These time limitations required that Sidley's professionals develop concise legal arguments and witness testimony to maximize the impact of their presentations to the Court.  It also required Sidley's professionals to confer on a continuous basis with professionals for the other DCL Proponents, in order to maintain a cohesive trial strategy.

70.     In total, the DCL Proponents and Noteholder Proponents presented seventeen witnesses, which including five fact witnesses and twelve expert witnesses, in support of the respective Competing Plans.  The expert witnesses addressed a variety of complex issues including corporate valuation, liquidation analysis and recovery models, corporate governance, compliance with regulations promulgated by the FCC, decision tree analysis, and settlement

---

[23] Although the Bankruptcy Court did not confirm the DCL Plan, the Court concluded the bulk of these provision passed muster under section 1129 of the Bankruptcy Code, such that comparatively few issues remained to be addressed as part of the confirmation proceedings on the Third Amended DCL Plan, which was filed on November 18, 2011.

recovery analysis. Sidley's professionals in the Bankruptcy and Litigation practice groups

divided responsibility for the preparation and presentation of witness testimony, with others, or

between the two practice groups, and collaborated to the extent necessary to advance the

Debtors' strategic objectives in both litigation and bankruptcy matters during the confirmation

hearing.

### (b)    Resolution of Objections to Confirmation

71.    Sidley's professionals continued to work with the various parties that

objected to the DCL Plan in an effort to resolve such objections consensually. Thirty-one (31)

objections were filed in response to the DCL Plan, and the DCL Proponents were able to resolve

approximately nineteen (19) of such objections in their entirety, while partially resolving several

other objections. In addition, Sidley's professionals reviewed and summarized the objections to

the DCL Plan, the DCL Proponents' responses to the objections, and the status of the objections,

to assist the Court in conducting the confirmation hearing. Specifically, at the Court's request,

Sidley's professionals prepared and filed a chart providing this information to aid the Bankruptcy

Court in determining which objections remained to be adjudicated. (See Docket No. 8607.) The

chart of objections and their resolutions was updated on a continuous basis prior to its filing, as

objections were resolved or clarified with the relevant objectors. Sidley's professionals also

prepared and filed a supplemental objection to the Noteholder Plan based on certain

modifications made to the Noteholder Plan and reviewed and assessed the supplemental

objection to the DCL Plan filed by the Noteholder Proponents.

### (c)    Post-Confirmation Hearing Briefing

72.    Extensive post-trial briefing took place following the presentation of

witnesses and evidence at the confirmation hearing. Pursuant to a briefing schedule set by the

Bankruptcy Court, the Plan Proponents were permitted to submit initial post-trial briefs that were

limited to 125 pages per proponent group, followed by 40-page reply briefs to the initial post-trial briefs.  The Court authorized objecting parties other than the Plan Proponents to file five-page letter briefs further stating their position on any objections to the DCL Plan and Noteholder Plan following the confirmation hearing that remained unresolved, and the Plan Proponents to file ten-page responses to any such third-party objections.  Finally, the Plan Proponents were required to submit their proposed findings of fact and conclusions of law to the Bankruptcy Court.

73.    The DCL Proponents and Noteholder Proponents filed their post-trial briefs in support of the respective plans on May 11, 2011.  (Docket Nos. 8897, 8898, 8899 and 8900.)  Four third-party letter briefs were also filed on May 11, 2011 by Samuel Zell, EGI-TRB, LLC, certain Directors and Officers, and the U.S. Department of Labor.  (Docket Nos. 8884, 8885, 8888 and 8890.)  The DCL Proponents and Noteholder Proponents filed their responses to the third-party letter briefs on May 20, 2011 (Docket Nos. 8963 and 8960) and filed their post-trial reply briefs in response to the initial post-trial briefs on May 27, 2011 (Docket Nos. 9021 and 9022).  The DCL Proponents and Noteholder Proponents also filed their proposed findings of fact and conclusions of law on June 3, 2011.  (Docket Nos. 9062, 9063, 9064, and 9065.)

74.    Sidley's professionals were extensively involved in all of the foregoing post-trial briefing activities, and spent significant time preparing outlines for each of the briefs, thoroughly reviewing the record evidence, and drafting arguments based on the testimony and evidence presented at the confirmation hearing.  Preparing the post-trial briefing required substantial coordination among the DCL Proponents and required Sidley's professionals to be intimately familiar with the testimony presented at the confirmation hearing, the exhibits submitted by each of the Plan Proponents, the arguments made on the record, the positions of

each of the parties involved, and the legal and factual assertions made by the parties in each of the prior briefs and objections. In addition to preparing the post-trial briefs in support of the DCL Plan, Sidley's professionals also reviewed and assessed the merits of the pleadings prepared by the Noteholder Proponents and the other third-party objectors.

### (d)     Plan Modifications and Supplemental Solicitation and Election Procedures

75.     After the DCL Proponents originally solicited votes to accept or reject the DCL Plan in December 2010 and January 2011, the DCL Proponents further modified the DCL Plan to address and resolve a wide range of objections that were filed respecting the DCL Plan and, in addition, to implement the settlement reached with the Bridge Lenders, which resulted in significant modifications to the DCL Plan and the withdrawal of the Bridge Lenders' proposed plan of reorganization. Sidley's professionals spent considerable time collaborating with counsel for the other DCL Proponents to negotiate and implement these modifications to the DCL Plan. During the Tenth Interim Fee Period, modifications to the DCL Plan were filed on March 3, 2011, April 5, 2011, and April 26, 2011. (Docket Nos. 8259, 8580 and 8769.)

76.     As a result of certain modifications, the DCL Proponents determined it was appropriate to seek a limited, supplemental solicitation of the DCL Plan to (a) allow Holders of Senior Loan Claims and Senior Guaranty Claims reconsider their vote to accept or reject the DCL Plan, (b) allow Holders of Senior Noteholder Claims and Other Parent Claims make certain treatment elections, (c) allow Holders of Claims against the Debtors to modify certain release elections, and (d) provide Holders of Claims against Tribune with an additional opportunity to opt out of transferring their Disclaimed State Law Avoidance Claims to the Creditors' Trust

established under the DCL Plan.[24] Sidley's professionals prepared and filed the Motion of the

Debtors and Debtors in Possession for an Order Approving (I) Form, Scope and Procedures to

(A) Provide Holders of Senior Loan Claims and Senior Guaranty Claims With an Opportunity to

Change Votes on Debtor/Committee/Lender Plan; (B) Allow Holders of Senior Noteholder

Claims and Other Parent Claims to Make New Treatment Elections; (C) Allow Holders of

Claims that Previously Granted Certain Releases to Make Elections Concerning Such Releases

as Modified; and (D) Allow Holders of Claims Against Tribune Company to Opt Out of Transfer

of Disclaimed State Law Avoidance Claims to Creditors' Trust Under Debtor/Committee/Lender

Plan; and (II) Supplement to Disclosure Statement and Explanatory Statement and Distribution

of the Same (the "Changed Votes/Elections Motion") (Docket No. 8754) on April 25, 2011.

77.     In connection with the Changed Votes/Elections Motion, Sidley's

professionals prepared a supplemental ballot, eight separate election forms for the creditors

entitled to make certain elections, and an explanatory statement describing the modifications to

the DCL Plan and the elections that creditors were entitled to make under the DCL Plan.

Sidley's professionals reviewed and revised a supplemental disclosure statement prepared by

counsel to certain of the Senior Lenders.  The professionals that provided services to the Debtors

in connection with preparing the Changed Votes/Elections Motion and the attendant disclosure

and explanatory statements, supplemental ballot and election forms did so based on their

thorough understanding of the DCL Plan and the modifications thereto, as well as the procedures

necessary to effectuate the supplemental solicitation.  In addition, Sidley's professionals worked

---

[24] All capitalized terms used but not defined in the preceding sentence have the meanings assigned to such terms in the DCL Plan.

with creditor constituencies to resolve informal objections and concerns raised by creditors, including the Noteholder Proponents, regarding the Changed Votes/Elections Motion.

78.    After the Bankruptcy Court entered an order granting the Changed Votes/Elections Motion (Docket No. 8926), Sidley's professionals worked with the Court-appointed claims, noticing, and balloting agent (the "Voting Agent") to produce and distribute the supplemental solicitation and election packages to holders of claims that were entitled to change their votes to accept or reject the DCL Plan or make new elections under the DCL Plan. More than 7,420 claimants were served with solicitation and election packages as part of this supplemental solicitation process. Sidley's professionals also worked with the Voting Agent and the other DCL Proponents to address and resolve all noticing issues as they arose in the supplemental solicitation process. Sidley established a dedicated hotline for creditors to call with questions related to the supplemental solicitation and responded to such questions as received.

79.    In addition to negotiating and documenting modifications to the DCL Plan, Sidley's professionals also continued to monitor modifications made by the Noteholder Proponents to the Noteholder Plan. The Noteholder Proponents filed modifications to the Noteholder Plan on March 28, 2011 and April 25, 2011 (Docket Nos. 8509 and 8755). Sidley's professionals spent significant time reviewing, analyzing and summarizing the modifications to the Noteholder Plan and the impact of such modifications on the Debtors' reorganization.

**M.    Professional Retention (30510):    Hours: 73.90    Fees: $39,196.50**

80.    The Debtors' large and diverse businesses require the employment and retention of a variety of professionals to support these bankruptcy proceedings and to continue managing the litigation, real estate, tax, accounting, and other needs of their business operations in the ordinary course. During the Tenth Interim Fee Period, Sidley's professionals assisted the Debtors with modifying the scope of the existing retention of Ernst & Young, LLP (Docket Nos.

8277 and 9041) in connection with additional services to be provided to the Debtors by such firm. Sidley's professionals consulted with the Debtors' management to determine the appropriate scope and terms of the supplemental retention, and coordinated with counsel for and personnel of such retained professional and prepared the necessary pleadings to obtain Court approval of such supplemental retention.

81.     In addition, during the Tenth Interim Fee Period, Sidley's professionals twice prepared and filed supplements to the list of the Debtors' ordinary course professionals ("OCP") and coordinated with the Debtors' legal department and financial advisors to prepare and file monthly and quarterly reports of proposed payments to OCPs. (Docket Nos. 8310, 8536, 8788.) Sidley's professionals also advised the Debtors as to the legal requirements set forth in the Bankruptcy Code and Rules regarding the filing of professional fee applications, and, where requested by the Debtors, assisted in the preparation and review of fee applications of certain professionals retained by the Debtors, including the OCPs.

**N.     Tax Matters (30520):    Hours: 59.40    Fees: $48,602.50**

82.     During the Tenth Interim Fee Period, Sidley's tax professionals contributed substantially to the analysis of the tax implications of the DCL Plan and the resolution of objections to the DCL Plan filed by federal, state, and local taxing authorities. Specifically, objections to the DCL Plan were filed by the Internal Revenue Service, the State of California Franchise Tax Board, the Missouri Department of Revenue, the New York State Department of Taxation and Finance, Commonwealth of Pennsylvania Department of Revenue, Illinois Secretary of State, State of Illinois Department of Revenue and Employment Security, and Cook County, Illinois Department of Revenue. Each of the foregoing objections was resolved in its entirety, or in substantial part, prior to the commencement of the confirmation

hearing, based on the efforts of Sidley's tax and bankruptcy professionals to negotiate consensual resolutions of such objections.

83.     Sidley's professionals also continued to analyze numerous potential tax issues relating to the DCL Plan and potential modifications thereto, including the impact of the DCL Plan on various holders of claims and interests and the tax implications of the Debtors' proposed corporate structure as of their emergence from chapter 11.  Additionally, Sidley's professionals analyzed issues relating to the Noteholder Plan and modifications thereto, given their differing treatment of claims and interests.

84.     In addition, Sidley's professionals reviewed and analyzed a variety of discrete tax issues on behalf of the Debtors, both arising from and in connection with these chapter 11 cases and in connection with Sidley's representation of the Debtors in tax matters in the ordinary course of the Debtors' business.  For example, Sidley's professionals reviewed and analyzed tax-related claims and liabilities, considered the tax implications of proposed transactions, handled appeals of tax assessments, advised the Debtors with respect to potential settlements of tax claims, and communicated with taxing authorities concerning all such matters.

**O.     Claims Processing (30530):   Hours: 535.20___ Fees: $277,784.50**

85.     The complexity and breadth of the Debtors' businesses has resulted in well over 7,000 proofs of claim being filed in these chapter 11 cases.  These claims were grounded in a significant variety of legal areas, including, but not limited to, liabilities arising from labor contracts, trade vendors, securities, real estate leases, contracts, tax obligations, and prepetition litigation.  Sidley's professionals assigned to handle claims-related matters participated in regular conference calls with the Debtors' financial advisors, Alvarez & Marsal, in order to coordinate the processing of the proofs of claim, evaluating the legal sufficiency of the claims, and preparing objections thereto. In conjunction with the Debtors' personnel, Sidley

reviewed the claims and underlying supporting documents, and developed legal theories to support substantive and non-substantive objections to claims.

86.     During the Tenth Interim Fee Period, Sidley's professionals continued evaluating, researching, and analyzing the treatment of various types of claims arising in the Debtors' chapter 11 cases, covering the full spectrum of potential liabilities. Specifically, Sidley's professionals, working together with the Debtors' management, business personnel, and Alvarez & Marsal, prepared and filed the Debtors' 43rd, 44th and 45th omnibus objections to claims as well as stand-alone notices of stipulations resolving claims. (Docket Nos. 8583, 9006, 9009 and 9010.) Additionally, Sidley's professionals reviewed and responded to formal and informal responses by claimants to the foregoing claims objections, and coordinated with the Debtors' personnel to negotiate the consensual resolution of objections where feasible. Sidley's professionals also continued to advance resolution on numerous outstanding proofs of claim that were the subject of pending objections. During the Tenth Interim Fee Period, the Bankruptcy Court entered orders sustaining, in whole or in part, the Debtors' 24th, 41st, and 42nd omnibus objections that had previously been filed by Sidley on behalf of the Debtors (subject to the continuance of objections to certain claims of creditors who filed responses to such objections). (Docket Nos. 8204, 8523 and 8988.)

87.     In addition, Sidley's professionals assisted the Debtors with negotiating and implementing agreements and stipulations to resolve disputed claims without need for formal objections, in accordance with the Order approving claims settlement procedures that was entered by the Bankruptcy Court to facilitate consensual resolution of claims. (Docket Nos. 2657 and 7250.) Those procedures provide the Debtors with authority to settle or compromise disputed claims of less than $50,000 in their discretion, claims equal to or greater than $50,000

but less than $1,000,000 upon notice to the UST and counsel to the Committee and certain senior lenders, and claims equal to or greater than $1,000,000 with the approval of the Court pursuant to Bankruptcy Rule 9019.

88.     Finally, during the Tenth Interim Fee Period, Sidley's professionals reviewed and assessed four (4) motions filed on April 18, 2011 by certain former officers of the Debtors who had been named as defendants in the adversary proceeding commenced by the Committee entitled Official Committee Of Unsecured Creditors v. Fitzsimons (In re Tribune Co.), Case No. 10-54010 (KJC) (Docket Nos. 8594, 8595, 8596, and 8597) (the "D&O Claims Motions").  Each of the D&O Claims Motions sought entry of an order deeming the respective officer's late-filed indemnification and/or contribution claim arising from any judgment and costs incurred in connection with the adversary proceeding as timely.  The D&O Claims Motions were opposed by the Committee (Docket No. 8689) and were the subject of a contested hearing held on April 25, 2011.  Following entry of Orders approving the D&O Claims Motions by the Bankruptcy Court (Docket Nos. 8747, 8748, 8749, and 8750), on May 6, 2011, ten additional defendants in the adversary proceeding filed motions for orders deeming their respective indemnification claims against the Debtors to be timely-filed (Docket Nos. 8841, 8850, 8851, 8852, 8853, 8854, 8855, 8856, 8857, 8858) (the "Additional D&O Claims Motions").  The bases for the Additional D&O Claims Motions were substantially the same as those set forth in the initial D&O Claims Motions.  The Committee objected to the Additional D&O Claims Motions on May 18, 2011 (Docket No. 8941], asserting that the delay by such officers in filing their claims one month after the initial D&O Claims Motions were approved was unjustifiable.  The Committee also requested, in the event that the Bankruptcy Court granted the Additional D&O Claims Motions, that a unified procedure be created to address the merits of the underlying

indemnification claims in a systematic and cost-effective manner. Following a hearing on May 25, 2011, the Bankruptcy Court granted the Additional D&O Claims Motions. (See Docket Nos. 8992, 8994, 8995, 8996, 8997, 8998, 8999, 9000, 9001, 9002.) The Bankruptcy Court also noted on the record that it agreed with the Committee that a unified process to address the merits of the underlying indemnification claims was logical. Sidley participated in substantive negotiations with the Committee and counsel for the various former officers and directors potentially impacted by the Court's ruling, in order to develop and implement terms for the filing of indemnification claims. These activities continued into subsequent interim fee periods.

**P.    Business Operations (30550):    Hours: 557.00    Fees: $324,075.50**

89.    The Business Operations matter category encompasses the activities of Sidley's professionals with respect to their representation of the Debtors in corporate and transactional matters in the ordinary course of the Debtors' business, as well as other general corporate law and transactional advice, both related to these chapter 11 cases and otherwise related to the Debtors' businesses. These services are necessary to facilitate the Debtors' efforts to stabilize and reposition their businesses through cost saving and revenue enhancing strategies, as well as to prepare the Debtors for their emergence from chapter 11.

90.    During the Tenth Interim Fee Period, Sidley's professionals in the Corporate practice group expended substantial time and effort to prepare, research, and analyze potential value maximization strategies regarding the Debtors and certain of the Debtors properties. In addition, Sidley's professionals addressed a variety of discrete matters arising postpetition in the ordinary course of the Debtors' business, including the review of proposed transactions, contracts, leases, and general corporate governance matters.

91.    Sidley's professionals in the Corporate practice group advised the Debtors with respect to certain potential strategic transactions, reviewed and assessed the restructuring

transactions proposed by the DCL Plan, and participated in the negotiation and drafting of the

Registration Rights Agreement contemplated by the DCL Plan.  Additionally, Sidley's

professionals engaged in legal due diligence and negotiations with respect to other potential

strategic business transactions.  Finally, Sidley's professionals also reviewed and assisted in the

preparation of the Debtors' 2010 financial statements.

**Q.      Case Administration (30560):    Hours: 186.50    Fees: $71,873.50**

92.      During the Tenth Interim Fee Period, Sidley's professionals engaged in

various general case administration tasks, including scheduling and participating in hearings,

reviewing and reporting on docketed filings to the Debtors, the Committee, the United States

Trustee, and other interested parties, and maintaining a schedule of critical dates and deadlines.

On a periodic basis during this Tenth Interim Fee Period, Sidley's professionals participated in

status calls with the Debtors' senior management and financial advisors to discuss pending

motions and issues and the outcome of each hearing.  In addition, Sidley's paraprofessionals are

responsible for monitoring the docket for all filed pleadings and preparing and distributing a

daily status report to the Debtors' senior management and Sidley professionals.

**R.      Creditor Communications (30570):    Hours: 6.40    Fees: $2,697.50**

93.      Throughout the Tenth Interim Fee Period, Sidley's professionals

responded to numerous inquiries and communications from individual creditors as well as from

representatives of larger groups of the Debtors' creditor constituencies regarding the status of

these chapter 11 cases.  As a convenience to individual creditors, particularly individuals who are

generally new to and/or unfamiliar with the bankruptcy process and their role therein, the

Debtors established a Tribune Company Bankruptcy "hotline."  This toll-free number connects

directly to a voice mailbox maintained by Sidley.  Each work day, attorneys at Sidley monitored

the hotline for messages and returned all phone calls promptly, generally within 24 hours of the

message being left.  Typical callers to the hotline were bond holders, brokerage firms calling on behalf of clients, former employees of the Debtors, pro se creditors, and attorneys for creditors. Questions posed to Sidley's professions by the Debtors' creditors ranged from specific questions regarding claims treatment under the DCL Plan to general inquires regarding the status of the chapter 11 cases.

**S.      Employee Matters (30590):   Hours: 551.60    Fees: $334,446.50**

94.      During the Tenth Interim Fee Period, Sidley's professionals in the Bankruptcy and Employment practice groups continued to advise the Debtors with respect to various legal issues pertaining to employee-related matters, including negotiating employment contracts, implementing employee benefit and incentive plans, and negotiating termination and severance of former employees.  Sidley prepared and edited drafts of various of the Debtors' employment-related benefit and severance plans and addressed inquiries from creditors and made appropriate adjustments to such plans in response.

95.      With respect to the Debtors' incentive and compensation programs, during the Tenth Interim Fee Period, Sidley's professionals reviewed and analyzed provisions related to employee compensation in the DCL Plan.   Sidley's professionals continued to work with the expert retained by the Debtors to provide an opinion on the reasonableness of the equity incentive plan provided for in the DCL Plan.  Sidley's professionals prepared the expert to testify at the confirmation hearing, and ultimately prepared and presented the proffer of the expert's testimony at the confirmation hearing.  Sidley's professionals also continued to evaluate and advise the Debtors on the 2011 management incentive plan (the "MIP").

96.      In addition to the foregoing, Sidley's professionals responded to inquiries from the Debtors' management and in-house employment lawyers regarding employment issues, analyzed various issues involving the Debtors' tax-qualified pension plans, drafted and edited

severance agreements, reviewed consulting contracts, responded to numerous information requests from and/or regarding current and former employees, analyzed employee-related claims, and handled various other issues in connection with the Debtors' employees.

**T.       2010 Exit Credit Facility (13700):    Hours: 6.40    Fees: $5,130.00**

97.       During the Tenth Interim Fee Period, Sidley continued to provide services to the Debtors relating to the evaluation, negotiation, and eventual implementation of a post-confirmation financing facility that will provide a source of funding for the reorganized Debtors upon their emergence from these chapter 11 cases.  The DCL Plan authorizes the Debtors to procure exit financing as described by an exit financing term sheet in the Plan Supplement that was filed prior to the confirmation hearing.  The fees incurred by Sidley in connection with this matter related to certain preparatory matters required for an exit financing facility, including reviewing the terms of the exit facility filed with the Plan Supplement for the DCL Plan, reviewing forms of assignment agreements, and advising the Debtors with respect to particular legal issues concerning the exit facility.

**EXPENSES INCURRED**

98.       Sidley has incurred expenses of $1,133,692.42 in connection with its services rendered to the Debtors during the Tenth Interim Fee Period.  These expenses represent actual out-of-pocket costs for items incurred exclusively for the direct benefit of the Debtors, including, but not limited to, duplicating charges, document delivery and messenger services, telephone and facsimile charges, computer-assisted legal research, travel-related expenses, overtime services, in-house document production, and professional services from contract attorneys relating to discovery activities.

99.       Sidley submits that all such expenses are necessary and actual expenses for the performance of its services in these cases, and further submits that many of such expenses

were necessitated by the time constraints under which Sidley's professionals and staff have operated in these cases. Specifically, many of the expenses incurred during the Tenth Interim Fee Period are attributable to the confirmation hearing on the Competing Plans, which was held in Wilmington, Delaware during March and April 2011. Sidley's representation of the Debtors in support of the DCL Plan required the preparation and physical production of documents and exhibits for use at trial, and ongoing discovery activities leading up to the trial required the services of outside contract attorneys and technical service providers. Additional information respecting certain categories of expenses are described below. A detailed breakdown of Sidley's expenses incurred in rendering services to the Debtors during the period covered by this application is incorporated into this Application as part of Attachment B hereto.

(a)    **Travel Expenses**

100.    Sidley submits that all travel expenses incurred during the period covered by this Application were necessary, reasonable, and reflect the prevailing market rates. In particular, Sidley submits that, to the best of its knowledge, all air travel utilized by Debtors' personnel during the period covered by this Application was at the prevailing coach-class rate for such travel less any corporate discounts received by Sidley, in accordance with Sidley's policies for business travel for bankruptcy and non-bankruptcy matters. Hotel charges reflect rates for one night of lodging, unless otherwise indicated.

(b)    **Court-Related Expenses**

101.    Sidley incurred $110,889.35 in out-of-pocket expenses relating to Court fees and Court Reporting fees. For the convenience of the parties and the Court, Sidley retained TGS Reporting, Inc. to provide real-time transcripts of the confirmation hearing. TGS issued those transcripts to the parties at the close of testimony each day, which was invaluable for the preparation of testimony and oral argument on subsequent days. The immediate availability of

trial transcripts also assisted Sidley's professionals in preparing detailed summaries of the

confirmation hearing at the request of those members of Tribune's senior management who did

not attend each day of the trial in person.  All Court-related expenses reflect actual, reasonable,

and necessary costs incurred by Sidley on behalf of the Debtors.

### (c)    Document-Related Expenses

102.    Sidley's normal billing practices, as set forth in the pleadings supporting

its retention in these chapter 11 cases, include standard secretarial services as part of normal

overhead.  For certain projects involving large and/or time-sensitive administrative and logistical

requirements resulting from client needs, Sidley utilizes the services of third-party providers in

the place of clerical personnel on staff during normal business hours and bills those services to

the client at Sidley's cost for such services.  During the Tenth Interim Fee Period, Sidley charged

a total of $248,814.94 relating to in-house duplication, outside document production, document

processing and/or document binding/drilling services that were billed to the Debtors at cost; that

is, no markup for such services is applied by Sidley.[25]  Of this amount, $171,104.85 relates to

trial exhibits prepared, processed, BATES-stamped, and printed by TrialGraphix for the

confirmation hearing.

### (d)    Computer-Assisted Research

103.    Computer research and information retrieval services are charged on a

time, item and/or search-type basis which takes advantage of certain discounts that Sidley is able

to negotiate with the relevant service providers because of the Firm's size and volume of usage.

The Firm's charges for computerized legal research such as Westlaw or Lexis are based on a rate

that recovers no more than the Firm's costs.

---

[25] By agreement between Sidley and the Office of the United States Trustee, Sidley has not charged the Debtors for
any expenses relating to third-party proof-reading services.

(e)     **Overtime**

104.    It is Sidley's standard practice and policy to reimburse professionals and

staff for overtime meals and overtime transportation home when working late, provided such

professional or staff member has worked a certain number of hours per day, on a particular client

matter.  Additionally, Sidley's provides overtime pay to certain eligible staff employees when

they are required to work past normal business hours on a particular client matter.  Sidley

submits that all requested overtime expenses are reasonable given the increased time demands in

these cases during the Tenth Interim Fee Period.

(f)     **Professional Services/Specialists**

105.    During the Tenth Interim Fee Period, Sidley charged a total of

$396,713.07 relating to such outside professional services that were billed to the Debtors at cost.

In connection with Sidley's population and maintenance of the Document Depository, in which

the equivalent of approximately 4.5 million pages of documents relating to the Leveraged ESOP

Transactions are electronically stored, Sidley utilized the services of an outside vendor, LD

Discovery, to host and process electronic data files for production upon request to Depository

Designees and creditor constituencies authorized to receive such documents.  Sidley also utilized

the services of contract attorneys to supplement the Firm's Litigation professionals in the review

and analysis of documents received and produced in discovery to meet the deadlines imposed by

the confirmation hearing schedule set by the Bankruptcy Court.  Additionally, Sidley retained

courtroom technology consultancy firm TrialGraphix to assist with the hosting, indexing, and

projection of trial exhibits, including video deposition designations, on video screens throughout

the courtroom during the confirmation hearing.

51

## REVIEW OF APPLICABLE LOCAL RULE

106.    The undersigned has reviewed the requirements of Local Rule of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware 2016-2 and certifies to the best of his information, knowledge and belief that this application substantially complies with Rule 2016-2.

## NOTICE

107.    Notice of this Application has been served upon the Notice Parties specified in the Fee Orders.  In accordance with the terms of the Fee Orders, Sidley respectfully submits that no other or further notice is required.

## NO PRIOR REQUEST

108.    Other than the applicable Monthly Fee Applications, no previous application respecting the relief requested herein has been made to this or any other Court.

WHEREFORE, after appropriate notice and hearing, Sidley Austin LLP respectfully requests the Court (i) to approve, pursuant to 11 U.S.C. §§ 327, 331, and 503, interim compensation in the amount of $8,941,857.00 and reimbursement of expenses in the amount of $1,133,692.42, (ii) to authorize the payment of such amounts by the Debtors to Sidley, less any amounts previously paid to Sidley pursuant to the Monthly Fee Applications for the period covered by this tenth Quarterly Fee Application Request and the procedures set forth in the Interim Compensation Order and the Fee Examiner Order, and (iii) to grant such further relief as is just and proper.

Dated: January 27, 2012

Respectfully submitted,

 /s/ Kenneth P. Kansa
James F. Conlan
Bryan Krakauer
Kenneth P. Kansa
Jillian K. Ludwig
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

ATTORNEYS FOR DEBTORS AND DEBTORS
IN POSSESSION