## EXHIBIT B

Black-line Comparison of the Supplemental Disclosure to the
Supplemental Disclosure Document filed November 19, 2011 [Docket No. 10273]

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered |

## SUPPLEMENTAL DISCLOSURE DOCUMENT RELATING TO THIRD AMENDED JOINT PLAN OF REORGANIZATION FOR TRIBUNE COMPANY AND ITS SUBSIDIARIES PROPOSED BY THE DEBTORS, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, OAKTREE CAPITAL MANAGEMENT, L.P., ANGELO, GORDON & CO., L.P., AND JPMORGAN CHASE BANK, N.A. (AS MODIFIED FEBRUARY 20, 2012)

SIDLEY AUSTIN LLP
James F. Conlan
Bryan Krakauer
Jeffrey C. Steen
Dennis M. Twomey
Kerriann S. Mills
One South Dearborn Street
Chicago, IL 60603
Telecopier: (312) 853-7036

COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telecopier: (302) 652-3117

*Counsel For Debtors and Debtors In Possession and Certain Non-Debtor Affiliates*

CHADBOURNE & PARKE LLP
Howard Seife
David M. LeMay
30 Rockefeller Plaza
New York, New York 10112
Telecopier: (212) 541-5369

LANDIS RATH & COBB LLP
Adam G. Landis
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telecopier: (302) 467-4450

ZUCKERMAN SPAEDER LLP
Graeme W. Bush
James Sottile
1800 M Street, N.W., Suite 1000
Washington, D.C. 20036
Telecopier: (202) 822-8106

*Counsel For the Official Committee of Unsecured Creditors*

DEWEY & LEBOEUF LLP
Bruce Bennett
James O. Johnston
Joshua M. Mester
333 South Grand Avenue, Suite 2600
Los Angeles, California 90071
Telecopier: (213) 621-6100

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Robert S. Brady (No. 2847)
M. Blake Cleary (No. 3614)
The Brandywine Building – 17th Floor
1000 West Street, Post Office Box 391
Wilmington, Delaware 19899 0391
Telecopier: (302) 571-1253

*Counsel For Oaktree Capital Management, L.P. and Angelo, Gordon & Co., L.P.*

WILMER CUTLER PICKERING HALE &
DORR LLP
Andrew Goldman
399 Park Avenue
New York, New York 10022
Telecopier: (212) 230-8888

*Co-Counsel For Angelo, Gordon & Co, L.P.*

DAVIS POLK & WARDWELL LLP
Donald S. Bernstein
Damian S. Schaible
450 Lexington Avenue
New York, New York 10017
Telecopier: (212) 701 5800

RICHARDS LAYTON & FINGER
Mark Collins
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telecopier: (302) 651-7701

*Counsel For JPMorgan Chase Bank, N.A.*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are listed on the next page.

DATED: ~~November 18, 2011~~ February 20, 2012

Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223~~); Publishers Forest Products Co. of Washington (4750~~); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc., f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); and WPIX, Inc. (0191).  The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................. 1

        A.      Voting Procedures, Ballots and Supplemental Voting Deadline ..................... 3

                1.      Supplemental Voting Deadline................................................ 3

                2.      Voting Procedures ............................................................... 3

        B.      Confirmation Hearing and Deadline for Objections to Confirmation .............. 4

II.     THE SECOND AMENDED PLAN AND RELATED CONFIRMATION OPINION.................. 5

III.    RULE 59 MOTIONS ............................................................................ 8

IV.     OVERVIEW OF THE LIMITED CONFORMING MODIFICATIONS IN THE THIRD
        AMENDED PLAN ............................................................................. 8 9

        A.      Plan Modifications Addressing Concerns Raised in Amended Confirmation Opinion. 9 10

                1.      1129(a)(10) Finding ......................................................... 9 10

                2.      Release Finding .............................................................. 10

                3.      Exculpation Finding ....................................................... 10 11

                4.      Bar Order Finding.......................................................... 11 12

                5.      PHONES Subordination Findings. .........11 Other Parent Claim Allocation Matter.    12

        B.      Plan Modifications Addressing Certain Potential Allocation Disputes.......................... 12

                1.      Potential Impact of the Adjudication or Resolution of the Potential Allocation
                        Disputes on Distributions to Holders of Claims in Revoting Classes................. 14

                2.      Impact of the Schedule for Adjudication or Resolution of the Potential Allocation
                        Disputes on the Procedures for Distributions to Holders of  Claims in Revoting
                        Classes....................................................................... 15    16

        C.      Retiree Claimant Settlement ............................................................. 16 17

V.      OTHER MISCELLANEOUS PROVISIONS OF THE THIRD AMENDED PLAN ................. 17

        A.      Distributions to MSCS ..................................................................... 18

        B.      Participation in the Step Two/Disgorgement Settlement............................... 18

        C.      Distribution of New Common Stock ..................................................... 18

        D.      Calculation of Step Two/Disgorgement Settlement Participants' Distributions ..... 18

        E.      Litigation Trust Valuation Expert ....................................................... 19

VI.     REORGANIZED VALUE UPDATE.......................................................... 19

VII.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE THIRD AMENDED PLAN 17 20

        A.      Federal Tax Consequences to the Debtors.............................................. 21

        B.      Federal Income Tax Consequences to Certain U.S. Holders of Claims in Revoting
                Classes....................................................................................... 17 21

                1.      Amounts Attributable to Allocation Dispute Protocol.............................. 17

                2.      U.S. Holders of Senior Noteholder Claims. ......................................... 18 21

i

3.2.    U.S. Holders of Other Parent Claims (not including the Swap Claim and Claims against Tribune arising from a Non-Qualified Former Employee Benefit Plan).~~19~~22

4.3.    U.S. Holders of Claims arising from a Non-Qualified Former Employee Benefit Plan. ....................................................................................~~19~~22

5.4.    U.S. Holders of EGI-TRB LLC and PHONES Notes Claims.......................~~20~~23

~~B~~C.    Federal Income Tax Treatment of ~~Allocation Dispute Reserves.21~~ the MSCS/Senior Noteholder Reserv

~~VI~~VIII. CONCLUSION AND RECOMMENDATION .................................................................~~21~~24

## I.    INTRODUCTION

On November 18, 2011, (i) the Debtors; (ii) the official committee of unsecured creditors appointed by the U.S. Trustee pursuant to section 1102(a) of the Bankruptcy Code (the "Creditors' Committee"); (iii) certain investment funds and accounts managed by Oaktree Capital Management, L.P. and/or its affiliates ("Oaktree") and Angelo, Gordon & Co., L.P. and/or certain of its affiliates ("Angelo Gordon"), each in its capacity as Holders of Senior Loan Claims, or as a general partner or manager of an entity that is a Holder of Senior Loan Claims; and (iv) JPMorgan Chase Bank, N.A. and certain of its affiliates ("JPMorgan"), as the Senior Loan Agent and as a Holder of Senior Loan Claims (collectively, the "DCL Proponents") filed the Third Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, The Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A. [Docket No. 10273] (as amended on February 20, 2012 [Docket No. 10958], the "Third Amended Plan") with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").[2]  A copy of the Third Amended Plan, without exhibits other than Exhibit 5.18, is attached hereto as Exhibit B.[3]

The Third Amended Plan was filed because, as described below, on October 31, 2011, the Bankruptcy Court denied confirmation of the Second Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, The Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A. (as modified April 26, 2011) (the "Second Amended Plan") [Docket No. 8769].[4]  In its opinion [Docket No. 10133] (the "Confirmation Opinion"),[5] however, the Bankruptcy Court found that each of the LBO Settlement and the Step Two Disgorgement Settlement (each as defined below) – the core components of the Second Amended Plan – was "achieved as a result of arms-length, good faith negotiations" and was "fair, reasonable, and in the best interest of the Debtors' estates" (Confirmation Opinion at 35-39, 79). However, the Bankruptcy Court concluded that the Second Amended Plan, which was overwhelmingly accepted by creditors across the capital structure of the Debtors, did not satisfy several requirements for confirmation under section 1129 of the Bankruptcy Code.

The Confirmation Opinion identified certain discrete components of the Second Amended Plan that would need to be revised in order to achieve confirmation.  In addition, on December 29, 2011, the Bankruptcy Court issued an opinion [Docket No. 10531 (the "Reconsideration Opinion") and related

---

[2]    Capitalized terms used but not defined in this supplemental disclosure document (the "Supplement") shall have the meanings ascribed to such terms in the Third Amended Plan.

[3]    Exhibits to the Third Amended Plan are available via the Debtors' reorganization website at ~~http://chapter11.epiqsystems.com/tribune~~http://chapter11.epiqsystems.com/tribune, under the "Key Documents" tab.

[4]    The Bankruptcy Court also denied confirmation of a competing plan of reorganization jointly proposed by, *inter alia*, certain Holders of Senior Notes and PHONES Notes (the "Noteholder Plan").  The Bankruptcy Court explained that, "assuming that both sets of plan proponents addressed only the flaws in their respective plans and both returned confirmable plans containing terms otherwise similar to those presently proposed, with similar voting results, the [Second Amended] Plan would survive the crucible of § 1129(c)" of the Bankruptcy Code, which provides that if the requirements of confirmation are met with respect to more than one plan, the court shall consider the preferences of creditors and equity security holders in determining which plan to confirm.

[5]    You may obtain a copy of the Confirmation Opinion from the Debtors' reorganization website at http://chapter11.epiqsystems.com/tribune, under the "Key Documents" tab or under the "Docket" tab at Docket No. 10133.

order [Docket No. 10532] (the "Reconsideration Order" and, together with the Reconsideration Opinion, the "Reconsideration Decision") which, among other things, modified and clarified certain aspects of the Confirmation Opinion.  Specifically, as further discussed in Article III herein, in the Reconsideration Decision, the Bankruptcy Court vacated its Subordination Finding (as defined herein) in the Confirmation Opinion (the "Subordination Reconsideration Ruling").  In addition, in the Reconsideration Decision, the Bankruptcy Court clarified that the Confirmation Opinion did not address the amount of indebtedness of the PHONES Notes and denied a request by the proponents of the Noteholder Plan (the "Noteholder Proponents") to reconsider certain other aspects of the Confirmation Opinion.

The Third Amended Plan reflects modifications to the Second Amended Plan (the "Modifications") that are intended to address the limited issues identified in the Confirmation Opinion. In order to expedite the Debtors' prompt emergence from these Chapter 11 Cases, as modified by the Reconsideration Decision (the "Amended Confirmation Opinion").  The Third Amended Plan also establishes a protocol for the adjudication or consensual resolution of a number of potential allocation issues Allocation Disputes (as defined herein) – described in detail below – that have been or may be raised by parties in interest.  Those issues primarily involve which categories of plan distributions are subject to the subordination provisions of the PHONES Notes Indenture (the "PHONES Subordination Provisions") and the subordination agreement governing the EGI-TRB LLC Notes (the "EGI-TRB Subordination Provisions") and which Holders of Senior Noteholder Claims (Class 1E) and Other Parent Claims (Class 1F) are entitled to the benefit of subordination provisions the PHONES Subordination Provisions and the EGI-TRB Subordination Provisions with respect to various distributions contemplated by the Third Amended Plan, in the manner.  As described in greater detail below.  such issues shall be determined by the Bankruptcy Court in accordance with the schedule established by the Order Establishing Scheduling For (1) Resolution of The Allocation Disputes and (2) Consideration of  DCL Plan Proponents' Supplemental Disclosure Document, Solicitation Procedures Motion and Plan (the "Scheduling Order") entered by the Bankruptcy Court on January 24, 2012 (Docket No 10692).

The principal purpose of this Supplement is to provide supplementary information concerning the Modifications to the Holders of:

- (i) Senior Noteholder Claims (Class 1E), (ii) Other Parent Claims (Class 1F), (iii) EGI-TRB LLC Notes Claims (Class 1I), and (iv) PHONES Notes Claims (Class 1J) against Tribune; and

- General Unsecured Claims against certain Filed Subsidiary Debtors (Classes 2E, 4E through 7E, 10E, 12E through 15E, 18E through 20E, 22E through 29E, 31E through 38E, 40E, 42E, 43E, and 46E through 49E) where no Holders of General Unsecured Claims previously voted on the Second Amended Plan.

The above are the only Classes from which votes and elections are being solicited resolicited (collectively, the "Revoting Classes"), because there are no other Classes with Claims (or Interests) that may be materially adversely affected by the Modifications.

As a result of the Modifications, the Holders of Claims in the Revoting Classes are being afforded the opportunity to (a) vote on the Third Amended Plan (whether or not such holders Holders voted on the Second Amended Plan) and (b) submit treatment and release elections under the Third Amended Plan.  Regardless of how the Allocation Disputes (defined below) are ultimately resolved, distributions will be made in accordance with the Third Amended Plan without any further solicitation of votes or elections.  **If no Holders of Claims in a particular Revoting Class vote to accept or reject the Third Amended Plan, then such Class of Claims shall be deemed to accept the Third Amended Plan.  Holders of Claims in Classes other than the Revoting Classes (the "Non-Voting Holders"), are not entitled to**

**vote anew on the Third Amended Plan because the treatment of such Non-Voting Holders' Claims is not materially adversely affected by the Modifications.  Whether or not the Third Amended Plan is accepted by the Non-Voting Holders will be determined according to the votes cast by such Non-Voting Holders on the Second Amended Plan.  Further, all treatment and release elections submitted by the Non-Voting Holders in connection with the Second Amended Plan shall be deemed to be elections made in connection with the Third Amended Plan.**

This Supplement is intended to supplement certain prior disclosure documents previously approved by the Bankruptcy Court and addresses only issues related to the modifications incorporated into the Third Amended Plan and the voting and election procedures thereunder.  In particular, the DCL Proponents expressly direct your attention to, and hereby incorporate herein by reference, each of the following disclosure documents: (i) the General Disclosure Statement dated December 15, 2010 [Docket No. 7232] (the "General Disclosure Statement"), which contains a general description of (among other things) the Debtors, their respective businesses and their reorganization proceedings, and was approved by the Bankruptcy Court on December 9, 2010 [Docket Nos. 7126, 7215]; (ii) the Specific Disclosure Statement Relating to First Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, The Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A. [Docket No. 7135] (the "Specific Disclosure Statement"), which contains a detailed description of (among other things) the provisions of the Second Amended Plan, including those provisions that are retained in the Third Amended Plan, and was approved by the Bankruptcy Court on December 9, ~~2009~~2010 [Docket No. 7126]; and (iii) the Explanatory Statement Relating to Modified Elections Under Second Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, The Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A. (as modified April 26, 2011) [Docket No. 8911, Ex. 1-H] (the "Explanatory Statement"), which contains a description of (among other things) certain elections offered under the Second Amended Plan, and was approved by the Bankruptcy Court on May 17, 2011 [Docket No. 8926]. If you did not receive or no longer have a copy of the General Disclosure Statement, the Specific Disclosure Statement, or the Explanatory Statement, you may obtain a copy from the Debtors' reorganization website at http://chapter11.epiqsystems.com/tribune.  You may also obtain a hard copy of the General Disclosure Statement, the Specific Disclosure Statement, and the Explanatory Statement free of charge by contacting the Voting Agent at (888) 287-7568 or at tribunevote@epiqsystems.com.

      **A.**      **Voting Procedures, Ballots and Supplemental Voting Deadline**.

      1.    Supplemental Voting Deadline.

~~On [●], 2011, the Bankruptcy Court entered an order which~~The Scheduling Order, among other things, establishes ~~[●], 2011~~April 30, 2012 **at 4:00 p.m., prevailing Eastern time** (the "Supplemental Voting Deadline") as the date and time by which Holders of Claims in Revoting Classes must return a Ballot to vote to accept or reject the Third Amended Plan.

      2.    Voting Procedures.

If you are ~~the~~a Holder of a Claim in a Revoting Class, you should carefully review the terms of the Third Amended Plan, the General Disclosure Statement, the Specific Disclosure Statement, the Explanatory Statement, and this Supplement.  After such review, please indicate (a) your acceptance or rejection of the Third Amended Plan by voting to accept or reject the Third Amended Plan on the Ballot

and (b) your treatment and release elections by checking the applicable boxes on the Ballot or relevant election form.[6]

For all Holders of Claims in Revoting Classes other than beneficial holders of Senior Noteholder Claims and PHONES Notes Claims (except PHONES Notes Exchange Claims), Ballots must be returned to Epiq Bankruptcy Systems, LLC (the "Voting Agent") by no later than the Supplemental Voting Deadline.  Only original signatures will be accepted.  You may use the pre-paid return envelope provided with your Ballot, or you may return your Ballot by personal delivery, overnight courier, or first class mail to the Voting Agent at the following address:

| **If By Mail**: | **If By Personal Delivery or Overnight Courier**: |
| --- | --- |
| Tribune Company Ballot Processing Center | Tribune Company Ballot Processing Center |
| c/o Epiq Bankruptcy Solutions, LLC | c/o Epiq Bankruptcy Solutions |
| FDR Station, P.O. Box 5014 | 757 Third Avenue, Third Floor |
| New York, NY 10150-5014 | New York, NY 10017 |

If you are a beneficial holder of a Senior Noteholder Claim or PHONES Notes Claim (other than a PHONES Notes Exchange Claim) who has received a Ballot from a broker, bank, commercial bank, trust company, dealer, or other agent or nominee (each, a "Voting Nominee"), you must return the Ballot and any election form provided therewith to such Voting Nominee, at the address provided by such Voting Nominee.  In order for your vote to be counted, your Ballot must be completed in accordance with the voting instructions on the Ballot and received by the Voting Nominee in enough time for the Voting Nominee to transmit the information in the Ballot to the Voting Agent so that it is received no later than the Supplemental Voting Deadline.

**Any Ballot received after the Supplemental Voting Deadline will be counted at the sole discretion of the DCL Proponents.  Any executed Ballot that does not indicate either an acceptance or rejection of the Third Amended Plan or indicates both an acceptance and rejection of the Third Amended Plan will not be counted as a vote either to accept or reject the Third Amended Plan.**

If you have any questions about the procedure for voting your Claim, the packet of materials that you have received, the amount of your Claim, or if you wish to obtain an additional copy of this Supplement, please contact the Voting Agent.

### B.    Confirmation Hearing and Deadline for Objections to Confirmation.

The Confirmation Hearing with respect to the Third Amended Plan will be held commence on [●], May 16, 2012 at [●] 10:00 a.m. (prevailing Eastern Time), before the Honorable Kevin J. Carey, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, 824 N. Market Street, Fifth Floor, Courtroom No. 5, Wilmington, Delaware 19801.  If necessary, the Confirmation Hearing shall continue on May 17, 2012 commencing at 10:00 a.m. (prevailing Eastern Time).  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of adjournment at the Confirmation Hearing, or at any subsequent adjourned Confirmation Hearing.

---

[6]    If you are the a Holder of a Claim in a Revoting Class and did not receive a Ballot or lost your Ballot, please call the Voting Agent at (646) 282-2400 or toll-free at (800) 622-1125.

Any objections to confirmation of the Third Amended Plan must (i) be made in writing; (ii) state the name and address of the objecting party and the nature of the claim or interest of such party; (iii) state with particularity the legal and factual basis and nature of any objection to the Third Amended Plan; and (iv) be filed with the Bankruptcy Court, together with proof of service, and served so that they are received **on or before [●], April 30, 2012 at 411:0059 p.m., (prevailing Eastern Time)** by the following parties:

**Counsel to the DCL Proponents:**

Counsel to the Debtors:

| | |
|---|---|
| Sidley Austin LLP | Cole Schotz Meisel Forman & Leonard, P.A. |
| One South Dearborn Street | 500 Delaware Avenue, Suite 1410 |
| Chicago, Illinois 60603 | Wilmington, Delaware 19801 |
| Facsimile: (312) 853-7036 | Facsimile: (302) 652-3117 |
| Attn: Jessica C.K. Boelter | Attn: Norman L. Pernick |

Counsel to the Official Committee of Unsecured Creditors:

| | |
|---|---|
| Chadbourne & Parke LLP | Landis Rath & Cobb LLP |
| 30 Rockefeller Plaza | 919 Market Street, Suite 1800 |
| New York, New York 10112 | Wilmington, Delaware 19801 |
| Fax (212) 541-5369 | Fax (302) 467-4450 |
| Attn: David M. LeMay | Attn: Adam G. Landis |

Counsel to Oaktree and Angelo Gordon:

| | |
|---|---|
| Dewey & LeBoeuf LLP | Young Conaway Stargatt & Taylor, LLP |
| 333 South Grand Avenue, Suite 2600 | The Brandywine Building – 17th Floor |
| Los Angeles, California 90071 | 1000 West Street, Post Office Box 391 |
| Telecopier: (213) 621-6100 | Wilmington, Delaware 19899 0391 |
| Attn: Bruce Bennett | Telecopier: (302) 571-1253 |
| | Attn: Robert S. Brady |

Co-Counsel to Angelo Gordon:

Wilmer Cutler Pickering Hale & Dorr LLP
399 Park Avenue
New York, New York 10022
Telecopier: (212) 230-8888
Attn: Andrew Goldman

Counsel to JPMorgan:

| | |
|---|---|
| Davis Polk & Wardwell LLP | Richards Layton & Finger |
| 450 Lexington Avenue | One Rodney Square |
| New York, New York 10017 | 920 North King Street |
| Telecopier: (212) 701-5800 | Wilmington, Delaware 19801 |
| Attn: Damian S. Schaible | Telecopier: (302) 651-7701 |
| | Attn: Mark Collins |

**The U.S. Trustee:**
U.S. Trustee
Office of the U.S. Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207
Lock Box #35
Wilmington, Delaware 19899
Facsimile: (302) 573-6497
Attn: David Klauder

5

## II.    THE SECOND AMENDED PLAN AND RELATED CONFIRMATION OPINION

The Second Amended Plan had two primary components.  First, as described in greater detail in the Specific Disclosure Statement, the Second Amended Plan provided for (a) certain settlements of LBO-Related Causes of Action held by the Debtors' ~~estate~~estates against current and former Senior Lenders, the Senior Loan Agent and the Senior Loan Arrangers, and participating current and former Bridge Lenders and Bridge Loan Arrangers~~, and the Step One Selling Stockholders~~ (the "LBO Settlement", as defined in the Confirmation Opinion) and (b) a settlement of claims for the disgorgement of prepetition payments made by Tribune in respect of the Step Two Financing against parties who elected to participate in the settlement, with a backstop feature designed to ensure that the Debtors' estates would receive $120 million of consideration in settlement of such claims (the "Step Two Disgorgement Settlement", as defined in the Confirmation Opinion and, together with the LBO Settlement, the "DCL Plan Settlement").  Second, and also as described in the Specific Disclosure Statement, the Second Amended Plan provided for the preservation of virtually all of the Estates' remaining LBO-Related Causes of Action for the benefit of Tribune's creditors, which causes of action were to be assigned under the Second Amended Plan to a Litigation Trust and a Creditors' Trust formed to prosecute individual creditor's claims to the extent such creditor elected to transfer them to the Creditors' Trust.[7]

The Second Amended Plan was sent for voting in December 2010.  All 128 Classes that were entitled to vote and had one or more creditors that actually cast Ballots – other than the Classes ~~of~~ consisting of the Senior Noteholder Claims, EGI-TRB LLC Notes Claims, and PHONES Notes Claims – voted to accept the Second Amended Plan.  ~~A hearing~~Hearings to consider confirmation of the Second Amended Plan and the Noteholder Plan ~~was~~were held on March 7-11, March 14-18, April 12-14, and June 27, 2011 (the "Prior Confirmation Hearing").

On October 31, 2011, the Bankruptcy Court entered the Confirmation Opinion and Order Denying Confirmation of Competing Plans [Docket No. 10134].  In the Confirmation Opinion, the Bankruptcy Court denied confirmation of both the Second Amended Plan and the Noteholder Plan.  However, after weighing all of the relevant evidence and the credibility of the witnesses, the Bankruptcy Court concluded that most of the provisions of the Second Amended Plan satisfied the requirements for confirmation under the Bankruptcy Code.  In particular, the Bankruptcy Court approved the DCL Settlement as "fair, reasonable, and in the best interest of the Debtors' estates" (Confirmation Opinion at 71), and further found that the DCL Settlement was "achieved as a result of arms-length, good faith negotiations" and was "properly part of the [Second Amended] Plan pursuant to Bankruptcy Code §1123(b)(3)(A)" (Id.).  The Bankruptcy Court also approved the following aspects of the Second Amended Plan:

- ▪ the inclusion of the Bar Order in the Second Amended Plan (subject to a limited modification) (Confirmation Opinion at 76-77);

- ▪ the feasibility of the Second Amended Plan (Confirmation Opinion at 125);

---

[7]    Subsequent to the filing of the LBO Avoidance Adversaries (as defined in the General Disclosure Statement), in June of 2011, (a) the indenture trustees on behalf of Holders of Senior Notes and PHONES Notes and (b) certain retirees of The Times Mirror Company, Tribune Company, and ~~/or one or more of 110~~ various other affiliates or subsidiaries of Tribune Company filed approximately 53 separate lawsuits in various jurisdictions asserting state law constructive fraudulent conveyance claims against certain former stockholders of Tribune.  A consolidated multidistrict action with respect to approximately 52 such lawsuits is currently pending before the United States District Court for the Southern District of New York.

- the voluntary assignment of State Law Constructive Fraudulent Conveyance Claims to the Creditors' Trust under the Second Amended Plan (Confirmation Opinion at 100);

- the Litigation Trust established under the Second Amended Plan (as an appropriate structure for pursuit of estate claims) (Confirmation Opinion at 101);

- the Retiree Settlement (as an important piece of the Debtors' reorganization) (Confirmation Opinion at 93);

- the classification of the Swap Claim in Class 1F under the Second Amended Plan (Confirmation Opinion at 103-104); and

- the treatment of prepetition indemnification and reimbursement claims under the Second Amended Plan (Confirmation Opinion at 95-96).

The Bankruptcy Court also found that the Debtors had a Total Distributable Value of $7.019 billion as of January 19, 2011 (Confirmation Opinion at 21, 29), which was within the range of the DCL Proponents' valuation of the Debtors.  In addition, in accordance with section 1129(c) of the Bankruptcy Code, the Bankruptcy Court examined the preferences of creditors respecting the Second Amended Plan and the Noteholder Plan and found that "creditors overwhelmingly prefer the [Second Amended] Plan over the Noteholder Plan." (Confirmation Opinion at 124).  In light of this clearly manifested creditor preference, the Bankruptcy Court concluded that, as between a modified Second Amended Plan and a modified Noteholder Plan that addressed their respective confirmation issues and had similar voting results, the modified Second Amended Plan would be confirmed instead of the modified Noteholder Plan, because, as the Bankruptcy Court observed, the modified Second Amended Plan would "survive the crucible of [section] 1129(c)." (Confirmation Opinion at 125).

As noted, notwithstanding these otherwise favorable rulings, the Bankruptcy Court also concluded that the Second Amended Plan was inconsistent with the requirements for confirmation under section 1129 of the Bankruptcy Code in the following targeted ways:

- The Second Amended Plan was not affirmatively accepted by at least one Impaired Class for certain Filed Subsidiary Debtors where no creditors cast ballots on the Second Amended Plan, and thus failed to satisfy section 1129(a)(10) of the Bankruptcy Code with respect to those Debtors (Confirmation Opinion at 83-84) (the "1129(a)(10) Finding");

- With respect to the release provisions of Section 11.2.1 of the Second Amended Plan, (a) the parties granting the release should be limited to the Debtors and should not include the Litigation Trustee, the Creditors' Trustee, or the Subsidiary Non-Debtors; and (b) the following persons were not entitled to the release because the record did not establish that they had provided a substantial contribution to the Estates or that the release was necessary for the Debtors' reorganization:  the Debtors' Related Persons, Current Employees (as defined in the Confirmation Opinion), and 401(k) Shareholders (as defined in the Confirmation Opinion) (Confirmation Opinion at 91, 93) ((a) and (b) collectively, the "Release Finding");[8]

---

[8]    The Bankruptcy Court also held that the DCL Proponents should prove that the proposed releases of Guarantor Non-Debtors by Senior Lenders who voted against the Second Amended Plan satisfy the "Genesis test", which requires an evaluation of whether (i) such release is necessary to the success of the reorganization, (ii) the released parties have provided a critical financial contribution to the plan, (iii) the released parties' financial

- The Bar Order provisions in Section 11.3 of the Second Amended Plan should be clarified to enjoin and restrain each Plaintiff from seeking relief or collecting judgments against any Non-Settling Defendants in any manner that fails to conform to the terms of the Bar Order, including, without limitation, the proportionate judgment reduction provision set forth therein (Confirmation Opinion at 77) (the "<u>Bar Order Finding</u>");

- The exculpation provision in Section 11.5 of the Second Amended Plan should be limited to estate fiduciaries (Confirmation Opinion at 94) (the "<u>Exculpation Finding</u>");

- The Second Amended Plan did not comply with sections 510(a) and 1129(b) of the Bankruptcy Code because it improperly applied certain subordination provisions of the PHONES Notes Indenture to the distribution of proceeds of causes of action that may be asserted under Chapter 5 of the Bankruptcy Code by the Litigation Trust (the "~~Chapter 5/Litigation Trust~~<u>Subordination</u> Finding") (Confirmation Opinion at 112-113).  In addition, the Bankruptcy Court determined that, because the record was unclear, the Court "[could not] conclude that the [Second Amended] Plan's treatment is fair or appropriately enforces the terms of the subordination agreements in accordance with Bankruptcy Code §510(a)" with respect to distributions to Holders of Other Parent Claims (Confirmation Opinion at 111) (the "Other Parent Claim Allocation ~~Finding" and, together with the Chapter 5/Litigation Trust Finding, the "PHONES Subordination Findings~~<u>Matter</u>"); and

- There was an insufficient record to permit the Bankruptcy Court to resolve disputes regarding the proper Allowed amount of the PHONES Notes Claims (Confirmation Opinion at 106).

### III.    RULE 59 MOTIONS

On November 14, 2011, (i) Aurelius Capital Management, LP and (ii) Law Debenture Trust Company of New York and Deutsche Bank Trust Company Americas, joined by Davidson Kempner Capital Management LLC and Brigade Capital Management, LLC, filed motions (the "<u>Motions to Reconsider</u>") for reconsideration of the portion of the Confirmation Opinion that held that "causes of action that the Debtors' estate may assert under Chapter 5 of the Bankruptcy Code are not 'assets of the Company' subject to the PHONES Notes' subordination provision." (Confirmation Opinion at 112-113, n.84; Docket Nos. 10222, 10223, 10225, 10226, 10238).  Also on November 14, 2011, the ~~proponents of the~~ Noteholder ~~Plan~~<u>Proponents</u> filed a motion for reconsideration and/or clarification of the Confirmation Opinion with respect to the following three issues: (i) reconsideration of the Bankruptcy Court's determination that the Senior Lenders and Bridge Lenders are entitled to share in recoveries by the Litigation Trust, (ii) reconsideration of the Bankruptcy Court's approval of the proportionate judgment reduction included in Section 11.3 of the Second Amended Plan, and application of a *pro tanto* judgment reduction instead of the proportionate judgment reduction, and (iii) clarification that the Bankruptcy Court did not make a determination as to how the PHONES Notes should be valued for purposes of determining Tribune's solvency at the time of the leveraged buy-out (the "<u>Motion to Reconsider/Clarify</u>" and, together with the Motions to Reconsider, the "<u>Rule 59 Motions</u>").  (Docket No. 10227).  ~~The Rule 59 Motions are scheduled to be~~<u>On December 6, 2011, objections were filed to the Rule 59 Motions [Docket Nos. 10363, 10365, 10366, 10371, 10373, 10376] and, on December 9, 2011, the movants filed replies to such</u>

---

contribution is necessary to make the plan feasible, and (iv) such release is fair to the non-consenting creditors, including whether the non-consenting creditors received reasonable compensation in exchange for such release. (Confirmation Opinion at 118, n.89; <u>In re Genesis Health Ventures, Inc.</u>, 266 B.R. 591, 607-08 (Bankr. D. Del. 2001)).  The DCL Proponents intend to make that showing at the ~~hearing on the Third Amended Plan~~<u>Confirmation Hearing</u>.

objections [Docket Nos. 10396, 10398, 10399, 10401].  Arguments on the Rule 59 Motions were heard by the Bankruptcy Court at a hearing on December 13, 2011 at 1:00 p.m. (ET).  In addition, the proponents of the Noteholder Plan filed a notice of appeal of the Confirmation Order on November 14, 2011.  (Docket No. 10228). 14, 2011.

On December 29, 2011, the Bankruptcy Court issued its Reconsideration Decision granting the Motions to Reconsider and denying (subject to one clarification) the Motion to Reconsider/Clarify.  In its Subordination Reconsideration Ruling, the Bankruptcy Court amended the Confirmation Opinion to strike the Subordination Finding, thereby holding that the PHONES Subordination Provisions apply to the proceeds of, from, or relating to any and all causes of action asserted by the Litigation Trust.[9]  In its Reconsideration Decision, the Bankruptcy Court also denied the Motion to Reconsider/Clarify with respect to the Litigation Trust waterfall and Bar Order judgment reduction issues raised in such Motion, but granted the Motion in part by clarifying that the Bankruptcy Court did not make any determination regarding the amount of indebtedness of the PHONES Notes in the Confirmation Opinion.

## IV.    OVERVIEW OF THE ~~LIMITED~~ CONFORMING MODIFICATIONS IN THE THIRD AMENDED PLAN

In order to comply with the Amended Confirmation Opinion, the Third Amended Plan contains Modifications that the DCL Proponents believe address each of the issues identified by the Bankruptcy Court but otherwise preserve substantially all of the other terms of the Second Amended Plan, including the DCL Plan Settlement.  As described below, the Third Amended Plan includes Modifications (i) providing that, subject to the conditions set forth in the Third Amended Plan, any Revoting Class in which no creditors return any valid and timely Ballots, shall be deemed to have accepted the Third Amended Plan, (ii) limiting the parties granting a release pursuant to Section 11.2.1 of the Third Amended Plan to the Debtors and narrowing the scope of the parties so released to exclude the Debtors' Related Persons, Current Employees, and 401(k) Shareholders, (iii) limiting the parties exculpated pursuant to Section 11.5 of the Third Amended Plan to estate fiduciaries, and (iv) clarifying the Bar Order under Section 11.3 of the Third Amended Plan to enjoin and restrain each Plaintiff from seeking relief or collecting judgments against any Non-Settling Defendants in any manner that fails to conform to the terms of the Bar Order, including, without limitation, the proportionate judgment reduction provision set forth therein, and (v) amending the definition of "Class 1J Litigation Trust Interests" in Section 1.1.45 of the Third Amended Plan to exclude the distribution of proceeds of causes of action asserted by the Litigation Trust under Chapter 5 of the Bankruptcy Code.[9] [10]

---

[9]    On January 10, 2012, Wilmington Trust Company, solely in its capacity as successor Indenture Trustee pursuant to the PHONES Notes Indenture ("Wilmington Trust"), filed a notice of appeal of the Reconsideration Decision and the Confirmation Order.  On that same day, Wilmington Trust filed a motion seeking leave to appeal the Reconsideration Decision [Docket No. 10582] (the "Reconsideration Appeal Motion").  The DCL Plan Proponents, Law Debenture Trust Company of New York, Deutsche Bank Trust Company Americas, and Aurelius Capital Management, L.P. objected to the Reconsideration Appeal Motion on January 24, 2012 [Docket Nos. 10690, 10702, and 10703].  A hearing with respect to the Reconsideration Appeal Motion has not yet been scheduled.

[9] [10]    On April 8, 2010, 2011, the DCL Proponents indicated that they would amend the definition of "Class 1J Creditors' Trust Interests" in the Second Amended Plan to clarify that the PHONES Subordination Provisions would only apply to the Creditors' Trust distributions to the extent provided in the PHONES Notes Indenture [See Docket No. 8607, Ex. A.].  The foregoing modification to the Second Amended Plan was filed with the Bankruptcy Court on April 26, 2011 [See Docket No. 8769].  The Third Amended Plan further modifies the definition of "Class 1J Creditors' Trust Interests" to provide that the priority of distributions that may be made on account of "Class 1J Creditors' Trust Interests" shall be subject to adjustment by the Bankruptcy Court pursuant to the Allocation Dispute Protocol (as defined below).

Additionally, the Third Amended Plan establishes a protocol for the adjudication or consensual resolution of certain potential allocation issues that have been raised ~~or may be raised~~ as a result of, or may otherwise be implicated by, the Amended Confirmation Opinion.  An overview of the Modifications incorporated into the Third Amended Plan follows.

The following summary is a general overview only, which is qualified in its entirety by, and should be read in conjunction with, the information appearing elsewhere in this Supplement and the Third Amended Plan.  **In the event of any inconsistency between this Supplement and the Third Amended Plan, the Third Amended Plan will control**.  The Debtors and the DCL Proponents reserve the right to modify the Third Amended Plan consistent with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

A.   **Plan Modifications Addressing Concerns Raised in Amended Confirmation Opinion.**

1.   1129(a)(10) Finding.

In connection with the 1129(a)(10) Finding, the Bankruptcy Court noted that "'deemed acceptance' by a non-voting impaired class, in the absence of objection," may "constitute the necessary 'consent' to a proposed 'per plan' scheme." (Confirmation Opinion at 84).  Accordingly, the DCL Proponents have modified Section 4.2 of the Third Amended Plan to provide that if the Holders of Claims in a particular Impaired Class are (a) given the opportunity to vote to accept or reject the Third Amended Plan and (b) notified that a failure of any Holders of Claims in such Class to vote to accept or reject the Third Amended Plan would result in such Class being deemed to have accepted ~~this~~the Plan, to the extent no votes to accept or reject the Third Amended Plan are cast within such Class, the Class shall be deemed to have accepted the Third Amended Plan unless otherwise determined by the Bankruptcy Court.  The additional language incorporated into Section 4.2 of the Third Amended Plan is shown in the following blacklined text:

4.2   Acceptance by an Impaired Class of Claims.

   4.2.1   Pursuant to section 1126(c) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if, after excluding any Claims held by any Holder designated pursuant to section 1126(e) of the Bankruptcy Code, (a) the Holders of at least two-thirds in dollar amount of the Allowed Claims actually voting in such Class have voted to accept such Plan, and (b) more than one-half in number of such Allowed Claims actually voting in such Class have voted to accept the Plan.

   4.2.2   Except for Holders of Claims in Classes that are deemed or presumed to have accepted or rejected this Plan pursuant to the terms of this Plan other than this Section 4.2.2, if Holders of Claims in a particular Impaired Class of Claims were given the opportunity to vote to accept or reject this Plan and notified that a failure of any Holders of Claims in such Impaired Class of Claims to vote to accept or reject this Plan would result in such Impaired Class of Claims being deemed to have accepted this Plan, but no Holders of Claims in such Impaired Class of Claims voted to accept or reject this Plan (or the Second Amended Plan if such Holders' votes on the Second Amended Plan are deemed to be votes on this Plan), then such Class of Claims shall be deemed to have accepted this Plan.

Moreover, the Third Amended Plan also provides that if (i) the Plan fails to be accepted by the requisite number and amount of Claims voting with respect to any particular Debtor, or (ii) the Bankruptcy Court, for any reason, denies confirmation of the Plan with respect to such Debtor, the DCL

Proponents may withdraw the Plan as to such Debtor.  Further, if the DCL Proponents withdraw the Third Amended Plan as to any particular Debtor, then pursuant to Section 4.6.3 of the Third Amended Plan, at the option of such Debtor, (a) such Debtor's Chapter 11 Case may be dismissed or (b) such Debtor's assets may be sold to a Debtor that is a proponent of the Third Amended Plan, with such sale to be effective at or prior to the Effective Date of the Third Amended Plan for such proponent.  The sale price shall be paid to the seller in Cash and shall be in an amount equal to the fair value of such assets as proposed by Tribune and approved by the Court.

> 2. Release Finding.

To address the Release Finding, the Third Amended Plan revises the releases granted under Section 11.2.1 of the Second Amended Plan so that the Debtors and the Reorganized Debtors are the only parties granting the releases.  The effect of the releases under the Third Amended Plan is to preclude third parties (including, without limitation, the Creditors' Committee, any other estate representative and individual creditors that are not deemed to have given a release under Section 11.2 of the Third Amended Plan) from asserting, on behalf of the Debtors' Estates or otherwise, any Released Claims.  In addition, the Third Amended Plan narrows the scope of the parties so released to exclude the Debtors' Related Persons, Current Employees, and 401(k) Shareholders.  The Modifications incorporated into Section 11.2.1 of the Third Amended Plan are shown in the following blacklined text:

---

11.2.1    Releases by Debtors and Estates.  Except for the Preserved Causes of Action, on the Effective Date and effective simultaneously with the effectiveness of this Plan, the Debtors and the Reorganized Debtors on their own behalf and as representatives of their respective Estates and any Person seeking to exercise the rights of the Debtors' Estates (including, without limitation, any successor to the Debtors, the Litigation Trustee on behalf of the Litigation Trust or any estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code), and the Creditors' Trustee on behalf of the Creditors' Trust, release unconditionally and hereby cause the Subsidiary Non-Debtors to release unconditionally,release unconditionally and are hereby deemed to release unconditionally, each and all of the Released Parties of and from any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever (including, without limitation, the Released LBO-Related Causes of Action and those arising under the Bankruptcy Code, including any avoidance claims), whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event or other occurrence taking place or existing on or prior to the Effective Date that are in connection with the Debtors or any of them, or their respective assets, property and Estates, the Chapter 11 Cases or the Plan, the Disclosure Statement or the Restructuring Transactions, in each case excluding any claims against Chase Bank USA, N.A. or JPMorgan Chase Bank, N.A. for disgorgement of payments made in the ninety days prior to the Petition Date solely to the extent they were made by Tribune Company pursuant to its obligations under the First USA Commercial Card Master Agreement dated as of October 18, 1999, as amended, which for the avoidance of doubt shall be Ordinary Litigation Claims (the "Debtor Released Claims"), provided, however, that, with the exception of the Released LBO-Related Causes of Action, nothing in this Section shall be construed to release any party from liability for actions or omissions constituting willful misconduct or gross negligence as determined by a Final Order; provided further, that nothing in this Section shall be construed to release any Released Party from a Related Person Preference Action.  Except as the Debtors may otherwise provide prior to the Confirmation Date, the releases contained in this Section shall not apply to or otherwise affect the obligations of any of the Debtors' officers or directors to repay loans or advances of money or other property contractually owed to the Debtors or their Estates or with respect to loans or advances of money that the Debtors guaranteed on behalf of such officers or directors.  Furthermore, notwithstanding the foregoing, such release, waiver and discharge shall not operate as a release, waiver or discharge of any express contractual commercial obligations arising in the ordinary course of any Person to the Debtors not directly related to the Released LBO-Related Causes of Action.  On the Effective Date, each Guarantor Non-Debtor will provide each Holder of a Loan Guaranty Claim against the Guarantor Non-Debtors, the Senior Loan Agent, the Former Bridge Loan Agent, the Bridge Loan Agent, the Settling Step Two Payees and the other Released Parties a release of scope equivalent to the release provided by the Debtors hereunder in consideration for the Guarantor Non-Debtor Release contemplated hereby.  For the avoidance of doubt, the Debtor Released Claims do not include any Disclaimed State Law Avoidance Claims.

3.      Exculpation Finding.

To address the Exculpation Finding, the Third Amended Plan modifies Section 11.5 by providing an exculpation from liability arising from any act or omission taken during or in connection with the Chapter 11 Cases solely in favor of the following estate fiduciaries: (i) the Debtors (including, without limitation, the Special Committee of the Board of Directors of Tribune formed during the Chapter 11 Cases), the Creditors' Committee, and the Related Persons of the Debtors and the Creditors' Committee and (ii) the current and former members of the Creditors' Committee (in their capacities as such) and their Related Persons.  The corresponding Modifications incorporated into Section 11.5 of the Third Amended Plan are shown in the following blacklined text:

11.5      To the fullest extent permitted under applicable law, (a) none of the ~~Proponents~~Debtors (including without limitation the Special Committee of the Board of Directors of Tribune formed during the Chapter 11 Cases), or the Creditors' Committee, (b) none of the current and former members of the Creditors' Committee (in their capacities as such), and (c) none of the Related Persons to the ~~Proponents~~parties in (a) and (b) to the extent a claim arises from actions taken by such Related Person in its capacity as a Related Person of one of ~~the Proponents~~such parties, shall have or incur any liability to any person or entity for any act or omission in connection with, relating to, or arising out of the Chapter 11 Cases, negotiation of any plans of reorganization, including this Plan, pursuit of confirmation of any plans of reorganization, including this Plan, the administration, consummation and implementation of the Plan or the property to be distributed under the Plan, the Disclosure ~~Statement~~Statement Documents, the Restructuring Transactions, the Plan Supplement, the releases and injunctions, or the management or operation of the Debtors (except for any liability that results from willful misconduct or gross negligence as determined by a Final Order or from any act or omission occurring before the Petition Date).  Any of the ~~Proponents~~Debtors (including without limitation the Special Committee of the Board of Directors of Tribune formed during the Chapter 11 Cases) ~~and~~, the Creditors' Committee ~~and~~, the members of the Creditors' Committee and the Related Persons to each of the foregoing (with respect to actions taken by such Related Person in its capacity as a Related Person of one of such parties) shall be entitled to rely upon the advice of counsel and financial advisors with respect to their duties and responsibilities under, or in connection with, the Chapter 11 Cases, the Plan, and the administration thereof.

4.      Bar Order Finding.

To address the Bar Order Finding, the DCL Proponents have added corresponding language to Section 11.3 of the Third Amended Plan expressly providing that "each Plaintiff is hereby enjoined and restrained from seeking relief or collecting judgments against any Non-Settling Defendants in any manner that fails to conform to the terms of this Bar Order, including, without limitation, the proportionate judgment reduction provision set forth herein."  The additional language incorporated in the new paragraph of Section 11.3 of the Third Amended Plan is shown in the following blacklined text:

ORDERED that each Plaintiff is hereby enjoined and restrained from seeking relief or collecting judgments against any Non-Settling Defendants in any manner that fails to conform to the terms of this Bar Order, including, without limitation, the proportionate judgment reduction provision set forth herein; and it is further

~~5.      Chapter 5/Litigation Trust Finding.~~

~~5.            To address the Chapter 5/Litigation Trust Finding, the DCL Proponents have modified the definition of "Class 1J Litigation Trust Interests" in Section 1.1.49 of the Third Amended Plan to specifically exclude "distribution[s] arising from Preserved Cause[s] of Action asserted pursuant to Chapter 5 of the Bankruptcy Code" from the distributions that would be turned over to the beneficiaries of subordination under the subordination provisions~~

~~of the PHONES Notes Indenture (the "PHONES Subordination Provisions").[10]   As a result of this Modification, the Holders of PHONES Notes Claims will retain any distributions from proceeds of Preserved Causes of Action asserted pursuant to Chapter 5 of the Bankruptcy Code, unless the Bankruptcy Court determines that the priority of distributions should be determined pursuant to the Allocation Dispute Protocol.~~Other Parent Claim Allocation Matter.

~~To address any such potential modifications, as well as any modifications required by the Bankruptcy Court with respect to distributions to Holders of Other Parent Claims and Senior Noteholder Claims, and~~ ~~the priority of distributions from the~~ ~~Litigation Trust and/or Creditors' Trust,~~In order to fully and fairly resolve any issues relating to or implicated by the Other Parent Claim Allocation Matter, the Scheduling Order establishes an Allocation Dispute Protocol consistent with Section 5.18 of the Third Amended Plan ~~provides for an Allocation Dispute Protocol~~ ~~that sets forth a process~~ pursuant to which, among other things, (i) the Bankruptcy Court shall determine or the relevant parties may otherwise resolve ~~which of the Other Parent Claims (if any) are~~whether and to what extent the distributions under Article III of the Third Amended Plan (the "Article III Distributions") or the priority of distributions from the Creditors' Trust and/or the Litigation Trust must be adjusted in order for the distributions under the Third Amended Plan to satisfy the applicable requirements of the Bankruptcy Code in connection with assertions that any category of Other Parent Claims should or should not be entitled to benefit from the PHONES ~~subordination and~~Subordination Provisions and the EGI-TRB Subordination Provisions, (ii) the distributions under the Third Amended Plan shall be modified, if and to the extent necessary, to reflect such determination or resolution ~~.  The Allocation Dispute Protocol also provides for the adjudication or resolution of certain other potential subordination issues, as described further below,~~ and (iii) certain other Allocation Disputes may be adjudicated or resolved at or in connection with an Allocation Dispute hearing scheduled to commence on March 5, 2012, in each case in accordance with Fed.R.Bankr.P. 7001(8) and subject to confirmation of a plan.

### B.      Plan Modifications Addressing Certain Potential Allocation Disputes.

The DCL Proponents believe that the foregoing Modifications are appropriate and in keeping with the Amended Confirmation Opinion and the narrow impediments to confirmation identified therein. In connection with confirmation of the Third Amended Plan, further evidence and arguments in support of the distributions set forth in the Third Amended Plan will be presented.

The Third Amended Plan ~~therefore~~ provides that as a default ~~(with the exception of Chapter 5/Litigation Trust Finding),~~ Holders of Claims ~~will~~shall receive the same distributions as those provided under the Second Amended Plan.  However, in light of~~, among other things, the relief requested in the Rule 59 Motions~~ certain Allocation Disputes that have arisen or become more evident in the wake of the Amended Confirmation Opinion, the Third Amended Plan also contemplates and provides that the Bankruptcy Court may ~~(a) reallocate~~enter orders that (a) may require the reallocation of distributions among the Holders of Senior Noteholder Claims, Other Parent Claims, EGI-TRB LLC Claims, and PHONES Notes Claims  and/or (b) adjust the priority of distributions from the Litigation Trust and/or Creditors' Trust, if it concludes it is necessary to do so to ensure that the Third Amended Plan satisfies the requirements of the Bankruptcy Code based on the resolution of the Allocation Disputes ~~(defined below)~~ or if the relevant parties otherwise consensually resolve the Allocation Disputes~~.~~

---

[10] ~~As noted above, see supra at note 9, the Third Amended Plan provides that the priority of distributions that may be made on account of "Class 1J Creditors' Trust Interests" shall be subject to adjustment by the Bankruptcy Court pursuant to the Allocation Dispute Protocol.~~

The issues relevant to the foregoing potential allocation adjustments (~~are defined in the Scheduling Order as~~ the "Allocation Disputes"~~, as defined in Exhibit 5.18 to the Plan)~~ (which definition is incorporated herein by reference) and include the following:

- whether and to what extent ~~distributions under~~the Article III ~~of the Third Amended Plan~~Distributions must be adjusted in order for such distributions to satisfy the applicable requirements of the Bankruptcy Code ~~because some or all~~in connection with assertions that (a) all or any portion of the consideration provided by the Senior Lenders, Bridge Lenders, and Settling Step Two Payees in respect of the DCL Plan Settlement ~~is~~are or are not subject to the PHONES Subordination Provisions ~~or the subordination agreement governing the EGI-TRB Notes (the "EGI-TRB Subordination Provisions~~(the "PHONES/Settlement Dispute") and (b) all or any portion of the consideration provided by the Senior Lenders, Bridge Lenders, and Settling Step Two Payees in respect of the DCL Plan Settlement are or are not subject to the EGI-TRB LLC Subordination Provisions (the "EGI-TRB/Settlement Dispute"");

- whether and to what extent ~~(a)~~ the priority of the distributions from (a) the Creditors' Trust ~~and/or the Litigation Trust (if the Bankruptcy Court deems it necessary)~~ must be adjusted in order for ~~the~~ distributions under the Third Amended Plan to satisfy the applicable requirements of the Bankruptcy Code ~~because some or all distributions from the Creditors' Trust and/or the Litigation Trust (if applicable)~~in connection with assertions that all or any distributions from the Creditors' Trust are or are not subject to the PHONES Subordination Provisions (the "PHONES/CT Dispute") and (b) the ~~priority of the distributions from the~~ Creditors' Trust and/or the Litigation Trust must be adjusted in order for the distributions under the Third Amended Plan to satisfy the applicable requirements of the Bankruptcy Code ~~because some or all distributions from the Creditors' Trust and/or the Litigation Trust~~in connection with assertions that all or any distributions from the Creditors' Trust and/or the Litigation Trust are or are not subject to the EGI-TRB Subordination Provisions (the "EGI-TRB/CT/LT Dispute");

- whether and to what extent the ~~distributions under~~ Article III ~~of the Third Amended Plan~~Distributions or the priority of distributions from the Creditors' Trust and/or the Litigation Trust must be adjusted in order for ~~the~~such distributions ~~under the Third Amended Plan~~ to satisfy the applicable requirements of the Bankruptcy Code ~~because any category of Other Parent Claims does~~ ~~not constitute "Senior Indebtedness,~~in connection with assertions that any category of Other Parent Claims (i.e. the Swap Claim, the Retiree Claims or general unsecured trade claims against Tribune) does or does not constitute (a) "Senior Indebtedness", as defined by ~~the PHONES Notes Indenture or "Senior Obligations,~~the PHONES Notes Indenture (including, without limitation, because any category of Other Parent Claims does or does not constitute "Indebtedness," as that term is defined in the PHONES Notes Indenture and used in the PHONES Note Indenture's definition of "Senior Indebtedness") (the "PHONES/OPC Dispute") and (b) "Senior Obligations", as defined by the EGI-TRB Subordination Provisions[‡‡] (the "EGI-TRB/OPC Dispute");

- the Allowed amount of the PHONES Notes Claims (the "PHONES/Allowance Dispute");

---

[‡‡]  ~~The issue of whether and to what extent (a) beneficiaries of the subordination provisions of the PHONES Notes Indenture (as determined by the Bankruptcy Court, if applicable) are entitled to receive post-petition interest prior to the Holders of PHONES Notes Claims receiving any payment on account of their Claims and (b) beneficiaries of the EGI-TRB Subordination Provisions (as determined by the Bankruptcy Court, if applicable) are entitled to receive post-petition interest prior to the Holders of EGI-TRB LLC Notes Claims receiving any payment on account of their Claims shall also be determined by the Allocation Dispute Protocol.~~

- whether and to what extent (a) the beneficiaries of the PHONES Subordination Provisions (as determined by the Bankruptcy Court, if applicable) are entitled to receive post-petition interest prior to the Holders of PHONES Notes Claims receiving any payment on account of their Claims (the "PHONES/PPI Dispute") and (b) the beneficiaries of the EGI-TRB Subordination Provisions (as determined by the Bankruptcy Court, if applicable) are entitled to receive post-petition interest prior to the Holders of EGI-TRB LLC Notes Claims receiving any payment on account of their Claims (the "EGI-TRB/PPI Dispute"); and

- the relative priority of the PHONES Notes and the EGI-TRB LLC Notes; and

- any other issues that (a) are related to the foregoing issues and raised by a party in interest or (b) the Bankruptcy Court may determine are necessary to the resolution of the foregoing. the "PHONES/EGI Priority Dispute").[11]

Depending upon their outcome, the adjudication and/or resolution of the Allocation Disputes could potentially affect the distributions to which the Holders of Senior Noteholder Claims, Other Parent Claims, EGI-TRB LLC Notes Claims, and PHONES Notes Claims are entitled under the Third Amended Plan.  The Second Amended Plan generally provided for distributions premised on the assumption that (i) distributions of DCL Plan Settlement consideration would be subject to both the PHONES Subordination Provisions and the EGI-TRB Subordination Provisions (such that neither the Holders of the PHONES Notes Claims nor the Holders of the EGI-TRB LLC Notes Claims shared in such distributions) and (ii) Holders of Other Parent Claims benefited from the PHONES Subordination Provisions and the EGI-TRB Subordination Provisions.

The Third Amended Plan provides that the Holders of Claims will shall receive the same distributions as those provided under the Second Amended Plan **subject, however, to the Chapter 5/Litigation Trust Finding and any further adjustments necessary to reflect the adjudication and/or resolution of the Allocation Disputes.**  The Third Amended Plan further provides that the Allocation Disputes shall be resolved by the Bankruptcy Court in connection with the Confirmation Hearing or as soon as practicable thereafter.[12]  The Scheduling Order, consistent with the Third Amended Plan, further provides that a hearing on the Allocation Disputes shall commence before the Bankruptcy Court on March 5, 2012 at 10:00 a.m. (prevailing Eastern time).  Although the resolution of the Allocation Disputes may potentially result in a number of different outcomes, a summary of the maximum potential cumulative adjustment to the distributions Article III Distributions to Holders of Allowed Senior Noteholder Claims, Other Parent Claims, EGI-TRB LLC Notes Claims, and PHONES Notes Claims under the Third Amended Plan pursuant to the Allocation Dispute Protocol is set forth in Section IV.B.1 below. [13]  In addition, the Subordination Allocation Appendix attached hereto as Exhibit A contains a

---

[11]    As used in Exhibit 5.18 to the Third Amended Plan, the term "Allocation Dispute" shall exclude any Allocation Dispute(s) set forth in the Scheduling Order as to which the Bankruptcy Court concludes need not be resolved in order to determine that the distributions made under the Third Amended Plan satisfy the applicable requirements of the Bankruptcy Code.

[12]    By proposing the Allocation Dispute Protocol in response to the Confirmation Opinion, none of the DCL Proponents shall be deemed to have waived or otherwise be estopped from asserting any arguments, rights, remedies, defenses, claims, or causes of action arising from, or in connection with, the Allocation Disputes, all of which arguments, rights, remedies, defenses, claims, and causes of action are expressly reserved.

[13]    In addition, Sections A1-A5 of the Subordination Allocation Appendix attached hereto as Exhibit A contain a more detailed summary of the potential impact upon the treatment of Holders of Allowed Senior Noteholder Claims, Other Parent Claims, EGI-TRB LLC Notes Claims, and PHONES Notes Claims under the Third Amended Plan based upon the potential resolution of certain individual Allocation Disputes.

more detailed summary of the intermediate potential adjustments to the Article III Distributions to the Holders of Allowed Senior Noteholder Claims, Other Parent Claims, EGI-TRB LLC Notes Claims, and PHONES Notes Claims under the Third Amended Plan based upon the potential resolution of certain individual Allocation Disputes.

      1.      Potential Impact of the Adjudication or Resolution of the Potential Allocation <u>Disputes on Distributions to Holders of Claims in Revoting Classes</u>.

Depending upon their outcome, the adjudication or resolution of the Allocation Disputes may potentially impact the distributions to be received under the Third Amended Plan by the Holders of Senior Noteholder Claims, Other Parent Claims, EGI-TRB LLC Notes Claims, and PHONES Notes Claims. That potential impact on distributions may vary significantly depending upon the numerous combinations of outcomes that may potentially result from the adjudication or resolution of the Allocation Disputes. As described in greater detail in the Recovery Chart included in the Subordination Allocation Appendix attached hereto as <u>Exhibit A</u>, the cumulative effect of the adjudication ~~or resolution~~ of all Allocation Disputes could potentially result in the following adjustments to the estimated <u>initial</u> recoveries of the Holders of Senior Noteholder ~~Claims, PHONES Notes~~ Claims, Other Parent Claims, ~~and~~ EGI-TRB LLC Notes Claims:~~[11]~~ and PHONES Notes Claims:[13]

- the estimated recovery percentage of the Holders of Senior Noteholder Claims could potentially be adjusted from 33.6% under the Second Amended Plan to an estimated range of 19.8% to 36.5% under the Third Amended Plan;

- the estimated recovery percentage of the Holders of Other Parent Claims could potentially be adjusted from 36.0% under the Second Amended Plan to an estimated range of 21.8% to 36.0%[14] under the Third Amended Plan;[15][16]

---

~~[11]~~[13]    Certain key factors and assumptions utilized in connection with determining the potential impact that the adjudication or resolution of the Allocation Disputes may have on the allocation of distributions to the Holders of Senior Noteholder Claims, Other Parent Claims, EGI-TRB- LLC Notes Claims, and PHONES Notes Claims are also set forth in Section B of the Subordination Allocation Appendix attached hereto as <u>Exhibit A</u>.

[14]    The maximum potential recovery percentage of the Holders of Other Parent Claims is estimated to be 36.0% if all categories of Other Parent Claims are treated equally. If, however, solely for purposes of illustration, the Bankruptcy Court were to determine that one, but not all, of the categories of Other Parent Claims were entitled to benefit from the PHONES Subordination Provisions or the EGI-TRB Subordination Provisions, then, as illustrated in Section D of the Subordination Allocation Appendix attached hereto as Exhibit A, the maximum potential recovery percentage for the Holders of Claims in such category might potentially be slightly higher than the recovery percentages noted above.

~~[15]~~    ~~The maximum potential recovery percentage of the Holders of PHONES Notes Claims is estimated to be 36.0% if all categories of Other Parent Claims are treated equally. If, however, solely for purposes of illustration, the Bankruptcy Court were to determine that one, but not all, of the categories of Other Parent Claims were entitled to benefit from the PHONES Subordination Provisions or the EGI-TRB Subordination Provisions, then, as illustrated in Section D of the Subordination Allocation Appendix attached hereto as Exhibit A, the maximum potential recovery percentage for the Holders of Claims in such category might potentially be slightly higher than the recovery percentages noted above.~~

~~[16]~~[15]    Under the Second Amended Plan, Holders of Senior Noteholder Claims and Other Parent Claims were to receive approximately 32.73% of their Allowed Claims, plus a pro rata share of proceeds resulting from the settlement with Bridge Lenders, as well as Litigation Trust Interests and Creditors' Trust Interests. Holders of Other Parent Claims, however, also had the option of receiving 35.18% of their Allowed Claims if they elected to forego receiving Litigation Trust Interests and Creditors' Trust Interests. (Second Amended Plan, § 3.2.6(c).)

- the estimated recovery percentage of the Holders of PHONES Notes Claims could potentially be adjusted from 0.0% under the Second Amended Plan to an estimated range of 0.0% to 16.4% under the Third Amended Plan;[~~17~~16] and

- the estimated recovery percentage of the Holders of EGI-TRB LLC Notes Claims could potentially be adjusted from 0.0% under the Second Amended Plan to an estimated range of 0.0% to 26.7% under the Third Amended Plan.[~~18~~17]

~~If the Bankruptcy Court were to deny, or defer ruling upon, the Rule 59 Motions with respect to the Chapter 5/Litigation Trust Finding in the Confirmation Opinion, then all of the Allocation Disputes would still be subject to resolution in the manner contemplated by the Allocation Dispute Protocol in the Third Amended Plan. If, however, the Court were to grant the Motions to Reconsider with respect to the Chapter 5/Litigation Trust Finding prior to the confirmation hearing on the Third Amended Plan, then (i) the scope, nature and extent of the Allocation Disputes still subject to resolution pursuant to the Allocation Dispute Protocol would be significantly reduced, (ii) the potential economic effect that the resolution of the remaining Allocation Disputes may have upon distributions to the Holders of Senior Noteholder Claims, Other Parent Claims, EGI-TRB LLC Notes Claims, and PHONES Notes Claims under the Third Amended Plan would potentially be substantially less material than if all of the Allocation Disputes were still unresolved, and (iii) the aggregate amount of the potential Allocation Dispute Reserves as of the Effective Date would likely be substantially less than the amount that would be potentially set aside on or after the Effective Date if none of the Allocation Disputes have been resolved on or before such date.~~

After the Bankruptcy Court has issued a decision on the Allocation Disputes that are relevant for purposes of determining that the distributions made under the Third Amended Plan satisfy the applicable requirements of the Bankruptcy Code, but no later than 5 business days after the entry of the Confirmation Order, the DCL Proponents shall file and serve on the "Parties" (as defined in the Scheduling Order) and affected Holders of Claims a notice setting forth all adjustments to the Article III Distributions resulting from the resolution of the Allocation Disputes, unless resolution of the Allocation Disputes does not result in any adjustment to Article III Distributions.

2.    ~~Impact of the~~ Schedule for Adjudication or Resolution of the Potential Allocation Disputes ~~for Distributions to Holders of  Claims in Revoting Classes~~.

---

The estimated recovery percentages set forth ~~in~~ herein for the Holders of Other Parent Claims assume that such Holders ~~elected~~ elect to forego receiving Litigation Trust Interests and Creditors' Trust Interests and to instead receive 35.18% of their Allowed Other Parent Claim and a pro rata share of the Bridge Settlement Proceeds. The estimated recovery percentages  for the Holders of Allowed Other Parent Claims that elected to receive 32.73% of their Allowed Claims and a pro rata share of the Bridge Settlement Proceeds, plus Litigation Trust Interests and Creditors' Trust Interests, would be approximately 2.45% lower than the estimated recovery percentages set forth herein for the Holders of Allowed Other Parent Claims.

[~~17~~16]    An estimated recovery percentage of 16.4% assumes, solely for purposes of illustration, that the PHONES Notes Claims are allowed in the aggregate amount of $1.197 billion.  If, however, solely for purposes of illustration, the PHONES Notes Claims are allowed in the aggregate amount of $761 million, the estimated recovery percentage for (a) PHONES Notes Claims arising from PHONES Notes not submitted for exchange is approximately 17.5% and (b) Holders of PHONES Notes Claims arising from PHONES Notes exchanged and not settled in cash prior to the Petition Date is approximately 2%.

[~~18~~17] This outcome will be conditioned upon the allowance of the EGI-TRB LLC Notes Claims.  Moreover, the Allocation Dispute Protocol is not contemplated to address issues raised in the lawsuit titled *Official Committee of Unsecured Creditors of the Tribune Company v. FitzSimons, et al. (In re Tribune Co.)*, Adv. Proc. No. 10-54010 (Bankr. D. Del.) (KJC).

The ~~Allocation Dispute Protocol is designed to determine the Allocation Disputes as fairly and expeditiously as possible, preferably in connection with the Confirmation Hearing or, if necessary, prior to the Effective Date. If any of the Allocation Disputes are not resolved by the Confirmation Order or settled prior to the Confirmation Date, then the DCL Proponents will request that the Bankruptcy Court establish in the Confirmation Order a schedule (the "Proposed Schedule") for the resolution of the Allocation Disputes. To the extent reasonably practicable, the Proposed Schedule shall provide for the resolution of Allocation Disputes prior to the Effective Date. To the extent, however, that the adjudication or resolution of the Allocation Disputes would unreasonably delay the Debtors' emergence from these Chapter 11 Cases, then such disputes shall be resolved as soon as practicable after the Confirmation Hearing and potentially after the Effective Date if necessary.[19]~~ Scheduling Order provides for, among other things, discovery deadlines and briefing deadlines in respect of the Allocation Disputes. As noted above, pursuant to the Scheduling Order, a hearing on the Allocation Disputes shall commence on March 5, 2012 at 10:00 a.m. (prevailing Eastern time). Each party taking a position on any of the Allocation Disputes has filed a Preliminary Statement (as defined in the Scheduling Order) setting forth the Allocation Dispute(s) on which such party intends to take a position and a brief statement of such position with respect to each such Allocation Dispute. Specifically, eleven parties have filed Preliminary Statements indicating that they will be taking positions on the Allocation Disputes, as follows: (i) Preliminary Statement Regarding Allocation Disputes filed by the Debtors [Docket No. 10776], pursuant to which the Debtors assert that, while they may possess relevant information that may be of assistance to the Bankruptcy Court in resolving the PHONES/OPC, EGI-TRB/OPC, and PHONES/Allowance Disputes, the Debtors do not currently intend to take a position on the merits of any of the Allocation Disputes; (ii) Oaktree Capital Management, L.P.'s Preliminary Statement on Allocation Disputes [Docket No. 10782] (the "Oaktree Preliminary Statement"), which sets forth Oaktree's position on the PHONES/Settlement, EGI-TRB/Settlement, PHONES/OPC, EGI-TRB/OPC, PHONES/PPI, and EGI-TRB/PPI Disputes; (iii) Preliminary Statement filed by Law Debenture Trust Company of New York [Docket No. 10784] (the "Law Debenture Preliminary Statement"), which sets forth Law Debenture Trust Company of New York's position on the PHONES/Settlement, EGI-TRB/Settlement, PHONES/CT, EGI-TRB/CT/LT, PHONES/OPC, EGI-TRB/OPC, PHONES/PPI, and the EGI-TRB/PPI Disputes; (iv) Joinder of Davidson Kempner Capital Management LLC, as Investment Advisor, to Preliminary Statement of Law Debenture Trust Company of New York [Docket No. 10785]; (v) Joinder of Brigade Capital Management, LLC in the "Preliminary Statement" of Law Debenture Trust Company of New York [Docket No. 10786]; (vi) Preliminary Statement of TM Retirees With Respect to Resolution of Allocation Disputes in Connection with Confirmation of the Third Amended DCL Plan [Docket No. 10787] (the "TM Retirees Preliminary Statement"), which sets forth the TM Retirees' position on the PHONES/OPC and EGI-TRB/OPC Disputes; (vii) Preliminary Statement of Aurelius Capital Management, LP, on Allocation Disputes [Docket No. 10789], which sets forth Aurelius Capital Management, LP's position on the PHONES/Settlement, EGI-TRB/Settlement, PHONES/CT, EGI-TRB/CT/LT, PHONES/OPC, EGI-TRB/OPC, PHONES/Allowance, PHONES/PPI, and EGI-TRB/PPI Disputes; (viii) EGI-TRB's Preliminary Statement on Allocation Disputes [Docket No. 10791] (as amended by EGI-TRB's Amended Preliminary Statement on Allocation Disputes [Docket No. 10800], the "EGI-TRB Preliminary Statement"), which sets forth EGI-TRB's position on the PHONES/Settlement, EGI-TRB/Settlement, PHONES/CT, EGI-TRB/CT/LT, PHONES/OPC, EGI-TRB/OPC,  EGI-TRB/PPI, and PHONES/EGI Priority Disputes; (ix) Preliminary Statement of Wilmington Trust Company, as Successor Indenture Trustee for the PHONES Notes on the Allocation Disputes [Docket No. 10792] (the "Wilmington Trust Preliminary Statement"), which sets forth Wilmington Trust's position on the PHONES/Settlement, PHONES/CT, PHONES/OPC, PHONES/Allowance, PHONES/PPI, and PHONES/EGI Priority Disputes; (x) Preliminary Statement of

---

[19] ~~Pursuant to the terms of the Third Amended Plan, Effective Date shall not be delayed for the resolution of the Allocation Disputes without the consent of the DCL Proponents. (Third Amended Plan, § 5.18, Ex. 5.18.)~~

the Official Committee of Unsecured Creditors in Connection with the Resolution of the Allocation Disputes [Docket No. 10793] (the "Creditors' Committee Preliminary Statement"), which sets forth the Creditors' Committees' position on the PHONES/OPC and EGI-TRB/OPC Disputes; and (xi) Joinder of Deutsche Bank Trust Company Americas to Preliminary Statement of Law Debenture Trust Company of New York In Connection With Allocation Disputes [Docket No. 10794].  A brief summary of certain of these Preliminary Statements is contained in the Subordination Allocation Appendix attached hereto as Exhibit A.[18]

If all of the Allocation Disputes are adjudicated or resolved in connection with the Confirmation Hearing or prior to the Effective Date of the Third Amended Plan, then the Holders of Senior Noteholder Claims, PHONES Notes Claims, Other Parent Claims, and EGI-TRB LLC Notes Claims shall receive the distributions that are provided in Article III of the Third Amended Plan, with any adjustments required by the Chapter 5/Litigation Trust Finding, the Confirmation Order or any other orders entered by the Bankruptcy Court adjudicating any Allocation Disputes or approving the terms of a stipulation resolving any such disputes (each, an "Allocation Order").

If, on the other hand, all of the Allocation Disputes are not resolved as of the Effective Date of the Third Amended Plan, then on or as soon as reasonably practical after the Effective Date, the Reorganized Debtors will establish one or more distribution reserves pending the outcome of all such remaining Allocation Disputes (collectively, the "Allocation Dispute Reserves").  Pursuant to the Third Amended Plan, the amount, if any, of consideration that will be contributed to the Allocation Dispute Reserves as of the Effective Date shall be equal to (a) the sum of distributions under Article III of the Third Amended Plan (excluding Class 1E Creditors' Trust Interests, Class 1E Litigation Trust Interests, Class 1J Creditors' Trust Interests and Class 1J Litigation Trust Interests) to be provided to the Holders of Senior Noteholder Claims and Other Parent Claims (as estimated by the Debtors in their reasonable discretion), less (b) the sum of such consideration that the Holders of Allowed Senior Noteholder Claims and Other Parent Claims would be entitled to receive if each of the Allocation Disputes that have not been resolved as of the date of the establishment of the Allocation Dispute Reserves were resolved in a manner adverse to the Holders of Allowed Senior Noteholder Claims and Other Parent Claims.  The consideration distributed to the Allocation Dispute Reserves shall be in the form of an amount of Cash, New Warrants, and New Senior Secured Term Loan in proportion to the aggregate elections made by the Holders of Senior Noteholder Claims and Other Parent Claims pursuant to Sections 3.2.5 and 3.2.6 of the Third Amended Plan (as estimated by the Debtors in their reasonable discretion).  If, solely for purposes of illustration, none of the Allocation Disputes are adjudicated or resolved prior to the Effective Date, then the DCL Proponents estimate that the aggregate amount of the Allocation Dispute Reserves will potentially be approximately $215.1 million of consideration.  Any amounts remaining in the Allocation Dispute Reserves after all of the Allocation Disputes have been resolved by Allocation Order(s) shall be distributed in accordance with the applicable final Allocation Order or as otherwise directed by the Bankruptcy Court.

Distributions to the Holders of Senior Noteholder Claims and Other Parent Claims, EGI-TRB LLC Notes Claims, and PHONES Notes Claims on the Initial Distribution Date would accordingly be modified from those provided for in the Second Amended Plan to reflect the funding of the Allocation Dispute Reserves and any Allocation Order.  Specifically, under this scenario, the aggregate distributions to the Holders of Senior Noteholder Claims and Other Parent Claims on the Initial Distribution Date would be reduced by the amounts in the Allocation Dispute Reserves plus any amounts that are to be

---

[18]    For a full understanding of the parties' respective positions, reference should be made to the Preliminary Statements on file with the Bankruptcy Court and available on the Debtors' reorganization website, at http://chapter11.epiqsystems.com/tribune, under the "Key Documents" tab.

allocated to other Classes in accordance with any Allocation Order(s).  Subsequent distributions from the Allocation Dispute Reserves to the Holders of Senior Noteholder Claims, Other Parent Claims, EGI-TRB LLC Notes Claims, and PHONES Notes Claims would then be determined by the outcome of the litigation or any settlement of the Allocation Disputes and would be made on or as soon as reasonably practicable after the Quarterly Distribution Date immediately following the calendar quarter in which such determination is entered.

The Scheduling Order further provides that opening briefs and response briefs in respect of the Allocation Disputes are required to be filed by February 24 and March 2, 2012, respectively.  The DCL Proponents anticipate that the Bankruptcy Court may issue a decision with respect to those Allocation Disputes that may potentially impact Initial Distributions under the Third Amended Plan prior to the Confirmation Hearing.  **The various Preliminary Statements and briefs, as well as all orders entered by the Bankruptcy Court adjudicating any Allocation Disputes (each, an "Allocation Order"), will be posted on the Debtors' reorganization website, at http://chapter11. epiqsystems.com/tribune, under the "Key Documents" tab.**

      **C.**      **Retiree Claimant Settlement**.

The Third Amended Plan incorporates the terms of the Retiree Claimant Settlement that was included in the Second Amended Plan, subject, however, to any adjustments thereto necessary in connection with the Allocation Dispute Protocol.  Pursuant to Section 5.15.4 of the Third Amended Plan, unless otherwise provided in the Confirmation Order or any applicable Allocation Order, and subject to any Allocation Dispute Reserves, the Third Amended Plan implements and incorporates by reference the terms of the Retiree Claimant Settlement Agreement, including, without limitation, the allowance of the Claims of Retiree Claimants that are party to the Retiree Settlement Agreement.  Subject to the Allocation Dispute Protocol, any applicable Allocation Order, and the terms of the Confirmation Order, entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date of the Third Amended Plan, of the Retiree Claimant Settlement Agreement.  Entry of the Confirmation Order shall also constitute the Bankruptcy Court's approval, as of the Effective Date of the Plan, of the Retiree Claimant Settlement Agreement and the Bankruptcy Court's finding that the Retiree Claimant Settlement Agreement is in the best interests of the Debtors, the Reorganized Debtors, their respective Estates, and the Holders of Claims and Interests, and is fair, equitable and reasonable, solely to the extent the Retiree Claimant Settlement Agreement is implemented.

**V.**      **OTHER MISCELLANEOUS PROVISIONS OF THE THIRD AMENDED PLAN**

In addition to modifications incorporated into the Third Amended Plan to address the Amended Confirmation Opinion, the Third Amended Plan contains certain amendments which, among other things, clarify the implementation of certain provisions of the Third Amended Plan.  Certain of these amendments are described below.

      **A.**      **Distributions to MSCS.**

Section 3.2.5(c) of the Third Amended Plan clarifies that, with respect to distributions to be made to Holders of Senior Noteholder Claims pursuant to section 3.2.5 of the Third Amended Plan, Reorganized Tribune shall (a) withhold the amount of any consideration allocable to the Senior Noteholder Claims held by Morgan Stanley Capital Services Inc. and its Affiliates and Related Persons of such entities, including, without limitation, Morgan Stanley & Co., Inc (collectively, "MCSC") and (b) hold such amount in a reserve pending a determination of the allowance of  MSCS' s Senior Noteholder Claims and MSCS's entitlement to such distributions.  If the Senior Noteholder Claims held by MSCS are disallowed or MSCS is otherwise found not to be entitled to such distribution, then the consideration that would otherwise be distributed to MSCS on account of its Senior Noteholder Claims shall instead be

distributed to the other Holders of Allowed Senior Noteholder Claims as set forth in Section 3.2.5(c) of the Third Amended Plan.

### B. Participation in the Step Two/Disgorgement Settlement.

For the avoidance of doubt, Section 5.15.1 of the Third Amended Plan provides that any of the Step Two Arrangers and current or former Senior Lenders or Bridge Lenders that received any principal, interest or fees under the Bridge Loan Agreement or under the Senior Loan Agreement in respect of the Incremental Senior Loans prior to the Petition Date (each, a "Potential Step Two Disgorgement Defendant") that elected to participate in the Step Two/Disgorgement Settlement in accordance with the procedures set forth in the form of Exhibit 5.15.1(2) attached to the Second Amended Plan shall be deemed to have elected to participate in the Step Two/Disgorgement Settlement in connection with the Third Amended Plan except to the extent that any such party shall have delivered to the Debtors a notice revoking such election on or before the first day of the Confirmation Hearing. Any Potential Step Two Disgorgement Defendant that did not elect to participate in the Step Two/Disgorgement Settlement in connection with the Second Amended Plan may elect to participate in the Step Two/Disgorgement Settlement in connection with the Third Amended Plan in accordance with the procedures set forth in Exhibit 5.15.1(2) attached to the Second Amended Plan at any time on or before the first day of the Confirmation Hearing or such later date as may be agreed to by the Step Two Arrangers.

### C. Distribution of New Common Stock.

Section 7.2.3 of the Third Amended Plan has been modified to provide that in the event that a Holder of an Allowed Claim entitled to receive a distribution of New Common Stock under the Third Amended  Plan shall advise the Voting Agent in writing prior to the deadline established by the Bankruptcy Court that all or part of such distribution of New Common Stock should be made to one or more affiliates of such Holder or other parties as such Holder shall have designated in the written notice provided to such Voting Agent, the Disbursing Agent shall make such distribution to the party designated in the written notice, which distribution shall satisfy any and all obligations of the Disbursing Agent to distribute New Common Stock on account of the relevant Holder's Allowed Claim under the Third Amended Plan.

### D. Calculation of Step Two/Disgorgement Settlement Participants' Distributions.

Section 10.1.1(l) of the Third Amended Plan has been modified to clarify that as a condition precedent to the Effective Date, the Disbursing Agent, in accordance with the terms of Exhibit 5.15.1(2) to the Third Amended Plan, shall have calculated amounts that will be offset from Step Two/Disgorgement Settlement participants' distributions pursuant to Article III of the Third Amended Plan that, together with any payments received from the Step Two/Disgorgement Settlement participants, shall be an amount that is equal to the aggregate Step Two/Disgorgement Settlement Proceeds.

### E. Litigation Trust Valuation Expert.

Section 13.2.2 of the Third Amended Plan contains certain modifications regarding the calculation of the initial estimated fair market value of the Litigation Trust Assets to be transferred to the Litigation Trust. Specifically, Section 13.2.2 of the Third Amended Plan has been modified to clarify that the Debtors shall retain a valuation expert (the "Valuation Expert"), which Valuation Expert shall be acceptable to the other Proponents. Prior to the Effective Date, the Valuation Expert shall determine and provide to the Debtors an initial estimated fair market value of all Litigation Trust Assets to be transferred to the Litigation Trust. Promptly after the Effective Date, the Valuation Expert shall determine and file with the Bankruptcy Court the final fair market value as of the Effective Date of all Litigation Trust

Assets transferred to the Litigation Trust, giving due regard to the initial estimated valuation of such Litigation Trust Assets.  The Valuation Expert's final determination of the fair market value as of the Effective Date of all Litigation Trust Assets transferred to the Litigation Trust shall be used consistently by the Litigation Trust, the Litigation Trustee, and the Litigation Trust Beneficiaries for all U.S. federal income tax purposes, including for purposes of determining tax basis and gain or loss.

## VI.    REORGANIZED VALUE UPDATE

In connection with the Second Amended Plan, the Debtors' investment banker and financial adviser, Lazard, undertook a valuation analysis to determine the value available for distribution to holders of Allowed Claims (the "Initial Reorganized Value Analysis").  Lazard's Initial Reorganized Value Analysis, which it prepared in October 2010, was attached as Exhibit F to the General Disclosure Statement and estimated a range of Distributable Value for the Reorganized Debtors from $6.3 billion to $7.1 billion with an approximate mid-point of $6.75 billion, as of a December 27, 2010 assumed Effective Date.  Lazard subsequently updated its Initial Reorganized Value Analysis in January 2011 (as updated, the "January 2011 Reorganized Value Analysis"), at which time it estimated a range of Distributable Value for the Reorganized Debtors from $6.6 billion to $7.4 billion with an approximate mid-point of $7.019 billion, as of a June 30, 2011 assumed Effective Date.

In the Confirmation Opinion, the Bankruptcy Court found persuasive Lazard's January 2011 Reorganized Value Analysis and concluded that "the Debtors' Total Distributable Value is … $7.019 billion."  Confirmation Opinion at 29.  The Bankruptcy Court's discussion of "Valuation" is set forth on pages 20-29 of the Confirmation  Opinion.  Testimony and other evidence supporting the Debtors' valuation reports is set forth in the March 11, 2011 transcript of the Confirmation Hearing at pages 14 to 137 (Mandava testimony) and pages 140 to 214 (Chachas testimony).  See also DCL Exs. 1092, 1104, 1485, 1494.

As did the Second Amended Plan, the Third Amended Plan permits the Senior Noteholders and Holders of Other Parent Claims to elect to receive either an all-cash distribution or a "strip" of consideration consisting of a portion of Distributable Cash, New Senior Secured Term Loan, and New Common Stock (a "Strip").  See Third Amended Plan, Sections 3.2.5(c), 3.2.6(c).  The ultimate recovery percentages of creditors who elect a Strip distribution may potentially be higher or lower than the recovery percentages of creditors who elect an all-cash distribution due to, for example, potential variations in the Debtors' Distributable Value.  See Section C of Exhibit A to this Supplement for further explanation.  Accordingly, the Debtors are updating the Bankruptcy Court-approved valuation of $7.019 billion to reflect the impact on value of developments since completion of the January 2011 Reorganized Value Analysis.  That update uses the same methodology that was used in the January 2011 Reorganized Value Analysis but computes value based on the Debtors' most current financial data as well as multiples that are updated to reflect current market performance.  Based on the update, the Reorganized Debtors' Distributable Value is estimated at a range of $[●] billion to $[●] billion with an approximate mid-point of $[●] billion, as of a [●], 2012 assumed Effective Date.[19]

The foregoing updated estimate of the Distributable Value of the Reorganized Debtors is subject to various assumptions and qualifications, including those stated in the January 2011 Reorganized Value Analysis, and is solely for purposes of determining the value available for distribution pursuant to a plan of reorganization.  Further, the update does not account for certain potential tax and related liabilities for

---

[19]    The Debtors are in the process of completing the valuation update.  The DCL Proponents will provide additional disclosure regarding such update once it is complete and, in any event, a reasonable period of time before the March 23, 2012 hearing on the Supplement.

Ⅰ592886v.7

which the Debtors may be liable.  As a result of those potential liabilities, the actual Distributable Value of the Reorganized Debtors could be lower than that set forth above.

## VII. ~~V.~~ CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE THIRD AMENDED PLAN

The following discussion is a summary of certain U.S. federal income tax aspects of the Third Amended Plan, is for general information purposes only, and should not be relied upon for purposes of determining the specific tax consequences of the Third Amended Plan with respect to a particular holder of a Voting Claim.  This discussion does not purport to be a complete analysis or listing of all potential tax considerations.

This discussion is based on existing provisions of the Internal Revenue Code of 1986, as amended (the "IRC"), existing and proposed Treasury Regulations promulgated thereunder, and current administrative rulings and court decisions.  Legislative, judicial, or administrative changes or interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below with respect to the U.S. federal income tax consequences of the Third Amended Plan.  Any such changes or interpretations may be retroactive and could significantly affect the U.S. federal income tax consequences of the Third Amended Plan.  No representations or assurances are being made to the U.S. Holders of Claims in Revoting Classes with respect to the U.S. federal income tax consequences described in the Third Amended Plan

*Except as otherwise noted below ~~with respect to Subsections V.A.2 through V.A.5 of this Supplement~~, the following discussion serves only to supplement Article VI of the Specific Disclosure Statement ("Certain Federal Income Tax Consequences of the Debtor/Committee/Lender Plan").*

\*        \*        \*        \*

Any discussion of U.S. federal tax issues set forth in this Supplement was written solely in connection with the confirmation of the Third Amended Plan to which the transactions described in this Supplement are ancillary.  Such discussion is not intended or written to be legal or tax advice to any person and is not intended or written to be used, and cannot be used, by any person for the purpose of avoiding any U.S. federal tax penalties that may be imposed on such person.  Each holder of a Voting Claim should seek advice based on its particular circumstances from an independent tax advisor.

\*        \*        \*        \*

### A.        Federal Tax Consequences to the Debtors.

This Supplement incorporates by reference the disclosure of tax-related consequences and risks associated with the Second Amended Plan, as set forth in Sections XII.B.15 of the General Disclosure Statement and Sections V.C.2 and VI of the Specific Disclosure Statement.  In addition, the Debtors are still evaluating the tax consequences, if any, of certain transactions contemplated by the Third Amended Plan, including the establishment of the Litigation Trust.

### B. ~~A.~~ Federal Income Tax Consequences to Certain U.S. Holders of Claims in Revoting Classes.

~~1.        Amounts Attributable to Allocation Dispute Protocol~~

~~Certain Holders of Allowed Claims may have a contingent right to receive additional distributions in accordance with the Allocation Dispute Protocol.  The treatment of such right is unclear. It is possible that such contingent claims should be ignored until such distributions are received, at which time the recipient would account for such distributions by reference to the accounting that would have resulted if such distributions had been received at the time the recipient received its initial distribution pursuant to the Third Amended Plan.  The existence of such a contingent right may also affect the timing of recognition of any loss by such Holder.  Alternatively, such a contingent claim might be ascribed value in determining the tax consequences of the initial distribution pursuant to the Third Amended Plan, with any difference between such ascribed value and the amount of consideration actually received accounted for when such consideration is actually received.  Holders with such contingent rights to receive additional distributions should consult their own tax advisors regarding the treatment of such rights.  For ease of discussion, the existence of such contingent rights will not be referred to in the discussion that follows.~~

*The following discussions ~~in Subsections V.A.2 through V.A.5 below~~ of certain U.S. federal income tax consequences to U.S. Holders of Claims in Revoting Classes supersedes the discussions of U.S. federal income tax consequences to such Holders contained in Article VI of the Specific Disclosure Statement.*

<u>1.</u>    ~~2.~~ U.S. Holders of Senior Noteholder Claims.

U.S. Holders of Allowed Senior Noteholder Claims will receive Trust Interests and Cash, and may elect to receive interests in the New Senior Secured Term Loan and New Common Stock (and where applicable, New Warrants) in exchange for their Claims.  The treatment of a U.S. Holder of an Allowed Senior Noteholder Claim will depend on such U.S. Holder's election.

If a U.S. Holder of an Allowed Senior Noteholder Claim elects to exchange its Claim for Trust Interests and Cash, such Holder should generally recognize gain or loss in an amount equal to the difference between the Holder's adjusted tax basis in its Claim surrendered in the exchange, determined immediately prior to the Effective Date, and the sum of (i) the fair market value of the Holder's share of Trust Assets, and (ii) the amount of Cash received.

If, however, a U.S. Holder of an Allowed Senior Noteholder Claim elects to exchange its Claim for interests in the New Senior Secured Term Loan, New Common Stock (and where applicable, New Warrants), Trust Interests and Cash, the exchange of such Claim will likely be treated as a recapitalization for U.S. federal income tax purposes.   Such Holder will realize gain or loss in an amount equal to the difference between the Holder's adjusted tax basis in its Claim surrendered in the exchange, determined immediately prior to the Effective Date, and the sum of (i) the fair market value of the Holder's share of Trust Assets, (ii) the issue price of the Holder's interest in the New Senior Secured Term Loan, (iii) the fair market value of the New Common Stock (and where applicable New Warrants), and (iv) the amount of Cash received.

The tax consequences of a recapitalization to a U.S. Holder of such Claim will depend, in part, upon whether the New Senior Secured Term Loan constitutes a "security" for U.S. federal income tax purposes.  Although not free from doubt, the New Senior Secured Term Loan will likely not constitute a security for U.S. federal income tax purposes.  See "Definition of 'Security'," in Article VI of the Specific Disclosure Statement.  U.S. Holders are encouraged to consult with their tax advisors in connection with the determination of whether the New Senior Secured Term Loan constitutes a security for U.S. federal income tax purposes.  The remainder of this discussion assumes that the New Senior Secured Term Loan will not constitute a security for U.S. federal income tax purposes.

In the case of a recapitalization, a U.S. Holder of such Claim who realizes a loss on the exchange will not be permitted to recognize such loss, except to the extent of any loss attributable to accrued but unpaid interest with respect to such Claim. A U.S. Holder of such Claim who realizes gain on the exchange will be required to recognize the lesser of (i) the amount of gain realized on the exchange and (ii) the sum of (a) the issue price of the Holder's interest in the New Senior Secured Term Loan, (b) the fair market value of the Holder's share of Trust Assets, if any, and (c) the amount of Cash received as part of the exchange. A U.S. Holder's tax basis in the New Common Stock and any New Warrants received in exchange for its Claim will equal its adjusted tax basis in its Claim, increased by the amount of gain recognized on the exchange, if any, and reduced by the sum of (i) the fair market value of the U.S. Holder's interest in the New Senior Secured Term Loan, (ii) the fair market value of the Holder's share of Trust Assets, if any, and (iii) the amount of Cash received as part of the exchange. If a U.S. Holder receives both New Common Stock and New Warrants in exchange for its Claim, such basis will be allocated between the New Common Stock and the New Warrants in proportion to their relative fair market values on the date received. A U.S. Holder's holding period in the New Common Stock and any New Warrants will include the holding period in its Claim surrendered. A U.S. Holder's tax basis in its share of Trust Assets, if any, will equal the fair market value of such assets on the date received. A U.S. Holder's holding period in its share of Trust Assets, if any, will commence on the day after the date received. A U.S. Holder's tax basis in its interest in the New Senior Secured Term Loan will equal the issue price of the Holder's interest in the New Senior Secured Term Loan. A U.S. Holder's holding period in its interest in the New Senior Secured Term Loan will commence on the day after the date received.

See "Federal Income Tax Treatment of New Senior Secured Term Loan," in Article VI of the Specific Disclosure Statement, for a discussion related to the determination of the issue price of, as well as the tax considerations of holding an interest in, the New Senior Secured Term Loan.

      2. ~~3.~~ U.S. Holders of Other Parent Claims (not including the Swap Claim and Claims against Tribune arising from a Non-Qualified Former Employee Benefit Plan).

U.S. Holders of Allowed Other Parent Claims will receive Cash and may elect to receive Trust Interests, interests in the New Senior Secured Term Loan and/or New Common Stock (and where applicable, New Warrants) in exchange for their Claims. Accordingly, a U.S. Holder of an Allowed Other Parent Claim should generally recognize income or loss in an amount equal to the difference between the adjusted tax basis in its Claim surrendered in the exchange, determined immediately prior to the Effective Date, and the sum of (i) the amount of Cash received, (ii) the fair market value of the U.S. Holder's share of Trust Assets, if any, (iii) the issue price of the U.S. Holder's interest in the New Senior Secured Term Loan, if received and (iv) the fair market value of the New Common Stock (and where applicable, New Warrants), if received.

A U.S. Holder's tax basis in its share of Trust Assets, if any, and any New Common Stock (and where applicable, New Warrants) received in the exchange, will equal the fair market value of such assets on the date received. A U.S. Holder's tax basis in its interest in the New Senior Secured Term Loan, if received, will equal the issue price of the Holder's interest in the New Senior Secured Term Loan. A U.S. Holder's holding period in such assets will commence on the day after the date received.

See "Federal Income Tax Treatment of New Senior Secured Term Loan," in Article VI of the Specific Disclosure Statement, for a discussion related to the determination of the issue price of, as well as the tax considerations of holding an interest in, the New Senior Secured Term Loan.

      3. ~~4.~~ U.S. Holders of Claims arising from a Non-Qualified Former Employee

Benefit Plan.

U.S. Holders of Allowed Claims arising from a Non-Qualified Former Employee Benefit Plan will receive Cash and may elect to receive Trust Interests, interests in the New Senior Secured Term Loan and/or New Common Stock (and where applicable, New Warrants) in exchange for their Claims. Accordingly, a U.S. Holder of such a Claim will likely recognize compensation income in an amount equal to the sum of the following, determined immediately prior to the Effective Date: (i) the amount of Cash received as part of the exchange, (ii) the fair market value of the U.S. Holder's share of Trust Assets, if any, (iii) the issue price of the Holder's interest in the New Senior Secured Term Loan, if received, and (iv) the fair market value of the New Common Stock (and where applicable, New Warrants), if received.  Under Treasury Regulations promulgated under Section 409A of the IRC, such a payment may be treated as an acceleration of deferred compensation, and, if so, would be subject to an additional twenty percent (20%) tax, and interest would be due at the federal underpayment rate plus one percent (1%) on the underpayments of income tax on the amount of such deferred compensation had it been included in income in the first year it was no longer subject to a substantial risk of forfeiture.

A U.S. Holder's tax basis in its share of Trust Assets, if any, and any New Common Stock (and where applicable, New Warrants) received in the exchange, will equal the fair market value of such assets on the date received.  A U.S. Holder's tax basis in its interest in the New Senior Secured Term Loan, if received, will equal the issue price of the Holder's interest in the New Senior Secured Term Loan.  A U.S. Holder's holding period in such assets will commence on the day after the date received.

See "Federal Income Tax Treatment of New Senior Secured Term Loan," in Article VI of the Specific Disclosure Statement, for a discussion related to the determination of the issue price of, as well as the tax considerations of holding an interest in, the New Senior Secured Term Loan.

4.    5.  U.S. Holders of EGI-TRB LLC and PHONES Notes Claims.

U.S. Holders of Allowed EGI-TRB LLC Notes Claims and U.S. Holders of Allowed PHONES Notes Claims will receive Trust Interests and Cash, and, pursuant to the Allocation Dispute Protocol, may receive Cash, interests in the New Senior Secured Term Loan and New Common Stock (and where applicable, New Warrants) in exchange for their Claims.  The treatment of a U.S. Holder of an Allowed EGI-TRB LLC or PHONES Notes Claim will depend upon the outcome of the Allocation Disputes.

If a U.S. Holder of an Allowed EGI-TRB LLC Notes Claim or PHONES Notes Claim receives only Trust Interests and Cash in exchange for its Claim, such Holder should generally recognize gain or loss in an amount equal to the difference between the Holder's adjusted tax basis in its Claim surrendered in the exchange, determined immediately prior to the Effective Date, and the sum of (i) the fair market value of the Holder's share of Trust Assets, and (ii) the amount of Cash received.

If, however, pursuant to any Confirmation Order or applicable Allocation Order, a U.S. Holder of an Allowed EGI-TRB LLC Notes Claim or PHONES Notes Claim receives, in addition to Trust Interests and, Cash, interests in the New Senior Secured Term Loan and New Common Stock (and where applicable, New Warrants) in exchange for its Claim, the exchange of such Claim will likely be treated as a recapitalization for U.S. federal income tax purposes.  Such Holder will realize gain or loss in an amount equal to the difference between the Holder's adjusted tax basis in its Claim surrendered in the exchange, determined immediately prior to the Effective Date, and the sum of (i) the fair market value of the Holder's share of Trust Assets, (ii) the issue price of the Holder's interest in the New Senior Secured Term Loan, (iii) the fair market value of the New Common Stock (and where applicable New Warrants), and (iv) the amount of Cash received.

The tax consequences of a recapitalization to a U.S. Holder of such Claim will depend, in part, upon whether the New Senior Secured Term Loan constitutes a "security" for U.S. federal income tax purposes. Although not free from doubt, the New Senior Secured Term Loan will likely not constitute a security for U.S. federal income tax purposes. See "Definition of 'Security'," in Article VI of the Specific Disclosure Statement. U.S. Holders are encouraged to consult with their tax advisors in connection with the determination of whether the New Senior Secured Term Loan constitutes a security for U.S. federal income tax purposes. The remainder of this discussion assumes that the New Senior Secured Term Loan will not constitute a security for U.S. federal income tax purposes.

In the case of a recapitalization, a U.S. Holder of such Claim who realizes a loss on the exchange will not be permitted to recognize such loss, except to the extent of any loss attributable to accrued but unpaid interest with respect to such Claim. A U.S. Holder of such Claim who realizes gain on the exchange will be required to recognize the lesser of (i) the amount of gain realized on the exchange and (ii) the sum of (a) the issue price of the Holder's interest in the New Senior Secured Term Loan, (b) the fair market value of the Holder's share of Trust Assets, if any, and (c) the amount of Cash received as part of the exchange. A U.S. Holder's tax basis in the New Common Stock and any New Warrants received in exchange for its Claim will equal its adjusted tax basis in its Claim, increased by the amount of gain recognized on the exchange, if any, and reduced by the sum of (i) the fair market value of the U.S. Holder's interest in the New Senior Secured Term Loan, (ii) the fair market value of the Holder's share of Trust Assets, if any, and (iii) the amount of Cash received as part of the exchange. If a U.S. Holder receives both New Common Stock and New Warrants in exchange for its Claim, such basis will be allocated between the New Common Stock and the New Warrants in proportion to their relative fair market values on the date received. A U.S. Holder's holding period in the New Common Stock and any New Warrants will include the holding period in its Claim surrendered. A U.S. Holder's tax basis in its share of Trust Assets, if any, will equal the fair market value of such assets on the date received. A U.S. Holder's holding period in its share of Trust Assets, if any, will commence on the day after the date received. A U.S. Holder's tax basis its interest in the New Senior Secured Term Loan will equal the issue price of the Holder's interest in the New Senior Secured Term Loan. A U.S. Holder's holding period in its interest in the New Senior Secured Term Loan will commence on the day after the date received.

See "Federal Income Tax Treatment of New Senior Secured Term Loan," in Article VI of the Specific Disclosure Statement, for a discussion related to the determination of the issue price of, as well as the tax considerations of holding an interest in, the New Senior Secured Term Loan.

### C. B. Federal Income Tax Treatment of Allocation Dispute Reservesthe MSCS/Senior Noteholder Reserve.

Pursuant to the Third Amended Plan, Reorganized Tribune may establish one or more Allocation Dispute Reserves to make distributions to Holders of certain Allowed Claims after the entry of any post-Effective Date Allocation Order(s)shall establish a reserve (the "Reserve") for purposes of holding any consideration that may be allocable to the Senior Noteholder Claims held by MSCS in the event MSCS's Senior Noteholder Claims become Allowed Claims. Distributions from each such Allocation Dispute Reserve willshall be made to MSCS in the event its Senior Noteholder Claims are subsequently Allowed, and to Holders of Allowed Senior Noteholder Claims (whether such Claims were Allowed on or after the Effective Date) on or as soon as reasonably practicable after the Quarterly Distribution Date immediately following the calendar quarter in which any Allocation Order is enteredin the event the Senior Noteholder Claims held by MSCS are subsequently disallowed.

Each Allocation DisputeThe Reserve may be structured in a manner intended to cause it to be subject to a separate entity-level tax on its income. Therefore, distributions from each such Allocation Disputethe Reserve may be reduced to satisfy any taxes payable by the Allocation Dispute Reserve.

~~Distributions to Holders of cash or other property from each Allocation Dispute Reserve may be reduced by taxes payable by such Allocation Dispute Reserve that are attributable to such cash or other property.~~ Reserve.

Holders of Senior Noteholder Claims should note that the tax treatment of ~~such Allocation Dispute~~ the Reserve~~(s)~~ is unclear and should consult their own tax advisors.

## VIII. ~~VI.~~ CONCLUSION AND RECOMMENDATION

The DCL Proponents believe that confirmation of the Third Amended Plan is in the best interests of the Debtors, the Debtors' Estates and creditors.  Further, the DCL Proponents believe that the limited Modifications incorporated in the Third Amended Plan conform to and cure each of the limited legal issues identified by the Bankruptcy Court in the Amended Confirmation Opinion.  The DCL Proponents further believe that, to the extent a modified Noteholder Plan is proposed, the Third Amended Plan will, consistent with the Bankruptcy Court's finding that a modified Second Amended Plan would "survive the crucible of [section] 1129(c) [of the Bankruptcy Code]," be the preferred Plan that would "provid[e] the Debtors with more certainty regarding preservation of estate value and a better foundation for revitalizing business operations." (Confirmation Opinion at 125.)

**Accordingly, the DCL Proponents urge the Holders of Claims in Revoting Classes to vote to <u>accept</u> the Third Amended Plan and to evidence such acceptance by returning their Ballot to the Voting Agent so that they are received no later than 4:00 p.m. ( prevailing Eastern Time) on ~~[●],~~April 30, 2012.**

Dated: ~~November ____, 2011~~February 20, 2012

TRIBUNE COMPANY (for itself and on behalf of the
other Debtors, as Debtors and Debtors in Possession, and
the Guarantor Non-Debtors and Non-Guarantor Non-
Debtors)


_____

By: Donald J. Liebentritt
Title:  Chief Restructuring Officer, Tribune

Date: ~~November ____, 2011~~February 20, 2012

THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF TRIBUNE COMPANY, <u>ET</u> <u>AL</u>.
Warner Bros., solely in its capacity as Co-Chair of the
Creditors' Committee and not in its individual capacity

_____

By:   Wayne M. Smith
Title: Vice President, Senior Litigation & Chief Patent
Counsel

Date: ~~November ___, 2011~~February 20, 2012

OAKTREE CAPITAL MANAGEMENT, L.P.
on behalf of certain funds and accounts it manages


_____
By:  Mr. Ken Liang
Title: Managing Director

_____
By:  Mr. Edgar Lee
Title: Senior Vice President

Date: ~~November ____, 2011~~February 20, 2012

ANGELO, GORDON & CO., L.P.
on behalf of certain funds and managed accounts

_____

By:
Title:

Date:  ~~November ____, 2011~~February 20, 2012

                                        JPMORGAN CHASE BANK, N.A.


                                        _____ _____
                                        By:
                                        Title: