## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al., | Case No. 08-13141 (KJC) |
| Debtors. | (Jointly Administered) |
| | **Ref. No.: 10692 and 10787** |

## OPENING BRIEF OF TM RETIREES WITH RESPECT TO RESOLUTION OF ALLOCATION DISPUTES IN CONNECTION WITH CONFIRMATION OF THE THIRD AMENDED DCL PLAN

**HILLER & ARBAN, LLC**
Adam Hiller
1500 North French Street, Second Floor
Wilmington, Delaware 19801
(302) 442-7677
ahiller@hillerarban.com

and

**TEITELBAUM & BASKIN, LLP**
Jay Teitelbaum
1 Barker Avenue
White Plains, New York 10601
(914) 437-7670
jteitelbaum@tblawllp.com

Attorneys for the TM Retirees

Dated: February 24, 2012

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... iii

TABLE OF EXHIBITS ................................................................................................... v

PRELIMINARY STATEMENT ..................................................................................... 2

RELEVANT PROCEDURAL HISTORY ....................................................................... 4
    The Confirmation Opinion ...................................................................................... 4
    The Reconsideration Decision ................................................................................. 6
    The Allocation Disputes Scheduling Order ............................................................ 9

STATEMENT OF FACTS ............................................................................................ 11
    Tribune-Times Mirror Merger ............................................................................... 11
    The Tribune Bankruptcy and EGI/Zell .................................................................. 12
    The TM Retiree Claims: Unfunded, Non Qualified, Deferred Compensations Plans ......... 14
    Susan P. Bell ................................................................................................. 16, 17
    The Times Mirror Deferred Compensation plan for Executives ........................... 19
    The Times Mirror Supplemental Retirement Plan ................................................ 19
    The Times Mirror Excess Pension Plan ................................................................ 20
    The Times Mirror Pension Plan for Directors ....................................................... 20
    The Times Mirror Non Employee Directors Stock Plan and the Times Mirror Deferred
        Compensation Plan for Directors ................................................................... 20
    Individual Agreements ........................................................................................... 21

ARGUMENT ................................................................................................................ 22
    Point I: DCL Plan Settlement Proceeds are Subject to the Terms of the PHONES Indenture
    ..................................................................................................................... 21
    Point II: The Litigation Trust and the Plan Settlement Distributions are Subject to the
        Terms of the EGI Subordination Agreement ................................................. 22
    Point III: The TM Retiree Claims Constitute Senior Indebtedness under the PHONES
        Indenture ........................................................................................................ 26
        Indebtedness for the Deferred Purchase Price of Services Other Than, In the Case
            of Any Such Deferred Purchase Price, on Normal Trade Terms ................... 27
        Indebtedness of Others Assumed/Guaranteed By Tribune in the Merger ............. 30
        Indebtedness for Borrowed Money ....................................................................... 31
        The Carve Out for Normal Trade Terms is not Applicable .................................... 33
    Point IV: The TM Retiree Claims Constitute Senior Obligations under the EGI
        Subordination Agreement ............................................................................... 38
        Exclusio Unius Est Exclusio Alterius .................................................................... 38
        Exceptions to Senior Obligations .......................................................................... 38
        Trade Payables Exception ...................................................................................... 40
        Accrued Expenses .................................................................................................. 40
        Ordinary Course of Business .................................................................................. 41

Point V: Assuming Subordination: Neither the PHONES Noteholders nor EGI Have Standing to Object to the TM Retirees' Treatment as Senior Indebtedness or Senior Obligations...................................................................................................................44

CONCLUSION ...........................................................................................................................47

## TABLE OF AUTHORITIES

**Cases**

*Bank of New York Mellon Trust Co., N.A. v. Liberty Media Corp. ,* 29 A. 3d 225 (Del. Supreme 2011)................................................................................................................................27

*Bank of New York v. Tyco Intern. Group, S.A.,* 545 F. Supp. 2d 312 (S.D.N.Y. 2008)................27

*Bennett v. Spear,* 520 U.S. 154, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) ...................................46

*Berens v. Ludwig,* 964 F. Supp. 1215 (N.D.Ill. 1997)...................................................................38

*Chadwick v. Janecka,* 312 F. 3d 597 (3d Cir. 2002) .....................................................................46

*Deputy v. Du Pont,* 308 U.S. 488, 60 S.Ct. 363 (1940)................................................................32

*Frontier Oil Corp. v. Holly Corp.,* 2005 WL 1039027 (Del Ch. 2005) ........................................43

*Horne v. Flores,* 557 U.S. 433, ——, 129 S.Ct. 2579, 174 L.Ed.2d 406......................................46

*In re Adelphia Communications Corporation,* 371 B.R. 660 (S.D.N.Y. 2007) ...........................45

*In re America Capital Corp.* 425 B.R. 714 (Bankr.S.D.Fla 2010)................................................33

*In re Crazy Eddied Securities Litigation,* 906 F. Supp. 840 (E.D.N.Y. 1995).............................43

*In re Insilco Technologies,* 351 B.R. 313 (Bankr.D.Del 2006).....................................................46

*In re Jersey City Medical Center,* 817 F. 2d 1055 (3d Cir 1987)..................................................34

*In re Tribune,Co.,* 2011 WL 5142420 (Bankr. Del 2011)......................................................*passim*

*In re Tribune,Co.,* 2011 WL 6826407 (Bankr. Del 2011)......................................................*passim*

*In re NationsRent, Inc.* 381 B.R. 83 (Bankr D. Del. 2008)............................................................34

*In re Nutritional Sourcing Corporation,* 398 B.R. 816 (Bankr. D. Del 2008)..............................33

*In re Payless Cashways, Inc.,* 215 B.R. 409 (Bankr.W.D.Mo. 1997).....................................27, 28

*In re Spansion,* 426 B.R. 114 (Bankr. D. Del. 2010) .....................................................................8

*In re Stratford of Texas, Inc.,* 635 F. 2d 365 (5th Cir. 1981) .......................................................34

*JPMorgan Chase Bank N.A. v. The Baupost Group, LLC (In re Enron Creditors Recovery Corp.),* 380 B.R. 307 (S.D.N.Y. 2008)...............................................................................7,8

*Kurak v. Dura Automotive Systems, Inc. (In re Dura Automotive Systems, Inc.),* 379 B.R 257 (Bankr. D. Del. 2007)...........................................................................................................8, 22

*Mayflower Investment Co. v. Commissioner,* 239 F. 2d 624 (5th Cir.1956).................................32

*McLean, Koehler, Sparks & Hammond v. Schnepfe,* 309 Md. 399, 524 A. 2d 86 (Md., 1987)....40

*Monsanto v. Geertson Seed Farms,* 130 S.Ct. 2743 (2010) .........................................................46

*Nike v. Kasky,* 539 U.S. 654 (2003)..............................................................................................46

*Off'l Comm. of Unsecured Creditors of Cybergenics Corp. v. Scott Chinery (In re Cybergencis Corp.),* 226 F. 3d 237 (3d Cir. 2000)..................................................................................7

*Old Colony Railroad Co. v. Commissioner,* 284 U.S. 552, 52 S.Ct. 211, 76 L.Ed. 484 (1932)...32

*Securities and Exchange Commission v. Teo,* 2011 WL 4074085 (D.N.J. 2011).........................43

*Snyder v. Thomas & Betts Corp.,* 2003 WL 22723021 (ND Ill 2003) ..........................................43

*United States v. Brown,* 348 F. 3d 1200 (10th Cir. 2003) .............................................................33

*United States v. Midland–Ross Corp.,* 381 U.S. 54, 85 S.Ct. 1308, 14 L.Ed.2d 214 (1965)........32

*Vermont Agency of Natural Resources v. United States ex. rel. Stevens,* 529 U.S. 765, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000)............................................................................................46

**Statutes**

11 U.S.C. §507(a)(5) ....................................................................................................................29

Bankruptcy Code §1123(b)(3)(A) ..................................................................................................4

Del Code tit. 8 §251 (2010)...........................................................................................................43

**Other Authorities**

Black's Law Dictionary (9th ed. 2009)....................................................................28, 29, 32, 39

*Bloomberg Businessweek,* July 30, 2008..................................................................................13

*Financial Accounting Standard No. 87*...................................................................16, 29, 30, 40

*Financial Accounting Standard No.158*..........................................................................40, 41

*Fundamentals of Intermediate Accounting,* Kiesco, Weygandt, Warfield (14th ed 2012) ......35, 40

*IRS Audit Guide JCX 29-02*..............................................................................................15

Joint *Committee on Taxation, Present Law and Background Related to Executive Compensation*
 (JCX-29-02), April 17, 2002.............................................................................................15

*Norman J. Singer, Sutherland Statutes & Statutory Construction* § 47:33 (7th ed. 2007) .............8

*SEC Regulations Rule 5-102, Article 5 Reg S-X (17 CFR Part 201)*......................................35

*SEC Form 8-K Instructions*..............................................................................................42

*The Dictionary of Modern Economics* (1981)......................................................................33, 34

*The Wall Street Dictionary* (1990) ...................................................................................34

## TABLE OF EXHIBITS

**DECLARATION OF JAY TEITELBAUM – EXHIBITS**

**Exhibit A** – Tribune – March 13, 2000 8-K
**Exhibit B** – Tribune – June 12, 2000 8K
**Exhibit C** – Tribune – Fiscal Year 2000 10-K (excerpted)
**Exhibit D** - Tribune – Fiscal Year 2007 10-K (excerpted)
**Exhibit E** – Times Mirror Notice of Special Meeting of Stockholders, dated May 5, 2000 (excerpted)
**Exhibit F** – Tribune Notice of Special Meeting of Stockholders, dated May 5, 2000 (excerpted)
**Exhibit G** – Agreement and Plan of Merger between Tribune Company and The Times Mirror Company, dated as of March 13, 2000 (excerpted)
**Exhibit H** – Internal Revenue Service Nonqualified Deferred Compensation Audit Techniques Guide (02-2005)
**Exhibit I** – Joint Committee on Taxation, Present Law and Background Related to Executive Compensation, (JCX-29-02), April 17, 2002 (excerpted)
**Exhibit J** – Financial Accounting Standards No. 87 and 150 Employers' Accounting for Pensions
**Exhibit K** –Times Mirror – Fiscal Year 1995 10-K(excerpted)
**Exhibit L** – Times Mirror – Fiscal Year 1996 10-K (excerpted)
**Exhibit M** – Times Mirror – Fiscal Year 1997 10-K (excerpted)
**Exhibit N** – Times Mirror – Fiscal Year 1998 10-K (excerpted)
**Exhibit O** – Times Mirror – Fiscal Year 1999 10-K/A (excerpted)
**Exhibit P** – Trial Balance
**Exhibit Q** – Fundamentals of Intermediate Accounting , Kiesco Weygandt Warfield, 14th Edition (excerpted)
**Exhibit R** – Tribune – September 2008 10-Q (excerpted)
**Exhibit S** – SEC Form 8-k – Instructions – Information to be Included in the Report – Section 2, Item 2.01 – Completion of Acquisitions or Disposition of Assets.


**AFFIDAVIT OF SUE BELL – EXHIBITS**

**Exhibit A** – Times Mirror Negotiated Retiree Claim Chart
**Exhibit B** – The Times Mirror Deferred Compensation Plan for Executives
**Exhibit C** – The Times Mirror Supplemental Retirement Plan
**Exhibit D** - The Times Mirror Excess Pension Plan
**Exhibit E** – The Times Mirror Pension Plan for Directors
**Exhibit F** – The Times Mirror Non Employee Directors Stock Plan and the Times Mirror Deferred Compensation Plan for Directors
**Exhibit G1** – Individual Agreement of Otis Chandler
**Exhibit G2** – Individual Agreement of William D. Crawford
**Exhibit G3** – Individual Agreement of Peter J. Fernald
**Exhibit G4** – Individual Agreement of Michael J. Forgione
**Exhibit G5** – Individual Agreement of Daniel Frost

**Exhibit G6** – Individual Agreement of Lee J. Guittar

**Exhibit G7** – Individual Agreement of Harvey Guttry, Jr.

**Exhibit G8** – Individual Agreement of William P. Keller

**Exhibit G9** – Individual Agreement of Donald S. Kellerman

**Exhibit G10** – Individual Agreement of George C. Kuekes

**Exhibit G11** – Individual Agreement of Martin P. Levin

**Exhibit G12** – Individual Agreement of Robert C. Lobdell

**Exhibit G13** – Individual Agreement of Kathleen G. McGuinness

**Exhibit G14** – Individual Agreement of William A. Niese

**Exhibit G15** – Individual Agreement of Larry W. Peterson

**Exhibit G16** – Individual Agreement of James W. Wallace

**Exhibit G17** – Individual Agreement of Mark H. Willes

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al., | Case No. 08-13141 (KJC) |
| Debtors. | (Jointly Administered) |
| | **Ref. No.: 10692 and 10787** |

## OPENING BRIEF OF TM RETIREES WITH RESPECT TO RESOLUTION OF ALLOCATION DISPUTES IN CONNECTION WITH CONFIRMATION OF THE THIRD AMENDED DCL PLAN

Teitelbaum & Baskin, LLP ("**T&B**") and Hiller & Arban, LLC, as attorneys for approximately 200 former employees and/or directors (and beneficiaries of such former employees and/or directors) (the "**TM Retirees**")[1] of The Times Mirror Company ("**Times Mirror**"), who were receiving or entitled to receive payments under certain non-qualified deferred compensation plans assumed by one or more of the Debtors, for their opening brief as required by Order of this Court dated January 24, 2012 (ECF Docket No. 10692) (the "**Allocation Disputes Scheduling Order**") respectfully submit this opening brief in further support of the preliminary statement filed by the TM Retirees (ECF Docket No. 10787).

---

[1] Among the TM Retirees supporting this statement is William Niese, a member of the Official Committee of Unsecured Creditors (the "**Committee**"). T&B also represents Mr. Niese in his role as a member of the Committee and as plaintiff in various state law constructive fraud claim actions commenced pursuant to this Court's Order of April 25, 2011. This pleading is filed on behalf of the TM Retirees, including Mr. Niese, in their capacity as creditors and parties in interest and not in any manner as a representative of the Committee. The positions taken herein do not necessarily reflect the position of the Committee, and the Committee has not been consulted in connection with this pleading.

1

## PRELIMINARY STATEMENT

The TM Retirees are fighting to preserve the settlement that this Court determined was an important piece of the reorganization of Tribune Company ("**Tribune**") and the other Debtors. *In re Tribune Company,* 2011 WL 5142420 at *45. At stake for the TM Retirees is $12-$15 million (34%-42%) of their approximately 35% negotiated claim settlement incorporated into the Third Amended Joint Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo Gordon & Co., L.P. and JPMorgan Chase Bank, N.A. filed on February 20, 2012 (ECF Docket No. 10958) (the "**Third DCL Plan**").[2]

The TM Retirees are "Senior Indebtedness" and "Senior Obligations" under the terms of the PHONES Indenture and the EGI Subordination Agreement (each as defined below). As such, the treatment proposed under the Third DCL Plan is reasonable and appropriate and does not discriminate (fairly, unfairly or otherwise) against the investors and speculators who are the holders of the Senior Notes, the PHONES Notes and the EGI Note.

Each of the TM Retiree Plans described herein provide for the payment of deferred compensation as retirement benefits to people who provided years of service to The Times Mirror Company ("**Times Mirror**") prior to its merger with Tribune. These obligations were assumed by Tribune as part of any extraordinary $8.3 Billion merger and, at all times, constituted long term liabilities of Times Mirror and Tribune. The Senior Noteholders, the PHONES and

---

[2] The entire allocation dispute involves approximately $30 million. To put this into the context of the claims of unfair discrimination, the aggregate fees incurred by the estate through August 31, 2011 is $278,654,656, not including the Examiner's fees of $12,246,951 and fees incurred by the Senior Lenders after August 25, 2010, which are being accrued and are to be paid pursuant to the Third DCL Plan. The average monthly burn for this case is over $6 million. It is submitted that the fees incurred by the estate and non-estate professionals over the past several months with respect to this Allocation Dispute and claims of unfair discrimination will approach or exceed the amount in controversy.

EGI are attempting to torture the construction of the plain meaning of words drafted by sophisticated parties to the detriment of innocent creditors. No construction of the PHONES Indenture can alter the fact that the claims of the TM Retirees arise from obligations of Times Mirror, as assumed by Tribune, to pay deferred compensation for services rendered or to repay the TM Retirees for their agreement effectively to lend working capital to Times Mirror in the form of deferred compensation.    Similarly, the EGI Subordination Agreement cannot be construed to treat the TM Retiree obligations, indebtedness or other liabilities as trade payables or accrued expenses incurred in the ordinary course of business.

To the extent that this Court determines that the PHONES and EGI are subordinate to the payments or distributions to be made under the Third DCL Plan, including with respect to the claims asserted or to be asserted by the Litigation Trust and the DCL Plan Settlement, it is submitted that the probability of any recovery to the PHONES and EGI under the Third DCL is so remote as to be utterly speculative.    Thus, the lack of any realistic economic interest by the PHONES and EGI  in the outcome of this dispute raises issues of standing and whether these parties are acting in good faith in prosecuting these issues.

Based upon this Court's prior rulings in the Reconsideration Decision, the TM Retirees assert that they are senior to the PHONES and EGI with respect to the right of payment of all consideration to be paid under the Third DCL Plan, including with respect to the claims asserted or to be asserted by the Litigation Trust (and the proceeds thereof) and to the consideration to be paid as a settlement by certain alleged LBO Lenders as part of the DCL Plan Settlement (as defined below).

The TM Retirees request that the Allocation Dispute be resolved such that the TM Retiree Settlement is approved as part of the Third DCL Plan.

3

## RELEVANT PROCEDURAL HISTORY

### *The Confirmation Opinion*

The tortured history of this case should not be forgotten, though it need not be recounted for purposes of these proceedings. The relevant starting point for the Allocation Dispute hearing is this Court's October 31, 2011 Opinion on Confirmation (ECF Docket No. 10133), 2011 WL 5142420 (the "**Confirmation Opinion**"), pursuant to which this Court, among other things, denied confirmation of the two competing plans of reorganization identified in the Confirmation Opinion as the "Debtor/Committee/Lender Plan or the DCL Plan" and the "Noteholder Plan". 2011 WL 5142420 at *1. However, this Court left open the possibility of resurrecting only the DCL Plan, finding:

> Although both plans claim to allow the Debtors to reorganize, the DCL Plan better supports this goal by resolving significant claims and providing the Debtors with more certainty regarding preservation of estate value and a better foundation for revitalizing business operations. The DCL Plan is feasible. The settlement of claims in the DCL Plan treats creditors fairly. That other creditors might benefit from extensive and costly litigation, as the Noteholder Plan Proponents assert, is highly speculative. The overwhelming majority of creditors have made their preference for the settlement known through the voting results.

> Accordingly, assuming that both sets of plan proponents addressed only the flaws in their respective plans and both returned confirmable plans containing terms otherwise similar to those presently proposed, with similar voting results, the DCL Plan would survive the crucible of §1129(c).

(2011 WL 5142420 at *63).

Addressing the settlements under the DCL Plan, this Court concluded:

> [T]hat the DCL Plan Settlement should be approved because it is fair, reasonable and in the best interest of the Debtors' estates and it is properly part of the DCL Plan pursuant to Bankruptcy Code §1123(b)(3)(A) .
>
> * * *

4

> The Retiree Claims, however, are different. The Retiree Claimants
> filed proofs of claim in the aggregate amount of approximately
> $113 million. The Debtors' disputed the amount and treatment of
> the Retiree Claims. After lengthy negotiations, the Retiree
> Claimants and the Debtors entered into a settlement agreement
> (attached as Exhibit 5.15.4 of the DCL Plan) which, among other
> things, reduced the aggregate amount of the Retiree Claims by $10
> million. The Retiree Settlement is an important piece of the
> reorganization. In light of the settlement, I am satisfied that the
> release       of       the       Retiree       Claims       is       proper.

(2011 WL 5142420 at *34 and *45).

The door to the instant proceedings was opened in the Confirmation Opinion when the

Court found that the subordination provision in that certain Indenture dated as of April 1, 1999

(the "**PHONES Indenture**") between Tribune Company, as Issuer and Bank of Montreal Trust

Company, as Trustee did not apply to the Preserved Causes of Action (and proceeds thereof) to

be pursued by the Litigation Trust. This Court found:

> The Litigation Trust will pursue the Preserved Causes of Action as
> defined in §1.1.188 of the DCL Plan. Pursuant to *Cybergenics*,
> causes of action that the Debtors' estate may assert under Chapter
> 5 of the Bankruptcy Code are not "assets of the Company" subject
> to the PHONES Notes' subordination provision. However, causes
> of action that are based on direct claims owned by the Debtors (for
> example, a claim for breach of fiduciary duty by an officer or
> director) would be an asset of the Company and subject to the
> PHONES Notes' subordination provision.

(2011 WL 5142420 at *57).

### *The Reconsideration Decision*

On reconsideration, the Court closed, but unfortunately did not lock the door on issues

relating to the effect of the subordination agreements. (Memorandum on Reconsideration, dated

December 29, 2011 (ECF Docket No. 10531), 2011 WL 6826407. (the "**Reconsideration**

**Decision**"). Upon motions for reconsideration filed by Law Debenture Trust Company of New

York ("**Law Debenture**") and Aurelius Capital Management, LP ("**Aurelius**"), the Court

determined that the subordination provisions in the PHONES Indenture did, in fact, apply to the claims asserted or to be asserted by Litigation Trust (and the proceeds thereof). (Reconsideration Decision at *2 and *9).

The Court undertook a detailed and thorough analysis of the use of the phrase "upon any distribution of assets of the Company" . . . "in light of the entirety of the PHONES Indenture" in order to give effect to the intention of the parties. (*Id.* at *4). In so doing, the Court began with Section 14.02 of the PHONES Indenture, which provides in pertinent part:

Upon any distribution of assets of the Company in the event of:

(1)      any insolvency or bankruptcy case or proceeding, or any receivership, liquidation, reorganization or other similar case or proceeding in connection therewith, relative to the Company or to its creditors, as such, or to its assets; or

(2)      any liquidation, dissolution or other winding up of the Company, whether voluntary or involuntary and whether or not involving insolvency or bankruptcy; or

(3)      any assignment for the benefit of creditors or any other marshaling of assets and liabilities of the Company; then and in such event

(A)      the holders of Senior Indebtedness shall be entitled to receive payment in full of all amounts due or to become due on or in respect of all Senior Indebtedness, or provision shall be made for such payment in cash, before the Holders of the Securities of any series are entitled to receive any payment on account of the principal amount, interest or such other amounts as may be provided for in Section 3.01, if any, in respect of the Securities of such series; and

(B)      any payment or distribution of assets of the Company of any kind or character, whether in cash, property or securities, by set-off or otherwise, to which the Holders or the Trustee would be entitled but for the provisions of this Article Fourteen, including any such payment or distribution which may be payable or deliverable by reason of the payment of any other Indebtedness of the Company being subordinated to the payment of the Securities of such series, shall be paid by the liquidating trustee or agent or other Person making such payment or distribution, whether a trustee in bankruptcy, a receiver or liquidating trustee or otherwise, directly to the holders of Senior Indebtedness or their representative or representatives or to the trustee or trustees under

6

any indenture under which any instruments evidencing any of such Senior Indebtedness may have been issued, ratably according to the aggregate amounts remaining unpaid on account of the principal of (and premium, if any) and interest on the Senior Indebtedness held or represented by each, to the extent necessary to make payment in full of all Senior Indebtedness remaining unpaid, after giving effect to any concurrent payment or distribution to the holders of such Senior Indebtedness or provision therefor.

(2011 WL 6826407 at * 5).

First, relying upon rules of sentence construction, the Court rejected the argument by Wilmington Trust Company ("**WTC**") that the introductory phrase "*upon any distribution of assets of the Company*" was a condition which limited the entirety of the PHONES subordination agreement to carve out claims to be pursued by the Litigation Trust and proceeds thereof. Relying upon *Off'l Comm. of Unsecured Creditors of Cybergenics Corp. v. Scott Chinery (In re Cybergencis Corp.)*, 226 F. 3d 237, 245 (3d Cir. 2000), WTC argued that the claims to be pursued by the Litigation Trust (and proceeds thereof) were not assets of the Company and therefore were not subject to the subordination provisions of the PHONES Indenture. (*Id.* at *6).

The Court dismissed this argument and determined that the phrase "*upon any distribution of assets of the Company*" was unqualified and clearly expressed the intent of the parties that, once assets of the Company were distributed as a result of a triggering event identified in Section 14.02 (1), (2) or (3), pursuant to Sections 14.02 (A) and (B), the subordinated creditors would not receive or retain any payment of any kind or character on account of the subordinated obligations made by or on behalf of the Company until the Senior Indebtedness was paid in full. (*Id.* at *6-*9). The Court's interpretation of the PHONES Indenture was predicated upon the "rule of the last antecedent". *See JPMorgan Chase Bank N.A.*

7

*v. The Baupost Group, LLC (In re Enron Creditors Recovery Corp.)*, 380 B.R. 307, 319 (S.D.N.Y. 2008) ("There exists a common rule of English grammar known as the 'rule of the last antecedent.' The rule provides that, where no contrary intention appears, a limiting clause or phrase should ordinarily be read as modifying only the noun or phrase that it immediately follows"; citing 2A *Norman J. Singer, Sutherland Statutes & Statutory Construction* § 47:33 (7th ed. 2007)).

When applied to the clause "payment or distribution of assets of the Company" (PHONES Indenture, Section 14.02(B)), the Court concluded that the word "payment" must be separated from the word "distribution" and construed "broadly", and not limited by the phrase "***assets of the Company***." (*Id.* at *8) (emphasis added).

Second, considering the overall purpose and intent of the PHONES Indenture, the Court found:

> Previously, when considering an attempt to limit the reach of the subordination provisions of an indenture, I decided that a clause in the subordination provision:
>
>> should not be considered based upon its grammatical structure alone, but also within the context of the entire agreement, which, here, is more reflective of the parties' intent: that except in very limited circumstances, no payment can be made to the Subordinated Noteholders until (1) the Senior Notes are paid in full, or (2) the Senior Noteholders consent [The proposed interpretation of the clause would] eviscerate the purpose of the subordination provisions in the Subordinated Notes Indenture and expand the limited carve out beyond its intended scope.
>
> *Kurak v. Dura Automotive Systems, Inc. (In re Dura Automotive Systems, Inc.)*, 379 B.R 257, 270 (Bankr. D. Del. 2007). *See also In re Spansion*, 426 B.R. 114, 150-51 (Bankr. D. Del. 2010). ***Similar considerations are present here. The overall purpose of Article 14, in general, and Section 14.02, in particular, is to ensure that the PHONES Notes are subordinated to the Senior Indebtedness. . . Therefore, the Section 14.02 introductory phrase***

> *"upon distribution of the assets of the Company" must be read in*
> *light of the overall language of the Section,* particularly (i) the
> lengthy catalog of bankruptcy, insolvency and liquidation
> proceedings described in subsections (1), (2) and (3) of Section
> 14.02, (ii) the unqualified subordination language of Section
> 14.02(A), (iii) application of subordination provisions to all
> sources of "payment" in Section 14.02(B), and (iv) the catch-all
> language of the pay-over obligation in the paragraph following
> Section                                                    14.02(B).

(*Id.* at \*9) (emphasis added).

### The Allocation Disputes Scheduling Order

Not explicitly decided by this Court in the Confirmation Opinion or the Reconsideration

Decision was (i) whether the proceeds of the "**DCL Plan Settlement**" (comprised of the LBO

Settlement and the Step Two Disgorgement Settlement as defined by this Court) are subject to

the subordination provisions of the PHONES Indenture. 2011 WL 5142420 at \*13; and (ii)

whether the causes of action preserved for the Litigation Trust (and proceeds thereof) and the

proceeds of the DCL Plan Settlement are subject to the Subordination Agreement, dated as of

December 20, 2007 (the "**EGI Subordination Agreement**") made by EGI-TRB, LLC ("**EGI**").

However, as discussed below, the Court's decisions and construction of the PHONES

Indenture in the Reconsideration Decision each mandate a finding that all claims by the holders

of the PHONES notes (the "**PHONES**") and EGI with respect to the Litigation Trust and the

DCL Plan Settlement are subordinate to the claims of the TM Retirees and the Senior

Noteholders pursuant to their respective subordination agreements.

Nevertheless, this Court and the parties are required to endure yet another distraction on

the road to confirmation. Pursuant to the Allocation Disputes Scheduling Order, the Court will

need to decide:

i.    Whether the distributions to be made pursuant to the DCL Plan Settlement are subject to the subordination provisions of the PHONES Indenture;

ii.    Whether the claims asserted or to be asserted by the Litigation Trust and the proceeds of such claims are subject to the subordination provisions of the EGI Subordination Agreement;

iii.    Whether the distributions to be made pursuant to the DCL Plan Settlement are subject to the subordination provisions of the EGI Subordination Agreement;

iv.    Whether Other Parent Claims (i.e., the Swap Claim, the Retiree Claims or general unsecured trade claims against Tribune) do or do not constitute "Senior Indebtedness", as defined by the PHONES Indenture (including, without limitation, because any category of Other Parent Claims does or does not constitute "Indebtedness," as that term is defined in the PHONES Indenture and used in the PHONES Indenture's definition of "Senior Indebtedness"); and

v.    Whether Other Parent Claims (*i.e.*, the Swap Claim, the Retiree Claims or general unsecured trade claims against Tribune) do or do not constitute "Senior Obligations", as defined by the subordination agreement governing the EGI Notes.

Depending upon the outcome of the above, the Court may need to decide:

i.    The amount of the PHONES claims: if it is determined that

only the Senior Noteholders benefit from the PHONES Indenture;
and

ii.      The relative priority of the PHONES and EGI: in the
unlikely event that it is determined that the PHONES or EGI are to
receive any distribution under the DCL Plan.

### STATEMENT OF FACTS

*Tribune – Times Mirror Merger*

On June 12, 2000, Tribune announced the completion of the merger (the "**Merger**") with
Times Mirror, dated as of March 13, 2000, pursuant to which Tribune acquired 100% of the
outstanding stock of Times Mirror for either 2.5 shares of common Tribune stock for each share
of Times Mirror common stock, or $95 cash per share of Times Mirror common stock. (There
were two Tribune 8-K filings in connection with the Merger: Tribune 8-K dated March 13, 2000
("**Tribune March 2000 8-K**") and Tribune 8-K dated June 12, 2000 "**Tribune June 2000 8-K**"
and collectively the "**Tribune 2000 8-K's**") (A copy of the relevant portions of Tribune 2000 8-
K's are annexed to the declaration of Jay Teitelbaum, dated February 24, 2012, accompanying
this brief and submitted in support hereof (the "**Teitelbaum Declaration**") as Exhibits A and B).
In its Form 10-K for the year ended December 2000 (the "**Tribune FY 2000 10-K**"), Tribune
identified the $8.3 billion acquisition of Times Mirror as a "**Significant Event**". (A copy of the
relevant portions of Tribune FY 2000 10-K is annexed to the Teitelbaum Declaration as Exhibit
C).

It is not disputed that, in connection with the Merger, Tribune, among other things:

assumed defined benefit pension plans and various other
contributory and non-contributory retirement plans covering
substantially all of Times Mirror's former employees. In general,
benefits under the defined benefit plans are based on years of

11

service and the employee's compensation during the last five years of employment.

(Tribune FY 2000 10-K, at p. 66). *See also* Tribune Form 10-K for the year ended December 2007 ("**Tribune FY 2007 10-K**") at p. 123; the Times Mirror Notice of Special Meeting of Stockholders, dated May 5, 2000 (the "**TM Shareholder Notice**") at pp. 51, 54, 58, 60 and 69; the Tribune Notice of Special Meeting of Stockholders, dated May 5, 2000 (the "**Tribune Shareholder Notice**") at pp. 51, 54, 58, 60 and 69; and the Agreement and Plan of Merger between Tribune Company and The Times Mirror Company, dated as of March 13, 2000 (the "**Merger Agreement**"). (A copy of the relevant portions of each of the Tribune FY 2007 10-K, the TM Shareholder Notice, the Tribune Shareholder Notice and the Merger Agreement is annexed to the Teitelbaum Declaration as Exhibit D, E, F and G, respectively).

Tribune and Times Mirror negotiated the terms of the Merger, including with respect to Tribune's obligations to assume the Times Mirror non-qualified benefit plans. Susan P. Bell, Director of Executive Compensation and Executive Benefits of Times Mirror, was the lead Human Resources representative for Times Mirror at these negotiations. (Declaration of Susan P. Bell, dated to February 24, 2012, the "**Bell Declaration**" accompanying this brief and submitted in support hereof). As a result of the negotiations, among other things, Tribune and Times Mirror agreed that all of the benefit plans of Times Mirror, including those described below as TM Retiree Plans (except for the Tribune Company Supplemental 401(k) Plan which was not a Times Mirror sponsored plan), would be assumed by Tribune. (*Id.*). In addition, the parties agreed that the terms of the TM DC Plan (as defined below), and the TM Directors DC Plan (as defined below), would be modified to provide for a fixed interest rate for computing the ongoing obligations of Tribune, rather than the floating rate provided for in the TM DC Plan and the TM Directors DC Plan. (Bell Declaration; Merger Agreement at Section 6.9(c)). The interests of the

12

TM Retirees were fully vested in each of the Times Mirror plans as of the Merger.  (Bell

Declaration ).

### *The Tribune Bankruptcy and EGI/Zell*

There is no point rehashing the fall of Tribune - - with one exception particularly

relevant to the Allocation Disputes - - the role of Samuel Zell and EGI in the transaction that Zell

called the "Deal From Hell". (*See Bloomberg Businessweek,* July 30, 2008).[3]  As detailed in the

Third Amended Complaint, dated January 11, 2012 (the "**Fitzsimons Complaint**") captioned,

*The Official Committee of Unsecured Creditors of Tribune Company, etc. v. Dennis J.*

*Fitzsimons. . . Samuel Zell, Equity Group Investments, L.L.C., EGI-TRB, L.L.C., Sam Investment*

*Trust, et al.* Adv. Case No . 10-54010 (the "**Fitzsimons Action**"), EGI and Samuel Zell

masterminded one of the worst transactions in history, which imposed $13 billion of debt upon

Tribune in order to take Tribune private in a LBO Transaction.  (Complaint at ¶¶ 4-7 and 109-

113).  With virtually no money at risk, Zell took control of Tribune and promptly ran it aground

at the expense of employees and creditors - - including the TM Retirees. In the Complaint, the so

called Zell Defendants, either individually or collectively, face various claims.[4]  Most

significantly, however are the claims for equitable subordination and disallowance of claims

based upon a pattern of misconduct designed to enrich the Zell defendants at the expense of the

Debtors and their estates and stakeholders, including creditors, by causing the Debtors to enter

---

[3] See *www.businessweek.com/magazine/content/08_32/b4095000408330.htm* (last visited
February 22, 2012)
[4] These claims include: Breach of Fiduciary Duty (Count Two, ¶ 238 *et. seq.*); Aiding and
Abetting Breach of Fiduciary Duty (Count Seven, ¶ 278 *et. seq.*); Violations of Delaware
Corporations Law (Count Eleven, ¶ 305 *et. seq.*); Unjust Enrichment  (Count Twelve, ¶ 312 *et.
seq.*); Intentional Fraudulent Transfers (Count Thirteen, ¶ 317 *et. seq.*); Recharacterization of
Exchangeable Note (Count Seventeen, ¶ 348 *et. seq.*); Constructive And/Or Intentional
Fraudulent Transfers (Count Eighteen, ¶ 354 *et. seq.*); and Avoidance of Preferential Transfers
(Counts Nineteen and Twenty, ¶ 363 *et. seq.*).

into the LBO Transaction (Count Twenty Two, ¶ 384 *et. seq.*).

Not satisfied with the destruction of Tribune and the lives of its employees and retirees, and in the face of the claims asserted by the Committee, in the ultimate display of *chutzpah,* Zell and EGI are asserting that their tainted claims should now be treated on par with innocent creditors who had nothing to do with the LBO. In addition to the utter lack of merit in the legal arguments asserted by EGI, EGI cannot, as a matter of equity or conscience, be considered a creditor with a priority equal to or above innocent unsecured creditors.

### *The TM Retiree Claims: Unfunded, Non Qualified, Deferred Compensation Plans*

As set forth in detail in the Bell Declaration, each of the TM Retiree Plans is a nonqualified deferred compensation plan ("**NQDC Plan**") for services rendered. For purposes of this Allocation Dispute, 185 TM Retirees with claims against Tribune in the original amount of approximately $108.4 Million have asserted their claims in the negotiated amount of approximately $99.6 million.[5] As noted in the Confirmation Opinion and in the DCL Plan, the claims of the TM Retirees are the subject of a settlement agreement, dated May 18, 2010 (the "**TM Retiree Settlement**") and annexed to the DCL Plan as Exhibit 5.14.3 (ECF Docket No. 4008) and to the Third DCL Plan. In addition to the settlement of the amount of the claims, pursuant to the TM Retiree Settlement (i) each TM Retiree claim was compromised in an amount to be treated as an allowed claim; (ii) the methodology for determining similar claims (based upon interest rates, mortality tables and other metrics) was agreed upon; and (iii) the treatment of such claims was agreed upon, including the payment to the TM Retirees of approximately 35.2% of their allowed claims. (*See* Third DCL Plan Section 3.2.6).

---

[5] The amounts asserted by the TM Retirees for this dispute are the agreed upon negotiated amounts in the TM Retiree Settlement annexed to the Third DCL Plan.

A NQDC Plan is any elective or non-elective plan, agreement, method, or arrangement between an employer and an employee (or service recipient and service provider) to pay the employee compensation at some time in the future. *See* Internal Revenue Service Nonqualified Deferred Compensation Audit Techniques Guide (02-2005) ("**IRS Audit Guide**") (A copy of the IRS Audit Guide is annexed to the Teitelbaum Declaration as Exhibit H). In the simplest form, a nonqualified deferred compensation arrangement is merely an unsecured, unfunded promise to pay a stated dollar amount at an agreed upon date in the future. *See Joint Committee on Taxation, Present Law and Background Related to Executive Compensation,* (JCX-29-02), April 17, 2002. (A copy of JCX-29-02 is annexed to the Teitelbaum Declaration as Exhibit I).

While NQDC Plans often bear a variety of labels, they typically fall into four categories: (i) salary reduction arrangements that simply defer the receipt of otherwise currently includible compensation by allowing the participant to defer a portion of his or her salary; (ii) bonus deferral plans which resemble salary reduction arrangements, except that they enable participants to defer up to 100% of any bonuses; (iii) Top-Hat Plans (*aka* Supplemental Executive Retirement Plans or SERPs) that are maintained primarily for a select group of management or highly compensated employees; and (iv) excess benefit plans which provide benefits solely to employees whose benefits under the employer's qualified plan are limited by the legal maximum benefit limitation. Also, despite their name, phantom stock plans are NQDC Plans, not stock arrangements. (IRS Audit Guide at p. 1; JCX-29-02 at pp. 2-5).

To the extent that these NQDC Plans are not funded with specific assets set aside from creditors and the participant has no claim to specific assets of the company, the benefits are considered unfunded and the employee is treated as a general unsecured creditor faced with a

substantial risk of forfeiture. Thus, amounts earned under a NQDC Plan are not includible in taxable income until the amount is received. (JCX-29-02 at p. 9).

Statement of Financial Accounting Standards No. 87 Employers' Accounting for Pensions ("**FAS 87**") confirms that these types of plans are part of the employees' compensation for services rendered. Paragraphs 12 and 79 of FAS 87[6] state:

> 12. A pension benefit is part of the compensation paid to an employee for services. In a defined benefit pension plan, the employer promises to provide, in addition to current wages, retirement income payments in future years after the employee retires or terminates service. Generally, the amount of benefit to be paid depends on a number of future events that are incorporated in the plan's benefit formula, often including how long the employee and any survivors live, how many years of service the employee renders, and the employee's compensation in the years immediately before retirement or termination. In most cases, services are rendered over a number of years before an employee retires and begins collecting the pension. . . .

> 79. The Board's conclusions in this Statement derive from the basic idea that a defined benefit pension is an exchange between the employer and the employee. In exchange for services provided by the employee, the employer promises to provide, in addition to current wages and other benefits, an amount of retirement income. It follows from that basic view that pension benefits are not gratuities but instead are part of an employee's compensation, and since payment is deferred, the pension is a type of deferred compensation. It also follows that the employer's obligation for that compensation is incurred when the services are rendered.

*See,* FAS 87 (A copy of the relevant portions of FAS 87 is annexed to the Teitelbaum Declaration as Exhibit J).

***Susan P. Bell*** [7]

---

[6] Effective September 15, 2009, the Financial Accounting Standards Board enacted its Accounting Standard Codification ("ASC").  At that time, FAS 87 was superseded and became part of ASC 715 Compensation – Retirement Benefits.  Paragraph 12 of FAS 87 became ASC 715-30-05-4 and ASC 715-30-05-5, while Paragraph 79 became ASC 715-10-05-6.

Susan P. Bell was an employee of Times Mirror from 1978 until 2000 and the Director of Executive Compensation and Executive Benefits at Times Mirror from 1995 until the Merger in 2000. (Bell Declaration). Ms. Bell was responsible for, among other things, designing, drafting, implementing, communicating and administering the compensation packages for Times Mirror executives and directors and for working with Times Mirror accountants and actuaries to identify the obligations required to be disclosed on Times Mirror financial statements with respect to the NQDC Plans. (*Id.*). In addition, as part of her job at Times Mirror, Ms. Bell surveyed executive and director compensation packages at comparable companies and engaged outside consultants to determine that each of the TM Retiree Plans described herein (other than with respect to the Individual Agreements and the Tribune Supplemental 401(k) plan) was competitive in the industry, or that those plans when considered in conjunction with Times Mirror's other compensation practices provided a total compensation package that was competitive. Following the Merger, Ms. Bell provided transitional services to Tribune for several months and then retired. (*Id*).

As a result of her duties and services rendered to Times Mirror in the ordinary course of business over 22+ years, Ms. Bell has personal knowledge of each of the Times Mirror non-qualified deferred compensation benefit plans which form the basis for the TM Retiree claims.

---

[7] Ms. Bell is a creditor in this case with a claim in the amount of $34,604. Following the commencement of these cases, Ms. Bell was engaged as a consultant to T&B, as attorneys for the TM Retirees, to assist counsel in these cases. In that capacity, Ms. Bell, at the direction of T&B, among other things, gathered information from each TM Retiree to prepare a proof of claim on behalf of each TM Retiree. Each TM Retiree reviewed and executed his/her own proof of claim. In her capacity as a consultant to T&B, Ms. Bell was personally involved in the negotiations with the Debtors in connection with fixing the adjusted amount of the TM Retiree claims in the TM Retiree Settlement. Ms. Bell's compensation for services performed for T&B on behalf of the TM Retiree is not contingent upon the outcome of this case and, other than being reimbursed for travel expenses, Ms. Bell is not being specifically compensated for her testimony in connection with this case.

(*Id*). Each of the benefit plans sponsored by Times Mirror are unfunded NQDC Plans created and provided by Times Mirror in the ordinary course of its business, according to ordinary business terms that were usual and customary for compensating executives at comparable companies. (*Id*).

Ms. Bell reviewed the Times Mirror financial statements for the years 1995 through 1999, filed as part of 10-K filings with the Securities and Exchange Commission. (Copies of the relevant portions of the TM Form 10-K for fiscal year ended December 1995, 1996, 1997, 1998 and the TM Form 10-K/A for the fiscal year ended December 1999 are annexed to the Teitelbaum Declaration as Exhibits K, L, M, N, and O). These filings were consistent with the treatment of NQDC Plans as Long Term Liabilities identified as "Other Liabilities", not as "Accounts Payable", "Employee's Compensation" or "Other Current Liabilities", under the Current Liabilities section of the balance sheet. (*Id*). For example, Note 15 to the TM FY 1995 10-K at p. 46-47, which sets forth the actuarial present value of unfunded obligations for retirees, which is then reflected as a non current liability under "Other Liability". (*Id*); (TM FY 1995 10-K at p. 30) (Teitelbaum Declaration Exhibit K). Similar entries are found at TM FY 1996 10-K at pp. 28 & 46; TM FY 1997 10-K at pp. 31 & 54; TM FY 1998 10-K at pp. 35 & 60; TM FY 1999 10-K/A at pp. 31 & 56-57. (Teitelbaum Declaration Exhibits L, M, N and O).

Ms. Bell will also testify that a benefit to Times Mirror of its NQDC Plans was additional liquidity, resulting from the ability to have a competitive compensation package without a full immediate cash cost. (Bell Declaration).

Ms. Bell prepared a summary chart of the negotiated amount of each TM Retiree claim asserted against Tribune as it relates to the relevant NQDC Plans under which the claim derives, including the Times Mirror Deferred Compensation Plan for Executives (the "**TM DC Plan**");

Times Mirror Company Excess Pension Plan (the "**Excess Plan**"); Times Mirror Company Supplemental Retirement Plan for Certain Times Mirror Officers (the "**SERP**"); Times Mirror Company Pension Plan for Directors (the "**Directors Pension Plan**"); Times Mirror Company Non-Employee Directors' Stock Plan (the "**TM Directors Stock Plan**"); Times Mirror Deferred Compensation Plan for Directors (the "**TM Directors DC Plan**"); the Tribune Company Supplemental 401(k) Plan (the "**Supplemental 401(k) Plan**");  and Individual Agreements (the "**Individual Agreements**") (collectively, the "**TM Retiree Plans**").  A copy of this chart is annexed to the Bell Declaration as Exhibit A (the "**TM Retiree Chart**") and a copy of each TM Retiree Plan, is annexed to the Bell Declaration along with a detailed description thereof.  The TM Retiree Plans may be summarized as follows:

*__The Times Mirror Deferred Compensation Plan for Executives (the "TM DC Plan")__:* The negotiated amounts of each claim under the TM DC Plan are detailed in the 5th column of the TM Retiree Chart and aggregate $20,620,208.13[8]. (A true and accurate copy of the TM DC Plan is annexed to the Bell Declaration as Exhibit B). This is an NQDC Plan which is unfunded. Pursuant to its express terms, the TM DC Plan allowed participants to defer receipt of compensation which was due for services rendered.  (*Id.* at p. 1).

*__The Times Mirror Supplemental Retirement Plan (the "SERP")__:* The negotiated amounts of each claim under the SERP are detailed in the 6th column of the TM Retiree Chart and aggregate $55,892,710.37. (A true and accurate copy of the SERP is annexed to the Bell Declaration as

---

[8] As referenced in the Bell Declaration, the TM Directors DC Plan is an additional deferred compensation plan for non-employee directors which was recently discovered as relevant to the TM Retiree claims.  A copy is attached to the Bell Declaration. This plan does not change the aggregate amounts in the TM Retiree Chart; it is an additional source plan for the amounts shown for Mssrs. Bryson and Armstrong. This total does not include amounts detailed in the 5th column of the TM Retiree Chart which were deferred under the TM Directors Stock Plan or the TM Directors DC Plan.

Exhibit C). This is an NQDC plan which is unfunded.  Pursuant to its express terms, the SERP

allowed participants to defer receipt of compensation which was due for services rendered.  (*Id.*

at p. 1).

**The Times Mirror Excess Pension Plan (the "Excess Plan")**: The negotiated amounts of each

claim under the Excess Plan are detailed in the 7th column of the TM Retiree Chart and aggregate

$13,317,470.02. (A true and accurate copy of the TM DC Plan is annexed to the Bell Declaration

as Exhibit D). This is an NQDC plan which is unfunded. Pursuant to its express terms, the

Excess Plan allowed participants to defer receipt of compensation which is due for services

rendered.  (*Id.* Article I).

**The Times Mirror Pension Plan for Directors (the "Directors Pension Plan")**: The negotiated

amount of the single claim under the Directors Pension Plan is detailed in the 8th column of the

TM Retiree Chart and is $239,907.66.  (A true and accurate copy of the Directors Pension Plan is

annexed to the Bell Declaration as Exhibit E.)  This is an NQDC Plan which is unfunded.

Pursuant to its express terms, the Directors Pension Plan allowed participants to defer receipt of

compensation which is due for services rendered. This plan was terminated effective December

31, 1996 for then current active non-employee directors.  (*Id. at* Article I and Article VII).

**Times Mirror Non Employee Directors Stock Plan (the "TM Directors Stock Plan") and the**
**Times Mirror Deferred Compensation Plan for Directors (the "TM Directors DC Plan")**: Non-

employee directors were able to defer all or a portion of their retainer and fees under NQDC

plans sponsored by Times Mirror.  Deferrals made prior to 1997 were made under the TM

Directors DC Plan.  Deferrals made after 1996 were made under the TM Directors Stock Plan.

The negotiated amounts of the three claims under the TM Directors Stock Plan and the Directors

DC Plan have been combined and are detailed in the 5th column of the TM Retiree Chart and

total $1,128,316.23. (True and accurate copies of the TM Directors Stock Plan and the TM Directors DC Plan are annexed to the Bell Declaration as Exhibit F).  The TM Directors Stock Plan was an NQDC plan referred to as a "phantom" stock plan which is unfunded.  The TM Directors DC Plan is a NQDC plan referred to as a "cash-or-deferred" or account balance plan which is unfunded.  Pursuant to the terms of both plans, participants deferred receipt of compensation which was due for services rendered. (*Id.* TM Directors Stock Plan, ¶1; TM Directors DC Plan p. 1).

***Individual Agreements (the "Individual Agreements")***:  The negotiated amounts of each claim under the Individual Agreements are detailed in the 8th column of the TM Retiree Chart and aggregate $8,416,329.95[9]. (True and accurate copies of the Individual Agreements are annexed to the Bell Declaration as Exhibit G1 – G17). Unlike the preceding plans, these Individual Agreements were tailored to the individual participant and generally supplemented existing agreements between the employee and Times Mirror. (Bell Declaration).  Each agreement provides for deferred compensation to the participant as detailed in the Bell Declaration.

## ARGUMENT

### Point I

### DCL Plan Settlement Proceeds Are Subject To The Terms Of The PHONES Indenture

This Court, on reconsideration, determined that the PHONES Notes were expressly subordinated to the claims asserted or to be asserted by the Litigation Trust and the proceeds of such claims. (Reconsideration Decision at *2 and *9).  The DCL Plan Settlement has been approved by this Court as an appropriate settlement of certain LBO Related Causes of Action (as

---

[9] This amount does not include the single claim for one director identified with a claim under the Directors Pension Plan, but listed with the Individual Agreements.

defined in the Third DCL Plan) that were preserved for the Litigation Trust by the commencement of the adversary proceeding captioned *Official Committee of Unsecured Creditors, etc. v. JPMorgan Chase Bank, N.A., et al.* Adv Pro. No. 10-53963 (the "**Chase Action**"). (Confirmation Opinion 2011 WL 5142420 at \*34 and \*45).

A *fortiori,* claims by the PHONES to share ratably with respect to distributions of the DCL Plan Settlement pursuant to the Third DCL Plan are subject to the same subordinate treatment under the PHONES Indenture as this Court found with respect to the claims (and proceeds) preserved for the Litigation Trust.

## Point II

### The Litigation Trust and the DCL Plan Settlement Distributions Are Subject To The Terms Of The EGI Subordination Agreement

EGI should not even be afforded an opportunity to assert a claim as a general unsecured creditor in these cases in light of the equitable subordination and other claims asserted against EGI and the Zell Defendants by the Committee in the *Fitzsimons* Action. Assuming that this Court is willing to let the fox back into the henhouse, EGI's arguments that the claims asserted or to be asserted by the Litigation Trust (and the proceeds thereof) and the distributions of the DCL Plan Settlement are not subject to the subordination provisions of the EGI Subordination Agreement, must be rejected for the same reasons that the identical arguments were rejected by this Court in respect of the PHONES Indenture.

This Court has ruled that the primary objective in contract interpretation is to give effect to the intention of the parties by looking to the language of the contract as a whole and not viewing a clause or provision in isolation.  (Reconsideration Decision at \*4; *see also Kurak v. Dura Automotive Systems, Inc. (In re Dura Automotive Systems, Inc.)*, 379 B.R. 257, 270 (Bankr.

22

D. Del. 2007). Further, this Court has painstakingly applied rules of construction to the terms of the PHONES Indenture which are equally dispositive of EGI's arguments.

Pursuant to the express provisions and intent of the EGI Subordination Agreement, EGI agreed to be subordinated in favor of the "Senior Obligations" to all payments received or to which it is entitled under that certain $225 million subordinated promissory note for the benefit of the Zell Entity (the "**EGI Note**").

The EGI Subordination Agreement provides in pertinent part:

> "Subordinated Obligations" means the collective reference to the unpaid principal of and interest on the Subordinated Note and all other obligations and liabilities of the Company to the Subordinating Creditor, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, in each case, arising under the Subordinated Note.

(EGI Subordination Agreement, Definitions)

> Subordination. The Subordinated Obligations are subordinate and junior in right of payment to all Senior Obligations to the extent provided in this Agreement. No part of the Subordinated Obligations shall have any claim to the assets of the Company on a parity with or prior to the claim of the Senior Obligations. **Unless and until the obligations to extend credit to the Company under the Senior Documents shall have been irrevocably terminated and the Senior Obligations have been paid in full in cash, the Subordinating Creditor will not take, demand or receive from the Company, and the Company will not make, give or permit, directly or indirectly, by set-off, redemption, purchase or in any other manner, any payment of (of whatever kind or nature, whether in cash, property, securities or otherwise)**, whether in respect of principal, interest or otherwise, or security for the whole or any part of the Subordinated Obligations.

(*Id.* at Section 2) (emphasis added)

> Limitation on Enforcement. **Unless and until the obligations to extend credit to the Company under the Senior Documents shall have been irrevocably terminated and the Senior Obligations have been paid in full in cash, at no time shall the**

23

> **Subordinating Creditor take or continue any action, or exercise any rights, remedies or powers under the terms of the Subordinated Note**, or exercise or continue to exorcise any other right or remedy at law or in equity that the Subordinating Creditor might otherwise possess, to collect any Subordinated Obligation, including, without limitation, the acceleration of the Subordinated Obligations, the commencement of any action to enforce payment or foreclosure on any lien or security interest, the filing of any petition in bankruptcy or the taking advantage of any other insolvency law of any jurisdiction. . . .

(*Id.* at Section 4) (emphasis added)

> Payments Received by Subordinating Creditor. Except as to payments or distributions which the Company is permitted to pay to Subordinating Creditor or which Subordinating Creditor is permitted to accept and retain pursuant to this Agreement, **all payments or distributions upon or with respect to any Subordinated Obligation which are made by or on behalf of the Company or received by or on behalf of the Subordinating Creditor in violation of or contrary to the provisions of this Agreement shall be received in trust for the benefit of the holders of Senior Obligations and shall be paid over upon demand to such holders for application to the Senior Obligations until the Senior Obligations shall have been paid in full in cash.**

(*Id.* at Section 6) (emphasis added)

The intent of the parties is clearly set forth in the first sentence of each of Section 2 and 4 of the EGI Subordination Agreement which, without limitation, provide that the Subordinated Obligations are "*junior in right of payment*" and in the right to "*take any action, or exercise any rights, remedies or powers*". Unlike the slender reed upon which the PHONES relied, EGI's contention that these rights are limited to assets of the Company or payments made by the Company is devoid of support.

To the extent that EGI strains to rely upon the clause in the second sentence of Section 2 to limit the application of the word "payment" to payments made by the Company, this Court's application of the "rule of last antecedent" should end the discussion. The relevant clause in

24

Section 2 provides that "*the Subordinating Creditor will not take, demand or receive from the Company . . . any payment of [sic] (of whatever kind or nature, whether in cash, property, securities or otherwise)*". Applying the "rule of the last antecedent" to a limiting clause or phrase, the limiting phrase "from the Company" modifies only "receive". Thus, EGI is precluded from and cannot "take" or "demand" any payment from any source on account of the Subordinating Obligations.

Further, the "assets of the Company" argument made by the PHONES does not exist with respect to the EGI Subordination Agreement. The phrase "Assets of the Company" appears in isolation in the first sentence of Section 2 of the EGI Subordination Agreement providing only that the Subordinating Obligations have "no claim to the assets of the Company".

Moreover, consistent with this Court's construction of the PHONES Indenture at pages 13-14 of the Reconsideration Decision, a broad interpretation of "payment" is supported by the breadth of the turnover provision in Section 6 of the EGI Subordination Agreement which requires the turnover of "all payments or distributions upon or with respect to any Subordinated Obligation which are made by or on behalf of the Company or received by or on behalf of the Subordinating Creditor. . ." until the Senior Obligations shall have been paid in full in cash.

Finally, as this Court determined in connection with the PHONES Indenture, the overall purpose and intent of the EGI Subordination Agreement is to ensure that the Subordinating Obligations are subordinated to the Senior Obligations. (Reconsideration Decision at *9). In addition to the express provisions of the EGI Subordination Agreement identified above, and consistent with the covenant and agreement of the Company at section 14.01 of the PHONES Indenture, Tribune expressly acknowledged and agreed that "(a) it will not pay any of the Subordinated Obligations in violation of this Agreement and (b) it will be bound by all

25

provisions of this Agreement". (EGI Subordination Agreement, Section 14).

Therefore, all of the consideration provided by the Senior Lenders, Bridge Lenders, and Settling Step Two Payees in respect of the DCL Plan Settlement is subject to the EGI Subordination Agreement governing the EGI Note claims and, thus, all such consideration must be turned over by the holders of the EGI notes to the holders of "Senior Obligations".

**Point III**

**The TM Retiree Claims Constitute Senior Indebtedness under the PHONES Indenture**

Section 14.01(1) of the PHONES Indenture defines "Indebtedness" as:

> as applied to a Person, means, as of the date on which Indebtedness is to be determined and without duplication (i) all obligations represented by notes, bonds, debentures or similar evidences of indebtedness; (ii) *all indebtedness for borrowed money or for the deferred purchase price of property or services other than, in the case of any such deferred purchase price, on normal trade terms*; (iii) all rental obligations as lessee under leases which shall have been or should be, in accordance with generally accepted accounting principles, recorded as capital leases; and (iv) *all Indebtedness of others for the payment of which such Person is responsible or liable as obligor or guarantor*. (emphasis added).

In pertinent part, Section 14.01(2) of the PHONES Indenture defines "Senior Indebtedness" as:

> the principal of (and premium, if any) and interest on . . . such Indebtedness of the Company . . . *and other amounts due on or in connection with any Indebtedness of the Company incurred, assumed or guaranteed by the Company, whether outstanding on the date of this Indenture or hereafter incurred, assumed or guaranteed* . . . provided, however, that the following will not constitute Senior Indebtedness:
>
> * * *
>
> (C) Any Indebtedness of the Company constituting trade accounts payable arising in the ordinary course of business . . . .

The TM Retiree Claims constitute Indebtedness/Senior Indebtedness as one or more of the following:

26

- indebtedness for the deferred purchase price of property or services other than, in the case of any such deferred purchase price, on normal trade terms; or

- indebtedness of others assumed or guaranteed by Tribune; or

- indebtedness for borrowed money

### Indebtedness For the Deferred Purchase Price Of Services Other Than, In The Case Of Any Such Deferred Purchase Price, On Normal Trade Terms

Section 14.01(1)(ii) of the PHONES Indenture includes the boilerplate clause "*indebtedness for . . . the deferred purchase price of property or services*". *In re Payless Cashways, Inc.*, 215 B.R. 409, 416 (Bankr.W.D.Mo. 1997). In order to promote consistent and uniform interpretation of boilerplate clauses, courts have determined that the interpretation should be made by the Court as a matter of law, based upon the objective and accepted common usage of the language, rather than as an issue of fact based upon the subjective intent of the parties. *Bank of New York Mellon Trust Co., N.A. v. Liberty Media Corp.*, 29 A. 3d 225, 241 (Del. Supreme 2011); *Bank of New York v. Tyco Intern. Group, S.A.*, 545 F. Supp. 2d 312, 319 (S.D.N.Y. 2008).

Research has revealed a dearth of case law interpreting this clause. In *Payless Cashways,* the court interpreted a similar clause in connection with claims by insiders of the debtor that deferred compensation was "Indebtedness". The specific definition of "Indebtedness" in *Payless Cashways* was "all Obligations of such Person under *conditional sale or other title retention agreements* relating to property purchased by such Person or representing the *deferred purchase price of property or services* (other than Obligations of such Person constituting trade accounts payable arising in the ordinary course of business) . . . ." 215 B.R. at 412.

The court ultimately rejected the argument that the deferred compensation claims were

27

"Indebtedness" based upon an exercise in sentence mapping which concluded that the phrase "conditional sale or other title retention agreements" immediately preceded the participle phrase "deferred purchase price of property or services" and thus limited the phrase "deferred purchase price of property or services" to purchase price in connection with "conditional sale or other title retentions agreements." Since there was no evidence that the deferred compensation claims were incurred in connection with such "conditional sale or other title retentions agreements", the Court determined that the deferred compensation claims did not constitute Indebtedness as claims based upon "deferred purchase price of property or services". *Id.* at 412.

There is no such limitation to overcome in the PHONES Indenture. The PHONES Indenture does not include any limiting language that precedes "deferred purchase price of property or services", thus creating a broad category of obligations constituting "Indebtedness" on account of the deferred purchase price for services. *Id.* at 417. Following the analysis in *Payless Cashways,* breaking the clause down to its constituent parts, it is clear that the TM Retiree Plans were and are obligations for the deferred purchase price of services rendered by the TM Retirees and thus constitute Indebtedness.

"Deferred" means to "[d]elay; put off; remand; postpone to a future time". BLACK'S LAW DICTIONARY (9th ed. 2009). By their very terms, each of the TM Retiree Plans delayed the payment of a current obligation.

"Purchase Price" is defined as the "[p]rice agreed upon as a consideration for which property or goods are sold and purchased. BLACK'S LAW DICTIONARY (9th ed. 2009).

Since Purchase Price does not clearly translate to compensation for services, the complete phrase "all indebtedness for borrowed money or for the deferred purchase price of property or services..." should be broken down at each disjunctive such that the natural meaning of the

28

sentence is construed.  A more natural reading would permit the modifying words that precede the two disjunctives "or" to modify the noun "indebtedness" that is located at the beginning of the sentence.  The result would be three concise clauses which modify "indebtedness for":

- borrowed money; or

- the deferred purchase price of property; or

- services.

"Services" includes work performed by an employee.  The definition includes "[d]uty or labor to be rendered by one person to another, the former being bound to submit his will to the direction and control of the latter.  The act of serving the labor performed or the duties required … Performance of labor for benefit of another…"  BLACK'S LAW DICTIONARY (9th ed. 2009).  Indeed, Tribune's Chief Financial Officer, in support of certain first day motions,  stated "[w]ithout the continued *services* of the Employees, an effective reorganization of the Debtors will not be possible" (emphasis added) (*See* Affidavit of Chandler Bigelow III, Senior Vice President and Chief Financial Officer of Tribune Company In Support of First Day Motions ("**Bigelow Affidavit**") (Docket No.3).  *See also* Debtors' motion dated December 8, 2008, for an Order Authorizing, among other things Payment of Prepetition Employee Wages, Salaries, and other Compensation (the "**Wages Motion**") (Docket No. 9) (citing Bigelow Affidavit and referring to Employee "services").  The Bankruptcy Code also recognizes that benefit obligations are due to employees for services. (11 U.S.C. §507(a)(5) ("The following expenses and claims have priority in the following order:  (5) Fifth, allowed unsecured claims for contributions to an employee benefit plan – (A) arising from *services* rendered within 180 days before the date of the filing of the petition…") (emphasis added).

NQDC Plans provide deferred compensation for services. FAS 87 provides:

12. A pension benefit is part of the compensation paid to an employee for services. . .

79. The Board's conclusions in this Statement derive from the basic idea that a defined benefit pension is an exchange between the employer and the employee. In exchange for services provided by the employee, the employer promises to provide, in addition to current wages and other benefits, an amount of retirement income. It follows from that basic view that pension benefits are not gratuities but instead are part of an employee's compensation, and since payment is deferred, the pension is a type of deferred compensation. It also follows that the employer's obligation for that compensation is incurred when the services are rendered.

As discussed above, each of the TM Retiree Plans is a NQDC Plan specifically made available to participants on account of *services* to Times Mirror, rendered over the course of employment or to be rendered.

### *Indebtedness of Others Assumed/Guaranteed By Tribune In The Merger*

There is no dispute that Tribune assumed the obligations under the TM Retiree Plans (other than the Supplemental 401(k) Plan) pursuant to the Merger Agreement. (Tribune FY 2000 10-K, at p. 66 and Tribune FY 2007 10-K at p. 123; TM Shareholder Notice at pp. 51, 54, 58, 60 and 69; Tribune Shareholder Notice at pp. 51, 54, 58, 60 and 69; and Merger Agreement (Teitelbaum Declaration Exhibit C, D, E, F and G, respectively).

Pursuant to Section 14.01(1)(iv) of the PHONES Indenture, "Indebtedness" includes "*all Indebtedness of others for the payment of which such Person is responsible or liable as obligor or guarantor".* The obligations of Times Mirror under the TM Retiree Plans were Indebtedness as defined in the Phones Indenture. Times Mirror deferred the payment of compensation for services and reflected these obligations as non-current liabilities to employees/retirees. The TM FY Form 10-K for each of 1995, 1996, 1997 and 1998 and the TM FY 1999 10-K/A (Teitelbaum Declaration as Exhibits K, L. M. N, and O) reflect that Times

Mirror recorded its unfunded obligations in connection with the TM Retiree Plans in the long term, non- current, liability section of the balance sheet identified as Other Liabilities; not as Accounts Payable, Employee's Compensation or Other Current Liabilities, under the Current Liabilities Section of the balance sheet. [10]

In addition, in the Merger Pro Forma Balance Sheet for Tribune and Times Mirror included in the TM Shareholder Notice at pp. 51-54, and the Tribune Shareholder Notice at pp. 51- 54 (Teitelbaum Declaration, Exhibits E and F), Tribune and Times Mirror included the obligations to TM Retirees as a non current liability. The Merger Pro Forma Balance Sheet identified a non current liability of $587,210,000 on the line "Compensation and Other Obligations".    The TM FY 1999 10-K/A reveals that the $587,210,000 is comprised of "Postretirement Benefits" $221,111,000; "Other Liabilities" $338,808,000; and "Common Stock Subject to Put Options" $27,291,000. Moreover, the Merger Pro Forma Balance Sheet reflects an adjusting entry of ($93,297,000), which is identified at Note I "To record Time's Mirror unfunded post-retirement liabilities at fair value". (Teitelbaum Declaration Exhibit E at pp. 51 & 54).

### *Indebtedness for Borrowed Money*

The PHONES Indenture specifically provides that borrowed money is Indebtedness. However, the PHONES Indenture does not limit the manner in which borrowed money may be reflected. To the contrary, the PHONES Indenture provides that borrowed money may be evidenced by (i) traditional indicia of borrowings such as "notes, bonds, debentures or other similar evidence of indebtedness" (PHONES Indenture Section 14.01(1) (i)); or (ii) any other

---

[10] Note 15 to the TM FY 1995 10-K at p. 46 includes a line for the actuarial present value of obligations to retirees. This amount is then included in Other Liabilities, which is a non-current liability on the balance sheet at p. 30 of the TM FY 1995 Form 10-K (Teitelbaum Declaration Exhibit K). Similar entries are found at TM FY 1996 10-K at pp. 28 & 46; TM FY 1997 10-K at pp. 31 & 54; TM FY 1998 10-K at pp. 35 & 60; TM FY 1999 10-K/A at pp. 31 & 56-57. (Teitelbaum Declaration Exhibits L, M, N and O).

form of "borrowed money" (*Id.* at 14.01(1)(ii)).

All of the TM Retiree claims are based upon one or more agreements by each TM Retiree to defer receipt of a sum of money presently due in exchange for an unsecured promise of Times Mirror to pay the TM Retiree over time. These NDQC obligations of Times Mirror were assumed by Tribune in the Merger. All of these NQDC payment obligations carried an interest component. Both Times Mirror and Tribune relied upon cash flow from operations as a primary source of liquidity and both Tribune and Times Mirror reflected these obligations as liabilities on their books and records. *See,* Tribune FY 2007 10-K at pp. 69-70; Tribune FY 2000 10-K at pp. 33-34; TM FY 1999 10-K/A at p. 23. (Teitelbaum Declaration Exhibits D, C, and O).

Black's Law Dictionary defines "indebtedness" as "[t]he condition or state of owing money" or "[s]omething owed; a debt" and "Borrow" as "[t]o solicit and receive from another any article of property, money or thing of value with the intention and promise to repay or return it or its equivalent". (BLACK'S LAW DICTIONARY (9th ed. 2009)). Further, an interest component to a repayment obligation is indicative of a borrowing/lending relationship. *See, e.g., Old Colony Railroad Co. v. Commissioner,* 284 U.S. 552, 560, 52 S.Ct. 211, 214, 76 L.Ed. 484 (1932) (interest is "the amount which one has contracted to pay for the use of borrowed money"); *Deputy v. Du Pont,* 308 U.S. 488, 498, 60 S.Ct. 363, 368 (1940)(interest is "compensation for the use or forbearance of money"); *United States v. Midland–Ross Corp.,* 381 U.S. 54, 57, 85 S.Ct. 1308, 1310, 14 L.Ed.2d 214 (1965); *Mayflower Investment Co. v. Commissioner,* 239 F. 2d 624, 625 (5th Cir.1956).[11]

---

[11]   While the TM Retirees allege that each of the TM Retiree Plans contains an interest component, in order to constitute a loan, an interest component is not mandatory. "Loan" – Delivery by one party to and receipt by another party of a sum of money upon agreement, express or implied, to repay it with or without interest. (BLACK'S LAW DICTIONARY (9th ed. 2009)).

A benefit to Times Mirror of its NQDC plans was the ability to have a competitive compensation package without a full immediate cash cost. (Bell Declaration).   Each such deferral was in effect a borrowing event pursuant to which Times Mirror was effectively able to use the NQDC Plans to borrow money from its employees to enhance its liquidity. *In re America Capital Corp.* 425 B.R. 714, 720-21 (Bankr.S.D.Fla 2010) (interpreting "borrowed money" in a subordination agreement, the court determined that there needed to be a "borrowing event" for there to be borrowed money). Further, similar to other borrowings, the obligations due with respect to the TM Retiree Plans was reflected as a long term liability on the Times Mirror financial statements.  TM FY 1995 10-K p. 30; TM FY 1996 10-K at pp. 28 & 46; TM FY 1997 10-K at pp. 31 & 54; TM FY 1998 Form 10-K at pp. 35 & 60; TM FY 1999 10-K/A at pp. 31 & 56-57. (Teitelbaum Declaration Exhibits K, L, M, N and O).

Accordingly, the TM Retiree Claims arising from the TM Retiree Plans are Indebtedness under Section 14.01 (1) (ii) and/or (iv) and Senior Indebtedness under Section 14.01(2).

### *The Carve Out For Normal Trade Terms Is Not Applicable*

To the extent that the Court gives any consideration to the phrase "on normal trade terms" in order to determine Indebtedness under Section 14.01(1) (ii) or Senior Indebtedness under Section 14.01(2)(C), it is abundantly clear that such phrase has no applicability to the TM Retiree claims or employee compensation.

"*Normal trade terms*" refers to the terms of ordinary course business transactions between buyers and sellers, not between employers and its employees. *In re Nutritional Sourcing Corporation*, 398 B.R. 816, 831 (Bankr. D. Del 2008) (trade creditors are simply vendors who transacted business with a counterparty in the ordinary course of business); *United States v. Brown,* 348 F. 3d 1200, 1213–14 (10th Cir. 2003) (citing *The Dictionary of Modern Economics*

(1981) and *The Wall Street Dictionary* (1990) ("trade creditors" are "those to whom a debt is

owed for the provision of goods (or perhaps goods or services) used in the conduct of one's

business."); *In re Stratford of Texas, Inc.,* 635 F. 2d 365, 367 (5th Cir. 1981) ("[T]heir

indebtedness was to trade creditors, *i.e.,* suppliers of goods and services for these operations.").

Parties and courts readily distinguish the claims of trade creditors and employees. *See,*

*e.g., In re NationsRent, Inc.,* 381 B.R. 83, 88 (Bankr D. Del. 2008) (example of a common

indenture provision separately identifying trade creditor and employee claims as a carve out to

Senior Debt). The Third Circuit in *In re Jersey City Medical Center,* 817 F. 2d 1055, 1061 (3d

Cir. 1987) held that:

> We immediately note the reasonableness of distinguishing the
> claims of physicians, medical malpractice victims, employee
> benefit plan participants, and trade creditors.

Pleadings filed in this case also distinguish between trade creditor and employee/retiree

claims. *See e.g.,* Debtors' Schedule F (ECF Docket No. 577) (expressly indentified the

obligations to trade creditors as "trade payables" and the obligations to retirees as "deferred

compensation plans" or the name of the NQDC plan under which the claim arose); Debtors' Pre-

petition Wages Motion (ECF Docket No. 9) (seeking authorization to approve payment of certain

pre-petition employment obligations and post-petition payment of wages and salaries); Motion

for (I) An Order Authorizing, on an Emergency Basis, Payment of Certain Prepetition Claims of

Critical Vendors and (II) An Order Authorizing, But Not Directing, After Notice and a Hearing,

the Debtors to Pay Certain Obligations Arising In Connection with Goods Received by the

Debtors Within the Twenty Day Period Before the Petition Date (the "**Critical Vendors**

**Motion**") (ECF Docket No. 15) (seeking authority to pay certain critical vendors that delivered

goods or provided services to the Debtors before the Petition Date under certain conditions

including that such vendors continue to supply goods and services to the debtors on favorable *trade terms* (including "credit limits, pricing, cash discounts, timing of payments, allowances, rebates, coupon reconciliation, normal product mix and availability and other applicable terms and programs)); Joint Disclosure Statement (ECF Docket No. 6090) (section III, subsection B at p. 26 identified *Prepetition Trade Payables & Other Operating Liabilities* as liabilities to various trade vendors related to the purchase of broadcast rights, newsprint and ink, and other goods and services used in the Debtors' business operations; and section III, subsection C, paragraph 10 at p. 34 identified *Prepetition Compensation and Benefit Programs* as including the obligations to the TM Retirees on account of the *Nonqualified Retirement / Deferred Compensation Plans*).

"Trade Payables" are a subset of Accounts Payable as defined by Securities and Exchange Commission regulations governing the form and content of financial statements [Rule 5-02 of Article 5 of Regulation S-X (17 CFR Part 210)], exist at the date of the financial statements. *Fundamentals Of Intermediate Accounting* , Kiesco Weygandt Warfield, page 723 (14th Ed. 2012) (A copy of the relevant pages of this text is annexed to the Teitelbaum Declaration as Exhibit Q). Trade Payables are reflected as current liabilities (i.e. due within the current accounting cycle or one year). Trade payables represent amounts owing to non employee providers of goods and services (*i.e.* amounts due to trade creditors) pursuant to trade terms.

Finally, Tribune's financial accounting records separately accounted for (i) trade payables in the Current Liability line items "Accounts payable" and "Contracts payable for broadcast rights"; (ii) current employee compensation obligations, including current obligations under the TM Retiree Plans in the Current Liability item "Employee compensation and benefits"; and (iii) long term employee compensation obligations, including deferred obligations under the TM Retiree Plans in the Non- Current Liability item "Deferred compensation and benefits".

(Tribune FY 2007 10-K at p. 83). The Consolidated Trial Balance for the Tribune December 2007 a year end balance sheet and the September 2008 balance sheet, as made a part of the Tribune FY 2007 10-K and September 2008 10-Q (the "**Tribune Trial Balance**") was produced by the Debtors on February 22, 2012 and is attached to the Teitelbaum Declaration as Exhibit P).[12] The Tribune Trial Balance contains seven consecutive pages under the heading "Trial Balance – Accounts Payable, Accrued Liabilities and Other Current Liabilities" and a single page titled "Trial Balance- Deferred Compensation and Benefits."

The page "Trial Balance- Deferred Compensation and Benefits" includes a list of accounts which aggregate $264,479.244. This amount is reflected on the Tribune FY 2007 10-K Balance Sheet at p. 83 (Teitelbaum Declaration Exhibit D) in the "Other Non Current Liabilities" line "Deferred Compensation and Benefits". Within the accounts on this page (as carried over to the "Other Non Current Liabilities" line "Deferred Compensation and Benefits") are the account balances for the TM Retiree Plans including: "Def Comp –Directors Fees Total"; "Def Comp-McGuiness Settlement"; "Defrd Comp - Exec Bonus/Salary Bonus Total"; "Bonus Deferral Plan Total"; "Deferred Dir Stock Award Total"; "Deferred Supplemental 401K Total"; "Deferred Co Sponsored Pension Total". As reflected on page 124 at Note 15 of the Tribune FY 2007 10-K, the item for "Deferred Co Sponsored Pension Total" in the amount of $53,367,000 is carried over to the non current liability item "Deferred Compensation and Benefits". This sum includes the present value of the unfunded annuity claims under the TM Retiree Plans. The claims for the non-annuity TM Retiree Plans such as the TM DC Plan and the TM Directors DC Plan are

---

[12] Given that this document was produced after the discovery cut off and is important to the TM Retirees' case, to the extent that parties to the Allocation Dispute cannot agree upon the admissibility, content and effect of the Trial Balance, the TM Retirees intend to call a witness from the Debtors with knowledge of the Trial Balance. The TM Retirees intend to raise this issue at the February 28, 2012 status conference.

separately identified in accounts including "Defrd Comp - Exec Bonus/Salary Bonus Total" , which are combined into the non current liability line item "Deferred Compensation and Benefits". These items are not reflected as current accounts payable or trade payables. Current accounts payable and trade payables are reflected in pages 1 of 7 through 7 of 7 of the Tribune Trial Balance.

The seven pages "Trial Balance – Accounts Payable, Accrued Liabilities and Other Current Liabilities" include a list of accounts which total $625,175,000. This total is reflected on the Tribune FY 2007 10-K Balance Sheet at p. 83 (Teitelbaum Declaration Exhibit D) in the "Current Liabilities" line items "Accounts Payable" ($188,017); "Employee Compensation and Benefits" ($129,677); and Other ($307,481).[13] The line item "Employee Compensation and Benefits" includes approximately $6 Million of the TM Retiree claims which were payable within 12 months and were reflected in the account item "Employee Compensation and Benefits" at page 83 of the Tribune FY 2007 10-K. (Teitelbaum Declaration Exhibit D). This $6 Million current liability is reflected as $5.899 Million at page 124 Note 15 of the Tribune FY 2007 10-K. (Teitelbaum Declaration Exhibit D) and as $5.899 Million at page 3 of 7 of the Trial Balance in the account "Accrued Co Sponsored Pen Plan Total" (Account No. 213300). Thus, even the current portion of the TM Retiree claims was not recorded as a trade payable in the Tribune Trial Balance, including at page 1 of the Trial Balance in account 211600 "Trade Payable Total" in the amount of $32,148, 600.

---

[13] $188,017+$129,677+$307,481= $625,175

### Point IV

### The TM Retiree Claims Constitute Senior Obligations under the EGI Subordination Agreement

The EGI Subordination Agreement defines "Senior Obligations" as follows:

> "Senior Obligations" means ***all obligations, indebtedness and other liabilities*** of the Company ***other than*** (i) any such obligations, indebtedness or liabilities that by their express terms rank pari passu or junior to the Company's obligations under the Subordinated Note and (ii) ***trade payables and accrued expenses incurred in the ordinary course of business***, in each case, whether incurred on or prior to the date hereof or hereafter incurred.

(EGI Subordination Agreement, p.1).

Thus, "Senior Obligations" is all inclusive with the limited exceptions identified.

#### *Exclusio Unius Est Exclusio Alterius*

Notably, the EGI Subordination Agreement was executed 7 years after the Merger. EGI certainly knew about the assumed obligations to the TM Retirees, but did not specifically carve out such obligations from the definition of Senior Obligations. Following the principle of *exclusio unius est exclusio alterius*, "when certain matters are mentioned in a contract, other similar matters not mentioned were intended to be excluded", as a matter of law, this Court should determine that the TM Retiree Claims are Senior Obligations. *Berens v. Ludwig*, 964 F. Supp. 1215, 1220 (N.D.Ill. 1997).

#### *Exceptions to Senior Obligations*

The TM Retirees are not carved out of the express definition of Senior Obligations under the EGI Subordination Agreement. As discussed above, following the Merger, the obligations assumed by Tribune with respect to the TM Retirees were carried as a liability on the financial statements of Tribune in either the current liability "Employee compensation and benefits" for the current portion of obligations due under the TM Retiree Plans, or the non current liability

38

section "Deferred Compensation and benefits" for the non current portion of the obligations.

The EGI Subordination Agreement does not separately define "indebtedness". The common definitions are "[t]he condition or state of owing money" and the second is "[s]omething owed; a debt." BLACK'S LAW DICTIONARY (9th ed. 2009). There are four definitions of "debt," two of which are applicable. The first is "[l]iability on a claim; a specific sum of money due by agreement or otherwise" and the second is "[t]he aggregate of all existing claims against a person, entity, or state." *Id.* There are two definitions of "liability," both of which are relevant. The first is "[t]he quality or state of being legally obligated or accountable; legal responsibility to another or to society, enforceable by civil remedy or criminal punishment" and the second is "[a] financial or pecuniary obligation; DEBT." *Id.*

Each of the TM Retiree Plans included an express promise to pay a sum of money over time. In connection with the Merger, Tribune expressly assumed the liabilities defined as Employee Benefit Plans, which included the TM Retiree Plans. (Tribune FY 2000 10-K, at p. 66 and Tribune FY 2007 10-K at p. 123; TM Shareholder Notice at pp. 51, 54, 58, 60 and 69; Tribune Shareholder Notice at pp. 51, 54, 58, 60 and 69; Merger Agreement (Teitelbaum Declaration as Exhibit C, D, E, F, and G, respectively).

There can be no dispute that the TM Retiree claims are either obligations, indebtedness or other liabilities.

The first exception to the definition of Senior Obligations is not applicable as there could be no express provision in the TM Retiree Plans referring to EGI Note, since the EGI Note and Subordination Agreement were each created years after the TM Retiree Plans were assumed by Tribune in the Merger.

***Trade Payables Exception***

The exception for "trade payables" is wholly inapplicable. As discussed above, the TM Retiree Claims are not trade payables and were not treated as trade payables by Tribune or Times Mirror. EGI, a sophisticated party with knowledge of the TM Retiree claims, could have easily identified these claims as an exception to Senior Obligations, but did not do so. It is disingenuous to try to rectify this omission by claiming that retiree claims are trade payables.

***Accrued Expenses***

The other exception to the definition of "Senior Obligations", "accrued expenses incurred in the ordinary course of business," is similarly inapplicable. "Accrued Expenses" reflect an accrual accounting adjusting entry made at the end of an accounting cycle to identify expenses which were incurred during the accounting cycle but have not been paid as of the date of the financial statements. An accrued expense is recorded as an expense in the income statement and, since it will be paid within a short period of time or within the next 12 months, it is reflected as a current liability in the balance sheet. *Fundamentals of Intermediate Accounting*, page 79 (Teitelbaum Declaration Exhibit Q). *See also, McLean, Koehler, Sparks & Hammond v. Schnepfe*, 309 Md. 399, 409, 524 A. 2d 86, 91 (Md., 1987) ("'Debts' and not 'expenses' is more characteristic of the liability for retirement payments.").

Pursuant to FAS 87, as amended and replaced by FAS 158, the overfunded or underfunded status of defined benefit plans are to be reflected as an asset (overfunded) or liability (underfunded) on the balance sheet:

> The employer shall aggregate the statuses of all overfunded plans and recognize that amount as an asset in its statement of financial position. It also shall aggregate the statuses of all underfunded plans and recognize that amount as a liability in its statement of financial position. An employer that presents a classified statement of financial position shall classify the liability for an underfunded

40

plan as a current liability, a noncurrent liability, or a combination of both. The current portion (determined on a plan-by-plan basis) is the amount by which the actuarial present value of benefits included in the benefit obligation payable in the next 12 months, or operating cycle if longer, exceeds the fair value of plan assets. The asset for an overfunded plan shall be classified as a noncurrent asset in a classified statement of financial position

FAS No. 87, para. 36.

Similarly, Paragraph 4(b) of FAS 158 provides that a business entity shall:

Aggregate the statuses of all overfunded plans and recognize that amount as an asset in its statement of financial position. It also shall aggregate the statuses of all underfunded plans and recognize that amount as a liability in its statement of financial position. A business entity that presents a classified statement of financial position shall classify the liability for an underfunded plan as a current liability, a noncurrent liability, or a combination of both. The current portion (determined on a plan-by-plan basis) is the amount by which the actuarial present value of benefits included in the benefit obligation payable in the next 12 months, or operating cycle if longer, exceeds the fair value of plan assets. The asset for an overfunded plan shall be classified as a noncurrent asset in a classified statement of financial position.

As discussed above in the section *Normal Trade Terms* (pp. 33-37 *supra*), the unfunded obligations for the TM Retiree Plans were reflected as a non current liability or a current liability identified as "Employee Compensation and Benefits" - - not as an accrued expense.

Simply, an accrued expense is reflected as a current liability for the amount due since it will be paid within a short period.  *A-fortiori* the long term obligations to the TM Retirees could not be and were not accounted for as accrued expense.

## Ordinary Course of Business

Finally, even assuming that the TM Retiree obligations could be construed as an accrued expense, the inapplicability of the further limitation that such accrued expense must be incurred in the "ordinary course of business" requires treating such obligations as Senior Obligations. The

TM Retiree Plans and the obligations were assumed by Tribune as part of the Merger. As defined, by treatment under Delaware law and Federal Securities Law, and by admission of Tribune, the Merger was not a transaction in the ordinary course of business. Thus, the assumption of over $100 million in Times Mirror deferred compensation plan obligations could not be an ordinary course business transaction of Tribune.

For example, the Securities and Exchange Commission ("SEC") mandates submission to the SEC of a Form 8-K "[i]f the registrant or any of its majority-owned subsidiaries has completed the acquisition or disposition of a significant amount of assets, otherwise than in the ordinary course of business." *See* SEC Form 8-K, Information to be Included in the Report, Section 2, Item 2.01 Instructions. Item 2.01 of the instructions provides:

> "Completion of Acquisition or Disposition of Assets." "The term acquisition includes every purchase, acquisition by lease, exchange, *merger*, consolidation, succession or other acquisition, except that the term does not include the construction or development of property by or for the registrant or its subsidiaries or the acquisition of materials for such purpose.

(emphasis added) *Id.*

Tribune filed two Form 8-Ks in connection with its merger with Times Mirror (*See* Tribune March 2000 8-K (announcing execution of "Agreement and Plan of Merger") and Tribune June 2000 8-K (announcing "the completion of Tribune's acquisition of Times Mirror through a merger of Times Mirror with and into Tribune")). In addition, in the Tribune FY 2000 10-K, the first 10-K issued by Tribune following the Merger, Tribune identified the Merger as a "Significant Event" involving the purchase price of $8.3 Billion, including direct costs and debt and preferred stock assumed. Tribune FY 2000 10-K at p. 19-20 (Teitelbaum Exhibit C). As discussed above, Tribune, thereafter, specifically identified the assumption of the Times Mirror

42

pension obligations in its SEC filings. *See, e.g.,* Tribune FY 2007 10-K at p. 123 (Teitelbaum Declaration Exhibit D).

Further, under Delaware law, a merger on the terms such as those set forth in the Merger Agreement is deemed an extraordinary event, requiring due notice and a vote by the surviving company's shareholders. Del. Code Tit.8 § 251 (2010); *Frontier Oil Corp. v. Holly Corp.*, 2005 WL 1039027 at *27 (Del Ch. 2005) ("The Merger Agreement, of course, was not an ordinary contract. Before the Merger could occur, the shareholders of Holly had to approve it."). In compliance with Delaware Law, Tribune issued the Tribune Shareholder Notice (Teitelbaum Declaration Exhibit F) notifying shareholders of the proposed merger, the terms of the proposed merger and the scheduling a special meeting to seek approval of the Merger. *See also In re Crazy Eddie Securities Litigation,* 906 F. Supp 840, 847 (E.D.N.Y. 1995) ( "a merger is one of then most significant and uncommon events to affect businesses"); *Snyder v. Thomas & Betts Co.,* 2003 WL 22723021 at *1 (ND Ill. 2003) (" Form 8-K is a document required by the SEC to announce certain significant changes in a public company, such as a merger or acquisition. . . ."); *Securities and Exchange Commission v. Teo,* 2011 WL 4074085 at *9 (D. N.J. 2011) (merger is an extraordinary transactionthat must be reported under Section 13(d))

Under no circumstances can there be an argument that the TM Retiree claims assumed by Tribune in the Merger are obligations (or accrued expenses) incurred in the ordinary course of business.

**Point V**

**Assuming Subordination: Neither the PHONES Noteholders Nor EGI Have Standing To Object To The TM Retirees' Treatment As Senior Indebtedness or Senior Obligations**

Assuming that this Court determines that the claims of the PHONES and EGI are subordinate to Senior Indebtedness and Senior Obligations with respect to all payments made in connection with the Third DCL Plan, including with respect to the Litigation Trust and the DCL Plan Settlement, the PHONES and EGI lack any reasonable possibility of having an economic interest in the outcome of the remaining Allocation Disputes or any distributions to be overseen by this Court and therefore lack standing.[14]

As set forth in the Allocation Dispute Chart agreed upon by the parties in connection with these proceedings (and with all reservations of rights as set forth by the parties with respect to such chart), the Senior Noteholder claims are in the amount of $1.283 Billion; the PHONES claims are between $761 Million and $1.2 Billion and the EGI claims are in the amount of $235 Million. The range of projected pre Litigation Trust recoveries to the Senior Noteholders as set forth in the Allocation Dispute Chart is between $431 Million and $468 Million. Even assuming that the Senior Noteholders are the sole beneficiaries of the subordination, since the Senior

---

[14] Pursuant to order of this Court dated April 25, 2010, creditors were granted relief from the stay to commence state law constructive fraud claim actions which had not been commenced by the Debtors or the Committee prior to the expiration of the relevant two year period under Bankruptcy Code §546. Over 48 actions were commenced by creditors, including four actions commenced by the TM Retirees. All of these actions are under the jurisdiction and supervision of the United States District Court for the Southern District of New York in a multi district litigation proceeding captioned *In re Tribune Company Fraudulent Conveyance Litigation,* 11 MD 2296 (WHP) (the "**SLCFC Actions**"). The SLCFC Actions are not property of the Debtors or subject to the jurisdiction of this Court, except to the extent that this Court has properly stayed the prosecution of such actions to avoid interference with the conclusion of these cases. Thus, to the extent that there may be recoveries from these SLCFC Actions, such recoveries are not payments to be made pursuant to the Third DCL Plan and are not properly considered by this Court in the analysis of unfair discrimination or standing.

Noteholders must be paid in full before either the PHONES or EGI could receive any payment under the PHONES Indenture and the EGI Subordination Agreement, the Senior Noteholders would need to recover an additional $815 Million before the PHONES or EGI could receive any distribution. Based upon the waterfall in the DCL Plan Settlement, it appears that net recoveries from the Litigation Trust and payments under the Third DCL Plan would need to exceed $1.2 Billion before the Senior Noteholders could recover the principal amount of the Senior Note claims. [15]  Given this Court's reliance upon the findings of the Examiner in connection with the DCL Plan Settlement, the probability of hitting this target is remote at best. *See* 2011 WL 5142420 at *20 (this Court concluded that only one scenario out of six identified in the chart would result in a recovery which exceeds the amount of the DCL Plan Settlement).  Thus, this Court found:

> The settlement of claims in the DCL Plan treats creditors fairly. That other creditors might benefit from extensive and costly litigation, as the Noteholder Plan Proponents assert, is highly speculative.

Confirmation Opinion at 2011 WL 5142420 at *63 (emphasis added).

Following the DCL Plan Settlement, such a recovery with respect to the remaining claims preserved for the Litigation Trust is more remote as evidenced by the fact that the parties to this Allocation Dispute have agreed to the Allocation Disputes chart which considers recovery scenarios up to $750 million.

To the extent that the PHONES and/or EGI are subordinated, whether they are affected by the remaining Allocation Disputes does not need to be determined with precision. In *In re Adelphia Communications Corporation*, 371 B.R. 660 (S.D.N.Y. 2007), the bankruptcy court

---

[15] This figure is based upon the payment waterfall agreed to pursuant to the DCL Plan Settlement described at page 20 of the DCL Specific Disclosure Statement.

withdrew standing previously granted to an equity committee to pursue certain claims, holding:

> [U]nless there's a grand slam home run in the litigation pursued by the [debtor], it is beyond rational dispute that the holders of the Equity interests are out of the money.'    Specifically, the Bankruptcy Court found that 'for value to pour down all the way to equity, the [debtor] would have to recover at least $6.5 billion,' and that this was 'an ambitious goal so ambitious that it could fairly be said that equity is hopelessly out of the money.

371 B.R. at 672.

Without an injury or any other justiciable harm, the PHONES and EGI have no further standing in this Allocation Disputes proceeding. *See Monsanto v. Geertson Seed Farms*, 130 S.Ct. 2743, 2747 (2010) ("Article III standing requires an injury that is (i) concrete, particularized, and actual or imminent, (ii) fairly traceable to the challenged action, and (iii) redressable by a favorable ruling. *See Horne v. Flores*, 557 U.S. 433, ——, 129 S.Ct. 2579, 174 L.Ed.2d 406."); *Nike v. Kasky*, 539 U.S. 654, 667 (2003) ("Article III requires a litigant to have "standing"- *i.e.,* to show that he has suffered "injury in fact," that the injury is "fairly traceable" to actions of the opposing party, and that a favorable decision will likely redress the harm. *Bennett v. Spear,* 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (internal quotation marks omitted)"); *In re Insilco Technologies*, 351 B.R. 313 (Bankr.D.Del 2006) ("The Third Circuit Court of Appeals has espoused three requirements to have standing: (1) the plaintiff must demonstrate "injury in fact"—a harm that is both concrete and actual or imminent, not conjectural or hypothetical; (2) the plaintiff must establish causation, tracing the connection between the injury and the alleged conduct of the defendant; and (3) the plaintiff must demonstrate a substantial likelihood that the requested relief will remedy the alleged injury. *Chadwick v. Janecka,* 312 F. 3d 597, 602 (3d Cir. 2002) (citing *Vermont Agency of Natural*

*Resources v. United States ex. rel. Stevens,* 529 U.S. 765, 771, 120 S.Ct. 1858, 146 L.Ed.2d 836

(2000))").

## CONCLUSION

For all of the forgoing reasons, the TM Retirees respectfully request that this Court

resolve the Allocation Disputes in favor of treating the holders of the PHONES Notes and EGI

Note as subordinate to the Senior Noteholders and the TM Retirees with respect to all payments

or distributions under the Third DCL Plan, including with respect to claims asserted or which

could be asserted by the Litigation Trust (and proceeds thereof) and payments or distributions of

the DCL Plan Settlement.


Dated: February 24, 2012               Respectfully submitted,
      Wilmington, Delaware

                                   HILLER & ARBAN, LLC

                                   **/s/ Brian Arban**
                                   Adam Hiller (DE No. 4105)
                                   Brian Arban (DE No. 4511)
                                   1500 North French Street, 2nd Floor
                                   Wilmington, Delaware 19801
                                   (302) 442-7676 telephone
                                   barban@hillerarban.com

                                   -and-

                                   Jay Teitelbaum, Esq. (JT-4619)
                                   TEITELBAUM & BASKIN, LLP
                                   1 Barker Avenue
                                   Third Floor
                                   White Plains, New York 10601
                                   (914) 437-7670
                                   jteitelbaum@tblawl1p.com