## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

_____
                                          )
In re:                                    )          Chapter 11 Cases
                                          )          Case No. 08-13141 (KJC)
TRIBUNE COMPANY, et al.,                  )          (Jointly Administered)
                                          )
        Debtors.                          )
_____          )


## OPENING BRIEF OF
## WILMINGTON TRUST COMPANY,
## AS SUCCESSOR INDENTURE
## TRUSTEE FOR THE PHONES NOTES,
## ON THE ALLOCATION DISPUTES


**SULLIVAN HAZELTINE ALLINSON LLC**
William D. Sullivan (I.D. No. 2820)
Elihu E. Allinson, III (I.D. No. 3476)
901 N. Market St., Suite 1300
Wilmington, DE 19801
302-428-8191

-and-

**BROWN RUDNICK LLP**
Robert J. Stark
Martin S. Siegel
Gordon Z. Novod
Seven Times Square
New York, NY 10036
212-209-4800

Counsel for Wilmington Trust Company, solely in
its capacity as successor Indenture Trustee for the
PHONES Notes

Dated: February 24, 2012

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................................1

KEY FACTS AND CONTRACT PROVISIONS APPLICABLE TO THE
ALLOCATION DISPUTES ....................................................................................................3

I.      The PHONES Indenture Subordination Provision ..............................................................3

II.     Facts and PHONES Indenture Provisions Relevant to the High/Low PHONES Claim
        Amount ..............................................................................................................................5

III.    The EGI-TRB LLC Notes' Subordination Agreement .......................................................7

        ARGUMENT .....................................................................................................................9

I.      Proceeds from Chapter 5 Avoidance Actions are Not Subject to Subordination
        Pursuant to the PHONES Indenture, and, in Light of Wilmington Trust's Pending
        Appeal of this Court's Reconsideration Opinion, Distributions of Settlement
        Proceeds Should be Reserved Pending Final Adjudication of That Appeal (Phones
        Allocation Dispute Issue 1).................................................................................................9

II.     The Priority of Distributions from the Creditors' Trust is Moot as it Relates to the
        PHONES Notes Because the PHONES Noteholders Have Opted Their Claims
        Out of the Creditors' Trust (Phones Allocation Dispute Issue 2)......................................13

III.    Aside from Wilmington Trust's Class 1F Fee Claim, None of the Other Parent
        Claims Asserted are Senior Indebtedness Under the PHONES Indenture
        (PHONES Allocation Dispute Issue 3)..............................................................................13

        A.      The Swap Claim is Not "Indebtedness," and thus Cannot Constitute
                "Senior Indebtedness" to Which the PHONES are Subordinated Because
                the Swap Claim is not an Obligation Represented by Notes, Bonds,
                Debentures or Similar Evidence of Indebtedness nor is the Swap Claim
                Indebtedness for Borrowed Money........................................................................15

B. The Retiree Claims are not "Indebtedness," and thus Cannot Constitute Senior Indebtedness to Which the PHONES are Subordinated Because the Retiree Claims are not Claims for the Deferred Purchase Price of Services Other than on Normal Trade Terms...................................................................16

C. Trade Claims are Expressly Excluded from the Definition of "Senior Indebtedness" under the PHONES Indenture ........................................................18

D. Other Claims in the Other Parent Claim Catch-all Class do not Qualify as Senior Indebtedness Under the PHONES Indenture ..............................................19

E. Wilmington Trust's Class 1F Fee Claim is the only Other Parent Claim that is "Senior Indebtedness" Under the PHONES Indenture ..............................20

IV. The PHONES Notes Claims Should be Treated as an Allowed Claim in the Amount of $1,183,833,767 Plus Unpaid Interest that Accrued Prior to the Petition Date (PHONES Allocation Dispute Issue 4) .....................................................................20

A. The Unauthorized and Mistaken Reduction in the Balance of PHONES that were Outstanding was a Mistake, Contrary to the Parties' Intent..................21

B. Parties Advocating the "Low" PHONES Notes Claim Amount Should not Benefit from DTC's Mistaken and Unauthorized Reduction in the Principal Amount of Outstanding PHONES..........................................................24

C. The Argument that an Election to Tender PHONES for Exchange is Irrevocable is not Supported by the Terms of the PHONES Indenture, the Global Note, or the Revised Exchange Notice and Should be Rejected ..............25

D. Even if the Court were to Order the "Low" PHONES Notes Claim Amount, The Correct "Low" Phones Notes Claim Amount is $818,808,727 (Plus Unpaid Interest that Accrued Prior to the Petition Date)....................................................................................................................26

V. The PHONES are not Subordinated to Post-Petition Interest on Senior Indebtedness (PHONES Allocation Dispute Issue 5).......................................................26

VI. The PHONES are Senior in Right of Payment to the EGI-TRB LLC Notes (Phones Allocation Dispute Issue 6 / EGI-TRB Allocation Dispute Issue 5) ..................29

A. The Plain Language of the EGI Subordination Agreement Compels a Reading Finding that the PHONES Notes are Senior in Right of Payment to the EGI-TRB Notes ..........................................................................................29

B.      Significant Contemporaneous Evidence Demonstrates that the EGI-TRB
        Notes were Intended to be Junior to the PHONES. ................................................33

C.      The Subordination Provision in the Step One EGI Note and the Step Two
        EGI Subordination Agreement are Identical as Applied to the PHONES.............36

D.      The EGI Subordination Agreement Subordinates EGI-TRB Notes to the
        PHONES, Without Regard to Source of Recovery ...............................................39

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*155 Harbor Drive Condo. Ass'n v. Harbor Point Inc.,*
    568 N.E.2d 365 (Ill. App. Ct. 1991) ...............................................................14

*Auerbach v. Earth Energy Sys. Inc.,*
    No. 8868, 1988 WL 39982 (Del. Ch. Apr. 26, 1988) .......................................37

*Aumiller v. Univ. of Delaware,*
    434 F. Supp. 1273, 1290 (D. Del. 1977)..........................................................34

*Bank of Am. v. N. LaSalle St. LP (In re 203 N. LaSalle St. P'ship),*
    246 B.R. 325 (Bankr. N.D. Ill. 2000) .............................................................15

*Best Products Co., Inc.,*
    168 B.R. 35 (Bankr. S.D.N.Y. 1994).............................................................15

*Braithwaite v. Henneberry,*
    124 Ill. App. 407 (Ill. App. Ct. 1906) ............................................................23

*Delaware Ins Co. of Philadelphia v. SS White Dental Mfg Co.,*
    109 F. 334 (3d Cir. 1901) ...............................................................................37

*Deloitte LLP v. Flanagan,*
    No. 4125, 2009 WL 5200657 (Del. Ch. Dec. 29, 2009)...................................30

*Doe v. Cedars Acad., LLC,*
    No. 136, 2010 WL 5825343 (Del. Sup. Oct. 27, 2010)...................................30

*El Paso Nat. Gas Co. v. Amoco Prod. Co.,*
    No. 12083, 1994 WL 148263 (Del. Ch. Mar. 29, 1994)..................................30

*Forest Laboratories, Inc. v. Ivax Pharmaceuticals, Inc.,*
    237 F.R.D. 106 (D. Del. 2006) .......................................................................34

*Frost v. PetSmart, Inc.,*
    Civ. A. No. 05-6759, 2007 WL 602990 (E.D. Pa. Feb. 26, 2007) ...................38

*FSC Paper Corp. v. Sun Ins. Co. of N.Y.,*
    744 F.2d 1279, (7th Cir. 1984) .......................................................................25

*Fuller v. Samuels,*
    137 Ill. App 536 (Ill. App. Ct., 1907) ............................................................23

*GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.,*
    Nos. 514, 516, 2012 WL 10916 (Del. Sup. Jan. 3, 2012)................................29

*Griggs v. Provident Consumer Disc. Co.*,
    459 U.S. 56 (1982) ..........................................................................................11

*Guarantee Bank v. Magness Const. Co.*,
    462 A.2d 405 (Del. 1983) ...............................................................................29

*In re Demarco*,
    258 B.R. 30 (Bankr. M.D. Fla. 2000) .............................................................12

*In re Dura Automotive Sys., Inc.*,
    379 B.R. 257 (Bankr. D. Del. 2007) ................................................................28

*In re Enron Creditors Recovery Corp.*,
    370 B.R. 64 (Bankr. S.D.N.Y. 2007) ..............................................................14

*In re Hardy*,
    30 B.R. 109 (Bankr. S.D. Ohio 1983) .............................................................12

*In re Joy Global, Inc.*,
    346 B.R. 659 (D. Del. 2006) ...........................................................................34

*In re Kendrick Equip. Corp.*,
    60 B.R. 356 (Bankr. W.D. Va. 1986) .............................................................12

*In re Mid-Am. Petroleum, Inc., .,*
    71 B.R. 140 (Bankr. N.D. Tex. 1987) ............................................................23

*In re Payless Cashways*,
    215 B.R. 409 (Bankr. W.D. Mo. 1997) ..........................................................14

*In re Strawberry Square Assocs.*,
    152 B.R. 699 (Bankr. E.D.N.Y. 1993) ...........................................................12

*In re Tribune Co.*,
    ___ B.R. ___, 2011 WL 5142420 (Del. Bankr. Oct. 31, 2011) ...................15, 20

*In re W.R. Grace & Co.*,
    No. 01-1139,  2009 WL 1469831 (Bankr. D. Del. May 19, 2009) ..................27

*James Julian, Inc. v. Raytheon Co.*,
    557 F. Supp. 1058, (D. Del. 1983) ..............................................................34-35

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*,
    No. 02-20, 2002 WL 1401693 (D. Del. June 27, 2002) ..................................11

*Martis v. Grinnell Mut. Reinsurance Co.*,
    905 N.E.2d 920 (Ill. App. Ct. 2009) ...............................................................14

*Matter of Genesis Health Ventures, Inc.,*
  266 B.R. 591 (Bankr. D. Del. 2001) ...........................................................15

*Matter of Great Bay Hotel & Casino, Inc.,*
  251 B.R. 213 (Bankr. D.N.J. 2000) ...........................................................15

*Nat'l Supermarkets, Inc. v. The First Nat'l Bank of Springfield,*
  251 B.R. 213 (Bankr. D.N.J. 2000) ...........................................................23

*Official Comm. of Unsecured Creditors v. Chinery (In re Cybergenics Corp.,*
  226 F.3d 237 (3d Cir. 2000)........................................................................9

*Osborn ex rel. Osborn v. Kemp,*
  991 A.2d 1153 (Del. Sup. 2010) ...............................................................30

*Petrol Stops Nw. v. Cont'l Oit Co.,*
  647 F.2d 1005 (9th Cir. 1981) ...................................................................12

*Quereguan v. New Castle County,*
  No. 20298, 2006 WL 1215193 (Del. Ch. Apr. 24, 2006) ..................................30

*Rizzo v. PPL Serv. Corp.,*
  No. Civ. A. 03-5779, 2005 WL 913091 (E.D. Pa. Apr. 19, 2005) ...................38

*Rothe v. Revco D.S., Inc.,*
  148 F.3d 672 (7th Cir. 1998) .....................................................................25

*Salce v. Saracco,*
  949 N.E.2d 284 (Ill. App. Ct. 2011) .........................................................15

*Seidensticker v. Gasparilla Inn, Inc.,*
  No. 2555, 2007 WL 1930428 (Del. Ch. June. 19, 2007).................................37

*See Sea Star Line, LLC. v. Emerald Equip. Leasing, Inc.,*
  No. 05-245, 2009 WL 3805569 (D. Del. Nov. 12, 2009)...........................11-12

*Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n,*
  322 F.3d 1039 (9th Cir. 2003) ...................................................................16

*United States v. Hernandez,*
  176 F.3d 719 (3d Cir. 1999)........................................................................38

*Venen v. Sweet,*
  758 F.2d 117 (3d Cir. 1985)........................................................................11

*Whispering Pines Estates v. Flash Island, Inc. (In re Whispering Pines Estates),*
  369 B.R. 752 (B.A.P. 1st Cir. 2007) ..........................................................11

*Wil-Fred's, Inc. v. Metro. Sanitary Dist. of Chicago*
    372 N.E.2d 946  (Ill. App. Ct. 1978) ..............................................................................23


**Statutes**

11 U.S.C. § 502(b)(2) .........................................................................................................1, 27

11 U.S.C. § 510(a) ............................................................................................................14, 15

810 Ill. Comp. Stat. § 5/8-405 ................................................................................................23


**Rules**
Fed. R. Evid. 801 ....................................................................................................................34

Fed. R. Evid. 803 ..................................................................................................................6, 33

Fed. R. Evid. 804 .....................................................................................................................6


**Other Authorities**
6 Collier Bankruptcy Practice Guide ¶ 92.07[2].....................................................................13

Ad Hoc Committee for Revision of the 1983 Model Simplified Indenture, 55 Bus. Law. 1115
(2000).................................................................................................................................27, 28

Wilmington Trust Company ("Wilmington Trust"), as successor Indenture Trustee for the PHONES Notes, respectfully submits this opening brief on the Allocation Disputes as defined in paragraph 2 of the Court's scheduling order (the "Scheduling Order"), dated January 24, 2012 [D.I. 10692].  In connection with each of these allocation disputes, Wilmington Trust respectfully represents as follows:

## PRELIMINARY STATEMENT

1.     These Allocation Disputes relative to the PHONES arise in two separate contexts. First, with respect to the application of the PHONES subordination, certain unsecured creditors claim that they are entitled to the benefit of PHONES subordination, or claim the right to post-petition interest, in order to improve their personal recoveries at the expense of the PHONES Noteholders.  Second, the Court is being asked to consider the allowed amount of the PHONES claim as the consequence of a mistake in the execution of a contractual exchange right.

2.     Each of the subsets of Allocation Disputes[1] implicate certain inescapable black letter legal principles, or involve a number of undisputed facts, that directly impact the outcome of the Allocation Disputes before the Court.

3.     First, as a matter of law, only a party that is entitled to benefit from a contractual subordination provision should benefit from the enforcement of that provision under a bankruptcy plan.  Since the subordination provision contained in the PHONES Indenture is enforceable in bankruptcy only "to the same extent [it] is enforceable under non-bankruptcy law" (*see* 11 U.S.C. § 502(b)(2)), it cannot be enforced in a manner that is inconsistent with state contract law.  Accordingly, the PHONES Indenture should be read to afford its terms their plain meaning, comporting with surrounding contract language and common sense, to only permit

---

[1]   Capitalized terms not otherwise defined herein shall have the meaning in the Scheduling Order.

parties that hold claims that actually meet the requirements of "Indebtedness" and "Senior Indebtedness" to benefit from the PHONES subordination.

4.      Second, as a matter of law, the party seeking the benefit of the PHONES subordination needs to meet its burden to prove that it qualifies as "Indebtedness" and "Senior Indebtedness" under the PHONES Indenture.  Here, none of the claimants in Class 1F Other Parent Claims have met or can meet their burden of demonstrating that they are entitled to the benefit of PHONES subordination, other than Wilmington Trust's Class 1F fee claim.  Even though the Plan provides that the PHONES will not receive an initial distribution, the misapplication of PHONES subordination will directly affect the PHONES Noteholders as it will divert funds from holders of Senior Indebtedness who must be paid in full to the extent provided by the PHONES Indenture (excluding post-petition interest) before the PHONES can receive a recovery from the Litigation Trust.

5.      Third, under the PHONES Indenture and applicable bankruptcy law, those holding Senior Indebtedness who benefit from the subordination provisions of the PHONES Indenture are not entitled to receive post-petition interest prior to the holders of PHONES receiving payment on their claims.

6.      Fourth, the contractual requirements and mechanisms for the exchange right of the tendering PHONES were not observed.  Those tendering PHONES did not receive the benefit of their bargain since Tribune did not pay them ***and*** their tendered PHONES were not preserved pending receipt of cash as required by the Revised Exchange Notices (defined below).  Thus, the Court should look to the intent of the parties as evidenced in the applicable documents and examples in other areas of the law for unauthorized and mistaken acts, and allow the PHONES Notes Claim Amount in the "High" amount (discussed below).

7.   Lastly, the language of the EGI Subordination Agreement (defined below) provides that the EGI-TRB Notes are junior in right of payment to the PHONES.  There also is an abundance of contemporaneous evidence demonstrating that, when Tribune's 2007 LBO was crafted and consummated, the EGI-TRB Notes were intended to occupy the most junior part of the capital structure, and be junior to the PHONES Notes.

**KEY FACTS AND CONTRACT**
**PROVISIONS APPLICABLE TO THE ALLOCATION DISPUTES**

**I.    The PHONES Indenture Subordination Provision**

8.   Section 14.01 is the key subordination provision in the PHONES Notes Indenture relevant to PHONES Allocation Dispute Issues 3, 5, and 6.  It provides, in relevant part:

> The Securities shall be subordinated to Senior Indebtedness as set forth in this Article Fourteen . . .
>
> For purposes of this Article Fourteen, the following terms shall have the following meanings:
>
> (1) "*Indebtedness*," . . . means, as of the date on which Indebtedness is to be determined and without duplication (i) *all obligations represented by notes, bonds, debentures or similar evidences of indebtedness*; (ii) *all indebtedness for borrowed money or for the deferred purchase price of* property or *services other than, in the case of any such deferred purchase price, on normal trade terms*; (iii) all rental obligations as lessee under leases which shall have been or should be, in accordance with generally accepted accounting principles, recorded as capital leases; and (iv) all Indebtedness of others for the payment of which such Person is responsible or liable as obligor or guarantor.
>
> (2) "*Senior Indebtedness*" means the *principal of* (and premium, if any) *and interest on (including interest accruing after the filing of a petition initiating any proceeding pursuant to any Federal bankruptcy law* or any other applicable Federal or State law, *but only to the extent allowed or permitted to the holder of such Indebtedness of the Company against the bankruptcy* or any other insolvency *estate of the Company in such proceeding*) and other amounts due on or in connection with any Indebtedness of the Company incurred, assumed or guaranteed by the Company, whether outstanding on the date of this Indenture or hereafter incurred, assumed or guaranteed and all renewals, extensions and refundings of any such Indebtedness of the Company; *provided, however, that the following will not constitute Senior Indebtedness*:

-3-

(A) *any Indebtedness of the Company as to which, in the instrument creating the same or evidencing the same or pursuant to which the same is outstanding, it is expressly provided that such Indebtedness of the Company shall be subordinated to or pari passu with the Securities;*

(B) Indebtedness of the Company in respect of the Securities;

(C) *any Indebtedness of the Company constituting trade accounts payable arising in the ordinary course of business*; and

(D) any Indebtedness of the Company to any Subsidiary of the Company.

PHONES Indenture, § 14.01 (Exhibit A, WTC 0000001-77) (emphasis added). For the convenience of the Court, the exhibits referenced herein are contained in an accompanying binder and filed as an exhibit hereto.

9.     First, with respect to Allocation Dispute 3, PHONES Indenture Section 14.01(1) specifies the types of debt that qualify as "Indebtedness" and therefore what can be "Senior Indebtedness."  As noted herein, the Swap Claim is not "Indebtedness" under the PHONES Notes Indenture because it does not fit into categories (i), (iii) or (iv) of Section 14.01(1). Similarly, the Retiree Claims could only qualify if these are claims under (ii) of Section 14.01 (i.e., the "*deferred purchase price of ... services other than, ... , on normal trade terms*"). The Retiree Claims are not claims for "the deferred purchase price of ... services." Even if the Retiree Claims somehow were considered to be for "the deferred purchase price of ... services," the TM Retirees acknowledge that these claims are for deferred compensation in the ordinary course of business, *i.e.* on normal trade terms. Therefore, none of the Retiree Claims qualify as "Indebtedness." Lastly, Trade Claims are specifically excluded from "Senior Indebtedness" under Section 14.01(2). Accordingly, neither the Retiree Claims, the Swap Claims nor Trade Claims can enjoy the benefit of PHONES subordination.

10.     Second, with respect to Allocation Dispute 5, Section 14.01(2) of the PHONES Indenture specifically provides that post-petition interest may be "Senior Indebtedness" only to

-4-

the extent that it is allowed or permitted against a bankruptcy estate, and to the extent permitted

by federal bankruptcy law.  It is well settled that a holder of an unsecured claim shall not receive

post-petition interest on its claim if the debtor's estate is not solvent, as is the case here.

Accordingly, the Court should rule that the PHONES are not subordinated to post-petition

interest.

**II.    Facts and PHONES Indenture Provisions**
        **Relevant to the High/Low PHONES Claim Amount.**

11.    Allocation Dispute 4 addresses the allowed amount of the PHONES Notes Claim.

This question requires not only a numerical computation to determine claim amount, but also a

determination concerning the substantive rights of holders of PHONES who tendered their

PHONES for exchange in the days and weeks leading up to Tribune's Chapter 11 filing.  It is

undisputed that:

    (i)    The Global Note (as defined in the PHONES Claim Stip.) for the PHONES gave each PHONES Noteholder the right to tender his or her PHONES for an amount of cash tied to the trading value of Time Warner stock (TWX) (Exhibit B, WTC 0000094-114);

    (ii)    In recognition that the mechanism for tender contained in the Global Note was antiquated and did not work under DTC's then current computer systems, Tribune, DBTCA and each tendering PHONES Noteholder agreed on the requirements to tender PHONES for exchange and the mechanism by which that exchange would occur;

    (iii)    Such new procedures were memorialized a revised form of exchange notice (the "Revised Exchange Notice") that "supersede[d] and replace[d] the procedures set forth in the [Global Note]." (Exhibit C, WTC 0000089-91);

    (iv)    DBTCA, Tribune and each tendering PHONES Noteholder agreed that any PHONES tendered for exchange would be cancelled only upon receipt of cash (i.e., the consummation of the exchange) and that DBTCA would take possession of PHONES, properly submitted into the DWAC system for exchange, pending consummation of the exchange;

    (v)    Upon submission to DWAC, DTC automatically and mistakenly reduced the amount of PHONES that were on its books and records by the amount

of tendered PHONES that were accepted into the DWAC system, notwithstanding the explicit terms of the Revised Exchange Notices that authorized the tendered PHONES to be reduced or cancelled only upon consummation (i.e., receipt of the cash);

(vi)    Neither Tribune nor DBTCA instructed DTC to debit the outstanding amount of PHONES for each tender for Exchange;

(vii)    In the period from November 26, 2008 through and including December 8, 2008 (the "Exchange Period"), holders of 3,093,941 PHONES attempted to tender their PHONES for exchange, but did *not* receive payment from Tribune in accordance with the Exchange Right;

(viii)    It is those tendered PHONES that are subject to this Allocation Dispute; and

(ix)    In addition, certain PHONES Noteholders attempted to submit PHONES for exchange into the DWAC system, but those submissions were not accepted into the DWAC system.  These also are subject to this Allocation Dispute.

12.    These facts have been stipulated to by the Debtors, Aurelius Capital Management, Barclays Bank, Waterstone Capital Management and Wilmington Trust by Stipulation filed contemporaneously with this opening brief (("PHONES Claim Stip."), ¶ 1) (the form of which is Exhibit D).  The parties also agreed in the PHONES Claim Stip. that the Revised Exchange Notices and all the other documents referenced in the stipulation are deemed business records as that phrase is used in the Federal Rules of Evidence Rule 803(d), and that DBTCA's Responses to Interrogatory Nos. 1, 2, 3, 4, 5, 6, and 7 are treated for evidentiary purposes as if it was the testimony of DBTCA pursuant to Federal Rules of Evidence Rule 804(b)(1).  [Ex. D, ¶ 55-56]. Wilmington Trust incorporates by reference the facts set forth in the PHONES Claim Stip. and DBTCA's Responses to Wilmington Trust's First Set of Interrogatories ("DBTCA Responses") (Exhibit E).

13.     Section 3.06 of the PHONES Indenture is instructive as it evidences the parties'

intent in the circumstance where PHONES are mutilated, destroyed, lost and stolen.  PHONES

Indenture Section 3.06 provides in pertinent part that:

> If there shall be ***delivered to the Company and the Trustee*** (i) ***evidence*** to their
> satisfaction ***of the destruction, loss or theft of any [PHONES Notes]*** . . . , ***then,
> in the absence of notice to the Company or the Trustee that such Security has
> been acquired by a bona fide purchaser***, ***the Company shall execute*** and upon
> the Company's request the Trustee shall authenticate and deliver, in lieu of any
> such destroyed, lost or stolen Security, ***a new Security of the same series and of
> like tenor and principal amount and bearing a number not contemporaneously
> outstanding***. . . The provisions of this Section are exclusive and shall preclude (to
> the extent lawful) all other rights and remedies with respect to the replacement or
> payment of mutilated, destroyed, lost or stolen Securities.

PHONES Indenture, § 3.06 (emphasis added).

14.     In light of the facts in the PHONES Claim Stip., and the DBTCA Responses, and

the intent of the parties as evidenced by the applicable documents, it is apparent that the

unauthorized and mistaken reduction in the balance of PHONES was contrary to the terms of the

exchange.   In order to correct that mistake, so that innocent holders of PHONES are not

penalized for the premature reduction in the principal amount of their tended PHONES claims,

this Court should, in furtherance of its claim allowance powers, allow the PHONES Notes Claim

Amount in the "High" PHONES Notes Claim Amount.

### III.     The EGI-TRB LLC Notes' Subordination Agreement

15.     The key subordination provision relevant to PHONES Allocation Dispute Issues 6

and EGI-TRB LLC Notes Allocation Dispute Issue 5 is found in the Subordination Agreement,

dated as of December 20, 2007, made by EGI-TRB, L.L.C. in favor of the holders of Senior

Obligations (the "EGI Subordination Agreement") (Exhibit F).   Section 1 of the EGI

Subordination Agreement defines "Senior Obligations" as follows:

"Senior Obligations" means all obligations, indebtedness and other liabilities of the Company other than (i) any such obligations, indebtedness or liabilities that ***by their express terms rank pari passu or junior to the Company's obligations under the Subordinated Note*** and (ii) trade payables and accrued expenses incurred in the ordinary course of business, in each case, whether incurred on or prior to the date hereof or hereafter incurred.

[Ex. F, § 1, at EGI-LAW 00243350] (emphasis added).

16.     The EGI Subordination Agreement also defines "Senior Documents" as "those documents, instruments and agreements evidencing, securing or otherwise relating to any of the Senior Obligations." *Id.*  The EGI Subordination Agreement is the operative agreement for the Allocation Disputes concerning the relative priority between the PHONES and the EGI-TRB Notes.  That subordination agreement was executed at the same time as the issuance of the EGI-TRB LLC Notes (the "EGI-TRB Notes") in December 2007 in connection with the merger component of the LBO.  Although executed in December 2007, its terms were substantially negotiated in the spring of 2007 at the same time the LBO was negotiated, and the proceeds of the EGI-TRB LLC Notes were used to pay off the subordinated exchangeable promissory note given by Tribune to EGI-TRB, L.L.C. on April 23, 2007 (the "Step One EGI Note").  *See* Examiner Report Ex. 153 (Exhibit G).  Further, Section 14.01 of the PHONES Indenture governs who is entitled to the benefit of PHONES subordination.  When Section 14.01 is read with the EGI Subordination Agreement (executed some 8 years later), the inescapable conclusion is that the PHONES are "Senior Obligations" as defined under the EGI Subordination Agreement, and therefore are senior to the EGI-TRB Notes for all purposes.

-8-

## ARGUMENT

I.     **Proceeds from Chapter 5 Avoidance Actions are Not Subject to Subordination Pursuant to the PHONES Indenture, and, in Light of Wilmington Trust's Pending Appeal of this Court's Reconsideration Opinion, Distributions of Settlement Proceeds Should be Reserved Pending Final Adjudication of that Appeal.**

**(PHONES Allocation Dispute Issue 1)**

17.     Those portions of the Article III Distributions that represent settlement with the Senior Lenders, Bridge Lenders and Settling Step Two Payees (the "Settlement Proceeds") are proceeds from the settlement of Chapter 5 causes of action.  This Court has already ruled that proceeds of Chapter 5 causes of action are, under *Cybergenics*, not assets of Tribune Company. Reconsideration Opinion [D.I. 10531], pg. 7 n.11 (citing *Official Comm. of Unsecured Creditors v. Chinery (In re Cybergenics Corp.),* 226 F.3d 237, 245 (3d Cir. 2000)).

18.     The record before this Court unquestionably demonstrates that, through the Settlement Proceeds, each of the Senior Lenders, Bridge Lenders and Settling Step Two Payees are settling Chapter 5 claims and causes of action.  For example, the record is replete with characterizations of the LBO lender settlement as a global settlement of *all* causes of action against the LBO lenders — including, most notably, avoidance actions.  *See, e.g.*, Debtors' Responsive Statement in connection with solicitation of the competing plans [D.I. 7141], pg. 4 ("[t]he cornerstone of the [DCL] Plan is the ***settlement, . . ., of the Estate's LBO-Related Causes of Action against the holders of Senior Loan Claims and Settling Step Two Payees in exchange for $521 million*** . . .") (emphasis added).

19.     Any attempt by any party to argue that the Settlement Proceeds are not proceeds from Chapter 5 causes of action should be rejected by the Court.  Testimony at the confirmation hearing from Ms. Kulnis and Mr. Kurtz on the Second Amended DCL Plan establishes that the settlement was a settlement of *all* claims; in effect, a "package deal."  3/9/2011 Hr'g Tr., 527:8-

20; 3/8/2011 Hr'g Tr., 220:12-221:13 (excerpted in Exhibit H and Exhibit I, respectively).

When questioned about the adequacy of the settlement of Step Two disgorgement claims by the

Settling Step Two Payees, Ms. Kulnis of JPMorgan testified:

> No. **We *looked at it as a package. I think the committee considered it a package.
> We considered it a package*.** We never would have agreed … to pay $120 million
> for disgorgement if it wasn't part of a broader settlement. ***We looked at it as part
> of an entire package settling all the claims.***

[Ex. H, at 527:8-20] (emphasis added).  Mr. Kurtz testified that:

> Under this settlement, ***step one and step two avoidance claims*** would be resolved
> as they exist against or purportedly exist against senior lenders, senior loan
> arrangers and step one selling shareholders, in exchange for the senior lenders
> forgoing $401 million of cash recoveries...in addition, the ***step two disgorgement
> claims*** -- … that arose or would arise in the event that step two were determined
> to be a fraudulent conveyance, this is to claw back payments that were made in
> account of step two debt -- were settled for $120 million.

[Ex. I, at 220:12-221:13] (emphasis added).

20.    Although the Reconsideration Opinion held that the PHONES are subordinated to

"Senior Indebtedness" as it relates to Litigation Trust proceeds, this Court has not yet ruled on

the application of PHONES subordination to the Settlement Proceeds, notwithstanding the

current assertion by Law Debenture.  *See, e.g.*, Law Debenture Preliminary Statement [D.I.

10784] (Reconsideration Order decided that all plan distributions are subject to subordination

under the PHONES Indenture.).   To avoid repetition, Wilmington Trust incorporates by

reference its Omnibus Objection to the Subordination Reconsideration Motions [D.I. 10371], as

well as its oral argument at the hearing on the subordination reconsideration motions on

December 14, 2011, as its argument that the Settlement Proceeds are not subject to the PHONES

subordination.

21.    As the Court is aware, Wilmington Trust has appealed the Reconsideration

Opinion.  In that regard, Wilmington Trust respectfully requests the Court note that the Supreme

Court has held, and numerous courts have echoed, "[t]he filing of a notice of appeal is an event of jurisdictional significance – it confers jurisdiction on the [appellate court] and divests the [trial court] of its control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982); *see also Venen v. Sweet*, 758 F.2d 117, 120 (3d Cir. 1985) ("[T]he timely filing of a notice of appeal is an event of jurisdictional significance, immediately conferring jurisdiction on a[n appellate court] and divesting a [trial court] of its control over those aspects of the case involved in the appeal."). This rule – commonly known as the "Divestiture Rule" – serves an important role in promoting judicial economy by "avoid[ing] the confusion of placing the same matter before two courts at the same time and ***preserv[ing] the integrity of the appeal process***." *Whispering Pines Estates v. Flash Island, Inc. (In re Whispering Pines Estates)*, 369 B.R. 752, 757 (B.A.P. 1st Cir. 2007) (emphasis added); *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, No. 02-20, 2002 WL 1401693, at *1 (D. Del. June 27, 2002) (GMS) (citing *Venen*, 758 F.2d at 120) ("It is well established that the filing of a notice of appeal divests the district court of jurisdiction to rule on the merits of the issue underlying the appeal."); *see Venen*, 758 F.2d at 120-21 ("'Divest' means what it says – the power to act, in all but a limited number of circumstances, has been taken away and placed elsewhere.").

22.    Once an appeal is taken, a trial court faced with a subsequent request to act must first determine whether the requested post-appeal action falls within "one of the *limited* circumstances in which the court retain[s] power to act." *Id.*, 758 F.2d at 122 (emphasis added). In cases where there is any question as to whether the trial court has been divested of jurisdiction, doubt should be resolved in favor of awaiting disposition of the appeal by the appellate court. *See Sea Star Line, LLC. v. Emerald Equip. Leasing, Inc.*, No. 05-245, 2009 WL

-11-

3805569, at *3 (D. Del. Nov. 12, 2009) (considering the exception to the Divestiture Rule associated with premature appeals, and stating "[i]n cases in which the answer is less clear, however, doubts as to the legitimacy of the appeal should be resolved in favor of awaiting disposition of the appeal by the court of appeals") (internal quotations omitted).

23.    Under the Divestiture Rule, a plan cannot be confirmed that would impair the District Court's jurisdiction until it decides the appeal before it.  *See, e.g., In re Demarco*, 258 B.R. 30, 34 (Bankr. M.D. Fla. 2000) (the Bankruptcy Court delayed confirmation of the debtor's plan pending resolution of an appeal, finding that "confirmation of the Debtor's plan would preclude any effective judicial relief for the [government] in the event it prevails on its appeal."); *In re Kendrick Equip. Corp.*, 60 B.R. 356, 358 (Bankr. W.D. Va. 1986) ("In order to assure the integrity of the appeal process, it is imperative that the lower court take no action which might in any way interfere with the jurisdiction of the appeal court.... ***This Court should not entertain any request which touches directly or indirectly on the issues presented in the appeal or which might otherwise interfere with the integrity of the appeal process***.") (emphasis added); *Petrol Stops Nw. v. Cont'l Oil Co.*, 647 F.2d 1005, 1010 (9th Cir. 1981) (filing of a notice of appeal "transfer[s] jurisdiction over ***any matters involved in the appeal*** from the [trial] court to [the appellate] court") (emphasis added); *In re Strawberry Square Assocs.*, 152 B.R. 699, 701 (Bankr. E.D.N.Y. 1993) (stating that "***the bankruptcy court [may not] exercise jurisdiction over those issues which, although not themselves on appeal, nevertheless so impact those on appeal as to effectively circumvent the appeal process***") (emphasis added); *In re Hardy*, 30 B.R. 109, 111 (Bankr. S.D. Ohio 1983).

24.    Accordingly, given the pending appeal, Wilmington Trust respectfully requests that Plan distributions on account of Settlement Proceeds should be reserved pending final

adjudication of Wilmington Trust's appeal of the Reconsideration Opinion.  6 *Collier Bankruptcy Practice Guide* ¶ 92.07[2] ("Because the Bankruptcy Code permits the bankruptcy court to adjudicate all sorts of disputed, contingent and unliquidated claims, the proponent of a plan must reserve and find a mechanism for distribution to such claimants.").

## II.    The Priority of Distributions from the Creditors' Trust is Moot as it Relates to the PHONES Notes Because the PHONES Noteholders Have Opted Their Claims Out of the Creditors' Trust.

### (PHONES Allocation Dispute Issue 2)

25.    Under the solicitation procedures concerning the competing plans, holders of at least $1,097,373,579 of PHONES opted their claims out of the Creditors' Trust.  *See* Amended Declaration (Fourth Supplemental) of Stephenie Kjontvedt on Behalf of Epiq Bankruptcy Solutions, LLC, Exhibit B-3 thereto [D.I. 10090].  Although the principal amount of PHONES opted out of the Creditors' Trust is slightly less than the "High" PHONES Notes Claim Amount (discussed below), Wilmington Trust is not aware of any holder of PHONES who elected to contribute their claims to the Creditors' Trust.  Under the PHONES Indenture, Wilmington Trust has commenced litigation, on behalf of all PHONES Noteholders, to pursue the claims for PHONES Noteholders that the Creditors' Trust would pursue absent such an opt-out.  For this reason, the application of PHONES subordination to distributions by the Creditors' Trust is moot and inapplicable to the PHONES.  Accordingly, there is no need to adjust the priority of distributions from the Creditors' Trust for PHONES subordination.

## III.    Aside from Wilmington Trust's Class 1F Fee Claim, None of the Other Parent Claims Asserted are Senior Indebtedness Under the PHONES Indenture.

### (PHONES Allocation Dispute Issue 3)

26.    None of Class 1F Other Parent Claims are Senior Indebtedness under the PHONES Indenture, except for Wilmington Trust's Class 1F fee claim.  Accordingly, the

distribution scheme established under the Plan and Litigation Trust must be revised.  As noted above, the PHONES are directly affected by such distribution scheme, because misapplication of the PHONES subordination will delay payment to holders of Senior Indebtedness, who must be paid in full to the extent provided by the PHONES Indenture (excluding post-petition interest) before the PHONES can receive a recovery from the Litigation Trust.

27.    In order for a creditor to receive the benefit of PHONES subordination, that creditor must first qualify as a third-party beneficiary under the PHONES Indenture, intended to receive the benefit of the subordination.  *In re Enron Creditors Recovery Corp.*, 370 B.R. 64, 72 (Bankr. S.D.N.Y. 2007) ("Entities that fall within the definition of Senior Indebtedness are third-party beneficiaries of the various indentures and loan agreements."), *rev'd on other grounds*, 380 B.R. 307 (S.D.N.Y. 2008).  A party claiming third-party beneficiary status has the burden of establishing that the contract was intended for its benefit.  *In re Enron Creditors Recovery Corp.*, 370 B.R. at 72 ("the party seeking to benefit from the subordination provisions bears the burden of proof."); *see also Martis v. Grinnell Mut. Reinsurance Co.*, 905 N.E.2d 920, 924 (Ill. App. Ct. 2009) (holding that "[t]he plaintiff bears the burden of showing that the parties to the contract intended to confer a direct benefit on him"); *155 Harbor Drive Condo. Ass'n v. Harbor Point Inc.*, 568 N.E.2d 365, 375 (Ill. App. Ct. 1991) (same).

28.    Further, a party alleging entitlement to superior treatment based on the subordination provisions of an indenture only is entitled to such superior treatment where the plain language of the indenture expressly provides for it.  *See In re Payless Cashways*, 215 B.R. 409, 417 (Bankr. W.D. Mo. 1997).  Bankruptcy Code Section 510(a) provides that "a subordination agreement is enforceable in a case under [Title 11] to the same extent that such agreement is enforceable under applicable nonbankruptcy law."  11 U.S.C. § 510(a).  Under

-14-

Illinois law, applicable under Section 1.12 of the PHONES Indenture, contracts must be interpreted as a whole, with meaning given to all provisions, in order to effect the intent of the parties. *Salce v. Saracco*, 949 N.E.2d 284, 288 (Ill. App. Ct. 2011) ("the primary goal of contract interpretation is to give effect to the intent of the parties"). Words selected should be given their plain and ordinary meaning. *Bank of Am. v. N. LaSalle St. LP (In re 203 N. LaSalle St. P'ship.)*, 246 B.R. 325, 329 (Bankr. N.D. Ill. 2000).

29.    Here, none of the holders of Class 1F Other Parent Claims receiving the benefit of subordination under the Plan have met (or can meet) their burden to demonstrate that their claims qualify as "Indebtedness" and thus "Senior Indebtedness" under the PHONES Indenture.[2] Accordingly, with the sole exception of Wilmington Trust's Class 1F fee claim, none of the "Other Parent Claims" are senior to the PHONES.

      **a.**     **The Swap Claim is Not "Indebtedness," and thus Cannot Constitute "Senior Indebtedness" to Which the PHONES are Subordinated Because the Swap Claim Is Not An Obligation Represented by Notes, Bonds, Debentures or Similar Evidence <u>of Indebtedness nor is the Swap Claim Indebtedness for Borrowed Money.</u>**

30.    Oaktree's Swap Claim is not "Indebtedness" and therefore cannot qualify as "Senior Indebtedness" under the PHONES Indenture. On its face, the Swap Claim does not fit into categories (i), (iii) or (iv) of Section 14.01(1). Moreover, Oaktree's counsel has admitted that the Swap Claim is *not* "for money loaned." *See* 4/14/2011 Hr'g Tr., 3755:2-19 (excerpted in

---

[2]    The DCL Plan proponents also have an affirmative burden to prove at confirmation that the Plan complies with the provisions of 11 U.S.C. § 1129(a)(1), and in turn the requirements of 11 U.S.C. § 510(a). *See In re Tribune Co.*, ___ B.R. ___, 2011 WL 5142420, *56 (Bankr. D. Del. Oct. 31, 2011) ("... I cannot conclude that the [DCL] Plan's treatment is fair or appropriately enforces the terms of the subordination agreement in accordance with Bankruptcy Code § 510(a)."); *see also Matter of Genesis Health Ventures, Inc.*, 266 B.R. 591, 599 (Bankr. D. Del. 2001); *Matter of Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 221 (Bankr. D.N.J. 2000) (citations omitted); *Best Products Co., Inc.*, 168 B.R. 35 (Bankr. S.D.N.Y. 1994) ("Pursuant to sections 510(a) and 1129(a)(1) of the Bankruptcy Code, [the debtor] was mandated to enforce the subordination agreements...").

Exhibit J) ("[t]he Swap Claim is not for money loaned.  It represents Tribune's liability under an interest rate swap agreement that was terminated as a consequence of Tribune's bankruptcy filing ... So the liability on the swap claim doesn't arise from a loan."); *see also Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 322 F.3d 1039, 1048 (9th Cir. 2003) ("[a] fundamental characteristic of an interest rate swap is that the counterparties never actually loan or advance the notional amount.").  All of the DCL Plan Proponents, including Oaktree (as holder of the Swap Claim), took that same position in their post-trial brief in support of confirmation, asserting "[t]he amount of the Swap Claim depended upon interest rate fluctuations and ***not on any money loaned or financing provided to the Debtors***."  DCL Plan Proponents *Post-Trial Brief In Support of Confirmation of Second Amended Joint Plan of Reorganization*, at p. 95 [D.I. 8897] (emphasis added).

31.     Accordingly, pursuant to the plain language of the PHONES Indenture, the admissions by Oaktree, and the case law, the Swap Claim is not "Indebtedness."  Since the Swap Claim is not "Indebtedness," under the plain language of the PHONES Indenture, it cannot constitute "Senior Indebtedness" to which the PHONES are subordinated.

      **b.**     **The Retiree Claims are not "Indebtedness," and thus Cannot Constitute "Senior Indebtedness" to Which the PHONES Are Subordinated Because the Retiree Claims are not Claims for the <u>Deferred Purchase Price Of Services Other than on Normal Trade Terms.</u>**

32.     Each of the Retiree Claims are unique and arise under varied factual circumstances.  Nevertheless, neither the TM Retirees, nor the other retirees not part of the TM

-16-

Retirees' group (collectively with the TM Retirees, the "Retirees"), can meet their burden, discussed above, to prove that their claims are entitled to the benefit of PHONES subordination.[3]

33.    First, from their position during discovery and prior proceedings, it appears that the TM Retirees will argue that all claims included in the Retiree Settlement are "deferred compensation" and therefore are "Indebtedness." This position is not supported by the actual terms of the PHONES Indenture, and is inconsistent with the terms used by the Debtors and the TM Retirees in the Retiree Settlement Agreement. *See* DCL Plan, Exhibit 5.14.3 [D.I. 4693]. In that Settlement Agreement, "Deferred Compensation Claims" and "Annuity Claims" and "Other Claims" are separately classified and distinguished. The Retirees have not demonstrated (nor can they demonstrate), that the "Deferred Compensation Claims," "Annuity Claims" and the "Other Claims" fit within the definition of "Indebtedness." Section 14.01 of the PHONES Indenture requires that such indebtedness be "(ii) **all indebtedness** for borrowed money or **for the deferred purchase price of** property or **services other than**, in the case of any such deferred purchase price, **on normal trade terms.**" *See* PHONES Indenture, § 14.01(1)(ii) (emphasis added).

34.    First, "Annuity Claims" and "Other Claims" do not qualify on their face. Even deferred compensation claims are not automatically the same thing as "deferred purchase … of services…" The Retirees cannot meet their burden simply by using these terms interchangeably as the TM Retirees intend to do.

35.    Second, at the deposition of Ms. Susan Bell, the TM Retiree's witness in connection with the Allocation Disputes, Mr. Teitelbaum, counsel for the TM Retirees, stipulated

---

[3]    The basis for the claims of retirees, other than the TM Retirees, is set forth in a chart that is the subject of a stipulation among the Debtors, Wilmington Trust and other parties that will be submitted to the Court at or before the Allocation Disputes hearing. [Exhibit L, TRB 200103-121].

that with respect to the deferred compensation plans upon which they rely (the supplemental executive retirement plan, excess plan, individual agreements, and supplemental 401(k)) that "Times Mirror formulated and entered into these plans in the ordinary course of its business and maintained those plans in the ordinary course of its business."  Bell Dep. 41:19-25, 2/15/2012 (excerpted in Exhibit L).

36.    While such stipulation as made on behalf of the TM Retirees, it applies equally to all Retiree Claims, and is fatal to their arguments.  There is no substantive difference between the "ordinary course of business" as used in the offered stipulation and the phrase "normal trade terms" as used in Section 14.01(1)(iii) of the PHONES Indenture.  Indeed, in Section 14.01(2)(c), the PHONES Indenture uses the phrase "ordinary course of business" when describing "trade accounts payable" not entitled to the benefit of PHONES subordination.  All of the Retirees' Claims for "deferred compensation" arise from normal trade terms.  Therefore, the retirees have not met their burden to demonstrate that Retiree Claims fit within the narrow definition of "Indebtedness" in the PHONES Indenture.  Thus, none of the Retiree Claims are eligible to receive the benefit of PHONES subordination.

      c.      **Trade Claims are expressly Excluded from the Definition of "Senior Indebtedness" Under the PHONES Indenture.**

37.    Section 14.01(2)(c) of the PHONES Indenture expressly excludes from the definition of "Senior Indebtedness" "any Indebtedness of [Tribune] constituting trade accounts payable arising in the ordinary course of business."  All of the trade claims arose in the ordinary course of the Debtors' business.  Accordingly, by the express terms of this provision, holders of trade claims in Class 1F cannot be "Senior Indebtedness" and thus cannot benefit from PHONES subordination.

**d.    Other Claims in the Other Parent Claim Catch-all Class
Do Not Qualify as Senior Indebtedness Under the PHONES Indenture.**

38.    Wilmington Trust Class 1F fee claim (as discussed below) is the only "Other Parent Claim" that qualifies as "Senior Indebtedness."    No remaining creditor in Class 1F has taken the position that its claims qualify as "Senior Indebtedness," nor have the Debtors taken such a position in these Allocation Disputes.  This should come as no surprise in light of the nature of these claims.

39.    According to the Debtors' summary of the remaining Other Parent Claims, a significant portion of the claims classified as "Other Parent Claims" are characterized on the Debtors' books and records as "Trade Payables."  [Exhibit K, TRB 200103-121].  As noted above, "trade accounts payable arising in the ordinary course of business" are not "Senior Indebtedness" under the plain language of Section 14.01(2) of the PHONES Indenture. Similarly, "Indebtedness" only includes "indebtedness … for the deferred purchase price of property or services other than, in the case of any such deferred purchase price, on normal trade terms."  PHONES Indenture, § 14.01(1)(ii).  Thus, none of the Trade Payables included in Other Parent Claims are entitled to PHONES subordination.

40.    Similarly, the remaining Other Parent Claims do not, on their face, qualify as "Indebtedness," much less "Senior Indebtedness" under the PHONES Indenture.  The Debtors describe these claims as "employee" claims, "former shareholder" claims, "indemnification" claims, "insurance" claims, "litigation" claims, "real estate" claims, "tax" claims, or "employee claims."  None of those types of claims qualify as "Indebtedness," under the PHONES Indenture.

  **e.**  **Wilmington Trust's Class 1F Fee Claim is the only Other Parent**
      **Claim that is "Senior Indebtedness" Under the PHONES Indenture.**

  41.  Wilmington Trust's claim for Indenture Trustee Fees is classified under the DCL

Plan in Class 1F and was permitted to vote on the Second Amended DCL Plan in the amount of

$14.16 million. *See* Order Temporarily Allowing Claims of Wilmington Trust Company

pursuant to Bankruptcy Rule 3018(a) [D.I. 7626]. Section 14.13 of the PHONES Indenture

provides that Wilmington Trust "in its individual capacity shall be entitled to all the rights set

forth in this [Article on Subordination] with respect to Senior Indebtedness, and nothing in this

Indenture shall deprive the Trustee of any of its rights as such holder." PHONES Indenture,

§ 14.13. It further provides that, "[n]othing in this [Article on Subordination] shall apply to

claims of, or payments made, to the Trustee under or pursuant to" the fee and expense

reimbursement provision in the PHONES Indenture. Accordingly, Wilmington Trust's Other

Parent Claim qualifies as "Senior Indebtedness" under the PHONES Indenture and is entitled to

benefit from PHONES subordination.

**IV.**  **The PHONES Notes Claims Should be Treated as an**
    **Allowed Claim In the Amount of $1,183,833,767,**
    **Plus Unpaid Interest that Accrued Prior to the Petition Date.**

   **(PHONES Allocation Dispute Issue 4)**

  42.  Even though Wilmington Trust filed a motion seeking, *inter alia*, estimation of

the PHONES claims [D.I. 7352], and this issue was addressed at confirmation, the Court was not

able to make a determination of this issue based on the argument made and the evidence in the

record before it. *See In re Tribune Co.*, ___ B.R. ___, 2011 WL 5142420, at *56 (Del. Bankr.

2011). For this reason, the underlying facts are addressed below and are stated in detail in the

PHONES Claim Stip., in DBTCA's Responses [Ex. D; Ex. E, respectively], and the documents

referenced therein.

43.     Based on the requirements of the Revised Exchange Notices, the facts articulated in the DBTCA Responses, and the facts contained in the PHONES Claims Stip., it cannot be disputed that the exchange mechanism and requirements for exchanges to occur were not followed.   Contrary to the Revised Exchange Notice procedures, and without any specific instruction from the Debtors or DBTCA, DTC automatically debited the outstanding amount of PHONES for each PHONES tendered for exchange upon acceptance into DWAC.   Once this automatic debit occurred, DBTCA could not fulfill its contractual obligation to take possession of the PHONES tendered for exchange, and to cancel the tendered PHONES only upon the Exchange Payment Date.    Accordingly, Wilmington Trust submits that there was an unauthorized and mistaken reduction in the balance of PHONES that were outstanding on the books and records of DTC while the each exchange was pending – in direct contravention of the terms of the Revised Exchange Notices.

### a.     The Unauthorized and Mistaken Reduction in the Balance of PHONES that were Outstanding was a Mistake, Contrary to the Parties' Intent.

44.     By virtue of Tribune's bankruptcy filing, the applicable questions are what the PHONES Notes Claim Amount should be and how is that claim amount calculated.   Since the dispute revolved around the impact of mistakenly reduction in the balance of PHONES that was outstanding, Wilmington Trust submits that the Court should look to the Revised Exchange Notices, Global Note, PHONES Indenture and Prospectus Supplement for the PHONES to consider the intent of the parties when determining the allowed claim amount of the PHONES.

45.     The Revised Exchange Notice and Global Note evidence a bargained-for-right for a PHONES Noteholder to tender a PHONES and to receive cash in return.   These documents do not reflect an intent to create a risk that even if Tribune did not pay, their PHONES would be canceled and the Revised Exchange Notices' procedures would not be followed.   For example,

-21-

the Revised Exchange Notice does not contemplate such a risk.  In fact, it attempts to protect against this scenario by providing that a tendered PHONES will not be cancelled until consummation of the Exchange.  [Ex. C].   Similarly, the Prospectus Supplement for the PHONES does not disclose any such risk.   In fact, the "Risk Factors" discussion in the Prospectus Supplement is devoid of any disclosure of the risk that their PHONES would be canceled even if Tribune did not pay.  [Exhibit M, at WTC0000541-85].

46.    Since none of the Global Note, the Revised Exchange Notice nor the Prospectus Supplement specifies how non-payment on an Exchange should be treated, the Court should look elsewhere in the PHONES Indenture for the context to determine the intent of the parties.  As noted above, Wilmington Trust submits that PHONES Indenture Section 3.06 (establishing procedures for mutilated, destroyed, lost or stolen PHONES) is informative.   Section 3.06 provides, in pertinent part, that if PHONES are mutilated, destroyed, lost or stolen, then the PHONES will be replaced, with a new security "*of the same series and of like tenor and principal amount and bearing a number not contemporaneously outstanding*."   PHONES Indenture, §3.06 (emphasis added).

47.    The provisions of Section 3.06 indicate an intent of the parties to restore to the claim holder a claim that enjoys the same tenor and principal amount as the destroyed, lost or stolen PHONES.  Here, Wilmington Trust submits that the appropriate remedy for the mistaken reduction in the outstanding number of PHONES is to allow the PHONES Notes Claim Amount in the "High" amount.  Such an allowance would permit the tendering PHONES Noteholders to

enjoy the position that they would have enjoyed but for the mistaken and unauthorized reduction in the principal amount of outstanding PHONES.[4]

48.     Article 8 of the Illinois Uniform Commercial Code ("Illinois UCC") provides a similar procedure to the mechanic contained in PHONES Indenture Section 3.06.  Article 8-405 of the Illinois UCC provides for a means for "Replacement of a Lost, Destroyed, or Wrongfully Taken Security Certificate."  810 Ill. Comp. Stat. § 5/8-405.  In short, this provision provides for the replacement of lost, destroyed or stolen security certificates.   Viewed together with the PHONES Indenture provision, the Illinois UCC demonstrates that, where a security is inadvertently destroyed, appropriate steps will be taken to restore the innocent party to the same place they would be if the mistake did not happen.  Allowing the PHONES Notes Claim Amount in the "High" amount accomplishes that goal.[5]

---

[4]    There is no prohibition to treating the tendered PHONES as "Mutilated, Destroyed, Lost and Stolen Securities" under the PHONES Indenture.  At least one court has found that a debtor can issue stock post-petition. *See In re Mid-Am. Petroleum, Inc.*, 71 B.R. 140, 141 (Bankr. N.D. Tex. 1987).

[5]    Illinois law has consistently held that "[t]he jurisdiction of a court of chancery to so correct mistakes in contracts and agreements as to make them express the actual intent of the parties, is one of the ancient and well established heads of the jurisdiction of that court."  *Braithwaite v. Henneberry*, 124 Ill. App. 407, 413 (Ill. App. Ct. 1906).   Illinois courts have adopted this principle and related principles in a variety of contexts involving an agent committing an unauthorized act or where a mistake has been made by one of the parties.  *See, e.g., Fuller v. Samuels*, 137 Ill. App 536, 542-43 (Ill. App. Ct., 1907), *aff'd sub nom. Samuels v. Northrup Nat. Bank of Iola, Kansas*, 84 N.E. 721 (1908) (where agent was not authorized to cancel a contract, and such cancellation was beyond the scope of his authority, the cancellation was "unauthorized and void."); *Nat'l Supermarkets, Inc. v. The First Nat'l Bank of Springfield*, 390 N.E.2d 602 (Ill. App. Ct. 1979), (innocent party should not suffer burden of unilateral mistake or misapprehension from other party's failure to strike language from an agreement as it had agreed to do."); *Wil-Fred's, Inc. v. Metro. Sanitary Dist. of Chicago*, 372 N.E.2d 946, 953 (Ill. App. Ct. 1978), (facts surrounding mistake determine whether relief is granted to correct mistake; where innocent party acted in good faith other side not allowed to take advantage of mistake.).

-23-

**b.      Parties Advocating the "Low" PHONES Notes Claim Amount
Should not Benefit from DTC's Mistaken And Unauthorized
Reduction in the Principal Amount of Outstanding PHONES.**

49.      The Debtors and Aurelius, as parties that advocate for the "low" PHONES Notes

Claim Amount, should not benefit from DTC's mistaken and unauthorized reduction in the

number of outstanding PHONES.  The Debtors' position that the tender was irrevocable, and that

the PHONES Noteholders should not receive a claim in the "High" PHONES Notes Claim

Amount as a result of events over which they had no control, is not justified either by the law or

equity.  Tribune's other creditors, including Aurelius who is taking a position on this allocation

dispute, also would be unjustly enriched if the amount of the PHONES Notes Claim was allowed

at the "Low" amount.

50.      The fact that DTC reduced the number of outstanding PHONES while the

Revised Exchange Notices required that those tendered PHONES be canceled only upon

payment to the tendering PHONES Noteholders certainly was not the fault of the tendering

PHONES Noteholders.   These PHONES Noteholders complied with the Revised Exchange

Notices, and had the right to expect their PHONES would not be canceled until the exchange

was consummated as required by the Revised Exchange Notice.

51.      Should the Court determine that it is appropriate to order the "High" PHONES

Notes Claim Amount, then the claim amount would include the full amount of the PHONES

mistakenly reduced from DTC's records or 2,659,467 PHONES be allowed in the outstanding

principal amount per PHONES.  [Ex. D, at ¶ 39-41].  As a result, the total outstanding PHONES

would be 7,613,351 PHONES, calculated as follows: (i) 4,953,884 PHONES currently listed on

DTC's books and records plus (ii) 2,659,467 PHONES tendered for exchange but unpaid, and

mistakenly reduced from DTC's records.  *Id.*  The principal amount of the PHONES Notes

Claim is then calculated by multiplying 7,613,351 PHONES times $155.4944 per PHONES to equal $**1,183,833,767**, plus unpaid interest that accrued prior to the petition date.  *Id.*

      c.     **The Argument that an Election to Tender PHONES for Exchange is Irrevocable is not Supported by the Terms of the PHONES Indenture, <u>the Global Note or the Revised Exchange Notice and Should be Rejected</u>.**

      52.     During these bankruptcy cases, Tribune has insisted that it "considers each election to exercise the Exchange Right pursuant to an Exchange Notice ... to be irrevocable ..." [Ex. D, at ¶ 31; Ex. E, at Response No. 3].  Tribune's position is without foundation.  None of the Revised Exchange Notices, the Global Note nor the PHONES Indenture state that an unconsummated exchange is irrevocable.  [Ex. A; Ex. C, at WTC0000089–91; Ex. B, at WTC000094–114].  Under Illinois law, courts do not read omitted term into a contract.  "A court may not make a new contract or supply omitted terms while professing to construe the contract." *Rothe v. Revco D.S., Inc.*, 148 F.3d 672, 675 (7th Cir. 1998) (citation omitted) (applying Indiana law); *see also FSC Paper Corp. v. Sun Ins. Co. of N.Y.*, 744 F.2d 1279, 1283 n. 5 (7th Cir. 1984) (citation omitted) (applying Illinois law, "courts will not, simply because a more equitable result might be reached, construe into the contract provisions that are not there.").  The argument that the unconsummated exchanges were irrevocable also ignores the fundamental fact that pending receipt of cash, the PHONES tendered for exchange were contractually bound to be held and cancelled only upon receipt of cash in consummation of the exchange.  [Ex. D, at ¶ 12].  Thus, this is not a situation where a tendering PHONES Noteholder simply changed his/her mind and wants the PHONES back.  Here, when as a result of Tribune's bankruptcy filing, the tendered PHONES would still be outstanding and held by DBTCA if they had not been mistakenly cancelled.  *See* Letter from Deutsche Bank Trust Company Americas to David P. Eldersveld

(December 30, 2008) (Exhibit N, at WTC0000078–79); Letter from David P. Eldersveld to

Deutsche Bank Trust Company Americas (January 14, 2009) (Exhibit O, at WTC0000086).

> **d.    Even if the Court were to Order the "Low" PHONES Notes Claim Amount, the Correct "Low" PHONES Notes Claim Amount is $818,808,727 (Plus Unpaid <u>Interest that Accrued Prior to the Petition Date).</u>**

53.     Even if the Court were to decline to allow the PHONES Notes Claim Amount at

the "High" amount, the "Low" PHONES Notes Claim amount asserted by the Debtors still is

wrong.   Three Exchanges Requests (two by Goldman Sachs and one by Citibank) were not

accepted by DTC and DTC never reduced the amount of the PHONES on its records to account

for these three rejected tenders.   [Ex. D, at ¶¶ 27-29; Ex. E, at Responses Nos. 5-6].   This is

evidenced by the fact that the current outstanding balance of PHONES on DTC's system is

4,953,884.   [Ex. D, at ¶ 29] (the current outstanding balance for Cusip # 896047305 (PHONES)

of 4,953,884 as of February 9, 2012).   As a result of their non-acceptance by DTC, it was

impossible for these three exchanges to have occurred under the procedures and terms of the

Revised Exchange Notices.   Accordingly, at a minimum, the "Low" PHONES Notes Claim

Amount should be calculated based on the same number of outstanding PHONES as currently

reflected on DTC's books, 4,953,884 PHONES.   Accordingly, in that event the "Low" PHONES

Notes Claim Amount should be $818,808,727 (plus unpaid interest that accrued prior to the

petition date (i.e., between November 15, 2008 and December 8, 2008)).

**V.    The PHONES are Not Subordinated <u>to Post-Petition Interest on Senior Indebtedness.</u>**

> **(PHONES Allocation Dispute Issue 5)**

54.     The plain language of the PHONES Indenture demonstrates that the PHONES are

not subordinated to the right of holders of Senior Indebtedness to receive post-petition interest

because post-petition interest does not qualify as "Senior Indebtedness."  Section 14.01(2) of the

PHONES Indenture expressly provides that Senior Indebtedness includes "interest accruing after

the filing of a petition initiating any proceeding pursuant to any Federal bankruptcy law or any

other applicable Federal or State law, ***but only to the extent allowed or permitted to the holder***

***of such Indebtedness of the Company against the bankruptcy or any other insolvency estate of***

***the Company in such a proceeding***."  PHONES Indenture, § 14.01(2) (emphasis added).

55.     Accordingly, post-petition interest only constitutes "Senior Indebtedness" to the

extent it would be permitted in this chapter 11 proceeding.  However, Section 502(b)(2) of the

Bankruptcy Code expressly disallows claims for unmatured interest.  Indeed, the "*presumption* is

that unsecured creditors receive no interest at all."  *In re W.R. Grace & Co.*, No. 01-1139 (JKF),

2009 WL 1469831, at *1 (Bankr. D. Del. May 19, 2009) *aff'd*, 2012 WL 310815 (D. Del. Jan.

30, 2012).  There are limited exceptions to this rule – none of which are applicable here.  As

such, because post-petition interest is not payable in this chapter 11 proceeding, any beneficiaries

of the PHONES subordination are not entitled to receive post-petition interest prior to the

Holders of PHONES receiving payment on their claims.

56.     In reading the plain language of the PHONES Indenture, the Court should

consider that the applicable provision in the PHONES Indenture is almost the direct opposite

from the language used on the Revised Model Simplified Indenture.  *See* Ad Hoc Committee for

Revision of the 1983 Model Simplified Indenture, 55 Bus. Law. 1115, 1221 (2000).  The

Revised Model Simplified Indenture provides

> Upon any Distribution in any Proceeding, (1) any Distribution to which the
> Holders are entitled shall be paid directly to the holders of Senior Debt to the
> extent necessary to make payment in full of all Senior Debt remaining unpaid
> after giving effect to all other Distributions to or for the benefit of the holders of
> Senior Debt…

*See id.*  The Revised Model Simplified Indenture defines "Debt" as "… any obligation of such Person to pay the principal of, premium of, if any, interest on (including interest accruing on or ***after the filing of any petition in bankruptcy or for reorganization relating to the Company, whether or not a claim for such post-petition interest is allowed in such proceeding***)…"  *Id.* at 1124 (emphasis added).  The comments to Section 11.02 of the Revised Model Simplified Indenture observed that "most indentures now include such post-petition interest expressly (if at all) in the definition of debt or Senior Debt." *Id.*, Comment No. 3 to Section 11.01.

57.    Similarly, this Court considered the language of the subordinated notes indenture at issue in *Dura's* x-clause litigation.  The subordinated notes indenture in *Dura* provided as follows:

> Upon any distribution to creditors of the Company in a liquidation or dissolution of the Company, in a bankruptcy, reorganization, insolvency, receivership or similar proceeding relating to the Company or its property, in an assignment for the benefit of creditors or in any marshalling of the Company's assets and liabilities:
>
> (i) holders of Senior Debt shall be entitled to receive payment in full of all Obligations due in respect of such Senior Debt (***including interest after the commencement of any such proceeding at the rate specified in the applicable Senior Debt***) before Holders of the Notes shall be entitled to receive any payment with respect to the Notes (except that Holders may receive (i) Permitted Junior Securities and (ii) payments and other distributions made from any defeasance trust created pursuant to Section 8.01 hereof); and

*See In re Dura Automotive Sys., Inc.*, 379 B.R. 257, 261 (Bankr. D. Del. 2007) (emphasis in original deleted, emphasis added).

58.    Thus, when contrasted to provision from the Revised Model Simplified Indenture and the *Dura* subordinated note indenture, Section 14.01(2) of the PHONES Indenture does not contain the magic language that universally indicates an intent to include post-petition interest in senior indebtedness.  The PHONES Indenture was not drafted with the intent to subordinate the

-28-

PHONES to post-petition interest on Senior Indebtedness, and it should not be allowed until the PHONES receive payment on their claims.

**VI.    The PHONES are Senior in
      Right of Payment to the EGI-TRB LLC Notes.**[6]

   **(PHONES Allocation Dispute Issue 6 / EGI-TRB Allocation Dispute Issue 5)**

   59.    In these two Allocation Disputes, the Court must decide whether the PHONES are senior in right of payment to the EGI-TRB Notes, or whether the EGI-TRB Notes are senior in right of payment to the PHONES Notes.  While the Court has interpreted Section 14.02 of the PHONES Indenture to determine the scope of the PHONES subordination solely as it relates to the Litigation Trust, the Court's Reconsideration Opinion did not address *who* is entitled to the benefit of the PHONES subordination.

   **a.    The Plain Language of the EGI Subordination Agreement
         Compels a Reading Finding that the PHONES Notes
         are Senior in Right of Payment to the EGI-TRB Notes.**

   60.    The language of the EGI Subordination Agreement reflects that the EGI-TRB Notes are junior in right of payment to the PHONES.  The EGI Subordination Agreement is governed by Delaware law.  EGI Subordination Agreement, § 13(a).  Under Delaware law, "[i]n construing the terms of a subordination clause… such agreements to be strictly construed where their terms are unambiguous."  *Guarantee Bank v. Magness Const. Co.*, 462 A.2d 405, 408-09 (Del. 1983).  In interpreting a contract, the Court gives plain and ordinary meaning to its unambiguous terms.  *See GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.*, Nos. 514, 516, 2012 WL 10916 at *3 (Del. Sup. Jan. 3, 2012) ("The Court will interpret clear and unambiguous terms according to their ordinary meaning. Contract terms themselves will be

---

[6]   Because PHONES Allocation Dispute Issue 6 is merely the inverse of EGI-TRB Allocation Dispute Issue 5, for the sake of brevity and clarity, Wilmington Trust addresses its argument that the PHONES are senior in right of payment to the EGI-TRB Notes in one section.

controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language."); *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159-1160 (Del. Sup. 2010) ("When the contract is clear and unambiguous, we will give effect to the plain-meaning of the contract's terms and provisions."); *Quereguan v. New Castle County*, No. 20298, 2006 WL 1215193 at *5 (Del. Ch. Apr. 24, 2006) (same).

61.    The purpose of the applicable contract must be considered and given effect in determining its intended application. *See, e.g., Deloitte LLP v. Flanagan*, No. 4125, 2009 WL 5200657 at *5 (Del. Ch. Dec. 29, 2009) ("[T]he court strives to determine the parties' shared intent, interpreting the contractual language using their common or ordinary meaning, unless the contract clearly shows that the parties' intent was otherwise.") (internal citations omitted); *see also Doe v. Cedars Acad., LLC*, No. 136, 2010 WL 5825343 at *5 (Del. Sup. Oct. 27, 2010) ("[T]he court must interpret the contract so as to conform to an evident consistent purpose.") (internal citations omitted); *El Paso Nat. Gas Co. v. Amoco Prod. Co.*, No. 12083, 1994 WL 148263 at *10 (Del. Ch. Mar. 29, 1994) (same).

62.    The intent that the EGI-TRB Notes are junior to the PHONES is clear from the plain language of the EGI Subordination Agreement.  Under the EGI Subordination Agreement, the EGI-TRB Notes are subordinated to "***all obligations, indebtedness and other liabilities of [Tribune] other than*** (i) any such obligations, indebtedness or liabilities ***that by their express terms rank pari passu or junior to the Company's obligations under [the EGI-TRB Notes]*** and (ii) trade payables and accrued expenses incurred in the ordinary course of business ..."  [Ex. F, at EGI-LAW 00243350] (emphasis added). Thus, for indebtedness to qualify under category (i)

-30-

of the EGI Subordination Agreement, the indebtedness must, *by its express terms*, rank *pari passu* or junior to the EGI-TRB Notes.

63.    Section 14.01 of the PHONES Indenture, however, does not expressly reference the EGI-TRB Notes.  Nor could it:  the PHONES Indenture was entered into in 1999, and the EGI-TRB Notes were issued in December 2007.  The PHONES Indenture do provide an exception to "Senior Indebtedness" for "any Indebtedness of the Company as to which, in the instrument creating the same or evidencing the same or pursuant to which the same is outstanding, it is expressly provided that such Indebtedness of the Company shall be subordinated to or pari passu with the [PHONES]."  PHONES Indenture, §14.01(2)(A).  Here, neither the EGI-TRB Notes nor the EGI Subordination Agreement contains such language.

64.    Accordingly, under the specific and narrow carve-out of "junior" indebtedness in the EGI Subordination Agreement – a provision that was drafted and agreed upon when the PHONES had been in existence for eight years, and when Tribune, EGI-TRB and the banks structuring the LBO were all well aware of the terms of the PHONES Indenture – the PHONES are *not* subordinated to the EGI-TRB Notes because there is *no express language* in the PHONES Indenture that, by its express terms, states that the PHONES are pari passu or junior to the EGI-TRB Notes.

65.    In EGI-TRB's Objection to the Competing Plans, EGI-TRB argued that the EGI Subordination Agreement "does not require another debt instrument to specifically state that it is subordinated to EGI-TRB's claims."  EGI-TRB's Objection to Competing Plans, pg. 15 [D.I. 7988].  This argument is contradicted by the plain language of the EGI Subordination Agreement.  The EGI Subordination Agreement carves out from "Senior Obligations" any "obligations, indebtedness or liabilities that ***by their express terms rank pari passu or junior to***

***the Company's obligations under the Subordinated Note***…"  [Ex. F, §1, EGI-LAW 00243350]

(emphasis added).

66.     Although the EGI Subordination Agreement defines *who* is entitled to the benefit

of EGI-TRB's subordination, EGI-TRB also has argued that Section 14.01 of the PHONES

Indenture is the governing document.  Section 14.01(2)(A) provides:

> any Indebtedness of the Company as to which, in the instrument creating the same
> or evidencing the same or pursuant to which the same is outstanding, it is
> expressly provided that such Indebtedness of the Company shall be subordinated
> to or pari passu with the [PHONES]

PHONES Indenture, § 14.01(2)(A).

67.     The EGI Subordination Agreement does not have that express language as it

relates to the PHONES.  Had Tribune, the banks structuring the LBO, and EGI-TRB intended for

the EGI-TRB Notes to rank senior to the PHONES, then – given that a prior-in-time PHONES

Indenture could have no language rendering the PHONES thereunder junior to the EGI-TRB

Notes – the parties would have specifically listed the PHONES along with the two categories of

exceptions to the definition of "Senior Obligations" in the EGI Subordination Agreement

discussed below or otherwise stated that the PHONES are junior to the EGI-TRB Notes.  The

two narrow exceptions in the EGI Subordination Agreement – exceptions drafted by parties with

full knowledge of the pre-existence of the PHONES – contains no language that would carve the

PHONES out of the broad subordination of the EGI-TRB Notes to nearly all obligations of the

Debtors other than those stated.  Accordingly, under the PHONES Indenture too, the PHONES

are senior in right of payment to the EGI-TRB Notes.

**b.    Significant Contemporaneous Evidence Demonstrates that the
EGI-TRB Notes were Intended to be Junior to the PHONES.**

68.    There is significant contemporaneous evidence demonstrating that the EGI-TRB

Notes were intended to be the most junior debt in the capital structure, and junior to the

PHONES.    Pursuant to the stipulation Wilmington Trust and EGI-TRB Regarding Allocation

Disputes Hearing, which was approved by this Court on February 21, 2012 [D.I. 10961], all of

the documents referred therein and below are deemed business records, as that phrase is used in

the Federal Rules of Evidence Rule 803(d) (Exhibit P).    Wilmington Trust will offer those

documents into evidence at the Allocation Disputes Hearing.

69.    The evidence shows that, in March, 2007, Tribune made inquiries concerning the

ratings impact of Tribune's contemplated leveraged buyout transaction.    *See* Examiner Report,

Vol. I, pg. 199 (citing Examiner Report Ex. 214 Moody's Letter (March 29 2008), at 1) (Exhibit

Q).  Moody's Investors Service would eventually issue a March 29, 2007 letter summarizing its

assumptions and reporting its conclusions concerning the ratings impact of the LBO.  [Ex. Q, at

TRB0099118-23].    Prior to reaching the conclusions found in that letter, Moody's received

various presentations from Tribune, and had various meetings and subsequent presentations,

emails and telephone conversations with Tribune concerning Moody's assessment of the

proposed LBO.  [Ex. Q, at TRB0099118-23].

70.    Before issuing the March 29, 2007 letter, John Puchalla of Moody's contacted

Chandler Bigelow, Tribune's Treasurer, and provided Bigelow with the inputs of Moody's

"statistical "notching model, that Bigelow described as Moody's "waterfall" analysis (Exhibit R,

at TRB0086033; Exhibit S, at CITI-TRIB-CC 00050753).  Moody's *explicitly* ranked the

PHONES as a "6" priority and effective priority rank, and ***ahead*** of the $225 million "Zell

Investment Subordinate Note," that ranks as a "7" priority and effective priority rank.  [Ex. Q, at

-33-

TRB0099118-23]. In response to the receipt of this model, Bigelow solicited the comments of,

JPMorgan, Citigroup, and Merrill Lynch, the entitles structuring the LBO, and asked "Anyone

have a view on the PHONES versus Zell note – is the PHONES senior?" (Exhibit T, at TRB-

G0026949). The responses were unanimous:

<blockquote>

(i) "*The Zell Note should be junior to PHONES for sure*" stated Patricia Deans, a Managing Director at JPMorgan in its Syndicated and Leveraged Financing practice (Exhibit U, at JPM_00291398; Exhibit V, at CITI-TRIB-CC 00050005) (emphasis added);

(ii) "*Zell junior*" stated Peter Cohen, a Managing Director at JPMorgan in its Technology, Media and Telecom Group (Exhibit W, at TRIB-G0026952) (emphasis added);

(iii) "*Zell sub note will be most junior in the capital structure*" stated Joachim Sonne, a Vice President in JPMorgan's Telecoms, Media and Technology Investment Banking group [Ex. W, at TRIB-G0026952] (emphasis added); and

(iv) "*The Zell Note is Jr to the PHONES*" stated Julie Persily, then Managing Director and Head of North American Leveraged Finance for Citigroup (Exhibit X, at CITI-TRIB-CC 00049261; Exhibit Y, at TRIB-G0026947) (emphasis added).

</blockquote>

71. In addition, Sonne informed his supervisor, Peter Cohen, that, "Talked to EGI,

Chris Hochschild, and he confirmed that they see their security as the most junior in the capital

structure and junior to the Phones" (Exhibit Z, at JPM_00226635). Sonne's email is a business

record pursuant to the EGI Subordination Stip.[7] [Ex. P, at ¶ 2]. Following the exchange of these

---

[7] Any claimed "double hearsay" objection to that email should be overruled because Hochschild's statement is an admission by EGI-TRB, admissible under Federal Rules of Evidence 801(d)(2)(D). *Forest Laboratories, Inc. v. Ivax Pharmaceuticals, Inc.*, 237 F.R.D. 106, 111 (D. Del. 2006) ("[a] statement is not hearsay if…[t]he statement is offered against a party and is a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship")." *Aumiller v. Univ. of Delaware*, 434 F. Supp. 1273, 1290 (D. Del. 1977) (same). The fact that Hochschild's admission may be considered double hearsay since it is contained in Mr. Sonne's email is of no moment since the email itself is a business record covered by the stipulation between Wilmington Trust and EGI-TRB, and Sonne's statement concerning his communication with Hochschild is an admission against EGI-TRB. *See In re Joy Global, Inc.*, 346 B.R. 659, 665, n. 13 (D. Del. 2006) (admitting document involving three layers of hearsay because each layer was covered by a hearsay exception); *James Julian, Inc. v. Raytheon Co.*, 557 F. Supp.

-34-

emails and other correspondence, Bigelow informed Puchalla of Moody's that "I have confirmed that the Zell note would be subordinated to the PHONES" (Exhibit AA, at  TRB0090708-11).

72.     Upon receiving this confirmation, Moody's sent the March 29, 2007 letter that provided its assumptions and reporting its conclusions concerning the ratings impact of the LBO following the completion of Step Two in December 2007.  [Ex. Q].  As part of that letter, Moody's treated the "$225 million subordinated promissory note issued to the Zell group ... as *junior subordinated debt*."  *Id*.at 2-3 (emphasis added).  At the same time, Moody's describes the PHONES as "*senior subordinated obligations*."  *Id*. at 6 (emphasis added).

73.     Moreover, prior to the March 27, 2007 exchange among Tribune, Citigroup and JPMorgan concerning Moody's assumptions, Tribune advised Nils Larsen of EGI that Tribune had provided various term sheets to the rating agencies (Exhibit BB, at EGI-LAW 00031058). These terms sheets described *both* Zell's (Step One) Convertible Subordinated Promissory Note (Exhibit BB, at EGI-LAW 00031059) *and* the Zell's (Step Two) Subordinated Promissory Note (Exhibit BB, at EGI-LAW 00031060) as "Fully subordinated in all rights and remedies."  Nils Larsen acknowledged in response that the terms sheets "are fine with me" (Exhibit CC, TRB0082471).    Moreover, Gary Weitman, Tribune's Senior Vice President of corporate relations, told a reporter from the New York Times on April 4, 2007 that "Zell note will be fully subordinated, just above the common equity" (Exhibit DD, at TRB1249941).

---

1058, 1063, n. 11 (D. Del. 1983) (admitting documentary evidence that may have raised double hearsay problems because each hearsay was subject to a hearsay exception).  At his deposition, Hochschild denied or had no recollection of that conversation.  However, Wilmington Trust submits that the contemporaneous utterance from Sonne, made at a time when the LBO was being structured, and where Sonne had no reason not to be truthful in reporting his conversation with Hochschild to his superior, is more reliable than Hochschild's unrecalled recollection some four years later, after a dispute arose.

74.     As the EGI Subordination Agreement was being drafted, JPMorgan's attorneys from Cahill Gordon & Reindel advised Zell's attorneys from Jenner & Block that the EGI Subordination Agreement should "use [the] same subordination terms as the junior capital note." (Exhibit EE, at TRB1169521) (handwritten comments to form of EGI Subordination Agreement, attached to email dated May 22, 2007 from Denise Ryan at Cahill Gordon & Reindel to Farhad Patel of Jenner, with "JPM/Cahill comments to the form of junior capital note and subordination agreement related to Zell Sub Note."). Thereafter, the drafts of the EGI Subordination Agreement were revised to include virtually the same subordination language that is contained the Step One EGI Note. *See, e.g.*, November 2, 2007 Draft [Exhibit FF] (EGI-Law 00243377-81).

        **c.**     **The Subordination Provisions in the Step One EGI Note and the Step Two EGI Subordination Agreement are Identical as Applied to the PHONES.**

75.     Despite this overwhelming evidence supporting the intent of the parties, in EGI-TRB's letter brief to the court on discovery disputes, EGI-TRB argues that the subordination terms of Step Two's EGI Subordination Agreement "differs materially from the [Step One EGI Note's] subordination provisions." February 8, 2012 Letter Brief by EGI-TRB, at pg. 2 [D.I. 10879]. As its sole example, EGI-TRB references to the exclusion of trade payables and accrued expenses as evidence that the two subordination agreements are materially different.

76.     While the EGI Subordination Agreement did restrict the scope of subordination by excluding trade payables and accrued expenses from "Senior Obligations," and there may have been some other changes in the terms of the EGI-TRB Notes irrelevant to these disputes, the relevant terms of the EGI Subordination Agreement remained the same, including as to the PHONES. Had EGI-TRB and Tribune intended to change the subordination provision to exclude the PHONES, as it did to exclude trade payables and accrued expenses, they could have

-36-

done so, but did not.  In Delaware, courts "cannot imply an omitted term in a contract unless it is clearly shown that the parties would have agreed to the terms had it been proposed."  *Auerbach v. Earth Energy Sys. Inc.*, No. 8868, 1988 WL 39982, at *228 (Del. Ch. Apr. 26, 1988). Delaware's approach to contract interpretation is grounded in the policy that if "alteration[s] and substitution[s] [are] made by express contract, written or oral, it would be required that the intent of the parties to that end should clearly and unequivocally appear."  *Delaware Ins Co. of Philadelphia v. S S White Dental Mfg Co.*, 109 F. 334, 338 (3d Cir. 1901); *see Seidensticker v. Gasparilla Inn, Inc.*, No. 2555, 2007 WL 1930428, at *4 (Del. Ch. Jun. 19, 2007) (holding that Delaware law will not "create contract rights and obligations that were not part of the original bargain, especially, where [the] contract could easily have been drafted to expressly provide for them").  The remaining provisions of the subordination provisions between the Step One EGI-TRB Note and the Step Two EGI Subordination Agreement are virtually identical.

77.     For example, a comparison of the definition of Senior Obligations in the two instruments shows that they are virtually identical, except for the two exceptions discussed above.

| Step One EGI Note | Step Two EGI Subordination Agreement |
|---|---|
| all obligations, indebtedness and other liabilities of [Tribune Company] other [than] any such obligations, indebtedness or liabilities that by its express terms ranks pari passu or junior to the [Tribune Company's] obligations under this Note, in each case, whether incurred on or prior to the date hereof or hereafter incurred. (§2(e)) | all obligations, indebtedness and other liabilities of the Company other than (i) any such obligations, indebtedness or liabilities that by their express terms rank pari passu or junior to the Company's obligations under the Subordinated Note and (ii) trade payables and accrued expenses incurred in the ordinary course of business, in each case, whether incurred on or prior to the date hereof or hereafter incurred.  (§1) |

78.     EGI-TRB apparently has now discovered another reason why the EGI-TRB Notes are not junior to the PHONES.  At the Allocation Disputes hearing, if the Court admits the parole evidence offered by Wilmington Trust, EGI-TRB will seek to offer, as rebuttal evidence, the

videotaped deposition of William Pate, now a Tribune Director, but prior to the closing of Step

Two, a high ranking officer affiliated with EGI and Sam Zell.  At his deposition on February 23,

2012, Mr. Pate testified that he believed the PHONES were subordinated to the EGI-TRB Notes

because the EGI-TRB Notes were not "convertible" notes.  However, Mr. Pate also conceded

that he never disclosed this subjective belief to Tribune and the banks while the terms of the

EGI-TRB Notes or the EGI Subordination Agreement were being negotiated.

79.    Mr. Pate's subjective but undisclosed belief as to the effect of the change in the

business terms of the EGI-TRB Notes on the relative subordination of the PHONES and the

EGI-TRB Notes is not admissible to prove the intent of the parties to the EGI Subordination

Agreement as to the respective subordination of the PHONES and EGI-TRB Notes.  *See, e.g.,*

*United States v. Hernandez*, 176 F.3d 719, 726-27 (3d Cir. 1999) (subjective belief of a party's

intent cannot be used to prove the truth of the underlying facts or that there actually was such an

intention.); *Frost v. PetSmart, Inc.*, Civ. A. No. 05-6759, 2007 WL 602990, at *5 (E.D. Pa. Feb.

26, 2007) (undisclosed subjective beliefs not admissible.); *Rizzo v. PPL Serv. Corp.*, No. Civ. A.

03-5779, 2005 WL 913091, at *11 (E.D. Pa. Apr. 19, 2005) (undisclosed subjective beliefs not

admissible.).

80.    Moreover, Mr. Pate's undisclosed subjective beliefs as to the effect on

subordination of the change in the business terms of the Step One EGI Note and the EGI-TRB

Notes are directly contradicted by the drafts of the EGI Subordination Agreement.  As noted

above, JPMorgan specifically requested that the EGI Subordination Agreement use the same

language as the Step One EGI Note, and the drafts of the EGI Subordination Agreement reflect

that the language in that agreement was changed to incorporate substantially the same

subordination language as in the Step One EGI Note.

-38-

**d.    The EGI Subordination Agreement Subordinates EGI-TRB
Notes to the PHONES, Without Regard to Source of Recovery.**

81.    Contrary to EGI-TRB's suggestion, this Allocation Dispute is not about "the scope of the [EGI] subordination agreement, and whether, unlike the PHONES subordination agreement, it extends to avoidance recoveries that are not assets of the Company."  February 8, 2012 Letter Brief by EGI-TRB, at pg. 2 [D.I. 10879].  EGI-TRB also argues in its letter brief that the result of the analysis of its subordination agreement varies depending on the source of the payments.   There is, however, no basis under the EGI Subordination Agreement to limit subordination of the EGI-TRB Notes to "assets of the Company."   Section 2 of the EGI Subordination Agreement provides:

> Subordination.  ***The Subordinated Obligations are subordinate and junior in right of payment to all Senior Obligations*** to the extent provided in this Agreement.  No part of the Subordinated Obligations shall have any claim to the assets of the Company on parity with or prior to the claim of Senior Obligations.  Unless and until the obligations to extend credit to the Company under the Senior Documents shall have been irrevocably terminated and the Senior Obligations have been paid in full in cash, the Subordinating Creditor will not take, demand or receive from the Company, and the Company will not make, give or permit, directly or indirectly..., any payment of (of whatever kind or nature, whether in cash, property, securities or otherwise), whether in respect of principal, interest or otherwise, or security for the whole or any part of the Subordinated Obligations.

[Ex. F, § 2, at EGI-LAW 00243351]

82. Thus, according to the plain terms of this provision, EGI-TRB Notes are "subordinate and junior in right of payment to all Senior Obligations…"   EGI-TRB's subordination is not limited or qualified except as set forth in the Subordination Agreement.  The language that EGI-TRB apparently is relying on to support its argument only states that "[n]o part of the Subordinated Obligations shall have any claim to the assets of the Company on parity with or prior to the claim of Senior Obligations."  That language does not, however, restrict the scope of EGI-TRB's subordination only to "assets of the Company."   To read the EGI

-39-

Subordination Agreement in the manner advocated by EGI-TRB would be in conflict with the intent of the EGI Subordination Agreement to subordinate the EGI-TRB Notes to almost all indebtedness of Tribune, including the PHONES, other than those specifically listed. Accordingly, this Court should rule that the PHONES are senior to the EGI-TRB Notes in right of payment from all sources, not just of "assets of the Company."

83.    Since the EGI-TRB Notes are presently subject to a pending adversary proceeding initiated by the Committee, seeking, among other things, avoidance and/or recharacterization of the EGI-TRB Notes (Adv. Proc. No. 10-54010), all arguments and evidence admitted in connection with the Allocation Disputes should be without prejudice to the Committee's pending complaint against EGI-TRB. Accordingly, this Allocation Dispute is only relevant to the extent the EGI-TRB Notes are ultimately allowed claims after resolution of that litigation.

**WHEREAS**, for the foregoing reasons, Wilmington Trust respectfully submits that the Court rule that:

(i)    proceeds from Chapter 5 Avoidance Actions are not subject to subordination pursuant to the PHONES Indenture, and, in light of Wilmington Trust's pending appeal of this Court's Reconsideration Opinion, distributions of settlement proceeds should be reserved pending final adjudication of Wilmington Trust's appeal of this Court's Reconsideration Opinion;

(ii)   the priority of distributions from the Creditors' trust is moot as it relates to the PHONES;

(iii)  aside from Wilmington Trust's Class 1F Fee Claim, none of the Class 1F Other Parent Claims, including (A) the Swap Claim, (B) Retiree Claims, and (C) Trade Claims, are "Senior Indebtedness" under the PHONES Indenture;

(iv)   (A) the PHONES Notes Claims Amount is $1,183,833,767, plus unpaid interest that accrued prior to the Petition Date or (B) if the Court were to decline to order the "High" PHONES Notes Claim Amount, the Court should find that the "Low" PHONES Notes Claim Amount is $818,808,727 (plus unpaid interest that accrued prior to the Petition Date);

(v)    the PHONES are not subordinated to Post-Petition Interest on Senior Indebtedness as defined under the PHONES Indenture;

(vi)    the PHONES are Senior in Right of Payment to the EGI-TRB LLC Notes regardless of source of payment; and

(vii)   Wilmington Trust should be afforded such other and further relief as is just and proper.

Dated: February 24, 2012
Wilmington, Delaware

**SULLIVAN · HAZELTINE · ALLINSON** LLC

*/s/ William D. Sullivan*
William D. Sullivan (I.D. No. 2820)
Elihu E. Allinson, III (I.D. No. 3476)
901 N. Market St., Suite 1300
Wilmington, DE 19801
302-428-8191

-and-

BROWN RUDNICK LLP
Robert J. Stark
Martin S. Siegel
Gordon Z. Novod
Seven Times Square
New York, NY 10036
212-209-4800

Counsel for Wilmington Trust Company, solely in its capacity as successor Indenture Trustee for the PHONES Notes