IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered |

## MEMORANDUM OF LAW OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS ON UNFAIR DISCRIMINATION ALLOCATION DISPUTE

CHADBOURNE & PARKE LLP
Howard Seife
David M. LeMay
Andrew Rosenblatt
Marc B. Roitman
30 Rockefeller Plaza
New York, New York 10112
Telecopier: (212) 541-5369

- and -

LANDIS RATH & COBB LLP
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Kimberly A. Brown (No. 5138)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telecopier: (302) 467-4450

- and -

ZUCKERMAN SPAEDER LLP
Graeme W. Bush
James Sottile
1800 M Street, N.W., Suite 1000
Washington, D.C. 20036
Telecopier: (202) 822-8106

*Counsel for the Official Committee of Unsecured Creditors*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are listed on the next page.

Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc., f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); and WPIX, Inc. (0191). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

# TABLE OF CONTENTS

**Pages**

I.      PRELIMINARY STATEMENT ......................................................................... 1

II.     ARGUMENT ................................................................................................ 4

      A.      Under Any Scenario, The Alleged Discrimination Against The Senior
             Noteholders Is Not Material And Therefore Not Unfairly Discriminatory ............ 4

             1.      Applicable Legal Framework: Materiality Requirement ............................ 4

                    a.      Minor Differences In Plan Treatment Are Not Material ................ 5

                    b.      Discrimination Only Becomes Material Where A Plan Proposes
                          "Grossly Disparate" Treatment To Similarly Situated Creditors .... 6

             2.      Alleged Discrimination Under The DCL Plan  And Impact Of Other
                 Allocation Disputes .................................................................... 9

              3.      The Record Raises No Presumption Of Unfair Discrimination
                 Because Any Alleged Discrimination Under the DCL Plan Is Not
                 Material .................................................................................... 11

      B.      The Treatment Of Creditors Under The DCL Plan Is Appropriate Because
             Certain Other Parent Claimants Provided Value To The Reorganization ............ 12

             1.      Applicable Legal Framework: Rebuttable Presumption ........................... 12

             2.      The Contribution Of The Retiree Claimants To The Reorganization
                 Rebuts Any Presumption Of Unfair Discrimination .................................. 13

III.    CONCLUSION ............................................................................................ 15

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Armstrong World Indus., Inc.*,
   348 B.R. 111 (D. Del. 2006)..................................................................................4, 5, 12

*In re Aztec Co.*,
   107 B.R. 585 (Bankr. M.D. Tenn. 1989) ...............................................................7, 8

*In re Barney & Carey Co.*,
   170 B.R. 17 (Bankr. D. Mass. 1994) .....................................................................7, 8

*In re Caldwell*,
   76 B.R. 643 (Bankr. E.D. Tenn. 1987) ....................................................................7

*In re Cranberry Hill Assocs. L.P.*,
   150 B.R. 289 (Bankr. D. Mass. 1993) ...................................................................7, 8

*In re Crosscreek Apartments, Ltd.*,
   213 B.R. 521 (Bankr. E.D. Tenn. 1997) ...............................................................7, 8

*In re Dow Corning Corp.*,
   244 B.R. 696 (Bankr. E.D. Mich. 1999)...............................................................4, 5, 12

*In re Great Bay Hotel & Casino, Inc.*,
   251 B.R. 213 (Bankr. D.N.J. 2000) ...................................................................5, 6, 8, 12

*In re Jersey City Med. Ctr.*,
   817 F.2d 1055 (3d Cir. 1987) ..................................................................................7

*In re Tribune Co.*,
   No 08-13141-KJC, 2011 WL 5142420 (Bankr. D. Del. Oct. 31, 2011) ...............1, 3, 5, 13, 14

*In re Unbreakable Nation Co.*,
   437 B.R. 189 (Bankr. E.D. Pa. 2010) ................................................................5, 6, 7, 11

*Mason v. Paradise Irrigation Dist.*,
   326 U.S. 536 (1946) ...............................................................................................13

*NLRB v. Bildisco & Bildisco*,
   465 U.S. 513 (1984) .................................................................................................4

*Oxford Life Ins. Co. v. Tucson Self-Storage, Inc. (In re Tucson Self-Storage, Inc.)*,
   166 B.R. 892 (B.A.P. 9th Cir. 1994) ...................................................................7, 8

**STATUTES**

11 U.S.C. § 1129(b)..........................................................................................................1, 2

**OTHER AUTHORITIES**

Bruce A. Markell, *A New Perspective On Unfair Discrimination In Chapter 11*,
    72 AM. BANKR. L.J. 227, 256 (1998).................................................................4, 13

H.R. REP. NO. 95-595, pt. 1 (1978) ...........................................................................5

## I.    PRELIMINARY STATEMENT

The DCL Plan[2] provides the Senior Noteholders and the Other Parent Claimants[3] with equivalent initial distributions—33.6% of their allowed claim amounts—and equivalent distributions of any recoveries obtained by the Litigation Trust. That treatment of Other Parent Claims in part implements a settlement with the Retiree Claimants (the "Retiree Settlement") that was endorsed by the Court in the Confirmation Opinion.[4]

In their objection to the Second Amended DCL Plan, the Senior Noteholders argued that this equal treatment contravenes the requirement of Bankruptcy Code section 1129(b)(1) that a plan "not discriminate unfairly" because, they assert, none of the obligations held by Other Parent Claimants are entitled to the benefits of the PHONES Notes and EGI-TRB LLC Notes subordination and turnover provisions (together, the "Subordination Provisions"). The Senior Noteholders contend that they are the only non-LBO creditors entitled to the benefits of the

---

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Third Amended Joint Plan Of Reorganization For Tribune Company And Its Subsidiaries filed on February 20, 2012 [Docket No. 10958] (the "DCL Plan") proposed by the Debtors, the Committee, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A. (the "DCL Plan Proponents").

The other DCL Plan Proponents support the position articulated herein. The Debtors have filed a Joinder of the Debtors to Memorandum of Law of the Official Committee of Unsecured Creditors on Unfair Discrimination Allocation Dispute. Oaktree Capital Management has filed Oaktree Capital Management, L.P.'s Opening Brief Regarding Allocation Disputes. Angelo, Gordon & Co., L.P. and JPMorgan Chase Bank, N.A. have advised the Creditors' Committee that they support the arguments set forth herein.

[3]    The class of Other Parent Claims includes the Swap Claim (comprising approximately 57% of the class), Retiree Claims (approximately 40%), and "Trade and Other" Claims (approximately 3%). *See In re Tribune Co.*, No. 08-13141-KJC, 2011 WL 5142420, at *55 (Bankr. D. Del. Oct. 31, 2011) (the "Confirmation Opinion").

[4]    In the words of the Court, "[t]he Retiree Settlement is an important piece of the reorganization." *In re Tribune Co.*, 2011 WL 5142420, at *45. The Retiree Settlement provides, among other things, that "the classification and treatment of the Retiree Claims [will be] consistent with their classification and treatment under the [April 12, 2010] Plan," pursuant to which each Retiree Claimant would have received a cash distribution equal to 35.18% of his or her allowed claim. See Exhibit 5.15.4 of the DCL Plan at ¶ 8.

Subordination Provisions and, as a result, the disputed allocation should be paid exclusively to them. Anything short of that treatment, they argue, would result in unfair discrimination.

The holders of the Retiree Claims and Swap Claim disagree. They assert that their respective claims are contractually entitled to the benefits of the Subordination Provisions. The Retiree Claimants and the Swap Claimant have filed separate briefs addressing those contract issues. To the extent the Retiree Claimants and/or the Swap Claimant are found to be contractually entitled to the benefits of the Subordination Provisions, the impact of the alleged discrimination on Senior Noteholder recoveries would be reduced, as detailed below.

In this brief, the Official Committee of Unsecured Creditors (the "Creditors' Committee") takes no position on whether the claims held by various Other Parent Claimants are contractually entitled to the benefits of the Subordination Provisions. Instead, the Creditors' Committee demonstrates that, even assuming that none of the Other Parent Claims are contractually entitled to the benefits of the Subordination Provisions, the treatment afforded to the Senior Noteholders under the DCL Plan does not amount to unfair discrimination.

This is so for two independent reasons. First, the alleged discrimination does not materially impact the Senior Noteholders' recoveries and therefore does not run afoul of Section 1129(b). The cases in which courts have found a presumption of unfair discrimination all involved plans that provided vastly different recovery percentages (generally, 50% or more) to two similarly situated creditor classes. Here, the Senior Noteholders argue that the DCL Plan should not have provided identical treatment to the Senior Noteholders and the Other Parent Claimants, and that the Senior Noteholders should receive higher recoveries on account of the disputed allocation. But this alleged discrimination does not have a material impact upon the Senior Noteholders' recoveries. Specifically, even if *none* of the Other Parent Claimants were contractually entitled to the benefits of the Subordination Provisions and the entirety of the

disputed allocation were paid to the Senior Noteholders, the Senior Noteholders' initial distribution would increase from the DCL Plan amount of 33.6% to—at a maximum—36.5%. Such an immaterial impact cannot support a finding that the DCL Plan unfairly discriminates against the Senior Noteholders.

Second, even if the difference in treatment were deemed material, the value to the Debtors' reorganization provided by certain Other Parent Claimants rebuts any presumption of unfair discrimination. The courts have found that the presumption of unfair discrimination raised by even a material difference in treatment is not dispositive but rebuttable, particularly in cases where the creditors receiving favorable treatment contribute to the debtor's reorganization. Here, the Retiree Settlement, which dictates the treatment of Other Parent Claims, provides a logical and rational basis for the DCL Plan's distribution structure. The benefits that flow from preserving the Retiree Settlement justify the comparable treatment of Senior Noteholders and Other Parent Claimants under the DCL Plan.[5]

---

[5] At the prior confirmation hearing, the Senior Noteholders asserted that the Second Amended DCL Plan was unfairly discriminatory because none of the Other Parent Claims fell within the PHONES Indenture's definition of Senior Indebtedness. The DCL Plan Proponents addressed this objection by analyzing the effect of the subordination provisions on creditors' natural recoveries, showing how the application of those provisions did not materially impact the Senior Noteholders' natural recoveries. In the Confirmation Opinion, the Court was unable to rule conclusively on this objection, and held that "[t]he record here is unclear," as "[t]here is no analysis of the impact a reallocation would have on the distribution of settlement consideration or Litigation Trust proceeds." *In re Tribune Co.*, 2011 WL 5142420, at *56. As discussed in detail below, the record before the Court no longer suffers from this deficiency.

## II.    ARGUMENT

### A.    Under Any Scenario, The Alleged Discrimination Against The Senior Noteholders Is Not Material And Therefore Not Unfairly Discriminatory

#### 1.    Applicable Legal Framework: Materiality Requirement

The Bankruptcy Code does not prohibit all discrimination in plan treatment but only "unfair" discrimination.  *See In re Armstrong World Indus., Inc.*, 348 B.R. 111, 121 (D. Del. 2006).  Indeed, allowing a plan of reorganization to embody some degree of flexibility in the treatment of different classes of the same priority—so long as it does not do so "unfairly"—is consistent with the fundamental purposes of Chapter 11.  The Supreme Court has emphasized that "policies of flexibility and equity [are] built into Chapter 11 of the Bankruptcy Code" and courts must often be given "great latitude" in determining "how the equities relate to the success of the reorganization."  *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 525, 525-27 (1984).

Under the "rebuttable presumption" test for unfair discrimination, which was first proposed by then-Professor Bruce A. Markell[6]—and subsequently applied in the *Armstrong* and *Dow Corning* cases, among others—a chapter 11 plan is presumptively deemed to discriminate unfairly[7] when there is "(1) a dissenting class; (2) another class of the same priority; and (3) difference in the plan's treatment of the two classes that results in . . . a ***materially*** lower percentage recovery for the dissenting class . . . ."  *In re Armstrong World Indus., Inc.*, 348 B.R.

---

[6]    *See* Bruce A. Markell, *A New Perspective On Unfair Discrimination In Chapter 11*, 72 AM. BANKR. L.J. 227, 227-28 (1998).  Subsequent to the publication of this article, Professor Markell was appointed as a United States Bankruptcy Judge for the District of Nevada.

[7]    This presumption is rebuttable, if it arises.

at 121 (quoting *In re Dow Corning Corp.*, 244 B.R. 696, 702 (Bankr. E.D. Mich. 1999)) (emphasis added).

The presumption of unfair discrimination ***does not arise*** if the difference in the plan's treatment of the two classes is not material.   In analyzing the materiality question, courts evaluate the alleged discrimination from the ***perspective of the dissenting class***, *see, e.g.*, H.R. REP. NO. 95-595, pt. 1, at 417 (1978) ("The criterion of unfair discrimination . . . preserves just treatment of a dissenting class from the class's own perspective."), and focus on the difference in treatment in terms of ***percentage recovery*** differential rather than the dollar amount.   *See In re Armstrong World Indus., Inc.*, 348 B.R. at 122 ("the presumption of unfair discrimination only arises if the ***dissenting class*** would receive a 'materially lower' ***percentage recovery*** . . . .") (emphasis added); *see also In re Unbreakable Nation Co.*, 437 B.R. 189, 202-03 (Bankr. E.D. Pa. 2010) (careful analysis of materiality strictly in terms of percentage recoveries, despite small dollar amount at stake).

  a.  <u>Minor Differences In Plan Treatment Are Not Material</u>

The question for the Court, therefore, is not whether all disparity of treatment is prohibited—clearly it is not—but rather whether the disputed allocation of DCL Plan consideration is "material" to the Senior Noteholders' recovery percentage.   As this Court noted, "[m]inor or immaterial differences in plan treatment do not rise to the level of ***unfair*** discrimination." *In re Tribune Co.*, 2011 WL 5142420, at *56 (citing *In re Unbreakable Nation Co.*, 437 B.R. at 203; *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 231 (Bankr. D.N.J. 2000)).   Plans involving small or trivial impacts on the dissenting class's recovery percentage have been upheld against challenge on unfair discrimination grounds.

In *Unbreakable Nation*, the Bankruptcy Court for the Eastern District of Pennsylvania considered whether unfair discrimination was present where a plan provided that two classes of

unsecured creditors would share equally in an "unsecured fund," despite the fact that the face amount of the claims in one class was greater than the face amount of the claims in the other class. Based on the difference in claim amount, the allegedly harmed class asserted it was entitled to a 1.47%[8] recovery rather than a 1.25% recovery. Ultimately, the court concluded that the treatment of the allegedly harmed class was not unfairly discriminatory because "the equal distribution to each class . . . would not rise to the level of a *material* lower percentage recovery for the Objectors." *In re Unbreakable Nation Co.*, 437 B.R. at 202. In other words, the percentage discrepancy between the recovery the dissenting class was provided under the plan and what the class asserted it was entitled to receive was not material. *See id.* at 202-03.

In *Greate Bay*, the objecting noteholders argued that the receipt of approximately 76% on their unsecured deficiency claims (a recovery of approximately $61.69 million) was unfairly discriminatory when similarly situated creditors were entitled to receive 80% on their claims. The Bankruptcy Court for the District of New Jersey concluded that the difference between a recovery of 80% and one of 76% was not a "materially lower percentage recovery" that would constitute unfair discrimination. *See In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. at 231.

b. Discrimination Only Becomes Material Where A Plan Proposes "Grossly Disparate" Treatment To Similarly Situated Creditors

Courts that have rejected plans on the basis of unfair discrimination have confronted *"plans proposing grossly disparate treatment (50% or more) to similarly situated creditors."*

---

[8]    As explained in *Unbreakable Nation*, the objecting class asserted their claims were approximately $4 million, and that the claims of the allegedly preferred class were approximately $2.8 million. As a result, the objecting class argued they were entitled to 58.7% of the $100,000 unsecured fund, or $58,724 (a recovery of 1.47%), rather than 50% of the unsecured fund, or $50,000 (a recovery of 1.25%). The court concluded, "the degree of the discrimination is minor." *In re Unbreakable Nation Co.*, 437 B.R. at 202-03.

*Id.* (emphasis added); *see, e.g., Oxford Life Ins. Co. v. Tucson Self-Storage, Inc. (In re Tucson Self-Storage, Inc.*), 166 B.R. 892 (B.A.P. 9th Cir. 1994) (finding unfair discrimination where plan provided 100% recovery to unsecured trade creditors and 10% recovery to deficiency claimants); *In re Barney & Carey Co.*, 170 B.R. 17 (Bankr. D. Mass. 1994) (finding unfair discrimination where plan proposed to pay deficiency claims in full while paying general unsecured creditors only 15% of their claims); *In re Crosscreek Apartments, Ltd.*, 213 B.R. 521, 537-38 (Bankr. E.D. Tenn. 1997) (plan unfairly discriminated where class of unsecured creditors paid in full on effective date while deficiency claim paid in the present value range of 50% since bulk of that claim would not be paid for several years); *In re Cranberry Hill Assocs. L.P.*, 150 B.R. 289, 290-91 (Bankr. D. Mass. 1993) (same); *In re Aztec Co.*, 107 B.R. 585, 589-91 (Bankr. M.D. Tenn. 1989) (finding unfair discrimination where plan proposed to pay insider unsecured claims in full while paying nonrecourse deficiency claim 3%); *cf. In re Caldwell*, 76 B.R. 643, 646 (Bankr. E.D. Tenn. 1987) (confirmation denied on classification grounds where plan proposed to pay credit card debt in full while paying all other unsecured creditors only 22.7% of their claims); *but cf. In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1060-61 (3d Cir. 1987) (affirmed confirmation of a chapter 9 plan that paid 100% of the claims of one unsecured class but only 30% of the claims of the other unsecured classes).

The table below highlights the recovery percentage differentials in the unfair discrimination cases cited above and each court's conclusion on the unfair discrimination objection.

| Case | Dissenting Class % Recovery | Preferred Class % Recovery | Conclusion |
|---|---|---|---|
| *In re Great Bay Hotel & Casino, Inc.*, 251 B.R. 213 (Bankr. D.N.J. 2000) | 76% | 80% | No unfair discrimination |
| *In re Unbreakable Nation Co.*, 437 B.R. 189 (Bankr. E.D. Pa. 2010) | 1.25% | 1.78%[9] | No unfair discrimination |
| *In re Crosscreek Apartments, Ltd.*, 213 B.R. 521, 537-38 (Bankr. E.D. Tenn. 1997) | 50% | 100% | Unfair discrimination |
| *In re Cranberry Hill Assocs. L.P.*, 150 B.R. 289, 290-91 (Bankr. D. Mass. 1993) | 50% | 100% | Unfair discrimination |
| *In re Barney & Carey Co.*, 170 B.R. 17 (Bankr. D. Mass. 1994) | 15% | 100% | Unfair discrimination |
| *In re Tucson Self-Storage, Inc.*, 166 B.R. 892 (B.A.P. 9th Cir. 1994) | 10% | 100% | Unfair discrimination |
| *In re Aztec Co.*, 107 B.R. 585, 589-91 (Bankr. M.D. Tenn. 1989) | 3% | 100% | Unfair discrimination |

---

[9]    As described in footnote 8 *supra*, the court in *Unbreakable Nation* compared the recovery the dissenting class was provided under the plan to the recovery the dissenting class asserted it was entitled to receive.  However, for purposes of this table, the recovery of the allegedly preferred class in *Unbreakable Nation* was 1.78% ($50,000 on claims of $2,811,521).  *In re Unbreakable Nation Co.*, 437 B.R. at 202.

2.    **Alleged Discrimination Under The DCL Plan
And Impact Of Other Allocation Disputes**[10]

The initial distribution to the Senior Noteholders would vary (but only slightly) if the

Court were to preclude Other Parent Claimants from receiving the benefits of the Subordination

Provisions.  The exact impact of the disputed allocation on the Senior Noteholders' recoveries

depends on the Court's determination of several of the other pending Allocation Disputes.  To

illustrate, and as set forth in Appendix A, Table 1:

- If the Swap Claim and the Retiree Claims but not the remaining Other Parent Claims were entitled to the benefits of the Subordination Provisions, the initial distribution to the Senior Noteholders would increase from the DCL Plan amount of 33.6% to 33.67%, a 0.2% Percentage Impact;[11]

- If the Swap Claim but not the remaining Other Parent Claims were entitled to the benefits of the Subordination Provisions, the initial distribution to the Senior Noteholders would increase from the DCL Plan amount of 33.6% to 34.7%, a 3.3% Percentage Impact;

- If the Retiree Claims but not the remaining Other Parent Claims were entitled to the benefits of the Subordination Provisions, the initial distribution to the Senior Noteholders would increase from the DCL Plan amount of 33.6% to 35.2%, a 4.8% Percentage Impact; and

---

[10]    Unless otherwise noted, the illustrative recoveries described in this brief are approximate and based on the following assumptions: (i) PHONES Notes Claims are allowed at the high amount (approximately $1.197 billion); and (ii) all holders of Retiree Claims and Trade and Other Claims elect the same treatment received by the Senior Noteholders (*i.e.*, 33.6% initial distribution plus interests in the Litigation Trust), while the holder of the Swap Claim elects the alternative treatment (*i.e.*, 36.0% initial distribution, forgoing participation in the Litigation Trust).  A more detailed summary of the effect of the Subordination Provisions on initial distributions and Litigation Trust recoveries is provided in the "Subordination Scenario Recovery Charts," annexed hereto as Appendix B.  All parties to the Allocation Disputes have affirmatively agreed to stipulate to the accuracy and admissibility of the Subordination Scenario Recovery Charts.

[11]    For purposes of this brief, the term "**Percentage Impact**" will be used to facilitate an apples-to-apples comparison of the impact of alleged unfair discrimination in different scenarios.  Percentage Impact is calculated as follows:  Percentage Impact = (Higher recovery amount / Lower recovery amount) - 1.  For example, if a plan provides a class with a recovery of $20, but the class asserted that it was entitled to receive $30, the Percentage Impact is: (30/20) - 1 = 0.5, or 50%.

- If none of the Other Parent Claims were entitled to the benefits of the Subordination Provisions, the initial distribution to the Senior Noteholders would increase from the DCL Plan amount of 33.6% to 36.5%, an 8.5% Percentage Impact.[12]

The same pattern emerges when significant recoveries are assumed to be obtained by the Litigation Trust. For example, assuming that the Litigation Trust were to obtain $250 million in Net Litigation Trust Proceeds, the Senior Noteholders would receive total distributions (initial distributions plus Litigation Trust distributions) under the DCL Plan amounting to 46.6% of their total allowed claims. In this hypothetical, the total distribution to the Senior Noteholders would vary slightly if the Court were to preclude Other Parent Claimants from receiving the benefits of the Subordination Provisions. To illustrate, and as set forth in Appendix A, Table 2:

- If the Swap Claim and the Retiree Claims but not the remaining Other Parent Claims were entitled to the benefits of the Subordination Provisions, the total distribution to the Senior Noteholders would increase from the DCL Plan amount of 46.55% to 46.67%, a 0.26% Percentage Impact;[13]

- If the Swap Claim but not the remaining Other Parent Claims were entitled to the benefits of the Subordination Provisions, the total distribution to the Senior Noteholders would increase from the DCL Plan amount of 46.6% to 48.2%, a 3.6% Percentage Impact;

- If the Retiree Claims but not the remaining Other Parent Claims were entitled to the benefits of the Subordination Provisions, the total distribution to the Senior Noteholders would increase from the DCL Plan amount of 46.6% to 48.2%, a 3.5% Percentage Impact; and

- If none of the Other Parent Claims were entitled to the benefits of the Subordination Provisions, the total distribution to the Senior Noteholders would

---

[12]   It should also be noted that the distributions to the Senior Noteholders in these scenarios would vary marginally depending on the allowed amount of the PHONES Notes Claims.

[13]   In any scenario, the incremental impact on the Senior Noteholders' recoveries of providing the Trade and Other Claims with a comparable distribution is less than a rounding error. Such discrimination is not just immaterial under the case law, but is truly *de minimis*.

increase from the DCL Plan amount of 46.6% to 50.0%, a 7.4% Percentage Impact.[14]

**3.    The Record Raises No Presumption Of Unfair Discrimination Because Any Alleged Discrimination Under the DCL Plan Is Not Material**

In short, under any possible resolution of the Allocation Disputes—even if all the variables that have been identified were calculated in a manner that maximized the amount of the alleged discrimination the Senior Noteholders complain of—the recoveries under the DCL Plan do not provide Senior Noteholders with a materially lower percentage recovery than that to which they claim to be entitled.    Therefore, the record in this case raises no presumption of unfair discrimination.

As shown above, even if the Court were to preclude some or all of the Other Parent Claimants from receiving the benefits of the Subordination Provisions, the Percentage Impact on the Senior Noteholders' initial distributions under the various scenarios would never exceed 8.5%.[15] The potential Percentage Impact upon the Senior Noteholders' recoveries is similarly immaterial when additional potential recoveries from the Litigation Trust are taken into account.

---

[14]    As set forth on Exhibit A, Table 2 and Table 3, Senior Noteholder success in excluding Other Parent Claims from the disputed allocation would produce increases in total distributions for Senior Noteholders of a comparable but even smaller magnitude if the Litigation Trust were to obtain recoveries above the $250 million illustrative example.    For instance, if the Litigation Trust were to recover $500 million in Net Litigation Trust Proceeds, the Senior Noteholders would receive total distributions under the DCL Plan amounting to 58.2% of their total allowed claims.    If none of the Other Parent Claims were entitled to the benefits of the Subordination Provisions, the total distribution to the Senior Noteholders would increase from the DCL Plan amount of 58.2% to 62.2%, which represents a 6.8% Percentage Impact.    Similarly, if the Litigation Trust were to recover $750 million in Net Litigation Trust Proceeds, the Senior Noteholders would receive total distributions under the DCL Plan amounting to 69.8% of their total allowed claims.    If none of the Other Parent Claims were entitled to the benefits of the Subordination Provisions, the total distribution to the Senior Noteholders would increase from the DCL Plan amount of 69.8% to 74.3%, which represents a 6.4% Percentage Impact.    It should also be noted that the Senior Noteholders' recoveries from the Litigation Trust in these scenarios would be affected slightly by the results of the Other Parent Claims treatment election.

[15]    It should be noted that Aurelius Capital Management, LP, the largest holder of Senior Noteholder claims, indicated in its Preliminary Statement on Allocation Disputes [Docket No. 10789] that it will take the position

(Cont'd on following page)

The impacts upon recoveries in this case are comparable to or less than those held *not* to be unfairly discriminatory in *Unbreakable Nation* and *Greate Bay*, and are far below the "grossly disparate" treatment present in all the cases where unfair discrimination was found. Accordingly, under any scenario, there is no basis in the case law for a claim of unfair discrimination.[16]

**B.**   **The Treatment Of Creditors Under The DCL Plan Is Appropriate Because Certain Other Parent Claimants Provided Value To The Reorganization**

**1.**   **Applicable Legal Framework: Rebuttable Presumption**

Even where the impact on treatment of a dissenting class from alleged discrimination is found to be material and the rebuttable presumption of unfair discrimination arises, it may nevertheless be overcome by the plan proponents in a variety of ways. For example, a demonstration "that the alleged preferred class had infused new value into the reorganization which offset its gain" would serve to rebut the presumption of unfair discrimination. *See In re Armstrong World Indus., Inc.*, 348 B.R. at 121 (citing *In re Dow Corning Corp.*, 244 B.R. at 702). Indeed, creditor contributions that further the reorganization plan have "long been recognized as a reasonable basis for different plan treatment consistent with the unfair

---

(Cont'd from preceding page)

that the PHONES Notes Claims should be allowed at the low amount in the pending Allocation Dispute relating to the proper allowed amount of those claims. If the PHONES Notes Claims were allowed at the low amount, the alleged discrimination would be even smaller. For example, if none of the Other Parent Claims were entitled to the benefits of the Subordination Provisions, and the PHONES Notes Claims were allowed at the low amount, the initial distribution to the Senior Noteholders would increase from the DCL Plan amount of 33.6% to only 35.9%, a 6.95% Percentage Impact.

[16]   As explained above, certain Allocation Disputes are "variables" that may change the calculation of the amount of the alleged unfair discrimination. In order to have a fixed number, the Court could defer its own conclusion on the unfair discrimination Allocation Dispute until it has reached its conclusions on the other Allocation Disputes that affect the percentage calculations, so that the decision on unfair discrimination could be based on the Court's view of the actual impact of the alleged discrimination, rather than a potential range of outcomes.

discrimination principle." *See* Bruce A. Markell, *A New Perspective On Unfair Discrimination In Chapter 11*, 72 AM. BANKR. L.J. 227, 256 (1998) (citing *Mason v. Paradise Irrigation Dist.*, 326 U.S. 536 (1946)).

### 2. The Contribution Of The Retiree Claimants To The Reorganization Rebuts Any Presumption Of Unfair Discrimination

The treatment of the Retiree Claimants is supported by the Retiree Settlement, which is incorporated into the DCL Plan, because the Retiree Settlement constitutes a contribution to the Debtors' reorganization. As this Court concluded in its Confirmation Opinion, "[t]he Retiree Settlement is an important piece of the reorganization." *In re Tribune Co.*, 2011 WL 5142420, at *45. Accordingly, the Retiree Settlement provides a logical and rational basis for the DCL Plan's distribution structure.

Specifically, in exchange for certain treatment under the DCL Plan, the Retiree Claimants agreed to reduce the aggregate amount of their claims by approximately $10 million. The $10 million reduction in claim amount was conditioned on "the classification and treatment of the Retiree Claims consistent with their classification and treatment under the [April 12, 2010] Plan," pursuant to which each Retiree Claimant would have received a cash distribution equal to 35.18% of his or her allowed amount. See Exhibit 5.15.4 of the DCL Plan at ¶ 8.[17] Moreover, the Retiree Claimants have steadfastly maintained their support for the DCL Plan, notwithstanding the numerous DCL Plan modifications made since the initial Retiree Settlement that were unfavorable to them, including the loss of certain releases and reductions in recovery amounts.

---

[17] The DCL Plan also provides the same classification and treatment for other similarly situated retirees, who are not currently parties to the Retiree Settlement. DCL Plan, §§1.1.176, 3.2.6. The Debtors' records indicate that there are at least 46 such claimants, and the Debtors have provided such records to the other parties as part of the discovery involved in the Allocation Disputes.

If the Retiree Settlement were nullified, the Retiree Claimants would have the right to assert their respective claims in the higher original asserted amounts. Thus, the Retiree Settlement provides sufficient value to the Debtors' reorganization to justify their alleged favorable treatment.

In the Confirmation Opinion, this Court discussed the fact that "the amount and treatment of the Retiree Claims" was disputed and acknowledged that the DCL Plan's treatment of the Retiree Claims permitted a key settlement to go forward while providing value to the reorganization. *In re Tribune Co.*, 2011 WL 5142420, at *45. Accordingly, the Retiree Settlement should not be upset and the Senior Noteholders' allegations of unfair discrimination should be rejected.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## III.   CONCLUSION

For the reasons set forth herein, the Creditors' Committee respectfully requests that the Bankruptcy Court conclude that the treatment of creditors provided for in the DCL Plan satisfies the requirements of the Bankruptcy Code and does not discriminate unfairly against the Senior Noteholders.

Dated: February 24, 2012
   Wilmington, Delaware

**LANDIS RATH & COBB LLP**

Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Kimberly A. Brown (No. 5138)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone:  (302) 467-4400
Facsimile:  (302) 467-4450

- and -

Howard Seife
David M. LeMay
Andrew Rosenblatt
Marc B. Roitman
**CHADBOURNE & PARKE LLP**
30 Rockefeller Plaza
New York, New York 10112
Telephone:  (212) 408-5100
Facsimile:  (212) 541-5369

- and -

Graeme W. Bush
James Sottile
**ZUCKERMAN SPAEDER LLP**
1800 M Street, N.W., Suite 1000
Washington, DC 20036
Telephone:  (202) 778-1800
Facsimile:  (202) 822-8106

*Counsel for the Official Committee of Unsecured Creditors*