# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) |
| | ) |
| | ) Chapter 11 |
| TRIBUNE COMPANY, *et al.*, | ) |
| | ) Case No. 08-13141 (KJC) |
| Debtors. | ) |
| | ) Jointly Administered |
| | ) **Hearing date**:  March 5, 2012, at 10:00 a.m. |
| | ) |
| | ) |
| | ) |

## OAKTREE CAPITAL MANAGEMENT, L.P.'s
## OPENING BRIEF REGARDING ALLOCATION DISPUTES

Robert S. Brady (Bar No. 2847)
M. Blake Cleary (Bar No. 3614)
YOUNG CONAWAY STARGATT &
    TAYLOR LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
Telephone (302) 571-6600
Facsimile (302) 571-1253

        - and -

Bruce Bennett
James O. Johnston
Joshua M. Mester
DEWEY & LEBOEUF LLP
333 South Grand Avenue, Suite 2600
Los Angeles, CA 90071-1530
Telephone (213) 621-6000

*Attorneys for Oaktree Capital Management, L.P.*

# TABLE OF CONTENTS

**Page**

I.    **INTRODUCTION** ........................................................................................1

II.   **BACKGROUND** .......................................................................................2

     A.    The PHONES Notes. ...................................................................2

     B.    The Credit Agreement And The Swap Documents. ..................................4

     C.    The EGI Subordinated Note....................................................................6

III.  **ARGUMENT** .............................................................................................7

     A.    The Plan's Treatment Of The Swap Claim As Senior To
The PHONES Notes And The EGI Subordinated Note Is Appropriate. .................8

          1.    *The Swap Claim Is Contractually Senior To Both The PHONES
Notes And The EGI Subordinated Note.* ......................................................8

               a.    The Swap Claim Represents Amounts Due On Or
In Connection With The Credit Agreement Indebtedness............10

               b.    The Swap Claim Represents Indebtedness Of Tribune. .................12

          2.    *The DCL Plan Does Not "Unfairly" Discriminate  With Respect
To The Swap Claim.* ....................................................................................16

     B.    The Subordination Provisions Include Distributions Of Settlement
Consideration. ...................................................................................18

          1.    *The PHONES Indenture Provides For Subordination Of The
Settlement Consideration.* ..........................................................................18

          2.    *The EGI Subordination Agreement Provides For Subordination Of
The Settlement Consideration.* ...................................................................19

     C.    The Contractually-Senior Swap Claim Is Entitled To Postpetition Interest. .........24

IV.  **CONCLUSION** .......................................................................................27

US1 32338859.2

## <u>TABLE OF AUTHORITIES</u>

<u>**Page**</u>

<u>**Cases**</u>

*In Armstrong World Ind., Inc.*,
    348 B.R. 111 (D. Del. 2006) ...........................................................................................16

*In re Bank of New England Corp.*,
    364 F.3d 355 (1st Cir. 2004)...........................................................................................25

*Chemical Bank v. First Trust of New York (In re Southeast Banking Corp,)*,
    93 N.Y.2d 178 (N.Y. 1999) ............................................................................................25

*Dean Mgmt., Inc. v. TBS Constr., Inc.*,
    790 N.E.2d 934 (Ill. App. 2003) .....................................................................................27

*Demetree v. Commonwealth Trust Co.*,
    Case No. 14354, 1996 WL 494910 (Del. Ch. Aug. 27, 1996)........................................26

*In re Dura Auto Sys., Inc.*,
    379 B.R. 257 (Bankr. D. Del. 2007) ..............................................................................23

*Federal Deposit Ins. Co. v. W.R. Grace & Co.*,
    877 F.2d 614 (7th Cir. 1989) .........................................................................................15

*In re Greate Bay Hotel & Casino, Inc.*,
    251 B.R. 213 (Bankr. D.N.J. 2000) ..........................................................................16, 17

*Lukasik v. Riddell, Inc.*,
    452 N.E.2d 55 (Ill.App. 1983) .......................................................................................12

*New York Stock Exchange v. Pickard & Co., Inc.*,
    296 A.2d 143 (Del. Ch. 1972).....................................................................................25, 26

*Official Comm. Of Unsecured Creditors of Cybergenics Corp. v. Chinery
    (In re Cybergenics Corp.)*, 226 F.3d 237 (3d Cir. 2000) ...............................................20

*Osborn v. Kemp*,
    991 A.2d 1153 (Del. 2010) .............................................................................................24

*In re Southeast Banking Corp.*,
    156 F.3d 1114 (11th Cir. 1998) ......................................................................................25

*Thompson v. Gordon*,
    948 N.E.2d 39 (Ill. 2011) ...............................................................................................12

US1 32338859.2

**Cases Cont.**

*In re Time Sale Finance Corp.,*
    491 F.2d 841 (3rd Cir. 1974) ............................................................................................24

*In re Unbreakable Nation Co.,*
    437 B.R. 189 (Bankr. E.D. Pa. 2010) ..............................................................................16

*In re Washington Mutual, Inc.,* Case No. 08-12229,
    2011 Bankr. LEXIS 3361 (Bankr. D. Del. Sept. 13, 2011) ..............................................25

**Statutes**

11 U.S.C. § 510(a) ...................................................................................................... 24-25

**Other Authorities**

Calligar, *Subordination Agreements*, 70 Yale L.J. 376 (1961)......................................................25

US1 32338859.2

Oaktree Capital Management, L.P., on behalf of certain investment funds and accounts it manages (collectively, "Oaktree"), as holder of the Swap Claim, submits this Opening Brief in accordance with the Order Establishing Scheduling For (1) Resolution Of The Allocation Disputes And (2) Consideration Of DCL Plan Proponents' Supplemental Disclosure Document, Solicitation Procedures Motion and Plan [docket no. 10692] (the "Allocation Disputes Order").[1]

I.      INTRODUCTION

The Allocation Disputes implicate the Swap Claim in three ways.  *First*, certain parties have challenged the Plan's treatment of the Swap Claim as senior indebtedness entitled to the benefits of subordination vis-à-vis the PHONES Notes and the EGI Subordinated Note.  As shown below, the Plan's treatment of the Swap Claim is appropriate because (a) the Swap Claim is contractually senior to both the PHONES Notes and the EGI Subordinated Note, and (b) even if the Court determines that the Swap Claim does not fall within the scope of the applicable contractual subordination provisions, the Plan does not unfairly discriminate by treating the Swap Claim as if it does.

*Second*, certain parties have argued that, even if the Swap Claim is entitled to the benefits of subordination vis-à-vis the PHONES Notes and the EGI Subordinated Note, the applicable subordination provisions do not apply to distributions of Settlement consideration under the Plan. As shown below, the Plan's inclusion of all Settlement consideration as within the scope of the contractual subordination governing both the PHONES Notes and the EGI Subordinated Note is

---

[1]     Terms not otherwise defined in this Brief have the meanings ascribed to them in the Allocation Disputes Order and the Third Amended Joint Plan Of Reorganization For Tribune Company And Its Subsidiaries Proposed By The Debtors, The Official Committee Of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., And JPMorgan Chase Bank, N.A. (the "Plan") [docket no. 10958].

US1 32338859.2

consistent with the plain language of the subordination agreements and in fact compelled by the Court's holding in its Memorandum on Reconsideration [docket no. 10531] (the "Reconsideration Decision").

*Third*, certain parties have argued that the Swap Claim (and other senior indebtedness) is not entitled to payment of postpetition interest prior to payment of the contractually-subordinated indebtedness.  As shown below, under applicable nonbankruptcy law the EGI Subordinated Note is subordinated to the payment in full of all senior indebtedness, including postpetition interest even where a claim for such interest is disallowed as a matter of bankruptcy law, and the PHONES Notes are subordinated to the payment of postpetition interest to the extent allowed as a matter of bankruptcy law.

## II.    BACKGROUND

### A.    The PHONES Notes.

On April 1, 1999, Tribune Company ("Tribune") issued eight million subordinated debt securities (the "PHONES Notes") pursuant to an Indenture between Tribune and Bank of Montreal Trust Company (the "PHONES Indenture"), excerpts of which are attached as Exhibit A.

The PHONES Notes are subordinated to virtually all material indebtedness of Tribune. Specifically, the PHONES Indenture provides that "the payment of the principal amount, interest, and such other amounts . . . in respect of each and all of the [PHONES Notes] are

hereby expressly made subordinate and subject in right of payment to the prior payment in full of

all Senior Indebtedness."  PHONES Indenture § 14.01 (OCMS-935).[2]

The "Senior Indebtedness" that benefits from such subordination is defined as:

> (2) "<u>Senior Indebtedness</u>" means the ***principal of*** (and
> premium, if any) and ***interest on*** (including interest accruing after
> the filing of a petition initiating any proceeding pursuant to any
> Federal bankruptcy law or any other applicable Federal or State
> law, but only to the extent allowed or permitted to the holder of
> such Indebtedness of the Company in such proceeding) and ***other
> amounts due on or in connection with any Indebtedness*** of the
> Company incurred, assumed or guaranteed and all renewals,
> extensions and refundings of any such Indebtedness of the
> Company; provided, however, that the following will not constitute
> Senior Indebtedness:  [exceptions not relevant to the Swap Claim]

PHONES Indenture § 14.01(2) (OCMS-936) (emphasis added).

"Indebtedness" in turn is defined in relevant part as:

> (1) "<u>Indebtedness</u>" as applied to a Person, means, as of the
> date on which Indebtedness is to be determined and without
> duplication (i) ***all obligations represented by notes, bonds,
> debentures or similar evidences of indebtedness***; [and] (ii) ***all
> indebtedness for borrowed money*** . . . .

PHONES Indenture § 14.01(1) (OCMS-936) (emphasis added).

Under the PHONES Indenture, Tribune was free to incur unlimited amounts of Senior

Indebtedness.  The Prospectus for the PHONES (the "<u>PHONES Prospectus</u>"), excerpts of which

are attached as Exhibit B, specifically warned prospective investors that:

> The subordinated indenture under which the PHONES will be
> issued ***will not limit Tribune's or our subsidiaries' ability to incur
> additional indebtedness***, or to grant liens on assets to secure
> indebtedness, to pay dividends or to repurchase shares of capital

---

[2]    References to "OCMS-___" are to the Bates stamp number on the Exhibits attached to the
accompanying Appendix Of Exhibits In Support Of Oaktree Capital Management, L.P.'s
Opening Brief Regarding Allocation Disputes.  All Exhibit references are to that
Appendix.

stock. ***The subordinated indenture does not contain any
provisions specifically intended to protect holders of the
PHONES in the event of a future highly leveraged transaction
involving us***, including a change of control, or other similar
transaction that may adversely affect holders of the PHONES.

PHONES Prospectus at S-9 (OCMS-955) (emphasis added).

## B.    The Credit Agreement And The Swap Documents.

As contemplated by the PHONES Prospectus, Tribune engaged in a series of leveraged

transactions in 2007.  Those transactions included incurring approximately $8 billion in "Senior

Indebtedness" (as defined in the PHONES Indenture) under the Credit Agreement dated as of

May 17, 2007 (as amended, restated, supplemented or otherwise modified from time to time, the

"Credit Agreement"), excerpts of which are attached as Exhibit C.

The Credit Agreement provided for interest to accrue at a variable rate.  *See* Credit

Agreement § 2.07 (providing for interest to accrue at a "Base Rate" or a "Eurodollar Rate")

(OCMS-1181) and § 1.01 (defining "Base Rate" as "a fluctuating interest rate" calculated in

reference to the Federal Funds Rate and "Eurodollar Rate" as calculated in reference to LIBOR

at specified points in time) (OCMS-1138 and -1147).  Section 5.01(k) of the Credit Agreement,

however, obligated Tribune to "enter into, and for a minimum of two years thereafter maintain,

Hedge Agreements . . . that result in at least 35% of the aggregate principal amount of total

Consolidated Debt for Borrowed Money being effectively subject to a fixed or maximum interest

rate."  Credit Agreement § 5.01(k) (OCMS-1204).

In compliance with that obligation, Tribune entered into the 1992 ISDA Master

Agreement, dated as of July 2, 2007 (the "Swap Agreement") with Barclays Bank PLC

("Barclays"), and on July 3, 2007, Tribune and Barclays executed three Rate Swap

Confirmations under the Swap Agreement relating to a total of $2.5 billion of borrowings under

- 4 -

the Credit Agreement (such Confirmations, together with the Swap Agreement, the "Swap Documents"), copies of which are attached as Exhibit D.

Under those Swap Documents, Tribune agreed to pay interest on the hedged Credit Agreement obligations at a fixed rate and, in return, Barclays agreed to pay interest on the hedged obligations at the variable rates set forth in the Credit Agreement. The Swap Documents therefore fixed Tribune's interest obligations for the $2.5 billion of borrowings under the Credit Agreement at the rates specified in the Rate Swap Confirmations, thus satisfying Tribune's obligations under Section 5.01(k) of the Credit Agreement and effectively substituting a portion of Tribune's Credit Agreement indebtedness with its obligations under the Swap Documents.

As is typical in interest rate swap agreements, the Swap Documents provide for the termination and settling up of the hedging arrangements upon an event of default. *See* Swap Agreement §§ 6(a), (b), and (c) (OCMS-1464 to -1465). Among other things, upon termination, the breaching "out of the money" party (the party against whom interest rates have moved) is obligated to make a payment to the non-breaching "in the money" party to compensate for the loss in value occasioned by the termination, calculated with reference to what the "in the money" party would have to pay in the market to replicate the hedging arrangement at the time of termination. *See* Swap Agreement §§ 6(d) and (e) (OCMS-1465 to 1466). Like other obligations represented by notes, bonds, debentures or similar evidences of indebtedness, that payment obligation bears interest and gives rise to contractual rights of set off. *See* Swap Agreement §§ 2(e) (OCMS-1459), 5(b) (OCMS-1481), and 5(h) (OCMS-1482).

On December 8, 2008, Tribune filed its petition under chapter 11 of the Bankruptcy Code and, pursuant to Sections 5 and 6 of the Swap Agreement, Barclays issued a "Notice of Early Termination" terminating the Swap Agreement (OCMS-169), a copy of which is attached as

Exhibit E.  Because interest rates had declined, Barclays thereby became entitled to payment in

accordance with Section 6(e) of the Swap Agreement.  Accordingly, on December 9, 2008,

Barclays delivered to Tribune a "Statement Of Payment On Early Termination Of ISDA Master

Agreement" (OCMS-172), a copy of which is attached as Exhibit F, pursuant to which Barclays

calculated the amount due from Tribune at $150,948,822.[3]  Barclays thereafter filed proofs of

claim against Tribune and its guarantor subsidiaries for the amounts due in respect of the Swap

Documents and funds or accounts managed by Oaktree subsequently acquired those claims from

Barclays.[4]

### C.    The EGI Subordinated Note.

On December 20, 2007, Tribune issued a Subordinated Promissory Note (the "EGI

Subordinated Note") in the amount of $225 million to EGI-TRB LLC ("EGI").  The EGI

Subordinated Note is subject to a Subordination Agreement (the "EGI Subordination

Agreement"), a copy of which is attached as Exhibit G, providing for the complete subordination

of the EGI Subordinated Note to all "Senior Obligations" as follows:

> 2.    Subordination.  The Subordinated Obligations[5] are
> subordinate and junior in right of payment to all Senior Obligations
> to the extent provided in this Agreement.  No part of the

---

[3]    There is no dispute about the amount of this liability.  The Plan, in fact, provides that "[t]he Swap Claim shall be Allowed against Tribune in the amount of $150,948,822." Plan § 3.2.6(b).

[4]    Barclays' claim against Tribune (without exhibits) and Oaktree's notices of partial transfer of claim are attached as Exhibits H and I.  Copies of Barclays' claims against the guarantor subsidiaries and Oaktree's assignments of those claims are available upon request.

[5]    "Subordinated Obligations" are defined as "the unpaid principal of and interest on the [EGI] Subordinated Note and all other obligations and liabilities of [Tribune] to the Subordinating Creditor, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, in each case, arising under the Subordinated Note."  EGI Subordination Agreement § 1 (OCMS-1427).

US1 32338859.2

> Subordinated Obligations shall have any claim to assets of the
> Company on a parity with or prior to the claim of the Senior
> Obligations.  Unless and until the obligations to extend credit to
> the Company under the Senior Documents shall have been
> irrevocably terminated and the Senior Obligations have been paid
> in full in cash, the Subordinating Creditor will not take, demand or
> receive from the Company, and the Company will not make, give
> or permit, directly or indirectly, by set-off, redemption, purchase or
> in any other manner, any payment of (of whatever kind or nature,
> whether in cash, property, securities or otherwise), whether in
> respect of principal, interest or otherwise, or security for the whole
> or any part of the Subordinated Obligations.

EGI Subordination Agreement § 2 (OCMS-1427).

The EGI Subordination Agreement broadly defines "<u>Senior Obligations</u>" as:

> [A]ll obligations, indebtedness and other liabilities of the Company
> other than (i) any such obligations, indebtedness or liabilities that
> by their express terms rank pari passu or junior to the Company's
> obligations under the Subordinated Note and (ii) trade payables
> and accrued expenses incurred in the ordinary course of business,
> in each case, whether incurred on or prior to the date hereof or
> hereafter incurred.

Subordination Agreement § 1 (OCMS-1426).

The intent of the Subordination Agreement apparently was to make the EGI Subordinated Note the "most junior in the capital structure."  *See* Motion of Wilmington Trust Company, As Successor Indenture Trustee, For An Order Granting Leave To Take Discovery And Compelling Discovery From JPMorgan and Citigroup [docket no. 10868] at Ex. B.

## III.    ARGUMENT

Three Allocation Disputes now involve the Swap Claim:  (1) whether the Plan properly treats the Swap Claim as senior indebtedness entitled to the benefits of subordination vis-à-vis the PHONES Notes and the EGI Subordinated Note; (2) whether, even if the Swap Claim is entitled to the benefits of subordination vis-à-vis the PHONES Notes and the EGI Subordinated

- 7 -

Note, the applicable subordination provisions apply to distributions of Settlement consideration under the Plan; and (3) whether the Swap Claim, as a contractually senior claim, is entitled to payment of postpetition interest prior to payment of the contractually-subordinated indebtedness.

Taking each in turn, as shown in detail below, the Plan's treatment of the Swap Claim is appropriate because the Swap Claim is contractually senior to both the PHONES Notes and the EGI Subordinated Note and because, even if the Court determines that the Swap Claim does not fall within the scope of the applicable contractual subordination provisions, the Plan does not unfairly discriminate by treating the Swap Claim as if it does.  Further, the Plan's inclusion of all Settlement consideration as within the scope of the contractual subordination governing both the PHONES Notes and the EGI Subordinated Note is consistent with the plain language of the subordination agreements and compelled by the Court's holding in the Reconsideration Decision. Finally, the subordination provisions of the EGI Subordination Agreement provide for subordination to the payment in full of all senior indebtedness, including the Swap Claim, with postpetition interest even to the extent disallowed as a matter of bankruptcy law, and the plain language of the PHONES Indenture makes the PHONES Notes subordinated to the payment of postpetition interest to the extent allowed as a matter of bankruptcy law.

A.    **The Plan's Treatment Of The Swap Claim As Senior To The PHONES Notes And The EGI Subordinated Note Is Appropriate.**

1.    The Swap Claim Is Contractually Senior To Both The PHONES Notes And The EGI Subordinated Note.

EGI Subordinated Note.  EGI concedes that the Swap Claim constitutes a Senior Obligation under the EGI Subordination Agreement.  Specifically, in its Preliminary Statement regarding the Allocation Disputes, EGI identified only "Trade Claims" and "Retiree Claims" as categories of claims not entitled to the benefits of the EGI Subordination Agreement.  *See* EGI-TRB's Preliminary Statement On Allocation Disputes [docket no. 10791] at 3-4.  By implication,

EGI agrees that the Swap Claim *is* senior, and its failure to argue otherwise precludes it from taking any contrary position at this time. *See* Allocation Disputes Order ¶ 13 (any party "that wishes to take a position on any Allocation Dispute shall file a statement setting forth the Allocation Dispute(s) that such Party intends to take a position on [and] a brief statement of such position with respect to each such Allocation Dispute").[6]

PHONES Notes.  Although they now argue to the contrary, the former proponents of the Noteholder Plan – including Wilmington Trust Company (indenture trustee for the PHONES) ("Wilmington Trust"), Aurelius Capital Management, Law Debenture Trust Company, and Deutsche Bank Trust Company Americas (collectively, the "Noteholders") – previously made a similar concession with respect to the seniority of the Swap Claim vis-à-vis the PHONES Notes. Specifically, in their objection to confirmation of the Second Amended Plan, the Noteholders stated:

> The proper "waterfall" allocation of $446 million in "settlement consideration" allocable to Tribune would be as follows:  First, there would be a pro rata allocation of $446 million among the Senior Noteholder Claims, the Swap Claim, Other Parent Claims (excluding the Swap Claim), PHONES Notes Claims and EGI-TRB LLC Notes Claims.  Second, the initial allocations to the PHONES Notes Claims and EGI-TRB LLC Notes Claims would

---

[6]    In any event, EGI had no choice but to make that concession, as the Swap Claim clearly is senior under the EGI Subordination Agreement.  That agreement defines "Senior Obligations" as "all obligations, indebtedness and other liabilities of the Company." Subordination Agreement § 1 (OCMS-1426).  This encompasses the Swap Claim.  The EGI Subordination Agreement only excludes from the broad definition of Senior Obligations "obligations, indebtedness or liabilities that by their express terms rank pari passu or junior to" the EGI Subordinated Note or "trade payables and accrued expenses incurred in the ordinary course of business, in each case, whether incurred on or prior to the date hereof or hereafter incurred."  *Id.*  Neither category of exclusion applies to the Swap Claim, which contains no provisions providing for equal or junior ranking vis-à-vis the EGI Subordinated Note and is not a trade payable or accrued ordinary course of business expense.  Oaktree reserves all rights in the event that EGI argues to the contrary notwithstanding the concession in its Preliminary Statement.

- 9 -

> be **reallocated on a pro rata basis to Senior Noteholder Claims
> <u>and the Swap Claim</u>**, but not the Other Parent Claims because such
> claims are not entitled to the benefit of the subordination
> provisions according to the [t]erms of the PHONES Notes
> Indenture and the EGI-TRB LLC Notes. . . .    **Recoveries on Senior
> Noteholder Claims ($1.283 billion) and <u>Swap Claim</u>
> ($150.9 million) would increase if the waterfall and
> subordination provisions were applied correctly** from 33.59% to
> 34.7%.

Objection Of Noteholder Plan Proponents To Confirmation Of The Debtor/Committee/Lender

Plan Of Reorganization (Part I) [docket no. 8013] at ¶396 (emphasis added) (footnote omitted).[7]

Although each of the Noteholders has now recanted that concession and argued that the

Swap Claim does not constitute "Senior Indebtedness" under the PHONES Indenture, it is telling

that these sophisticated parties read the language of the PHONES Indenture as providing for

seniority of the Swap Claim at all times through the hearing on confirmation of the Second

Amended Plan.  In any event, as shown below, the plain language of the PHONES Indenture

refutes the Noteholders' new argument.

      a.      *The Swap Claim Represents Amounts Due On Or In Connection
With The Credit Agreement Indebtedness.*

The Noteholders assert that the Swap Claim does "not fall within the definition of

'Indebtedness' under the PHONES Notes Indenture and thus cannot qualify as 'Senior

Indebtedness' under the PHONES Notes Indenture."  Wilmington Trust Preliminary Statement

[docket no. 10792] at ¶ 4(a)(i).  This is a *non sequitur*.  In order to benefit from the subordination

provisions of the PHONES Indenture, the Swap Claim need only fit within the definition of

---

[7]    The first time that any party argued that the Swap Claim was not contractually senior to
the PHONES was two weeks into the confirmation hearings.  April 13, 2011 Hearing
Transcript at 192-195; April 14, 2011 Hearing Transcript at 128-129.  Wilmington Trust
did not raise the argument until the submission of its post-trial brief on May 11, 2011.  *See*
Post-Confirmation Hearing Brief of Wilmington Trust Company, as Successor Indenture
Trustee for the PHONES [docket no. 9268].

US1 32338859.2

"Senior Indebtedness," which is defined to include all "amounts **due on or in connection with** Indebtedness of [Tribune]."  PHONES Indenture § 14.01(2) (OCMS-936).  The Swap Claim constitutes Senior Indebtedness because it represents "amounts due on or in connection with" Tribune Indebtedness – specifically, obligations arising under the Credit Agreement.

To start, there is no question that amounts due under the Credit Agreement are "Indebtedness."  Those are "obligations represented by notes, bonds, debentures, or similar evidences of indebtedness" and are "for borrowed money".  PHONES Indenture § 14.01(1) (OCMS-936).

Moreover, as the Noteholders previously have conceded,[8] there also is no question that Tribune's obligations under the Swap Documents are amounts due "in connection with" the Credit Agreement indebtedness.  In fact, the Credit Agreement affirmatively **required** Tribune to enter into the Swap Documents in order to replace a portion of the variable-rate Credit Agreement debt with fixed-rate obligations.  Credit Agreement § 5.01(k) (OCMS-1204).  The Swap Documents did this by fixing Tribune's interest obligations for $2.5 billion of borrowings under the Credit Agreement and effectively substituting a portion of Tribune's Credit Agreement indebtedness with the obligations now embodied in the Swap Claim.  Tribune's obligations arising under the Swap Documents inexorably are related to – and are now due "in connection with" – the Credit Agreement.

Lest there be any doubt about this point, one need only look to the Guarantee Agreement by which various Tribune subsidiaries guaranteed Tribune's obligations in respect of **both** the

---

[8]   "Pursuant to the senior loan agreement which provided financing for the LBO transaction, Tribune was required, contractually required to enter into a hedging agreement to offset a percentage of its interest rate exposure under the senior loan agreement.  As a result, Tribune did, in fact, enter into" the Swap Documents.  Remarks of D. Golden, April 14, 2011 Hearing Transcript at 109-110, excerpts of which are attached as Exhibit J.

- 11 -

Credit Agreement and the Swap Documents in the same document, on the same terms, and on equal footing. The Guarantee Agreement actually combines together within the same defined term "Guaranteed Obligations" *all* obligations under the Swap Documents *and* the Credit Agreement, treating those obligations as one and the same. *See* Guarantee Agreement dated June 4, 2007 (the "Guarantee Agreement") § 1 (OCMS-147), a copy of which is attached as Exhibit K. That combination of Swap and Credit Agreement obligations clearly shows that the Swap Claim is due "in connection with" the Credit Agreement.

As a consequence, the Swap Claim constitutes "Senior Indebtedness" under the PHONES Indenture because it represents "other amounts due on or in connection with" Indebtedness of Tribune – the Credit Agreement debt. Indeed, if the amounts due and payable under the Swap Documents are not "in connection with" the Credit Agreement, it is hard to conceive of any obligation that would be covered by this phrase and no other term of the definition of Senior Indebtedness. *See Thompson v. Gordon*, 948 N.E.2d 39, 47 (Ill. 2011) (under governing Illinois law, "[a] contract must be construed as a whole, viewing each provision in light of the other provisions."); *Lukasik v. Riddell, Inc.*, 452 N.E.2d 55, 60 (Ill. App. 1983) (under governing Illinois law, "[a]n agreement is to be construed to give meaning to all parts and the court must avoid a construction which renders some provisions superfluous.").

b.    *The Swap Claim Represents Indebtedness Of Tribune.*

In addition to constituting "Senior Indebtedness" by virtue of being due "in connection with" the Credit Agreement, the Swap Claim *also* independently constitutes "Indebtedness" – and therefore "Senior Indebtedness" – in its own right. As explained above, with exceptions not relevant to the Swap Claim, "Senior Indebtedness" is defined to include amounts "due on" "Indebtedness" of Tribune. The term "Indebtedness" is defined to include "(i) *all obligations represented by notes, bonds, debentures or similar evidences of indebtedness*; [and] (ii) *all*

- 12 -

***indebtedness for borrowed money***." PHONES Indenture § 14.01(1) (OCMS-936) (emphasis added).

The Swap Claim qualifies as "Indebtedness" under both prongs of that definition because Tribune's obligations in respect of the Swap Documents have all of the hallmarks of "evidences of indebtedness" similar to those "represented by notes, bonds, [and] debentures" and of "indebtedness for borrowed money." Among other things, as with typical notes, bonds, and debentures, the Swap Claim bears interest and gives rise to contractual rights of set off. *See* Swap Agreement §§ 2(e) (OCMS-1459), 5(b) (OCMS-1481), and 5(h) (OCMS-1482).

Moreover, Tribune and other parties consistently have treated Tribune's obligations under the Swap Documents as indebtedness for borrowed money. For example, Tribune regularly reported the Swap Claim as "Debt" in its publicly reported financial statements. First, in its 2007 Form 10-K, Tribune included amounts due on account of the Swap Documents as "Debt," stating: "[T]he Company is party to three interest rate swaps covered under the Swap Documents. At Dec. 30, 2007, the fair value of these swaps had declined since their inception date of July 3, 2007 by $91 million, ***which is included in long-term debt***." Tribune 10-K for 2007, an excerpt of which is attached as Exhibit L, at 114 (OCMS-301) (emphasis added). Tribune then made similar pronouncements in each of its first three quarterly reports for 2008. *See* Tribune 10-Q for Quarter Ending March 30, 2008, an excerpt of which is attached as Exhibit M, at 17 (OCMS-636) ("At March 30, 2008, the fair value of these swaps had declined since their inception date of July 3, 2007 by $160 million, ***which is included in long-term debt***") (emphasis added); Tribune 10-Q for Quarter Ending June 29, 2008, an excerpt of which is attached as Exhibit N, at 17 (OCMS-697) ("At June 29, 2008, the fair value of these swaps had declined since their inception date of July 3, 2007 by $104 million, ***which is included in long-***

- 13 -

*term debt*") (emphasis added); Tribune 10-Q for Quarter Ending September 28, 2008, an excerpt

of which is attached as Exhibit O, at 17 (OCMS-773) ("At September 28, 2008, the fair value of

these swaps had declined since their inception date of July 3, 2007 by $100 million, *of which*

*$16 million is included in short-term debt and $84 million is included in long-term debt*")

(emphasis added).

    Tribune's credit documents also treat the Swap Claim as indebtedness for borrowed

money.  The Credit Agreement, for example, specifically includes in its definition of "***Debt for***

***Borrowed Money***" the "net payment obligations of [a] Person in respect of Hedge Agreements"

(which are defined to include the Swap Documents).  Credit Agreement § 1.01 (OCMS-1143).

Similar definitions exist in Section 1.01 of the Bridge Credit Agreement dated as of June 19,

2006, an excerpt of which is attached as Exhibit P, which defines "Debt for Borrowed Money" to

include "net payment obligations . . . in respect of Hedge Agreements", and in Section 1.01 of

Tribune's Credit Agreement dated as of June 19, 2006, an excerpt of which is attached as Exhibit

Q, which contains an identical definition.  *See* OCMS-1000 and OCMS-1063, respectively.

    Other provisions of the Credit Agreement similarly recognize the Swap Claim as debt.

For example, Section 5.02 limits Tribune's ability to incur "***Debt in respect of Hedging***

***Obligations*** (other than Secured Hedging Obligations) that does not exceed $25,000,000 in an

aggregate principal amount outstanding at any time."  Credit Agreement § 5.02(c)(x) (OCMS-

1209) (emphasis added).  Similarly, Section 1.01 provides that "Consolidated Interest Expense"

"shall be calculated after giving effect to Hedge Agreements related to interest rates (including

associated costs)."  Credit Agreement § 1.01 (OCMS 1141-2).  In each case, these provisions

US1 32338859.2

recognize that the Swap Claim is a component of borrowed money – namely, the interest that is attributable to the money borrowed under the Credit Agreement.[9]

All of this confirms what the Noteholders (and every other party) assumed from the beginning of these proceedings – that the deeply-subordinated PHONES Notes are subordinated to the $151 million Swap Claim, which was treated as "Debt for Borrowed Money" in Tribune's loan agreements and financial statements and which arose out of and in connection with the Credit Agreement that everyone agrees is senior under the PHONES Indenture.[10]

---

[9]   Consideration of Tribune's loan documents and financial statements is appropriate in this context. The Seventh Circuit has held that, under Illinois law (which applies under Section 1.12 of the PHONES Indenture), there are two types of contractual ambiguities that may give rise to the admission of parol evidence:

> One is internal ("intrinsic"), and is present when the agreement itself is unclear. The other is external ("extrinsic") and is present when, although the agreement itself is a perfectly lucid and apparently complete specimen of English prose, anyone familiar with the real-world context of the agreement would wonder what it meant with reference to the particular question that has arisen. So parol and other extrinsic evidence is admissible, even in a case involving a contract with an integration clause, to demonstrate that the contract is ambiguous.

*Federal Deposit Ins. Co. v. W.R. Grace & Co.*, 877 F.2d 614, 620 (7th Cir. 1989) (internal citations omitted). In this case, even if the language in the PHONES Indenture is clear, "anyone familiar with the real-world context of the agreement" might "wonder what it meant with reference to" the question of whether the Swap Claim falls within the definition of "Indebtedness".

[10]   Although the Court previously approved the classification of the Swap Claim in the class of Other Parent Claims, *see* Opinion On Confirmation [docket no. 10133] (the "Confirmation Opinion") at 102-04, it is anticipated that, as they did in connection with the prior confirmation proceedings, the Noteholders will point to the DCL Plan Proponents' arguments in support of that classification as "evidence" that the Swap Claim is not "Indebtedness" under the PHONES Indenture. Specifically, the Noteholders likely will argue that the DCL Plan Proponents' statements that the Swap Claim does not constitute Credit Agreement debt and is not "for money loaned" somehow prove that the Swap Claim is not senior.

Not so. There is nothing inconsistent with the arguments made in support of classification of the Swap Claim and the points established above. Oaktree is not suggesting that the Swap Claim itself is for money loaned or that it is part of the Senior Loan Claims. The point simply is that the Swap Claim is due "in connection with" the Credit Agreement,

- 15 -

2.    The DCL Plan Does Not "Unfairly" Discriminate
<u>With Respect To The Swap Claim</u>.

Further, even if the Court concludes that the Swap Claim does not constitute Senior

Indebtedness notwithstanding the points made above, the Court nevertheless should hold that the

Plan's treatment of the Swap Claim – as negotiated by the Debtors and the Official Committee of

Unsecured Creditors (the "<u>Committee</u>") in the Plan Settlement – does not unfairly discriminate

vis-à-vis the Senior Noteholders (as the other beneficiaries of the subordination provisions).

To start, as the Court recognized in the Confirmation Opinion, "[m]inor or immaterial

differences in plan treatment do not rise to the level of ***unfair*** discrimination."  Confirmation

Opinion at 110 (emphasis in original) (citing *In re Unbreakable Nation Co.*, 437 B.R. 189, 203

(Bankr. E.D. Pa. 2010) (the difference between 1.5% and 1.25% in a proposed distribution to

two classes was not unfair discrimination); and *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R.

213, 231 (Bankr. D.N.J. 2000) (the difference between an 80% and 76% distribution was not a

"materially lower percentage recovery" that would constitute unfair discrimination)).

Specifically, under *In Armstrong World Ind., Inc.*, 348 B.R. 111 (D. Del. 2006), a rebuttable

presumption of unfair discrimination only arises where, among other things, there exists "a

materially lower percentage recovery" for one group of similarly situated creditors than another.

Confirmation Opinion at 110.

Here, as shown in the Appendix to the Brief filed by the Committee in respect of the

Allocation Disputes (the "<u>Committee Recovery Appendix</u>"), there is not a "materially lower

---

that the Swap Claim is an obligation represented by "evidences of indebtedness" similar to
"notes, bonds, [and] debentures", and that, as evidenced by its treatment in Tribune's
financial statements and credit agreements, the Swap Claim effectively is "indebtedness
for borrowed money" even though the Swap Documents themselves did not involve any
advance of funds to Tribune.

- 16 -

percentage recovery" for the Senior Noteholders even if the *entire* class of Other Parent Claims is held not to be entitled to seniority under the PHONES Indenture or the EGI Subordination Agreement.[11]  Rather, even in the "worst case" scenario involving allowance of the PHONES Notes at the "high" amount and no seniority for any Other Parent Claim – itself a completely unrealistic scenario given EGI's concession that the Swap Claim is entitled to seniority under the EGI Subordination Agreement – initial recoveries for the Senior Noteholders only decline from *36.5%* to *33.6%*[12] – hardly a "materially lower percentage recovery".

Moreover, because the Swap Claim only accounts for approximately 57% of the estimated amount of Other Parent Claims[13] – the proportion of that immaterial lower recovery actually attributable to the Swap Claim is even smaller.  Just taking the Swap Claim into account, even in the worst case scenario involving allowance of the PHONES Notes at the "high" amount, the impact of treating the Swap Claim as senior only reduces initial recoveries for the Senior Noteholders from 36.5% to 34.7%,[14] *less than two percentage points*.

This is a far cry from the "grossly disparate treatment (50% or more) to similarly situated creditors" condemned by other courts.  *Greate Bay*, 251 B.R. at 231.  Accordingly, the Plan's treatment of the Swap Claim – pursuant to the negotiated compromise embodied in the Settlement already approved by the Court in the Confirmation Opinion – does not discriminate unfairly against the Senior Noteholders and is appropriate under the circumstances.

---

[11]   Oaktree joins in the arguments raised by the Committee in its Brief in respect of the Allocation Disputes.

[12]   These figures compare the amounts set forth in the fifth row of Table 1 on the Committee Recovery Appendix to the amounts set forth in the first row in the same Table.

[13]   The total amount of Other Parent Claims is estimated to be $264,743,000, with the Swap Claim comprising 150,949,000 (57%) of that total.

[14]   These figures compare the amounts set forth in the fifth row of Table 1 on the Committee Recovery Appendix to the amounts set forth in the third row in the same Table.

US1 32338859.2

B.     **The Subordination Provisions Include Distributions Of Settlement Consideration.**

Wilmington Trust and EGI assert that, even if the Swap Claim is entitled to the benefits

of subordination vis-à-vis the PHONES Notes and the EGI Subordinated Note, the applicable

subordination provisions do not apply to distributions of Settlement consideration under the Plan.

These assertions are fundamentally wrong and directly in conflict with the Court's express

findings and conclusions in the Reconsideration Decision.

1.     The PHONES Indenture Provides For
       Subordination Of The Settlement Consideration.

In its Position Statement, Wilmington Trust asserts that the Settlement consideration to

be provided by Senior Lenders, Bridge Lenders and Settling Step Two Payees pursuant to the

Plan is not subject to subordination under the PHONES Indenture – meaning that holders of the

PHONES Notes are entitled to share in distributions of that Settlement consideration under the

Plan – because "[s]ettlement proceeds from Chapter 5 avoidance actions are not subject to

subordination under the PHONES Notes Indenture."  Wilmington Trust Position Statement

¶ 2(a)(ii).

The Court, however, already decided this exact issue in the Reconsideration Decision

where, following an exhaustive analysis, the Court concluded that future recoveries on fraudulent

conveyance actions by the Litigation Trust to be formed pursuant to the Plan *are* included within

the subordination provisions of the PHONES Indenture.  Wilmington Trust acknowledges that

the Court's rationale and ruling are dispositive on this point with respect to the Settlement

consideration, asserting only that the issue "should be reserved pending final adjudication of

Wilmington Trust's appeal" of the Reconsideration Decision.  Wilmington Trust Position

Statement ¶ 2(a)(iii).[15]

    As a consequence, Oaktree relies upon the Reconsideration Decision in this respect and

reserves the right to address in its Reply Brief any new argument made by Wilmington Trust on

the issue.

> 2.    The EGI Subordination Agreement Provides For
> Subordination Of The Settlement Consideration.

    Much like Wilmington Trust, notwithstanding the Reconsideration Decision, EGI asserts

that the EGI Subordination Agreement does not provide for subordination of Settlement

consideration because "(i) EGI-TRB's claims are subordinated only as to distributions of 'assets

of the Company,' (ii) proceeds from avoidance actions are not 'assets of the Company,' and

(iii) the consideration given under the Settlement is properly classified as proceeds from

avoidance actions because . . . those are the only claims against the Settling Parties that the

Examiner found reasonably likely to prevail."  EGI Preliminary Statement [docket no. 10791]

at 3.  This is flatly wrong for several reasons.

    *First*, as an initial matter, the Settlement under the Plan settles a wide panoply of causes

of action, including the claims asserted by the Committee in its adversary proceeding against

Senior Lenders for unjust enrichment, equitable subordination, and aiding and abetting breach of

fiduciary duty.  There has been no allocation of Settlement consideration between and among

those causes of action and the "avoidance actions" referenced by EGI, nor could there be.

---

[15]    Wilmington Trust is not correct that this Court has been divested of jurisdiction to
    consider the issue as a consequence of its pending appeal.  Oaktree and the other DCL
    Plan Proponents previously raised arguments on this point, which are incorporated by this
    reference.  *See* DCL Plan Proponents' Objection to Motion of Wilmington Trust Company
    for Leave to Appeal Bankruptcy Court's Decision on Subordination [docket no. 10690].

US1 32338859.2

Moreover, even if EGI were correct (it is not) that all Settlement consideration was paid only in respect of the "avoidance actions" (it was not), the primary avoidance actions against the settling parties were brought under section 548 of the Bankruptcy Code – not section 544 – and therefore arguably are assets of Tribune in any event.[16]

*Second*, even if all of the Settlement consideration were attributable to claims that fall within the scope of *Cybergenics* (it is not), the plain language of the EGI Subordination Agreement does not support EGI's bald assertion that its claims "are subordinated only as to distributions of 'assets of the Company,'" particularly considering the Court's highly-analogous reasoning in the Reconsideration Decision.

To the contrary, like the PHONES Indenture, the EGI Subordination Agreement clearly evinces an "overall purpose" to "ensure that the [EGI Subordinated Notes] are subordinated to the Senior Obligations." Reconsideration Decision at 15. To start, Section 2 of the EGI Subordination Agreement clearly and unequivocally provides for the subordination of the EGI Note and other "Subordinated Obligations" to all "Senior Obligations":

---

[16]    The Court has held that *Cybergenics* stands for the proposition that "fraudulent transfer claims are not assets of the debtor." Reconsideration Decision at 7 n.11 (citing *Official Comm. Of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.)*, 226 F.3d 237, 245 (3d Cir. 2000)). It is worth noting, however, that *Cybergenics* only involved causes of action arising under state law in favor of individual creditors and pursued in the bankruptcy cases by authority of section 544. Because the transfers at issue here were within the two-year lookback period, the Settlement implicates causes of action arising under section 548, which do not involve state law and are not available to individual creditors. This is an important distinction, as *Cybergenics* itself recognized the difference between federal causes of action available to the debtor and its estate and state law causes of action only viable by virtue of section 544. *Id.* at 243 & n.8 ("The avoidance power provided in section 544(b) is distinct from others because a trustee or debtor in possession can use this power only if there is an unsecured creditor of the debtor that actually has the requisite nonbankruptcy cause of action.[n.8] Section 548 of the Bankruptcy Code also authorizes a trustee (or debtor in possession) to avoid fraudulent transfers and obligations, and, unlike section 544(b), is not contingent upon the identification of an actual unsecured creditor with a state law cause of action.").

> 2.    <u>Subordination</u>.  The Subordinated Obligations are subordinate and junior in right of payment to all Senior Obligations to the extent provided in this Agreement.  No part of the Subordinated Obligations shall have any claim to the assets of the Company on a parity with or prior to the claim of the Senior Obligations.  Unless and until the obligations to extend credit to the Company under the Senior Documents shall have been irrevocably terminated and the Senior Obligations shall have been paid in full in cash, the Subordinating Creditor will not take, demand or receive from the Company, and the Company will not make, give or permit, directly or indirectly, by set-off, redemption, purchase or in any other manner, any payment of (of whatever kind or nature, whether in cash, property, securities or otherwise), whether in respect of principal, interest or otherwise, or security for the whole or any part of the Subordinated Obligations.

EGI Subordination Agreement § 2 (OCMS-1427).  EGI apparently asserts that this unequivocal subordination somehow is limited by the follow-on references in Section 2 to "assets of the Company" and payments from "the Company".  But those references clearly are not limitations on the scope of the subordination.  They are means of ***enforcing*** the subordination by ensuring that EGI cannot make any claim to assets of Tribune, and that Tribune will not make any payment to EGI, unless and until all Senior Obligations are "paid in full in cash."

The far-reaching nature of the EGI subordination is evidenced by Sections 4 and 6 of the EGI Subordination Agreement.  Section 4, for example, expressly and comprehensively prohibits EGI from taking "any action" to enforce the EGI Subordinated Note unless and until the Senior Obligations are paid in full in cash:

> 4.    <u>Limitation on Enforcement</u>.  Unless and until the obligations to extend credit to the Company under the Senior Documents shall have been irrevocably terminated and the Senior Obligations have been paid in full in cash, ***at no time shall the Subordinating Creditor take or continue any action, or exercise any rights, remedies or powers under the terms of the Subordinated Note, or exercise or continue to exercise any other right or remedy at law or in equity that the Subordinating Creditor might otherwise possess, to collect any Subordinated Obligations***, including without limitation, the acceleration of the Subordinated Obligations, the commencement of any action to

- 21 -

> enforce payment or foreclosure on any lien or security interest, the filing of any petition in bankruptcy or the taking advantage of any other insolvency law of any jurisdiction. . . . If the Subordinating Creditor shall attempt to enforce, collect or realize upon any of the Subordinated Obligations in violation of the terms hereof, any holder of Senior Obligations may, by virtue of the terms hereof, restrain such enforcement, collection or realization, either in its own name or in the name of the Company.

EGI Subordination Agreement § 4 (OCMS-1427) (emphasis added). Under Section 4, EGI expressly is prohibited from exercising "any rights, remedies or powers" under the EGI Subordinated Note, or "any other right or remedy at law or in equity that [EGI] might otherwise possess, to collect" on the EGI Subordinated Note. This sweeping prohibition contains no limitation whatsoever, including no limitation that otherwise would permit enforcement actions in respect of something other than "assets of the Company." As such, it is fundamentally inconsistent with the suggestion that the subordination of the EGI Subordinated Note somehow is limited to "assets of the Company".

Section 6 of the EGI Subordination Agreement, which provides for broad turnover obligations by EGI, further confirms that the subordination of the EGI Subordinated Note is not limited to "assets of the Company":

> 6.    Payments Received By Subordinating Creditor. Except as to payments or distributions which the Company is permitted to pay to Subordinating Creditor or which Subordinating Creditor is permitted to accept and retain pursuant to this Agreement, ***all payments or distributions*** upon or with respect to any Subordinated Obligation which are made by or on behalf of the Company or ***received by or on behalf of the Subordinating Creditor*** in violation of or contrary to the provisions of this Agreement shall be received in trust for the benefit of the holders of Senior Obligations and ***shall be paid over upon demand to such holders for application to the Senior Obligations until the Senior Obligations shall have been paid in full in cash***.

EGI Subordination Agreement § 6 (OCMS-1428) (emphasis added). Notably, those turnover obligations are not limited to payments made by Tribune or payments made from "assets of the

- 22 -

Company."  Instead, the turnover obligations arise in respect of "all payments or distributions

upon or with respect to any Subordinated Obligation which are [1] made by or on behalf of the

Company *or* [2] received by or on behalf of the Subordinating Creditor."  EGI's interpretation

directly conflicts with clause [2], which provides for turnover in circumstances other than those

described in clause [1] (payments "by or on behalf of the Company").

Indeed, EGI's proffered interpretation – which would exempt, as the Noteholders have

asserted, $446 million in Settlement consideration from the scope of the subordination provisions

– would make a mockery of the total subordination effected by Sections 2, 4, and 6 of the EGI

Subordination Agreement.  As this Court has noted on several occasions, subordination

agreements are not so easily evaded:

> [A provision in a subordination agreement] should not be
> considered based upon its grammatical structure alone, but also
> within the context of the entire agreement, which, here, is more
> reflective of the parties' intent:  that except in very limited
> circumstances, no payment can be made to the Subordinated
> Noteholders until (1) the Senior Notes are paid in full, or (2) the
> Senior Noteholders consent. . . .  [A limiting interpretation would]
> eviscerate the purpose of the subordination provision in the
> Subordinated Notes Indenture and expand the limited carve out
> beyond its intended scope.

Reconsideration Decision at 15 (quoting *In re Dura Auto Sys., Inc.*, 379 B.R. 257, 270 (Bankr.

D. Del. 2007)).

EGI's interpretation not only would "eviscerate the purpose of the subordination

provision," it would lead to frankly bizarre results.  For example, if EGI were correct, Tribune

could have had $1 billion to distribute on the day before it filed for bankruptcy.  If Tribune kept

that $1 billion, everyone (including EGI) would agree that the funds would be subject to the EGI

Subordination Agreement and disbursed to senior creditors.  If, however, Tribune fraudulently

conveyed that $1 billion immediately before bankruptcy, but then recovered the fraudulent

- 23 -

conveyance during the bankruptcy case, EGI would claim an entitlement to share in the proceeds (as not being "assets of the Company").  That illogical result demonstrates the absurdity of EGI's position in this respect and should not be countenanced by this Court.  *See Osborn v. Kemp*, 991 A.2d 1153, 1160-1 (Del. 2010) (under governing Delaware law, court refused to adopt an absurd interpretation of a contract contrary to its plain meaning).

In the context of the Reconsideration Decision, Wilmington Trust at least had a plausible textual argument that the subordination effected by the PHONES Indenture was limited by a clause in the PHONES Indenture that arguably constrained turnover to senior creditors to circumstances involving "[a]ny distribution of assets of the Company."  EGI has no plausible textual argument whatsoever, and its assertion that the unequivocal subordination of the EGI Subordination Agreement does not apply to Settlement consideration or avoidance actions recoveries must be rejected as fanciful.

### C. The Contractually-Senior Swap Claim Is Entitled To Postpetition Interest.

The PHONES Trustee and EGI assert that beneficiaries of the subordination provisions of the PHONES Indenture and the EGI Subordination Agreement, respectively, are not entitled to payment of postpetition interest prior to the payment of the PHONES Notes or the EGI Subordinated Note.  These assertions are incorrect.

Prior to the enactment of the Bankruptcy Code in 1978, the Third Circuit adopted an equitable rule that a contractually-senior creditor may enforce subordination provisions as to otherwise disallowed postpetition interest only where the subordination agreement at issue "clearly show[s] that the general rule that interest stops on the date of the filing of the petition is to be suspended."  *In re Time Sale Finance Corp.*, 491 F.2d 841, 844 (3rd Cir. 1974).

This so-called "Rule of Explicitness" was abrogated by Congress in the enactment of section 510(a) of the Bankruptcy Code, which provides that a "subordination agreement is

enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law." 11 U.S.C. § 510(a); *see In re Bank of New England Corp.*, 364 F.3d 355, 359 (1st Cir. 2004) ("we conclude that the enactment of section 510(a) of the Bankruptcy Reform Act of 1978 . . . extinguished the Rule of Explicitness in its classic form"); *In re Southeast Banking Corp.*, 156 F.3d 1114, 1124 (11th Cir. 1998) ("we conclude that Congress, by enacting section 510(a) of the Bankruptcy Code, abrogated the pre-Code rule of explicitness").

Pursuant to section 510(a), courts now enforce subordination agreements to the extent "enforceable under applicable nonbankruptcy law." Some "nonbankruptcy law" continues to apply the "Rule of Explicitness." *See, e.g.*, *In re Washington Mutual, Inc.*, Case No. 08-12229, 2011 Bankr. LEXIS 3361 at *115-*118 (Bankr. D. Del. Sept. 13, 2011) (the Rule of Explicitness applies under New York law) (citing *Chemical Bank v. First Trust of New York (In re Southeast Banking Corp,)*, 93 N.Y.2d 178, 186 (N.Y. 1999)).

Here, however, the EGI Subordination Agreement is governed by Delaware law. EGI Subordination Agreement § 13 (OCMS-1429). No court applying Delaware law has applied the equitable gloss of the Rule of Explicitness to the enforcement of subordination agreements. To the contrary, under Delaware law, subordination agreements are interpreted like any other contract. Thus, for example, in *New York Stock Exchange v. Pickard & Co., Inc.*, 296 A.2d 143 (Del. Ch. 1972), the Delaware Chancery Court held that "[g]enerally speaking, a subordination agreement is simply a contract in which a creditor (the 'subordinated' or 'junior' creditor) agrees that the claims of specified senior creditors must be paid in full before any payment on the subordinated debt may be made to, and retained by, the subordinated creditor." *Id.* at 147 (citing Calligar, *Subordination Agreements*, 70 Yale L.J. 376, 383-392 (1961)). As such, subordination

US1 32338859.2

agreements are enforced according to their plain meaning under Delaware law. *See Demetree v.*
*Commonwealth Trust Co.*, Case No. 14354, 1996 WL 494910, *4 (Del. Ch. Aug. 27, 1996)
("Under the plain meaning rule of contract construction, if a contract is clear on its face, the
Court should rely solely on the clear, literal meaning of the words. Where parties have entered
into an unambiguous integrated written contract, the contract's construction should be that which
would be understood by an objective reasonable third party.") (internal citations omitted).

As shown above, the EGI Subordination Agreement provides for the complete and
absolute subordination of the EGI Subordinated Notes to the payment "in full in cash" of all
"Senior Obligations," including the Swap Claim. EGI Subordination Agreement §§ 2, 4, 6
(OCMS-1427 to -1429). Under the Swap Documents, the Swap Claim accrues interest "for the
period from (and including) the original due date for payment to (but excluding) the date of
actual payment." Swap Agreement § 2(e) (OCMS-1459). As a consequence, under the "clear,
literal meaning of the words," the Swap Claim will not be paid "in full in cash" unless and until
all such interest is paid, including the interest accrued from and after Tribune's petition date.
This is consistent with the Delaware Chancery Court's decision in *Pickard & Co.*, where the
court held that a subordination agreement providing for subordination until senior claims were
"fully satisfied" was plain and comprehensive and did not have any implied exceptions. *Pickard*
*& Co.*, 296 A.2d at 148. Thus, under governing Delaware law, the EGI Subordinated Note is
fully subordinated to all such postpetition interest, whether or not Oaktree's claim for
postpetition interest against Tribune is allowed as a matter of bankruptcy law.

The PHONES Notes, on the other hand, are governed by Illinois law, PHONES Indenture
§ 1.12 (OCMS-885), and provide for subordination to the "payment in full of all Senior
Indebtedness," *id.* § 14.01 (OCMS-935). Unlike in the EGI Subordination Agreement, the

PHONES Indenture expressly references postpetition interest, defining "Senior Indebtedness" to include "interest on (including interest accruing after the filing of a petition initiating any proceeding pursuant to any Federal bankruptcy law or any other applicable Federal or State law, but only to the extent allowed or permitted to the holder of such Indebtedness of the Company in such proceeding)." *Id.* § 14.01(2) (OCMS-936).

Under Illinois law (or, for that matter, the abrogated Rule of Explicitness), this clear language is enforceable in accordance with its plain meaning. Specifically, the PHONES Notes are subordinated to all postpetition interest on the Swap Claim "to the extent allowed or permitted to the holder of such Indebtedness" in these bankruptcy cases. *See Dean Mgmt., Inc. v. TBS Constr., Inc.*, 790 N.E.2d 934, 939 (Ill. App. 2003) ("A court must construe the meaning of a contract by examining the language and may not interpret the contract in a way contrary to the plain and obvious meaning of its terms. Unless the contract clearly defines its terms, the court must give the contractual language its common and generally accepted meaning.") Any argument to the contrary flies in the face of the explicit language of the PHONES Indenture and cannot stand.


IV.    **CONCLUSION**

For all of the foregoing reasons, the Court should conclude that (a) the Swap Claim is entitled to the benefit of the subordination provisions of both the PHONES Indenture and the EGI Subordination Agreement; and (b) those subordination provisions encompass distributions of all Settlement consideration under the Plan and postpetition interest on the Swap Claim.

Dated: Wilmington, Delaware
February 24, 2012

*/s/ Robert S. Brady*

Robert S. Brady (Bar No. 2847)
M. Blake Cleary (Bar No. 3614)
YOUNG CONAWAY STARGATT &
TAYLOR LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
Telephone (302) 571-6600
Facsimile (302) 571-1253

-and-

Bruce Bennett
James O. Johnston
Joshua M. Mester
DEWEY & LEBOEUF LLP
333 South Grand Avenue, Suite 2600
Los Angeles, CA 90071-1530
Telephone (213) 621-6000

*Attorneys for Oaktree Capital Management, L.P.*

- 28 -