## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re:                                    :
                                          :  Chapter 11
TRIBUNE COMPANY, et al.,                  :
                                          :  Case No. 08-13141 (KJC)
                    Debtors.              :
                                          :  (Jointly Administered)
                                          :
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

## JOINT OPENING BRIEF OF LAW DEBENTURE TRUST COMPANY OF NEW YORK AND DEUTSCHE BANK TRUST COMPANY AMERICAS WITH RESPECT TO THE ALLOCATION DISPUTES

KASOWITZ, BENSON, TORRES
  & FRIEDMAN LLP
David S. Rosner
Sheron Korpus
Christine A. Montenegro
Matthew B. Stein
1633 Broadway
New York, New York 10019
212-506-1700

*Counsel for Law Debenture Trust Company of New York, solely in its capacity as successor Indenture Trustee for certain series of Senior Notes*

BIFFERATO GENTILOTTI LLC
Garvan F. McDaniel (I.D. No. 4167)
800 N. King Street, Plaza Level
Wilmington, Delaware 19801
302-429-1900

McCARTER & ENGLISH, LLP
David J. Adler
245 Park Avenue
New York, New York 10167
212-609-6800

*Counsel for Deutsche Bank Trust Company Americas, solely in its capacity as successor Indenture Trustee for certain series of Senior Notes*

McCARTER & ENGLISH, LLP
Katharine L. Mayer (I.D. No. 3758)
Renaissance Centre
405 N. King Street
Wilmington, Delaware 19801
302-984-6300

Dated: February 24, 2012

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ................................................................................................. 5

I.    The First Confirmation Process ................................................................. 5

II.   The Reconsideration Order ....................................................................... 6

III.  The Allocation Disputes ........................................................................... 7

ARGUMENT ...................................................................................................... 8

I.    The Subordination Agreements Subordinate any Payment to Holders of the
      PHONES Notes and EGI Note to the Prior Payment in Full of the Senior Notes .............. 8

      A.    The Court Has Previously Held That the Subordination Provisions of the
            PHONES Notes Indenture Apply to All Payments ................................. 8

            1.    The Law of the Case Doctrine Applies ...................................... 8

            2.    The Court's Rationale for Complete Subordination Applies to the
                  Settlement Distributions and Creditors' Trust Distributions ................... 10

            3.    This Court Still Has Jurisdiction to Rule On Whether The
                  Subordination Provisions Apply To Article III and the Creditors'
                  Trust Distributions ................................................................. 14

      B.    The Subordination Provisions Applicable to the EGI Note Apply to All
            Payments On Account of the Indebtedness ......................................... 16

II.   The DCL Plan Must Be Adjusted Because Other Parent Claims Cannot Benefit
      From The Subordination Of The PHONES Notes And The EGI Note ........................... 19

      A.    Other Parent Claims Are Not Senior Indebtedness Under the PHONES
            Notes Indenture ..................................................................... 20

            1.    The Trade Claims Are Not Senior Indebtedness ............................ 21

            2.    The Swap Claim Is Not Senior Indebtedness ............................... 21

            3.    The Retiree Claims Are Not Senior Indebtedness .......................... 23

      B.    Other Parent Claims Are Not Senior Obligations Under the EGI Note .............. 26

            1.    The Trade Claims Are Not Senior Obligations ............................. 26

       2.       The Retiree Claims Are Not Senior Obligations ...................................... 26

       3.       The Swap Claim Is Not Senior Obligations ............................................... 28

   C.    The DCL Plan's Awarding The Economic Benefits Of Subordination To Other Parent Claims That Are Not Contractually Entitled to Such Benefit Violates Key Provisions Of The Bankruptcy Code ............................................... 28

   D.    The DCL Plan's Awarding The Economic Benefits Of Subordination To Other Parent Claims That Are Not Contractually Entitled To Such Benefit Diverts Value That The Senior Noteholders Are Contractually Entitled To Receive .......................................................................................................................... 35

III.    The Determination Of Entitlement To Post-Petition Interest Is Premature and Not Ripe For Adjudication ......................................................................................................... 35

CONCLUSION ............................................................................................................................ 39

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abbott Labs. v. Gardner,*
    387 U.S. 136 (1967)............................................................................................................37

*ACLU v. Mukasey,*
    534 F.3d 181 (3d Cir. 2008)..............................................................................................9

*Barnhart v. Thomas,*
    540 U.S. 20 (2003)............................................................................................................12

*Begier v. I.R.S.,*
    496 U.S. 53 (1990)............................................................................................................14

*Buenz v. Frontline Transp. Co.,*
    227 Ill. 2d 302, 882 N.E.2d 525 (Ill. 2008) ..............................................................10, 11

*Chem. Bank v. First Trust, N.A. (In re Southeast Banking Corp.),*
    93 N.Y.2d 178, 710 N.E.2d 1083 (N.Y. 1999) ..........................................................11

*Chemical Bank v. First Trust of N.Y., N.A. (In re Southeast Banking Corp.),*
    156 F.3d 1114 (11th Cir. 1998) ..........................................................................36, 38, 39

*CIGNA Ins. Co. v. Didimoi Prop. Holdings, N.V.,*
    110 F. Supp. 2d 259 (D. Del. 2000)..................................................................................17

*City of L.A. v. Santa Monica BayKeeper,*
    254 F.3d 882 (9th Cir. 2001) ............................................................................................15

*Commerce Nat'l Ins. Servs. v. Buchler,*
    2003 U.S. Dist. LEXIS 22429 (D. Del. Dec. 10, 2003)....................................................16

*Cybergenics Corp. v. Scott Chinery (In re Cybergenics Corp.),*
    226 F.3d 237 (3d Cir. 2000)........................................................................................13, 14

*DuFrayne v. FTB Mortg. Servs. (In re DuFrayne),*
    194 B.R. 354 (Bankr. E.D. Pa. 1996) ................................................................................9

*Estate of Osborn v. Kemp,*
    991 A.2d 1153 (Del. 2010) ........................................................................................18, 19

*FTC v. Mandel Bros. Inc.,*
    359 U.S. 385 (1959)..........................................................................................................12

*HSBC Bank USA v. Branch (In re Bank of New Engl. Corp.),*
    364 F.3d 355 (1st Cir. 2004) ..............................................................................36, 38, 39

*In re Armstrong World Indus., Inc.,*
   348 B.R. 111 (D. Del. 2006) ........................................................................................29, 30

*In re Barney & Carey Co.,*
   170 B.R. 17 (Bankr. D. Mass. 1994) .......................................................................34

*In re Caldwell,*
   76 B.R. 643 (Bankr. E.D. Tenn. 1987) ....................................................................34

*In re Crosscreek Apts.,*
   213 B.R. 521 (Bankr. E.D. Tenn. 1997) ..................................................................34

*In re Enron Creditors Recovery Corp.,*
   380 B.R. 307 (S.D.N.Y. 2008) ..................................................................................22

*In re Exide Techs.,*
   303 B.R. 48 (Bankr. D. Del. 2003) ..........................................................................29

*In re Greate Bay Hotel & Casino, Inc.,*
   251 B.R. 213 (Bankr. D.N.J. 2000) .........................................................................34

*In re Hoffinger Indus.,*
   321 B.R. 498 (Bankr. E.D. Ark. 2005) ....................................................................34

*In re Koenigsberg,*
   Case No. 09-20968-MER ...........................................................................................37

*In re Orfa Corp. of Phil.,*
   1991 Bankr. LEXIS 1952 (Bankr. E.D. Pa. Oct. 30, 1991) ......................................9

*In re Payless Cashways, Inc.,*
   215 B.R. 409 (Bankr. W.D. Mo. 1997) ......................................................19, 26, 27

*In re Tribune,*
   2011 Bankr. LEXIS 4128 ................................................................................1, 6, 29

*In re Tribune,*
   2011 Bankr. LEXIS 5018 ............................................................................... passim

*In re Union Meeting Partners,*
   178 B.R. 664 (Bankr. E.D. Pa. 1995) ........................................................................9

*In re Wash. Mut., Inc.,*
   2011 Bankr. LEXIS 3361 (Bankr. D. Del. Sept. 13, 2011) ........................................9

*James v. Cadillac Co. Inc. (In re James),*
   2010 Bankr. LEXIS 713 (Bankr. N.D. Ill. Mar. 3, 2010) .........................................19

*JFE Steel Corp. v. ICI Ams., Inc.*,
  797 F. Supp. 2d 452 (D. Del. 2011) ...................................................................................18

*Kurak v. Dura Auto. Sys., Inc. (In re Dura Auto. Sys., Inc.)*,
  379 B.R. 257 (Bankr. D. Del. 2007) .............................................................................7, 19

*L.R.S.C. Co. v. Rickel Home Ctrs., Inc. (In re Rickel Home Ctrs., Inc.)*,
  209 F.3d 291 (3d Cir. 2000)................................................................................................36

*Liscinski v. Cambridge Mgmt. Group (In re Trimble)*,
  2008 Bankr. LEXIS 835 (Bankr. D.N.J. Mar. 18, 2008) .........................................15

*Madison Ave. Leasehold, LLC v. Madison Bentley Assocs., LLC*,
  811 N.Y.S.2d 47 (1st Dep't 2006) ...................................................................................11

*Majchrowski v. Norwest Mort. Inc.*,
  6 F. Supp. 2d 946 (N.D. Ill. 1998) ...................................................................................23

*Marks v. New Century TRS Holdings, Inc. (In re New Century TRS Holdings, Inc.)*,
  2011 Bankr. LEXIS 1695 (Bankr. D. Del. May 10, 2011) (Carey, J.) ...................16

*MBIA Ins. Corp. v. Royal Indem. Co.*,
  519 F. Supp. 2d 455 (D. Del. 2007)..................................................................................20

*Motorola, Inc. v. Official Comm. Of Unsecured Creditors (In re Iridium Operating LLC)*,
  478 F.3d 452 (2d Cir. 2007)................................................................................................29

*N. Trust Co. v. MS Sec. Servs.*,
  2006 U.S. Dist. LEXIS 11037 (N.D. Ill. Mar. 15, 2006).........................................22

*Related Westpac LLC v. JER Snowmass LLC*,
  2010 Del. Ch. LEXIS 158 (Del. Ch. July 23, 2010) ................................................16

*Suburban Auto Rebuilders, Inc. v. Associated Tile Dealers Warehouse, Inc.*,
  388 Ill. App. 3d 81, 902 N.E.2d 1178 (Ill. App. Ct. 2009)......................................11

*Surrick v. Killion*,
  449 F.3d 520 (3d Cir. 2006).........................................................................................36, 37

*Thomason v. Thomason (In re Thomason)*,
  2012 U.S. App. LEXIS 45 (9th Cir. Jan. 3, 2012) ...................................................16

*Thompson v. Gordon*,
  241 Ill. 2d 428, 948 N.E.2d 39 (Ill. 2011) ...........................................................10, 11, 12

*Thrifty Oil Co. v. Bank of Am. Nat. Trust & Sav. Ass'n*,
  322 F.3d 1039 (9th Cir. 2003) ...........................................................................................23

*United States v. Kapelushnik*,
    306 F.3d 1090 (11th Cir. 2002) ...........................................................................15

*Venen v. Sweet*,
    758 F.2d 117 (3d Cir. 1985)..................................................................................15

*Webb v. GAF Corp.*,
    78 F.3d 53 (2d Cir. 1998)......................................................................................16

STATUTES

11 U.S.C. § 544(b) ............................................................................................................14

11 U.S.C. § 547(b) ............................................................................................................14

11 U.S.C. § 548(a)(1).........................................................................................................14

11 U.S.C. § 1129(b)(1) ......................................................................................................34

Chapter 5 of the Bankruptcy Code...............................................................................6, 14

Section 510(a) of the Bankruptcy Code.............................................................................38

Bankruptcy Code Section 1129(a)(1) ....................................................................20, 21, 22

Section 1129(b) of the Bankruptcy Code....................................................................29, 30

OTHER AUTHORITIES

http://dictionary.reference.com/browse/accrued+expenses ............................................27

*Memorandum Of Law In Support Of Confirmation And Omnibus Reply To Objections To
    Confirmation Of Second Amended Joint Plan Of Reorganization For Tribune
    Company And Its Subsidiaries Proposed By The Debtors, The Official Committee Of
    Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co.,
    L.P., and JPMorgan Chase Bank, N.A.* ........................................................................22

*Order Establishing Scheduling For (1)* ..........................................................................1

*Sam Zell's Deal from Hell*, Business Week, July 30, 2008 ...........................................3

Law Debenture Trust Company of New York ("Law Debenture"), as successor indenture trustee under that certain Indenture dated March 19, 1996 between Tribune Company (with its debtor subsidiaries, "Tribune" or the "Debtors") (successor to The Times Mirror Company) and Citibank, N.A. (as amended, the "1996 Indenture"), and Deutsche Bank Trust Company Americas ("DBTCA" and together with Law Debenture, the "Senior Indenture Trustees"), successor trustee under (i) that certain indenture dated March 1, 1992, by and between Tribune and Continental Bank, N.A. (as amended, the "1992 Indenture"); (ii) that certain indenture dated January 30, 1995, by and between Tribune and First Interstate Bank of California (as amended, the "1995 Indenture"); and (iii) that certain indenture dated January 1, 1997, by and between Tribune and Bank of Montreal Trust Company (as amended, the "1997 Indenture," and together with the 1992 Indenture, the 1995 Indenture, and the 1996 Indenture, the "Senior Indentures" and the notes and holders of notes issued pursuant to the Senior Indentures, respectively, the "Senior Notes" and "Senior Noteholders"), by their undersigned counsel, hereby submit their opening brief pursuant to the *Order Establishing Scheduling For (1) Resolution Of The Allocation Disputes And (2) Consideration Of DCL Plan Proponents' Supplemental Disclosure Document, Solicitation Procedures Motion And Plan*, dated January 24, 2012 [Dkt. No. 10692] (the "Allocation Disputes Order") and respectfully represent as follows:[1]

## PRELIMINARY STATEMENT[2]

The Allocation Disputes arise out of efforts to ignore the express subordination provisions of the PHONES Notes Indenture and the subordination agreement (the "EGI

---

[1]    The Senior Indenture Trustees take positions on the PHONES Notes Indenture Disputes 1-3 and 5 and on the EGI-TRB LLC Notes Disputes 1-4.

[2]    Capitalized terms not otherwise defined have the meanings ascribed in the *Third Amended Joint Plan of Reorganization for Tribune Company and its Subsidiaries Proposed By the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., and Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank N.A.*, dated November 18, 2011 [Dkt. No. 10273] (the "DCL Plan").

Subordination Agreement," and together with the PHONES Notes Indenture, the "Subordination Agreements") pertaining to the EGI-TRB LLC Note (the "EGI Note") solely to the prejudice of the Senior Noteholders. Both the PHONES Notes Indenture Trustee and EGI-TRB LLC ("EGI") ask the Court to ignore or to misconstrue the plain meaning of their respective, applicable Subordination Agreements to make the contractual subordination meaningless and to divert the Senior Noteholders' rightful recoveries. Of course, if successful, the effect is staggering. Should the PHONES and EGI wriggle out of their contractual subordination agreements, they will succeed in impermissibly transferring between $174 to $215 million – 61% to 85% -- away from the Senior Noteholders (depending on the allowed amount of the PHONES Notes Claim).

With respect to the PHONES Notes, this Court already held in its *Memorandum On Reconsideration*, dated December 29, 2011 [Dkt. No. 10531] (the "Reconsideration Memorandum"), that the PHONES Notes are completely subordinate to the prior payment in full of Senior Indebtedness, as defined by the PHONES Notes Indenture. The Court held that the PHONES Notes' subordination is not, in fact, restricted to "assets of the Company," but includes recoveries from avoidance actions. This is now law of the case on this issue. Aside from law of the case, the PHONES Notes Indenture makes plain that holders of the PHONES Notes may not recover anything on account of their claims against Tribune unless and until the Senior Indebtedness is paid in full. Accordingly, the PHONES Notes are subordinate as to all payments under the Plan and all payments from the Litigation Trust and the Creditors' Trust.

As to the EGI Subordination Agreement, if not law of the case, the Reconsideration Memorandum is certainly persuasive authority. The EGI Subordination Agreement, when read in its entirety with a view towards its purpose in Tribune's disastrous LBO, demonstrates that EGI may not recover anything on account of its "claim" against Tribune unless and until the

Senior Obligations, as such term is defined by the EGI Subordination Agreement, are paid in full. EGI's grasping at the word "Company," a ploy which this Court rejected as to the PHONES Notes, to defeat subordination would eliminate subordination exactly when it applies – Tribune's bankruptcy. Moreover, as with the holders of PHONES Notes and consistent with this Court's decision, the holders of the EGI Note may not get paid from any source, including from avoidance recoveries, unless and until the Senior Obligations are paid in full. In fact, the EGI Subordination Agreement provides that EGI may not even *seek* to get paid until the Senior Obligations are paid in full. EGI simply breached that agreement. One further point bears mention. An EGI recovery would be a perversion of the bankruptcy process. Zell orchestrated one of the most, if not the most, disastrous leveraged buy-outs of all time. Zell himself admitted that, to him, it was merely "60 ways to get lucky."[3] Zell purchased Tribune with close to 97% leverage and his 3% pittance put in as the subordinate EGI Note. The Court should view that "investment," at very best, as completely subordinate.

Compounding the Senior Noteholders' harm, the DCL Plan treats non-senior general unsecured creditor claims (the "Other Parent Claims") as if they were "senior," diverting value directly from the Senior Noteholders' rightful recoveries. The Other Parent Claims, which consist of the claims arising under the Retiree Claimant Settlement Agreement (the "Retiree Claims"), the Swap Claim, and certain trade claims (the "Trade Claims"), all quite clearly are general unsecured creditors of Tribune without senior status under the Subordination Agreements. The effect of improperly treating Other Parent Claims as if they are senior debt under the Subordination Agreements transfers approximately $30 to $37 million (depending on the allowed amount of the PHONES Notes Claim) from the Senior Noteholders, enhancing the

---

[3]     *Sam Zell's Deal from Hell*, Business Week, July 30, 2008,
http\\www.businessweek.com/magazine/content/08_32/b4095000408330.htm.

non-senior Other Parent Claims' recovery by a staggering 53% to 73%.  Further, the impermissible value shift at the Senior Noteholders' expense *increases* as holders of Other Parent Claims share beyond their rightful proportion in litigation recoveries as a result of this improper treatment.  For example, upon $750 million in litigation recoveries, $47 to $58 million is shifted away from the Senior Noteholders.  The diversion of payments (under the DCL Plan) of $30 to $37 million is by definition material to the Senior Noteholders.  It represents a startling 8% to 10% of the $369 million allocated to them as part of the Settlement of the disastrous LBO.  And, as stated, this gets worse as recoveries come in.

However, the applicable Subordination Agreements, as is typical of such agreements, exclude ordinary, general unsecured claims.  The Retiree Claimants will incongruously and incorrectly argue that their claims are the "deferred purchase price for services" and although they are ordinary claims, arising in the ordinary course of business consistent with industry norms, their claims somehow became extraordinary when Tribune absorbed these obligations in its merger with Times Mirror.  That is flat out wrong.  They also will protest that their claims are not "trade" accounts as to which the expenses accrued.  Well, the definition of a trade account is dependent upon the question of what is the trade in which your claim arises.  If your trade is providing services, *i.e.*, as employment, then Tribune's obligation to you is a trade account.  And your account gets expensed like all others when the obligation becomes current.  In other words, the Retiree Claimants will argue that *all* of their claims are "the deferred purchase price for services" but then flip and say the obligation to pay for those services somehow is not a trade account for such services.  What else could it be?

As to the others, there can be little question that the Trade Claims do not qualify for senior status; they are specifically excluded.  And the Swap Claim is not even Indebtedness (as

4

defined by the PHONES Notes Indenture) as it is not a note, bond, debenture or other similar evidence of indebtedness and it is not indebtedness for borrowed money.

Faced with the foregoing, the DCL Plan Proponents protest that even if Other Parent Claims are not entitled to the economic benefits of seniority under the Subordination Agreements (which is the case), treating them as if they are, and providing them the same recovery as Senior Noteholders that are entitled to the economic benefits of the Subordination Agreements, is not unfairly discriminatory.  It is hard to fathom how, not only giving senior status to non-senior creditors to equalize their recovery with incontestably senior creditors and then actually taking the funds necessary to do so from the incontestably senior creditors is not only unfair discrimination, but also bad faith.  This is not a question of preferring one group of creditors over another, but rather diverting value that contractually belongs to the Senior Noteholders.

Unlike the others, each asking the Court to ignore the obvious and not to apply the contracts as they are written, the Senior Indenture Trustees simply ask the Court, as they have once before, to read and to apply the plain terms of the Subordination Agreements, taken in their totality, with the appropriate view of their overall purpose and the gravamen of their derivation.

## BACKGROUND

### I.    The First Confirmation Process

Following a trial (the "Confirmation Hearing"), briefing and argument, the Court on October 31, 2011, issued its *Opinion on Confirmation* [Dkt. No. 10133] (the "Confirmation Opinion") and its *Order Denying Confirmation Of Competing Plans* [Dkt. No. 10134] denying confirmation of both proposed plans of reorganization that it considered, including the predecessor to the DCL Plan.

II.    **The Reconsideration Order**

On November 14, 2011, certain creditors, including the Senior Indenture Trustees, filed

motions seeking reconsideration of the Confirmation Opinion.  The dispute at the core of the

reconsideration motions involved the extent to which the PHONES are subordinated to the

Senior Notes.  Specifically, the Senior Indenture Trustees sought reconsideration of the Court's

conclusion (the "Subordination Determination") that "causes of action that the Debtors' estate

may assert under Chapter 5 of the Bankruptcy Code are not 'assets of the Company' subject to

the PHONES Notes' subordination provision."[4]

On December 29, 2011, the Court entered its *Memorandum on Reconsideration* [Dkt. No.

10531] (the "Reconsideration Memorandum") and the *Order Regarding Motions for*

*Reconsideration of the Confirmation Opinion and Order* [Dkt. No. 10532] (the "Reconsideration

Order") striking the Subordination Determination from its Confirmation Opinion.[5]

The Court, correctly applying Illinois contract law, analyzed whether the phrase "[u]pon

any distribution of assets of the Company" in § 14.02(B) of the PHONES Notes Indenture limits

subordination solely to payments and distributions of "assets of the Company" or is part of a

general introduction of the "triggering events" or conditions precedent to the application of the

subordination provisions.[6]  In reaching the conclusion that the introductory phrase is not a

limitation on subordination, the Court reasoned that the grammatical "rule of the last antecedent"

dictates that the phrase "assets of the Company," only modified "distributions" and not

"payments."[7]  The Court further held that broadly construing the term "payment" to mean "any

---

[4]        *In re Tribune*, 2011 Bankr. LEXIS 4128, at *193.

[5]        *In re Tribune*, 2011 Bankr. LEXIS 5018, at *31.

[6]        *Id.* at *15-16.

[7]        *Id.* at *25.

payment, including one received from a liquidating trust," was consistent with reading the

PHONES Notes Indenture as a whole.[8]  Amongst other things, the Court relied on its prior

decision *Kurak v. Dura Auto. Sys., Inc. (In re Dura Auto. Sys., Inc.)*, 379 B.R. 257, 270 (Bankr.

D. Del. 2007), in which the Court held that a subordination provision should "not be considered

based upon its grammatical structure alone, but also within the context of the entire agreement."[9]

Thus, the Court, upon examining "(i) the lengthy catalog of bankruptcy, insolvency and

liquidation proceedings described in subsections (1), (2) and (3) of Section 14.02, (ii) the

unqualified subordination language of Section 14.02(A), (iii) application of subordination

provisions to all sources of 'payment' in Section 14.02(B), and (iv) the catch-all language of the

pay-over obligation in the paragraph following Section 14.02(B)" concluded that the overall

purpose of the subordination provisions of the PHONES Notes Indenture is to ensure that the

PHONES Notes are properly subordinated to the Senior Indebtedness regardless of the source of

the debt repayment.[10]

## III.    The Allocation Disputes

The Confirmation Opinion left open certain disputes regarding the allocation of

distributions to creditors of Tribune Company, the parent entity (collectively, the "Allocation

Disputes").[11]  These Allocation Disputes, which arose out of the respective priority of certain

creditors based upon the provisions of the Subordination Agreements, still persist under the DCL

Plan.  On January 24, 2012, the Court entered the Allocation Disputes Order establishing, in part,

the procedures for the adjudication of the Allocation Disputes.

---

[8]      *Id.* at *25-27.

[9]      *Id.* at *28-29 (quoting *Dura Auto. Sys., Inc.*, 379 B.R. at 270).

[10]     *Id.* at *30-31.

[11]     As indicated *infra* the Senior Indenture Trustees submit that the Court actually already decided several of these so-called "open" Allocation Disputes.

## ARGUMENT

**I.    The Subordination Agreements Subordinate any Payment to Holders of the PHONES Notes and EGI Note to the Prior Payment in Full of the Senior Notes**

The Subordination Agreements require subordination as to any payments otherwise attributable to the PHONES Notes and EGI Note to the prior payment in full of the Senior Notes. "Any payments" means any and all payments from the Settlement proceeds, the Litigation Trust, and the Creditors' Trust, including those payments resulting from avoidance action recoveries. The Subordination Agreements, as properly interpreted in the context of Tribune's bankruptcy, do not formalistically limit the covered "payments" to those from some conception of "the Company." Indeed, this Court has already found, in a ruling equally applicable to the EGI Subordination Agreement, that the PHONES Notes Indenture requires turnover of *all* payments on account of the underlying debt. *In re Tribune*, 2011 Bankr. LEXIS 5018, at *29. There is no reason for this Court to depart from its prior ruling.

### A.    The Court Has Previously Held That the Subordination Provisions of the PHONES Notes Indenture Apply to All Payments

#### 1.    The Law of the Case Doctrine Applies

This Court has already ruled that the PHONES Notes are subordinated in their entirety to "Senior Indebtedness" with respect to all payments – irrespective of the source of such payments – in the context of payments from the Litigation Trust. Accordingly, the law of the case doctrine compels the same ruling as to any and all distributions from Settlement proceeds, the Litigation Trust, and the Creditors' Trust, regardless of whether such payments constitute proceeds from avoidance actions.

"Under the law-of-the-case doctrine, 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.' 'This rule of practice promotes the finality and efficiency of the judicial process by protecting against

the agitation of settled issues.'"  *ACLU v. Mukasey*, 534 F.3d 181, 187 (3d Cir. 2008) (quoting

*Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988) (internal citations and

quotation marks omitted)).  Courts routinely apply law of the case in the bankruptcy context.

And do so, as here, in the context of non-final orders.  In fact, a court in this district recently

considered and rejected arguments that an order denying confirmation, though not final in an

appealable sense (without leave), precludes the doctrine's application.  *See In re Wash. Mut.,*

*Inc.*, 2011 Bankr. LEXIS 3361, at *33-34 (Bankr. D. Del. Sept. 13, 2011).  Instead, the court

concluded that the law of case applies anytime that a court decides a disputed issue.  *Id.* at *34

("ruling [in order denying confirmation] . . . is law of the case because it decided a disputed

issue"). [12]

     The law of the case doctrine applies both to factual and legal findings in the context of

denial of plan confirmation.  *See DuFrayne v. FTB Mortg. Servs. (In re DuFrayne)*, 194 B.R.

354, 358 (Bankr. E.D. Pa. 1996) ("factual findings made in the Prior Opinion [denying plan

confirmation] are the law of the case and are therefore binding on the parties in this

proceeding."); *In re Union Meeting Partners*, 178 B.R. 664, 679 (Bankr. E.D. Pa. 1995) ("Under

'the law of the case' doctrine, it appears that, absent a clearly erroneous decision on our part, we

should refuse to 'reopen what has already been decided.'  To the extent that the Debtor presents

the same arguments and explanations for its separate treatment of the Class 2 claim as we already

---

[12]     Finality for the purposes of law of the case is distinguishable from finality for the purposes of determining
whether an order is appealable.  *See In re Orfa Corp. of Phil.*, 1991 Bankr. LEXIS 1952, at *7-8 (Bankr. E.D. Pa.
Oct. 30, 1991) (finding that many of the objections raised by SPNB were "a course of action reasonably calculated
to preserve all of the objections raised by SPNB in response to the 2d Plan and apparently rendered unappealable at
that juncture by our denial of confirmation of the 2d Plan.  Nevertheless, application of the 'law of the case' doctrine
. . . prompts us to refrain from reiterating what we said in that Opinion and once again addressing the issues decided
there in detail on the assumption that the parties will know that our disposition of the issue previously addressed has
not changed.") (internal citations omitted).

considered and rejected in denying confirmation of prior plans, we will not reconsider them now.") (citations omitted).

Here, the PHONES Notes Indenture Trustee essentially is seeking re-reconsideration. EGI simply is ignoring the import of the Court's prior ruling.  In terms of the PHONES Notes Indenture, this Court concluded that "[t]he overall purpose of Article 14, in general, and Section 14.02, in particular, is to ensure that the PHONES Notes are subordinated to the Senior Indebtedness," and that "full payment" subordination is appropriate when examining the entirety of the agreement.  *In re Tribune*, 2011 Bankr. LEXIS 5018, at *29-30.  Thus, this Court found subordination applies to "*any payment*," including the Litigation Trust distributions.  *Id.* at *25-26 (emphasis added).  Plainly, this Court's ruling applies with equal force to all other payments that would be made on account of the PHONES Notes, specifically including those from all Settlement proceeds and all recoveries from the Creditors' Trust.

### 2.       The Court's Rationale for Complete Subordination Applies to the Settlement Distributions and Creditors' Trust Distributions

Even if the Court for some reason chose not to rely strictly on law of the case to hold that subordination applies to any payment, the Court's unassailable reasoning in the Reconsideration Memorandum applies to the instant dispute.

Pursuant to Illinois law, which governs the PHONES Notes Indenture, "the cardinal rule of contract interpretation is to discern the parties' intent from the contract language.  Where the contract language is unambiguous, it should be given its plain and ordinary meaning."  *Buenz v. Frontline Transp. Co.*, 227 Ill. 2d 302, 308, 882 N.E.2d 525, 528-29 (Ill. 2008) (citation omitted); *Thompson v. Gordon*, 241 Ill. 2d 428, 441, 948 N.E.2d 39, 47 (Ill. 2011) ("If the words in the contract are clear and unambiguous, they must be given their plain, ordinary and popular meaning.").  "A contract must be construed as a whole, viewing each provision in light of the

other provisions.  The parties' intent is not determined by viewing a clause or provision in

isolation, or in looking at detached portions of the contract." *Thompson*, 241 Ill. 2d at 441, 948

N.E.2d at 47 (citing *Gallagher v. Lenart*, 226 Ill. 2d 208, 232-33, 874 N.E.2d 43, 58 (Ill. 2007)).

     Viewing a contract as a whole, a court should "not interpret a contract in a manner that

would nullify or render provisions meaningless, or in a way that is contrary to the plain and

obvious meaning of the language used." *Thompson*, 241 Ill. at 441, 948 N.E.2d at 47 (*citing Fid.*

*Nat'l Title Ins. Co. v. Westhaven Props. P'ship*, 386 Ill. App. 3d 201, 214, 898 N.E.2d 1051,

1064 (Ill. App. Ct. 1st Dist. 2007).  And such interpretation must avoid a result that is illogical

and contrary to market expectations.  *Suburban Auto Rebuilders, Inc. v. Associated Tile Dealers*

*Warehouse, Inc.*, 388 Ill. App. 3d 81, 92, 902 N.E.2d 1178, 1190 (Ill. App. Ct. 2009) (stating that

courts must construe contracts "in accordance with the ordinary expectations of reasonable

people" and "reasonably to avoid absurd results.") (*citing Carey v. Richards Bldg. Supply Co*.,

367 Ill. App. 3d 724, 728, 856 N.E.2d 24 (Ill. App. Ct. 2006) and *Health Prof., Ltd. v. Johnson*,

339 Ill. App. 3d 1021, 1036, 791 N.E.2d 1179, (Ill. 2003)); *see also Chem. Bank v. First Trust,*

*N.A. (In re Southeast Banking Corp.)*, 93 N.Y.2d 178, 184, 710 N.E.2d 1083, 1086 (N.Y. 1999)

(in construing a subordination provision, relying on "commercial and legal policies" to

determine the relevance of the rule of explicitness); *Madison Ave. Leasehold, LLC v. Madison*

*Bentley Assocs., LLC*, 811 N.Y.S.2d 47 (1st Dep't 2006) (noting that "consideration in

interpreting [a commercial contract] is . . . the business purpose to be served by their contract.").

     First, as recognized by this Court, the plain, unambiguous language of the PHONES

Notes Indenture imposes no limitation on subordination of *payments* to "assets of the Company,"

nor to any other source.  *In re Tribune*, 2011 Bankr. LEXIS 5018, at *25-26; *Buenz v. Frontline*

*Transp. Co.*, 227 Ill. 2d at 308, 882 N.E. 2d at 528-29; Movants' Reconsideration Motions at 8-

11.  As this Court already decided, the phrase "assets of the Company" must be considered in light of the entirety of the PHONES Notes Indenture.  *In re Tribune*, 2011 Bankr. LEXIS 5018, at *29-31.  When read as a whole, the PHONES Notes Indenture explicitly provides for absolute subordination as holders of Senior Notes must be paid in full, in cash, prior to any payment being made to holders of the PHONES Notes.[13]  *See Thompson v. Gordon*, 241 Ill. 2d at 441, 948 N. E. 2d at 47.

Second, the qualifier "assets of the Company" that appears in section 14.02(B) of the PHONES Notes Indenture, actually does not apply to "payments" inasmuch as the term "payments" is not the last antecedent in the phrase "payment or distribution of assets of the Company."  This Court, relying on a Supreme Court decision – *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003) – has already applied this grammatical rule to the PHONES Notes Indenture.  *In re Tribune*, 2011 Bankr. LEXIS 5018, at *24 (citing *Barnhart*, 540 U.S. at 26 ("[A] limiting clause or phrase . . . should be read ordinarily as modifying *only the noun or phrase that it immediately follows*.") (emphasis added)); *see also FTC v. Mandel Bros. Inc.*, 359 U.S. 385, 389 (1959) (noting that a limiting clause applies only to the last antecedent).  There is no reason why this grammatical rule would not continue to apply in this instance.

Third, section 14.02 of the PHONES Notes Indenture mandates that any payment on account of the PHONES Notes prior to payment in full of the Senior Indebtedness shall be turned over and applied to the payment of all unpaid Senior Indebtedness.  Further, section 14.06 of the PHONES Notes Indenture provides that the holders of the PHONES Notes are "subrogated to the extent of the payments or distributions made to the holders of such Senior Indebtedness" subject to the payment in full of the Senior Indebtedness.

---

[13]      *See* PHONES Notes Indenture § 14.02(A).

Fourth, section 14.02(B) of the PHONES Notes Indenture recognizes that "payments" subject to the subordination provisions may be made by a "liquidating trustee or agent or other Person." PHONES Notes Indenture, at § 14.02(B). Further, the term "Person" is defined broadly and includes distributions by trusts. PHONES Notes Indenture, at § 1.01. This broad definition corresponds to the broad interpretation of payment.

Fifth, restricting subordination to the source of payments – *i.e.*, assets of the Company rather than all payments in the bankruptcy – leads to a result inconsistent with this Court's prior ruling as well as the commercial concept of subordination. When this Court previously held the subordination provisions applied to the Litigation Trust distributions, it relied upon Illinois contract interpretation and did not analyze whether the claims preserved under the Litigation Trust were considered assets of the Company rather than assets of the estate. *In re Tribune*, 2011 Bankr. LEXIS 5018, at *9-30. Likewise, this Court should not depart from applying Illinois contract law when deciding the subordination provisions apply equally to every dollar in Settlement proceeds and every dollar in Creditors Trust distributions.

Sixth, the distinction under bankruptcy law between property of the debtor and property of the estate has no application to this contract-related dispute. Indeed, this Court – when deciding the subordination provisions apply to the Litigation Trust distributions in its Reconsideration Memorandum – did not rely upon *Cybergenics Corp. v. Scott Chinery (In re Cybergenics Corp.)*, 226 F.3d 237, 245 (3d Cir. 2000) – the primary case relied upon by the PHONES Notes Indenture Trustee and EGI in claiming such a distinction exists for purposes of subordination. *In re Tribune*, 2011 Bankr. LEXIS 5018, at *9-30.

Seventh, the United States Supreme Court several years ago explained that property of the debtor includes avoidance actions recoveries. *Begier v. I.R.S.*, 496 U.S. 53, 58 (1990)

(explaining that in the context of chapter 5 avoidance actions, although "property of the debtor" is not defined by the Bankruptcy Code, it "is best understood as that property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings.").  Indeed, the Third Circuit in *Cybergenics* stated that it was not commenting "on any sort of 'equitable interest' that some courts have said may be retained by a debtor in fraudulently-transferred property."  *Cybergenics*, 226 F.3d at 247.  Thus, even if there is a meaningful difference between property of the debtor and property of the estate, that difference cannot be relevant here, where property, had it not been fraudulently conveyed, would have been the debtor's property available for the payment of its creditors at the outset.  *See* 11 U.S.C. § 544(b) (providing that "the trustee may avoid any transfer of an *interest of the debtor in property*"); 11 U.S.C. § 547(b) (providing that "the trustee may avoid any transfer of an *interest of the debtor in property* . . . .") (emphasis added); 11 U.S.C. § 548(a)(1) (providing that the trustee may avoid any transfer "of an *interest of the debtor in property* . . . .") (emphasis added). Therefore, when the debtor recovers that property or its monetary substitute it regains its character as property of the debtor.  And that is property of and for the debtor from which to make payments in accordance with the Debtors' creditors' agreed upon contractual priorities. [14]

### 3.   This Court Still Has Jurisdiction to Rule On Whether The Subordination Provisions Apply To Article III and the Creditors' Trust Distributions

The PHONES Notes Indenture Trustee has no basis for claiming that its premature motion for leave to appeal precludes this Court from determining whether the PHONES Notes

---

[14]     To avoid unnecessary repetition, the Senior Indenture Trustees also incorporate by reference their *Joint Motion Of Law Debenture Trust Company Of New York And Deutsche Bank Trust Company Americas Requesting Reconsideration Of The Court's Confirmation Opinion With Respect To The Subordination Of The PHONES and Joint Reply Of Law Debenture Trust Company Of New York And Deutsche Bank Trust Company Americas In Further Support Of Their Request For Reconsideration Of The Court's Confirmation Opinion With Respect To The Subordination Of The PHONES* [Dkt. Nos. 10222 and 10399], which in further detail explain why the PHONES Notes Indenture provides for complete subordination as to all payments.

Indenture's subordination provisions apply to the Article III distributions and Creditors' Trust distributions.  [Dkt. No. 10792.]  Merely seeking leave to appeal does not divest a trial court of its jurisdiction.  As the Third Circuit Court of Appeals explained, "the jurisdiction of the lower court to proceed in a cause (sic) is not lost by the taking of an appeal from an order or judgment which is not appealable," because "a contrary conclusion would enable a litigant temporarily to deprive a district court of jurisdiction at any non-critical or critical juncture including trial itself, thus bringing proceedings in the district court to a standstill while a non-appealable ruling wends its way through the appellate process."  *Venen v. Sweet*, 758 F.2d 117, 121 (3d Cir. 1985) (citation omitted); *see also United States v. Kapelushnik*, 306 F.3d 1090, 1094 (11th Cir. 2002) ("a premature notice of appeal does not divest the district court of jurisdiction over the case") (citing cases).  Even if the PHONES Notes Indenture Trustee's motion for leave to appeal had any merit, the court retains jurisdiction until such time as leave is granted.  *See City of L.A. v. Santa Monica BayKeeper*, 254 F.3d 882, 886 (9th Cir. 2001) ("Here, we did not issue an order granting . . . permission to bring an interlocutory appeal - and thus did not divest the district court of jurisdiction over the issues to be raised in the interlocutory appeal"); *Liscinski v. Cambridge Mgmt. Group (In re Trimble)*, 2008 Bankr. LEXIS 835, at *1 (Bankr. D.N.J. Mar. 18, 2008) ("The court must determine if this appeal divests it of jurisdiction over the proceeding.  The court finds the appeal is interlocutory in nature and requires a grant of leave by the district court in order to be heard.  Since such leave has not been granted, this court retains jurisdiction over the proceeding.").

Additionally, a grant of leave to appeal does not divest this Court of jurisdiction to consider the remaining Allocation Disputes.  *See Thomason v. Thomason (In re Thomason)*, 2012 U.S. App. LEXIS 45, at *3 (9th Cir. Jan. 3, 2012) (noting that "appeal only divests the

bankruptcy court of jurisdiction over matters directly involved in the appeal"); *Webb v. GAF Corp.*, 78 F.3d 53, 55 (2d Cir. 1998) (noting that an interlocutory appeal only divests a lower court of jurisdiction with respect to "issues decided in the order being appealed.")

> **B.    The Subordination Provisions Applicable to the EGI Note**
> <u>**Apply to All Payments On Account of the Indebtedness**</u>

Although this Court did not directly rule on the application of the subordination provisions of the EGI Note, the Court's unassailable rationale in its Reconsideration Memorandum applies equally.  Similar to the PHONES Notes Indenture Trustee, EGI wrongly contends that under paragraph 2 of the EGI Subordination Agreement, its claims are only subordinated as to distributions of "assets of the Company;" that the Settlement proceeds, the avoidance actions proceeds, and the Creditors' Trust proceeds are not "assets of the Company.[15]

Delaware law governs the terms of the EGI Subordination Agreement.  Like Illinois, under Delaware law, "when a contract is clear and unambiguous, the courts will give effect to the plain meaning of the contract's terms and provisions."  *Marks v. New Century TRS Holdings, Inc. (In re New Century TRS Holdings, Inc.)*, 2011 Bankr. LEXIS 1695, at *8 (Bankr. D. Del. May 10, 2011) (Carey, J.); *Commerce Nat'l Ins. Servs. v. Buchler*, 2003 U.S. Dist. LEXIS 22429, at *9 (D. Del. Dec. 10, 2003) ("[w]here the language of a contract is plain and clear on its face, the writing itself is the sole source for gaining an understanding of its intent.").  "A court cannot imply an obligation inconsistent with the parties' express agreement. . . ." *Related Westpac LLC v. JER Snowmass LLC*, 2010 Del. Ch. LEXIS 158, at *21 (Del. Ch. July 23, 2010) (refusing to imply a condition that was expressly excluded by the terms of the contract).  Nor will courts interpret contracts to include obligations that are expressly excluded.  *See CIGNA Ins. Co. v. Didimoi Prop. Holdings, N.V.*, 110 F. Supp. 2d 259, 274 (D. Del. 2000) (rejecting contract

---

[15]    *See* EGI's Amended Preliminary Settlement on Allocation Disputes [Dkt. No. 10800], at 2.

interpretation that would require the court "to construe the word 'except' … to mean 'including' – a definition which is exactly opposite of its plain and ordinary meaning.").

Here, the plain language of EGI Subordination Agreement does not restrict subordination to "assets of the Company."  In particular, the relevant language of paragraph 4 provides that:

> [u]nless and until the obligations to extend credit to the Company under the Senior Documents shall have been irrevocably terminated and the *Senior Obligations have been paid in full in cash*, at no time shall the Subordinating Creditor take or continue any action, or exercise any rights, remedies or powers under the terms of the Subordinated Note, or *exercise or continue to exercise any other right or remedy at law or in equity that the Subordinating Creditor might otherwise possess, to collect any Subordinated Obligation*, including, without limitation, the acceleration of the Subordinated Obligations, the commencement of any action to enforce payment or foreclosure on any lien or security interest, the filing of any petition in bankruptcy or the taking advantage of any other insolvency law of any jurisdiction.

EGI Subordination Agreement, at ¶ 4 (emphasis added).  This provision plainly provides that until the "Senior Obligations have been paid in full in cash," EGI may not "collect any Subordinated Obligation."  Thus, the EGI Subordination Agreement contains a broad limitation, breached here, on EGI's power to enforce the EGI Note until the Senior Notes have been paid in full.  If the EGI Subordination Agreement limited subordination to "assets of the Company," (and that limitation was meaningful which it is not), that phrase would appear in this paragraph to qualify the limitation on enforcement.  Yet, no such qualification exists.

The breadth of the prohibition on collection activity until the Senior Obligations are paid in full is highlighted by the very narrow exception in Paragraph 4 that permits EGI only to "file a proof of claim in any bankruptcy or similar proceeding instituted by another entity and may vote such claim in a manner not inconsistent with the terms hereof."  EGI Subordination Agreement, at ¶ 4.  Thus, the Paragraph 4 prohibition is so broad that, absent the explicit exception, EGI could not even file a proof of claim in Tribune's bankruptcy case if the Senior Obligations were not paid in full.  Although EGI is permitted to *file* and *vote* a proof of claim, that is where the

exception stops; there is no exception in Paragraph 4 that permits EGI to engage in the additional collection activity of demanding or receiving payment on that proof of claim if the Senior Obligations have not been paid in full.  Thus, the only provision of the EGI Subordination Agreement that expressly addresses a bankruptcy proceeding – Paragraph 4 – flatly prohibits EGI from taking any collection activity whatsoever other than filing and voting a proof of claim, until the Senior Obligations are paid in full.

Additionally, as this Court already recognized with respect to the PHONES Notes Indenture and as required under Delaware law, the provisions of the EGI Subordination Agreement must be read as a whole to understand the parties' intent.  *In re Tribune*, 2011 Bankr. LEXIS 5018, at *30-31.  Delaware principles of contract interpretation require this Court to "read a contract as a whole" and "give each provision and term effect, so as not to render any part of the contract mere surplussage."  *JFE Steel Corp. v. ICI Ams., Inc.*, 797 F. Supp. 2d 452, 469 (D. Del. 2011).  Further, Delaware courts will not "read a contract to render a provision or term meaningless or illusory."  *Estate of Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010).  Nor will they countenance an unreasonable interpretation that "produces an absurd result or one that no reasonable person would have accepted when entering the contract."  *Id.* at 1160.

Accepting EGI's interpretation of the word "Company" in paragraph 2 to exclude avoidance action recoveries, would render other provisions of the EGI Subordination Agreement nonsensical.  *See* EGI Subordination Agreement, at ¶¶ 2, 14.  EGI's narrow reading of "Company" is contrary to Court's reasoning in the Reconsideration Memorandum with respect to this same issue regarding the PHONES Notes Indenture and results in a limitation on subordination in the event of a Tribune bankruptcy – which is exactly the situation during which a subordination agreement is supposed to apply.  The Court should not adopt a reading leading to

such an absurd result.  *See Estate of Osborn v. Kemp*, 991 A.2d at 1160.  For the Debtors' estate

to pay EGI anything on account of its "contribution" to Tribune's disastrous LBO prior to the

payment of any other creditor is grossly inequitable and must not occur.  *See Dura Auto. Sys.,*

*Inc.*, 379 B.R. at 270 (holding that subordination provisions should not be read in such a manner

that would "eviscerate the purpose of the subordination provisions . . . .").

## II.    The DCL Plan Must Be Adjusted Because Other Parent Claims Cannot Benefit From The Subordination Of The PHONES Notes And The EGI Note[16]

The Other Parent Claims, which include the Swap Claim, Retiree Claims, and Trade

Claims, have not met their evidentiary burden of demonstrating that they are entitled to "senior"

treatment under the Subordination Agreements.  *See In re Payless Cashways, Inc.*, 215 B.R. 409,

417 (Bankr. W.D. Mo. 1997) (in determining the breadth of a subordination provision in an

indenture, the court stated that "[a] party claiming that it is entitled to treatment superior to other

creditors has the burden of proving that entitlement."); *see also James v. Cadillac Co. Inc. (In re*

*James)*, 2010 Bankr. LEXIS 713 at *25 (Bankr. N.D. Ill. Mar. 3, 2010) (Under Illinois contract

law, "[t]he party claiming to be a third party beneficiary bears the burden of showing that the

parties to the contract intended to confer a direct benefit on it.") (citing *Martis v. Grinnell Mut.*

*Reinsurance Co.*, 388 Ill. App. 3d 1017, 1020, 905 N.E.2d 920, 924 (Ill. App. Ct. 3d Dist.

2009)); *MBIA Ins. Corp. v. Royal Indem. Co.*, 519 F. Supp. 2d 455, 465 (D. Del. 2007) ("The

party asserting third party beneficiary status bears the burden of demonstrating that the contract,

or a provision thereof, was made for its benefit.") (citing 13 Williston on Contracts § 37:8).

The holders of Other Parent Claims cannot satisfy their burden because they are not

"Senior Indebtedness," as defined by the PHONES Notes Indenture, nor "Senior Obligations," as

---

[16]    There is no dispute that the Senior Noteholders are entitled to the benefits of the Subordination Agreements.

defined by the EGI Subordination Agreement.  The DCL Plan, in providing an equal distribution

to the Senior Noteholders and the holders of Other Parent Claims, effectively treats the Other

Parent Claims as if they did benefit from the Subordination Agreements, without any legitimate

reason.  In fact, Brian Whittman, one of the Debtors' expert witnesses, admitted in his expert

report from the first confirmation proceeding that "[t]he settlements in the Plan also provide the

benefit of the subordination [of the PHONES] to the remaining Other Parent Claims for

simplicity of *plan construction*" rather than because they were entitled to the benefits of

subordination.[17]  Plan construction that by fiat strips the Senior Noteholders of their contractual

rights violates Illinois and Delaware contract law and Bankruptcy Code Section 1129(a)(1) as

well as Section 1129(b)(1)'s prohibition against unfair discrimination.  Viewed for what it is, the

DCL Plan prescribes taking a significant portion of the Senior Noteholders' rightful settlement

recovery and then a forced transfer to non-senior creditors.

> **A.      Other Parent Claims Are Not Senior Indebtedness**
> **Under the PHONES Notes Indenture**

For the Other Parent Claims to benefit from the subordination provisions of the PHONES

Notes Indenture, they must qualify as "Senior Indebtedness" as defined under § 14.01 (2).[18]  The

PHONES Notes Indenture defines "Senior Indebtedness" as "the principal of . . . and interest on

. . . and any other amounts due on or in connection with *any Indebtedness of the Company*

. . . ."[19]  Thus, to qualify as "Senior Indebtedness," the Other Parent Claims must first fall within

the scope of the definition of "Indebtedness," which means:

> (i) all obligations represented by notes, bonds, debentures or similar evidence of
> indebtedness; (ii) all indebtedness for borrowed money or for the deferred

---

[17]      DCL Ex. 1110 at 16, n.33 (emphasis in original).

[18]      PHONES Notes Indenture, at Art. 14.01.

[19]      PHONES Notes Indenture, at Art. 14.01 (2) (emphasis added).

purchase price of property or services other than, in the case of any such deferred purchase price, on normal trade terms; (iii) all rental obligations as lessee under leases which shall have been or should be, in accordance with generally accepted accounting principles, recorded as capital leases; and (iv) all Indebtedness of others for the payment of which such Person is responsible or liable as obligor or guarantor.[20]

Even if a claim is classified as "Indebtedness," it will not be considered "Senior Indebtedness" if it falls within certain exceptions in the "Senior Indebtedness" definition.[21]  In particular, the PHONES Notes Indenture specifically excepts from "Senior Indebtedness" "any Indebtedness of the Company constituting trade accounts payable arising in the ordinary course of business."[22]  In the instant case, the holders of Other Parent Claims have not met their burden to establish that their claims are properly classified as "Senior Indebtedness" under the PHONES Notes Indenture.

## 1.    The Trade Claims Are Not Senior Indebtedness

The Trade Claims at issue here involve liabilities Tribune owes to various trade vendors arising in the ordinary course of business, including the purchase of broadcast rights, newsprint and ink, and other goods and services used in the Debtors' business operations.  Because the Trade Claims "constitute[s] trade accounts payable arising in the ordinary course of business," they are specifically excluded from the definition of "Senior Indebtedness"[23] and do not benefit from the subordination of the PHONES Notes.

## 2.    The Swap Claim Is Not Senior Indebtedness

The Swap Claim arises out of the termination of a 1992 ISDA Master Agreement, dated as of July 2, 2007, between Barclays Bank PLC and Tribune ("Swap Agreement").  Under the

---

[20]    *Id.*

[21]    *Id.*

[22]    *Id.*

[23]    *Id.*

terms of the Swap Agreement, the parties exchanged interest rate cash flows, which represent either an asset or liability of Tribune, depending on the prevailing conditions underlying the swap.  *See* Exhibit NPP_2300.  The Swap Agreement does not qualify as "Indebtedness" because it is not a note, bond, debenture or any "similar evidence of indebtedness."[24]   Although the phrase "similar evidence of indebtedness" appears in the list of obligations that are "Indebtedness," the *ejusdem generis* rule prevents the phrase from being read more broadly than the preceding terms in the list.  *See In re Enron Creditors Recovery Corp.*, 380 B.R. 307, 323 (S.D.N.Y. 2008) ("The canon of *ejusdem generis* is employed to limit 'broad catch-all terms' in a manner consistent with other listed terms that are more specific."); *N. Trust Co. v. MS Sec. Servs.*, 2006 U.S. Dist. LEXIS 11037 at *20 (N.D. Ill. Mar. 15, 2006) ("When a list of specific terms precede, it is sensible to apply the *ejusdem generis* rule, which essentially interposes words such as "other" or "similar" before the general term."); *Majchrowski v. Norwest Mort. Inc.*, 6 F. Supp. 2d 946, 965 (N.D. Ill. 1998) ("The doctrine of *ejusdem generis* provides that when a statute lists several classes of persons or things but provides that the list is not exhaustive, the class of unarticulated things will be interpreted as those 'others such like' the named persons or things.").

A note, bond or indenture evidences a debt which has a fixed principal amount from the outset.  By contrast, a swap agreement has no fixed principal amount at the outset; in fact, one does not even know who owes whom money, let alone the amount of the ultimate claim, until

---

[24]     *See Memorandum Of Law In Support Of Confirmation And Omnibus Reply To Objections To Confirmation Of Second Amended Joint Plan Of Reorganization For Tribune Company And Its Subsidiaries Proposed By The Debtors, The Official Committee Of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A.*, dated February 26, 2011 [Dkt. No. 8173] at 145-46; *Post-Trial Brief In Support Of Confirmation Of Second Amended Joint Plan Of Reorganization For Tribune Company And Its Subsidiaries Proposed By The Debtors The Official Committee Of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A. (As Modified April 26, 2012)*, dated May 11, 2011 [Dkt. No. 8897] at 95.

periodic calculations are subsequently made and the swap agreement is subsequently terminated.

Accordingly, the Swap Claim, which arose out of the Swap Agreement, is not evidenced by

anything "similar" to a note, bond or indenture.  Likewise, the Swap Claim is not indebtedness

for borrowed money as the Swap Agreement's "fundamental characteristic ... is that the

"counterparties never actually loan or advance the notational amount. …  The damages due upon

termination of the swap merely provide the replacement cost of the lost swap payments and

likewise cannot represent interest, unmatured or otherwise." *Thrifty Oil Co. v. Bank of Am. Nat.*

*Trust & Sav. Ass'n*, 322 F.3d 1039, 1048 (9th Cir. 2003).  Indeed, counsel to Oaktree Capital

Management, L.P., the current holder of the Swap Claim, has admitted this fact, stating during

oral argument that "the Swap Claim is not for money loaned.  It represents Tribune's liability

under an interest rate agreement that was terminated as a consequence of Tribune's bankruptcy

filing."[25]  The fact that Oaktree, the current holder of the Swap Claim, is a DCL Plan Proponent,

is no basis to manufacture seniority under the PHONES Notes Indenture when none otherwise

exists.

### 3.    The Retiree Claims Are Not Senior Indebtedness

The Retiree Claims do not fall within the scope of "Indebtedness" under the PHONES

Notes Indenture either – let alone "Senior Indebtedness."  The Retiree Claims are based upon the

claims of individual former Times Mirror Company executives arising out of four non-qualified

plans and various retirement agreements.[26]  Of course, the Retiree claims are not "notes, bonds,

debentures or other similar evidences of indebtedness" within the definition of "Indebtedness."[27]

The non-qualified plans and retirement agreements look nothing like notes, bonds or debentures.

---

[25]    4/14/11 Trial Tr. 117:13 – 118:9.

[26]    *See Declaration in Support Preliminary Statement of TM Retirees With Respect To Allocation Disputes*, dated January 31, 2012 [Dkt. No. 10787].

[27]    PHONES Notes Indenture, at § 14.01(1)(i).

Further, on their face, the Retiree Claims do not qualify as "Indebtedness" on account of borrowed money or an obligation of Tribune as a lessee under a capital lease.[28]

Instead, the Retirees wrongly contend that their claims qualify as Senior Indebtedness because the claims are for "the deferred purchase price of … services."[29]  Employee compensation, however, cannot constitute a purchase price for services.  The plain meaning of "services," in this context, refers to those liabilities associated with the cost of doing business with third parties.  A company does not consider the wages paid for work performed by its own employees as the "purchase" of "services;" it is employment.  Tribune's own financial statements establish that it never equated the two concepts, as its balance sheet plainly distinguishes between "accounts payable," "contracts payable for broadcast rights" and "deferred compensation."[30]  Moreover, as classified in the Retiree Claimant Settlement Agreement, the majority of the Retiree claims constitute annuities and other pension payments or compensation in connection with retirement which is separate and distinct from deferred compensation.

Even if the Retiree Claims constitute the deferred purchase price for services, subsection (ii) of the "Indebtedness" definition specifically excludes any deferred purchase price "*on normal trade terms*."[31]  If the Retirees are able to argue successfully that employment constitutes services, then they must also constitute trade.  Under the Retirees logic, the act of performing services must be engaging in a trade – *i.e.* services are performed in exchange for compensation. The Retiree Claims are also liabilities incurred in the ordinary course in accordance with industry norms on "normal trade terms."  There are over 200 retirees in this class and the claims arise for

---

[28]     PHONES Notes Indenture, at § 14.01(ii), (iii).

[29]     PHONES Notes Indenture, at § 14.01(ii).

[30]     Tribune Company, 2007 10-K, at 83.

[31]     PHONES Notes Indenture, at § 14.01(1), (iii) (emphasis added).

the most part under three commonly entered into and applied retirement agreements between the

claimant and the Times Mirror Company.  Moreover, in her deposition, Susan Bell, a retiree

claimant herself and the former Director of Executive Compensation and Benefits at The Times

Mirror Company, admitted that the plans out of which the Retiree Claims arise "are really

common plans" and that they were entered into in the ordinary course on terms that were

competitive with the rest of the industry.[32]  Therefore, the Retirees cannot contend that the

underlying plans deviated from "normal trade terms."

Rather, what the Retirees will try to do is mince words.  They will contend that their

claims cannot be on ordinary "trade" terms because they were executives not tradesmen and

women.  But the Retirees cannot have it both ways.  If they would like to be considered as

holders of claims for the "deferred purchase price of … services" then it is those services that

define the trade.  That is made plain because the modifier "normal *trade* terms" applies to the

deferred purchase price for **both** assets and services.  So the trade terms that must be "normal"

are those applicable to the "services" in question; here employment.  Because the Retiree Claims

do not fall within the definition of "Indebtedness," they cannot constitute "Senior Indebtedness."

Further, the PHONES Notes Indenture lacks any language extending the definition of

"Indebtedness" to include the deferred compensation claims of former employees, and the

Retirees fail to establish why the definition of "Indebtedness" should be read to do so.  *See In re*

*Payless Cashways, Inc.*, 215 B.R. at 417 ("Claimants, however, did not show that deferred

compensation claims had been found to be included in this definition of Indebtedness in any

other indenture documents.  They also failed to show that the deferred purchase price of property

or services had been found to include deferred compensation . . . Thus, Claimants failed to

---

[32]    *See* Deposition of Susan Bell, dated February 15, 2012 ("Bell Tr."), at 41:14 – 42:15.

demonstrate that either the intent of the parties, or custom and usage, should be used to depart from an interpretation of subset (iii) that is grammatically correct.").

Accordingly, there exists no legitimate basis to treat any of the Other Parent Claims under the DCL Plan as if they were "Senior Indebtedness" and allow them to benefit from the subordination provisions of the PHONES Notes Indenture. Yet, the DCL Plan provides them with the same economic treatment as if they were entitled to benefit from those subordination provisions.

### B.    Other Parent Claims Are Not Senior Obligations Under the EGI Note

Similarly, Other Parent Claims cannot benefit from the subordination under the EGI Subordination Agreement because they do not qualify as "Senior Obligations" as defined by the EGI Subordination Agreement. The EGI Subordination Agreement defines "Senior Obligations" as "all obligations, indebtedness and other liabilities of the Company *other than* … (ii) trade payables and accrued expenses incurred in the ordinary course of business . . . ."[33] Because the Other Parent Claims are all "trade payables and accrued expenses incurred in the ordinary course of business," they are specifically carved out of the "Senior Obligations" provision.

#### 1.    The Trade Claims Are Not Senior Obligations

For the reasons discussed above, it is undisputed that the Trade Claims constitute "trade payables . . . incurred in the ordinary course of business."[34] There is no reasonable or plausible argument otherwise.

#### 2.    The Retiree Claims Are Not Senior Obligations

The Retiree Claims relate to the claims of former employees that, as a matter of course, have accrued in ever increasing amounts since the date of their retirement. As set forth in the

---

[33]    EGI Subordination Agreement, at ¶ 1 (emphasis added).

[34]    *Id.*

preceding section, the Retiree Claims consist of claims of over 200 retirees who entered into substantially similar retirement agreements with substantially similar terms in the ordinary course of business of the Times Mirror Company. This fact was admitted by the TM Retirees during the deposition of Susan Bell.[35]

Furthermore, the Retiree Claims constitute both "trade payables" and "accrued expenses." First, the Retiree Claims constitute "trade payables" as they constitute payments owed by Tribune for services rendered. Similar to the argument above, if the TM Retirees argue that their claims are deferred compensation for services rendered, they cannot argue that those same claims are not trade payables. Compensation is a liability incurred by Tribune in its ordinary course of business and thus it constitutes a "trade payable" incurred in the ordinary course of business.

Second, the Retiree Claims are accrued expenses. Accrued expenses are defined as "an expense incurred but not yet paid."[36] They include any expense that a business expects to pay in the future, including those payments related to wages. It is irrelevant whether those liabilities are contingent or unliquidated; they constitute an obligation of Tribune just the same. Here, the Retiree Claims are incurred liabilities of Tribune, the payment of which is deferred. Moreover, the amounts due under the pertinent agreements were never prepaid into a segregated account.[37] By Tribune not segregating the amounts that it reasonably expected to owe, these liabilities constitute accrued expenses; rendering the outside the definition of Senior Obligations.

---

[35]    *See* Bell Tr., at 41:14 – 42:15.

[36]    *See* http://dictionary.reference.com/browse/accrued+expenses, last visited on 2/17/2012.

[37]    *See* Bell Tr., Exs. 2, 3, 4.

### 3.    The Swap Claim Is Not Senior Obligations

The Swap Claim is not a Senior Obligation because it is an accrued expense incurred in the ordinary course of business.  The obligations associated with the Swap Claim, and in particular, the termination payment, were contingent and unliquidated expenses of Tribune and were disclosed in each of Tribune's SEC filings.  The Swap Claim was an accrued expense incurred in the ordinary course of business – it was an owed but unpaid liability acknowledged by Tribune.  Indeed, Tribune's obligations under the Swap Agreement were incurred when it entered into the Swap Agreement and were ongoing pursuant to the collateral requirements of the pertinent Rate Swap Confirmations.  Additionally, the Swap Claim was incurred in the ordinary course of business.  Tribune's entry into the Swap Agreement was a required condition of the credit agreements that Tribune entered into in 2007 as part of the LBO.  Moreover, it is a common course of business for businesses, such as Tribune, to enter into swap agreements and other hedging arrangements, such as the one at issue here, to hedge the risk associated with the fluctuation of interest rates and other expenses subject to fluctuation.

Thus, none of the Other Parent Claims can demonstrate that they benefit from the subordination of the EGI Note.

### C.    The DCL Plan's Awarding The Economic Benefits Of Subordination To Other Parent Claims That Are Not Contractually Entitled to Such Benefit Violates Key Provisions Of The Bankruptcy Code

Allowing the DCL Plan to accord the holders of the Other Parent Claims the economic benefits of seniority under the Subordination Agreements – despite that, as discussed above, they are not contractually entitled to such benefits – results in unfair discrimination against the Senior Noteholders (who are entitled to the benefits of such seniority) in violation of Section 1129(b).  *See Motorola, Inc. v. Official Comm. Of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 464-5 (2d Cir. 2007) (holding that settlements must comply with the Bankruptcy

Code's priority scheme).  Section 1129(b) requires that in order for a debtor to confirm a plan

over the plan's rejection by a dissenting class of creditors, "the Plan 'does not discriminate

unfairly, and is fair and equitable' with respect to each impaired class that has not accepted the

plan." *In re Exide Techs.*, 303 B.R. 48, 78 (Bankr. D. Del. 2003) (quoting 11 U.S.C.

§ 1129(b)(1)).

A common formulation of the test for "unfair discrimination" is that "a rebuttable

presumption of unfair discrimination arises when there is: (1) a dissenting class; (2) another class

of the same priority; and (3) a difference in the plan's treatment of the two classes that results in

either (a) a materially lower percentage recovery for the dissenting class (measured in terms of

the net present value of all payments), or (b) regardless of percentage recovery, an allocation

under the plan of materially greater risk to the dissenting class in connection with its proposed

distribution."  *In re Armstrong World Indus., Inc.,* 348 B.R. 111, 121 (D. Del. 2006) (citing *In re

Dow Corning Corp.*, 244 B.R. 696, 702 (Bankr. E.D. Mich. 1999)); *In re Tribune Co.*, 2011

Bankr. LEXIS 4128, at *188 (Bankr. D. Del. Oct. 31, 2011).

The *In re Armstrong* test, however, is not appropriate for (and was not developed in the

context of) the current situation where there exists two classes of equal rank vis-à-vis one

another, but that have *different* rights under a subordination agreement with respect to a third

class.  This is because while the two classes may be of equal rank, they do not have an equal

ability to recover the value of their claims.  The *Armstrong* test would seemingly permit two

classes to be treated exactly the same even where one class is the beneficiary of a subordination

agreement and the other class was not, in those cases where one class did not receive a

"materially lower percentage recovery" or an allocation of greater risk than the other class; yet,

the legislative history of the "unfair discrimination" requirement, described below, makes clear

that such a construct is the paradigm of "unfair discrimination."  Thus, the *Armstrong*

formulation cannot control here without refinement – in applying *Armstrong*, the Court can only

take into account and compare those distributions that come directly from the Debtor before

considering the effect of any subordination agreement (and not the reallocation of payments from

subordinated parties.

The legislative history of Section 1129(b) of the Bankruptcy Code makes clear that

treating a dissenting creditor class that is entitled to the benefits of contractual subordination the

same as a second creditor class that is not entitled to such subordination *does* discriminate

unfairly against the former.  Thus, the error in rote application of the *In re Armstrong* test –

which does not address the equal treatment of class with unequal rights -- under these

circumstances is made plain by that legislative history:

> This point illustrates the lack of precision in the first criterion which
> demands that a class not be unfairly discriminated against with respect to
> equal classes. From the perspective of unsecured trade claims, there is no
> unfair discrimination as long as the total consideration given all other
> classes of equal rank does not exceed the amount that would result from
> an exact aliquot distribution. Thus if trade creditors, senior debt, and
> subordinate debt are each owed $100 and the plan proposes to pay the
> trade debt $15, the senior debt $30, and the junior debt $0, the plan would
> not unfairly discriminate against the trade debt nor would any other
> allocation of consideration under the plan between the senior and junior
> debt be unfair as to the trade debt as long as the aggregate consideration is
> less than $30. The senior debt could take $25 and give up $5 to the junior
> debt and the trade debt would have no cause to complain because as far as
> it is concerned the junior debt is an equal class.
>
> However, in this latter case the senior debt would have been unfairly
> discriminated against because the trade debt was being unfairly over-
> compensated; of course the plan would also fail unless the senior debt was
> unimpaired, received full value, or accepted the plan, because from its
> perspective a junior class received property under the plan. *Application of
> the test from the perspective of senior debt is best illustrated by the plan
> that proposes to pay trade debt $15, senior debt $25, and junior debt $0.
> Here the senior debt is being unfairly discriminated against with respect
> to the equal trade debt even though the trade debt receives less than the
> senior debt.* The discrimination arises from the fact that the senior debt is

> *entitled to the rights of the junior debt which in this example entitle the*
> *senior debt to share on a 2:1 basis with the trade debt.*

Volume C Collier on Bankruptcy App. Pt. 4(d)(i)(15th ed. rev.) (emphasis added).  This latter example of unfair discrimination in the legislative history of unfair discrimination virtually mirrors the construct that the DCL Plan is attempting to cram down over the dissent of the Senior Noteholders.  The error in doing so is made all the more glaring by the fact that this is the ***only*** illustration of "unfair discrimination" in that legislative history.

Accordingly, unfair discrimination must be assessed by comparing (i) the percentage distribution that the dissenting class is receiving without counting that portion of the distribution that is allocable to the application of the subordination/turnover provisions of the Subordination Agreements, with (ii) the percentage distribution that the class of equal rank is receiving (all of which is attributable to direct distributions from the estate, and none to any such subordination/turnover).  This allows for a comparison based on what similarly situated creditors are receiving on account of their claims against the estate, as distinguished from their claims against third parties.  Moreover, it accounts for the potential that unfair discrimination can result not only from unequal percentage distribution to classes with the same rights and priorities, but also from equal percentage distributions to classes with unequal rights.

The correct way to allocate Settlement proceeds is to take the total amount of the Settlement payments to be made and divide it by the total amount of claims sharing in that consideration (including the claims held by the subordinated creditors) resulting in an equal initial distribution amongst creditors.  The columns labeled "Plan Prior to PHONES / EGI Subordination" in the recovery chart attached as Exhibit A (the "Recovery Chart") illustrates the correct initial allocation of Settlement recoveries amongst the Senior Notes, Other Parent Claims,

PHONES Notes Claims and EGI from the estate.[38]  Only once this initial distribution from the

estate is made do subordinated creditors turn over their recoveries to the senior creditors pursuant

to the Subordination Agreements.

Instead of following this fair and reasonable method of allocating the Settlement proceeds

the DCL Plan circumvents the creditor waterfall to achieve the recoveries desired by the DCL

Plan.  To do this the proceeds of the Settlement, the Litigation Trust and the Creditors' Trust

must be distributed to provide materially *unequal* percentage recoveries to classes of equal rank

*before* the effect of the provisions of the Subordination Agreements are taken into account.  The

DCL Plan's unfair discrimination against the Senior Noteholders as evidenced by several

numerical examples based upon the outcomes reflected in the recovery analysis.  The DCL Plan

provides that Other Parent Claims and the Senior Noteholders will receive an equal distribution

of 33.6% of their claims, before taking into account any additional distributions from the Post-

Confirmation Trusts.  However, because only the Senior Noteholders are legally entitled to

benefit from contractual subordination under the Subordination Agreements, their initial

distribution from the estate (exclusive of the amount of their recovery allocable to the third party

subordination/turnover provisions) is actually a much lower percentage of their claims than is the

percentage distribution to Other Parent Claims on account of their direct claims against the estate

(*i.e.* the Senior Notes recover 33.6% only after receiving the consideration that otherwise would

have been distributed to holders of the PHONES Notes and EGI Note, while Other Parent Claims

receive the same percentage without being entitled to any such third party consideration).  In

fact, the Senior Noteholders' *pro rata* distribution from the Debtors' estates before taking that

---

[38]     In the attached Recovery Chart, the Swap Claim's recovery is greater as a result of the assumption that they
will elect the "cash out option."  The recovery on the PHONES Notes and the EGI Note is lower as a result of
turnover of natural recoveries to the LBO lenders pursuant to the Subordination Agreements.

reallocation into account is actually less than 19.4%, which reflects the percentage recovery they are entitled to receive from the Debtors' estates prior to the enforcement of the Subordination Agreements.

Although the Senior Noteholders receive 19.4% of their claim through their direct claim against the estate, the Other Parent Claims receive a 33.6% *pro rata* distribution from the Debtors' estates (representing their ultimate recovery because they are not entitled to benefit from subordination). These widely diverging initial distributions reflect approximately a 53% - 73% premium (depending on the allowed amount of the PHONES Notes Claim) to the Other Parent Claims as compared to the Senior Noteholders. The fact that the Senior Noteholders eventually will receive a 33.6% recovery is irrelevant to a proper "unfair discrimination" analysis because using that number as a benchmark (i) disregards the amount of distribution from the Debtors' estates before taking into account the effects of the Subordination Agreements, (ii) supplements the recovery of the Senior Noteholders from the estate with their recovery from the PHONES and the EGI Note, and (iii) ignores the legislative history and the underlying purpose of the "not discriminate unfairly" requirement of the Bankruptcy Code.

Moreover, the discrimination demonstrated by this Settlement "base case" is further exacerbated when payments from the Litigation Trust are factored into the analysis. In the scenario in which the Litigation Trust recovers $250 million, the misallocation of proceeds generated from the subordination of the PHONES Notes and EGI Note to both the Senior Notes and the Other Parent Claims results in a 58% to 81% (depending on the allowed amount of the PHONES Notes Claim) greater distribution to the Other Parent Claims than the Senior Noteholders from the direct claims against the Debtors' estates (as distinguished from the subordination claims against the PHONES Notes and EGI Note). The premium paid to the Other

Parent Claims only increases as the Litigation Trust recoveries increase.  This drastic contrast in

percentage recoveries from the estate of creditor classes who are of equal rank against the estate

constitutes unfair discrimination against the Senior Noteholders.  *See*, *e.g.*, *In re Hoffinger*

*Indus.*, 321 B.R. 498, 509 (Bankr. E.D. Ark. 2005) (finding unfair discrimination where one

claimant would receive 20% of her allowed claims while similarly situated claimants would

receive 30%); *In re Crosscreek Apts.*, 213 B.R. 521, 537-538 (Bankr. E.D. Tenn. 1997) (finding

unfair discrimination where unsecured trade debt would be paid in full in 180 days while the

unsecured deficiency claim would be paid approximately 50% over the ten-year life of the plan);

*In re Barney & Carey Co.*, 170 B.R. 17, 25 (Bankr. D. Mass. 1994) (denying confirmation where

deficiency claim was to receive 100% and general unsecured 15%); *In re Caldwell*, 76 B.R. 643,

646 (Bankr. E.D. Tenn. 1987) (confirmation denied where 100% of credit card debt was

proposed to be paid but only 22.7% of all other unsecured debt would be paid).  *Cf. In re Greate*

*Bay Hotel & Casino, Inc.*, 251 B.R. 213, 231 (Bankr. D.N.J. 2000) (noting that "[c]ourts which

have rejected confirmation on the basis of unfair discrimination have confronted plans proposing

grossly disparate treatment (50% or more) to similarly situated creditors.").  Thus, it is

inescapable that the distribution scheme under the DCL Plan violates Section 1129(b)(1) of the

Bankruptcy Code.  Whether the premium to Other Parent Claims over the percentage recovery to

Senior Noteholders on account of claims against the estate (as opposed to rights against third

parties) is 53% or 73% or 81%, it is more than "material" enough to constitute unfair

discrimination.  Accordingly, the distribution scheme for Article III distributions and

distributions from the Post-Confirmation Trusts must be revised to reflect the proper functioning

of the contractual subordination.

**D.    The DCL Plan's Awarding The Economic Benefits Of
Subordination To Other Parent Claims That Are Not
Contractually Entitled To Such Benefit Diverts Value That
The Senior Noteholders Are Contractually Entitled To Receive**

Finally, even if the Court correctly holds that the Other Parent Claims are not senior,

distributions under the DCL Plan, if left unaltered, unfairly discriminates against the Senior

Noteholders.  Though the Senior Noteholders should be the only class benefitting from

subordination, the DCL Plan diverts part of the Senior Noteholders' recovery to the Other Parent

Claims.  As evidenced by the recovery chart, under the DCL Plan, the Senior Noteholders would

receive between 7% and 9% less on their claim, representing approximately $30 to $37 million,

depending upon the amount of the PHONES Notes claim, compared to what they would receive

pursuant to the scenario where the Other Parent Claims are not given the economic benefits of

the Subordination Agreements, and those benefits are limited to the parties entitled thereto, *i.e.*

the Senior Noteholders.  This $30 to $37 million of diverted payments is material to the

recoveries of Senior Noteholders, representing approximately 8% to 10% of the $369 million

allocated to them as part of the Settlement of the disastrous LBO.  This diversion of value is only

magnified once additional recoveries are realized by the Litigation Trust, increasing to a

staggering $47 to $58 million if the Litigation Trust recovers $750 million.  This simply smacks

of bad faith value shifting without even a meager attempt to assert a business purpose (none

exists) which would not permit the transfer anyway.

**III.    The Determination Of Entitlement To Post-Petition Interest
Is Premature and Not Ripe For Adjudication**

At this point, though a denominated Allocation Dispute, the issue of whether the

Subordination Agreements provide for the subordination of post-petition interest recoveries

actually is not ripe for adjudication.  The Senior Noteholders are not being paid their principal

and pre-petition interest in full and the time at which that may occur unfortunately appears far

away under the current recovery scenario.  It is at that time, payment in full, that courts address

post-petition interest.  *See*, *e.g.*, *HSBC Bank USA v. Branch (In re Bank of New Engl. Corp.)*, 364

F.3d 355, 361 (1st Cir. 2004) ("Since filing for bankruptcy, BONE, under the careful

stewardship of its Chapter 7 trustee, has made three distributions to creditors.  Through these

distributions, the bankruptcy estate has paid the holders of the Senior Debt the full amount of all

unpaid principal and pre-petition interest, together with all approved fees and expenses incurred

through the date of the last distribution"); *Chemical Bank v. First Trust of N.Y., N.A. (In re*

*Southeast Banking Corp.)*, 156 F.3d 1114, 1117 (11th Cir. 1998) ("Pursuant to the orders of the

bankruptcy court, Southeast has distributed or will distribute amounts sufficient to satisfy the

principal on the Senior Notes and all interest that accrued on the Senior Notes prior to the

petition date.").

In order to be ripe for judicial review, an issue "must involve 'a real and substantial

controversy admitting of specific relief through a decree of a conclusive character, as

distinguished from an opinion advising what the law would be upon a hypothetical state of

facts.'"  *Surrick v. Killion*, 449 F.3d 520, 527 (3d Cir. 2006) (quoting *North Carolina v. Rice*,

404 U.S. 244, 246 (1971)).  As explained by the Third Circuit in the bankruptcy context,

"[w]hether an issue is ripe for review depends on the 'fitness of the issues for judicial decision

and the hardship to the parties of withholding court consideration.'"  *L.R.S.C. Co. v. Rickel Home*

*Ctrs., Inc. (In re Rickel Home Ctrs., Inc.)*, 209 F.3d 291, 307 (3d Cir. 2000) (quoting *Pacific Gas*

*& Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n.*, 461 U.S. 190, 201

(1983); *Pic-A-State PA, Inc. v. Reno*, 76 F.3d 1294, 1298 (3d Cir. 1996)).  Regarding the

"fitness" factor, the Supreme Court has observed that where "the issue tendered is a purely legal

one," it supports a finding that the issue is "appropriate for judicial resolution."  *Abbott Labs. v.*

*Gardner*, 387 U.S. 136, 149 (1967). "Ripeness prevents courts from 'entangling themselves in abstract disagreements.'" *Surrick*, 449 F.3d at 527 (quoting *Abbott*, 387 U.S. at 148).

If the Court were to interpret the Senior Noteholders' entitlement to post-petition interest under the Subordination Agreements now, the impact of any such ruling would be contingent on future circumstances as to whether future litigation recoveries are sufficient to enable Senior Noteholders – who, under the DCL Plan, will receive an initial distribution of about one-third of their claims – to recover the remaining two-thirds of their claims. Such a ruling would merely be "'an opinion advising what the law would be upon a hypothetical state of facts'" – exactly what the ripeness doctrine is designed to prevent. *Surrick*, 449 F.3d at 527 (quoting *Rice*, 404 U.S. at 246); *see also In re Koenigsberg*, Case No. 09-20968-MER [Dkt. No. 111] ((Bankr. D. Colo. Mar. 22, 2011), p. 13 ("The Court finds the issue whether [creditor] is entitled to post-petition interest on its general unsecured claim is not ripe for adjudication until it is determined whether the Debtor's assets exceed the Debtor's liabilities"). As a matter of efficiency and sound judicial administration, it makes no sense to spend the time and resources of this Court and the parties on an issue that will not rise unless the Senior Noteholders realize hundreds of millions of dollars in litigation recoveries.

Notwithstanding the above, both Subordination Agreements provide for the subordination of the PHONES Notes and the EGI Note with respect to all indebtedness defined as "Senior Indebtedness" and "Senior Obligations." The Subordination Agreements clearly and unequivocally define "Senior Indebtedness" and "Senior Obligations" to mean *all* obligations, indebtedness and other indebtedness. Post-petition interest is as much an "obligation," "indebtedness" or "other liability" as is any other debt. The fact that such a claim for post-

petition interest may not be allowed as a claim against the estate does not detract from the fact that it remains an obligation of Tribune.

The language in the PHONES indenture regarding post-petition interest appears to contemplate payment where, if it occurs here in the future, the Senior Noteholders are paid in full triggering an ability to seek post-petition interest. Also, under the law applicable to the subordination agreements here, it is irrelevant that neither explicitly provide for post-petition interest in the current scenario. Both Circuit Courts that have examined this issue have concluded that the so-called Rule of Explicitness, which prior to the enactment of the Bankruptcy Code required that subordination to post-petition interest on contractually senior debt required the existence of "explicit" language providing for subordination to post-petition interest, was superseded by Section 510(a) of the Bankruptcy Code. *HSBC Bank USA v. Branch (In re Bank of New Engl. Corp.*), 364 F.3d 355, 362-63 (1st Cir. Mass. 2004) (concluding that section 510(a) "supplants the judge-made doctrine through which the courts previously had dealt with such agreements."); *Chemical Bank v. First Trust of N.Y., N.A. (In re Southeast Banking Corp.)*, 156 F.3d 1114, 1124 (11th Cir. Fla. 1998) (concluding "that Congress, by enacting section 510(a) of the Bankruptcy Code, abrogated the pre-Code rule of explicitness. As a necessary consequence of this change in bankruptcy law, the Rule of Explicitness can no longer survive as the progeny of the bankruptcy courts' equity powers or as a federal canon of contract construction."). Accordingly, to the extent that the Rule of Explicitness remains, it does so only by operation of the state law governing the subordination provisions. *Bank of New Engl. Corp.*, 364 F.3d at 363; *Southeast Banking*, 156 F.3d at 1124.

Here, Illinois and Delaware state law are both silent on any Rule of Explicitness. Instead, the subordination framework that was applicable pre-petition must continue to operate post-petition.

**CONCLUSION**

WHEREFORE, for the reasons stated above, this Court should conclude that (i) the subordination provisions of both the PHONES Notes Indenture and the EGI Subordination Agreement are without limitation and must be enforced until "Senior Indebtedness" and "Senior Obligations," respectively, are paid in full; (ii) Other Parent Claims are not beneficiaries of the Subordination Agreements because they do not constitute "Senior Indebtedness" or "Senior Obligations;" (iii) equal treatment of Senior Noteholders and Other Parent Claims regardless of the effect of the Subordination Agreements constitutes unfair discrimination; (iv) distributions under the DCL Plan must be adjusted to account properly for the Subordination Agreements; and (v) any decision on the applicability of the Subordination Agreements to post-petition interest on senior claims should be deferred until an award of such interest becomes ripe; and should grant such other relief as may be necessary to effectuate the relief sought.

Dated: February 24, 2012
      Wilmington, Delaware

                              Respectfully submitted,

KASOWITZ, BENSON, TORRES         BIFFERATO GENTILOTTI LLC
  & FRIEDMAN LLP
David S. Rosner                       /s/ Garvan F. McDaniel
Sheron Korpus                     Garvan F. McDaniel (I.D. No. 4167)
Christine A. Montenegro          800 N. King Street, Plaza Level
Matthew B. Stein                  Wilmington, Delaware 19801
1633 Broadway                    302-429-1900
New York, New York 10019
212-506-1700

*Counsel for Law Debenture Trust Company of New York, solely in its capacity as successor Indenture Trustee for certain series of Senior Notes*

McCARTER & ENGLISH, LLP
David J. Adler
245 Park Avenue
New York, New York 10167
212-609-6800

McCARTER & ENGLISH, LLP

_____/s/ Katharine L. Mayer_____
Katharine L. Mayer (I.D. No. 3758)
Renaissance Centre
405 N. King Street
Wilmington, Delaware 19801
302-984-6300

*Counsel for Deutsche Bank Trust Company Americas, solely in its capacity as successor Indenture Trustee for certain series of Senior Notes*