## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered |

## REPLY MEMORANDUM OF LAW OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS ON UNFAIR DISCRIMINATION ALLOCATION DISPUTE

CHADBOURNE & PARKE LLP
Howard Seife
David M. LeMay
Andrew Rosenblatt
Marc B. Roitman
30 Rockefeller Plaza
New York, New York 10112
Telecopier:  (212) 541-5369

- and -

LANDIS RATH & COBB LLP
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Kimberly A. Brown (No. 5138)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telecopier:  (302) 467-4450

- and -

ZUCKERMAN SPAEDER LLP
Graeme W. Bush
James Sottile
1800 M Street, N.W., Suite 1000
Washington, D.C. 20036
Telecopier:  (202) 822-8106

*Counsel for the Official Committee of Unsecured Creditors*

Dated: March 2, 2012

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are listed on the next page.

Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC (KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc., f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); and WPIX, Inc. (0191). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

## TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ........................................................................... 1

II.     ARGUMENT ................................................................................................... 4

        A.      The Rebuttable Presumption Test Provides The Appropriate Legal
                Framework And Produces Logical And Valid Results In This Case ..................... 4

                1.      The Legislative History Is Not A Persuasive Guide To The Court
                        On This Issue ................................................................................. 5

                2.      The Rebuttable Presumption Test Is The Most Effective And Fair
                        Method Of Analyzing Unfair Discrimination ............................................ 8

        B.      The Committee's Quantitative Analysis Is Derived From The Case Law
                And Presents A Fair Assessment Of Alleged Discrimination; The Senior
                Noteholders' Quantitative Analysis Is Not Supportable ......................................... 12

        C.      The Bankruptcy Code Permits Confirmation Of Chapter 11 Plans
                Notwithstanding Subordination Agreement Terms ................................................ 14

III.    CONCLUSION ................................................................................................ 16

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Bruesewitz v. Wyeth Inc.*,
    561 F.3d 233 (3d Cir. 2009) ...................................................................6

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
    545 U.S. 546 (2005) ...........................................................................6

*In re Aleris Int'l, Inc.*,
    No. 09-10478-BLS, 2010 WL 3492664 (Bankr. D. Del. May 13, 2010) ...............9

*In re Armstrong World Indus., Inc.*,
    348 B.R. 111 (D. Del. 2006) ..........................................................passim

*In re Aztec Co.*,
    107 B.R. 585 (Bankr. M.D. Tenn. 1989) ...............................................6

*In re Consul Restaurant Corp.*,
    146 B.R. 979 (Bankr. D. Minn. 1992) ................................................15

*In re Croatan Surf Club, LLC*,
    No. 11-00194-SWH, 2011 WL 5909199 (Bankr. E.D.N.C. Oct. 25, 2011) ........14, 15

*In re Dow Corning Corp.*,
    244 B.R. 696 (Bankr. E.D. Mich. 1999) .............................................8, 9

*In re Exide Techs.*,
    303 B.R. 48 (Bankr. D. Del. 2003) ...................................................8, 9

*In re Genesis Health Ventures, Inc.*,
    266 B.R. 591 (Bankr. D. Del. 2001) ....................................................10

*In re Greate Bay Hotel & Casino, Inc.*,
    251 B.R. 213 (Bankr. D.N.J. 2000) ...................................................2, 8

*In re Greystone III J.V.*,
    102 B.R. 560 (Bankr. W.D. Tex. 1989), *rev'd en banc, Phoenix Mut. Life Ins. Co v.
    Greystone III J.V. (In re Greystone III J.V.)*, 995 F.2d 1274 (5th Cir. 1991) ...........6

*In re Hoffinger Indus., Inc*,
    321 B.R. 498 (Bankr. E.D. Ark. 2005) ...............................................11

*In re Johns-Manville Corp.*,
    68 B.R. 618 (Bankr. S.D.N.Y. 1986) ...................................................6

*In re Lernout & Hauspie Speech Prods., N.V.*,
    301 B.R. 651 (Bankr. D. Del. 2003), *aff'd*, 308 B.R. 672 (D. Del. 2004) ..............................10

*In re TCI 2 Holdings, LLC*,
    428 B.R. 117 (Bankr. D.N.J. 2010) ..............................................................................4, 14, 15

*In re Tribune Co.*,
    No. 08-13141-KJC, 2011 WL 5142420 (Bankr. D. Del. Oct. 31, 2011) ........................passim

*In re Unbreakable Nation Co.*,
    437 B.R. 189 (Bankr. E.D. Pa. 2010) ......................................................................10, 11

*Morgan v. Gay*,
    466 F.3d 276, 278 (3d Cir. 2006) ..................................................................................7

*Puerto Rico Dep't of Consumer Affairs v. Isla Petrol. Corp.*,
    485 U.S. 495 (1988) ......................................................................................................6

## STATUTES

11 U.S.C. § 510(a) ......................................................................................................4, 14

11 U.S.C. § 1129 ..............................................................................................4, 6, 14, 15

## OTHER AUTHORITIES

Bruce A. Markell, *A New Perspective On Unfair Discrimination In Chapter 11*,
    72 AM. BANKR. L.J. 227 (1998)..................................................................................passim

H.R. REP. NO. 95-595 (1977)................................................................................3, 7, 12

Steven M. Abramowitz, *et al.*, *Making The Test For Unfair Discrimination More "Fair":*
    *A Proposal*, 58 BUS. LAW. 83, 89 (2002). ..............................................................6, 8, 9, 10

## I.    PRELIMINARY STATEMENT

Upon reviewing the opening briefs on this issue, the Court may initially wonder how an agreed set of numbers[2] can produce such wildly differing interpretations.  The Committee[3] argues that the DCL Plan's initial distributions to Senior Noteholders are never more than 8.5% lower than the distributions they claim to be entitled to even if all disputed variables are resolved entirely in the Senior Noteholders' favor.  On the other hand, the Senior Noteholders argue that the same facts result in "diverging initial distributions" of between 53% and 73%.[4]  How can this be?

The answer is simple: the Committee measures the possible harm to the dissenting class, as required by the case law, and the Senior Noteholders look instead to their own new formula based on the benefit to the alleged preferred class.  Their proposed "test" is contrary to the governing case law and designed solely to magnify the alleged discrimination.  The Senior

---

[2]    A detailed summary of the effect of the Subordination Provisions on initial distributions and Litigation Trust recoveries is provided in the Appendix filed at Docket No. 11015, which is annexed hereto as Exhibit A and referred to herein as the "**Recovery Chart**."  *See* ADH Ex. 89.  All parties to the Allocation Disputes have affirmatively agreed to stipulate to the accuracy and admissibility of the Recovery Chart.

[3]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Memorandum of Law of the Official Committee of Unsecured Creditors (the "Committee") on Unfair Discrimination Allocation Dispute [Docket No. 11000] (the "Committee Brief") or the Third Amended Joint Plan Of Reorganization For Tribune Company And Its Subsidiaries filed on February 20, 2012 [Docket No. 10958] (the "DCL Plan") proposed by the Debtors, the Committee, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A. (the "DCL Plan Proponents").

The other DCL Plan Proponents support the position articulated herein.  The Debtors have filed a Joinder of the Debtors to Reply Memorandum of Law of the Official Committee of Unsecured Creditors on Unfair Discrimination Allocation Dispute.  Oaktree Capital Management has filed Oaktree Capital Management, L.P.'s Response Brief Regarding Allocation Disputes.  Angelo, Gordon & Co., L.P. and JPMorgan Chase Bank, N.A. have advised the Committee that they support the arguments set forth herein.

[4]    *See* Joint Opening Brief of Law Debenture Trust Company of New York and Deutsche Bank Trust Company Americas With Respect To the Allocation Disputes [Docket No. 11010] (the "Senior Noteholder Brief"), at 33.

Noteholders' efforts to shoehorn this case into the "grossly disparate treatment (50% or more)"[5] category of cases underscores the immateriality of the alleged discrimination.

The Committee's approach is based on a legal standard adopted by numerous courts in this District and elsewhere and cited with approval by this Court. As described in the Committee Brief: the Senior Noteholders assert they are entitled to as much as a 36.5% initial recovery; the DCL Plan provides the Senior Noteholders with a 33.6% initial recovery; so, the DCL Plan's alleged discrimination reduces Senior Noteholder recoveries by no more than 8.5%,[6] an amount which is not material and therefore not unfair.

The impact of the disputed Subordination Provisions on the initial distribution to the Senior Noteholders ranges from *de minimis* (if the Court determines that the Swap Claim and the Retiree Claims are both contractually entitled to the benefits of the Subordination Provisions), to between 6.95% and 8.5% (if the Court determines that only the Senior Noteholders are contractually entitled to the benefits of the Subordination Provisions), depending on the allowed amount of the PHONES Notes.[7]

In contrast, the Senior Noteholder Brief asks this Court to ignore applicable case law and to measure not the alleged harm to the dissenting class but rather the benefits to the allegedly

---

[5]   *See In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 231 (Bankr. D.N.J. 2000).

[6]   If none of the Other Parent Claims received the benefits of the Subordination Provisions, and the PHONES Notes Claims were allowed at the high amount, the initial distribution to the Senor Noteholders would increase from the DCL Plan amount of $431 million to $467.8 million, an 8.5% percentage impact ($467.8 / $431 - 1 = 0.085).

[7]   The largest holder of Senior Noteholder claims contends that the PHONES Notes Claims should be allowed in the *low* amount. *See* Brief of Aurelius Capital Management, LP in Support of Its Positions Regarding the Allocation Disputes [Docket No. 11007]. The alleged discrimination would be smaller in all scenarios if the PHONES Notes Claims were allowed in the low amount.

preferred class.  The Senior Noteholders do not attempt to argue that they will receive materially *less* than they believe they deserve; they argue instead that other creditors are receiving too much.  This approach is completely unsupported by the case law or even the legislative history that is presented as the sole basis for the Senior Noteholders' argument.  This would have been evident if the Senior Noteholders had continued their block quote for an additional paragraph, in which the House Report states, "[t]he criterion of unfair discrimination . . . preserves just treatment of a dissenting class from the class's own perspective."  *See* H.R. REP. NO. 95-595, at 417 (1977).

The Senior Noteholders argue that applying prevailing case law here would be an "error." Senior Noteholder Brief at 30.  But rather than confront that case law head-on and explain why exactly it should not govern, the Senior Noteholders instead create a new formulation of unfair discrimination without citing a single supporting case.

This Court has already observed that the facts of this case are somewhat unusual.[8]  But unusual facts do not mean that a doctrine of law cannot be applied.  To the contrary, a sound doctrine of law can be applied in myriad contexts.  The "rebuttable presumption" test for unfair discrimination is a sound doctrine of law, supported by the case law of this District and elsewhere, and the Court should decline the Senior Noteholders' invitation to abandon it.

---

[8]  "The issue, here, arises in an unusual context, for instead of arguing that creditors should be treated equally, the [Senior Noteholders] argue that the DCL Plan should treat the claimants differently, by providing a greater recovery to those claimants who should benefit from the subordination." *In re Tribune Co.*, No. 08-13141-KJC, 2011 WL 5142420, at *55 (Bankr. D. Del. Oct. 31, 2011) (the "Confirmation Opinion").

## II.    ARGUMENT

### A.    The Rebuttable Presumption Test Provides The Appropriate Legal Framework And Produces Logical And Valid Results In This Case

The Senior Noteholders assert that the *Armstrong* "rebuttable presumption" test should not be used here because it does not contemplate a situation where two classes are treated equally but have different rights. *See* Senior Noteholder Brief at 29-30. The Senior Noteholders instead advocate a *per se* rule of their own creation that "treating a dissenting creditor class that is entitled to the benefits of contractual subordination the same as a second creditor class that is not entitled to such subordination *does* discriminate unfairly against the former." Senior Noteholder Brief at 30.

The Senior Noteholders' position is premised entirely on a portion of the legislative history of section 1129(b)(1). The Senior Noteholders ask this Court to ignore the developments in the law of unfair discrimination that have occurred over the last 35 years, including the *Armstrong* case, in favor of a mechanical formulation that was unclear and confusing when written and has been criticized ever since. Their mechanical formulation is contrary to the express language of the Bankruptcy Code itself[9] and would overrule an entire body of case law holding that the Bankruptcy Code does not prohibit all discrimination in plan treatment but only "unfair" discrimination. *See, e.g., In re Tribune Co.*, 2011 WL 5142420, at *56 ("Minor or immaterial differences in plan treatment do not rise to the level of ***unfair*** discrimination."); *In re*

---

[9]    *See* 11 U.S.C. § 1129(b); *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 141 (Bankr. D.N.J. 2010) (The introductory phrase of section 1129(b), "notwithstanding section 510(a) of this title," makes clear that "even though section 510(a) [otherwise] requires the enforceability of [a] subordination agreement in a bankruptcy case to the same extent that the agreement is enforceable under nonbankruptcy law, if a nonconsensual plan meets all of the § 1129(a) and (b) requirements, the court 'shall confirm the plan'" notwithstanding its deviation from a subordination agreement's terms). *See* Section II.C, *infra*.

*Armstrong World Indus., Inc.*, 348 B.R. 111, 122 (D. Del. 2006) ("A finding that all classes of the same priority will receive the identical amount under the proposed Plan is not necessary to find that the Plan does not discriminate."). As shown below, courts have embraced the *Armstrong* analysis in a variety of factual situations and have rejected the notion that the legislative history should be mechanically or restrictively applied.

1. **The Legislative History Is Not A Persuasive Guide To The Court On This Issue**

The Senior Noteholders argue that *Armstrong* should be treated as a limited or fact-bound holding. Specifically, they cite to the legislative history to support the position that application of the *Armstrong* test here would be an error because it "does not address the equal treatment of class[es] with unequal rights." Senior Noteholder Brief at 30. But there is no merit to the argument that a House Report from 1977 should somehow limit or restrict the application of the rebuttable presumption test proposed by Professor (now Bankruptcy Judge) Bruce A. Markell in 1998,[10] applied by the *Armstrong* court in 2006, and accepted by numerous other courts both before and since.

Professor Markell described the legislative history cited by the Senior Noteholders as "roundabout, almost otiose," and as showing only "that disparities in recovery are presumptively unfair discrimination, not a particularly novel concept." Markell, *supra* note 10, at 237-38. The *Armstrong* court noted that "[u]nfair discrimination is not defined in the Bankruptcy Code, nor does the statute's legislative history provide guidance as to its interpretation." *In re Armstrong*

---

[10]   *See* Bruce A. Markell, *A New Perspective On Unfair Discrimination In Chapter 11*, 72 AM. BANKR. L.J. 227 (1998).

*World Indus., Inc.*, 348 B.R. at 121 (citing *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986)).  That observation by itself dispels any suggestion that the legislative history is of any real interpretative value—much less dispositive value—to this Court.  And the cases that have relied most mechanically on the passage cited by the Senior Noteholders, *see, e.g., In re Greystone III J.V.*, 102 B.R. 560, 571-72 (Bankr. W.D. Tex. 1989), *rev'd en banc, Phoenix Mut. Life Ins. Co v. Greystone III J.V.* (*In re Greystone III J.V.*), 995 F.2d 1274 (5th Cir. 1991), have been criticized precisely for doing so.  *See In re Aztec Co.*, 107 B.R. 585, 589 (Bankr. M.D. Tenn. 1989) ("The mechanical approach threatens the vitality of the word 'unfairly' in § 1129(b)(1).").[11]

Legislative history is not law and therefore does not bind this or any Court.  *See Puerto Rico Dep't of Consumer Affairs v. Isla Petrol. Corp.*, 485 U.S. 495, 501 (1988) ("[U]nenacted approvals, beliefs, and desires [set forth in legislative history] are not laws.") (Scalia, J.).  It is also among the least reliable sources for determining Congressional intent.  *See Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005) ("[L]egislative history is itself often murky, ambiguous, and contradictory. . . . [And] judicial reliance on legislative materials like committee reports, which are not themselves subject to the requirements of Article I, may give unrepresentative committee members—or, worse yet, unelected staffers and lobbyists—both the power and the incentive to attempt strategic manipulations of legislative history to secure results they were unable to achieve through the statutory text.") (Kennedy, J.); *see also Bruesewitz v. Wyeth Inc.*, 561 F.3d 233, 244 (3d Cir. 2009) ("We have recognized that legislative history is not

---

[11]  *See also* Steven M. Abramowitz, *et al.*, *Making The Test For Unfair Discrimination More "Fair": A Proposal*, 58 BUS. LAW. 83, 89 (2002).

without its shortcomings as a tool of interpretation. 'As a point of fact, there can be multiple legislative intents because hundreds of men and women must vote in favor of a bill in order for it to become a law.'") (quoting *Morgan v. Gay,* 466 F.3d 276, 278 (3d Cir. 2006)).

The passages cited by the Senior Noteholders stand only for the unremarkable proposition that subordination rights must be considered when undertaking an unfair discrimination analysis to "preserve[] just treatment of a dissenting class from the class's own perspective." *See* H.R. REP. NO. 95-595, at 417 (1977). The Committee does not dispute that proposition. Rather, the Committee has relied on *Armstrong* and similar cases to show that no presumption of unfair discrimination arises unless, after all subordination rights are taken into account, the impact of the purported misapplication of the Subordination Provisions is material to the Senior Noteholders' recoveries. *See* Committee Brief at 5. The legislative history certainly does not suggest discrimination should be presumed "unfair" when not material from the perspective of the dissenting class simply because subordination rights are implicated. Nor do the Senior Noteholders cite any cases for that proposition.

In any case, nothing in the legislative history makes the rebuttable presumption test inapplicable to the facts here. To the contrary, the rebuttable presumption test can even be applied to the hypothetical example contained in the House Report that the Senior Noteholders characterize as "virtually mirror[ing] the construct [of] the DCL Plan." Senior Noteholder Brief at 31. In that illustration, the House Report concludes that the senior debt's receipt of $25 is unfair discrimination because "the senior debt is entitled to [receive $30]" on the basis of its contractual subordination rights. H.R. REP. NO. 95-595, at 416 (1977). Applying the rebuttable presumption test to this illustration—where supposedly it cannot possibly be applied—the alleged harm to the senior debt is 20% ($30 / $25 - 1 = 0.2). The conclusion of the House Report

that such discrimination is "unfair" would admittedly apply a more stringent materiality threshold than, say, the "50% or more" gross disparity test noted by the *Greate Bay* court. But the harm to the dissenting class in that illustration is still well more than twice the alleged harm of 8.5% that would occur here if the Court were to determine that only the Senior Noteholders were contractually entitled to the benefits of the Subordination Provisions and the PHONES Notes Claims were allowed in the high amount.

### 2.    The Rebuttable Presumption Test Is The Most Effective And Fair Method Of Analyzing Unfair Discrimination

The rebuttable presumption test[12] is a valid general rule that comports with fairness and the purposes of the Bankruptcy Code and stays true to the historical origins of the unfair discrimination provision. It stems from Professor Markell's seminal article that examines the history of the unfair discrimination provision in both courts and Congress (including the section of the legislative history cited by the Senior Noteholders). As discussed in *In re Exide Techs.*, 303 B.R. 48, 78-79 (Bankr. D. Del. 2003),[13] Professor Markell's article was itself scrutinized by the Committee on Bankruptcy and Corporate Reorganization of the Association of the Bar of the City of New York.[14] After analyzing the unfair discrimination case law and legislative history,

---

[12]    As set forth in more detail in the Committee Brief, a chapter 11 plan is presumptively deemed to discriminate unfairly when there is "(1) a dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in . . . a materially lower percentage recovery for the dissenting class . . . ." *In re Armstrong World Indus., Inc.*, 348 B.R. at 121 (quoting *In re Dow Corning Corp.*, 244 B.R. 696, 702 (Bankr. E.D. Mich. 1999)) (emphasis added).

[13]    In the Confirmation Opinion, this Court noted that, "[i]n *Exide*, [the Court] discussed but did not adopt, the Markell Test." *In re Tribune Co.*, 2011 WL 5142420, at *56 n.82. *Exide* was decided before this Court had the benefit of the *Armstrong* decision.

[14]    *See* Abramowitz, *supra* note 11, at 98-100.

the Bar Committee proposed to adopt the Markell rebuttable presumption test, concluding that "the current trend . . . reflected in Professor Markell's approach and in those courts that have followed him is warranted . . . ." Abramowitz, *supra* note 11, at 88.

Contrary to what the Senior Noteholders assert, the rebuttable presumption test can readily apply to this case. Courts have applied the rebuttable presumption test to many differing factual situations with equitable results.

The first application of the "rebuttable presumption" test was in *In re Dow Corning Corp.*, 244 B.R. 696 (Bankr. E.D. Mich. 1999). There, the bankruptcy court undertook a thorough analysis of the tangled web of unfair discrimination case law and ultimately adopted Professor Markell's test. The court concluded:

> [Markell's] reasoning in formulating the new analysis is sound. The presumption-based analysis he proposes . . . effectively targets the kind of discrimination or disparate treatment that is commonly understood as being 'unfair' . . . . This test so realistically focuses on and balances those factors that directly impact the equality of treatment between similarly situated creditors that a plan which does not give rise to a presumption under this test must necessarily be fair.

*In re Dow Corning Corp.*, 244 B.R. at 702.

The *Armstrong* court adopted the reasoning of *Dow Corning* in determining to apply Professor Markell's test. *In re Armstrong World Indus., Inc.*, 348 B.R. at 114-15. *Armstrong* is logical and well-reasoned, and it is just one of several cases in the District of Delaware that have applied or discussed the Markell analysis. Not one of these cases has ever indicated that the rebuttable presumption test applied in *Armstrong* is fact-bound or limited in its potential application. *See, e.g., In re Aleris Int'l, Inc.*, No. 09-10478-BLS, 2010 WL 3492664, at *31 (Bankr. D. Del. May 13, 2010) (presumption of unfair discrimination did not apply because there was no class of the same priority as the dissenting class); *In re Exide Techs.*, 303 B.R. at 78-80 (record was insufficient to determine whether discrimination was unfair but noting that

discrimination is permissible under certain conditions postulated by Markell, *supra* note 10, and Abramowitz, *supra* note 11); *In re Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 660-62 (Bankr. D. Del. 2003), *aff'd*, 308 B.R. 672 (D. Del. 2004) (no discrimination existed against dissenting creditor vis-à-vis treatment of certain foreign claimants and there was a legitimate basis for discrimination against dissenting creditor); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 611-12 (Bankr. D. Del. 2001) (presumption of unfair discrimination was rebutted because the disparate treatment was the result of "a permissible allocation by the secured creditors of a portion of the distribution to which they would otherwise be entitled . . . .").

*Armstrong* has also been cited with approval by other courts in the Third Circuit that have applied the rebuttable presumption test. *See, e.g.*, *In re Unbreakable Nation Co.*, 437 B.R. 189 (Bankr. E.D. Pa. 2010). The Senior Noteholders completely ignore *Unbreakable Nation* even though it was specifically cited in the Confirmation Opinion. *See In re Tribune Co.*, 2011 WL 5142420, at *56. The omission is unsurprising, because *Unbreakable Nation* directly contradicts the crux of the Senior Noteholders' argument—that the *Armstrong* test cannot be applied to a plan that proposes equal treatment of classes with unequal rights. In *Unbreakable Nation*, the court applied the rebuttable presumption test and concluded that an "equal distribution to each class . . . [did] not rise to the level of a ***material*** lower percentage recovery for the Objectors," and therefore the treatment of the allegedly harmed class was not unfairly discriminatory. *In re Unbreakable Nation Co.*, 437 B.R. at 202.[15]

---

[15]   The plan in *Unbreakable Nation* proposed that two classes of unsecured creditors would share equally in an "unsecured fund," despite the fact that the face amount of the claims in one class was greater than the face amount of the claims in the other class. The dissenting class asserted their claims were approximately $4 million, and that the claims of the allegedly preferred class were approximately $2.8 million. As a result, the

(Cont'd on following page)

Under the Markell rebuttable presumption test, as adopted and/or applied by various courts, the presumption of unfair discrimination does not arise where, as here, the impact of the alleged discrimination is not material.   Indeed, the Senior Noteholders cite many of the same cases as the Committee for the position that discrimination only becomes material where a plan proposes "grossly disparate" treatment.[16]  The Senior Noteholders assert that "$30 to $37 million is by definition material to the Senior Noteholders."   Senior Noteholder Brief at 4.   That assertion is not supported by the case law.  The rebuttable presumption test requires materiality to be evaluated in the context of the individual case (by measuring its effect on percentage recovery) rather than looking at a dollar amount in a vacuum.  *See In re Armstrong World Indus., Inc.*, 348 B.R. at 122 ("the presumption of unfair discrimination only arises if the dissenting class would receive a 'materially lower' *percentage recovery* . . . .") (emphasis added).   The key dispute is whether this Court should apply the rebuttable presumption test, focusing on the harm to the dissenting class, or focus instead on the benefit to the allegedly preferred class.

---

(Cont'd from preceding page)

objecting class argued they were entitled to 58.7% of the $100,000 unsecured fund, or $58,724 (a recovery of 1.47%), rather than 50% of the unsecured fund, or $50,000 (a recovery of 1.25%).  The court concluded, "the degree of the discrimination is minor." *In re Unbreakable Nation Co.*, 437 B.R. at 202-03.

[16]  *See* Senior Noteholder Brief at 34 ("[D]rastic contrast in percentage recoveries . . . constitutes unfair discrimination . . . .").  The plan proposed in the first case cited by the Senior Noteholders, *In re Hoffinger Indus.*, was so egregious in its individualized discrimination against one specific creditor that the bankruptcy court noted that the debtor's entire reorganization was complicated by consistent efforts to harm that single creditor.  *See In re Hoffinger Indus., Inc*, 321 B.R. 498, 502, 509 (Bankr. E.D. Ark. 2005) (finding unfair discrimination where plan provided 30% recovery to all claims of less than $2.6 million in a certain class and 20% recovery to the one claim in the class of more than $2.6 million).  No such isolation of a single creditor exists here.

**B.     The Committee's Quantitative Analysis Is Derived From The Case
Law And Presents A Fair Assessment Of Alleged Discrimination;
The Senior Noteholders' Quantitative Analysis Is Not Supportable[17]**

The quantitative analysis presented in the Committee Brief is consistent with the case law

and evaluates the materiality of the alleged harm by measuring its impact on the Senior

Noteholder class.     In addressing the materiality question, courts evaluate the alleged

discrimination from the *perspective of the dissenting class*. *See In re Armstrong World Indus.,

Inc.*, 348 B.R. at 122 ("the presumption of unfair discrimination only arises if the dissenting class

would receive a 'materially lower' percentage recovery . . . ."); *see also* H.R. REP. NO. 95-595, at

417 (1977) ("The criterion of unfair discrimination . . . preserves just treatment of a dissenting

class from the class's own perspective.").

Under the DCL Plan, the Senior Noteholder class will receive an initial distribution of

approximately $431 million, comprised of (i) "natural" recovery, (ii) direct proceeds of the DCL

Settlement, and (iii) turnover from the PHONES and EGI Subordination Provisions (including

both natural recovery and settlement proceeds).

As reflected in the columns in the Recovery Chart labeled "Plan Prior to PHONES/EGI

Subordination," the Senior Noteholders receive a combined $249 million in "natural" recoveries

plus direct proceeds of the DCL Settlement. The Senior Noteholders also receive approximately

$182 million as a result of turnover from the PHONES and EGI ($431 million - $249 million =

---

[17] Unless otherwise noted, the illustrative recoveries described in this brief are approximate and based on the following assumptions: (i) PHONES Notes Claims are allowed at the high amount (approximately $1.197 billion); and (ii) all holders of Retiree Claims and Trade and Other Claims elect the same treatment received by the Senior Noteholders (*i.e.*, 33.6% initial distribution plus interests in the Litigation Trust), while the holder of the Swap Claim elects the alternative treatment (*i.e.*, 36.0% initial distribution, forgoing participation in the Litigation Trust). *See* Recovery Chart, annexed hereto as Exhibit A, available at Docket No. 11015.

$182 million). As further reflected in those columns, the maximum amount that would otherwise go to the PHONES and EGI is approximately $220 million. Accordingly, the Senior Noteholders currently receive approximately 83% of the total economic benefit of turnover from the PHONES and EGI, resulting in a distribution of $431 million. They argue that they should instead receive 100% of that amount, resulting in a distribution of $467.8 million (in the "high" PHONES scenario). The difference, approximately $37 million, is referred to herein as the "Disputed Allocation."

To see the effect of assuming that the Senior Noteholders receive 100% of that turnover, the Court can consult the columns in the Recovery Chart labeled "Only Sr. Noteholders Benefit" (colored yellow), which reflect that the Senior Noteholders' initial distribution would be approximately $467.8 million if all disputed issues were determined in the Senior Noteholders' favor. To measure the impact of the alleged discrimination, the Court need only compare what the Senior Noteholders assert they are entitled to receive ($467.8 million) to their recovery under the DCL Plan ($431 million). The reduction to the Senior Noteholders' alleged entitlement in this scenario is 8.5%.

The Senior Noteholders instead ask the Court to look at the benefit to the allegedly preferred class of Other Parent Claims. That approach exaggerates the alleged discrimination. Because the Other Parent Claims class comprises approximately $265 million in claims, as compared to the $1.283 billion in Senior Notes, the percentage impact of providing the Disputed Allocation to the Other Parent Claims class will always be significantly larger than the percentage impact of not providing the Disputed Allocation to the Senior Noteholder class.

Lastly, the Senior Noteholders argue that the alleged discrimination "is further exacerbated when payments from the Litigation Trust are factored into the analysis." Senior

Noteholder Brief at 33.   However, as fully demonstrated in the Committee Brief, the alleged discrimination actually decreases as recoveries from the Litigation Trust increase because the percentage impact upon the Senior Noteholders' recoveries decreases.

### C.   The Bankruptcy Code Permits Confirmation Of Chapter 11 Plans Notwithstanding Subordination Agreement Terms

The Senior Noteholders suggest that the distributions made to the Other Parent Claimants under the DCL Plan breach the Senior Noteholders' contractual rights under the Subordination Provisions.   Senior Noteholder Brief at 35.   They provide no support for this suggestion, but they seem to be saying that courts cannot confirm chapter 11 plans that do not fully implement subordination agreements.   The law is to the contrary—a claim that a plan is inconsistent with a subordination agreement is not an independent basis for denying confirmation under section 1129(b).   Subordination agreements are generally made enforceable in bankruptcy through section 510(a).   But Section 1129(b) expressly provides that "*[n]otwithstanding section 510(a) of this title*, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court . . . shall confirm the plan . . . ." 11 U.S.C. § 1129(b) (emphasis added).   As one of the few courts that have analyzed that language concluded:

> The only logical reading of the term "notwithstanding" in section 1129(b)(1) seems to be: "Even though section 510(a) requires the enforceability of [a] subordination agreement in a bankruptcy case to the same extent that the agreement is enforceable under nonbankruptcy law, if a nonconsensual plan meets all of the § 1129(a) and (b) requirements, the court 'shall confirm the plan.'" The phrase "[n]otwithstanding section 510(a) of this title" removes section 510(a) from the scope of 1129(a)(1), which requires compliance with "the applicable provisions of this title."

*In re TCI 2 Holdings, LLC*, 428 B.R. 117, 141 (Bankr. D.N.J. 2010) (finding that alleged violation of a subordination agreement would not impede confirmation of plan); *see also In re Croatan Surf Club, LLC*, No. 11-00194-SWH, 2011 WL 5909199, at *2 (Bankr. E.D.N.C. Oct.

25, 2011) (citing *In re TCI 2 Holdings, LLC*, 428 B.R. at 141) ("[A] court can confirm a plan

which . . . is inconsistent with the terms of a subordination agreement, as long as it is fair and

equitable and does not discriminate unfairly.").[18]    Congress has expressly authorized

confirmation of plans that contradict subordination agreements, subject only to satisfaction of the

section 1129(b) requirements for confirmation of a nonconsensual plan.

Finally, the Senior Noteholders question the good faith of the DCL Plan Proponents.

Senior Noteholder Brief at 5, 35.    This Court has already concluded "that the DCL Plan

Settlement was achieved as a result of arms-length, good faith negotiations" and that assertions

to the contrary "are unsupported by the evidentiary record."    *In re Tribune Co.*, 2011 WL

5142420, at *15-17.    The Court's determination on this matter is clearly "law of the case" and

the Senior Noteholders are simply ignoring the import of the Court's prior ruling.    *See* Senior

Noteholder Brief at 8-10 (discussing law of the case principles).    Accordingly, any allegation of

bad faith must be rejected.


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

---

[18]    *But see In re Consul Restaurant Corp.*, 146 B.R. 979, 988-89 (Bankr. D. Minn. 1992) (decided before *TCI 2 Holdings* and *Croatan Surf Club* and disregarding, without analysis, the plain language of section 1129(b) in finding that improper application of subordination agreement violated absolute priority rule).

## III.    CONCLUSION

For the reasons set forth herein, the Creditors' Committee respectfully requests that the

Bankruptcy Court conclude that the treatment of creditors provided for in the DCL Plan satisfies

the requirements of the Bankruptcy Code and does not discriminate unfairly against the Senior

Noteholders.


Dated: March 2, 2012            **LANDIS RATH & COBB LLP**
       Wilmington, Delaware
                                _____
                                Adam G. Landis (No. 3407)
                                Matthew B. McGuire (No. 4366)
                                Kimberly A. Brown (No. 5138)
                                919 Market Street, Suite 1800
                                Wilmington, Delaware 19801
                                Telephone:  (302) 467-4400
                                Facsimile:  (302) 467-4450

                                        - and -

                                Howard Seife
                                David M. LeMay
                                Andrew Rosenblatt
                                Marc B. Roitman
                                **CHADBOURNE & PARKE LLP**
                                30 Rockefeller Plaza
                                New York, New York 10112
                                Telephone:  (212) 408-5100
                                Facsimile:  (212) 541-5369

                                        - and -

                                Graeme W. Bush
                                James Sottile
                                **ZUCKERMAN SPAEDER LLP**
                                1800 M Street, N.W., Suite 1000
                                Washington, DC 20036
                                Telephone:  (202) 778-1800
                                Facsimile:  (202) 822-8106

                                *Counsel for the Official Committee of Unsecured Creditors*