# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:                  :

                     :   Chapter 11

TRIBUNE COMPANY, et al.,    :

                     :   Case No. 08-13141 (KJC)

        Debtors.       :

                     :   (Jointly Administered)

                     :

                     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## JOINT RESPONSE BRIEF OF LAW DEBENTURE TRUST COMPANY OF NEW YORK AND DEUTSCHE BANK TRUST COMPANY AMERICAS WITH RESPECT TO THE ALLOCATION DISPUTES

KASOWITZ, BENSON, TORRES
  & FRIEDMAN LLP
David S. Rosner
Sheron Korpus
Christine A. Montenegro
Matthew B. Stein
1633 Broadway
New York, New York 10019
212-506-1700
*Counsel for Law Debenture Trust Company of New York, solely in its capacity as successor Indenture Trustee for certain series of Senior Notes*

BIFFERATO GENTILOTTI LLC
Garvan F. McDaniel (I.D. No. 4167)
800 N. King Street, Plaza Level
Wilmington, Delaware 19801
302-429-1900

McCARTER & ENGLISH, LLP
David J. Adler
245 Park Avenue
New York, New York 10167
212-609-6800

McCARTER & ENGLISH, LLP
Katharine L. Mayer (I.D. No. 3758)
Renaissance Centre
405 N. King Street
Wilmington, Delaware 19801
302-984-6300

*Counsel for Deutsche Bank Trust Company Americas, solely in its capacity as successor Indenture Trustee for certain series of Senior Notes*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ ii

PRELIMINARY STATEMENT ................................................................................... 1

ARGUMENT ............................................................................................................... 2

    I.    The PHONES Are Subordinate to the Senior Notes With Respect To All Payments ................................................................................................................ 2

    II.    The EGI Note is Subordinate to the Senior Notes as to All Payments ................. 4

        A.    The EGI Subordination Agreement Does Not Restrict Subordination To Assets of the Company ..................................... 5

        B.    EGI's Characterization of the Settlement Proceeds Is Incorrect ................................................................................................. 10

    III.    The TM Retirees Have Not Met Their Burden of Showing Contractual Entitlement To Subordination Benefits Under the PHONES Indenture or EGI Subordination Agreement ......................................................................... 10

        A.    The TM Retirees' Claims Do Not Qualify As Senior Indebtedness Under the PHONES ................................................. 11

            1.    The TM Retirees Claims Are Not For Deferred Purchase Price of Services ............................................ 11

            2.    The TM Retirees' Claims Are Trade Payables By Their Own Admission ............................................... 14

            3.    The Retirees Claims Are Not For Borrowed Money ....................................................................................... 15

            4.    The Retirees Claims Are Not Indebtedness Of Others As Obligor or Guarantor ............................................ 17

        B.    The TM Retirees Claims Do Not Qualify As "Senior Obligations" Under the EGI Subordination Agreement .............. 18

            1.    The TM Retirees' Claims Are Trade Payables and Accrued Expenses ................................................. 18

    IV.    Oaktree Has Not Met Its Burden of Showing The Swap Claim's Contractual Entitlement To Subordination Benefits Under The Subordination Agreements .................................................................................. 21

      A.      The Swap Claim Is Not A Beneficiary of
              The PHONES Note Indenture .................................................................... 23

              1.      The Swap Claim is Not "Indebtedness" ........................................ 23

              2.      The Swap Claim Is Not "An Amount
                       Due in Connection with" Senior Indebtedness ............................ 25

      B.      The EGI Subordination Agreement Does Not
              Apply to the Swap Claim ........................................................................ 27

V.      The UCC Distorts The Unfair Discrimination Test And Undervalues
      The Harm Caused By The DCL Plan Against Senior Noteholders ..................... 28

      A.      The Unfair Discrimination Test Is Satisfied
              Because Disparate Treatment Exists Between
              The Senior Notes And Other Parent Claims .............................................. 28

      B.      The Other Parent Claims Did Not Provide Value
              To Overcome the Presumption of Unfair Discrimination ......................... 33

      C.      Failure To Enforce Subordination Provisions Violate
              Key Bankruptcy Code Provisions ............................................................. 35

VI.      The Senior Noteholders Are Entitled to Postpetition Interest .............................. 36

CONCLUSION ............................................................................................................. 37

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*ACLU v. Mukasey,*
    534 F.3d 181 (3d Cir. 2008)..................................................................................22

*AT&T Corp. v. Lillis,*
    953 A.2d 241 (Del. 2008) ....................................................................................4

*Blue Ridge Investors, II L.P. v. Wachovia Bank, N.A. (In re Aerosol Packaging, LLC),*
    362 B.R. 43 (Bankr. D. Ga. 2006) .......................................................................9

*Crabtree v. Illinois Dep't of Agric.,*
    128 Ill.2d 510, 539 N.E.2d 1252 (Ill. 1989) ........................................................16

*Crofton Convalescent Ctr., Inc. v. Dep't of Health & Mental Hygiene,*
    413 Md. 201, 991 A.2d 1257 (Md. 2010)..............................................................26

*Dayan v. McDonald's Corp.,*
    125 Ill. App. 3d 972, 466 N.E.2d 958 (Ill. App. Ct. 1st Dist. 1984)............................14, 19, 24

*Del. Ins. Guar. Ass'n v. Christiana Care Health Servs.,*
    892 A.2d 1073 (Del. 2006) .................................................................................21

*Deputy v. du Pont,*
    308 U.S. 488 (1940)............................................................................................16

*Dzikowski v. N. Trust Bank of Fla., N.A. (In re Prudential of Fla. Leasing, Inc.),*
    478 F.3d 1291 (11th Cir. 2007) ...........................................................................10

*Eagle Indus. v. DeVilbiss Health Care,*
    702 A.2d 1228 (Del. 1997) .................................................................................11

*Edwin's, Inc. v. United States,*
    501 F.2d 675 (7th Cir. 1974) ..............................................................................17

*Estate of Adler v. SunTrust Bank, N.A. (In re Am. Capital Corp.),*
    425 B.R. 714 (Bankr. S.D. Fla. 2010)..................................................................16

*Gallagher v. Lenart,*
    226 Ill. 2d 208, 874 N.E.2d 43 (Ill. 2007) ..........................................................15

*Great Lakes Chem. Corp. v. Monsanto Co.,*
    96 F. Supp. 2d 376 (D. Del. 2000).......................................................................24

*Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*,
    995 F.2d 425 (3d Cir. 1993)........................................................................10

*Hess v. Kanoski & Assocs.*,
    2012 U.S. App. LEXIS 1936 (7th Cir. Feb. 2, 2012) ..............................15

*HSBC Bank USA v. Branch*
    *(In re Bank of New Engl. Corp.)*, 364 F.3d 355 (1st Cir. 2004) .............36

*In re Allegheny Int'l, Inc.*,
    118 B.R. 282 (Bankr. W.D. Pa. 1990) ......................................................5

*In re Armstrong World Indus., Inc.*,
    348 B.R. 111 (D. Del. 2006).............................................................28, 29

*In re Armstrong World Indus., Inc.*,
    432 F.3d 507 (3d Cir. 2005).....................................................................34

*In re Curtis Ctr. Ltd. P'ship*,
    192 B.R. 648 (Bankr. E.D. Pa. 1996) ........................................................9

*In re Dow Corning Corp.*,
    244 B.R. 696 (Bankr. E.D. Mich. 1999) ..................................................29

*In re Greate Bay Hotel & Casino, Inc.*,
    251 B.R. 213 (Bankr. D.N.J. 2000) ..........................................................29

*In re Handy Andy Home Improvement Ctrs.*,
    1997 Bankr. LEXIS 1197 (Bankr. N.D. Ill. July 9, 1997).......................20

*In re Inter Urban Broad of Cincin., Inc.*,
    1994 U.S. Dist. LEXIS 16546 (E.D. La. Nov. 16, 1994) ..........................9

*In re Jersey City Med. Ctr.*,
    817 F.2d 1055 (3d Cir. 1987)....................................................................13

*In re NationsRent, Inc.*,
    381 B.R. 83 (Bankr. D. Del. 2008) ...........................................................13

*In re Nutritional Sourcing Corp.*,
    398 B.R. 816 (Bankr. D. Del. 2008) ........................................................13

*In re Payless Cashways, Inc.*,
    215 B.R. 409 (Bankr. W.D. Mo. 1997)..............................12, 15, 19, 27

*In re Sentry Operating Co. of Tex., Inc.*,
    264 B.R. 850 (S.D. Tex. 2001) .................................................................33

*In re Stratford of Tex., Inc.*,
    635 F.2d 365 (5th Cir. 1981) .......................................................................................13

*In re Tribune Co.*,
    2011 Bankr. LEXIS 5018 (Bankr. D. Del. Dec. 29, 2011) .............................................. *passim*

*In re Tribune Co.*,
    No. 08-13141 (KJC), 2011 Bankr. LEXIS 4128 (Bankr. D. Del. Oct. 31, 2011).............22, 29

*Ion Media Networks, Inc. v. Cyrus Select Opportunities Master Fund Ltd. (In re Ion Media Networks, Inc.)*, 419 B.R. 585 (Bankr. S.D.N.Y. 2009) ..................................................9

*Jameson Realty Grp. v. Kostner*,
    351 Ill. App. 3d 416, 813 N.E.2d 1124 (Ill. App. Ct. 1st Dist. 2004)....................................15

*Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*,
    2002 U.S. Dist. LEXIS 11587 (D. Del. June 27, 2002)............................................................4

*Lorillard Tobacco Co. v. Am. Legacy Found.*,
    903 A.2d 728 (Del. 2006) ........................................................................................................4

*Mayflower Inv. Co. v. Comm'r*,
    239 F.2d 624 (5th Cir. 1956) ..................................................................................................16

*New York Stock Exch. v. Pickard & Co.*,
    296 A.2d 143 (Del. Ch. 1972).................................................................................................36

*Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics)*, 226 F.3d 237 (3d Cir. 2000) ................................................................................5

*Old Colony R.R. Co. v. Comm'r*,
    284 U.S. 552 (1932)................................................................................................................16

*Procter & Gamble Co. v. Bankers Trust Co.*,
    925 F. Supp. 1270 (S.D. Ohio 1996) .....................................................................................24

*Richey v. Metaxpert, LLC*,
    2011 U.S. Dist. LEXIS 76731 (E.D. Wash. July 15, 2011)....................................................17

*RTN Investors, LLC v. RETN, LLC*,
    2011 Del. Super. LEXIS 103 (Del. Super. Ct. Feb. 10, 2011)..................................................5

*Sea Star Line, LLC v. Emerald Equip. Leasing, Inc.*,
    2009 U.S. Dist. LEXIS 105824 (D. Del. Nov. 12, 2009) .........................................................4

*Sims v. DeArmond (In re Lendvest Mortgage)*,
    42 F.3d 1181 (9th Cir. 1994) ..................................................................................................10

*TAS Distrib. Co. v. Cummins Engine Co.*,
    491 F.3d 625 (7th Cir. 2007) ............................................11

*Taylor v. Mooney Aircraft Corp.*,
    265 Fed. Appx. 87 (3d Cir. 2008) ......................................22

*Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n*,
    322 F.3d 1039 (9th Cir. 2003) .....................................24, 26

*Town & Country Bank v. E. & D. Bancshares, Inc.*,
    172 Ill. App. 3d 1066, 527 N.E.2d 637 (Ill. App. Ct. 4th Dist. 1988) ...................................18

*Union Bank v. Wolas*,
    502 U.S. 151 (1991) .......................................................19

*United States v. Brown*,
    348 F.3d 1200 (10th Cir. 2003) .........................................13

*United States v. La. Generating, LLC*,
    2011 U.S. Dist. LEXIS 137973 (M.D. La. Nov. 30, 2011) ....................................21

*United States v. Midland-Ross Corp.*,
    381 U.S. 54 (1965) .........................................................16

*Whispering Pines Estates, Inc. v. Flash Island, Inc. (In re Whispering Pines Estates,*
    *Inc.)*, 369 B.R. 752 (B.A.P. 1st Cir. 2007) ...........................4

## STATUTES

11 U.S.C. § 510(a) ............................................2, 31, 35, 36

11 U.S.C. § 1122 .......................................................13

11 U.S.C. § 1124(1) ...................................................37

11 U.S.C. § 1129(a)(1) ................................................35

11 U.S.C. § 1129(a)(2) ................................................35

11 U.S.C. § 1129(b)(1) ................................................31

## OTHER AUTHORITIES

BLACK'S LAW DICTIONARY (9TH ed. 2009)...........................12, 18

Joshua Rosenbaum & Joshua Pearl, *Investment Banking: Valuation, Leveraged Buyouts*
    *and Mergers & Acquisitions* (2009) ....................................20

Bruce Markell, *A New Perspective On Unfair Discrimination in Chapter 11*, 72 AM.
    BANKR. L.J. 227, 249 (1998)............................................................................................29, 33

Volume C, Collier on Bankruptcy App. Pt. 4(d)(i) (15th ed. rev.)................................................30

The Senior Indenture Trustees,[1] by their undersigned counsel, submit their Response Brief pursuant to the Allocation Disputes Order and respectfully represent as follows:

## PRELIMINARY STATEMENT

As this Court previously determined, the purpose of subordination agreements is to subordinate a claim completely to the prior payment of senior debt in full without any limitations. The PHONES Indenture and the EGI Subordination Agreement adhere to this principle. The terms of the Subordination Agreements clearly and unambiguously provide that the PHONES and EGI Notes are subordinate in right of payment to Senior Indebtedness and Senior Obligations, respectively, as to *any and all* payments on account of those claims.

Moreover, the TM Retirees' and Oaktree's opening briefs reflect their inability to satisfy their burden to prove that they qualify as senior debt under the plain terms of the Subordination Agreements. Instead, both parties rely extensively on extrinsic evidence and incongruously strained descriptions of their respective claims to distract the Court from the plain meaning of those Subordination Agreements and the bases of the TM Retirees' and Oaktree's non-senior general unsecured claims. Under the provisions of the Subordination Agreements, none of the Other Parent Claims (the Retirees, Oaktree, or any other claims in this class) is entitled to the economic benefits of subordination.

Meanwhile, by treating the Other Parent Claims as if they were entitled to the benefits of subordination, the DCL Plan violates the Bankruptcy Code and discriminates unfairly against the Senior Noteholders as a dissenting class and as such, is unconfirmable. Put simply, the recoveries under the current version of the DCL Plan grant the Other Parent Claims a percentage recovery on their claims *at least 53% greater* than the distribution to the Senior Noteholders

---

[1]      Capitalized terms have the meanings set forth in the *Joint Opening Brief Of Law Debenture Trust Company Of New York And Deutsche Bank Trust Company Americas With Respect To The Allocation Disputes*, dated February 24, 2012 [Dkt No.11010] (the "Opening Brief").

1

(excluding, as the Court must for this analysis, the distribution to the PHONES and EGI Claims that must be reallocated to the Senior Notes under the Subordination Agreements and Section 510(a) of the Bankruptcy Code). There exist no legal bases (1) to favor a class with claims *against the Debtor* equal in rank to the Senior Notes with an extraordinary premium, and (2) literally to fund the extraordinary recovery by taking it from the discriminated-against class, the Senior Noteholders.

Accordingly, this Court should hold that (i) the Subordination Agreements completely subordinate the PHONES and EGI Note with respect to all payments on account of their claims against Tribune, (ii) the Other Parent Claims are not senior claims under the Subordination Agreements, and (iii) the DCL Plan Proponents must modify the distribution scheme in the DCL Plan to comply with these holdings.

## ARGUMENT

**I.     The PHONES Are Subordinate to the
        Senior Notes With Respect To All Payments**

Contrary to the PHONES Trustee's assertions,[2] this Court already ruled that the PHONES Indenture subordinates the PHONES to the Senior Notes with respect to the Settlement Proceeds. As more fully set forth in the Opening Brief,[3] because this Court previously decided that the PHONES are subordinated in their entirety to Senior Indebtedness with respect to "any payments," the law of the case doctrine compels the holding that the subordination applies to the Settlement Proceeds as well as the Creditors' Trust distributions.

The PHONES Trustee fails to refute the applicability of the law of the case doctrine here. Rather, it simply reiterates its previous argument about the distinction between Chapter 5 causes

---

[2]     *Opening Brief of Wilmington Trust Company, As Successor Indenture Trustee for the PHONES Notes, on the Allocation Disputes*, dated Feb. 24, 2012 [Dkt. No. 10999] (the "PHONES Br.") at 10.

[3]     Opening Br. at 8-10.

of action and "assets of the Company"[4] – a distinction that the Court already ruled is irrelevant in this context. *See In re Tribune Co.*, 2011 Bankr. LEXIS 5018, at *9-10 (Bankr. D. Del. Dec. 29, 2011). Even assuming the distinction were relevant, which it is not, the PHONES Trustee is asking this Court – without any supporting case law – to speculate about the viability of each of the settled claims and apportion an amount to those settled claims. However, the Settlement under the DCL Plan makes no such allocation and settles not just avoidance claims, but a wide array of claims.[5]  (DCL Plan at § 5.15.2.)

Moreover, the PHONES Trustee does not dispute that the PHONES are subordinated to Senior Notes with respect to the Creditors' Trust proceeds; instead it claims that the issue of the priority of distributions from the Creditors' Trust is moot because the PHONES Trustee (as opposed to all PHONES holders) opted out from the Creditors' Trust under the April 2011 DCL Plan.[6]  However, (i) not all holders of PHONES opted out of the Creditors' Trust, and (ii) any prior opt outs are not operative under the current DCL Plan, which involves a new opt out procedure under a new solicitation process. There is no guarantee that all holders of PHONES will elect to opt-out of the Creditors' Trust. Thus, this issue is ripe for this Court to decide.

---

[4]        PHONES Br. at 9.

[5]        Furthermore, contrary to the PHONES Trustee's characterization of the Settlement Proceeds, only a fraction of the proceeds could be attributed to actual recoveries from third parties. In particular, the Settlement resolves, among others, (i) claims partially to avoid *obligations* (which results in no new cash flow to the estate but frees up existing *Company* assets for distribution to other creditors) and (ii) claims to avoid transfers (which does result in an influx of cash to the estate of up to $120 million). (DCL Plan, at § 5.15.1.) Thus, the PHONES Trustee could contend that, at most, $120 million of the Settlement Proceeds are attributable to the avoidance of certain pre-petition transfers. Even that amount may be too high. Section 10.1.1(l) of the DCL Plan and Exhibit 5.15.1(2) to the DCL Plan enable a portion of the avoidance recoveries to be offset by existing claims against the estate arising out of the same transaction. As a result of this offset provision, the amount of new cash flow to the estate may be substantially less than $120 million.

[6]        PHONES Br. at 13. As used herein, "April 2011 DCL Plan" refers to the *Second Amended Joint Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angel, Gordon & Co., L.P., and JP Morgan Chase Bank, N.A.* (as Modified April 26, 2011) [Dkt. No. 8769].

Lastly, the PHONES Trustee's motion for leave to appeal does not preclude this Court from adjudicating "Plan distributions on account of Settlement Proceeds."[7]  The Reconsideration Order is not a final order and, even if leave to appeal were granted, it would not divest this Court of jurisdiction to consider the remaining Allocation Disputes.[8]

## II.    The EGI Note is Subordinate to the Senior Notes as to All Payments

To avoid the inevitable conclusion of its full subordination, EGI relies upon selective provisions of the EGI Subordination Agreement (while ignoring others), unsupported factual assertions, and inadmissible evidence that violates the parol evidence rule.[9]

As an initial matter, because the subordination provisions in the EGI Subordination Agreement are as clear as the PHONES Indenture, which this Court previously held is unambiguous, the Court should not consider any of EGI's extrinsic evidence.  *See In re Tribune*, 2011 Bankr. LEXIS 5018, at *25-26; *see also AT&T Corp. v. Lillis*, 953 A.2d 241, 252, n.29 (Del. 2008); *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006) (in interpreting a contract, a court is "constrained by a combination of the parties' words and the plain meaning of those words where no special meaning is intended").  This is particularly true, where, like here, the EGI Subordination Agreement has an integration clause that expressly

---

[7]        PHONES Br. at 12-13.

[8]        *See* Opening Br. at 14-16.  The cases cited by the PHONES Trustee do not refute this point.  *See, e.g., Whispering Pines Estates, Inc. v. Flash Island, Inc. (In re Whispering Pines Estates, Inc.)*, 369 B.R. 752, 758 (B.A.P. 1st Cir. 2007) ("The application of a broad rule that a bankruptcy court may not consider any request filed while an appeal is pending has the potential to severely hamper a bankruptcy court's ability to administer its cases in a timely manner."); *Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 2002 U.S. Dist. LEXIS 11587, at *3 (D. Del. June 27, 2002) (concluding that court retained jurisdiction to entertain a motion because it would not affect any of the issues on appeal); *Sea Star Line, LLC v. Emerald Equip. Leasing, Inc.*, 2009 U.S. Dist. LEXIS 105824, at *11 (D. Del. Nov. 12, 2009) ("In clear cases of a premature appeal, the Third Circuit has counseled that the district court should continue to exercise jurisdiction").

[9]        *EGI-TRB, LLC's Opening Brief in Support of Its Position on Allocation Disputes Identified in Its Preliminary Statement*, dated Feb. 24, 2012 [Dkt. No. 11001] (the "EGI Br.") at 18-19.

precludes consideration of this type of evidence.[10]  *See RTN Investors, LLC v. RETN, LLC*, 2011

Del. Super. LEXIS 103, at *47 (Del. Super. Ct. Feb. 10, 2011) ("Delaware courts consistently

uphold integration or merger clauses within agreements.").

More fundamentally, EGI, as the sponsor of the LBO, agreed that it would not even seek

to collect any payment until all Senior Obligations were paid in full.  EGI's attempt to bootstrap

itself to equality with the very Senior Noteholders most damaged by its LBO (and at their

expense), much like EGI's recently brought fraudulent conveyance action against the LBO

shareholders, is simply "chutzpah with a vengeance."  *Accord In re Allegheny Int'l, Inc.*, 118

B.R. 282, 297 (Bankr. W.D. Pa. 1990).

### A.      The EGI Subordination Agreement Does Not Restrict Subordination To Assets of the Company

EGI argues that the phrase "assets of the Company," which appears only in ¶ 2 of the EGI

Subordination Agreement, limits subordination to only assets of the Company, thereby excluding

all payments from avoidance actions, which are assets of the estate.  Like the PHONES, EGI

relies upon *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re

Cybergenics)*, 226 F.3d 237 (3d Cir. 2000), in arguing the distinction between a debtor and the

estate – which the Court has already held is irrelevant for the purpose of interpreting the

Subordination Agreements.[11]

Contrary to EGI's assertions, the only interpretation of the term "Company" that

comports as a whole with ¶¶ 4 and 6, among others, of the EGI Subordination Agreement is that

"Company" must include Tribune, and following its bankruptcy filing, Tribune's bankruptcy

---

[10]     EGI Subordination Agreement at ¶ 15.

[11]     In its Reconsideration Memorandum, the Court declined to reconsider the legal principles embodied in the *Cybergenics* decision, not because it was settled law, but because it was irrelevant to interpreting the PHONES Indenture.  *In re Tribune Co.*, 2011 Bankr. LEXIS 5018, at *14 n.11.  Similarly, *Cybergenics* is inapplicable to interpreting the EGI Subordination Agreement.

estate as its successor entity for these purposes.[12]  It is incontrovertible that EGI intended its

subordination to operate in bankruptcy.[13]  Not only is bankruptcy virtually the only context in

which contractual subordination typically becomes an issue, but ¶ 4 of the EGI Subordination

Agreement specifically addresses the filing of a proof of claim in bankruptcy, and ¶ 7 includes

specific reference to "the insolvency, bankruptcy, or reorganization of the Company or any of its

subsidiaries."[14]

　　　EGI further argues ¶ 2 of the EGI Subordination Agreement limits subordination to assets

of the Company because payments are "from the Company."  However, applying the "rule of last

antecedent" as the Court did in interpreting the PHONES Indenture proves the contrary.  The

relevant portion of ¶ 2 states:  "the Subordinating Creditor will not take, demand or *receive from

the Company* . . . any payment . . . ." until Senior Obligations are paid in full.[15]  Applying the

rule of the last antecedent, the phrase "from the Company" modifies only "receive."  Thus, the

provision specifically prohibits EGI from "taking" or "demanding" any payment on account of

Subordinated Obligations, without limitation.  That includes demanding or taking from the

recovery of avoidance actions.

　　　This prohibition on taking or demanding payment from any source is consistent with the

rest of the EGI Subordination Agreement.  For instance, ¶ 4 of the EGI Subordination Agreement

would be superfluous if the agreement limited subordination to only those payments from the

---

[12]　　　Of course, the Creditors' Trust is not a successor entity to the Company.  Instead, the Creditors' Trust is comprised of creditor claims voluntarily contributed by individual creditors.

[13]　　　*See* EGI Subordination Agreement at ¶ 7 ("The provisions of this Agreement shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Senior Obligations is rescinded or must otherwise be returned by any holder of Senior Obligations for any reason whatsoever (including, without limitation, the insolvency, bankruptcy or reorganization of the Company or any of its subsidiaries) all as though such payments had not been made.").

[14]　　　EGI Subordination Agreement at ¶¶ 4, 7.

[15]　　　EGI Subordination Agreement at ¶ 2 (emphasis added).

assets of the Company.  Paragraph 4 provides, in pertinent part, that until Senior Obligations are paid in full, EGI cannot exercise any right or remedy under the Subordinated Obligations "or exercise or continue to exercise any other right or remedy at law or equity that the Subordinating Creditor might otherwise possess, to collect any Subordinated Obligation…."[16]  Commencing a fraudulent conveyance action is clearly a right or remedy the Subordinated Creditor might "otherwise possess" to recover on the Subordinated Obligation.  Similarly, the exercise of a purported right of turnover under the PHONES Indenture is also a right EGI might "otherwise possess" to collect on the Subordinated Obligations.

EGI's theory that the EGI Subordination Agreement was intended to allow EGI to collect proceeds of these actions while simultaneously prohibiting EGI from exercising any right or remedy to do so leads to an absurd result that this Court cannot adopt.[17]  The more sensible interpretation of this provision is that EGI has no right to *any* proceeds or recovery on account of its debt, regardless of whether such proceeds or recovery are derived from pre-petition assets of Tribune, post-petition assets of Tribune's bankruptcy estate, avoidance actions or turnover recoveries from the PHONES, until Senior Obligations are paid in full.

Additionally, ¶ 6 of the EGI Subordination Agreement is a broad turn-over provision – similar to the PHONES Indenture's "pay-over" provision – that supports the "parties' intent to apply the subordination provisions to a broad array of payments," including those from the Debtor's estate.  *See In re Tribune*, 2011 Bankr. LEXIS 5018, at *26.  Paragraph 6 provides, in pertinent part:

> all payments or distributions upon or with respect to any Subordinated Obligation which are made by or on behalf of the Company *or received by or on behalf of the Subordinating Creditor in violation of or contrary to the provisions of this*

---

[16]    EGI Subordination Agreement at ¶ 4.

[17]    EGI Br. at 10.

> *Agreement shall be received in trust for the benefit of the holders of Senior Obligations.*[18]

EGI focuses on the language "made by or on behalf of the Company" to argue that the turnover provision excludes recoveries other than from the Company.  EGI ignores, however, the remaining portion of the provision that makes clear that all payments or distributions *received by or on behalf of the Subordinating Creditor in violation of or contrary to the provisions of this Agreement* must be turned over until all Senior Obligations are paid in full.  This "or received by" language would be meaningless if subordination was limited only to "assets of the Company" or "payments by the Company."   Rather, this disjunctive provision only makes sense when considered in conjunction with ¶ 4 and the limitation on EGI's right to enforce any right it might "otherwise possess" on account of the Subordinated Obligations.  Under ¶ 6, all payments and distributions received by EGI, unless expressly permitted by ¶ 3 of the EGI Subordination Agreement (which provides for a narrow basket of permitted payments), must be turned over to the Senior Obligations immediately without any limitation or restriction, until the Senior Obligations are paid in full.

These provisions nullify the very basis of EGI's argument.  EGI curiously argues that because "'Subordinated Obligations' is a defined term that refers only to 'the unpaid principal of and interest on the Subordinated Note and all other obligations and liabilities of the Company to the Subordinating Creditor,'" avoidance action proceeds do not qualify as a payment on account of the Subordinated Obligations.[19]  If such proceeds are not a payment on account of the Subordinated Obligations, then what are they and why is EGI entitled to them in the first place?

---

[18]     EGI Subordination Agreement at ¶ 6 (emphasis added).

[19]     EGI Br. at 9-10.

EGI further claims avoidance recoveries are not subject to subordination because EGI is permitted to file and vote its proof of claim pursuant to ¶ 4.[20]  EGI's attempt to have this exception engulf the rule ignores the fact that the exception is carefully limited to filing and voting the claim, and says nothing about receiving payment or distribution.  Further, EGI does not dispute that the Subordinated Obligations are subordinated with respect to certain plan distributions.  The idea that filing a proof of claim invalidates subordination only as to certain proceeds (or at all) is absurd.  The cases cited by EGI do not hold that a right to file and vote a proof of claim somehow eliminates subordination.  Instead, they stand only for the proposition that a senior creditor, as part of the subordination agreement, can demand that it file and vote the proof of claim of the subordinated creditor.[21]  The absence of a senior creditor's right to file and vote a claim does not invalidate or limit the underlying payment subordination.

Thus, reading the plain language of these provisions together, the EGI Subordination Agreement flatly prohibits EGI from trying to collect or exercise any remedy to collect on the Subordinated Obligations, without limitation (except the expressly permitted tasks of filing and voting a claim), until Senior Obligations have been paid in full.  *See Ion Media Networks, Inc. v. Cyrus Select Opportunities Master Fund Ltd. (In re Ion Media Networks, Inc.)*, 419 B.R. 585, 595 (Bankr. S.D.N.Y. 2009) ("[P]lainly worded contracts establishing priorities and limiting

---

[20]    EGI Br. at 10-11; EGI Subordination Agreement at ¶ 4.

[21]    EGI Opening Br. at 11.  *See Blue Ridge Investors, II L.P. v. Wachovia Bank, N.A. (In re Aerosol Packaging, LLC)*, 362 B.R. 43, 47 (Bankr. D. Ga. 2006) (finding that "[t]he express terms of the Subordination Agreement … compel the conclusion that the right to vote any claim of Blue Ridge [the subordinated creditor] in Debtor's bankruptcy proceeding was assigned by Blue Ridge to Wachovia [the senior creditor]."); *In re Curtis Ctr. Ltd. P'ship*, 192 B.R. 648, 659-60 (Bankr. E.D. Pa. 1996) (finding that debtor could not rely on junior creditor's vote in favor of the plan for cram down purposes because subordination agreement allowed senior creditor to reject the plan on behalf of the junior creditor's claim); *In re Inter Urban Broad of Cincin., Inc*., 1994 U.S. Dist. LEXIS 16546, at *6-7 (E.D. La. Nov. 16, 1994) (finding that "when a creditor has assigned and subordinated its claim and interests to another creditor" a senior creditor's vote of a junior creditor's claim "was proper and in accord with the law").

obstructionist, destabilizing and wasteful behavior should be enforced and creditor expectations should be appropriately fulfilled.").

      **B.**      **EGI's Characterization of the Settlement Proceeds Is Incorrect**

EGI attempts to characterize the Settlement Proceeds as representing solely avoidance action recoveries from third parties and asks this Court to speculate about the allocation of those proceeds. For the reasons discussed above, *supra* at 5-10, this Court should not only reject this characterization, but not allocate indistinguishable Settlement Proceeds.[22]

**III.**    **The TM Retirees Have Not Met Their Burden of Showing Contractual Entitlement To Subordination Benefits Under the PHONES Indenture or EGI Subordination Agreement**

The TM Retirees improperly rely upon extrinsic statements, such as financial statements, certain of Tribune's 2007 Trial Balance (as defined by the TM Retirees' Brief),[23] FAS rules, IRS rules and accounting publications, in violation of the parol evidence rule, in claiming that they are entitled to subordination under the Subordination Agreements.[24] Without demonstrating that the provisions at issue are ambiguous – actually contending that the provisions are clear[25] – the TM Retirees have no basis to put extrinsic evidence before this Court to explain the meaning of the terms in the Subordination Agreements. *See TAS Distrib. Co. v. Cummins Engine Co.*, 491

---

[22]      The cases cited by EGI all concern the allocation of negotiated settlements among defendants for the purposes of determining the liability of non-settling defendants. *See Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 435-436 (3d Cir. 1993) (discussing allocation of the proceeds of the settlement of an antitrust case for the purposes of determining the amounts of liability for non-settling, jointly liable defendants); *Dzikowski v. N. Trust Bank of Fla., N.A. (In re Prudential of Fla. Leasing, Inc.)*, 478 F.3d 1291, 1302 (11th Cir. 2007) (determining only that federal law of single satisfaction applies as opposed to Florida state law and remanding to district court for further action); *Sims v. DeArmond (In re Lendvest Mortgage)*, 42 F.3d 1181, 1184 (9th Cir. 1994) (finding that the bankruptcy court must undertake an independent allocation of the settlement among jointly liable defendants before it may conclude that a preferential transfer claim is satisfied.).

[23]      *Opening Brief of TM Retirees With Respect To Resolution of Allocation Disputes in Connection With Confirmation of the Third Amended Plan*, dated Feb. 24, 2012 [Dkt. No. 10994] (the "TM Retirees' Br.").

[24]      Exhibits A through S annexed to Jay Teitelbaum's Declaration, dated February 24, 2012 [Dkt. No. 10996] ("Teitelbaum Decl.").

[25]      TM Retirees' Br. at 24 ("[t]he intent of the parties is clearly set forth in . . . the EGI Subordination Agreement"), 33 ("the phrase 'on normal trade terms' . . . is abundantly clear").

F.3d 625, 637 (7th Cir. 2007) ("The law is clear in Illinois that only the four corners of an

integrated contract are properly considered when interpreting a contract.  Illinois courts have

interpreted the parole evidence rule to bar the introduction of evidence relating to understandings

not reflected in the terms of the contract, reached either before or at the time of the contract's

execution, where those terms would vary or modify the terms of the contract itself.") (citations

omitted); *Eagle Indus. v. DeVilbiss Health Care*, 702 A.2d 1228, 1232 (Del. 1997) ("If a contract

is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary

the terms of the contract or to create an ambiguity.").  This Court – having already decided the

PHONES Indenture is unambiguous – need only look at the four corners of the Subordination

Agreements to reach the conclusion that the TM Retirees' claims do not constitute "Senior

Indebtedness" under the PHONES Indenture or "Senior Obligations" under the EGI

Subordination Agreement.  *In re Tribune*, 2011 Bankr. LEXIS 5018, at *25-26.[26]

### A.      The TM Retirees' Claims Do Not Qualify As Senior Indebtedness Under the PHONES

The TM Retirees claim they are entitled to subordination under the PHONES Indenture

because their claims fall within the definition of "Indebtedness" within subsections (ii) and (iv)

of § 14.01(1),[27] but have not met their burden.[28]

### 1.      The TM Retirees Claims Are Not For Deferred Purchase Price of Services

The TM Retirees, in an attempt to classify their claims as "deferred purchase price of

services," adopt a contorted reading of § 14.01(1)(ii) that is inconsistent with the natural meaning

---

[26]      Even worse than the typical "parol evidence" case, the extrinsic evidence here is not evidence of any understanding before or at the time of the contract's execution, but instead consists of documents that post-date the PHONES Indenture, in some cases by many years.

[27]      *See* TM Retirees' Br. at 26-27.

[28]      *See* Opening Br. at 19-20.

of that provision.[29]  As the Court in *In re Payless Cashways, Inc.*, 215 B.R. 409, 414 (Bankr. W.D. Mo. 1997) explained, "[r]ules of grammar serve an important function because they impart meaning to language" and will be followed where they "produce[] a plain and natural meaning." Here, § 14.01(1)(ii) defines Indebtedness as "all indebtedness for borrowed money or *for the deferred purchase prices of property or services other than, in the case of any such deferred purchase price, on normal trade terms*."  (PHONES Indenture at § 14.01(1)(ii) (emphasis added)).  Applying rules of grammar, "deferred purchase price of property or services" consist of participial phrases connected by the disjunctive word "or" and must be considered together. Thus, both the terms "property" and "services" are modified by the phrase "deferred purchase price."  The TM Retirees attempt to rewrite the PHONES Note Indenture, claiming the phrase "deferred purchase price" does not modify the term "services," because, as they themselves concede, "[p]urchase [p]rice does not clearly translate to compensation for services."[30]  In other words, the TM Retirees ignore the plain meaning of the contract because it would not make sense that they received a "purchase price"– *i.e.* a "price agreed upon as a consideration of which property or goods are sold and purchased – for their *employment* services."  *See* BLACK'S LAW DICTIONARY (9TH ed. 2009) (emphasis added).  This Court should reject the TM Retirees' nonsensical interpretation as subsection (ii) is clearly meant to refer to liabilities arising from business transactions with third-parties, such as contractors and vendors.[31]

Even assuming the TM Retirees can show that their obligations are for the "deferred purchase price of services," §14.01(1)(ii) specifically carves out services on "normal trade

---

[29]     TM Retirees' Br. at 27-30.

[30]     TM Retirees' Br. at 28.

[31]     Opening Br. at 35.

terms."[32]  The TM Retirees argue that normal trade terms refer only to ordinary course of

business "between buyers and sellers, not between employers and its employees."[33]  However,

the PHONES Indenture makes no such distinction and the case law upon which the TM Retirees

rely does not support this interpretation.[34]  Moreover, if the transactions with the TM Retirees are

not "between buyers and sellers," than how can those transactions involve a "deferred purchase

price?"  A "purchase" assumes a "buyer" and a "seller."  The TM Retirees cannot have it both

ways.  If their claims constitute services, then by default they must constitute trade.[35]  The

relevant part of the definition provides that "the deferred purchase price for property or services

other than, *in the case of any such deferred purchase price*, on normal trade terms."[36]  Thus, the

repeated reference to "any such deferred purchase price" means that normal trade terms must

modify all property or services swept up by the first part of the definition.

It is unquestionable that the TM Retirees claims arose on normal trade terms.  Ms. Bell

has already admitted that the obligations to the TM Retirees arose in the ordinary course of

business and therefore the TM Retirees' claims were on "normal trade terms," precluding their

---

[32]     PHONES Indenture at § 14.01(1).

[33]     TM Retirees' Br. at 33.

[34]     *See In re Nutritional Sourcing Corp.*, 398 B.R. 816 (Bankr. D. Del. 2008) (although containing a lengthy discussion of the definition of "trade creditors" under New York contract law, the phrase "normal trade terms" is not addressed, nor is any similar phrase); *United States v. Brown*, 348 F.3d 1200 (10th Cir. 2003) (interpreting Treas. Reg. § 1.468B-1(g)(3) in the context of a tax dispute); *In re Stratford of Tex., Inc.*, 635 F.2d 365, 367 (5th Cir. 1981) (description of trade creditors was merely a recitation of the facts particular to that case and not a legal conclusion); *In re NationsRent, Inc.*, 381 B.R. 83, 88 (Bankr. D. Del. 2008) (distinction between trade creditors and employees made expressly in operative indenture agreement); *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987) (claims of trade creditors and employee benefit plan participants placed into separate classes only for purposes of administrative convenience under 11 U.S.C. § 1122).

[35]     *See* Opening Br. at 24.

[36]     PHONES Indenture at § 14.01(1) (ii).

classification as "Indebtedness" under the PHONES Indenture.[37]  The TM Retirees have also stipulated to that effect.[38]

### 2. The TM Retirees' Claims Are Trade Payables By Their Own Admission

The TM Retirees further argue their claims are not "trade payables" to avoid the exception to the definition of "Senior Indebtedness" under § 14.01(2) of the PHONES Indenture.[39]  However, this is directly contrary to their position that the claims constitute "deferred purchase price for services."

The TM Retirees have not demonstrated that § 14.01(2) is ambiguous, in fact they concede the opposite.  Accordingly they are precluded from relying upon extrinsic evidence to argue that their claims are not "trade payables" such as Tribune's practice not to classify the TM Retirees' claims as such in their accounting records.[40]  In any event the manner in which Tribune accounts for its liabilities is irrelevant.  What matters is what the Subordination Agreements say and what those liabilities in fact are.

First, because the PHONES Indenture makes absolutely no reference to any accounting or IRS rules, regulations, or the application thereof, the usage of such documents cannot be used to ascertain the intent of the PHONES Indenture.  *See Dayan v. McDonald's Corp.*, 125 Ill. App. 3d 972, 985, 466 N.E.2d 958, 968 (Ill. App. Ct. 1st Dist. 1984) (upholding trial court's finding that contract in dispute "imposed contractual duties and obligations different from those in the standard license agreement and therefore evidence of contractual performance and QSC compliance of these franchises was neither relevant nor material.").  Second, the language in the

---

[37]     Bell Tr. at 41:14-42:15.

[38]     *Id.*

[39]     TM Retirees' Br. at 34-37; PHONES Notes Indenture at § 14.01(2).

[40]     TM Retirees' Br. at 34-37.

TM Retirees' plans and agreements have nothing to do with the meaning of the PHONES

Indenture provisions as they were not negotiated contemporaneously with the Indenture.  *See In*

*re Payless Cashways*, 215 B.R. at 415-16 (rejecting extrinsic evidence that was not made

contemporaneously with the contract in question); *see also Jameson Realty Grp. v. Kostner*, 351

Ill. App. 3d 416, 431, 813 N.E.2d 1124, 1136 (Ill. App. Ct. 1st Dist. 2004) (contracts entered into

after initial contract were inadmissible parol evidence and could not be used to show that party

who signed initial contract was merely an agent and not liable for breach).

Even if this Court were to consider the extrinsic evidence – which it should not – the type

of evidence that the TM Retirees have put forth has absolutely no bearing on what the parties

intended the provisions to mean.  *See Hess v. Kanoski & Assocs.*, 2012 U.S. App. LEXIS 1936,

at *12 (7th Cir. Feb. 2, 2012) ("Where language in a contract appears to be 'susceptible to more

than one meaning,' Illinois courts will 'consider extrinsic evidence to determine the parties'

intent.'") (citing *Thompson v. Gordon*, 241 Ill. 2d 428, 441, 948 N.E.2d 39, 47 (Ill. 2011));

*Gallagher v. Lenart*, 226 Ill. 2d 208, 242, 874 N.E.2d 43, 63 (Ill. 2007) (same).  The "parties"

here include the PHONES Trustee and PHONES Noteholders, neither of whom has been shown

to have had any involvement with the extrinsic evidence adduced by the TM Retirees.

### 3.    The Retirees Claims Are Not For Borrowed Money

Contrary to the TM Retirees' assertion, their claims are not indebtedness "for borrowed

money" within the scope of §14.01(1)(ii) of the PHONES Indenture.[41]  Tribune's obligations to

the TM Retirees are not for a loan, but wage compensation.  As the TM Retirees admit, borrowed

money/loan refers to the "[d]elivery by one party to and receipt by another party of a sum of

---

[41]      TM Retirees' Br. at 31-33.

money upon agreement, express or implied, to repay it with or without interest."[42] Here, the TM

Retirees did not "deliver" money to anyone; and there is no evidence in the retirement plans or

agreements[43] that the TM Retirees and Times Mirror Company ("Times Mirror") agreed for the

TM Retirees to loan money to Times Mirror with the expectation of repayment. *See Crabtree v.*

*Illinois Dep't of Agric.*, 128 Ill.2d 510, 519, 539 N.E.2d 1252, 1257 (Ill. 1989) ("The character of

a transaction is determined by the 'intention' of the parties, which is not synonymous with their

purposes or motives. . . .  There is no evidence in this record indicating that repayment was

intended.  In fact, there is nothing to contradict James Crabtree's characterization of the

transaction as a purchase."); *Estate of Adler v. SunTrust Bank, N.A. (In re Am. Capital Corp.)*,

425 B.R. 714, 720 (Bankr. S.D. Fla. 2010) (finding the insiders' claims did not constitute

indebtedness for borrowed money where "[t]he insider Plaintiffs did not loan any money to

ACC, and it is clear from the allegations of the Amended Complaint that ACC never borrowed

any money from Plaintiffs").  Rather, the former Times Mirror employees are being

compensated by Tribune, as successor in interest to Times Mirror, for their prior employment

services with Times Mirror in the form of either a lump sum or deferred payment and the sources

of such payments were to come from Tribune's general funds.[44]  The mere fact that the TM

---

[42]      TM Retirees' Br. at 32.  The TM Retirees' assertion that deferred compensation with interest constitutes borrowed money because "an interest component to a repayment obligation is indicative of a borrowing/lending relationship," (TM Retirees Br. at 32), is not supported by the case law they cite.  *See, e.g., Old Colony R.R. Co. v. Comm'r*, 284 U.S. 552, 560 (1932) (tax litigation case examining the definition of interest under a specific statute; does not address deferred compensation or whether or not collecting interest on deferred compensation creates a borrowing/lending relationship); *Deputy v. du Pont*, 308 U.S. 488 (1940) (interpreting whether payments for stock were deductible under § 23(b) of the revenue Act of 1928 as interest paid or accrued on indebtedness); *United States v. Midland-Ross Corp.*, 381 U.S. 54, 57 (1965) (tax refund case comparing the earned original issue discount to stated interest under the Internal revenue Code of 1939); *Mayflower Inv. Co. v. Comm'r*, 239 F.2d 624, 625 (5th Cir. 1956) (noting in tax litigation cases the Supreme Court has defined interest as "compensation for the use of forbearance of money").  Furthermore, the TM Retirees do not and, of course, cannot cite to any case law classifying "deferred compensation" as a "repayment obligation."

[43]      *See* Declaration of Susan Bell dated February 24, 2012 [Dkt. No. 10998] ("Bell Decl.") at Exs. A-G.

[44]      *See, e.g.*, Bell Decl. at Exs. B, C, D, E, F.

Retirees "deferred payment" for the obligations relating to the retirement plans were categorized as "long term liability" on Times Mirrors' financial statements does not change the nature of the transaction.  *See Edwin's, Inc. v. United States*, 501 F.2d 675, 679 (7th Cir. 1974) ("That the employee's receipt of the money is deferred does not change the payments into something other than compensation."); *Richey v. Metaxpert, LLC*, 2011 U.S. Dist. LEXIS 76731, at *8-9 (E.D. Wash. July 15, 2011) ("The wages withheld from Mr. Richey were tracked in a QuickBooks file titled 'loan,' but there is no further evidence to suggest that either party actually considered it to be a loan or that it was in any legal sense a loan. . . .  Simply tracking deferred compensation in a file titled 'loan' does not make it so.").  Finally, if the drafters of the PHONES Indenture understood that the deferral of payment gave rise to a debt for borrowed money, there would have been no need to include a separate clause in the definition of "Indebtedness" for the "deferred purchase price" of anything.

### 4.    The Retirees Claims Are Not Indebtedness Of Others As Obligor or Guarantor

The TM Retirees argue that because Tribune assumed the obligations relating to the TM Retirees as a result of the merger with Times Mirror, their claims qualify as the "*Indebtedness* of others for the payment of which such Person is responsible or liable as obligor or guarantor" under § 14.01(1)(iv) of the PHONES Indenture (emphasis added).[45]  However, the TM Retirees read the provision too broadly.  The use of the defined term "Indebtedness" in § 14.01(1)(iv) restricts the type of debt implicated.[46]  The clause is not a catch-all provision.  Instead, § 14.01(1)(iv) is intended to apply to only those types of obligations identified in § 14.01(1)(i) – (iii) under which Tribune is an obligor or guarantor in addition to a third party which is liable on

---

[45]    PHONES Indenture at § 14.01(1)(iv) (emphasis added).

[46]    PHONES Notes Indenture at § 14.01(1)(iv).

such debt.  The Retirees' Claims do not satisfy this criterion because they do not qualify as

"Indebtedness" within the meaning of those clauses, regardless of who owes them.  *See Town &*

*Country Bank v. E. & D. Bancshares, Inc.*, 172 Ill. App. 3d 1066, 1073, 527 N.E.2d 637, 641 (Ill.

App. Ct. 4th Dist. 1988) ("In becoming a guarantor, one promises to pay a debt in the event

another fails to do so"); BLACK'S LAW DICTIONARY (9th ed. 2009) (Obligor means "[o]ne who

has undertaken an obligation; a promisor or debtor.").  Additionally, the Retirees' Claims are not

"[i]ndebtedness of others," but rather became an obligation of Tribune upon its merger with

Times Mirror.

> **B.      The TM Retirees Claims Do Not Qualify As**
> **        "Senior Obligations" Under the EGI Subordination Agreement**

The TM Retirees contend that they are entitled to benefit from subordination under the

EGI Subordination Agreement because their claims do not fall within the exceptions to the

definition of "Senior Obligations," which relate to "*trade payables* and *accrued expenses*

*incurred in the ordinary course of business* . . . ."[47]  Again, without once claiming any ambiguity

in the EGI Subordination Agreement, the TM Retirees rely solely upon inadmissible extrinsic

evidence – *i.e.* Tribune's financial statements and Trial Balance – in arguing their claims

constitute "Senior Obligations" and not "trade payables" or "accrued expenses."

> **1.      The TM Retirees' Claims Are Trade Payables and Accrued Expenses**

The TM Retirees contend that the "trade payables" and "accrued expenses" exceptions

are inapplicable because Tribune did not classify the claims as trade payables or accrued

expenses on their financial statements.  Yet, Tribune's financial statements' classifications have

no bearing on whether the TM Retirees claims are in fact trade payables or accrued expenses as

such terms were used in the EGI Subordination Agreement.  None of the provisions of the EGI

---

[47]      EGI Subordination Agreement at ¶ 1 (emphasis added).

Subordination Agreement make any reference to accounting rules or regulations.  There is no basis to rely upon financial statements, FAS rules and various accounting literature to interpret what is meant by the words "trade payables" and "accrued expenses."  *See Dayan*, 125 Ill. App. 3d at 985; *In re Payless Cashways*, 215 B.R. at 416; *supra* at 14-15.  Rather, these terms should be interpreted according to their meaning in the context asserted.

By virtue of the TM Retirees' very own admission that their claims are "deferred purchase price for services" for the purpose of the PHONES Indenture as discussed above, their claims would qualify as "trade payables."[48]

With respect to the "accrued expenses" exception, the TM Retirees acknowledge this refers to expenses incurred but not yet paid, but contend that the expenses must be short term.[49] However, the EGI Subordination Agreement does not limit accrued expenses to short-term obligations and there is no reason to read such an unexpressed limitation into the agreement when accrued expenses could also extend over long periods.  *Accord Union Bank v. Wolas*, 502 U.S. 151, 163 (1991) (Scalia, J., concurring) ("It is regrettable that we have a legal culture in which such arguments have to be addressed (and are indeed credited by a Court of Appeals), with respect to a statute utterly devoid of language that could remotely be thought to distinguish between long-term and short-term debt.  Since there was here no contention of a 'scrivener's error' producing an absurd result, the plain text of the statute should have made this litigation unnecessary and unmaintainable.").  Clearly, the TM Retirees' claims constitute "accrued expenses" because Tribune – standing in the shoes of Times Mirror – *incurred the obligation* to pay wage compensations to the TM Retirees' when they rendered employment services prior to the merger on March 13, 2000 and all those *expenses have not been paid*.  *See* Joshua

_____

[48]      TM Retirees' Br. at 27-30.

[49]      TM Retirees' Br. at 40.

Rosenbaum & Joshua Pearl, *Investment Banking: Valuation, Leveraged Buyouts and Mergers & Acquisitions*, 124 (2009) (defining accrued liabilities merely as "expenses such as salaries . . . that have been incurred . . . but not yet paid."); s*ee also In re Handy Andy Home Improvement Ctrs.*, 1997 Bankr. LEXIS 1197, at *11-12 (Bankr. N.D. Ill. July 9, 1997) ("The Kulins court held that severance pay is a form of deferred compensation and when services were rendered by the employee, the employee's right to the promised compensation vested as much as the right to receive wages or any other form of compensation.").[50]  It is simply irrelevant whether the expense was a short term or long term expense.  Accrued means accrued.

The Debtors acknowledge that Tribune accounts for deferred compensation by crediting either short or long term liabilities on its balance sheet *and* by debiting expenses on its income statement.  The TM Retirees' focus on merely the Trial Balance for the balance sheet misses the corresponding debit entry.  Every journal entry requires a debit and a credit.  The credit to short- and long-term liability for deferred compensation corresponds to the debit entry for accrued expense.  That much is made clear by the very Statement of Financial Accounting Standards No. 87, ("FAS 87") (Teitlebaum Decl. Ex. J). upon which the TM Retirees rely.  Paragraph 20 provides that the "service cost" "shall be included in the net pension cost recognized for a period by an employer sponsoring a defined benefit pension plan."  Paragraph 16 provides that "[t]he service cost component of net periodic pension cost is the actuarial present value of benefits attributed by the plan's benefit formula to services rendered by employees during the period."  Further, ¶ 95 included in the "basis for conclusions" section provides that "compensation cost should be recognized in the period in which the employee renders services."  Thus, because the services rendered by the TM Retirees giving rise to their claims have all been completed, all

---

[50]      *See also* Bell Tr. at 123:15-21 ("Q:  And all of the annuity benefits, they begin after an employee ceases to work; correct? A: The accruals take place while they are working based on their salary and service while they're working and then the payments are paid upon termination and achievement of retirement age, whatever that is.").

costs must have been previously recognized as a "service cost" and included as an expense that has accrued.  Notably, FAS 87 makes no distinction between short term and long term costs.[51]

The TM Retirees argue that even if their claims are accrued expenses they were not incurred in the ordinary course of business because Tribune assumed those obligations as a result of the merger with Times Mirror.[52]  The expenses were not incurred on the date of the merger but incurred on the dates the TM Retirees rendered their services to Times Mirror (all of which occurred prior to the merger).  The date of the merger is irrelevant in determining when the expenses were incurred because Tribune stepped into the shoes of Times Mirror when it became its successor in interest and assumed its obligations to the TM Retirees as if it had been party to the initial contracts.  *Del. Ins. Guar. Ass'n v. Christiana Care Health Servs*., 892 A.2d 1073, 1077-78 (Del. 2006); *see also United States v. La. Generating, LLC*, 2011 U.S. Dist. LEXIS 137973, at *24 (M.D. La. Nov. 30, 2011) (a purchaser "steps into the shoes" of an acquired company).

**IV.    Oaktree Has Not Met Its Burden of Showing The Swap Claim's Contractual Entitlement To Subordination Benefits Under The Subordination Agreements**

Bound by the Court's Confirmation, Oaktree cannot change course and suddenly claim the Swap Claim is part of the Senior Loan Claim and therefore constitutes "Senior Indebtedness" under the PHONES Indenture and "Senior Obligations" under the EGI Subordination Agreement.  In upholding the separate classification of the Swap Claim, the Court held that:

> [t]he DCL Plan Proponents have provided reasonable justification for separate classification of the Swap Claim from the Senior Loan Claims.  I conclude that classifying the Swap Claim with Class 1F 'Other Parent Claims' is appropriate.

---

[51]    *See also* "Accounting Considerations," available at http://www.oneamerica.com/wps/wcm/connect/oa/executiveprivilege/deferred+compensation/understanding+non-qualified+deferred+compensation/accounting+considerations.

[52]    TM Retirees' Br. at 41-43.

*In re Tribune Co.*, No. 08-13141 (KJC), 2011 Bankr. LEXIS 4128, at *177 (Bankr. D. Del.

Oct. 31, 2011). Therefore, the separateness of the Senior Loan Claim and the Swap Claim is the

law of the case. *See, e.g., ACLU v. Mukasey*, 534 F.3d 181, 187 (3d Cir. 2008) ("Under the law-

of-the-case doctrine, 'when a court decides upon a rule of law, that decision should continue to

govern the same issues in subsequent stages in the same case.' 'This rule of practice promotes

the finality and efficiency of the judicial process by protecting against the agitation of settled

issues.'" (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988)

(internal quotation marks and citations omitted))).

Oaktree cannot argue otherwise. In support of the April 2011 DCL Plan, Oaktree

supported the separate classification of the Senior Loan Claims and the Swap Claim, arguing that

the Swap Claim is not a loan when, as a plan proponent, it sought to justify  classification of its

claim as an "other Parent Claim."[53]  It succeeded in persuading the Court of this argument.

Oaktree cannot now reverse its prior, successful position to fit its Swap Claim within its

contorted definition of "Indebtedness." *Taylor v. Mooney Aircraft Corp.*, 265 Fed. Appx. 87, 93

n.6 (3d Cir. 2008) (When a party has made statements of fact in prior court filings, "he is barred

from taking any position inconsistent with those statements under the doctrine of judicial

admission.").  In addition, Oaktree has failed to satisfy its burden of showing the Swap Claim

qualifies as Senior Indebtedness under the Subordination Agreements.

---

[53]     *See Post-Trial Brief In Support Of Confirmation Of Second Amended Joint Plan Of Reorganization For Tribune Company And Its Subsidiaries*, dated May 11, 2011 [Dkt. No. 8897] ("DCL Post-Trial Brief") at 95 (Oaktree contending that the "Swap Claim is not substantially similar to the Senior Loan claims. 'A fundamental characteristic of an interest rate swap is that the counter-parties never actually loan or advance the notional amount. The swap involves an exchange of periodic payments calculated by reference to interest rates and a hypothetical notional amount.'") (quoting *Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 322 F.3d 1039, 1048 (9th Cir. 2003)); *see also* 4/14/2011 Hearing Tr. at 3755:2-19 (excerpt attached as Exhibit J to the *Opening Brief Of Wilmington Trust Company As Successor Indenture Trustee For The PHONES On The Allocation Disputes*, dated February 24, 2012 [Dkt. No.  10999] ) (Oaktree admitting in open court that "[t]he Swap Claim is not for money loaned. . . . So the liability on the swap claim doesn't arise from a loan.")

A.    **The Swap Claim Is Not A Beneficiary of The PHONES Note Indenture**

1.    **The Swap Claim is Not "Indebtedness"**

Despite Oaktree's attempt to transmogrify the Swap Claim into "Indebtedness," the Swap Claim plainly lacks the fundamental characteristic of the borrowings contemplated in the PHONES Indenture.  Without demonstrating that the PHONES Indenture is ambiguous on its face, Oaktree resorts to extrinsic evidence, such as the Credit and Guarantee Agreements and Tribune's SEC filings, to support the fiction that the Swap Claim can be classified as "borrowed money" or "obligations represented by notes, bonds, debentures or similar evidences of indebtedness,"[54] under the PHONES Indenture.[55]

Oaktree contends the Swap Claim is "Indebtedness" as defined under §14.01(1) because it is "(i) . . . obligations represented by notes, bonds, debentures or similar evidences of indebtedness" and "(ii) . . . indebtedness for borrowed money."[56]  As explained in the Opening Brief, the Swap Claim cannot be fairly characterized as "similar evidences of indebtedness" under § 14.01(1)(i) because that term must be read in a manner consistent with the preceding items in the list (notes, bonds and debentures) under the doctrine of *ejusdem generis*.[57]

---

[54]    PHONES Indenture at §14.01(1)(i) and (ii).

[55]    Oaktree's resort to the "extrinsic ambiguity" doctrine to introduce its improper parol evidence is an implicit recognition that the PHONES Indenture is unambiguous.  *See Oaktree Capital Management, L.P.'s Opening Brief Regarding Allocation Disputes*, dated Feb. 24, 2012 [Dkt. No. 11003] ("Oaktree Br.") at 15, n.9 (quoting *F.D.I.C. v. W.R. Grace & Co.*, 877 F.2d 614, 620 (7th Cir. 1989).)  The "extrinsic ambiguity" doctrine, otherwise known as "provisional admission approach," is no longer – or never was – good law in Illinois.  Id. at 621; See also River's Edge Homeowners' Ass'n v. Naperville, 353 Ill. App. 3d 874, 819 N.E.2d 806 (Ill. App. Ct. 2d Dist. 2004) ("[t]he supreme court's decision . . ., which declared the four corners rule, has never been reversed or modified. . . .  The holding . . . remains binding precedent upon this court") (citations omitted); *Gassner v. Raynor Mfg. Co*., 409 Ill. App. 3d 995, 948 N.E.2d 315 (Ill. App. Ct. 2d Dist. 2011) ("[t]he First District has cited River's Edge with approval, and federal courts have now predicted that a strict application of the four corners rule will become the law in Illinois.") (citing cases).  In fact, although omitted from Oaktree's brief, even the case relied upon by Oaktree questioned whether "extrinsic ambiguity" was the law of Illinois at the time.  *F.D.I.C.*, 877 F.2d at 621 ("The Illinois cases provide firmer support for allowing extrinsic evidence when the contract is patently ambiguous than for allowing such evidence to establish that an otherwise clear contract is (to those in the know) ambiguous.").

[56]    PHONES Note Indenture at § 14.01(1)(i) and (ii).

[57]    Opening Br. at 22.

Moreover, the Swap Claim is clearly not for "borrowed money," as Oaktree and the relevant case law recognize. *See supra* at 22-23.

Indeed, the Swap Claim is ontologically distinct from both subsections (i) and (ii) of §14.01(l) because "[s]wap agreements do not involve the payment of principal; the notional amount never changes hands." *Procter & Gamble Co. v. Bankers Trust Co.*, 925 F. Supp. 1270, 1280 (S.D. Ohio 1996). The court in *Procter & Gamble* expressly held that interest rate swaps are neither "notes" nor "evidence of indebtedness" under the Securities Act because they lack this fundamental feature. *Id.* (cited favorably by *Great Lakes Chem. Corp. v. Monsanto Co.*, 96 F. Supp. 2d 376 (D. Del. 2000)); s*ee also Thrifty Oil*, 322 F.3d at 1048 ("A fundamental characteristic of an interest rate swap is that the counter-parties never actually loan or advance the notional amount."). The *Procter* reasoning applies equally here. Moreover, as explained in the Opening Brief, swap agreements lack other key characteristics of a loan, because it is not even clear which party owes money, let alone the amount owed, until the swap agreement is terminated.[58]

Additionally, the fact that the Credit and Guarantee Agreements as well as the SEC filings – all improperly before this Court – discuss the Swap Claim in the context of debt, does not transform the Swap Claim into either "borrowed money" or "obligations represented by notes, bonds, debentures or similar evidences of indebtedness" under §14.01(1)(i) and (ii).[59] The term "Debt," particularly as used in those agreements and SEC filings, is distinguishable from the borrowing narrowly defined by "Indebtedness." *See Dayan*, 125 Ill. App. 3d at 985;

---

[58]    Opening Br. at 22-23.

[59]    *See* Oaktree Br. at 14. Oaktree's statement that "the Swap Claim effectively is 'indebtedness for borrowed money' even though the Swap Documents themselves did not involve any advance of funds to Tribune" demonstrates the strain in its logic and shows exactly why parol evidence should not be offered to attempt to contort a facially unambiguous term. (Oaktree Br. at 15-16, n.10.).

*supra* at 14-15.  As the Examiner explained, any reference to the Swap Claim as "Debt" in the Credit Agreement merely reflects that the swaps were assumed subject to the Subsidiary Guarantees: "[t]he obligations of Tribune under the Swap Documents do not constitute the Credit Agreement Debt, but are guaranteed by the Guarantor Subsidiaries pursuant to the Credit Agreement Subsidiary Guarantee."[60]  Thus, the term "Debt" as defined in the agreements and SEC filings is not interchangeable with the carefully crafted definition of "Indebtedness" as used in the PHONES Indenture.

## 2.    The Swap Claim Is Not "An Amount Due in Connection with" Senior Indebtedness

Oaktree argues that even though the Swap Claim is not "Indebtedness," it can still constitute "*Senior* Indebtedness" because it purportedly arose under the Credit Agreement.[61]  In making this argument, Oaktree relies on §14.01(2) which defines "Senior Indebtedness" as "the principal of . . . and interest on . . . and other amounts due on or *in connection with* any Indebtedness of the Company."[62]  However, the fact that the Credit Agreement required Tribune to enter into an interest rate swap agreement does not mean the obligations arising under that separate, independent, non-borrowing Swap Agreement became subsumed within the obligations under the Credit Agreement.  The debt on the Swap Claim is not "*due* . . . in connection with" the Credit Agreement  (*Id.*)

Adhering to Oaktree's logic quickly leads to absurd results.  Under its reasoning, because the Credit Agreement requires Tribune and its subsidiaries to maintain its properties, a facilities contractor could have a claim as Senior Indebtedness for monies owed for upkeep as an amount

---

[60]    Examiner Report, Vol. II, Annex B at B6, n.9.

[61]    Oaktree Br. at 10-12.

[62]    PHONES Indenture at §14.01(2) (emphasis added).

due "*in connection with* any Indebtedness of the Company."[63]  Further, because the Credit

Agreement requires Tribune to maintain insurance, pay its taxes, and provide audited

financials,[64] insurance premiums, taxes, and auditors' fees could all fall within the aegis of

"Senior Indebtedness."  As Oaktree itself acknowledged, the Swap Claim obligation is entirely

independent from the obligations incurred under the Credit Agreement.[65]  *See supra* at 22.

Indeed, the court in *Crofton Convalescent Ctr., Inc. v. Dep't of Health & Mental Hygiene*, 413

Md. 201, 213, 991 A.2d 1257 (Md. 2010), relying on *Thrifty Oil*, recognized that interest rate

swaps are obligations separate from the underlying indebtedness, even where the parties intended

to integrate the swap and loan agreements.

Oaktree argues that "if the amounts due and payable under the Swap Documents are not

'in connection with' the Credit Agreement, it is hard to conceive of any obligation that would be

covered by this phrase and no other term of the definition of Senior Indebtedness."[66]  However,

"due in connection with any Indebtedness" plainly refers to ancillary amounts owed by the

debtor to the primary creditor, such as bank fees and associated attorneys' fees, which are only

captured by this catch-all phrase.  Under the doctrine of *ejusdem generis*, discussed *supra* at 23-

24, "[i]n connection with any Indebtedness" is a catch-all term that must be limited to conform

with the more specific, preceding items in the sentence.  Thus, the preceding terms in that phrase

– "[p]rincipal," "premium," and "interest" – each limit and define the character of indebtedness

---

[63]  Credit Agreement at § 5.01(g).

[64]  *Id.* at §§ 5.01(b), (c), (i).

[65]  *See* DCL Post-Trial Br. at 95 ("the Swap Claim is governed by a different agreement than the Senior Loan Claims, executed among different parties and almost a month after the Senior Credit Agreement.").  Oaktree acknowledges that the Swap Claim here is for swap termination payments that are not even connected or related to claims of interest under the Credit Agreement.  Its own description of the swap mechanics as set forth in the Swap Documents is conspicuously void of any reference to calculations under, or term of, the Credit Agreement.

[66]  Oaktree Br. at 12.

contemplated by the catch-all, "amounts due on or in connection with any Indebtedness."[67] Because each of these items relate to transfers between the debtor and principal lender (and not ancillary transfers between undefined third-parties mentioned in the Credit Agreement), the Swap Claim cannot qualify as "in connection with . . . Senior Indebtedness."[68]

### B.  The EGI Subordination Agreement Does Not Apply to the Swap Claim

The Swap Claim similarly does not constitute a "Senior Obligation" under the EGI Note because it is an accrued expense incurred in the ordinary course of business.[69]  Oaktree offers nothing besides a conclusory assertion that the Swap Claim does not fall within this exception.[70] This assertion fails to satisfy Oaktree's burden of proof that it is entitled to the benefits of the EGI Subordination Agreement.  As noted in the Opening Brief, interest rate swaps and similar hedges against contingent liabilities are common for large companies, like Tribune, and thus constitute an "ordinary course of business" expense.[71]

---

[67]    PHONES Note Indenture at §14.01(2).

[68]    *Id.*

[69]    *See* Opening Br. at 28.

[70]    Oaktree Br. at 9, n.6.

[71]    *See* Opening Br. at 28.

## V.    The UCC Distorts The Unfair Discrimination Test And Undervalues The Harm Caused By The DCL Plan Against Senior Noteholders[72]

### A.    The Unfair Discrimination Test Is Satisfied Because Disparate Treatment Exists Between The Senior Notes And Other Parent Claims

The UCC ignores its own legal analysis, established case law, and spot on legislative history in advocating for an "unfair discrimination" test that minimizes the true extent to which the DCL Plan unfairly discriminates against the Senior Noteholders.  Pursuant to the "unfair discrimination" test – articulated in *In re Armstrong World Indus., Inc.,* 348 B.R. 111, 121 (D. Del. 2006) – that the UCC purports (yet fails) to apply, the Court is supposed to analyze the comparative treatment of two creditor groups.  *In re Armstrong*, 348 B.R. at 121 (applying the third prong of unfair discrimination test by "compare[ing] the proposed allocations to the Asbestos PI Claimants and the Unsecured Creditors to determine whether the Plan unfairly discriminates against the UCC").

The UCC misapplies the third prong of the *Armstrong* test which evaluates whether "a difference in the plan's treatment of the two classes" results in "*a materially lower percentage recovery for the dissenting class*."  348 B.R. at 121 (emphasis added).  The UCC erroneously compares the Senior Notes' recovery with and without the addition of funds used to increase the

---

[72]    While the UCC's "unfair discrimination" argument applies to all of the Other Parent Claims, no Party argues in either their Preliminary Statement or Opening Brief that Other Parent Claims, other that the TM Retirees' Claims and the Swap Claim, qualifies as Senior Indebtedness under the PHONES Indenture or Senior Obligations under the EGI Subordination Agreement.  *See In re Payless Cashways,* 215 B.R. at 417 ("[a] party claiming that it is entitled to treatment superior to other creditors has the burden of proving that entitlement.")  Nor could they.  The list of such claims includes trade payables, employee claims, insurance claims, litigation claims and other "ordinary course of business" payables that squarely fall within the exceptions to both Subordination Agreements.  *See* TRB2000103 – TRB2000121.  Other than this schedule, there is nothing in the record that would satisfy any party's burden to demonstrate that these claims are entitled to the economic benefit of subordination.

The one exception is that the PHONES Trustee, relying on § 14.13 of the PHONES Indenture, argues that its "fee claim" qualifies as Senior Indebtedness under the PHONES Indenture.  (PHONES Br. at 20.).  There is no merit to this argument.  Section 14.13 provides, in pertinent part, that "[n]othing in this Article Fourteen shall apply to claims of, or payments to, the Trustees under or pursuant to Section 6.07." (PHONES Indenture, at Art. 14.13 (emphasis in original).)  Thus, while the PHONES Trustee's fee claim is not subject to subordination, it also cannot qualify as Senior Indebtedness because both concepts are embedded within Article Fourteen of the PHONES Notes Indenture.

Other Parent Claims' recoveries to equal that of the Senior Notes.[73]  Oaktree mimics this

misunderstanding by trying to test whether the DCL Plan discriminates unfairly against Senior

Noteholders by comparing the distribution to holders of Senior Notes under different plan

scenarios.[74]

However, the "unfair discrimination" test is not whether the discrimination results in a

material downward adjustment to the dissenting class's recovery; rather, under well-established

case law the test is whether the dissenting class is receiving a materially lower percentage on its

claims (before taking account of the subordination provisions) compared with a class of equal

rank.[75]  The "discrimination" results from a disparity in the percentage recoveries of different

classes of equal rank.  Indeed, Professor (now Bankruptcy Judge) Bruce A. Markell, who

proposed the "unfair discrimination" test adopted by *Armstrong,* explained the "materially lower

percentage recovery" prong of the test as follows:

> Under the third factor, discrimination is presumptively unfair in two
> circumstances.  First, unfairness is presumptively present *if the plan specifies
> materially different percentage recoveries for two classes having the same
> priority.*

Bruce Markell, *A New Perspective On Unfair Discrimination in Chapter 11*, 72 Am. Bankr. L.J.

227, 249 (1998) (emphasis added).

---

[73]    *See Memorandum of Law of the Official Committee of Unsecured Creditors on Unfair Discrimination Allocation Dispute*, dated Feb. 24, 2012 [Dkt. No. 11000] (the "UCC Br.") at 11-13 (comparing 36.5% recovery to Senior Notes under one scenario to 33.6% recovery to Senior Notes under another scenario, and arguing this percentage difference is not "material.")

[74]    *See* Oaktree Br. at 16-17 (comparing 36.5% recovery to Senior Notes under one scenario to 33.6% recovery to Senior Notes under another scenario, and arguing this percentage difference is not "material").

[75]    *See In re Dow Corning Corp.*, 244 B.R. 696, 703 (Bankr. E.D. Mich. 1999) ("The inability to designate with certainty a comparable class is however, [sic] not necessary to disposition of the case because any alleged difference in treatment between Class 18 and another class or classes of the same priority would give rise to a presumption of unfairness under the test only if the Plan provided for either a materially lower recovery or a greater allocation of risk for Class 18.  This is not the case here as there is no evidence that any other class is receiving more favorable treatment than Class 18 under the Plan."); *see also In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 231-32 (Bankr. D.N.J. 2000) (comparing dissenting noteholder class's recovery on deficiency claims to recovery received by general unsecured creditors).

While the very case law the UCC cites requires this comparative approach, the UCC outright misapplies it.[76]  The UCC's failure to abide by a straightforward comparison of the percentage recovery of two different classes (Other Parent Claims and Senior Notes) to determine properly whether unfair discrimination exists, as required by the case law, is quite revealing, demonstrating the improper lengths to which the UCC is willing to go to take sides in a dispute between two of its creditor constituents.  The UCC's intentional misapplication of the legal standard for testing unfair discrimination is further highlighted by the only "unfair discrimination" example contained in the legislative history.[77]  There, using an example that is precisely the case here, Congress did not compare what the discriminated-against class received and the amount it should have received.  Instead, Congress compared the recoveries of a senior creditor and a general unsecured creditor, each owed the same amount and each *pari passu* as to the debtor where there also existed a subordinated creditor whose recovery was subject to turn over to the senior creditor.  Congress stated that the creditor that was the sole beneficiary of the subordination of junior debt was entitled to a recovery twice as large as the general unsecured creditor who was not entitled to the benefit of the contractual subordination.  The failure of the ultimate recoveries in the illustration to adhere to this ratio *between classes* of equal caliber *as to the debtor* amounted to unfair discrimination.  *See* Volume C, Collier on Bankruptcy App. Pt. 4(d)(i) (15th ed. rev.) (explaining that if trade creditors, senior debt, and subordinate debt are each owed $100 and the "plan proposes to pay trade debt $15, senior debt $25, and junior debt $0," then, "[T]he senior debt is being unfairly discriminated against with respect to the equal trade debt even though the trade debt receives less than the senior debt. The discrimination arises from the fact that the senior debt is entitled to the rights of the junior debt which in this example

---

[76]        UCC Br. at 7-8.

[77]        Opening Brief at 30.

entitle the senior debt to share on a 2:1 basis with the trade debt.").  Tellingly, while the UCC quotes a statement out of context from this legislative history,[78] the UCC avoids any analysis, discussion, or even mention of this on-point illustration.

If, as is the case, the Other Parent Claims are not entitled to subordination, all of their recovery must come from Tribune.  In contrast, the recovery of the Senior Noteholders comes from two distinct sources:  distributions from Tribune on account of the claims of Senior Notes, and reallocated distributions from the PHONES and EGI Notes.  The unfair discrimination analysis requires a comparison of the distributions received *from the estate* under the plan by the two classes (Other Parent Claims and Senior Notes) *prior* to giving effect to the subordination provisions.  Thus, in applying the test for unfair discrimination, the ultimate Senior Noteholder recovery is the improper measuring point.

Section 1129(b)(1) of the Bankruptcy Code further supports this interpretation.  That section provides, in pertinent part, that a plan must "not discriminate unfairly" "notwithstanding section 510(a) of this title."  11 U.S.C. § 1129.  Section 510(a) requires the post-petition enforcement of subordination agreements.  11 U.S.C. § 510.  In other words, the plan must not unfairly discriminate in its distribution scheme *even before* giving effect to third party contractual rights embodied in a subordination agreement.  The UCC, however, fails to acknowledge that only a portion of the Senior Noteholders' recovery comes from Tribune and that the balance of their recovery comes from the contractually modified turnover of the distribution to other claims, *i.e.*, the PHONES and EGI Notes.

Once one focuses properly on the percentage recovery of Senior Noteholders before considering their right to the distributions otherwise allocable to PHONES and EGI Notes, the

---

[78]     UCC Br. at 5.

discriminatory impact of the DCL Plan exceeds 50% in every scenario, worsening as payments from the Litigation Trust increase.  The extent of the discrimination is summarized in the chart below:[79]

**% Discrimination Against Senior Notes - High PHONES**

| | Recovery from the Estate to | | % Discrimination |
| | Senior Notes | Other Parent Claims | Against Senior Notes |
|---|---|---|---|
| Legislative History Example of Unfair Discrimination | 12.5% | 15.0% | 20.0% |
| DCL Plan with no Litigation Trust Recoveries | 19.4% | 33.6% | 73.3% |
| DCL Plan with $250 Million in Litigation Trust Recoveries | 25.8% | 46.6% | 80.6% |
| DCL Plan with $500 Million in Litigation Trust Recoveries | 31.5% | 58.2% | 84.6% |
| DCL Plan with $750 Million in Litigation Trust Recoveries | 37.3% | 69.8% | 87.3% |

**% Discrimination Against Senior Notes - Low PHONES**

| | Recovery from the Estate to | | % Discrimination |
| | Senior Notes | Other Parent Claims | Against Senior Notes |
|---|---|---|---|
| Legislative History Example of Unfair Discrimination | 12.5% | 15.0% | 20.0% |
| DCL Plan with no Litigation Trust Recoveries | 21.9% | 33.6% | 53.1% |
| DCL Plan with $250 Million in Litigation Trust Recoveries | 29.5% | 46.6% | 57.8% |
| DCL Plan with $500 Million in Litigation Trust Recoveries | 36.3% | 58.2% | 60.3% |
| DCL Plan with $750 Million in Litigation Trust Recoveries | 43.1% | 69.8% | 62.0% |

Based upon the above chart, the discriminatory effects of the DCL Plan are far worse than the sole example in the legislative history and resoundingly exceed even the imaginary 50% threshold advocated by the UCC and Oaktree.[80]

---

[79]    This chart is based upon the recovery chart attached to the Opening Brief.

**B.     The Other Parent Claims Did Not Provide Value
To Overcome the Presumption of Unfair Discrimination**

There is no merit to the UCC's assertion that the value that the Other Parent Claims

provided to the Debtors' reorganization rebuts a presumption of unfair discrimination.  Certainly,

such rebuttable presumption cannot be overcome when the UCC has not even identified (much

less presented any evidence of) what benefits have been provided to the reorganization by the

Trade Claims, Swap Claims, and other non-retiree Other Parent Claims, who represent 57% of

the Other Parent Claims class.  Moreover, neither the UCC, nor any other party, has shown how

the TM Retirees – a group of former executive employees of Times Mirror who retired well over

11 years ago – have contributed to Tribune's current reorganization to warrant dramatically

superior treatment under the DCL Plan to that of the Senior Noteholders.

Although the UCC correctly argues that in certain, very narrow circumstances the unfair

discrimination presumption may be rebutted if the plan proponent shows "that a lower recovery

for the dissenting class is consistent with the results that would obtain outside of bankruptcy, or

that a greater recovery for the other class is offset by contributions from that class to the

reorganization," *A New Perspective on Unfair Discrimination in Chapter 11*, 72 Am. Bankr. L.J.

at 229 the UCC misapplies the standard.  A creditor may possibly receive preferential treatment

under a plan if such creditor contributes to the Debtors' reorganization, the contribution must

extend beyond merely the bankruptcy case itself.  Instead, the contribution must enhance the

estate's value.

In *In re Sentry Operating Co. of Tex., Inc.*, 264 B.R. 850 (S.D. Tex. 2001), the court

found the creditors' contribution was insufficient to rebut the presumption of unfair

---

[80]     The TM Retirees' claim that it is unlikely that the Litigation Trust will not recover significant proceeds is unfounded.

discrimination.  Analyzing whether the preferred class deserved the greater distribution, the

*Sentry* court reasoned:

> [i]n the Plan, there is no such justification for gross discrimination between the
> percentage payouts to Classes 3 and 4.  Class 3 contains some small creditors
> whose continued work with the funeral homes would probably provide some
> value.  However, Class 3 contains many more national creditors (some of them
> very large) who appear to be *paid for reasons other than preservation of value.*
> *Thus there does not appear to be sufficient "contribution to preservation of value*
> *through the plan" that justifies a payout differential.*

*Id.* at 864 (emphasis added).

Sentry Operating demonstrates the insufficiency of the supposed "contribution" of the

TM Retirees here.  The TM Retirees are not providing any continuing service to Tribune, nor

have they aided any aspect of Tribune's restructuring of its business operations.  The UCC

admits as much when the only two "contributions" of TM Retirees it can come up with are their

agreement to settle their disputed unsecured claims and to vote in favor of the DCL.[81]    And the

Committee's reliance on these two factors, however, distorts the meaning and intent of this test.

With no real value being added to the reorganization by the TM Retirees, they have no basis for

its superior treatment vis-à-vis a creditor class of equal rank, the Senior Noteholders.  The two

purported contributions made by the TM Retirees provide no contribution to the Debtors of the

type required by the case law.  First, if voting in favor of a plan was sufficient contribution to

overcome the presumption of unfair discrimination, then it would be legitimate for the debtor to

circumvent the "unfair discrimination" requirement by "buying" the vote of the

disproportionately favored class to confirm the debtor's preferred plan.  Yet, this is akin to

gifting, which the Third Circuit has resoundingly rejected.  *See e.g., In re Armstrong World*

*Indus., Inc.*, 432 F.3d 507, 514 (3d Cir. 2005).  Moreover, support for a plan, no matter how

---

[81]        *See* UCC Br. at 11.

34

"steadfast," cannot be used to overcome the presumption of unfair discrimination; if it could, then the requirement that a plan "not discriminate unfairly" would be meaningless because more favorable treatment to a favored class is invariably offered to obtain its acceptance to a plan.

Second, there is no merit to the UCC's assertion that the TM Retirees' agreement to reduce the aggregate amount of their disputed claims by approximately $10 million is a contribution to the reorganization in the face of a $30 million challenge.[82]  Remarkably the TM Retirees actually received rather than provided greater value in "settling" its claims.  The Debtors asserted that the TM Retirees' claims were overstated by approximately $30 million and then agreed to only an approximate $10 million, or 8%, deduction[83] – a two-thirds give up by the Debtor.  Hardly a contribution.  The UCC cites no case treating the reduction of a disputed claim as the kind of "contribution" that is necessary to overcome the presumption of unfair discrimination.

C.    **Failure To Enforce Subordination Provisions Violate Key Bankruptcy Code Provisions**

It gets worse.  The DCL Plan's treatment of the Other Parent Claims, not only unfairly discriminates against the Senior Noteholders, but also deprives them of their rightful recovery. Distributing the Settlement Proceeds to the holders of Other Parent Claims as senior claimants when they are not necessarily results in the *diversion of proceeds* away from the Senior Noteholders.  This transcends mere unfair discrimination.  Section 510(a) of the Bankruptcy Code specifically requires that the Subordination Agreements be enforced "to the same extent as such agreement is enforceable under applicable non-bankruptcy law."  11 U.S.C. § 510(a). "Applicable non-bankruptcy law" requires that all distributions that would otherwise be made to

---

[82]    UCC Br. at 13.

[83]    Bell Decl. at ¶ 17.

the PHONES and EGI Notes be turned over to the holders of claims that constitute "Senior

Indebtedness" and "Senior Obligations" under the Subordination Agreements; it does not permit

part of that turnover to be diverted or "gifted" to claims that do not so qualify.  As the Recovery

Chart (attached to the Opening Brief) shows, if the initial distribution to the Senior Noteholders

is 19.4%, then, under a high PHONES amount, the Senior Noteholders are entitled to receive

36.5% after benefiting from subordination.  Instead, the DCL Plan provides that the Senior

Noteholders would be paid only 33.6%, diverting approximately $30-$37 million in recoveries

from the Senior Noteholders, representing approximately 8 %-10% of the $369 million allocated

to them as part of the settlement.  This disregard of the Senior Noteholders' rights and failure to

adhere to the terms of the Subordination Agreement violates Sections 510(a), 1129(a)(1), and

1129(a)(2) of the Bankruptcy Code.

**VI.**    **The Senior Noteholders Are Entitled to Postpetition Interest**

As a result of Congress's enactment of Section 510(a) of the Bankruptcy Code, which

abrogated the "Rule of Explicitness, courts now enforce subordination agreements to the extent

"enforceable under applicable nonbankruptcy law." 11 U.S.C. § 510(a); *HSBC Bank USA v.*

*Branch (In re Bank of New Engl. Corp.*), 364 F.3d 355, 362-63 (1st Cir. 2004).  With respect to

the EGI Subordination Agreement, Delaware courts would not apply the Rule of Explicitness,

but rather enforce subordination agreements, like other contracts, based upon their plain

meaning.  *New York Stock Exch. v. Pickard & Co.*, 296 A.2d 143, 147 (Del. Ch. 1972).  The EGI

Subordination Agreement provides for absolute subordination of EGI unless and until the Senior

Obligations have been "paid in full in cash" and makes no exception with respect to interest.

EGI Subordination Agreement at ¶¶ 2, 4, 6; *Pickard & Co.*, 296 A.2d at 148 (finding the

language of a subordination agreement to be plain and comprehensive where it provided for

senior claims to be "fully satisfied" and did not have "an implied exception").  Thus, under the

plain meaning, EGI would be subordinate to all post-petition interest of the Senior Noteholders irrespective of whether they are allowed such interest under bankruptcy law.

Similarly, with respect to the PHONES Indenture, Illinois courts enforce subordination agreements based upon their plain meaning.  (Opening Br. at 10-11.)  The PHONES Indenture specifically provides for subordination of postpetition interest under § 14.01(2) by defining "Senior Indebtedness" to broadly include "interest on (including interest accruing after the filing of a petition initiating any proceeding pursuant to Federal bankruptcy law or any other applicable Federal or State law, but only to the extent allowed or permitted to the holder such Indebtedness of the Company . . .")  (PHONES Indenture at § 14.01(2).)  Thus, the PHONES are subordinated to all postpetition interest of the Senior Noteholders "to the extent allowed or permitted to the holders of such Indebtedness" in bankruptcy.  Such interest would be permitted if not allowed (the terms are disjunctive), for example, to render creditors unimpaired under Section 1124(1) of the Bankruptcy Code.

<u>**CONCLUSION**</u>

WHEREFORE, for the reasons stated above and in the Opening Brief, this Court should conclude that (i) the subordination provisions of both the PHONES Notes Indenture and the EGI Subordination Agreement are without limitation and must be enforced until "Senior Indebtedness" and "Senior Obligations," respectively, are paid in full; (ii) Other Parent Claims are not beneficiaries of the Subordination Agreements because they do not constitute "Senior Indebtedness" or "Senior Obligations;" (iii) equal treatment of Senior Noteholders and Other Parent Claims regardless of the effect of the Subordination Agreements constitutes unfair discrimination; (iv) distributions under the DCL Plan must be adjusted to account properly for the Subordination Agreements; and (v) any decision on the applicability of the Subordination Agreements to post-petition interest on senior claims should be deferred until an award of such

interest becomes ripe, or, in the alternative, the Senior Noteholders are entitled to postpetition

interest before any payment is made to the holders of either the PHONES Notes or EGI Note;

and should grant such other relief as may be necessary to effectuate the relief sought.

Dated:  March 2, 2012
       Wilmington, Delaware

                              Respectfully submitted,

| KASOWITZ, BENSON, TORRES<br>  & FRIEDMAN LLP | BIFFERATO GENTILOTTI LLC |
|---|---|
| | */s/ Garvan F. McDaniel* |
| David S. Rosner | Garvan F. McDaniel (I.D. No. 4167) |
| Sheron Korpus | 800 N. King Street, Plaza Level |
| Christine A. Montenegro | Wilmington, Delaware 19801 |
| Matthew B. Stein | 302-429-1900 |
| 1633 Broadway | |
| New York, New York 10019 | |
| 212-506-1700 | |

*Counsel for Law Debenture Trust Company of New York, solely in its capacity as successor
Indenture Trustee for certain series of Senior Notes*

| McCARTER & ENGLISH, LLP | McCARTER & ENGLISH, LLP |
|---|---|
| | */s/ Katharine L. Mayer* |
| David J. Adler | Katharine L. Mayer (I.D. No. 3758) |
| 245 Park Avenue | Renaissance Centre |
| New York, New York 10167 | 405 N. King Street |
| 212-609-6800 | Wilmington, Delaware 19801 |
| | 302-984-6300 |

*Counsel for Deutsche Bank Trust Company Americas, solely in its capacity as successor
Indenture Trustee for certain series of Senior Notes*

38