IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) ) ) ) ) ) ) | Chapter 11 Cases<br>Case No. 08-13141 (KJC)<br>(Jointly Administered) |
| TRIBUNE COMPANY, et al., |  |  |
| Debtors. |  |  |

**REPLY BRIEF OF
WILMINGTON TRUST COMPANY,
AS SUCCESSOR INDENTURE
TRUSTEE FOR THE PHONES NOTES,
ON THE ALLOCATION DISPUTES**

**SULLIVAN HAZELTINE ALLINSON LLC**
William D. Sullivan (I.D. No. 2820)
Elihu E. Allinson, III (I.D. No. 3476)
901 N. Market St., Suite 1300
Wilmington, DE 19801
302-428-8191

-and-

**BROWN RUDNICK LLP**
Robert J. Stark
Martin S. Siegel
Gordon Z. Novod
Seven Times Square
New York, NY 10036
212-209-4800

Counsel for Wilmington Trust Company, solely in
its capacity as successor Indenture Trustee for the
PHONES Notes

Dated: March 2, 2012

## TABLE OF CONTENTS

POINTS ON REPLY .................................................................................................................2

I.      PHONES And EGI Contractual Subordination Should Be Enforced Strictly;
        Wilmington Trust Has Standing To Assert Its Views On The Matter...............................2

II.     TM Retirees' Argument That They Are Entitled To Participate In PHONES
        Contractual Subordination Borders On Frivolity .............................................................3

III.    The SWAP Claim Is Not A Contractual   "Adjunct" To The LBO Credit
        Agreement For Purposes Of PHONES Contractual Subordination) ..................................4

IV.     No Other Parent Level Creditor Has Claimed Entitlement To PHONES
        Contractual Subordination ...............................................................................................7

V.      The PHONES are Senior in Right of Payment to the EGI-TRB LLC Notes
        ((PHONES Allocation Dispute Issue 6 / EGI-TRB Allocation Dispute Issue 5)...............7

VI.     The High/Low PHONES Questions Turns On Due Recognition Of The Parties'
        Expressed Intent, To Wit: No Cash From Tribune, No Termination Of The
        PHONES...........................................................................................................................12

VII.    Law Debenture's Argument Regarding Post-Petition Interest on Senior
        Indebtedness Is Inconsistent With Basic Legal Principle) .............................................15

## TABLE OF AUTHORITIES

<u>Cases</u>

*Am. Eagle Outfitters v. Lyle & Scott Ltd.,*
 584 F.3d 575 (3d Cir. 2009) ...................................................................9

*Baldwin v. Univ. of Pittsburgh Med. Ctr.,*
 636 F.3d 69 (3d Cir. 2011) ....................................................................9

*Chicago Title & Trust Co. v. Telco Capital Corp.,*
 685 N.E.2d 952 (Ill. App. Ct. 1997) .......................................................3

*Conger v. Gruenig,*
 96 A.2d 821 (Vt. 1953)........................................................................13

*Danow v. Borack,*
 346 F. App'x 409 (11th Cir. 2009) ........................................................11

*Dayan v. McDonald's Corp.,*
 466 N.E.2d 958 (Ill. App. Ct. 1984) .......................................................4

*Estate of Sheppard ex rel. Sheppard v. Sec'y of Dept. of Health & Human Servs.,*
 No. 04-112, 2007 WL 5160383 (Fed. Cl. Aug. 7, 2007)........................10

*Georgacopulos v. Hruby,*
 147 N.E. 376  (Ill. 1925)......................................................................13

*Ha 2003, Inc. v. Fed. Ins. Co. (In re HA 2003, Inc.),*
 310 B.R. 710 (Bankr. N.D. Ill. 2004) .................................................6, 11

*In re Payless Cashways,*
 215 B.R. 409 (Bankr. W.D. Mo. 1997) ...................................................4

*In re Polis,*
 217 F.3d 899 (7th Cir. 2000) ...............................................................15

*In re Tribune Co.,*
 ___ B.R. ___, 2011 WL 5142420 (Del. Bankr. Oct. 31, 2011)...............4

*In re Wood,*
 582 F.2d 638 (Cust. Ct. 1978) .............................................................11

*Jefferson Trust & Sav. Bank v. W. Heller & Son,*
 16 N.E.2d 433 (Ill. App. Ct. 1938) .......................................................13

*Kinwood Capital Group, LLC v. BankPlus (In re Northlake Dev., LLC),*
    60 So. 3d 792 (Miss. 2011) ................................................................................13

*Kraemer v. Franklin & Marshall Coll.,*
    909 F. Supp. 267 (E.D. Pa. 1995) .....................................................................12

*Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.,*
    619 F.2d 1001 (3d Cir. 1980) ...............................................................................9

*Montgomery Coca–Cola Bottling Co. v. U.S.,*
    615 F.2d 1318 (Ct. Cl. 1980) .............................................................................10

*Netbula, LLC v. Storage Tech. Corp.,*
    No. 06-07391, 2008 WL 228036 (N.D. Cal. Jan. 18, 2008) ...............................6

*Rohn v. Heidrich,*
    No. 16,495, 1912 WL 2804 (Ill. App. Ct. 1912) ..............................................13

*UPIC v. Kinder-Care Learning Ctrs., Inc.,*
    793 F. Supp. 448 (S.D.N.Y. 1992) ......................................................................3

*U.S. v. U.S. Gypsum Co.,*
    333 U.S. 364 (1948) ....................................................................................... 9-10

## Statutes

11 U.S.C. § 510(a) ...............................................................................................2, 3

11 U.S.C. § 1129(a) .............................................................................................2, 3

11 U.S.C. § 1129(b) .................................................................................................2

810 ILCS § 5/3-403 ...............................................................................................14

## Other Authorities

Restatement (Second) of Contracts § 60, cmt. b (1981) .......................................13

Restatement (Third) of Agency § 1.01, cmt. c (2005) ...........................................13

Wilmington Trust Company ("Wilmington Trust"), as successor Indenture Trustee for the PHONES Notes, respectfully submits this Omnibus Reply to:

- Opening Brief Regarding Allocation Disputes Filed by Oaktree Capital Management, L.P., filed February 24, 2012 [D.I. 11003] ("Oaktree Brief");

- Opening Brief of TM Retirees With Respect to Resolution of Allocation Disputes in Connection With Confirmation of the Third Amended DCL Plan, filed February 24, 2012 [D.I. 10994] ("TM Retiree Brief");

- Brief in Support of Its Position on Allocation Disputes Identified in Its Preliminary Statement filed by EGI-TRB LLC, filed February 24, 2012 [D.I. 11001] ("EGI Brief");

- Memorandum of Law of the Official Committee of Unsecured Creditors on Unfair Discrimination Allocation Dispute, filed February 24, 2012 [D.I. 11000] ("Committee Brief");

- Debtors' Opening Brief Regarding Factual Information Relevant to Allocation Disputes, filed February 24, 2012 [D.I. 11004] ("Debtors' Brief");

- Joinder of the Debtors to Memorandum of Law of the Official Committee of Unsecured Creditors on Unfair Discrimination Allocation Dispute, filed February 24, 2012 [D.I. 11005] ("Debtors' Joinder");

- Brief of Aurelius Capital Management, LP in Support of Its Positions Regarding the Allocation Disputes, filed February 24, 2012 [11007] ("Aurelius Brief"); and

- Brief (Joint Opening) with Respect to Allocation Disputes Filed by Deutsche Bank Trust Company Americas, and Law Debenture Trust Company of New York [D.I. 11010] ("Law Debenture/DBTCA Brief" and, collectively with the preceding pleadings, the "Opening Briefs").

In reply to the Opening Briefs and in furtherance of Wilmington Trust's Opening Brief on Allocation Disputes [D.I. 10999], Wilmington Trust respectfully represents as follows:

**POINTS ON REPLY**

I.    **PHONES And EGI Contractual Subordination**
      **Should Be Enforced Strictly; Wilmington Trust**
      **Has Standing To Assert Its Views On The Matter.**

1.      Wilmington Trust respectfully submits that much of the "unfair discrimination" advocacy in the Opening Briefs shoots in the wrong direction. To confirm the Plan, the Court must find not only that it complies with Bankruptcy Code Section 1129(b) respecting dissenting classes, but also that it complies with Section 1129(a) in all other respects (excepting, of course, Section 1129(a)(8)). Particularly relevant here, the Plan must comply with Section 1129(a)(1), mandating that the Plan comply "with the applicable provisions" of the Bankruptcy Code -- including Section 510(a). Section 510(a) ensures that a plan of reorganization duly recognizes an inter-creditor subordination agreement "to the same extent that such agreement is enforceable under applicable non-bankruptcy law."

2.      A plan that affords parties Section 510(a) rights that they are not entitled to outside of bankruptcy *feels* wrong because it *is* wrong: Such plan violates the explicit limits of Section 510(a) and, in turn, Section 1129(a)(1). That is true irrespective of whether the Plan does or does not discriminate "unfairly" because the unnatural taking of someone else's property is or is not "meaningful" in the grand scheme of things. In other words, equitably "fudging" subordination rights may or may not work under Section 1129(b), but it most assuredly does not work under Section 1129(a)(1) and should not be allowed.

3.      In its Opening Brief, the TM Retirees contend that Wilmington Trust is so far "out of the money" that it lacks standing to offer its view on this or any other allocation issue. A little late in the game for that kind of argument. But, regardless, it is not substantively viable. Holders of PHONES have bankruptcy value entitlements that are recognized in, among many

2

other places in the case record, the Plan (which the TM Retirees fervently support). And, it bears

noting that, under Section 14.06 of the PHONES Indenture, Wilmington Trust subrogates to each

and every dollar of senior creditor claim satisfied by contractual subordination turnover, and that

is true even respecting senior creditor claims satisfied via reallocation from EGI-TRB ("EGI") to

Wilmington Trust and from Wilmington Trust to senior creditors. *See UPIC v. Kinder-Care*

*Learning Ctrs., Inc.,* 793 F. Supp. 448, 460 (S.D.N.Y. 1992); *see also Chicago Title and Trust*

*Co. v. Telco Capital Corp.,* 685 N.E.2d 952 (Ill. App. Ct. 1997) ("[a]s the court articulated in

*UPIC & Co.,* a debenture holder benefits when he collects on a judgment then disgorges the

proceeds of that judgment to holders of senior indebtedness because the debenture holder then

becomes subrogated to the senior holders' rights.").[1]

4.      Getting to the correct analytical answer respecting contractual subordination thus

has important economic implications for holders of the PHONES. Wilmington Trust has

standing, and respectfully submits that turnover should be enforced strictly in accordance with

Section 1129(a)(1), Section 510(a) and applicable non-bankruptcy law.

**II.    TM Retirees' Argument That They
        Are Entitled To Participate In PHONES
        Contractual Subordination Borders On Frivolity.**

5.      Wilmington Trust respectfully posits that, even in this most litigious of

bankruptcy cases, adversaries should be able to stipulate to at least certain basic unassailable

facts, such as the following: (1) human beings are not widgets; (2) the benefits conferred by an

employee on an employer are not third-party vendor services; (3) an employee's salary is not a

trade account payable; and (4) retirement benefits are not debt service for money loaned.

---

[1]    Although an issue for another day, it should be noted here that the Plan deprives PHONES holders of the benefit of subrogation. *See* Plan § 11.1.2 (enjoining creditors from "(iv) asserting any … right of subrogation … against any debt, liability or obligation due the Debtors, the Reorganized Debtors or their respective property."). This will need to be modified for the Plan to be confirmable.

6.      It may be *ipsit dixit* argument, but Wilmington Trust respectfully submits it need

not furnish a comparable number of citations to Black's Law Dictionary, IRS guidelines, or

accounting principles to establish that retirement benefits do not facially qualify as "indebtedness

for ... the deferred purchase price of ... services other than ... on normal trade terms." *See In re*

*Payless Cashways*, 215 B.R. 409, 417 (Bankr. W.D. Mo. 1997) (finding that retirees failed to

prove they were intended beneficiary of comparable contractual subordination provision in bond

indenture, and holding that the plain meaning of the provision was that retirees are not entitled to

Section 510(a) turnover).[2]

7.      The rhetorical contortions may be awe-inspiring, but they still must be rejected.

**III.    The SWAP Claim Is Not A Contractual**
**"Adjunct" To The LBO Credit Agreement For**
**Purposes Of PHONES Contractual Subordination.**

8.      Oaktree primarily bases its argument that the Swap Claim benefits from PHONES

contractual subordination by tying it to the LBO Lenders' Credit Agreement, thus positing that

the Swap Claim is Indebtedness incurred "in connection with" the LBO bank debt.  This is very

curious advocacy after: (1) Oaktree so vehemently opposed classification of the Swap Claim

with the Senior Loan Claims, because the claim is (so protested Oaktree) not for money loaned,

*see* Wilmington Trust Brief, ¶¶ 30-31 (citations to DCL Plan Proponents' briefs and argument by

Oaktree's counsel); and (2) Oaktree actually prevailed in that argument, with the Court finding

that the Swap Claim is sufficiently removed from the Senior Loan Claims that it should be

classified separately, *see In re Tribune Co.*, __ B.R. __, 2011 WL 5142420, *51 (Bankr. D. Del.

Oct. 31, 2011).  Under the circumstances, principles of estoppel should come into play.

---

[2]   The IRS guidelines and accounting principles are not even admissible (let alone persuasive authority), because
they are irrelevant under applicable State contract law.  *See Dayan v. McDonald's Corp.*, 466 N.E.2d 958, 968
(Ill. App. Ct. 1984) ("Evidence of a course of dealings under a contract which does not contain the same
provisions as the contract in issue [i.e., course of dealings under a different legal rubric] is generally held to be
irrelevant and inadmissible.").

9.       But, on the merits, the argument goes too far.  To be sure, "in connection with" is a contractual phrase that joins to clauses. To avail itself of PHONES contractual subordination relying on this language, Oaktree must establish that there is something particularly special, something deal-specific that joins the Swap Claim to the LBO Lenders' Credit Agreement.  After all, every large bank credit agreement includes "garden variety" covenants that, on some level, tie the bank indebtedness to – quite literally – every single aspect of the borrower's business and every single party contracting with the borrower.  For example, the LBO Credit Agreement obligated Tribune not to default on any funded debt.  *See* Credit Agreement § 6.01. It also obligated Tribune to pay taxes, maintain insurance, preserve property, and deliver financial statements. *See, e.g.,* Credit Agreement, §§ 5.01(b), (c), (g), (i).  It would be well beyond the extreme to think that any form of Tribune funded debt, unsecured tax claim, unpaid insurance premium, benefits owed to a former employee that pushed a broom across the shop floor, or the unpaid bill of an IT consultant that helped put accounting software on the mainframe gets to sling-shot to the front of the line because they are claims "in connection" with the Senior Loan Claims.

10.      Again, leaving aside how Oaktree pressed so hard to distance the Swap  Claim from the Senior Loan Claims, focusing only on the intrinsic qualities of the two forms of debt, Wilmington Trust is hard pressed to see what makes the Swap Claim so inexplicably tied to the Senior Loan Claims.  It is true that the LBO Credit Agreement required Tribune to hedge its interest obligations, *see* Credit Agreement § 5.01(k) (ADH Ex. 11), just like it required Tribune to maintain workers compensation insurance.  But, there were no specifics: (i) the hedging agreement simply had to be on "terms and conditions reasonably acceptable to the Agent that result in at least 35% of the aggregate principal amount of total Consolidated Debt for Borrowed

Money being effectively subject to a fixed or maximum interest rate reasonably acceptable to the Agent." *Id.* § 5.01(k); (ii) it did not impose Barclays Bank PLC (the original Swap Claim counterparty) to serve as the counter-party; (iii) it did not dictate the cost, duration, or other terms of any particular hedging arrangement (merely that there needed to be hedging); and (iv) it would not be an event of default if one particular hedging arrangement was replaced with any other particular hedging arrangement.

11.    This was, in other words, a credit maintenance and preservation obligation just like any other "garden variety" credit maintenance and preservation obligation contained in the agreement. The Swap Claim is no more "connected" to the Senior Loan Claims than virtually any other claim asserted in the case. It no more enjoys the benefits of PHONES contractual subordination than quite literally any other claim simply by dint on the "in connection with" language.

12.    Oaktree's remaining arguments are contradicted by the plain terms of the PHONES Indenture, as discussed at length in Wilmington Trust's Opening Brief.[3] For the reasons discussed therein, those arguments also should be rejected.

---

[3]    Oaktree's reliance on the statements made by the Debtors in their 2007 and 2008 SEC filings to try to establish the intent of the PHONES Indenture is improper. Extrinsic evidence arising after the time of contracting cannot be used to interpret ambiguous language from a contract. *See Netbula, LLC v. Storage Tech. Corp.*, No. 06-07391, 2008 WL 228036, at *7 (N.D. Cal. Jan. 17, 2008) (finding that evidence offered that occurred "one or more years after the time of contracting" did "not illuminate the meaning of the contract *at the time of contracting.*") (emphasis added); *see also Ha 2003, Inc. v. Fed. Ins. Co. (In re HA 2003, Inc.)*, 310 B.R. 710, 717 (Bankr. N.D. Ill. 2004) (letter drafted after negotiation of the contract inadmissible since it did not reflect "the parties' intent before or at the time of execution of the contract... The letter thus does not shed any light on the intent of the drafters when the contract was executed.").

## IV.    No Other Parent Level Creditor Has Claimed
## Entitlement To PHONES Contractual Subordination.

13.    It is useful to note that no other creditor (except Wilmington Trust's Class 1F

Claim) has asserted that it qualifies as a third-party beneficiary entitled to the benefit of

PHONES subordination.  Moreover, neither the Debtors nor the Official Creditors' Committee

take any position on this issue.  Thus, it should be beyond dispute that the Trade Claims and the

other types of Other Parent Claims identified by the Debtors (*see* Wilmington Trust's Opening

Brief, ¶ 38-40) are not "Indebtedness" and "Senior Indebtedness" entitled to PHONES

subordination.

## V.    The PHONES are Senior in Right of Payment to the EGI-TRB LLC Notes.[4]

### (PHONES Allocation Dispute Issue 6 / EGI-TRB Allocation Dispute Issue 5)

14.    The Court has been furnished the EGI-TRB Notes and, with so much briefing

already, is now well positioned to determine whether EGI's strained interpretation makes any

sense.  Wilmington Trust need not here guild the lily.[5]

15.    But, what should be highlighted here is how unbalanced the total evidentiary

packages are.  On the one hand, there is the contractual language which (at least to everyone

other than EGI) seems quite clearly to express EGI-TRB subordination to the level just above

equity.  That seems to comport with gut instinct too, given that private equity sponsors to a

leverage buyout are actually supposed to put in their contribution *as equity* (sort of what makes

---

[4]    Because PHONES Allocation Dispute Issue 6 is merely the inverse of EGI-TRB Allocation Dispute Issue 5, for the sake of brevity and clarity, Wilmington Trust addresses its argument that the PHONES are senior in right of payment to the EGI-TRB Notes in one section.

[5]    EGI also argues that the EGI-TRB Notes are a claim that qualifies as "Indebtedness" and "Senior Indebtedness" entitled to benefit from PHONES subordination.  As such, EGI asserts that, because the EGI-TRB Notes are senior to the PHONES, any Plan distribution turned over from the PHONES as a result of PHONES subordination is not subject to EGI's own subordination. EGI Brief, pg. 11. This puts the cart before the horse. EGI must first prove that the EGI-TRB Notes qualify as "Indebtedness" and "Senior Indebtedness" entitled to benefit from PHONES subordination.  EGI failed to do so.

the LBO deal structure work). But, beyond the contract, there are numerous emails and other communications in the record establishing the collective, contemporaneous understanding that the EGI-TRB Notes would, in fact, be contractually subordinated to the PHONES and all other funded debt. EGI personnel were actual participants in certain of those communications.

16.    The Court should reject EGI-TRB's argument that the extrinsic evidence should be given little weight because it relates to the Step One EGI Note, and not to the Step Two EGI Subordination Agreement. While there were some changes to the business terms, and an additional restriction on the scope of subordination to exclude trade payables and accrued expenses from "Senior Obligations," the evidence overwhelmingly shows that the relevant terms of the EGI Subordination Agreement remain substantially the same, including as to the PHONES. *See* Wilmington Trust Brief, ¶¶ 75-77 (including the chart in ¶ 77 demonstrating that the definition of Senior Obligations in the two instruments were virtually identical, except for the addition of the trade payables and accrued expenses exceptions).

17.    In juxtaposition to all this evidence, EGI offers the testimony of a longstanding EGI-affiliated person, William Pate, offering facially "made-to-order" testimony of his subjective belief (not shared with anyone, ever, or memorialized anywhere), four-years after the fact, that the EGI-TRB Notes were not (when negotiated four-years earlier) supposed to have been subordinated to the PHONES.

18.    Specifically, Pate testified that he "assumed" that EGI was senior to the PHONES because the EGI-TRB Notes were not "convertible" notes and the PHONES were a "convertible" subordinated security.    Pate Deposition, 15:21-16:3.    Pate's assumption is based on a fundamental misunderstanding of the nature of the PHONES debt. Although the PHONES had an exchange right for cash that tracks the trading value of Time Warner stock, at all times, the

PHONES were <u>debt</u>, with a principal amount due in 2029 and only exchangeable to cash as set forth in the PHONES Global Note. Pate's assumption that the PHONES were a convertible security just was not correct. Pate also had an unexpressed subjective belief that the EGI-TRB Notes needed to be considered debt for tax purposes. Even if the EGI-TRB Notes had to be a "hard note" for tax purposes, it is not credible that Pate believed that EGI-TRB Notes could not be convertible securities for tax purposes, but that the PHONES could not. Since the ESOP was to be the only equity holder, the effect would have been the same if the PHONES were convertible. For this reason alone, Pate's testimony is unbelievable.

19.    As shown in Wilmington Trust's Brief (¶¶ 78-80), Pate also conceded that he never disclosed this subjective belief to Tribune and the LBO Banks while the terms of the EGI-TRB Notes or the EGI Subordination Agreement were being negotiated. (Pate Tr., pg. 76-81, 87-89, 91-97). That fact by itself, makes Pate's testimony inadmissible. It is black letter contract law that a party's subjective intent without external manifestations of that intent is inadmissible. *See Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1009-1010 (3d Cir. 1980) (courts must "eschew the ideal of ascertaining the parties' subjective intent and instead bind parties by the objective manifestations of their intent"); *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 582 (3d Cir. 2009) (same); *Baldwin v. University of Pittsburgh Medical Center*, 636 F.3d 69, 75 (3d Cir. 2011) (same); *see also* cases cited at Wilmington Trust Brief, ¶ 79.

20.    Even if the Court were to admit Pate's testimony on his subjective intent and understanding, it should give that testimony little, if any, weight. *See United States v. United States Gypsum Co.*, 333 U.S. 364, 396 (1948) ("[w]here [witness] testimony is in conflict with contemporaneous documents we can give it little weight[.]"); *Estate of Sheppard ex rel.*

*Sheppard v. Sec'y of Dept. of Health & Human Services*, No. 04-112, 2007 WL 5160383, *10 (Fed. Cl. Aug. 7, 2007) (same); *Montgomery Coca–Cola Bottling Co. v. United States*, 615 F.2d 1318, 1327 (Ct. Cl. 1980) (same).

21.     That is precisely the situation here – the objective evidence is not consistent with Pate's testimony.  Neither Pate nor anyone else at EGI wrote a single e-mail, memorandum, letter or any other objective document that supports Pate's subjective understanding.  Indeed, Pate's undisclosed subjective beliefs as to the effect on subordination created by the change in the business terms in the EGI-TRB Notes are directly contradicted by the drafts of the EGI Subordination Agreement.  As set forth in the Wilmington Trust Brief at ¶ 74, during the negotiations of the Step Two Subordination Agreement, JPMorgan specifically requested that the EGI Subordination Agreement use the same subordination language as the Step One EGI Note.  ADH Ex. 141, at TRB1169521.  Thereafter, all of the drafts of the EGI Subordination Agreement reflect that the language in that agreement was changed to incorporate substantially the same subordination language as in the Step One EGI Note.  *See* Ex. 146, at EGI-Law 00243377-81; ADH Exs. 8, 147-49.  And as stated above, the subordination language in the executed Step Two EGI-TRB Notes are virtually identical to the subordination language in the Step One Note.

22.     In apparent recognition of the need to have independent corroborative evidence of Pate's subjective belief, EGI has stated that it will argue in its reply brief that such support is found in Tribune's April 2007 Form 8-K.  EGI Brief, pg. 24, purported to quote the Form 8-K as stating that "EGI-TRB Step One Note is subordinated only to the Senior Obligations."  ADH Ex. 141.  The actual text of the Form 8-K, however, does not capitalize or define the term "senior obligations."  *Id*.  That language, even if quoted correctly, cannot support Pate's subjective

understanding because it does not specifically refer to the PHONES or the PHONES' relative priority to the EGI-TRB Notes. Indeed, the issue before this Court on the allocation disputes is whether the PHONES are "Senior Obligations" as that term is used in the EGI Subordination Agreement. Thus, absent some other contextual evidence as to the meaning of the statement in the Form 8-K, that general statement in the Form 8-K cannot be used to bolster Pate's testimony. That testimony, should be given little, if any, weight.

23.     EGI also apparently intends to rely on a letter sent by its attorneys at Goldberg Kohn, dated June 2, 2009, to Debtors' counsel setting forth EGI's position with respect to the PHONES subordination.    ADH Ex. 150, EGI-LAW 00243345-47    (the "Goldberg Letter"). Lawyer's arguments and conclusory statements are not admissible evidence. *See In re Wood*, 582 F.2d 638, 642 (CCPA 1978); *see also Danow v. Borack*, 346 F. App'x 409, 412 (11th Cir. 2009) (lawyer's arguments are not evidence and should not be factored into the jury's deliberations").

24.     In addition, the Goldberg Letter was written a year and a half after the EGI Subordination Agreement was executed. Accordingly, it also is inadmissible to shed light on the intent of the drafters of the EGI Subordination Agreement. *Ha 2003* is directly on point. 310 B.R. 717. In *Ha*, a party attempted to introduce a letter from its counsel written one year after a D&O policy was issued to determine an ambiguous term from that policy. The court concluded that that letter was "irrelevant." *Id.* The court stated: "Extrinsic evidence is inadmissible unless the contract is ambiguous, and even then, the extrinsic evidence must reflect the parties' intent *before or at the time of execution of the contract...* The letter in question was written both *after the negotiation of the contract and by someone who was not involved in drafting it*. The letter

thus does not shed any light on the intent of the drafters when the contract was executed." *Id.* (emphasis added).

25.     The Goldberg Letter also cannot be used by EGI as objective evidence to bolster Pate's undisclosed subjective understanding. Obviously, the advocacy piece by EGI's lawyer is not "objective." Tellingly, however, the Goldberg Letter directly contradicts, and does not support, Pate's testimony. Nowhere does the Goldberg Letter mention Pate's theory of the relative priority between EGI-TRB Notes and the PHONES. Instead, the Goldberg Letter only relies on EGI's subjective interpretation of the various provisions of the PHONES Indenture and the EGI-TRB Subordination Agreement. If Pate truly believed in 2009 what he now says, one would think that his understanding would be expressed by EGI's attorneys in the Goldberg Letter, but it is not. For this reason, even though the Goldberg Letter is not admissible on EGI's case in chief, it can be used to impeach Pate's unexpressed subjective understanding. *See Kraemer v. Franklin & Marshall Coll.*, 909 F. Supp. 267, 268 (E.D. Pa. 1995) (lawyer's letter not admissible on merits but used "to impeach the credibility of the [defendant].")

26.     Wilmington Trust respectfully submits that the record overwhelmingly supports a finding that the EGI-TRB Notes were intended to be subordinated to the PHONES.

**VI.    The High/Low PHONES Questions Turns On Due Recognition Of The Parties' Expressed Intent, To Wit: <u>No Cash From Tribune, No Termination Of The PHONES.</u>**

27.     Aurelius argues (and the Debtors somewhat posit in a footnote) that the PHONES claim should be the "low" number, likening the applicable Indenture provisions (as augmented/modified/supplemented by the Revised Exchange Notice) as akin to an irrevocable option contract without conditions precedent. That position does not jibe with the actually words chosen, which explicitly established a critical condition precedent: PHONES are terminated only

after cash is received from Tribune.  ADH Ex. 94, at WTC0000089, WTC0000091.  No cash

tendered, no resultant PHONES termination; that was the deal.

28.     The legal implication of that deal structure could not be clearer: "If a promise …

is in terms conditional[,] the promisor is bound thereby, but performance becomes due only upon

the occurrence of the condition." Restatement (Second) of Contracts § 91; *see also Jefferson*

*Trust & Sav. Bank v. W. Heller & Son*, 296 Ill. App. 447, 457 (Ill. App. Ct. 1938) (citing *Rohn v.*

*Heidrich,* 174 Ill. App. 423 (Ill. App. Ct. 1912) ("A tender of performance may be accompanied

with such conditions as were by the terms of the contract between the parties conditions

precedent to be performed by the party to whom the tender is made")).

29.     DTC's mechanical and unauthorized actions (inconsistent with the deal terms and

the expectations of the parties) did not rewrite the contractual language, converting a clearly

expressed condition precedent into a condition subsequent.   DTC's actions (clearly beyond the

scope of its automated, but still agency, function) should not penalize innocent PHONES

holders, requiring them to pay first and receive later (that is if Tribune felt like paying).

*Georgacopulos v. Hruby*, 147 N.E. 376, 378 (Ill. 1925) ("an agent has no authority to bind his

principal beyond the terms of the specific authority conferred upon him by the agency

contract."); *see also Kinwood Capital Group, LLC v. BankPlus (In re Northlake Dev. L.L.C.)*, 60

So. 3d 792, 796 (Miss. 2011) ("the act of an agent who exceeds his authority, is binding upon his

principal to the extent of his authority, but is void for the residue."); *Conger v. Gruenig*, 96 A.2d

821 (Vt. 1953) (if an "agent exceeds his authority, the principal is not bound and the contract, as

to him, is void"); *Restatement (Third) of Agency*, Section 1.01 cmt. c (2005)("Only interactions

that are within the scope of an agency relationship affect the principal's legal position.").

13

30.     Aurelius makes another strained argument by claiming that the PHONES Indenture's definition of "Outstanding" PHONES evidences that claims of tendering PHONES Noteholders should be limited to the amount of the exchange payments, not the original principal amount of the debt.  In support of this conclusion, Aurelius incorrectly states that "[t]here is no dispute that the Tendered PHONES Notes were 'delivered to the Trustee for cancellation.'" Aurelius Brief, ¶ 14.

31.     Aurelius' argument is misleading since it cites only to the definition of "Outstanding" under the PHONES Indenture and not to the Revised Exchange Notices.  The Revised Exchange Notices, which modified the terms of the Global Note, is clear on the timing of cancellation of PHONES – which shall occur only upon consummation of the exchange and not upon delivery to the Trustee.  Moreover, the cancellation is governed by Section 3.09 of the PHONES Indenture.  Section 3.09 provides that, if PHONES are "surrendered for ... exchange... [are] surrendered to any Person other than the Trustee, [they shall] be delivered to the Trustee and *shall be promptly cancelled by it*..."  PHONES Indenture §3.09 (emphasis added). PHONES Indenture Section 3.09 does not say, however, that that the indenture trustee must immediately cancel PHONES tendered for exchange upon surrender.  *Id.*  Rather, the PHONES Indenture only requires that the PHONES be promptly cancelled by the indenture trustee.  *Id.* Section 3.20 of the PHONES Indenture, cited by Aurelius, must be read consistently with the terms of the Global Note and the Revised Exchange Notices promulgated thereunder.[6]

---

[6]   A useful analogy can be found in the Illinois statutory law.  Because the outstanding balance of the PHONES was reduced without authority and in contravention of the Revised Exchange Notices, it is similar to the situation where an agent exceeds his authority through an unauthorized signature.  In such circumstances, Article 3 of the Illinois Uniform Commercial Code provides that "Unauthorized signature.  (a) Unless otherwise provided in this Article or Article 4 [810 ILCS §5/4-101 et seq.], an unauthorized signature is ineffective except as the signature of the unauthorized signer in favor of a person who in good faith pays the instrument or takes it for value." 810 ILCS § 5/3-403.   Under this rule, a signature made by one exceeding actual or apparent authority is "wholly inoperative as that of the person whose name is signed." 810 ILCS 5/3-403 cmt. 1-2.  Similarly here, the

32.     The Court should harmonize the PHONES Indenture's general cancellation requirements with the specific requirements under the Revised Exchange Notices.   In either event, neither provision provides that the PHONES tendered for exchange are only cancelled immediately upon tender, and Aurelius argument to the contrary must be rejected.

33.     In sum, the inapposite law cited by Aurelius and the Debtors on this issue does nothing to contradict the factual and legal arguments in the Wilmington Trust Brief  (¶¶ 42-53) that demonstrate that the Court should allow the PHONES claims in the "High" PHONES amount.

## VII.    Law Debenture's Argument Regarding Post-Petition Interest on Senior Indebtedness Is Inconsistent With Basic Legal Principle.

34.     To be sure, Chapter 11 is event-driven.  Plan confirmation obligates a trial and, to the extent a party opposes the proponent's valuation thesis, that opponent is perfectly entitled to offer up evidence of an alternative valuation thesis.   Respecting estate causes of action, the law instructs how parties are supposed to go about offering up valuation evidence.   *See, e.g., In re Polis*, 217 F.3d 902 (7th Cir. 2000) (instructing how expert testimony regarding the value of estate causes of action should be presented to the Bankruptcy Court).

35.     In its Opening Brief, Law Debenture advances the argument that the Court should, essentially, reformulate the Plan, instructing the proponents to incorporate new provisions that put off for another day the question of post-petition interest entitlements.  Law Debenture does not support its request with any evidence as to the worth of estate causes of action.  Its argument is unsupported and facially unavailing.

---

reduction in the outstanding amount of the PHONES was unauthorized and therefore it should be deemed to be "wholly inoperative" to effect a cancellation of the tendered PHONES, as Aurelius and the Debtors seek to do

**WHEREAS**, for the foregoing reasons, and the reasons stated in Wilmington Trust's opening brief, Wilmington Trust respectfully submits that the Court rule that:

(i)     proceeds from Chapter 5 Avoidance Actions are not subject to subordination pursuant to the PHONES Indenture, and, in light of Wilmington Trust's pending appeal of this Court's Reconsideration Opinion, distributions of settlement proceeds should be reserved pending final adjudication of Wilmington Trust's appeal of this Court's Reconsideration Opinion;

(ii)    the priority of distributions from the Creditors' trust is moot as it relates to the PHONES;

(iii)   aside from Wilmington Trust's Class 1F Fee Claim, none of the Class 1F Other Parent Claims, including (A) the Swap Claim, (B) Retiree Claims, and (C) Trade Claims, are "Senior Indebtedness" under the PHONES Indenture;

(iv)    (A) the PHONES Notes Claims Amount is $1,183,833,767, plus unpaid interest that accrued prior to the Petition Date, or (B) if the Court were to decline to order the "High" PHONES Notes Claim Amount, the Court should find that the "Low" PHONES Notes Claim Amount is $818,808,727 (plus unpaid interest that accrued prior to the Petition Date);

(v)     the PHONES are not subordinated to Post-Petition Interest on Senior Indebtedness as defined under the PHONES Indenture;

(vi)    the PHONES are Senior in Right of Payment to the EGI-TRB Notes regardless of source of payment; and

(vii)   Wilmington Trust should be afforded such other and further relief as is just and proper.

Dated:  March 2, 2012
        Wilmington, Delaware

Respectfully submitted,


**SULLIVAN HAZELTINE ALLINSON LLC**


*/s/ William D. Sullivan*_____
William D. Sullivan (I.D. No. 2820)
Elihu E. Allinson, III (I.D. No. 3476)
901 N. Market St., Suite 1300
Wilmington, DE 19801
302-428-8191

-and-

BROWN RUDNICK LLP
Robert J. Stark
Martin S. Siegel
Gordon Z. Novod
Seven Times Square
New York, NY 10036
212-209-4800

Counsel for Wilmington Trust Company, solely in
its capacity as successor Indenture Trustee for the
PHONES Notes