## EXHIBIT B

Black-line Comparison of the Supplemental Disclosure Document, Dated March 7, 2012
to the Supplemental Disclosure Document, Filed February 20, 2012 [Docket No. 10959]

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered |

## SUPPLEMENTAL DISCLOSURE DOCUMENT RELATING TO THIRD AMENDED JOINT PLAN OF REORGANIZATION FOR TRIBUNE COMPANY AND ITS SUBSIDIARIES  PROPOSED BY THE DEBTORS, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, OAKTREE CAPITAL MANAGEMENT, L.P., ANGELO, GORDON & CO., L.P., AND JPMORGAN CHASE BANK, N.A. (AS MODIFIED FEBRUARY 20, 2012)

| | |
|---|---|
| SIDLEY AUSTIN LLP | COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A. |
| James F. Conlan | Norman L. Pernick (No. 2290) |
| Bryan Krakauer | J. Kate Stickles (No. 2917) |
| Jeffrey C. Steen | Patrick J. Reilley (No. 4451) |
| Dennis M. Twomey | 500 Delaware Avenue, Suite 1410 |
| Kerriann S. Mills | Wilmington, DE  19801 |
| One South Dearborn Street | Telecopier:  (302) 652-3117 |
| Chicago, IL  60603 | |
| Telecopier:  (312) 853-7036 | |

*Counsel For Debtors and Debtors In Possession and Certain Non-Debtor Affiliates*

| | | |
|---|---|---|
| CHADBOURNE & PARKE LLP | LANDIS RATH & COBB LLP | ZUCKERMAN SPAEDER LLP |
| Howard Seife | Adam G. Landis | Graeme W. Bush |
| David M. LeMay | 919 Market Street, Suite 1800 | James Sottile |
| 30 Rockefeller Plaza | Wilmington, Delaware 19801 | 1800 M Street, N.W., Suite 1000 |
| New York, New York 10112 | Telecopier:  (302) 467-4450 | Washington, D.C.  20036 |
| Telecopier:  (212) 541-5369 | | Telecopier:  (202) 822-8106 |

*Counsel For the Official Committee of Unsecured Creditors*

| | |
|---|---|
| DEWEY & LEBOEUF LLP | YOUNG CONAWAY STARGATT & TAYLOR, LLP |
| Bruce Bennett | Robert S. Brady (No. 2847) |
| James O. Johnston | M. Blake Cleary (No. 3614) |
| Joshua M. Mester | The Brandywine Building – 17th Floor |
| 333 South Grand Avenue, Suite 2600 | 1000 West Street, Post Office Box 391 |
| Los Angeles, California 90071 | Wilmington, Delaware 19899 0391 |
| Telecopier:  (213) 621-6100 | Telecopier:  (302) 571-1253 |

*Counsel For Oaktree Capital Management, L.P. and Angelo, Gordon & Co., L.P.*

WILMER CUTLER PICKERING HALE & DORR LLP
Andrew Goldman
399 Park Avenue
New York, New York 10022
Telecopier:  (212) 230-8888

*Co-Counsel For Angelo, Gordon & Co, L.P.*

| | |
|---|---|
| DAVIS POLK & WARDWELL LLP | RICHARDS LAYTON & FINGER |
| Donald S. Bernstein | Mark Collins |
| Damian S. Schaible | One Rodney Square |
| 450 Lexington Avenue | 920 North King Street |
| New York, New York 10017 | Wilmington, Delaware 19801 |
| Telecopier:  (212) 701 5800 | Telecopier: (302) 651-7701 |

*Counsel For JPMorgan Chase Bank, N.A.*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are listed on the next page.

**DATED:** ~~February 20,~~March 7, 2012

Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc., f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); and WPIX, Inc. (0191). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................................... 1

        A.    Voting Procedures, Ballots and Supplemental Voting Deadline ...................... 3

              1.    Supplemental Voting Deadline.................................................................. 3

              2.    Voting Procedures ................................................................................... 3

        B.    Confirmation Hearing and Deadline for Objections to Confirmation ............... 4

II.     THE SECOND AMENDED PLAN AND RELATED CONFIRMATION OPINION.................. 5

III.    RULE 59 MOTIONS................................................................................................ 8

IV.     OVERVIEW OF THE CONFORMING MODIFICATIONS IN THE THIRD AMENDED PLAN9

        A.    Plan Modifications Addressing Concerns Raised in Amended Confirmation Opinion. .. 10

              1.    1129(a)(10) Finding................................................................................. 10

              2.    Release Finding ....................................................................................... 10

              3.    Exculpation Finding................................................................................. 11

              4.    Bar Order Finding.................................................................................... 12

              5.    Other Parent Claim Allocation Matter..................................................... 12

        B.    Plan Modifications Addressing Certain Potential Allocation Disputes........................... 12

              1.    Potential Impact of the Adjudication or Resolution of the Potential Allocation
                    Disputes on Distributions to Holders of Claims in Revoting Classes................ 14

              2.    Schedule for Adjudication or Resolution of the Potential Allocation Disputes .. 16

        C.    Retiree Claimant Settlement ............................................................. ~~17~~18

V.      OTHER MISCELLANEOUS PROVISIONS OF THE THIRD AMENDED PLAN ............... ~~17~~18

        A.    Distributions to MSCS ........................................................................ 18

        B.    Participation in the Step Two/Disgorgement Settlement............................... ~~18~~19

        C.    Distribution of New Common Stock ....................................................... ~~18~~19

        D.    Calculation of Step Two/Disgorgement Settlement Participants' Distributions........... ~~18~~19

        E.    Litigation Trust Valuation Expert ........................................................ 19

VI.     REORGANIZED VALUE UPDATE............................................................................ ~~19~~20

VII.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE THIRD AMENDED PLAN~~20~~21

        A.    Federal Tax Consequences to the Debtors................................................ 21

        B.    Federal Income Tax Consequences to Certain U.S. Holders of Claims in Revoting
              Classes ........................................................................................... 21

              1.    U.S. Holders of Senior Noteholder Claims. ............................................. ~~21~~22

              2.    U.S. Holders of Other Parent Claims (not including the Swap Claim and Claims
                    against Tribune arising from a Non-Qualified Former Employee Benefit Plan).~~22~~23

              3.    U.S. Holders of Claims arising from a Non-Qualified Former Employee Benefit
                    Plan. ................................................................................................... ~~22~~23

          4.      U.S. Holders of EGI-TRB LLC and PHONES Notes Claims.......................~~23~~24

     C.      Federal Income Tax Treatment of the MSCS/Senior Noteholder Reserve..................~~24~~25

VIII.   CONCLUSION AND RECOMMENDATION ...................................................................~~24~~25

## I.    INTRODUCTION

On November 18, 2011, (i) the Debtors; (ii) the official committee of unsecured creditors appointed by the U.S. Trustee pursuant to section 1102(a) of the Bankruptcy Code (the "Creditors' Committee"); (iii) certain investment funds and accounts managed by Oaktree Capital Management, L.P. and/or its affiliates ("Oaktree") and Angelo, Gordon & Co., L.P. and/or certain of its affiliates ("Angelo Gordon"), each in its capacity as Holders of Senior Loan Claims, or as a general partner or manager of an entity that is a Holder of Senior Loan Claims; and (iv) JPMorgan Chase Bank, N.A. and certain of its affiliates ("JPMorgan"), as the Senior Loan Agent and as a Holder of Senior Loan Claims (collectively, the "DCL Proponents") filed the Third Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, The Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A. [Docket No. 10273] (as amended on February 20, 2012 [Docket No. 10958], the "Third Amended Plan") with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").[2]  A copy of the Third Amended Plan, without exhibits other than Exhibit 5.18, is attached hereto as Exhibit B.[3]

The Third Amended Plan was filed because, as described below, on October 31, 2011, the Bankruptcy Court denied confirmation of the Second Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, The Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A. (as modified April 26, 2011) (the "Second Amended Plan") [Docket No. 8769].[4]  In its opinion [Docket No. 10133] (the "Confirmation Opinion"),[5] however, the Bankruptcy Court found that each of the LBO Settlement and the Step Two Disgorgement Settlement (each as defined below) – the core components of the Second Amended Plan – was "achieved as a result of arms-length, good faith negotiations" and was "fair, reasonable, and in the best interest of the Debtors' estates" (Confirmation Opinion at 35-39, 79). However, the Bankruptcy Court concluded that the Second Amended Plan, which was overwhelmingly accepted by creditors across the capital structure of the Debtors, did not satisfy several requirements for confirmation under section 1129 of the Bankruptcy Code.

The Confirmation Opinion identified certain discrete components of the Second Amended Plan that would need to be revised in order to achieve confirmation.  In addition, on December 29, 2011, the Bankruptcy Court issued an opinion [Docket No. 10531] (the "Reconsideration Opinion") and related order [Docket No. 10532] (the "Reconsideration Order" and, together with the Reconsideration Opinion,

---

[2]    Capitalized terms used but not defined in this supplemental disclosure document (the "Supplement") shall have the meanings ascribed to such terms in the Third Amended Plan.

[3]    Exhibits to the Third Amended Plan are available via the Debtors' reorganization website at http://chapter11.epiqsystems.com/tribune, under the "Key Documents" tab.

[4]    The Bankruptcy Court also denied confirmation of a competing plan of reorganization jointly proposed by, *inter alia*, certain Holders of Senior Notes and PHONES Notes (the "Noteholder Plan").  The Bankruptcy Court explained that, "assuming that both sets of plan proponents addressed only the flaws in their respective plans and both returned confirmable plans containing terms otherwise similar to those presently proposed, with similar voting results, the [Second Amended] Plan would survive the crucible of § 1129(c)' of the Bankruptcy Code, which provides that if the requirements of confirmation are met with respect to more than one plan, the court shall consider the preferences of creditors and equity security holders in determining which plan to confirm.

[5]    You may obtain a copy of the Confirmation Opinion from the Debtors' reorganization website at http://chapter11.epiqsystems.com/tribune, under the "Key Documents" tab or under the "Docket" tab at Docket No. 10133.

the "Reconsideration Decision") which, among other things, modified and clarified certain aspects of the Confirmation Opinion.  Specifically, as further discussed in Article III herein, in the Reconsideration Decision, the Bankruptcy Court vacated its Subordination Finding (as defined herein) in the Confirmation Opinion (the "Subordination Reconsideration Ruling").  In addition, in the Reconsideration Decision, the Bankruptcy Court clarified that the Confirmation Opinion did not address the amount of indebtedness of the PHONES Notes and denied a request by the proponents of the Noteholder Plan (the "Noteholder Proponents") to reconsider certain other aspects of the Confirmation Opinion.

The Third Amended Plan reflects modifications to the Second Amended Plan (the "Modifications") that are intended to address the limited issues identified in the Confirmation Opinion, as modified by the Reconsideration Decision (the "Amended Confirmation Opinion").  The Third Amended Plan also establishes a protocol for the adjudication or consensual resolution of a number of potential Allocation Disputes (as defined herein) – described in detail below – that have been raised by parties in interest.  Those issues primarily involve which categories of plan distributions are subject to the subordination provisions of the PHONES Notes Indenture (the "PHONES Subordination Provisions") and the subordination agreement governing the EGI-TRB LLC Notes (the "EGI-TRB Subordination Provisions") and which Holders of Senior Noteholder Claims (Class 1E) and Other Parent Claims (Class 1F) are entitled to the benefit of the PHONES Subordination Provisions and the EGI-TRB Subordination Provisions with respect to various distributions contemplated by the Third Amended Plan.  As described in greater detail below, such issues shall be determined by the Bankruptcy Court in accordance with the schedule established by the Order Establishing Scheduling For (1) Resolution of The Allocation Disputes and (2) Consideration of  DCL Plan Proponents' Supplemental Disclosure Document, Solicitation Procedures Motion and Plan (the "Scheduling Order") entered by the Bankruptcy Court on January 24, 2012 (Docket No 10692).

The principal purpose of this Supplement is to provide supplementary information concerning the Modifications to the Holders of:

- ▪ (i) Senior Noteholder Claims (Class 1E), (ii) Other Parent Claims (Class 1F), (iii) EGI-TRB LLC Notes Claims (Class 1I), and (iv) PHONES Notes Claims (Class 1J) against Tribune; and

- ▪ General Unsecured Claims against certain Filed Subsidiary Debtors (Classes 2E, 4E through 7E, 10E, 12E through 15E, 18E through 20E, 22E through 29E, 31E through 38E, 40E, 42E, 43E, and 46E through 49E) where no Holders of General Unsecured Claims previously voted on the Second Amended Plan.

The above are the only Classes from which votes and elections are being resolicited (collectively, the "Revoting Classes"), because there are no other Classes with Claims (or Interests) that may be materially adversely affected by the Modifications.

As a result of the Modifications, the Holders of Claims in the Revoting Classes are being afforded the opportunity to (a) vote on the Third Amended Plan (whether or not such Holders voted on the Second Amended Plan) and (b) submit treatment and release elections under the Third Amended Plan.  Regardless of how the Allocation Disputes are ultimately resolved, distributions will be made in accordance with the Third Amended Plan without any further solicitation of votes or elections.  **If no Holders of Claims in a particular Revoting Class vote to accept or reject the Third Amended Plan, then such Class of Claims shall be deemed to accept the Third Amended Plan.  Holders of Claims in Classes other than the Revoting Classes (the "Non-Voting Holders") are not entitled to vote anew on the Third Amended Plan because the treatment of such Non-Voting Holders' Claims is not materially adversely affected by the Modifications.  Whether or not the Third Amended Plan is**

**accepted by the Non-Voting Holders will be determined according to the votes cast by such Non-Voting Holders on the Second Amended Plan.  Further, all treatment and release elections submitted by the Non-Voting Holders in connection with the Second Amended Plan shall be deemed to be elections made in connection with the Third Amended Plan.**

This Supplement is intended to supplement certain prior disclosure documents previously approved by the Bankruptcy Court and addresses only issues related to the modifications incorporated into the Third Amended Plan and the voting and election procedures thereunder.  In particular, the DCL Proponents expressly direct your attention to, and hereby incorporate herein by reference, each of the following disclosure documents: (i) the General Disclosure Statement dated December 15, 2010 [Docket No. 7232] (the "General Disclosure Statement"), which contains a general description of (among other things) the Debtors, their respective businesses and their reorganization proceedings, and was approved by the Bankruptcy Court on December 9, 2010 [Docket Nos. 7126, 7215]; (ii) the Specific Disclosure Statement Relating to First Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, The Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A. [Docket No. 7135] (the "Specific Disclosure Statement"), which contains a detailed description of (among other things) the provisions of the Second Amended Plan, including those provisions that are retained in the Third Amended Plan, and was approved by the Bankruptcy Court on December 9, 2010 [Docket No. 7126]; and (iii) the Explanatory Statement Relating to Modified Elections Under Second Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, The Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A. (as modified April 26, 2011) [Docket No. 8911, Ex. 1-H] (the "Explanatory Statement"), which contains a description of (among other things) certain elections offered under the Second Amended Plan, and was approved by the Bankruptcy Court on May 17, 2011 [Docket No. 8926]. If you did not receive or no longer have a copy of the General Disclosure Statement, the Specific Disclosure Statement, or the Explanatory Statement, you may obtain a copy from the Debtors' reorganization website at http://chapter11.epiqsystems.com/tribune.  You may also obtain a hard copy of the General Disclosure Statement, the Specific Disclosure Statement, and the Explanatory Statement free of charge by contacting the Voting Agent at (888) 287-7568 or at tribunevote@epiqsystems.com.

> A.     **Voting Procedures, Ballots and Supplemental Voting Deadline**.

> 1.   Supplemental Voting Deadline.

The Scheduling Order, among other things, establishes **April 30, 2012 at 4:00 p.m., prevailing Eastern time** (the "Supplemental Voting Deadline") as the date and time by which Holders of Claims in Revoting Classes must return a Ballot to vote to accept or reject the Third Amended Plan.

> 2.   Voting Procedures.

If you are a Holder of a Claim in a Revoting Class, you should carefully review the terms of the Third Amended Plan, the General Disclosure Statement, the Specific Disclosure Statement, the Explanatory Statement, and this Supplement.  After such review, please indicate (a) your acceptance or rejection of the Third Amended Plan by voting to accept or reject the Third Amended Plan on the Ballot and (b) your treatment and release elections by checking the applicable boxes on the Ballot or relevant election form.[6]

---

[6]    If you are a Holder of a Claim in a Revoting Class and did not receive a Ballot or lost your Ballot, please call the Voting Agent at (646) 282-2400 or toll-free at (800) 622-1125.

For all Holders of Claims in Revoting Classes other than beneficial holders of Senior Noteholder Claims and PHONES Notes Claims (except PHONES Notes Exchange Claims), Ballots must be returned to Epiq Bankruptcy Systems, LLC (the "Voting Agent") by no later than the Supplemental Voting Deadline.  Only original signatures will be accepted.  You may use the pre-paid return envelope provided with your Ballot, or you may return your Ballot by personal delivery, overnight courier, or first class mail to the Voting Agent at the following address:

| **If By Mail**: | **If By Personal Delivery or Overnight Courier:** |
|---|---|
| Tribune Company Ballot Processing Center | Tribune Company Ballot Processing Center |
| c/o Epiq Bankruptcy Solutions, LLC | c/o Epiq Bankruptcy Solutions |
| FDR Station, P.O. Box 5014 | 757 Third Avenue, Third Floor |
| New York, NY 10150-5014 | New York, NY 10017 |

If you are a beneficial holder of a Senior Noteholder Claim or PHONES Notes Claim (other than a PHONES Notes Exchange Claim) who has received a Ballot from a broker, bank, commercial bank, trust company, dealer, or other agent or nominee (each, a "Voting Nominee"), you must return the Ballot and any election form provided therewith to such Voting Nominee, at the address provided by such Voting Nominee.  In order for your vote to be counted, your Ballot must be completed in accordance with the voting instructions on the Ballot and received by the Voting Nominee in enough time for the Voting Nominee to transmit the information in the Ballot to the Voting Agent so that it is received no later than the Supplemental Voting Deadline.

**Any Ballot received after the Supplemental Voting Deadline will be counted at the sole discretion of the DCL Proponents.  Any executed Ballot that does not indicate either an acceptance or rejection of the Third Amended Plan or indicates both an acceptance and rejection of the Third Amended Plan will not be counted as a vote either to accept or reject the Third Amended Plan.**

If you have any questions about the procedure for voting your Claim, the packet of materials that you have received, the amount of your Claim, or if you wish to obtain an additional copy of this Supplement, please contact the Voting Agent.

    **B.**    **Confirmation Hearing and Deadline for Objections to Confirmation**.

The Confirmation Hearing with respect to the Third Amended Plan will commence on **May 16, 2012 at 10:00 a.m. (prevailing Eastern Time)**, before the Honorable Kevin J. Carey, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, 824 N. Market Street, Fifth Floor, Courtroom No. 5, Wilmington, Delaware 19801.  If necessary, the Confirmation Hearing shall continue on May 17, 2012 commencing at 10:00 a.m. (prevailing Eastern Time).  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of adjournment at the Confirmation Hearing, or at any subsequent adjourned Confirmation Hearing.

Any objections to confirmation of the Third Amended Plan must (i) be made in writing; (ii) state the name and address of the objecting party and the nature of the claim or interest of such party; (iii) state with particularity the legal and factual basis and nature of any objection to the Third Amended  Plan; and (iv) be filed with the Bankruptcy Court, together with proof of service, and served so that they are received **on or before April 30, 2012 at 11:59 p.m., (prevailing Eastern Time)** by the following parties:

**Counsel to the DCL Proponents:**

Counsel to the Debtors:
Sidley Austin LLP
One South Dearborn Street
Chicago, Illinois 60603
Facsimile:  (312) 853-7036
Attn: Jessica C.K. Boelter

Cole Schotz Meisel Forman & Leonard, P.A.
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Facsimile:  (302) 652-3117
Attn: Norman L. Pernick

Counsel to the Official Committee of Unsecured Creditors:
Chadbourne & Parke LLP
30 Rockefeller Plaza
New York, New York 10112
Fax (212) 541-5369
Attn:  David M. LeMay

Landis Rath & Cobb LLP
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Fax (302) 467-4450
Attn: Adam G. Landis

Counsel to Oaktree and Angelo Gordon:
Dewey & LeBoeuf LLP
333 South Grand Avenue, Suite 2600
Los Angeles, California 90071
Telecopier:  (213) 621-6100
Attn:  Bruce Bennett

Young Conaway Stargatt & Taylor, LLP
The Brandywine Building – 17th Floor
1000 West Street, Post Office Box 391
Wilmington, Delaware 19899 0391
Telecopier: (302) 571-1253
Attn:  Robert S. Brady

Co-Counsel to Angelo Gordon:
Wilmer Cutler Pickering Hale & Dorr LLP
399 Park Avenue
New York, New York 10022
Telecopier:  (212) 230-8888
Attn:  Andrew Goldman

Counsel to JPMorgan:
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017
Telecopier:  (212) 701-5800
Attn:  Damian S. Schaible

Richards Layton & Finger
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telecopier: (302) 651-7701
Attn: Mark Collins

**The U.S. Trustee**:
U.S. Trustee
Office of the U.S. Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207
Lock Box #35
Wilmington, Delaware 19899
Facsimile: (302) 573-6497
Attn:  David Klauder

## II.    THE SECOND AMENDED PLAN AND RELATED CONFIRMATION OPINION

The Second Amended Plan had two primary components.  First, as described in greater detail in the Specific Disclosure Statement, the Second Amended Plan provided for (a) certain settlements of LBO-Related Causes of Action held by the Debtors' estates against current and former Senior Lenders, the Senior Loan Agent and the Senior Loan Arrangers, and participating current and former Bridge

Lenders and Bridge Loan Arrangers (the "LBO Settlement", as defined in the Confirmation Opinion) and (b) a settlement of claims for the disgorgement of prepetition payments made by Tribune in respect of the Step Two Financing against parties who elected to participate in the settlement, with a backstop feature designed to ensure that the Debtors' estates would receive $120 million of consideration in settlement of such claims (the "Step Two Disgorgement Settlement", as defined in the Confirmation Opinion and, together with the LBO Settlement, the "DCL Plan Settlement"). Second, and also as described in the Specific Disclosure Statement, the Second Amended Plan provided for the preservation of virtually all of the Estates' remaining LBO-Related Causes of Action for the benefit of Tribune's creditors, which causes of action were to be assigned under the Second Amended Plan to a Litigation Trust and a Creditors' Trust formed to prosecute individual creditor's claims to the extent such creditor elected to transfer them to the Creditors' Trust.[7]

The Second Amended Plan was sent for voting in December 2010. All 128 Classes that were entitled to vote and had one or more creditors that actually cast Ballots – other than the Classes consisting of the Senior Noteholder Claims, EGI-TRB LLC Notes Claims, and PHONES Notes Claims – voted to accept the Second Amended Plan. Hearings to consider confirmation of the Second Amended Plan and the Noteholder Plan were held on March 7-11, March 14-18, April 12-14, and June 27, 2011 (the "Prior Confirmation Hearing").

On October 31, 2011, the Bankruptcy Court entered the Confirmation Opinion and Order Denying Confirmation of Competing Plans [Docket No. 10134]. In the Confirmation Opinion, the Bankruptcy Court denied confirmation of both the Second Amended Plan and the Noteholder Plan. However, after weighing all of the relevant evidence and the credibility of the witnesses, the Bankruptcy Court concluded that most of the provisions of the Second Amended Plan satisfied the requirements for confirmation under the Bankruptcy Code. In particular, the Bankruptcy Court approved the DCL Settlement as "fair, reasonable, and in the best interest of the Debtors' estates" (Confirmation Opinion at 71), and further found that the DCL Settlement was "achieved as a result of arms-length, good faith negotiations" and was "properly part of the [Second Amended] Plan pursuant to Bankruptcy Code §1123(b)(3)(A)" (Id.). The Bankruptcy Court also approved the following aspects of the Second Amended Plan:

- the inclusion of the Bar Order in the Second Amended Plan (subject to a limited modification) (Confirmation Opinion at 76-77);

- the feasibility of the Second Amended Plan (Confirmation Opinion at 125);

- the voluntary assignment of State Law Constructive Fraudulent Conveyance Claims to the Creditors' Trust under the Second Amended Plan (Confirmation Opinion at 100);

- the Litigation Trust established under the Second Amended Plan (as an appropriate structure for pursuit of estate claims) (Confirmation Opinion at 101);

---

[7]  Subsequent to the filing of the LBO Avoidance Adversaries (as defined in the General Disclosure Statement), in June of 2011, (a) the indenture trustees on behalf of Holders of Senior Notes and PHONES Notes and (b) certain retirees of The Times Mirror Company, Tribune Company, and various other affiliates or subsidiaries of Tribune Company filed approximately 53 separate lawsuits in various jurisdictions asserting state law constructive fraudulent conveyance claims against certain former stockholders of Tribune. A consolidated multidistrict action with respect to approximately 52 such lawsuits is currently pending before the United States District Court for the Southern District of New York.

- the Retiree Settlement (as an important piece of the Debtors' reorganization) (Confirmation Opinion at 93);

- the classification of the Swap Claim in Class 1F under the Second Amended Plan (Confirmation Opinion at 103-104); and

- the treatment of prepetition indemnification and reimbursement claims under the Second Amended Plan (Confirmation Opinion at 95-96).

The Bankruptcy Court also found that the Debtors had a Total Distributable Value of $7.019 billion as of January 19, 2011 (Confirmation Opinion at 21, 29), which was within the range of the DCL Proponents' valuation of the Debtors.  In addition, in accordance with section 1129(c) of the Bankruptcy Code, the Bankruptcy Court examined the preferences of creditors respecting the Second Amended Plan and the Noteholder Plan and found that "creditors overwhelmingly prefer the [Second Amended] Plan over the Noteholder Plan."  (Confirmation Opinion at 124).  In light of this clearly manifested creditor preference, the Bankruptcy Court concluded that, as between a modified Second Amended Plan and a modified Noteholder Plan that addressed their respective confirmation issues and had similar voting results, the modified Second Amended Plan would be confirmed instead of the modified Noteholder Plan, because, as the Bankruptcy Court observed, the modified Second Amended Plan would "survive the crucible of [section] 1129(c)."  (Confirmation Opinion at 125).

As noted, notwithstanding these otherwise favorable rulings, the Bankruptcy Court also concluded that the Second Amended Plan was inconsistent with the requirements for confirmation under section 1129 of the Bankruptcy Code in the following targeted ways:

- The Second Amended Plan was not affirmatively accepted by at least one Impaired Class for certain Filed Subsidiary Debtors where no creditors cast ballots on the Second Amended Plan, and thus failed to satisfy section 1129(a)(10) of the Bankruptcy Code with respect to those Debtors (Confirmation Opinion at 83-84) (the "1129(a)(10) Finding");

- With respect to the release provisions of Section 11.2.1 of the Second Amended Plan, (a) the parties granting the release should be limited to the Debtors and should not include the Litigation Trustee, the Creditors' Trustee, or the Subsidiary Non-Debtors; and (b) the following persons were not entitled to the release because the record did not establish that they had provided a substantial contribution to the Estates or that the release was necessary for the Debtors' reorganization:  the Debtors' Related Persons, Current Employees (as defined in the Confirmation Opinion), and 401(k) Shareholders (as defined in the Confirmation Opinion) (Confirmation Opinion at 91, 93) ((a) and (b) collectively, the "Release Finding");[8]

- The Bar Order provisions in Section 11.3 of the Second Amended Plan should be clarified to enjoin and restrain each Plaintiff from seeking relief or collecting judgments against any

---

[8]    The Bankruptcy Court also held that the DCL Proponents should prove that the proposed releases of Guarantor Non-Debtors by Senior Lenders who voted against the Second Amended Plan satisfy the "Genesis test", which requires an evaluation of whether (i) such release is necessary to the success of the reorganization, (ii) the released parties have provided a critical financial contribution to the plan, (iii) the released parties' financial contribution is necessary to make the plan feasible, and (iv) such release is fair to the non-consenting creditors, including whether the non-consenting creditors received reasonable compensation in exchange for such release. (Confirmation Opinion at 118, n.89; In re Genesis Health Ventures, Inc., 266 B.R. 591, 607-08 (Bankr. D. Del. 2001)).  The DCL Proponents intend to make that showing at the Confirmation Hearing.

Non-Settling Defendants in any manner that fails to conform to the terms of the Bar Order, including, without limitation, the proportionate judgment reduction provision set forth therein (Confirmation Opinion at 77) (the "<u>Bar Order Finding</u>");

- The exculpation provision in Section 11.5 of the Second Amended Plan should be limited to estate fiduciaries (Confirmation Opinion at 94) (the "<u>Exculpation Finding</u>");

- The Second Amended Plan did not comply with sections 510(a) and 1129(b) of the Bankruptcy Code because it improperly applied certain subordination provisions of the PHONES Notes Indenture to the distribution of proceeds of causes of action that may be asserted under Chapter 5 of the Bankruptcy Code by the Litigation Trust (the "<u>Subordination Finding</u>") (Confirmation Opinion at 112-113).  In addition, the Bankruptcy Court determined that, because the record was unclear, the Court "[could not] conclude that the [Second Amended] Plan's treatment is fair or appropriately enforces the terms of the subordination agreements in accordance with Bankruptcy Code §510(a)" with respect to distributions to Holders of Other Parent Claims (Confirmation Opinion at 111) (the "<u>Other Parent Claim Allocation Matter</u>"); and

- There was an insufficient record to permit the Bankruptcy Court to resolve disputes regarding the proper Allowed amount of the PHONES Notes Claims (Confirmation Opinion at 106).

## III.    RULE 59 MOTIONS

On November 14, 2011, (i) Aurelius Capital Management, LP and (ii) Law Debenture Trust Company of New York and Deutsche Bank Trust Company Americas, joined by Davidson Kempner Capital Management LLC and Brigade Capital Management, LLC, filed motions (the "<u>Motions to Reconsider</u>") for reconsideration of the portion of the Confirmation Opinion that held that "causes of action that the Debtors' estate may assert under Chapter 5 of the Bankruptcy Code are not 'assets of the Company' subject to the PHONES Notes' subordination provision." (Confirmation Opinion at 112-113, n.84; Docket Nos. 10222, 10223, 10225, 10226, 10238).  Also on November 14, 2011, the Noteholder Proponents filed a motion for reconsideration and/or clarification of the Confirmation Opinion with respect to the following three issues: (i) reconsideration of the Bankruptcy Court's determination that the Senior Lenders and Bridge Lenders are entitled to share in recoveries by the Litigation Trust, (ii) reconsideration of the Bankruptcy Court's approval of the proportionate judgment reduction included in Section 11.3 of the Second Amended Plan, and application of a *pro tanto* judgment reduction instead of the proportionate judgment reduction, and (iii) clarification that the Bankruptcy Court did not make a determination as to how the PHONES Notes should be valued for purposes of determining Tribune's solvency at the time of the leveraged buy-out (the "<u>Motion to Reconsider/Clarify</u>" and, together with the Motions to Reconsider, the "<u>Rule 59 Motions</u>").  (Docket No. 10227).  On December 6, 2011, objections were filed to the Rule 59 Motions [Docket Nos. 10363, 10365, 10366, 10371, 10373, 10376] and, on December 9, 2011, the movants filed replies to such objections [Docket Nos. 10396, 10398, 10399, 10401].  Arguments on the Rule 59 Motions were heard by the Bankruptcy Court at a hearing on December 14, 2011.

On December 29, 2011, the Bankruptcy Court issued its Reconsideration Decision granting the Motions to Reconsider and denying (subject to one clarification) the Motion to Reconsider/Clarify.  In its Subordination Reconsideration Ruling, the Bankruptcy Court amended the Confirmation Opinion to strike the Subordination Finding, thereby holding that the PHONES Subordination Provisions apply to the

8

proceeds of, from, or relating to any and all causes of action asserted by the Litigation Trust.[9]  In its Reconsideration Decision, the Bankruptcy Court also denied the Motion to Reconsider/Clarify with respect to the Litigation Trust waterfall and Bar Order judgment reduction issues raised in such Motion, but granted the Motion in part by clarifying that the Bankruptcy Court did not make any determination regarding the amount of indebtedness of the PHONES Notes in the Confirmation Opinion.

## IV.    OVERVIEW OF THE CONFORMING MODIFICATIONS IN THE THIRD AMENDED PLAN

In order to comply with the Amended Confirmation Opinion, the Third Amended Plan contains Modifications that the DCL Proponents believe address each of the issues identified by the Bankruptcy Court but otherwise preserve substantially all of the other terms of the Second Amended Plan, including the DCL Plan Settlement.  As described below, the Third Amended Plan includes Modifications (i) providing that, subject to the conditions set forth in the Third Amended Plan, any Revoting Class in which no creditors return any valid and timely Ballots shall be deemed to have accepted the Third Amended Plan, (ii) limiting the parties granting a release pursuant to Section 11.2.1 of the Third Amended Plan to the Debtors and narrowing the scope of the parties so released to exclude the Debtors' Related Persons, Current Employees, and 401(k) Shareholders, (iii) limiting the parties exculpated pursuant to Section 11.5 of the Third Amended Plan to estate fiduciaries, and (iv) clarifying the Bar Order under Section 11.3 of the Third Amended Plan to enjoin and restrain each Plaintiff from seeking relief or collecting judgments against any Non-Settling Defendants in any manner that fails to conform to the terms of the Bar Order, including, without limitation, the proportionate judgment reduction provision set forth therein.[10]

Additionally, the Third Amended Plan establishes a protocol for the adjudication or consensual resolution of certain potential allocation issues that have been raised as a result of, or may otherwise be implicated by, the Amended Confirmation Opinion.  An overview of the Modifications incorporated into the Third Amended Plan follows.

The following summary is a general overview only, which is qualified in its entirety by, and should be read in conjunction with, the information appearing elsewhere in this Supplement and the Third Amended Plan.  **In the event of any inconsistency between this Supplement and the Third Amended**

---

[9]    On January 10, 2012, Wilmington Trust Company, solely in its capacity as successor Indenture Trustee pursuant to the PHONES Notes Indenture ("Wilmington Trust"), filed a notice of appeal of the Reconsideration Decision and the Confirmation Order.  On that same day, Wilmington Trust filed a motion seeking leave to appeal the Reconsideration Decision [Docket No. 10582] (the "Reconsideration Appeal Motion").  The DCL Plan Proponents, Law Debenture Trust Company of New York, Deutsche Bank Trust Company Americas, and Aurelius Capital Management, L.P. objected to the Reconsideration Appeal Motion on January 24, 2012 [Docket Nos. 10690, 10702, and 10703].  A hearing with respect to the Reconsideration Appeal Motion has not yet been scheduled.

[10]    On April 8, 2011, the DCL Proponents indicated that they would amend the definition of "Class 1J Creditors' Trust Interests" in the Second Amended Plan to clarify that the PHONES Subordination Provisions would only apply to the Creditors' Trust distributions to the extent provided in the PHONES Notes Indenture [See Docket No. 8607, Ex. A].  The foregoing modification to the Second Amended Plan was filed with the Bankruptcy Court on April 26, 2011 [See Docket No. 8769).  The Third Amended Plan further modifies the definition of "Class 1J Creditors' Trust Interests" to provide that the priority of distributions that may be made on account of "Class 1J Creditors' Trust Interests" shall be subject to adjustment by the Bankruptcy Court pursuant to the Allocation Dispute Protocol (as defined below).

**Plan, the Third Amended Plan will control**.  The Debtors and the DCL Proponents reserve the right to modify the Third Amended Plan consistent with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

### A.    Plan Modifications Addressing Concerns Raised in Amended Confirmation Opinion.

1.    1129(a)(10) Finding.

In connection with the 1129(a)(10) Finding, the Bankruptcy Court noted that "'deemed acceptance' by a non-voting impaired class, in the absence of objection," may "constitute the necessary 'consent' to a proposed 'per plan' scheme." (Confirmation Opinion at 84).  Accordingly, the DCL Proponents have modified Section 4.2 of the Third Amended Plan to provide that if the Holders of Claims in a particular Impaired Class are (a) given the opportunity to vote to accept or reject the Third Amended Plan and (b) notified that a failure of any Holders of Claims in such Class to vote to accept or reject the Third Amended Plan would result in such Class being deemed to have accepted the Plan, to the extent no votes to accept or reject the Third Amended Plan are cast within such Class, the Class shall be deemed to have accepted the Third Amended Plan unless otherwise determined by the Bankruptcy Court.  The additional language incorporated into Section 4.2 of the Third Amended Plan is shown in the following blacklined text:

---

4.2    Acceptance by an Impaired Class of Claims.

   4.2.1    Pursuant to section 1126(c) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if, after excluding any Claims held by any Holder designated pursuant to section 1126(e) of the Bankruptcy Code, (a) the Holders of at least two-thirds in dollar amount of the Allowed Claims actually voting in such Class have voted to accept such Plan, and (b) more than one-half in number of such Allowed Claims actually voting in such Class have voted to accept the Plan.

   4.2.2    Except for Holders of Claims in Classes that are deemed or presumed to have accepted or rejected this Plan pursuant to the terms of this Plan other than this Section 4.2.2, if Holders of Claims in a particular Impaired Class of Claims were given the opportunity to vote to accept or reject this Plan and notified that a failure of any Holders of Claims in such Impaired Class of Claims to vote to accept or reject this Plan would result in such Impaired Class of Claims being deemed to have accepted this Plan, but no Holders of Claims in such Impaired Class of Claims voted to accept or reject this Plan (or the Second Amended Plan if such Holders' votes on the Second Amended Plan are deemed to be votes on this Plan), then such Class of Claims shall be deemed to have accepted this Plan.

---

Moreover, the Third Amended Plan also provides that if (i) the Plan fails to be accepted by the requisite number and amount of Claims voting with respect to any particular Debtor, or (ii) the Bankruptcy Court, for any reason, denies confirmation of the Plan with respect to such Debtor, the DCL Proponents may withdraw the Plan as to such Debtor.  Further, if the DCL Proponents withdraw the Third Amended Plan as to any particular Debtor, then pursuant to Section 4.6.3 of the Third Amended Plan, at the option of such Debtor, (a) such Debtor's Chapter 11 Case may be dismissed or (b) such Debtor's assets may be sold to a Debtor that is a proponent of the Third Amended Plan, with such sale to be effective at or prior to the Effective Date of the Third Amended Plan for such proponent.  The sale price shall be paid to the seller in Cash and shall be in an amount equal to the fair value of such assets as proposed by Tribune and approved by the Court.

2.    Release Finding.

To address the Release Finding, the Third Amended Plan revises the releases granted under Section 11.2.1 of the Second Amended Plan so that the Debtors and the Reorganized Debtors are the only parties granting the releases.  The effect of the releases under the Third Amended Plan is to preclude third parties (including, without limitation, the Creditors' Committee, any other estate representative and individual creditors that are not deemed to have given a release under Section 11.2 of the Third Amended Plan) from asserting, on behalf of the Debtors' Estates or otherwise, any Released Claims.  In addition, the Third Amended Plan narrows the scope of the parties so released to exclude the Debtors' Related Persons, Current Employees, and 401(k) Shareholders.  The Modifications incorporated into Section 11.2.1 of the Third Amended Plan are shown in the following blacklined text:

> 11.2.1    Releases by Debtors and Estates.  Except for the Preserved Causes of Action, on the Effective Date and effective simultaneously with the effectiveness of this Plan, the <u>Debtors and the </u>Reorganized Debtors on their own behalf and as representatives of their respective Estates ~~and any Person seeking to exercise the rights of the Debtors' Estates (including, without limitation, any successor to the Debtors, the Litigation Trustee on behalf of the Litigation Trust or any estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code), and the Creditors' Trustee on behalf of the Creditors' Trust, release unconditionally and hereby cause the Subsidiary Non-Debtors to release unconditionally,~~ <u>release unconditionally</u> and are hereby deemed to release unconditionally, each and all of the Released Parties of and from any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever (including, without limitation, the <u>Released </u>LBO-Related Causes of Action and those arising under the Bankruptcy Code, including any avoidance claims), whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event or other occurrence taking place or existing on or prior to the Effective Date that are in connection with the Debtors or any of them, or their respective assets, property and Estates, the Chapter 11 Cases or the Plan, the Disclosure Statement or the Restructuring Transactions, in each case excluding any claims against Chase Bank USA, N.A. or JPMorgan Chase Bank, N.A. for disgorgement of payments made in the ninety days prior to the Petition Date solely to the extent they were made by Tribune Company pursuant to its obligations under the First USA Commercial Card Master Agreement dated as of October 18, 1999, as amended, which for the avoidance of doubt shall be Ordinary Litigation Claims (the "<u>Debtor Released Claims</u>"), <u>provided</u>, <u>however</u>, that, with the exception of the Released LBO-Related Causes of Action, nothing in this Section shall be construed to release any party from liability for actions or omissions constituting willful misconduct or gross negligence as determined by a Final Order; <u>provided</u> <u>further</u>, that nothing in this Section shall be construed to release any Released Party from a Related Person Preference Action.  Except as the Debtors may otherwise provide prior to the Confirmation Date, the releases contained in this Section shall not apply to or otherwise affect the obligations of any of the Debtors' officers or directors to repay loans or advances of money or other property contractually owed to the Debtors or their Estates or with respect to loans or advances of money that the Debtors guaranteed on behalf of such officers or directors.  Furthermore, notwithstanding the foregoing, such release, waiver and discharge shall not operate as a release, waiver or discharge of any express contractual commercial obligations arising in the ordinary course of any Person to the Debtors not directly related to the Released LBO-Related Causes of Action.  On the Effective Date, each Guarantor Non-Debtor will provide each Holder of a Loan Guaranty Claim against the Guarantor Non-Debtors, the Senior Loan Agent, the Former Bridge Loan Agent, the Bridge Loan Agent, the Settling Step Two Payees and the other Released Parties a release of scope equivalent to the release provided by the Debtors hereunder in consideration for the Guarantor Non-Debtor Release contemplated hereby.  For the avoidance of doubt, the Debtor Released Claims do not include any Disclaimed State Law Avoidance Claims.

   3.  Exculpation Finding.

To address the Exculpation Finding, the Third Amended Plan modifies Section 11.5 by providing an exculpation from liability arising from any act or omission taken during or in connection with the Chapter 11 Cases solely in favor of the following estate fiduciaries: (i) the Debtors (including, without limitation, the Special Committee of the Board of Directors of Tribune formed during the Chapter 11 Cases), the Creditors' Committee, and the Related Persons of the Debtors and the Creditors' Committee and (ii) the current and former members of the Creditors' Committee (in their capacities as such) and their

Related Persons.  The corresponding Modifications incorporated into Section 11.5 of the Third Amended Plan are shown in the following blacklined text:

---

11.5    To the fullest extent permitted under applicable law, (a) none of the ~~Proponents~~Debtors (including without limitation the Special Committee of the Board of Directors of Tribune formed during the Chapter 11 Cases)~~,~~ or the Creditors' Committee, (b) none of the current and former members of the Creditors' Committee (in their capacities as such), and (c) none of the Related Persons to the ~~Proponents~~parties in (a) and (b) to the extent a claim arises from actions taken by such Related Person in its capacity as a Related Person of one of ~~the Proponents~~such parties, shall have or incur any liability to any person or entity for any act or omission in connection with, relating to, or arising out of the Chapter 11 Cases, negotiation of any plans of reorganization, including this Plan, pursuit of confirmation of any plans of reorganization, including this Plan, the administration, consummation and implementation of the Plan or the property to be distributed under the Plan, the Disclosure ~~Statement~~Documents, the Restructuring Transactions, the Plan Supplement, the releases and injunctions, or the management or operation of the Debtors (except for any liability that results from willful misconduct or gross negligence as determined by a Final Order or from any act or omission occurring before the Petition Date). Any of the ~~Proponents~~Debtors (including without limitation the Special Committee of the Board of Directors of Tribune formed during the Chapter 11 Cases) ~~and~~, the Creditors' Committee, the members of the Creditors' Committee and the Related Persons to each of the foregoing (with respect to actions taken by such Related Person in its capacity as a Related Person of one of such parties) shall be entitled to rely upon the advice of counsel and financial advisors with respect to their duties and responsibilities under, or in connection with, the Chapter 11 Cases, the Plan, and the administration thereof.

---

    4.        Bar Order Finding.

To address the Bar Order Finding, the DCL Proponents have added corresponding language to Section 11.3 of the Third Amended Plan expressly providing that "each Plaintiff is hereby enjoined and restrained from seeking relief or collecting judgments against any Non-Settling Defendants in any manner that fails to conform to the terms of this Bar Order, including, without limitation, the proportionate judgment reduction provision set forth herein."  The additional language incorporated in the new paragraph of Section 11.3 of the Third Amended Plan is shown in the following blacklined text:

---

ORDERED that each Plaintiff is hereby enjoined and restrained from seeking relief or collecting judgments against any Non-Settling Defendants in any manner that fails to conform to the terms of this Bar Order, including, without limitation, the proportionate judgment reduction provision set forth herein; and it is further

---

    5.        Other Parent Claim Allocation Matter.

In order to fully and fairly resolve any issues relating to or implicated by the Other Parent Claim Allocation Matter, the Scheduling Order establishes an Allocation Dispute Protocol consistent with Section 5.18 of the Third Amended Plan pursuant to which, among other things, (i) the Bankruptcy Court shall determine or the relevant parties may otherwise resolve whether and to what extent the distributions under Article III of the Third Amended Plan (the "Article III Distributions") or the priority of distributions from the Creditors' Trust and/or the Litigation Trust must be adjusted in order for the distributions under the Third Amended Plan to satisfy the applicable requirements of the Bankruptcy Code in connection with assertions that any category of Other Parent Claims should or should not be entitled to benefit from the PHONES Subordination Provisions and the EGI-TRB Subordination Provisions, (ii) the distributions under the Third Amended Plan shall be modified, if and to the extent necessary, to reflect such determination or resolution, and (iii) certain other Allocation Disputes ~~may be adjudicated or resolved at or in connection with an~~that were heard at the Allocation Dispute ~~hearing scheduled to commence~~hearings that occurred on March ~~5,~~5-6, 2012, in each case in accordance with Fed.R.Bankr.P. 7001(8) and subject to confirmation of a plan.

    **B.**      **Plan Modifications Addressing Certain Potential Allocation Disputes**.

The DCL Proponents believe that the foregoing Modifications are appropriate and in keeping with the Amended Confirmation Opinion and the narrow impediments to confirmation identified therein. In connection with confirmation of the Third Amended Plan, further evidence and arguments in support of the distributions set forth in the Third Amended Plan will be presented.

The Third Amended Plan provides that as a default, Holders of Claims shall receive the same distributions as those provided under the Second Amended Plan.  However, in light of certain Allocation Disputes that have arisen or become more evident in the wake of the Amended Confirmation Opinion, the Third Amended Plan also contemplates and provides that the Bankruptcy Court may enter orders that (a) may require the reallocation of distributions among the Holders of Senior Noteholder Claims, Other Parent Claims, EGI-TRB LLC Claims, and PHONES Notes Claims and/or (b) adjust the priority of distributions from the Litigation Trust and/or Creditors' Trust, if it concludes it is necessary to do so to ensure that the Third Amended Plan satisfies the requirements of the Bankruptcy Code based on the resolution of the Allocation Disputes or if the relevant parties otherwise consensually resolve the Allocation Disputes.

The issues relevant to the foregoing potential allocation adjustments are defined in the Scheduling Order as the "Allocation Disputes" (which definition is incorporated herein by reference) and include the following:

- whether and to what extent the Article III Distributions must be adjusted in order for such distributions to satisfy the applicable requirements of the Bankruptcy Code in connection with assertions that (a) all or any portion of the consideration provided by the Senior Lenders, Bridge Lenders, and Settling Step Two Payees in respect of the DCL Plan Settlement are or are not subject to the PHONES Subordination Provisions (the "PHONES/Settlement Dispute") and (b) all or any portion of the consideration provided by the Senior Lenders, Bridge Lenders, and Settling Step Two Payees in respect of the DCL Plan Settlement are or are not subject to the EGI-TRB LLC Subordination Provisions (the "EGI-TRB/Settlement Dispute");

- whether and to what extent the priority of the distributions from (a) the Creditors' Trust must be adjusted in order for distributions under the Third Amended Plan to satisfy the applicable requirements of the Bankruptcy Code in connection with assertions that all or any distributions from the Creditors' Trust are or are not subject to the PHONES Subordination Provisions (the "PHONES/CT Dispute") and (b) the Creditors' Trust and/or the Litigation Trust must be adjusted in order for the distributions under the Third Amended Plan to satisfy the applicable requirements of the Bankruptcy Code in connection with assertions that all or any distributions from the Creditors' Trust and/or the Litigation Trust are or are not subject to the EGI-TRB Subordination Provisions (the "EGI-TRB/CT/LT Dispute");

- whether and to what extent the Article III Distributions or the priority of distributions from the Creditors' Trust and/or the Litigation Trust must be adjusted in order for such distributions to satisfy the applicable requirements of the Bankruptcy Code in connection with assertions that any category of Other Parent Claims (i.e. the Swap Claim, the Retiree Claims or general unsecured trade claims against Tribune) does or does not constitute (a) "Senior Indebtedness", as defined by the PHONES Notes Indenture (including, without limitation, because any category of Other Parent Claims does or does not constitute "Indebtedness," as that term is defined in the PHONES Notes Indenture and used in the PHONES Note Indenture's definition of "Senior Indebtedness") (the "PHONES/OPC Dispute") and (b) "Senior Obligations", as defined by the EGI-TRB Subordination Provisions (the "EGI-TRB/OPC Dispute");

- the Allowed amount of the PHONES Notes Claims (the "PHONES/Allowance Dispute");

- whether and to what extent (a) the beneficiaries of the PHONES Subordination Provisions (as determined by the Bankruptcy Court, if applicable) are entitled to receive post-petition interest prior to the Holders of PHONES Notes Claims receiving any payment on account of their Claims (the "PHONES/PPI Dispute") and (b) the beneficiaries of the EGI-TRB Subordination Provisions (as determined by the Bankruptcy Court, if applicable) are entitled to receive post-petition interest prior to the Holders of EGI-TRB LLC Notes Claims receiving any payment on account of their Claims (the "EGI-TRB/PPI Dispute"); and

- the relative priority of the PHONES Notes and the EGI-TRB LLC Notes the "PHONES/EGI Priority Dispute").[11]

Depending upon their outcome, the adjudication and/or resolution of the Allocation Disputes could potentially affect the distributions to which the Holders of Senior Noteholder Claims, Other Parent Claims, EGI-TRB LLC Notes Claims, and PHONES Notes Claims are entitled under the Third Amended Plan. The Second Amended Plan generally provided for distributions premised on the assumption that (i) distributions of DCL Plan Settlement consideration would be subject to both the PHONES Subordination Provisions and the EGI-TRB Subordination Provisions (such that neither the Holders of the PHONES Notes Claims nor the Holders of the EGI-TRB LLC Notes Claims shared in such distributions) and (ii) Holders of Other Parent Claims benefited from the PHONES Subordination Provisions and the EGI-TRB Subordination Provisions.

The Third Amended Plan provides that the Holders of Claims shall receive the same distributions as those provided under the Second Amended Plan **subject, however, to any further adjustments necessary to reflect the adjudication and/or resolution of the Allocation Disputes**.[12] The~~Pursuant to the~~ Scheduling Order, and consistent with the Third Amended Plan, ~~further provides that a hearing~~hearings on the Allocation Disputes ~~shall commence~~occurred before the Bankruptcy Court on March ~~5, 2012 at 10:00 a.m. (prevailing Eastern time).~~5-6, 2012. Although the resolution of the Allocation Disputes may potentially result in a number of different outcomes, a summary of the maximum potential cumulative adjustment to the Article III Distributions to Holders of Allowed Senior Noteholder Claims, Other Parent Claims, EGI-TRB LLC Notes Claims, and PHONES Notes Claims under the Third Amended Plan pursuant to the Allocation Dispute Protocol is set forth in Section IV.B.1 below. In addition, the Subordination Allocation Appendix attached hereto as Exhibit A contains a more detailed summary of the intermediate potential adjustments to the Article III Distributions to the Holders of Allowed Senior Noteholder Claims, Other Parent Claims, EGI-TRB LLC Notes Claims, and PHONES Notes Claims under the Third Amended Plan based upon the potential resolution of certain individual Allocation Disputes.

1.  Potential Impact of the Adjudication or Resolution of the Potential Allocation Disputes on Distributions to Holders of Claims in Revoting Classes.

---

[11]   As used in Exhibit 5.18 to the Third Amended Plan, the term "Allocation Dispute" shall exclude any Allocation Dispute(s) set forth in the Scheduling Order as to which the Bankruptcy Court concludes need not be resolved in order to determine that the distributions made under the Third Amended Plan satisfy the applicable requirements of the Bankruptcy Code.

[12]   By proposing the Allocation Dispute Protocol, none of the DCL Proponents shall be deemed to have waived or otherwise be estopped from asserting any arguments, rights, remedies, defenses, claims, or causes of action arising from, or in connection with, the Allocation Disputes, all of which arguments, rights, remedies, defenses, claims, and causes of action are expressly reserved.

Depending upon their outcome, the adjudication or resolution of the Allocation Disputes may potentially impact the distributions to be received under the Third Amended Plan by the Holders of Senior Noteholder Claims, Other Parent Claims, EGI-TRB LLC Notes Claims, and PHONES Notes Claims. That potential impact on distributions may vary significantly depending upon the numerous combinations of outcomes that may potentially result from the adjudication or resolution of the Allocation Disputes. As described in greater detail in the Recovery Chart included in the Subordination Allocation Appendix attached hereto as Exhibit A, the cumulative effect of the adjudication of all Allocation Disputes could potentially result in the following adjustments to the estimated initial recoveries of the Holders of Senior Noteholder Claims, Other Parent Claims, EGI-TRB LLC Notes Claims, and PHONES Notes Claims:[13]

- the estimated recovery percentage of the Holders of Senior Noteholder Claims could potentially be adjusted from 33.6% under the Second Amended Plan to an estimated range of 19.8% to 36.5% under the Third Amended Plan;

- the estimated recovery percentage of the Holders of Other Parent Claims could potentially be adjusted from 36.0% under the Second Amended Plan to an estimated range of 21.8% to 36.0%[14] under the Third Amended Plan;[15]

- the estimated recovery percentage of the Holders of PHONES Notes Claims could potentially be adjusted from 0.0% under the Second Amended Plan to an estimated range of 0.0% to 16.4% under the Third Amended Plan;[16] and

---

[13]    Certain key factors and assumptions utilized in connection with determining the potential impact that the adjudication or resolution of the Allocation Disputes may have on the allocation of distributions to the Holders of Senior Noteholder Claims, Other Parent Claims, EGI-TRB LLC Notes Claims, and PHONES Notes Claims are also set forth in Section B of the Subordination Allocation Appendix attached hereto as Exhibit A.

[14]    The maximum potential recovery percentage of the Holders of Other Parent Claims is estimated to be 36.0% if all categories of Other Parent Claims are treated equally. If, however, solely for purposes of illustration, the Bankruptcy Court were to determine that one, but not all, of the categories of Other Parent Claims were entitled to benefit from the PHONES Subordination Provisions or the EGI-TRB Subordination Provisions, then, as illustrated in Section D of the Subordination Allocation Appendix attached hereto as Exhibit A, the maximum potential recovery percentage for the Holders of Claims in such category might potentially be slightly higher than the recovery percentages noted above.

[15]    Under the Second Amended Plan, Holders of Senior Noteholder Claims and Other Parent Claims were to receive approximately 32.73% of their Allowed Claims, plus a pro rata share of proceeds resulting from the settlement with Bridge Lenders, as well as Litigation Trust Interests and Creditors' Trust Interests. Holders of Other Parent Claims, however, also had the option of receiving 35.18% of their Allowed Claims if they elected to forego receiving Litigation Trust Interests and Creditors' Trust Interests. (Second Amended Plan, § 3.2.6(c).) The estimated recovery percentages set forth herein for the Holders of Other Parent Claims assume that such Holders elect to forego receiving Litigation Trust Interests and Creditors' Trust Interests and to instead receive 35.18% of their Allowed Other Parent Claim and a pro rata share of the Bridge Settlement Proceeds. The estimated recovery percentages for the Holders of Allowed Other Parent Claims that elected to receive 32.73% of their Allowed Claims and a pro rata share of the Bridge Settlement Proceeds, plus Litigation Trust Interests and Creditors' Trust Interests, would be approximately 2.45% lower than the estimated recovery percentages set forth herein for the Holders of Allowed Other Parent Claims.

[16]    An estimated recovery percentage of 16.4% assumes, solely for purposes of illustration, that the PHONES Notes Claims are allowed in the aggregate amount of $1.197 billion. If, however, solely for purposes of illustration, the PHONES Notes Claims are allowed in the aggregate amount of $761 million, the estimated recovery percentage for (a) PHONES Notes Claims arising from PHONES Notes not submitted for exchange is

- the estimated recovery percentage of the Holders of EGI-TRB LLC Notes Claims could potentially be adjusted from 0.0% under the Second Amended Plan to an estimated range of 0.0% to 26.7% under the Third Amended Plan.[17]

    After the Bankruptcy Court has issued a decision on the Allocation Disputes that are relevant for purposes of determining that the distributions made under the Third Amended Plan satisfy the applicable requirements of the Bankruptcy Code, but no later than 5 business days after the entry of the Confirmation Order, the DCL Proponents shall file and serve on the "Parties" (as defined in the Scheduling Order) and affected Holders of Claims a notice setting forth all adjustments to the Article III Distributions resulting from the resolution of the Allocation Disputes, unless resolution of the Allocation Disputes does not result in any adjustment to Article III Distributions.

        2.    Schedule for Adjudication or Resolution of the Potential Allocation Disputes.

    The Scheduling Order provides for, among other things, discovery deadlines and briefing deadlines in respect of the Allocation Disputes.  As noted above, pursuant to the Scheduling Order, ~~a hearing~~ hearings on the Allocation Disputes ~~shall commence~~occurred on March ~~5, 2012 at 10:00 a.m. (prevailing Eastern time).~~ 5-6, 2012. Each party taking a position on any of the Allocation Disputes ~~has~~ filed a Preliminary Statement (as defined in the Scheduling Order) setting forth the Allocation Dispute(s) on which such party ~~intends~~intended to take a position and a brief statement of such position with respect to each such Allocation Dispute.  Specifically, eleven parties ~~have~~ filed Preliminary Statements ~~indicating that they will be taking positions on the Allocation Disputes~~, as follows: (i) Preliminary Statement Regarding Allocation Disputes filed by the Debtors [Docket No. 10776], pursuant to which the Debtors assert that, while they may possess relevant information that may be of assistance to the Bankruptcy Court in resolving the PHONES/OPC, EGI-TRB/OPC, and PHONES/Allowance Disputes, the Debtors do not currently intend to take a position on the merits of any of the Allocation Disputes; (ii) Oaktree Capital Management, L.P.'s Preliminary Statement on Allocation Disputes [Docket No. 10782] (the "Oaktree Preliminary Statement"), which sets forth Oaktree's position on the PHONES/Settlement, EGI-TRB/Settlement, PHONES/OPC, EGI-TRB/OPC, PHONES/PPI, and EGI-TRB/PPI Disputes; (iii) Preliminary Statement filed by Law Debenture Trust Company of New York [Docket No. 10784] (the "Law Debenture Preliminary Statement"), which sets forth Law Debenture Trust Company of New York's position on the PHONES/Settlement, EGI-TRB/Settlement, PHONES/CT, EGI-TRB/CT/LT, PHONES/OPC, EGI-TRB/OPC, PHONES/PPI, and the EGI-TRB/PPI Disputes; (iv) Joinder of Davidson Kempner Capital Management LLC, as Investment Advisor, to Preliminary Statement of Law Debenture Trust Company of New York [Docket No. 10785]; (v) Joinder of Brigade Capital Management, LLC in the "Preliminary Statement" of Law Debenture Trust Company of New York [Docket No. 10786]; (vi) Preliminary Statement of TM Retirees With Respect to Resolution of Allocation Disputes in Connection with Confirmation of the Third Amended DCL Plan [Docket No. 10787] (the "TM Retirees Preliminary Statement"), which sets forth the TM Retirees' position on the PHONES/OPC and EGI-TRB/OPC Disputes; (vii) Preliminary Statement of Aurelius Capital Management, LP, on Allocation Disputes [Docket No. 10789], which sets forth Aurelius Capital Management, LP's position on the PHONES/Settlement, EGI-TRB/Settlement, PHONES/CT, EGI-TRB/CT/LT, PHONES/OPC, EGI-TRB/OPC, PHONES/Allowance, PHONES/PPI, and EGI-TRB/PPI Disputes; (viii) EGI-TRB's

---

    approximately 17.5% and (b) Holders of PHONES Notes Claims arising from PHONES Notes exchanged and not settled in cash prior to the Petition Date is approximately 2%.

[17]    This outcome would be conditioned upon the allowance of the EGI-TRB LLC Notes Claims.  Moreover, the Allocation Dispute Protocol is not contemplated to address issues raised in the lawsuit titled *Official Committee of Unsecured Creditors of the Tribune Company v. FitzSimons, et al. (In re Tribune Co.)*, Adv. Proc. No. 10-54010 (Bankr. D. Del.) (KJC).

Preliminary Statement on Allocation Disputes [Docket No. 10791] (as amended by EGI-TRB's Amended Preliminary Statement on Allocation Disputes [Docket No. 10800], the "EGI-TRB Preliminary Statement"), which sets forth EGI-TRB's position on the PHONES/Settlement, EGI-TRB/Settlement, PHONES/CT, EGI-TRB/CT/LT, PHONES/OPC, EGI-TRB/OPC,  EGI-TRB/PPI, and PHONES/EGI Priority Disputes; (ix) Preliminary Statement of Wilmington Trust Company, as Successor Indenture Trustee for the PHONES Notes on the Allocation Disputes [Docket No. 10792] (the "Wilmington Trust Preliminary Statement"), which sets forth Wilmington Trust's position on the PHONES/Settlement, PHONES/CT, PHONES/OPC, PHONES/Allowance, PHONES/PPI, and PHONES/EGI Priority Disputes; (x) Preliminary Statement of the Official Committee of Unsecured Creditors in Connection with the Resolution of the Allocation Disputes [Docket No. 10793] (the "Creditors' Committee Preliminary Statement"), which sets forth the Creditors' Committees' position on the PHONES/OPC and EGI-TRB/OPC Disputes; and (xi) Joinder of Deutsche Bank Trust Company Americas to Preliminary Statement of Law Debenture Trust Company of New York In Connection With Allocation Disputes [Docket No. 10794].  Additionally, consistent with the Scheduling Order, opening briefs (the "Opening Briefs") containing detailed arguments in respect of the positions asserted in the Preliminary Statements were filed by the foregoing parties on February 24, 2012.[18]  On March 2, 2012, response briefs (the "Response Briefs") addressing certain positions asserted in the opening briefs were filed by the foregoing parties.[19]  A brief summary of certain of these ~~Preliminary Statements~~positions is contained in the Subordination Allocation Appendix attached hereto as Exhibit A.[18][20]

---

[18]    See Opening Brief of TM Retirees With Respect to Resolution of Allocation Disputes in Connection With Confirmation of the Third Amended DCL Plan [Docket No. 10994]; Opening Brief of Wilmington Trust Company, as Successor Indenture Trustee for the Phones Notes, on the Allocation Disputes [Docket No. 10999]; Memorandum of Law of the Official Committee of Unsecured Creditors on Unfair Discrimination Allocation Dispute [Docket No. 11000]; EGI-TRB, LLC'S Opening Brief in Support of its Position on Allocation Disputes Identified in its Preliminary Statement [Docket No. 11001]; Oaktree Capital Management, L.P.'s Opening Brief Regarding Allocation Disputes [Docket No. 11003]; Debtors' Opening Brief Regarding Factual Information Relevant to Allocation Disputes [Docket No. 11004]; Joinder of the Debtors to Memorandum of Law of the Official Committee of Unsecured Creditors on Unfair Discrimination Allocation Dispute [Docket No. 11005]; Joinder of Barclays Bank PLC and Waterstone Capital Management LP to the Opening Brief of Wilmington Trust Company, as Successor Indenture Trustee for the Phones Notes on the Allocation Disputes [Docket No. 11006]; Brief of Aurelius Capital Management, LP in Support of Its Positions Regarding the Allocation Disputes Filed by Aurelius Capital Management, LP [Docket No. 11007]; Joint Opening Brief of Deutsche Bank Trust Company Americas and Law Debenture Trust Company of New York with Respect to Allocation Disputes [Docket No. 11010]; Joinder of Davidson Kempner Capital Management LLC, as Investment Advisor, to Joint Opening Brief of Law Debenture Trust Company of New York and Deutsche Bank Trust Company Americas with Respect to Allocation Disputes [Docket No. 11012]; and Joinder Brigade Capital Management in the "Joint Opening Brief of Law Debenture Trust Company of New York and Deutsche Bank Trust Company Americas with Respect to the Allocation Dispute" [Docket No. 11013].

[19]    See Joinder-In-Part of Aurelius Capital Management, LP to Opening Brief of Wilmington Trust Company, as Successor Indenture Trustee for the PHONES Notes, on the Allocation Disputes [Docket No. 11060]; Joinder-In-Part of Aurelius Capital Management, LP to Opening Brief of Wilmington Trust Company, as Successor Indenture Trustee for the PHONES Notes, on the Allocation Disputes [Docket No. 11061]; Reply Brief of TM Retirees With Respect to Resolution of Allocation Disputes in Connection With Confirmation of the Third Amended DCL Plan [Docket No. 11064]; EGI-TRB LLC's Response Brief Related To Allocation Disputes [Docket No. 11065]; Debtors' Response Brief Regarding Allocation Disputes [Docket No. 11066]; Oaktree Capital Management, L.P.'s Response Brief Regarding Allocation Disputes [Docket No. 11067]; Reply Memorandum of Law of the Official Committee of Unsecured Creditors on Unfair Discrimination Allocation Dispute [Docket No. 11068]; Joint Response Brief of Deutsche Bank Trust Company Americas and Law Debenture Trust Company of New York With Respect to Allocation Disputes [Docket No. 11069]; Joinder of Davidson Kempner Capital Management LLC, as Investment Advisor, to Joint Response Brief of Deutsche Bank Trust Company Americas and  Law Debenture Trust Company of New York With Respect to Allocation Disputes [Docket No. 11070]; Joinder of the Debtors to Reply Memorandum of Law of the Official Committee

The Scheduling Order further provides that opening briefs and response briefs in respect of the Allocation Disputes are required to be filed by February 24 and March 2, 2012, respectively.  The DCL Proponents anticipate that the Bankruptcy Court may issue a decision with respect to those Allocation Disputes that may potentially impact Initial Distributions under the Third Amended Plan prior to the Confirmation Hearing.  **The various Preliminary Statements and briefs, as well as, Opening  Briefs, and Response Briefs are posted on the Debtors' reorganization website, at http://chapter11. epiqsystems.com/tribune, under the "Key Documents" tab.  In addition, all orders entered by the Bankruptcy Court adjudicating any Allocation Disputes (each, an "Allocation Order"), will be posted on the Debtors' reorganization website, at  http://chapter11. epiqsystems.com/tribune,also under the "Key Documents" tab.**

### C.    Retiree Claimant Settlement.

The Third Amended Plan incorporates the terms of the Retiree Claimant Settlement that was included in the Second Amended Plan, subject, however, to any adjustments thereto necessary in connection with the Allocation Dispute Protocol.  Pursuant to Section 5.15.4 of the Third Amended Plan, unless otherwise provided in the Confirmation Order or any applicable Allocation Order, the Third Amended Plan implements and incorporates by reference the terms of the Retiree Claimant Settlement Agreement, including, without limitation, the allowance of the Claims of Retiree Claimants that are party to the Retiree Settlement Agreement.  Subject to the Allocation Dispute Protocol, any applicable Allocation Order, and the terms of the Confirmation Order, entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date of the Third Amended Plan, of the Retiree Claimant Settlement Agreement.  Entry of the Confirmation Order shall also constitute the Bankruptcy Court's approval, as of the Effective Date of the Plan, of the Retiree Claimant Settlement Agreement and the Bankruptcy Court's finding that the Retiree Claimant Settlement Agreement is in the best interests of the Debtors, the Reorganized Debtors, their respective Estates, and the Holders of Claims and Interests, and is fair, equitable and reasonable, solely to the extent the Retiree Claimant Settlement Agreement is implemented.

## V.    OTHER MISCELLANEOUS PROVISIONS OF THE THIRD AMENDED PLAN

In addition to modifications incorporated into the Third Amended Plan to address the Amended Confirmation Opinion, the Third Amended Plan contains certain amendments which, among other things, clarify the implementation of certain provisions of the Third Amended Plan.  Certain of these amendments are described below.

### A.    Distributions to MSCS.

---

of Unsecured Creditors on Unfair Discrimination Allocation Dispute [Docket No. 11071]; Response Brief of Aurelius Capital Management, LP In Further Support Of Its Positions Regarding The Allocation Disputes [Docket No. 11072]; Reply Brief of Wilmington Trust Company, as Successor Indenture Trustee for the Phones Notes [Docket No. 11073]; Joinder of Brigade Capital Management in the "Joint Response Brief of Law Debenture Trust Company of New York and Deutsche Bank Trust Company Americas with Respect to the Allocation Disputes" [Docket No. 11076]; and Partial Joinder of the Official Committee of Unsecured Creditors to the Debtors' Response Brief Regarding Allocation Disputes [Docket No. 11080].

18 20  For a full understanding of the parties' respective positions, reference should be made to the Preliminary Statements on file with the Bankruptcy Court and available on the Debtors' reorganization website, at http://chapter11.epiqsystems.com/tribune, under the "Key Documents" tab.

Section 3.2.5(c) of the Third Amended Plan clarifies that, with respect to distributions to be made to Holders of Senior Noteholder Claims pursuant to section 3.2.5 of the Third Amended Plan, Reorganized Tribune shall (a) withhold the amount of any consideration allocable to the Senior Noteholder Claims held by Morgan Stanley Capital Services Inc. and its Affiliates and Related Persons of such entities, including, without limitation, Morgan Stanley & Co., Inc (collectively, "<u>MCSC</u>") and (b) hold such amount in a reserve pending a determination of the allowance of MSCS's Senior Noteholder Claims and MSCS's entitlement to such distributions. If the Senior Noteholder Claims held by MSCS are disallowed or MSCS is otherwise found not to be entitled to such distribution, then the consideration that would otherwise be distributed to MSCS on account of its Senior Noteholder Claims shall instead be distributed to the other Holders of Allowed Senior Noteholder Claims as set forth in Section 3.2.5(c) of the Third Amended Plan.

**B.      Participation in the Step Two/Disgorgement Settlement**.

For the avoidance of doubt, Section 5.15.1 of the Third Amended Plan provides that any of the Step Two Arrangers and current or former Senior Lenders or Bridge Lenders that received any principal, interest or fees under the Bridge Loan Agreement or under the Senior Loan Agreement in respect of the Incremental Senior Loans prior to the Petition Date (each, a "<u>Potential Step Two Disgorgement Defendant</u>") that elected to participate in the Step Two/Disgorgement Settlement in accordance with the procedures set forth in the form of Exhibit 5.15.1(2) attached to the Second Amended Plan shall be deemed to have elected to participate in the Step Two/Disgorgement Settlement in connection with the Third Amended Plan except to the extent that any such party shall have delivered to the Debtors a notice revoking such election on or before the first day of the Confirmation Hearing. Any Potential Step Two Disgorgement Defendant that did not elect to participate in the Step Two/Disgorgement Settlement in connection with the Second Amended Plan may elect to participate in the Step Two/Disgorgement Settlement in connection with the Third Amended Plan in accordance with the procedures set forth in Exhibit 5.15.1(2) attached to the Second Amended Plan at any time on or before the first day of the Confirmation Hearing or such later date as may be agreed to by the Step Two Arrangers.

**C.      Distribution of New Common Stock**.

Section 7.2.3 of the Third Amended Plan has been modified to provide that in the event that a Holder of an Allowed Claim entitled to receive a distribution of New Common Stock under the Third Amended Plan shall advise the Voting Agent in writing prior to the deadline established by the Bankruptcy Court that all or part of such distribution of New Common Stock should be made to one or more affiliates of such Holder or other parties as such Holder shall have designated in the written notice provided to such Voting Agent, the Disbursing Agent shall make such distribution to the party designated in the written notice, which distribution shall satisfy any and all obligations of the Disbursing Agent to distribute New Common Stock on account of the relevant Holder's Allowed Claim under the Third Amended Plan.

**D.      Calculation of Step Two/Disgorgement Settlement Participants' Distributions.**

Section 10.1.1(l) of the Third Amended Plan has been modified to clarify that as a condition precedent to the Effective Date, the Disbursing Agent, in accordance with the terms of Exhibit 5.15.1(2) to the Third Amended Plan, shall have calculated amounts that will be offset from Step Two/Disgorgement Settlement participants' distributions pursuant to Article III of the Third Amended Plan that, together with any payments received from the Step Two/Disgorgement Settlement participants, shall be an amount that is equal to the aggregate Step Two/Disgorgement Settlement Proceeds.

**E.      Litigation Trust Valuation Expert**.

19

Section 13.2.2 of the Third Amended Plan contains certain modifications regarding the calculation of the initial estimated fair market value of the Litigation Trust Assets to be transferred to the Litigation Trust.  Specifically, Section 13.2.2 of the Third Amended Plan has been modified to clarify that the Debtors shall retain a valuation expert (the "Valuation Expert"), which Valuation Expert shall be acceptable to the other Proponents.  Prior to the Effective Date, the Valuation Expert shall determine and provide to the Debtors an initial estimated fair market value of all Litigation Trust Assets to be transferred to the Litigation Trust.  Promptly after the Effective Date, the Valuation Expert shall determine and file with the Bankruptcy Court the final fair market value as of the Effective Date of all Litigation Trust Assets transferred to the Litigation Trust, giving due regard to the initial estimated valuation of such Litigation Trust Assets.  The Valuation Expert's final determination of the fair market value as of the Effective Date of all Litigation Trust Assets transferred to the Litigation Trust shall be used consistently by the Litigation Trust, the Litigation Trustee, and the Litigation Trust Beneficiaries for all U.S. federal income tax purposes, including for purposes of determining tax basis and gain or loss.

## VI.    REORGANIZED VALUE UPDATE

In connection with the Second Amended Plan, the Debtors' investment banker and financial adviser, Lazard, undertook a valuation analysis to determine the value available for distribution to holders of Allowed Claims (the "Initial Reorganized Value Analysis").  Lazard's Initial Reorganized Value Analysis, which it prepared in October 2010, was attached as Exhibit F to the General Disclosure Statement and estimated a range of Distributable Value for the Reorganized Debtors from $6.3 billion to $7.1 billion with an approximate mid-point of $6.75 billion, as of a December 27, 2010 assumed Effective Date.  Lazard subsequently updated its Initial Reorganized Value Analysis in January 2011 (as updated, the "January 2011 Reorganized Value Analysis"), at which time it estimated a range of Distributable Value for the Reorganized Debtors from $6.6 billion to $7.4 billion with an approximate mid-point of $7.019 billion, as of a June 30, 2011 assumed Effective Date.

In the Confirmation Opinion, the Bankruptcy Court found persuasive Lazard's January 2011 Reorganized Value Analysis and concluded that "the Debtors' Total Distributable Value is … $7.019 billion."  Confirmation Opinion at 29.  The Bankruptcy Court's discussion of "Valuation" is set forth on pages 20-29 of the Confirmation  Opinion.  Testimony and other evidence supporting the Debtors' valuation reports is set forth in the March 11, 2011 transcript of the Confirmation Hearing at pages 14 to 137 (Mandava testimony) and pages 140 to 214 (Chachas testimony).  See also DCL Exs. 1092, 1104, 1485, 1494.

As did the Second Amended Plan, the Third Amended Plan permits the Senior Noteholders and Holders of Other Parent Claims to elect to receive either an all-cash distribution or a "strip" of consideration consisting of a portion of Distributable Cash, New Senior Secured Term Loan, and New Common Stock (a "Strip").  See Third Amended Plan, Sections 3.2.5(c), 3.2.6(c).  The ultimate recovery percentages of creditors who elect a Strip distribution may potentially be higher or lower than the recovery percentages of creditors who elect an all-cash distribution due to, for example, potential variations in the Debtors' Distributable Value.  See Section C of Exhibit A to this Supplement for further explanation.  Accordingly, the Debtors are updating the Bankruptcy Court-approved valuation of $7.019 billion to reflect the impact on value of developments since completion of the January 2011 Reorganized Value Analysis.  That update uses the same methodology that was used in the January 2011 Reorganized Value Analysis but computes value based on the Debtors' most current financial data as well as multiples that are updated to reflect current market performance.  Based on the update, as of February 16, 2012, the Reorganized Debtors' Distributable Value is estimated at a range of $[●]6.917 billion to $[●]7.826 billion

with an approximate mid-point of $[●]7.372 billion, as of a [●], 2012 assumed Effective Date.[19]. The increase in value from the Bankruptcy Court-approved valuation of $7.019 billion is principally attributable to the Debtors' continuing accrual of Distributable Cash.

The foregoing updated estimate of the Distributable Value of the Reorganized Debtors is subject to various assumptions and qualifications, including those stated in the January 2011 Reorganized Value Analysis, and is solely for purposes of determining the value available for distribution pursuant to a plan of reorganization.  Further, the update does not account for certain potential tax and related liabilities for which the Debtors may be liable.  As a result of those potential liabilities, the actual Distributable Value of the Reorganized Debtors could be lower than that set forth above.

## VII.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE THIRD AMENDED PLAN

The following discussion is a summary of certain U.S. federal income tax aspects of the Third Amended Plan, is for general information purposes only, and should not be relied upon for purposes of determining the specific tax consequences of the Third Amended Plan with respect to a particular holder of a Voting Claim.  This discussion does not purport to be a complete analysis or listing of all potential tax considerations.

This discussion is based on existing provisions of the Internal Revenue Code of 1986, as amended (the "IRC"), existing and proposed Treasury Regulations promulgated thereunder, and current administrative rulings and court decisions.  Legislative, judicial, or administrative changes or interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below with respect to the U.S. federal income tax consequences of the Third Amended Plan.  Any such changes or interpretations may be retroactive and could significantly affect the U.S. federal income tax consequences of the Third Amended Plan.  No representations or assurances are being made to the U.S. Holders of Claims in Revoting Classes with respect to the U.S. federal income tax consequences described in the Third Amended Plan

*Except as otherwise noted below, the following discussion serves only to supplement Article VI of the Specific Disclosure Statement ("Certain Federal Income Tax Consequences of the Debtor/Committee/Lender Plan").*

\*        \*        \*        \*

Any discussion of U.S. federal tax issues set forth in this Supplement was written solely in connection with the confirmation of the Third Amended Plan to which the transactions described in this Supplement are ancillary.  Such discussion is not intended or written to be legal or tax advice to any person and is not intended or written to be used, and cannot be used, by any person for the purpose of avoiding any U.S. federal tax penalties that may be imposed on such person.  Each holder of a Voting Claim should seek advice based on its particular circumstances from an independent tax advisor.

\*        \*        \*        \*

A.        Federal Tax Consequences to the Debtors.

---

[19]   The Debtors are in the process of completing the valuation update.  The DCL Proponents will provide additional disclosure regarding such update once it is complete and, in any event, a reasonable period of time before the March 23, 2012 hearing on the Supplement.

This Supplement incorporates by reference the disclosure of tax-related consequences and risks associated with the Second Amended Plan, as set forth in Sections XII.B.15 of the General Disclosure Statement and Sections V.C.2 and VI of the Specific Disclosure Statement.  In addition, the Debtors are still evaluating the tax consequences, if any, of certain transactions contemplated by the Third Amended Plan, including the establishment of the Litigation Trust.

### B.    Federal Income Tax Consequences to Certain U.S. Holders of Claims in Revoting Classes.

*The following discussions of certain U.S. federal income tax consequences to U.S. Holders of Claims in Revoting Classes supersedes the discussions of U.S. federal income tax consequences to such Holders contained in Article VI of the Specific Disclosure Statement.*

1.    U.S. Holders of Senior Noteholder Claims.

U.S. Holders of Allowed Senior Noteholder Claims will receive Trust Interests and Cash, and may elect to receive interests in the New Senior Secured Term Loan and New Common Stock (and where applicable, New Warrants) in exchange for their Claims.  The treatment of a U.S. Holder of an Allowed Senior Noteholder Claim will depend on such U.S. Holder's election.

If a U.S. Holder of an Allowed Senior Noteholder Claim elects to exchange its Claim for Trust Interests and Cash, such Holder should generally recognize gain or loss in an amount equal to the difference between the Holder's adjusted tax basis in its Claim surrendered in the exchange, determined immediately prior to the Effective Date, and the sum of (i) the fair market value of the Holder's share of Trust Assets, and (ii) the amount of Cash received.

If, however, a U.S. Holder of an Allowed Senior Noteholder Claim elects to exchange its Claim for interests in the New Senior Secured Term Loan, New Common Stock (and where applicable, New Warrants), Trust Interests and Cash, the exchange of such Claim will likely be treated as a recapitalization for U.S. federal income tax purposes.  Such Holder will realize gain or loss in an amount equal to the difference between the Holder's adjusted tax basis in its Claim surrendered in the exchange, determined immediately prior to the Effective Date, and the sum of (i) the fair market value of the Holder's share of Trust Assets, (ii) the issue price of the Holder's interest in the New Senior Secured Term Loan, (iii) the fair market value of the New Common Stock (and where applicable New Warrants), and (iv) the amount of Cash received.

The tax consequences of a recapitalization to a U.S. Holder of such Claim will depend, in part, upon whether the New Senior Secured Term Loan constitutes a "security" for U.S. federal income tax purposes.  Although not free from doubt, the New Senior Secured Term Loan will likely not constitute a security for U.S. federal income tax purposes.  See "Definition of 'Security'," in Article VI of the Specific Disclosure Statement.  U.S. Holders are encouraged to consult with their tax advisors in connection with the determination of whether the New Senior Secured Term Loan constitutes a security for U.S. federal income tax purposes.  The remainder of this discussion assumes that the New Senior Secured Term Loan will not constitute a security for U.S. federal income tax purposes.

In the case of a recapitalization, a U.S. Holder of such Claim who realizes a loss on the exchange will not be permitted to recognize such loss, except to the extent of any loss attributable to accrued but unpaid interest with respect to such Claim. A U.S. Holder of such Claim who realizes gain on the exchange will be required to recognize the lesser of (i) the amount of gain realized on the exchange and (ii) the sum of (a) the issue price of the Holder's interest in the New Senior Secured Term Loan, (b) the

fair market value of the Holder's share of Trust Assets, if any, and (c) the amount of Cash received as part of the exchange. A U.S. Holder's tax basis in the New Common Stock and any New Warrants received in exchange for its Claim will equal its adjusted tax basis in its Claim, increased by the amount of gain recognized on the exchange, if any, and reduced by the sum of (i) the fair market value of the U.S. Holder's interest in the New Senior Secured Term Loan, (ii) the fair market value of the Holder's share of Trust Assets, if any, and (iii) the amount of Cash received as part of the exchange. If a U.S. Holder receives both New Common Stock and New Warrants in exchange for its Claim, such basis will be allocated between the New Common Stock and the New Warrants in proportion to their relative fair market values on the date received. A U.S. Holder's holding period in the New Common Stock and any New Warrants will include the holding period in its Claim surrendered. A U.S. Holder's tax basis in its share of Trust Assets, if any, will equal the fair market value of such assets on the date received. A U.S. Holder's holding period in its share of Trust Assets, if any, will commence on the day after the date received. A U.S. Holder's tax basis in its interest in the New Senior Secured Term Loan will equal the issue price of the Holder's interest in the New Senior Secured Term Loan. A U.S. Holder's holding period in its interest in the New Senior Secured Term Loan will commence on the day after the date received.

See "Federal Income Tax Treatment of New Senior Secured Term Loan," in Article VI of the Specific Disclosure Statement, for a discussion related to the determination of the issue price of, as well as the tax considerations of holding an interest in, the New Senior Secured Term Loan.

2.    U.S. Holders of Other Parent Claims (not including the Swap Claim and Claims against Tribune arising from a Non-Qualified Former Employee Benefit Plan).

U.S. Holders of Allowed Other Parent Claims will receive Cash and may elect to receive Trust Interests, interests in the New Senior Secured Term Loan and/or New Common Stock (and where applicable, New Warrants) in exchange for their Claims. Accordingly, a U.S. Holder of an Allowed Other Parent Claim should generally recognize income or loss in an amount equal to the difference between the adjusted tax basis in its Claim surrendered in the exchange, determined immediately prior to the Effective Date, and the sum of (i) the amount of Cash received, (ii) the fair market value of the U.S. Holder's share of Trust Assets, if any, (iii) the issue price of the U.S. Holder's interest in the New Senior Secured Term Loan, if received and (iv) the fair market value of the New Common Stock (and where applicable, New Warrants), if received.

A U.S. Holder's tax basis in its share of Trust Assets, if any, and any New Common Stock (and where applicable, New Warrants) received in the exchange, will equal the fair market value of such assets on the date received. A U.S. Holder's tax basis in its interest in the New Senior Secured Term Loan, if received, will equal the issue price of the Holder's interest in the New Senior Secured Term Loan. A U.S. Holder's holding period in such assets will commence on the day after the date received.

See "Federal Income Tax Treatment of New Senior Secured Term Loan," in Article VI of the Specific Disclosure Statement, for a discussion related to the determination of the issue price of, as well as the tax considerations of holding an interest in, the New Senior Secured Term Loan.

3.    U.S. Holders of Claims arising from a Non-Qualified Former Employee Benefit Plan.

U.S. Holders of Allowed Claims arising from a Non-Qualified Former Employee Benefit Plan will receive Cash and may elect to receive Trust Interests, interests in the New Senior Secured Term Loan and/or New Common Stock (and where applicable, New Warrants) in exchange for their Claims. Accordingly, a U.S. Holder of such a Claim will likely recognize compensation income in an amount

equal to the sum of the following, determined immediately prior to the Effective Date: (i) the amount of Cash received as part of the exchange, (ii) the fair market value of the U.S. Holder's share of Trust Assets, if any, (iii) the issue price of the Holder's interest in the New Senior Secured Term Loan, if received, and (iv) the fair market value of the New Common Stock (and where applicable, New Warrants), if received. Under Treasury Regulations promulgated under Section 409A of the IRC, such a payment may be treated as an acceleration of deferred compensation, and, if so, would be subject to an additional twenty percent (20%) tax, and interest would be due at the federal underpayment rate plus one percent (1%) on the underpayments of income tax on the amount of such deferred compensation had it been included in income in the first year it was no longer subject to a substantial risk of forfeiture.

A U.S. Holder's tax basis in its share of Trust Assets, if any, and any New Common Stock (and where applicable, New Warrants) received in the exchange, will equal the fair market value of such assets on the date received. A U.S. Holder's tax basis in its interest in the New Senior Secured Term Loan, if received, will equal the issue price of the Holder's interest in the New Senior Secured Term Loan. A U.S. Holder's holding period in such assets will commence on the day after the date received.

See "Federal Income Tax Treatment of New Senior Secured Term Loan," in Article VI of the Specific Disclosure Statement, for a discussion related to the determination of the issue price of, as well as the tax considerations of holding an interest in, the New Senior Secured Term Loan.

  4.  U.S. Holders of EGI-TRB LLC and PHONES Notes Claims.

U.S. Holders of Allowed EGI-TRB LLC Notes Claims and U.S. Holders of Allowed PHONES Notes Claims will receive Trust Interests, and, pursuant to the Allocation Dispute Protocol, may receive Cash, interests in the New Senior Secured Term Loan and New Common Stock (and where applicable, New Warrants) in exchange for their Claims. The treatment of a U.S. Holder of an Allowed EGI-TRB LLC or PHONES Notes Claim will depend upon the outcome of the Allocation Disputes.

If a U.S. Holder of an Allowed EGI-TRB LLC Notes Claim or PHONES Notes Claim receives only Trust Interests in exchange for its Claim, such Holder should generally recognize gain or loss in an amount equal to the difference between the Holder's adjusted tax basis in its Claim surrendered in the exchange, determined immediately prior to the Effective Date, and the fair market value of the Holder's share of Trust Assets.

If, however, pursuant to any Confirmation Order or applicable Allocation Order, a U.S. Holder of an Allowed EGI-TRB LLC Notes Claim or PHONES Notes Claim receives, in addition to Trust Interests, Cash, interests in the New Senior Secured Term Loan and New Common Stock (and where applicable, New Warrants) in exchange for its Claim, the exchange of such Claim will likely be treated as a recapitalization for U.S. federal income tax purposes. Such Holder will realize gain or loss in an amount equal to the difference between the Holder's adjusted tax basis in its Claim surrendered in the exchange, determined immediately prior to the Effective Date, and the sum of (i) the fair market value of the Holder's share of Trust Assets, (ii) the issue price of the Holder's interest in the New Senior Secured Term Loan, (iii) the fair market value of the New Common Stock (and where applicable New Warrants), and (iv) the amount of Cash received.

The tax consequences of a recapitalization to a U.S. Holder of such Claim will depend, in part, upon whether the New Senior Secured Term Loan constitutes a "security" for U.S. federal income tax purposes. Although not free from doubt, the New Senior Secured Term Loan will likely not constitute a security for U.S. federal income tax purposes. See "Definition of 'Security'," in Article VI of the Specific Disclosure Statement. U.S. Holders are encouraged to consult with their tax advisors in connection with the determination of whether the New Senior Secured Term Loan constitutes a security

for U.S. federal income tax purposes. The remainder of this discussion assumes that the New Senior Secured Term Loan will not constitute a security for U.S. federal income tax purposes.

In the case of a recapitalization, a U.S. Holder of such Claim who realizes a loss on the exchange will not be permitted to recognize such loss, except to the extent of any loss attributable to accrued but unpaid interest with respect to such Claim. A U.S. Holder of such Claim who realizes gain on the exchange will be required to recognize the lesser of (i) the amount of gain realized on the exchange and (ii) the sum of (a) the issue price of the Holder's interest in the New Senior Secured Term Loan, (b) the fair market value of the Holder's share of Trust Assets, if any, and (c) the amount of Cash received as part of the exchange. A U.S. Holder's tax basis in the New Common Stock and any New Warrants received in exchange for its Claim will equal its adjusted tax basis in such Claim, increased by the amount of gain recognized on the exchange, if any, and reduced by the sum of (i) the fair market value of the U.S. Holder's interest in the New Senior Secured Term Loan, (ii) the fair market value of the Holder's share of Trust Assets, if any, and (iii) the amount of Cash received as part of the exchange. If a U.S. Holder receives both New Common Stock and New Warrants in exchange for its Claim, such basis will be allocated between the New Common Stock and the New Warrants in proportion to their relative fair market values on the date received. A U.S. Holder's holding period in the New Common Stock and any New Warrants will include the holding period in its Claim surrendered. A U.S. Holder's tax basis in its share of Trust Assets, if any, will equal the fair market value of such assets on the date received. A U.S. Holder's holding period in its share of Trust Assets, if any, will commence on the day after the date received. A U.S. Holder's tax basis its interest in the New Senior Secured Term Loan will equal the issue price of the Holder's interest in the New Senior Secured Term Loan. A U.S. Holder's holding period in its interest in the New Senior Secured Term Loan will commence on the day after the date received.

See "Federal Income Tax Treatment of New Senior Secured Term Loan," in Article VI of the Specific Disclosure Statement, for a discussion related to the determination of the issue price of, as well as the tax considerations of holding an interest in, the New Senior Secured Term Loan.

### C.    Federal Income Tax Treatment of the MSCS/Senior Noteholder Reserve.

Pursuant to the Third Amended Plan, Reorganized Tribune shall establish a reserve (the "Reserve") for purposes of holding any consideration that may be allocable to the Senior Noteholder Claims held by MSCS in the event MSCS's Senior Noteholder Claims become Allowed Claims. Distributions from the Reserve shall be made to MSCS in the event its Senior Noteholder Claims are subsequently Allowed, and to Holders of Allowed Senior Noteholder Claims (whether such Claims were Allowed on or after the Effective Date) in the event the Senior Noteholder Claims held by MSCS are subsequently disallowed.

The Reserve may be structured in a manner intended to cause it to be subject to a separate entity-level tax on its income. Therefore, distributions from the Reserve may be reduced to satisfy any taxes payable by the Reserve.

Holders of Senior Noteholder Claims should note that the tax treatment of the Reserve is unclear and should consult their own tax advisors.

## VIII.    CONCLUSION AND RECOMMENDATION

The DCL Proponents believe that confirmation of the Third Amended Plan is in the best interests of the Debtors, the Debtors' Estates and creditors. Further, the DCL Proponents believe that the limited Modifications incorporated in the Third Amended Plan conform to and cure each of the limited legal issues identified by the Bankruptcy Court in the Amended Confirmation Opinion. The DCL Proponents

further believe that, to the extent a modified Noteholder Plan is proposed, the Third Amended Plan will, consistent with the Bankruptcy Court's finding that a modified Second Amended Plan would "survive the crucible of [section] 1129(c) [of the Bankruptcy Code]," be the preferred Plan that would "provid[e] the Debtors with more certainty regarding preservation of estate value and a better foundation for revitalizing business operations." (Confirmation Opinion at 125.)

**Accordingly, the DCL Proponents urge the Holders of Claims in Revoting Classes to vote to <u>accept</u> the Third Amended Plan and to evidence such acceptance by returning their Ballot to the Voting Agent so that they are received no later than 4:00 p.m. (prevailing Eastern Time) on April 30, 2012.**

Dated: ~~February 20,~~ March 7, 2012

TRIBUNE COMPANY (for itself and on behalf of the other Debtors, as Debtors and Debtors in Possession, and the Guarantor Non-Debtors and Non-Guarantor Non-Debtors)

_____

By: Donald J. Liebentritt
Title:  Chief Restructuring Officer, Tribune

Date: ~~February 20,~~ March 7, 2012

THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF TRIBUNE COMPANY, <u>ET AL</u>.
Warner Bros., solely in its capacity as Co-Chair of the
Creditors' Committee and not in its individual capacity


_____

By:   Wayne M. Smith
Title: Vice President, Senior Litigation & Chief Patent
Counsel

Date:  February 20,March 7, 2012

OAKTREE CAPITAL MANAGEMENT, L.P.
on behalf of certain funds and accounts it manages

_____
By:  Mr. Ken Liang
Title: Managing Director

_____
By:  Mr. Edgar Lee
Title: Senior Vice President

Date:  ~~February 20,~~ March 7, 2012

ANGELO, GORDON & CO., L.P.
on behalf of certain funds and managed accounts

_____

By:
Title:

Date:  ~~February 20,~~ March 7, 2012

                           JPMORGAN CHASE BANK, N.A.


                           _____

                           By:

                           Title:

# EXHIBIT A

***Subordination Allocation Appendix***

## <u>TABLE OF CONTENTS</u>

A.    Allocation Disputes and Potential Impact Upon Recoveries .............................................. 3

     1.    Application of the PHONES Subordination Provisions and the EGI-TRB Subordination Provisions to the DCL Plan Settlement Consideration.................. 3

     2.    Application of (i) the EGI-TRB Subordination Provisions to the Creditors' Trust Interests and/or the Litigation Trust Interests and (ii) the PHONES Subordination Provisions to the Creditors' Trust Interests...................................................... 6

     3.    Entitlement of Holders of Other Parent Claims to Benefit From the PHONES Subordination Provisions and the EGI-TRB Subordination Provisions ............... 7

     4.    Allowed Amount of PHONES Notes Claims................................................... 10

     5.    Relative Priorities of the PHONES Notes and the EGI-TRB LLC Notes.......... 12

B.    Certain Hypothetical Litigation Trust Recoveries........................................................ 12

C.    Notes & Assumptions for Recovery Charts.................................................................. 14

D.    Explanation of Recovery Chart.................................................................................... 17

E.    Recovery Chart ............................................................................................................ 18

**A.      Allocation Disputes and Potential Impact Upon Recoveries**

As described in Section IV.B.2 of the Supplement, various parties ~~have~~ filed Preliminary Statements ~~in respect of the Allocation Disputes on January 31, 2012, opening briefs and response briefs~~, Opening Briefs, and Response Briefs in respect of the Allocation Disputes ~~are required to be filed by February 24 and March 2, 2012, respectively, and a hearing on~~  Additionally, hearings with respect to the Allocation Disputes ~~shall commence~~occurred on March ~~5, 2012 at 10:00 a.m. (prevailing Eastern time).~~5-6, 2012.  A summary of the various Allocation Disputes as well as the potential impact that the adjudication and/or resolution of such Allocation Disputes may have on the allocation of distributions to the Holders of Senior Notes Claims, Other Parent Claims, EGI-TRB-LLC Claims, and PHONES Notes Claims under the Third Amended Plan follows.  Sections A.1 through A.5 below isolate the potential impacts of individual Allocation Disputes.  These potential impacts are not cumulative.

The chart set forth in Section E of this <u>Exhibit A</u> (the "<u>Recovery Chart</u>") provides additional numerical and other information regarding certain of the scenarios described below.  Where a given scenario also is depicted in the Recovery Chart, a cross-reference to the corresponding column in the Recovery Chart is included.  For a summary of certain additional hypothetical recoveries with respect to the Litigation Trust, please refer to Section B of this <u>Exhibit A</u>.[1]

      1.      Application of the PHONES Subordination Provisions and the EGI-TRB
<u>Subordination Provisions to the DCL Plan Settlement Consideration</u>.

The applicability of the PHONES Subordination Provisions and the EGI-TRB Subordination Provisions to the distribution of the DCL Plan Settlement consideration was not expressly addressed in the Confirmation Opinion or the Reconsideration Ruling.  Wilmington Trust has asserted that the consideration from the DCL Plan Settlement is not subject to the PHONES Subordination Provisions,[2] which provide in part that "[u]pon any distribution of assets of the Company in the event of: (1) any insolvency or bankruptcy case or proceeding . . . then . . . (A) the holders of Senior Indebtedness shall be entitled to receive payment in full of all amounts due or to become due on or in respect of all Senior Indebtedness, . . . before the Holders of the Securities of any series are entitled to receive any payment on account of the principal amount, interest or such other amounts as may be provided for in Section 3.01 [of the PHONES Notes Indenture], if any, in respect of the Securities of such series; and (B) any payment or distribution of assets of the Company of any kind or character . . . to which the Holders or the Trustee would be  entitled but for the provisions of . . . Article Fourteen [of the PHONES Notes Indenture] . . . shall be paid . . . directly to the holders of Senior Indebtedness . . .". (PHONES Notes Indenture at Section 14.02)[3]  Certain other parties have asserted that the consideration from the DCL Plan Settlement is subject

---

[1]    Various parties to the Allocation Disputes are in the process of preparing a stipulation as to the admissibility for purposes of the March 5, 2012 Allocation Dispute hearing of a chart regarding the hypothetical Litigation Trust recovery scenarios set forth herein.  The DCL Proponents reserve the right to supplement this <u>Exhibit A</u> if and to the extent such stipulation is completed.

[2]    <u>See</u> Wilmington Trust Preliminary Statement, Opening Brief, and Response Brief.

[3]    "Senior Indebtedness" under the PHONES Notes Indenture includes, among other things, (i) "the principal of (and premium, if any) and interest on (including interest accruing after the filing of a petition initiating any proceeding pursuant to any Federal bankruptcy law or any other applicable Federal or State law, but only to the extent allowed or permitted to the holder of such Indebtedness of the Company against the bankruptcy or any other insolvency estate of the Company in such proceeding)," (ii) "all obligations represented by notes, bonds, debentures or similar evidences of indebtedness" (excluding the PHONES Notes themselves), (iii) "all indebtedness for borrowed money  . . .", and (iv) "all indebtedness for . . . the deferred purchase price of property or services . . . .", but does not include, among  other things, "any [i]ndebtedness of the Company

to the PHONES Subordination Provisions.[4]  Moreover, similar arguments have been asserted in connection with the EGI-TRB Subordination Provisions,[5] which provide that (among other things) the EGI-TRB LLC Notes are subordinate in right of payment to all "Senior Obligations"[6] and have no "claim to the assets of the Company on parity with or prior to the claim of Senior Obligations."  (EGI-TRB Subordination Agreement at 1-2.).[7]

The questions of whether and to what extent the DCL Plan Settlement consideration is or is not subject to either or both of the PHONES Subordination Provisions and the EGI-TRB Subordination Provisions shall be adjudicated or resolved pursuant to the Allocation Dispute Protocol.  Depending upon their outcome, the adjudication or resolution of these issues may potentially impact the distributions received under the Third Amended Plan by the Holders of Senior Noteholder Claims, Other Parent Claims, EGI-TRB LLC Notes Claims, and PHONES Notes Claims.  For example, and solely for purposes of illustration, if the Bankruptcy Court were to determine that all of the DCL Plan Settlement consideration is subject to the PHONES Subordination Provisions and the EGI-TRB Subordination Provisions, no adjustments to the distributions provided to the Holders of Senior Noteholder Claims, Other Parent Claims, EGI-TRB LLC Notes Claims, and PHONES Notes Claims would be required (although such distributions would remain subject to any other potential adjustments necessary to reflect the adjudication or resolution of other Allocation Disputes).  On the other hand, and solely for purposes of illustration, if the Bankruptcy Court were to determine that none of the DCL Plan Settlement consideration is subject to the PHONES Subordination Provisions, recoveries provided under the Second Amended Plan to the following creditors would potentially be adjusted pursuant to the Allocation Dispute Protocol as follows:

▪ projected distributions to the Holders of Senior Noteholder Claims would decrease from approximately 33.6% to approximately 25.0%;

---

constituting trade accounts payable arising in the ordinary course of business."  (Phones Notes Indenture at Section 14.01)

[4]  In particular, Aurelius Capital Management, LP ("Aurelius"), EGI-TRB LLC, Oaktree, and Law Debenture Trust Company of New York ("Law Debenture") have asserted that all of the consideration from the DCL Plan Settlement is subject to the PHONES Subordination Provisions.  See Aurelius Preliminary Statement, Opening Brief, and Response Brief; Oaktree Preliminary Statement, Opening Brief, and Response Brief; and Law Debenture Preliminary Statement, Opening Brief, and Response Brief.

[5]  The relevant subordination provisions of the EGI-TRB LLC Notes are set forth in the Subordination Agreement, dated as of December 20, 2007, by EGI-TRB, L.L.C., a Delaware limited liability company, in favor of the Holders of Senior Obligations (as defined therein) (the "EGI-TRB Subordination Agreement").

[6]  "Senior Obligations" is defined in the EGI-TRB Subordination Agreement to include "all obligations, indebtedness and other liabilities of the Company other than (i) any such obligations, indebtedness or liabilities that by their express terms rank pari passu or junior to the Company obligations under the [EGI-TRB LLC Notes] and (ii) trade payables and accrued expenses incurred in the ordinary course of business . . ." (EGI-TRB Subordination Agreement at 1).

[7]  More specifically, EGI-TRB LLC has asserted that all or virtually all of the consideration from the DCL Plan Settlement is not subject to the EGI Subordination Provisions, while Aurelius, Oaktree and Law Debenture have asserted that all of the consideration from the DCL Plan Settlement is subject to the EGI-TRB Subordination Provisions.  See EGI-TRB Preliminary Statement, Opening Brief, and Response Brief; Aurelius Preliminary Statement, Opening Brief, and Response Brief; Oaktree Preliminary Statement, Opening Brief, and Response Brief; and Law Debenture Preliminary Statement, Opening Brief, and Response Brief.

- projected distributions to the Holders of and Other Parent Claims would decrease from approximately 36.0% to approximately 27.4%;[8]

- projected distributions to the Holders of PHONES Notes Claims would increase from 0% to approximately 17.5%; and

- projected distributions to the Holders of EGI-TRB LLC Notes Claims would remain approximately the same (i.e., no recovery).

See Recovery Chart, column 3.  Similarly, solely for purposes of illustration, if the Bankruptcy Court were to determine that none of the DCL Plan Settlement consideration falls within the scope of the EGI-TRB Subordination Provisions, recoveries provided under the Second Amended Plan to the following creditors would potentially be adjusted pursuant to the Allocation Dispute Protocol as follows:

- projected distributions to the Holders of Senior Noteholder Claims would decrease from approximately 33.6% to approximately 30.9%;

- projected distributions to the Holders of Other Parent Claims would decrease from approximately 36.0% to approximately 33.4%;

- projected distributions to the Holders of PHONES Notes Claims would remain approximately the same (i.e., no recovery); and

- projected distributions to the Holders of EGI-TRB LLC Notes Claims would increase from 0% to approximately 17.5%.[9]

See Recovery Chart, column 4.  The projected distributions in each of the foregoing scenarios would be subject to any additional potential adjustments pursuant to the Allocation Dispute Protocol necessary to reflect the adjudication or resolution of other Allocation Disputes.

It is also possible that the Bankruptcy Court may determine that some, but not all, of the DCL Plan Settlement Consideration is subject to the PHONES Subordination Provisions and EGI-TRB Subordination Provisions.  In particular, the Bankruptcy Court may determine that consideration in

---

[8]    Under the Second Amended Plan, Holders of Senior Noteholder Claims and Other Parent Claims were to receive approximately 32.73% of their Allowed Claims, plus a pro rata share of proceeds resulting from the settlement with Bridge Lenders, as well as Litigation Trust Interests and Creditors' Trust Interests.  Holders of Other Parent Claims, however, also had the option of receiving 35.18% of their Allowed Claims if they elected to forego receiving Litigation Trust Interests and Creditors' Trust Interests.  (Second Amended Plan, § 3.2.6(c).) The estimated recovery percentages set forth herein for the Holders of Other Parent Claims assume that such Holders elected to forego receiving Litigation Trust Interests and Creditors' Trust Interests and to instead receive 35.18% of their Allowed Other Parent Claim and a pro rata share of the Bridge Settlement Proceeds. The estimated recovery percentages for the Holders of Allowed Other Parent Claims that elected to receive 32.73% of their Allowed Claims and a pro rata share of the Bridge Settlement Proceeds, plus Litigation Trust Interests and Creditors' Trust Interests, would be approximately 2.45% lower than the estimated recovery percentages set forth herein for the Holders of Allowed Other Parent Claims.

[9]    This outcome would be conditioned upon the allowance of the EGI-TRB LLC Notes Claims.  The EGI-TRB LLC Notes Claims are subject to challenge by the Litigation Trust pursuant to Article XIII of the Third Amended Plan, and the allowance of such Claims is not subject to the Allocation Dispute Protocol.  Moreover, the Allocation Dispute Protocol is not contemplated to address issues raised in the lawsuit titled *Official Committee of Unsecured Creditors of the Tribune Company v. FitzSimons, et al. (In re Tribune Co.)*, Adv. Proc. No. 10-54010 (Bankr. D. Del.) (KJC).

respect of the Step Two Disgorgement Settlement is not subject to the applicable subordination provisions but that the remainder of the DCL Plan Settlement consideration is subject to those provisions. Solely for purpose of illustration, the chart below provides a comparison of the distributions that would have been received under the Second Amended Plan with results that may occur under the Third Amended Plan in the event the Bankruptcy Court were to determine that only the Step Two Disgorgement Settlement consideration is not subject to (i) the PHONES Subordination Provisions ("Scenario One"), or the EGI-TRB Subordination Provisions ("Scenario Two").

PHONES Subordination Provisions – Step Two Disgorgement Settlement Proceeds:

| Class | Second Amended Plan | Scenario One | Scenario Two |
|---|---|---|---|
| Senior Noteholder Claims | 33.6% | 31.3% | 32.9% |
| Other Parent Claims | 36.0% | 33.7% | 35.3% |
| PHONES Notes Claims | 0.0% | 4.7% | 0.0% |
| EGI-TRB LLC Notes Claims | 0.0% | 0.0% | 4.7% |

See Recovery Chart, columns 6-7. Again, the projected distributions in each of the foregoing hypothetical scenarios would be subject to any additional potential adjustments pursuant to the Allocation Dispute Protocol necessary to reflect adjudication and/or resolution of other Allocation Disputes.

      2.     Application of (i) the EGI-TRB Subordination Provisions to the Creditors' Trust Interests and/or the Litigation Trust Interests and (ii) the PHONES Subordination Provisions to the Creditors' Trust Interests.

In light of the Bankruptcy Court's Subordination Reconsideration Ruling, questions have arisen as to whether the Bankruptcy Court's reasoning therein also applies to the potential distributions from the Litigation Trust and/or Creditors' Trust for purposes of the EGI-TRB Subordination Provisions[10] and from the Creditors' Trust for purposes of the PHONES Subordination Provisions.[11] Accordingly, the questions of whether and to what extent (a) any or all potential distributions from the Litigation Trust and/or the Creditors' Trust are or are not subject to the EGI-TRB Subordination Provisions and (b) any or all potential distributions from the Creditors' Trust are or are not subject to the PHONES Subordination Provisions shall be adjudicated or resolved pursuant to the Allocation Dispute Protocol. Depending upon their outcome, the adjudication or resolution of these issues may potentially impact the distributions

---

[10]    In particular, EGI-TRB LLC has asserted that the EGI-TRB Subordination Provisions do not apply to (i) potential distributions of recoveries by the Litigation Trust and the Creditors' Trust on account of chapter 5 avoidance actions and state law fraudulent transfer actions, respectively, and (ii) any recoveries by the Litigation Trust and the Creditors' Trust on account of claims that are not "assets of the Company." See EGI-TRB Preliminary Statement, Opening Brief, and Response Brief. In contrast, Aurelius and Law Debenture have asserted that distributions from the Litigation Trust and the Creditors' Trust are subject to the EGI-TRB Subordination Provisions. See Aurelius Preliminary Statement, Opening Brief, and Response Brief; Law Debenture Preliminary Statement, Opening Brief, and Response Brief.

[11]    For example, Wilmington Trust has asserted, among other things, that the issue of whether distributions from the Creditors' Trust are subject to the PHONES Subordination Provisions is moot. See Wilmington Trust Preliminary Statement, Opening Brief, and Response Brief. On the other hand, Aurelius, EGI-TRB LLC, and Law Debenture have asserted that all distributions from the Creditors' Trust are subject to the PHONES Subordination Provisions. See Aurelius Preliminary Statement, Opening Brief, and Response Brief; Law Debenture Preliminary Statement, Opening Brief, and Response Brief.

received under the Third Amended Plan by the Holders of Senior Noteholder Claims, Other Parent Claims, EGI-TRB LLC Notes Claims, and PHONES Notes Claims.  For example, and solely for purposes of illustration, in the event that the Bankruptcy Court were to determine that (a) all potential distributions from the Litigation Trust and the Creditors' Trust are subject to the EGI-TRB Subordination Provisions and (b) all potential distributions from the Creditors' Trust are subject to the PHONES Subordination Provisions, then no adjustments to the distributions provided under the Third Amended Plan would be required (although such distributions would remain subject to any additional potential adjustments necessary to reflect the adjudication or resolution of other Allocation Disputes).

However, and solely for purposes of illustration, if the Bankruptcy Court were to determine that some or all of the potential distributions from the Litigation Trust and/or Creditors' Trust do not fall within the scope of the EGI-TRB Subordination Provisions, or that some or all of the potential distributions from the Creditors' Trust do not fall within the scope of the PHONES Subordination Provisions, then the Holders of EGI-TRB LLC Notes Claims and/or PHONES Notes Claims, respectively, would be permitted to retain such distributions and would not be required to turn them over to the beneficiaries of the subordination provisions (subject to any additional potential adjustments necessary to reflect the adjudication or resolution of other Allocation Disputes).  Though it is not possible to predict with certainty the actual distributions that will be made by the Litigation Trust and/or the Creditors' Trust, in such event, the proportionate share of potential distributions from the Litigation Trust provided to the Holders of Senior Noteholder Claims and Other Parent Claims would be smaller than those provided under the Second Amended Plan, and the proportionate share of potential distributions from the Litigation Trust and/or Creditors' Trust provided to the Holders of EGI-TRB LLC Notes Claims, and/or the proportionate share of Creditors' Trust Interests provided to the Holders of PHONES Notes Claims, would be greater than those provided under the Second Amended Plan (subject to any additional potential adjustments necessary to reflect the adjudication or resolution of other Allocation Disputes).

3.    Entitlement of Holders of Other Parent Claims to Benefit From the PHONES Subordination Provisions and the EGI-TRB Subordination Provisions.

The Second Amended Plan provided that, consistent with the PHONES Subordination Provisions, distributions on account of Allowed PHONES Notes Claims would be turned over to the Holders of Claims arising from "Senior Indebtedness", including the Holders of Senior Loan Claims, Senior Noteholder Claims, and all categories of Other Parent Claims (i.e. the Swap Claim, the Retiree Claims, and General Unsecured Claims against Tribune).   The Second Amended Plan further provided that the Holders of Other Parent Claims and the Holders of Senior Noteholder Claims, as the Holders of Claims entitled to receive the benefit of the PHONES Subordination Provisions, would receive substantially the same pro rata share[12] of the DCL Plan Settlement consideration.[13]  While the Creditors' Committee,

---

[12]    As noted above, the Second Amended Plan provided that the Holders of Senior Noteholder Claims and Other Parent Claims would, as a default, receive approximately 32.73% of their Allowed Claims, plus Litigation Trust Interests and Creditors' Trust Interests.  Holders of Other Parent Claims, however, also had the option of receiving 35.18% of their Allowed Other Parent Claim if they elected to forego receiving Litigation Trust Interests and Creditors' Trust Interests.  (Second Amended Plan, § 3.2.6(c).)

[13]    The DCL Proponents believe that, under the terms of the PHONES Notes Indenture, the Holders of Senior Loan Claims are entitled to receive the benefit of the PHONES Subordination Provisions because they constitute "indebtedness for borrowed money" for purposes of the definition of "Senior Indebtedness" thereunder.  However, under the terms of the DCL Plan Settlement, the Holders of Senior Loan Claims agreed to forego approximately $318 million of Cash distributions which would otherwise be allocated to them under the Second Amended Plan. These distributions would instead be reallocated under both the Second Amended Plan and the Third Amended Plan to the Holders of Senior Noteholder Claims, Other Parent Claims and Convenience Claims against Tribune.

Oaktree, and the TM Retirees have taken the position that such distributions to the Holders of Other Parent Claims, as well as the priority of distributions from the Creditors' Trust and Litigation Trust provided under the Second Amended Plan to the Holders of Other Parent Claims, are appropriate,[14] Aurelius, Law Debenture, Wilmington Trust, and EGI-TRB LLC have asserted that such distributions are inappropriate because Other Parent Claims allegedly do not constitute "Senior Indebtedness" or "Senior Obligations," or, alternatively, because such treatment otherwise discriminates unfairly against the Holders of Senior Notes Claims.[15]

Depending upon its outcome, the adjudication or resolution of this Allocation Dispute may potentially impact to whom approximately $30.8 million (if Low PHONES (as defined below)) or $37.6 million (if High PHONES (as defined below)) will be distributed under the Third Amended Plan. For example, and solely for purposes of illustration, the following chart summarizes how these amounts would be distributed if the Bankruptcy Court were to determine that (i) on the one hand (as reflected in the second column labeled "Third Amended Plan"), all of the Other Parent Claims are entitled to receive the benefit of the PHONES Subordination Provisions and the EGI-TRB Subordination Provisions and (ii) on the other hand (as reflected in the third (if Low PHONES) and fourth (if High PHONES) columns labeled "Only Sr. Noteholders Benefit")), none of the Other Parent Claims are entitled to receive the benefit of the PHONES Subordination Provisions or the EGI-TRB Subordination Provisions (if Low PHONES or High PHONES):

---

[14]  For example, the Creditors' Committee has asserted that neither the Article III Distributions nor the priority of distributions from the Creditors' Trust and/or the Litigation Trust must be adjusted in order for such distributions to satisfy the applicable requirements of the Bankruptcy Code. See Creditors' Committee Preliminary Statement, Opening Brief, and Response Brief. Similarly, Oaktree contends that the Swap Claim is entitled to the benefits of the PHONES Subordination Provisions and that  the priority of distributions from the Creditors' Trust and/or Litigation Trust do not need to be adjusted in order for the distributions under the Third Amended Plan in respect of the Swap Claim to satisfy the applicable requirements of the Bankruptcy Code.  See Oaktree Preliminary Statement, Opening Brief, and Response Brief. In addition, the TM Retirees have argued that the TM Retiree Claims constitute "Senior Indebtedness" and "Senior Obligations." See TM Retirees Preliminary Statement, Opening Brief, and Response Brief.

[15]  More specifically, Aurelius has asserted that Other Parent Claims do not constitute "Senior Indebtedness" or "Senior Obligations" and that allowing Other Parent Claims to receive distributions under the Third Amended Plan or distributions from the Creditors' Trust and/or the Litigation Trust as if they were entitled to benefit from the PHONES Subordination Provisions or the EGI-TRB Subordination Provisions breaches the contractual rights of the Senior Noteholders, violates the Bankruptcy Code, and/or results in unfair discrimination against the Senior Noteholders.  See Aurelius Preliminary Statement, Opening Brief, and Response Brief. Similarly, Law Debenture has asserted that Other Parent Claims do not constitute "Senior Indebtedness" or "Senior Obligations," and that allowing Other Parent Claims to receive distributions under the Third Amended Plan from the Creditors' Trust and/or the Litigation Trust as if they were entitled to benefit from the PHONES Subordination Provisions and EGI-TRB Subordination Provisions results in unfair discrimination against the Senior Noteholders."  See Law Debenture Preliminary Statement, Opening Brief, and Response Brief.  In addition,  Wilmington Trust has argued that (i) the Swap Claims and Retiree Claims do not fall within the definition of "Indebtedness" under the PHONES Notes Indenture and, therefore, do not qualify as "Senior Indebtedness," (ii) general unsecured trade claims against Tribune are explicitly excluded from qualifying as "Senior Indebtedness," and (iii) with the exception of Other Parent Claims held by Wilmington Trust, there is no basis for any remaining Other Parent Claim to qualify as "Indebtedness" under the PHONES Notes Indenture and, therefore, such claims do not qualify as "Senior Indebtedness." See Wilmington Trust Preliminary Statement, Opening Brief, and Response Brief. EGI-TRB also contends that, among other things, (i) the general unsecured trade claims against Tribune, Swap Claims and Retiree Claims are not entitled to benefit from the EGI-TRB Subordination Provisions with respect to avoidance recoveries and Settlement Proceeds because those monies are not assets of the Company and (ii) the PHONES Notes are not subordinate to the general unsecured trade claims against Tribune or the Retiree Claims.  See EGI-TRB Preliminary Statement, Opening Brief, and Response Brief.

| ($ in thousands) | Third Amended Plan | Only Senior Noteholders Benefit | |
|---|---|---|---|
| | | Low PHONES | High PHONES |
| Allowed Amount of PHONES Notes Claims | n/a | $ 760,881 | $ 1,196,823 |
| Senior Noteholder Claims | $ 431,041 | $ 461,016 | $ 467,800 |
| Other Parent Claims - Retirees | $ 37,843 | $ 25,611 | $ 22,920 |
| Other Parent Claims - Trade & Other | $ 3,169 | $ 2,145 | $ 1,920 |
| Other Parent Claims - Swap Claim | $ 54,403 | $ 36,818 | $ 32,950 |

See Recovery Chart, columns 1, 11, and 15 respectively.  Although it is possible that the Allowed amount of "Trade & Other" Claims ultimately may exceed the amount set forth in the column of the Recovery Chart titled "Claim $," any such variance should not affect the amounts at issue in this Allocation Dispute.  The Third Amended Plan and the DCL Plan Settlement do not provide for any decrease in the Senior Noteholders' share of the DCL Plan Settlement consideration in the event the amount of Other Parent Claims exceeds the amount set forth in the column of the Recovery Chart titled "Claim $."  Any distributions to the Holders of such additional Other Parent Claims would instead be funded by the Senior Lenders.

The questions of whether and to what extent Other Parent Claims do or do not constitute "Indebtedness" and "Senior Indebtedness",  as defined by the PHONES Notes Indenture or "Senior Obligations," as defined by the EGI-TRB Subordination Provisions, shall be adjudicated or resolved pursuant to the Allocation Dispute Protocol.  Depending upon their outcome, the adjudication or resolution of these issues may potentially impact the distributions to be received under the Third Amended Plan by the Holders of Senior Noteholder Claims and Other Parent Claims.  For example, and solely for purposes of illustration, if the Bankruptcy Court were to determine that (a) the Third Amended Plan is unfairly discriminatory because none of the Other Parent Claims constitute "Senior Indebtedness" for purposes of the PHONES Subordination Provisions and (b) all of the DCL Plan Settlement consideration is subject to the PHONES Subordination Provisions, the recoveries provided under the Second Amended Plan to the following creditors would potentially be adjusted pursuant to the Allocation Dispute Protocol:

- projected distributions to the Holders of  Senior Noteholder Claims would increase from approximately 33.6% to approximately 35.4%;

- projected distributions to the Holders of Other Parent Claims would decrease from approximately 36.0% to approximately 27.1%;

- projected distributions to the Holders of PHONES Notes Claims would remain approximately the same (i.e., no recovery); and

- projected distributions to the Holders of EGI-TRB LLC Notes Claims would remain approximately the same (i.e., no recovery).

See Recovery Chart, column 9.  Similarly, solely for illustrative purposes, if the Bankruptcy Court were to determine that (a) the Third Amended Plan is unfairly discriminatory because none of the Other Parent Claims constitute "Senior Obligations" under the EGI-TRB Subordination Provisions and (b) all of the

9

DCL Plan Settlement consideration is within the scope of the EGI-TRB Subordination Provisions, the recoveries provided under the Second Amended Plan to the following creditors would potentially be adjusted pursuant to the Allocation Dispute Protocol:[16]

- projected distributions to the Holders of Senior Noteholder Claims would increase from approximately 33.6% to approximately 34.1%;

- projected distributions to the Holders of Other Parent Claims would decrease from approximately 36.0% to approximately 33.3%;

- projected distributions to the Holders of PHONES Notes Claims would remain approximately the same (i.e., no recovery); and

- projected distributions to the Holders of EGI-TRB LLC Notes Claims would remain approximately the same (i.e., no recovery).

See Recovery Chart, column 10. The projected distributions under each of the foregoing scenarios would be subject to any additional potential adjustments pursuant to the Allocation Dispute Protocol necessary to reflect the adjudication or resolution of other Allocation Disputes.[17]

4.    Allowed Amount of PHONES Notes Claims.

As noted in the Supplement, in the Confirmation Opinion, the Bankruptcy Court determined that there was an insufficient record to permit the Bankruptcy Court to resolve disputes regarding the proper

---

[16]    For reasons that are similar to those noted in footnote 9, *supra*, this outcome would be conditioned upon the allowance of the EGI-TRB LLC Notes Claims.

[17]    Certain parties have also raised the issue of whether and to what extent postpetition interest accruing in respect of the Senior Noteholder Claims and Other Parent Claims (to the extent applicable) constitutes "Senior Indebtedness" for purposes of the PHONES Subordination Provisions and "Senior Obligations" for purposes of the EGI-TRB Subordination Provisions. Specifically, Wilmington Trust has asserted that the beneficiaries of the PHONES Subordination Provisions are not entitled to receive postpetition interest prior to the Holders of PHONES Notes Claims receiving payment on their Claims. See Wilmington Trust Preliminary Statement, Opening Brief, and Response Brief. Similarly, EGI-TRB LLC has argued that the beneficiaries of the EGI-TRB Subordination Provisions are not entitled to receive postpetition interest before the Holders of EGI-TRB LLC Notes Claims receive payment on their Claims. See EGI-TRB Preliminary Statement, Opening Brief, and Response Brief. Aurelius, however, contends, among other things, that while, on the one hand, beneficiaries of the PHONES Subordination Provisions are not entitled to receive postpetition interest prior to the Holders of PHONES Notes Claims receiving payment in full of their Allowed prepetition Claims, on the other hand, beneficiaries of the EGI-TRB Subordination Provisions are entitled to receive post-petition interest prior to the Holders of EGI-TRB LLC Notes Claims receiving payment on their Claims. See Aurelius Preliminary Statement, Opening Brief, and Response Brief. In contrast, Law Debenture and Oaktree have taken the position that (i) the beneficiaries of the PHONES Subordination Provisions are entitled to receive postpetition interest prior to the Holders of PHONES Notes Claims receiving payment on their Claims, and (ii) the beneficiaries of the EGI-TRB Subordination Provisions are entitled to receive postpetition interest prior to the Holders of EGI-TRB LLC Notes Claims receiving payment on their Claims. See Law Debenture Preliminary Statement, Opening Brief, and Oaktree Response Brief. Oaktree Preliminary Statement, Opening Brief, and Response Brief. In order to fairly and expeditiously address these potential subordination issues, the questions of whether and to what extent post-petition interest accruing in respect of the Senior Noteholder Claims and Other Parent Claims (to the extent applicable) constitutes "Senior Indebtedness" for purposes of the PHONES Subordination Provisions and "Senior Obligations" for purposes of the EGI-TRB Subordination Provisions shall be adjudicated or resolved pursuant to the Allocation Dispute Protocol.

Allowed amount of the PHONES Notes Claims (Confirmation Opinion at 106).[18]  In order to fairly and expeditiously determine the Allowed amount of the PHONES Notes Claim, such amount shall be adjudicated or resolved pursuant to the Allocation Dispute Protocol.[19]

Depending upon its outcome, the adjudication or resolution of this issue may potentially impact the distributions to be received under the Third Amended Plan by the Holders of Senior Noteholder Claims, Other Parent Claims, EGI-TRB LLC Notes Claims, and PHONES Notes Claims.  For example, and solely for purposes of illustration, in the event that the Bankruptcy Court were to determine that (a) the aggregate Allowed amount of the PHONES Notes on the Petition Date was approximately $1.197 billion (the "High Phones") as opposed to $761 million (the "Low PHONES"),[20] (b) all of the Other Parent Claims constitute "Indebtedness" and "Senior Indebtedness" for purposes of the PHONES Notes Indenture, and (c) all of the DCL Plan Settlement consideration is subject to the PHONES Subordination Provisions and the EGI-TRB Subordination Provisions, the resolution of this issue would impact only the potential distributions from the Litigation Trust and the Creditors' Trust that may be received under the Third Amended Plan by the Holders of Senior Noteholder Claims, Other Parent Claims, EGI-TRB LLC Notes Claims, and PHONES Notes Claims.  However, solely for purposes of illustration, if the Bankruptcy Court were to determine that (a) the aggregate Allowed amount of the PHONES Notes on the Petition Date was $1.197 billion as opposed to $761 million and (b) none of the Other Parent Claims constitute "Indebtedness" and "Senior Indebtedness" for purposes of the PHONES Subordination Provisions, the recoveries provided under the Second Amended Plan to the following creditors would potentially be adjusted pursuant to the Allocation Dispute Protocol as follows:

- projected distributions to the Holders of  Senior Noteholder Claims would increase from approximately 33.6% to approximately 35.4% (Low PHONES) or approximately 36.0% (High PHONES);

- projected distributions to the Holders of Other Parent Claims would decrease from approximately 36.0% to approximately 27.1% (Low PHONES) or approximately 24.2% (High PHONES);

- projected distributions to the Holders of PHONES Notes Claims would remain approximately the same (i.e., no recovery); and

- projected distributions to the Holders of EGI-TRB LLC Notes Claims would remain approximately the same (i.e., no recovery).

See Recovery Chart, columns 12 (Low PHONES), 13 (High PHONES).  The foregoing projected distributions would remain subject to any additional adjustments pursuant to the Allocation Dispute Protocol necessary to reflect the adjudication of the other Allocation Disputes.

---

[18]    As clarified in the Reconsideration Decision, the Bankruptcy Court did not make any determination regarding the value of the PHONES Notes in the Confirmation Opinion.  Reconsideration Decision at 4.

[19]    Wilmington Trust has asserted that the allowed amount of the PHONES Notes Claims should be $1,184,941,949.64.  See Wilmington Trust Preliminary Statement, Opening Brief, and Response Brief. Aurelius has asserted that the PHONES Notes Claims should be allowed "in an amount representing the aggregate principal amount of PHONES Notes that were outstanding as of, and were not delivered to Deutsche Bank Trust Company of Americas or Tribune Company for exchange prior to, the Petition Date. . .".  See Aurelius Preliminary Statement at 3, 3, Opening Brief, and Response Brief.

[20]    Alternatively, Wilmington Trust has asserted that the principal amount of the Low PHONES should equal at least $819,529,804.06 (excluding interest that accrued prior to the Petition Date).

Consistent with the Bankruptcy Court's determination that "it is not appropriate to use § 510(b) to sub-subordinate the Tendering Holders' claims to other PHONES Noteholder Claims", each PHONES Notes Claim shall be considered on an equal priority basis, regardless of whether such claim arises from the exchanged PHONES Notes that were not settled in cash prior to the Petition Date.[21]

    5.  Relative Priorities of the PHONES Notes and the EGI-TRB LLC Notes.

  The Confirmation Opinion did not address the relative priorities of the PHONES Notes Claims and the EGI-TRB LLC Notes Claims because the Second Amended Plan did not provide for any up-front recovery or compensation to the Holders of Allowed EGI-TRB LLC Notes Claims or PHONES Notes Claims.[22] Depending upon the outcome of the Allocation Disputes, it is possible that the relative priorities of the EGI-TRB LLC Notes Claims and PHONES Notes Claims may be relevant for purposes of determining the distributions to be received under the Third Amended by the Holders of Allowed EGI-TRB LLC Notes Claims and PHONES Notes Claims.[23] Accordingly, the relative priorities of the EGI-TRB LLC Notes Claims and the PHONES Notes Claims shall be adjudicated or resolved pursuant to the Allocation Dispute Protocol.[24] Depending upon its outcome, the adjudication or resolution of this issue may potentially impact the distributions to be received under the Third Amended Plan by Holders of PHONES Notes Claims and EGI-TRB LLC Notes Claims. For example, and solely for purposes of illustration, if the Bankruptcy Court were to determine that the PHONES Notes are contractually subordinated in their entirety in right of payment to the EGI-TRB LLC Notes, then any distributions that would otherwise have been made to the Holders of PHONES Notes Claims under the Third Amended Plan would instead potentially be made to the Holders of EGI-TRB LLC Notes Claims.

**B.**  **Certain Hypothetical Litigation Trust Recoveries**[25]

  In connection with the Allocation Dispute Protocol, certain parties have assessed the potential impact that certain hypothetical Litigation Trust recoveries may have on the distributions under the Third Amended Plan to the Holders of Senior Noteholder Claims and Other Parent Claims. A summary of such hypothetical outcomes follows. For example, and solely for illustrative purposes, in the event that (a) the Bankruptcy Court were to determine that all of the Other Parent Claims constitute (i) "Indebtedness" and "Senior Indebtedness" for purposes of the PHONES Notes Indenture and (ii) "Senior Obligations" for purposes of the EGI-TRB Subordination Provisions, and (b) the Litigation Trust were to hypothetically

---

[21] Section 1.1.185 of the Third Amended Plan provides that PHONES Notes Claims include "any Claim[s] arising under or evidenced by the PHONES Notes Indenture".

[22] Second Amended Plan, § 7.15.

[23] The determination regarding the relative priorities of the EGI-TRB LLC Notes and the PHONES Notes may impact the potential recoveries of the Senior Noteholder Claims and Other Parent Claims in scenarios where some or all of the Other Parent Claims benefit from either the Phones Subordination Provisions or EGI Subordination Provisions, but not both. Such potential impact on the recoveries of Senior Noteholder Claims and Other Parent Claims is not significant. See Section E for more information.

[24] EGI-TRB has asserted that the EGI-TRB Notes are senior in right of payment to the PHONES Notes, while Wilmington Trust has asserted that the PHONES Notes are senior in right of payment to the EGI-TRB Notes. See EGI-TRB Preliminary Statement, Opening Brief, and Response Brief; Wilmington Trust Preliminary Statement, Opening Brief, and Response Brief.

[25] In this Section B only, the Holders of Retiree Claims and general unsecured trade claims against Tribune Company are assumed to elect to participate in the Litigation Trust recoveries. Therefore, the Holders of Retiree Claims and general unsecured trade claims against Tribune Company are assumed to receive lower initial distributions in the scenarios set forth in this Section B than the initial distributions such Holders would receive in similar scenarios set forth in other sections of this Exhibit A.

recover gross proceeds ranging between $0 and $750 million, then the Holders of Senior Noteholder Claims and Other Parent Claims would potentially receive the following distributions (expressed in terms of percentage of claims) under the Third Amended Plan:[26]

- the Holders of Senior Noteholder Claims would potentially receive approximately 33.6% in the event the Litigation Trust were to recover no gross proceeds, approximately 46.6% in the event the Litigation Trust were to recover $250 million of gross proceeds, approximately 58.2% in the event the Litigation Trust were to recover $500 million of gross proceeds, and approximately 69.8% in the event the Litigation Trust were to recover $750 million of gross proceeds;

- projected distributions to the Holders of the Swap Claim would equal approximately 36.0% in the event the Litigation Trust were to recover no gross proceeds, $250 million of gross proceeds, $500 million of gross proceeds, or $750 million of gross proceeds;[27]

- the Holders of Retiree Claims would potentially receive approximately 33.6% in the event the Litigation Trust were to recover no gross proceeds, approximately 46.6% in the event the Litigation Trust were to recover $250 million of gross proceeds, approximately 58.2% in the event the Litigation Trust were to recover $500 million of gross proceeds, and approximately 69.8% in the event the Litigation Trust were to recover $750 million of gross proceeds; and

- the Holders of general unsecured trade claims against Tribune would potentially receive approximately 33.6% in the event the Litigation Trust were to recover no gross proceeds, approximately 46.6% in the event the Litigation Trust were to recover $250 million of gross proceeds, approximately 58.2% in the event the Litigation Trust were to recover $500 million of gross proceeds, and approximately 69.8% in the event the Litigation Trust were to recover $750 million of gross proceeds.

Similarly, solely for illustrative purposes, if (a) the Bankruptcy Court were to determine that (i) none of the Other Parent Claims constitute (x) "Indebtedness" or "Senior Indebtedness" for purposes of the PHONES Notes Indenture or (y) "Senior Obligations" for purposes of the EGI-TRB Subordination Provisions and (ii) the PHONES are Allowed in the amount of $1,196,823.00, and (b) the Litigation Trust were to recover gross proceeds ranging between $0 and $750 million, then the Holders of Senior Noteholder Claims and Other Parent Claims would potentially receive the following distributions under the Third Amended Plan:

- the Holders of Senior Noteholder Claims would potentially receive approximately 36.5% in the event the Litigation Trust were to recover no gross proceeds, approximately 50.0% in the event the Litigation Trust were to recover $250 million of gross proceeds, approximately 62.2% in the event the Litigation Trust were to recover $500 million of gross proceeds, and approximately 74.3% in the event the Litigation Trust were to recover $750 million of gross proceeds;

---

[26]   Whether the Allowed amount of the PHONES Notes Claims is equal to the Low PHONES amount or the High PHONES Amount would not materially alter the estimated projected recoveries of the Holders of Senior Notes Claims and the Holders of Other Parent Claims in this particular scenario.

[27]   This estimate assumes that the Holders of the Swap Claim elect Option 1 pursuant to Section 3.2.6(c)(i) of the Third Amended Plan, which provides for the Holders of the Swap Claim to receive a higher initial distribution on account of their claim against Tribune Company in lieu of receiving Litigation Trust recoveries.

- projected distributions to the Holders of the Swap Claim would equal approximately 21.8% in the event the Litigation Trust were to recover no gross proceeds, $250 million of gross proceeds, $500 million of gross proceeds, or $750 million of gross proceeds;[28]

- the Holders of Retiree Claims would potentially receive approximately 19.4% in the event the Litigation Trust were to recover no gross proceeds, approximately 25.8% in the event the Litigation Trust were to recover $250 million of gross proceeds, approximately 31.5% in the event the Litigation Trust were to recover $500 million of gross proceeds, and approximately 37.3% in the event the Litigation Trust were to recover $750 million of gross proceeds; and

- the Holders of general unsecured trade claims against Tribune would potentially receive approximately 19.4% in the event the Litigation Trust were to recover no gross proceeds, approximately 25.8% in the event the Litigation Trust were to recover $250 million of gross proceeds, approximately 31.5% in the event the Litigation Trust were to recover $500 million of gross proceeds, and approximately 37.3% in the event the Litigation Trust were to recover $750 million of gross proceeds.

**C.**     **Notes & Assumptions for Recovery Charts**

The projected recoveries set forth in the Recovery Charts are provided solely for illustrative purposes. Additionally, such projected recoveries are estimates only and are subject to a number of variables, including, among other things, the outcome of the Allocation Disputes and the amount of Allowed Claims within any particular Class. As a result of the foregoing and other uncertainties which are inherent in such estimates, the projected distributions set forth in the Recovery Charts may vary from the actual recoveries.

Certain key factors and assumptions utilized in connection with determining the projected recoveries set forth in the Recovery Charts include the following:

Distributable Enterprise Value and Treatment Elections

- The projected recoveries in the Supplement and this Exhibit A are based, solely for illustrative purposes, upon an assumed Distributable Enterprise Value ("DEV") of $6.870 billion, comprised of Total Distributable Value of $6.75 billion and $120 million of Step Two Disgorgement Settlement proceeds. The $6.870 billion DEV number was previously utilized in the General Disclosure Statement and is the DEV at which the cash and Strip treatment options for Senior Noteholders and Holders of Other Parent Claims have identical value. As noted below, the Bankruptcy Court found in the Confirmation Opinion that the DEV as of January 19, 2011, was different from this amountDebtors' Total Distributable Value as of January 19, 2011 was $7.019 billion. As set forth in Section VI of the Supplement, the Debtors estimate that, based on the valuation methodology approved by the Bankruptcy Court, as of February 16, 2012, the Reorganized Debtors' Total Distributable Value is a range of $6.917 billion to $7.826 billion, with an approximate mid-point of $7.372 billion, subject to adjustment for certain potential liabilities.

- The Second Amended Plan permitted the Senior Noteholders and Holders of Other Parent Claims to elect to receive in lieu of an all-cash distribution, a "strip" of consideration consisting of a portion of Distributable Cash, New Senior Secured Term Loan and New Common Stock (a "Strip"). This

---

[28]     This estimate assumes that the Holders of the Swap Claim elect Option 1 pursuant to Section 3.2.6(c)(i) of the Third Amended Plan, which provides for the Holders of the Swap Claim to receive a higher initial distribution on account of their claim against Tribune Company in lieu of receiving Litigation Trust recoveries.

option to receive a Strip distribution was added to the Second Amended Plan in part to address concerns about potential changes to the DEV, and such option is preserved in the Third Amended Plan.  To the extent that the Holders of Other Parent Claims or Senior Noteholder Claims elect to receive a Strip, their ultimate recovery percentages may potentially be higher or lower than the projected recoveries set forth in the Recovery Charts due to, for example,  potential variations between the *estimated* value of the New Common Stock or *estimated* amount of Distributable Cash utilized for purposes of estimating the Debtors' Total Distributable Value (as reflected in the Recovery Charts) and the *actual* value on the Effective Date of the New Common Stock issued and amount of Distributable Cash distributed to the Holders of such Claims.

- In the Confirmation Opinion, the Bankruptcy Court found the Total Distributable Value to be $7.019 billion as of January 19, 2011, which when added to the Step Two Disgorgement Settlement proceeds yields a DEV of $7.139 billion.  If the DEV as of the Effective Date were $7.139 billion rather than $6.870 billion, Holders of Senior Noteholder Claims who elect to receive a Strip would receive their pro rata share of $447.9 million of consideration (6.27425% of DEV), whereas those electing cash would receive their pro rata share of $431.0 million of cash (a fixed amount that does not vary with DEV).  Consequently, the estimated recovery percentage for Holders of Senior Noteholder Claims that receive a Strip would be approximately 1.3 percentage points higher than the recovery percentage of those who elect cash.  Similarly (and based upon the foregoing assumptions), the estimated recovery percentage for Holders of Other Parent Claims who elect to receive a Strip would be approximately ~~1.3~~1.4 percentage points higher than the recovery percentage of those who elect cash.  As discussed in Section VI of the Supplement, the Debtors estimate that, as of February 16, 2012, the Reorganized Debtors' Total Distributable Value is a range of $6.917 billion to $7.826 billion, with an approximate mid-point of $7.372 billion, subject to adjustment for certain potential liabilities.  Assuming a DEV as of the Effective Date of $7.492 billion (comprised of Total Distributable Value of $7.372 billion and $120 million of Step Two Disgorgement Settlement proceeds) rather than $6.870 billion, the value of the Strip option for Holders of Senior Noteholder Claims would exceed the value of the cash distribution option.  At this DEV, Holders of Senior Noteholder Claims who elect to receive a Strip would receive their pro rata share of consideration valued at $470.1 million in the aggregate (6.27425% of DEV), whereas those electing cash would receive their pro rata share of $431.0 million of cash (a fixed amount that does not vary with DEV).  As a result, the estimated recovery percentage for Holders of Senior Noteholder Claims that receive a Strip would be approximately 3.0 percentage points higher than the recovery percentage of those who elect cash, and the estimated recovery percentage for Holders of Other Parent Claims who elect to receive a Strip would be approximately 3.3 percentage points higher than the recovery percentage of those who elect cash.

## Other Notes and Assumptions

- Except where inconsistent with the Notes and Assumptions in this Exhibit A, the key factors and assumptions underlying the projected recoveries in the Recovery Charts include the Key Factors and Assumptions set forth in Article II.C of the Specific Disclosure Statement, which are hereby incorporated herein by reference (Specific Disclosure Statement at 11-12).

- The projected recoveries assume that the aggregate consideration provided pursuant to the DCL Plan Settlement is $534.9 million of which $452 million is allocable to the Holders of Claims against Tribune, as further described in Article II.A of the Specific Disclosure Statement, including $13.3 million from the settlement reached with the Bridge Lenders pursuant to the Bridge Settlement Term Sheet. (Specific Disclosure Statement at 3-6 and Exhibit A to the Order Approving the Mediators 3rd Report [Docket No. 7656 at 1]).

-  The projected recoveries assume that no Claim will receive value in excess of 100% of the Allowed amount of such Claim.

- The Holders of Allowed General Unsecured Claims against Tribune that elect, pursuant to Section 3.2.6(c) of the Third Amended Plan, to forego receiving Litigation Trust Interests and Creditors' Trust Interests receive a 2.45% greater distribution than those who do not elect to forego trust interests.  Specifically, those who forego trust interests receive an estimated recovery of approximately 36% (comprised of 35.18% of their Allowed Claim plus a Pro Rata Share of the Bridge Settlement Proceeds), while those who elect to receive trust interests receive 32.73% of their Allowed Claim plus a Pro Rata Share of the Bridge Settlement Proceeds.  The estimated recovery percentages set forth in the Recovery Charts for the Holders of Other Parent Claims assume that all such Holders elected to forego receiving trust interests and instead receive approximately 36% of their Allowed Other Parent Claim (subject to resolution of the Allocation Disputes).

- PHONES Notes Claims and EGI-TRB Notes are assumed to be of equal priority (unless specifically stated otherwise).

- In scenarios where the Allowed amount of the PHONES is assumed to be approximately $761 million ("Low PHONES"), the recovery percentages will be different for holders of exchanged PHONES Notes and holders of unexchanged PHONES Notes – the recovery percentage shown in the Recovery Charts is that for holders of unexchanged Notes.  In scenarios where the Allowed amount of the PHONES is assumed to be approximately $1.2 billion ("High PHONES"), the recovery percentages will be identical for holders of exchanged and unexchanged Notes.

- For ease of calculation, scenarios that include a High PHONES assumption do not reflect changes in the "base" portion of each creditor group's recoveries that would potentially result from such High PHONES assumption.  Any such changes in "base" recoveries would likely impact overall recoveries by less than $1 million for each affected creditor group

- There may be multiple scenarios that would lead to the same Minimum or Maximum Recovery for a Class of Claims.

D.     **Explanation of Recovery Chart**

- The columns of the Recovery Charts summarize the recoveries for the Tribune creditors under each of the Allocation Dispute scenarios described in Section I above (as well as three intermediate scenarios).

- The headings at the top of each column provide a brief description of the scenario illustrated in such column. The parenthetical at the end of each description is a cross-reference to the particular sub-section of Section A that discusses the scenario depicted in the column.

- The top third ("Assumptions for Illustrative Resolution of Allocation Disputes") of the Recovery Chart describes the combination of outcomes of the various Allocation Disputes that are depicted in a given column (each, an "Allocation Scenario").

- The middle third ("Illustrative Recovery as a % of Claim") represents the recovery percentage that each class of claims would receive under each given Allocation Scenario.

- The bottom third ("Illustrative Recovery Amount") represents the recovery dollar amount that each class of claims would receive under each given Allocation Scenario.

- Column 1 ("Article III Distributions (no adjustments for Allocations Disputes")) provides the estimated recoveries under the Second Amended Plan. Column 2 represents the least favorable outcomes for all parties except the Holders of PHONES Notes Claims and EGI-TRB LLC Notes Claims. The consideration that would be received by the Holders of PHONES Notes Claims and EGI-TRB LLC Notes Claims based on the scenario illustrated in Column 2 is excluded as their minimum recovery without resolution of the Allocation Disputes is zero. For ease of reference Columns 1 and 2 are shown on both pages of the Recovery Chart.

- Columns 3, 4, 6, 7, 9, 10, 12 and 13 illustrate Allocation Scenarios that are specifically discussed in Section A while columns 5, 8 and 11 are not specifically referenced in the Section A (column 5 shows a combination of columns 3 & 4; column 8 shows a combination of columns 6 & 7; and column 11 shows a combination of columns 9 &10).

- Columns 14 through 23 illustrate Allocation Scenarios that result in the minimum and maximum recoveries to the following group of claimants: Senior Noteholders, Other Parent Claims, PHONES Notes Claims and EGI-TRB LLC Notes Claims. These Allocation Scenarios are discussed in Section IV.B.1 of the Supplement.

**E.**    **Recovery Chart**

[Remainder of Page Intentionally Blank]