*THOMSON*    104 Feeding Hills Road, Southwick, MA 01077 Tel 413-998-1100  Fax 413-569-6178/413-998-1178  www.thomson.net

**THOMSON PROPOSAL**

| | |
|---|---|
| **To:** WTXX DTV CH 20, WATERBURY, CT | **Proposal No:** #6681-060807-R2-contract amendment #1 |
| | **Date:** 27-Feb-08 |
| | **Your Contact:** jack.mcanulty@thomson.net |

| | |
|---|---|
| **Attn.** | **Andy Bater** |
| **Email** | abater@tribune.com |
| **Attn.** | **Paul Brenner** |
| **Email** | pbrenner@tribune.com |

## CONTRACT AMENDMENT #1 TO #6681-060807-R2

## TRIBUNE BROADCASTING

Thank you for your inquiry.  We are pleased to submit our quotation as follows:                                    **All Prices In US Dollars**

| Description | TOTAL PRICE |
|---|---|
| 1 Each    THOMSON type analog CXIC2R convert to CTT-U-DCX-2 Millennium IOT equipped (water cooled) UHF-Digital Television Transmitter as detailed in the attached equipment/services list. | $220,871.00 |
| Customer Selected Options as detailed in the attached equipment/services list. | $124,045.00 |
| Total Net Price: | $344,916.00 |
| Total Contract Amendment #1 Equipment | $2,425.00 |
| New Total Net Price: | $347,341.00 |

"This Proposal and all sales hereunder shall be subject to the attached Sales Terms and Conditions.  Although the customer may include or reference its standard forms for orders or other notices hereunder, such standard forms will be superseded by the terms and conditions of this proposal including the attached Sales Terms and Conditions and any term or condition in such standard forms that is inconsistent with or in addition to the terms and conditions of this Proposal shall have no force or effect."

This quotation contains proprietary information and it may not to be divulged to any third party without the expressed written consent of THOMSON Broadcast & Multimedia Inc.

This order is issued pursuant to THOMSON Proposal number  #6681-060807-R2-contract    and be governed by the terms contained within.

If this proposal is acceptable, please sign below and fax a copy to THOMSON Broadcast & Multimedia (413) 998-1178.

**Delivery:**                                                                           **Purchaser's Acceptance**
THOMSON shall use all reasonable efforts to Deliver     90-120
the equipment "FOB Seller's Factory or Origin" (UCC) quoted herein within    Please Enter Our Order As Above
THOMSON'S Terms & Conditions Attached

**Payment:**                                              Standard
(Refer to THOMSON'S Terms & Conditions Attached)                               Purchaser's Name

Price and shipment time quoted are firm for     60    Days
from the date of this quotation.                                                Signature / Date

**Jack McAnulty**
Transmission Sales Manager                                                      Title

**Ship To:**                                                                    **Bill To:**

# Paul R Brenner

Digitally signed by Paul R Brenner
DN: cn=Paul R Brenner, o=Tribune
Broadcasting, ou=WTIC/WTXX,
email=pbrenner@tribune.com,
c=US
Date: 2008.03.01 20:18:42 -05'00'



104 Feeding Hills Road, Southwick, MA 01077 Tel 413-998-1100 Fax 413-569-6178/413-998-1178 www.thomson.net

**WTXX DTV CH 20, WATERBURY, CT**
**THOMSON PROPOSAL**
**#6681-060807-R2**
**EQUIPMENT & SERVICES**

All Prices In US Dollars

| ITEM | QTY | PART NO. | DESCRIPTION | UNIT PRICE | EXTN'D PRICE |
|------|-----|----------|-------------|------------|--------------|
| | | | Family - DCX<br>TV Standard - 8 VSB DTV<br>TV Channel - DTV 20<br>Maximum System Average Output - 50kW * with in-band signal to noise ratio of >= 27 dB<br>Final Amplifier Type and Quantity - 2 Existing Tube<br>Input Voltage/Frequency - 480 /277 VAC/60Hz | | |
| 1 | 1 | CTT-U-DCX | THOMSON type analog CXIC2R convert to CTT-U-DCX-2 Millennium IOT equipped (water cooled) UHF-Digital Television Transmitter | $220,871.00 | $220,871.00 |
| | | | Inclusive features of the entire "*DCX*" product line are: | | |
| | | | > IEC 215 Compliance | | |
| | | | > Connectorized System Interface | | |
| | | | > Modular Construction | | |
| | | | > Positive Pressure Cabinet Cooling (Stand-alone) or Ducted | | |
| | | | **Transmitter System Includes:** | | |
| 1.1 | 1 | | **Exciter/Control Cabinet containing:** | | |
| 1.1.1 | 1 | | **> THOMSON' ADAPT-IV™ Advanced "On Channel" UHF TV 8VSB Exciter containing:** | | |
| | | | > Reed Solomon Error Correction Coding<br>> Data Randomization<br>> Data Interleaving and Trellis coding<br>> Side Band Correction<br>> Digital Adaptive Precorrection DAP™<br>> Automatic Power Control (APC)<br>> Remote Interface | | |
| 1.1.2 | 1 | | >Transmitter System Controller including Programmable Logic Control (PLC) system for remote and local operation of transmitter and R.F. power supply and "DeviceNet" remote system with color touch screen display, Input/Output (I/O) units. | | |
| 1.1.3 | 1 | | **>"DSP" Digital Signal Processor with Total Power Control Unit:** | | |
| 1.1.3a | | | > Up to 8 channels of system power monitoring for local and remote display.<br>> Uses active detectors for accurate 8VSB monitoring.<br>> Digital calibration for all channels. | | |
| 1.1.3b | | | > Provides for System Reverse Automatic Power Control (VSWR Foldback). System Forward Output Power is automatically reduced to maintain Reverse Power below a selectable level. Forward Power is automatically returned to normal when the VSWR condition is reduced below the selected level | | |
| 1.1.4 | 1 | | > Set of Interconnection Cables | | |



104 Feeding Hills Road, Southwick, MA 01077 Tel 413-998-1100  Fax 413-569-6178/413-998-1178  www.thomson.net

WTXX DTV CH 20, WATERBURY, CT
THOMSON PROPOSAL
#6681-060807-R2
EQUIPMENT & SERVICES

**All Prices In US Dollars**

| ITEM | QTY | PART NO. | DESCRIPTION | UNIT PRICE | EXTN'D PRICE |
|------|-----|----------|-------------|------------|--------------|
| 1.2 | 2 | | Amplifier Cabinet Assembly Upgrade each containing: | | |
| 1.2.1 | 1 | | > Intermediate Power Amplifier System Containing: | | |
| 1.2.1a | | | > Class AB 400W amplifier modules (lot) | | |
| 1.2.1b | | | > Switching Power Supply (1) | | |
| 1.2.1c | | | > Broadband balanced Splitter/Combiner Assembly (1) | | |
| 1.2.2 | 1 | | > Micro-processor based "Intelligent Controller" system with LCD and tricolor LED status display and power supply | | |
| 1.2.3 | 1 | | HPA Power monitor board | | |
| 1.3 | 1 | | THOMSON R.F. waveguide and coax filter and switching system containing | | |
| 1.3.1 | 2 | | > Coaxial step transition | | |
| 1.3.2 | 2 | | > Coaxial low pass filter | | |
| 1.3.3 | 1 | | > Waveguide Constant Impedance (Band Pass) Filter CIF (FCC Mask  Filter) | | |
| 1.3.4 | 1 | | Waveguide "Magic Tee" (2 tube) switch-less combiner comprised of: | | |
| 1.3.4a | | | > Waveguide to Coax transitions (3) | | |
| 1.3.4b | | | > Waveguide "Magic Tee" combiner (1) | | |
| 1.3.4c | | | > Coax water column reject load (1) | | |
| 1.3.4d | | | > Waveguide precision output coupler | | |
| 1.3.5 | 1 | | > Miscellaneous Coaxial and Waveguide interconnect parts including: | | |
| 1.3.5a | | | > Coaxial precision output couplers (2) | | |
| 1.3.5b | | | > Coaxial sections  (2) | | |
| 1.3.5c | | | > Coaxial elbows (4) | | |
| 1.3.5d | | | > Waveguide to "H" plane elbow (1) | | |
| 1.3.5e | | | > Waveguide tuner (1) | | |
| 1.3.5f | | | > Waveguide manual switch (1) | | |
| 1.3.6 | 1 | | System Load assembly comprised of: | | |
| 1.3.6a | | | > Coaxial water column load (1) | | |
| 1.3.6b | | | > Thruline wattmeter and elements (1) | | |
| 1.3.6c | | | > Coaxial precision directional coupler section (1) | | |
| 1.3.7 | 1 | | > High Power Calorimetry set composed of: | | |
| 1.3.7a | | | > Precision flow meter (Rotameter) (1) | | |
| 1.3.7b | | | > Custom thermometer wells (2) | | |
| 1.3.7c | | | > National Institute of Standards and Technology traceable long stem digital thermometers (2) | | |
| 1.3.8 | Lot | | > Mechanical hardware for standard RF installation | | |
| 1.4 | Lot | | Technical Manuals | | |
| | | | >1 Set of technical manuals covering exciter, IPA driver, high voltagepower supply, high power amplifier and standard system information | | |

| | | | Total Transmitter Price Ex-Factory | | $220,871.00 |



104 Feeding Hills Road, Southwick, MA 01077 Tel 413-998-1100  Fax 413-569-6178/413-998-1178  www.thomson.net

**WTXX DTV CH 20, WATERBURY, CT**
**THOMSON PROPOSAL**
**#6681-060807-R2**
**EQUIPMENT & SERVICES**

<u>All Prices In US Dollars</u>

| ITEM | QTY | PART NO. | DESCRIPTION | UNIT PRICE | EXTN'D PRICE |
|------|-----|----------|-------------|------------|--------------|
| | | | <u>Customer Selected Options</u> | | |
| | | | **(The cost of items selected will be added to the price shown on cover page)** | | |
| | | | | | |
| | | | <u>SCHEDULE B/TRANSMITTER OPTIONS:</u> | | |
| T-1 | 1 | | **Standby Exciter with** | $36,780.00 | $36,780.00 |
| | | | > THOMSON Advanced "On Channel" UHF TV 8VSB Exciter system  same as item 1.1.1 above containing: | | |
| | | | > Reed Solomon Error Correction Coding | | |
| | | | > Data Randomization | | |
| | | | > Data Interleaving and Trellis coding | | |
| | | | > Side Band Correction | | |
| | | | > Digital Adaptive Precorrection DAP™ | | |
| | | | > Automatic Power Control (APC) | | |
| | | | > Automatic Exciter switching with level sensing one time  switch over assembly. | | |
| | | | | | |
| T-5 | 1 | | **Motorized switch** | $1,847.00 | $1,847.00 |
| | | | Replacement of item 1.3.5f (above) with motorized output switch to  allow motorized switching of transmitter output between station load and antenna | | |



104 Feeding Hills Road, Southwick, MA 01077 Tel 413-998-1100 Fax 413-569-6178/413-998-1178 www.thomson.net

**WTXX DTV CH 20, WATERBURY, CT**
**THOMSON PROPOSAL**
**#6681-060807-R2**
**EQUIPMENT & SERVICES**

**All Prices In US Dollars**

| ITEM | QTY | PART NO. | DESCRIPTION | UNIT PRICE | EXTN'D PRICE |
|------|-----|----------|-------------|------------|--------------|
| | | | **SCHEDULE C/SYSTEM OPTIONS:** | | |
| S-1 | 1 | | **THOMSON TV Transmitter Installation:** >Complete professional installation of the conversion system in customer's finished building. Includes all mechanical and interconnect materials for standard installation. Installation is subject to all conditions and limitations indicated herein. | $20,533.00 | $20,533.00 |
| S-2 | 1 | | **THOMSON Transmitter Proof of Performance for DTV** >Complete checkout and commissioning of the purchased THOMSON conversion system as described herein. Proof-of-Performance testing of transmitter will be performed into station load. One original set of the tests and measurements taken will be provided. NOTE: **Thomson assumes that all existing equipment is in good working order and capable of passing a proof of performance. Any parts or labor to correct existing deficiencies will be billed to WTXX.** | $16,239.00 | $16,239.00 |
| S-2a | 1 | | **THOMSON Transmitter Proof of Performance for NTSC** >Complete checkout and commissioning of the Analog transmitter system as described herein. Proof-of-Performance testing of transmitter will be performed into station load. One original set of the tests and measurements taken will be provided. **NOTE: Thomson assumes that all existing equipment is in good working order and capable of passing a proof of performance. Any parts or labor to correct existing deficiencies will be billed to WTXX.** | $11,429.00 | $11,429.00 |
| S-16 | 1 | | **Transmitter System Transportation:** >This service includes the transportation of the conversion system, including all major subassemblies, from THOMSON'S factory, and vendor facilities to CUSTOMER's site. The price included for this service is a budgetary amount based upon estimated transportation miles and is contingent upon the assumption that the site is readily accessible by air-ride moving vans (tractor-trailer up to 82 feet in length) and has adequate conditions for off-loading. If the site conditions require that the equipment be transferred to other conveyances at locations other than the actual transmitter site and transported to the site, or if the actual charge to THOMSON based upon distance, etc., is more than the amount estimated, CUSTOMER understands that the price may be adjusted accordingly. This service does not include either off-loading equipment or personnel required to remove the equipment from the transport vehicles. | $2,577.00 | $2,577.00 |
| S-17 | 1 | | **Offloading and Equipment Placement:** >This service includes the offloading and placement of transmitter components including heat exchangers and High Voltage Power Suppliers. The price included for this service is an estimate and is contingent upon an offloading/rigging company to be within a thirty-mile radius of the transmitter site, and that transmitter room access and equipment pad access is solid, level, and clear of obstructions. If the actual costs are more than the budgeted amount the price may be adjusted accordingly. | $1,100.00 | $1,100.00 |
| S-22 | 1 | | **Dielectric RF Option. Replacement of RF components with Dielectric RF Components. Others may manufacture RF Feeder lines.** | $7,112.00 | $7,112.00 |
| S-22.1 | 1 | | **Dielectric Motorized Switch replaces T-5 above** | Included | Included |



104 Feeding Hills Road, Southwick, MA 01077 Tel 413-998-1100  Fax 413-569-6178/413-998-1178  www.thomson.net

**WTXX DTV CH 20, WATERBURY, CT**
**THOMSON PROPOSAL**
**#6681-060807-R2**
**EQUIPMENT & SERVICES**

<u>All Prices In US Dollars</u>

| ITEM | QTY | PART NO. | DESCRIPTION | UNIT PRICE | EXTN'D PRICE |
|------|-----|----------|-------------|-----------|--------------|
| NS-1 | 2 | | **CB3 Breaker Upgrade**<br>>Installation of the retrofit kist containing necessary components to change the existing CB3 breaker in a HPA cabinet to a more robust model for increased reliability and less servicing. | $4,525.50 | $9,051.00 |
| NS-2 | 2 | | **Crowbar Retrofit**<br>>U5 Retrofit Module<br>>U7 Retrofit Module<br>>Low Voltage Control Board<br>>High Voltage control Board<br>>Installation | $778.50 | $1,557.00 |
| NS-3 | 1 | | **Filament Bias**<br>>Installation Kit, IOX Filament/Bias (2)<br>>PCB Assembly, Main Processor (2)<br>>Front Panel Assembly: Allows adjustment of voltages without the need to turn off<br>>Installation | $14,037.00 | $14,037.00 |
| NS-4 | 1 | | **NTSC Modifications for WTIC**<br>**Convert System Programming**<br>RF Flow Window<br>Display Board Assembly<br>PLC Processor<br>EPROM Memory Module | $1,783.00 | $1,783.00 |
| NS-5 | 1 | | **Precision Forward and Reverse Power Directional Coupler for Power Measurement** | Included | Included |

| | | |
|---|---|---|
| **Total Customer selected Options Ex-Factory** | | $124,045.00 |

| | | |
|---|---|---|
| **Grand Total $** | | 344,916.00 |

## THOMSON BROADCAST AND MULTIMEDIA, INC.
## STANDARD SALES TERMS AND CONDITIONS

_____, is hereinafter referred to as "CUSTOMER" and THOMSON Broadcast & Multimedia, Inc. is hereinafter referred to as "SELLER."

## ARTICLE 1  SCOPE OF WORK

SELLER shall furnish the necessary personnel, equipment, material, services and facilities to perform the effort specified in SELLER'S quotation, referred to herein as "Product(s)."

Unless otherwise specified, Products do not include installation or proof of performance services. If either of said services are to be provided per the Scope of Work, the said services shall be provided pursuant to the terms and conditions of the Commissioning & Proof-of-Performance Testing Rider attached hereto.

## ARTICLE 2 PERIOD OF PERFORMANCE AND EFFECTIVE DATE

The Effective Date of this contract shall be the first date upon which a contract is signed by both parties or SELLER issues an acknowledgement of an order placed pursuant to the quotation submitted herewith. SELLER shall not be obligated to perform pursuant to this contract until all referenced deposits and letters of credit are established and received by SELLER as required in the quotation.

## ARTICLE 3 PRICE/PAYMENT

Unless otherwise specified in the Proposal, the contract price shall be due and payable to SELLER in accordance with the following schedule:

- Thirty-Five (35%) Percent of the total contract price (hereinafter "Initial Deposit") is due and payable upon signature of this Contract by CUSTOMER;
- Thirty (30%) Percent of the total contract price is due and payable within sixty (60) days of the date this Contract is signed by CUSTOMER;
- Thirty (30%) Percent of the total contract price is due and payable upon notification to CUSTOMER that the Product shall be available for shipment within Thirty (30) Days;
- Five (5%) Percent of the total contract price is due and payable upon FCC Proof of Performance testing of the transmitter into station dummy load or Sixty (60) Days after notification to CUSTOMER that the Product is ready to ship, whichever occurs first.

Any offer of credit contained in the quotation or proposal is subject to, and contingent upon, SELLER'S review and approval of CUSTOMER'S credit at any time prior to Delivery of equipment and/or performance of services. The price of this contract includes only such spare parts or other product support as are described in the quotation. All other spare parts or support shall be ordered from SELLER via purchase orders, or other separate agreement, and governed by the terms and conditions stated therein. Unless specifically stated otherwise, all monetary amounts are in U.S. Dollars.

Any amounts due SELLER but not received by SELLER within the time periods as stated in the quotation shall bear interest from the date of invoice, at the lesser rate of one percent (1%) per month or the highest interest rate allowed by law. CUSTOMER shall pay SELLER any and all collection and/or litigation expenses, including reasonable attorneys fees, incurred by SELLER in collecting any late payments. Furthermore, should payment arrears reach fifteen (15) days, SELLER at its sole discretion shall have the right to suspend performance and remove the Product(s) for return to the manufacturer in addition to seeking those remedies available at law or equity. For the purpose of effectuating the removal of said Product(s), CUSTOMER hereby grants to SELLER'S permission to enter onto the premises wherein the Product(s) is located and to take the action necessary to remove said Product(s). CUSTOMER waives all claims against SELLER for any and all damages, which may result from said removal. The parties agree that, notwithstanding any passage of title, SELLER shall retain a Purchase Money Security Interest under the Uniform Commercial Code in each item of equipment to be delivered hereunder and the proceeds derived from such Equipment. CUSTOMER shall execute such documents as SELLER may require, including, but not limited to, a Security Agreement, one or more Financing Statements, and provide to SELLER signed waivers and consents from landowner(s) and mortgagee(s). CUSTOMER agrees and

hereby does appoint SELLER as attorney-in-fact to do, at the option of SELLER, all acts and things SELLER may deem desirable to perfect and continue to perfect the Purchase Money Security Interest, including SELLER'S authority to file financing statements naming CUSTOMER as debtor and SELLER as secured party without CUSTOMER'S signature in those states where such filings are permitted.  At SELLER'S option, there shall be no delivery of any of the Equipment purchased hereunder until all documents necessary to perfect the Security Interest have been executed to SELLER'S satisfaction.  These interests shall be satisfied by payment in full of the contract price.

**The Remit to Address for all payments is:** THOMSON Broadcast & Multimedia, 104 Feeding Hills Road, Southwick, MA 01077

**The wire transfer/ACH payments information is:**
BANK ADDRESS:        JP Morgan Chase, NY
ACCOUNT NUMBER: 304670073
ABA ROUTING #:      021000021
Swift Code:              CHASUS33
BENEFICIARY:         THOMSON Broadcast & Multimedia, Inc.

All payments to be secured by a Letter of Credit shall be with terms as set forth in the attached Letter of Credit Instructions Rider and provide for an Irrevocable Letter of Credit confirmed by a wholly owned major US bank.

## ARTICLE 4 TAXES AND DUTIES

CUSTOMER is responsible for payment of all taxes, duties or similar charges resulting from the sale of Products. CUSTOMER shall prior to delivery either provide THOMSON proof of payment of all taxes, duties or similar charges or provide THOMSON a certificate evidencing exemption of payment of all such charges.  If such proof or certificate is not so received THOMSON, at its election, may pay said charges and bill CUSTOMER.

## ARTICLE 5 CUSTOMER RESPONSIBILITIES

In addition to the requirements identified in the quotation as CUSTOMER responsibilities, CUSTOMER shall also be responsible for the following:

5.1  Obtaining any permits, visas, licenses or other approvals or authorizations necessary for the installation and/or operation of the Product(s) provided hereunder.

5.2  Providing SELLER with all information needed regarding the site and its equipment for SELLER to perform the services required under this contract.

5.3  Ensuring that SELLER shall have timely and complete access to the work sites and facilities needed by all SELLER employees and/or subcontractors performing hereunder.

5.4  Notify SELLER, in writing, of the frequency assignment for each item of equipment supplied as part of the Product(s) at least ninety (90) days prior to the date of Delivery.  Timely receipt of the frequency assignments is critical to the manufacture, testing and delivery of the Product(s) supplied under this contract.  Once CUSTOMER notifies SELLER in writing of the frequency assignment, CUSTOMER may change the frequency assignment only by a written change order to this contract accepted by both parties.  In such instance, SELLER shall be entitled to an adjustment in the contract price and Delivery schedule for any delay and extra costs caused by the change, plus a reasonable profit thereon.

5.5  If the work to be performed by SELLER under this contract includes site preparation, CUSTOMER shall provide at its expense a copy of a site survey, which shall be attached as an Exhibit to this contract.  CUSTOMER represents and warrants that the description of the site and other information contained in the site survey is accurate.  After commencement of site preparation by SELLER, SELLER will give written notice to CUSTOMER of any subsurface, latent or previously unknown physical condition, which differs materially from that indicated in the site survey provided by CUSTOMER.  SELLER shall be entitled to an adjustment in the contract price and Delivery schedule for the delay and extra costs caused by any such differing site condition, plus reasonable profit.

## ARTICLE 6 SHIPMENT, ACCEPTANCE, TITLE AND RISK OF LOSS

6.1    "Delivery" of all Product(s) to be provided under this Contract shall be F.O.B. SELLER factory or Origin (UCC). Unless otherwise specifically identified as a line item in the Scope Of Work (Equipment & Service Schedule), the price does not include shipping, transit insurance, offloading services, or taxes of any kind. Partial shipments are allowed. In the event that CUSTOMER is unable to receive shipment to site on the scheduled Delivery date, SELLER shall Deliver the Product F.O.B. warehouse for storage on CUSTOMER'S behalf, at CUSTOMER'S sole risk and expense until CUSTOMER is able to receive the Product at site.

6.2    Acceptance shall be deemed to have occurred as follows:

       6.2.1  If SELLER is not to perform FCC Proof-of-Performance services; upon the earlier of inspection of the Product(s) by the CUSTOMER or thirty (30) days after Delivery; or,

       6.2.2  If SELLER is to perform FCC Proof-of-Performance services (if included in Scope of Work) of the Product(s); upon the earlier of installation (including commissioning if included in Scope of Work) of the Product(s); as required by the Contract or sixty (60) days after Delivery if such service is delayed or prevented for reasons beyond SELLER'S direct control.

6.3    Title of ownership and risk of loss or damage of the Product(s) shall transfer to CUSTOMER upon Delivery at the F.O.B. point specified above.

6.4    For Deliveries within the Continental United States, unless otherwise directed by CUSTOMER, SELLER shall arrange, and prepay on CUSTOMER'S behalf, for transportation and insurance of the Product to CUSTOMER'S designated location. In consideration for such prepayment and logistical services SELLER reserves the right, and CUSTOMER agrees to pay, a ten-percent (10%) service and handling fee, calculated on the amount of the prepaid freight and insurance, in addition to reimbursing SELLER for the actual freight and insurance charges. If SELLER'S price is specified as F.O.B. Destination (UCC) and includes the cost of freight and insurance to site then the ten-percent (10%) fee shall not be assessed.

6.5    Unless otherwise specified in the Proposal, and provided that CUSTOMER performs its obligations under the Contract, SELLER shall use all reasonable efforts to Deliver the Equipment within One Hundred Fifty (150) Days of the effective date of the Contract. The installation and/or Proof-of-Performance services, if included in the Scope of Work, shall be completed as soon as reasonably possible after shipment to site.

## ARTICLE 7 DISCLOSURE AND USE OF CONFIDENTIAL OR PROPRIETARY INFORMATION

7.1    If documents supplied to one party by the other party ("Owner") are marked "Confidential" or "Proprietary", the recipient shall take all necessary steps to ensure that the contents of such documents are not disclosed to or used by, now or hereafter, any person, firm, corporation, or entity other than a person employed or engaged by the recipient whether under subcontract or otherwise for the performance of this contract. Any document marked "Confidential" or "Proprietary" and all copies made of any such document shall be returned by the recipient to Owner upon completion of the purpose for which they were provided, or destroyed by recipient at Owner's instruction.

7.2    Any disclosure to any person permitted under Paragraph 7.1 above shall be made in confidence and shall extend only so far as may be necessary to fulfill the purposes of this contract.

7.3    Except with the written consent of Owner, the recipient shall not make use of any document mentioned in Paragraph 7.1 above, including manufacture or sale to third parties, other than to fulfill the purposes of this contract.

7.4    The foregoing restriction on use and disclosure will not apply to information: (1) if such information is or becomes legally available to the public from a source other than the receiving party; (2) if such information is lawfully obtained by the receiving party without an obligation of confidentiality from a third party or parties; (3) if such information is known by the receiving party prior to such disclosure; or (4) if such information is, at any time, developed by the receiving party completely independent of such disclosures from the disclosing party.

## ARTICLE 8 FORCE MAJEURE/EXCUSABLE DELAYS/ATTENDANT CONTRACT MODIFICATION

8.1    (a)    If either party in good faith is rendered wholly or partially unable by Force Majeure conditions to carry out its obligations under this contract, or if SELLER'S supplier is unable to provide Product(s), and if that party gives prompt written notice and full particulars of such Force Majeure condition to the other party, that party shall be excused from performance of its obligations during the continuance of any such inability, but for no longer period. Such cause shall be

remedied as far as possible with all reasonable speed, and with all reasonable efforts, and notice shall be given when the cause is remedied.

(b)     During the period of any Force Majeure condition, the parties shall cooperate to perform under this contract to the best of the parties' abilities.

(c)     "Force Majeure" means act of God, acts of public enemies, wars, other hostilities, blockades, insurrections, riots, epidemics, quarantine restrictions, floods, unavailability of components or supplies, lightning, fire, storms, earthquakes, washouts, arrests, restraints of rulers and people, civil disturbances, acts of any governmental or local authority, and any other acts and causes, not within the control of the party claiming excuse from performance, which by the exercise of due diligence and reasonable effort, that party shall not have been able to foresee, avoid or overcome.

(d)     If performance by a party is precluded or restrained by Force Majeure for more than ninety (90) days, either party may terminate this contract upon written notice to the other.

8.2      In the event that SELLER is delayed by the failure of CUSTOMER to provide access to the site or furnished equipment, information or services in accordance with the schedule and requirements set forth in this contract, SELLER shall receive an equitable adjustment to the Delivery schedule, and/or contract price.

8.3      SELLER reserves the right to suspend, without any liability to or recourse from CUSTOMER, all or part of the services to be performed hereunder (including the shipment of equipment) during any period when, in the reasonable judgment of SELLER, the health and/or safety of SELLER or its subcontractors' personnel performing any such service could be jeopardized.

## ARTICLE 9 VENUE, JURISDICTION AND PERIOD LIMITATION OF ACTION

This Contract shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts applicable to contracts between residents of the Commonwealth of Massachusetts that are to be wholly performed with such state.  The interested party agrees that any action or proceeding arising out of or related in any way to this Contract shall be brought solely in a court of competent jurisdiction sitting in the Commonwealth of Massachusetts.  The interested party hereby irrevocably and unconditionally consents to the jurisdiction of any such court and hereby irrevocably and unconditionally waives any defense of an inconvenient forum to the maintenance of any action or proceeding in any such court, any objection to venue with respect to any such action or proceeding and any right of jurisdiction on account of the place of residence or domicile of any party thereto.  The interested party hereby irrevocably and unconditionally waives the right to a jury trial in connection with any claim arising out of or related to this Contract, the information or the transaction.  No action with regard to any dispute or controversy arising out of or in connection with this Contract or the Product(s) shall be brought more than one (1) year after the cause of action accrues.

## ARTICLE 10 INDEMNIFICATION

Each party shall indemnify and hold the other Party and its officers, agents, servants, subsidiaries, assigns and employees, harmless from any direct loss, damage, liability or expense, resulting from damage to property, private or public, and injuries, including death, to persons, arising from any occurrence caused by its act or omission or its subcontractors' or representatives' acts or omissions, and at its expense shall defend any suits or other proceeding brought against the other party or its officers, agents, servants, subsidiaries and employees, or any of them, on account thereof, and shall pay all direct expenses and satisfy all judgments which may be incurred by or rendered against them, or any of them in connection therewith.

## ARTICLE 11 INSURANCE

The Parties shall carry adequate insurance to protect each other against all losses, damages and costs which may be incurred resulting from events under this contract. Each party shall provide, at the request of the other, a Certificate of Insurance giving evidence that such insurance is in effect and will be kept in effect and not materially changed during the life of this contract.

## ARTICLE 12 SOFTWARE LICENSES GRANTED

Subject to CUSTOMER'S compliance with all material obligations under this Contract (especially as regards to the payment of the compensation for the rights granted), THOMSON BROADCAST & MULTIMEDIA, INC. hereby grants to CUSTOMER a nonexclusive, perpetual, nontransferable right and license to use, copies of software programs embedded in, or used in connection

with, Product(s) which CUSTOMER has purchased hereunder, in Object Code only, for use as part of the Product(s).   No modification or preparation of derivative works of such software whatsoever is permitted.

Said software license is subject to the following restrictions:

(1)     Only a personal, nontransferable and non-exclusive right to use the software with a single designated Product is granted to CUSTOMER;

(2)     THOMSON BROADCAST & MULTIMEDIA, INC. or its supplier retains all title to the software, and all copies thereof, and no title to the software, or any intellectual property in the software, is transferred to CUSTOMER;

(3)     CUSTOMER may not copy the software;

(4)     CUSTOMER agrees not to reverse assemble, decompile, or otherwise attempt to derive source code from the software;

(5)     CUSTOMER agrees to comply with all export and re-export restrictions and regulations of the Department of Commerce or other United States agency or authority, and not to transfer, or authorize the transfer, of the software to a prohibited country or otherwise in violation of any such restrictions or regulations;

(6)     CUSTOMER may transfer the software to a transferee in connection with the transfer of the Product in which it is incorporated (i) only to a transferee within the same country, and (ii) to a transferee within a different country only with the written consent of THOMSON BROADCAST & MULTIMEDIA, INC.  and in compliance with US law, and in either case subject to the transferee's executing a written license agreement in the same form as the License Agreement granted herein;

(7)     Although the software is copyrighted, it is unpublished and contains proprietary and confidential information of THOMSON BROADCAST & MULTIMEDIA, INC. and its supplier and is considered by THOMSON BROADCAST & MULTIMEDIA, INC. and its supplier to contain trade secrets, and the CUSTOMER shall agree to hold the software in confidence. Without limiting the foregoing, the CUSTOMER shall agree to protect the software at least to the same extent that the CUSTOMER protects its own similar confidential information and to take all reasonable precautions to safeguard the confidentiality of such software. The CUSTOMER shall further agree not to use the software to develop competitive systems or derivative products, or for any other purpose except the operation of the designated Product(s);

(8)     THOMSON BROADCAST & MULTIMEDIA, INC.'s suppliers are direct and intended beneficiaries of this License Agreement and may enforce it directly against the CUSTOMER; and

(9)     THOMSON BROADCAST & MULTIMEDIA, INC. AND THOMSON BROADCAST & MULTIMEDIA, INC.'S SUPPLIERS SHALL NOT BE LIABLE TO CUSTOMER FOR ANY GENERAL, SPECIAL, DIRECT, INDIRECT, CONSEQUENTIAL, INCIDENTAL, OR OTHER DAMAGES ARISING OUT OF THE SUBLICENSE OF THE PROGRAM OR THE CUSTOMER'S USE THEREOF.

## ARTICLE 13 LIMITED WARRANTIES

(a)     Product(s) are warranted against defects in workmanship and material as set forth in the attached Warranty.

(b)     SELLER'S liability howsoever arising under or in connection with this contract (whether in contract, tort, or otherwise) is specifically limited as provided herein and in Article 16. This contract sets forth CUSTOMER'S exclusive remedies with respect to any claim under this contract.

## ARTICLE 14 PRODUCT PREPARATION

(a)   SELLER shall prepare and pack Product(s) for domestic shipment in accordance with good commercial practice. Any additional handling or preparation for shipment, especially international shipments, shall be as specified by CUSTOMER and at prices agreed to by CUSTOMER and SELLER in writing prior to shipment.

(b)   Product(s) returned to SELLER by CUSTOMER for warranty repair, service, or replacement by SELLER shall be packed in the original containers furnished by SELLER or equivalent containers furnished by CUSTOMER.

## ARTICLE 15 ALTERATION TO PRODUCT PURCHASED

It is understood and agreed that any modification or alteration to Product(s) manufactured and warranted by SELLER or its supplier, other than any modification or alteration specifically authorized by this contract, or performed or authorized by SELLER, may VOID and NULLIFY, at SELLER'S option, in part or in its entirety, the warranty obligations of SELLER with respect to such modified or altered Product(s).

## ARTICLE 16 LIMITATION OF LIABILITY

16.1   The remedies of the CUSTOMER as set forth herein are exclusive, and the liability of SELLER with respect to any sale or anything done in connection therewith, such as the performance or breach thereof or from the manufacture, sale, delivery, resale, installation or use of any Product(s) covered by or furnished under this contract, whether arising out of a statute, agreement, negligence, strict liability in tort, or under any warranty or otherwise, shall not exceed the price of the equipment supplied (including installation) upon which such liability is based, except as expressly provided for herein.

16.2   SELLER shall not under any circumstances be liable for: (i) delays in delivery of the equipment to the site attributable to CUSTOMER; (ii) damage to or loss of SELLER supplied equipment/Product(s) caused by CUSTOMER or its subcontractors; (iii) delays caused by Force Majeure events specified in Article 8.

16.3   SELLER shall not, under any circumstances, be liable for special, indirect, incidental or consequential damages, including but not limited to lost profits or revenues, which may arise out of or under this contract. The limitation in the previous sentence and the exclusion of consequential, special or incidental damages shall remain in full force and effect even if the remedies for breach of warranty provided in this Contract fail of their essential purpose. The above limitation shall be effective regardless of the fact that SELLER is or has been made aware of the possibility or likelihood of any such potential damages.

## ARTICLE 17 GOVERNMENT APPROVALS

17.1   This contract is subject to all United States laws and regulations relating to exports and to all administrative acts of the U.S. Government pursuant to such laws and regulations.

17.2   In the event that lawful performance of this contract or any part of this contract by either party is delayed or rendered impossible by, or as consequence of any law, regulation, or act of any Government having jurisdiction over it, such party shall not be considered to be in default by reason of such delay or failure to perform, and the parties shall consult in good faith to develop an equitable resolution of the issue with due regard for the respective interests of the parties.

17.3   The equipment, technical data and information exported from the United States in furtherance of this contract shall only be used for the installation and operation of the Product(s) and shall not be transferred directly or indirectly to a person in a third country without the prior written consent, if required, of the Office of Export Licensing of the U.S. Department of Commerce.

17.4   All provisions in this contract, which refer to the United States Government and the Department of Commerce will remain binding on the parties after the termination of the contract.

## ARTICLE 18 GENERAL

18.1   Except for assignment or delegation to another division, affiliate or wholly-owned subsidiary of SELLER, neither Party shall assign or delegate this contract or any of its rights, duties or obligations thereunder to any other person without the prior written consent of the other Party. Any attempt by either Party to assign or delegate any of its rights, duties or obligations under this contract without such consent shall be void and of no effect. However, SELLER shall be permitted to subcontract.

18.2  If either Party, at its option, agrees to a waiver of any of the terms and conditions recited herein, such waiver shall not for any purpose be construed as a waiver of any succeeding breach of the same or any other terms and conditions; nor shall such a waiver be deemed as a course of conduct.

18.3  If any provision or clause, or portion thereof, of this contract, or application thereof to any person or circumstances is held invalid or unconscionable, such invalidity or unconscionability shall not affect other provisions, or portions thereof, or applications of this contract which can be given effect without the invalid or unconscionable provision, or portion thereof, or application, and to this end the provisions of these terms and conditions are declared to be severable.

18.4  Captions and heading in this Contract are strictly for the purpose of convenience and general reference only, and shall not affect the meaning or interpretation of any of the provisions of this Contract.

## ARTICLE 19 TRAINING

19.1  In the event SELLER has agreed to provide training for CUSTOMER'S personnel pursuant to this contract, the training of CUSTOMER'S personnel, unless otherwise agreed in writing, shall be conducted at SELLER'S facility in either Southwick, Massachusetts; Mountaintop, Pennsylvania, as determined by SELLER.

19.2  All instruction, training aids and materials shall be prepared and presented in the English language and in the units of measure used by SELLER in designing the Product(s). If interpreters are required for CUSTOMER'S personnel, CUSTOMER shall provide such interpreters. SELLER may increase the length of classes, if required, to cover course content when an interpreter is used. Training, unless otherwise agreed, shall be conducted during the normal working hours and days of SELLER.

19.3  CUSTOMER must attend the scheduled training within one (1) year of the date of either the original FCC "Proof of Performance" test or the arrival of the Product on-site if no such test is included in the Contract. If CUSTOMER does not attend the training within that period, the obligation to provide such training shall be voided.

19.4  Personnel of CUSTOMER participating in training shall, at a minimum, have previous experience in fields directly related to the Product(s). Unless otherwise agreed in writing, CUSTOMER shall assume all costs of and liabilities for CUSTOMER'S personnel while they are in transit to and at SELLER'S facilities.

19.5  CUSTOMER shall not be relieved of its obligation to pay any amounts due and owing under this contract in the event CUSTOMER fails to furnish a qualified trainee for scheduled training or if such training is not completed by the trainee.

## ARTICLE 20 LANGUAGE AND COMMUNICATIONS

This contract and all documentation and communications required hereunder, shall be in the English language. All communications relating to this contract shall be made or confirmed in writing including telegram, telex, or facsimile, or any other method agreeable to both parties.

## ARTICLE 21 DEFAULT

CUSTOMER shall be deemed to be in default of this Contract if:

21.1  CUSTOMER fails to pay when due any amounts required to be paid under this Contract or fails to perform any obligation required by the terms of this Contract within ten (10) days after SELLER shall have demanded in writing its performance;

21.2  CUSTOMER commits any act of bankruptcy or any proceeding under its jurisdiction's bankruptcy statutes is commenced by or against CUSTOMER.

21.3  A receiver is appointed to take possession of CUSTOMER'S assets.

21.4  CUSTOMER makes a general assignment for the benefit or creditors, or sells, transfers, or disposes of all or substantially all of its assets or property, or merges with any other entity or engages in any form of corporate reorganization.

If at any time during the performance of this Contract CUSTOMER is indebted to SELLER for goods or services sold or supplied under this Contract or otherwise, and CUSTOMER fails to make payment therefore in strict accordance with the terms and conditions applicable to said debt, then SELLER is authorized to apply any portion of any payment or deposit credited to this Contract to said debt and any interest and other expenses accrued thereon. In any case, SELLER is further authorized to demand an

additional payment of funds to bring the account under this Contract or otherwise current and, if CUSTOMER fails to make such payment, SELLER may apply its remedies for non-payment under this Contract.

## ARTICLE 22 AMENDMENTS TO THE CONTRACT

Any modification or amendment of this contract including any exhibits or attachments hereto shall be valid only if it is in writing and signed by the authorized representatives of both parties.

(Ver. Universal 2003-10-10 rkm)
(Ver. Universal 2004-03-05 jaf)

## THOMSON BROADCAST & MULTIMEDIA, INC.
## INSTALLATION & PERFORMANCE TESTING RIDER

1. INSTALLATION: Installation services will be performed by the SELLER as specified in this contract at the location(s) designated in this contract, provided that all of CUSTOMER'S obligations have been met, subject to the following terms and conditions which are hereby incorporated into this contract:

   A. If the location for the installation of the Equipment is modified due to problems which may not be known by, or disclosed to, SELLER at time of order, CUSTOMER will be responsible for all additional costs and expenses, if any, incurred by SELLER due to any change of location or locations for the installation.

   B. If the CUSTOMER does not own the location in which the Equipment is to be installed and is merely a tenant in that location, a true copy of the lease as fully executed must be attached hereto as an Exhibit, and made a part hereof. The CUSTOMER must supply SELLER with a written Consent and/or a Waiver by the Landlord allowing SELLER to enter the premises and make said installation. If a lease exists, and CUSTOMER fails to supply SELLER with a fully executed copy of the lease and a copy of the Landlord's Consent and/or Waiver by the effective date of this contract, then any delivery dates and/or installation services shall be extended and the times noted herein for delivery and/or installation shall not begin to run until the SELLER receives the fully executed lease and the Landlord's Consent and/or Waiver as required herein. Any delays in this regard shall not relieve CUSTOMER from making timely payments when originally due. If a lease exists, and CUSTOMER fails to supply SELLER with a fully executed copy of the lease and a copy of the Landlord's Consent and/or Waiver by the original delivery date sent forth in this contract, then, in addition to all other remedies, SELLER shall have the right to exercise the termination by default and storage rights set forth in this contract.

   C. The building where Equipment is to be located must be complete to the extent that:
      1. It is dust free, weather proof, securable from unauthorized entry.
      2. Satisfactory heat, lighting, toilet facilities and proper electrical service are available at the building for use by the SELLER'S employees or agents.

   D. CUSTOMER must provide, secure or arrange at its own expense the following:
      1. Any and all construction, building and occupancy permits as required by all applicable authorities.
      2. Access to the work site for twelve (12) continuous hours per day, seven (7) days per week.
      3. Sufficient electrical service to the area within which the Equipment will be installed including but not limited to 3-phase power, main disconnect switches, circuit breakers, water pump and heat exchanger motor starters, disconnect switches, conduit runs, service panels and service wiring.
      4. Services of a properly licensed electrician to install items listed above in accordance with SELLER'S requirements and applicable codes.
      5. Sufficient quantities of water, distilled water and suitably inhibited ethylene glycol to repeatedly flush and fill Equipment's cooling system according to the SELLER'S recommendations.
      6. If applicable laws and regulations define the effluent created by the flushing of the Equipment's cooling system as a regulated waste, treatment and disposal of said effluent in accordance with any and all applicable laws and regulations.
      7. Ventilated protective roofing and sun shielding for outdoor components.
      8. Adequate heating and/or air conditioning to maintain optimal environmental conditions for Equipment according to SELLER'S recommendations.
      9. Suitable building roof and ceiling structure to support Equipment loading according to SELLER'S recommendations.
      10. Minimum doorway, ceiling height clearances and floor capacities to accommodate SELLER'S Equipment.
      11. Adequate devices or systems to protect personnel and Equipment from harm or damage from electrical hazards. **It is imperative that CUSTOMER install sufficient grounding systems, transient protection, lightning protection and powerline variation protection.**
      12. Resolution of disputes arising from conflicts during installation with other contractors or trade unions. **CUSTOMER will be responsible for delays or additional cost or expense incurred by SELLER as a result of any such disputes.**
      13. Provide tower riggers to perform any adjustments to external transmission line systems and/or antenna. Unless specified otherwise, CUSTOMER assumes full responsibility for the installation, adjustment and performance of external transmission line systems and/or antennas.
      14. If the weather conditions so require, the Customer may need to provide "salamander" type heaters to heat the water during the process of flushing the cooling system(s). It is recommended that two heaters, each rated at a minimum of One Hundred Fifty Thousand (150,000) Btu, be used per heat exchanger.

2. ON-SITE PROOF-OF-PERFORMANCE TESTING: If included in the Scope of Work and subject to the following conditions, SELLER agrees to test transmitter into the system's test load and measure performance in accordance with either the applicable portions of the technical requirements of the FCC's 6th report and order, (for Digital Television) or with section 73.1590 of the F.C.C. rules (for Analog Television). (SELLER will provide CUSTOMER with one (1) original set of data to satisfy filing requirements for the F.C.C).
   In order for SELLER to test the Equipment the following conditions must be met:
   A. Equipment must be installed in accordance with SELLER'S instructions.
   B. Installation workmanship must be deemed by SELLER to be of acceptable quality.
   Should SELLER'S employees or agents determine that conditions stated above have not been met, SELLER reserves the right to delay Proof-of-Performance testing until CUSTOMER resolves the situation to the satisfaction of the SELLER. Any delay in this regard shall not relieve CUSTOMER of making timely payments when due as if the proof of performance testing had been completed on schedule. SELLER'S Proof-of-Performance testing will be limited to the main transmitter assembly covered under this Agreement unless specifically stated otherwise.
   Unless otherwise agreed, SELLER is not responsible for any documentation other than F.C.C. Proof-of-Performance data.

3.  PROOF-OF-PERFORMANCE TESTING WITH ANTENNA:  If CUSTOMER requires that the SELLER test the transmitter into the transmission line and antenna instead of the system's test load and SELLER has to perform such service for the price stated, then in addition to the requirements of Paragraph 2 above, CUSTOMER is responsible for ensuring and demonstrating to SELLER'S agents that the transmission line and antenna are in good operating condition and meet generally accepted good engineering practices for television broadcast stations including, but not limited to either, a VSWR of 1.1 to 1 or less at any frequency with in the channel bandwidth (for Digital Television) or 1.05 to 1 or less at visual carrier frequency, and 1.10 to 1 over the remainder of the channel (for Analog Television).  If CUSTOMER is not able to demonstrate compliance with these standards to SELLER'S agents, then CUSTOMER is required to take all actions necessary to comply with these standards at its expense and in such a fashion so as to not interfere with the installation in progress or delay in the completion of SELLER'S responsibilities including the scheduled time for the Proof-Of-Performance testing.  CUSTOMER is responsible for all costs and expenses incurred due to the fact that CUSTOMER was not able to demonstrate compliance with the standards set forth in this paragraph including any costs and expenses incurred by SELLER in connection therewith which shall be added to and due with the final payment due under this contract.  Any delay in this regard shall not relieve CUSTOMER of making timely payments when due as if the proof of performance testing had been completed on schedule.  SELLER may, if requested by CUSTOMER, provide the services of a representative of SELLER to perform or assist CUSTOMER in performing the corrective action in which case the costs for said services shall be added to the final payment due under this contract.
4.  COMMISSIONING/TESTING: If the Equipment sold herein does not require F.C.C testing, SELLER will commission the Equipment in accordance with the terms described in the Statement of Work.
5.  IN-FACTORY COMMISSIONING TESTING:  If the Scope of Work includes factory commissioning, then SELLER shall, prior to Delivery, perform an in-factory commissioning test on the transmitter sold herein in a format similar to, but not in lieu of, a formal FCC Proof-Of-Performance test for DTV transmitters.  One copy of the in-factory test results shall be provided to the CUSTOMER.  This service does not include any on-site testing, which shall be the responsibility of the CUSTOMER. CUSTOMER is responsible for obtaining, at its expense, the actual FCC Proof-Of-Performance test upon initial installation.

## TOWER & ANTENNA INSTALLATION RIDER

1.  TOWERS AND ANTENNA - LIMITATION OF LIABILITY AND INSTALLATION SERVICES:  The following will apply if a tower or an antenna is being supplied, but not installed:
    A.  The tower will be designed and fabricated in accordance with E.I.A. standards in existence as of the effective date of this contract.
    B.  The foundation will be designed for normal soil as defined in the E.I.A. standards, and unless CUSTOMER submits soil borings, CUSTOMER is responsible for the assumption that the soil was standard. If soil borings submitted by CUSTOMER show that non-standard soil exists, CUSTOMER agrees to pay SELLER for all additional work or special hardware required.
    C.  The tower is designed for installation on level land.  Unless CUSTOMER submits plot plans and guy line profiles, CUSTOMER assumes responsibility for the assumption that there is sufficient level land to accommodate the tower and supporting guys.  If examination of plot plans and guy line profiles submitted by CUSTOMER show that changes or additions to the tower or its guys to use the tower at its designed wind load on CUSTOMER'S lot are needed, those changes will be at an added charge to CUSTOMER.
2.  INSTALLATION SERVICES:
    A.  The following will apply if this contract includes antenna installation, transmission line installation, tower erection, foundation installation, or the laying of ground systems.
        1.  All such work will be done under normal ground and space conditions.  Normal ground conditions do not exist if blasting,
        2.  CUSTOMER shall provide without charge the following:
            a.  Electrical power at the base of the tower
            b.  Identification of tower and guy anchor locations
            c.  Plot plans
            d.  Soil boring data and guy data
            e.  Tag line and horizontal path profiles
        3.  The price set forth for these services in the contract is based upon the work being carried out without encountering labor disputes and being done under suitable outdoor construction conditions not involving sand, snow, ice, severe cold or high winds.  The price is also based upon the work being done without any other interference or other delays not under SELLER'S reasonable control.
        4.  CUSTOMER will provide SELLER and its agents free access to the tower and site and that radiation energy density, if existing, will be or be made non-hazardous during and at the places of performance of the work.
        5.  The work done will be performed during normal daylight hours.
        6.  In the event that any of the foregoing conditions are not met, any resulting additional costs and delays will be borne by CUSTOMER.
    B.  In addition to the foregoing, the following will also apply:
        1.  The SELLER and its subcontractors will be satisfied that the tower is in a condition that will not prevent, hinder, or delay performance by the SELLER, and that there is sufficient space adjacent to the tower to rig the tower and handle the new and any removed Equipment.
        2.  CUSTOMER assumes full responsibility for the structural adequacy of tower to withstand any change in loadings which will result from adding to it or removing from it of the antenna, transmission line and associated Equipment and fixtures covered by this Agreement.
        3.  CUSTOMER agrees to indemnify the SELLER and its subcontractors and hold them harmless from any liability, loss, costs, or damages arising out of or relating to any tower failure, however caused, whether by its or their negligence or otherwise, either during or after the adding or removing of such equipment.
        4.  The contract price includes the costs of builder's risk insurance providing "All Risk" physical damage protection in the amount

representing 100% of the insurable value of the antenna, transmission line, and associated equipment, and fixtures to be placed upon the tower by the SELLER, but does not include such coverage for the tower or any other equipment or structures on or about the tower.

5. To the extent that the SELLER and/or its subcontractors will otherwise be protected against risk or liability if the tower and other equipment and structures were included in such coverage, CUSTOMER agrees to indemnify the SELLER and its subcontractors and hold them harmless against any liability, loss, damage, or cost arising out of or relating to any such loss or damages, however caused, whether by its or their negligence or otherwise.

6. CUSTOMER assures SELLER that it will have free access to the tower and that radio frequency sources will not be present during the performance of the work.

C. The Agreement is based on erection procedures, which are normal in the tower industry. The use of scaffolding, netting, barricades, hoisting engine enclosures, or personnel elevators are not considered normal, and these, if required, will be at CUSTOMER'S additional expense.

D. In the event the CUSTOMER is not the owner of the tower, CUSTOMER shall obtain prior to the start of work, in writing, in a form satisfactory to the SELLER, the following:

1. Permission of the owner for SELLER to do the work, and
2. The owner's agreement to indemnify and hold the SELLER harmless in the event of partial or total tower collapse as set forth in (b) above.

3. WARRANTY PROVISION - The following warranty provision applies to the sale and installation of television antennas and towers: Although SELLER has agreed to supply CUSTOMER with a television antenna or tower for same, CUSTOMER understands that SELLER is not the manufacturer or installer of the television antenna and that SELLER is not the manufacturer or installer of the tower upon which the television antenna and transmission line is to be installed. SELLER will supply CUSTOMER with the manufacturer's warranty on the antenna or tower simultaneously with the delivery of the antenna or tower. CUSTOMER recognizes and agrees that its sole remedy for any defects in material or workmanship in the antenna or tower will be contained in the warranty as supplied by the manufacturer. SELLER has no liability to CUSTOMER for defective workmanship or materials in to the antenna or tower. CUSTOMER AGREES THAT SELLER OFFERS NO WARRANTIES, WHETHER STATUTORY, EXPRESS, OR IMPLIED, INCLUDING, BUT NOT LIMITED TO LIMITED TO, THOSE OF MERCHANTABILITY, FITNESS FOR ANY PARTICULAR PURPOSE, AND FREEDOM FROM INFRINGEMENT OR THE LIKE. CUSTOMER AGREES THAT SELLER IS NOT LIABLE FOR ANY CONSEQUENTIAL DAMAGES FOR THE NEGLIGENCE OF THE INSTALLERS AND MANUFACTURERS OR FOR ANY BREACH OF WARRANTY WITH RESPECT TO THE SUPPLYING OF THE TELEVISION ANTENNA OR TOWER HEREUNDER.

## THOMSON Broadcast & Multimedia, Inc.  WARRANTY

THOMSON Broadcast & Multimedia, Inc. hereinafter "SELLER", warrants to CUSTOMER and CUSTOMER only that the Product purchased herein is free from defects in workmanship and material for a period of one (1) year from the date of Delivery.

SELLER agrees, subject to SELLER'S evaluation, to make good "FOB factory or origin" (UCC) all defective parts of such Product which are returned, within fifteen (15) days of issuance of written return authorization by SELLER, to SELLER'S factory, transportation prepaid, provided that:

A.    SELLER receives prompt written notification of such defects.
B.    SELLER issues prior written authorization to CUSTOMER to return such parts to SELLER'S factory.
C.    Product has been operated in accordance with the SELLER'S instructions and has been properly maintained.
D.    Product has not been misused, altered or repaired by the CUSTOMER.
E.    Product was installed properly according to SELLER'S standards and criteria.

All returned parts of the Product become SELLER'S property.  Correction of such defects by repair or replacement at SELLER'S factory and shipment of the repaired or replacement parts to CUSTOMER "FOB SELLER'S factory" (UCC) shall constitute CUSTOMER'S sole and exclusive remedy and the fulfillment of all of SELLER'S obligations in respect to the Product. The CUSTOMER agrees that except for such repair and replacement, SELLER shall in no event be liable for damage or damages of any kind connected with the use of the Product or its failure to function properly.  In the event SELLER fails to repair or replace any defective parts CUSTOMER agrees that the exclusive measure of damages for such breach shall be the reasonable cost of repair or replacement of the defective part or parts at the time of the breach.

High power electron amplifier tubes and associated circuit assemblies; generators; heat exchangers; pumps; remote control systems; high voltage power supplies; uninterruptible power supplies; surge suppressors; STLs; antennas and RF systems furnished by the SELLER but manufactured by another company shall bear no warranties other than the special hours-of-use and other warranties extended by and enforceable against the manufacturer at the time of delivery to CUSTOMER (which warranties SELLER will furnish on CUSTOMER'S written request), for the period stated in that warranty or for a period of thirty (30) days from such delivery, whichever is longer.

ALTERATION, MODIFICATION OR UNAUTHORIZED REPAIR OF THE PRODUCT, OPERATION OF PRODUCT OUTSIDE OF SELLER'S RECOMMENDED ENVIRONMENTAL CONDITIONS (INCLUDING BUT NOT LIMITED TO TEMPERATURE AND HUMIDITY), IMPROPER INSTALLATION OR OTHER MISUSE VOIDS THIS WARRANTY AND OPERATES TO RELIEVE SELLER FROM ALL LIABILITY THEREUNDER. SALE OR TRANSFER OF THE PRODUCT TERMINATES THE WARRANTY.

SELLER SHALL NOT, UNDER ANY CIRCUMSTANCES, BE LIABLE FOR ANY SPECIAL, INDIRECT, INCIDENTIAL OR CONSEQUENTIAL DAMAGES, INCLUDING BUT NOT LIMITED TO LOST PROFITS OR REVENUES, WHICH MAY ARISE OUT OF OR UNDER THIS CONTRACT.   THE LIMITATION IN THE PREVIOUS SENTENCE AND THE EXCLUSION OF INDIRECT, CONSEQUENTIAL, SPECIAL AND INCIDENTAL DAMAGES SHALL REMAIN IN FULL FORCE AND EFFECT EVEN IF THE REMEDIES FOR BREACH OF WARRANTY PROVIDED IN THIS CONTRACT FAIL OF THEIR ESSENTIAL PURPOSE. THE ABOVE LIMITATION SHALL BE EFFECTIVE REGARDLESS OF THE FACT THAT SELLER IS OR HAS BEEN MADE AWARE OF THE POSSIBILITY OR LIKELIHOOD OF ANY SUCH POTENTIAL DAMAGES.

THE WARRANTY STATED HEREIN IS PERSONAL TO CUSTOMER AND IS EXPRESSLY IN LIEU OF ANY OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND OF ANY OTHER OBLIGATIONS OR LIABILITY ON THE PART OF THE SELLER, OR ANY OF ITS AFFILIATES WHETHER IN CONTRACT, TORT OR OTHERWISE. THE SELLER NEITHER ASSUMES NOR HAS AUTHORIZED ANY PERSON TO ASSUME FOR IT ANY OTHER WARRANTY OR LIABILITY IN CONNECTION WITH THE PRODUCT SOLD BY IT.

IT IS SPECIFICALLY UNDERSTOOD AND AGREED THAT SELLER DOES NOT UNDERTAKE TO DO MORE OR OTHER THAN TO CONVEY TO CUSTOMER SELLER'S RIGHT, TITLE AND INTEREST IN AND TO THE PRODUCT; NOR SHALL PROOF OF ALLEGED DEALINGS OR TRADE USAGES, INCONSISTENT WITH THE TERMS HEREOF, BE ADMISSIBLE TO EXPAND THIS OBLIGATION.

Components that are shipped as replacement parts to the Product may be remanufactured; provided, however, said remanufactured parts shall in all other ways perform and conform to the specifications of new parts.  Any replacement Product or any repair, modification, installation or other service performed by SELLER shall be warranted for a period of ninety (90) days from the date of delivery or the remainder of the original warranty, whichever is longer.

(Rev. 02/27/04)
(Rev. 071706 name change.llc)

MAY-25-2010 00:04   From:916 652 9228                                    Page:16/16



**THOMSON** Inc.
104 Feeding Hills Road
Southwick, MA 01077
TEL: (413) 998-1100
FAX: (413) 569-0679

# Invoice

SHIPMENT ID NUMBER: 1046114

| INVOICE NO. | RVSN | DATE | PAGE |
|---|---|---|---|
| 159D797 | 0 | 12/28/07 | 1 |

| CUSTOMER ORDER NO | SALES ORDER NO | TAXABLE |
|---|---|---|
| *SEE BELOW | 54877 | YES |

| BILL OF LADING NO | DATE OF SHIPMENT |
|---|---|
| | 12/28/07 |

| SHIPPED VIA | F.O.B. | PPD |
|---|---|---|
| MEYER | 4 | |

| S.A. |
|---|
| JGM |

| TERMS |
|---|
| SEE PAYMENT TERMS BELOW |

**SHIP TO:**
WTXX - TRIBUNE BROADCASTING
RATTLESNAKE MOUNTAIN
200 COLT HIGHWAY
FARMINGTON
CT
                06032

**BILL TO:**
TRIBUNE BROADCASTING-WTXX

ONE CORPORATE CENTER
HARTFORD
CT
                06103

BILL TO
CUSTOMER        ▶ WTXX-DIP        SHIP TO
                                  CUSTOMER        ▶ WTXX        *P.O. ▶ PROPOSAL 6681-R2

PAYMENT ACCEPTED IN US $ ONLY

| ITEM | PRODUCT NUMBER | DESCRIPTION | TAX | QTY SHIPPED | QTY BKORD | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|---|---|
| | | REMIT-TO ADDRESS: | | | | | |
| | | THOMSON INC | | | | | |
| | | JP MORGAN CHASE, NEW YORK NY | | | | | |
| | | ABA# 021000021 | | | | | |
| | | SWIFT: CHASUS 33 | | | | | |
| | | ACCOUNT #:304670073 | | | | | |
| 1 | 413807-01 | SYSTEM, WTXX D20 CONVERT    DCX | * | 0 | 0 | 257274.00 | 257274.00 .0 |
| 2 | ENG-54877 | ENGINEERING, WTXX D20 | * | 0 | 0 | 36857.00 | 36857.00 .0 |

SUBTOTAL:
TAX CODE: CT01 CONNECTICUT SALES TAX                                          294131.00
                                                                              17647.86

TOTAL:                                                                        ----------
                                                                              311778.86
                                    CIA APPLIED:                              120720.60
                                                                              ----------
                                         NET:                                 191058.26

FREIGHT TERMS FOB ORIGIN, PREPAID

ALL UNPAID BALANCES WILL BE SUBJECT TO A MONTHLY FINANCE
CHARGE OF 1.5% OR HIGHEST ALLOWABLE UNDER APPLICABLE LAW

CUSTOMER INVOICE

MAY-25-2010 00:00    From:916 652 9228                                    Page:6/16



**THOMSON Inc.**
104 Feeding Hills Road
Southwick, MA 01077
TEL: (413) 998-1100
FAX: (413) 569-0679

# Invoice

SHIPMENT TO NUMBER: 1046336

| INVOICE NO. | RVSN | DATE | PAGE |
|---|---|---|---|
| 159524 | 0 | 03/12/08 | 1 |

| CUSTOMER ORDER NO | SALES ORDER NO | TAXABLE |
|---|---|---|
| *SEE BELOW | 54877 | YES |

| BILL OF LADING NO | DATE OF SHIPMENT |
|---|---|
| .00 | 03/10/08 |

| SHIPPED VIA | F.O.B. | PPD |
|---|---|---|
| N/A | 4 | |

| S.A. | | |
|---|---|---|
| JGM | | |

| TERMS |
|---|
| SEE PAYMENT TERMS BELOW |

**SHIP TO:**
WTXX - TRIBUNE BROADCASTING
RATTLESNAKE MOUNTAIN
200 COLT HIGHWAY
FARMINGTON
CT
            06032

**BILL TO:**
TRIBUNE BROADCASTING-WTXX
ONE CORPORATE CENTER
HARTFORD
CT
            06103

BILL TO        ▶ WTXX-DIP        SHIP TO        ▶ WTXX        *P.O. ▶ PROPOSAL 6681-R2
CUSTOMER                          CUSTOMER

PAYMENT ACCEPTED IN US $ ONLY

| ITEM | PRODUCT NUMBER | DESCRIPTION | TAX | QTY SHIPPED | QTY BK-ORD | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|---|---|
| | REMIT-TO ADDRESS: | | | | | | |
| | THOMSON INC | | | | | | |
| | JP MORGAN CHASE, NEW YORK NY | | | | | | |
| | ABA# 021000021 | | | | | | |
| | SWIFT: CHASUS 33 | | | | | | |
| | ACCOUNT #:304670073 | | | | | | |
| 3 | SHIP-54877 | SHIPPING, WTXX D20 | * | 1.0 | 0 | 4762.00 | 4762.00 | .0 |
| 7 | ENG-54877 | ENGINEERING, WTXX D20 | * | 1.0 | 0 | -6000.00 | -6000.00 | .0 |
| 8 | 413807-REV | AMENDMENT, WTXX D20 CONVER DCX | * | 1.0 | 0 | 2425.00 | 2425.00 | .0 |

```
                                              ------------
SUBTOTAL:                                          1187.00
TAX CODE: CT01 CONNECTICUT SALES TAX                 71.22
                                              ------------
TOTAL:                                             1258.22
                            - CIA APPLIED:          1258.22
                                              ------------
                                    NET:               .00
```

FREIGHT TERMS FOB ORIGIN, PREPAID

ALL UNPAID BALANCES WILL BE SUBJECT TO A MONTHLY FINANCE
CHARGE OF 1.5% OR HIGHEST ALLOWABLE UNDER APPLICABLE LAW

CUSTOMER INVOICE

MAY-25-2010 00:02    From:916 652 9228                                    Page:12/16


**THOMSON**
*images & beyond*

**THOMSON Inc.**
104 Feeding Hills Road
Southwick, MA 01077
TEL: (413) 998-1100
FAX: (413) 569-0679

# *Invoice*

SHIPMENT ID NUMBER: 1046300

| INVOICE NO. | AVSN | DATE | PAGE |
|---|---|---|---|
| 1596696 | 0 | 03/28/08 | 1 |

| CUSTOMER ORDER NO | SALES ORDER NO | TAXABLE |
|---|---|---|
| SEE BELOW | 54877 | YES |

| BILL OF LADING NO | DATE OF SHIPMENT |
|---|---|
| .00 | 03/25/08 |

| SHIPPED VIA | F.O.B. | PPD |
|---|---|---|
| N/A | 4 | |

| S.A. |
|---|
| JGM |

| TERMS |
|---|
| SEE PAYMENT TERMS BELOW |

**SHIP TO:**
WTXX - TRIBUNE BROADCASTING
RATTLESNAKE MOUNTAIN
200 COLT HIGHWAY
FARMINGTON
CT
06032

**BILL TO:**
TRIBUNE BROADCASTING-WTXX
ONE CORPORATE CENTER
HARTFORD
CT
06103

BILL TO      ▶ WTXX-DIP      SHIP TO      ▶ WTXX      *P.O.▶ PROPOSAL 6681-R2
CUSTOMER                     CUSTOMER

**PAYMENT ACCEPTED IN US $ ONLY**

| ITEM | PRODUCT NUMBER | DESCRIPTION | TAX | QTY SHIPPED | QTY BK ORD | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|---|---|
| | REMIT-TO ADDRESS: | | | | | | |
| | THOMSON INC | | | | | | |
| | JP MORGAN CHASE, NEW YORK NY | | | | | | |
| | ABA# 021000021 | | | | | | |
| | SWIFT: CHASUS 33 | | | | | | |
| | ACCOUNT #:304670073 | | | | | | |
| 4 | INSTALL-54877 | INSTALLATION, WTXX D20 | * | 0 | 0 | 22161.00 | 22161.00 | .0 |

SUBTOTAL:                                                    22161.00

TAX CODE: CT01 CONNECTICUT SALES TAX                         1329.66

TOTAL:                                                       23490.66

                                            - CIA APPLIED:   14633.12

                                                  NET:       8857.54

FREIGHT TERMS FOB ORIGIN, PREPAID

ALL UNPAID BALANCES WILL BE SUBJECT TO A MONTHLY FINANCE
CHARGE OF 1.5% OR HIGHEST ALOWABLE UNDER APPLICABLE LAW

**CUSTOMER INVOICE**

MAY-24-2010 23:59     From:916 652 9228                                            Page:4/16


**THOMSON**
*images & beyond*

**THOMSON Inc.**
104 Feeding Hills Road
Southwick, MA 01077
TEL: (413) 998-1100
FAX: (413) 569-0679

# Invoice

SHIPMENT ID NUMBER: 1047084

| INVOICE NO; | RVSN | DATE | PAGE |
|---|---|---|---|
| 161186 | 0 | 11/04/08 | 1 |

| CUSTOMER ORDER NO | SALES ORDER NO | TAXABLE |
|---|---|---|
| *SEE BELOW | 54877 | YES |

| BILL OF LADING NO | DATE OF SHIPMENT |
|---|---|
| | 10/20/08 |

| SHIPPED VIA | P.O.B. | PPD |
|---|---|---|
| N/A | 4 | |

| S.A. | | |
|---|---|---|
| JGM | | |

| TERMS |
|---|
| DCX - NET 30 DAYS |

**SHIPPED TO:**
WTXX - TRIBUNE BROADCASTING
RATTLESNAKE MOUNTAIN
200 COLT HIGHWAY
FARMINGTON
CT
                    06032

**BILLED TO:**
TRIBUNE BROADCASTING-WTXX
ONE CORPORATE CENTER
HARTFORD
CT
                    06103

BILL TO     ▶ WTXX-DIP     SHIP TO     ▶ WTXX     *P.O.▶ PROPOSAL 6681-R2
CUSTOMER                    CUSTOMER

**PAYMENT ACCEPTED IN US $ ONLY**

| ITEM | PRODUCT NUMBER | DESCRIPTION | TAX | QTY SHIPPED | QTY B/ORD | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|---|---|
| | | REMIT-TO ADDRESS: | | | | | |
| | | THOMSON INC | | | | | |
| | | JP MORGAN CHASE, NEW YORK NY | | | | | |
| | | ABA# 021000021 | | | | | |
| | | SWIFT: CHASUS 33 | | | | | |
| | | ACCOUNT #:304670071 | | | | | |
| 5 | COP-54877 | COP, WTXX D20 | * | 0 | 0 | 29862.00 | 29862.00 | .0 |

SUBTOTAL:                                                          29862.00
TAX CODE: CT02 FARMINGTON     HARTFORD    CT                        1791.72
                                                                   ------------
TOTAL:                                                             31653.72

REFERENCE PROPOSAL #6681-060807-R2

DELIVERY DATE:  12/31/07

PAYMENT TERMS:  35% DEPOSIT; 30% 60 DAYS AFTER CONTRACT
  SIGNATURE; 30% UPON NOTIFICATION TO SHIP; 5% ON PROOF OR
  60 DAYS AFTER SHIPMENT

WARRANTY CODE:  1DNX10
  NO TRAINING

01/02/08:  DATA ENTRY ERROR FOR RNG-54877-S/H/B $30,857;
  ADDED LINE TO SUBTRACT DIFFERENCE-WILL RECOGNIZE THE

ALL UNPAID BALANCES WILL BE SUBJECT TO A MONTHLY FINANCE
CHARGE OF 1.5% OR HIGHEST ALLOWABLE UNDER APPLICABLE LAW

**CUSTOMER INVOICE**