# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| TRIBUNE COMPANY, et al., | : | Case No. 08-13141 (KJC) |
| | : | |
| | : | Jointly Administered |
| Debtors. | : | |
| | : | |
| | : | |
| OFFICIAL COMMITTEE OF UNSECURED | : | |
| CREDITORS, on behalf of the Debtors' Estates, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | Adv. No. _____ (KJC) |
| | : | |
| CITIGROUP GLOBAL MARKETS, INC. and | : | |
| MERRILL LYNCH, PIERCE, FENNER & SMITH | : | |
| INCORPORATED, | : | |
| | : | |
| Defendants. | | |

## COMPLAINT

Plaintiff, the Official Committee of Unsecured Creditors of the Tribune Company

and of 111 of its subsidiaries (the "Debtors"),[1] by and through its undersigned special

counsel, on behalf of and as the representative of the bankruptcy estates of the Debtors,

hereby complains against the defendants as follows:

## NATURE OF THE ACTION

1.      This is an action to avoid and recover fraudulent transfers, preferences, and

to obtain additional relief against the defendants arising from their role as advisors to the

Tribune Company (the "Company"), one of the most venerable news and media

organizations in the United States, when the Company participated in a failed leveraged

---

[1] The Debtors in these Chapter 11 Cases are listed on Exhibit A to this Complaint.

buyout (the "LBO") in 2007.  The defendants advised the Company as it obtained

debilitating loans made and arranged by non-party banks (the "Non-Party Banks") to

fund the LBO.  The LBO had two principal purposes:  (a) to meet the demands of major

shareholders of the Company that they be cashed out; and (b) to transfer control of the

Company to Samuel Zell ("Zell").  To accomplish these purposes, the Company

obligated itself to buy out all its shareholders, borrowed some $13 billion -- more than

doubling its prior debt load – to finance the LBO (the "LBO Debt" or "LBO Loans")[2] and

caused most of its subsidiaries (the "Guarantors")[3] to guarantee that debt.  The

obligations assumed by the Company in connection with the LBO rendered the Company

and the Guarantors insolvent at all relevant times.  The LBO closed in December 2007.

Less than one year later, unable to carry the massive burden of the LBO Debt, the

Company and most of the Guarantors filed for relief under the Bankruptcy Code on

December 8, 2008 (the "Petition Date").

       2.     The Company and the Guarantors did not benefit from the LBO Debt.

           a.    Pursuant to a Plan of Merger and merger agreement (the "Merger

Agreement") entered into on April 1, 2007, over $8 billion of the

LBO Loans were paid to the shareholders of the Company and

provided no benefit to the Company or its creditors.

           b.    Over $2.5 billion of the LBO Loans was used to refinance the

Company's pre-existing bank debt, which had been arranged in 2006

(the "2006 Bank Debt").  At the time of the refinancing, the 2006

Bank Debt was held primarily by certain Non-Party Banks.  The

---

[2]  For the purpose of this Complaint, LBO Debt shall include all indebtedness incurred by the Debtors in connection with the Senior Credit Facility and the Bridge Facility (each as defined below).

[3]  The Guarantors are those subsidiaries of the Company listed on Exhibit B to the Complaint.

refinancing materially harmed the Company by giving such parties better terms than the 2006 Bank Debt without benefiting the Company or its subsidiaries. The refinanced debt bore a higher interest rate than the 2006 Bank Debt and benefited from guarantees from the subsidiary Guarantors that the 2006 Bank Debt did not have.

c. The Guarantors received nothing for their guarantees of billions of dollars in new and refinanced debt of the Company.

d. Finally, over $200 million was transferred to the defendants and others for fees in connection with the LBO, again providing no benefit to the Company or its creditors.

e. Those who did benefit from the LBO Debt were the shareholders, whose shares were purchased with the loan proceeds and who, as a result of the cash-out, were insulated from any adverse effect the excessive loan burden would have on the Company or its creditors; Zell, who obtained *de facto* control of the Company while placing a tiny portion of his own wealth at risk; and defendants, who received enormous fees for advising Tribune regarding the LBO Loans; and the Non-Party Banks, who received enormous fees for making and arranging the LBO Loans, improved their security on and increased the interest rates on the 2006 Bank Debt, and stood to reap very high interest on the LBO Debt.

3.    Contemporaneous e-mails and other documents in the defendants' and Non-Party Banks' files demonstrate that the defendants and Non-Party Banks recognized the LBO and the LBO Debt would render the Company insolvent or, at a minimum, create a high risk of insolvency.  The Non-Party Banks were willing to proceed with the LBO notwithstanding the insolvency risk because they were paid large fees up front and imposed most of the insolvency risk on others.  The structure of the LBO Debt and the flow of payments to third parties ensured that the Company's existing and future non-bank creditors (such non-bank creditors, together with their successors or assigns, the "Non-Bank Lenders")[4] would bear the primary risk of loss if the LBO were unsuccessful.  In effect, the Non-Party Banks placed a bet with the Non-Bank Lenders' money that the LBO would not cause the Company's insolvency.  The Non-Bank Lenders included several hundred retirees with non-qualified retirement benefit programs upon which they rely for their retirement income.

4.    The Non-Party Banks also minimized the risk they faced from the massive leverage imposed on the Company by syndicating the debt so that their default risk on the loan was transferred to purchasers of the debt who did not realize any of the fees.  In addition, the defendants sought to further or nurture relationships with Zell that would lead to other profitable business.

5.    The defendants acted simultaneously as financial advisors to the Company and as lead lenders and arrangers of the LBO Loans (through affiliated entities).  While occupying these conflicting roles, they advised the Company to proceed with an LBO

---

[4] For the avoidance of doubt, the term "Non-Bank Lenders" shall in all cases exclude the LBO Lenders as defined below.

transaction that imposed substantial burdens on the Company and its existing creditors while providing significant and massive benefits to themselves.

6.    As the date for closing the LBO approached, the likelihood that the LBO would make the Company insolvent became more and more apparent.  Company management, which stood to realize substantial financial benefits if the LBO closed, responded by taking steps to ensure a favorable solvency opinion and ensure the LBO would close notwithstanding the increasing likelihood of insolvency.  Those actions included making unjustifiable changes to the Company's financial projections and misleading the Company's solvency expert concerning the prospects for refinancing the LBO Debt.

7.    The creditors of the Company and the Company are entitled to substantial relief as a result of the wrongful conduct of defendants.

## JURISDICTION AND VENUE

8.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334(a) because the claims asserted in this adversary proceeding arise in the above-referenced Chapter 11 bankruptcy cases.  This proceeding is a "core proceeding" within the meaning of 28 U.S.C. § 157(b)(2)(A).  Venue is proper in this Court by reason of 28 U.S.C. §§ 1408 and 1409 and because the Debtors' bankruptcies, which have been administratively consolidated, are being administered in this Court.

## PARTIES

9.    Plaintiff is the Official Committee of Unsecured Creditors (the "Committee") appointed by the Office of the United States Trustee in the above-referenced bankruptcy proceedings.  The Debtors have consented to the Committee

commencing and prosecuting this action and all claims asserted herein on behalf of the Debtors' estates, and the Committee has been granted standing and authority by this Court to commence and prosecute this action and all claims asserted herein on behalf of the Debtors' estates.

10.    Defendant Citigroup Global Markets, Inc. ("CGMI"), an entity under common control with Citicorp, as defined below, acted as financial advisor to the Company in connection with the LBO and served as one of the lead arrangers for the 2006 Bank Debt, the Senior Credit Facility and the Bridge Facility (together with Citicorp, "Citigroup").

11.    Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill") acted as financial advisor to the Tribune Company in connection with the LBO (together with MLCC, as defined below, "Merrill Lynch") and served as one of the lead arrangers for the Senior Credit Facility and the Bridge Facility.

12.    Non-Party Bank JPMorgan Chase Bank, N.A. ("JPMCB") was one of the LBO Lenders, as defined below and administrative agent for the "Senior Credit Facility" as defined herein.

13.    Non-Party Bank Merrill Lynch Capital Corporation ("MLCC") was one of the LBO Lenders, as defined below, former administrative agent for the $1.6 billion Senior Unsecured Interim Loan Agreement (the "Bridge Facility"), and initial transferee of the Step Two Repayments and certain of the LBO Fees as defined herein.  MLCC was administrative agent for the Bridge Facility in 2007.

14. Non-Party Bank J.P. Morgan Securities Inc. ("JPMS"), an entity under common control with JPMCB, served as one of the lead arrangers for the 2006 Bank Debt, the Senior Credit Facility and the Bridge Facility (together with JPMCB, "JPM").

15. Non-Party Bank Citicorp North America, Inc. ("Citicorp") served as co-documentation agent for the Senior Credit Facility and the Bridge Facility. As co-documentation agent, Citicorp materially facilitated the lending described below. Citicorp was also administrative agent for the 2006 Bank Debt.

16. Non-Party Bank Bank of America, N.A. served as co-documentation agent for the 2006 Bank Debt, the Senior Credit Facility and the Bridge Facility. As co-documentation agent, Bank of America, N.A. materially facilitated the lending discussed below.

17. Non-Party Bank Banc of America Securities LLC ("BAS"), an entity under common control with Bank of America, N.A., served as one of the lead arrangers for both the Senior Credit Facility and the Bridge Facility (together with Bank of America, N.A., "Bank of America").

18. Non-party Morgan Stanley & Co. Inc. ("Morgan Stanley") was engaged by the Company to act as a financial advisor to the Special Committee of the Board of Directors of the Company in connection with the LBO. In addition, Morgan Stanley acted as a financial advisor to the Company in late 2008, immediately before the Petition Date.

19. Each of the banks and other lenders participating currently, previously or in the future in the Senior Credit Facility and the Bridge Facility are referred to herein collectively as the "LBO Lenders").

## FACTUAL BACKGROUND

20.    The Company is the owner of a multitude of media businesses providing

newspaper, radio, television and entertainment products and services to nearly 80% of the

households in the United States.  The Company is divided into two business groups:  (a)

publishing; and (b) broadcasting and entertainment.  The publishing group owns major

newspapers and related Internet web sites in many of the most significant markets in the

United States, including the *Chicago Tribune*, the *Los Angeles Times*, the *Baltimore Sun*,

the *Orlando Sentinel*, the *South Florida Sun Sentinel*, and the *Hartford Courant*

newspapers.  The broadcasting and entertainment group includes numerous radio and

television stations in major markets.  In addition, the Company owns many other

prominent media and entertainment properties, and interests in other real estate and

entertainment properties.  As of the date the Company initiated these bankruptcy

proceedings, the publishing segment employed approximately 12,000 full-time equivalent

employees, and the broadcasting and entertainment segment employed an additional

2,600 full-time equivalent employees.

21.    Until the LBO closed, the Company was publicly traded with its stock listed

on the New York Stock Exchange.  Among the largest shareholders of the publicly traded

Company prior to the LBO were Chandler Trust Nos. 1 and 2 (together, the "Chandler

Trusts"), which owned the Times Mirror Company, publisher of the *Los Angeles Times*

newspaper before its acquisition by the Company in 2000.  Representatives of the

Chandler Trusts were directors of the Company during the time leading up to the LBO.

22.    Prior to 2006, the Company's debt was modest in relation to the size of the Company's business and consisted primarily of publicly traded bonds and subordinated debentures. Between 1992 and 1997 the Company issued bonds in the aggregate amount of $1.26 billion, which were evidenced by unsecured notes with maturity dates ranging between December 8, 2008 and November 2026 (collectively, the "Bond Debt"). Each of the indentures governing the Bond Debt provides that it shares *pari passu* in payment priority with all other non-subordinated debt owed by the Company. The Bond Debt is not, however, guaranteed by any of the Company's subsidiaries. As of the Petition Date, the outstanding amount of the Bond Debt was approximately $1,263,463,000.

23.    In April 1999, the Company issued a series of subordinated debentures in the aggregate principal amount of $1.3 billion (the "PHONES"), the trading value of which was linked to the trading value of AOL Time Warner company stock. The PHONES are subordinated in right of payment to all other funded indebtedness of the Company.

24.    The Company and its subsidiaries also owed various other debt to trade creditors and others incurred in the ordinary course of business. Among the other creditors affected by the LBO are approximately 450 retirees of the Company, many of whom gave a lifetime of service to the Company. These retirees are beneficiaries of four non-qualified plans provided by the Company, as well as various individualized retirement agreements. The claims of these retirees against the Company exceeded $125 million as of the Petition Date.

25.    The Bond Debt, PHONES and other unsecured non-bank debt of the Company are referred to collectively as the "Non-Bank Debt."

## STRATEGIC REVIEW

26.    Beginning in late 2005, the Company's Board of Directors (the "Board")
undertook a strategic review of the broadcasting and entertainment sector of the
Company's business and considered possible changes to the structure and ownership of
its properties.  The Company retained the services of Merrill on or about October 17,
2005, to assist in this evaluation and approved in advance the participation of Merrill or
its affiliates in financial transactions that might develop from the strategic review.  The
Company later retained CGMI to assist in the evaluation as well and provided to CGMI
the same advance approval for CGMI or its affiliates to participate in financial
transactions resulting from the review.  Pursuant to their advisory engagements with the
Company, both Merrill and CGMI stood to reap millions of dollars in fees, fees that
would increase if the Company entered into a transaction at the recommendation of
Merrill and CGMI.  The Company paid CGMI and Merrill over $25 million in advisory
fees (the "Advisory Fees").

## CASHING OUT SHAREHOLDERS – ROUND ONE

27.    In May 2006, the Board, with the advice of Merrill and CGMI, decided to
engage in a leveraged recapitalization transaction pursuant to which it would borrow
money to repurchase up to 75 million shares of its common stock.  The Chandler Trusts'
three representatives on the Board voted against the transaction.  The Company
nonetheless proceeded to repurchase 55 million of its shares for a total of nearly $1.8
billion through a public tender offer and a private transaction with the Robert R.
McCormick Tribune Foundation and the Cantigny Foundation (the "Foundations").  As a

result of these share repurchases, the Chandler Trusts became the Company's largest stockholders. The Foundations continued to be major shareholders.

28.    In June 2006, primarily to finance the share repurchases described above, the Company entered into a credit agreement for the 2006 Bank Debt with Citicorp as administrative agent; Merrill as syndication agent; Bank of America, N.A., Morgan Stanley Bank and JPMCB as three of the four documentation agents; and CGMI, Merrill and JPMS as joint lead arrangers and joint bookrunners. As of December 31, 2006, there was approximately $2.8 billion of the 2006 Bank Debt outstanding.

## THE CHANDLER TRUSTS SEEK TO CASH OUT

29.    On or about June 13, 2006, the Chandler Trusts sent a letter to the Board, stating that the Chandler Trusts would not tender their shares in the leveraged recapitalization, which they found ill-advised and hasty. The Chandler Trusts pressed the Board to explore other strategic alternatives including a leveraged buyout. The Chandler Trusts publicly filed the letter.

30.    From the summer of 2006 until April 2007, the Chandler Trusts continued to press the Board to take steps that would allow the Chandler Trusts to cash out some or all of their Company shares through a sale or recapitalization of the Company.

31.    In response to the pressure from the Chandler Trusts, the Company decided in September 2006 to pursue a sale or recapitalization and formed a special committee of the Board (the "Special Committee") to consider and evaluate sale and recapitalization alternatives, excluding from its membership the Chandler Trusts' representatives. In or around October 2006, the Company retained Morgan Stanley to act as the financial

advisor to the Special Committee. The Company agreed to, and did, pay Morgan Stanley $10 million in fees and reimbursed its expenses for serving in that role.

32.    Although Morgan Stanley was the Special Committee's financial advisor, it was Merrill and CGMI that solicited third parties to express interest in a buyout of the Company. By October 2006, 17 potential outside purchasers had expressed interest in the Company. Merrill and CGMI acted as advisors to the Company in evaluating these proposals. However, Merrill and CGMI each had an inherent conflict of interest. If any of the transactions went forward, Merrill and CGMI, or their affiliates, were highly likely to participate in financing the transactions and stood to make tens of millions of dollars in fees from such financing. If no transactions took place, they would still receive millions of dollars in advisory fees, but much less than the financing fees associated with a large transaction. Merrill and CGMI thus had a strong financial incentive to advise the Company to agree to a substantial sale or recapitalization even if doing so was not in the best interest of the Company. Both Merrill and CGMI were in fact strong advocates for the LBO.

33.    Among the parties expressing interest in late 2006 in a buyout of the Company's shareholders was Equity Group Investments, LLC ("EGI"), owned principally by Zell, a prominent, successful Chicago-based real estate investor. Zell was advised by JPM in his structuring of the transaction. JPM later took the lead in arranging the financing of the LBO.

34.    Many companies expressed initial interest in the Company. By February 2007, however, only two third-party bidders (and the Chandler Trusts) remained interested in the Company, one of whom was Zell. Notwithstanding favorable overall

market conditions, interest in the auction was depressed by severe deterioration in the newspaper business.

35.    Both remaining third-party bids contemplated highly leveraged transactions financed primarily by enormous loans to be taken on by the Company.  Under both proposals, the bidders' equity contributions would be small in relation to the size of the transactions.

36.    In addition to the two third-party bids, the Company was considering in February 2007 a possible recapitalization of the Company and a spin-off of its broadcasting business under which the Company would pay a special dividend of $20 or more per share before the spin-off.

37.    While the bid process moved forward, the Company's financial results deteriorated.  By February 2007, the Company had already lowered its internal forecast of 2007 financial results because of lackluster results in the first month of the year. Company management and members of the Special Committee expressed concern about any deal that would require the Company to take on a large amount of debt given the weakening business outlook for newspapers.

## THE ZELL LBO STRUCTURE

38.    Under the LBO structure Zell proposed originally, the Company would increase its total debt load to over $14 billion – more than ten times its projected annual earnings before interest, taxes, depreciation and amortization ("EBITDA") – to buy out the public shareholders and refinance the 2006 Bank Debt.

39.    Under Zell's proposal, the Company would end up owned by a newly formed employee stock ownership plan ("ESOP") for the Company's employees.  Zell's

entity, EGI, would invest $315 million and obtain warrants entitling it to buy up to a 40%

stake in the Company, and Zell would become Chairman of the Board. This structure

achieved the two goals of satisfying the large shareholders' demands to be cashed out and

vesting control of the Company in Zell.

40.    The Company's financial advisors, Merrill and CGMI, advised the

Company with respect to Zell's proposal. Their inherent conflict of interest as advisors

and potential lenders crystallized as the Zell proposal moved forward. At the same time

Merrill and CGMI were advising the Company on Zell's proposal, they were already

negotiating for themselves or their affiliates to provide financing for the LBO transaction

from which they would receive millions of dollars in fees and interest at premium rates

far higher than the 2006 Bank Debt. Because Zell's proposal called for refinancing the

2006 Bank Debt, Merrill and CGMI also stood to benefit, to the extent that they

participated in the 2006 Bank Debt, from increased interest rates and improved security

in the form of subsidiary guarantees. They were thus inherently biased in favor of the

LBO without regard to whether it was in the Company's interests.

## THE COMPANY DECIDES TO PROCEED WITH THE ZELL LBO

41.    On March 10, 2007, the Company informed Zell that it was reconsidering

whether to proceed with his LBO proposal because, among other things, of the high

degree of leverage under that proposal. Thereafter, the Company discussed with the

Chandler Trusts and the Foundations the possibility of pursuing a recapitalization and

spin-off transaction with a lower per share dividend to reduce the leverage required for

that transaction.

42.    The pause in the Company's interest in the Zell LBO transaction was brief. After the other remaining third-party bidder failed to develop a satisfactory competing proposal, and notwithstanding concerns about the leverage contemplated by the Zell LBO proposal, the Board, acting with advice from Merrill, CGMI and Morgan Stanley (through its recommendations to the Special Committee), approved the LBO proposed by Zell at a final price of $34 per share at a meeting on April 1, 2007. The Board approved the LBO as a whole, not merely the first step tender offer described *infra*, evidencing the Board's understanding that the LBO was a single integrated transaction.

43.    Also on April 1, 2007, the Board approved, and the Company signed, the Merger Agreement, which obligated it to proceed with the LBO by buying all the publicly owned shares of the Company in two steps. As set out in the Merger Agreement, the Company agreed first to make a tender offer for purchase of approximately one-half of the outstanding shares of the Company (126,000,000 shares) at a price of $34/share ("Step One"). Total consideration for Step One was approximately $4.284 billion. Pursuant to the Merger Agreement, the Company also committed to convert to cash the remaining publicly owned shares of the Company following regulatory approvals from the Federal Communications Commission (the "FCC"), required for certain aspects of the LBO, at a price of $34/share ("Step Two"). Total consideration associated with Step Two was some $4 billion. The Company committed in the Merger Agreement and otherwise to undertake all actions necessary to consummate the LBO in its entirety.

44. At all relevant times, consistent with the Merger Agreement and related transactional documents, the Company viewed and publicly described the LBO as a single integrated transaction occurring in two steps primarily to allow time to obtain approvals from the FCC. The Company intended at all relevant times to complete the LBO and was obligated, pursuant to the Merger Agreement and otherwise, to do so.

45. For example, the Company's April 2, 2007 press release announced that the Company had entered "a transaction which will result in the company going private and Tribune shareholders receiving $34 per share" and that "[s]hareholders will receive their consideration in a two-stage transaction."

46. Documents prepared by the LBO Lenders similarly confirm that the LBO Lenders considered the LBO to be a single integrated transaction executed in two steps. For example, a March 2007 presentation prepared by Merrill Lynch, Citigroup, and JPM approached the LBO as a single transaction:

> Our proposed financing structure assumes a signed purchase agreement whereby Equity Group Investments and an ESOP purchase Tower [the Company] for $33 per share (the "Transaction").

> We believe that the rating agencies will immediately rate Tower pro forma for the entirety of the Transaction when the purchase agreement is signed. Thus, we assume a B2/B corporate rating in our analysis for both steps.

> Merrill Lynch, Citigroup and JP Morgan recommend that Tower and Equity Group Investments approach the ratings agencies and employ their advisory services to facilitate a rapid, private reading on the prospective ratings for the whole Transaction.

47.    In May 2007, when Citigroup's Leveraged Finance department sought final internal approval to participate in the financing of the LBO, it similarly described the transaction to take the Company private as a single one that would occur "in two steps" with two stages of financing.

48.    At the same time as the Merger Agreement, the Chandler Trusts entered into a stock voting agreement, committing them to support the LBO. The Chandler Trusts' shares, together with the remaining shares held by the Foundations, would be cashed out at top-dollar at the expense of the Company and the Non-Bank Lenders.

## FINANCING THE LBO

49.    While negotiating the Merger Agreement, Zell and the Company also worked to develop a financing package that would enable the Company to pay the shareholders the over $8 billion necessary to the implementation of the LBO, to refinance the 2006 Bank Debt and to pay over $200 million in fees. On April 1, 2007, the same day the Company signed the Merger Agreement, a consortium of four lenders, JPMCB, MLCC, Citigroup, and Bank of America, N.A. (the "Lead Banks"), issued two loan commitment letters, restated as of April 5, 2007 (the "Loan Commitment Letters"), committing to loan the Company some $12.233 billion needed to finance the LBO.

50.    A more detailed agreement reflecting the terms of the financing was executed on or about May 17, 2007. This agreement formalized the Lead Banks' agreement to lend up to $8.028 billion for Step One of the LBO (the "Credit Agreement"), which was to close in early June 2007.

51.    The Credit Agreement provided for financing of Step One of the LBO through several different credit facilities: a two-year term facility in the amount of $1.5

billion (the "Tranche X Facility"), a seven-year term facility in the amount of $5.515

billion (the "Tranche B Facility"), a separate seven-year delayed draw facility in the

amount of up to $263 million and a revolving credit facility in the amount of up to $750

million. Those credit facilities are referred to collectively as the "Step One Financing,"

and the LBO Lenders that participated in them, or that acquired an interest in the loans

from the LBO Lenders that originally participated, are referred to as the "Step One

Lenders." The Credit Agreement also included the LBO Lenders' agreement to provide

$2.105 billion of the financing needed for Step Two of the LBO through an "Incremental

Facility" that would become part of the Tranche B Facility. The Step One Financing and

the Incremental Facility make up the "Senior Credit Facility." The Loan Commitment

Letters also committed the Lead Banks to provide up to $2.1 billion in financing for Step

Two through the "Bridge Facility," which was junior in payment priority to the Senior

Credit Facility.

52.    The Lead Banks knew that the amount of debt incurred in connection with

the LBO would place the Company in a precarious financial condition. For example, a

Citigroup employee closely involved in the transaction wrote, in an email to a colleague

less than ten days before the Lead Banks committed to finance the LBO, that after

reviewing information about the Zell proposal, "I am still extremely uncomfortable with

Zell. No matter the rating . . . . Declining ebitda is scary. Until yesterday I did not know

that Q1 cash flow is down 20 from last year . . . . I'm very concerned."

53.    The Lead Banks nevertheless aggressively promoted the transaction so that

they could collect massive fees, while at the same time planning to limit their own

exposure to a default in repayment of the loan by selling most of the lending obligation to a syndicate of lenders.

54.    Like the Lead Banks, the Company recognized that the degree of leverage created by the LBO left the Company in a precarious situation in which even minor underperformance compared to the Company's projections would leave the Company unable to meet its obligations as they came due. Two Company executives acknowledged in an email exchange in the week before April 1, 2007, that if the Company performed only 2% worse than projected, "there is no equity value in the first 5 yrs." On March 25, 2007, the Company learned that its revenue and operating cash flow for the first quarter of 2007 were, in fact, both 2% below the Company's plan.

55.    Analysts and rating agencies also warned that the Company would be unable to survive the burden of the LBO Debt. For example, a Standard & Poor's research report dated April 19, 2007, identified a "default scenario" suggesting that, should the Company's performance prove worse than the Company's expectations, the Company would default on its LBO Debt obligations in 2009.

56.    While the Company and the Lead Banks worked on the financing of the LBO, the Company's financial performance worsened month by month. The financial projections on which the LBO was based were finalized in early February 2007. The Company's actual performance each month from February through May was materially worse than projected. In April 2007, the Company's total operating profit was down 15% from the projections finalized two months earlier. Operating profit from the publishing group alone was down 26% in April from the February 2007 projections. The May results were even worse. The Company's total operating profit was down 21% from the

February projections.  The operating profits that the Company was counting on to pay interest on the massive debt load imposed by the LBO were disappearing as the Company and the Lead Banks finalized the financing.

## SUBORDINATING THE NON-BANK DEBT – THE GUARANTEES

57.    The Lead Banks were willing to arrange and finance the LBO only if they could effectively subordinate the Non-Bank Debt to the LBO Debt because, at all relevant times, they believed there was a high risk the Company would have to file for bankruptcy as a result of the LBO Debt.  On March 28, 2007, for example, a senior JPM employee wrote in an internal e-mail that he was concerned about the structure of the LBO Debt because the LBO Lenders would not be entitled to "post [bankruptcy] petition interest."  He added that "I've told the team I'm not comfortable approving the new structure for the reasons cited but would understand if Senor Mangement [sic] wanted to do this to further the Zell relationship [sic].  It's a question of lost income and leverage in a bankruptcy negotiation."

58.    The Bond Debt, by virtue of its indentures, shared *pari passu* in payment priority with other non-subordinated debt owed by the Company, thereby preventing a later lender to the Company from taking a more senior position.  The Lead Banks sought to avoid the provisions of the Bond Debt indentures, and effectively subordinate the Bond Debt, by insisting that the Guarantors, which did not guarantee the Bond Debt or the 2006 Bank Debt, guarantee all of the LBO Debt, including amounts used to refinance the 2006 Bank Debt (the "Step One Guarantee").  Without the Step One Guarantee, the Bond Debt would share with the LBO Debt *pari passu* in the equity of the Guarantors because they were owned by the Company.  By obtaining the Step One Guarantee from the

Guarantors, the Lead Banks intended to obtain priority over the Bond Debt and to ensure that in the event of a bankruptcy, the first losses would fall disproportionately on the Bond Debt and the Non-Bank Debt generally.  As a result, the Company effectively transferred the value of the Company's equity interest in the Guarantors to the LBO Lenders (the "Step One Equity Value Transfers"), by putting the rights of the LBO Lenders as creditors of the Guarantors ahead of the Company's rights as shareholder of the Guarantors.

59.   The Credit Agreement required the Guarantors to issue guarantees in favor of the Step One Lenders jointly and severally guaranteeing the full amount of the Step One Financing, plus the amount of future disbursements contemplated to take place under the Incremental Facility in connection with the Step Two Financing.  By executing the Step One Guarantee, each of the Guarantors became jointly and severally liable for up to $10.133 billion of debt, an amount far exceeding the net worth as of June 4, 2007, of each individual Guarantor and of all Guarantors collectively.

60.   The Guarantors did not receive anything in exchange for the Step One Guarantee.

61.   The Lead Banks also took other steps that were intended to make it more difficult for the holders of the Non-Bank Debt to share recoveries equitably with the LBO Debt in the event of a bankruptcy.  Those steps included the creation of two new subsidiaries of the Company, Tribune Broadcasting Holdco, LLC ("Holdco") and Tribune Finance, LLC ("Finance").  Holdco became the holding company for the Company's broadcasting subsidiaries through the Company's transfer to Holdco of the stock of the previous broadcasting holding company, Tribune Broadcasting Company.

Finance became a creditor of the Company's principal publishing subsidiaries through a complex circle of transactions in which some $3 billion of the Step One Financing was first distributed by the Company to Finance, then loaned by Finance to the publishing subsidiaries and finally returned to the Company from the publishing subsidiaries by means of dividends, so that the $3 billion ended up right where it had started. The only difference was that now the publishing subsidiaries were obligated on substantial intercompany obligations in favor of Finance. All of these circular transactions occurred simultaneously by means of book entries on the day of the closing of Step One.

62.    Holdco and Finance are among the Guarantors of the LBO Debt. The Company also pledged its stock in Holdco and Finance to further secure the LBO Debt (the "Pledge"). The holders of the Bond Debt share *pari passu* in the Pledge by virtue of the bond indentures, but other holders of Non-Bank Debt do not.

63.    The Company and the Lead Banks agreed to the creation of Holdco and Finance and the complex related transactions in part to hinder, delay and impede the ability of Non-Bank Lenders to challenge the guarantees as fraudulent in the event of a bankruptcy. As newly created entities, Holdco and Finance had no pre-existing creditors, unlike the other Guarantors. The Lead Banks apparently believed, incorrectly, that this fact would make it more difficult for the Non-Bank Lenders to challenge the Holdco and Finance guarantees as fraudulent. Holdco and Finance effectively controlled all the value of the other Guarantors through Holdco's ownership of the broadcasting subsidiaries and Finance's loans to the publishing subsidiaries.

## CLOSING STEP ONE

64.    On or about June 4, 2007, the Company closed the tender offer for 126,000,000 shares. The tender offer was heavily oversubscribed. Approximately 224,000,000 shares, over 90% of the total shares outstanding, were tendered. Pursuant to the terms of the tender offer, the Company purchased the 126,000,000 shares it had offered to purchase at Step One on a pro rata basis from the shares tendered.

65.    The Step One Financing also closed on June 4, 2007, and $7.015 billion of loan proceeds was disbursed as follows: $4.284 billion was paid out to shareholders; $2.534 billion was paid to Citicorp as administrative agent for the 2006 Bank Debt to pay it off in full; and tens of millions of dollars were paid out as fees, costs or expenses associated with Step One of the LBO.

66.    The Company retained Valuation Research Corp. ("VRC") in March 2007 to opine on the Company's solvency in connection with both steps of the LBO. The Company took a number of steps to ensure that it would obtain positive solvency opinions from VRC. Before Step One closed, the Company, among other things: (i) agreed to pay VRC one of the largest fees it had ever received for issuing solvency opinions in connection with both Step One and Step Two; (ii) decided not to revise the overly optimistic performance projections upon which VRC relied uncritically for its Step One solvency opinion despite the fact that by early March 2007 the Company was materially underperforming relative to its plan; (iii) obtained a preliminary opinion from VRC, in May 2007, that the Company would be solvent after Step Two; and (iv) directed VRC to ignore Step Two in opining on solvency at Step One. The Company's efforts succeeded in connection with the closing of Step One. VRC issued opinions, dated May

17 and May 24, 2007, concluding that the Company would be solvent after giving effect to Step One of the LBO.

## THE COMPANY'S FINANCIAL PERFORMANCE WORSENS

67.    The Company's financial performance, particularly in the publishing side of its business, continued to fall far below the February 2007 projections after the Step One Financing closed on June 4, 2007. The Company's operating profits from its publishing division for the first nine months of 2007 were down 24% from its February projections. Operating profits for the Company as a whole were down 14% from the February projections for the first nine months of 2007.

## ENSURING THE CLOSURE OF STEP TWO

68.    The closing of Step Two depended upon issuance of an opinion from VRC that the Company would be solvent after giving effect to Step Two. Over and above the several steps it had previously taken to ensure that VRC opined that the LBO would not render the Company insolvent, senior management of the Company took additional steps between October and December 2007 to ensure that VRC would issue an opinion finding solvency at Step Two.

69.    On information and belief, those steps included: (1) preparing revised financial projections in October 2007 that dramatically increased the Company's projected growth rate in later years as compared to the February 2007 projections, even though the Company had consistently failed to meet the February projections; (2) instructing VRC to use the Company's inflated growth rate projections for later years, projections that VRC accepted uncritically; (3) instructing VRC to use a definition of "fair market value" that was contrary to well-established valuation principles, which

VRC agreed to do; and (4) leading VRC to believe that Morgan Stanley had opined that the Company would be able to refinance the LBO Debt when it came due in 2014 and 2015 when, on information and belief, Morgan Stanley had not done so.

70.    In October 2007, in anticipation of the closing of Step Two, the Company revised the February 2007 long-term financial projections on which the LBO was based. The Company sought to offset the effect of its deteriorating financial performance by making unjustifiable changes in the assumptions used for its February 2007 projections.

71.    Most notably, the Company's October 2007 projections assumed that the Company's operating cash flows would grow by 2.4% per year from 2012-2017, matching the projected growth rate from 2011-2012, a presidential election year in which the Company expected its advertising revenues to receive a substantial boost from election-related advertising.  In sharp contrast, the Company's February 2007 projections assumed that operating cash flows would grow by less than .5% per year from 2012-17. In other words, even though the Company was consistently falling short of its February 2007 projections, the October 2007 projections increased the assumed 2012-17 growth rate more than four times.

72.    The Company's October 2007 projections also increased the assumed growth rate for the Company's interactive business from the February 2007 projections. Although the Company had missed its February 2007 projections for the interactive business by more than 4% through September 2007, its October 2007 projections increased the assumed growth of the interactive business starting in 2009.  There was no reasonable justification for this changed assumption.

73.   The Company provided its October 2007 projections to VRC for use in preparing a solvency opinion in connection with Step Two, and VRC uncritically relied upon those projections in giving its December 20, 2007 solvency opinion.

74.   On information and belief, Company management instructed VRC to change its valuation methodology to use the Company's projected growth rate for 2012-17, and VRC agreed to adjust its approach without making an independent judgment whether this change was appropriate.  VRC's May 2007 solvency opinions for Step One did not rely on the 2012-2017 growth rates from the Company's February 2007 projections but instead calculated a "terminal value" for the Company's 2012 and later operating cash flows that implied an annual growth rate (after correction for a calculation error) of 0.8%.  In sharp contrast, VRC's December 2007 opinion used the inflated 2.4% growth rate assumptions for 2012-2017 from the Company's October projections. Donald Grenesko, the Company's Chief Financial Officer, supplied VRC with a representation letter supporting the 2.4% growth rate for 2012-2017, and VRC accepted and used that inflated projection without making any effort to determine whether there was any reasonable basis for it.

75.   These unjustifiable changes helped to ensure that VRC would issue a favorable solvency opinion by increasing the Company's enterprise valuation by more than $600 million from what it would have been had the Company and VRC used the same assumptions they had used earlier in the year.

76.   As a condition of issuing its December 20, 2007 solvency opinion, VRC also sought a representation from Company management concerning the Company's ability to refinance approximately $8 billion in LBO Debt when it came due in 2014 and

2015.  On or about December 1, 2007, Mose Rucker, a VRC Managing Director, called Chandler Bigelow, then Tribune's Treasurer, and told him that VRC needed a representation from the Company that it was reasonable for VRC to assume the Company would be able to refinance the LBO Debt.  Mr. Rucker also asked that Mr. Bigelow speak to the Company's financial advisor to make sure that the advisor agreed that the refinancing assumption was reasonable.

77.   On or about December 2, 2007, Mr. Bigelow, Mr. Grenesko and other members of Company management called Bryan Browning, a VRC Senior Vice President.  During that conversation, Bigelow and/or Grenesko stated that Morgan Stanley, financial advisor to the Special Committee, had agreed that the Company could refinance its debt in 2014 even in a "downside" scenario.  Upon information and belief, Morgan Stanley had not told the Company that it agreed with management's refinancing assumptions.

78.   The Company provided a representation letter to VRC, signed by Mr. Grenesko and dated December 20, 2007, that stated in part:  "Based upon (i) management's best understanding of the debt and loan capital markets and (ii) management's recent discussions with Morgan Stanley, management believes it is reasonable and appropriate for VRC to assume that Tribune . . . would be able to refinance."  VRC's Step Two solvency opinion relied in part on that representation letter, expressly citing management's purported discussions with Morgan Stanley regarding the company's ability to refinance its debt when it came due.  Upon information and belief, Morgan Stanley in fact had not advised management that it was reasonable and appropriate for VRC to assume that Tribune would be able to refinance the LBO Debt.

## THE DEFENDANTS AND STEP TWO

79.    As Step Two of the LBO approached, the defendants and Non-Party Banks knew that Company performance continued to decline and that piling the Step Two Debt on the Company, which was already highly leveraged after Step One, made insolvency a reasonably likely result of the LBO.

80.    In the summer of 2007, the defendants and Lead Banks were aware that financial analysts were expressing concern about the Company's ability to survive the LBO. On August 14, 2007, the Lehman Brothers analyst tracking the Company warned that "[i]f the privatization deal does end up going through [as a result of Step Two], we continue to think the probability of significant financial difficulty at Tribune is much, much greater than 50%/50% – given the secularly declining fundamentals and the large amount of leverage involved which is currently at 9.6 times 2008E EBITDA and would rise to nearly 12 times if the second tranche occurs . . . . So by our calculations, if the second tranche of the privatization deal happens, the company will not be able to cover the estimated annual interest expense from operations let alone have excess free cash flow to pay down debt each year."

81.    Also in August 2007, S&P lowered Tribune's corporate credit rating from BB- to B+, and the bank loan rating from BB+ to BB. The downward change "reflect[ed] deterioration in expected operating performance and cash flow generation compared to previous expectations."

## CLOSING STEP TWO

82.    The Company obtained the necessary regulatory approvals from the FCC on November 30, 2007. Step Two closed on December 20, 2007, triggering the conversion

of the remaining outstanding shares of the Company to cash at $34 per share, as provided in the Merger Agreement.

83.   The financing for Step Two had been committed by the Lead Banks in the Commitment Letters and consisted of two facilities:  the Incremental Facility of $2.105 billion and up to $2.1 billion in the Bridge Facility (together, the "Step Two Financing"). The Incremental Facility funding was provided through a series of "Increased Joinders" executed on or about December 20, 2007, by which various LBO Lenders added this funding to the Tranche B Facility originated in the Step One Financing.  Because of this structure, the Incremental Facility loan was accorded the priority of the Tranche B Facility and was covered by the Step One Guarantee.

84.   Concerns about the continued deterioration of the Company's financial performance led to negotiations regarding the amount of the Step Two Financing.  These negotiations led to an agreement between the Company and the Lead Banks to reduce the amount of the Bridge Facility from $2.1 billion to $1.6 billion.  The result of this reduction was to reduce the exposure of the LBO Lenders on the highest risk portion of the LBO Debt.

85.   On December 20, 2007, the day Step Two closed, the Company issued notes in favor of JPMCB as administrative agent for the Senior Credit Facility with respect to the Incremental Facility and in favor of MLCC as administrative agent for the Bridge Facility (together, the "Step Two Notes").

86.   At the same time, the Guarantors executed a separate guarantee of the $1.6 billion Bridge Facility (the "Step Two Guarantee"), subordinate to the Step One Guarantee, by which the Guarantors jointly and severally unconditionally guaranteed

repayment of the Bridge Facility.  Through the execution of the Step Two Guarantee, the
Guarantors increased their obligation to $11.733 billion.  As with the Step One
Guarantee, the Company effectively transferred the value of the Company's equity
interest in the Guarantors to the LBO Lenders by means of the Step Two Guarantee (the
"Step Two Equity Value Transfers," taken together with the Step One Equity Value
Transfers, the "Equity Value Transfers"), by putting the rights of the LBO Lenders as
creditors of the Guarantors ahead of the Company's rights as shareholder of the
Guarantors.  The amount of indebtedness guaranteed by the Step One and Step Two
Guarantees far exceeded the net worth as of December 20, 2007, of the Company and of
each individual Guarantor and of all Guarantors collectively.

87.    Furthermore, in connection with and at the same time as the Guarantors
executed the Step Two Guarantee, the Guarantors executed two Indemnity, Subrogation
and Contribution Agreements (the "Subordination Agreements"), one for Step One and
one for Step Two.  The Subordination Agreement respecting the Step One Financing was
executed by the Guarantors six months after the Step One Financing transaction as an
attachment to the Increased Joinders executed by certain lenders and the Company for the
funding of the Incremental Facility.  It had the effect of subordinating indemnity,
subrogation and/or contribution claims from a Guarantor and the Company or between or
among Guarantors to the claims of the Step One Lenders.  The Subordination Agreement
respecting the Step Two Financing was executed by the Guarantors at the time of the
Step Two Financing and subordinated to the Bridge Facility all of the Guarantors' rights
to assert indemnity, subrogation and/or contribution claims such Guarantors then had or
thereafter acquired against the Company or other Guarantors.  The effect of the

Subordination Agreements was to divert additional value in the Guarantors away from the Non-Bank Lenders in the event of non-payment by the Company of the debt incurred in the Step One or Step Two Financings and thereby to reduce the equity value of the Guarantors available to the Company or to its Non-Bank Lenders.

88.    Thus, in connection with the Step Two Financing, the Company and the Guarantors became liable for the additional sum of approximately $3.7 billion, which was used entirely, along with prior borrowings, to complete the conversion of the remaining 117,115,055 shares of stock to a right to receive $34 per share, for a total of $3,981,911,860.

89.    The Guarantors did not receive anything in exchange for the Step Two Guarantee.

## BANKRUPTCY PETITION FILING

90.    The Company's financial performance after the LBO closed was consistently far below the Company's February 2007 projections. The bankruptcy that the Lead Banks had contemplated before the Step One Financing became inevitable as the Company struggled under the weight of the enormous debt it had taken on to buy out the shareholders and pay off the 2006 Bank Debt. By late 2008, the Company had begun active planning for a bankruptcy filing. Unsurprisingly, given the financing structure designed to impose the first losses on the Non-Bank Debt, it was an impending payment due on the Bond Debt that immediately precipitated the filing.

91.    The Bond Debt included a series of bonds issued in 1997 which was due to mature on December 8, 2008, when the Company would be obligated to make a principal payment of $69,500,000. Recognizing that a payment of that magnitude would affect the

funds available for repayment of the LBO Debt, Zell approached JPM and others –

including two of the Company's advisors and one of Zell's – and the Board and

recommended the initiation of these bankruptcy proceedings to avoid having to make the

$69,500,000 payment to the holders of the Bond Debt.  Upon approval of the Board, and

after consultation with the LBO Lenders, the Company and 111 of its subsidiaries filed

voluntary petitions under Chapter 11 of the Bankruptcy Code on the Petition Date.

Subsequently, the Committee was appointed and granted the authority to bring this

action.


## COUNT ONE

### AIDING AND ABETTING BREACHES OF FIDUCIARY DUTIES AGAINST MERRILL AND CGMI

92.    Plaintiff incorporates by reference paragraphs 1-91 of this Complaint as if

set forth again in full.

93.    The officers and directors of Tribune owed Tribune fiduciary duties of good

faith, care and loyalty.  As Tribune was either rendered insolvent or placed in the zone of

insolvency as a result of the LBO, the officers and directors of Tribune owed fiduciary

duties to all of Tribune's stakeholders, including its creditors.

94.    The officers and directors of Tribune, acting both individually and

collectively, failed to exercise the necessary care, and breached their respective duties of

good faith, care and loyalty by, among other things, acting in their own personal self-

interests, and/or in the interests of others besides the Company, in approving and/or

facilitating the LBO transaction even though they knew or were reckless in not knowing

that it would result in harm to Tribune.  At a minimum, the officers and directors of

Tribune were willfully blind to the foreseeable consequences of the LBO transaction, and acted grossly negligently and/or recklessly in approving and/or facilitating a transaction that in short order would result in disaster for the Company while providing themselves substantial personal financial benefits.

95.    The Company's management, including Messrs. Grenesko and Bigelow, acting both individually and collectively, further failed to exercise the necessary care, and breached their respective duties of good faith, care and loyalty by, among other things, (a) making unjustifiable assumptions for the Company's October 2007 financial projections and instructing VRC to use such unreliable projections, which VRC did uncritically; (b) instructing VRC to make unjustifiable and unreasonable assumptions in connection with its Step Two solvency opinion, which VRC agreed to do; (c) representing to VRC that Morgan Stanley agreed with the Company's assumptions concerning refinancing of the LBO when Morgan Stanley had not so agreed; (d) representing to VRC that the Company would be solvent after giving effect to Step Two without a reasonable basis for such representation; (e) failing to advise the Board that management had represented to VRC that Morgan Stanley agreed with the Company's assumptions concerning refinancing of the LBO Debt when Morgan Stanley had not so agreed; and (f) agreeing to, approving and/or facilitating the imprudent and highly leveraged LBO transaction that rendered the Company insolvent knowingly, grossly negligently and/or willfully blindly disregarding the foreseeable disastrous consequences of the LBO.

96.    Merrill and CGMI knew that the Company's officers and directors had the fiduciary duties alleged herein.

97.    Merrill and CGMI aided and abetted the officers' and directors' breaches of fiduciary duties, and were active and knowing participants in those breaches of fiduciary duties by, among other things, recommending and supporting the LBO in their role as financial advisors to the Company when they knew or recklessly disregarded the substantial risk that the LBO would or was highly likely to render Tribune insolvent or on the brink of insolvency.

98.    Merrill and CGMI acted in bad faith and were grossly negligent.  In recommending and supporting the LBO, Merrill and CGMI failed to exercise even slight care, in such a way as to show complete disregard for the rights and safety of others.

99.    The Company has been substantially damaged as a direct and proximate result of Merrill and CGMI'saiding and abetting the breaches of fiduciary duties set forth herein.

WHEREFORE, Plaintiff demands judgment against Merrill and CGMI for compensatory damages in an amount to be proved at trial, costs and such other and further relief as the Court may deem just and proper.

## COUNT TWO

### CONSTRUCTIVE FRAUD AGAINST CGMI AND MERRILL TO AVOID AND RECOVER PAYMENT OF THE ADVISORY FEES (11 U.S.C. §§ 544(b), 548(a)(1)(B) AND 550(a))

100.    Plaintiff incorporates by reference paragraphs 1-99 of this Complaint as if set forth again in full.

101.    By October 2006, the Company engaged CGMI and Merrill to advise it in connection with a potential financial transaction.

102.  Pursuant to the Company's engagement of CGMI and Merrill, the Debtors transferred or caused to be transferred over $25 million in advisory fees in connection with the LBO Financing to CGMI and Merrill.

103.  The Debtors did not receive reasonably equivalent value in exchange for payment of the Advisory Fees.

104.  At the time of payment of the Advisory Fees, taking into consideration the LBO as a whole, the Company's obligations under the Merger Agreement and otherwise to complete the LBO, reasonable projections of the performance of the Company's businesses and the fair value of its assets and liabilities, the Debtors were insolvent within the meaning of 11 U.S.C. § 101(32)(A).

105.  At the time of payment of the Advisory Fees, the Debtors were left with unreasonably small capital to operate its business as a result of and following the LBO.

106.  At the time of payment of the Advisory Fees, the Debtors intended to incur or believed they would incur debts beyond the Debtors' ability to pay as such debts matured.

WHEREFORE, the Committee seeks avoidance and recovery of the Advisory Fees for the benefit of the Non-Bank Claims, together with interest from the date of each particular transfer, attorneys' fees and costs of suit and collection allowable by law.

## COUNT THREE
## PROFESSIONAL MALPRACTICE AGAINST CGMI AND MERRILL

107. Plaintiff incorporates by reference paragraphs 1-106 of this Complaint as if set forth again in full.

108. CGMI and Merrill agreed to provide professional financial advice to assist the Company in its business decision making in connection with the LBO, including providing advice on whether and what form of transaction to pursue, and advice on how to structure and finance the LBO.

109. Acting in their capacity as professional financial advisors to the Company, and pursuant to their engagement agreements with the Company, CGMI and Merrill had a duty to use the same degree of knowledge, skill, and ability as would an ordinarily prudent professional in similar circumstances.

110. CGMI and Merrill deviated from the standard of care expected of a professional financial advisor under these circumstances, and in fact, failed to exercise even slight care in rendering financial advice to the Company. CGMI and Merrill acted in bad faith and were grossly negligent by, among other things, (a) allowing their conduct as advisors to be influenced by the opportunity for affiliates of CGMI and Merrill to earn, in addition to the Advisory Fees, millions of dollars of fees from participating in the LBO Financing as lenders to Tribune, and (b) advising the Company on the Zell proposal at the same time they were negotiating to provide financing for the transaction from which their affiliates would receive millions of dollars in fees and interest at premium rates far higher than the 2006 Bank Debt. CGMI and Merrill each had a strong incentive to recommend that the Company pursue the LBO transaction, and both advisors were in fact advocates for the LBO.

111.  CGMI and Merrill also acted in bad faith and were grossly negligent by, among other things, recommending and supporting the LBO in their roles as professional financial advisors to the Company when they knew or recklessly disregarded the substantial risk that the LBO would or was highly likely to render Tribune insolvent or leave Tribune on the brink of insolvency.

112.  The Company has been substantially damaged as a direct and proximate result of CGMI's and Merrill's professional malpractice set forth fully herein.

WHEREFORE, Plaintiff demands judgment against CGMI and Merrill for damages in an amount to be proved at trial, costs and such other and further relief as the Court may deem just and proper.

## RESERVATION OF RIGHTS

113.  The Committee reserves the right, to the extent permitted under the Bankruptcy Code or by agreement, to assert any claims relating to the subject matter of this action or otherwise relating to the Debtors and their estates against any third party.

Dated:  April 2, 2012
       Wilmington, Delaware

**LANDIS RATH & COBB LLP**

Adam G. Landis (No. 3407)
Daniel B. Rath (No.3022)
Richard S. Cobb (No. 3157)
James S. Green, Jr. (No. 4406)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone:  (302) 467-4400
Facsimile:   (302) 467-4450

- and -

{698.001-W0020338.2}

Graeme W. Bush
James Sottile
Andrew N. Goldfarb
**ZUCKERMAN SPAEDER LLP**
1800 M Street, NW, Suite 1000
Washington, DC  20036
Telephone:   (202) 778-1800
Facsimile:    (202) 822-8106

*Counsel to the Official Committee of Unsecured
Creditors*