# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered |

**Objection Deadline: May 1, 2012 at 4:00 p.m. (ET)**
**Hearing Date: May 8, 2012 at 10:00 a.m. (ET)**

## MOTION OF THE DEBTORS FOR AN ORDER AUTHORIZING THE DEBTORS TO IMPLEMENT A MANAGEMENT INCENTIVE PLAN FOR 2012

Tribune Company (the "Company") and most of its wholly-owned subsidiaries, each of which is a debtor and debtor in possession herein (each a "Debtor" and collectively, the "Debtors"), hereby move this Court (the "Motion") for entry of an order, in substantially the form attached hereto as Exhibit A (the "Order"), authorizing, but not directing, the Debtors

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc., f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); and WPIX, Inc. (0191). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

pursuant to Section 363(c) and, as applicable, Sections 363(b) and 503(c)[2] of Title 11 of the

United States Code (the "Bankruptcy Code"), to continue their self-funding annual cash

Management Incentive Plan ("MIP") as described in this Motion for 2012 for approximately 425

management employees with an aggregate payout opportunity of approximately:

(a)   $15.0 million – representing a 50%-of-target payout – if the Company achieves
      "threshold" performance equal to approximately 85% of its "planned" 2012
      consolidated operating cash flow ("OCF") goal included in the 2012 operating plan
      that was approved by the Company's Board of Directors (the "Board") on February 9,
      2012;

(b)   $30.0 million – representing a 100%-of-target payout – if the Company achieves
      "target" performance equal to 100% of its "planned" 2012 consolidated OCF goal
      included in the 2012 operating plan that was approved by the Board on February 9,
      2012; and

(c)   $45.0 million – representing a 150%-of-target payout – if the Company achieves
      "maximum" performance equal to approximately 127% of its "planned" 2012
      consolidated OCF goal included in the 2012 operating plan that was approved by the
      Board on February 9, 2012.

## SUMMARY

### Court Approval of Prior MIPs and the Continued Imperative for Meaningful Incentives

          The Debtors seek to continue in the ordinary course for 2012 the historical MIP

that has been a key component of their incentive-based compensation structure since at least

1997.  Like the 2008, 2009, 2010 and 2011 MIP programs that were approved by this Court, the

2012 MIP has been reviewed and approved by the Compensation Committee of the Company's

---

[2] The Debtors are filing the instant Motion with respect to the 2012 MIP out of an abundance of caution because some participants are statutory insiders, notwithstanding the Debtors' position that Section 363(c) authorizes the continuation of that program without the need for notice and a hearing.

Board (the "Compensation Committee"), and was analyzed by Mercer (U.S.), Inc. ("Mercer"), an

independent compensation consulting firm. Mercer concluded that the incentive opportunities

provided under the 2012 MIP are reasonable and appropriate, and indeed result in total cash

compensation ("TCC") that is relatively competitive and total direct compensation ("TDC")[3] that

is still materially below the market median.[4] Furthermore, the anticipated participant level

(approximately 425) and aggregate payout opportunities of the 2012 MIP ($15.0 million at

"threshold" performance, $30.0 million at "target" performance and $45.0 million at "maximum"

performance) are consistent with and in certain respects below the comparable figures for the

Court-approved 2009, 2010 and 2011 MIP programs.[5]

     The Debtors have shared a draft of this Motion and information regarding the

2012 MIP with the official committee of unsecured creditors (the "Creditors Committee"), and

its financial advisors and attorneys. The Creditors Committee supports the relief requested in

this Motion. The Debtors also have shared a draft of this Motion and information regarding the

2012 MIP with JPMorgan Chase Bank, N.A. ("JPM"), Oaktree Capital Management, L.P.

("Oaktree") and Angelo, Gordon & Co., L.P. ("Angelo Gordon" and, together with JPM and

---

[3] TCC is comprised of base salary and short-term (e.g., annual) cash incentives. TDC is comprised of base salary, short-term (e.g., annual) cash incentives and long-term (e.g., equity-based) incentives, if any (i.e., TDC = TCC + long-term incentive compensation). See Ex. D (Mercer Report) at 10.

[4] A redacted copy of Mercer's April 13, 2012 report describing and analyzing the proposed 2012 MIP (the "Mercer Report") is attached as Exhibit D hereto. Concurrently with this Motion, the Debtors are filing the Motion of the Debtors to File Under Seal an Exhibit to Motion Of The Debtors For An Order Authorizing The Debtors To Implement A 2012 Management Incentive Plan. Pursuant to Del. Bankr. L. R. 9018-1(b), an unredacted copy of Exhibit D, the Mercer Report, will be provided to the Judge's chambers in an envelope marked "Documents To Be Kept Under Seal."

[5] The 2009 MIP had approximately 670 authorized participants and authorized payout opportunities of approximately $17.5 million at "threshold" performance, $35.0 million at "target" performance and $45.9 million at "maximum" performance. The 2010 MIP had approximately 660 authorized participants and authorized payout opportunities of approximately $16.5 million at "threshold" performance, $33.0 million at "target" performance, and $42.9 million at "maximum" performance. The 2011 MIP had approximately 640 authorized participants and authorized payout opportunities of approximately $16.4 million at "threshold" performance, $32.4 million at "target" performance, and $42.5 million at "maximum" performance.

Oaktree, the "Principal Senior Lenders"), and their respective financial advisors and attorneys. The Debtors have incorporated into the 2012 MIP certain creditor constituency feedback received.

Approval of the 2012 MIP continues to be critically important to maintain proper incentives for the management team as the Company strives to sustain its strong performance despite the strains of the Chapter 11 process and the significant headwinds that the media industry still faces. As explained in the proffered testimony of Company President and Chief Executive Officer) and Publisher and Chief Executive Officer of the *Los Angeles Times* Eddy Hartenstein at the October 4, 2011 Hearing on the 2011 MIP (the "October 4, 2011 Hearing"): "[T]he challenges have been even greater than expected particularly due to the deteriorating overall economic outlook and the accelerated pace at which advertising dollars have migrated away from publishing." Id. (excerpts attached as Exhibit F hereto), at 14. Mr. Hartenstein's proffered testimony further confirmed that the Debtors' ability to weather these "economic headwinds has only been achieved as a result of excellent performance of the workforce. This performance includes the continued successful implementation and initiation of a number of revenue enhancing initiatives, as well as, cost cutting initiatives." Id. at 15; see also Transcript of November 10, 2010 Hearing on the 2010 MIP ("November 10, 2010 Hearing") (excerpts attached as Exhibit G hereto), at 42 ("[N]ow's not the time to take the foot off the pedal and [not] keep incentivizing these core – this core group of people here and exhorting them to continue to excel.").

Consistent with this undisputed evidence, this Court has recognized that these MIP programs are important means of ensuring that the Debtors maintain proper incentives for their management team during the Chapter 11 process. For example, with respect to the 2011

MIP, the Court held that "the relief requested here is justified under the facts and circumstances" and that "it's entirely appropriate to order this relief in these uncertain times with respect to this particular debtor." Transcript of October 4, 2011 Hearing (Ex. F hereto), at 22. Similarly, with respect to the 2010 MIP, the Court held: "I find that the targets and the benchmarks have been appropriately fixed as incentives. They contain the necessary reach. The metrics chosen in the setting of the targets and benchmarks that is revenue and operating cash flow I think is reasonably chosen under the circumstances." Transcript of November 10, 2010 Hearing (Ex. G hereto), at 59-60.

The Court expressed the same sentiments in approving the 2009 MIP at the January 27, 2010 Hearing on the 2009 MIP ("January 27, 2010 Hearing") (excerpts attached as Exhibit H hereto), citing the Company's evidence that:

> costs are fixed, the company is under intense revenue pressure, and it's harder to do things in a Chapter 11 . . . [and] that all eight newspapers owned by the company are cash flow positive and that the program that's proposed was approved by three independent directors. I mean, it's undisputed that the debtor operates in a troubled industry....Here the evidence demonstrated that the debtor is performing well, relative to its competitors.

Transcript of January 27, 2010 Hearing, at 15; see also Transcript of January 27, 2010 Hearing (Ex. H hereto), at 13 (the Court stating that the Debtors' evidence regarding the 2009 MIP "demonstrated the need for incentives" and that the "Debtors' expert, John Dempsey [of Mercer], among other things said, 'It's a basic principle of human resources management that incentives are a tool used to both motivate people and to align the interests of people with the company.'"); Transcript of May 12, 2009 Hearing on 2008 MIP ("May 12, 2009 Hearing") (excerpts attached as Exhibit J hereto), at 52-53 (the Court stating: "You look at the industry, and considering the debtors' place in the industry in which it's trying to survive and transform itself in what are truly

5

extraordinary times, and you compare that to what's proposed to be paid in relation to its revenue.").

Meaningful incentives are also vital given the fact that the Debtors' management are now in at least their fourth consecutive year of below-market compensation, as Mercer's analysis (see infra) and other record evidence demonstrates. See Transcript of October 4, 2011 Hearing (Ex. F hereto), at 18-19 (proffer of Eddy Hartenstein testimony: "Mr. Hartenstein if called to testify, would state that the 2011 proposed MIP should be approved so that eligible company employees through their efforts and successes can attain compensation that even somewhat approaches market based payouts."); Transcript of November 10, 2010 Hearing (Ex. G hereto), at 41 (Eddy Hartenstein testifying: "We are already operating, as I think you'll see from some of the other material here, with folks in [the] industry well below where I think the median compensation should be and I will attest to – down to a person on that list that these – this is a group that is not median or mediocre in any way in their performance and their capabilities.").

As detailed below, the Court's rulings approving several prior years' MIP programs fully support the current relief requested. This Court authorized the Debtors to implement the 2011 and 2010 MIP programs and held that they met the standard under Section 503(c)(3) of the Bankruptcy Code, without regard to whether the plan should be analyzed under Section 363(b) or 363(c). See Transcript of October 4, 2011 Hearing (Ex. F hereto), at 22 ("the relief requested here is justified under the facts and circumstances"); Transcript of November 10, 2010 Hearing (Ex. G hereto), at 59 ("I don't address whether the relief should be awarded or viewed under 363(b) or (c). No one has argued that these are – or is not now arguing this is relief that should be applied against the standard set in 503(c)(1) or (c)(2). So I will apply the

6

standard provided in 503(c)(3).  And I conclude that the debtor has met its burden for the relief

that it's now requesting."); 11 U.S.C. § 503(c)(3).  This Court also authorized the Debtors to

implement the 2009 MIP as an ordinary course program under Section 363(c) of the Bankruptcy

Code.  See Transcript of January 27, 2010 Hearing (Ex. H hereto), at 17-18 ("The plan that is

proposed is similar enough to the 2008 and prior plans, with the evidence showed, appropriate

adjustments to fit the change in the circumstances, that it meets the [Section] 363 Ordinary

Course standard.").

   Finally, an expeditious ruling approving the 2012 MIP is, in the Debtors' view,

vital to providing all participants with some modicum of stability and predictability given the

uncertainties that the participants face.  See Transcript of October 4, 2011 (Ex. F hereto), at 19

(proffer of Eddy Hartenstein testimony: "it is critical that the MIP be approved as soon as

possible so that employees are incentivized to continue their hard work and outperform . . . in

[the] face of what was referred to as an uncertain operating environment in an uncertain

economy.").

Consistency of the 2012 MIP with Prior Court-Approved and Historical MIPs

   The Debtors respectfully submit that the 2012 MIP is consistent with the 2011

MIP, 2010 MIP and 2009 MIP that this Court approved, and it continues in any event to be more

conservative than the Debtors' longstanding ordinary course MIP programs from prior years.

For example:

- The Debtors' historical practice has been to offer an annual MIP program every year since at least 1997;

- The anticipated number of 2012 MIP participants (approximately 425) is lower than for prior years' programs and represents a decrease of approximately 200 MIP participants

7

relative to 2011. Such former participants generally had individual MIP award targets equal to less than 25% of their base salary. The Debtors made the judgment for 2012, in light of continuing media industry conditions and these employees' positions in the Debtors' organization, that their compensation was more appropriately addressed through means that do not depend upon consolidated OCF to the extent that the MIP does. It is anticipated that these individuals generally will instead participate in local bonus plans currently existing at the segment (i.e., Publishing or Broadcasting) or individual business unit levels;[6]

- Individual participant percentage-of-salary target bonus opportunities generally are the same as they were for 2011, other than adjustments in connection with promotions or other increased responsibilities, internal or market comparability, exceptional performance or contractual requirements;

- The OCF performance metric used in the 2012 MIP is the metric traditionally used in the MIP, including without limitation in 2008, 2009, 2010 and 2011;[7] and

- As noted, the aggregate payout opportunities under the 2012 MIP are consistent with and in certain instances less than the corresponding payout opportunities under the 2009, 2010 and 2011 MIP programs, and historical MIP programs (see supra note 5).

The 2012 MIP pay-for-performance structure also is more conservative than historical MIP programs, and consistent with the Court-approved 2009, 2010 and 2011 MIP programs:

- The 2012 MIP comports with the historical payout structure of the MIP and offers a "threshold" aggregate payout opportunity of 50% of target for achieving approximately

---

[6] Even with this transition to local bonus programs, the Debtors still anticipate that the total bonus cost for such transitioned individuals and for the continuing participants in the 2012 MIP will be similar to the total approved cost of the 2011 MIP.

[7] The Debtors operate on a 52/53 week fiscal year ending on the last Sunday of December, which requires a 53-week year every 5 to 6 years. 2012 is a 53-week year. To normalize 2012 for budgeting and performance purposes, the 2012 MIP utilizes the 52-week "planned" OCF figure set forth in the Debtors' Board-approved operating plan, and thus only 52 weeks of actual consolidated OCF will be considered for 2012 in measuring performance against objectives.

46429/0001-8464395V1

85% of the Debtors' "planned" level of consolidated OCF. This concept is consistent with the 2009, 2010 and 2011 MIP programs, each of which offered an aggregate payout pool of 50% of target for achieving a certain level of "threshold" performance.[8] It also is in line with the Debtors' historical practice of offering a 40%-of-target "threshold" MIP payout where business units achieve approximately 75% to 85% of their forecasted OCF (see infra at ¶ 14).

- The 2012 MIP requires "planned" performance in order to achieve a "target" MIP pool. This is consistent with historical MIP programs, which also typically required achievement of "planned" performance to fund a target MIP pool.

- Additionally, as under the 2009, 2010 and 2011 MIPs, "maximum" performance would fund a "maximum" aggregate pro forma bonus pool that is capped for all participants. For 2012, the "maximum" cap is 150% of the target pool. This is significantly lower than the historical maximum opportunity under the MIP – 200% of target – and substantially lower than the maximum annual cash incentive award opportunities offered by the Debtors' peers. See infra ¶¶ 14, 39.

---

[8] While the "threshold" level of performance under the 2009 and 2010 MIPs (which were approved by the Court later in the year or, in the case of the 2009 MIP, early the following year) was at or slightly above "planned" consolidated OCF, this was not the case with the 2011 MIP, which required "threshold" performance equal to approximately 91% of "planned" consolidated OCF. The "threshold" requirement of 85%-of-"planned" consolidated OCF for 2012 as noted is also consistent with the historical "threshold" requirement of 75%-to-85% of "planned" consolidated OCF. The 2009, 2010 and 2011 MIP programs also required somewhat greater above-"planned" performance in order to achieve "target" and "maximum" level payouts, respectively (142%, 129%, and 106% of "plan" at "target," respectively, and 200%, 161%, and 141% of "plan" at "maximum," respectively), and the cap for these years on the "maximum"-level award pool was 130% of the "target" pool. Importantly, however, all such metrics for these years were the product of negotiations with the Debtors' creditor constituencies and were based on the operating environment and related circumstances facing the Debtors at that time. Furthermore, in each of these years including 2012, the relationship between the applicable "target" performance goal (whether or not it was above-"plan") and the "maximum" performance goal was proportional to the historical relationship of "planned" to "maximum" performance, i.e., the "maximum" performance goal was approximately 120% to 140% of the applicable performance "target" goal ("maximum" performance was 141% of "target" performance in 2009, 125% in 2010, 133% in 2011, and 127% in 2012). Moreover, both the "maximum" pool cap of 150%-of-target-pool for 2012 and the 130% cap for the past few years are well below the 200%-of-target "maximum" opportunity under the Debtors' historical MIP plans and those of the Debtors' peer group. See infra ¶¶ 14, 39. As stated, the Compensation Committee of the Debtors' Board has deemed the current metrics to be appropriate for 2012 given the Debtors' current operating circumstances, and those 2012 metrics again have been reviewed by the Creditors Committee, which supports the relief requested in this Motion, and the Principal Senior Lenders. Indeed, the Debtors' "planned" consolidated OCF target again is itself a stretch goal, including without limitation due to the continued contraction expected in the Debtors' industry and the difficulties that the Debtors face in Chapter 11 in competing effectively through consolidations and other similar transactions. This structure also is justified given the fact that the MIP participants are now experiencing at least their fourth consecutive year of significantly below-market compensation.

- On top of this more conservative cap on maximum payouts, the level of performance required to qualify for a "maximum"-level 2012 MIP pool (approximately 127% of "planned" consolidated OCF) is consistent with the level of "maximum" performance required under historical MIP programs – traditionally 120% to 140% of "planned" OCF. See infra ¶ 14(a)-(b).

Furthermore, the 2012 MIP is even more conservative than historical MIP programs in several additional respects. As with the 2009, 2010 and 2011 MIPs, the 2012 MIP limits the Debtors' discretion to make awards when a minimum specified level of "threshold" performance is not achieved. Historically, the Debtors retained discretion to make MIP awards even when threshold-level performance was not achieved. For 2012, if the Debtors do not reach at least "threshold" consolidated OCF, no aggregate MIP pool is funded, no awards to Corporate division participants or to Publishing or Broadcasting segment group office participants may be made, and individual business units that achieve at least "threshold" performance will then be eligible only for substantially discounted partial awards. Furthermore, any discretion that is permitted will be exercised within the pay-for-performance framework of the 2012 MIP and with due regard for Company, business unit and individual performance results.

The Market-Based Nature of the 2012 MIP Incentive Opportunities

The Debtors again have taken a thoughtful and conservative approach with the 2012 MIP to ensure proper incentives, to bring the participants' compensation closer to the market median relative to their peers, and to avoid the substantial undercompensation and dilution of incentives that otherwise would occur. As stated, for the fourth year in a row, the MIP participants lack any equity-based compensation and thus are missing a core compensation

10

component that is provided by their competitors.[9]  As Eddy Hartenstein testified at the

November 10, 2010 Hearing:

> Prior to the bankruptcy, of course, [the Debtors' historical non-sales management compensation structure was] very similar to other companies I'm familiar with, and in business as general, not just in the media business, but there are three legs to the compensation stool, if you will.  There is base compensation, there is bonus and then there is equity.  Equity is sometimes given in terms of actual stock, RSU's or options.  Of course, for us in the state of play that we're in, the equity leg of that triad is basically zero, so we're left with just the two, base and hopefully bonus.

See Transcript of November 10, 2010 Hearing (Ex. G hereto), at 40.

Mercer has confirmed that, without the 2012 MIP, TCC and TDC on average

would fall substantially below the market median for the MIP participants – in the case of TDC,

at *approximately one-quarter* of the applicable market median.  See Ex. D, at 4, 11.

Implementing the 2012 MIP would make TCC and TDC more competitive, although TDC in

particular again would be well below market at all performance and payout levels given the

absence of any long-term equity-based compensation, as well as the conservative payout

structure of the 2012 MIP.   Id. at 11-14; see infra ¶¶ 37-40.  It remains critically important to

ensure that the Debtors have the necessary tools to appropriately compensate and attract top-tier

executive and management talent, and to preserve meaningful incentives for all participants.

* * * * * * *

In sum, the Debtors believe in their reasonable business judgment that

implementation of the 2012 MIP as proposed is essential to the success of both their ongoing

---

[9] The Debtor/Creditors Committee/Lender Plan of Reorganization (the "DCL Plan") authorizes the Compensation Committee of the reorganized Company's Board to implement a management equity plan providing for the grant of up to 5% of the common equity of the reorganized Company, but only once emergence occurs.  Additionally, the DCL Plan currently does not specify any individual equity grants.

operations and their restructuring efforts.  Additional facts and circumstances supporting this

Motion are set forth below and are verified in the Affidavit of Eddy Hartenstein, President and

Chief Executive Officer, in support of the Motion (the "Hartenstein Affidavit") and the Affidavit

of John Dempsey, Partner, Mercer (U.S.), Inc., in support of the Motion (the "Dempsey

Affidavit").  Copies of the Hartenstein Affidavit and the Dempsey Affidavit are attached hereto

as Exhibit B and Exhibit C, respectively.  A redacted copy of the Mercer Report is designated as

Exhibit D hereto.  In further support of this Motion, the Debtors respectfully represent as

follows:

## STATUS OF THE CASE AND JURISDICTION

1.     On December 8, 2008 (the "Petition Date"), Tribune and certain of its

subsidiaries each filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

An additional Debtor, Tribune CNLBC, LLC,[10] filed a voluntary petition for relief under Chapter

11 of the Bankruptcy Code on October 12, 2009.  In all, the Debtors comprise 111 entities.

2.     The Debtors have continued in possession of their respective properties and

have continued to operate and maintain their businesses as debtors in possession pursuant to

Sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee has been appointed.

3.     The Creditors Committee was established on December 18, 2008.

4.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this

Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The Debtors submit that Section 363(c) of the

---

[10] Tribune CNLBC, LLC was formerly known as Chicago National League Ball Club, LLC.

12

Bankruptcy Code authorizes implementation of the 2012 MIP as an ordinary course program. 11

U.S.C. § 363(c). The Debtors also submit that the 2012 MIP would comport with Sections

363(b) and 503(c) of the Bankruptcy Code even if those sections are deemed applicable. 11

U.S.C. §§ 363(b), 503(c); see supra note 2.

## **BACKGROUND**

### **The Debtors' Principal Segments and Business Units**

5.      The Company is the ultimate parent company of each of the Debtors. It

reaches more than 80% of U.S. households through its newspapers and other publications, its

television and radio broadcast stations and cable channels, and its other entertainment offerings.

The Debtors' operations are conducted through two primary business segments:  (i) Publishing

and (ii) Broadcasting.

6.      The Publishing segment currently operates eight (8) major-market daily

newspapers, and distributes entertainment listings and syndicated content through its Tribune

Media Services business unit.  It also manages the websites of the Debtors' daily newspapers,

television stations, and other branded sites targeting specific communities of interests. As of the

Petition Date, the Publishing segment employed approximately 12,000 full-time equivalent

employees.

7.      The Broadcasting segment includes 23 television stations in 19 markets,

including seven stations in the top 10 U.S. markets and the Chicago area's first and only 24-hour

cable news channel, CLTV.  It also operates the cable "Superstation" WGN America and

Chicago radio station WGN-AM. As of the Petition Date, the Broadcasting segment employed

approximately 2,600 full-time equivalent employees.

8.     The Debtors also have a Corporate division that includes the senior management team as well as other corporate-level and centralized administrative personnel, including legal, finance, accounting, technology and human resources personnel.

**Overview of the MIP and the Debtors' Historical Compensation Practices**

9.     The Debtors have paid incentive compensation as a central component of employee compensation for many years.  As part of that practice, in 1997, they implemented the MIP as part of the Tribune Company Incentive Compensation Plan (the "Incentive Plan"), a copy of which is attached hereto as Exhibit E.  The Incentive Plan authorizes the Debtors to make incentive awards to eligible participants consisting of annual cash incentive awards through the MIP.  See Ex. E (Incentive Plan) Art. VI.  The Debtors have awarded cash incentive awards under the MIP each year since 1997.

10.     Historically, most management employees across the Company's and its affiliates' operations (other than those in sales positions) with target cash incentive award opportunities of at least 15% of their base salary have participated in the annual MIP.  There were a total of approximately 1,039 participants in the MIP for 2004, 1,040 for 2005, 1,010 for 2006, 953 for 2007, 720 for 2008, 670 for 2009 (which was the approximate number of 2009 MIP participants when payouts were made in February 2010), 661 for 2010 (the approximate number of 2010 MIP participants when payouts were made in February 2011), and 624 for 2011 (the approximate number of 2011 MIP participants when payouts were made in January 2012).  As stated, the Debtors currently anticipate approximately 425 participants in the 2012 MIP (as in prior years, the actual end-of-year figure may vary including due to any newly hired, promoted or other additional employees who become eligible for the 2012 MIP, provided that the addition

14

of any such additional employees shall not increase any aggregate payout otherwise payable under the 2012 MIP).

11.     The Debtors have used a consistent methodology over the years in setting annual cash incentive award targets and in subsequently determining such awards. Each participant has an annual target award opportunity expressed as a percentage of his or her base salary. For example, a participant with a base salary of $100,000 and a 30%-of-salary cash incentive award target percentage would be eligible for a target MIP award of $30,000. The Debtors then use these individual bonus opportunities to determine target bonus pools for each business unit and segment, as well as the consolidated Company-wide target pool.[11]

12.     Within the Publishing segment, each individual newspaper is its own business unit, as is Tribune Media Services. Within the Broadcasting segment, each television and radio station is its own business unit. The Corporate division, as well as certain group offices that oversee the entire Publishing segment and Broadcasting segment, respectively, also constitute distinct business units.

13.     Starting early in the fourth quarter of each year, a budget and operating plan is developed by each business unit for the following year. These plans include forecasted income statements for each business unit, as well as other objectives such as, in the case of Broadcasting business units, market share goals. Senior management then separately meets in person with representatives of each business unit to review and discuss that business unit's

---

[11] As discussed below, the "target" annual cash incentive award opportunity of a given participant, expressed as a percentage-of-salary, is *different* in concept from the "target" level annual MIP *pool* as a whole. While individual participants' percentage-of-salary cash incentive award targets historically have varied under the MIP, they typically have been *lower* than *aggregate* cash MIP pool payouts as a percentage of the target pool. For example, even though "threshold" level Company performance typically resulted in a pro forma bonus pool equal to 40% of the target pool (see infra ¶ 14(a)), individual awards from that pool as a percentage of salary generally were significantly lower than 40% of such participants' base salaries in the aggregate.

15

individual budget and plan, in some instances resulting in changes to applicable goals.
Following that extensive process, individual business unit budgets and plans are aggregated into
a consolidated budget and operating plan for the Company as a whole, taking into account the
unique characteristics of each geographic market and business segment in which the Company's
business units operate, as well as broader industry and macroeconomic factors.  In or about the
end of the fourth quarter of such year, senior management and the Company's Board then review
and assess these consolidated and individual budgets and operating plans for the upcoming year
and make any further refinements that may be appropriate.  Following this iterative and
deliberative process, the Company then submits these consolidated and business-unit-specific
budgets and operating plans to the Company's Board for final review and approval during the
first quarter of the applicable year.  The Board-approved budgets and operating plans generally
guide the Company and its business units for that year.  As noted, the Company's 2012 budget
and operating plan were approved by the Board at its February 9, 2012 meeting.

14.    The OCF goals established in this extensive and thorough planning process
for the business units also historically served as the primary performance target for that year's
MIP, and set the MIP participants' performance and incentive goals and expectations for that
year:

a.    Publishing: Each Publishing segment business unit's OCF forecast
historically served as its annual cash incentive award performance target as well.  Under the
Debtors' practice:

16

- When a Publishing business unit achieved "threshold" performance – usually in the range of 75% to 85% of its forecasted OCF – a pro forma[12] annual cash incentive bonus pool was established for that business unit at 40% of the target pool.[13]

- Historically, if the business unit met its "planned" OCF goal, a pro forma bonus pool was established at 100% of target. OCF between a minimum "threshold" and the "planned" goal historically would result in a linearly interpolated pro forma bonus pool achievement from 40% to 100% of target.

- OCF in excess of a business unit's "planned" goal historically resulted in a proportionally increased pro forma achieved pool, up to 200% of the target pool for "maximum" performance in the range of 120% to 140% of "planned" OCF depending on the business unit.

        b.    <u>Broadcasting</u>:  For Broadcasting segment business units, OCF and market share goals historically have determined a majority of their achieved annual cash incentive bonus pool opportunity, with a portion being determined based on discretionary factors.  A Broadcasting business unit's achievement of "threshold," "planned" or "maximum" performance on its goals typically resulted in a pro forma MIP pool opportunity equal to 40%, 100% or 200% of its target pool, respectively.

        c.    <u>Publishing and Broadcasting Group Offices</u>:  For the Publishing group office and the Broadcasting group office, their annual cash incentive bonus pool

---

[12] This and other amounts are referred to as "pro forma" because, as discussed below, the Debtors have always reserved and exercised the discretion to adjust achieved pool and payout amounts.

[13] For example, assume that a Publishing business unit's OCF target was $10 million, its threshold performance target was 85% of that amount, and its aggregate bonus pool target was $1 million (at 100% achievement of forecasted OCF). If this business unit generated OCF of $8.5 million (85% of target), it would achieve a pro forma bonus pool of $400,000 (40% of the $1 million target pool), subject to further adjustment in the Debtors' discretion. As discussed, payout at the threshold level of 40% of the target bonus pool did *not* result in a payout at 40% of each participant's base salary.  To the contrary, while individual participants' annual cash incentive bonus targets, expressed as a percentage of base salary, vary (<u>see supra</u> ¶ 11), aggregate annual cash incentive award payouts under past years' MIP programs as a percentage of base pay have been well below 40% of the participants' aggregate base salaries.

achievement levels historically have been based, respectively, on a weighted average of the

bonus achievement levels for the various individual business units within the Publishing segment

and the Broadcasting segment.

      d.    <u>Corporate Division</u>: Historically, the Corporate division's annual

cash incentive pool opportunity has been based on a blend of the Publishing segment's

achievement, the Broadcasting segment's achievement, and individual goals including equity

investment income achievement.

      15.    Given the complexity and breadth of the Debtors' organization, the

diversity of their business units, and the variety of markets in which they operate, the Debtors

traditionally have exercised discretion in adjusting actual business unit and segment annual cash

incentive pool amounts, as well as individual awards, upwards or downwards relative to

achieved pro forma amounts. This includes making discretionary awards, where deemed

appropriate, to business units that did not meet their goals. The Incentive Plan expressly

authorizes such exercises of discretion. <u>See</u> Ex. E (Incentive Plan) §§ 3.2, 10.6.

      16.    In addition to their annual cash incentive awards, a majority of MIP

participants historically have been eligible to receive equity-based awards to incentivize long-

term performance. Through 2007, such equity-based awards were made as option or restricted

stock unit grants under the Incentive Plan. Following the merger that returned the Company to

private ownership at the end of 2007, the Company began to award phantom equity to certain

management personnel through a new Management Equity Incentive Plan (this plan is being

discontinued under the DCL Plan).

17.    Under the Debtors' longstanding compensation philosophy, the TCC of key personnel (base salary and annual cash incentive award) purposefully was kept low relative to market.  Equity-based compensation comprised a substantial component of their compensation to incentivize long-term performance, align managements' and the shareholders' interests, and bring the recipients' TDC (base salary, cash incentive award and long-term equity award) to market.

18.    However, the Debtors have been unable to provide equity compensation to their key personnel for several years now.  In fact, no awards have been made under the Management Equity Incentive Plan since 2008.  As this Court stated at the January 27, 2010 Hearing, "it's plain from the evidence that the equity has de minimis or no value and would not be an appropriate component of a bonus program."  Transcript of January 27, 2010 Hearing (Ex. H hereto), at 15.  As a result, the key management team has been significantly undercompensated relative to the market, as discussed above and further below.  See supra note 9.

## REQUESTED RELIEF

I.    <u>Implementation of the 2012 Management Incentive Plan</u>

19.    The Debtors seek approval, for the reasons stated above and below, to continue their annual cash MIP opportunity and implement the 2012 MIP as described in this Motion, including in the Mercer Report, for a lower number of participants relative to prior years, as well as for any newly hired or promoted employees, or any other employees at management's discretion, who in each case become eligible for the MIP (as stated, the Debtors have attached a redacted copy of the Mercer Report as Exhibit D hereto and are

contemporaneously seeking leave to file the unredacted Mercer Report under seal).[14] See
generally Ex. D.

20.    Applicable MIP performance levels, related payout percentages and
aggregate pool amounts for the 2012 performance period are set forth in the following chart
(percentages and pool amounts in between the stated reference points are determined by linear
interpolation):

|  | Threshold Performance | Planned/Target Performance | Maximum Performance |
|---|---|---|---|
| Performance (approximate consolidated OCF, in $ millions) | 85% of Planned Performance ($528) | 100% of Planned Performance ($620) | 127% of Planned Performance ($785) |
| Payout as a % of target | 50% | 100% | 150% |
| Aggregate Payout (approximate, in $ millions) | $15.0 | $30.0 | $45.0 |

Ex. D, at 5.[15]  To determine actual performance for purposes of the MIP, OCF is calculated net
of any applicable incentive payouts, making the MIP self-funding.[16]  Id.

---

[14] Any increases in the number of MIP participants will not increase the aggregate ordinary course MIP payout at
any given performance level. Ex. D, at 4.

[15] In addition to the typical annual exclusions from the OCF calculation (e.g., non-operating items and
reorganization costs), OCF for purposes of the 2012 MIP excludes non-cash pension expense, which is an actuarial
calculation that does not impact actual cash flow and is not a cost over which the MIP participants have direct
control. The effect of this exclusion is simply to increase the various OCF performance goals at all levels relative to
what they would have been had this non-cash expense been included in the OCF calculation. The net result does not
impact the real performance requirements applicable to the MIP participants. See Transcript of October 4, 2011
Hearing (Ex. F hereto), at 14 (proffer of Eddy Hartenstein testimony: "with respect to its pension plans due to an
actuarial review, the company was required to accrue significantly higher non-cash pension expense for 2011 versus
2010. Specifically, this expense increased those amounts by an accounting basis by $44 million."); Ex. D, at 6.

[16] Actual consolidated OCF used to measure bonus achievement will reflect an appropriate level of MIP bonus
expense, consistent with the Company's historical accounting practices. For example, achieving "target" OCF for

46429/0001-8464395V1

21.     Once funded, management will allocate the MIP pool to business units based on a formula that includes OCF, a blend of financial and operational metrics, and some discretion based on management assessment of individual business unit performance. See Ex. D, at 6. Specifically, 50% to 60% of the MIP pool for a given business unit will be allocated based on such business unit's OCF; 20% to 25% will be allocated based on business-unit-specific financial and operational goals (such as market share and audience delivery gains; certain revenue and subscriber growth; reduction in controllable expenses; and other criteria); and the remainder will be reserved for management discretion to recognize innovation, leadership, change management, and other measures of success and value creation (as with the MIP historically, management reserves the right to award a greater or lesser discretionary percentage to any business unit or participant on a case-by-case basis, but in doing so will not exceed the aggregate Company-wide bonus pool achieved based on consolidated OCF). See Ex. D, at 6.

22.     As in prior years, the Debtors also have incorporated limitations for 2012 on their historical discretion to make annual cash incentive awards in the event that goals are not achieved. Specifically, if consolidated OCF does not reach the "threshold" level, no Company-wide aggregate MIP pool will be funded for 2012, and participants in the Corporate division, the Publishing group office and the Broadcasting group office will not receive any MIP award. Ex. D at 5, 7. Even if "threshold" consolidated OCF *is* achieved, a given business unit that does not achieve at least "threshold" OCF will not be allocated an MIP pool. Ex. D, at 5, 7. Such a business unit then will only be eligible for a partial discretionary MIP pool if that pool is paid out

---

2012 funds a pro forma MIP pool of $30.0 million. In this case, the achievement of "target" OCF would be determined net of a $30.0 million bonus expense (i.e., actual OCF before bonus expense must equal "target" OCF plus $30.0 million). The MIP bonus expense, or "funding" for MIP bonuses, increases up to 150% of target as the Company's actual OCF increases up to the "maximum" target. To achieve a "maximum" pro forma MIP bonus pool of $45.0 million for all participants, actual OCF before bonus expense must equal "maximum" OCF plus $45.0 million.

of one or more other business units' awards (thereby reducing those other awards), or out of

"excess" aggregate MIP pool amounts that have funded (due to consolidated Company

performance) but that the Company has elected not to award to other business units for

performance or discretionary reasons.

23.     At the same time, the Debtors again have taken care to ensure that

continued economic pressure and an inability to achieve *consolidated* operating goals do not

dampen the incentives of those individual business units that remain successful in achieving their

goals. Accordingly, in the event that "threshold" performance is *not* achieved on a consolidated

basis, an individual business unit will remain eligible for a MIP pool if, and only if, it achieves

its individual OCF goal at least at the "threshold" level. See Ex. D, at 7. Even then, however,

individual business unit pools would be reduced by *60%* relative to pro forma pool amounts that

potentially would have been available had consolidated performance goals been achieved.[17] Id.

24.     As with past practice, any MIP payouts earned for 2012 shall be paid

within the first two-and-a-half months of 2013. A participant generally must be employed on the

date of payment to receive an MIP award, except in cases of death, disability, retirement or

termination without cause, which would result in a pro-rated payment based on length of service

during the year. Id. at 7.

## BASIS FOR RELIEF REQUESTED

25.     Section 363(c) of the Bankruptcy Code fully authorizes the continuation in

2012 of the Debtors' ordinary course MIP program. Moreover, the 2012 MIP would meet any

---

[17] Thus, for example, if consolidated goals are not achieved but a business unit achieves "target" performance, it would be eligible for an MIP pool of 40% (calculated as 40% x 100%) of target.

and all requirements of Sections 363(b) and 503(c) of the Bankruptcy Code even if those sections are deemed applicable.

**I.    The 2012 MIP is an Ordinary Course Program Under Section 363(c).**

26.    Under Section 363(c)(1) of the Bankruptcy Code, "[i]f the business of the debtor is authorized to be operated under … this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of the estate without notice or hearing." 11 U.S.C. § 363(c)(1).  A transaction is within the ordinary course of business if it is an ordinary transaction when looked at from the horizontal and vertical dimensions.  See In re: Roth American, Inc., 975 F.2d 949, 952 (3rd Cir. 1992).

**A.    The 2012 MIP Satisfies the Horizontal Ordinary Course Requirement.**

27.    From the horizontal dimension, a transaction is within the ordinary course of business if, from an industry-wide perspective, the transaction is of the sort commonly undertaken by companies in that industry.  Id. at 953.  The 2012 MIP clearly meets the horizontal standard.  As the Mercer Report reflects, and as the evidence at the October 4, 2011 Hearing, the November 10, 2010 Hearing, the September 25, 2009 Hearing on the 2009 MIP ("September 25, 2009 Hearing") (transcript excerpts attached as Exhibit I hereto), and the May 12, 2009 Hearing on the 2008 MIP demonstrated, it is commonplace for businesses within the Debtors' industry to provide ongoing short-term performance-based cash compensation such as the MIP, including during a Chapter 11 proceeding.  See Ex. C (Dempsey Affidavit); Ex. D; Transcript of October 4, 2011 Hearing (Ex. F hereto), at 17, 19; Transcript of November 10, 2010 Hearing (Ex. G

23

hereto), at 45-46; Transcript of September 25 2009 Hearing (Ex. I hereto), at 115-117, 131;

Transcript of May 12, 2009 Hearing (Ex. J hereto), at 40-43, 52-53.  Numerous cases also

demonstrate that short-term cash incentive programs are a common form of compensation,

including for debtors in possession.  See, e.g., In re: Dana Corporation, 358 B.R. 567 (Bankr.

S.D.N.Y. 2006) (approving annual cash incentive program); In re: Propex, Inc., No. 08-10249

(Cook, J.) (Bankr. E.D. Tenn. Apr. 9, 2008) (approving annual cash incentive program).

**B.**      **The 2012 MIP Satisfies the Vertical Ordinary Course Requirement.**

28.      From the vertical dimension, a transaction is within the ordinary course of

business if, from the hypothetical creditor's perspective, the transaction does not subject the

creditor to economic risk of a nature different from those accepted when it decided to extend

credit.  See In re: Roth American, Inc., 975 F.2d at 952 (noting that primary focus is on the

debtor's pre-petition business practices and conduct).  Continuation of the Debtors' historical

MIP for 2012 also easily meets this standard.  As detailed above and below, the 2012 MIP is

self-funding, has a lower participant level than prior years' MIP programs (see supra at 7-10),

and is consistent with if not lower in cost in certain respects than the MIP in past years.[18]  See

supra notes 5-6.  The 2012 MIP also is consistent in its payout curve and structure with the

Debtors' historical MIP practices, and provides for reasonable levels of incentive compensation

that, while remedying the Debtors' compensation gap to market somewhat, still leave the

participants overall with below-median TDC.  See Ex. D, at 9-15.

29.      While this Court did not address whether the 2010 and 2011 MIP programs

were ordinary course programs (given its holding that those plans satisfied the standard of

---

[18] As stated, the Debtors expect that the aggregate of the 2012 MIP costs, plus any 2012 local bonus costs for those
former participants who have been transitioned from the MIP for 2012, will still be similar to the corresponding
costs of the 2011 MIP.  See supra notes 5-6.

Section 503(c)(3) of the Bankruptcy Code in any event), the Court previously held that the 2009

MIP program constituted an ordinary course program under Section 363(c) of the Bankruptcy

Code. See Transcript of January 27, 2010 Hearing (Ex. H hereto), at 17-18. Similarly, the Court

observed at the May 12, 2009 Hearing that the 2008 MIP program also may have met the Section

363(c) standard (even though that issue technically was not before the Court). See Transcript of

May 12, 2009 Hearing (Ex. J hereto), at 9 ("With respect to the motion at Number 5, to make

payments according to prepetition incentive plans, it may be really – it may be the first time that

it really is an ordinary course thing and doesn't fall under the 503(c)(3) standard.").

30.     The Debtors respectfully submit that the same is true of the 2012 MIP. See

supra at 7-10. For example, the annual OCF performance metric used in the 2012 MIP is

consistent with historical practice, including during 2008, 2009, 2010 and 2011, and motivates

performance towards realistic goals for which participants have a clear "line of sight." Indeed,

MIP participants were involved in the rigorous budgeting and operating plan development

process used to determine "planned" OCF for 2012, and the resulting consolidated and business-

unit-specific OCF metrics were extensively analyzed by senior management and approved by the

Company's Board on February 9, 2012. MIP participants have been actively working towards

these OCF goals during 2012, with the understanding that they also would determine their MIP

award opportunities. Nevertheless, the Debtors have incorporated certain creditor constituency

feedback into the 2012 MIP.

31.     The total MIP pool potentially payable at "target" performance

(approximately $30.0 million), and the anticipated participant level for 2012 (approximately

425), are lower than recent MIP programs and historical levels. See supra at 7-10; supra notes 5,

6 and 8. There were approximately 1,039 participants in the MIP for 2004, 1,040 for 2005,

1,010 for 2006, 953 for 2007, 720 for 2008, 670 for 2009 (720 at the time the 2009 MIP initially was proposed), 661 for 2010 (640 at the time the 2010 MIP initially was proposed), and 624 for 2011 (640 at the time the 2011 MIP initially was proposed).  Additionally, aggregate "target" pools over the past several years were $37.9 million for 2004, $39.3 million for 2005, $41.9 million for 2006, $39.8 million for 2007, $35.1 million for 2008, $35.0 million for 2009, $33.0 million for 2010, and $32.4 million for 2011.  The median 2012 award for all participants at "target" performance is approximately $50,000.

32.     The Debtors also have made various refinements to the 2012 MIP pay-for-performance structure that are analogous to those made in recent years and that continue to make it more conservative than historical MIP programs.  The Debtors believe in their considered business judgment that this structure for 2012 is eminently justified and appropriately incentivizing given the business and industry circumstances that they continue to face.  See Transcript of October 4, 2011 Hearing (Ex. F hereto), at 14 (proffer of Eddy Hartenstein testimony:  "[T]he challenges have been even greater than expected particularly due to the deteriorating overall economic outlook and the accelerated pace at which advertising dollars have migrated away from publishing.").  Furthermore, as stated, all such payout and performance metrics have been reviewed by the Creditors Committee, which supports the relief requested in this Motion, and the Principal Senior Lenders.  For example:

- The 2012 MIP funds a partial Company-wide bonus pool if the Company achieves at least a minimum "threshold" level of OCF – a 50%-of-target payout for achieving approximately 85% of "planned" consolidated OCF.  Historically, the MIP provided for at least a 40%-of-target partial payout if a business unit achieved between 75% and 85% of its "planned" OCF.  The Court-approved 2009, 2010 and 2011 MIP programs similarly provided for 50%-of-target payouts upon the achievement of a specified level of "threshold" performance.

- The 100%-of-target opportunity for "planned" performance under the 2012 MIP is consistent with the Debtors' historical MIP programs, which also typically permitted a 100%-of-target payout upon the achievement of "planned" performance.

- The 2012 MIP offers a "maximum"-level payout if the Company achieves approximately 127% of "planned" performance. This performance requirement is consistent with the Company's historical practice of providing a "maximum" payout to business units for achieving from 120% to 140% of plan.

- The 2012 MIP also caps the "maximum" aggregate bonus pool opportunity at 150% of the target pool. This metric is well-justified for 2012 given the increased challenges to achieving maximum performance in the current environment. The 2012 cap also is well below the historical and typical peer group maximum payouts of 200% of target. See Ex. D, at 21; infra ¶ 39.

- Also like the 2009, 2010 and 2011 MIP programs, the 2012 MIP eliminates the Debtors' historical discretion to fund an aggregate pool for below-"threshold" performance, and instead requires at least "threshold" consolidated OCF performance in order to fund a Company-wide aggregate bonus pool and to permit individual awards to any Corporate division or segment group office participants. As in the past three years, individual business units may qualify for MIP pools only at *reduced* levels if consolidated results are *not* achieved, provided the business units themselves achieve at least "threshold" performance, to ensure that otherwise successful business units do not have their incentives diminished by an overall downturn. The 2012 MIP again restricts the Debtors' historical discretion to allocate an MIP pool to a business unit that does not achieve at least "threshold" OCF under its individual budget, unless that pool is paid out of one or more other business units' awards (thereby reducing those other awards), or out of "excess" aggregate MIP pool amounts that have funded (due to consolidated Company performance) but that the Company has elected not to award to other business units for performance or discretionary reasons.[19]

---

[19] While as noted the 2012 MIP is not identical in all respects to the 2011, 2010 and 2009 MIPs (which were approved later in the year or, in the case of the 2009 MIP, early the following year), all such programs including the

33.    The Debtors respectfully submit that the 2012 MIP, with its reasonable and carefully thought-out structure, provides critically important incentives to their key management personnel while appropriately recognizing the current circumstances that the Debtors face. Accordingly, because the 2012 MIP is an ordinary course program under Section 363(c) of the Bankruptcy Code, court approval technically is not required, but the Debtors seek such approval because the 2012 MIP involves insiders, as noted. See supra note 2. The Debtors respectfully submit that such approval is warranted for reasons stated.

C.    **The 2012 MIP Satisfies the Business Judgment Requirement for Ordinary Course Programs.**

34.    Because continuation of the MIP program for 2012 thus falls squarely within the scope of ordinary course transactions authorized by Section 363(c) of the Bankruptcy Code, a court "will not entertain an objection to the transaction, provided that the conduct involves a business judgment made in good faith upon a reasonable basis and within the scope of authority under the Bankruptcy Code." Nellson, 369 B.R. at 799. Meeting this standard for ordinary course programs is a "relatively light evidentiary burden . . . . " Id. at 800.

---

2012 MIP were reviewed by and incorporate the input of various creditor constituencies. As noted, the Creditors Committee supports the relief requested in this Motion, and the Debtors respectfully submit that any variations are well-justified for reasons discussed, see supra note 8, that an incentive plan need not be identical from year to year in order to constitute an ordinary course (or otherwise justified) program, and that the 2012 MIP structure is more typical both in terms of the Debtors' historical practice and market practice. See Transcript of January 27, 2010 Hearing (Ex. H hereto), at 17-18 (this Court stating that the 2009 MIP "is similar enough to the 2008 and prior plans, with the evidence showed, appropriate adjustments to fit the change in the circumstances, that it meets the 363 Ordinary Course standard."); cf. Transcript of May 12, 2009 Hearing (Ex. J hereto), at 54 (this Court observing that while legal standards may not change, "circumstances change," and that in considering the appropriateness of the Debtors' proposed 2008 MIP payouts, it is important "to recognize the circumstances in which we now find ourselves in the world today."); see also In re: Nellson Nutraceutical, Inc., 369 B.R. 787, 800-01 (Bankr. D. Del. 2007) (approving ordinary course modification of incentive plan targets where payment of the bonuses "'made good business sense' notwithstanding the failure to achieve the lowest threshold for payment of bonuses under the original plan."); In re: Dana Corporation, 358 B.R. 567 (Bankr. S.D.N.Y. 2006) (approving continuation of short-term incentive program, slightly refined from the prior year, as an ordinary course transaction); In re: Buffets Holdings, Inc., No. 08-10141 (Walrath, J.) (Bankr. D. Del. May 14, 2008) (approving continuation of prepetition plan, modified due to changed circumstances, in the ordinary course of business).

46429/0001-8464395V1

35.    The 2012 MIP clearly meets this business judgment standard given its sound objectives, its conservative cost and payout structure, and the Debtors' strong operating performance in the face of adversity when management has proper incentives. See Transcript of October 4, 2011 Hearing (Ex. F hereto), at 21-22 (the Court ruling that "under these circumstances, the metrics that the debtor has chosen here and the methods . . . on which they base incentive plans and payments, that is operating cash flow is reasonable and sensible, and that the relief requested here is justified under the facts and circumstances. There is no objection to the relief that's been requested. And I think it's entirely appropriate to order this relief in these uncertain times with respect to this particular debtor."); id. at 14-15 (proffered testimony of Eddy Hartenstein stating that "the challenges have been even greater than expected particularly due to the deteriorating overall economic outlook and the accelerated pace at which advertising dollars have migrated away from publishing," and that the Debtors' navigation of these "economic headwinds has only been achieved as a result of excellent performance of the workforce. This performance includes the continued successful implementation and initiation of a number of revenue enhancing initiatives, as well as, cost cutting initiatives."); Transcript of November 10, 2010 Hearing (Ex. G hereto), at 59-60 (this Court stating that "I find that the targets and the benchmarks have been appropriately fixed as incentives. They contain the necessary reach. The metrics chosen in the setting of the targets and benchmarks that is revenue and operating cash flow I think is reasonably chosen under the circumstances . . . . The awards and potential awards under the proposed plan are meaningful but not excessive. They're within the market and the company's historical practice, arguably, below each of them.").

36.    Additionally, Mercer has independently validated that the Debtors' key management team members would be severely undercompensated relative to their competitors

29

without annual cash incentive opportunities. See infra. As stated, the Company (like its peers) remains under significant industry and macroeconomic pressures to transform its businesses. See supra at 4-7. Doing so requires a highly motivated executive and management team of the highest caliber, including the attraction of new talent where circumstances warrant, as well as maintaining a consistent drive among existing executive and management personnel despite below-market compensation and above-average daily performance demands.

37.    The Company cannot meet these challenges effectively if it cannot remain even minimally competitive with its peers in terms of compensation. Mercer has confirmed that, without the 2012 MIP, TCC and TDC on average would fall substantially below the market median for the management team. TCC for senior management[20] would be approximately 59% of the market median, while TDC would be only approximately 27% of the market median.[21] Ex. D, at 11. Based on this data, Mercer's consistent market analyses of prior MIP programs, and the consistency of the 2012 MIP with prior years' MIP plans, the other 2012 MIP participants would suffer a comparable degree of undercompensation if the 2012 MIP were not approved. See Ex. D, at 9, 15; see supra note 21.

38.    Even with a 2012 MIP award opportunity, key management members' TCC on average would be reasonable, but their TDC would remain significantly below the

---

[20] For 2012, the Debtors' senior management includes the following seven positions:  Chief Executive Officer; Chief Restructuring Officer; Chief Financial Officer; President/Tribune Broadcasting & Chief Investment Officer; President/Publishing; Chief Technology Officer; and General Counsel. The incumbent Chief Technology Officer has informed the Company that he is resigning from his employment. The Company currently intends to fill this role, and Mercer has retained it as part of the current market study. See Ex. D, at 2 n.3.

[21] Mercer benchmarked senior management's compensation under the 2012 MIP and evaluated the other participants' 2012 compensation opportunities based on Mercer's detailed benchmarking of several prior years' MIP programs, the consistency of the 2012 MIP with prior years' MIP plans, and the reasonableness of the 2012 compensation opportunities for senior management. Ex. D, at 9, 15. This methodology is consistent with market practice in Mercer's field, and with its methodology in benchmarking the Court-approved 2011 MIP.

market median given the absence of long-term incentives combined with the conservative payout structure of the MIP. Mercer has confirmed the following benchmarking for senior management:

| | Benchmarking of 2012 MIP For Senior Management | | |
| --- | --- | --- | --- |
| | Threshold Performance | Target Performance | Maximum Performance |
| TCC as a % of Market Median | 87% | 114% | 101% |
| TDC as a % of Market Median | 39% | 51% | 37% |

(Ex. D, at 11-14).[22]

39.    Furthermore, even with the 2012 MIP in place, the senior executives' TDC remains significantly below the market median, as the above data indicates. Ex. D, at 11-15. In particular, the significant shortfall in aggregate TDC at maximum performance is exacerbated by the fact that the 150%-of-target cap is well below the maximum payout opportunity of 200%-of-target most commonly offered by the Company's peers as well as under the Debtors' historical MIP programs. See Ex. D, at 4, 15; id. at 21 (showing median maximum award opportunities for peer group Chief Executive Officers and Named Executive Officers of 200%-of-target each, and

---

[22] As Mercer notes in its Report, competitive pay is generally defined as a range, not a point, due to inherent variations in market data. Ex. D, at 13. Therefore, Mercer typically considers total compensation to be competitive if it falls within 15% of the market median. Id. Mercer also states that it is typical for actual pay to vary from incumbent to incumbent, and in some cases to exceed the 15% range, based on multiple factors including pay required to initially attract the candidate to the organization, prior pay, individual performance, and other factors. Id.  As in prior years, payouts upon "maximum" performance are benchmarked against the "market maximum median" for TCC and TDC, which is base salary plus two times target annual incentives (TCC) plus two times long-term incentives (TDC). See Ex. D, at 9, 10, 14.

average maximum award opportunities of 208% and 194% of target, respectively, for such peer

group populations).[23]

40.    Mercer also has determined that the 2012 MIP overall would result in

reasonable compensation for the MIP participant population as a whole at all levels of

performance and potential payouts.  Ex. D, at 9, 15.  Indeed, as with the 2011 MIP, Mercer's

analyses indicate that implementing the 2012 MIP would somewhat address but not eliminate the

undercompensation of the other MIP participants relative to market.  Id.; see also Mercer's

Supplemental Report dated July 23, 2010, attached as Exhibit A to Debtors' Notice of Revision

to 2010 Management Incentive Plan [D.I. No. 5112] (determining that, with the 2010 MIP in

place, TCC for all surveyed MIP participants (including but not limited to senior management)

would be 93% of market at "threshold" payout, 111% of market at "target" payout, and 97% of

market at "maximum" payout, and that TDC would be only 60% of market at "threshold"

payout, 72% of market at "target" payout, and 52% of market at "maximum" payout).

41.    Accordingly, the Debtors respectfully submit that the 2012 MIP easily

meets the Section 363(c) ordinary course standard.  See supra ¶ 26.

42.    The Debtors therefore respectfully request authorization to implement the

2012 MIP as an ordinary course program, as provided in the proposed Order attached hereto as

Exhibit A.

---

[23] Indeed, maximum payouts would still be reasonable even if benchmarked against the regular (i.e., non-maximum) market median – TDC would fall only at approximately 64% of the (regular) market median.  See Ex. D, at 14. Given that this "apples to oranges" comparison measures above-target performance against at-target compensation figures, this substantially below-regular-market TDC reinforces the reasonableness of such maximum-level payouts. Id.

46429/0001-8464395V1

II.     **Approval of the 2012 MIP Would be Warranted Under Sections 363(b) and 503(c) of the Bankruptcy Code Even if They Are Deemed to Apply to the 2012 MIP.**

43.     While the 2012 MIP constitutes an ordinary course transaction under Section 363(c) of the Bankruptcy Code, the Debtors submit out of an abundance of caution that it would also qualify as a valid exercise of the Debtors' business judgment under Sections 363(b) and 503(c)(3) for reasons stated above and herein, if those sections are deemed applicable. See 11 U.S.C. §363(b)(1) ("The trustee, after notice and hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."); id. § 503(c)(3) (requiring that "transfers or obligations that are outside the ordinary course of business" and for which administrative expense priority is sought be "justified by the facts and circumstances of the case"). By their express terms, neither Section 363(b) nor Section 503(c)(3) applies to payments made in the ordinary course of business (which includes the 2012 MIP). See In re: Nellson Nutraceutical, 369 B.R. at 803-04.

44.     In determining whether to authorize the use of property pursuant to Section 363(b), the debtor need only demonstrate that a sound business purpose justifies such use. In re: Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999); see also In re: Delaware & Hudson Railway Co., 124 B.R. 169, 176 (D. Del. 1991). With respect to Section 503(c)(3), this Court has described the standard therein as a "heightened business judgment standard." Transcript of January 27, 2010 Hearing (Ex. H hereto), at 18; see also Transcript of May 12, 2009 Hearing (Ex. J hereto), at 52-53 (the Court characterizes the Section 503(c)(3) "justified by the facts and circumstances" standard as a "business judgment plus" standard).

45.     This Court already approved the 2011 MIP as "justified under the facts and circumstances." See Transcript of October 4, 2011 Hearing (Ex. F hereto), at 22). The Court

33

also approved the 2008 MIP payments as transactions outside the ordinary course, and held that

the 2010 MIP and 2009 MIP programs would meet a "heightened business judgment standard"

under Section 503(c)(3).  Transcript of November 10, 2010 Hearing (Ex. G hereto), at 59-60;

Transcript of January 27, 2010 Hearing (Ex. H hereto), at 18; Transcript of May 12, 2009

Hearing (Ex. J hereto), at 52-55.  These same holdings and considerations would warrant

implementation of the 2012 MIP as another valid exercise of the Debtors' business judgment

even if it were not an ordinary course program, including without limitation under the six-factor

Dana II framework cited by this Court in approving the 2009 MIP:

(1) Reasonable Relationship Between Plan and Business Objectives:  There is a clear
    relationship between the Debtors' OCF-based plan and their objective of enhancing their
    chances of survival and prosperity by increasing their profitability.  The Debtors' ability
    to stabilize the profitability of the Company is perhaps the best evidence that the
    incentives provided under the MIP program work.  See Transcript of October 4, 2011
    Hearing (Ex. F hereto), at 14-15 (proffered testimony of Eddy Hartenstein stating that
    "the challenges have been even greater than expected particularly due to the deteriorating
    overall economic outlook and the accelerated pace at which advertising dollars have
    migrated away from publishing," and that the Debtors' navigation of these "economic
    headwinds has only been achieved as a result of excellent performance of the workforce.
    This performance includes the continued successful implementation and initiation of a
    number of revenue enhancing initiatives, as well as, cost cutting initiatives."); id. at 21-22
    (Court holding in approving 2011 MIP that "the metrics that the debtor has chosen here
    and the methods . . . on which they base incentive plans and payments, that is operating
    cash flow is reasonable and sensible, and that the relief requested here is justified under
    the facts and circumstances"); Transcript of November 10, 2010 Hearing (Ex. G hereto),
    at 29 (Eddy Hartenstein testimony regarding strong 2010 performance); id. at 60 (the
    Court stating: "I find that the targets and the benchmarks have been appropriately fixed
    as incentives.  They contain the necessary reach.  The metrics chosen in the setting of the

34

targets and benchmarks that is revenue and operating cash flow I think is reasonably chosen under the circumstances.").

(2) <u>Reasonable Cost</u>: The cost of the proposed self-funding 2012 MIP is reasonable in the context of the Debtors' assets, liabilities and earning potential, including their 2011 revenues of approximately $3.1 billion. These facts have been confirmed by Mercer and validated by the Compensation Committee. Furthermore, the aggregate payout opportunities under the 2012 MIP are consistent with and in certain instances lower than the corresponding opportunities under the 2011, 2010, 2009 and historical MIP programs (as noted, the Debtors anticipate that aggregate costs would be similar to the 2011 MIP even taking into account any local bonus payments to individuals transferred out of the MIP for 2012). <u>See</u> <u>supra</u> notes 6, 8 and ¶¶ 31-32; Transcript of October 4, 2011 Hearing (Ex. F hereto), at 21-22 (Court approving for the 2011 MIP "the metrics that the debtor has chosen here and the methods . . . on which they base incentive plans and payments"); <u>see also</u> Transcript of November 10, 2010 Hearing (Ex. G hereto), at 60 (the Court stating: "The awards and potential awards under the proposed [2010 MIP] plan are meaningful but not excessive. They're within the market and the company's historical practice, arguably, below each of them."); Transcript of January 27, 2010 Hearing (Ex. H hereto), at 16 (the Court stating that "[t]he cost [of the 2009 MIP] is reasonable as well.").

(3) <u>Reasonable Scope</u>: The scope of the 2012 MIP is reasonable. It generally covers the same management population that has historically participated in that program, with appropriate modifications for 2012 in light of the Debtors' current operating circumstances to address through other means (including local bonus programs) the compensation of certain former participants for whom MIP awards were a smaller percentage of their total pay. As a result, the 2012 MIP has a lower participation level than prior years and historical levels (and the Debtors believe that the 2012 MIP participant level would have been consistent with that of the 2011 MIP even if such individuals had remained in the 2012 MIP). <u>See</u> Transcript of January 27, 2010 Hearing (Ex. H hereto), at 16 (the Court stating in approving the 2009 MIP that "[t]he scope is

reasonable.  It covers the same management population covered in previous plans, which is a critical core group.").

(4) Consistent with Industry Standards:  Mercer confirms, as does the other evidence presented at the hearings on the 2008, 2009, 2010 and 2011 MIP programs, that implementation of the 2012 MIP is consistent with industry standards, including for companies in Chapter 11, and the case law is in accord.  See supra ¶¶ 27, 32 n.19 (cases); infra ¶ 46 (cases).

(5) Due Diligence:  The proposed plan has been reviewed by Mercer, the Compensation Committee and the Debtors' management, and is informed by the extensive annual budgeting process described above.  See Transcript of October 4, 2011 Hearing (Ex. F hereto), at 12-13 (proffered testimony of Eddy Harstenstein describing the budgeting process, including the "give-and-take process [among individual business units and senior management] to review and challenge assumptions and budgets in order to understand the reasoning and basis for the projections.");  Transcript of January 27, 2010 Hearing (Ex. H hereto), at 17 (this Court stating that "[t]he proposed [2009 MIP] plan was reviewed by an independent committee of the board and validated, the evidence shows, by a credible expert.").  The Debtors also have shared information regarding the 2012 MIP with the Creditors Committee and the Principal Senior Lenders, and have incorporated creditor constituency feedback received.  Furthermore, the 2012 MIP continues to incorporate various changes, such as limitations on the Debtors' historical discretion to make awards in certain circumstances, that had been proposed by the Debtors' creditor constituencies in prior years' MIP programs.  As noted, the Creditors Committee supports the relief requested in this Motion.

(6) Independent Review:  The Debtors received independent counsel in performing due diligence, and in creating and authorizing the 2012 MIP.  As stated, the Compensation Committee, whom the undisputed evidence has shown is a disinterested body, reviewed and approved the proposed plan and retained Mercer, an independent compensation consultant, to evaluate the plan.  Mercer independently reviewed and validated the 2012

36

MIP as reasonable and appropriate.  Furthermore, as noted, the Debtors have incorporated creditor constituency feedback received.

In re Dana Corp. ("Dana II"), 358 B.R. 567, 576-77 (Bkrtcy. S.D.N.Y. 2006); see id. at 581 n.20 (noting in context of analyzing incentive plan that "Under applicable case law, in this and other circuits, courts should authorize business transactions outside the ordinary course of business if the Debtors have exercised sound business judgment."); see also In re Global Home Products, LLC, 369 B.R. 778, 786 (Bankr. D. Del. 2007) (affirming plan approved by compensation committee, even though company did not retain independent counsel to review the plan).

46.    Consistent with the foregoing, since the amendments to the Bankruptcy Code went into effect in October 2005, numerous courts in addition to this Court have approved employee compensation programs outside the ordinary course of business.  See e.g., In re Global Home Products, LLC, 369 B.R. at 784 ("The reasonable use of incentives and performance bonuses are considered the proper exercise of a debtor's business judgment.") (internal citation omitted); In re: Nobex Corp., No. 05-20050, 2006 WL 4063024 (Bankr. Del. Jan. 19, 2006) (approving an incentive plan based on the gross purchase price of the sale of the company's assets); In re: Sharper Image, No. 08-10322 (Gross, J.) (Bankr. Del. Jun. 25, 2008) (approving an incentive plan based on successful wind down of the business); In re: Semcrude, L.P., No. 08-11525 (Shannon, J.) (Bankr. Del. Jan. 13, 2009) (approving bonus plan based on EBITDA and substantial sale of the business units).

47.    For reasons detailed above, the requested relief falls directly within the Debtors' valid business judgment, is amply "justified by the facts and circumstances," and would

37

comport with Sections 363(b) and 503(c)(3) of the Bankruptcy Code even if those Sections are deemed applicable.[24]

48.    The Debtors therefore respectfully request authorization to implement the 2012 MIP, as provided in the proposed Order attached hereto as Exhibit A.

**III.    The 2012 MIP Should be Approved for All Participants Including the Same Two Current Debtor Employees Whose 2011 MIP Awards Were Placed in "Rabbi Trusts" Pursuant to this Court's 2011 MIP Order.**

49.    The Debtors respectfully submit that the foregoing considerations apply equally to all of the Debtors' management personnel. This includes the same two 2012 MIP participants who continue to be employed by the Debtors, and whose 2011 MIP payments were deposited into "rabbi trust" accounts pursuant to the Court's Order dated October 4, 2011 authorizing the 2011 MIP [D.I. No. 9880] (the "2011 MIP Order"), pending resolution of the Creditors Committee's claims against them relating to the Company's 2007 leverage buyout transactions. These two employees are valuable to the Debtors' organization, and the Debtors believe that they should receive their 2012 MIP awards at the same time as other 2012 MIP participants (once all such awards are determined). However, the Debtors have consented to depositing their 2012 MIP awards into "rabbi trust" accounts, as with the 2011 MIP, in light of the Creditors Committee's prior objection to paying them before resolution the foregoing claims against them.

---

[24]The 2012 MIP again does not involve "severance" or "retention" payments (whether or not to insiders), and thus Sections 503(c)(1) and (2) of the Bankruptcy Code do not apply. See 11 U.S.C. § 503(c)(1), (2). No party claimed at the 2011 or 2010 MIP hearings that such provisions applied, and the Court also has already held that they are inapplicable to the 2009 MIP program. See Transcript of September 25, 2009 Hearing (Ex. I hereto), at 212; Transcript of January 27, 2010 Hearing (Ex. H hereto), at 18; see also In re: Nellson Nutraceutical, Inc., 369 B.R. 787, 802 (Bankr. D. Del. 2007); Global Home Products, LLC, 369 B.R. 778, 785 (Bankr. D. Del. 2007); In re: Dana Corp., 358 B.R. 567, 576 (Bankr. S.D.N.Y. 2006).

50.    As a consequence, these two individuals have been included as participants in the 2012 MIP as well by the Compensation Committee, and the proposed 2012 MIP Order (attached hereto as Exhibit A) contains the same "rabbi trust" authorization provisions for them, subject to the same terms and conditions, as the comparable provisions of the Court's 2011 MIP Order.  The proposed 2012 MIP Order also contains the same "clawback" provisions as are in the 2011 MIP Order.

51.    The Debtors therefore respectfully request authorization to implement the 2012 MIP including for these two current Debtor employees, as provided in the proposed Order attached hereto as Exhibit A.

## CONCLUSION

52.    For the foregoing reasons, the Debtors respectfully submit that the 2012 Management Incentive Plan is an ordinary course program (and in any event would satisfy any applicable Bankruptcy Code requirements for transactions outside the ordinary course), and that granting the relief requested herein is well within the Court's authority, is a valid exercise of the Debtors' business judgment, and thus is clearly in the best interests of the Debtors' estates and creditors.  Accordingly, the Debtors respectfully request that the Court grant the relief requested herein and enter the proposed Order attached as Exhibit A hereto authorizing, but not directing, them to implement the 2012 Management Incentive Plan.

## NOTICE

53.    Notice of this Motion has been provided to:  (i) the Office of the United States Trustee; (ii) counsel for the Creditors Committee; (iii) the administrative agents for the

39

Company's prepetition loan facilities; (iv) the administrative agent for the Debtors' post-petition loan facility; and (v) all parties having requested notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

<u>**NO PRIOR REQUEST**</u>

54.    The Debtors have not previously sought the relief requested herein from this or any other Court.

WHEREFORE, for the foregoing reasons, the Debtors respectfully seek entry of an Order in substantially the form of the proposed Order attached hereto as <u>Exhibit A</u>:

(1)    authorizing, but not directing, the Debtors pursuant to Section 363(c) and, as applicable, Sections 363(b) and 503(c) of the Bankruptcy Code, to implement an ordinary course Management Incentive Plan for 2012 as described in this Motion for approximately 425 management employees, with an aggregate payout opportunity of approximately:

    (a)    $15.0 million – representing a 50%-of-target payout – if the Company achieves "threshold" performance equal to approximately 85% of its "planned" 2012 consolidated OCF goal included in the 2012 operating plan that was approved by the Board on February 9, 2012;

    (b)    $30.0 million – representing a 100%-of-target payout – if the Company achieves "target" performance equal to 100% of its "planned" 2012 consolidated OCF goal included in the 2012 operating plan that was approved by the Board on February 9, 2012; and

    (c)    $45.0 million – representing a 150%-of-target payout – if the Company achieves "maximum" performance equal to approximately 127% of its "planned" 2012 consolidated OCF goal included in the 2012 operating plan that was approved by the Board on February 9, 2012; and

(2)    granting such other and further relief as the Court may deem just and proper.


Dated:    Wilmington, Delaware          Respectfully submitted,
          April 13, 2012
                                        SIDLEY AUSTIN LLP
                                        Bryan Krakauer
                                        Kevin T. Lantry
                                        Brian J. Gold
                                        Jonathan D. Lotsoff
                                        One South Dearborn Street
                                        Chicago, Illinois  60603
                                        Telephone:  (312) 853-7000
                                        Facsimile:  (312) 853-7036

                                              -and-

                                        COLE, SCHOTZ, MEISEL,
                                        FORMAN & LEONARD, P.A.

                                        By: _____
                                        Norman L. Pernick (No. 2290)
                                        J. Kate Stickles (No. 2917)
                                        500 Delaware Avenue, Suite 1410
                                        Wilmington, Delaware  19801
                                        Telephone:  (302) 652-3131
                                        Facsimile:  (302) 652-3117

                                        ATTORNEYS FOR DEBTORS AND
                                        DEBTORS IN POSSESSION

46429/0001-8464395V1