# EXHIBIT F

## Excerpts of Transcript of October 4, 2011 Hearing

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Case No. 08-13141(KJC) |
| | ) | (Jointly Administered) |
| | ) | |
| TRIBUNE COMPANY, et al., | ) | Chapter 11 |
| | ) | |
| | ) | Related to Docket 9853 |
| | ) | |
| Debtors. | ) | Courtroom 5 |
| | ) | 824 Market Street |
| | ) | Wilmington, Delaware |
| | ) | |
| | ) | October 4, 2011 |
| | ) | 10:00 a.m. |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JUDGE KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

TELEPHONIC APPEARANCES:

For Debtor:          Sidley Austin, LLP
                     BY: BRIAN GOLD, ESQ.
                     BY: JAMES BENDERNAGEL, ESQ.
                     BY: JONATHAN LOTSOFF, ESQ.
                     One South Dearborn
                     Chicago, IL   60603
                     (312) 853-7000

                     Cole, Schotz, Meisel, Forman
                     & Leonard, P.A.
                     BY: NORMAN PERNICK, ESQ.
                     500 Delaware Avenue, Suite 410
                     Wilmington, DE   19801
                     (302) 652-3131

ECRO:                AL LUGANO

Transcription Service:   DIAZ DATA SERVICES
                         331 Schuylkill Street
                         Harrisburg, Pennsylvania 17110
                         (717) 233-6664
                         www.diazdata.com

Proceedings recorded by electronic sound recording;
transcript produced by transcription service

1 leaves us with No. 14, No. 15, which is the motion for order
2 authorizing the proposed changes to the official
3 confirmation transcript.
4     And No. 16, which is the debtor's motion to
5 implement the 2011 management incentive plan.
6     And with the Court's permission, we'd propose to
7 actually take these a little bit out of order and go with
8 No. 16 first and then come back and deal with 14 and 15.
9     THE COURT: That's fine.
10     MR. PERNICK: Thank you, Your Honor.
11     MR. GOLD: Good morning, Your Honor. Brian Gold
12 on behalf of the debtors with respect to the motion to
13 approve the 2011 MIP.
14     Per our telephone conference call yesterday, Your
15 Honor, I think the one resolution of it was we would proceed
16 by proffer with respect to the motion and then obviously, we
17 have witnesses available should the need arise.
18     So, Your Honor, I -- we would first want to
19 proffer the testimony of Eddy Hartenstein, who is, as you'll
20 hear in the testimony, is the current CEO of the debtor.
21 And with Your Honor's permission, I would proceed with that
22 proffer.
23     THE COURT: Go ahead.
24     MR. GOLD: Your Honor, if called to testify in
25 this proceeding, Mr. Hartenstein would testify as follows:

1          He's currently the President and CEO of the
2   debtor, Tribune Company and also is the Publisher and CEO of
3   the L.A. Times. He was appointed the President and CEO
4   position by the Tribune board of directors effective May 6
5   of this year.
6          Prior to that, from October 2010 until May 2011,
7   Mr. Hartenstein was Co-President of the Tribune Company,
8   part of an executive council along with three other
9   executives.
10          In May of this year, the board of directors with
11  the encouragement of all members of the executive council
12  agreed that it was time to make the transition back to a
13  more traditional single CEO structure.
14          Prior to that, Mr. Hartenstein was President,
15  Publisher, and CEO of the L.A. Times, positions that he held
16  since he joined the company in August 2008.
17          And as the Court knows from prior testimony, Mr.
18  Hartenstein joined the company after the LBO and had no
19  involvement in it.
20          As the Court also knows, the debtor is in the
21  media business with extensive holdings in publishing and
22  broadcasting. The debtor's operations are conducted through
23  two primary business units; publishing and broadcasting.
24          The publishing business currently consists of
25  eight major market daily newspapers and also has numerous

1 niche and other publications.

2     The broadcasting unit includes 23 television
3 stations in 19 markets, as well as, certain cable operations
4 and radio stations.

5     There is a third business, the corporate
6 division, that consists of senior management and certain
7 centralized corporate activities such as finance, legal,
8 accounting, IT, HR, and the like.

9     The 2011 management incentive plan or MIP, which
10 has been approved by the compensation committee of the
11 debtor's board of directors, is based upon the achievement
12 of the company's and/or business unit's financial
13 performance; namely, what's known as operating cash flow,
14 and I'll refer to it also, and I know it's been referred
15 before this way, as OCF.

16     Each year, including for 2011, the company's
17 management establishes an operating plan and budget that is
18 presented to and approved by the board of directors.  The
19 operating plan budget for 2011 was constructed by a process
20 that was substantially similar as in prior years and I'll
21 just briefly outline what Mr. Hartenstein would testify to
22 as that process.

23     Individual business units prepared initial
24 budgets.  Individual business units then met with the senior
25 management of the company.  There's a give-and-take process

1   to review and challenge assumptions and budgets in order to
2   understand the reasoning and basis for the projections.
3   While in the end management wants to ensure that the
4   projections are not overly optimistic or overly
5   conservative, as part of the process, the senior management
6   team attempts to ensure that all reasonably achievable
7   revenue enhancements and cost cutting initiatives are
8   identified and included.
9       Management then continues to monitor trends in
10  the interim between budget meetings.  And the first weeks of
11  2011 and they make appropriate adjustments to the plan.  And
12  then the board was updated finally in the fourth quarter of
13  2010 and then finally approved the final operating plan on
14  February the 2nd of 2011.
15      Now, Your Honor, when Mr. Hartenstein testified
16  to the Court earlier this year in March in connection with
17  the confirmation hearings, he noted some of the challenges
18  that the company faced in 2011, both due to the uncertainty
19  in the overall economy and in particular, uncertainty and
20  challenges that face the media industry.  Those challenges
21  have not abated, Your Honor.  In fact, they have
22  accelerated.  As a result, 2011's performance is consistent
23  with the performance discussed by Mr. Hartenstein with the
24  Court in March 2011.
25      On the publishing side, newspapers generally are

1   facing accelerated advertising declines and the Tribune is
2   no exception in that regard.  Publishing advertising revenue
3   is down from last year.  And on the broadcasting side,
4   advertising though has fared somewhat better.  In
5   particular, Tribune's advertising revenue in broadcasting
6   has been relatively stable.  However, broadcasting has been
7   impacted by the fact that 2011 is not a political year and
8   political advertising spend is down dramatically relative to
9   2010.
10              Also, with respect to its pension plans due to an
11  actuarial review, the company was required to accrue
12  significantly higher non-cash pension expense for 2011
13  versus 2010.  Specifically, this expense increased those
14  amounts by an accounting basis by $44 million.
15              When the operating plan budget for 2011 was
16  prepared by management, these challenges were taken into
17  account and appropriately accounted for in the budgeting
18  process.  To some extent, however, the challenges have been
19  even greater than expected particularly due to the
20  deteriorating overall economic outlook and the accelerated
21  pace at which advertising dollars have migrated away from
22  publishing.
23              The board of directors approved an operating plan
24  for 2011, Your Honor, and this number may be good for a
25  point of reference as we go of $497 million OCF.

1   Notwithstanding these challenges, due to the rigor of
2   management's construction of the operating plan and budget
3   and the hard work of Tribune's employees in devising and
4   implementing new initiatives, the company continues to be on
5   plan, that is with respect to the operating plan for 2011,
6   and even somewhat ahead of it on a consolidated basis.
7              And to answer the question that Your Honor posed
8   yesterday, in terms of this year's performance, the company
9   currently projects OCF for 2011 of $517 million, which is
10  about $20 million above that $497 budgeted OCF number.  And
11  I'll come back and through the proffer compare that to the
12  actual MIP targets for Your Honor's reference.
13             THE COURT:  Well I see from the report that it's
14  just shy of the 100 percent target payout.
15             MR. GOLD:  It's in the -- yeah, probably in the
16  mid '90s somewhere, Your Honor.
17             Mr. Hartenstein would testify that the
18  performance in achieving and somewhat exceeding the
19  operating budget by about 4 percent in the face of both
20  predicted and emerging economic headwinds has only been
21  achieved as a result of excellent performance of the
22  workforce.  This performance includes the continued
23  successful implementation and initiation of a number of
24  revenue enhancing initiatives, as well as, cost cutting
25  initiatives.  Those cost cutting initiatives have resulted

1   in $136 million in savings, in the last two years, on top of
2   over $600 million in savings over the preceding two years.
3           And with Your Honor's permission, I would
4   approach and proffer an exhibit with respect to the MIP
5   metrics.
6           THE COURT: Very well. Thank you. Has this been
7   shared with others?
8           MR. LOTSOFF: It's in -- Your Honor, Jonathan
9   Lotsoff on behalf of the debtors. It basically restates
10  what's in the Mercer report.
11          THE COURT: Very well. Okay. I'm looking at
12  Page 5 of the Mercer report, which is part of what was not
13  redacted, and this looks to be a summary of what's on that
14  page.
15          MR. GOLD: That's accurate, Your Honor.
16          THE COURT: All right.
17          MR. GOLD: We'd mark this particular exhibit as
18  Debtor's Exhibit 1. And turning to these MIP metrics, in
19  order to achieve a target payout under the proposed MIP, the
20  company would need t achieve an OCF of $525 million. As
21  Your Honor just pointed out, the $517 million projection is
22  just slightly below that number to achieve the target
23  payout.
24          As noted, to achieve its budgeted OCF, that was
25  $497, so the company is somewhat above that with respect to

1   its current projected OCF of $517 million.
2          To put this in perspective, just from the metrics
3   standpoint, if the company's performance equals its budgeted
4   OCF, Your Honor, the payout under the proposed MIP is only
5   at 81 percent of target.
6          These MIP targets are a result of discussions,
7   compromise, and eventual agreement with certain key creditor
8   constituencies.  The company as Your Honor knows from prior
9   motions on the subject, has had a MIP in effect outside of
10  bankruptcy since at least 1997.  That plan is encompassed by
11  the 1997 incentive compensation plan which is Exhibit E to
12  the MIP motion.  When comparing the proposed 2011 MIP to
13  these historical MIP's that were in place, the proposed MIP
14  is more conservative than the historical MIP's in all
15  respects.  Comparing the number of proposed participants it
16  is lower.  Comparing the percentage payout at budgeted OCF
17  it is lower.  Comparing the dollar payouts at each of the
18  threshold target and max levels, all lower.  Comparing the
19  2011 actual total dollars that will be paid based on current
20  OCF projections, also lower than 2010.
21         In addition to approval of the MIP plan, Your
22  Honor, just to move away from the metrics, the company's
23  motion and proposed order seeks approval of the proposed MIP
24  with respect to two individuals who remain employed by the
25  debtor, but who had not been included without prejudice

1  under the 2010 MIP order.  The three other individuals who
2  also had been included in 2010, have since left the company
3  and were separated solely as a result of position reductions
4  as part of the company's cost cutting efforts that I alluded
5  to earlier.
6          The proposed order contains a provision
7  specifically including these two individuals who remain
8  employed in the 2011 MIP.  However, as a result of
9  discussions, and a compromise reached with the creditors'
10 committee, the order before you also provides that such
11 amounts be paid into a trust and distributed to the
12 individuals only upon satisfaction of certain conditions
13 specified in the proposed order related to the pendency of
14 certain claims by the creditors' committee.
15         The board of directors has approved -- the
16 company has approved these two individuals for inclusion in
17 the MIP.  And Mr. Hartenstein, like the board, continues to
18 believe these individuals are very valuable and hardworking
19 employees that are integral to the debtor's success.  Mr.
20 Hartenstein believes it would be manifestly unfair to these
21 individuals not to receive their 2011 MIP and, therefore, be
22 paid substantially below market compensation.  However, he
23 views the compromise with the creditors' committee as a
24 reasonable solution under the circumstances.
25         In summary, Your Honor, Mr. Hartenstein if called

Case 08-13141-BLS   Doc 11377-7   Filed 04/13/12   Page 12 of 15

19

1  to testify, would state that the 2011 proposed MIP should be
2  approved so that eligible company employees through their
3  efforts and successes can attain compensation that even
4  somewhat approaches market based payouts.  Further, it is
5  critical that the MIP be approved as soon as possible so
6  that employees are incentivized to continue their hard work
7  and outperform during the fourth quarter in face of what was
8  referred to as an uncertain operating environment in an
9  uncertain economy.
10             That would conclude the proffer with respect to
11 Mr. Hartenstein, Your Honor.  Your Honor may have questions
12 and others may as well.  I would state before we get to that
13 that our only other proffer would be with respect to Mr.
14 Dempsey, if Your Honor desires.  On the other hand, if Your
15 Honor is amenable, we can move for the introduction of Mr.
16 Dempsey's affidavit in lieu of that, but that's solely up to
17 Your Honor.
18             THE COURT:  All right.  Well let's address Mr.
19 Hartenstein's testimony first.  Does anyone wish to cross
20 examine Mr. Hartenstein?
21                  (No audible response.)
22             THE COURT:  I hear no response.  All right.
23 Anyone object to the introduction of the Dempsey
24 declaration?
25                  (No audible response.)

1           THE COURT:  I hear no response.  And I take it
2  that the motion is to include introduction of the report --
3           MR. GOLD:  Yes, Your Honor.
4           THE COURT:  -- as well.  Is there any objection
5  to that?
6           (No audible response.)
7           THE COURT:  I hear no response.  They're admitted
8  without objection.
9           MR. GOLD:  And we also would move for the
10 introduction of what I referred to as Debtor's Exhibit 1,
11 Your Honor.
12          THE COURT:  Is there objection to the
13 introduction of D1?
14          (No audible response.)
15          THE COURT:  I hear none, it's admitted without
16 objection.  Does the debtor have anything further in support
17 of its motion?
18          MR. GOLD:  We do not, Your Honor.
19          THE COURT:  Does anyone else wish to be heard in
20 connection with the MIP motion?
21          MR. LEMAY:  Good morning, Your Honor.  David
22 LeMay from Chadbourne and Parke for the official committee
23 of unsecured creditors.
24          As the Court is aware from yesterday's telephone
25 hearing, the committee supports this motion.  I rise only,

1  as I have in years past, to assure the Court that the
2  committee and its financial and legal professionals have
3  reviewed this year's iteration of the MIP with great care,
4  have negotiated certain provisions of that MIP, have
5  negotiated and obtained certain changes to the form of the
6  proposed order that would approve the MIP, and those are
7  embodied in the version that's before Your Honor.  And after
8  that review and after that, those negotiations, and with all
9  those changes, the committee has voted to support the MIP,
10 and request that the order be entered in the form before the
11 Court now.  That's all I have, Your Honor.
12         THE COURT:  Thank you.  Does anyone else wish to
13 be heard in connection with the MIP motion?
14         (No audible response.)
15         THE COURT:  I hear no further response.  All
16 right, thank you.  I'm prepared to make my ruling now.  I've
17 reviewed all of the written submissions, including but not
18 limited to the Mercer un-redacted version of the report.
19 And based upon the testimony, I'm prepared to approve the
20 relief that's been requested.
21         The Mercer report reflects that, frankly, there
22 have been a variety of approaches to management compensation
23 among the samples chosen, but I find under these
24 circumstances, the metrics that the debtor has chosen here
25 and the methods by which they -- on which they base

1   incentive plans and payments, that is operating cash flow is
2   reasonable and sensible, and that the relief requested here
3   is justified under the facts and circumstances.  There is no
4   objection to the relief that's been requested.  And I think
5   it's entirely appropriate to order this relief in these
6   uncertain times with respect to this particular debtor.  Is
7   there a form of order?
8           MR. LOTSOFF:  There is, Your Honor.  May I
9   approach?
10          THE COURT:  You may.  Thank you.  That order has
11  been signed.  What's next?
12          MR. SOTTILE:  Your Honor, James Sottile of
13  Zuckerman Spaeder, special counsel to the official committee
14  of unsecured creditors.
15          Your Honor, I rise, with the Court's indulgence,
16  to address briefly Item No. 14 on the agenda.  That's the
17  second motion of the committee to extend the time to
18  effectuate service of process with respect to two preference
19  complaints against certain insiders and professionals of the
20  debtors.
21          Your Honor, I understand the Court has already
22  entered the order and nothing I saw will affect entry of the
23  order.  There's no objection that was filed in time, and the
24  issue that I'm going to address does not concern an
25  objection to entry of the relief sought by the motion.