**EXHIBIT G**

**Excerpts of Transcript of November 10, 2010 Hearing**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE: | ) | Chapter 11 |
|  | ) |  |
| TRIBUNE COMPANY, et al., | ) | Case No. 08-13141 (KJC) |
|  | ) |  |
|  | ) | Courtroom 5 |
|  | ) | 824 Market Street |
| _____Debtors._____ ) | ) | Wilmington, Delaware |

November 10, 2010
10:05 a.m.


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For Debtors:                    Sidley Austin LLP
                                BY: JONATHAN LOTSOFF, ESQ.
                                BY: KEVIN LANTRY, ESQ.
                                BY: JAMES BENDERNAGEL, JR., ESQ.
                                BY: BRIAN J. GOLD, ESQ.
                                One South Dearborn
                                Chicago, IL 60603
                                (213) 896-6022

                                Cole, Schotz, Meisel, Forman &
                                Leonard, PA
                                BY:  KATE STICKLES, ESQ.
                                1000 North West Street
                                Suite 1200
                                Wilmington, DE 19801
                                (302) 652-3131


ECRO:                           AL LUGANO

Transcription Service:          DIAZ DATA SERVICES
                                331 Schuylkill Street
                                Harrisburg, Pennsylvania 17110
                                (717) 233-6664
                                www.diazdata.com

Proceedings recorded by electronic sound recording; transcript
produced by transcription service

APPEARANCES:
(Continued)

For Tribune:                    Mercer
Debtors:                        BY:  JOHN DEMPSEY
                                155 North Wacker Drive
                                15th Floor
                                Chicago, IL 60606
                                (312) 917-9900

                                Tribune Company
                                BY:  NILS LARSEN
                                BY:  EDDY HARTENSTEIN


For The Creditors Committee:    Landis Rath & Cobb
                                BY:  ADAM G. LANDIS, ESQ.
                                BY:  KIMBERLY BROWN, ESQ.
                                919 Market Street Suite 1800
                                P.O. Box 2087
                                Wilmington, DE 19899
                                (302) 467-4400

                                Chadbourne & Parke LLP
                                BY:  DOUGLAS DEUTSCH, ESQ.
                                BY:  DAVID LEMAY, ESQ.
                                BY:  THOMAS MCCORMACK, ESQ.
                                30 Rockefeller Plaza
                                New York, NY 10112
                                (212) 408-5100

                                Zuckerman Spaeder LLP
                                BY:  JAMES SOTTILE, ESQ.
                                1800 M Street
                                Suite 1000
                                Washington, DC 20036-5807
                                (202) 778-1800

For Great Banc:                 Womble Carlyle
                                BY:  THOMAS M. HORAN, ESQ.
                                222 Delaware Avenue
                                Wilmington, DE 19801
                                (302) 252-4320

For Merrill Lynch:              Potter Anderson & Corroon LLP
                                BY: LAURIE SELBER SILVERSTEIN
                                Hercules Plaza
                                1313 North Market Street
                                6th Floor
                                Wilmington, DE 19801
                                (302) 984-6000

APPEARANCES:

(Continued)

| For Aurelius Capital Management: | Akin Gump Strauss Hauer & Feld<br>BY: DANIEL H. GOLDEN, ESQ.<br>BY: DAVID M. ZENSKY, ESQ.<br>One Bryant Park<br>New York, NY 10036<br>(212) 872-1000 |
|---|---|
| For U.S. Trustee: | Office of the U.S. Trustee<br>BY: DAVID KLAUDER, ESQ.<br>844 King Street, Suite 2207<br>Lockbox 35<br>Wilmington, DE 19801<br>(302) 573-6491 |
| For Credit Agreement Lenders: | Young Conaway Stargatt & Taylor<br>BY: BLAKE CLEARY, ESQ.<br>The Brandywine Building<br>1000 West Street 17th Floor<br>P.O. Box 391<br>Wilmington, DE 19801<br>(302) 571-6600 |
| For Wells Fargo As Bridge Agent: | Fox Rothschild LLP<br>BY: JEFFREY M. SCHLERF, ESQ.<br>Citizens Bank Center<br>919 North Market Street<br>Suite 1300<br>P.O. Box 2323<br>Wilmington, DE 19899-2323<br>(302) 654-7444 |
| | White & Case LLP<br>BY: ANDREW W. HAMMOND, ESQ.<br>1155 Avenue of the Americas<br>New York, NY 10036-2787<br>(212) 819-8200 |
| For Step One Lenders: | Morris Nichols Arsht & Tunnell<br>BY: DEREK C. ABBOTT, ESQ.<br>1201 North Market Street<br>18th Floor<br>P.O. Box 1347<br>Wilmington, DE 19899-1347<br>(302) 658-9200 |

TELEPHONIC APPEARANCES:

For Debtor:                      Tribune Company
                                 BY:  CHANDLER BIGELOW
                                 BY:  DAVID ELDERSVEID
                                 BY:  DON LIEBENTRITT
                                 BY:  MICHAEL D. O'NEAL
                                 (312) 853-7778

                                 Sidley Austin
                                 BY:  JILLIAN LUDWIG, ESQ.
                                 BY:  GARY WEITMAN, ESQ.
                                 BY:  BRIAN KRAKAUER, ESQ.
                                 BY:  CANDACE KLINE, ESQ.
                                 BY:  KERIANN MILLS, ESQ.
                                 BY:  DAVID MILES, ESQ.
                                 (312) 853-7030

For Bank of America:             O'Melveny & Myers
                                 BY:  DANIEL SHAMAH, ESQ.
                                 (212) 326-2000

For Wilmington Trust             Brown Rudnick LLP
Company:                         BY:  JARED ELLIAS, ESQ.
                                 BY:  MARTIN SIEGEL, ESQ.
                                 BY:  GORDON NOVOD, ESQ.
                                 (212) 209-4811

For Anna Kalenchits:             BY:  ANNA KALENCHITS
                                 (212) 723-1808

For The Creditors Committee:     Chadbourne & Parke LLP
                                 BY:  HOWARD SEIFE, ESQ.
                                 BY:  MARC ROITMAN, ESQ.
                                 (212) 408-5169

For Citigroup:                   Paul Weiss Rifkind Wharton &
                                 Garrison LLP
                                 BY:  ANDREW LEVY, ESQ.
                                 BY:  ANDREW GORDON, ESQ.
                                 BY:  OKSANA LASHKO, ESQ.
                                 BY:  ELIZABETH MCCOLM, ESQ.
                                 (212) 373-3543

For JPMorgan Chase Bank:         BY:  KEVIN C. KELLEY
                                 BY:  SHACHAR MINKOVE
                                 (212) 648-0427

                                 Davis Polk & Wardwell LLP
                                 BY:  DONALD S. BERNSTEIN, ESQ.
                                 (212) 450-4092

TELEPHONIC APPEARANCES:
(Continued)

| | |
|---|---|
| For Morgan Stanley: | Weil Gotshal & Manges LLP<br>BY:  EVAN LEDERMAN, ESQ.<br>(212) 310-8948 |
| For Barclays: | Mayer Brown LLP<br>BY:  MICHAEL L. SIMES, ESQ.<br>BY:  AMIT K. TREHAN, ESQ.<br>BY:  JEAN-MARIE ATAMIAN, ESQ.<br>(212) 506-2607 |
| For Kramer Levin: | BY:  DAVID E. BLABEY, JR., ESQ.<br>(212) 715-9100 |
| For David & Kempner: | DK Partners<br>BY:  EPHRAIM DIAMOND<br>(646) 282-5841 |
| For Aurelius Capital<br>Management: | Akin Gump Strauss Hauer & Feld<br>BY:  JASON GOLDSMITH, ESQ.<br>BY:  PHILLIP DUBLIN, ESQ.<br>(212) 872-1000 |
| For Jefferies & Company: | BY:  JUSTIN BRASS<br>(203) 708-5847 |
| For Perry Capital: | BY:  JAMES FREEMAN<br>(212) 583-4000 |
| For Schulte Roth & Zabel: | BY:  KAREN S. PARK<br>(212) 756-2036 |
| For Dennis A. Prieto: | Aurelius Capital Management<br>BY:  MATTHEW A. ZLOTO<br>(646) 445-6516 |
| For Law Debenture Trust<br>Company of New York: | Kasowitz Benson Torres &<br>Friedman<br>BY:  MATTHEW STEIN, ESQ.<br>(212) 506-1726 |
| For Miller Tabak Roberts<br>Securities: | BY:  ANDREW M. THAU<br>(212) 692-5178 |
| For Alvarez & Marsal Inc.: | BY:  BRIAN WHITTMAN<br>(312) 601-4227 |

TELEPHONIC APPEARANCES:
(Continued)

| | |
|---|---|
| For Dow Jones News Wires: | Dow Jones & Company<br>BY:  PEG BRICKLEY<br>(215) 462-0953 |
| For Credit Agreement Lenders: | Hennigan Bennett & Dorman LLP<br>BY:  JAMES O. JOHNSTON, ESQ.<br>(213) 694-1030 |
| For Neil S. Losquadro: | Brigade Capital Management<br>BY:  NEIL S. LOSQUADRO, PRO SE<br>(212) 745-9758 |
| For Merrill Lynch: | Kaye Scholer LLP<br>BY:  MADLYN G. PRIMOFF, ESQ.<br>(212) 836-7042 |
| For Deutsche Bank National Trust Company: | MCCARTER & ENGLISH<br>BY:  DAVID J. ADLER, ESQ.<br>(212) 609-6800 |
| For George Dougherty: | BY:  GEORGE DOUGHERTY<br>(312) 704-7700 |
| Special Committee of the Board of Directors: | Jones Day<br>BY:  BRAD ERENS, ESQ.<br>BY:  DAVID HALL, ESQ.<br>BY:  DAVID HEIMAN, ESQ.<br>(312) 269-4050 |
| For Wells Fargo Bank: | White & Case LLP<br>BY:  SCOTT GREISSMAN, ESQ.<br>(212) 819-8567 |
| For Royal Bank of Scotland: | BY:  COURTNEY ROGERS<br>(203) 897-4815 |
| For EGI-TRB, LLC: | Jenner & Block LLP<br>BY:  ANDREW VAIL, ESQ.<br>(312) 840-8688 |

1                              INDEX

2                                                      Further

3  WITNESSES FOR THE        Direct  Cross  Redirect  Recross  Redirect

4    DEBTORS:

5  Eddy Hartenstein          23

6

7    EXHIBITS:                                   Marked  Received

8    DEBTORS:

9  Exhibit 1                                              31

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  WILMINGTON, DELAWARE, WEDNESDAY, NOVEMBER 10, 2010, 10:05 A.M.

2          THE CLERK:  All rise.  Be seated, please.

3          THE COURT:  Good morning, everyone.

4          THE ATTORNEYS:  Good morning, Your Honor.

5          THE COURT:  Is the debtor ready?  Well, don't

6  everybody run up at once.

7      (Laughter)

8          MR. LOTSOFF:  Good morning, Your Honor.  Jonathan

9  Lotsoff on behalf of the debtors.  I believe the first item on

10 the agenda is the motion to seal the unredacted copies of the

11 May and July 2010 Mercer report.  The redacted copies, of

12 which, were filed in support of the 2010 MIP motion.  We

13 understand that there are no objections to that motion by the

14 U.S. Trustee, the bridge agent or the committee of unsecured

15 creditors.  And so, consistent with what was done at the 2008

16 and 2009 MIP hearings, we would ask that the Court enter that

17 order.

18         THE COURT:  Does anyone wish to be heard in

19 connection with that matter?

20             I hear no response.  Do you have a form of order for

21 me?

22         MR. LOTSOFF:  I do, Your Honor.

23         THE COURT:  That order's been signed.  Should we

24 deal next with the tolling agreement?

25         MR. LOTSOFF:  There was one more related --

9

1          THE COURT:  I'm sorry.  Go ahead.

2          MR. LOTSOFF:  Oh.  At the last hearing, as the Court

3     is aware, there are likely to be some exhibits that encompass

4     information that's comparable to what is in the redacted

5     versions of the Mercer reports, so we would ask that consistent

6     with the Court's treatment of those exhibits, which we can

7     identify in the course of the hearing at the '09 MIP hearing

8     that such exhibits also be filed under seal and maintained

9     confidential consistent with what was done last time.

10         THE COURT:  Anyone wish to weigh in on that subject?

11         I hear no response.  Okay.

12         MR. LOTSOFF:  Thank you, Your Honor.

13         MR. LANTRY:  Good morning, Your Honor.  Kevin Lantry

14    on behalf of the debtors regarding the motion for the tolling

15    agreement involving the inter-company parties.  We don't

16    believe anyone has objected, but I sense Your Honor may want to

17    address something?

18         THE COURT:  I do.  The agreement and the form of

19    order -- well, the agreement is designed to put in place a

20    tolling agreement between and among the debtor and its

21    subsidiaries to preserve statutes of limitation to the extent

22    they apply and without waiving any rights or safe harbors there

23    may be under other applicable law for the purpose of avoidance

24    actions and actions which may concern inter-company claims; is

25    that --

18

1   think is on Page 10, if I'm not mistaken, on the Mercer report,

2   in the so called middle group, and then whatever the difference

3   is, about 605 or so would be everyone else.

4          THE COURT:  Okay.  So they did survey then all the

5   26 what they called key incumbents in that category.  So in

6   that category, Mr. Klauder, does the U.S. Trustee have a

7   position about how many are insiders?

8          MR. KLAUDER:  We do not.

9          THE COURT:  Does anyone else like to be heard

10  preliminarily?  I hear no further response.

11          This round is very different, in terms of what the

12  parties have presented to me.  In the original objections, both

13  the bridge agent and the U.S. Trustee had said this is a matter

14  which should be put off to confirmation.  The U.S. Trustee has

15  backed away from that position; the bridge agent has not.

16          Frankly, based on earlier rounds, I had that thought

17  myself, but we have a circumstance here, which given what I've

18  learned from prior hearings, given the continuing disputes

19  among various constituents, which are now represented in the

20  competing plans, and the atmosphere that must have created, and

21  I figure continues at the debtor in part as a result of that

22  anyway, I sympathize with the debtors' request for the Court t

23  act at this time.

24          On the other hand, there still is no plan and five

25  individuals among the top management group have been named as

1  defendants in the long-awaited committee complaint.  And then I

2  look at that middle group -- and I haven't asked the debtor the

3  same question I asked the U.S. Trustee and that is, how many

4  insiders are there within the meaning of the bankruptcy code

5  anyway.  I take it that group is largely station managers,

6  newspaper heads, with one or two exceptions maybe; is that

7  accurate?

8          MR. GOLD:  Yes, I think that's right, Your Honor.

9  They all, frankly, hold some officer, director position at some

10 level.

11         THE COURT:  But in the other key execs group would

12 you say there are individuals among them who drive the

13 reorganization process directly or not?

14         MR. GOLD:  There certainly may be some.  I don't --

15 not predominately, but certainly there are some, Your Honor.

16         THE COURT:  Okay.

17         MR. GOLD:  And as I look at the list, you know,

18 it's, I guess, a matter of perspective.  I'm looking at the

19 list, Your Honor, and it -- you know, the lion's share of

20 anyone's duties would not, from what I can tell.

21         THE COURT:  And that was my general impression, but

22 I couldn't just from a review of the documents reach a

23 conclusion as to every individual included in that group.  I

24 will tell you I was initially inclined to put this off until

25 the time of confirmation, but I will say given the narrowing of

20

1   the objections, I'm now inclined to move forward to let the

2   debtor make its record and then decide what to do and decide

3   when to decide what I will do.  So -- somebody stole our clock.

4   I'll take a five minute break, then we'll begin with the

5   evidence.

6          MR. GOLD:  Thank you, Judge.

7          THE COURT:  All right.

8      (Recess taken at 10:26 a.m. to 10:43 a.m.)

9          THE CLERK:  All rise.  Be seated, please.

10         MR. GOLD:  Your Honor, Brian Gold again on behalf of

11  the debtors.  During the intervening recess, the debtors had a

12  chance to confer with the Official Committee of Unsecured

13  Creditors.  I think it's fair to say that the debtors and, I

14  think you can hear from the official committee itself on the

15  subject, just feel that while the five people who are subject

16  of the objections are important in their own right, that the

17  635 people who are before you are extraordinarily important for

18  some significant business reasons that the MIP get approved and

19  it get approved, frankly, here we are on the 11th month of the

20  year with some immediacy, some certainty in terms of running

21  the business.

22         With that, Your Honor, we would intend to proceed

23  without making our case, if you will, at this time for the

24  payment with respect to the five individuals who have been

25  subject of the objections that you just heard of.  We would

1   hope -- we're happy to proceed with whatever evidence Your

2   Honor would like us to proceed with and we're prepared to do so

3   with respect to the 635.  I guess we would hope that together

4   with the official committee and for the business reasons I

5   alluded to that, Your Honor, would take that with some force,

6   if you will, in terms of the consideration for a ruling both

7   positively and a ruling with some immediacy.

8           I throw that your way, Your Honor, with all due

9   respect and am ready to proceed, you know, however you would

10  like to directly do so.

11          THE COURT:  Let me try to figure out what you just

12  said to me.

13          MR. GOLD:  Sure.  A lot of people have that problem,

14  Judge.

15      (Laughter)

16          THE COURT:  Are you withdrawing request that the

17  five individuals who have been named as defendants be included

18  in the MIP program that's been proposed?

19          MR. GOLD:  Yes, without prejudice for their

20  consideration for payment at a later date, Your Honor,

21  presumably as part of the plan of reorganization or, you know,

22  after we regroup, frankly decide how we would like to proceed

23  in that regard.

24          THE COURT:  Okay.  I think that's a wise decision.

25  For the benefit of the corporate officers involved, I would

1  have sustained those objections anyway for the reasons which

2  Mr. LeMay say are obvious, but having said that, they're only

3  allegations in a complaint so far and --

4         MR. GOLD:  And the examiner -- just for the record,

5  Your Honor, the examiner took great pains to point that out.

6         THE COURT:  Yeah.

7         MR. GOLD:  And took great pains to point out that

8  there really were no findings with respect to -- of wrongdoing

9  with respect to specific individuals and I -- for the sake of

10 those five, I really feel compelled to state that on the record

11 today.

12        THE COURT:  Understood.  And, you know, the Court

13 forms know view about the merits of any such claims, but I

14 think it's wise that the debtor came to that decision.

15        Okay.  Now, further plumbing the depths of your

16 earlier statement, is it your intention to make proffers, put

17 live testimony on?  I think a record needs to be made in light

18 of the bridge agent's objection.

19        MR. GOLD:  Yeah, and -- yes, I agree with that, Your

20 Honor.  Our intention would be to put both on; live testimony

21 through one initial witness and presumably a proffer would

22 suffice with respect to Mr. Dempsey of Mercer's testimony.

23        THE COURT:  All right.  Let's proceed.

24        MR. GOLD:  Okay.  Thank you, Your Honor.  At this

25 time I'd like to call Eddy Hartenstein to the stand.

1          THE CLERK:  Please remain standing.  Raise your

2   right hand and place your left hand on the Bible.

3          EDDY HARTENSTEIN, DEBTORS' WITNESS, SWORN

4          THE CLERK:  Please be seated.

5          MR. GOLD:  And, Your Honor, I think we may end up

6   only using one exhibit, but we do have exhibit binders if I --

7   with your indulgence, we might as well distribute them now and

8   without breaking the flow?

9          THE COURT:  One moment.

10         THE CLERK:  Please state your full name for the

11  record, spelling your last.

12         MR. GOLD:  I'm sorry.

13         THE WITNESS:  It's Eddy Hartenstein, that's Eddy

14  with a Y.  Hartenstein, H-A-R-T-E-N-S-T-E-I-N.

15         THE CLERK:  Thank you.

16         THE COURT:  Now we can distribute binders, if you'd

17  like.

18         MR. GOLD:  Thank you, Your Honor.

19                      DIRECT EXAMINATION

20  BY MR. GOLD:

21  Q    Mr. Hartenstein -- Hartenstein, excuse me.

22  A    Yes, thank you.

23  Q    Where do you work?

24  A    I work for the Tribune Company.  I am one of the co-

25  presidents -- co-CEOs of all of Tribune Company and I'm also

1   otherwise aggressive about trying to include initiatives in the

2   budgeting and the plan?

3   A     Absolutely.

4   Q     Well, here we are, as I mentioned earlier to the Court,

5   we're in the 11th month of 2010, so the budget was prepared

6   much earlier.  How is the company doing with respect to that

7   budget?

8   A     We're doing terrific and I would even push it to a more

9   expansive aggretive (sic).  I think by any means in a media

10  company in this environment, I think we're experiencing what I

11  would call stellar performance.

12  Q     And can you comment on the cash flow, in terms of cash

13  flow positive, with respect to the newspapers and broadcast

14  properties?

15  A     Yes, we have one key operating metric that's operating

16  cash flow, which is no more difficult than understanding the

17  difference in doing the arithmetic calculation of revenues

18  minus expenses.  We are exceeding our operating cash flow,

19  known as OCF, parameters.  We are exceeding with every

20  publishing unit the targets and with all but one of our

21  broadcast markets are we exceeding our plan, both on revenue

22  and on OCF.

23  Q     Let me ask you to take a look at Company -- or Debtor

24  Exhibit 1, which is --

25            MR. GOLD:  For reference, Your Honor, and others in

1   our sellers, both on the broadcast television side and on the

2   publishing side, to be very results oriented.  They can't sit

3   still.  If they don't meet their numbers, they don't make their

4   mortgage payments, they can't live.  So we did a lot of

5   creative, out of the box types of training, incentivization, we

6   created new products, as well as just reorganizing our business

7   operations from top to bottom.

8   Q     Well, let me ask you about those new products in a

9   second, but with respect to, I think, what you said the sales

10  process, I think you called it solution selling; is that right?

11  A     There's a -- internally we call it selling the Tribune

12  way, which is a radically different way than publishing and

13  television has been sold in the past.

14  Q     I'd like you to give a Court -- the Court a sense, and

15  I'm going to ask you this when I get to the other initiatives

16  as well -- you've testified that you put these in place, you

17  testified what they are, that they've been successful.  I'd

18  like you to give the Court a sense of, if you will, the level

19  of effort, the kinds of effort and the type of effort that's

20  necessary from these 640 people who are -- you know, 100 and

21  some people are here before the Court today to ask for approval

22  of the MIP, you know, what was required in 2010 to make this a

23  success?

24  A     To get the kind of results that you see here, which I

25  characterize, my word, stellar, I think the efforts by the core

1   management team that we have represented across the 600 plus

2   was nothing short of herculean.  I come from a place -- I came

3   from a company where we created enormous value for our

4   shareholders out of nothing.  This was an industry in

5   transition, a company in both transition in that industry, and

6   in turmoil through the fact that we've been in bankruptcy since

7   December of 2008.  That we have -- I have never seen a group of

8   people, and I have personally never worked as hard in all my

9   years in business to make this happen.  I've asked people to do

10  extraordinary things and they've responded and other business

11  unit leaders in the company have as well.

12  Q     Let me ask you about some of the other initiatives that

13  go into that work you described.  In terms of the actual

14  revenue creation side, have you created new products, if you

15  will, or new sources of revenue that has been partially

16  responsible for this stellar performance?

17  A     Yes.

18  Q     And can you name one or more of those?

19  A     Oh, sure.  We are -- it starts with the fact that we are

20  no longer a -- in the publishing world we're no longer a one

21  instant in a 24 hour cycle kind of deadline.  We have converted

22  our newsgathering operations, our newsrooms and our reporting

23  out as a 24/7 operation.  We have consolidated a lot of the

24  functions to be more efficient, but from the top down, as we

25  look at the web based products that we had, we all have

```
 1   MIP, just so it's in the record as well, the management

 2   incentive plan.  First, can you talk about historically what

 3   the components of compensation has been for the non-sales

 4   management at the Tribune?

 5   A      Prior to the bankruptcy, of course, it's very similar to

 6   other companies I'm familiar with, and in business as general,

 7   not just in the media business, but there are three legs to the

 8   compensation stool, if you will.  There is base compensation,

 9   there is bonus and then there is equity.  Equity is sometimes

10   given in terms of actual stock, RSU's or options.  Of course,

11   for us in the state of play that we're in, the equity leg of

12   that triad is basically zero, so we're left with just the two,

13   base and hopefully bonus.

14   Q      And with respect to the bonus, the management incentive

15   plan, we'll get into specifics later in the proffer for the

16   Court, but can you just give the Court a general sense of the

17   portion of compensation that the MIP comprises for the

18   individuals in management.

19   A      For the individuals in management in the pool it's

20   roughly a third to half -- as much as a half of their

21   compensation.

22   Q      You were -- you've been here present in the courtroom

23   this morning before you stepped up to testify, Mr. Hartenstein?

24   A      Yes.

25   Q      You, I think, heard some of the statements I made and I'm
```

41

1   sure some of the statements the Court made as well, so I want

2   to ask you this question.  What, in your view, would be the

3   impact on these initiatives, these efforts to transform the

4   business, if the MIP program wasn't approved now?

5   A     Boy, that is a -- that's one of the things that I just

6   don't want to -- I don't even contemplate what it would be like

7   without that.  Everybody has worked very hard, asked above and

8   beyond the call for virtually everybody in every aspect of what

9   we've been doing and it's one of those situations where I don't

10  want to know and I don't think any shareholder wants to find

11  out what would happen if we can't get that done.  We are

12  already operating, as I think you'll see from some of the other

13  material here, with folks in industry well below where I think

14  the median compensation should be and I will attest to -- down

15  to a person on that list that these -- this is a group that is

16  not median or mediocre in any way in their performance and

17  their capabilities.

18  Q     Do you feel like you've asked this workforce to do a lot

19  during this calendar year 2010?

20  A     Yes, I have and we all have.

21  Q     Do you plan to continue to do that?

22  A     Yes.  I think it's my job now, first as my role at the LA

23  Times, but now even more so as my role that has been given to

24  me, along with my other colleagues on the executive committee,

25  to continue to preserve and even enhance the value going

1   forward of Tribune Company and looking to make the right

2   decisions and position us in the right way for emergence.

3        Emergence, just going off the reservation here a little

4   bit, can't happen soon enough, as far as I'm concerned.  There

5   are so many opportunities out there, which we should be acting

6   on now, in terms of consolidation and other things that we

7   could be doing as the economy looks like it might be turning

8   around, we are making all the infrastructure adjustments, we

9   are making all the client and market adjustments to prepare

10  ourselves for that, now's not the time to take the foot off the

11  pedal and keep incentivizing these core -- this core group of

12  people here and exhorting them to continue to excel.

13  Q    With respect to that, keeping the foot on the gas

14  analogy, if the MIP isn't approved, if there remains

15  uncertainty as to whether the MIP will be approved, do you

16  think it will have any effect on the morale of the 600 and some

17  employees?

18  A    That would be absolutely devastating.  I can't emphasize

19  strongly enough from my general experience in business and from

20  my specific experience these two years and two months I've been

21  here at Tribune, how debilitating and devastating that would

22  be, to not come back and leave here today with an approval for

23  the MIP.  Every one of those folks on that list knows this is

24  happening today, knows that I am here today, and we need to

25  keep doing that to preserve the value, I think, for the benefit

43

1  of all the stakeholders that are looking here and that have

2  been darkening your doorway, Your Honor.

3          THE COURT:  Oh, I kind of look at it as the passage

4  of bright lights through the doors every day.

5          (Laughter)

6          THE WITNESS:  Well, hopefully you view us as a

7  bright light.

8  BY MR. GOLD:

9  Q     Well, let me just, I guess, close with one question and

10  do that -- I'll paraphrase, and I apologize, I won't do it as

11  eloquently as Mr. LeMay did with -- to Your Honor and you

12  quoted it in your last MIP ruling, but I think there was a

13  statement with respect to the 2009 MIP, you weren't here for

14  that at the time, Mr. Hartenstein, but that business people

15  understand the importance of an incentive plan and its

16  motivation to employees and that these business people,

17  frankly, don't want to find out what would happen if a MIP

18  wasn't implemented.  Do you share those sentiments?

19  A     I absolutely do.  I'm a business guy, have been that for

20  over 35, almost going on 40 years now.  I completely get that.

21  It's the right assessment.  I can't again emphasize A, how hard

22  a work these folks have done in very difficult and trying

23  circumstances.  I view this MIP as an investment in the human

24  capital of what is Tribune Company, the women and men that are

25  in management, leading all of the employees there.  And they

1 │ are believers, as am I, in that we will see a better day, and

2 │ that we are believers in doing the right thing here for the

3 │ company and to not only preserve, but enhance the underlying

4 │ asset value of what is Tribune Company today.

5 │ Q    Thank you, Mr. Hartenstein.

6 │        MR. GOLD:  I have no further questions at this time,

7 │ Your Honor.

8 │        THE COURT:  All right.  I want to take another five

9 │ minute break then we'll resume with cross-examination.  I don't

10 │ mean to give you that much usage out of that Mr. LeMay, but

11 │ good for you.

12 │        MR. LEMAY:  Thank you, Your Honor.

13 │        THE COURT:  Five minute recess.

14 │     (Recess taken at 11:24 a.m. to 11:32 a.m.)

15 │        THE CLERK:  All rise.

16 │        THE COURT:  All right.  Does anyone wish to

17 │ cross-examine Mr. Hartenstein?  Anyone?  I hear no response.

18 │        You may stay there, sir.  Thank you very much.

19 │        MR. GOLD:  Your Honor, at this time, I'll cede

20 │ the podium to Mr. Lotsoff, who will provide a proffer with

21 │ respect to the testimony of Mr. Dempsey of Mercer.

22 │        THE COURT:  All right.

23 │        MR. GOLD:  Thank you.

24 │        MR. LOTSOFF:  Good morning, Your Honor.  Jonathan

25 │ Lotsoff on behalf of the debtors.  We'd offer a proffer of

1   the testimony of John Dempsey, a principal with Mercer.

2   This court may recall that Mr. Dempsey testified in these

3   proceedings with respect to the 2008 and 2009 MIP programs.

4   And so, his background and experience I believe is already

5   in the record.   I will just summarize some salient points

6   here.

7        He's been with Mercer since 1985.  He's been a

8   principal or partner for the past 10 years.  Mercer is a

9   compensation consulting firm as the Court knows.  Mr.

10  Dempsey's principal practice area for his 20 years of

11  practice has been in the executive compensation consulting

12  field, including the development and analysis of incentive

13  plans.  And for almost 10 years, he's specialized in that

14  area of compensation consulting, specifically with respect

15  to restructurings in and out of Chapter 11.  He's worked

16  with numerous clients, testified as an expert witness in

17  numerous proceedings, including this one.  Other details,

18  again, are in the record.

19       He was retained by Tribune Company at the

20  direction of the compensation committee, and most recently

21  assisted Tribune in the design and analysis of the proposed

22  2010 MIP Program.

23       Mr. Dempsey would testify that, in his

24  experience, paying significantly below market compensation

25  can have a devastating effect on management incentives and

1   performance.  He would also testify that that's precisely

2   what would happen in terms of the level of compensation

3   being paid in this case if the 2010 MIP Program were not

4   approved.

5            Under those circumstances, as you've heard, the

6   640 -- 635 participants would receive only their base

7   salary.  Their total direct compensation relative to their

8   peers would be less than 50 percent of the market median.

9   So they would be less than half of the median relative to

10  the competitors that they're involved with day in and day

11  out.

12           With respect to the top management group, their

13  total direct compensation without this MIP program would be

14  28 percent of the median, so the bottom quartile.  And with

15  respect to the other key executives that the Court mentioned

16  earlier, they would be at 42 percent, again, less than 50

17  percent of the market median.

18           Mr. Dempsey, along with his colleagues at Mercer,

19  prepared a report, which the Court has at tab 3 of its

20  binder, basically describing and providing an analysis and

21  benchmarking of the 2010 MIP Program that was actually

22  proposed in May of this year.  A description of the

23  mechanics of the program is set forth at page 5.  I'll be

24  presenting a summary or offering -- proffering a summary

25  exhibit in due course.  So I won't go through the details

1    think that's the genesis of the objection.

2              THE COURT:  All right, thank you.

3              MR. HAMMOND:  Thank you, Your Honor.

4              THE COURT:  Does anyone else with to be heard?   I

5    hear no further response.

6              Well, several different ways to -- that I look at

7    this in view of the record that's been made.  And let's

8    start with the standard.  I don't address whether the relief

9    should be awarded or viewed under 363(b) or (c).  No one has

10   argued that these are -- or is not now arguing this is

11   relief that should be applied against the standard set in

12   503(c)(1) or (c)(2).  So I will apply the standard provided

13   in 503(c)(3).  And I conclude that the debtor has met its

14   burden for the relief that it's now requesting.  And here's

15   how I view why that relief should be granted.

16             First, I'll look at what, in an unusual

17   circumstance for this case, is a relative absence of

18   objection.  Not something I've seen frequency -- frequently

19   to date.  And that's not always the end of the game.  But on

20   the other hand, I guess which is the corollary to the

21   absence of objection, and that is meaningful support,

22   particularly from the committee here for the reasons it's

23   expressed.

24             The MIP that's been proposed here is somewhat

25   less generous than 2009.  I find that the targets and the

1   benchmarks have been appropriately fixed as incentives.

2   They contain a necessary reach.  The metrics chosen in the

3   setting of the targets and benchmarks that is revenue and

4   operating cash flow I think is reasonably chosen under the

5   circumstances.

6           There's nothing wrong with relatively simple

7   means of determining such things.  I think sometimes the

8   parties, in requesting such relief, build frameworks that

9   are much more complicated than they need be.  The awards and

10  potential awards under the proposed plan are meaningful but

11  not excessive.  They're within the market and the company's

12  historical practice, arguably, below each of them.

13          So for all of these reasons, I will overrule any

14  remaining objections and approve the relief that's been

15  requested with the alteration that was made earlier in court

16  today.  Will this require a change to the form of order that

17  the debtor was otherwise expected to present?

18          MR. GOLD:  I believe it may, Your Honor.  And so,

19  we'd propose that we make those modifications, circulate

20  them, and get it to you in due course.

21          THE COURT:  Okay.  Now with tomorrow as a federal

22  holiday and court staff taking advantage of that, my comment

23  is if you wish an order to be signed and docketed today, you

24  should get it to me by mid-afternoon.  Otherwise, it would

25  likely be acted upon Friday.

1  scheduled for the 23rd.  At this point, what does the debtor

2  anticipate will be considered at that time?

3          MR. LANTRY:  Nothing at this point, Your Honor.

4  We do have quite a backlog of claims, objections, and those

5  types of more ministerial things to tend to, but beyond

6  that, nothing that's specifically scheduled.

7          THE COURT:  Well, it's now November 10th.  Is it

8  anticipated that --

9          MR. LANTRY:  We would be happy to give way on

10  that omnibus, Your Honor, if that's where you're going.

11          THE COURT:  Oh, I can have a day back?

12          MR. LANTRY:  Yes.

13          THE COURT:  Oh, it's like a gift.  Thank you.

14  Okay.  Anything further for today?  I'll take a look at my

15  calendar.  I'll, understanding that the parties are

16  generally looking toward March, figure out what fits where

17  and when.  And I'm sure we'll have further discussions on

18  it.

19          Thank you all very much.  That concludes this

20  hearing.  Court is adjourned.

21      (Whereupon at 12:09 p.m., the hearing was adjourned)

22

23

24

25

69

## CERTIFICATION

1

2          I certify that the foregoing is a correct

3   transcript from the electronic sound recording of the

4   proceedings in the above-entitled matter.

5

6

7   *Stephanie McMeel*                    November 11, 2010

8   Stephanie McMeel

9   AAERT Cert. No. 452

10  Certified Court Transcriptionist