# EXHIBIT I

## Excerpts of Transcript of September 25, 2009 Hearing

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF DELAWARE

```
                              )
IN RE:                        )
                              )        Bankruptcy Action
TRIBUNE COMPANY, et al.,      )
                              )
                              )        Chapter 11
                Debtors,      )        Wilmington, DE
                              )        September 25, 2009
```

EXCERPT FROM
TRANSCRIPT OF HEARING
BEFORE THE HONORABLE KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:              JONATHAN LOTSOFF, ESQUIRE
                              BRIAN GOLD, ESQUIRE
                              Sidley, Austin, LLP
                              One South Dearborn Street
                              Chicago, Illinois 60603

                              NORMAN PERNICK, ESQUIRE
                              Cole, Schotz, Meisel, Forman &
                              Leonard, P.A.
                              500 Delaware Avenue
                              Wilmington, Delaware 19801

Audio Operator:               Sherry Stiles

Transcribed by:               DIANA DOMAN TRANSCRIBING
                              P.O. Box 129
                              Gibbsboro, New Jersey  08026-129
                              PHONE:  (856)435-7172
                              FAX:    (856) 435-7124
                              Email:  Dianadoman@comcast.ne

Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

(Appearances Continued)

For Creditors Committee:  DAVID LeMAY, ESQUIRE
                                     Chadbourne & Parke, LLP
                                     30 Rockefeller Plaza
                                     New York, New York 10112

For U.S. Trustee:          JOSEPH J. McMAHON, JR., ESQUIRE
                                     Office of the U.S. Trustee
                                     844 King Street
                                     Wilmington, Delaware

For Guild:                CHRISTOPHER SIMON, ESQUIRE
                                     MICHAEL JOYCE, ESQUIRE
                                     Cross & Simon
                                     913 North Market Street
                                     Wilmington, Delaware 19801

For Dow Jones:            JOEL FRIEDLANDER, ESQUIRE
                                     Bouchard, Margules & Friedlander
                                     222 Delaware Avenue
                                     Wilmington, Delaware

Dempsey - Direct (Lot)                    Page 115

1   always included in the motions that come before the Court.  And

2   for that reason, it's hard to do a consistent analysis, and so

3   we did not include -- we did not include them.  And where it

4   was disclosed, we did make an effort to separate out the short

5   term incentive from the special compensation.

6   Q.  And so in some instances, is information regarding

7   ordinary course programs even available?

8   A   It isn't always available, that's correct.

9   Q   Having gone through this process, and I'll ask you some

10  more questions about specific aspects of your report in a

11  moment, but having gone through this process, what were your

12  overall conclusions with respect to the debtors' proposed

13  incentive plan?

14  A   My conclusion is that the program will offer a market

15  competitive compensation, and that it does provide an incentive

16  to generate strong operating cash flows in 2009.  And that it's

17  appropriate and in the circumstances for the company.

18  Q   And there are various payout levels under these proposed

19  plans.  Did you reach any conclusions with respect to whether

20  the proposed plan is or is not market at each of those various

21  payout levels --

22  A   Yes, I did.

23  Q   -- depending on performance?

24  A   Yes, I did.

25  Q   And what was that conclusion?

1    A     That it, in each case, in the aggregate, the programs are

2    at or below the market median relative to the benchmarks.

3    Q     And did you also reach a conclusion as to whether or not

4    these plans, and in particular the TMIP and the KOB are

5    appropriate plans for a company in Chapter 11?

6    A     Yes, I did.

7    Q     And what was your conclusion?

8    A     That they are appropriate.

9    Q     All of these plans use cash flow as a core performance

10   metric.  Is that a common performance metric in incentive plans

11   in your experience?

12   A     Yes, it is. The operating cash flow is another name for

13   EBITDAR or Earnings Before Interest, Taxes, Depreciation,

14   Amortization and Restructuring costs.  And so that is the most

15   common metric for incentive plans in this environment.  And so

16   absolutely.

17   Q     Your report speaks of total direct compensation and total

18   cash compensation.  Can you briefly explain what those terms

19   mean?

20   A     So in the -- in a typical package you have a salary.  Then

21   you have the total -- then you have an annual incentive, the

22   sum of the salary and the annual incentive is the total cash

23   compensation.  Then there's this long term incentive element,

24   and then as we add the expected value of that to the cash

25   compensation, we get what we call total direct compensation.

Dempsey - Direct (Lot)                    Page 117

1    Q    Mr. Bigelow testified that the company does not currently

2    have any equity value to grant, as it historically has done.

3    What does that mean in terms of the management team's total

4    direct compensation without the proposed plan?

5    A    Well, without any sort of equity compensation, the total

6    direct compensation will be far below the market, the

7    prevailing market or at levels.

8    Q    And could you look at page 14 of your report.

9    A    Okay.

10   Q    And this page is entitled "impact on TDC at plan".  Can

11   you tell us what this page of your report shows?

12   A    This page shows that the market competitiveness of the

13   compensation for the top ten without -- with and without the

14   CEO and also with other key executives who are the participants

15   in the TMIP and KOB, compares in aggregate to the market.

16   Q    So, taking for example the line, top ten without CEO, and

17   because the CEO doesn't participate in this plan, I'll have you

18   walk through that line, but could you take us just across that

19   row and explain those figures and what they signify?

20   A    Certainly.  So you have the sum of the salaries for the

21   top ten without the CEO, and then the column market index which

22   shows 40 percent.  That is their pay relative to total direct

23   compensation if they receive only base salary.  So, if there

24   were no MIP, no TMIP, no KOB, we did nothing, people would be

25   paid 40 cents on the dollar relative to the market median.

Dempsey - Direct (Lot)                    Page 131

1    everything even harder during difficult economic times than

2    they do in better times when you know, it's easier to have the

3    earnings roll in.

4         And so, it's important to offer the carrot and keep

5    people focused on the right things and moving forward.  And so,

6    I think that it's desirable that -- and a very good thing that

7    Tribune is putting forward incentive plans for this year.

8    Q    And if you look at the ten companies on the peer group

9    that you used, are a majority of them still to your knowledge

10   offering incentive plans for 2009 --

11   A    Yes.

12   Q    -- they have not thrown in the towel?

13   A    That's correct.

14   Q    For informational purposes, did you rerun your

15   benchmarking using the actual figures that the Guild, and in

16   particular, Mr. Phillips, suggested should have been used in

17   his report for certain of the peer group companies?

18   A    Yes, I did.

19   Q    And did that rerunning of the benchmarking, using those

20   figures proposed by the Guild, did that change the

21   competitiveness of these programs at any payout level?

22   A    The program --

23        MR. SIMON:  Your Honor, I'm going to object to this.

24   We haven't seen any supplemental report or calculation or

25   anything from the debtors on this point.  We've worked with the

1    MR. LOTSOFF:  You know, with respect to some of the

2  Guild's points, in considering your decision, its attacks on

3  Mercer's methodology as flawed, I think the evidence shows that

4  those attacks are off base, and that Mr. Phillips is not a

5  compensation expert.

6    We believe that the Guild's claim that this plan is a

7  retention plan is also simply wrong.  All of the components of

8  the plan are directly tied to a central performance metric

9  which is the generation of operating cash flow, and the payment

10  provision of this plan which again is intended to incentivize

11  emergence, and you heard the benefits of that from Mr. Bigelow,

12  was also --

13    THE COURT:  Well, let me just put that one to rest.

14    Every bonus plan, virtually every bonus plan has some

15  element of retention in it.  I have routinely held that unless

16  a plan is demonstrated to be primarily for the purpose of

17  retention, it doesn't fit within the 503(c)(1) rubric.  And I

18  don't see the evidence here supporting that view either.

19    I mean, largely, as I understand the debtors' goal,

20  it's to reward those who are most responsible for, to put it

21  plainly, strapping the company on its back and pulling it

22  through these times.

23    MR. LOTSOFF:  We appreciate that, Your Honor.

24    The Guild also argues that the targets in the plan

25  are lay-ups in essence because the debtors have had the good

Page 238

# C E R T I F I C A T I O N

We, Josette M. Jones and  Sandra Carbonaro, court approved transcriber,   certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

JOSETTE M. JONES

SANDRA CARBONARO

Doman Transcribing & Recording Svcs.        10/07/09

AGENCY                                        DATE