IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11<br>Case No. 08-13141 (KJC) |
| TRIBUNE COMPANY, et al., | Jointly Administered<br>**Related Docket No. 11399** |
| Debtors. | Hearing Date: June 7, 2012 |

## OBJECTION OF AURELIUS CAPITAL MANAGEMENT, LP TO CONFIRMATION OF THE FOURTH AMENDED JOINT PLAN OF REORGANIZATION FOR TRIBUNE COMPANY AND ITS SUBSIDIARIES PROPOSED BY THE DEBTORS, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, OAKTREE CAPITAL MANAGEMENT, L.P., ANGELO, GORDON & CO., L.P., AND JPMORGAN CHASE BANK, N.A.

Aurelius Capital Management, LP, on behalf of its managed entities ("Aurelius")[1] by and through its undersigned counsel, hereby files this objection (the "Objection") to the *Fourth Amended Joint Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A.* [ECF No 11399] (the "DCL Plan").[2] In support of this Objection, Aurelius respectfully represents as follows:

### PRELIMINARY STATEMENT

1. As this Court is well aware, Aurelius and the Indenture Trustees for both the Senior Notes and the PHONES Notes have been resolute in opposing the DCL Plan's proposal to settle the LBO-Related Causes of Action against the Senior Lenders and others for inferior and unreasonable consideration, and instead have pushed their own plan of reorganization that would have preserved all LBO-Related Causes of Action for prosecution by a litigation trustee following confirmation. Having failed to convince this Court that the Settlement is inappropriate

---

[1] Entities managed by Aurelius own a substantial amount of Senior Notes and PHONES Notes. Neither Aurelius nor any of its managed entities owe any fiduciary duties to any party in interest in these cases, nor is Aurelius or any of its managed entities an insider of Tribune Company or any of its affiliates.

[2] Terms not otherwise defined herein shall have the meanings ascribed to such terms in the DCL Plan.

and having completed the Allocation Disputes litigation, Aurelius will now address in this Objection its remaining objections to confirmation of the DCL Plan which have not previously been raised and addressed by this Court. These objections consist primarily of procedural or discrete language-based objections to the DCL Plan in its current form.

2. Aurelius continues to be of the view that the Court erred in approving the Settlement, and that the DCL Plan, as amended, remains unconfirmable as a matter of both law and fact given that the DCL Plan is still premised on a settlement that does not satisfy the lowest rung of reasonableness and was neither negotiated nor proposed in good faith. Aurelius incorporates by reference its previous objections in respect of the Settlement, and asserts them with equal force in this Objection.[3]

3. Aurelius also continues to assert that the DCL Plan unfairly discriminates against holders of Senior Notes Claims in violation of Bankruptcy Code sections 510 and 1129(b)(1) by extending the benefit of subordination to creditors not contractually entitled to it—including the holder of the Swap Claim—and treating creditors who are not entitled to the benefit of subordination on a parity with those who are entitled to such benefits.[4] Indeed, Aurelius submits that the DCL Plan discriminates unfairly against the Senior Noteholders for the reasons set forth in the (a) Original Objection at 206-207, (b) Post-Trial Reply Brief at 30-32, (c) Amended

---

[3] *See Amended Objection of the Noteholder Plan Proponents to Confirmation of the Debtor/Committee/Lender Plan of Reorganization (Part I)*, dated February 16, 2011 [ECF No. 8025] (the "Original Objection"); *Amended Supplemental Objection of the Noteholder Plan Proponents to the Second Amended Joint Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A. (as Modified)*, dated April 12, 2011 [ECF No. 8635] (the "Amended Supplemental Objection"); the *Post-Trial Brief of the Noteholder Plan Proponents*, dated May 11, 2011 [ECF No. 8932] (the "Post-Trial Reply Brief"); the *Post-Trial Reply Brief of the Noteholder Plan Proponents*, dated May 27, 2011 [ECF No. 9022]; the *Noteholder Plan Proponents' Proposed Findings of Fact*, dated June 3, 2011 [ECF No. 9246]; the *Noteholder Plan Proponents' Proposed Conclusions of Law*, dated June 3, 2011 [ECF No. 9247]; along with every other pleading in which the Noteholder Plan Proponents contested the reasonableness of the Settlement and the complete record compiled in connection with the contested confirmation hearing held to consider the second amended DCL Plan.

[4] Aurelius disagrees with the Court's determination that the Swap Claim falls within the definition of "Indebtedness" for purposes of the PHONES Notes Indenture and thus is entitled to the benefit of subordination thereunder. *See Memorandum on Allocation Disputes*, dated April 9, 2012 [ECF No. 11337] at 21-22 n.19.

Supplemental Objection at 3-7, (d) *Joinder-in-Part of Aurelius Capital Management, LP to Joint Opening Brief of Law Debenture Trust Company of New York and Deutsche Bank Trust Company Americas with Respect to the Allocation Disputes*, dated March 2, 2012 [ECF No. 11060] at 2 and (e) *Joint Response Brief of Law Debenture Trust Company of New York and Deutsche Bank Trust Company Americas with Respect to Allocation Disputes*, dated March 2, 2012 [ECF No. 11069] and incorporates such objections and arguments by reference and asserts them with equal force herein.

    4.    For the reasons set forth and incorporated in paragraphs 2 and 3 herein, the DCL Plan should not be confirmed.

    5.    Aurelius's remaining confirmation objections, which are the subject of this pleading, are summarized below:

- The DCL Plan's provision for the payment of, *inter alia*, the fees and expenses of the Senior Lenders and the Bridge Lenders without requiring such parties to demonstrate that (i) they have made a substantial contribution to the Debtors' cases as required by Bankruptcy Code section 503(b) and (ii) the requested fees and expenses are reasonable pursuant to Bankruptcy Code section 1129(a)(4) renders the DCL Plan unconfirmable.

- The DCL Plan's provision regarding the cancellation of the Senior Notes Indenture and the PHONES Notes Indenture should be modified to reflect unambiguously and unequivocally the intent of the DCL Plan to provide that the Indentures, the Senior Notes and the PHONES Notes survive for *all* purposes relevant to the pursuit of the Preserved Causes of Action and the Disclaimed State Law Avoidance Claims against the state law defendants.

- The definitions of "Selling Stockholders" and "Disclaimed State Law Avoidance Claims" should be modified to reflect unambiguously and unequivocally the intent of the DCL Plan to aid in the pursuit of the Preserved Causes of Action and the Disclaimed State Law Avoidance Claims against the state law defendants.

- The Litigation Trust Confidentiality and Common Interest Agreement to be executed by the Reorganized Debtors and the Litigation Trustee should expressly provide for the transfer of all work-product, attorney-client and other privileges to the Litigation Trust to be utilized by the Litigation Trustee in connection with the prosecution of the Preserved Causes of Action for the benefit of all Litigation Trust Beneficiaries

(including, where appropriate, waiving the applicable privilege with respect to any Privileged Information (as defined below)).

- The terms of the Litigation Trust Agreement should be modified as set forth herein to ensure the proper operation of the Litigation Trust for the benefit of all Litigation Trust Beneficiaries.

## OBJECTION

### I. The DCL Plan's Provision for the Carte Blanche Payment of Professional Fees and Expenses Violates Bankruptcy Code Sections 1129(a)(1) and 1129(a)(4)

6.     In its current form, the DCL Plan provides that no later than 45 days after the Effective Date, the Senior Lenders and the Bridge Lenders are required to submit to Reorganized Tribune, the United States Trustee, and the Creditors' Committee reasonably detailed statements of the Senior Lender Fee/Expense Claims[5] or Bridge Lender Fee/Expense Claims,[6] as applicable. DCL Plan § 9.1. The DCL Plan further provides that the requested fees and expenses will be paid within 30 days of submission of the fee statements unless the Reorganized Debtors, Creditors' Committee and/or the United States Trustee otherwise object. *Id.* Only in the event that the parties are otherwise unable to resolve a fee dispute would the matter (and the magnitude of the fees sought) be brought before the Court. *Id.* As discussed in greater detail below, this procedure is wholly inappropriate given that any other party in interest who intends to seek reimbursement of fees and expenses in these cases will be required to file a full-blown fee application, which will be subject to the "substantial contribution" requirements of Bankruptcy Code section 503(b). Moreover, the payment of fees and expenses incurred by the Senior

---

[5] Senior Lender Fee/Expense Claims are defined as "all of the reasonable and documented fees, costs and expenses of the Senior Lender Professionals incurred in connection with the Chapter 11 Cases and not previously reimbursed by the Debtors or Reorganized Debtors." DCL Plan § 1.1.203.

[6] Bridge Lender Fee/Expense Claims are defined as "all of the reasonable and documented fees, costs and expenses of the professionals and advisors for the Bridge Plan Proponents and/or the Bridge Loan Agent incurred in connection with the Chapter 11 Cases on or after the Petition Date through the Effective Date and not previously reimbursed by the Debtors or Reorganized Debtors." DCL Plan § 1.1.15.

4

Lenders and Bridge Lenders without Court approval is squarely at odds with precedent within the Third Circuit and applicable provisions of the Bankruptcy Code.

7. The Senior Lenders and Bridge Lenders will be seeking the reimbursement of at least $72 million in fees and expenses (as reported in the Supplemental Disclosure Document dated April 17, 2012, but presumably the request will exceed $72 million by tens of millions of dollars) without submitting a fee application or otherwise providing this Court with an opportunity to review the reasonableness of the requested amounts. In addition, various other parties in interest in these cases may file fee applications under Bankruptcy Code section 503(b), which will require any such applicants to demonstrate a "substantial contribution" to the Debtors' chapter 11 cases. It is both inequitable and inappropriate for the fees and expenses of such potential 503(b) fee applicants to be subject to an entirely different standard of review than those incurred by the Senior Lenders and Bridge Lenders, particularly given that the fees and expenses of the Senior Lenders and Bridge Lenders will likely not be subject to review under *any* standard if the DCL Plan is confirmed without modification.

8. Moreover, the provisions of the DCL Plan that provide for the payment of the Senior Lenders and Bridge Lenders' fees and expenses without requiring such lenders to file fee applications violate Bankruptcy Code § 1129(a)(4) and are squarely at odds with precedent within the Third Circuit. In *In re TCI 2 Holdings, LLC*, the Bankruptcy Court for the District of New Jersey recently evaluated whether an ad hoc committee of second lien noteholders (the "TCI AHC") was entitled to reimbursement of professional fees pursuant to a plan of reorganization absent a showing that such fees satisfied the substantial contribution requirement of Bankruptcy Code section 503(b). *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 145-48 (Bankr. D.N.J. 2010). Specifically, the debtors' proposed plan (of which the TCI AHC was a co-

proponent) sought to exempt certain professional fees and expenses, including the fees and expenses of the TCI AHC, from review by providing that such fees would be paid on the effective date of the plan without application to or review by the court unless the parties disagreed on the fees. *See id.* at 131.

9. The United States Trustee objected to the proposed plan on the grounds that the professional fee provisions circumvented applicable provisions of the Bankruptcy Code by (i) allowing the fees and expenses of, among others, the TCI AHC to be paid by the reorganized debtors without disclosing the amounts owed and/or filing appropriate fee applications under Bankruptcy Code section 503(b) and (ii) failing to require that the payment of such fees and expenses was subject to approval by the bankruptcy court as "reasonable" under Bankruptcy Code section 1124(a)(4). *See id.* at 146; *see also* TCI UST Objection at 8-9.[7] The court agreed. *See In re TCI 2 Holdings, LLC*, 428 B.R. at 146.

10. The *TCI* Court held that, before the TCI AHC could be reimbursed for the requested fees and expenses, the TCI AHC had to *first* demonstrate that it had made a substantial contribution to the debtors' cases, as is required by Bankruptcy Code section 503(b),[8] and *second* had to satisfy Bankruptcy Code section 1129(a)(4) by demonstrating that its requested fees were reasonable.[9] *See id.* at 145-47. The court's holding was predicated upon the Third Circuit's

---

[7] *Objection of the Acting United States Trustee to the (I) Modified Sixth Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code Proposed by the Ad Hoc Committee of Holders of 8.5% Senior Secured Notes Due 2015 and the Debtors, and (II) Modified Fourth Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code Proposed by Beal Bank and Ichan Parties*, dated Feb. 19, 2010 [ECF No. 1237] (the "TCI UST Objection").

[8] Although Bankruptcy Code section 1129 does not expressly reference section 503(b), section 1129(a)(1) "mandates compliance with the applicable provisions of Title 11." *Id.*

[9] Other courts have similarly held that compliance with Bankruptcy Code section 1129(a)(4) expressly requires that any fees to be paid under a plan be approved by, or subject to approval by, the bankruptcy court through the submission of fee applications. *See In re Washington Mutual, Inc.*, No. 08-12229, 2011 WL 57111, at *43-44 (Bankr. D. Del. Jan 7, 2011) (holding that parties seeking reimbursement of fees and expenses must submit fee applications so that the court may evaluate the reasonableness of the requested fees, as is required by Bankruptcy Code section 1129(a)(4)); *In re American Media, Inc.*, No. 10-16140, Hearing Transcript of December 20, 2010 Confirmation Hearing at 14:15-20, attached hererto as Exhibit A, (stating, with respect to a proposed plan that

decision in *O'Brien*, in which the Third Circuit held that "claims that arise after the date on which the debtor petitioned for bankruptcy protection . . . are generally allowed, if at all, only as administrative expenses pursuant to 11 U.S.C. § 503." *See In re O'Brien Env. Energy*, 181 F.3d at 532.[10]

11.   The two-step process set forth by the court in *TCI 2 Holdings* provides an instructive framework for an evaluation of the propriety of the DCL Plan's mechanism for allowance of any payment of the Senior Lenders and Bridge Lenders' requested fees and expenses. In order for the DCL Plan to be confirmable, the Senior Lenders and Bridge Lenders must comply with the mandates of Bankruptcy Code sections 503(b) *and* 1129(a)(4).

12.   In response, the DCL Plan Proponents will likely cite *In re Adelphia Communications Corp.*, a non-binding decision from the Bankruptcy Court for the Southern District of New York. *In re Adelphia Communications Corp.*, 441 B.R. 6 (Bankr. S.D.N.Y. 2010). In *Adelphia*, the court held that the reasonable legal fees and expenses of unsecured creditors may be paid by a debtor's estate without showing that such creditors have made a "substantial contribution," as is required by Bankruptcy Code section 503(b). *See* DCL Disclosure Reply at 9. The *Adelphia* holding, however, is squarely at odds with precedent within the Third Circuit. *See In re O'Brien Env. Energy*, 181 F.3d at 532 ("[C]laims that arise after the date on which the debtor petitioned for bankruptcy protection. . . are generally allowed, if at all, only as administrative expenses pursuant to 11 U.S.C. § 503."). Moreover, a key fact distinguishes *Adelphia* from the facts here—the requesting parties in *Adelphia had* filed fee applications, per

---

contemplated the payment of an ad hoc committee's fees, that "I will not approve a plan provision that simply says that the reorganized debtor shall pay all reasonable fees, costs and expenses of the committee's counsel . . . without the need for approval by the [b]ankruptcy [c]ourt. That is directly contrary to 1129(a)(4)").

[10] The *TCI* Court also determined that "under the clear terms [of Bankruptcy Code section 1129(a)(4)], 'any payment made or to be made by the plan proponent or the debtor for services 'in or in connection with' the plan or the case must be approved by or 'subject to the approval of' the bankruptcy court as 'reasonable.'" *In re TCI 2 Holdings*, 428 B.R. at 145 (internal citations omitted) (collecting cases).

the court's directive, which applications included a discussion of the relevant section 503(b) standards. *See In re Adelphia Commuc'ns*, 441 B.R. at 11; *see also In re Adelphia Commuc'ns*, Case No. 02-41729 (Bankr. S.D.N.Y. Mar. 30, 2007) [ECF Nos. 13366, 13401, 13406, 13407, 13409, 13412, 13415, 13416, 13421, 13443].

13.     Even if this Court were to decline to apply the two-step analysis employed by the court in *TCI*, the Senior Lenders and Bridge Lenders must be required at the very least to file fee applications in accordance with Bankruptcy Code section 1129(a)(4) under *Adelphia*. *See id.*

14.     Based on the foregoing, in order for the DCL Plan to be confirmed, the Senior Lenders and Bridge Lenders must be required to file fee applications that (i) demonstrate that such creditors have made a substantial contribution to the Debtors' cases and (ii) address the extent to which the requested fees and expenses are reasonable.

## II.     Requested Language Changes to DCL Plan

15.     Prior to the approval of the Supplemental Disclosure Document, in an effort to foster a consensual resolution of Aurelius's outstanding concerns regarding certain provisions contained in the DCL Plan and Supplemental Disclosure Document, counsel for Aurelius engaged counsel for the DCL Plan Proponents in discussions over proposed language modifications to the DCL Plan. Aurelius and the DCL Plan Proponents were ultimately able to resolve some, but not all, of Aurelius's issues. Aurelius's remaining concerns are set forth below, together with proposed language which, if incorporated, would resolve Aurelius's concerns without adversely affecting the DCL Plan Proponents.

### A.     Cancellation of Senior Notes Indenture and PHONES Notes Indenture

16.     Section 5.8.2 of the DCL Plan, as most recently amended, properly provides that the Senior Notes Indenture and the PHONES Notes Indenture shall continue in effect after the

Effective Date for certain limited purposes including, among other things, to allow the Indenture Trustees and individual holders of Senior Notes and PHONES Notes "to prosecute the Disclaimed State Law Avoidance Claims in the event that a court determines they are necessary parties" and to allow "the Litigation Trust to prosecute Preserved Causes of Action." DCL Plan § 5.8.2. The foregoing provisions were incorporated at the request of Aurelius to foreclose any argument that the Senior Notes Indenture Trustee (and/or the Senior Noteholders) or PHONES Notes Indenture Trustee (and/or holders of the PHONES Notes) lacked standing to pursue the Disclaimed State Law Avoidance Claims, or that the Litigation Trustee lacked standing to pursue the Preserved Causes of Action, by virtue of the fact that the Senior Notes Indenture and PHONES Notes Indenture did not expressly continue in effect post-Effective Date for the purpose of prosecuting such claims.

17.     Given that a scorched earth strategy is likely to be employed by many of the defendants in the litigation over the Disclaimed State Law Avoidance Claims and the Preserved Causes of Action, Aurelius believes that additional language should be added to section 5.8.2 of the DCL Plan to further discredit any potential argument that the Senior Notes Claims and PHONES Notes Claims are nevertheless discharged under the DCL Plan for *all* purposes, including with respect to pursuing the Disclaimed State Law Avoidance Claims against the state law defendants or Preserved Causes of Action.[11] In that regard, Aurelius believes that section 5.8.2 should be modified to read as follows (requested language in bold italics):

---

[11] Analogous arguments were recently made by certain defendants in the pending *Lyondell* state law fraudulent transfer claim litigation. *See Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Complaint* at 28-30, *In re Lyondell Chem. Co.*, No. 09-10023 (Bankr. S.D.N.Y. Mar. 3, 3012). Specifically, certain defendants argued that the litigation trustee charged with pursuing the state law transfer claims lacked standing to pursue such claims because he never actually acquired them pursuant to the plan of reorganization. *See id.* The defendants argued that, pursuant to the plan, the trust's beneficiaries transferred only their "respective rights, title, and interests in and to the [s]tate [l]aw [a]voidance [c]laims" but did not assign the underlying claims themselves. *See id.* This is the very sort of diversionary and meritless claim that Aurelius now seeks to preempt by the inclusion of the requested language in section 5.8.2 of the DCL Plan.

"Notwithstanding anything contained elsewhere in this Plan, (x) the Indentures *and the debt issued thereunder* shall continue in effect solely to the extent necessary to allow . . . ."[12] Adding the requested language would insulate the Indenture Trustees and/or holders of Senior Notes Claims and PHONES Notes Claims from allegations that such Indenture Trustees and/or holders lacked standing to prosecute the Disclaimed State Law Avoidance Claims, and would bolster the Litigation Trustee's ability to do that which he is authorized and directed to do under the DCL Plan—prosecute the Preserved Causes of Action.

B.  Definition of Selling Stockholders

18.  The DCL Plan provides that "Disclaimed State Law Avoidance Actions" include "any and all LBO-Related Causes of Action arising under state fraudulent conveyance law that existed in favor of any Holder of a Claim that arose prior to the Petition Date *against Selling Stockholders*." DCL Plan § 1.1.67 (emphasis supplied). Conversely, "Released Parties" include "the current and former Senior Lenders in all capacities except their capacities, if any, *as (ii) Selling Stockholders* . . . ." *Id.* § 1.1.186 (emphasis supplied). Given these defined terms, the definition of "Selling Stockholders" must encompass all appropriate defendants in the Disclaimed State Law Avoidance Actions. Otherwise, many Senior Lenders who are defendants in the Disclaimed State Law Avoidance Actions may argue that they are entitled to receive releases in capacities that were never intended by the Settlement.

19.  "Selling Stockholders," however, is defined solely as "those beneficial owners of issued and outstanding common stock of Tribune whose shares of common stock were purchased by Tribune on or about June 4, 2007, or redeemed for Cash pursuant to the Step Two Transactions, solely in their capacity as a recipient of payments with respect to such purchase or

---

[12] Aurelius requests that the words "and the debt issued thereunder" be added to section 5.8.2 solely to permit the prosecution of the Preserved Causes of Action and Disclaimed State Law Avoidance Claims and not to impair or otherwise affect the Debtors' discharge pursuant to the DCL Plan.

10

redemption." *Id.* § 1.1.199. Given this limited definition, the DCL Plan could be erroneously interpreted as releasing current and former Senior Lenders who are proper defendants in the Disclaimed State Law Avoidance Actions in capacities other than as beneficial owners of Tribune shares, including, *inter alia*, as guardians, trustees, general partners or custodians. Indeed, Aurelius is aware of at least 25 Senior Lenders who are being sued in such capacities in the Disclaimed State Law Avoidance Actions, and there are likely many more. If the definition of Selling Stockholders is not amended, these Senior Lenders will no doubt argue that the claims against them have been released, when such a release was never intended. Even worse, such unintended releases could affect individual creditors' rights to pursue beneficial holders of Tribune stock as well, to the extent that a guardian, trustee, general partner or custodian is found to be a necessary party to a claim against a beneficial owner of shares.

20. Following discussions with counsel for Aurelius, on April 15, 2012, the DCL Plan Proponents modified the DCL Plan's definition of "Preserved Causes of Action" (*i.e.*, the claims to be pursued by the Litigation Trust) to make clear that the DCL Plan preserves **all** such claims against current and former Senior Lenders, which would include claims against Senior Lenders in their capacities not only as beneficial owners of Tribune shares, but also as, *inter alia*, guardians, trustees, general partners and custodians. *See* DCL Plan, as filed on April 15, 2012, Ex. 2 § 1.1.174. However, the DCL Plan Proponents have failed to change the definition of "Selling Stockholders" to make clear that it encompasses all defendants to the Disclaimed State Law Avoidance Actions, in **any** capacity in which they have been sued in those actions. Thus, if these provisions are not changed in the current form of the DCL Plan, Tribune creditors could be forced to defend against a baseless argument that was not intended by the drafters of the DCL Plan.

11

C.   Definition of Disclaimed State Law Avoidance Claims

21.   Section 1.1.67 of the DCL Plan currently provides as follows:

> Disclaimed State Law Avoidance Claims means any and all LBO-Related Causes of Action arising under state fraudulent conveyance law that existed in favor of any Holder of a Claim that arose prior to the Petition Date against Selling Stockholders, solely in their capacities as such and solely with respect to funds received in their capacities as such, that are not released by the relevant Holder of a Claim in accordance with Section 11.2.2 of this Plan; provided, however, that Disclaimed State Law Avoidance Claims shall not include (i) any claims for intentional fraudulent conveyance, (ii) any and all LBO-Related Causes of Action arising under state fraudulent conveyance law set forth in the amended complaint filed by the Creditors' Committee on December 7, 2010 in the lawsuit entitled *Official Committee of Unsecured Creditors of the Tribune Company v. FitzSimons, et al. (In re Tribune Co.)*, Adv. Proc. No. 10-54010 (Bankr. D. Del.) (KJC), (iii) any Released Claims, (iv) any LBO-Related Causes of Action against any Released Parties or (v) for the avoidance of doubt, any LBO-Related Causes of Action arising under state fraudulent conveyance law as to which the right to pursue, prosecute, settle or release such claims has been retained by the Estates.

DCL Plan § 1.1.67. Aurelius objects to the inclusion in 1.1.67 of the DCL Plan of subsections (iv) and (v) of the "provided however" clause, which lists, for the avoidance of doubt, what is not included in the Disclaimed State Law Avoidance Claims. First, subsection (iv) is entirely redundant of subsection (iii), but its inclusion could give rise to erroneous, unintended arguments that it must mean something else because all parts to an agreement must be given some operative meaning or effect. Second, subsection (v) is entirely redundant of subsections (i)-(iii), which already list all of the LBO-Related Causes of Action that the Debtors' Estates have reserved the right to pursue, or have released. To avoid having to address any argument that these subsections mean something different than (i)-(iii), Aurelius requests that subsections (iv) and (v) be deleted.

III.   **Work-Product, Attorney-Client, and Other Privileges Must Transfer to the Litigation Trustee**

22.   The DCL Plan provides for the Reorganized Debtors and the Litigation Trustee to be parties to a "Litigation Trust Confidentiality and Common Interest Agreement" (the "LT Confidentiality Agreement") which, when executed, will govern the production of potentially

privileged information and documents by the Reorganized Debtors to the Litigation Trustee. While counsel for Aurelius has been provided with a draft of the LT Confidentiality Agreement and is in the process of reviewing same,[13] Aurelius believes that it is imperative for the LT Confidentiality Agreement to provide explicitly that, without restriction or limitation, all of the Debtors' privileges attached to any and all documents, communications or other information related to the Preserved Causes of Action (the "Privileged Information") be transferred to the Litigation Trustee to be utilized by the Litigation Trustee in any manner he deems appropriate in connection with the prosecution of the Preserved Causes of Action, and that the Litigation Trustee enjoy the right to waive any applicable privilege with respect to such Privileged Information. It is particularly crucial that the Litigation Trustee have the ability to waive any or all such privileges as may be in the interest of the Litigation Trust, thereby enabling the Litigation Trustee to introduce into evidence previously-privileged, highly relevant documents in connection with the prosecution of the Preserved Causes of Action, including claims for intentional fraudulent transfer and breach of fiduciary duty.

23.     Indeed, applicable law requires that these privileges be transferred to the Litigation Trustee. *See, e.g., In re Sweetwater*, 884 F.2d 1323, 1327 (10th Cir. 1989) ("If § 1123(b)(3)(B) is to function...a reorganization plan must empower a representative of the estate to enforce claims of the estate."); *Whyte v. Williams*, 152 B.R. 123, 130 (Bankr. N.D. Tex. 1992) (holding that the trustee must determine whether to invoke or waive applicable privileges depending on the trustee's ability to realize benefit from the causes of action). The transfer of all work-product, attorney-client and other privileges will provide the Litigation Trustee with access

---

[13] Aurelius intends to work with the DCL Plan Proponents to resolve its objections to the terms of the LT Confidentiality Agreement prior to confirmation. In the event that such objections cannot be resolved, Aurelius reserves the right to object to the terms of the LT Confidentiality Agreement (including the issues raised herein) in connection with confirmation.

13

to documents and information that likely will be material (if not central) to the prosecution of the Preserved Causes of Action. Without access to, and the ability to control, the Privileged Information, the Litigation Trustee will be unable to acquit his duties and obligations to the Litigation Trust Beneficiaries pursuant to the terms of the DCL Plan.

24. The terms for the LT Confidentiality Agreement requested by Aurelius are consistent with precedent in this and other jurisdictions. As summarized in the chart below, chapter 11 debtors regularly transfer all privileges to the fiduciary vested with control over trust causes of action.

| *Case Name* | *Transfer of Attorney-Client and Work Product Privileges to Litigation Trust?* |
|---|---|
| *In re CTC Commc'ns Grp., Inc.* (D. Del.) | Yes. (*Litigation Trust Agreement* § 10.2) |
| *In re Fruit of the Loom, Inc., et al.* (D. Del.) | Yes. (*Liquidation Trust Agreement* § 13.2) |
| *In re IDEARC Inc., et al.* (N.D. Tx.) | Yes. (*Litigation Trust Agreement* § 1.1) |
| *In re Lyondell Chemical Company, et al.* (S.D.N.Y.) | Yes. (*Litigation Trust Agreement* § 2.2(b)) |
| *In re Meridian Auto. Systems-Composites Operations, Inc.* (D. Del.) | Yes. (*Ligation Trust Agreement*, § 4.1) |
| *In re National Steel Corp.* (N.D. Ill.) | Yes. (*Litigation Trust Agreement* § 11.14) |
| *In re Semcrude, L.P., et al.* (D. Del.) | Yes. (*Litigation Trust Agreement* § 1.2) |
| *In re Trenwick America Corp.* (D. Del.) | Yes. (*Litigation Trust Agreement* § 11.2) |

25. For the foregoing reasons, Aurelius respectfully requests that the DCL Plan or the Confirmation Order expressly provide that the (i) Tribune Debtors shall transfer all privileges to the Litigation Trustee with respect to the Privileged Information and (ii) the Litigation Trustee shall maintain all rights with respect to these privileges (including the right to waive any such privilege).[14]

### IV. Additional Objections to the Litigation Trust Agreement

26. In addition to the foregoing, Aurelius also objects to the Litigation Trust Agreement filed with the Plan Supplement on the following bases:[15]

- Section 1.5: The Litigation Trust Agreement provides: "[t]he Litigation Trustee shall have full power and authority to take any action consistent with the purpose and provisions of the Plan and to seek any orders from the Bankruptcy Court in furtherance of implementation of the Plan, in each case solely to the extent such actions or orders *directly* affect the interest of the Litigation Trust or are in furtherance of this Litigation Trust Agreement . . . ." (emphasis added). Aurelius believes that the Litigation Trustee must have full power and authority to take action or seek orders from the Court that materially affect the interests of the Litigation Trust—whether such affect is "direct" or "indirect". Accordingly, the word "directly" should be stricken from the above sentence in section 1.5 of the Litigation Trust Agreement.

- Section 3.3(b): The Litigation Trust Agreement provides "[t]he Litigation Trustee, acting on behalf of the Litigation Trust, shall agree to comply with, and shall not take any actions inconsistent with or seek to modify or seek relief from, any provision of the [DCL] Plan or the Confirmation Order including, without limitation, the Bar Order, as set forth in Section 11.3 of the [DCL] Plan." The foregoing language should either be deleted in its entirety, or revised to preserve the Litigation Trustee's ability to seek, on notice, appropriate modifications of the DCL Plan or confirmation order to the extent necessary to aid the Litigation Trustee in the acquitting of its duties and obligations under the DCL Plan and the Litigation Trust Agreement.

- Section 3.4(c): The Litigation Trust Agreement provides that "the Litigation Trustee shall maintain an expense fund (the "Expense Fund") as a reserve to pay fees and expenses anticipated to be incurred in the future . . ." *See* Litigation Trust Agreement

---

[14] In further support of its objection, Aurelius also incorporates the arguments contained and referred to in the *Objection of Wilmington Trust Company, as Successor Indenture Trustee for the PHONES Notes, to the Fourth Amended Joint Debtor/Committee/Lender Plan*, dated May 21, 2012 at § V.C.ii.

[15] To the extent the below modifications require conforming changes to the DCL Plan, such changes should be made prior to entry of any confirmation order.

15

§ 3.4(b). The Litigation Trust Agreement further provides that the Litigation Trustee "may, subject to the approval of the Litigation Trust Advisory Board, retain from the Litigation Trust Proceeds . . . such amounts as the Litigation Trustee determines should be held in the Expense Fund to ensure that the Expense Fund will be adequate to pay fees and expenses anticipated to be incurred . . .", but leaves open the question of the appropriate cap on such Expense Fund. *Id.* § 3.4(c). Aurelius believes that there should not be a cap on the permitted size of the Expense Fund. Section 3.4(c) of the Litigation Trust Agreement should be amended to provide that the Expense Fund is not subject to a cap. Moreover, the Litigation Trust Agreement and the DCL Plan should provide that the Litigation Trust should not be required to repay the Litigation Trust Loan unless it has received sufficient proceeds from the Litigation Trust Assets to replenish the Expense Fund to $50 million after repayment of the Litigation Trust Loan and after payment of the Parent GUC Trust Preference.

- Section 4.7(d): The Litigation Trust Agreement provides that in the event that Wilmington Trust or Deutsche Bank's designee on the Litigation Trust Advisory Board ceases, for any reason, to be a member of the Litigation Trust Advisory Board, Wilmington Trust or Deutsche Bank will have the right to appoint a successor member as long as Wilmington Trust or Deutsche Bank, as applicable, continues to serve as Indenture Trustee. *See* Litigation Trust Agreement § 4.7(d). Section 4.7(d) of the Litigation Trust Agreement should also provide that any successor Indenture Trustee appointed for any reason will have the ability to appoint its designee to the Litigation Trust Advisory Board.

- Section 5.3: The Litigation Trust Agreement provides that "promptly after the Effective Date, the Valuation Expert shall determine and file with the Bankruptcy Court the final fair market value as of the Effective Date of all Litigation Trust Assets transferred to the Litigation Trust . . ." Litigation Trust Agreement § 5.3. The Litigation Agreement does not, however, disclose the identity of the Valuation Expert. The Litigation Trust Agreement should be amended to disclose the identity of the Valuation Expert. Further, the Litigation Trust Agreement should be modified to provide that the valuation submitted by the Valuation Expert will be made available to all Litigation Trust Beneficiaries and that such beneficiaries will be afforded the opportunity to challenge the valuation. Finally, the Litigation Trust Agreement should be amended to provide, for the avoidance of doubt, that failure to challenge the valuation will not prejudice the Litigation Trust or the Litigation Trust Beneficiaries in any way.

- Section 11.3: The Litigation Trust Agreement does not identify the state law that will govern the Litigation Trust Agreement in the event there is no applicable federal law. *See* Litigation Trust Agreement § 11.3. The Litigation Trust Agreement should be amended to provide that the law of the state of New York will govern the Litigation Trust Agreement.

## CONCLUSION

For all of the reasons set forth in Section I herein and in the prior objections and other pleadings referred to therein, the DCL Plan does not comply with applicable provisions of the Bankruptcy Code necessary for such plan to be confirmed, and the Court should deny confirmation of the DCL Plan. If the Court is inclined to confirm the DCL Plan, however, the DCL Plan should be modified in accordance with Sections II, III and IV herein prior to the entry of an order confirming the DCL Plan.

Dated: May 21, 2012

Respectfully submitted,

| AKIN GUMP STRAUSS HAUER & FELD LLP | ASHBY & GEDDES, P.A. |
|---|---|
| Daniel H. Golden | |
| David M. Zensky | */s/ Leigh-Anne M. Raport* |
| Philip C. Dublin | William P. Bowden (I.D. No. 2553) |
| One Bryant Park | Amanda M. Winfree (I.D. No. 4615) |
| New York, NY 10036 | Leigh-Anne M. Raport (I.D. No. 5055) |
| (212) 872-1000 | 500 Delaware Avenue, P.O. Box 1150 |
| | Wilmington, DE 19899 |
| | (302) 654-1888 |

*Counsel for Aurelius Capital Management, LP*