# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br>TRIBUNE COMPANY, et al.,[1]<br>　　　　　　　　　　　　　Debtors. | Chapter 11<br>Case No. 08-13141 (KJC)<br>Jointly Administered<br>Hearing Date: **June 7, 2012 at 3:00 pm (EST)** |

**MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION AND OMNIBUS REPLY TO OBJECTIONS TO CONFIRMATION OF FOURTH AMENDED JOINT PLAN OF REORGANIZATION FOR TRIBUNE COMPANY AND ITS SUBSIDIARIES PROPOSED BY THE DEBTORS, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, OAKTREE CAPITAL MANAGEMENT, L.P., ANGELO, GORDON & CO., L.P., AND JPMORGAN CHASE BANK, N.A.**

SIDLEY AUSTIN LLP
James F. Conlan
Bryan Krakauer
Kevin T. Lantry
Jessica C.K. Boelter
One South Dearborn Street
Chicago, IL 60603
Telecopier: (312) 853-7036

COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telecopier: (302) 652-3117

*Counsel For Debtors and Debtors In Possession and Certain Non-Debtor Affiliates*

CHADBOURNE & PARKE LLP
Howard Seife
David M. LeMay
30 Rockefeller Plaza
New York, New York 10112
Telecopier: (212) 541-5369

LANDIS RATH & COBB LLP
Adam G. Landis
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telecopier: (302) 467-4450

ZUCKERMAN SPAEDER LLP
Graeme W. Bush
James Sottile
1800 M Street, N.W., Suite 1000
Washington, D.C. 20036
Telecopier: (202) 822-8106

*Counsel For the Official Committee of Unsecured Creditors*

JONES DAY
Bruce Bennett
James O. Johnston
Joshua M. Mester
555 South Flower Street, Fiftieth Floor
Los Angeles, CA 90071
Telecopier: (213)243-2539

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Robert S. Brady (No. 2847)
M. Blake Cleary (No. 3614)
Rodney Square; 1000 North King Street
Wilmington, Delaware 19801
Telecopier: (302) 571-1253

*Counsel For Oaktree Capital Management, L.P. and Angelo, Gordon & Co., L.P.*

WILMER CUTLER PICKERING HALE & DORR LLP
Andrew Goldman
399 Park Avenue
New York, New York 10022
Telecopier: (212) 230-8888

*Co-Counsel For Angelo, Gordon & Co, L.P.*

DAVIS POLK & WARDWELL LLP
Donald S. Bernstein
Damian S. Schaible
450 Lexington Avenue
New York, New York 10017
Telecopier: (212) 701 5800

RICHARDS LAYTON & FINGER P.A.
Mark D. Collins
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telecopier: (302) 651-7701

*Counsel For JPMorgan Chase Bank, N.A.*

---

[1]　　The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are listed on the next page.

Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc., f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); and WPIX, Inc. (0191).  The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

## TABLE OF CONTENTS

I.   RELEVANT BACKGROUND TO THE DCL PLAN ................................................................ 3
     A.   Second Amended DCL Plan And Prior Confirmation Opinion. ........................................ 3
     B.   Third Amended Plan, Reconsideration Decision And Allocation Disputes Decision........ 4
     C.   DCL Plan, Solicitation, And Voting Results. ................................................................. 6

II.  THE DCL PLAN COMPLIES WITH THE AMENDED CONFIRMATION OPINION AND
     ALLOCATION DISPUTES DECISION ............................................................................... 8
     A.   The DCL Plan Incorporates Modifications That Resolve The Confirmation Issues
          Identified In The Amended Confirmation Opinion. ......................................................... 9
          1)   The DCL Plan Resolves The Section 1129(A)(10) Issue Identified In The
               Confirmation Opinion. ......................................................................................... 9
          2)   The DCL Plan Resolves The Section 11.2.1 Release Issues Identified In The
               Confirmation Opinion. ....................................................................................... 11
          3)   The DCL Plan Resolves The Bar Order Issue Identified In The Confirmation
               Decision. ............................................................................................................ 12
          4)   The DCL Plan Resolves The Exculpation Issue Identified In The Confirmation
               Decision. ............................................................................................................ 12
     B.   The Evidentiary Issues Identified In The Confirmation Opinion Are Also Satisfied By
          The DCL Plan. ............................................................................................................. 13
          1)   The Guarantor Non-Debtor Release Is Reasonable And Appropriate. ............... 13
          2)   The Distributions To The Holders Of Other Parent Claims Comply With The
               Confirmation Decision And Allocation Disputes Decision. .............................. 16
          3)   The Allowed PHONES Notes Claims Amount Incorporated In The DCL Plan
               Complies With The Confirmation Decision And The Allocation Disputes
               Decision. ............................................................................................................ 17

III. OBJECTIONS RAISING ISSUES PREVIOUSLY CONSIDERED BY THIS COURT SHOULD
     NOT BE RECONSIDERED ............................................................................................. 18
     A.   Objections Challenging This Court's Prior Rulings Should Be Overruled. .................... 18
     B.   Objections Challenging The Same Classification Structure That Existed In The Second
          Amended DCL Plan Should Be Overruled. ................................................................... 18
          1)   The DCL Plan Properly Classifies The Swap Claim. ........................................ 19
          2)   The DCL Plan Properly Classifies The Indenture Trustees' Expense Claims. ... 22
          3)   The DCL Plan Properly Classifies The Tendering Noteholders' Claims............ 24
     C.   Objections Challenging The Same Claims Reconciliation Procedures That Existed Under
          The Second Amended DCL Plan Should Be Overruled. ................................................. 28
     D.   Objections Requesting The Establishment Of Reserves Despite This Court's Prior
          Rulings Should Be Overruled. ..................................................................................... 30
          1)   The Relief Requested Is Tantamount To A Stay Pending Appeal; The Objectors
               Cannot Meet The Requirements To Obtain A Stay. .......................................... 31
          2)   The DCL Plan Does Not Discriminate Unfairly By Not Establishing The
               Requested Reserves. .......................................................................................... 33
          3)   A Possible Appeal Of The Confirmation Order Does Not Impact The Feasibility
               Of The DCL Plan............................................................................................... 35

E. Objections Challenging The Implementation Of The Previously-Approved DCL Plan Settlement Are Without Merit And Should Be Overruled...................................................... 35

    1) The Litigation Trust Loan Contemplated By The DCL Plan Settlement Is Reasonable And Appropriate. .......................................................................... 35

    2) The Payment Of Senior And Bridge Lender Fee/Expense Claims Pursuant To The DCL Plan Settlement Is Reasonable And Appropriate. .............................. 38

IV. CERTAIN OBJECTIONS HAVE BEEN RESOLVED BY THE DCL PLAN PROPONENTS . 50

A. Certain Objections Are Or Should Be Resolved Through Modifications To The DCL Plan.......................................................................................................................... 50

    1) WTC Objection. ......................................................................................... 50

    2) Aurelius Objection and Foundation Response. .................................. 51

    3) DBTCA Objection. ..................................................................................... 52

    4) DIP Facility Agent. .................................................................................... 53

B. Certain Objections Are Resolved Through Modifications To The Litigation Trust Agreement. ............................................................................................................... 53

C. Certain Objections Are Or Should Be Resolved Through Proposed Language In The Confirmation Order. ................................................................................................. 54

V. ALL OTHER UNRESOLVED OBJECTIONS SHOULD BE OVERRULED .......................... 56

A. The Unresolved Objections To The Litigation Trust Agreement Are Without Merit. ...... 56

    1) The Scope And Amount Of Fees And Expenses Paid Pursuant To The Litigation Trust Agreement Are Reasonable And Appropriate.......................................... 56

    2) The Objections Of WTC And Aurelius Regarding The Transfer Of Privileges To And Cooperation With The Litigation Trustee Are Reasonably And Appropriately Addressed By The Litigation Trust Confidentiality And Common Interest Agreement....................................................................................... 60

    3) The Litigation Trustee Should Not Be Permitted To Seek Modification Of The DCL Plan Or The Confirmation Order. ........................................................... 65

    4) The Cap On The Litigation Trust's Expense Fund Is Reasonable. .................... 66

B. The Unresolved Objections To Other Provisions Of The DCL Plan Are Without Merit. 67

    1) Indemnification Claims Of Former Employees Who Provided No Services After The Commencement Of These Cases Are Not Entitled To Administrative Priority. .................................................................................................... 67

    2) Aurelius's Requested Language Changes To The DCL Plan's Release Provisions Should Be Rejected................................................................................... 69

VI. THE DCL PLAN SATISFIES ALL OTHER APPLICABLE REQUIREMENTS OF THE BANKRUPTCY CODE.................................................................................................... 72

VII. WAIVER OF STAY ...................................................................................................... 72

VIII. CONCLUSION ............................................................................................................. 73

# TABLE OF AUTHORITIES

**Cases**                                                                           **Page(s)**

Ad Hoc Comm. of Convertible Noteholders v. Spansion, Inc. (In re Spansion Inc.),
    2011 WL 3420441 (D. Del. Aug. 4, 2011) ..................................................... 35, 66

American International Specialty Lines Insurance Co. v. NWI-I Inc.
    (f/k/a Fruit of the Loom Inc.), 240 F.R.D. 401 (Bankr. N.D. Ill. 2007) ................................. 62

Beal Sav. Bank v. Sommer, 8 N.Y.3d 318 (N.Y. 2007).............................................. 14

Blondheim Real Estate, Inc., 91 B.R. 639 (Bankr. D.N.H. 1988) ............................................. 26

Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.),
    181 F.3d 527 (3d Cir. 1999).......................................................................45, 47, 48

Chase Manhattan Bank v. Motorola, Inc., 136 F. Supp. 2d 265, 271 (S.D.N.Y. 2001)............... 14

Christian Life Ctr. Litig. Def. Comm. v. Silva (In re Christian Life Ctr.),
    821 F.2d 1370, 1374 (9th Cir. 1987) ..................................................................... 68

Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.),
    280 F.3d 648 (6th Cir. 2002)................................................................................ 14

Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343 (1985)............................... 62

First Nat'l Bank of Louisville v. Cont'l Illinois Nat'l Bank, N.A.,
    933 F.2d 466 (7th Cir. 1991) ................................................................................ 14

In re Adelphia Communications Corp., 441 B.R. 6 (Bankr. S.D.N.Y. 2010) ...................... passim

In re Berhard Steiner Pianos USA, Inc., 292 B.R. 10 (Bankr. N.D. Tex. 2002). ........................ 23

In re Brewery Park Assocs.,
    Case No. 10-11555, 2011 Bankr. LEXIS 1596 (Bankr. E.D. Pa. April 29, 2011)................... 39

In re Extended Stay Inc., No. 09-13764, 2010 Bankr. LEXIS 5411 (S.D.N.Y. July 20, 2010) ... 64

In re G-1 Holdings Inc., 420 B.R. 216 (Bankr. D.N.J. 2009)...................................................... 39

In re Genesis Health Ventures, Inc., 266 B.R. 591 (Bankr. D. Del. 2001)................................. 14

In re Gold & Appel Transfer S.A., 342 B.R. 386 (Bankr. D.D.C. 2006)................................... 62

In re Hardwood P-G, Inc., 403 B.R. 445 (Bankr. W.D. Tex. 2009) ........................................ 62

In re Hechinger Inv. Co. of Del., 285 B.R. 601 (Bankr. D.D.C. 2002)...................................... 62

In re Lisanti Foods, Inc., 329 B.R. 491 (D.N.J. 2005) ............................................................ 23

v

In re Mahoney Hawkes, LLP, 289 B.R. 285 (Bankr. D. Mass. 2002) ....................... 23

In re Mid-Am. Waste Sys., 228 B.R. 816 (Bankr. D. Del. 1999) ............................... 68

In re Orlando Investors, L.P., 103 B.R. 593 (Bankr. E.D. Pa. 1989) ........................ 39

In re Pinnacle Brands, Inc., 259 B.R. 46 (Bankr. D. Del. 2001)................................ 68

In re Smurfit-Stone Container Corp., No. 09-10234 (BLS),
    2010 Bankr. LEXIS 1971 (Bankr. D. Del. June 11, 2010) ..................................... 23

In re Summit Metals, Inc., 379 B.R. 40 (Bankr. D. Del. 2007) ................................. 68

In re TCI 2 Holdings, LLC, 428 B.R. 117 (Bankr. D.N.J. 2010)........................ 45, 47

In re Tribune Co., 464 B.R. 126 (Bankr. D. Del. 2011) ................................... passim

In re Tribune Co., 464 B.R. 208 (Bankr. D. Del. 2011). ............................................ 5

In re Winstar Communications, Inc., 435 B.R. 33, 39 (Bankr. D. Del. 2010)............ 20

In re Worldwide Direct, Inc., 334 B.R. 112, 121 (Bankr. D. Del. 2005)) .................. 58

Kenton County Bondholders Comm. v. Delta Air Lines, Inc. (In re Delta Air Lines, Inc.),
    374 B.R. 516, 527 (S.D.N.Y. 2007), aff'd, sub nom. Ad Hoc Comm. of Kenton County
    Bondholders v. Delta Airlines, Inc., 2009 U.S. App. LEXIS 2464 (2d Cir. Feb. 9, 2009),
    cert. denied, 130 S.Ct. 539 (U.S. Nov. 2, 2009)....................................................... 14

Official Comm. of Unsecured Creditors of LTV Aerospace and Defense Co. v.
    Official Comm. of Unsecured Creditors of LTV Steel Co. (In re Chateaugay Corp.),
    988 F.2d 322 (2d Cir. 1993)..................................................................................... 32

Ogle v. Fid. & Deposit Co., 586 F.3d 143 (2d Cir. 2009) ................................... 46, 48

OHC Liquidation Trust v. U.S. Fire Ins. Co. (In re Oakwood Homes Corp.),
    394 B.R. 352 (Bankr. D. Del. 2008)........................................................................ 46

Rake v. Wade, 508 U.S. 464, 471 (1993) ................................................................. 41

Republic of Philippines v. Westinghouse Elec. Corp., 949 F.2d 653, 658 (3d Cir. 1991).......... 33

**Statutes**

11 U.S.C. § 1122 ..................................................................................................... 22

11 U.S.C. § 1123(b)................................................................................................. 46

11 U.S.C. § 1129(a)(4). ........................................................................................... 49

11 U.S.C. § 503(b)................................................................................40, 42, 67, 68

11 U.S.C. §§ 503(b)(3)(D) .................................................................................................... 42

**Rules**

Fed. R. Bankr. P. 3020(e) .................................................................................................... 73

Fed. R. Bankr. P. 8005 ........................................................................................................ 33

**Treatises**

4 Collier on Bankruptcy ¶ 502.04 (16th ed.) ...................................................................... 32

The debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), the Official Committee of Unsecured Creditors (the "Creditors' Committee"), Oaktree Capital Management, L.P. ("Oaktree"), Angelo, Gordon & Co., L.P. ("Angelo Gordon") and JPMorgan Chase Bank, N.A. ("JPMorgan", and together with the Debtors, the Creditors' Committee, Oaktree, and Angelo Gordon, the "DCL Plan Proponents") hereby submit this memorandum of law (the "Memorandum") (i) in support of an order confirming the Fourth Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Change Bank N.A., Apr. 17, 2012 [Docket No. 11399] (as may be further amended, modified or supplemented, the "DCL Plan")[2] pursuant to section 1129 of the Bankruptcy Code and (ii) in response to the objections (the "Objections") to the DCL Plan.  As an aid to this Court and to parties in interest, the DCL Plan Proponents have provided a comprehensive summary of the Objections in a chart attached hereto Exhibit A.[3]

**PRELIMINARY STATEMENT**

1.      These cases have been pending for nearly four years.  Much has transpired, including months of investigation and thousands of pages of analysis by the Examiner charged with considering the Debtors' prepetition leveraged buyout transactions, the hard-fought mediated settlement of various potential causes of action arising from those transactions, weeks of trial and argument respecting the prior version of the DCL Plan centered around that

---

[2]   Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the DCL Plan or the Disclosure Documents, as applicable.

As used herein, (i)"DCL Ex." refers to trial exhibits admitted into evidence in connection with the 2011 Confirmation Hearing, (ii) "ADH Ex." refers to exhibits admitted into evidence in connection with the hearing on the Allocation Disputes, and (iii) "Tr. [date] at [page:line]" refers to the transcript of the 2011 Confirmation Hearing.

[3]   The summary chart attached as Exhibit A hereto (i) identifies each objecting party, (ii) summarizes the substance of each Objection, and (iii) with respect to each Objection, provides either the DCL Plan Proponents' response to the Objection or a cross-reference to the portion of this Memorandum addressing the Objection.

settlement and this Court's ensuing 125-page Confirmation Opinion[4], the multi-party skirmish of the Allocation Disputes, this Court's ensuing 50-page Allocation Disputes Decision, and countless battles, compromises, setbacks, and achievements along the way.  After all that, the time has come to conclude these cases through the confirmation of a plan of reorganization.

2.      As shown below, and as will be demonstrated at the upcoming confirmation hearing, the DCL Plan now before this Court embodies the DCL Plan Settlement that this Court approved in the prior confirmation opinion, while addressing and correcting specific infirmities that this Court found to render the DCL Plan unconfirmable in its former iteration.  As before, the DCL Plan enjoys widespread creditor support, with vast majorities of voting creditors casting ballots to accept in all Classes of Claims other than the Classes that previously rejected the DCL Plan – namely, the Senior Noteholders, Holders of the PHONES Notes Claims, and EGI-TRB.  As before, even within the rejecting Class of Senior Notes, the rank-and-file overwhelmingly support the DCL Plan and the substantial distributions it provides to Senior Noteholders, with more than 85% by number of the Senior Noteholders who cast ballots voting to accept the DCL Plan.

3.      Representatives of the rejecting Classes do continue to object to confirmation of the DCL Plan, but the objections that they now press (as opposed to renewed objections preserved for purposes of appeal), and the objections raised by other objectors, largely are technical in nature, and limited to specific, discrete plan provisions.  Fundamentally, none of the issues raised by the objectors calls into question the reasonableness of the DCL Plan Settlement or the confirmability of the DCL Plan.  As demonstrated below, the objections have either been resolved or are without merit.

---

[4] In re Tribune Co., 464 B.R. 126 (Bankr. D. Del. 2011).

4.       Accordingly, based upon the evidence summarized and the arguments made

below, as well as the evidence to be adduced and the arguments to be made at the upcoming

confirmation hearing, the DCL Plan Proponents request that this Court confirm the DCL Plan at

the earliest possible opportunity.  For the benefit of thousands of employees and creditors, it is

time to allow a rehabilitated, reorganized Tribune to emerge from these proceedings.

## I.    RELEVANT BACKGROUND TO THE DCL PLAN

### A.    Second Amended DCL Plan And Prior Confirmation Opinion.

5.       On October 31, 2011, this Court issued the Opinion on Confirmation [Docket No.

10133] (the "Confirmation Opinion"), which, inter alia, denied confirmation of the Second

Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by

the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P.,

Angelo, Gordon & Co., L.P. and JPMorgan Chase Bank, N.A. (as modified April 26, 2011)

[Docket No. 8769], as amended on October 19, 2011 [Docket No. 10024] (the "Second

Amended DCL Plan"), and the competing plan of reorganization that was proposed by certain

holders of Tribune's prepetition notes (the "Noteholder Plan").[5]  In the Confirmation Opinion,

this Court identified certain specific provisions of the Second Amended DCL Plan that required

modification in order to satisfy the applicable requirements of the Bankruptcy Code for

confirmation.  See Confirmation Opinion 113-114.  This Court also concluded that the other

provisions of the Second Amended DCL Plan, including the settlements of LBO-Related Causes

of Action and the Step Two Disgorgement Settlement incorporated in the Second Amended DCL

Plan (collectively, the "DCL Plan Settlement"), satisfied the requirements for confirmation under

---

[5]    See Third Amended Joint Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by
Aurelius Capital Management, LP, on behalf of its Managed Entities, Deutsche Bank Trust Company Americas,
in its Capacity as Successor Indenture Trustee for Certain Series of Senior Notes, Law Debenture Trust
Company of New York, in its Capacity as Successor Indenture Trustee for Certain Series of Senior Notes, and
Wilmington Trust Company, in its Capacity as Successor Indenture Trustee for the PHONES Notes, Apr. 25,
2011 [Docket No. 8755].

the Bankruptcy Code.  Id.  This Court further determined that, as between the Second Amended

DCL Plan and the Noteholder Plan, an amended Second Amended DCL Plan addressing the

confirmation issues identified in the Confirmation Opinion would be the preferred plan under

section 1129(c) of the Bankruptcy Code.  See id. at 125.

      **B.**     **Third Amended Plan, Reconsideration Decision And Allocation Disputes Decision.**

      6.     On November 18, 2011, the DCL Plan Proponents filed the Third Amended Joint

Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, the

Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon

& Co., L.P., and JPMorgan Chase Bank, N.A. [Docket No. 10273], as amended on February 20,

2012 [Docket No. 10958] (the "Third Amended Plan").  The Third Amended Plan (i)

incorporated the previously-approved DCL Plan Settlement, (ii) included certain modifications

to the Second Amended DCL Plan addressing, among other things, the issues that were identified

in the Confirmation Opinion, (iii) eliminated the Creditors' Trust contemplated by the Second

Amended DCL Plan, and (iv) contained an allocation dispute protocol (the "Allocation Dispute

Protocol") for resolving certain disputes regarding the allocation of distributions under the Third

Amended Plan among the Holders of Senior Noteholder Claims, Other Parent Claims, EGI-TRB

LLC Notes Claims and PHONES Notes Claims (the "Allocation Disputes").[6]  The Third

Amended Plan provided for Holders of Allowed Claims to receive the same estimated initial

recoveries as those provided under the Second Amended DCL Plan.

---

[6]    The term "Allocation Disputes" is defined in Order Establishing Scheduling for (1) Resolution of the Allocation Disputes and (2) Consideration of DCL Plan Proponents Supplemental Disclosure Document, Solicitation Procedures Motion and Plan, Jan. 24, 2012 [Docket No. 10692], which definition is incorporated herein by reference.

7.      Meanwhile, the proponents of the Noteholder Plan (the "Noteholder Plan Proponents"),[7] individually and jointly, filed the following three motions for reconsideration of the Confirmation Opinion: (i) Joint Motion of Law Debenture Trust Company of New York and Deutsche Bank Trust Company Americas Requesting Reconsideration of this Court's Confirmation Opinion with Respect to the Subordination of the PHONES, Nov. 14, 2012 [Docket No. 10222] (the "Law Debenture Reconsideration Motion"); (ii) Motion of Aurelius Capital Management, LP for Reconsideration of this Court's October 31, 2011 Decision as it Pertains to the Application of the PHONES Notes Subordination, Nov. 14, 2011 [Docket No. 10226] (the "Aurelius Reconsideration Motion"); and (iii) Motion of the Noteholder Plan Proponents for Reconsideration and Clarification of this Court's October 31, 2011 Decision, Nov. 14, 2011 [Docket No. 10227] (the "NPP Reconsideration Motion").

8.      On December 29, 2011, this Court issued a Memorandum on Reconsideration [Docket No. 10531] (the "Reconsideration Decision")[8] which, among other things, modified and clarified certain aspects of the Confirmation Opinion (the Confirmation Opinion as modified by the Reconsideration Decision, the "Confirmation Decision").  Specifically, in the Reconsideration Decision, this Court granted the relief requested in the Law Debenture Reconsideration Motion and the Aurelius Reconsideration Motion by striking the portion of the Confirmation Opinion that determined that recoveries on account of causes of action arising

---

[7]    Specifically, the Noteholder Plan Proponents are: Aurelius Capital Management, LP, on behalf of its Managed Entities ("Aurelius"), Deutsche Bank Trust Company Americas, in its Capacity as Successor Indenture Trustee for Certain Series of Senior Notes ("DBTCA"), Law Debenture Trust Company of New York, in its Capacity as Successor Indenture Trustee for Certain Series of Senior Notes ("Law Debenture"), and Wilmington Trust Company, in its Capacity as Successor Indenture Trustee for the PHONES Notes ("WTC").

[8]    In re Tribune Co., 464 B.R. 208 (Bankr. D. Del. 2011). On January 10, 2012, WTC, solely in its capacity as successor Indenture Trustee pursuant to the PHONES Notes Indenture, filed a notice of appeal of the Reconsideration Decision and the Confirmation Opinion.  On that same day, WTC filed a motion seeking leave to appeal the Reconsideration Decision [Docket No. 10582] (the "Reconsideration Appeal Motion").  The DCL Plan Proponents, Law Debenture, DBTCA, and Aurelius objected to the Reconsideration Appeal Motion on January 24, 2012 [Docket Nos. 10690, 10702, and 10703].  The Reconsideration Appeal Motion is currently pending before the United States District Court for the District of Delaware.  See Case No. 1:12-mc-00029-GMS (D. Del. 2012).

under Chapter 5 of the Bankruptcy Code are not subject to the subordination provisions of the

PHONES Notes Indenture (the "PHONES Subordination Provisions").  The Reconsideration

Decision also granted, in part, the NPP Reconsideration Motion, by clarifying that this Court did

not make any finding in the Confirmation Opinion as to the Allowed amount of the PHONES

Notes Claims.  The Reconsideration Decision did not require any adjustments to the distributions

contemplated by the Third Amended Plan.

9.     On April 9, 2012, this Court issued the Memorandum Regarding Allocation

Disputes [Docket No. 11337] (the "Allocation Disputes Memorandum") and related Order

Regarding Allocation Disputes [Docket No. 11338] (the "Allocation Disputes Order" and,

together with the Allocation Disputes Memorandum, the "Allocation Disputes Decision").  The

Allocation Disputes Decision adjudicated all of the Allocation Disputes this Court determined to

be ripe for determination.[9] The allocation of distributions among the Holders of Allowed Senior

Noteholder Claims, Other Parent Claims, EGI-TRB LLC Notes Claims and PHONES Notes

Claims that was approved by this Court in the Allocation Disputes Decision is identical to the

allocation of distributions to such Holders that was proposed under the Second Amended DCL

Plan.  As a result, the Allocations Disputes Decision did not require any adjustments to the

distributions contemplated by the Third Amended Plan.

### C.     DCL Plan, Solicitation, And Voting Results.

10.    On April 17, 2012, the DCL Plan Proponents filed the DCL Plan (i.e., the Fourth

Amended Plan).  The DCL Plan incorporates the previously-approved DCL Plan Settlement and

includes the modifications that were incorporated in the Third Amended Plan.  Additionally, in

light of the entry of the Allocations Disputes Decision, the DCL Plan eliminates the Allocation

---

[9]    The Court determined that the issue of whether and to what extent the beneficiaries of the subordination
provisions of the EGI-TRB Notes are entitled to receive post-petition interest prior to the Holders of EGI-TRB
LLC Notes Claims receiving any payment on account of their Claims is not yet ripe for determination.  See
Allocation Disputes Memorandum 49.

Dispute Protocol.  Consistent with the Allocation Disputes Decision, the DCL Plan contemplates

the same allocation of distributions that was proposed under the Second Amended DCL Plan.

The DCL Plan also provides for Holders of Allowed Claims to receive the same estimated initial

recoveries as those provided under the Second Amended DCL Plan and Third Amended Plan.

11.     On April  17, 2012 the DCL Plan Proponents filed a disclosure document relating

to the DCL Plan [Docket No. 11400] (the "Supplemental Disclosure Document").  The

Supplemental Disclosure Document provided information to the Holders of Claim entitled to

vote to accept or reject the DCL Plan (collectively, the "Revoting Classes")[10] concerning, among

other things, (i) the Confirmation Decision, (ii) the Allocation Disputes Decision, (ii) the

modifications incorporated in the DCL Plan to address the confirmation issues identified in the

Confirmation Decision, and (iv) the elimination of the Creditors' Trust.  Additionally, the

Supplemental Disclosure Document informed the Revoting Classes that, under the DCL Plan,

Holders of Allowed Claims would receive the same estimated initial recoveries as those provided

under the Second Amended DCL Plan.

12.     On April 17, 2012, following a hearing on the adequacy of the Supplemental

Disclosure Document, this Court entered the DCL Plan Solicitation Order, among other things,

(i) approving the Supplemental Disclosure Document pursuant to section 1125 of the Bankruptcy

---

[10]     Pursuant to the Order (I) Approving Supplemental Disclosure Document; (II) Establishing Scope, Forms,
Procedures, and Deadlines for Resolicitation and Tabulation of Votes to Accept or Reject DCL Plan From
Certain Classes; (III) Authorizing Tabulation of Prior Votes and Elections on DCL Plan Made by Holders of
Claims in Non-Resolicited Classes; (IV) Scheduling the Confirmation Hearing and Establishing Notice and
Objection Procedures in Respect Thereof; and (V) Granting Related Relief, Apr. 17, 2012 [Docket No. 11419]
(the "DCL Plan Solicitation Order"), the following Classes comprise the Revoting Classes: (i) Senior Loan
Claims (Class 1C); (ii) Bridge Loan Claims (Class 1D); (iii) Senior Noteholder Claims (Class 1E), (iv) Other
Parent Claims (Class 1F), (v) EGI-TRB LLC Notes Claims (Class 1I), and (vi) PHONES Notes Claims (Class
1J) against Tribune;  (vi) Senior Guaranty Claims (Classes 50C through 111C) against the relevant Guarantor
Debtors; and (vii) General Unsecured Claims against certain Filed Subsidiary Debtors (Classes 2E, 4E through
7E, 10E, 12E through 15E, 18E through 20E, 22E through 29E, 31E through 38E, 40E, 42E, 43E, and 46E
through 49E).

Code, (ii) establishing procedures for the solicitation and tabulation of votes to accept or reject

the DCL Plan, and (iii) scheduling the Confirmation Hearing and establishing related deadlines.

13. In accordance with the Solicitation Order, on April 23, 2012,[11] the DCL Plan

Proponents commenced the solicitation of votes to accept or reject the DCL Plan from the

Revoting Classes. As summarized in the Epiq Voting Declaration,[12] the DCL Plan has been

accepted by most Holders of Claims in the Revoting Classes, as follows:

| Classes | Number of Voting Creditors | % Number Accepting | Amount Voted | % Amount Accepting | Result |
|---|---|---|---|---|---|
| Class 1C: Senior Loan Claims Against Tribune Company | 352 | 99.72% | $8,275,396,770.39 | 99.97% | Accept |
| Class 1D: Bridge Loan Claims Against Tribune Company | 30 | 100% | $1,600,000,000.00 | 100% | Accept |
| Class 1E: Senior Noteholder Claims Against Tribune Company | 196 | 85.20% | $1,143,639,844.07 | 9.95% | Reject |
| Class 1F: Other Parent Claims Against Tribune Company | 278 | 98.92% | $286,027,485.95 | 91.57% | Accept |
| Class 1I: EGI-TRB LLC Notes Claims Against Tribune Company | 1 | 0% | $167,047,531.55 | 0% | Reject |
| Class 1J: PHONES Notes Claims Against Tribune Company | 23 | 4.35% | $734,994,736.40 | 0.45% | Reject |
| Classes 2E, 4E-7E, 10E, 12E-15E, 18E-20E, 22E-29E, 31E-38E, 40E, 42E, 43E, and 46E-49E: General Unsecured Claims Against the Filed Subsidiary Debtors | 1 | 100% | $1.00 | 100% | Accept[13] |
| Classes 50C-111C: Senior Guaranty Claims | 358 | 99.72% | $8,426,345,592.39 | 99.97% | Accept |

## II.    THE DCL PLAN COMPLIES WITH THE AMENDED CONFIRMATION OPINION AND ALLOCATION DISPUTES DECISION

14. In the Confirmation Decision, this Court concluded that most of the provisions of

the Second Amended DCL Plan satisfied the requirements for confirmation under the

---

[11]    See Affidavit of Solicitation Mailing, May 10, 2012 [Docket No. 11594].

[12]    See Declaration of Stephenie Kjontvedt on behalf of Epiq Bankruptcy Solutions, LLC Regarding Voting and Tabulation of Ballots Accepting and Rejecting the Fourth Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed By the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A., May 29, 2012 [Docket No. 11711] (the "Epiq Voting Declaration").

[13]    As further discussed herein, see ¶¶ 16-19, Holders of General Unsecured Claims in Classes 2E, 4E-7E, 10E, 12E-15E, 18E-20E, 22E-29E, 31E-38E, 40E, 42E, 43E, and 46E-49E that did not submit a Ballot are deemed to accept the DCL Plan pursuant to Section 4.2 of the DCL Plan.

Bankruptcy Code.  Of particular importance, this Court approved the DCL Plan Settlement at the core of the Second Amended DCL Plan as "fair, reasonable, and in the best interest of the Debtors' estates," and further found that the DCL Settlement was "achieved as a result of arms-length, good faith negotiations."  Confirmation Opinion 39, 71.  This Court concluded that the Second Amended DCL Plan was feasible and also approved numerous other aspects of the Second Amended DCL Plan, including, among others, (i) the Litigation Trust established under the Second Amended DCL Plan, (ii) the Retiree Settlement contained in the Second Amended DCL Plan, (iii) the classification of the Swap Claim in Class 1F under the Second Amended DCL Plan, and (iv) the treatment of prepetition indemnification and reimbursement claims under the Second Amended DCL Plan.  Id. 113-114.

15.    In addition to the aforementioned favorable rulings, this Court also identified, as prerequisites for confirmation of the Second Amended DCL Plan, four issues that required resolution and three issues that required further information.  As detailed below, the DCL Plan incorporates modifications that the DCL Plan Proponents believe address each of the issues identified by the Bankruptcy Court in the Confirmation Decision, including as supplemented by the Allocation Disputes Decision.  The DCL Plan otherwise preserves substantially all of the other terms of the Second Amended DCL Plan, including the DCL Plan Settlement previously approved by this Court.

**A.    The DCL Plan Incorporates Modifications That Resolve The Confirmation Issues Identified In The Amended Confirmation Opinion.**

1)    The DCL Plan Resolves The Section 1129(A)(10) Issue Identified In The Confirmation Opinion.

16.    In the Confirmation Decision, this Court determined that the Second Amended DCL Plan did not satisfy the requirements for confirmation because "the [Second Amended] Plan [had] not been accepted by at least one impaired class for each Debtor as required by

[Section] 1129(a)(10) [of the Bankruptcy Code]" (the "Section 1129(a)(10) Finding").

Confirmation Opinion 114.  However, this Court also concluded that, under applicable caselaw,

"deemed acceptance" by a non-voting impaired class, in the absence of objection, may satisfy the

requirements of section 1129(a)(10) of the Bankruptcy Code.  Confirmation Opinion 84.

17.    Consistent with this Court's findings in the Confirmation Opinion, Section 4.2 of

the DCL Plan has been modified to provide that if no votes to accept or reject the DCL Plan are

cast within an Impaired Class of Claims, the Class shall be deemed to have accepted the DCL

Plan, unless otherwise determined by this Court, provided that the Holders of Claims in a

particular Impaired Class of Claims are (a) given the opportunity to vote to accept or reject the

DCL Plan and (b) notified that the failure of any Holders of Claims within such Class to vote to

accept or reject the DCL Plan would result in such Class being deemed to have accepted the

DCL Plan.  DCL Plan § 4.2.

18.    The DCL Plan Proponents identified Classes of Claims against thirty-six (36)

Debtors (the "Subsidiary Revoting Classes") in which no creditors submitted ballots.[14]  The DCL

Plan Proponents provided all Holders of Claims in the Subsidiary Revoting Classes (the "Non-

Voting Holders") an opportunity to revote to accept or reject the DCL Plan.  However, no votes

to accept or reject were cast by the Non-Voting Holders.

19.    The Subsidiary Revoting Classes were provided an opportunity to vote on the

DCL Plan in a manner consistent with that outlined by this Court in the Confirmation Decision.

The ballots provided to the Non-Voting Holders included bold-faced, capitalized language

informing such Holders that if their Claims are in a Class in which no valid Ballots to accept or

---

[14]    Subsequent to the issuance of the Confirmation Opinion, the DCL Plan Proponents withdrew the Plan as it
related to Publishers Forest Products Co. of Washington, which was one of the Debtors originally implicated by
the Section 1129(a)(10) Finding.

10

reject are received by the Debtors, such Class will be deemed to accept the DCL Plan.[15]

Accordingly, the DCL Plan Proponents submit that, pursuant to Section 4.2 of the DCL Plan, the

Subsidiary Voting Classes are deemed to accept the DCL Plan.  The DCL Plan, therefore, has

been accepted by at least one Impaired Class for each Debtor, as required by Section 1129(a)(10)

of the Bankruptcy Code.

> 2) The DCL Plan Resolves The Section 11.2.1 Release Issues Identified In The Confirmation Opinion.

20.    This Court found in the Confirmation Decision that the releases contained in

Section 11.2.1 of the Second Amended DCL Plan were too broad.  See Confirmation Opinion at

114.  Specifically, this Court determined that, "(a) the parties granting the release in Section

11.2.1 should be limited to the Debtors [and] (b) the following persons may not be released in

Section 11.2.1 because the record does not establish that they provided a substantial contribution

or their release is necessary for a reorganization: the Debtors' 'Related Persons," "Current

Employees," and "401(k) Shareholders" (the "Release Finding").  Id.

21.    The DCL Plan Proponents have incorporated modifications into Section 11.2.1 of

the DCL Plan which resolve the issues raised by this Court in the Release Finding.  Specifically,

the modifications revise the releases granted under Section 11.2.1 of the DCL Plan so that the

Debtors and the Reorganized Debtors are the only parties granting the releases.  In addition,

Section 11.2.1 of the DCL Plan narrows the scope of the parties so released to exclude the

Debtors' Related Persons, Current Employees, and 401(k) Shareholders.  Accordingly – with the

---

[15]    Specifically, the ballots provided to the Non-Voting Holders contained the following language, in bold-faced type: PURSUANT TO THE FOURTH AMENDED DCL PLAN, IF YOUR CLAIM IS IN A CLASS OF CLAIMS IN WHICH NO VALID BALLOTS TO ACCEPT OR REJECT THE FOURTH AMENDED DCL PLAN ARE RECEIVED THEN SUCH CLASS OF CLAIMS WILL BE DEEMED TO ACCEPT THE FOURTH AMENDED DCL PLAN.  See DCL Ex. 3004, Declaration of Stephenie Kjontvedt on Behalf of Epiq Bankruptcy Solutions, LLC Regarding Form of Ballots for Resoliciting Votes to Accept or Reject Fourth Amended Joint Plan of Reorganization For Tribune Company and Its Subsidiaries by Holders of Claims in Subsidiary Revoting Classes.

exception of the releases given to the Released Stockholder Parties in their capacities as such –

the Debtors' Related Persons, Current Employees, and 401(k) Shareholders no longer receive the

benefit of the releases set forth in Sections 11.2.1 and 11.2.2 of the DCL Plan.  The releases set

forth in Sections 11.2.1 and 11.2.2 of the DCL Plan, as modified, are consistent with the

Confirmation Decision and should be approved.

       3) <u>The DCL Plan Resolves The Bar Order Issue Identified In The Confirmation
Decision.</u>

22.      In the Confirmation Decision, the Bankruptcy Court determined that the Bar

Order provided pursuant to Section 11.3 of the Second Amended DCL Plan should be clarified to

enjoin and restrain each Plaintiff from seeking relief or collecting judgments against any Non-

Settling Defendants in any manner that fails to conform to the terms of the Bar Order.

Confirmation Opinion 78.

23.      The DCL Plan Proponents have incorporated modifications into Section 11.3 of

the DCL Plan that expressly provide that "each Plaintiff is hereby enjoined and restrained from

seeking relief or collecting judgments against any Non-Settling Defendants in any manner that

fails to conform to the terms of this Bar Order, including, without limitation, the proportionate

judgment reduction provision set forth herein."  DCL Plan § 11.3.  The revised Bar Order is

consistent with the Confirmation Decision and should be approved.

       4) <u>The DCL Plan Resolves The Exculpation Issue Identified In The Confirmation
Decision.</u>

24.      This Court concluded in the Confirmation Decision that "the [e]xculpation

provision in Section 11.5 [of the Second Amended DCL Plan] [was] too broad and must be

limited to estate fiduciaries."  Confirmation Opinion 114.

25.      To resolve this Court's concern, the DCL Plan has been modified to remove the

Creditor Proponents from the exculpation provided pursuant to Section 11.5 of the DCL Plan.

The modified exculpation provisions set forth in Section 11.5 of the DCL Plan are consistent

with the Confirmation Decision and should be approved.

**B.    The Evidentiary Issues Identified In The Confirmation Opinion Are Also
    Satisfied By The DCL Plan.**

1)    The Guarantor Non-Debtor Release Is Reasonable And Appropriate.

26.    In the Confirmation Decision, the Bankruptcy Court found that the DCL Plan

Proponents should prove that the proposed releases of non-debtors Tribune (FN) Cable Ventures,

Tribune Interactive, Inc., Tribune N.D. Inc., and Tribune National Marketing Company

(collectively, the "Guarantor Non-Debtors") by Senior Lenders who voted against the Second

Amended DCL Plan satisfy the "Genesis test."  Confirmation Opinion at 118, n.89.

27.    The almost entirely consensual nature of the Guarantor Non-Debtor Release,

which is preserved in the DCL Plan, alone provides ample support for approval of the release.

Importantly, no party has objected to the Guarantor Non-Debtor Release.  Moreover, the Holders

of Senior Loan Guaranty Claims and Bridge Loan Guaranty Claims, the only persons who hold

guarantee claims impacted by the release, overwhelmingly voted to accept the DCL Plan by (a)

99.72% in number and 99.97% in dollar amount and (b) 100% in number and dollar amount,

respectively.[16,17]  The overwhelming support of the DCL Plan by the affected Classes justifies the

release of non-consenting lenders' claims against the Guarantor Non-Debtors.[18]  See Class Five

---

[16]    Holders of Bridge Loan Guaranty Claims were not entitled to vote on the Second Amended Plan or the DCL
Plan.  However, the Holders of Bridge Loan Claims, who also hold the Bridge Loan Guaranty Claims, voted to
accept the DCL Plan by 100% in number and dollar amount.

[17]    The DCL Plan was accepted by a greater number of Holders of Senior Loan Guaranty Claims and Bridge Loan
Guaranty Claims (in their capacity as Holders of Bridge Loan Claims) than the Second Amended Plan, which
was also overwhelmingly accepted by such Holders.  Specifically, Holders of Senior Loan Guaranty Claims and
Bridge Loan Guaranty Claims (in their capacity as Holders of Bridge Loan Claims) voted to accept the Second
Amended Plan by (a) 97.76% in number and 97.57% in amount and (b) 89.66% in number and 98.62% in
amount, respectively.

[18]    Further, such overwhelming support by the impacted Classes holding guarantor claims would be sufficient to
support the Guarantor Non-Debtor Release even if one or more dissenting members of the Class were objecting
to the Guarantor Non-Debtor Release provisions of the DCL Plan. For example, numerous courts have
recognized the need for collective action in the post-default context and bar tactics by individual dissenting

Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.), 280 F.3d 648, 658 (6th Cir.

2002) (plan may release dissenting creditors' claims against non-debtors only if, among other

things, the "impacted class, or classes, has overwhelmingly voted to accept the plan").

28.     The Guarantor Non-Debtor Release further easily meets the Genesis test which

has been applied to allow non-debtor guarantor releases even in cases where support for such

releases is neither overwhelming nor objection free.  The Genesis test considers whether (i) a

release is necessary to the success of the reorganization, (ii) the released parties have provided a

critical financial contribution to the plan, (iii) the released parties' financial contribution is

necessary to make the plan feasible, and (iv) such release is fair to the non-consenting creditors,

including whether the non-consenting creditors received reasonable compensation in exchange

for such release.  In re Genesis Health Ventures, Inc., 266 B.R. 591, 607-08 (Bankr. D. Del.

2001).

29.     Each of the Genesis factors is satisfied.  First, the Guarantor Non-Debtor Release

is necessary, indeed critical, to the Debtors' successful reorganization because, among other

things, the Guarantor Non-Debtors consist of business interests that provide very material and

significant value and cash flow, and important business services, to the Debtors.  Tribune (FN)

Cable Ventures, Inc. is a holding company with a 31.3% interest in the Television Food Network

---

lenders from disturbing settlement agreements agreed to by a majority of lenders.  See, e.g., First Nat'l Bank of
Louisville v. Cont'l Illinois Nat'l Bank, N.A., 933 F.2d 466, 469-70 (7th Cir. 1991) (noting that collective
action, especially in the bankruptcy context, overrides individual lender interests to "prevent a destructive
angling for advantage"); Kenton County Bondholders Comm. v. Delta Air Lines, Inc. (In re Delta Air Lines,
Inc.), 374 B.R. 516, 527 (S.D.N.Y. 2007), aff'd, sub nom. Ad Hoc Comm. of Kenton County Bondholders v.
Delta Airlines, Inc., 2009 U.S. App. LEXIS 2464 (2d Cir. Feb. 9, 2009), cert. denied, 130 S.Ct. 539 (U.S. Nov.
2, 2009) (agreeing with bankruptcy court and concluding that nonimpairment clauses relied on by minority
bondholders became "moot in the context of default because of bankruptcy"); Chase Manhattan Bank v.
Motorola, Inc., 136 F. Supp. 2d 265, 271 (S.D.N.Y. 2001) (noting fractious syndicate bank relationships post-
default as supporting "sound commercial purpose . . . to require centralized decision-making"); Beal Sav. Bank
v. Sommer, 8 N.Y.3d 318, 330-31 (N.Y. 2007) (finding settlement agreement did not trigger unanimity clause,
although had a "similar effect" to a release, and therefore did not preclude agent and 95.5% of lenders to agree
to restructuring settlement).

general partnership.[19]  This interest in the Television Food Network is perhaps the Debtors' most

valuable single asset and is anticipated to generate substantial cash flow critical to the Debtors'

future business operations.  Tribune Interactive, Inc. manages the website operations for

Tribune's publishing and broadcasting subsidiaries and assists in the management of Tribune's

various online classified businesses, thus providing services critical to the Debtors' continued

business operations.[20]  The remaining Guarantor Non-Debtors also have material importance to

the Debtors' reorganization.  Tribune ND, Inc. is a holding company owned by Tribune with an

approximate 3% interest in Newsday Holdings, LLC, which is the parent company of the entity

that owns and operates Newsday.[21]  Tribune National Marketing Company is a holding company

with a 32.1% interest in Career Builder and a 13.9% interest in Classified Ventures, both of

which are valuable businesses whose cash flows and future prospects are also important to the

Debtors' successful reorganization.[22]

30.    Second, as just noted above, the Guarantor Non-Debtors are providing critical

financial contributions to the DCL Plan in the form of assets that comprise a portion of the value

that is being distributed pursuant to the DCL Plan, including in substantial part to the impacted

Holders of Senior Loan Guaranty Claim and Bridge Loan Guaranty Claims, and anticipated cash

flow and services important to a successful reorganization.  Indeed, the value contributed by the

Guarantor Non-Debtors comprises approximately 30% of the value to be distributed pursuant to

the DCL Plan, and the anticipated cash flow and services from these entities comprise a critical

element of the Debtors' future business plans.  In addition, Section 11.2.5 of the DCL Plan

provides that the Non-Debtor Guarantor Release is dependent upon the Guarantor Non-Debtors

---

[19]    See Periodic Report of Debtors Pursuant to Bankruptcy Rule 2015.3, Jan. 17, 2012 [Docket No. 10744].

[20] Id.

[21] Id.

[22] Id.

guaranteeing the New Senior Secured Term Loan to the extent provided in Section 5.6 of the

DCL Plan.  The New Senior Secured Term Loan and the guarantees thereof provided by the

Non-Debtor Guarantors are significant components of the consideration being provided to the

Holders of Senior Guaranty Claims.

31.     Third, for the reasons stated, the assets contributed by the Guarantor Non-

Debtors are clearly necessary to make the DCL Plan feasible.

32.     Fourth, the Guarantor Non-Debtor Release, which, as noted above, is substantially

consensual, is entirely fair to the non-consenting creditors, who are all directly benefiting from

an increased recovery on account of their claims against the Debtors due to the financial and

business contributions of the Guarantor Non-Debtors to the Debtors' reorganization.

33.     For all of these reasons, the DCL Plan Proponents submit that the Guarantor Non-

Debtor release continues to be fair and equitable and necessary to the Debtors' successful

reorganization and entirely appropriate under existing case law.  Accordingly, the Guarantor

Non-Debtor Release should be approved.

> 2)   The Distributions To The Holders Of Other Parent Claims Comply With The
> Confirmation Decision And Allocation Disputes Decision.

34.     This Court concluded in the Confirmation Opinion that, because the record was

unclear, this Court could not determine that the application of the PHONES Subordination

Provisions to distributions to the Holders of Other Parent Claims under the Second Amended

DCL Plan was fair or appropriately enforced the terms of the PHONES Subordination Provisions

in accordance with section 510(a) of the Bankruptcy Code.  Confirmation Opinion 111.

35.     This Court subsequently considered and resolved this issue.  In the Allocation

Disputes Decision, this Court determined that the alleged discriminatory effect on the Class of

Other Parent Claims resulting from the application of the PHONES Subordination Provisions as

contemplated by the DCL Plan was immaterial and, therefore, the distributions to Holders of

Other Parent Claims under the DCL Plan do not discriminate unfairly and do not violate section

510(a) of the Bankruptcy Code.  Allocation Dispute Memorandum 30.  This Court also held that

the Swap Claim was entitled to the benefit of the PHONES Subordination Provisions as a matter

of contract interpretation.  Id. at 21-22 n.19.  The DCL Plan incorporates the same distribution

provisions as those provided under the Second Amended DCL Plan.  Accordingly, the DCL Plan

Proponents submit that no modifications to such distributions are necessary to comply with this

Court's prior rulings.

> 3) <u>The Allowed PHONES Notes Claims Amount Incorporated In The DCL Plan
> Complies With The Confirmation Decision And The Allocation Disputes
> Decision.</u>

36.     In the Confirmation Decision, this Court concluded that "[t]he record before me is

not developed enough to resolve the issue about the PHONES' claim amount." Confirmation

Opinion 106.  This Court subsequently determined in the Allocation Disputes Memorandum that

"[t]he claim amount for the [Holders of] PHONES [Notes Claims] should be $759,252,932 . . . ."

Allocation Disputes Memorandum 19.

37.     Consistent with the Allocation Disputes Decision and the Stipulation by and

among the Debtors, Aurelius Capital Management, Wilmington Trust Company, as Successor

Indenture Trustee for the PHONES, Barclays Bank PLC, and Waterstone Capital Management,

L.P. on Certain Facts Relevant to the Allocation Disputes and the Determination of the Allowed

Amount of the PHONES Claim, Feb. 24, 2012 [Docket No. 11016], the DCL Plan provides that

the PHONES Notes Claims shall together be deemed Allowed in the amount of $759,252,932.01

plus unpaid interest that accrued prior to the Petition Date.  DCL Plan § 3.2.9.  Accordingly, the

DCL Plan conforms with and satisfies the requirements set forth in this Court's prior rulings.

### III.    OBJECTIONS RAISING ISSUES PREVIOUSLY CONSIDERED BY THIS COURT SHOULD NOT BE RECONSIDERED

38.    In an effort to revive their previously denied objections, certain parties inappropriately seek to have this Court reconsider provisions of the DCL Plan that were already resolved by this Court's prior rulings.  Indeed, certain parties have raised objections that seek nothing more than to challenge provisions of the DCL Plan that are identical to, and formed an integral part of, the provisions of the Second Amended DCL Plan that were expressly approved by this Court in the Confirmation Opinion and the Allocation Disputes Memorandum.  The DCL Plan Proponents submit that for the reasons set forth below, each such objection is without merit and should be overruled.

### A.    Objections Challenging This Court's Prior Rulings Should Be Overruled.

39.    Six parties have each raised objections specifically challenging this Court's prior rulings solely for purposes of preserving the record for appeal.  Specifically, (i) Aurelius, (ii) WTC, (iii) Law Debenture, (iv)  DBTCA, (v) EGI-TRB LLC ("EGI-TRB"), and (vi) certain former directors and officers of the Debtors (collectively, "Certain Directors and Officers") have reiterated certain previously raised objections to the DCL Plan Settlement, the allocation of distributions under the DCL Plan, and certain other issues that are already the subject of this Court's prior rulings.  In each instance, the aforementioned objectors expressly acknowledge that this Court has already overruled their previously raised arguments.  The DCL Plan Proponents submit that, for the reasons already articulated in this Court's prior rulings, this Court should, once again, overrule these objections.

### B.    Objections Challenging The Same Classification Structure That Existed In The Second Amended DCL Plan Should Be Overruled.

40.    The classification of claims under the current version of the DCL Plan remains unchanged from the classification of claims under the Second Amended DCL Plan.  Although

this Court expressly overruled the Noteholder Plan Proponents' prior challenges to that

classification regime, and did not identify classification as among the four issues that prevented

confirmation of the Second Amended DCL Plan, various noteholders – Law Debenture,

DBTCA, Citadel Equity Fund LTD ("Citadel") and Camden Asset Management ("Camden") –

object to confirmation yet again on classification grounds.  As demonstrated below, these

rehashed and renewed arguments are without merit and do not call into question the

confirmability of the DCL Plan.

        1)   The DCL Plan Properly Classifies The Swap Claim.

    41.    Law Debenture asserts, again, that "[t]he DCL Plan . . . improperly classifies the

Swap Claim as an Other Parent Claim rather than as a Senior Loan Claim."  Objection of Law

Debenture Trust Company of New York to Confirmation of the Fourth Amended Joint Plan of

Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, the Official

Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co.,

L.P., and JPMorgan Chase Bank, N.A. at ¶ 22, May 21, 2012 [Docket No. 11668] (the "Law

Debenture Objection").  Law Debenture (and the other Noteholder Plan Proponents) made this

exact same argument in opposing the Second Amended DCL Plan.

    42.    In the Confirmation Decision, however, this Court thoroughly considered the

argument and expressly rejected it, holding that "[t]he DCL Plan Proponents have provided

reasonable justification for separate classification of the Swap Claim from the Senior Loan

Claims."  Confirmation Opinion 103-04; see id. at 113 ("For the reasons set forth above, the

following objections to confirmation are overruled: . . . (viii) the objection to classification of the

SWAP claim.").  Among other things, this Court noted that "the basic nature of the claims are

different," that "the Swap Claim is governed by a different loan agreement than the Senior Loan

Claims," that the Examiner had concluded that "the obligations of Tribune under the Swap

19

Documents do not constitute Credit Agreement Debt," and that, "[b]ecause of the protection afforded to swap claims by § 546(g), there is no basis to include the Swap Claim as part of the settlement with the Senior Lenders." Id. at 103.

43.    As this Court has held, "the law of the case doctrine 'posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.  The rule of practice promotes the finality and efficiency of the judicial process by protecting against the agitation of settled issues.'" In re Winstar Communications, Inc., 435 B.R. 33, 39 (Bankr. D. Del. 2010) (quoting Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 816 (1988)).  The current version of the DCL Plan classifies the Swap Claim in exactly the same manner as the prior version of the DCL Plan, and this Court's approval of that classification is now law of the case and dispositive with respect to Law Debenture's attempted second bite at the apple.

44.    Undaunted by the failure of its prior attack on the Swap Claim, Law Debenture attempts to evade the Confirmation Decision by arguing that "recent findings of fact made by this Court render this initial ruling no longer applicable."  Law Debenture Obj. ¶ 22. Specifically, Law Debenture contends that this Court's conclusion in the Allocation Disputes Decision[23] that the Swap Claim constitutes Senior Indebtedness under the PHONES Indenture somehow equates to a finding that "the Swap Claim and the Senior Loan Claims . . . both arise out of the Credit Agreement, are substantially similar and must be classified together in the Senior Loan Claims class."  Id. ¶ 25.

45.    Nonsense.  The Allocation Disputes involved the interpretation of the definition of "Senior Indebtedness" under the subordination provisions of the PHONES Indenture.  This

---

[23]    The Allocation Disputes were proceedings in which Law Debenture, consistent with its course of conduct throughout the case, continued its repeated attacks on the Swap Claim.

Court correctly concluded that it was "easily determined" that the Swap Claim fell within the definition of "Senior Indebtedness" because the Swap Claim "is an amount due in connection with the Credit Agreement." Allocation Disputes Memorandum 21-22 n.19. As this Court observed, the "connection" between the Swap Claim and the Senior Loan Claims exists by virtue of the fact that the Senior Loan Agreement obligated Tribune to hedge a portion of its interest rate exposure in respect of the Senior Loan Claims, which Tribune ultimately did by executing the Swap Documents. Id.[24]

46.     This Court's recognition of that "connection" for purposes of interpreting the PHONES Indenture is a far cry from a determination that the Swap Claim and the Senior Loan Claims "both arise out of the Credit Agreement" as Law Debenture now claims. To the contrary, while the Senior Loan Claims "arise out of" the Senior Loan Agreement, the Swap Claim "arises out of" the Swap Documents – a different set of agreements executed on different dates with different contracting parties. For all the reasons previously set forth and endorsed by this Court in the Confirmation Decision,[25] the Swap Claim (a claim arising from Tribune's interest rate hedging) simply is not substantially similar to the Senior Loan Claims (claims for money borrowed under the Senior Loan Agreement), and the Swap Claim properly is classified separately from the Senior Loan Claims.[26]

---

[24]    See Oaktree Capital Management, L.P.'s Opening Brief Regarding Allocation Disputes, 9-15, Feb. 24, 2012 [Docket No. 11003]; Oaktree Capital Management, L.P.'s Response Brief Regarding Allocation Disputes, 3-6, Mar. 2, 2012 [Docket No. 11067].

[25]    See Memorandum Of Law In Support Of Confirmation And Omnibus Reply To Objections To Confirmation Of Second Amended Joint Plan Of Reorganization, 145-47, Feb. 26, 2011 [Docket No. 8173]; Post-Trial Brief In Support Of Confirmation Of Second Amended Joint Plan Of Reorganization, 95-96, May 11, 2011 [Docket No. 8897].

[26]    Notably, the DCL Plan classifies the guarantee of the Swap Claim made by the Guarantor Debtors together with the guarantee of the Senior Loan Claims made by those same Debtors because, unlike the Swap Claim and the Senior Loan Claims themselves, the guarantee liability arises under the same contract, executed at the same time, by the same parties. The guarantee claims are substantially similar. The underlying obligations are not.

47.     Accordingly, Law Debenture's renewed objection to classification of the Swap

Claim remains without merit and should be overruled.

     2)   The DCL Plan Properly Classifies The Indenture Trustees' Expense Claims.

48.     After asserting that the Swap Claim must be classified together with the Senior

Loan Claims notwithstanding the fact that such claims arise under different agreements with

different parties, Law Debenture (joined by DBTCA) paradoxically argues that its own claim for

attorneys fees must not be classified together with the other Senior Noteholder Claims that arise

under the very same Indenture that gives rise to the fee claims that Law Debenture asserts.[27]

Law Debenture Obj. ¶¶ 17-21; Objection of Deutsche Bank Trust Company Americas In its

Capacity as Successor Indenture Trustee to, the Fourth Amended Joint Plan of Reorganization

for Tribune Company and its Subsidiaries Proposed by the Debtors, the Official Committee of

Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and

JPMorgan Chase Bank, N.A., ¶¶ 16-21, May 21, 2012 [Docket No. 11667] (the "DBTCA

Objection").

49.     Both Law Debenture and DBTCA made this same argument in connection with

confirmation of the Second DCL Plan but apparently thought so little of its merits that they

abandoned it. [28]  That was a wise decision, as the argument plainly fails under applicable law.

50.     Under section 1122 of the Bankruptcy Code, "a plan may place a claim or an

interest in a particular class only if such claim or interest is substantially similar to the other

claims or interests of such class."  11 U.S.C. § 1122.  Claims are "substantially similar" where,

---

[27]     Law Debenture asserts a fee claim of $11,949,130 through April 30, 2012, and asserts that "[f]ees and expenses continue to be incurred on a daily basis and this amount will increase as the cases move through the confirmation process."  Law Debenture Obj. ¶ 15 and n.3.  DBTCA asserts a fee claim of $5,918,025 through April 30, 2012, and asserts that "[f]ees and expenses continue to be incurred on a daily basis and this amount will increase as the cases progress toward confirmation."  DBTCA Obj. ¶ 14 and n.7.

[28]     While DBTCA sought to reserve time to argue this objection at oral argument, counsel never raised it.  (Tr. 4/14/11 199:9-12 (Adler)).  Neither DBTCA nor Law Debenture raised the objection in post-trial briefing.

among other things, they share common priority status and similar legal rights against the

bankruptcy estate.  See, e.g., In re Smurfit-Stone Container Corp., No. 09-10234 (BLS), 2010

Bankr. LEXIS 1971, at *15 (Bankr. D. Del. June 11, 2010); In re Lisanti Foods, Inc., 329 B.R.

491, 510 (D.N.J. 2005); In re Mahoney Hawkes, LLP, 289 B.R. 285, 294 (Bankr. D. Mass.

2002); In re Berhard Steiner Pianos USA, Inc., 292 B.R. 109, 113 (Bankr. N.D. Tex. 2002).

      51.     Under that standard, there clearly exists a reasonable basis for classifying the

indenture trustees' fee claims together with the underlying Senior Noteholder Claims.  First, both

sets of claims arise under the exact same documents – the Senior Notes Indentures.  Neither Law

Debenture nor DBTCA alleges the existence of a side agreement or other contract governing the

repayment of their fees.  Second, the claims are asserted against the same entity – Tribune.

Third, the claims have the same priority against Tribune.  Finally, Law Debenture and DBTCA

asserted the fee claims in the same proofs of claim that they filed in respect of the other Senior

Noteholder Claims for the principal and interest due on the Senior Notes issued under the Senior

Notes Indentures, and they cannot now perform an about-face and assert that the claims joined

together in their proofs of claim (Claim Nos. 3525-32) – all arising under the same documents –

are so dissimilar that their classification together violates the Bankruptcy Code.  There simply is

no question that substantial similarities exist between the fee claims and the other Senior

Noteholder Claims arising under the Senior Notes Indentures such that the classification of the

claims into the same class is reasonable and appropriate under section 1122 of the Bankruptcy

Code.[29]

---

[29]   Law Debenture and DBTCA imply that such classification is inappropriate because it "limits the distributions to the class." Law Debenture Obj. ¶ 19; DBTCA Obj. ¶ 18.  Not so.  The classification of indenture trustee fee claims with the underlying Senior Noteholder Claims is simply a function of the documents that govern the Senior Notes – the very documents that give rise to both the fee claims and the claims for repayment of principal and interest.  In fact, the DCL Plan Proponents amended the DCL Plan to provide for the allowance of Senior Noteholder Claims in an amount equal to the principal and prepetition interest due on the Senior Notes plus "the amount (if any) of any other Claims arising under or evidenced by the Senior Notes Indentures and

52.     For all of these reasons, the DCL Plan's classification of the indenture trustee fee and expenses claims together with the other Senior Noteholder Claims is appropriate, and the objections of Law Debenture and DBTCA in this regard should be overruled.

>    3)    The DCL Plan Properly Classifies The Tendering Noteholders' Claims.

53.     Citadel and Camden are among the seventeen (17) PHONES Noteholders who, pursuant to the terms of the PHONES Notes Indenture and the PHONES global note (the "Global Note") tendered their Notes for exchange in 2008 shortly prior to the Petition Date, but did not receive payment from Tribune prior to that date due to the intervening chapter 11 bankruptcy filing (collectively, the "Tendering Noteholders").  Citadel and Camden's objection to the DCL Plan [Docket No. 11659] ("Tendering Noteholders' Objection") asserts that the Plan's classification of the Tendering Noteholders together with the other PHONES Noteholders in Class 1J violates section 1122 of the Bankruptcy Code.

54.     This Court in several prior decisions has interpreted various provisions of the PHONES Notes Indenture and concluded that the claims of the Tendering Noteholders should be classified with the PHONES Notes Claims, and that the act of tender did not somehow transform those claims or erase the applicable subordination provisions.  See, e.g., Confirmation Opinion 107-108 ("the issue here addresses priorities between subordinated creditors on 'the same level,' . . . Whether the amount of the Tendering Holders' claim is fixed as of the date the Exchange Notices were given, or whether the Exchange Notices were revoked or never took effect for failure of the Debtors to complete the process, the PHONES Noteholder claims should be treated alike.) (emphasis added).

---

related documents, solely to the extent any such Claims are Allowed" specifically in response to objections raised by Law Debenture and DBTCA in connection with the Second Amended Plan.  See DCL Plan § 3.2.5(b). If the Senior Noteholders are concerned about the impact of the sizable fees that Law Debenture and DBTCA apparently have incurred in these cases, their proper recourse is with the indenture trustees, not with the Tribune estate.

55.     Neither Citadel nor Camden appeared, much less actively participated, in these Chapter 11 Cases until April 23, 2012, when – notwithstanding this Court's Confirmation Opinion – they filed the Tendering Noteholders' Motion for Reconsideration and/or Clarification of this Court's April 9, 2012 Memorandum and Order Regarding Allocation Disputes [Docket No. 11458] (the "Motion").  The Tendering Noteholders' Objection and the Motion are substantially identical.  Both seek belated reconsideration of issues that parties had been litigating for years, and that this Court addressed and resolved, while the Tendering Noteholders sat on the sidelines.  The Debtors' response to the Tendering Noteholders' Motion [Docket No. 11660] (the "Debtors' Response") demonstrates that this Court's prior rulings regarding the classification of the Tendering Noteholders' claims are correct and the Tendering Noteholders' Motion and Objection should be overruled.[30]

56.     First, the claims of all of the PHONES Noteholders – including the Tendering Noteholders – arise under, and are defined by, the terms of the PHONES Notes Indenture. Debtors' Response 5.  The terms of the PHONES Global Note provide that the holder of each PHONES Note has a right at any time and from time to time to exchange each PHONES Note (the "Exchange Rights") for an amount of cash based on the value of certain reference stock. Allocation Disputes Memorandum 12.  The Global Note also sets forth detailed procedures for exercise of the Exchange Rights.  Id.

57.     Second, the issues of the amount of the PHONES Notes Claims and whether the Tendering Noteholders' claims should be classified with, or separate from, the Claims of all the other PHONES Noteholders have been litigated for years, while Citadel and Camden sat idle.

---

[30]   The Tendering Noteholders never explain in either their Motion or Objection where they have been or why they should be allowed to have sat on the sidelines, presumably in the hope that WTC would prevail in arguing for a larger value to be assigned to the tendered Notes, and now, having lost that argument, to make a fall-back claim. The Tendering Noteholders had adequate notice and a full opportunity to participate.  They should be barred from raising these claims now at the eleventh hour in an effort to escape the natural consequences of this Court's previous decision.

Debtors' Response 5-7.  Most significantly, following briefing and oral arguments in connection

with the confirmation proceedings in 2011 (in which neither Citadel nor Camden participated),

this Court considered whether the Tendering Noteholders' claims should be subordinated to the

claims of non-tendering PHONES Noteholders pursuant to section 510(b) of the Bankruptcy

Code – an issue this Court explicitly noted that "could impact claim classification".

Confirmation Opinion 106 (emphasis added).  Addressing the arguments of certain Tendering

Noteholders (other than Citadel and Camden) that section 510(b) does not apply because "their

claims are not for damages arising out of the purchase or sale of the PHONES Notes, but are

claims to collect the amount due under the terms of the Notes," id. at 107 (emphasis added), this

Court concluded that claims of the Tendering Noteholders were not subordinated to the claims of

the non-tendering PHONES Noteholders, regardless of whether such claims were ultimately held

to be allowed in the face amount of the PHONES Notes or, alternatively, limited to the amount

due as a result of the exercise of the Exchange Rights.  Making clear that the tender did not

impact the priority of PHONES Notes Claims, this Court stated: "Whether the amount of the

Tendering Holders' claim is fixed as of the date the Exchange Notices were given, or whether

the Exchange Notices were revoked or never took effect for failure of the Debtors to complete

the process, the PHONES Noteholder claims should be treated alike."  Id. at 108 (emphasis

added).

      58.    In reaching its decision, this Court cited and discussed Blondheim Real Estate,

Inc., 91 B.R. 639 (Bankr. D.N.H. 1988), in which the court determined that a noteholder's claims

for the amounts owing on the debtor's notes were not claims for damages subject to section

510(b), noting that the "concept of 'damages' has the connotation of some recovery other than

the simple recovery of an unpaid debt due upon an instrument.  Id. at 640 (emphasis in original).

In applying Blondheim to this case, this Court concluded: "Like Blondheim, the issue here

addresses priorities between <u>subordinated creditors on 'the same level</u>,' rather than a noteholder's attempt to bootstrap its claim into a more senior class expected to receive a better recovery." Confirmation Opinion 107 (emphasis added).

59.    Although the Tendering Noteholders' Objection makes reference to the Confirmation Opinion, the Objection ignores the decision's language which makes clear that the claims of the Tendering Noteholders and all other PHONES Noteholders should be "treated alike." Tendering Noteholders' Obj. 3-4.  Likewise, the Tendering Noteholders' Objection ignores the Allocation Disputes Memorandum, in which this Court, in concluding that "the claim amount for the PHONES Noteholders should be $759,252,932," Allocation Disputes Memorandum 19), included <u>both</u> the claims of Tendering Noteholders ($56,509,795) <u>and</u> the non-tendering Noteholders ($702,743,137) in a single aggregate claim amount.  <u>Id.</u>  This Court's inclusion of the claims of the Tendering Noteholders in calculating the total claims of the PHONES Noteholders was completely consistent with the conclusion in the Confirmation Opinion that the Tendering Noteholders were "subordinated creditors on 'the same level'" as the non-tendering Noteholders and that "the PHONES Noteholder claims should be treated alike." <u>See</u> Confirmation Opinion 108.[31]

60.    <u>Third</u>, the Debtors' Response demonstrated that the purported basis advanced by the Tendering Noteholders for ignoring this Court's conclusions in the Confirmation Decision, and permitting the Tendering Noteholders to escape the subordination provisions of the

---

[31]    In reaching the Decision, this Court relied on a stipulation (the "<u>Stipulation</u>") entered into by the Debtors, Aurelius, WTC, Barclays PLC and Waterstone Capital Management, L.P. regarding certain facts relevant to the determination of the Allowed amount of the PHONES Notes Claims.  Allocation Disputes Memorandum 11-12; ADH Ex. 115.  Neither Citadel nor Camden participated in the Stipulation or otherwise made any appearance in connection with the Allocation Disputes, despite having been on notice of the issues.  Although the parties to the Stipulation did not agree whether the "High" or "Low" PHONES amount should be adopted by this Court, they did agree that, in calculating the amount of the PHONES Notes Claims, the amounts attributable to the claims of the Tendering Noteholders should be included together with the amounts attributable to the claims of the non-tendering PHONES Noteholders.  Stipulation ¶¶ 35, 38 (alternative calculations of the PHONES amounts explicitly including the value of tendered PHONES Notes in the total PHONES claim amount).

PHONES Notes was meritless. Debtors' Response 9-10. The Tendering Noteholders cite

Section 14.02 of the PHONES Indenture, which provides that the subordination provisions apply

to payments to be made to "Holders" of the PHONES Notes, arguing that by tendering their

notes they ceased to be "Holders" and thus ceased to be bound by the subordination provisions.

The Tendering Noteholders' argument ignores not only the Confirmation Opinion, but also the

fact that both the Global Note and the Revised Exchange Notice state that payment amounts for

the tendered shares will be made to the "tendering <u>Holder(s)</u>"[32] even though the "Holders" at the

point of payment have previously tendered their Notes. Stipulation ¶¶ 14, 15. Moreover, the

subordination rights created under Section 14.02 are applicable upon "<u>any</u> distribution of assets

of the Company" following "<u>any</u> insolvency or bankruptcy case" (emphases added). <u>See</u> DCL

Ex. 668, PHONES Notes Indenture, § 14.02. The structure and language of the governing

documents thus belie the Tendering Noteholders' suggestion that the subordination provisions of

the PHONES Notes Indenture are applicable to the claims of some holders of the PHONES

Notes but not others.

      61.    In sum, the Claims of the Tendering Noteholders are appropriately classified

together with the claims of all other PHONES Noteholders in Class 1J under section 1122 of the

Bankruptcy Code. Their objection to the contrary should be overruled.

     **C.**    **Objections Challenging The Same Claims Reconciliation Procedures That
Existed Under The Second Amended DCL Plan Should Be Overruled.**

      62.    WTC's assertion that the "DCL Plan's Claims Objection Process is

Unreasonable" is without merit. Objection to Confirmation of Plan Objection of Wilmington

Trust Company, As Successor Indenture Trustee for the Phones Notes, to the Fourth Amended

Joint Debtor/Committee/Lender Plan Filed by Wilmington Trust Company, 10, May 21, 2012

---

[32]   <u>See</u> ADH Ex. 3, Global Note at R-7; ADH Ex. 94, Revised Exchange Notice at 3 (emphasis added).

[Docket No. 11666] (the "WTC Objection").  WTC recognizes in the objection that the Debtors

are likely to object to WTC's purported $24.1 million claim, which WTC asserts is for

"reasonable" fees and expenses that it claims are reimbursable under section 6.07 of the

PHONES Notes Indenture.  WTC Obj. 25.  The Debtors have discussed with WTC the

possibility of a more expedited timetable for evaluating WTC's claims and resolving any

objections thereto, either on a consensual basis or through a determination by this Court if that

does not succeed.  The Debtors are optimistic such a timetable can be worked out between the

parties, which resolution would moot this objection.

        63.      In the absence of such a resolution, the sole basis for WTC's objection is that the

210-day period for claims objections proposed in the Plan is too long for WTC's liking.  Even if

WTC's preferences were grounds for an objection, the 210-day period proposed is similar to

claims objection periods approved or proposed in numerous other chapter 11 plans in large cases

in this District and others.  See, e.g., Seventh Amended Joint Plan of Affiliated Debtors Pursuant

to Chapter 11 of the United States Bankruptcy Code at § 26.1, In re Washington Mutual, Inc.,

Case No. 08-12229 (Bankr. D. Del. Dec. 12, 2011) [Docket No. 9178] (180-day period post

effective date for claims objections; subject to extension by the Court); Debtors' Second

Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code at § 1.135, In

re AbitibiBowater, Inc., Case No. 09-11296 (KJC) (Bankr. D. Del. Aug. 2, 2010) [Docket No.

2796] (claims objection deadline 180 days after the effective date; subject to extension by the

Court); Debtors' Second Amended Joint Chapter 11 Plan at § 7.1(c), In re Motors Liquidation

Co., Case No. 09-50026 (Bankr. S.D.N.Y. Dec. 7, 2010) [Docket No. 8015] (claims objection

deadline 180 days after effective date; subject to extension ex parte by the Court); Debtors'

Modified Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy

Code at § 11.B, In re New Century TRS Holdings Inc., Case No. 07-10416 (KJC) (Bankr. D.

Del. Sept. 30, 2009) [Docket No. 9905] (claims objection deadline 180 days after effective date; subject to extension by the Court).  Indeed, the 210-day period for claims objections is precisely the same period for claims objections that was contained in the Noteholder Plan, of which WTC was a co-proponent.  See Noteholder Plan § 8.1(a).

64.    The need for the Debtors to have adequate time to review and assess claims is perhaps best demonstrated by WTC's claim.  To date, WTC has provided no documentary support for its claim, which at $24 million would be one of the largest General Unsecured Claims against Tribune's estate.  Indeed, WTC has declined on numerous occasions to provide backup for its claims in response to requests by the Debtors.  While WTC may have had its tactical reasons for withholding that backup from the Debtors, it cannot do so and then demand that the Debtors review its claim on an expedited basis – over other claims that the Debtors have been negotiating for months or even years – when, if ever, WTC elects to provide the support for its claim.  This is especially true in the period immediately following the Effective Date, when the Debtors and their principal creditor constituencies will have to address the numerous challenges affecting entities of the Debtors' size in transitioning out of chapter 11.  WTC's objection should be denied.

**D.    Objections Requesting The Establishment Of Reserves Despite This Court's Prior Rulings Should Be Overruled.**

65.    In their objections, WTC and EGI-TRB argue that this Court should order the Debtors to maintain reserves sufficient to pay the PHONES Notes Claims and the EGI-TRB LLC Notes Claims on an unsubordinated basis in the event that this Court's prior rulings are overturned on appeal.[33] WTC Obj. ¶¶ 16-17; Objection to Confirmation of Plan Objection of Wilmington Trust Company, As Successor Indenture Trustee for the Phones Notes, to the Fourth

---

[33]    WTC has appealed the Confirmation Decision and the Allocation Disputes Decision.  EGI-TRB suggests in its Objection that it may appeal the Allocation Disputes Decision.  See EGI-TRB Obj. 2.

Amended Joint Debtor/Committee/Lender Plan Filed by Wilmington Trust Company, 5-7, May 21, 2012, [Docket No. 11658] (the "EGI-TRB Objection").  WTC also requests that a "catch-up" reserve be added to the DCL Plan to permit PHONES Holders to receive distributions from the Litigation Trust equivalent to "the recovery that they would have received" absent this Court's ruling regarding contractual subordination of the PHONES.  WTC Obj. ¶ 18.

66.    These arguments are plainly without merit.  For one thing, the request for a distribution reserve – particularly with respect to Article III distributions – would result in the withholding of hundreds of millions of dollars of distributions to creditors who have already waited almost four years for payment.  For another, although couched in the guise of a request for the establishment of distribution "reserves", in substance WTC and EGI-TRB actually seek a stay pending appeal without meeting (or even attempting to meet) any of the requirements for such a stay and without having to post any bond.

67.    WTC and EGI-TRB have fully litigated and have lost the issues of subordination in connection with the Allocation Disputes.  The DCL Plan implements the Allocation Disputes Decision.  If WTC and EGI-TRB believe that the Allocation Disputes Decision is in error, the proper course of action is to pursue an appeal.  This Court should not permit them to circumvent or disregard the legal and factual showings necessary for a stay of pending appeal (including the posting of a bond), and should overrule the objections.

    1)  <u>The Relief Requested Is Tantamount To A Stay Pending Appeal; The Objectors Cannot Meet The Requirements To Obtain A Stay.</u>

68.    In essence, WTC and EGI-TRB request that, if and when the DCL Plan is ultimately confirmed, this Court should nevertheless prevent the DCL Plan from being consummated and instead require that the Debtors withhold hundreds of millions of dollars from

general unsecured creditors.[34]  The sole basis for their request is that WTC and EGI-TRB intend to prosecute appeals of the Confirmation Order.[35]  But the relief requested – preventing distributions from being made while an appeal is pending – can only be obtained through one legal remedy: a stay pending appeal.

a)    <u>Standard Applied And Factors Considered In Granting A Stay</u>

69.    Bankruptcy Rule 8005 sets forth a procedure by which an appellant may seek a stay of a bankruptcy court's order "so that the estate and the status quo may be preserved pending resolution of [an] appeal."  <u>Official Comm. of Unsecured Creditors of LTV Aerospace and Defense Co. v. Official Comm. of Unsecured Creditors of LTV Steel Co. (In re Chateaugay Corp.)</u>, 988 F.2d 322, 326 (2d Cir. 1993).  This is exactly the relief that WTC and EGI-TRB seek by way of their requested reserves.  Of course, an appellant is not obligated to obtain a stay before commencing an appeal, but a stay pending appeal may be necessary to preserve the opportunity for effective relief following possible reversal.  As the Second Circuit has noted, "[t]he party who appeals without seeking to avail himself of th[e] protection [of a stay] does so at his own risk."  <u>Id.</u>

70.    Courts have developed a four-part test to determine whether a stay pending appeal under Bankruptcy Rule 8005 is appropriate.  Specifically, a moving party must show (i) a likelihood of success on the merits of the appeal, (ii) that the movant will suffer irreparable harm

---

[34]    If created, the requested reserves would initially withhold as much as $215 million that would be distributed to general unsecured creditors of Tribune on the Effective Date, and would potentially withhold hundreds of millions of additional dollars from those creditors with respect to possible litigation recoveries.  <u>See</u> ADH Ex. 89.

[35]    WTC notes in its objection that bankruptcy law permits reserves to be established to satisfy disputed, contingent or unliquidated claims.  WTC Obj. ¶ 16.  Although WTC quotes from the Collier Bankruptcy Practice Guide in support of that proposition, WTC omits from the quoted passage a citation to section 502(c) of the Bankruptcy Code.  When the Collier Bankruptcy Practice Guide passage is read within its context, it is clear that it is referring to the mechanism provided in section 502(c) for estimating the amount of a claim "when the fixing or liquidation of the claim . . . would unduly delay the administration of the case."  <u>See</u> 4 Collier on Bankruptcy ¶ 502.04 (16th ed.).  The PHONES Notes Claims are deemed allowed in a fixed, liquidated amount, and the disputes as to their priority have been fully litigated and resolved.  Accordingly, section 502(c) does not apply and WTC's citation is entirely inapposite.

32

if the stay is denied, (iii) that substantial harm will not be suffered by non-moving parties if the

stay is granted, and (iv) that the issuance of the stay will not harm the public interest.  See

Republic of Philippines v. Westinghouse Elec. Corp., 949 F.2d 653, 658 (3d Cir. 1991).  Neither

EGI-TRB nor WTC has even tried to show – or could show – that the four-part test is met in the

present case.  As a consequence, their request for a stay – in the guise of a "reserve" – must be

rejected.

### b) Bond Required For Stay Of Confirmation Order

71.     Bankruptcy Rule 8005 also allows a court, in its discretion, to condition a stay

pending appeal upon the posting of a supersedeas bond which secures the value of the judgment.

Fed. R. Bankr. P. 8005.  In the context of confirmation appeals, courts often look in this regard to

Federal Rule of Civil Procedure 62(d), which requires appellants to post a bond absent

"exceptional circumstances."  ACC Bondholder Group v. Adelphia Commc'ns Corp. (In re

Adelphia Commc'ns Corp.), 361 B.R. 337, 350 (S.D.N.Y. 2007).  Thus, for example, the District

Court in Adelphia concluded that, in order to stay a confirmation order, a supersedeas bond must

be posted in an amount "commensurate with the threatened loss to the non-moving parties."  Id.

at 368.  Ultimately, the appellants in Adelphia were ordered to post a $1.3 billion bond in order

to stay effectiveness of the plan while proceeding with their confirmation appeal.  Id.

72.     A party seeking a stay without posting a bond has the burden of proving the

appropriateness of such a ruling.  Id. at 350-51.  Here again, neither EGI-TRB nor WTC has

even attempted to make such a showing, again mandating denial of the requested stay/reserve.

### 2) The DCL Plan Does Not Discriminate Unfairly By Not Establishing The Requested Reserves.

73.     EGI-TRB also asserts that, because the DCL Plan establishes reserves sufficient

to make distributions to Holders of Disputed Claims but does not establish a similar reserve to

33

pay Holders of EGI-TRB LLC Notes in the event that this Court's Allocation Disputes Decision

is later reversed on appeal. the DCL Plan discriminates unfairly against the Holders of EGI-TRB

LLC Notes Claims.  Not so.  Simply put, denying EGI-TRB a special reserve to hold funds that

are the subject of a to-be-filed appeal from the fully litigated Allocation Disputes Decision does

not remotely resemble the creation of a reserve to address disputed claims that have not yet been

litigated, and plainly does not amount to unfair discrimination.

74.     The crux of EGI-TRB's unfair discrimination argument appears to be that the

DCL Plan "effectively deprives EGI-TRB of its appellate rights while honoring those of other

unsecured creditors."  EGI-TRB Obj. 7.  This is simply not true.  EGI-TRB's appellate rights

have been fully preserved and EGI-TRB is free to pursue an appeal of the Allocation Disputes

Decision upon entry of the confirmation order. EGI-TRB also is free to seek a stay pending

appeal, provided that it satisfies the standards set forth above (it will not be able to do so).  EGI-

TRB suffers no "discrimination" – much less unfair discrimination – in this regard.

75.     Further, the analogy that EGI-TRB attempts to draw between itself – having fully

litigated its allocation disputes and lost – and claimants who hold disputed claims that have not

yet been the subject of litigation – is a fundamentally false comparison.  Unlike the claimants

holding true Disputed Claims, EGI-TRB's claims have already been fully adjudicated in

connection with the Allocation Disputes Decision, in which the Bankruptcy Court determined

that the EGI-TRB LLC Notes are at the very "bottom of Tribune's capital structure."  Allocation

Disputes Memorandum at 48.  It is therefore irrelevant that the EGI-TRB LLC Notes remain

subject to challenge from the Litigation Trust (and thus may be equitably disallowed or

recharacterized as equity, among other possible remedies) because the subordination issues and

the treatment of those claims under the plan have been fully litigated, and EGI-TRB is now free

to appeal this Court's rulings in that regard should it so choose.

34

> 3) A Possible Appeal Of The Confirmation Order Does Not Impact The Feasibility Of The DCL Plan.

76.    Finally, EGI-TRB claims that, to be feasible for purposes of section 1129(a)(11), "a plan must take into account the possibility that a potential creditor may, following confirmation, recover a large judgment against the debtor." EGI Obj. 7 (citing Sherman v. Harbin (In re Harbin), 486 F.3d 510, 518 (9th Cir. 2007)).

77.    This completely misses the mark. In the context of a confirmation-related bankruptcy appeal, if an appeal is likely to affect the success of a consummated reorganization plan (and no stay pending appeal has been obtained), that fact will weigh against the appellant and could potentially result in a determination that the appeal is equitably moot. See, e.g., Ad Hoc Comm. of Convertible Noteholders v. Spansion, Inc. (In re Spansion Inc.), No. 10-369, U.S. Dist. LEXIS 86152, at *11 (D. Del. Aug. 4, 2011) (dismissing appeal as equitably moot where the appeal could "unravel the reorganization plan"). Accordingly, EGI-TRB's belief that its success on appeal might harm Reorganized Tribune in no way supports its argument that it is entitled to a "reserve" of all consideration to which it claims to be entitled. To the contrary, it merely confirms the fact that, if the DCL Plan is confirmed, EGI-TRB will be required to seek a stay pending appeal, prove that a stay is warranted, and post the requisite bond.

### E.    Objections Challenging The Implementation Of The Previously-Approved DCL Plan Settlement Are Without Merit And Should Be Overruled.

> 1) The Litigation Trust Loan Contemplated By The DCL Plan Settlement Is Reasonable And Appropriate.

78.    DBTCA and WTC raise two objections related to the terms of the Trust Loan Agreement. First, DBTCA argues that funding the Litigation Trust through a loan, as opposed to a grant, "is wholly inappropriate and inconsistent with applicable precedent in the Third Circuit as well as other jurisdictions." DBTCA Obj. ¶ 28. Although referencing allegedly "applicable

precedent," DBTCA has provided no citations for this proposition. Indeed, DBTCA has simply provided the names of a handful of cases in which a post-confirmation trust was purportedly funded through an outright grant. See DBTCA Obj. ¶28 n.9. These references do not point to a reported opinion or order, provide no discussion of any facts or any comparison to the facts of these Chapter 11 Cases, contain no factual or legal conclusion made by any court, and fail to indicate whether funding of a post-confirmation trust was a contested matter that required adjudication. The DCL Plan Proponents are not aware of any decision that references, much less analyzes, the propriety of funding a litigation trust through a grant rather than a loan. At most, DBTCA has informed this Court that certain cases exist whereby post-confirmation trusts may have been funded with a grant – a completely unremarkable proposition. Consequently, the alleged "applicable precedent" is of no moment.

79.      In this case, the Trust Loan is part of the overall DCL Plan Settlement that forms the foundation of the DCL Plan and which was the result of the mediation overseen by U.S. Bankruptcy Judge Kevin Gross. Indeed, the second mediation term sheet, which the Debtors filed after mediation, expressly provided that "the Trusts will be funded with a $20 million loan from Reorganized Tribune, with the Trusts jointly and severally liable for repayment of the loan" and further set forth the terms of the repayment waterfall, which has been incorporated into the DCL Plan. See Docket No. 6685, Exhibit B at 4. Moreover, in approving the DCL Plan Settlement, this Court took no issue with the funding of the Litigation Trust though a loan during the previous confirmation hearings or in the Confirmation Decision, notwithstanding the fact that Aurelius raised the identical argument and referred to the same handful of cases in its objection to the Second Amended DCL Plan. See Notice of Filing of Redacted Objection of the Noteholder Plan Proponents to Confirmation of the Debtor/Committee/Lender Plan of

Reorganization, Ex. A at 201-202, Feb. 16, 2011 [Docket No. 8026].  DBTCA's objection now

both untimely and inconsistent with the Confirmation Decision.

80.     Second, WTC and DBTCA both suggest that the DCL Plan Proponents have

failed to disclose certain material terms of the Trust Loan Agreement.  See WTC Obj. ¶¶ 27-28;

DBTCA Obj. ¶ 30.  This too is meritless.  On January 3, 2011, nearly 16 months ago, the DCL

Plan Proponents filed a detailed term sheet for the Trust Loan Agreement.  See Notice of Filing

of Debtor/Committee/Lender Plan Supplement, Attach. I, Jan. 31, 2011 [Docket No. 7701].  On

May 4, 2012, the DCL Plan Proponents filed a supplement to the DCL Plan which contained

both an updated term sheet for the Trust Loan Agreement and a blackline comparison to what

was filed on January 3, 2011.  See Notice of Filing of Exhibits to Fourth Amended Joint Plan of

Reorganization for Tribune Company and its Subsidiaries Proposed by the Debtors, the Official

Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co.,

L.P., and JPMorgan Chase Bank, N.A., Attachs. L-1 & L-2, May 4, 2012 [Docket No. 11545].

The most recent terms of the Trust Loan Agreement are substantially similar to those filed in

early 2011.  Indeed, the only two changes of any substance are (i) the removal of reference to a

Creditors' Trust (which caused numerous immaterial revisions to the term sheet) and (ii) the

deletion of provisions for interest on the Trust Loan.  In addition to the DCL Plan Proponents'

public disclosure of the terms of the Trust Loan Agreement, the DCL Plan Proponents have

provided a copy of the complete working draft of the Trust Loan Agreement to each party that

has so requested, including WTC and Aurelius.[36]  The form of the Trust Loan Agreement is also

attached hereto as Exhibit B.  As evidenced therein, the Trust Loan is non-interest bearing.  The

representations and warranties, affirmative and negative covenants, and the events of default are

---

[36]    Instead of filing a form of the Trust Loan Agreement on the docket with a previous plan supplement, the DCL
Plan Proponents determined that it would be most sensible to first consider comments from those who have
reviewed the term sheet and those who have requested and reviewed a draft of the Trust Loan Agreement, and
to incorporate such comments that the DCL Plan Proponents believe to be appropriate.

all entirely consistent with the term sheet, very limited in nature and extent, and appropriate under the circumstances.

81.     For these reasons, the objections of WTC and DBTCA regarding the Trust Loan Agreement should be overruled.

>     2)   The Payment Of Senior And Bridge Lender Fee/Expense Claims Pursuant To The DCL Plan Settlement Is Reasonable And Appropriate.

82.     As in many chapter 11 cases that conclude in compromise, the DCL Plan Settlement already endorsed by this Court in this case provides for the reimbursement of certain of the fees and expenses incurred by the settling parties.  Specifically, Section 9.1 of the DCL Plan provides a mechanism for the reimbursement of the Senior Lender Fee/Expense Claims and Bridge Lender Fee/Expense Claims (the "Lender Fee/Expense Claims"), which generally consist of fees and expenses incurred by professionals retained by the settling Senior Lenders and Bridge Lenders.

83.     Section 9.1 is an integral part of the DCL Plan Settlement.  As this Court is well aware, as part of the DCL Plan Settlement the Senior Lenders and Bridge Lenders (together, the "Lenders") agreed to forgo hundreds of millions of dollars that otherwise would comprise part of the contractual recoveries on their Senior Loan Claims and Bridge Loan Claims Loans (together, the "Loan Claims"), to relinquish part of their pro rata entitlement to proceeds received by the Litigation Trust, and to release billions of dollars of claims (including claims for reimbursement of fees and expenses) against Tribune's Guarantor Non-Debtor subsidiaries.  The Lenders agreed to make these concessions in exchange for a package of consideration, including the allowance of their Loan Claims, the release of LBO-Related Causes of Action against them, and the reimbursement of their Lender Fee/Expense Claims.

38

84.    Although the DCL Plan and Settlement always have provided for reimbursement of the Lender Fee/Expense Claims, and notwithstanding the fact that <u>Aurelius's own proposed plan contained a substantially identical provision providing for reimbursement of the fees and expenses of the Noteholder Plan Proponents,</u> Aurelius now objects – for the first time, after the denial of the confirmation of its own plan – and claims that it is *never* appropriate to reimburse settling parties for their fees and expenses absent a showing of a "substantial contribution" pursuant to section 503(b).  This untimely attack on the DCL Plan Settlement is without merit and must be rejected.

85.    As a threshold matter, the sole objector to Section 9.1 – Aurelius – no longer has any economic interest in the outcome of this issue.  Aurelius has confirmed that it elected to receive its distribution on account of its Senior Noteholder Claims in the form of a fixed pure cash payment, its pro rata share of $431,041,451, and not the "strip" of consideration that includes equity in the Reorganized Debtor.  In other words, Aurelius's distribution under the Plan <u>will be exactly the same</u> without regard to the payment or amount of the Lender Fee/Expense Claims to which Aurelius objects.  The Court should not credit an objection that is raised by a party with no interest in the outcome.  <u>See</u> <u>In re G-1 Holdings Inc.</u>, 420 B.R. 216, 255 (Bankr. D.N.J. 2009) ("In the context of bankruptcy plan confirmation hearings, creditors have standing only to challenge those parts of a reorganization plan that affect their direct interests.") (internal quotations and citations omitted); <u>In re Orlando Investors, L.P.</u>, 103 B.R. 593, 596-97 (Bankr. E.D. Pa. 1989) (same); <u>see also</u> <u>In re Brewery Park Assocs.</u>, Case No. 10-11555 , 2011 Bankr. LEXIS 1596, at *36 n.13 (Bankr. E.D. Pa. April 29, 2011) (same).

86.    In any event, Section 9.1's provision for the reimbursement of the Lender Fee/Expense Claims has remained exactly the same since the Second Amended DCL Plan was filed in February 2011, some fifteen months ago.  Aurelius did not object to Section 9.1 either in

its lengthy Objection to the Second Amended DCL Plan[37] or at the multi-week confirmation

hearing held in respect of that plan.  Indeed, Aurelius sat silent (as it was compelled to do, given

the identical provision for reimbursement of professional fees in its own plan) as another

objector unsuccessfully challenged the DCL Plan's provision for reimbursement of Bridge

Lender Fee/Expense Claims.[38]

87.    As with its prior objections to the DCL Plan Settlement, Aurelius's new objection

is without merit.  In particular, Aurelius ignores the distinction between consensual

reimbursement of the Lender Fee/Expense Claims as part of a reasonable settlement of

prepetition claims and causes of action, on the one hand, and the statutory right of a creditor to

unilaterally seek an administrative claim for legal fees if it can show that it made a "substantial

contribution" under section 503(b), on the other.[39]  As for Aurelius's complaints about

disclosure, while the mechanism provided for by the DCL Plan – which affords the right of

review to the Reorganized Debtors, Committee, U.S. Trustee, and this Court – easily satisfies

---

[37]    Notice of Filing of Redacted Objection of the Noteholder Plan Proponents to Confirmation of the Debtor/Committee/Lender Plan of Reorganization, Ex. A at 201-202, Feb 15, 2011 [Docket No. 8026].

[38]    Specifically, EGI-TRB objected to the reimbursement of the Bridge Lender Fee/Expense Claims.  See EGI-TRB LLC's Objection to Confirmation of (A) The Second Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed By the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo Gordon & Co., and JPMorgan Chase Bank N.A. and (B) The Joint Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by Aurelius Capital Management, LP, on Behalf of its Managed Entities, Deutsche Bank Trust Company Americas, in its Capacity as Successor Indenture Trustee for Certain Series of Senior Notes, Law Debenture Trust Company of New York, in its Capacity as Successor Indenture Trustee for Certain Series of Senior Notes and Wilmington Trust Company, in its Capacity as Indenture Trustee for the PHONES Notes at 19-20, Feb. 15, 2011 [Docket No. 7988], urging this Court to apply a "substantial contribution" standard to Section 9.1.2, much as Aurelius does here.  At the April 13, 2011, confirmation hearing, this Court asked counsel for EGI-TRB the pertinent question: "What makes this proposal different from what I find is a common dynamic in bankruptcy proceedings and that is a party who wants something, bargaining for the other party's acquiescence or cooperation? What makes this different?" (Tr. 4/13/11 at 77:20-25).  EGI-TRB's objection to Section 9.1.2 was not upheld in the Confirmation Decision.

[39]    Section 503(b) does not require the consent of other creditors and provides for an administrative claim not conditioned on the approval of a settlement or plan. 11 U.S.C. § 503(b)  Section 9.1's provision for reimbursement of Lender Fee/Expense Claims is obviously conditioned on approval of the DCL Plan Settlement and confirmation of the DCL Plan.  Accordingly, it is not at all "inequitable and inappropriate," Aurelius Obj. ¶ 7, that creditors whose fees are being paid under a plan and settlement are not held to the same standard as those creditors who did *not* settle any claims, who continue to resist confirmation, and who unilaterally seek to recover their fees from the estate under section 503(b).

section 1129(a)(4) and already has been endorsed by the U.S. Trustee in this case, the Lenders

have agreed to file their fee and expense statements on the public docket to moot Aurelius's

alleged concerns.

> a) The Lender Fee/Expense Claims May Be Reimbursed Pursuant To
> The DCL Plan Settlement Without Requiring A "Substantial
> Contribution."

88.     Despite the virtually-identical contents of its own competing plan, Aurelius now

argues that a plan may only permit reimbursement of a creditor's professional fees by a "two

step" process under which the creditor must first "demonstrate that it had made a substantial

contribution to the debtors' cases, as is required by Bankruptcy Code section 503(b)" and,

second, "satisfy Bankruptcy Code section 1129(a)(4) by demonstrating that its requested fees

were reasonable."  Aurelius Obj. ¶ 10.

89.     First and foremost, this argument conflicts with the plain language of the

Bankruptcy Code.  If, as Aurelius argues, any reimbursement of professional fees incurred by a

creditor must pass muster under section 503(b), section 1129(a)(4) would be made redundant and

unnecessary.  See Rake v. Wade, 508 U.S. 464, 471 (1993) ("To avoid deny[ing] effect to a part

of a statute, we accord significance and effect . . . to every word.") (internal citations omitted).

90.     Indeed, Judge Gerber carefully considered – and rejected – Aurelius's proposed

reading of section 1129(a)(4) in In re Adelphia Communications Corp., 441 B.R. 6, 19 (Bankr.

S.D.N.Y. 2010).  In that case, Adelphia's confirmed Plan of Reorganization embodied a Global

Settlement, one element of which was the reimbursement of professional fees of certain settling

creditors out of the Debtors' estates without requiring those creditors to demonstrate that they

had made a "substantial contribution" within the meaning of section 503(b).  Id. at 10-11.  The

U.S. Trustee objected to this aspect of Adelphia's plan and argued, in effect, that section 503(b)

was the exclusive means of providing for a creditor's professional fees out of the estate.  Id. at

11.

91.     Judge Gerber began his analysis with the plain text of section 503(b)(3)(D), which

permits "a creditor . . . making a substantial contribution" to recover, via section 503(b)(4),

"reasonable compensation for professional services rendered by [that creditor's] attorney."  11

U.S.C. §§ 503(b)(3)(D), 503(b)(4).  Judge Gerber noted that, "importantly, section 503(b) does

not provide, in words or substance, that it is the only way by which fees of this character may be

absorbed by an estate," in contrast to other sections of the Code, such as section 503(c), that

explicitly provide that they are the exclusive means for recovery or payment of certain other

types of claims.  Adelphia, 441 B.R. at 12 (emphasis in original).  Accordingly, Judge Gerber

concluded that "the Court is free to look to other provisions of the Code that might also authorize

a payment."  Id. at 13.

92.     Next, Judge Gerber turned to section 1129(a)(4), which provides that a plan may

be confirmed where "[a]ny payment made or to be made . . . by the debtor . . . for services or for

costs and expenses in or in connection with the case . . . has been approved by, or is subject to

the approval of, the court as reasonable."  Judge Gerber found section 1129(a)(4) to provide an

independent "reasonableness" test in respect of payments for "costs and expenses in or in

connection with the case," and concluded that, were section 503(b)'s authorization for

"reasonable compensation" of a creditor's professionals the only source of authority for

reimbursement of creditors' professional fees under a plan, section 1129(a)(4) would be

unnecessary and superfluous: "there would be no need to impose the reasonableness requirement

twice.  Applying section 503(b) in accordance with its terms would already have skinned the

cat."  Id. at 13.

42

93.     Accordingly, Judge Gerber concluded that fees may be reimbursed pursuant to a settlement embodied in a plan of reorganization without requiring a showing of a "substantial contribution" as required by section 503(b).  Id. at 19 ("the Court rules that to the extent that the requested fees are reasonable . . . the Code permits the Applicants' reasonable fees to be recovered under [the plan] without showing compliance with sections 503(b)(3) or (4)."); id. at 22 ("The Court determines that under the Code and the caselaw, reasonable fees may be paid where, as here, the provision for fees is an element of a chapter 11 reorganization plan.").[40]

94.     Under the reasoning of Adelphia, it is entirely appropriate that the Lenders need not show a "substantial contribution" under section 503(b) to receive the bargained-for reimbursement of Lender Fee/Expense Claims as a component of the comprehensive DCL Plan Settlement.  Indeed, the Lenders' significant settlement concessions, which are a foundation of the DCL Plan, provide an even more compelling basis on which to approve reimbursement of the Lender Fee/Expense Claims than was present in Adelphia.  Aurelius's objection provides no reason to depart from the clear statutory framework and from what this Court already has recognized to be the common practice in bankruptcy cases.

95.     Moreover, numerous plans confirmed by Bankruptcy Courts in this District provide for reimbursement of professional fees for settling creditors without a showing of a "substantial contribution", contrary to Aurelius's unsubstantiated assertion that it is "at odds with Third Circuit precedent" to confirm a plan including such a provision.  Aurelius Obj. ¶ 12.  Among the relevant examples are the plans confirmed in the following cases:

---

[40]  The Adelphia decision expressly holds that "the Code permits [creditor's] reasonable fees to be recovered under [a plan] without showing compliance with sections 503(b)(3) or (4)."  Adelphia, 441 B.R. at 19.  It is therefore utterly irrelevant that certain parties in Adelphia, prior to the court's ruling, submitted fee applications that "included a discussion of the relevant section 503(b) standards."  Aurelius Obj. ¶ 12.

| *Case* | *Provision for Creditors' Professional Fees:* |
|---|---|
| In re Harry & David Holdings, Inc., Case No. 11-10884 (MFW) (Bankr. D. Del.). | Confirmation Order dated August 29, 2011 [Docket No. 767], Exhibit A, Second Amended Joint Plan of Reorganization, Section XII.C. |
| In re Capmark Fin. Group Inc., Case No. 09-13684 (CSS) (Bankr. D. Del.). | Confirmation Order dated August 24, 2011 [Docket No. 3568] ¶ 23. |
| In re Smurfit-Stone Container Corp, Case No. 09-10235 (BLS) (Bankr. D. Del.). | Confirmation Order dated June 21, 2010 [Docket No. 8107] ¶ 10. |
| In re Trident Res. Corp., Case No. 09-13150 (MFW) (Bankr. D. Del.). | Confirmation Order dated June 15, 2010 [Docket No. 398] ¶ 23. |
| In re Hawkeye Renewables, LLC, Case No. 09-14461(KJC) (Bankr. D. Del.). | Confirmation Order dated June 2, 2010 [Docket No. 349] ¶ 24. |
| In re Premier Int'l Holdings Inc., Case No. 09-12019 (CSS) (Bankr. D. Del.). | Confirmation Order dated April 29, 2010 [Docket No. 2114] ¶¶ 76-78. |
| In re Simmons Bedding Co., Case No. 09-14037 (MFW) (Bankr. D. Del.). | Confirmation Order dated January 5, 2010 [Docket No. 198] ¶ 16. |

Aurelius's counsel, Akin Gump, was in fact the beneficiary of a plan previously approved in this District that provided for reimbursement of its fees without any disclosure mechanism at all.  See Confirmation Order ¶ 24, In re Hawkeye Renewables, LLC, Case No. 09-14461 (KJC) (Bankr. D. Del. June 2, 2010) [Docket No. 349] ("Reorganized Renewables shall promptly pay in Cash in full reasonable and documented fees and expenses incurred by the First Lien Agent . . . including, without limitation, the fees and expenses of Akin Gump Strauss Hauer & Feld LLP . . . .  All amounts distributed and paid to the foregoing parties pursuant to the Plan of Reorganization shall not be subject to setoff, recoupment, reduction or allocation of any kind and shall not require the filing or approval of any fee application.").

96.     The case for reimbursement is even stronger here, where the Lenders are not merely seeking reimbursement of fees in exchange for support of a plan but are settling creditors who have agreed to provide hundreds of millions of dollars of consideration as part of the DCL Plan Settlement, and where several of Lenders serve as co-proponents of the DCL Plan with the Debtors and the Committee.  As a consequence of the DCL Plan Settlement, the Lenders have substantially compromised their contractual entitlements under the Senior Loan and Bridge Loan

Agreements.  The Plan provides for a portion of those diminished distributions to be made on account of the Lender Fee/Expense Claims.[41]  As shown by <u>Adelphia</u> and the legions of other cases involving plans with similar reimbursement and distribution provisions in this District, this is perfectly reasonable and appropriate under the circumstances.

97.    In the face of this body of precedent, Aurelius relies almost entirely on <u>In re TCI 2 Holdings, LLC</u>, 428 B.R. 117 (Bankr. D.N.J. 2010), but that non-binding opinion is not inconsistent with reimbursement of the Lender Fee/Expense Claims as part of the DCL Plan Settlement embodied in the DCL Plan.  Notably, the Lenders here occupy a very different position than that of the Ad Hoc Committee that sought fee reimbursement in <u>TCI 2 Holdings</u>, as nothing in <u>TCI 2 Holdings</u> suggests that the Ad Hoc Committee there had any prepetition contractual entitlement to recover fees from the debtors or from non-debtor affiliates.  To the contrary, the opinion comments that the Ad Hoc Committee "[did] not cite to any other Code authority [but 503(b)]" supporting its right to reimbursement of professional fees from the estate. <u>TCI 2 Holdings</u>, 428 B.R. at 146 n.37.  The court in <u>TCI 2 Holdings</u> viewed this as a critical point, concluding that "courts may not create a right to recover from the bankruptcy estate where no such right exists under the Bankruptcy Code" and holding, therefore, that the Ad Hoc Committee was required to satisfy section 503(b) in order to recover its fees from the estate.  <u>Id.</u> at 146-47 (citing <u>Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)</u>, 181 F.3d 527, 532 (3d Cir. 1999)).

---

[41]    The fact that the Senior Lenders will hold approximately 94% of the equity of Reorganized Tribune – and so will themselves bear the vast majority of the Lender Fee/Expense claims to be reimbursed – highlights the fact that the Lender Fee/Expense Claims are merely a form of distribution on account of the Loan Claims. Additionally, if the Senior Lender Fee/Expense Claims were not paid, all Senior Lenders potentially would be obligated under Section 7.05 of the Senior Loan Agreement to reimburse the fees and expenses incurred by the Senior Loan Agent in defending the interests of the Senior Lenders and negotiating the DCL Plan Settlement. Payment of these Lender Fee/Expense Claims is settlement consideration to the Senior Lenders as it relieves them of the risk of this liability.

98.     Here, in contrast, the Lenders have a preexisting right to reimbursement from Tribune, the Guarantor Debtors, and, importantly, the Guarantor Non-Debtors.  The Lenders' contractual entitlement to distributions on their Loan Claims exceeds the total consideration to be received by them under the DCL Plan Settlement (including reimbursement of the Lender Fee/Expense Claims).  Moreover, the Lenders' claims for reimbursement of professional fees specifically arise under the Senior Loan Agreement and Bridge Loan Agreement.  See Senior Loan Agreement § 8.04; Bridge Loan Agreement § 8.04.  As claims arising out of prepetition contracts, the Lender Fee/Expense claims are subject to allowance under section 502(b) of the Bankruptcy Code.  See OHC Liquidation Trust v. U.S. Fire Ins. Co. (In re Oakwood Homes Corp.), 394 B.R. 352, 356 (Bankr. D. Del. 2008) (Walsh, J.) (noting that "in the bankruptcy context, the Supreme Court has held that attorneys' fees authorized by prepetition contracts may be awarded even if they are incurred in postpetition litigation") (citing Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co., 549 U.S. 443, 450 (2007)); accord Ogle v. Fid. & Deposit Co., 586 F.3d 143, 147 (2d Cir. 2009) ("an unsecured claim for post-petition fees, authorized by a valid pre-petition contract, is allowable under section 502(b) and is deemed to have arisen pre-petition.").  Finally, in addition to compromising their claims against the Debtors, the Lenders have agreed under the DCL Plan Settlement to release their claims against the Guarantor Non-Debtors, allowing those subsidiaries to remain assets of the Reorganized Debtors.  All of these concessions were agreed to in exchange for a package of consideration, including reimbursement of the Lender Fee/Expense Claims.

99.     The DCL Plan and Settlement may provide for reimbursement of the Lender Fee/Expense Claims, just as a plan may provide for settlement of any prepetition claim.  See, e.g., 11 U.S.C. § 1123(b) (providing that a plan may "provide for . . . the settlement or adjustment of any claim or interest belonging to the debtor or the estate" or "modify the

rights . . . of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims"); Adelphia, 441 B.R. at 14 (commenting that "textual analysis would tend to suggest the possibility that [payment of creditors' professional fees] could be" authorized under the settlement authority granted by section 1123(b)(3)).  Because Section 9.1 of the Plan does not "create" any right to payment not found in the Bankruptcy Code, the Lenders need not rely on section 503(b) for allowance and payment of the fee claims, in contrast to the Ad Hoc Committee that sought payment of fees in TCI 2 Holdings.

100.    Additionally, the fact that the U.S. Trustee has not objected to the DCL Plan further distinguishes this case from TCI 2 Holdings.  As Aurelius highlights, the U.S. Trustee objected to the payment of the Ad Hoc Committee's fees in TCI 2 Holdings.  See Aurelius Obj. ¶ 9 (citing TCI 2 Holdings, 428 B.R. at 146).  Here, however, the U.S. Trustee has not objected to the DCL Plan – indeed, Section 9.1 was developed specifically to address and consensually resolve a prior objection by the U.S. Trustee.[42]

101.    Finally, contrary to Aurelius's contention, the DCL Plan's provision for reimbursement of the Lender Fee/Expense Claims is consistent with the Third Circuit's holding in In re O'Brien Environmental Energy, Inc., 181 F.3d at 532.  See Aurelius Obj. ¶ 12.  In O'Brien, the Third Circuit rejected the attempt of an unsuccessful bidder at a section 363 sale to obtain payment of a break-up fee and reimbursement of expenses from the debtor's estate

---

[42]    Following the U.S. Trustee's objection to the Second Amended Plan, the DCL Plan Proponents agreed to amend Section 9.1 to provide Reorganized Tribune, the Creditor's Committee, and the U.S. Trustee with the opportunity to review and object to the payment of the Lender Fee/Expense Claims and the right to seek review of any disputed amount by this Court.  The U.S. Trustee subsequently withdrew its objection to the Second Amended Plan.  See United States Trustee's Objection to Second Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo Gordon & Co., L.P., and JPMorgan Chase Bank, N.A. at ¶ 23, Feb. 15, 2011 [Docket No. 7980]; see also Notice of Filing of Proposed Second Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A. (As Modified)), Ex. B at Cumulative Blackline of Second Amended Joint Plan of Reorganization § 9.1, March 3, 2011 [Docket No. 8259].

47

without showing that the fee could be recovered as an administrative expense under section 503(b).  Id. at 532-533.  Like the Ad Hoc Committee in TCI 2 Holdings – and unlike the Lenders here – the bidder in O'Brien expressly disclaimed any entitlement to its fees under any provision of the Bankruptcy Code, instead relying on "case law setting forth standards for approval of break-up fees and break-up expenses."  Id. at 532 (internal quotations omitted).  The Third Circuit  "decline[d] the invitation to develop a general common law of break-up fees," and noted that the Bankruptcy Code sets out express means for distribution of the estate, such as under sections 503(b) or 1123.  Id.  Here, reimbursement of the Lender Fee/Expense Claims is authorized under section 1123, both because the contractual entitlements on the Loan Claims exceed the value to be distributed pursuant to the DCL Plan Settlement and because the fee claims are themselves allowed claims in the case by virtue of the express contractual provisions providing for such claims in the Senior Loan and Bridge Loan Agreements.  Therefore, nothing in O'Brien is inconsistent with reimbursement of the Lender Fee/Expense Claims under the Plan.  See Adelphia, 441 B.R. at 14.[43]

102.    In sum, a plain reading of section 1129(a)(4) of the Bankruptcy Code, the persuasive authority of Adelphia, common practice in numerous chapter 11 cases in this District, Aurelius's own proposed plan, the fact that a similar objection previously was raised by EGI-TRB and not upheld by this Court, and the fact that the reimbursement of the Lenders is part of the overall DCL Plan Settlement consideration, all dictate that Aurelius's untimely objection should be overruled and that the Lenders need not show a "substantial contribution" under

---

[43]    Aurelius's quotation from O'Brien is misleading and inapposite.  Because the Lender Fee/Expense Claims arise out of a prepetition contract, even claims for fees incurred postpetition are prepetition claims.  See, e.g., Ogle, 586 F.3d at 147.  It is therefore irrelevant that "claims that arise after the date on which the debtor petitioned for bankruptcy protection . . . are generally allowed, if at all, only as administrative expenses pursuant to 11 U.S.C. § 503" (Aurelius Obj. ¶ 12 (quoting O'Brien, 181 F.3d at 532)).

section 503(b) in order to have their Lender Fee/Expense Claims reimbursed as provided by Section 9.1 of the Plan.

b)    The Reimbursement Provisions Of The DCL Plan Satisfy Section 1129(a)(4).

103.    Aurelius's objection to the mechanics of Section 9.1 is likewise unavailing. Section 9.1 requires the Senior Lenders and Bridge Lenders, respectively, to provide "reasonably detailed statements of the [Lender] Fee/Expense Claims" to the United State Trustee, the Committee and the Debtors.  DCL Plan §§ 9.1.1, 9.1.2.

104.    Although the DCL Plan already contemplated judicial review of the Lender Fee/Expense Claims in the event of an objection by any of the reviewing parties, to address any concerns as to the level of disclosure, the DCL Plan will be amended to provide for the Lenders to file their fee statements on the public docket.  Doing so eliminates any argument that the DCL Plan fails to comport with section 1129(a)(4), which requires only that the payment to be made to the Lenders be "approved by, or is subject to the approval of, the court as reasonable."  11 U.S.C. § 1129(a)(4).

105.    To the extent that Aurelius is suggesting that the Lenders must file formal fee applications or that Aurelius should be afforded the right to object to the reasonableness of the fee statements, Aurelius is wrong.  The disclosure mechanism provided by Section 9.1 is more comprehensive than that required by section 1129(a)(4), and far more detailed than similar provisions found in plans of reorganization approved by Courts in this District as noted above.

106.    Aurelius articulates no reason why this Court, the U.S. Trustee, the Debtors, and the Committee will not ensure that the Lender Fee/Expense Claims are "reasonable" under section 1129(a)(4).  The DCL Plan Proponents oppose giving Aurelius a right of objection to which Aurelius is not entitled under the law, particularly given that the matter will have no

49

impact whatsoever on Aurelius due to its decision to take an all cash distribution under the DCL Plan.

107.     For all of these reasons, Aurelius's objection to the reimbursement of Lender Fee/Expense Claims pursuant to Section 9.1 of the DCL Plan is without merit and should be overruled.

## IV.    CERTAIN OBJECTIONS HAVE BEEN RESOLVED BY THE DCL PLAN PROPONENTS

### A.    Certain Objections Are Or Should Be Resolved Through Modifications To The DCL Plan.

108.     Concurrently herewith, the DCL Plan Proponents have filed proposed amendments to the DCL Plan to resolve certain Plan objections.  These Plan amendments are described below.

1)    WTC Objection.

109.     In paragraphs 19-21 of WTC's Objection, WTC asserts that the DCL Plan does not adequately preserve WTC's charging lien due to a purported scrivener's error in the DCL Plan.  See WTC Obj. ¶¶ 19-21.  The DCL Plan Proponents have modified Section 7.7.2 of the DCL Plan as requested by WTC.

110.     In paragraph 15 and Annex A of WTC's objection, WTC requests certain changes to Section 5.8.2 of the DCL Plan.  See WTC Obj. ¶ 15, Annex A.  The DCL Plan Proponents have agreed to make the following changes to Section 5.8.2 of the Plan to resolve WTC's objection, and they understand such changes are acceptable to WTC:[44]

> Notwithstanding the foregoing provisions of this Section 5.8 and anything contained elsewhere in this Plan, but subject to Section 5.8.1, (x) the Indentures shall continue in effect solely to the extent necessary to allow (i) the Reorganized Debtors and the Indenture Trustees to make distributions pursuant to the Plan under the respective Indentures, (ii) for the applicable Indenture

---

[44]    Law Debenture has also requested certain changes to Section 5.8.2 of the DCL Plan.  See Law Debenture Obj. ¶¶ 4, 26-29.  The DCL Plan Proponents believe that the changes incorporated into Section 5.8.2 of the DCL Plan should also resolve Law Debenture's objection to Section 5.8.2 of the DCL Plan.

Trustee to assert, prosecute or defend on behalf of Holders of Senior Notes or PHONES Notes, as applicable, Disclaimed State Law Avoidance Claims and to perform such other functions with respect thereto, including, without limitation, to make distributions to their respective Holders, (iii) for the applicable Indenture Trustee to assert any rights preserved under subsection (z) of this Section 5.8.2, (iv) for the individual Holders of Senior Notes or PHONES Notes to prosecute the Disclaimed State Law Avoidance Claims in the event a court determines they are necessary parties, (v) for the Litigation Trust to prosecute Preserved Causes of Action, ~~and~~ (vi) the Holders of PHONES Notes to assert any subrogation rights such Holders may have under section 14.06 of the PHONES Notes Indenture, (vii) any Indenture Trustee to pursue or continue to pursue any appeal of an order of the Bankruptcy Court, commenced by such Indenture Trustee on or before the Effective Date, (viii) Wilmington Trust or Deutsche Bank (or their respective successors under the applicable Indentures) to serve as members of the Litigation Trust Advisory Board or to replace a designee to the Litigation Trust Advisory Board appointed by such member solely in accordance with the terms of this Plan and the Litigation Trust Agreement, and (ix) the continuation of any contractual right or obligation that any Indenture Trustee has with any Person other than the Debtors, the Reorganized Debtors or a Released Party; (y) the Loan Agreements (including, without limitation, the intercreditor provisions described in Section 7.3 of this Plan) shall continue in effect (i) to the extent necessary to allow the Reorganized Debtors and Loan Agents to make distributions pursuant to the Plan on account of the Loan Claims and Loan Guaranty Claims and perform such other functions in connection with this Plan as the applicable Loan Agent shall deem reasonably necessary or appropriate, (ii) with respect to all rights of the applicable Loan Agent and all Persons other than the Reorganized Debtors or Subsidiary Non-Debtors, and (iii) for all purposes with respect to Assigned Senior Guaranty Claims (if any); and (z) nothing herein shall waive, release, or impair any rights, claims or interests, if any, that any Indenture Trustee may have under the applicable Indenture or otherwise or that any other party acting in a representative capacity may have (subject to the limitations imposed pursuant to Section 7.3.2) to the recovery and/or reimbursement of its fees, costs and expenses (including the fees, costs and expenses of counsel and financial advisors) from any distribution hereunder or any amounts allocable or otherwise payable resulting from the pursuit or settlement of Disclaimed State Law Avoidance Claims to the Holders of Claims for which such party is a representative, whether such rights, claims or interests are in the nature of a charging lien or otherwise, all of which rights, claims and interests expressly are preserved.  Except as otherwise provided herein, upon cancellation of the applicable Indenture, the respective Indenture Trustee shall be relieved of any obligations as Indenture Trustee under such Indenture.  Except as expressly provided in this Plan, neither the Debtors nor the Reorganized Debtors shall have any obligations to any Indenture Trustee or Loan Agent for any fees, costs or expenses; provided, however, that if any applicable Indenture Trustee timely asserts a Claim in the chapter 11 cases and such Claim becomes an Allowed Claim, such Allowed Claim shall receive the treatment specified for the applicable Class of Claims pursuant to this Plan.

2)    Aurelius Objection and Foundation Response.

111.    In paragraph 17 of Aurelius's objection, Aurelius requests that the DCL Plan be amended to provide that the debt issued under the Indentures remaining outstanding for various purposes articulated in Section 5.8.2 of the DCL Plan, including so that no party could allege that the Indenture Trustees or holders of Senior Notes Claims and PHONES Notes Claims lacked standing to prosecute the Disclaimed State Law Avoidance Claims or impede the Litigation Trustee's ability to prosecute the Preserved Causes of Action.  See Aurelius Obj. ¶ 17.  The DCL

Plan Proponents believe that any amendment to the DCL Plan suggesting that the debt issued

under the indentures remain outstanding after the Effective Date is inappropriate and inconsistent

with the bankruptcy discharge.  Moreover, the Robert R. McCormick Tribune Foundation and

Cantigny Foundation (collectively, the "Foundations") have strenuously objected to Aurelius's

proposal.  See Statement of Robert R. McCormick Tribune Foundation and Cantigny Foundation

in Response to Objection of Aurelius Capital Management, LP ("Aurelius") to Confirmation of

the Fourth Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries

Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital

Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A., May 31,

2011 [Docket No. 11725] (the "Foundations Reply").    In order to satisfy both Aurelius and the

Foundations, the DCL Plan Proponents propose that the following language be added to Section

5.8.2 of the DCL Plan:

> For the avoidance of doubt, nothing in this Plan shall or is intended to impair the rights of (i) any
> Indenture Trustee or any Holder of a Senior Notes Claim or PHONES Notes Claim from
> prosecuting any Disclaimed State Law Avoidance Claim, with the exception of any Disclaimed
> State Law Avoidance Claim that becomes a Holder Released Claim pursuant to Section 11.2.2 of
> this Plan, (ii) the Litigation Trust and Litigation Trustee from pursuing the Preserved Causes of
> Action, and (iii) any defendant in defending against a Disclaimed State Law Avoidance Claim or a
> Preserved Cause of Action.

112.    As of the date of this Memorandum, the DCL Plan Proponents and Aurelius have

not reached agreement on the above language.

### 3)   DBTCA Objection.

113.    Paragraphs 6-7 of the DBTCA objection take issue with Section 3.2.5 of the DCL

Plan as it pertains to distributions on account of the disputed Senior Noteholder Claims held by

MSCS and requests that the DCL Plan be modified to require that MSCS remove its holdings

from DTC prior to any distribution under the Plan.  See DBTCA Obj. ¶¶ 6-7.  While this

objection raises a mechanical point related to the process by which DTC is able to make

distributions on account of note claims, the DCL Plan Proponents propose to add the following

language to Section 3.2.5 of the DCL Plan in order to resolve DBTCA's objection with respect to this issue:

> The Debtors, the Creditors' Committee, the applicable Indenture Trustee and MSCS shall work in good faith to agree upon an appropriate procedure to insure that MSCS does not receive a distribution on account of any Senior Noteholder Claims held by MSCS for its own account unless and until it is determined that such Senior Noteholder Claims are Allowed Claims and entitled to a distribution pursuant to this Section 3.2.5(c); provided, however, if such parties are unable to agree upon an appropriate procedure, upon notice to the applicable Indenture Trustee and MSCS and an opportunity for such parties to be heard, the Debtors and the Creditors' Committee may seek an order in aid of confirmation of this Plan resolving any disputes and implementing an appropriate procedure.

114.     The DCL Plan Proponents have discussed this language with MSCS and understand this language is acceptable to them.

   4)  <u>DIP Facility Agent.</u>

115.     Prior to the objection deadline, the DCL Plan Proponents received informal feedback from the DIP Facility Agent with respect to Section 2.1 of the DCL Plan.  In response, the DIP Facility Agent and the DCL Plan Proponents have agreed to amend Section 2.1 as follows:

> On or as soon as reasonably practicable after the Effective Date, in full satisfaction, settlement, release, and discharge of and in exchange for each Allowed DIP Facility Claim, the Reorganized Debtors shall pay Allowed DIP Facility Claims in full in Cash.  In addition, on the Effective Date, any unexpired letters of credit outstanding under the DIP Facility shall be, at Reorganized Tribune's option, (i) returned to the issuer undrawn and marked ~~canceled~~<u>cancelled</u>, (ii) collateralized with Cash in an amount equal to 105% of the face amount of such outstanding letter of credit in form and substance acceptable to the issuer thereof, (iii) collateralized with back-to-back letters of credit issued under the Exit Facility in an amount equal to 105% of the face amount of such outstanding letter of credit, in form and substance acceptable to the issuer thereof, or (iv) <u>to the extent not as described in the foregoing clauses (i)-(iii), then </u>otherwise deemed to be subject to reimbursement pursuant to ~~the ~~terms and conditions of the Exit Facility<u>; provided that any such treatment of unexpired letters of credit outstanding under the DIP Facility pursuant to this clause (iv), including, without limitation, treatment of reimbursement claims on account of such unexpired letters of credit, shall be in form and substance acceptable to the issuer of any such outstanding letters of credit</u>.

**B.     Certain Objections Are Resolved Through Modifications To The Litigation Trust Agreement.**

116.     The DCL Plan Proponents have resolved certain objections to the DCL Plan by modifying the terms of the Litigation Trust Agreement.  The summary chart attached hereto as

<u>Exhibit A</u> identifies the objections that have been resolved through modifications to the

Litigation Trust Agreement.

    **C.**    **Certain Objections Are Or Should Be Resolved Through Proposed Language In The Confirmation Order.**

    117.    Two taxing authorities – the Internal Revenue Service (the "<u>IRS</u>") and Missouri

Department of Revenue (the "<u>MDOR</u>") – have raised objections to the DCL Plan that are

virtually identical to the objections[45] raised by such parties to the Second Amended Plan.   An

additional taxing authority – the State of Michigan, Department of Treasury ("<u>MDOT</u>") – has

raised objections to the DCL Plan that are substantially similar to the objections raised by certain

other taxing authorities to the Second Amended Plan.

    118.    The DCL Plan Proponents previously agreed with the IRS and MDOR to resolve

their objections[46] to the Second Amended Plan by incorporating language in the proposed

Confirmation Order, as set forth below.   Additionally, the DCL Plan Proponents previously

agreed with certain other taxing authorities to include language in the proposed Confirmation

Order that resolved objections to the Second Amended Plan that were substantially similar to

MDOR's objection, as set forth below.

- <u>Proposed Confirmation Order Language Responsive To IRS And MDOR Objections As To Installment Payments</u>: "For the avoidance of doubt, should the Reorganized Debtors elect to satisfy an Allowed Priority Tax Claim in regular installment payments in Cash pursuant to sub-part (b) of section 2.3 of the DCL Plan, such regular installment payments shall be in equal quarterly installments in Cash."

- <u>Proposed Confirmation Order Language Responsive To IRS Objection As To Administrative Claims Of Governmental Units</u>: "Notwithstanding anything to the contrary in the Plan or in this Confirmation Order, an Administrative Expense Claim that

---

[45]   <u>See</u> Missouri Department of Revenues Objection to Confirmation of Debtors' Fourth Amended Joint Plan of Reorganization, May 21, 2012 [Docket No. 11656]; Objection to Fourth Amended Joint Plan of Reorganization, May 21, 2012 [Docket No. 11653].

[46]   <u>See</u> The State of Michigan, Department of Treasury's Objection to the Fourth Amended Plan of Reorganization for the Tribune Company and its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P. and JPMorgan Chase Bank, N.A., May 21, 2012 [Docket No. 11652].

is an expense under sections 503(b)(1)(B) and/or 503(b)(1)(C) of the Bankruptcy Code, including interest due thereon under applicable non-bankruptcy law, shall be timely paid in the ordinary course of business without the need of any governmental unit to file a request for payment of such Administrative Expense Claim or any other document, including a Proof of Claim."

- **Proposed Confirmation Order Language Responsive To IRS And MDOT Objections As To Release Of Third Parties**:  "Notwithstanding any provision to the contrary, nothing in the DCL Plan or in this Confirmation Order shall affect the rights of the United States, including the Internal Revenue Service (1) from seeking, pursuant to applicable nonbankruptcy law, to assess or collect from any non-debtor person or entity that may be liable directly or indirectly for the Debtors' taxes, including but not limited to liability under 26 U.S.C. §§ 4975 & 6672, or (2) from assessing or collecting from the Debtor any taxes that the Bankruptcy Code renders nondischargeable."

  "Notwithstanding anything to the contrary in the Plan, this Confirmation Order, or any implementing Plan document, nothing shall affect the rights of the State of Michigan, Department of Treasury to take action against non-debtor third parties who may be responsible for payment of prepetition and/or postpetition tax liabilities of any of the Debtors, and such rights are expressly reserved."

- **Proposed Confirmation Order Language Responsive To IRS Objection As To Jurisdiction**: "Nothing in the Plan or this Order is intended to, or shall, confer jurisdiction on the Bankruptcy Court to determine the tax consequences of the Plan or to determine the tax liability of a non-debtor beyond the jurisdiction permitted under applicable law."

- **Proposed Confirmation Order Language Responsive To MDOR And MDOT Objections As To Default**: "If the Debtors fail to cure a default with respect to a tax payment owed to a Taxing Authority that is not the subject of a bona fide dispute within 90 days after service of written notice of such default from Taxing Authority, then such Taxing Authority may (a) enforce the entire amount of its undisputed claim, (b) exercise any and all rights and remedies under applicable non-bankruptcy law, and (c) seek such relief as may be appropriate in this Court."

119.    The DCL Plan Proponents intend to include the previously-settled language set forth above in the proposed Confirmation Order.  Nonetheless, as of the date of this Memorandum, the IRS, MDOR, and MDOT have not confirmed that such inclusion will resolve their respective objections.

120.    The DCL Plan Proponents believe that their agreement to include the above language in the proposed Confirmation Order should resolve each of the objections raised by the IRS, MDOR, and MDOT.  The DCL Plan Proponents, therefore, respectfully request that the

foregoing language be included in the Confirmation Order.  With the inclusion of the foregoing

language in the Confirmation Order,  the objections filed by the IRS, MDOR, and MDOT, to the

extent not consensually withdrawn prior to the Confirmation Hearing, should be overruled.[47]

## V.    ALL OTHER UNRESOLVED OBJECTIONS SHOULD BE OVERRULED

### A.    The Unresolved Objections To The Litigation Trust Agreement Are Without Merit.

1)    The Scope And Amount Of Fees And Expenses Paid Pursuant To The Litigation Trust Agreement Are Reasonable And Appropriate.

a)    Individual Litigation Trust Advisory Board Members Should Not Be Reimbursed For Legal Fees.

121.    WTC and DBTCA argue[48] that the Litigation Trust Agreement should be

modified to permit each of the individual members of the Litigation Trust Advisory Board to be

reimbursed for the legal fees, costs, and expenses of their own personal legal counsel.[49] WTC

Obj. ¶ 43-44; DBTCA Obj. ¶ 24.  WTC and DBTCA note that they will serve on the Litigation

Trust Advisory Board as indenture trustees serving in a representative capacity and are

"accustomed to having counsel with them."  WTC Obj. ¶ 43.  Therefore, they argue, they should

be reimbursed for their individual attorneys' fees to avoid finding themselves in an

"uncomfortable position when faced with situations that require advice."  Id.[50]

---

[47]    The DCL Plan Proponents also intend to include in the proposed Confirmation Order the language that was previously agreed to with the following parties in connection with the Second Amended Plan: ACE American Insurance Company; California Franchise Tax Board; Federal Communications Commission; New York State Department of Taxation and Finance; Office of the United States Trustee; The Travelers Indemnity Company; United States Environmental Protection Agency; Warren Beatty; and Zurich American Insurance Company.

[48]    See also Limited Joinder of TM Retirees With Respect to Objections Filed by Deutsche Bank Trust Company Americas and Wilmington Trust Company to the Fourth Amended DCL Plan [Docket No. 11720].

[49]    The Litigation Trust Agreement provides that each member of the Litigation Trust Advisory Board shall receive (i) a $25,000 annual aggregate fee as compensation for time expended in connection with the Litigation Trust, and (ii) reimbursement for all reasonable and documented out-of-pocket expenses incurred by such members in connection with the performance of their respective services.  Litigation Trust Agreement §§ 4.8(a) and (b).

[50]    DBTCA also argues that it is in a "catch-22" because certain provisions of the Litigation Trust Agreement permit Board Members to consult with counsel but fail to provide reimbursement for such consultations.  There is no such "catch-22" – defined as "a situation in which a desired outcome or solution is impossible to attain because of a set of inherently illogical rules or conditions" – because, while the Board Members are authorized

122.    Those arguments are without merit and, in any event, do not raise any issues that render the DCL Plan unconfirmable.  It is true that the proper prosecution of the Preserved Causes of Action will "require a high level of sophistication and expertise."  Id.  It is for that very reason that the DCL Plan provides for the appointment of a Litigation Trustee who "shall be responsible for all decisions and duties with respect to the Litigation Trust."  Litigation Trust Agreement § 3.1.  While the Litigation Trust Advisory Board is given consultation rights and may direct the Litigation Trustee in certain respects, the prosecution of the Preserved Causes of Action and liquidation of the Litigation Trust Assets ultimately are the responsibilities of the Litigation Trustee.  Id. at §§ 3.1 and 3.2.  Moreover, the Litigation Trustee is permitted to retain counsel and the Litigation Trustee's counsel is paid for out of the Litigation Trust Assets, including the $20,000,000 Trust Loan to be funded by Reorganized Tribune.  Id. at § 3.2(f).  The Litigation Trustee's counsel will be able to advise the Litigation Trust Advisory Board as to the business of the trust.  If individual Board members believe they have individual legal interests that diverge from the interests of the Litigation Trust Beneficiaries as a whole, it is appropriate that the individual board members pay their own attorneys' fees.

123.    Neither WTC nor DBTCA cite any legal authority in support of their claim that their personal outside counsel fees should be paid out of Litigation Trust Assets or that the failure to include such a provision would in any way impair confirmation of the DCL Plan.  Rather, WTC and DBTCA merely insist that their status as indenture trustees somehow entitles them to unlimited funding of their own attorneys' fees from the Litigation Trust notwithstanding the fact that the DCL Plan already provides reimbursement of the legal fees of the Litigation

---

to consult with their personal counsel, they certainly not required to do so.  Moreover, as described below, all members of the Litigation Trust Board will have access to the counsel retained by the Litigation Trustee.  This simply is not a situation in which the "desired outcome" (effective service as a Litigation Trust Board member) is "impossible to attain" due to "a set of inherently illogical rules or conditions."

Trustee.  This is not the law.  As Judge Walrath pointed out in <u>In re Worldwide Direct, Inc.</u>, in

the analogous context of payment of indenture trustee fees from a chapter 11 estate itself:

> [T]he activities of an indenture trustee are focused on benefitting its constituents
> rather than all creditors. . . .  "In order to satisfy its fiduciary duty to its debenture
> holders, the indenture trustee may take actions that are of only marginal or
> incidental benefit to the bankruptcy estate.  The bankruptcy estate should not have
> to pay for services which primarily benefit the debenture holders and only
> incidentally benefit the bankruptcy estate."

<u>In re Worldwide Direct, Inc.</u>, 334 B.R. 112, 121 (Bankr. D. Del. 2005) (quoting <u>In re Flight</u>

<u>Transp. Corp. Sec. Litig.</u>, 874 F.2d 576, 581 (8th Cir. 1989)).

124.    There simply is no legal basis to compel the Litigation Trust – itself a creation of

contract pursuant to the DCL Plan – to provide the indenture trustees with reimbursement from

the Litigation Trust of their personal attorneys' fees incurred in connection with service on the

Litigation Trust Advisory Board.  Ultimately recognizing this, WTC argues that failure to

include a fee reimbursement provision for its personal attorney fees "falls outside the customary

structure" for litigation trust advisory boards.  WTC Obj. ¶ 44.  Even if this were demonstrably

the case (as shown below, it is not), none of the confirmation requirements of section 1129 of the

Bankruptcy Code are implicated by allegedly "customary" practice with respect to post-

confirmation litigation trusts (which always are individually structured to address the unique

needs and concerns of the constituents in a particular given case).

125.    In any event, the only "evidence" cited by WTC with respect to "customary"

provisions of a litigation trust agreement comes from the Litigation Trust Agreement in the

<u>Lyondell</u> case.  That agreement, however, was the product of a global compromise in which

beneficiaries of the litigation trust bargained for certain compensation and reimbursement

provisions in exchange for the withdrawal of their objections to plan confirmation.  WTC and

DBTCA by contrast, seek the benefits of a negotiated settlement (as in Lyondell) while continuing to pursue their objections to confirmation of the DCL Plan.

126.    Moreover, as the litigation trust comparison chart attached hereto as Exhibit C (the "LT Comparison Chart") demonstrates, the Lyondell fee reimbursement arrangement does not provide evidence of a norm.  As demonstrated in the LT Comparison Chart, it is at least as "customary" for board members of post-confirmation trusts to be responsible for their own individual attorneys' fees should they choose to retain outside counsel.

> b)    The Compensation Provided To Individual Litigation Trust Advisory Board Members Pursuant To The Litigation Trust Agreement Is Reasonable And Appropriate.

127.    WTC asserts that $25,000 annual compensation per member of the Litigation Trust Advisory Board for time expended in connection with the Litigation Trust is inadequate and below market.  WTC Obj. ¶¶ 41-42.  Nowhere in its objection does WTC suggest – nor could it reasonably argue – that the purported deficiency in compensation contravenes a confirmation requirement of section 1129 of the Bankruptcy Code.  And, again, the only "market" evidence provided by WTC is the Lyondell Litigation Trust Agreement – the product of a global compromise – which provided a greater amount of annual compensation to trust board members than the amount contemplated here.

128.    The DCL Plan Proponents are of the view that $25,000 annually is adequate compensation for the time expended in attending quarterly board meetings (out-of-pocket expenses are reimbursed separately) as well as the fulfillment of other fiduciary duties given that any such compensation reduces the amounts that might otherwise be distributed to creditors.  In addition, as the LT Comparison Chart demonstrates, the $25,000 annual compensation falls within the bounds of precedents of compensation provided to litigation trust board members in other restructurings.

2) The Objections Of WTC And Aurelius Regarding The Transfer Of Privileges To And Cooperation With The Litigation Trustee Are Reasonably And Appropriately Addressed By The Litigation Trust Confidentiality And Common Interest Agreement.

129.    WTC argues that the Plan and the Litigation Trust Agreement should be amended (i) to mandate cooperation with the Litigation Trustee, in particular with regard to access to witnesses "under the Reorganized Debtors' Control," WTC Obj. ¶ 32, and (ii) to ensure that the Litigation Trustee has access to all privileges and work product of the Debtors and the Creditors' Committee relating to the Preserved Causes of Action, and the right to enforce or waive such privileges. Id. at ¶¶ 32-40.  In a similar vein, Aurelius requests that the Plan or the Confirmation Order expressly provide that the Debtors shall transfer all privileges relating to the Preserved Causes of Action to the Litigation Trustee and that the Litigation Trustee shall maintain all rights with respect to these privileges, including the right to waive any such privilege.  Aurelius Obj. ¶¶ 22-25.

130.    Both the DCL Plan (§ 13.3.8) and the Litigation Trust Agreement (§ 1.2(b)) provide that, on the Effective Date, the Debtors and Litigation Trustee will enter into a Litigation Trust Confidentiality and Common Interest Agreement ("LT Confidentiality Agreement") to provide the Litigation Trustee with reasonable access to the Debtors' records and information relating to the Litigation Trust Assets.  Consistent with these provisions, the Debtors, the Committee and the Senior Lenders have negotiated a draft of the LT Confidentiality Agreement (attached hereto as Exhibit D) which balances, among other factors:

▪ the interests of the Litigation Trust in securing reasonable access to the Debtors' records and information relating to the Litigation Trust Assets,

▪ the interest in preserving coverage under the Directors and Officers insurance policies potentially available to fund recoveries by the Litigation Trust,

▪ the interest of Reorganized Debtors in conducting their business operations without unreasonable interference, and

- the interest in preserving privileges associated with documents shared by the Debtors with the Litigation Trust.

131.    The DCL Plan Proponents have provided a copy of the draft LT Confidentiality Agreement to any party that has so requested, including both WTC and Aurelius.[51] On May 30, twenty-one days after the LT Confidentiality Agreement was provided to Aurelius and only two days before the filing deadline of this Memorandum, Aurelius and WTC proposed substantial revisions to the draft LT Confidentiality Agreement, which in critical respects, described below, would destroy the balance reflected in the DCL draft.

132.    As a threshold matter, no provision of the Bankruptcy Code nor, as discussed below, any case mandates the transfer of privileges from a debtor to a litigation trustee where control of the reorganized debtor is not also being transferred to the litigation trust.  While such provisions are sometimes the subject of negotiation and included in a plan, the absence, inclusion or details of a privilege-transfer provision does not present a confirmation issue.

133.    In any event, the draft LT Confidentiality Agreement reasonably and appropriately balances the interests of all concerned and, in doing so, addresses the issues raised by WTC and Aurelius objections with regard to the Litigation Trustee's access to witnesses and interest in privileges.  With respect to access to potential witnesses, Section II. C of the draft LT Confidentiality Agreement requires the Reorganized Debtors to provide reasonable access to employees of the Reorganized Debtors who have knowledge relating to the Claims,[52] including

---

[51]    On May 9, 2012, Aurelius requested a copy, which the Committee provided the next day.   In its objections filed on May 21, Aurelius stated that it "intends to work with the DCL Plan Proponents to resolve its objections to the terms of the LT Confidentiality Agreement prior to confirmation."  Aurelius Obj. ¶ 22  n.13.  In its objections filed on May 21, WTC acknowledges the existence of the draft LT Confidentiality Agreement, WTC Obj. ¶ 40 n. 11, but WTC never requested a copy of the draft prior to filing its objections.  Upon receipt of WTC's Objections, the Committee promptly provided WTC a copy of the draft Agreement on May 22.

[52]    "Claims" is defined in § I.A.3. of the LT Confidentiality Agreement.  In order to preserve coverage under insurance policies potentially available to fund recoveries by the Litigation Trust, the term "Claims" is defined to "consist of the Litigation Trust Assets, excluding those Preserved Causes of Action against the Directors and Officers of the Tribune Company and its subsidiaries and any other individuals or entities covered by the Insurance Policies."  Id.  The May 30 revisions proposed by Aurelius and WTC could give rise to arguments by

in the scheduling of telephone conferences, periodic meetings, interviews and appearances of such employees as witnesses at depositions or trials without the need for the Litigation Trustee to serve a subpoena upon such individuals.  In recognition of the rights of employees and the Reorganized Debtor's interest in positive employee relations, this provision does not limit the rights of such individuals or their counsel to object to the appearances sought by the Litigation Trustee.[53]

134.    Likewise, Section II.B provides the Litigation Trustee with reasonable access to Documents Relating to the Claims,[54] including Privileged Documents Relating to the Claims. See § II.B.3.  Section II.E. provides for the preservation of confidentiality and privileges of documents and information shared under the LT Confidentiality Agreement.

135.    The cases cited by WTC and Aurelius[55] are inapposite as they involve the transfer of privileges of a company, where the assignees or transferees of causes of action will continue to control the company during bankruptcy or emerging from bankruptcy."[56]  By contrast, in American International Specialty Lines Insurance Co. v. NWI-I Inc. (f/k/a Fruit of the Loom

---

insurance carriers with respect to coverage by requiring access to information relating to causes of actions against the Directors and other individuals or entities covered by the Insurance Policies.

[53]    By contrast, the May 30 revisions proposed by Aurelius and WTC would require the Reorganized Debtors to direct employees to provide the Litigation Trustee with any privileged information "that relates, directly or indirectly, in full or in part, to the Claims."  The Aurelius/WTC proposal would thereby create an adversary relationship between the Reorganized Debtors and their employees.

[54]    "Documents Relating to the Claims" is defined in § I.A.13 of the LT Confidentiality Agreement as Documents "created contemporaneously with and related to Tribune Company's 2007 leveraged buy out transactions, or created thereafter in pursuit of the Claims."

[55]    See WTC Obj. ¶¶ 35-36; Aurelius Obj. ¶ 13.

[56]    See, e.g., Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 348-349 (1985) (privilege transferred to trustee of corporation in bankruptcy because trustee's duties most closely resemble those of corporation's management); In re Hardwood P-G, Inc., 403 B.R. 445, 456 (Bankr. W.D. Tex. 2009) (privilege transferred to litigation trustee where "all of the Debtors' assets (including those causes of action that had been asserted on behalf of the debtor estate by the Committee) were transferred to the Litigation Trust under the sole management and control of the Trustee"); In re Gold & Appel Transfer S.A., 342 B.R. 386, 387-88 (Bankr. D.D.C. 2006) (privilege transferred to Official Liquidator who has the power to operate the debtor's business as well as sue officers, directors and other insiders); In re Hechinger Inv. Co. of Del., 285 B.R. 601, 604-07 (Bankr. D.D.C. 2002) (privilege transferred to Liquidation Trust to whom any and all of debtors' assets are transferred).  See also American International, 240 F.R.D. at 405-406 ("American International") (summarizing case law).

Inc.), 240 F.R.D. 401, 408 (Bankr. N.D. Ill. 2007) ("American International"), the court held that

"[a]bsent control of the corporation, this Court finds that the attorney-client privilege does not

pass to a successor entity, even with respect to assets that were transferred to that successor.

136.    In negotiating the LT Confidentiality Agreement, the DCL Plan Proponents

balanced the interests of both the Litigation Trust and the Reorganized Debtors as set forth above

and the practicalities of the arrangements created under the DCL Plan.  Section II.B.3 provides

the Litigation Trustee with access to Privileged Documents Relating to the Claims,[57] but in doing

so identifies the following discrete categories of privileged documents that are not included in

the transfer:

- Privileged Documents created during (or in preparation for) the Chapter 11 Cases regarding or relating to the conduct of the Chapter 11 cases are not included, except to the extent such documents contain an analysis of the Claims.  See id. at § II.B.3.a. Similarly, Privileged Documents evaluating the reasonableness, effectiveness or confirmability of any of the plans of reorganization (id. at § II.B.3.c.) and Privileged Documents exchanged among the DCL Plan Proponents and their professionals relating to the DCL Plan, including the negotiation of the DCL Plan (id. at § II.B.3.d.), are not included because they were not undertaken in pursuit of the Claims.

- Privileged Documents created in connection with the Examiner's Report are not included, except for Privileged Documents reflecting statements by witnesses interviewed by the Examiner.  See id. § at II.B.3.b.  A critical premise underlying this Court's order appointing the Examiner and promoting the cooperation of the parties with the Examiner was that privileged communications made during the Examiner Report process would remain privileged and confidential.  See Agreed Order Directing Appointment of an Examiner, April 20, 2010 [Docket No. 4120] ("The Debtors' and the Committee's privileges, including, but not limited to, the attorney-client privilege and attorney work-

---

[57]  WTC's Objection suggests that the Litigation Trustee should be afforded access to "all privileged information that relates, directly or indirectly to the Preserved Causes of Action from the Debtors, the Reorganized Debtors, the Creditors' Committee, and their respective professionals."  See WTC Obj. ¶ 37.  Both the Plan (§ 13.3.8) and the Litigation Trust Agreement (§ 1.2(b)) provide that the LT Confidentiality Agreement should govern cooperation between the Litigation Trustee and the Reorganized Debtors.  As to the applicable privileged information in the possession of the Creditors' Committee, the DCL Proponents propose to modify Section 15.2 of the DCL Plan to provide that "the Creditors' Committee shall provide the Litigation Trustee with reasonable access to documents relating to the Litigation Trust Assets within the possession, custody or control of the Creditors' Committee pursuant to the terms of a separate agreement between the Creditors' Committee and the Litigation Trustee."  With respect to "professionals," the Debtors, for example, retained a number of law firms in connection with the leveraged buy-out in 2007.  None of those firms is a party to these chapter 11 cases, and these firms, not the Reorganized Debtors, have custody of their files.  Given these circumstances, access to documents in their files is not appropriately addressed in the LT Confidentiality Agreement.

product privilege, remain and are not deemed waived or in any way impaired by this Order"). Likewise, the cooperation of parties with examiners appointed in future Chapter 11 proceedings would be chilled if they faced the prospect that their privileged documents would be turned over to litigation trustees following an examiner report process.

▪ <u>Privileged Documents created by the Debtors or on the Debtors' behalf, on or after October 27, 2010, the date on which this Court entered the Order Granting Unsecured Creditors Committee's Standing Motions</u>, Oct. 27, 2010, [Docket No. 6150] are not included. <u>See id.</u> at § II.B.3.e. So long as the Debtors controlled potential causes of action relating to the 2007 leveraged buy out transactions, the Debtors and successors shared an interest in those causes of action. However, once control over the causes of action transferred to the Committee, the Debtors no longer had an interest in those assets. <u>See, e.g., In re Extended Stay Inc.</u>, No. 09-13764, 2010 Bankr. LEXIS 5411, at *181-82 (S.D.N.Y. July 20, 2010). Once the Debtors no longer had control over the claims arising out of the leveraged buy-out transactions, there was no common interest between the Debtors and the successor entities controlling the claims, and no legal basis for transferring the Debtors' subsequently-created privileged documents to such entities.

▪ <u>Privileged Documents created by the Debtors or on the Debtors' behalf, relating to the state law constructive fraudulent conveyance actions (id.</u> at § II.B.3.f.) are not included, because such actions are not Claims covered by the LT Confidentiality Agreement.[58]

137.    Further, Section II.E.5 of the LT Confidentiality Agreement provides that the disclosure of documents or information to the Litigation Trustee is not intended to waive any applicable privilege. Again balancing the varying interests described above, Section II.E.6 authorizes the Litigation Trustee to waive an applicable privilege attaching to a Document Relating to the Claims after notifying the Reorganized Debtors at least fifteen days prior to such waiver.

138.    Finally, as provided under Section 13.3.9 of the Plan, Section II.A.5 of the LT Confidentiality Agreement provides that the Litigation Trust shall reimburse the Reorganized Debtors for all reasonable and documented out-of-pocket expenses incurred in performing their

---

[58]    By contrast, the May 30 revisions proposed by Aurelius and WTC would require production of, <u>inter alia</u>, privileged documents created in connection with the Examiner Report process, privileged documents created after the Debtors no longer had any control over the claims arising out of the leveraged buy-out transactions and thus after there was no longer any common interest between the Debtors and the successor entities controlling the claims, and privileged documents relating to the state law constructive fraudulent conveyance actions, even though such actions are not Claims covered by the LT Confidentiality Agreement.

obligations under this Agreement.  This was a key component of the DCL Plan Settlement because it provides a cost-based incentive for the Litigation Trust to make only reasonable and measured requests for assistance from the Reorganized Debtors.  In the absence of such a provision, the Litigation Trust effectively would face no constraint in demanding that the Reorganized Debtors search for Information Relating to the Claims.  No party ever filed an objection to this critical provision – including Aurelius and WTC in their objections filed on May 21.  Notwithstanding the lack of any prior or timely objections to Section 13.3.9 of the Plan, in their proposed revisions of the draft LT Confidentiality Agreement, Aurelius and WTC struck Section II.A.5 of the Agreement.

139.    In sum, the objections to the DCL Plan based on differing views concerning the scope of the privilege-transfer to the Litigation Trust have no basis in precedent and should be overruled.  The draft LT Confidentiality Agreement reasonably and appropriately balances all of the relevant interests and, in doing so, adequately addresses the points raised by WTC and Aurelius with regard to the Litigation Trustee's access to witnesses and interest in privileges.

### 3) The Litigation Trustee Should Not Be Permitted To Seek Modification Of The DCL Plan Or The Confirmation Order.

140.    Aurelius asserts that the Section 3.3(b) of the Litigation Trust Agreement should be revised to allow the Litigation Trustee to seek modifications of the DCL Plan or confirmation order.[59]  As a threshold matter, this objection should be overruled simply because Aurelius does not allege – nor could it allege – that the existing language is in any manner inconsistent with the Bankruptcy Code's confirmation standards.  Plan objectors have no right to seek to impose terms simply because they want to.  Unless they can demonstrate a violation of the Bankruptcy Code's

---

[59]    The Litigation Trust Agreement provides that "[t]he Litigation Trustee, acting on behalf of the Litigation Trust, shall agree to comply with, and shall not take any actions inconsistent with or seek to modify or seek relief from, any provision of the Plan or the Confirmation Order."  Litigation Trust Agreement § 3.3(b).

legal standards for confirmation, their sole recourse is to vote against a plan they dislike, and they have done so.

141.    More fundamentally, it is completely illogical to allow the trustee of a post-confirmation trust established to pursue a defined and limited class of litigation claims the right to seek to modify substantive provisions of a confirmed plan of reorganization or the terms of a confirmation order.  In a nonconsensual plan confirmation setting, permitting plan modifications to be sought by an entity acting on behalf of a trust that will be controlled primarily by plan opponents would serve only to provide a vehicle for a collateral attack on the plan.  Moreover, third party reliance on the finality of a plan is of paramount importance, and a substantial alteration to the confirmed plan would undoubtedly affect the rights of third parties.  See, e.g., Spansion, 2011 U.S. Dist. LEXIS 86152, at *10 (dismissing appeal as equitably moot where shares of new common stock had been issued and were publicly traded).

### 4)    The Cap On The Litigation Trust's Expense Fund Is Reasonable.

142.    Aurelius and WTC objected to the inclusion of a cap on the expense fund to be maintained by the Litigation Trustee (the "Expense Fund"),[60] which provides a mechanism by which the Litigation Trustee may maintain a reserve of funds from which the Litigation Trust need not repay the Trust Loan.  As a fallback, Aurelius argues that the Litigation Trust distribution schedule should be modified to enable the Litigation Trust to maintain at least $50 million in the Expense Fund before repayment of the Litigation Trust Loan.  As with other objections to specific provisions of the Litigation Trust Agreement, the DCL Plan's existing provisions are not inconsistent with any of the Bankruptcy Code's confirmation standards.  In any case, the objections to the Expense Fund cap are completely unsupportable.  There is no

---

[60]    The Litigation Trust Agreement, as filed on May 4, 2012, provided for an Expense Fund in an amount to be determined to maintain "a reserve to pay fees and expenses anticipated to be incurred" in connection with, among other things, pursuing the Litigation Trust Assets Litigation Trust Agreement § 3.4.  Subsequent to the objection deadlines, the DCL Proponents determined that the Expense Fund cap should be $20 million.

basis for the position that $20 million will be an insufficient reserve for paying the fees and

expenses of the Litigation Trustee.  Indeed, the entire initial funding of the Litigation Trust is

$20 million, and the objectors cannot plausibly assert that the Litigation Trust needs to maintain

more than that amount in reserve before undertaking to repay the Trust Loan that provided such

initial funding.   Accordingly, the objections to the Expense Fund cap should be overruled.

## B.    The Unresolved Objections To Other Provisions Of The DCL Plan Are Without Merit.

### 1)    Indemnification Claims Of Former Employees Who Provided No Services After The Commencement Of These Cases Are Not Entitled To Administrative Priority.

143.    The Former Employees filed a limited objection to Section 11.6.1 of the DCL

Plan, which provides that the obligations of the Debtors to indemnify and reimburse individuals

who were directors, officers or employees of the Debtors on or after the Petition Date will

survive confirmation of the DCL Plan, thereby providing that any indemnification claims held by

those individuals will receive administrative expense treatment.[61]  The Former Employees seek

to modify Section 11.6.1 to extend its reach to directors, officers and employees of the Debtors

who were no longer employed by the Debtors as of the Petition Date.  That request is

inappropriate and should be denied.

144.    Under section 503(b), administrative expenses are recoverable for "the actual,

necessary costs and expenses of preserving the estate, including wages, salaries, or commissions

for services rendered after the commencement of the case." 11 U.S.C. § 503(b)(1)(A) (emphasis

added).  It is well established that "a company's duty to indemnify officers is a form of

---

[61]    The Former Employees are F. Ashley Allen, Catherine M. Hertz, Michael D. Slason, and Louis J. Stancampiano.  See Limited Objection of Former Tribune Company Employees F. Ashley Allen, Catherine M. Hertz, Michael D. Slason, and Louis J. Stancampiano to Fourth Amended for Tribune Company and its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., and Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A., May 21, 2012 [Docket No. 11661].

compensation." See In re Mid-Am. Waste Sys., 228 B.R. 816, 821 (Bankr. D. Del. 1999);

Christian Life Ctr. Litig. Def. Comm. v. Silva (In re Christian Life Ctr.), 821 F.2d 1370, 1374

(9th Cir. 1987) ("A corporation's duty to indemnify its officer, whether conferred by statute or by

contract, is a form of compensation for the officer's services.").

    145.    To establish administrative priority under section 503(b)(1)(A), a claimant "must

demonstrate that the claimed expenses (i) arose out of a postpetition transaction with the debtor-

in-possession and (ii) directly and substantially benefitted the estate." In re Mid-Am. Waste

Sys., 228 B.R. at 821. Courts have consistently held that "an indemnification claim based upon

pre-petition services or conduct is not a cost or expense for 'services rendered after the

commencement of a case' . . . [and] is not entitled to administrative expense priority." See In re

Summit Metals, Inc., 379 B.R. 40, 56 (Bankr. D. Del. 2007); In re Pinnacle Brands, Inc., 259

B.R. 46, 51-52 (Bankr. D. Del. 2001) (denying administrative priority because indemnification

under a pre-petition contract does not by itself constitute an ongoing actual use of services); In re

Mid-Am. Waste Sys., Inc., 228 B.R. at 821 (same).

    146.    The Former Employees were no longer employed as of the petition date, there

was no postpetition transaction between the Debtors and the Former Employees, and the Former

Employees did not perform any services that benefitted the bankruptcy estate. For this reason

alone, the Former Employees cannot possibly establish that their indemnity claims should be

entitled to administrative expense priority. It is irrelevant whether the Former Employees'

claims for indemnification matured before or after the Petition Date. Rather, "the critical fact is

that the claim for indemnity arose from pre-petition services." In re Christian Life Ctr., 821 F.2d

at 1374. Accordingly, the Former Employees' request must be denied.[62]

---

[62]    Priority disputes aside, the ultimate issue of whether the Former Employees are entitled to indemnification
under the applicable corporate documents for the defense of preference lawsuits is not before this Court. All

2)  <u>Aurelius's Requested Language Changes To The DCL Plan's Release Provisions
    Should Be Rejected.</u>

147.    Aurelius seeks "modifications" to certain defined terms in the DCL Plan,
specifically "Selling Stockholders" and "Disclaimed State Law Avoidance Claims," that would
unilaterally redraft the carefully negotiated release provisions at the core of the DCL Plan
Settlement.  This effort should be rejected because (1) the heavily-negotiated and carefully-
drafted releases (and these definitions, to which they refer) are an integral part of the DCL Plan
Settlement and any changes to them threaten to upset the careful balance struck in the DCL Plan
Settlement, (2) Aurelius failed to object to these provisions during the prior confirmation
hearing, and (3) Aurelius's proposed changes are unnecessary to prosecute the Disclaimed State
Law Avoidance Claims' against Selling Stockholders.  Nonetheless, in the spirit of compromise,
the DCL Plan Proponents have made certain changes to accommodate any arguably legitimate
concerns that Aurelius might have.

148.    The DCL Plan's releases are a key component of the DCL Plan Settlement, which
this Court approved over Aurelius's objection and declared "fair, reasonable and in the best
interest of the Debtors' estates."  Confirmation Opinion at 71.  Those releases, which incorporate
the defined terms "Selling Stockholders" and "Disclaimed State Law Avoidance Claims," were
the product of months of vigorous negotiation among numerous parties, including the Debtors,
the Committee and the Senior Lenders.  Indeed, the DCL Plan Proponents solicited and
incorporated comments from many parties in arriving at this language.  These provisions have
been in the DCL Plan in substantially the same form since at least the Second Amended DCL
Plan.  Having failed to convince the Court of the merits of its objections to that plan, Aurelius

---

rights to challenge the merits of the Former Employees' indemnity claims at the appropriate time are hereby
reserved.

should not now be permitted to reopen the debate and risk upsetting the DCL Plan Settlement by modifying the release provisions to its liking. Put simply, the time for doing so has lapsed.

149.    Aurelius's objection also should be rejected because it would only risk introducing ambiguity and uncertainty. With respect to the definition of "Selling Stockholders," Aurelius speculates that the DCL Plan's current language is somehow incomplete, but despite that language remaining virtually unchanged for many months, Aurelius has not proposed language in its objection that would improve it. Aurelius instead asks this Court to rewrite those provisions to ensure that all defendants Aurelius deems "proper" or "appropriate" can be sued in the Disclaimed State Law Avoidance Actions. Aurelius Obj. ¶ 19. This belated and open-ended request only serves to delay and interject uncertainty into what has already been a protracted process.

150.    Nonetheless, in order to facilitate consensus, the DCL Plan Proponents have voluntarily proposed certain revisions that fully address and resolve any and all arguably legitimate concerns raised by Aurelius in its objection. Aurelius posits two primary arguments against the existing definition of Selling Shareholders: first, that it could be interpreted to release current and former Senior Lenders who are "proper defendants" in the Disclaimed State Law Avoidance Claims in capacities other than as beneficial owners of Tribune shares; and, second, that it could result in certain claims against shareholders being released on a legal technicality because legal owners, such as "guardians, trustees, general partners and custodians" could not be named in a lawsuit. To accommodate these objections, the DCL Plan Proponents have modified the definition of Selling Stockholders to include any recipient of shareholder proceeds, including all "legal" as well as "beneficial" owners of Tribune's shares. This revision makes clear that the Plan does not preclude the Disclaimed State Law Avoidance Claims from being asserted against any legal or beneficial owner of Tribune common stock whose shares were sold or redeemed in

70

the leveraged buy-out in 2007, in their capacity as a recipient of payments with respect to the shares' sale or redemption. It also makes clear that the Plan does not preclude Aurelius or any other similarly situated party from pursuing beneficial owners of Tribune stock because of a legal technicality that might prevent them from naming a party as a nominal defendant in a lawsuit against such shareholders, to the extent that is Aurelius's concern.[63]

151.    Aurelius also objects to and seeks to remove as "redundant" language from Section 1.1.67's definition of "Disclaimed State Law Avoidance Claims" that Aurelius acknowledges is included "for the avoidance of doubt."[64]  Aurelius Obj. ¶ 21. It argues that Subsections (iv) and (v) of § 1.1.67's "provided however" clause are "entirely redundant" of the preceding more general provisions and must be removed to prevent unspecified arguments that "these [S]ubsections mean something different than" the preceding ones. Id.  Plans of reorganization (like many other contracts) routinely include "for the avoidance of doubt" language in order to help clarify general provisions and to provide certainty and assurance to interested parties. Indeed, Aurelius itself recognizes the term's clarifying role: The Noteholder Plan used the phrase more than twenty times. See, e.g., Noteholder Plan §§ 1.1.3, 1.1.5, 1.1.32, 1.1.64, 1.1.147, 1.1.157, 1.1.159, 1.1.199, 1.1.203, 1.1.209, 1.1.231, 1.1.269.  Nevertheless, the

---

[63]    As the Plan also makes clear, these changes are not a determination or concession that any Selling Stockholder properly faces liability as either a legal owner, beneficial owner, initial recipient, subsequent transferee or otherwise with respect to the Disclaimed State Law Avoidance Claims.

[64]    Section 1.1.67's full text (prior to the clarifying amendments described below) is:  Disclaimed State Law Avoidance Claims means any and all LBO-Related Causes of Action arising under state fraudulent conveyance law that existed in favor of any Holder of a Claim that arose prior to the Petition Date against Selling Stockholders, solely in their capacities as such and solely with respect to funds received in their capacities as such, that are not released by the relevant Holder of a Claim in accordance with Section 11.2.2 of this Plan; provided, however, that Disclaimed State Law Avoidance Claims shall not include (i) any claims for intentional fraudulent conveyance, (ii) any and all LBO-Related Causes of Action arising under state fraudulent conveyance law set forth in the amended complaint filed by the Creditors' Committee on December 7, 2010 in the lawsuit entitled Official Committee of Unsecured Creditors of the Tribune Company v. FitzSimons, et al. (In re Tribune Co.), Adv. Proc. No. 10-54010 (Bankr. D. Del.) (KJC), (iii) any Released Claims, (iv) any LBO-Related Causes of Action against any Released Parties or (v) for the avoidance of doubt, any LBO-Related Causes of Action arising under state fraudulent conveyance law as to which the right to pursue, prosecute, settle or release such claims has been retained by the Estates.

DCL Plan Proponents have voluntarily modified the provision to make clear that Subsections (iv) and (v), now combined into a single Subsection (iv), clarify, "for the avoidance of doubt," language in the preceding section.  No other change is required and Aurelius's request to remove the provisions should be denied.

152.    Accordingly, for the reasons set forth above, Aurelius's untimely objections to the definitions of "Selling Stockholders" and "Disclaimed State Law Avoidance Claims" should be denied.

## VI.    THE DCL PLAN SATISFIES ALL OTHER APPLICABLE REQUIREMENTS OF THE BANKRUPTCY CODE

153.    As demonstrated in this Memorandum, the modifications incorporated in the DCL Plan comply with the requirements for confirmation identified in this Court's prior rulings. Also as demonstrated in this Memorandum, the contested elements of the DCL Plan remain reasonable and appropriate, and should be approved.  Additionally, for the reasons set forth in the Memorandum of Law in Support of Confirmation and Omnibus Reply to Objections to Confirmation of the Second Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A., Feb. 26, 2011 [Docket No. 8173] (the "Prior Memorandum"), the DCL Plan Proponents submit that the other provisions of the DCL Plan also continue to comply with all other applicable requirements of the Bankruptcy Code.[65]

## VII.    WAIVER OF STAY

154.    The DCL Plan Proponents respectfully request that this Court direct that the Confirmation Order shall be effective immediately upon its entry notwithstanding the fourteen

---

[65]    The DCL Plan Proponents incorporate by reference the Prior Memorandum, to the extent relevant to, and consistent with, the DCL Plan.

stay imposed by Bankruptcy Rule 3020(e).  Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 3020(e).  Based on the circumstances surrounding these Chapter 11 Cases, it is appropriate for this Court to exercise its discretion to waive the fourteen-day stay imposed by Bankruptcy Rule 3020(e).  The DCL Plan Proponents are eager to proceed with implementing the DCL Plan , including the process of obtaining the requisite waivers and consents from the Federal Communications Commission, and, as demonstrated by the record of these Chapter 11 Cases, believe that an accelerated emergence is in the best interests of the Debtors' estates and creditors.  Accordingly, the DCL Plan Proponents request a waiver of the stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e).

## VIII.   CONCLUSION

155.    For the reasons stated in this Memorandum and to be set forth during the Confirmation Hearing, the DCL Plan Proponents respectfully request that this Court enter an order confirming the DCL Plan at the earliest practicable time.

Dated: Wilmington, Delaware
June 1, 2012

Respectfully submitted,

SIDLEY AUSTIN LLP
James F. Conlan
Bryan Krakauer
Kevin T. Lantry
Jessica C.K. Boelter
One South Dearborn Street
Chicago, Illinois  60603
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036

-and-

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.

    _/s/ J. Kate Stickles_
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone:  (302) 652-3131
Facsimile:  (302) 652-3117

Counsel for Debtors and Debtors in
Possession and Certain Non-Debtor
Affiliates

CHADBOURNE & PARKE LLP
Howard Seife
David M. LeMay
30 Rockefeller Plaza
New York, New York 10112
Telecopier:  (212) 541-5369

-and-

LANDIS RATH & COBB LLP

_____ */s/ Matthew B. McGuire* _____
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telecopier:  (302) 467-4450

-and-

ZUCKERMAN SPAEDER LLP
Graeme W. Bush
James Sottile
1800 M Street, N.W., Suite 1000
Washington, D.C.  20036
Telecopier:  (202) 822-8106

Counsel for the Official Committee of
Unsecured Creditors

JONES DAY
Bruce Bennett
James O. Johnston
Joshua M. Mester
555 South Flower Street,  Fiftieth Floor
Los Angeles, CA 90071
Telecopier:  (213)243-2539

-and-

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

_____ */s/ M. Blake Cleary* _____
Robert S. Brady (No. 2847)
M. Blake Cleary (No. 3614)
Rodney Square;
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Telecopier: (302) 571-1253

Counsel For Oaktree Capital Management,
L.P. and Angelo, Gordon & Co., L.P.

WILMER CUTLER PICKERING HALE &
DORR LLP
Andrew Goldman
399 Park Avenue
New York, New York 10022
Telecopier:  (212) 230-8888

Co-Counsel For Angelo, Gordon & Co, L.P.

DAVIS POLK & WARDWELL LLP
Donald S. Bernstein
Damian S. Schaible
450 Lexington Avenue
New York, New York 10017
Telecopier:  (212) 701 5800

-and-

RICHARDS LAYTON & FINGER P.A.

_____*/s/ Drew G. Sloan*_____
Mark D. Collins (No. 2981)
Robert J. Stearn, Jr. (No. 2915)
Drew G. Sloan (No. 5069)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telecopier: (302) 651-7701

Counsel For JPMorgan Chase Bank, N.A.