## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>TRIBUNE COMPANY, et al.,<br><br>Debtors. | Chapter 11<br><br>Case No. 08-13141 (KJC)<br><br>Jointly Administered<br><br>**Related to Docket Nos. 11399, 11665, 11745** |

## BRIDGE AGENT'S REPLY, AND JOINDER TO DCL PLAN PROPONENTS' REPLY, TO OBJECTION OF AURELIUS CAPITAL MANAGEMENT, LP TO CONFIRMATION OF THE FOURTH AMENDED JOINT PLAN OF REORGANIZATION FOR TRIBUNE COMPANY AND ITS SUBSIDIARIES PROPOSED BY THE DEBTORS, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, OAKTREE CAPITAL MANAGEMENT, L.P., ANGELO, GORDON & CO., L.P., AND JPMORGAN CHASE BANK, N.A.

Wells Fargo Bank, N.A., as successor administrative agent and not in its individual capacity (solely in such capacity, the "Bridge Agent"), under that certain $1.6 billion Senior Unsecured Interim Loan Agreement, dated as of December 20, 2007, by and among Tribune Company (collectively with its affiliated debtors and debtors in possession, the "Debtors"), each lender from time to time party thereto (collectively, the "Bridge Lenders"), and the other named parties thereto, hereby submits this Reply, and also joins in the Memorandum of Law in Support of Confirmation and Omnibus Reply to Objections to Confirmation of Fourth Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries ([Docket No. 11399], the "DCL Plan") Proposed by the Debtors, The Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo Gordon & Co., L.P., and JPMorgan Chase Bank, N.A. ([Docket No. 11745], the "DCL Plan Proponents' Reply"), to the Objection

([Docket No. 11665], the "Aurelius Objection") of Aurelius Capital Management, LP ("Aurelius"), to Confirmation of the DCL Plan.[1]

## PRELIMINARY STATEMENT

1.  The Bridge Lenders agreed to settle their $1.6 billion of Bridge Loan Claims for payment of up to $71.5 million, which includes payments of $64.5 million to the Bridge Lenders and up to $7 million of the professional fees incurred by the Bridge Agent and Bridge Proponents (the "Bridge Agent's Professional Fees"). The settlement (the "Bridge Settlement") provides that the Bridge Agent's Professional Fees are subject to review for reasonableness by any or all of the U.S. Trustee, the Reorganized Debtors, the Creditors' Committee and, ultimately, the Court. The payment of the Bridge Agent's Professional Fees is an integral aspect of the Bridge Settlement, and the maximum amount for such payment ($7 million) is only a small fraction of the total professional and advisory fees paid by the estates in these Chapter 11 Cases; yet, it comprises almost ten percent of the total settlement compensation for the Bridge Lenders.

2.  Unsuccessful in its prior efforts to derail the Settlement and DCL Plan, Aurelius now belatedly asserts its "remaining" objections to the DCL Plan and the Settlement in a transparent attempt to extract additional consideration from the various settling parties. As it relates specifically to the Bridge Lenders, Aurelius argues that the payment of up to $7 million of the Bridge Agent's Professional Fees – a key term of the Bridge Settlement – may not be made absent demonstration of a "substantial contribution" under section 503(b) of the Bankruptcy Code and a formal filed fee application demonstrating "reasonableness" (the "Bridge Professional Fees Objection"). Aurelius' belated objection with respect to the Bridge Agent's Professional Fees should be overruled.

---

[1] Terms not otherwise defined herein shall have the meanings ascribed to such terms in the DCL Plan.

3. First, this issue was already raised by another party in interest with respect to the Second Amended Plan, and was implicitly rejected in the Court's October 31, 2011 opinion on confirmation, which concluded that the Settlement "should be approved because it is fair, reasonable and in the best interest of the Debtors' estates and it is properly part of the DCL Plan pursuant to Bankruptcy Code § 1123(b)(3)(A)." Thus, under the "law of the case" doctrine, this matter has already been resolved by the Court and there is no reason for the Court to revisit this decision. In addition, having remained silent until now with respect to this matter during the entirety of the plan confirmation process, Aurelius should not now be permitted to challenge a critical component of the settlement the Court has previously determined after a lengthy trial to be fair, and thereby attempt to substantially diminish the bargained for recoveries of the Bridge Lenders. Finally, as set forth herein and in the DCL Plan Proponents' Reply, the Bankruptcy Code simply does not require the Bridge Agent's professional fees be subjected to a "substantial contribution" analysis or a formal fee application process. Accordingly, the Bridge Agent joins in the DCL Plan Proponents' Reply to the extent it relates to the Bridge Professional Fees Objection, and also responds in respect thereof as follows:

## REPLY

4. The terms of the Bridge Settlement were reached as part of the mediation administered by Judge Gross and were publicly disclosed on January 28, 2011 in the Mediator's Third Report [Docket No. 7656], a copy of which is attached hereto as <u>Exhibit A</u>.[2] The Bridge

---

[2] Paragraph 3 of the Bridge Loan Settlement Term Sheet, attached to the Mediator's Third Report as Exhibit A states:

> The reasonable professional fees and expenses of the proponents of the Bridge Plan (the "Bridge Plan Proponents") and/or the current Bridge Loan Agent will be reimbursed by Reorganized Tribune up to a maximum amount of $7 million subject to the same standards applicable to the payments of Senior Lender Fee/Expense Claims and Creditors' Committee Member Fee/Expense Claims by Reorganized Tribune under Section 9.1 of the Plan, and in no event shall such fees/expenses be subject to a standard other than reasonableness of invoices (which may be

Settlement and the payment of the Bridge Agent's professionals have been integrated in every iteration of the DCL Plan thereafter. This payment (capped at $7 million)[3] to the Bridge Agent's professionals, together with the payment of $64.5 million under the Bridge Settlement, is the material consideration provided to the Bridge Lenders in exchange for their agreement to discontinue litigation, withdraw their plan, and compromise their $1.6 billion of Bridge Loan Claims.[4] Without assurance of payment of the Bridge Agent's Professional Fees (subject only to a review of reasonableness by estate fiduciaries and the U.S. Trustee),[5] the Bridge Lenders would not have agreed to the Bridge Settlement. Subjecting such fees to the costs and risks of a formal fee application, and a "substantial contribution" analysis, during which meritless strategic objections might be raised, was <u>not</u> part of the deal, could potentially substantially reduce the net recovery of the Bridge Lenders, and would undermine a core aspect of the Bridge Settlement.

5. Having had every opportunity to do so, Aurelius never specifically raised the propriety of payment of the Bridge Agent's Professional Fees as an objection to the Settlement or the DCL Plan (including in any of the over 700 pages of documents cited in note 3 of the Aurelius Objection).[6] As set forth below, Aurelius' failure to specifically object to the

---

redacted to prevent public disclosure of privileged, confidential or commercially sensitive information).

[3] The portion of the payment of the Bridge Agent's Professional Fees under the DCL Plan is a tiny fraction of the total professional and advisory fees paid in these Chapter 11 Cases. Indeed, the actual fees and expenses of the Bridge Agent in these Chapter 11 Cases far exceed $7 million. The Bridge Agent is not waiving its right to full payment of such fees and expenses under the Bridge Loan Documents.

[4] Indeed, as a result of the Bridge Settlement, the Debtors were able to avoid, among other things, (i) lengthy and expensive litigation over billions of dollars of intercompany clams, (ii) the risk that Aurelius might obtain an impaired accepting class at the numerous Guarantor Debtors' cases, and (iii) the assertion of Bridge Lender claims against, and the resulting necessity of filing new chapter 11 cases in respect of, a number of non-Debtor affiliates.

[5] The Bridge Agent already has agreed that the underlying invoices must be reasonable, and the Bridge Agent has no objection to such review being conducted by any or all of the U.S. Trustee, the Reorganized Debtors, the Creditors' Committee or (as Aurelius suggests) the Court.

[6] Aurelius finally raised for the first time a related objection to a lack of disclosure of the rationale for the payment of the Senior Lenders' and the Bridge Agent's fees in its Limited Objection to the DCL Plan Proponents'

Bridge Settlement or the professional fees component thereof was specifically noted on the record at a hearing on objections to the Second Amended Plan.

6. Nor should that be surprising, given that Aurelius' own proposed plan contained a very similar provision with respect to the payment of its professional and advisory fees.[7] Now, beyond the eleventh hour, after months of notice and multiple opportunities to object, and even having sought substantially the same treatment for itself, Aurelius cannot reasonably be heard to complain about the payment of such amounts under the Settlement and the DCL Plan. Aurelius' objection to the payment of the Bridge Agent's Professional Fees is nothing more than a last-ditch attempt to further delay the confirmation process and extract concessions from the settling parties.[8] Thus, as explained below, the Bridge Professional Fees Objection should be precluded under the "law of the case" doctrine and, to the extent necessary, on the merits because the applicable law does not require the Bridge Agent's professionals to demonstrate "substantial contribution" or file a formal fee application. The Bridge Agent also joins in the DCL Plan Proponents' Reply to the Bridge Professional Fees Objection.

---

Supplemental Disclosure Document Relating to Third Amended Joint Plan of Reorganization (As Modified February 20, 2012). [Docket No. 11134]

[7] *See* Third Amended Joint Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by Aurelius Capital Management, LP, on Behalf of its Managed Entities, Deutsche Bank Trust Company Americas, in its Capacity as Successor Indenture Trustee for Certain Series of Senior Notes, Law Debenture Trust Company of New York, in its Capacity as Successor Indenture Trustee for Certain Series of Senior Notes and Wilmington Trust Company, in its Capacity as Successor Indenture Trustee for the PHONES Notes, § 9.1. [Docket No. 8755]

[8] It is unclear at this juncture what treatment Aurelius elected under the DCL Plan on account of its Senior Noteholder Claims – (A) its pro rata portion of a lump sum cash payment of $431,041,451 or (B) its pro rata share of a "strip" of 6.27425% of each of (i) the Distributable Cash, (ii) the New Senior Secured Term Loan, and (iii) the New Common Stock (subject to dilution by the Equity Incentive Plan). In any event, any reduction in Aurelius' recovery based on the payment of $7 million of the Bridge Agent's Professional Fees is *de minimis* or nonexistent. Aurelius' motivation in raising the Bridge Professional Fees Objection now, for the first time, must therefore be viewed with skepticism. In any event, as argued in the DCL Plan Proponents' Reply, it is unclear if Aurelius has standing to even make the Bridge Professional Fees Objection.

## I. Aurelius' Objection to the Payment of Fees and Expenses Should be Precluded Under the "Law of the Case" Doctrine

7. The Bridge Professional Fees Objection should be precluded under the "law of the case" doctrine because an objection to payment of the Bridge Agent's Professional Fees as part of the Settlement was timely raised by another party in interest and implicitly overruled by this Court. On February 15, 2011, EGI-TRB LLC ("EGI-TRB") filed an objection to confirmation of the Second Amended Plan ([Docket No. 7988], the "EGI-TRB Objection"), in which EGI-TRB opposed, among other things, the payment of the Bridge Lenders' professional fees.[9] Specifically, EGI-TRB objected to the Bridge Settlement on the grounds that the plan "impermissibly proposes to pay the Bridge Lenders up to $8 million for their professional fees and expenses incurred during the pendency of the Debtors' bankruptcy cases, without any oversight from this or any other Court." EGI-TRB Objection at 19.[10]

8. At a hearing held on April 13, 2011, EGI-TRB presented oral argument on its objection to the payment of the professional fees and expenses incurred by the Bridge Lenders. April 13, 2011 Hr'g Tr. at 76:21-77:19; 78:1-79:1.[11] Specifically, EGI-TRB stated the following:

> There's no basis in the bankruptcy code to allow the bridge lenders reimbursement for their fees and expenses. They're not a secured creditor that's over-secured that's entitled to collect that under Section 506(b), simply because they withdrew a plan. That's not a substantial contribution. No one is suggesting it is under Section 503(b).

*Id.* at 77:6-12. In response, the Court asked, "What makes this proposal different from what I find is a common dynamic in bankruptcy proceedings and that is a party who wants something,

---

[9] The U.S. Trustee also objected to the payment of professional fees under the plan, but that objection was withdrawn in response to plan modifications made before the confirmation hearings. *See* note 16 below.

[10] The relevant portion of the EGI-TRB Objection is attached as Exhibit B.

[11] The relevant portions of this transcript are attached hereto as Exhibit C.

6

bargaining for the other party's acquiescence or cooperation?" *Id.* at 77:21-25. EGI-TRB further responded as follows:

> What makes it different, Your Honor, is the creation of a claim for this party that they would not otherwise be entitled to under the code. The code specifically provides for reimbursement of expenses and fees to certain creditors if they're secured and they're over-secured under Section 506(b). It might allow for recovery of expenses under 503(b) if a party has made a substantial contribution . . . . There's no basis in the code to provide this type of claim to induce their cooperation. That's different than reaching an agreement over a claim that the code would allow to be paid under a plan, agreement you're going to pay a creditor a certain percentage amount on their claim in exchange for their support of your plan, you're dealing with a claim the code recognizes.

*Id.* at 78:1-19.

9. Aurelius' failure to object to the Bridge Settlement and the payment of professional fees contained therein was specifically noted at trial. The Creditors' Committee stated the following:

> With respect to the bridge loan settlement, I'm kind of amused you know. That is the one aspect of what we've done that the noteholders and Aurelius actually have not taken us to task on. If the bridge settlement was such a rotten deal and was giving away money that ought not to have been given, I'm quite confident that these gentlemen over here would have called our attention to it. They didn't do that. In fact, their most recent supplemental filing seems to suggest that they'd be willing to embrace the bridge settlement itself. It's actually a pretty good settlement. . . . A portion of that is in effect stated to be on account of legal fees, it is stated to be subject to the Court's approval, so I think we've met the Court approval requirement that's come out of some of the recent case law here . . . A portion of it is allocated under the settlement to legal fees. . . . So I think all in all that was a very good settlement and I think Your Honor hit the nail on the head when you suggested that this is just how claims get resolved in the attribution of a portion of that consideration, subject to your Court – to Your Honor's approval to legal fees I think is just not problematical. I think that really is more of an internal kind of scorekeeping mechanism within the bridge community itself. So those issues I think, Your Honor, should come off the table relatively quickly.

*Id.* at 84:24-86:11.

10. On October 31, 2011, the Court issued its Opinion on Confirmation with respect to the Second Amended Plan ([Docket No. 10133], the "Confirmation Opinion").

7

Although not confirming the Second Amended Plan at that time, the Court ruled that the Settlement, which included as a key provision (as it does now) the Bridge Settlement and the payment of the Bridge Agent's Professional Fees, "should be approved because it is fair, reasonable and in the best interest of the Debtors' estates and it is properly part of the DCL Plan pursuant to Bankruptcy Code § 1123(b)(3)(A)." Confirmation Opinion at 71.[12] The Court further stated that "assuming that both sets of plan proponents addressed only the flaws in their respective plans and both returned confirmable plans containing terms otherwise similar to those

---

[12] In ruling on the issue of plan confirmation, the Court also held:

> For the reasons set forth above, the following objections to confirmation are overruled: (i) the objection to the reasonableness of the DCL Plan Settlement, (ii) the objection to feasibility of the DCL Plan based on FCC regulations, (iii) the objection to the Bar Order in Section 11.3 (except to the extent that the Bar Order must be revised to enjoin specifically potential plaintiffs from acting contrary to its provisions), (iv) the objection to the DCL Plan provision regarding treatment of prepetition indemnification and reimbursement claims, (v) the objection to the DCL Plan provision providing an option to assign state law constructive fraudulent conveyance claims to the Creditors' Trust (subject to any applicable non-bankruptcy law restricting assignment of such claims), (vi) Zell and EGI's objection to the establishment of the Litigation Trust and the Creditors' Trust, (vii) the objection to equal treatment of the PHONES Noteholders who exercised exchange rights pre-petition, objection to equal treatment of the PHONES Noteholders who exercised exchange rights pre-petition, and (viii) the objection to classification of the SWAP claim.
>
> However, for the reasons discussed in more detail above, I conclude that the DCL Plan does not meet the requirements for confirmation under Bankruptcy Code §1129 because, *inter alia*:
>
> (i) the DCL Plan has not been accepted by at least one impaired class for each Debtor as required by §1129(a)(10),
>
> (ii) the Debtors' release in DCL Plan Section 11.2.1 is too broad to be fair and equitable, more specifically (a) the parties granting the release in Section 11.2.1 should be limited to the Debtors, (b) the following persons may not be released in Section 11.2.1 because the record does not establish that they provided a substantial contribution or their release is necessary for a reorganization: the Debtors' "Related Persons," "Current Employees," and "401(k) Shareholders,"
>
> (iii) the Exculpation provision in Section 11.5 is too broad and must be limited to estate fiduciaries, and
>
> (iv) the DCL Plan does not comply with Bankruptcy Code §510(b) by unfairly applying subordination provisions of the PHONES notes to all "Other Parent Claims" and to the distribution of the proceeds of Chapter 5 causes of action by the Litigation Trust
>
> Accordingly, the request to confirm the DCL Plan in its current form is denied.

Confirmation Opinion at 113-14 (internal citation omitted).

presently proposed, with similar voting results, the DCL Plan would survive the crucible of §1129(c)." *Id.* at 125. Although the Court was presented with both written and oral objections to the proposed payment of the Bridge Agent's Professional Fees, the Court did not identify the proposed payment of the Bridge Agent's Professional Fees as a flaw in the plan that prevented confirmation. Notably, the Settlement (including the Bridge Settlement and the payment of the Bridge Agent's Professional Fees) that the Court assessed in connection with the Second Amended Plan has been in all respects identical and unchanged when presented as part of subsequent iterations of the DCL Plan.

11. The "law of the case" doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Winstar Holdings, LLC v. The Blackstone Group, LP (In re Winstar Commc'ns, Inc.)*, 435 B.R. 33, 39 (Bankr. D. Del. 2010) (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988)). "This rule promotes the finality and efficiency of the judicial process by 'protecting against the agitation of settled issues.'" *In re Integrated Health Servs., Inc.*, 358 B.R. 637, 641 (Bankr. D. Del. 2007) (quoting *In re Continental Airlines, Inc.*, 279 F.3d 226, 233 (3d Cir. 2002)). Here, the Court was presented with dozens of objections raising a plethora of issues regarding the Settlement. That the Court did not identify specifically every objection in its prior opinion is irrelevant; the Bridge Professional Fees Objection was argued and at the very least implicitly dispensed with by the Court in its lengthy opinion. It should not be raised again. *See KDH Elec. Sys., Inc. v. Curtis Tech. Ltd.*, 826 F. Supp. 2d 782, 800-01 (E.D. Pa. 2011) (holding that the court's earlier decision regarding ownership rights under a contract precluded a party, by implication, from subsequently raising a claim for detrimental reliance, which is predicated on the lack of a contract); *see also Smith-Boughan, Inc. v. SunTrust Bank (In*

9

*re GOE Lima, LLC*), No. 09-3020, 2012 WL 930250, at *3, 5 (Bankr. N.D. Ohio Mar. 19, 2012) (holding that three arguments raised in adversary proceeding seeking determination that party was not subject to order staying lawsuits pending arbitration were barred by "law of the case" doctrine because (i) one argument was precluded by the order staying the suits pending arbitration and (ii) the other two arguments addressed an assignment that was part of an approved settlement contained in a confirmed plan).

12. By approving the Settlement, this Court implicitly rejected EGI-TRB's timely objection to the payment of the Bridge Agent's Professional Fees as part of the Bridge Settlement and under a chapter 11 plan. Aurelius' belated objection to the payment of the Bridge Agent's Professional Fees thus should be precluded under the law of these Chapter 11 Cases.

## II. The Payment of Professional Fees Provided under the DCL Plan is Consistent with the Bankruptcy Code and Applicable Precedent

13. As set forth more fully in the DCL Plan Proponents' Reply, the Bridge Professional Fees Objection is incorrect as a matter of law. Contrary to Aurelius' assertions, the law does not impose a "two-step" process requiring the Bridge Agent's professionals and advisors to demonstrate that they provided a "substantial contribution" to the estates under section 503(b) of the Bankruptcy Code and that their requested fees and expenses are reasonable before they may receive payment under Section 9.1.2 of the DCL Plan.

14. As an initial matter, the Bankruptcy Code permits the confirmation of reorganization plans that provide for the payment of reasonable professional fees and expenses as part of a settlement agreement. As explained in a recent, well-reasoned decision by the Bankruptcy Court for the Southern District of New York, section 503(b) of the Bankruptcy Code "does not provide, in words or substance, that it is the *only* way" that the fees of non-estate professionals may be paid by the estate under any circumstances. *In re Adelphia Commc'ns.*

*Corp.*, 441 B.R. 6, 12 (Bankr. S.D.N.Y. 2010) (emphasis in original). Rather, section 1129(a)(4)[13] makes clear that section 503(b) is not the only source of authority for the payment of professional fees. *Id.* at 13-14. As the *Adelphia* court recognized, however, section 1129(a)(4) itself does not provide the court with the affirmative authority to order such relief; but section 1123(b), which explains what may be included in a chapter 11 plan, does supply that authorization. *Id.* Specifically, section 1123(b)(6) provides that a plan may "include any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code.]" *Id.* at 14; 11 U.S.C. § 1123(a)(6). [14] Thus, in *Adelphia*, the court approved the payment of reasonable and appropriate professional fees as part of a global settlement incorporated in a plan of reorganization under sections 1123(a)(6) and 1129(a)(4) without requiring the professionals to demonstrate "substantial contribution" under section 503(b). 441 B.R. at 19.[15] Similarly, the Bridge Agent's Professional Fees are part of a comprehensive settlement which (just as in *Adelphia*) was subject to a lengthy trial and has already been approved. Thus, such professional fees are payable under the DCL Plan pursuant to sections 1123(b) and 1129(a)(4) of the Bankruptcy Code without any need to demonstrate a "substantial contribution" as required by section 503(b).

---

[13] Section 1129(a)(4) of the Bankruptcy provides, as one of the requirements for confirmation of a plan, the following:

> Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

11 U.S.C. § 1129(a)(4).

[14] The *Adelphia* court also identified section 1123(b)(3) as a potential affirmative statutory basis for the payment of professional fees as part of a settlement agreement with the debtor through a plan. 441 B.R. at 14.

[15] Specifically, the court held that "to the extent that the requested fees are reasonable, and the requirements of section 1129(a)(4) likewise are complied with, [the section of the plan providing for fee payments] is permissible, and the Code permits the Applicants' reasonable fees to be recovered under that provision without showing compliance with sections 503(b)(3) or (4)." *Id.* at 19.

15.     Moreover, neither of the two cases on which Aurelius exclusively relies, *In re TCI 2 Holdings, LLC*, 428 B.R. 117 (Bankr. D. N.J. 2010) and *In re O'Brien Envtl. Energy*, 181 F.3d 527 (3d Cir. 1999), contradict or rebut the statutory basis for paying the Bridge Agent's Professional Fees under the DCL Plan. Rather, both decisions are clearly distinguishable and inapposite.

16.     Although the *TCI 2 Holdings* court ultimately determined that the professional fees of an ad hoc committee of noteholders could not be paid pursuant to a settlement absent a showing of "substantial contribution" under section 503(b), that court never considered the applicability of section 1123(b) of the Bankruptcy Code. As the court noted,

> [t]he proponents of the [plan] do not cite to any other Code authority for the payments, but contend that "it is common practice in large and complex chapter 11 cases, such as these, for the Debtors' estates to be responsible for the fees and expenses of the plan sponsor, but for whose equity commitment the Debtors could not reorganize."

428 B.R. at 146, n. 37. The debtor and the ad hoc group presented no arguments based upon section 1123(b), and thus, the court never considered whether section 1123(b) provides a statutory basis for the payment of the fees of non-estate professionals separate and apart from section 503(b).

17.     Furthermore, the reimbursement request made by the ad hoc group in *TCI 2 Holdings* was clearly distinguishable from the request proposed by the Bridge Lenders. The *TCI 2 Holdings* opinion does not suggest that the debtors in that case had any prepetition obligation to reimburse the professional fees of the ad hoc committee – in stark contrast to the Bridge Lenders, whose entitlement to payment of the Bridge Agent's Professional Fees arises out of the Bridge Loan Documents. Nor is there any indication that the ad hoc group in *TCI 2 Holdings* agreed to forego a portion of their natural recovery as the Bridge Lenders did here.

12

Finally, unlike in *TCI 2 Holdings*, the U.S. Trustee has not objected to the plan language to which Aurelius now objects.[16] As such, the holding of *TCI 2 Holdings* is distinguishable and inapposite and does little more than provide Aurelius with seemingly helpful sound bites to further its agenda.

18. Aurelius' reliance on the *O'Brien* decision is similarly misplaced. First, the Bridge Loan Claims (including the Bridge Agent's Professional Fees), which were compromised as part of the Bridge Settlement, are contractual pre-petition claims whereas *O'Brien* involved post-petition claims. Second, *O'Brien* concerned the applicable standard for approving a break-up fee in connection with a stalking horse bid and had nothing to do with the payment of professional fees in connection with a negotiated settlement approved by the Court following a lengthy trial. 181 F.3d at 533. That case contained no analysis of the payment of professional fees pursuant to a settlement embodied in a chapter 11 plan or of sections 1123(b) and 1129(a)(4) of the Bankruptcy Code. Accordingly, that decision is simply inapposite, and Aurelius' reference to the court's general statement that "claims that arise after the date on which the debtor petitioned for bankruptcy protection . . . are generally allowed, if at all, only as administrative expenses pursuant to 11 U.S.C. § 503," *Id.* at 532, is largely true in the broader sense, but irrelevant to this particular controversy.

19. In sum, the payment of the Bridge Agent's Professional Fees is an essential element of the settlement reached with the Debtors and the other DCL Plan Proponents.

---

[16] As noted in the DCL Plan Proponents' Reply, the U.S. Trustee withdrew its prior objection to the DCL Plan after the DCL Plan Proponents amended Section 9.1 of the DCL Plan to address the U.S. Trustee's concerns. *See* United States Trustee's Objection to Second Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo Gordon & Co., L.P., and JPMorgan Chase Bank, N.A. [Docket No. 7980] ¶ 23; *see also* Notice of Filing of Proposed Second Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P. and JPMorgan Chase Bank, N.A. (As Modified) [Docket No. 8259], Exhibit B, Cumulative Blackline of Second Amended Joint Plan of Reorganization § 9.1.

13

Section 9.1.2 of the DCL Plan properly reflects the terms of the Bridge Settlement and provides for the payment of the Bridge Agent's Professional Fees. The Bridge Agent's Professional Fees under the DCL Plan, as approved as part of the Settlement, are not unlimited; but, rather, are capped at $7 million. *See* DCL Plan, § 9.1.2.[17] Subjecting such fees to the costs and risks of a formal fee application and/or a "substantial contribution" analysis was not part of the settled and would strip the Bridge Lenders of the full benefit of their bargain. The payment of the Bridge Agent's Professional Fees has already been approved as part of the Court's determination that the Settlement is reasonable and that the DCL Plan is confirmable subject to certain adjustments, which appear to have been made. Thus, the payment of the Bridge Agent's Professional Fees as proposed in the DCL Plan is authorized by Bankruptcy Code sections 1123(b) and 1129(a)(4). Aurelius should not, at this point, be permitted to challenge a fundamental aspect of the Settlement, prejudice the Bridge Lenders and hold hostage the payment of professional fees of the various settling parties.

* * * * *

---

[17] *See* note 3 above.

## CONCLUSION

20. Wherefore, the Bridge Agent respectfully requests that the Court overrule Aurelius' Bridge Professional Fees Objection.

Dated: June 1, 2012
      Wilmington, Delaware

FOX ROTHSCHILD LLP

By: _____
Jeffrey M. Schlerf, Esq. (No. 3047)
Eric M. Sutty, Esq. (No. 4007)
L. John Bird, Esq. (No. 5310)
Citizens Bank Center
919 North Market Street, Suite 1600
Wilmington Delaware 19801
Telephone: (302) 654-7444

-and-

WHITE & CASE LLP
Thomas E Lauria
David Hille
Andrew Hammond
Scott Greissman
1155 Avenue of the Americas
New York, NY 10036
Telephone: (212) 819-8200
Facsimile: (212) 819-8113

*Attorneys for the Bridge Agent*

NEWYORK 8512637 (2K)