# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered<br>**Objection Date: June 25, 2012 at 4:00 p.m.**<br>**Hearing Date:  TBD**<br>**Related to Docket Nos. 9613, 9749, and 9917** |

## ELEVENTH QUARTERLY FEE APPLICATION OF SIDLEY AUSTIN LLP FOR COMPENSATION FOR SERVICES RENDERED AND REIMBURSEMENT OF EXPENSES AS COUNSEL TO THE DEBTORS AND DEBTORS IN POSSESSION <u>FOR THE PERIOD OF JUNE 1, 2011 THROUGH AUGUST 31, 2011</u>

| | |
|---|---|
| Name of Applicant: | **Sidley Austin LLP** |
| Authorized to Provide<br>Professional Services to: | **Debtors** |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc., f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); and WPIX, Inc. (0191). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

Date of Retention:                                    **February 20, 2009 (<u>nunc</u> <u>pro</u> <u>tunc</u> to December 8, 2008)**

Period for Which Compensation
and Reimbursement is Sought:                **June 1, 2011 through August 31, 2011**

Amount of compensation sought as actual,      **$5,073,861.25**
reasonable and necessary:

Amount of Expense Reimbursement sought as      **$445,493.14**
actual, reasonable and necessary

This is a(n):      _____ monthly      __X__ interim      _____ final application

The total time expended during the Eleventh Interim Fee Period for fee application preparation
for the monthly and quarterly fee applications, including time expended for review and response
to preliminary and final reports and recommendations of the Fee Examiner, is approximately
449.60 hours and the corresponding compensation requested is approximately $173,526.00.

<u>Prior Interim Applications</u>

| Quarter | Date Filed | Period Covered | Requested | | Approved | |
| | | | Fees | Expenses | Fees | Expenses |
|---|---|---|---|---|---|---|
| 1 | 4/15/09 | 12/8/08-2/28/09 | $3,897,043.25 | $165,360.71 | $3,886,289.75 | $158,441.67 |
| 2 | 7/16/09 | 3/1/09-5/31/09 | $4,209,274.75 | $105,524.36 | $4,203,235.50 | $104,118.90 |
| 3 | 10/15/09 | 6/1/09-8/31/09 | $4,513,018.00 | $99,429.34 | $4,510,127.00 | $99,253.67 |
| 4 | 1/15/10 | 9/1/09-11/30/09 | $5,292,782.75 | $221,808.01 | $5,275,754.14 | $220,748.76 |
| 5 | 4/15/10 | 12/1/09-2/28/10 | $5,426,757.50 | $205,852.05 | $5,412,303.00 | $201,565.16 |
| 6 | 12/14/10 | 3/1/10-5/31/10 | $6,581,178.43 | $425,733.29 | $6,582,868.12 | $418,736.42 |
| 7 | 5/4/11 | 6/1/10-8/31/10 | $7,081,656.37 | $310,093.90 | $7,077,989.87 | $304,357.14 |
| 8 | 7/1/11 | 9/1/10-11/30/10 | $7,126,734.00 | $334,255.68 | $7,120,542.46 | $323,696.86 |
| 9 | 9/20/11 | 12/1/10-2/28/11 | $14,478,878.00 | $599,999.17 | | |
| 10 | 1/27/12 | 3/1/11-5/31/11 | $8,941,857.00 | $1,133,692.42 | | |

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered<br>**Objection Date: 25, 2012 at 4:00 p.m.**<br>**Hearing Date: TBD**<br>**Related to Docket Nos. 9613, 9749, and 9917** |

## ELEVENTH QUARTERLY FEE APPLICATION OF SIDLEY AUSTIN LLP FOR COMPENSATION FOR SERVICES RENDERED AND REIMBURSEMENT OF EXPENSES AS COUNSEL TO THE DEBTORS AND DEBTORS IN POSSESSION FOR THE PERIOD OF JUNE 1, 2011 THROUGH AUGUST 31, 2011

Sidley Austin LLP ("Sidley"), attorneys for Tribune Company ("Tribune") and

the affiliated companies that filed voluntary petitions for relief in the above-captioned chapter 11

cases (collectively, the "Debtors"), respectfully submits this application (the "Application") to

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspapers Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc., f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); and WPIX, Inc. (0191). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

this Court, pursuant to (i) sections 327, 331, and 503 of title 11 of the United States Code (the "Bankruptcy Code"), (ii) Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (iii) Rule 2016-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), (iv) the Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals and Committee Members Pursuant to 11 U.S.C. §§ 105(a) and 331 (Docket No. 225) (the "Interim Compensation Order"), as amended, and (v) the Order Appointing Fee Examiner and Establishing Related Procedures for Compensation and Reimbursement of Expenses for Professionals and Consideration of Fee Applications (Docket No. 546) (the "Fee Examiner Order") for approval of interim compensation and reimbursement of expenses for the eleventh quarterly period from June 1, 2011 through August 31, 2011 (the "Eleventh Interim Fee Period"). In support of the Application, Sidley respectfully states as follows:

## FACTUAL BACKGROUND OF THE CASES

1.    On December 8, 2008 (the "Petition Date"), Tribune Company and certain of its subsidiaries each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. An additional Debtor, Tribune CNLBC, LLC (f/k/a Chicago National League Ball Club, LLC) ("Tribune CNLBC"), filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on October 12, 2009.[2]  On March 22, 2010, this Court entered an order dismissing the chapter 11 petition of New River Center Maintenance Association, Inc.  On May

---

[2] Orders of the Court applicable to this Application have subsequently been extended to Tribune CNLBC. (See Order Directing (I) Joint Administration of Chapter 11 Cases and (II) that Certain Orders and Other Pleadings Entered or Filed in the Chapter 11 Cases of Tribune Company, et al. be Made Applicable to the Chapter 11 Case of Chicago National League Ball Club, LLC (entered Oct. 14, 2009) (Docket No. 2333) (the "CNLBC Joint Administration Order")).

24, 2011, this Court entered an order dismissing the chapter 11 petition of Publishers Forest Products Co. of Washington. In all, the Debtors comprise 110 entities.

2.     The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b). (Docket Nos. 43, 2333.)

3.     The Debtors have continued in possession of their respective properties and have continued to operate and maintain their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.     On December 18, 2008, the Office of the United States Trustee appointed an official committee of unsecured creditors (the "Committee").

5.     On March 19, 2009, pursuant to Fee Examiner Order, the Court appointed Stuart Maue as fee examiner (the "Fee Examiner") to act as special consultant to the Court for professional fee and expense analysis and review, effective nunc pro tunc to February 20, 2009. (Docket No. 546.)

6.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief sought herein are sections 327, 331, and 503 of the Bankruptcy Code, Rule 2016 of the Bankruptcy Rules, and Rule 2016-2 of the Local Rules.

## PROCEDURAL BACKGROUND FOR THE APPLICATION

7.     The Debtors sought approval of this Court to retain Sidley as general reorganization and bankruptcy counsel, pursuant to 11 U.S.C. §§ 327(a) and 1107, by application filed on December 26, 2008. As set forth in the application seeking such approval, Sidley's services to the Debtors encompass a wide range of legal services, focused upon restructuring and

3

insolvency issues but also encompassing certain general corporate, litigation, tax, media law and regulatory, employee-related, and real estate matters.  In particular, Sidley's retention application sets forth the following scope of services:

a) to provide legal advice with respect to the Debtors' powers and duties as debtors in possession in the continued operation of their business;

b) to take all necessary action on behalf of the Debtors to protect and preserve the Debtors' estates, including prosecuting actions on behalf of the Debtors, negotiating any and all litigation in which the Debtors are involved, and objecting to claims filed against the Debtors' estates;

c) to prepare on behalf of the Debtors all necessary motions, answers, orders, reports, and other legal papers in connection with the administration of the Debtors' estates;

d) to attend meetings and negotiate with representatives of creditors and other parties in interest, attend court hearings, and advise the Debtors on the conduct of their chapter 11 cases;

e) to perform any and all other legal services for the Debtors in connection with both their chapter 11 cases and with the formulation and implementation of the Debtors' plan of reorganization;

f) to advise and assist the Debtors regarding all aspects of the plan confirmation process, including, but not limited to, negotiating and drafting a plan of reorganization and accompanying disclosure statement, securing the approval of a disclosure statement, soliciting votes in support of plan confirmation, and securing confirmation of the plan;

g) to provide legal advice and representation with respect to various obligations of the Debtors and their managers and officers;

h) to provide legal advice and perform legal services with respect to matters involving the negotiation of the terms of and the issuance of corporate securities, matters related to corporate governance, and the interpretation, application, or amendment of the Debtors' organizational documents, including their limited liability company agreements, material contracts, and matters involving the fiduciary duties of the Debtors and their officers and managers;

i) to provide legal advice and perform legal services with respect to litigation, tax (state and federal income tax and local property tax assessment matters) and other general non-bankruptcy legal issues for the Debtors to the extent requested by the Debtors; and

j) to render such other services as may be in the best interests of the Debtors in connection with any of the foregoing and all other necessary or appropriate legal services in connection with these chapter 11 cases, as agreed upon by Sidley and the Debtors.

4

Sidley's retention, nunc pro tunc to the Petition Date, was approved by this Court by order dated February 20, 2009. (Docket No. 435.)

8.    The Interim Compensation Order and the Fee Examiner Order (together, the "Fee Orders") provide that all professionals retained in these cases pursuant to sections 327, 328, or 1103 of the Bankruptcy Code (the "Case Professionals") must file with the Court and provide to the Fee Examiner monthly applications for interim allowance of compensation for services rendered and reimbursement of expenses incurred, together with the applicable time entries and itemized expenses (the "Monthly Fee Application"). The notice parties specified in the Fee Orders (the "Notice Parties") have twenty (20) days after service of a Monthly Fee Application to object to such Monthly Fee Application (the "Objection Deadline"). Upon expiration of the Objection Deadline, the applicable Case Professional must certify in writing that no objection or partial objection has been filed with the Court relative to that professional's Monthly Fee Application, whereupon the Debtors are authorized to pay such professional an amount equal to the lesser of (i) 80% of the fees and 100% of the expenses requested in the Monthly Fee Application or (ii) 80% of the fees and 100% of the expenses not subject to an objection.

9.    Pursuant to the procedures set forth in the Fee Orders, Sidley prepared, filed with the Court, and served upon the Notice Parties and the Fee Examiner Monthly Fee Applications for the periods of June 2011, July 2011, and August 2011, which Monthly Fee Applications are incorporated herein by reference.[3] Sidley has accordingly submitted all of its Monthly Fee Applications for the Debtors' chapter 11 cases for the Eleventh Interim Fee Period.

---

[3] The docket numbers of Sidley's Monthly Fee Applications for June 2011, July 2011, and August 2011 are 9613, 9749, and 9917, respectively.

10.    In addition to the Monthly Fee Applications, beginning with the three-month period ending February 28, 2009, and each three-month period thereafter, all Case Professionals must file with the Court and serve on the Notice Parties interim applications for allowance of compensation and reimbursement of expenses of the amounts sought in the Monthly Fee Applications filed during such period (a "<u>Quarterly Fee Application Request</u>"). (<u>See</u> Interim Compensation Order at 3.)  Quarterly Fee Application Requests must include a summary of the Monthly Fee Applications that are the subject of the request and any other information requested by the Court or required by the Local Rules.  (<u>Id.</u>)  This Application represents the eleventh Quarterly Fee Application Request that Sidley has filed with the Court in connection with these chapter 11 cases, and it covers the period from June 1, 2011 through August 31, 2011, both dates inclusive.

### **RELIEF REQUESTED**

11.    By this Application, Sidley respectfully requests that the Court approve the interim allowance and award of compensation for professional services rendered and reimbursement of actual and necessary expenses incurred by Sidley as general bankruptcy counsel to the Debtors during the Eleventh Interim Fee Period.

12.    The amount of fees sought for services rendered during the Eleventh Interim Fee Period is $5,073,861.25, representing 8,510 hours in professional and paraprofessional time for such services.  Reimbursement of actual, necessary expenses incurred by Sidley during the Eleventh Interim Fee Period in connection with these services is requested in the amount of $445,493.14.  Sidley seeks the interim allowance of such compensation, and this Court's authorization for payment of such amounts by the Debtors to Sidley, less amounts previously paid to Sidley pursuant to the Monthly Fee Applications for the period covered by this Application and the procedures set forth in the Fee Orders.

6

13.    The hourly rates charged by Sidley professionals and paraprofessionals during the Eleventh Interim Fee Period are no greater than the customary hourly rates for such individuals both inside and outside of bankruptcy cases.  The highest billing rate charged by any Sidley attorney for services rendered during the Eleventh Interim Fee Period under Sidley's billing rates that became effective on January 1, 2011 was $975 per hour.  (See Supplemental Affidavit (Second) of James F. Conlan in Support of Application for an Order Authorizing the Employment and Retention of Sidley Austin LLP as Attorneys for the Debtors and Debtors in Possession ¶ 3, Docket No. 424.)  Sidley believes these rates are comparable to those charged by the bankruptcy and other professionals of other firms of comparable size, stature, and experience.

14.    Sidley has received no payment and no promises for payment from any source other than the Debtors for services rendered in these chapter 11 cases.  There is no agreement between Sidley and any other party for the sharing of compensation to be received for the services rendered by Sidley in these chapter 11 cases.  All professional and paraprofessional services for which compensation is sought herein were rendered solely on behalf of the Debtors in these cases.

### SERVICES RENDERED

15.    Sidley has rendered substantial services to the Debtors in connection with these chapter 11 cases during the period covered by this Application, both in its capacity as general bankruptcy counsel to the Debtors and continuing in its capacity as corporate, litigation, and transactional counsel to the Debtors in their ordinary course of business.  The services performed by Sidley's professionals and paraprofessionals during the period covered by this Application were necessary and have directly contributed to the effective administration of the Debtors' chapter 11 cases.

16.    A breakdown of the total hours expended by each professional on all matters and a breakdown of amounts sought by each matter category covered herein are included as a part of <u>Attachment A</u> to this Application, as required by Local Rule 2016-2.  A detailed description of the services provided to the Debtors is incorporated by reference to the Monthly Fee Applications previously filed by Sidley with the Court.  The following is a summary of the activities performed by Sidley's professionals and paraprofessionals during the Eleventh Interim Fee Period:

**A.    <u>FCC Matters (20100):    Hours: 175.00    Fees: $70,847.50</u>[4],[5]**

17.    During the Eleventh Interim Fee Period, Sidley's professionals continued to represent the Debtors' broadcast stations on several matters as communications regulatory counsel.  A substantial majority of the fees incurred by Sidley's professionals during the Eleventh Interim Fee Period relates to the Newspaper Crossownership matter, which, as described in Sidley's prior Quarterly Fee Application Requests, involves petitions for review before the U.S. Court of Appeals for the Third Circuit of the Federal Communication Commission's ("FCC") newspaper-broadcast cross-ownership regulations.  The FCC had issued various rules that continue to prohibit owners of newspapers, including Tribune, from also holding licenses to operate certain television or radio stations within the same markets.  The Debtors challenged these rules on constitutional and Administrative Procedure Act grounds.  The

---

[4] Commencing in December 2009, the Debtors requested that Sidley provide separate invoices for professional fees for certain discrete FCC-related services attributable to KWGN/FCC General, KPLR-TV, Nextel Negotiations, and Newspaper Crossownership matters, on which Sidley represents the Debtors in the ordinary course of business.  In accordance with this request, and after consultation with the Fee Examiner, Sidley has included such invoices within the broader category of FCC Matters for the purposes of calculating the total fees and expenses in Sidley's Monthly Fee Applications and Quarterly Fee Application Requests.

[5] This amount reflects a voluntary reduction of $9,739.00 per an agreement with the Debtors for services performed in connection with the Newspaper Crossownership matter during the month of August 2011.

outcome of the appeal is of substantial importance to the Debtors' broadcasting and publishing operations in several key markets in which the Debtors conduct business.

18.    Of particular significance to this ongoing appeal, in July 2011 the Third Circuit issued a decision addressing the FCC's media ownership rules. Sidley's professionals with responsibility for the Newspaper Crossownership matter reviewed and analyzed the July 2011 decision of the Third Circuit and also researched, drafted, and filed a petition for reconsideration and rehearing en banc of that decision before the Third Circuit. The Third Circuit's opinion also remanded the newspaper-broadcast crossownership rule for consideration in the FCC's 2010 Quadrennial Review, requiring an analysis by Sidley's professionals of the 2010 Quadrennial Review.

19.    Sidley's professionals also assisted the Debtors with respect to matters related to the upcoming and prior broadcast license renewal application cycles, and provided advice related to certain commercial contract negotiations affecting broadcast licenses held by the Debtors. Sidley's professionals with responsibility for assisting the Debtors with upcoming renewals and commercial agreements invoking FCC rules compiled FCC license renewal application data, identified and located network affiliation agreements, and reviewed and edited intellectual property license agreements using FCC market definitions. Sidley's professionals also reviewed and prepared an Opposition to an Application for Review that challenged the grant of license renewal for the Debtors' television station KRCW, located in Portland, Oregon.

**B.**    **Fee Applications (30390):    Hours: 449.60    Fees: $173,526.00**

20.    This matter category encompasses all tasks relating to the preparation and filing of Sidley's Monthly Fee Applications and Quarterly Fee Application Requests with the Court. The fees requested for such services reflect an increased volume of activity by Sidley's professionals and paraprofessionals in this matter category during the Eleventh Interim Fee

Period.  Specifically, Sidley's professionals and paraprofessionals drafted and filed Sidley's

twenty-ninth, thirtieth, and thirty-first Monthly Fee Applications, filed Sidley's Eighth Quarterly

Fee Application, and reviewed and complied with the Court's Fee Orders respecting all of the

foregoing.  During the Eleventh Interim Fee Period, Sidley also prepared portions of its Ninth,

Tenth, and Eleventh Quarterly Fee Applications.  In addition, Sidley reviewed and drafted

responses to the Fee Examiner's preliminary report with respect to Sidley's Fourth and Fifth

Quarterly Fee Application Requests.  In light of the number of monthly and quarterly fee

applications prepared, in whole or in part, during this period, Sidley respectfully submits that the

hours expended and fees requested are reasonable.

C.      **Executory Contracts and Leases (30410):    Hours: 12.10    Fees: $5,302.50**

21.      As of the Petition Date, the Debtors in these cases were party to

approximately 45,000 executory contracts and unexpired leases.  During the Eleventh Interim

Fee Period, Sidley's professionals, together with the Debtors' financial advisors at Alvarez &

Marsal, advised the Debtors with respect to the assumption, assumption and assignment, or

rejection of certain executory contracts and unexpired leases under section 365 of the

Bankruptcy Code and in accordance with the terms of the plan of reorganization proposed for the

Debtors, on terms favorable to the Debtors.  Specifically, the DCL Plan (defined below) provides

for the assumption of all executory contracts and unexpired leases other than those identified on

the exhibit of rejected contracts and leases, which was filed as part of the Plan Supplement

(defined below) during the Ninth Interim Fee Period.

22.      During the Eleventh Interim Fee Period, Sidley's professionals, along with

the Debtors' financial advisors at Alvarez & Marsal, the Debtors' management and personnel,

and counsel for contract counterparties, continued their efforts to reach consensual

determinations of amounts required to be cured upon the assumption of executory contracts and

unexpired leases pursuant to the terms of the DCL Plan, and in accordance with the procedures

approved by the Bankruptcy Court in the Motion of the Debtors for an Order Establishing

Procedures (I) Fixing Cure Amounts and (II) Providing Notice of Assumption and/or

Assignment of Certain Executory Contracts and Unexpired Leases By A Successor Reorganized

Debtor Pursuant to Sections 365, 1123 and 1129 of the Bankruptcy Code (Docket No. 8287) (the

"Global Contract Motion") and corresponding order (Docket No. 8745) (the "Global Contract

Order").  In connection therewith, Sidley's professionals responded to numerous inquiries from

contract counterparties, researched various assertions raised by contract and lease counterparties

as to why such counterparties were entitled to a particular cure amount pursuant to section 365 of

the Bankruptcy Code, reviewed the procedures established under the Global Contract Order, and

reviewed and assessed determinations of cure amounts and contractual damages.

**D.    Use/Sale/Lease of Assets (30430):    Hours: 16.60    Fees: $10,156.00**

23.    During the Eleventh Interim Fee Period, Sidley's professionals remained

engaged in negotiating and documenting transactions for the use, sale, and lease of assets on

behalf of the Debtors, both in connection with these chapter 11 cases and with Sidley's ongoing

representation of the Debtors in their ordinary course of business.  In addition, Sidley's

professionals provided advice to the Debtors' business personnel on discrete transactions and

whether such transactions implicated sections 363(b) or (c) of the Bankruptcy Code.

24.    Beginning in July 2011, Sidley's professionals began advising Tribune

Broadcasting Company ("Tribune Broadcasting") regarding its negotiations with Local TV, LLC

("Local TV") respecting the parties' entry into a license agreement for certain broadcasting

systems and software developed by Tribune Broadcasting.  During the Eleventh Interim Fee

Period, Sidley's professionals reviewed the proposed license agreement and analyzed the

potential legal issues arising with respect to Tribune Broadcasting's entry into the license

11

agreement, including under section 363 of the Bankruptcy Code.  The license agreement between

Tribune Broadcasting and Local TV was ultimately executed in January 2012.  Additional

information concerning Sidley's activities regarding the Tribune Broadcasting/Local TV license

agreement will be provided in Sidley's subsequent Quarterly Fee Application Requests relating

to the periods in which such license agreement was more fully negotiated and executed.

**E.**     **Insurance Matters (30450):    Hours: 4.40    Fees: $3,960.00**

25.     During the Eleventh Interim Fee Period, Sidley's professionals continued

to work with the Debtors, their outside insurance counsel, and various insurance providers to

resolve certain insurance coverage issues, and to advise upon the impact of these chapter 11

cases on the Debtors' insurance and risk management procedures.  Sidley's professionals also

reviewed and addressed various legal issues arising in connection with the Debtors' primary and

excess liability policies covering certain prepetition lawsuits pending against the Debtors and

certain of their directors and officers, as well as the SLCFC Actions (defined and discussed

below).  Sidley's professionals specifically reviewed legal issues pertaining to the Debtors'

directors' and officers' liability insurance policies and provided advice to the Debtors regarding

such policies in connection with lawsuits pending against the Debtors' directors and officers.

**F.**     **Committee-Related Matters (30460):    Hours: 0.90    Fees: $737.00**

26.     Sidley's professionals continued during the Eleventh Interim Fee Period to

work diligently to maintain a cooperative and responsive relationship with the Debtors' major

creditor constituencies, including the Committee.  During this Eleventh Interim Fee Period,

Sidley's professionals conferred with the Committee and their professionals and advisors on a

regular basis in connection with the DCL Plan (defined below), of which the Committee was a

co-proponent, and also on pending motions and general case administration issues as they arose

in the Debtors' chapter 11 cases.  Communications with the Committee related to specific

substantive matters, including with respect to the DCL Plan and the Noteholder Plan (defined

below) are reflected in the applicable substantive matter categories.

**G.**    **Litigated Matters (30470):    Hours: 4,072.90    Fees: $2,429,895.00**

27.    The "Litigated Matters" category encompasses all of Sidley's activities

relating to actual and potential litigation, contested matters, and adversary proceedings.  This

category also includes much of Sidley's litigation-related activities concerning the contested plan

confirmation process as it continued to develop during the Eleventh Interim Fee Period, which

required substantial attention from Sidley, the Debtors' senior management, the Committee, the

Debtors' senior lenders, and other key creditor constituencies during the Eleventh Interim Fee

Period.[6]

28.    On March 7, 2011, the Court commenced a fourteen (14) day[7]

confirmation hearing with respect to the two competing plans of reorganization proposed for the

Debtors that were pursued by their proponents to confirmation at that hearing: (i) the Second

Amended Joint Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by

the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P.,

Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A. (As Modified April 26, 2011)

(Docket No. 8769) (the "DCL Plan") and (ii) the Third Amended Joint Plan Of Reorganization

For Tribune Company and its Subsidiaries Proposed by Aurelius, Deutsche Bank Trust Company

---

[6] Given the contested nature of the Debtors' plan confirmation process, both the Litigated Matters category and the Plan and Disclosure Statement category include narrative descriptions and corresponding fee detail regarding Sidley's services in connection with the Debtors' plan confirmation process.  As a general rule, the services performed by professionals in Sidley's Litigation practice group in connection with the plan confirmation process appear in the Litigated Matters category, and the services performed by professionals in Sidley's Corporate Reorganization and Bankruptcy practice group in connection with the plan confirmation process appear in the Plan and Disclosure Statement category.

[7] The confirmation hearing took place on March 7, 2011 through March 18, 2011 and continued on April 12, 2011 through April 14, 2011, with closing arguments on June 27, 2011.

Americas, Law Debenture Trust Company of New York, and Wilmington Trust Company

(Docket No. 8755) (the "Noteholder Plan").[8]

      29.     The pre-trial and trial activities relating to the confirmation hearing are

described in detail in Sidley's Ninth and Tenth Quarterly Fee Application Requests.  During the

Eleventh Interim Fee Period, Sidley's professionals in the Bankruptcy and Litigation practice

groups continued their efforts to advance confirmation of the DCL Plan, including by preparing

for and participating in post-trial briefing and closing arguments in support of confirmation of

the DCL Plan and in opposition to confirmation of the Noteholder Plan, as described in detail

below.

      (a)     **Post-Trial Activities Relating to the Contested Plan Confirmation Hearing**

           *(i)     Post-Confirmation Hearing Briefing*

      30.     The DCL Proponents and Noteholder Proponents filed their proposed

findings of fact and conclusions of law in support of confirmation of their respective Competing

Plans on June 3, 2011.  (See Docket Nos. 9062, 9063, 9064, and 9065.)  Much of Sidley's efforts

in the development of the proposed findings of fact and conclusions of law centered on the

---

[8] Two other plans of reorganization were proposed for the Debtors by the following plan proponent groups: (i) King Street Acquisition Company, L.L.C., King Street Capital, L.P. and Marathon Asset Management, L.P. (the "Bridge Lender Plan"); and (ii) the Step One Credit Agreement Lenders (the "SOCAL Plan" and, together with the DCL Plan, the Noteholder Plan, and the Bridge Lender Plan, as applicable, the "Competing Plans").  As described in detail in the Ninth Quarterly Fee Application, the Bridge Lender Plan and the SOCAL Plan were each withdrawn by their respective proponents during the Ninth Interim Fee Period.

The Debtors, the Committee, Oaktree, Angelo Gordon, and JPMorgan are collectively referred to herein as the "DCL Proponents"; Aurelius, Law Debenture, Deutsche Bank and Wilmington Trust are collectively referred to herein as the "Noteholder Proponents"; and King Street Acquisition Company, L.L.C., King Street Capital, L.P. and Marathon Asset Management, L.P. are collectively referred to herein as the "Bridge Proponents."  The DCL Proponents, Noteholder Proponents, Bridge Proponents, and Step One Credit Agreement Lenders are collectively referred to herein, as applicable, as the "Plan Proponents."

Time entries referencing communications and meetings with the DCL Proponents, the Noteholder Proponents, the Bridge Proponents, the Step One Credit Agreement Lenders and/or the Plan Proponents in Sidley's Monthly Fee Applications should be read to include both bankruptcy and litigation counsel, as applicable, for each of the respective Plan Proponents so referenced.

contested factual and legal issues relating to the approval of the settlement of the claims and

causes of action arising out of the Leveraged ESOP Transactions that returned Tribune to private

ownership in 2007 (the "LBO-Related Claims") embodied in the DCL Plan.[9]  The central issue

underpinning the Noteholder Proponents' objections to the DCL Plan was whether the settlement

of the LBO-Related Claims embodied in the DCL Plan was reasonable.  Resolution of this issue

involved the presentation of both factual and legal arguments to the Bankruptcy Court, including

but not limited to arguments and evidence concerning the Debtors' enterprise value, allocation of

that value and settlement consideration among the Debtors' creditors, and whether the factors

supporting the settlement enunciated by the Third Circuit Court of Appeals in Myers v. Martin

had been satisfied.  In addition, Sidley's professionals analyzed the record and prepared findings

of fact and conclusions of law in support of (i) the DCL Plan's feasibility with respect to FCC

approval, (ii) the classification and relative recoveries of various claimants, including the impact

of contractual subordination provisions, (iii) the bar order and judgment reduction mechanisms

embodied in the DCL Plan, (iv) the Litigation Trust established under the DCL Plan (as an

appropriate structure for pursuit of estate claims), (v) the Retiree and Intercompany Claims

settlements, (vi) third-party release provisions, (vii) the treatment of prepetition indemnification

and reimbursement claims, and (viii) post-emergence corporate governance and executive

compensation provisions, among other legal issues.

> 31.     Sidley's professionals in the Litigation practice group were extensively

involved in all of the foregoing post-trial briefing activities, and spent significant time preparing

outlines for each of the briefs, thoroughly reviewing the record evidence, and drafting arguments

---

[9] The reasonableness of the settlement of the LBO-Related Claims embodied in the DCL Plan was considered by the Bankruptcy Court in connection with the confirmation hearing on the DCL Plan and was upheld in the Court's Confirmation Opinion issued on October 31, 2011 (Docket No. 10133).

based on the testimony and evidence presented at the confirmation hearing.  Preparing the findings of fact and conclusions of law required substantial coordination among the DCL Proponents and required Sidley's professionals to be intimately familiar with the testimony presented at the confirmation hearing, the exhibits submitted by each of the Plan Proponents, the arguments made on the record, the positions of each of the parties involved, and the legal and factual assertions made by the parties in each of the prior briefs and objections.

32.    At the request of the Court, Sidley's professionals prepared "iBriefs" of the DCL Proponents' post-trial brief, post-trial reply brief, and proposed findings of fact and conclusions of law.  Sidley retained courtroom technology consultancy firm TrialGraphix to assist with the indexing and hyperlinking of all trial exhibits and other documents cited in the DCL Proponents' post-trial briefs, which were then substantively reviewed by Sidley's professionals in the Litigation and Corporate Reorganization and Bankruptcy practice groups for accuracy.  The creation of the iBriefs facilitated the Court's deliberations regarding the confirmation hearing.

33.    In addition to preparing the proposed findings of fact and conclusions of law in support of the DCL Plan, Sidley's professionals also reviewed and assessed the post-trial pleadings filed by the Noteholder Proponents and other third-party objectors, including the post-trial briefs (filed on May 12, 2011), post-trial reply briefs (filed on May 27, 2011), and proposed findings of fact and conclusions of law (filed on June 3, 2011).

*(ii)    Closing Arguments in the Confirmation Hearing*

34.    Closing arguments on the DCL Plan and the Noteholder Plan were held in Wilmington, Delaware on June 27, 2011.  Closing arguments represented the culmination of the confirmation hearing, in which the DCL Proponents and the Noteholder Proponents each presented oral arguments in support of their respective plans and in opposition to the

16

confirmation of the other plan.  In preparation for the closing arguments, Sidley's professionals

in the Corporate Reorganization and Bankruptcy and Litigation practice groups prepared outlines

of oral arguments and various graphics and demonstrative exhibits for presentation to the

Bankruptcy Court.  Sidley's professionals also anticipated and analyzed the arguments that

would likely be raised by the Noteholder Proponents and other parties objecting to the DCL Plan

and prepared rebuttal arguments.

        35.    The closing arguments lasted a full day, and covered an extensive number

of objections and complex legal and factual issues raised by the parties during the preceding

thirteen days of testimony and argument in connection with the confirmation of the DCL Plan

and the Noteholder Plan, including the reasonableness of the settlements embodied in the DCL

Plan and likely litigation outcomes if there were no settlement, the FCC implications of the DCL

Plan and the Noteholder Plan and corporate governance issues underlying each of the plans, the

competing valuation expert testimony and evidence, the evidentiary and legal basis in support of

the Bar Order included in the DCL Plan, the overall operation and implications of the key

provisions of the DCL Plan and the Noteholder Plan, and the various bankruptcy-related

objections asserted against the DCL Plan and Noteholder Plan.

        *(iii)*    *Post-Trial Admission of Evidence, Resolution of Evidentiary*
                  *Objections, and Closing of the Trial Record*

        36.    An aggregate total of 3,485 exhibits were designated for use at the

confirmation hearing, with 1,587 exhibits designated by the DCL Proponents and 2,648 exhibits

designated by the Noteholder Proponents.  Sidley's professionals continued to review and

analyze each of the exhibits designated and/or introduced at the confirmation hearing by the

Noteholder Proponents, including deposition video and transcript designations.

37.     On May 6, 2011, the Bankruptcy Court entered the Order Establishing

Procedures Related to the Post-Confirmation Hearing Admission of Evidence and Resolution of

Evidentiary Objections (Docket No. 8843), which order was modified on June 6, 2011 (Docket

No. 9107) (the "Evidentiary Order").  In the Evidentiary Order, the Court established procedures

and deadlines for the admission of documents and deposition testimony into evidence to the

extent such documents and deposition testimony were not admitted into evidence by the Court

during the confirmation hearing.  The Evidentiary Order provided, in part, for procedures

governing the resolution of the respective Plan Proponents' objections to certain of such

documents and deposition testimony, and, failing consensual resolution, required that motions to

strike testimony from certain fact deponents and motions concerning the admissibility and use of

certain documents be filed by the Plan Proponents, and scheduled a hearing on any such

contested evidentiary motions for June 13, 2011.

38.     Sidley's professionals participated in numerous formal and informal "meet

and confer" sessions with counsel for the Noteholder Proponents and counsel for the other DCL

Proponents regarding contested evidentiary issues in May and early June 2011.  On June 6, 2011,

the DCL Proponents filed a motion to admit certain exhibits into evidence in support of the DCL

Plan (Docket No. 9150).  Sidley's professionals collaborated with counsel for the other DCL

Proponents to research, draft, and file the evidentiary motion.  The Noteholder Proponents filed

their own evidentiary motions on June 6, 2011 (Docket Nos. 9153, 9157).  On June 9, 2011, the

Noteholder Proponents filed an objection to the DCL Proponents' evidentiary motion (Docket

No. 9219), which Sidley's professionals reviewed and analyzed.  Prior to the hearing on the

evidentiary motions and objections thereto scheduled for June 13, 2011, Sidley's professionals

and counsel for the other DCL Proponents and Noteholder Proponents engaged in vigorous

negotiations and discussions to reach a consensual resolution of the evidentiary motions.  The

Plan Proponents also negotiated and drafted a form of agreed order that was presented to the

Court at the June 13 hearing, which resolved the evidentiary motions and also precluded the use

of the findings of fact and conclusions of law in connection with confirmation in other unrelated

proceedings.

> 39.    After the conclusion of the confirmation hearing, the Bankruptcy Court

asked Diaz Data Services ("Diaz"), the Court's official court reporting service, to listen to the

electronic recordings from the confirmation hearing and to transcribe the "official" court

transcripts.  Diaz then sent those transcripts to the Plan Proponents several weeks after the

conclusion of the confirmation hearing.  It became apparent to all of the Plan Proponents that the

"official" transcripts that were transcribed by Diaz varied in certain material respects from the

real-time transcripts prepared during the confirmation hearing.  With the Court's consent, the

Plan Proponents engaged in a comprehensive review of the confirmation hearing transcripts to

ensure that the "official" transcripts that would be relied upon by the Court were accurate.  Those

efforts, facilitated by professionals in Sidley's Corporate Reorganization and Bankruptcy and

Litigation practice groups, in collaboration with counsel for the other DCL Proponents and

counsel for the Noteholder Proponents, resulted in the identification and submission to Diaz of

several hundred pages of corrections and clarifications to the "official" Court transcript of the

confirmation hearing in mid-July 2011.

> **(b)    Avoidance Actions and Related Adversary Proceedings and Tolling Agreements**

> 40.    In the Ninth Interim Fee Period, Sidley filed 94 Avoidance Actions, by

which the Debtors sought to avoid and recover for the benefit of their estates various transfers of

property made to certain of the Debtors' third party vendors and suppliers prior to the Petition

Date.[10]  The Court entered an order providing for a broad stay of the Avoidance Actions until

June 30, 2011, which was also the date that the approximately 127 tolling agreements with third

party vendors and suppliers were set to expire.  Beginning in late April 2011 and continuing

through May and June 2011, Sidley's professionals and the Debtors' financial advisors at

Alvarez & Marsal undertook the substantial efforts necessary to further extend the stay of the

Avoidance Actions and the tolling agreements.  Sidley's professionals ultimately filed the

Motion to Extend the Stay of Avoidance Actions Commenced by the Debtors on June 10, 2011

(Docket No. 9230), which further extended the stay of the Avoidance Actions through and

including December 30, 2011.  Sidley's professionals, together with co-counsel and Alvarez &

Marsal, also secured amendments to each of the outstanding tolling agreements to extend them

through the same date.

### (c)    ERISA Mediation and Settlement

41.    As described in Sidley's Tenth Quarterly Fee Application Request, in May

2011, Sidley participated on behalf of the Debtors in a non-binding mediation concerning the

resolution of certain claims, causes of action, and related matters arising from alleged violations

of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), in connection

with the Tribune Employee Stock Ownership Plan, an employee retirement benefit plan

sponsored by Tribune (the "ERISA Mediation").  (See Order Appointing Mediator for Mediation

of Certain ERISA-Related Claims, Docket No. 8815.)  Participants in the ERISA Mediation

other than the Debtors included the United States Department of the Treasury, Internal Revenue

Service ("IRS"), the Department of Labor ("DOL"), GreatBanc Trust Company ("GreatBanc"),

---

[10] See Sidley's Ninth Quarterly Fee Application Request, at ¶¶ 48-50, for a detailed description of the Avoidance Actions commenced by the Debtors.

Samuel Zell, the plaintiffs to that certain class action lawsuit styled <u>Neil, et al. v. Zell, et al.</u>, (the

"<u>Neil Plaintiffs</u>"), and certain of the Debtors' primary and excess fiduciary liability insurance

providers (the "<u>Insurers</u>").  That mediation and subsequent negotiations culminated in two

settlement agreements resolving all of the claims and causes of action asserted by the IRS, the

DOL, GreatBanc and the Neil Plaintiffs (collectively, the "<u>ERISA-Related Claims</u>").

Specifically, Tribune reached an agreement with the DOL, GreatBanc, the Neil Plaintiffs, Mr.

Zell, and the Insurers to settle the <u>Neil</u> litigation (the "<u>ERISA Claims Settlement</u>") and a separate

agreement with the IRS to settle excise tax claims asserted by the IRS on account of the ERISA

violations alleged in the <u>Neil</u> litigation and by the DOL (the "<u>IRS Settlement</u>").  Those

settlement agreements also resolved the outstanding objections filed against the DCL Plan by the

IRS and the DOL.

      42.     During the Eleventh Interim Fee Period, Sidley's professionals engaged in

substantial negotiations with the other mediation parties to document the foregoing settlement

agreements as well as an additional funding agreement between Tribune and the Insurers.

Sidley's professionals also prepared and filed motions for approval of the ERISA Claims

Settlement on August 19, 2011 and the IRS Settlement on October 7, 2011.  Those motions were

each set for hearing on October 19, 2011.  Additional details regarding the settlements of the

ERISA-Related Claims will be provided in subsequent Quarterly Fee Applications, in relation to

the motions for approval of the settlement agreements and the implementation of the settlements

following that approval.

      **(d)**     <u>**State Law Constructive Fraudulent Conveyance Actions**</u>

      43.     On April 25, 2011, the Bankruptcy Court entered an order authorizing the

Noteholder Proponents to commence state law constructive fraudulent conveyance actions

against the shareholders who received a cash distribution on account of their shares in Tribune as

part of the Leveraged ESOP Transactions (Docket No. 8740).  On June 2, 2011, indenture

trustees for the Noteholders and certain retirees commenced over 50 lawsuits in over 20 different

federal and state courts, seeking to recover all of the $8 billion that was paid to all former

shareholders of Tribune whose stock was purchased or cashed out in conjunction with the

Leveraged ESOP Transactions in 2007 under state law constructive fraudulent transfer causes of

action (collectively, the "SLCFC Actions").  These lawsuits named over 2,000 individuals and

entities as defendants, included thousands of "doe" defendants, and also asserted defendant class

actions against the balance of the approximately 38,000 individuals or entities who held stock

that was purchased or redeemed via the Leveraged ESOP Transactions.  The SLCFC Actions

were brought for the sole benefit of the Noteholders and/or retirees and not for the benefit of all

of Tribune's creditors.

44.     During the Eleventh Interim Fee Period, Sidley analyzed each complaint

on behalf of the Debtors and conducted an analysis of the SLCFC Actions as they applied to

entities related to the Debtors and/or current and former employees of the Debtors.  Sidley

prepared and filed appearances on behalf of the Debtors in the SLCFC Actions and negotiated

with opposing counsel for, among other things, dismissal of Debtor Eagle New Media

Investments, LLC from the SLCFC Actions.  Sidley's associates in the Litigation and

Bankruptcy practice groups spent considerable time reviewing and analyzing the massive

volume of pleadings in each of the 50 SLCFC Actions, for the purpose of alerting the Debtors to

pleadings which might impact the Bankruptcy Court's stay applicable to the SLCFC Actions, or

any pleadings or rulings that might impact Eagle New Media Investments, LLC, the employees

of the Debtors named in the SLCFC Actions, or any Tribune-related entity or party.  Sidley's

professionals prepared daily updates to Tribune's senior management, with cumulative updates

provided following important milestones.  Additionally, several of the SLCFC Actions were filed

in state court, necessitating coordination with support staff to review dockets across the United

States, in addition to raising several research questions regarding removal of those actions to the

federal courts.

45.     During the Eleventh Interim Fee Period, the plaintiffs to the SLCFC

Actions filed amended complaints in many of the SLCFC Actions in August, and thereafter filed

a motion to have all the SLCFC Actions removed to federal court during the pre-trial stages

through multi-district litigation ("MDL") proceedings before a single judge.  The amended

complaints required additional analysis of both the underlying causes of action and the potential

employees and entities named in the actions.  The MDL motion required research into the

applicability of the MDL process to the SLCFC Actions and additional research into the

mechanics of the MDL.

(e)     **Other Pending Litigation**

46.     Prior to the Petition Date and since, Sidley has served the Debtors as

defense counsel with respect to a number of litigation matters pending in all levels of state and

federal courts across the country, including such prepetition litigation matters as Neuman v.

Goldstone, a prepetition employment contract lawsuit in Los Angeles, CBS Broadcasting Inc. v.

Kincaid, a civil litigation suit pending in California, and certain litigation matters pending in

New York, including the cases styled Schultz v. Tribune, Crab House of Douglaston, Inc. v.

Newsday, and Furnell v. Tribune.  Sidley continued to represent the Debtors in connection with

these litigation matters during the Eleventh Interim Fee Period, to the extent such matters were

not stayed by section 362(a) of the Bankruptcy Code, and also provided advice to the Debtors in

connection with proofs of claim filed by the plaintiffs on account of such litigated matters.

Sidley's professionals also successfully defended the Debtors against litigation commenced by

claimants, asserting prepetition causes of action, in violation of the automatic stay.  For example,

Sidley prepared and filed a declaration on behalf of Debtor Los Angeles Times Communications

LLC in California state court, in support of the dismissal of the civil action <u>Hanlon v. Los</u>

<u>Angeles Times Communications LLC</u>.  Sidley's pleadings and appearance in state court on

behalf of the Debtors resulted in the dismissal of that action on June 10, 2011.  Sidley's

professionals also advised the Debtors with respect to certain actual or threatened postpetition

litigation.

**H.      Travel Time (30480):    Hours: 87.70    Fees: $28,577.75**

       47.      During the Eleventh Interim Fee Period, Sidley's professionals spent time

traveling to various locations throughout the country to attend hearings, mediation sessions, and

other meetings and events in the Debtors' chapter 11 cases.  The hours reflect non-working travel

time and the fees requested in this matter category have been reduced by 50% in accordance with

Local Rule 2016-2(d)(viii).

**I.      Labor Issues (30490):    Hours: 0.50    Fees: $355.00**

       48.      Approximately 15% of the Debtors' employees are represented by labor

unions.  During the Eleventh Interim Fee Period, Sidley's professionals continued to address and

analyze a variety of legal issues concerning the impact of these chapter 11 cases on the Debtors'

collective bargaining agreements, multiemployer pension plans, and obligations thereunder.

       49.      Specifically, Sidley's professionals provided information to the Debtors'

auditors regarding labor-related aspects of Sidley's representation of the Debtors.  In addition,

Sidley's professionals advised the Debtors on whether a proposed employment severance

agreement complied with the applicable requirements of California law.

**J.**    **Plan and Disclosure Statement (30500):    Hours: 1,718.80    Fees: $1,218,741.50**

50.    A central part of Sidley's representation of the Debtors during these

chapter 11 cases has been the negotiation and formulation of a plan of reorganization for the

Debtors.  Those efforts culminated in the fourteen-day contested confirmation hearing on the

Competing Plans, held in Wilmington, Delaware during the Tenth Interim Fee Period, and

continuing into the Eleventh Interim Fee Period.  The negotiations, closing arguments, post-trial

briefing, and other confirmation-related activities that took place during the Eleventh Interim Fee

Period in connection with the advancement of the DCL Plan required substantial attention of

Sidley's professionals in both the Corporate Reorganization and Bankruptcy and Litigation

practice groups, due to the contested nature of the proceedings and the number of substantive

legal and factual issues implicated by the Competing Plans.  The time detail of Sidley's

professionals recorded in the Plan and Disclosure Statement matter category principally reflects

the services rendered by Sidley's bankruptcy and corporate professionals in connection with the

advancement of the DCL Plan, and should be read in conjunction with the narrative description

accompanying the Litigated Matters category, supra.

51.    In addition to those activities discussed above, Sidley's professionals in

the Corporate Reorganization and Bankruptcy practice groups expended considerable efforts

during the Eleventh Interim Fee Period preparing for the Debtors' eventual emergence from their

chapter 11 cases.  Sidley's professionals addressed, among other matters, (i) the timing and

iterative tasks required to complete the Restructuring Transactions (set forth and described in

detail in the Plan Supplement filed during the Ninth Interim Fee Period), which involved the

participation of Sidley's bankruptcy and corporate professionals as well as the Debtors' senior

management; (ii) the mechanics of distributions and reserves on account of allowed claims,

which involved the participation of Sidley's bankruptcy professionals, working in conjunction

with the Debtors' financial advisors at Alvarez & Marsal as well as the Debtors' senior

management and business unit-level manages; (iii) the FCC approval process, which involved

participation of Sidley's bankruptcy, regulatory, and corporate professionals, working in

conjunction with the Debtors' outside FCC counsel and the Debtors' senior management; and

(iv) various corporate governance and disclosure matters necessary to return the Debtors to

ordinary operations upon their emergence from the chapter 11 cases.

   52. Sidley's professionals also analyzed the implications of the Court's

decision on confirmation, including (a) confirmation of the DCL Plan and denial of confirmation

of the Noteholder Plan, (b) confirmation of the Noteholder Plan and denial of confirmation of the

DCL Plan, and (c) denial of confirmation of both the DCL Plan and the Noteholder Plan (which

ultimately occurred, in the Court's decision and order dated October 31, 2011).  Sidley's

professionals researched applicable decisional law from Delaware and the Third Circuit on

procedural, jurisdictional, and substantive issues raised by the potential outcomes of plan

confirmation, including finality of orders confirming or denying confirmation, appeals and

motions for reconsideration, the circumstances under which a confirmation order may be stayed

(or alternatively, consummated) pending appeal, and other legal issues.  In addition, Sidley's

professionals analyzed and considered certain modifications to the DCL Plan.  On June 23, 2011,

the Supreme Court of the United States issued its decision in Stern v. Marshall, which concerned

the Constitutional limitations on the adjudicatory powers of bankruptcy courts.  Sidley's

professionals analyzed the potential implications of the Stern decision for the Debtors' plan

confirmation process, as reflected in the decision itself, subsequent opinions of other courts

interpreting Stern, and pleadings that chiefly relied upon Stern filed in comparable chapter 11

confirmation proceedings.

53.    These research and analytical activities prepared the Debtors for the issuance of the Court's confirmation opinion in October 2011 and facilitated the preparation of Sidley's responses on behalf of the Debtors to the subsequent appeals and motions for reconsideration (and the various legal issues raised therein), filed by the Noteholder Proponents, as well as preparation of updated versions of the DCL Plan filed subsequent to the Bankruptcy Court's confirmation opinion during the Twelfth Interim Fee Period, which will be described in detail in Sidley's Twelfth Quarterly Fee Application Request.

**K.    Professional Retention (30510):    Hours: 71.20    Fees: $34,444.00**

54.    The Debtors' large and diverse businesses require the employment and retention of a variety of professionals to support these bankruptcy proceedings and to continue managing the litigation, real estate, tax, accounting, and other needs of their business operations in the ordinary course.  During the Eleventh Interim Fee Period, Sidley's professionals assisted the Debtors with modifying the scope of the existing retention of Ernst & Young, LLP ("E&Y") (Docket Nos. 9041) in connection with additional services to be provided to the Debtors thereby. Sidley's professionals consulted with the Debtors' management to determine the appropriate scope and terms of the supplemental retention, and coordinated with counsel for and personnel of E&Y and prepared the necessary pleadings to obtain Court approval of such retention.

55.    In addition, during the Eleventh Interim Fee Period, Sidley's professionals twice prepared and filed supplements to the list of the Debtors' ordinary course professionals ("OCP") (Docket Nos. 9333 and 9689) and coordinated with the Debtors' legal department and financial advisors to prepare monthly and quarterly reports of proposed payments to OCPs (Docket No. 9399.)  Sidley's professionals also advised the Debtors as to the legal requirements set forth in the Bankruptcy Code and Rules regarding the filing of professional fee applications,

and, where requested by the Debtors, assisted in the preparation and review of fee applications of certain professionals retained by the Debtors, including OCPs.

**L.    Tax Matters (30520):    Hours: 24.20    Fees: $14,809.50**

56.    During the Eleventh Interim Fee Period, Sidley's tax professionals continued to review and analyze a variety of discrete tax issues on behalf of the Debtors, both arising from and in connection with these chapter 11 cases and in connection with Sidley's representation of the Debtors in tax matters in the ordinary course of the Debtors' business.  For example, Sidley's professionals reviewed and analyzed tax-related claims and liabilities, considered the tax implications of proposed transactions, handled appeals of tax assessments, advised the Debtors with respect to potential settlements of tax claims, and communicated with taxing authorities concerning all such matters.

**M.    Claims Processing (30530):    Hours: 726.20    Fees: $347,663.00**

57.    The complexity and breadth of the Debtors' businesses has resulted in well over 7,000 proofs of claim being filed in these chapter 11 cases.  These claims were grounded in a significant variety of legal areas, including, but not limited to, liabilities arising from labor contracts, trade vendors, securities, real estate leases, contracts, tax obligations, and prepetition litigation.  Sidley's professionals assigned to handle claims-related matters participated in regular conference calls with the Debtors' financial advisors, Alvarez & Marsal, in order to coordinate the processing of the proofs of claim, evaluating the legal sufficiency of the claims, and preparing objections thereto.  In conjunction with the Debtors' personnel, Sidley reviewed the claims and underlying supporting documents, and developed legal theories to support substantive and non-substantive objections to claims.

58.    During the Eleventh Interim Fee Period, Sidley's professionals continued evaluating, researching, and analyzing the treatment of various types of claims arising in the

Debtors' chapter 11 cases. Specifically, Sidley's professionals, working together with the Debtors' management, business personnel, and Alvarez and Marsal, reviewed and responded to formal and informal responses by claimants to the Debtors' Forty-Fourth and Forty-Fifth Omnibus Objections to Claims (which were each filed in the Tenth Interim Fee Period), and coordinated with the Debtors' personnel to negotiate the consensual resolution of objections and other pending objections where feasible. The Bankruptcy Court entered orders sustaining, in whole or in part, the Debtors' Thirty-Third, Thirty-Fourth, Fortieth, Forty-Third, Forty-Fourth, and Forty-Fifth Omnibus Objections that had previously been filed by Sidley on behalf of the Debtors (subject to the continuance of objections to certain claims of creditors who filed responses to such objections). (Docket Nos. 9535, 9342, 9344, 9345, 9346, and 9347.)

      59.    In addition, Sidley's professionals assisted the Debtors with negotiating and implementing agreements and stipulations to resolve disputed claims without need for formal objections, in accordance with the Order approving claims settlement procedures that was entered by the Bankruptcy Court to facilitate consensual resolution of claims. Those procedures provide the Debtors with authority to settle or compromise disputed claims of less than $50,000 in their discretion, claims equal to or greater than $50,000 but less than $1,000,000 upon notice to the UST and counsel to the Committee and certain senior lenders, and claims equal to or greater than $1,000,000 with the approval of the Court pursuant to Bankruptcy Rule 9019. Sidley prepared and filed a comprehensive report of the claims stipulations executed pursuant to those procedures on June 30, 2011 (Docket No. 9400).

      60.    Finally, during the Eleventh Interim Fee Period, Sidley's professionals continued their ongoing substantive negotiations with the Committee and counsel for the various former officers and directors potentially impacted by the Bankruptcy Court's order granting the

Additional D&O Claims Motions.[11]  (See Docket Nos. 8992, 8994, 8995, 8996, 8997, 8998, 8999, 9000, 9001, 9002.)  At the hearing held on May 25, 2010, the Bankruptcy Court directed the parties to develop and implement terms for the filing and processing of indemnification claims asserted by certain former officers of the Debtors who had been named as defendants in the adversary proceeding commenced by the Committee entitled Official Committee Of Unsecured Creditors v. Fitzsimons (In re Tribune Co.), Case No. 10-54010 (KJC).  Sidley's professionals participated in the negotiation and preparation of a form of stipulation that would permit additional former officers and directors of the Debtors named as defendants in the Fitzsimons litigation, or who were potential members of the defendant class, to file a late proof of claim under certain enumerated terms and conditions, consistent with the Court's directions. Sidley's professionals also undertook substantial diligence efforts to identify former officers and directors of the Debtors to provide notice regarding the foregoing indemnification claims procedures.

**N.    Business Operations (30550):   Hours: 190.30   Fees: $120,277.00**

61.    The Business Operations matter category encompasses the activities of Sidley's professionals with respect to their representation of the Debtors in corporate and transactional matters in the ordinary course of the Debtors' business, as well as other general corporate law and transactional advice, both related to these chapter 11 cases and otherwise related to the Debtors' businesses.  These services are necessary to facilitate the Debtors' efforts to stabilize and reposition their businesses through cost saving and revenue enhancing strategies, as well as to prepare the Debtors for their emergence from chapter 11.

---

[11] Background concerning the D&O Claims Motions and Additional D&O Claims Motions is provided in detail in Sidley's Tenth Quarterly Fee Application Request.

62.     During the Eleventh Interim Fee Period, Sidley's professionals in the Corporate practice group expended substantial time and effort to prepare, research, and analyze potential value maximization strategies regarding the Debtors and certain of the Debtors' properties.  Sidley's professionals in the Corporate practice group also reviewed and assessed the steps necessary to complete the Restructuring Transactions proposed by the DCL Plan.  In addition, Sidley's professionals addressed a variety of discrete matters arising postpetition in the ordinary course of the Debtors' business, including the review of certain potential strategic transactions, contracts, leases, and general corporate governance matters.  Finally, Sidley's professionals also provided information to the Debtors' auditors regarding the various legal matters for which Sidley represents the Debtors in connection with the Debtors' annual financial reporting.

**O.      Case Administration (30560):    Hours:  109.00    Fees: $51,558.00**

63.     During the Eleventh Interim Fee Period, Sidley's professionals engaged in various general case administration tasks, including scheduling and participating in hearings, reviewing and reporting on docketed filings to the Debtors, the Committee, the United States Trustee, and other interested parties, and maintaining a schedule of critical dates and deadlines. On a periodic basis during the Eleventh Interim Fee Period, Sidley's professionals participated in status calls with the Debtors' senior management and financial advisors to discuss pending motions and issues and the outcome of each hearing.  In addition, Sidley's paraprofessionals are responsible for monitoring the docket for all filed pleadings and preparing and distributing a daily status report to the Debtors' senior management and Sidley professionals.

**P.      Creditor Communications (30570):    Hours: 15.00    Fees: $6,243.00**

64.     Throughout the Eleventh Interim Fee Period, Sidley's professionals responded to numerous inquiries and communications from individual creditors as well as from

31

representatives of larger groups of the Debtors' creditor constituencies regarding the status of these chapter 11 cases.  As a convenience to individual creditors, particularly individuals who are generally new to and/or unfamiliar with the bankruptcy process and their role therein, the Debtors established a Tribune Company Bankruptcy "hotline."  This toll-free number connects directly to a voice mailbox maintained by Sidley.  Each work day, attorneys at Sidley monitored the hotline for messages and returned all phone calls promptly, generally within 24 hours of the message being left.  Typical callers to the hotline were bond holders, brokerage firms calling on behalf of clients, former employees of the Debtors, pro se creditors, and attorneys for creditors.  Questions posed to Sidley's professionals by the Debtors' creditors ranged from specific questions regarding claims treatment under the DCL Plan to general inquiries regarding the status of the chapter 11 cases.

**Q.      Employee Matters (30590):    Hours: 834.40    Fees: $555,911.00**

65.      During the Eleventh Interim Fee Period, Sidley's professionals in the Corporate Reorganization and Bankruptcy and Employment practice groups continued to advise the Debtors with respect to various legal issues pertaining to employee-related matters, including negotiating employment contracts, implementing employee benefit and incentive plans, and negotiating termination and severance of former employees.  Sidley prepared and edited drafts of various of the Debtors' employment-related benefit and severance plans and addressed inquiries from creditors and made appropriate adjustments to such plans in response.

66.      Additionally, Sidley's professionals continued the process of developing the 2011 management incentive plan ("2011 MIP"), which entailed researching, editing, and advising the Debtors, in part based on the Court's decisions respecting the implementation of the 2009 and 2010 MIPs.  Sidley's professionals worked in cooperation with the Debtors and Mercer (U.S.), Inc. ("Mercer"), an independent compensation consultant, to formulate and present the

2011 MIP to the Court.  The Motion of the Debtors for an Order Authorizing the Debtors to

Implement a Management Incentive Plan for 2011 was filed on August 30, 2011 (Docket No.

9726) (the "2011 MIP Motion"), together with a corresponding motion to file under seal an

unredacted copy of Mercer's report regarding the 2011 MIP (Docket No. 9727).  Prior to the

filing of the 2011 MIP Motion, Sidley's professionals in the Corporate Reorganization and

Bankruptcy, Litigation, and Employment practice groups engaged in substantive negotiations

with certain of the Debtors' creditor constituencies, including the Committee, regarding the

proposed terms of the 2011 MIP.  Further proceedings on the 2011 MIP were held in the Twelfth

Interim Fee Period and will be described in Sidley's subsequent Quarterly Fee Application

Requests.

       67.    At the Debtors' request, Sidley's professionals in the Corporate

Reorganization and Bankruptcy and Employment practice groups undertook a comprehensive

analysis of the implications of the SLCFC Actions for the Debtors' current employees who were

either individually named as defendants in those actions or who were potentially members of the

putative defendant classes, by virtue of being former shareholders of Tribune.  The SLCFC

Actions potentially implicate several thousand of the Debtors' current and former employees,

who held stock directly or indirectly through one or more of the Debtors' benefit plans.  The

SLCFC Actions raise complex legal issues of first impression at the intersection of state

fraudulent conveyance laws and ERISA.

       68.    In addition to the foregoing, Sidley's professionals responded to inquiries

from the Debtors' management and in-house employment lawyers regarding employment issues,

analyzed various issues involving the Debtors' tax-qualified pension plans, drafted and edited

severance agreements, reviewed consulting contracts, responded to numerous information

requests from and/or regarding current and former employees, analyzed employee-related claims, and handled various other issues in connection with the Debtors' employees.

**R.    2010 Exit Credit Facility (13700):   Hours: 1.20    Fees: $857.50**

69.    During the Eleventh Interim Fee Period, Sidley continued to provide services to the Debtors relating to the evaluation, negotiation, and eventual implementation of a post-confirmation financing facility that will provide a source of funding for the reorganized Debtors upon their emergence from these chapter 11 cases.  The DCL Plan authorizes the Debtors to procure exit financing as described by an exit financing term sheet in the Plan Supplement that was filed prior to the confirmation hearing.  The fees incurred by Sidley in connection with this matter related to certain preparatory activities required to implement the exit financing facility, including reviewing the terms of the exit facility filed with the Plan Supplement for the DCL Plan, reviewing forms of assignment agreements, and advising the Debtors with respect to particular legal issues concerning the exit facility.

## EXPENSES INCURRED

70.    Sidley has incurred expenses of $445,493.14 in connection with its services rendered to the Debtors during the Eleventh Interim Fee Period.  These expenses represent actual out-of-pocket costs for items incurred exclusively for the direct benefit of the Debtors, including, but not limited to, duplicating charges, document delivery and messenger services, telephone and facsimile charges, computer-assisted legal research, travel-related expenses, overtime services, in-house document production, and professional services from contract attorneys relating to discovery activities.

71.    Sidley submits that all such expenses are necessary and actual expenses for the performance of its services in these cases, and further submits that many of such expenses were necessitated by the time constraints under which Sidley's professionals and staff have

34

operated in these cases.  Specifically, many of the expenses incurred during the Eleventh Interim

Fee Period are attributable to the confirmation hearing on the Competing Plans, which was held

in Wilmington, Delaware during March and April 2011, with closing arguments held in June

2011.[12]  Sidley's representation of the Debtors in support of the DCL Plan required the

preparation and physical production of documents and exhibits for use at trial, and ongoing

discovery activities leading up to the trial required the services of outside contract attorneys and

technical service providers.  Additional information respecting certain categories of expenses are

described below. A detailed breakdown of Sidley's expenses incurred in rendering services to the

Debtors during the period covered by this application is incorporated into this Application as part

of Attachment B hereto.

(a)     **Travel Expenses**

72.     Sidley submits that all travel expenses incurred during the period covered

by this Application were necessary, reasonable, and reflect the prevailing market rates.  In

particular, Sidley submits that, to the best of its knowledge, all air travel utilized by Debtors'

personnel during the period covered by this Application was at the prevailing coach-class rate for

such travel less any corporate discounts received by Sidley, in accordance with Sidley's policies

for business travel for bankruptcy and non-bankruptcy matters.  Hotel charges reflect rates for

one night of lodging, unless otherwise indicated.

(b)     **Court-Related Expenses**

73.     Sidley incurred $7,936.90 in out-of-pocket expenses relating to Court fees

and Court Reporting fees.  For the convenience of the Plan Proponents and the Court, Sidley

---

[12] Many of the expenses relating to the confirmation hearing were incurred during the Tenth Interim Fee Period but, because of the normal time associated with third-party invoicing and processing, such expenses were not charged to the Debtors until the Eleventh Interim Fee Period.

retained TSG Reporting, Inc. to provide real-time transcripts of the confirmation hearing, including during the closing arguments held during the Eleventh Interim Fee Period.[13]  All Court-related expenses reflect actual, reasonable, and necessary costs incurred by Sidley on behalf of the Debtors.

### (c)    Document-Related Expenses

74.    Sidley's normal billing practices, as set forth in the pleadings supporting its retention in these chapter 11 cases, include standard secretarial services as part of normal overhead.  For certain projects involving large and/or time-sensitive administrative and logistical requirements resulting from client needs, Sidley utilizes the services of third-party providers in the place of clerical personnel on staff during normal business hours and bills those services to the client at Sidley's cost for such services.  During the Eleventh Interim Fee Period, Sidley charged a total of $18,561.10 relating to in-house duplication, outside document production, document processing and/or document binding/drilling services that were billed to the Debtors at cost; that is, no markup for such services is applied by Sidley.[14]

### (d)    Computer-Assisted Research

75.    Computer research and information retrieval services are charged on a time, item and/or search-type basis which takes advantage of certain discounts that Sidley is able to negotiate with the relevant service providers because of the Firm's size and volume of usage. The Firm's charges for computerized legal research such as Westlaw or Lexis are based on a rate that recovers no more than the Firm's costs.

---

[13] As set forth in n.11, above, certain of TSG Reporting, Inc.'s invoices charged to the Debtors during the Eleventh Interim Fee Period were for reporting services performed during the confirmation hearing that occurred during the Tenth Interim Fee Period.

[14] By agreement between Sidley and the Office of the United States Trustee, Sidley has not charged the Debtors for any expenses relating to third-party proof-reading services.

(e)    **Overtime**

76.    It is Sidley's standard practice and policy to reimburse professionals and staff for overtime meals and overtime transportation home when working late, provided such professional or staff member has worked a certain number of hours per day on a particular client matter.  Additionally, Sidley provides overtime pay to certain eligible staff employees when they are required to work past normal business hours on a particular client matter.  Sidley submits that all requested overtime expenses are reasonable given the time demands in these cases during the Eleventh Interim Fee Period.

(f)    **Professional Services/Specialists**

77.    During the Eleventh Interim Fee Period, Sidley charged a total of $339,976.21 relating to outside professional services and specialists that were billed to the Debtors at cost.  In connection with Sidley's ongoing maintenance of the Document Depository, in which the equivalent of approximately 5.82 million pages of documents relating to the Leveraged ESOP Transactions are electronically stored, Sidley utilized the services of an outside vendor, LD Discovery, to host and process electronic data files for production upon request to Depository Designees and creditor constituencies authorized to receive such documents.  Sidley also utilized the services of contract attorneys to supplement the Firm's Litigation professionals in the review and analysis of documents received and produced in discovery to meet the deadlines imposed by the confirmation hearing schedule set by the Bankruptcy Court.  Additionally, Sidley retained courtroom technology consultancy firm TrialGraphix to assist with the hosting, indexing, and projection of trial exhibits, including video deposition designations, on video screens throughout the courtroom during the confirmation hearing, including during the closing arguments held in the Eleventh Interim Fee Period.

37

## REVIEW OF APPLICABLE LOCAL RULE

78.    The undersigned has reviewed the requirements of Local Rule of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware 2016-2 and certifies to the best of his information, knowledge and belief that this application substantially complies with Rule 2016-2.

## NOTICE

79.    Notice of this Application has been served upon the Notice Parties specified in the Fee Orders.  In accordance with the terms of the Fee Orders, Sidley respectfully submits that no other or further notice is required.

## NO PRIOR REQUEST

80.    Other than the applicable Monthly Fee Applications, no previous application respecting the relief requested herein has been made to this or any other Court.

WHEREFORE, after appropriate notice and hearing, Sidley Austin LLP respectfully requests the Court (i) to approve, pursuant to 11 U.S.C. §§ 327, 331, and 503, interim compensation in the amount of $5,073,861.25 and reimbursement of expenses in the amount of $445,493.14, (ii) to authorize the payment of such amounts by the Debtors to Sidley, less any amounts previously paid to Sidley pursuant to the Monthly Fee Applications for the period covered by this eleventh Quarterly Fee Application Request and the procedures set forth in the Interim Compensation Order and the Fee Examiner Order, and (iii) to grant such further relief as is just and proper.

Dated: _4 Jue_ , 2012

Respectfully submitted,

James F. Conlan
Bryan Krakauer
Kenneth P. Kansa
Jillian K. Ludwig
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

ATTORNEYS FOR DEBTORS AND DEBTORS
IN POSSESSION