## EXHIBIT A

### 2011 Plan Audit Engagement Letter



Mr. Jack Rodden
Treasurer
Tribune Company
435 North Michigan Avenue
Chicago, IL 60604


May 29, 2012


Dear Mr. Rodden:

The purpose of this letter is to confirm our understanding of the terms of our engagement as independent accountants of Tribune Employee Stock Ownership Plan ("the Plan").

**Service and related report**

We will audit the Plan's statement of net assets available for benefits at December 31, 2011 and the statement of changes in net assets available for benefits for the year then ending. Upon completion of our audit, we will provide you with our audit report on the financial statements referred to above. Our audit and the related report also will address the supplemental information required by the Employee Retirement Income Security Act of 1974 ("ERISA"). If for any reason relating to the affairs or management of the Plan we are unable to complete the audit, we may decline to issue a report as a result of this engagement.

**Our responsibilities and limitations**

The objective of a financial statement audit is the expression of an opinion on the financial statements. We will be responsible for performing the audit in accordance with auditing standards generally accepted in the United States. These standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The audit will include examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements and supplemental information, assessing accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation.

We will consider the Plan's internal control over financial reporting solely for the purpose of determining the nature, timing and extent of auditing procedures necessary for expressing our opinion on the financial statements and supplementary information. This consideration will not be sufficient to enable us to provide assurance on the effectiveness of internal control over financial reporting. However, all significant deficiencies and material weaknesses relating to internal control over financial reporting identified during our audit will be communicated in writing to the Plan oversight entity and management of the Plan. All deficiencies in internal control over financial reporting (i.e., those deficiencies in internal control over financial reporting that are of a lesser magnitude than significant deficiencies) relating to internal control over financial reporting identified while performing our work will be communicated to management of the Plan.



We will design our audit to obtain reasonable, but not absolute, assurance of detecting errors or fraud that would have a material effect on the financial statements as well as other illegal acts having a direct and material effect on financial statement amounts. Absolute assurance is not attainable due to the nature of audit evidence and the characteristics of fraud. Our audit will not include a detailed audit of transactions, such as would be necessary to identify errors or fraud that did not cause a material misstatement of the financial statements. It is important to recognize that there are inherent limitations in the auditing process. An audit is based on the concept of selective testing of the data underlying the financial statements, which involves judgment regarding the areas to be tested and the nature, timing, extent and results of the tests to be performed. An audit is, therefore, subject to the limitation that material errors or fraud or other illegal acts having a direct and material financial statement impact, if they exist, may not be detected. Because of the characteristics of fraud, an audit designed and executed in accordance with auditing standards generally accepted in the United States may not detect a material fraud. Characteristics of fraud include (i) concealment through collusion among management, employees, or third parties; (ii) withheld, misrepresented, or falsified documentation; and (iii) the ability of management to override or instruct others to override what otherwise appears to be effective controls. Further, while effective internal control reduces the likelihood that errors, fraud or other illegal acts will occur and remain undetected, it does not eliminate that possibility. For these reasons we cannot ensure that errors, fraud or other illegal acts, including prohibited transactions with parties in interest and other violations of ERISA rules and regulations, if present, will be detected. However, we will communicate to you the Plan oversight entity, Plan Administrator, and management of the Plan, as appropriate, any such matters identified during our audit.

We will perform certain procedures directed at considering the Plan's compliance with Internal Revenue Code requirements for tax-exempt status, including inspecting the Plan's latest tax determination letter from the Internal Revenue Service (IRS). As we perform our audit, we will be aware of the possibility that events affecting the Plan's tax status may have occurred. Similarly, we will be aware of the possibility that events affecting the Plan's compliance with the requirements of ERISA may have occurred. These procedures do not constitute an examination or review for the purpose of determining compliance with the Internal Revenue Code or ERISA. However, any instances of tax or ERISA non-compliance identified during our audit will be communicated to you.

We also are responsible for determining that the Plan oversight entity and Plan sponsor is informed about certain other matters related to the conduct of the audit, including (i) any disagreements with management about matters that could be significant to the Plan's financial statements or our report thereon; (ii) any serious difficulties encountered in performing the audit; (iii) information relating to our independence with respect to the Plan; and (iv) other matters related to the Plan's financial statements including its accounting policies and practices; and (v) all significant deficiencies and material weaknesses identified during the audit, as previously mentioned.

The audit will not be planned or conducted in contemplation of reliance by any specific third party or with respect to any specific transaction. Therefore, items of a possible interest to a third party will not be specifically addressed or matters may exist that would be assessed differently by a third party, possibly in connection with a specific transaction.

Tribune Company - Page 2 of 6



### Management's responsibilities

The Plan's management is responsible for the financial statements and supplemental information referred to above. In this regard, management is responsible for establishing policies and procedures that pertain to the maintenance of accounting records, the authorization of receipts and disbursements, the safeguarding of assets, the proper recording of transactions in the accounting records, and for reporting financial information in conformity with accounting principles generally accepted in the United States. Management also is responsible for the design and implementation of programs and controls to prevent and detect fraud, and for informing us (i) about all known or suspected fraud affecting the plan involving (a) management, (b) employees who have significant roles in internal control over financial reporting, and (c) others where the fraud could have a material effect on the financial statements; and (ii) of its knowledge of any allegations of fraud or suspected fraud affecting the plan received in communications from employees, former employees, analysts, regulators, short sellers, or others. Management is responsible for (i) adjusting the financial statements to correct material misstatements and for affirming to us that the effects of any uncorrected misstatements aggregated by us during the current engagement and pertaining to the year under audit are immaterial, both individually and in the aggregate, to the financial statements taken as a whole; and (ii) notifying us of all material weaknesses, including other significant deficiencies, in the design or operation of the Plan's internal control over financial reporting that are reasonably likely to adversely affect the Plan's ability to record, process, summarize and report external financial data reliably in accordance with generally accepted accounting principles. Management also is responsible for identifying and ensuring that the Plan complies with the laws and regulations applicable to its activities.

As part of management's responsibility for the financial statements and the effectiveness of its internal control over financial reporting, management is responsible for making available to us, on a timely basis, all of the Plan's original accounting records and related information and plan personnel to whom we may direct inquiries. As required by auditing standards generally accepted in the United States, we will make specific inquiries of management and others about the representations embodied in the financial statements and supplemental information and the effectiveness of internal control over financial reporting. Auditing standards generally accepted in the United States also require that we obtain written representations covering the audited financial statements and supplemental information from certain members of management. The results of our audit tests, the responses to our inquiries and the written representations comprise the evidential matter we intend to rely upon in forming our opinion on the financial statements and the supplemental information.

### Other documents

Auditing standards generally accepted in the United States require that we read any annual report (or similar document) that contains our audit report. Our engagement does not include preparation of the Plan's 2011 Form 5500 for filing with the IRS and Department of Labor ("DoL"). We will, however, read the Form 5500 prior to filing and consider whether the information in the Form 5500, including the manner of its presentation, is materially inconsistent with information appearing in the financial statements. Management agrees for this purpose to provide us with the final draft Form 5500 before it is filed with the IRS and DoL. These procedures are not sufficient, nor are they intended, to ensure that the Plan's Form 5500 is completely and accurately prepared. We assume no obligation to perform procedures to corroborate such other information as part of our audit.



**Release and indemnification**

Because of the importance of oral and written management representations to an effective audit, the Plan releases and indemnifies PricewaterhouseCoopers LLP and its personnel from any and all claims, liabilities, costs and expenses attributable to any knowing misrepresentation by management.

In no event shall PricewaterhouseCoopers LLP be liable to the Plan, whether a claim be in tort, contract or otherwise, for any consequential, indirect, lost profit or similar damages relating to PricewaterhouseCoopers LLP's services provided under this engagement letter, except to the extent finally determined to have resulted from the willful misconduct or fraudulent behavior of PricewaterhouseCoopers LLP relating to such services.

In the event that our report is subsequently included in a filing with the Securities and Exchange Commission (unless our report is included as a result of Rule 3-05 or Rule 3-14 of Regulation S-X), we and the Company hereby agree that the preceding two paragraphs in this "Release and Indemnification" section of this letter and any paragraphs covering the same issues in our previous engagement letters for previously issued reports included in the filing will be null and void and will no longer confer any rights or obligations on the parties. Such engagement letters will be deemed to be amended accordingly at the time of such filing, without further action by either party. Any letters so amended will remain in full force and effect unless otherwise amended by the parties.

In the unlikely event that differences concerning our services or fees should arise that are not resolved by mutual agreement, to facilitate judicial resolution and save time and expense of both parties, the Plan and PricewaterhouseCoopers LLP agree not to demand a trial by jury in any action, proceeding or counterclaim arising out of or relating to our services and fees for this engagement.

**Other PricewaterhouseCoopers LLP firms and subcontractors**

PricewaterhouseCoopers LLP is the U.S. firm of the global network of separate and independent PricewaterhouseCoopers firms (exclusive of PricewaterhouseCoopers LLP, the "Other PwC Firms"). PricewaterhouseCoopers LLP may, in its discretion, draw on the resources of and/or subcontract to its subsidiaries, the Other PwC Firms and/or third party contractors and subcontractors (each, a "PwC Subcontractor"), in each case within or outside the United States in connection with the provision of the services and/or for internal, administrative and/or regulatory compliance purposes. The Company agrees that PricewaterhouseCoopers LLP may provide information PricewaterhouseCoopers LLP receives in connection with this agreement to the PwC Subcontractors for such purposes. PricewaterhouseCoopers LLP will be solely responsible for the provision of the services (including those performed by the PwC Subcontractors) and for the protection of the information provided to the PwC Subcontractors. You agree that neither you nor any group entity will bring any claim, whether in contract, tort (including negligence) or otherwise against any Other PwC Firms in respect of this engagement letter or in connection with the services herein. In the event that our report is subsequently included in a filing with the Securities and Exchange Commission (unless our report is included as a result of Rule 3-05 or Rule 3-14 of Regulation S-X), for independence purposes we and the Company hereby agree that the immediately preceding sentence will be null and void and will no longer confer any rights or obligations on the parties. This letter will be deemed to be amended accordingly at the time of such filing, without further action by either party. The amended letter will remain in full force and effect unless otherwise amended by the parties.



**Timing and fees**

Completion of our work is subject to, among other things, 1) appropriate cooperation from the Plan's personnel including timely preparation of necessary schedules, 2) timely responses to our inquiries, and 3) timely communication of all significant accounting and financial reporting matters. When and if for any reason the Plan is unable to provide such schedules, information and assistance, PricewaterhouseCoopers LLP and you will mutually revise the fee to reflect additional services, if any, required of us to complete the audit.

Our fee estimates are based on the time required by the individuals assigned to the engagement. We estimate our fees for this audit engagement will be $10,000, subject to the terms and conditions above. We will advise you should any other circumstances arise which may cause actual time to exceed that estimate.

We also will bill the Company for our reasonable out-of-pocket expenses, any applicable sales, use or value added tax, and our internal per ticket charges for booking travel. Amounts billed for services performed by PricewaterhouseCoopers LLP or PwC Subcontractors shall be considered fees and not expenses and will be billed at rates determined by PricewaterhouseCoopers LLP based on experience, skill and other factors or as otherwise agreed by the parties.

Invoices rendered are due and payable upon receipt.

Any additional services that may be requested and we agree to provide will be the subject of separate arrangements.

**Other matters**

PricewaterhouseCoopers LLP is owned by professionals who hold CPA licenses as well as by professionals who are not licensed CPAs. Depending on the nature of the services we provide, non-CPA owners may be involved in providing services to you now or in the future.

We may be requested to make certain working papers available to the DoL pursuant to authority given to it by law or regulation. If requested, access to such working papers will be provided under the supervision of PricewaterhouseCoopers LLP personnel. Furthermore, upon request, we may provide photocopies of selected working papers to the DoL. We will mark all information as confidential and maintain control over the duplication of all such information. However, the DoL may intend, or decide, to distribute the photocopies or information contained therein to others, including other governmental agencies. You will be billed for additional fees as a result of the aforementioned work.

In the event we are requested or authorized by you or required by government regulation, subpoena, or other legal process to produce our working papers or our personnel as witnesses with respect to our engagement for the Plan, the Plan will, so long as we are not a party to the proceeding in which the information is sought, reimburse us for our professional time and expenses, as well as the fees and expenses of our counsel, incurred in responding to such a request.

The Company agrees that it will not, directly or indirectly, agree to assign or transfer this engagement letter or any rights, obligations, claims or proceeds from claims against PricewaterhouseCoopers LLP



arising under this engagement letter to anyone, except to an entity with which the Company merges or an entity which acquires all or substantially all of the assets of the Company and where, in either case, the assignee entity agrees to be bound by this provision. Any assignment or transfer by the Company in violation of this paragraph shall be void and invalid.

This engagement letter reflects the entire agreement between us relating to the services covered by this letter. It replaces and supersedes any previous proposals, correspondence and understandings, whether written or oral. The agreements contained in this engagement letter shall survive the completion or termination of this engagement.

*   *   *   *   *

We are pleased to have the opportunity to provide services to Tribune Company. If you have any questions about this letter, please discuss them with Robert Farr at (312) 298-2919 or Heather Vasilenko at (312) 298-3430. If the services and terms outlined in this letter are acceptable, please sign one copy of this letter in the space provided and return it to me. You may return the signed copy by hand, by mail, by air courier, by facsimile to me at 813-375-8874, or attached to an email as a pdf, jpeg or similar file type sent to me at Robert.t.farr@us.pwc.com.

Very truly yours,

*PricewaterhouseCoopers LLP*

cc:     Tribune Company Employee Benefits Committee
        Mr. Brian Litman, Tribune Company Controllor

The services and terms as set forth in this letter are agreed to.

Tribune Employee Stock Ownership Plan

By: _____
       Mr. Jack Rodden
       Treasurer, Tribune Company

       _____6/6/2012_____
       (Date)

## EXHIBIT B

**2011 Employee Benefit Plan Filings Engagement Letter**



May 2, 2012

Mr. Jack Rodden
Vice President and Treasurer
Tribune Company
435 North Michigan Avenue
Chicago, IL  60611


**Re:      Tribune Company Employee Benefit Plan Filings**


Dear Mr. Rodden:

This letter is to confirm that PricewaterhouseCoopers LLP ("PwC" "we" or "us") will provide certain services to Tribune Company and subsidiaries ("Tribune" or "Client" or "you") in connection with the annual employee benefit plan filing requirements for Tribune Company.  Tribune may procure services under this engagement letter for itself and for those of its consolidated subsidiaries or affiliates that Tribune binds to this engagement letter by its signature or which separately agree to the provisions of this engagement letter (collectively, the "Subsidiaries").

**Summary of Services**

Our services will include the preparation of the 2011 Forms 5500 (Annual Return/Report of Employee Benefit Plan) and certain other consultations for the Plans ("Services").  The attached chart lists the plans and filings that we understand to be covered by our Services, as of the date of this letter.

Our Services will include:

- Overall coordination assistance related to the completion of the filings;

- Preparation of a data request for all required filings and monitoring of the progress of the data accumulation;

- On-site review of the accumulated data, including discussions and resolution of certain issues regarding the data;

- Preparation of all required requests for extension of time to file the returns (Form 5558);



- Preparation of the Forms 5500 and other filings for the plans;

- Preparation of the 2011 Form 8955-SSA for the Plans (where applicable);

- Coordination of the necessary steps with the PricewaterhouseCoopers audit team;

- Coordination of the electronic filing of the Forms 5500 with the Department of Labor and the Forms 8955-SSA with the IRS;

- Certain coordination and review related to filings prepared by other service providers or Tribune Company entities;

- Preparation of a Summary Annual Report for distribution to participants and beneficiaries for each of the plans (where applicable); and

- Review and discussion of technical and other issues that arise during our project.

In preparing the Forms 5500, PricewaterhouseCoopers will be relying upon data, representations and other information provided by, the plan administrator, recordkeeper and/or other plan agents and vendors. The Forms 5500 require electronic signature, under penalty of perjury, by the plan administrator, affirming that the return/report and accompanying schedules, statements and attachments are true, correct and complete to the best of his or her knowledge and belief.  The plan administrator is responsible for understanding and agreeing with the various amounts, computations and statements presented in the Forms 5500 before filing with the regulatory authorities.

If the scope of the engagement changes, or you request additional services that are not within the scope of this agreement, we will notify you that those services are out-of-scope and additional fees will be incurred at our hourly rates.  We will also provide you with a fee estimate and request your approval before proceeding.  Finally, if the scope of the work is unrelated to this engagement, or there is a significant departure from the existing engagement, we will provide you with a scope of services description which will incorporate the terms of this agreement for your approval and signature.

**Electronic Filing**

The Department of Labor ("DOL") requires the electronic filing of the Forms 5500. PwC will prepare the Forms 5500 using DOL-approved software, and Tribune agrees to provide PwC with the appropriate contact information for the individual(s) that Tribune has designated to review, sign, and file the return with the DOL. Tribune is responsible for complying with the DOL's requirements for electronically signing the returns, including obtaining a credential, and taking the necessary steps to electronically file the returns with the DOL. Tribune agrees to accept responsibility for any notifications received regarding the Forms 5500, and to notify PwC of any notifications and decide with PwC who is responsible for taking remedial action.



The IRS has implemented a voluntary electronic filing system for the Forms 8955-SSA. PwC will prepare the Forms 8955-SSA using approved software, and facilitate the electronic filing in accordance with IRS guidelines.  Tribune agrees to provide PwC with the appropriate contact information for the individual(s) that Tribune has designated to review and approve the Forms 8955-SSA, and to provide written confirmation to PwC that the Forms 8955-SSA should be filed with the IRS by electronic filing process. Alternatively, if directed by Tribune, PwC will prepare a paper version of Forms 8955-SSA for Tribune to manually sign and file with the IRS.  Tribune agrees to accept responsibility for any notifications received regarding the Forms 8955-SSA, and to notify PwC of any notifications and decide with PwC who is responsible for taking remedial action.

**Additional Services**

From time to time, you may request PwC to provide services outside the scope of these Form 5500 preparation services that may not be significant enough to require a separate agreement ("Additional Services").  Subject to our acceptance, PwC will provide Additional Services necessary to respond to matters presented to PwC by you, or matters PwC brings to your attention for which you agree PwC should provide assistance.  The following illustrates the nature of the Additional Services intended to be covered by this agreement:

- **Additional assistance related to data**

    In the event that you require additional assistance related to the accumulation and review of data required for the Form 5500, outside of our usual procedures for requesting and monitoring of data, we can provide any additional assistance deemed to be necessary.

- **Recurring consulting services**

    We will provide advice, answers to questions and/or opinions on tax planning or reporting matters, including research, discussions, preparation of memoranda, and attendance at meetings relating to such matters, as mutually determined to be necessary.

- **Matters involving tax authorities**

    We will provide advice and/or assistance with respect to matters involving the Department of Labor (DOL) or Internal Revenue Service ("IRS") or other tax and regulatory authorities on an as-needed or as-requested basis.

These examples are not meant to limit the Additional Services we may provide to you under the terms of this agreement.  We will keep you fully apprised of the nature of any Additional Services we are providing under this agreement.  All related periodic billings (see discussion below) will describe the Additional Services rendered during the period.



**Ownership and Use**

We are providing these Services and deliverables solely for your use and benefit and pursuant to a client relationship exclusively with you.  We disclaim any contractual or other responsibility or duty of care to others based upon these Services or upon any deliverables or advice we provide.

You will own all tangible written material prepared for and delivered to you under this engagement letter, except as follows:  we own our working papers, pre-existing materials and any general skills, know-how, processes, or other intellectual property (including a non-client specific version of any deliverables) which we may have discovered or created as a result of the Services.  You have a nonexclusive, non-transferable license to use such materials included in the deliverables for your own use as part of such deliverables.

In addition to deliverables, we may develop software or electronic materials (including spreadsheets, documents, databases and other tools) to assist us with an engagement.  If we make these available to you, they are provided "as is" and your use of these materials is at your own risk.

**Confidentiality**

"Confidential Information" means non-public information that Tribune marks as "confidential" or "proprietary" or that otherwise should be understood by a reasonable person to be confidential in nature. All terms of this engagement letter, including but not limited to fee and expense structure, are considered Confidential Information.  Confidential Information does not include any information which (i) is rightfully known to PwC prior to its disclosure; (ii) is released to any other person or entity (including governmental agencies) without restriction; (iii) is independently developed by PwC without use of or reliance on Confidential Information; or (iv) is or later becomes publicly available without violation of this engagement letter or may be lawfully obtained by PwC from a non-party.  PwC will protect the confidentiality of Confidential Information that it receives, except as required by applicable law, statute, rule, regulation or professional standard.  If disclosure is required by law, statute, rule or regulation (including any subpoena or other similar form of process), or by professional standards, PwC shall (other than in connection with routine supervisory examinations by regulatory authorities with jurisdiction and without breaching any legal or regulatory requirement) provide Tribune with prior prompt written notice thereof and, if practicable under the circumstances, allow you to seek a restraining order or other appropriate relief.

**Our Responsibilities**

We will perform the Services in accordance with, as applicable, the Statements on Standards for Consulting Services, or the Statements on Standards for Tax Services established by the American Institute of Certified Public Accountants.  Accordingly, we will not provide an audit or attest opinion or other form of assurance, and we will not verify or audit any information provided to us.



**Your Responsibilities**

You are responsible for all management functions and decisions relating to this engagement, including evaluating and accepting the adequacy of the scope of the Services in addressing your needs. You are also responsible for the results achieved from using any Services or deliverables, and it is your responsibility to establish and maintain your internal controls. You will designate a competent member of your management to oversee the Services.

We expect that you will provide timely, accurate and complete information and reasonable assistance, and we will perform the engagement on that basis.

**Fees and Expenses**

Our fees are based on the time required by our professionals to complete the engagement. Individual hourly rates vary according to the experience and skill required. We estimate that our fees for this engagement will be between $95,000 and $110,000.

We also will bill Tribune for our reasonable out-of-pocket expenses, any applicable sales, use or value added tax, and PwC's internal per ticket charges for booking travel.

The amount of our fee is based on the assumption that we will receive the information and assistance as detailed throughout this engagement letter. In the event we believe an additional fee is required as the result of the failure of Tribune to meet any of these requests or for any other reason, we will inform you promptly.

**Payment Schedule**

Our standard practice is to render our invoices on a monthly basis, and we will bill a portion of our estimated fees upon commencement of our work. Payment of our invoices is due on presentation and expected to be received within 60 days of the invoice date.

**Termination and Dispute Resolution**

Either party may terminate the Services by giving notice to that effect.

Any unresolved dispute relating in any way to the Services or this engagement letter shall be resolved by arbitration. The arbitration will be conducted in accordance with the Rules for Non-Administered Arbitration of the International Institute for Conflict Prevention and Resolution ("Rules") then in effect. The arbitration will be conducted before a panel of three arbitrators selected using the screened process provided in the Rules. The arbitration panel, and not any federal, state or local court or agency, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of this engagement letter. The arbitration panel shall have no power to award non-monetary or



equitable relief of any sort.  It shall also have no power to award damages inconsistent with the Limitations on Liability provisions below or any other terms in this engagement letter.  Judgment on any arbitration award may be entered in any court having jurisdiction.  All aspects of the arbitration shall be treated as confidential.  You accept and acknowledge that any demand for arbitration arising from or in connection with the Services must be issued within one year from the date you became aware or should reasonably have become aware of the facts that give rise to our alleged liability and, in any event, no later than two years after the cause of action accrued.

This engagement letter and any dispute relating to the Services will be governed by and construed, interpreted and enforced in accordance with the laws of the State of New York, without giving effect to any provisions relating to conflict of laws that would require the laws of another jurisdiction to apply.

**Limitations on Liability**

Except to the extent finally determined to have resulted from our gross negligence or intentional misconduct, our aggregate liability for all claims, losses, liabilities or damages in connection with this engagement letter or the Services, whether as a result of breach of contract, tort (including negligence) or otherwise, regardless of the theory of liability asserted, is limited to no more than the total amount of annual fees paid to us for the particular Service giving rise to the liability under this engagement letter.  In addition, we will not be liable in any event for lost profits, consequential, indirect, punitive, exemplary or special damages.  Also, we shall have no liability arising from or relating to any third party hardware, software, information or materials selected or supplied by you.

**Indemnification**

You agree to indemnify and hold PwC and the Beneficiaries (defined below) harmless from and against any and all third party claims, losses, liabilities and damages arising from or relating to the Services or deliverables under this engagement letter, except to the extent finally determined to have resulted from PwC's gross negligence or intentional misconduct relating to such Services and/or deliverables.

**Other PricewaterhouseCoopers Firms and Subcontractors**

PwC is the U.S. firm of the global network of separate and independent PricewaterhouseCoopers firms (exclusive of PwC, the "Other PwC Firms").  PwC may draw on the resources of and/or subcontract to its subsidiaries, the Other PwC Firms and/or third party contractors and subcontractors, in each case within or outside of the United States (each, a "PwC Subcontractor") in connection with the provision of Services and/or for internal, administrative and/or regulatory compliance purposes.  Tribune agrees that PwC may provide information PwC receives in connection with this engagement letter to the PwC Subcontractors for such purposes.  PwC will be solely responsible for the provision of Services (including those performed by the PwC Subcontractors) and for the protection of the information provided to the PwC Subcontractors.  The PwC Subcontractors and theirs and PwC's respective partners, principals or employees (collectively, the "Beneficiaries") shall have no liability or obligations arising out of this



engagement letter. Tribune agrees to: (a) bring any claim or other legal proceeding of any nature arising from the Services against PwC and not against the Beneficiaries; and (b) ensure or procure that the Subsidiaries do not assert any such claim or other legal proceeding against PwC or the Beneficiaries. If any of the Subsidiaries receive Services under this engagement letter, you agree to provide a copy of this engagement letter to such Subsidiaries, and you will notify them that although the Beneficiaries may interact with them, the delivery of the Services is governed by the terms of this engagement letter (including the liability limitations herein), and Tribune's Subsidiaries should notify you of any disputes or potential claims arising from the Services. PwC disclaims any contractual or other responsibility or duty of care to any other subsidiaries or affiliates. While PwC is entering into this engagement letter on its own behalf, this section also is intended for the benefit of the Beneficiaries.

## Consents to Disclose Client Information

Notwithstanding anything to the contrary in this engagement letter, Tribune agrees that PwC may disclose your current and/or prior years' tax return information to PwC Subcontractors within or outside the United States for the purposes described above. Tribune authorizes PwC to participate in discussions with and to disclose your information, including your tax return information, to your agents, representatives, administrators or professional advisors (including accountants, attorneys, financial and other professional advisors), their respective officers, directors or employees, and other parties as you may direct. The foregoing consents are valid until further notice by you. Tribune may request in writing a more limited disclosure than the foregoing.

## Regulatory Matters

Notwithstanding anything to the contrary in this engagement letter, you have no obligation of confidentiality with respect to any portion of any materials, advice or deliverables to the extent they concern the tax structure or tax treatment of any transaction.

## Codification of Economic Substance

Federal law (IRC Section 6662(b)) subjects taxpayers to a strict liability penalty equal to 40% (or 20% if adequately disclosed in a tax return) of any underpayment of tax attributable to that portion of a transaction which is determined to lack economic substance under IRC Section 7701(o) or fails to satisfy any other similar rule of law. The higher penalty will be due if the transaction that is determined to lack economic substance is not "adequately disclosed" in the taxpayer's return; therefore, it is important that you advise your tax return preparers of transactions to which this penalty provision might apply, recognizing that no guidance has yet been issued on the substantive aspects of the codified economic substance doctrine. Penalties can also be imposed by states to the extent that state laws have adopted similar provisions.

To the extent that we provide any advice with respect to the potential impact of the economic substance doctrine included in IRC Section 7701(o) or similar state provisions or any related penalties that might be imposed, such advice rendered as part of our Services will be based on applicable case law, reasonable



interpretation of legislation and available guidance.  Under IRC Section 6664(c), no exceptions (including the reasonable cause exception) to the imposition of such penalties are available and therefore no advice will protect you from any such penalties.  Therefore, PwC shall not be liable for any federal or state penalties imposed on you if any portion of a transaction is determined to lack economic substance or fails to satisfy any similar rule of law or if the disclosure of such transaction is determined to be inadequate.

**Other Written Advice**

Based on our discussions, it is anticipated that the written advice PwC provides during the course of this engagement will be Other Written Advice as defined by Circular 230.  Accordingly, unless otherwise prohibited or we agree to issue a Covered Opinion as defined by Circular 230, our written advice may include a disclosure stating that the advice was not intended or written to be used, and it cannot be used, for the purpose of avoiding tax penalties that may be imposed, including, but not limited to penalties that may apply if the transaction that is the subject of our engagement is found to lack economic substance or fails to satisfy any other similar rule of law.  Our advice will contain any other disclosures required by Circular 230.

**Tax Return Disclosure and Tax Advisor Listing Requirements**

Certain federal and state regulations require taxpayers to disclose their participation in certain reportable transactions to the taxing authorities.  Tribune shall advise PwC if you determine that any matter covered by this engagement letter is a reportable transaction that is required to be disclosed.  Certain federal and state regulations also require PwC to submit information returns and maintain lists of certain client engagements if PwC is a material advisor to clients that have participated in a reportable transaction. Therefore, if PwC determines, after consultation with Tribune, that you have participated in a transaction causing PwC to have a registration and/or list maintenance obligation, PwC will place Tribune's name and other required information on a list.  PwC will contact Tribune if PwC is required to provide your name to the U.S. Internal Revenue Service or any state in connection with any matter under this engagement letter.

**Federal (Internal Revenue Code Section 6694) and State Preparer Standards**

Federal law and certain state laws impose obligations on tax return preparers with respect to a position reported on a tax return or claim for refund that does not meet certain standards regarding levels of confidence.  If during the course of this engagement we identify a position that does not meet these standards, we will advise you about your penalty exposure and whether you can avoid penalty through disclosure. If we are preparing the return or claim for refund and it is concluded that disclosure is required, we will prepare the disclosure and provide it to you.

Our work may require consultation with a PwC subject matter specialist to reach and document the level of technical support for the position. We will discuss with you any additional fees that may be incurred as a result of complying with these requirements.



**Other Matters**

No party to this engagement letter may assign or transfer this engagement letter, or any rights, obligations, claims or proceeds from claims arising under it, without the prior written consent of the other party, and any assignment without such consent shall be void and invalid.  If any provision of this engagement letter is found to be unenforceable, the remainder of this engagement letter shall be enforced to the extent permitted by law. If we perform the Services prior to both parties executing this engagement letter, this engagement letter shall be effective as of the date we began the Services.  Neither party shall be liable to the other for any delay or failure to perform any of the Services or obligations in this engagement letter due to causes beyond its reasonable control.

You agree we may use your name in experience citations and recruiting materials.  This engagement letter supersedes any prior understandings, proposals or agreements with respect to the Services, and any changes must be agreed to in writing.

PwC is owned by professionals who hold CPA licenses as well as by professionals who are not licensed CPAs.  Depending on the nature of the Services, non-CPA owners may be involved in providing Services under this engagement letter.

*    *    *    *    *



If you have any questions about the contents of this letter, please contact Chris King at 312 298-2231 or Ben Joseph at 312 298-5256.

Yours very truly,

PricewaterhouseCoopers LLP

By: *Paul Perry*

     Paul C. Perry, Partner

If the Services and terms outlined in this letter are acceptable, please sign one copy of this letter in the space provided and return it to (a scanned, PDF or facsimile document is acceptable):

     Christopher J. King
     PricewaterhouseCoopers LLP
     One North Wacker Drive
     Chicago, IL 60606

     Facsimile:  813 741-5432
     chris.king@us.pwc.com

**ACKNOWLEDGED AND AGREED:**

**Tribune Company**

Signature of client official: *J Rodden*

Please print name: *Jack Rodden*

Title: *VP / Treasurer*

Date: *6/11/12*



**ATTACHMENT 1**
**TRIBUNE COMPANY**
**2011 FORMS 5500 AND RELATED FILINGS**

| Plan Name | EIN | PN | 2011 Filing | 2011 Audit Required |
|---|---|---|---|---|
| Tribune Company Hourly Pension Plan | 36-1880355 | 002 | 5500 | Yes |
| Tribune Company 401(k) Savings Plan | 36-1880355 | 003 | 5500 | Yes |
| Tribune Company Defined Contribution Retirement Plan | 36-1880355 | 006 | 5500 | Yes |
| Tribune Company Cash Balance Pension Plan | 36-1880355 | 007 | 5500 | Yes |
| Tribune Company ESOP (if required) | 36-1880355 | 015 | 5500 | Yes |
| Tribune Company Master Trust for Pensions | 36-1880355 | 201 | 5500 (DFE) | N/A |
| Stable Value Fund Master Trust | 36-1880355 | 205 | 5500 (DFE) | N/A |
| Tribune Company Master Retirement Savings Trust | 36-1880355 | 207 | 5500 (DFE) | N/A |
| Tribune Company Benefit Program | 36-1880355 | 502 | 5500 | No |
| Tribune Company LTD Plan | 36-1880355 | 503 | 5500 | No |
| Tribune Company Business AD&D Plan | 36-1880355 | 506 | 5500 | No |
| Tribune Company Employee Assistance Program | 36-1880355 | 560 | 5500 | No |
| Chicago Tribune Co. Voluntary Group Accident Plan | 36-2643437 | 505 | No filing* | No |
| Baltimore Sun Employees' Retirement Plan | 95-4066880 | 001 | 5500 | Yes |
| Baltimore Mailers Union Local No. 888 Retirement Plan | 95-4066880 | 002 | 5500 | Yes |
| Master Trust for Pension Plans | 36-2944700 | N/A | 990-T | N/A |
| Master Trust for Pension Plans | 36-2944700 | N/A | IL-990-T | N/A |

## EXHIBIT C

**Amendment No. 1 to the 2011 Audit Engagement Letter**



**Amendment #1 to Existing Engagement Letter**

May 16, 2012

Mr. William A. Osborn
Director, Audit Committee Chair of Tribune Company
435 North Michigan Avenue
Chicago, IL  60611

Dear Mr. Osborn:

This letter reflects our agreement to amend our engagement letter of April 25, 2011, with Tribune Company in the following respects.

<u>Incremental audit fees</u>
We incurred additional time as a result of incremental audit procedures performed due to control deficiencies identified at Blue Lynx Media and other incremental testing procedures.  As a result of these items, we incurred $135,000 in fees in the aggregate.

All other provisions of our engagement letter dated April 25, 2011 remain unchanged.

If you have any questions, please call William T. England at (312) 298-2808.  Please have one copy of this letter signed in the space provided below acknowledging your agreement and return it to us.

Very truly yours,

*Pricewaterhouse Coopers LLP*

PricewaterhouseCoopers LLP



The services and terms as set forth in this letter are agreed to.

Tribune Company by and through its Audit Committee

By:

_William A. Osborn_
Audit Committee Chair

5/30/12

(Date)

## EXHIBIT D

**2012 Audit Engagement Letter**



May 16, 2012

Mr. William A. Osborn
Director, Audit Committee Chair of Tribune Company
435 North Michigan Avenue
Chicago, IL 60611

Dear Mr. Osborn:

The purpose of this letter is to confirm our understanding of the terms of our engagement as independent accountants of Tribune Company (the "Company").

<u>2012 Integrated Audit of the Consolidated Financial Statements and Internal Control Over Financial Reporting - Services and related report</u>

We will perform an integrated audit of the consolidated financial statements of the Company at December 30, 2012 and for the year then ending and of the effectiveness of the Company's internal control over financial reporting as of December 30, 2012. Upon completion of our work, we will provide the Company with our report on the audit work referred to above. If for any reason relating to the affairs or management of the Company we are unable to complete our integrated audit, we may decline to issue a report as a result of this engagement.

In conjunction with the annual financial statement audit, we will perform reviews of the Company's unaudited consolidated quarterly financial information for each of the first three quarters in the year ending December 30, 2012. These reviews will be conducted in accordance with the standards established by the Public Company Accounting Oversight Board (the "PCAOB") and are substantially less in scope than an audit. Accordingly, a review may not reveal material modifications necessary to make the quarterly financial information conform with generally accepted accounting principles. We will communicate to the audit committee and management any matters that come to our attention as a result of the review that we believe may require material modifications to the quarterly financial information to make it conform with accounting principles generally accepted in the United States. If for any reason relating to the affairs or management of the Company we are unable to complete our review, we will notify the audit committee and management.

You confirm that the requirements for audit committee pre-approval under the Sarbanes-Oxley Act of 2002 have been complied with relating to this engagement.

<u>Our responsibilities and limitations</u>

The objective of a financial statement audit is the expression of an opinion on the financial statements. We will be responsible for performing the audit in accordance with the standards established by the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The audit will include examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We will consider the Company's internal control over



financial reporting in determining the nature, timing and extent of auditing procedures necessary for expressing our opinion on the financial statements.

The objective of an audit of internal control over financial reporting is the expression of an opinion on the effectiveness of the Company's internal control over financial reporting. We will be responsible for performing the audit in accordance with the standards established by the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. The audit will include obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control over financial reporting based on the assessed risk, and performing such other procedures as we consider necessary in the circumstances.

Under the standards established by the PCAOB, the existence of one or more material weaknesses will require us to issue an adverse opinion regarding the effectiveness of the Company's internal control over financial reporting.

All significant deficiencies and material weaknesses relating to internal control over financial reporting identified while performing our work will be communicated in writing to management and the audit committee. All deficiencies in internal control over financial reporting (i.e., those deficiencies in internal control over financial reporting that are of a lesser magnitude than significant deficiencies) identified while performing our work will be communicated in writing to management of the Company, and the Audit Committee will be informed when such a communication has been made. We will communicate in writing to the Board of Directors of the Company if we conclude that the oversight of the Company's external financial reporting and internal control over financial reporting by the Company's audit committee is ineffective.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness of internal control over financial reporting from December 30, 2012, the date of our audit of the Company's internal control over financial reporting, to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

We will design our audit to obtain reasonable, but not absolute, assurance of detecting errors or fraud that would have a material effect on the financial statements as well as other illegal acts having a direct and material effect on financial statement amounts, and of identifying material weaknesses in internal control over financial reporting. Absolute assurance is not attainable due to the nature of audit evidence and the characteristics of fraud. Our audit will not include a detailed audit of transactions, such as would be necessary to identify errors or fraud that did not cause a material misstatement of the financial statements or procedures designed to identify deficiencies in internal control over financial reporting that, individually or in combination, are less severe than a material weakness. It is important to recognize that there are inherent limitations in the auditing process. An audit is based on the concept of selective testing of the data underlying the financial statements, which involves judgment regarding the areas to be tested and the nature, timing, extent and results of the tests to be performed. An audit is, therefore, subject to the limitation that material errors or fraud or other illegal acts having a direct and material financial statement impact, if they exist, may not be detected. Because of the characteristics of fraud, an audit designed and executed in accordance with the standards established by the PCAOB may not detect a



material misstatement due to fraud.  Characteristics of fraud include (i) concealment through collusion among management, employees, or third parties; (ii) withheld, misrepresented, or falsified documentation; and (iii) the ability of management to override or instruct others to override what otherwise appears to be effective controls.  Further, while effective internal control over financial reporting reduces the likelihood that errors, fraud or other illegal acts will occur and remain undetected, it does not eliminate that possibility.  For these reasons we cannot ensure that errors, fraud or other illegal acts, if present, will be detected.  However, we will communicate to the audit committee and management of the Company, as appropriate, any such matters identified during our audit.

We also are responsible for determining that the audit committee is informed about certain other matters related to the conduct of our audit, including (i) any disagreements with management about matters that could be significant to the Company's financial statements or our report thereon; (ii) any serious difficulties encountered in performing the audit; (iii) information relating to our independence with respect to the Company; (iv) other matters related to the Company's financial statements including its significant accounting policies and practices, including critical accounting policies and alternative treatments within accounting principles generally accepted in the United States; and (v) all significant deficiencies and material weaknesses identified during the audit, as previously mentioned.  Lastly, we are responsible for ensuring that the audit committee receives copies of certain written communications between us and management, including management representation letters and written communications on accounting, auditing, internal control or operational matters.

The financial statement audit and the audit of the Company's internal control over financial reporting will not be planned or conducted in contemplation of reliance by any specific third party or with respect to any specific transaction.  Therefore, items of possible interest to a third party will not be specifically addressed and matters may exist that would be assessed differently by a third party, possibly in connection with a specific transaction.

<u>Management's responsibilities</u>

The Company's management is responsible for the financial statements and information referred to above including establishing and maintaining adequate internal control over financial reporting.  In this regard, management is responsible for establishing policies and procedures that pertain to the maintenance of accounting records, the authorization of receipts and disbursements, the safeguarding of assets, the proper recording of transactions in the accounting records, and for reporting financial information in conformity with accounting principles generally accepted in the United States.  Management also is responsible for the design and implementation of programs and controls to prevent and detect fraud, and for informing us (i) about all known or suspected fraud affecting the entity involving (a) management, (b) employees who have significant roles in internal control over financial reporting, and (c) others where the fraud could have a material effect on the financial statements; and (ii) of its knowledge of any allegations of fraud or suspected fraud affecting the entity received in communications from employees, former employees, analysts, regulators, short sellers, or others.  Management is responsible for (i) adjusting the financial statements to correct material misstatements and for affirming to us that the effects of any uncorrected misstatements aggregated by us during the current engagement and pertaining to the year under audit are immaterial, both individually and in the aggregate, to the financial statements taken as a whole; and (ii) notifying us of all deficiencies in the design or operation of internal control over financial reporting identified as part of management's assessment, including separately disclosing to us all such deficiencies that it believes to be significant deficiencies or material weaknesses in internal control over financial



reporting. Management also is responsible for identifying and ensuring that the Company complies with the laws and regulations applicable to its activities. Furthermore, management of the Company is responsible for:

- Establishing and maintaining internal control over financial reporting;
- Evaluating the effectiveness of the Company's internal control over financial reporting using suitable control criteria;
- Supporting its evaluation with sufficient evidential matter, including documentation, and
- Presenting a written assessment of the effectiveness of the Company's internal control over financial reporting as of the end of the Company's most recent fiscal year.

As part of management's responsibility for the financial statements and the effectiveness of internal control over financial reporting, management is responsible for making available to us, on a timely basis, all of the Company's original accounting records and related information and company personnel to whom we may direct inquiries. Management is responsible for maintaining evidential matter, including documentation of the design of controls to provide reasonable support for management's assessment of the operating effectiveness of internal control over financial reporting.

As required by the standards of the PCAOB, we will make specific inquiries of management and others about the representations embodied in the financial statements and the internal control over financial reporting. Standards of the PCAOB also require that we obtain written representations regarding the financial statements and the internal control over financial reporting from certain members of management. The results of our tests, the responses to our inquiries and the written representations comprise the evidential matter we intend to rely upon in forming our opinion on the financial statements and the effectiveness of the Company's internal control over financial reporting. Similarly, the results of our analytical procedures, the responses to our inquiries and the written representations obtained comprise the basis for our review on the unaudited quarterly financial information.

<u>Document retention</u>

The Company agrees to maintain documentation sufficient to support its assessment of internal control over financial reporting as of December 30, 2012 for a period of seven years from the date of our audit report.

<u>Other documents</u>

Standards established by the PCAOB require that we read any annual report (or similar document) that contains our audit report. The purpose of this procedure is to consider whether other information in the annual report, including the manner of its presentation, is materially inconsistent with information appearing in the financial statements or management's assessment of the effectiveness of the Company's internal control over financial reporting. We assume no obligation to perform procedures to corroborate such other information as part of our audit.

With regard to electronic filings, such as in connection with the SEC's Electronic Data Gathering, Analysis, and Retrieval ("EDGAR") system, you agree that, before filing any document in electronic format with the SEC with which we are associated, management of the Company will advise us of the proposed filing on a timely basis. We will provide the Company with a signed copy of our report(s) and consent(s). These



manually signed documents will serve to authorize the use of our name prior to any electronic transmission by the Company. For our files, management of the Company will provide us with a complete copy of the document as accepted by EDGAR.

The Company may wish to include our report on these financial statements and internal control over financial reporting in a registration statement proposed to be filed under the Securities Act of 1933 or in some other securities offering. You agree that the aforementioned audit report, or reference to our Firm, will not be included in any such offering without our prior permission or consent. Any agreement to perform work in connection with an offering, including an agreement to provide permission or consent, will be a separate engagement.

Additionally, regulations established by certain non-U.S. countries include a requirement for the auditor to be registered in that country if the Company offers its securities to the public in the non-U.S. country or provides financial information to a non-U.S. regulator or government. The potential consequences of our non-compliance with these regulatory regimes in a timely manner can be severe for both our Firm and the Company. Accordingly, you will notify us of (i) your current or planned offerings of securities on a regulated market in a non-U.S. country or (ii) when you have provided or plan to provide audited financial statements to a non-U.S. regulator or government in connection with your access to its public capital markets, whether or not you include or refer to our report or include reference to our Firm.

Agreement not to demand jury trial

In the unlikely event that differences concerning our services or fees should arise that are not resolved by mutual agreement, to facilitate judicial resolution and save time and expense of both parties, the Company and PricewaterhouseCoopers LLP agree not to demand a trial by jury in any action, proceeding or counterclaim arising out of or relating to our services and fees for this engagement.

Other PricewaterhouseCoopers LLP firms and subcontractors

PricewaterhouseCoopers LLP is the U.S. firm of the global network of separate and independent PricewaterhouseCoopers firms (exclusive of PricewaterhouseCoopers LLP, the "Other PwC Firms"). PricewaterhouseCoopers LLP may, in its discretion, draw on the resources of and/or subcontract to its subsidiaries, the Other PwC Firms and/or third party contractors and subcontractors (each, a "PwC Subcontractor"), in each case within or outside the United States in connection with the provision of the services and/or for internal, administrative and/or regulatory compliance purposes. The Company agrees that PricewaterhouseCoopers LLP may provide information PricewaterhouseCoopers LLP receives in connection with this agreement to the PwC Subcontractors for such purposes. PricewaterhouseCoopers LLP will be solely responsible for the provision of the services (including those performed by the PwC Subcontractors) and for the protection of the information provided to the PwC Subcontractors.

Timing and fees

Completion of our work is subject to, among other things, 1) appropriate cooperation from the Company's personnel, including timely preparation of necessary schedules; 2) timely responses to our inquiries; and 3) timely communication of all significant accounting, financial, and internal control over financial reporting matters. When and if for any reason the Company is unable to provide such schedules,



information and assistance, PricewaterhouseCoopers LLP and you will mutually revise the fee to reflect additional services, if any, required of us to complete our work.

Our fees are based on the time required by the individuals assigned to the engagement. We estimate our fees for this integrated audit engagement will be $1,695,000, inclusive of out-of-pocked expenses and the required incremental audit procedures on the financial statements due to the Company's bankruptcy, subject to the terms and conditions above. We will update you on significant changes in our fee estimate as the audit progresses.

Our fees and out-of-pocket expenses and internal charges will be billed as follows:

| Date | Amount |
|------|--------|
| June 1, 2012 | $ 180,000 |
| July 1, 2012 | $ 180,000 |
| August 1, 2012 | $ 180,000 |
| September 1, 2012 | $ 180,000 |
| October 1, 2012 | $ 180,000 |
| November 1, 2012 | $ 180,000 |
| December 1, 2012 | $ 180,000 |
| January 1, 2013 | $ 230,000 |
| February 1, 2013 | $ 205,000 |
| | $ 1,695,000 |

We will submit detailed billing statements and request payment of our fees in accordance with the United States Bankruptcy Code as long as required.

Other matters

PricewaterhouseCoopers LLP is owned by professionals who hold CPA licenses as well as by professionals who are not licensed CPAs. Depending on the nature of the services we provide, non-CPA owners may be involved in providing services to you now or in the future.

In the event we are requested or authorized by the Company or required by government regulation, subpoena, or other legal process to produce our working papers or our personnel as witnesses with respect to our engagement for the Company, the Company will, so long as we are not a party to the proceeding in which the information is sought, reimburse us for our professional time and expenses, as well as the fees and expenses of our counsel, incurred in responding to such a request.

The Company agrees that it will not, directly or indirectly, agree to assign or transfer this engagement letter or any rights, obligations, claims or proceeds from claims against PricewaterhouseCoopers LLP arising under this engagement letter to anyone, except to an entity with which the Company merges or an entity which acquires all or substantially all of the assets of the Company and where, in either case, the assignee entity agrees to be bound by this provision. Any assignment or transfer by the Company in violation of this paragraph shall be void and invalid.



This engagement letter reflects the entire agreement between us relating to the services covered by this letter.  It replaces and supersedes any previous proposals, correspondence and understandings, whether written or oral.  The agreements contained in this engagement letter shall survive the completion or termination of this engagement.

\*    \*    \*    \*    \*

We are pleased to have the opportunity to provide services to Tribune Company.  If you have any questions about this letter, please discuss them with William T. England at (312) 298-2808.  If the services and terms outlined in this letter are acceptable, please sign one copy of this letter in the space provided and return it to us.

Very truly yours,

PricewaterhouseCoopers LLP

cc:      Eddy Hartenstein
         Chandler Bigelow



The services and terms as set forth in this letter are agreed to.

Tribune Company by and through its Audit Committee

By:    _____

       William A. Osborn
       Audit Committee Chair

       5/30/12
       _____
       (Date)

By signing below I acknowledge and agree to my obligation to ensure that the responsibilities of the Company and its management as set forth herein are properly discharged:

By:    _____

       Eddy Hartenstein
       President and Chief Executive Officer

       5/17/12
       _____
       (Date)

By:    _____

       Chandler Bigelow
       Executive Vice President and Chief Financial
       Officer

       5-17-12
       _____
       (Date)