# Exhibit F

```
        IN THE UNITED STATES BANKRUPTCY COURT
        FOR THE DISTRICT OF DELAWARE


                              )
       IN RE:                 ) Chapter 11
                              )
       TRIBUNE COMPANY, et al., ) Case No. 08-13141 (KJC)
                              )
                           )  Courtroom 5
                           )  824 Market Street
       _____Debtors.____ ) Wilmington, Delaware

   November 10, 2010
   10:05 a.m.


        TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE KEVIN J. CAREY
        UNITED STATES BANKRUPTCY JUDGE

        APPEARANCES:

        For Debtors: Sidley Austin LLP
   BY: JONATHAN LOTSOFF, ESQ.
   BY: KEVIN LANTRY, ESQ.
   BY: JAMES BENDERNAGEL, JR., ESQ.
   BY: BRIAN J. GOLD, ESQ.
   One South Dearborn
   Chicago, IL 60603
   (213) 896-6022

   Cole, Schotz, Meisel, Forman &
   Leonard, PA
   BY:  KATE STICKLES, ESQ.
   1000 North West Street
   Suite 1200
   Wilmington, DE 19801
   (302) 652-3131


        ECRO: AL LUGANO

        Transcription Service: DIAZ DATA SERVICES
   331 Schuylkill Street
   Harrisburg, Pennsylvania 17110
   (717) 233 6664
   www.diazdata.com

        Proceedings recorded by electronic sound recording; transcript
        produced by transcription service
```

1    these five individuals, in effect, should not be paid their MIP
2    payments for 2010 at this point and the reason for that is just
3    blatantly obvious.  It just seems to us not to be a thoughtful
4    business judgment exercise to pay money out regardless of the
5    performance of the individuals right now this year.  It does
6    not make sense to pay that money out to the individuals who are
7    already named defendants in complaints that have been filed by
8    the committee.  Generally speaking in bankruptcy, it's simply
9    heard of to let money go out the door to someone who you later
10   might have to chase back for it.
11   It's an unfortunate situation and I don't address
12       the Court on this topic with any glee or relish, but I think
13       that's just incredibly important, as a record matter and as a
14       fiduciary vigilance matter, that the committee make its voice
15       heard here.  We like the MIP, we think it creates the right
16       incentives.  If these five individuals are in later proceedings
17       proved to have been completely without fault and to have done
18       the right thing, then I think the committee would have no issue
19       with them getting their MIP payments at that point.
20   But to let them be paid now when we are in the midst
21       of a lawsuit, albeit a lawsuit that's been stayed, we're in the
22       midst of a lawsuit seeking to recover money against them, to us
23       does not square with the kind of business judgment and enhanced
24       scrutiny of insider transactions that the MIP requires.  So
25       that's our bone to pick in a nutshell, Your Honor.  I can

1     the objections, I'm now inclined to move forward to let the
2     debtor make its record and then decide what to do and decide
3     when to decide what I will do.  So -- somebody stole our clock.
4     I'll take a five minute break, then we'll begin with the
5     evidence.
6  MR. GOLD:  Thank you, Judge.
7  THE COURT:  All right.
8  (Recess taken at 10:26 a.m. to 10:43 a.m.)
9  THE CLERK:  All rise.  Be seated, please.
10 MR. GOLD:  Your Honor, Brian Gold again on behalf of
11    the debtors.  During the intervening recess, the debtors had a
12    chance to confer with the Official Committee of Unsecured
13    Creditors.  I think it's fair to say that the debtors and, I
14    think you can hear from the official committee itself on the
15    subject, just feel that while the five people who are subject
16    of the objections are important in their own right, that the
17    635 people who are before you are extraordinarily important for
18    some significant business reasons that the MIP get approved and
19    it get approved, frankly, here we are on the 11th month of the
20    year with some immediacy, some certainty in terms of running
21    the business.
22 With that, Your Honor, we would intend to proceed
23    without making our case, if you will, at this time for the
24    payment with respect to the five individuals who have been
25    subject of the objections that you just heard of.  We would

1    hope -- we're happy to proceed with whatever evidence Your
2    Honor would like us to proceed with and we're prepared to do so
3    with respect to the 635. I guess we would hope that together
4    with the official committee and for the business reasons I
5    alluded to that, Your Honor, would take that with some force,
6    if you will, in terms of the consideration for a ruling both
7    positively and a ruling with some immediacy.
8    I throw that your way, Your Honor, with all due
9    respect and am ready to proceed, you know, however you would
10   like to directly do so.
11   THE COURT: Let me try to figure out what you just
12   said to me.
13   MR. GOLD: Sure. A lot of people have that problem,
14   Judge.
15   (Laughter)
16   THE COURT: Are you withdrawing request that the
17   five individuals who have been named as defendants be included
18   in the MIP program that's been proposed?
19   MR. GOLD: Yes, without prejudice for their
20   consideration for payment at a later date, Your Honor,
21   presumably as part of the plan of reorganization or, you know,
22   after we regroup, frankly decide how we would like to proceed
23   in that regard.
24   THE COURT: Okay. I think that's a wise decision.
25   For the benefit of the corporate officers involved, I would

1    our sellers, both on the broadcast television side and on the
2    publishing side, to be very results oriented. They can't sit
3    still. If they don't meet their numbers, they don't make their
4    mortgage payments, they can't live. So we did a lot of
5    creative, out of the box types of training, incentivization, we
6    created new products, as well as just reorganizing our business
7    operations from top to bottom.
8    Q Well, let me ask you about those new products in a
9    second, but with respect to, I think, what you said the sales
10   process, I think you called it solution selling; is that right?
11   A There's a -- internally we call it selling the Tribune
12   way, which is a radically different way than publishing and
13   television has been sold in the past.
14   Q I'd like you to give a Court -- the Court a sense, and
15   I'm going to ask you this when I get to the other initiatives
16   as well -- you've testified that you put these in place, you
17   testified what they are, that they've been successful. I'd
18   like you to give the Court a sense of, if you will, the level
19   of effort, the kinds of effort and the type of effort that's
20   necessary from these 640 people who are -- you know, 100 and
21   some people are here before the Court today to ask for approval
22   of the MIP, you know, what was required in 2010 to make this a
23   success?
24   A To get the kind of results that you see here, which I
25   characterize, my word, stellar, I think the efforts by the core

1   management team that we have represented across the 600 plus
2   was nothing short of herculean. I come from a place -- I came
3   from a company where we created enormous value for our
4   shareholders out of nothing. This was an industry in
5   transition, a company in both transition in that industry, and
6   in turmoil through the fact that we've been in bankruptcy since
7   December of 2008. That we have -- I have never seen a group of
8   people, and I have personally never worked as hard in all my
9   years in business to make this happen. I've asked people to do
10  extraordinary things and they've responded and other business
11  unit leaders in the company have as well.
12  Q Let me ask you about some of the other initiatives that
13  go into that work you described. In terms of the actual
14  revenue creation side, have you created new products, if you
15  will, or new sources of revenue that has been partially
16  responsible for this stellar performance?
17  A Yes.
18  Q And can you name one or more of those?
19  A Oh, sure. We are -- it starts with the fact that we are
20  no longer a -- in the publishing world we're no longer a one
21  instant in a 24 hour cycle kind of deadline. We have converted
22  our newsgathering operations, our newsrooms and our reporting
23  out as a 24/7 operation. We have consolidated a lot of the
24  functions to be more efficient, but from the top down, as we
25  look at the web based products that we had, we all have

1   websites, we made those better.  We are also pushing out new
2   mobile services so you can news and information wherever you
3   are and on whatever device that you have.  We have generated
4   iPhone apps, we are in the process of getting iPad apps.  We
5   are looking at other forms of devices to disseminate our news
6   and information.
7   We have also created, on the broadcast side, done things
8   to maximize our revenue there, where in most of our television
9   markets we have greatly expanded the amount of local news.  In
10  -- for example, in the Los Angeles market, our television
11  station there went from a mere, you know, two hour morning news
12  block to a four-and-a-half hour morning news block and expanded
13  by almost 50 percent the amount of local news, which --
14  Q Does that increase revenue?
15  A Absolutely, because the type of advertising dollars you
16  can get for a 30 -- meaning a 30 second spot or a 60 second
17  spot -- in a news show at either prime time in the morning or
18  in the evening where we also expanded far exceeds that that we
19  would have gotten in some of the other types of programming
20  that was on before we started.
21  Q Have you also created any new events, if you will, in
22  terms of source of revenue?
23  A Another great example, thank you, we have created at --
24  through our publishing entities, more theme driven events.  We
25  have book festivals, we have movie review festivals, we have

1   food and wine festivals.  In Los Angeles alone we created a
2   festival of books where we enhanced that this year so that we
3   had over 140,000 visitors over a weekend on one of the local
4   college campuses.  We created a travel and recreation show that
5   on a rainy Tuesday -- excuse me, on a rainy February weekend
6   drew close to 80,000 at the LA Convention Center out of brand
7   new -- newly created 8,000 attendees for a one day food and
8   wine festival.
9   Again, allowing our advertising clients to do more
10  than just by an ad, if you will, but to show up, be present,
11  allow participants to sample their wares and then tie that back
12  in through the presence that they can have in our various
13  publications, be that the local regional papers that we have
14  and our flagship product there, the Los Angeles Times.
15  Q And again, and maybe it's obvious, but I take it there
16  was a fair amount of management effort to conceive of this and
17  then put it in place?
18  A With almost no expansion of the ranks of management, we
19  created all of these new products, these events.  We went from
20  four events in 2008 to sixteen -- excuse me, sixteen events
21  this year so far in 2010.
22  Q Likewise, have you devised opportunities to be, if you
23  will, the outsourced entity for other publishing entities?
24  A Sure. We do that both internally and externally.  For
25  example, we do all of the foreign newsgathering and national

1   newsgathering, including our Washington, D.C. office, through
2   Los Angeles, which in turn creates on multiple deadlines, news
3   stories, features and reporting that then, in Chicago, gets put
4   into modules for the smaller publications, the T-6
5   publications, those on the eastern seaboard I described, to
6   insert in their publications and on their websites in a way
7   that doesn't require them to staff up and try to do a foreign
8   report, a national report or even a regional report.
9   We benefit also the various websites for the television
10  stations for that and we then, in preparing those modules or
11  mods as we call them, are able to sell those -- or have begun
12  to start to attempt to sell those to other newsgathering
13  organizations, be they publishing or otherwise.  Tribune Media
14  Services is an entity, for example, that provides that for
15  various wire services frankly around the world for
16  newsgathering.  We're one of the only remaining news
17  organizations in the United States that has foreign
18  correspondents and national correspondents.  You can count on
19  fewer than the fingers on one hand of the number of news
20  organizations that still do that here in the US.
21  Q Let me ask again, and not to be a broken record over
22  here, but you know, the one thing you described as part of your
23  answer was the additional consolidation that took place in Los
24  Angeles, on the international side and then the modules that
25  are now being created in Chicago.  From a management

Case 08-13141-BLS    Doc 11859-6    Filed 06/20/12    Page 11 of 17

Page 38

1   standpoint, as you put that new initiative in place, again
2   could you describe to the Court, you know, what did management
3   have to do, what burden did management take on by not just
4   sitting still and putting into place a new initiative like
5   this?
6   A Basically we had management overhaul just the very way
7   that they work day-to-day.  They had to work from the bottom
8   up, from reporters to editors, to videographers and
9   photographers, across Tribune to go to that 24/7 type of
10  format, to cover not only the news that we are expected to
11  cover by our readership and our advertising clients, but also
12  to go to cover the -- and provide for the new types of events
13  that we created.  A health and wellness event and feature had
14  experts from the industry talk about, both at the event and
15  then through our other reporting, you know, things of interest
16  -- subjects of interest that connect our readers to the target
17  audience of our advertising clients.
18  That's what we're all about.  That's how we have achieved
19  the kind of revenue performance that we show here on Exhibit 1.
20  Q And not to belabor the point, but on the revenue side as
21  well, did you consolidate -- excuse me, did you bring in house
22  through other entities their printing and their distribution?
23  A That's another great example.  We, in multiple of our
24  locations, now provide printing services for other
25  publications.  In Los Angeles, for example, we print and

1   distribute and deliver the Wall Street Journal for News Corp.
2   That's something that we hadn't done prior to 2009. We do that
3   for a number of smaller publications as well, in various other
4   of our markets.
5   And we consolidated, which was a very difficult task to
6   achieve, but we consolidated from two printing plant operations
7   into one large printing plant operation, all of those
8   functions. That's a task that affected every single facet of
9   our business in Los Angeles, that gave us a little bit of cost
10  reduction for 2010 so far, and for which we will see a huge
11  benefit going forward on a full year basis, almost $10 million
12  of cost reduction for 2011 and beyond.
13  Q Well, let me ask you on that cost reduction front because
14  when we looked at Exhibit 1 earlier we noted that revenues had
15  gone up as it related to your budget, but that you had
16  basically met the budget with respect to costs, but now I hear
17  you talking about cost initiatives that result in savings.
18  From a real savings standpoint, you know, year over year how
19  much cost have you been able to take out of this business?
20  A Tribune-wide we have taken out almost $700 million of
21  costs in the last two years across all operations.
22  Q And a substantial portion of that -- was a substantial
23  portion of that in 2010?
24  A Yes, it was.
25  Q Can you -- let's talk, I guess, a little bit about the

1   MIP, just so it's in the record as well, the management
2   incentive plan. First, can you talk about historically what
3   the components of compensation has been for the non-sales
4   management at the Tribune?
5   A Prior to the bankruptcy, of course, it's very similar to
6   other companies I'm familiar with, and in business as general,
7   not just in the media business, but there are three legs to the
8   compensation stool, if you will. There is base compensation,
9   there is bonus and then there is equity. Equity is sometimes
10  given in terms of actual stock, RSU's or options. Of course,
11  for us in the state of play that we're in, the equity leg of
12  that triad is basically zero, so we're left with just the two,
13  base and hopefully bonus.
14  Q And with respect to the bonus, the management incentive
15  plan, we'll get into specifics later in the proffer for the
16  Court, but can you just give the Court a general sense of the
17  portion of compensation that the MIP comprises for the
18  individuals in management.
19  A For the individuals in management in the pool it's
20  roughly a third to half -- as much as a half of their
21  compensation.
22  Q You were -- you've been here present in the courtroom
23  this morning before you stepped up to testify, Mr. Hartenstein?
24  A Yes.
25  Q You, I think, heard some of the statements I made and I'm

1  sure some of the statements the Court made as well, so I want
2  to ask you this question. What, in your view, would be the
3  impact on these initiatives, these efforts to transform the
4  business, if the MIP program wasn't approved now?
5  A Boy, that is a -- that's one of the things that I just
6  don't want to -- I don't even contemplate what it would be like
7  without that. Everybody has worked very hard, asked above and
8  beyond the call for virtually everybody in every aspect of what
9  we've been doing and it's one of those situations where I don't
10  want to know and I don't think any shareholder wants to find
11  out what would happen if we can't get that done. We are
12  already operating, as I think you'll see from some of the other
13  material here, with folks in industry well below where I think
14  the median compensation should be and I will attest to -- down
15  to a person on that list that these -- this is a group that is
16  not median or mediocre in any way in their performance and
17  their capabilities.
18  Q Do you feel like you've asked this workforce to do a lot
19  during this calendar year 2010?
20  A Yes, I have and we all have.
21  Q Do you plan to continue to do that?
22  A Yes. I think it's my job now, first as my role at the LA
23  Times, but now even more so as my role that has been given to
24  me, along with my other colleagues on the executive committee,
25  to continue to preserve and even enhance the value going

1    forward of Tribune Company and looking to make the right
2    decisions and position us in the right way for emergence.
3    Emergence, just going off the reservation here a little
4    bit, can't happen soon enough, as far as I'm concerned.  There
5    are so many opportunities out there, which we should be acting
6    on now, in terms of consolidation and other things that we
7    could be doing as the economy looks like it might be turning
8    around, we are making all the infrastructure adjustments, we
9    are making all the client and market adjustments to prepare
10   ourselves for that, now's not the time to take the foot off the
11   pedal and keep incentivizing these core -- this core group of
12   people here and exhorting them to continue to excel.
13   Q With respect to that, keeping the foot on the gas
14   analogy, if the MIP isn't approved, if there remains
15   uncertainty as to whether the MIP will be approved, do you
16   think it will have any effect on the morale of the 600 and some
17   employees?
18   A That would be absolutely devastating.  I can't emphasize
19   strongly enough from my general experience in business and from
20   my specific experience these two years and two months I've been
21   here at Tribune, how debilitating and devastating that would
22   be, to not come back and leave here today with an approval for
23   the MIP.  Every one of those folks on that list knows this is
24   happening today, knows that I am here today, and we need to
25   keep doing that to preserve the value, I think, for the benefit

Page 43

1    of all the stakeholders that are looking here and that have
2    been darkening your doorway, Your Honor.
3    THE COURT:  Oh, I kind of look at it as the passage
4    of bright lights through the doors every day.
5    (Laughter)
6    THE WITNESS:  Well, hopefully you view us as a
7    bright light.
8    BY MR. GOLD:
9    Q Well, let me just, I guess, close with one question and
10   do that -- I'll paraphrase, and I apologize, I won't do it as
11   eloquently as Mr. LeMay did with -- to Your Honor and you
12   quoted it in your last MIP ruling, but I think there was a
13   statement with respect to the 2009 MIP, you weren't here for
14   that at the time, Mr. Hartenstein, but that business people
15   understand the importance of an incentive plan and its
16   motivation to employees and that these business people,
17   frankly, don't want to find out what would happen if a MIP
18   wasn't implemented.  Do you share those sentiments?
19   A I absolutely do.  I'm a business guy, have been that for
20   over 35, almost going on 40 years now.  I completely get that.
21   It's the right assessment.  I can't again emphasize A, how hard
22   a work these folks have done in very difficult and trying
23   circumstances.  I view this MIP as an investment in the human
24   capital of what is Tribune Company, the women and men that are
25   in management, leading all of the employees there.  And they

1     are believers, as am I, in that we will see a better day, and
2     that we are believers in doing the right thing here for the
3     company and to not only preserve, but enhance the underlying
4     asset value of what is Tribune Company today.
5     Q Thank you, Mr. Hartenstein.
6   MR. GOLD: I have no further questions at this time,
7     Your Honor.
8   THE COURT: All right. I want to take another five
9     minute break then we'll resume with cross-examination. I don't
10    mean to give you that much usage out of that Mr. LeMay, but
11    good for you.
12  MR. LEMAY: Thank you, Your Honor.
13  THE COURT: Five minute recess.
14  (Recess taken at 11:24 a.m. to 11:32 a.m.)
15  THE CLERK: All rise.
16  THE COURT: All right. Does anyone wish to
17    cross-examine Mr. Hartenstein? Anyone? I hear no response.
18  You may stay there, sir. Thank you very much.
19  MR. GOLD: Your Honor, at this time, I'll cede
20    the podium to Mr. Lotsoff, who will provide a proffer with
21    respect to the testimony of Mr. Dempsey of Mercer.
22  THE COURT: All right.
23  MR. GOLD: Thank you.
24  MR. LOTSOFF: Good morning, Your Honor. Jonathan
25    Lotsoff on behalf of the debtors. We'd offer a proffer of