Response to Supplemental Objection: Claim No. 7106, Case No. 08-13141(KJC)
Page 28
June 27, 2012

**Exhibit B: Amended Complaint**

**ROBERT HENKE**

        **Plaintiff**

**v.**

**THE BALTIMORE SUN COMPANY, et al.**

        **Defendant(s)**

**IN THE**

**CIRCUIT COURT**

**FOR BALTIMORE CITY**

**Case No. 24–C–09-000340**

## Amended Defamation Complaint:
### Originally Dated October 3, 2008, Amended April 15, 2012

**1.** Herein, plaintiff Robert Henke presents an amended *pro se* defamation complaint (the "complaint") against a newspaper publisher, *The Baltimore Sun* Company ("*The Sun*"), and then *Sun* education reporter, Mr. Gadi Dechter. The address of *The Sun* is *The Baltimore Sun*; 501 North Calvert Street; Baltimore, Maryland; 21278. Mr. Dechter's work address is Center for American Progress; 1333 H Street NW; 10th Floor; Washington DC; 20005. Below, plaintiff introduces his complaint by summarizing his allegations, the background, harm, and the remedy sought. Then, he provides selected supporting details. He provides much detail, for clarity and with the understanding courts review defamation complaints with special care.

## Introduction

**2. Summary of Allegations and Background -** Plaintiff's complaint stems from a Sunday, two and one-half page, front page news article (the "article") published by *The Sun* on October 7, 2007. Exhibit A is a copy of the article. The article, entitled "A modern-day Ahab," was reported by Mr. Dechter. The article is centered on experiences of plaintiff and his and Ms. W. Henke's (plaintiff's wife) small firm (the "firm") in bringing a new earthquake engineering geotechnical (soil) testing technology (the "technology") to practice and effects of the undertaking (the "undertaking") on their family.

**3.** Plaintiff believes the article is a well-crafted fabrication that defames him falsely. (Note: herein, "defame" does not imply falsity.) Facts and reason suggest *The Sun* defamed him falsely intentionally.

**4.** As to background, the article came into being late 2006. Plaintiff had been pressing to have investigated the possibility he, the firm, and so, his family, had been brought to a state of ruin by two decades of official and professional misconduct (the "misconduct") that drove him, Ms. Henke, and the firm from their profession unjustly. He believed findings of a sincere investigation would allow him to restore some of the family's well-being, through, for example, litigation.

**5.** The misconduct, plaintiff believes, had grown from his tenure (1985-89) on the faculty of The Johns Hopkins University (the "University"). His tenure was marked by several academic controversies. Ultimately, he was dismissed from the University. Facts and reason suggest *The Sun* may have taken part in the misconduct, through a large number of articles it had published (the "past *Sun* articles").

**6.** As part of his quest for an investigation, during November 2006, plaintiff approached *The Sun*. He did so to obtain information regarding the past *Sun* articles (for example, the identities of the individuals who had suggested the articles). *The Sun* did not address this matter. Rather, *The Sun* expressed interest in writing an article on plaintiff's experience in and consequences of bringing the technology to practice. He did not approach *The Sun* for an article. However, he agreed to an article because he felt a sincere article might well lead to the investigation he had long sought, because of representations *The Sun* made in relation to the article, and because he believed *The Sun* would publish a sincere article.

**7.** *The Sun*, though, did not publish a sincere article. The article put forth, as fact, a largely

personal history that is materially false and defamatory; invades family privacy; conceals the possible misconduct; and violates representations *The Sun* made and impressions that it gave. Instead of spurring investigation, plaintiff believes the article put that possibility to rest; *The Sun* discredited him fatally and, also, in doing so, greatly concealed cause for investigation.

**8. Summary of Harm and Remedy Sought** - Plaintiff seeks redress for what he believes to have been the essence of the article; a material defamatory fabrication that came to being through deceitful misrepresentation and maliciously harmed his reputation to protect two decades of official and professional misconduct that had brought him and the firm and so, his family, to a state of ruin unjustly and in which *The Sun* took part. He believes *The Sun* deliberately snuffed out the possibility his circumstances would be investigated, to bury the truth of those circumstances. This, he believes, denied him and so, his family, long-overdue justice and redress, leaving them in a state of deteriorating well-being without hope for escape. He also believes the article harmed their immediate well-being, prospects, and standing.

**9.** There was much need for investigation. When he approached *The Sun* during 2006, plaintiff, the firm, and his family had already suffered much harm, he believes, as a direct or indirect result of the misconduct. The family's ability to function as a family had been disrupted; the family had lost its home; plaintiff's younger son had experienced serious juvenile difficulties and faced the possibility of a prison term; his older son experienced serious difficulties and plaintiff and Ms. Henke had not been able to provide him the help a family normally could; the firm's progress with the technology, which had shown great promise for contributing significantly to public safety, had been brought to a standstill; plaintiff and Ms. Henke had suffered huge firm-related financial losses including their personal investment (roughly $1M) and patent-related losses; they had been driven from their profession; plaintiff had been blacklisted, it seems, and unable to secure positions for which he believes he had been strongly qualified; he had no

Defamation Complaint (Amended April 15, 2012); Case No. 24-C-09-000340
Page 4
April 15, 2012

income or security; Ms. Henke had lost her first teaching position and was in fear of losing her second; plaintiff's and Ms. Henke's financial and social standings had been blackened greatly; Ms. Henke and his younger son had been subjected to immense legal indignities; and plaintiff and his family had endured mental anguish, loss of health, and strained family relationships.

**10.** *The Sun* knew that plaintiff and his family may have suffered these harms unjustly. Yet, *The Sun* published, as fact, a deceitful defamatory history that actively conceals this possibility and that could only intensify their plight and deny them hope for relief.

**11.** So, plaintiff seeks redress both for redress he believes the article denied and for immediate harm. He seeks a monetary remedy of $100M (On April 4, 2012 he made a greatly reduced counter offer to settle the case.) and a non-monetary remedy. These are driven by said harm from the article, intangibles, and facts that suggest the article came to being through misrepresentation. On the basis of the apparent duration, deceit, and relentlessness of the said misconduct and irreversible harm inflicted, plaintiff believes the denied redress would have been substantial. He also believes the immediate harm was substantial. He seeks non-monetary redress to help towards more fully repairing his family.

### Selected Supporting Details

### I. Coverage

II. Abbreviations and Nomenclature ------------------------------------------------------------- Page 5

III. Relevant History ------------------------------------------------------------------------------- Page 5

IV. Main Counts: False Defamation --------------------------------------------------------------- Page 8

V. Secondary Counts: Deceitful Misrepresentation ------------------------------------------- Page 32

VI. Further Relevant Conduct of *The Sun* --------------------------------------------------- Page 39

VII. Motive -------------------------------------------------------------------------------------------- Page 41

Defamation Complaint (Amended April 15, 2012); Case No. 24-C-09-000340
Page 5
April 15, 2012

VIII. Possibility of Collusion ------------------------------------------------------------------ Page 42

IX. Harm from the Article ------------------------------------------------------------------ Page 43

X. Remedies Sought ------------------------------------------------------------------ Page 45

## II. Abbreviations and Nomenclature

The article --- the news article in question

The Circuit Court --- The Circuit Court for Baltimore City

The downfall --- the downfall of plaintiff, the firm, and his family

FHWA --- Federal Highway Administration

The firm --- Dynamic In Situ Geotechnical Testing, Inc.; firm founded by plaintiff and Ms. Henke

The Institute --- Geo-Research Institute of Osaka, Japan

The misconduct --- the possible official and professional misconduct aimed at plaintiff and Ms.

Henke

NIST --- National Institute of Standards and Technology

NSF --- National Science Foundation

The past *Sun* articles --- articles *The Sun* had published prior to the article that seem related to

plaintiff's circumstances

*The Sun* --- *The Baltimore Sun* or *The Baltimore Sun* Company

The technology --- the technology invented by plaintiff and Ms. Henke

The undertaking --- the effort to bring the technology to practice

The University --- The Johns Hopkins University

{ } --- the paragraph number of the copy of the article that is Exhibit A

## III. Relevant History

**12. History of Article** - During 2005-06, in seeking investigation of his circumstances, plaintiff

approached the Office of the National Science Foundation's (NSF's) Inspector General, the

University, and selected national politicians, each without success. He next approached the then publisher of The Sun, with a November 30, 2006 letter and enclosures. He believed The Sun could shed light on the misconduct; facts and reason suggest The Sun had been complicit in the misconduct, possibly pivotally. Starting soon after plaintiff left the University, The Sun, over roughly two decades (1990-2009), conspicuously published a large number of articles that suggest the possibility The Sun may have stalked him, the firm, and his family; interfered with progress on the technology; and protected possible architects of the misconduct. For example, the stalking articles publicized, in separate articles, a large number of plaintiff's students in a particular course of his; close friends and associates of his sons; and contractors of the firm. Among other things, the articles gave him the unsettling impression that he, his family, and the firm were under surveillance. Facts and reason suggest the University inspired the articles; the University is close to The Sun (for example, see par. 28, p. 10) and the initial articles coincided roughly with plaintiff leaving the University and publicized students of his. The oddity of the matter moved him to save roughly two decades of article clippings.

13. Apparently, the publisher turned the matter and plaintiff's mailings over to Mr. Dechter. On December 12, 2006, Mr. Dechter telephoned plaintiff and, among other things, asked about the past Sun articles. With a December 14, 2006 email, plaintiff provided him a listing and/or discussions of what he then believed were many of the articles. Mr. Dechter next contacted him on January 3, 2007. However, Mr. Dechter didn't address the articles; rather, he expressed The Sun's interest in publishing an article on plaintiff's circumstances. Plaintiff didn't have an article in mind; he sought the identities of the individuals who had proposed the past Sun articles and their motives for doing so. He believed such information might move, for example, the University to investigate the matter. He agreed to an article only because he believed a sincere article

might well lead to the investigation he had long sought, because of representations *The Sun* made regarding the article, and because he believed *The Sun* would publish a sincere article.

14. The article was a substantial 9 month effort. Plaintiff provided *The Sun* additional documents, including ones he specially prepared at *The Sun's* request, and a slide set. Mr. Dechter interviewed him and his family by telephone and May 1-4, 2007 he interviewed them directly in Apex, North Carolina. Mr. Dechter electronically recorded his Apex interviews, at least of plaintiff. Plaintiff took detailed notes immediately after each interview. *Sun* photographer Amy Davis visited him and his family on July 24, 2007.

15. *The Sun* published the two and one-half page article on its front page Sunday, October 7, 2007 and on its Internet site (baltimoresun.com). The site included two comments but plaintiff did not copy these. *The Sun* published a letter to the editor on the article on October 9, 2007.

16. **History of Complaint** – Becoming increasingly concerned over the article as he absorbed it with time, plaintiff analyzed the article, the conduct of *The Sun* and the University, and the relevant history. Eventually, he turned to a legal remedy and, with further time, came to believe the article was a well-crafted fabrication that defamed him falsely. He expressed concerns of his in a May 1, 2008 letter to *The Sun's* publisher and copied the letter to the Chairperson of the University's Board of Trustees; neither responded.

17. Plaintiff filed his original complaint, but under difficult circumstances. He did not intend to represent himself; he had carried out a consuming but unsuccessful national search for *pro bono* representation. On September 25, 2008, facing an October 7, 2008 statute of limitations for a defamation lawsuit, he decided to file a lawsuit himself. On October 3, 2008 he mailed his complaint to the Circuit Court for Baltimore City (the "Circuit Court"). The complaint arrived October 6, 2008 but apparently was registered only after some difficulties (mainly, it appears

mailings of his had been misplaced). Additionally, it appears that Mr. Dechter was not served with the complaint.

**18.** Late 2008, Tribune Company, the parent of *The Baltimore Sun* Company, filed for bankruptcy protection and so, plaintiff's case was stayed. As a result of the bankruptcy proceedings, plaintiff prepared this amended complaint.

## IV. Main Counts: False Defamation

**Overview of *The Sun's* False Defamation of Plaintiff**

**19.** *The Sun* defamed plaintiff falsely at the statement level. *The Sun* did so through 1) the theme of the article, 2) material concealments, 3) further direct personal attacks, and 4) falsifications regarding the technology and undertaking.

**20.** Added to that, *The Sun's* statement-level falsifications combine to result in a coherent false defamatory narrative. The narrative discredits plaintiff fatally and, also, in doing so, conceals the possibility of official and professional misconduct. In all, the narrative holds that plaintiff's and the firm's and so, his family's, downfall (the "downfall") was self-inflicted, the product of a paranoid, delusional, unaccomplished, and unsavory eccentric who recklessly sought scientific glory without regard for his family's well-being. Truth and the whole give rise to the alternative that the downfall may have been the product of targeted misconduct.

**Guide to Remaining Subsections**

**21.** In the following subsections, for brevity, plaintiff first addresses legal matters that apply to largely all counts of false defamation; he presents legal matters that apply only to specific counts or count groups under those counts or groups. Then, he brings out general signs of actual malice and addresses *The Sun's* false defamation of him through the means listed in par. 19, p. 8.

## Legal Matters that Apply to Largely All Counts of False Defamation

**22. Cause of Action -** Plaintiff understands that for a cause of action for false defamation, he must show 1) a statement was published that was defamatory, false, and harmful to him, and 2) fault – actual malice or negligence - in publishing the statement. A defamatory statement, he understands, is one that would cause him to suffer contempt, ridicule, loss of esteem from others, or the like, and/or to be shunned. Plaintiff understands "actual malice" to mean knowledge of falsity or "reckless disregard" for truth. The latter he understands to mean the publisher had strong doubts about the truth of the statement.

**23. Omissions -** *The Sun* defamed plaintiff falsely through material omissions as well as untruths. He believes the omissions may be seen as equivalent to falsity in defamation; they represent the withholding of truths that contradict false and harmful statements or impressions and so give them strength they would not otherwise have.

## General Signs of Actual Malice

**24.** Plaintiff believes *The Sun* defamed him falsely with actual malice; he believes the entire article to have been grounded in deceit. Particularly in view of the information he provided *The Sun*, its omissions, and the flagrancy and scale of its violations, he believes *The Sun* could hardly not have known it was creating materially false impressions of him and his circumstances. And he believes that flagrancy and scale could have come about only through a conscious breakdown of traditional safeguards. He does not believe the false defamation can credibly be seen as less than the product of extraordinary negligence.

**25.** With its untruths and omissions, plaintiff believes *The Sun* unbecomingly, abnormally, and seemingly methodically violated standards of responsible journalism. The matters omitted were newsworthy, of public interest, and essential to a truthful narrative and the untruths were

substantive; this, he believes, would have been evident to *The Sun*. And, in many cases, *The Sun* did not provide sources for untruths, nor did it inform plaintiff of, ask him to verify, or invite him to comment on them, suggesting both fabrication and truth avoidance. Moreover, *The Sun's* reporting was not neutral; *The Sun* attacked plaintiff as greatly as it concealed the possibility of misconduct. Plus, *The Sun's* untruths and omissions are coherent – towards discrediting plaintiff and concealing possible misconduct. And many of the falsifications seem guileful. Plaintiff is unable to see this order and craft as anything other than the product of conscious effort.

26. *The Sun's* facts checks seem to have been further avoidances of truth. The checks suggest *The Sun* knew much of what it published was untrue or likely so and would not survive scrutiny. Though the article was a nine month effort, *The Sun* started its main checks only two days before publication. The checks covered much ground but little substance. In the few instances *The Sun* did raise substantive claims it does not appear it did so in the interest of verification and seems to have disregarded plaintiff's corrections, apparently knowingly leaving false and harmful impressions. And *The Sun's* checks seem to have been slanted, demanding in matters favorable to plaintiff and without standard in its defamation of him.

27. Moreover, in the article, *The Sun* failed to disclose material facts regarding *Sun* neutrality that plaintiff believes would have brought the article, as is, into question. These include apparent ties of Mr. Dechter to the University and that the University seemingly pressured him regarding the article. Given news media's sensitivity to and practice of full disclosure, plaintiff believes the disclosure failures further suggest that *The Sun* intended to deceive with the article.

28. As to ties of Mr. Dechter, apparently he had a fellowship to, has a degree from, and had taught at the University (par. 114, p. 38). Plaintiff believes these ties alone would have made it difficult for him to have reported impartially on matters that could harm the University deeply.

29. As to University pressure, it appears a division of the University pressured Mr. Dechter. During a May 4, 2007 interview, plaintiff asked him if he would get into trouble because of the article. Plaintiff recalls and his diary states that Mr. Dechter replied "the [University's] engineering school (?) had said you [Mr. Dechter] might want to think about writing [the] story." Plaintiff believes Mr. Dechter may have been particularly vulnerable to such pressure. Not only did he have strong ties to the University, plaintiff has come to understand that, as an education reporter, he would have been additionally beholden as the University is the dominant force in education in the Baltimore area.

**Count #1: False Defamation through Theme**

30. The prominent theme of the article represents plaintiff falsely as a reckless eccentric who willingly destroyed his family for scientific glory.

31. It appears *The Sun* crafted its theme with much care. *The Sun* introduced the theme, as fact, stating falsely at the head of the article, in large bold type:

> **"In pursuit of geologic immortality, inventor Robert Henke has sacrificed everything: comfort, career, family"**

*The Sun* seems to have based the theme on apparent testimony of a former colleague of plaintiff's, a Dr. J. Templeton. *The Sun* stated falsely, as fact, "[plaintiff] is also, as a former boss says, a 'Captain Ahab ....,' willing to wreck everything – including his family – chasing a dream that has become an obsession" {7; paragraph number in Exhibit A} and stated "It was his boss at Exxon, Jack Templeton, who likens him to Herman Melville's Captain Ahab because of his messianic pursuit of his invention." {33}. That is, it seems Dr. Templeton claimed, falsely, plaintiff was willing to destroy his family for the technology. Then, *The Sun*, it appears, harmfully colored this claim by falsely stating, as fact, plaintiff admitted "he is willing to hurt those he loves

for a long shot at glory" and also speculating that Ms. Henke might believe this {143}. *The Sun* greatly and falsely reinforced the theme throughout. At the head of the second page, *The Sun* stated, as fact, in large bold type:

**"Obsession comes at high cost"**

And in the body, *The Sun* falsely likened plaintiff to "dreamers, single-minded in their pursuit of greatness" {7}; stated falsely, he believes, that he claimed the technology had "cost him ... an aborted academic career ..." {9}; represented him falsely as having been fanatical over the technology with a number of false claims {12, 24, 114, 115, 125, 149}; and, he believes, altered the sense of comments he made to falsely represent him as delusional, seeing himself as a Steve Jobs and Christopher Columbus {39, 53}.

32. As to truth, as is clear from his University tenure alone (par. 38, p. 14), plaintiff was neither obsessed with the technology nor in a quest for "geologic immortality." Plaintiff and Ms. Henke continued with the technology for other reasons. When he left the University, they faced difficult circumstances. First, they had invested heavily in the technology they had been developing for 6 years. For instance, just before he was told of his dismissal, they had invested roughly $200k of their own resources in an elaborate testing chamber they were having constructed at the University for evaluations of the technology. Fortunately, they were able to carry out a series of tests before he left. Second, the test results were unexpectedly promising and revealing; that greatly reduced technical risk, making it that much more difficult to abandon the technology. Third, they decided to continue with the technology because plaintiff had it in mind, ultimately, to return to academia. He is narrowly gifted; he felt academia was one of the few routes he could take to secure his family's future. Given the interest in and importance of the area of the technology, he felt the technology provided an especially strong means to realize this goal.

33. Plaintiff's and Ms. Henke's plan, though, was fully upended and they were drawn into their existing state by the unexpected: the possibilities of official and professional misconduct including the manipulation of government grant competitions and retaliation. Plaintiff believed his family had suffered ruinous losses as a result of these. If he has been obsessed, it has been in seeking to restore, for the family, that which he believes had been taken from it unjustly and for which it had sacrificed so greatly. He has sought this through the only means he felt he has had – the technology and investigation of his circumstances.

34. As to specific signs of actual malice, first, plaintiff believes *The Sun's* claims that he sought "geologic immortality" {main heading} and admitted he was willing to harm his family for glory {143} were outright fabrications. At best, he believes, *The Sun* had to have had strong doubts about these claims. The claims were strikingly at odds with facts. Plaintiff did not seem an individual in search of immortality or glory; he didn't seek recognition aggressively, shunned attention, placed effort into teaching at a research university, became deeply embroiled in fundamental academic controversies, and gave his sons much attention. *The Sun* was aware of most if not all these facts. Yet, *The Sun* provided no source for nor did it verify with him the first claim, a claim as to his state of mind. Regarding the second claim, according to plaintiff's diary and recollections, during a May 4, 2007 interview, Mr. Dechter did ask him if he would let his family starve. After deep thought, he replied he would allow his family to suffer if he thought the family would benefit from that suffering in the long term; but, he sure wouldn't like that. That's all he said. He does not recall or have record of his ever having discussed his seeking glory, geologic immortality, or anything comparable.

35. Second, though *The Sun* placed great effort towards developing its theme and the theme was potentially harmful and violated the facts, *The Sun*, it appears, avoided seemingly

obligatory steps towards insuring truth. It seems *The Sun* did not question the reliability of the apparent source for the basis of its theme, despite its weight. Plaintiff does not see how Dr. Templeton could possibly have commented on plaintiff's mindset reliably; they hadn't been in contact since 1984. And *The Sun* fully withheld the theme from plaintiff and Ms. Henke, the only two individuals who had any true sense of that mindset. It's hard for plaintiff to see these missteps as anything but conscious deceit driven by fear the theme would collapse without.

**False Defamation through Material Concealments**

**36. Overview and Additional Legal Matters that Apply to Counts #2 - 3** – Plaintiff believes *The Sun* defamed him falsely through a fabricated history that, in large part, conceals – actively in many cases - the possibility that he, Ms. Henke, and their firm and family had fallen victim to targeted official and professional misconduct. Among the defamatory harms, the concealments complement and so, greatly strengthen the false defamatory theme of the article that plaintiff willingly destroyed his family in an obsessive quest for scientific glory (pars. 30-5, pp. 11-3). Moreover, through its concealments, *The Sun* created the false and defamatory impression that plaintiff had been paranoid and rashly combative, acting without substantive cause.

**37. Count #2: False Defamation through Falsification of Tenure at the University** – *The Sun* falsified plaintiff's tenure at the University. In doing so, *The Sun* defamed him falsely both directly and effectively (par. 23, p. 9 and par. 36, p. 14), the latter by actively concealing his sincerity and productivity as an academic and credible origins and possible first signs of said misconduct that targeted him and Ms. Henke.

**38.** *The Sun* falsified plaintiff's dismissal from the University. First, *The Sun* stated, as fact, falsely, plaintiff believes, that plaintiff claimed the technology had "cost him .... an aborted academic career ...." {9}. Plaintiff believes *The Sun* fabricated this claim; he does not recall or have record of having made the claim. Moreover, materials he provided *The Sun* show –

unmistakably - that he has been of the steadfast belief he was dismissed as a result of specific academic controversies that marked his tenure. These gave rise to open hostility against him. *The Sun*, though, omitted the three most material of these. In the most notable, plaintiff charged three students with plagiarism. This drew intense hostility towards him. For example, the department chairman assigned one of the students plaintiff had just charged to work with plaintiff as a teaching assistant. He believes this matter to have been particularly inflammatory as the students, he believes, were of Indian (Asian) descent. Many of the department's students were so; he believes the chairman feared harm to enrollment. Plaintiff also opposed grade inflation and insincere career development.

39. Second, *The Sun* stated, as fact, plaintiff was dismissed "in 1989 for failing to publish a single research paper in five years" {24}. However, *The Sun* omitted the material fact that he was also officially dismissed for inadequate success in attracting research funds. That conceals much regarding the possibility of misconduct. Facts and reason suggest funding difficulties of his (discussed further in pars. 45-8, pp. 17-8) may have been engineered, to justify the dismissal; he does not believe the dismissal could have been justified without such difficulties. (Success in funding is, perhaps, the dominant measure of faculty performance at research universities.) Facts and reason suggest University faculty may have colluded with officials of the National Science Foundation (NSF) to manipulate grant competitions to insure his proposals would fail. (NSF is a major source of government support for academic and small business scientific research.) In an abrupt, hostile, and seemingly groundless reversal, his (and Ms. Henke's and his) proposals did start to fail – irregularly. And he was officially dismissed, in large part, for inadequate funding.

40. Moreover, *The Sun* falsified the reversal. *The Sun* stated, as fact, "Convinced that grant-application rejections were linked to personal animus within his department, Henke began filing

formal objections with the National Science Foundation – an impolitic move that would foreshadow later lawsuits against the federal hand that feeds the nation's scientific research. {47} [new paragraph] In the meantime, he kept his worries a secret from his students ..." {48}. These statements claim plaintiff believed his grant proposals were being targeted during his tenure and suggest, as a result, he rashly provoked NSF.

41. There is little truth in *The Sun's* statements. For one, plaintiff had no idea his proposals might have been targeted until January 1990, after he had left the University (see par. 85, p. 29). But most notably, *The Sun* omitted that ill will was solidly in place at NSF well before he ever questioned NSF. *The Sun* omitted that, during July 1986, in a University-related matter, abruptly and without apparent grounds, previously supportive NSF officials began to turn on Ms. Henke, with intense hostility. In a coordinated manner, just as she and plaintiff were about to be awarded a major NSF grant, officials began, for example, to challenge her leadership of the undertaking and threaten to deny the grant. Plaintiff cannot see these extraordinary attacks as anything but the first sign of official and professional misconduct aimed at him and Ms. Henke.

42. *The Sun* also otherwise falsified plaintiff's tenure in declaring that he failed "to publish a single research paper in five years" {24} and stated falsely, as fact, that he "ignored" a "publish-or-perish warning .... " {45}. As to truth, he wasn't in reckless contempt of publication. Rather, he didn't publish for a specific reason that *The Sun* omitted; unlike most fledgling faculty, he had published all his thesis work before he joined academia. (Usually, faculty publish their thesis work during their early years in academia and are evaluated largely on that basis.) Plaintiff published that work in four articles in leading journals - an unusually large number. To further publish, with sincerity, he first needed to develop and carry out new research. He was doing just that, visibly and aggressively. But that research was experimental; it first required the design and construction of unique and elaborate equipment. While consuming, that didn't lead to

scholarly publication. Still, plaintiff was productive towards that end. However, *The Sun* actively concealed his University accomplishments (pars. 75, 77, p. 26). He did start publishing articles on his University research immediately after his dismissal. What's more, only because of the pressure to publish, during his tenure, he did submit and resubmit a substantial manuscript to a journal.

**43.** As to specific signs of actual malice, *The Sun's* concealment of the plagiarism matter stands out. Apparently, both Mr. Dechter and *The Sun* saw plagiarism as a serious matter. Early 2006, *The Sun* reported that Mr. Dechter had alleged plagiarism by a long-time *Sun* columnist and this led to the columnist's resignation. Also, there are signs of fabrication, tampering with context, and disregard of a facts check and contradictory context.

**44. Count #3: False Defamation through Concealment of Possibility of Retaliation** – *The Sun* largely and actively concealed the possibility plaintiff and Ms. Henke had been victims of a broad, calculated, and enduring retaliatory assault on their ability to succeed professionally and so, in effect, falsely defamed plaintiff (par. 23, p. 9 and par. 36, p. 14).

**45.** First, *The Sun* actively concealed material facts that suggest that a number of government grant competitions to which plaintiff and Ms. Henke had submitted proposals had been methodically corrupted, in distinct ways, to insure the proposals would fail.

**46.** As to background, there are many signs of corrupted grant competitions. For instance, though initially plaintiff and Ms. Henke attracted much government support, hindsight shows, abruptly, during plaintiff's University tenure (1986/87), they began facing a string of specific irregularities in grant competitions. Their good fortune had reversed, but without any apparent grounds. For example, through 1986/87, 3 of 4 of their NSF proposals had been funded; their relationship with NSF seemed strong; and their proposals were reviewed favorably. Thereafter,

. Defamation Complaint (Amended April 15, 2012); Case No. 24-C-09-000340
Page 18
April 15, 2012

though, only 2 of 15 of their proposals were funded. And those two, plaintiff believes, were funded only through intervention by NSF's then Inspector General. Plus, their relationship with NSF had soured and reviews had become hostile.

**47.** Late 1992, plaintiff and Ms. Henke formally expressed concerns to NSF over the possibility of manipulated grant competitions, citing the specific irregularities they had faced. The concerns were not dismissed. For example, NSF's then Inspector General, for one, it appears, was so moved she offered them the grant of their choice in compensation.

**48.** Regarding concealments, as brought out in pars. 39-41, pp. 15-6, *The Sun* did bring up NSF's reversal towards plaintiff and Ms. Henke, but untruthfully. Additionally, *The Sun* failed to report that they had experienced irregularities in grant competitions, let alone specific ones. Nor did *The Sun* report the response of NSF's Inspector General to the concerns they had expressed. Moreover, regarding the federal lawsuits plaintiff and Ms. Henke filed against NSF and NIST to help uncover the source(s) of their difficulties, *The Sun* falsely stated, as fact, that they "were convinced {64} ... competing scholars sitting on private peer-review panels were giving low marks to [grant] applications" {65}. (Identities of reviewers were held confidential.) In truth, their overriding concern was a specific issue of calculated official misconduct: that individuals known to be hostile to them had been deliberately selected, by agency officials, repetitiously, to review proposals of theirs, to insure the proposals would fail. And they filed the lawsuits against NSF and NIST to verify this possibility, not the former as *The Sun* falsely claimed {64-5}.

**49.** Second, *The Sun*, in essence, actively concealed material facts that suggest that retaliation had spread beyond grant competitions to the sabotage of professional relationships. As to signs of sabotage, for instance, with time, against all odds, each relationship disintegrated, irregularly

– despite the demonstrated promise of and great need for their technology. The relationships include solid and long-standing collaborations with the Federal Highway Administration (FHWA) and Geo-Research Institute of Osaka, Japan. Ultimately, progress on the technology was brought to a standstill. Yet, in what appears to have been a total disregard for irregularities and plaintiff's accounts, *The Sun* simply stated, as fact, the firm's support from FHWA "…..was discontinued for budgetary reasons…" {22} and "….the Geo-Research Institute decided against using the probe….." {111}. At least the latter is untrue (pars. 88-9, pp. 30-1) and there are signs the former may be as well.

50. Third, *The Sun* did acknowledge the possibility of blacklisting, stating "Privately, Henke's colleagues say that the lawsuits were tantamount to professional suicide" {67}. However, facts and reason suggest this statement simply to be further active and defamatory concealment, on the part of *The Sun*, of the far more likely truth that plaintiff committed "professional suicide" seven years earlier when he charged three students with plagiarism.

51. Fourth, *The Sun* omitted the possibilities of theft from various of plaintiff's and Ms. Henke's grant proposals and insincere oversight. Plaintiff believes that insincere oversight gave license to continued retaliation against them.

52. In summary of the matters, shortly after plaintiff left the University, he came upon signs that other researchers may have taken up on ideas, for example, he had advanced in University proposals. Concerned not so much over the possibility of theft as the possibility of a link to their deteriorating circumstances, plaintiff and Ms. Henke asked the Office of NSF's Inspector General to carry out a formal inquiry mainly into this matter. An investigator consumed two and one-half years on the inquiry but concluded there was insufficient evidence to continue with the case. Plaintiff and Ms. Henke reviewed the report of the inquiry, obtained through a Freedom of

Information Act request. The report suggests the investigator may have been less than sincere in his work. For example, on the possibility of idea theft by a colleague of plaintiff's at the University – one of the few matters investigated in which plaintiff knew precise truths – the investigator made a bold and seemingly pivotal claim plaintiff knew to be false. Moreover, the investigator did not turn to him to verify the claim. Plaintiff and Ms. Henke expressed concern over the report. A second investigator consumed another two and one-half years on a review of the work of the first. The second investigator supported that work. However, his arguments are unconvincing. Plus, his report shows signs of spite.

**53.** Fifth, *The Sun* actively concealed the matter of the past *Sun* articles which moved plaintiff to approach *The Sun* during 2006 (pars. 12-3, pp. 5-6). Those article suggest, among other things, that *The Sun* may have interfered with plaintiff's and Ms. Henke's progress on the technology, possibly pivotally.

**54.** *The Sun* stated, as fact, "Henke knows that it's [plaintiff's story] a 'tough story to swallow' and that its airing might only cement his reputation as unsuitable for mainstream work. But he sees no other option than to lay bare the facts of his life in the hopes that some 'angel' will come to his rescue." {124}. This creates the false impression that, among other things, plaintiff approached *The Sun* to solicit an article, and one that publicized his life.

**55.** As to truth, he approached *The Sun* not for an article but specifically for information regarding the past *Sun* articles (pars. 12-3, pp. 5-6); the article was *The Sun's* idea. Nor did he seek to have his life publicized (pars. 98-100, pp. 33-4; pars. 103-5, p. 35; pars. 108-9, p. 36; and pars. 111-2, p. 37); bringing in a "human side" was also *The Sun's* idea (par. 99, p. 33). He agreed to an article in the belief that it would be a sincere account of the undertaking and unaware that coverage of human matters might be more than shallow (pars. 98-100, pp. 33-4;

Defamation Complaint (Amended April 15, 2012); Case No. 24-C-09-000340
Page 21
April 15, 2012

pars. 103-5, p. 35; pars. 108-9, p. 36; and pars. 111-2, p. 37). In fact, plaintiff proposed abandoning the article when it came out, quite belatedly, that *The Sun* would only publish that for which there was proof (pars. 103-5, p. 35); *The Sun* opposed that. And, plaintiff made *The Sun* aware, repeatedly, that he did not wish to have a particular personal and private matter publicized (pars. 108-9, p. 36). Yet, *The Sun* defiantly and deceitfully rejected his need for privacy. Furthermore, apparently fully aware of plaintiff's and Ms. Henke's concern over the well-being of their younger son, who was experiencing serious juvenile difficulties, *The Sun*, more than once and quite sincerely, vowed that it would never exploit a juvenile (pars. 111-3, pp. 37-8). And then, it seems, *The Sun* flagrantly violated that pledge in the article.

**False Defamation through Further Direct Personal Attacks**
**56. Overview -** Plaintiff believes *The Sun* directly defamed him falsely through a broad personal attack that extends well beyond its false theme. *The Sun* represented him largely falsely, he believes, and demonstrably so as, among other things, less than honorable, profane, uncooperative, spiteful, godless, raving, hypocritical, and parasitic and falsified his parenting. For brevity, he addresses in detail only three of the falsifications and fully omits others.

**57. Count #4: False Defamation through Falsification of Air Force Discharge –** *The Sun* falsely represented plaintiff's discharge from the Air Force as less than honorable. *The Sun* stated "...Henke had arranged for a 'self-initiated elimination' discharge [from the Air Force]...." {98}. He did leave the Air Force through a "self-initiated elimination;" however, he received an honorable discharge. *The Sun's* phrasing, though, effectively disguised this.

**58.** As to facts, as plaintiff's diaries show, on January 4, 2007, he told Mr. Dechter he had resigned from the Air Force due to family problems. On July 19, 2007, Mr. Dechter, apparently at the press of an editor, asked plaintiff how he had been able to do so and asked for his discharge papers. Plaintiff explained he withdrew through a "self-initiated elimination." He recalls

and his diary suggests he told Mr. Dechter he had received an honorable discharge but didn't think he would be able to find the papers. So he gave him his social security number to access his records. He recalls, during an October 5, 2007 facts check, simply curious, he asked Mr. Dechter about his findings as to the discharge. Plaintiff's diary shows Mr. Dechter told him he had found out about the self-initiated elimination policy but not about his discharge as he needed his signature for this. As he recalls, he offered to provide that; but, Mr. Dechter declined. It should be noted that, in his 2009 move from Apex to Wilmington, North Carolina, plaintiff did find his discharge papers; these show he was discharged honorably.

59. As to specific signs of actual malice, *The Sun's* need to verify the discharge suggests *The Sun* was acutely aware of the need for truth in representing a discharge. Yet, though truth was readily at hand, *The Sun* seemingly chose to avoid that truth and to publish what was a substantive misrepresentation.

60. **Count #5: False Defamation Regarding Profanity** - *The Sun* falsely represented plaintiff as profane. *The Sun* quoted his son, Kevin, as having said "My father said, `F___ furniture, ..."
{23}. Plaintiff did not say "F___;" he isn't keen on swearing. Among defamatory harms, he believes it would be seen as unbecoming of a teacher, even a former one, to be profane, especially with a son experiencing juvenile difficulties.

61. As to specific signs of actual malice, plaintiff believes *The Sun*, at the very least, had strong doubts over its representation; he believes the profanity would have struck Mr. Dechter odd since he wasn't once profane in his presence. Yet, *The Sun* did not verify the quote with him.

62. **Count #6: False Defamation through Falsification of Parenting** – *The Sun* harmfully falsified plaintiff's parenting intentions and practices. While plaintiff did stumble greatly as a

parent, the thought and care he placed into parenting was immense. *The Sun*, though, made it appear otherwise.

**63.** *The Sun* claimed, as fact, that, with his family, plaintiff was in a "ruthless hunt for monumental accomplishment." {10}. This is false. His aim was to spare his sons a 15 year period of destructive aimlessness he had experienced. He sought this by making them aware of the value of effort and promoting an active, broad lifestyle.

**64.** *The Sun* stated, as fact, plaintiff "rarely permitted his sons to traffic in popular culture." {69}. That is false. He did filter that which he felt, for example, stole youth; but, much remained. For example, his family visited Walt Disney World often, while financially able; was heavily involved in youth sports; read Calvin and Hobbes together, nightly; went to ice cream parlors, weekly; attended major sporting events, plays, and ice shows; went to museums and to the beach; did many scientific experiments; participated in school science fairs; and constructed model airplanes. Plaintiff also encouraged art and school work.

**65.** *The Sun* stated, as fact, "No movies, .." {69}. This is false. Each week, the family watched a movie. These included Star Wars, The Natural, Back to the Future, Indiana Jones, Superman, Batman, Dead Poets Society, The Sting, Rocky, Beauty and the Beast, James Bond, and Zorro.

**66.** *The Sun* stated, as fact, "Even books were suspect." {69}. This is misleading. Plaintiff only opposed excessive reading and books that didn't have much to teach. During his younger son's kindergarten years, every morning, at school, plaintiff would, for 15 minutes, sit with him on the floor and read books to him (for example, "My First Book on Space"). Later, each night, he read Calvin and Hobbes to him. Plaintiff encouraged his older son regarding his vast collection of comic books. And, he ordered subscriptions to Time for Kids for both of his sons.

Defamation Complaint (Amended April 15, 2012); Case No. 24-C-09-000340
Page 24
April 15, 2012

67. *The Sun* stated, as fact, each morning plaintiff had his sons run and exercise. {72}. Factual error aside, among other things, *The Sun* did not state that as he became aware the exercises were becoming emotionally difficult for his younger son he adapted.

68. As to specific signs of actual malice, *The Sun* failed to verify with plaintiff, in particular, its representations of his state of mind. He believes this to have been an avoidance of truth.

69. **Selected Other False Defamations** – Through false statements, *The Sun* represented plaintiff as hypocritical {71}, parasitic {11}, and uncooperative {115}; *The Sun* falsely represented plaintiff as godless {69}; *The Sun* falsely claimed he resented his wrestling coaches representing him as spiteful and seemingly fabricated most of what they said to him {87}; and, through its sanitizing omissions and untruths, *The Sun* represented plaintiff falsely as raving with statements regarding letters he sent to politicians and the University {122}.

**False Defamation through Falsifications Regarding Undertaking and Technology**
70. **Overview and Additional Legal Matters that Apply to Counts #7 - 11** – *The Sun* defamed plaintiff falsely through a seemingly fabricated account of the undertaking that reflects falsely and harmfully on him. The account represents the undertaking falsely as opportunistic, unprofessional, flighty, unpromising, without substantial support, visibly risky, unproductive, and greed-driven. Among harms, this gives the false impression the undertaking was clearly doomed, and on multiple counts, strengthening the impression the downfall was self-inflicted. Among defamatory harms, the account represents plaintiff falsely as insincere, greed-driven, inept, delusional, unproductive, unprofessional, and opportunistic and strengthens its false theme that he was a reckless eccentric willing to harm his family for scientific glory.

**71.** Regarding actual malice, *The Sun* seemingly was aware of the history of the undertaking; for one, at *The Sun's* request, plaintiff specially prepared for and provided *The Sun* materials, including a set of slides along with discussions, which charted its progress.

**72. Count #7: False Defamation through Falsification of Promise of Technology and Productivity of Undertaking** – *The Sun* defamed plaintiff falsely by falsely representing the technology as unpromising and the undertaking as unproductive and so him as delusional and unaccomplished. In fact, *The Sun* described plaintiff as " ...a man whose main accomplishment so far has been a refusal to quit." {18}.

**73.** *The Sun* created strong doubts over the workability of the technology. *The Sun* essentially falsely described the technology as a product of "basement development" (pars. 82-3, p. 28). And *The Sun* stated twice "If [or if] it [the technology] works" {4, 32}; stated "On that score [If it works], the geotechnical jury is still out..." {5}; and stated, as fact, "An on-site – or in situ – test is an exceedingly difficult nut to crack, according to experts, and no researchers have been able to devise a method that meets civil engineers' standards of predictive accuracy, ease of use and cost effectiveness, according to Kenneth Stokoe, a civil engineer at the University of Texas who has been working on competing technology. {38}. [new paragraph] '... This is not simple stuff.' {40}."

**74.** However, *The Sun* failed to provide balance regarding potential workability. For instance, *The Sun* omitted that, during April 1986, before any show of hostility towards plaintiff and Ms. Henke, the National Institute of Standards and Technology officially reported of the technology:

> "Quite conceivably the device can be used in every important and critical civil engineering project where [various soil properties] are required to evaluate the seismic safety, and to ensure the dynamic stability of the structure."

**75.** Additionally, *The Sun*, in essence, omitted all the solid demonstrations of the performance of the technology – basically, the accomplishments of the undertaking. First, *The Sun* seemingly actively concealed the laboratory testing program plaintiff and Ms. Henke had carried out at the University using an elaborate laboratory prototype testing system they had had designed and constructed. This was the foremost milestone of the undertaking; a product of six years of effort that clearly provided the first physical confirmation of the promise of the technology. However, *The Sun* stated, as fact, "The device Henke.....began to build at Hopkins..." {33}. This plus the statements cited in par. 79, p. 27 suggest, falsely, that plaintiff and Ms. Henke had neither completed the building of a testing system nor carried out substantial evaluative tests at the University.

**76.** Second, in essence, *The Sun* omitted most of plaintiff's and Ms. Henke's field testing work. Some time after plaintiff left the University, with support from the Federal Highway Administration (FHWA), they designed and constructed an entirely new and substantial testing system, a field prototype system. Then, with further government support, over the following six years, they conducted evaluative field tests of the system nationwide; in Washington, D.C., Massachusetts, Alabama, Florida, San Francisco, and Los Angeles. Their work represented eleven years of effort and the tests clearly confirmed the practical promise of the technology. The FHWA testing system and the field tests attracted the Japanese to the technology.

**77.** Third, *The Sun* effectively failed to bring up the publication of these works in a series of three articles in what plaintiff believes to be the foremost international peer-reviewed journal on earthquake matters. Those articles demonstrate the promise of the technology for providing the capabilities of which Dr. Stokoe spoke (par. 73, p. 25).

**78.** As to specific signs of actual malice, *The Sun* seems to have disregarded plaintiff's thoughts

on the one of these matters of which *The Sun* informed him, leaving expert opinion without challenge.

**79. Count #8: False Defamation through Falsification of Sincerity of Undertaking** - *The Sun* defamed plaintiff falsely by falsifying the sincerity of the undertaking, representing it and so, him, falsely as flighty, opportunistic, and greed-driven. *The Sun* stated, as fact, "In the beginning [after he left the University], Henke felt the wind at his back. He had a spacious house ... that served as laboratory and offices for his start-up company ..." {56} and [new paragraph] "The timing of their risky enterprise seemed auspicious. The 1989 earthquake in San Francisco had killed more than 60 people and caused massive infrastructure collapse, giving rise to government interest in earthquake research. {58}. [new paragraph] The Henkes figured all they needed to do was a series of tests to confirm the probe's accuracy and publish their findings. Soon afterwards, engineering firms or governments would come calling, and they would have a tidy income from the licensing of their technology. {59}. [new paragraph] Instead, the Henkes were 'rejected left and right' for grants, Robert says, ......" {60}.

**80.** There is little truth to *The Sun's* statements. Among other things, the undertaking and firm were sober, well-planned efforts that were launched in 1984, not 1989. Throughout, plaintiff and Ms. Henke steadfastly held to their 1984 plan. It was that plan, not the chance to profit from disaster, that moved them to do evaluative tests; by the time of the 1989 earthquake, they had 1) already conducted such tests, at the University (par. 75, p. 26) and 2) submitted a grant proposal that outlined, quite precisely, the work they would go on to carry out over the following one and one-half decades (par. 85, p. 29). And as to the claimed rush to publish, they did not submit a journal manuscript on their University laboratory tests (par. 75, p. 26) until mid-1991, over a year and a half after the earthquake. They followed an even more deliberate pace in the publication of their field testing work (par.76, p. 26).

81. As to specific signs of actual malice, *The Sun's* writing appears at odds with its thinking as well as with the facts; plaintiff's records for a May 4, 2007 interview include "He [Mr. Dechter] said what we [plaintiff and Ms. Henke] did was special – chasing money is not. ...."

82. **Count #9: False Defamation through Falsification of Professionalism** – *The Sun* defamed plaintiff falsely by representing the undertaking and so, him, falsely as unprofessional and by representing him directly as so. *The Sun* stated, as fact, "But an in situ soil test, requiring millions of dollars of research and development, is not the sort of invention readily suited to basement development" {39} [new paragraph] and "'You don't have enough money for the long haul,' Stokoe [an expert in the area of the technology] says. 'Technology like this takes several decades to be accepted. This is not simple stuff.' {40} [new paragraph] Striking out on one's own, as Henke did, without the backing of a major institution, says Stokoe, 'is the dumbest thing you could do'" {41}.

83. Among the untruths, first, *The Sun's* likening of the undertaking to "basement development" is false. Before plaintiff and Ms. Henke had to turn to their "basement" they had carried out roughly 6 years of research and development on the technology under ideal circumstances. In particular, they had conducted the evaluative tests of their laboratory testing system at the University (par. 75, p. 26). The facilities were exceptional and the tests were immensely revealing, reducing future risk and future workplace needs greatly. What's more, working at their home actually proved productive. In developing and constructing their FHWA testing system (par. 76, p. 26) and a testing system for the Japanese, they contracted out work for which the home was not suitable and all of their evaluative testing was field testing (par. 76, p. 26) for which the home was not needed. This was not "basement development" and the evaluative testing was of the highest standard. Plaintiff's and Ms. Henke's journal publications on that

testing (par. 77, p. 26) and their attracting the Japanese to the technology (par. 76, p. 26) speak to this.

**84.** Second, the claim that plaintiff simply struck out on his own is untrue. *The Sun* provided a rebuttal {42-60}; however, that itself was also materially false and defamatory (for example, pars. 79-80, p. 27) and actually strengthened the thrust of the claim.

**85.** As to truth, after learning of plaintiff's dismissal from the University (April 1989), he and Ms. Henke faced the difficult circumstances described in par. 32, p. 12. They decided to continue to develop their technology after he left the University on the bases put forth there and in their 1984 plan, but with no intention whatsoever of proceeding alone. During June 1989, six months before plaintiff left the University, in preparation for the departure, he and Ms. Henke submitted to NSF a proposal for support for continuing their work. In view of, among other things, the results of their laboratory testing program, they did not expect the declination of the proposal. They were notified of the declination only after he left the University. (Regarding par. 41, p. 16, it should be noted that it is this declination that first made plaintiff and Ms. Henke aware that their proposals may have been targeted; the review comments were technically absurd.) The declination moved them to intensify their efforts towards securing institutional support. While they did suffer setbacks, ultimately those efforts proved successful; FHWA, a force in civil engineering, provided them support. That support led to their FHWA field testing system, their nationwide field testing programs, two articles on those programs in a leading peer-reviewed international journal, and the interest of the Japanese in the technology. *The Sun*, though, in essence, omitted all of this (pars. 76-7, p. 26). *The Sun's* claim is also troubling because it was well-known in the profession that FHWA supported their work and, though plaintiff does not know if it had any bearing on his apparent testimony, Dr. Stokoe did have a severe conflict of interest that plaintiff believes *The Sun* should have uncovered and disclosed. Government

Defamation Complaint (Amended April 15, 2012); Case No. 24-C-09-000340
Page 30
April 15, 2012

documents suggest that he was one of the four reviewers of a 1993 grant proposal submitted to NSF by plaintiff and Ms. Henke whose identities they were seeking with their federal lawsuit against NSF. They believed the reviews of the proposal had been insincere.

86. As to specific signs of actual malice, plaintiff believes that if *The Sun* did not knowingly falsify with its claims, it published them recklessly. Regarding the "basement development" claim, plaintiff believes that, at the very least, *The Sun* had to have strong doubts about its truth. *The Sun* knew of much that suggests the undertaking was professional: 1) *The Sun* seemingly knew of the history of the undertaking; 2) *The Sun* saw the testing element (probe) of the technology; 3) plaintiff provided *The Sun* slides along with discussions on the undertaking and the technology; 4) *The Sun* seemingly knew of the journal publications on the technology; and 5) *The Sun* knew that the Japanese had invested heavily in the technology. Plaintiff does not know of anything of substance that would suggest that the undertaking was unprofessional.

87. Regarding the "striking out on one's own" claim, plaintiff does not believe either that Dr. Stokoe had the knowledge of plaintiff's and Ms. Henke's circumstances needed to put forth that unqualified claim as fact or that *The Sun* established his level of knowledge. Plaintiff believes that it fell on *The Sun* to have done so before publishing the claim.

88. Count #10: False Defamation through Falsification of Japanese Collaboration - *The Sun* defamed plaintiff falsely by falsifying the firm's collaboration with Geo-Research Institute ("the Institute") of Osaka, Japan. The falsifications, among other things, brought his work, sincerity, and commitment into question unjustly and concealed substantial accomplishments of his. *The Sun* described the collaboration, factually, as "lucrative" {109} and stated, as fact, "The project was supposed to last one year. It dragged on for four" {110} and the Institute "decided against using the probe." {111}.

89. Regarding truth, the project was anything but "lucrative." Still, plaintiff and Ms. Henke designed, constructed, and delivered a specially equipped probe for the Institute and carried out training tests in Japan. *The Sun*, though, in essence, omitted this. Second, the Institute was so excited about the probe they had started to construct, it asked them to expand their work to provide immensely complex features. They agreed. This is what led to the lengthy extension of the project. However, *The Sun* omitted this material fact, harmfully inverting the meaning of the extension. Third, the Institute didn't decide "against using the probe." After they delivered the probe, for various reasons, plaintiff and Ms. Henke suspended the collaboration. Still, it seems the Institute had no intention of not "using the probe." For example, after plaintiff and Ms. Henke severed ties, the Institute actually conducted tests of the probe. They formally asked the Institute not to do so as that violated the suspension of the collaboration.

90. As to specific signs of actual malice, as recorded in his diary, during an October 5, 2007 facts check, plaintiff did alert Mr. Dechter to the matter of project duration.

91. **Count #11: False Defamation through Falsification of Risk of Undertaking** – *The Sun* defamed plaintiff falsely by creating the false impression that the risk he believed he faced in the undertaking at the time of his dismissal from the University was substantial and he still proceeded, knowingly endangering his family. *The Sun* stated, as fact, "Just like Columbus at the point of no return, Henke chose to stay the course, despite risk to his own crew, his family." {55}. *The Sun* reinforced the impression of high risk through many other falsifications and unchallenged expert opinion (pars. 73, 82, pp. 25, 28).

92. Regarding truth, the risk plaintiff saw at the time, as expressed in, for example, plaintiff's and Ms. Henke's 1990 NIST proposal, was only "moderate." He and Ms. Henke had eliminated most of the original technical risk with their previous 6 years of effort (pars. 75, 83, pp. 26, 28). The

non-technical risk they believed they faced was also moderate; there was much need for technologies such as theirs, there was much interest in their technology, and their laboratory work had been heavily supported by eminent organizations. They did not start becoming aware of the apparent misconduct (pars. 36-53, pp. 14-20) which plaintiff believes was the dominant source of risk until after he left the University (par. 41, p. 16).

**93.** As to specific signs of actual malice, *The Sun's* representing plaintiff's state of mind harmfully without his verification seems at best reckless.

### V. Secondary Counts: Deceitful Misrepresentation

**94. Overview and Legal Matters that Apply to Counts #12 – 16 -** Plaintiff believes *The Sun* deliberately made material misrepresentations to him regarding the article. He believes *The Sun* did so to gain or maintain his and his family's cooperation towards the article and so, access to information it would not otherwise have had and that it could use, among other things, to discredit him.

**95.** Plaintiff understands for a cause of action for deceitful misrepresentation he must allege 1) *The Sun* knowingly or recklessly made a material false representation with his reliance in mind and 2) he did justifiably rely and act on the representation and so, was harmed. He understands for a cause of action for silent deceitful misrepresentation he must allege 1) *The Sun* knowingly created a false impression by withholding a material fact from him with his reliance in mind and 2) he did justifiably rely and act on the impression and so, was harmed.

**96.** In view of the nature and materiality of the representations at issue, *The Sun's* standing, plaintiff's relative ignorance of media matters, the absence of alternatives to good faith reliance, the vulnerability of plaintiff and his family (par. 9, p. 3), the potential for harm, and the article having been *The Sun's* idea (par. 13, p. 6), plaintiff believes it was *The Sun's* duty to have been

forthright. He believes *The Sun* was aware its representations were false and that he was under false impressions or, in cases, at best, *The Sun* was reckless. There are many signs *The Sun* made the representations with the aim of giving plaintiff false impressions on which he would rely. General signs include the large number and flagrancy of the representations and their coherence towards gaining or maintaining his cooperation. Specific signs are addressed under the counts. Plaintiff did rely and act on his impressions; he cooperated with *The Sun*. He believes this was justified; each of the matters at issue was material and, given the standing of *The Sun*, his impressions were entirely reasonable and the alternative – that an eminent newspaper was engaged in deceit to harm him and to protect possible wrongdoing - was not.

**97.** As to harm, plaintiff believes *The Sun's* representations led to the harm of the article (sec. IX, p. 43). Had *The Sun* been forthright in any one of the matters, clearly he and his family would not have cooperated with *The Sun*; likely, the article would not have come into being.

**98. Count #12: Misrepresentation of Intent** - *The Sun* misrepresented what plaintiff believes to have been, from the outset, its true intent with the article: to discredit him while concealing possible official and professional misconduct. He was of the belief *The Sun* intended to publish a sincere account of the undertaking with, perhaps, shallow coverage of human matters. *The Sun* fully upended his expectations; *The Sun,* in essence, published a history that, among other things, was largely personal; brought out deeply private and personal matters; was broadly and deeply untruthful; and stripped the undertaking of its material truths.

**99.** As to facts, on January 3, 2007, in part, according to plaintiff's diary and, in part, as he recalls, in expressing interest in writing an article, Mr. Dechter said he sought to write an article about bringing out something new and useful and the troubles that can be faced in that, an article that would also bring out a "human side." To verify his expectations, plaintiff queried he

would expect the article to be consistent with *Sun* reporter Douglas Birch's article about plaintiff's and Ms. Henke's lawsuits against NSF and NIST. Essentially, Mr. Dechter said it would be; and he added he had read the article and it was a good article. That article covered the lawsuits, not human, let alone personal and private matters. Especially because of the public interest element of the matters at hand and the standing of *The Sun*, it was beyond plaintiff's grasp to see *The Sun* greatly straying from that model.

100. *The Sun* further suppressed the possibility of its intruding into personal and private matters. Mr. Dechter said the article would be very difficult, suggesting the family would suffer blows. Unclear as to what he meant, plaintiff asked him how they would differ from those of the past. (At that time, though the family had suffered greatly (par. 9, p. 3), personal and private matters had never been raised and his family had never been attacked directly.) Plaintiff does not recall Mr. Dechter's answer or if he did answer; he knows, though, Mr. Dechter did not say *The Sun* would inquire into and publicize personal and private matters. Mr. Dechter did ask him, on February 13, 2007, to provide a list of individuals from his past. Plaintiff felt truly uneasy about this. He complied only because of the standing of *The Sun* and because he did not even consider the possibility that *The Sun* would invade his privacy.

101. In hindsight, there are many signs *The Sun's* true intent was to discredit plaintiff while concealing possible misconduct and many of these suggest it held this intent from the outset. Main signs of that intent include the flagrancy of the article and *The Sun's* reporting towards discrediting of plaintiff and concealment (pars. 19-20, 24-9, pp. 8, 9-11); *The Sun's* repeated evasion of the matter of plaintiff's 2006 approach to *The Sun* (par. 119, p. 39); *The Sun's* disclosure and avoidance failures (pars. 114-5, p. 38 and par. 117, p. 39); *The Sun's* invasion of the privacy of plaintiff's family (par. 116, p. 39), its seeming deceit regarding his younger son (pars. 111-3, pp. 37-8), and its scheduling of its interviews in North Carolina during a court

hearing for him (par. 113, p. 38); *The Sun's* seeming deceit regarding plaintiff's leaving the Air Force (pars. 108-10, pp. 36-7); and *The Sun's* seeming deceit regarding its need for proof (pars. 103-7, pp. 35-6).

**102.** Taking that *The Sun* intended to discredit plaintiff while concealing the possibility of misconduct, plaintiff believes *The Sun's* failure to disclose this to him suggests *The Sun* was aware he was under a false impression regarding intent. This is so since it would seem irregular 1) for an essentially private figure to consider that a reputable newspaper sought to discredit him and to conceal the possibility of wrongdoing and 2) for him to continue to cooperate if that was his impression. In fact, *The Sun* was aware of his views of the intent of the article and coverage (pars. 98-9, p. 33; par. 105, p. 35; pars. 108-10, pp. 36-7; and pars. 111-3, pp. 37-8); yet, *The Sun* took no legitimate steps to discourage those views (pars. 99-100, pp. 33-4), suggesting intent to deceive.

**103. Count #13: Misrepresentation of Need for Proof** – At the outset, *The Sun* led plaintiff to believe that proof of his concerns wasn't an issue. This allowed *The Sun* to maintain his cooperation. Then, well into the article, *The Sun* abruptly grew a need for such proof.

**104.** As to facts, plaintiff recalls and his diary shows Mr. Dechter volunteered to him and Ms. Henke at the outset *The Sun* would not try to prove matters. This left him believing proof was not an issue. This was a key matter; while his beliefs were greatly supported by circumstances, he was not aware of absolute proof. Had he known proof was needed, he would not have seen value in an article and would not have consented to it.

**105.** But, during a May 2, 2007 interview of plaintiff in North Carolina, four months into the article and having had detailed and unambiguous materials on plaintiff's beliefs for those four months, Mr. Dechter expressed concern plaintiff didn't have proof of his beliefs. He said,

according to plaintiff's diary, "[The] Sun needed to be certain of matters." During the interview, plaintiff said if he had proof he wouldn't have needed The Sun. And, seeing the loss of the value of the article, he recalls having said maybe the article should be abandoned. Mr. Dechter opposed that idea.

106. If it is true that The Sun needed proof of plaintiff's claims, then he believes the original impression that The Sun created that proof was not an issue was knowing deceit. Plaintiff believes this to be the case because he believes the need for proof to be a fundamental matter of journalism. That is, he believes that any journalist for a reputable newspaper would have known whether or not proof was needed. As to reliance, plaintiff believes The Sun, aware of his ignorance of media practices, would have made any material representation on such practices with the intent of reliance.

107. In seeming added deceit, while it expressed concern over proof of plaintiff's beliefs, The Sun, he believes, knowingly withheld from him such proof (par. 119, p. 39). He also believes The Sun's continuing with the article and then publishing it prominently despite the apparent collapse of what seemingly was the main intent of the article (par. 105, p. 35) – to publish a sincere account of the undertaking – suggests it had an undisclosed intent. In light of all else, it seems that intent was to discredit him.

108. Count #14: Silent Misrepresentation Regarding Air Force - Through seeming evasion, The Sun gave plaintiff the impression it would honor his repeatedly expressed need for privacy regarding his leaving the Air Force. However, instead of doing so, in defiance of him, The Sun apparently sought to and did uncover why he left and then published the reason. The Sun stated "His [plaintiff's] bride had had an affair." {99}.

109. As to facts, a January 4, 2007 entry in plaintiff's diary on the matter states "[plaintiff told Mr.

Dechter he] left [the Air Force] after 2 months – [for] family problems. He [Mr. Dechter] wanted to know what they were. I [plaintiff] said I wanted to keep that private." Though he raised the issue and thereby created an impression in plaintiff, Mr. Dechter said nothing. Because of the standing of *The Sun,* plaintiff quite naturally saw this response as consent to honor his privacy. He restated his need twice, as a constraint in a release statement, in an attachment to a February 16, 2007 email to Mr. Dechter. (Mr. Dechter had specifically requested a release statement from plaintiff.) Again, Mr. Dechter said nothing. It appears, though, *The Sun* had no intention of complying with plaintiff's constraint. In her May 2, 2007 interview with Mr. Dechter, Ms. Henke told him why plaintiff left the Air Force. During a May 4, 2007 interview, Mr. Dechter told him of that. He responded with disbelief; his diary shows he replied, "your [you're] not going to write about that[,] are you. [?]" Mr. Dechter said he would.

110. Plaintiff cannot see *The Sun* as not having been acutely aware he was relying on *The Sun* to honor what he believed was a pledge and that, through repeated silence, it was creating the false impression it would. *The Sun's* failure to undo that impression suggests it intended for him to rely on the impression. Particularly in view of *The Sun* having raised the issue and created an impression (par. 109, p. 36); its representations regarding coverage (pars. 99-100, pp. 33-4); and plaintiff having included his constraint as part of a release statement, he believes *The Sun's* withholding to have been the knowing deceit of active concealment.

111. **Count #15: Misrepresentation Regarding Treatment of Younger Son** - *The Sun* made repeated pledges regarding its treatment of plaintiff's and Ms. Henke's younger son, Kevin, who was experiencing serious juvenile difficulties. *The Sun,* then, failed to honor the pledges.

112. As to facts, plaintiff recalls and his diary entries show, in a February 10, 2007 conversation, Mr. Dechter, apparently in recognition of plaintiff's and Ms. Henke's concern over Kevin's well-

being, volunteered to Ms. Henke, quite sincerely, that *The Sun* would never exploit a juvenile. Plaintiff recalls Mr. Dechter having made the same pledge to him early on. On April 20, 2007, plaintiff's records show, Mr. Dechter did so again, in relation to his attending a May 3, 2007 court hearing for Kevin and, on May 1, 2007, he told plaintiff he wished to attend the hearing, not to write about it directly but because it relates to the story. Plaintiff agreed to his attendance. Mr. Dechter, though, wrote about the hearing and in an especially hurtful manner {132-9}.

**113.** While plaintiff believes *The Sun* knew its pledges could be false, given the character of the matter, he believes they cannot be seen as less than reckless. His belief of knowing deceit is based on the totality of the circumstances and, in particular, *The Sun's* scheduling of Mr. Dechter's trip to North Carolina during the hearing. Plaintiff believes this suggests a calculated aim to possibly violate its pledges. *The Sun's* persistence with its pledges suggests *The Sun* intended reliance on them.

**114. Count #16: Silent Misrepresentation of *The Sun's* Neutrality** - Mr. Dechter failed to disclose to plaintiff, in a timely manner (at the outset), an interest he believes would have made it difficult for him to have reported neutrally on the matters at hand. Not until May 1, 2007, four months into the article, in North Carolina, did Mr. Dechter disclose he had a fellowship to, has a degree from, and had taught at the University.

**115.** With news media's culture of disclosure, plaintiff cannot see *The Sun* as not having been keenly aware of the deceit of its silence. It did not come to plaintiff, essentially a private figure, that *The Sun* might be represented by a reporter with substantive hidden interests. He believes that, with its silence, *The Sun*, in awareness of its standing and plaintiff's media ignorance, would have known it was creating a false impression regarding neutrality and that it intended for him to rely and act on the impression. Plaintiff believes *The Sun's* silence to have been active

concealment; for one, it withheld from him a material obstacle to realizing representations it made regarding its intent with the article (par. 99, p. 33).

## VI. Further Relevant Conduct of *The Sun*

### Invasion of Privacy of Plaintiff and His Family

116. In a sign that *The Sun* intended to discredit plaintiff with the article, after deceitfully gaining his and his family's cooperation towards the article (sec. V, p. 32), *The Sun* invaded the privacy of the family, which was unguarded because of the standing of *The Sun*. *The Sun* engaged in discussions with at least one family member over deeply personal and private matters. And it did so knowing the family was vulnerable, in a state of ruin with frightening prospects (par. 9, p. 3).

### Failure to Insure Neutrality in Reporting

117. In a sign that it intended to harm plaintiff with the article, *The Sun* did not exclude Mr. Dechter from the reporting of the article. He had two interests (pars. 27-9, p. 10-1) that were in conflict with impartiality. Plaintiff believes this would have stood out to *The Sun*.

### Timing of Article

118. In a sign *The Sun* intended to harm plaintiff with the article, *The Sun* knowingly published what he believes it knew to be a fatal defamation when a promising application of his for a position with the Nuclear Regulatory Commission (NRC) was under review. The NRC is the only organization that had interviewed him formally during his multi-year position search.

### Evasion by *The Sun*

119. In a sign that it did take part in the possible misconduct against plaintiff and Ms. Henke, *The Sun* has been broadly evasive over the matter of his approach to *The Sun* (par. 12, p. 5). As to facts, plaintiff approached *The Sun* to obtain information regarding that misconduct. *The Sun*, though, has yet to address this matter. Plaintiff believes it fell on *The Sun* to have done so

in at least three distinct instances: 1) during Mr. Dechter's January 3, 2007 conversation with him, which apparently was *The Sun's* response to details of the matter he provided Mr. Dechter (par. 13, p. 6); 2) in the article; and 3) in response to plaintiff's May 1, 2008 letter to the publisher of *The Sun*, in which he raised the matter (par. 16, p. 7). In the conversation, Mr. Dechter only expressed *The Sun's* interest in publishing an article on plaintiff's circumstances; in the article, *The Sun* actively concealed the matter (pars. 53-5, p. 20); and *The Sun* did not respond to the letter.

120. Additionally, in response to an October 9, 2007 request of Mr. Dechter's for plaintiff's comments on the article, he provided him some of his initial thoughts in two emails. Mr. Dechter replied he would be willing to explain his thinking in the writing of the article – in detail. Plaintiff invited him to do so twice in emails, but he never did.

**Possible Interference with Search for Representation**

121. Facts and reason bring out the possibility *The Sun* may have interfered with plaintiff's consuming but unsuccessful search for representation for his lawsuit against *The Sun* (par. 17, p. 7). Without counsel, he believes he has been greatly handicapped in seeking justice.

122. As to facts, on July 28, 2008, plaintiff received an email from Mr. A. Grosso of Andrew Grosso and Associates, a law firm he had contacted about the lawsuit. Mr. Grosso declined to take up the case; however, he did offer to refer the case to another attorney, a Mr. Mark Zaid, and to provide him the materials plaintiff had sent. This was the only specific reference given to him in his search for representation and so seemed his most promising possibility. He accepted Mr. Grosso's offer by email. On August 7, 2008, little more than a week later, *The Sun* published a large article in which Mr. Zaid was heavily cited. (Plaintiff did not uncover this until September 21, 2009.) It would appear, among other things, this would have compromised the ability of Mr.

Zaid to represent plaintiff. Though plaintiff sent him an introductory email, Mr. Zaid never responded. Plaintiff has not seen Mr. Zaid cited by The Sun since.

## VII. Motive

123. Plaintiff believes that, considering the totality of the circumstances, facts and reason suggest The Sun defamed him falsely to quash the possibility of investigation of his circumstances, in protection of said possible Sun-complicit misconduct (for example, pars. 36-55, pp. 14–20).

124. In broad terms, first, he approached The Sun in 2006 openly seeking investigation of his circumstances (pars. 12-3, pp. 5-6). Second, facts and reason suggest that The Sun and any accomplices it may have had had much to fear of sincere investigation. Plaintiff believes findings would have included the following:

a. Plaintiff had been dismissed from the University not for the official reasons put forth but for i) charging three students with plagiarism and ii) opposing grade inflation and the like (par. 38, p. 14).

b. To justify plaintiff's dismissal, at least one faculty member from the University and at least one program officer from the National Science Foundation had colluded to insure failure of University proposals of his to NSF grant competitions (par. 39, p. 15).

c. Grant proposals submitted by Ms. Henke and plaintiff after his dismissal had also been manipulated to insure their failure (pars. 45-8, pp. 17-8). This was to drive them from their profession, in protection of the misconduct cited in item b and in retaliation for their contesting grant competitions.

**d.** Ideas presented, in particular, by plaintiff in University proposals of his had been taken up improperly by other researchers (pars. 51-2, p. 19).

**e.** A 5 year inquiry/review carried out into matters of items d and c by investigators of the Office of NSF's Inspector General (pars. 51-2, p. 19) was insincere.

**f.** Plaintiff's and Ms. Henke's decades-long undertaking was brought to a standstill through sabotage (par. 49, p. 18).

**g.** Plaintiff was blacklisted from university and other positions for which he applied (par. 50, p. 19).

**h.** Through many articles spanning roughly two decades, *The Sun*, at the bidding of those behind the misconduct, had stalked plaintiff, his firm, and his family; had interfered with the undertaking; and had protected architects of the misconduct (par. 12, p. 5).

Plaintiff believes these matters, among others, left him and his family in the state of ruin described in par. 9, p. 3, deprived essentially of all well-being and prospects. And third, not only did *The Sun* discourage investigation by falsely defaming plaintiff fatally but, though the possibilities of pars. 124.a-h, pp. 41-2, largely defined his circumstances, *The Sun* effectively concealed most and the most material of them and so, cause for investigation.

### VIII. Possibility of Collusion

**125.** Plaintiff believes that, considering the totality of the circumstances, facts and reason suggest that *The Sun's* false defamation of him may have been the product of collusion. Facts that point to a collective effort in the defamation include the relevant history (believed by plaintiff to be largely represented by pars. 124.a-h, pp. 41-2) that seems to have required collusion; the breadth of the evasion by *The Sun* of the matter of his 2006 approach to *The Sun* (par. 119, p.

Defamation Complaint (Amended April 15, 2012); Case No. 24-C-09-000340
Page 43
April 15, 2012

39); *The Sun* allowing Mr. Dechter to author the article despite his background (par. 117, p. 39);

the pressure a division of the University apparently applied to *The Sun* regarding the article

(pars. 27-9, pp. 10-1); the flagrancy and scale of *The Sun's* violations of plaintiff (pars. 19-122,

pp. 8-40); and any *The Sun* may have interfered with his search for representation for a lawsuit

against *The Sun* (pars. 121-2, p. 40).

## IX. Harm from the Article

**Harm to Reputation**

126. The article harmed plaintiff's reputation. As to signs of this and also the power of the

article, one Larry Bonander was moved to write, in a letter to the editor published on October 9,

2007 by *The Sun* under the boldfaced title "**Soil pioneer leaves but a shabby legacy:**"

> "I was sad after reading the story of Robert Henke and his soil probe ('A modern-day
>
> Ahab,' Oct. 7).
>
> Here's a gifted man whose brilliance is overshadowed by his selfishness.
>
> It's too bad that Mr. Henke's legacy will be a shattered, dysfunctional family."

The Internet comments plaintiff saw on the article put forth similar, though less restrained,

thoughts, he recalls.

**Injury Resulting from Harm to Reputation**

127. Because of the harm to his reputation, plaintiff's and so, his family's plight (par. 9, p. 3) has

intensified and they have been deprived hope for relief. He describes specific injuries below.

128. **Denied Justice and Redress** – The false defamation of the article, plaintiff believes,

disabled his ability to draw the interest he had long sought in investigating his circumstances, in

hopes of restoring well-being to his family; it's hard to see who would act on behalf of an

unsavory, unbalanced, and delusional eccentric who willingly destroyed his family for scientific

glory. Moreover, in defaming plaintiff, *The Sun* concealed cause for investigation.

**129. Denied Professional Prospects** - The article, plaintiff believes, irreversibly deprived him

of professional prospects. He believes he had growing prospects. At the time of the publication

of the article, plaintiff had attracted sincere interest from the Nuclear Regulatory Commission

(NRC) (par. 118, p. 39). Plus, he had just been invited to review a manuscript for what he

believes to be the foremost journal on earthquake matters. The lead author had even expressed

interest in further exchanges with him. He was not offered the NRC post and he never again

heard from the author or the journal.

**130.** Plaintiff also believes the article irreversibly deepened rifts between his profession and him,

preventing him from ever again being able to contribute to his field or academia. For example,

his thesis advisor, his closest tie to his profession, has stopped sending him Christmas cards.

And, whereas he believes a sincere article likely would have helped undermine the blacklisting

of him, he believes the blacklisting was prolonged and strengthened, through the addition of a

personal basis.

**131. Deteriorating Financial State** – By depriving plaintiff of professional prospects and

progress towards redress, he believes *The Sun* has held him in the deteriorating financial state

to which he believes the said misconduct had brought him (par. 9, p. 3). This has, among other

things, kept him from meeting urgent needs of his and his family (educational, environmental,

health, security, and the like), leaving them deeply and irreversibly scarred. He believes it has

also weakened his ability to realize justice regarding *The Sun's* false defamation by greatly

limiting his ability to attract representation for his lawsuit. Without counsel, for instance, he has

stumbled greatly in putting forth his case.

**132. Compromised Social Standing** – Plaintiff believes that, with its representations of him, the article irreversibly deprived him of social standing. For one, he could never again live comfortably in the state of Maryland, where he had hoped to return.

**133. Distraction -** The article and its aftermath have distracted plaintiff greatly from his family and other matters. Self-representation has been particularly consuming; he has had to put forth his case before a Federal Bankruptcy Court as well as the Circuit Court.

**134. Emotional Distress** – The article, the deceit that plaintiff believes made it possible, and all he believes it denied his family and also *The Sun's* invasion of privacy (par. 116, p. 39) inflicted on him much emotional distress.

**Harm in Relation to Possible Interference with Search for Representation**
**135.** If *The Sun* prevented plaintiff from attracting representation for a lawsuit against *The Sun* stemming from the article (pars. 121-2, p. 40), that would have greatly limited his ability to realize justice for him and his family.

## X. Remedies Sought

**Monetary Remedy**
**136.** Plaintiff seeks monetary redress of $100M (On April 4, 2012, he put forth a greatly reduced counter offer to attorney's for Tribune Company's bankruptcy case.). This is based on 1) the immediate harm inflicted by the article and 2) the obstruction of his progress towards justice and redress. The second, he believes, is not a small matter. Plaintiff believes findings of a sincere investigation (pars. 124.a-h, pp. 41-2) would have allowed him to restore, for his family, through redress, some of the well-being he believes had been taken from it through two decades of calculated misconduct. He believes the flagrancy of the article and the conduct of *The Sun* are measures of the truth of his beliefs and signs that redress would have been substantial.

Defamation Complaint (Amended April 15, 2012); Case No. 24-C-09-000340
Page 46
April 15, 2012

**Non-monetary Remedy**

**137.** Plaintiff seeks redress of a less monetary nature to help more fully repair the lives harmed as a result of the article. He seeks to have restored for him and his family, to the extent reasonably possible, denied well-being, educational opportunities, health, prospects, standing, and the like.

Robert Henke, plaintiff

April 15, 2012

4104 Hearthside Drive, Apt. # 101

Wilmington, North Carolina    28412

910-791-3896 (home phone); 919-610-5865 (cell phone); hroberthenke@aol.com

Defamation Complaint (Amended April 15, 2012); Case No. 24-C-09-000340
Page 47
April 15, 2012

## Exhibit A

This exhibit is a copy of the article taken from *The Sun's* Internet site, baltimoresun.com. The copy does not include photographs. Plaintiff numbered the paragraphs.

www.baltimoresun.com/news/nation/bal-
te.md.henke07oct07,0,1618962.story?coll=bal_tab01_layout



# baltimoresun.com

## A modern-day Ahab

**In pursuit of geologic immortality, inventor Robert Henke has sacrificed everything: comfort, career, family**

By Gadi Dechter

Sun reporter

October 7, 2007

APEX, N.C.



Find your comfort zone at Comfort Inn® hotels.

Comfort INN      LEARN MORE →

In a small North Carolina garage are Robert Henke's two remaining worldly possessions: a slightly banged-up 1967 Lotus Elan sports car and something that resembles a slim, 6-foot torpedo suspended from an aluminum frame.

When he takes it out for the rare spin, the cherry-colored ragtop gets admiring looks from passers-by - though it is the metal cylinder that ought to grab the world's attention.

But nobody cares.

The product of more than $2 million and 25 years of development, the device might just be the holy grail of earthquake engineering: a probe that can accurately predict the way various soils will react in a major quake. It could prevent building collapses and save lives. If it works.

On that score, the geotechnical jury is still out, though belated recognition and its attendant rewards will offer scant comfort to Henke, 60, a former Johns Hopkins engineering professor and McDonogh School graduate who lives alone in a tiny one-bedroom apartment outside Raleigh filled with little more than dozens of cardboard file boxes for furniture.

If success ever comes for Henke, "I won't be breaking out the champagne," he says, managing a wobbly laugh. A short, reedy man with a frizzled gray ponytail, Henke peers at his invention with drooping eyes from behind oversized eyeglasses. He continues in a sandy, quavering voice. "The human cost has been too high. It hasn't been worth it."

American culture valorizes the uncompromising dreamers, single-minded in their pursuit of greatness, and delights when they are plucked from obscurity, as in the case of some recent MacArthur Foundation "genius" grantees. Robert Henke's monastic life is a testament to that ideal, but he is also, as a former boss says, a "Captain Ahab of our generation," willing to wreck everything - including his family - chasing a dream that has become an obsession.

"If you to look at the life of a another man who fits every description of my father, but who made it, you will probably find they made just as many bad decisions, and are as singularly self-involved and selfish," says Henke's eldest son, Michael, 33, with a hint of bitterness. "When they make it, they're off the hook."

By Henke's accounting, the probe has cost him $1 million in personal investment and an aborted academic career that began promisingly at Hopkins in 1985 and ended five years later. In 2002, he lost his Lutherville home. His wife and research partner, Wanda, left him soon afterward.

Their 17-year-old son, Kevin, was hospitalized for clinical depression in middle school and recently faced a stint in adult prison, partly the consequence, the teenager and his mother say, of an intermittently neglectful and overbearing father who demanded of his family the same ruthless hunt for monumental accomplishment.

At an age when former university colleagues are contemplating comfortable retirements, Henke is unemployed and living off a meager allowance from his ailing mother in Potomac. He has no job prospects, no savings, few friends and little hope, he admits, of a happy ending.

Still, Henke works obsessively on the soil probe, shunning even in penury any gainful employment that would distract him from his research. It is no longer a labor of love - it never really was - but an increasingly desperate bid to make a privileged upbringing amount to something more than a cautionary tale about excessive ambition and idealism.



With his absent-minded-professor fashion sense (polo shirt neatly tucked into sweat pants), oddly winning personality quirks (giggling fits, mild obsessive-compulsive disorder) and mad-scientist digs, Robert Henke is the very picture of the eccentric genius archetype - like mathematicians John Nash or Kurt Goedel - whose human failings history forgives because of their larger contributions to humanity.



But Henke knows all too well that history takes note of marginal lives such as his only when their accomplishments are as brilliant as their promise. In the absence of ultimate triumph, posterity might well remember Henke, if it memorializes him at all, as the ghostly shadow of genius.



And so he works.

Already has a job
At 6:45 a.m. on a Friday in early May, Henke leaves his apartment for his daily run, shielded beneath a visor and old transparent poncho bandaged by electrical tape. Hobbled by a recent knee injury, he fixes his gaunt face into a determined grimace, clenches his fists and shuffles off, merging minutes later onto the shoulder of a busy highway.



His seven-mile jogging route is not picturesque, but then, Henke runs for principle, not pleasure. "I'm not an exercise enthusiast," he says. "It makes me feel sick."



But to abandon the morning routine at this point would carry too much symbolic significance for a man whose main accomplishment so far has been a refusal to quit.



At Apex High School, where son Kevin is a sophomore, Henke turns back, jogging 3.5 miles against the tide of morning commuters on their way to jobs.



With a doctorate in civil engineering from the University of Michigan, Henke could probably get decent work somewhere here in North Carolina's Research Triangle, a metropolitan thicket of large universities and private research-and-development laboratories.

But, he points out, he already has a job.



By 8:00 a.m., he is back at his makeshift desk: a plank of wood suspended between file boxes. With no more money to conduct costly site experiments on his soil probe - the last meager grant, from the Federal Highway Administration, was discontinued for budgetary reasons in 2004 - Henke is reduced to making theoretical design improvements to his device, such as replacing embedded electronics with a sophisticated wireless system.



"He refuses to work under his level," says Kevin with a mixture of admiration and pity. "My father said, 'F--- furniture, I'll put a whole bunch of boxes together and make a couch.' And decided he would keep on going after it until he can't breathe anymore."



Not that Henke would refuse the right sort of job, one that would allow him to continue his research in more suitable surroundings. He still applies regularly for faculty positions at research universities, such as the one he lost at Hopkins in 1989 for failing to publish a single research paper in five years.

With wife Wanda as co-author, Henke has since published several papers in peer-reviewed journals and has sent out scores of queries to universities.  

Not a single bite.

That unpromising track record hasn't prompted Henke from lowering his sights to, say, adjunct work as a community college lecturer. "The problem with that idea," he explains, "is it would take me away from groundbreaking research, and it's not clear to me why I should have to do that." 

His family says the reasons are obvious: to help his wife - herself an engineer who recently worked in a dry-cleaning shop and is now a high school teacher - put food on the table. To give comfort to his 88-year-old mother, distraught that her 60-year-old son is still living off her. 

But that is precisely why Henke cannot in good conscience make concessions to practicality. Though paid employment "would give my family relief," he says, "in the longer term it would deprive them of something we've all sacrificed for." 

The sacrifice has been for a rather esoteric branch of civil engineering not likely to capture the popular imagination even under happier circumstances. The stainless steel tube in Henke's garage doesn't predict earthquakes, after all, just how various soils will behave in quakes of different magnitudes. 

Still, a quantum leap is a quantum leap. 

That's what the Henke soil probe - if it works - represents for geotechnical engineering, according to University of Washington professor Steven L. Kramer, an expert on the branch of civil engineering concerned with the behavior of earth materials. 

The device Henke conceived at Houston's Exxon Production Research Corp. in the early 1980s and began to build at Hopkins is designed to predict how soil "deforms" in earthquake-like conditions. He was so convinced of the probe's possibilities that he persuaded Exxon to allow him to take the patent with him. It was his boss at Exxon, Jack Templeton, who likens him to Herman Melville's Captain Ahab because of his messianic pursuit of his invention. 

Depending on their density and other characteristics, some soils can well withstand the compression and shear waves that travel underground in a major seismic event. Others transform into sandy liquids, providing no support to structures built atop the soil. 

Precise knowledge of how the earth will respond to major disturbances would be prized by engineers designing sensitive projects such as power plants and off-shore oil-drilling platforms. 

"I'm working on a consulting project now involving a nuclear waste treatment facility," Kramer says. "This kind of information ... would be enormously useful," potentially saving millions of dollars in earthquake-resistant construction. 

Current technology does allow fairly sophisticated soil tests to be conducted in laboratories, but not at the actual site of interest. Because lab-tested soil samples are necessarily disturbed in the



process of gathering and transporting them to labs, the results of laboratory tests are subject to major error.

An on-site - or in situ - test is an exceedingly difficult nut to crack, according to experts, and no researchers have been able to devise a method that meets civil engineers' standards of predictive accuracy, ease of use and cost effectiveness, according to Kenneth Stokoe, a civil engineer at the University of Texas who has been working on competing technology. 

Henke compares his entrepreneurial drive to those of Apple Computer founders Steve Jobs and Steve Wozniak, who started their company in a Silicon Valley home. But an in situ soil test, requiring millions of dollars of research and development, is not the sort of invention readily suited to basement development. 

"You don't have enough money for the long haul," Stokoe says. "Technology like this takes several decades to be accepted. This is not simple stuff." 

Striking out on one's own, as Henke did, without the backing of a major institution, says Stokoe, "is the dumbest thing you could do." 

It didn't seem like such a dumb idea in 1989. 

Henke had just lost his job at Hopkins for failing to heed his department chair's recommendation that the engineer diversify his research and get his name on peer-reviewed publications. 

"Publishing is very important ... to disseminate the results of your research and to become respected by your peers," civil engineering chairman Ross B. Corotis wrote Henke two years before his dismissal, according to Henke's transcription of the letter. "I know major research efforts involving extensive laboratory experimentation you are doing does not lend itself easily to this." 

Henke ignored the publish-or-perish warning, believing that the university would appreciate the "cancer-curing" potential of his probe project. "I thought of myself as really important at that time," he says. 

More troubling, federal grant dollars that had flowed in regularly during his first three years at Homewood suddenly slowed to a trickle. 

Convinced that grant-application rejections were linked to personal animus within his department, Henke began filing formal objections with the National Science Foundation - an impolitic move that would foreshadow later lawsuits against the federal hand that feeds the nation's scientific research. 

In the meantime, he kept his worries a secret from his students, many of whom recall him as an unusually dedicated and patient instructor.

"He was one of my favorite professors," says Tim Rosenzweig, chief financial officer for a Massachusetts wind power company who worked in Henke's lab as an undergraduate. "He definitely had a passion for what he was doing."



Then a junior, Rosenzweig remembers the spring day in 1989 when Henke told him his contract would not be renewed. "He was very much an adult about it," Rosenzweig says. "He said it would be a growing period."

But in his heart, Henke was devastated at what he calls "the seismic shift" in his life. "When I left Johns Hopkins," he says, "I felt the world was over for me. ... I don't know if I did anything right afterward."



Point of no return
It was his Christopher Columbus moment.



Over days of conversation this spring, Henke repeatedly turned to the Italian explorer's discovery of America as an analogue to his own journey.



"Columbus charted his course to the New World," Henke says, "and when he reached a certain point, he was halfway out of his supplies."



Just like Columbus at the point of no return, Henke chose to stay the course, despite the risk to his own crew, his family. "In many ways, I think it was irresponsible." But, he points out, "Columbus came out a winner."



In the beginning, Henke felt the wind at his back. He had a spacious house in Lutherville - a gift from his mother that served as laboratory and offices for his start-up company, Dynamic In Situ Geotechnical Testing Inc.



In his wife, Wanda, he had a devoted partner, who in addition to being an engineer also knew how to manage the business, coordinate projects with contractors and handle money without having to put on gloves. "I was Robert's buffer to the world," she says.



The timing of their risky enterprise seemed auspicious. The 1989 earthquake in San Francisco had killed more than 60 people and caused massive infrastructure collapse, giving rise to government interest in earthquake research.



The Henkes figured all they needed to do was a series of tests to confirm the probe's accuracy and publish their findings. Soon afterward, engineering firms or governments would come calling, and they would have a tidy income from the licensing of their technology.



Instead, the Henkes were "rejected left and right" for grants, Robert says, and he was reduced to asking his mother for money to pay the bills.



A retired doctor who profited from real estate investments, Maria Benzinger would end up pouring about $1 million into supporting her son's mission, Robert Henke says.



"It was pretty weird," Kevin Henke says. "The whole basement was this laboratory. The walls had plastic on them, and they always had a lot of high-tech equipment around. And the probe would always be sitting on this table."

Kevin recalls a tumultuous household: "There were always money problems, everybody was mad, the family was fighting all the time."  

By 1994, Robert and Wanda were convinced that their difficulty in winning grants was not because they had bitten off more science than any two people could chew - but because the fruits of their labor were being poisoned by rivals. That year, they sued the National Science Foundation and the National Institute of Standards and Technology.

The Henkes believed that competing scholars sitting on private peer-review panels were giving low marks to applications, but they needed to know the names of their reviewers to prove it. The lawsuit threatened the secret peer review process - a pillar of modern science - and developments were covered in Science magazine, The Sun and The Chronicle of Higher Education. 

Ultimately a federal judge in Washington ruled against the Henkes in their suit against the NSF. In May 1994, the same judge ruled in their favor in the NIST case, ordering the agency to open its files, but that judgment was overturned on appeal. 

Privately, Henke's colleagues say that the lawsuits were tantamount to professional suicide. 

Henke's mounting social and professional isolation from the outside world led him to focus his energies inwardly. As the decade dragged on, the man who resented any impingement on his academic freedom at Hopkins began to exert at home a dictator's control, his children say. 

"When you grow up without religion, someone must supplant God," Michael says. "And my father became that for me and ... I could not help but fear his wrath," he says. While the young Robert had found social refuge in clowning and cartoons, he rarely permitted his sons to traffic in popular culture. No movies, no video games, no television save the occasional videotaped History Channel documentary. Even books were suspect. 

"If I spent too long reading, I was being lazy," Kevin says. 

Michael, who maintains a deep love for his father, recalls having to read books in secret. "It was crazy," he says. "It was unbelievable, especially from someone as intelligent as my father, who reads a lot." 

Concerned the boys would grow up shiftless, Henke forced them to wake early each day and submit to a grueling exercise regimen of running, sit-ups, push-ups and pull-ups. 

When Michael tried to push back, he found his father as obstinate in his parenting style as he was with his research program. "The same characteristics that made him so unilaterally focused made him a bad listener," he says. 

Over time, Kevin developed a hatred of the word "probe" and a fear of going to sleep at night. "I knew that I was that much closer to having to exercise again." 

For Wanda, life at home was increasingly unbearable. Though she accepted Henke's unrelenting schedule, she was almost never rewarded with praise or affection. "I felt like I was totally worthless for a long time," she says.



She often thought about leaving him but couldn't tear herself away from the probe. "You have no idea how much I wanted to say, 'This is no good, let's stop.'" 

But it was good. When they had the money to conduct site tests, the results were promising. Whenever they were so beaten down that going on seemed pointless, another small grant would trickle in - proof that other people believed, too. 

And no matter what anyone else thought, Wanda's faith in her husband's genius never faltered, even when her love did. "This is a man who did something really special," she says, "and got knocked down for it." 

Sweet but tough
Robert Henke was introduced to hard knocks at the McDonogh School in the mid-1960s, where he was a mediocre student and nicknamed "Hanky Do-Right," for his wont to act out scenes from the animated cartoon, Dudley Do-Right. 

"He was a sweet person," says classmate Jeffrey Fountain, who played the villainous Snidley Whiplash to Henke's super-virtuous Canadian Mountie. 

The pastoral Owings Mills campus was still being run as an all-boys, semi-military boarding school, with an emphasis on athletics and rank. Henke's childish preoccupations with model airplanes and his failure to achieve distinction in the classroom, drill or sport field relegated him to marginal status. 

But even then, there were glimpses of the future engineer's propensity for self-sacrifice. 

"When he was a junior, he decided that he was going to be a wrestler," says Fountain. "I think he wanted some respect." But Henke's only shot at making the team was in a lower weight class, so he embarked on a starvation diet. 

"He dieted and dieted," Fountain recalls, "and he became this tough little guy. And everybody admired how tough he was and how hard he worked." 

Dudley Ives, a standout wrestler at McDonogh, remembers Henke with some admiration. "Bob would challenge me, and occasionally he'd beat me," Ives says. "I learned to stay away from him. ... He just kept coming back, kept hammering." 

Ives and Fountain remember Henke as "brainy" and introspective, a "quiet guy," Ives says, "but the wheels were turning, and when his time came, he had something to say and it was pretty profound." 

But in Henke's own coming-of-age narrative, he was nothing more than a quitter. To this day, he resents his wrestling coaches at McDonogh for discouraging his diet, for counseling him to come to terms with his in-born physical disadvantages and accept being "average." 

He graduated without concrete plans or aspirations and enrolled at North Carolina State, because "it was the only place that accepted me," he says. 



His college career began no more auspiciously than his prep years. By the time he met his future wife three years later, he was a 21-year-old who had already failed out of college three times for low grades and spent much of his time playing poker and racing cars. 

Wanda Kelly recognized Henke's potential for greatness even before he did. "He was just so different and so exciting," she says of their first encounter in 1968. "I just thought life with him would be an exciting journey." 

She was 18, the valedictorian of nearby Apex High School, attending college with help from a scholarship she won in a beauty pageant. Wanda's roommate was dating one of Henke's fraternity brothers, so she agreed to a group date. 

"He had dark hair that was kind of curly," she says. "I thought he was really good-looking." 

She was intrigued by the shy boy's life growing up in boarding schools in New York, Cleveland and finally Baltimore, as his German-born mother moved from one hospital job to another. 

He told Wanda about his stepfather Theodor H. Benzinger, a celebrated researcher at Bethesda's Naval Medical Research Institute who invented the ear thermometer. By the time he reached high school, Henke's mother was chief anesthesiologist at D.C. General, an accomplishment for a woman that seemed impossibly glamorous to Wanda, who grew up on a tobacco farm. 

While Wanda worked on her studies, Henke was more interested in playing poker and racing his Lotus hard-top convertible, a gift from his mother. He taught her how to drive it on their first road trip up to Maryland several months later, to visit his parents. 

She was cowed by the elegant house in Potomac, by the formality of having to dress for dinner. The courtship was quick. They met in October. By summer, Henke proposed, after winning in a poker game enough money for an engagement ring. 

Wanda's parents opposed the marriage because of her age, but she was afraid of losing Henke. "I had this horrible fear that I would be an old maid." 

After finally graduating with a mechanical engineering degree from N.C. State, Henke signed up for an Air Force officer's training course. Just two months later, Henke had arranged for a "self-initiated elimination" discharge and was back in North Carolina. 

The reason, Robert and Wanda Henke agree: His bride had had an affair. 

The reaction: Hanky Do-Rite became a serious man. 

'Bottom of the heap'
The transformation was almost instantaneous. Back in North Carolina, with no skills, an unhappy young wife and no direction, Henke was gripped with an all-consuming fear. 

"When I left the Air Force, I found myself with no credentials, no future, nothing, and I was afraid," he says. "Here I had gone 26 years and everyone else was dancing and doing fine, and I was at the bottom of the heap."

He re-enrolled at N.C. State as an undergraduate and completed a second bachelor's degree, this time in two years and with nearly straight A's.  

He chose earthquake studies because he was "narrowly gifted in math" but was also attracted to the idea of working on research that would directly help people, he says. 

After graduating, he stayed on in the department, earning a master's degree, and then transferred to the Ph.D. program at Michigan, which had one of the top earthquake-research specialties in the country. 

For his doctoral thesis, he developed the mathematical formula that would become the brain of his soil probe, translating the numerical data measured by accelerometers in the tube into predictive data. 

The fruits of his dissertation research are still in use in the profession today. "I'm writing a paper that's based on some of the stuff that Bob and some of his advisers did back then," says Richard Ray, a civil engineer at the University of South Carolina. 

It was a remarkable about-face for a formerly dissolute young man who developed an almost religious faith in his own willpower. 

But it could not sustain his family. Things finally fell apart at the end of the 1990s. In 1997, the Henkes won a lucrative contract with the Japanese Geo-Research Institute in Osaka, to build a soil probe for the earthquake-riddled island nation. 

The project was supposed to last one year. It dragged on for four. Though the Japanese paid the Henke's $450,000 over the years, Henke and Wanda say they funneled all the money into development rather than paying themselves a salary - in the hope that a licensing deal would be the payoff. 

In the meantime, they mortgaged their Lutherville home. When the Geo-Research Institute decided against using the probe, the Henkes were left destitute. They sold the house and moved to an apartment near Mount Washington. 

To make matters worse, their son Kevin was diagnosed with depression and hospitalized three times while at the Gilman School, and had to leave school before the end of seventh grade. 

That was Wanda's breaking point. She asked Henke to leave. A year later, when Kevin started running with a rough crowd of kids from Pikesville Middle School, Wanda decided to move to North Carolina, to be near her parents. The couple remain separated but have not divorced.

"I wish he had chosen us," Michael says now. "I wish he had given up his dreams for us."

Alone and broke, Henke moved back in with his recently widowed mother in Potomac and continued to work on the probe. He ignored Maria Benziger's pleas that he give up the probe project and get a job.

His only relief, he says, were Sunday drives in the Lotus, when he allowed his mind to wander and think about "anything other than the probe."

But when Kevin was arrested in North Carolina on a concealed-weapon charge, Henke felt his family needed him around. In 2004, he moved to Apex and now tries to spend as much time with his son as Kevin will allow. Sometimes that's only for a few hours a week.

"I got love for him," Kevin says. "But I can't be around him all the time."

Failure's lessons
Robert Henke has no retirement savings or much money invested in Social Security. When his mother dies, her Potomac property will go to Henke's stepsister, who lives in South Africa.

He tries not to dwell on such things. "It's a frightening thing," he says. "I can't think about it because it would be paralyzing."

In any event, Henke is not, by nature, self-reflective. "I'm entirely focused on the future," he says. "I try to think about how I'm going to get out of these circumstances. I don't reflect."

But he has taken to sending darkly worded and lengthy missives to various politicians and to Johns Hopkins officials, demanding the university investigate and acknowledge its responsibility for his downfall.

"No one has this much bad luck," Henke says. The university has declined to investigate his claims.

Henke knows that it's a "tough story to swallow" and that its airing might only cement his reputation as unsuitable for mainstream work. But he sees no other option than to lay bare the facts of his life in the hopes that some "angel" will come to his rescue.

In the meantime, he tinkers with the probe. He appears remarkably cheerful for a man who has weathered so much rejection and loss. He has sad eyes but an easy smile.

When pressed to contemplate the prospect that the soil probe will die with him, Henke admits in a rare moment of sustained melancholy that, more than defeat, he fears the lessons of his failure:

"Play the system. Do what you're told. Be average," he says. "Be careful when you strive for high goals." He removes his enormous glasses and stares at his sweat pants. "Diversify in life so if you do lose on one count, you haven't lost it all."

Henke gathers his features into an apologetic smile. "I wish I could come up with something more uplifting."

His youngest son already has.

"He's a proud person, and I think he'll be happy that he held onto his ideals," Kevin says. "I draw from his values, and a lot of them are mine. I don't quit. That's something that's been ingrained in me. My mother lost her whole life to that, but for me, it's all I've ever known."

Kevin says he has noticed recent changes in Henke's behavior. "He's become a lot more understanding."

Henke's capacity for empathy was recently put to the test. In May, Kevin faced a hearing in Wake County Superior Court that could have sent him to prison for several months.

Kevin's case manager asked Judge Ronald L. Stephens to imprison the boy - already on probation for a second arrest - with adult murderers and thieves after an unannounced search of his room unearthed a pellet-gun and a personal journal containing intimate thoughts that authorities found disturbing.

"The stuff I've read in this journal frightened me," Stephens said from the bench.

Kevin, who has the words "Thug Life" tattooed across his chest, in homage to murdered Baltimore rapper Tupac Shakur, said later that his writings were mainly just hip-hop lyrics.

"I'm not going to revoke [the probation]," Stephens ruled, because the pellet-gun is not technically considered a firearm. "I feel like my hands are tied on this one."

A rail-thin teenager with an awkward page-boy haircut, Kevin turned back to his parents, sitting together in the courtroom, and grinned.

"But let me tell you," the judge continued angrily, "there's enough here in my mind to have you committed." Stephens paged through Kevin's journal, excoriating the boy for his "deviant thoughts and crazy thoughts and weird thoughts."

Robert Henke's mouth twisted in outrage as the judge railed against his son for several minutes more. Wanda repeatedly poked him to keep him silent.

Moments later, on the steps outside the courtroom, Henke awkwardly reached out to his son. "Let me give you a hug," he said.

Such gestures have always embarrassed Henke, and he is clearly unpracticed at them. But he's trying. "I love the kid," he says later. It's a declaration he very rarely makes to his own sons, though Kevin often says it to him.

"Every once in a while I'll give in and say it," Henke says with a laugh.

He is reluctant to express love but admits he is willing to hurt those he loves for a long shot at glory. Perhaps that is why Wanda Henke's summary of her husband is ultimately so uncharitable.

"He would starve" for the soil probe, she says. "Whether or not he would let his family starve, I don't know."

It's a question that has been troubling Henke in the months since Wanda posed it.



In June, he interviewed for a position with the federal Nuclear Regulatory Commission in Rockville. The job is to evaluate the earthquake-readiness of U.S. nuclear power plants, and would pay a salary over $90,000, he says.



"We've come to this question about whether I'd let my family starve to achieve my goals," he says with a hint of reluctance. "I guess this is the answer to that. I would be willing to give up the research in order to have a future that I think is respectable and that allows me to contribute to my family."

Three months later, he has not heard back about the job. Such positions become available only rarely, Henke says, but he would consider similar opportunities, provided they meet his requirements.

In the meantime, he works.

gadi.dechter@baltsun.com

Copyright © 2007, The Baltimore Sun