## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered<br>**Objection Date: August 1, 2012 at 4:00 p.m.**<br>**Hearing Date: TBD**<br>**Related to Docket Nos. 10314, 10326, and 10632** |

## TWELFTH QUARTERLY FEE APPLICATION OF SIDLEY AUSTIN LLP FOR COMPENSATION FOR SERVICES RENDERED AND REIMBURSEMENT OF EXPENSES AS COUNSEL TO THE DEBTORS AND DEBTORS IN POSSESSION FOR THE PERIOD FROM SEPTEMBER 1, 2011 THROUGH NOVEMBER 30, 2011

| | |
|---|---|
| Name of Applicant: | **Sidley Austin LLP** |
| Authorized to Provide Professional Services to: | **Debtors** |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc., f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); and WPIX, Inc. (0191). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

| Date of Retention: | **February 20, 2009 (<ins>nunc</ins> <ins>pro</ins> <ins>tunc</ins> to December 8, 2008)** |

| Period for Which Compensation and Reimbursement is Sought: | **September 1, 2011 through November 30, 2011** |

| Amount of compensation sought as actual, reasonable and necessary: | **$4,486,113.50** |

| Amount of Expense Reimbursement sought as actual, reasonable and necessary | **$290,379.17** |

This is a(n):  _____ monthly  __X__ interim  _____ final application

The total time expended during the Twelfth Interim Fee Period for fee application preparation for the monthly and quarterly fee applications, including time expended for review and response to preliminary and final reports and recommendations of the Fee Examiner, is approximately 436.40 hours and the corresponding compensation requested is approximately $170,253.50.

<u>Prior Interim Applications</u>

| Quarter | Date Filed | Period Covered | Requested | | Approved | |
|---|---|---|---|---|---|---|
| | | | Fees | Expenses | Fees | Expenses |
| 1 | 4/15/09 | 12/8/08-2/28/09 | $3,897,043.25 | $165,360.71 | $3,886,289.75 | $158,441.67 |
| 2 | 7/16/09 | 3/1/09-5/31/09 | $4,209,274.75 | $105,524.36 | $4,203,235.50 | $104,118.90 |
| 3 | 10/15/09 | 6/1/09-8/31/09 | $4,513,018.00 | $99,429.34 | $4,510,127.00 | $99,253.67 |
| 4 | 1/15/10 | 9/1/09-11/30/09 | $5,292,782.75 | $221,808.01 | $5,275,754.14 | $220,748.76 |
| 5 | 4/15/10 | 12/1/09-2/28/10 | $5,426,757.50 | $205,852.05 | $5,412,303.00 | $201,565.16 |
| 6 | 12/14/10 | 3/1/10-5/31/10 | $6,581,178.43 | $425,733.29 | $6,582,868.12 | $418,736.42 |
| 7 | 5/4/11 | 6/1/10-8/31/10 | $7,081,656.37 | $310,093.90 | $7,077,989.87 | $304,357.14 |
| 8 | 7/1/11 | 9/1/10-11/30/10 | $7,126,734.00 | $334,255.68 | $7,120,542.46 | $323,696.86 |
| 9 | 9/20/11 | 12/1/10-2/28/11 | $14,478,878.00 | $599,999.17 | $14,448,735.77 | $585,309.27 |
| 10 | 1/27/12 | 3/1/11-5/31/11 | $8,941,857.00 | $1,133,692.42 | $8,796,500.97 | $1,082,606.25 |
| 11 | 6/4/12 | 6/1/11-8/31/11 | $5,073,861.25 | $445,493.14 | | |

46429/0001-8688048V1

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered<br>**Objection Date: August 1, 2012 at 4:00 p.m.**<br>**Hearing Date: TBD**<br>**Related to Docket Nos. 10314, 10326, and 10632** |

### TWELFTH QUARTERLY FEE APPLICATION OF SIDLEY AUSTIN LLP FOR COMPENSATION FOR SERVICES RENDERED AND REIMBURSEMENT OF EXPENSES AS COUNSEL TO THE DEBTORS AND DEBTORS IN POSSESSION FOR THE PERIOD FROM SEPTEMBER 1, 2011 THROUGH NOVEMBER 30, 2011

Sidley Austin LLP ("Sidley"), attorneys for Tribune Company ("Tribune") and its

affiliated companies that filed voluntary petitions for relief in the above-captioned chapter 11

cases (collectively, the "Debtors"), respectfully submits this application (the "Application") to

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc., f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); and WPIX, Inc. (0191). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

this Court, pursuant to (i) sections 327, 331, and 503 of title 11 of the United States Code (the

"Bankruptcy Code"), (ii) Rule 2016 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), (iii) Rule 2016-2 of the Local Rules of Bankruptcy Practice and Procedure

of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), (iv) the

Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of

Professionals and Committee Members Pursuant to 11 U.S.C. §§ 105(a) and 331 (Docket No.

225) (the "Interim Compensation Order"), as amended, and (v) the Order Appointing Fee

Examiner and Establishing Related Procedures for Compensation and Reimbursement of

Expenses for Professionals and Consideration of Fee Applications (Docket No. 546) (the "Fee

Examiner Order") for approval of interim compensation and reimbursement of expenses for the

twelfth quarterly period from September 1, 2011 through November 30, 2011 (the "Twelfth

Interim Fee Period").  In support of the Application, Sidley respectfully states as follows:

## FACTUAL BACKGROUND OF THE CASES

1.      On December 8, 2008 (the "Petition Date"), Tribune and certain of its

subsidiaries each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

An additional Debtor, Tribune CNLBC, LLC (f/k/a Chicago National League Ball Club, LLC)

("Tribune CNLBC"), filed a voluntary petition for relief under chapter 11 of the Bankruptcy

Code on October 12, 2009.[2]  On March 22, 2010, this Court entered an order dismissing the

chapter 11 petition of New River Center Maintenance Association, Inc.  On May 24, 2011, this

---

[2] Orders of the Court applicable to this Application have subsequently been extended to Tribune CNLBC.  (See Order Directing (I) Joint Administration of Chapter 11 Cases and (II) that Certain Orders and Other Pleadings Entered or Filed in the Chapter 11 Cases of Tribune Company, et al. be Made Applicable to the Chapter 11 Case of Chicago National League Ball Club, LLC (entered Oct. 14, 2009) (Docket No. 2333) (the "CNLBC Joint Administration Order").

Court entered an order dismissing the chapter 11 petition of Publishers Forest Products Co. of Washington. In all, the Debtors comprise 110 entities.

2.      The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b). (Docket Nos. 43, 2333.)

3.      The Debtors have continued in possession of their respective properties and have continued to operate and maintain their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.      On December 18, 2008, the Office of the United States Trustee appointed an official committee of unsecured creditors (the "Committee").

5.      On March 19, 2009, pursuant to Fee Examiner Order, the Court appointed Stuart Maue as fee examiner (the "Fee Examiner") to act as special consultant to the Court for professional fee and expense analysis and review, effective nunc pro tunc to February 20, 2009. (Docket No. 546.)

6.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief sought herein are sections 327, 331, and 503 of the Bankruptcy Code, Rule 2016 of the Bankruptcy Rules, and Rule 2016-2 of the Local Rules.

## PROCEDURAL BACKGROUND FOR THE APPLICATION

7.      The Debtors sought approval of this Court to retain Sidley as general reorganization and bankruptcy counsel, pursuant to 11 U.S.C. §§ 327(a) and 1107, by application filed on December 26, 2008. As set forth in the application seeking such approval, Sidley's services to the Debtors encompass a wide range of legal services, focused upon restructuring and

3

insolvency issues but also encompassing certain general corporate, litigation, tax, media law and regulatory, employee-related, and real estate matters.  In particular, Sidley's retention application sets forth the following scope of services:

a) to provide legal advice with respect to the Debtors' powers and duties as debtors in possession in the continued operation of their business;

b) to take all necessary action on behalf of the Debtors to protect and preserve the Debtors' estates, including prosecuting actions on behalf of the Debtors, negotiating any and all litigation in which the Debtors are involved, and objecting to claims filed against the Debtors' estates;

c) to prepare on behalf of the Debtors all necessary motions, answers, orders, reports, and other legal papers in connection with the administration of the Debtors' estates;

d) to attend meetings and negotiate with representatives of creditors and other parties in interest, attend court hearings, and advise the Debtors on the conduct of their chapter 11 cases;

e) to perform any and all other legal services for the Debtors in connection with both their chapter 11 cases and with the formulation and implementation of the Debtors' plan of reorganization;

f) to advise and assist the Debtors regarding all aspects of the plan confirmation process, including, but not limited to, negotiating and drafting a plan of reorganization and accompanying disclosure statement, securing the approval of a disclosure statement, soliciting votes in support of plan confirmation, and securing confirmation of the plan;

g) to provide legal advice and representation with respect to various obligations of the Debtors and their managers and officers;

h) to provide legal advice and perform legal services with respect to matters involving the negotiation of the terms of and the issuance of corporate securities, matters related to corporate governance, and the interpretation, application, or amendment of the Debtors' organizational documents, including their limited liability company agreements, material contracts, and matters involving the fiduciary duties of the Debtors and their officers and managers;

i) to provide legal advice and perform legal services with respect to litigation, tax (state and federal income tax and local property tax assessment matters) and other general non-bankruptcy legal issues for the Debtors to the extent requested by the Debtors; and

j) to render such other services as may be in the best interests of the Debtors in connection with any of the foregoing and all other necessary or appropriate legal services in connection with these chapter 11 cases, as agreed upon by Sidley and the Debtors.

4

Sidley's retention, nunc pro tunc to the Petition Date, was approved by this Court by order dated February 20, 2009. (Docket No. 435.)

8.     The Interim Compensation Order and the Fee Examiner Order (together, the "Fee Orders") provide that all professionals retained in these cases pursuant to sections 327, 328, or 1103 of the Bankruptcy Code (the "Case Professionals") must file with the Court and provide to the Fee Examiner monthly applications for interim allowance of compensation for services rendered and reimbursement of expenses incurred, together with the applicable time entries and itemized expenses (the "Monthly Fee Application"). The notice parties specified in the Fee Orders (the "Notice Parties") have twenty (20) days after service of a Monthly Fee Application to object to such Monthly Fee Application (the "Objection Deadline"). Upon expiration of the Objection Deadline, the applicable Case Professional must certify in writing that no objection or partial objection has been filed with the Court relative to that professional's Monthly Fee Application, whereupon the Debtors are authorized to pay such professional an amount equal to the lesser of (i) 80% of the fees and 100% of the expenses requested in the Monthly Fee Application or (ii) 80% of the fees and 100% of the expenses not subject to an objection.

9.     Pursuant to the procedures set forth in the Fee Orders, Sidley prepared, filed with the Court, and served upon the Notice Parties and the Fee Examiner Monthly Fee Applications for the periods of September 2011, October 2011, and November 2011, which Monthly Fee Applications are incorporated herein by reference.[3] Sidley has accordingly submitted all of its Monthly Fee Applications for the Debtors' chapter 11 cases for the Twelfth Interim Fee Period.

---

[3] The docket numbers of Sidley's Monthly Fee Applications for September 2011, October 2011, and November 2011 are 10314, 10326, and 10632, respectively.

10.     In addition to the Monthly Fee Applications, beginning with the three-month period ending February 28, 2009, and each three-month period thereafter, all Case Professionals must file with the Court and serve on the Notice Parties interim applications for allowance of compensation and reimbursement of expenses of the amounts sought in the Monthly Fee Applications filed during such period (a "Quarterly Fee Application Request"). (See Interim Compensation Order at 3.)  Quarterly Fee Application Requests must include a summary of the Monthly Fee Applications that are the subject of the request and any other information requested by the Court or required by the Local Rules.  (Id.)  This Application represents the twelfth Quarterly Fee Application Request that Sidley has filed with the Court in connection with these chapter 11 cases, and it covers the period from September 1, 2011 through November 30, 2011, both dates inclusive.

**RELIEF REQUESTED**

11.     By this Application, Sidley respectfully requests that the Court approve the interim allowance and award of compensation for professional services rendered and reimbursement of actual and necessary expenses incurred by Sidley as general bankruptcy counsel to the Debtors during the Twelfth Interim Fee Period.

12.     The amount of fees sought for services rendered during the Twelfth Interim Fee Period is $4,486,113.50, representing 7,181.40 hours in professional and paraprofessional time for such services.  Reimbursement of actual, necessary expenses incurred by Sidley during the Twelfth Interim Fee Period in connection with these services is requested in the amount of $290,379.17.  Sidley seeks the interim allowance of such compensation, and this Court's authorization for payment of such amounts by the Debtors to Sidley, less amounts previously paid to Sidley pursuant to the Monthly Fee Applications for the period covered by this Application and the procedures set forth in the Fee Orders.

6

13.    The hourly rates charged by Sidley's professionals and paraprofessionals during the Twelfth Interim Fee Period are no greater than the customary hourly rates for such individuals both inside and outside of bankruptcy cases.  The highest billing rate charged by any Sidley attorney for services rendered during the Twelfth Interim Fee Period under Sidley's billing rates then in effect was $975 per hour.  (See Supplemental Affidavit (Second) of James F. Conlan in Support of Application for an Order Authorizing the Employment and Retention of Sidley Austin LLP as Attorneys for the Debtors and Debtors in Possession ¶ 3, Docket No. 424.) Sidley believes these rates are comparable to those charged by the bankruptcy and other professionals of other firms of comparable size, stature, and experience.

14.    Sidley has received no payment and no promises for payment from any source other than the Debtors for services rendered in these chapter 11 cases.  There is no agreement between Sidley and any other party for the sharing of compensation to be received for the services rendered by Sidley in these chapter 11 cases.  All professional and paraprofessional services for which compensation is sought herein were rendered solely on behalf of the Debtors in these cases.

**SERVICES RENDERED**

15.    Sidley has rendered substantial services to the Debtors in connection with these chapter 11 cases during the period covered by this Application, both in its capacity as general bankruptcy counsel to the Debtors and continuing in its capacity as corporate, litigation, and transactional counsel to the Debtors in their ordinary course of business.  The services performed by Sidley's professionals and paraprofessionals during the period covered by this Application were necessary and have directly contributed to the effective administration of the Debtors' chapter 11 cases.

46429/0001-8688048V1

16.     A breakdown of the total hours expended by each professional on all matters and a breakdown of amounts sought by each matter category covered herein are included as a part of Attachment A to this Application, as required by Local Rule 2016-2.  A detailed description of the services provided to the Debtors is incorporated by reference to the Monthly Fee Applications previously filed by Sidley with the Court.  The following is a summary of the activities performed by Sidley's professionals and paraprofessionals during the Twelfth Interim Fee Period:

**A.     FCC Matters (20100):   Hours: 182.40   Fees: $99,092.50[4]**

17.     During the Twelfth Interim Fee Period, Sidley's professionals continued to represent the Debtors' broadcast stations on several matters as communications regulatory counsel.  A substantial majority of the fees incurred by Sidley's professionals during the Twelfth Interim Fee Period relates to the Newspaper Crossownership matter, which, as described in Sidley's prior Quarterly Fee Application Requests, involves petitions for review before the United States Court of Appeals for the Third Circuit of the Federal Communication Commission's ("FCC") newspaper-broadcast cross-ownership regulations.  The FCC had issued various rules that continue to prohibit owners of newspapers, including the Debtors, from also holding licenses to operate certain television or radio stations within the same markets.  The Debtors and twenty-one (21) other parties challenged these rules on constitutional and Administrative Procedure Act grounds; some arguing that the cross-ownership restrictions should be further strengthened and others, including the Debtors, arguing that the cross-

---

[4] Commencing in December 2009, the Debtors requested that Sidley provide separate invoices for professional fees for certain discrete FCC-related services attributable to KWGN/FCC General, KPLR-TV, Nextel Negotiations, and Newspaper Crossownership matters, on which Sidley represents the Debtors in the ordinary course of business.  In accordance with this request, and after consultation with the Fee Examiner, Sidley has included such invoices within the broader category of FCC Matters for the purposes of calculating the total fees and expenses in Sidley's Monthly Fee Applications and Quarterly Fee Application Requests.

ownership restrictions should be further relaxed.  The outcome of the appeal is of substantial

importance to the Debtors' broadcasting and publishing operations in several key markets in

which the Debtors conduct business.

18.    Of particular significance to this ongoing appeal, in July 2011, the Third

Circuit issued an opinion that overruled certain of the FCC's media ownership rules on

procedural grounds, which had the effect of preserving the FCC's ban on common ownership of

a broadcast station and daily newspaper in the same market.[5]  In response, the Debtors and other

media parties petitioned the Third Circuit for a rehearing en banc.  In September 2011, the Third

Circuit voted 4-3 not to re-hear the case.  Accordingly, Sidley's professionals researched and

prepared a petition for writ of certiorari with the United States Supreme Court on behalf of the

Debtors, seeking that Court's review of the Third Circuit's actions with respect to the FCC's

media ownership rules.  The petition for writ of certiorari was filed with the United States

Supreme Court in December 2011 (and will be further discussed and described in detail in

Sidley's Thirteenth Quarterly Fee Application Request).  The Third Circuit's July 2011 opinion

also remanded the newspaper-broadcast crossownership rule for consideration in the FCC's 2010

Quadrennial Review, requiring continued analysis by Sidley's professionals of the 2010

Quadrennial Review.

19.    Sidley's professionals also assisted the Debtors with respect to matters

related to the upcoming and prior broadcast license renewal application cycles, and provided

advice related to certain commercial contract negotiations affecting broadcast licenses held by

the Debtors.  Sidley's professionals with responsibility for assisting the Debtors with upcoming

---

[5] The appeal is captioned Prometheus Radio Project v. FCC, Case Nos. 08-3078, 08-4454, 08-4455, 08-4456, 08-4457, 08-4458, 08-4459, 08-4461, 08-4462, 08-4463, 08-4464, 08-4465, 08-4467, 08-4468, 08-4470, 08-4471, 08-4472 08-4475, 08-4477, 08-4478 & 08-4652 (3d Cir. July 7, 2011).

9

renewals and commercial agreements invoking FCC rules compiled FCC license renewal

application data, identified and located network affiliation agreements, assisted the Debtors with

public inspection file requirements in preparation for upcoming renewal filings, and reviewed

and edited intellectual property license agreements using FCC market definitions. Sidley's

professionals also (i) completed and filed responsive pleadings to the challenge to the renewal of

the broadcast license for station KRCW in Portland, Oregon, (ii) assisted in reviewing challenges

to the Debtors' compliance with FCC media ownership rules in Hartford, Connecticut, and (iii)

advised the Debtors regarding the impact of their bankruptcy proceedings on certain FCC

applications.

**B.    Fee Applications (30390):    Hours: 436.40    Fees: $170,253.50**

20.    This matter category encompasses all tasks relating to the preparation and

filing of Sidley's Monthly Fee Applications and Quarterly Fee Application Requests with the

Court. In the Twelfth Interim Fee Period, Sidley's professionals and paraprofessionals drafted

and filed Sidley's thirty-first, thirty-second, thirty-third, and thirty-fourth Monthly Fee

Applications, drafted portions of Sidley's thirty-fifth Monthly Fee Application, drafted and filed

Sidley's Ninth Quarterly Fee Application, drafted portions of Sidley's Tenth, Eleventh, and

Twelfth Quarterly Fee Applications, and reviewed and complied with the Court's Fee Orders

respecting all of the foregoing. In addition, Sidley reviewed and drafted responses to the Fee

Examiner's preliminary report with respect to Sidley's Fifth and Sixth Quarterly Fee Application

Requests. In light of the number of monthly and quarterly fee applications prepared, in whole or

in part, during this period, Sidley respectfully submits that the hours expended and fees requested

are reasonable.

C.    **Executory Contracts and Leases (30410):    Hours: 18.30    Fees: $8,664.50**

      21.    As of the Petition Date, the Debtors in these cases were party to

approximately 45,000 executory contracts and unexpired leases.  During the Twelfth Interim Fee

Period, Sidley's professionals, together with the Debtors' financial advisors at Alvarez & Marsal,

advised the Debtors with respect to the assumption, assumption and assignment, or rejection of

certain executory contracts and unexpired leases under section 365 of the Bankruptcy Code and

in accordance with the terms of the plan of reorganization proposed for the Debtors, on terms

favorable to the Debtors.  Specifically, the DCL Plan (defined below) provides for the

assumption of all executory contracts and unexpired leases other than those identified on the

exhibit of rejected contracts and leases, which was filed as part of the Plan Supplement (as

defined in the DCL Plan) during the Ninth Interim Fee Period.[6]

      22.    During the Twelfth Interim Fee Period, Sidley's professionals, along with

the Debtors' financial advisors at Alvarez & Marsal, the Debtors' management and personnel,

and counsel for contract counterparties, continued their efforts to reach consensual

determinations of amounts required to be cured upon the assumption of executory contracts and

unexpired leases pursuant to the terms of the DCL Plan, and in accordance with the procedures

described in the Motion of the Debtors for an Order Establishing Procedures (I) Fixing Cure

Amounts and (II) Providing Notice of Assumption and/or Assignment of Certain Executory

Contracts and Unexpired Leases By A Successor Reorganized Debtor Pursuant to Sections 365,

1123 and 1129 of the Bankruptcy Code (Docket No. 8287) (the "Global Contract Motion"),

which was subsequently approved by order of the Bankruptcy Court (Docket No. 8745) (the

---

[6] A revised Plan Supplement was filed on May 4, 2012 (during the Fourteenth Interim Fee Period) and the exhibit of rejected contracts and leases was included (without modification) in that filing.  (See Docket No. 11545.)

"Global Contract Order").  In connection therewith, Sidley's professionals continued their

ongoing negotiations on behalf of the Debtors with contract and lease counterparties regarding

appropriate cure amounts pursuant to section 365 of the Bankruptcy Code, in accordance with

the procedures established under the Global Contract Order.

**D.      Use/Sale/Lease of Assets (30430):   Hours: 2.80   Fees: $2,009.00**

23.      During the Twelfth Interim Fee Period, Sidley's professionals advised the

Debtors' senior management with respect to certain transactions for the use, sale, and lease of

assets on behalf of the Debtors, both in connection with these chapter 11 cases and with Sidley's

ongoing representation of the Debtors in their ordinary course of business.  Specifically, Sidley's

professionals in the Corporate Reorganization and Bankruptcy practice group provided advice to

the Debtors' business personnel on four (4) discrete transactions, including whether such

transactions implicated sections 363(b) or (c) of the Bankruptcy Code.  Among those

transactions was Tribune Broadcasting Company's ("Tribune Broadcasting") proposed entry into

a regarding license agreement with Local TV, LLC ("Local TV") respecting certain broadcasting

systems and software developed by Tribune Broadcasting.  The license agreement between

Tribune Broadcasting and Local TV was ultimately executed in January 2012.  Additional

information concerning Sidley's activities regarding the Tribune Broadcasting/Local TV license

agreement will be provided in Sidley's subsequent Quarterly Fee Application Requests relating

to the periods in which such license agreement was more fully negotiated and executed.

**E.      Insurance Matters (30450):   Hours: 1.70   Fees: $1,530.00**

24.      During the Twelfth Interim Fee Period, Sidley's professionals continued to

work with the Debtors, their outside insurance counsel, and various insurance providers to

resolve certain insurance coverage issues, and to advise the Debtors with respect to the impact of

these chapter 11 cases on the Debtors' insurance and risk management procedures.  Sidley's

12

professionals also reviewed and addressed various legal issues arising in connection with the Debtors' primary and excess liability policies covering certain prepetition lawsuits pending against the Debtors and certain of their directors and officers, as well as the SLCFC Actions (defined and discussed below). Sidley's professionals specifically reviewed legal issues pertaining to the Debtors' directors' and officers' liability insurance policies and provided advice to the Debtors regarding such policies in connection with lawsuits pending against certain of the Debtors' current and former directors and officers.

F.    **Committee-Related Matters (30460):    Hours: 0.10    Fees: $53.50**

25.    Sidley's professionals continued during the Twelfth Interim Fee Period to work diligently to maintain a cooperative and responsive relationship with the Debtors' major creditor constituencies, including the Committee. During this Twelfth Interim Fee Period, Sidley's professionals conferred with the Committee and their professionals and advisors on a regular basis in connection with the DCL Plan (defined below), of which the Committee was a co-proponent, and also on pending motions and general case administration issues as they arose in the Debtors' chapter 11 cases. Communications with the Committee related to specific substantive matters, including with respect to the Competing Plans (defined below), the 2011 Confirmation Opinion (defined below), ongoing negotiations with the Debtors' creditor constituencies, and/or discovery-related matters, are reflected in the applicable substantive matter categories.

G.    **Litigated Matters (30470):    Hours: 1,715.50    Fees: $1,163,172.50**

26.    The "Litigated Matters" category encompasses all of Sidley's activities relating to actual and potential litigation, contested matters, and adversary proceedings. This category also includes the bulk of the time related to Sidley's litigation-related activities concerning the contested plan confirmation process as it continued to develop during the Twelfth

13

Interim Fee Period, which required substantial attention from Sidley, the Debtors' senior management, the Committee, the Debtors' senior lenders, and other key creditor constituencies during the Twelfth Interim Fee Period.[7]

    (a)       **Activities Relating to the Contested Plan Confirmation Proceedings**

27.      As described in detail in Sidley's prior Quarterly Fee Application Requests, on March 7, 2011, the Court commenced a fourteen (14) day[8] confirmation hearing (the "2011 Confirmation Hearing") with respect to the two competing plans of reorganization proposed for the Debtors that were pursued by their proponents to confirmation at that hearing: (i) the Second Amended Joint Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A. (as modified on April 26, 2011) (Docket No. 8769) (the "Second Amended DCL Plan") and (ii) the Third Amended Joint Plan Of Reorganization For Tribune Company and its Subsidiaries Proposed by Aurelius Capital Management, L.P., Deutsche Bank Trust Company Americas, Law Debenture Trust Company of New York, and Wilmington Trust Company (Docket No. 8755) (the "Noteholder Plan" and together with the DCL Plan, the "Competing Plans").[9]

---

[7] Given the contested nature of the Debtors' plan confirmation process, both the Litigated Matters category and the Plan and Disclosure Statement category include narrative descriptions and corresponding fee detail regarding Sidley's services in connection with the Debtors' plan confirmation process. As a general rule, the services performed by professionals in Sidley's Litigation practice group in connection with the plan confirmation process appear in the Litigated Matters category, and the services performed by professionals in Sidley's Corporate Reorganization and Bankruptcy practice group in connection with the plan confirmation process appear in the Plan and Disclosure Statement category.

[8] The confirmation hearing took place on March 7, 2011 through March 18, 2011 and continued on April 12, 2011 through April 14, 2011, with closing arguments on June 27, 2011.

[9] Two other plans of reorganization were proposed for the Debtors by the following plan proponent groups: (i) King Street Acquisition Company, L.L.C., King Street Capital, L.P. and Marathon Asset Management, L.P. (the "Bridge Lender Plan"); and (ii) the Step One Credit Agreement Lenders (the "SOCAL Plan"). As described in detail in the Ninth Quarterly Fee Application, the Bridge Lender Plan and the SOCAL Plan were each withdrawn by their respective proponents during the Ninth Interim Fee Period.

14

28.     The pre-trial, trial, and post-trial activities performed by Sidley's professionals relating to the 2011 Confirmation Hearing are described in detail in Sidley's Ninth, Tenth, and Eleventh Quarterly Fee Application Requests.  During the Twelfth Interim Fee Period, Sidley's professionals in the Corporate Reorganization and Bankruptcy and Litigation practice groups continued their efforts to advance confirmation of a plan of reorganization for the Debtors, as described in detail below.

(i)      *Post-Trial Admission of Evidence, Resolution of Evidentiary Objections, and Closing of the Trial Record*

29.     During the Twelfth Interim Fee Period, Sidley's professionals continued their efforts to finalize and close the record of proceedings relating to the 2011 Confirmation Hearing.  On August 24, 2011, during the Eleventh Interim Fee Period, Sidley's professionals, on behalf of the Debtors, filed the Motion for Entry of An Order Authorizing (I) the Implementation of Proposed Changes to the Official Confirmation Trial Transcript and (II) the Public Release of Non-Confidential Trial Exhibits and Deposition Designations (Docket No. 9700) (the "Trial Record Motion"), which requested authorization to implement proposed changes to the official confirmation trial transcript[10] and to release publicly the trial exhibits identified by the Plan Proponents as non-confidential.[11]

---

The Debtors, the Committee, Oaktree Capital Management, L.P. ("Oaktree"), Angelo, Gordon & Co., L.P. ("Angelo Gordon"), and JPMorgan Chase Bank, N.A. ("JPMorgan") are collectively referred to herein as the "DCL Proponents"; Aurelius Capital Management, L.P., Deutsche Bank Trust Company Americas, Law Debenture Trust Company of New York, and Wilmington Trust Company are collectively referred to herein as the "Noteholder Proponents".  The DCL Proponents and the Noteholder Proponents are collectively referred to herein, as applicable, as the "Plan Proponents."  Time entries referencing communications and meetings with the DCL Proponents, the Noteholder Proponents, and/or the Plan Proponents in Sidley's Monthly Fee Applications should be read to include both bankruptcy and litigation counsel, as applicable, for each of the respective Plan Proponents so referenced.

[10] After the conclusion of the 2011 Confirmation Hearing, the Bankruptcy Court asked Diaz Data Services ("Diaz"), the Court's official court reporting service, to listen to the electronic recordings from the 2011 Confirmation Hearing and to transcribe the "official" court transcripts.  Diaz then sent those transcripts to the Plan Proponents several weeks after the conclusion of the 2011 Confirmation Hearing.  It became apparent to all of the Plan Proponents that the "official" transcripts that were transcribed by Diaz varied in certain material respects from the real-time

15

30.      Following the filing of the Trial Record Motion, Sidley's professionals in

the Litigation practice group conferred with counsel for the other DCL Proponents, Noteholder

Proponents, and third parties regarding the public release of certain of the trial exhibits and

deposition designations.  Based on those ongoing discussions, Sidley's professionals agreed to

adjourn the hearing on the Trial Record Motion from September 14 to October 4, to facilitate a

consensual resolution of parties' concerns about the public release of the trial exhibits identified

in the Trial Record Motion.  Those efforts were ultimately successful, and as a result no formal

objections to the Trial Record Motion were filed.  The Bankruptcy Court entered an order

granting the relief requested in the Trial Record Motion on October 4, 2011 (Docket No. 9881).

Revised trial transcripts were filed on October 6, 2011 (Docket Nos. 9904-9915) and upon such

filing, the record for the 2011 Confirmation Hearing was finally closed.

>    (ii)      *The 2011 Confirmation Opinion and the Modifications Made to the*
>              *Second Amended DCL Plan in Response Thereto*

31.      On October 31, 2011, the Bankruptcy Court entered the Confirmation

Opinion and Order Denying Confirmation of Competing Plans (Docket No. 10134) (the "2011

---

transcripts prepared during the 2011 Confirmation Hearing.  With the Court's consent, the Plan Proponents engaged in a comprehensive review of the confirmation hearing transcripts to ensure that the "official" transcripts that would be relied upon by the Court were accurate.  Those efforts, facilitated by professionals in Sidley's Corporate Reorganization and Bankruptcy and Litigation practice groups, in collaboration with counsel for the other DCL Proponents and counsel for the Noteholder Proponents, resulted in the identification and submission to Diaz of several hundred pages of corrections and clarifications to the "official" Court transcript of the confirmation hearing in mid-July 2011.

[11] As discussed in Sidley's prior Quarterly Fee Application Requests, an aggregate total of 3,485 exhibits were designated for use at the 2011 Confirmation Hearing, with 1,587 exhibits designated by the DCL Proponents and 2,648 exhibits designated by the Noteholder Proponents.  During the Tenth and Eleventh Interim Fee Periods, Sidley's professionals reviewed and analyzed each of the exhibits designated and/or introduced at the 2011 Confirmation Hearing by the DCL Proponents and the Noteholder Proponents, and engaged in negotiations with the Noteholder Proponents and other parties regarding the admission of certain documents and deposition testimony into evidence to the extent such documents and deposition testimony were not admitted into evidence by the Court during the 2011 Confirmation Hearing.  Following the completion of that process, the DCL Proponents engaged in discussions with the Noteholder Proponents to identify which of the trial exhibits could be publicly released, and which exhibits should remain under seal on confidentiality grounds.  Those discussions resulted in the preparation and filing of the Trial Record Motion.

16

Confirmation Opinion"), in which the Court denied confirmation of both the Second Amended

DCL Plan and the Noteholder Plan.  However, after weighing all of the relevant evidence and the

credibility of the witnesses, the Bankruptcy Court concluded that many of the provisions of the

Second Amended DCL Plan, including the settlements of the LBO-Related Causes of Action

embodied therein, satisfied the requirements for confirmation under the Bankruptcy Code.[12]

Notwithstanding these otherwise favorable rulings, the Bankruptcy Court also concluded that the

Second Amended DCL Plan was inconsistent with, in certain limited respects, the requirements

for confirmation under section 1129 of the Bankruptcy Code.

        32.     Immediately upon the issuance of the 2011 Confirmation Opinion,

Sidley's professionals reviewed and analyzed the issues identified by the Bankruptcy Court in

the opinion as preventing confirmation of the Second Amended DCL Plan, and engaged in

discussions and negotiations with counsel for the other DCL Proponents regarding the extent to

which the Second Amended DCL Plan should be modified and amended to comply with the

2011 Confirmation Opinion.  Sidley's professionals also advised the Debtors' senior

management with respect to the legal and procedural issues raised by the 2011 Confirmation

Opinion, and the various options available to the Debtors to advance confirmation of the DCL

Plan, with potential modifications to address the issues raised in the 2011 Confirmation Opinion.

Specifically, Sidley's professionals identified a number of issues raised by the Court as

preventing confirmation of the Second Amended DCL Plan that were straightforward and easily

---

[12] The Bankruptcy Court also approved the following aspects of the Second Amended DCL Plan:  (i) the inclusion of the Bar Order in the Second Amended DCL Plan (subject to a limited modification) (Op. at 76-77); (ii) the feasibility of the Second Amended DCL Plan (Op. at 125); (iii) the voluntary assignment of State Law Constructive Fraudulent Conveyance Claims to the Creditors' Trust under the Second Amended DCL Plan (Op. at 100); (iv) the Litigation Trust established under the Second Amended DCL Plan as an appropriate structure for pursuit of estate claims (Op. at 101); (v) the Retiree Settlement (as an important piece of the Debtors' reorganization) (Op. at 93); (vi) the classification of the Swap Claim in Class 1F under the Second Amended DCL Plan (Op. at 103-104); and (vii) the treatment of prepetition indemnification and reimbursement claims under the Second Amended DCL Plan (Op. at 95-96).

correctable. Certain of the Court's findings, however—particularly, those findings pertaining to the application of certain contractual subordination provisions—were more difficult to address by way of modifications to the Second Amended DCL Plan because creditors had expressed differing interpretations of the scope of those findings and how they should impact the treatment of claims.

33.     As a result of extensive negotiations and discussions, Sidley's professionals (together with the professionals for the other DCL Proponents prepared and, on November 18, 2011, filed the Third Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A. (Docket No. 10273) (the "Third Amended DCL Plan" and, as later modified and amended thereafter from time to time, the "DCL Plan").[13] As amended, the DCL Plan continued to incorporate the settlement of the LBO-Related Causes of Action that was approved by the Bankruptcy Court in the 2011 Confirmation Opinion, and included certain modifications addressing the impediments to confirmation that were identified by the Court in the 2011 Confirmation Opinion. Sidley's professionals also prepared and filed a Status Report concurrently with the Third Amended DCL Plan, which contained detailed descriptions of the specific modifications made to the Second Amended DCL Plan to address each of the issues identified in the 2011 Confirmation Opinion as a bar to confirmation of the Second Amended

---

[13] The Third Amended DCL Plan was modified on February 20, 2012 (Docket No. 10958) and March 16, 2012 (Docket No. 11168). The Third Amended Plan was further amended on April 12, 2012 when the DCL Proponents filed the Fourth Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P. and JPMorgan Chase Bank, N.A. (Docket No. 11354) (the "Fourth Amended DCL Plan"). The Fourth Amended DCL Plan was modified on April 15, 2012 (Docket No. 11354), April 17, 2012 (Docket No. 11399), and June 19, 2012 (Docket No. 11836).

DCL Plan and the reasons why it was critical that the Third Amended DCL Plan proceed to confirmation as rapidly as possible.

*(iii)*        *The Allocation Dispute Protocol*

34.      The Third Amended DCL Plan, as amended, incorporated a protocol (the "Allocation Dispute Protocol") for resolution of certain disputes (the "Allocation Disputes") arising among the DCL Proponents and certain holders of claims against the Debtors regarding the allocation of distributions among the holders of Senior Noteholder Claims, Other Parent Claims, EGI-TRB LLC Claims, and PHONES Notes Claims and the application of the applicable subordination provisions of the PHONES Notes Indenture (the "PHONES Subordination Provisions") and the subordination agreement governing the EGI-TRB LLC Notes (the "EGI-TRB Subordination Provisions").  Sidley's professionals in the Litigation and Corporate Reorganization and Bankruptcy practice groups identified, reviewed, and analyzed each of the Allocation Disputes for inclusion in the Allocation Dispute Protocol, which were comprised of the following issues:[14]

a)        whether and to what extent distributions to certain Holders of Claims must be adjusted in order for the distributions under the DCL Plan to satisfy the applicable requirements of the Bankruptcy Code because all or any portion of the consideration provided by the Senior Lenders, Bridge Lenders, and Settling Step Two Payees in respect of the Plan Settlements are not subject to (i) the subordination provisions of the PHONES Notes Indenture or (ii) the subordination agreement governing the EGI-TRB LLC Notes;

b)        whether and to what extent the priority of the distributions from the Creditors' Trust and/or the Litigation Trust (if the Bankruptcy Court deems it to be necessary) must be adjusted in order for the distributions under the DCL Plan to satisfy the applicable requirements of the Bankruptcy Code because all or any distributions from the Creditors' Trust and/or Litigation Trust (if applicable) are not subject to the subordination provisions of the PHONES Notes Indenture;

---

[14] Capitalized terms used but not defined in this paragraph have the meanings ascribed to them in the DCL Plan and/or the Allocation Dispute Protocol, as applicable.  (See Third Amended DCL Plan, Docket No. 10273, at § 5.18 and Exhibit 5.18.)

19

c)     whether and to what extent distributions to certain Holders of Claims or the priority of the distributions from the Creditors' Trust and/or the Litigation Trust must be adjusted in order for the distributions under the DCL Plan to satisfy the applicable requirements of the Bankruptcy Code because any category of Other Parent Claims does not constitute "Senior Indebtedness," as defined by the PHONES Notes Indenture;

d)     whether and to what extent the priority of the distributions from the Creditors' Trust and/or the Litigation Trust must be adjusted in order for the distributions under the DCL Plan to satisfy the applicable requirements of the Bankruptcy Code because all or any distributions from the Creditors' Trust and/or the Litigation Trust are not subject to the subordination agreement governing the EGI-TRB LLC Notes;

e)     whether and to what extent distributions to certain Holders of Claims or the priority of the distributions from the Creditors' Trust and/or the Litigation Trust must be adjusted in order for the distributions under the DCL Plan to satisfy the applicable requirements of the Bankruptcy Code because any category of Other Parent Claims does not constitute "Senior Obligations" as defined in the subordination agreement governing the EGI-TRB LLC Notes;

f)     whether and to what extent beneficiaries of the subordination provisions of the PHONES Notes Indenture and the subordination agreement governing the EGI-TRB LLC Notes (as determined by the Court, if applicable) are entitled to receive post-petition interest before distributions to the Holders of the PHONES Notes and the EGI-TRB LLC Notes can be made;

g)     the Allowed Amount of the PHONES Notes Claims; and

h)     whether and to what extent the PHONES Notes are senior in right of payment to the EGI-TRB LLC Notes, or vice versa.

(See Allocation Dispute Protocol at §§ 2.1.1, 2.1.2.)  The Allocation Disputes also include any other issues that (a) are related to those listed above, raised by a party in interest in an objection to confirmation of the Third Amended DCL Plan, and must be resolved in order to determine that the distributions made under the Plan satisfy the applicable requirements of the Bankruptcy Code, or (b) are determined by the Bankruptcy Court to be necessary to the resolution of the issues listed above.  (See id. at § 2.1.3.)

35.     The Allocation Dispute Protocol set forth the major issues remaining as a bar to plan confirmation and the procedures by which those issues might be resolved.

Specifically, pursuant to the Allocation Dispute Protocol, the Allocation Disputes were reserved

for litigation before the Bankruptcy Court, which litigation was envisioned by the Allocation

Dispute Protocol to be capable of occurring before or in connection with the confirmation

hearing on the DCL Plan, between the confirmation hearing and the effective date of the DCL

Plan, or after the effective date of the DCL Plan, in which case reserves would be created to

provide for future distributions as dictated by the outcome of the Allocation Disputes.[15]

Ultimately, the Bankruptcy Court elected to determine the Allocation Disputes in advance of the

confirmation hearing on the DCL Plan, the proceedings and outcome of which will be described

in detail in Sidley's Thirteenth Quarterly Fee Application Request.

    *(iv)*        *Motions for Reconsideration Filed by the Noteholder Proponents*

    36.      Meanwhile, on November 14, 2011, the Noteholder Proponents,

individually and jointly, filed three motions for reconsideration of the 2011 Confirmation

Opinion, as follows: (i) Joint Motion of Law Debenture Trust Company of New York and

Deutsche Bank Trust Company Americas Requesting Reconsideration of the Court's

Confirmation Opinion with Respect to the Subordination of the PHONES (Docket No. 10222)

(the "Law Debenture Reconsideration Motion");[16] (ii) Motion of Aurelius Capital Management,

L.P. for Reconsideration of the Court's October 31, 2011 Decision as it Pertains to the

Application of the PHONES Notes Subordination (Docket No. 10226) (the "Aurelius

Reconsideration Motion"); and (iii) Motion of the Noteholder Plan Proponents for

---

[15] The Allocation Dispute Protocol provided that the holders of Senior Noteholder Claims, Other Parent Claims, PHONES Notes Claims and EGI-TRB LLC Notes Claims would receive only those distributions to which they would be entitled were the remaining unresolved Allocation Disputes resolved in a manner adverse to them, with the balance of the consideration payable to such holders reserved for distribution upon resolution of the remaining Allocation Disputes.

[16] The Law Debenture Reconsideration Motion was joined by joined by Davidson Kempner Capital Management LLC and Brigade Capital Management, LLC.  (See Docket Nos. 10223, 10225.)

Reconsideration and Clarification of the Court's October 31, 2011 Decision (Docket No. 10227) (the "NPP Reconsideration Motion", and together with the Law Debenture Reconsideration Motion and the Aurelius Reconsideration Motion, the "Reconsideration Motions"). In addition, the Noteholder Proponents filed a notice of appeal of the 2011 Confirmation Opinion on November 14, 2011 (Docket No. 10228).

37.    The Reconsideration Motions raised complex legal issues that required the substantial attention of Sidley's professionals during the Twelfth Interim Fee Period. For example, the Law Debenture Reconsideration Motion requested that the Court reconsider its conclusion in the 2011 Confirmation Opinion that the Second Amended DCL Plan improperly applied the PHONES Subordination Provisions to the distribution of proceeds of causes of action that may be asserted under chapter 5 of the Bankruptcy Code by the Litigation Trust (the "Subordination Finding").[17] The NPP Reconsideration Motion sought reconsideration and/or clarification of the 2011 Confirmation Opinion with respect to the following three issues: (i) reconsideration of the Bankruptcy Court's determination that the Senior Lenders and Bridge Lenders are entitled to share in recoveries by the Litigation Trust, (ii) reconsideration of the Bankruptcy Court's approval of the proportionate judgment reduction included in Section 11.3 of the Second Amended Plan, and application of a pro tanto judgment reduction instead of the proportionate judgment reduction, and (iii) clarification that the Bankruptcy Court did not make a determination as to how the PHONES Notes should be valued for purposes of determining

---

[17] As will be described in Sidley's Thirteenth Quarterly Fee Application Request, on December 29, 2011, the Court issued a Memorandum on Reconsideration granting the relief requested in the Law Debenture Reconsideration Motion and the Aurelius Reconsideration Motion and denying (subject to one clarification) the NPP Reconsideration Motion (the "Reconsideration Decision"). In re Tribune Co., 464 B.R. 208 (Bankr. D. Del. 2011). Specifically, the Reconsideration Decision amended the 2011 Confirmation Opinion to vacate and reverse the Subordination Finding, thereby holding that the PHONES Subordination Provisions apply to the proceeds of, from, or relating to any and all causes of action asserted by the Litigation Trust.

Tribune's solvency at the time of the Leveraged ESOP Transactions.  Sidley's professionals

reviewed and analyzed each of the Reconsideration Motions and conferred with counsel for the

other DCL Proponents regarding the preparation and filing of objections thereto, which were

filed on December 6, 2011, during the Thirteenth Interim Fee Period.

**(b)**     <u>**Avoidance Actions and Related Adversary Proceedings and Tolling**</u>
<u>**Agreements**</u>

*(i)*     *Avoidance Actions Commenced or Tolled by the Debtors*

38.     In the Ninth Interim Fee Period, Sidley filed 94 Avoidance Actions on

behalf of the Debtors, by which the Debtors sought to avoid and recover for the benefit of their

estates various transfers of property made to certain of the Debtors' third party vendors and

suppliers prior to the Petition Date.[18]  The Court entered an order providing for a broad stay of

the Avoidance Actions until June 30, 2011, which was also the date that the approximately 127

tolling agreements with third party vendors and suppliers were set to expire.  During the

Eleventh Interim Fee Period, Sidley's professionals prepared and filed the Debtors' Motion to

Extend the Stay of Avoidance Actions Commenced by the Debtors on June 10, 2011 (Docket

No. 9230), which further extended the stay of the Avoidance Actions through and including

December 30, 2011.  Beginning in late October 2011 and continuing through November and

December 2011, Sidley's professionals and the Debtors' financial advisors at Alvarez & Marsal

undertook the substantial efforts necessary to further extend the stay of the Avoidance Actions

and the tolling agreements.  During the Twelfth Interim Fee Period, Sidley's professionals

prepared the Supplemental Motion to Extend the Stay of Avoidance Actions Commenced by the

Debtors, which requested a further extension of the stay through and including June 30, 2012

---

[18] <u>See</u> Sidley's Ninth Quarterly Fee Application Request, at ¶¶ 48-50, for a detailed description of the Avoidance
Actions commenced by the Debtors.

23

(the "Supplemental Stay Extension Motion").  The Supplemental Stay Extension Motion was

ultimately filed on December 16, 2011 (Docket No. 10464) and was granted by the Bankruptcy

Court on January 9, 2012 (Docket No. 10557).[19]  Sidley's professionals, together with co-

counsel and Alvarez & Marsal, also secured amendments to each of the outstanding tolling

agreements to extend them through the same date.

> (ii)    *Avoidance Actions Commenced by the Committee*

39.    Also in the Ninth Interim Fee Period, the Committee commenced

approximately 210 adversary proceedings against individual current and former directors and

officers of the Debtors for the avoidance of allegedly preferential or fraudulent transfers

(collectively, the "Insider Preference Actions") and two adversary proceedings on November 1,

2010, amended on December 7, 2010, asserting LBO-Related Causes of Action in actions

captioned Official Committee Of Unsecured Creditors v. JPMorgan Chase Bank, N.A. (In re

Tribune Co.), Case No. 10-53963 (KJC) (the "Lender Action"), and Official Committee Of

Unsecured Creditors v. FitzSimons (In re Tribune Co.), Case No. 10-54010 (KJC) (the

"FitzSimons Action").  Those actions were also stayed by the Bankruptcy Court.  (See Docket

Nos. 6150, 6657 and 6658.)

40.    During the Twelfth Interim Fee Period, at the request of the Debtors,

Sidley's professionals continued to review and analyze each of the Insider Preference Actions

commenced by the Committee, particularly with respect to any potential claims that could be

asserted by the defendants in those actions against the Debtors, and the effect of those actions on

the Debtors' businesses and employee morale.  Sidley's professionals also engaged in numerous

---

[19] The stay was subsequently extended further, to a date that is ninety (90) days after the effective date of the DCL
Plan, by Order dated May 24, 2012 (Docket No. 11685).

discussions with the Committee, the Debtors' management, and counsel for certain of the

defendants to the Insider Preference Actions regarding their impact on the Debtors and their

personnel.[20]   Those discussions led to the Committee's filing, on September 23, 2011, of the

Motion for Authority to Dismiss Certain Insider Preference Actions (Docket No. 9811), in which

the Committee sought authority to dismiss nineteen (19) of the Insider Preference Actions

commenced against current employees of the Debtors that seek recovery of transfers below

$50,000.  The Debtors conferred with the Committee regarding the filing of that motion , and

supported the dismissal of those Insider Preference Actions.  The Committee's motion was

approved by order dated October 19, 2011 (Docket No. 10025).

### (c)   ERISA Mediation and Settlement

41.    As described in Sidley's Tenth Quarterly Fee Application Request, in May

2011, Sidley participated on behalf of the Debtors in a non-binding mediation concerning the

resolution of certain claims, causes of action, and related matters arising from alleged violations

of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), in connection

with the Tribune Employee Stock Ownership Plan, an employee retirement benefit plan

sponsored by Tribune (the "ERISA Mediation").  (See Order Appointing Mediator for Mediation

of Certain ERISA-Related Claims, Docket No. 8815.)  Participants in the ERISA Mediation

other than the Debtors included the United States Department of the Treasury, Internal Revenue

Service ("IRS"), the Department of Labor ("DOL"), GreatBanc Trust Company ("GreatBanc"),

Samuel Zell, the plaintiffs to that certain class action lawsuit styled Neil, et al. v. Zell, et al., (the

"Neil Plaintiffs"), and certain of the Debtors' primary and excess fiduciary liability insurance

providers.  That mediation and subsequent negotiations culminated in two settlement agreements

---

[20] Those discussions occurred on a number of occasions during the Eleventh and Twelfth Interim Fee Periods.

resolving all of the claims and causes of action asserted by the IRS, the DOL, GreatBanc and the Neil Plaintiffs (collectively, the "ERISA-Related Claims"). Specifically, on August 19, 2011, Tribune reached an agreement with the DOL, GreatBanc, the Neil Plaintiffs, Mr. Zell, and the insurers to settle the Neil litigation (the "ERISA Claims Settlement") and a separate agreement with the IRS to settle excise tax claims asserted by the IRS on account of the ERISA violations alleged in the Neil litigation and by the DOL (the "IRS Settlement").[21] On that same date, Sidley, on behalf of the Debtors, filed a motion with the Bankruptcy Court to approve the ERISA Claims Settlement and filed a letter with the Bankruptcy Court advising Judge Carey that the ERISA Claims Settlement, if approved, would resolve the DOL's pending objection to the Second Amended DCL Plan.

42.    During the Eleventh Interim Fee Period and continuing into the Twelfth Interim Fee Period, Sidley's professionals engaged in substantial negotiations with the other mediation parties to document the foregoing settlement agreements as well as an additional funding agreement between Tribune and the insurers. During the Twelfth Interim Fee Period, Sidley's professionals also prepared and filed a motion for approval of the IRS Settlement on October 7, 2011, together with a supporting declaration and a motion to shorten notice so that the motion for approval of the IRS Settlement could be heard with the related motion to approve the ERISA Claims Settlement (See Docket Nos. 9922, 9923). The motion to shorten notice was granted on October 7, 2011 (Docket No. 9924) and the motions to approve the ERISA Claims Settlement and the IRS Settlement were each set for hearing on October 19, 2011.

---

[21] Much of Sidley's time relating to the negotiation of the IRS Settlement with the IRS, and the preparation of the corresponding motion to approve the IRS Settlement, is recorded under the Tax Matters category.

43.     Leading up to the hearing, Sidley's professionals engaged in extensive discussions with counsel for the Committee and the Debtors' senior lenders regarding the terms of the ERISA Claims Settlement and the IRS Settlement, particularly as they related to the release of claims asserted by the DOL and IRS against the Debtors' estates, the resolution of the DOL's objections to the Second Amended DCL Plan, and the classification and treatment of the IRS's ERISA-Related Claims under the Second Amended DCL Plan.[22]  Neither the ERISA Claims Settlement nor the IRS Settlement were formally contested, and the Bankruptcy Court entered orders approving the ERISA Claims Settlement and the IRS Settlement on October 19, 2011 (Docket Nos. 10019, 10023).  On that same date, Sidley, on behalf of the Debtors, filed an amendment to the Second Amended DCL Plan to implement the ERISA Claims Settlement as it related to the DOL claims (Docket No. 10024).  The DOL formally withdrew its objection to the Second Amended DCL Plan on October 26, 2011 (Docket No. 10069).  The IRS Claims Settlement was fully implemented on November 18, 2011, when Tribune paid $7 million to the IRS in full satisfaction of the IRS claim.

44.     On October 20, 2011, the Neil Plaintiffs filed a motion with the District Court in which the Neil litigation was pending, for preliminary approval of the ERISA Claims Settlement as it relates to the Neil litigation.  Sidley's professionals reviewed the draft motion and corresponding proposed order and conferred with counsel for the Neil Plaintiffs regarding the motion and the proceedings before the District Court.  Sidley's professionals also conferred with counsel for the Neil Plaintiffs and counsel for the other parties to the ERISA Claims

---

[22] The IRS also asserted an objection to the DCL Plan to the extent it provided for the subordination of the IRS's $37.5 million claim for excise taxes pursuant to section 4975(c)(1)(A) of the Internal Revenue Code.  Tribune and the IRS resolved that objection by agreeing to defer the question of subordination until after confirmation, with both parties reserving their rights on the issue.  The IRS's $37.5 million claim was subsequently finally resolved pursuant to the IRS Settlement, as described herein.

27

Settlement regarding the proposed notices to be disseminated to class members pursuant to the requirements of the Class Action Fairness Act ("CAFA").  On October 24, 2011, the District Court presiding over the Neil litigation granted the Neil Plaintiffs' motion for preliminary approval of the ERISA Claims Settlement, and thereafter the parties began to implement the settlement in accordance with its terms, including (i) disseminating the CAFA notices to class members and (ii) making the initial payments required to fund the settlement.  Additional details regarding the implementation of the ERISA Claims Settlement (including activity undertaken to seek and obtain final approval of the ERISA Claim Settlement by the District Court presiding over the Neil litigation) will be provided in Sidley's Thirteenth Quarterly Fee Application Request.

> **(d)      State Law Constructive Fraudulent Conveyance Actions**

45.      On April 25, 2011, the Bankruptcy Court entered an order authorizing the Noteholder Proponents to commence state law constructive fraudulent conveyance actions against Tribune's shareholders who received a cash distribution on account of their shares in Tribune as part of the Leveraged ESOP Transactions (Docket No. 8740).  On June 2, 2011, indenture trustees for the Noteholders and certain retirees commenced over 50 lawsuits in over 20 different federal and state courts, seeking to recover approximately $8 billion allegedly paid to all former shareholders of Tribune whose stock was purchased and/or redeemed in conjunction with the Leveraged ESOP Transactions in 2007, under state law constructive fraudulent transfer causes of action (collectively, the "SLCFC Actions").  These lawsuits named over 2,000 individuals and entities as defendants, included thousands of "doe" defendants, and also asserted defendant class actions against the balance of the approximately 38,000 individuals or entities who held stock that was purchased or redeemed.  The SLCFC Actions were brought

28

for the sole benefit of the Noteholders and/or retirees, and not for the benefit of all of Tribune's creditors.

46.    During the Twelfth Interim Fee Period, Sidley's professionals, on behalf of the Debtors, analyzed a series of amended complaints filed in September and early October 2012 and conducted an analysis of the SLCFC Actions as they applied to entities related to the Debtors and/or current and former employees of the Debtors.  Sidley worked with the Debtors' financial advisors at Alvarez & Marsal to identify current and former Tribune employees listed among the thousands of named defendants in the amended complaints.  Sidley's associates in the Litigation and Corporate Reorganization and Bankruptcy practice groups spent considerable time reviewing and analyzing the massive volume of pleadings in each of the 50 SLCFC Actions, as amended, for the purpose of alerting the Debtors to pleadings which might impact the Bankruptcy Court's stay applicable to the SLCFC Actions, or any pleadings or rulings that might impact Eagle New Media Investments, LLC (a Debtor named in certain of the SLCFC Actions), the current and former employees of the Debtors named in the SLCFC Actions, or any Tribune-related entity or party.  Sidley prepared, filed, and served notices of appearance and corporate disclosure statements (as prescribed by the Federal Rules of Civil Procedure) on behalf of Eagle New Media Investments, LLC in a number of jurisdictions.  See, e.g., Deutsche Bank Trust Company Americas et al. v. Ohlson Enterprises, et al., N.D. Ill. Case No. 11-cv-03754-GMS (D.I. 260); In re Tribune Company Fraudulent Conveyance Litigation, MDL Case No. 2296 (D.I. 208, 213, 251, 521, and 523).  Several of the SLCFC Actions were filed in state court, necessitating coordination with support staff to review dockets across the United States, in addition to raising legal issues regarding removal of those actions to the federal courts.  At Tribune's request, Sidley's professionals prepared daily updates to Tribune's senior

29

management, with cumulative updates provided following important milestones in the SLCFC

Actions. Sidley also prepared a series of questions and answers that were provided by Tribune's

management to Tribune employees with respect to the SLCFC Actions, their status, and potential

issues for those employees who were named or otherwise affected by the actions.

47.     During the Twelfth Interim Fee Period, the plaintiffs to the SLCFC

Actions conducted a large-scale litigation campaign in order to have the SLCFC Actions

consolidated in multi-district litigation ("MDL") proceedings before a single judge. The Judicial

Panel on Multi-District Litigation ("JPML") scheduled a hearing on December 1, 2011 to

determine whether the SLCFC Actions should be consolidated in an MDL proceeding. Sidley's

professionals spent significant time monitoring and analyzing the voluminous pleadings filed by

parties in interest, both in favor of and against consolidation. Sidley's professionals, on behalf of

the Debtors, performed an analysis of, among other issues, the jurisdictional legitimacy of a

consolidated proceeding, the potential applicability of the automatic stay for Eagle New Media,

past rulings by potential judges for the proposed consolidated docket, analysis of the proper

venue should consolidation occur, and the likelihood that certain actions related to the Leveraged

ESOP Transactions (including the Lender Action and the FitzSimons Action) would be

designated and/or approved as "tag-along actions" for consolidation together with the SLCFC

Actions. Sidley's professionals researched the foregoing issues and prepared multiple legal

memoranda regarding the MDL's mechanics, specialized rules, proposed venues, and potential

and likely outcomes. The number of legal issues presented, and the highly-specialized nature of

MDL litigation, necessitated the participation of multiple Sidley professionals with relevant

experience in MDL proceedings to perform the foregoing analyses. Based on the results of those

research activities, Sidley's professionals prepared potential responsive pleadings regarding the

30

proposed consolidation of the SLCFC Actions in MDL proceedings. In addition, Sidley prepared for, and in the Thirteenth Interim Fee Period attended, the December 1, 2011 hearing on potential consolidation. The complicated nature of the MDL proceedings and their interplay with the Debtors' ongoing bankruptcy necessitated both bankruptcy and litigation teams working in concert.

48.    Additionally, in the Twelfth Interim Fee Period, the Debtors received requests from certain current and former directors and officers that were named as defendants in the SLCFC Actions to have the Debtors or their insurers advance defense costs pursuant to the Debtors' primary and excess directors' and officers' liability insurance policies, on similar terms previously authorized by the Court with respect to certain individual defendants named in the Insider Preference Actions and the FitzSimons Action. (See Docket No. 8515 (modifying the automatic stay to the extent necessary to permit Tribune's insurers to advance defense costs for those actions)). Sidley undertook an analysis at the Debtors' request regarding whether and under what terms the Debtors could or should do so, and the potential implications of that decision on claims against the Debtors' estates. This task involved an analysis of applicable bankruptcy issues, the interpretation of the relevant corporate law in Delaware, and analysis of certain tax considerations, necessitating bankruptcy, litigation, corporate, and tax analyses from professionals in Sidley's various practice groups.

(e)    **Other Pending Litigation**

49.    Prior to the Petition Date and since, Sidley has served the Debtors as defense counsel with respect to a number of litigation matters pending in all levels of state and federal courts across the country, including such prepetition litigation matters as Neuman v. Goldstone, a prepetition employment contract lawsuit in Los Angeles; CBS Broadcasting Inc. v. Kincaid, a civil litigation suit pending in California; and certain litigation matters pending in

31

New York, including the cases styled <u>Schultz v. Tribune</u>, <u>Crab House of Douglaston, Inc. v.</u>

<u>Newsday</u> (the "<u>Crab House Matter</u>") and <u>Furnell v. Tribune</u>.  Sidley continued to represent the

Debtors and their non-Debtor affiliates in connection with these litigation matters during the

Twelfth Interim Fee Period, to the extent such matters were not stayed by section 362(a) of the

Bankruptcy Code, and also provided advice to the Debtors in connection with certain proofs of

claim filed by the plaintiffs on account of such litigated matters.

   50. Beginning in late September 2011, counsel to the parties to the Crab

House Matter, including Sidley on behalf of the Debtor and non-Debtor defendants thereto,

engaged in formal mediation under the auspices of mediator Ken Feinberg, which took place

over a period of approximately seven weeks.  In connection therewith, Sidley's professionals

prepared and submitted a 23-page mediation statement on behalf of Tribune ND, Inc. ("<u>Tribune</u>

<u>ND</u>") a non-Debtor defendant.  In November 2011, with no resolution having been reached in

mediation, the plaintiffs in the Crab House Matter filed a motion requesting that the District

Court set a briefing schedule on class certification pursuant to Federal Rule of Civil Procedure

23.  Sidley's litigation professionals, in conjunction with Sidley's bankruptcy professionals,

prepared and filed two responsive pleadings: (1) a response on behalf of Tribune ND regarding a

proposed briefing schedule and (2) a response on behalf of Debtor Hoy Publications, LLC

("<u>Hoy</u>") reiterating that Hoy was in bankruptcy and that it would violate the automatic stay to

file a motion for class certification against Hoy.  The plaintiffs to the Crab House Matter

contested Hoy's motion, and the District Court ultimately issued an order in favor of Hoy on

December 14, 2011.

   51. Sidley's professionals also successfully defended the Debtors against

litigation commenced by claimants, asserting prepetition causes of action, in violation of the

32

automatic stay. For example, Sidley's bankruptcy professionals worked in collaboration with Tribune's outside defense counsel to prepare pleadings and argument in support of Chicago Tribune Company's ("CTC") defense of a prepetition employment litigation suit that was commenced by a former employee, Joann Parker, in the United States District Court for the Northern District of Illinois (the "Parker Matter"). In response to CTC's motion for summary judgment, Ms. Parker filed a series of untimely proofs of claim in the bankruptcy proceedings, and then argued in the District Court that the proceedings there should not be dismissed on the grounds that she failed to properly preserve her causes of action against CTC. During the Twelfth Interim Fee Period, Sidley's professionals in the Corporate Reorganization and Bankruptcy practice group simultaneously drafted pleadings for submission to the District Court regarding the Parker Matter as well as prepared an objection to Ms. Parker's late-filed claims in the Bankruptcy Court, which was filed on October 21, 2011 (Docket No. 10053).[23] Sidley's professionals also advised the Debtors with respect to certain actual or threatened postpetition litigation.

**H.    Travel Time (30480):    Hours: 73.70    Fees: $27,691.50**

52.    During the Twelfth Interim Fee Period, Sidley's professionals spent time traveling to Wilmington, Delaware to attend hearings in the Debtors' cases. In addition, Sidley's professionals traveled to a variety of locations to attend meetings with the Debtors and various creditor constituencies. During the Twelfth Interim Fee Period, the Bankruptcy Court held hearings on October 4, October 19, October 31, and November 22.[24] These hearings required the

---

[23] Time billed by Sidley's professionals to the preparation of the objection to the late claims filed by Joann Parker, and the proceedings in the Bankruptcy Court in connection therewith, appear in the Claims Processing matter category and are discussed infra at ¶ 71.

[24] In addition, telephonic hearings were held on October 3, 2011 and November 29, 2011, which did not require travel.

attendance in person of certain Sidley professionals from Sidley's Chicago, Washington, D.C., and Los Angeles offices who had done significant work on the matters set for hearing. The hours reflect non-working travel time and the fees requested in this matter category have been reduced by 50% in accordance with Local Rule 2016-2(d)(viii).

I.    **Plan and Disclosure Statement (30500):    Hours: 2,855.50    Fees: $1,905,953.50**

53.    A central part of Sidley's representation of the Debtors during these chapter 11 cases has been the negotiation and formulation of a plan of reorganization for the Debtors. Throughout the Twelfth Interim Fee Period, Sidley's professionals in the Corporate Reorganization and Bankruptcy and Litigation practice groups continued their efforts to advance confirmation of the DCL Plan. The time detail of Sidley's professionals recorded in the Plan and Disclosure Statement matter category principally reflects the services rendered by Sidley's bankruptcy and corporate professionals in connection with the advancement of the DCL Plan, and should be read in conjunction with the narrative description accompanying the Litigated Matters category, supra at ¶¶ 27-37.

(a)    **The 2011 Confirmation Opinion and the Modifications Made to the Second Amended DCL Plan in Response Thereto**

54.    Leading up to the issuance of the 2011 Confirmation Opinion, Sidley's professionals continued to analyze the potential impact of the Court's decision on confirmation and its effect on the Debtors' restructuring. These research and analytical activities prepared the Debtors for the issuance of the 2011 Confirmation Opinion and facilitated the preparation of Sidley's responses on behalf of the Debtors to the subsequent appeals and motions for reconsideration (and the various legal issues raised therein), filed by the Noteholder Proponents, as well as preparation of modified versions of the Second Amended DCL Plan filed subsequent to the issuance of the 2011 Confirmation Opinion. Indeed, the Third Amended DCL Plan, which

included certain modifications to address the issues identified by the Court in the 2011

Confirmation Opinion as preventing confirmation, was filed less than three weeks after the 2011

Confirmation Opinion was issued.

55.    As discussed above in ¶ 31, on October 31, 2011, the Bankruptcy Court

issued the 2011 Confirmation Opinion, which denied confirmation of both the Second Amended

DCL Plan and the Noteholder Plan.  The Bankruptcy Court scheduled a status conference on

plan confirmation-related matters for November 22, 2011.  Accordingly, immediately upon the

issuance of the 2011 Confirmation Opinion, Sidley's professionals in the Corporate

Reorganization and Bankruptcy practice group began to prepare proposed term sheets for

amendments that would address and remedy the limited obstacles to confirmation of the Second

Amended DCL Plan identified in the opinion, so that the DCL Proponents could present an

amended DCL Plan to the Bankruptcy Court at the November 22 hearing.  Sidley's

professionals, on behalf of the Debtors, engaged in extensive and intensive discussions and

negotiations with counsel for the other DCL Proponents regarding the extent to which the

Second Amended DCL Plan should be modified and amended to comply with the 2011

Confirmation Opinion, using the term sheets prepared by Sidley as a framework for those

discussions.  Sidley's professionals also advised the Debtors' senior management with respect to

the legal and procedural issues raised by the 2011 Confirmation Opinion, and the various options

available to the Debtors to advance confirmation of a modified version of the Second Amended

DCL Plan.

56.    As a result of those negotiations and discussions, in less than three weeks

after the issuance of the 2011 Confirmation Opinion, Sidley's professionals, together with the

professionals for the other DCL Proponents, prepared and filed the Third Amended DCL Plan on

35

November 18, 2011 (Docket No. 10273).[25]  As amended, the Third Amended DCL Plan

continued to incorporate the settlement of the LBO-Related Causes of Action that was approved

by the Bankruptcy Court in the 2011 Confirmation Opinion, included certain modifications

addressing the impediments to confirmation that were identified by the Court in the 2011

Confirmation Opinion, and contained the Allocation Dispute Protocol as a mechanism for

resolving the Allocation Disputes.

57.    In an effort to facilitate a rapid emergence, the Debtors and the other DCL

Proponents provided a description of the amendments reflected in the Third Amended DCL Plan,

including the Allocation Dispute Protocol, to counsel for the Noteholder Proponents and certain

other holders of Senior Noteholder Claims prior to its filing.  After the filing of the Third

Amended DCL Plan, Sidley's professionals engaged in further discussions and negotiations with

the Debtors' creditor constituencies, including the Noteholder Proponents, regarding the

Debtors' and other DCL Proponents' intention to advance confirmation of the Third Amended

DCL Plan.  Sidley's professionals, on behalf of the Debtors and the other DCL Proponents,

presented the Third Amended DCL Plan and the Allocation Dispute Protocol to the Court at the

hearings held on November 22, 2011 and November 29, 2011.  Sidley's continuing efforts to

advance confirmation of the DCL Plan in subsequent interim fee periods, which culminated in

the June 2012 hearing on confirmation of the Fourth Amended DCL Plan (the "2012

Confirmation Hearing"), will be discussed in detail in subsequent Quarterly Fee Application

Requests.

---

[25] As noted in footnote 13, supra, the DCL Plan was further modified and amended on February 20, 2012 (Docket No. 10958), March 16, 2012 (Docket No. 11168), April 12, 2012 (Docket No. 11354) (i.e., with the filing of the Fourth Amended DCL Plan), April 15, 2012 (Docket No. 11388), April 17, 2012 (Docket No. 11399), and June 19, 2012 (Docket No. 11836).  Those modifications and amendments will be discussed in detail in Sidley's subsequent Quarterly Fee Application Requests.

36

(b)    **Disclosure, Resolicitation, and Notice Respecting the DCL Plan**

58.    Contemporaneously with the preparation and filing of the Third Amended

DCL Plan, Sidley's professionals in the Corporate Reorganization and Bankruptcy practice

group, acting in conjunction with counsel to the other DCL Proponents, researched, negotiated,

drafted, and filed (i) the Supplemental Disclosure Document relating to the DCL Plan (Docket

No. 10275) (the "Supplemental Disclosure Document")[26] and (ii) the Debtors' Motion for an

Order (I) Approving Supplemental Disclosure Document; (II) Establishing Scope, Forms,

Procedures, and Deadlines for Resolicitation and Tabulation of Votes to Accept or Reject DCL

Plan From Certain Classes; (III) Authorizing Tabulation of Prior Votes and Elections on DCL

Plan Made by Holders of Claims in Non-Resolicited Classes; (IV) Scheduling the Confirmation

Hearing and Establishing Notice and Objection Procedures in Respect Thereof; and (V) Granting

Related Relief (Docket No. 10274) (the "Resolicitation Motion") on November 18, 2011.

59.    The Supplemental Disclosure Document supplemented the previously-

approved Disclosure Documents respecting the prior versions of the DCL Plan that were

distributed to all holders of claims entitled to vote on the DCL Plan.[27]  The Supplemental

Disclosure Document was tailored to provide information respecting those modifications

reflected in the Third Amended DCL Plan to the classes of creditors that were entitled to revote

---

[26] The Supplemental Disclosure Document was further modified at Docket Nos. 10959, 11106, 11169, 11355, 11389, and 11400.

[27] See General Disclosure Statement dated December 15, 2010 (Docket No. 7232) , approved by order entered on December 9, 2010 (Docket Nos. 7215, 7126); Specific Disclosure Statement Relating to First Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, The Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A. (Docket No. 7135) approved by order entered on December 9, 2009 (Docket No. 7216); Explanatory Statement Relating to Modified Elections Under Second Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, The Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A. (as modified April 26, 2011) (Docket No. 8754) approved by order entered on May 17, 2011 (Docket No. 8926) (collectively with the Supplemental Disclosure Document, and as defined in Section 1.1.85 of the Third Amended DCL Plan, the "Disclosure Documents").

on and make new elections thereunder (collectively, the "Revoting Classes").[28]  Among other

things, the Supplemental Disclosure Document included a description of (a) modifications

incorporated into the Third Amended DCL Plan to address the impediments to confirmation

identified by the Court in the 2011 Confirmation Opinion, and (b) the Allocation Disputes and

the proposed Allocation Dispute Protocol.

      60.    In connection with preparation of the Supplemental Disclosure Document,

Sidley's professionals, together with the Debtors' financial advisors at Alvarez & Marsal,

completed a comprehensive analysis of the potential impact that the adjudication or resolution of

the Allocation Disputes could have on the treatment of Holders of Allowed Senior Noteholder

Claims, Other Parent Claims, EGI-TRB LLC Notes Claims, and PHONES Notes Claims under

the DCL Plan.  A summary of this analysis was annexed to the Supplemental Disclosure

Document.  Certain key factors and assumptions utilized in connection with determining the

potential impact that the adjudication or resolution of the Allocation Disputes could have on the

allocation of distributions to the holders of Senior Noteholder Claims, Other Parent Claims, EGI-

TRB-LLC Notes Claims, and PHONES Notes Claims was also annexed to the Supplemental

Disclosure Document.

      61.    The Resolicitation Motion, among other things, (i) sought approval of the

Supplemental Disclosure Document, (ii) established procedures for the solicitation and

tabulation of votes to accept or reject the DCL Plan and elections under the DCL Plan from the

Revoting Classes; and (iii) proposed a schedule for the confirmation hearing on the DCL Plan

---

[28] The Revoting Classes consisted of:  (i) Senior Noteholder Claims (Class 1E); (ii) Other Parent Claims (Class 1F); (iii) EGI-TRB LLC Notes Claims (Class 1I); (iv) PHONES Notes Claims (Class 1J); and (v) the Subsidiary Revoting Classes, which are the Classes of General Unsecured Claims against the thirty-seven (37) Non-Guarantor Subsidiary Debtors that had no impaired accepting Classes, due to the fact that no votes to accept or reject the DCL Plan were cast by any members of such Classes (Classes 2E, 4E through 7E, 10E, 12E through 15E, 18E through 20E, 22E through 38E, 40E, 42E, 43E, and 46E through 49E).

and a schedule of other deadlines and important dates prior to that hearing.  In connection with

the filing of the Resolicitation Motion, Sidley's professionals prepared supplemental ballots,

election forms, instructions, notices and other materials to be distributed to creditors for the

purposes of voting on and making elections under the DCL Plan (collectively, the

"Resolicitiation Materials").  The Resolicitation Materials comprised eighteen (18) separate

documents.  Sidley's professionals, together with the Court-appointed claims, noticing, and

balloting agent (the "Voting Agent"), developed and implemented the process for resoliciting

votes on and elections under the DCL Plan from the Revoting Classes.  The preparation of

appropriate Resolicitation Materials respecting the DCL Plan required Sidley's professionals to

have considerable knowledge and understanding of the mechanics of the DCL Plan, and the

impact of the amendments thereto on voting and elections.  Preparation of the Resolicitation

Materials required extensive discussions with the other DCL Proponents, the Voting Agent, the

Debtors' financial advisors at Alvarez & Marsal, agents for the Senior Lenders and Bridge

Lenders, indenture trustees for the PHONES Notes and Senior Notes, and numerous other

parties.

### (c)    Reconsideration Motions and Appeal of the 2011 Confirmation Opinion

62.    As discussed above in ¶¶ 36-37, Sidley's professionals reviewed and

responded to the Reconsideration Motions filed by the Noteholder Proponents and others and

considered the notice of appeal of the 2011 Confirmation Opinion filed by the Noteholder

Proponents on November 14, 2011 (Docket No. 10228).  Sidley's professionals continued to

research the applicable decisional law from Delaware and the Third Circuit on procedural,

jurisdictional, and substantive legal issues raised by the Reconsideration Motions and the notice

of appeal, including finality of orders denying confirmation, the application of applicable or

39

potentially applicable case law on the Debtors' plan confirmation process, the application of the

PHONES Subordination Provisions to the distribution of proceeds of causes of action that may

be asserted under chapter 5 of the Bankruptcy Code by the Litigation Trust, decisional law on the

application of a pro tanto judgment reduction instead of the proportionate judgment reduction in

the Bar Order provision of the DCL Plan, and the value of the PHONES Notes, among other

legal issues.  Sidley's professionals reviewed and analyzed each of the Reconsideration Motions

and conferred with counsel for the other DCL Proponents regarding the preparation and filing of

objections thereto, which were filed on December 6, 2011, during the Thirteenth Interim Fee

Period.

        **(d)**      **Activities Relating to the Debtors' Emergence from Chapter 11**

        63.      In addition to those activities discussed above, Sidley's professionals in

the Corporate and Corporate Reorganization and Bankruptcy practice groups expended

considerable efforts during the Twelfth Interim Fee Period preparing for the Debtors' eventual

emergence from their chapter 11 cases.  Sidley's professionals addressed, among other matters,

(i) the timing and iterative tasks required to complete the Restructuring Transactions and certain

modifications to the Restructuring Transactions (set forth and described in detail in the Plan

Supplement),[29] which involved the participation of Sidley's bankruptcy and corporate

professionals as well as the Debtors' senior management; (ii) the mechanics of distributions and

reserves on account of allowed claims, which involved the participation of Sidley's bankruptcy

professionals, working in conjunction with the Debtors' financial advisors at Alvarez & Marsal

as well as the Debtors' senior management and business unit-level managers; (iii) the FCC

---

[29] The Plan Supplement, as defined in the DCL Plan, is comprised of numerous exhibits to the DCL Plan, including an exhibit setting forth and describing the Restructuring Transactions.  The Plan Supplement was originally filed in January 2011 during the Ninth Interim Fee Period, and was updated and filed in May 2012 during the Fourteenth Interim Fee Period.

approval process, which involved participation of Sidley's bankruptcy, regulatory, and corporate

professionals, working in conjunction with the Debtors' outside FCC counsel and the Debtors'

senior management; and (iv) various corporate governance and disclosure matters necessary to

return the Debtors to ordinary operations upon their emergence from the chapter 11 cases.

**J.**     **Professional Retention (30510):   Hours: 98.40   Fees: $44,032.00**

64.     The Debtors' large and diverse businesses require the employment and

retention of a variety of professionals to support these bankruptcy proceedings and to continue

managing the litigation, real estate, tax, accounting, and other needs of their business operations

in the ordinary course.  During the Twelfth Interim Fee Period, Sidley's professionals assisted

the Debtors with the preparation and filing of the Second Supplemental Application for an Order

Modifying the Scope of the Retention of PricewaterhouseCoopers LLP to Include Certain

Advisory Services in Connection with Records Management, Payroll Processing, and Operations

Management (Docket No. 10158) and the Fourth Supplemental Application for an Order

Modifying the Scope of the Retention of Ernst & Young LLP to Include Valuation of Certain

Cooking Channel Assets (Docket No. 10163), each of which were filed on November 4, 2011

and approved by the Bankruptcy Court without objection on November 18, 2011 (Docket Nos.

10259 and 10260, respectively).  Sidley's professionals also filed an application on November

23, 2011 to convert the retention of SNR Denton as an ordinary course professional ("OCP") to

special counsel pursuant to section 327 of the Bankruptcy Code, which application was approved

by the Bankruptcy Court on December 12, 2011.  (Docket Nos. 10295, 10422.)

65.     In addition, during the Twelfth Interim Fee Period, Sidley's professionals

prepared and filed three (3) supplements to the list of the Debtors' ordinary course professionals

(Docket Nos. 9758, 9772, 9847) and coordinated with the Debtors' legal department and

financial advisors to prepare and file monthly and quarterly reports of proposed payments to

41

OCPs (Docket No. 9856). Sidley's professionals also coordinated with certain OCP firms retained by the Debtors to assist such professionals with preparing and filing fee applications on behalf of their firms. In connection therewith, Sidley's professionals reviewed fee applications for Phelps Dunbar, SNR Denton (three), Morrison & Head, and Jackson Walker LLP.

**K.     Tax Matters (30520):   Hours: 216.20    Fees: $122,076.50**

        66.      During the Twelfth Interim Fee Period, Sidley's tax professionals continued to advise the Debtors with respect to a variety of discrete tax issues both arising from and in connection with these chapter 11 cases and in connection with Sidley's representation of the Debtors in certain tax matters in the ordinary course of the Debtors' business. For example, Sidley's professionals reviewed and analyzed tax-related claims and liabilities, considered the tax implications of proposed transactions, handled appeals of tax assessments, advised the Debtors with respect to potential settlements of tax claims, and communicated with taxing authorities concerning all such matters.

        67.      Much of Sidley's time in the Tax Matters category during the Twelfth Interim Fee Period relates to Sidley's representation of the Debtors in connection with the negotiation, analysis, and documentation of the IRS Settlement, which is described in connection with the related ERISA Claim Settlement, supra, in ¶¶ 41-44. Sidley's professionals in the Corporate Reorganization and Bankruptcy, Litigation, and Tax practice groups conferred with Tribune's senior management and outside tax professionals regarding the terms of the IRS Settlement, and also negotiated those terms with representatives from the IRS. As discussed above, the motion to approve the IRS Settlement was filed on October 7, 2011 (Docket No. 9922) and was granted on October 19, 2011 (Docket No. 10023). Thereafter, Sidley's professionals worked with the Debtors' management to facilitate the payment of $7 million to

42

the IRS in full satisfaction of the IRS's alleged $37.5 million claim relating to potential ERISA liability.

68.    With respect to the settlement of tax claims, Sidley's professionals in the Corporate Reorganization and Bankruptcy and Tax practice groups collaborated with Tribune's in-house tax personnel and Tribune's outside tax professionals to review and analyze a proposed settlement of certain proofs of claim filed by the California Franchise Tax Board ("CFTB"). Sidley's professionals prepared and filed a motion pursuant to Bankruptcy Rule 9019 seeking authorization to enter into a settlement agreement with the CFTB resolving the Debtors' disputed prepetition liability for California state taxes for tax years ending 2002 through 2007, on November 1, 2011 (Docket No. 10137). That motion was approved by the Bankruptcy Court on November 18, 2011 (Docket No. 10258). Sidley's professionals also reviewed and analyzed certain tax-related claims filed against the Debtors by the state of Maryland, in advance of preparing and filing on behalf of the Debtors a motion to resolve certain tax claims asserted by the state of Maryland, which was filed and granted subsequent to the Twelfth Interim Fee Period.

69.    Sidley's professionals in the Tax practice group also analyzed numerous potential tax consequences arising from the modifications to the DCL Plan and the tax consequences of the Debtors' proposed corporate structure as of their emergence from chapter 11, and prepared disclosures relating to those potential tax consequences for the Supplemental Disclosure Document.

**L.    Claims Processing (30530):    Hours: 456.90    Fees: $259,229.00**

70.    During the Twelfth Interim Fee Period, Sidley's professionals continued evaluating, researching, and analyzing the treatment of various types of claims arising in the Debtors' chapter 11 cases, covering the full spectrum of potential liabilities. To date, over 7,000 proofs of claim have been filed in the Debtors' chapter 11 cases. Sidley's professionals assigned

43

to handle claims-related matters continued to participate in regular conference calls with the

Debtors' financial advisors, Alvarez & Marsal, in order to coordinate the processing of the

proofs of claim, evaluating the legal sufficiency of the claims, and preparing objections thereto.

(a)    **Claims Objections and Settlements of Certain Claims**

71.    During the Twelfth Interim Fee Period, Sidley's professionals, working

together with the Debtors' management, business personnel, and Alvarez & Marsal, researched,

prepared, and filed the Debtors' forty-sixth, forty-seventh, forty-eighth, and forty-ninth omnibus

objections to claims (Docket Nos. 9788, 9789, 10053, 10191).  Sidley's professionals reviewed

and responded to formal and informal responses by claimants to the foregoing claims objections

and coordinated with the Debtors' personnel to negotiate the consensual resolution of objections

where feasible.  In cooperation with the Debtors, Sidley conducted necessary informal discovery

and developed legal theories sufficient to respond to claimants and bolster the Debtors' claims

objections.  The Bankruptcy Court entered orders sustaining, in whole or in part, the Debtors'

forty-sixth, forty-seventh, and forty-ninth omnibus objections (subject to the continuance of

objections to certain claims of creditors who filed responses to such objections) (Docket Nos.

10022, 10021, 10420).  The Debtors' forty-eighth omnibus objection to claims related to the

multiple late-filed claims of Joann Parker, which were described in connection with the pending

District Court litigation proceedings commenced by Ms. Parker against CTC, in ¶ 51, supra.  The

forty-eighth omnibus objection to claims was argued to the Bankruptcy Court subsequent to the

Twelfth Interim Fee Period, and remains under advisement with the Court.

72.    Sidley's professionals also continued their efforts to process and resolve

claims objections that had been previously filed by Sidley on behalf of the Debtors.  For

example, on September 13, 2011, Sidley's professionals prepared and filed a certification of

counsel regarding the Debtors' twenty-fourth omnibus objection to claims as it related to the

44

contested claim of pro se claimant Maureen Dombeck (Docket No. 9771).  In connection

therewith, Sidley's professionals prepared a submission to the Court of all materials relating to

Ms. Dombeck's claim, so that the claim could be adjudicated by the Court.  On October 6, 2011,

Sidley's professionals prepared and filed a certification of counsel regarding the resolution of the

Debtors' forty-fifth omnibus objection as it related to the claim of Dun & Bradstreet (Docket No.

9918).

73.     In addition, Sidley's professionals assisted the Debtors with negotiating

and implementing agreements and stipulations settling disputed claims without need for formal

objections, in accordance with the Order approving claims settlement procedures that was

entered by the Court to facilitate consensual resolution of claims (Docket Nos. 2657, 7250).

Those procedures provide the Debtors with authority to settle or compromise disputed claims of

less than $50,000 in their discretion, claims equal to or greater than $50,000 but less than

$1,000,000 upon notice to the United States Trustee and counsel to the Committee and certain

senior lenders, and claims equal to or greater than $1,000,000 with the approval of the Court

pursuant to Bankruptcy Rule 9019.  Sidley's professionals prepared and filed a notice of claims

settled pursuant to the foregoing procedures on October 11, 2011 (Docket No. 9949), which

listed forty-three (43) claims that had been settled during the prior quarter.

**(b)     Indemnification Claims of Current and Former Directors and
         Officers**

74.     During the Twelfth Interim Fee Period, Sidley's professionals continued

their ongoing substantive negotiations with the Committee and counsel for the various former

officers and directors potentially impacted by the Bankruptcy Court's orders[30] granting (i) the

---

[30] See Docket Nos. 8747, 8748, 8749, 8750, 8992, 8994, 8995, 8996, 8997, 8998, 8999, 9000, 9001, 9002.

four (4) motions filed by certain former officers of the Debtors who had been named as

defendants in the FitzSimons Action (Docket Nos. 8594, 8595, 8596, and 8597) (the "D&O

Claims Motions"), and (ii) the ten (10) additional motions filed by certain former officers and

directors of the Debtors seeking to have their deeming their respective indemnification claims

against the Debtors to be timely-filed (Docket Nos. 8841, 8850, 8851, 8852, 8853, 8854, 8855,

8856, 8857, 8858) (the "Additional D&O Claims Motions").[31]  At the hearing held on May 25,

2010, the Bankruptcy Court directed the parties to develop and implement terms for the filing

and processing of indemnification claims asserted by certain former officers of the Debtors who

had been named as defendants in the FitzSimons Action.  Sidley's professionals participated in

the negotiation and preparation of a form of stipulation that would permit additional former

officers and directors of the Debtors named as defendants in the FitzSimons Action or SLCFC

Actions, or who were potential members of the defendant classes therein, to file a late proof of

claim under certain enumerated terms and conditions, consistent with the Court's directions (the

"D&O Stipulation").

75.    On September 1, 2011, Sidley's professionals and counsel for the

Committee jointly prepared and filed, on behalf of the Debtors and the Committee, respectively,

a joint motion pursuant to Bankruptcy Rule 9019 seeking approval of the D&O Stipulation and

approval of a procedure for entry into the D&O Stipulation with certain former directors and

officers (Docket No. 9741) (the "Former D&O Claims Motion").  Also on September 1, 2011,

the Debtors and the Committee filed a joint motion for an order clarifying the bar date and

establishing procedures and deadlines for certain current directors and officers to file

---

[31] Background concerning the D&O Claims Motions and Additional D&O Claims Motions is provided in detail in Sidley's Tenth Quarterly Fee Application Request.

indemnification and/or contribution claims (Docket No. 9742) (the "Current D&O Claims Motion").  No formal objections were filed to either the Former D&O Claims Motion or the Current D&O Claims Motion.  Subsequent to the filing of the Former D&O Claims Motion and the Current D&O Claims Motion, Sidley's professionals, counsel for the Committee, and certain other parties engaged in further negotiation regarding the forms of order approving the motions.  Counsel for the Committee filed revised forms of order for the Court's consideration on September 30, 2011 and October 3, 2011, on behalf of the Committee and the Debtors (Docket Nos. 9849, 9850, 9870, 9871).  The Court approved both the Former D&O Claims Motion and the Current D&O Claims Motion on October 3, 2011 (Docket Nos. 9875, 9876) (the "Former D&O Claims Order" and the "Current D&O Claims Order", respectively).

76.    In connection with the Former D&O Claims Motion, Sidley's professionals also undertook considerable efforts to identify the former officers and directors of the Debtors eligible to enter into the D&O Stipulation and to provide notice to such parties regarding entry of the Former D&O Claims Order and the procedures for entering into the D&O Stipulation.  Sidley's professionals also responded to inquiries from certain of the Debtors' former directors and officers and/or counsel representing certain former directors and officers regarding the terms of the Former D&O Claims Order and the D&O Stipulation.  On November 30, 2011, the Debtors and the Committee filed a certification of counsel with the Court, together with copies of the D&O Stipulations executed pursuant to the Former D&O Claims Order (Docket No. 10325).[32]

---

[32] Approximately 190 of the Debtors' former directors and officers are party to the eighteen (18) D&O Stipulations that were filed with the Court on November 30, 2011.

47

**M.**    **Business Operations (30550):    Hours: 235.90    Fees: $146,174.00**

77.    The Business Operations matter category encompasses the activities of

Sidley's professionals with respect to their representation of the Debtors in corporate and

transactional matters in the ordinary course of the Debtors' business, as well as other general

corporate law and transactional advice, both related to these chapter 11 cases and otherwise

related to the Debtors' businesses.  These services are necessary to facilitate the Debtors' efforts

to stabilize and reposition their businesses through cost saving and revenue enhancing strategies,

as well as to prepare the Debtors for their emergence from chapter 11.

78.    During the Twelfth Interim Fee Period, Sidley's professionals in the

Corporate practice group expended substantial time and effort to prepare, research, and analyze

potential value maximization strategies regarding the Debtors and certain of the Debtors'

properties.  Sidley's professionals in the Corporate practice group also reviewed and assessed the

steps necessary to complete the Restructuring Transactions proposed by the DCL Plan.  In

addition, Sidley's professionals addressed a variety of discrete matters arising postpetition in the

ordinary course of the Debtors' business, including the review of certain potential transactions,

contracts, leases, and general corporate governance matters.  Finally, Sidley's professionals also

provided information to the Debtors' auditors regarding the various legal matters for which

Sidley represents the Debtors in connection with the Debtors' annual financial reporting.

**N.**    **Case Administration (30560):    Hours: 91.40    Fees: $33,424.50**

79.    During the Twelfth Interim Fee Period, Sidley's professionals engaged in

various general case administration tasks, including scheduling and participating in hearings,

reviewing and reporting on docketed filings to the Debtors, the Committee, the United States

Trustee, and other interested parties, and maintaining a schedule of critical dates and deadlines.

On a periodic basis during this Twelfth Interim Fee Period, Sidley's professionals participated in

status calls with the Debtors' senior management and financial advisors to discuss pending

motions and issues and the outcome of each hearing. In addition, Sidley's paraprofessionals are

responsible for monitoring the docket for all filed pleadings and preparing and distributing a

daily status report to the Debtors' senior management and Sidley professionals.

**O.    Creditor Communications (30570):   Hours: 7.80   Fees: $4,328.00**

80.    Throughout the Twelfth Interim Fee Period, Sidley's professionals have

responded to numerous inquiries and communications from individual creditors as well as from

representatives of larger groups of the Debtors' creditor constituencies regarding the status of the

Debtors' chapter 11 cases. As a convenience to individual creditors, particularly individuals who

are generally new to and/or unfamiliar with the bankruptcy process and their role therein, the

Debtors established a dedicated Tribune bankruptcy "hotline." This toll-free number connects

directly to a voice mailbox maintained by Sidley. Each work day, attorneys at Sidley monitored

the hotline for messages and returned all phone calls promptly, generally within 24 hours of the

message being left. Typical callers to the hotline were bond holders, brokerage firms calling on

behalf of clients, former employees of the Debtors, pro se creditors, and attorneys for creditors.

Questions posed to Sidley's professionals by the Debtors' creditors ranged from specific

questions regarding claims treatment under the DCL Plan to general inquiries regarding the

status of the chapter 11 cases.

**P.    Employee Issues (30590):   Hours: 724.30   Fees: $467,479.00**

81.    During the Twelfth Interim Fee Period, Sidley's professionals in the

Corporate Reorganization and Bankruptcy and Employment practice groups continued to advise

the Debtors with respect to various legal issues pertaining to employee-related matters, including

negotiating employment contracts, implementing employee benefit and incentive plans, and

negotiating termination and severance of former employees. Sidley prepared and edited drafts of

49

various of the Debtors' employment-related benefit and severance plans and addressed inquiries

from creditors and made appropriate adjustments to such plans in response.

82.     Additionally, Sidley's professionals continued the process of developing

the 2011 management incentive plan ("2011 MIP"), which entailed researching and drafting

materials relating to the 2011 MIP, as well as advising the Debtors with respect to the 2011 MIP,

in part based on the Court's decisions respecting the implementation of the 2009 and 2010 MIPs.

Sidley's professionals worked in cooperation with the Debtors and Mercer (U.S.), Inc.

("Mercer"), an outside compensation consultant, to formulate and present the 2011 MIP to the

Court.  The Motion of the Debtors for an Order Authorizing the Debtors to Implement a

Management Incentive Plan for 2011 was filed on August 30, 2011 (Docket No. 9726) (the

"2011 MIP Motion"), together with a corresponding motion to file under seal an unredacted copy

of Mercer's report regarding the 2011 MIP (Docket No. 9727).

83.     Subsequent to the filing of the 2011 MIP Motion, Sidley's professionals

engaged in substantive discussions with counsel for the Committee regarding the relief requested

therein.  The Committee did not object to the 2011 MIP Motion; however, the Committee

requested certain modifications be made to the form of proposed order submitted to the Court to

provide that the Committee may file a motion seeking to restrict payments under the 2011 MIP

to any otherwise eligible participant whom the Court later identifies as having acted in a manner

inconsistent with his or her fiduciary duties, or with willful misconduct.  (See Docket No. 9820.)

No other parties filed responsive pleadings or raise informal objections to the 2011 MIP Motion.

A hearing on 2011 MIP Motion was held before the Bankruptcy Court on October 4, 2011.

Sidley's professionals presented the 2011 MIP Motion to the Court and proffered the testimony

of Eddy Hartenstein, Tribune Company's Chief Executive Officer, in support of the 2011 MIP.

Sidley also proffered the declaration of John Dempsey of Mercer in support of the 2011 MIP.  At the conclusion of the hearing, the Court entered an order authorizing the Debtors to implement the 2011 MIP (Docket No. 9880).

84.    At the Debtors' request, Sidley's professionals in the Corporate Reorganization and Bankruptcy and Employment practice groups continued to undertake a comprehensive analysis of the implications of the SLCFC Actions for the Debtors' current employees who were either individually named as defendants in those actions or who were potentially members of the putative defendant classes, by virtue of being former shareholders of Tribune.  The SLCFC Actions potentially implicate several thousand of the Debtors' current and former employees, who held stock directly or indirectly through one or more of the Debtors' benefit plans.  The SLCFC Actions raise complex legal issues at the intersection of state fraudulent conveyance laws and ERISA.

85.    In addition to the foregoing, Sidley's professionals responded to inquiries from the Debtors' management and in-house employment lawyers regarding employment issues, analyzed various issues involving the Debtors' tax-qualified pension plans, drafted and edited severance agreements, reviewed consulting contracts, responded to numerous information requests from and/or regarding current and former employees, analyzed employee-related claims, and handled various other issues in connection with the Debtors' employees.

**Q.    Exit Credit Facility (13700):    Hours: 64.10    Fees: $30,950.00**

86.    During the Twelfth Interim Fee Period, Sidley continued to provide services to the Debtors relating to the evaluation, negotiation, and expected implementation of a post-confirmation financing facility that will provide a source of funding for the reorganized Debtors upon their emergence from their chapter 11 cases.  The DCL Plan authorizes the Debtors to procure exit financing on terms consistent with an exit financing term sheet in the Plan

51

Supplement.  Sidley's professionals extensively reviewed and analyzed potential exit financing

terms and alternatives, which analysis necessitated detailed research regarding the current terms

of such facilities (mostly of a similar scope and size) entered into by similarly-situated

companies.  Based on that review and research, Sidley's professionals continue to advise the

Debtors regarding exit-financing options and to negotiate proposed terms of the exit facility with

potential lenders, review forms of assignment agreements, and advise the Debtors with respect to

related issues.  Preliminary term sheets respecting the exit facility as well as a new senior

secured term loan were filed with the Court as part of the Plan Supplement on May 4, 2012

(Docket No. 11545), and the extensive exit financing research done to date is being used by the

Debtors to advance the progress of the exit financing process and the evolution of its terms.

## EXPENSES INCURRED

87.    Sidley has incurred expenses of $290,379.17 in connection with its

services rendered to the Debtors during the Twelfth Interim Fee Period.  These expenses

represent actual out-of-pocket costs for items incurred exclusively for the direct benefit of the

Debtors, including, but not limited to, duplicating charges, document delivery and messenger

services, telephone and facsimile charges, computer-assisted legal research, travel-related

expenses, overtime services, in-house document production, and professional services from

contract attorneys relating to discovery activities.

88.    Sidley submits that all such expenses are necessary and actual expenses

for the performance of its services in these cases, and further submits that many of such expenses

were necessitated by the time constraints under which Sidley's professionals and staff have

operated in these cases.  Specifically, many of the expenses incurred during the Twelfth Interim

Fee Period are attributable to the 2011 Confirmation Hearing on the Competing Plans, which

was held in Wilmington, Delaware during March and April 2011, with closing arguments held in

June 2011.[33]  Sidley's representation of the Debtors in pursuit of confirmation of the DCL Plan

required the preparation and physical production of documents and exhibits for use at trial, and

ongoing discovery activities leading up to the trial required the services of outside contract

attorneys and technical service providers.  Additional information respecting certain categories

of expenses are described below. A detailed breakdown of Sidley's expenses incurred in

rendering services to the Debtors during the period covered by this application is incorporated

into this Application as part of Attachment B hereto.

> (a)    **Travel Expenses**

> 89.    Sidley submits that all travel expenses incurred during the period covered

by this Application were necessary, reasonable, and reflect the prevailing market rates.  In

particular, Sidley submits that, to the best of its knowledge, all air travel utilized by Debtors'

personnel during the period covered by this Application was at the prevailing coach-class rate for

such travel less any corporate discounts received by Sidley, in accordance with Sidley's policies

for business travel for bankruptcy and non-bankruptcy matters.  Hotel charges reflect rates for

one night of lodging, unless otherwise indicated.

> (b)    **Court-Related Expenses**

> 90.    Sidley incurred $1,219.00 in out-of-pocket expenses relating to Court fees

and Court Reporting fees.  For the convenience of the Plan Proponents and the Court, Sidley

retained TSG Reporting, Inc. to provide real-time transcripts of the 2011 Confirmation Hearing,

including during the closing arguments held during the Eleventh Interim Fee Period.[34]  All

---

[33] Many of the expenses relating to the confirmation hearing were incurred during the Tenth and Eleventh Interim Fee Periods but, because of the normal time associated with third-party invoicing and processing, such expenses were not charged to the Debtors until the Twelfth Interim Fee Period.

[34] Certain of TSG Reporting, Inc.'s invoices charged to the Debtors during the Twelfth Interim Fee Period were for reporting services performed during the 2011 Confirmation Hearing that occurred during the Eleventh Interim Fee

Court-related expenses reflect actual, reasonable, and necessary costs incurred by Sidley on behalf of the Debtors.

### (c)    Document-Related Expenses

91.    Sidley's normal billing practices, as set forth in the pleadings supporting its retention in these chapter 11 cases, include standard secretarial services as part of normal overhead. For certain projects involving large and/or time-sensitive administrative and logistical requirements resulting from client needs, Sidley utilizes the services of third-party providers in the place of clerical personnel on staff during normal business hours and bills those services to the client at Sidley's cost for such services. During the Twelfth Interim Fee Period, Sidley charged a total of $6,847.79 relating to in-house duplication, outside document production, document processing and/or document binding/drilling services that were billed to the Debtors at cost; that is, no markup for such services is applied by Sidley.[35]

### (d)    Computer-Assisted Research

92.    Computer research and information retrieval services are charged on a time, item and/or search-type basis which takes advantage of certain discounts that Sidley is able to negotiate with the relevant service providers because of the Firm's size and volume of usage. The Firm's charges for computerized legal research such as Westlaw or Lexis are based on a rate that recovers no more than the Firm's costs.

### (e)    Overtime

93.    It is Sidley's standard practice and policy to reimburse professionals and staff for overtime meals and overtime transportation home when working late, provided such

---

Period.

[35] By agreement between Sidley and the Office of the United States Trustee, Sidley has not charged the Debtors for any expenses relating to third-party proof-reading services.

46429/0001-8688048V1

professional or staff member has worked a certain number of hours per day on a particular client matter. Additionally, Sidley provides overtime pay to certain eligible staff employees when they are required to work past normal business hours on a particular client matter. Sidley submits that all requested overtime expenses are reasonable given the time demands in these cases during the Eleventh Interim Fee Period.

**(f)** **Professional Services/Specialists and Litigation Support Services**

94.     During the Twelfth Interim Fee Period, Sidley charged a total of (i) $65,893.50 relating to outside professional services and specialists, and (ii) $156,300.94 relating to litigation support services, each of which were billed to the Debtors at cost. In connection with Sidley's ongoing maintenance of the Document Depository, in which the equivalent of approximately 5.82 million pages of documents relating to the Leveraged ESOP Transactions are electronically stored, Sidley utilized the services of an outside vendor, LD Discovery, to host and process electronic data files for production upon request to Depository Designees and creditor constituencies authorized to receive such documents. Sidley also utilized the services of contract attorneys in certain circumstances, and on a limited basis, to supplement the Firm's Litigation professionals in the review and analysis of documents received and produced in discovery. Additionally, Sidley retained courtroom technology consultancy firm TrialGraphix to assist with the hosting, indexing, and projection of trial exhibits, including video deposition designations, on video screens throughout the courtroom during the 2011 Confirmation Hearing, including during the closing arguments held in the Eleventh Interim Fee Period. Those materials continued to be hosted by Trial Graphix in the Twelfth Interim Fee Period.

## REVIEW OF APPLICABLE LOCAL RULE

95.     The undersigned has reviewed the requirements of Local Rule of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of

Delaware 2016-2 and certifies to the best of his information, knowledge and belief that this

Application substantially complies with Rule 2016-2.

## NOTICE

96.     Notice of this Application has been served upon the Notice Parties

specified in the Fee Orders.   In accordance with the terms of the Fee Orders, Sidley respectfully

submits that no other or further notice is required.

## NO PRIOR REQUEST

97.     Other than the applicable Monthly Fee Applications, no previous

application respecting the relief requested herein has been made to this or any other Court.

56

WHEREFORE, after appropriate notice and hearing, Sidley Austin LLP respectfully requests the Court (i) to approve, pursuant to 11 U.S.C. §§ 327, 331, and 503, interim compensation in the amount of $4,486,113.50 and reimbursement of expenses in the amount of $290,379.17, (ii) to authorize the payment of such amounts by the Debtors to Sidley, less any amounts previously paid to Sidley pursuant to the Monthly Fee Applications for the period covered by this twelfth Quarterly Fee Application Request and the procedures set forth in the Interim Compensation Order and the Fee Examiner Order, and (iii) to grant such further relief as is just and proper.

Dated: July 12, 2012

Respectfully submitted,

James F. Conlan
Bryan Krakauer
Kenneth P. Kansa
Jillian K. Ludwig
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

ATTORNEYS FOR DEBTORS AND DEBTORS
IN POSSESSION