## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | CHAPTER 11 |
| | : | (Jointly Administered) |
| **TRIBUNE COMPANY, *et. al*,**[1] | : | |
| | : | Case No. 08-13141 (KJC) |
| Debtors | : | (Re: D.I. 11399, 11836, 11458) |

# MEMORANDUM OVERRULING OBJECTIONS TO CONFIRMATION OF THE FOURTH AMENDED PLAN OF REORGANIZATION FOR TRIBUNE COMPANY AND ITS SUBSIDIARIES AND DENYING CLARIFICATION MOTION[2]

## BY:   KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE

Before the Court for consideration is the Fourth Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo Gordon & Co., L.P., and JPMorgan Chase Bank, as revised (the "Fourth Amended Plan").[3]   The DCL Plan Proponents seek confirmation of the Fourth Amended Plan, but objections to confirmation filed by the

---

[1]The chapter 11 case filed by Tribune Media Services, Inc. (Bky. Case No. 08-13236) is jointly administered with the Tribune Company bankruptcy case and 109 additional affiliated debtors pursuant to the Order dated December 10, 2008 (docket no. 43).  An additional debtor, Tribune CNLBC, LLC (formerly known as Chicago National League Baseball Club, LLC) filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on October 12, 2009 (Bky. Case No. 09-13496), and is also jointly administered with the Tribune Company bankruptcy case pursuant to this Court's Order dated October 14, 2009 (docket no. 2333). The debtors in the jointly administered cases are referred to herein as the "Debtors."

[2]This Memorandum constitutes the findings of fact and conclusions of law, required by Fed.R.Bankr.P. 7052.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a).  This is a core proceeding pursuant to 28 U.S.C. §157(b)(1) and (b)(2)(A), (B), (L), and (O).

[3]The Debtors, the Official Committee of Unsecured Creditors (the "Creditors' Committee"), Oaktree Capital Management, L.P. ("Oaktree"), Angelo Gordon & Co., L.P. ("Angelo Gordon") and JPMorgan Chase Bank ("JPM") may be referred to jointly herein as the "DCL Plan Proponents." At the hearing on June 7, 2012  the Fourth Amended Plan (docket no. 11399) was admitted into evidence as DCL Exhibit 3000.  Since then, the Fourth Amended Plan has been revised. (docket no. 11836).

following parties remained unresolved: (i) Aurelius Capital Management, L.P. ("Aurelius") (docket nos. 11664 and 11753), (ii) Law Debenture Trust Company of New York ("Law Debenture") (docket no. 11668), (iii) Deutsche Bank Trust Company of Americas ("Deutsche Bank") (docket no. 11667), (iv) Wilmington Trust Company ("WTC") (docket no. 11666), (v) Citadel Equity Fund Ltd. and Camden Asset Management LP (together,"Citadel Camden") (docket no. 11659), (vi) EGI-TRB LLC ("EGI") (docket no. 11658), (vii) certain former directors and officers of the Debtors (the "D&Os") (docket no. 11657), and (viii) F. Ashley Allen, Catherine M. Hertz, Michael D. Slason, and Louis J. Stancampiano ("Certain Former Employees") (docket no. 11661).[4]

The DCL Plan Proponents responded to the objections to confirmation of the Fourth Amended Plan by filing the Memorandum of Law in Support of Confirmation and Omnibus Reply to Objections to Confirmation (docket no. 11746).  Other parties weighed in by filing replies to some of the objections, including (i) the Statement of Robert R. McCormick Tribune Foundation (the "McCormick Foundation") and Cantigny Foundation in Response to Objection of Aurelius Capital Management, LP (docket no. 11725), (ii) the D&Os' Reply to the Objection of Aurelius Capital Management, LP (docket no. 11739), (iii) the D&Os' Joinder to the Statement of the Robert R. McCormick Tribune and Cantigny Foundations (docket no. 11740), and (iv) the Bridge Agent's Reply, and Joinder to the DCL Plan Proponents' Reply, to the

---

[4]The Plan Proponents resolved the objections to confirmation filed by the State of Michigan, Department of Treasury (docket no. 11562), the United States (on behalf of the Internal Revenue Service) (docket no. 11653), the Missouri Department of Revenue (docket no. 11656), and certain former employees and/or directors (and beneficiaries of such former employees and /or directors) of the Times Mirror Company (the "TM Retirees") (docket no. 11720).   A letter objection sent by Malcolm Berko (docket no. 11600) was listed as an objection to confirmation. Neither Mr. Berko nor anyone on his behalf appeared at the Confirmation Hearing to press this objection, which raises no issues of merit; accordingly, it is also overruled for his failure to appear and prosecute the objection.

Objection of Aurelius Capital Management, LP (docket no. 11748).

A hearing to consider confirmation of the Fourth Amended Plan was held on June 7 and 8, 2012, and continued via conference call on June 11, 2012 (together, the "Fourth Amended Plan Confirmation Hearing").

On June 18, 2012, the DCL Plan Proponents filed the revised Fourth Amended Plan (docket no. 11836) to incorporate modifications that resolved a number of objections to confirmation.  On the same date, the DCL Plan Proponents also filed revised exhibits and other documents related to the Fourth Amended Plan, including (i) Plan Exhibit 13.1 - the Litigation Trust Agreement, the Litigation Trust Loan Agreement, the proposed Agreement Respecting Transfer of Documents, Information, and Privileges from Debtors and Reorganized Debtors (the "Debtors' LT Agreement"), the proposed Agreement Respecting Transfer of Documents, Information, and Privileges from the Official Committee of Unsecured Creditors (the "Committee's LT Agreement").[5]

On June 20, 2012, Aurelius filed a letter objection with the Court (docket no. 11856) arguing that changes made to the proposed Committee's LT Agreement regarding the Litigation Trustee's discovery rights with respect to the Creditors' Committee did not address its concerns. The Creditors' Committee filed a letter in response (docket no. 11867) and a telephonic hearing was held on June 21, 2012 to discuss the issue.

On July 11, 2012, a further hearing was held to address the Certain Former Employees' objection and Aurelius' objection to the Committee's LT Agreement. After colloquy with

---

[5] These documents were attached as exhibits to the revised Fourth Amended Plan and are also found at docket no. 11836.

3

counsel at the July 11, 2012 hearing, the objection by the Certain Former Employees was withdrawn. At the July 11, 2012 hearing, the Court also suggested language to address Aurelius' objection to provisions in the proposed Committee's LT Agreement concerning certain discovery rights of the Litigation Trustee vis-a-vis the Creditors' Committee (including its retained professionals). The parties discussed the Court's proposed language and agreed to make further revisions to the affected paragraphs. However, Aurelius requested one additional change to which the Creditors' Committee did not agree. The revised language as otherwise agreed to by the parties at the July 11, 2012 hearing (without Aurelius' final change), was submitted under Certification on July 12, 2012 (docket no. 12001). The proposed Committee's LT Agreement, as revised, fairly addresses Aurelius' concerns. Accordingly, Aurelius' last remaining request is denied.

For the reasons set forth herein, the remaining objections by Aurelius, Law Debenture, Deutsche Bank, WTC, EGI, Citadel Camden, the McCormick Foundation, and the D&Os will be overruled. Subject to submission of final revisions to the Fourth Amended Plan consistent with various resolutions that have been made, by agreement and consistent with this Memorandum, the Fourth Amended Plan will be confirmed.

<u>BACKGROUND</u>

The arduous journey for confirmation of a plan is chronicled in three previous decisions: the Confirmation Opinion dated October 31, 2011, *In re Tribune Co.*, 464 B.R. 126 (Bankr.D.Del. 2011) (the "Confirmation Opinion" or *"Tribune I"*), the Memorandum on Reconsideration dated December 29, 2011, *In re Tribune Co.*, 464 B.R. 208 (Bankr.D.Del. 2011) (the "Reconsideration Decision" or *"Tribune II"*), and the Memorandum Regarding Allocation

Disputes dated April 9, 2012, *In re Tribune Co.,* 2012 WL 1190142 (Bankr.D.Del. April 9, 2012) (the "Allocation Decision" or "*Tribune III*").[6]  A detailed description of the Debtors (including an overview of the Debtors' business, their pre-petition debt structure, the 2007 leveraged buy-out (the "LBO")), and the chapter 11 proceedings (including the appointment of and investigation by the Examiner, plan mediation efforts, and the filing of four competing plans of reorganization) can be found in the Confirmation Opinion.  *Tribune I*, 464 B.R. at 136-46.

The Confirmation Opinion addressed two proposed competing plans of reorganization for the Debtors: (i) the Second Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries (the "Debtor/Committee/Lender Plan" or the "DCL Plan") proposed by the Debtors, the Creditors' Committee, Oaktree, Angelo Gordon, and JPM, and (ii) the Joint Plan of Reorganization for Tribune Company and Its Subsidiaries (the "Noteholder Plan") proposed by Aurelius, Deutsche Bank, Law Debenture and WTC.  After a confirmation hearing spanning more than two weeks, followed by post-hearing briefing and closing arguments,  I determined that both plans failed to meet the requirements of Bankruptcy Code §1129, for the reasons detailed in the Confirmation Opinion, and I denied confirmation of both plans.[7]  However, the Confirmation Opinion contained detailed analyses and determined a number of disputed issues related to confirmation, including, among other things, the Debtors' valuation, and the

---

[6]The conclusions in the Allocation Decision were made subject to, conditioned upon and for the purpose of obtaining confirmation of a chapter 11 plan substantially in the form of the Third Amended Plan. *Tribune III*, 2012 WL 1190142 at *1.  The Fourth Amended Plan is substantially in the form of the Third Amended Plan.

[7]The DCL Plan Proponents' Supplemental Disclosure Document Related to the Fourth Amended Plan (docket no. 11400, DCL Exhibit 3001) (the "Supplemental Disclosure Document") describes the manner in which the Fourth Amended Plan resolves the defects in the DCL Plan that were identified in the Confirmation Opinion.  *See* Supplemental Disclosure Document at 9 - 12.

reasonableness of the Settlements proposed in the DCL Plan.[8] The Confirmation Opinion also analyzed the competing plans under §1129(c)[9] and decided that, assuming the proponents of the competing plans could correct the flaws that prevented confirmation under §1129, and then refiled the corrected plans with substantially similar terms and similar voting results, then the DCL Plan would have the edge for confirmation.  *Tribune I*, 464 B.R. at 207-08.

Various parties filed motions for reconsideration of the Confirmation Opinion.[10]  On December 29, 2011, this Court issued the Reconsideration Decision granting the relief requested in the Law Debenture Reconsideration Motion and the Aurelius Reconsideration Motion and striking that part of the Confirmation Opinion defined as the "Subordination Determination," which considered whether the subordination provisions of the PHONES Notes applied to any

---

[8]In the Confirmation Opinion, the Debtors' Total Distributable Value was determined to be the mid-point of a July 2011 expert report, or $7.019 billion.  At the Fourth Amended Plan Confirmation Hearing, the DCL Proponents provided an updated valuation of the Debtors through the Expert Report of John G. Chachas dated April 27, 2012. DCL Ex. 3002.  The Expert Report was admitted into evidence without objection. Tr. 6/7/12 at 20.  The Expert Report determined that the range of the Debtors' Total Distributable Value was between $6.917 billion to $7.826 billion, with an approximate midpoint value of $7.372 billion. DCL Ex. 3002 at 3-4.  The asserted increase in value was attributed, in part, to growth in Distributable Cash between December 27, 2010 and December 25, 2011.  *Id.* No opposing valuation evidence was offered. However, the Court was not asked to determine a revised value for the Debtors; rather, the information was provided in the Supplemental Disclosure Document for informational purposes and as part of the record in support of the DCL Plan Proponents' request for confirmation of the Fourth Amended Plan. Tr. 6/8/12 at 86-88.

[9]Bankruptcy Code §1129(c) provides, in pertinent part: "If the requirements of subsections (a) and (b) of this section are met with respect to more than one plan, the court shall consider the preferences of creditors and equity security holders in determining which plan to confirm."

[10]The three motions for reconsideration were: (1) Joint Motion of Law Debenture Trust Company of New York and Deutsche Bank Trust Company Americas Requesting Reconsideration of the Court's Confirmation Opinion with Respect to the Subordination of the PHONES (the "Law Debenture Reconsideration Motion") (docket no. 10222), (2) Motion of Aurelius Capital Management, LP for Reconsideration of the Court's October 31, 2011 Decision as it Pertains to the Application of the PHONES Notes Subordination (the "Aurelius Reconsideration Motion") (docket no. 10226),  and (3) Motion of the Noteholder Plan Proponents for Reconsideration and Clarification of the Court's October 31, 2011 Decision (the "NPP Reconsideration Motion") (docket no. 10227).

funds recovered from the Litigation Trust's pursuit of causes of action arising under Chapter 5 of the Bankruptcy Code.[11]  *Tribune II,* 464 B.R. at 213-221.  Upon reconsideration and further review of applicable state law and the entirety of the language in the PHONES Indenture, I concluded in the Reconsideration Decision that the subordination provisions in the PHONES Indenture applied to distribution of monies recovered by the Litigation Trust on Chapter 5 causes of action.  *Id.*

On November 18, 2011, the DCL Plan Proponents filed the Third Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries (docket no. 10273)(the "Third Amended Plan").  The Third Amended Plan included an "Allocation Dispute Protocol" which proposed to establish reserves for distributions to holders of allowed claims in certain classes that would be impacted by unresolved disputes regarding inter-creditor priorities, particularly with respect to the PHONES Notes and the EGI-TRB LLC Notes (the "EGI Notes").[12]  Third Amended Plan, §5.18 and Exhibit 5.18.  Upon the request of certain parties, I agreed to resolve the "Allocation Disputes," as defined in the Order dated January 24, 2012 (docket no. 10692) before parties were required to vote on or object to confirmation of the Third Amended Plan.  On April 9, 2012, I issued the Allocation Decision which, among other things, determined the applicability of subordination provisions and the order of priority of distributions under the DCL

---

[11]The "PHONES Notes" are those certain exchangeable Subordinated Debentures due 2029, issued pursuant to that certain Indenture dated April 1, 1999 (the "PHONES Indenture") between Tribune as issuer and Wilmington Trust Company as successor indenture trustee.  *See Tribune III,* 2012 WL 1190142 at *1 n.5.

[12]The EGI-TRB LLC Notes are those certain promissory notes in the aggregate principal amount of $225 million issued by Tribune in favor of EGI-TRB LLC and certain direct and indirect assignees of EGI-TRB LLC. Third Amended Plan, §1.1.95. Copies of the EGI Notes were introduced at the Allocation Dispute Hearing ("ADH") on March 5 and 6, 2012 as ADH Ex. 6 and ADH Ex. 7.

Plan Proponents' amended plan, contingent upon and subject to confirmation of a plan substantially in the form of the Third Amended Plan.

On April 17, 2012, the DCL Plan Proponents filed the Fourth Amended Plan, which incorporated the previously-approved DCL Plan Settlement, as well as Third Amended Plan modifications that addressed the issues raised in the Confirmation Opinion.  Further, in light of the Allocation Decision, the Fourth Amended Plan eliminated the Allocation Dispute Protocol and provided for the allocation of distributions that had been proposed under the DCL Plan and Third Amended Plan (which, the DCL Plan Proponents assert, was upheld by the Allocation Decision).

On April 17, 2012, the DCL Plan Proponents also filed the Supplemental Disclosure Document relating to the Fourth Amended Plan. Following a hearing on the adequacy of the Supplemental Disclosure Document, the Court entered the DCL Plan Solicitation Order which, among other things, (i) approved the Supplemental Disclosure Document pursuant to section 1125 of the Bankruptcy Code, (ii) established procedures for the solicitation and tabulation of votes to accept or reject the Fourth Amended Plan, and (iii) scheduling the Confirmation Hearing and related deadlines.[13]

---

[13] Pursuant to the Order (I) Approving Supplemental Disclosure Document; (II) Establishing Scope, Forms, Procedures, and Deadlines for Resolicitation and Tabulation of Votes to Accept or Reject [the Fourth Amended Plan] From Certain Classes; (III) Authorizing Tabulation of Prior Votes and Elections on [the Fourth Amended Plan] Made by Holders of Claims in Non-Resolicited Classes;      (IV) Scheduling the Confirmation Hearing and Establishing Notice and Objection Procedures in Respect Thereof; and (V) Granting Related Relief dated April 17, 2012 (docket no. 11419) (the "DCL Plan Solicitation Order"), the following Classes comprise the Revoting Classes: (i) Senior Loan Claims (Class 1C), (ii) Bridge Loan Claims (Class 1D); (iii) Senior Noteholder Claims (Class 1E); (iv) Other Parent Claims (Class 1F), (v) EGI-TRB LLC Notes Claims (Class 1I), and (vi) PHONES Notes Claims (Class 1J) against Tribune, (vii) Senior Guaranty Claims (Classes 50C through 111C) against relevant Guarantor Debtors; and (viii) General Unsecured Claims against certain Filed Subsidiary Debtors (Classes 2E, 4E through 7E, 10E, 12E through 15E, 18E through 20E, 22E through 29E, 31E through 38E, 40E, 42E, 43E, and 46E through 49E).

The DCL Plan Proponents solicited votes to accept or reject the Fourth Amended Plan from the Revoting Classes in accordance with the DCL Plan Solicitation Order. As summarized in the Epiq Voting Declaration (DCL Ex. 3005), the Fourth Amended Plan was accepted by most Holders of Claims in the Revoting Classes, as follows:

| Classes | Number of Voting Creditors | % Number Accepting | Amount Voted | % Amount Accepting | Result |
|---|---|---|---|---|---|
| Class 1C: Senior Loan Claims against Tribune Company | 352 | 99.72% | $8,275,396,770.39 | 99.97% | Accept |
| Class 1D: Bridge Loan Claims against Tribune Company | 30 | 100% | $1,600,000,000.00 | 100% | Accept |
| Class 1E: Senior Noteholder Claims against Tribune Company | 196 | 85.20% | $1,143,639,844.07 | 9.95% | Reject |
| Class 1F: Other Parent Claims against Tribune Company | 278 | 98.92% | $   286,027,485.95 | 91.57% | Accept |
| Class 1I: EGI-TRB LLC Notes Claims against Tribune Company | 1 | 0% | $   167,047,531.55 | 0% | Reject |
| Class 1J: PHONES Notes Claims against Tribune Company | 23 | 4.35% | $ 734,994,736.40 | 0.45% | Reject |

| | | | | | |
|---|---|---|---|---|---|
| Classes 2E, 4E - 7E, 10E, 12E-15E, 18E-20E, 22E-29E, 31E- 38E, 40E, 42E, 43E and 46E-49E: General Unsecured Claims against Filed Subsidiary Debtors | 1 | 100% | $1.00 | 100% | Accept[14] |
| Classes 50C - 111C: Senior Guaranty Claims | 358 | 99.72% | $8,426,345,592.39 | 99.97% | Accept |

Prior to the Confirmation Hearing for the Fourth Amended Plan, the DCL Plan Proponents negotiated with objecting parties and resolved a number of the objections. The remaining unresolved objections are discussed in detail below.

OBJECTIONS TO CONFIRMATION OF THE FOURTH AMENDED PLAN

A.    Objections Challenging This Court's Prior Rulings

To preserve their rights on appeal, six parties (specifically, (i) Aurelius, (ii) WTC, (iii) Law Debenture, (iv) Deutsche Bank, (v) EGI, and (vi) the D&Os) filed objections to the Fourth Amended Plan that are reiterations of previously raised objections to the DCL Plan and the Third Amended Plan, including objections to the reasonableness of the DCL Plan Settlement, allocation of distributions under the DCL Plan, unfair discrimination, the establishment of the Litigation Trust, the proposed Bar Order, and other issues that were ruled upon in the Confirmation Opinion, the Reconsideration Decision, and the Allocation Decision. To the extent that the same objections are reasserted in opposition to the Fourth Amended Plan, they will be

_____

[14]Holders of General Unsecured Claims in Classes 2E, 4E-7E, 10E, 12E - 15E, 18E-20E, 22E-29E, 31E-38E, 40E, 42E, 43E and 46E-49E that did not submit a Ballot are deemed to accept the DCL Plan pursuant to Section 4.2 of the Fourth Amended Plan.

overruled for the same reasons as set forth in the Confirmation Opinion, Reconsideration

Decision and/or the Allocation Decision.  The objecting parties have not demonstrated a basis

for reconsideration of those prior rulings.[15]

B.    Objection to the Fourth Amended Plan's Classification of the Swap Claim

Law Debenture argues that the Fourth Amended Plan improperly classifies the Swap

Claim as an "Other Parent Claim" rather than a "Senior Loan Claim."[16]   This objection was

addressed directly and overruled in the Confirmation Opinion when I decided that the DCL Plan

Proponents provided a reasonable justification for classifying the Swap Claim separately from

the Senior Loan Claims.

Law Debenture, in effect, argues that the Court should reconsider its decision regarding

classification of the Swap Claim in light of language in the Allocation Decision, in which I

decided that the Swap Claim falls within the PHONES Indenture's definition of "Senior

---

[15]A motion to alter or amend a judgment under Fed.R.Civ.P. 59(e), applicable hereto by Fed.R.Bankr.P. 9023, must be grounded on (1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct a clear error of law or prevent manifest injustice. *Max's Seafood Café v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999). No basis for reconsideration of the prior *Tribune* decisions has been asserted here.

[16]The Swap Claim was described in the General Disclosure Statement to the DCL Plan (docket no. 7232) as follows:

> Under the terms of the Senior Loan Agreement, Tribune was required to enter into hedge arrangements to offset a percentage of its interest rate exposure under the Senior Loan Agreement and other debt with respect to borrowed money.  On July 2, 2007, Tribune entered into an International Swap and Derivatives Association, Inc. ("ISDA") Master Agreement, a schedule to the 1992 ISDA Master Agreement and on July 3, 2007, entered into three interest rate swap confirmations (collectively, the "Swap Documents") with Barclays. . . .  The Swap Documents were terminated on the Petition Date.  As of that date, Tribune's aggregate liability in connection with the Swap Documents was approximately $150.9 million, which liability is subject to the guarantee of the Senior Loan Agreement indebtedness by the Guarantor Subsidiaries on a *pari passu* basis with Tribune's Senior Loan Agreement indebtedness.

General Disclosure Statement at 22.

Indebtedness" because the Swap Claim is an amount due in connection with the Credit Agreement.[17]  *Tribune III*, 2012 WL 1190142 at *10 n. 19.  Law Debenture argues that if the Swap Claim is an amount due in connection with the 2007 LBO Credit Agreement, it must be substantially similar to and classified with the Senior Loan Claims.

Law Debenture's argument, however, merely plucks phrases out of context to arrive at a faulty comparison between the Swap Claim and the Senior Loan Claims.  Although the Senior Loan Claims and the Swap Claim are *amounts due in connection with the Credit Agreement*, this single factor does not require that the claims be classified together.[18]  Rather, the reasoning underlying the classification analysis in the Confirmation Opinion is not in conflict with the analysis in the Allocation Decision.   While the Swap Claim reflects amounts due *in connection with* the Credit Agreement, there remains a reasonable basis to classify it separately from the Senior Loan Claims: (i) the basic nature of the Swap Claim and the Senior Loan claims are different, (ii) the Swap Claim is governed by a different loan agreement, and (iii) the potential for avoidance of the Swap Claim under Bankruptcy Code §548 is substantially different from the Senior Loan Claims. *See Tribune I,* 464 B.R. at 194-95. The Law Debenture objection will be overruled.

---

[17]The Allocation Decision analysis of the Swap Claim, simply summarized, provides as follows: (i) The PHONES Indenture defined "Senior Indebtedness" as including amounts due in connection with the 2007 Credit Agreement, (ii) the 2007 Credit Agreement, which enabled Tribune to borrow approximately $8 billion dollars of financing as part of the 2007 LBO transaction, includes a section entitled "Interest Rate Protection," that obligated Tribune to enter into separate hedge agreements so that part of the principal amount of the debt would be "effectively subject to a fixed or maximum interest rate," (iii) to comply with the obligations under the Credit Agreement, Tribune entered into the Swap Agreement, and (iv) therefore, Tribune's obligations under the Swap Agreement (*i.e.*, the Swap Claim) is an amount due "in connection with" the Credit Agreement.  *Tribune III,* 2012 WL 1190142 at *10 n. 19.

[18]*See* the discussion in Section C, *infra.*, providing that separate classification of similar claims is permissible so long as there is a reasonable basis for separate classification and separate classification is not designed to "gerrymander" votes or for an arbitrary or fraudulent purpose.

C.    Objection to the Fourth Amended Plan's Classification of the Senior Notes Indenture
Trustee Attorney Fees Claim

Deutsche Bank, in its capacity as successor indenture trustee under the DBTCA

Indentures,[19] and Law Debenture, in its capacity as successor indenture trustee under the 1996

Indenture,[20]  each objected to the Fourth Amended Plan's classification of their claims based

upon their asserted contractual rights to recover fees, costs and other amounts due in connection

with their roles as indenture trustees under the DBTCA Indentures and the 1996 Indenture,

respectively (collectively, the "Indenture Trustee Expense Claims").[21]

The Fourth Amended Plan classifies the Indenture Trustee Expense Claims as Senior

Noteholder Claims in Class 1E.  "Senior Noteholder Claims" are defined as "all Claims arising

under or evidenced by the Senior Notes Indentures and related documents and any Claim of the

Senior Noteholders arising under the Pledge Agreement."[22]  Fourth Amended Plan, §1.1.213.

Deutsche Bank and Law Debenture argue that the Indenture Trustee Expense Claims are

---

[19]Deutsche Bank defines the "DBTCA Indentures" as including: (i) that certain indenture dated as of March 1, 1992, as amended and supplemented by and between Tribune and Continental Bank, N.A., as the predecessor indenture trustee (the "1992 Indenture), (ii) that certain indenture dated as of January 30, 1995, as amended and supplemented, by and between Tribune and First Interstate Bank of California, as the predecessor indenture trustee (the "1995 Indenture"), and (iii) that certain indenture dated as of January 1, 1997, as amended and supplemented, by and between Tribune and Bank of Montreal Trust company (the "1997 Indenture") (collectively, the "1992 Indenture, the 1995 Indenture and the 1997 Indenture are referred to herein as the "DBTCA Indentures.").

[20]Law Debenture defines the "1996 Indenture" as that certain indenture dated March 19, 1996, between Tribune Company and Citibank, N.A. for the 6.61% Debentures due 2027 and the 7 1/4% Debentures due 2096, as amended (the "1996 Indenture").

[21]Deutsche Bank asserts that, as of April 30, 2012, it has incurred reasonable fees and expenses in an amount no less than $5,918,025.35 in its capacity as Indenture Trustee under the DBTCA Indentures, and Law Debenture asserts that, as of April 30, 2012, it has incurred reasonable fees and expenses in an amount no less than $11,949,130.00 in its capacity as Indenture Trustee under the 1996 Indenture.

[22]The Fourth Amended Plan defines the "Senior Notes Indentures" as including the DBTCA Indentures and the 1996 Indenture. Fourth Amended Plan, §1.1.216.

contractual obligations under the Senior Notes Indentures and are separate from the claims for

payment of principal and interest owed to the Senior Noteholders. They argue that Bankruptcy

Code §1122(a) requires claims within a class to be "substantially similar" and, therefore, contend

that the Indenture Trustee Expense Claims should be classified as "Other Parent Claims" in

Class 1F, which includes "General Unsecured Claims against Tribune and the Swap Claim (and

for the avoidance of doubt includes all Claims against Tribune under Non-Qualified Former

Employee Benefit Plans, but does not include Convenience Claims)."  Fourth Amended Plan,

§1.1.157.  The definition of General Unsecured Claims also includes any allowed claim by WTC

for fees and expenses arising under the PHONES Notes Indenture. Fourth Amended Plan,

§1.1.101.

    The DCL Plan Proponents respond that the Indenture Trustee Expense Claims are

properly classified because (i) the claims arise under the Senior Notes Indentures, (ii) the claims

are asserted against the same entity (Tribune Company), (iii) the claims have the same priority

against Tribune, and (iv) the claims are asserted in the same proofs of claim that were filed for

the other Senior Noteholder Claims for principal and interest due on the Senior Notes.

    Section 1122(a) of the Bankruptcy Code provides that "a plan may place a claim or an

interest in a particular class only if such claim or interest is substantially similar to the other

claims or interests of such class." 11 U.S.C. § 1122(a).  Section 1122(a) is mandatory in one

respect: only substantially similar claims may be classified together.  Yet, Section 1122(a) is

permissive is this respect: it does *not* provide that *all* similar claims must be placed in the same

class.  *See In re AOV Indus., Inc.*, 792 F.2d 1140, 1150 (D.C. Cir. 1986).  *See also In re Jersey

City Med. Ctr.,* 817 F.2d 1055, 1061 (3d Cir. 1987) ("[W]e agree with the general view which

permits the grouping of similar claims in different classes."); *In re Coram Healthcare Corp.,* 315 B.R. 321, 348 (Bankr. D. Del. 2004) (the Code "does not expressly prohibit placing 'substantially similar' claims in separate classes.").

Although plan proponents have discretion to classify claims, the Third Circuit has recognized that the Code does not allow a plan proponent complete freedom to place substantially similar claims in separate classes. *John Hancock Mut. Life Inc. Co. v. Route 37 Bus. Park Assocs. (In re Route 37 Bus. Park Assocs.)*, 987 F.2d 154, 158 (3d Cir. 1993). Instead, a classification scheme must be reasonable. *Id.* The *John Hancock* Court wrote:

> [When] the sole purpose and effect of creating multiple classes is to mold the outcome of plan voting, it follows that the classification scheme must provide a reasonable method for counting votes. In a "cram down" case, this means that each class must represent a voting interest that is sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed. Otherwise, the classification scheme would simply constitute a method for circumventing the requirement set out in 11 U.S.C. §1129(a)(10).

*Id.* at 159. *See also Phoenix Mutual Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture),* 995 F.2d 1274, 1279 (5th Cir. 1991) ("thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan."); *In re W.R. Grace & Co.,* 2012 WL 2130981 at *37 (D.Del. June 11, 2012) ("It is a well-recognized principle that the classification of claims or interests must be 'reasonable,' and cannot be grouped together for arbitrary or fraudulent purposes.")

The threshold issue is whether the claims are "substantially similar" and presents two questions: first, are the claims within Class 1E (*i.e.*, the Indenture Trustee Expense Claims and the Senior Notes Claims) substantially similar, and, second, are the Indenture Trustee Expense Claims and the Other Parent Claims in Class 1F substantially similar?

Courts in this Circuit have interpreted "substantially similar" as a reflection of the "legal attributes of the claims, not who holds them." *Coram*, 315 B.R. at 350 (internal citations omitted).  This analysis focuses on how the "legal character of [a] claim relates to the assets of the debtor" and whether the claims "exhibit a similar effect on the debtor's bankruptcy estate." *W.R. Grace & Co.*, 2012 WL 2130981 at *37 (internal citations omitted); *see also In re Frascella Enters., Inc.*, 360 B.R. 435, 442 (Bankr.E.D.Pa. 2007) ("The similarity of claims is not judged by comparing creditor claims *inter se*. Rather, the question is whether the claims in a class have the same or similar legal status in relation to the assets of the debtor.")  For example, in *AOV*, the Court determined that a plan may classify all unsecured creditors in a single class, rejecting the argument that an unsecured claim with a third-party guaranty should be classified separately, writing:

> The existence of a third-party guarantor does not change the nature of a claim vis-a-vis the bankruptcy estate and, therefore, is irrelevant to a determination of whether claims are "substantially similar" for classification purposes.

*AOV*, 792 F.2d at 1151. *See also Coram*, 315 B.R. at 350 (holding that the plan inappropriately classified an insider's unsecured claim separately from general unsecured claims).

Deutsche Bank and Law Debenture argue that the claims in Class 1E are of different character and effect because the Indenture Trustee Expense Claims are contractual obligations to reimburse fees and expenses, while the Senior Notes Claims seek to recover principal and interest under the Notes.  However, both types of claims are contractual claims arising from the Senior Notes Indentures.[23]  More importantly, as the DCL Plan Proponents point out, the Indenture Trustee Expense Claims and the Senior Notes Claims have the same priority as

---

[23]Courts have recognized that "the relationship between a corporation and its debentureholders is contractual in nature." *Lorenz v. CSX Corp.,* 1 F.3d 1406, 1417 (3d Cir. 1993) (citing cases).

16

unsecured claims and are asserted against Tribune.[24]   Therefore, the Indenture Trustee Expense Claims and the Senior Notes Claims are substantially similar as to their rights against the Debtors' assets and may be placed within the same class.[25]

Employing the reasoning above, I also conclude that the Indenture Trustee Expense Claims are substantially similar to the Other Parent Claims in Class 1F because all are unsecured claims asserted against Tribune. Is the Fourth Amended Plan's classification of the Indenture Trustee Expense Claims with the Senior Notes Claims, and separate from the Other Parent Claims, reasonable?

The parties have not alleged - - and there is no evidence to indicate - - that the Fourth Amended Plan's classification scheme was intended to gerrymander votes.  Nor is there any indication that the Indenture Trustee Expense Claims were included in Class 1E with the Senior Notes Claims arbitrarily or for a fraudulent purpose.

---

[24]The DCL Plan Proponents also argue that the Indenture Trustee Expense Claims and the Senior Notes Claims are alike because they were asserted in the same proofs of claim.  While perhaps of some relevance, I do not find this to be a determinative factor.

[25]*See In re Worldwide Direct, Inc.*, 334 B.R. 112, 126 (Bankr. D. Del. 2005) (noting that the Plan allowed the indenture trustee expense claim as a component of the allowed noteholder claims); *but see In re Gillette Assoc., Ltd.*, 101 B.R. 866 (Bankr.N.D. Ohio 1989) (deciding that a plan improperly lumped together bondholders' claims with the indenture trustee's expense claim).  The *Gillette* Court concluded that the indenture trustee's claim and the bondholders' claims were not substantially similar because the trustee's expense claim was "open ended" (that is, it continued to accrue in the bankruptcy proceedings), and was subject to the Court's final review.  The *Gillette* Court wrote: "Perhaps the difference in the interests of the indenture trustee and of the bond holders in the assets of the Debtors is most evident when one considers the standard of review which the indenture trustee's entitlement to the Debtors' assets will be judged.  The Court will consider the claim of the indenture trustee to attorney fees in light of the extent to which services rendered were contemplated by the contract and the extent to which they benefitted the Debtor's estate." *Id.* at 873.  The *Gillette* Court's distinction based upon the  "open ended" nature of the indenture trustee claim found its basis in an earlier decision involving workers' compensation benefits claims, which were open-ended in character under state law.  *See In re U.S. Truck Co.*, 42 B.R. 790, 796 (Bankr.E.D. Mich. 1984). I am not convinced that the open-ended distinction is the appropriate characteristic upon which the analysis should turn and, therefore, will not use it here.

In *Coram*, the Court noted that separate classification was reasonable when it determined that a group of unsecured noteholders represented a voting interest that was sufficiently distinct from the trade creditors to merit a separate voice in the reorganization. *Coram*, 315 B.R. at 350-51. *See also In re Armstrong World Indus., Inc.*, 348 B.R. 136, 159 (D. Del. 2006) (holding that it was reasonable to separately classify personal injury claims and general unsecured claims despite their equal priority status). The Senior Noteholders merit a separate voice in this bankruptcy case and, therefore, the Fourth Amended Plan reasonably classifies the Senior Noteholder Claims separately from the Other Parent Claims.

Moreover, throughout this bankruptcy case, the Indenture Trustees have represented the interests of their respective noteholders. *See Worldwide Direct*, 334 B.R. at 129 (noting that an indenture trustee has a fiduciary duty to the noteholders and is required to act with the same care as if it owned the investment). Accordingly, the interests of the Indenture Trustees align with Senior Noteholders and the Plan reasonably includes the Indenture Trustees Expense Claims within Class 1E. [26] The classification objections by Deutsche Bank and Law Debenture will be overruled.[27]

---

[26] I reject the argument implied by Deutsche Bank and Law Debenture that "misclassification" of the Indenture Trustee Expense Claims improperly limits the distributions to the Senior Noteholders. As recognized by the *Worldwide Direct* Court, it is not unfair for Senior Noteholders to bear the cost of the Indenture Trustee Expense Claims when those expense claims provided a benefit to the Senior Noteholders only. *Worldwide Direct*, 334 B.R. at 128.

[27] I recognize that, on the surface, the decision that the Senior Loan Claims and the Swap Claim, both of which are liabilities originating from the Credit Agreement, but which may be classified separately, while the Senior Notes Claims and the Indenture Trustee Expense Claims, both of which originate from the Senior Notes Indentures, but which may be classified together, may appear to be at odds with one another.

The Bankruptcy Code allows a plan proponent discretion to classify claims within a plan. *See John Hancock*, 987 F.2d at 158, discussed *supra*. There is a difference between what a plan proponent *must* do (*see, e.g.*, 1122(a), §1123(a), §1129) and what a plan proponent *may* do (*see, e.g.,* §1122(b), §1123(b)). The Fourth Amended Plan's classification scheme illustrates this critical distinction. The

D.      Objection to Fourth Amended Plan's Classification of the Tendering Noteholder Claims

        The amount of the PHONES Noteholders' claims has been disputed throughout this case.

The Debtors listed the PHONES Notes on their Amended Schedules of Assets and Liabilities in

the amount of $758,871,303; WTC filed a proof of claim on behalf of the PHONES Noteholders

in the amount of $1.197 billion. *Tribune I*, 464 B.R. at 195.  The disparity in the claim amount

stems from the right given to each PHONES Noteholder to exchange a PHONES Note at any

time for an amount of cash based on the value of certain reference stock (the "Exchange Right").

*Tribune III*, 2012 WL 1190142 at *6.  Immediately prior to the bankruptcy filing, some

PHONES Noteholders (the "Tendering Noteholders") attempted to exercise their Exchange

Rights by tendering their PHONES Notes and an Exchange Notice to then-Indenture Trustee

Deutsche Bank.  Although Deutsche Bank delivered the Exchange Notices to Tribune, Tribune's

bankruptcy filing intervened before payment of the Exchange Amount to the some of the

Tendering Noteholders.

        The Confirmation Opinion deferred a decision on the PHONES Notes' claim amount

since it was not essential to a determination of the issues before the Court at that time, and the

record was not developed sufficiently about the exchange procedures, dates of the Exchange

Notices or cancellation of the tendered PHONES Notes. *Tribune I*, 464 B.R. at 196.

        The issue was renewed as part of the Allocation Disputes. Additional evidence was

provided, including a Stipulation by and among the Debtors, Aurelius, WTC, Barclays Bank

PLC, and Waterstone Capital Management, L.P. offering agreed facts relevant to the Allocation

Court's determinations, therefore, are in harmony.

Disputes and determination of the allowed amount of the PHONES claim (the "Stipulation").[28] After reviewing the Exchange Procedures and other agreed facts described in the Stipulation, I determined that the claim amount depended on the nature of Tribune's obligation to the Tendering Noteholders at the time the bankruptcy petition was filed on December 8, 2008, and concluded:

> As of the petition date, . . ., Tribune's obligation to make the Exchange Payments was set due to (i) the Tendering Noteholders' delivery of the Exchange Notices and the Notes, and (ii) Tribune's acknowledgment of receipt of all of the Exchange Notices (including the Exchange Notices for those three exchanges that were not accepted in DWAC) by setting the Exchange Payment Date and determining the amount of the payments.  Tribune was complying with the Exchange Procedures when the bankruptcy filing interrupted that process and prevented payment.

*Tribune III*, 2012 WL 1190142 at *9.  I determined that "the Tendering Noteholders' claims should be allowed in the amount that Tribune was obligated to pay in exchange for the tendered Notes."  *Id.* at *10.   The Stipulation provided that if the Tendering Noteholders' claims were based upon the exchange amount (rather than the original principal amount of the PHONES Notes), then the PHONES Claim Amount should be  $759,252,932.  *Id.*

On April 23, 2012, Citadel Camden filed its Motion for Reconsideration and/or Clarification of the Court's April 9, 2012 Memorandum and Order Regarding Allocation Disputes (docket no. 11458) (the "Clarification Motion"), which sought reconsideration and/or clarification of two issues:

> (1)    Did this Court, in its Decision, intend in any way to affect the rights and remedies of Tendering Noteholders in the state law fraudulent conveyance litigation captioned *In re Tribune Company Fraudulent Conveyance Litigation* 11-MD-02296 (WHP) (S.D.N.Y.) (the "MDL") (or, alternatively, were all such matters relating to the MDL entirely reserved

---

[28]The Stipulation was introduced as ADH Ex. 115 at the hearing on the Allocation Disputes.

for disposition by the MDL Court)?

(2)    Did this Court, in its Decision, intend in any way to fix or establish the classification of the claims of Tendering Noteholders in any Chapter 11 Plan for the Debtors (or, alternatively, was that issued reserved for determination in connection with Plan confirmation)?

Clarification Motion, ¶2. At a telephonic status conference on April 27, 2012, the Court ordered that the Clarification Motion would be heard at the Confirmation Hearing. On May 21, 2012, Citadel Camden filed an objection to confirmation of the Fourth Amended Plan, arguing that, based on the Allocation Decision, the Tendering Noteholders' claims and the PHONES Notes Claims are not substantially similar and, therefore, the Fourth Amended Plan improperly classifies the Tendering Noteholders' Claims and the PHONES Notes Claims together. I now address both the Clarification Motion and the Citadel Camden objection to confirmation of the Fourth Amended Plan.

(A)    The Allocation Decision and the MDL

Citadel Camden asks this Court to clarify that the Allocation Decision does not affect the rights and remedies of the Tendering Noteholders in the MDL. Aurelius objects to this request, arguing that the Allocation Decision is binding upon the Tendering Noteholders in other litigation. Consistent with my comments to the parties throughout this case, I have not made and do not intend to make any determination on the effect of my decisions upon the Court in the MDL or with respect to litigation now pending or that may be brought in other fora. If and when an issue arises about what effect, if any, this Court's decisions have upon other litigation, such an issue will be decided by the court in which such litigation is pending.

(B)    Classification of the Tendering Noteholder Claims

(1)    The particular classification issue raised by Citadel Camden was not

21

<u>addressed in the Confirmation Opinion or the Allocation Decision</u>

In the Clarification Motion, Citadel Camden asks this Court to clarify whether the Allocation Decision decided that the DCL Plan Proponents had properly classified the Tendering Noteholders' claims with the other PHONES claims.  The Debtors and Aurelius argue that this Court's Confirmation Opinion and Allocation Decision have already determined that the DCL Plan Proponents properly classified all PHONES Notes claims - - including the Tendering Noteholders' claims - - together.  I disagree that either decision addressed directly the particular classification issue that Citadel Camden now asserts.

First, the Debtors and Aurelius assert that the Confirmation Opinion resolved this classification issue and cite to language in the Confirmation Opinion stating that the PHONES Noteholders and the Tendering Noteholders are "subordinated creditors on the 'same level'" and that "the PHONES Noteholder claims should be treated alike." *Tribune I*, 464 B.R. at 197.  A closer reading of the Confirmation Opinion reveals that the classification issue decided therein is not identical to the one now presented by the Tendering Noteholders. In the Confirmation Opinion, I determined that Bankruptcy Code §510(b) did not apply to subordinate further the Tendering Noteholders' claims to a position that was junior to the other PHONES Noteholder claims. *Id.*  Citadel Camden now contends that their claims are not substantially similar to the other PHONES Notes claims because, they argue, the Tendering Noteholder claims should be classified with unsubordinated general unsecured claims, thereby placing the Tendering Noteholder Claims in a position senior to the other PHONES Notes claims.  This specific issue was not addressed in the Confirmation Opinion.

The Debtors and Aurelius also argue that the determination of the claim amount in the

Allocation Decision necessarily held that the proposed plan properly classified the Tendering

Noteholder Claims and the PHONES Notes claims together. This particular classification issue

was not addressed in the Allocation Decision. The Allocation Decision determined only that the

Tendering Noteholders' claims should be allowed in the amount that Tribune was obligated to

pay on the bankruptcy petition date. *Tribune III,* 2012 WL 1190142 at *9-*10.  Consequently,

pursuant to an agreement embodied in the Stipulation, the total claim amount for the PHONES

Notes was established, including the Tendering Noteholder claims and the other PHONES Notes

claims.  Whether the Tendering Noteholders' claims could be classified separately as general

unsecured claims was not raised or determined as part of the Allocation Issues.

> (2)    Citadel Camden's objection is not barred by law of the case, collateral
>          estoppel, res judicata, judicial estoppel, waiver or laches.

At oral argument, the Debtors argued that Citadel Camden should be precluded from

raising the classification issue at this time, particularly after the parties worked together to define

the Allocation Disputes to address specifically priority issues and the amount of the PHONES

Notes claim.  The issue is whether the doctrines of law of the case, collateral estoppel, res

judicata, judicial estoppel, waiver or laches prevent Citadel Camden from raising the

classification issue at this stage in the confirmation process. Because I decided that the particular

classification issue now raised by Citadel Camden was not actually decided in the previous

*Tribune* decisions, the doctrines of law of the case and collateral estoppel do not apply.[29]

---

[29]"The law of the case doctrine provides that when a court actually decides a rule of law, that decision  should continue to govern the same issues in subsequent stages of the same case.  However, the doctrine only applies to issues that were actually litigated and decided by the court." *Philip Serv. Corp. v. Luntz (In re Philip Serv. (Delaware), Inc.)*, 267 B.R. 62, 67 (Bankr.D.Del. 2001).  The four standard requirements for applying collateral estoppel, or issue preclusion, are (1) the identical issue was previously adjudicated; (2) the issue was actually litigated; (3) the previous determination was necessary to the decision; and (4) the party being precluded from relitigating the issue was fully represented in the

The doctrine of res judicata (or claim preclusion) precludes a party from relitigating claims that were *or could have been asserted* in a prior action. *EXDS, Inc. v. Ernst & Young, LLP*, 316 B.R. 817, 821 (Bankr.D.Del. 2004) (emphasis added). Three factors must be present before res judicata will apply: (1) a final judgment on the merits in a prior action involving; (2) the same parties or their privies; and (3) a subsequent suit based on the same cause of action. *Id.* Res judicata does not apply here because, as of the Fourth Amended Plan Confirmation Hearing, neither the Confirmation Opinion nor the Allocation Decision was a final decision.[30]

Judicial estoppel is a "judge-made doctrine that seeks to prevent a litigant from asserting a position inconsistent with one that she has previously asserted in the same or in a previous proceeding. It is not intended to eliminate all inconsistencies, however slight or inadvertent; rather, it is designed to prevent litigants from playing fast and loose with the courts." *EXDS*, 316 B.R. at 824 (quoting *In re Chambers Dev. Co., Inc*., 148 F.3d 214, 229 (3d Cir. 1998)).  The *EXDS* Court further explained:

> Asserting inconsistent positions does not trigger the application of judicial estoppel unless intentional self-contradiction is used as a means of obtaining unfair advantage. Thus, the doctrine of judicial estoppel does not apply when the prior position was taken because of a good faith mistake rather than as part of a scheme to mislead the court. *Ryan Operations G.P. v. Santiam–Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir.1996).  . . .  In sum, "judicial estoppel is an extraordinary remedy to be invoked when a party's inconsistent behavior will otherwise result in a miscarriage of justice. It is not meant to be a technical defense for litigants seeking to derail potentially meritorious claims, especially when the alleged inconsistency is insignificant at best and there is no evidence of intent to manipulate or mislead the courts."

---

prior action. *Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 249 (3d Cir. 2006).

[30]A confirmation order usually constitutes a final judgment on the merits with respect to the issues addressed in the plan of reorganization.  *EXDS*, 316 B.R. at 822. However, in this case, the DCL Plan was not confirmed and the parties went "back to the drawing board." And, as noted previously, the Allocation Decision was made subject to, conditioned upon, and in anticipation of confirmation of a plan.

*EXDS*, 316 B.R. at 825.  Even assuming that Citadel Camden participated in the previous confirmation litigation and the Allocation Disputes, Citadel Camden's current argument against classification with the other PHONES Notes does not appear as an attempt to play fast and loose with the Court.  Rather, Citadel Camden points out that it is asserting a new argument in response to the Allocation Decision's determination of the low claim amount for the Tendering Noteholders.  Judicial estoppel is not applicable here.

The confirmation process has been lengthy and hotly contested in this bankruptcy, but was still ongoing.  Citadel Camden asserted its classification objection before deadlines for voting upon and objecting to the Fourth Amended Plan.  Therefore, despite its previous silence, I cannot conclude that Citadel Camden intentionally waived its right to raise a basic confirmation issue, such as classification.  *See Evcco Leasing Corp. v. Ace Trucking Co.,* 828 F.2d 188, 195 (3d Cir. 1987) (Waiver is the intentional relinquishment or abandonment of a known right or privilege.).  Further, due to the ongoing nature of this confirmation process, the "belated" objection to classification did not prejudice the DCL Plan Proponents materially.  *See Lawhon v. Winding Ridge Homeowners Ass'n, Inc.*, 2008 WL 5459246 at *9  n. 78 (Del. Ch. Dec. 31, 2008) (The essential elements of laches are (1) a defendant with knowledge of a right, and (2) prejudice to the plaintiff arising from an unreasonable delay in exercising that right.).

It might have been appropriate, exceedingly more convenient for the Court, and more cost efficient for the parties, had Citadel Camden, which is well-represented by counsel, raised this issue in connection with the Allocation Disputes.  However, I cannot conclude that any of the asserted doctrines ought to keep Citadel Camden from its day in court.

(3)    The Tendering Noteholder Claims are substantially similar to the PHONES Notes Claims

25

Citadel Camden argues that the Fourth Amended Plan violates Bankruptcy Code §1122 by classifying improperly the claims of the Tendering Noteholders with the subordinated claims of the PHONES Noteholders.  Citadel Camden contends that the subordination provision of the PHONES Indenture applies only to "Holders of the Securities" and, based upon the Allocation Decision, the Tendering Noteholders are no longer "Holders of the Securities" since (i) they delivered their  PHONES Notes for exchange to the Indenture Trustee prior to the Debtors' bankruptcy filing, and (ii) the PHONES Indenture's definition of "Outstanding" PHONES Notes excludes notes that were "cancelled by the Trustee . . . or delivered to the Trustee . . . for cancellation." *Tribune III*, 2012 WL 1190142 at *9 (quoting ADH Ex. 2, p. 4).

The Debtors, joined by Aurelius, argue in response that the Tendering Holders continue to be "Holders of the Securities" under the PHONES Indenture and, thus, subject to the subordination provisions.  The Debtors point out that Global Note, the Exchange Procedures, and the Revised Exchange Notice (setting forth modified Exchange Procedures) refer to the Tendering Noteholders as tendering "Holders" throughout the entire exchange process. The Debtors argue that the broad, unqualified subordination provisions of the PHONES Indenture applies to *all* "Holders"of PHONES Notes - - including those who tendered the PHONES Notes for exchange.

While I have already reviewed the PHONES Indenture's subordination provisions at length in the Reconsideration Decision and the Allocation Decision, it is necessary to revisit the applicable language.  Section 14.02 of the PHONES Indenture provides in pertinent part:

Upon any distribution of asset of the Company in the event of:

(1)    any insolvency or bankruptcy case or proceeding, or any receivership, liquidation, reorganization or other similar case or proceeding in

connection therewith, relative to the Company or to its creditors, as such, or to its assets;

. . . .   then, and in such event

(A)     the holders of Senior Indebtedness shall be entitled to receive payment in full of all amounts due or to become due on or in respect of all Senior Indebtedness, or provision shall be for such payment in cash, before the Holders of the Securities of any series are entitled to receive any payment on account of the principal amount, interest or such other amounts as may be provided for in Section 3.01, if any, in respect of the Securities of such series;

. . . .

PHONE Indenture, §14.02.[31]

As discussed in the Reconsideration Decision, the beginning of Section 14.02 lists the "triggering events" or conditions precedent to application of the subordination provisions, which include any "bankruptcy case or proceeding" or "reorganization."  *Tribune II*, 464 B.R. at 218. Here, the triggering event of a bankruptcy filing occurred and interrupted the Exchange Procedure process, preventing Tribune from making the Exchange Payments to the Tendering Noteholders. Section 14.02(A) of the PHONES Indenture provides that, in the event of a bankruptcy filing, holders of Senior Indebtedness must be paid in full before *Holders of the Securities* are entitled to receive any payments.[32]  The Debtors are correct that the Global Note and the Exchange Procedures refer to Tendering Noteholders as "Holders" throughout the exchange process.[33]  More importantly, however, Section 14.02(A) provides that, in the event of

---

[31] The PHONES Indenture was admitted as ADH Ex. 2 at the Allocation Disputes Hearing.

[32] Section 1.01 of the PHONES Indenture defines a "Holder" as "the Person or Persons in whose name or names a particular Security is registered in the Security Register."  Neither the Debtors nor the Tendering Noteholders provided any evidence about the names of the registered holders of the tendered securities.

[33] For example, the Revised Exchange Procedures provide that "[Tribune's] Officers' Certificate shall set forth the amount to be paid to the *tendering Holder(s)* and the Exchange Payment Date," and

a bankruptcy filing, the subordination provisions apply to "any payment on account of the

principal amount, interest, or *such other amounts as may be provided for in Section 3.01, if any,*

*in respect to the Securities* . . . ." PHONES Indenture, §14.02(A) (emphasis added).   Section

3.01 of the PHONES Indenture describes the Securities by providing as follows:

Section 3.01.    <u>Amount Unlimited; Issuable in Series</u>.

> The aggregate principal amount of Securities which may be authenticated and
> delivered under this Indenture is unlimited.
>
> The Securities may be issued in one or more series.  There shall be established in
> or pursuant to a Board Resolution, and set forth in an Officers' Certificate, or
> established in one or more indentures supplemental hereto, prior to the initial
> issuance of Securities of any Series:

. . . .

> (8)    the obligation, if any, of the Company to redeem, purchase, convert,
> exchange or repay Securities of the series pursuant to any sinking fund or
> analogous provisions or otherwise or at the option of a Holder thereof and
> the period or periods within which, the price or prices at which and the
> terms and conditions upon which Securities of the series shall be
> redeemed, purchased, converted, exchanged or repaid, in whole or in part,
> pursuant to such obligation and/or the method by which such period or
> periods, price or prices or terms and conditions shall be determined;

PHONES Indenture, §3.01. Thus, the plain language of Section 14.02 provides that a payment

due under the Company's obligation to redeem or exchange a PHONES Note is subject to the

subordination provisions.   The Tendering Noteholders' claims are subject to the PHONES

Indenture subordination provisions and, therefore, the Tendering Noteholders' claims are

---

"Based on the Officers' Certificate, Trustee will provide the Exchange Payment Date and amount to the *Holder(s)*, " and  "On the Exchange Payment Date, . . . [Tribune] will pay the *Holder(s)*." *See Tribune III*, 2012 WL 1190142 at *7 (quoting Stipulation, ¶¶14-15 ADH Ex. 115). The Global Note, however, refers to a Tendering Noteholder as both a "DTC participant electing to exercise such participant's Exchange Right" and a "tendering Holder" in the same paragraph. *See* ADH Ex. 3 at R-7.

properly classified with non-tendering PHONES Noteholders' claims.[34]  The Clarification

Motion will be denied and Citadel Camden's objection to confirmation will be overruled.

E.      Objection to the Fourth Amended Plan's Failure to Establish Reserves for the
        Subordinated Claims of the PHONES Noteholders and EGI Noteholders

        The Third Amended Plan filed by the DCL Plan Proponents on November 18, 2011,

included an "Allocation Dispute Protocol" and proposed to establish reserves for distributions to

holders of allowed claims in certain classes that would be impacted by unresolved disputes

regarding inter-creditor priorities.  Some parties objected to this procedure, and argued that the

"Allocation Disputes" should be resolved prior to voting on the Third Amended Plan.[35]  *See*

*Tribune III*, 2012 WL 1190142 at *2.  I agreed to resolve the Allocation Disputes prior to plan

solicitation and voting.  I also noted that resolution of the Allocation Disputes would reduce the

need for reserves. *Id.* at *1.

        On April 9, 2012, I issued the Allocation Decision resolving a number of issues related to

inter-creditor priority disputes including, among other things, that the PHONES Indenture's

subordination provisions were applicable to any distribution of Settlement Proceeds and

Creditors' Trust proceeds, that the subordination provisions of the EGI Subordination Agreement

are applicable to any distribution of Settlement Proceeds, Litigation Trust proceeds and

----

[34]Citadel Camden decries the unfairness of this result, arguing that the Court has taken a claim
that was based on approximately $222 million of initial principal amount and reduced it to a claim based
upon the Exchange Payment amount of approximately $26 million:  the Court determined in the
Allocation Decision that upon tender, the Tendering Noteholders were entitled only to the Exchange
Amount, a sum far lower than had the Court held that the tenders were ineffective. It is unfortunate for the
Tendering Noteholders that the exchange process was thwarted by the Debtors' bankruptcy filing.  Their
desire to "cash out" on the eve of the bankruptcy is entirely understandable, but applying the
subordination provision of the PHONES Indenture gives effect to the contract among the parties; placing
the PHONES debt - - all of it - - below all other creditors except EGI.

[35]The "Allocation Disputes" were defined by the parties in the Allocation Procedures Order dated
January 24, 2012 (docket no. 10692).

Creditors' Trust proceeds (as those terms are defined in the Allocation Decision), and that the EGI Notes were junior in priority to the PHONES Notes.[36] *See generally Tribune III,* 2012 WL 1190142.[37]    The Allocation Decision stated that determination of the Allocation Disputes were "subject to, conditioned upon, and for the purpose of obtaining confirmation of a chapter 11 plan substantially in the form of the Third Amended Plan." *Tribune III*, 2012 WL 1190142 at *1. The DCL Plan Proponents filed the Fourth Amended Plan that modified the Third Amended Plan by, among other things, removing the Allocation Dispute Protocol and the provisions for reserves related to the Allocation Disputes.  The Fourth Amended Plan does, however, include two reserves: an "Other Parent Claim Reserve" Fourth Amended Plan, §7.2.1 and a "Subsidiary GUC Reserve" Fourth Amended Plan, §7.2.2.

EGI and WTC have filed (or intend to file) appeals related to, among other things, the determinations regarding subordination of their claims in the Reconsideration Decision and the Allocation Decision.  EGI and WTC object to the Fourth Amended Plan for failing to establish reserves in an amount that is sufficient to pay their claims if this Court's decisions regarding subordination are overturned on appeal.  EGI argues that the plan's provision for reserves for other unsecured creditors holding Disputed Claims amounts to unfair discrimination.  Both EGI and WTC argue that the Fourth Amended Plan is not fair and equitable because it fails to establish reserves for their claims.

The DCL Plan Proponents argue that the objections of EGI and WTC have no merit.

---

[36]The plan provisions establishing a Creditors Trust were removed from the Fourth Amended Plan for the reasons set forth in the Supplemental Disclosure Document.  *See* Supplemental Disclosure Document, DCL Ex. 3001, at 20.

[37]The Reconsideration Decision also decided that the PHONES Indenture's subordination provisions applied to Litigation Trust proceeds.  *Tribune II,* 464 B.R. at 213-221.

They argue that the demand for establishing reserves is tantamount to seeking a stay pending appeal without meeting (or attempting to meet) the requirements for such a stay pursuant to Fed.R.Bankr.P. 8005.

I agree with the DCL Plan Proponents. The parties have litigated the subordination issues related to the EGI claims and the PHONES Notes claims, and I have issued my decisions. Upon confirmation of the Fourth Amended Plan, EGI and WTC will likely pursue their appeals. If EGI and WTC want to prevent plan distributions while their appeals are pending, they may seek a stay pending appeal pursuant to Fed.R.Bankr.P. 8005.[38]

I disagree with EGI's argument that the plan's reserves for other unsecured creditors holding disputed claims amounts to unfair discrimination.

> The concept of unfair discrimination is not defined under the Bankruptcy Code. Various standards have been developed by the courts to test whether or not a plan unfairly discriminates. *In re Dow Corning Corp.,* 244 B.R. 705, 710 (Bankr.E.D.Mich. 1999), *aff'd* 255 B.R. 445 (E.D.Mich. 2000). The hallmarks of the various tests have been whether there is a reasonable basis for the discrimination, and whether the debtor can confirm and consummate a plan without the proposed discrimination. *See, e.g., In re Ambanc La Mesa L.P.,* 115 F.3d 650, 656 (9th Cir. 1997) *cert. denied,* 522 U.S. 1110, 118 S.Ct. 1039, 140 L.Ed.2d 105 (1998).

*In re Exide Tech.,* 303 B.R. 48, 78 (Bankr.D.Del. 2003) quoting *Matter of Genesis Health Ventures, Inc.*, 266 B.R. 591, 611 (Bankr.D.Del. 2001). *See also Tribune III,* 2012 WL 1190142, *14 (quoting *Armstrong,* 348 B.R. at 121) ("The pertinent inquiry is not whether the plan

---

[38]In determining whether to grant a stay pending appeal, courts should consider: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies. *In re Genesis Health Ventures, Inc.,* 367 B.R. 516, 519 (Bankr.D.Del. 2007) (quoting *Republic of Philippines v. Westinghouse Elec. Corp.,* 949 F.2d 653, 658 (3d Cir. 1991)). I make no determination about whether such relief would be warranted here.

discriminates, but whether the proposed discrimination is "unfair.").

The Fourth Amended Plan establishes reserves for "Holders of Disputed Claims" that become "Allowed Claims" after the Effective Date. Fourth Amended Plan, §7.2.1, §7.2.2. Generally, the objections to the Disputed Claims have not yet been litigated.  Fourth Amended Plan, §1.1.69.  At the request of the parties, I have determined the subordination issues related to the EGI Notes claims and the PHONES Notes claims.[39]  The EGI Claims and the PHONES Notes Claims are at a different stage of litigation than the other unsecured creditors. Accordingly, when it comes to establishing reserves, there is a reasonable basis to discriminate between the Holders of Disputed Claims, whose claims have not yet been litigated, and the holders of the EGI Notes and PHONES Notes claims, whose subordination disputes have been the subject of litigation before this Court.

The objection based on the Fourth Amended Plan's failure to establish reserves for the subordinated claims will be overruled.

F.    Objection to amendments to Section 5.8.2 of the Fourth Amended Plan

Section 5.8 of the Fourth Amended Plan is entitled: "Cancellation of Loan Agreements, Loan Guaranty Agreements, the Pledge Agreement, Notes Issued Under the Loan Agreements, Senior Notes, Debentures, Instruments, Indentures, EGI-TRB LLC Notes, PHONES Notes, Old Common Stock and Other Tribune Interests."  The DCL Plan Proponents and Aurelius resolved Aurelius' objections to Section 5.8.2 of the Fourth Amended Plan by adding language to give the

---

[39]Likewise, WTC argues that the Collier Bankruptcy Practice Guide provides that a plan must contain reserves for future payment of disputed, contingent and unliquidated claims after those claims are resolved through settlement or litigation.  6-92 COLLIER BANKRUPTCY PRACTICE GUIDE ¶92.07[2].  The phrase "disputed, contingent and unliquidated" does not aptly describe the EGI and PHONES Notes claims currently before this Court, since disputes regarding those claims were the subject of litigation here.

Senior Noteholders "a belt, suspenders, shoelaces and everything else"[40] to ensure that this provision did not contradict that Plan's intent to preserve creditors' rights to pursue certain Disclaimed State Law Avoidance Claims and Preserved Causes of Action in accordance with the terms of the Fourth Amended Plan.

The McCormick Foundation responded to the compromise by asking the DCL Plan Proponents to further revise Section 5.8.2 to add "neutral" language to preserve the rights of defendants to the Disclaimed State Law Avoidance Claims or Preserved Causes of Action by adding the following italicized language to the end of Section 5.8.2:

> For the avoidance of doubt, nothing in this Plan shall or is intended to impair the rights of (i) any Indenture Trustee or any Holder of a Senior Note Claim or PHONES Notes Claim from prosecuting any Disclaimed State Law Avoidance Claim, with the exception of any Disclaimed State Law Avoidance Claim that becomes a Holder Released Claim pursuant to Section 11.2.2 of this Plan, (ii) the Litigation Trust and Litigation Trustee from pursuing the Preserved Causes of Action, *[and (iii) any defendant in defending against a Disclaimed State Law Avoidance Claim or Preserved Cause of Action.]*

Ultimately, the DCL Plan Proponents declined to add the requested language of (iii), above, to Section 5.8.2. Aurelius argues that the McCormick Foundation's language is not neutral, but is contrary to the intent of its proposed language - - which indeed seeks to impair a defendant's right to argue that the discharge provisions of Section 5.8 and otherwise in the Plan prevent creditors from asserting Disclaimed State Law Avoidance Claims or Preserved Causes of Action. Aurelius and the DCL Plan Proponents argue that the Fourth Amended Plan's definitions of "Disclaimed State Law Avoidance Claims" (Section 1.1.67) and "Preserved Causes of Action" (Section 1.1.74) provide the neutral, protective language the defendants seek, by stating at the end of each section:

---

[40]Tr. 6/8/2012 at 22:21-24.

For the avoidance of doubt, nothing in this Plan is intended to determine whether a Selling Stockholder properly faces liability with respect to the Disclaimed State Law Avoidance Claims. (Section 1.1.67)

and

For the avoidance of doubt, nothing in this Plan is intended to determine whether any defendant properly faces liability with respect to the Preserved Causes of Action  (Section 1.1.174)

Upon review of the relevant Plan provisions, I conclude that the definitions in Section 1.1.67 and 1.1.174 provide the appropriate neutrality to protect the McCormick Foundation and other defendants and make clear the Plan's intent.

<u>CONCLUSION</u>

For the reasons set forth herein, the remaining objections to confirmation of the Fourth Amended Plan filed by Aurelius, Law Debenture, Deutsche Bank, WTC, Citadel Camden, EGI, the D&Os, the McCormick Foundation, and Malcolm Berko will be overruled.  The objection by the Certain Other Employees was withdrawn. Any remaining objection of Aurelius to the proposed Committee LT Agreement is overruled.  Subject to submission of final revisions to the

Fourth Amended Plan consistent with various resolutions that have been made, either by

agreement or consistent with this Memorandum, the Fourth Amended Plan will be confirmed.

The Clarification Motion will be denied.

    An appropriate order follows.


                        BY THE COURT:


                        _____
                        KEVIN J. CAREY
                        UNITED STATES BANKRUPTCY JUDGE

Dated: July 13, 2012