## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re<br><br>TRIBUNE COMPANY, *et al.*,<br><br>Debtors. | Chapter 11<br>Case No. 08-13141 (KJC)<br>Jointly Administered<br><br>**Hearing Date: (*Expedited Consideration Requested*)**<br>**Response Deadline: (*Expedited Consideration Requested*)** |

## MOTION FOR A STAY PENDING APPEAL
## PURSUANT TO BANKRUPTCY RULE 8005

Appellant Aurelius Capital Management, LP ("Aurelius"), on behalf of its managed

entities, by and through its undersigned counsel, hereby respectfully requests, pursuant to Rule

8005 of the Federal Rules of Bankruptcy Procedure, that this Court grant a stay pending

Aurelius's appeal from the Order Confirming Fourth Amended Joint Plan of Reorganization for

Tribune Company and Its Subsidiaries Proposed by The Debtors, The Official Committee of

Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P. and

JPMorgan Chase Bank, N.A. dated July 23, 2012 [Docket No. 12074] (the "Confirmation

Order"), the Memorandum Overruling Objections to Confirmation of the Fourth Amended Plan

of Reorganization for Tribune Company and its Subsidiaries and Denying Clarification Motion

dated July 13, 2012 [Docket No. 12033], the Order Overruling Plan Objections and Denying the

Clarification Motion dated July 13, 2012 [Docket No. 12034], and the Opinion on Confirmation

dated October 31, 2011 [Docket No. 10133] (the "Opinion" or "Op." and, collectively with the

Confirmation Order and the July 13, 2012 order and memorandum, the "Order").[1]   If granted,

---

[1]   Entities managed by Aurelius own a substantial amount of senior and subordinated notes issued by the Tribune Company ("Tribune").   Neither Aurelius nor any of its managed entities owe any fiduciary duties to any party in interest in these cases, nor is Aurelius or any of its managed entities an insider of Tribune or any of its affiliates.

1

the stay sought by Aurelius will defer consummation of the Fourth Plan of Reorganization proposed by the Debtors, the Official Committee of Unsecured Creditors, and certain senior lenders (the "DCL Plan" and the "DCL Plan Proponents") until the final resolution of Aurelius's appeal.   In support of this motion, Aurelius states as follows:

## PRELIMINARY STATEMENT

1.      The DCL Plan approved by the Court incorporates a settlement (the "DCL Settlement") of valuable estate claims arising out of the extremely leveraged buyout (the "LBO") of Debtor Tribune in 2007.    The DCL Settlement was hotly contested during the first confirmation hearing held in this case, where Aurelius, joined by Indenture Trustees for the Debtors' senior and subordinated bond debt (collectively, the "Noteholders"), argued, *inter alia*, that given the merits and likelihood of success of the causes of action arising out of the LBO (the "LBO-Related Causes of Action") that the DCL Settlement would settle, the DCL Settlement fell far below the lowest rung in the range of reasonableness.

2.      It is undisputed that if a court avoided the debt incurred at both principal steps of the LBO ("Step One" and "Step Two" respectively), the Noteholders – who collectively hold claims against Tribune totaling approximately $2.0 billion, exclusive of post-petition interest, and approximately $2.3 billion, when post-petition interest is considered – would be paid in full.   *See* Op. at 10-12, 44-45.[2]   The Noteholders argued that the Debtors' non-LBO creditors would also be able to recover significantly more than provided under the DCL Settlement even if only the Step Two transactions were avoided, because the Step One lenders, who were the same entities who

---

[2]  At the time that the Opinion was issued, the claims asserted against Tribune by the indenture trustee for the subordinated Noteholders on behalf of the subordinated Noteholders totaled approximately $1.197 billion, exclusive of post-petition interest.    *See* Op. at 12, n. 18.    The Court subsequently determined that the allowed amount of the subordinated Noteholders' claims was $759.25 million, exclusive of post-petition interest.    *See* Memorandum Regarding Allocation Disputes [Docket No. 11337] at 19.    Therefore, the total amount of the Noteholders' allowed claims is approximately $2 billion, exclusive of post-petition interest, and approximately $2.3 billion, when post-petition interest is considered.

2

orchestrated, participated in, received fees from, funded and made possible the Step Two debt, would be legally and/or equitably precluded from participating in the benefit of Step Two avoidance based upon well-established doctrines of waiver, equitable estoppel, and assumption of risk.   Non-LBO creditors would then be entitled to all of the approximately $318 million resulting from Step Two disgorgement at Tribune, and the approximately $1.6 billion resulting from avoidance of the Step Two debt at the Tribune subsidiaries that guaranteed the LBO debt (the "Guarantor Subsidiaries") would flow to Tribune on account of Tribune's intercompany claim at the Guarantor Subsidiaries and consistent with principles of equity.   NPP Findings of Fact ¶ 366; 3/15/11 Trial Tr. 241:23-242:2.   This nearly $2 billion of additional value for non-LBO creditors would allow the senior Noteholders to receive a full recovery, and subordinated Noteholders – who will receive nothing under the DCL Plan – to receive a substantial recovery.   *See* NPP Findings of Fact ¶ 367; 3/15/11 Trial Tr. at 242:11-24.   Given the strength of the foregoing claims, the DCL Settlement — which provides the Noteholders with only $369 million of settlement consideration, equivalent to only 16%-18% of the Noteholders' allowed claims, depending upon whether post-petition interest is included — could not, as a matter of law, be deemed reasonable.

3.      In its October 31, 2011 Opinion, the Court acknowledged that the record supports a finding that the Step Two transactions would be avoided, and that the question of whether the Step One transactions could also be avoided was in "equipoise."  Op. at 64-65.  The Court found further that the possibility that the Step One lenders would be precluded from sharing in the benefit of Step Two avoidance at either Tribune or the Guarantor Subsidiaries if only Step Two is avoided cannot be ruled out.   The Court failed, however, to value the LBO-Related Causes of Action based on these findings, or to compare such values against the amount being offered in exchange

for the settlement of those claims.  *See* Op. at 30-69.   Thus, the Court erroneously concluded that the DCL Settlement's provision of $369 million – or 16-18 cents on the dollar – in exchange for the release of claims ranging between approximately $2.0 and $2.3 billion falls within the range of reasonableness.  *See* Op. at 12, 30-69.   In addition, the Court erred further by failing to recognize the strength of the Noteholders' argument that the structurally senior Step One lenders would be legally and equitably precluded from benefitting from Step Two avoidance in advance of non-LBO creditors, based on the Court's faulty conclusion that "upstreaming" such benefit from the Tribune Guarantors to Tribune would be an "uphill battle." *Id.* at 65.

4.      The Bankruptcy Court's ruling approving the DCL Settlement defied the best interests of creditors most affected by the DCL Settlement, given that the overwhelming majority of the non-LBO creditors who would benefit from the DCL Settlement, calculated by dollar amount, opposed it.    Specifically, over 85.7% in dollar amount ($2,338,419,621.37) of the non-LBO creditors at Tribune voted *against* the DCL Plan.   *See* Second Supplemental Declaration of Stephanie Kjontvedt on Behalf of Epiq Bankruptcy Solutions, LLC Regarding Voting and Tabulation of Ballots Accepting and Rejection the Join Plans of Reorganization Proposed for Tribune Company and its Subsidiaries dated May 10, 2011 [ECF No. 8882] at 3, 6. Certainly, these voting results provide strong evidence that the DCL Settlement is not fair and equitable to non-settling creditors.

5.      Aurelius's appeal raises the issues of whether the Court erred in approving the DCL Settlement by (i) failing to properly value the LBO-Related Causes of Action based on their likelihood of success, and to compare that value against the amount being offered in settlement of those claims, and (2) disregarding the value that the Noteholders would receive if only the Step Two transactions were avoided.

{00653725;v1 }

6.      A stay is necessary to ensure that these issues receive full consideration from the District Court on appeal.    Each of the four factors that courts analyze when considering whether to issue a stay supports staying consummation of the DCL Plan pending final resolution of Aurelius's appeal.    First, Aurelius raises significant issues on appeal.    Second, Aurelius could potentially suffer irreparable harm if estate assets are distributed in accordance with the Order prior to a determination of the appeal, because it is likely that the appeal will then be challenged as equitably moot.    Third, the appeal raises issues of significant public interest, because it involves the bankruptcy of one of the largest media conglomerates in the nation, and implicates the very lending practices that are at the heart of the financial crisis plaguing the country today. Resolution of the appeal will help establish guidelines for future courts faced with insolvencies driven by leveraged buyouts, and the question of whether settlements in such cases should be approved under Rule 9019.    Finally, the balance of harms favors a stay, as the importance of the issues on appeal outweighs any inconvenience of delay that the parties or any third party might claim.

7.      For all of these reasons, this Court should stay consummation of the DCL Plan pending final resolution of Aurelius's appeal.

## JURISDICTION AND VENUE

8.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b).    Venue is proper under 28 U.S.C. §§ 1408 and 1409.

## FACTUAL AND PROCEDURAL BACKGROUND

9.      Tribune is one of the nation's leading media conglomerates, reaching more than eighty percent of households in the United States through its 128 subsidiaries, which own

newspapers, other publications and websites, television and radio stations, and other news and entertainment offerings.   Op. at 5-6.

### The LBO

10.    On April 1, 2007, following a period of steady decline in revenues and profitability, the Tribune board of directors approved a bid by billionaire investor Samuel Zell to acquire Tribune through an extraordinarily leveraged buy-out.[3]   Op. at 9-10.   Under Zell's proposal, the Company borrowed approximately $12 billion — while Zell invested just $315 million — to buy out Tribune's shareholders.   In other words, Zell acquired the Company by putting up approximately 2.5% of the entire purchase price, and shifting almost the entire risk of the transaction onto the shoulders of the Company's existing creditors.   Op at 10-11, 17-18.

11.    The Tribune LBO was consummated in two principal steps in June and December 2007, commonly referred to as "Step One" and "Step Two."   Op. at 10-11.   In connection with Step One, Tribune commenced a cash tender offer to repurchase approximately 52% of its outstanding common stock at a price of $34 per share.   Op. at 10.   In connection with Step Two, Tribune consummated a merger with a newly formed Tribune Employee Stock Ownership Plan (the "ESOP"), in which all outstanding shares of Tribune's common stock were purchased or redeemed and Tribune became wholly owned by the ESOP.   Op. at 11.

12.    The Tribune LBO has been characterized as "one of the most absurd deals ever,"

---

[3]   In an LBO, a corporation's shares are purchased primarily with borrowed funds.   Because LBOs replace the target company's outstanding equity with new debt, it is well-recognized that LBOs are inherently risky to the target company's existing creditors and frequently give rise to massive fraudulent transfer claims where the target company is left unable to satisfy its obligations to its pre-LBO creditors.   *See, e.g.*, *Moody v. Sec. Pac. Bus. Credit Inc.*, 971 F.2d 1056, 1065 (3d Cir. 1992) ("[T]he stakes are higher in the typical leveraged buyout, and, at least from the perspective of unsecured creditors, the potential for abuse is great. . . . The level of risk facing the newly structured corporation rises significantly due to the increased debt to equity ratio.   This added risk is borne primarily by the unsecured creditors, those who will most likely not be paid in the event of insolvency.") (Internal citations omitted); *Mellon Bank, N.A. v. Metro Commc'ns*, 945 F.2d 635, 646 (3d Cir. 1991) (explaining that while "shareholders receive direct benefit in the LBO transaction as they are cashed out . . . The target corporation, however, receives no direct benefit to offset the greater risk of now operating as a highly leveraged corporation.").

and a "deal from hell." NPP Findings of Fact at 71; 6/27/11 Trail Tr. 86:13-20. Before the LBO, Tribune's principal amount of debt was less than $5 billion. Op. at 8. The LBO increased this number to approximately $12.7 billion, notwithstanding that both Tribune and the newspaper publishing industry had been experiencing a steady decline for years. Op. at 12. The additional LBO indebtedness, which dwarfed the pre-LBO debt, was secured by the Guarantor Subsidiaries that held most of Tribune's value. Through the guarantees, the LBO lenders sought to obtain structural seniority over the non-LBO creditors that had claims only against the Tribune parent company. Op. at 7, n.10. The risk of the LBO transaction thus fell squarely on to the shoulders of Tribune's non-LBO creditors, including the Noteholders.

13.      Tribune's post-LBO debt load was too much for Tribune to bear. On December 8, 2008 — less than one year after Step Two of the LBO was consummated — Tribune and certain of its subsidiaries (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code (11 U.S.C. § 101 et seq.). Op. at 2.

### *The DCL Settlement*

14.      From the outset of the bankruptcy cases, the major constituents understood that the investigation and resolution (or preservation) of the LBO-Related Causes of Action would be a central issue in the formulation of a plan of reorganization. Op. at 14; *see also id* at 42. The DCL Plan proposed to settle the valuable LBO-Related Causes of Action against the banks and arrangers that financed and facilitated the LBO, as well as any parties who purchased such debt in the aftermarket (collectively, the "LBO Lenders"). Op. at 3-4. In all, the DCL Settlement releases the LBO Lenders from between approximately $2.0 and $2.3 billion in claims held by the Noteholders, in exchange for settlement consideration to the Noteholders of only $369 million, a mere 16-18% of the Noteholders' total claims. *See* NPP Findings of Fact ¶ 365, Op.

7

at 12.

15.     The Noteholders objected to the DCL Settlement on multiple grounds, including that given the value of the LBO-Related Causes of Action that the DCL Settlement proposed to settle, the DCL Settlement falls below the lowest rung in the range of reasonableness.    In addition, the Noteholders argued that if Step Two but not Step One was avoided, the Step One Lenders, who were the same entities who participated in, funded, and made possible the Step Two Debt, would be legally and/or equitably precluded from participating in the benefit of Step Two avoidance in advance of non-LBO creditors based upon doctrines of waiver, equitable estoppel, and assumption of risk.   The value of Step Two avoidance at the Guarantor Subsidiaries would then flow to Tribune, due to Tribune's intercompany claim at the Guarantor Subsidiaries and consistent with principles of equity.   Op. at 62-64.    Under this scenario, the combined value of Step Two avoidance at the Guarantor Subsidiaries and Tribune would result in nearly $2 billion to non-LBO creditors.   Op. at 64; NPP Findings of Fact ¶ 367.

16.     The DCL Plan Proponents conceded that the Step Two transactions were almost certainly avoidable but argued that the Noteholders would not benefit from the avoidance of Step Two only.   Op. at 62.   The DCL Plan Proponents also conceded that avoidance of both the Step One and Step Two transactions would result in full payment to the Noteholders, but argued that it was unlikely that the Step One transactions could be avoided.   *Id.*

17.     On October 31, 2011, the Court issued its Opinion, concluding that the record supported a finding that the Step Two transactions would be avoided, and that the question of whether the Step One transactions would be avoided was in "equipoise."   Op. at 62.   The Court found further that the possibility that the Step One lenders would be precluded from sharing in the benefit of Step Two avoidance at either Tribune or the Guarantor Subsidiaries if

8

only Step Two was avoided cannot be ruled out.    Op. at 64-65.    The Court failed, however, to assess the aggregate value of the various LBO-Related Claims being released under the DCL Settlement based on these conclusions.    Op. at 30-69.    Additionally, the Court wholly disregarded the value to non-LBO creditors of avoiding only the Step Two transactions – which could result in approximately $2 billion going to non-LBO creditors – based on its faulty conclusion that "upstreaming" the value of such avoidance from the Guarantor Subsidiaries to Tribune would be an "uphill battle."    Op. at 65.    Thus, the Court erroneously concluded that the DCL Settlement – which releases between approximately $2.0 and $2.3 billion in claims held by the Noteholders for a mere $369 million, or between 16-18 cents on the dollar – falls within the range of reasonableness.    *See* Op. at 12, 69, 71.

18.    Notwithstanding its approval of the DCL Settlement, the Court denied confirmation of the prior version of the DCL Plan being proposed by the DCL Plan Proponents on other grounds.

### The Second Confirmation Hearing

19.    The Court held a hearing on June 7, 2012 concerning the DCL Plan, which incorporated the previously-approved DCL Settlement.    The Court overruled all remaining objections to confirmation of the DCL Plan on July 13, 2012, and confirmed the DCL Plan on July 23, 2012 when it issued the Confirmation Order.    Contemporaneously with the filing of this motion, Aurelius filed a Notice of Appeal from the Order.

### REQUESTED RELIEF

20.    Aurelius respectfully requests the entry of an order staying consummation of the DCL Plan pending final resolution of Aurelius' appeal.

{00653725;v1 }

## LEGAL ARGUMENT

21.     Rule 8005 of the Bankruptcy Rules provides, in pertinent part, that a "motion for a stay of the ... order ... of a bankruptcy judge ... must ordinarily be presented to the bankruptcy judge in the first instance. ...    A motion for such relief ... may be made to the district court ..., but the motion shall show why the relief ... was not obtained from the bankruptcy judge."    Fed. R. Bankr. P. 8005.    "'The test for determining whether to grant a stay pending appeal under Federal Rule of Bankruptcy Procedure 8005 mirrors ... the standard for preliminary injunctions pursuant to Federal Rule of Civil Procedure 65(a)."    *Fox Sports Net West 2, LLC v. L.A. Dodgers LLC (In re L.A. Dodgers LLC)*, 465 B.R. 18, 28 (D. Del. 2011) ("*Dodgers*") (quoting *Madera v. Ameriquest Mortg. Co. (In re Madera)*, No. 07-cv-1396, 2008 WL 447497, at *4 (E.D. Pa. Feb. 7, 2008); *see also Official Comm. of Equity Sec. Holders v. Finova Grp., Inc. (In re Finova Grp., Inc.)*, No. 07-480-JJF, 2007 WL 3238764, at *1 (D. Del. Oct. 31, 2007).    To demonstrate that a stay pending appeal is justified, the moving party must establish: (1) a strong showing of likelihood of success on the merits, (2) irreparable harm absent a stay, (3) that issuance of the stay will not substantially injure the other parties to the proceeding, and (4) that a stay is in the public interest.    *Republic of Phil. v. Westinghouse Elec. Corp.*, 949 F.2d 653, 658 (3d Cir. 1991); *accord Dodgers*, 465 B.R. at 28.

22.     Courts in this Circuit have applied the "sliding scale" approach – "a more flexible overall 'balancing' of all the factors, so that a movant's failure to demonstrate one or more of the factors is not necessarily fatal to the stay request."    *In re Countrywide Home Loans, Inc.*, 387 B.R. 467, 471-472 (Bankr. W.D. Pa. 2008); *see, e.g., Republic of Phil.*, 949 F.2d at 658 (a decision on a motion for stay should reflect the "individualized considerations relevant [to the case at hand]"). Under this approach, "when the movant is more likely to succeed, the harm required to be shown is less; if success is less likely, then the harm needed must weigh more heavily in the movant's

10

favor." *Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*, 397 F. Supp. 2d 537, 548 (D. Del. 2005); *see also Williams v. Republic (In re Cujas)*, 376 B.R. 480, 485-86 (Bankr. E.D. Pa. 2007) (stating that the balancing approach is the majority view, is "more consonant with the court's role in making decisions based on the equities and provides the court with the flexibility required to reach a fair result").

23.    This Court should grant a stay pending appeal because Aurelius will raise significant issues on appeal that have a substantial possibility of success, and because the balance of hardships and public interest considerations tip sharply in Aurelius' favor.

### A.    Aurelius's Appeal Raises Significant Issues That Have A Substantial Possibility Of Success

24.    Likelihood of success on the merits means that a movant has a "'substantial case,' or a strong case on appeal." *In re The Columbia Gas Sys., Inc.,* No. 92-127-SLR, 1992 U.S. Dist. LEXIS 3253, at *4 (D. Del. Mar. 10, 1992) (quoting *In re Pub. Serv. Co. of N.H.,* 116 B.R. 347, 349 (Bankr. D.N.H. 1990); *accord Morsan v. Polaroid Corp. (In re Polaroid Corp.)*, Civ.A. 02-1353 JJF, 01-10864 PJW, 2004 WL 253477, at *1 (D. Del. Feb. 9, 2004).   All of the issues that Aurelius raises in its appeal satisfy this standard.

### 1.    Aurelius Is Likely To Succeed On The Merits Of Its Argument That Given The Court's Findings Regarding The Likelihood of Success of The LBO-Related Causes of Action, The Court Erred In Approving The DCL Settlement

25.    In deciding whether a settlement may be approved under Bankruptcy Rule 9019, a court must determine whether "the compromise is fair, reasonable, and in the best interest of the estate." *In re Spansion, Inc.,* No. 09-10690 (KJC), No. 09-10690(KJC), 2009 WL 1531788, at *3 (Bankr. D. Del. June 2, 2009); *Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.)*, 283 F.3d 159, 165 (3d Cir. 2002) (directing district court to assess the "fairness, reasonableness and adequacy" of proposed LBO settlement).   Such a finding should be based on "the probabilities

11

of ultimate success should the claim be litigated," and "all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise."   *In re Chemtura Corp.*, 439 B.R. 561, 593-594 (Bankr. S.D.N.Y. 2010) (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968)).   In addressing the probability of success of the claims to be settled, the Court must familiarize itself with "all of the facts" bearing on the range of potential outcomes and likelihood of each such outcome.   *TMT Trailer Ferry*, 390 U.S. at 424; *see also In re Texaco*, 84 B.R. 893, 902 (Bankr. S.D.N.Y. 1988) ("Decisions as central to bankruptcy proceedings as approval of [LBO] settlements . . . must issue from reason and rest upon factual undergirdings").   Where, as here, the debtors propose to release claims for a small fraction of the amount sought, the debtors must show that these claims have a low likelihood of success.   *See, e.g., In re Exide Techs.*, 303 B.R. 48 (Bankr. D. Del. 2003) (debtor failed to show low likelihood of success), 70 (even assuming objecting committee's projections are overly optimistic, fractional LBO settlement unreasonably low).

26.   For example, Bankruptcy courts have rejected settlements when an expert's calculations showed that the settled claims were likely to yield recoveries that were greater than the amounts being offered in the settlement.   *See Cames v. Joiner (In re Joiner)*, 319 B.R. 903, 906 (Bankr. M.D. Ga. 2004) (rejecting settlement of cause of action where expert analysis of unsecured creditors opposing settlement demonstrated that cause of action "ha[d] better than a 50 percent chance of prevailing."); *In re Revelle*, 256 B.R. 905, 913 (Bankr. W.D. Mo. 2001) (finding the objecting creditors who were "prepared to walk away from as much as 69 percent payout" "should be allowed their day in court," because they had "a substantial basis" to "believe that in contested litigation they w[ould] ultimately prevail and be paid 100 percent").   Similarly, in Rule 23 class action settlement cases, courts have concluded that a "settlement for less than"

{00653725;v1 }

"the net expected value of continued litigation . . . would not be adequate." *Reynolds v.*

*Beneficial Nat'l Bank*, 288 F.3d 277, 284-85 (7th Cir. 2002); *see also In re Fort Wayne Telsat,*

*Inc.*, 665 F.3d 816, 820 (7th Cir. 2011) ("Determining the reasonableness of a settlement requires

comparing the amount of the settlement to the net expected gain of seeking a litigated

judgment."); *Lachance v. Harrington*, 965 F. Supp. 630, 638 (E.D. Pa. 1997) ("[A] settlement is

fair to the plaintiffs in a substantive sense . . . if it gives them the expected value of their claim if

it went to trial.") (internal citations omitted).    In fact, the Third Circuit has expressly held that in

evaluating a settlement, "the present value of the damages plaintiffs would likely recover if

successful, appropriately discounted for the risk of not prevailing, should be compared with the

amount of the proposed settlement" when evaluating whether a settlement is fair, reasonable, and

adequate.    *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768,

806 (3d Cir. 1995) (explaining that likelihood-of-success inquiry under Rule 23 "attempts to

measure the expected value of litigating the action rather than settling it at the current time") (*id.*

at 816); *see also Reynolds,* 288 F.3d at 285 (reversing district court's approval of a class

settlement that was less than the net expected value of the pending litigation).[4]

27.    Here, in approving the DCL Settlement, the Court failed to assess the aggregate

value of the LBO-Related Causes of Action based on the Court's determination of their likelihood

of success, or to compare such value against the amount being offered in exchange for the

settlement of those claims.    Given the Court's findings regarding the likelihood of succeeding on

the LBO-Related Causes of Action, such an analysis would have shown that only $369 million to

---

[4] The process of approving class-action settlements under Federal Rule of Civil Procedure 23 directly parallels the
inquiry required under Bankruptcy Rule 9019.    *See, e.g.*, *In re Carla Leather, Inc.*, 44 B.R. 457, 466 (Bankr.
S.D.N.Y. 1984) (recognizing that a Rule 9019 inquiry "should parallel that contemplated by Rules 23 and 23.1 of
the Federal Rules of Civil Procedure, pursuant to which courts are called upon to consider settlement of a class or
derivative action."); *Ehre v. People of the State of N.Y. (In re Adirondack Ry. Corp.)*, 95 B.R. 867, 873 (N.D.N.Y.
1988) (agreeing that the court in Carla Leather "accurately analogized the bankruptcy court's review of a settlement
to court consideration of a class or derivative action pursuant to [Rules 23 and 23.1]").

{00653725;v1 }

the Noteholders, or between 16 and 18 cents on the dollar, in exchange for the release of the

Noteholders' claims of between approximately $2.0 and $2.3 billion, falls far outside the range

of reasonableness.    Accordingly, Aurelius is likely to succeed on the merits of its argument that

the Court erred as a matter of law by approving the DCL Settlement.

28.    Indeed, the voting results on the DCL Plan show conclusively that the DCL

Settlement is not in the best interests of creditors most affected by the DCL Settlement, as the

overwhelming majority of the non-LBO creditors who would benefit from settlement, calculated

by dollar amount, *opposed* it.    Specifically, over 85.7% in dollar amount ($2,338,419,621.37) of

the non-LBO creditors at Tribune voted *against* the DCL Plan.    *See* Second Supplemental

Declaration of Stephanie Kjontvedt on Behalf of Epiq Bankruptcy Solutions, LLC Regarding

Voting and Tabulation of Ballots Accepting and Rejection the Join Plans of Reorganization

Proposed for Tribune Company and its Subsidiaries dated May 10, 2011 [ECF No. 8882] at 3, 6.

Certainly, these voting results provide strong evidence that the DCL Settlement is not fair and

equitable to non-settling creditors.

      2.    <u>Aurelius Is Likely to Succeed On the Merits Of Its Argument That the</u>
<u>Court Erred In Approving the DCL Settlement Without Adequately</u>
<u>Considering The Benefit That Would Flow To Non-LBO Creditors If</u>
<u>Only Step Two Was Avoided</u>

29.    The Bankruptcy Court's approval of the DCL Settlement should also be reversed

for the independent and additional reason that the Court failed to properly assess the value that

would inure to the Debtors' non-LBO creditors if only Step Two was avoided, based on its

erroneous conclusion that "upstreaming" the benefit of such avoidance from the Guarantor

Subsidiaries to Tribune would be an "uphill battle."

30.    Numerous courts have held that facilitators of, and willing participants in, a

transaction are prohibited from benefiting from that transaction's avoidance, at least until the

innocent parties who did not participate in and were harmed by the transaction are made whole.

For example:

- In *In re PWS Holding Corp.*, the Third Circuit held that leveraged buyout lenders may be estopped from recovering on leveraged buyout-related claims, and observed that there was a reasonable possibility that the [leveraged buyout lenders] would be estopped from sharing in any fraudulent transfer recoveries. 228 F.3d 224, 229, 239-40 (3d Cir. 2000).

- In *Morion v. OYO Instruments, L.P. (In re Labelon Corp.)*, the court refused to allow a creditor to benefit from an action for fraudulent conveyance, where the creditor had "knowingly and actively participated in and benefitted from" the challenged transaction.   No. 02-02-22582, 2006 WL 2516386, at *5 (Bankr. W.D.N.Y. Aug. 28, 2006).   The Court stated that "on equitable grounds, this Court would not make a finding of avoidance and recovery on the proposed Section 548 and [state law] causes of action when the only entity that would benefit from that avoidance and recovery would be [a creditor] which specifically approved the [subject] transaction in writing and significantly benefited from the transaction."   *Id* at *4.

- In *Harris v. Huff (In re Huff)*, the court held that the trustee was estopped from challenging a transfer as a fraudulent conveyance, where the creditor on whose behalf the trustee was acting had consented to the transfer.   160 B.R. 256 (Bankr. M.D. Ga. 1993).

31.     In light of this well-established law, Aurelius is likely to succeed on the merits of its argument that the Step One lenders – who were the same entities who participated in, arranged, funded, and made possible the Step Two debt – would be precluded from participating in the benefit of the Step Two avoidance.   The approximately $1.6 billion of value that otherwise would have gone to the Step One lenders would be used to satisfy Tribune's allowed intercompany claim against the Guarantor Subsidiaries of approximately $2.4 billion, and distributed to Tribune's non-LBO creditors.   *See* DCL Plan, Exhibit 1.1.122 (Terms of Intercompany Claims Settlement).   Given this intercompany claim, the Court's conclusion that "upstreaming" the benefit of Step Two avoidance from the Tribune Guarantors to Tribune would be an "uphill battle," Op. at 65, is wrong as a matter of law.

32.     Indeed, the benefit of Step Two avoidance would be used to satisfy the claims of

15

Tribune's non-LBO creditors even in the absence of the parent's intercompany claim, as it would be implausible for a court to find that the LBO Lenders cannot benefit from Step Two avoidance, but that the value of such avoidance cannot reach the very creditors who were harmed by the LBO.

33.     Case law also shows that such a result is unlikely.   Courts have frequently held that equity holders such as the Tribune parent company may benefit from an avoidance action if all other allowed claims have been paid in full.   *See, e.g.*, *Kraft, LLC v. Greiner (In re Kraft LLC)*, 429 B.R. 637, 667-68 (Bankr. N.D. Ind. 2010) (holding that equity could receive surplus if creditors are paid in full); *In re Goss*, 43 F.2d 746, 747-48 (N.D. Ga. 1930) (holding that where a transferee has engaged in the fraud and comes to the court with unclean hands, the debtor is permitted to keep a surplus in recoveries.); *In re Bayou Group, LLC*, 372 B.R. 661, 664 (Bankr. S.D.N.Y. 2007) (holding that "[i]t is not clear that fraudulent conveyance claims can never be brought in whole or in part to benefit equity . . . ."); *Calpine Corp. v. Rosetta Res. Inc. (In re Calpine Corp.)*, 377 B.R. 808, 812 n.3 (Bankr. S.D.N.Y. 2007) (denying motion to dismiss fraudulent transfer action brought by debtor where recovery could benefit creditors and equity holders).   Here, once Step One lenders are precluded from sharing in the benefit of Step Two avoidance, approximately $1.6 billion will flow to the Tribune parent for the benefit of its non-LBO creditors.

34.     Thus, Aurelius is likely to succeed on the merits of its argument that the Court erred in approving the DCL Settlement without adequately considering the benefit that would flow to non-LBO creditors if only Step Two was avoided.

**B.     The Balance Of Hardships And The Public Interest Favor A Stay.**

1.     Aurelius is Likely to Suffer Irreparable Injury in the Absence of a Stay.

35.     Aurelius risks irreparable injury if a stay is not entered.   First, now that a plan

16

has been confirmed, it is likely that the DCL Plan Proponents will attempt to consummate that plan by effectuating the releases and distributions for which it provides as expeditiously as possible.    Indeed, the Debtors have indicated that that is their intent.    *See* Hrg. Trans. 6/8/2012, 4964:11-18 ("I think people want to get moving, and quite frankly, look it, it's very, very important to the company to get this decision done quickly, because, as you know, there is a pacing item here to emergence with the FCC, and the sooner we get through this hurdle, the faster we can get through the next.").    Additionally, while the DCL Plan Proponents have previously stated that the process of obtaining FCC approval could take at least three months, Aurelius is concerned that this timeframe could now be significantly shorter, and that the DCL Plan Proponents may seek to consummate the DCL Plan in just a few short weeks.    *See* 3/17/11 Trial Tr. at 60:24-61:8; 11/22/11 Trial Tr. at 46:7-16.

36.    If the Debtors are able to effectuate the DCL Plan and distribute estate assets prior to the adjudication of Aurelius's appeal, it is possible that the Debtors could be precluded from recovering estate assets that rightfully belong to non-LBO creditors, and that Aurelius could be harmed irreparably.    *See In re Finova Group, Inc.*, 2007 WL 3238764, at *2 (finding likelihood of distribution of assets to constitute "real and substantial" risk of irreparable harm); *see also In re Netia Holdings, S.A.*, 278 B.R. 344, 357 (Bankr. S.D.N.Y. 2002) (finding balance of hardships weighed in favor of granting preliminary injunction and stating that "[i]f the funds leave State Street, they will be distributed to diverse parties, and be difficult or impossible to recover.    This is of course a concrete example exemplifying the well-established principle that piecemeal distribution of a debtor's estate constitutes irreparable harm.").

37.    Second, once the releases and distributions are implemented, the DCL Plan Proponents will likely move to dismiss Aurelius's appeal as equitably moot under Third Circuit

17

law.    *E.g., United States Tr. v. Official Comm. of Equity Sec. Holders (In re Zenith Elecs.*

*Corp.)*, 329 F.3d 338, 343 (3d Cir. 2003) (quoting *In re PWS Holding Corp.*, 228 F.3d 224, 236

(3d Cir. 2000) (observing that the "foremost consideration" in determining whether equitable

mootness applies is "whether the reorganization plan has been substantially consummated.").

The doctrine is almost invariably invoked after a Chapter 11 plan of reorganization has been

confirmed and "substantially consummated."    *E.g., Deutsche Bank AG v. Metromedia Fiber*

*Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 144 (2d Cir. 2005)

(doctrine is "invoked to avoid disturbing a reorganization plan once implemented."); *In re Zenith*

*Elecs. Corp.*, 329 F.3d at 340 ("the equitable mootness doctrine is to be applied *only* in order to

'prevent[] a court from unscrambling complex bankruptcy reorganizations when the appealing

party should have acted before the plan became extremely difficult to retract'") (citation omitted,

emphasis added); *In re UNR Indus. Inc.*, 20 F.3d 766, 769 (7th Cir. 1994) (discussing equitable

mootness doctrine:   "with other courts of appeals, we have recognized that a plan of

reorganization, once implemented, should be disturbed only for compelling reasons.").    While

Aurelius disputes that consummation of the plan would render its appeal equitably moot, there is

no question that the DCL Plan Proponents will argue to the contrary.    Therefore, there is a risk

that Aurelius's appeal will be dismissed and the DCL Plan's treatment of the LBO-Related

Causes of Action will escape appellate review.

38.    Where, as here, "'the denial of a stay pending appeal risks mooting any appeal of

significant claims of error, the irreparable harm requirement is satisfied.'"    *Dodgers*, 465 B.R. at

36 (finding risk of equitable mootness supported issuance of stay) (quoting *Williams v. Republic*

*(In re Cujas)*, 376 B.R. 480, 487 (Bankr. E.D. Pa. 2007)).    As the Third Circuit has stated,

"[c]ertainly, the fact that the decision on the stay may be dispositive of the appeal . . . is a factor

that an appellate court must consider" in determining whether irreparable harm will result from the denial of a stay.  *Republic of Phil.,* 949 F.2d at 658; *but see Black Horse Capital LP v. JP Morgan Chase Bank (In re Washington Mutual),* No. 1:11-cv-00124-GMS (D. Del. Jan. 19, 2012) (risk of equitable mootness not sufficient to establish irreparable harm).

2.   Other Parties and Third Parties will not be Substantially Harmed by the Entry of a Stay.

39.    In contrast to the harm that Aurelius may incur in the absence of a stay, other parties, including the DCL Plan Proponents, will not be unduly burdened if a stay pending appeal is granted.   Given that the Debtors' bankruptcy case has been pending for nearly four years, during which time the Debtors' value has increased, any argument that parties will be irreparably harmed by the minimal additional delay necessary to ensure that the Order may be fully vetted through the appeals process would be highly specious.   *See* NPP Proposed Findings of Fact ¶¶ 373.

40.    Additionally, to lessen any impact of delay, Aurelius will move the District Court to expedite its appeal and waive mediation.   The DCL Plan Proponents could also join in these requests.   If granted, the motion to expedite and waive meditation will decrease any delay and diminish any alleged harm that the DCL Plan Proponents or third parties might claim.

3.   Public Interest Considerations Weigh in Favor of a Stay.

41.    The public interest also weighs strongly in favor of a stay.   This case arises from the bankruptcy of one of America's oldest and most renowned media corporations, with holdings that include some of the country's leading news and entertainment sources.   Billions of dollars are at stake; the rights and interests of many dozens of parties are implicated; and allegations of fraud have been leveled against major financial institutions.   Aurelius's appeal raises complex and significant issues related to the very lending practices that are at the heart of the financial

19

crisis plaguing the country today and the avoidance of debt arising from ill-conceived LBOs. The way in which this case proceeds will influence future LBOs and affect the resolution of other LBO-driven bankruptcy cases.   *See, e.g.* John H. Ginsburg, et al., *Befuddlement Betwixt Two Fulcrums: Calibrating The Scales of Justice To Ascertain Fraudulent Transfers In Leveraged Buyouts*, 19 Am. Bankr. Inst. L. Rev. 71 (2011) (citing Tribune as a critical instance of LBO-driven insolvency that raises important issues about the scope of fraudulent transfer law.).   Ensuring that Aurelius's arguments receive full consideration on appeal, rather than risking their dismissal as equitably moot, will not only provide a definitive ruling for the parties to this proceeding, but will also furnish important precedent for parties and courts in other proceedings.

### C.    Aurelius Should Not Be Required To Post A Bond

42.    Bankruptcy Rule 8005 allows the Court to condition a stay pending appeal on the filing of a bond.   The purpose of such a bond "is to protect the adverse party from potential losses resulting from the stay."   *In re United Merchs. & Mfrs., Inc.*, 138 B.R. 426, 430 (D. Del. 1992).   The Court has "wide discretion in the matter of requiring security and if there is an absence of proof showing a likelihood of harm, certainly no bond is necessary."   *Cont'l Oil Co. v. Frontier Ref. Co.*, 338 F.2d 780, 782 (10th Cir. 1964) (footnote omitted).

43.    Where, as here, the adverse party will not suffer any losses as a result of a stay pending appeal, a bond is not necessary.   *United Merchs.*, 138 B.R. at 430; see also *Nordhoff Investments, Inc. v. Zenith Elecs. Corp.*, 258 F.3d 180, 191 (3d Cir. 2001) (noting that a stay may be sought "with or without posting a bond").   Generally a bond is only necessary where the stay is "likely to cause harm by diminishing the value of an estate or endanger [the non-moving parties'] interest in the ultimate recovery . . . ."   *See, e.g., ACC Bondholder Grp. v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 361 B.R. 337, 368 (Bankr. S.D.N.Y. 2007)

20

(internal quotations omitted).

44.    Here, the assets to be distributed to creditors consist of equity and debt of the reorganized Tribune, and cash.    Clearly, there is no risk that the delay in consummation necessary to ensure that Aurelius's appeal may be heard will result in a diminution of reorganized Tribune's debt or cash.    Additionally, there is no evidence even suggesting that the requested stay will result in a loss of value to the company's equity, as the Debtors' enterprise value has *increased* during the pendency of their bankruptcy cases.    The risk of any harm to parties in interest as a result of the stay is thus *de minimus*, at best, and no bond should be required.    *See In re Sphere Holding Corp.*, 162 B.R. 639, 644-45 (E.D.N.Y. 1994) (bond not required as a condition to enjoin creditors from collection pending appeal when there was no evidence that the creditor's collateral was diminishing in value and little damage would occur); *United Merchs.*, 138 B.R. at 430 (stay of further distributions pursuant to confirmed chapter 11 plan would not be conditioned upon a bond because the debtor would not suffer any loss as a result of the stay pending appeal).

## NOTICE

45.    Aurelius has provided notice of this Motion to counsel to:    (a) the Debtors; (b) the Official Committee of Unsecured Creditors; (c) Deutsche Bank Trust Company Americas; (d) Law Debenture Trust Company of New York; (e) Wilmington Trust Company; (f) Oaktree Capital Management, L.P.; (g) Angelo Gordon & Co., L.P.; (h) JPMorgan Chase Bank, NA; (i) EGI-TRB LLC; (j) TM Retirees; (k) certain directors and officers; (l) all those parties entitled to notice pursuant to Federal Rule of Bankruptcy Procedure 2002; and (m) the Office of the United States Trustee.    Aurelius respectfully submits that no further notice of the Motion is required.

## NO PRIOR RELIEF

46.     No prior request for the relief sought herein has been made to this Court or any

other court.

## CONCLUSION

WHEREFORE, for the foregoing reasons, Aurelius respectfully requests that this Court

enter an order, substantially in the form attached hereto as <u>Exhibit A</u>, (i) staying consummation

of the DCL Plan pending final resolution of Aurelius's appeal; and (ii) granting such other and

further relief as the Court deems equitable and proper.

Dated: July 23, 2012
         Wilmington, Delaware

                                              Respectfully submitted,


AKIN GUMP STRAUSS HAUER & FELD LLP       ASHBY & GEDDES, P.A.
Daniel H. Golden
David Zensky                             */s/ William P. Bowden*
Philip C. Dublin                         William P. Bowden (I.D. No. 2553)
Deborah Newman                           Amanda M. Winfree (I.D. No. 4615)
One Bryant Park                          500 Delaware Avenue, P.O. Box 1150
New York, NY    10036                    Wilmington, DE    19899
(212) 872-1000                           (302) 654-1888

*Counsel for Aurelius Capital Management, LP*

{00653725;v1 }