## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - x | |
| In re: | : |
| | : Chapter 11 |
| TRIBUNE COMPANY, et al., | : |
| | : Case No. 08-13141 (KJC) |
| Debtors. | : |
| | : (Jointly Administered) |
| | : |
| | : |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - x | |

## MOTION OF LAW DEBENTURE TRUST COMPANY OF NEW YORK
## AND DEUTSCHE BANK TRUST COMPANY AMERICAS FOR
## STAY PENDING APPEAL OF CONFIRMATION ORDER

Law Debenture Trust Company of New York ("Law Debenture"), as successor indenture trustee under that certain Indenture dated March 19, 1996 between Tribune Company (with its debtor subsidiaries, "Tribune" or the "Debtors") (successor to The Times Mirror Company) and Citibank, N.A. (as amended, the "1996 Indenture"), and Deutsche Bank Trust Company Americas ("DBTCA" and together with Law Debenture, the "Appellants"), successor trustee under (i) that certain indenture dated March 1, 1992, by and between Tribune and Continental Bank, N.A. (as amended, the "1992 Indenture"); (ii) that certain indenture dated January 30, 1995, by and between Tribune and First Interstate Bank of California (as amended, the "1995 Indenture"); and (iii) that certain indenture dated January 1, 1997, by and between Tribune and Bank of Montreal Trust Company (as amended, the "1997 Indenture," and together with the 1992 Indenture, the 1995 Indenture, and the 1996 Indenture, the "Senior Indentures" and the notes and holders of notes issued pursuant to the Senior Indentures, respectively, the "Senior Notes" and "Senior Noteholders"), by their undersigned counsel, hereby respectfully request (the "Motion"), pursuant to Rule 8005 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), that this Court grant a stay pending appeal of the *Order Regarding Allocation Disputes* [Dkt. No. 11338] (the "Allocation Disputes Order") as incorporated in the *Order Confirming Fourth Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by The Debtors, The Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P. and JPMorgan Chase Bank, N.A.*, dated July 23, 2012 [Dkt. No. 12074] (the "Confirmation Order") issued by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court" or "Court").  In support of their Motion, Appellants respectfully represent as follows:[1]

## PRELIMINARY STATEMENT

1.      The imposition of a stay of the Confirmation Order confirming the Fourth Amended Joint Plan of Reorganization For Tribune Company and Its Subsidiaries Proposed By the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A. (As Modified June 18, 2012) [Dkt. No. 11836] (the "Plan" or "DCL Plan") in connection with the appeal of the Confirmation Order is essential to ensure that effective relief is available to the Appellants if such appeal is successful.

2.      Appellants satisfy the four prong test set forth in *Haskell v. Goldman, Sachs & Co. (In re Genesis Health Ventures, Inc.)*, 367 B.R. 516, 519 (Bankr. D. Del. 2007), to warrant a stay of the Confirmation Order.  First, there is a strong likelihood that Appellants will prevail on the merits of their appeal.  Specifically, the Court's holding in the Allocation Disputes Order that the distributive provisions of the Plan did not have to comport fully with the reallocation provisions of the Subordination Agreements (as defined below) to satisfy the requirement that

---

[1]  Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Plan.

the Plan not discriminate unfairly against the dissenting class of Senior Noteholders was

erroneous as a matter of law.

3.    Indeed, by holding, in substance, that the provisions of a subordination agreement

could essentially be disregarded in applying the "not discriminate unfairly" requirement of

Section 1129(b)(1) of the Bankruptcy Code, the Court discounted legislative history that is

singularly and directly on point.  Instead, the Court relied on a single out of jurisdiction

bankruptcy court decision, *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 141 (Bankr. D.N.J. 2010),

and held, as a matter of law, that the phrase "notwithstanding section 510(a)" in Section

1129(b)(1) requires that "§ 1129(b) [be] applied without prevention or obstruction of any

applicable subordination agreements." *See Declaration Of Matthew B. Stein In Support Of Law*

*Debenture Trust Company of New York's And Deutsche Bank Trust Company Americas'*

*Certification Motion and Stay Motion*, dated July 23, 2012 (the "Stein Declaration"), Ex. A, at

24-25.  It is respectfully submitted that in so doing, the Court erred by disregarding basic tenets

of bankruptcy law that recognize subordination agreements are enforceable "under the

discrimination and fair and equitable concepts of [Section 1129(b)(1)]," *In re Consul Restaurant*

*Corp.*, 146 B.R. 979, 988 (Bankr. D. Minn. 1992), and a canon of statutory construction that

required it to respect the on-point legislative history.

4.    The Court also improperly applied *In re Armstrong World Indus.*, 348 B.R. 111,

121 (D. Del. 2006), in analyzing whether the Plan's reallocation of the distributions otherwise

attributable to the contractually subordinated debt ratably to Senior Noteholders and Other Parent

Claims constituted unfair discrimination against the Senior Noteholders.  In particular, the Court

applied the wrong comparison in determining whether the Plan discriminates unfairly against the

Senior Noteholder class by erroneously comparing the Senior Noteholders' recovery as the sole

beneficiary of the Subordination Agreements versus the Senior Noteholders' recovery when sharing the benefits of subordination with the holders of Other Parent Claims. Rather, *In re Armstrong* requires the evaluation of whether "a difference in the plan's treatment of the two classes" – *i.e.* comparing the recovery of the Senior Noteholders *from the estate* without subordination with the recovery of the Other Parent Claims – results in a "materially lower percentage recovery for the dissenting class." 348 B.R. at 121. The Court also disregarded the on-point legislative history of Section 1129(b) which required it to compare the distributions received *from the estate* under the Plan by the two classes (Other Parent Claims and Senior Noteholders) *prior* to giving effect to the Subordination Agreements.

5.      As a result of the Court's decision, the Plan unfairly discriminates against the Senior Noteholders by under-compensating them vis-à-vis similarly situated creditors who are not beneficiaries under the Subordination Agreements. Further, the Court's reading of Section 1129(b) to permit the disregard of subordination agreements in evaluating "cramdown" plans leads directly to a system that encourages collusion among subordinated and non-senior creditors to cramdown a plan for the sole purpose of avoiding obligations under subordination agreements that otherwise would be enforced if a plan were confirmed with the consent of all creditor classes. As one commentator noted referring to this precise situation, this is a "very strange result." *See* Prof. Dan Schechter, *Cramdown Plan May Violate Intercreditor Agreement, Even Though Consensual Plan Could Not Do So*, 2010 Comm. Fin. News. 36 (May 3, 2010) ("Schechter"). Further, this dangerous precedent threatens to stymie lending as creditors realize that subordination agreements are unenforceable in cramdown plans.

6.      Additionally, the Court erred in its Allocation Disputes Memorandum by holding that "the SWAP Claim falls within the definition of Senior Indebtedness in the PHONES

Indenture" and "within the definition of Senior Obligations under the EGI Subordination Agreement."  Stein Declaration, Ex. A, at 21-22 n.19.  Contrary to the Court's holding, however, the Swap Claim lacks the fundamental characteristics of "Indebtedness" as contemplated by the PHONES Indenture as it neither constitutes borrowed money nor obligations represented by notes, bonds, debentures or similar evidences of indebtedness. Similarly, the Swap Claim cannot constitute a Senior Obligation because interest rate swaps and similar hedges against contingent liabilities are an accrued expense incurred in the ordinary course of business for companies such as Tribune.

7.     Second, Appellants and the Senior Noteholders may be irreparably harmed if the funds subject to subordination are distributed under the Plan pursuant to the Confirmation Order before Appellants have an opportunity to obtain appellate review of the Confirmation Order. The Plan proponents intend to "go effective" as soon as possible and to distribute funds to a variety of numerous creditors.  Upon a successful appeal, there is a risk that Appellants may be unable to recover all of these funds and, even if they could, would have to incur substantial costs that would ultimately be charged against the distributions to Senior Noteholders.  Also, once the Plan is consummated and the assets are distributed, the DCL Plan Proponents certainly will seek to dismiss the appeal on the grounds of mootness and deprive Appellants of any remedy.

8.     Third, Appellants will move to expedite their appeal.  Given that the Debtors' bankruptcy cases have been pending for nearly four years, a brief stay will not materially harm any party whatsoever.  In fact, according to the Plan proponents, during the pendency of the Debtors' bankruptcy cases, the value of the Debtors' estates has steadily increased.  The balance of hardship weighs in Appellants' and the Senior Noteholders' favor because there is virtually no harm to the Plan proponents if a stay is granted and material, if not irreparable, harm to

Appellants and the Senior Noteholders if a stay is not granted.  Therefore, the risk that a short delay to permit appellate review of what Appellants submit are legal errors in the Confirmation Order will harm any party is minimal.

9.    Finally, public policy favors Appellants retaining the ability to appeal the Confirmation Order and ensuring the availability of effective relief.  The public policy of creating uniformity and encouraging judicial review, as embodied by 28 U.S.C. § 158(d)(2)(A) (allowing direct appeal to the Courts of Appeals for this precise reason), is further served by granting a stay where an appeal might otherwise be dismissed as equitably moot.  This policy is particularly strong where, like here, there is a decision with no appellate precedent and no directly on point trial court precedent of an issue that has far-reaching implications for the financial markets.  For these reasons, as well as others discussed below, the granting of a limited stay is both necessary and appropriate.

## JURISDICTION AND VENUE

10.    The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper under 28 U.S.C. §§ 1408 and 1409.

## RELEVANT PROCEDURAL AND FACTUAL BACKGROUND

11.    The Court held the first confirmation hearing over a two-week period in March and April 2011 with closing arguments in June 2011 to consider two proposed competing plans of reorganization for Tribune (the "First Confirmation Hearing").  On October 31, 2011, the Court issued its *Opinion on Confirmation* [Dkt. No. 10133] (the "First Confirmation Opinion") and its *Order Denying Confirmation Of Competing Plans* [Dkt. No. 10134] denying confirmation of both plans. The First Confirmation Opinion left unresolved certain disputes regarding the allocation of distributions under the Plan to certain creditors of Tribune Company,

the parent entity (collectively, the "<u>Allocation Disputes</u>").

12.     On January 24, 2012, the Court entered an *Order Establishing Scheduling For (1)*

*Resolution of the Allocation Disputes and (2) Consideration of DCL Plan Proponents'*

*Supplemental Disclosure Document, Solicitation Procedures Motion and Plan* [Dkt. No. 10692]

establishing, in part, the procedures for the adjudication of the Allocation Disputes. The

Allocation Disputes principally dealt with the enforceability of the subordination provisions in

the PHONES Notes Indenture and the EGI-TRB Subordination Agreement (collectively, the

"<u>Subordination Agreements</u>") to which *only* the Senior Noteholders have contractual

entitlement.[2]

13.     On March 5 and 6, 2012, after the parties submitted their briefs, the Bankruptcy

Court held a hearing to determine the Allocation Disputes. One of the issues raised at that

hearing – and at issue in this appeal – is whether and to what extent the distributions under the

Plan must be adjusted to account for inter-creditor priorities under the Subordination Agreements

so that the dissenting class, Senior Noteholders, is not subject to unfair discrimination in

violation of Section 1129(b)(1) of the Bankruptcy Code. Appellants, among others, argued that

only those creditors contractually entitled to a "spin up" or reallocation of distributions (*i.e.*

Senior Noteholders) otherwise allocable to the junior creditors (PHONES Noteholders and EGI-

TRB LLC Noteholders) under the Subordination Agreements should receive such benefits under

the Debtors' Plan based on, among other things, the on-point legislative history of Section

1129(b)(1) and the proper application of the unfair discrimination test. As such, the distributive

provisions of the Plan must reflect the redistribution of the ratable distribution that would

otherwise have been allocable to the PHONES Noteholders and EGI-TRB LLC Noteholders in

---

[2] It is undisputed that at least some other general unsecured claims do not have contractual entitlement to the
benefits of subordination under the Subordination Agreements.

the absence of their respective subordination provisions solely to the Senior Noteholders to avoid

unfair discrimination against the class of Senior Noteholders.

14.     On April 9, 2012, the Bankruptcy Court entered its *Memorandum Regarding Allocation Disputes* [Dkt. No. 11337] (the "Allocation Disputes Memorandum") and accompanying *Order Regarding Allocation Disputes* [Dkt. No. 11338] (the "Allocation Disputes Order"). A copy of the Allocation Disputes Memorandum and Allocation Disputes Order are attached to the Stein Declaration, as Exhibits A and B, respectively. The Bankruptcy Court concluded that "[t]he discriminatory effect on the dissenting class is immaterial and, therefore, no rebuttable presumption of unfair discrimination arises." *See* Stein Declaration, Ex. A, at 30. Both the Allocation Disputes Memorandum and the Allocation Disputes Order provided that their determinations remained "subject to, conditioned upon and for the purpose of obtaining confirmation of a chapter 11 plan . . . ." *See, e.g.*, Stein Declaration, Ex. A, at 3; Stein Declaration, Ex. B, at 1, 2.

15.     In reaching its decision, the Court assumed that all of the Other Parent Claims, except for the Swap Claims, were not contractually entitled to the benefit of the Subordination Agreements (*i.e.*, did not qualify as senior indebtedness or senior obligations under their terms). Nevertheless, the Court held that such Other Parent Claims could receive the same distributions as senior creditors who were entitled to the benefit of the Subordination Agreements – at the expense of the Senior Noteholders – without violating the unfair discrimination prohibition of Section 1129(b)(1). The Court reached this decision in direct contradiction of clear and specific legislative history that expressly and in fact only addressed this precise scenario and makes clear that treating a dissenting creditor class that is entitled to the benefits of contractual subordination the same as a second creditor class that is not entitled to such subordination *does* discriminate

unfairly against the former by diverting value away from the "senior" creditor class.  Stein Declaration, Ex. A, at 21-23.

16.     On June 7, 8 and 11, 2012, the Court held a hearing to consider the confirmation of the Plan.  On July 13, 2012, the Bankruptcy Court issued its *Memorandum Overruling Objections To Confirmation Of The Fourth Amended Plan of Reorganization For Tribune Company And Its Subsidiaries And Denying Clarification Motion And Order Overruling Plan Objections And Denying The Clarification Motion* [Dkt. No. 12033] (the "Confirmation Memorandum") in which the Court overruled certain parties' objections to the Plan and denied certain parties' motion for reconsideration and/or clarification of the Allocation Disputes Order.

17.     On July 23, 2012, the Bankruptcy Court entered the Confirmation Order.  A copy of the Confirmation Memorandum and Confirmation Order are attached to the Stein Declaration as Exhibits C and D, respectively.  Both the Confirmation Memorandum and the Confirmation Order incorporated by reference the Court's conclusions in the Allocation Disputes Memorandum and the Allocation Disputes Order.

18.     On July 23, 2012, Appellants filed their *Notice of Appeal* of the Confirmation Order and their *Motion Pursuant To 28 U.S.C. § 158(d)(2) And Fed. R. Bankr. P. 8001(f) Requesting Certification Of Direct Appeal To United States Court Of Appeals For Third Circuit Of The Unfair Discrimination Issue In The Allocation Disputes Order As Incorporated In The Order And Memorandum Opinion On Confirmation.*

## REQUESTED RELIEF

19.     Appellants respectfully request entry of an order issuing a brief stay upon the effectiveness of the Confirmation Order pending resolution of the appeal.

## ARGUMENT

20.     Bankruptcy Rule 8005 provides that a bankruptcy court can protect the rights of

the parties while an appeal of one of its orders is pending:

> the bankruptcy judge may suspend or order the continuation of other proceedings
> in the case under the Code or make any other appropriate order during the
> pendency of an appeal on such terms as will protect the rights of all parties in
> interest.

Bankruptcy Rule 8005; *see also Nordhoff Invs., Inc. v. Zenith Elecs. Corp. (In re Zenith Elecs.*

*Corp.)*, 250 B.R. 207, 214-15 (D. Del. 2000) ("*Zenith I*"), aff'd, 258 F.3d 180 (3d Cir. 2001)

("*Zenith II*").  The Third Circuit has recognized that "a myriad of circumstances can occur that

would necessitate the grant of a stay pending appeal in order to preserve a party's position." *In*

*re Highway Truck Drivers & Helpers Local Union #107*, 888 F.2d 293, 298 (3d Cir. 1989).  The

granting of a motion for a stay pending appeal is commended to the bankruptcy court's sound

discretion. *In re United Merchs. & Mfrs., Inc.*, 138 B.R. 426, 430 (D. Del. 1992).

21.     In determining whether a stay of proceedings pending appeal is warranted under

Rule 8005, courts apply a four-part test:

> (1) whether the stay applicant has made a strong showing that he is likely to
> succeed on the merits; (2) whether the applicant will be irreparably injured absent
> the stay; (3) whether the issuance of the stay will substantially injure the other
> parties interested in the proceedings; and (4) where the public interest lies.

*Haskell v. Goldman, Sachs & Co. (In re Genesis Health Ventures, Inc.)*, 367 B.R. 516, 519

(Bankr. D. Del. 2007) (quoting *Republic of Philippines v. Westinghouse Elec. Corp.*, 949 F.2d

653, 658 (3d Cir. 1991)).  A court must balance all four elements, as no single factor is outcome

determinative. *In re Genesis Health Ventures*, 367 B.R. at 519; *see also In re Allegheny Health,*

*Educ. & Research Found.*, 252 B.R. 309, 321 (W.D. Pa. 1999).

22.     Critical to the matter at hand, the more likely it is that the movant may suffer

irreparable harm absent a stay, the less strong the showing of success on appeal needs to be, and

vice-versa.  *See BEPCO, L.P. v. 15375 Mem'l Corp. (In re 15375 Mem'l Corp.)*, No. 08-313,

2009 US. Dist. LEXIS 12004, at *4 (D. Del. Feb. 18, 2009); *NMSBPCSLDHB L.P. v. Integrated*

*Telecom Express, Inc. (In re Integrated Telecom Express, Inc.)*, No. 03-236, 2004 U.S. Dist.

LEXIS 9109, at *23-24 (D. Del. May 19, 2004), *rev'd on other grounds*, 384 F.3d 108 (3d Cir.

2004) (finding a court can grant a stay, even if it is "skeptical" of the prospects of success on

appeal, where the showing of irreparable harm is strong); *Kahn v. Elwood*, 232 F. Supp. 2d 344,

349 (M.D. Pa. 2002) (The probability of success that a plaintiff must demonstrate "is inversely

proportional to the amount of irreparable injury [the Movant] will suffer absent the stay.")

(quoting *Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150,

153 (6th Cir. 1991)); *see also Sofinet v. INS*, 188 F.3d 703, 707 (7th Cir. 1999).  Moreover, in

*Integrated Telecom*, the court rejected the argument of the party opposing the stay that a delay in

distributions under the plan was a legitimate factor against granting the stay.  2004 U.S. Dist.

LEXIS 9109, at *24, n.16.

     23.     To satisfy the "likelihood of success" factor in obtaining a stay pending appeal,

Appellants need not convince the Court to "change its mind or develop serious doubts

concerning the correctness of its decision." *See Goldstein v. Miller*, 488 F. Supp. 156, 172-73

(D. Md. 1980), *aff'd*, 649 F.2d 863 (4th Cir. 1981).  Courts should not take the "likelihood of

success" test too literally; a court need not confess error to grant a stay. *Evans v. Buchanan*, 435

F. Supp. 832, 843-844 (D. Del. 1977).  Further, a court may properly stay its own order when it

has ruled on a difficult legal question and the equities of the case suggest that the status quo

should be maintained. *See Goldstein*, 488 F. Supp. at 172-73; *see also Evans*, 435 F. Supp. at

844 (stay may be appropriate, and fourth factor satisfied, where appeal raises serious and

difficult questions of law and threat of irreparable injury to applicant is immediate and

substantial); *BEPCO, L.P.*, 2009 US. Dist. LEXIS 12004, at *4 ("movant must demonstrate that

it has a substantial issue to raise on appeal"). "Simply stated, more of one excuses less of the

other." *Kahn,* 232 F. Supp. 2d at 349-350.

24.     Further, where there is a danger that an appeal of a plan of confirmation may

become dismissed as moot, courts are urged to appreciate the special consequences of denying a

stay. *See Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*, 105 F.3d 837, 840 (2d Cir. 1997)

(dismissing appeal as moot and noting that "[i]t therefore becomes important for district judges

to appreciate the special consequences of denying a stay").

## I.      There Is A Strong Likelihood That Appellants
Will Prevail On The Merits Of The Appeal.

25.     Appellants possess a strong likelihood that they will prevail on the merits of their

appeal because the Court made legal errors in interpreting Section 1129(b) of the Bankruptcy

Code and applying the unfair discrimination test under *In re Armstrong*.

### A.      The DCL Plan's Awarding Of The Economic Benefits Of Subordination
To Other Parent Claims That Are Not Contractually Entitled
To Such Benefits Violates Key Provisions Of The Bankruptcy Code.

#### 1.      The Phrase "Notwithstanding Section 510(a)"
In Section 1129(b)(1) Does Not Exclude Subordination
Agreements From The Analysis Of Unfair Discrimination.

26.     Section 1129(b)(1) requires that in order for a court to confirm a plan over the

objections of a dissenting class of creditors, "the Plan '[must] not discriminate unfairly, and [be]

fair and equitable' with respect to each impaired class that has not accepted the plan." *In re*

*Exide Techs.*, 303 B.R. 48, 78 (Bankr. D. Del. 2003) (Carey, J.) (quoting 11 U.S.C.

§ 1129(b)(1)); *see also Motorola, Inc. v. Official Comm. Of Unsecured Creditors (In re Iridium*

*Operating LLC)*, 478 F.3d 452, 464-65 (2d Cir. 2007) (holding that settlements must comply

with the Bankruptcy Code's priority scheme). In particular, Section 1129(b)(1) provides that

"[n]otwithstanding section 510(a) . . . if all of the applicable requirements of [1129(a)] . . . are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of [section 1129(a)(8)] if *the plan does not discriminate unfairly*, and is *fair and equitable*, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129 (emphasis added).

27.    Importantly, the legislative history of the Bankruptcy Code makes it clear that the determination of whether a plan discriminates unfairly requires a comparison of distributions from the debtor to different classes under the plan independent of any additional recovery that a senior creditor would receive as a result of a subordination agreement. That legislative history specifically provides that a plan which provides equal treatment to a class of creditors that is entitled to the benefit of a third creditor class's contractual subordination and a class of creditors that are not so entitled does discriminate unfairly against the former.

28.    First, Section 510(a) of the Bankruptcy Code *explicitly requires* the post-petition enforcement of subordination agreements. 11 U.S.C. § 510. The legislative history of this section provides that the only exception to the mandatory enforcement of subordination agreements in a reorganization case is if the class of senior creditors waive their rights by *agreeing* to some form of lesser treatment under a plan. *See* H.R. Rep. No. 95-595, at 359 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6315 ("A subordination agreement will not be enforced, however, in a reorganization case *in which the [class] that is the beneficiary of the agreement has accepted . . . a plan that waives their [sic] rights under the agreement*. Otherwise, the agreement would prevent just what chapter 11 contemplates: that seniors may give up rights to juniors in the interest of confirmation of a plan and rehabilitation of the debtor." (emphasis added)).

29.     Second, the legislative history of Section 1129(b)(1) emphasizes that the section

does not vitiate the consideration of subordination agreements in determining whether a plan is

"fair and equitable" and "does not discriminate unfairly" as required to confirm a cramdown

plan.  *See* H.R. Rep. No. 95-595, at 416-17 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6372-

73 (explaining that senior debt is unfairly discriminated against when a plan does not provide for

the distribution of the full benefits of subordination to the class of senior debt); 124 Cong. Rec.

32,407 (1978) ("The requirement of the House bill that a plan not 'discriminate unfairly' with

respect to a class is included for clarity: the language in the House report interpreting that

requirement, in the context of subordinated debentures, applies equally under the requirements of

section 1129(b)(1) of the House amendment.") (statement of Rep. Edwards); 124 Cong. Rec.

34,006 (1978) (same) (statement of Sen. DeConcini).  Further, as Collier states, discussing

subordination in cramdown plans, "[w]hen creditors have made contractual arrangements

altering their liquidation priorities, the Code respects them."  7 *Collier on Bankruptcy* ¶

1129.03[3](b)(vi) (16th ed. 2012) (citing 11 U.S.C. § 510(a)).

30.     Thus, as explained by Kenneth Klee – whose work and expertise as the Examiner

is well-known to this Court – the "notwithstanding 510(a)" language of Section 1129(b)(1)

allows the *majority of a non-dissenting classes* to agree to a modification of rights under

subordination agreements, but still empowers dissenting classes to enforce them:

> As a general proposition a subordination agreement is enforceable in a
> reorganization case to the same extent it is enforceable under nonbankruptcy law.
> 11 U.S.C § 510(a).  However, the confirmation standard of 11 U.S.C. §
> 1129(b)(1) applies "[n]otwithstanding section 510(a)."  **This means that to the**
> **extent a class of senior claims chooses not to enforce the subordination**
> **agreement, the minority in the class will be bound notwithstanding 510(a).**
> ***On the other hand, if the senior class insists on its rights by dissenting to the***
> ***plan, then the subordination agreement will be enforced through the fair and***
> ***equitable test.  The additional requirement that the plan does not discriminate***

14

> ***unfairly protects the senior class, the subordinated class, and classes not
> involved in the subordination agreement from being treated unfairly.***

K. Klee, All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code,

53 Am. Bankr. L.J. 133, 142 n.70 (1979) ("Klee I") (emphasis added).[3]

    31.    Indeed, courts and commentators have long supported a dissenting class's ability

to enforce subordination agreements in cramdown plans under Section 1129(b)(1).  For instance,

the court in *Consul Restaurant Corp.* explicitly rejected the argument that contractual

subordination agreements are somehow entirely excluded from cramdown plans. 146 B.R. at

988.  The court examined whether the "subordination rights of classes are *not* enforceable in

cramdown [based on] the plain language of 11 U.S.C. § 1129(b)(1)." *Id.* (emphasis added).

Rejecting this argument, the court concluded that "it is generally understood that such rights are

enforceable under the discrimination and fair and equitable concepts of the statute." *Id.* (citing 5

Collier on Bankruptcy ¶ 1129.03[3][b], 1129–67 (15th ed. 1992); *Klee I*, at 142 n. 70); *see also* 5

Bankr. Service Law. Edition § 45:353 (Apr. 2012) ("Subordination rights of classes are

enforceable in cram down under fair and equitable concepts of 11 U.S.C.A. § 1129(b)") (citing

*Consul Restaurant Corp.*, 146 B.R. at 988).

    32.    The Ninth Circuit similarly recognized that the impact of subordination

agreements must be considered in applying the "not discriminate unfairly" requirement when it

explained that "the concept of unfair discrimination applies to plans in which claims or interests

have been subordinated." *In re Acequia, Inc.*, 787 F.2d 1352, 1364 (9th Cir. 1986).

---

[3]  Klee briefly revisited the issue in a later article, cited in *TCI 2*, 428 B.R. at 140-41 as the primary authority for
that court's holding.  Kenneth N. Klee, *Adjusting Chapter 11: Fine Tuning the Plan Process*, 69 Am. Bankr. L.J.
551, 561 (1995) ("*Klee II*"). In brief commentary in an article focused on revising the Bankruptcy Code, Klee
advocates for revision of this provision, but only for clarity's sake, commenting that "[w]here the class votes to
reject the plan, there is no apparent rationale to disregard the subordination agreement." *Klee II*, n. 53.  As Klee
made clear in his 1979 article, the Bankruptcy Code does *not* currently mandate this irrational result.

33.    Finally, the Supreme Court has found that the Bankruptcy Code cannot be used "to defeat traditional property interests [because] [t]the bankruptcy power is subject to the Fifth Amendment's prohibitions against taking private property without compensation." *United States v. Sec. Indus. Bank*, 459 U.S. 70, 75 (1982) (citation omitted); *ACC Bondholder Group v. Adelphia Commc'n. Corp. (In re Adelphia Commc'n. Corp.)*, 361 B.R. 337, 358 (S.D.N.Y. 2007) (to "[p]ermit[] the Plan to go effective as confirmed – thereby distributing the finite estate to the creditors and taking away forever the rights of Appellants . . . could be a fundamental violation of Appellants' constitutional due process rights"). This deprivation of property rights, however, is exactly what the Court's interpretation of Section 1129(b)(1) of the Bankruptcy Code accomplishes.

34.    Thus, the Court's holding that subordination agreements do not have to be enforced in cramdown plans is likely to be reversed because it erroneously interprets the "notwithstanding section 510(a)" provision in Section 1129(b)(1) to eliminate the Senior Noteholders' rights under the Subordination Agreements.

**2.    Public Policy Supports The Application Of Subordination Agreements To Unfair Discrimination Analyses.**

35.    Sound policy also supports the enforcement of subordination agreements when considering whether a plan unfairly discriminates under Section 1129(b)(1).

36.    First, ignoring creditors' contractual subordination rights in cramdown plans encourages junior lenders to collude with senior lenders to create cramdown situations in order to avoid the effect of otherwise valid subordination agreements. As Professor Schechter explained:

> The statute says what it says, but this is a very strange result. If the debtor manages to negotiate a consensual plan under 11 U.S.C.A. § 1129(a), the plan must uphold the subordination agreement. However, if the debtor is unable to do so, and is forced to fall back on a cramdown plan under § 1129(b), then the debtor is freed from the constraints of the subordination agreement.

This anomaly encourages the strategic use of cramdown.  The debtor and a dissatisfied junior lienholder could easily work together so that the junior creditor's claim is classified as a "sweetheart" impaired claim; and under the cramdown rules, the debtor need only obtain one impaired consenting class.  The junior, of course, has a strong incentive to tip the plan into a cramdown, in order to escape the effects of the subordination agreement (which would otherwise prohibit the junior from receiving anything until the senior is paid in full).  Is this what Congress really intended to accomplish?

*Schechter*, at 36.  Of course not.  And Congress' express legislative history demonstrates that that is not what it meant and that is not what the statute provides.

37.    Second, lending will increasingly dry up as lenders become unable to rely upon subordination agreements because of the danger that courts will disregard them in a cramdown plan.  *Accord* 5 Norton Bankr. L. & Prac. 3d § 94:37 ("To the extent the waivers might not be enforceable in bankruptcy, disputes between the first lienholder and the second lienholder will impact upon the debtor in possession's ability to obtain postpetition financing.  Indeed, the uncertainty of whether the prebankruptcy waivers are enforceable could drive key decisions in the case as the two lenders jockey for position and circle the bankruptcy ring like two sumo wrestlers seeking the right leverage to toss their opponent aside.").  Indeed, this reasoning may later be adopted by courts "to challenge adequate protection payments, 363 sales or other basic bankruptcy rights asserted by senior lenders."  Andrew Tenzer, *Do Intercreditor Agreements Survive Cramdown?*,  PLC Global Finance (Nov. 30, 2010), *available at* http://usld.practicallaw.com/4-504-0013.

**B.    The Discrimination Under the DCL Plan is Unfair.**

      **1.    The Court Erroneously Applied**
            **_Armstrong's_ Rebuttable Presumption Test.**

38.    In concluding that the discriminatory effect of the Plan's distribution scheme on the Senior Noteholders is immaterial, the Court improperly applied the test under *In re Armstrong* (first proposed by Bankruptcy Judge Bruce Markell).  Stein Declaration, Ex. A, at 30.

Under *In re Armstrong*,[4] a rebuttable presumption of unfair discrimination arises where there is:

> "(1) a dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments), or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution."

348 B.R. at 121.

i.     **The Unfair Discrimination Test Requires Comparison Of The Distributions Of Two Creditors Groups.**

39.     First, the Court improperly applied the test requiring an analysis of the comparative treatment of two creditor groups under the third-prong of *In re Armstrong*. 348 B.R. at 122 (applying the third prong of unfair discrimination test by "compar[ing] the proposed allocations to the Asbestos PI Claimants and the Unsecured Creditors to determine whether the Plan unfairly discriminates against the UCC"). *In re Armstrong* explicitly requires an evaluation of whether "a difference in the plan's *treatment of the two classes*" results in "*a materially lower percentage recovery for the dissenting class.*" *Id.* at 121 (emphasis added). Instead, the Court explicitly rejected such approach by evaluating only alternative distributions to the dissenting class when determining materiality by comparing the Senior Noteholders' recovery under the Plan with the Senior Noteholders' recovery if the Subordination Agreements were enforced. Stein Declaration, Ex. A, at 27-29.

40.     However, the "unfair discrimination" test is not whether the discrimination results in a material downward adjustment to the dissenting class's recovery; rather, under *Armstrong*, the test is whether the dissenting class is receiving a materially lower percentage on its claims (before taking account of the subordination provisions) *compared with another class of equal*

---

[4] The unfair discrimination discussion in *Armstrong* occurred only at the district court level. The issue did not arise before the Third Circuit.

*rank.*[5]  Indeed, Bankruptcy Judge Markell, who proposed the "unfair discrimination" test

adopted by *In re Armstrong,* explained the "materially lower percentage recovery" prong of the

test as follows:

> [u]nder the third factor, discrimination is presumptively unfair in two
> circumstances.  First, unfairness is presumptively present *if the plan specifies
> materially different percentage recoveries for two classes having the same
> priority.*

Bruce A. Markell, "A New Perspective on Unfair Discrimination in Chapter 11," 72 Am. Bankr.

L.J. 227, 249 (1998) ("*Markell*") (emphasis added).  The "discrimination" results from a

disparity in the percentage recoveries of different classes of equal rank.

### ii.     The Unfair Discrimination Test Should Be Applied Prior To Giving Effect To Distributions That Result From Reallocation Under The Subordination Agreements.

41.     Second, the Court erred in disregarding legislative history that required it to

compare the distributions of the two classes *prior* to giving effect to the subordination

provisions.  The rote application of the *In re Armstrong* test to analyze recoveries under a plan is

inappropriate where there are two classes of equal rank vis-à-vis one another, but that have

different rights under a subordination agreement with respect to a third creditor class.  The two

classes may be of equal rank, but they do not have an equal ability to recover out of the ratable

distribution that would otherwise be allocable to the third creditor class absent the subordination

agreement.  *See 7 Collier on Bankruptcy* ¶ 1129.03[3](b)(vi) (16th ed. 2012) ("The problem as

discussed in the legislative history is that a plan can be fair and equitable to a class vis-à-vis all

---

[5]    *See In re Dow Corning Corp.*, 244 B.R. 696, 703 (Bankr. E.D. Mich. 1999) ("The inability to designate with certainty a comparable class is however, [sic] not necessary to disposition of the case because any alleged difference in treatment between Class 18 and another class or classes of the same priority would give rise to a presumption of unfairness under the test only if the Plan provided for either a materially lower recovery or a greater allocation of risk for Class 18.  This is not the case here as there is no evidence that any other class is receiving more favorable treatment than Class 18 under the Plan."); *see also In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 231-32 (Bankr. D.N.J. 2000) (comparing dissenting noteholder class's recovery on deficiency claims to recovery received by general unsecured creditors).

other senior and junior classes, while still causing problems with creditors of the same rank.").[6]

42.    Indeed, as Bankruptcy Judge Markell explained: "[e]state assets may not be equally available to all creditors. . . . If the different resources existed prebankruptcy, or are created by acts of nonplan proponents, *then the risk and expectations of the dissenting class cannot be frustrated by the plan's allocation.*"  Markell, *supra*, at 261-62 (emphasis added). Thus, the *Armstrong* formulation cannot control here without requiring a court to take into account and compare only those distributions that come <u>directly from the debtor</u> before considering the effect of any subordination agreement (and before considering the reallocation of payments from subordinated parties.)[7]

43.    This framework finds direct support in the legislative history of Section 1129(b) which makes clear that treating a dissenting creditor class that is entitled to the benefits of contractual subordination the same as a second creditor class that is not entitled to such subordination *does* discriminate unfairly against the former.  The legislative history of Section 1129(b)(1) provides in relevant part:

> This point illustrates the lack of precision in the first criterion which demands that a class not be unfairly discriminated against with respect to equal classes. From the perspective of unsecured trade claims, there is no unfair discrimination as long as the total consideration given all other classes of equal rank does not exceed the

---

[6]  Indeed, courts analyzing unfair discrimination under Section 1129(b)(1) consistently hold that disparate treatment is *permitted* where there *is* a subordination agreement. *See In re Aztec Co.*, 107 B.R. 585, 589 (Bankr. M.D. Tenn. 1989) ("The legislative history of 1129(b)(1) considers only one circumstance which would support disparate treatment, a subordination agreement.") (citation omitted); *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 232 (Bankr. D.N.J. 2000) (holding that Section 1129(b) only prohibits unfair discrimination among creditors with the same level of priority and therefore because a subordination agreement "change[d] the level of priority enjoyed" by the subordinated debt holder, the plan did not "unfairly discriminate" against it where the plan recognized the effect of the subordination in connection with distributions to creditors.); *In re Walnut Equip. Leasing Co.*, No. 97-19699 (DWS), 1999 Bankr. LEXIS 1460, at *26 (Bankr. E.D. Pa. Nov. 23, 1999) (concluding that absent a finding that an indenture for subordinated debt was unenforceable, a plan's treatment of subordinated debt in accordance with the indenture was not unfair or discriminatory).

[7]  In the Allocation Disputes Memorandum, the Court, having held that Section 1129(b)(1) permits a plan to not fully enforce a subordination agreement, did not distinguish between situations involving two classes of equal rank vis-à-vis one another, but that have different rights under a subordination agreement with respect to a third class. Stein Declaration, Ex. A, at 26.

amount that would result from an exact aliquot distribution.  Thus if trade creditors, senior debt, and subordinate debt are each owed $100 and the plan proposes to pay the trade debt $15, the senior debt $30, and the junior debt $0, the plan would not unfairly discriminate against the trade debt nor would any other allocation of consideration under the plan between the senior and junior debt be unfair as to the trade debt as long as the aggregate consideration is less than $30. The senior debt could take $25 and give up $5 to the junior debt and the trade debt would have no cause to complain because as far as it is concerned the junior debt is an equal class.

*However, in this latter case the senior debt would have been unfairly discriminated against because the trade debt was being unfairly over-compensated*; of course the plan would also fail unless the senior debt was unimpaired, received full value, or accepted the plan, because from its perspective a junior class received property under the plan.  Application of the test from the perspective of senior debt is best illustrated by the plan that proposes to pay trade debt $15, senior debt $25, and junior debt $0.  Here the senior debt is being unfairly discriminated against with respect to the equal trade debt even though the trade debt receives less than the senior debt.  The discrimination arises from the fact that the senior debt is entitled to the rights of the junior debt which in this example entitle the senior debt to share on a 2:1 basis with the trade debt.

H.R. Rep. No. 95-595, at 416-17, *reprinted in* 1978 U.S.C.C.A.N. 5963, 6372-73 (emphasis

added).

44.    As reflected above and as Bankruptcy Judge Markell explained: "the House

Report appears to assume that evaluation of the plan treatment of subordinated claims should

occur *before the subordination is given effect*."  Markell, *supra*, at 237 (emphasis added).  Thus,

the House Report seems to adopt the view that in a classic subordination scenario – in which there are three claims of equal priority, one of which is made senior to another by a subordination agreement, with the remaining claim not affected by the agreement – the only fair way to assess the plan consideration is to aggregate all proposed consideration and divide by the amount of debt owed.  Thus, if the three parties are owed $100 each, and the plan proposed to pay thirty dollars with respect to all three classes, then unfair discrimination is present if one party is initially allocated more than ten percent of its claim.

*Id.* (footnote omitted).

45.    This legislative history should have been dispositive.  The Court, however,

dismissed this legislative history without any basis for doing so other than (i) what the Court

referred to as "numerous developments in case law," without elaboration (even though there is

no case law applying the "not discriminate unfairly" requirement in the context of subordination

agreements), and (ii) a conclusion in Bankruptcy Judge Markell's law review article that the

examples in the legislative history are "roundabout" – even though the examples were not too

"roundabout" to enable Judge Markell to explain them as described above. *See Stein*

Declaration, Ex. A, at 23. Where, like here, there is no Third Circuit or Supreme Court

precedent, the legislative history of Section 1129(b) is dispositive on Congressional intent.[8]

46.    The "notwithstanding section 510(a)" lead-in to Section 1129(b)(1) cannot be

read to eliminate the consideration of subordination agreements in applying the "not discriminate

unfairly" requirement of Section 1129(b)(1), in direct contradiction of the legislative history. In

dismissing that legislative history, the Bankruptcy Court disregarded the basic principle that

apparent "plain meaning" of a statute is ***not*** conclusive where "the literal application of a statute

will produce a result demonstrably at odds with the intention of its drafters. In such cases, the

intention of the drafters, rather than the strict language, controls." *United States v. Ron Pair,*

*Entrs., Inc.*, 489 U.S. 235, 242 (1989) (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S.

564, 571 (1982)); *see also In re Armstrong World Indus. Inc.*, 432 F.3d 507, 512 (3d Cir. 2005)

(court will make no further inquiry where meaning of statute is plain "unless the literal

application of the statute will end in a result that conflicts with Congress's intentions," in which

case, "the intentions of Congress will control."). Here, the Bankruptcy Court's interpretation of

Section 1129(b)(1) of the Bankruptcy Code is demonstrably at odds with the intent of the

---

[8]    This Court quoted *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 125 S. Ct. 2611, 2626, 162 L.
Ed. 2d 502 (2005) for the proposition that legislative history may, in some, cases be unreliable. Nevertheless, courts
routinely rely upon it as *Exxon Mobil* acknowledges. *Id.* ("[e]xtrinsic materials have a role in statutory interpretation
. . . ."). Courts routinely rely on the legislative history to assess the bankruptcy code, including Section 1129(b)(1)
and unfair discrimination. *See, e.g., In re Aztec*, 107 B.R. at 589; *In re Acequia*, 787 F.2d at 1364 & n.18
(discussing legislative history and concluding that "unfair discrimination applies to plans in which claims or
interests have been subordinated").

drafters of that section; the legislative history makes it clear that the distributive provisions of a plan must comport with the terms of a subordination agreement to comply with the "not discriminate unfairly" requirement. Yet, the Bankruptcy Court held, in substance, that this legislative history was irrelevant.

47.    Moreover, a plan construct that provides for the *pari passu* treatment of unsecured claims that are not entitled to the benefit of a subordination agreement with those that are entitled to such benefit also represents a significant departure from pre-Bankruptcy Code law and practice. In particular, under the former Bankruptcy Act (including in reorganization proceedings under Chapter X of the former Bankruptcy Act, the pre-Code analog to chapter 11), subordination agreements were enforced in bankruptcy using a two part analysis. *See In re Assoc. Gas & Elec. Co.*, 53 F. Supp. 107, 114 (S.D.N.Y. 1943), *aff'd sub nom. Elias v. Clarke*, 143 F.2d 640, 647 (2d Cir. 1944). First, the dividends that would be distributed to junior creditors, senior creditors, and other creditors if all were on an equal footing would be determined. *Id.* Then, the dividends computed in this matter and distributable to the subordinated junior creditors would be added "to the dividends [] going to the . . . ***creditors to whom the [subordinated debt holders] agreed to subordinate their claims.***" *Id.* (emphasis added).

> ***The first step gives effect to the provisions of the contract that the [junior creditors] are not subordinate to the [other creditors].*** The second step gives effect to the provision of the contract that [the junior creditors] are subordinate to [the senior] creditors. ***Thus, all provisions of the contract are enforced without any inconsistency.***

*Id.* (*citing Bird & Sons Corp. v. Tobin*, 78 F.2d 371, 373 (8th Cir. 1935)) (emphasis added); *see also Pioneer-Cafeteria Feeds, Ltd. v. Mack (In re Wyse)*, 340 F.2d 719, 722-23 (6th Cir. 1965) ("the enforcement of subordination agreements between creditors of the same bankrupt, affects only their rights and does not interfere with or change the rights of other creditors."); Dee Martin

Calligar, *Subordination Agreements*, 70 Yale L.J. 376, 383-84 (1961) (citations omitted)

(surveying the case law holding that subordination agreements arising in bankruptcy proceedings

under the Act are nearly always enforced such that dividends paid from the bankrupt estate on

the subordinated claims are allocated to the senior debt and not to other debt which is neither

subordinated nor entitled to the benefit of subordination).

48.     Thus, although the Bankruptcy Code requirement that a plan "not discriminate

unfairly" was a new one, the only illustration of the application of that requirement in the

legislative history, regarding the application of subordination agreements, expressly continues

the pre-Code treatment of subordination agreements in reorganization cases.  In disregarding this

legislative history and departing from this prior law and practice, the Bankruptcy Court erred.

*See Graver v. Various Defendants (In re Asbestos Prods. Liab. Litig.)*, 801 F. Supp. 2d 337, 340

(E.D. Pa. 2011) (rejecting the plain meaning interpretation of 28 U.S.C. § 1446(b)(3) because the

statutory text apparently discarded a particular rule, but the legislative history suggested

Congress intended to preserve the prior state of the law including that rule); *cf. Midlantic Nat'l*

*Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 501 (1986) (noting that "[t]he normal rule of

statutory construction is that if Congress intends for legislation to change the interpretation of a

judicially created concept, it makes that intent specific," court held that the non-literal

interpretation of Section 554 of the Code preserving the pre-Code judge-made limits on the

trustee's abandonment right was appropriate in spite of the absence of any statutory text or

legislative history suggesting such limits in the statute).

49.     By failing to analyze unfair discrimination prior to giving effect to the

subordination agreements, and concluding that a Plan that provides the same treatment to an

unsecured creditor class that is entitled to the benefit of a subordination agreement and to a

creditor class that is not entitled to such benefit passes muster under the "not discriminate unfairly" test, the Court incorrectly assessed the Senior Noteholders' aggregate recoveries from two distinct sources: distributions from the Debtors on account of the claims of Senior Noteholders and reallocated distributions from the PHONES and EGI Notes to the Senior Noteholders. Instead, the Court was obligated to compare the recovery of the Senior Noteholders absent any distribution attributable to the enforcement of the subordination agreements to the distribution of Other Parent Claims. As the parties stipulated prior to the hearing on the Allocation Disputes, the amount of the distribution to the Senior Noteholders that was derived from the Debtors was only 21.9%. A copy of the chart depicting such stipulated distribution is attached to the Stein Declaration as Ex. E.

50.    Thus, based on these legal errors, the Court improperly conducted its comparative analysis which led to its erroneous conclusion that no rebuttable presumption of unfair discrimination exists. Stein Declaration, Ex. A, at 30.

2.    **The Discriminatory Effect On The Senior Noteholders Is Material.**

51.    When the proper unfair discrimination test is applied, the only conclusion that can be reached is that the discrimination is material. The chart below illustrates the proper analysis of unfair discrimination based on the "perspective of senior debt," comparing (i) the percentage distribution that the dissenting Senior Noteholder class is receiving without counting that portion of the distribution that is allocable to the application of the subordination/turnover provisions of the subordination agreements with (ii) the percentage distribution that the class of equal rank (Other Parent Claims) is receiving (all of which is attributable to direct distributions from the estate, and none to any such subordination/turnover).[9]    This allows for a comparison based on

---

[9]    This chart is based upon Exhibit E to the Stein Declaration.

what similarly situated creditors are receiving on account of their claims against the estate, as

distinguished from their claims against third parties.  Moreover, it accounts for the potential that

unfair discrimination can result not only from unequal percentage distribution to classes with the

same rights and priorities, but also from equal percentage distributions to classes with unequal

rights.

**% Discrimination Against Senior Notes - Low PHONES**

|  | Recovery from the Estate to | | % Discrimination |
|---|---|---|---|
|  | **Senior Notes** | **Other Parent Claims** | **Against Senior Notes** |
| Legislative History Example of Unfair Discrimination | 12.5% | 15.0% | 20.0% |
| **DCL Plan with no Litigation Trust Recoveries** | **21.9%** | **33.6%** | **53.1%** |
| DCL Plan with $250 Million in Litigation Trust Recoveries | 29.5% | 46.6% | 57.8% |
| DCL Plan with $500 Million in Litigation Trust Recoveries | 36.3% | 58.2% | 60.3% |
| DCL Plan with $750 Million in Litigation Trust Recoveries | 43.1% | 69.8% | 62.0% |

52.    Once one focuses properly on the percentage recovery of Senior Noteholders

before considering their right to the distributions otherwise allocable to PHONES and EGI

Notes, the discriminatory impact of the DCL Plan exceeds 50% in every scenario, worsening as

payments from the Litigation Trust increase.

53.    As demonstrated by the above chart, the discriminatory effects of the DCL Plan

are far worse than the sole example in the legislative history for Section 1129(b)(1).

**C.    The Swap Claim Does Not Constitute Either Senior Indebtedness Under The PHONES Indenture Or Senior Obligation Under The EGI Subordination Agreement.**

54.    In its Allocation Disputes Memorandum, the Court based its conclusion that the

Swap Claim was "Senior Indebtedness" on the baseless finding that "indebtedness due under the

Swap Agreement is an amount due in connection with the Credit Agreement . . . ." *See* Stein

Declaration, Ex. A, at 21-22, n. 19.  In so holding, the Court relied on § 14.01(2) of the PHONES

Indenture which defines "Senior Indebtedness" as "the principal of . . . and interest on . . . and

other amounts due on or *in connection with* any Indebtedness of the Company." *See* Stein

Declaration, Ex. A, at 22, n. 19; *see also* Stein Declaration, Ex. C, at 12 (noting that the Senior

Loan Claims and the Swap Claim are "*amounts due in connection with the Credit Agreement*"

(emphasis in original)).

55.    The Court's conclusion is misguided, subjects subordinated public debt holders

who think they are subordinating to very specific classes of senior debt to open-ended

subordination, and subjects parties who acquire senior debt in the belief that "Senior Debt" is

specifically delineated, to a broad and open ended dilution of their seniority.  The fact that the

Credit Agreement required Tribune to enter into an interest rate swap agreement does not mean

the obligations arising under that separate and independent agreement became subsumed within

the obligations under the Credit Agreement.  The Swap Claim obligation is entirely independent

from the obligations incurred under the Credit Agreement.  *See* DCL Post-Trial Br. at 95 ("the

Swap Claim is governed by a different agreement than the Senior Loan Claims, executed among

different parties and almost a month after the Senior Credit Agreement."); *see also Crofton

Convalescent Ctr., Inc. v. Dep't of Health & Mental Hygiene*, 413 Md. 201, 213, 991 A.2d 1257

(Md. 2010) (recognizing that interest rate swaps are obligations separate from the underlying

indebtedness, even where the parties intended to integrate the swap and loan agreements).

56.    Adhering to the Court's logic quickly leads to absurd and open-ended results.

Under its reasoning, because the Credit Agreement requires Tribune and its subsidiaries to

maintain its properties, a facilities contractor could have a claim as Senior Indebtedness for

monies owed for upkeep as an amount due "*in connection with* any Indebtedness of the Company." Further, because the Credit Agreement requires Tribune to maintain insurance, pay its taxes, and provide audited financials, insurance premiums, taxes, and auditors' fees could all fall within the aegis of "Senior Indebtedness."

57. Instead, the "due in connection with any Indebtedness" plainly refers to ancillary amounts owed by the debtor to the primary creditor, such as bank fees and associated attorneys' fees, which are only captured by this catch-all phrase. Under the doctrine of *ejusdem generis*, "[i]n connection with any Indebtedness" is a catch-all term that must be limited to conform with the more specific, preceding items in the sentence. Thus, the preceding terms in that phrase – "[p]rincipal," "premium," and "interest" – each limit and define the character of indebtedness contemplated by the catch-all, "amounts due on or in connection with any Indebtedness." Because each of these items relate to transfers between the debtor and principal lender (and not ancillary transfers between undefined third-parties mentioned in the Credit Agreement), the Swap Claim cannot qualify as "in connection with . . . Senior Indebtedness."

58. The Court's conclusion that the Swap Claim also constitutes Senior Obligations under the EGI Subordination Agreement is even flimsier, relying solely on the fact that the definition of Senior Obligations is broader. Stein Declaration, Ex. A, at 22 n.19. Rather than rejecting the argument that the Swap Claim was an accrued expense incurred in the ordinary course of business, the Court simply ignored it entirely. First, no party denies the fact that the Swap Claim is an owed, but unpaid liability of Tribune (though not indebtedness for borrowed money). As such, it is an accrued expense. Second, interest rate hedging arrangements such as the Swap Claim are common requirements in any large loan agreement – the requirement in the Credit Agreement to enter into the Swap Agreement was ordinary in all respects. Thus, the

Swap Claim is properly classified as an ordinary course of business expense. Therefore, the Swap Claim is not a Senior Obligation under the EGI Subordination Agreement.

***

59.    Based upon the Court's legal errors described above, Appellants have a substantial possibility of success on appeal and, accordingly, has satisfied the first prong of *In re Genesis Health Ventures, Inc.* 367 B.R. at 519.

## II.    Movant May Suffer Irreparable Harm If The Stay Is Denied.

60.    In considering Appellants' motion for a stay pending appeal, the Court must consider "the critical role a stay pending appeal plays, not only in maintaining the status quo, but in preserving the right to a review on the merits." *In re Charles & Lillian Brown's Hotel, Inc.*, 93 B.R. 49, 53 (Bankr. S.D.N.Y. 1988); *see also Trone v. Roberts Farms, Inc. (In re Roberts Farms, Inc.)*, 652 F.2d 793, 798 (9th Cir. 1981) ("If an appellant fails to obtain a stay after exhausting all appropriate remedies, that well may be the end of his appeal. . . . For this reason there is a concomitant obligation on the courts to consider such stay application thoroughly and with full appreciation of the consequences of a denial.").

61.    Here, the second prong of *In re Genesis Health Ventures*, 367 B.R. at 519, is satisfied because Appellants and the Senior Noteholders may be irreparably harmed if a stay is not granted. Without a stay, the DCL Plan Proponents will attempt to consummate the Plan and distribute the funds to the Other Parent Claims that would otherwise be subject to subordination. In such event, the Debtors and the Other Parent Claims certainly will argue that effective relief is unavailable and that the appeal is equitably moot. *See Zenith II*, 258 F.3d at 185-86; *In re Continental Airlines*, 91 F.3d 553, 560-561 (3d Cir. Del. 1996). Consequently, Appellants and the Senior Noteholders may suffer irreparable harm if the assets under the Plan are distributed and the Debtors are unable to reclaim such assets. *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 426

29

(8th Cir. 1996) ("The threat of unrecoverable economic loss, however, does qualify as irreparable harm.") (citations omitted); *Official Comm. of Equity Sec. Holders v. Finova Group Inc. (In re Finova Group Inc.)*, No. 07-480, 2007 U.S. Dist. LEXIS 80577, at *4 (D. Del. Oct. 31, 2007) (finding likelihood of distribution of assets to constitute "real and substantial" risk of irreparable harm); *In re Netia Holdings, S.A.*, 278 B.R. 344, 357 (Bankr. S.D.N.Y. 2002) (finding balance of hardships weighed in favor of granting preliminary injunction and stating that "[i]f the funds leave State Street, they will be distributed to diverse parties, and be difficult or impossible to recover. This is of course a concrete example exemplifying the well-established principle that piecemeal distribution of a debtor's estate constitutes irreparable injury.").

62.     Similarly, here, once the Plan is consummated, the Plan proponents will argue that equitable mootness frustrates Appellants' appellate review.

63.     Although Appellants do not concede nor believe that consummation of the Plan will render their appeal moot, there is a significant risk that Appellants may be denied their appellate right of review without a stay.  Courts recognize where, like here, "the denial of a stay pending appeal *risks* mooting any appeal of significant claims of error, the irreparable harm requirement is satisfied." *Fox Sports Net West 2, LLC v. Los Angeles Dodgers LLC (In re Los Angeles Dodgers LLC)*, 465 B.R. 18, 36 (D. Del. 2011) (finding risk of equitable mootness supported issuance of stay) (quoting *Williams v. Republic (In re Cujas)*, 376 B.R. 480, 487 (Bankr. E.D. Pa. 2007)) (emphasis added).  As the Third Circuit has stated, "[c]ertainly, the fact that the decision on the stay may be dispositive of the appeal . . . is a factor that an appellate court must consider" in determining whether irreparable harm will result from the denial of a stay. *Republic of Philippines v. Westinghouse Elec. Corp.*, 949 F.2d 653, 658 (3d Cir. 1991).[10]

---

[10] *But see In re TWA*, No. 01-0056, 2001 Bankr. LEXIS 723, at *28 (Bankr. D. Del. Mar. 27, 2001) ("an appeal being rendered moot does not itself constitute irreparable harm").

64.    Further, Appellants and the Senior Noteholders face an imminent danger of being bound by a Plan constructed with the intent to strip Appellants and the Senior Noteholders of their contractual property interest in subordination rights and the amounts otherwise allocable to the subordinated debt without an opportunity to obtain an appellate court's review of the underlying decision and ruling of law.

65.    Finally, should the Court's ruling stand without a meaningful opportunity for appellate review, the Senior Noteholders may suffer ongoing harm in an amount that is impossible to ascertain currently.  As long as the Litigation Trust is bringing in funds pursuant to the Plan, the Senior Noteholders will be injured by receiving less than the true amount to which they are entitled if the Subordination Agreements were properly enforced.  A party is irreparably harmed where damages are impossible to ascertain such that there is no other way short of a stay to maintain the status quo.  *See Commercial Radio Institute, Inc. v. W. Pa. Christian Broad. Co.*, 428 F. Supp. 1054, 1057 (W.D. Pa. 1977).

### III.    The Harm to Appellants Outweighs The Minimal, If Any, Harm To The Non-Moving Parties.

66.    The third prong of *In re Genesis Health Ventures*, 367 B.R. at 519, weighs in favor of a stay.  In contrast to the potential irreparable harm faced by Appellants, non-moving parties, including the Debtors, will suffer virtually no harm if this Court grants the limited stay requested herein.  Appellants will seek to expedite their appeal.  The additional length of the Debtors' bankruptcy cases beyond the almost four years that these cases have been pending will not harm the Debtors' estates.  *See In re St. Johnsbury Trucking Co.*, 185 B.R. 687, 690-91 (S.D.N.Y. 1995) (finding that, after a two-year confirmation process, a brief delay in the distribution of estate property resulting from a stay of the confirmation order did not impose an undue burden on creditors); *In re Gen. Motors Corp.*, 409 B.R. 24, 33 (Bankr. S.D.N.Y. 2009)

(recognizing the line of "[c]ases expressing a willingness to grant a brief stay pending expedited appeal" as establishing a sound reason for granting such stay, where the stay does nothing more than "delay[] distributions to creditors for a little longer").

67.     Indeed, the enterprise value of the Debtors actually has grown during the pendency of these bankruptcy cases.[11] Most creditors are receiving stock in Reorganized Tribune. As the company increases in value, so does the value of the stock. Therefore, there is no harm whatsoever. And, if a creditor wants to trade its stock, it can do so as a "when issued" stock or the underlying claim itself. Further, Appellants contend that the FCC process is far along, will not be delayed beyond the brief period of the requested stay, but may permit the Plan's "effectiveness" prior to appropriate appellate review.

68.     Accordingly, the harm facing Appellants far outweighs the minimal harm that the Debtors and other non-appellants will face.

**IV.    Granting the Stay Will Not Harm the Public Interest.**

69.     A stay is justified under the fourth prong of *In re Genesis Health Ventures*, 367 B.R. at 519, as the issuance of a stay in this case will not negatively impact any significant public interest. A stay preserves the ability to redress harm through appellate review. *See Charles & Lillian Brown's Hotel*, 93 B.R. at 53 (recognizing the vital role stays pending appeal play in preserving parties' rights, including the "right to a review on the merits"); *see also AT&T Co. v.*

---

[11] *See* Supplemental Disclosure Document Relating to Fourth Amended Joint Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A., dated April 17, 2012 [Dkt. 11400, Ex. 1, at 21-22] ("Lazard's Initial Reorganized Value Analysis, which it prepared in October 2010, was attached as Exhibit F to the General Disclosure Statement and estimated a range of Distributable Value for the Reorganized Debtors from $6.3 billion to $7.1 billion with an approximate mid-point of $6.75 billion, as of a December 27, 2010 assumed Effective Date. . . . Based on the update, as of February 16, 2012, the Reorganized Debtors' Distributable Value is estimated at a range of $6.917 billion to $7.826 billion with an approximate mid-point of $7.372 billion. As discussed in Exhibit C, the overall increase in value from the Bankruptcy Court-approved valuation of $7.019 billion is principally attributable to the Debtors' continuing accrual of Distributable Cash.")

*Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994) ("As a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff."). Although public policy favors the "expedient administration of the bankruptcy proceedings," parties "objecting to [a] settlement and [] distribution scheme have a right to appellate review . . . [and] [d]istribution of the challenged settlement award before its validity has been tested would deprive those parties of that right." *Adelphia*, 361 B.R. at 349-50 (internal quotations and citations omitted). Expediency here is trumped by the risk that, if Appellants are correct, the distributions that should have been made to Appellants and the Senior Noteholders may not be recovered retroactively without a stay. Moreover, a delay of weeks or even a few months is minimal compared with the almost four years that these cases have been pending.

70.     Indeed, in this case, there are only two relevant public policy considerations, both of which support granting the stay to ensure effective appellate review.

71.     The first is the correct application of the law. *See Ams. United for Separation of Church & State v. City of Grand Rapids*, 922 F.2d 303, 306 (6th Cir. 1990) (noting that "[t]he public interest lies in the correct application [of the law]"). It is a fundamental principle of bankruptcy that subordination agreements be upheld and that the plan not unfairly discriminate against a dissenting class. *In re Coastal Broad. Sys., Inc.*, No. 11-10596, 2012 Bankr. LEXIS 3098, at *22-23 (Bankr. D.N.J. July 6, 2012) ("Congress's enactment of section 510(a) signaled that the enforcement of subordination provisions was no longer a matter that was committed to the bankruptcy courts' notions of what may, or may not be, equitable; enforcement of such agreements is necessary to prevent junior creditors from receiving windfalls after having

explicitly agreed to accept less lucrative payment arrangements.") (citation omitted)  Failure to grant the stay subjects these bankruptcy cases to such a risk.

72.    Second, granting a stay furthers the Congressional policy of encouraging uniformity and circuit-level guidance on important questions of bankruptcy law.  Congress passed a statute permitting direct appeals from bankruptcy court to circuit court.  *See* 28 U.S.C. § 158(d)(2)(A); *AD HOC Group of Timber Noteholders v. Pac. Lumber Co. (In re Scotia Pac. Co. LLC)*, 508 F.3d 214, 219 n.4 (5th Cir. 2007).  The purpose of this grant was to promote greater circuit-level guidance and uniformity on important questions of bankruptcy law, a purpose contemplated by the United States Constitution.  U.S. Const. art. I, § 8, cl. 4.[12]

73.    This concern is most relevant with respect to the uncertainty in the financial markets over the integrity of subordination agreements in chapter 11 cases – the very scenario in which they are most likely to be relevant – that must surely result from the Court's conclusion that subordination agreements can essentially be disregarded in applying the cramdown provisions of Section 1129(b) of the Bankruptcy Code.  *See* Stein Declaration, Ex. A, at 25; *see generally Sharon Steel Corp. v. Chase Manhattan Bank N.A.,* 691 F.2d 1039, 1048 (2d Cir. 1982), *cert. denied*, 460 U.S. 1012, 103 S. Ct. 1253 (1983) (emphasizing the importance of uniformity and certainty in the interpretation of public indentures for the efficient working of the capital markets: "uniformity in interpretation is important to the efficiency of capital markets," and "the creation of enduring uncertainties as to the meaning of boilerplate provisions would decrease the value of all debenture issues and greatly impair the efficient working of capital markets."); *Springfield Assocs., L.L.C. v. Enron Corp. (In re Enron Corp.),* 379 B.R. 425, 448

---

[12]    *See Weber v. United States Tr.*, 484 F.3d 154, 158 (2d Cir. 2007) ("Congress intended [the direct appeal procedure] to facilitate our provision of guidance on pure questions of law.  Among the reasons for the direct appeal amendment was widespread unhappiness at the paucity of settled bankruptcy-law precedent.") (footnote omitted); H.R. Rep. No. 109-31, pt. 1, at 148 (2005), *reprinted in* 2005 U.S.C.C.A.N. 88, 206.

(S.D.N.Y. 2007) ("in order to ensure that untenable distinctions and unreasonable results are avoided, it is proper to consider the effect that the Court's interpretation would have on the markets" (citing *Elliott Assocs. v. Banco De La Nacion*, 194 F.3d 363, 380 (2d Cir. 1999))). Circuit-level guidance is necessary to resolve this uncertainty; and a stay is necessary to ensure that such appellate guidance is obtainable.

74.    Because the issue regarding unfair discrimination and enforcement of subordination agreements implicated by this appeal arises *only* in the context of plan confirmation and because the appellees likely will argue that appeals of unstayed confirmation orders are capable of being treated as moot once the plan is effective, this important and unsettled issue may never generate a Third Circuit opinion. Thus, the stay pending appeal will serve the public interest by preserving the right to an effective appellate process and promoting uniformity. *See In re Gucci*, 105 F.3d at 840 (dismissing appeal as moot and noting that "[i]t therefore becomes important for district judges to appreciate the special consequences of denying a stay.").

75.    To provide for the most expeditious review of the Confirmation Order in order, among other things, to shorten any period in which the Confirmation Order is stayed, Appellants have contemporaneously sought direct appeal to the Third Circuit Court of Appeal through certification as to the Unfair Discrimination Issue.

**V.    No Bond is Required Because the Limited Stay Of The Confirmation Order Has No Adverse Financial Affect.**

76.    Bankruptcy Rule 8005 allows the Court to condition a stay pending appeal on the filing of a bond. The purpose of such a bond "is to protect the adverse party from potential losses resulting from the stay." *In re United Merchs. & Mfrs., Inc.*, 138 B.R. 426, 430 (D. Del. 1992). The Court has "wide discretion in the mater of requiring security and if there is an

absence of proof showing a likelihood of harm, certainly no bond is necessary." *Cont'l Oil Co. v. Frontier Ref. Co.*, 338 F.2d 780, 782 (10th Cir. 1964) (footnote omitted).

77.     Where, as here, the adverse party will not suffer any losses as a result of a stay pending appeal, a bond is not necessary. *United Merchs.*, 138 B.R. at 430; *see also Zenith II*, 258 F.3d at 191 (noting that a stay may be sought "with or without posting a bond"). Generally a bond is only necessary where the stay is "likely to cause harm by diminishing the value of an estate or endanger [the non-moving parties'] interest in the ultimate recovery . . . ." *See, e.g.*, *Adelphia*, 361 B.R. at 368 (internal quotations omitted).

78.     Here, the Debtors' enterprise value has increased during the pendency of their bankruptcy cases. Accordingly, the risk that an additional delay will harm the Debtors and that protection is needed in the form of a bond is non-existent. As the stay seeks to maintain the status quo and preserve the funds for distribution until after the appeal is decided, no real harm will be suffered by the creditors. Moreover, the creditors have the ability to trade to monetize their recovery, if necessary. Therefore, a bond is unnecessary. *See In re Sphere Holding Corp.*, 162 B.R. 639, 644-45 (E.D.N.Y. 1994) (bond not required as a condition to enjoin creditors from collection pending appeal when there was no evidence that the creditor's collateral was diminishing in value and little damage would occur); *United Merchs.*, 138 B.R. at 430 (stay of further distributions pursuant to confirmed chapter 11 plan would not be conditioned upon a bond because the debtor would not suffer any loss as a result of the stay pending appeal).

## NOTICE

79.     Appellants have provided notice of this Motion to counsel to: (a) the Debtors; (b) the Official Committee of Unsecured Creditors; (c) Wilmington Trust Company; (d) Aurelius Capital Management, L.P.; (e) Brigade Capital Management, LLC; (f) Davidson Kempner Capital Management LLC; (g) Oaktree Capital Management, L.P.; (h) Angelo Gordon & Co.,

L.P.; (i) JPMorgan Chase Bank, NA; (j) Citadel Equity Fund, Ltd.; (k) Camden Asset

Management LP; (l) EGI-TRB LLC; (m) TM Retirees; (n) Barclays Bank Plc; (o) Waterstone

Capital Management L.P.; (p) certain directors and officers; and (q) the Office of the United

States Trustee.  Appellants respectfully submit that no further notice of the Motion is required.

## NO PRIOR RELIEF

80.     No prior request for the relief sought herein has been made to this Court or any

other court.

## CONCLUSION

WHEREFORE, for all of the reasons set forth above, Appellants request that this Court

enter an order (i) staying the Confirmation Order solely to the extent that it provides for the

distribution of those funds subject to the subordination provisions of the Subordination

Agreements pending adjudication of the appeal; and (ii) granting such other and further relief as

is equitable and proper.

Dated: July 23, 2012
      Wilmington, Delaware

                                  Respectfully submitted,

KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP

    David S. Rosner
    Sheron Korpus
    Christine A. Montenegro
    Matthew B. Stein
    1633 Broadway
    New York, New York 10019
    212-506-1700

BIFFERATO GENTILOTTI LLC

       /s/ *Garvan F. McDaniel*
Garvan F. McDaniel (I.D. No. 4167)
800 N. King Street, Plaza Level
Wilmington, Delaware 19801
302-429-1900

*Counsel for Law Debenture Trust Company of New York, solely in its capacity as successor*
*Indenture Trustee for certain series of Senior Notes*

McCARTER & ENGLISH, LLP
David J. Adler
245 Park Avenue
New York, New York 10167
212-609-6800

McCARTER & ENGLISH, LLP

_____/s/ Katharine L. Mayer_____
Katharine L. Mayer (I.D. No. 3758)
Renaissance Centre
405 N. King Street
Wilmington, Delaware 19801
302-984-6300

*Counsel for Deutsche Bank Trust Company Americas, solely in its capacity as successor Indenture Trustee for certain series of Senior Notes*