## EXHIBIT A

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | CHAPTER 11 |
| | : | (Jointly Administered) |
| **TRIBUNE COMPANY,** *et. al,*[1] | : | |
| | : | Case No. 08-13141 (KJC) |
| Debtors | : | (Re: D.I. 10692) |

## MEMORANDUM REGARDING
## ALLOCATION DISPUTES[2]

**BY:   KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE**

As detailed in its October 31, 2011 Opinion, this Court denied confirmation of two

competing plans of reorganization for the Debtors because both plans failed to meet the

requirements of Bankruptcy Code §1129. *In re Tribune Co.,* 464 B.R. 126, 2011 WL 5142420

(Bankr. D.Del. 2011) (the "Confirmation Opinion" or *Tribune I*).   Three motions for

reconsideration of the Confirmation Opinion were filed.[3]   On December 29, 2011, this Court

---

[1]The chapter 11 case filed by Tribune Media Services, Inc. (Bky. Case No. 08-13236) is jointly administered with the Tribune Company bankruptcy case and 109 additional affiliated debtors pursuant to the Order dated December 10, 2008 (docket no. 43).  An additional debtor, Tribune CNLBC, LLC (formerly known as Chicago National League Baseball Club, LLC) filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on October 12, 2009 (Bky. Case No. 09-13496), and is also jointly administered with the Tribune Company bankruptcy case pursuant to this Court's Order dated October 14, 2009 (docket no. 2333). The debtors in the jointly administered cases are referred to herein as the "Debtors."

[2]This Memorandum constitutes the findings of fact and conclusions of law, required by Fed.R.Bankr.P. 7052.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a).  This is a core proceeding pursuant to 28 U.S.C. 157(b)(1) and (b)(2)(A), (B), (L), and (O).

[3]The three motions for reconsideration were: (1) Joint Motion of Law Debenture Trust Company of New York and Deutsche Bank Trust Company Americas Requesting Reconsideration of the Court's Confirmation Opinion with Respect to the Subordination of the PHONES (the "Law Debenture Reconsideration Motion") (D.I. 10222), (2) Motion of Aurelius Capital Management, LP for Reconsideration of the Court's October 31, 2011 Decision as it Pertains to the Application of the PHONES Notes Subordination (the "Aurelius Reconsideration Motion") (D.I. 10226),  and (3) Motion of the Noteholder Plan Proponents for Reconsideration and Clarification of the Court's October 31, 2011

issued a Memorandum on Reconsideration granting the relief requested in the Law Debenture Reconsideration Motion and the Aurelius Reconsideration Motion and striking that part of the Confirmation Opinion defined as the "Subordination Determination."[4]  *In re Tribune Co.,* 464 B.R. 208 (Bankr.D.Del. 2011) (the "Reconsideration Decision" or *Tribune II*).   There, I concluded that fraudulent transfer claims, that would be pursued by the Litigation Trust established by the DCL Plan (*see* n. 6), are not assets belonging to the Debtors and, therefore, could not be "assets of the Company" subject to the subordination provisions of the PHONES Notes.[5]  Upon reconsideration and further review of the meaning of the phrase "[u]pon distribution of the assets of the Company" in light of applicable state law and the entirety of the PHONES Indenture, I determined that the phrase "assets of the Company" must be read broadly and amended the Confirmation Opinion to strike the Subordination Determination.  (*Id.*).

On November 18, 2011, the DCL Plan Proponents filed the Third Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries (D.I. 10273)(the "Third Amended Plan").[6]  The Third Amended Plan includes an "Allocation Dispute Protocol" which proposes to

---

Decision (the "NPP Reconsideration Motion") (D.I. 10227).

[4]The NPP Reconsideration Motion was granted, in part, regarding a request for clarification that the Court did not make any finding as to the claim amount of the PHONES Noteholders, and denied, in part, regarding the remainder of the relief requested.

[5]The "PHONES Notes" are those certain exchangeable Subordinated Debentures due 2029, issued pursuant to that certain Indenture dated April 1, 1999 (the "PHONES Indenture") between Tribune as issuer and Wilmington Trust Company as successor indenture trustee ("WTC") (ADH Ex. 2).

[6]The DCL Plan Proponents is the term used by the parties to refer to the parties proposing a joint plan of reorganization with the Debtors.  The "DCL Plan Proponents" are the Debtors, the Official Committee of Unsecured Creditors (the "Creditors' Committee"), Oaktree Capital Management, L.P. ("Oaktree"), Angelo, Gordon & Co., L.P. ("Angelo Gordon"), and JPMorgan Chase Bank, N.A. ("JPMorgan"). The DCL Plan Proponents' plan that was being considered in the Confirmation Opinion was the Second Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries, as

2

establish reserves for distributions to holders of allowed claims in certain classes that would be impacted by unresolved disputes regarding inter-creditor priorities, particularly with respect to the PHONES Notes and the EGI-TRB LLC Notes (the "EGI Notes").[7] (Third Amended Plan, §5.18 and Exhibit 5.18). The parties disagreed about the timing for resolution of the "Allocation Disputes," specifically whether the disputes should be resolved prior to solicitation of votes on the Third Amended Plan. The parties have argued persuasively that those entitled to vote on the Third Amended Plan should know definitively where they may fall in the priority scheme before being required to cast a vote. Moreover, resolution of the Allocation Disputes will reduce the need for reserves. Bankruptcy Rule 7001(8) provides that subordination issues must be decided either via adversary proceeding or in connection with confirmation.

Therefore, the Court has agreed to resolve the Allocation Disputes prior to plan solicitation and voting; however, all such determinations are subject to, conditioned upon and for the purpose of obtaining confirmation of a chapter 11 plan substantially in the form of the Third Amended Plan (D.I. 10273), hearing on which is scheduled to commence on June 7, 2012 (D.I. 11362).[8]

The parties submitted proposed schedules for resolution of the "Allocation Disputes" and the process for confirmation of the Third Amended Plan. On January 24, 2012, the Court entered the Order Establishing Scheduling for (1) Resolution of the Allocation Disputes and (2)

---

amended (*see* D.I. 8769) (the "DCL Plan").

[7]The EGI-TRB LLC Notes are those certain promissory notes in the aggregate principal amount of $225 million issued by Tribune in favor of EGI-TRB LLC and certain direct and indirect assignees of EGI-TRB LLC. (Third Amended Plan, §1.1.95) (ADH Ex. 6 and ADH Ex. 7).

[8]Hearing on the plan solicitation procedures motion and supplemental disclosure statement are scheduled for April 16, 2012.

Consideration of the DCL Plan Proponents' Supplemental Disclosure Document, Solicitation Procedures Motion and Plan. (D.I. 10692) (the "Allocation Procedures Order"). The Allocation Procedures Order defined the "Allocation Disputes" as follows:

a.    PHONES Notes Disputes. Disputes concerning the following issues related to the PHONES Notes: (i) whether and to what extent the Article III Distributions must be adjusted in order for the distributions under the Plan to satisfy the applicable requirements of the Bankruptcy Code in connection with assertions that all or any portion of the consideration provided by the Senior Lenders, Bridge Lenders, and Settling Step Two Payees in respect of the Settlement are or are not subject to the subordination provisions of the PHONES Notes Indenture; (ii) whether and to what extent the priority of the distributions from the Creditors' Trust must be adjusted in order for the distributions under the Plan to satisfy the applicable requirements of the Bankruptcy Code in connection with assertions that all or any distributions from the Creditors' Trust are or are not subject to the subordination provisions of the PHONES Notes Indenture; (iii) whether and to what extent the Article III Distributions or the priority of distributions from the Creditors' Trust and/or the Litigation Trust must be adjusted in order for the distributions under the Plan to satisfy the applicable requirements of the Bankruptcy Code in connection with assertions that any category of Other Parent Claims (*i.e.*, the Swap Claim, the Retiree Claims or general unsecured trade claims against Tribune) does or does not constitute "Senior Indebtedness", as defined by the PHONES Notes Indenture (including, without limitation, because any category of Other Parent Claims does or does not constitute "Indebtedness," as that term is defined in the PHONES Notes Indenture and used in the PHONES Notes Indenture's definition of "Senior Indebtedness"); (iv) the Allowed amount of the PHONES Notes Claims; (v) whether and to what extent beneficiaries of the subordination provisions of the PHONES Notes Indenture (as determined by the Bankruptcy Court, if applicable) are entitled to receive post-petition interest prior to the Holders of PHONES Notes Claims receiving payment on their Claims; and (vi) whether the PHONES Notes are senior in right of payment to the EGI-TRB LLC Notes; and

b.    EGI-TRB LLC Notes Disputes: Disputes concerning the following issues related to the EGI-TRB LLC Notes: (i) whether and to what extent the Article III Distributions must be adjusted in order for the distributions under the Plan to satisfy the applicable requirements of the Bankruptcy Code in connection with assertions that all or any portion of the consideration provided by the Senior Lenders, Bridge Lenders, and Settling Step Two Payees in respect of the Settlement are or are not subject to the subordination agreement governing the EGI-TRB LLC Notes; (ii) whether and to what extent the priority of the

4

distributions from the Creditors' Trust and/or the Litigation Trust must be adjusted in order for the distributions under the Plan to satisfy the applicable requirements of the Bankruptcy Code in connection with the assertions that all or any distributions from the Creditors' Trust and/or the Litigation Trust are or are not subject to the subordination agreement governing the EGI-TRB LLC Notes; (iii) whether and to what extent the Article III Distributions or the priority of distributions from the Creditors' Trust and/or the Litigation Trust must be adjusted in order for the distributions under the Plan to satisfy the applicable requirements of the Bankruptcy Code in connection with assertions that any category of Other Parent Claims (*i.e.,* the Swap Claim, the Retiree Claims or general unsecured trade claims against Tribune) does or does not constitute "Senior Obligations", as defined by the subordination agreement governing the EGI-TRB LLC Notes; (iv) whether and to what extent beneficiaries of the subordination agreement governing the EGI-TRB LLC Notes (as determined by the Bankruptcy Court, if applicable) are entitled to receive post-petition interest prior to the Holders of EGI-TRB LLC Notes Claims receiving payment on their Claims; and (v) whether the EGI-TRB LLC Notes are senior in right of payment to the PHONES Notes.

(Allocation Procedures Order, ¶2).[9]  The parties engaged in discovery and submitted briefs according to the schedule in the Allocation Procedures Order.  A hearing to consider the Allocation Disputes was held on March 5 and 6, 2012 (the "AD Hearing").  Limited, post-hearing letter briefs were submitted.  The parties have also stipulated to certain facts and have agreed to an Amended Master Exhibit List (D.I. 11116).[10]

---

[9]Capitalized terms used through out this Memorandum, but not defined herein, shall have the definitions set forth in the Third Amended Plan.

[10]The exhibits admitted into evidence at the AD Hearing were marked as "ADH Ex. ___."

## DISCUSSION

A.   **Issues Related to the PHONES Notes**

1.   Are the PHONES Notes' subordination provisions applicable to (i) a distribution
of Settlement Proceeds under the Third Amended Plan, or (ii) a distribution of
Creditors' Trust proceeds?

The Confirmation Opinion noted that the DCL Plan included two settlements known as

the LBO Settlement and the Step Two Disgorgement Settlement (together the "DCL Plan

Settlement").[11] *Tribune I*, 464 B.R. at 152. The DCL Plan Settlement is preserved substantially

in the Third Amended Plan. (*See* Supplemental Disclosure Document Relating to the Third

Amended Plan (D.I. 10275) at 18).

The DCL Plan created (and the Third Amended Plan includes) a "Creditors' Trust" to

pursue certain pre-petition LBO-Related Causes of Action arising under state fraudulent

conveyance law (known as the "Disclaimed State Law Avoidance Claims") that may be assigned

to the Creditors' Trust by creditors. *(See* Third Amended Plan, §§1.1.61, 1.1.84 and Article

XIV). The plans also create a "Litigation Trust" to pursue unsettled LBO-Related Causes of

Action and other specific claims (the "Preserved Causes of Action"). (*See* Third Amended Plan,

§§1.1.138, 1.1.193 and Article XIII).

WTC argues that the DCL Plan Settlement includes the settlement of causes of action

brought under chapter 5 of the Bankruptcy Code (the "Chapter 5 Causes of Action"), which are

not assets of Tribune under *Off'l Comm. Of Unsecured Creditors of Cybergenics Corp. v. Scott*

---

[11]The LBO Settlement was described as "the settlement with current and former Senior Lenders,
Bridge Lenders, and other parties of certain LBO-Related Causes of Action" and the Step Two
Disgorgement Settlement was described as "the settlement with current and former Senior Lenders,
Bridge Lenders, or Step Two Arrangers who received pre-petition payments from the Debtors on account
of the Step Two Financing." *Tribune I*, 464 B.R. at 152.

*Chinery (In re Cybergenics Corp.)*, 226 F.3d 237, 245 (3d Cir. 2000). WTC further argues that

the subordination provisions in the PHONES Notes apply only to a distribution of "assets of the

Company" and, therefore, a distribution of DCL Plan Settlement proceeds (the "Settlement

Proceeds") would not be subject to the subordination provisions in the PHONES Notes.

WTC concedes that the Reconsideration Decision determined that the PHONES Notes'

subordination provisions applied to any proceeds distributed by the *Litigation Trust*, but argues,

correctly, that no decision was made about applicability of the subordination provisions to

distributions of the *Settlement Proceeds* or the *Creditors' Trust proceeds*.[12] In response, other

parties assert that the reasoning of the Reconsideration Decision applies equally to the Settlement

Proceeds and Creditors' Trust proceeds.

    a.    <u>Jurisdiction</u>

WTC filed an appeal of the Reconsideration Decision.[13] (D.I. 10580). Although WTC

argues that the Reconsideration Decision did not address the applicability of the PHONES Notes

subordination provisions to the Settlement Proceeds and the Creditors' Trust proceeds, WTC

argues simultaneously that its appeal of the Reconsideration Decision divests this Court of

jurisdiction to determine the same issues.

The "Divestiture Rule" provides that an appeal divests the lower court of any further

---

[12]WTC argues that this issue is moot as to the Creditors' Trust proceeds because the PHONES Noteholders opted out of the Creditors' Trust in voting on the DCL Plan. However, PHONES Noteholders will be permitted to decide anew whether to opt out of the Creditors' Trust as part of the solicitation procedures for the Third Amended Plan. Since not all PHONES Noteholders may opt out of the Creditors' Trust, the applicability of the subordination provisions to the Creditors' Trust proceeds is not moot.

[13]On January 21, 2012, WTC also filed a Motion for Leave to Appeal, which is before the United States District Court for the District of Delaware (the "Delaware District Court") in miscellaneous case no. 12-mc-00029.

jurisdiction over the subject of the appeal. *In re Washington Mutual, Inc.*, 461 B.R. 200, 217-18 (Bankr.D.Del. 2011) ("*WaMu*") citing (among other cases) *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58, 103 S.Ct. 400, 74 L.Ed.2d 225 (1982) ("The filing of a notice of appeal is an event of jurisdictional significance - - it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal."); *Venen v. Sweet*, 758 F.2d 117, 120-21 (3d Cir. 1985) ("'Divest' means what it says - - the power to act, in all but a limited number of circumstances, has been taken away and placed elsewhere."); *In re Whispering Pines Estates, Inc.*, 369 B.R. 752, 757 (1st Cir. BAP 2007) ("It is well established that the filing of a notice of appeal is an event of jurisdictional significance in which a lower court loses jurisdiction over the subject matter involved in the appeal. The purpose of the general rule is to avoid the confusion of placing the same matter before two courts at the same time and preserve the integrity of the appeal process.") (citations omitted).

The *WaMu* Court recognized, however, that in a bankruptcy context the appeal of one ruling does not stay the entire bankruptcy case. *WaMu*, 461 B.R. at 218. As explained by one Court:

> As courts have noted, however, a bankruptcy case typically raises a myriad of issues, many totally unrelated and unconnected with the issues involved in any given appeal. The application of a broad rule that a bankruptcy court may not consider any request filed while an appeal is pending has the potential to severely hamper a bankruptcy court's ability to administer its cases in a timely manner.

*Whispering Pines*, 369 B.R. at 758. Bankruptcy Rule 8005 provides that during an appeal "the bankruptcy judge may suspend or order the continuation of other proceedings in the case under the Code or make any other appropriate order during the pendency of an appeal on such terms as will protect the rights of all parties in interest." Fed.R.Bankr.P. 8005. *See also In re Hagel*, 184

8

B.R. 793, 798-99 (9th Cir. BAP 1995) (superceded by statute on other grounds) (holding that Rule 8005 "does not provide that the bankruptcy court must stay all proceedings" but that it has discretion to stay any proceedings.).

The *WaMu* Court determined that "the correct statement of the Divestiture Rule is that so long as the lower court is not altering the appealed order, the lower court retains jurisdiction to enforce it." *WaMu*, 461 B.R. at 219 citing *In re Dardashti*, No. CC–07–1311, 2008 WL 8444787, at *6 (9th Cir. BAP Feb. 12, 2008) (stating that "when there is no stay pending appeal, the bankruptcy court retains jurisdiction to enforce an order that is on appeal, on condition that in doing so, the bankruptcy court does not significantly alter or expand upon the terms of that order."); *Hagel*, 184 B.R. at 798 ("courts have recognized a distinction between acts undertaken to enforce the judgment which are permissible, and acts which expand upon or alter it, which are prohibited.").

In *WaMu*, the Court held that it retained jurisdiction to consider confirmation of a modified plan, even though the plan authorized the transfer of certain securities, the ownership of which was the subject of a pending appeal. The modified plan's treatment of the securities was consistent with the Court's prior decision. The *WaMu* Court decided that confirmation was not a request to *modify* the appealed order, but to enforce it. *WaMu*, 461 B.R. at 220. Judge Walrath stated that the appellant had not moved for a stay pending appeal and, therefore, declined to exercise discretion under Rule 8005 *not* to consider the confirmation just because it might render the appeal moot.[14] *Id.*

---

[14]On January 15, 2012, the appellants in *WaMu* filed an Emergency Motion for Stay of Confirmation Proceedings Pending the Appeal and a Motion for a Writ of Mandamus before the District Court. The *WaMu* Court's decision on jurisdiction was upheld by the District Court's decision denying

The jurisdictional question currently before me is not as difficult as the one presented in *WaMu.* The matters before me do not implicate application of the PHONES Notes' subordination provisions *as to the Litigation Trust proceeds*; instead the issues now before me require consideration of the applicability of the PHONES subordination provisions to other distributions. Therefore, the Allocation Disputes do not seek to modify the Reconsideration Decision and my decision on these disputes will not change the Reconsideration Decision. This Court has jurisdiction to consider the Allocation Disputes.

b.    <u>Applicability of the PHONES Notes' subordination provisions to distribution of the Settlement Proceeds and Creditors' Trust proceeds.</u>

Although the issue before me applies to different distributions than previously considered in the Reconsideration Decision, WTC's arguments are the same: (i) that the DCL Plan Settlement includes resolution of Chapter 5 Causes of Action, (ii) that Chapter 5 causes of action are not assets of Tribune Company pursuant to the Third Circuit Court of Appeals' decision in *Cybergenics*, (iii) that the PHONES Notes' subordination provisions only apply to distributions of "assets of the Company" and, (iv) therefore, the subordination provisions do not apply to a distribution of DCL Plan Settlement Proceeds or Creditors' Trust proceeds.

Bankruptcy Code §510(a) provides that "[a] subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable non-bankruptcy law." Determining the meaning of the phrase "assets of the Company" as it is used in

---

the Writ of Mandamus and Emergency Motion for a Stay of the Confirmation Proceedings Pending the Appeal. *See Black Horse Capital L.P. v. JPMorgan Chase Bank NA (In re Washington Mutual, Inc.),* Civil Action No. 11-124 (GMS) (D.Del. Jan.19, 2012). A further appeal of the request for a writ of mandamus seeking to stay the confirmation proceedings was denied by the Third Circuit. *In re Washington Mutual, Inc.*, No. 12-1263 (3d Cir. Feb. 6, 2012).

the PHONES Indenture requires consideration of basic rules of contract interpretation. This is precisely the exercise that was undertaken in the Reconsideration Decision. As required by Illinois state law (which is applicable pursuant to Article 1.12 of the PHONES Indenture), I considered the phrase "assets of the Company" in light of the entirety of the PHONES Indenture and determined that the subordination provisions applied to a distribution of the Litigation Proceeds based upon, among other things, the unqualified subordination language of Section 14.02(A), the application of subordination provisions to all sources of "payment" in Section 14.02(B), and the catch-all language of the pay-over obligation in the paragraph following Section 14.02(B). (*See Tribune II,* 464 B.R. at 215- 21). I perceive no reason why the same analysis does not apply to a distribution of the Settlement Proceeds or the Creditors' Trust proceeds. WTC has not provided any basis to differentiate between the Litigation Trust Proceeds and the Settlement Proceeds or Creditors' Trust proceeds. WTC argues merely that my previous analysis is wrong. For the same reasons as set forth in the Reconsideration Decision, I conclude that the PHONES Indenture subordination provisions apply to any distribution of Settlement Proceeds and Creditors' Trust proceeds.

2.     <u>What is the allowed amount of the PHONES Notes Claim?</u>

      In the Confirmation Opinion, this Court was asked to determine the outstanding claim amount of the PHONES Noteholders but, due to an insufficient record, the issue was not resolved. (*See Tribune I,* 464 B.R. at 195-97). The parties have now presented additional evidence, including a Stipulation by and among the Debtors, Aurelius Capital Management, WTC, Barclays Bank PLC, and Waterstone Capital Management, L.P. on certain facts relevant to

11

the Allocation Disputes and the determination of the Allowed Amount of the PHONES Claim (the "Stipulation").  (ADH Ex. 115).

Prior to the Debtors' bankruptcy filing, and as permitted under the PHONES Indenture and the Global Note, some PHONES Noteholders attempted to exchange their Notes for cash, but, due to the intervening bankruptcy, those Noteholders never received payment from Tribune. The practical effect of a successful exchange entitled a PHONES Noteholder to receive cash in an amount, as it turns out, that is lower than the amount due to those PHONES Noteholders who did not tender their notes for exchange.  This dynamic has generated the dispute about whether the claim amount should be reduced by the amount of those PHONES Notes that were presented for exchange.

(a)    The Exchange Rights and Procedures

The terms of the form of global note (the "Global Note") (ADH Ex. 3) provide that the holder of each PHONES (a "Holder") has a right at any time and from time to time, to exchange (the "Exchange Right") each PHONES Note for an amount of cash based on the value of certain reference stock.  (Stipulation, ¶1).  Pursuant to the Global Note, with respect to any PHONES held through the Depository Trust Company ("DTC"), the Holders may exercise their Exchange Right through through the DTC ATOP system by "delivering an agent's message and delivering the PHONES of such Holder to the Trustee's DTC participant account."  (Stipulation, ¶2).  Upon delivery of a notice from any Holder (the "Exchange Notice") to the Indenture Trustee, Tribune is obligated to pay "the amount due upon exchange as soon as reasonably practicable" but in no event "later than ten Trading Days after the date of such Exchange Notice."  (Stipulation, ¶3). Pursuant to the Global Note, Tribune is required to deliver an officer's certificate with respect to

any received Exchange Notice specifying the exchange amount to be paid and the date such amount would be paid (the "Exchange Payment Date").  On the Exchange Payment Date, Tribune is required to deposit with the Indenture Trustee the due exchange amount and the Indenture Trustee is required to pay DTC as soon as practicable. (Stipulation, ¶4).

In September 2008, Tribune and Duetsche Bank Trust Company Americas ("DBTCA") determined that the "mechanism outlined in the [Global] note is obsolete and will not work" because the DTC ATOP System no longer worked for those types of trades.  (Stipulation, ¶8). Therefore, Tribune and DBTCA agreed on a revised form of exchange notice (the "Revised Exchange Notice") and revised PHONES exchange instructions for DBTCA.  (Stipulation, ¶9). Pursuant to the Revised Exchange Notice, to the extent the new "Exchange Procedures" modified the procedures in the Global Note, they "shall supercede and replace the procedures set forth in the [Global Note]."  (Stipulation, ¶11).

The Exchange Procedures attached to the Revised Exchange Notice included the following:

- "Holder will send [DBTCA] an Exchange Notice and submit the PHONES to be exchanged through the DWAC system [defined below] for withdrawal by [DBTCA]; [DBTCA] will accept DWAC and take possession of the PHONES tendered for Exchange (such date, the "Exchange Date")."

- "[DBTCA] will notify [Tribune] of [the] Exchange by delivering the Exchange Notice and acknowledging that [DBTCA] has taken possession of the PHONES tendered for Exchange by 12:00 pm on the Business Day following the Exchange Date."

- If Exchange Notices relating to more than 500,000 PHONES have been delivered on any Exchange Date, [DBTCA] shall notify [Tribune] by 6:00 pm New York City time on the Exchange Date and [Tribune] will give notice of such fact by issuing a press release prior to 9:00 am New York City time on the next Trading Day to be provided to DTC for dissemination and by providing such notice to

[DBTCA].

- [Tribune] will deliver an Officers' Certificate to [DBTCA] no later than 1 [one] Business Day after the Trading Day following the Exchange date; provided, however, if Exchange Notices relating to more than 500,000 PHONES have been delivered on any Exchange Date, the Company will deliver an Officers' Certificate no later than 1 Business Day after th e5th Trading Day following the Exchange Date.

- The Officers' Certificate shall set forth the amount to be paid to the tendering Holder(s) and the Exchange Payment Date.

- Based on the Officers' Certificate, Trustee will provide the Exchange Payment Date and amount to the Holder(s)

On the Exchange Payment Date (no later than 10 Trading Days following Exchange Date):

- [DBTCA] will cancel the tendered PHONES in the [DBTCA]'s possession"

- [Tribune] will pay the Holder(s)

(Stipulation, ¶¶14-16; ADH Ex. 94).   "DWAC" stands for Deposit/Withdrawal At Custodian, which is the automated system for deposits and withdrawals of securities run by the Depository Trust Company.  (Stipulation, ¶17).  In an email dated September 17, 2008 from DBTCA's Vice President to Tribune's outside counsel, DBTCA stated: "When [DBTCA] accept[s] the DWAC it means that we match with the instructions the holder has put up.  Accepting the DWAC will remove the bonds from DTC's records and move them to ours."  (Stipulation, ¶18).

    (b)    <u>Undisputed Facts</u>

Beginning November 26, 2008 and continuing through the December 8, 2008 (the "Exchange Period"), holders of 3,093,941 PHONES in 17 different exchanges tendered their PHONES for exchange (the "Tendering Noteholders"), but did not receive payment from

Tribune. (Stipulation, ¶24; ADH Ex. 91). Notices for the 17 exchanges given during the Exchange Period were delivered by DBTCA to Tribune. (Stipulation, ¶25). According to DBTCA's records, 14 exchanges were accepted into DWAC and 3 exchanges were not. (Stipulation, ¶26).[15] The current outstanding balance of PHONES on DTC's system is 4,953,884. (Stipulation, ¶29).

The Debtors' chapter 11 cases were commenced on December 8, 2008. By letter dated December 30, 2008, DBTCA advised Tribune that it had "received a number of requests from the PHONES holders seeking to withdraw their election to exercise [of] the Exchange Option . . . [and] requests that [Tribune] advise the Trustee and WTC as to whether it will honor the [w]ithdrawal [r]equests." (Stipulation, ¶30).

By letter dated January 14, 2009, Tribune advised DBTCA that "the Company considers each election to exercise the Exchange Right pursuant to an Exchange Notice submitted by a holder of PHONES to be irrevocable. Accordingly, the company is not prepared to honor any [w]ithdrawal [r]equest." (Stipulation, ¶31).

 (c) Discussion Regarding the PHONES Notes Claim Amount

The claim amount of the PHONES Noteholders depends upon the rights of the Tendering Noteholders at the time the bankruptcy petition was filed on December 8, 2008. *See Nantahala*

---

[15]In its Responses and Objections to Interrogatories served by WTC, DBTCA states, in part, regarding two separate proposed exchanges of 197,237 PHONES by Goldman Sachs on 12/3/2008 and 12/8/2008 and one proposed exchange of 40,000 PHONES by Citigroup Global Markets on 12/2/2008, that "to our knowledge [these exchanges] were not accompanied by a DWAC that had been initiated by the broker and accepted by DBTCA. After a reasonable inquiry of its own files, DBTCA is unable to determine whether these exchanges were duplicates or what the circumstances and/or reasons why the [proposed exchanges] were not approved into the DWAC system. Because a DWAC instruction was not approved, it is our understanding that DTC did not reduce the amount of the PHONES Notes on its bookkeeping system." (Stipluation, ¶27, ¶28).

*Capital Partners, LP v. Washington Mutual, Inc. (In re Washington Mutual, Inc.)*, 464 B.R. 656, 668 (Bankr.D.Del. 2012)(deciding that equity holders' interests remained only equity interests when the right to elect a cash payment did not arise as of the bankruptcy petition date) citing *Carrieri v. Jobs.com, Inc.*, 393 F.3d 508, 522 (5th Cir. 2004) (holding that warrants with cash redemption provision are equity interests unless the right to receive a cash payment matured before the petition date). *See also The Minority Voting Trust v. Orange County Nursery, Inc. (In re Orange County Nursery, Inc.)*, 439 B.R. 144, 151 (C.D. Cal. 2010) (deciding that the bankruptcy court correctly noted that the nature of the minority shareholders' interest "depends on its position at the time the bankruptcy petition was filed.").

The parties do not dispute that the Tendering Noteholders delivered their PHONES Notes to DBTCA for exchange prior to the Debtors' petition date. Although three of the exchanges were not accepted into the DWAC system, Tribune received notice of all 17 exchanges. The Debtors' records demonstrated that Tribune, after receiving the Exchange Notices, established the Exchange Payment Date and amount for most the tendered notes. (ADH Ex. 91).[16] Before the applicable Exchange Payment Dates, however, the chapter 11 bankruptcy filing intervened and the Tendering Noteholders were not paid. At the time the chapter 11 petitions were filed, Tribune was obligated (pursuant to the terms of the Global Note and the Revised Exchange

---

[16]ADH Ex. 91 provides that Officers' Certificates specifying the Exchange Payment Date and amounts were not provided to Notes exchanged on December 2, 2008 and December 8, 2008, since more than 500,000 PHONES Notes were received on those exchange dates, thereby subjecting those Notes to a different procedure for calculating the payment amounts. ADH Ex. 91 shows that the Officers' Certificates for the December 2 and 8, 2008 were not due until 12/10/2008 and 12/16/2008, respectively. The parties do not specify exactly when in the day the Notes were tendered for exchange on the petition date, but I will rely upon their Stipulation, which calculates competing claim amounts assuming that the exchanges on December 8, 2008 were made prior to the time the petitions were filed.

Procedures) to pay the applicable exchange amounts to the Tendering Noteholders. The triggering event that established the parties' rights and obligations as of the petition filing was the Noteholders' delivery of the PHONES Notes for exchange.

WTC argues that the Tendering Noteholders' attempted exchange was ineffective because payment was not received from Tribune. WTC argues that DTC wrongfully cancelled the Notes because the Revised Exchange Procedures provided that the Notes would be cancelled on the Exchange Payment Date - - after payment by Tribune. WTC further argues that this unauthorized termination of the Notes should be treated like "mutilated, destroyed, lost or stolen" securities under Section 3.06 of the PHONES Indenture, requiring Tribune to issue a new security with the same benefits as other securities under the Indenture, or pay the security. (ADH Ex. 2).

Ultimately, cancellation of the Notes (wrongful or otherwise) is not relevant to this inquiry. The relevant inquiry is: what was the obligation of Tribune with respect to the Notes as of the petition date? As of the petition date, here, Tribune's obligation to make the Exchange Payments was set due to (i) the Tendering Noteholders' delivery of the Exchange Notices and the Notes, and (ii) Tribune's acknowledgment of receipt of all of the Exchange Notices (including the Exchange Notices for those three exchanges that were not accepted in DWAC) by setting the Exchange Payment Date and determining the amount of the payments. Tribune was complying with the Exchange Procedures when the bankruptcy filing interrupted that process and prevented payment. There is no need to treat the notes as destroyed, lost or stolen. Cancellation of the Notes, wrongfully or not, is not the event that triggers the parties' rights and obligations.

Aurelius contends that the language of the Indenture supports this conclusion because the Indenture's definition of the term "Outstanding" specifically excludes "Securities theretofore

17

cancelled by the Trustee. . . . *or delivered to the Trustee* or any Authenticating Agent for cancellation." (ADH Ex. 2, p. 4 (emphasis added)).  Aurelius notes that, regardless of whether the Notes should have been cancelled before payment, the parties should agree that the Notes were *delivered* for cancellation. But WTC does not agree, and argues that the Notes should not have been delivered for cancellation before the Exchange Payment Date. A review of the Revised Exchange Procedures provides that there is only one *delivery* of the Notes - - at the beginning of the process when the Exchange Notice is given. The Trustee holds the Notes and cancels them after the Holder receives payment. Therefore, Notes are *delivered* for cancellation at the beginning of the process. Consequently, the definition of "Outstanding" excludes Notes as soon as they are delivered for exchange and, ultimately, cancellation.

Next, WTC argues that the Tendering Noteholders are entitled to rescind the Exchange Notices since Tribune failed to make the required payment.  By letter dated December 30, 2008, DBTCA advised Tribune that it had received a number of withdrawal requests, but Tribune refused to honor them. The parties agreed that "[n]either the PHONES Indenture, the Global Note nor the Revised Exchange Notices address whether or not an election to tender is revocable or contain any provisions as whether or not a tender is revocable." (Stipulation, ¶22).  The parties do not cite to any provision in the Bankruptcy Code that would allow rescission post-petition.

"Rescission is an extraordinary remedy that involves the judicial termination of a party's contractual obligation." *Bucciarelli-Tieger v. Victory Records, Inc.,* 488 F.Supp.2d 702,712 (N.D. Ill. 2007).  Under Illinois law, rescission is generally granted only for fraud, mutual mistake or breaches of contract so material that they go to the very root of the contract. *Id. See*

*also Scott & Fetzer Co. v. Montgomery Ward & Co., Inc.*, 129 Ill.App.3d 1011, 1021, 473 N.E.2d 421, 429 (Ill. App. Ct. 1984) (deciding that rescission is equitable in nature and the trial court did not err by denying equitable relief when an adequate remedy at law exists). The Noteholders ask for rescission because Tribune failed to pay the exchange amounts. Rescission is not appropriate here when the Tendering Noteholders' have an adequate remedy in law for Tribune's breach of contract: a claim for the amount the Tendering Noteholders were entitled to receive if Tribune had complied with the Exchange Notices.

Therefore, the Tendering Noteholders' claims should be allowed in the amount that Tribune was obligated to pay in exchange for the tendered Notes. According to the Stipulation, the PHONES Claim Amount should be $759,252,932, calculated as follows:

| | Number of PHONES | PHONES Claim Amount (calculated at $155.4944 per PHONES) |
|---|---|---|
| Original PHONES | 8,000,000 | $ 1,243,955,537 |
| <u>Less</u> Exchanges not subject to challenge (prior to the Exchange Period) | (386,649) | ($60,121,771) |
| **subtotal** | 7,613,351 | $ 1,183,833,767 |
| <u>Less</u> Exchanges subject to determination (tendered during the Exchange Period, including the rejected DWAC tenders) | (3,093,941) | ($ 481,090,630) |
| **subtotal** | 4,519,410 | $ 702,743,137 |
| <u>Add</u> Exchange Value of Accepted DWAC Tenders (including Rejected DWAC tenders) | | $ 56,509,795 |
| **Total** | 4,519,410 | $759,252,932 |

(Stipulation, ¶35).

19

3.  Whether the Third Amended Plan's treatment of the "Other Parent Claims" class is "unfair discrimination"?

In their objection to the DCL Plan, the Senior Noteholders argued that the DCL Plan contravened the requirements of Bankruptcy Code §1129(b)(1) that a plan "not discriminate unfairly" and Bankruptcy Code §510(a), providing that subordination agreements are enforceable in a bankruptcy case, because, they argue, the DCL Plan allowed other unsecured creditors of Tribune to reap the benefits of the PHONES and EGI subordination provisions undeservedly. This issue of "unfair discrimination" was discussed, but not resolved, in the Confirmation Opinion because the record was unclear (*Tribune I*, 464 B.R. at 198-199), and the issue remains unresolved with respect to the Third Amended Plan.

The Third Amended Plan provides the Senior Noteholders and the Other Parent Claims[17] with equivalent distributions - - 33.6% of their allowed claim amounts - - of the initial distribution under the plan, and equivalent distributions of any recoveries obtained by the Litigation Trust.[18]  The Senior Noteholders contend that they are the only non-LBO creditors entitled to the benefit of subordination provisions related to the PHONES Notes and EGI Notes,

---

[17]"Other Parent Claims" are defined in the Third Amended Plan as "General Unsecured Claims against Tribune and the Swap Claim [described in n. 19, *infra.*] (and for the avoidance of doubt includes all Claims against Tribune under Non-Qualified Former Employee Benefit Plans, but does not include Convenience Claims)." (Third Amended Plan, §1.1.175). At the previous confirmation hearing, the DCL Plan Proponents asserted that the class of Other Parent Claims included the Swap Claim (approximately 57%), Retiree Claims (approximately 40%), and Trade Claims. (*Tribune I*, 464 B.R. at 198).

[18]The distribution figures used herein are reflected on ADH Ex. 89 ("Subordination Scenario Recovery Charts"), which are based upon certain assumptions appearing in the footnotes to the Charts. At oral argument, counsel for the Creditors' Committee noted that the "footnotes were heavily negotiated among all the parties and were essentially the caveats and reservations that were necessary to get everybody to agree that Exhibit 89 could indeed come in [as evidence]." (Tr. 3/6/12 at 26:25 - 27:3).

20

and, as a result, argue that distribution of the plan's allocation for the PHONES Noteholders' and EGI Noteholders' claims (the "Disputed Allocation") should be turned over for the benefit of *only* the Senior Noteholders. They argue that the Third Amended Plan's distribution of the Disputed Allocation to the Senior Noteholders *and* the Other Parent Claims results in unfair discrimination.

Underlying the Senior Noteholders' argument is the position that the Other Parent Claims do not fall within the PHONES Indenture's definition of "Senior Indebtedness" or the EGI Subordination Agreement's definition of "Senior Obligations." These issues comprise separate Allocation Disputes argued by the parties at the hearing. However, based upon my decision on the issue of unfair discrimination, I need not decide each of those separate disputes. For this purpose, I could assume (without deciding) that the none of the Other Parent Claims are Senior Indebtedness or Senior Obligations and are not entitled to the benefit of either subordination agreement.[19]

---

[19]The issue with respect to the SWAP Claim is easily determined and, therefore, I do decide here that the SWAP Claim falls within the definition of Senior Indebtedness in the PHONES Indenture. The SWAP Claim is defined in the Third Amended Plan as "any Claims asserted under the certain 1992 ISDA [International Swap and Derivatives Association, Inc.] Master Agreement, dated as of July 2, 2007, between Barclays Bank PLC and Tribune. (Third Amended Plan, §1.1.252, ADH Ex. 13). As part of the 2007 LBO, Tribune obtained approximately $8 billion dollars of financing pursuant to a Credit Agreement, dated May 17, 2007, as amended, restated, supplemented or otherwise modified from time to time (the "Credit Agreement"). Section 5.01(k) of the Credit Agreement, entitled "Interest Rate Protection," obligated Tribune to "enter into, and for a minimum of two years thereafter maintain, Hedge Agreements . . . that result in at least 35% of the aggregate principal amount of total Consolidated Debt for Borrowed Money being effectively subject to a fixed or maximum interest rate reasonably acceptable to the Agent." (ADH Ex. 11, §501(k)). To comply with the obligation in §5.01(k) of the Credit Agreement, Tribune entered into the Swap Agreement. Thereafter, on July 3, 2007, Tribune entered into three interest rate swap confirmations (collectively, the "Swap Documents") with Barclays Bank, which Swap Documents provide for (i) a two-year hedge with respect to $750 million in notional amount, (ii) a three-year hedge with respect to $1 billion in notional amount and (iii) a five-year hedge with respect to $750 million notational amount. (ADH Ex. 15, at 16 (OCMS 0000635)).
The PHONES Indenture defines "Senior Indebtedness," in part, as "the principal of (and

21

Generally speaking, the Bankruptcy Code's prohibition against "unfair discrimination" ensures that a dissenting class will receive relative value equal to the value given to all other similarly situated classes. *In re Armstrong World Ind., Inc.*, 348 B.R. 111, 121 (D.Del. 2006)(citations omitted). In *Tribune I*, I noted that the issue here arose "in an unusual context" since the Senior Noteholders argued that the DCL Plan was unfairly discriminatory because it treated the unsecured classes equally. *Tribune I,* 464 B.R. at 199. The Senior Noteholders point out, however, that the statute's legislative history provides that the standard of unfair discrimination must be viewed in precisely this context:

> This point illustrates the lack of precision in the first criterion which demands that a class not be unfairly discriminated against with respect to equal classes. From the perspective of unsecured trade claims, there is no unfair discrimination as long as the total consideration given all other classes of equal rank does not exceed the amount that would result from an exact aliquot distribution. Thus if trade creditors, senior debt, and subordinate debt are each owed $100 and the plan proposes to pay the trade debt $15, the senior debt $30, and the junior debt $0, the plan would not unfairly discriminate against the trade debt nor would any other allocation of consideration under the plan between the senior and junior debt be unfair as to the trade debt as long as the aggregate consideration is less than $30.

---

premium, if any) and interest on . . . and other amounts due on or in connection with any Indebtedness of the Company incurred, assumed or guaranteed by the Company, whether outstanding on the date of this Indenture or hereafter incurred, assumed or guaranteed and all renewals, extensions and refundings of any such Indebtedness of the Company; provided, however, that the following will not constitute Senior Indebtedness: [exceptions listed do not apply here]." (PHONES Indenture, §14.01(2)). The parties do not dispute that the Credit Agreement is Indebtedness and Senior Indebtedness as defined by the PHONES Indenture. The record before me establishes that the indebtedness due under the Swap Agreement is an amount due in connection with the Credit Agreement and, therefore, within the definition of the Senior Indebtedness under the PHONES Indenture.

The definition of "Senior Obligations" in the EGI Subordination Agreement is even broader, and includes "all obligations, indebtedness and other liabilities of the Company." The indebtedness under the Swap Agreement also falls within the definition of Senior Obligations under the EGI Subordination Agreement.

Because the Swap Agreement indebtedness is part of the Senior Indebtedness and Senior Obligations as defined in the relevant documents, the treatment in the Third Amended Plan of the Senior Noteholder Claims and the Other Parent Claims becomes even less vulnerable to a charge of "unfair discrimination." (*See* n. 21, *infra.*).

The senior debt could take $25 and give up $5 to the junior debt and the trade debt would have no cause to complain because as far as it is concerned the junior debt is an equal class.

However, in this latter case the senior debt would have been unfairly discriminated against because the trade debt was being unfairly over-compensated; of course the plan would also fail unless the senior debt was unimpaired, received full value, or accepted the plan, because from its perspective a junior class received property under the plan. Application of the test from the perspective of senior debt is best illustrated by the plan that proposes to pay trade debt $15, senior debt $25, and junior debt $0. Here the senior debt is being unfairly discriminated against with respect to the equal trade debt even though the trade debt receives less than the senior debt. The discrimination arises from the fact that the senior debt is entitled to the rights of the junior debt which in this example entitle the senior debt to share on a 2:1 basis with the trade debt.

. . . .

The criterion of unfair discrimination is not derived from the fair and equitable rule or from the best interests of creditors test. Rather it preserves just treatment of a dissenting class from the class's own perspective.

Vol. C COLLIER ON BANKRUPTCY App. Pt. 4(d)(i) at 416-418 (15th ed. rev.). The Senior Noteholders argue that this legislative history compels the conclusion that the Third Amended Plan unfairly discriminates against the Senior Noteholders by treating the Senior Noteholders class and the Other Parent Claims class equally.

The legislative history is not determinative for analyzing this issue, especially in light of the numerous developments in case law, discussed below, on this particular issue since the Code's enactment. Further, the examples of unfair discrimination in the legislative history have been described as "roundabout, almost otiose." Bruce A. Markell, *A New Perspective on Unfair Discrimination in Chapter 11*, 72 Am.Bankr.L.J. 227, 237-38 (1998) (hereinafter, *Markell* at ___). *See also Armstrong*, 348 B.R. at 121 ("Unfair discrimination is not defined in the Bankruptcy Code, nor does the statute's legislative history provide guidance as to its interpretation."). I

agree. The legislative history is useful for confirming that the concept of unfair discrimination

may be applied to examine facts such as those before me, but further analysis must be viewed in

light of the plain language of the statute and applicable decisional law.[20]

The Senior Noteholders argue that the statute may be read as requiring that a plan must

not unfairly discriminate, even before giving effect to third party contractual rights embodied in a

subordination agreement, but in any event, a plan cannot be confirmed under §1129(b) unless the

subordination agreements are fully implemented. The Senior Noteholders' position is not

supported by relevant decisional law. The Bankruptcy Court for the District of New Jersey

analyzed this specific language in §1129(b) and determined:

> The only logical reading of the term "notwithstanding" in section 1129(b)(1)
> seems to be: "Even though section 510(a) requires the enforceability of [a]
> subordination agreement in a bankruptcy case to the same extent that the
> agreement is enforceable under nonbankruptcy law, if a nonconsensual plan meets
> all of the §1129(a) and (b) requirements, the court 'shall confirm the plan.'" The
> phrase "[n]otwithstanding section 510(a) of this title" removes section 510(a)
> from the scope of 1129(a)(1), which requires compliance with "the applicable
> provisions of this title."

---

[20]*See Exxon Mobil Corp. v. Allapattah Serv., Inc.*, 545 U.S. 546, 568, 125 S.Ct. 2611, 2626, 162
L.Ed.2d 502 (2005):

> As we have repeatedly held, the authoritative statement is the statutory text, not the legislative
> history or any other extrinsic material. Extrinsic materials have a role in statutory interpretation
> only to the extent they shed a reliable light on the enacting Legislature's understanding of
> otherwise ambiguous terms. Not all extrinsic materials are reliable sources of insight into
> legislative understandings, however, and legislative history in particular is vulnerable to two
> serious criticisms. First, legislative history is itself often murky, ambiguous, and contradictory.
> Judicial investigation of legislative history has a tendency to become, to borrow Judge
> Leventhal's memorable phrase, an exercise in " 'looking over a crowd and picking out your
> friends.' " *See* Wald, *Some Observations on the Use of Legislative History in the 1981 Supreme
> Court Term*, 68 Iowa L.Rev. 195, 214 (1983). Second, judicial reliance on legislative materials
> like committee reports, which are not themselves subject to the requirements of Article I, may
> give unrepresentative committee members—or, worse yet, unelected staffers and lobbyists—both
> the power and the incentive to attempt strategic manipulations of legislative history to secure
> results they were unable to achieve through the statutory text.

*In re TCI 2 Holdings, LLC*, 428 B.R. 117, 141 (Bankr.D.N.J. 2010).  The Third Circuit reviewed

the meaning of "notwithstanding" in the context of a different Code section, writing:

> Section 503(b)(1) is specifically mentioned in §365(d)(3).  The provision [section
> 365(d)(3)] imposes the duties . . . "notwithstanding section 503(b)(1) of [the Bankruptcy
> Code]." 11 U.S.C. § 365(d)(3). The key word here is "notwithstanding." It means "in
> spite of" or "without prevention or obstruction from or by." Webster's Third New Int'l
> Dictionary 1545 (1971). In this context, § 365(d)(3) is best understood as an exception to
> the general procedures of § 503(b)(1) that ordinarily apply.

*In re Goody's Family Clothing, Inc.*, 610 F.3d 812, 817 (3d Cir. 2010).  Therefore, the meaning

of "notwithstanding section 510(a) of this title" means that §1129(b) is applied without

prevention or obstruction of any applicable subordination agreements.

When considering whether a plan complies with the unfair discrimination test, the

*Armstrong* Court recognized that several courts have adopted a rebuttable presumption test, first

proposed by then professor, now Bankruptcy Judge, Bruce A. Markell.  *Armstrong*, 348 B.R. at

121.  Professor Markell wrote:

> I propose that a court should not confirm a nonconsensual plan, even if it provides
> fair and equitable treatment for all classes, when there is: (1) a dissenting class;
> (2) another class of the same priority; and (3) a difference in the plan's treatment
> of the two classes that results in either (a) a materially lower percentage recovery
> for the dissenting class (measured in terms of the net present value of all
> payments), or (b) regardless of percentage recovery, an allocation under the plan
> of materially greater risk to the dissenting class in connection with its proposed
> distribution.

> Under the third factor, discrimination is presumptively unfair in two circumstances. First,
> unfairness is presumptively present if the plan specifies materially different percentage
> recoveries for two classes having the same priority. If, for example, a plan gave an
> assenting class of trade creditors consideration, measured in terms of present value, equal
> to ninety percent of their claims, while giving a dissenting class of bank deficiency claims
> consideration worth only five percent, unfairness would presumptively exist. Second, a
> plan that allocates to dissenting classes plan consideration containing risks materially
> greater than those assumed under the plan by other similar assenting classes is also
> presumptively unfair. This second presumption exists even if the plan pays each class the

same percentage recovery on its prepetition claims. This later type of unfairness could occur, for example, if a plan allocated common stock to a dissenting class of trade creditors, while giving short term secured notes to an assenting insider class of unsecured creditors.

In either case—disparity of recovery or disparity of risk—the plan proponent can rebut the presumption of unfairness by proving that the difference in treatment is attributable to differences in the prepetition status of the creditors. In the case of a difference in the present value of the recovery, the presumption may also be overcome by a demonstration that contributions will be made by the assenting classes to the reorganization, and that these contributions are commensurate with the different treatment. In such cases, while discrimination exists, it is not unfair.

*Markell* at 249-250. This rebuttable presumption test has been adopted or applied by a number of courts. *See Armstrong,* 348 B.R. at 122, *In re Unbreakable Nation Co.,* 437 B.R. 189, 202 (Bankr.E.D.Pa. 2010), *In re Quay Corp.,Inc.,* 372 B.R. 378, 386 (Bankr.N.D.Ill. 2007), *In re Greate Bay Hotel & Casino, Inc.,* 251 B.R. 213, 231 (Bankr.D.N.J. 2000), *In re Dow Corning Corp.,* 244 B.R. 696, 701-03 (Bankr.E.D.Mich. 1999). I join the courts adopting the rebuttable presumption test for analyzing the unfair discrimination issue of Bankruptcy Code §1129(b).

The presumption of unfair discrimination does not arise unless the plan's treatment of two classes results in "a *materially* lower percentage recovery for the dissenting class" or an allocation of "*materially* greater risk to the dissenting class." Materiality is important because "[t]he pertinent inquiry is not whether the plan discriminates, but whether the proposed discrimination is "unfair." *Armstrong,* 348 B.R. at 121. Minor or immaterial differences in plan treatment do not rise to the level of *unfair* discrimination. *See Unbreakable Nation,* 437 B.R. at 203 (Relying, in part, on the rebuttable presumption test, the court determined that the difference between 1.5% and 1.25% in a proposed distribution to two classes was not unfair discrimination); *Greate Bay Hotel,* 251 B.R. at 231(deciding that the difference between an 80%

26

and 76% distribution was not a "materially lower percentage recovery" that would constitute

unfair discrimination).   Disparity of risk has not been raised as an issue in this present dispute.

At issue is whether the plan's equal treatment of the Senior Noteholders and the Other Parent

Claims results in a *materially* lower recovery for the Senior Noteholders.

The Recovery Scenarios admitted into evidence show the change in the Senior

Noteholders' recovery due to allowing the Other Parent Claims to benefit from the subordination

provisions:

| | percentage recovery if **only** senior note-holders benefit from subord. provisions | percentage recovery to senior note-holders under the Plan | percentage difference |
|---|---|---|---|
| Initial Distributions | 35.9% | 33.6% | 2.3% |
| Initial Distributions plus $250mm net Litigation Trust proceeds | 49.4% | 46.6% | 2.8% |
| Initial Distributions plus $500mm net Litigation Trust proceeds | 61.4% | 58.2% | 3.2% |
| Initial Distributions plus $750mm net Litigation Trust proceeds | 73.5% | 69.8% | 3.7% |

(*See* ADH Ex. 89).[21]  Furthermore, ADH Ex. 89 also demonstrates that the dollar amount the

Senior Noteholders would receive under the Initial Distribution is decreased from $461,016 (if

only the Senior Noteholders benefitted from the subordination provisions) to $431,041 under the

Plan (if the Other Parent Claims benefitted from the subordination provisions).  This represents a

---

[21]The figures in this chart are taken from ADH Ex. 89, which is the Recovery Scenarios that the parties agreed could be submitted into evidence. (*See* n. 18, *supra*.) If both the Senior Noteholders *and* the Swap Claim benefit from the subordination provisions, the decrease in the Senior Noteholders' percentage recovery is even smaller.  (*See* n. 19, *supra*.)  The Initial Distributions' percentage recovery would decrease from 34.5% (if both Senior Noteholders and the Swap Claim benefit from the subordination) to 33.6% (Plan Distribution) resulting in a decrease of 0.9%.

6.5% decrease in the payment. Are any of these reductions *material*?

Courts considering the issue of unfair discrimination have roundly rejected plans proposing grossly disparate treatment (50% or more) to similarly situated creditors, while at least two courts decided that unfair discrimination did not exist when the difference in recoveries was 4% or less. A chart prepared by the Creditors's Committee summarized those cases as follows:

*intellectually dishonest*

| Case | Dissenting Class % Recovery | Preferred Class % Recovery | Conclusion |
|---|---|---|---|
| *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213 (Bankr.D.N.J. 2000) | 76% | 80% | no unfair discrimination |
| *In re Unbreakable Nation Co.*, 437 B.R. 189 (Bankr. E.D.Pa. 2010) | 1.25% | 1.78%[22] | no unfair discrimination |
| *In re Crosscreek Apartments, Ltd.*, 213 B.R. 521, 537-38 (Bankr. E.D. Tenn. 1997) | 50% | 100% | unfair discrimination |
| *In re Cranberry Hill Assocs., L.P.*, 150 B.R. 289, 290-91 (Bankr.D.Mass. 1993) | 50% | 100% | unfair discrimination |
| *In re Barney & Carey Co.*, 170 B.R. 17, 25-26 (Bankr.D.Mass. 1994) | 15% | 100% | unfair discrimination |
| *In re Tucson Self-Storage, Inc.*, 166 B.R. 892, 898 (B.A.P. 9th Cir. 1994) | 10% | 100% | unfair discrimination |
| *In re Aztec Co.*, 107 B.R. 585, 589-91 (Bankr. M.D. Tenn. 1989) | 3% | 100% | unfair discrimination |

---

[22]The Court in *Unbreakable Nation* compared the dissenting class's recovery under the plan against what the dissenting class claimed it was entitled to receive (i.e., 1.25% to 1.5%). For purposes of this chart's comparison, the Creditors Committee compared the dissenting class's recovery to the recovery of the allegedly preferred class, which the Committee calculated to be 1.78% *Unbreakable Nation*, 437 B.R. at 202.

(Creditors Comm. Brief, D.I. 1000, at 8).

The Senior Noteholders argue that the discriminatory treatment in this case is grossly disproportionate when viewed in terms of the percentage *increase* to the Other Parent Creditors receiving the benefit of the subordination provisions. If viewed by looking at the increase in payment of the proposed Initial Distribution to the Other Parent Claims, the SWAP claimant's payment increases from $36,818 to $54,403 (47.8% increase) and the Retirees claimants' payment increases from $23,043 to $35,275 (53% increase). When viewed in terms of percentage of recovery, the SWAP claimants' recovery increases from 24.4% (if only the Senior Noteholders benefit) to 36% under the Plan - - an 11.6% increase; likewise the Retirees recovery increases from 21.9% (if only the Senior Noteholders benefit) to 33.6% under the Plan - - an 11.7% increase.

However, the analysis for determining whether the discriminatory treatment is unfair should be viewed by its effect on the dissenting class. *See Greate Bay Hotel*, 251 B.R. at 231-32 ("confirmation would be denied only if there was a 'materially lower' percentage recovery for the dissenting class" citing the *Markell* rebuttable presumption test), *see also* Legislative History, *supra.* ("[the unfair discrimination test] preserves just treatment of a dissenting class from the class's own perspective."). As shown above, the proposed distributions in the Third Amended Plan will result in a decrease to the Senior Noteholders' percentage of recovery of less than four percent.[23]   When viewed in terms of a decrease in *amount* (rather than percentage), the decrease

---

[23]Even if we looked to the example of unfair discrimination in the Legislative History, the Plan's proposed effect to the Senior Noteholders passes muster. The parties agreed that the example in the Legislative History showed a change to the dissenting class' recovery of 20%. The decrease in recovery

29

in amount of the Senior Noteholders' initial distribution recovery, caused by the forced sharing

of the Disputed Allocation, is 6.5%. The discriminatory effect on the dissenting class is

immaterial and, therefore, no rebuttable presumption of unfair discrimination arises here.

4.    Whether the PHONES Notes are senior in right of payment to the EGI Notes?

The parties dispute whether the PHONES Notes or the EGI Notes are senior to each other

in right of payment. For the following reasons, I conclude that the EGI Notes are subordinate to

the PHONES Notes.

On the same date the EGI Notes were executed, EGI-TRB, LLC entered into a

Subordination Agreement (the "EGI Subordination Agreement") (ADH Ex. 8) that was "in favor

of the holders of Senior Obligations." The term "Senior Obligations" is defined as:

> "Senior Obligations" means all obligations, indebtedness and other liabilities of
> the Company [Tribune Company] other than (i) any such obligations,
> indebtedness or liabilities that by their express terms rank pari passu or junior to
> the Company's obligations under the Subordinated Note and (ii) trade payables
> and accrued expenses incurred in the ordinary course of business, in each case,
> whether incurred on or prior to the date hereof or hereafter incurred.

(ADH Ex. 8 at 1). WTC argues that because the PHONES Indenture does not does not expressly

state that it is subordinate to the EGI Notes, the PHONES Notes are Senior Obligations.

Moreover, WTC points out that the PHONES Indenture could not expressly reference the EGI

Notes since the PHONES Indenture was entered into in 1999, while the EGI Notes were issued in

December 2007. WTC further argues that the EGI Subordination Agreement was written with

---

to the Senior Noteholders  - - whether viewed as a change to the recovery percentage (less than 4%) or
based on the amount that the dollars paid to the dissenting class decreased (6.5%) - - does not reach that
threshold.

full knowledge that the PHONES Notes had been in existence for eight years and that the PHONES Indenture had no *express language* stating that the PHONES Notes were pari passu or junior to the EGI Notes. If EGI intended to exclude the PHONES Notes from the Senior Obligations, the drafters would have included the PHONES as one of the specific exceptions to Senior Obligations.

On the other hand, EGI argues that PHONES Notes were drafted in a way that contemplated that the PHONES Notes would be subordinated to Tribune's future debt, since the definition of "Senior Indebtedness" includes subordination to the Company's indebtedness "whether outstanding on the date of this Indenture or hereafter incurred, assumed or guaranteed." EGI also points out that the exception to "Senior Indebtedness" in the PHONES Indenture states:

> any Indebtedness of the Company as to which, in the instrument creating the same or evidencing the same or pursuant to which the same is outstanding, it is *expressly provided* that such Indebtedness of the Company shall be subordinated to or pari passu with the Securities;

(PHONES Indenture, §14.01 (2)(A) (emphasis added)). And, similar to WTC's argument, EGI argues that the EGI Notes and the EGI Subordination Agreement do not *expressly* provide that the EGI Notes are subordinated or pari passu to the PHONES Notes.

Thus I am faced with similar, but not identical, language in the subordination provisions relating to both the PHONES Notes and the EGI Notes. Clearly, the EGI Subordination Agreement was drafted with full knowledge of the existence of the PHONES Notes, so I begin my analysis with that agreement. Each party argues that the failure to specifically reference the PHONES Notes in the EGI Subordination Agreement - - either as a Senior Obligation or as an exception to the Senior Obligations - - falls in its favor.

31

The EGI Subordination Agreement provides that it should be interpreted according to the laws of the State of Delaware. (ADH Ex. 8 at ¶13). "A court applying Delaware law to interpret a contract is to effectuate the intent of the parties." *JFE Steel Corp. v. ICI Americas, Inc.*, 797 F.Supp.2d 452, 469 (D.Del. 2011). The *JFE Steel* Court further wrote:

> Accordingly, the Court must first determine whether a contract is unambiguous as a matter of law. *See Nw. Nat'l Inc. Co. v. Esmark, Inc.*, 672 A.2d 41, 43 (Del. 1996) *GB Biosciences Corp. v. Ishihara Sangyo Kaisha, Ltd.*, 270 F.Supp.2d 476, 481-82 (D.Del. 2003). If the language of the contract is unambiguous, the Court interprets the contract based on the plain meaning of the language contained on the face of the document. *See GB Biosciences*, 270 F.Supp.2d at 482. ("The use of extrinsic evidence to interpret clear and unambiguous language in a contract is not permitted.") (internal citations omitted). A contract is ambiguous only if it is fairly and reasonably susceptible to different interpretations. *See Esmark*, 672 A.2d at 43.

*JFE Steel*, 797 F.Supp.2d at 469.

The EGI Subordination Agreement provides that "Senior Obligations" includes all indebtedness of Tribune, with certain exceptions. I do not infer anything from the EGI subordination agreement's "failure" to list the PHONES Notes as a Senior Obligation - - the document is written so that the term is broad. However, the exceptions to the Senior Obligations are ambiguous. On the one hand, it is reasonable to argue that the first exception to the definition of "Senior Obligations" refers to the PHONES Notes, since the PHONES Indenture expressly provides that PHONES Notes will be subordinated to future indebtedness. Parties must have intended that the phrase "express terms" in the exception language refers to the intent to be subordinated to future indebtedness generally - - not specific future obligations, which are unknown.

However, because the PHONES Indenture has a similar "exception" to its definition of

32

"Senior Indebtedness" (which would except the EGI Notes from the PHONES Notes' definition

of "Senior Indebtedness") the argument becomes circular as the reader continuously refers to

each document's "exception," thereby leading to the ambiguity.

Therefore, Court must review parol evidence to resolve the ambiguity presented by the

"exceptions" to the Senior Obligations and the Senior Indebtedness.  In *Falco v. Alpha Affiliates,*

*Inc.*, 2000 WL 727116 (D.Del. 2000), the Court wrote:

> Under Delaware law, the parol evidence rule generally bars the admission of
> extrinsic evidence of prior or contemporaneous contract negotiations to interpret
> the meaning of, vary the terms of, or create ambiguity in a contract. *See Eagle
> Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del.1997).
> However, . . . evidence is admissible under two exceptions to the parol evidence
> rule: (1) to interpret ambiguous contract terms, *see id.*; and/or (2) to prove one
> party was fraudulently induced to enter the contract. *See Anglin v. Bergold*, 565
> A.2d 279, 1989 WL 88265,*2 (Del.1989) (citing *Scott Douglas Corp. v.
> Greyhound Corp.*, 304 A.2d 309, 317 (Del.Super.1973)).

*Falco*, 2000 WL 717116 at *8.  WTC argues that there is "significant contemporaneous evidence

demonstrating that the EGI-TRB Notes were intended to be the most junior debt in the capital

structure, and junior to the PHONES." (D.I. 10999 at 33).  EGI argues that parol evidence shows

that the parties intended the EGI Notes to be junior only to LBO-related debt.

The parties do not dispute that in March 2007, Tribune made inquiries concerning the

ratings impact of Tribune's contemplated LBO-Transaction. (ADH Ex. 151, Examiner's Report,

Vol. I  at 199).  Moody's Investors Service ("Moody's") eventually issued a March 29, 2007

letter summarizing its assumptions and report its conclusions concerning the rating impact of the

LBO.  (ADH Ex. 125). Included in those conclusions is reference to the EGI Notes as "junior

subordinated debt" (*Id.* at 3) and reference to the PHONES Notes as "senior subordinated debt

(*Id.* at 6).  The conclusions in Moody's letter were based, in part, on "specific information

provided during our March 2007 meeting and subsequent presentations, related projections, e-mails and other information and telephone conversation." (*Id.*).

One set of correspondence related to the Moody's letter involved a "notching model" or "waterfall analysis" prepared by Moody's, which listed Tribune Company's debt instruments together with a "priority rank" for each. (ADH Ex. 124). Moody's ranked the PHONES Notes as a "6" priority, ahead of the "Zell Investment Subordinate Note" (i.e., the EGI Notes), which was given a "7" priority rank. (*Id.*). John Puchalla of Moody's sent the "notching model" via email to Chandler Bigelow, Tribune's Treasurer, asking him "to review the inputs." (*Id.*). Bigelow forwarded the Puchalla email to entities involved in structuring the LBO, including JPMorgan, Citigroup, and Merrill Lynch, and asked "Anyone have a view on the PHONES vs. Zell note - is the PHONES [Note] senior?" (the "Bigelow Email") (ADH Ex. 123). He received the following responses:

(i)    "The Zell Note should be junior to the PHONES for sure" stated Patricia Deans of JPMorgan (ADH Ex. 122);

(ii)   "Zell junior" stated Peter Cohen of JPMorgan (ADH Ex. 123);[24]

(iii)  "The Zell Note is Jr to the PHONES" stated Julie Persily of Citigroup (ADH Ex. 121).

In preparing his response to the Bigelow Email, Peter Cohen of JPMorgan contacted another JPMorgan employee, Joachim Sonne, who advised by email:

Talked to EGI, Chris Hochschild, and he confirmed that they see their security as the most junior in the capital structure and junior to the PHONES.

(ADH Ex. 128). The parties agreed that ADH Exhibits 116 - 136 are admissible under the

---

[24]Joachim Sonne, of the same JPMorgan group as Peter Cohen, also responded to the Bigelow Email stating, "Zell sub note will be the most junior in the capital structure" (ADH Ex. 135).

business records exception to hearsay (Fed.R.Evid. 803(6)).  However, EGI objects to the

admissibility of ADH Ex. 128 on the grounds of double hearsay, because the email contains a

statement attributed to Hochschild, an analyst at EGI, who was not copied on the email and, in a

recent deposition, stated that he has no recollection of making the statement.  (*See* ADH Ex. 157

at 55:5 - 56:3).  WTC argues that ADH Ex. 128 overcomes the double hearsay objections: the

first layer of hearsay is overcome by the parties' agreement that the email is admissible under the

business records exception, and the second layer of hearsay related to the Hochschild statement is

overcome under Fed.R.Evid. 801(d)(2)(D), which provides that a statement is not hearsay if

"[t]he statement is offered against an opposing party and . . .was made by the party's . . .

employee on a matter within the scope of that relationship and while it existed."[25]  I agree that

Fed.R.Evid. 801(d)(2)(D) applies and that ADH Ex. 128 is admissible.[26]

---

[25]*See Joy Global, Inc. v. Wisconsin Dept. Of Workforce Dev. (In re Joy Global, Inc.)*, 346 B.R. 659, 665 n. 13 (D.Del. 2006) (admitting an exhibit subject to a triple hearsay objection after deciding that each layer of hearsay was overcome by a separate hearsay exception).

[26]EGI argues that Fed.R.Evid. 801(d)(2)(D) does not apply to ADH Ex. 128 because WTC failed to establish that the statement was within Hochschild's role and responsibilities for EGI.  *See McAdams v. United States*, 297 Fed. App'x 183, 186 (3d Cir. 2008) (affirming lower court's exclusion of statement by VA medical center x-ray technician that the lobby floor was "like a skating rink," since the x-ray technician was not responsible for the condition or maintenance of the medical center floors), *Greishaw v. Base Mfg.*, 2008 WL 509077, *4 (W.D. Pa. Feb. 21, 2008)(statement by accounts payable clerk held inadmissible because the clerk had no responsibility for personnel, compensation and sales commissions). William Pate, one of the leaders of EGI's team of professionals who structured and negotiated the 2007 LBO, stated that he was surprised JPMorgan would contact Hochschild on the subordination issue, rather than himself or Nils Larsen. (ADH Ex. 156 at 10:24- 11:12, 56:1 - 57:2). However, Fed.R.Evid. 801(d)(2)(D) does not require that a declarant have authority to bind its employer, but simply requires that an agent make the statement "within the scope of" his or her employment. *Big Apple BMW, Inc. v. BMW of North America, Inc.*, 974 F.2d 1358, 1372 (3d Cir. 1992) ("As the Advisory Committee noted when amending this rule, to limit its scope in this manner would preclude much probative evidence because an employer will rarely authorize it employee to make incriminating statements.")
    In his deposition, Hochschild testified that he did not have a formal title at EGI, but was essentially an analyst (ADH Ex. 157 at 10:23 - 11:2) and that he "was involved in the operational due diligence [and]. . . also worked on the models and analytics around the investment." (*Id.* at 14:18-21).

In connection with providing information to the ratings agencies, Tribune also advised Nils Larsen of EGI that Tribune had provided terms sheets to the rating agencies describing the Step One Convertible Subordinated Promissory Note and the Step Two Subordinated Promissory Note. (ADH Ex. 117). The term sheets described both obligations to EGI as "[f]ully subordinated in all rights and remedies." (*Id.*). In his response email, Nils Larsen responded that the term sheets "are fine with me." (ADH Ex. 118).

As further evidence, ADH Ex. 138 demonstrates that another Tribune officer, Gary Weitman, told a reporter from the New York Times on April 4, 2007, that the "Zell Note will be fully subordinated, just above common equity." (ADH Ex. 138 at 3).

In rebuttal, EGI offers deposition testimony of William Pate, who was one of the leaders of EGI's team of professionals who structured and negotiated the 2007 LBO. (ADH Ex. 156 at 10:24 - 11:5). Pate testified that the documentation presented by WTC, including the terms sheets and information provided to Moody's, were relevant to a combined note and warrant received by EGI at Step One of the LBO, and that the deal changed before the EGI Notes were provided at Step Two. (*Id.* at 108:4 - 110:13). He stated that, for Step Two, the parties used a different structure that separated the note and the equity warrant, making the note "hard" and "independent" for tax reasons. (*Id.* at 17:20 - 19:15). Pate also assumed the Step Two EGI

---

The evidence shows that in this position Hochschild had information about the framework of the deal and proposed capital structure for Tribune. (*See, e.g.*, ADH Ex. 144 (email dated June 29, 2007 from Chandler Bigelow to Chris Hochschild with the subject heading "May 31st Debt/Cash (PF for the 1st step)", attaching financial information that includes the amount of the PHONES Notes in an entry titled "Total debt (before Zell note)")). Knowledge of information on the priority of the PHONES Notes relative to the EGI Notes was within the scope of Hochschild's responsibilities during his employment at EGI. ADH Ex. 128 is admissible, but, recognizing Hochschild's junior status, the statement in the email will be weighed accordingly.

Notes would be senior to the PHONES Notes, stating: "My view of the PHONES was they were a convertible subordinated security. I wouldn't say I had a specific understanding, but I had seen other convertible subordinated securities and assumed that they were similarly subordinated." (*Id.* at 15:21 - 16:2). However, at the deposition, Pate was uncertain whether his understanding of the EGI Notes' seniority over the PHONES Notes was ever communicated to anyone outside of EGI. (*Id.* at 95:14 - 96:8).

Pate's testimony regarding his subjective understanding of the priority between the EGI Notes and the PHONES Notes at Step Two of the LBO is not helpful. "[I]n order to interpret contracts with some consistency, and in order to provide contracting parties with a legal framework which provides a measure of predictability, the courts must eschew the ideal of ascertaining the parties' subjective intent and instead bind parties by the objective manifestations of their intent." *Mellon Bank, N.A. v. Aetna Business Credit, Inc.,* 619 F.2d 1001, 1009 (3d Cir. 1980).[27] "The strongest objective manifestation of intent is the language of the contract." *Id.* Although I have already determined the subordination agreements are ambiguous on this topic, WTC asks me to review the language of the Step One EGI Note and the Subordination Agreement to determine whether the subordination provisions changed between the two steps.

The Step One EGI Note defined "Senior Obligations" as "

---

[27]EGI argues that Pate's subjective understanding of the priority of the EGI Notes should be considered by the Court under the "forthright negotiator principle," which allows the Court to consider "evidence of what one party *subjectively* 'believed the obligation to be, coupled with evidence that the other party knew or should have known of such belief.'" *United Rentals, Inc. v. Ram Holdings, Inc.,* 937 A.2d 810, 835 (Del. Ch. 2007) citing *U.S. West, inc. v. Time Warner, Inc.,* 1996 WL 307445, *11 (Del.Ch. June 6, 1996) (emphasis in original). The record before me lacks any evidence that the other parties negotiating the LBO had any reason to know of Pate's subjective belief that the Step Two EGI Notes would be senior to the PHONES Notes.

> "Senior Obligations" means all obligations, indebtedness and other liabilities of
> the Maker [Tribune Company] other [than] any such obligations, indebtedness or
> liabilities that by its express terms ranks pari passu or junior to the Maker's
> obligations under this Note, in each case, whether incurred on or prior to the date
> hereof or hereafter incurred.. . . .

(ADH Ex. 5 at ¶2(e)).   The term "Senior Obligations" was changed in the Subordination

Agreement executed along with the EGI Notes at Step Two, with the following changes marked

in bold text:

> "Senior Obligations" means all obligations, indebtedness and other liabilities of the
> **Company** [Tribune Company] other **than (i)** any such obligations, indebtedness or
> liabilities that by **their** express terms rank pari passu or junior to the **Company's**
> obligations under **the Subordinated Note and (ii) trade payables and accrued
> expenses incurred in the ordinary course of business**, in each case, whether incurred
> on or prior to the date hereof or hereafter incurred.

(ADH Ex. 8 at 1).   The changes in the subordination provisions from Step One to Step Two do

not alter the language applicable to the PHONES priority dispute.   The changes do not indicate

any intent to ensure that, after the deal changed to a "hard" note,  the EGI Notes would be senior

to the PHONES Notes.

To further rebut WTC's parol evidence, EGI argues that three public filings with the SEC

between April and July 2007 expressly described the EGI Note as "subordinated to the senior

obligations of the Company."  (ADH Ex. 137 at 7, ADH Ex. 139 at 2, ADH Ex. 145 at 114).  EGI

argues that the PHONES are not senior obligations of the Company.   Although not capitalized,

this language may refer to the term "Senior Obligations" as defined in the Subordination

Agreement.   However, this language does not directly refer to the priority issue between the

PHONES Notes and the EGI Notes and is far less convincing than the emails and drafts which

discuss the issue directly.

Finally, EGI also relies upon a letter dated June 2, 2009 from EGI's attorneys to the Debtors' attorneys stating that the PHONES Notes are junior to the EGI Notes. (ADH Ex. 150). This letter, written well after the LBO negotiations and after the chapter 11 filing, merely sets forth EGI's position on the subordination issue. "It is black letter law that lawyers' arguments are not evidence." *Perry v. Shinseki*, 783 F.Supp.2d 125, 135 (D.D.C. 2011). Thus, I accord no weight to this letter in determining this issue.

After review of the evidence offered by the parties, including parol evidence, I conclude that the collective, contemporaneous understanding of the parties negotiating the LBO was that the EGI Notes would be the most junior in Tribune's capital structure. Accordingly, I conclude that the PHONES Notes are senior to the EGI Notes.

5.    Whether beneficiaries of the subordination provisions of the PHONES Indenture are entitled to receive post-petition interest prior to the PHONES Noteholders receiving payment of their claims?

The background of judicial analyses of the post-petition interest/subordination agreement issue was succinctly summarized by the Bankruptcy Court in *203 North LaSalle Street*, as follows:

- Under the Bankruptcy Act of 1898, there was no statutory treatment of subordination agreements, and the courts enforced these agreements according to equitable principles.

- One of the general principles of bankruptcy law is that interest on unsecured claims stops at the time of the filing of a bankruptcy case.

- A senior creditor under a subordination agreement could argue that its claim was entitled to postpetition interest, despite the general prohibition, with the payment of interest coming not from the estate, but from the dividend that would otherwise

be paid to the subordinated claim.  The idea was that the senior claim was to be paid "in full" before the subordinated claim was paid, and that full payment required postpetition interest.

- The Third Circuit, faced with such an assertion by a senior creditor, rule that in order for the parties to a subordination agreement to change the general bankruptcy rule ("that interest stops on the date of the filing of the petition"), their agreement would have to "clearly show that the general rule . . . is to be suspended, at least vis-a-vis these parties." *In re Time Sales Fin. Corp.*, 491 F.2d 841, 844 (3d Cir. 1974).  This requirement, operant only in the context of postpetition interest, became known as the Rule of Explicitness.

*Bank of America v. North LaSalle Street Ltd. P'ship (In re 203 North LaSalle Street P'ship)*, 246

B.R. 325, 330 (Bankr.N.D. Ill. 2000) .  Since the enactment of Bankruptcy Code §510(a),

however, some courts have questioned whether the Rule of Explicitness continues to be viable.

*Id.* citing *Chemical Bank v. First Trust of New York (In re Southeast Banking Corp.)*, 156 F.3d

1114, 1120-24 (11th Cir. 1998).  Section 510(a) directs courts to enforce subordination

agreements to the extent the agreement are enforceable under "applicable nonbankruptcy law."

*Southeast Banking*, 156 F.3d at 1121 quoting 11 U.S.C. §510(a).  Lacking a federal statute or

common law to guide in the interpretation of the subordination agreements, the *Southeast*

*Banking* Court decided that the issue must be addressed under applicable state law, recognizing

that "the enforcement and interpretation of private contracts is ordinarily a question of state law"

*Id.* (citations and internal quotations omitted).  *See also In re Washington Mutual, Inc.*, 461 B.R.

200, 249 (Bankr.D.Del. 2011) (applying New York law - - which still requires the Rule of

Explicitness - - to interpret a subordination agreement on the postpetition interest issue).

As noted earlier, the PHONES Indenture is governed by the law of the State of Illinois.

(ADH Ex. 2 at §1.12).  Illinois law provides that, "in the absence of ambiguity, the terms of

subordination agreements are to be construed according to their plain language." *203 North*

40

*LaSalle*, 246 B.R. at 329.

The definition of "Senior Indebtedness" in the PHONES Indenture addresses expressly the inclusion of post-petition interest:

> "Senior Indebtedness" means the principal of (and premium, if any) and interest on *(including interest accruing after the filing of a petition initiating any proceeding pursuant to any Federal bankruptcy law or any other applicable Federal or State law, but only to the extent allowed or permitted to the holder of such Indebtedness of the Company against the bankruptcy or any other insolvency estate of the Company in such proceeding)* and other amounts due on or in connection with any Indebtedness of the Company incurred, assumed or guaranteed by the Company, whether outstanding on the date of this Indenture or hereafter incurred, assumed or guaranteed and all renewals, extensions and refundings of any such Indebtedness of the Company; . . .

(ADH Ex. 2, §14.01(2))(emphasis added).  This provision permits a senior noteholder to recover postpetition interest only to the extent permitted in the bankruptcy proceeding.  The general rule in bankruptcy is that unsecured creditors are not entitled to recover postpetition interest, *unless* the debtor is solvent.  *Washington Mutual*, 461 B.R. at 241 (citations omitted).  *See also In re W.R. Grace & Co.*, 2012 WL 310815 at *74 (D.Del. Jan. 30, 2012) ("[T]he general rule is that payment of any post-petition interest, whether at a default or non-default rate, on pre-petition unsecured claims is prohibited by the Bankruptcy Code." The exceptions to that rule (for oversecured creditors or when the debtor is solvent) were determined to be inapplicable.)

The record does not support a finding that the Debtor is solvent.  Some creditors argue that this issue is not ripe for adjudication since there is a possibility of recoveries by the Litigation Trust and the Creditors' Trust to pay creditors in full.  I conclude that, at this time, the senior noteholders have not demonstrated any entitlement to recover post-petition interest before the PHONES Noteholders can receive payment.  However, this determination is without prejudice to allow the parties to revisit the issue in a court of competent jurisdiction if the Trusts'

41

recoveries reach a level that would cause the solvency exception to become applicable.

**B.**     **Issues Related to the EGI Notes**

1.      Are the subordination provisions of the EGI Subordination Agreement applicable to (i) a distribution of Settlement Proceeds under the Third Amended Plan, (ii) a distribution of Litigation Trust proceeds, or (iii) a distribution of Creditors' Trust proceeds?

EGI argues that the terms of the EGI Subordination Agreement expressly limit

subordination of EGI's claims to "assets of the Company" or payments "from the Company."

Like the PHONES Noteholders, EGI argues that fraudulent transfer claims are not "assets of the

Company" based upon the decision *Off'l Comm. Of Unsecured Creditors of Cybergenics Corp.*

*v. Scott Chinery (In re Cybergenics Corp.),* 226 F.3d 237, 245 (3d Cir. 2000). Therefore, EGI

argues, its claims are not subordinated to the Senior Obligations in the distribution of (i) DCL

Plan Settlement Proceeds (which includes, in part, resolution of fraudulent transfer claims), (ii)

recoveries by the Litigation Trust (which is pursuing unsettled LBO-Related Causes of Action,

including fraudulent transfer claims), and (iii) recoveries by the Creditors' Trust (which is

pursuing certain pre-petition LBO-Related Causes of Action arising under state fraudulent

conveyance law (known as the "Disclaimed State Law Avoidance Claims") that may be assigned

to the Creditors' Trust by creditors).[28]  EGI also argues that the EGI Subordination Agreement

---

[28]The DCL Plan Settlement Proceeds, Litigation Trust recoveries, and Creditors' Trust recoveries will be jointly referred to, herein, as the "Avoidance Recoveries." Referring to these proposed recoveries in this manner should not be deemed a finding or conclusion that those recoveries consist solely of fraudulent transfer recoveries. Indeed, the fact that the DCL Plan Settlement and the Litigation Trust consist of more than fraudulent transfer claims is a flaw in EGI's argument.

does not contain that broad, unqualified language found in the PHONES Indenture, which the Court relies upon, in part, in the Reconsideration Decision when deciding that the PHONES Notes were subordinated. Therefore, EGI contends that the Reconsideration Decision does not foretell the outcome of this dispute.

The Subordination provision in the EGI Subordination Agreement provides:

> 2.    Subordination.  The Subordinated Obligations are subordinate and junior in right to payment to all Senior Obligations to the extent provided in this Agreement. No part of the Subordinated Obligations shall have any claim **to the assets of the Company** on a parity with or prior to the claim of the Senior Obligations. Unless and until the obligations to extend credit to the company under the Senior Documents shall have been irrevocably terminated and the Senior Obligations have been paid in full in cash, the Subordinating Creditor will not take, demand or receive **from the Company,** and **the Company** will not make, give or permit, directly or indirectly, by set-off, redemption, purchase or in any other manner, any payment of (of whatever kind or nature, whether in cash, property, securities or otherwise), whether in respect of principal, interest or other, or security for the whole or any part of the Subordinated Obligations.

(ADH Ex. 8 at ¶2) (emphasis added).  EGI argues that the language emphasized in bold print demonstrates that the EGI Notes are subordinate to senior debt only with respect to claims on "assets of the Company" and payments "from the Company." EGI also argues this interpretation is consistent with the "payover" provision of the Subordination Agreement, which provides:

> 6.    Payments Received by Subordinating Creditor.  Except as to payment or distributions which the Company is permitted to pay to Subordinating Creditor or which Subordinating Creditor is permitted to accept and retain pursuant to this Agreement, all payments or distributions upon or with respect to any Subordinated Obligation **which are made by or on behalf of the Company** or received by or on behalf of the Subordinating Creditor in violation of or contrary to the provisions of this Agreement shall be received in trust for the benefit of the holders of Senior Obligations and shall be paid over upon demand to such holders for application to the Senior Obligations until the Senior Obligations shall have been paid in full in cash.

43

(ADH Ex. 8, ¶6) (emphasis added). EGI again emphasizes that the language in this provision limits its application to payments and distributions made by or on behalf of the Company, thereby excluding distribution of the Avoidance Recoveries.

EGI's argument is based upon its assertion that the Avoidance Recoveries, which include claims for fraudulent transfer, are not property of the Debtor, Tribune. The flaw in EGI's argument is the focus upon whether the fraudulent transfer claims *belong* to the Debtors.[29] As the Third Circuit explained in *In re PWS Holding Corp.*, 303 F.3d 308 (3d Cir. 2002), this focus fails to consider properly the interplay between claims under state law fraudulent transfer laws and the Bankruptcy Code. *Id.* at 314.

"Fraudulent conveyance law aims 'to make available to creditors those assets of the debtor that are rightfully a part of the bankruptcy estate, even if they have been transferred away." *Id.* at 313 citing *Buncher Co. v. Official Comm. Of Unsecured Creditors of Gen-Farm Ltd. P'ship IV*, 229 F.3d 245, 250 (3d Cir. 2000). "Section 544(b) places the debtor in possession in the shoes of its creditors, giving it the right to prosecute individual creditors' fraudulent transfer claims for the benefit of the bankruptcy estate. This provision of the Bankruptcy Code is consistent with its objective of equitable distribution." *PWS*, 303 F.3d at 314.

In *PWS*, a creditor sought to assert state law fraudulent transfer actions, arguing that the confirmed chapter 11 plan could not extinguish those claims because *Cybergenics* decided that the debtor did not *own* those claims. The Third Circuit held that the chapter 11 plan, which had

---

[29] This flaw was carried over into that section of the Confirmation Opinion, later defined as the Subordination Determination (*see Tribune I*, 464 B.R. at 195-96), which was struck in the Reconsideration Decision and is not longer in effect (*see Tribune II*, 464 B.R. at 221).

been confirmed over the creditor's objection, could properly extinguish those claims, explaining:

> In arguing that his claims as a noteholder were not extinguished under the Reorganization Plan and Confirmation Order, [creditor] fixates upon our conclusion in *Cybergenics* that fraudulent transfer claims do not constitute assets of the debtor in possession. In doing so, however, he neglects to consider the well-established rule under § 544(b) that we reaffirmed in *Cybergenics*, namely, that "a debtor in possession is empowered to pursue ... fraudulent transfer claims for the benefit of all creditors." *Id.* at 245. Unlike in *Cybergenics*, the debtor in possession in this case, after thoroughly investigating and evaluating the potential fraudulent transfer claims, explicitly extinguished all such claims in its Reorganization Plan. The District confirmed the Reorganization Plan in its December 7, 1999 order, which we then affirmed in *PWS Holding Corp.*, 228 F.3d [224] at 250. Much as a party might decide to resolve a claim by reaching an out-of-court settlement, [debtor] resolved the fraudulent transfer claims here by extinguishing them. In contrast, the debtor in *Cybergenics* merely completed a sale of its assets. It did not exercise its power under § 544(b) to resolve potential fraudulent transfer claims, as did the debtor in this case.

*Id.*, 303 F.3d at 315. In this case, the Debtors have proposed a plan that will exercise their power to resolve, or pursue through the Litigation Trust, potential fraudulent transfer claims on behalf of creditors under Bankruptcy Code §544(b) and §548. Any recoveries will be property of the estate pursuant to §541(a)(3) (Property of the estate includes "any interest in property that the trustee recovers under section . . . 550"). Since the DCL Plan Settlement Proceeds and the Litigation Trust recoveries are property of the estate, the distribution of those funds would be a distribution or payment "by or on behalf of the Company" and the subordination provisions of the EGI Subordination Agreement will apply to those distributions.

It is not as clear whether the same result follows for the Creditors' Trust proceeds, since that trust is pursuing the Disclaimed State Law Fraudulent Transfer Claims. Bankruptcy Code §510(a) directs the court to determine enforceability of the subordination agreement by reviewing "applicable non-bankruptcy law." The EGI Subordination Agreement is governed by the law of

the State of Delaware (ADH Ex. 8 at ¶13), which requires "[a] court applying Delaware law to interpret a contract . . . to effectuate the intent of the parties." *JFE Steel Corp. v. ICI Americas, Inc.*, 797 F.Supp.2d 452, 469 (D.Del. 2011). Furthermore,

> Delaware adheres to the objective theory of contracts, i.e., a contract's construction should be that which would be understood by an objective, reasonable third party. We will read a contract as a whole and we will give each provision and term effect, so as not to render any part of the contract mere surplusage. We will not read a contract to render a provision or term meaningless or illusory.

*Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (internal quotations omitted). *See also JFE Steel*, 797 F.Supp.2d at 469 (same).[30] Accordingly, the use of the phrases "assets of the Company" or payment "by or on behalf of the Company" must be read in the context of the Subordination Agreement as a whole and considered in light of how that phrase would be understood by an objective reasonable third party.

Paragraph 4 of the Subordination Agreement limits EGI's ability to exercise rights and remedies to collect amount due on the EGI Note, stating:

> 4.    Limitation on Enforcement.  Unless and until . . . the Senior Obligations have been paid in full in cash, at no time shall the Subordinating Creditor take or continue any action, or exercise any rights, remedies or powers under the terms of the Subordinated Note, or exercise or continue to exercise any other right or remedy at law or in equity that the Subordinating Creditor might otherwise possess, to collect any

---

[30]Delaware Courts also have decided that unambiguous subordination agreements must be strictly construed.  *Guarantee Bank v. Magness Construction* Co., 462 A.2d 405, 408-09 (Del. 1983), *Master Lumber & Supply Co. v. Suburban  Builders, Inc.*, 269 A.2d 252, 254 (Del. Super. 1970). In the foregoing cases, however, the subordination agreements were very specific as to the parties and the purpose of loans that would be senior. The courts determined the unambiguous and specific language of the subordination agreements should be construed strictly. Here, I have already determined that some provisions of the EGI Subordination Agreement are ambiguous and require parol evidence to interpret. The Subordination Agreement in this case is not analogous to the agreements in *Guarantee Bank* or *Master Lumber*.

46

> Subordinated Obligation, including, without limitation, the acceleration of the Subordinated Obligations, the commencement of any action to enforce payment or foreclose on any lien or security interest, the filing of any petition in bankruptcy or the taking advantage of any other insolvency law of any jurisdiction. Notwithstanding the foregoing, the Subordinating Creditor may file a proof of claim in any bankruptcy or similar proceeding instituted by another entity and may vote such claim in a manner not inconsistent with the terms hereof. If the Subordinating Creditor shall attempt to enforce, collect or realize upon any of the Subordinated Obligations in violation of the terms hereof, any holder of Senior Obligations may by virtue of the terms hereof, restrain any such enforcement, collection or realization, either in its own name or in the name of the Company.

(ADH Ex. 8, ¶4). The exception in this paragraph that allows EGI to file a proof of claim and vote its claim in any bankruptcy proceeding reinforces the broad scope of its prohibitions, since the parties determined the need to specify EGI's ability to exercise even those rights. This paragraph plainly prevents EGI from pursuing fraudulent transfer claims on its own. Under EGI's reading of paragraphs 2 and 4, the phrases "of the Company" or "by or on behalf of the Company" would allow EGI to bypass the overall subordination intent of this agreement and permit EGI to share in those proceeds. Such a result is implausible and not one that a reasonable, objective third party would reach. *Osborn*, 991 A.2d at 1160 ("An unreasonable interpretation produces an absurd result or one that no reasonable person would have accepted upon entering the contract.").

Similar arguments that rely on a phrase or subsection found within a broad subordination agreement to limit a scope of the subordination agreement have arisen before me on at least three prior occasions. *See Tribune II*, 464 B.R. at 213-221, *In re Spansion*, 426 B.R. 114, 148-51 (Bankr.D.Del. 2010), *Kurak v. Dura Automotive Systems, Inc. (In re Dura Automotive Systems, Inc.)*, 379 B.R 257 (Bankr.D.Del. 2007). In *Dura*, when considering an attempt to limit the

reach of the subordination provisions of an indenture, I decided that a clause in the subordination provision:

> should not be considered based upon its grammatical structure alone, but also within the context of the entire agreement, which, here, is more reflective of the parties' intent: that except in very limited circumstances, no payment can be made to the Subordinated Noteholders until (1) the Senior Notes are paid in full, or (2) the Senior Noteholders consent. . . . . [The proposed interpretation of the clause would] eviscerate the purpose of the subordination provisions in the Subordinated Notes Indenture and expand the limited carve out beyond its intended scope.

*Dura*, 379 B.R. at 270. Similar considerations are present here. The overall purpose of the Subordination Agreement is to ensure that the EGI Notes are at the bottom of Tribune's capital structure. (*See* previous discussion regarding the priority between the PHONES Notes and the EGI Notes). EGI's argument that the phrases "of the Company" or "by the Company" in paragraphs 2 and 6 should be read as *limiting* the scope of the Subordination Agreement to reach the Avoidance Proceeds is inconsistent with those provisions and the agreement as a whole and must be rejected.

2.   Whether beneficiaries of the subordination agreement governing the EGI-TRB LLC Notes are entitled to receive post-petition interest prior to the Holders of EGI-TRB LLC Notes Claims receiving payment on their Claims?

As discussed above in connection with the PHONES Notes, determining whether senior noteholders are entitled to recover post-petition interest to be "paid in full" requires courts to interpret and enforce subordination agreements according to applicable non-bankruptcy law. *Southeast Banking*, 156 F.3d at 1121, 11 U.S.C. §510(a). The EGI Subordination Agreement is governed by the laws of the State of Delaware. (ADH Ex. 8 at ¶13). The parties have not cited and independent research has not revealed any Delaware decisions addressing whether a senior

noteholder's "full payment" permits recovery of post-petition interest, particularly whether

Delaware Courts would continue to apply the Rule of Explicitness.

I have determined that the EGI Notes are junior subordinated debt, at the bottom of

Tribune's capital structure. At this point in the case, it is far from certain whether senior

noteholders, including the PHONES Noteholders, will be paid in full.  The issue of post-petition

interest is an intercreditor issue, rather than a bankruptcy issue.[31]  I decline the invitation to parse

through the unsettled law on this issue, especially since the issue is not ripe for adjudication on

this set of facts.

## CONCLUSION

For the reasons set forth herein, I conclude as follows with respect to the PHONES Notes

issues (subject to, conditioned upon, and for the purpose of obtaining confirmation of a chapter

11 plan substantially in the form of the Third Amended Plan):

(1)    The subordination provisions in the PHONES Indenture are applicable to distributions of the Settlement Proceeds and the Creditors' Trust proceeds,

(2)    The claim amount for the PHONES Noteholders should be $759,252,932 (known as the "low PHONES Amount"),

---

[31]As one article stated:

[W]hen a senior noteholder is seeking postpetition interest on its claim, it is not seeking that payment from the bankruptcy estate.  Rather the senior noteholder is seeking to enforce its seniority rights against a junior noteholder.  Thus the allowance or disallowance of postpetition interest arising from subordination agreements is a matter of intercreditor relationships and not the relationship between a debtor and creditors.  As such, the debtor, and the estate is not prejudiced when senior debt is able to recover postpetition interest payment through distributions that may be made to a junior creditor.  There is no added depletion of the estate in these situations and thus, the rationale behind the general rule disallowing postpetition interest in bankruptcy does not apply.

Dennis J. Connolly and William Hao, *X Marks the Spot: Contractual Interpretation of Indenture Provisions*, 17 J. Bankr. L. & Prac. 6 Art. 1 (Sept. 2008).

(3)    The Third Amended Plan's equal treatment of the Senior Noteholders and the Other Parent Claims does not amount to unfair discrimination under Bankruptcy Code §1129(b),

(4)    The EGI Notes are junior in priority to the PHONES Notes, and

(5)    The beneficiaries of the PHONES Indenture subordination provisions are not entitled to receive post-petition interest prior to the PHONES Noteholders receiving payment of their claims.

For the reasons set forth herein, I conclude as follows with respect to the EGI Notes issues (subject to, conditioned upon, and for the purpose of obtaining confirmation of a chapter 11 plan substantially in the form of the Third Amended Plan):

(1)    The subordination provisions in the EGI Subordination Agreement are applicable to (i) a distribution of Settlement Proceeds under the Third Amended Plan, (ii) a distribution of Litigation Trust proceeds, and (iii) a distribution of Creditors' Trust proceeds, and

(2)    The issue of whether beneficiaries of the subordination provisions in the EGI Subordination Agreement are entitled to post-petition interest prior to payment of the EGI Notes is not ripe for determination.

An appropriate Order follows.

BY THE COURT:

_____
KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

Dated: April 9, 2012

50