# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered<br>**Objection Date: August 16, 2012 at 4:00 p.m.**<br>**Hearing Date:  TBD**<br>**Related to Docket Nos. 11117, 11118, and 11472** |

## THIRTEENTH QUARTERLY FEE APPLICATION OF SIDLEY AUSTIN LLP FOR COMPENSATION FOR SERVICES RENDERED AND REIMBURSEMENT OF EXPENSES AS COUNSEL TO THE DEBTORS AND DEBTORS IN POSSESSION FOR THE PERIOD FROM DECEMBER 1, 2011 THROUGH FEBRUARY 29, 2012

| | |
|---|---|
| Name of Applicant: | **Sidley Austin LLP** |
| Authorized to Provide<br>Professional Services to: | **Debtors** |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC (KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc., f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); and WPIX, Inc. (0191). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

| | |
|---|---|
| Date of Retention: | **February 20, 2009 (<u>nunc pro tunc</u> to December 8, 2008)** |
| Period for Which Compensation and Reimbursement is Sought: | **December 1, 2011 through February 29, 2012** |
| Amount of compensation sought as actual, reasonable and necessary: | **$5,331,970.50** |
| Amount of Expense Reimbursement sought as actual, reasonable and necessary | **$168,703.44** |

This is a(n): _____ monthly ___X___ interim _____ final application

The total time expended during the Thirteenth Interim Fee Period for fee application preparation for the monthly and quarterly fee applications, including time expended for review and response to preliminary and final reports and recommendations of the Fee Examiner, is approximately 515.80 hours and the corresponding compensation requested is approximately $212,042.50.

### Prior Interim Applications

| Quarter | Date Filed | Period Covered | Requested | | Approved | |
|---|---|---|---|---|---|---|
| | | | Fees | Expenses | Fees | Expenses |
| 1 | 4/15/09 | 12/8/08-2/28/09 | $3,897,043.25 | $165,360.71 | $3,886,289.75 | $158,441.67 |
| 2 | 7/16/09 | 3/1/09-5/31/09 | $4,209,274.75 | $105,524.36 | $4,203,235.50 | $104,118.90 |
| 3 | 10/15/09 | 6/1/09-8/31/09 | $4,513,018.00 | $99,429.34 | $4,510,127.00 | $99,253.67 |
| 4 | 1/15/10 | 9/1/09-11/30/09 | $5,292,782.75 | $221,808.01 | $5,275,754.14 | $220,748.76 |
| 5 | 4/15/10 | 12/1/09-2/28/10 | $5,426,757.50 | $205,852.05 | $5,412,303.00 | $201,565.16 |
| 6 | 12/14/10 | 3/1/10-5/31/10 | $6,581,178.43 | $425,733.29 | $6,582,868.12 | $418,736.42 |
| 7 | 5/4/11 | 6/1/10-8/31/10 | $7,081,656.37 | $310,093.90 | $7,077,989.87 | $304,357.14 |
| 8 | 7/1/11 | 9/1/10-11/30/10 | $7,126,734.00 | $334,255.68 | $7,120,542.46 | $323,696.86 |
| 9 | 9/20/11 | 12/1/10-2/28/11 | $14,478,878.00 | $599,999.17 | $14,448,735.77 | $585,309.27 |
| 10 | 1/27/12 | 3/1/11-5/31/11 | $8,941,857.00 | $1,133,692.42 | $8,796,500.97 | $1,082,606.25 |
| 11 | 6/4/12 | 6/1/11-8/31/11 | $5,073,861.25 | $445,493.14 | | |
| 12 | 7/12/12 | 9/1/11-11/30/11 | $4,486,113.50 | $290,379.17 | | |

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered<br>**Objection Date: August 16, 2012 at 4:00 p.m.**<br>**Hearing Date: TBD**<br>**Related to Docket Nos. 11117, 11118, and 11472** |

### THIRTEENTH QUARTERLY FEE APPLICATION OF SIDLEY AUSTIN LLP FOR COMPENSATION FOR SERVICES RENDERED AND REIMBURSEMENT OF EXPENSES AS COUNSEL TO THE DEBTORS AND DEBTORS IN POSSESSION FOR THE PERIOD FROM DECEMBER 1, 2011 THROUGH FEBRUARY 29, 2012

Sidley Austin LLP ("Sidley"), attorneys for Tribune Company ("Tribune") and its

affiliated companies that filed voluntary petitions for relief in the above-captioned chapter 11

cases (collectively, the "Debtors"), respectfully submits this application (the "Application") to

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc., f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); and WPIX, Inc. (0191). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

this Court, pursuant to (i) sections 327, 331, and 503 of title 11 of the United States Code (the "Bankruptcy Code"), (ii) Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (iii) Rule 2016-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), (iv) the Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals and Committee Members Pursuant to 11 U.S.C. §§ 105(a) and 331 (Docket No. 225) (the "Interim Compensation Order"), as amended, and (v) the Order Appointing Fee Examiner and Establishing Related Procedures for Compensation and Reimbursement of Expenses for Professionals and Consideration of Fee Applications (Docket No. 546) (the "Fee Examiner Order") for approval of interim compensation and reimbursement of expenses for the thirteenth quarterly period from December 1, 2011 through February 29, 2012 (the "Thirteenth Interim Fee Period"). In support of the Application, Sidley respectfully states as follows:

## FACTUAL BACKGROUND OF THE CASES

1. On December 8, 2008 (the "Petition Date"), Tribune and certain of its subsidiaries each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. An additional Debtor, Tribune CNLBC, LLC (f/k/a Chicago National League Ball Club, LLC) ("Tribune CNLBC"), filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on October 12, 2009.[2] On March 22, 2010, this Court entered an order dismissing the chapter 11 petition of New River Center Maintenance Association, Inc. On May 24, 2011, this

---

[2] Orders of the Court applicable to this Application have subsequently been extended to Tribune CNLBC. (See Order Directing (I) Joint Administration of Chapter 11 Cases and (II) that Certain Orders and Other Pleadings Entered or Filed in the Chapter 11 Cases of Tribune Company, et al. be Made Applicable to the Chapter 11 Case of Chicago National League Ball Club, LLC (entered Oct. 14, 2009) (Docket No. 2333) (the "CNLBC Joint Administration Order").

Court entered an order dismissing the chapter 11 petition of Publishers Forest Products Co. of Washington. In all, the Debtors comprise 110 entities.

2. The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b). (Docket Nos. 43, 2333.)

3. The Debtors have continued in possession of their respective properties and have continued to operate and maintain their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4. On December 18, 2008, the Office of the United States Trustee appointed an official committee of unsecured creditors in the Debtors' chapter 11 cases (the "Committee").

5. On March 19, 2009, pursuant to Fee Examiner Order, the Court appointed Stuart Maue as fee examiner (the "Fee Examiner") to act as special consultant to the Court for professional fee and expense analysis and review, effective nunc pro tunc to February 20, 2009. (Docket No. 546.)

6. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief sought herein are sections 327, 331, and 503 of the Bankruptcy Code, Rule 2016 of the Bankruptcy Rules, and Rule 2016-2 of the Local Rules.

## PROCEDURAL BACKGROUND FOR THE APPLICATION

7. The Debtors sought approval of this Court to retain Sidley as general reorganization and bankruptcy counsel, pursuant to 11 U.S.C. §§ 327(a) and 1107, by application filed on December 26, 2008. As set forth in the application seeking such approval, Sidley's services to the Debtors encompass a wide range of legal services, focused upon restructuring and

insolvency issues but also encompassing certain general corporate, litigation, tax, media law and regulatory, employee-related, and real estate matters.  In particular, Sidley's retention application sets forth the following scope of services:

a)  to provide legal advice with respect to the Debtors' powers and duties as debtors in possession in the continued operation of their business;

b)  to take all necessary action on behalf of the Debtors to protect and preserve the Debtors' estates, including prosecuting actions on behalf of the Debtors, negotiating any and all litigation in which the Debtors are involved, and objecting to claims filed against the Debtors' estates;

c)  to prepare on behalf of the Debtors all necessary motions, answers, orders, reports, and other legal papers in connection with the administration of the Debtors' estates;

d)  to attend meetings and negotiate with representatives of creditors and other parties in interest, attend court hearings, and advise the Debtors on the conduct of their chapter 11 cases;

e)  to perform any and all other legal services for the Debtors in connection with both their chapter 11 cases and with the formulation and implementation of the Debtors' plan of reorganization;

f)  to advise and assist the Debtors regarding all aspects of the plan confirmation process, including, but not limited to, negotiating and drafting a plan of reorganization and accompanying disclosure statement, securing the approval of a disclosure statement, soliciting votes in support of plan confirmation, and securing confirmation of the plan;

g)  to provide legal advice and representation with respect to various obligations of the Debtors and their managers and officers;

h)  to provide legal advice and perform legal services with respect to matters involving the negotiation of the terms of and the issuance of corporate securities, matters related to corporate governance, and the interpretation, application, or amendment of the Debtors' organizational documents, including their limited liability company agreements, material contracts, and matters involving the fiduciary duties of the Debtors and their officers and managers;

i)  to provide legal advice and perform legal services with respect to litigation, tax (state and federal income tax and local property tax assessment matters) and other general non-bankruptcy legal issues for the Debtors to the extent requested by the Debtors; and

j)  to render such other services as may be in the best interests of the Debtors in connection with any of the foregoing and all other necessary or appropriate legal services in connection with these chapter 11 cases, as agreed upon by Sidley and the Debtors.

Sidley's retention, <u>nunc pro tunc</u> to the Petition Date, was approved by this Court by order dated

February 20, 2009.  (Docket No. 435.)

8.    The Interim Compensation Order and the Fee Examiner Order (together,

the "<u>Fee Orders</u>") provide that all professionals retained in these cases pursuant to sections 327,

328, or 1103 of the Bankruptcy Code (the "<u>Case Professionals</u>") must file with the Court and

provide to the Fee Examiner monthly applications for interim allowance of compensation for

services rendered and reimbursement of expenses incurred, together with the applicable time

entries and itemized expenses (the "<u>Monthly Fee Application</u>").  The notice parties specified in

the Fee Orders (the "<u>Notice Parties</u>") have twenty (20) days after service of a Monthly Fee

Application to object to such Monthly Fee Application (the "<u>Objection Deadline</u>").  Upon

expiration of the Objection Deadline, the applicable Case Professional must certify in writing

that no objection or partial objection has been filed with the Court relative to that professional's

Monthly Fee Application, whereupon the Debtors are authorized to pay such professional an

amount equal to the lesser of (i) 80% of the fees and 100% of the expenses requested in the

Monthly Fee Application or (ii) 80% of the fees and 100% of the expenses not subject to an

objection.

9.    Pursuant to the procedures set forth in the Fee Orders, Sidley prepared,

filed with the Court, and served upon the Notice Parties and the Fee Examiner Monthly Fee

Applications for the periods of December 2011, January 2012, and February 2012, which

Monthly Fee Applications are incorporated herein by reference.[3]  Sidley has accordingly

submitted all of its Monthly Fee Applications for the Debtors' chapter 11 cases for the Thirteenth

Interim Fee Period.

_____

[3] The docket numbers of Sidley's Monthly Fee Applications for December 2011, January 2012, and February 2012 are 11117, 11118, and 11472, respectively.

10.     In addition to the Monthly Fee Applications, beginning with the three-month period ending February 28, 2009, and each three-month period thereafter, all Case Professionals must file with the Court and serve on the Notice Parties interim applications for allowance of compensation and reimbursement of expenses of the amounts sought in the Monthly Fee Applications filed during such period (a "Quarterly Fee Application Request"). (See Interim Compensation Order at 3.)  Quarterly Fee Application Requests must include a summary of the Monthly Fee Applications that are the subject of the request and any other information requested by the Court or required by the Local Rules.  (Id.)  This Application represents the thirteenth Quarterly Fee Application Request that Sidley has filed with the Court in connection with these chapter 11 cases, and it covers the period from December 1, 2011 through February 29, 2012, both dates inclusive.

## RELIEF REQUESTED

11.     By this Application, Sidley respectfully requests that the Court approve the interim allowance and award of compensation for professional services rendered and reimbursement of actual and necessary expenses incurred by Sidley as general bankruptcy counsel to the Debtors during the Thirteenth Interim Fee Period.

12.     The amount of fees sought for services rendered during the Thirteenth Interim Fee Period is $5,331,970.50, representing 7,961.20 hours in professional and paraprofessional time for such services.  Reimbursement of actual, necessary expenses incurred by Sidley during the Thirteenth Interim Fee Period in connection with these services is requested in the amount of $168,703.44.  Sidley seeks the interim allowance of such compensation, and this Court's authorization for payment of such amounts by the Debtors to Sidley, less amounts previously paid to Sidley pursuant to the Monthly Fee Applications for the period covered by this Application and the procedures set forth in the Fee Orders.

13.     The hourly rates charged by Sidley's professionals and paraprofessionals during the Thirteenth Interim Fee Period are no greater than the customary hourly rates for such individuals both inside and outside of bankruptcy cases.  The highest billing rate charged by any Sidley attorney for services rendered under Sidley's current billing rates that became effective on January 1, 2012 and continuing until Sidley's next Firm-wide rate adjustment was $1,000 per hour.  (See Supplemental Affidavit (Second) of James F. Conlan in Support of Application for an Order Authorizing the Employment and Retention of Sidley Austin LLP as Attorneys for the Debtors and Debtors in Possession ¶ 3, Docket No. 424.)  Sidley believes these rates are comparable to those charged by the bankruptcy and other professionals of other firms of comparable size, stature, and experience.

14.     Sidley has received no payment and no promises for payment from any source other than the Debtors for services rendered in these chapter 11 cases.  There is no agreement between Sidley and any other party for the sharing of compensation to be received for the services rendered by Sidley in these chapter 11 cases.  All professional and paraprofessional services for which compensation is sought herein were rendered solely on behalf of the Debtors in these cases.

## SERVICES RENDERED

15.     Sidley has rendered substantial services to the Debtors in connection with these chapter 11 cases during the period covered by this Application, both in its capacity as general bankruptcy counsel to the Debtors and continuing in its capacity as corporate, litigation, and transactional counsel to the Debtors in their ordinary course of business.  The services performed by Sidley's professionals and paraprofessionals during the period covered by this Application were necessary and have directly contributed to the effective administration of the Debtors' chapter 11 cases.

16.     A breakdown of the total hours expended by each professional on all matters and a breakdown of amounts sought by each matter category covered herein are included as a part of Attachment A to this Application, as required by Local Rule 2016-2. A detailed description of the services provided to the Debtors is incorporated by reference to the Monthly Fee Applications previously filed by Sidley with the Court. The following is a summary of the activities performed by Sidley's professionals and paraprofessionals during the Thirteenth Interim Fee Period:

**A.     FCC Matters (20100):    Hours: 194.60    Fees: $113,493.50[4]**

17.     During the Thirteenth Interim Fee Period, Sidley's professionals continued to represent the Debtors' broadcast stations on several matters as communications regulatory counsel. A substantial majority of the fees incurred by Sidley's professionals in this category during the Thirteenth Interim Fee Period relates to the Newspaper Crossownership matter, which, as described in Sidley's prior Quarterly Fee Application Requests, involves petitions for review of the Federal Communication Commission's ("FCC") newspaper-broadcast cross-ownership regulations. The FCC had issued various rules that continued to prohibit owners of newspapers, including the Debtors, from also holding licenses to operate certain television or radio stations within the same markets. The Debtors and twenty-one (21) other parties challenged these rules on constitutional and Administrative Procedure Act grounds; some arguing that the cross-ownership restrictions should be further strengthened and others, including the Debtors, arguing that the cross-ownership restrictions should be further relaxed.

---

[4] Commencing in December 2009, the Debtors requested that Sidley provide separate invoices for professional fees for certain discrete FCC-related services attributable to KWGN/FCC General, KPLR-TV, Nextel Negotiations, and Newspaper Crossownership matters, on which Sidley represents the Debtors in the ordinary course of business. In accordance with this request, and after consultation with the Fee Examiner, Sidley has included such invoices within the broader category of FCC Matters for the purposes of calculating the total fees and expenses in Sidley's Monthly Fee Applications and Quarterly Fee Application Requests.

18.     On December 5, 2011, Sidley's professionals prepared and filed a petition

for writ of certiorari with the United States Supreme Court on behalf of the Debtors, seeking that

Court's review of the July 2011 decision of the United States Court of Appeals for the Third

Circuit with respect to the FCC's media ownership rules, which had the effect of preserving the

FCC's ban on common ownership of a broadcast station and daily newspaper in the same

market.[5]  Subsequent to that filing, Sidley's professionals reviewed two other petitions for

certiorari addressing the same Third Circuit decision, as well as oppositions to all three petitions,

and prepared a reply brief that was filed with the Supreme Court in March 2012.  The outcome

of the appeal is of substantial importance to the Debtors' broadcasting and publishing operations

in several key markets in which the Debtors conduct business.

19.     During the Thirteenth Interim Fee Period, Sidley's professionals also

drafted and filed comments on behalf of the Debtors in connection with the FCC's most-recent

2010 Quadrennial Review proceeding, which will again address the potential relaxation of the

cross-ownership restrictions, including the newspaper-broadcast cross-ownership rule, the radio-

television cross-ownership rule, and the television station multiple ownership rule.  During this

period, Sidley professionals prepared and filed initial comments, reviewed the comments filed by

opponents of the relaxation of the FCC's media cross-ownership restrictions, and drafted reply

comments to the FCC in support of their positions.

20.     Sidley's professionals also assisted the Debtors with respect to matters

related to the upcoming and prior broadcast license renewal application cycles, and provided

advice to the Debtors related to newly-adopted rules with respect to the public disclosure of

---

[5] The appeal is captioned Prometheus Radio Project v. FCC, Case Nos. 08-3078, 08-4454, 08-4455, 08-4456, 08-4457, 08-4458, 08-4459, 08-4461, 08-4462, 08-4463, 08-4464, 08-4465, 08-4467, 08-4468, 08-4470, 08-4471, 08-4472 08-4475, 08-4477, 08-4478 & 08-4652 (3d Cir. July 7, 2011).

various information concerning broadcasters and their programming.  Sidley's professionals with responsibility for assisting the Debtors with upcoming renewals and commercial agreements invoking FCC rules (i) compiled FCC license renewal application data, (ii) identified and reviewed network affiliation agreements, and (iii) assisted the Debtors with meeting their "public inspection file" requirements under Federal law in connection with the renewal filings.  Finally, Sidley's professionals advised the Debtors regarding the impact of their bankruptcy proceedings on certain FCC applications and procedures.

**B.**    **Fee Applications (30390):    Hours: 515.80    Fees: $212,042.50**

21.    This matter category encompasses all tasks relating to the preparation and filing of Sidley's Monthly Fee Applications and Quarterly Fee Application Requests with the Court.  In this Thirteenth Interim Fee Period, Sidley's professionals and paraprofessionals drafted and filed Sidley's thirty-fifth Monthly Fee Application, drafted portions of Sidley's thirty-sixth and thirty-seventh Monthly Fee Applications, drafted and filed Sidley's Tenth Quarterly Fee Application Request, drafted portions of Sidley's Eleventh, Twelfth, and Thirteenth Quarterly Fee Application Requests, and reviewed and complied with the Court's Fee Orders respecting all of the foregoing.  In addition, Sidley reviewed and drafted responses to the Fee Examiner's preliminary reports with respect to Sidley's Sixth, Seventh, and Eighth Quarterly Fee Application Requests.  In light of the number of monthly and quarterly fee applications prepared, in whole or in part, during this period, Sidley respectfully submits that the hours expended and fees requested are reasonable.

**C.**    **Executory Contracts and Leases (30410):    Hours: 14.30    Fees: $7,204.00**

22.    As of the Petition Date, the Debtors in these cases were party to approximately 45,000 executory contracts and unexpired leases.  During the Thirteenth Interim Fee Period, Sidley's professionals, together with the Debtors' financial advisors at Alvarez &

Marsal, advised the Debtors with respect to the assumption, assumption and assignment, or rejection of certain executory contracts and unexpired leases under section 365 of the Bankruptcy Code and in accordance with the terms of the plan of reorganization proposed for the Debtors, on terms favorable to the Debtors.  Specifically, the DCL Plan (defined below) provides for the assumption of all executory contracts and unexpired leases other than those identified on the exhibit of rejected contracts and leases, which was filed as part of the Plan Supplement (as defined in the DCL Plan) during the Ninth Interim Fee Period.[6]

   23. During the Thirteenth Interim Fee Period, Sidley's professionals, along with the Debtors' financial advisors at Alvarez & Marsal, the Debtors' management and personnel, and counsel for contract counterparties, continued their efforts to reach consensual determinations of amounts required to be cured upon the assumption of executory contracts and unexpired leases pursuant to the terms of the DCL Plan, and in accordance with the procedures described in the Motion of the Debtors for an Order Establishing Procedures (I) Fixing Cure Amounts and (II) Providing Notice of Assumption and/or Assignment of Certain Executory Contracts and Unexpired Leases By A Successor Reorganized Debtor Pursuant to Sections 365, 1123 and 1129 of the Bankruptcy Code (Docket No. 8287) (the "Global Contract Motion"), which was approved by order of the Bankruptcy Court on April 25, 2011 (Docket No. 8745), amended on May 4, 2012 (Docket No. 11546) (the "Global Contract Order").

**D.** **Use/Sale/Lease of Assets (30430): Hours: 31.40 Fees: $21,865.00**

   24. During the Thirteenth Interim Fee Period, Sidley's professionals advised the Debtors' senior management with respect to certain transactions for the use, sale, and lease of

---

[6] The Plan Supplement, as defined in the DCL Plan, is comprised of numerous exhibits to the DCL Plan.  The Plan Supplement was originally filed in January 2011, during the Ninth Interim Fee Period, and was updated and filed on May 4, 2012, during the Fourteenth Interim Fee Period.  (See Docket No. 11545.)  The exhibit of rejected contracts and leases was included (without modification) in that filing.  (Id.)

assets on behalf of the Debtors, both in connection with these chapter 11 cases and with Sidley's

ongoing representation of the Debtors in the ordinary course of business.  Specifically, Sidley's

professionals in the Corporate Reorganization and Bankruptcy practice group provided advice to

the Debtors' business personnel on certain discrete transactions, including whether such

transactions implicated sections 363(b) or (c) of the Bankruptcy Code.  Among those

transactions was Tribune Broadcasting Company's ("Tribune Broadcasting") proposed entry into

a regarding license agreement with Local TV, LLC ("Local TV") respecting certain broadcasting

systems and software developed by Tribune Broadcasting.  The license agreement between

Tribune Broadcasting and Local TV was finalized and executed in January 2012.  Sidley's

professionals negotiated and prepared a motion, pursuant to section 363(b) of the Bankruptcy

Code, for an order authorizing Tribune Broadcasting to enter into the license agreement with

Local TV, which was filed with the Bankruptcy Court together with a supporting declaration on

January 25, 2012 (Docket No. 10716) (the "Local TV Motion").  In connection therewith,

Sidley's professionals also prepared and filed a motion to file the license agreement between

Tribune Broadcasting the Local TV with the Court under seal (Docket No. 10717).  No parties in

interest opposed the Local TV Motion, and the Bankruptcy Court entered orders granting the

Local TV Motion and the motion to file the license agreement under seal on February 14, 2012

(Docket Nos. 10918, 10919 (corrected at 10940)).

**E.**     **Insurance Matters (30450):    Hours: 2.30    Fees: $2,185.00**

        25.       During the Thirteenth Interim Fee Period, Sidley's professionals continued

to work with the Debtors, their outside insurance counsel, and various insurance providers to

resolve certain insurance coverage issues, and to advise the Debtors with respect to the impact of

these chapter 11 cases on the Debtors' insurance and risk management procedures.  Sidley's

professionals specifically reviewed legal issues pertaining to the Debtors' directors' and officers'

liability insurance policies and provided advice to the Debtors regarding such policies in connection with lawsuits pending against certain of the Debtors' current and former directors and officers.

**F.      Litigated Matters (30470):    Hours: 2,782.00    Fees: $1,978,059.50**

26.     The "Litigated Matters" category encompasses all of Sidley's activities relating to actual and potential litigation, contested matters, and adversary proceedings, which continued to require substantial attention from Sidley, the Debtors' senior management, the Committee, the Debtors' senior lenders, and other key creditor constituencies during the Thirteenth Interim Fee Period.

27.     This category also includes fees incurred by Sidley's professionals in the Litigation practice group in connection with litigation-related activities concerning the contested plan confirmation process as it continued to develop during the Thirteenth Interim Fee Period.[7] A detailed narrative description of the services provided by Sidley's professionals in both the Litigation practice group and the Corporate Reorganization and Bankruptcy practice group (among others) to advance confirmation of the DCL Plan is provided in Section H, _infra_, of this Application.[8]

---

[7] Given the contested nature of the Debtors' plan confirmation process, Sidley's invoices and time detail in both the Litigated Matters category and the Plan and Disclosure Statement category include Sidley's services in connection with the Debtors' plan confirmation process. As a general rule, the services performed by professionals in Sidley's Litigation practice group in connection with the plan confirmation process appear in the Litigated Matters category, and the services performed by professionals in Sidley's Corporate Reorganization and Bankruptcy practice group in connection with the plan confirmation process appear in the Plan and Disclosure Statement category.

[8] The narrative description of the services provided by Sidley's professionals to advance confirmation of the DCL Plan should be read in conjunction with the time detail submitted in both the Litigated Matters category and the Plan and Disclosure Statement category, to the extent those services are inter-related. The professionals from Sidley's Litigation practice group that were primarily responsible for providing litigation-related services in connection with the contested plan confirmation process during the Thirteenth Interim Fee Period were Mr. Bendernagel, Mr. Miles, Mr. Flagg, Ms. Kenney, Mr. Ross, Mr. Wackerly, and Ms. Eavy.

(a)    **Avoidance Actions and Related Adversary Proceedings and Tolling Agreements**

(i)    *Avoidance Actions Commenced or Tolled by the Debtors*

28.    In the Ninth Interim Fee Period, Sidley filed 94 Avoidance Actions, by which the Debtors sought to avoid and recover for the benefit of their estates various transfers of property made to certain of the Debtors' third party vendors and suppliers prior to the Petition Date.[9]  The Court entered an order providing for a broad stay of the Avoidance Actions until June 30, 2011, which was also the date that the approximately 127 tolling agreements with third party vendors and suppliers were set to expire.[10]  Beginning in late October 2011 and continuing through November and December 2011, Sidley's professionals and the Debtors' financial advisors at Alvarez & Marsal undertook the substantial efforts necessary to extend further the stay of the Avoidance Actions and the tolling agreements.  On December 16, 2011, Sidley's professionals prepared and filed the Supplemental Motion to Extend the Stay of Avoidance Actions Commenced by the Debtors (Docket No. 10464) (the "Supplemental Stay Extension Motion"), which requested a further extension of the stay through and including June 30, 2012.  The order approving the Supplemental Stay Extension Motion was granted by the Bankruptcy Court on January 9, 2012 (Docket No. 10557).[11]  Sidley's professionals, together with co-counsel and Alvarez & Marsal, also secured amendments to each of the outstanding tolling agreements to extend them through the same date.

---

[9] See Sidley's Ninth Quarterly Fee Application Request, at ¶¶ 48-50, for a detailed description of the Avoidance Actions commenced by the Debtors.

[10] During the Eleventh Interim Fee Period, Sidley's professionals filed the Motion to Extend the Stay of Avoidance Actions Commenced by the Debtors on June 10, 2011 (Docket No. 9230), which further extended the stay of the Avoidance Actions through and including December 30, 2011.

[11] The stay was subsequently extended further, to a date that is ninety (90) days after the effective date of the DCL Plan, by Order dated May 24, 2012 (Docket No. 11685).

(b)     **ERISA Mediation and Settlement**

29.     During the Thirteenth Interim Fee Period, Sidley's professionals continued their efforts to obtain approval for, and consummate, the settlement of certain claims, causes of action, and related matters arising from alleged violations of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), in connection with the Tribune Employee Stock Ownership Plan, an employee retirement benefit plan sponsored by Tribune, with (i) the Department of Labor ("DOL"), GreatBanc Trust Company ("GreatBanc"), Samuel Zell, the plaintiffs to that certain class action lawsuit styled Neil, et al. v. Zell, et al., (the "Neil Plaintiffs"), and certain of the Debtors' primary and excess fiduciary liability insurance providers (the "ERISA Claims Settlement").[12]

30.     As discussed in Sidley's Twelfth Quarterly Fee Application Request, following the entry by the United States District Court for the Northern District of Illinois (the "Illinois District Court") of the order granting preliminary approval of the ERISA Claims Settlement as it relates to the Neil litigation, the parties began to implement the ERISA Claims Settlement in accordance with its terms, including (i) disseminating notices to class members pursuant to the requirements of the Class Action Fairness Act ("CAFA") and (ii) making the initial payments required to fund the settlement. Sidley's professionals conferred with the Debtors' senior management, counsel to the Debtors' insurers, counsel for the Neil Plaintiffs, and counsel for the other parties to the ERISA Claims Settlement regarding the implementation

---

[12] Background to Sidley's participation in the mediation, negotiations, and preparation of pleadings filed in the Bankruptcy Court and District Court presiding over the Neil litigation is provided in detail in Sidley's Tenth, Eleventh, and Twelfth Quarterly Fee Application Requests. The Bankruptcy Court entered orders approving the ERISA Claims Settlement and the related settlement between the Debtors and the United States Department of the Treasury, Internal Revenue Service ("IRS") to settle excise tax claims asserted by the IRS on account of the ERISA violations alleged in the Neil litigation and by the DOL (the "IRS Settlement") on October 19, 2011 (Docket Nos. 10019, 10023).

and funding of the ERISA Claims Settlement.  Sidley's professionals also conferred with the independent fiduciary appointed pursuant to the terms of the ERISA Claims Settlement with responsibility for reviewing the reasonableness of the settlement for the class members, in preparation for his report to the Illinois District Court presiding over the Neil litigation.  The deadline for class members to object to the ERISA Claims Settlement was December 16, 2011, and no class members filed an objection.  On or about January 17, 2012, the independent fiduciary issued his report to the Illinois District Court, in which he found the ERISA Claims Settlement to be reasonable.  Accordingly, on January 24, 2012, the Neil Plaintiffs filed a motion with the Illinois District Court seeking final approval of the ERISA Claims Settlement, which was granted after a hearing on January 30, 2012.  Sidley's professionals participated on behalf of the Debtors in the foregoing hearing before the Illinois District Court, and advised the Debtors' senior management regarding their obligations to implement the ERISA Claims Settlement further following the entry of the final approval order and judgment by the Illinois District Court.

31.     To that end, Sidley's professionals negotiated, drafted, and filed a motion with the Bankruptcy Court to dismiss the pending adversary proceeding against the Neil Plaintiffs (Adv. Pro. No. 09-50445 (KJC)), which was filed on February 23, 2012 (Docket No. 10990) and which was ultimately approved by the Bankruptcy Court on March 22, 2012 (Docket No. 11224 and Adv. Docket No. 54).  Sidley's professionals also negotiated and filed a stipulation between the Debtors and the DOL resolving the seventy-three (73) proofs of claim asserted by the DOL against the Debtors, based on alleged liability under ERISA, which was implemented in accordance with the terms of the ERISA Claim Settlement (Docket No. 10989).

(c)      **The State Law Constructive Fraudulent Conveyance Actions**

32.      On April 25, 2011, the Bankruptcy Court entered an order authorizing the

Noteholder Proponents[13] to commence state law constructive fraudulent conveyance actions

against Tribune's shareholders who received a cash distribution on account of their shares in

Tribune as part of the Leveraged ESOP Transactions (Docket No. 8740).  On June 2, 2011, the

Noteholder Proponents and certain retirees of Times Mirror Company (the "TM Retirees")[14]

commenced over 50 lawsuits in over 20 different federal and state courts, seeking to recover

approximately $8 billion allegedly paid to all former shareholders of Tribune whose stock was

purchased and/or redeemed in conjunction with the Leveraged ESOP Transactions in 2007,

under state law constructive fraudulent transfer causes of action (collectively, the "SLCFC

Actions").  These lawsuits named over 2,000 individuals and entities as defendants, included

thousands of "doe" defendants, and also asserted defendant class actions against the balance of

the approximately 38,000 individuals or entities who held stock that was purchased or

redeemed.  The SLCFC Actions were brought for the sole benefit of the plaintiffs thereto, and

not for the benefit of all of Tribune's creditors.

33.      During the Thirteenth Interim Fee Period, Sidley's professionals, on

behalf of the Debtors, analyzed a series of amended complaints filed in December 2011 and

conducted an analysis of the SLCFC Actions as they applied to entities related to the Debtors

and/or current and former employees of the Debtors.  Sidley worked with the Debtors' financial

advisors at Alvarez & Marsal to identify current and former Tribune employees listed among the

---

[13] Aurelius Capital Management, L.P. ("Aurelius"), Deutsche Bank Trust Company Americas ("DBTCA"), Law
Debenture Trust Company of New York ("Law Debenture") and Wilmington Trust Company ("Wilmington Trust"),
are collectively referred to herein as the "Noteholder Proponents" for the sake of consistency with Sidley's prior
Quarterly Fee Application Requests, although the Noteholder Proponents are no longer advancing confirmation of a
competing plan of reorganization for the Debtors.

[14] Times Mirror Company was merged with and into Tribune in 2000.

thousands of named defendants in the amended complaints. Sidley's associates in the Litigation

and Corporate Reorganization and Bankruptcy practice groups spent considerable time reviewing

and analyzing the massive volume of pleadings in each of the 50 SLCFC Actions, as amended,

for the purpose of advising the Debtors with respect to pleadings that might impact the

Bankruptcy Court's stay applicable to the SLCFC Actions, or any pleadings or rulings that might

impact Eagle New Media Investments, LLC (a Debtor named in certain of the SLCFC Actions),

the current and former employees of the Debtors named in the SLCFC Actions, or any Tribune-

related entity or party. Several of the SLCFC Actions were filed in state court, necessitating

coordination with support staff to review dockets across the United States, in addition to raising

legal issues regarding removal of those actions to the federal courts. At the request of Tribune's

senior management, Sidley's professionals prepared daily updates to Tribune's senior

management, with cumulative updates provided following important milestones in the SLCFC

Actions. Additionally, certain additional Tribune-sponsored employee benefit plans and related

entities were added as defendants in the December 2011 amended complaints. Sidley

professionals from the Litigation, Employee Benefits, and Corporate Reorganization and

Bankruptcy practice groups researched and advised the Debtors on the potential consequences

for the Debtors of the assertion of claims against their sponsored employee benefit plans and the

defenses that those entities could raise to the SLCFC Actions.

   34. During the Thirteenth Interim Fee Period, the plaintiffs to the SLCFC

Actions continued their efforts to have the SLCFC Actions consolidated in multi-district

litigation ("MDL") proceedings before a single judge. The Judicial Panel on Multi-District

Litigation ("JPML") held a hearing on December 1, 2011 to determine whether the SLCFC

Actions should be consolidated in an MDL proceeding. A Sidley professional attended the

hearing and prepared a report on the hearing for consideration by the Debtors' senior

management.  On December 19, 2011, the JPML entered an order (the "Transfer Order")

consolidating all of the SLCFC Actions pending in federal courts in a consolidated proceeding

(the "Consolidated Action") in the United States District Court for the Southern District of the

New York (the "New York District Court").  Sidley's professionals reviewed and analyzed the

Transfer Order and the effect of the Transfer Order on the underlying SLCFC Actions that were

transferred to the Consolidated Action.  Sidley's professionals prepared, filed, and served notices

of appearance (as prescribed by the Federal Rules of Civil Procedure) on behalf of Debtor Eagle

New Media Investments, LLC in the Consolidated Action.  See In re Tribune Fraudulent

Conveyance Litigation, S.D.N.Y. Case No. 1:11-md-02296-WHP (MDL Docket No. 187).

Sidley's professionals also conducted research regarding a pilot project for litigation in the New

York District Court, which, for a time, applied to the Consolidated Action.

        35.     On December 28 and 29, 2011, the JPML issued conditional transfer

orders covering the remaining SLCFC Actions and related litigation that was not transferred to

the Consolidated Action by the Transfer Order.  Among the actions identified as potential "tag-

along" actions to be consolidated with the SLCFC Actions in the conditional transfer orders were

the two adversary proceedings commenced by the Committee captioned Official Committee Of

Unsecured Creditors v. JPMorgan Chase Bank, N.A. (In re Tribune Co.), Case No. 10-53963

(KJC) (the "Lender Action"), and Official Committee Of Unsecured Creditors v. FitzSimons (In

re Tribune Co.), Case No. 10-54010 (KJC) (the "FitzSimons Action") pending before the

Bankruptcy Court.  The Committee, the Robert F. McCormick Foundation, and the Cantigny

Foundation filed objections to the consolidation of the FitzSimons Action with the SLCFC

Actions in the Consolidated Action.  Sidley's professionals spent significant time monitoring and

analyzing the voluminous pleadings filed by parties in interest, both in favor of and against

consolidation, in the New York District Court.  Sidley's professionals also analyzed and briefed

the legal issues implicated by the potential consolidation of the Lender Action and the

FitzSimons Action with the SLCFC Actions, particularly given the stay of proceedings

applicable to the FitzSimons Action in the Bankruptcy Court.  The number of legal issues

presented, and the highly-specialized nature of MDL litigation, necessitated the participation of

multiple Sidley professionals with relevant experience in MDL proceedings to perform the

foregoing analyses.

        36.     On January 12, 2012, the Noteholder Proponents filed a motion seeking a

termination of the Bankruptcy Court's stay of proceedings in the SLCFC Actions (Docket No.

10594).  On January 17, 2012, the Committee filed a motion with the Bankruptcy Court to

extend the stay applicable to the FitzSimons Action and requesting that the stays applicable to

the SLCFC Actions be coordinated with the stay of the FitzSimons Action (Docket No. 10634).

In response to both of the foregoing motions, Sidley's professionals, on behalf of the Debtors,

filed the Debtors' (1) Response to Third Motion of the Official Committee of Unsecured

Creditors to Amend Definition of "Termination Event" in Standing Orders and (2) Objection to

Motion for Order Lifting Stays of State Law Constructive Fraudulent Conveyance Suits (Docket

No. 10728).  Sidley's professionals also reviewed and analyzed each of the joinders, responses,

and objections of third parties to the foregoing motions.  (See, e.g., Docket Nos. 10718, 10722,

10723, 10724, 10725, 10726, 10727, 10729, 10730, 10731, 10732, 10735, 10753, 10754,

10822.)  On February 1, 2012, the Bankruptcy Court held a hearing to consider the Noteholder

Proponents' motion and the Committee's motion respecting the stay of the SLCFC Actions and

the FitzSimons Action, respectively.  The Court held further hearings on the foregoing motions

on February 15 and 28, 2012.  Following the February 28, 2012 hearing, the parties in interest

conferred and negotiated a proposed form of order that granted a partial lifting of the stay

applicable to the FitzSimons Action, which was submitted to the Court on March 14, 2012 and

entered by the Court on March 15, 2012 (Docket No. 11158).

37.      Also in the Thirteenth Interim Fee Period, two actions were filed in

Illinois state court by Equity Group Investments, LLC, which asserted causes of action similar to

the SLCFC Actions.  Sidley's professionals analyzed the suits, potential removal issues, statute

of limitations issues, and the process by which the suits might be designated as "tag-along"

actions to the Consolidated Action.

**(d)      Motions for Relief From Stay**

38.      As in most chapter 11 cases, the Debtors are faced with periodic requests

for relief from the automatic stay.  Specifically, as of the date of this Quarterly Fee Application

Request, the Debtors have received twenty-one (21) requests for relief from stay since the

commencement of these cases, one of which was filed during the Thirteenth Interim Fee

Period.[15]  That motion, filed pro se by Anthony Conte on December 19, 2011 (Docket No.

10472) (the "Conte Motion"), related to ongoing litigation in the United States District Court for

the Eastern District of New York (the "Conte Litigation"), against Tribune's non-Debtor

subsidiary Tribune ND, Inc. ("Tribune ND").  Mr. Conte requested relief from the automatic stay

to the extent it applied to the media liability insurance policies owned by Tribune that covered

the claims he asserted against Tribune ND in the Conte Litigation.  Mr. Conte also requested the

Court enter an order directing Tribune to modify its schedules of assets and liabilities to remove

---

[15] This number excludes (1) motions filed by the Debtors for relief from the automatic stay, and (2) the motion filed by the Noteholder Proponents confirming the automatic stay does not bar the commencement of the SLCFC Actions.

Mr. Conte as a potential creditor.  Sidley's professionals, together with Tribune's in-house

counsel and Tribune ND's outside defense counsel, reviewed the assertions raised in the Conte

Motion and engaged in discussions with Mr. Conte in an effort to resolve the Conte Motion on a

consensual basis.  To that end, Sidley's professionals and Mr. Conte engaged in negotiations on a

form of stipulation and agreed order that would provide Mr. Conte with certain limited relief

from the automatic stay.  Sidley's professionals also conferred with Mr. Conte regarding the

Debtors' opposition to modifying Tribune's schedules of assets and liabilities.  When the

negotiations between the Debtors and Mr. Conte proved unsuccessful, Sidley's professionals

prepared and filed the Debtors' Limited Objection to the Motion of Anthony Conte for (I) Relief

from the Automatic Stay as to Media Liability Insurance Policy and (II) Modification of Tribune

Company's Schedules of Assets and Liabilities on February 8, 2012 (Docket No. 10872).  The

objection was also joined and supported by the Committee (Docket No. 10874).  Mr. Conte filed

a reply to the Debtors' objection on February 17, 2012 (Docket No. 10971).  The Conte Motion

was heard by the Bankruptcy Court on March 22 and April 25, 2012, and those proceedings, and

Sidley's role in connection therewith, will be described in detail in Sidley's Fourteenth Quarterly

Fee Application Request.

(e)      **Other Pending Litigation**

39.      Prior to the Petition Date and since, Sidley has served the Debtors as

defense counsel with respect to a number of litigation matters pending in all levels of state and

federal courts across the country, including such prepetition litigation matters as Neuman v.

Goldstone, a prepetition employment contract lawsuit in Los Angeles; CBS Broadcasting Inc. v.

Kincaid, a civil litigation suit pending in California; and certain litigation matters pending in

New York, including the cases styled Schultz v. Tribune, Crab House of Douglaston, Inc. v.

Newsday (the "Crab House Matter") and Furnell v. Tribune.  Sidley continued to represent the

Debtors and their non-Debtor affiliates in connection with these litigation matters during the Thirteenth Interim Fee Period, to the extent such matters were not stayed by section 362(a) of the Bankruptcy Code, and also provided advice to the Debtors in connection with certain proofs of claim filed by the plaintiffs on account of such litigated matters.

40.    As discussed in Sidley's Twelfth Quarterly Fee Application Request, beginning in late September 2011, counsel to the parties to the Crab House Matter, including Sidley on behalf of the Debtor and non-Debtor defendants thereto, engaged in formal mediation under the auspices of mediator Ken Feinberg, which took place over a period of approximately seven weeks.  In connection therewith, Sidley's professionals prepared and submitted a 23-page mediation statement on behalf of Tribune ND a non-Debtor defendant.  In November 2011, with no resolution having been reached in mediation, the plaintiffs in the Crab House Matter filed a motion requesting that the District Court presiding over the Crab House Matter set a briefing schedule on class certification pursuant to Federal Rule of Civil Procedure 23.  Sidley's litigation professionals, in conjunction with Sidley's bankruptcy professionals, prepared and filed two responsive pleadings: (1) a response on behalf of Tribune ND regarding a proposed briefing schedule and (2) a response on behalf of Debtor Hoy Publications, LLC ("Hoy") reiterating that Hoy was in bankruptcy and that it would violate the automatic stay to file a motion for class certification against Hoy.  The plaintiffs to the Crab House Matter contested Hoy's motion, and the District Court ultimately issued an order in favor of Hoy on December 14, 2011.  However, the District Court entered an order setting a briefing schedule on class certification as it applied to the plaintiffs' claims against Tribune ND, which were not affected by the automatic stay.

41.    Accordingly, during the Thirteenth Interim Fee Period, Sidley's professionals in the Litigation practice group expended considerable efforts on behalf of Tribune

ND in opposition to the Crab House plaintiffs' motion for class certification pursuant to Federal Rule of Civil Procedure 23, which was filed in the Crab House Matter on January 10, 2012. Sidley's professionals analyzed the amended complaint filed in the Crab House Matter, performed legal and factual research in opposition to class certification, and drafted the opposition to class certification. Sidley's professionals also participated in discovery on behalf of Tribune ND in connection with the plaintiffs' motion for class certification, including preparing for and taking the depositions of three named plaintiffs (Crab House of Douglaston Inc. d/b/a Douglaston Manor, College Point Restaurant, Corp. d/b/a Gallagher's II, and Parallel Productions, Inc.). Those depositions were taken on February 29, 2012, March 5, 2012, and March 9, 2012, respectively. Sidley's professionals also prepared and served written discovery requests on the plaintiffs and third parties on behalf of Tribune ND, and responded to discovery requests issued by the plaintiffs.

**G.     Travel Time (30480):   Hours: 74.00    Fees: $28,850.50**

       42.     During the Thirteenth Interim Fee Period, Sidley's professionals spent time traveling to Wilmington, Delaware to attend hearings in the Debtors' cases. In addition, Sidley's professionals traveled to a variety of locations to attend meetings with the Debtors and various creditor constituencies. During the Thirteenth Interim Fee Period, the Bankruptcy Court held hearings on December 13, 2011, December 14, 2011, January 11, 2012, February 2, 2012, February 15, 2012, and February 28, 2012.[16] These hearings required the attendance in person of certain Sidley professionals from Sidley's Chicago, Washington, D.C., and Los Angeles offices who had done significant work on the matters set for hearing. The hours reflect non-working

---

[16] In addition, telephonic hearings were held on February 10 and February 22, 2012, which did not require travel.

travel time and the fees requested in this matter category have been reduced by 50% in accordance with Local Rule 2016-2(d)(viii).

**H.      Plan and Disclosure Statement (30500):    Hours: 2,831.50    Fees: $2,016,972.00**

43.      A central part of Sidley's representation of the Debtors during these chapter 11 cases has been the negotiation and formulation of a plan of reorganization for the Debtors.  Throughout the Thirteenth Interim Fee Period, Sidley's professionals in the Corporate Reorganization and Bankruptcy and Litigation practice groups continued their efforts to advance confirmation of the Third Amended Joint Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A. (Docket No. 10273) (the "Third Amended DCL Plan" and, as later modified and amended thereafter from time to time, the "DCL Plan").[17]

44.      Specifically, Sidley's professionals (i) continued to negotiate, review, and analyze the provisions of the DCL Plan and the disclosures contained in the Supplemental Disclosure Document (defined below); (ii) participated in contested proceedings on various motions filed by the Noteholder Proponents seeking reconsideration of the Court's Confirmation Opinion and Order Denying Confirmation of Competing Plans (Docket No. 10134) (the "2011 Confirmation Opinion"); (iii) negotiated with the Noteholder Proponents and other parties in interest, and participated in contested hearings, regarding the respective timing and procedures

---

[17] The Third Amended DCL Plan was modified on February 20, 2012 (Docket No. 10958) and March 16, 2012 (Docket No. 11168).  The Third Amended Plan was further amended on April 12, 2012 when the DCL Proponents filed the Fourth Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P. and JPMorgan Chase Bank, N.A. (Docket No. 11354) (the "Fourth Amended DCL Plan").  The Fourth Amended DCL Plan was modified on April 15, 2012 (Docket No. 11354), April 17, 2012 (Docket No. 11399), and June 19, 2012 (Docket No. 11836).  The Court entered an order confirming the Fourth Amended DCL Plan on July 23, 2012 (Docket No. 12074).

for the Court's consideration of the Allocation Disputes, Supplemental Disclosure Document, resolicitation of the DCL Plan, and confirmation of the DCL Plan; (iv) engaged in discovery and other substantive proceedings respecting the resolution of the Allocation Disputes; (v) negotiated and filed modifications to the DCL Plan, Supplemental Disclosure Document, and Resolicitation Motion (defined below) to reflect the parties' ongoing negotiations as well as the Court's determinations on the foregoing contested matters; and (vi) continued to undertake the numerous tasks necessary to prepare the Debtors for their eventual emergence from bankruptcy.  Each of these activities is discussed in greater detail below.

45.     Sidley's continuing efforts to advance confirmation of the DCL Plan in subsequent interim fee periods, which culminated in the June 2012 hearing on confirmation of the Fourth Amended DCL Plan (the "2012 Confirmation Hearing"), and the Bankruptcy Court's subsequent issuance of the memorandum opinion and order overruling all objections to confirmation of the DCL Plan (Docket Nos. 12033, 12034) and order confirming the DCL Plan (Docket No. 12074), will be discussed in detail in subsequent Quarterly Fee Application Requests.

(a)     **Filing and Advancement of the Third Amended DCL Plan, Supplemental Disclosure Document, and Resolicitation Motion**

46.     As described in detail in Sidley's Twelfth Quarterly Fee Application Request, in less than three weeks after the issuance of the 2011 Confirmation Opinion, Sidley's professionals, together with the professionals for the other DCL Proponents[18] filed the Third Amended DCL Plan on November 18, 2011.  As amended, the Third Amended DCL Plan

---

[18] The Debtors, the Committee, Oaktree Capital Management, L.P. ("Oaktree"), Angelo, Gordon & Co., L.P. ("Angelo Gordon"), and JPMorgan Chase Bank, N.A. ("JPMorgan") are collectively referred to herein as the "DCL Proponents".  Time entries referencing communications and meetings with the DCL Proponents in Sidley's Monthly Fee Applications should be read to include both bankruptcy and litigation counsel, as applicable.

incorporated the settlement of the LBO-Related Causes of Action that was approved by the Bankruptcy Court in its 2011 Confirmation Opinion, as had prior versions of the DCL Plan. Furthermore, the Third Amended DCL Plan included certain modifications addressing the issues that were identified by the Court in the 2011 Confirmation Opinion as preventing confirmation of the Second Amended Joint Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A. (as modified on April 26, 2011) (Docket No. 8769) (the "Second Amended DCL Plan").

47.    Contemporaneously with the preparation and filing of the Third Amended DCL Plan, Sidley's professionals in the Corporate Reorganization and Bankruptcy practice group, acting in conjunction with counsel to the other DCL Proponents, researched, negotiated, drafted, and filed (i) the Supplemental Disclosure Document relating to the DCL Plan (Docket No. 10275) (the "Supplemental Disclosure Document")[19] and (ii) the Debtors' Motion for an Order (I) Approving Supplemental Disclosure Document; (II) Establishing Scope, Forms, Procedures, and Deadlines for Resolicitation and Tabulation of Votes to Accept or Reject DCL Plan From Certain Classes; (III) Authorizing Tabulation of Prior Votes and Elections on DCL Plan Made by Holders of Claims in Non-Resolicited Classes; (IV) Scheduling the Confirmation Hearing and Establishing Notice and Objection Procedures in Respect Thereof; and (V) Granting Related Relief (Docket No. 10274) (the "Resolicitation Motion") on November 18, 2011. After the filing of the Third Amended DCL Plan, the Supplemental Disclosure Document, and the Resolicitation Motion, and continuing well into the Fourteenth Interim Fee Period, Sidley's

---

[19] The Supplemental Disclosure Document was further modified at Docket Nos. 10959, 11106, 11169, 11355, 11389, and 11400.

professionals engaged in extensive discussions and negotiations with the Debtors' creditor

constituencies, including the Noteholder Proponents, regarding the Debtors' and other DCL

Proponents' intention to advance confirmation of the Third Amended DCL Plan.

48.    In connection therewith, Sidley's professionals continued their analysis of

the substantive provisions of the DCL Plan in support of confirmation.  Among the legal issues

and matters that Sidley's professionals researched, analyzed, and considered during the

Thirteenth Interim Fee Period were: (i) issues respecting valuation of the Debtors' businesses,

(ii) tax considerations of the DCL Plan and the contribution of certain LBO-Related Causes of

Action to the Litigation Trust, (iii) the procedures by which the LBO-Related Causes of Action

transferred to the Litigation Trust would be transferred and litigated; (iv) the continuing role of

the Creditors' Trust (in light of the filing of the SLCFC Actions) and the potential effect of

removing the Creditors' Trust from the DCL Plan (which subsequently occurred); (v) the plan's

provisions regarding releases, exculpation, and discharge; (vi) mechanics for distributions to

creditors; (vii) the operation of the Bar Order contained in the DCL Plan, and (viii) the effect of

the application of the subordination provisions of the PHONES Notes Indenture (the "PHONES

Subordination Provisions") and the subordination agreement governing the EGI-TRB LLC Notes

(the "EGI-TRB Subordination Provisions") on distributions to creditors provided for under the

DCL Plan.  In addition, and as discussed in detail below, Sidley's professionals expended

substantial efforts during the Thirteenth Interim Fee Period to advance the proceedings on

confirmation of the DCL Plan at the same time as the resolution of certain disputes arising

among the DCL Proponents and certain holders of claims against the Debtors regarding the

allocation of distributions among the holders of Senior Noteholder Claims, Other Parent Claims,

EGI-TRB LLC Notes Claims, and PHONES Notes Claims (the "Allocation Disputes").[20]

49.    Sidley's professionals, together with the Debtors' financial advisors at

Alvarez & Marsal, also continued their comprehensive analysis of the potential impact that the

adjudication or resolution of the Allocation Disputes could have on the treatment of Holders of

Allowed Senior Noteholder Claims, Other Parent Claims, EGI-TRB LLC Notes Claims, and

PHONES Notes Claims under the DCL Plan.  Such research and analysis was necessary to

ensure that the disclosures contained in the Supplemental Disclosure Document were thorough

and unobjectionable, and the treatment of the foregoing claims under the DCL Plan was

accurately disclosed therein.

### (b)    Motions for Reconsideration of the 2011 Confirmation Opinion Filed by the Noteholder Proponents

50.    During the Thirteenth Interim Fee Period, Sidley's professionals, on

behalf of the Debtors, continued their review and analysis of the three motions for

reconsideration of the 2011 Confirmation Opinion that were filed on November 14, 2011 by the

Noteholder Proponents, individually and jointly, as follows: (i) Joint Motion of Law Debenture

Trust Company of New York and Deutsche Bank Trust Company Americas Requesting

Reconsideration of the Court's Confirmation Opinion with Respect to the Subordination of the

PHONES (Docket No. 10222) (the "Law Debenture Reconsideration Motion");[21] (ii) Motion of

Aurelius Capital Management, L.P. for Reconsideration of the Court's October 31, 2011

Decision as it Pertains to the Application of the PHONES Notes Subordination (Docket No.

---

[20] A comprehensive list of the Allocation Disputes is set forth in ¶ 34 of Sidley's Twelfth Interim Fee Application.

[21] The Law Debenture Reconsideration Motion was joined by Davidson Kempner Capital Management LLC and Brigade Capital Management, LLC.  (See Docket Nos. 10223, 10225.)

10226) (the "Aurelius Reconsideration Motion"); and (iii) Motion of the Noteholder Plan

Proponents for Reconsideration and Clarification of the Court's October 31, 2011 Decision

(Docket No. 10227) (the "NPP Reconsideration Motion", and together with the Law Debenture

Reconsideration Motion and the Aurelius Reconsideration Motion, the "Reconsideration

Motions").

51.    The Reconsideration Motions raised complex legal issues that required the

substantial attention of Sidley's professionals during the Thirteenth Interim Fee Period.

Specifically, the Law Debenture Reconsideration Motion requested that the Court reconsider its

conclusion in the 2011 Confirmation Opinion that the DCL Plan improperly applied the

PHONES Subordination Provisions to the distribution of proceeds of causes of action that may

be asserted under chapter 5 of the Bankruptcy Code by the Litigation Trust (the "Subordination

Finding"). The NPP Reconsideration Motion sought reconsideration and/or clarification of the

2011 Confirmation Opinion with respect to the following three issues: (i) reconsideration of the

Bankruptcy Court's determination that the Senior Lenders and Bridge Lenders are entitled to

share in recoveries by the Litigation Trust, (ii) reconsideration of the Bankruptcy Court's

approval of the proportionate judgment reduction included in the Bar Order contained in Section

11.3 of the DCL Plan, and application of a pro tanto judgment reduction instead of the

proportionate judgment reduction, and (iii) clarification that the Bankruptcy Court did not make

a determination as to how the PHONES Notes should be valued for purposes of determining

Tribune's solvency at the time of the Leveraged ESOP Transactions.

52.    On December 6, 2011, Sidley's professionals filed a joint objection on

behalf of the Debtors concerning each of the foregoing Reconsideration Motions. (Docket No.

10363 (corrected at 10373)). Sidley's professionals also reviewed and analyzed (i) objections to

the Reconsideration Motions that were filed by EGI-TRB LLC, the TM Retirees, Wilmington

Trust, and certain of the Debtors' directors and officers on December 6, 2011 (Docket Nos.

10365, 10366, 10371, 10376) and (ii) the replies filed by the Noteholder Proponents in support

of the Reconsideration Motions, which were filed on December 9, 2011 (Docket Nos. 10396,

10398, 10399).[22]  On December 14, 2011, the Bankruptcy Court held a hearing on the

Reconsideration Motions and the objections thereto, at which Sidley's professionals participated

in approximately two and a half hours of oral argument on behalf of the Debtors and the other

DCL Proponents.

> 53.    On December 29, 2011, the Bankruptcy Court issued a Memorandum on

Reconsideration granting the relief requested in the Law Debenture Reconsideration Motion and

the Aurelius Reconsideration Motion and denying (subject to one clarification) the NPP

Reconsideration Motion (the "Reconsideration Decision").  See In re Tribune Co., 464 B.R. 208

(Bankr. D. Del. 2011).  Specifically, the Reconsideration Decision amended the 2011

Confirmation Opinion to vacate and reverse the Subordination Finding, and held that the

PHONES Subordination Provisions apply to the proceeds of, from, or relating to any and all

causes of action asserted by the Litigation Trust.  The Reconsideration Decision also denied the

NPP Reconsideration Motion with respect to the Litigation Trust "waterfall" and Bar Order

judgment reduction issues raised in that Motion, but granted the NPP Reconsideration Motion in

part by clarifying that the Court did not make any determination regarding the amount of the

PHONES Notes in the Confirmation Opinion.  The Reconsideration Decision had an obvious

impact on the timing and content of the proceedings respecting confirmation of the DCL Plan.

---

[22] The Joint Reply of Law Debenture Trust Company of New York and Deutsche Bank Trust Company Americas in Further Support of Their Request for Reconsideration of the Court's Confirmation Opinion with Respect to the Subordination of the PHONES was joined by Brigade Capital Management, LLC.  (See Docket No. 10401.)

Sidley's professionals accordingly analyzed the Reconsideration Decision and then took account

of the Reconsideration Decision, as informed by that analysis, in preparing modifications to the

DCL Plan and its supporting materials.

      (c)     **Contested Proceedings Relating to the Scheduling of the Resolution of the Allocation Disputes and the Approval of the Supplemental Disclosure Document, Resolicitation, and Confirmation of the DCL Plan**

      54.     One key component of the Third Amended DCL Plan was the inclusion of

a protocol (the "Allocation Dispute Protocol") for the resolution of the Allocation Disputes.

Pursuant to the Allocation Dispute Protocol, the Allocation Disputes were reserved for litigation

before the Bankruptcy Court, which litigation could occur before or in connection with the

confirmation hearing on the Third Amended DCL Plan, between the confirmation hearing and

the effective date of the Third Amended DCL Plan, or after the effective date of the Third

Amended DCL Plan, in which case reserves would be created to provide for future distributions

as dictated by the outcome of the Allocation Disputes.[23]  Sidley's professionals, together with the

professionals for the other DCL Proponents, advocated for the Court to consider confirmation

and the resolution of the Allocation Disputes contemporaneously as a means of allowing the

Debtors to exit bankruptcy promptly.  By contrast, Aurelius and Wilmington Trust each

advocated for a single-track approach, whereby proceedings relating to confirmation would not

occur until after the proceedings on the Allocation Disputes were concluded.  Thus, the

scheduling of the resolution of the Allocation Disputes relative to the Court's consideration of

---

[23] The Allocation Dispute Protocol provided that the holders of Senior Noteholder Claims, Other Parent Claims, PHONES Notes Claims and EGI-TRB LLC Notes Claims would receive only those distributions to which they would be entitled were the remaining unresolved Allocation Disputes resolved in a manner adverse to them, with the balance of the consideration payable to such holders reserved for distribution upon resolution of the remaining Allocation Disputes.

the Supplemental Disclosure Document, Resolicitation Motion, and confirmation of the DCL

Plan became a hotly contested issue during the Thirteenth Interim Fee Period.

        55.      Consistent with the Court's directives at the November 22, 2011 status

hearing on the Third Amended DCL Plan, professionals for the DCL Proponents (including

Sidley on behalf of the Debtors) and professionals for the Noteholder Proponents and other third

parties met and conferred during the Thirteenth Interim Fee Period regarding the scheduling of

further confirmation proceedings and the resolution of the Allocation Disputes.  Although the

parties made substantial progress toward a consensual timetable for consideration and resolution

of the Allocation Disputes, the parties were not able to reach an agreement.  Accordingly, at the

November 29, 2011 hearing, the Bankruptcy Court directed the parties to submit written

memoranda on the scheduling issues.

        56.      In compliance with those instructions, on December 6, 2011, Sidley's

professionals, together with the professionals for the other DCL Proponents, prepared and filed a

memorandum on behalf of the DCL Proponents in support of the dual-track approach to

confirmation and the resolution of the Allocation Disputes.  (See Docket No. 10370.)  Aurelius

and Wilmington Trust each filed a competing memorandum in favor of the single-track

approach.  (See Docket Nos. 10369, 10374.)  Also on December 6, 2011, Wilmington Trust filed

a preliminary objection to the Resolicitation Motion, in which it argued that proceedings on the

Resolicitation Motion (and specifically the approval of the Supplemental Disclosure Document)

were premature, based on Wilmington Trust's belief that the Allocation Disputes should be

resolved prior to the hearing on the adequacy of the Supplemental Disclosure Document.  (See

Docket No. 10367.)  Sidley's professionals reviewed and analyzed the Aurelius and Wilmington

Trust memoranda and the Wilmington Trust objection, as well as the pleadings filed by other

parties in interest, including EGI-TRB LLC (Docket No. 10364) and DBTCA (Docket No.

10392).  The DCL Proponents, Aurelius, Wilmington Trust, and EGI-TRB LLC each filed

responsive pleadings to the opening memoranda on December 9, 2011.  (See Docket Nos. 10393,

10394, 10395, 10397.)

   57. At the omnibus hearing held on December 13, 2011, the Bankruptcy Court

considered the foregoing pleadings and oral arguments presented by the parties regarding

scheduling of the Allocation Disputes and proceedings on confirmation of the DCL Plan, and

took those matters under advisement.  On the following day, as described in ¶ 52 of this

Application, the Bankruptcy Court heard oral arguments on the Reconsideration Motions.  In the

Reconsideration Decision issued on December 29, 2011, in addition to resolving the

Reconsideration Motions, the Bankruptcy Court directed the parties to engage in further meet-

and-confer sessions, in advance of the January 11, 2012 status hearing, regarding finalizing the

process and schedule in connection with the resolution of the Allocation Disputes and disclosure,

solicitation, and confirmation of the Third Amended DCL Plan.

   58. Sidley's professionals, on behalf of the Debtors, met and conferred on

several occasions with counsel for the other DCL Proponents, Aurelius, Wilmington Trust, and

EGI-TRB LLC, among others, to carry out the Bankruptcy Court's directive and develop a

consensual schedule on confirmation and the resolution of the Allocation Disputes.  Those

meetings were productive, and resulted in a schedule for the Allocation Disputes agreed upon by

the DCL Proponents, Aurelius, and Wilmington Trust.  However, the parties continued to

disagree on whether plan confirmation proceedings should occur concurrently with, or following,

the resolution of the Allocation Disputes.  On January 10, 2012, the DCL Proponents and

Aurelius each filed supplemental statements and competing proposed schedules, supporting their

views on scheduling of the confirmation proceedings and the Allocation Disputes. (See Docket Nos. 10569, 10571.)

59.    At the January 11, 2012 status hearing, following discussions and oral argument by the DCL Proponents and Aurelius in support of their respective scheduling proposals, the Court established a schedule for further proceedings on the Allocation Disputes, approval of the Supplemental Disclosure Document, and confirmation of the DCL Plan, and directed the parties to confer regarding the submission of a consensual scheduling order. Consistent with the Court's directive, the parties engaged in further negotiations during the January 11 hearing, and reported to the Court that they had reached agreement on most issues relating to the scheduling order. Following the January 11 hearing, the parties continued to confer on the remaining issues. On January 20, 2012, Sidley's professionals, on behalf of the Debtors and with the consent of the other parties, filed a proposed scheduling order with the Court (Docket No. 10661). The Court entered the Order Establishing Scheduling for (1) Resolution of the Allocation Disputes and (2) Consideration of DCL Plan Proponents' Supplemental Disclosure Document, Solicitation Procedures Motion and Plan (Docket No. 10692) (the "Allocation Dispute/Confirmation Scheduling Order") on January 24, 2012. The Allocation Dispute/Confirmation Scheduling Order set forth the scope, procedures, and timeline for (i) discovery, briefing, and proceedings related to the Allocation Disputes; and (ii) consideration of the Supplemental Disclosure Document, resolicitation and voting, discovery, briefing, and similar proceedings relating to confirmation of the Third Amended DCL Plan.

(d)    **Substantive Proceedings Relating to the Resolution of the Allocation Disputes**

60.    Following the entry of the Allocation Dispute/Confirmation Scheduling Order, Sidley's professionals, on behalf of the Debtors, participated in discovery and briefing of

the substantive legal issues involved in the Allocation Disputes. The discovery proceedings in connection with Allocation Disputes were extensive and involved numerous parties, including the Debtors, the TM Retirees, the holder of the Swap Claims, EGI-TRB LLC, the Committee, Aurelius, the indenture trustees for the Senior Notes and the PHONES Notes, and certain other parties.[24] The briefing schedule set forth in the Allocation Dispute/Confirmation Scheduling Order provided for the submission of a preliminary statement, opening brief, and response brief over the course of less than six weeks prior to the scheduled hearing on the Allocation Disputes, which hearing was scheduled for two days commencing March 5, 2012.

61.     Thus, between January 24, 2012 and March 5, 2012, Sidley's professionals in the Corporate Reorganization and Bankruptcy and Litigation practice groups researched, addressed, and briefed the legal and factual issues underpinning the Allocation Disputes. On January 31, 2012, Sidley's professionals filed a Preliminary Statement Regarding Allocation Disputes with the Court. (Docket No. 10776.) On January 31 and February 1, 2012, twelve (12) other parties filed preliminary statements and/or joinders to the preliminary statements of others, as follows: Barclays Bank PLC and Waterstone Capital Management LP (Docket No. 10777), Oaktree (Docket No. 10782), Law Debenture (Docket No. 10784), Davidson Kempner Capital Management LLC (Docket No. 10785), Brigade Capital Management, LLC (Docket No. 10786), the TM Retirees (Docket No. 10787), Aurelius (Docket No. 10789), EGI-TRB LLC (Docket No. 10792, amended at 10800), Wilmington Trust (Docket No. 10792), the Committee (Docket No. 10793), and DBTCA (Docket No. 10794. Sidley's

---

[24] By way of illustration, Aurelius filed and served six (6) requests for production of documents on January 23, 2012, on JPMorgan (Docket No. 10678), the Debtors (Docket No. 10679), the TM Retirees (Docket No. 10680), the Committee (Docket No. 10681), EGI-TRB LLC (Docket No. 10682), and Oaktree (Docket No. 10683). Law Debenture filed and served four (4) requests for production of documents on January 31, 2012, on EGI-TRB LLC (Docket No. 10778), Oaktree (Docket No. 10779), the TM Retirees (Docket No. 10780), and Wilmington Trust (Docket No. 10781).

professionals reviewed and analyzed each of the foregoing preliminary statements on behalf of the Debtors in order to be prepared to address the arguments set forth in those statements during the hearing on the Allocation Disputes and in discussions among the parties leading up to such hearing.

62.     Sidley's professionals also prepared and filed an opening brief regarding factual information relevant to the Allocation Disputes on behalf of the Debtors, on February 24, 2012 (Docket No. 11004) and a joinder to the memorandum of law filed by the Committee regarding the Allocation Disputes (Docket No. 11005).  On that same date, twelve (12) other parties also filed their opening briefs and/or joinders regarding the Allocation Disputes, as follows: TM Retirees (with supporting declarations) (Docket Nos. 10994, 10996, 10998), Wilmington Trust (with exhibits) (Docket Nos. 10999, 11011), the Committee (with appendix) (Docket Nos. 11000, 11015), EGI-TRB LLC (with appendix) (Docket Nos. 11001, 11008), Oaktree (with appendix) (Docket Nos. 11003, 11009), Barclays Bank PLC and Waterstone Capital Management LP (Docket No. 11006), Aurelius (Docket No. 11007), DBTCA and Law Debenture (Docket No. 11010), Davidson Kempner Capital Management LLC (Docket No. 11012), and Brigade Capital Management, LLC (Docket No. 11013).  Sidley's professionals reviewed and analyzed each of the foregoing opening briefs on behalf of the Debtors, again in order to be prepared to address the arguments set forth in those statements during the hearing on the Allocation Disputes and in discussions among the parties leading up to such hearing.

63.     Additionally, the Debtors participated in negotiating and drafting a stipulation between the Debtors, Aurelius, Wilmington Trust, Barclays Bank PLC, and Waterstone Capital Management LP regarding the value of the PHONES Notes Claims, which was filed under certification of counsel on February 24, 2012 and approved by the Court by

39

order dated February 28, 2012.  (See Docket Nos. 11016, 11041.)  That stipulation narrowed the

contested issues presented to the Court in connection with the Allocation Disputes considerably,

and was relied on by the Court when it issued its decision on the Allocation Disputes on April 9,

2012.

        64.      Subsequent to the Thirteenth Interim Fee Period, on March 2, 2012,

Sidley's professionals filed the Debtors' Response Brief Regarding Allocation Disputes, which

responded to each of the opening briefs filed by the parties regarding the Allocation Disputes.

(See Docket No. 11066.)  In particular, Sidley's professionals addressed Wilmington Trust's

arguments regarding (i) the Court's jurisdiction to hear and resolve the Allocation Disputes; (ii)

application of the PHONES Subordination Provisions and EGI-TRB Subordination Provisions;

and (iii) contentions regarding Wilmington Trust's claims for fees and expenses.  Additionally,

the Debtors provided evidence regarding certain claims classifications as either "senior

indebtedness" or "senior obligations" under the PHONES Notes Indenture and/or the EGI-TRB

Subordination Agreement, as applicable.  (See id.)

        65.      A two-day hearing on the Allocation Disputes was scheduled to

commence March 5, 2012, just after the end of the Thirteenth Interim Fee Period.  Therefore, all

activities related to discovery and nearly all briefing activities relating to the Allocation Disputes

were performed by the Debtors during the Thirteenth Interim Fee Period in advance of that

hearing.  Further proceedings on the Allocation Disputes that occurred in March, April, and May

2012, and the roles of Sidley's professionals with respect to those proceedings, will be described

in detail in Sidley's Fourteenth Quarterly Fee Application Request.

(e)    **Modifications to the DCL Plan, Supplemental Disclosure, Document, and Resolicitation Motion Following Entry of the Allocation Dispute/Confirmation Scheduling Order**

66.    As discussed above, following the filing of the Third Amended DCL Plan, the Supplemental Disclosure Document, and the Resolicitation Motion on November 18, 2011, Sidley's professionals, together with counsel for the other DCL Proponents, continued to negotiate with the Debtors' key creditor constituencies to resolve contested issues relating to confirmation of the DCL Plan. Based on those negotiations, and the Court's issuance of the Reconsideration Decision on December 31, 2011 and the Allocation Dispute/Confirmation Scheduling Order on January 24, 2012, Sidley's professionals prepared and filed modified versions of the DCL Plan and Supplemental Disclosure Document on February 20, 2012 (Docket Nos. 10958, 10959). Also on February 20, 2012, Sidley's professionals prepared and filed a supplement to the Resolicitation Motion (Docket No. 10960) (the "Resolicitation Supplement"), which incorporated the revised schedule for resolicitation of the DCL Plan set forth in the Allocation Disputes/Confirmation Scheduling Order.

67.    In connection with the filing of the Resolicitation Supplement, Sidley's professionals revised the supplemental ballots, election forms, instructions, notices and other materials to be distributed to creditors for the purposes of voting on and making elections under the DCL Plan (collectively, the "Resolicitation Materials"). The Resolicitation Materials comprised eighteen (18) separate documents. Sidley's professionals, together with the Court-appointed claims, noticing, and balloting agent (the "Voting Agent"), developed and implemented the process for resoliciting votes on and elections under the DCL Plan from the Revoting Classes. The preparation of appropriate Resolicitation Materials respecting the DCL Plan required Sidley's professionals to have considerable knowledge and understanding of the mechanics of the DCL Plan, and the impact of the amendments thereto on voting and elections.

Preparation and finalization of the Resolicitation Materials also required Sidley's professionals

working thereon to confer with the other DCL Proponents, the Voting Agent, the Debtors'

financial advisors at Alvarez & Marsal, the agent for the Bridge Lenders, the indenture trustees

for the PHONES Notes and Senior Notes, and numerous other parties.

**(f)    Activities Relating to the Debtors' Emergence from Chapter 11**

68.    In addition to those activities discussed above, Sidley's professionals in

the Corporate and Corporate Reorganization and Bankruptcy practice groups expended

considerable efforts during the Thirteenth Interim Fee Period preparing the Debtors for their

eventual emergence from their chapter 11 cases.  Sidley's professionals addressed, among other

matters, (i) the timing and tasks required to complete the Restructuring Transactions (set forth

and described in detail in the Plan Supplement),[25] which involved the participation of Sidley's

bankruptcy and corporate professionals as well as the Debtors' senior management; (ii) the

mechanics of distributions and reserves on account of allowed claims, which involved the

participation of Sidley's bankruptcy professionals, working in conjunction with the Debtors'

financial advisors at Alvarez & Marsal as well as the Debtors' senior management and business

unit-level managers; (iii) the FCC approval process, which involved participation of Sidley's

bankruptcy, regulatory, and corporate professionals, working in conjunction with the Debtors'

outside FCC counsel and the Debtors' senior management; and (iv) various corporate

governance and disclosure matters necessary to return the Debtors to ordinary operations upon

their emergence from the chapter 11 cases.

---

[25] A revised Plan Supplement was filed on May 4, 2012 (during the Fourteenth Interim Fee Period), and the exhibit describing the Restructuring Transactions was included (with modifications) in that filing.  (See Docket No. 11545.)

**I.**     **Professional Retention (30510):   Hours: 42.80   Fees: $21,270.50**

69.     The Debtors' large and diverse businesses require the employment and retention of a variety of professionals to support these bankruptcy proceedings and to continue managing the litigation, real estate, tax, accounting, and other needs of the Debtors' business operations in the ordinary course.  During the Thirteenth Interim Fee Period, Sidley's professionals assisted the Debtors with modifying the scope of the existing retention of Ernst & Young, LLP ("E&Y") to include additional services to be provided to the Debtors (Docket No. 10507), which was approved by the Bankruptcy Court on January 9, 2012 (Docket No. 10559). Sidley's professionals consulted with the Debtors' management to determine the appropriate scope and terms of the supplemental retention, and coordinated with E&Y's counsel to prepare the necessary pleadings to obtain Court approval of such supplemental retention.

70.     In addition, during the Thirteenth Interim Fee Period, Sidley's professionals prepared and filed two (2) supplements to the list of the Debtors' ordinary course professionals ("OCPs") (Docket Nos. 10350 and 10684) and coordinated with the Debtors' legal department and financial advisors to prepare and file monthly and quarterly reports of proposed payments to OCPs (Docket No. 10530).  Sidley's professionals also coordinated with certain OCP firms retained by the Debtors to assist such professionals with preparing and filing fee applications on behalf of their firms.  In connection therewith, Sidley's professionals reviewed fee applications for SNR Denton US LLP prior to the filing of such applications with the court (Docket Nos. 10621 and 10614).

**J.**     **Tax Issues (30520):   Hours: 272.40   Fees: $193,557.50**

71.     During the Thirteenth Interim Fee Period, Sidley's tax professionals continued to advise the Debtors with respect to a variety of discrete tax issues on behalf of the Debtors, both arising from and in connection with these chapter 11 cases and in connection with

Sidley's representation of the Debtors in tax matters in the ordinary course of the Debtors' business.  For example, Sidley's professionals reviewed and analyzed tax-related claims and liabilities, considered the tax implications of proposed transactions, handled appeals of tax assessments, advised the Debtors with respect to potential settlements of tax claims, and communicated with taxing authorities concerning all such matters.  Sidley's professionals in the Tax practice group also analyzed numerous potential tax consequences arising from the modifications to the DCL Plan and the tax consequences of the Debtors' proposed corporate structure as of their emergence from chapter 11, and prepared disclosures relating to those potential tax consequences for the Supplemental Disclosure Document.

72.    Much of the time of Sidley's tax and restructuring professionals during the Thirteenth Interim Fee Period was dedicated to extensive research, internal memoranda and meetings regarding post-confirmation tax issues.  Of particular importance was analysis and assessment of the tax consequences of the restructuring transactions that are contemplated to occur upon the Debtors' emergence from chapter 11 protection.  Sidley's tax professionals also advised the Debtors and consulted with the other DCL Proponents with respect to the tax implications of the litigation trust proposed by the Debtors' plan of reorganization.  Sidley spent considerable time researching these issues and advising the Debtors on the potential tax consequences of the Restructuring Transactions and the litigation trust structure.  In addition to these services, towards the end of the Thirteenth Interim Fee Period, certain of Sidley's tax and restructuring partners participated in an in-person meeting with the Debtors' management regarding tax issues presented by the Debtors' anticipated emergence from chapter 11 and the coming into being of the litigation trust.

73.    Sidley's professionals also conferred with the Debtors' in-house tax professionals with respect to an agreement with the Maryland Comptroller of the Treasury to settle a disputed prepetition corporate income tax liability of The Baltimore Sun Company and Los Angeles Times International, Ltd. for the periods ending December 2000 through December 2007. Sidley provided comments on the proposed settlement agreement and advised the Debtors as to obtaining Bankruptcy Court approval thereof. Thereafter, Sidley drafted a motion and proposed order seeking approval of the settlement pursuant to Bankruptcy Rule 9019. The motion was filed on March 1, 2012 (Docket No. 11055) and was approved by the Bankruptcy Court on March 22, 2012 (Docket No. 11218).

**K.    Claims Processing (30530):    Hours: 358.70    Fees: $224,309.50**

74.    During the Thirteenth Interim Fee Period, Sidley's professionals continued evaluating, researching, and analyzing the treatment of various types of claims arising in the Debtors' chapter 11 cases, covering the full spectrum of potential liabilities. To date, well over 7,000 proofs of claim have been filed in the Debtors' chapter 11 cases. Sidley's professionals assigned to handle claims-related matters participated in regular conference calls with the Debtors' financial advisors, Alvarez & Marsal, in order to coordinate the processing of the proofs of claim, evaluating the legal sufficiency of the claims, and preparing objections thereto.

75.    Specifically, Sidley's professionals, working together with the Debtors' management, business personnel, and Alvarez & Marsal, researched, prepared, and filed the Debtors' fiftieth, fifty-first, and fifty-second omnibus objections to claims as well as stand-alone objections to certain claims filed by Vincent Comparsi, Jacqueline Oxendine, and Marta Waller (Docket Nos. 10610, 10611, 10624, 10963, 10964, and 10965) during the Thirteenth Interim Fee Period. Sidley's professionals reviewed and responded to formal and informal responses by claimants to certain of the foregoing claims objections and coordinated with the Debtors'

personnel to negotiate the consensual resolution of objections where feasible.  For example, on February 14, 2012, Sidley's professionals filed a stipulation that resolved the Debtors' objection to the claim of Jacqueline Oxendine, reducing the claim filed by Ms. Oxendine from $10,000,000 to $7,000, which stipulation was approved by the Court by order entered that same day (see Docket Nos. 10916, 10922).  During the Thirteenth Interim Fee Period, the Bankruptcy Court also entered orders sustaining, in whole or in part, the Debtors' forty-ninth and fiftieth omnibus objections (subject to the continuance of objections to certain claims of creditors who filed responses to such objections) (Docket Nos. 10420, 10912), and the Debtors' objection to the claim of Vincent Comparsi (Docket Nos. 10913), resulting in the disallowance of $377,891,577.70 in face amount of claims against the Debtors' estates.  The Bankruptcy Court entered orders sustaining, in whole or in part, the Debtors' fifty-first and fifty-second omnibus objections and the Debtors' objection to the claim of Marta Waller after the Thirteenth Interim Fee Period, resulting in the disallowance of an additional $10,143,720.67 in face amount of claims against the Debtors' estates.

        76.    Sidley's professionals also continued their efforts to process and resolve claims objections that had been previously filed by Sidley on behalf of the Debtors.  For example, Sidley's professionals participated in a contested hearing in support of the Debtors' forty-eighth omnibus objection to the claims of Joann Parker (the "Parker Claims"), to which the Debtors objected as being late-filed.  At the January 11 hearing, counsel for Ms. Parker requested that the Court hold an evidentiary hearing on whether Ms. Parker's delay in filing the Parker Claims was justified under prevailing case law.  That evidentiary hearing was held in March 2012, and the Court has taken the Debtors' objection to the Parker Claims under advisement.

77.    In addition, Sidley's professionals assisted the Debtors with negotiating and implementing agreements and stipulations settling disputed claims without need for formal objections, in accordance with the Order approving claims settlement procedures that was entered by the Court to facilitate consensual resolution of claims (Docket No. 2657).[26]  On February 21, 2012, Sidley's professionals prepared and file a notice with the Bankruptcy Court disclosing that the Debtors had resolved certain claims against the Debtors' estates in the prior quarter that resulted in the reduction of $554,535.41 in face amount of claims against the Debtors' estates (Docket No. 10967).

**L.    Business Operations (30550):    Hours: 192.30    Fees: $121,179.50**

78.    The Business Operations matter category encompasses the activities of Sidley's professionals with respect to their representation of the Debtors in corporate and transactional matters in the ordinary course of the Debtors' business, as well as other general corporate law and transactional advice, both related to these chapter 11 cases and otherwise related to the Debtors' businesses.  These services are necessary to facilitate the Debtors' efforts to stabilize and reposition their businesses through cost saving and revenue enhancing strategies, as well as to prepare the Debtors for their emergence from chapter 11.

79.    During the Thirteenth Interim Fee Period, Sidley's professionals in the Corporate practice group expended substantial time and effort to prepare, research, and analyze potential value maximization strategies regarding the Debtors and certain of the Debtors' properties.  Sidley's professionals also addressed a variety of discrete matters arising postpetition in the ordinary course of the Debtors' business, including the review of certain potential strategic

---

[26] Those procedures provide the Debtors with authority to settle or compromise disputed claims of less than $50,000 in their discretion, claims equal to or greater than $50,000 but less than $1,000,000 upon notice to the United States Trustee and counsel to the Committee and certain senior lenders, and claims equal to or greater than $1,000,000 with the approval of the Court pursuant to Bankruptcy Rule 9019.

transactions, joint-venture related issues, resource supply agreements, contracts, leases, licenses, filings with the Securities and Exchange Commission, and general corporate governance and business planning matters.  Sidley's professionals also provided information to the Debtors' auditors regarding the various legal matters for which Sidley represents the Debtors in connection with the Debtors' annual financial reporting.

80.    In addition, in connection with the Debtors' emergence from bankruptcy, Sidley's professionals in the Corporate practice group reviewed and assessed the steps necessary to complete the Restructuring Transactions proposed by the DCL Plan, as set forth in the Plan Supplement, which was filed during the Ninth Interim Fee Period.  Sidley's professionals coordinated with the Debtors' senior management and corporate agents to prepare corporate documents (including charters, bylaws, resolutions, limited liability company agreements, and certificates) in connection with the implementation of the Restructuring Transactions upon emergence.  Sidley's professionals also advised the Debtors regarding certain modifications to the Restructuring Transactions, which were reflected in the exhibit to the DCL Plan filed with the updated Plan Supplement on May 4, 2012, during the Fourteenth Interim Fee Period.  (See Docket No. 11545.)

## M.    Case Administration (30560):    Hours: 107.90    Fees: $41,936.00

81.    During the Thirteenth Interim Fee Period, Sidley's professionals engaged in various general case administration tasks, including scheduling and participating in hearings, reviewing and reporting on docketed filings to the Debtors, the Committee, the United States Trustee, and other interested parties, and maintaining a schedule of critical dates and deadlines. On a periodic basis during the Thirteenth Interim Fee Period, Sidley's professionals participated in status calls with the Debtors' senior management and financial advisors to discuss pending motions and issues and the outcome of each hearing.  In addition, Sidley's paraprofessionals are

responsible for monitoring the docket for all filed pleadings and preparing and distributing a

daily status report to the Debtors' senior management and Sidley professionals.

**N.      Creditor Communications (30570):    Hours: 4.10    Fees: $1,970.00**

82.      Throughout the Thirteenth Interim Fee Period, Sidley's professionals have

responded to numerous inquiries and communications from individual creditors as well as from

representatives of larger groups of the Debtors' creditor constituencies regarding the status of the

Debtors' chapter 11 cases. As a convenience to individual creditors, particularly individuals who

are generally new to and/or unfamiliar with the bankruptcy process and their role therein, the

Debtors established a dedicated Tribune bankruptcy "hotline." This toll-free number connects

directly to a voice mailbox maintained by Sidley. Each work day, attorneys at Sidley monitored

the hotline for messages and returned all phone calls promptly, generally within 24 hours of the

message being left. Typical callers to the hotline were bond holders, brokerage firms calling on

behalf of clients, former employees of the Debtors, pro se creditors, and attorneys for creditors.

Questions posed to Sidley's professionals by the Debtors' creditors ranged from specific

questions regarding claims treatment under the DCL Plan to general inquiries regarding the

status of the chapter 11 cases.

**O.      Employee Matters (30590):    Hours: 511.20    Fees: $328,088.00**

83.      During the Thirteenth Interim Fee Period, Sidley's professionals in the

Corporate Reorganization and Bankruptcy and Employment practice groups continued to advise

the Debtors with respect to various legal issues pertaining to employee-related matters, including

negotiating employment contracts and negotiating termination and severance of former

employees. Sidley's professionals also advised the Debtors with respect to the structure and

implementation of their tax-qualified and non-tax-qualified employment-related incentive,

benefit, pension, and severance plans, addressed inquiries from the Debtors' senior management

and creditors regarding those plans, and made appropriate adjustments to such plans in response. In addition to the foregoing, Sidley's professionals responded to inquiries from the Debtors' management and in-house employment lawyers regarding various employment issues, reviewed consulting contracts, responded to numerous information requests from and/or regarding current and former employees, and handled various other issues in connection with the Debtors' employees. Sidley's professionals also analyzed employee-related claims filed in the Debtors' chapter 11 cases, including claims filed by certain of the Debtors' current and former directors and officers for potential indemnification arising from the FitzSimons Action, SLCFC Actions, and insider preference actions commenced by the Committee.

84.    Among the matters handled by Sidley's professionals during the Thirteenth Interim Fee Period was the negotiation, documentation, and proceedings on a settlement between Tribune and its former chief executive officer, Randy Michaels, relating to Mr. Michaels's claims for the payment of a 2010 management incentive plan ("MIP") award, notwithstanding his resignation from the company in October 2010. Beginning in December 2010, the Debtors, with Sidley's advice, engaged in discovery with Mr. Michaels pursuant to the Order Approving Stipulation Governing the Production of Documents and Testimony of Randy Michaels Pursuant to Bankruptcy Rule 2004 (Docket No. 7204). Over the subsequent eleven months, Sidley's professionals reviewed and analyzed documents produced by Mr. Michaels and conducted interviews of Mr. Michaels and certain of the Debtors' other current and former employees. On November 22, 2011, during the Twelfth Interim Fee Period, Sidley's professionals filed a motion with the Bankruptcy Court seeking approval of a settlement of Mr. Michaels's post-petition claims, pursuant to section 363 of the Bankruptcy Code and Bankruptcy

Rule 9019.  That motion was heard by the Bankruptcy Court on December 13, 2011 and was approved by the Court following the hearing (Docket No. 10438).

85.    In connection with the implementation of the Debtors' annual MIP, Sidley's professionals consulted with counsel for the Committee regarding the treatment of certain MIP awards that were placed in a rabbi trust pending resolution of the FitzSimons Action, consistent with the orders approving the Debtors' MIP.  Sidley's professionals reviewed, analyzed, and revised the trust agreement relating to the MIP awards placed in trust.  Sidley's professionals also began to undertake the initial prepatory steps necessary to develop and implement the Debtors' 2012 MIP.[27]

86.    Sidley's professionals in the Employment and Labor Law practice group were also retained by the Debtors to defend against litigation initiated by certain former employees in state courts, on a postpetition basis, including the matters captioned Gellman v. Los Angeles Times Communications LLC (the "Gellman Litigation") and Mitchell v. Los Angeles Times Communications LLC (the "Mitchell Litigation").[28]  Sidley's professionals reviewed and analyzed the complaints and other pleadings filed in the Gellman Litigation and the Mitchell Litigation, advised the Debtors on the preparation and filing of answers and dispositive pleadings, and researched and prepared such pleadings on behalf of the Debtors.

87.    Finally, at the Debtors' request, Sidley's professionals in the Corporate Reorganization and Bankruptcy and Employment practice groups continued to undertake a comprehensive analysis of the implications of the SLCFC Actions for the Debtors' current

---

[27] Sidley's professionals filed the motion seeking approval of the 2012 MIP on April 13, 2012 (Docket No. 11377) (the "2012 MIP Motion"), which was approved by the Court on May 4, 2012 (Docket No. 11535).  Sidley's activities undertaken in connection with the preparation and filing of the 2012 MIP Motion will be provided in Sidley's Quarterly Fee Application Request for the Fourteenth Interim Fee Period.

[28] Time entries relating to the Gellman Litigation and the Mitchell Litigation are specifically denoted in the Employee Matters invoices submitted in connection with the Application.

employees who were either individually named as defendants in those actions or who were potentially members of the putative defendant classes, by virtue of being former shareholders of Tribune. The SLCFC Actions potentially implicate several thousand of the Debtors' current and former employees, who held stock directly or indirectly through one or more of the Debtors' benefit plans. The SLCFC Actions raise complex legal issues at the intersection of state fraudulent conveyance laws and ERISA.

**P.**   **2010 Exit Credit Facility (13700):   Hours: 5.90   Fees: $5,640.00**

88.     During the Thirteenth Interim Fee Period, Sidley's professionals continued to provide services to the Debtors relating to the evaluation, negotiation, and expected implementation of a post-confirmation financing facility that will provide a source of funding for the reorganized Debtors upon their emergence from their chapter 11 cases. The DCL Plan authorizes the Debtors to procure exit financing on terms consistent with an exit financing term sheet in the Plan Supplement. (See Third Amended DCL Plan, Sections 1.1.87, 1.1.88, 5.10, and Exhibit 5.10.) Sidley's professionals continued to review and analyze potential exit financing terms and alternatives and advised the Debtors regarding their exit financing options. Preliminary term sheets respecting the exit facility, as well as a new senior secured term loan, were filed with the Court as part of the Plan Supplement on May 4, 2012 (Docket No. 11545), and the extensive exit financing research done to date is being used by the Debtors to advance the exit financing process and the evolution of the terms of the proposed exit facility.

<strong>EXPENSES INCURRED</strong>

89.     Sidley has incurred expenses of $168,703.44 in connection with its services rendered to the Debtors during the Thirteenth Interim Fee Period. These expenses represent actual out-of-pocket costs for items incurred exclusively for the direct benefit of the Debtors, including, but not limited to, duplicating charges, document delivery and messenger

52

services, telephone and facsimile charges, computer-assisted legal research, travel-related expenses, overtime services, in-house document production, and professional services from contract attorneys relating to discovery activities.

90.     All such expenses are necessary and actual expenses for the performance of its services in these cases; many of such expenses were necessitated by the time constraints under which Sidley's professionals and staff have operated in these cases.  Sidley's representation of the Debtors in support of the DCL Plan continued to require the preparation and physical production of documents and exhibits for use at contested hearings, including the hearings on the Allocation Disputes that were held beginning on March 5, 2012.  Ongoing discovery activities leading up to the hearing on the Allocation Disputes required the services of outside contract attorneys and technical service providers.  Additional information respecting certain categories of expenses are described below. A detailed breakdown of Sidley's expenses incurred in rendering services to the Debtors during the period covered by this Application is incorporated into this Application as part of Attachment B hereto.

(a)    **Travel Expenses**

91.     All travel expenses incurred during the period covered by this Application were necessary, reasonable, and reflect the prevailing market rates.  In particular, to the best of Sidley's knowledge, all air travel utilized by Debtors' personnel during the period covered by this Application was at the prevailing coach-class rate for such travel less any corporate discounts received by Sidley, in accordance with Sidley's policies for business travel for bankruptcy and non-bankruptcy matters, excepting certain limited instances where coach-class reservations were unavailable.  Hotel charges reflect rates for one night of lodging, unless otherwise indicated.

### (b)    Court-Related Expenses

92.    Sidley incurred $5,580.55 in out-of-pocket expenses relating to Court fees and Court Reporting fees.  All Court-related expenses reflect actual, reasonable, and necessary costs incurred by Sidley on behalf of the Debtors.

### (c)    Document-Related Expenses

93.    Sidley's normal billing practices, as set forth in the pleadings supporting its retention in these chapter 11 cases, include standard secretarial services as part of normal overhead.  For certain projects involving large and/or time-sensitive administrative and logistical requirements resulting from client needs, Sidley utilizes the services of third-party providers in the place of clerical personnel on staff during normal business hours and bills those services to the client at Sidley's cost for such services.  During the Thirteenth Interim Fee Period, Sidley charged a total of $9,727.91 relating to in-house duplication, outside document production, document processing and/or document binding/drilling services that were billed to the Debtors at cost; that is, no markup for such services is applied by Sidley.[29]

### (d)    Computer-Assisted Research

94.    Computer research and information retrieval services are charged on a time, item and/or search-type basis which takes advantage of certain discounts that Sidley is able to negotiate with the relevant service providers because of the Firm's size and volume of usage. The Firm's charges for computerized legal research such as Westlaw or Lexis are based on a rate that recovers no more than the Firm's costs.

---

[29] By agreement between Sidley and the Office of the United States Trustee, Sidley has not charged the Debtors for any expenses relating to third-party proof-reading services.

(e)    **Overtime**

95.    It is Sidley's standard practice and policy to reimburse professionals and staff for overtime meals and overtime transportation home when working late, provided such professional or staff member has worked a certain number of hours per day on a particular client matter.  Additionally, Sidley provides overtime pay to certain eligible staff employees when they are required to work past normal business hours on a particular client matter.  Sidley incurred $422.24 in overtime expenses during the Thirteenth Interim Fee Period.  All requested overtime expenses are reasonable given the time demands in these cases during the Thirteenth Interim Fee Period.

(f)    **Professional Services/Specialists and Litigation Support Services**

96.    During the Thirteenth Interim Fee Period, Sidley charged a total of (i) $3,348.00 relating to outside professional services and specialists, and (ii) $58,279.97 relating to litigation support services, each of which were billed to the Debtors at cost.  In connection with Sidley's ongoing maintenance of the Document Depository, in which the equivalent of approximately 5.82 million pages of documents relating to the Leveraged ESOP Transactions are electronically stored, Sidley utilized the services of an outside vendor, LD Discovery, to host and process electronic data files for production upon request to Depository Designees and creditor constituencies authorized to receive such documents.  Sidley also utilized the services of contract attorneys to supplement the Firm's Litigation professionals in the review and analysis of documents received and produced in discovery to meet the deadlines imposed by the Allocation Disputes hearing schedule, the Supplemental Disclosure Document hearing schedule, and the confirmation hearing schedule set by the Bankruptcy Court.  Additionally, Sidley retained courtroom technology consultancy firm TrialGraphix to assist with the hosting, indexing, and projection of trial exhibits, including video deposition designations, on video screens throughout

the courtroom during the 2011 Confirmation Hearing, including during the closing arguments held in the Eleventh Interim Fee Period. Those materials continued to be hosted by TrialGraphix in the Thirteenth Interim Fee Period.

## REVIEW OF APPLICABLE LOCAL RULE

97.    The undersigned has reviewed the requirements of Local Rule of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware 2016-2 and certifies to the best of his information, knowledge and belief that this Application substantially complies with Rule 2016-2.

## NOTICE

98.    Notice of this Application has been served upon the Notice Parties specified in the Fee Orders. In accordance with the terms of the Fee Orders, Sidley respectfully submits that no other or further notice is required.

## NO PRIOR REQUEST

99.    Other than the applicable Monthly Fee Applications, no previous application respecting the relief requested herein has been made to this or any other Court.

WHEREFORE, Sidley Austin LLP respectfully requests the Court (i) to approve, pursuant to 11 U.S.C. §§ 327, 331, and 503, interim compensation in the amount of $5,331,970.50 and reimbursement of expenses in the amount of $168,703.44, (ii) to authorize the payment of such amounts by the Debtors to Sidley, less any amounts previously paid to Sidley pursuant to the Monthly Fee Applications for the period covered by this thirteenth Quarterly Fee Application Request and the procedures set forth in the Interim Compensation Order and the Fee Examiner Order, and (iii) to grant such further relief as is just and proper.

Dated: July 27, 2012

Respectfully submitted,

*/s/ Kenneth P. Kansa*
James F. Conlan
Bryan Krakauer
Kenneth P. Kansa
Jillian K. Ludwig
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

ATTORNEYS FOR DEBTORS AND DEBTORS IN POSSESSION