# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

TRIBUNE COMPANY, et al.,[1]

Debtors.

Chapter 11

Case No. 08-13141 (KJC)

Jointly Administered

**Related to Docket Nos. 12084, 12147, 12159, 12198**
**Hearing Date: August 17, 2012 at 10:00 a.m. ET**

## OBJECTION OF THE DCL PLAN PROPONENTS TO THE TRUSTEES' AND EGI-TRB, LLC'S MOTIONS FOR AN ORDER CERTIFYING DIRECT APPEAL OF THE CONFIRMATION ORDER TO THE COURT OF APPEALS FOR THE THIRD CIRCUIT

The DCL Plan Proponents[2] hereby object to (i) the *Motion of Law Debenture*

*Trust Company of New York and Deutsche Bank Trust Company Americas pursuant to 28 U.S.C.*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc., f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); and WPIX, Inc. (0191). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

[2] The "DCL Plan Proponents" are the debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A. Capitalized terms not otherwise defined have the meanings given to them in the DCL Plan, as amended [D.I. 12072].

*§ 158(d)(2) and Fed. R. Bankr. P. 8001(f) Requesting Certification of Direct Appeal to United States Court of Appeals for Third Circuit of the Unfair Discrimination Issue in the Allocation Disputes Order as Incorporated in the Order and Memorandum Opinion on Confirmation* [D.I. 12084] (the "Law Debenture/DBTCA Motion"), to which Wilmington Trust Company ("WTC") filed a Joinder [D.I. 12159], and (ii) *EGI-TRB, LLC's Motion for Certification of Direct Appeal to the United States Court of Appeals for the Third Circuit* [D.I. 12198] (the "EGI-TRB Motion") (collectively, the "Motions"). In support of this Objection, the DCL Plan Proponents state as follows:

## PRELIMINARY STATEMENT

1.    By the Motions, the Appellants[3] request that the Court certify certain discrete parts of the *Order Confirming Fourth Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries* [D.I. 12074] (the "Confirmation Order")[4] for direct appeal to the Third Circuit. For the reasons set forth below, the requested piecemeal certification is neither available under applicable law nor advisable under the circumstances of these cases.

2.    Multiple appeals have now been filed with respect to the Confirmation Order and the various orders incorporated into the Confirmation Order. WTC filed notices of appeal (a) on January 31, 2012, with respect to the 2011 Confirmation Order and

---

[3] The "Appellants" are WTC, Law Debenture Trust Company of New York ("Law Debenture"), Deutsche Bank Trust Company Americas ("DBTCA"), and EGI-TRB, LLC ("EGI-TRB"). The "Trustees" are Law Debenture, DBTCA, and WTC.

[4] In addition to the Confirmation Order, the Court has entered the following confirmation-related opinions and orders: *Order Denying Confirmation of Competing Plans*, entered on October 31, 2011 [D.I. 10134]; *Opinion on Confirmation*, entered on October 31, 2011 [D.I. 10133] (the "2011 Confirmation Decision"); *Order Regarding Motions for Reconsideration of the Confirmation Opinion and Order*, entered on December 29, 2011 [D.I. 10532] (the "Reconsideration Order"); *Memorandum on Reconsideration*, entered on December 29, 2011 [D.I. 10531] (the "Reconsideration Decision"); *Memorandum Regarding Allocation Disputes*, entered on April 9, 2012 [D.I. 11337] (the "Allocation Decision"); *Order Regarding Allocation Disputes*, entered on April 9, 2012 [D.I. 11338] (the "Allocation Order"); *Confirmation Opinion*, entered on July 13, 2012 [D.I. 12033] (the "Confirmation Decision"); and *Order Overruling Plan Objections and Denying the Clarification Motion*, entered on July 13, 2012 [D.I. 12034] (collectively, with the Confirmation Order, the "Confirmation Rulings").

2

Reconsideration Order, (b) on April 23, 2012, with respect to the Allocation Decision and

Allocation Order, and (c) on August 3, 2012, with respect to the Confirmation Decision and

Confirmation Order. Aurelius Capital Management, LP ("Aurelius") filed a notice of appeal on

July 23, 2012, with respect to the Confirmation Decision and Confirmation Order,[5] as did the

Trustees. Finally, EGI-TRB filed a notice of appeal on August 3, 2012, with respect to the

Confirmation Decision and Confirmation Order.

      3.        These multiple appeals of the same order create numerous procedural

difficulties. For example, WTC already has filed a brief with District Judge Sleet in the first of

its three appeals (which itself is interlocutory and subject to dismissal), while its latest pending

appeal has not yet been docketed or assigned to a District Judge, much less been given a briefing

schedule. Ultimately, it will be critical for the District Court to consolidate and coordinate the

appeals in order to avoid appellate chaos and the potential for conflicting or duplicative rulings.

      4.        Against that backdrop, the Appellants now seek to complicate matters

further by asking the Court to certify discrete parts of the Confirmation Order – relating to its

determination that the DCL Plan does not discriminate unfairly against Senior Noteholders and

its interpretation of the PHONES Indenture and the EGI Subordination Agreement – for direct

appeal to the Third Circuit, thereby isolating these issues and bypassing the District Court where

the other appeals would remain to be decided.[6] There is no conceivable merit to or basis for this

requested relief.

---

[5] This appeal (the "Aurelius Appeal") has not yet been docketed in the District Court.

[6] In addition to joining the arguments in the Law Debenture/DBTCA Motion, WTC Joinder ¶ 1, WTC further argues that certification of its "unfair discrimination" issues to the Third Circuit is warranted because holders of the PHONES Notes have been "materially harmed" by the Confirmation Rulings. Id. ¶¶ 3-6. This assertion is irrelevant to the Motion because material harm to the appealing party, even assuming harm could be shown, is not a basis for certification of a direct appeal under 28 U.S.C. § 158(d)(2). Accordingly, WTC's Joinder adds nothing to the Law Debenture/DBTCA Motion.

5.          Pursuant to 28 U.S.C. § 158(d)(2), certification of a direct appeal to the Third Circuit is permitted only if the appeal involves a question of law as to which there is no controlling decision or as to which there are conflicting decisions, the appeal involves a matter of public importance, or an immediate direct appeal to the Third Circuit would materially advance the progress of the case.  The Appellants cannot meet *any* of these requirements for certification.

6.          *First*, none of the issues for which the Appellants seek certification involves a question of law as to which there is a lack of controlling authority.[7]  In deciding the Unfair Discrimination Issue, the Court relied on a Third Circuit decision construing the meaning of the statutory term "notwithstanding" as a basis for rejecting the Appellants' argument that a plan cannot be confirmed under section 1129(b) unless it literally enforces every term of a subordination agreement, no matter how immaterial.  Allocation Decision at 24-25.  The Court also relied on a Supreme Court opinion in concluding that the legislative history that forms the only other legal basis for this appeal is "not determinative" for analyzing the unfair discrimination issue.  Id. at 23-24 & n.20.  The Court's determination therefore is well supported by controlling authority.  The Court's decision also is based on its factual finding that "any discriminatory effect on the dissenting class is immaterial" under the circumstances of these cases.  See id. at 26-30.  The Appellants' objection in this regard thus raises, at best, a mixed question of fact and law as to which certification of a direct appeal is inappropriate.

7.          The Swap Claim Issue fares no better.  Whether the Swap Claim is entitled to benefit from the subordination provisions of the PHONES Indenture and the EGI

---

[7]  The Trustees raise two issues on appeal:  (1) whether the Court erred in confirming the DCL Plan because it discriminates unfairly in violation of section 1192(b)(1) (the "Unfair Discrimination Issue"); and (2) whether the Court erred in determining that the Swap Claim constitutes Senior Indebtedness under the PHONES Indenture and Senior Obligations under the EGI Subordination Agreement (the "Swap Claim Issue").  Law Debenture/DBTCA Motion ¶ 21; WTC Joinder ¶ 8.  EGI-TRB raises one issue on appeal:  whether the Court improperly interpreted and applied the EGI Subordination Agreement to subordinate EGI-TRB's claims as to proceeds from chapter 5 avoidance actions and other third-party recoveries (the "EGI Subordination Issue").  EGI-TRB Motion ¶ 14.

4

Subordination Agreement turns on the specific terms of those agreements and does not implicate any issue for which Third Circuit authority could provide a controlling decision of law. Indeed, if disagreement over the application of contract terms to the facts of a particular case was sufficient to qualify for certification, legions of bankruptcy rulings would warrant direct appeal to the Third Circuit, something that demonstrably is not the case.

8.        EGI-TRB similarly fails to raise a pure legal question. As with the Swap Claim Issue, whether the Court properly applied the terms of the EGI Subordination Agreement in determining the priority of EGI-TRB's claims amounts to nothing more than a routine application of contract terms to the facts of this case. The Court's determination of this issue was based on its application of well-established rules of contract interpretation under Delaware state law to the specific language of the specific subordination provision, and it implicates no question of law as to which there is a lack of controlling authority.

9.        *Second*, the issues for which the Appellants seek review do not implicate matters of public importance. Contrary to the Trustees' hyperbolic arguments, the Court's Confirmation Rulings do not immunize subordination agreements from enforcement in bankruptcy proceedings nor do they create a license for debtors to divert value to subordinated creditors in derogation of senior creditors' contractual rights. Rather, the Court merely determined that the DCL Plan's equal treatment of the Senior Noteholders and holders of Other Parent Claims *in this case* did not constitute unfair discrimination because it did not result in a *materially* lower recovery for the Senior Noteholders, even if the claimed subordination rights were taken into account. And the EGI Subordination Issue is specific to the parties to the EGI Subordination Agreement. The Court's determinations, consequently, concern only the

Appellants and, further, affect them in a way that is immaterial to the overall distributions they are entitled to under the DCL Plan.

10.        Indeed, a reversal on appeal would benefit the Senior Noteholders by only $11.5 million in a case that involves more than $7 billion in distributions.  Because the Court's Confirmation Rulings in no way alter the jurisprudence of unfair discrimination under section 1129(b), there is no risk that they will have the "unsettling effect . . . on the financial markets" that the Trustees predict.  Law Debenture/DBTCA Motion ¶ 37.  In fact, the Trustees do not put forth any evidence that the Allocation Decision has had a discernible impact on the relevant financial markets to date.

11.        *Third*, EGI-TRB's argument that certification is warranted because its appeal raises a question of law requiring resolution of conflicting decisions misstates this prong of the certification standard.  EGI-TRB does not point to conflicting decisions among different courts within the Third Circuit regarding a legal question as to which circuit court guidance is needed.  Rather, it simply argues that the Court misapplied two Third Circuit cases (PWS Holdings and Cybergenics) without showing that such cases are inconsistent with each other or with other Third Circuit authority.  This is not a valid basis for certification.

12.        *Finally*, the Appellants fail to show that a direct appeal will materially advance the progress of these cases.  To the contrary, certification would do precisely the opposite – it would split between at least two appellate courts consideration of the very same Confirmation Order, creating appellate chaos and almost certainly delaying the progress of the cases.

13.        The Appellants have cited no authority – and the DCL Plan Proponents are aware of none – for the proposition that it is possible to certify only part but not all of a

6

bankruptcy court's order.  Particularly where, as here, the District Court already has jurisdiction over pending appeals of the Confirmation Order, this Court does not have the power to grant the relief that the Appellants seek.  Furthermore, as shown below, given the District Court's jurisdiction over WTC's previously-filed appeals, the Court also does not have the power to certify the *entire* Confirmation Order for direct appeal, as doing so would usurp the District Court of jurisdiction over matters now pending before it.  In any event, just as there are no grounds for piecemeal certification of the Appellants' issues, there is absolutely no basis for certification of the remainder of the appeals of the Confirmation Order, most of which involve challenges to the Court's fact-intensive determination that the DCL Plan Settlement is reasonable and appropriate under the circumstances.

14.    Because the Appellants cannot satisfy any of the grounds for certifying a direct appeal to the Third Circuit, the Motions should be denied.

## ARGUMENT

15.    Certification of a bankruptcy court's order for immediate appeal to the court of appeals under 28 U.S.C. § 158(d)(2) is rare in the Third Circuit.[8]  This is because a bankruptcy court may certify an order for direct appeal only if it is convinced that "(i) the judgment, order, or decree involves a question of law as to which there is no controlling decision . . . , or involves a matter of public importance; (ii) the judgment, order, or decree involves a

---

[8]  District and bankruptcy courts in the Third Circuit routinely deny requests for certification.  See, e.g., Reorganized Debtors ex rel. Goody's Family Clothing, Inc. v. Blue Dog Props. Trust (In re Goody's Family Clothing, Inc.) ["Goody's I"], No. 09-409 (RMB), 2009 WL 2355705 (D. Del. July 30, 2009); Am. Home Mortg. Inv. Corp. v. Lehman Bros. Inc. (In re Am. Home Mortg. Inv. Corp.) ["AHM"], 408 B.R. 42 (D. Del. 2009); Official Comm. of Unsecured Creditors v. Motor Coach Indus. Int'l Inc. (In re Motor Coach Indus. Int'l Inc.), No. 09-078-SLR, 2009 WL 435295 (D. Del. Feb. 23, 2009); Bepco LP v. GlobalSantaFe Corp. (In re 15375 Memorial Corp.), Case Nos. 08-313-SLR et al., 2008 WL 2698678 (D. Del. July 3, 2008); In re Specialty Prods. Holdings Corp., No. 10-11780-JKF (Bankr. D. Del. Oct. 4, 2011) [D.I. 1727]; In re Nortel Networks Corp., No. 09-10138(KG), 2010 WL 1172642 (Bankr. D. Del. Mar. 18, 2010); In re New Century TRS Holdings, Inc., No. 07-10416 (KJC) (Bankr. D. Del. Aug. 22, 2008) [D.I. 8846]; Simon & Schuster, Inc. v. Advanced Mktg. Servs. Inc., 360 B.R. 429 (Bankr. D. Del. 2007); In re Fields, No. 05-60595/JHW, 2006 WL 4455764 (Bankr. D.N.J. Oct. 24, 2006).

question of law requiring resolution of conflicting decisions; or (iii) an immediate appeal from

the judgment, order, or decree may materially advance the progress of the case." 28 U.S.C.

§ 158(d)(2)(A), (B)(i); see also AHM, 408 B.R. at 43 (quoting 28 U.S.C. § 158(d)(2)(A));

Goody's I, 2009 WL 2355705, at *1-*2 (same).

16.    Bankruptcy courts serve a gatekeeping function and narrowly construe the

circumstances appropriate for certification, generally concluding that certification is appropriate

only for unresolved issues of pure questions of law and regularly denying certification where the

appeal involves questions of fact or mixed questions of fact and law. See, e.g., AHM, 408 B.R.

at 43-44 (denying certification where appeal involved "mixed questions that implicate the

particular circumstances of this case, . . . not pure legal questions warranting direct

certification").

17.    Here, the Motions should be denied because the Appellants cannot satisfy

any of the requirements for certification.

**A.    The Appeal Does Not Involve A Question Of Law For Which There Is No Controlling Decision.**

18.    To warrant certification under the controlling decision prong, bankruptcy

courts "require that there be 'no governing law on the issue before the court.'" Nortel Networks,

2010 WL 1172642, at *1 (quoting Mull Drilling Co. v. SemCrude, L.P. (In re SemCrude, L.P.),

407 B.R. 82, 111 (Bankr. D. Del. 2009)).  Direct appeals are not intended for alleged errors in

the application of controlling law to the facts of the case, but rather to "settle *unresolved*

*questions of law*." H.R. Rep. No. 109-31, pt. 1, at 147 (2005), as reprinted in 2005 U.S.C.C.A.N.

88, 206 (emphasis added); see also Weber v. U.S. Tr., 484 F.3d 154, 159 (2d Cir. 2007) (direct

appeal intended to "resolve controlling legal questions expeditiously and . . . foster the development of coherent bankruptcy-law precedent").[9]

19.         The Appellants cannot meet this standard.  Indeed, certification must be denied where, as here, the appeal is based *not* on unresolved legal questions but on the application of settled law to the court's well-founded factual determinations.  See, e.g., 15375 Memorial, 2008 WL 2698678, at *1 (denying certification because a "pure question of law has not been stated"); AHM, 408 B.R. at 43-44 (denying certification where issues linked to bankruptcy court's decision were "mixed questions that implicate the particular circumstances of this case") (citing Weber, 484 F.3d at 158).

### (1)    The Unfair Discrimination Issue Does Not Implicate A Question Of Law For Which There Is No Controlling Decision.

20.         The Trustees argue that certification is warranted because there is no controlling authority regarding "the statutory interpretation of either the 'not discriminate unfairly' or the 'notwithstanding section 510(a)' language in 11 U.S.C. § 1129(b)(1)."  Law Debenture/DBTCA Motion ¶ 30.  Even a cursory reading of the Court's Allocation Decision reveals that the Trustees are simply incorrect.  The Court's determination that the DCL Plan does not unfairly discriminate against Senior Noteholders relies directly on a controlling Third Circuit decision that directs how the word "notwithstanding" is to be interpreted by courts construing the Bankruptcy Code.

---

[9] The standard for certifying a direct appeal on this ground is similar to that for granting an interlocutory appeal. Compare 28 U.S.C. § 158(d)(2)(A) with 28 U.S.C. § 1292(b) (requiring a district judge to decide whether an interlocutory order "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation").  Courts often analogize the two standards in determining whether to certify or to grant direct appeals. See, e.g., Weber, 484 F.3d at 158-59 (relying on prior analysis of grants of discretionary jurisdiction when interpreting the text and legislative history of 28 U.S.C. § 158(d)(2)); Simon & Schuster, 360 B.R. at 434 (concluding that the legal analysis under a motion for leave to appeal is "virtually identical" to that required for a request for direct appeal).

21.      In In re Goody's Family Clothing, Inc. ["Goody's II"], 610 F.3d 812 (3d

Cir. 2010), the Third Circuit interpreted "notwithstanding" in a similarly-constructed section of

the Bankruptcy Code to mean "in spite of" or "without prevention or obstruction from or by."

610 F.3d at 817 (quoting Webster's Third New Int'l Dictionary 1545 (1971)).  The Court's

Allocation Decision quotes extensively from Goody's II in reaching its conclusion that

"'notwithstanding section 510(a) of this title' means that § 1129(b) is applied without prevention

or obstruction of any applicable subordination agreements."  Allocation Decision at 25.  The

Trustees correctly observe that Goody's II "dealt with an entirely separate provision of the

Bankruptcy Code," Law Debenture/DBTCA Motion ¶ 31, but they do not argue (nor could they

plausibly do so) that there is any reason to believe the Third Circuit would give the word

"notwithstanding" a different meaning in another section of the very same Bankruptcy Code.

See, e.g., In re Aucoin, No. 99-12081DWS, 1999 WL 1080364, at *2 (Bankr. E.D. Pa. Nov. 29,

1999) (a "general rule of construction is that identical words used in different parts of the same

act are intended to have the same meaning") (citing U.S. Nat'l Bank of Or. v. Indep. Ins. Agents

of Am., Inc., 508 U.S. 439, 460 (1993)).  Because the meaning of the term "notwithstanding" in

the Bankruptcy Code is settled under the Third Circuit law on which this Court relied in deciding

the Unfair Discrimination Issue, the Trustees' argument fails.

22.      Nor is certification warranted on the basis that there is no controlling

authority with respect to the Bankruptcy Code's mandate that a plan "not discriminate unfairly."

Law Debenture/DBTCA Motion ¶ 30.  To the contrary, courts repeatedly hold that certification

is not warranted where the plain meaning of operative statutory language requires no further

appellate interpretation and the lower courts are in accord regarding the standard to be applied.

See, e.g., AHM, 408 B.R. at 44 (declining certification where issues required straightforward

interpretation of New York state law, the Bankruptcy Code, and/or the Federal Rules of Civil

Procedure); In re Marrama, 345 B.R. 458, 474 (Bankr. D. Mass. 2006) (denying certification

where the court determined there to be "no significant dispute regarding the applicable standard"

despite a lack of controlling case law).

       23.      Here, the Delaware District Court and several bankruptcy courts in the

Third Circuit have issued decisions, cited by the Court, that establish the applicable legal

framework in determining whether a plan unfairly discriminates against a dissenting class. See

Allocation Decision at 25-30 (citing In re Armstrong World Indus., Inc., 348 B.R. 111 (D. Del.

2006); In re Unbreakable Nation Co., 437 B.R. 189 (Bankr. E.D. Pa. 2010); In re Greate Bay

Hotel & Casino, Inc., 251 B.R. 213 (Bankr. D.N.J. 2000)).  Each of the cases cited by the Court

in its Allocation Decision adopted or applied the rebuttable presumption test first proposed by

professor, now Bankruptcy Judge, Bruce A. Markell.  Id. at 25-26; see also Bruce A. Markell, A

New Perspective on Unfair Discrimination in Chapter 11, 72 Am. Bankr. L.J. 227, 249-50 (1998)

(A rebuttable presumption of unfair discrimination exists where "a difference in the plan's

treatment of the two classes . . . results in . . . a materially lower percentage recovery for the

dissenting class . . . .").  Applying the Markell rebuttable presumption test, those courts

uniformly held that a plan does not unfairly discriminate within the meaning of

section 1129(b)(1) in the absence of a showing that the dissenting class will receive a *materially*

lower percentage recovery when viewed from the perspective of that dissenting class.  Allocation

Decision at 26 (citing Armstrong, 348 B.R. at 121; Unbreakable Nation, 437 B.R. at 203; Greate

Bay Hotel, 251 B.R. at 231).  Thus, under the undisputed and uniform line of in-circuit authority

cited by the Court, minor or immaterial differences in plan treatment of two classes do not

violate section 1129(b)(1).

24.      Indeed, the Trustees do not seriously contend on appeal that materiality is not a requirement under applicable law.  Rather, the real issue on appeal is not the legal standard to be applied but whether the Court properly applied the materiality requirement *to the facts of this case*.  See Law Debenture/DBTCA Motion ¶ 21 (issue presented for appeal is whether the Court erred in confirming the DCL Plan because it "discriminates unfairly against the Senior Noteholders . . . *by providing materially lower and disparate treatment to the Senior Noteholders . . .*") (emphasis added).  A dispute over the application of controlling law to specific facts, however, does not warrant certification.  See Nortel Networks, 2010 WL 1172642, at *1 (declining certification where the court had "applied such controlling authority in length in reaching its decision") (citing SemCrude, 407 B.R. at 111; In re General Motors Corp., 409 B.R. 24, 28 (Bankr. S.D.N.Y. 2009)).[10]

25.      In reaching its materiality determination, the Court reviewed extensive stipulated documentary evidence presented in this case, including stipulated calculations of potential recovery scenarios under the DCL Plan.  Allocation Decision at 27-28.  Based on this evidence and in the exercise of its broad fact-finding mandate, the Court determined that any decrease in the Senior Noteholders' recovery under the DCL Plan was not material and, as a consequence, the dissenting class could not establish unfair discrimination.  Id. at 27-30.  The Court's materiality finding was bolstered by its determination that the Swap Claim is contractually entitled to benefit from the subordination provisions in the PHONES Indenture and the EGI Subordination Agreement, which meant that the percentage recovery for Senior Noteholders could change by, at most, 0.9%.  See id. at nn.19, 21 (holding that the treatment of

---

[10] See also H.R. Rep. 109-31, pt. 1, at 148, as reprinted in 2005 U.S.C.C.A.N. 88, 206-07 ("While fact-intensive issues may occasionally offer grounds for certification even when binding precedent already exists on the general legal issue in question, it is anticipated that this procedure will rarely be used in that circumstance or in an attempt to bring to the circuit courts of appeals matters that can appropriately be resolved initially by district court judges or bankruptcy appellate panels.").

46429/0001-8755073v1

Senior Noteholders and the Other Parent Claims "becomes even less vulnerable to a charge of 'unfair discrimination'" in light of this finding). Whether this evidence supports the Court's materiality finding is a mixed question of fact and law that cannot support certification of a direct appeal. See, e.g., 15375 Memorial, 2008 WL 2698678, at *1 (denying certification where appellate review "is necessarily fact-intensive"); Nortel Networks, 2010 WL 1172642, at *1.

26.       Moreover, it is axiomatic that none of the Court's underlying factual determinations may be disturbed on appeal unless the Appellants establish that they are clearly erroneous or that the Court abused its discretion in rendering them. See In re SGL Carbon Corp., 200 F.3d 154, 159 (3d Cir. 1999) ("[A]n abuse of discretion exists where the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact." (citation omitted)). Because review of a bankruptcy court's factual findings is best reserved for the district court, see Weber, 484 F.3d at 161 ("percolation through the district court would cast more light on the issue and facilitate a wise and well-informed decision"), the Court's application of the materiality standard to its factual findings is ill-suited for certification for direct appeal.

27.       Finally, the Trustees' legal theory that the Court should rely on a murky passage from a 1977 House Report on unfair discrimination is directly contrary to controlling law. The Trustees seek to elevate the passage from the House Report into law and to bootstrap an unsupported argument into a rule of decision that somehow justifies reversal of the Allocation Decision. But the Court's conclusion that the legislative history was "not determinative for analyzing this issue, especially in light of the numerous developments in case law" since 1978, itself is based directly on the Supreme Court's opinion in Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 568 (2005). Allocation Decision at 23-24 & n. 20. The Allocation

46429/0001-8755073v1

Decision quotes a lengthy passage from Justice Kennedy's opinion, which noted that the Supreme Court has "repeatedly held" that "the authoritative statement is the statutory text, not the legislative history or any other extrinsic material" because legislative history is "often murky, ambiguous, and contradictory" and susceptible to "strategic manipulations" by lobbyists, staffers, and unrepresentative committee members.  Exxon Mobil Corp, 545 U.S. at 568.[11] Indeed, as this Court recognized in the Allocation Decision (at 23), the particular bit of legislative history on which the Trustees rely is especially dubious and unreliable, and it certainly provides no basis to support a direct appeal to the Third Circuit on the Unfair Discrimination Issue.

> **(2)     The Swap Claim Does Not Implicate A Question Of Law For Which There Is No Controlling Decision.**

28.          The second issue raised by the Trustees on appeal – whether the Swap Claim constitutes Senior Indebtedness under the PHONES Indenture and Senior Obligations under the EGI Subordination Agreement – similarly fails to raise a question of law that justifies certification of a direct appeal to the Third Circuit.

29.          To start, the Trustees' claim that a direct appeal is required because "all parties agreed that the interpretation of the PHONES Indenture and the EGI Subordination Agreement was an issue of law," Law Debenture/DBTCA Motion at 9 n.2, is unsupported by any citation.  Indeed, it cannot be true that the routine application of the terms of a contract to the stipulated facts of a case is sufficient for certification.

---

[11]   Other controlling authority confirms the Court's conclusion that legislative history is not binding law and is of limited analytical value.  See Puerto Rico Dep't of Consumer Affairs v. Isla Petrol. Corp., 485 U.S. 495, 501 (1988) ("[U]nenacted approvals, beliefs, and desires [set forth in legislative history] are not laws.") (Scalia, J.); see also Bruesewitz v. Wyeth Inc., 561 F.3d 233, 244 (3d Cir. 2009) ("We have recognized that legislative history is not without its shortcomings as a tool of interpretation.  'As a point of fact, there can be multiple legislative intents because hundreds of men and women must vote in favor of a bill in order for it to become a law.'") (quoting Morgan v. Gay, 466 F.3d 276, 278 (3d Cir. 2006)).

46429/0001-8755073v1

30.         Moreover, even if the Swap Claim Issue could be characterized as raising only a legal question, contract interpretation is fundamentally a matter of state law.  A decision from the Third Circuit could not, therefore, govern interpretation of the relevant provisions of the PHONES Indenture (governed by Illinois law) and the EGI Subordination Agreement (governed by Delaware law).  See, e.g., 15375 Memorial, 2008 WL 2698678, at *1 (declining certification where certain issues involved application of state law).

31.         Ultimately, the relegation of the entire discussion of the Swap Claim to a single footnote in the Law Debenture/DBTCA Motion (at 9 n.2) reveals that even the Trustees do not believe that the Swap Claim Issue independently satisfies the requirement for certification of a direct appeal.

(3)     **The EGI Subordination Issue Does Not Implicate A Question Of Law For Which There Is No Controlling Decision.**

32.         The EGI Subordination Issue fails to meet the first prong of the certification standard for the same reason the Swap Claim Issue fails – both turn on the routine application of state law to the terms of a contract and to the stipulated facts of a case.  Nothing about the interpretation of the EGI Subordination Agreement presents a pure legal question on which Third Circuit authority would be controlling.

33.         Indeed, in its Joinder to the Law Debenture/DBTCA Motion, WTC effectively concedes that the very issue EGI-TRB now presents as the basis for a direct appeal does not, on its own, meet the standard for certification.  WTC Joinder at 3 n.3.  In fact, WTC's appeal of this very issue is now pending before the District Court, and WTC does not seek a direct appeal of the EGI Subordination Issue independent of its request for certification of the Unfair Discrimination and Swap Claim Issues.  Id.  WTC's position is correct in this regard, and EGI-TRB's request for certification should be denied.

15

**B.     The Appeal Does Not Involve A Matter Of Public Importance.**

34.     The Motions should be denied for the additional reason that ordinary inter-creditor disputes like those raised on appeal here do not implicate a matter of public importance. Courts certify direct appeals under the "public importance" prong only where the order at issue "transcend[s] the litigants and involves a legal question the resolution of which will advance the cause of jurisprudence to a degree that is usually not the case." AHM, 408 B.R. at 44 (quoting 1 Collier on Bankruptcy ¶ 5.05[A] (15th ed. rev.)); see also Nortel Networks, 2010 WL 1172642, at *2 ("An appeal that impacts only the parties, and not the public at large, is not 'a matter of public importance.'") (quoting Goody's I, 2009 WL 2355705, at *2); Mark IV Indus., Inc. v. N.M. Env't Dep't, 452 B.R. 385, 390 (S.D.N.Y. 2011) (denying certification where appellant "does not explain how the resolution of the issues on appeal would advance the development of the law *to an unusual degree*, or impact the public at large") (emphasis added); General Motors, 409 B.R. at 28 (finding an absence of "public importance" where the appeal was "ultimately a matter of statutory interpretation and common law analysis – as contrasted, for example, to constitutional issues").

35.     The Trustees boldly predict that the Court's Confirmation Rulings will cause widespread "uncertainty" within the financial markets because "the plan eliminates inter-creditor third-party subordination rights over the dissent of the beneficiary class of creditors." Law Debenture/DBTCA Motion ¶¶ 33-34, 37. Nonsense. The Allocation Decision, from which the Trustees appeal, does not eliminate subordination rights. Rather, the Court confirmed the DCL Plan because it determined that, even if the Trustees' claimed subordination rights are taken into account, any disparate treatment between the Senior Noteholders and the Other Parent Claims would be immaterial given the facts of this case. Allocation Decision at 30 ("The

46429/0001-8755073v1

discriminatory effect on the dissenting class is immaterial and, therefore, no rebuttable

presumption of unfair discrimination arises here.").

36.        The Court's Confirmation Rulings thus do not affect the market at large

and do not involve a matter of public importance.  Quite simply, the existence of a subordination

agreement does not transform section 1129(b)'s prohibition of *unfair* discrimination into a

prohibition of *all* discrimination.  The import of the Court's ruling is unremarkable –

subordination beneficiaries who are the subject of cramdown are entitled to the same protections

under section 1129(b) (but nothing more) as other creditors who are subject to cramdown – and

the effect of the Confirmation Rulings will be confined to the parties to this case, based on the

facts and circumstances of this bankruptcy proceeding.  As the Court properly concluded, the

impact on the affected parties to this proceeding is immaterial – the issues involved implicate

only $11.5 million in a case that involves more than $7 billion in distributions.  Further, the

Court heard each of the intercreditor issues now on appeal, after extensive briefing and litigation,

with full due process for the involved parties at every turn, in an effort to diligently resolve the

subordination and allocation disputes prior to entry of the Confirmation Order.  See, e.g., Nortel

Networks, 2010 WL 1172642, at *2 (the public importance prong favors the non-moving parties

who "worked diligently and in good faith with their foreign counterparts to resolve critical issues

in an efficient manner").

37.        Similarly, the Swap Claim Issue does not implicate a matter of public

importance because it involves a routine application of contractual provisions to this case.  All

questions about this issue can be answered by reference to the Credit Agreement, the Swap

Agreement, the PHONES Indenture, and the EGI-TRB Subordination Agreement.  This issue is a

quintessential "private contract dispute" and "is not the type of 'matter of public importance' that

is within the meaning of section 158(d)(2)(A)(i)." Travelers Indemn. Co. v. Common Law

Settlement Counsel (In re Johns-Manville Corp.), 449 B.R. 31, 34 (S.D.N.Y. 2011).[12]

38.     Notably, the Trustees do not present any evidence in support of their

claims as to the alleged far-reaching effect of the Allocation Decision on financial markets.  For

instance, they have not put forth any data showing that the market for senior debt has been

adversely affected in any manner in the wake of the Allocation Decision.  Nor have they shown

that investors in the senior high yield bond market believe their investments have more risk as a

result of that decision.  Finally, if the financial markets were truly unsettled by the Allocation

Decision, one would expect that such alarm would be reported in the financial press.  But the

Trustees point to no discussion in the financial press or elsewhere suggesting that the Allocation

Decision had any systemic significance to the markets whatsoever, and the DCL Plan Proponents

are aware of none.

39.     In short, the Trustees' unsupported contention that debt markets

everywhere will be impacted or alarmed by the Confirmation Rulings falls well short of

establishing any public importance for the parochial disputes that characterize their appeals and,

accordingly, certification should be denied.

C.     **The EGI Subordination Issue Does Not Raise A Question Of Law Requiring
        Resolution Of Conflicting Decisions.**[13]

40.     EGI-TRB's appeal not only fails to raise a pure legal question on which

Third Circuit authority is lacking, it also does not implicate a question of law on which courts in

---

[12] EGI-TRB does not argue that its appeal raises a matter of public importance.  The EGI Subordination Issue affects only the parties to that agreement and is not an issue that would advance the development of the law more generally.

[13] The Trustees do not argue, because they cannot, that their appeal concerns a question of law requiring the resolution of conflicting decisions within the lower courts in the Third Circuit.  To the contrary, the Court cited numerous lower court decisions related to the Unfair Discrimination Issue, all of which are in accord as to the applicable law.  See, e.g., Allocation Decision at 25-26.

the Third Circuit have issued conflicting decisions.  The request for certification of its appeal on

this basis therefore must be denied as well.

41.        Courts certify a direct appeal under the second prong of the certification

standard when multiple courts within the same circuit have issued inconsistent decisions that

confuse the state of the law and make it difficult for the lower courts to render clear decisions.

See Goody's I, 2009 WL 2355705, at *2 (denying certification where "no split of authority exists

in the Third Circuit"); General Motors, 409 B.R. at 29 (denying certification where there are "no

conflicting decisions within the Second Circuit for the Circuit to resolve").

42.        The crux of EGI-TRB's argument is that the Court's Allocation Decision

inconsistently applies the Third Circuit's opinions in Cybergenics[14] and PWS Holdings.[15]  More

specifically, EGI-TRB argues that the Court first determined, in the 2011 Confirmation Decision,

that chapter 5 avoidance actions are not "assets of the company" under Cybergenics, and that this

determination "leads to the conclusion that avoidance action proceeds" fall outside the scope of

the EGI Subordination Agreement.  EGI-TRB Motion ¶ 20.  EGI-TRB then points to the Court's

subsequent determination in the Allocation Decision that chapter 5 avoidance actions fall within

the terms of the EGI Subordination Agreement, citing PWS Holdings as an alleged conflicting

decision that warrants certification.  Id. ¶ 21.

43.        But EGI-TRB has not shown that Cybergenics and PWS Holdings are

inconsistent or in conflict in any way.  Indeed, as the Court explained at length, Cybergenics and

PWS Holdings are fully consistent with each other.  Allocation Decision at 42-45 (holding that

this case is governed by PWS Holdings because, like that case, "the Debtors have proposed a

---

[14] Off'l Comm. Of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.), 226 F.3d 237
(3d Cir. 2000).

[15] In re PWS Holding Corp., 303 F.3d 308 (3d Cir. 2002).

plan that will exercise their power to resolve, or pursue through the Litigation Trust, potential

fraudulent transfer claims on behalf of creditors"); see also id. at 44 ("The flaw in EGI's

argument is the focus upon whether the fraudulent transfer claims *belong* to the Debtors."

(emphasis in original)).  Indeed, the Third Circuit expressly recognized and distinguished

Cybergenics in the PWS Holdings decision, stating: "In contrast, the debtor in Cybergenics

merely completed a sale of its assets.  It did not exercise its power under § 544(b) to resolve

potential fraudulent transfer claims, as did the debtor in this case."  PWS Holdings, 303 F.3d at

315.

   44.   Consequently, the Court's determination in the Allocation Decision that

PWS Holdings rather than Cybergenics controls resolution of the EGI Subordination Issue is not

a basis for certification to the Third Circuit.  Indeed, if the opposite were true, certification would

be justified merely because a disappointed litigant alleges that two circuit court decisions are in

conflict, even where the circuit court itself sees no conflict and the lower court applies and

harmonizes the decisions in a reasoned way.  See 15375 Memorial, 2008 WL 2698678, at *2

(denying certification where the appeal "voices nothing more than a disagreement with the

disposition of this case by the bankruptcy court").[16]

### D.  A Direct Appeal Will Not Materially Advance The Case.

   45.   The Appellants also have not met the third prong of the certification

standard because a direct appeal to the Third Circuit will not materially advance this case.

---

[16] The Court expressly stated in its Reconsideration Memorandum that it was "not reconsidering the legal principle, as decided by the Third Circuit in Cybergenics, that fraudulent transfer claims are not assets of the debtor." Reconsideration Decision at 7 n.11.  But even if the Court's legal rulings were inconsistent in the manner alleged by EGI-TRB, which they are not, EGI-TRB fails to explain how a court's reconsideration and reversal of its own earlier ruling during the course of the same bankruptcy proceeding could create any inconsistency among *courts within the Third Circuit*, as required under this prong.  Certification is not meant to challenge a single court's resolution of an issue under Third Circuit law, even where that determination differs from its earlier ruling.  Rather, certification is warranted only where a "split" of authority creates confusion among the courts as to the applicable legal standard. Goody's I, 2009 WL 2355705, at *2.

46429/0001-8755073v1

46.     The Trustees' only argument in support of this prong is that certification will bring finality to the bankruptcy proceedings. Law Debenture/DBTCA Motion ¶ 45. However, this is legally insufficient to demonstrate that certification will materially advance the case and, in any event, is simply not true.

47.     As an initial matter, the possibility of perceived speed by cutting out a layer of appellate review does not alter the conclusion that certification is inappropriate, particularly where, as here, the appeal is of a final order and the circuit court would benefit from review by the district court. See, e.g., Weber, 484 F.3d at 160 (Congress "did not wish us to privilege speed over other goals . . . ."). Certification of a final order makes no sense if "the only argument for expedition is that the appeal will be quicker because it need only be heard by one court – the Court of Appeals." Johns-Manville, 449 B.R. at 34. If this justification were sufficient, all final orders should be certified to the Court of Appeals. See id. Moreover, denial of direct certification is particularly appropriate where, as here, there are related, pending District Court appeals that would nevertheless be subject to a second layer of review by the Third Circuit.

48.     Further, the Trustees ignore the fact that an order confirming the DCL Plan has been entered, and therefore no further action by the Court could possibly advance the case toward its end goal of confirmation of a plan. As the Court previously noted in denying certification of an appeal of a confirmation order, chapter 11's "emphasis really is . . . on plan confirmation." In re New Century TRS Holdings, Inc., No. 07-10416 (KJC), Hr'g Tr. 66:3-4, Aug. 13, 2008 (Bankr. D. Del. 2008) [D.I. 8743]. An immediate appeal to the Third Circuit will not resolve any issues preventing confirmation of the DCL Plan because the DCL Plan has been confirmed, completing a process nearly four years in the making. Thus, a direct appeal of the

21

issues raised by the Appellants will not materially advance the case and is inappropriate.  See

Motor Coach, 2009 WL 435295, at *1 n.3 ("I certainly do not find that an immediate appeal [of a

confirmation order] will 'materially advance the progress of the case;' indeed, I find the

opposite.").

49.     Rather than advance the case, certification to the Third Circuit would

instead hinder resolution of the case by creating a procedural morass in which appeals of

different aspects of the very same Confirmation Order would be pending before both the District

Court and the Third Circuit, creating the possibility of conflicting, overlapping, or duplicative

decisions.  See Johns-Manville, 449 B.R. at 34 (denying certification where appeals were already

being briefed before the district court and certification likely would lengthen the appellate

process rather than advance it); Goody's I, 2009 WL 2355705, at *2 (declining to certify a direct

appeal where an appeal of a related order was already pending and certification would create

complications).

50.     As noted above, supra at ¶ 2, multiple appeals of the Confirmation Rulings

now have been filed by different parties, and the issues, facts, and underlying documents

implicated in each of the appeals overlap.  Consequently, from an efficiency standpoint, it defies

common sense for these related issues to be considered by different courts at different times.

Indeed, the judicial inefficiency and potential for inconsistent rulings caused by multi-track

appeals would justify the Court's refusal to even consider the Motions.  See Simon & Schuster,

360 B.R. at 434 ("the most sensible use of judicial resources and the course of action most

consistent with the hierarchy governing our Federal court system" is to deny the request for

direct appeal when a motion for leave to appeal was pending before the district court).  And,

because multiple, related appeals of the Court's Confirmation Rulings would still remain

pending in the District Court, EGI-TRB's argument that it should be permitted to tag along with the Trustees to the Third Circuit to promote efficiencies, EGI-TRB Motion at ¶ 19, is unpersuasive.

**E.**     *Sua Sponte* **Certification Of A Direct Appeal Of The Entire Confirmation Order Is Neither Possible Nor Advisable.**

51.      Finally, it is not possible for the Court, *sua sponte*, to certify the entire Confirmation Order for direct appeal, thereby consolidating the various appeals of the Confirmation Rulings before the Third Circuit, because the Court no longer has jurisdiction to do so.

52.      Specifically, WTC previously appealed the 2011 Confirmation Order, the Reconsideration Order, and the Allocation Order, and those appeals have been docketed by the District Court and are pending before District Judge Sleet. Indeed, WTC already has filed a brief in respect of the Reconsideration Order appeal.[17] It is axiomatic that only the District Court itself may make a certification of matters pending before it. See Fed. R. Bankr. P. 8001(f)(2)(A)(ii); Ambac Assur. Corp. v. Las Vegas Monorail Co. (In re Las Vegas Monorail Co.), No. 2:10-CV-S-678 JCM (LRL), 2011 WL 1113343, at *2-*3 (D. Nev. Mar. 25, 2011) (where the district court had entertained briefing, the district court was the proper court to determine a request for certification); Nortel Networks, 2010 WL 1172642, at *1 ("A certification motion under U.S.C. § 158(d)(2) must be filed in the court where the matter is pending."). Thus, the Court cannot certify all of the pending appeals for direct appeal to the

---

[17] WTC's appeal of the 2011 Confirmation Order and the Reconsideration Order (the "Reconsideration Appeal") is Case No. 12-cv-128-GMS (docketed in the District Court on Jan. 31, 2012). WTC's appeal of the Allocation Order (the "Allocation Appeal") is Case No. 12-mc-108-GMS (motion for leave to appeal docketed in the District Court on May 9, 2012). On June 26, 2012, the District Court issued a briefing schedule in the Reconsideration Appeal [D.I. 6] setting the date for WTC's opening brief as July 26, 2012, and the date for answering briefs as September 7, 2012. WTC filed its opening brief as required by this schedule. [D.I. 7] No briefing schedule has yet been set in WTC's pending Allocation Appeal.

Third Circuit, and the only way these appeals will be consolidated for appellate review is if the Motions are denied.

53.     Further, the Appellants have cited no authority – and the DCL Plan Proponents are aware of none – for the proposition that it is possible to certify only part but not all of a bankruptcy court's order.  Particularly where, as here, the District Court already has jurisdiction of pending appeals of the Confirmation Order, this Court does not have the power to grant the relief that the Appellants seek, whether *sua sponte* or not.

54.     In any event, just as there are no grounds for piecemeal certification of the Unfair Discrimination, Swap Claim, and EGI Subordination Issues, there is absolutely no basis for certification of the remainder of appeals of the Confirmation Order, most of which involve challenges to the Court's fact-intensive determination that the DCL Plan Settlement is reasonable and appropriate under the circumstances.  Indeed, even if it were possible to certify the entire Confirmation Order, it would make no sense whatsoever that the Trustees' appeal of the $11.5 million Unfair Discrimination Issue (or EGI-TRB's appeal of the limited, narrow and parochial EGI Subordination Issue) could or should justify certification of a direct appeal of the other issues in this case, which involve billions of dollars and which, standing on their own, do not remotely meet the standards imposed by section 158(d)(2).

46429/0001-8755073v1

## CONCLUSION

55.      For the foregoing reasons, the DCL Plan Proponents respectfully request

that this Court enter an order denying the Certification Motions.

Dated:  Wilmington, Delaware                  Respectfully submitted,
              August 8, 2012

                                                            SIDLEY AUSTIN LLP
                                                            James F. Conlan
                                                            Bryan Krakauer
                                                            Jeffrey C. Steen
                                                            Candice L. Kline
                                                            One South Dearborn Street
                                                            Chicago, Illinois  60603
                                                            Telephone:  (312) 853-7000
                                                            Telecopier:  (312) 853-7036

                                                                     -and-

                                                            James F. Bendernagel Jr.
                                                            Ronald S. Flagg
                                                            1501 K Street N.W.
                                                            Washington, D.C.  20005
                                                            Telephone:  (202) 736-8000
                                                            Telecopier:  (202) 736-8711

                                                                     -and-

                                                            COLE, SCHOTZ, MEISEL,
                                                            FORMAN & LEONARD, P.A.

                                                            By: /s/ Norman L. Pernick
                                                            Norman L. Pernick (No. 2290)
                                                            J. Kate Stickles (No. 2917)
                                                            Patrick J. Reilley (No. 4451)
                                                            500 Delaware Avenue, Suite 1410
                                                            Wilmington, Delaware  19801
                                                            Telephone: (302) 652-3131
                                                            Telecopier:  (302) 652-3117

                                                            Counsel for Debtors and Debtors in
                                                            Possession and Certain Non-Debtor
                                                            Affiliates

CHADBOURNE & PARKE LLP
Howard Seife
David M. LeMay
30 Rockefeller Plaza
New York, New York 10112
Telecopier:  (212) 541-5369

-and-

LANDIS RATH & COBB LLP

By: */s/ Matthew B. McGuire*
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telecopier:  (302) 467-4450

-and-

ZUCKERMAN SPAEDER LLP
Graeme W. Bush
James Sottile
1800 M Street, N.W., Suite 1000
Washington, D.C.  20036
Telecopier:  (202) 822-8106

Counsel for the Official Committee of
Unsecured Creditors

46429/0001-8755073v1

JONES DAY
Bruce Bennett
James O. Johnston
Joshua M. Mester
555 South Flower Street, Fiftieth Floor
Los Angeles, Califorrna  90071
Telecopier:  (213)243-2539

-and-

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

By: */s/ Robert S. Brady*_____
Robert S. Brady (No. 2847)
M. Blake Cleary (No. 3614)
Rodney Square;
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Telecopier: (302) 571-1253

Counsel For Oaktree Capital Management,
L.P. and Angelo, Gordon & Co., L.P.

WILMER CUTLER PICKERING HALE &
DORR LLP
Andrew Goldman
399 Park Avenue
New York, New York 10022
Telecopier:  (212) 230-8888

Co-Counsel For Angelo, Gordon & Co, L.P.

27

DAVIS POLK & WARDWELL LLP
Donald S. Bernstein
Damian S. Schaible
450 Lexington Avenue
New York, New York 10017
Telecopier:  (212) 701 5800

-and-

RICHARDS LAYTON & FINGER, P.A.

By: /s/ Robert J. Stearn, Jr.
Mark D. Collins (No. 2981)
Robert J. Stearn, Jr. (No. 2915)
Drew G. Sloan (No. 5069)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telecopier: (302) 651-7701

Counsel For JPMorgan Chase Bank, N.A.

46429/0001-8755073v1