# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered |
| | **Related to Docket Nos. 12080, 12085, 12087, 12147 and 12160** |
| | **Hearing Date: August 17, 2012 at 10:00 a.m. ET** |

## OBJECTION OF THE DCL PLAN PROPONENTS TO THE
## MOTIONS FOR A STAY PENDING APPEAL OF THE CONFIRMATION ORDER

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc., f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); and WPIX, Inc. (0191). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

The DCL Plan Proponents[2] hereby object to (i) the *Motion of Law Debenture Trust Company of New York and Deutsche Bank Trust Company Americas for Stay Pending Appeal of Confirmation Order* [D.I. 12085] (the "Trustees' Motion"), to which Wilmington Trust Company ("WTC") filed a Joinder [D.I. 12160]; and (ii) the *Motion for a Stay Pending Appeal Pursuant to Bankruptcy Rule 8005* [D.I. 12080] (the "Aurelius Motion") filed by Aurelius Capital Management, LP ("Aurelius"), by which the Appellants[3] seek a stay pending appeal of the *Order Confirming the Fourth Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries* [D.I. 12074] (the "Confirmation Order") and related rulings.[4]

In support of this Objection, the DCL Plan Proponents submit the Declaration of Eddy W. Hartenstein, President and Chief Executive Officer of Tribune Company, attached hereto as Exhibit A (the "Hartenstein Declaration"), and the Declaration of David S. Kurtz, Vice Chairman of Investment Banking and Head of the Global Restructuring Group at Lazard Ltd., attached hereto as Exhibit B (the "Kurtz Declaration" and, with the Hartenstein Declaration, the "Declarations"), and state as follows:

---

[2] The "DCL Plan Proponents" are the debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A. The term "Company" refers to the Debtors and their non-debtor subsidiaries. Capitalized terms not otherwise defined have the meanings given to them in the DCL Plan, as amended [D.I. 12072].

[3] The "Appellants" are Aurelius, WTC, Law Debenture Trust Company of New York ("Law Debenture") and Deutsche Bank Trust Company Americas ("DBTCA"). The "Trustees" are WTC, Law Debenture, and DBTCA. EGI-TRB, LLC also filed a notice of appeal, but has not sought a stay pending appeal.

[4] In addition to the Confirmation Order, the Court has entered the following confirmation-related opinions and orders: *Order Denying Confirmation of Competing Plans*, entered on October 31, 2011 [D.I. 10134]; *Opinion on Confirmation*, entered on October 31, 2011 [D.I. 10133] (the "2011 Confirmation Decision"); *Order Regarding Motions for Reconsideration of the Confirmation Opinion and Order*, entered on December 29, 2011 [D.I. 10532]; *Memorandum on Reconsideration*, entered on December 29, 2011 [D.I. 10531] (the "Reconsideration Decision"); *Memorandum Regarding Allocation Disputes*, entered on April 9, 2012 [D.I. 11336] (the "Allocation Decision"); *Order Regarding Allocation Disputes*, entered on April 9, 2012 [D.I. 11337] (the "Allocation Order"); *Confirmation Opinion*, entered on July 13, 2012 [D.I. 12033] (the "Confirmation Decision"); and *Order Overruling Plan Objections and Denying the Clarification Motion*, entered on July 13, 2012 [D.I. 12034] (collectively, with the Confirmation Order, the "Confirmation Rulings").

## PRELIMINARY STATEMENT

1.      By the Motions, the Appellants seek to prevent tens of thousands of creditors from receiving billions of dollars of distributions, while halting the Company's reorganization and thereby allowing its business prospects and thousands of jobs to remain exposed to the risks attendant to a pending bankruptcy case.  Having litigated for years and lost on every significant contested issue, the Appellants would have the Court grant them an indefinite stay without any requirement of a bond to protect against the billions of dollars of harm that might ensue.  In so doing, the Appellants reveal yet again the wisdom of the Court's prior observation of "an inescapable facet of human character:  the willingness to visit harm upon others, even at one's own peril."  2011 Confirmation Decision at 2.

2.      The Confirmation Order is the culmination of nearly four years of bankruptcy proceedings, settlement negotiations, mediation, and litigation, a journey the Court has characterized as "arduous".  Confirmation Decision at 4.  Among many other things, that journey involved months of investigation and thousands of pages of analysis by the Examiner, the multi-party settlement mediated by Judge Gross regarding various potential causes of action arising from the Company's prepetition leveraged buyout transactions, weeks of trial and argument respecting the prior version of the DCL Plan, the Court's ensuing 125-page 2011 Confirmation Decision, the subsequent Reconsideration Decision, the intercreditor skirmish of the Allocation Disputes and resulting 50-page Allocation Decision, the renewed confirmation hearings in June 2012, the 35-page 2012 Confirmation Decision, and the 44-page Confirmation Order.

3.      After all that, the Company, with the support of the DCL Plan Proponents, has earned the right to emerge from chapter 11 and enjoy its fresh start by consummating the DCL Plan, which has been overwhelmingly accepted by creditors at all levels of the capital

3

structure.  As importantly, it is now time for those creditors – almost all of whom have received

nothing on account of their claims for four years – to begin to receive distributions.  The Court

did not enter the Confirmation Order lightly or carelessly.  Yet, the Appellants now demand that

the Court disregard it and involuntarily freeze the Debtors in bankruptcy for an indefinite period

of time, just so that the Appellants may continue to rehash the same tired arguments that have

been fully, fairly, and repeatedly aired and now finally overruled.

    4.  There is no basis here for what courts aptly have called an "extraordinary

remedy."  As shown below, the Appellants utterly fail to meet their heavy burden of proving

entitlement to the extreme remedy of a stay pending appeal of a plan confirmation order under

applicable law and the facts of these cases.  Among other things, the Appellants have not made

the requisite "strong showing" of success on the merits.  Instead, they merely make the same

arguments that the Court has considered at length and rejected.  They also have not shown that

they will suffer imminent or irreparable harm or that a stay would serve the public interest.

Indeed, having submitted *no evidence whatsoever*, the Appellants fail each and every one of the

applicable standards.

    5.  Perhaps most importantly, the Appellants have not shown that a stay

would not harm the Debtors and their creditors.  Nor have the Appellants stated a willingness (or

the ability) to post the substantial supersedeas bond that would be necessary to protect the

Debtors, their creditors, employees, customers, and other stakeholders from the full extent of

harm that might result from or during any stay pending appeal.  In contrast, as explained below,

the DCL Proponents will prove that the potential harm from a stay would be at least $1.548

billion and could potentially exceed $3 billion, and that any stay in this case must be

accompanied by a bond in at least that amount.

6.    This latter point is critical.  Any stay would impose added expenses of administering the chapter 11 cases, would delay (and therefore dilute) creditor recoveries, and would subject the Debtors and their creditors to enormous additional risk.  Although the Debtors and all creditors are forced to bear such costs and risks while a bankruptcy is pending and before a plan is confirmed, the expenses, delays and risks should cease once a plan has been confirmed and is ready to be implemented.  If a stay pending an appeal is to be granted (under applicable law, it should not be), it is the Appellants who are required to bear the risk of loss and who must fully protect the Debtors, their creditors and other stakeholders from the harm that might ensue in the likely, if not inevitable, event that their appeals are unsuccessful and the Confirmation Order ultimately is affirmed.  The Appellants cannot evade this fundamental requirement though their cavalier, unsupported assertions that "no real harm will be suffered by the creditors."  Trustees' Mot. ¶ 78; see Aurelius Mot. ¶ 44 ("[t]he risk of any harm to parties in interest as a result of the stay is thus *de minimis*, at best").

7.    Fundamentally, the Confirmation Rulings have consequences.  It is time to give full force and effect to those rulings and to enable the Company to emerge from bankruptcy for the benefit of its thousands of creditors, employees, customers and other stakeholders without further delay.

## ARGUMENT

8.    In determining whether a stay pending appeal of a confirmation order is appropriate, the Supreme Court has directed courts to consider:

> (1) whether the stay applicant has made a strong showing that it is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) whether a stay is in the public interest.

5

In re W.R. Grace, Case No. 11-199, 2012 U.S. Dist. LEXIS 88887, at *12 (D. Del. June 27,

2012) (quoting Hilton v. Braunskill, 481 U.S. 770, 776 (1987)); see also Haskell v. Goldman,

Sachs & Co. (In re Genesis Health Ventures, Inc.), 367 B.R. 516, 519 (Bankr. D. Del. 2007).

9.        This is not, however, a rote inquiry or a matter of tallying up the "factors".

Fundamentally, "[a] motion for a stay of a Court's decision is an 'extraordinary remedy'" that

must be justified by clear and satisfactory evidence.[5] W.R. Grace, 2012 U.S. Dist. LEXIS

88887, at *11 (quoting United States v. Cianfrani, 573 F.2d 835, 846 (3d Cir. 1978)). "When

seeking such relief, the moving party bears the burden of showing that the circumstances justify

the imposition of a stay." Id.; see, e.g., In re New Century TRS Holdings, Inc., Case No. 08-cv–

546, 2009 WL 1833875, at *2 (D. Del. June 26, 2009) (movant must prove entitlement to a stay

with "clear and satisfactory evidence"); In re Adelphia Commc'ns Corp., 333 B.R. 649, 659

(S.D.N.Y. 2005) ("A party seeking a stay pending appeal carries a heavy burden.").

10.       Here, the Appellants submitted no evidence, meaning that the Motions fail

as a matter of law without need to consider the factors cited above.  Even if the Court decides to

undertake that consideration, however, it is clear that no stay is appropriate because the

---

[5] Indeed, the general practice in this District is to deny requests to stay confirmation orders or otherwise stay implementation of a plan of reorganization. See, e.g., W.R. Grace, 2012 U.S. Dist. LEXIS 88887, at * 24 (denying the stay because of appellant's "failure to produce sufficient evidence on all four factors, coupled with its lack of acknowledgment of the potential for entry of a supersedeas bond in a case of this magnitude"); In re Spansion, Inc., Case No. 10-369 (D. Del. May 19, 2010) (denying motion to stay the confirmation order following the bankruptcy court's denial of a motion for post-confirmation stay relief); Official Comm. of Unsecured Creditors v. Motor Coach Indus. Int'l, Inc. (In re Motor Coach Indus. Int'l, Inc.), 2009 WL 330993, at *3 (D. Del. Feb. 10, 2009) (affirming bankruptcy court's denial of motion to stay the confirmation order); Morgan v. Polaroid Corp. (In re Polaroid Corp.), 2004 WL 253477, at *1 (D. Del. Feb. 9, 2004) (affirming bankruptcy court's denial of motion to stay implementation of a plan of reorganization for failure to establish a likelihood of success on the merits); Hertz Corp. v. ANC Rental Corp. (In re ANC Rental Corp.), Case No. 02-288, 2002 WL 1058196, at *2 (D. Del. May 22, 2002) (denying stay for failure to show irreparable harm); In re Dura Auto. Sys., Inc., Case No. 06-11202, Docket No. 3440 (Bankr. D. Del. June 10, 2008) (order entered denying motion to stay the confirmation order); see also In re Continental Airlines, 91 F.3d 553, 562 (3d Cir. 1996) (acknowledging that the district court denied stay of the confirmation order in part because of "the unwillingness of the Trustees to post a bond satisfactory to the court"); In re G-1 Holdings, Inc., 2009 U.S. Dist. LEXIS 108339, at *179 (D.N.J. Nov. 12, 2009) (denying request to stay effective date of plan of reorganization).  The Appellants have failed to show any basis to depart from this practice.

46429/0001-8755250v1

Appellants have failed to establish that *any* of the factors – much less all of them – are present here to justify the extraordinary relief that they seek.[6]

### A.    The Appellants Have Failed To Prove Any Of The Four Requirements For A Stay

### (1)    The Appellants Have Failed to Demonstrate That They Are Likely To Succeed On The Merits

11.    First and foremost, the Appellants have not made the requisite "strong showing" that they are likely to succeed on the merits of their appeals.  Under any circumstances, this is a high hurdle to surmount because the Appellants bear the burden of demonstrating a "substantial possibility" of success on the merits of litigation they already have lost.[7]  Here, the hurdle is insurmountable because the Appellants challenge findings of fact – many of which are based upon facts in the Examiner's Report to which the Appellants stipulated – and determinations of mixed questions of fact and law as to which the standard of review is limited and narrow.[8]  Moreover, the Appellants make not a single new argument or cite a single new

---

[6]  Aurelius urges the Court to utilize a "more flexible" balancing of all factors by applying a "sliding scale" approach that would alleviate the requirement that the Appellants prove all four factors.  See Aurelius Mot. ¶ 22 (citing In re Countrywide Home Loans, Inc., 387 B.R. 467 (Bankr. W.D. Pa. 2008); Honeywell Int'l, Inc. v. Univ. Avionics Sys. Corp., 397 F. Supp. 2d 537 (D. Del. 2005)).  The cases cited by Aurelius, however, discuss a "sliding scale" in the context of evaluating the success on the merits prong, not as a way to eliminate the remaining factors. See, e.g., Countrywide, 387 B.R. at 472 (concluding that the various approaches to examining the likelihood of success on the merits were essentially "different ways of looking at the same thing"); Williams v. George Junior Republic (In re Cujas), 376 B.R. 480, 486 (Bankr. E.D. Pa. 2007) (adopting a "sliding scale" approach as to factor involving likelihood of success on the merits).  Notably, *in every case cited by Aurelius the stay requested by the appellant was denied*.  See Countrywide, 387 B.R. at 480 ("After much thought and careful consideration, for these reasons the Court is compelled to find that the overall balancing test favors the position of the [non-movant] and therefore concludes that the [stay motion] must be denied."); Cujas, 376 B.R. at 491 ("I conclude that it would not be equitable to grant [movant] the stay pending appeal that it has requested"); Honeywell, 397 F. Supp. 2d at 550 ("[The movant] has failed to make an adequate showing that it will succeed on the merits and cannot demonstrate that the [relevant stay factors] weigh in its favor.  As a result, [the movant's] motion for stay of the entry of a permanent injunction is denied.").

[7]  See In re Forty-Eight Insulations, Inc., 115 F.3d 1294, 1301 (7th Cir. 1997) ("in the context of a stay pending appeal, where the applicant's arguments have already been evaluated on the success scale, the applicant must make a stronger threshold showing of likelihood of success to meet his burden"); In re General Motors Corp., 409 B.R. 24, 32 (Bankr. S.D.N.Y. 2009) ("theoretical possibility does not . . . equate to a *substantial* possibility" of success on the merits) (emphasis in original).

[8]  See, e.g., In re SGL Carbon Corp., 200 F.3d 154, 159 (3d Cir. 1999) (appellant must show "clearly erroneous finding of fact" to establish an abuse of discretion).

case. The Court thoroughly evaluated, addressed at length and rejected the merits of each of the findings and determinations now challenged by Appellants on appeal.

12.     It is insufficient for the Appellants simply to rehash arguments previously considered and rejected by the Court. See W.R. Grace, 2012 U.S. Dist. LEXIS 88887, at *12 (denying stay pending appeal where appellant "rehashes the allegations it previously argued at length"); Trans World Airlines, Inc., Case No. 01–0056, 2001 WL 1820019, at *1 (Bankr. D. Del. Mar. 16, 2001) (denying stay pending appeal where movants presented the same arguments previously addressed by extensive testimony and oral argument); In re Olick, Case No. Civ. A. 96–784, 1996 WL 287344, at *1 (E.D. Pa. May 29, 1996) (denying stay where movant "has not presented any arguments or authority not considered previously by this court").

13.     This Court's recent decision in W.R. Grace is instructive. There, having issued a lengthy confirmation opinion after contentious litigation, the Court denied a motion for stay pending appeal where the movant simply raised all the same arguments it had raised in contesting confirmation itself: "Having now been given the benefit of two oral arguments before this Court and the opportunity to submit over 100 pages of briefing, any finding other than that [the movant]'s arguments have been awarded ample consideration by this Court is incomprehensible. As such, the Court declines to once again discuss in extensive detail here its reasoning for why [the movant] is unlikely to succeed on the merits of its claims. To view its full consideration of these issues Appellant is instructed to consult the Court's 228-page Opinion." W.R. Grace, 2012 U.S. Dist. LEXIS 88887, at *13. The same can, and should, be said here.

### a.    Aurelius Has Failed To Demonstrate Any Probability Of Success On The Merits Of Its Appeal Of The DCL Plan Settlement

14.    For its part, Aurelius challenges – yet again – the Court's approval of the DCL Plan Settlement.  In particular, Aurelius's argument is *precisely* the same as the one it pressed during confirmation – *i.e.*, that the DCL Plan Settlement must be found to be unreasonable because Aurelius believes that the value of the settled claims exceeds the settlement consideration.  But the applicable standard for the Court to apply in evaluating the fairness of a settlement is not, as Aurelius asserts, whether "claims were likely to yield recoveries that were greater than the amounts being offered in the settlement."  Aurelius Mot. ¶ 26.  To the contrary, the standard to be applied (which the Court correctly applied, and which is not mentioned by Aurelius in its Motion) is "whether the settlement fall[s] below the lowest point in the range of reasonableness."  2011 Confirmation Decision at 41 (citing In re Exide Techs., 303 B.R. 48, 68 (Bankr. D. Del. 2003) and In re Cellular Info Sys. Inc., 171 B.R. 926, 950 (Bankr. S.D.N.Y. 1994) (alteration in original)).

15.    Aurelius's primary allegation of error in this regard is its remarkable assertion that, "in approving the DCL Settlement, the Court failed to assess the aggregate value of the LBO-Related Causes of Action based on the Court's determination of their likelihood of success, or to compare such value against the amount being offered in exchange for the settlement of those claims."  Aurelius Mot. ¶ 27.  Aurelius simply ignores (or has chosen to forget) the Court's exhaustive discourse in the 2011 Confirmation Decision, in which it did just that.  Indeed, the 2011 Confirmation Decision contains 41 pages of analysis of the reasonableness of the DCL Plan Settlement, including 27 pages of analysis of the "probability of success in litigation" of the settled causes of action (at pages 41-69) and a detailed comparison of the potential value of those causes of action "against the amount being offered in exchange for

9

the settlement of those claims" (to use Aurelius's words).  The 2011 Confirmation Decision in

fact includes a chart that details the Examiner's assessments of potential Noteholder recoveries

in various litigation scenarios in comparison to the value of the DCL Plan Settlement (and which

shows that the DCL Plan Settlement provides greater consideration in every realistic litigation

scenario other than the "home run" of full avoidance) – 2011 Confirmation Decision at 45 – the

very exercise that Aurelius now says is missing from the Court's analysis.

16.    The Court needs no reminder of the thoroughness of its consideration and

analysis of the DCL Plan Settlement.  The Court also needs no reminder of the conclusion it

reached as a result of that analysis:  "upon consideration of the Examiner's extensive exercise

and suggested Recovery Scenarios, alternative theories of recovery, the risks of litigation, and

the record made, I conclude that the DCL Plan Settlement falls above the lowest point in the

range of reasonable litigation possibilities."  2011 Confirmation Decision at 69.  Nothing more

was required.[9]

17.    Critically for purposes of the Motions, the Court's conclusion involved

numerous complex factual assessments and credibility determinations based on the Examiner's

Report (to which the Appellants stipulated) and the voluminous evidence presented during the

course of the thirteen-day confirmation hearing.  On appeal, those factual determinations may

not be disturbed unless Aurelius establishes that they are clearly erroneous or that this Court

abused its discretion in rendering them.  See SGL Carbon Corp., 200 F.3d at 159 ("[A]n abuse of

discretion exists where the district court's decision rests upon a clearly erroneous finding of fact,

an errant conclusion of law, or an improper application of law to fact.").  Aurelius certainly has

not made a strong showing that it is likely to convince an appellate court that the Court abused its

---

[9]  As the Court correctly noted, its role was not "to decide the numerous questions of law and fact raised by the [objections] but rather to canvass the issues."  2011 Confirmation Decision at 41 (citing Exide Techs., 303 B.R. at 68 and Cellular Info. Sys., 171 B.R. at 950).

discretion and committed clear error in this regard, particularly considering that many of the

Court's factual findings were premised on facts found by the Examiner pursuant to stipulations

made by Aurelius.

18.     In any event, it is impossible to read the 2011 Confirmation Decision and

reach any conclusion other than that the analysis performed by the Court was diligent and

exhaustive.  Aurelius, in fact, makes only one actual substantive critique of the Court's analysis –

that "the Court failed to properly assess the value that would inure to the Debtors' non-LBO

creditors if only Step Two was avoided, based on its erroneous conclusion that 'upstreaming' the

benefit of such avoidance from the Guarantor Subsidiaries to Tribune would be an 'uphill

battle.'"  Aurelius Mot. ¶ 29.

19.     In this regard, Aurelius cites no new cases or authority – it merely cuts and

pastes case citations from its prior briefs, adding no new analysis.  Ultimately, Aurelius simply

ignores the Court's extensive assessment of the merits (or lack thereof) of Aurelius's so-called

waiver, estoppel and assumption of risk (or "WEAR") theory, which the Court concluded was

inconsistent with binding Third Circuit precedent, In re Owens Corning, 419 F.3d 195, 210-11

(3d Cir. 2005), and unlikely to apply.  2011 Confirmation Decision at 62-65.

20.     Indeed, Aurelius does not dispute the fundamental fact that "upstreaming"

is premised on transferring value from the Guarantor Subsidiaries to Tribune notwithstanding the

fact that creditors of the Guarantor Subsidiaries would remain unpaid.  In other words, as the

Court found, "upstreaming" "turns on uncertain theories of equitable subordination or equitable

estoppel," and on substantive consolidation of the Guarantor Subsidiaries into Tribune, none of

which was supported by the record developed at the confirmation hearing.  2011 Confirmation

11

Decision at 64-65.  It is hard to see how an assertion unsupported either by legal authority[10] or

the record developed during a three-week trial possibly could constitute a basis for a finding that

an appellant made a strong showing that it is likely to succeed on the merits of its appeal.

21.    In short, the Court's conclusion that the DCL Plan Settlement was within

the range of reasonableness is amply supported by the evidence presented and applicable law.

Aurelius has failed to show that it has any possibility of success on appeal, and has certainly not

made the requisite showing of a substantial likelihood of success.

> **b.    The Trustees Have Failed To Demonstrate Any Probability Of Success On The Merits With Respect To The Unfair Discrimination Issue**

22.    The Trustees attack a different aspect of the Court's Confirmation

Rulings, contending yet again that the DCL Plan unfairly discriminates against Senior

Noteholders.[11]  Like Aurelius, the Trustees offer no new cases and make no new arguments.

---

[10]  The cases cited by Aurelius merely applied the doctrine of equitable estoppel, see In re PWS Holding Corp., 228 F.3d 224, 239 (3d Cir. 2000) (noting the *possibility* that lenders could be estopped from recovering on claims relating to a recapitalization in which they participated); Morin v. OYO Instruments (In re Labelon Corp.)., Case No. 02-22582, Adv. No. 04-2122, 2006 WL 2516386, at *4 (Bankr. W.D.N.Y. Aug. 28, 2006) (refusing to allow a chapter 7 trustee to amend complaint in order to prosecute fraudulent conveyance claims on behalf of an entity that knowingly approved and benefited from the transaction to be challenged); Harris v. Huff, 160 B.R. 256, 261 (Bankr. M.D. Ga. 1993) (creditor's preexisting contract not to contest a conveyance bound Chapter 7 Trustee from bringing fraudulent conveyance claim), or otherwise discuss the general notion that equity may benefit from avoidance actions if the estate recovers in excess of the amount of all creditors' claims, see Kraft, LLC v. Geiner (In re Kraft), 429 B.R. 637, 667-68 (Bankr. N.D. Ind. 2010); In re Bayou Group, LLC, 372 B.R. 661, 644 (Bankr. S.D.N.Y. 2007); Calpine Corp. v. Rosetta Res., Inc. (In re Calpine Corp.), 377 B.R. 808, 812 n.3 (Bankr. S.D.N.Y. 2007); In re Goss, 43 F.2d 746, 747-48 (N.D. Ga. 1930).  This authority, however, does not address the essence of the "upstreaming" claim, which would call for *de facto* substantive consolidation and disregard of corporate separateness in violation of the standards set forth by the Third Circuit in Owens Corning.  419 F.3d at 210-11; see 2011 Confirmation Decision at 65 ("Neither prepetition disregard of corporate entity borders nor postpetition scrambling of assets and liabilities has been shown on this record, which does not support a conclusion that the [Senior] Noteholders[ ] are likely to prevail on a WEAR theory and render the proposed DCL Plan Settlements unreasonable.").  And while Aurelius now contends that liberated value from the Step One lenders' claims, if equitably disallowed, can "upstream" to Tribune by way of the Intercompany Claims Settlement, see Aurelius Mot. At ¶ 31, this argument is based on a mischaracterization of the Intercompany Claims Settlement that ignores countervailing obligations flowing from Tribune to the Guarantor and Non-Guarantor Subsidiaries and obligations among the Guarantor and Non-Guarantor Subsidiaries.  See DCL Plan, Exhibit 1.1.122.

[11]  In its joinder, WTC joins the Trustees' Motion and adopts their arguments with respect to unfair discrimination and the Swap Claim issue.  WTC does not offer any new arguments on the merits of its appeals under the four-factor test for a stay pending appeal or otherwise.  Accordingly, for the same reasons set forth below, WTC, like the

They merely advance the same unfounded assertions previously considered and rejected by the Court. This, as shown above, is insufficient to warrant a stay.

23.    Here again, there can be no argument that the Court failed to conduct a thorough analysis of the issue or somehow failed to give the Trustees their "day in court". To the contrary, after hundreds of pages of briefing and lengthy oral argument, the Court issued the Allocation Decision, which contains ten full pages of analysis of the "unfair discrimination" issue. Allocation Decision at 20-30. In that opinion, the Court did not hold that subordination agreements can be ignored in cramdown plans, as the Trustees now hyperbolically allege.[12] Rather, the Court correctly rejected the Trustees' position that a cramdown plan must allocate every dollar of distributable value in a precise mathematical manner under a subordination agreement, without exception.[13]

24.    By doing so, the Court simply determined that a subordination agreement is not entitled to special, bulletproof treatment under section 1129(b). In other words, the existence of a subordination agreement does not transform section 1129(b)'s prohibition of *unfair* discrimination into a prohibition of *all* discrimination, no matter how immaterial. The import of the Court's ruling is unremarkable – subordination beneficiaries who are the subject of cramdown are entitled to the same protections under section 1129(b) (but nothing more) as other creditors who are subject to cramdown.

25.    As shown in prior briefing, the Court's ruling is fully consistent with the language of the statute and applicable case law. Section 1129(b) expressly provides that

---

Trustees, has failed to prove that it has a substantial probability of success on the merits and to otherwise satisfy the remaining factors for a stay pending appeal.

[12] Trustees' Mot. at ¶ 34 ("the Court's holding that subordination agreements do not have to be enforced in cramdown plans is likely to be reversed").

[13] Allocation Decision at 24 ("The Senior Noteholders argue that . . . a plan cannot be confirmed under § 1129(b) unless the subordination agreements are fully implemented.").

"*[n]otwithstanding section 510(a) of this title*, if all of the applicable requirements of subsection

(a) of this section other than paragraph (8) are met with respect to a plan, the court . . . shall

confirm the plan." 11 U.S.C. § 1129(b) (emphasis added).  The Court applied Third Circuit

precedent interpreting the term "notwithstanding" and concluded that the import of

"notwithstanding section 510(a)" is that section 1129(b) should be applied "without prevention

or obstruction of any applicable subordination agreements."  Allocation Decision at 25 (citing In

re Goody's Family Clothing, Inc., 610 F.3d 812, 817 (3d Cir. 2010).  In so holding, the Court

followed well-reasoned authority that applied the Third Circuit's definition of "notwithstanding"

to section 1129(b) and reached the exact same conclusion.  See, e.g., In re TCI 2 Holdings, LLC,

428 B.R. 117, 141 (Bankr. D.N.J. 2010); In re Croatan Surf Club, LLC, Case No. 11-00194-8-

SWH, 2011 WL 5909199, at *2 (Bankr. E.D.N.C. Oct. 25, 2011) ("[A] court can confirm a plan

which . . . is inconsistent with the terms of a subordination agreement, so long as it is fair and

equitable and does not discriminate unfairly.").

        26.      Indeed, there can be no question that the Court's holding is fully

consistent with the widely-adopted rebuttable presumption test first proposed by Judge Markell.

See Allocation Decision at 25-26.  Under that test, no presumption of unfair discrimination arises

unless a plan's treatment of two classes results in "a *materially* lower percentage recovery for the

dissenting class."  Id.  Minor or immaterial differences in plan treatment – evaluated from the

perspective of the dissenting class – do not rise to the level of *unfair* discrimination.  See In re

Armstrong World Indus., Inc., 348 B.R. 111, 121 (D. Del. 2006); In re Unbreakable Nation Co.,

437 B.R. 189, 203 (Bankr. E.D. Pa. 2010); In re Greate Bay Hotel & Casino, Inc., 251 B.R. 213,

231 (Bankr. D.N.J. 2000).

27.     The Court hewed closely to this reasoning and properly found that the DCL Plan does not unfairly discriminate against Senior Noteholders because the impact of the "forced sharing" of the disputed plan allocations would result in just a 6.5% decrease in the amount of Senior Noteholder recovery *even if the Swap Claim is assumed not to benefit from the subordination provisions* and that any "discriminatory effect" is "immaterial." Allocation Decision at 30. If, as the Court correctly held, the Swap Claim benefits from the subordination provisions,[14] then the impact of the alleged discrimination is further reduced by over 60%, to only approximately $11.5 million – unquestionably an immaterial amount in the context of the Senior Noteholders' $1.2 *billion* claim amount and the proposed initial distribution to them of $431 million.[15]

28.     The Trustees further contend that the Court "disregarded" the legislative history of Section 1129(b) in reaching its decision. Trustees' Mot. at ¶¶4, 41. That statement is simply false. The Court did not ignore the legislative history in the Allocation Decision but rather confronted it directly and analyzed it extensively. First, the Court quoted the entire passage from the relevant House Report and correctly applied Supreme Court precedent to conclude that it was "not determinative for analyzing this issue, especially in light of the numerous developments in case law" since the Bankruptcy Code's enactment. Allocation Decision at 23. Second, the Court decided that the Trustees' interpretation of the legislative

---

[14] The Trustees make no new argument whatsoever in respect of the Court's determination that the Swap Claim is entitled to the benefit of the subordination provisions under the PHONES Indenture and the EGI Subordination Agreement. Rather, the Trustees do nothing more than characterize the Court's decision as a "baseless finding" that "quickly leads to absurd and open-ended results" and that is "flims[y] – Trustees' Mot. ¶¶ 54, 56, 58 – a far cry from the showing necessary for a stay pending appeal. The Court properly concluded that the seniority of the Swap Claim was "easily determined," and then reaffirmed that conclusion in connection with the Confirmation Decision. The Trustees have shown no prospect of success in their appeal of this issue.

[15] As a result of some holders of Class 1E Senior Noteholder Claims electing the "strip" via the Alternative Treatment Election under DCL Plan section 3.2.5(c)(i) available to holders of Class 1E Senior Noteholder Claims, the total consideration will be approximately $436 million, as opposed to total consideration for the all-cash option of $431 million.

history – which is exactly the same now as it was then – was "not supported by relevant decisional law." Allocation Decision at 24. Finally, the Court found that the DCL Plan "passes muster" even if the Court used the "otiose" example in the legislative history as its guide. Allocation Decision at 29 n. 23.

29.     There is no basis whatsoever – much less the required strong showing – to conclude that the Trustees have a likelihood of success on the merits of their appeal of this issue.

**(2)     The Appellants Have Failed To Show That They Will Suffer Imminent Or Irreparable Harm Absent A Stay**

30.     The Appellants also have failed to show that they will suffer irreparable harm in the absence of a stay pending appeal. See W.R. Grace, 2012 U.S. Dist. LEXIS 88887, at *13-14 ("To establish irreparable harm, plaintiffs must demonstrate an injury that is neither remote nor speculative, but actual and imminent" (citations omitted)). Indeed, the Appellants do not even attempt to satisfy this factor. Rather, the Appellants argue only that, because the confirmed DCL Plan may be implemented before the appeal process has run its course, their appeals some day may be held to be equitably moot by an appellate court.[16] Well-established law in this and other jurisdictions teaches that equitable mootness alone is insufficient to prove irreparable harm.

31.     Courts in this jurisdiction routinely reject the argument that equitable mootness, standing alone, is sufficient to establish that Appellants will suffer irreparable harm in the absence of a stay. See, e.g., W.R. Grace, 2012 U.S. Dist. LEXIS 88887, at *14-15 ("The Third Circuit and courts within its appellate jurisdiction have previously recognized, however, that the risk of equitable mootness by itself is insufficient to demonstrate irreparable injury for

---

[16] See, e.g., Trustees' Mot. ¶ 61 ("Appellants and the Senior Noteholders may suffer irreparable harm if the assets under the Plan are distributed and the Debtors are unable to reclaim such assets"); Aurelius Mot. ¶ 36 ("it is possible that the Debtors could be precluded from recovering estate assets").

purposes of a stay"); <u>Black Horse Capital LP, v. JP Morgan Chase Bank N.A., (In re Wash.</u>

<u>Mut.</u>), Case No. 11-124-GMS, 2012 U.S. Dist. LEXIS 51184, at *5 (D. Del. Jan. 19, 2012) ("as

appellants concede, equitable mootness does not constitute irreparable harm"); <u>Royal Ware, Inc.</u>

<u>v. Global Home Prods., LLC (In re Global Home Prods., LLC)</u>, Case No. 06-508-UNA, 2006

WL 2381918, at *1 (D. Del. Aug. 17, 2006) (same).[17] Indeed, to hold otherwise, would mean

that every appeal of a confirmation order would warrant a supersedeas stay. See <u>W.R. Grace</u>,

2012 U.S. Dist. LEXIS 88887, at *15.[18]

32.    Even where courts outside of this District have considered equitable

mootness as a factor in determining whether a stay should be imposed, they have concluded that

the theoretical risk of mootness typically is far outweighed by the effects of a stay on the

reorganizing debtors, their creditors and other stakeholders. See, e.g., <u>General Motors</u>, 409 B.R.

at 31-34 (assuming, without deciding, that "the threat of equitable mootness is enough to satisfy

the requirement of showing *some* irreparable injury – enough to get on the scoreboard with

respect to this issue," but denying a stay because of the "extraordinary prejudice" that would be

caused to "all of the other parties in this case in both direct monetary terms and terms

---

[17] Courts in other jurisdictions also routinely apply the general principle that the risk of equitable mootness is not enough to carry a movant's burden to prove irreparable harm. See, e.g., In re 203 N. LaSalle St. P'ship, 190 B.R. 595, 597-598 (N.D. Ill. 1995) ("[w]e agree that [mootness] is a legitimate concern, but it still does not reach the level of irreparable harm. It is well settled that an appeal being rendered moot does not itself constitute irreparable harm"); In re Shenandoah Realty Partners, L.P., 248 B.R. 505, 510 (W.D. Va. 2000) ("It is well settled that an appeal being rendered moot does not itself constitute irreparable harm.") (citations omitted); In re Pub. Serv. Co. of N.H., 116 B.R. 347, 349-350 (Bankr. D.N.H. 1990) (stating that even if the effective date were to occur, *all courts confronted with [the mootness argument] hold it is not enough to show sufficient injury to appellant to warrant the stay*") (emphasis in original).

[18] Because equitable mootness standing alone does not establish irreparable harm, *a fortiori,* the *threat* of equitable mootness as alleged by the Appellants here does not constitute irreparable harm. See Trans World Airlines, 2001 WL 1820325, at *10 (it is "well settled" that a risk of equitable mootness "does not itself constitute irreparable harm" (citations omitted)); Motor Coach, 2009 WL 330993, at *1 (same). The Appellants have the burden of showing actual and imminent (not just speculative) harm before a stay may be granted. See, e.g., ANC Rental, 2002 WL 1058196, at *2 (in the absence of a prima facie showing by the movants of a "tangible financial or other loss," any loss is speculative and does not establish irreparable harm); In re Innovative Commc'ns Co., LLC, Civil No. 2007-106, et al. at *4 (D.V.I. Oct. 27, 2008) (denying stay in part because movants' alleged harm was "simply too speculative to be considered irreparable harm"). The Appellants have failed to show that their alleged harm is either irreparable or imminent.

of *irreparable* injury") (emphasis in original); <u>Cujas</u>, 376 B.R. at 487, 491 (finding that, in certain instances, potential mootness "may" constitute irreparable harm, but noting that such harm must be balanced against the potential harm that other parties may suffer if the stay is granted, and ultimately denying the stay request).  As shown below, the harm that might befall the Debtors and their creditors from a stay in this case vastly outweighs the speculative prejudice to the Appellants from potentially not being able to relitigate the case they already have tried and lost before the Court.  Similarly, courts that do consider equitable mootness as a form of harm regularly hold it to be an insufficient basis for a stay where, as here, there is a low probability of success on appeal.  <u>See</u>, <u>e.g.</u>, <u>In re Roth American, Inc.</u>, 90 B.R. 94, 96 (Bankr. M.D. Pa. 1988) (acknowledging that denial of stay motion may render appeal moot, but stating "once again, we cannot stress enough that the [appellant] has not presented any argument which this Court has not already considered").[19]

33.    In sum, the Appellants have not established that they will suffer imminent irreparable harm.  Simply put, the fear that the "egg could not be unscrambled" in the event that their appeals succeed "does not reach the level of irreparable harm."  <u>See</u>, <u>e.g.</u>, <u>203 N. LaSalle St. P'ship</u>, 190 B.R. at 597-98.  This serves as yet another reason why a stay pending appeal is not appropriate here.

---

[19] The various cases cited by the Appellants do not help their cause.  For example, in <u>Iowa Utils. Bd. v. FCC</u>, 109 F.3d 418, 426 (8th Cir. 1996), the court found that in the absence of a stay the movant would face *certain and imminent harm* from the imposition of government regulations that would impact current and future business practices.  In <u>Fox Sports Net West 2, LLC v. Los Angeles Dodgers LLC (In re Los Angeles Dodgers, LLC)</u>, 465 B.R. 18, 36 (D. Del. 2011), the appellant was found to risk a severe disadvantage in its ability to obtain a unique and irreplaceable asset.  <u>See also</u> <u>Official Comm. of Equity Sec. Holders v. Finova Group Inc. (In re Finova Group Inc.)</u>, Case No. 07-480-JFF, 2007 U.S. Dist. LEXIS 80577, at *4 (D. Del. Oct. 31, 2007) (extension of stay caused no substantial injury to debtors because court would be able to resolve the appeal within the time frame contemplated by the debtors for their liquidation); <u>In re Netia Holdings, S.A.</u>, 278 B.R. 344, 357-58 (Bankr. S.D.N.Y. 2002) (preliminary injunction issued to protect foreign debtors' estate from irreparable injury resulting from premature dismemberment of its assets).

(3)    **The Appellants Have Failed to Show The Absence Of Harm To The Debtors, Their Creditors, Employees And Other Stakeholders In The Event A Stay Is Imposed**

34.    The Appellants also have failed to prove that a stay will not substantially harm the Debtors, their creditors and other stakeholders.  This is yet another fatal blow to the relief they seek.  See, e.g., W.R. Grace, 2012 U.S. Dist. LEXIS 88887, at *20 ("The third factor requires [the movant] to present satisfactory evidence that imposition of the stay will not substantially injure other parties in the litigation."); ANC Rental, 2002 WL 1058196, at *3 (denying stay where movants "failed to demonstrate . . . lack of substantial harm to other interested parties").

35.    Here, as summarized below, the evidence establishes that the imposition of any stay not only will substantially prejudice the Debtors but also will harm their estates and the thousands of non-moving creditors, employees, customers and other stakeholders.  To start, however, it is important to note that the Appellants' fact-free allegations that no harm will ensue from a stay simply make no sense.

36.    In a nutshell, the Appellants contend that a stay pending appeal would not harm the Debtors or their creditors because the value of the Debtors allegedly has increased since last year and because the Company's creditors can monetize their claims by trading out of their positions.  Trustees' Mot. ¶¶ 67, 78; Aurelius Mot. ¶¶ 39, 44.  This is incorrect for many reasons.

37.    First, it is telling that Aurelius does not even believe its own rhetoric.  The Court will recall that, after vigorously arguing that a prior version of the DCL Plan was unconfirmable because it undervalued the Company and failed to provide Senior Noteholders with the option to receive a distribution in the form of a "strip" that would include equity in the

reorganized enterprise, Aurelius ultimately elected to take the "all cash" distribution option.[20] This clearly means that Aurelius – which describes itself as "extremely sophisticated" – believes the "strip" is worth *less* than the all cash distribution option, and that the value of the Company therefore is *less* than the value for the Company upon which the DCL Plan distributions are premised and *less* than the value of the Company as found by the Court in the Confirmation Rulings.  Aurelius's own actions do not support its claim that the Company's value will only increase during the pendency of an appeal.

38.    Second, a creditor's alleged ability to trade its claim in the debt markets is different than the market in which the shares of Reorganized Tribune will trade – and is no balm to the harm from a stay.  The right to protection against harm from a stay inures to anyone who holds claims against the Debtors, including those who hold today *and their successors*.  Perhaps more importantly, unsecured creditors of Tribune Company (the parent entity) who retained their claims through the DCL Plan process bargained for and voted for the right to convert those claims into equity in Reorganized Tribune.  They are entitled to promptly obtain the property they bargained to receive.

39.    Third, it is simply untrue that the increase in the Company's estimated Total Distributable Value during these chapter 11 cases somehow indicates that the Company has not been in the past, and will not be in the future, harmed by remaining in bankruptcy. Management has worked extraordinarily hard to overcome the obstacles associated with being in

---

[20] Out of a total Senior Noteholder class claim amount of $1,283,055,743.77, only 7% or $96.5 million in amount elected the "strip" via the Alternative Treatment Election under DCL Plan section 3.2.5(c)(i) available to holders of Class 1E Senior Noteholder Claims.  See Supplemental Declaration of Stephenie Kjontvedt on behalf of Epiq Bankruptcy Solutions, LLC Regarding Voting and Tabulation of Ballots Accepting and Rejecting the Fourth Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A., June 1, 2012 [Docket No. 11737] (the "Supplemental Kjontvedt Declaration").

bankruptcy, efforts which they might have been able to re-direct to achieve even better results had the Company been able to emerge sooner. (Hartenstein Decl. at ¶¶ 4-5).

40.    Further, the increase in the midpoint of the Company's Total Distributable Value largely reflects a $329 million increase in the Distributable Cash, which is, in turn, primarily explained by the fact that, in accordance with bankruptcy law, the Debtors have not been making payments on their prepetition unsecured debt during the bankruptcy cases. (Hartenstein Decl. at ¶¶ 4-5). The resulting accretion of cash during the pendency of chapter 11 is unsurprising and neither demonstrates lack of harm to the Debtors and their creditors during, nor justifies the imposition of, an involuntary extension of bankruptcy for months or years to come. Moreover, creditors are entitled to receive the Company's actual value *today*, whatever that value may be. Nothing in the DCL Plan (or in the failed Noteholder plan) included a ceiling on the value of the enterprise or on creditor recoveries. The values cited by the DCL Plan Proponents – and the values found by the Court – are merely estimates of what the Company's actual value might be, and they were described in the form of ranges. Creditors are entitled to that value now, without bearing the risk that the value declines during the time when the Appellants attempt to reverse the Confirmation Rulings.

### *Harm to the Company*

41.    In any event, notwithstanding any recent increases in the Company's estimated Total Distributable Value, the record is clear that, if the Company is forced to continue to remain in bankruptcy for even a modest additional period of time, the likely harm to the Debtors, their creditors, and non-moving parties is real, imminent, and substantial. (Id. at ¶¶ 3-

21

17).[21]  As succinctly put by Eddy Hartenstein, the Company's President and Chief Executive

Officer, constraints created by the bankruptcy continue to hinder the Company from performing

as well as it can and realizing its optimum value.  (Id. at ¶ 4).  And, as Mr. Hartenstein has

testified, the longer the Company remains in bankruptcy the greater the risk to the Debtors, their

creditors and other stakeholders:  "I feel that we have seen much of the competition move by us,

and we need to do everything we can to catch up and try to overtake them, to make for a brighter

future."  (Tr. 3/14/11, 113:23-114:5).

42.     In fact, sentencing the Company to remain in bankruptcy for additional

months or years would harm the Company in numerous material and distinct ways.  For

example, any significant delay in emergence likely will result in further brand erosion and impair

the Company's ability to take advantage of potential strategic opportunities.  (Id. at ¶ 6).  Indeed,

during the chapter 11 cases, all of the Company's business operations have experienced

competitive disadvantages that include an inability to successfully and swiftly pursue strategic

opportunities.  (Id. at ¶¶ 8-12).  For the broadcasting business, in particular, the Company's

ability to produce differentiated and better content through partnerships, which often is the best

and most cost-effective approach, is constrained while in bankruptcy.  (Id. at ¶ 11).

43.     The chapter 11 cases also may continue to negatively impact the

Company's ability to maximize the value of its minority interest holdings.  (Id. at ¶ 12).  Further,

a stay introduces a significant risk that the Company may lose key senior managers and other top

performers, and will make it difficult for the Company to attract and retain top talent, who are

cognizant of the challenges and incremental burdens associated with operating a major enterprise

while in bankruptcy.  (Id. at ¶ 13).  In addition, in the event of an indefinite stay or other

---

[21]  See also Testimony of Eddy Hartenstein ("Hartenstein Testimony"), Tr. 3/14/11: 110: 14-111:4, 112: 11-22, 113: 19-115:12 (testifying as to the negative effect of bankruptcy on the individual business segments as well as the company as a whole).

substantial delay, there can be no assurance that each of the parties to the DCL Plan Settlement

and the other settlements under the confirmed DCL Plan will remain committed to such

settlements or the confirmed DCL Plan.  (Id. at ¶ 17).

        44.     Finally, as indicated at the July 25, 2012 telephonic hearing, the DCL Plan

Proponents are concerned about the potential impact of a stay pending appeal on the process of

obtaining the FCC approvals and waivers necessary for the Company to consummate the DCL

Plan.  Since there is a very real risk that a stay may delay or impede that process, this factor

weighs strongly in favor of denying the Motions.

### *Harm to Creditors, Employees, Customers and Other Stakeholders*

        45.     Aside from the foregoing risks, any stay that further delays the Debtors'

emergence also will substantially harm the Debtors' thousands of non-moving creditors,

employees, customers and other stakeholders.  To start, a delay in distributions to creditors is a

tangible and substantial harm in and of itself.[22]  See, e.g., ANC Rental, 2002 WL 1058196, at *3

(parties would be substantially harmed by a one year delay in implementing the plan); In re F.G.

Metals, 390 B.R. 467, 478 (Bankr. M.D. Fla. 2008) (a delay in distributions to creditors under a

plan constitutes "substantial harm" to other parties); Pub. Serv. Co. of N.H., 116 B.R. at 350

("the delay caused to creditors receiving their payments is also a significant harm warranting

denial of a stay"); see also W.R. Grace, 2012 U.S. Dist. LEXIS 88887, at *20-21 (denying stay

due to the "detrimental effects for both Grace and its thousands of creditors, who at this point are

---

[22] This type of harm is well-recognized, even by the Appellants.  Indeed, WTC concedes that a significant delay in the ability of creditors (namely, holders of the PHONES Notes) to receive their distributions *is* a source of material harm.  See WTC's Joinder to Law Debenture/DBTCA's Motion for Certification of Direct Appeal to the Third Circuit [D.I. 12159] ¶ 14.

more than entitled to take steps forward towards emergence from bankruptcy and obtaining payment of their long-awaited claims").[23]

46.    Moreover, as set forth in further detail in Section B below with support provided in the Kurtz Declaration, any stay preventing creditors from reinvesting their anticipated $1.912 billion in cash distributions under the DCL Plan for additional months or years may result in substantial lost opportunity costs for those creditors, who would be forced to accept the Debtors' near-zero investment returns in bankruptcy.  Similarly, delay would prejudice the ability of the Company's creditors (the prospective equity holders) to benefit from the significant future free cash flows that the reorganized Company is projected to generate after emergence, which may be reinvested at a more favorable rate of return than is available to the Company in bankruptcy.  Further, a stay likely would jeopardize the ability of the Debtors' creditors to sell their interests in (and reinvest the proceeds of) the $1.1 billion New Senior Secured Term Loan contemplated by the DCL Plan or any potential replacement facility therefor, which replacement facility could, in turn, be more-favorably priced.  A stay would also prevent creditors entitled to equity interests under the DCL Plan from exercising their bargained-for rights under the DCL Plan, including certain corporate governance rights and the ability to pursue strategic investments.

47.    More significantly, a stay would place the risks and vagaries of the capital markets, as well as macroeconomic and specific industry risks, on the shoulders of the Debtors and their creditors.  The risks attributable to market volatility and macroeconomic factors caused

---

[23] The Trustees mischaracterize the decision in Integrated Telecom as a rejection of the fact that a delay in distributions "was a legitimate factor against granting the stay."  Trustees' Mot. ¶ 22 (citing NMSBPCSLDHB L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.), Case No. 03-236, 2004 U.S. Dist. LEXIS 1136547, at *24 n. 16 (D. Del. May 19, 2004), rev'd on other grounds, 384 F.3d 108 (3d Cir. 2004)).  To the contrary, the Integrated Telecom court merely declined, on the record before it, to require the appellant to post a bond that would include the investors' lost opportunity cost to reinvest money held in reserve, because the non-moving parties failed to adduce any evidence on the point except for historical NASDAQ returns, and such costs were "speculative" and "not enough to tip the balance of hardship." See id.

by forcing creditors to remain in potentially illiquid, contingent positions for prolonged periods of time are enormous, particularly in light of creditors' expectations of timely distributions upon confirmation of the DCL Plan.  As set forth more fully in the Hartenstein and Kurtz Declarations, such risks would be thrust upon the Debtors and their creditors while the Company continued to be faced with the numerous harms associated with operating in bankruptcy, as opposed to a post-emergence Company with an improved ability to pursue certain business strategies. (Hartenstein Decl. at ¶¶ 6-12; see also Kurtz Decl. at ¶ 14).[24]

48.     Lastly, during the months or years that the Company may be forced to remain in bankruptcy while the Appellants pursue their various appeals, the Debtors would continue to incur substantial administrative costs and expenses, including professional fees and expenses of various estate professionals.  By way of example, the *average* monthly fees and expenses from August through October 2011, a period of time with relatively limited court activity, was approximately $4.7 million.  (Kurtz Decl. at ¶ 8).  The potential avoidance of unnecessary administrative costs and expenses weighs heavily against a stay.[25]

49.     In the 2011 Confirmation Decision, the Court pointedly observed that it was imperative for the Debtors to find a viable exit strategy with "alacrity."  2011 Confirmation Decision at 125 ("[T]he Court is of the determined view that . . . the Debtors must promptly find an exit door to this chapter 11 proceeding.").  Now that the Debtors and the DCL Plan

---

[24] These harms include "(1) brand erosion; (2) impairment of the Company's ability to take advantage of potential strategic opportunities and the Company's ability to protect itself from competitor-driven initiatives that weaken the Company's position; (3) hampering the Company in attracting and retaining the most-qualified individuals; (4) causing the Company to bear enormous administrative costs associated with the bankruptcy; and (5) should the Company's emergence be delayed significantly, potentially undermining the various complex and interrelated settlements underlying the confirmed DCL Plan." (Hartenstein Decl. at ¶ 6).

[25] See, e.g., ANC Rental, 2002 WL 1058196, at *3 (denying stay, noting that saving even $6 million is important to a bankrupt estate); see also ACC Bondholder Group v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.); 361 B.R. 337, 353 (S.D.N.Y. 2007) (accrual of professional fees was a "less substantial but far from trivial" harm to the estate).

Proponents have been able to forge "a viable exit strategy" with broad consensus, the Court must

not permit the Appellants to slam that "exit door" shut through the guise of a stay pending

appeal.

**(4)    Denial Of The Motions Is Strongly In the Public Interest**

50.    The Appellants are required to prove that the issuance of a stay will serve

the public interest.  As the Delaware District Court has explained, "[t]he public has an interest in

the fair and judicious application of the bankruptcy laws to the specific facts of each case."

Gonzalez Class Action Plaintiffs v. Freedom Commc'ns Holdings, Inc. (In re Freedom

Commc'ns Holdings, Inc.), No. 09-825, 2009 WL 4506553, at *2 (D. Del. Dec. 4, 2009).  In the

context of a stay pending appeal of a plan confirmation order, "[t]he public interest requires

bankruptcy courts to consider the good of the case as a whole, and not individual creditors'

investment concerns."  In re Adelphia Commc'ns Corp., 368 B.R. 140, 284 (Bankr. S.D.N.Y.

2007) ("[T]he public interest . . . strongly dictate[s] against any further extension of the stay. . . .

It would be grossly unconscionable . . . to thwart the will of such an overwhelming majority [of

voting creditors] to accommodate the desires of such a small minority, who are simply

dissatisfied with the Settlement under the Plan.").[26]  Courts have also recognized the importance

of affording finality to bankruptcy judgments.  See, e.g., W.R. Grace, 2012 U.S. Dist. LEXIS

88887, at *21 ("When investors and other third parties can rely on a confirmed plan of

reorganization and other bankruptcy judgments, they have the footing and confidence they need

to pursue investments and business arrangements with the reorganized debtor, all of which foster

---

[26] See also Triple Net Invs. IX, LP v. DJK Residential, LLC (In re DJK Residential, LLC), 2008 WL 650389, at *4 (S.D.N.Y. Mar. 7, 2008) (denying stay where a "continued smooth operation" of the debtor's business . . . is beneficial not only to the parties to the bankruptcy proceedings, but also to the broad consuming public"); General Motors, 409 B.R. at 33 (the public interest, including interests of creditors, employees, supplying businesses, compelled denial of stay); Turner v. Frascella Enters., Inc. (In re Frascella Enters., Inc.), 388 B.R. 619, 629 (Bankr. E.D. Pa. 2008) ("Allowing [the movants] to freeze these proceedings undermines the integrity of the bankruptcy process.").

26

the debtor's successful reorganization.") (quoting In re Genesis Health Ventures, Inc., 280 B.R. 339, 346-47 (D. Del. 2002); see also In re Calpine Corp., Case No. 05–60200, 2008 WL 207841, at *7 (Bankr. S.D.N.Y. Jan. 24, 2008) ("[T]here is a strong public need for finality of decisions, especially in a bankruptcy proceeding.") (quoting In re Twenty-Six Realty Assocs., L.P., Case No. 95-1262, 1995 WL 170124, at *16 (E.D.N.Y. Apr. 4, 1995)).

51.     Here, based on all of the facts and circumstances before the Court in these nearly four-year proceedings culminating in confirmation of the DCL Plan, permitting the Debtors to proceed toward emergence best serves the public interest.  In contrast, peremptorily "freezing" these proceedings would not benefit the public, let alone the thousands of creditors, customers, employees, and other parties that have been affected by this bankruptcy.  In short, prohibiting the Debtors from completing their reorganization serves no interest other than the litigation efforts of the Appellants.

52.     Rather than confronting the obvious public interest in favor of the Company's prompt exit from bankruptcy, the Trustees instead argue that the public interest prong is met by a dramatic, but completely unsupported, prediction that the Court's decision will have "far-reaching" market impact, and perhaps dry up commercial lending altogether.  Trustees' Mot. ¶¶ 9, 37 and 73.  Nonsense.  The Allocation Decision applies to the specific facts and circumstances of these chapter 11 cases and turned largely on the factual determinations that any discrimination under the DCL Plan was immaterial and therefore not "unfair" for purposes of section 1129(b)(1).  Allocation Decision at 29-30.  Despite the Appellants' rhetoric, that circumspect ruling has not disrupted and should not disrupt the financial markets, and the Trustees provided not a shred of evidence in support of their claims.

53.    Finally, it is worth noting that the Court found that the amount at stake in the challenged unfair discrimination ruling was only approximately $30 million. See id. at 27. This amount was further reduced by over sixty percent (60%) to approximately $11.5 million by the Court's determination that the Swap Claim (accounting for approximately 57% of the Other Parent Claims) is contractually entitled to seniority under the relevant indentures and agreements. In examining the public interest, this indisputably modest amount impacting a narrow group of sophisticated creditors is, and should be, heavily outweighed by the strong and established public policy in favor of permitting reorganizing debtors to re-enter the stream of commerce with a fresh start for the best interests of the greatest number of creditors, employees, customers, and other stakeholders.

54.    For all of these reasons, the Appellants utterly have failed to meet their burden of establishing entitlement to a stay pending appeal, and there are no grounds to prevent tens of thousands of creditors, including trade creditors and retirees, from receiving billions of dollars of distributions under the confirmed DCL Plan.

**B.    Even If The Court Is Willing To Consider A Stay, The Court Should Require A Substantial Bond To Protect The Debtors And Their Estates**

55.    Even if the Court were to conclude that the Appellants have carried their heavy burden of proving entitlement to the extraordinary remedy of a stay pending appeal (which they have not), it is imperative that the Court condition any stay upon the posting of a supersedeas bond in an amount sufficient to protect the Debtors, their creditors and other stakeholders against the potential harm they may suffer as a result of or during the stay. Adelphia, 361 B.R. at 350-351, 368 (requiring appellants to "post a substantial bond that is commensurate with the threatened loss to the non-moving parties" and that protects the

46429/0001-8755250v1

prevailing parties "against any loss that might be sustained as a result of an ineffectual appeal" (citation omitted)).[27]

### *A Bond Is Absolutely Required*

56.    The Appellants are not entitled to a free "litigation option" to pursue their appeal without any obligation to make the Debtors and their creditors whole in the event the Appellants fail on appeal.  Simply put, once an order of confirmation has been entered, the costs and risks of delay shift to an unsuccessful litigant who seeks to continue the battle.[28]

57.    Thus, a bond in the full amount of the potential harm to the non-moving parties is required to protect and compensate the Debtors, their creditors, employees, and all other stakeholders for any and all potential harm arising from or during the stay.  See, e.g., Adelphia, 361 B.R. at 368 n. 166 (in concluding that a $1.3 billion appeal bond was required as a condition to staying the appeal of a confirmation order, the District Court held that such substantial bonds are "required where the financial risks justified bonds of that size" (citations

---

[27]  It also is important to note that the Appellants are not entitled to a stay merely by offering to post an adequate bond (which they have not done).  Unlike in normal civil litigation, where a stay is available as a matter of right to an appellant willing to post a bond, there is no automatic right to a stay in the context of an order confirming a plan of reorganization.  See, e.g., In re Capital West Investors, 180 B.R. 240, 245 (N.D. Cal. 1995) ("[B]ecause an order of confirmation is not a money judgment or the like, HUD is not entitled to a stay as a matter of right in appealing the bankruptcy court's order confirming the Plan").  Rather, an appellant from a plan confirmation order must satisfy the four factors described above, which the Appellants here demonstrably have not done.

[28]  The cases cited by the Appellants stand for the unremarkable proposition that, if the non-moving parties neither oppose the stay nor otherwise argue that they would be harmed, then a stay pending appeal may issue without a supersedeas bond.  See Cont'l Oil Co. v. Frontier Ref. Co., 338 F.2d 780, 782 (10th Cir. 1964) (finding no likelihood of harm and affirming denial of bond where the party seeking an injunction was "a corporation with considerable assets and [was] able to respond in damages if [the enjoined party] does suffer damages by reason of the injunction"); In re Sphere Holding Corp., 162 B.R. 639, 644-45 (E.D.N.Y. 1994) (requiring no bond to stay creditors' collections pending appeal of dismissal of chapter 11 case because no collateral was at stake, no creditors would be harmed during the appeal, and no party opposed the motion for stay); United Merchs. & Mfrs., Inc., 138 B.R. at 426, 430 (D. Del. 1992) (denying bond because the debtor "will not suffer any loss as a result of the stay pending appeal" where the effect of the stay was to delay distributions to a single class of creditors, none of which actively opposed the stay).  That assuredly is not this case here.  Furthermore, the Nordhoff case cited by Aurelius does not even remotely support the assertion that Appellants should not be required to post a bond here.  Nordhoff Invs., Inc. v. Zenith Elecs. Corp., 258 F.3d 180, 191 (3d Cir. 2001).  The appellants in Nordhoff did not seek a stay at any time - whether with or without a bond - and after the plan had been substantially consummated the Third Circuit held that the appeal was equitably moot.  Id. at 191.

omitted)); see also General Motors, 409 B.R. at 34 (noting that if a stay were granted, the court

would require a bond of at least $7.4 billion in light of the potential losses to non-moving

parties); In re Chemtura Corp., Case No. 09-11233, 2010 Bankr. LEXIS 3988, at *2 & n.4

(Bankr. S.D.N.Y. Nov. 8, 2010) (although stay of confirmation order, given the "enormous harm

to so many parties", was "unthinkable," a supersedeas bond of "hundreds of millions" would be

required if one were requested and granted); Contrarian Funds LLC v. Aretex, LLC (In re

Westpoint Stevens, Inc.), 2007 WL 1346616, at *10 (S.D.N.Y. May 9, 2007) ($200 million

dollar bond required for stay); In re Innovative Commc'ns, 390 B.R., 184, 191 (Bankr. D.V.I.

2008) ("'The bond secures the prevailing party against any loss sustained as a result of being

forced to forgo execution on a judgment during the course of an ineffectual appeal.'") (quoting

Culwell v. Texas Equip. Co., Inc., 283 B.R. 222, 229 (Bankr. N.D. Tex. 2002)); In re Miraj &

Sons, Inc., 201 B.R. 23, 28 (Bankr. D. Mass. 1996) (bond must be sufficient to protect against

"'any loss that might be sustained as a result of an ineffectual appeal'" (citations omitted)).

        58.     Stated differently, as the District Court in the influential Adelphia opinion

held, the purpose of a supersedeas bond in this context is "to protect 'against diminution in the

value of property pending appeal'", while further stating that "if a stay pending appeal is likely

to cause harm by diminishing the value of an estate or 'endanger [the non-moving parties']

interest in the ultimate recovery,' and there is no good reason not to require the posting of a

bond, then the court should set a bond at or near the full amount of the potential harm to the non-

moving parties." 361 B.R. at 350, 368.  Similarly, this Court has also emphasized that a bond

should be "commensurate with the threatened loss to the non-moving parties." In re Dura Auto.

Sys., Inc., Case No. 06-11202 (Bankr. D. Del.), Tr.  6/5/08: 13:20-22.

59.    A party seeking a stay pending appeal of a bankruptcy confirmation order

has the heavy burden of proving, with clear evidence, that a bond in the full amount of the

potential harm is not required.[29]  See, e.g., W.R. Grace, 2012 U.S. Dist. LEXIS 88887, at *23;

see also Adelphia, 361 B.R. at 351 (party seeking a stay without bond has the burden of

"providing specific reasons" why a stay should be granted without posting a bond "in the full

amount of the judgment") (quoting De la Fuente v. DCI Telecomms., Inc., 269 F. Supp. 2d 237,

240 (S.D.N.Y. 2003)).  The Appellants obviously cannot satisfy this standard with their empty

assertion that no bond is necessary because the Debtors have been generating cash during the

suspension of debt service afforded to them during the pendency of the chapter 11 cases.

60.    Thus, because the Appellants have failed to offer any evidence

whatsoever, the Motions must be denied or, at a minimum, conditioned upon the posting of a

substantial bond.  Indeed, at least one court has held that, where the appellants failed to sustain

their burden of proof on the bond issue, the refusal of the trial court to impose a supersedeas

bond constituted reversible error because it unfairly shifted the burden of proof and risk of loss to

the prevailing parties.  Westpoint Stevens, 2007 WL 1346616, at *7 (bankruptcy court's issuance

of an unbonded stay pending appeal was an abuse of discretion where the court's decision was

based on an improper shifting of the burden of proof).

61.    Indeed, a supersedeas bond is especially important in the context of the

confirmation of a complicated and multi-faceted plan of reorganization in a large and complex

chapter 11 case where, as here, a debtor's business operations, its wherewithal, and the

anticipated distributions of billions of dollars of consideration to thousands of creditors, may be

---

[29]  The Appellants carry a heavy burden to prove that "exceptional circumstances" exist such that a substantial bond
is not required in these cases.  See Adelphia, 361 B.R. at 350-51 (consistent with practice under Fed. R. Civ. P. 62,
bankruptcy appellants must generally "post a bond when appealing a lower court order absent 'exceptional
circumstances'") (citations omitted); see also DJK Residential, 2008 WL 650389, at *3 (a bond must be posted
where "no case has been made whatsoever to deviate from the general rule").

31

threatened by a stay. <u>See</u>, <u>e.g.</u>, <u>Calpine</u>, 2008 WL 207841, at *7 (denying the stay, but adding

that no stay could issue without a bond to cover the "enormous risk of loss to the Debtors, their

estates, creditors and interest holders in the range of $900 million to $1 billion"); <u>Adelphia</u>, 361

B.R. at 354 (imposing a $1.3 billion bond in order to protect against the risk "that the Plan will

fall apart and that the parties will fail to reach a new agreement given the uncertainty associated

with what could be a seven-month stay").

        62.     The Appellants' conclusory plea that no bond is required while the

Debtors are involuntarily frozen in bankruptcy for however long it may take the Appellants to

exhaust their appeals improperly imposes the entire risk of loss that may result from future

contingencies upon the Debtors, their creditors and other stakeholders.  Under the Appellants'

construct, any material adverse change in the Company's business operations, the media

industry, the capital markets, the domestic or global economy or other exogenous factors would

fall squarely, and solely, on the laps of the Company's creditors (especially those creditors

entitled to receive stock under the DCL Plan), employees, customers and other stakeholders.

The Appellants' "no bond" approach is nothing more than a heads-we-win-and-tails-you-lose

proposition not remotely supported under applicable law.

        63.     The Appellants' self-serving proposition is further belied by their failure

to grapple with the lengthy period of time that it often takes for bankruptcy appeals to proceed

through at least two sets of federal appellate courts.  Although the Appellants claim, without any

support, that the appeal period here should be "short" or "brief", this Court can, and should, take

judicial notice of the fact that, according to the Administrative Office of the United States

Courts, the median amount of time during 2011 for the completion of a bankruptcy appeal

through the issuance of a merits decision by the Third Circuit Court of Appeals is more than

*24 months*, excluding any additional time period for seeking review before the Supreme Court.[30]

64.     Although the Appellants assert that they will seek expedited review, apparently before at least two different sets of appellate courts concurrently (in light of WTC's prior pending appeals before District Judge Sleet, as well as EGI-TRB's request to appeal the Confirmation Rulings directly to the Third Circuit), they obviously have no control over whether an appellate court will accede to any expedited review schedule or, indeed, how long it may take an appellate court to ultimately render a decision.  In weighing the substance and credibility of the Appellants' conclusory contention that no bond is necessary here, the Court should account for the considerable period of time it often takes to achieve a final order no longer subject to appeal (or writ of certiorari), even in the extraordinary circumstance of a certified direct appeal to the Court of Appeals.  In this case, with the possibility of multiple, unconsolidated appeals wending their way through multiple appellate courts and multiple levels of appeal, a 24-month period to final resolution actually seems optimistic.

### *A Bond Should Be Set At No Less Than Approximately $1.548 Billion*

65.     As set forth in more detail in the attached Hartenstein and Kurtz Declarations, given the size, nature and complexity of these cases, the significant risk and impact

---

[30] See Administrative Office of the United States Courts. 2011 Annual Report of the Director: Judicial Business of the United States Courts. Washington, D.C.: 2012.  Table B-4B at page 86, available at http://www.uscourts.gov/uscourts/Statistics/JudicialBusiness/2011/JudicialBusiness2011.pdf (showing a 24.3 month interval in the Third Circuit from filing in lower court to final disposition in the appellate court).  More specifically, in several appeals of orders entered by bankruptcy courts in this district, the time between the date of the initial appeal to the District Court to the date of disposition by the Third Circuit has varied from approximately 39 months in the *Continental Airlines* case (see In re Cont'l Airlines, Inc., 91 F.3d 553 (3d Cir. 1996)), to 27 months in the *Finova Group* case (see In re Finova Group v. Official Comm. of Equity Sec. Holders (In re Finova Group), Case No. 08-3990, 2009 U.S. App. LEXIS 23213 (3d Cir. Oct. 21, 2009)), to 22 months in the *United Merchants* case (without the Third Circuit ultimately adjudicating the merits of the case) (see In re United Merchants & Mfrs., Inc., D. Del. Case No. 91-489 [D.I. 79] (copy of stipulation of voluntary dismissal of appeal prior to issuance of Third Circuit disposition), to 17 months in the *Integrated Telecom* case (see In re Integrated Telecom Express, Inc., 384 F.3d 108 (3d Cir. 2004)).

of any indefinite stay pending appeal on the Company's substantial business operations and capital structure, and the interrelated transactions contemplated by the DCL Plan, as a condition to granting any stay pending appeal, the Court should direct the Appellants to post a supersedeas bond in an amount no less than approximately $1.548 billion, and potentially as much as $3 billion, based on a potential two-year stay period.[31]

66.    As summarized below, this bond amount is necessary to protect the Debtors, their creditors and other stakeholders from at least five distinct components of harm: (1) additional administrative fees and costs that will be incurred during the stay period; (2) potential losses arising from delay in reinvesting cash distributions under the DCL Plan; (3) potential losses arising from delay in reinvesting free cash flow after emergence; (4) potential losses arising from delay in reinvesting cash proceeds from the Company's anticipated New Senior Secured Term Loan or any replacement facility for that loan; and (5) potential losses from continued exposure of the Company and its creditors to market volatility and other macroeconomic risks during the stay period.

67.    First, as set forth in greater detail in the Kurtz Declaration, the Debtors and their estates will continue to bear substantial additional administrative costs, professional fees and expenses and other similar costs during any extension of these cases. The *average* administrative costs per month from August through October 2011, a period of time with relatively limited Court activity, was approximately $4.7 million. (Kurtz Decl. at ¶ 8). Therefore, a reasonable, conservative projection of the aggregate incremental administrative costs and expenses assuming a two-year stay period is approximately $113 million. (Id.).

---

[31] See Kurtz Decl. at ¶ 6, Ex. A.

Accordingly, such a stay would potentially harm the Debtors and their creditors in an amount no less than approximately $113 million. (Id.).

68.     Second, as set forth in greater detail in the Kurtz Declaration, a stay pending appeal could materially impair the ability of the Company's creditors to reinvest the roughly $1.912 billion of cash currently on hand that is to be distributed to the non-moving creditors on or shortly after the Effective Date. (Kurtz Decl. at ¶ 9).  Consistent with their duties and legal obligations as debtors in possession, over the past two years the Debtors have generated only a nominal return on cash of approximately 0.01%, largely because of the investment restrictions imposed under section 345 of the Bankruptcy Code and applicable United Trustee Guidelines. (Id.).

69.     Upon emergence, the Company's creditors would be free to reinvest their cash distributions in securities or other opportunities generating a more favorable rate of return, conservatively assumed here to equal approximately 6.896%.[32]  Applying this conservative alternate investment rate, non-moving creditors would likely be able to earn additional investment income of at least $272 million over a two-year stay period, as compared to the de minimis amount that could be earned by the Debtors during such period.[33]  (Id.).  Accordingly, a

---

[32]  The rate is based on the Merrill Lynch U.S. High Yield Master II Index, which is a commonly-used index to analyze the high yield market.  As of August 3, 2012, the yield to worst for the index was 6.896%.  "Yield to worst" typically means the lowest yield that can be received on a bond without the issuer defaulting.  All of the Debtors' creditors have a different cost of capital and investment return target.  For example, JPMorgan Chase's annualized return on equity (a simple proxy for its cost of capital) in its most recently reported quarterly report was 9.6% and many other creditors are alternative asset managers (i.e., hedge funds or private equity funds) that often target returns above 20%.  For purposes of this analysis, we have conservatively used a yield from a commonly-quoted high yield bond index, which is likely less than many of the creditors' cost of capital, and is also less than the Company's weighted average cost of capital of [9.9]% in accordance with the Updated Valuation dated February 16, 2012. (Id. at ¶ 9 & n.6).

[33]  Lost reinvestment costs are a legitimate factor in calculating an appeal bond.  See, e.g., Adelphia, 361 B.R. at 352 n.70 ("There is also an inherent loss to the creditors in any delay because the interest on the proceeds from the Sale earned by Debtors accrues at a very low rate.  If the funds were distributed to the various creditors. . .they could likely achieve much higher rates of return"); see also Chemtura, 2010 Bankr. LEXIS 3988, at *31 (In calculating hypothetical bond amount, the Court stated that "stockholders would be delayed in their receipt [of stock and cash], and depriving them of that would have an opportunity cost").

two-year delay in reinvesting the cash distributions contemplated by the DCL Plan potentially
would harm the Debtors' creditors in an additional amount of no less than approximately $272
million. (Id.).[34]

70.    Third, as set forth in greater detail in the Kurtz Declaration, a stay also
could materially impair the ability of the Company's creditors to reinvest the Company's
projected post-emergence free cash flow distributions.  Based on current projections, the Debtors
are expected to generate significant free cash flow over the next two years – cash that, absent a
stay, would be available for distribution to equity holders (including the Debtors' current
creditors that are entitled to receive equity upon emergence).  (Id. at ¶ 10).  Assuming quarterly
distributions of such free cash flow beginning in the first quarter of 2013, the projected amount
of cash distributions to non-Appellant equity holders over a two-year period is approximately
$272 million.  (Id.).  If the quarterly free cash flow distributions were reinvested at a rate of
return of 6.896%, then a two-year delay in reinvesting such proceeds potentially could harm the
Debtors' creditors and prospective equity holders (other than the Appellants themselves) in an
additional amount of approximately $14 million. (Id.).[35]

71.    Fourth, as set forth in greater detail in the Kurtz Declaration, a stay
pending appeal would also prevent the distribution of an additional $1.1 billion in cash proceeds
under the New Senior Secured Term Loan pursuant to the DCL Plan or, potentially, a
replacement facility for such loan.[36]  Similar to the cash distributions discussed above, such a

---

[34] As set forth in the Kurtz Declaration, this amount *excludes* any lost reinvestment costs that may be incurred by the Appellants themselves.

[35] As set forth in the Kurtz Declaration, this amount *excludes* any lost reinvestment costs that may be incurred by the Appellants themselves.

[36] Even if such reinvestments were not to occur, the non-moving creditors who are to receive interests in the New Senior Secured Term Loan would experience additional damage from the failure to receive interest payments on the that loan over a two-year stay period.  In addition, the Company is using its best efforts to attempt to negotiate a replacement facility for the New Senior Secured Term Loan with a more favorably-priced term loan.  A stay

46429/0001-8755250v1

stay would preclude creditors of Tribune Company that are to receive their plan consideration in the form of a "strip" of cash, new common stock, and New Senior Secured Term Loan from receiving their allocable portion of the New Senior Secured Term Loan and selling such portion into the debt market in exchange for cash proceeds that they could, in turn, reinvest at the estimated rate of return of 6.896%. Assuming that those creditors would reinvest the cash, a two-year delay in reinvestment would potentially harm non-moving creditors in an additional amount of approximately $156 million. (Id. at ¶ 11).[37]

72.     Fifth, as set forth in greater detail in the attached Kurtz Declaration, an extended delay in emergence would also likely materially prejudice those creditors of the Company entitled to receive stock under the DCL Plan by exposing the Company (and the equity in Reorganized Tribune) to substantial forces of market volatility, negative publicity and brand damage, changes in the media industry, increased competition, disruptive technologies, changes in industry regulations, the loss of other potential value-enhancing opportunities, and other macroeconomic risks while the Company continues to operate in bankruptcy.[38]

---

pending appeal would disrupt these efforts, may impair the Company's ability to take advantage of the competitive rate environment in the near term, and would be another potential source of harm resulting from a stay pending appeal.

[37] As set forth in the Kurtz Declaration, this amount *excludes* any lost reinvestment costs that may be incurred by the Appellants themselves.

[38] Several courts have held that it is reasonable to take into consideration these types of market volatility and other macroeconomic risks in calculating the amount of an appeal bond in favor of a reorganizing company and its creditors in bankruptcy. See, e.g., In re Adelphia, 361 B.R. at 353 n.72 (In evaluating the harm to the Debtors and their estates that may result from a stay pending appeal, the Court found that the Debtors would likely be forced to conduct a partial IPO of certain stock proceeds due in part to current market volatility and contractual and fiduciary obligations, with the remainder of the stock subject to a 180-day lockup period that would "[subject] the creditors to the volatility of the marketplace and [deprive] them of the right to make their own investment decisions with respect to the stock."). Similarly, in the recent Chemtura case in the Southern District of New York, Bankruptcy Judge Gerber declined to stay plan distributions to equity security holders, but nevertheless recognized that, if a bond were required, then such a bond should protect such equity security holders against potential loss in equity value that may occur during a stay, including losses relating to potential opportunity costs and "downward market movements." 2010 Bankr. LEXIS 2988, at *31; see also General Motors, 409 B.R. at 34 (Court declined to grant a stay of the sale of the estates' assets, but observed that, if a stay were granted, then a bond would likely be required in an amount sufficient to account for the pervasive, catastrophic and difficult-to-quantify damages that would potentially be

73.    As Mr. Kurtz explains, in the event of an extended stay pending appeal, the Company's creditors entitled to receive equity under the DCL Plan would be denied significant benefits associated with the completion of the Company's reorganization.  These benefits include:  (i) the collective right to receive a controlling share of the stock of Reorganized Tribune;[39] (ii) the right of certain creditors to designate members of the Board of Reorganized Tribune and related corporate governance rights; (iii) other shareholder voting rights under applicable non-bankruptcy corporate law; (iv) the right to trade the stock of Reorganized Tribune in a deeper and more liquid market than the secondary markets currently available for trading debt claims against the Company; and (v) the right, if they choose to hold their stock, to share in any equity upside of Reorganized Tribune following emergence.  Further, as attested by Mr. Hartenstein, the President and Chief Executive Officer of Tribune, if these chapter 11 cases continue, the Company (and therefore the equity holders of Reorganized Tribune) could be harmed in numerous ways, including brand erosion, an impaired ability to take advantage of potential strategic opportunities, and enormous administrative costs associated with the bankruptcy.  (See Hartenstein Decl. at ¶ 6).

74.    As Mr. Kurtz further notes, the only way to guarantee that the non-moving creditors would be fully protected against these potential harms would be to set an appeal bond in the full amount of the Debtors' projected equity value upon emergence, which is approximately $4.515 billion.[40]  Alternatively, he suggests that the bond could be set at an

---

incurred by numerous stakeholders and other third parties as a result of the stay, including the "systemic damage" to the automobile industry, states, municipalities and workers).

[39]  JPMorgan Chase, Angelo Gordon, and Oaktree, each DCL Plan Proponents, are expected to receive more than 40% of the equity of Reorganized Tribune (subject to dilution).  The Senior Lenders collectively are expected to control approximately 99% of the equity of Reorganized Tribune (subject to dilution) under the DCL Plan.

[40]  The total equity value is adjusted to exclude the allocation to the Senior Noteholders as set forth in Table 1 in the Kurtz Declaration.

amount designed to protect the Company's creditors entitled to receive equity under the DCL

Plan against the risk of market volatility and other macroeconomic risks resulting from an

extended stay pending appeal. To calculate that amount, Mr. Kurtz used an equity put option

approach, pursuant to which he estimated that the potential damage to such creditors would be no

less than approximately $992 million, and potentially much greater, over a two-year stay period.

(Id. at ¶¶ 12, 22-24).[41]

      75.     Finally, there is no merit to the Trustees' contention that a bond is

unnecessary here because creditors can simply trade out of their debt positions in the secondary

markets and effectively avoid any harm. See Trustees' Mot. ¶ 78. This argument ignores the

substantial harm that would be incurred by creditors who trade their debt claims prior to

emergence. As Mr. Kurtz demonstrates in his declaration, if the Senior Lenders, by way of

example, were to pursue such an approach, then, based on current trading values, they would

lose approximately $523 million. Moreover, this estimate likely does not reflect the full extent

of the harm because, during any extended stay, the discount rate would likely increase

significantly, thereby resulting in even more harm to such creditors.[42] (Kurtz Decl. at ¶ 20).

Additionally these trading losses would deprive the creditors who elected to take equity in

Reorganized Tribune of the benefits of their bargain. (Id.).

      76.     In sum, if the Appellants prevail and no supersedeas bond were required,

the Debtors' non-moving creditors would be caught in a no-win situation: lose if they sell in the

secondary markets pre-emergence or lose if they wait to receive the distributions they are entitled

to receive for many additional months or years to come during a stay pending appeal. The

---

[41] This approach essentially determines the cost of an insurance policy against the potential decline in equity value
due to market risks and market volatility relative to the current adjudicated amount of Reorganized Tribune's equity
value pursuant to the DCL Plan. (Id.).

[42] It is fair to assume that this discount does not take into account a potential extended stay period as requested by
the Appellants in their Motions. (Id. at ¶ 18).

46429/0001-8755250v1

Appellants, by comparison, would enjoy a free option to litigate their appeals. This unprecedented result would inappropriately and unfairly shift the risks and burdens of a stay pending appeal onto the non-moving creditor body, and all other stakeholders.

77.    Based on the foregoing, the total bond amount should be no less than $1.548 billion for a two-year stay period. Moreover, separate and apart from these quantifiable harms, the negative impact of a prolonged stay on the health and strategic flexibility of the Company, the ability of the Company to retain senior managers and top performers, and to recruit industry-leading talent, and the continued support of the Company's many thousands of creditors, vendors, partners, and other stakeholders after almost four long years in bankruptcy should be obvious. Although many of these additional sources of harm are difficult to quantify, they collectively represent a very real harm to the Company (and its stakeholders) from delaying its well-earned reentry into the stream of commerce.

78.    Lastly, whether considered collectively or individually, the foregoing risks do not represent the worst case of potential harm that the Debtors and their creditors may incur as a result of an indefinite stay pending appeal now that the DCL Plan has been confirmed. Indeed, as attested in the Hartenstein Declaration, if the parties are subjected to a stay, there can be no assurance that each of the parties to the DCL Plan Settlement and other settlements under the confirmed DCL Plan will remain committed to such settlements or the confirmed DCL Plan. (Hartenstein Decl. at ¶ 17). In the event that the Company's reorganization efforts fail or that other developments cause any of the key parties to withdraw their support for the DCL Plan during an appeal process that may potentially extend for more than two years, the potential loss to the Debtors and their creditors would be catastrophic. Withdrawal of support for the DCL

Plan or any other major component of the Debtors' reorganization would pose a potential

liquidation risk to the Company and its creditors.

79.     Thus, to fully protect against such liquidation risk, the supersedeas bond

amount should be no less than the sum of (a) the difference between (i) the Debtors' total

distributable enterprise value as previously determined by this Court and (ii) the estimate of the

Debtors' liquidation value, plus (b) a reasonable estimate of the additional administrative, legal

and related costs and expenses that would accrue between the time the stay is granted and the

completion of the Company's potential liquidation, an aggregate amount that the DCL Plan

Proponents estimate to be well in excess of $3 billion.[43]

80.     For the reasons discussed above, if the Appellants are unwilling or unable

to post an appropriate appeal bond sufficient to protect the Debtors, their creditors and other

stakeholders as outlined above, the Court should deny the Motions.

## CONCLUSION

81.     For the foregoing reasons, the DCL Plan Proponents respectfully request

that this Court enter an order (i) denying the Motions, (ii) solely in the event that the Court grants

either or both of the Motions in whole or in part, conditioning any stay upon the requirement that

the Appellants first post an appeal bond in an amount sufficient to protect the Debtors, their

---

[43] In the 2011 Confirmation Decision, this Court determined that the Debtors' Total Distributable Value was the mid-point of a July 2011 expert report, or approximately $7.019 billion. 464 B.R. at 147; see also Confirmation Decision at p. 6, n.8. Although, during the June 2012 confirmation hearings, the DCL Proponents offered an updated expert report (the 2012 Chachas Report), which was admitted into evidence and estimated that the reference range of Total Distributable Value for the Reorganized Debtors would be $6.917 to $7.826 billion, as of June 30, 2012 (see DCL Ex. 3002 at 3-4), no opposing valuation evidence was offered, and the Court was not asked to determine a revised enterprise value for the Debtors. See Confirmation Decision at p. 6, n.8. Additionally, the Total Net Liquidation Proceeds available to satisfy pre-petition claims is estimated to range between $3.3 billion and $3.8 billion as set forth in the Liquidation Analysis attached to the expert report of Brian Whittman proffered at the March 2011 confirmation hearing. See the Liquidation Analysis, General Disclosure Statement, Ex. D [Docket No. 7232] and the Whittman Expert Report (DCL Ex. 1109). No opposing liquidation valuation evidence was offered at the confirmation hearings.

creditors and other stakeholders pursuant to the methodologies set forth herein, and

(iii) providing such further relief as is just and proper.

Dated:  Wilmington, Delaware
       August 8, 2012

                                   Respectfully submitted,

                                   SIDLEY AUSTIN LLP
                                   James F. Conlan
                                   Bryan Krakauer
                                   Jeffrey C. Steen
                                   Candice L. Kline
                                   One South Dearborn Street
                                   Chicago, Illinois 60603
                                   Telephone:  (312) 853-7000
                                   Telecopier:  (312) 853-7036

                                         -and-

                                   James F. Bendernagel Jr.
                                   Ronald S. Flagg
                                   1501 K Street N.W.
                                   Washington, D.C.  20005
                                   Telephone:  (202) 736-8000
                                   Telecopier:  (202) 736-8711

                                         -and-

                                   COLE, SCHOTZ, MEISEL,
                                   FORMAN & LEONARD, P.A.

                                   By: */s/ Norman L. Pernick*
                                   Norman L. Pernick (No. 2290)
                                   J. Kate Stickles (No. 2917)
                                   Patrick J. Reilley (No. 4451)
                                   500 Delaware Avenue, Suite 1410
                                   Wilmington, Delaware 19801
                                   Telephone:  (302) 652-3131
                                   Telecopier:  (302) 652-3117

                                   Counsel for Debtors and Debtors in
                                   Possession and Certain Non-Debtor
                                   Affiliates

46429/0001-8755250v1

CHADBOURNE & PARKE LLP
Howard Seife
David M. LeMay
Andrew Rosenblatt
30 Rockefeller Plaza
New York, New York 10112
Telecopier:  (212) 541-5369

-and-

LANDIS RATH & COBB LLP

By: */s/ Matthew B. McGuire*
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telecopier:  (302) 467-4450

-and-

ZUCKERMAN SPAEDER LLP
Graeme W. Bush
James Sottile
1800 M Street, N.W., Suite 1000
Washington, D.C. 20036
Telecopier:  (202) 822-8106

Counsel for the Official Committee of
Unsecured Creditors

JONES DAY
Bruce Bennett
James O. Johnston
Joshua M. Mester
555 South Flower Street, Fiftieth Floor
Los Angeles, California 90071
Telecopier:  (213) 243-2539

-and-

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

By: */s/ Robert S. Brady*
Robert S. Brady (No. 2847)
M. Blake Cleary (No. 3614)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telecopier:  (302) 571-1253

Counsel for Oaktree Capital Management,
L.P. and Angelo, Gordon & Co., L.P.

WILMER CUTLER PICKERING HALE &
DORR LLP
Andrew Goldman
399 Park Avenue
New York, New York 10022
Telecopier:  (212) 230-8888

Co-Counsel for Angelo, Gordon & Co, L.P.

46429/0001-8755250v1

DAVIS POLK & WARDWELL LLP
Donald S. Bernstein
Damian S. Schaible
450 Lexington Avenue
New York, New York 10017
Telecopier:  (212) 701-5800

-and-

RICHARDS LAYTON & FINGER, P.A.

By: /s/ Robert J. Stearn, Jr.
Mark D. Collins (No. 2981)
Robert J. Stearn, Jr. (No. 2915)
Drew G. Sloan (No. 5069)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telecopier:  (302) 651-7701

Counsel for JPMorgan Chase Bank, N.A.

46429/0001-8755250v1