**EXHIBIT B**

KURTZ DECLARATION

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered |

## DECLARATION OF DAVID S. KURTZ OF LAZARD LTD.
## IN SUPPORT OF THE OBJECTION OF THE DCL PLAN PROPONENTS TO THE
## MOTIONS FOR A STAY PENDING APPEAL OF THE CONFIRMATION ORDER

I, David S. Kurtz, declare as follows:

1.     I am Vice Chairman of Investment Banking and Head of the Global Restructuring

Group at Lazard Ltd. ("Lazard"), a financial advisory and investment banking firm that has been

retained by the Debtors as their investment banker and financial advisor in connection with their

Chapter 11 Cases.  I am familiar with the Debtors' businesses and financial affairs, their

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc., f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); and WPIX, Inc. (0191).  The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

anticipated financial and restructuring transactions upon emergence and pursuant to the DCL Plan, and other matters that concern the Debtors' reorganization.

2.     I have extensive experience in restructuring, M&A, and financing transactions, including recent engagements in other major chapter 11 cases.  Prior to joining Lazard in 2002, I was a senior partner from 1999 to 2002 in the Corporate Restructuring Department at Skadden, Arps, Slate, Meagher & Flom, a partner at Jones, Day, Reavis & Pogue from 1989 to 1999, and a partner at Mayer, Brown & Platt from 1986 to 1989.  In total, I have over 30 years of restructuring experience.  I earned a B.A. from Case Western Reserve University and a J.D. from Case Western Reserve University School of Law.

3.     I submit this declaration (the "Declaration") in support of the *Objection of the DCL Plan Proponents to the Motions for a Stay Pending Appeal of the Confirmation Order* (the "Objection").[2]  I have reviewed the Motions, the joinder filed by WTC, and the related appeals filed by the Appellants and am familiar with the Court's Confirmation Rulings.

4.     All matters set forth in this Declaration are based on: (a) my personal knowledge; (b) my review of relevant documents; (c) my experience with and knowledge of the Debtors' financial affairs; (d) my knowledge of the DCL Plan; (e) information supplied to me by the Debtors and their legal and financial advisors; (f) analysis prepared by Lazard in support of this Declaration; or (g) as to matters involving United States bankruptcy law or rules or other applicable laws or practice, my reliance on the advice of the Debtors' counsel and their other advisors.  If called upon to testify, I could and would testify completely to the facts set forth herein.

---

[2] Capitalized terms used and not otherwise defined shall have the meaning ascribed to them in the Objection.

5.     The Debtors, their creditors, and other stakeholders would incur substantial harm if the Court were to grant the Appellants a stay pending appeal.  There are many different types of harm caused by a delay in emergence, including, for example, brand erosion, weakened relationships with advertisers, impairment in the Company's ability to take advantage of potential strategic opportunities and protect against competitor-driven initiatives that weaken the Company's position, and obstacles the Company faces in attracting and retaining employees while in bankruptcy.  Here, I endeavor to quantify some, but not all, of the many sources of potential harm to the Debtors, their creditors, and other stakeholders, with particular focus on lost opportunity costs and market and other macroeconomic risks that the Debtors' creditors may potentially face during a lengthy stay pending appeal as well as direct costs to the Debtors' estates.

6.     As I discuss below, if a stay were granted for a hypothetical two-year appeal period, then a reasonable quantification of the potential harm that the Debtors, their creditors, and other stakeholders would likely suffer as a result of or during the stay would be no less than approximately $1.548 billion and could potentially be much greater than that amount.  The estimated bond amount is primarily comprised of the following five components of harm: (1) approximately $113 million in additional professional fees and other administrative costs during the stay period; (2) approximately $272 million in lost opportunity costs incurred by non-moving creditors due to a delay in reinvesting anticipated cash distributions under the DCL Plan; (3) approximately $14 million in lost opportunity costs incurred by non-moving creditors due to a delay in reinvesting anticipated free cash flow distributions after emergence; (4) approximately $156 million in harm to the non-moving creditors caused by the delay in the Company's New Senior Secured Term Loan or any replacement facility for that loan; and (5) the potential harm to

non-moving creditors entitled to receive equity under the DCL Plan based upon the exposure of

the Company's equity to market volatility and other macroeconomic risks during the stay period,

which I quantify to be no less than approximately $992 million.[3]

7.      As an initial matter, based on my experience and information provided by the

Debtors' legal counsel, for purposes of this analysis, I assume a two-year stay period (the "Stay

Period").  I also provide, however, a sensitivity analysis showing the potential harm to the

Debtors, their non-moving creditors, and other stakeholders for stay periods ranging in duration

from twelve to thirty months in Exhibit A.  For example, as set forth in Exhibit A, a reasonable

quantification of the potential harm that would likely be suffered by the Debtors, their non-

moving creditors, and other stakeholders over a twelve-month appeal period is no less than

approximately $974 million.

### 1.      Additional Chapter 11 Administrative Costs during Stay Period

8.      First, the Debtors and their estates will continue to bear substantial additional

administrative costs, professional fees and expenses, and other similar costs during any lengthy

---

[3] For the purpose of this calculation and elsewhere, the assumptions used in my analysis generally exclude any potential harm that may be suffered by the Appellants on account of an extended stay period.  Table 1 below illustrates the adjustments to exclude Effective Date Distributions to the Appellants.  The Effective Date Distributions reflected in Table 1 are based on the adjudicated value of equity plus the New Senior Secured Term Loan and the projected Distributable Cash for an end of September 2012 emergence.

**Table 1**

| _$ in billions_ | Effective Date Distributions [(a)] | | Less: Amts Distr. To Sr Noteholders (Cash/Strip) | | Net Distr. (Excluding Sr Noteholders) | |
|---|---|---|---|---|---|---|
| Distributable Cash | $ | 2.322 | $ | (0.410) | $ | 1.912 |
| New Sr Sec. Term Loan | | 1.100 | | (0.005) | | 1.095 |
| Equity Value | | 4.536 | | (0.021) | | 4.515 |

_Note:_
_(a) Effective Date Distributions based on the adjudicated value of equity plus the New Senior Secured Term Loan and the projected Distributable Cash for an end of September 2012 emergence_

4

extension of these cases.[4]  Based on an analysis of the Debtors' books and records, the average

administrative costs per month from August through October 2011, a period of time with

relatively limited Court activity (after conclusion of the first confirmation proceedings, but prior

to issuance of the 2011 Confirmation Decision), was in excess of $4.7 million.  Accordingly,

during the Stay Period, a reasonable projection of the aggregate incremental administrative costs

and expenses that would ultimately be borne by the Debtors' estates is approximately $113

million.

### 2.    Opportunity Costs from Delay in Reinvesting Distributable Cash

9.    Second, during the Stay Period, the Debtors' non-moving creditors would be

unable to access or reinvest the roughly $1.912 billion of cash currently on hand that is to be

distributed to the non-moving creditors on or shortly after the Effective Date pursuant to the

DCL Plan, as reflected in Table 1 above.  The amount of lost opportunity costs associated with

these funds can be estimated by calculating the difference between (i) the investment income

currently generated by the Debtors with respect to its cash on hand and (ii) the anticipated rates

of return that could reasonably be earned by the non-moving creditors assuming that they were

able to invest the distributable cash during the Stay Period without any significant restrictions.

Over the past two years, the Debtors, consistent with their duties and legal obligations, have

generated a nominal return on cash of approximately 0.01% based on information provided by

---

[4]  Based on the Company's books and records, these costs include not only the bankruptcy-specific professional fees
and expenses for the professionals employed by the Company pursuant to sections 327(a) and 327(e) of the
Bankruptcy Code, but also the professional fees and expenses for counsel and advisors to the Committee, potential
fees and expenses for the individual members of the Committee, the Company's claims, noticing, and balloting
agent, Epiq Bankruptcy Solutions, LLC, the Committee's website administrative agent, Kurtzman Carson
Consulting LLC, and Stuart Maue as the court-appointed fee examiner.  In addition, the confirmed DCL Plan
provides that the Company is to pay certain fees and expenses which could potentially continue to accrue during an
extended Stay Period, including, but not limited to, those fees and expenses of the Senior Lenders' professionals,
and potentially other parties and professionals.  These types of administrative fees and expenses almost certainly
will continue to accrue during the pendency of any protracted appeal.

the Company's Treasury Department and financial advisors.[5]  Upon emergence, however, the

non-moving creditors would not be so constrained and would be free to reinvest their cash

distributions under the DCL Plan in securities or other opportunities generating a more favorable

rate of return.  Given the sophisticated nature of the Debtors' creditors and their investment

opportunities, I believe that a conservative and reasonable estimate of their potential investment

rate of return is approximately 6.896% based on a commonly-used high yield index.[6]  Based on

these assumptions, the Company's non-moving creditors would likely be able to earn additional

investment income of at least $272 million over the Stay Period, as compared to the *de minimis*

amount of approximately $383,000 that could be earned by the Debtors over such period.  This

estimate of approximately $272 million, in my view, fairly represents the financial harm related

to the delay in reinvesting anticipated cash distributions under the DCL Plan during the Stay

Period.

### 3.    Opportunity Costs from Delay in Reinvesting Free Cash Flow Distributions

10.    Third, the Debtors' non-moving creditors would also be unable to reinvest the

Company's projected post-emergence free cash flow distributions during the Stay Period.  Based

on their current projections, the Debtors reasonably expect to generate significant post-

---

[5]  I understand that the Debtors' investments must comply with the investment restrictions imposed on the Debtors while in bankruptcy under Section 345 of the Bankruptcy Code and applicable United Trustee Guidelines, which largely limit their investment options to low-yielding, high quality U.S. Treasury money market funds or their equivalent.

[6]  The rate is based on the Merrill Lynch U.S. High Yield Master II Index, which is a commonly-used index to analyze the high yield market.  As of August 3, 2012, the yield to worst for the index was 6.896%.  "Yield to worst" typically means the lowest yield that can be received on a bond without the issuer defaulting.  All of the Debtors' creditors have different costs of capital and investment return targets.  For example, JPMorgan Chase's annualized return on equity (a simple proxy for its cost of capital) in its most recently reported quarterly report was 9.6% and many other creditors are alternative asset managers (*i.e.*, hedge funds or private equity funds) that often target returns above 20%.  For purposes of this analysis, we have conservatively used a return from a commonly-quoted high yield bond index, which is likely less than many of the creditors' cost of capital, and is also less than the Company's weighted average cost of capital of 9.9% in accordance with the Updated Valuation dated February 16, 2012.

emergence free cash flow over the next two years that, after a projected 50% sweep to prepay

debt, would be available for distribution to Reorganized Tribune's equity holders (including the

Debtors' current creditors that are entitled to receive equity upon emergence pursuant to the DCL

Plan).[7]  Assuming quarterly distributions beginning in the first quarter of 2013, the Debtors

project distributions of such free cash flow over the next two years in the aggregate amount of

approximately $272 million.  This estimate is based on seven quarters of free cash flow

distributions due to a one quarter delay in distribution.  If, in turn, these quarterly free cash flow

distributions were reinvested at a rate of return of 6.896%, for the reasons set forth in paragraph

9 above, then a two-year delay in reinvesting such proceeds would potentially harm the Debtors'

non-moving creditors (and prospective equity holders) in an additional amount of approximately

$14 million, as shown in Table 2 below.

### Table 2[8]

| $ in billions | 2013 | 2014 | |
|---|---|---|---|
| Estimated FCF Available for All Equity Holders | $  0.159 | $  0.152 | |
| % FCF Available to Non-Appealing Creditors | 99.5% | 99.5% | |
| Estimated FCF Available for Non-Appealing Equity Holders | $  0.158 | $  0.151 | |
| | Est. Distr. (a) | 6.896% APY | Income |
| Q4 2012 Dividend Distributed at Q1 2013 Close (b) | $  0.039 | 10.5% | $  0.004 |
| Q1 2013 Dividend Distributed at Q2 2013 Close | 0.039 | 8.7% | 0.003 |
| Q2 2013 Dividend Distributed at Q3 2013 Close | 0.040 | 6.9% | 0.003 |
| Q3 2013 Dividend Distributed at Q4 2013 Close | 0.040 | 5.1% | 0.002 |
| Q4 2013 Dividend Distributed at Q1 2014 Close | 0.040 | 3.4% | 0.001 |
| Q1 2014 Dividend Distributed at Q2 2014 Close | 0.037 | 1.7% | 0.001 |
| Q2 2014 Dividend Distributed at Q3 2014 Close | 0.037 | 0.0% | - |
| **Total** | **$  0.272** | | **$ 0.014** |

Notes:

   (a) For simplicity, annual free cash flow is assumed to be earned evenly throughout the year

   (b) Q1 2013 distribution amount (Q4 2012 dividend) assumed to be in line with FY 2013 average quarterly free cash flow

---

[7]  The Reorganized Debtors may elect to reinvest the cash in the business or pursue other uses for the cash, but such uses would presumably generate similar rates of return on investment.

[8]  For simplicity, annual free cash flow is assumed to be earned evenly throughout the year.

### 4.    Potential Harm Caused by Delay in Reinvesting Proceeds from Post-Emergence Debt Financing

11.    Fourth, during the Stay Period, the Debtors would also be unable to consummate the post-emergence $1.1 billion New Senior Secured Term Loan contemplated under the DCL Plan or, potentially, a replacement facility, which I understand the Company is pursuing on a best efforts basis.[9] In either case, similar to the cash distributions discussed in paragraph 9 above, during the Stay Period, the creditors of Tribune Company that are to receive their plan consideration in the form of a "strip" of cash, new common stock, and New Senior Secured Term Loan would therefore be precluded from receiving their allocable portion of the New Senior Secured Term Loan (designed to trade at par) and selling such portion into the debt markets in exchange for cash proceeds that they could, in turn, reinvest at the estimated rate of return of 6.896%. Assuming that those creditors would reinvest the $1.095 billion[10] in cash proceeds in securities or other opportunities at the foregoing rate of return, a two-year delay in reinvesting such proceeds would potentially harm the Debtors' non-moving creditors in an additional amount of $156 million.[11]

### 5.    Potential Harm Based on Market Volatility and Macroeconomic Risks during the Stay Period

12.    Fifth, an extended delay in emergence would also likely materially prejudice those creditors of the Company entitled to receive stock under the DCL Plan by exposing the

---

[9] Based on information provided by the Company, I understand that the Company is attempting to replace the New Senior Secured Term Loan with a more favorably-priced replacement facility in the near term. Assuming that, on a hypothetical basis and for illustrative purposes only, the Company is able to replace the New Senior Secured Term Loan with a facility that is priced at 100 basis points less than the interest rate on the New Senior Secured Term Loan, the Company could potentially save approximately $39 million in interest expense over a five-year term. This hypothetical assumes that 50% of quarterly free cash flows is used to repay debt and the remaining 50% is distributed as dividends to equity holders.

[10] The portion of the New Senior Secured Term Loan available for reinvestment is adjusted to exclude the allocation to the Senior Noteholders as set forth in Table 1.

[11] Alternatively, if the creditors decided to keep their positions in the New Senior Secured Term Loan, then they would lose the right to receive interest payments on that loan over a two-year stay period.

Company (and the equity in Reorganized Tribune) to substantial forces of market volatility, negative publicity and brand damage, changes in the media industry, increased competition, disruptive technologies, changes in industry regulations, the loss of other potential value-enhancing opportunities, and other macroeconomic risks while the Company continues to operate in bankruptcy. Based on the analysis summarized below, I have quantified this potential risk to such creditors to be no less than approximately $992 million, and potentially much greater, over a two-year stay period.

> **a.    Overview of Potential Market Volatility and Other Macroeconomic Risks Against Which the Company's Creditors Should Be Protected**

13.    In the event of an extended stay pending appeal, the Company's creditors entitled to receive equity under the DCL Plan would be denied significant benefits associated with the completion of the Company's reorganization. It is my understanding that these benefits include: (i) the collective right to receive a controlling share of the stock of Reorganized Tribune;[12] (ii) the right of certain creditors to designate members of the Board of Reorganized Tribune and related corporate governance rights; (iii) other shareholder voting rights under applicable non-bankruptcy corporate law; (iv) the right to trade the stock of Reorganized Tribune in a deeper and more liquid market than the secondary markets currently available for trading debt claims against the Company; and (v) the right, if they choose to hold their stock, to share in any equity upside of Reorganized Tribune following emergence. I also have been advised that certain of the largest senior lenders, who are proponents of the DCL Plan and holders of at least 40% of the aggregate amount of senior debt, hold board designation and related governance rights under the DCL Plan.

---

[12] JPMorgan Chase, Angelo Gordon, and Oaktree, each DCL Plan Proponents, are expected to receive more than 40% of the equity of Reorganized Tribune (subject to dilution). The Senior Lenders collectively are expected to control approximately 99% of the equity of Reorganized Tribune (subject to dilution) under the DCL Plan.

14.     In addition, as attested by Mr. Hartenstein, the President and Chief Executive Officer of Tribune, if these Chapter 11 Cases continue, "the Company would be harmed in numerous ways, including the following:  (1) brand erosion; (2) impairment of the Company's ability to take advantage of potential strategic opportunities and the Company's ability to protect itself from competitor-driven initiatives that weaken the Company's position; (3) hampering the Company in attracting and retaining the most-qualified individuals; (4) causing the Company to bear enormous administrative costs associated with the bankruptcy; and (5) should the Company's emergence be delayed significantly, potentially undermining the various complex and interrelated settlements underlying the confirmed DCL Plan." See Hartenstein Decl. at ¶ 6.

15.     Based upon these factors, it is not unreasonable to assume that many, if not most, of the Company's creditors that are entitled to receive equity under the DCL Plan have an expectation of receiving the benefit of their projected equity interests in Reorganized Tribune, rather than trading out of their debt positions prior to the Company's emergence.  I believe that it is also reasonable to assume that the denial or postponement of the foregoing rights and benefits as a result of any stay pending appeal would likely significantly harm all creditors entitled to receive equity under the DCL Plan.  Indeed, as explained in greater detail below, there is currently a significant discount from DCL Plan values in the trading values of senior debt claims in the secondary markets.  Consequently, if these creditors were to trade out of their positions in the secondary markets, then they would almost certainly trade at a significant loss relative to the intrinsic value of their claims.  Moreover, it is doubtful that such a trade would deliver to these creditors the full benefit of their bargain.

16.     It is my understanding that the purpose of the bond is to protect against the maximum potential harm the non-moving creditors could incur as a result of the imposition of

the stay.  Perhaps the only way to ensure against such harm would be to set an appeal bond in the

full amount of the Debtors' projected equity value upon emergence, which is approximately

$4.515 billion.[13]  However, as a more conservative alternative, I have analyzed an approach for

calculating an amount which is designed to protect the Company's creditors entitled to receive

equity under the DCL Plan against the risk of market volatility, lost business opportunities, and

other macroeconomic risks resulting from an extended stay pending appeal.  The results of my

analysis are summarized below and are supported by the data set forth in more detail in Exhibits

A and B.

> **b.    Pre-Emergence Trading of Senior Lender Debt Would**
> **Potentially Expose Creditors to Additional Costs Outside of**
> **Their Bargain**

17.    I understand that some of the Appellants (including Law Debenture/DBTCA in

their motion at p. 36) contend that the Senior Lenders of the Debtors would not be harmed by the

issuance of a stay pending appeal here because they can simply trade out of their debt positions

in the secondary markets and effectively cut their losses.  To the contrary, based upon my review

of the trading data described below, I believe that trading out of their debt positions would likely

not make the Senior Lenders whole.  Simply put, the senior debt claims that Senior Lenders own

today are not as valuable as what those creditors are entitled to receive under the DCL Plan upon

the Company's emergence.  Several of the reasons for this disparity in value are outlined in

section (a) above.

18.    Indeed, based on an analysis of current bid-ask quotes in the secondary markets,[14]

the average trading value for the debt of the Senior Lenders was approximately 72.2% of par,

---

[13]  The total equity value is adjusted to exclude the allocation to the Senior Noteholders as set forth in Table 1.

[14]  The above discount is determined based on the difference between (a) the recovery to the Senior Lenders based
on the valuation included in the Supplemental Disclosure Statement of $7.492 billion (comprised of Total
Distributable Value of $7.372 billion and the $120 million of Step Two Disgorgement Settlement proceeds) and (b)

implying an approximately 6.1% discount off of the imputed aggregate value of the initial

distributions that would be made to the Senior Lenders pursuant to the DCL Plan. The aggregate

differential between (i) the total amount of initial distributions to which the Senior Lenders

would be entitled under the DCL Plan and (ii) the total amount of cash consideration that would

be paid for their debt claims in the secondary markets based upon the foregoing discount is

approximately $523 million. It is fair to assume that this discount does not take into account a

potential extended stay period as requested by the Appellants in their Motions.[15]

      19.    Contrary to the Appellants' contention, this differential between the face amount

of anticipated distributions to Senior Lenders under the DCL Plan and the current discounted

trading value of the claims of such creditors in the secondary markets demonstrates, among other

things, that the Senior Lenders would likely suffer substantial harm by trading out of their claims

in the secondary markets before the Debtors' emergence from bankruptcy.

      20.    Moreover, it is also reasonable to conclude that, in the event of an extended stay

for many additional months or years, the foregoing discount would likely increase significantly,

thereby increasing the potential harm posed to any Senior Lenders that may seek to trade out of

their positions, and essentially relinquish their benefit of the bargain, before the completion of

the appeal process. For example, given the nature of the secondary trading markets, it is fair to

assume that, as a practical matter, the Senior Lenders would not be able to monetize their claims

without incurring substantial losses while the Company remains in bankruptcy. Further, Senior

Lenders that trade out of their positions for cash prior to emergence would lose the benefit of

---

the weighted average bid-ask quotes for the various tranches of Senior Loans over the two-week period from the
entry of the Confirmation Order on July 23, 2012 and August 6, 2012.

[15] Based on our review of the trading data, the discount rate declined by approximately two percentage points
between entry of the Court's Confirmation Opinion on July 13, 2012 and entry of the Confirmation Order on July
23, 2012.

their bargain under the DCL Plan to own a fair and negotiated share of Reorganized Tribune upon emergence and exercise control rights that they bargained to receive, including the chance to realize the potential equity upside that such rights entail. Consequently, based on my analysis, it is not unreasonable to conclude that an indefinite appeal period would likely result in even steeper discounting of trading values, resulting in potential harm well in excess of $523 million.

21.    Based on these observations, I believe that the Senior Lenders should not be required to sell their debt claims at a loss, and that the Appellants' suggestion that debt trading adequately protects the interests of the Debtors' creditors during an extended stay period ignores the potentially substantial losses that Senior Lenders may incur by selling their claims prior to emergence at discounted trading values. In addition, other non-moving creditors, including Holders of Other Parent Claims and Subsidiary Unsecured Claims, would likely face similar or greater challenges in monetizing their claims, thus increasing the amount of potential harm resulting from discounted trading values.

c.    **An Equity Put Option Is a Fair Proxy for Measuring the Substantial Downside Market Risks that Creditors May Bear during an Extended Stay Period**

22.    As discussed above, the Company's creditors entitled to receive equity under the DCL Plan would be exposed to potential market risks and market volatility over a stay period. Although there are alternative ways of quantifying such risks, one well-recognized approach that reasonably approximates the anticipated downside risk to equity holders during the Stay Period is the potential price at which a third party would assume the foregoing market risks associated with such equity for a two-year period by purchasing an equity put option. A put option is essentially an insurance policy against the potential decline in equity value. In other words, the put option would measure the cost to insure that Reorganized Tribune's projected equity at the end of the Stay Period would still be worth at least as much as its current adjudicated amount

13

pursuant to the DCL Plan. I believe that the put option is a reasonable proxy for measuring the potential downside market risks and market volatility. A put option does not, however, take into consideration the lost strategic opportunities and other harms that the Company would potentially experience during an extended stay period (as set forth in Mr. Hartenstein's declaration). Accordingly, the put option probably underestimates the total potential downside risk to equity that the creditors entitled to receive equity under the DCL Plan may incur during a stay.

     23. As applied here, an at-the-money put option would essentially grant non-moving creditors entitled to receive equity under the DCL Plan the right to sell their interests in Reorganized Tribune at the end of the Stay Period at the Company's adjudicated valuation of $4.536 billion (adjusted to $4.515 billion to exclude the Senior Notes represented by Law Debenture/DBTCA), in exchange for a fixed price today.[16] This quantification of market risk, using an at-the-money equity put option as an analogy, has been calculated using the Black-Scholes pricing model, which is widely adopted by investors, traders, and other capital market professionals to determine the fair market value of options, warrants, and other derivative securities. In summary, the primary variables used to estimate the price of the two-year put option are: (1) a term of two years; (2) a two-year U.S. Treasury rate of 0.24%; (3) volatility based on an analysis of the mean and median 100-day volatility and current implied volatility for comparable media companies representative of the Company's various lines of business as of August 6, 2012 (those same companies used in the Court-approved valuation of the Company); and (4) the equity value of the Company to the non-moving creditors upon emergence of $4.515 billion, which equals the exercise price. Based on this conservative approach to valuing the

---

[16] The assumptions underlying the put option calculation are set forth in more detail in Exhibit B.

potential risks to equity, a fair quantification of such risks, using a two-year at-the-money equity put option as an analogy, would likely be approximately $992 million.

24.    The equity put methodology is also a fair proxy for measuring the potential downside market risks during an extended stay period based on the nature and composition of the creditors who are to receive equity under the DCL Plan and the quantum of property interests for which they bargained under the DCL Plan.  Moreover, given the conservative assumptions underlying the foregoing put analysis, the actual amount of aggregate harm could potentially be even greater based on the considerable business constraints and other strategic risk that the Company may face during any such stay period, as outlined in greater detail in the Hartenstein Declaration.  If the equity value were to decline by an amount exceeding the put value of approximately $992 million, then a bond in that amount will not protect the non-moving creditors from the risk of that decline.

### d.    Estimated Potential Harm

25.    Based on the foregoing, the amount of potential harm that may arise from market volatility and other macroeconomic risks during an extended stay period would likely be no less than approximately $992 million, and may, indeed, be potentially higher.  Moreover, contrary to the contention of the Appellants, if the non-moving creditors entitled to receive equity under the DCL Plan were to trade out of their positions by selling their claims in the secondary markets before the Company's emergence, then the potential amount of harm to those creditors would be no less than approximately $523 million based on current discounted trading rates, and it is fair to conclude that the amount of that harm would likely increase in the event of an extended stay pending appeal.

[Signature page to follow]

I declare under penalty of perjury that the foregoing is true and correct.

Dated: August 6, 2012

DAVID S. KURTZ
Vice Chairman of Investment Banking and Head of
the Global Restructuring Group
Lazard Ltd.

Sworn to and subscribed before me this
6 day of August, 2012.

Notary Public

OFFICIAL SEAL
CHRISTINA K CELESTINO
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:08/18/15

**EXHIBIT A**

BOND SENSITIVITY ANALYSIS

TO STAY DURATION

**Bond Amount Estimates for Potential Stay Periods**

| $ in billions | | | | |
|---|---|---|---|---|
| **Delayed Effective Date:**<br>**Stay Duration:** | **23-Sep-13**<br>**12 months** | **23-Mar-14**<br>**18 months** | **23-Sep-14**<br>**24 months** | **23-Mar-15**<br>**30 months** |
| Incremental Chapter 11 Expenses | $    0.056 | $    0.085 | $    0.113 | $    0.141 |
| Distributable Cash Delay [a] | 0.132 | 0.201 | 0.272 | 0.346 |
| Free Cash Flow Distribution Delay [a] | 0.002 | 0.007 | 0.014 | 0.025 |
| Debt Amount Delay [a] | 0.075 | 0.115 | 0.156 | 0.199 |
| Equity Delay | 0.709 | 0.864 | 0.992 | 1.104 |
| **Total Financial Impact / Harm** | **$    0.974** | **$    1.271** | **$    1.548** | **$    1.814** |

Note:
  *(a) Estimates based on reinvestment yield of 6.896%*

# **EXHIBIT B**

PUT OPTION ANALYSIS

# TRIBUNE

# Bond Sizing Analysis: Put Option Valuation

($ in millions)

The value of the hypothetical put option is presented below using the Black-Scholes model

- The analysis assumes the Plan Equity Value is $4,515 million (adjusted to exclude the equity value attributable to Senior Noteholders) per the midpoint of the February 2012 Valuation Update
- Volatility is based on the mean and median volatility of the companies used in the various comparable public company analyses in the Lazard valuation
- Based on the analysis below, a two-year at-the-money put option for Tribune would cost $992 million

| INPUTS | |
| --- | --- |
| Time to Expiration in Years (T) | 2.0 |
| U.S. Treasury Rate (2-yr) (r) | 0.24% |
| Volatility (s) | 40.0% |
| Plan Equity Value (S) | $4,515 |
| Exercise Price (K) | $4,515 |

| BLACK - SCHOLES FORMULA ASSUMING PUT-CALL PARITY | |
| --- | --- |
| D1 = (ln(S/K) + (r + s^2/2)(T)) / s(T^0.5) = | 0.2913 |
| D2 = D1 - s(T^0.5) = | (0.2744) |
| Call Option Price = S* N(D1) - K*e^(-r*T)*N(D2) = | $1,013.94 |
| Put Option Price = K*e^(-r*T) - S + Call Price | $992.32 |

| PUT OPTION VALUE SENSITIVITY | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Time to Expiration | | | | | | |
| Volatility | 1.00 | 1.25 | 1.50 | 1.75 | 2.00 | 2.25 | 2.50 |
| 15.0% | $264 | $295 | $322 | $347 | $370 | $391 | $412 |
| 20.0% | 354 | 395 | 431 | 465 | 496 | 525 | 552 |
| 25.0% | 443 | 494 | 540 | 582 | 621 | 658 | 692 |
| 30.0% | 532 | 594 | 649 | 699 | 746 | 789 | 830 |
| 35.0% | 621 | 693 | 757 | 815 | 870 | 920 | 968 |
| 40.0% | 709 | 791 | 864 | 931 | 992 | 1,050 | 1,104 |
| 45.0% | 797 | 889 | 970 | 1,045 | 1,114 | 1,178 | 1,238 |
| 50.0% | 885 | 986 | 1,076 | 1,158 | 1,234 | 1,304 | 1,370 |
| 55.0% | 972 | 1,082 | 1,181 | 1,270 | 1,352 | 1,429 | 1,500 |