## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

**ROBERT HENKE,**

      **Claimant**

**Chapter 11**

**Case No. 08–13141 (KJC)**

**TRIBUNE COMPANY, et al.,**

      **Debtors**

### CLAIMANT'S RESPONSE TO DEBTORS' ADDITION TO THEIR
### SUPPLEMENTAL OBJECTION TO CLAIMS OF ROBERT HENKE

**1.** Herein, claimant provides a response to an addition to a supplemental objection (the "addition;" Exhibit A), filed by the debtors and the debtors in possession in the subject chapter 11 bankruptcy cases (the "debtors"), mainly to an amended claim, Claim No. 7106 (the "amended claim" or the "amended complaint"). Claimant filed this claim against debtor *The Baltimore Sun* Company ("*The Sun*"). The claim consists of a cover form and an amended legal complaint that claimant plans to submit to the Circuit Court for Baltimore City (the "Circuit Court"). Essentially, the amended complaint (Exhibit B) is to replace his original complaint (the "original complaint") put forth in Claim No. 3697 (the "original claim"). The original claim was filed by Robert Henke on June 8, 2009 and the amended claim on April 19, 2012. The amended complaint includes counts of false defamation and deceitful misrepresentation.

**2.** A hearing on the supplemental objection was held in the U.S. Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") in Wilmington, Delaware on July 11, 2012. The presiding judge was the Honorable Kevin J. Carey, United States Bankruptcy Judge. Claimant received the addition to the supplemental objection on July 6, 2012. Whereas the supplemental objection addressed claimant's counts of false defamation, the addition addressed claimant's counts of deceitful misrepresentation. With little time, claimant was only able to prepare a partial

response to the addition for the hearing. Judge Carey allowed claimant an additional 30 days to provide a complete response.


**3.** Additionally, regarding an issue of the possibility of a statute of limitations violation, Judge Carey allowed claimant to address relevant Maryland state case history. Claimant, who is not an attorney, did not know that it fell on him to do so.


## Abbreviations

The addition ———————————— the addition to debtors' supplemental objection

The amended claim ——————— Claim No. 7106 of Robert Henke

The amended complaint ————— the body of the amended claim

The article ——————————————— the news article that is the subject of claimant's complaints

The Bankruptcy Court —————— The U.S. Bankruptcy Court for the District of Delaware

The Circuit Court ——————————— The Circuit Court for Baltimore City

The Court of Appeals —————— The Court of Appeals of Maryland

The debtors ——————————————— the debtors or debtors in possession

The firm ————————————————— claimant's and his wife's firm

The misconduct ————————————— the possible official and professional misconduct that targeted claimant, his wife, and their firm

NIST ——————————————————————— the National Institute of Standards and Technology

NSF ————————————————————————— the National Science Foundation

The original claim ——————————— Claim No. 3697 of Robert Henke

The original complaint ————————— the complaint put forth in the original claim

The original objection —————————— debtors' objection to the original claim

The original reply ————————————— claimant's response to debtors' objection to his original claim

Response to Addition to Supplemental Objection; Claim No. 7106; Case No. 08-13141 (KJC)
Page 3
August 8, 2012

The primary misrepresented contents of the article ---- the misrepresented contents of the article that claimant links to non-reputational harm

*The Sun* ------------------------- *The Baltimore Sun* Company, *The Baltimore Sun*

The supplemental objection ------ debtors' objection to the amended claim

The undertaking ----------------- the efforts of claimant and his wife towards bringing their new technology to practice

The University ------------------ The Johns Hopkins University

## Contents that Follow

|  | Page |
|---|---|
| Introduction | 3 |
| Background Summary | 4 |
| Summary of Issues at Hand and Allegations | 4 |
| Details: Possibility of Statute of Limitations Violation | 5 |
| Details: Deceitful Misrepresentation Claim | 8 |
| Conclusion | 37 |
| Appendix: Exhibits | 38 |

## Introduction

**4.** In the following sections, claimant first provides a background summary. Then, he provides a summary, basically of the remainder of the document. Thereafter, he provides details, first, regarding the possibility of a statute of limitations violation and second, regarding his claim of deceitful misrepresentation. Lastly, claimant provides a conclusion.

Response to Addition to Supplemental Objection; Claim No. 7106; Case No. 08-13141 (KJC)
Page 4
August 8, 2012

## Background Summary

**5.** The amended claim stems from a *pro se* lawsuit filed by claimant Robert Henke in the Circuit Court against newspaper publisher *The Baltimore Sun* Company and a *Sun* reporter. Claimant alleges that *The Sun* prominently published a material fabrication, authored by the reporter, in a two-and-one-half page, front-page Sunday, October 7, 2007, article (the "article") that defamed claimant falsely. Claimant also alleges that *The Sun* gained his consent to and his and his family's cooperation towards the article, to their harm, through deceitful misrepresentation.

**6.** Claimant originally sought monetary relief of $100M and seeks non-monetary relief for harms brought about by the article.

**7.** Facts and reason suggest 1 ) that *The Sun* defamed claimant falsely to protect two decades of possible official and professional misconduct that targeted claimant, his wife, and their firm (the "firm") and 2) that *The Sun* took part in that misconduct. Claimant contends that the misconduct methodically brought him, the firm, and his family to a state of ruin.

## Summary of Issues at Hand and Allegations

**8. Possibility of statute of limitations violation** – In their original and supplemental objections, debtors allege that, in the submission of his original complaint, claimant violated the one year statute of limitations for a defamation lawsuit. Claimant searched Maryland state case history and found a case that appears to support his contention that he did not do so.

**9. Deceitful misrepresentation claim** – In debtors' addition to their supplemental objection (Exhibit A), debtors put forth four allegations regarding claimant's counts of deceitful misrepresentation. On the basis of the allegations, debtors argue that claimant's claim should

Response to Addition to Supplemental Objection; Claim No. 7106; Case No. 08-13141 (KJC)
Page 5
August 8, 2012

be disallowed. Debtors allege that 1) claimant re-cast his defamation complaint as a fraud complaint; 2) claimant's allegations of deceitful misrepresentation consisted of "vague, indefinite promises" and "vague, subjective predictions" (par. 4, Exhibit A); 3) claimant failed to "plead damages proximately caused by reliance on the alleged misrepresentations" (par. 5, Exhibit A); and 4) claimant's allegations of deceitful misrepresentation violate First Amendment considerations.

10. Claimant argues that his claim should be allowed. He alleges that 1) even before he submitted his original complaint his charges included deceitful misrepresentation; 2) three of his five counts of deceitful misrepresentation were not promises or predictions and the two that were promises were not vague; 3) he did plead proximately caused damages – though unknowingly - and in instances in which he did not he seeks to amend his amended complaint in recognition of this legal issue; and 4) he believes *The Sun* forfeited First Amendment protections.

## Details: Possibility of Statute of Limitations Violation

11. **Issue** - The issue in question is that of whether claimant filed his lawsuit on October 6, 2008 (one day before the expiration date of the one-year statute of limitations for a defamation complaint in the state of Maryland), when the Circuit Court signed for his mailing, or on January 12, 2009, when the complaint was registered in the Circuit Court's record system (three months after the expiration date of the statute of limitations). This issue was raised most recently by debtors in their June 11, 2012 supplemental objection to claimant's amended claim, No. 7106, and addressed by claimant in his June 27, 2012 reply to that objection. Both of these documents have been distributed; he repeats only a minimum of the contents herein.

Response to Addition to Supplemental Objection; Claim No. 7106; Case No. 08-13141 (KJC)
Page 6
August 8, 2012

**12. Claimant's findings** - Claimant found a Maryland state case that appears to support his contention that he did not violate that state's one year statute of limitations for a defamation lawsuit. The case (Exhibit C) is identified as *Eastern Air Lines, Inc. v. Phoenix Savings and Loan Association, Inc.*, 239 Md. 195; 210 A.2d 515; 1965 Md. LEXIS 540. This case was decided by the Court of Appeals of Maryland (the "Court of Appeals") on June 4, 1965.

**13.** As claimant understands (He draws on the Opinion, p. 3, rather than the Overview, p. 1. The two seem somewhat at odds; the Overview refers to a rejected claim whereas the Opinion refers to a rejected "petition of contest."), this case is centered on the question of whether or not a "petition of contest" stemming from a denied bankruptcy claim was timely filed. The petition was submitted in time but was returned because of the absence of a signature of a Maryland attorney. Plaintiff did not submit a revised petition until after the period allowed. The Court of Appeals ruled that the petition was timely filed. The ruling seemingly was based on 1) apparent Maryland state legal practice regarding statutes of limitations and 2) a finding that plaintiff "was not guilty of laches, nor was anyone hurt by the late amended filing." (p. 1, Exhibit C)

**14.** Of particular interest is the apparent Maryland state legal practice regarding statute of limitations on which the Court of Appeals drew (p. 5, Exhibit C):

> **14a.** "In furtherance of the aim and purpose of law to ascertain and give effect to the truth and so do substantial justice, there has evolved a rule, exemplified in various aspects, that [HN2] the filing within the period of limitations of an assertion of a claim which is deficient or wrong in form or otherwise technically defective will toll the statute of limitations to the extent that the filing of a correct assertion of claim after the expiration of the statute will relate back to and validate the original assertion of claim, as long as

the corrected statement does not introduce a new cause of action or a new theory of liability or new parties. 34 Am. Jur. *Limitation of Actions*, Secs. 260-264, 266; *Cline v. Fountain, Etc., Company*, 214 Md. 251; *Brooks v. Childress*, 198 Md. 1; *Doughty v. Prettyman*, 219 Md. 83; *cf. Haldas v. Comrs. of Charlestown*, 207 Md. 255; and *Talbott v. Gegenheimer*, 237 Md. 62."

15. And, in the Opinion, the Court of Appeals put forth a specific and relevant example (p. 7, Exhibit C):

15a. "The weight of authority seems to be that [HN7] the absence of a signature to a pleading does not make it void or a nullity but only irregular. The case of *Canadian Bank of Commerce v. Leale* (Ct. of App. Calif.), 111 Pac. 759, citing many supporting cases, so found. There, a complaint seeking recovery on a promissory note was filed one day before the end of the period of limitations. Neither the plaintiff nor its counsel had signed the complaint. An amended complaint bearing both signatures was filed fifteen days later. The Court held that the filing of the unsigned complaint commenced the action and tolled the statute, and the omission of the signatures was an irregularity which could be cured by an amendment which related back to the original filing. See also *J.M. Batterson Estate, Inc. v. Edwards* (Mo.), 115 S. W. 2d 1, to the same effect."

16. Claimant believes that his complaint falls under the cited rule and that the example applies. As brought out in detail in his reply to debtors supplemental objection (pars. 9-32 of that reply), he submitted his complaint before the expiration of the statute of limitations for the complaint. The Circuit Court asked for more information and, it seems, a different form of the fee payment than that he had provided. He provided the requested information and proper payment form

within two weeks but, he did not change his complaint. However, it appears that the Circuit Court had misplaced his mailings, leading to an additional delay in the registering of his complaint in the Circuit Court's system of records. Claimant believes that the history of his filing that he put forth in, for example, his reply to debtors' supplemental objection (par. 13 of that reply) does not show signs of negligence on his part. Nor does he believe that debtors suffered harm as a result of the delay in the official registering of his complaint. In fact, *The Sun* had timely notice of the complaint; claimant had sent a copy of the complaint to the publisher of *The Sun*. *The Sun* signed for the corresponding mailing on October 6, 2008 (Exhibit D), a day before the October 7, 2008 expiration of the statute of limitations.

## Details: Deceitful Misrepresentation Claim

**17.** In this section, claimant addresses the four allegations put forth by debtors in the addition to the supplemental objection: 1) claimant re-cast his defamation complaint as a fraud complaint; 2) claimant's allegations of deceitful misrepresentation are "vague, indefinite promises" and "vague, subjective predictions" (par. 4, Exhibit A); 3) claimant failed to "plead damages proximately caused by reliance on the alleged misrepresentations" (par. 5, Exhibit A); and 4) claimant's allegations of deceitful misrepresentation violate First Amendment considerations. Lastly, claimant discusses the matter of his retaining counsel for his lawsuit against *The Sun*.

**18.** Claimant provides a copy of the opinion of the U.S. Court of Appeals for the First Circuit on *Veilleux, et al., v. National Broadcasting Co., et al.*; 206 F.3d 92; 2000 U.S. App. LEXIS 3388 as Exhibit E. Debtors cited this opinion in their addition to the supplemental objection. Claimant includes the opinion as an exhibit because much of his understanding and many of his arguments regarding debtors' objections to his misrepresentation claim stem from that opinion.

## Re-casting of defamation complaint as fraud complaint

**19.** Debtors state "Mr. Henke's newly-asserted fraud claim seeks the same damages as his defamation claim and is grounded on the same complaints about the Sun's reporting, but it seeks to re-cast that claim as one for fraud" (par. 2, Exhibit A) and "I[i]n short, Mr. Henke's attempt to avoid the statute of limitations for defamation by re-casting his complaint as one for fraud fails to state a claim ....." (par. 6, Exhibit A)

**20.** Much of this is incorrect.

**21. "Newly-asserted"** - Claimant's intent to allege fraud pre-dates even his October 3, 2008 original complaint (Exhibit F) and has been well within debtors' view since their receipt of that complaint.

**22.** In his original complaint, claimant alleged that "...... *The Sun* gained my family's cooperation through false pretenses; ....." (par. 4, Exhibit F).

**23.** And in his April 7, 2010 reply to debtors' original objection to his original claim, Claim No. 3697, claimant put forth three example draft amendments to the original complaint. Two of these were examples of false defamation (pars. 44-62, claimant's original reply). One was an example of what claimant referred to as "deceit ... with intent to do harm" (pars. 63-6, Exhibit G). While claimant did not use the term "deceitful misrepresentation" as he had not yet progressed to that stage of knowledge, it is unmistakable that he was putting forth the elements of a deceitful misrepresentation allegation.

**24.** If debtors did not see the makings of an allegation of deceitful misrepresentation in

Response to Addition to Supplemental Objection; Claim No. 7106; Case No. 08-13141 (KJC)
Page 10
August 8, 2012

claimant's original complaint, they should have in his April 7, 2010 reply to debtors' original objection to his original claim. Debtors have had access to that reply for over two years.

25. Moreover, this history is entirely consistent with claimant's mindset before he ever filed his original complaint. For example, in a July 15, 2008 letter (Exhibit H) by which he approached an attorney in his search for representation for a lawsuit against *The Sun*, claimant wrote

25a. "I am writing in search of representation in a matter involving the possibility of defamation by a newspaper, *The Baltimore Sun* ("*The Sun*"), and, perhaps, fraud. .... [par. 1, Exhibit H]

25b. .......... Regarding the possibility of fraud, my family and I cooperated with *The Sun* on the article only because of what appear to have been false pretenses. [par. 2, Exhibit H]"

26. **Grounding of claim** - Regarding debtors' claims that "Mr. Henke's newly-asserted fraud claim ....... is grounded on the same complaints about the Sun's reporting" (par. 2, Exhibit A) and that he is "re-casting his [defamation] complaint as one for fraud" (par. 6, Exhibit A), the defamation and misrepresentation claims are quite distinct from each other. Claimant's claim of false defamation is based on false defamatory statements in the article; his deceitful misrepresentation claim is based on statements made and impressions given to him by *The Sun* before the publication of the article. There is very little overlap between the two.

**Vagueness of misrepresentations**

27. Debtors charge that claimant does not allege "specific misrepresentations of material facts;"

rather, he puts forth "vague, indefinite promises .... vague, subjective predictions of what a future news article might look like." (par. 4, Exhibit A) Claimant disagrees. He addresses each misrepresentation by the count in the amended complaint (pars. 94-115, Exhibit B). Claimant addresses only main issues.

**28. Count #12: Misrepresentation of intent** – Debtors classify claimant's allegations under this count seemingly as "vague, indefinite promises" (par. 4, Exhibit A). They allege the "promises" to be that "the Sun would not discredit him" (par. 4, Exhibit A) and that "the article would be sympathetic" (footnote 4, Exhibit A). Debtors' classification and restatement of claimant's allegations are materially incorrect.

**29.** Regarding classification, claimant's allegation was not one of unmet "promises." Rather, he alleged that *The Sun* misrepresented then-existing intentions; that is, *The Sun* misrepresented its state of mind. This, he understands, is a critical distinction in deceitful misrepresentation (pp. 967-71; *McElrath v. Electric Investment Co.* and *Burgdorfer v. Thielemann*; 7. Prediction and Intention; Misrepresentation, Chapter XVII; Torts, *Cases and Materials* – Seventh Edition; Prosser, Wade, and Schwartz).

**30.** Moreover, the "promises" that debtors' allege do not resemble the representations that claimant had put forth in his amended complaint (Exhibit B). Claimant repeats relevant excerpts of Count #12 (pars. 98-102, Exhibit B) in support of his claims:

**30a.** "**98.** ..... *The Sun* misrepresented what plaintiff believes to have been, from the outset, its true intent with the article: to discredit him while concealing possible official and professional misconduct. He was of the belief *The Sun* intended to publish a sincere

account of the undertaking with, perhaps, shallow coverage of human matters. *The Sun* fully upended his expectations; *The Sun,* in essence, published a history that, among other things, was largely personal; brought out deeply private and personal matters; was broadly and deeply untruthful; and stripped the undertaking of its material truths."

**30b.** "**99.** As to facts, on January 3, 2007, in part, according to plaintiff's diary and, in part, as he recalls, in expressing interest in writing an article, Mr. Dechter said he sought to write an article about bringing out something new and useful and the troubles that can be faced in that, an article that would also bring out a "human side." To verify his expectations, plaintiff queried he would expect the article to be consistent with *Sun* reporter Douglas Birch's article about plaintiff's and Ms. Henke's lawsuits against NSF [the National Science Foundation] and NIST [the National Institute of Standards and Technology]. Essentially, Mr. Dechter said it would be; and he added he had read the article and it was a good article. That article covered the lawsuits, not human, let alone personal and private matters. Especially because of the public interest element of the matters at hand and the standing of *The Sun*, it was beyond plaintiff's grasp to see *The Sun* greatly straying from that model."

**30c.** "**100.** *The Sun* further suppressed the possibility of its intruding into personal and private matters. Mr. Dechter said the article would be very difficult, suggesting the family would suffer blows. Unclear as to what he meant, plaintiff asked him how they would differ from those of the past. (At that time, though the family had suffered greatly (par. 9, p. 3), personal and private matters had never been raised and his family had never been attacked directly.) Plaintiff does not recall Mr. Dechter's answer or if he did answer; he knows, though, Mr. Dechter did not say *The Sun* would inquire into and publicize

personal and private matters. Mr. Dechter did ask him, on February 13, 2007, to provide a list of individuals from his past. Plaintiff felt truly uneasy about this. He complied only because of the standing of *The Sun* and because he did not even consider the possibility that *The Sun* would invade his privacy."

**30d.** "**101.** In hindsight, there are many signs *The Sun's* true intent was to discredit plaintiff while concealing possible misconduct and many of these suggest it held this intent from the outset. Main signs of that intent include the flagrancy of the article and *The Sun's* reporting towards discrediting of plaintiff and concealment (pars. 19-20, 24-9, pp. 8, 9-11); *The Sun's* repeated evasion of the matter of plaintiff's 2006 approach to *The Sun* (par. 119, p. 39); *The Sun's* disclosure and avoidance failures (pars. 114-5, p. 38 and par. 117, p. 39); *The Sun's* invasion of the privacy of plaintiff's family (par. 116, p. 39), its seeming deceit regarding his younger son (pars. 111-3, pp. 37-8), and its scheduling of its interviews in North Carolina during a court hearing for him (par. 113, p. 38); *The Sun's* seeming deceit regarding plaintiff's leaving the Air Force (pars. 108-10, pp. 36-7); and *The Sun's* seeming deceit regarding its need for proof (pars. 103-7, pp. 35-6)."

**30e.** "**102.** Taking that *The Sun* intended to discredit plaintiff while concealing the possibility of misconduct, plaintiff believes *The Sun's* failure to disclose this to him suggests *The Sun* was aware he was under a false impression regarding intent. This is so since it would seem irregular 1) for an essentially private figure to consider that a reputable newspaper sought to discredit him and to conceal the possibility of wrongdoing and 2) for him to continue to cooperate if that was his impression. In fact, *The Sun* was aware of his views of the intent of the article and coverage (pars. 98-9, p. 33; par. 105, p.

35; pars. 108-10, pp. 36-7; and pars. 111-3, pp. 37-8); yet, *The Sun* took no legitimate

steps to discourage those views (pars. 99-100, pp. 33-4), suggesting intent to deceive."

**31.** Clearly, claimant's allegation was one of misrepresentation of then-existing intent and he did

not allege that *The Sun* promised it "would not discredit him" and that "the article would be

sympathetic." Claimant did not complain of such qualitative and contingent measures of an

article. Rather, he alleges that *The Sun* 1) made two specific representations regarding contents

of the article that it did not intend to honor: i) to include the troubles that claimant and his wife

faced in bringing their technology to practice (the "undertaking") and ii) that the article would be

consistent with *The Sun's* 1995 article on their lawsuits and 2) failed to disclose to claimant that

it would publish personal and private matters.

**32.** Regarding the specificity of *The Sun's* representations and disclosure failure, given the

history of claimant's circumstances, of which *The Sun* was made fully aware, claimant believes

the representations and disclosure failure on which he based his impressions of *The Sun's*

intent are specific matters of fact.

**33.** First, the representation that *The Sun* intended to publish an article that would bring out the

troubles faced in advancing something new (par. 30b herein) had precise meaning to both

claimant and *The Sun*. In particular, those troubles included, among others, claimant's charging

of students with plagiarism, the possibility of retaliation for this through methodical manipulation

of government grant competitions, and the possibility of related misconduct by *The Sun*. *The Sun*

*Sun* was fully aware of these specific troubles; those and other troubles are what moved

claimant to approach *The Sun* in 2006 (pars. 4-6 and 12-3, Exhibit B). At the very least, *The*

*Sun's* representation carried the intent to include the most substantial of the troubles, especially

considering the element of public interest. Not only did *The Sun* omit those troubles, it actively concealed them (for example, pars. 38, 40-1, 45-8, 49, and 53-5, Exhibit B).

**34.** Second, *The Sun's* representation that the article would be consistent with *The Sun's* August 3, 1995 article on claimant's lawsuits against the National Science Foundation and the National Institute of Standards and Technology (Exhibit I) was quite specific. That article focused solely on the matter of public interest – the lawsuits. Claimant believes that consistency could reasonably be interpreted in only one way – that the subject article would, for the most part, cover the public interest element of claimant's circumstances. Yet, the contrast between *The Sun's* 1995 article (Exhibit I) and its 2007 article (Exhibit A of Exhibit B) could not be more stark; the former was solely a public interest article while the latter was largely a deep personal profile in which the elements of greatest public interest had been actively concealed. This was not an inversion from which the public benefited.

**35.** And, third, *The Sun's* failure to disclose to claimant that it would publish personal and private family matters, particularly under questioning, appears to claimant to have been a very specific concealment of material fact. Claimant believes that it fell on *The Sun* to have alerted him to this possibility. At the time, claimant was, in the most fundamental sense, a private figure; he was unaware of what he could be facing with the press. Plus, he was overwhelmed by the suffering of his family. (This, he believes, required even greater need for clarity on the part of *The Sun*.) And so he was unguarded and vulnerable.

**36.** Furthermore, claimant believes each of *The Sun's* representations and its disclosure failure to be of a level of specificity that courts have ruled sufficient for a misrepresentation claim. For example, in *Veilleux, et al., v. National Broadcasting Co., et al.*; 206 F.3d 92; 2000 U.S. LEXIS

Response to Addition to Supplemental Objection; Claim No. 7106; Case No. 08-13141 (KJC)
Page 16
August 8, 2012

3388 (Exhibit E), the U.S. Court of Appeals for the First Circuit judged "defendants' alleged promise not to include PATT [Parents Against Tired Truckers; a vocal advocacy group] in the Dateline program ..... to be a misrepresentation made in circumstances that a Maine court today would find actionable." And each of the three matters addressed above regards specific contents of the article (past troubles; public interest matters; or personal and private matters) that, given the circumstances, claimant believes would be seen by any reasonable person as being material towards gaining claimant's consent to and cooperation towards an article.


**37. Count #13: Misrepresentation of need for proof** – Debtors classify claimant's allegations under this count seemingly as "vague, indefinite promises" (par. 4, Exhibit A). They allege the promises to be that "the Sun .... would not seek proof" (par. 4, Exhibit A) and that "the Sun would take whatever Mr. Henke had to say at face value without seeking proof" (footnote 4, Exhibit A). Claimant questions debtors' classification and he did not put forth the latter restatement of claimant's allegation.


**38.** With his limited knowledge of legal matters, claimant does not see the matter of proof as being raised as a promise. Rather, it was simply put forth as a representation of the article that *The Sun* volunteered in describing the article and that claimant accepted on its face; he had no reason not to accept it. As claimant recalls, *The Sun* said, roughly, it would not try to prove who did what. At the time, *The Sun* was quite aware of claimant's concerns. *The Sun's* representation simply led claimant to believe that proof of his concerns was not an issue. As it happened, though, *The Sun's* representation was material to claimant. It would have been perfectly fine with him, if, initially, *The Sun* had been unwilling to publish that for which there was not proof. However, then claimant would not have consented to the article or cooperated towards its publication. He repeats relevant excerpts of Count #13 to provide support for his

claims:

**38a.** "**103.** .... At the outset, *The Sun* led plaintiff to believe that proof of his concerns wasn't an issue. This allowed *The Sun* to maintain his cooperation. Then, well into the article, *The Sun* abruptly grew a need for such proof."

**38b.** "**104.** As to facts, plaintiff recalls and his diary shows Mr. Dechter volunteered to him and Ms. Henke at the outset *The Sun* would not try to prove matters. This left him believing proof was not an issue. This was a key matter; while his beliefs were greatly supported by circumstances, he was not aware of absolute proof. Had he known proof was needed, he would not have seen value in an article and would not have consented to it."

**38c.** "**105.** But, during a May 2, 2007 interview of plaintiff in North Carolina, four months into the article and having had detailed and unambiguous materials on plaintiff's beliefs for those four months, Mr. Dechter expressed concern plaintiff didn't have proof of his beliefs. He said, according to plaintiff's diary, "[The] *Sun* needed to be certain of matters." During the interview, plaintiff said if he had proof he wouldn't have needed *The Sun*. And, seeing the loss of the value of the article, he recalls having said maybe the article should be abandoned. Mr. Dechter opposed that idea."

**38d.** "**106.** If it is true that *The Sun* needed proof of plaintiff's claims, then he believes the original impression that *The Sun* created that proof was not an issue was knowing deceit. Plaintiff believes this to be the case because he believes the need for proof to be a fundamental matter of journalism. That is, he believes that any journalist for a

reputable newspaper would have known whether or not proof was needed. As to reliance, plaintiff believes *The Sun*, aware of his ignorance of media practices, would have made any material representation on such practices with the intent of reliance."

**38e.** "**107.** In seeming added deceit, while it expressed concern over proof of plaintiff's beliefs, *The Sun*, he believes, knowingly withheld from him such proof (par. 119, p. 39). He also believes *The Sun's* continuing with the article and then publishing it prominently despite the apparent collapse of what seemingly was the main intent of the article (par. 105, p. 35) – to publish a sincere account of the undertaking – suggests it had an undisclosed intent. In light of all else, it seems that intent was to discredit him."

**39.** Regarding specificity, given the circumstances, *The Sun's* representation does not appear to have been either vague or unreasonable. To claimant, it seems there were three distinct possibilities as to what *The Sun* could publish: 1) that initially advanced by *The Sun* in which *The Sun* would not seek to prove who did what, 2) an investigative piece in which *The Sun* would publish what it represented it would publish (par. 30b herein) but would seek proof, and 3) a piece in which *The Sun* would publish only that for which there was proof. Given the crippling downturn in print media at the time, to claimant, it seemed an investigative piece would have required an unfitting level of effort and investment. The third possibility made even less sense. That would have stripped the article of material matters essentially leaving a half-truth of little public interest value.

**40.** In hindsight, facts and reason suggest that neither proof nor public interest were genuine issues for *The Sun*; in the article, *The Sun* actively concealed material facts of public interest for which there was proof and published a large number of material untruths of questionable public

interest which, by definition, could not possibly have had proof. The concealed facts include, for
example, that claimant charged three students with plagiarism (par. 38, Exhibit B), that many
grant proposals claimant and his wife submitted to government funding agencies were treated
irregularly in various manners (pars. 45-8, Exhibit B), and that *The Sun* had published a large
number of articles that suggest it had, over a period of roughly two decades, among others
things, stalked claimant and protected possible architects of the official and professional
misconduct that he believes targeted him, his wife, and their firm (pars. 53-5, Exhibit B). The
material untruths of questionable public interest include *The Sun's* false theme that claimant
sacrificed his family for "geologic immortality" (pars. 30-5, Exhibit B) and other representations
of his person (pars. 56-69, Exhibit B).

**41. Count #14: Silent misrepresentation regarding Air Force** - Debtors appear to classify
claimant's allegation under this count seemingly as a "vague, indefinite" promise (par. 4, Exhibit
A). They describe the allegation as "an alleged 'silent misrepresentation' giving Mr. Henke 'the
impression' that the Sun would not report about his reasons for leaving the Air Force" (footnote
4, Exhibit A).

**42.** Claimant objects to debtors' classification and description for two reasons: 1) claimant does
not believe the promise, which he saw as implied, to have been either vague or indefinite and 2)
debtors' omit material facts regarding the context of the promise. The following repeats relevant
excerpts of Count #14 in support of his claims:

    **42a.** "**108.** ..... Through seeming evasion, *The Sun* gave plaintiff the impression it would
    honor his repeatedly expressed need for privacy regarding his leaving the Air Force.
    However, instead of doing so, in defiance of him, *The Sun* apparently sought to and did

uncover why he left and then published the reason. *The Sun* stated "His [plaintiff's] bride had had an affair." {99}."

**42b.** "**109.** As to facts, a January 4, 2007 entry in plaintiff's diary on the matter states "[plaintiff told Mr. Dechter he] left [the Air Force] after 2 months – [for] family problems. He [Mr. Dechter] wanted to know what they were. I [plaintiff] said I wanted to keep that private." Though he raised the issue and thereby created an impression in plaintiff, Mr. Dechter said nothing. Because of the standing of *The Sun,* plaintiff quite naturally saw this response as consent to honor his privacy. He restated his need twice, as a constraint in a release statement, in an attachment to a February 16, 2007 email to Mr. Dechter [Exhibit J herein]. (Mr. Dechter had specifically requested a release statement from plaintiff.) Again, Mr. Dechter said nothing. It appears, though, *The Sun* had no intention of complying with plaintiff's constraint. In her May 2, 2007 interview with Mr. Dechter, Ms. Henke told him why plaintiff left the Air Force. During a May 4, 2007 interview, Mr. Dechter told him of that. He responded with disbelief; his diary shows he replied, "your [you're] not going to write about that[,] are you. [?]" Mr. Dechter said he would."

**42c.** "**110.** Plaintiff cannot see *The Sun* as not having been acutely aware he was relying on *The Sun* to honor what he believed was a pledge and that, through repeated silence, it was creating the false impression it would. *The Sun's* failure to undo that impression suggests it intended for him to rely on the impression. Particularly in view of *The Sun* having raised the issue and created an impression (par. 109, p. 36); its representations regarding coverage (pars. 99-100, pp. 33-4); and plaintiff having included his constraint as part of a release statement, he believes *The Sun's* withholding to have been the

knowing deceit of active concealment."

43. Claimant believes *The Sun's* implied promise to be of the level of specificity of the promise

that the U.S. Court of Appeals for the First Circuit judged to be actionable in *Veilleux, et al., v.*

*National Broadcasting Co., et al.*; 206 F.3d 92; 2000 U.S. LEXIS 3388 (Exhibit E) (par. 36

herein). Especially with claimant having twice put forth his constraint in a release statement that

*The Sun* requested (Exhibit J), *The Sun's* silence left him with the specific and definite but false

impression that *The Sun* would honor his unambiguous constraint. What's more, in contrast to

the breach of the cited case, the dishonoring of *The Sun's* implied promise offered no element

of public interest; its only purpose seems to have been to inflict harm on a family in public.

44. **Count #15: Misrepresentation regarding treatment of younger son** - Debtors classify

claimant's allegation under this count seemingly as a "vague, indefinite" promise (par. 4, Exhibit

A). They correctly put forth one variation of the promise: that "the Sun .... 'would never exploit a

juvenile'" (footnote 4, Exhibit A). Claimant contests debtors' classification in this matter on two

grounds.

45. First, to claimant, as a parent and an obviously distressed one at that, there was nothing

"vague" or "indefinite" about this promise. Coming from an eminent newspaper, "never" meant to

him, in no uncertain terms, never - regardless. Claimant believes it would have carried that

meaning to any sincere parent in similar circumstances. Moreover, claimant notes that in

*Veilleux, et al., v. National Broadcasting Co., et al.*; 206 F.3d 92; 2000 U.S. LEXIS 3388 (Exhibit

E), the appeals court ruled the promise of "positive" coverage to be too vague to give rise to a

fraud claim. It seems that a substantial factor in the court's thinking was expressed in, for

example, its statement that "An initial difficulty is whether the promise to provide 'positive' [**65]

coverage was unconditional or whether it should be interpreted as containing an implied condition that plaintiff's own conduct ..... must at least be consistent with such favorable treatment" (p. 21, Exhibit E). Claimant believes *The Sun's* "never" suggests neither ambiguity nor contingency. Additionally, given the circumstances, claimant believes that debate over the precise meaning of "exploit" would be inappropriate; for one, the circumstances did not promote deliberate analysis.

**46.** Second, on the basis of the relevant circumstances, claimant sees *The Sun's* repeated pledges as a misrepresentation of its then-existing intention; that is, its state of mind. Again, this, he understands, is a critical distinction in deceitful misrepresentation (pp. 967-71; *McElrath v. Electric Investment Co.* and *Burgdorfer v. Thielemann*; 7. Prediction and Intention; Misrepresentation, Chapter XVII; Torts, *Cases and Materials* – Seventh Edition; Prosser, Wade, and Schwartz). He repeats the allegations of Count #15 below to bring out those circumstances:

**46a.** "**111.** ...... *The Sun* made repeated pledges regarding its treatment of plaintiff's and Ms. Henke's younger son, Kevin, who was experiencing serious juvenile difficulties. *The Sun*, then, failed to honor the pledges."

**46b.** "**112.** As to facts, plaintiff recalls and his diary entries show, in a February 10, 2007 conversation, Mr. Dechter, apparently in recognition of plaintiff's and Ms. Henke's concern over Kevin's well-being, volunteered to Ms. Henke, quite sincerely, that *The Sun* would never exploit a juvenile. Plaintiff recalls Mr. Dechter having made the same pledge to him early on. On April 20, 2007, plaintiff's records show, Mr. Dechter did so again, in relation to his attending a May 3, 2007 court hearing for Kevin and, on May 1, 2007, he told plaintiff he wished to attend the hearing, not to write about it directly but because it

relates to the story. Plaintiff agreed to his attendance. Mr. Dechter, though, wrote about the hearing and in an especially hurtful manner {132-9}."

46c. "113. While plaintiff believes *The Sun* knew its pledges could be false, given the character of the matter, he believes they cannot be seen as less than reckless. His belief of knowing deceit is based on the totality of the circumstances and, in particular, *The Sun's* scheduling of Mr. Dechter's trip to North Carolina during the hearing. Plaintiff believes this suggests a calculated aim to possibly violate its pledges. *The Sun's* persistence with its pledges suggests *The Sun* intended reliance on them."

47. Count #16: Silent misrepresentation of *The Sun's* neutrality – Debtors seem to classify claimant's allegation under this count as a "vague, indefinite" promise (par. 4, Exhibit A). They describe the allegation as "a final 'silent misrepresentation' by not disclosing that its reporter had been to Johns Hopkins University ..... " (footnote 4, Exhibit A). Debtors seem to have misclassified the allegation; the misrepresentation was not put forth as a promise but as an active concealment of material fact. Furthermore, debtors greatly understate the reporter's ties to the University. Claimant repeats relevant excerpts of Count #16 in support of his claims:

47a. "114. ...... Mr. Dechter failed to disclose to plaintiff, in a timely manner (at the outset), an interest he believes would have made it difficult for him to have reported neutrally on the matters at hand. Not until May 1, 2007, four months into the article, in North Carolina, did Mr. Dechter disclose he had a fellowship to, has a degree from, and had taught at the [Johns Hopkins] University."

47b. "**115.** With news media's culture of disclosure, plaintiff cannot see *The Sun* as not having been keenly aware of the deceit of its silence. It did not come to plaintiff, essentially a private figure, that *The Sun* might be represented by a reporter with substantive hidden interests. He believes that, with its silence, *The Sun*, in awareness of its standing and plaintiff's media ignorance, would have known it was creating a false impression regarding neutrality and that it intended for him to rely and act on the impression. Plaintiff believes *The Sun's* silence to have been active concealment; for one, it withheld from him a material obstacle to realizing representations it made regarding its intent with the article (par. 99, p. 33). [par. 30b herein]"

**48.** *The Sun's* active concealment seems comparable to the misrepresentations complained of, for example, in *Food Lion, Inc. v. Capital Cities/ABC, Inc., et al.*; 194 F.3d 505; 1999 U.S. App. LEXIS 26373, cited by debtors. In that matter, reporter's falsified their credentials for the purpose of inducing Food Lion to hire them. Their aim was to gain access to Food Lion's operations with the intent of exposing unhealthy "meat-handling practices." It seems the U.S. Court of Appeals for the Fourth Circuit dismissed a corresponding fraud claim only because Food Lion was unable to demonstrate that it was injured as a result of reasonable reliance on the misrepresentations of the reporters. Claimant sees two main differences between these misrepresentations and *The Sun's* active concealment: 1) claimant believes he can demonstrate injury from reasonable reliance on *The Sun's* concealment and 2) the misrepresentations of which Food Lion complained resulted in the publication of seeming truths that served public interests whereas *The Sun's* concealment resulted in the publication of many falsehoods and a largely personal history that appears only to have served to protect the possibility of official and professional misconduct (pars. 19-93, Exhibit B).

Response to Addition to Supplemental Objection; Claim No. 7106; Case No. 08-13141 (KJC)
Page 25
August 8, 2012

**Proximately caused damages**

**49.** Claimant was not aware of the issue of "proximately caused" damages that debtors raised; his readings did not alert him to this issue. It should also be noted that, in addressing harms due to misrepresentation, he inadvertently did not distinguish clearly between "consent" and "cooperation." He will seek to amend his complaint to improve clarity and to more completely state his claims, so that justice is more likely to follow.

**50.** Additionally, in this subsection, claimant assumes that First Amendment protections apply and that he will be unable to seek damages resulting from reputational harm through a deceitful misrepresentation claim. However, he wishes to retain the right to do so – if he is allowed – in the event that First Amendment protections do not apply. As he discusses under First Amendment protections (pars. 68-71 herein), claimant is uncertain as to whether those protections apply fully.

**51.** Debtors state (par. 5, Exhibit A) "Mr. Henke's alleged injuries to his reputation were not proximately caused by any reliance on the supposed misrepresentations made by the Sun. Mr. Henke alleges that he was induced to grant interviews and otherwise 'cooperate' with the Sun, but there is nothing injurious or alleged to be injurious about sitting for interviews. Rather, his alleged reputational and emotional injuries came not from granting interviews, but rather from the Sun's editorial decisions about how to present all of the information it gathered in an allegedly false, defamatory manner. Redress for those alleged injuries would lie in a claim for defamation, not fraud, and as a result Mr. Henke fails to state a claim." Claimant addresses four issues below. However, first he cites relevant matters from past cases.

**52.** *Brock, et al., v. VIACOM INTERNATIONAL, INC., et al.*; 2005 U.S. Dist. LEXIS 12217; 33 Media L. Rep. 1764 states (p. 4 of the opinion):

**52a.** ".... [HN3] The Supreme Court has divided claims related to speech against the media into two categories based on the damages sought:

> If a party seeks damages for harm to reputation or state of mind, the suit can only proceed if that party meets the constitutional requirements of a defamation claim. If a party seeks damages for non-reputational harms, which include lost jobs and diminished employment prospects, then the First Amendment does not bar suit as long as the claims are brought under generally applicable law."

**53.** Also, *Cohen v. Cowles Media Co., et al.*; 501 U.S. 663; 115 L. Ed. 2d 586; 111 S. Ct. 2513; 1991 U.S. LEXIS 3639 states (p. 2 of the opinion):

**53a.** "[HN3] Generally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news. The truthful information sought to be published must have been lawfully acquired. .......... "

**54. First issue** – In his amended complaint, claimant allegations extended beyond granting interviews and otherwise cooperating with *The Sun*. Claimant twice stated he "agreed to an article .......... because of representations *The Sun* made in relation to [or regarding] the article, .... " (pars. 6 and 13, Exhibit B) It was his impression that *The Sun's* decision as to whether or not to go forward with an article hinged on claimant's consent. He gave his consent, in part, on

the basis of the three initial (January 3-4, 2007) misrepresentations that *The Sun* made (Counts #12, #14, and #16).


55. And regarding the resulting harm, claimant stated "plaintiff believes *The Sun's* representations led to the harm of the article (sec. IX, p. 43). Had *The Sun* been forthright in any one of the matters, clearly he and his family would not have cooperated with *The Sun*; likely, the article would not have come into being." (par. 97, Exhibit B) Claimant does not believe that *The Sun* would have decided to publish an article without his cooperation and consent. As a result, he believes that the article was the immediate product of *The Sun's* misrepresentations.


56. Herein, claimant puts forth the harm of the article, revised in consideration of the issues brought out by debtors. In this, consistent with par. 52a herein, which states that "non-reputational harms ... include lost jobs and diminished employment prospects," claimant lists only such and other pecuniary damages he believes he suffered as a result of *The Sun's* misrepresentations. Also, consistent with the rulings in *Veilleux, et al., v. National Broadcasting Co., et al.*; 206 F.3d 92; 2000 U.S. LEXIS 3388 (Exhibit E), claimant lists only such damages stemming from specific misrepresentations. In that case, to claimant's understanding, the U.S. Court of Appeals for the First Circuit concluded that a claim of misrepresentation based on a specific promise made by defendants to plaintiff "was actionable under Maine law" (p. 20, Exhibit E). The appeals court concluded "that there was sufficient evidence for the jury to reasonably find that defendants' alleged misrepresentations were a substantial factor in inducing" plaintiff to reveal operation of his business on a national television show. (p. 23, Exhibit E) The show placed the business in an unfavorable light. The appeals court also concluded "that some portion of the ensuing harm to Ray's [plaintiff's] business was foreseeable to defendants. Ray's recovery is limited, however, to those damages specifically caused by" the

breach of defendants' promise. Plaintiff "may not recover generally for harm flowing from the entirety of the broadcast" (p. 23, Exhibit E) ... "Ray must establish that his pecuniary loss was caused by the difference between the broadcast that was represented ... and the broadcast that was delivered ..." (p. 24, Exhibit E).

57. While claimant believes all his counts of misrepresentation could be argued as having contributed to non-reputational damages, he believes that Counts #12, #13, and #16 (pars. 98-102, pars. 103-7, and pars. 114-5, Exhibit B) could most easily be seen as having done so. Count #12 regards the misrepresentations that led claimant to believe that *The Sun* intended to publish an account of the efforts of claimant and his wife to bring their technology to practice 1) that, in particular and in the interest of the public, brought out the difficulties they encountered in these efforts and 2) that did not include personal and private matters. Count #13 regards the misrepresentation that led claimant to believe that *The Sun* would publish more than that for which there was proof. And Count #16 regards *The Sun's* failure to disclose, in a timely manner, ties that represent material obstacles to realizing, in particular, the publication of the difficulties claimant and Ms. Henke experienced in their undertaking.

58. Claimant believes that the differences between the actual contents of the article and the contents of the article that would be reasonably be expected on the basis of *The Sun's* representations put forth in Counts #12, #13, and #16 (the "primary misrepresented contents of the article") gave rise to the following non-reputational damages:

**58a. Obstruction of progress towards justice and redress** – Claimant believes that the primary misrepresented contents of the article helped to disable his ability to draw the interest he had long sought in investigating his circumstances. He had sought such

interest in hopes of restoring well-being to his family (pars. 4 and 12-3, Exhibit B). Claimant believes that both the misrepresented inclusions and the misrepresented omissions served as the bases for many false defamatory statements and a false defamatory theme. These, claimant believes, discouraged interest in investigation. He believes the omissions further discouraged such interest by concealing cause for investigation.

**58b. Denied professional prospects** - The primary misrepresented contents of the article, claimant believes, materially helped to irreversibly deprive him of professional prospects. He believes he had growing prospects. He had had two articles published in what he believes to be the foremost international peer-reviewed journal on earthquake matters (*The Bulletin of the Seismological Society of America*, June 2002 and December 2003). And, at the time of the publication of the article, he had attracted sincere employment interest from the Nuclear Regulatory Commission (NRC) (par. 118, Exhibit B). Plus, he had just been invited to review a manuscript for the journal cited above. The lead author had even expressed interest in further exchanges with him. He was not offered the NRC post and he never again heard from the author or the journal.

**58c.** Claimant also believes that the primary misrepresented contents of the article materially helped to irreversibly deepen rifts between his profession and him, preventing him from ever again being able to contribute to his field or academia. For example, his thesis advisor, his closest tie to his profession, has stopped sending him Christmas cards. And, whereas he believes a sincere article likely would have helped undermine the blacklisting of him, he believes the blacklisting was prolonged and strengthened, through the addition of a personal basis.

**58d. Deteriorating financial state** – By materially helping to deprive claimant of professional prospects and progress towards redress, he believes *The Sun*, through the primary misrepresented contents of the article, has materially helped to hold him in the deteriorating financial state to which he believes the possible misconduct that predated the article had brought him (par. 9, Exhibit B). This has, among other things, greatly helped to keep him from meeting urgent needs of his and his family (educational, environmental, health, security, and the like), leaving them deeply and irreversibly scarred. He believes it has also helped to weaken his ability to realize justice regarding *The Sun's* false defamation by greatly limiting his ability to attract representation for his lawsuit. Without counsel, for instance, he has stumbled greatly in putting forth his case.

**58e. Abnormal burdening of claimant** - Claimant filed his lawsuit against *The Sun*, in large part, as a result of the primary misrepresented contents of the article. Given that he is not an attorney, the lawsuit abnormally consumed, distracted, and financially burdened him. The lawsuit included complex allegations of false defamation and deceitful misrepresentation and carried over to the Bankruptcy Court.

**59.** Additionally, claimant believes that the misrepresentations of Counts #12, #13, and #16 gave rise to the following non-reputational damages not seated in the contents of the article:

**59a. Further obstruction of progress towards justice and redress** - Claimant's cooperation with *The Sun*, gained in large part through the misrepresentations of Counts #12, #13, and #16, drew him away from genuine progress towards justice and restoring well-being to his family. As brought out more fully in his amended complaint (pars. 4–6 and 12–3, Exhibit B), he approached *The Sun* during 2006 not for an article but to obtain

information regarding the possibility of the official and professional misconduct that he believed had brought his family to a state of ruin. Claimant believed that information would allow him to attract the investigation needed to confirm that possibility and to restore well-being to his family. *The Sun* did not address this matter; rather, *The Sun* expressed interest in publishing the article in question. In large part, on the basis of the misrepresentations of Counts #12 and #16, claimant agreed to an article. Claimant set aside his aim with his approach to *The Sun* in the belief that *The Sun's* article would equally serve the purpose of attracting investigation. After the publication of the article, in a May 1, 2008 letter, he asked *The Sun* for the information he had sought with his 2006 approach. *The Sun* did not respond to the letter.

**59b. Further burdening of claimant** – Claimant's cooperation with *The Sun* towards the article, gained in large part through the misrepresentations of Count #12, #13, and #16, consumed claimant greatly and so, further distracted him from important matters. These matters included pressing family matters and his search for a position.

**60. Second issue** - Even if *The Sun* had published an article without claimant's consent and his and his family's cooperation, claimant believes that much of the non-reputational harm brought out in pars. 58-9 above would have been avoided. As argued in pars. 62-7 herein, as a result of its misrepresentations, claimant provided information to *The Sun* without which, he believes, it would have been unable to publish many false defamatory statements credibly, a credible and coherent false defamatory narrative, and personal and private matters.

**61. Third issue** - Claimant also believes that the fraction of the seemingly singular and broad contempt shown by *The Sun* for First Amendment issues (par. 70 herein) that is linked to its

misrepresentations alone requires substantial punitive damages. Added to that, claimant believes that to deceive a family into destroying itself in print in the protection of the possibility of misconduct is reprehensible.


**62. Fourth issue** – Should the Bankruptcy Court conclude that the immediate consequence of *The Sun's* misrepresentation was not the article but the cooperation of claimant and his family towards the article, claimant contests debtors' claim that "there is nothing injurious or alleged to be injurious about sitting for interviews" (par. 5, Exhibit A). In his amended complaint (par. 94, Exhibit B), he stated that he believes *The Sun* deliberately made said misrepresentations to him "to gain or maintain his and his family's cooperation towards the article and so, access to information it would not otherwise have had and that it could use, among other things, to discredit him." Without that information he believes it would have been infinitely more difficult for *The Sun* to have defamed him falsely, actively concealed the possibility of misconduct, or published personal and private matters; *The Sun* would not have had bases for its false defamatory theme, many of its false defamatory statements and active concealments, or the personal and private matters it published. So, even under these narrower circumstances, claimant believes that, for all practical purposes, the harms of pars. 58-9 above still apply.


**63.** For one example of consequences of the cooperation of claimant and his family towards the article, without that cooperation, claimant does not believe *The Sun* would have had credible bases for its false defamatory theme that claimant willingly destroyed his family for "geologic immortality." (pars. 30-5, Exhibit B).


**64.** As claimant stated in his amended complaint, " .... *The Sun* seems to have based the theme on apparent testimony of a former colleague of his, a Dr. J. Templeton. *The Sun* stated falsely,

as fact, '[plaintiff] [claimant] is also, as a former boss says, a 'Captain Ahab ....,' willing to wreck everything – including his family – chasing a dream that has become an obsession' {7; paragraph number in Exhibit A} and stated 'It was his boss at Exxon, Jack Templeton, who likens him to Herman Melville's Captain Ahab because of his messianic pursuit of his invention.' {33}. That is, it seems Dr. Templeton claimed, falsely, plaintiff [claimant] was willing to destroy his family for the technology. Then, *The Sun*, it appears, harmfully colored this claim by falsely stating, as fact, claimant admitted 'he is willing to hurt those he loves for a long shot at glory' and also speculating that Ms. Henke might believe this {143}." (par. 31, Exhibit B)

**65.** Without the release statement (Exhibit J) that claimant provided *The Sun* as a result of the misrepresentations that it made, claimant does not believe that Dr. Templeton would have put forth so frank a testimony as it seems he did. The release statement freed interviewees to speak over the matters at hand. In fact, without the accompanying list of names claimant provided at the request of *The Sun* (Exhibit J), claimant doubts that *The Sun* would have even considered interviewing Dr. Templeton. Additionally, without interviews, *The Sun* would not have been able to make the false claim that claimant admitted "he is willing to hurt those he loves for a long shot at glory" or to speculate that Ms. Henke might believe this. (par. 31, Exhibit B).

**66.** For a second example of consequences of the cooperation of claimant and his family towards the article, without that cooperation, *The Sun* would not have had any substantive information regarding claimant's history related to the Air Force (pars. 57–9 and 108-10, Exhibit B). *The Sun* used the information it gathered to falsely defame him (pars. 57-9, Exhibit B) and to publish a personal and private matter that served no legitimate public interest (pars. 108-10, Exhibit B).

Response to Addition to Supplemental Objection; Claim No. 7106; Case No. 08-13141 (KJC)
Page 34
August 8, 2012

**67.** There are numerous other false defamatory statements that *The Sun* made in the article for which there would not have been credible bases without the information claimant and his family provided as a result of *The Sun's* misrepresentations. Many of these can be easily identified in the false defamation counts of the amended complaint (pars. 30-93, Exhibit B). Claimant does not present these herein for brevity.

**First Amendment protections**

**68.** Claimant was not aware of the legal issue raised by debtors under this topic; his readings did not alert him to this issue.

**69.** Debtors argue that "as a matter of First Amendment law, Mr. Henke may not evade the requirements of a defamation claim by seeking defamation damages from the publication of a news report through the tort of fraud, the elements of which do not require the pleading and proof of the constitutionality-required elements of defamation." (par. 6, Exhibit A)

**70.** Claimant recognizes that his knowledge is greatly limited; but, he must respectfully question whether First Amendment protections apply in the circumstances at hand. It appears to him *The Sun* may have forfeited such protections, for the reasons that follow:

> **70a.** 1) Claimant alleges that *The Sun* defamed him falsely with actual malice. For example, in the amended complaint, claimant stated "P[p]articularly in view of the information he provided *The Sun*, its omissions, and the flagrancy and scale of its violations, he believes *The Sun* could hardly not have known it was creating materially false impressions of him and his circumstances" (par. 24, Exhibit B). To claimant's understanding (for example, pp. 1035-47; *Gertz v. Robert Welch, Inc.*; Defamation,

Chapter XVIII; Torts, *Cases and Materials* – Seventh Edition; Prosser, Wade, and Schwartz), the First Amendment does not protect the publication of false, defamatory statements with actual malice.

**70b.** 2) Claimant and his family were private figures, and in the most fundamental sense – they did not know to be guarded and so, were not. To claimant's understanding, First Amendment protections are weakened when the targets of defamation are private figures. (for example, pp. 1039–40; *Gertz v. Robert Welch, Inc.*; Defamation, Chapter XVIII; Torts, *Cases and Materials* – Seventh Edition; Prosser, Wade, and Schwartz)

**70c.** 3) Claimant alleges, through his deceitful misrepresentation counts (pars. 94-115, Exhibit B), *The Sun* gathered information for the article unlawfully. It appears that this would further weaken First Amendment protection (par. 53 herein).

**70d.** 4) To claimant's understanding, with the article, *The Sun* flagrantly violated what appears to him to be the main aim of modern rulings in defamation law. This aim was given voice in, for example, *New York Times Co. v. Sullivan* (1964): to promote "debate on public issues" that is "uninhibited, robust, and wide-open" (for example, p. 1025; *New York Times Co. v. Sullivan*; Defamation, Chapter XVIII; Torts, *Cases and Materials* – Seventh Edition; Prosser, Wade, and Schwartz). Instead, in claimant's case, in place of bringing forth the matters of public concern, *The Sun*, claimant alleges, sought to suppress those matters with its article; he contends that the intent of the article was to protect the possibility of official and professional misconduct, by falsely defaming him and by concealing that possibility.

**70e.** 5) It seems that none of the media misrepresentation/defamation cases cited by debtors in their addition to the supplemental objection, nor any he has seen in his preparations, has put forth an instance in which the object of the alleged violations was the protection of misconduct. Rather, many of those cases had a redeeming social value (for example, regarding *Food Lion, Inc. v. Capital Cities/ABC, Inc., et al.*; 194 F.3d 505; 1999 U.S. App. LEXIS 26373, through alleged deceitful misrepresentation, undercover reporters sought to expose unhealthy practices in the handling of meats). Claimant is unable to see any value to societal order of *The Sun's* deceitful misrepresentation and false defamation. Quite the contrary, the matters concealed and otherwise protected by *The Sun's* misrepresentations and article (possible substantial failures of integrity within the nation's educational and research enterprises) are of fundamental interest to the public.

**71.** Now, in what seems to claimant to be a perversion of intent of First Amendment protections, debtors seem to be turning to such protections to further discourage the type of meaningful debate that should have emerged from *The Sun's* article – precisely the type of public interest debate that recent First Amendment rulings had sought to promote (par. 70d herein).

**Matter of retaining counsel**

**72.** As was the case with the possibility of a statute of limitations violation (par. 33, Claimant's Response to Debtors' Supplemental Objection to Claims of Robert Henke, dated June 27, 2012), it seems to claimant that the matter again becomes relevant of the possibility that *The Sun* may have interfered with his efforts to attract representation for a lawsuit against *The Sun* (pars. 121-2, Exhibit B). Without counsel, claimant has been greatly handicapped in the matters at hand, as he was with the statute of limitations issue. The issues put forth by debtors in the

addition to their supplemental objection are quite elevated to claimant. It was well beyond his abilities to foresee those issues; he was only able to react to them. As he stated in his reply to debtors' supplemental objection, he plans to address the matter of possible interference as part of discovery during his case, should his case advance to that stage.

## Conclusion

73. Claimant respectfully requests that the Bankruptcy Court deny the request of debtors to disallow his claims, so as to allow progress towards justice to take place.

74. Claimant believes that his allegations of deceitful misrepresentation and false defamation against *The Sun* are legitimate and that the consequences of those violations were substantial and merit redress.

75. Claimant appreciates the efforts of the Bankruptcy Court in reviewing his case.

Robert Henke, claimant

August 8, 2012

4104 Hearthside Drive, Apt. # 101

Wilmington, North Carolina    28412

910-791-3896 (home phone); 919-610-5865 (cell phone); hroberthenke@aol.com