Response to Addition to Supplemental Objection; Claim No. 7106; Case No. 08-13141 (KJC)
Page 43
August 8, 2012

**Exhibit E: Opinion -** ***Veilleux, et al., v. National Broadcasting Co.,***

***et al.***

12 of 49 DOCUMENTS

**RAYMOND VEILLEUX, KELLY VEILLEUX and PETER KENNEDY, Plaintiffs, Appellees, v. NATIONAL BROADCASTING COMPANY, ALAN HANDEL and FRED FRANCIS, Defendants, Appellants. RAYMOND VEILLEUX, KELLY VEILLEUX and PETER KENNEDY, Plaintiffs, Appellants, v. NATIONAL BROADCASTING COMPANY, ALAN HANDEL and FRED FRANCIS, Defendants, Appellees.**

No. 98-2104, No. 98-2176

UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

206 F.3d 92; 2000 U.S. App. LEXIS 3388

March 6, 2000, Decided

**SUBSEQUENT HISTORY:** [**1] As Amended April 14, 2000.

**PRIOR HISTORY:** APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE. Hon. Morton A. Brody, U.S. District Judge.

**DISPOSITION:** Reversed in part, vacated in part, and remanded for further proceedings.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendants appealed jury verdicts in the United States District Court for the District of Maine for plaintiffs in diversity action on claims of defamation, misrepresentation, negligent infliction of emotional distress, invasion of privacy, and loss of consortium, alleging that defendants portrayed them in distorted manner in a television program. Plaintiffs cross-appealed for punitive damages.

**OVERVIEW:** Plaintiffs sued defendants under diversity jurisdiction on state-law claims including defamation, and misrepresentation, alleging that defendants portrayed them in a distorted, untrue manner in a television program. The district court rejected defendant's motion for judgment as a matter of law and entered judgment for the plaintiffs. On appeal the court reversed (1) the judgment on the defamation claim because the allegedly defamatory statements were reasonably based on plaintiff trucker's admissions or were otherwise supported or protected, plaintiffs failed to carry their burden of proving that the statements were materially false and negligently made as required by Maine law and U.S. Const. amend. I, and (2) the judgment on plaintiff employer's misrepresentation claim to the extent it was premised on defendants' alleged assurances that the program's portrayal of the trucking industry would be positive; however, awarding damages for misrepresentation based on defendants' more specific promise not to include opposition group in the program neither offended state law or U.S. Const. amend. I, and court remanded this part of claim.

**OUTCOME:** Judgment reversed on defamation claim because plaintiffs failed to carry their burden of proof under state and First Amendment law. Judgment on misrepresentation claim reversed in part and remanded in part. Negligent infliction of emotional distress and invasion of privacy claims reversed. Loss of consortium claim vacated and remanded. Plaintiffs' cross-appeal denied.

**CORE TERMS:** broadcast, misrepresentation, defamation, trip, driving, false light, driver, sleep, defamatory, trucking, truck, defamation claim, emotional distress, public concern, infliction, station, misrepresentation claim, pecuniary, inspection, privacy, trucker, logbook, actionable, drug test, invasion, emotional distress, emotional, premised, malice, test results

**LexisNexis(R) Headnotes**

*Civil Procedure > Appeals > Standards of Review > Substantial Evidence > General Overview*
*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > General Overview*
[HN1] In weighing a contention that the evidence was insufficient for submission of a plaintiffs' claims to the jury in the ordinary case, the court reviews the evidence in the light most favorable to the prevailing plaintiffs, drawing all reasonable inferences in their favor. Reversal would be in order only if the evidence, so viewed, would not permit a reasonable jury to find in favor of the plaintiffs on any permissible theory. Deference to the jury is muted, however, when free speech is implicated.

*Civil Procedure > Appeals > Standards of Review*
*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > General Overview*
[HN2] In cases raising U.S. Const. amend. I considerations, appellate courts must conduct an independent review of the evidence on the dispositive constitutional issue. The rule of independent review applies regardless of whether the fact-finding function is performed by a court or a jury.

*Civil Procedure > Appeals > Standards of Review*
*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > General Overview*
[HN3] The court states that where the trial court is called upon to resolve a number of mixed fact/law matters which implicate core U.S. Const. amend. I. concerns, review, at least on these matters, is plenary.

*Civil Procedure > Appeals > Standards of Review > De Novo Review*
*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > General Overview*
[HN4] Independent review is subject to limitations. First, a court of appeals will not conduct a plenary review of the entire record. The independent review function is not equivalent to a "de novo" review of the ultimate judgment itself, in which a reviewing court makes an original appraisal of all the evidence to decide whether or not it believes that judgment should be entered for plaintiff. Second, the reviewing court does not extend the independent review standard to all determinations concerning a particular legal claim, but only to those that specifically involve the application of U.S. Const. amend. I law to specific facts. Purely factual determinations, particularly those involving the credibility of witnesses, remain best addressed by the factfinder, and are subject to the usual, more deferential standard of review.

*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Defamation > General Overview*
*Torts > Intentional Torts > Defamation > Elements > General Overview*
[HN5] A common law claim of defamation under Maine law requires: (a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting to at least negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.

*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Defamation > General Overview*
*Torts > Intentional Torts > Defamation > General Overview*
[HN6] Under Maine law, a statement is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.

*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Defamation > General Overview*
*Torts > Intentional Torts > Defamation > General Overview*
[HN7] Allegedly defamatory language must be construed in the light of what might reasonably have been understood therefrom by the persons who heard it. A defamation claim may not be based solely on a reading that interprets the language in the most negative way possible.

*Civil Procedure > Remedies > Damages > Punitive Damages*
*Torts > Intentional Torts > Defamation > Defenses > Exaggerations & Imaginative Commentary*
*Torts > Intentional Torts > Defamation > Defenses > Fair Comment & Opinion*
[HN8] The Supreme Court of the United States has determined that the federal constitution imposes certain requirements on defamation actions independent of those established by the state's own law. First, where the statements are uttered by a media defendant and involve matters of public concern, the plaintiff must shoulder the burden of proving the falsity of each statement. Second, only statements that are "provable as false" are actionable; hyperbole and expressions of opinion unprovable as false are constitutionally protected. Third, private individuals must prove fault amounting at least to negligence on the part of a media defendant, at least as to matters of public concern. Fourth, a private plaintiff must prove "actual malice" to recover presumed and punitive damages for a statement involving public concern.

*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Defamation > General Overview*
*Criminal Law & Procedure > Juvenile Offenders > Juvenile Proceedings > Statements*
*Torts > Intentional Torts > Defamation > General Overview*
[HN9] Falsity, for purposes of defamation actions where the statements are uttered by a media defendant and involve matters of public concern, overlooks minor inaccuracies and concentrates upon substantial truth. Where a defendant alters a speaker's words but effects no material change in meaning, the speaker suffers no injury to reputation that is compensable under the law of defamation. A statement is not false unless it would have a different effect on the mind of the reader from that which the pleaded truth would have produced.

*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Defamation > General Overview*
*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Free Press > General Overview*
*Torts > Intentional Torts > Defamation > General Overview*
[HN10] Reporters have leeway to draw reasonable conclusions from the information before them without incurring defamation liability.

*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Defamation > General Overview*
*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Scope of Freedom*
*Torts > Intentional Torts > Defamation > Defenses > Fair Comment & Opinion*
[HN11] U.S. Const. amend. I does not inoculate all opinions against the ravages of defamation suits. A statement couched as an opinion that presents or implies the existence of facts that are capable of being proven true or false may be actionable.

*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Defamation > General Overview*
*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Scope of Freedom*
*Torts > Intentional Torts > Defamation > General Overview*
[HN12] Opinions amounting to "imaginative expression" and "rhetorical hyperbole" are protected speech under U.S. Const. amend. I. Whether an opinion is protected hyperbole depends primarily upon whether a reasonable person would not interpret it as providing actual facts about the described individual.

*Constitutional Law > Bill of Rights > Fundamental Freedoms > Judicial & Legislative Restraints > General Overview*
*Torts > Business Torts > Fraud & Misrepresentation > Negligent Misrepresentation > General Overview*
[HN13] The Maine common law requirements for actionable misrepresentation are (1) the statements must be of present fact; (2) the statements must be sufficiently specific; and (3) the statements must be the proximate cause of a plaintiff's harm.

*Torts > Business Torts > Fraud & Misrepresentation > General Overview*
[HN14] In appropriate circumstances, promises concerning future performance may be sufficiently akin to averments of fact as to be actionable under Maine misrepresentation law.

*Business & Corporate Law > Distributorships & Franchises > Causes of Action > Fraud & Misrepresentation*
*Torts > Business Torts > Fraud & Misrepresentation > General Overview*
[HN15] "Puffing" or "trade talk," would not support recovery in fraud.

*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Defamation > General Overview*
*Constitutional Law > Bill of Rights > Fundamental Freedoms > Judicial & Legislative Restraints > Overbreadth & Vagueness*
[HN16] Under U.S. Const. amend. I, a statement cannot be defamatory unless it can be reasonably understood as having an "objectively verifiable" meaning: the vaguer a term, or the more meanings it reasonably can convey, the less likely it is to be actionable.

*Torts > Business Torts > Fraud & Misrepresentation > Negligent Misrepresentation > Elements*
*Torts > Negligence > Causation > General Overview*
*Torts > Negligence > Defenses > Contributory Negligence > Limits on Application > Intentional Torts*
[HN17] Under either a fraudulent or negligent misrepresentation theory, plaintiffs may recover for pecuniary harm caused to them by their justifiable reliance upon an actionable representation. To be considered a proximate cause of a plaintiff's injury, the representation must be a "substantial factor" in bringing about the harm. Moreover, the injury must have been a reasonably foreseeable consequence of the representation. Proximate cause is generally a question of fact for the jury.

*Torts > Business Torts > Fraud & Misrepresentation > Negligent Misrepresentation > General Overview*
*Torts > Negligence > Causation > Proximate Cause > Intervening Causation*
[HN18] The chain of causation for actions to recover for pecuniary harm caused to them by their justifiable reliance upon an actionable representation can be interrupted by an intervening cause, which forecloses a defendant's liability. An intervening cause, under Maine law, is a new and independent cause, which is neither anticipated nor reasonably foreseeable by the

defendant; it must operate independently of the defendant's tortious conduct.

*Torts > Business Torts > Fraud & Misrepresentation > Negligent Misrepresentation > General Overview*
*Torts > Damages > Compensatory Damages > Lost Income > General Overview*
[HN19] Under Maine law, the proper measure of damages for a misrepresentation claim is plaintiff's lost bargain.

*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Scope of Freedom*
*Trademark Law > Likelihood of Confusion > Noncompeting Products > Parodies & Satires*
[HN20] U.S. Const. amend. I is concerned with speech itself, not the tone or tastefulness of the journalism that disseminates it.

*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Scope of Freedom*
[HN21] The Supreme Court of the United States has long recognized that not all speech is of equal U.S. Const. amend. I importance. Speech about matters of public concern is particularly entitled to strong constitutional safeguards.

*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Defamation > General Overview*
*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Scope of Freedom*
[HN22] U.S. Const. amend. I requires some leeway for inadvertent false statements of fact as they are nevertheless inevitable in free debate. The necessary "breathing space" for freedom of expression is provided by the constitutional rule requiring that false statements be made with the requisite fault to support a defamation claim.

*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Free Press > General Overview*
*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Scope of Freedom*
[HN23] Even when information being disseminated is truthful, the press does not enjoy general immunity from tort liability. Where a journalist has acquired information through unlawful means, such as by making an actionable false promise, the U.S. Const. amend. I protection of the publication of that information may be diminished. Hence, the enforcement against the press of generally applicable laws is not subject to stricter scrutiny than would be applied to enforcement against other persons or organizations.

*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Defamation > Public Figures*
*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Scope of Freedom*
*Torts > Intentional Torts > Defamation > Public Figures > Voluntary Public Figures*
[HN24] The status of the plaintiff in defamation actions is of constitutional significance. Less U.S. Const. amend. I protection is warranted where the plaintiff is a public figure, as such individuals must reasonably anticipate criticism, including vehement, caustic, and sometimes unpleasantly sharp attacks.

*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Defamation > General Overview*
*Torts > Damages > Compensatory Damages > Pain & Suffering > Emotional & Mental Distress > General Overview*
*Torts > Intentional Torts > Defamation > Remedies > General Overview*
[HN25] The type of damages sought in a defamation action bears on the necessity of constitutional safeguards.

*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Free Press > General Overview*
*Torts > Intentional Torts > Defamation > General Overview*
[HN26] Misrepresentation under Maine common law is a cause of general applicability. Applying it to journalists subjects them to the same consequences as all others.

*Torts > Negligence > Actions > Negligent Infliction of Emotional Distress > Elements*
[HN27] Under Maine law, proof of negligent infliction of emotional distress requires plaintiffs to show that (1) defendants were negligent; (2) plaintiffs suffered emotional distress that was a reasonably foreseeable result of defendants' negligent conduct; (3) and plaintiffs suffered severe emotional distress as a result of defendants' negligence.

*Torts > Negligence > Actions > Negligent Infliction of Emotional Distress > General Overview*
[HN28] Proof of an underlying tort or a physical injury is no longer required to sustain a negligent infliction claim of distress claim.

*Torts > Damages > Compensatory Damages > Lost Income > General Overview*
*Torts > Damages > Compensatory Damages > Pain & Suffering > Emotional & Mental Distress > General Overview*
[HN29] Recovery for misrepresentation is limited to pecuniary harm, and emotional or mental pain and suffering are not recoverable.

*Torts > Negligence > Actions > Negligent Infliction of Emotional Distress > General Overview*

*Torts > Negligence > Duty*
[HN30] A plaintiff who fails to prove that the defendant violated a duty of care owed to the plaintiff cannot recover, whether the damage is emotional, physical, or economic.

*Torts > Negligence > Actions > Negligent Infliction of Emotional Distress > Elements*
*Torts > Negligence > Duty*
*Torts > Negligence > Duty > Affirmative Duty to Act > Special Relationships > General Overview*
[HN31] To establish a defendant's duty for purposes of a separate claim of negligent infliction of emotional distress, the plaintiff must do more than show that the emotional harm was foreseeable. The plaintiff must additionally show that public policy favors the recognition of a legal duty to refrain from inflicting emotional injury, based upon plaintiff's status or the relationship between the parties.

*Torts > Negligence > Actions > Negligent Infliction of Emotional Distress > General Overview*
[HN32] According to the Courts of Maine, only where a particular duty based upon the unique relationship of the parties has been established may a defendant be held responsible, absent some other wrongdoing, for harming the emotional well-being of another.

*Torts > Intentional Torts > Defamation*
*Torts > Intentional Torts > Invasion of Privacy > Appropriation > General Overview*
*Torts > Intentional Torts > Invasion of Privacy > Intrusion > General Overview*
[HN33] The right of privacy is invaded by: (a) unreasonable intrusion upon the seclusion of another; (b) appropriation of the other's name or likeness; (c) unreasonable publicity given to the other's private life; or (d) publicity that unreasonably places the other in a false light before the public. .

*Torts > Intentional Torts > Invasion of Privacy > Public Disclosure of Private Facts > General Overview*
[HN34] Under Maine law, one who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public.

*Torts > Intentional Torts > Invasion of Privacy > Public Disclosure of Private Facts > General Overview*
[HN35] "News" includes publications concerning, inter alia, crimes, arrests, deaths resulting from drugs, and other matters of genuine, even if more or less deplorable, popular appeal. Individuals' drug use, particularly where related to public safety, may be a legitimate matter of public concern.

*Torts > Intentional Torts > Invasion of Privacy > Public Disclosure of Private Facts > General Overview*
[HN36] Information does not have to be a matter of public record, however, in order to relate to a matter of public concern such that it can be disclosed by the media.

*Torts > Intentional Torts > Invasion of Privacy > False Light Privacy > Elements*
[HN37] One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability for invasion of privacy, if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other was placed. Put another way, Maine law requires proof of defendants' actual malice.

*Torts > Intentional Torts > Defamation > Defenses > Fair Comment & Opinion*
*Torts > Intentional Torts > Invasion of Privacy > False Light Privacy > Defenses*
[HN38] Protected statements of opinion can not support a claim of false light.

*Civil Procedure > Remedies > Damages > Punitive Damages*
*Evidence > Procedural Considerations > Burdens of Proof > Clear & Convincing Proof*
*Torts > Damages > Punitive Damages > General Overview*
[HN39] To receive punitive damages, Maine law requires a plaintiff to prove by clear and convincing evidence that the defendant was motivated by "ill will" toward the plaintiff, or acted so "outrageously" that malice could be inferred.

**COUNSEL:** William D. Robitzek with whom Berman & Simmons, P.A. was on brief for plaintiffs.

Kenneth A. Cohen with whom John C. Englander and Goodwin, Procter & Hoar LLP, Richard Cotton, Susan E. Weiner, Daniel M. Kummer, National Broadcasting Company, Inc., Bernard J. Kubetz and Eaton, Peabody, Bradford & Veague, P.A. were on brief for defendants.

**JUDGES:** Before Boudin, Circuit Judge, Campbell, Senior Circuit Judge, and Lipez, Circuit Judge.

**OPINION BY:** CAMPBELL

**OPINION**

[*101] **CAMPBELL, *Senior Circuit Judge.*** Defendant-appellants National Broadcasting Company, Inc. ("NBC"), Alan Handel, and Fred Francis (collectively, "defendants") appeal from jury verdicts totaling $ 525,000 in the District Court for the District of Maine. Plaintiff-appellees Peter Kennedy, Raymond Veilleux, ("Ray") and Kelly Veilleux (collectively, "plaintiffs") sued defendants under diversity jurisdiction on state-law claims of defamation, misrepresentation, negligent infliction of emotional distress, invasion of privacy, and loss [**2] of consortium.

[*102] Plaintiffs alleged that defendants portrayed them in a distorted, untrue manner in a "Dateline NBC" television program concerning the perils to highway users caused by tired long-distance truck drivers. The program prominently and often unflatteringly featured Kennedy, a truck driver, as he drove a tractor-trailer across the country in the employ of Ray Veilleux's trucking company.

Plaintiffs say their voluntary participation in the program was enlisted by defendants' false promises that the show would not include a group critical of the trucking industry, Parents Against Tired Truckers ("PATT"), and would portray trucking in a "positive" light. To plaintiffs' dismay, Kennedy was depicted as an unsafe truck driver who regularly violated federal regulations and who used illegal drugs shortly before the program was filmed. The program suggested that many truckers and trucking companies engaged in similar illegal and dangerous practices in order to meet deadlines, and portrayed Ray as tolerating or encouraging such conduct.

Defendants contend that there was insufficient evidentiary support for the jury's verdict on the many claims, and this appeal gives rise to numerous [**3] complex factual and legal issues. We find adequate evidence to support part of the plaintiffs' misrepresentation claim, but otherwise we reverse the judgment below and remand, in part, for further proceedings. Moreover, we reject plaintiffs' cross-appeal, which was conditioned upon our reversal of the judgment.

*I. FACTUAL BACKGROUND*

The following facts are undisputed unless otherwise indicated. On April 19 and 26, 1995, Dateline NBC, an hour-long news magazine program produced by NBC News, broadcast two reports concerning the long-distance trucking industry entitled "Keep on Truckin'" and "On the Road Again" ("the program" or "the report"). The program emphasized the pressures on long-distance truckers, the danger posed by truck-driver fatigue to others on the nation's highways, and the disregard of federal "hours of service" and other regulations that govern the industry. It prominently featured Kennedy, a long-distance truck driver who, with his employer, Raymond Veilleux, allowed a Dateline crew to accompany and film Kennedy on a coast-to-coast run from California to Maine in September and October of 1994.

The idea for the Dateline program arose out of [**4] a tragic highway accident that occurred in Maine in October, 1993, in which four teenagers were killed when their car was struck by a truck driven by Robert Hornbarger, who later pleaded guilty to falsifying his driving hours in his logbook. In July, 1994, Handel, a freelance producer, contacted Dateline to suggest a possible story concerning long-distance trucking: the proposed story would be titled "Truckers -- Asleep at the Wheel." Dateline approved the story proposal and commissioned Handel to produce the program. It assigned a Dateline associate producer, Tracey Vail, to assist Handel, and assigned Fred Francis, a veteran reporter, to help write the script and be the on-air voice. [1]

---

1 Vail created a similar story proposal in August, 1994, titled "Big Rig Deadly Dozing."

In August, 1994, Dateline interviewed and filmed relatives of one of the teenagers who was killed in Maine. The Izers were the co-founders of Parents Against Tired Truckers ("PATT"), a group advocating stronger and better-enforced trucking [**5] regulations, including those concerning driving hours. Dateline then sought a long-distance truck driver who would allow a television crew to accompany him or her on a coast-to-coast run. On or about September 20, 1994, Vail contacted Kennedy. Much of the content of the ensuing conversations between Vail, Kennedy, Handel, and the Veilleuxs was disputed at trial.

Kennedy testified that Handel stated that he had "heard you guys had a lot of negative publicity up there in Maine" and [*103] that "he'd like to do a trip on a truck to see what it was really like, and do a little thing to put us in a positive light, instead of all the negative publicity we've had." In response to Handel's questions concerning how he "normally" drove,

Kennedy stated that he "occasionally" made minor falsifications to his logbook. [2] Kennedy told Handel that he would need Ray Veilleux's approval before participating in the program.

2 Similarly, Vail testified that Kennedy told her before the filming that in the course of a typical coast-to-coast run, he would exceed the permissible number of driving hours. This was disputed at trial.

[**6] Ray testified at trial that when Handel contacted him and his wife, he asked Handel his "intentions" with regard to the program. Handel responded that Dateline was seeking a company that operated lawfully and safely to show "what it's really like to run a trip cross-country." Ray testified that Handel agreed that PATT had already gotten enough publicity, and that he "wanted to show the other side of the coin," the "positive side." Ray's wife, Kelly Veilleux, similarly testified that Handel had stated that he had no intention of including PATT in the program, and that she and Ray had made clear that they "did not want to be involved in the show if PATT had anything to do with it." Handel did not disclose that he had already filmed the Izers. At trial, Handel denied making these representations.

After additional conversations with defendants, Kennedy and Ray eventually agreed to participate in the program. It was arranged that Dateline would videotape Kennedy's departure from Maine, scheduled for September 22, 1994, but would not otherwise accompany or film him on his trip to California. Instead, Dateline's crew would film Kennedy on the return trip carrying produce from [**7] California to Maine ("the Dateline trip").

The Veilleuxs testified that after Kennedy's departure from Maine, Handel called and stated that Dateline wanted to show Kennedy falsifying his logbook and evading inspection stations. Ray insisted that he would not agree to engage in such conduct for the sake of the program and threatened to terminate plaintiffs' participation. According to Ray, Handel withdrew his request and agreed to "do it your way." Handel denied that this conversation occurred.

During Kennedy's westward trip, he was informed by his dispatcher that he had to go to a medical center in Phoenix, Arizona, to submit to a random drug test required by federal law. Kennedy contacted the Veilleuxs and informed him that he had smoked marijuana at home about ten days earlier. Ray told him that he must take the test, and that he should proceed with the Dateline trip. Kennedy and the Veilleuxs did not learn of the results of the test until after the Dateline trip was completed.

On September 30, 1994, Kennedy met the NBC crew in Salinas, California, where he picked up produce. The produce was scheduled for delivery to Chelsea, Massachusetts, on or about October 6. The NBC crew, [**8] including Dateline correspondent Fred Francis, accompanied Kennedy, filming and interviewing him en route. As discussed in more detail below, Kennedy stated in the interview that he was violating the DOT hours regulations and falsifying his logbook to cover up the violations. [3]

3 The hours-of-service regulations are set forth at 49 C.F.R. § 395.3.

In mid-October, Kennedy and the Veilleuxs received notice of the results of the drug test in Phoenix. Kennedy had tested positive for marijuana and amphetamines. Kennedy immediately requested a retest of the sample.

Later in the fall of 1994, Vail and Francis received information that Kennedy was no longer driving for Ray. When Francis contacted Kennedy, he responded "it's a [*104] long story. . . I can't get into it with you." However, Kennedy later agreed to meet with Francis and Vail in Portland, Maine, on December 6, 1994, to discuss his employment status. At that meeting, Kennedy told Francis and Vail that he had tested positive for amphetamines and marijuana in a [**9] drug test administered days before the Dateline trip. Kennedy testified that this information was disclosed "off the record," while Francis and Vail testified that it was not.

Dateline was subsequently provided with a written statement dated December 19, 1994, prepared by Kennedy in anticipation of a lawsuit for wrongful termination that Kennedy considered bringing against Ray. The statement contained Kennedy's account of the drug test and the circumstances of his termination. In that statement, Kennedy denied ever taking amphetamines and discussed the administration of the drug test, his reaction to testing positive, and his attempts to clear his name. Kennedy also stated that Ray had disclosed the results of the drug test to another employee, who, in turn, had told other drivers. This written statement was entered into evidence at trial.

In early January, 1995, Kennedy agreed to be re-interviewed by Francis on camera. When Francis first inquired about the

drug test, Kennedy stated that he did not want to discuss it on camera. Kennedy threatened to leave when Francis stated that the drug test "had to be" a part of the program. After proceeding with the interview as to other topics [**10] for several minutes, Francis revisited the issue. This time, Kennedy admitted that he had failed the test but denied using drugs. He then discussed his reaction to the discovery that he failed the test, how he dealt with his employer, and his efforts to get a second test taken.

The Dateline report was broadcast nationwide on NBC in two parts on April 19 and 26, 1995. The first part primarily covered Francis' cross-country trip from California with Kennedy; the second part recapped the trip and explored policy issues relating to long-distance trucking and driver fatigue. The program featured interviews with a Department of Transportation ("DOT") official charged with enforcing trucking regulations, an expert on sleep deprivation, and PATT members whose children had been killed in trucking accidents. It included statements by Kennedy, including on-camera admissions, that he had repeatedly violated federal regulations limiting the number of hours truck drivers may drive and work in a specific period, falsified his logbooks, and lied to federal inspectors. [4] The report also disclosed that Kennedy had tested positive for marijuana and amphetamines in a random drug test.

> [4] Plaintiffs alleged that eighteen separate statements made in the program were defamatory, and the jury identified thirteen of those statements as supporting their conclusion that plaintiffs prevailed on their claims of defamation and "false light" invasion of privacy. The thirteen statements are addressed below.

[**11] Ray testified that he was hospitalized with chest pains following the first part of the broadcast, and his treating physician testified that the stress of watching the program contributed to his illness. Ray also testified that he was financially damaged by the report, in that the company to which he had leased his trucks terminated their business relationship, causing loss of business from some major customers. Ray and Kennedy testified that their reputations in the industry had been damaged.

## II. *PRIOR PROCEEDINGS*

On January 17, 1997, Ray and Kennedy filed a diversity complaint in the district court asserting seven causes of action under Maine law, including defamation, fraudulent and negligent misrepresentation, intentional and negligent infliction of emotional distress, unreasonable publication of private facts, and false light invasion of privacy. Kelly brought a claim for [*105] loss of consortium. Defendants moved for summary judgment on all claims. In a published memorandum and order, *Veilleux v. National Broadcasting Co., Inc.*, 8 F. Supp. 2d 23 (D. Me. 1998), the district court dismissed Kennedy's (but not Ray's) claim for misrepresentation on the [**12] ground that Kennedy had failed to demonstrate pecuniary loss, as required by Maine law. It also dismissed all plaintiffs' claims for intentional infliction of emotional distress and for punitive damages. The court allowed the remaining claims to proceed to trial.

In the course of an eleven-day trial, the defendants moved for judgment as a matter of law at the close of the plaintiffs' case. The district court denied that motion. The jury awarded Ray $ 150,000 for pecuniary loss on his misrepresentation claim; $ 50,000 for physical injury and/or emotional distress on his negligent infliction of emotional distress, defamation, and false light claims; and $ 100,000 for injury to reputation on the defamation and false light claims. It gave Kelly $ 50,000 for loss of consortium. The jury awarded Kennedy $ 100,000 for emotional distress on his unreasonable publication, negligent infliction of emotional distress, defamation, and false light claims; and $ 75,000 for injury to his reputation on the unreasonable publication, defamation, and false light claims. The court entered judgment for plaintiffs on July 8, 1998.

On July 22, 1998, defendants moved again for judgment as a matter of law, or in [**13] the alternative for a new trial or remittitur. The district court rejected the defendants' legal arguments "for the reasons set forth in its summary judgment memorandum and order and elsewhere in the record," and held that, "viewing the trial evidence in a light most favorable to plaintiffs and drawing all justifiable inferences in their favor, there is a legally sufficient basis on which a reasonable jury could have rendered the verdict that this jury did." The court also declined to reduce the damages award. Accordingly, an amended judgment was entered on September 22, 1998. This appeal followed.

## III. *SUMMARY OF OPINION*

Reviewing the jury's verdict on each of the counts under the heightened review standard required under the First Amendment, *see* section IV, *infra*, we hold as follows:

First, we reverse the judgment in favor of Ray and Kennedy on their defamation claim. *See* section V, *infra*. Because the allegedly defamatory statements were reasonably based on Kennedy's admissions to Dateline or were otherwise supported or protected, plaintiffs failed to carry their burden of proving that the statements were materially false and negligently made

as [**14] required by Maine law and the First Amendment.

Second, we reverse the judgment in favor of plaintiff Ray Veilleux on his misrepresentation claims to the extent it was premised on defendants' alleged assurances that the program's portrayal of the trucking industry would be "positive." *See* section VI, *infra*. We believe that Maine courts would not find actionable such a vague and, in this context, constitutionally suspect promise. Awarding damages for misrepresentation based on defendants' more specific promise not to include PATT in the program, however, offends neither Maine law nor the First Amendment, and we remand that portion of the claim to the district court for further proceedings. [5] 

    5 We also deny Kennedy's cross-appeal on this claim, in which he contends that the harm to his reputation was sufficient to permit him to state a misrepresentation claim under Maine law.

Third, we reverse the judgment as to Ray and Kennedy's negligent infliction of emotional distress claim *See* section VII, *infra*. This claim impermissibly [**15] circumvents Maine's express limitation on the underlying misrepresentation tort, which confines damages to pecuniary harm. [*106] Moreover, plaintiffs have not established a unique relationship between the parties, as required by Maine law, through which defendants may be held responsible for harming plaintiffs' emotional well-being. 

Fourth, we reverse the invasion of privacy judgment in its entirety. *See* section VIII, *infra*. Under one theory, Kennedy contended that defendants' disclosure of his drug test results amounted to actionable "unreasonable publication." Because Kennedy's drug use was closely related to the theme of highway safety, an issue of public concern featured in the Dateline program, we conclude that the First Amendment protects defendants' publication. Kennedy and Ray's "false light" theory of invasion of privacy also fails, for the same reasons we reverse the defamation judgment, as these causes of action overlap in their relevant constitutional requirements.

Finally, we vacate and remand Kelly Veilleux's loss of consortium claim for further proceedings in the district court, as her claim is entirely dependent on the outcome of Ray's claims. *See* section IX, [**16] *infra*. We also reject plaintiffs' cross-appeal for punitive damages, on the ground that they did not adduce sufficient evidence of common-law malice. *See* section X, *infra*. 

## IV . *STANDARD OF REVIEW*

Defendants contend that the evidence was insufficient for submission of plaintiffs' claims to the jury. [HN1] In weighing such a contention in the ordinary case, we would review the evidence in the light most favorable to the prevailing plaintiffs, drawing all reasonable inferences in their favor. *See McMillan v. Massachusetts Soc'y for the Prevention of Cruelty to Animals*, 140 F.3d 288, 299 (1st Cir. 1998) (quoting *Morrison v. Carleton Woolen Mills, Inc.*, 108 F.3d 429, 436 (1st Cir. 1997)). Reversal would be in order only if the evidence, so viewed, would not have permitted a reasonable jury to find in favor of the plaintiffs on any permissible theory. *See Andrade v. Jamestown Hous. Auth.*, 82 F.3d 1179, 1186 (1st Cir. 1996); *Conway v. Electro Switch Corp.*, 825 F.2d 593, 598 (1st Cir. 1987).

Deference to the jury is muted, however, when free speech is implicated. *See Levinsky's, Inc. v. Wal-mart Stores, Inc.*, 127 F.3d 122, 127 (1st Cir. 1997) [**17] (citing *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 80 L. Ed. 2d 502, 104 S. Ct. 1949 (1984)). [HN2] In cases raising First Amendment considerations, appellate courts must conduct an "independent review of the evidence on the dispositive constitutional issue." *Bose*, 466 U.S. at 508. Appellate courts -- especially but not only the Supreme Court -- have been assigned this obligation in order to safeguard precious First Amendment liberties. *See id.* at 511; *Duffy v. Sarault*, 892 F.2d 139, 145 (1st Cir. 1989). The rule of independent review applies regardless of whether the fact-finding function was performed by a court or a jury. *See Bose*, 466 U.S. at 501.

In *Bose*, the Supreme Court addressed a determination of "actual malice" in a bench trial of a product disparagement claim. The petitioner challenged the First Circuit's application of a de novo standard in reviewing that determination, arguing that Fed. R. Civ. P. 52(a) prescribed a clearly-erroneous standard of review. *See Bose*, 466 U.S. at 498-99. Citing the companion case of *New York Times Co. v. Sullivan*, 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710 (1964), [**18] the Court held that a standard of "independent review" was appropriate as a matter of federal constitutional law, trumping Fed. R. Civ. P. 52(a). *Bose*, 466 U.S. at 511.

Following *Bose*, this court, like other courts of appeal, has extended the independent review rule well beyond defamation claims. [HN3] We have stated that "where the trial court is called upon to resolve a number of mixed fact/law matters which implicate core First Amendment concerns, our [*107] review, at least on these matters, is plenary." *United States v.*

*Amirault*, 173 F.3d 28, 32 (1st Cir. 1999) (quoting *AIDS Action Comm. of Mass., Inc. v. Mass. Bay Transp. Auth.*, 42 F.3d 1, 7 (1st Cir. 1994)). Accordingly, we have applied a heightened standard of review to several types of constitutional claims. *See, e.g., Amirault*, 173 F.3d at 33 (determination that photograph met definition of "lasciviousness"); *AIDS Action*, 42 F.3d at 7 (findings that state agency's rejection of condom advertisements was content-based and that MBTA cars are public fora); *Duffy*, 892 F.2d at 145 (findings as to what constitutes protected speech [**19] in public employee discharge case).

[HN4] Independent review is subject to limitations, however. First, a court of appeals will not conduct a plenary review of the entire record. The *Bose* Court limited the scope of the independent review:

> The independent review function is not equivalent to a "de novo" review of the ultimate judgment itself, in which a reviewing court makes an original appraisal of all the evidence to decide whether or not it believes that judgment should be entered for plaintiff.

466 U.S. at 514 n.31. Second, the reviewing court does not extend the independent review standard to all determinations concerning a particular legal claim, but only to those that specifically involve the application of First Amendment law to specific facts. *See id.; Amirault*, 173 F.3d at 32-33; *Duffy*, 892 F.2d at 145. Purely factual determinations, particularly those involving the credibility of witnesses, remain best addressed by the factfinder, and are subject to the usual, more deferential standard of review. *See Duffy*, 892 F.2d at 145.

We review the contested issues in this appeal under these standards.

## [**20] V. *DEFAMATION*

The jury found that plaintiffs had proven that thirteen of the eighteen statements submitted to it were defamatory, and that defendants had acted with actual malice. [6] Accordingly, it awarded Kennedy and Ray Veilleux damages for reputational harm and emotional distress; it awarded Ray pecuniary damages as well. Because the jury found actual malice, the district court permitted it to award presumed as well as actual damages.

6 Plaintiff-appellee Kelly Veilleux asserted only a claim for loss of consortium. In discussing defamation and the other claims apart from loss of consortium, our use of the term "plaintiffs" refers ordinarily to Kennedy and Ray Veilleux.

Defendants contend that plaintiffs failed to prove falsity and negligence as to any of the thirteen statements. They argue that these elements cannot be satisfied, as a matter of law, because *Dateline* accurately reported what Kennedy himself had stated during videotaped interviews. Alternatively, defendants insist that at least [**21] three statements were constitutionally protected expressions of opinion or figurative speech, and that others were not "of and concerning" the plaintiffs. Finally, defendants argue that there was insufficient evidence of actual malice to permit plaintiffs to recover presumed damages.

### A. *Common law and constitutional principles*

[HN5] A common law claim of defamation under Maine law requires: (a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting to at least negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication. *See Lester v. Powers*, 596 A.2d 65, 69 (Me. 1991) (citing Restatement (Second) of Torts § 558).

[HN6] Under Maine law, a statement is defamatory "if it tends so to harm the reputation of another as to lower him in the estimation of the community or to [*108] deter third persons from associating or dealing with him." *Bakal v. Weare*, 583 A.2d 1028, 1029 (Me. 1990). [HN7] Allegedly defamatory language must be "construed in the light of what might reasonably have been understood [**22] therefrom by the persons who [heard] it." *Marston v. Newavom*, 629 A.2d 587, 592 (Me. 1993). A defamation claim may not be based solely on a reading that interprets the language in the most negative way possible. *See Bakal*, 583 A.2d at 1030.

[HN8] The Supreme Court of the United States has determined that the federal constitution imposes certain requirements on defamation actions independent of those established by the state's own law. *See generally Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 11-17, 111 L. Ed. 2d 1, 110 S. Ct. 2695 (1990). First, where the statements are uttered by a media defendant and involve matters of public concern, the plaintiff must shoulder the burden of proving the falsity of each statement. *See Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776, 89 L. Ed. 2d 783, 106 S. Ct. 1558 (1986). Second, only statements that are "provable as false" are actionable; hyperbole and expressions of opinion unprovable as false are constitutionally protected. *See Milkovich*, 497 U.S. at 19-20; *Levinsky's*, 127 F.3d at 127. Third, private individuals must prove fault amounting [**23] at least to negligence on the part of a media defendant, at least as to matters of public concern.

*See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 347, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974); *see also Levinsky's*, 127 F.3d at 128 n.4; Restatement (Second) of Torts § 580B cmt. c. Fourth, a private plaintiff must prove "actual malice" to recover presumed and punitive damages for a statement involving public concern. *Levinsky's*, 127 F.3d at 128 (citing *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 756-57, 86 L. Ed. 2d 593, 105 S. Ct. 2939 (1985)). Insofar as the jury's verdict raises questions of compliance with these constitutionally-mandated elements, it warrants independent review.
[7] *See Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 685, 105 L. Ed. 2d 562, 109 S. Ct. 2678 (1989).

> 7 Hence we must independently review, inter alia, whether plaintiffs established that defendants were at least negligent in making the statements, as this is a constitutional requirement (as well as a necessary element of proof under Maine law).

[**24] Before turning to the broadcast statements themselves, we note that as each related to the risks that long-distance truckers pose to other drivers on the nation's highways, they unquestionably involved a matter of public concern. It was therefore plaintiffs' constitutional burden to show the falsity of each statement, and our duty, on appeal, to independently verify that this burden was met. *See Hepps*, 475 U.S. at 776. [HN9] Falsity "overlooks minor inaccuracies and concentrates upon substantial truth." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516, 115 L. Ed. 2d 447, 111 S. Ct. 2419 (1991). Where a defendant alters a speaker's words but effects no material change in meaning, the speaker suffers no injury to reputation that is compensable under the law of defamation. *See id.* A statement is not false unless it "would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Id.* at 517 (internal quotations omitted); *see also* Restatement (Second) of Torts § 581A cmt. f (1977) (it is not necessary to establish the literal truth of the precise statement made; slight inaccuracies [**25] of expression are immaterial provided the defamatory charge is true in substance).

## B. *Regulatory violations: Category 1*

On appeal, defendants have grouped the thirteen broadcast statements for which they were found liable into four categories, groupings we shall follow in this opinion. The statements in Category 1 include Dateline's broadcast assertions of Kennedy's [*109] violation of federal regulations as to his hours and his logbook. Defendants contend that each of their statements was truthfully, or at least non-negligently, based on Kennedy's own admissions made before the broadcast. Hence, according to defendants, the statements could not justify the jury's finding of defamation.

In the first of the Category 1 statements, identified as statement (C), Dateline describes the portion of Kennedy's trip from Phoenix to Salinas, where he met the Dateline crew before proceeding to Reno:

> (C) "Kennedy started this trip in Maine and drove six days to Denver and on to Phoenix. After a drive that long, federal regulations required Kennedy to spend a day off the road, resting. Instead, ignoring the law, on his seventh day on the road, he's come straight to Salinas, California. [**26] " [later] "After driving west all the way across the country in seven days, Kennedy now has just six days to deliver his load back east from Salinas, California, to Boston . . . " [later] "In fact, regulations required Kennedy to sleep before leaving Salinas, because he spent twelve hours loading." [later] "So on his eighth day on the road, Kennedy heads out without any sleep at all."

Defendants insist that all of statement (C) was substantially accurate, having been based on Kennedy's own taped statements to Francis after he met the Dateline crew in California.

Statement (C) can be split into four parts. The first concerns the alleged illegality of Kennedy's driving from Phoenix to Salinas (with a stop in Wheeler Ridge, California, to sleep) without spending a day "off the road." 49 C.F.R. § 395.3(b)(2) (1994) sets forth the "seventy-hour rule," in which a driver cannot drive after being on duty for seventy hours within an eight-day period. The relevant eight-day period revolves, such that each day, the driver subtracts from his or her total hours the on-duty hours accrued nine days previously.

The record cannot be said to establish definitively whether Kennedy [**27] in fact "ignored the law," *viz.* violated the seventy-hour rule in driving to Salinas from Phoenix. Kennedy testified at trial that, upon redoing his logbook, he concluded that he had enough hours remaining to drive legally from Phoenix to Salinas without taking a day off. However, Kennedy's admissions, made in the recorded interviews prior to the airing of the Dateline program, support the broadcast statement. Plaintiffs have not proven fault, as required by Maine and federal constitutional law, if defendants' report was reasonably based upon information the plaintiffs gave them even if later the truth of the information becomes questionable. *See Courtney v. Bassano*, 1999 ME 101, 733 A.2d 973, 976 (Me. 1999) (plaintiff not negligent for purposes of Maine defamation law because she had "reasonable basis" for her statements); *see also Penobscot Indian Nation v. Key Bank of Maine*, 112 F.3d 538, 559-61 (1st Cir. 1997).

Here, defendants' report was supported by a recorded interview with Kennedy, not included in the program, in which Kennedy told Francis that he did not have "enough hours" to get from Phoenix to Salinas. In addition, the following further [**28] exchange between Francis and Kennedy further supported the broadcast report:

> Kennedy: So we'll say that I had eleven hours available. You know, Okay. So I have a seven-hour ride to get to the L.A. area or the produce area to get my produce. Well, when I get there I got sixty-seven or sixty-eight hours or something like that. Okay? We'll say -- but that night I don't pick up any hours cause it was the eighth day back home, you know, eight days, I was off. So it's a zero, nothing comes off.
>
> Francis: The next day at midnight zero again?
>
> [*110] Kennedy: Nothing comes off. And I still only have three hours available. What can I do? I gotta sit for two days to get enough hours to load to get started back home again.
>
> Francis: What you did was what all drivers do? Right?
>
> And what is that? You didn't sit for two days?
>
> Kennedy: No.

Based upon the above exchange, defendants could have reasonably understood that when Kennedy reached Los Angeles he had already driven for sixty-seven or sixty-eight hours, and that since he still had approximately three hundred miles to go before reaching Salinas, he would necessarily have exceeded the seventy-hour maximum by the time he got [**29] to Salinas.

To be sure, Kennedy later testified at trial that he was not in fact legally required to take a day off after reaching Phoenix, as his further review indicated that he had enough hours to drive legally from Phoenix to Salinas. But this post-broadcast recapitulation does not establish that defendants were negligent in earlier accepting Kennedy's contrary admissions. Kennedy had conceded, in interviews taped before the broadcast, that he did not have enough hours and, absent reason to disbelieve that version, Dateline was entitled to rely on it. Plaintiffs point to no facts indicating that it was unreasonable for defendants to have credited Kennedy's admissions at the time of the broadcast; for example, Kennedy did not inform anyone before the broadcast that he had miscalculated the hours in his logbook, or of other circumstances showing that a seventy-hour-rule violation had not taken place. Plaintiffs have not, therefore, presented evidence from which a jury could reasonably conclude that defendants spoke negligently in this portion of statement (C). [8]

---

8 Kennedy testified that the quoted statements were merely hypothetical discussions of the operation of the seventy-hour rule, and did not pertain directly to the Phoenix-Salinas portion of the trip. The record indicates sufficient contextual specificity, however, such that defendants could have reasonably believed that Kennedy was describing this particular journey.

[**30] The next controverted portion of statement (C) was that, "After driving west all the way across the country in seven days, Kennedy now has just six days to deliver his load back east from Salinas, California, to Boston . . . " Plaintiff Kelly Veilleux, a driver-manager for her husband's company and Kennedy's supervisor at the time of the Dateline run, testified at trial without contradiction that the time allotted for Kennedy's return journey was, in fact, six days. It is hard to see, therefore, why Dateline's remark that he "now has just six days . . ." is untruthful.

Plaintiffs note that Kennedy testified at trial that he felt no pressure *from the client* (i.e. the shipper) to complete the trip within six days. However, Kennedy did not question that *his employer* had -- as Kelly Veilleux testified -- scheduled six days for the run. Moreover, saying that Kennedy had just six days for the return trip does not disparage Kennedy or portray him in a negative manner. A too-short deadline would primarily reflect upon whomever imposed the deadline, in this case Kennedy's employer, who conceded allotting six days for the return trip. Thus, in Kennedy's case, the statement was not only supported [**31] by Kelly Veilleux's testimony, but failed to satisfy the requirement under Maine law that it "tend . . . to harm the reputation of another [so] as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *See Bakal*, 583 A.2d at 1029.

Kennedy's employer, Ray Veilleux, was, to be sure, also one of the plaintiffs, and Dateline's statement might be seen as harming him. However, given Kelly Veilleux's uncontradicted testimony that six days had been scheduled for Kennedy's return trip, we think the record provides insufficient basis for a jury finding that the [*111] Dateline assertion was negligent or materially false as to Ray. Kennedy's testimony -- that he felt no pressure *from the client* to complete the eastward trip

precisely within six days, i.e. by midnight on October 5, 1994, and that he could have received an extension of time from the client if he so requested -- did not controvert Kelly Veilleux's testimony that the employer had set a six-day return schedule. We see no material falsehood. *See Masson*, 501 U.S. at 517.

In the third portion of statement (C), Dateline stated, "In fact, regulations [**32] required Kennedy to sleep before leaving Salinas, because he spent twelve hours loading." Kennedy testified at trial, without contradiction, that this statement was false in that he had spent only three hours loading his truck. Moreover, the relevant regulations only require that he take time off, not that he sleep.

The statement as to taking twelve loading hours was indeed unsupported, and no regulation has been called to our attention requiring drivers to sleep rather than, in specified circumstances, to take time off. However, the thrust of the statement -- that regulations prohibited Kennedy from driving when he left Salinas -- was amply supported by Kennedy's taped statements prior to the broadcast. Not only did Kennedy then indicate that he was in violation of the seventy-hour rule when he reached Salinas, but he also stated prior to the broadcast that leaving Salinas without a break, after having been "up all day," was "probably illegal." (Kennedy admitted that he did not sleep until reaching Reno, twenty-two hours after he last slept in Wheeler Ridge.) Given these admissions, which were not withdrawn before the broadcast, we do not believe that whatever inaccuracies existed [**33] were sufficiently material to establish defamation. *See Masson*, 501 U.S. at 517.

The final disputed portion of (C) immediately follows the assertion that "regulations required Kennedy to sleep before leaving Salinas." It states: "So on his eighth day on the road, Kennedy heads out without any sleep at all." Although conceding that Kennedy did not sleep in Salinas before heading out, plaintiffs point out that, before driving to Salinas, he had slept in Wheeler Ridge, and criticizes as false the assertion that Kennedy headed out "without any sleep at all." But we think the most plausible interpretation of this statement is that Kennedy did not sleep in Salinas before heading out (a matter iterated in the preceding sentence) before departing on the eastbound journey with the Dateline crew. That construction fits with Kennedy's statement in an interview that was aired in the report:

    Francis: But why didn't you take a snooze break before you left for California?

    Kennedy: Never do. I, I get out of here . . . that's the way I've always done it for years -- I always get to Reno.

*See Bakal*, 583 A.2d at 1030 (defamation claim may not be based [**34] on interpretation of language in most negative way possible). In context, we think the statement was substantially true, hence not a sufficient basis for finding defamation.

We turn next to statement (M), another of the Category 1 statements upon which the jury found defamation liability. This also concerned Kennedy's violation of regulations relating to permissible on-duty hours:

    (M) "As you will see, incredibly, it will be his last sleep. As he often does, Kennedy will go from Chicago to Boston -- eleven hundred miles, a drive of over twenty hours -- with no sleep."

Plaintiffs contend that Kennedy's trial testimony that he napped in Ohio was evidence from which the jury could find statement (M) to be false. Regardless of whether statement (M) was literally true, however, the record indicates that Kennedy made taped admissions prior to the broadcast that fully supported it at that time. Defendants point to the following taped [*112] colloquy between Francis and Kennedy:

    Francis: You, right now, it's almost midnight, have been awake forty hours.

    Kennedy: Yeah.

    Francis: How d'you feel? Honest.

    Kennedy: Well, I'm tired, but I'm not falling asleep. I'm not dozing or anything [**35] like that.

    I'm worn out, you know . . . .

    Francis: . . . You think -- you're not fatigued.

    Kennedy: No. Programmed.

    Francis: You know that a lot of people listening to this are going to think you're BS-ing me -- that nobody can drive a big eighteen-wheeler like that for forty hours from Chicago to Boston and not be really wiped out.

Kennedy: [Laughing] I'm not bullshittin'. But I had to do it. To be here, right? . . . It's routine, that's all I can say, it's routine.

While Kennedy testified at trial that he had, in fact, napped for a couple of hours in Ohio, he did not make this point to Francis at the earlier interview when Francis stated that Kennedy had been "awake forty hours." Moreover, Kennedy himself repeated that statement later, in a taped conversation with his girlfriend in Waterville, Maine: "Fred says 'do you realize you've been up for forty-something hours?'. . . yeah, so what? I mean, I do it all the time." Defendants could reasonably rely, in the broadcast, on Kennedy's version as conveyed to them then. They cannot be held accountable for corrections to which Kennedy testified after the broadcast.

We turn next to statement (Q), which further alleged illegal [**36] conduct by Kennedy:

(Q) [Francis to Veilleux:] "[Kennedy] didn't take the required time off. He made the log up as he went along so he would look legal."

As discussed above, the statement that "Kennedy didn't take the required time off" was supported by Kennedy's recorded pre-broadcast admissions; plaintiffs failed, therefore, to make the necessary showing of negligence. As to whether Kennedy "made the log up as he went along so he would look legal," defendants based their contention on the following taped statements made prior to the broadcast:

Handel: So here we are, Sunday morning, just outside of Salt Lake City, Utah . . . and you're just sitting in your cab doing what?

Kennedy: Falsifying my log book. . . . I have to do it. You know, there's no way around it.

I have to do it.

Kennedy also referred to his log book as "a lie book" in which he had to "incriminate himself . . . to make a living." Moreover, Kennedy indicated that he would create a log of a fictitious trip in order to conceal his admitted violation of the seventy-hour rule on the final leg of his journey:
Kennedy: Yeah. . . . Oh, I'll have to make out a little log book.

Francis: [**37] Oh, you'll do this whole fiction all over again? . . .

Kennedy: What I'll have to do is -- make a little log: "Left home, took a load of berries, one to Middleboro, cold storage" or something like that.

These statements provide ample support for Dateline's broadcast assertion that Kennedy falsified his logbook "as he went along so he would look legal." Defamation liability cannot be premised on them.

Another challenged broadcast statement, statement (K), similarly concerns Dateline's portrayal of Kennedy's alleged failure to take off-duty time as required by law:

(K) "Remember, Kennedy hasn't taken any time off since he left Maine eleven days ago. That's blatantly illegal" [later]

"But he hasn't taken any time off since he began. That's [*113] against the law, and it now appears Kennedy's headed for trouble."

The truthfulness of this statement turns in part on the meaning of the phrase "time off." A reasonable viewer would not necessarily understand the broadcast to mean that Kennedy had not slept for eleven days. The statement more plausibly indicates that Kennedy had not had taken any significant amount of time off-duty during the trip, or perhaps that he [**38] had driven every day since leaving Maine.

In describing the conduct as illegal, defendants could reasonably have relied on Kennedy's admissions of illegality described *supra*. Moreover, the statement "hasn't taken any time off" was vague and susceptible of more than one meaning. Defamation liability should not be premised on statements of such uncertain meaning. *See Levinsky's*, 127 F.3d at 129-30; *see also McCullough v. Visiting Nurse Service of Southern Maine, Inc.*, 1997 ME 55, 691 A.2d 1201, 1204 (Me. 1997) (visiting nurse, who had been fired, could not recover for defamation on basis of vague statement that she was "unavailable" to perform her assigned visits).

Plaintiffs complain that the voice-over statement was misleadingly accompanied by an inappropriate videotape of Kennedy pulled over on the side of the road, supposedly in nervous anticipation of an inspection station. The footage was, in fact, taped several days previously, in Salinas. Inaccurate reportage is not to be condoned and could well be defamatory if it otherwise met the necessary standards. Plaintiffs fail, however, to show how the use of the earlier taped scene effected any [**39] "material change in the meaning conveyed by the statement." *See Masson*, 501 U.S. at 517. We conclude that plaintiffs did not present a jury question as to statement (K)'s falsity or defendants' negligence.

The next statement at issue, statement (A), purportedly summarizes the illegal activities practiced by Kennedy:

> (A) "Almost every time [Peter Kennedy] goes to work he breaks the law."

This statement is not expressly limited to the several days that Dateline filmed Kennedy; rather, it appears to characterize Kennedy's general driving practices. The question is whether defendants had sufficient evidence from which to make such a generalization, not limited to violations of regulations on the trip with Dateline. Could Dateline reasonably infer from what it observed and heard about Kennedy's activities that he likely broke the law "almost every time [he] goes to work" as part of his usual truck driving practices?

Several taped admissions allow reasonable inferences that Kennedy's regulatory violations were not isolated instances. Kennedy told Francis that he "can't be reprogrammed, so I am breaking the law"; that he does "drive over the 10 hours"; [**40] and that he "never" took a "snooze break" before departing California, even though this practice was "probably illegal." Kennedy also admitted to Francis:

> Kennedy: I know my limits . . . I can go sometimes -- fifteen hours, twelve hours, eighteen hours -- sometimes only four hours.
>
> Francis: How about twenty hours, forty hours? You've done that too, right?
>
> Kennedy: Oh, it has been done, oh yeah, yeah, many times.

With regard to falsifications in his log-book, Kennedy stated on camera "no one would last doing it legally . . . it would be over for them." Moreover, Kennedy admitted in his trial testimony that the statement in the report that he was "used to going over the ten-hour legal driving limit" was true.

Kennedy argues that defendants possessed ample information, at the time they made the report, that Kennedy was normally a safe and law-abiding driver. Kennedy also testified that the Dateline trip was unusual, and that he violated regulations only because of delays imposed by Dateline. The above admissions, however, [*114] point to more frequent and regular violations. For Dateline to say these violations occurred "almost every time [he] goes to work" is not so far [**41] off the mark as to warrant finding that defendants negligently extrapolated from the information they possessed at the time they created the report. [HN10] Reporters have leeway to draw reasonable conclusions from the information before them without incurring defamation liability. *Cf. Courtney*, 733 A.2d at 976; *see also Penobscot Indian Nation*, 112 F.3d at 559-61. We hold that plaintiffs did not meet their burden to establish the falsity of the comment and defendants' negligence in making it.

The next and final statement in Category 1 also concerns Kennedy's alleged law-breaking:

> (B) "Kennedy is angry that he has to sidestep federal rules just about every day he's on the job; so he allowed DATELINE cameras to record his journey. It will be a rare look at a pressure-packed run, with the law being broken all the way."

There is ample evidence in the record supporting the veracity of defendants' statement that Kennedy was angry about the regulations. In addition to the statements described above, Kennedy repeatedly expressed on camera his opposition to federal trucking regulations:

> Kennedy: I'm against the system. I'm against their -- their rules [**42] and their regulations, and invasion of my privacy. And my constitutional rights are taken right away the minute I walk in the door of this cab.

Kennedy also referred to the hours-of-service and log-keeping requirements as "communism" and "regulation-strangulation." Moreover, he stated to Handel that under the regulations, "we'd be already a day late for where we're going with a load. The shelf life would be gone by two or three days by the time we ever got there legally . . ." This exchange continued as follows:

Handel: So your beef is that in order to do your job, to earn a living, you got to do something that's in effect illegal, you got to falsify your log books?

Kennedy: Right, I do, yes. Or I'll just sit here and twiddle my thumbs, because I'm out -- I'm out of hours for the day . . . .

Given these and Kennedy's other statements, plaintiffs cannot justify the defamation verdict based upon defendants' statement that Kennedy was angry about government regulation. Plaintiffs contend that defendants falsely drew a causal link between Kennedy's "anger" and his agreement to participate in the Dateline show, and that Kennedy in fact chose to participate [**43] in order to show the positive side of the trucking industry. Between the broadcast report and plaintiffs' own briefs, however, a number of motivations have been ascribed to Kennedy, and the motivation at issue in statement (B) appears as well-supported by the evidence as any. [9] In any event, the drawing of this connection did not cause plaintiffs to suffer injury beyond what would have otherwise occurred. *See Masson*, 501 U.S. at 516. In the absence of this specific statement, listeners might have logically concluded from Kennedy's comments in the broadcast itself that these stemmed from his anger at the regulatory system.

9 Toward the close of the final segment of the Dateline report, the narrator states that Kennedy "wanted to show the pressures that hard-working drivers face." In their appellate brief, plaintiffs contend that Kennedy's motivation was, inter alia, to show the need for regulatory reform and demonstrate that the regulations were outdated.

As to the reference in statement (B) [**44] to "the law being broken all the way," this was similar to statement (A), *supra*. For the same reasons given in reference to (A), we conclude that a defamation claim cannot be sustained on that assertion.

[*115] C. *Risk and danger: Category 2*

A second set of the thirteen statements upon which the jury premised its defamation verdict concern the risks flowing from Kennedy's behavior. Defendants contend that these statements are constitutionally protected because they are true or, alternatively, because they described Kennedy's driving routine "with some rhetorical flourish, or added an opinion about the risks on the road."

This court said in *Levinsky's* that "the [HN11] First Amendment does not inoculate all opinions against the ravages of defamation suits." 127 F.3d at 127. A statement couched as an opinion that presents or implies the existence of facts that are capable of being proven true or false may be actionable. *See id.* (citing *Milkovich*, 497 U.S. at 18-19); *see also* Restatement (Second) of Torts § 566 (1977) ("A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only [**45] if it implies the allegation of undisclosed defamatory facts as the basis for the opinion.").

Nonetheless, [HN12] opinions amounting to "imaginative expression" and "rhetorical hyperbole" are protected. *See Milkovich*, 497 U.S. at 20; *Levinsky's*, 127 F.3d at 127. Whether an opinion is protected hyperbole depends primarily upon whether a reasonable person would not interpret it as providing actual facts about the described individual. *See Levinsky's*, 127 F.3d at 131. We now turn to the statements at issue.

(E) "In twenty-seven years of hard driving, Kennedy says he has racked up over three million miles -- sleeping less than he should, and gambling that his fatal fatigue number doesn't come up."

Kennedy testified that while it was true he has driven more than three million miles, the remainder of the statement was false. He complains that the tape was edited to give the impression that he admitted to sleeping less than he should and gambling with lives. Defendants contend that statement (E) is either true, being based on verifiable facts, or else is a protected expression of opinion and/or hyperbole.

We find the statement that Kennedy [**46] said he was "sleeping less than he should" to be non-actionable. Kennedy's admissions *supra* regarding lack of sleep and off-duty time undermine the required finding of negligence. Here there was a sufficient foundation for this assertion, especially given the vagueness of the term "should." *See id.* at 129-30 (no defamation liability based on words that are "highly subjective and susceptible of numerous interpretations").

Dateline's statement that "in twenty-seven years of hard driving, Kennedy [was] . . . gambling that his fatal fatigue number doesn't come up" was, we think, a permissible summation of Dateline's evaluation of Kennedy's driving practices. *See id.* at 131. The expression was hyperbolic, but did not exceed what a journalist, presented with the information Dateline had about Kennedy, could reasonably report. *See id.* This narration was accompanied by film footage of Kennedy playing a slot

machine at a rest stop. We think a reasonable observer would understand it to be a dramatic expression of Dateline's viewpoint that inadequate sleep among truck drivers, as exemplified by Kennedy, is widespread and dangerous. We do not believe [**47] that the First Amendment allows defamation liability to be premised on a statement such as (E).

(P) "You met Peter Kennedy, a trucker who says he has to lie to inspectors to stay on the road . . . But this stay awake and on the road at all costs mentality has led to many accidents and deaths."

Plaintiffs contend that this statement inaccurately links Kennedy's lies to accidents and deaths, and leads viewers to believe that Kennedy personally caused [*116] mayhem on the road. Defendants argue that this interpretation is unreasonable and that the latter portion of the statement reflects its protected opinion about the dangers of violating regulations.

The reference to "lies to inspectors," standing alone, is not defamatory, as it is amply supported by Kennedy's admissions, described *supra*, regarding false statements in his log book. We do not believe, furthermore, that a reasonable viewer would conclude that Dateline was accusing Kennedy of personally causing highway accidents and deaths. Rather, this "stay awake and on the road at all costs mentality" was said to have "led" to many accidents and deaths, presumably in the cases of other drivers. The program nowhere reported any accidents [**48] or deaths involving plaintiffs, nor did it accuse plaintiffs of being so responsible.

Insofar as Dateline was expressing its own opinion as to a supposed connection between the described "mentality" and accidents, that expression was constitutionally protected. Looking at the broadcast in its entirety, defendants' statement drew reasonable support from the information presented. Besides Kennedy's own admissions and conduct, there were supporting comments by an expert on sleep deprivation. [10] See Phantom Touring, Inc. v. Affiliated Publications, 953 F.2d 724, 730 (1st Cir. 1992) (newspaper piece not defamatory when considered in context of full disclosure of underlying facts, such that readers could draw different conclusions). We think that reasonable viewers would understand this statement, even if sensationally worded, to be one of viewpoint rather than fact.

10 Moreover, Kennedy himself described a connection between the pressures imposed by compliance with regulations and accidents:

They don't have any idea of what it's like to sit in this truck for seven hundred miles a day, for five days, and baby-sit this load, helping you load, checking your temperatures, and running and juggling your logs, to be right -- to be as legal as you can -- stress! Stress causes fatigue. Fatigue causes sleep. Sleep causes accidents. It's the pressure.

[**49] We conclude Category 2 with statement (O):

(O) "In just under six days, he has slept only twenty-one hours, an average of three and a half hours a day . . . [Peter Kennedy] has broken the law, put himself and others at risk through dangerously long hours."

Plaintiffs do not contend on appeal that the tally of Kennedy's sleep in the first sentence of statement (O) is defamatory; nor do they dispute that Kennedy broke the law. [11] Rather, they contest the characterization of Kennedy as putting people at risk by driving long hours. Defendants reply that Statement (O) expresses Dateline's protected opinion that Kennedy's behavior was risky.

11 Plaintiffs contend that Kennedy violated applicable regulations only once, when he admittedly exceeded the seventy-hour rule at the end of the eastward trip, between Boston and Maine. As discussed *supra*, however, plaintiffs have not established negligence as to defendants' reportage of Kennedy's law-breaking to the extent reasonably based on Kennedy's on-camera admissions at the time.

[**50] Again, defendants' statement as to the risk involved in Kennedy's activity is not provably false, and was supported by other information presented in the program from which such conclusions might rationally be drawn. As to the Dateline opinion itself -- that driving without much sleep, as Kennedy did, puts people at risk -- Dateline was entitled to express it. It was not a view that implied new and additional, or unsupported, facts about Kennedy.

### D. Inspection stations: Category 3

The next category of statements concern the inspection stations encountered by Kennedy on his eastbound journey with the Dateline crew.

[*117] (H) "As Kennedy heads east through Utah, all the inspection stations on the trip east have been closed. He's escaped

any scrutiny, and as far as he's concerned, none is needed."

Plaintiffs argue that this statement is defamatory insofar as it represents that Kennedy "escaped any scrutiny." [12] Kennedy testified at trial that he did indeed "go through" inspection stations, while accompanied by the Dateline crew, in Utah and Wyoming. In a recorded interview, however, Kennedy engaged in this dialogue with Francis:

> Francis: You've just come all the way across [**51] the country and you haven't been stopped once. What's your analysis of that?

> Kennedy: Well it's the first time . . . Not usually stopped and checked on paperwork [?] but usually there's a scale open, but this time I came all the way across with not one scale open.

Kennedy also conceded at trial that his truck was not weighed and his logbooks were not inspected at any point in the trip.

> 12 On appeal, plaintiffs do not premise their defamation claim on the portion of statement (H) indicating that Kennedy believes that his driving needs no scrutiny.

In view of the above, it is difficult to fault defendants for stating that Kennedy "escaped any scrutiny." It is, moreover, scarcely a statement that disparages plaintiffs. Whether all the inspection stations were closed so as to permit Kennedy to evade scrutiny was not under defendants' control and does not reflect on them in a negative way. Hence, it fails to satisfy the requirement under Maine law that it "tend . . . to harm the reputation of another [**52] [so] as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Bakal*, 583 A.2d at 1029; *see also McCullough*, 691 A.2d at 1204 (no defamation liability where challenged statement was no more damaging to plaintiff's reputation than the truth would have been). (L) "Kennedy heads out to discover his fate. If they check his fuel and toll receipts carefully, they'll know he doctored his logbook. He'll be put off the road for a day or two and be late with his perishable load to Boston. Kennedy and his company will lose money, and maybe a customer." [later] "Kennedy is about to go through the first open inspection station so far. Like other truckers, he's falsified his legal logbook . . . ."

The video footage accompanying this voice-over showed Kennedy's truck approach what might have appeared to viewers to be an inspection station. [13] Plaintiffs contend, however, that the footage depicted a weigh station, not an inspection station. Moreover, they assert, at this point in the trip, Kennedy's fuel receipts were in accordance with his logbook and there had not yet been any tolls.

> 13 The footage shows a sign that reads "WEIGH STATION." The same signage, however, illustrates the Pennsylvania inspection station referenced in statement (N), discussed *infra*; plaintiffs do not contend that the Pennsylvania station was also a weigh station.

[**53] This visual deception does not, we think, rise to the level of defamation. The fact that the video footage was from a different portion of the trip and showed a weigh station, while perhaps contrived, is not a falsification material to plaintiffs' reputations. Showing footage that accurately depicted an inspection station would not, in these circumstances, have had any materially different effect on a reasonable viewer's perception of Kennedy.

To the extent that plaintiffs also contend that the voice-over was defamatory, they have not borne their burden of proof on the essential elements. As discussed *supra*, the portions of statement (L) relating to the lack of open inspection stations are not harmful to plaintiffs' reputations. [*118] Furthermore, the references to Kennedy's falsification of his logbook were supported, as discussed *supra*. As to the potential consequences for plaintiffs of an inspection, defendants reasonably relied on Kennedy's own statements, including the following exchange immediately after passing an inspection station in Iowa that closed just before Kennedy arrived:

> Handel: So you were worried. You were really worried.

> Kennedy: Yeah, 'cause it's just [**54] a hassle. You know, it's just -- they can shut you down there if they want to. I mean, they can -- and then I'm -- I've lost eight hours right there if I'm shut down.

When asked about these statements at trial, Kennedy responded, "I don't know what I meant." Plaintiffs offer no evidence to suggest that defendants had any reason to doubt the accuracy of Kennedy's statements before the broadcast. In the absence of defendants' negligence, statement (L) does not support the defamation verdict.

(N) "Finally, in Pennsylvania, an open inspection station. If Kennedy is caught and grounded now, the whole run will be a disaster. Kennedy and his company will lose money. He drives in cautiously.

The inspector is nowhere to be seen, and so Kennedy heads right out the other side."

Plaintiffs do not challenge the pictorial accuracy of the footage accompanying statement (N). Insofar as this statement speaks of the risks inherent in being "caught and grounded now," and the absence of an inspector, it is not much different than statement (L), hence was not defamatory for reasons already discussed *supra*.

Defamation liability cannot rest, moreover, upon the assertion "and so Kennedy [**55] heads right out the other side." True, viewers could infer from this portion of statement (N) that Kennedy was relieved not to have to undergo an inspection. Defendants, however, had ample basis from Kennedy's admissions described *supra* to conclude that he was relieved. A reasonable viewer would not conclude that it was unlawful or wrong for Kennedy to head "right out the other side." The inspector was absent, "and so" Kennedy drove away. The most that can be said is that, like much reporting of this type, the language has an ominous tone, perhaps suggesting guilt for unknown reasons. Here the only guilty party was the absent inspector, who was not a plaintiff. Statement (N) was not defamatory.

## E. *Subsequent illegal trip: Category 4*

The final statement at issue concerns Ray's assignment of an additional coast-to-coast run to Kennedy shortly after the trip with Dateline:

> (R) "Just forty-eight hours after getting home, Peter Kennedy was ordered illegally without rest to drive back out west."

Statement (R) appears reasonably based on a written statement by Kennedy dated December 19, 1994:

> I was out of hours, so Ray told me to take a few days off, but Saturday [**56] (2 days later) he called me and said "do me a favor. Can you leave Sunday for four drops . . . . I said yeah, I guess I can start a new log book to do this trip as I have no hours. I could not believe they would send me back out knowing that I had no hours left to drive.

Plaintiffs contend that this statement was controverted by Kennedy's trial testimony that he was not "ordered" to go on the run, but rather agreed to go as a favor to Ray. They also maintain that the trip was legal in that Kennedy had enough hours under the pertinent regulations and that he had sufficient rest in between the trips. Plaintiffs point to no persuasive evidence, however, that defendants' reliance [*119] on his December 19, 1994, statement was unreasonable. [14]

14 That the document was delivered by Kennedy's ex-girlfriend rather than Kennedy himself did not so undermine the veracity of the statement as to make it unreasonable for defendants to rely upon it. Plaintiffs' argument that defendants should not have relied upon Kennedy's written statement because they had "agreed to keep information 'off the record'" also is without merit. Any such agreement concerned Kennedy's drug test results, not whether Ray sent Kennedy out on another run illegally.

[**57] Kennedy also testified that there were three full days between when he arrived home from the Dateline run and when he actually departed on the next trip. However, statement (R) does not convey that Kennedy actually departed on another trip forty-eight hours after arriving home, only that he was "ordered" to go; accordingly, this portion of the statement was not materially false, as plaintiffs contend.

In sum, none of the statements sent to the jury can support a finding of defamation under standards consistent with the federal constitution. We reverse the judgment in favor of plaintiffs on their defamation claim. Because there is no surviving portion of the defamation claim to remand to the district court, there is no need to address the issue raised by plaintiffs on cross-appeal, namely the required degree of proof as to the element of falsity. [15]

15 Plaintiffs contend in their cross-appeal that the district court erroneously instructed the jury that they must find that plaintiffs proved falsity by clear and convincing evidence; rather, they contend, the correct standard requires only a preponderance of the evidence. As the instruction on degree of proof does not change the result of our independent review, we see no need to reach this question.

[**58] VI. *MISREPRESENTATION*

Ray was awarded damages for negligent and fraudulent misrepresentation under Maine common law. His misrepresentation claims were premised on defendants' statements to him that the contemplated Dateline program in which he was being asked to participate (1) would portray the trucking industry in a positive light; and (2) would not include PATT (the organization, Parents Against Tired Truckers, formed after fatal truck accidents to force greater regulatory compliance). [16] The program, in fact, focused on how some truck drivers falsified logs, drove longer hours than regulations allowed, and used drugs. Moreover, it showed PATT members, some in footage filmed before defendants' alleged assurances, criticizing trucking and enforcement practices and displaying grief over the loss of loved ones in accidents caused by fatigued truck drivers.

16 The district court did not permit Kennedy to submit any misrepresentation claims to the jury, on the ground that he had shown no evidence of pecuniary harm, as required by Maine law. Kennedy contests this ruling on cross-appeal, arguing that the jury should be allowed to "assess whether any intangible commercial loss was suffered." He does not cite any authority supporting this argument, however, and this court lacks authority to create the new Maine law rule he proposes.

[**59] Defendants contend that the [HN13] misrepresentations Ray alleges fall short of Maine common law requirements in that (1) they were not statements of present fact; (2) they were not sufficiently specific; and (3) they were not the proximate cause of Ray's harm. [17] They also maintain that the misrepresentation claims are barred under First Amendment criteria. We consider these issues in turn, concluding that the representation to portray the trucking industry in a positive light was too vague to be actionable under Maine common law, but that the alleged promise to exclude PATT from the program was actionable under Maine law and passes muster under First Amendment criteria.

17 Defendants make no distinctions between fraudulent and negligent misrepresentation for the purpose of these arguments.

## A. *Future promises*

Traditionally, an action for deceit could be brought under Maine law only if the [*120] challenged misrepresentation was of past or existing fact, not just of opinion or of promises for future performance. [**60] *See Wildes v. Pens Unlimited Co.*, 389 A.2d 837, 840 (Me. 1978). Even "a preconceived intention not to perform" was said to be incapable of turning a breach of a promise not to do something in the future into an action for deceit. *Shine v. Dodge*, 130 Me. 440, 157 A. 318, 319 (Me. 1931).

In the *Wildes* case, however, the Maine Supreme Judicial Court pointed to a sentence in *Shine, supra,* as broadening the blanket rule. Allowing a finding of deceit to be based on a disingenuous promise of employment, the *Wildes* court quoted *Shine*:

> The relationship of the parties or the opportunity afforded for investigation and the reliance, which one is thereby justified in placing on the statement of the other, may transform into an averment of fact that which under ordinary circumstances would be merely an expression of opinion.

389 A.2d at 840 (quoting *Shine*, 157 A. at 318). The court went on to state:

> Plaintiff herein was clearly at the mercy of the defendant insofar as any representations made regarding such areas as, among others, employment opportunities and remuneration. We find [**61] that given the circumstances under which plaintiff was obliged to make his decisions, the representations made by Mr. Forde could well have been justifiably understood as being of fact and not mere opinion.

389 A.2d at 840.

While involving an employment relationship, the holding in *Wildes* was not expressly limited to that setting. Nor was the employment relationship noted as determinative in the later case of *Boivin v. Jones & Vining, Inc.*, 578 A.2d 187, 188-89 (Me. 1990). There, an assurance of continued employment was also upheld as a basis for a deceit action, notwithstanding the argument that the promise was unenforceable as being for future performance. *See id.* at 188. As in *Wildes*, the *Boivin* court relied on the above-quoted language from *Shine*. However, it took the additional step of quoting, without comment, from section 525 of the Restatement (Second) of Torts, which sets forth a theory of liability that includes misrepresentations of opinion and intention as well as of fact:

> One who fraudulently makes a misrepresentation of *fact, opinion, intention or law* for the purpose of inducing another to [**62] act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation.

*Boivin*, 578 A.2d at 189 (quoting Restatement (Second) of Torts § 525 (emphasis supplied)). We therefore conclude that [HN14] in appropriate circumstances, promises concerning future performance may be sufficiently akin to averments of fact as to be actionable under Maine misrepresentation law. It is also possible, but unclear, that Maine will someday move to adopt section 525 *in toto*. Looking first at defendants' alleged promise not to include PATT in the Dateline program, we believe this to be a misrepresentation made in circumstances that a Maine court today would find actionable. Defendants' statements concerning PATT can reasonably be considered "specific facts" about aspects of the program within defendants' exclusive control upon which Ray reasonably could have relied. *See Schott Motorcycle Supply, Inc. v. American Honda Motor Company, Inc.*, 976 F.2d 58, 65 (1st Cir. 1992). Ray was not in position to know about, investigate or influence defendants' [**63] inclusion of PATT in the program; he was "at the mercy of the defendants" with regard to their representations. *Wildes*, 389 A.2d at 840. Indeed, a jury could reasonably find on the present record that defendants deliberately concealed from Ray, at the time they told him that PATT would not be included, the fact that they had already filmed and [*121] recorded taped comments highly critical of truckers from PATT's co-founders, the Izer family, in preparation for use in the projected program. Parts of this footage were later included, to powerful effect, in the broadcast program. [18] The program therefore was already a work in progress when the misrepresentation was made. A promise [*122] not to include PATT and the concealment of the prior PATT filming can be regarded under the rationale of *Wildes* and *Boivin* as pertaining to existing "facts" rather than mere opinions or projections. Accordingly, we do not think the fact that defendants' alleged representation to exclude PATT also pertained to a time in the future (i.e. when the completed program would be aired) prevents it from being actionable as a misrepresentation of fact under recent Maine law.

> 18 The Dateline show interspersed the Izers' emotional statements concerning their son's death with Kennedy's comments indicating that he ignored relevant regulations. For example, Ms. Izer's statement that had the trucker who killed their son gotten enough sleep, "our lives wouldn't be ruined . . . Jeffrey and his friends would be here," was immediately followed by footage of Kennedy filling out his logbook while singing and saying "Hey, I have to do what I have to do." (Dateline also juxtaposed Kennedy's comments with statements by Bruce Dubrow, a proponent of regulatory reform whose son was killed when a truck driver fell asleep behind the wheel. The program did not make clear whether Dubrow was a member of PATT.)

[**64] The situation is, however, much less clear when we turn to the alleged assurance to present the trucking industry in a "positive" light. To be sure, that promise also pertained to matters within defendants' control as to which plaintiffs had little opportunity for investigation, but it did not pertain to a concrete, easily ascertainable fact (such as the fact of whether or not PATT was included in the program). Rather, it set forth a vague standard, "positive," to which defendants' filmed portrayal of the trucking industry was supposed to adhere. In the next section, we conclude that such a vague future criterion, relative to a news broadcast about a matter of public concern, is insufficient under Maine law to support an action in misrepresentation.

## B. *Lack of specificity*

The *Wildes* and related state precedent indicate that the Maine courts today will treat as actionable promises of future performance that are closely akin to representations of existing fact. We doubt, however, that defendants' alleged promises to show plaintiffs and fellow truckers in a "positive" light fit into this category.

An initial difficulty is whether the promise to provide "positive" [**65] coverage was unconditional or whether it should be interpreted as containing an implied condition that plaintiffs' own conduct, while driving cross-country under defendants' scrutiny, must at least be consistent with such favorable treatment. Dateline is, after all, a news program; reporters do not normally overlook newsworthy conduct, and it is hard to imagine that the parties expected positive coverage no matter how badly plaintiffs later behaved. Here, subsequent to the alleged promise, Kennedy admitted on camera to various regulatory violations and to taking illegal drugs. Should the alleged promise be construed to require defendants to ignore this evidence

of misconduct and to present plaintiffs in all respects favorably? If we read the promise to contain an implied condition that plaintiffs behave appropriately in order to receive positive coverage, then it is hard to see that defendants can be held liable for misrepresentation. Even had the promise been initially disingenuous, in that defendants were "out to get" plaintiffs all along, Kennedy's voluntary breach of the implied condition entitled defendants to provide truthful coverage that was less than positive. In any event, [**66] the difficulty of construing the promise in light of subsequent events makes it a questionable basis for recovery under Maine's evolving law of deceit, unlike the clear-cut representation not to include PATT in the program. *See Wildes,* 389 A.2d at 840.

The promise to provide positive coverage might, indeed, be viewed as more akin to [HN15] "puffing" or "trade talk," which we held in *Schott* would not support recovery in fraud. 976 F.2d at 65. We determined in *Schott* that the plaintiff franchisee could not have reasonably relied on a defendant franchiser's statements that new products would increase sales in the coming years and that it would continue to be committed to the motorcycle market. *See id.* We thought that the plaintiff "could not have justifiably understood the alleged misrepresentations to be assurances as to specific facts, rather than mere opinion." *Id.*

The Seventh Circuit, in *Desnick v. Am. Broad. Cos., Inc.,* 44 F.3d 1345 (7th Cir. 1995), likened journalists' promises of this nature to "puffery":

> Investigative journalists well known for ruthlessness promise to wear kid gloves. They break their promise, [**67] as any person of normal sophistication would expect. If that is 'fraud,' it is the kind against which potential victims can easily arm themselves by maintaining a minimum of skepticism about journalistic goals and methods.

*Id.* at 1354. There, an ophthalmic clinic and two of its surgeons sued a television network and others involved in the broadcast of a report regarding certain medical practices at the clinic. *See id.* at 1347. Their fraud claim was premised on defendants' representations that the report would be "balanced" and would not involve "ambush" interviews or undercover surveillance. *Id.* at 1348. The court went so far as to suggest that no reasonable person could rely on such promises. *See id.* at 1354. Similarly, a Maine court might think that defendants' "positive" assurances were simply too vague and laconic to inspire, on the part of a reasonable person, the reliance necessary for a misrepresentation claim.

There is a further reason for believing that a Maine court would reject the promise to provide positive coverage as the basis for a misrepresentation claim. Were the Maine court to rule that [**68] this promise was sufficiently factual, it would then have to face the difficult issue of whether it would be constitutional to use so vague a yardstick in a misrepresentation action founded on speech relating to matters of public concern. State courts, like their federal counterparts, normally seek to avoid construing common law rules so as to create serious constitutional problems. *See Watters v. TSR, Inc.,* 904 F.2d 378, 383 (6th Cir. 1990) (state court would avoid applying its common law "in a way that would bring the constitutional problems to the fore"). *Cf. Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council,* 485 U.S. 568, 575, 99 L. Ed. 2d 645, 108 S. Ct. 1392 (1988) (court must adopt reasonable alternative interpretation of statute when necessary to avoid serious constitutional problems).

The constitutional prohibition of vagueness within the realm of defamation is well established. *See Levinsky's,* 127 F.3d at 129-30 (statement that plaintiff store was "trashy" too vague to support finding of defamation). We noted in *Levinsky's* that [HN16] under the First Amendment, a statement cannot be defamatory [**69] unless it can be reasonably understood as having an "objectively verifiable" meaning: "the vaguer a term, or the more meanings it reasonably can convey, the less likely it is to be actionable." *Id.* at 129.

Similar requirements of objectivity and specificity have been applied to non-defamation claims that implicate the First Amendment. In *Hustler Magazine v. Falwell,* 485 U.S. 46, 55, 99 L. Ed. 2d 41, 108 S. Ct. 876 (1988), the Supreme Court acknowledged the dangers of vagueness in holding that a jury should not be permitted to apply a standard of "outrageousness" to plaintiff's claim of intentional infliction of emotional distress. 485 U.S. at 55. The Court held that that standard possessed an "inherent subjectiveness" [*123] that impermissibly allowed a jury to impose liability based on personal beliefs. *Id.* Statements challenged as vague also have been given heightened scrutiny under the First Amendment in a variety of other contexts. *See, e.g., Hynes v. Mayor and Council of Borough of Oradell,* 425 U.S. 610, 620, 48 L. Ed. 2d 243, 96 S. Ct. 1755 (1976) (stating, in considering constitutionality of municipality's [**70] canvassing and solicitation ordinance, that "the general test of vagueness applies with particular force in review of laws dealing with speech"); *Kusek v. Family Circle, Inc.,* 894 F. Supp. 522, 528 (D. Mass. 1995) (in cookbook author's trademark infringement claim against publisher, court was "reluctant to enforce vague, oral contracts where Defendant's First Amendment rights might be affected").

Defendants point out that whether the resultant program in a given case was sufficiently "positive" might often be incapable of being proven or disproven sufficient for First Amendment purposes. How much criticism is permissible before the program would lose its positive character? Would the revelation of a single regulatory violation on Kennedy's part suffice to establish misrepresentation? And, as discussed above, the promise of positive coverage may have had an implied condition of good conduct that Kennedy breached when he admitted to wrongdoing during the Dateline trip. All of these actual or potential problems suggest that the promise to provide positive coverage could be too contingent to satisfy constitutional norms.

We conclude that a Maine court would at least [**71] worry that premising a finding of misrepresentation on such a vague term would place too great a burden on speech protected by the state and federal constitutions. [19] Without declaring ourselves one way or the other on the constitutional issue, we believe that the Maine court would not choose to include the positive coverage assurance within its traditional common law rule merely to arrive in these uncharted constitutional waters. [20]

19 Article 1, Section 4 of the Maine Constitution is similar to the First Amendment of the federal constitution.

20 The constitutional issue might be further influenced in particular cases by whether the alleged misrepresentation affected purely private speech or speech touching upon matters of public concern. See Levinsky's, 127 F.3d at 128 n.4. Here the misrepresentation fell into the latter category. A businessperson's broken promise, for example, to promote another's product line in a "positive" way might -- in the absence of protected public interest in the speech and in the narrower commercial context -- be deemed sufficiently definite to be actionable. We venture no opinion on this.

[**72] We conclude, therefore, that an action in misrepresentation under Maine law did not lie in these circumstances for defendants' alleged promise to provide "positive" coverage. It was, therefore, error to submit this representation to the jury as a potential basis for liability.

## C. Proximate causation and damages

We continue our analysis of Ray's misrepresentation claims, now limited to defendants' promise to exclude PATT from the program. Defendants argue that such alleged misrepresentations did not proximately cause Ray's pecuniary harm calculated from the business he lost as a result of the program. Rather, defendants insist, Kennedy's later taped statements about driving too many hours, falsifying his logbook, and other wrongdoing were the true causes of any harm to Ray's business.

[HN17] Under either a fraudulent or negligent misrepresentation theory, plaintiffs may recover for pecuniary harm caused to them by their justifiable reliance upon an actionable representation. See McCarthy v. U.S.I. Corp., 678 A.2d 48, 53 (Me. 1996); Chapman v. Rideout, 568 A.2d 829, 830 (Me. 1990). To be considered a proximate cause of a plaintiff's injury, the representation [**73] must be a "substantial factor" [*124] in bringing about the harm. [21] See Wheeler v. White, 1998 ME 137, 714 A.2d 125, 127-28 (Me. 1998). Moreover, the injury must have been a reasonably foreseeable consequence of the representation. See id. at 128; see also Restatement (Second) of Torts, § 548A. Proximate cause is generally a question of fact for the jury. See Webb v. Haas, 1999 ME 74, 728 A.2d 1261, 1267 (Me. 1999).

21 In the absence of case law explicitly addressing causation requirements in the context of misrepresentation, we apply general tort principles consistent with the Restatement (Second) of Torts §§ 525-549 (1977). See Springer v. Seaman, 658 F. Supp. 1502, 1508-09 & n.4 (D. Me. 1987), rev'd in part on other grounds, 821 F.2d 871 (1st Cir. 1987).

[HN18] The chain of causation can be interrupted by an intervening cause, which forecloses a defendant's liability. See Ames v. Dipietro-Kay Corp., 617 A.2d 559, 561 (Me. 1992). [**74] An intervening cause, under Maine law, is "a new and independent cause, which is neither anticipated nor reasonably foreseeable" by the defendant; it must "operate independently" of the defendant's tortious conduct. Springer, 658 F. Supp. at 1508 (quoting Johnson v. Dubois, 256 A.2d 733, 735 (Me. 1969)).

We must determine, therefore, (1) whether defendants' alleged misrepresentations as to PATT could be found to be a proximate and efficient cause of Ray's business losses, by inducing plaintiffs' participation in the show; and (2) if so, whether Kennedy's incriminating statements to defendants could have constituted an intervening cause of the injury so as to relieve Dateline of liability. As explained below, we conclude that there was sufficient evidence for the jury to reasonably find that defendants' alleged misrepresentations were a substantial factor in inducing Ray to allow defendants to film Kennedy on his cross-country trip, and that some portion of the ensuing harm to Ray's business was foreseeable to defendants. Ray's recovery is limited, however, to those damages specifically caused by the inclusion of PATT in the program; he may not [**75]

recover generally for harm flowing from the entirety of the broadcast. Moreover, we reject defendants' intervening cause argument, concluding that a reasonable jury could determine that Kennedy's wrongdoing was itself foreseeable to defendants.

First, Ray has adduced sufficient evidence of his reliance on defendants' representations as to PATT, permitting a reasonable finding that the representations were a substantial factor in bringing about his harm. That the program would not have featured plaintiffs but for defendants' promises concerning PATT is supported by Ray and Kelly Veilleux's testimony that they told Dateline that they would not agree to participate in the show if PATT was involved. Moreover, the conversations between defendants and Kennedy around the time of the alleged misrepresentations indicate that defendants were aware of the possibility, if not a likelihood, that Kennedy would violate regulations on the trip with Dateline. [22] Evidence that PATT members had already been filmed, and that titles of Handel and Vail's proposed scripts for the program referred to "deadly" or "asleep at the wheel" truckers, further supports the conclusion that Dateline planned in advance [**76] the unflattering juxtaposition of PATT with plaintiffs' trucking practices. While much depended on how matters played out -- whether in fact Kennedy broke the law and engaged in conduct supporting Dateline's themes of tired and dangerous truckers -- a jury could reasonably find that defendants set up Ray as a potential villain of the piece, and certainly were well aware that the surreptitious insertion of PATT's representatives [*125] into the program could only sharpen that image, the PATT spokespersons being highly critical of truckers. It was therefore foreseeable that, after unflattering exposure on national television, coupled with PATT's aired criticism, Ray might suffer pecuniary loss as his customers took their business elsewhere.

22 Kennedy testified that before Ray agreed to participate in the program, Kennedy told Handel that he "occasionally" made minor falsifications to his logbook. Moreover, Dateline associate producer Tracy Vail testified that, before the filming, Kennedy told her that in the course of a typical coast-to-coast run, he would exceed the permissible number of driving hours.

[**77] This does not, however, end our causation analysis. Ray must prove not only that defendants' representations as to PATT caused plaintiffs to participate in the program, but that those representations - not just the program itself -- caused his pecuniary loss. See Stewart v. Winter, 133 Me. 136, 174 A. 456, 457 (Me. 1934) (distinguishing between harm caused by reliance on representation and harm flowing from related promise). [HN19] Under Maine law, the proper measure of damages for a misrepresentation claim is plaintiff's lost bargain. See Wildes, 389 A.2d at 841; Jourdain v. Dineen, 527 A.2d 1304, 1307 (Me. 1987); Shine, 157 A. at 319. Here, Ray must establish that his pecuniary loss was caused by the difference between the broadcast that was represented (which excluded PATT) and the broadcast that was delivered (which included PATT). Accordingly, we limit Ray's recovery to those damages specifically and directly caused by the program's inclusion of PATT; he may not recover generally for all harm flowing from the entire broadcast. While we recognize that this may be difficult for Ray to prove, we will allow him the opportunity [**78] to do so upon remand, insofar as his damages are explicitly limited to pecuniary harm flowing from the portions of the broadcast featuring PATT.

Defendants argue that their representations concerning the content of the broadcast were simply too remote from Ray's harm to be its proximate cause, and that Kennedy himself was the intervening cause of the harm. They rely upon findings of inadequate causation in district court cases in which investigative journalists misrepresented their identities in order to gain access to behind-the-scenes information about defendants' business operations, then broadcast truthful reports about the wrongdoings they discovered. See, e.g., Medical Laboratory Management Consultants v. Am. Broad. Cos., Inc., 30 F. Supp. 2d 1182 (D. Ariz. 1998); Food Lion, Inc. v. Capital Cities/ABC, Inc., 964 F. Supp. 956 (M.D.N.C. 1997), rev'd on other grounds, 194 F.3d 505 (4th Cir. 1999). In those cases, the district courts concluded that the reporters' misrepresentations designed to gain access did not proximately cause whatever damages flowed from the broadcast of the facts the reporters uncovered. Rather, any [**79] harm resulted from the plaintiffs' own wrongful practices, as revealed to the public on videotape. See Medical Laboratory, 30 F. Supp. 2d at 1199; Food Lion, 964 F. Supp. at 962-63. In Food Lion, the district court went on to hold that even if the defendants could have foreseen the harm to the plaintiff at the time of their fraudulent statements, the acts of Food Lion employees "interrupted any causal connection" between defendants' fraud and the ultimate loss of profits and sales. Food Lion, 964 F. Supp. at 963. (The Fourth Circuit, in its recent review of the district court's decision, decided on grounds other than proximate cause. Food Lion, 194 F.3d at 522.)

Even if we were inclined to follow these district court decisions on their own facts, a question we need not answer, their facts were insufficiently apposite to the instant case. In Medical Laboratory and Food Lion, the alleged misrepresentations did not pertain to the content of the subsequent broadcasts, and the broadcasts themselves did not violate any promises. See 30 F. Supp. 2d at 1198-99; 964 F. Supp. 956 at 958-59. [**80] [23] In this case, the alleged representations [*126] did not serve to disguise defendants' identity, but rather misrepresented the persons and viewpoints to be included in the report. Defendants' contention of surprise that the Dateline "investigation" revealed unflattering information about Kennedy is significantly less plausible given the evidence of Dateline's knowledge about Kennedy's driving practices around the time of the misrepresentations, as well as the evidence that defendants intended from the beginning to portray the sort of violations Kennedy came to exemplify. Moreover, unlike the general broadcast damages sought in Food Lion and Medical Laboratory,

Ray will not be permitted to recover for harm flowing from the entirety of the report. Hence, the nexus between defendants' representations concerning PATT and Ray's alleged harm is significantly closer than the nexus between representations as to reporters' identities and the broadcast damages sought in those cases.

<hr />

23 Defendants also cite *Desnick*, 44 F.3d 1345, in support of their argument. The factual circumstances of *Desnick* are closer to the instant case, in that the plaintiff's fraud claim was premised in part on representations that a television tabloid report would be "balanced." 44 F.3d at 1348. However, the *Desnick* decision rested chiefly on the plaintiff's failure to satisfy applicable state law, which required a "scheme" to defraud. *See id.* at 1354-55. To the extent that the opinion addressed causation at all, the court's analysis rested on factual circumstances not present here. *See id.*

## [**81] D. *First Amendment*

Having determined that Ray would be entitled to recover pecuniary damages on his misrepresentation claims under Maine law insofar as the claims are premised on the promise to exclude PATT, we next consider whether the operation of the First Amendment changes this outcome. Defendants argue that the First Amendment's protection of truthful speech on issues of public concern, protection of the editing function of the press, and prohibition of regulating speech based on vague and subjective criteria operate collectively to bar Ray's claims. Furthermore, they contend, newsgathering will be impermissibly inhibited if every disgruntled subject of a news story can obtain a trial on the basis of a "swearing contest" as to whether the journalist made promises about the content of the story.

The Supreme Court has not yet addressed the relevant constitutional implications of a common law misrepresentation action against a media defendant. Twice in recent years, however, the Court has considered whether the First Amendment protects the media from liability under other common law theories, with divergent results. *See id.*; *Cohen v. Cowles Media Co.*, 501 U.S. 663, 115 L. Ed. 2d 586, 111 S. Ct. 2513 (1991). [**82]

In *Hustler*, Reverend Jerry Falwell brought claims against a magazine, under theories of libel and intentional infliction of emotional distress, that arose from publication of an advertisement parody. *See* 485 U.S. at 48-49. The jury rejected the libel claim, but awarded compensatory and punitive damages for emotional distress. *See id.* at 49. The Court held that, in order to protect the "free flow of ideas and opinions on matters of public interest and concern," the First Amendment permits public figures to recover damages for emotional distress only where they can show "actual malice," as is required in defamation claims. *Id.* at 56. Plaintiffs should not be permitted to "end-run" around the First Amendment by seeking emotional distress damages under the lower state law standards of proof. *See id.*

Several years later, in *Cohen*, 501 U.S. 663, 115 L. Ed. 2d 586, 111 S. Ct. 2513, the Supreme Court addressed the First Amendment implications of a promissory estoppel claim based on an assurance of confidentiality. The plaintiff, who was affiliated with a party in a gubernatorial campaign, gave information about another [**83] party's candidate to the defendant publisher's newspapers in return for a promise of confidentiality. *See id.* at 665. After the newspapers breached this promise and published his identity, Cohen's [*127] employer fired him. *See id.* at 666.

The Court concluded that the First Amendment did not preclude plaintiff's recovery of damages under a promissory estoppel theory. *See id.* at 669. It referenced the "well-established line of decisions" holding that the First Amendment is not offended by the operation of a generally applicable law that, when enforced against the press, has merely an incidental effect on its ability to gather and report the news. *Id.* The Court distinguished *Hustler* on the ground that unlike Falwell, Cohen was not attempting to use the promissory estoppel cause of action "to avoid the strict requirements for establishing a libel or defamation claim," and was not seeking damages for injury to his reputation or his state of mind. *Id.* at 671. Cohen was allowed to recover economic damages associated with the loss of his job under normal state law standards of proof, since these damages did not "end-run" [**84] around the First Amendment by duplicating defamation damages. *See id.*

These two cases provide opposing points of reference from which to evaluate Ray's misrepresentation claims. From them, and from subsequent lower court decisions, several principles emerge.

First, [HN20] the First Amendment is concerned with speech itself, not the tone or tastefulness of the journalism that disseminates it. *See Desnick*, 44 F.3d at 1355 (tabloid television journalism entitled to First Amendment safeguards similar to other reportage); *see also Hustler*, 485 U.S. at 55 (noting impossibility of "laying down a principled standard to separate" a distasteful advertising parody, which itself contributed little to public discourse, from political cartoons or caricatures that enjoy First Amendment protection).

Second, [HN21] the Supreme Court "has long recognized that not all speech is of equal First Amendment importance." *Id.* at

56 (quoting *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.* 472 U.S. 749, 758, 86 L. Ed. 2d 593, 105 S. Ct. 2939 (1985)). Speech about matters of public concern is particularly entitled to strong constitutional safeguards. **[\*\*85]** *See* 485 U.S. at 50. Truthful information is, of course, more deserving of protection than false information. [24] *See id.* at 52.

> 24 [HN22] The First Amendment requires some leeway for inadvertent false statements of fact, however, as they are "nevertheless inevitable in free debate." *Hustler,* 485 U.S. at 52 (quoting *Gertz,* 418 U.S. 323 at 329). The necessary "breathing space" for freedom of expression is provided by the constitutional rule requiring that false statements be made with the requisite fault to support a defamation claim. *Id.*

Third, [HN23] even when the information being disseminated is truthful, the press does not enjoy general immunity from tort liability. *See Cohen,* 501 U.S. at 669-70. Where a journalist has acquired information through unlawful means, such as by making an actionable false promise, the First Amendment protection of the publication of that information may be diminished. *See id.* at 671; *see also Desnick,* 44 F.3d at 1355. **[\*\*86]** Hence, the enforcement against the press of generally applicable laws is "not subject to stricter scrutiny than would be applied to enforcement against other persons or organizations." *Cohen,* 501 U.S. at 670.

Fourth, [HN24] the status of the plaintiff is of constitutional significance. *See Hustler,* 485 U.S. at 51. Less First Amendment protection is warranted where the plaintiff is a public figure, as such individuals must reasonably anticipate criticism, including "vehement, caustic, and sometimes unpleasantly sharp attacks." *Id.* (quoting *New York Times,* 376 U.S. at 270).

Fifth, [HN25] the type of damages sought bears on the necessity of constitutional safeguards. **[\*128]** In *Hustler,* the plaintiff sought emotional distress damages, which (along with reputational damages) are properly compensable in defamation actions, and are thus subject to the same "constitutional libel standards." *Cohen,* 501 U.S. at 671. The plaintiff in *Cohen,* however, sought only economic damages connected to the loss of his job, which had resulted from the defendant's breach of its promise of confidentiality. *See id.* at 666. The **[\*\*87]** *Cohen* Court, in distinguishing its holding from *Hustler,* focused on the fact that Cohen did *not* seek damages for injury to his reputation or his state of mind. *Id.* at 671. It thus concluded that Cohen could recover on his common law claim without having to additionally prove actual malice, unlike the plaintiff in *Hustler. See id.*

The importance of this factor was recently emphasized by the Fourth Circuit in *Food Lion,* 194 F.3d at 505. There, the plaintiff had conceded that it could not quantify its actual damages with regard to its common law claims of breach of loyalty and trespass. *See id.* at 515 n.3. It thus sought reputational damages instead, but did not do so via a defamation claim, because it could not prove actual malice. *See id.* at 522. The Fourth Circuit held that this attempt to recover "defamation-type" damages without satisfying the stricter First Amendment standards of a defamation claim was barred by *Hustler. Id.*

On balance, the above factors disfavor a conclusion that Ray's recovery of pecuniary, not reputational, damages for an actionable misrepresentation about PATT's **[\*\*88]** appearance in the broadcast violates the First Amendment. To be sure, some of the factors favor defendants: the Dateline report involved a matter of serious public concern, and the statements in the broadcast were, as we have already discussed, substantially true (or, at least, non-negligent when made on the basis of then-existing information). Still, [HN26] misrepresentation under Maine common law is a cause of general applicability. Applying it to journalists subjects them to the same consequences as all others. *See Cohen,* 501 U.S. at 670. If the plaintiffs' evidence is believed, the defendants did not gather information from plaintiffs "lawfully," but rather secured plaintiffs' cooperation by withholding the fact of their prior PATT interviews and denying, untruthfully, that PATT would be in the show. *See id.* at 670; *Desnick,* 44 F.3d at 1355. [25] These factual misrepresentations, if made, were highly material: if PATT were included, Ray did not wish to participate, as he realized that the PATT representatives were outspokenly unfriendly to trucking interests. Moreover, plaintiffs were not public officials or figures inured to the rough-and-tumble **[\*\*89]** of public discourse, and hence deserved greater protection. *Compare Hustler,* 485 U.S. at 51.

> 25 The court in *Food Lion* pointed out that in *Hustler,* the underlying act of intentional infliction of emotional distress was unlawful, yet that did not diminish First Amendment protections. *See* 194 F.3d at 523-24. The *Hustler* Court acknowledged, however, that "the law does not regard the intent to inflict emotional distress as one which should receive much solicitude." 485 U.S. at 53. The interest in protecting victims of that underlying tort, as opposed to the torts of misrepresentation (in *Desnick* and this case) and promissory estoppel (in *Cohen*), might be more easily outweighed by the First Amendment.

Furthermore, the district court carefully distinguished between the different types of damages potentially available under this cause of action. The court permitted the jury to award Ray damages only for his pecuniary loss (primarily the loss of trucking **[\*\*90]** customers) flowing from the misrepresentations, not reputational or emotional distress damages. Unlike *Hustler* and *Food Lion,* this is not a case where Ray could avoid the strict requirements of a defamation claim by seeking "defamation-type" damages under an easier common law standard. *See Cohen,* 501 U.S. at 671; *Food Lion,* 194 F.3d at

[*129] 523. Moreover, as discussed *supra*, we are further limiting Ray's damages to preclude recovery based upon the general tone of the broadcast; he may obtain damages only if he can prove pecuniary losses specifically resulting from the inclusion of PATT in the program. *Cf. Cohen*, 501 U.S. at 671.

Defendants request that we adopt a rule requiring "independent evidence" in every case in which a news source alleges that a journalist breached a promise as to the content of a story. We recognize the danger that newsgathering might be inhibited by forcing journalists to frequently litigate disputes concerning their purported representations to sources. An independent evidence rule would, however, grant journalists a greater license to lie than is enjoyed by other citizens. Defendants' proposed rule [**91] would exceed any protection of newsgathering that the Supreme Court has yet fashioned, and would be more appropriately developed at that level, if at all. Moreover, since *both* Ray and Kelly Veilleux testified that defendants had assured them that PATT would not be part of the report, such a rule, to apply here, would have to reject evidence from multiple witnesses so long as they were parties.

We conclude that allowing recovery of damages for common law misrepresentation, limited to Ray's pecuniary losses caused by statements that PATT would not be included in the program, does not offend the First Amendment. The jury's verdict on Ray's misrepresentation claims, however, included both bases for the claims (defendants' statement that the show would be positive *and* defendants' promise not to include PATT in the program) and permitted broad recovery based on the entirety of the broadcast. Hence, we must vacate the judgment on the misrepresentation claims and remand for further proceedings on those claims not inconsistent with this opinion. *See Levinsky's*, 127 F.3d at 134.

## VII. *NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS*

Kennedy and Ray Veilleux [**92] both asserted claims for negligent infliction of emotional distress. The district court correctly determined that under Maine law, plaintiffs could not premise this cause of action on the allegedly defamatory content of the broadcast. *See Rippett v. Bemis*, 672 A.2d 82, 87-88 (Me. 1996) (emotional distress claim based on defamatory statements is subsumed by defamation claim). It concluded that the claim could be grounded instead in defendants' alleged negligent or deliberate misrepresentations designed to secure plaintiffs' cooperation (i.e., the promises that the coverage would be positive and that PATT would not be included). Accordingly, the district court instructed the jury that in considering whether defendants had negligently inflicted emotional distress upon the two plaintiffs, it could look only to the representations made by defendants before plaintiffs agreed to participate in the report, and not to the alleged defamatory statements made during the broadcast.

The jury found that the defendants negligently made false representations to plaintiffs that were designed to induce their participation in the broadcast, causing them foreseeable and severe emotional [**93] distress. It awarded Kennedy $ 100,000 on this claim, and awarded Veilleux $ 50,000. Defendants assert several points on appeal: that the negligent infliction claim is barred because it is based on a misrepresentation theory, which precludes emotional distress damages; that it is duplicative of plaintiffs' defamation claim; and that it offends the First Amendment.

[HN27] Under Maine law, proof of negligent infliction of emotional distress requires plaintiffs to show that (1) defendants were negligent; (2) plaintiffs suffered emotional distress that was a reasonably foreseeable result of defendants' negligent conduct; (3) and plaintiffs suffered severe emotional distress as a result of defendants' negligence. *See Braverman* [*130] *v. Penobscot Shoe Co.*, 859 F. Supp. 596, 607 (D. Me. 1994) (citing *Bolton v. Caine*, 584 A.2d 615, 617-18 (Me. 1990)). [HN28] Proof of an underlying tort or a physical injury is no longer required to sustain a negligent infliction claim. *See Gammon v. Osteopathic Hosp. of Maine, Inc.*, 534 A.2d 1282, 1285 (Me. 1987). Recent Maine Supreme Judicial Court cases have extended recovery for negligent infliction of severe emotional distress [**94] to cases even where "emotional distress damages are the only damages alleged." *Salley v. Childs*, 541 A.2d 1297, 1300 n.2 (Me. 1988) (citing *Gammon*, 534 A.2d at 1285).

The Maine SJC, however, has reiterated that in eliminating the requirements of an underlying tort or physical injury, it did not create a new claim on which relief could be granted. *See Devine v. Roche Biomedical Labs., Inc.*, 637 A.2d 441, 447 (Me. 1994) (citing *Gammon*, 534 A.2d at 1285). Rather, it simply removed barriers that prevented plaintiffs from proceeding with claims already recognized in Maine law when the only damage they suffered was to their psyches:

> [*Gammon*] represented a recognition that emotional distress alone may constitute compensable damage, but was not meant to create a new ground for liability, nor was it meant to give plaintiffs a license to circumvent other requirements of the law of torts.

*Id.*

To allow plaintiffs' emotional distress claim here appears to us to circumvent a well-established limitation on the reach of the underlying misrepresentation tort expressly declared by the Maine Law Court [**95] in 1987. As noted *supra*, the Law Court

then stated with utmost clarity that [HN29] recovery for misrepresentation is limited to pecuniary harm, and that "emotional or mental pain and suffering are not recoverable." *Jourdain*, 527 A.2d at 1307; *see also Chapman*, 568 A.2d at 830. [26] The Maine Law Court derived this restriction from the quasi-contractual nature of misrepresentation torts, which serve to protect economic interests. *See Jourdain*, 527 A.2d at 1307. Significantly, the Court's express refusal to remove the limitation on recovery for psychic damages in misrepresentation cases occurred in the very same year that the Court gave general recognition to a broader basis for emotional distress damages in *Gammon*. It seems unlikely, therefore, that the Maine Law Court intended plaintiffs to evade its specific limitation on misrepresentation damages simply by restyling what is in essence a misrepresentation claim as a separate action for negligent infliction. *See Devine*, 637 A.2d at 447.

26 While the Maine court has suggested that emotional distress damages might be available for misrepresentation in some limited circumstances, *see Commercial Union Ins. Co. v. Royal Ins. Co.*, 658 A.2d 1081, 1083 (Me. 1995), it has never expressly overruled *Jourdain* or *Chapman*. We are reluctant to rely on this dicta to chart a broad new course in Maine law.

[**96] Moreover, treating plaintiffs' claim for negligent infliction of emotional distress as outside the purview of the misrepresentation tort and its restricted recovery would lead to a further difficulty under Maine law: namely, Maine's refusal to permit separate emotional distress recovery absent a special duty of care. "A [HN30] plaintiff who fails to prove that the defendant violated a duty of care owed to the plaintiff cannot recover, whether the damage is emotional, physical, or economic." *Devine*, 637 A.2d at 447. [HN31] To establish a defendant's duty for purposes of a separate claim of negligent infliction of emotional distress, the plaintiff must do more than show that the emotional harm was foreseeable. *See Cameron v. Pepin*, 610 A.2d 279, 284 (Me. 1992). The plaintiff must additionally show that public policy favors the recognition of a legal duty to refrain from inflicting emotional injury, based upon plaintiff's status or the relationship between the parties. *See Bryan R. v. Watchtower Bible and Tract Soc. of* [*131] *New York, Inc.*, 1999 ME 144, 738 A.2d 839, 849 (Me. 1999) (declining to recognize relationship between churches and their members [**97] that would give rise to duty to avoid psychic injury to members); *Bolton*, 584 A.2d at 618 (holding that a physician-patient relationship gives rise to a duty to avoid emotional harm from failure to provide critical information to patient); *Gammon*, 534 A.2d at 1285 (holding that a hospital's relationship to the family of deceased gives rise to a duty to avoid emotional harm from handling of remains); *Rowe v. Bennett*, 514 A.2d 802, 806-07 (Me. 1986) (holding that the unique nature of psychotherapist-patient relationship gives rise to a duty of care to the patient).

The Maine Law Court has proceeded cautiously in determining the scope of a defendant's duty to avoid inflicting emotional distress. *See Bryan R.*, 738 A.2d at 848. That court recently stated: "Only [HN32] where a particular duty based upon the unique relationship of the parties has been established may a defendant be held responsible, absent some other wrongdoing, for harming the emotional well-being of another.". *Id.* Hence, we are reluctant to expand this relatively undeveloped doctrine beyond the narrow categories addressed thus far. *See Dayton v. Peck, Stow and Wilcox Co.*, 739 F.2d 690, 694-95 (1st Cir. 1984) [**98] (federal court in diversity case will not innovate in state law); *see also Nieves v. Univ. of Puerto Rico*, 7 F.3d 270, 278 (1st Cir. 1993) (noting that "state-law claimants who bypass an available state forum generally are not entitled to adventurous state-law interpretations from the federal forum"). The relationship between a journalist and a potential subject bears little resemblance to those the Law Court permitted to recover in the above-cited cases. Moreover, the First Amendment might arguably make it less appropriate to find such a relationship, although we make no ruling in this regard.

Accordingly, as we find no basis on these facts for a viable claim for negligent infliction of emotional distress under Maine law, we reverse the judgment awarding damages to Kennedy and Ray Veilleux on that claim.

## VIII. *INVASION OF PRIVACY*

Maine courts have explicitly adopted the Restatement approach to invasion of privacy, which recognizes four kinds of interests, the invasion of which may give rise to a tort action for breach of another person's right to privacy. *See Nelson v. Maine Times*, 373 A.2d 1221, 1223 (Me. 1977) (citing Restatement [**99] (Second) of Torts §§ 652A-E). As set forth in Restatement (Second) of Torts § 652A, [HN33] the right of privacy is invaded by:

    (a) unreasonable intrusion upon the seclusion of another;

    (b) appropriation of the other's name or likeness;

    (c) unreasonable publicity given to the other's private life; or

    (d) publicity that unreasonably places the other in a false light before the public.

*Nelson v. Maine Times*, 373 A.2d 1221, 1223 (Me. 1977). Plaintiffs asserted and prevailed upon claims under the theories of unreasonable publication of private facts and false light. [27] Defendants contend that both claims fail as a matter of law.

27 The unreasonable publication claim pertained only to Kennedy, while the false light claim pertained to both Kennedy and Ray.

A. *Unreasonable Publication*

[HN34] Under Maine law, one who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind [**100] that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public. *See Nelson v. Maine Times*, 373 A.2d 1221, 1225 (Me. 1977) (quoting Restatement (Second) of Torts § 652D). [*132] Defendants argue that Kennedy's claim for unreasonable publicity, based on the broadcast revelation of Kennedy's failure of a federally-mandated random drug test, fails because (1) the test result was a matter of public concern, and (2) the test result was already public at the time of the broadcast.

The constitutional validity of the unreasonable publication tort is unclear. To date, the Supreme Court has declined to decide "whether truthful publications may *ever* be subjected to civil or criminal liability consistently with the First and Fourteenth Amendments, or to put it another way, whether the State may ever define and protect an area of privacy free from unwanted publicity in the press . . ." *Cox Broadcasting Co. v. Cohn*, 420 U.S. 469, 491, 43 L. Ed. 2d 328, 95 S. Ct. 1029 (1975); *see also Florida Star v. B.J.F.*, 491 U.S. 524, 533, 105 L. Ed. 2d 443, 109 S. Ct. 2603 (1989) (again declining to answer that [**101] question). We need not consider whether this tort is constitutionally viable, because we conclude that plaintiffs did not establish its state law elements.

We ask first whether the result of Kennedy's drug test was "of legitimate concern to the public." *Nelson*, 373 A.2d at 1225 (quoting Restatement (Second) of Torts § 652D). The Restatement includes within the scope of legitimate public concern matters of the kind customarily regarded as "news." *See* Restatement (Second) of Torts § 652D cmt. g. [HN35] "News" includes publications concerning, inter alia, crimes, arrests, deaths resulting from drugs, and other "matters of genuine, even if more or less deplorable, popular appeal." *Id.* Individuals' drug use, particularly where related to public safety, may be a legitimate matter of public concern. *See White v. Fraternal Order of Police*, 285 U.S. App. D.C. 273, 909 F.2d 512, 517 (D.C. Cir. 1990) (drug tests performed on police officer). So, too, may be the regulation of public health or safety. *See, e.g., Shulman v. Group W Productions, Inc.*, 18 Cal. 4th 200, 955 P.2d 469, 488 (Cal. 1998) (traffic accidents); *Reuber*, 925 F.2d 703 at 719-20 [**102] (effectiveness of government's fight against cancer); *Lee v. Calhoun*, 948 F.2d 1162, 1165 (10th Cir. 1991) (policing medical malpractice).

We believe that Kennedy's drug test results reasonably tend to illustrate the report's newsworthy themes of interstate truck driving, highway safety and relevant government regulation. [28] Because the public may be legitimately concerned with federally-mandated drug testing of truckers, Kennedy's test results, and the consequences of the results with regard to his driving career, defendants cannot be liable for invasion of privacy as a matter of law. *See Nelson*, 373 A.2d at 1225.

28 Kennedy was tested pursuant to DOT regulations requiring random drug tests of drivers of commercial vehicles. *See* 49 C.F.R. § 382.305 (1998). A driver who tests positive for controlled substances is prohibited from remaining on duty, and an employer who learns of such test results may not allow the driver to continue to drive. *Id.* § 382.501.

Plaintiffs [**103] concede that the general subject matter of the broadcast is of legitimate public concern. They also concede the newsworthiness of the general topic of drug use among interstate truck drivers. They deny, however, that the public has a legitimate interest in the identity of an individual driver who tested positive for drugs. *See Y.G. and L.G. v. Jewish Hosp. of St. Louis*, 795 S.W.2d 488, 500 (Mo. Ct. App. 1990) (while in vitro fertilization program may well have been matter of public interest, identity of plaintiffs, who participated in program, was not). We think, however, that the factual circumstances for disclosure here are more compelling than in *Y.G.*, and we follow other circuit courts that have permitted journalists to portray individuals' personal circumstances in ways that reveal their identities where sufficiently related to a matter of public concern. *See, e.g., Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1233 (7th Cir. 1993); *White*, 909 F.2d at 517; *Gilbert v.* [*133] *Medical Economics Company*, 665 F.2d 305, 308 (10th Cir. 1981).

The plaintiff in *Gilbert*, a doctor who had been featured in an article [**104] about malpractice, similarly complained that while the topic of policing failures in the medical profession was newsworthy, her name and photograph were not. *See* 665 F.2d at 308.

The court disagreed:

With respect to the publication of plaintiff's photograph and name, we find that these truthful representations are substantially relevant to a newsworthy topic because they strengthen the impact and credibility of the article. They obviate any impression that the problems raised in the article are remote or hypothetical, thus providing an aura of immediacy and even urgency that might not exist had plaintiff's name and photograph been suppressed.

*Id.* [29] *See also Haynes*, 8 F.3d at 1233 (Posner, J.)(defendant author's decision to use identified individuals to illustrate themes in historical study was constitutionally protected); *White*, 909 F.2d at 517 (identity of high-ranking police officer who tested positive for marijuana was matter of public concern).

29 *Gilbert* and other federal cases applied what may well be a more stringent test for the nexus between the disclosed information and public concern than Maine law requires. The Seventh Circuit considered whether the statements at issue were "*substantially* relevant to a newsworthy topic," 665 F.2d at 308 (emphasis added), while Maine law requires only that the statements be "of legitimate concern to the public." *Nelson*, 373 A.2d at 1225.

[**105] The same rationale applies here. Defendants learned that the truck driver whom they had filmed for their program, who had insisted that he did not currently use drugs and was a safe driver, tested positive in DOT-mandated random tests for marijuana and amphetamines. We think defendants were entitled to illustrate their messages about highway safety and regulation with new information about the individual subject of their report. [30] Simply reporting statistics about truckers who use drugs, or discussing the details of Kennedy's case without mentioning him by name, would have substantially less impact.

30 We note that the information learned about Kennedy pertained directly to highway safety, as Kennedy's random drug test was ordered pursuant to DOT requirements for commercial drivers like Kennedy. Kennedy's positive test took place while he was engaged in a driving assignment: the westbound portion of the same trip later accompanied by Dateline. Kennedy denied using amphetamines and attributed the marijuana test results to recreational usage some weeks before leaving for the Dateline run. Under relevant DOT regulations, however, the test results were clearly material to his suitability to drive. *See* 49 C.F.R. § 382.501 (1998).

[**106] The district court held that Kennedy's test results were insufficiently linked to the topic of highway safety because there is no evidence that Kennedy was actually drug-impaired while driving on the Dateline run. DOT regulations, however, forbid driving after testing positive for drugs, and given that positive results emerged from a test administered while Kennedy was actually driving, it cannot be dismissed as lacking in newsworthiness. Defendants could draw from Kennedy's failure of the drug test the reasonable inference that there was some likelihood that his driving was sometimes drug-impaired, thereby endangering the public. "If the press is to have the generous breathing space that courts have accorded it thus far, editors must have freedom to make reasonable judgments and to draw one inference where others also reasonably could be drawn." *Gilbert*, 665 F.2d at 309.

It is true, as Kennedy contends, that his drug test results were subject to strict confidentiality requirements under state and federal law. This is not a case, therefore, in which the news media has simply reported a crime that is already a matter of public record. *Compare Cox*, 420 U.S. at 495-96 [**107] (identity of rape victim acquired from public court documents) with *Haynes*, 8 F.3d at 1232 [*134] (primary source of personal facts about plaintiff was personal interview, not public documents). [HN36] Information does not have to be a matter of public record, however, in order to relate to a matter of public concern so that it can be disclosed by the media. *See Haynes*, 8 F.3d at 1232; *see also* Restatement (Second) of Torts § 652D cmt. e ("the legitimate interest of the public may extend beyond those matters which are themselves made public, and to some reasonable extent may include information as to matters that would otherwise be private").

In short, we hold that Kennedy's drug test results were of legitimate public concern such that defendants may not be liable for invasion of privacy under an unreasonable publication theory. Accordingly, there is no need to reach the other issue presented by defendants on appeal, which was whether the test result was already public at the time of the broadcast.

**B. *False light***

In *Nelson v. Maine Times*, 373 A.2d 1221 (Me. 1977), the Maine Supreme Judicial Court adopted the requirements for

"false [**108] light" invasion of privacy of the Restatement (Second) of Torts § 652E (1977). *Id.* at 1223-24. [HN37] One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability for invasion of privacy, if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other was placed. *See* Restatement (Second) of Torts § 652E. Put another way, Maine law requires proof of defendants' "actual malice." *See Cantrell v. Forest City Publ'g Co.*, 419 U.S. 245, 251-52, 42 L. Ed. 2d 419, 95 S. Ct. 465 (1974); *Frobose v. American Sav. and Loan Ass'n of Danville*, 152 F.3d 602, 617 (7th Cir. 1998).

The plaintiffs' false light claim was premised on precisely the same thirteen statements that underlay their defamation claim, most of which were rejected on appeal because plaintiffs failed to establish that defendants acted with the requisite fault. *A fortiori*, plaintiffs cannot satisfy the more onerous standard [**109] of actual malice required by Maine law for their false light claim.

To the extent that our defamation holding was premised on concepts other than lack of fault, constitutional limitations on false light claims similarly preclude our entertaining a false light claim. *See Brown v. Hearst Corp.*, 54 F.3d 21, 27 (1st Cir. 1995); *see also* Restatement (Second) of Torts § 652E cmt. e. Specifically, those statements that we rejected because plaintiffs failed to establish that they were materially false cannot support a false light claim any more than they can a defamation claim. *See Brown*, 54 F.3d at 27; *Varnish v. Best Medium Publ'g Co. Inc.*, 405 F.2d 608, 611 (2d Cir. 1968); *see also* Restatement (Second) of Torts § 652E cmt. c. Nor can [HN38] protected statements of opinion support a claim of false light. *See Partington v. Bugliosi*, 56 F.3d 1147, 1160-61 (9th Cir. 1995); *Moldea v. New York Times Co.*, 306 U.S. App. D.C. 1, 22 F.3d 310, 319 (D.C. Cir. 1994); *White*, 909 F.2d at 518; *Rinsley v. Brandt*, 700 F.2d 1304, 1307 (10th Cir. 1983). Moreover, to the extent that we [**110] determined that the statements at issue did not disparage plaintiffs, those statements fail to satisfy the requirement under Maine law that the false light in which plaintiffs were placed be "highly offensive to a reasonable person."

Plaintiffs nonetheless contend that we should sustain their false light claim even if we reverse the defamation judgment. It is true that there are some differences in the common law elements of these two claims. *See, e.g., Machleder*, 801 F.2d 46 at 55-56 (unlike defamation, false light doctrine does not distinguish between oral and written words, or between slander per se and slander requiring special damages); *Frye v. IBP, Inc.*, 15 F. Supp. 2d 1032, 1043 [*135] (D. Kan. 1998) (false light and defamation differ in that former contains expanded publicity requirement); *see also* Restatement (Second) of Torts § 652E cmt. b (statement need not be defamatory to support a false light claim). None of these distinctions, however, are material here.

No Maine court has yet grappled with the question of whether a false light claim may proceed where a defamation claim premised on the same statement may not. Given that we previously [**111] have rejected this sort of evasion of constitutional restrictions, *see Brown*, 54 F.3d at 27; *Gashgai v. Leibowitz*, 703 F.2d 10, 12 (1st Cir. 1983), as well as the absence of clear precedent in other circuits, we will not break new and constitutionally suspect ground today. Accordingly, we reverse the judgment as to the plaintiffs' false light claim.

IX . *LOSS OF CONSORTIUM*

The parties agree that Kelly Veilleux's damages for loss of consortium are conditioned on the success of Ray's claims. We therefore vacate the judgment and that count and remand it to the district court for further proceedings consistent with this opinion.

X. *PUNITIVE DAMAGES*

In their cross-appeal, plaintiffs contend that the district court erred in deciding that there was insufficient evidence of common-law malice to allow the jury to consider awarding plaintiffs punitive damages. [HN39] To receive punitive damages, Maine law requires a plaintiff to prove by clear and convincing evidence that the defendant was motivated by "ill will" toward the plaintiff, or acted so "outrageously" that malice could be inferred. *Tuttle v. Raymond*, 494 A.2d 1353, 1361 (Me. 1985). [**112] Limiting our consideration of the evidence to defendants' conduct relating to the viable portions of the misrepresentation claim, we see no error.

Plaintiffs contend that the record contains sufficient evidence of defendants' "outrageous" conduct to support a punitive damages award. Reviewing the record as it stood before the district court at the time of its summary judgment ruling, *see Voutour v. Vitale*, 761 F.2d 812, 817 (1st Cir. 1985), we see no reason to disagree with the district court that the evidence fails to meet the strict standard set forth in *Tuttle*. The record does not support a conclusion that defendants' representations not to include PATT in the broadcast were motivated by anything more malicious than the zealous pursuit of an emotionally compelling story. While a jury could find that the alleged misrepresentations were made knowingly or even recklessly, it could not reasonably infer common-law malice as required under Maine law.

## XI. *CONCLUSION*

We hold as follows: (1) we reverse the judgment in favor of Ray and Kennedy on their defamation claim (Count III); (2) we reverse the judgment on Ray's misrepresentation claims (Counts [**113] I and II) insofar as premised on defendants' alleged assurances that their portrayal of the trucking industry would be "positive," and we vacate the judgment and remand for further proceedings those portions of the same claims premised on defendants' alleged promises not to include PATT in the program; (3) we reverse the judgment on Ray and Kennedy's negligent infliction of emotional distress claim (Count VI); (4) we reverse the judgment on the invasion of privacy claim as to both Kennedy's "unreasonable publication" theory (Count IV) and Ray and Kennedy's "false light" theory (Count V); (5) we vacate the judgment as to Kelly Veilleux's loss of consortium claim (Count VIII) and remand for further proceedings; and (6) we deny plaintiffs' cross-appeal in its entirety.

*Reversed in part, vacated in part, and remanded for further proceedings not inconsistent with this opinion.*