# Exhibit A

**Amended Declaration of Eddy W. Hartenstein in Support of the Objection of the DCL Plan Proponents to the Motions for a Stay Pending Appeal**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>TRIBUNE COMPANY, et al.,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 08-13141 (KJC)<br><br>Jointly Administered<br>Related to Docket No. 12217 |

## AMENDED DECLARATION OF EDDY W. HARTENSTEIN IN SUPPORT OF THE OBJECTION OF THE DCL PLAN PROPONENTS TO THE MOTIONS FOR A STAY PENDING APPEAL

I, Eddy W. Hartenstein, declare as follows:

1. I am the President and Chief Executive Officer at Tribune Company ("Tribune"), one of the debtors and debtors-in-possession (collectively, the "Debtors") in these proceedings. Tribune Company is the ultimate parent company of each of the Debtors and their respective

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc., f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); and WPIX, Inc. (0191). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

non-debtor subsidiaries. Tribune and all of its subsidiaries are hereinafter collectively referred to as the "Company." I also serve as Publisher and Chief Executive Officer of the Los Angeles Times. I hold Bachelor of Science degrees in aerospace engineering and mathematics from California State Polytechnic University, Pomona, and a Master of Science degree from Cal Tech.

2. I submit this declaration in support of the *Objection of the DCL Plan Proponents to the Motions for a Stay Pending Appeal of the Confirmation Order* (the "Objection").[2]

3. I believe it is important for Tribune and the other Debtors to emerge from bankruptcy as soon as possible. In the event the Stay Motions are granted, I believe the Company will incur substantial harm.

4. The Stay Motions are premised, in part, on the notion that, because the estimated Total Distributable Value of the Company has increased during these Chapter 11 cases, the Company has not been in the past, and will not be in the future, harmed by continuing to stay in bankruptcy. I strongly disagree with that premise. The Stay Motions wholly ignore the reasons for the apparent increase in the Company's Total Distributable Value and the constraints created by the bankruptcy which continue to hinder the Company from performing as well as it can and realizing its optimum value.

5. As an initial matter, the claim that the Company's operations have somehow benefitted from its extended stay in bankruptcy is wrong. As I have previously testified, management has worked extraordinarily hard to overcome the obstacles associated with being in bankruptcy and achieve the results that have driven the increase in value. If the Company had

---

[2] Capitalized terms used and not otherwise defined shall have the meaning ascribed to them in the Objection.

been able to emerge sooner it might have been able to re-direct those efforts and achieve even better results. Further, the Stay Motions wholly ignore the fact that some of the increase in value has been the result of the Company not making interest payments on its outstanding debt.

6. Even more significantly, however, the incremental changes in the Company's Total Distributable Value do not, in my view, address the question of whether the pendency of the bankruptcy cases has and, in the event a stay is granted, would continue to adversely affect the Company. I believe that if the bankruptcy cases continue, the Company would be harmed in numerous ways, including the following: (1) brand erosion; (2) impairment of the Company's ability to take advantage of potential strategic opportunities and the Company's ability to protect itself from competitor-driven initiatives that weaken the Company's position; (3) hampering the Company in attracting and retaining the most qualified individuals; (4) causing the Company to bear enormous administrative costs associated with the bankruptcy; and (5) should the Company's emergence be delayed significantly, potentially undermining the various complex and interrelated settlements underlying the confirmed DCL Plan.

*(1) Brand Erosion Causing Customer Driven Losses and Weakening of the Relationship with Advertisers*

7. The Company's brands, perceived strength, and pricing power erode every day it is in bankruptcy. The Company's primary business is distributing content through its print and broadcasting properties. Advertising revenues are tied directly to the quality of content and its popularity. Every additional day the Company remains in its current fragile position, it is incrementally disadvantaged in competing for high quality content, making its properties decrementally less attractive. Additionally, as long as the Company's future and capital structure remain uncertain, advertisers are less likely to invest in building premium relationships with the

3

Company. Uncertainty about future prospects also lowers customer confidence, which, in turn, can decrease revenues and enterprise value significantly.

*(2) Impairment of the Company's Ability to Take Advantage of Potential Strategic Opportunities or, Conversely, to Protect the Company from Competitor-Driven Initiatives that Weaken the Company's Position*

8. The bankruptcy also has significantly restricted the Company in its ability to pursue opportunistic investments. Whether due to counterparty refusals to engage because of the uncertainties of the bankruptcy process or just the lengthy and difficult process involved in seeking required approval for investments, the Company's ability in this regard has been significantly impaired. Conversely, our competitors have operated at a distinct advantage. Not only do they have the flexibility to successfully and swiftly pursue such opportunities, but they also have the added advantage of being able to point out to potential counterparties the significant constraints under which the Company has to operate. These problems affect all of the Company's business operations.

9. The Company has two major operating divisions: (i) publishing, which includes eight major market daily newspapers and numerous niche and other publications; and (ii) broadcasting, which includes 23 television stations in 19 markets, as well as certain cable operations and radio stations. Both of these divisions have faced significant challenges as a result of these Chapter 11 cases.

10. With regard to publishing, the trend in the industry has been to attempt to realize greater economies of scale and to achieve such efficiencies through consolidation. As a result of the bankruptcy, the Company has been hampered in its efforts to attract partners, or to take steps to consolidate its operations. Emerging from bankruptcy will, I believe, immediately improve

4

the Company's ability to pursue beneficial transactions involving the acquisition of assets, the consolidation of assets, and partnering with other companies. None of these actions can be done as effectively, efficiently, or timely if the Company continues to be hobbled in bankruptcy.

11. For the broadcast business, a key to success is the ability to produce differentiated and better content. Often, the best and most cost-effective path to these goals is to partner with other entities rather than seek to create new content organically. Like in publishing, however, the Company's ability to pursue such endeavors has been and would continue to be constrained while in bankruptcy.

12. Furthermore, the Chapter 11 cases will continue to negatively impact the Company's ability to maximize the value of its minority interest holdings. As a result of the bankruptcy, it has been quite difficult to participate in new third-party ventures.

*(3) Hampering the Company in Attracting and Retaining the Most Qualified Individuals*

13. For all of the Company's operations, the bankruptcy has made it very difficult to attract and retain top talent. Indeed, if the bankruptcy is further extended there is a significant risk that the Company may lose key senior managers and other top performers. It is also clear that the ability to recruit industry-leading talent would also be severely hampered. Qualified candidates are fully cognizant of the challenges and incremental burdens associated with operating a major enterprise while in bankruptcy and are thus understandably hesitant to join such an operation.

14. In addition, in my experience, in order to be as competitive as possible in the industry, it is crucial for media companies to be able to offer various forms of equity as

compensation to their top talent. However, while it has been in bankruptcy, the Company has been unable to offer this form of compensation to its current or prospective employees, which has made it difficult for the Company to compete for and attract world-class people in the disciplines that it needs.

*(4) Causing the Company to Bear the Enormous Administrative Costs Associated with the Bankruptcy*

15.  The administrative costs associated with the bankruptcy have resulted in a drain on the Company's finances. Any stay pending appeal would further burden the Company with continuing professional fees and expenses during the additional months or years that the Company is forced to remain in bankruptcy. These costs include the bankruptcy-specific professional fees and expenses for the professionals employed by the Company pursuant to sections 327(a) and 327(e) of the Bankruptcy Code, as well as the professional fees and expenses for counsel and advisors to the Committee, potential fees and expenses for individual members of the Committee, the Company's claims, noticing, and balloting agent, Epiq Bankruptcy Solutions, LLC, the Committee's website administrative agent, Kurtzman Carson Consulting LLC, and Stuart Maue as the court-appointed fee examiner. In addition, the confirmed DCL Plan provides that the Company is to pay certain fees and expenses which could potentially continue to accrue during an extended stay period, including, but not limited to, those fees and expenses of the Senior Lenders' professionals, and potentially other parties and professionals.

16.  To date, the Company has incurred approximately *$400 million* in fees and expenses in connection with this bankruptcy proceeding. Further, it is my understanding, based on the Declaration of David S. Kurtz, that the Company could expect to incur an additional *$113 million* in fees and expenses if the bankruptcy proceedings were to be extended for two years as

a result of the imposition of a stay. This would result in an enormous loss of value for the Company and, as a consequence, its creditors.

*(5) Undermining the Settlements Underlying the Confirmed DCL Plan*

17.   Finally, and perhaps most importantly, in the event of an indefinite stay or other substantial delay, there can be no assurance that each of the parties to the DCL Plan Settlement and the other settlements under the confirmed DCL Plan will remain committed to such settlements or the confirmed DCL Plan.

18.   For all of these reasons, I believe it is imperative that the Company emerge from bankuptcy as soon as possible.

[Signature page to follow]

I declare under penalty of perjury that the foregoing is true and correct.

Dated: August 10, 2012

/s/ Eddy W. Hartenstein
EDDY W. HARTENSTEIN