## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re | Chapter 11 |
|  | Case No. 08-13141 (KJC) |
| TRIBUNE COMPANY, *et al.*, | Jointly Administered |
|  | **Hearing Date:** August 17, 2012 at 10:00 a.m. |
| Debtors. |  |

## REPLY BRIEF IN FURTHER SUPPORT OF MOTION FOR A STAY PENDING APPEAL PURSUANT TO BANKRUPTCY RULE 8005 AND STATEMENT IN SUPPORT OF CERTIFICATION

Appellant Aurelius Capital Management, LP ("Aurelius"), on behalf of its managed entities, by and through its undersigned counsel, hereby respectfully submits this statement in support of certification, and reply brief in further support of its motion (the "Motion"), pursuant to Rule 8005 of the Federal Rules of Bankruptcy Procedure, requesting that this Court grant a stay pending Aurelius's appeal from the Confirmation Order (inclusive of related memoranda, orders and opinions), and in response to the Objection of the DCL Plan Proponents to the Motions For a Stay Pending Appeal Of The Confirmation Order (the "Objection").    In further support of the Motion and in support of certification, Aurelius states as follows:[1]

### PRELIMINARY STATEMENT

1.    The following facts are undisputed.    Tribune, acting in conjunction with the LBO Lenders, piled mountainous debt on the Company at a time when both the Company and the industry it inhabits were experiencing steady and relentless declines.    The LBO Lenders then extracted guarantees from Tribune's subsidiaries, to ensure that the risk of the LBO would be borne by Tribune's non-LBO creditors in the event of the (inevitable) bankruptcy.    When

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

that bankruptcy occurred less than a year later, the LBO Lenders and Debtors structured the DCL

Settlement, which provides the non-LBO Noteholders collectively with consideration of 16-18

cents on the dollar, while LBO Lenders walk away from these proceedings with distributions of

approximately 78% of their claims.    Not surprisingly, the DCL Settlement is opposed by the

vast majority of Noteholders, calculated by dollar amount, who would prefer to continue the

litigation rather than accept the woefully inadequate consideration provided thereunder.    *See*

Second Supplemental Declaration of Stephanie Kjontvedt on Behalf of Epiq Bankruptcy

Solutions, LLC Regarding Voting and Tabulation of Ballots Accepting and Rejection the Joint

Plans of Reorganization Proposed for Tribune Company and its Subsidiaries dated May 10, 2011

[ECF No. 8882] ("Kjontvedt Decl.") at Ex. 3.    Equally as unsurprising, the LBO Lenders

overwhelmingly support the DCL Settlement, and cannot write the paltry $369 million

check—to settle the Noteholders' collective claims of $2.0 – 2.3 billion—fast enough.    *See id.*

at Ex. 1.

2.    Having now obtained this Court's approval of the DCL Settlement, the DCL Plan

Proponents seek to foreclose, as a practical matter, any appellate consideration of the Court's

decision by arguing that Aurelius cannot obtain a stay.    Notably, the DCL Plan Proponents do

not dispute Aurelius's contention that in the absence of a stay, the DCL Plan Proponents will

consummate the DCL Plan as quickly as possible and argue that Aurelius's appeal is equitably

mooted.    Rather, the DCL Plan Proponents assert that because this Court approved the DCL

Settlement after a long and complex bankruptcy process, the DCL Plan Proponents have now

"earned the right" to consummate the DCL Plan without interference by or consideration of other

parties' appellate rights.    Obj. ¶ 3.    The DCL Plan Proponents argue that the requested stay is

conclusively foreclosed because Aurelius's appeal, like most appeals, raises arguments that were

previously raised.   Obj. ¶¶ 11-13.   The DCL Plan Proponents also assert that the stay should

be denied because Aurelius's "only" harm in the absence of a stay is the potential loss of its right

to pursue the appeal; because the public has an interest in the finality of bankruptcy decisions;

and because Aurelius cannot post a bond to protect against the parade of horribles that the DCL

Plan Proponents conjure for the Court.   *Id.* ¶¶ 30-33, 50-54, 59-80.

3.      Each of these arguments should be rejected.   To begin with, the complexity and

duration of these cases *heightens*, rather than lessens, the need for appellate review, as cases

involving complicated issues necessitating voluminous briefing and multiple hearings present

greater potential for error than those that are easily resolved.   Additionally, the DCL Plan

Proponents' assertion that they have "earned" the right to emerge from bankruptcy is true only if

the Court's decision that the DCL Plan may be confirmed is correct.   Aurelius's appeal of the

Confirmation Order raises pure issues of law, however, which will be evaluated *de novo*, and to

which no presumption of correctness applies.   *See infra* ¶¶ 12-14.

4.      Contrary to the DCL Plan Proponents' assertions, Aurelius should not be required

to insure the Debtors' future financial performance, fund the bankruptcy, and guarantee creditors

an astronomical rate of return that they would be unlikely to achieve absent a stay, in order to

protect its right to appellate review of these issues.   Imposing such an insurmountable hurdle to

appeal is the very definition of irreparable harm, which the Third Circuit defines as "potential

harm which cannot be redressed by a legal or an equitable remedy following a trial."   *Acierno v.*

*New Castle Cnty.*, 40 F.3d 645, 653 (3d Cir. 1994) (internal quotations omitted); *see Official*

*Comm. of Equity Sec. Holders v. Finova Grp., Inc. (In re Finova Grp., Inc.)*, No. 07-480-JJF,

WL 3238764, at *2 (D. Del. Oct. 31, 2007) (finding "real and substantial" risk of irreparable

harm where debtors advised court that "absent a stay, they intend[ed] to" distribute funds, and

court found that "[o]nce this distribution is made, Appellant will have little or no recourse available to reclaim the funds.").   It could also effectively preclude *any* appeal of a confirmation order, regardless of its merit.   This cannot be consistent with the public interest, or the recent admonishment from Judge Ambro of the Third Circuit against "weapon[s designed] to prevent any appellate review of bankruptcy court orders confirming reorganization plans."   *In re Phila. Newspapers, LLC*, __ F.3d __, 2012 WL 3038578, at *11, n.12 (3d Cir. July 26, 2012) (internal quotations omitted).

  5. As a show of good faith, and in response to the DCL Plan Proponents' contention that the requested stay could delay the Debtors' emergence from bankruptcy for as much as and potentially more than two years (Obj. ¶¶ 63-64), Aurelius is willing to agree to limit its stay request to 180 days, subject to Aurelius's right to seek a renewal of the stay from the appropriate court at the end of 180 days if warranted by the circumstances.[2]   This modest request strikes an appropriate balance between the need to ensure that bankruptcy court decisions are subjected to full and fair appellate review, while protecting creditors from a prolonged delay of consummation.   Indeed, to the extent that the DCL Plan Proponents' repeated assertions

---

[2] Aurelius understands that Deutsche Bank Trust Company Americas and Law Debenture Trust Company of New York (the "Indenture Trustees") will also agree to modify their stay request in this manner.   Aurelius intends to seek an expedited briefing schedule on its appeal in the district court, or the Third Circuit if the appeal is certified for direct appeal, so that the appeal may be heard within this timeframe.   Prior to filing this reply brief, Aurelius requested that the DCL Plan Proponents consent to a waiver of mediation and expedited briefing schedule that would (i) require Aurelius to file its opening brief in support of its appeal within seven days of receiving permission from the District Court to bypass mediation and expedite briefing, and (ii) provide the parties with ten days each to file opposition and reply papers.   *See Declaration of David M. Zensky in Support of Aurelius's Reply Brief in Further Support of Motion for a Stay Pending Appeal Pursuant to Bankruptcy Rule 8005 and Statement in Support of Certification ("Zensky Decl."), Ex. A.   The DCL Plan Proponents refused to consent to the proposed expedited briefing schedule, asserting instead that all of the pending appeals of the Confirmation Order, and the appeals filed by Wilmington Trust Company ("WTC") of this Court's prior orders and decisions that are currently pending before the district court (the "Prior Appeals"), should proceed on the same schedule.   *See Zensky Decl. Ex. B.

throughout the bankruptcy process that the Debtors would need at least a few months following

confirmation to obtain FCC approval were true—a question to which the DCL Plan Proponents

have yet to provide a clear answer—then the requested stay should have no, or a very minimal,

effect on creditors.   *See, e.g.*, 11/22/11 Trial Tr. at 46:9-16 (Johnston) ("[E]ntry of a

Confirmation Order in this case is not the end of the story with respect to the company then

going effective with a Plan.   There is an FCC approval process which actually can't start until

the Court enters a Confirmation Order.   And the FCC lawyers that I've talked to, and I don't

think there's a disagreement about this, all say that that process will take three to six months.").

6.      If the senior lenders are truly concerned about the hypothetical risks articulated by

the DCL Plan Proponents, they may easily protect themselves against such risks by selling their

bank debt, which trades in a highly liquid market at a price that is almost equivalent to the value

assigned to the senior lenders' distributions under the DCL Plan, and reflects the market's

current view of the value of Tribune generally.   *See* Zensky Decl. Ex. D (Deposition of David

S. Kurtz dated August 13, 2012 ("Kurtz Tr.")) at 143:16-148:2.

7.      Aurelius acknowledges that courts have previously erected substantial roadblocks

to an appellant's ability to obtain a stay of consummation of a plan of reorganization.   These

roadblocks are not mandated by the text of the Bankruptcy Code, however, and determination of

Aurelius's stay request falls squarely within this Court's equitable discretion.   Fed. R. Bankr. P.

8005.   Denial of the stay would be particularly inequitable here, given that the DCL Settlement

releases estate fraudulent conveyance claims that the Court itself found to have a far greater

chance of success than the Creditors' Committee and Debtors assumed when entering into the

DCL Settlement, and the overwhelming majority of Senior Noteholders and PHONES

Noteholders, calculated by dollar amount, *oppose* the DCL Settlement.   *See* Opinion on

Confirmation dated October 31, 2011 [ECF No. 10133] at 62; Kjontvedt Decl. at Ex. 3.

8.     Given the circumstances, equity requires that Aurelius be afforded at least the limited opportunity it is requesting to pursue its appeal.    Aurelius respectfully requests that the Objection be overruled, and that the Motion be granted in its entirety, with the modification that the stay be issued for 180 days, subject to Aurelius's right to request from the appropriate court that it be extended.

## LEGAL ARGUMENT

**I.     Aurelius's Request For A Stay Should Be Granted**

**A.     Legal Standard**

9.     The determination of Aurelius's stay request is within this Court's equitable discretion.    *See* Fed. R. Bankr. P. 8005; *see also Fox Sports Net West 2, LLC v. L.A. Dodgers LLC (In re L.A. Dodgers LLC)*, 465 B.R. 18, 28 (D. Del. 2011) (reviewing bankruptcy court's denial of stay pending appeal under the abuse of discretion standard and granting appellant's stay motion).    Courts determining a stay motion consider whether the movant has shown (1) a strong likelihood of success on the merits, (2) irreparable harm absent a stay, (3) that issuance of the stay will not substantially injure other parties, and (4) that a stay is in the public interest.    *See* Motion ¶ 21.    Contrary to the DCL Plan Proponents' assertions, "none of the factors are determinative and courts must balance all of the factors in order to decide whether or not to grant a stay." *Haskell v Goldman, Sachs & Co. (In re Genesis Health Ventures, Inc.)*, 367 B.R. 516, 519 (Bankr. D. Del. 2007); *In re Finova*, 2007 WL 3238764, at *2 (D. Del. Oct. 31, 2007) (granting stay upon balancing the factors and determination that "given the significant harm to the Appellant, the Court is inclined to give less weight to Appellant's likelihood of success on the merits."); *In re Bankruptcy Appeal of Allegheny Health, Educ., and Research Found.*, 252

B.R. 309, 321 (W.D. Pa. 1999) ("no one aspect [relating to a stay pending appeal] will

necessarily determine its outcome.    Rather, proper judgment entails a delicate balancing of all

elements.") (citations omitted).    A balancing of the factors here weighs in favor of the requested

stay.

### B.    Aurelius Is Likely To Succeed On The Merits Of Its Appeal

10.    The DCL Plan Proponents argue that Aurelius faces an "insurmountable hurdle"

to succeeding on the merits of its appeal because the appeal raises arguments that Aurelius has

previously raised, and – according to the DCL Plan Proponents – will be subject to a "limited

and narrow" standard of review on appeal.    Obj. ¶ 11.    The DCL Plan Proponents are wrong.

To begin with, Appellants are not precluded from raising arguments on appeal that they raised

below.    To the contrary, the purpose of an appeal is to provide an appellant with an opportunity

to argue to a higher tribunal that the lower court committed an error in ruling against it.    If

appellants could not reassert their arguments, no appeals could ever go forward.

11.    The cases cited by the DCL Plan Proponents on this point do not hold otherwise.

Rather, those cases simply stand for the unremarkable proposition that a trial court may be

unlikely to find a likelihood of success on an argument that it has previously rejected.    *See* Obj.

¶ 12 (citing *In re W.R. Grace & Co.*, No. 11-199, 2012 U.S. Dist. LEXIS 88887, at \*12-13 (D.

Del. June 27, 2012); *In re Trans World Airlines, Inc.*, No. 01-0056, 2001 WL 1820019, at \*2

(Bankr. D. Del. Mar. 16, 2001); *In re Olick*, No. Civ. A. 96-784, 1996 WL 287344, at \*1 (E.D.

Pa. May 29, 1996).    Courts have acknowledged, however, that even where they have previously

ruled against an appellant, the requisite likelihood of success on appeal may still exist.    *See,

e.g.*, *In re Genesis Health Ventures*, 367 B.R. at 521 (stay pending appeal to district court

granted); *In re Abebe*, 466 B.R. 63, 65-66 (Bankr. E.D. Va. 2012) (same); *Hoekstra v. Oak*

*Cluster Cmty. Council (In re Hoekstra)*, 268 B.R. 904, 907 (Bankr. E.D. Va. 2000) (same);

*Schumacher v. Cent. Sales, Inc. (In re Schumacher)*, Nos. 84-05422, 85-7024, 1985 WL 660461,

at *1 (Bankr. D.N.D. Oct. 25, 1985) (same).

12.     Aurelius does not, as the DCL Plan Proponents contend, challenge the

Bankruptcy Court's factual findings.     Rather, Aurelius argues that *given* the Court's findings

respecting the claims' likelihood of success, a proper application of Rule 9019 could not possibly

have resulted in the conclusion that the DCL Settlement falls above the lowest rung in the range

of reasonableness.     This is an issue of law that is subject to *de novo* review, *not* an abuse of

discretion standard.     *Pell v. E.I. DuPont de Nemours & Co. Inc.*, 539 F.3d 292, 305 (3d Cir.

2008); *Apeldyn Corp. v. AU Optronics Corp.*, 831 F. Supp. 2d 817, 835 (D. Del. 2011) ("the

appropriate legal standard to apply to the analysis of the facts is a question of law, subject to de

novo review"); *Ardis v. Educ. Credit Mgmt. Corp.*, 340 B.R. 309, 310-311 (D.S.C. 2006) ("The

application of the relevant legal standard to the facts reasonably found is, however, a question of

law to be resolved under a de novo standard of review.").     Based on the Court's findings

regarding the likelihood of avoiding the Step One debt alone, there is a strong possibility that an

appellate court would rule that, as a matter of law, the DCL Settlement does not fall anywhere

near the range of reasonableness.     *See, e.g.*, *Cames v. Joiner (In re Joiner)*, 319 B.R. 903, 906

(Bankr. M.D. Ga. 2004) (rejecting settlement of cause of action where expert analysis of

unsecured creditors opposing settlement demonstrated that cause of action "ha[d] better than a 50

percent chance of prevailing."); *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab.

Litig.*, 55 F.3d 768, 816 (3d Cir. 1995) (explaining that analogous inquiry of

likelihood-of-success under Rule 23 "attempts to measure the expected value of litigating the

action rather than settling it at the current time").

13.    Aurelius's other appellate issue—which questions whether the Court erred by ruling that it was "not likely" that Step One lenders would be precluded from sharing in the benefit of Step Two avoidance and disgorgement, such that the value from such avoidance would then flow to Tribune and its creditors—will also be subject to a *de novo* standard of review, rather than the limited abuse of discretion standard contended by the DCL Plan Proponents. *See, e.g., Cummings v. Connell*, 316 F.3d 886, 893 (9th Cir. 2003) ("We review de novo a district court's legal conclusion that a particular remedy is available.").    The likelihood of success analysis tips in Aurelius's favor on this issue as well.

14.    Specifically, the DCL Plan Proponents acknowledge that several courts have estopped creditors who consented to and participated in a transaction from benefitting from that transaction's avoidance, but argue, erroneously, that even if estoppel or other equitable principles were invoked here, there is no legal authority for "upstreaming" the value from Step Two avoidance to Tribune.    Obj. ¶ 20 n. 10.    Contrary to the DCL Plan Proponents' assertion, however, a number of cases hold that a debtor's equity holder—such as the Tribune parent here—can share in the benefit of avoidance recoveries once all of the debtor's allowed claims have been paid in full.    *See, e.g., Kraft, LLC v. Greiner (In re Kraft LLC)*, 429 B.R. 637, 667-68 (Bankr. N.D. Ind. 2010); *In re Goss*, 43 F.2d 746, 747-48 (N.D. Ga. 1930); *In re Bayou Group, LLC*, 372 B.R. 661, 664 (Bankr. S.D.N.Y. 2007); *Calpine Corp. v. Rosetta Res. Inc. (In re Calpine Corp.)*, 377 B.R. 808, 812 n.3 (Bankr. S.D.N.Y. 2007).    Moreover, Tribune holds intercompany claims at the Guarantor Subsidiaries of more than $2.4 billion, which also supports a finding that value from the Guarantor Subsidiaries should flow to Tribune.    *See DCL Plan*, Exhibit 1.1.122.    Thus, there is also a strong possibility that Aurelius will succeed on its argument that the Court underestimated the possibility that Step One lenders would be precluded

from sharing in the benefit of Step Two avoidance, and that the resulting value would flow to Tribune's creditors.

**C.    The Balance Of Harms And Public Interest Weigh In Favor Of A Stay**

15.    The balance of harms and public interest also weigh in favor of the requested stay. The Third Circuit defines "irreparable harm" as "potential harm which cannot be redressed by a legal or an equitable remedy following a trial." *Acierno*, 40 F.3d at 653.    It is hard to imagine a more perfect example of this definition than the case at hand.    The DCL Plan Proponents do not dispute that in the absence of a stay, they will consummate the DCL Plan as quickly as possible, and will seek to dismiss Aurelius's appeal as equitably moot.    While Aurelius disagrees that its appeal would be subject to such dismissal, there is no question that equitable mootness will, when asserted by the DCL Plan Proponents, pose a risk that Aurelius will be unable to obtain any remedy following consummation of the DCL Plan, regardless of the merits of its appeal.    *See Finova Grp.*, 2007 WL 3238764, at *2 (finding "real and substantial" risk of irreparable harm where debtors advised court that "absent a stay, they intend[ed] to" distribute funds, and court found that "[o]nce this distribution is made, Appellant will have little or no recourse available to reclaim the funds.").

16.    Conversely, the DCL Plan Proponents argue that non-moving creditors may be harmed by the Debtors' inability to perform as well in bankruptcy as they might outside of bankruptcy; by the risk that market conditions may cause the Debtors' value to diminish during the pendency of the stay, by continuing administrative expenses, and by creditors' alleged inability to obtain a higher interest rate on cash distributions that will or may be delayed by the stay, or cash that creditors might be able to obtain by selling the debt to be distributed to them under the plan.    *See* Obj. ¶¶ 45-48.

17.    The threat of these risks and potential expenses—to the extent that it actually

10

exists—is considerably diminished by Aurelius's agreement to limit the stay to 180 days.

Moreover, the risks and potential expenses cited by the DCL Plan Proponents are highly

speculative, in many cases wholly unsupported by admissible evidence, and significantly

outweighed by the risk that Aurelius's appeal will be foreclosed.    To begin with, if the DCL

Plan Proponents' prior statements that FCC approval will take between three and six months

subsequent to consummation prove to be true, then there is virtually no risk that the requested

stay will cause *any* harm or expense.    *See, e.g.*, 11/22/11 Trial Tr. at 46:9-16 (Johnston).

Moreover, the evidence shows that the continuing bankruptcy process has not had the deleterious

effect on the Debtors' business that the DCL Plan Proponents' claim.    Rather, the Debtors are

actually performing *better* than projected in their operating plan for 2012.[3]    *See* Zensky Decl.

Ex. C (Deposition of Eddy W. Hartenstein dated August 10, 2012 ("Hartenstein Tr.")) at

121:5-14.    And the Debtors' distributable enterprise value, as estimated by the Debtors, has

*increased* by more than a billion dollars over the course of these bankruptcy proceedings.

*Compare* Disclosure Statement, dated April 12, 2010 [ECF No. 4008] at 113 *to* Supplemental

Disclosure Document Related to DCL Plan dated April 17, 2012 ("Supplemental Disclosure

Document") [ECF No. 11400] at 22.

18.    The hypothetical harms to the Debtors' business alleged by the DCL Plan

Proponents are risks that debtors could cite in *every* bankruptcy case.    And there is no evidence

to suggest that they actually exist here.    Rather, while the DCL Plan Proponents argue that the

---

[3] The DCL Plan Proponents argue that Aurelius's election to take the "all cash" distribution option shows that Aurelius does not believe that the Debtors' performance will not be harmed by the stay.    *See* Obj. ¶ 37.    This is illogical.    To begin with, Aurelius's choice of a cash distribution upon the Debtors' emergence has no correlation to its views regarding the Company's ability to perform while in bankruptcy.    Moreover, it should be clear to anyone familiar with the history of these proceedings that Aurelius would not want to be a minority shareholder in a company controlled by the LBO Lenders.

requested stay will impair Tribune's ability to take advantage of corporate opportunities, Eddy

Hartenstein, the President and Chief Executive Officer of Tribune, refused to cite any specific

instances in which the Company lost opportunities, or potential business partners refused to

engage in discussions with the Company, as a result of the bankruptcy.   *Compare* Amended

Declaration of Eddy W. Hartenstein [ECF No.12243] ("Hartenstein Decl.") ¶¶ 6, 8-12 *to*

Hartenstein Tr. at 139:20-25, 141:14-17, 145:2-6, 170:17-171:1.    Similarly, Mr. Hartenstein

states in his declaration that the stay will "hamper[] the Company in retaining and attracting the

most qualified individuals," but would not provide any specific examples of Tribune employees

who have left the Company, or individuals who refused to join the Company, because of the

bankruptcy.   *Compare* Hartenstein Decl. ¶¶ 6, 13-14 *to* Hartenstein Tr. at 147:24-148:9,

154:9-25, 170:17-171:1.

19.    Much of the Bank Lenders' recovery under the DCL Plan is in the form of cash

(23% of total recovery) and new debt (15% of total recovery), which by definition will not

decline in value.   Only the equity is subject to any real trading risk.   And senior lenders face

the same risks today that market conditions could cause the business to deteriorate as they will

when or if they become equity holders under the DCL Plan.   To the extent that senior lenders

are concerned about this risk, they may protect themselves by selling their debt, just as

shareholders can sell their stock, and may do so at a price that is almost equivalent to the value

attributed to the senior debt under the DCL Plan.   *See* Kurtz Tr. at 143:16-148:2.   Contrary to

the DCL Plan Proponents' assertion, the senior debt currently trades in a highly liquid market.

Indeed, one need look only to the multiple statements filed by counsel to certain LBO Lenders

pursuant to Federal Rule of Bankruptcy Procedure 2019 to see that more than 50% of the senior

debt is currently held by LBO Lenders who purchased their debt in the secondary market during

the course of the bankruptcy.    *See, e.g.*, Joint Verified Statement of Representation of More Than One Creditor by Hennigan Bennett & Dorman, LLP and Young Conaway Stargatt & Taylor, LLP dated November 20, 2009 [ECF No. 2600]; Ninth Amended Joint Verified Statement of Representation of More Than One Creditor by Hennigan Bennett & Dorman, LLP and Young Conaway Stargatt & Taylor, LLP dated October 15, 2010 [ECF No. 5984].

20.    Moreover, there is no merit to the argument that creditors will be harmed by the extent of any disparity between the price at which the senior debt is currently trading and the value assigned to the senior lenders' distributions under the DCL Plan.    Rather, the trading price of the debt is a more reliable proxy for the value of plan distributions than the theoretical valuation assigned to the Company through the disclosure statement and confirmation process more than five months ago.    *See* Supplemental Disclosure Document at pp. 212-22.    If Tribune does well, the price of the debt will go up, and the equity will be worth more when the Debtors emerge from bankruptcy.    If creditors do not want to wait, they may capture that value now by selling their debt.    Conversely, if the Company's performance deteriorates, the price of the debt will go down, just as the price of the equity would if it had been issued.

21.    The DCL Plan Proponents' claims of hundreds of millions of dollars in administrative fees and expenses and lost interest for creditors are similarly unsupported.    For example, relying on a declaration from David Kurtz of Lazard Ltd., the Company's investment banking and financial advisory firm, the DCL Plan Proponents contend that the Debtors will incur an enormous $113 million in professional fees during the requested stay, notwithstanding that the vast majority of the Debtors' bankruptcy activity will have ceased.    Obj. ¶ 67.    Mr. Kurtz testified at his deposition, however, that the $113 million number is based on costs and expenses that the Debtors incurred during the bankruptcy, and conceded that he did not do any

analysis of what costs and expenses the Debtors would actually continue to incur during the stay, or what costs would be incurred by the Company even if it had emerged from bankruptcy. *See* Kurtz Tr. at 45:8-55:22.

22.     Similarly, relying again on Mr. Kurtz, the DCL Plan Proponents posit that the stay would result in $442 million in lost interest to creditors, based on Mr. Kurtz's assumption that creditors would be able to immediately attain a remarkable 6.896% interest rate on their cash distributions, or from cash derived from selling their debt distributions, but for the stay.   Obj. ¶¶ 69-71.   Yet Mr. Kurtz testified at his deposition that he has "no idea" if creditors would actually attain that rate.   Kurtz Tr. At 79:14-80:6.   Additionally, the DCL Plan Proponents completely overlook that the Debtors may begin accruing interest on the debt to be issued under the DCL Plan, so that any interest earned during the pendency of the stay may be paid upon emergence to creditors.

23.     The DCL Plan Proponents also argue that there is a "very real risk that a stay may delay or impede" the Debtors' ability to obtain the FCC approvals necessary to consummate the DCL Plan, and that the stay might cause the DCL Plan Proponents — who have staunchly supported the DCL Plan without waiver for nearly two years — to withdraw their support for the plan.   Obj. ¶¶ 43-44.   The DCL Plan Proponents have failed to submit any admissible evidence, however, supporting their contention that a stay will delay the Debtors' process of obtaining the FCC approval necessary to consummate the DCL Plan.   Additionally, the DCL Plan has now existed in substantially its current form for nearly two years, during which time the DCL Plan Proponents have never made any efforts to resolve this dispute.   The contention that the short stay requested by Aurelius will now somehow threaten the DCL Plan Proponents' support for the DCL Plan is not credible.

14

24.    Public interest considerations also weigh in favor of a stay.    While the DCL Plan Proponents are no doubt correct that the public has an interest in the finality of bankruptcy judgments, they cannot credibly argue that the public does not have at least an equally great interest in ensuring that those judgments are legally supportable, and that litigants' appellate rights are protected.    In an instance such as this, where the Debtors have been in bankruptcy for nearly four years and have been faring quite well, the assertion that the public interest weighs against an additional 180 days to ensure that the Court's decision may be subject to the appeal process strains credulity.

**D.    Aurelius Should Not Be Required To Post A Bond**

25.    The DCL Plan Proponents argue that Aurelius should be required to post a bond ranging between a whopping $1.548 billion to $3 billion, to protect against "administrative fees and costs," "potential losses arising from delay in reinvesting cash distributions," "continued exposure . . . to market volatility and other macroeconomic risks," and "liquidation risk."    Obj. ¶¶ 65, 66, 74, 78-79.    There is absolutely no basis for these numbers.    To begin with, the DCL Plan Proponents' suggestion that a stay will force the Company to liquidate, when the Debtors have been in bankruptcy for nearly four years and have *consistently increased in value* during that time, should be rejected out of hand.    Additionally, any risk that this trend will reverse is posed by market and industry conditions and management of the company, *not* the need to remain in bankruptcy so that parties' appellate rights may be preserved.    Imposing a bond requirement as requested by the DCL Plan Proponents would effectively require Aurelius to guarantee the Debtors' performance, when such performance is beyond its control and unaffected by its appeal, and to guarantee creditors a rate of return on their distributions, when there is no evidence to suggest that such returns would be attainable absent the stay.

15

26.     Moreover, as noted, in the event that creditors are truly concerned by the speculative risks cited by the DCL Plan Proponents, they may protect themselves against such risk by selling their debt.  *See Kurtz Tr. at 143:16-148:2*.   These creditors should not be immune from the Company's performance, to the upside or downside, during the course of the appellate process in the event that they choose not to do so.   Rather, if they decide not to sell their debt now, it is because they are willing to retain the securities with the hope — but not the guarantee — that the securities will appreciate in value.   If Aurelius was required to post a bond to protect against any loss in value of the securities, it would turn a "risked" investment into a "riskless," or guaranteed investment (*i.e.* if the securities appreciate in value the senior lenders retain such appreciation, and if the securities depreciate in value the bond will compensate for the depreciation).

27.     Creditors are not entitled to such a one-way shifting of value.   Requiring a bond here would make a meritorious appeal cost-prohibitive, which may be desired by the DCL Plan Proponents, but is not fair in a situation in which the vast preponderance of those economically affected by the settlement voted against it.   *See Kjontvedt Decl. at 3.*

28.     Further, while Bankruptcy Rule 8005 allows the Court to condition a stay pending appeal on the filing of a bond, courts have "wide discretion in the matter of requiring security," and neither the Bankruptcy Code nor the Federal Rules of Bankruptcy Procedure mandate that a bond be posted before a stay may be issued.   *Cont'l Oil Co. v. Frontier Ref. Co.*, 338 F.2d 780, 782 (10th Cir. 1964) (footnote omitted); *In re Diet Drugs*, 582 F.3d 524, 551 (3d Cir. 2009) ("courts may forego [the bond] requirement when there are other means to secure the judgment creditor's interests"); Fed. R. Bankr. P. 8005.[4]   Indeed, Judge Ambro of the Third Circuit has

---

[4] Bonds are typically required in instances where the appellant is a judgment debtor who would,

16

cautioned against judicial decisions that may be "used as a weapon to prevent any appellate review of bankruptcy court orders confirming reorganization plans," which Judge Ambro views as "plac[ing] far too much power in the hands of bankruptcy judges." *In re Phila. Newspapers LLC,* 2012 WL 3038578, at *11, n. 12 (internal quotations omitted); *see also In re Cont'l Airlines,* 91 F.3d 553, 567-73 (3d Cir. 1996) (dissent) (indicating that courts should fashion procedures that protect a creditor's statutory right to appellate review).

29.     Requiring a bond to address the risks and potential harms cited by the DCL Plan Proponents would have just this result, as a delay of distributions under *any* large corporation's plan of reorganization will be subject to market risk that could, hypothetically, number in the hundreds of millions, or billions, of dollars.   This could effectively foreclose all appeals of orders confirming such plans, regardless of their merit.   Imposing a bond as contended by the DCL Plan Proponents would be tantamount to a declaration that Confirmation Orders may *never* be appealed.   This cannot be consistent with the Third Circuit's directives, or the policy of the American bankruptcy system.

30.     And this result would be particularly unfair here, given that Aurelius's appeal challenges a settlement that was rejected by the vast majority of Noteholders, calculated by dollar amount, and releases claims belonging to Noteholders of $2.0 -$2.3 billion for a mere 16-18 cents on the dollar.   Aurelius has already incurred tens of millions of dollars in fees trying to protect the rights of non-LBO Noteholders, and has had its own distributions delayed as a result of the LBO Lenders' intransigence.   Requiring Aurelius to post even a fraction of the

---

in the absence of a stay, be required to pay a judgment to the appellee.   *See, e.g., Garcia v. Direct Fin. Servs. LLC (In re Garcia),* 436 B.R. 825 (Bankr. W. D. Va. 2010); *De la Fuente v. DCI Telecomm., Inc.,* 269 F. Supp. 2d 237, 240 (S.D.N.Y. 2003).   This is not the case here, where Aurelius seeks the stay of an order that would result in a distribution to it — rather than the other way around — and if and when distributions are ultimately made, it will be the Debtors, and not Aurelius, who will be responsible for making them.

bond requested by the LBO Lenders before it can seek justice from a higher court simply adds

insult to injury.

## II.    The Indenture Trustees' Request For Certification Of Direct Appeal Should Be Granted, And Aurelius's Appeal Should Be Certified To The Third Circuit Along With The Indenture Trustees' Appeal

31.    The Indenture Trustees have filed a motion before the Court seeking certification

of the Confirmation Order for direct appeal to the Third Circuit (the "Certification Motion").    If

the Indenture Trustees' Certification Motion is granted, then Aurelius's appeal should also be

certified for direct appeal for reasons of efficiency to the parties and conservation of judicial

resources, so that all appeals may be heard by a single court on a consolidated schedule.[5]

32.    Federal Rule of Bankruptcy Procedure 8001 provides that a Bankruptcy Court

may certify an appeal on its own initiative or at the request of a party.    Aurelius chose not to

seek certification for a direct appeal *not* because Aurelius believed that such relief was

unavailable, but rather because Aurelius was concerned that seeking such relief could, in the

absence of a stay, fatally delay a determination of the merits of its appeal.[6]    Nevertheless,

---

[5] Aurelius understands that in the event that the pending appeals of the Confirmation Order, all of which the Court presently has jurisdiction over, are certified by the Court for direct appeal, WTC will seek an immediate, limited remand of the Prior Appeals in order to enable the Bankruptcy Court to certify the Prior Appeals to the Third Circuit.    In the event that Aurelius's appeal is docketed in the district court before this Court rules on the question of whether appeals of the Confirmation Order should be certified for direct appeal, and the Court subsequently determines that Aurelius's appeal should be so certified, Aurelius will immediately request that the district court certify its appeal in the manner requested herein and recommended by this Court.

[6] Indeed, the DCL Plan Proponents have already done everything they can to delay Aurelius's appeal.    For example, the DCL Plan Proponents have filed a motion seeking to extend their time to file counterdesignations and a counterstatement of appellate issues to Aurelius's appeal [ECF No. 12203] (the "DCL Motion"), which, absent the DCL Motion, would have been due on August 7, 2012.    As set forth in Aurelius's objection to the DCL Motion [ECF No. 12237], a delay of the DCL Plan Proponents' counterdesignations and counterstatement could delay briefing on Aurelius's appeal.    Additionally, as noted, the DCL Plan Proponents have refused Aurelius's request that they consent to an expedited briefing schedule, arguing that Aurelius's

Aurelius's Appeal satisfies the standards for direct certification set forth in 11 U.S. 158(d) and incorporated into Federal Rule of Bankruptcy Procedure 8001.

33.    Moreover, all parties — including the DCL Plan Proponents — have expressed their desire that all appeals of the Confirmation Order move forward in a consolidated manner in one jurisdiction, so that the DCL Plan Proponents are not forced to litigate what they have referred to as "piecemeal" appeals.    *See, e.g.*, Response of the DCL Plan Proponents to the Motions of Aurelius Capital Management, LP, Law Debenture Trust Company of New York, and Deutsche Bank Trust Company America to Schedule Expedited Hearings and Shorten Notice Regarding Motions for Stay Pending Appeal and Motion for Certification of Direct Appeal of Confirmation Order [ECF No. 12096] ("DCL Stay Motion Response") at 2.    Thus, given that the Indenture Trustees' appeal clearly satisfies the standard for certification of direct appeal, considerations of judicial economy weigh heavily in favor of certifying Aurelius's appeal as well.

## A.    Aurelius's Appeal Meets The Standards For Certification of Direct Appeal

34.    28 U.S.C. § 158(d)(2) streamlines bankruptcy appeals by enabling parties to bankruptcy proceedings to obtain expedited access to the United States Courts of Appeals. Enacted in 2005, Section 158(d)(2) addresses problems that are attendant to the two-level bankruptcy appellate process, which requires appellants in bankruptcy cases to go to the district court (or to a bankruptcy appellate panel) before gaining access to a federal circuit court. Congress recognized that this extra step adds to the "time and cost" of bankruptcy litigation, and

---

appeal should be briefed on the same schedule as the other pending appeals of the Confirmation Order and the Prior Appeals.   *See* Zensky Decl. Ex. B.   This could be highly prejudicial to Aurelius, as the appellants to those appeals have chosen not to seek to expedite their appeals. Conversely, Aurelius is moving as expeditiously as possible, in order to minimize the risk that its appeal could be dismissed on equitable mootness grounds.

that the decisions of the district courts (or bankruptcy appellate panels) provide limited guidance to bankruptcy courts in future cases because they "are generally not binding and lack stare decisis value."   H.R. Rep. No. 109-31, at 148 (2005), reprinted in 2005 U.S.C.C.A.N. 88, 206. Section 158(d)(2) seeks to curtail the length and expense of the normal bankruptcy appellate process and to increase the opportunities for circuit courts to issue precedential rulings on which the parties and the bankruptcy courts can rely.

35.     Section 158(d)(2) accomplishes these goals through a mechanism by which bankruptcy court orders are certified for direct appeal to the relevant circuit court, thereby allowing the appellant to skip the intermediate step of going to the district court (or bankruptcy appellate panel).   While Section 158(d)(2) gives circuit courts discretion to entertain appeals of orders that a bankruptcy court has certified for direct appeal, it gives the bankruptcy courts themselves no discretion:   they "must" certify an order for direct appeal if the order presents *any* of the circumstances set forth in Section 158(d)(2)(A) exist.   *Simon & Schuster, Inc. v. Advanced Mktg. Servs. Inc.*, 360 B.R. 429, 433 (Bankr. D. Del. 2007) (citing 28 U.S.C. § 158(d)(2)(B)).   Those circumstances are as follows:

> ( i) the judgment, order, or decree involves a question of law as to which there is no controlling decision of the court of appeals for the circuit or of the Supreme Court of the United States, or involves a matter of public importance;

> (ii) the judgment, order, or decree involves a question of law requiring resolution of conflicting decisions; or

> (iii) an immediate appeal from the judgment, order, or decree may materially advance the progress of the case or proceeding in which the appeal is taken.

> 28  U.S.C. § 158(d)(2)(A).

36.     Aurelius's appeal easily satisfies the first factor.   Aurelius's appeal raises the issues of whether the Court erred by (i) misapplying Rule 9019 to determine that the LBO Settlement falls above the lowest rung of reasonableness, and (ii) ruling that the possibility that

the Step One lenders would be precluded from sharing in the benefit of Step Two avoidance and disgorgement was unlikely.   While the Third Circuit has set forth the factors that a court should consider when assessing a settlement under Rule 9019, and has given important, related instructions in the analogous context of considering class action settlements, neither the Third Circuit nor the Supreme Court has addressed whether a court may approve a settlement where the settlement consideration is significantly less than the risk adjusted value the court assigns to the claims being released.   *See, e.g., Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996); *In re Gen. Motors*, 55 F.3d at 806.

37.     Similarly, the Third Circuit has recognized that facilitators of, and willing participants in, a transaction are prohibited from benefiting from that transaction's avoidance, but neither the Third Circuit nor the Supreme Court has addressed how this precedent should be applied in the circumstances presented here, where the transaction's participants structured the transaction in the hopes that innocent creditors of a debtor parent corporation would bear the lion's share of risk.   *See, e.g., In re PWS Holding Corp.*, 228 F.3d 224, 229, 239-40 (3d Cir. 2000); *Official Comm. Of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*, 267 F.3d 340, 355 (3d Cir. 2001).

38.     Aurelius's appeal also raises issues of public importance because it "transcend[s]" this particular litigation and the parties to it.   *1-5 Collier on Bankruptcy* 5.06[4][b] (16th ed.). Aurelius's appeal raises complex and significant issues about the appropriate application of Rule 9019 and the proper legal and equitable remedies for fraudulent conveyances, when aggressive lending tactics that are at the root of the financial crisis and ill-conceived leveraged buyouts drive companies to insolvency and harm innocent creditors.   The way in which this case is resolved will influence future LBOs and affect the resolution of other LBO-driven bankruptcy

cases.   *See* John H. Ginsburg, *et al.*, *Befuddlement Betwixt Two Fulcrums:   Calibrating The Scales of Justice To Ascertain Fraudulent Transfers In Leveraged Buyouts*, 19 Am. Bankr. Inst. L. Rev. 71 (2011) (citing Tribune as an instance of LBO-driven insolvency that raises important issues about the scope of fraudulent transfer law.).   Thus, the Third Circuit's disposition of the issues raised on appeal here will not just provide a definitive ruling for the parties to this proceeding -- it also will furnish precedent for parties and courts in other proceedings.

39.   Certification of Aurelius's appeal will promote the public interest because it will provide the possibility that the Third Circuit may hear and decide the appeal before consummation of the DCL Plan.   Conversely, in the absence of a stay, and likely even if the limited stay Aurelius is seeking is granted, there is virtually no chance that the appeal will reach the Third Circuit prior to consummation if Aurelius must first proceed to the district court.   And once the DCL Plan is consummated, the DCL Plan Proponents will argue that Aurelius's appeal should be dismissed as equitably moot.   Certification of Aurelius's appeal for direct appeal to the Third Circuit will help to minimize the risk of equitable mootness and to provide the Third Circuit with the final word in this matter of public importance.

**B.      Judicial Economy Considerations Also Weigh In Favor Of Certifying Aurelius's Appeal For Direct Certification**

40.   Considerations of judicial economy also weigh in favor of certifying Aurelius's appeal for direct appeal to the Third Circuit.   As set forth in the Indenture Trustees' certification motion, the Indenture Trustees' appeal satisfies the factors set forth in Section 158(d)(2)(A) as warranting certification for direct appeal, and therefore must be certified by the Court for direct appeal.   Certification Motion ¶¶ 26-45; *Simon & Schuster, Inc.* 360 B.R. at 433.   Certification of Aurelius's appeal as well is thus in the interests of both the parties and the judiciary, as the most efficient way for appeals of the Confirmation Order to be heard is in a single forum on a

consolidated schedule.    *See, e.g., Jaffe v. Samsung Elecs. Co., Ltd. (In re Qimonda AG)*, 470

B.R. 374, 386 (E.D. Va. 2012) (holding that question of whether all issues raised by appeal

satisfied 11 U.S.C, 158(d)(a)(A) was "not necessary" to resolve because, *inter alia*, "there is at

least one question of law as to which there is no controlling decision").    Indeed, the DCL Plan

Proponents have acknowledged as much, indicating that the Appeals should not be heard in

"piecemeal" fashion.    DCL Stay Motion Response at 2.    The DCL Plan Proponents' proposed

solution, however, is that the meritorious request for certification should be denied, so that all of

the appeals may be heard before the district court.    Aurelius believes the far better approach is

to allow all of the appeals to proceed to the Third Circuit, which will benefit the public, the

judiciary and the parties alike, by minimizing the time that will be required for the appeals to be

heard by the Third Circuit, increasing the likelihood that the Third Circuit has an opportunity to

rule on these issues, and enabling the parties to litigate the appeals in a single forum.

## CONCLUSION

WHEREFORE, for the foregoing reasons and those set forth in the Motion, Aurelius

respectfully requests that this Court enter an order, (i) staying consummation of the DCL Plan for

180 days, subject to Aurelius's right to seek a renewal of the stay from the appropriate court if

warranted by the circumstances; (ii) in the event that the Court grants the Indenture Trustees'

motion for certification, certifying Aurelius's appeal for direct certification to the Third Circuit,

and (iii) granting such other and further relief as the Court deems equitable and proper.    In the

event that the Court denies Aurelius's request for a stay, Aurelius requests that the Court stay

consummation of the DCL Plan for 14 days so that Aurelius may seek a stay in the appropriate

forum.

Dated: August 15, 2012
       Wilmington, Delaware

                                             Respectfully submitted,


AKIN GUMP STRAUSS HAUER & FELD LLP    ASHBY & GEDDES, P.A.
Daniel H. Golden
David Zensky
Philip C. Dublin                      William P. Bowden (I.D. No. 2553)
Deborah J. Newman                     Amanda M. Winfree (I.D. No. 4615)
One Bryant Park                       Leigh-Anne M. Raport (I.D. No. 5055)
New York, NY    10036                 500 Delaware Avenue, P.O. Box 1150
(212) 872-1000                        Wilmington, DE    19899
                                      (302) 654-1888


*Counsel for Aurelius Capital Management, LP*

24