**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re:                                                      :
                                                            :  Chapter 11
TRIBUNE COMPANY, *et al.*,                                   :
                                                            :  Case No. 08-13141 (KJC)
                                Debtors.                     :
                                                            :  (Jointly Administered)
                                                            :
                                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**REPLY OF LAW DEBENTURE TRUST COMPANY OF NEW YORK**
**AND DEUTSCHE BANK TRUST COMPANY AMERICAS FOR**
**STAY PENDING APPEAL OF CONFIRMATION ORDER**

Appellants[1] file this reply (the "Reply") in further support of their Motion and in response to the *Objection of the DCL Plan Proponents to the Motions for a Stay Pending Appeal of the Confirmation Order*, dated August 8, 2012 [Dkt No. 12217] (the "Objection") submitted by DCL Plan Proponents ("Appellees") and respectfully represent as follows:

### PRELIMINARY STATEMENT

1.      Appellants hereby reduce their request to a limited 180-day stay pending Appellants' appeal, subject to Appellants' right to seek a renewal of the stay from the appropriate court at the end of 180 days if warranted by the circumstances.  The Court should use its discretion to grant the requested relief without requiring the posting of a bond.[2]

2.      Appellants have raised a substantial issue of law for which there is no precedent as to the application of the statutory requirement that a plan "not discriminate unfairly" in the context of contractual subordination provisions and as to the ability of cramdown plans to circumvent contractual subordination rights.  As this Court tacitly recognized, the legislative history of Section 1129(b)(1) of the Bankruptcy Code contradicts this Court's interpretation, and there is no binding Third Circuit precedent supporting the Court's conclusion.  Thus, commentators and at least one other court have come to the conclusion opposite of this Court.

3.      Absent a stay, Appellees will consummate their Plan and then argue that any appeal of the Confirmation Order is equitably moot.  Therefore, here, "simply denying a stay … [is] too simplistic a response" because "substantial legal issues can and ought to be preserved for

---

[1]   Capitalized terms have the meanings set forth in the *Motion of Law Debenture Trust Company of New York and Deutsche Bank Trust Company Americas for Stay Pending Appeal of Confirmation*, dated July 23, 2012 [Dkt No. 12085] (the "Motion").  The *Reply in Support of Motion of Law Debenture Trust Company of New York and Deutsche Bank Trust Company Americas Pursuant To 28 U.S.C. § 158(d)(2) and Fed R. Bankr. P. 8001(f) Requesting Certification of Direct Appeal to United States Court of Appeals For The Third Circuit of the Unfair Discrimination Issue in the Allocation Disputes Order as Incorporated in the Order and Memorandum Opinion on Confirmation*, dated August 15, 2012, and submitted herewith is referred to as the "Certification Reply."

[2]   The Court should note that Appellants' voluntary limitation is not in response to any actual alleged harm but rather is to eliminate the protest that the stay may last for up to 2 years.

review." *Bank of New York Trust Co., NA v. Official Unsecured Creditors' Comm. (In re Pacific Lumber Co.)*, 584 F.3d 229, 243 (5th Cir. 2009).

4.      Appellees cannot point to any real, specific harm from a brief stay that is not based on pure speculation.  Instead, Appellees conjecture "harm" under an apparent theory that a stay requires Appellants to post a bond that insures Appellees from *any* business loss risk, regardless of whether the loss is attributable to the stay.  Appellees claim there is potential for vague competitive harm but cannot point to a single business opportunity the Debtors will miss or a single critical employee that will leave, in either case for which a stay would be to blame. Instead, the actual evidence shows that the Debtors have continued to hire managers and consummate major business transactions, including selling the Chicago Cubs ("Cubs"), while in bankruptcy.  ███████████████████████████████████ ███████████████████████████  Moreover, the record contradicts Appellees' hardly serious conjecture that a stay "could" jeopardize support for the Plan.  Aside from the sheer illogic that parties who have stuck with the Plan all this time will now jump ship after it has been confirmed, the Appellees ignore the fact that the DCL Plan Proponents reserved the right to revoke or withdraw support for the Plan only until the "Confirmation Date."  And the Debtors will incur the same continuing bankruptcy expenses, overstated as they are, with or without the stay.  (Appellees control these costs to a large extent).

5.      Appellees' novel and unsupportable "estimate" of lost opportunity costs based on high-risk junk bonds investments fails to include the obvious unlikelihood of such outsized returns, the potential downside (*i.e.* massive trading losses), and the real likelihood that assumed investments could be lost.  Is there really a guaranteed 6.896% return in this economy?

Appellees also seek compensation for *accelerated* principal payments of a post-emergence loan that the Debtors are under no obligation to pay (nothing in the record suggests that they will).

6.      Appellees invent a hypothetical "put option," an unreliable, novel method to measure during the stay potential harm to the creditors' equity value associated with market risks and market volatility – such risks Appellees admit exist to equity holders irrespective of the stay. Under the Appellees "made up" put theory, Appellants insure against the downside risk while preserving the potential upside. This methodology is severely flawed as it provides creditors with protection greater than that which they are entitled. If creditors are to receive protection from downside risk, they must also be precluded from taking advantage of the risk-free upside.

7.      At bottom, Appellees cannot point to a single, actual, **demonstrated** legally cognizable harm based in the record. To the contrary, the record shows that Tribune has been performing well with its distributable value steadily increasing. The record and common sense shows that creditors can monetize their claims now in the admittedly active and liquid market for debt assignments (that is how Oaktree and Angelo Gordon came to the case) and use the cash to receive the startling returns that Appellees assert Appellants must guarantee. The docket reflects literally scores of claim assignments. Creditors routinely access this highly liquid market. And any differential in price for these claims from the hypothetical Plan value reflects not the stay but (1) the market's view of Tribune's actual value, (2) the market's recognition that "plan value" is not market driven but is the result of expensive investment banking analysis, and (3) the market's view of the risk that Appellants are right on appeal. No bond possibly can insure creditors against the market's views.

## ARGUMENT

8.      Appellants have satisfied their burden under Bankruptcy Rule 8005 to obtain a stay pending the Appeal. As explained in the Motion (*see* Motion, ¶¶ 20-24), in granting a stay

of proceedings pending appeal, this Court must balance the four factors set forth in *Haskell v.*

*Goldman, Sachs & Co. (In re Genesis Health Ventures, Inc.)*, 367 B.R. 516, 519 (Bankr. D. Del.

2007), with no single factor determinative:  (1) likelihood of success; (2) irreparable harm; (3)

substantial injury to other interested parties; and (4) the public interest.  *See also In re Adelphia*

*Commc'ns Corp.*, 361 B.R. 337, 346-47 (S.D.N.Y. 2007) (failure to "satisfy any one of the four

factors" does not "'doom[] the motion'" but rather the factors must be balanced).[3]  And,

importantly, this Court must disarm "weapon[s designed] to prevent any appellate review of

bankruptcy court orders confirming reorganization plans."  *In re Philadelphia Newspapers, LLC*,

__ F.3d __, 2012 WL 3038578, at *11 n.12 (3d Cir. July 26, 2012).

      9.     Appellants voluntarily reduce their request to a brief 180-day stay to enable an

expedited direct appeal to the Third Circuit or an appeal to the District Court to protect

Appellants from irreparable harm arising from consummation.  This is a workable, reasonably

balanced approach allowing needed appellate review without an unlimited stay.

**I.**     **Appellants Have Shown There Is A Strong Likelihood**
**They Will Prevail On The Merits Of The Appeal.**[4]

     **A.**     **To Establish A Likelihood Of Success On The Merits,**
           **Appellants Need Only Raise A Difficult Legal Question.**

      10.     Appellees contend that Appellants "rehash arguments previously considered and

rejected by the Court."  (Objection ¶ 12.)  But new evidence, law, or clear error, though bases for

reconsideration, are not the bases Courts use to measure "likelihood of success."  Rather,

---

[3]  The balancing test does not – as Appellees contend – apply to the "likelihood of success" prong alone but expressly applies to all four factors.  (Objection ¶ 11, n.6.)  The cases cited by the Appellees do not hold otherwise.  *See, e.g., In re Countrywide Home Loans, Inc.*, 387 B.R. 467, 471 (Bankr. W.D. Pa. 2008) ("In light of this [Third Circuit] direction, the Court concludes that the balancing approach represents the better view and adopts it . . . .") (citations omitted); *Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*, 397 F. Supp. 2d 537, 548 (D. Del. 2005) ("the *four* factors can effectively be merged and a sliding scale approach is utilized") (emphasis added); *Williams v. George Junior Republic (In re Cujas)*, 376 B.R. 480, 485-486 (Bankr. E.D. Pa. 2007) (recognizing "the majority view is that the court may balance all four (4) factors in deciding whether to grant a stay pending appeal.").

[4]  Appellants' argument on the merits of the "likelihood of success" factors is set forth in the Motion ¶¶ 25-34.)

Appellants need only demonstrate that they raise a difficult and substantial issue on appeal.  *See Evans v. Buchanan*, 435 F. Supp. 832, 843-44 (D. Del. 1977) (holding that the court need not "confess to having erred" but that a stay is appropriate where the "appeal raises serious and difficult questions of law"); *Schroeder v. New Century Liquidating Trust* (*In re New Century TRS Holdings, Inc.*), 2009 U.S. Dist. LEXIS 54245, at *5 (D. Del. June 26, 2009) (need only demonstrate "a substantial issue to raise on appeal" for likelihood of success requirement).  (*See also* Motion, ¶ 23.)  As the District of Delaware held:

> In considering the likelihood of success on the merits, "[i]t seems illogical . . . to require that the court in effect conclude that its original decision in the matter was wrong before a stay can be issued." In fact, a court may grant a motion for a stay pending appeal even when it has "confidence in the rectitude of its decision." … ***However, there is a significant issue in [the appealed from] opinion that to my knowledge has not been addressed in a reported opinion in the Third Circuit. … When a circuit court has not yet decided an issue of law, there may be substantial grounds for a difference of opinion within that circuit.***

*Genesis Health Ventures*, 367 B.R. at 521 (citations omitted and emphasis added).  Like in *Genesis Health Ventures*, there is a "significant issue" here that the Third Circuit has never addressed regarding the requirement that a plan not discriminate unfairly in the context of contractual subordination, and whether Section 1129(b) of the Bankruptcy Code requires full enforcement of priority and turnover provisions in subordination agreements for cramdown plans.[5]  Appellants' failure to convince the Court at trial does not cost them their stay, it merely creates the appeal and the need for the stay.  No appeals would be heard if the bases for the loss

---

[5]   Appellees' cases do not establish that there is a more stringent standard where certain issues have been heard in earlier phases of the case as this occurs in practically every motion for stay pending appeal.  (Objection, ¶ 11 & n.7.)  In *In re Forty-Eight Insulations, Inc.*, 115 F.3d 1294, 1301 (7th Cir. 1997), misleadingly cited by Appellees, the court found that the standard for grant of appeal was higher because both the Bankruptcy Court and the District Court had ruled on the underlying motion.  In *In re General Motors Corp.*, the court held that the standard "has been more precisely articulated by the Circuit as 'whether the movant has demonstrated a substantial possibility,' although less than a likelihood, of success' on appeal."  409 B.R. 24, 31 (Bankr. S.D.N.Y. 2009) (internal citations omitted).  There, the standard was not met due to an on-point Second Circuit case.

below eliminated the right to a stay.[6]

**B.      Appellants Are Likely To Succeed On The Merits Of Their Appeal Because Cramdown Plans Under Bankruptcy Code Section 1129(b)(1) May Not Ignore Subordination Agreements.**

11.      Appellees attempt to sidestep the controlling *legal issue* central to this Court's decision by downplaying the Court's finding that subordination agreements need not be enforced in cramdown plans.  Appellees argue that the Court held only that a cramdown plan can *partially* ignore subordination agreements.  (Objection ¶¶ 23-24.)  This is not what this Court held. Irrespective of Appellees' characterization, Appellants submit that the Court's interpretation is neither supported by the meaning and construction of Section 1129(b), nor is it supported by the legislative intent as Appellants explain in the Motion.

**1.      The Legislative History Controls.**

12.      As discussed more fully in the Certification Reply and the Motion, Appellants submit that this Court erred by failing to follow legislative history in construing Section 1129(b). Had this Court properly applied the principles of statutory interpretation and construction, it would have concluded the phrase "notwithstanding Section 510(a)" does not exempt the enforcement of the Subordination Agreements from the requirements of confirmation; instead, it merely provides the framework for the Court to determine whether the plan "does not discriminate unfairly."[7]  The phrase requires the Court to compare distributions received by creditors under the Plan independent of the effect of the enforcement of the turnover provisions in the Subordination Agreements.

---

[6]   Contrary to Appellees' assertions (Objection ¶¶ 12-13, 22-23), the court in *In re W.R. Grace*, 2012 U.S. Dist. LEXIS 88887, at *10-13 (D. Del. June 27, 2012), did not deny the stay because it had addressed the issues previously but found that the movant lacked standing.  *See also In re Olick*, 1996 U.S. Dist. LEXIS 7391, at *4 (E.D. Pa. May 29, 1996) (finding movant had not established any factors warranting a stay and referring to prior opinion in which District Court had already rejected appeal).

[7]   (*See* Certification Reply, ¶¶ 9-15; Motion, ¶¶ 26-37.)

13.     Courts frequently look to legislative history to determine the meaning of Section

1129(b) and have found the *same* legislative history that Appellants rely upon here – such as the

House Report and comments of Representative Edwards and Senator DeConcini – to be

*authoritative* sources.  *In re Armstrong World Indus. Inc.*, 432 F.3d 507, 513 (3d Cir. 2005);

*CoreStates Bank, N.A. v. United Chem. Techs., Inc.*, 202 B.R. 33, 47 (E.D. Pa. 1996).[8]

14.     Further, this Court erred by not deferring to Congressional intent when it found

the words of Section 1129(b)(1) to be inconsistent with the legislative intent.  *United States v.*

*Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989) (citing *Griffin v. Oceanic Contractors, Inc.*, 458

U.S. 564, 571 (1982)).[9]

15.     Nor was it proper for this Court to find that the plain meaning of Section

1129(b)(1) governs where it produces an absurd result.  *See In re Kaiser Aluminum Corp.*, 456

F.3d 328, 330 (3d Cir. 2006) ("[a] basic principle of statutory construction is that we should

avoid a statutory interpretation that leads to absurd results") (citing *Griffin v. Oceanic*

*Contractors, Inc.*, 458 U.S. 564, 575 (1982)); *United States v. Abraham*, 29 F. Supp. 2d 206, 211

(D.N.J. 1998) ("Courts may ignore the plain meaning . . . in order to avoid the absurd result").

Commentators have recognized the "anomalous" or "strange" result from reading subordination

agreements out of cramdowns.  (Motion ¶¶ 5, 36.)

---

[8]   *See also Lernout & Hauspie Speech Prods., N.V. v. Baker* (*In re Lernout & Hauspie Speech Prods., N.V.*), 264
B.R. 336, 341 (Bankr. D. Del. 2001) ("The Report was expressly intended '[u]ltimately ... [as] a great aid to courts
in determining the legislative intent behind the provisions of the bill that become law.'") (citations omitted); *In re
Calabrese*, 2012 U.S. App. LEXIS 14897, at *16 (3d Cir. July 20, 2012) (concluding that the court could "be
reasonably confident in looking to the Joint Statement of Representative Edwards and Senator DeConcini as a
manifestation of the legislature's purpose, because the Supreme Court has 'treated their floor statements on the
Bankruptcy Reform Act of 1978 as persuasive evidence of congressional intent.'") (citations omitted).

[9]   *See also In re Armstrong World Indus. Inc.*, 432 F.3d at 513 (finding no further inquiry needed where meaning of
statute is plain "unless the literal application of the statute will end in a result that conflicts with Congress's
intentions," in which case, "the intentions of Congress will control"); *United States v. Am. Trucking Ass'ns*, 310
U.S. 534, 543-44 (1940) ("[E]ven when the plain meaning did not produce absurd results but merely an
unreasonable one 'plainly at variance with the policy of the legislation as a whole' this Court has followed that
purpose, rather than the literal words.") (footnote omitted).

### 2.    The Third Circuit Never Addressed
The Legal Issues Raised On Appeal.

16.    Appellees' assertion that the Third Circuit already decided the issue raised by the Appeal is flat out wrong.  (Objection ¶ 25 (citing *In re Goody's Family Clothing, Inc.*, 610 F.3d 812, 817 (3d Cir. 2010)).)  Significantly, the *Goody's* court held that "§ 365(d)(3) does not supplant § 503(b) and the Landlords are entitled to 'stub rent' as an administrative expense." *In re Goody's Family Clothing, Inc.*, 610 F.3d at 817.  *Goody's* involved a wholly unrelated provision of the Bankruptcy Code – Section 365(d)(3) – which had nothing to do with the Unfair Discrimination Issue.  Further, the Third Circuit in *Goody's* – unlike this Court – actually considered legislative history to confirm its interpretation of Section 365(d)(3).  *Goody's*, 610 F.3d at 817-18 (finding that "[t]he text of § 365(d)(3) is consistent with the Conference Report explaining the provision").  In marked contrast to *Goody's*, this Court's interpretation of Section 1129(b)(1) was not consistent with the applicable legislative history; rather, it flatly rejects the applicable legislative history.  Thus, *Goody's* does not support an interpretation of a statute that conflicts with legislative history and Appellants have a legal basis to appeal this Court's decision, which indisputably failed to "discern the meaning of 'notwithstanding' from the legislative history, purpose, and structure of the entire statute, as it was required." *Conoco, Inc. v. Skinner*, 970 F.2d 1206, 1224 (3d Cir. 1992) (footnote omitted).

### C.    The Court Erred in Calculating The Nature Of
Discrimination And Its Materiality As A Matter Of Law.

17.    Appellees further claim that the Court's holding is fully consistent with *In Re Armstrong*'s rebuttable presumption test.  (Objection ¶ 26.)  Appellees are flat out wrong again.  The Court's application of the *Armstrong World Indus. Inc.* test was in direct contravention of

on-point legislative history of Section 1129(b).[10]  Had the Court complied with Congressional

intent expressed in its legislative history, the Court would have compared the distributions

received from the Debtor's estate under the Plan by two classes (Other Parent Claims and Senior

Noteholders) prior to giving effect to the third party turnover to the Senior Noteholders required

by the Subordination Agreements.  *See* H.R. Rep. No. 95-595, at 416-17, *reprinted in* 1978

U.S.C.C.A.N. 5963, 6372-73.  (Motion ¶ 43; Certification Reply ¶¶ 4, 13-15.)  Instead, the Court

only compared the actual recovery of Senior Noteholders under the Plan with the recovery they

were entitled to receive if the applicable turnover provisions of the Subordination Agreements

were enforced.

## II.    Appellants Are Irreparably Harmed Absent A Stay.

18.    In considering the Motion, this Court must consider "the critical role a stay

pending appeal plays, not only in maintaining the status quo, *but in preserving the right to a*

*review on the merits*."  *In re Charles & Lillian Brown's Hotel, Inc.*, 93 B.R. 49, 53 (Bankr.

S.D.N.Y. 1988) (emphasis added).  (*See also* Motion, ¶¶ 60-63.)  Further, numerous courts have

held that mootness may constitute irreparable harm.  *See Lutin v. U.S. Bankruptcy Court* (*In re*

*Advanced Min. Sys., Inc.*), 173 B.R. 467, 469 (S.D.N.Y. 1994) (equitable mootness "is a

quintessential form of prejudice").[11]  Here, while Appellants do not agree that their Appeal

would be equitably mooted, the risk that Appellants will be unable to obtain any remedy

---

[10] This is even more astonishing given that an appeal of *Armstrong* to the Third Circuit on unrelated issues, led the Third Circuit to state that "the House Report has been considered an authoritative source of legislative history for section 1129(b)," *In re Armstrong World Indus., Inc.*, 432 F.3d at 513.

[11]   *See also McDaniel v. Sanchez*, 448 U.S. 1318, 1322 (1980) ("The balance as to the possibility of 'irreparable harm' seems to favor the applicants" where they argued that "without a stay their petition … will become moot"); *Wise v. Lipscomb*, 434 U.S. 1329, 1334 (1977); *In re Bart*, 82 S. Ct. 675, 675-76 (1962); *In re Cujas*, 376 B.R. at 487; *ACC Bondholder Group v. Adelphia Commc'ns. Corp. (In re Adelphia Commc'ns Corp.)*, 361 B.R. 337, 347-48 (S.D.N.Y. 2007), *appeal dismissed*, 367 B.R. 84 (S.D.N.Y. 2007); *Country Squire Assocs. v. Roch. Cmty. Sav. Bank (In re Country Squire Assocs.)*, 203 B.R. 182, 183-84 (B.A.P. 2d Cir. 1996); *In re St. Johnsbury Trucking Co.*, 185 B.R. 687, 690 (S.D.N.Y. 1995); *Contrarian Funds, LLC v. Aretex, LLC (In re Westpoint Stevens Inc.)*, 2007 WL 1346616, at *5 (S.D.N.Y. May 9, 2007); *In re Grandview Estates Assocs., Ltd.*, 89 B.R. 42, 43 (Bankr. W.D. Mo. 1988).

following consummation of the Plan, regardless of the merits of their appeal, is sufficient to establish irreparable harm.

19.     Additionally, Appellees conveniently fail to address any of the other factors Appellants cite as constituting irreparable harm.  (Motion ¶¶ 60-65.)  For instance, Appellants face the permanent stripping of their contractual property interest in subordination rights and the amounts otherwise allocable to the subordinated debt; in other words, deprivation of Senior Noteholders' due process rights.  (*See* Motion ¶¶ 33-34, 64.)  "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."  *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) (citation omitted).  Thus, the irreparable harm Appellants will sustain without a stay warrants grant of the Motion.

## III.    Granting The Stay Will Not Harm The Public Interest.

20.     The limited stay benefits the public interest by promoting the creation of a uniform body of law – a central facet of the direct appeal statute.  *See Charles & Lillian Brown's Hotel*, 93 B.R. at 53 (recognizing the vital role stays pending appeal play in preserving parties' rights, including the "right to a review on the merits").

21.     Moreover, the ability to rely on contracts, including contractual subordination, benefits the public interest.  *See In re Enron Creditors Recovery Corp.*, 370 B.R. 64, 70-71 (Bankr, S.D.N.Y. 2007), *overruled on other grounds*, 380 B.R. 307 (S.D.N.Y. 2008); *ION Media Network Inc. v. Cyrus Select Opps. Master Fund Ltd. (In re ION Media Network Inc.)*, 419 B.R. 585, 595 (Bankr. S.D.N.Y. 2009).

## IV.    The Balance of Harms Favor Appellants Where the Asserted Countervailing "Harm" Is Entirely Speculative and Does Not Relate To The Stay.

22.     Where, like here, the alleged harm is speculative or unsupported by the record it is irrelevant to the stay analysis.  For example in *Fox Sports Net West 2, LLC v. Los Angeles*

*Dodgers LLC (In re Los Angeles Dodgers LLC)*, 465 B.R. 18, 37 (D. Del. 2011), the Court

discounted harm the debtors' sought to attribute to a claimed future valuation and business

opportunity where the record did not support their allegations.  *See also RoDa Drilling Co. v.*

*Siegal*, 552 F.3d 1203, 1214-15 (10th Cir. 2009) (holding that speculative injury does not

overcome irreparable harm); *President Casinos, Inc. v. Columbia Sussex Corp. (In re President*

*Casinos, Inc.)*, 360 B.R. 262, 266 (B.A.P. 8th Cir. 2007) ("A court is not required to order a bond

to protect a party from economic damages that are speculative."); *Int'l Equity Invs., Inc. v.*

*Opportunity Equity Partners Ltd.*, 441 F. Supp. 2d 552, 566 (S.D.N.Y. 2006) ("In fixing the

amount of security required, a court is not required to order security in respect of claimed

economic damages that are no more than speculative.")[12]  Alleged harm from sources other than

the stay – such as ordinary market factors – is irrelevant as well.  *See In re United Merchants &*

*Mfrs., Inc.*, 138 B.R. 426, 430 (D. Del. 1992) ("The purpose of Rule 8005 is to protect the

adverse party from potential losses ***resulting from the stay***.") (emphasis added).

### A.    The Alleged Harm To The Debtors Is Speculative And Unrelated To a Limited Stay.

23.    Appellees speculate, without record support, that a limited stay will cause (i)

brand erosion, (ii) the inability to take advantage of strategic opportunities, (iii) the inability to

retain talented employees and hire talented prospects, (iv) loss of support for the DCL Plan

Settlement, (v) delay in FCC approval, and (vi) the incurrence of additional costs and expenses

associated with bankruptcy.  (Objection ¶¶ 42-44, 48.)

24.    <u>Brand Erosion</u>.  The Company's CEO, Eddy Hartenstein, admits that there is no

empirical evidence that the Company's brand had eroded in bankruptcy.  Mr. Hartenstein

---

[12]    *N. Carolina Growers' Ass'n, Inc. v. Solis*, 644 F. Supp. 2d 664, 672 (M.D.N.C. 2009) (speculative injury insufficient to tip balance of hardships); *Beerheide v. Zavaras*, 997 F. Supp. 1405, 1411 (D. Colo. 1998) (same); *Thiry v. Carlson,* 891 F. Supp. 563, 566-567 (D. Kan. 1995) (no harm where claimed damages were speculative).

testified that advertising revenue would show brand erosion, if any.[13] 

[14]

25.  <u>Strategic Opportunities</u>.  Mr. Hartenstein identified no counterparties that have

refused to work with Tribune in strategic opportunities (claiming that the counterparties'

identities are "confidential" though his deposition was denominated as highly confidential).

(Hartenstein Dep. at 141:14-17, 143:15-24; 142:17-20.)  He identified no evidence of lost

business opportunities due to bankruptcy proceedings – certainly not where the Company's Plan

simply was on appeal –

(*Id*. at 145:24-

146:3, 146:18-147:3, 147:12-16.)  Record evidence shows the bankruptcy has not hindered the

Company's ability to consummate its business arrangements.  In fact, the Company successfully

sold the Cubs during its time in bankruptcy – a feat it was unable to achieve for over a year

before it filed for bankruptcy.[15]

26.  <u>Lost or Prospective Employees</u>.  Mr. Hartenstein, who himself joined Tribune just

months prior to bankruptcy and rose through the ranks to Chief Executive Officer, could not

identify any specific employee who specifically left due to the bankruptcy

(Hartenstein Dep. at

---

[13]  Declaration of Matthew B. Stein in Further Support of Law Debenture Trust Company of New York's and Deutsche Bank Trust Company of America's Certification Motion and Stay Motion dated August 15, 2012 (the "<u>Stein Reply Decl.</u>"), Exhibit F (Deposition Transcript of Eddy W. Hartenstein ("<u>Hartenstein Dep.</u>") dated August 10, 2012) at 135:12-136:13.

[14]  Hartenstein Dep. at 137:17-138:5.  *See also* Stein Reply Decl. Ex. G at TRB-HARTENSTEIN-069

[15]  *See* Stein Reply Decl., Ex. H (*Disclosure Statement for Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Filed by Tribune Company* date June 4, 2010 [Dkt. No. 4690, pp. 58-59]).

153:1-8, 154:9-18.)  Further, there is no record evidence of any lost talented prospects from an appeal of confirmation or bankruptcy at all.  Indeed, the Company recently hired a qualified Vice President for WGN America.  (*Id.* at 158:24-159:4.)

27.    Plan Support.  Mr. Hartenstein admitted at his deposition that none of the DCL Plan Proponents has informed the Company that they will not support the DCL Plan Settlement as a result of a stay.  (*Id.* at 168:1-7.)[16]  In fact, none of the DCL Plan Proponents have the right to do so:  under Section 15.11 of the Plan, they only reserved their right to revoke or withdraw support from the Plan "prior to the Confirmation Date."  Such time has passed.

28.    FCC.  Appellees merely state a conclusory and speculative "*concern[]* about the *potential* impact of a stay" on the FCC approval process.  (Objection ¶ 44 (emphasis added).) Their phrasing is telling as to the speculative nature of this alleged harm.  In fact, as of August 6, the FCC has reinstated the approval process and Appellees are unable to point to any evidence that this it will be jeopardized by a brief stay.[17]  Moreover the FCC stated that it was already well into its approval process, taking steps it must have taken during bankruptcy and even before confirmation.  No competent record evidence, as opposed to counsels' conjecture, demonstrates that FCC approval will slow.

29.    Bankruptcy Expenses.  Mr. Hartenstein admitted that the Company will still have to pay ongoing bankruptcy-related fees and expenses even if the Plan goes effective. (Hartenstein Dep. at 166:9-15.)  The asserted bankruptcy costs and expenses arise from post-confirmation actions (such as continuing to litigate and resolve disputed claims) and defending

---

[16]    David Kurtz admits that he had no independent evidence of brand erosion, harm to potential strategic opportunities, or the Company's ability to retain or hire employees, beyond that provided by Mr. Hartenstein.  Nor has Mr. Kurtz provided an independent analysis of these assumptions to support the analysis in his declaration. (Stein Reply Decl. Ex. I (Deposition Transcript of David S. Kurtz ("Kurtz Dep.") dated August 13, 2012) at 150:20-154:20).)

[17]    *See* Stein Reply Decl. Ex. J (August 2, 2012 FCC Letter).

the appeals, not from the stay.[18]  Further, administrative costs do not constitute harm sufficient to prevent the imposition of the stay where the merits of appeal justify one.  *See Mountain Empire Oil Co., Inc. v. Callahan* (*In re Lambert Oil Co., Inc.*), 375 B.R. 197, 201 (W.D. Va. 2007).[19]

### B.    The Alleged Harm To Non-Moving Creditors Is Speculative And Unrelated To The Stay.

30.    Appellees speculate, without record support, that a stay will make the non-moving creditors:  (i) unable to reinvest their cash distributions at the startling junk bond yield of 6.896% (no evidence that they all would buy junk bonds); (ii) unable to sell the debt portion of their "strip" again to obtain junk bond yield (same); (iii) unable to receive and reinvest cash distributions from the Company's speculative 50% pre-payment of the New Senior Secured Term Loan (the "Loan"); and (iv) exposed to market volatility and macroeconomic factors. (Objection ¶¶ 45-47; Kurtz Decl. ¶¶ 9-13.)

31.    Junk Bonds.  There is no record evidence that all non-moving creditors (like the Retirees) will invest in junk bonds.[20]  Mr. Kurtz fails to recognize that this would require such creditors to alter their current risk profile to subject themselves to significantly more risk.[21] (Kurtz Decl. ¶ 9, n.5.)  In fact, the creditors are just as likely to lose all of their distributable cash

---

[18]   Declaration of David Kurtz in Support of the Objection dated August 8, 2012[Dkt. 12217] (the "Kurtz Decl.") ¶¶ 6, 8.

[19]   Mr. Kurtz acknowledges that even absent a stay, the Company will continue to incur administrative fees, including for example for the fee examiner and legal fees.  (Kurtz. Dep. at 48:15-49:5 (acknowledging continued fees absent a stay from sources including for the fee examiner and legal fees).)  Kurtz admits that he did not make any attempt to segregate out ongoing fees that would be incurred apart from the appeal nor did he perform any due diligence to determine the actual fees that would be associated with handling an appeal.  (*Id.* at 47:4-15; 54:13-55:22.)

[20]   Indeed, Mr. Kurtz admits that his premise – that every creditor would invest 100% of the proceeds immediately upon receipt – is flawed or based on a "simplifying assumption."  (Kurtz Dep. at 110:5-22.)  Indeed creditors have not given any indication that they would reinvest their funds or sell their debt. (Kurtz Dep. at 57:12-25; 108:17-109:5.)

[21]   In 2008, the Barclays US Corp High Yield Index sustained losses of -26.16%.  (*See* Stein Reply Decl. Ex. K; s*ee also* Kurtz Dep. at 56:22-57:25; 78:3-17; 79:14-19 (admitting that the estimated return was made without examining creditors' actual investment portfolio, risk and return profiles or total returns, and that ███████████████ ███████████); 87:21-88:8; 99:6-100:14 (no support would invest at a 6.896% rate of return if Company were to reinvest cash).)

funds from such risky investments.  *See In re Integrated Telecom Express, Inc.*, 2004 WL

1136547, at *6 n.16 (D. Del. May 19, 2004) (lost opportunity to reinvest funds that would have

been otherwise available for distribution was too speculative a harm to tip the balance of

hardships in favor of the Debtor), *rev'd on other grounds*, 384 F.3d 108 (3d Cir. 2004).[22]

Further, Mr. Kurtz's analysis ignores that the yields on bonds decrease either when interest rates

increase and/or when bond issuers default.  (Kurtz Decl. ¶ 9, n.6.)[23]

      32.   <u>Loan Prepayment</u>.  Appellees have not shown that the Company intends to repay

the Loan at an accelerated rate, and its expert was unable to identity any basis for his assertion.[24]

Indeed, the Company is not required to prepay under the Plan and none of the circumstances

triggering prepayment under the Loan terms exist here.

      33.   <u>Equity</u>.  The alleged harm in a brief delay in receiving equity is not attributable to

the stay but instead represents risks any equity holder of a publicly traded company would

experience.  Indeed, Mr. Kurtz admits that the risk of market volatility and macroeconomic

factors that he identifies as attributable to the stay are the **very same risks** the Tribune equity

holders were subjected to prior to the bankruptcy and not attributable to the stay.  (Kurtz Dep. at

115:8-117:3; 117:22-122:21 (admitting that changes in regulatory, industry, competitive

---

[22]  *A & B Steel Shearing & Processing, Inc. v. United States*, 174 F.R.D. 65, 70-71 (E.D. Mich. 1997) (holding that there is no harm from delaying the sale of property where it "may appreciate such that the government obtains a larger offer for the subject property than it received in the past" and taking judicial notice of market conditions).

[23]  Mr. Kurtz bases the rate of return on the Merrill Lynch U.S. High Yield Master II Index which is comprised of junk bonds with inferior credit quality.  *See* Stein Reply Decl. Ex. L.  (*See also* Kurtz Dep. at 60:13-61:2; 61:10-64:9; 65:5-25; 68:11-69:3; 70:14-71:19 (acknowledging call and default risks as well as rate fluctuations associated with higher yields and that actual rate would not be constant); 90:22-92:3 (acknowledging that claimed 20% target rate of return for hedge funds (Kurtz Decl. ¶ 9 n.6) was not based on actual examples or studied for purpose of his declaration).)

[24]  Kurtz Dep. at 93:2-95:16; 96:11-25; 92:7-25 (admitting that he was unaware of the basis for the prepayment assumption and that he did not look at any documentation for the Loan; stating that projections have not been updated since used and that he did not independently verify them).  Mr. Kurtz offers no record evidence of a replacement facility with a lower rate, ███████████████████████████████████

landscape, economic condition, advertising demand, circulation and audience share, newsprint

prices, are all not unique to bankruptcy).)  Instead, for a brief stay, Appellees ask this Court to

require that Appellants insure against *all* risks an equity holder would be exposed to regardless

of whether it is associated with the stay – with no offset from benefits, like tax savings, that

accrue to the debtors by remaining in bankruptcy.[25]

34.   <u>Cashing Out</u>.  If creditors wish to monetize their positions, they could sell their

debt in the secondary market which continues to increase in value over time and is currently

above the 72.2% of par that Mr. Kurtz relies upon.[26]  As Appellants have established (Motion

¶ 67), the Company and its creditors are not harmed, because the enterprise value of the Debtors

has consistently grown, increasing the value of the stock, which creditors will remain free to

trade as a "when issued stock" or as the underlying claim itself.  Furthermore, the trading value

is the best indicator of equity value, not the hypothetical value determined by investment bankers

to arrive at Total Distributable Value.[27]

35.   <u>Delay</u>.  Of course, in every stay there is a delay of emergence and thus this cannot

in and of itself constitute substantial harm – particularly when other factors weigh in favor of a

stay.  *See N. Carolina Growers' Ass'n*, 644 F. Supp. 2d at 672 ("[D]elayed receipt of funds for

---

[25]   *See* Kurtz Dep. at 123:5-124:16 (acknowledging benefits from S-Corp/ESOP structure); 124:25-126:8 ▮

[26]   Moreover, although Mr. Kurtz has not updated the bid-ask quotes, he acknowledged that all three tranches of debt have increased and that at on August 9 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Kurtz Dep. at 142:25-147:25.)

[27]   *See VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 633 (3d Cir. 2007) ("To the extent [experts] purport to reconstruct a reasonable valuation of the company in light of uncertain future performance [using a discounted cash flow analysis], they are using inapt tools. … [T]he market price is "'a more reliable measure of the stock's value than the subjective estimates of one or two expert witnesses.'") (citation omitted); *see also Peltz v. Hatten*, 279 B.R. 710, 737-38 (D. Del. 2002) ("When sophisticated parties make reasoned judgments about the value of assets that are supported by then prevailing marketplace values and by the reasonable perceptions about growth, risks, and the market at the time, [courts should not] reevaluate or question those transactions…."), *aff'd*, 60 F. App'x 401 (3d Cir. 2003); *Iridium IP LLC v. Motorola, Inc. (In re Iridium Operating LLC)*, 373 B.R. 283, 291 (Bankr. S.D.N.Y. 2007) ("[It is] clear that the public markets constitute a better guide to fair value than the opinions of hired litigation experts whose valuation work is performed after the fact and from an advocate's point of view.").

which Applicant Defendants may be entitled might impose some hardship to Applicant

Defendants. … However, in light of Plaintiffs showing of *irreparable* harm, this hardship is not

enough to tip the balance in favor of not granting Plaintiffs' motion.") (emphasis in original).

## V.    The Limited Stay Requires No Bond.

36.    A bond is only necessary when (1) there is actual harm and (2) it is the stay that

causes the harm.  *See Spellman v. Aetna Plywood, Inc.*, 1992 U.S. Dist. LEXIS 5715, at *2 (N.D.

Ill. Apr. 8, 1992) (a bond "protect[s] the appellee from possible economic harm caused by

delayed enforcement of the final judgment."); *United Merchants*, 138 B.R. at 430 ("The purpose

of Rule 8005 is to protect the adverse party from potential losses resulting from the stay.").[28]  As

discussed above, Appellees have not shown that they will sustain concrete and substantial, rather

than speculative, harm from a limited 180-day stay.  Nor have they shown their purported

speculative harm relates to the stay.  *See President Casinos*, 360 B.R. at 266 ("A court is not

required to order a bond to protect a party from economic damages that are speculative.").[29]  As

such, the Court should not require a bond for the brief 180-day stay.

### A.    A Bond Here Is Unreasonable And Would Only Secure Speculation.

37.    The Appellees reply upon Mr. Kurtz, whose opinion is unreliable and

unsupported by the record evidence, in quantifying the amount of the bond they claim should be

---

[28]    Appellees rely on *In re Miraj and Sons, Inc.*, 201 B.R. 23, 28 (D. Mass. Bankr. 1996), which does not support requiring a bond here.  In *Muraj*, there, the court found that "the amount of the bond as proposed by the Debtor is overstated" because "proposed savings of interest upon a refinancing and the loss of sales of Units are too speculative."

[29]    *See also Simon Prop. Grp., Inc. v. Taubman Ctrs., Inc.*, 262 F. Supp. 2d 794, 798-99 (E.D. Mich. 2003) (staying injunction pending appeal and finding that no security bond was necessary because defendants' "assertion that it may incur damages in the proposed bond amount is … purely speculative"); *Bosley v. WildWetT.com*, 310 F. Supp. 2d 914, 936 (N.D. Ohio 2004) (granting only nominal bond of $100 where Defendants offered "scant evidence regarding the harm they will suffer").

posted.  However, a self-limited 180-day stay requires no bond regardless of whether an appeal

process lasts for Mr. Kurtz's overstated 2-year estimate.[30]

38.    <u>Costs of Appeal</u>.  Without even challenging the number, the Company's

prediction of $113 million in bankruptcy costs does not relate to the stay.  It relates to necessary

ongoing bankruptcy matters and the appeals.[31]

39.    <u>Junk Bond Yield</u>.  Mr. Kurtz incorrectly assumes the rate of return for the

reinvestment should be set at a constant rate determined by a high yield index.  (Kurtz Decl. ¶ 9.)

Rather, in calculating the opportunity cost associated with the inability to reinvest, the risk and

return components must remain the same to make a true comparison.  Therefore, if the same rate

of return the Debtors currently receive is applied to creditor distributions, the lost opportunity

costs (even assuming they invest their entire distribution) would be reduced from $556 million to

near zero.[32]

---

[30]  Mr. Kurtz assumes a two-year period of time for appeals.  (Kurtz Decl. ¶¶ 6-7.)  However, studies have shown that the median time for direct appeals is less than one year.  Laura B. Bartell, The Appeal of Direct Appeal - Use of the New 28 U.S.C. § 158(d)(2), 84 AM. BANKR. L.J. 145, 207 (2010) ("[T]he median time interval from the grant of leave to appeal to decision in the eighteen direct appeal cases decided in fiscal year 2009 was 11.6 months.")  And here, Appellants shorten this at least by half again, requesting only 180 days, and have sought direct appeal or expedited appeal if the Court does not grant certification to the Third Circuit.

[31]  *In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 352 (S.D.N.Y. 2007) did not hold that a bond should address lost opportunity costs; rather the court found the bond should include only the concrete amount of interest that was accruing per day on bank debt that would have otherwise been paid.  Here, there is no accruing bank debt interest. In *In re Chemtura Corp.*, 2010 Bankr. LEXIS 3988, at *32 (Bankr. S.D.N.Y. Nov. 8, 2010), when discussing the potential lost opportunity cost, the court noted that this "would be hard to quantify" and focused on the fact that a potential appeal could continue for "several years."  *Id.* at *33.  Here, the requested stay is of limited duration.

[32]  The cases Appellees cite do not compel a bond to compensate Appellees for vague claims of market volatilities. (Objection ¶ 72, n.38.)  In *Adelphia*, the court's consideration of market volatilities was in the context of whether a mandated IPO would have to proceed sooner as a result of the stay.  *Adelphia*, 361 B.R. at 353.  The costs the court considered were specific set fees associated with that IPO – not the specific market volatilities.  Additionally, the appellees there had demonstrated the specific market volatilities of Time Warner Cable stock over the past nine months.  Also, the facts of this case are a far cry from those in *In re General Motors Corp.*, 409 B.R. 24 (Bankr. S.D.N.Y. 2009).  There, the court did not account for vague claims of market volatility.  Rather, the court was concerned with the imminent liquidation of General Motors that would occur as a result of the stay because it would lose government funding.  *Id.* at 32.  This would have caused "irreparable injury to the interests of 225,000 GM employees, an estimated 500,000 GM retirees, 11,500 suppliers, and 6000 dealers whose lives turn on the ability to allow this sale to close.  We're here faced with potentially grievous systemic damage to the automobile industry and the states and municipalities where GM workers, retirees and dealers reside."  *Id.* at 34.

40.    <u>Put Option</u>.  Mr. Kurtz admits that he based his staggering $992 million in bond

on a method of valuation that they "came up with" that *no* published or peer reviewed articles

evaluated or supported, *no* court has used, and is *not* a generally accepted method of analysis.[33]

And Mr. Kurtz admits that he does not consider himself an expert "*per se*" in derivative

instruments and has been involved in "less than ten" cases where he was involved in calculating

put options (although he did not calculate them himself).[34]  *See In re Nellson Nutraceutical, Inc.*,

356 B.R. 364, 376 (Bankr. D. Del. 2006) (rejecting expert's "invented methodology" on

valuation, because the "methodology has not been tested, has not been subjected to peer review,

is not generally accepted in the field and has never been used or relied upon in a court of law,

there is no way to know whether the methodology leads to erroneous results and there are no

established standards controlling its application").

41.    The use of Mr. Kurtz's methodology for calculating damages in circumstances

such as here are flawed as Aswath Damodaran, a Professor of Finance at the Stern School of

Business at New York University, explained when discussing protective puts (which are similar

to European puts which Appellees model is purportedly based upon):

> There have been attempts to extend option pricing models to valuing illiquidity,
> with mixed results.  In one widely used variation, liquidity is modeled as a put
> option for the period when an investor is restricted from trading.  Thus, the
> illiquidity discount on value for an asset where the owner is restricted from
> trading for 2 years will be modeled as a 2-year at-the-money put option.  There
> are several flaws, both intuitive and conceptual, with this approach.  The first is
> that liquidity does not give you the right to sell a stock at today's market price
> anytime over the next 2 years.  What it does give you is the right to sell at the
> prevailing market price anytime over the next 2 years.

(Stein Reply Decl. Ex. M ("Marketability and Value:  Measuring the Illiquidity Discount,"

Aswath Damodaran, pp. 41-42 (citations omitted)); *see also* Stein Reply Decl. Ex. N (Aswath

---

[33]   Kurtz Dep. at 29:11-22; 160:23-161:4.

[34]   *Id.* at 21:7-8; 24:14-20.

DAMODARAN, STRATEGIC RISK TAKING, A FRAMEWORK FOR RISK MANAGEMENT 143-144 (Prentice Hall 2008).)

42.     Even if relevant (it is not) Mr. Kurtz's flawed methodology quantifies a bond that over compensates the creditors by addressing only downside volatility and volatility caused by *any* reason.  Mr. Kurtz's methodology is an unreliable valuation method for potential harm, because it removes the downside risk but allows the creditors to retain the full upside potential from Reorganized Tribune.  This is contrary to the basic assumption that the creditor would sell the stock that underlies the "put option" construct.  Absent a stay, the creditor could not, as the Kurtz model implies, sell the stock and keep the upside.  Appellees further claim that Appellants should be responsible for any potential market volatility, volatility that would exist even absent the stay.  Mr. Kurtz's made up method would provide them complete downside protection while preserving their benefit from any upside, which is a windfall to the Appellees and grants more protection than the Appellants are legally required to provide.  Thus, Appellees' theory, modified to account for the possibilities of upward market trends instead of solely downside volatilities, eliminates the potential for harm and the need for a bond.  *See A & B Steel Shearing & Processing*, 174 F.R.D. at 70-71 (finding no harm exists by taking judicial notice that upward market trends are just as likely as downward market trends).

43.     <u>Market Risk</u>.  Appellees seek to require Appellants to bond *any* loss in the equity value, thereby making a bond into an insurance policy, disassociated from the actual stay, which is the only thing relevant to a bond.

44.     <u>Cashing Out</u>.  The Court should not require a bond here where the creditors could monetize their positions during the time of the stay.  *In re Diet Drugs*, 582 F.3d 524, 552 (3d Cir.

2009) ("courts may forego [the bond] requirement when there are other means to secure the judgment creditor's interests").

## **CONCLUSION**

WHEREFORE, for all of the reasons set forth above, Appellants request that this Court enter an order (i) staying the Confirmation Order for 180 days pending adjudication of the appeal, subject to Appellants' right to seek a renewal of the stay from the appropriate court if warranted by the circumstances; and (ii) granting such other and further relief as is equitable and proper.

Dated: August 15, 2012
　　　　Wilmington, Delaware

Respectfully submitted,

KASOWITZ, BENSON, TORRES
　& FRIEDMAN LLP
David S. Rosner
Sheron Korpus
Christine A. Montenegro
Matthew B. Stein
1633 Broadway
New York, New York 10019
212-506-1700

BIFFERATO GENTILOTTI LLC

　/s/ Garvan F. McDaniel　　　　
Garvan F. McDaniel (I.D. No. 4167)
800 N. King Street, Plaza Level
Wilmington, Delaware 19801
302-429-1900

　　*Counsel for Law Debenture Trust Company of New York, solely in its capacity as successor Indenture Trustee for certain series of Senior Notes*

McCARTER & ENGLISH, LLP
David J. Adler
245 Park Avenue
New York, New York 10167
212-609-6800

McCARTER & ENGLISH, LLP

　/s/ Katharine L. Mayer　　　　
Katharine L. Mayer (I.D. No. 3758)
Renaissance Centre
405 N. King Street
Wilmington, Delaware 19801
302-984-6300

　　*Counsel for Deutsche Bank Trust Company Americas, solely in its capacity as successor Indenture Trustee for certain series of Senior Notes*