## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered |
| | **Objection Date: September 11, 2012 at 4:00 p.m.** |
| | **Hearing Date:  TBD** |
| | **Related to Docket Nos. 11631, 11807, and 12248** |

## FOURTEENTH QUARTERLY FEE APPLICATION OF SIDLEY AUSTIN LLP FOR COMPENSATION FOR SERVICES RENDERED AND REIMBURSEMENT OF EXPENSES AS COUNSEL TO THE DEBTORS AND DEBTORS IN POSSESSION FOR THE PERIOD OF MARCH 1, 2012 THROUGH MAY 31, 2012

| | |
|---|---|
| Name of Applicant: | **Sidley Austin LLP** |
| Authorized to Provide Professional Services to: | **Debtors** |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (5256); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc., f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); and WPIX, Inc. (0191). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

| Date of Retention: | **February 20, 2009 (<u>nunc pro tunc</u> to December 8, 2008)** |
|---|---|

| Period for Which Compensation and Reimbursement is Sought: | **March 1, 2012 through May 31, 2012** |
|---|---|

| Amount of compensation sought as actual, reasonable and necessary: | **$5,418,107.32** |
|---|---|

| Amount of Expense Reimbursement sought as actual, reasonable and necessary | **$182,859.76** |
|---|---|

This is a(n): _____ monthly ___X___ interim _____ final application

The total time expended during the Fourteenth Interim Fee Period for fee application preparation for the monthly and quarterly fee applications, including time expended for review and response to preliminary and final reports and recommendations of the Fee Examiner, is approximately 719.70 hours and the corresponding compensation requested is approximately $265,131.50.

<u>Prior Interim Applications</u>

| Quarter | Date Filed | Period Covered | Requested | | Approved | |
|---|---|---|---|---|---|---|
| | | | Fees | Expenses | Fees | Expenses |
| 1 | 4/15/09 | 12/8/08-2/28/09 | $3,897,043.25 | $165,360.71 | $3,886,289.75 | $158,441.67 |
| 2 | 7/16/09 | 3/1/09-5/31/09 | $4,209,274.75 | $105,524.36 | $4,203,235.50 | $104,118.90 |
| 3 | 10/15/09 | 6/1/09-8/31/09 | $4,513,018.00 | $99,429.34 | $4,510,127.00 | $99,253.67 |
| 4 | 1/15/10 | 9/1/09-11/30/09 | $5,292,782.75 | $221,808.01 | $5,275,754.14 | $220,748.76 |
| 5 | 4/15/10 | 12/1/09-2/28/10 | $5,426,757.50 | $205,852.05 | $5,412,303.00 | $201,565.16 |
| 6 | 12/14/10 | 3/1/10-5/31/10 | $6,581,178.43 | $425,733.29 | $6,582,868.12 | $418,736.42 |
| 7 | 5/4/11 | 6/1/10-8/31/10 | $7,081,656.37 | $310,093.90 | $7,077,989.87 | $304,357.14 |
| 8 | 7/1/11 | 9/1/10-11/30/10 | $7,126,734.00 | $334,255.68 | $7,120,542.46 | $323,696.86 |
| 9 | 9/20/11 | 12/1/10-2/28/11 | $14,478,878.00 | $599,999.17 | $14,448,735.77 | $585,309.27 |
| 10 | 1/27/12 | 3/1/11-5/31/11 | $8,941,857.00 | $1,133,692.42 | $8,796,500.97 | $1,082,606.25 |
| 11 | 6/4/12 | 6/1/11-8/31/11 | $5,073,861.25 | $445,493.14 | | |
| 12 | 7/12/12 | 9/1/11-11/30/11 | $4,486,113.50 | $290,379.17 | | |
| 13 | 7/27/12 | 12/1/11-2/29/12 | $5,331,970.50 | $168,703.44 | | |

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered<br>**Objection Date: September 11, 2012 at 4:00 p.m.**<br>**Hearing Date: TBD**<br>**Related to Docket Nos. 11631, 11807, and 12248** |

## FOURTEENTH QUARTERLY FEE APPLICATION OF SIDLEY AUSTIN LLP FOR COMPENSATION FOR SERVICES RENDERED AND REIMBURSEMENT OF EXPENSES AS COUNSEL TO THE DEBTORS AND DEBTORS IN POSSESSION FOR THE PERIOD OF MARCH 1, 2012 THROUGH MAY 31, 2012

Sidley Austin LLP ("Sidley"), attorneys for Tribune Company ("Tribune") and

the affiliated companies that filed voluntary petitions for relief in the above-captioned chapter 11

cases (collectively, the "Debtors"), respectfully submits this application (the "Application") to

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc., f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); and WPIX, Inc. (0191). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

this Court, pursuant to (i) sections 327, 331, and 503 of title 11 of the United States Code (the "Bankruptcy Code"), (ii) Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (iii) Rule 2016-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), (iv) the Order Establishing Procedure for Interim Compensation and Reimbursement of Expenses of Professionals and Committee Members Pursuant to 11 U.S.C. §§ 105(a) and 331 (Docket No. 225) (the "Interim Compensation Order"), as amended, and (v) the Order Appointing Fee Examiner and Establishing Related Procedures for Compensation and Reimbursement of Expenses for Professionals and Consideration of Fee Applications (Docket No. 546) (the "Fee Examiner Order") for approval of interim compensation and reimbursement of expenses for the fourteenth quarterly period from March 1, 2012 through May 31, 2012 (the "Fourteenth Interim Fee Period"). In support of the Application, Sidley respectfully states as follows:

## FACTUAL BACKGROUND OF THE CASES

1.    On December 8, 2008 (the "Petition Date"), Tribune and certain of its subsidiaries each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. An additional Debtor, Tribune CNLBC, LLC (f/k/a Chicago National League Ball Club, LLC) ("Tribune CNLBC"), filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on October 12, 2009.[2]  On March 22, 2010, this Court entered an order dismissing the chapter 11 petition of New River Center Maintenance Association, Inc.  On May 24, 2011, this

---

[2] Orders of the Court applicable to this Application have subsequently been extended to Tribune CNLBC. (See Order Directing (I) Joint Administration of Chapter 11 Cases and (II) that Certain Orders and Other Pleadings Entered or Filed in the Chapter 11 Cases of Tribune Company, et al. be Made Applicable to the Chapter 11 Case of Chicago National League Ball Club, LLC (entered Oct. 14, 2009) (Docket No. 2333) (the "CNLBC Joint Administration Order").

Court entered an order dismissing the chapter 11 petition of Publishers Forest Products Co. of Washington. In all, the Debtors comprise 110 entities.

2.    The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b). (Docket Nos. 43, 2333.)

3.    The Debtors have continued in possession of their respective properties and have continued to operate and maintain their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.    On December 18, 2008, the office of the United States Trustee appointed an official committee of unsecured creditors in the Debtors' chapter 11 cases (the "Committee").

5.    On March 19, 2009, pursuant to Fee Examiner Order, the Court appointed Stuart Maue as fee examiner (the "Fee Examiner") to act as special consultant to the Court for professional fee and expense analysis and review, effective nunc pro tunc to February 20, 2009. (Docket No. 546.)

6.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief sought herein are sections 327, 331, and 503 of the Bankruptcy Code, Rule 2016 of the Bankruptcy Rules, and Rule 2016-2 of the Local Rules.

## PROCEDURAL BACKGROUND FOR THE APPLICATION

7.    The Debtors sought approval of this Court to retain Sidley as general reorganization and bankruptcy counsel, pursuant to 11 U.S.C. §§ 327(a) and 1107, by application filed on December 26, 2008. As set forth in the application seeking such approval, Sidley's services to the Debtors encompass a wide range of legal services, focused upon restructuring and

insolvency issues but also encompassing certain general corporate, litigation, tax, media law and regulatory, employee-related, and real estate matters.  In particular, Sidley's retention application sets forth the following scope of services:

a) to provide legal advice with respect to the Debtors' powers and duties as debtors in possession in the continued operation of their business;

b) to take all necessary action on behalf of the Debtors to protect and preserve the Debtors' estates, including prosecuting actions on behalf of the Debtors, negotiating any and all litigation in which the Debtors are involved, and objecting to claims filed against the Debtors' estates;

c) to prepare on behalf of the Debtors all necessary motions, answers, orders, reports, and other legal papers in connection with the administration of the Debtors' estates;

d) to attend meetings and negotiate with representatives of creditors and other parties in interest, attend court hearings, and advise the Debtors on the conduct of their chapter 11 cases;

e) to perform any and all other legal services for the Debtors in connection with both their chapter 11 cases and with the formulation and implementation of the Debtors' plan of reorganization;

f) to advise and assist the Debtors regarding all aspects of the plan confirmation process, including, but not limited to, negotiating and drafting a plan of reorganization and accompanying disclosure statement, securing the approval of a disclosure statement, soliciting votes in support of plan confirmation, and securing confirmation of the plan;

g) to provide legal advice and representation with respect to various obligations of the Debtors and their managers and officers;

h) to provide legal advice and perform legal services with respect to matters involving the negotiation of the terms of and the issuance of corporate securities, matters related to corporate governance, and the interpretation, application, or amendment of the Debtors' organizational documents, including their limited liability company agreements, material contracts, and matters involving the fiduciary duties of the Debtors and their officers and managers;

i) to provide legal advice and perform legal services with respect to litigation, tax (state and federal income tax and local property tax assessment matters) and other general non-bankruptcy legal issues for the Debtors to the extent requested by the Debtors; and

j) to render such other services as may be in the best interests of the Debtors in connection with any of the foregoing and all other necessary or appropriate legal services in connection with these chapter 11 cases, as agreed upon by Sidley and the Debtors.

Sidley's retention, nunc pro tunc to the Petition Date, was approved by this Court by order dated February 20, 2009. (Docket No. 435.)

8.    The Interim Compensation Order and the Fee Examiner Order (together, the "Fee Orders") provide that all professionals retained in these cases pursuant to sections 327, 328, or 1103 of the Bankruptcy Code (the "Case Professionals") must file with the Court and provide to the Fee Examiner monthly applications for interim allowance of compensation for services rendered and reimbursement of expenses incurred, together with the applicable time entries and itemized expenses (the "Monthly Fee Application"). The notice parties specified in the Fee Orders (the "Notice Parties") have twenty (20) days after service of a Monthly Fee Application to object to such Monthly Fee Application (the "Objection Deadline"). Upon expiration of the Objection Deadline, the applicable Case Professional must certify in writing that no objection or partial objection has been filed with the Court relative to that professional's Monthly Fee Application, whereupon the Debtors are authorized to pay such professional an amount equal to the lesser of (i) 80% of the fees and 100% of the expenses requested in the Monthly Fee Application or (ii) 80% of the fees and 100% of the expenses not subject to an objection.

9.    Pursuant to the procedures set forth in the Fee Orders, Sidley prepared, filed with the Court, and served upon the Notice Parties and the Fee Examiner Monthly Fee Applications for the periods of March 2012, April 2012, and May 2012, which Monthly Fee Applications are incorporated herein by reference.[3] Sidley has accordingly submitted all of its Monthly Fee Applications for the Debtors' chapter 11 cases for the Fourteenth Interim Fee Period.

---

[3] The docket numbers of Sidley's Monthly Fee Applications for March 2012, April 2012, and May 2012 are 11631, 11807, and 12248, respectively.

10.    In addition to the Monthly Fee Applications, beginning with the three-month period ending February 28, 2009, and each three-month period thereafter, all Case Professionals must file with the Court and serve on the Notice Parties interim applications for allowance of compensation and reimbursement of expenses of the amounts sought in the Monthly Fee Applications filed during such period (a "Quarterly Fee Application Request"). (See Interim Compensation Order at 3.)  Quarterly Fee Application Requests must include a summary of the Monthly Fee Applications that are the subject of the request and any other information requested by the Court or required by the Local Rules.  (Id.)  This Application represents the fourteenth Quarterly Fee Application Request that Sidley has filed with the Court in connection with these chapter 11 cases, and it covers the period from March 1, 2012 through May 31, 2012, both dates inclusive.

## RELIEF REQUESTED

11.    By this Application, Sidley respectfully requests that the Court approve the interim allowance and award of compensation for professional services rendered and reimbursement of actual and necessary expenses incurred by Sidley as general bankruptcy counsel to the Debtors during the Fourteenth Interim Fee Period.

12.    The amount of fees sought for services rendered during the Fourteenth Interim Fee Period is $5,418,107.32, representing 8,394.60 hours in professional and paraprofessional time for such services.  Reimbursement of actual, necessary expenses incurred by Sidley during the Fourteenth Interim Fee Period in connection with these services is requested in the amount of $182,859.76.  Sidley seeks the interim allowance of such compensation, and this Court's authorization for payment of such amounts by the Debtors to Sidley, less amounts previously paid to Sidley pursuant to the Monthly Fee Applications for the period covered by this Application and the procedures set forth in the Fee Orders.

13.     The hourly rates charged by Sidley professionals and paraprofessionals during the Fourteenth Interim Fee Period are no greater than the customary hourly rates for such individuals both inside and outside of bankruptcy cases.  The highest billing rate charged by any Sidley attorney for services rendered under Sidley's current billing rates that became effective on January 1, 2012 and continuing until Sidley's next Firm-wide rate adjustment will be $1,000 per hour.  (See Supplemental Affidavit (Second) of James F. Conlan in Support of Application for an Order Authorizing the Employment and Retention of Sidley Austin LLP as Attorneys for the Debtors and Debtors in Possession ¶ 3, Docket No. 424.)  Sidley believes these rates are comparable to those charged by the bankruptcy and other professionals of other firms of comparable size, stature, and experience.

14.     Sidley has received no payment and no promises for payment from any source other than the Debtors for services rendered in these chapter 11 cases.  There is no agreement between Sidley and any other party for the sharing of compensation to be received for the services rendered by Sidley in these chapter 11 cases.  All professional and paraprofessional services for which compensation is sought herein were rendered solely on behalf of the Debtors in these cases.

## SERVICES RENDERED

15.     Sidley has rendered substantial services to the Debtors in connection with these chapter 11 cases during the period covered by this Application, both in its capacity as general bankruptcy counsel to the Debtors and continuing in its capacity as corporate, litigation, and transactional counsel to the Debtors in their ordinary course of business.  The services performed by Sidley's professionals and paraprofessionals during the period covered by this Application were necessary and have directly contributed to the effective administration of the Debtors' chapter 11 cases.

16.     A breakdown of the total hours expended by each professional on all matters and a breakdown of amounts sought by each matter category covered herein are included as a part of Attachment A to this Application, as required by Local Rule 2016-2.  A detailed description of the services provided to the Debtors is incorporated by reference to the Monthly Fee Applications previously filed by Sidley with the Court.  The following is a summary of the activities performed by Sidley's professionals and paraprofessionals during the Fourteenth Interim Fee Period:

A.     **FCC Matters (20100):   Hours: 363.30   Fees: $218,397.50**[4]

17.     During the Fourteenth Interim Fee Period, Sidley's professionals continued to represent the Debtors' broadcast stations on several matters as communications regulatory counsel.  More than one-third of the fees incurred by Sidley's professionals in this category during the Fourteenth Interim Fee Period relate to the Newspaper Crossownership matter, which, as described in Sidley's prior Quarterly Fee Application Requests, involves petitions for review of the Federal Communications Commission's ("FCC") newspaper-broadcast cross-ownership regulations.  The FCC had issued various rules that continued to prohibit owners of newspapers, including the Debtors, from also holding licenses to operate certain television or radio stations within the same markets.  The Debtors and twenty-one (21) other parties challenged these rules on constitutional and Administrative Procedure Act grounds; with some arguing that the cross-ownership restrictions should be further strengthened and

---

[4] Commencing in December 2009, the Debtors requested that Sidley provide separate invoices for professional fees for certain discrete FCC-related services attributable to the Newspaper Crossownership matter, on which Sidley represents the Debtors in the ordinary course of business.  In accordance with this request, and after consultation with the Fee Examiner, Sidley has included such invoices within the broader category of FCC Matters for the purposes of calculating the total fees and expenses in Sidley's Monthly Fee Applications and Quarterly Fee Application Requests.  $76,526.50 of this amount is attributable to the Newspaper Crossownership matter.

others, including the Debtors, arguing that the cross-ownership restrictions should be further relaxed.

18.    During the Fourteenth Interim Fee Period, Sidley's professionals continued to seek the United States Supreme Court's review of the July 2011 decision of the United States Court of Appeals for the Third Circuit with respect to the FCC's media ownership rules, which had the effect of preserving the FCC's ban on common ownership of a broadcast station and daily newspaper in the same market.  Specifically, Sidley's professionals reviewed the various oppositions to the Debtors' petition with the Supreme Court for certiorari, and prepared and, in March 2012, filed a reply to those oppositions on behalf of the Debtors. Subsequent to the filing of the reply, Sidley's professionals reviewed the Supreme Court's actions on several other petitions for certiorari, as the pendency of at least one case before the Supreme Court caused the Court to hold the Debtors' petition in abeyance pending resolution of that case.  The outcome of the appeal was of substantial importance to the Debtors' broadcasting and publishing operations in several key markets in which the Debtors conduct business.

19.    Additionally, at the end of 2011, the FCC initiated its 2010 Quadrennial Review proceeding, and sought comments from the public on the newspaper-broadcast cross-ownership prohibition, as well as the FCC's radio-television cross-ownership rule, which restricts owners of radio stations from also holding licenses to operate certain television stations within the same markets, and the television station multiple-ownership rule, which restricts owners of television stations from holding licenses for multiple stations in the same local markets.  Sidley's professionals continued to represent the Debtors in that proceeding during the Fourteenth Interim Fee Period.  Sidley's professionals prepared and filed initial comments on the media ownership rules, reviewed the comments filed by opponents of relaxation of the FCC's

media ownership rules, drafted and filed reply comments, monitored the filings and meetings reflected in the docket in that proceeding, and advised the Debtors with respect to several filings of relevance to the Debtors or their arguments before the FCC.

20.     Sidley's professionals also continued to assist the Debtors with respect to matters related to the upcoming and prior broadcast license renewal application cycles, including the filing of two renewal applications, and provided advice related to newly-adopted rules of the FCC with respect to the public disclosure of various information concerning broadcasters and their programming. Sidley's professionals with responsibility for assisting the Debtors with upcoming renewals and commercial agreements invoking FCC rules (i) compiled FCC license renewal application data, (ii) assessed options for modification of engineering operations of one station, (iii) identified and located network affiliation agreements, and (iv) assisted the Debtors with meeting their "public inspection file" requirements under Federal law in connection with the renewal filings. Sidley's professionals also advised the Debtors regarding the impact of their bankruptcy proceedings on certain FCC applications and procedures, and the reporting of litigation in various public filings or private disclosures. Finally, Sidley's professionals advised the Debtors with respect to certain legal issues arising in connection with a complaint filed with the FCC by DirecTV against the Debtors, based upon allegations concerning negotiations for DirecTV's retransmission rights to the Debtors' stations.

**B.     Fee Applications (30390):   Hours: 719.70   Fees: $265,131.50**

21.     This matter category encompasses all tasks relating to the preparation and filing of Sidley's Monthly Fee Applications and Quarterly Fee Application Requests with the Court. In this Fourteenth Interim Fee Period, Sidley's professionals and paraprofessionals drafted and filed Sidley's thirty-sixth, thirty-seventh, thirty-eighth, and thirty-ninth Monthly Fee Applications, drafted portions of Sidley's fortieth Monthly Fee Application, drafted portions of

Sidley's Eleventh, Twelfth, and Thirteenth Quarterly Fee Application Requests, and reviewed and complied with the Court's Fee Orders respecting all of the foregoing.  In addition, Sidley reviewed and drafted responses to the Fee Examiner's preliminary reports with respect to Sidley's Eighth, Ninth, and Tenth Quarterly Fee Application Requests.  In light of the number of monthly and quarterly fee applications prepared, in whole or in part, during this period, Sidley respectfully submits that the hours expended and fees requested are reasonable.

## C.      Executory Contracts and Leases (30410):   Hours: 7.30   Fees: $3,680.00

22.      As of the Petition Date, the Debtors in these cases were party to approximately 45,000 executory contracts and unexpired leases.  During the Fourteenth Interim Fee Period, Sidley's professionals, together with the Debtors' financial advisors at Alvarez & Marsal, advised the Debtors with respect to the assumption, assumption and assignment, or rejection of certain executory contracts and unexpired leases under section 365 of the Bankruptcy Code and in accordance with the terms of the plan of reorganization proposed for the Debtors, on terms favorable to the Debtors.  Specifically, the DCL Plan (defined below) provides for the assumption of all executory contracts and unexpired leases other than those identified on the exhibit of rejected contracts and leases, which was filed as part of the updated Plan Supplement (as defined in the DCL Plan) on May 4, 2012 (Docket No. 11545).[5]

23.      Sidley's professionals, together with the Debtors' financial advisors at Alvarez & Marsal and the Debtors' management and personnel, also prepared and filed an amended exhibit to the Order Establishing Procedures (I) Fixing Cure Amounts and (II) Providing Notice of Assumption and/or Assignment of Certain Executory Contracts and

---

[5] The Plan Supplement, as defined in the DCL Plan, is comprised of numerous exhibits to the DCL Plan.  The Plan Supplement was originally filed in January 2011, during the Ninth Interim Fee Period, and was updated and filed on May 4, 2012, during the Fourteenth Interim Fee Period.  (See Docket No. 11545.)  The exhibit of rejected contracts and leases was included (without modification) in that filing. (Id.)

Unexpired Leases by a Successor Reorganized Debtor Pursuant to Sections 365, 1123 and 1129

of the Bankruptcy Code (Docket No. 8745) (the "Global Contract Order") on May 4, 2012

(Docket No. 11546), which amended exhibit updated the list of executory contracts to be

assumed by the Debtors that have corresponding cure amounts.  In connection therewith, during

the Fourteenth Interim Fee Period, Sidley's professionals continued their efforts to reach

consensual determinations with counsel for contract counterparties of amounts required to be

cured upon the assumption of executory contracts and unexpired leases pursuant to the terms of

the DCL Plan, and in accordance with the procedures described in the Motion of the Debtors for

an Order Establishing Procedures (I) Fixing Cure Amounts and (II) Providing Notice of

Assumption and/or Assignment of Certain Executory Contracts and Unexpired Leases by a

Successor Reorganized Debtor Pursuant to Sections 365, 1123 and 1129 of the Bankruptcy Code

(Docket No. 8287) (the "Global Contract Motion"), which was approved by the Global Contract

Order.

**D.     Use/Sale/Lease of Assets (30430):    Hours: 2.90    Fees: $1,885.00**

   24. During the Fourteenth Interim Fee Period, Sidley's professionals advised

the Debtors' senior management with respect to certain transactions for the use, sale, and lease of

assets on behalf of the Debtors, both in connection with these chapter 11 cases and with Sidley's

ongoing representation of the Debtors in the ordinary course of business.  Specifically, Sidley's

professionals in the Corporate Reorganization and Bankruptcy practice group provided advice to

the Debtors' business personnel on certain proposed business transactions being contemplated by

the Debtors, including whether such transactions implicated sections 363(b) or (c) of the

Bankruptcy Code.

**E.**    **DIP Financing/Cash Collateral (30440):    Hours: 4.70    Fees: $3,986.00**

25.    During the Fourteenth Interim Fee Period, Sidley's professionals advised the Debtors' senior management, and communicated with the Debtors' outside counsel and counsel to the lenders for the Debtors' post-petition financing facility, regarding the terms of the Debtors' Letter of Credit facility and related agreements, and the treatment under the DCL Plan of the claims arising under such facility.

**F.**    **Insurance Matters (30450):    Hours: 1.70    Fees: $1,615.00**

26.    During the Fourteenth Interim Fee Period, Sidley's professionals continued to work with the Debtors, their outside insurance counsel, and various insurance providers to resolve certain insurance coverage issues, and to advise upon the impact of the Debtors' chapter 11 cases on the Debtors' insurance and risk management procedures.  Sidley's professionals specifically reviewed legal issues pertaining to the Debtors' directors' and officers' liability insurance policies and provided advice to the Debtors regarding such policies in connection with lawsuits pending against certain of the Debtors' current and former directors and officers.  Sidley's professionals also responded to certain information requests issued by counsel for certain of the Debtors' creditors relating to the insurance coverage applicable to certain litigation-related claims.

**G.**    **Litigated Matters (30470):    Hours: 1,944.20    Fees: $1,409,227.50**

27.    The "Litigated Matters" category encompasses all of Sidley's activities relating to actual and potential litigation, contested matters, and adversary proceedings, which continued to require substantial attention from Sidley, the Debtors' senior management, the Committee, the Debtors' senior lenders, and other key creditor constituencies during the Fourteenth Interim Fee Period.  This category also includes fees incurred by Sidley's professionals in the Litigation practice group in connection with litigation-related activities

concerning the contested plan confirmation process as it continued to develop during the

Fourteenth Interim Fee Period.[6]  A detailed narrative description of the services provided by

Sidley's professionals in both the Litigation practice group and the Corporate Reorganization and

Bankruptcy practice group (among others) to advance confirmation of the DCL Plan is provided

in Section J, infra, of this Application.[7]

      **(a)**     **Avoidance Actions and Related Adversary Proceedings and Tolling Agreements**

          *(i)*     *Avoidance Actions Commenced or Tolled by the Debtors*

     28.     In the Ninth Interim Fee Period, Sidley filed 94 Avoidance Actions, by

which the Debtors sought to avoid and recover for the benefit of their estates various transfers of

property made to certain of the Debtors' third party vendors and suppliers prior to the Petition

Date.[8]  The Court entered an order providing for a broad stay of the Avoidance Actions until

June 30, 2011, which was also the date that the approximately 127 tolling agreements with third

party vendors and suppliers were set to expire.  Pursuant to orders entered by the bankruptcy

Court prior to the Fourteenth Interim Fee Period, such stay of the Avoidance Actions was

extended through June 30, 2012.

      29.     Given the pending expiration of the stay, on May 11, 2012, Sidley's

professionals filed the Second Supplemental Motion to Extend the Stay of Avoidance Actions

---

[6] Given the contested nature of the Debtors' plan confirmation process, Sidley's invoices and time detail in both the Litigated Matters category and the Plan and Disclosure Statement category include Sidley's services in connection with the Debtors' plan confirmation process.  As a general rule, the services performed by professionals in Sidley's Litigation practice group in connection with the plan confirmation process appear in the Litigated Matters category, and the services performed by professionals in Sidley's Corporate Reorganization and Bankruptcy practice group in connection with the plan confirmation process appear in the Plan and Disclosure Statement category.

[7] The narrative description of the services provided by Sidley's professionals to advance confirmation of the DCL Plan should be read in conjunction with the time detail submitted in both the Litigated Matters category and the Plan and Disclosure Statement category, to the extent those services are inter-related.

[8] See Sidley's Ninth Quarterly Fee Application Request, at ¶¶ 48-50, for a detailed description of the Avoidance Actions commenced by the Debtors.

Commenced by the Debtors (Docket No. 11601) (the "Second Supplemental Stay Motion"), which requested a further extension of the stay to a date that is ninety (90) days after the effective date of the DCL Plan (defined below). The Second Supplemental Stay Motion was granted by the Bankruptcy Court on May 24, 2012 (Docket No. 11685). During the Fourteenth Interim Fee Period, Sidley's professionals, together with co-counsel and Alvarez & Marsal, prepared further amendments to each of the outstanding tolling agreements to extend them through the same date, and began the process of negotiating with the counter-parties to such tolling agreements regarding the proposed further extension of the tolling agreements. Those efforts continued into the Fifteenth Interim Fee Period. All tolling agreements were ultimately extended either to a date that is ninety (90) days after the effective date of the DCL Plan, or another date certain as agreed to by the parties, prior to the expiration of the tolling agreements on June 30, 2012.

(ii)     *Avoidance Actions Commenced by the Committee*

30.     In the Fourteenth Interim Fee Period, the Committee commenced an additional complaint, on behalf of the Debtors' estates, to avoid and recover certain alleged fraudulent transfers against advisors to Tribune in connection with the Leveraged ESOP Transactions. (See Docket No. 11303.) Sidley's professionals reviewed and analyzed this complaint, which was stayed pursuant to the Court's pre-existing orders staying avoidance adversary proceedings. This additional complaint was ultimately consolidated with the SLCFC Actions (defined below) in the Consolidated Action (defined below), on August 8, 2012.

**(b)     ERISA Mediation and Settlement**

31.     During the Fourteenth Interim Fee Period, Sidley's professionals continued their efforts to consummate the settlement of certain claims, causes of action, and related matters arising from alleged violations of the Employee Retirement Income Security Act

of 1974, as amended ("ERISA"), in connection with the Tribune Employee Stock Ownership

Plan, an employee retirement benefit plan sponsored by Tribune, with (i) the Department of

Labor ("DOL"), GreatBanc Trust Company ("GreatBanc"), Samuel Zell, the plaintiffs to that

certain class action lawsuit styled Neil, et al. v. Zell, et al., (the "Neil Plaintiffs"), and certain of

the Debtors' primary and excess fiduciary liability insurance providers (the "ERISA Claims

Settlement").[9]

      32.    As discussed in Sidley's Twelfth and Thirteenth Quarterly Fee

Application Requests, following the entry by the United States District Court for the Northern

District of Illinois (the "Illinois District Court") of the order granting final approval of the

ERISA Claims Settlement as it relates to the Neil litigation on January 30, 2012, the parties

continued to implement the ERISA Claims Settlement in accordance with its terms.  To that end,

Sidley's professionals negotiated, drafted, and filed a motion with the Bankruptcy Court to

dismiss the pending adversary proceeding against the Neil Plaintiffs (Adv. Pro. No. 09-50445

(KJC)), which was filed on February 23, 2012 (Docket No. 10990) and which was ultimately

approved by the Bankruptcy Court on March 22, 2012 (Docket No. 11224 and Adv. Docket No.

54).  Sidley's professionals also negotiated and filed a stipulation between the Debtors and the

DOL resolving the seventy-three (73) proofs of claim asserted by the DOL against the Debtors,

based on alleged liability under ERISA, which was implemented in accordance with the terms of

the ERISA Claim Settlement (Docket No. 10989).

_____

[9] Background to Sidley's participation in the mediation, negotiations, and preparation of pleadings filed in the Bankruptcy Court and District Court presiding over the Neil litigation, and the approval of the ERISA Claims Settlement by those Courts is provided in detail in Sidley's Tenth, Eleventh, Twelfth, and Thirteenth Quarterly Fee Application Requests.  The Bankruptcy Court also entered orders approving the ERISA Claims Settlement and the related settlement between the Debtors and the United States Department of the Treasury, Internal Revenue Service ("IRS") to settle excise tax claims asserted by the IRS on account of alleged ERISA violations in the Neil litigation and by the DOL (the "IRS Settlement") on October 19, 2011 (Docket Nos. 10019, 10023).

(c)    **The State Law Constructive Fraudulent Conveyance Actions**

33.    On April 25, 2011, the Bankruptcy Court entered an order authorizing the

Noteholder Proponents[10] to commence state law constructive fraudulent conveyance actions

against Tribune's shareholders who received a cash distribution on account of their shares in

Tribune as part of the Leveraged ESOP Transactions (Docket No. 8740).  On June 2, 2011, the

Noteholder Proponents and certain retirees of Times Mirror Company (the "TM Retirees")[11]

commenced over 50 lawsuits in over 20 different federal and state courts, seeking to recover

approximately $8 billion allegedly paid to all former shareholders of Tribune whose stock was

purchased and/or redeemed in conjunction with the Leveraged ESOP Transactions in 2007,

under state law constructive fraudulent transfer causes of action (collectively, the "SLCFC

Actions").  These lawsuits named over 2,000 individuals and entities as defendants, included

thousands of "doe" defendants, and also asserted defendant class actions against the balance of

the approximately 38,000 individuals or entities who held stock that was purchased or redeemed.

The SLCFC Actions were brought for the sole benefit of the plaintiffs thereto, and not for the

benefit of all of Tribune's creditors.  On December 19, 2011, the Judicial Panel On Multidistrict

Litigation ("JPML") entered an order (the "Transfer Order") consolidating a majority of the

SLCFC Actions in a single multi-district litigation ("MDL") proceeding (the "Consolidated

Action") in the United States District Court for the Southern District of the New York (the

"MDL Court").  On December 28 and 29, 2011, the JPML issued conditional transfer orders

covering a majority of the remaining SLCFC Actions and related litigation that was not

---

[10] Aurelius Capital Management, L.P. ("Aurelius"), Deutsche Bank Trust Company Americas ("DBTCA"), Law
Debenture Trust Company of New York ("Law Debenture") and Wilmington Trust Company ("Wilmington Trust"),
are collectively referred to herein as the "Noteholder Proponents" for the sake of consistency with Sidley's prior
Quarterly Fee Application Requests, although the Noteholder Proponents are no longer advancing confirmation of a
competing plan of reorganization for the Debtors.

[11] Times Mirror Company was merged with and into Tribune in 2000.

transferred to the Consolidated Action by the Transfer Order. Among the actions identified as potential "tag-along" actions to be consolidated with the SLCFC Actions in the conditional transfer orders were the two adversary proceedings commenced by the Committee captioned Official Committee Of Unsecured Creditors v. JPMorgan Chase Bank, N.A. (In re Tribune Co.), Case No. 10-53963 (KJC) (the "Lender Action"), and Official Committee Of Unsecured Creditors v. FitzSimons (In re Tribune Co.), Case No. 10-54010 (KJC) (the "FitzSimons Action") pending before the Bankruptcy Court. Sidley's professionals spent significant time monitoring and analyzing the voluminous pleadings filed by parties in interest, both in favor of and against further consolidation of the SLCFC Actions in the Consolidated Action.

34.    During the Fourteenth Interim Fee Period, on behalf of the Debtors, Sidley's associates in the Litigation and Corporate Reorganization and Bankruptcy practice groups spent considerable time reviewing and analyzing the large volume of pleadings in the Consolidated Action and the various state courts which held actions that were not transferred to the Consolidated Action, for the purpose of alerting the Debtors to pleadings which might impact the Bankruptcy Court's stay applicable to the SLCFC Actions, or any pleadings or rulings that might impact Eagle New Media Investments, LLC (a Debtor named in certain of the SLCFC Actions), the current and former employees of the Debtors named in the SLCFC Actions, or any Tribune-related entity or party. Several of the SLCFC Actions were filed in state court, necessitating coordination with support staff to review dockets across the United States, in addition to raising legal issues regarding removal of those actions to the federal courts. At Tribune's request, Sidley's professionals prepared daily updates to Tribune's senior management, with cumulative updates provided following important milestones in the SLCFC Actions. In addition, Sidley's professionals reviewed and analyzed the MDL Court's 35-page

case management order, which, among other things, (i) set forth a schedule and procedures for

initial case management conferences, (ii) directed the formation of a committee comprised of

representatives of similarly-situated defendants and identification of liaison counsel for such

defendants to serve on that committee, and (iii) approved various preliminary and procedural

motions that were filed in the Consolidated Action.

   35. Following the February 28, 2012 hearing regarding the Committee's

motion to extend the stay applicable to the FitzSimons Action and to coordinate the stays

applicable to the SLCFC Actions and the FitzSimons Action (Docket No. 10634), the parties in

interest, including Sidley's professionals on behalf of the Debtors, conferred and negotiated a

proposed form of order that granted a partial lifting of the stay applicable to the FitzSimons

Action.  That form of order was submitted to the Court under certification of counsel on March

14, 2012 (Docket No. 11156) and was entered by the Bankruptcy Court on March 15, 2012

(Docket No. 11158).  Sidley's professionals continued to monitor the hearings, on-going

negotiations, and draft pleadings during this time.  On March 20, 2012, the JPML entered an

order transferring the FitzSimons Action to the MDL Court to be consolidated in the

Consolidated Action.  (See Docket No. 11214.)  The complicated nature of the MDL

proceedings and their interplay with the Debtors' ongoing bankruptcy proceedings necessitated

both bankruptcy and litigation teams working in concert.

   **(d)**  **Motions for Relief from Stay**

   36. As in most chapter 11 cases, the Debtors are faced with periodic requests

for relief from the automatic stay.  Specifically, as of the date of this Quarterly Fee Application

Request, the Debtors have received twenty-one (21) requests for relief from stay since the

commencement of these cases, one of which was filed during the Thirteenth Interim Fee Period

and was considered by the Bankruptcy Court during the Fourteenth Interim Fee Period.[12]  That

motion, filed pro se by Anthony Conte on December 19, 2011 (Docket No. 10472) (the "Conte

Motion"), related to ongoing litigation in the United States District Court for the Eastern District

of New York (the "Conte Litigation") against Tribune's non-Debtor subsidiary Tribune ND, Inc.

("Tribune ND").  Mr. Conte requested relief from the automatic stay to the extent it applied to

the media liability insurance policies owned by Tribune that covered the claims he asserted

against Tribune ND in the Conte Litigation.  Mr. Conte also requested the Court enter an order

directing Tribune to modify its schedules of assets and liabilities to remove Mr. Conte as a

potential creditor.

        37.     Sidley's professionals, together with Tribune's in-house counsel and

Tribune ND's outside defense counsel, reviewed the assertions raised in the Conte Motion and

engaged in discussions with Mr. Conte in an effort to resolve the Conte Motion on a consensual

basis.  To that end, Sidley's professionals and Mr. Conte engaged in negotiations on a form of

stipulation and agreed order that would provide Mr. Conte with certain limited relief from the

automatic stay.  Sidley's professionals also conferred with Mr. Conte regarding the Debtors'

opposition to modifying Tribune's schedules of assets and liabilities.  When the negotiations

between the Debtors and Mr. Conte proved unsuccessful, Sidley's professionals prepared and

filed the Debtors' Limited Objection to the Motion of Anthony Conte for (I) Relief from the

Automatic Stay as to Media Liability Insurance Policy and (II) Modification of Tribune

Company's Schedules of Assets and Liabilities on February 8, 2012 (Docket No. 10872).  The

---

[12] This number excludes (1) motions filed by the Debtors for relief from the automatic stay, and (2) the motion filed by the Noteholder Proponents confirming the automatic stay does not bar the commencement of the SLCFC Actions.

objection was also joined and supported by the Committee (Docket No. 10874).  Mr. Conte filed

a reply to the Debtors' objection on February 17, 2012 (Docket No. 10971).

38.    The Conte Motion was heard by the Bankruptcy Court on March 22 and

April 25, 2012.[13]  At the March 22 hearing, Sidley's professionals advised the Court, on behalf

of the Debtors, that the Debtors consented to lift the stay but contested Mr. Conte's request to

modify Tribune's schedules of assets and liabilities.  At that hearing, Sidley's professionals

advised the Court that their opposition to Mr. Conte's request to modify Tribune's schedules

could be resolved if Mr. Conte were to stipulate that he waived and released all claims that he

may have against Tribune.  Subsequently, Sidley's professionals and Mr. Conte engaged in

negotiations over a form of stipulated waiver and release.  On April 16, 2012, Sidley's

professionals filed a certification of counsel with the Court, in which they advised the Court that

Mr. Conte no longer wished to resolve the motion by stipulation.  (See Docket No. 11397.)  At

the contested hearing held on April 25, 2012, Sidley's professionals, working in cooperation with

Tribune ND's defense counsel in the Conte Litigation, presented oral arguments to the Court in

opposition to the Conte Motion.  The Court ruled in favor of the Debtors on the issue of

modifying Tribune's schedules and entered an order granting in part and denying in part the

Conte Motion on April 25, 2012 (Docket No. 11469).

(e)    **Pro Se Motion to Dismiss Chapter 11 Cases**

39.    During the Fourteenth Interim Fee Period, Sidley's professionals reviewed

and analyzed the pro se Motion to Dismiss Case filed by Jo Anna Canzoneri McCormick, dated

May 8, 2012 (see Docket No. 11571), which was similar to prior filings by Ms. McCormick.

---

[13] Additionally, a status conference was held during the March 30 telephonic hearing, regarding the parties' progress towards resolving the Conte Motion consensually by stipulation.

Sidley's professionals promptly prepared and filed an objection to Ms. McCormick's motion on May 11, 2012 (Docket No. 11604), and the Bankruptcy Court entered an order denying Ms. McCormick's motion on May 29, 2012 (Docket No. 11706).

**(f)**     **Other Pending Litigation**

40.     Prior to the Petition Date and since, Sidley has served the Debtors as defense counsel with respect to a number of litigation matters pending in all levels of state and federal courts across the country, including such prepetition litigation matters as <u>Neuman v. Goldstone</u>, a prepetition employment contract lawsuit in Los Angeles; <u>CBS Broadcasting Inc. v. Kincaid</u>, a civil litigation suit pending in California;[14] and certain litigation matters pending in New York, including the cases styled <u>Schultz v. Tribune</u>, <u>Crab House of Douglaston, Inc. v. Newsday, Inc., et al.</u>, No. 04-cv-558 (E.D.N.Y.) (the "<u>Crab House Matter</u>") and <u>Furnell v. Tribune</u>. Sidley continued to represent the Debtors and their non-Debtor affiliates in connection with these litigation matters during the Fourteenth Interim Fee Period, to the extent such matters were not stayed by section 362(a) of the Bankruptcy Code, and also provided advice to the Debtors in connection with certain proofs of claim filed by the plaintiffs on account of such litigated matters.

*(i)*     *Substantive Proceedings in the Crab House Matter*

41.     During the Thirteenth Interim Fee Period, Sidley's professionals in the Litigation practice group expended considerable efforts on behalf of Tribune ND in opposition to the plaintiffs' motion to certify a class in the Crab House Matter that purports to include over 140,000 commercial advertisers and involves claims of fraud and unjust enrichment, pursuant to Federal Rule of Civil Procedure 23, which motion was served in the Crab House Matter on

---

[14] The Debtors and CBS Broadcasting reached a consensual resolution of this litigation in July 2012, and the proofs of claim corresponding to such litigation were withdrawn on July 27, 2012 (Docket Nos. 12126, 12127).

January 10, 2012. Sidley's efforts on behalf of Tribune ND to defeat class certification in the

Crab House Matter continued into the Fourteenth Interim Fee Period and required the substantial

participation of multiple attorneys in Sidley's Litigation practice group due to the scope of the

purported class and the potential impact that certification of that class might have on the Crab

House Matter. Sidley's professionals analyzed the amended complaint served in the Crab House

Matter, performed extensive legal and factual research in opposition to class certification, and

drafted the memorandum in opposition to class certification, together with various Declarations

in support thereof, which were served on behalf of Tribune ND on April 6, 2012. The plaintiffs

in the Crab House Matter served a reply brief in support of class certification on April 27, 2012.

A decision the class certification motion is currently pending.

        42.      Sidley's professionals also participated in discovery on behalf of Tribune

ND in connection with the plaintiffs' motion for class certification, including preparing for and

taking the depositions of five named plaintiffs. Those depositions were taken on February 29,

2012, March 2, March 5, 2012, and March 9, 2012. Sidley's professionals also prepared and

served written discovery requests on the plaintiffs on behalf of Tribune ND, and responded to

discovery requests issued by the plaintiffs.

        43.      On March 28, 2012, the plaintiffs in the Crab House Matter filed a request

with the presiding District Court for a pre-motion conference for permission to move for

summary judgment against Tribune ND. Sidley's professionals reviewed and analyzed the legal

and procedural issues presented by such request, and filed an opposition on behalf of Tribune

ND on April 9, 2012. On May 8, 2012, the District Court granted the plaintiffs leave to file a

motion for summary judgment, and thereafter the parties conferred on a joint briefing schedule,

which was approved by the District Court on May 15, 2012. Further proceedings on the parties'

motions for summary judgment, and the activities of Sidley's professionals in respect thereof, will be described in further detail in Sidley's future Quarterly Fee Application Requests.

**H.    Travel Time (30480):    Hours: 94.40    Fees: $35,199.00**

44.    During the Fourteenth Interim Fee Period, Sidley's professionals spent time traveling to Wilmington, Delaware to attend hearings in the Debtors' cases.  In addition, Sidley's professionals traveled to a variety of locations to attend meetings with the Debtors and various creditor constituencies.  During the Fourteenth Interim Fee Period, the Bankruptcy Court held hearings on March 5, March 6, March 22, April 16, April 25, and May 29, 2012.[15]  These hearings required the attendance in person of certain Sidley professionals from Sidley's Chicago, Washington, D.C., and Los Angeles offices who had done significant work on the matters set for hearing.  The hours reflect non-working travel time and the fees requested in this matter category have been reduced by 50% in accordance with Local Rule 2016-2(d)(viii).

**I.    Labor Matters (30490):    Hours: 0.40    Fees: $380.00**

45.    During the Fourteenth Interim Fee Period, Sidley's professionals provided advice to the Debtors' in-house labor and employment counsel regarding a discrete legal issue arising in connection with the Debtors' participation in a multi-employer pension plan.

**J.    Plan and Disclosure Statement (30500):    Hours: 3569.40    Fees: $2,461,340.00**

46.    A central part of Sidley's representation of the Debtors during these chapter 11 cases has been the negotiation and formulation of a plan of reorganization for the Debtors.  Throughout the Fourteenth Interim Fee Period, Sidley's professionals in the Corporate Reorganization and Bankruptcy and Litigation practice groups continued their efforts to advance confirmation of the Third Amended Joint Plan of Reorganization for Tribune Company and its

---

[15] In addition, telephonic hearings were held on March 16, March 30, and April 27, which did not require travel.

Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree

Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A.

(Docket No. 10273) (the "Third Amended DCL Plan").[16]  The Third Amended Plan was further

amended on April 12, 2012 when the DCL Proponents[17] filed the Fourth Amended Joint Plan of

Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, the Official

Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co.,

L.P. and JPMorgan Chase Bank, N.A. (Docket No. 11354) (as later modified and amended

thereafter from time to time, the "Fourth Amended DCL Plan").[18]  (The Third Amended Plan

and the Fourth Amended Plan are referred to generally in this Application and in the

corresponding time detail as the "DCL Plan").

> 47.    Specifically, Sidley's professionals (a) continued to negotiate, review, and

analyze the provisions of the DCL Plan and the disclosures contained in the Supplemental

Disclosure Document (defined below), (b) prepared and filed an update to the Plan Supplement

(defined below); (c) engaged in discovery and other substantive proceedings respecting the

resolution of the Allocation Disputes; (d) negotiated and filed modifications to the DCL Plan,

Supplemental Disclosure Document, and Resolicitation Motion (defined below) to reflect the

parties' ongoing negotiations as well as the Court's determinations on the Allocation Disputes;

(e) participated in proceedings respecting the approval of the Supplemental Disclosure

---

[16] The Third Amended DCL Plan was modified on February 20, 2012 (Docket No. 10958) and March 16, 2012 (Docket No. 11168).

[17] The Debtors, the Committee, Oaktree Capital Management, L.P. ("Oaktree"), Angelo, Gordon & Co., L.P. ("Angelo Gordon"), and JPMorgan Chase Bank, N.A. ("JPMorgan") are collectively referred to herein as the "DCL Proponents". Time entries referencing communications and meetings with the DCL Proponents in Sidley's Monthly Fee Applications should be read to include both bankruptcy and litigation counsel, as applicable.

[18] The Fourth Amended DCL Plan was modified on April 15, 2012 (Docket No. 11354), April 17, 2012 (Docket No. 11399), June 19, 2012 (Docket No. 11836), and July 20, 2012 (Docket No. 12072).  The Court entered an order confirming the Fourth Amended DCL Plan on July 23, 2012 (Docket No. 12074).

Document and resolicitation of the DCL Plan; (f) distributed the DCL Plan and related balloting

materials to creditors for the purpose of soliciting acceptances of the DCL Plan; (g) engaged in

discovery, briefing, and other pretrial proceedings respecting the proceedings on confirmation of

the DCL Plan, and (h) continued to undertake the numerous tasks necessary to prepare the

Debtors for their eventual emergence from bankruptcy.  Each of these activities is discussed in

greater detail below.

48.     Sidley's continuing efforts to advance confirmation of the DCL Plan in

subsequent interim fee periods, which culminated in the June 2012 hearing on confirmation of

the Fourth Amended DCL Plan (the "2012 Confirmation Hearing"), and the Bankruptcy Court's

subsequent issuance of the memorandum opinion and order overruling all objections to

confirmation of the DCL Plan (Docket Nos. 12033, 12034) and order confirming the DCL Plan

(Docket No. 12074), will be discussed in detail in applicable subsequent Quarterly Fee

Application Requests.

**(a)     Advancement of the DCL Plan and Supplemental Disclosure
Document**

49.     As described in detail in Sidley's Twelfth Quarterly Fee Application

Request, in less than three weeks after the issuance of the Court's Confirmation Opinion and

Order Denying Confirmation of Competing Plans (Docket No. 10134) (the "2011 Confirmation

Opinion"), Sidley's professionals, together with the professionals for the other DCL Proponents,

filed the Third Amended DCL Plan on November 18, 2011.  As amended, the Third Amended

DCL Plan incorporated the settlement of the LBO-Related Causes of Action that was approved

by the Bankruptcy Court in its 2011 Confirmation Opinion, as had prior versions of the DCL

Plan.  Furthermore, the Third Amended DCL Plan included certain modifications addressing the

issues that were identified by the Court in the 2011 Confirmation Opinion as preventing

confirmation of the Second Amended Joint Plan of Reorganization for Tribune Company and its

Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree

Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A. (as

modified on April 26, 2011) (Docket No. 8769) ( the "Second Amended DCL Plan").

      50.     During the Fourteenth Interim Fee Period, Sidley's professionals

continued their analysis and revision of the substantive provisions of the DCL Plan and the

Supplemental Disclosure Document relating to the DCL Plan (Docket No. 10275) (the

"Supplemental Disclosure Document")[19] in support of confirmation. Among the legal issues and

matters that Sidley's professionals researched, analyzed, and considered during the Fourteenth

Interim Fee Period were: (i) issues respecting valuation of the Debtors' businesses, (ii) tax

considerations of the DCL Plan and the contribution of certain LBO-Related Causes of Action to

the Litigation Trust, (iii) the procedures by which the LBO-Related Causes of Action transferred

to the Litigation Trust would be litigated; (iv) the continuing role of the Creditors' Trust (in light

of the filing of the SLCFC Actions) and the potential effect of removing the Creditors' Trust

from the DCL Plan (which subsequently occurred and was reflected in the Fourth Amended DCL

Plan); (v) the plan's provisions regarding releases, exculpation, and discharge; (vi) the mechanics

for distributions to creditors; (vii) the operation of the Bar Order contained in the DCL Plan, and

(viii) the effect of the application of the subordination provisions of the PHONES Notes

Indenture (the "PHONES Subordination Provisions") and the subordination agreement

governing the EGI-TRB LLC Notes (the "EGI-TRB Subordination Provisions") on distributions

to creditors provided for under the DCL Plan. In addition, and as discussed in detail below,

---

[19] The Supplemental Disclosure Document was further modified at Docket Nos. 10959, 11106, 11169, 11355, 11389, and 11400.

Sidley's professionals expended substantial efforts during the Fourteenth Interim Fee Period to advance the proceedings on confirmation of the DCL Plan at the same time as the resolution of certain disputes arising among the DCL Proponents and certain holders of claims against the Debtors regarding the allocation of distributions among the holders of Senior Noteholder Claims, Other Parent Claims, EGI-TRB LLC Notes Claims, and PHONES Notes Claims (the "Allocation Disputes").[20]  Throughout the Fourteenth Interim Fee Period, Sidley's professionals engaged in extensive discussions and negotiations with the Debtors' creditor constituencies, including the Noteholder Proponents, regarding the Debtors' and other DCL Proponents' advancement of confirmation of the DCL Plan.

51.     Sidley's professionals, together with the Debtors' financial advisors at Alvarez & Marsal, also continued their comprehensive analysis of the potential impact that the adjudication or resolution of the Allocation Disputes could have on the treatment of Holders of Allowed Senior Noteholder Claims, Other Parent Claims, EGI-TRB LLC Notes Claims, and PHONES Notes Claims under the DCL Plan.  Such research and analysis was necessary to ensure that the disclosures contained in the Supplemental Disclosure Document were thorough and unobjectionable, and the treatment of the foregoing claims under the DCL Plan was accurately disclosed therein.

**(b)     Filing of Revised Plan Supplement and Exhibits**

52.     Concurrently with the development of the DCL Plan, Sidley's professionals in the Corporate Reorganization and Bankruptcy, Corporate, Tax, Litigation, and FCC regulatory practice groups negotiated and drafted amendments, modifications, and updates to various exhibits to the DCL Plan, which had initially been filed with the Court on January 31,

---

[20] A comprehensive list of the Allocation Disputes is set forth in ¶ 34 of Sidley's Twelfth Interim Fee Application.

2011 (Docket No. 7701) during the Ninth Interim Fee Period (collectively, the "Plan

Supplement").[21]  A revised Plan Supplement was filed on May 4, 2012.  (See Docket No.

11545.)  The revised Plan Supplement consisted of the following exhibits to the DCL Plan:

- Exhibit 1.1.122 (Terms of Intercompany Claims Settlement Agreement);
- Exhibit 1.1.154 (Terms of New Warrant Agreement);
- Exhibit 5.2 (Restructuring Transactions);
- Exhibit 5.3.1(1) (Certificate of Incorporation of Reorganized Tribune);
- Exhibit 5.3.1(2) (By-Laws of Reorganized Tribune);
- Exhibit 5.3.1(3) (Registration Rights Agreement);
- Exhibit 5.3.2(1) (Initial Officers of Reorganized Tribune);
- Exhibit 5.3.2(2) (Initial Directors of Reorganized Tribune);
- Exhibit 5.3.3 (Initial Directors & Officers of Reorganized Debtors Other Than Reorganized Tribune);
- Exhibit 5.6 (Terms of New Senior Secured Term Loan);
- Exhibit 5.10 (Terms of Exit Facility);
- Exhibit 5.13 (Terms of Trust Loan Agreement);
- Exhibit 6.3 (Rejected Executory Contracts and Unexpired Leases); and
- Exhibit 13.1 (Litigation Trust Agreement).

Given the scope and breadth of the Plan Supplement exhibits, their preparation and revision

required the participation and expertise of a number of Sidley's professionals, working in

collaboration with the Debtors' board of directors, senior management and personnel,

counterparts at the Debtors' outside law firms, and counsel for the other DCL Proponents.

**(c)    Substantive Proceedings Relating to the Resolution of the Allocation Disputes**

53.    During the Fourteenth Interim Fee Period, Sidley's professionals, on

behalf of the Debtors, continued to participate in briefing of, and proceedings on, the resolution

---

[21] Additional exhibits to the DCL Plan were filed on March 2, 2011 (Docket No. 8231), and March 7, 2011 (Docket No. 8283).

of the substantive legal issues involved in the Allocation Disputes, pursuant to the Court's Order

Establishing Scheduling for (1) Resolution of the Allocation Disputes and (2) Consideration of

DCL Plan Proponents' Supplemental Disclosure Document, Solicitation Procedures Motion and

Plan (Docket No. 10692) (the "Allocation Disputes/Confirmation Scheduling Order").[22]   The

briefing schedule set forth in the Allocation Disputes/Confirmation Scheduling Order provided

for the submission of a preliminary statement, opening brief, and response brief over the course

of less than six weeks prior to the scheduled hearing on the Allocation Disputes, which hearing

was scheduled for two days commencing March 5, 2012.

54.      Thus, between January 24, 2012 and March 5, 2012, Sidley's

professionals in the Corporate Reorganization and Bankruptcy and Litigation practice groups

researched, addressed, and briefed the legal and factual issues underpinning the Allocation

Disputes.  As discussed in Sidley's Thirteenth Quarterly Fee Application Request, Sidley's

professionals filed a Preliminary Statement Regarding Allocation Disputes with the Court on

January 31, 2012 (Docket No. 10776), an opening brief regarding factual information relevant to

the Allocation Disputes on behalf of the Debtors on February 24, 2012 (Docket No. 11004), and

a joinder to the memorandum of law filed by the Committee regarding the Allocation Disputes

(Docket No. 11005).  Sidley's professionals also continued to review and analyze the position

statements, opening briefs, and responsive pleadings filed by other parties in interest in order to

be prepared to address the arguments set forth in those pleadings during the hearing on the

Allocation Disputes and in discussions among the parties leading up to such hearing (which other

---

[22] The Allocation Disputes/Confirmation Scheduling Order, entered on January 24, 2012, set forth the scope,
procedures, and timeline for (i) discovery, briefing, and proceedings related to the Allocation Disputes; and (ii)
consideration of the Supplemental Disclosure Document, resolicitation and voting, discovery, briefing, and similar
proceedings relating to confirmation of the DCL Plan.  The Allocation Disputes/Confirmation Scheduling Order was
supplemented by Orders dated March 6, 2012 and April 5, 2012 (Docket Nos. 11096 and 11326).

parties included Barclays Bank PLC and Waterstone Capital Management LP, Oaktree, Law

Debenture, Davidson Kempner Capital Management LLC, Brigade Capital Management, LLC,

the TM Retirees, Aurelius, EGI-TRB LLC, Wilmington Trust, the Committee, and DBTCA).

54.    On March 2, 2012, Sidley's professionals filed the Debtors' Response

Brief Regarding Allocation Disputes, which responded to each of the opening briefs filed by the

parties regarding the Allocation Disputes (see Docket No. 11066), and a joinder to the Reply

Memorandum of Law filed by the Committee (see Docket No. 11071).  In particular, Sidley's

professionals addressed Wilmington Trust's arguments regarding (i) the Court's jurisdiction to

hear and resolve the Allocation Disputes; (ii) application of the PHONES Subordination

Provisions and EGI-TRB Subordination Provisions; and (iii) contentions regarding Wilmington

Trust's claims for fees and expenses.  Additionally, the Debtors provided evidence regarding

certain claims classifications as either "senior indebtedness" or "senior obligations" under the

PHONES Notes Indenture and/or the EGI-TRB Subordination Agreement, as applicable.  (See

id.)

56.    Also on March 2, 2012, reply briefs and/or joinders regarding the

Allocation Disputes were filed by the following other parties in interest: Aurelius (reply brief at

Docket No. 11072 and joinders at Docket Nos. 11060, 11061); TM Retirees (Docket No. 11064);

EGI-TRB LLC (Docket No. 11065); Oaktree (Docket No. 11067); the Committee (reply brief at

Docket No. 11068 and joinder at Docket No. 11080); DBTCA and Law Debenture (Docket No.

11069); Davidson Kempner Capital Management LLC (joinder at Docket No. 11070);

Wilmington Trust (Docket No. 11073); and Brigade Capital Management (joinder at Docket No.

11076).  Sidley's professionals reviewed and analyzed each of the foregoing reply briefs filed by

other parties in interest in order to address the arguments set forth in those pleadings during the

hearing on the Allocation Disputes and in discussions among the parties leading up to such hearing.

57.     Additionally, the Debtors participated in negotiating and drafting a stipulation between the Debtors, the Committee, Law Debenture, Wilmington Trust, EGI-TRB LLC and the TM Retirees regarding certain facts relevant to the Allocation Disputes, which was filed on March 2, 2012 (Docket No. 11074).  Sidley's professionals coordinated with counsel for the other parties in interest to prepare and submit to the Court a Master Exhibit List for use in Connection with the hearing on the Allocation Disputes, which was filed on March 5, 2012 (Docket No. 11084) and amended on March 9, 2012 (Docket No. 11116).  Following the hearing on the Allocation Disputes, Sidley's professionals prepared a certification of counsel respecting the submission of certain of the designated exhibits under seal, which was filed on March 8, 2012 (Docket No. 11110) and approved by Order dated March 20, 2012 (Docket No. 11126).  A two-day hearing on the Allocation Disputes was held on March 5-6, 2012.  Sidley's professionals, counsel for the other DCL Proponents, and counsel for other parties in interest participated and presented extensive oral arguments during such hearing.

58.     Following the hearing on the Allocation Disputes, the parties were permitted to submit rebuttal arguments by letter brief.  Sidley's professionals prepared and filed the Letter to Judge Carey from James F. Bendernagel on March 9, 2012 (Docket No. 11123) (the "Bendernagel Letter"), in which Sidley's professionals, on behalf of the Debtors, addressed certain arguments advanced at the hearing on the Allocation Disputes by counsel for Wilmington Trust, Law Debenture, and DBTCA regarding whether the DCL Plan's distribution of settlement consideration "unfairly discriminates" against holders of Senior Noteholder Claims.  Also on March 9, 2012, rebuttal arguments were submitted by the following parties: Aurelius (Docket

No. 11120); Oaktree (Docket No. 11121); TM Retirees (Docket No. 11122); EGI-TRB LLC

(Docket No. 11124); the Committee (Docket No. 11125); and Law Debenture (Docket No.

11127).  DBTCA and Law Debenture filed a response to the Bendernagel Letter on March 13,

2012 (Docket No. 11144), requesting that the Court disregard and strike the Bendernagel Letter.

Sidley's professionals reviewed and analyzed the arguments contained in each of the foregoing

rebuttals in order to assess their potential impact on the Court's determination of the Allocation

Disputes.  On March 14, 2012, Sidley's professionals prepared and filed the Letter to Judge

Carey from James F. Bendernagel (Docket No. 11153), in opposition to DBTCA and Law

Debenture's request to strike.

        59.     On April 9, 2012, the Bankruptcy Court issued its Memorandum Opinion

and Order Regarding the Allocation Disputes (Docket Nos. 11337, 11338) (collectively, the

"Allocation Disputes Decision"), which adjudicated each of the Allocation Disputes with one

exception noted below.  Specifically, in the Allocation Disputes Decision, the Court decided the

Allocation Disputes, as follows:

> • PHONES/Settlement Dispute: During the Allocation Dispute hearing that
> occurred on March 5, 2012, counsel for WTC acknowledged that, in light of
> the Reconsideration Decision,[23] WTC was no longer prosecuting the
> PHONES/Settlement Dispute in connection with the Allocation Disputes
> hearings before the Court, but is instead reserving its rights for appeal.
> Nevertheless, in the Allocation Disputes Memorandum, the Court concluded
> that, for the reasons set forth in the Reconsideration Decision, the
> consideration provided by the Senior Lenders, Bridge Lenders, and Settling
> Step Two Payees in respect of the DCL Plan Settlement is subject to the
> PHONES Subordination Provisions.[24]

---

[23] See Sidley's Thirteenth Quarterly Fee Application Request for a detailed description of the motions for
reconsideration of the 2011 Confirmation Opinion filed by the Noteholder Proponents, and the Bankruptcy Court's
resolution of those motions by Memorandum on Reconsideration dated December 29, 2011 (the "Reconsideration
Decision").

[24] Allocation Disputes Memorandum at 6-11.

- EGI-TRB/LT Dispute: The Court concluded that the proceeds of, from, or relating to any and all causes of action asserted by the Litigation Trust are subject to the EGI-TRB Subordination Provisions.[25]

- EGI-TRB/Settlement Dispute: The Court concluded that the consideration provided by the Senior Lenders, Bridge Lenders, and Settling Step Two Payees in respect of the DCL Plan Settlement is subject to the EGI-TRB Subordination Provisions.[26]

- PHONES/OPC Dispute and EGI-TRB/OPC Dispute: The Court concluded the classification and treatment of the Other Parent Claims under the DCL Plan does not amount to unfair discrimination under section 1129(b) of the Bankruptcy Code or violate section 510(a) of the Bankruptcy Code.[27]

- PHONES/Allowance Dispute: The Court concluded that the PHONES Notes shall be Allowed in the aggregate amount of $759,252,932.[28]

- PHONES/PPI Dispute: The Court concluded that the beneficiaries of the PHONES Subordination Provisions are not entitled to receive post-petition interest prior to the Holders of PHONES Notes Claims receiving payment of their claims.[29]

- EGI-TRB/PPI Dispute: The Court determined this issue is not yet ripe for determination.

- PHONES/EGI-TRB Priority Dispute: The Court concluded that the EGI-TRB LLC Notes are junior in priority to the PHONES Notes.[30]

The Court expressly stated that the Allocation Disputes Decision is "subject to, conditioned upon, and for the purpose of obtaining confirmation of a chapter 11 plan substantially in the form of the Third Amended Plan."

---

[25] Id. at 42-45.

[26] Id.

[27] Id. at 20-30.

[28] Id. at 11-19.

[29] Id. at 39-42. The Court provided that this determination "is without prejudice to allow the parties to revisit the issue in a court of competent jurisdiction if the [Litigation Trust's] recoveries reach a level that would cause the solvency exception to become applicable. See id.

[30] Id. at 30-39.

60.     On April 23 2012, Wilmington Trust filed a notice of interlocutory appeal of the Allocation Disputes Decision.  On that same day, Wilmington Trust filed a motion seeking leave to appeal the Allocation Disputes Decision (Docket No. 11455) (the "Allocation Disputes Decision Appeal Motion").  The DCL Proponents, Law Debenture, DBTCA, and Aurelius objected to the Allocation Disputes Appeal Motion on May 7, 2012.  (Docket Nos. 11548, 11562, and 11595.)  The Allocation Disputes Appeal Motion is currently pending in the United States District Court for the District of Delaware.  (See Case No. 1:12-mc-000108-GMS (D. Del. 2012)).  Also on April 23, 2012, Citadel Equity Fund Ltd. and Camden Asset Management filed a motion for reconsideration of the Allocation Disputes Decision (Docket No. 11458) (the "Allocation Disputes Decision Reconsideration Motion").  Sidley's professionals reviewed and analyzed both the Allocation Disputes Appeal Motion and the Allocation Disputes Decision Reconsideration Motion, on behalf of the Debtors.  A telephonic status hearing on the Allocation Disputes Decision Reconsideration Motion was held on April 27, 2012, at which Sidley's professionals participated.  Following the April 27 hearing, the parties conferred on deadlines with respect to scheduling the Allocation Disputes Decision Reconsideration Motion for hearing during the 2012 Confirmation Hearing, in accordance with the Court's directives on the record. On May 3, 2012, Sidley's professionals prepared and filed a proposed order regarding further proceedings on the Allocation Disputes Decision Reconsideration Motion (Docket No. 11523), which was entered by the Court on May 4, 2012 (Docket No. 11534).  In accordance with that order, on May 21, 2012, Sidley's professionals filed the Debtors' response to the Allocation Disputes Decision Reconsideration Motion (Docket No. 11660).  Sidley's efforts in this matter required substantial research and briefing by professionals in both the Corporate Reorganization and Bankruptcy and Litigation practice groups, based on the legal and procedural issues raised

by the Allocation Disputes Decision Reconsideration Motion, which continued into the Fifteenth

Interim Fee Period.

**(d)** **Modifications to the DCL Plan, Supplemental Disclosure Document, and Resolicitation Motion**

61.     As discussed above, following the filing of the Third Amended DCL Plan,

the Supplemental Disclosure Document, and the Debtors' Motion for an Order (I) Approving

Supplemental Disclosure Document; (II) Establishing Scope, Forms, Procedures, and Deadlines

for Resolicitation and Tabulation of Votes to Accept or Reject DCL Plan From Certain Classes;

(III) Authorizing Tabulation of Prior Votes and Elections on DCL Plan Made by Holders of

Claims in Non-Resolicited Classes; (IV) Scheduling the Confirmation Hearing and Establishing

Notice and Objection Procedures in Respect Thereof; and (V) Granting Related Relief (Docket

No. 10274) (the "Resolicitation Motion") on November 18, 2011, Sidley's professionals,

together with counsel for the other DCL Proponents, continued to negotiate with the Debtors'

key creditor constituencies to resolve contested issues relating to confirmation of the DCL Plan.

62.     Based on those negotiations, the Court's issuance of the Allocation

Disputes/Confirmation Scheduling Order on January 24, 2012, as supplemented on March 6,

2012, and the proceedings on the Allocation Disputes, Sidley's professionals prepared and filed

(i) a modified version of the Supplemental Disclosure Document on March 7, 2012 (Docket No.

11106); and (ii) modified versions of the Third Amended DCL Plan and the Supplemental

Disclosure Document on March 16, 2012 (Docket Nos. 11168, 11169).  The limited

modifications reflected in those filings were intended to narrow the scope of the objections to the

DCL Plan and Supplemental Disclosure Document.  For example, the Third Amended DCL

Plan, as modified, eliminated the Creditors' Trust previously contemplated by the Second

Amended DCL Plan and earlier versions of the Third Amended DCL Plan, in light of the

decisions of various parties to pursue independently the SLCFC Actions.

63.     Also on March 16, 2012, Sidley's professionals prepared and filed a

second supplement to the Resolicitation Motion (Docket No. 11170) (the "Second Resolicitation

Supplement"), which responded to certain of the objections raised to the Supplemental

Disclosure Document and implemented revisions to the supplemental ballots, election forms,

instructions, notices and other materials to be distributed to creditors for the purposes of voting

on and making elections under the DCL Plan (collectively, the "Resolicitation Materials") to

reflect the elimination of the Creditors' Trust.  Specifically, elimination of the Creditors' Trust

caused the Debtors to propose resoliciting votes to accept or reject the Third Amended DCL Plan

from the Holders of Senior Loan Claims/Senior Guaranty Claims and Bridge Loan Claims, who

previously were to receive Creditors' Trust Interests as part of the consideration under the Third

Amended DCL Plan.

64.     On April 12, 2012, following the Bankruptcy Court's issuance of the

Allocation Dispute Decision, the DCL Proponents filed the Fourth Amended DCL Plan.  (See

Docket No. 11354.)  The Fourth Amended DCL Plan included various modifications in response

to the Allocation Disputes Decision.  Also on April 12, 2012, the DCL Proponents filed a further

revision to the Supplemental Disclosure Document (Docket No. 11355) and a revised proposed

form of order respecting the Resolicitation Motion (Docket No. 11356).  Following those filings,

the Debtors participated in further discussions with representatives of the other DCL Proponents

and with other parties in interest in an attempt to resolve consensually various issues and

concerns respecting those documents.  Based on those discussions and negotiations, Sidley's

professionals, working in cooperation with counsel for the other DCL Proponents, prepared and

filed further modifications to the Fourth Amended DCL Plan, the Supplemental Disclosure

Document, and the form of order respecting the Resolicitation Motion on April 15, 2012 (see

Docket Nos. 11388, 11389, 11390) and on April 17, 2012 (see Docket Nos. 11399, 11400,

11401).

      (e)      **Proceedings Respecting Approval of the Supplemental Disclosure Document and Resolicitation Motion**

      65.      During the Fourteenth Interim Fee Period, Sidley's professionals, in

conjunction and cooperation with the Debtors and counsel for the other DCL Proponents,

continued to negotiate with counsel for other parties in interest regarding the formal and informal

objections raised against the Supplemental Disclosure Document, which included an objection

filed on March 9, 2012 by Aurelius (Docket No. 11134), which was joined by Law Debenture

(Docket No. 11135), and an informal objection raised by counsel to Wilmington Trust.  Sidley's

professionals, on behalf of the Debtors and the other DCL Proponents, prepared and filed a reply

brief in support of the adequacy of the information set forth in the Supplemental Disclosure

Document.  (See Docket No. 11167.)  Status conferences on the timing of the hearing on the

approval of the Supplemental Disclosure Document and the Resolicitation Motion were held on

March 22, 2012 and March 30, 2012, at which Sidley's professionals participated on behalf of

the Debtors.

      66.      In connection with the resolicitation of the DCL Plan, and in order to

ensure the Debtors' compliance with certain regulations promulgated by the FCC regarding

foreign ownership of media, Sidley's professionals negotiated and prepared the Motion of the

Debtors for an Order Establishing Procedures for Compliance with Federal Communications

Commission Foreign Ownership Requirements (Docket No. 11089) (the "FCC Procedures

Motion"), which was filed with the Bankruptcy Court on March 5, 2012. The FCC Procedures

Motion was approved by the Bankruptcy Court on April 13, 2012 (Docket No. 11379).

       67.    The hearing on the approval of the Supplemental Disclosure Document

and the Resolicitation Motion was held on April 16, 2012. Following the hearing, on April 17,

2012, the Court entered the Order (I) Approving Supplemental Disclosure Document; (II)

Establishing Scope, Forms, Procedures, and Deadlines for Resolicitation and Tabulation of Votes

to Accept or Reject DCL Plan From Certain Classes; (III) Authorizing Tabulation of Prior Votes

and Elections on DCL Plan Made by Holders of Claims in Non-Resolicited Classes; (IV)

Scheduling the Confirmation Hearing and Establishing Notice and Objection Procedures in

Respect Thereof; and (V) Granting Related Relief (Docket No. 11419) (the "Resolicitation

Order"). Pursuant to the Resolicitation Order, the Court, among other things, (i) approved the

Supplemental Disclosure Document, (ii) established procedures for the solicitation and

tabulation of votes to accept or reject the DCL Plan; and (iii) scheduled the 2012 Confirmation

Hearing.

      **(f)**      **Resolicitation of the DCL Plan and Tabulation of Votes and Elections Thereon**

       68.    Sidley's professionals, together with the Court-appointed claims, noticing,

and balloting agent (the "Voting Agent"), developed and implemented the process for

resoliciting votes on and elections under the DCL Plan from the Revoting Classes.[31] The

Resolicitation Materials respecting the DCL Plan comprised eighteen (18) separate documents.

---

[31] Pursuant to the terms of the DCL Plan and in accordance with the Resolicitation Order, the following Classes of Claims were designated as "Revoting Classes": (i) Senior Loan Claims (Class 1C); (ii) Bridge Loan Claims (Class 1D); (iii) Senior Noteholder Claims (Class 1E); (iv) Other Parent Claims (Class 1F); (v) EGI-TRB LLC Notes Claims (Class 1I); (vi) PHONES Notes Claims (Class 1J); (vii) Senior Guaranty Claims (Classes 50C-111C); and (viii) General Unsecured Claims in Classes 2E, 4E through 7E, 10E, 12E through 15E, 18E through 20E, 22E through 29E, 31E through 38E, 40E, 42E, 43E, and 46E through 49E.

The preparation of appropriate Resolicitation Materials respecting the DCL Plan required Sidley's professionals to have considerable knowledge and understanding of the mechanics of the DCL Plan, and the impact of the amendments thereto on voting and elections. Preparation and finalization of the Resolicitation Materials following the Court's entry of the Resolicitation Order also required Sidley's professionals working thereon to confer with the other DCL Proponents, the Voting Agent, the Debtors' financial advisors at Alvarez & Marsal, the agent for the Bridge Lenders, the indenture trustees for the PHONES Notes and Senior Notes, and numerous other parties.

69.    Sidley's professionals were primarily responsible for the preparation of the Resolicitation Materials, on behalf of the DCL Proponents. Immediately upon the entry of the Resolicitation Order, Sidley's professionals coordinated with the Voting Agent to disseminate the Resolicitation Materials to creditors and other parties in interest. On April 23, 2012, the Voting Agent distributed the DCL Plan, the Supplemental Disclosure Document, the Resolicitation Order, the Confirmation Hearing Notice, and the Resolicitation Materials (collectively, the "Resolicitation Packages") to Holders of Claims in the Revoting Classes. The DCL Proponents also distributed notice materials relating to the DCL Plan and the 2012 Confirmation Hearing to numerous parties other than the Holders of Claim in the Revoting Classes. Following the mailing of the Resolicitation Materials and notice materials respecting the DCL Plan and the 2012 Confirmation Hearing, Sidley's professionals responded to numerous questions from the Debtors' creditor constituencies and other parties in interest regarding the solicitation of the DCL Plan.

70.    Also following the mailing of the Resolicitation Materials, Sidley's professionals coordinated with the Voting Agent and representatives from major newspapers to

publish notice of the confirmation hearing. (See Docket No. 11704.) Upon the expiration of the

voting deadline on May 21, 2012, Sidley consulted with the Voting Agent to tabulate all voting

results and analyzed such results for each of the plan classes. Sidley's professionals also advised

the Debtors regarding the outcome of the votes and elections on the DCL Plan. On May 29,

2012, the Voting Agent executed a Declaration regarding voting and tabulation of the

Resolicitation Packages (Docket No. 11711, supplemented on June 1, 2012 at Docket No.

11737) (the "Voting Declaration"). The Voting Declaration evidenced that 126 of the 129

Classes that were entitled to vote and had one or more creditors that actually voted, i.e., all

voting Classes other than the Classes consisting of the Senior Noteholder Claims, EGI-TRB LLC

Notes Claims, and PHONES Notes Claims, voted to accept the DCL Plan.

### (g)    Discovery, Briefing, and Other Pretrial Proceedings Respecting Confirmation of the DCL Plan

#### (i)    Pretrial Discovery Activities

71.    The Allocation Disputes/Confirmation Scheduling Order, as supplemented

on March 6, 2012 and April 5, 2012, established certain procedures and deadlines relating to

discovery and pretrial proceedings in advance of the 2012 Confirmation Hearing. Specifically,

the Allocation Disputes/Confirmation Scheduling Order provided that initial requests for written

discovery were to be served by March 9, 2012 and all fact and expert discovery relating to plan

confirmation was to be completed no later than May 21, 2012. (See Docket No. 11326.) In

accordance with the terms of the Allocation Disputes/Confirmation Scheduling Order, Sidley's

professionals in the Litigation and Corporate Reorganization and Bankruptcy practice groups,

working in conjunction with the professionals for the other DCL Proponents and the

professionals for the Noteholder Proponents, expended considerable efforts to undertake and

complete all fact and expert discovery relating to confirmation of the DCL Plan. For example,

Sidley's professionals, on behalf of the Debtors and the other DCL Proponents, filed the DCL

Proponents' disclosures regarding expert witnesses that would testify in support of confirmation

of the DCL Plan at the 2012 Confirmation Hearing on March 26, 2012 (see Docket No. 11236)

and fact witnesses that would testify in support of confirmation of the DCL Plan at the 2012

Confirmation Hearing on April 20, 2012 (see Docket No. 11443).

> (ii)    *Objections to the DCL Plan*

72.    The Allocation Disputes/Confirmation Scheduling Order further provided

that objections to the DCL Plan were to be filed on May 21, 2012.  Multiple objections were

filed to the DCL Plan.  (See Docket Nos. 11652, 11653, 11656, 11657, 11658, 11659, 11661,

11664, 11666, 11667, and 11668 (collectively, the "DCL Plan Objections")).  Sidley's

professionals reviewed and analyzed each of the DCL Plan Objections and engaged with each of

the objecting parties, to the extent practicable, to resolve the DCL Plan Objections consensually,

prior to the commencement of the 2012 Confirmation Hearing.  Sidley's professionals divided

responsibility for reviewing, negotiating, and/or drafting responses to the various DCL Plan

Objections, which was necessary in light of the briefing schedule and in order to avoid requiring

professionals to spend time analyzing and briefing responses to objections that were capable of

being resolved consensually.  In large measure, the DCL Plan Objections raised objections to

confirmation of the DCL Plan that were grounded in bankruptcy law, including the classification

and treatment of certain objecting parties' claims.  Generally, these objections were handled by

professionals in Sidley's Corporate Reorganization and Bankruptcy practice group, with support

as necessary from Sidley's Litigation, Tax, Corporate, and FCC regulatory practice groups as the

circumstances required.  As a result of these cumulative efforts, on or prior to the start of the

2012 Confirmation Hearing, Sidley's professionals successfully negotiated the resolution of

several of the DCL Plan Objections in whole or in part.

73.    In late May and prior to the commencement of the 2012 Confirmation

Hearing on June 6, 2012 (during the Fifteenth Interim Fee Period), Sidley's professionals

engaged in almost-daily formal and informal "meet and confer" sessions with the remaining

objecting parties, to identify and potentially narrow the DCL Plan Objections.  Sidley's

professionals also prepared and negotiated a proposed agenda and corresponding submissions to

the Bankruptcy Court regarding the unresolved DCL Plan Objections, which consisted of the

following categories of objections: (1) objection to classification of the Swap Claims; (2)

objection to classification of certain Indenture Trustee attorneys fees' claims; (3) objection to

classification of certain tendering PHONES Noteholder claims, and other issues raised in the

Allocation Disputes Decision Reconsideration Motion; (4) objection to the 210-day period for

objecting to disputed claims; (5) objections requesting establishment of reserves for certain

claims; (6) objection regarding indemnification provisions applicable to former employees; (7)

objection to the process of allowing lender fees; (8) numerous objections regarding the proposed

Litigation Trust; and (9) numerous objections to certain plan provisions, including releases and

language regarding the DCL Plan's neutrality on parties' rights respecting Disclaimed State Law

Avoidance Claims.

> (iii)    *DCL Proponents' Briefs in Support of the DCL Plan*

74.    Sidley's professionals in the Corporate Reorganization and Bankruptcy

and Litigation practice groups were heavily involved in drafting the (a) memorandum of law in

support of confirmation of the DCL Plan, which was filed on June 1, 2012 (Docket No. 11745)

(the "DCL Memorandum"), which included the DCL Proponents' responses to each of the DCL

Plan Objections, and (b) proposed findings of fact and conclusions of law in support of

confirmation of the DCL Plan (Docket No. 11746) (the "FOF/COL").  Sidley's professionals

devoted substantial time and effort to research, analyze, and draft the DCL Memorandum and

FOF/COL during the Fourteenth Interim Fee Period. Specifically, Sidley's professionals researched and briefed legal arguments in support of: (i) the DCL Plan's compliance with the 2011 Confirmation Opinion (as amended) and the Allocation Disputes Decision, (ii) the release, exculpation, injunction, and indemnification provisions of the DCL Plan, (iii) the classification of claims and interests under the DCL Plan (including the classification of the Swap Claim and certain fee claims that were the subject of the DCL Plan Objections), (iv) the treatment of claims and interests under the DCL Plan, (v) the satisfaction of all applicable provisions of section 1129(a) of the Bankruptcy Code, and (vi) all other contested legal issues concerning the confirmability of the DCL Plan. Given the size and scope of the DCL Memorandum, Sidley's professionals sub-divided responsibility for addressing certain key legal issues therein, largely based on such professionals' responsibilities for negotiating with the objecting parties and responding to the DCL Plan Objections.

**(h)      Activities Relating to the Debtors' Emergence from Chapter 11**

75.      In addition to those activities discussed above, Sidley's professionals in the Corporate and Corporate Reorganization and Bankruptcy practice groups expended considerable efforts during the Fourteenth Interim Fee Period preparing the Debtors for their eventual emergence from their chapter 11 cases. Sidley's professionals addressed, among other matters, (i) the timing and tasks required to complete the Restructuring Transactions (set forth and described in detail in the Plan Supplement), which involved the participation of Sidley's bankruptcy and corporate professionals as well as the Debtors' senior management; (ii) the mechanics of distributions and reserves on account of allowed claims, which involved the participation of Sidley's bankruptcy professionals, working in conjunction with the Debtors' financial advisors at Alvarez & Marsal as well as the Debtors' senior management and business unit-level managers; (iii) the FCC approval process, which involved participation of Sidley's

bankruptcy, regulatory, and corporate professionals, working in conjunction with the Debtors'
outside FCC counsel and the Debtors' senior management; and (iv) various corporate
governance and disclosure matters necessary to return the Debtors to ordinary operations upon
their emergence from the chapter 11 cases.

**K.    Professional Retention (30510):    Hours: 64.40    Fees: $40,354.50**

76.    The Debtors' large and diverse businesses require the employment and
retention of a variety of professionals to support these bankruptcy proceedings and to continue
managing the litigation, real estate, tax, accounting, and other needs of their business operations
in the ordinary course.  During the Fourteenth Interim Fee Period, Sidley's professionals assisted
the Debtors with preparing and filing a supplemental application modifying the scope of Davis
Wright Tremaine LLP's retention as special counsel, to include certain additional corporate and
litigation matters under Washington State law (Docket No. 11088).  That supplemental
application was approved by order dated March 22, 2012 (Docket No. 11219).

77.    In addition, during the Fourteenth Interim Fee Period, Sidley's
professionals prepared and filed four (4) supplements to the list of the Debtors' ordinary course
professionals ("OCPs") (Docket Nos. 11235, 11366, 11512, and 11612) and coordinated with the
Debtors' legal department and financial advisors to prepare and/or file monthly and quarterly
reports of proposed payments to OCPs (Docket No. 11283).  Sidley's professionals also
coordinated with certain OCP firms retained by the Debtors to assist such professionals with
preparing and filing fee applications on behalf of their firms.  In connection therewith, Sidley's
professionals reviewed a fee application for Winstead PC prior to the filing of such application
with the Court (Docket No. 11376)

**L.**     **Tax Matters (30520):    Hours: 100.90    Fees: $64,422.00**

78.     During the Fourteenth Interim Fee Period, Sidley's tax professionals continued to advise the Debtors with respect to a variety of discrete tax issues, both arising from and in connection with the Debtors' chapter 11 cases and in connection with Sidley's representation of the Debtors in tax matters in the ordinary course of the Debtors' business.  For example, Sidley's professionals reviewed and analyzed tax-related claims and liabilities, considered the tax implications of proposed transactions, handled appeals of tax assessments, advised the Debtors with respect to potential settlements of tax claims, and communicated with taxing authorities concerning all such matters.  Sidley's professionals in the Tax practice group also analyzed numerous potential tax consequences arising from the modifications to the DCL Plan and tax issues concerning the Debtors' proposed corporate structure as of their emergence from chapter 11, and prepared disclosures relating to those matters for the Supplemental Disclosure Document.

79.     Much of the time of Sidley's Tax and Corporate Reorganization and Bankruptcy professionals during the Fourteenth Interim Fee Period was dedicated to extensive research, internal memoranda and meetings regarding post-confirmation tax issues.  Of particular importance was analysis and assessment of the tax consequences of the Restructuring Transactions that are contemplated to occur upon the Debtors' emergence from chapter 11 protection.  Sidley's tax professionals also advised the Debtors and consulted with the other DCL Proponents with respect to the tax implications of the litigation trust proposed by the Debtors' plan of reorganization.  Sidley spent considerable time researching these issues and advising the Debtors on the potential tax consequences of the Restructuring Transactions and the litigation trust structure.  In addition to these services, certain of Sidley's Tax and Corporate Reorganization and Bankruptcy partners participated in periodic in-person meetings with the

Debtors' management regarding tax issues presented by the Debtors' anticipated emergence from chapter 11 and the coming into being of the Litigation Trust under the DCL Plan.

80.     Sidley's professionals also conferred with the Debtors' in-house tax professionals with respect to an agreement with the Maryland Comptroller of the Treasury to settle a disputed prepetition corporate income tax liability of The Baltimore Sun Company and Los Angeles Times International, Ltd. for the periods ending December 2000 through December 2007.  Sidley provided comments on the proposed settlement agreement and advised the Debtors as to obtaining Bankruptcy Court approval thereof.  Thereafter, Sidley drafted a motion and proposed order seeking approval of the settlement pursuant to Bankruptcy Rule 9019.  The motion was filed on March 1, 2012 (Docket No. 11055) and was approved by the Bankruptcy Court on March 22, 2012 (Docket No. 11218).

**M.     Claims Processing (30530):   Hours: 423.40   Fees: $255,701.00**

81.     During the Fourteenth Interim Fee Period, Sidley's professionals continued evaluating, researching, and analyzing the treatment of various types of claims arising in the Debtors' chapter 11 cases, covering the full spectrum of potential liabilities.  To date, well over 7,000 proofs of claim have been filed in the Debtors' chapter 11 cases.  Sidley's professionals assigned to handle claims-related matters participated in regular conference calls with the Debtors' financial advisors, Alvarez & Marsal, in order to coordinate the processing of the proofs of claim, evaluating the legal sufficiency of the claims, and preparing objections thereto.

82.     Specifically, Sidley's professionals, working together with the Debtors' management, business personnel, and Alvarez & Marsal, researched, prepared, and filed the Debtors' fifty-third omnibus objections to claims (Docket No. 11237).  Sidley's professionals also continued their efforts to process and resolve claims objections that had been previously

filed by Sidley on behalf of the Debtors.  For example, Sidley's professionals reviewed formal

and informal responses to the Debtors' fifty-first and fifty-second omnibus objections to claims,

which objections and responses were filed or made during the Thirteenth Interim Fee Period.

(See, e.g., Response of Katherine Chansky to Debtors' Fifty-First Omnibus (Substantive)

Objection to Claims, Docket No. 11104; Response of Thomson Broadcast LLC to Debtors'

Fifty-First Omnibus (Substantive) Objection to Claims, Docket No. 11119; Response of City of

Hartford to Debtors' Fifty-Second Omnibus (Non-Substantive) Objection to Claims, Docket No.

11143; Response of Hoi Huynh to Debtors' Fifty-First Omnibus (Substantive) Objection to

Claims, Docket No. 11227, Response of David Kissi to Order Sustaining Debtors' Fifty-First

Omnibus (Substantive) Objection to Claims, Docket No. 11437.)

      83.    During the Fourteenth Interim Fee Period, the Bankruptcy Court entered

orders sustaining, in whole or in part, the Debtors' fifty-first, and fifty-second, and fifty-third

omnibus objections (subject to the continuance of objections to certain claims of creditors who

filed responses to such objections) and the Debtors' objection to the claim of Marta Waller

(Docket Nos. 11216, 11226, 11245, 11459, 11460), resulting in the disallowance of

approximately $10,310,150 in face amount of claims against the Debtors' estates.

      84.    Sidley's professionals also continued their efforts to advance the Debtors'

forty-eighth omnibus objection to the claims of Joann Parker (the "Parker Claims"), to which the

Debtors objected as being late-filed.  At a preliminary hearing held on the objection on January

11, 2012, counsel for Ms. Parker requested that the Court hold an evidentiary hearing on whether

Ms. Parker's delay in filing the Parker Claims was justified under prevailing case law.  The

Court scheduled the evidentiary hearing to be held on March 22, 2012 (the "Parker Hearing").

Leading up to the Parker Hearing, Sidley's professionals engaged in extensive negotiations with

counsel for Ms. Parker regarding the preparation and submission of a Joint Pretrial Memorandum

regarding the legal and factual issues in dispute, in accordance with the Court's local rules.  On

March 13, 2012, counsel for Ms. Parker filed a Motion to Allow Expert Witness Opinion

Testimony Telephonically, Or, In the Alternative, for an Extension of Time to Take Evidentiary

Deposition of Her Expert Witness Pursuant to Federal Rule of Civil Procedure 32(a)(3)(B)

(Docket No. 11145).  Sidley's professionals contested that relief, and prepared and filed an

objection and cross-motion to strike the proposed expert witness testimony on March 14, 2012

(Docket No. 11150).  Counsel for Ms. Parker filed a reply to the Debtors' objection on March

15, 2012 (Docket No. 11160).  Sidley's professionals participated in a contested telephonic

hearing on those pleadings on March 16, 2012, at which the parties agreed to stipulate to certain

facts relating to the Parker Claims.  However, the parties were unable to reach consensus on

certain other statements of fact, legal issues in dispute, and proposed exhibits for use at the

Parker Hearing.  Accordingly, on March 20, 2012, Sidley's professionals filed the Debtors'

Pretrial Memorandum regarding the Parker Hearing (Docket No. 11190).  Subsequently, the

parties resolved all outstanding disputes regarding the submission of a Joint Pretrial

Memorandum, and Sidley's professionals filed such Joint Pretrial Memorandum with the Court

on March 21, 2012 (Docket No. 11207).

85.     On March 22, 2012, Sidley's professionals, on behalf of the Debtors,

participated in the Parker Hearing, at which Ms. Parker testified in support of the Parker Claims.

Sidley's professionals in the Corporate Reorganization and Bankruptcy practice group, with

support for professionals in the Litigation practice group and Chicago Tribune Company's

outside employment law defense counsel, reviewed all of the exhibits and prior deposition

testimony of Ms. Parker in preparation for conducting the cross-examination of Ms. Parker at the

Parker Hearing, in support of the Debtors' objection. The Court has taken the Debtors' objection to the Parker Claims under advisement.

86.    In addition, Sidley's professionals assisted the Debtors with negotiating and implementing agreements and stipulations settling disputed claims without need for formal objections, in accordance with the Order approving claims settlement procedures that was entered by the Court to facilitate consensual resolution of claims (Docket No. 2657).[32] Sidley's professionals negotiated five (5) stipulations with certain of the Debtors' landlords and trade creditors during the Fourteenth Interim Fee Period, which stipulations covered seventy-one (71) proofs of claim and reduced the outstanding claims against the Debtors by $1,251,492.89 in the aggregate.

## N.    Business Operations (30550):    Hours: 464.40    Fees: $246,712.82

87.    The Business Operations matter category encompasses the activities of Sidley's professionals with respect to their representation of the Debtors in corporate and transactional matters in the ordinary course of the Debtors' business, as well as other general corporate law and transactional advice, both related to these chapter 11 cases and otherwise related to the Debtors' businesses. These services are necessary to facilitate the Debtors' efforts to stabilize and reposition their businesses through cost saving and revenue enhancing strategies, as well as to prepare the Debtors for their emergence from chapter 11.

88.    During the Fourteenth Interim Fee Period, Sidley's professionals in the Corporate practice group expended substantial time and effort to prepare, research, and analyze potential value maximization strategies regarding the Debtors and certain of the Debtors'

---

[32] Those procedures provide the Debtors with authority to settle or compromise disputed claims of less than $50,000 in their discretion, claims equal to or greater than $50,000 but less than $1,000,000 upon notice to the United States Trustee and counsel to the Committee and certain senior lenders, and claims equal to or greater than $1,000,000 with the approval of the Court pursuant to Bankruptcy Rule 9019.

properties.  Sidley's professionals also addressed a variety of discrete matters arising postpetition

in the ordinary course of the Debtors' business, including the review of certain potential

transactions, joint-venture related issues, utility supply agreements, contracts, leases, licenses,

and general corporate governance and business planning matters.  Sidley's professionals also

provided information to the Debtors' auditors regarding the various legal matters for which

Sidley represents the Debtors in connection with the Debtors' annual financial reporting.

89.    In addition, in connection with the filing of the revised Plan Supplement

on May 4, 2012, Sidley's professionals in the Corporate practice group prepared, with the

cooperation of the Debtors' management, the corporate charter and bylaws of Reorganized

Tribune, the New Warrant Agreement, a detailed description of the Restructuring Transactions,

the Litigation Trust Agreement, and the Registration Rights Agreement.  (See Docket No.

11545.)  Sidley's professionals met and conferred with the Debtors' senior management on a

regular basis in advance of the filing of the revised Plan Supplement, for the purposes of

advising the Debtors on the legal issues raised by the Restructuring Transactions and post-

emergence corporate governance of the Debtors.  In anticipation of the Debtors' emergence from

bankruptcy, Sidley's professionals in the Corporate practice group reviewed and assessed the

steps necessary to complete the Restructuring Transactions proposed by the DCL Plan.  Sidley's

professionals coordinated with the Debtors' senior management and state corporate agents, such

as Corporation Service Company, to prepare corporate documents (including charters, bylaws,

resolutions, limited liability company agreements, merger certificates, merger agreements,

conversion certificates, asset transfer agreements, equity transfer agreements, dissolution

documents, equity certificates, qualification documents, and annual reports) in connection with

the implementation of the Restructuring Transactions upon emergence.  Sidley's professionals

coordinated with the Debtors' senior management and advisors on a regular basis to review, assess and plan the exchange, issuance, and distribution of securities and other interests in anticipation of Debtors' emergence from bankruptcy.  Sidley's professionals in the Corporate practice group also coordinated with the Debtors' management and advisors to prepare corporate documentation in anticipation of the implementation of a secured financing in connection with emergence.

**O.**     **Case Administration (30560):   Hours: 105.40   Fees: $40,516.00**

90.     During the Fourteenth Interim Fee Period, Sidley's professionals engaged in various general case administration tasks, including scheduling and participating in hearings, reviewing and reporting on docketed filings to the Debtors, the Committee, the United States Trustee, and other interested parties, and maintaining a schedule of critical dates and deadlines. On a periodic basis during the Fourteenth Interim Fee Period, Sidley's professionals participated in status calls with the Debtors' senior management and financial advisors to discuss pending motions and issues and the outcome of each hearing.  In addition, Sidley's paraprofessionals are responsible for monitoring the docket for all filed pleadings and preparing and distributing a daily status report to the Debtors' senior management and Sidley professionals, at the request of the Debtors' senior management.

91.     Working in conjunction with the Debtors' management and outside corporate counsel, Sidley's professionals also researched, drafted, and prepared a motion for an order dismissing the chapter 11 petition of Publishers Forest Products Co. of Washington ("Publishers"), which was filed on May 11, 2012 (Docket No. 11599).  On May 24, 2011, the Court entered an order dismissing Publishers' chapter 11 case (Docket No. 11688).

**P.    Creditor Communications (30570):    Hours: 15.00    Fees: $7,720.50**

92.    Throughout the Fourteenth Interim Fee Period, Sidley's professionals have responded to numerous inquiries and communications from individual creditors as well as from representatives of larger groups of the Debtors' creditor constituencies regarding the status of the Debtors' chapter 11 cases. As a convenience to individual creditors, particularly individuals who are generally new to and/or unfamiliar with the bankruptcy process and their role therein, the Debtors established a dedicated Tribune bankruptcy "hotline." This toll-free number connects directly to a voice mailbox maintained by Sidley. Each work day, attorneys at Sidley monitored the hotline for messages and returned all phone calls promptly, generally within 24 hours of the message being left. Typical callers to the hotline were bond holders, brokerage firms calling on behalf of clients, former employees of the Debtors, pro se creditors, and attorneys for creditors. Questions posed to Sidley's professionals by the Debtors' creditors ranged from specific questions regarding claims treatment under the DCL Plan to general inquiries regarding the status of the chapter 11 cases.

**Q.    Employee Matters (30590):    Hours: 404.40    Fees: $299,352.00**

93.    During the Fourteenth Interim Fee Period, Sidley's professionals in the Corporate Reorganization and Bankruptcy and Employment practice groups continued to advise the Debtors with respect to various legal issues pertaining to employee-related matters, including negotiating employment contracts and negotiating termination and severance of former employees. Sidley's professionals also advised the Debtors with respect to the structure and implementation of their tax-qualified and non-tax-qualified employment-related incentive, benefit, pension, and severance plans, addressed inquiries from the Debtors' senior management and creditors regarding those plans, and made appropriate adjustments to such plans in response. In addition to the foregoing, Sidley's professionals responded to inquiries from the Debtors'

management and in-house employment lawyers regarding various employment issues, reviewed

consulting contracts, responded to numerous information requests from and/or regarding current

and former employees, and handled various other issues in connection with the Debtors'

employees.  Sidley's professionals also analyzed employee-related claims filed in the Debtors'

chapter 11 cases, including claims filed by certain of the Debtors' current and former directors

and officers for potential indemnification arising from the FitzSimons Action, SLCFC Actions,

and insider preference actions commenced by the Committee.

94.    Among the matters handled by Sidley's professionals during the

Fourteenth Interim Fee Period was the implementation of the Debtors' annual management

incentive plan ("MIP"), which entailed researching, editing, and advising the Debtors, in part

based on the Court's decisions respecting the implementation of the 2009, 2010, and 2011 MIPs.

Sidley's professionals worked in cooperation with the Debtors and Mercer (U.S.), Inc.

("Mercer"), an independent compensation consultant, to formulate and present the Debtors' 2012

MIP to the Court.  Sidley's professionals filed the motion seeking approval of the 2012 MIP on

April 13, 2012 (Docket No. 11377) (the "2012 MIP Motion"), and a corresponding motion to file

Mercer's report concerning the 2012 MIP under seal (Docket No. 11378).  The 2012 MIP

Motion was approved by the Court on May 4, 2012 (Docket No. 11535).  Prior to the filing of

the 2012 MIP Motion, Sidley's professionals in the Corporate Reorganization and Bankruptcy,

Litigation, and Employment practice groups engaged in substantive negotiations with certain of

the Debtors' creditor constituencies, including the Committee, regarding the proposed terms of

the 2012 MIP.  Sidley's professionals also continued to consult with counsel for the Committee

regarding the treatment of certain MIP awards that were placed in a rabbi trust pending

resolution of the FitzSimons Action, consistent with the orders approving the Debtors' MIP.

Sidley's professionals reviewed, analyzed, and revised the trust agreement relating to the MIP awards placed in trust.

95.     Sidley's professionals in the Employment and Labor Law practice group were also retained by the Debtors to defend against litigation initiated by certain former employees in state courts, on a postpetition basis, including the matters captioned <u>Gellman v. Los Angeles Times Communications LLC</u> (the "<u>Gellman Litigation</u>") and <u>Mitchell v. Los Angeles Times Communications LLC</u> (the "<u>Mitchell Litigation</u>").[33]  Sidley's professionals reviewed and analyzed the complaints and other pleadings filed in the Gellman Litigation and the Mitchell Litigation, advised the Debtors on the preparation and filing of answers and dispositive pleadings, and researched and prepared such pleadings on behalf of the Debtors.

96.     Finally, at the Debtors' request, Sidley's professionals in the Corporate Reorganization and Bankruptcy and Employment practice groups continued to undertake a comprehensive analysis of the implications of the SLCFC Actions for the Debtors' current employees who were either individually named as defendants in those actions or who were potentially members of the putative defendant classes, by virtue of being former shareholders of Tribune.  The SLCFC Actions potentially implicate several thousand of the Debtors' current and former employees, who held stock directly or indirectly through one or more of the Debtors' benefit plans.  The SLCFC Actions raise complex legal issues at the intersection of state fraudulent conveyance laws and ERISA.

---

[33] Time entries relating to the Gellman Litigation and the Mitchell Litigation are specifically denoted in the Employee Matters invoices submitted in connection with the Application.

**R.**    **2010 Exit Credit Facility (13700):    Hours: 109.00    Fees: $62,207.00**

97.    During the Fourteenth Interim Fee Period, Sidley's professionals continued to provide services to the Debtors relating to the evaluation, negotiation, and expected implementation of post-confirmation financing facilities that will provide a source of funding for the reorganized Debtors upon their emergence from their chapter 11 cases.  The DCL Plan authorizes the Debtors to procure exit financing on terms consistent with an exit financing term sheet in the Plan Supplement (the "Exit Facility").  (See DCL Plan, Sections 1.1.87, 1.1.88, 5.10, and Exhibit 5.10.)  The DCL Plan also contemplates that the Debtors will enter into a new senior secured term loan or a replacement facility in addition to the Exit Facility (the "Term Loan Facility" and together with the Exit Facility, the "Proposed Facilities").  (See DCL Plan, Sections 1.1.145, 1.1.146, 5.6, and Exhibit 5.6.)  Preliminary term sheets respecting each of the Proposed Facilities were filed with the Court as part of the Plan Supplement on May 4, 2012 (Docket No. 11545).

98.    Sidley's professionals continued to review and analyze potential financing terms and alternatives for each of the Proposed Facilities and advised the Debtors' senior management regarding their post-emergence liquidity needs and financing options.  The post-emergence financing work performed by Sidley during the Fourteenth Interim Fee Period generally fits into two categories: (i) strategic analysis of financing options and alternatives, and (ii) due diligence efforts to streamline the process of obtaining financing on the terms set forth in the preliminary term sheets filed as part of the Plan Supplement.  This work involved the collective efforts of Sidley professionals across multiple disciplines, including, but not limited to, corporate, finance and bankruptcy law.

99.    Sidley's professionals worked diligently during the Fourteenth Interim Fee Period to assess the Debtors' financing needs and to formulate concrete financing plans.  As

Sidley's fee detail evidences, partners from Sidley's Global Finance, Corporate Reorganization and Bankruptcy, and Corporate practice groups communicated with the Debtors' senior management, prospective lenders, and the Debtors' outside FCC counsel regarding the Proposed Facilities. During this period, Sidley's professionals also drafted a confidentiality/non-disclosure agreement to be signed by potential lenders and advised the Debtors' senior management regarding the same.

100.    Sidley's professionals also began the exhaustive diligence work necessary for the Debtors to enter into the Proposed Facilities. It is customary in the industry, particularly for post-emergence financing, that lenders will require extensive diligence information relating to the Debtors, their post-emergence assets, and their anticipated post-emergence liabilities. Accordingly, Sidley's professionals began the process of researching and compiling the schedules of corporate and financial information the Debtors will have to provide their lenders, which required participation of professionals in Sidley's Finance, Corporate, and Corporate Reorganization and Bankruptcy practice groups. Sidley's professionals, working in conjunction with the Debtors' management and other professionals, were able to efficiently and effectively prepare such financing diligence schedules based upon their considerable knowledge of the Debtors' financial records and business operations.

### EXPENSES INCURRED

101.    Sidley has incurred expenses of $182,859.76 in connection with its services rendered to the Debtors during the Fourteenth Interim Fee Period. These expenses represent actual out-of-pocket costs for items incurred exclusively for the direct benefit of the Debtors, including, but not limited to, duplicating charges, document delivery and messenger services, telephone and facsimile charges, computer-assisted legal research, travel-related

expenses, overtime services, in-house document production, and professional services from

contract attorneys relating to discovery activities.

102.    Sidley submits that all such expenses are necessary and actual expenses

for the performance of its services in these cases, and further submits that many of such expenses

were necessitated by the time constraints under which Sidley's professionals and staff have

operated in these cases.  Sidley's representation of the Debtors in support of the DCL Plan

continued to require the preparation and physical production of documents and exhibits for use at

trial, and ongoing discovery activities leading up to the trial required the services of outside

contract attorneys and technical service providers.  Additional information respecting certain

categories of expenses are described below. A detailed breakdown of Sidley's expenses incurred

in rendering services to the Debtors during the period covered by this Application is incorporated

into this Application as part of <u>Attachment B</u> hereto.

### (a)    Travel Expenses

103.    Sidley submits that all travel expenses incurred during the period covered

by this Application were necessary, reasonable, and reflect the prevailing market rates.  In

particular, Sidley submits that, to the best of its knowledge, all air travel utilized by Debtors'

personnel during the period covered by this Application was at the prevailing coach-class rate for

such travel less any corporate discounts received by Sidley, in accordance with Sidley's policies

for business travel for bankruptcy and non-bankruptcy matters, excepting certain limited

instances where coach-class reservations were unavailable.  Hotel charges reflect rates for one

night of lodging, unless otherwise indicated.

### (b)    Court-Related Expenses

104.    Sidley incurred $12,207.10 in out-of-pocket expenses relating to Court

fees and Court Reporting fees (including for the depositions taken in connection with the Crab

House Matter during the Thirteenth and Fourteenth Interim Fee Periods and the hearing on the

Allocation Disputes held during the Fourteenth Interim Fee Period).  All Court-related expenses

reflect actual, reasonable, and necessary costs incurred by Sidley on behalf of the Debtors.

### (c)  Document-Related Expenses

105.  Sidley's normal billing practices, as set forth in the pleadings supporting

its retention in these chapter 11 cases, include standard secretarial services as part of normal

overhead.  For certain projects involving large and/or time-sensitive administrative and logistical

requirements resulting from client needs, Sidley utilizes the services of third-party providers in

the place of clerical personnel on staff during normal business hours and bills those services to

the client at Sidley's cost for such services.  During the Fourteenth Interim Fee Period, Sidley

charged a total of $19,182.55 relating to in-house duplication, outside document production,

document processing and/or document binding/drilling services that were billed to the Debtors at

cost; that is, no markup for such services is applied by Sidley.[34]

### (d)  Computer-Assisted Research

106.  Computer research and information retrieval services are charged on a

time, item and/or search-type basis which takes advantage of certain discounts that Sidley is able

to negotiate with the relevant service providers because of the Firm's size and volume of usage.

The Firm's charges for computerized legal research such as Westlaw or Lexis are based on a rate

that recovers no more than the Firm's costs.

### (e)  Overtime

107.  It is Sidley's standard practice and policy to reimburse professionals and

staff for overtime meals and overtime transportation home when working late, provided such

---

[34] By agreement between Sidley and the Office of the United States Trustee, Sidley has not charged the Debtors for any expenses relating to third-party proof-reading services.

professional or staff member has worked a certain number of hours per day on a particular client matter. Additionally, Sidley provides overtime pay to certain eligible staff employees when they are required to work past normal business hours on a particular client matter. Sidley incurred $649.28 in overtime expenses during the Fourteenth Interim Fee Period. Sidley submits that all requested overtime expenses are reasonable given the time demands in these cases during the Fourteenth Interim Fee Period.

### (f)    Legal Support Services

108.    During the Fourteenth Interim Fee Period, Sidley charged a total of $91,119.97 for Legal Support Services, which was billed to the Debtors at cost. In connection with Sidley's ongoing maintenance of the Document Depository, in which the equivalent of approximately 5.82 million pages of documents relating to the Leveraged ESOP Transactions are electronically stored, Sidley utilized the services of an outside vendor, LD Discovery, to host and process electronic data files for production upon request to Depository Designees and creditor constituencies authorized to receive such documents. Of the amount incurred by Sidley in connection with Legal Support Services, $78,488.87 relates to the services provided by LD Discovery. Sidley also utilized the services of E-Discovery Services to process certain discovery materials relating to the hearing on the Allocation Disputes and the 2012 Confirmation Hearing. Additionally, Sidley retained courtroom technology consultancy firm TrialGraphix to assist with the hosting, indexing, and projection of trial exhibits, including video deposition designations, on video screens throughout the courtroom during the 2011 Confirmation Hearing, including during the closing arguments held in the Eleventh Interim Fee Period. Those materials continued to be hosted by Trial Graphix in the Fourteenth Interim Fee Period and $5,893.95 of the amount incurred by Sidley in connection with Legal Support Services relates to monthly data hosting fees.

## REVIEW OF APPLICABLE LOCAL RULE

109.    The undersigned has reviewed the requirements of Local Rule of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware 2016-2 and certifies to the best of his information, knowledge and belief that this Application substantially complies with Rule 2016-2.

## NOTICE

110.    Notice of this Application has been served upon the Notice Parties specified in the Fee Orders.  In accordance with the terms of the Fee Orders, Sidley respectfully submits that no other or further notice is required.

## NO PRIOR REQUEST

111.    Other than the applicable Monthly Fee Applications, no previous application respecting the relief requested herein has been made to this or any other Court.

WHEREFORE, Sidley Austin LLP respectfully requests the Court (i) to approve, pursuant to 11 U.S.C. §§ 327, 331, and 503, interim compensation in the amount of $5,418,107.32 and reimbursement of expenses in the amount of $182,859.76, (ii) to authorize the payment of such amounts by the Debtors to Sidley, less any amounts previously paid to Sidley pursuant to the Monthly Fee Applications for the period covered by this fourteenth Quarterly Fee Application Request and the procedures set forth in the Interim Compensation Order and the Fee Examiner Order, and (iii) to grant such further relief as is just and proper.

Dated: August 21, 2012

Respectfully submitted,

James F. Conlan
Bryan Krakauer
Kenneth P. Kansa
Jillian K. Ludwig
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

ATTORNEYS FOR DEBTORS AND DEBTORS
IN POSSESSION

64