**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | : | CHAPTER 11 |
| | : | (Jointly Administered) |
| **TRIBUNE COMPANY, *et. al*,**[1] | : | |
| | : | Case No. 08-13141 (KJC) |
| Debtors | : | (Re: D.I. 12080, 12084, 12085, 12198) |

**MEMORANDUM (i) DENYING CERTIFICATION**
**FOR IMMEDIATE APPEAL TO THE THIRD CIRCUIT**
**AND (ii) GRANTING STAY PENDING APPEAL**
**(UPON POSTING OF BOND)**[2]

**BY:   KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE**

On July 23, 2012, an order was entered confirming the Fourth Amended Plan Joint Plan

of Reorganization for Tribune Company and Its Subsidiaries Proposed by The Debtors, The

Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo Gordon

& Co, L.P. and JPMorgan Chase Bank, N.A. (docket no. 12074) (the "Confirmation Order").[3]

The Confirmation Order was entered after a series of decisions addressing a myriad of issues

---

[1] The chapter 11 case filed by Tribune Media Services, Inc. (Bky. Case No. 08-13236) is jointly administered with the Tribune Company bankruptcy case and 109 additional affiliated debtors pursuant to the Order dated December 10, 2008 (docket no. 43). An additional debtor, Tribune CNLBC, LLC (formerly known as Chicago National League Baseball Club, LLC) filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on October 12, 2009 (Bky. Case No. 09-13496), and is also jointly administered with the Tribune Company bankruptcy case pursuant to this Court's Order dated October 14, 2009 (docket no. 2333). The debtors in the jointly administered cases are referred to herein as the "Debtors."

[2] This Memorandum constitutes the findings of fact and conclusions of law, required by Fed.R.Bankr.P. 7052. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a). This is a core proceeding pursuant to 28 U.S.C. §157(b)(1) and (b)(2)(A), and (L).

[3] The Debtors, the Official Committee of Unsecured Creditors (the "Creditors' Committee"), Oaktree Capital Management, L.P. ("Oaktree"), Angelo Gordon & Co., L.P. ("Angelo Gordon") and JPMorgan Chase Bank ("JPM") may be referred to jointly herein as the "DCL Plan Proponents." The Fourth Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the DCL Plan Proponents (as modified) is referred to herein as the "DCL Plan."

related to the DCL Plan Proponents' efforts to achieve confirmation of a plan of reorganization,

including:

(i)     the Confirmation Opinion dated October 31, 2011 and accompanying Order (docket nos. 10133, 10134), *In re Tribune Co.*, 464 B.R. 126 (Bankr.D.Del. 2011) (the "2011 Confirmation Opinion" or *"Tribune I"*),

(ii)    the Memorandum on Reconsideration dated December 29, 2011 and accompanying Order (docket nos. 10531 and 10532), *In re Tribune Co.*, 464 B.R. 208 (Bankr.D.Del. 2011) (the "Reconsideration Decision" or *"Tribune II"*),

(iii)   the Memorandum Regarding Allocation Disputes dated April 9, 2012 and accompanying Order (docket nos. 11337 and 11338), *In re Tribune Co.*, 472 B.R. 223 (Bankr.D.Del. 2012)  (the "Allocation Decision" or *"Tribune III"*), and

(iv)    the Memorandum Overruling Objections to Confirmation of the Fourth Amended Plan of Reorganization for Tribune Company and Its Subsidiaries and Denying Clarification Motion and accompanying Order (docket no. 12033 and 12034), *In re Tribune Co.*, 2012 WL 2885921 (Bankr.D.Del. July 13, 2012) (the "Fourth Amended Plan Decision" or *"Tribune IV"*).

Various parties filed appeals of the quartet of confirmation-related decisions and the

Confirmation Order.[4]  Currently before the Court are motions seeking certification for direct

appeal of certain issues to the United States Court of Appeals for the Third Circuit pursuant to 28

U.S.C. §158(d)(2), and motions seeking a stay pending appeal pursuant to Fed.R.Bankr.P. 8005;

more particularly:

(1)     Motion of Law Debenture Trust Company of New York ("Law Debenture") and

---

[4]The following appeals have been filed: (i) On January 10, 2012, Wilmington Trust Company, solely in its Capacity as Successor Indenture Trustee Pursuant to the PHONES Indenture ("WTC"), filed an appeal from the 2011 Confirmation Decision and the Reconsideration Decision (docket no. 10580); (ii) On April 23, 2012, WTC filed an appeal of the Allocation Decision (docket no. 11454); (iii) On July 23, 2012, Aurelius filed an appeal of the Confirmation Order (docket no. 12076); (iv) On July 23, 2012, Law Debenture and Deutsche Bank filed an appeal of the Confirmation Order (docket no. 12083); (v) On August 2, 2012, WTC filed an appeal of the Fourth Amended Plan Decision and the Confirmation Order (docket no. 12157); and (vi) On August 3, 2012, EGI filed an appeal of the Fourth Amended Plan Decision and the Confirmation Order (docket no. 12177).

Deutsche Bank Trust Company Americas ("Deutsche Bank") Pursuant to 28 U.S.C. §158(d)(2) and Fed.R.Bankr.P. 8001(f) Requesting Certification of Direct Appeal to United States Court of Appeals for Third Circuit of the Unfair Discrimination Issue in the Allocation Disputes Order as Incorporated in the Order and Memorandum Opinion on Confirmation (docket no. 12084) (the "Law Debenture Certification Motion"),

(2)    EGI-TRB, LLC's ("EGI") Motion for Certification of Direct Appeal to the United States Court of Appeals for the Third Circuit (docket no. 12198) (the "EGI Certification Motion"),

(3)    Motion for Stay Pending Appeal Pursuant to Bankruptcy Rule 8005 filed by Aurelius Capital Management, LP ("Aurelius") (docket no. 12080) (the "Aurelius Stay Motion"), and

(4)    Motion of Law Debenture and Deutsche Bank for Stay Pending Appeal of Confirmation Order (docket no. 12085) (the "Law Debenture Stay Motion").[5]

A scheduling order regarding the foregoing motions was entered on August 1, 2012 (docket no. 12147). The DCL Plan Proponents filed an Objection to the Motions for an Order Certifying Direct Appeal of the Confirmation Order (docket no. 12216) (the "DCL Objection to Certification") and an Objection to the Motions for a Stay Pending Appeal of the Confirmation Order (docket no. 12217) (the "DCL Objection to Stay"). A hearing to consider the Certification Motions and the Stay Motions was held on August 17, 2012 (the "Stay Hearing").

For the reasons set forth herein, the Certification Motions will be denied and the Stay Motions will be granted, conditioned upon the posting of a supersedeas bond in the amount of $1.5 billion.

---

[5]WTC filed a joinder to the Law Debenture Certification Motion (docket no. 12159) and a joinder to the Law Debenture Stay Motion (docket no. 12160). The Law Debenture Certification Motion and the EGI Certification Motion will be referred to jointly herein as the "Certification Motions." The Aurelius Stay Motion and the Law Debenture Stay Motion will be referred to jointly herein as the "Stay Motions."

**DISCUSSION**

I.    **The Certification Motions**

28 U.S.C. §158(d)(2)(A) provides that a bankruptcy court may certify a final order for

immediate appeal to a federal court of appeals if it determines that:

> (i)     the judgment, order or decree involves a question of law as to which there is no
>         controlling decision of the court of appeals for the circuit or of the Supreme Court
>         of the United States, or involves a matter of public importance;
>
> (ii)    the judgment, order or decree involves a question of law requiring resolution of
>         conflicting decisions; or
>
> (iii)   an immediate appeal from the judgment, order or decree may materially advance
>         the progress of the case or proceeding in which the appeal is taken; and if the
>         courts of appeals authorizes the direct appeal of the judgment order or decree.

28 U.S.C. §158(d)(2)(A).  *See also In re Nortel Networks Corp.*, 2010 WL 1172642, *1

(Bankr.D.Del. March 18, 2010).  Section 158(d)(2)(B) provides that certification to the court of

appeals is *mandatory* if the bankruptcy court determines that circumstances specified in (i), (ii) or

(iii) of subparagraph (A) exists.  28 U.S.C. §158(d)(2)(B).

A.    The Law Debenture Certification Motion

Law Debenture and Deutsche Bank (together, the "Indenture Trustees") request

certification for direct appeal of two issues:

1.    Whether the Bankruptcy Court erred in confirming the Plan because the Plan
      discriminates unfairly against the Senior Noteholders (as defined in the Plan) in violation
      of Section 1129(b)(1) of the Bankruptcy Code by providing materially lower and
      disparate treatment to the Senior Noteholders as compared to the treatment of Other
      Parent Claims with respect to distributions from the estate (before taking into account any
      reallocations resulting from contractual subordination) and by disregarding the
      subordination provisions of the PHONES Indenture and the EGI-TRB Subordination
      Agreement in reallocating distributions otherwise payable to the subordinated debt (the
      "Unfair Discrimination Issue").

2.      Whether the Bankruptcy Court erred in determining that the SWAP Claim falls within the definition of Senior Indebtedness in the PHONES Indenture and within the definition of Senior Obligations under the EGI Subordination Agreement (the "SWAP Claim Issue").

Law Debenture Certification Motion, ¶21.   The Indenture Trustees argue that immediate appeal of the foregoing issues is appropriate under both (i) and (iii) of 28 U.S.C. §158(d)(2)(A).

        Controlling Law

        The Indenture Trustees argue that certification of the Unfair Discrimination Issue is required because there is no controlling law regarding the statutory interpretation of either the "notwithstanding section 510(a)" or the "not discriminate unfairly" language in 11 U.S.C. §1129(b)(1).[6]

        In the Allocation Decision, my analysis of the statute's language "notwithstanding section 510(a)" was informed by the Third Circuit Court of Appeals' decision in *In re Goody's Family Clothing, Inc.*, 610 F.3d 812, 817 (3d Cir. 2010), which interpreted the meaning of "notwithstanding" as it appears in Bankruptcy Code §365(d)(3). *Tribune III,* 472 B.R. at 241. The Indenture Trustees argue that *Goody's* is not controlling law, since it interprets "notwithstanding" in the context of a different Bankruptcy Code section.  The United States Supreme Court has noted that "[p]resumptively, identical words used in different parts of the same act are intended to have the same meaning." *U.S. Nat'l Bank of Oregon v. Indep. Ins. Agents of America, Inc.*, 508 U.S. 439, 460, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993) (citations

----

[6]Section 1129(b)(1) provides:
        Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.
11 U.S.C. §1129(b)(1).

and internal punctuation omitted).

The Indenture Trustees further argue that any presumption of similar meaning of the word "notwithstanding" in separate Bankruptcy Code sections is rebutted by the legislative history of Section 1129(b)(1), which includes a discussion of a plan's treatment of senior debt and junior debt to illustrate examples of unfair discrimination. *See Tribune III*, 472 B.R. at 239 citing Vol. C Collier On Bankruptcy App. Pt. 4(d)(i) at 416-418 (15th ed. rev.) (legislative history of §1129(b)(1)). In the Allocation Decision, I determined that the legislative history of §1129(b)(1), which has been described as "roundabout, almost otiose," was not determinative of this issue. *Id.* There is controlling precedent for reliance on unambiguous statutory language, rather than the legislative history, in both the United States Supreme Court (*Exxon Mobil Corp. v. Allapattah Serv., Inc.*, 545 U.S. 546, 568, 125 S.Ct. 2611, 2626, 162 L.Ed.2d 502 (2005) ("As we have repeatedly held, the authoritative statement is the statutory text, not the legislative history or any other extrinsic material")) and, more recently, in the Third Circuit (*In re Federal-Mogul Global, Inc.*, 684 F.3d 355, 374 (3d Cir. 2012) (deciding that pre-Code bankruptcy practice and legislative history "is too equivocal to overcome the plain meaning of the text")).[7]

The Indenture Trustees also argue that there is no controlling law regarding the statutory interpretation of §1129(b)(1)'s "not discriminate unfairly" language. More particularly, the

---

[7]In *Federal-Mogul*, the Third Circuit interpreted §1123(a):
the critical words here are "Notwithstanding any otherwise applicable nonbankruptcy law . . ." The Supreme Court has held that a "notwithstanding" clause "clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions," noting numerous instances when the courts of appeals "have interrupted similar 'notwithstanding' language. . . to supercede all other laws, stating that '[a] clearer statement is difficult to imagine.'"
*Federal-Mogul*, 684 F.3d at 369 quoting *Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 16, 113 S.Ct. 1898, 123 L.Ed.2d 572 (1993).

Indenture Trustees contend that the Bankruptcy Court erred in measuring the *materiality* of the alleged discrimination.  The Indenture Trustees argue that no Third Circuit or Supreme Court cases have addressed the issue of how to measure *materiality*, especially when certain creditors are entitled to the benefits of a subordination agreement.

The Indenture Trustees argue that this Court wrongfully determined that the DCL Plan did not discriminate *unfairly* against the Senior Noteholders by disputing the Court's method of applying the facts, including stipulated calculations of potential recovery scenarios under the DCL Plan, to measure whether the DCL Plan's treatment of Senior Noteholders resulted in a *materially* lower percentage recovery.  *See Tribune III*, 472 B.R. at 242-43.  This part of the Unfair Discrimination Issue is fact-intensive.  The Second Circuit has noted:

> Congress believed direct appeal would be most appropriate where we are called upon to resolve a question of law not heavily dependent on the particular facts of a case, because such questions can often be decided based on an incomplete or ambiguous record.  *See* H.R. Rep. No. 109-31, at 148-49, U.S. Code Cong. & Admins. News 2005, 88, 206 (noting that Congress did not expect that [§158(d)(2)(A)] would be used to facilitate direct appeal of "fact-intensive issues," but rather "anticipated that . . . [for such issues] district court judges or bankruptcy appellate panels" would suffice).  When a discrete, controlling question of law is at stake, we may be able to settle the matter relatively promptly.

*Weber v. United States Trustee*, 484 F.3d 154, 158 (2d Cir. 2007).  The issue concerning how this Court  measured materiality is not a pure legal issue; it is not appropriate for direct appeal.  *American Home Mortg. Inv. Corp. v. Lehman Bros., Inc. (In re American Home Mortg. Inv. Corp.)*, 408 B.R. 42, 43-44 (D.Del. 2009) (deciding that mixed questions that implicate the particular circumstances of the case are not pure legal questions warranting direct certification), *Bepco LP v. Globalsantafe Corp. (In re 15375 Memorial Corp.)*, 2008 WL 2698678, *1 (D.Del. July 3, 2007) (deciding that "factual issues preclude a direct appeal" under 28 U.S.C.

§158(d)(2)).

The Indenture Trustees also argue that the SWAP Claim Issue is a pure legal issue requiring interpretation of the PHONES Indenture to determine if the SWAP Claim is falls within the definition of "Senior Indebtedness." Article 1.12 of the PHONES Indenture provides that the Indenture "shall be governed by and construed in accordance with the laws of the State of Illinois except as may be otherwise required by mandatory provisions of law." *Tribune II,* 464 B.R. at 215. Interpretation of the PHONES Indenture requires application of state law and is not appropriate for direct appeal to the Third Circuit. *15375 Memorial,* 2008 WL 2698678 at *1.

### Public Importance

The Indenture Trustees also argue that the Unfair Discrimination Issue should be certified for direct appeal under §158(d)(2)(i) because it is an issue of public importance. Specifically, it argues that enforcement of third-party contractual subordination rights is a matter of concern to the public markets. To constitute an issue of "public importance," the issue on appeal must transcend the litigants and involve a legal question, the resolution of which will advance the cause of jurisprudence to a degree that is usually not the case." *American Home Mortg.,* 408 B.R. at 44 citing 1 *Collier on Bankruptcy* 5.05(A) (15th ed. rev.). Despite the Indenture Trustees' insistence on the impact of the Unfair Discrimination Issue, I cannot agree that the issue will have any such repercussions. As discussed above, my interpretation of the word "notwithstanding" is in accord with controlling law in the Third Circuit and the remainder of the Unfair Discrimination Issue involves factual issues specific to this case.

### Advancing the Case

Finally, the Indenture Trustees also argue that certifying a direct appeal will materially

advance the Debtors' cases by providing all parties in interest, including the appellants, with the finality they "deserve" on the Unfair Discrimination Issue.  As discussed by the *Weber* Court, the Indenture Trustees contend that allowing a direct appeal would be helpful since parties adversely affected by the Bankruptcy Court's decision on the Unfair Discrimination Issue might very well "fold up their tents if convinced that the ruling has the approval of the court of appeals, but will not give up until that becomes clear." *Weber,* 484 F.3d at 158.  However, due to the number of appeals of the Confirmation Order involving  various issues, a final decision on the Unfair Discrimination Issue is not likely to materially advance this case because there are still a number of issues on appeal challenging confirmation of the DCL Plan.

2.      The EGI Certification Motion

EGI requests certification of a direct appeal of the issue of whether the Bankruptcy Court erred in confirming the DCL Plan because the DCL Plan improperly subordinates EGI's claims to distributions from chapter 5 avoidance actions and other third party recoveries.  EGI argues that certification is required pursuant to §158(d)(2)(A)(ii) and (iii) because this issue involves a question of law requiring resolution of conflicting Third Circuit decisions and resolution of the issue will materially advance the case.

"Conflicting" Decisions

In the 2011 Confirmation Decision, citing to *Off'l Comm. Of Unsecured Creditors of Cybergenics Corp. v. Scott Chinery (In re Cybergenics Corp.),* 226 F.3d 237, 245 (3d Cir. 2000), I decided that certain chapter 5 avoidance assets were not assets of the debtor and, therefore, were not subject to subordination provisions that applied to "assets of the Company." *Tribune I,* 464 B.R. at 200. *See also Tribune II*, 464 B.R. at 213-14 (defining the "Subordination

Determination"). However, upon reconsideration and further review of the meaning of the

phrase "[u]pon distribution of the assets of the Company" in light of applicable state law and the

entirety of the PHONES Indenture, I determined that the phrase "assets of the Company" must be

read broadly and amended the 2011 Confirmation Opinion to strike the Subordination

Determination. *Tribune II*, 464 B.R. at 213-21. In the Allocation Decision, I determined that the

same reasoning, along with the Third Circuit decision in *In re PWS Holding Corp.*, 303 F.3d 308

(3d Cir. 2002), rendered the subordination provisions of the EGI Subordination Agreement

applicable to chapter 5 causes of action. *Tribune III*, 472 B.R. at 251-56.

EGI argues that the Subordination Determination in the 2011 Confirmation Decision,

which was struck in the Reconsideration Decision, and the determinations in the Allocation

Decision, demonstrate that the Third Circuit must resolve the conflict between *Cybergenics* and

*PWS*. However, as discussed in the Allocation Decision, the *PWS* Court explained that its

opinion does not conflict with *Cybergenics. PWS*, 303 F.3d at 315.[8]  *See also Tribune III*, 472

---

[8]In *PWS*, a creditor sought to assert state law fraudulent transfer actions, arguing that the
confirmed chapter 11 plan could not extinguish those claims because *Cybergenics* decided that the debtor
did not *own* those claims. The Third Circuit held that the chapter 11 plan, which had been confirmed
over the creditor's objection, could properly extinguish those claims, explaining:

> In arguing that his claims as a noteholder were not extinguished under the
> Reorganization Plan and Confirmation Order, [creditor] fixates upon our conclusion in
> *Cybergenics* that fraudulent transfer claims do not constitute assets of the debtor in
> possession. In doing so, however, he neglects to consider the well-established rule under
> § 544(b) that we reaffirmed in *Cybergenics*, namely, that "a debtor in possession is
> empowered to pursue ... fraudulent transfer claims for the benefit of all creditors." *Id.* at
> 245. Unlike in *Cybergenics*, the debtor in possession in this case, after thoroughly
> investigating and evaluating the potential fraudulent transfer claims, explicitly
> extinguished all such claims in its Reorganization Plan. The District confirmed the
> Reorganization Plan in its December 7, 1999 order, which we then affirmed in *PWS
> Holding Corp.*, 228 F.3d [224] at 250. Much as a party might decide to resolve a claim
> by reaching an out-of-court settlement, [debtor] resolved the fraudulent transfer claims
> here by extinguishing them. In contrast, the debtor in *Cybergenics* merely completed a
> sale of its assets. It did not exercise its power under § 544(b) to resolve potential
> fraudulent transfer claims, as did the debtor in this case.

*PWS*, 303 F.3d at 315.

B.R. at 253-54. In the Allocation Decisions, I decided that *PWS* applied to this case because the Debtors have proposed a plan that exercised their power to resolve, or to pursue through the Litigation Trust, potential fraudulent transfer claims on behalf of creditors under Bankruptcy Code §544(b) and §548.

Mandatory certification is not appropriate because *Cybergenics* and *PWS* are not in conflict.

### Advancing the Case

EGI further argues that certification will materially advance this case since it would be far more efficient for the Third Circuit to resolve the subordination issues raised in EGI's appeal and the Indenture Trustees' appeal simultaneously.  Because I have already determined that the Indenture Trustees' issues are not entitled to certification for direct appeal, this argument has no merit.

For the reasons set forth above, Law Debenture's Certification Motion and EGI's Certification Motion will be denied.


II.    **The Stay Motions**

Aurelius and the Indenture Trustees (the "Movants") request that this Court enter a stay to prevent the Debtors from consummating the DCL Plan until final resolution of their appeals.  In their reply papers, the Movants modified their request, asking that the stay preventing consummation of the DCL Plan be issued for a period of 180 days, with no supersedeas bond, subject to the right to request an extension of the stay from the appropriate court.

Bankruptcy Rule 8005 ("Stay Pending Appeal") provides, in pertinent part, that:

11

> A motion for a stay of the judgment, order, or decree of the bankruptcy judge, for approval of a supersedeas bond, or for other relief pending appeal must ordinarily be presented to the bankruptcy judge in the first instance . . . .  [T]he bankruptcy judge may suspend or order the continuation of other proceedings in the case under the Code or make any other appropriate order during the pendency of an appeal on such terms as will protect the rights of all parties in interest.

Fed.R.Bankr.P. 8005.  In determining whether to grant a stay pending appeal, courts should consider:

(1)    whether the stay applicant has made a strong showing that the applicant is likely to succeed on the merits;

(2)    whether the applicant will be irreparably injured absent a stay;

(3)    whether issuance of the stay will substantially injure the other parties interested in the proceeding; and

(4)    where the public interest lies.

*Fox Sports Net West 2, LLC v. Los Angeles Dodgers, LLC (In re Los Angeles Dodgers, LLC),* 465 B.R. 18, 28  (D.Del. 2011) citing *Republic of Philippines v. Westinghouse Elec. Corp.,* 949 F.2d 653, 658 (3d Cir. 1991).   *See also In re W.R. Grace & Co.*, 2012 U.S. Dist. LEXIS 88887 (D.Del. June 27, 2012).

When considering the above factors in a preliminary injunction case, the Delaware District Court discussed that "equal weight for each factor is not required since, the formula cannot be reduced to a set of rigid rules." *Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.,* 397 F.Supp.2d 537, 548 (D.Del. 2005).   Thus, the analysis is flexible.[9]

---

[9]The *Honeywell* Court used a "sliding scale" approach: "[W]hen the movant is more likely to succeed [on the merits], the harm required to be shown is less; if success is less likely, then the harm needed must weigh more heavily in the movant's favor." *Honeywell*, 397 F.Supp.2d at 548 citing *Roland Mach. Co. v. Dresser Indus. Inc.*, 749 F.2d 380, 387-88 (7th Cir. 1984).

<u>A Strong Showing of Success on the Merits</u>

Here, both Aurelius and the Indenture Trustees spend many pages in the Stay Motions discussing why this Court wrongly decided the issues now on appeal.[10]  Although I am satisfied that I have thoroughly - - and correctly - - examined and determined the disputed  issues in the 2011 Confirmation Opinion, the Reconsideration Decision, the Allocation Decision and the Fourth Amended Plan Decision, the Movants have made an adequate showing of likelihood of success on the merits with respect to the issues on appeal to require analysis of the remaining Rule 8005 factors.

<u>The Public Interest</u>

The "public interest" factor does not favor either side.  As stated in the *Adelphia* decision:

> There are public considerations on both sides of this dispute.  On the one hand, there is a significant public interest in vindicating the rights of the minority and preventing the will of the majority to go unchecked by appellate review.  "[A] plan of reorganization which is unfair to some persons may not be approved by the court even though the vast majority of creditors have approved it. [*Protective Comm. For Ind. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414,  435, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968)] On the other hand, there is also a strong public interest in the swift and efficient resolution of bankruptcy proceedings.  Indeed, compromises are favored in bankruptcy precisely for the reason that they "minimize litigation and expedite the administration of a bankruptcy estate." [*In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996)].  On balance however, the public interest does not favor either side and thus, does not affect the Court's determination on the stay.

*ACC Bondholder Group v. Adelphia Commc'n Corp. (In re Adelphia Commc'n Corp.)*, 361 B.R.

---

[10]For Aurelius, the main issue on appeal is the decision to approve the DCL Plan Settlement.  For the Indenture Trustees, the main issues on appeal are (i) the Court erred in deciding that the Plan did not discriminate unfairly against Senior Noteholders because the Plan failed to implement the subordination agreements by providing the same treatment to the Senior Noteholders and Other Parent Claims (this Court determined any affect on the Senior Noteholder's distribution was "immaterial") and (ii) the Court erred in determining that the Swap Claim is "Senior Indebtedness" or "Senior Obligation" under the subordination agreements.

337, 367-68 (S.D.N.Y. 2007) (footnote omitted).    The same reasoning with respect to the public interest applies here.

<u>Irreparable Harm to the Movants</u>

Under the circumstances before me, the key exercise is the balancing of any irreparable harm to the Movants with any substantial injury to the non-moving parties.

Irreparable harm is an injury that cannot be redressed by a legal or equitable remedy following a trial. *Los Angeles Dodgers*, 465 B.R. at 34 citing *Novartis Consumer Health, Inc. v. Johnson & Johnson - Merck Consumer Pharms. Co.*, 290 F.3d 578, 595 (3d Cir. 2002).  In the *Dodgers* case, the Court determined that the movants would suffer irreparable harm if the stay were not granted due to the movants' loss of "unique sport-related marketing or media opportunities" and "being forced to negotiate with less leverage than it contracted for." *Los Angeles Dodgers*, 465 B.R. at 35-36.  Further, to establish irreparable harm, a movant must demonstrate an injury that is neither remote nor speculative, but actual and imminent. *W.R. Grace*, 2012 U.S.Dist. LEXIS 88887 at *14.

The Senior Noteholders argue they will suffer irreparable harm if a stay is not granted because (i) if the Debtors are able to effectuate the DCL Plan and distribute estate assets prior to the adjudication of the appeal, it is possible that those estate assets (which the Movants argue belong to non-LBO creditors or are subject to subordination agreements) will be difficult to recover, and (ii) once distributions are made, the DCL Plan Proponents will move to dismiss the appeals as "equitably moot."[11]

---

[11]However, in their papers and at the Stay Hearing, for what appear to be strategic reasons, the Movants were careful not to argue that, without a stay and after the occurrence of the DCL Plan effective date, it would be impossible to "unscramble the egg."

Some courts have determined that a distribution of funds to diverse parties may constitute irreparable harm because once a distribution is made, funds may be difficult or impossible to recover. *See Rubin v. Pringle (In re Focus Media, Inc.)*, 387 F.3d 1077, 1086 (9th Cir. 2004) (holding that bankruptcy court did not abuse its discretion by granting a preliminary injunction where the "specter" of irreparable harm existed if funds were dissipated), *Adelphia*, 361 B.R. at 351 ("Once the distribution are made pursuant to the Plan, it will become impracticable to ever fashion effective relief for the Appellants."), *In re Netia Holdings, S.A.,* 278 B.R. 344, 357 (Bankr.S.D.N.Y. 2002) (finding balance of hardships weighed in favor of granting a preliminary injunction and stating that 'if the funds leave State Street, they will be distributed to diverse parties and be difficult or impossible to recover. This is of course a concrete example exemplifying the well established principle that piecemeal distribution of the debtor's estate constitutes irreparable harm.").

Aurelius and the Indenture Trustees also argue that they may be irreparably harmed if their appeals may become "equitably moot" under Third Circuit law. Courts have held that this harm, alone, is not sufficient to justify a stay pending appeal. *Los Angeles Dodgers,* 465 B.R. at 36 citing *Schroeder v. New Century Liq. Trust (In re New Century TRS Holdings, Inc.)*, 2009 WL 1833875 at *2 (D.Del. June 26, 2009).

Recently, in *In re Philadelphia Newspapers, LLC*, 2012 WL 3038578 (3d Cir. July 26, 2012), Judge Ambro, writing for a unanimous panel, noted that equitable mootness is an "uncommon act" in which "a court dismisses an appeal even if it has jurisdiction and can grant relief if 'implementation of that relief would be inequitable.'" *Philadelphia Newspapers*, 2012 WL 3038578 at *3 citing *In re Continental Airlines*, 91 F.3d 553, 559 (3d Cir. 1996)

15

(*Continental I*).  Judge Ambro further explained:

> A court arrives at this decision through the application of "prudential" considerations that address "concerns unique to bankruptcy proceedings." *Id.* [*Continental I*] These concerns relate to the adverse effects of the unraveling of a confirmed plan that could result from allowing the appeal to proceed. The equitable mootness doctrine recognizes that if a successful appeal would be fatal to a plan, prudence may require the appeal be dismissed because granting relief to the appellant "would lead to a perverse outcome." *United States Tr. v. Official Comm. of Equity Sec. Holders ( In re Zenith Elecs. Corp.)*, 329 F.3d 338, 343 (3d Cir. 2003). A "perverse outcome" often involves injury to third parties, particularly investors, who have relied on the confirmed plan, *see Nordhoff Invs. Inc. v. Zenith Elecs. Corp.*, 258 F.3d 180, 184 (3d Cir. 2001) ("One inequity, in particular, that is often at issue is the effect upon innocent third parties. When transactions following court orders are unraveled, third parties not before us who [took actions] in reliance on those orders will likely suffer adverse effects."), or the potential for chaos in the bankruptcy court, *see Continental I*, 91 F.3d at 560–61 (citing *In re Robert Farms*, 652 F.2d 793 (9th Cir.1981)) (reversal of the plan's confirmation would "create an unmanageable, uncontrollable situation for the Bankruptcy Court").

*Philadelphia Newspapers*, 2012 WL 3038578 at *3.  The "prudential" factors considered in evaluating equitable mootness are:

(1)    whether the reorganization plan has been substantially consummated,

(2)    whether a stay has been obtained,

(3)    whether the relief requested would affect the rights of parties not before the court,

(4)    whether the relief requested would affect the success of the plan, and

(5)    the public policy of affording finality to bankruptcy judgments.

*Id.*  The *Philadelphia Newspapers* Court decided that, after consideration of these factors, a court should apply the equitable mootness doctrine if ordering relief would require the unscrambling of complex bankruptcy reorganizations. *Id.* at *5.

Here, there is a strong possibility that the Movants will be irreparably harmed if the

Debtors are able to effectuate the DCL Plan prior to adjudication of the appeals.  On or after the

effective date, the Debtors will obtain a $1.1 billion new term loan for use, in part, in making

distributions of debt, will distribute cash of approximately $1.9 billion, as well as common stock

or warrants, to thousands of creditors.  It will certainly be difficult to "unscramble the egg" if the

DCL Plan is allowed to go effective, since it is unlikely that the distributions could be recovered,

or, if recoverable, would be challenging and costly.[12]

<u>Substantial Injury to Non-Moving Parties</u>

Finally, in determining whether to grant a stay during the appeal, I must consider whether

a stay would cause substantial injury to non-moving parties with an interest in the proceeding.

The Movants argue that a stay maintaining the status quo would not harm the non-moving parties

because this bankruptcy case has already been pending for four years and, over the course of the

bankruptcy, the Debtors' enterprise value has increased.

Not surprisingly, the DCL Plan Proponents contend that a stay would substantially harm

them and "thousands of non-moving creditors, employees, customers and other stakeholders."

They argue that any stay must be conditioned upon the posting of a bond to protect them from

such injury.  I cannot agree with the Movants' counterintuitive assertion that continued

---

[12]The possibility of equitable mootness, while a factor here for irreparable harm, is not dispositive of the ultimate question of whether to grant a stay pending appeal.  I agree with Judge Scheindlin's comments in the *Adelphia* decision:

> While I place the highest value on the exercise of appellate rights, there is no doubt that the parties seeking appellate review here do so purely for the purpose of acquiring more money.  The right to appeal a loss of even hundreds of millions of dollars is surely less urgent, for example, than the loss of liberty. *Cf. In re St. Johnsbury Trucking Co.*, 185 B.R. at 690 n. 1 (concluding that the risk of the government's appeal being mooted satisfied the irreparable injury requirement only because mootness would preclude the government from, inter alia, enforcing provisions of federal law; it was "that threatened loss rather than the loss of the right to appeal *vel non* that [gave] rise to the Court's irreparable injury finding").

*Adelphia*, 361 B.R. at 352 n. 68.

confinement in chapter 11 will be beneficial to the company, the DCL Plan Proponents or other

non-moving creditors. Instead, to protect the non-moving parties from the substantial harm

(which is described in the next section), a stay will be conditioned upon the posting of a bond.

The Bond Requirement

The DLC Plan Proponents assert that if a stay pending appeal is imposed, the Court

should require the posting of a bond by the Movants to protect the non-moving parties against the

risk of serious potential harm.  I agree.  As discussed in *Adelphia*:

> In determining whether a bond should be ordered, the court looks to whether the bond
> would be necessary to protect "against diminution in the value of property pending
> appeal" and to "secure the prevailing party against any loss that might be sustained as a
> result of an ineffectual appeal." Moreover, the posting of a bond "guarantees the costs of
> delay incident to the appeal." In analyzing whether to order movants to post a bond in
> support of a stay pending an appeal of a bankruptcy court order, district courts have
> obtained guidance from Federal Rule of Civil Procedure 62(d), which requires appellants
> to post a bond when appealing a lower court order absent "exceptional circumstances."

*Adelphia*, 361 B.R. at 350 (citations omitted).[13]

At the Stay Hearing, the DCL Plan Proponents offered the testimony of Eddy W.

Hartenstein, Tribune Company's (the "Company") President and Chief Executive Officer.  Mr.

Hartenstein testified that, while difficult to quantify, five distinct types of harms would befall the

Company upon imposition of a stay:

1.      brand erosion ("[A] constant gnawing at what it is we stand for amongst our
        clients, our subscribers, our customers, our viewers, and the business partner that
        we try to do business with." Tr. 8/17/12 at 20);

2.      lost strategic opportunities ("[B]oth revenue enhancing and expense or cost
        reduction opportunities." Tr. 8/17/12 at 26).

---

[13]I acknowledge that Fed.R.Civ.P. 62(d) is not directly applicable here, but the Court's reasoning
is nonetheless highly relevant.

3.      difficulty in recruiting and retaining talent  ("It has been difficult to retain . . . key individuals, let alone recruit new talent that we need for . . . new initiatives that we have." Tr. 8/17/12 at 32);[14]

4.      continued administrative expenses ("It's roughly $400 million so far." Tr. 8/17/12 at 35); and

5.      placing plan settlements in jeopardy ("It is and was a very complicated feat to get all of the Proponents in agreement on the DCL Plan . . . It is my fear that . . . we [will] find ourselves back at square one." Tr. 8/17/12 at 36).

The DCL Plan Proponents also offered the expert testimony of David S. Kurtz, Vice Chairman of Investment Banking and Head of the Global Restructuring Group at Lazard, Ltd., the Debtors' investment banker and financial advisor.  Mr. Kurtz assumed that the course of appeal would take two years.[15]  The DCL Plan Proponents offer three methodologies for calculating a bond amount:

First, full protection from potential harms would require a bond in the amount of $4.515 billion, the Debtors' approximate equity value upon emergence. (This excludes allocations to the Senior Noteholders.)

Second, a bond could properly be set in the amount of $3 billion or more, representing the

---

[14]As one specific example about this category of harm, Mr. Hartenstein testified that the company's failure to find a chief technology officer, a critical role in the industry today, was due primarily, if not exclusively, to the Company's inability to, among other things, offer an equity component to any compensation it could offer while in chapter 11.

[15]This was based on data compiled by the Administrative Office the United States Courts (Ex. K-4) and included appeals proceeding first to the District Court, then to the Court of Appeals for the Third Circuit.  I do not mean by this suggest to the District Court or the Court of Appeals (should any appeals reach that far) how their respective dockets should proceed, but some assumption must be made about how far out to calculate potential harm.  I rely on the only evidence presented to do so.  *See* Ex. K-4 (reflecting a median time of 24.3 months from filing in lower court to Court of Appeals disposition. Tr. 8/17/12 at 105-08.  Any further adjustments to the bond requirements are the prerogatives of the appellate court(s) before whom any appeal(s) will lie.  *See* Fed.R.Bankr.P. 8005, Fed.R.App.P. 8.  At the Stay Hearing, no party challenged the notion that the District Court would not be the last stop on this tour.

sum of the difference between (i) the already determined distributable enterprise value $7.019 billion, and (ii) the estimate of the Debtors' liquidation value ($3.3 to $3.8 billion), plus estimated administrative, legal and related costs during any stay and completion of the liquidation.

Third, and the method pressed hardest by the DCL Plan Proponents, calls for a bond in the amount of at least $1.548 billion, calculated as follows:[16]

(1)    Additional professional fees and administrative costs ($113 million);

(2)    Lost opportunity costs incurred by non-moving creditors occasioned by the delay in reinvesting anticipated cash distributions under the DCL Plan ($272 million);

(3)    Lost opportunity costs incurred by non-moving creditors occasioned by the delay in reinvesting anticipated free cash flow distributions after emergence ($14 million);

(4)    Harm caused by delay in the Company's new senior secured term loan or any replacement facility for that loan ($156 million);

(5)    Potential harm to non-moving creditors who are to receive equity under the Plan, but whose equity holdings would be exposed to market volatility and other risks. ($992 million). Kurtz, whose testimony was obviously well thought out and credible, describes this last sub-category as an "equity put option," analogizing it (at its simplest) to an insurance policy against a decline in equity value due to downside market risks.

---

[16] I note that this is the most detailed (and least expensive) of the alternatives presented by the DCL Plan Proponents.

The Movants protest that if the potential harms identified by the DCL Plan Proponents here warrant the posting of a bond, *every* appeal of a confirmation order would as well.   The DCL Plan Proponents respond that:

> [A] supersedeas bond is especially important in the context of a complicated and multi-faceted plan of reorganization in a large and complex chapter 11 case, where, as here, a debtor's business operations, its wherewithal, and the anticipated distributions of billions of dollars of consideration to thousands of creditors, may be threatened by a stay.

DCL Objection to Stay, at 31-32.

The Debtors are an enterprise previously valued at over $7 billion with two major operating divisions: (1) publishing, which includes eight major market daily newspapers plus other publications, and (2) broadcasting, which includes 23 television stations in 19 markets, plus cable operations and radio stations.  This particular industry continues to exist in a volatile state. I am convinced that the Movants should be required to post a bond as a condition of receiving a stay pending appeal.  That leaves, then, the task of quantifying the potential harm for the purpose of fixing the amount of a bond.  I look first at the five-part third alternative offered by the DCL Plan Proponents.

1.      Incremental costs during a stay

Kurtz testified that the incremental costs of a stay pending appeal was calculated based upon an analysis of the average monthly administrative costs from August through October, 2011 (a period he said to be one "during the lowest point of the bankruptcy case." (Tr. 8/17/12 at 96)), or about $4.7 million per month for a total of $113 million.  This activity would encompass:

(a)     non-ordinary course transactions which would still require court approval, such as use, sale and lease of assets, contracts, settlements, financing renewals, management incentive plans and other employment-related issues;

(b)      creditors committee and lender professionals' reporting and monitoring costs;

(c)      Federal Communications Commission work (needed to obtain FCC approval for transfer of broadcast licenses under the confirmed plan) that would need to be redone after conclusion of the appeals;

(d)      work in connection with emerging from chapter 11 that would have to be redone;

(e)      additional fee application processing and fee examiner expenses;

(f)      multi-district litigation-related work (pending in the District Court of the Southern District of New York) because a litigation trustee would not be in place; and

(g)      various other miscellaneous costs incurred.

Tr. 8/17/12 at 95-104.

In addition, this Court's experience with cases that are consigned for an extended period to that no-man's land - - a time and place between the date of confirmation and the plan effective date - - is that this period is rife with uncertainty, sometimes causing parties to seek court guidance and relief on matters that would otherwise be unnecessary.

2.      Lost opportunity costs from delay in reinvesting distributable cash

Under the DCL Plan, approximately $1.9 billion is to be distributed to non-movants after the Effective Date. Kurtz testified that the lost opportunity costs here are estimated by determining the difference between investment income currently generated by the Debtors with cash on hand and anticipated rates of return that could reasonably be earned by non-moving creditors during the stay period, which Kurtz calculated "conservatively" at 6.896% based upon the Merrill Lunch U.S. High Yield Master II Index, a rate "commonly used" to analyze the high yield market. (The Movants offered no credible evidence of their own about the appropriate rate of return.)

22

The non-moving creditors could earn $272 million, while the funds sitting in the Debtors'

hands, could earn only $383,000, due to investment restrictions imposed by Bankruptcy Code

§345. *See* Tr. 8/17/12 at 107-14.

3.    Lost opportunity costs from delay in reinvesting free cash flow

Kurtz also testified that the Debtors expected to generate free cash flow after emerging

from chapter 11, half of which would be used to pay debt and half of which could be distributed

to the Company's new equity holders (primarily the Senior Lenders).  Using the same

assumptions as above, two years of aggregate free cash flow of about $272 million reinvested at a

rate of 6.896% yields a $14 million result. *See* Tr. 8/17/12 at 115-16.

4.    Potential harm from delay in debt refinancing

Under the DCL Plan, the Debtors plan to obtain a post-emergence $1.1 billion new senior

term loan.  Some creditors are to receive their distribution in the form of a "strip," which consists

of a combination of cash, stock and debt.  Assuming the debt component would trade at par and

that such debt could be sold for cash and again assuming an investment rate of return at 6.896%,

the lost return by non-moving creditors on distributed debt ($1.095 billion) would be $156

million. *See* Tr. 8/17/12 at 116-17.

5.    Downside market risk

I understand that the "equity put option" price is an attempt to quantify, in a principled

way, the specific and identifiable, but arguably elusive, market risks and volatility described by

Messrs. Hartenstein and Kurtz in their testimony.  At the Stay Hearing, the Movants attacked the

soundness of this "downside market risk" assessment designed to protect against the potential

decline in equity value during the course of appeals. Tr. 8/17/12 at 117-31. While this concept,

23

employing the Black-Scholes method used typically to value options, is intriguing, I am disinclined to apply this methodology, never adopted by any court under these circumstances, and now advocated in a contested matter to which the Fed.R.Civ.P. 26(a)(2) requirements do not apply.[9]

The sum of the first four components of this five-part alternative is $555 million, yet I am unconvinced that this would suffice to protect fully against harm to the non-moving creditors during the period of any stay.  Benefits potentially lost by the company's creditors upon an extended appeal include: the right to receive a controlling share of stock of the reorganized debtor, including board designation rights, the right to trade their equity in a more favorable post-emergence market or to share in increased equity value. I also credit Mr. Hartenstein's reasoning concerning brand erosion, lost strategic opportunities and difficulties in recruiting and retaining talent as real components of potential harm from the imposition of a stay pending appeal.

I conclude on this record, and with knowledge gained during the contentious administration of this case,[10] that Mr. Hartenstein's concerns are warranted.  The downside market risk described by Mr. Kurtz is *real* and the non-moving parties are entitled to protection from it during the course of the appeals.  But the Court is unable to quantify definitively this last component of harm (downside market risk) for purposes of fixing a bond amount.  I am

---

[9]*See* Fed.R.Bankr.P. 9014(c), which provides that, unless a court directs otherwise, Fed.R.Civ.P. 26(a)(2) (disclosures regarding expert testimony) are not applicable to a contested matter.

[10]Battles in the ongoing dispute between and among the major constituents in this chapter 11 proceeding have been - - to put it mildly - - unfailingly intense. *See* The Scorpion and the Fox, *Tribune I,* 464 B.R. at 134-35.  The estate-paid professional fees and expenses that have accrued in this case are in excess of $200 million (through only May 2011). I do not yet know how many more tens, or perhaps hundreds, of millions of dollars have been incurred in the more than one year since then.

compelled, therefore, to turn back and examine the other two methodologies suggested by the

DCL Plan Proponents to determine the bond amount necessary to protect the non-moving parties

from harm: post-emergence equity value ($4.515 billion) and the difference between

reorganization and liquidation value ($3 billion plus).[11]   I conclude that either of these

alternative amounts, under these circumstances, and on this record, could serve as reasonable and

justifiable bases for fixing the appropriate amount of a supersedeas bond.  However, the DCL

Plan Proponents main thrust is in support of the scenario for a $1.548 billion bond.  Therefore, I

will limit the amount of a bond to the sum advanced most vigorously by the DCL Plan

Proponents: $1.5 billion ("[A]pproximately 22 percent of the amount at risk . . . ." Tr. 8/17/12 at

134).

The District Court in *Adelphia* described well the "classic clash of competing interests" to

be reconciled  in determining whether to grant a stay pending appeal:

> Without a stay, it is extremely unlikely that Appellants will ever be able to have
> meaningful appellate review of the rulings of the Bankruptcy Court, a non-Article
> III court, and in any event, a lower court. The ability to review decisions of the
> lower courts is the guarantee of accountability in our judicial system. In other
> words, no single judge or court can violate the Constitution and laws of the United
> States, or the rules that govern court proceedings, with impunity, because nearly
> all decisions are subject to appellate review. At the end of the appellate process,
> all parties and the public accept the decision of the courts because we, as a nation,
> are governed by the rule of law. Thus, the ability to appeal a lower court ruling is
> a substantial and important right.

---

[11] I turn to these alternatives because the Movants offered no alternative for a bond amount other
than zero or some "nominal number." Tr. 8/17/12 at 187.  Indeed, although the burden of persuasion rests
with the Movants, they presented no testimony at the Stay Hearing, choosing only to cross examine the
DCL Plan Proponents' two witnesses. *See W.R. Grace*, 2012 U.S. Dist. LEXIS 88887 at *23-24 ("It has
been recognized 'if the movant seeks imposition of a stay without a bond, the applicant has the burden of
demonstrating why a court should deviate from the ordinary full security requirement . . . the Court
declines to do Appellant's work for it.'" (citations omitted)).

On the other hand, a stay of a confirmation order in one of the longest-running and most complex bankruptcies in our history threatens grave harm to thousands of parties who have been waiting for more than four years to obtain sizeable distributions from a group of bankrupt estates. After grueling negotiations, a plan of reorganization and a settlement of many ancillary disputes has been reached. The Plan was put to the vote of creditors and overwhelmingly approved. The Plan was subject to searching review by the Bankruptcy Court, which approved it in a lengthy decision. The inability to consummate the Plan resulting from a stay of that order could cause the estates to incur more than a billion dollars in additional costs or could even cause the Plan to collapse. This is not a risk that should be taken lightly.

*Adelphia*, 361 B.R. at 342 (footnote omitted).  The result I reach in the matter before me achieves the appropriate balance between these two legitimate, competing interests.

Accordingly, for the reasons set forth above, the Movants' request for a stay pending appeal will be granted, *conditioned* upon the posting of a supersedeas bond in the amount of $1.5 billion.  The Movants are ordered to post the required supersedeas bond in the amount of $1.5 billion in cash or bond or a combination thereof by the close of business on August 29, 2012, and certify the same to this Court.

An appropriate order follows.

BY THE COURT:

KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

Dated: August 22, 2012