# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al., | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered |

**Proposed Hearing Date: November 7, 2012 at 1:00 p.m. (ET)**
**Proposed Objection Deadline: October 31, 2012 at 4:00 p.m. (ET)**

## DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO (A) ENTER INTO COMMITMENT LETTER, LENDER FEE LETTERS AND AGENT FEE LETTER IN CONNECTION WITH EXIT FACILITY, (B) ENTER INTO ENGAGEMENT LETTER, FACILITY FEE LETTER AND AGENT FEE LETTER IN CONNECTION WITH REPLACEMENT FACILITY FOR NEW SENIOR SECURED TERM LOAN, (C) PAY ASSOCIATED FEES AND EXPENSES AND (D) FURNISH RELATED INDEMNITIES

The debtors and debtors in possession in the above-captioned cases (each a "Debtor," and

collectively, the "Debtors"),[1] by and through their undersigned counsel, hereby submit this

---

1 The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune

1

motion (the "Motion"), pursuant to sections 363(b) and 503(b)(1) of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), Rules 2002 and 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 2002-1 of the Local Rules of Practice and Procedures of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for entry of an order, substantially in the form attached hereto as Exhibit A, authorizing the Debtors to enter into certain commitment, engagement and fee letters in connection with the debt facilities authorized under their confirmed plan of reorganization. The Debtors also seek authority to pay fees and expenses related thereto, and to furnish the indemnities provided therein, as allowed administrative expenses. In support of this Motion, the Debtors respectfully represent as follows:

## THE LETTERS

1.    The letters that are the subject of this Motion relate to two proposed debt facilities: (i) a senior secured asset-based revolving credit facility of up to $300 million (the "Exit Facility" or the "Senior Credit Facility"),[2] generally used to fund ongoing operations after effectiveness of the plan, and (ii) a senior secured term loan facility in an aggregate amount of up to $1.1 billion (the "Term Loan Facility"), used exclusively to fund cash distributions to certain

---

Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268).  The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

[2] The Exit Facility, which is described as such in the Debtors' plan of reorganization, is referred to as the Senior Credit Facility in the summary of Exit Facility terms provided later in this Motion solely for the purpose of maintaining consistency with the terminology of the Exit Facility documentation.

creditors under the Debtors' plan of reorganization.[3]  The Exit Facility and the Term Loan Facility are defined herein as the "Proposed Facilities."

2.    The Debtors seek authority to enter into the following letters in connection with the Exit Facility:

(a) a commitment letter (the "ABL Commitment Letter"), substantially in the form attached hereto as Exhibit B, by and among Tribune Company (the "Company"), Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"), Bank of America, N.A. ("BofA"), J.P. Morgan Securities LLC ("J.P. Morgan"), JPMorgan Chase Bank, N.A. ("JPMCB"), Citigroup Global Markets Inc. ("Citigroup"), Credit Suisse AG ("CS"), Credit Suisse Securities (USA) LLC ("CS Securities"), Deutsche Bank Securities Inc. ("DBSI") and Deutsche Bank Trust Company Americas ("DBTCA") (collectively, the "Exit Facility Parties");

(b) a fee letter (the "ABL Lender Fee Letter") with BofA, Merrill Lynch, J.P. Morgan, JPMCB, Citigroup, Citibank, N.A. ("Citibank"), CS Securities, CS, DBSI and DBTCA;

(c) separate fee letters with parties to the ABL Lender Fee Letter (such separate letters, together with the ABL Lender Fee Letter, the "ABL Lender Fee Letters"); and

(d) a fee letter (the "ABL Agent Fee Letter") with BofA and Merrill Lynch.

3.    The Debtors seek authority to enter into the following letters in connection with the Term Loan Facility:

(a) an Engagement Letter (the "Term Loan Engagement Letter"), substantially in the form attached hereto as Exhibit C, with J.P. Morgan, JPMCB, Citigroup, DBSI, CS Securities and Merrill Lynch (collectively, the "Term Loan Facility Arrangers");

(b) a Facility Fee Letter (the "Term Loan Facility Fee Letter") with J.P. Morgan, JPMCB, Citigroup, DBSI, CS Securities and Merrill Lynch; and

(c) an Agent Fee Letter (the "Term Loan Agent Fee Letter" and collectively with the ABL Lender Fee Letters, the ABL Agent Fee Letter and the Term Loan Facility Fee Letter, the "Fee Letters", and the Fee Letters collectively with the ABL

---

[3] As described in greater detail in this Motion, the Term Loan Facility is a replacement facility for the debt facility referred to in the Debtors plan of reorganization as the New Senior Secured Term Loan.

Commitment Letter and the Term Loan Engagement Letter, the "Letters") with J.P. Morgan and JPMCB.

4.    The Debtors will provide copies of the Fee Letters to the Office of the United States Trustee and the Committee on a confidential and "professionals only" basis, and have set forth the aggregate maximum fees to be paid under the Fee Letters below. Contemporaneously with the filing of this Motion, the Debtors filed the Motion of the Debtors for Entry of an Order Authorizing the Filing of Fee Letters Under Seal (the "Seal Motion"). In the Seal Motion, the Debtors propose to file the Fee Letters under seal with the Bankruptcy Court as is required by the terms of the letter agreements listed above.

## STATUS OF THE CASE AND JURISDICTION

5.    On December 8, 2008 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. An additional Debtor, Tribune CNLBC, LLC,[4] filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on October 12, 2009.

6.    The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b) [Docket Nos. 43, 2333].

7.    On December 18, 2008, the Office of the United States Trustee appointed an official committee of unsecured creditors (the "Committee").

8.    The Bankruptcy Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the

---

[4] Tribune CNLBC, LLC was formerly known as Chicago National League Ball Club, LLC.

relief requested herein are sections 363(b) and 503(b)(1) of the Bankruptcy Code, Bankruptcy Rules 2002 and 6004(h) and Local Rule 2002-1.

## GENERAL BACKGROUND TO THE MOTION

*Confirmation of the Plan*

9.      On July 13, 2012, the Bankruptcy Court entered the Memorandum Overruling Objections to Confirmation of the Fourth Amended Plan of Tribune Company and its Subsidiaries and Denying Clarification Motion [Docket No. 12033] (the "Memorandum") and the Order Overruling Plan Objections and Denying the Clarification Motion [Docket No. 12034], overruling all unresolved objections to the Fourth Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A. (the "Plan")[5] and providing that the Plan would be confirmed, subject to submission of final revisions to the Plan consistent with various resolutions that were made either by agreement or consistent with the Memorandum.

10.      On July 23, 2012, the Bankruptcy Court entered the Order Confirming Fourth Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A. [Docket No. 12074] (the "Confirmation Order").

---

[5] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan.

*Relevant Plan and Confirmation Order Provisions*

11.     The Plan contemplates two post-Effective Date debt facilities.  The first such facility is the Exit Facility described in section 5.10 of the Plan.  The term sheet attached to the Plan as Exhibit 5.10 provides that the Exit Facility will be "a new securitization, asset-based loan facility or other revolving credit facility providing for loans and other extensions of credit in an aggregate amount up to $300 million, with a letter of credit sub-facility of up to $100 million." Id. at Ex. 5.10.  The Confirmation Order has already approved the terms of the Exit Facility and authorized the Debtors to take all actions to enter into and effectuate the Exit Facility.  See Confirmation Order pp. 14-15.

12.     The second debt facility contemplated under the Plan is the New Senior Secured Term Loan or its replacement.  Under the Plan, Holders of Allowed Senior Loan Claims/Senior Guaranty Claims, electing Holders of Allowed Senior Notes Claims, and electing Holders of Allowed Other Parent Claims are entitled to receive the New Senior Secured Term Loan as a component of their recoveries.  See Plan at Art. III.  To the extent that replacement indebtedness is available on commercially reasonable terms, however, the Debtors may instead distribute Cash to such Holders in lieu of all or part of the New Senior Secured Term Loan.  Id. at § 5.6.2. Furthermore, the Confirmation Order provides the Debtors with explicit authority to replace the New Senior Secured Term Loan with replacement indebtedness.  See Confirmation Order p. 18. The Debtors and the other co-proponents of the Plan have decided to take advantage of such option.  The Term Loan Facility that is the subject of this Motion will, if successfully syndicated, replace the New Senior Secured Term Loan contemplated under the Plan.  Replacing the New Senior Secured Term Loan with the Term Loan Facility will allow the Debtors to distribute more cash to creditors, while also offering more beneficial terms and simplifying the Debtors'

distribution process by allowing them to make cash distributions instead of facing the administrative and mechanical burdens of distributing hundreds of participations in a debt facility.

***Efforts to Secure the Proposed Facilities***

13.    The Debtors have spent considerable time and effort evaluating their liquidity needs for their emergence from chapter 11 and on a go-forward basis.  To that end, the Debtors had discussions with numerous financial institutions and weighed their options, including whether it was preferable to engage a single group of lenders to provide both facilities, engage separate lender groups for each facility or, as the Debtors ultimately decided to do, enlist the services of two distinct syndicates, lead by the same banks, to structure and participate in the facilities.  As a result, the Debtors were able to secure a commitment for the Exit Facility and an agreement by the Term Loan Facility Arrangers to pursue, on the Debtors' behalf, the Term Loan Facility.  This Motion addresses both components.

14.    The Debtors have determined that the Exit Facility Parties and the Term Loan Facility Arrangers offered the best option for the Debtors' post-Effective Date liquidity needs. The Debtors have spent the last several weeks negotiating the terms of the Letters and Proposed Facilities with the Exit Facility Parties and the Term Loan Arrangers, as applicable.  After these extensive, arm's length negotiations, the Debtors determined that their entry into the Letters is in the best interests of their estates and creditors.

15.    The Debtors believe that the terms of the Letters and the Proposed Facilities, as discussed in the term sheets referenced in the Letters, are fair and reasonable and are suitable for the Debtors' liquidity needs and for Plan distribution purposes, and such terms are consistent with the terms of similar facilities in today's market.

## THE EXIT FACILITY COMMITMENT DOCUMENTS[6]

16.     On August 6, 2012, the Bankruptcy Court entered the Order Authorizing the

Debtors to (A) Enter Into Expense Letter in Connection With Exit Financing and (B) Pay Certain

Fees and Expenses and Furnish Certain Indemnities Thereunder [Docket No. 12183] (the

"Expense Letter Order") approving entry into an Expense Letter (as defined in the Expense

Letter Order) with BofA and Merrill Lynch and authorizing the Debtors to incur and pay the

expenses due in, and furnish the indemnities provided by, the Expense Letter.  Entry into the

ABL Commitment Letter, the ABL Lender Fee Letters and the ABL Agent Fee Letters

constitutes the next step in the arranging of the Debtors' Exit Facility.

17.     The Exit Facility will be provided upon the terms and conditions set forth in the

ABL Commitment Letter and in the Summary of Terms and Conditions (the "ABL Term Sheet"

or the "Summary of Terms") attached thereto as Exhibit A.  The ABL Commitment Letter

provides that the Company will, *inter alia*, enter into the ABL Agent Fee Letter and the ABL

Lender Fee Letters and provide related indemnities and reimbursements.  The various provisions

of the ABL Commitment Letter related to the indemnification, fees and expenses and termination

are outlined below:

- **Commitments:**  BofA, JPMCB, Citibank, N.A., CS and DBTCA will severally, but not jointly, commit to provide the portion of the principal amount of the Senior Credit Facility in the respective amounts set forth in Schedule II to the ABL Commitment Letter.
- **Syndication:**  Merrill Lynch, J.P. Morgan, Citigroup, CS Securities and DBSI will act as joint lead arranger and joint book runner and will use commercially reasonable efforts to form a syndicate of financial institutions and institutional

---

[6] The descriptions of the terms and provisions of the ABL Commitment Letter and the Exit Facility contained herein are summary in nature, and are qualified in their entirety by the ABL Commitment Letter and the term sheet attached thereto as Exhibit A.  Capitalized terms used but not defined in this section shall have the meanings ascribed to them in the ABL Commitment Letter and related term sheet.

lenders (including the Committed Lenders) reasonably acceptable to the Company for the Senior Credit Facility. The Company will actively assist the Joint Lead Arrangers in achieving a syndication of the Senior Credit Facility, as set forth in the ABL Commitment Letter.

- <u>Fees and Expenses</u>: The Company will reimburse the Commitment Parties from time to time on demand for all reasonable documented out-of-pocket fees and expenses (including, but not limited to, (a) the reasonable fees, disbursements and other charges of Skadden, Arps, Slate, Meagher & Flom LLP, as sole lead counsel to the Joint Lead Arrangers and the Administrative Agent, and of one special or local counsel in each relevant jurisdiction retained by the Joint Lead Arrangers or the Administrative Agent, (b) due diligence expenses and (c) BofA's standard charges for field examinations, including a standard per diem field examiner charge and reasonable documented out-of-pocket expenses) incurred in connection with the Senior Credit Facility, the syndication thereof and the preparation of the definitive documentation therefor, and with any other aspect of the Transaction and any of the other transactions contemplated thereby.

- <u>Indemnification</u>: The Company will indemnify and hold harmless each of the Commitment Parties and each of their affiliates and their respective officers, directors, employees, agents, advisors and other representatives (each an "<u>Indemnified Party</u>") from and against (and will reimburse each Indemnified Party as the same are incurred for) any and all claims, damages, losses, liabilities and expenses (including, without limitation, settlement costs (subject to the limitations set forth below) and the reasonable and documented fees, disbursements and other charges of counsel) that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or by reason of (including, without limitation, in connection with any investigation, litigation or proceeding or preparation of a defense in connection therewith) (a) any matters contemplated by the ABL Commitment Letter, the Summary of Terms, any Fee Letter or any aspect of the Transaction and any of the other transactions contemplated hereby or thereby or (b) the Senior Credit Facility and the transactions contemplated thereby, or any use made or proposed to be made with the proceeds thereof, except to the extent such claim, damage, loss, liability or expense (i) is found in a final, nonappealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's bad faith, gross negligence or willful misconduct, (ii) has resulted from a material breach of the ABL Commitment Letter by such Indemnified Party or one of its affiliates, officers, directors or employees, (iii) has resulted from disputes between and among Indemnified Parties to the extent such disputes do not arise from any act or omission of the Company or any of its affiliates (other than claims against an Indemnified Party acting in its capacity as an agent or arranger or similar role under the Senior Credit Facility) or (iv) is an Excluded Claim. "<u>Excluded Claim</u>" shall mean any and all claims, damages, losses, liabilities or expenses that may be incurred by or asserted or awarded against any Indemnified Party, to the extent that (but only to the extent that) such claim, damage, loss,

liability or expense arises out of or relates to the leveraged buyout transactions consummated by Tribune Company in 2007.

- Confidentiality: Subject to certain limited exceptions provided in the ABL Commitment Letter, the ABL Commitment Letter, the Fee Letters and the contents thereof are confidential, except for disclosure thereof (a) on a confidential basis to the Company's board of directors, officers, agents, employees, accountants, attorneys, senior lender co-proponents of the Plan and other professional advisors retained by the Company or them in connection with the Transaction, (b) as may be compelled in a judicial or administrative proceeding or as otherwise required by law, *provided* that the Company shall provide prior written notice to the Commitment Parties of any such disclosure pursuant to the ABL Commitment Letter, unless prohibited by applicable law or court order from doing so, and shall use commercially reasonable efforts to effect any such disclosure on a confidential basis and, in the case of the Fee Letters, under seal or redacted in a manner satisfactory to the Commitment Parties, and (c) the ABL Commitment Letter, and a summary of aggregate fees payable pursuant to the Fee Letters, on a confidential basis to professional advisers to the Creditors' Committee (as defined in the Plan).  Subject to the immediately preceding sentence the ABL Commitment Letter (including the Summary of Terms) and the Fee Letters may not be disclosed in whole or in part to any person or entity without the Commitment Parties' prior written consent; *provided, however,* it is understood and agreed that after the Company accepts the ABL Commitment Letter and the Fee Letters, it shall be permitted to file (a) the ABL Commitment Letter and the Fee Letters (redacted, in the case of the Fee Letters, in a manner satisfactory to the Commitment Parties) on the public docket of the Bankruptcy Court, and (b) so long as they are filed under seal, unredacted Fee Letters in filings with the Bankruptcy Court.

18.    The ABL Term Sheet sets forth the key terms and conditions for the Exit Facility. The final terms and conditions of the Exit Facility will be included in a comprehensive new credit agreement to be entered into on the Effective Date.  However, various key terms and provisions of the Exit Facility as set forth in the ABL Term Sheet are summarized below:

- Borrowers: Tribune Company, a Delaware corporation, as reorganized pursuant to the Plan (the "Company"), and certain of its present and future domestic subsidiaries to be mutually agreed (together with the Company, the "Borrowers").

- Guarantors: The obligations of each Borrower under the Senior Credit Facility shall be guaranteed by each other Borrower and by all existing and future domestic subsidiaries of the Borrowers (subject to customary exclusions, including any entity that is (i) an unrestricted subsidiary, (ii) an immaterial subsidiary (to be defined with respect to individual and aggregate revenues or

assets excluded), (iii) any captive insurance subsidiary, (iv) any subsidiary that directly owns an interest in the Chicago Cubs as long as such subsidiary has no other material assets, (v) Tribune ND, LLC and NBBF, LLC as long as no such entity acquires any additional material assets after the date thereof and (vi) otherwise agreed to by the Company and the Administrative Agent) (the "Guarantors").

- <u>Administrative and Collateral Agent</u>: BofA will act as sole administrative and collateral agent (the "Administrative Agent").

- <u>Joint Lead Arranger and Joint Book Runner</u>: Merrill Lynch (or any of its affiliates) JPMCB (or any of its affiliates), Citigroup (or any of its affiliates), CS Securities (or any of its affiliates) and DBSI (or any of its affiliates) will act as joint lead  arrangers and joint book runner (the "Lead Arrangers").

- <u>Lenders</u>: BofA and each other Committed Lender (as defined in the ABL Commitment Letter) and other banks, financial institutions and institutional lenders acceptable to the Lead Arrangers and the Administrative Agent and reasonably acceptable to the Borrowers (collectively, the "Lenders").

- <u>Senior Credit Facility</u>: A senior credit facility (the "Senior Credit Facility") consisting of a revolving credit facility of up to $300 million, including a $100 million sublimit for letters of credit (which sublimit may be increased to $125 million, with the consent of the Company, the Administrative Agent and Bank of America, N.A., in its capacity as Letter of Credit issuing bank under the Senior Credit Facility) (each a "Letter of Credit") and a sublimit for swingline loans to be agreed (each a "Swingline Loan").

- <u>Purpose</u>: The Senior Credit Facility will be used by the Borrowers to issue standby or commercial letters of credit, pay transaction fees and expenses incurred in connection with the Senior Credit Facility and the transactions contemplated thereby, and to finance ongoing working capital needs and for other general corporate purposes of the Borrowers and their respective subsidiaries.

- <u>Commitment Increase</u>: Subject to the conditions of the ABL Term Sheet, the Borrowers will have the right to request one or more increases of the Senior Credit Facility (a "Commitment Increase"); provided, that the minimum increase on any one occasion shall be $25 million (and increments of $5 million above that minimum).

- <u>Closing Date</u>: The execution of definitive loan documentation, to occur on or before December 31, 2012 (the "Closing Date").

- <u>Interest Rates</u>: At the Company's option, loans will bear interest based on the Base Rate or LIBOR, as described in the ABL Term Sheet (except that all swingline borrowings will accrue interest based on the Base Rate) plus the Applicable Margin.

- <u>Maturity</u>: The Senior Credit Facility shall terminate and all amounts outstanding thereunder shall be due and payable in full, five years after the Closing Date.

- Loan Availability: Advances and Letters of Credit, other than Letters of Credit that have been cash collateralized by the Borrowers, under the Senior Credit Facility will be limited to the lesser of (i) the aggregate commitments from time to time in effect and (ii) the sum of (A) up to 85% of the Borrowers' eligible accounts receivable plus (B) up to $35 million in unrestricted cash which may be credited at the discretion of the Borrowers in a segregated investment account maintained at, and under the control of, the Administrative Agent (provided that such cash has been deposited in such account on the date as of which the Borrowing Base is calculated, and remains in such account through the date as of which the Borrowing Base is tested, it being understood that the Borrowing Base shall be immediately adjusted to reflect any cash removed from such account) minus (C) such reserves as the Administrative Agent may establish in its Permitted Discretion (the "Borrowing Base").

- Security: All obligations (including post-petition interest, fees and charges that accrue after (or which would have accrued but for) the commencement of a bankruptcy case, whether or not allowed) to the Administrative Agent, the Lenders, and to the affiliates of any Lender party to a cash management arrangement or hedge agreement with a Borrower or any subsidiary (the "Secured Parties") will be secured by first priority liens on all of the Borrowers' and all of the Guarantors' existing and future (a) (i) accounts and (ii) supporting obligations, rights, documents, chattel paper, general intangibles (excluding, for the avoidance of doubt, trademarks, trade names and other intellectual property), insurance and instruments relating thereto, (b) cash, cash equivalents, bank accounts (except to the extent such cash, cash equivalents or bank accounts are identified and segregated proceeds of the Second Lien Collateral (as defined below)), and investment accounts identified as cash collateral accounts with respect to the Senior Credit Facility, and (c) all proceeds of the foregoing in each case, subject to exceptions to be mutually agreed (the "First Lien Collateral"). All Senior Credit Facility and other cash management and hedging obligations owing to the Secured Parties will also be secured by second priority liens on all assets of the Borrowers and the Guarantors on which the Term Loan Facility has a first lien (and which shall exclude any and all assets (other than First Lien Collateral) that are expressly excluded from the lien granted in favor of the lenders under the Term Loan Facility) (the "Second Lien Collateral" and, together with the First Lien Collateral, the "Collateral"). The priority of the security interests and related creditor rights between the Senior Credit Facility and the Term Loan Facility would be required to be set forth in a customary intercreditor agreement, which intercreditor agreement shall be in form and substance acceptable to the Commitment Parties, the administrative agent for the Term Loan Facility and the Borrowers (the "Intercreditor Agreement").

- Conditions Precedent: The closing and the making available of the Senior Credit Facility, and each extension of credit thereunder, will be subject to satisfaction or waiver of certain specified conditions precedent.

- Representations, Warranties and Covenants:  The ABL Term Sheet contains certain specified representations, warranties and affirmative and negative covenants which are usual and customary.

- Events of Default:  The ABL Term Sheet contains certain specified events of default which are usual and customary.

- Fees:  The aggregate fees to be paid by Reorganized Tribune in connection with the Exit Facility, at the closing thereof, will not exceed $1.475 million, plus customary ongoing fees relating to administration of the facility.

## THE TERM LOAN FACILITY COMMITMENT DOCUMENTS[7]

19.    The Term Loan Facility will be provided upon the terms and conditions set forth in the Term Loan Engagement Letter and in the Summary of Principal Terms and Conditions (the "Term Loan Term Sheet") attached thereto as Exhibit A.  The Term Loan Engagement Letter provides that the Company will, *inter alia*, enter into the Term Loan Facility Fee Letter and the Term Loan Agent Fee Letter and pay the fees set forth therein, provide indemnities to the Engagement Parties and reimburse the Engagement Parties for all reasonable and documented out-of-pocket fees and expenses.  The various provisions of the Term Loan Engagement Letter related to indemnification, fees and expenses and termination of the Debtors' engagement of the Engagement Parties are outlined below:

- Syndication:  JP Morgan, Citigroup (on behalf of itself and its affiliates as set forth in the Term Loan Engagement Letter), CS Securities, DBSI and Merrill Lynch each agree to act as a joint lead arranger and bookrunner for the Term Loan Facility and use commercially reasonable efforts to assemble a syndicate of financial institutions identified by such parties in consultation with and reasonably satisfactory to the Company to provide the necessary commitments for the Term Loan Facility.  The Company will actively assist the Lead Arrangers in completing a syndication of the Term Loan Facility, as set forth in the Term Loan Engagement Letter.

- Fees and Expenses:  The Company will pay the Engagement Parties the nonrefundable fees set forth in the Fee Letters, on the terms and subject to the

---

[7] The descriptions of the terms and provisions of the Term Loan Engagement Letter and the Term Loan Facility contained herein are summary in nature, and are qualified in their entirety by the Term Loan Engagement Letter and the term sheet attached to the Term Loan Engagement Letter as Exhibit A.  Capitalized terms used but not defined in this section shall have the meanings ascribed to them in the Term Loan Engagement Letter and related term sheet.

conditions set forth therein, in addition to the reimbursement, indemnity and other undertakings set forth in the Term Loan Engagement Letter.  The Arrangement Fee (as defined in the Term Loan Facility Fee Letter) shall be in addition to any original issue discount or upfront fees payable by the Borrower as set forth in the Term Loan Term Sheet.

- Indemnification:  The Company agrees (a) to indemnify and hold harmless each Engagement Party, its respective affiliates and its and their respective officers, directors, employees, advisors, and agents (each, an "Indemnified Person") from and against any and all losses, claims, damages and liabilities to which any such Indemnified Person may become subject arising out of or in connection with the Term Loan Engagement Letter, the Term Loan Facility, the use of the proceeds thereof or any related transaction or any claim, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any Indemnified Person is a party thereto, and to reimburse each Indemnified Person upon demand for any reasonable and documented out-of-pocket legal or other expenses incurred in connection with investigating or defending any of the foregoing; provided that the foregoing indemnity will not, as to any Indemnified Person, apply to (A) losses, claims, damages, liabilities or related expenses to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from (i) the bad faith, willful misconduct or gross negligence of such Indemnified Person or (x) any of its controlled affiliates or any of the officers, directors, employees of any of the foregoing, in each case who are involved in or aware of the Transactions, or (y) any advisors or agents of such Indemnified Person acting at the direction of such Indemnified Person, (ii) a material breach of the Term Loan Engagement Letter by any such Indemnified Person or (iii) disputes between and among Indemnified Persons to the extent such disputes do not arise from any act or omission of the Borrower or any of its affiliates (other than claims against an Indemnified Person acting in its capacity as an agent or arranger or similar role in connection with the Term Loan Facility, unless such claims arise from the gross negligence, bad faith or willful misconduct of such Indemnified Person) or (B) any settlement entered into by such Indemnified Person without the Company's written consent (such consent not to be unreasonably withheld, delayed or conditioned); provided, however, that the foregoing indemnity will apply to any such settlement in the event (x) the Company were offered the ability to assume the defense of the action that was the subject matter of such settlement and elected not to assume such defense or (y) such Indemnified Person shall have requested that the Company reimburse it for legal or other expenses incurred by it in connection with investigating, responding to or defending any proceeding in accordance with the Term Loan Engagement Letter and the Company shall not have reimbursed such Indemnified Person within 30 days of such request), and (b) to reimburse the Engagement Parties and their affiliates on demand for all reasonable and documented out-of-pocket expenses (including due diligence expenses, syndication expenses, travel expenses, and reasonable fees, charges and disbursements of one primary counsel to the Engagement Parties  (and (i) appropriate local counsel in applicable jurisdictions, to the extent necessary, but limited to one local counsel in each such

jurisdiction, (ii) appropriate regulatory and other specialist counsel (including, without limitation, FCC counsel) and (iii) solely in the case of a conflict of interest, one additional counsel in each relevant jurisdiction to the affected Engagement Parties similarly situated)) incurred in connection with the Term Loan Facility and any related documentation (including the Term Loan Engagement Letter, the Term Sheet, the Fee Letters and the definitive financing documentation) or, the administration, amendment, modification, waiver or enforcement thereof. No Indemnified Person shall be liable for (i) any damages arising from the use by others of Information or other materials obtained through electronic, telecommunications or other information transmission systems except to the extent such damages resulted primarily and directly from the bad faith, gross negligence or willful misconduct of such Indemnified Person (as determined by a court of competent jurisdiction in a final and non-appealable judgment) or (ii) any special, indirect, consequential or punitive damages in connection with the Term Loan Facility. For the avoidance of doubt, notwithstanding anything to the contrary in the foregoing, the foregoing indemnity shall not apply to any damages, losses, liabilities or expenses of any Indemnified Person relating to facts, actions, occurrences or omissions occurring prior to December 8, 2008, including without limitation in connection with actions commenced or to be commenced with respect to the leveraged buyout transactions consummated by Tribune Company in 2007.

- <u>Confidentiality</u>:  Neither the Term Loan Engagement Letter, the Term Sheet or the Fee Letters nor any of their terms or substance shall be disclosed, directly or indirectly, to any other person except (a) to the Company's officers, agents, employees, attorneys, accountants and advisors who are directly involved in the consideration of this matter or (b) as may be compelled in a judicial or administrative proceeding (including, without limitation, as may be required to obtain court approval in connection with any acts or obligations to be taken pursuant to the Term Loan Engagement Letter or the Transactions or as otherwise required by law (in which case the Company agrees to inform the Engagement Parties promptly thereof); provided that the foregoing restrictions shall cease to apply (except in respect of the Fee Letters and the contents thereof) after the Closing Date.  In addition, the Term Sheet may be disclosed to any rating agency in connection with the Term Loan Facility.  Notwithstanding anything to the contrary in the foregoing, the Company shall be permitted to (x) file the Fee Letters with the Court under seal and provide an unredacted copy of each of the Fee Letters to the Court, the Office of the United States Trustee, the Creditors' Committee and the other co-proponents of the Plan; <u>provided</u> that such disclosure of the Fee Letters to the Creditors Committee is on a confidential "professionals only" basis and (y) disclose the fees contained in the Fee Letters as part of a generic disclosure to the Court of the aggregate fees, costs and expenses of the Borrower in connection with the Transactions.

20.     The Term Loan Term Sheet sets forth the terms and conditions for the Term Loan

Facility.    The final terms and conditions of the Term Loan Facility will be included in a

comprehensive new credit agreement to be entered into on the Effective Date.    However, various

key terms and provisions of the Term Loan Facility as set forth in the Term Loan Term Sheet are

summarized below:

- Borrower:  Tribune Company, a Delaware corporation (the "Borrower").
- Guarantors:  Each of the Borrower's wholly owned domestic subsidiaries (other than any entity that is (i) an unrestricted subsidiary, (ii) an immaterial subsidiary (to be defined in the Term Loan Credit Agreement with respect to individual and aggregate revenues or assets excluded), (iii) any captive insurance Subsidiary, (iv) any subsidiary that directly owns an interest in the Chicago Cubs as long as such subsidiary has no other material assets (the "Cubs Subsidiaries"), (v) Tribune ND, LLC and NBBF, LLC as long as such entity does not acquire any additional material assets after the date hereof (the "Newsday Subsidiaries" and, together with the Cubs Subsidiaries, the "Excluded Subsidiaries"), or (vi) otherwise agreed to by the Borrower and the Administrative Agent) existing on the Closing Date or thereafter created (including through the Restructuring Transactions (as defined in the Plan) or acquired shall unconditionally guarantee, on a joint and several basis, all obligations of the Borrower under the Term Loan Facility, any interest rate protection agreements, foreign exchange agreements and cash management obligations entered into with an institution that is a Lender or an affiliate of a Lender (collectively, the "Secured Obligations"), up to the maximum amount possible without violating applicable fraudulent conveyance laws.
- Joint Lead Arrangers and Bookrunners:  J.P. Morgan, Citigroup, CS Securities, DBSI and Merrill Lynch.
- Administrative Agent:  JPMCB.
- Co-Syndication Agents and Documentation Agents:  TBD.
- Lenders:  A syndicate of banks, financial institutions and other entities arranged by the Lead Arrangers in consultation with the Borrower (collectively, the "Lenders").
- Type and Amount of Facility:  Senior secured term loan exit facility in the principal amount of $1,100,000,000 comprising a single tranche of term loans (the "Term Loans").
- Availability:  The Term Loans shall be made available to the Borrower in a single drawing on the Closing Date.

- Maturity:  The Term Loan Facility will mature and be repaid in full on the 7th anniversary of the Closing Date (the "Maturity Date") (or, if earlier, the date of acceleration of the Term Loans in accordance with the Term Loan Credit Agreement).

- Amortization:  1.0% of the initial principal amount of the Term Loans on an annual basis payable in quarterly installments, beginning on the last day of the first full fiscal quarter following the Closing Date.

- Incremental Facility:  After the Closing Date and on or before the Maturity Date, the Borrower will have the right, but not the obligation, to increase the amount of the Term Loan Facility by incurring one or more incremental term loan facilities (each, an "Incremental Facility") or to the extent permitted to be incurred as an incremental facility, senior secured notes, senior unsecured debt, second lien debt or subordinated debt in an aggregate principal amount not to exceed an amount to be agreed, in each case under customary terms and conditions to be agreed upon. Such increased amounts will be provided by existing Lenders or other persons who become Lenders in connection therewith; provided that no existing Lender will be obligated to provide any such increased portion of the Term Loan Facility.

- Security:  The Secured Obligations will be secured by all of the following assets of the Borrower and each Guarantor, whether owned on the Closing Date or thereafter created or acquired, on a first-priority basis (the "Term Facility Collateral"): (i) a lien on, and security interest in, and pledge of, all of the capital stock (excluding direct equity interests in joint ventures ("Joint Venture Interests"), but including interests in any holding company holding such Joint Venture Interests) and intercompany notes owned by the Borrower and each other Credit Party, except that only 65% of the capital stock of "first-tier" non-U.S. subsidiaries shall be pledged and (ii) a lien on, and security interest in, all other tangible and intangible properties and assets (including, without limitation, all contract rights, inventory, intellectual property, trade names, equipment, licenses and proceeds of the foregoing, but excluding in any event (a) the First Lien Collateral (as defined in the ABL Term Sheet), (b) FCC licenses, but only to the extent that such security interest would not be permitted under applicable law, (c) motor vehicles as to which a security interest and perfection thereof is required to be effected by recordings of certificates of title under applicable state law, (d) all real property, (e) any commercial tort claims held by or assigned to the Litigation Trust (as defined in the Plan), (f) any equity in any captive insurance subsidiary and any Excluded Subsidiary and (g) properties and assets  for which the costs of obtaining such security interest are excessive in relation to the value of the security to be afforded thereby, as determined by the Administrative Agent in its good faith judgment.  The Secured Obligations will also be secured by a second-priority lien on and security interest in the First Lien Collateral (as defined in the ABL Term Sheet).

- Intercreditor Agreement.  The lien priority, relative rights and other creditors' rights issues in respect of the Term Loan Facility and the Exit Facility will be set forth in a customary intercreditor agreement that is reasonably acceptable to the

17

administrative agent in respect of the Exit Facility, the Administrative Agent and the Borrower (the "Intercreditor Agreement").

- Ranking:  The Term Loan Facility will be a senior obligation of the Borrower, secured by first priority liens on the Term Facility Collateral of the Borrower and second priority liens on the First Lien Collateral (as defined in the ABL Term Sheet) of the Borrower.  The Guarantees will be senior obligations of each Guarantor, secured by first priority liens on the Term Facility Collateral of such Guarantor and second priority liens on the First Lien Collateral (as defined in the ABL Term Sheet) of such Guarantor.

- Purpose:  The proceeds of the Term Loan Facility shall be used to make distributions to creditors in accordance with the Plan.

- Interest Rate and Periods:  The Term Loans will bear interest, at the election of the Borrower, at a per annum rate equal to (i) the sum of Adjusted LIBOR in effect from time *plus* the Applicable Margin or (ii) the sum of the ABR in effect from time to time plus the Applicable Margin.

- Default Rate:  Upon the occurrence of a payment or bankruptcy Event of Default, overdue principal, interest and other amounts shall bear interest at the applicable interest rate (including the Applicable Margin) *plus* 2.0% per annum. The terms and applicability of default interest may be amended with the consent of the Required Lenders.

- Conditions Precedent:  The closing and funding of the Term Loan Facility will be subject to satisfaction or waiver of certain specified conditions precedent.

- Representations, Warranties and Covenants:  The Term Loan Term Sheet contains certain specified representations, warranties and affirmative and negative covenants which are usual and customary.

- Events of Default:  The Term Loan Term Sheet contains certain specified events of default which are usual and customary.

- Fees:  The aggregate fees to be paid by Reorganized Tribune in connection with the Term Loan Facility are $20.35 million.  The terms of the Term Loan Facility may be modified as necessary or advisable to ensure successful syndication, including the payment of additional fees.

## RELIEF REQUESTED

21.    By this Motion, the Debtors respectfully request that the Bankruptcy Court authorize the Debtors to (i) enter into the Letters, (ii) pay the fees and expenses provided for therein as allowed administrative expenses, and (iii) furnish the indemnities provided for therein as allowed administrative expenses.  While the Debtors believe the Confirmation Order already

provides the requisite authority to enter into the Letters and Proposed Facilities, out of an abundance of caution and in the interest of providing their creditors and other parties in interest full disclosure of the terms of the Debtors' Proposed Facilities, the Debtors have filed this Motion.

22.     The Debtors have negotiated the terms of the Letters in good faith and at arm's-length with the counterparties thereto after considering a host of options.    Based on these negotiations, the Debtors believe that the Exit Facility and the Term Loan Facility contain fair market rates and standard terms for such facilities and that the accompanying terms and conditions, fees, expense reimbursement provisions and indemnities provided in the Letters are reasonable and appropriate.    The Debtors further believe that entry into the Letters is an appropriate exercise of their business judgment and the granting of the relief requested herein is in the best interests of their estates.

## BASIS FOR RELIEF REQUESTED

*Entry into the Letters Is a Sound Exercise of the Debtors' Business Judgment.*

23.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).    Courts in this circuit interpreting section 363(b) of the Bankruptcy Code have generally approved the use, sale, or lease of estate property out of the ordinary course of business where there exists a sound business justification for the proposed transaction.    See, e.g., Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996) (noting that courts defer to a trustee's judgment concerning use of property under section 363(b) when there is a legitimate business justification); In re Delaware and Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991) (noting that the Third Circuit has adopted the "sound business purpose" test

19

for the use of property under section 363).  To determine whether the business judgment test is

met, the court "is required to examine whether a reasonable business person would make a

similar decision under similar circumstances."  In re Exide Techs., Inc., 340 B.R. 222, 239

(Bankr. D. Del. 2006).

24.    Once a debtor articulates a valid business justification, it is presumed that "in

making a business decision the directors of a corporation acted on an informed basis, in good

faith and in the honest belief that the action was in the best interests of the company."  In re

Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488

A.2d 858, 872 (Del. 1985)).  The business judgment rule shields a debtor's management from

judicial second-guessing, and mandates that a court approve a debtor's business decision unless

that decision is a product of bad faith or gross abuse of discretion.  See Lubrizol Enters., Inc. v.

Richmond Metal Finishers, Inc., 756 F.2d 1043, 1047 (4th Cir. 1985), cert. denied, 475 U.S. 1057

(1986); see also In re Bridgeport Holdings, Inc., 388 B.R. 548, 567 (Bankr. D. Del. 2008).  Thus,

if a debtor's decisions satisfy the business judgment rule, then the transaction in question should

be approved under section 363(b) of the Bankruptcy Code.

25.    The Bankruptcy Court routinely authorizes debtors to enter into arrangement

agreements, pay fees and expenses and grant indemnities thereunder in connection with efforts to

locate exit financing as a sound exercise of a debtor's business judgment.  See, e.g., In re

AbitibiBowater Inc., No. 09-11296 (Bankr. D. Del. Jul. 14, 2010) (order authorizing entry into

fee letter, reimbursement of expenses and indemnification); In re Cooper-Standard, No. 09-

12743 (Bankr. D. Del. Feb 18, 2010) (order authorizing entry into fee letter and reimbursement

of expenses for proposed exit financings); In re Smurfit-Stone Container Corp., No. 09-10235

(Bankr. D. Del. Jan. 14, 2010) (order authorizing entry into exit term loan facility engagement

and work fee letter and fee letter); In re Spansion Inc., No. 09-10690 (Bankr. D. Del. Jan. 7, 2010) (order authorizing entry into a proposal letter for exit financing and a mandate letter); In re Buffets Holdings, Inc., No. 08-10141 (Bankr. D. Del. Mar. 4, 2009) (order approving the entry into exit facility engagement letter and to authorizing payment of certain fees and expenses).

26.     The Debtors respectfully submit that there are substantial business justifications for allowing the Debtors to enter into the Letters and to pay the fees and expenses set forth therein.  As discussed above, the Exit Facility and the Term Loan Facility (as a replacement to the New Senior Secured Term Loan) are an integral part of the Plan.  Indeed, entry into such facilities has already been blessed by the Bankruptcy Court.  See Confirmation Order at 14-15 and 17-18.  The Debtors, along with the other co-proponents of the Plan, have determined that the Exit Facility will provide the level of financing necessary for the Debtors to emerge successfully from these Chapter 11 Cases.  Entry into the ABL Commitment Letter is the next critical step forward in this process.

27.     Entry into the Term Loan Facility in lieu of issuing the New Senior Secured Term Loan improves the Reorganized Debtors' cost of capital post-emergence.  Apart from this benefit, entry into the Term Loan Facility upon emergence also enables the Debtors to distribute cash immediately, rather than facing the administrative and mechanical burdens of distributing participations in the New Senior Secured Term Loan, only to refinance such facility shortly after the Effective Date.  It is simply more efficient to distribute cash, and the Debtors believe that their creditors would overwhelmingly prefer to receive cash.  Notably, the Debtors' obligation to pay the nonrefundable fees subject of the Term Loan Facility Fee Letter and the Term Loan Engagement Fee Letter only arise if the Lead Arrangers' efforts are successful and thus the Debtors will not incur these costs if the benefits of the Term Loan Facility are not realized.  For

21

example, if the Lead Arrangers are unable to form a syndicate that is committed to providing the Term Loan Facility, the Debtors will not be required to pay the nonrefundable fees. Accordingly, it is a sound exercise of the Debtors' business judgment to enter into the Tern Loan Engagement Letter, the Term Loan Facility Fee Letter and the Term Loan Agent Fee Letter.

### *The Terms of the Letters and Related Term Sheets Are Reasonable and Appropriate under the Circumstances and are Necessary Costs of Preserving the Estates.*

28.    The terms of the Letters are fair and reasonable under the circumstances.  The Debtors went through the extensive process described above to ensure that the terms they obtained for the Exit Facility and the Term Loan Facility are the best available to them.  The terms of the Letters and the related term sheets are products of extensive negotiations conducted in good faith and on an arm's-length basis, and the Debtors understand that the terms are acceptable to the other co-proponents of the Plan.  As such, they contain competitive terms and conditions, including the proposed fees, expenses and indemnities, that are favorable in light of the other discussions the Debtors had with financial institutions and the other proposals received by the Debtors.

29.    The Debtors submit that the fees, expenses and indemnities to be provided under the Letters appropriately constitute "actual necessary costs and expenses of preserving the estates" under section 503(b)(1)(A) of the Bankruptcy Code.  The incurrence of such obligations in connection with the Letters is necessary to the Debtors' efforts to secure the post-Effective Date facilities.  The Debtors therefore submit that their obligations under the Letters should be awarded administrative expense status under section 503(b)(1) of the Bankruptcy Code as actual necessary costs and expenses of preserving their estates.

30.     Because the obligations to be incurred by the Debtors under the Letters are fair, reasonable and necessary to furthering the post-Effective Date financing process, the Debtors seek authorization to incur these obligations as administrative expenses.

## CONCLUSION

31.     The terms of the Letters and the related term sheets are the product of good faith, arm's-length negotiations and are reasonable and appropriate under the circumstances. Moreover, the Exit Facility and Term Loan Facility are necessary to preserving the estates and are critical in facilitating the Debtors' emergence from chapter 11 and on a go-forward basis. For these reasons, the Debtors have determined, in the exercise of their sound business judgment, that entry into Letters and incurrence of the obligations thereunder is in the best interests of the estates and should be approved.

## WAIVER OF BANKRUPTCY RULE 6004(h)

32.     The Debtors seek a waiver of any stay of the effectiveness of the order approving this Motion. Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale or lease of property other than cash collateral is stayed until the expiration of fourteen (14) days after the entry of the order, unless the court orders otherwise." As set forth herein, the relief requested above is essential for the post-Effective Date financing process and to make certain distributions under the Plan, and any delay with respect to the services of the financial institutions counterparty to the Letters and the marketing of the Exit Facility and Term Loan Facility could be detrimental to that process. Accordingly, the Debtors submit that cause exists to justify a waiver of the stay imposed by Bankruptcy Rule 6004(h).

**NOTICE**

33.    Notice of this Motion has been provided to: (i) the Office of the United States Trustee; (ii) counsel for the Committee; (iii) counsel for the administrative agents for Tribune Company's prepetition loan facilities; (iv) counsel for the administrative agent for Debtors' post-petition loan facility; (v) counsel for the financial institutions counterparty to the Letters; and (vi) all parties having requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

WHEREFORE, the Debtors respectfully request that the Bankruptcy Court enter
an order (i) authorizing the Debtors to enter into the Letters and to meet all obligations set forth
therein and (ii) granting such other and further relief as the Bankruptcy Court deems just and
proper.

Dated: Wilmington, Delaware
      October 19, 2012

Respectfully submitted,

SIDLEY AUSTIN LLP
James F. Conlan
Bryan Krakauer
Kevin T. Lantry
Jessica C.K. Boelter
One South Dearborn Street
Chicago, IL 60603
Telephone: (312) 853-0199
Facsimile: (312) 853-7036

-and-

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.

By: _____
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117

ATTORNEYS FOR THE DEBTORS AND DEBTORS
IN POSSESSION