## EXHIBIT B

**ABL Commitment Letter**

EXECUTION VERSION

MERRILL LYNCH, PIERCE,
FENNER & SMITH
INCORPORATED
BANK OF AMERICA, N.A.
One Bryant Park
New York, New York 10036

J.P. MORGAN SECURITIES LLC
JPMORGAN CHASE BANK, N.A.
383 Madison Avenue
New York, New York 10179

CITIGROUP GLOBAL MARKETS
INC.
390 Greenwich Street
New York, New York 10013

CREDIT SUISSE AG
CREDIT SUISSE SECURITIES (USA) LLC
Eleven Madison Avenue
New York, NY 10010

DEUTSCHE BANK SECURITIES INC.
DEUTSCHE BANK TRUST COMPANY AMERICAS
60 Wall Street
New York, New York 10005

October 18, 2012

Tribune Company
435 North Michigan Avenue
Chicago, IL 60611

Attention: Chandler Bigelow, Chief Financial Officer

Re: Senior Secured Asset-Based Loan Facility

Ladies and Gentlemen:

You have advised us that you intend to emerge from chapter 11 protection by implementing and consummating the Fourth Amended Joint Plan of Reorganization for Tribune Company and its Subsidiaries proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A. (as modified July 19, 2012) (as it may be further amended or modified in a manner not adverse to the Commitment Parties (as hereinafter defined) in any material respect, together with all exhibits and schedules thereto, the "*Plan*"). In connection with the Plan, you have advised us that you intend to finance the costs and expenses related to the Transaction (as defined in the Summary of Terms referred to below) and the ongoing working capital and other general corporate purposes of Tribune Company (the "*Company*") and its subsidiaries after consummation of the Plan from the following sources (and that no financing other than the financings described herein will be required in connection with the Transaction): (a) a senior secured asset-based revolving credit facility of the Borrowers (as defined in the Summary of Terms) of up to $300 million (the "*Senior Credit Facility*") and (b) a $1,100 million term loan facility of the Borrowers, which may take the form of a syndicated facility or take-back paper issued to certain existing creditors of the Company, in each case entered into pursuant to, and in accordance with, the Plan (the "*Term Loan Facility*"). The sources and uses for the financing for the Transaction are as set forth on Schedule I hereto.

In connection with the foregoing, each of Bank of America, N.A. ("*Bank of America*") and each of the other financial institutions identified on Schedule II hereto (together with Bank of America, the "*Committed Lenders*") is pleased to advise you of its several, but not joint,

commitment to provide the portion of the principal amount of the Senior Credit Facility set forth opposite its name on Schedule II, all upon and subject to the terms and conditions set forth in this letter (together with each exhibit and schedule hereto, this *"Commitment Letter"*) and in the Summary of Terms and Conditions attached as Exhibit A hereto and incorporated herein by this reference (the *"Summary of Terms"*).   Bank of America is pleased to advise you of its willingness to act as the sole administrative agent (in such capacity, the *"Administrative Agent"*) for the Senior Credit Facility.   Each of Merrill Lynch, Pierce, Fenner & Smith Incorporated (*"MLPFS"*) and each of the other financial institutions identified on Schedule III hereto is pleased to advise you of its willingness, as a joint lead arranger and joint book runner (in such capacities, the *"Joint Lead Arrangers"* and, together with the Committed Lenders, the *"Commitment Parties"*) for the Senior Credit Facility, upon entry of the order authorizing the Borrower's acceptance of this Commitment Letter and the Fee Letters as described below, to use commercially reasonable efforts to form a syndicate of financial institutions and institutional lenders (including the Committed Lenders) (collectively, the *"Lenders"*) reasonably acceptable to you for the Senior Credit Facility.   It is agreed that MLPFS shall have the "left" placement in any and all marketing materials or other documentation used in connection with the Senior Credit Facility and shall hold the leading role and responsibilities conventionally associated with such "left" placement, including sole selling role in respect of the Senior Credit Facility.   You hereby agree that, effective upon your acceptance of this Commitment Letter and continuing through December 31, 2012, you shall not solicit any other bank, investment bank, financial institution, person or entity to provide, structure, arrange or syndicate any component of the Senior Credit Facility or any other senior financing similar to or as a replacement of any component of the Senior Credit Facility.

The commitments and undertakings of the Commitment Parties herein are subject to the satisfaction of each of the following conditions precedent in a manner acceptable to the Commitment Parties:   (a) the accuracy and completeness in all material respects of all representations that you and your affiliates make to the Commitment Parties in connection herewith and your compliance, in all material respects, with the terms of this Commitment Letter (including the Summary of Terms) and the Fee Letters (as hereinafter defined); (b) until the earlier to occur of (i) a Successful Syndication (as defined in the Fee Letters) and (ii) sixty (60) days after the Closing Date (as hereinafter defined), there shall be no competing offering, placement or arrangement of any debt securities or bank financing by or on behalf of the Company or any of its subsidiaries or affiliates (other than the Term Loan Facility or, if the Term Loan Facility is initially in the form of take-back paper, any refinancing thereof with a syndicated facility in accordance with the requirements of a permitted refinancing under the definitive documents of the Senior Credit Facility); and (c) the satisfaction of the conditions precedent contained in the Summary of Terms.

After your acceptance of this Commitment Letter and each Fee Letter, the Joint Lead Arrangers intend to commence syndication of the Senior Credit Facility promptly upon entry of the order authorizing the Borrower's acceptance of this Commitment Letter and the Fee Letters as described below.   You agree to actively assist the Joint Lead Arrangers in achieving a syndication of the Senior Credit Facility that is satisfactory to the Joint Lead Arrangers and you. Such assistance shall include your (a) providing and using commercially reasonable efforts to cause your advisors to provide the Commitment Parties and the other Lenders upon request with all information reasonably deemed necessary by the Commitment Parties to complete

syndication, including, but not limited to, information and evaluations prepared by you and your advisors, or on your or its behalf, relating to the Transaction (including the Projections (as hereinafter defined), the "*Information*"), (b) assisting in the preparation of Information Memorandum and other materials to be used in connection with the syndication of the Senior Credit Facility (collectively with the Summary of Terms, the "*Information Materials*"), (c) using your commercially reasonable efforts to ensure that the syndication efforts of the Joint Lead Arrangers benefit materially from your existing lending relationships and the existing banking relationships of the Company, and (d) otherwise assisting the Commitment Parties in their syndication efforts, including by making your officers and advisors and the officers and advisors of your subsidiaries available from time to time to attend and make presentations regarding the business and prospects of the Company and its subsidiaries and affiliates, as appropriate, at one or more meetings of prospective Lenders, at times and locations to be mutually agreed upon. For the avoidance of doubt, you will not be required to provide any information to the extent that the provision thereof would violate any law, rule or regulation, or any obligation of confidentiality binding upon you or any of your affiliates; *provided* that you will use your commercially reasonable efforts to obtain the consent of the person or persons to whom such obligation of confidentiality is owned to the disclosure of such information to us in accordance with the foregoing; *provided further* that nothing contained in this provision shall be construed to limit, in any manner whatsoever, (i) your representations, warranties and covenants in the sixth paragraph of this Commitment Letter or (ii) any corresponding representations, warranties or covenants in the Authorization Letter (as hereinafter defined). Notwithstanding the Joint Lead Arrangers' right to syndicate the Senior Credit Facility and receive commitments with respect thereto, (i) no Committed Lender shall be relieved, released or novated from its obligations hereunder (including its obligation to fund the amount available to be drawn under the Senior Credit Facility on the Closing Date) in connection with any syndication, assignment or participation of the Senior Credit Facility, including its commitments in respect thereof, until after the Closing Date has occurred, (ii) no assignment or novation shall become effective with respect to all or any portion of any Committed Lender's commitments in respect of the Senior Credit Facility until the initial funding thereof and (iii) unless you and we otherwise agree in writing, each Commitment Party shall retain exclusive control over all rights and obligations with respect to its commitments in respect of the Senior Credit Facility, including all rights with respect to consents, modifications, supplements, waivers and amendments, until the Closing Date has occurred.

Without limiting your obligations to assist with the marketing and syndication efforts as set forth herein, it is understood that the Committed Lenders' commitments hereunder are not conditioned upon the syndication of, or receipt of commitments from other Lenders in respect of, the Senior Credit Facility and in no event shall the commencement or successful completion of syndication of the Senior Credit Facility constitute a condition to the availability of the Senior Credit Facility on the Closing Date. It is understood and agreed that MLPFS will manage and control all aspects of the syndication in consultation with you, including decisions as to the selection of prospective Lenders and any titles offered to proposed Lenders, when commitments will be accepted and the final allocations of the commitments among the Lenders (in each case in consultation with you and reasonably acceptable to you). You further agree that no other titles will be awarded and no compensation (other than that expressly contemplated by the Commitment Letter and the Fee Letters) will be paid in connection with the Senior Credit Facility unless you and we shall so agree.

3

You represent, warrant and covenant that (a) all financial projections concerning the Company and its subsidiaries and affiliates that have been or are hereafter made available to the Commitment Parties or the Lenders by you or any of your representatives (or on your or their behalf) or by any of your subsidiaries or representatives (or on their behalf) (the "*Projections*") have been or will be prepared in good faith based upon reasonable assumptions that you believed to be reasonable at the time made and at the time such Projections are made available to us; it being recognized that such Projections are not to be viewed as facts and that actual results during the period or periods covered by any such Projections may differ significantly from the projected results, and that no assurance can be given that the projected results will be realized, and (b) all Information, other than Projections, other forward looking information and information of a general economic nature, which has been or is hereafter made available to the Commitment Parties or the Lenders by you or any of your representatives (or on your or their behalf) or by any of your subsidiaries or representatives (or on their behalf) in connection with any aspect of the Transaction, as and when furnished, when taken as a whole, is and will be complete and correct in all material respects and does not and will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein not misleading in light of the circumstances under which such statements are made.  You agree to furnish us with further and supplemental information from time to time until the date of the initial extension of credit under the Senior Credit Facility (the "*Closing Date*") and, if requested by us, thereafter until the earlier to occur of (i) a Successful Syndication and (ii) sixty (60) days after the Closing Date, so that the representation, warranty and covenant in the immediately preceding sentence are correct on the Closing Date and on such later date on which the syndication of the Senior Credit Facility is completed as if the Information (including the Projections) were being furnished, and such representation, warranty and covenant were being made, on such date. In issuing this commitment and in arranging and syndicating the Senior Credit Facility, the Commitment Parties are and will be using and relying on the Information without independent verification thereof.

You acknowledge that MLPFS and/or Bank of America on your behalf will make available Information Materials to the proposed syndicate of Lenders by posting the Information Materials on IntraLinks or another similar electronic system.  In connection with the syndication of the Senior Credit Facility, unless the parties hereto otherwise agree in writing, you shall be under no obligation to provide Information Materials suitable for distribution to any prospective Lender (each, a "*Public Lender*") that has personnel who do not wish to receive material non-public information (within the meaning of the United States federal securities laws, "*MNPI*") with respect to the Company, its respective affiliates or any other entity, or the respective securities of any of the foregoing.  You agree, however, that the definitive credit documentation will contain provisions concerning Information Materials to be provided to Public Lenders and the absence of MNPI therefrom.  Prior to distribution of Information Materials to prospective Lenders, you shall provide us with a customary letter authorizing the dissemination thereof (the "*Authorization Letter*").

Subject to the entry of an order by the Bankruptcy Court approving your obligations hereunder, by executing this Commitment Letter, you agree to reimburse the Commitment Parties from time to time on demand for all reasonable documented out-of-pocket fees and expenses (including, but not limited to, (a) the reasonable fees, disbursements and other charges of Skadden, Arps, Slate, Meagher & Flom LLP, as sole lead counsel to the Joint Lead Arrangers and the

Administrative Agent, and of one special or local counsel in each relevant jurisdiction retained by the Joint Lead Arrangers or the Administrative Agent, (b) due diligence expenses and (c) Bank of America's standard charges for field examinations, including a standard per diem field examiner charge and reasonable documented out-of-pocket expenses) incurred in connection with the Senior Credit Facility, the syndication thereof and the preparation of the definitive documentation therefor, and with any other aspect of the Transaction and any of the other transactions contemplated thereby (the "*Expenses*"). You acknowledge that we may receive a benefit, including without limitation, a discount, credit or other accommodation, from any of such counsel based on the fees such counsel may receive on account of their relationship with us including, without limitation, fees paid pursuant hereto.

Subject to the entry of an order by the Bankruptcy Court approving your obligations hereunder, you agree to indemnify and hold harmless each of the Commitment Parties and each of their affiliates and their respective officers, directors, employees, agents, advisors and other representatives (each an "*Indemnified Party*") from and against (and will reimburse each Indemnified Party as the same are incurred for) any and all claims, damages, losses, liabilities and expenses (including, without limitation, settlement costs (subject to the limitations set forth below) and the reasonable and documented fees, disbursements and other charges of counsel) that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or by reason of (including, without limitation, in connection with any investigation, litigation or proceeding or preparation of a defense in connection therewith) (a) any matters contemplated by this Commitment Letter, the Summary of Terms, any Fee Letter or any aspect of the Transaction and any of the other transactions contemplated hereby or thereby or (b) the Senior Credit Facility and the transactions contemplated thereby, or any use made or proposed to be made with the proceeds thereof, except to the extent such claim, damage, loss, liability or expense (i) is found in a final, nonappealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's bad faith, gross negligence or willful misconduct, (ii) has resulted from a material breach of this Commitment Letter by such Indemnified Party or one of its affiliates, officers, directors or employees, (iii) has resulted from disputes between and among Indemnified Parties to the extent such disputes do not arise from any act or omission of the Company or any of its affiliates (other than claims against an Indemnified Party acting in its capacity as an agent or arranger or similar role under the Senior Credit Facility) or (iv) is an Excluded Claim. "*Excluded Claim*" shall mean any and all claims, damages, losses, liabilities or expenses that may be incurred by or asserted or awarded against any Indemnified Party, to the extent that (but only to the extent that) such claim, damage, loss, liability or expense arises out of or relates to the leveraged buyout transactions consummated by Tribune Company in 2007. In the case of an investigation, litigation or proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by you, your equityholders or creditors, a third party or an Indemnified Party, whether or not an Indemnified Party is otherwise a party thereto and whether or not any aspect of the Transaction is consummated. You shall not be liable for any settlement of any proceedings effected without your written consent (which consent shall not be unreasonably withheld, delayed or conditioned), but if settled with your written consent or if there is a final judgment against an Indemnified Party in any such proceedings, you agree to indemnify and hold harmless each Indemnified Party from and against any and all actual losses, claims, damages, liabilities and expenses by reason of such settlement or judgment in accordance with this paragraph. You also agree that no Indemnified Party shall

have any liability (whether direct or indirect, in contract or tort or otherwise) to you or your subsidiaries or affiliates or to your or their respective equity holders or creditors arising out of, related to or in connection with any aspect of the Transaction, except to the extent of direct, as opposed to special, indirect, consequential or punitive, damages determined in a final, nonappealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's bad faith, gross negligence or willful misconduct.  It is further agreed that each Committed Lender shall only have liability to you (as opposed to any other person), and that each Committed Lender shall be liable solely in respect of its own commitment to the Senior Credit Facility on a several, and not joint, basis with any other Lender, and that such liability shall only arise to the extent damages have been caused by a breach of such Committed Lender's obligations hereunder, as determined in a final, nonappealable judgment by a court of competent jurisdiction.  Notwithstanding any other provision of this Commitment Letter, no Indemnified Party shall be liable for any damages arising from the use by others of information or other materials obtained through electronic telecommunications or other information transmission systems, other than for direct or actual damages resulting from the bad faith, gross negligence or willful misconduct of such Indemnified Party as determined by a final and nonappealable judgment of a court of competent jurisdiction.

This Commitment Letter, the fee letter among you, Bank of America and MLPFS of even date herewith (the "***Bank of America Fee Letter***") and any fee letters between you and any other Commitment Party (together with the Bank of America Fee Letter, the "***Fee Letters***") and the contents hereof and thereof are confidential, except for disclosure hereof or thereof (a) on a confidential basis to your board of directors, officers, agents, employees, accountants, attorneys, senior lender co-proponents of the Plan and other professional advisors retained by you or them in connection with the Transaction, (b) as may be compelled in a judicial or administrative proceeding or as otherwise required by law, *provided* that you shall provide prior written notice to us of any such disclosure pursuant to this clause (b), unless prohibited by applicable law or court order from doing so, and shall use commercially reasonable efforts to effect any such disclosure on a confidential basis and, in the case of the Fee Letters, under seal or redacted in a manner satisfactory to us, and (c) the Commitment Letter, and a summary of aggregate fees payable pursuant to the Fee Letters, on a confidential basis to professional advisers to the Creditors' Committee (as defined in the Plan).  Subject to the immediately preceding sentence this Commitment Letter (including the Summary of Terms) and the Fee Letters may not be disclosed in whole or in part to any person or entity without our prior written consent; *provided, however,* it is understood and agreed that after your acceptance of this Commitment Letter and the Fee Letters, you shall be permitted to file (a) the Commitment Letter and the Fee Letters (redacted, in the case of the Fee Letters, in a manner satisfactory to us) on the public docket of the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***"), and (b) so long as they are filed under seal, unredacted Fee Letters in filings with the Bankruptcy Court.  We agree to use commercially reasonable efforts to assist with your efforts to file the Fee Letters under seal, which shall include providing, upon your reasonable request, testimony or other evidentiary support for the necessity of filing such letters under seal.  The Commitment Parties hereby notify you that pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law October 26, 2001) (the "***Act***"), each of them is required to obtain, verify and record information that identifies you, the other Borrowers and the guarantors of the Senior Credit Facility, which information includes the name and address of, and other information regarding, the Borrowers and such guarantors that will allow the Commitment

Parties, as applicable, to identify such parties in accordance with the Act. This notice is given in accordance with the requirements of the Act and is effective as to each Commitment Party and each other Lender. In addition, in the event that any rating is sought with respect to the Senior Credit Facility, the Summary of Terms may be disclosed on a confidential basis to any rating agency in connection therewith.

Each of the Commitment Parties and each of their affiliates agrees to keep confidential, and not to publish, disclose or otherwise divulge, information obtained from or on behalf of you in the course of the Transaction and the other transactions contemplated hereby, except that such party shall be permitted to disclose such confidential information (a) on a confidential basis to its affiliates and its and their respective directors, officers, employees, partners, accountants, attorneys and other professional advisors in connection with the Transaction, (b) on a confidential basis to any Lenders or participants or prospective Lenders or prospective participants, (c) in any legal, judicial or administrative proceeding or as otherwise required by law, (in which case such party agrees, to the extent permitted by law, to inform you promptly thereof), (d) as requested by a governmental authority, including any bank regulatory authority, or any self-regulatory body claiming oversight over any Commitment Party or any of its affiliates, (e) on a confidential basis to any direct or indirect contractual counterparties to any swap or derivative transaction relating to the Company or any of its affiliates or any of their respective obligations under the Senior Credit Facility, who are advised of the confidential nature of such information and agree to keep such information confidential, (f) to the extent such information: (i) becomes publicly available other than as a result of a breach of these confidentiality obligations or (ii) becomes available to such party on a non-confidential basis from a source other than you or on your behalf, (g) to the extent you shall have consented to such disclosure in writing, (h) for purposes of establishing a "due diligence" defense and (i) in protecting and enforcing such party's rights with respect to this Commitment Letter or any Fee Letter. Each Commitment Party's and each of their affiliates' obligations under this paragraph shall automatically terminate and be superseded by the confidentiality provisions in the definitive documentation relating to the Senior Credit Facility upon the execution and delivery of the definitive documentation therefore, and in any event shall terminate one year from the date hereof.

You acknowledge that the Commitment Parties or their affiliates may be providing financing or other services to parties whose interests may conflict with yours. We agree that we will not furnish confidential information obtained from you to any of our other customers and that we will treat confidential information relating to you and your affiliates with the same degree of care as we treat our own confidential information. We further advise you that we will not make available to you confidential information that we have obtained or may obtain from any other customer. In connection with the services and transactions contemplated hereby, you agree that we are permitted to access, use and share with any of our bank or non-bank affiliates, agents, advisors (legal or otherwise) or representatives any information concerning you or any of your affiliates that is or may come into our possession or the possession of any of our respective affiliates; *provided* that we shall not be permitted to utilize any such information for any purpose other than in connection with the Transaction.

You acknowledge that certain of the Committed Lenders currently are acting as lenders under the Credit Agreement, dated as of May 17, 2007, among the Company, the lenders thereto,

JPMorgan Chase Bank, N.A. as administrative agent, Merrill Lynch Capital Corporation, as syndication agent, and Citicorp North America, Inc., Bank of America, N.A. and Barclays Bank PLC, as co-documentation agents, J.P. Morgan Securities Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Citigroup Global Markets Inc. and Banc of America Securities LLC as Joint Lead Arrangers and Joint Bookrunners (as amended, supplemented or otherwise modified from time to time, the *"Existing Senior Credit Agreement"*), and your and your affiliates' rights and obligations under any other agreement with any Commitment Party or any of their affiliates (including the Existing Senior Credit Agreement) that currently or hereafter may exist are, and shall be, separate and distinct from the rights and obligations of the parties pursuant to this Commitment Letter, and none of such rights and obligations under such other agreements shall be affected by any Commitment Party's performance or lack of performance of services hereunder.  You further acknowledges that any Commitment Party or its affiliates may currently or in the future participate in other debt or equity transactions on behalf of or render financial advisory services to you or other companies that may be involved in a competing transaction. You hereby agree that any Commitment Party may render its services under this Commitment Letter notwithstanding any actual or potential conflict of interest presented by the foregoing, and you hereby waive any conflict of interest claims relating to the relationship between any Commitment Party and you and your affiliates in connection with the engagement contemplated hereby, on the one hand, and the exercise by any Commitment Party or any of its affiliates of any of their rights and duties under any credit or other agreement (including the Existing Senior Credit Agreement), on the other hand.  The terms of this paragraph shall survive the expiration or termination of this Commitment Letter for any reason whatsoever.

In connection with all aspects of each transaction contemplated by this Commitment Letter, you acknowledge and agree, and acknowledge your affiliates' understanding, that:   (a) (i) the arranging and other services described herein regarding the Senior Credit Facility are arm's-length commercial transactions between you and your affiliates, on the one hand, and the Commitment Parties, on the other hand, (ii) you have consulted your own legal, accounting, regulatory and tax advisors to the extent you have deemed appropriate, and (iii) you are capable of evaluating, and understand and accept, the terms, risks and conditions of the transactions contemplated hereby; (b) (i) each Commitment Party has been, is, and will be acting solely as a principal and, except as otherwise expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for you, any of your affiliates or any other person or entity and (ii) no Commitment Party has any obligation to you or your affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein; and (c) each Commitment Party and their respective affiliates may be engaged in a broad range of transactions that involve interests that differ from yours and those of your affiliates, and no Commitment Party has any obligation to disclose any of such interests to you or your affiliates. To the fullest extent permitted by law, you hereby waive and release any claims that you may have against any Commitment Party with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated by this Commitment Letter.

The provisions of the immediately preceding seven paragraphs shall remain in full force and effect regardless of whether any definitive documentation for the Senior Credit Facility shall be executed and delivered, and notwithstanding the termination of this Commitment Letter or any commitment or undertaking of any Commitment Party hereunder; provided, however, that upon

the execution and delivery of the definitive documentation for the Senior Credit Facility and the initial extension of credit thereunder on the Closing Date, the reimbursement and indemnification obligations contained in the eighth and ninth paragraphs hereof shall be superseded by the reimbursement and indemnification obligations in such definitive documentation for the Senior Credit Facility.

This Commitment Letter and the Fee Letters may be executed in counterparts which, taken together, shall constitute an original. Delivery of an executed counterpart of this Commitment Letter or any Fee Letter by telecopier or other electronic (e.g. ".pdf" or ".tif") transmission shall be effective as delivery of a manually executed counterpart thereof.

THIS COMMITMENT LETTER (INCLUDING THE SUMMARY OF TERMS) AND EACH FEE LETTER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS COMMITMENT LETTER (INCLUDING THE SUMMARY OF TERMS), ANY FEE LETTER, THE TRANSACTION AND THE OTHER TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY OR THE ACTIONS OF THE COMMITMENT PARTIES IN THE NEGOTIATION, PERFORMANCE OR ENFORCEMENT HEREOF. THE COMMITMENTS AND UNDERTAKINGS OF THE COMMITMENT PARTIES MAY BE TERMINATED BY THE COMMITMENT PARTIES IF YOU FAIL TO PERFORM YOUR MATERIAL OBLIGATIONS UNDER THIS COMMITMENT LETTER OR ANY FEE LETTER ON A TIMELY BASIS.

Each of the parties hereto hereby irrevocably and unconditionally (a) submits, for itself and its property, to the exclusive jurisdiction of any New York State court or Federal court of the United States of America sitting in New York County, or the Bankruptcy Court, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Commitment Letter (including the Summary of Terms), any Fee Letter or the transactions contemplated hereby or thereby (whether based on contract, tort or otherwise), or for recognition or enforcement of any judgment, and agrees that all claims in respect of any such action or proceeding shall only be heard and determined in such New York State court or, to the fullest extent permitted by law, in such Federal court or the Bankruptcy Court, (b) waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Commitment Letter (including the Summary of Terms), any Fee Letter or the transactions contemplated hereby in any New York State or in any such Federal court or the Bankruptcy Court, (c) waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court and (d) agrees that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Each of the parties hereto agrees that service of process, summons, notice or document by registered mail addressed to you or us at the addresses set forth above shall be effective service of process for any suit, action or proceeding brought in any such court.

This Commitment Letter (including the Summary of Terms) and the Fee Letters embody the entire agreement and understanding among the parties hereto and your affiliates with respect to the Senior Credit Facility and supersede all prior agreements and understandings relating to the specific matters hereof.  Any terms of the Senior Credit Facility that are not covered or made clear herein or in the Summary of Terms or the Fee Letters are subject to mutual agreement of the parties.  No party has been authorized by any Commitment Party to make any oral or written statements that are inconsistent with this Commitment Letter.

This Commitment Letter is not assignable by you or the Commitment Parties without the prior written consent of the Commitment Parties or you, respectively, and is intended to be solely for the benefit of the parties hereto and the Indemnified Parties, *provided* that the Commitment Parties may make assignments subject to the last sentence of the fourth paragraph hereof.  Any and all obligations of, and services to be provided by, any Commitment Party hereunder (including, without limitation, any Committed Lender's Commitment) may be performed and any and all rights of any Commitment Party hereunder may be exercised by or through any of their respective affiliates or branches; *provided* that no Commitment Party shall be relieved, released or novated from its obligations hereunder except in accordance with the fourth paragraph of this Commitment Letter.  This Commitment Letter may not be amended or any provision hereof waived or modified except by an instrument in writing signed by each Commitment Party and you.  From and after the Closing Date, each Commitment Party may place advertisements in financial and other newspapers and periodicals or on a home page or similar place for dissemination of information on the Internet or World Wide Web as it may choose, and circulate similar promotional materials, in the form of a "tombstone" or otherwise describing the names of you, the Borrowers and your and their respective subsidiaries (or any of them), and the amount, type and closing date of such Transaction, all at such Commitment Party's expense.

Promptly upon your acceptance of this Commitment Letter, you hereby agree to use your commercially reasonable efforts to obtain an order of the Bankruptcy Court authorizing the Borrower's acceptance of, and performance under, this Commitment Letter and the Fee Letters, which order shall specifically provide, among other things, that the Commitment Parties are entitled to receive all amounts due and owing to each of the Commitment Parties, including the fees as set forth herein and in the Fee Letters and reimbursement of all Expenses, and are entitled to indemnification as provided herein, in each case as and when payable hereunder or thereunder, and all claims for such amounts shall be entitled to priority as administrative expense claims under Sections 503(b)(1) and 507(a)(2) under chapter 11 of title 11 of the United States Code, whether or not the Senior Credit Facility is entered into or funded.

This Commitment Letter and all commitments and undertakings of the Commitment Parties hereunder will expire at 5:00 p.m. (Chicago time) on October 19, 2012, unless you execute this Commitment Letter and the Fee Letters and return them to us prior to that time (which may be by facsimile transmission), whereupon this Commitment Letter (including the Summary of Terms) and the Fee Letters (each of which may be signed in one or more counterparts) shall become binding agreements; *provided* that the undertakings and commitments of the Commitment Parties hereunder shall expire 30 days after the date of this Commitment Letter, unless the Bankruptcy Court shall have entered an order authorizing the Borrower's acceptance of this Commitment Letter and the Fee Letters as described in the immediately preceding paragraph on

10

or prior to such date.  Thereafter, all commitments and undertakings of the Commitment Parties hereunder will expire on December 31, 2012, unless the Closing Date occurs on or prior thereto.

We are pleased to have the opportunity to work with you in connection with this important financing.

Very truly yours,

**BANK OF AMERICA, N.A.**

By: _Brad H Breidenbach_
     Name: _Brad H. Breidenbach_
     Title: _Senior Vice President_


**MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED**

By: _____
     Name: _____
     Title: _____

[ABL Commitment Letter Signature Page]

We are pleased to have the opportunity to work with you in connection with this important financing.

Very truly yours,

**BANK OF AMERICA, N.A.**

By: _____

Name: _____

Title: _____

**MERRILL LYNCH, PIERCE, FENNER & SMITH
INCORPORATED**

By: _____

Name: *John C. McMenamin* _____

Title: *Director* _____

**J.P. MORGAN SECURITIES LLC**

By: _____

Name: _Scott Goodwin_

Title: _Vice President / Officer_

**JPMORGAN CHASE BANK, N.A.**

By: _____

Name: _Marina Levin_

Title: _Executive Director_

[ABL Commitment Letter Signature Page]

**CITIGROUP GLOBAL MARKETS INC.**

By: _____
Name:  Shane V. Azzara
Title:  Director

**CITIBANK, N.A.**

By: _____
Name:  MICHAEL SMOLOW
Title:  Vice President

**CREDIT SUISSE SECURITIES (USA) LLC**

By: _____

Name: _____

Title: _____

Joseph Kieffer
Managing Director

**CREDIT SUISSE AG, CAYMAN ISLANDS
BRANCH**

By: _____

Name: JUDITH E. SMITH

Title: MANAGING DIRECTOR

By: _____

Name: Tyler R. Smith

Title: Associate

[ABL Commitment Letter Signature Page]

**DEUTSCHE BANK SECURITIES INC.**

By: _____
    Name: Manfred Affenzeller
    Title: Director

By: _____
    Name: FRANK FAZIO
    Title: Managing Director

**DEUTSCHE BANK TRUST COMPANY
AMERICAS**

By: _____
    Name: LAUREN BERGEN
    Title: ASSOCIATE.

By: _____
    Name: _____
    Title: **KEVIN CHICHESTER**
             **Director**

14

921649.04E-CHISR02A - MSW

ACCEPTED AND AGREED TO
AS OF THE DATE FIRST ABOVE WRITTEN:

**TRIBUNE COMPANY**

By:    _____
       Name:  Chandler Bigelow
       Title:    EVP/Chief Financial Officer

[ABL Commitment Letter Signature Page]

SCHEDULE I

## SOURCES AND USES OF FUNDS

($ millions)

| SOURCES | | USES | AMOUNT |
|---|---|---|---|
| Senior Credit Facility | $0[1] | Cash to reorganized Tribune | $325 |
| Term Loan Facility | $1,100 | Cash to claims | $2,574 |
| Est. Distributable Cash | $2,779[2] | Takeback paper/payment of claims | $1,100 |
| Step 2 disgorgement settlement | $120 | | |
| **Total Sources** | **$3,999** | **Total Uses** | **$3,999** |

---

[1]    The ABL will be undrawn at closing (other than issuances of L/Cs).

[2]    Distributable Cash is defined in the Plan; reflects estimate of 10/22/2012 balance as of 9/30/2012.

**SCHEDULE II**

## COMMITMENT SCHEDULE

| Lender | Commitment |
|---|---|
| Bank of America, N.A. | $60,000,000 |
| JPMorgan Chase Bank, N.A. | $60,000,000 |
| Citibank, N.A. (or its affiliates) | $60,000,000 |
| Credit Suisse AG, Cayman Islands Branch | $60,000,000 |
| Deutsche Bank Trust Company Americas | $60,000,000 |

**SCHEDULE III**

## JOINT LEAD ARRANGERS AND JOINT BOOK RUNNERS

<u>Financial Institution</u>

Merrill, Lynch, Pierce, Fenner & Smith Incorporated

J.P. Morgan Securities LLC

Citigroup Global Markets, Inc.

Credit Suisse Securities (USA) LLC

Deutsche Bank Securities Inc.

**SUMMARY OF TERMS**

(to be attached)

## SUMMARY OF INDICATIVE TERMS AND CONDITIONS

### $300,000,000 SENIOR CREDIT FACILITY

| | |
|---|---|
| **BORROWERS:** | Tribune Company, a Delaware corporation, as reorganized pursuant to the Plan (as defined in the Commitment Letter) (the "***Company***"), and certain of its present and future domestic subsidiaries as designated by the Company and reasonably acceptable to the Lead Arrangers, including without limitation the subsidiaries listed on Addendum II hereto (together with the Company, the "***Borrowers***"). |
| **GUARANTORS:** | The obligations of each Borrower under the Senior Credit Facility (as defined below) shall be guaranteed by each other Borrower and by all existing and future domestic subsidiaries of the Borrowers (subject to customary exclusions, including any entity that is (i) an unrestricted subsidiary, (ii) an immaterial subsidiary (to be defined with respect to individual and aggregate revenues or assets excluded), (iii) any captive insurance subsidiary, (iv) any subsidiary that directly owns an interest in the Chicago Cubs as long as such subsidiary has no other material assets, (v) Tribune ND, LLC and NBBF, LLC as long as no such entity acquires any additional material assets after the date hereof and (vi) otherwise agreed to by the Company and the Administrative Agent) (the "***Guarantors***"). |
| **ADMINISTRATIVE AND COLLATERAL AGENT:** | Bank of America, N.A. ("***Bank of America***") will act as sole administrative and collateral agent (the "***Administrative Agent***"). |
| **SYNDICATION AGENTS:** | Each of JPMorgan Chase Bank, N.A. (or any of its affiliates), Citibank, N.A. (or any of its affiliates), Credit Suisse AG, Cayman Islands Branch (or any of its affiliates), and Deutsche Bank Securities Inc. (or any of its affiliates) will act as a syndication agent. |
| **JOINT LEAD ARRANGER AND JOINT BOOK RUNNER:** | Merrill Lynch, Pierce, Fenner & Smith Incorporated (or any of its affiliates), JPMorgan Chase Bank, N.A. (or any of its affiliates), Citigroup Global Markets Inc. (or any of its affiliates), Credit Suisse Securities (USA) LLC (or any of its affiliates) and Deutsche Bank Securities Inc. (or any of its affiliates) will act as joint lead arrangers and joint book runner (the "***Lead Arrangers***"). |
| **LENDERS:** | Bank of America and each other Committed Lender (as defined in the Commitment Letter) and other banks, financial institutions and institutional lenders acceptable to the Lead Arrangers and the Administrative Agent and reasonably acceptable to the Borrowers (collectively, the "***Lenders***"). |
| **SENIOR CREDIT FACILITY:** | A senior credit facility (the "***Senior Credit Facility***") consisting of a |

revolving credit facility of up to $300 million, including a $100 million sublimit for letters of credit (each a "*Letter of Credit*") and a sublimit for swingline loans to be agreed (each a "*Swingline Loan*"). Letters of Credit will be issued by Bank of America (in its capacity as Letter of Credit issuing bank, "*Issuing Bank*") (i) on the Closing Date to replace certain existing letters of credit previously issued by Barclays in favor of Zurich American Insurance and (ii) as requested by the Borrowers after the Closing Date from time to time.  In addition, on the Closing Date, the existing letters of credit issued by JPMorgan Chase Bank, N.A. under the Company's existing revolving credit facility will be deemed to be Letters of Credit issued by JPMorgan Chase Bank, N.A. (in its capacity as issuer of such existing letters of credit and, together with Issuing Bank, the "*Fronting Banks*") under the Senior Credit Facility and will remain in effect until the annual renewal date thereof. Swingline Loans may be made available by Bank of America, and each of the Lenders under the Senior Credit Facility will purchase an irrevocable and unconditional participation in each Letter of Credit and each Swingline Loan.  The Senior Credit Facility documentation shall contain only those conditions to borrowing, mandatory prepayments, representations, warranties, covenants and events of default expressly set forth in this term sheet (provided that the collateral and guaranty agreement, security agreement, or other similar security documentation shall contain representations, warranties and covenants regarding the collateral and administration thereof customary for an asset-based loan transaction of this type), and with standards, qualifications, thresholds, exceptions, "baskets" and grace and cure periods to be agreed.

**PURPOSE:**    The Senior Credit Facility will be used by the Borrowers to issue standby or commercial letters of credit, pay transaction fees and expenses incurred in connection with the Senior Credit Facility and the transactions contemplated thereby, and to finance ongoing working capital needs and for other general corporate purposes of the Borrowers and their respective subsidiaries.

**COMMITMENT INCREASE:**    Subject to the conditions below, the Borrowers will have the right to request one or more increases of the Senior Credit Facility (a "*Commitment Increase*"); provided, that the minimum increase on any one occasion shall be $25 million (and increments of $5 million above that minimum).  No consent of any Lender (other than Lenders participating in such Commitment Increase) shall be required to effect any such Commitment Increase.  New Lenders may be added to the Senior Credit Facility with the consent of the Administrative Agent, the Fronting Banks and any lender of Swingline Loans (to the extent such consent would be required under "Assignments and Participations" below) and the Borrowers (such consents not to be unreasonably withheld).  Such Commitment Increase may be provided by existing Lenders or other persons who become Lenders in connection therewith; provided that no existing Lender would be obligated to provide any portion of the Commitment Increase; provided further that (i) no default or event of default exists or would exist after giving effect thereto; (ii) all of the representations and warranties are true and correct in all

2

material respects (unless such representations and warranties are stated to relate to an earlier date, in which case, such representations and warranties shall be true and correct in all material respects as of such earlier date); (iii) the Administrative Agent shall have received any officers' certificates, board resolutions, legal opinions or other documents reasonably requested by the Administrative Agent in connection with the Commitment Increase; (iv) all terms of any such Commitment Increase shall be identical to the Senior Credit Facility; provided that the Borrowers may pay customary upfront and arrangement fees; (v) the Administrative Agent shall have received a certification from a senior officer of the Company, or other evidence reasonably satisfactory to the Administrative Agent, that such Commitment Increase is permitted under the Term Loan Facility (as defined in the Commitment Letter) (except to the extent that the indebtedness thereunder has been discharged in full); and (vi) if the Administrative Agent determines in its reasonable discretion upon the advice of counsel that the same is required by, or advisable under, applicable law, the Borrowers and Guarantors shall enter into any security documents, amendments, confirmations, reaffirmations or other agreements to maintain the perfected security interest of the Administrative Agent in the Collateral with the priority herein contemplated.

**CLOSING DATE:**      The execution of definitive loan documentation, to occur on or before December 31, 2012 (the "*Closing Date*").

**INTEREST RATES:**      As set forth in Addendum I.

**MATURITY:**      The Senior Credit Facility shall terminate and all amounts outstanding thereunder shall be due and payable in full five years after the Closing Date.

**LOAN AVAILABILITY:**      Advances and Letters of Credit, other than Letters of Credit that have been cash collateralized by the Borrowers, under the Senior Credit Facility will be limited to the lesser of (i) the aggregate commitments from time to time in effect and (ii) the sum of (A) up to 85% of the Borrowers' eligible accounts receivable plus (B) up to $35 million in unrestricted cash, which may be credited at the discretion of the Borrowers in a segregated investment account maintained at, and under the control of, the Administrative Agent (provided that such cash has been deposited in such account on the date as of which the Borrowing Base is calculated, and remains in such account through the date as of which the Borrowing Base is tested, it being understood that the Borrowing Base shall be immediately adjusted to reflect any cash removed from such account) minus (C) such reserves as the Administrative Agent may establish in its Permitted Discretion (defined below) (the "*Borrowing Base*"). Standards of eligibility will be specified in the loan documentation and will be determined by the Administrative Agent on the basis of the Administrative Agent's due diligence review. Accounts receivable acquired in connection with a permitted acquisition will be subject to a field exam in order to be

included in the Borrowing Base; provided, that such acquired accounts receivable that otherwise satisfy the eligibility criteria may be included in the Borrowing Base for a period not to exceed 60 days and in an aggregate amount not to exceed 10% of the Borrowing Base pending such field exam.

"Permitted Discretion" shall mean the Administrative Agent's reasonable credit judgment (from the perspective of a secured asset-based lender) exercised in good faith, provided, that (i) circumstances, conditions, events or contingencies arising prior to the Closing Date and disclosed to the Administrative Agent prior to the Closing Date shall not be the basis for any establishment or modification of reserves, eligibility criteria or advance rates (in each case other than reserves with respect to cash management arrangements or hedge agreements) unless (x) in the case of reserves and eligibility criteria, such category of reserves or such eligibility criteria were established on the Closing Date (which may include reserves and eligibility criteria set forth in the initial Borrowing Base Certificate) or (y) such circumstances, conditions, events or contingencies shall have changed since the Closing Date, (ii) any exercise of Permitted Discretion with respect to any reserve (other than reserves with respect to cash management arrangements or hedge agreements) shall be based on a good faith reasonable determination of the Administrative Agent that (x) the circumstances, conditions, events or contingencies giving rise thereto will or reasonably could be expected to adversely affect the value of the accounts in the Borrowing Base, the enforceability or priority of the Administrative Agent's Liens thereon or the amount that the Administrative Agent and Lenders would likely receive in liquidation of any Collateral and (y) the proposed action to be taken by the Administrative Agent to mitigate the effects described in clause (ii)(x) (including the amount of any reserves) bears a reasonable relationship to the circumstance, condition, event or other contingency that is the basis therefor, and (iii) upon delivery of notice to the Borrower by the Administrative Agent of its intent to establish or increase reserves, the Administrative Agent shall be available to discuss the proposed reserves or increase, and Borrowers may take such action as may be required so that the circumstance, condition, event or other contingency that is the basis for such reserves or increase no longer exists, in a manner and to the extent reasonably satisfactory to the Administrative Agent in the exercise of its Permitted Discretion. In no event shall such notice and opportunity limit the right of the Administrative Agent to establish or change such reserves, unless the Administrative Agent shall have determined in its Permitted Discretion that the circumstance, condition, event or other contingency that is the basis for such new reserves or such change no longer exists or has otherwise been adequately addressed by the Borrowers.  In the event that the event, condition or other matter giving rise to the establishment of any reserve shall cease to exist (unless the Administrative Agent determines there is a reasonable prospect that such circumstance, event, condition or other matter will occur again within a reasonable period of time thereafter), the Company may request in writing that the Administrative Agent discontinue the reserve established pursuant to

4

such event, condition or other matter (and the Administrative Agent will have a reasonable period of time to evaluate such request and will be available to discuss such request with the Company). In no event shall such request limit the right of the Administrative Agent to continue such reserves, unless the Administrative Agent shall have determined in its Permitted Discretion that the circumstance, condition, event or other contingency that is the basis for such new reserve has ceased to exist and that there is no reasonable prospect that such circumstance, event, condition or other matter will occur again within a reasonable period of time thereafter.

Subject to the immediately preceding paragraph, in exercising such judgment, the Administrative Agent may consider any factors that could increase the credit risk of lending to Borrowers on the security of the Collateral.

**MANDATORY PREPAYMENTS:** If at any time the outstanding principal amount of loans made to the Borrowers under the Senior Credit Facility together with the undrawn face amount of any Letters of Credit and the aggregate amount of unreimbursed letter of credit obligations (the *"Revolving Exposure"*) exceeds the lesser of (x) the commitments and (y) the Borrowing Base, each Borrower agrees to prepay the loans made to it (and/or cash collateralize Letters of Credit issued at its request) in an amount equal to such excess.

**OPTIONAL PREPAYMENTS AND COMMITMENT REDUCTIONS:** The Senior Credit Facility may be prepaid in whole or in part at any time without premium or penalty, subject to reimbursement of the Lenders' breakage and redeployment costs in the case of prepayment of LIBOR borrowings. The unutilized portion of the commitments under the Senior Credit Facility may be irrevocably reduced or terminated by the Borrowers at any time without penalty.

**SECURITY:** All obligations (including post-petition interest, fees and charges that accrue after (or which would have accrued but for) the commencement of a bankruptcy case, whether or not allowed) to the Administrative Agent, the Lenders, and to the affiliates of any Lender party to a cash management arrangement or hedge agreement with a Borrower or any subsidiary (the *"Secured Parties"*) will be secured by first priority liens on all of the Borrowers' and all of the Guarantors' existing and future (a)(i) accounts and (ii) supporting obligations, rights, documents, chattel paper, general intangibles (excluding, for the avoidance of doubt, trademarks, trade names and other intellectual property), insurance and instruments relating thereto, (b) cash, cash equivalents, bank accounts (except to the extent such cash, cash equivalents or bank accounts are identified and segregated proceeds of the Second Lien Collateral (as defined below)), and investment accounts identified as cash collateral accounts with respect to the Senior Credit Facility, and (c) all proceeds of the foregoing, in each case, subject to exceptions to be mutually agreed (the *"First Lien Collateral"*). All Senior Credit Facility and other cash management and hedging obligations owing to the Secured Parties will also be secured by second priority liens on all assets of the

Borrowers and the Guarantors on which the Term Loan Facility has a first lien (and which shall exclude any and all assets (other than First Lien Collateral) that are expressly excluded from the lien granted in favor of the lenders under the Term Loan Facility) (the "*Second Lien Collateral*" and, together with the First Lien Collateral, the "*Collateral*").

The Term Loan Facility will be secured by a second lien on the First Lien Collateral and by a first lien on the Second Lien Collateral.

The priority of the security interests and related creditor rights between the Senior Credit Facility and the Term Loan Facility would be required to be set forth in a customary intercreditor agreement, which intercreditor agreement shall be in form and substance acceptable to the Commitment Parties, the administrative agent for the Term Loan Facility and the Borrowers (the "*Intercreditor Agreement*").

|  |  |
|---|---|
| **CONDITIONS PRECEDENT TO CLOSING:** | The closing and the making available of the Senior Credit Facility will be subject to satisfaction or waiver by the Commitment Parties of the following conditions precedent: |

        (i)     The negotiation, execution and delivery of definitive documentation with respect to the Senior Credit Facility (including a Senior Credit Facility Agreement, collateral documentation and an Intercreditor Agreement, in each case consistent with the terms hereof) reasonably satisfactory to the Lead Arrangers and the Administrative Agent and receipt by the Lenders of (a) customary closing documentation (including insurance certificates evidencing insurance reasonably satisfactory to the Administrative Agent, lien searches, UCC and other filings, secretary's and other closing certificates, a solvency certificate, a borrowing base certificate prepared on the last day of the last month prior to the Closing Date and legal opinions) and (b) reasonably satisfactory evidence that the Administrative Agent (on behalf of the Lenders) shall have a valid and perfected first priority (subject to certain exceptions to be set forth in the loan documentation) lien and security interest on the First Lien Collateral and a valid and perfected second priority (subject to certain exceptions to be set forth in the loan documentation) lien and security on the Second Lien Collateral to the extent that the lenders under the Term Loan Facility have a perfected first priority lien on such collateral on the Closing Date; provided that blocked account agreements shall be required on the Closing Date only with respect to accounts held at Bank of America, N.A. for which blocked account agreements are contemplated hereunder (and blocked account agreements for all other accounts for which blocked account agreements are contemplated hereunder shall be delivered by a date to be mutually agreed).

        (ii)    Receipt of all governmental, shareholder and third party

consents (excluding the Confirmation Order, which is addressed under conditions (vi) and (vii) below) and approvals necessary in connection with the Plan, the Senior Credit Facility, the Term Loan Facility and the transactions contemplated thereby (collectively, the "*Transaction*") and expiration of all applicable waiting periods without any action being taken by any authority that could restrain, prevent or impose any material adverse conditions on any Borrower, any Guarantor or their respective subsidiaries or such other transactions or that could seek or threaten any of the foregoing, and no law or regulation shall be applicable which in the reasonable judgment of the Administrative Agent could have such effect.

(iii)    No change, occurrence or development shall have occurred or become known to any Commitment Party since December 31, 2011, that could reasonably be expected to have a material adverse effect on the business, assets, properties, liabilities (actual or contingent), operations or condition (financial or otherwise) of the Borrowers or their respective subsidiaries, taken as a whole, and the absence of any action, suit, investigation or proceeding pending or, to the knowledge of the Borrowers, threatened in any court or before any arbitrator or governmental authority that (A) could reasonably be expected to have a material adverse effect or (B) is related to the Transaction (other than litigation and appeals relating to the confirmation of the Plan, to the extent not inconsistent with clauses (vi) and (vii) below).

(iv)    The Lenders shall have received a *pro forma* unaudited consolidated balance sheet as to the Company and its subsidiaries giving effect to all elements of the Transaction to be effected on or before the Closing Date, and forecasts prepared by management of the Company (it being agreed that unaudited consolidated financial statements and forecasts in substantially the format of those provided by management to the Lead Arrangers prior to the date hereof are acceptable), each in form reasonably satisfactory to the Lenders.

(v)    The Lead Arrangers shall have received a final, pre-closing roll forward collateral and field examination conducted by Bank of America and/or a third party. If the Closing Date occurs on or after November 15, 2012, the Lead Arrangers shall have received unaudited consolidated financial statements (such financial statements to consist of income statement, balance sheet and cash flow statement) as to the Company and its subsidiaries as of the fiscal quarter ended September 23, 2012 (it being understood that such unaudited consolidated financial statements will not include a Management's Discussion and Analysis of Financial Condition and Results of Operations ("*MD&A*"), footnote disclosures or the recognition of

7

reorganization items and the impact of applying fresh start accounting and it being agreed that financial statements in substantially the format of those provided by management to the Lead Arrangers prior to the date hereof are acceptable).

(vi)    (a) The Bankruptcy Court shall not have expressly stated that it intends to reverse, vacate or reconsider the Confirmation Order in response to any appeal of, or motion to reconsider, the Confirmation Order, or (b) if the Bankruptcy Court has expressly stated such intention, (i) the Bankruptcy Court shall have subsequently stated that it does not intend to reverse, vacate or reconsider the Confirmation Order or (ii) such appeal of, or motion to reconsider, the Confirmation Order, shall have been withdrawn or otherwise denied.

(vii)    (a) Receipt by each Commitment Party of the Plan; (b) the Plan shall have been confirmed pursuant to the Confirmation Order attached as Annex I (the "***Confirmation Order***") and such Confirmation Order shall be in full force and effect and unstayed; (c) the effective date of the Plan shall have occurred without waiver or modification of the conditions thereto in any manner that could be reasonably expected to adversely affect the interests of the Administrative Agent or the Lenders in their capacities as such in connection with the Senior Credit Facility, unless consented to by the Lead Arrangers; and (d) the terms of the definitive documentation for the Term Loan Facility, the Intercreditor Agreement and all other documents, agreements and instruments necessary to consummate the Plan on the Effective Date (as defined in the Plan) shall, unless consented to by the Lead Arrangers, be consistent with the Plan and with the final engagement letter and term sheet for the Term Loan Facility reviewed by the Lead Arrangers prior to the date of the Commitment Letter, exclusive of any changes that do not materially and adversely affect the interests of the Administrative Agent or the Lenders in their capacities as such in connection with the Senior Credit Facility.

(viii)    Entry by the Borrowers into the Term Loan Facility and receipt (unless the Term Loan Facility is in the form of take-back paper) by the Borrowers of net proceeds of not less than $1,100 million on the terms described herein.

(ix)    All accrued reasonable documented out-of-pocket fees and expenses of the Lead Arrangers and the Administrative Agent (including the fees and expenses of one sole lead counsel (and one special or local counsel in each relevant jurisdiction) for the Administrative Agent and the Lead Arrangers shall have been paid.

(x)    Upon giving effect to the initial funding of loans (if any) and initial issuance of Letters of Credit, the consummation of the

8

Transactions and the payment by the Borrowers of all fees and expenses incurred in connection with the Transactions on the Closing Date, Excess Availability (as defined below) shall be at least $125 million.

(xi)    The Administrative Agent and Lenders shall have received at least three business days prior to the Closing Date all documentation and instruments required by regulatory authorities with respect to the Borrowers and the Guarantors under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the Patriot Act, that has been reasonably requested by Lenders at least five business days prior to the Closing Date.

(xii)    The entry of an order of the Bankruptcy Court (the "*Authorization Order*"), in form and substance reasonably satisfactory to the Lead Arrangers and the Administrative Agent, authorizing and directing the Company to assume and perform the obligations set forth in this Term Sheet, the Commitment Letter, and the Fee Letters, which order shall specifically provide that the payment obligations and all other obligations of the Company hereunder and under the Commitment Letter and the Fee Letters thereby assumed shall be entitled to priority as administrative claims against the Company and the other applicable Debtors on a joint and several basis under sections 503(b) and 507(a)(1) of the Bankruptcy Code, whether or not the Term Sheet, the Commitment Letter, the Fee Letter, or the Loan Documents are executed or delivered by any or all of the Debtors or any of the Loans are funded; and such Authorization Order remains in full force and effect, and such Authorization Order has not been vacated, stayed, reversed, modified, or amended in any respect (except to the extent the Lead Arrangers and Administrative Agent shall have consented in writing thereto).

| | |
|---|---|
| **CONDITIONS PRECEDENT TO ALL EXTENSIONS OF CREDIT:** | Each extension of credit under the Senior Credit Facility (including the initial extension of credit) will be subject to satisfaction of the following conditions precedent: (i) all of the representations and warranties in the loan documentation shall be true and correct in all material respects as of the date of such extension of credit (provided that any representation or warranty which is subject to any materiality qualifier shall be required to be true and correct in all respects); (ii) no event of default under the Senior Credit Facility or incipient default shall have occurred and be continuing or would result from such extension of credit (it being understood that representations and warranties relating to the creation, validity, perfection and priority of security interests on the Closing Date shall be limited to the extent that the Administrative Agent is not required hereunder to have a valid and perfected second priority security interest on any of the Second Lien Collateral on such date); (iii) the Administrative Agent shall have received, on a timely basis, a notice of borrowing or notice of issuance or renewal of Letter of Credit, as |

9

appropriate, with respect to such extension of credit, and with respect to an issuance or renewal of Letter of Credit, other customary letter of credit conditions shall have been satisfied; (iv) the Revolving Exposure, after giving effect to the applicable borrowing or issuance or renewal of a Letter of Credit, shall not exceed the lesser of (x) the commitments and (y) Borrowing Base; and (v) no event or circumstances that has or could reasonably be expected to have a material adverse effect.

**REPRESENTATIONS AND WARRANTIES:**

The Secured Credit Facility shall contain the following representations and warranties (applicable to the Borrowers, the Guarantors and their restricted subsidiaries, and which shall be subject to materiality qualifiers, exceptions, thresholds and limitations to be mutually agreed upon): (i) legal existence, qualification and power; (ii) due authorization and no contravention of law, contracts or organizational documents; (iii) governmental and third party approvals and consents; (iv) enforceability; (v) accuracy and completeness of specified financial statements and other information; (vi) no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a material adverse effect; (vii) no material litigation; (viii) no default; (ix) compliance with material contracts where such non-compliance could reasonably be expected to have a material adverse effect; (x) ownership of property; (xi) insurance matters; (xii) tax matters; (xiii) ERISA compliance; (xiv) use of proceeds and not engaging in business of purchasing/carrying margin stock; (xv) status under Investment Company Act; (xvi) accuracy of disclosure; (xvii) compliance with laws (including environmental laws); (xviii) intellectual property; (xix) solvency; (xx) labor matters; (xxi) liens and collateral documents; (xxii) organizational structure on the Closing Date; (xxiii) absence of certain restrictive agreements; (xxiv) accounts; and (xxv) Patriot Act / "know your customer" laws and OFAC / anti-terrorism laws.

**COVENANTS:**

The Senior Credit Facility shall contain the following affirmative, negative and financial covenants (applicable to the Borrowers, the Guarantors and their restricted subsidiaries and which shall be subject to materiality qualifiers, exceptions, thresholds and limitations to be mutually agreed upon):

(a)   Affirmative Covenants – (i) delivery of periodic financial and collateral reporting, including annual audited financial statements (provided that if issuance of audited financial statements for fiscal year 2012 is prevented by certain issues previously disclosed to the Lead Arrangers, annual consolidated financial statements for such period only shall not be required to be audited, it being understood that Borrowers shall be required to otherwise complete the audit process for such period, and deliver a completed audit report together with unaudited consolidated financial statements), unaudited quarterly internally prepared financial statements, and annual financial projections; (ii) delivery of borrowing base certificates monthly, or weekly if (a) Excess Availability (defined below) is

10

less than the greater of (x) 10.0% of the lesser of (i) the total Senior Credit Facility commitments and (ii) the Borrowing Base and (y) $15 million or (b) an event of default has occurred and is continuing until (1) Excess Availability has subsequently been at least the greater of (x) 10.0% of the lesser of (i) the total Senior Credit Facility commitments and (ii) the Borrowing Base and (y) $15 million for thirty (30) consecutive days and (2) no event of default is outstanding during such thirty (30) day period; (iii) delivery of other customary certificates and other information to be agreed; (iv) delivery of notices of certain material events; (v) payment of obligations; (vi) preservation of existence; (vii) maintenance of properties; (viii) maintenance of insurance; (ix) compliance with laws; (x) maintenance of books and records; (xi) inspection rights by the Administrative Agent; (xii) use of proceeds; (xiii) covenant to guarantee obligations, give security; (xiv) compliance with environmental laws; (xv) further assurances; (xvi) designation as senior debt; (xvii) maintenance of cash collateral accounts; (xviii) payment of taxes; (xix) maintenance of licenses; (xx) actions with regard to future subsidiaries; and (xxi) collateral administration.  In addition:

    (i)  The Borrowers will agree to cause all proceeds of accounts receivable included in the Borrowing Base to be forwarded to a lockbox or deposited in a blocked account; provided, that the Administrative Agent will exercise cash dominion over all blocked accounts during any period after (a) Excess Availability is less than the greater of (x) 10.0% of the lesser of (i) the total Senior Credit Facility commitments and (ii) the Borrowing Base and (y) $15 million, or (b) a payment or bankruptcy event of default or, at the election of the Administrative Agent, any other event of default, has occurred and is continuing, until (1) Excess Availability has subsequently been at least the greater of (x) 10.0% of the lesser of (i) the total Senior Credit Facility commitments and (ii) the Borrowing Base and (y) $15 million for thirty (30) consecutive days and (2) no default is outstanding during such thirty (30) day period; provided, further, that during such periods when the Administrative Agent has not exercised cash dominion, such proceeds may thereafter be swept into one or more unblocked concentration accounts; and

    (ii)  The Borrowers shall provide the Administrative Agent with access to allow the Administrative Agent to perform updated field exams once per annum; provided that if an event of default has occurred and is continuing, there shall be no limit to the number of field exams that may be conducted.

As used herein, the term "Excess Availability" shall mean an

amount equal to the difference of (a) the lesser of (i) the aggregate amount of commitments under the Senior Credit Facility and (ii) the Borrowing Base then in effect <u>minus</u> (b) the Revolving Exposure.

(b)    <u>Negative Covenants</u> - Restrictions on (i) indebtedness (including guarantees and other contingent obligations); (ii) liens; (iii) payments of dividends and other distributions; (iv) investments (including loans and advances); (v) sales and other dispositions of property or assets; (vi) prepayments of other indebtedness; (vii) mergers and other fundamental changes; (viii) formation or acquisition of subsidiaries; (ix) adverse amendments of organizational documents; (x) consolidation for tax purposes other than with the Company and its subsidiaries; (xi) changes in accounting policies or reporting practices except as permitted by generally accepted accounting principles in the United States of America ("*U.S. GAAP*"), or changes in fiscal year; (xii) entry into certain restrictive agreements; (xiii) hedging agreements for speculative purposes; (xiv) changes in the nature of business; (xv) transactions with affiliates; (xvi) employee benefit plans; (xvii) no modification of the Term Loan Facility to the extent prohibited by the Intercreditor Agreement; and (xviii) use of proceeds, in each case with such exceptions as may be agreed upon in the loan documentation; <u>provided</u> that (A) dispositions of (x) any publishing asset or business or publishing subsidiary (including Classified Ventures and CareerBuilder) and (y) any real estate shall be generally permitted and (B) exceptions for asset swaps and local marketing agreements (LMAs) shall be included, in each case subject to customary conditions for financings of this type. With respect to the incurrence of indebtedness and liens, sales of assets, payment of dividends and investments (including acquisitions and unrestricted subsidiaries), the negative covenants will be no more restrictive than the Term Loan Facility, except for such changes or restrictions as are necessary or appropriate to reflect the nature of the Senior Credit Facility as an asset-based loan, and will further allow such activities subject to compliance with (i) the absence of a default or event of default, (ii) unless Excess Availability exceeds a threshold to be agreed, pro forma compliance with the Fixed Charge Coverage Ratio (defined below) and (iii) pro forma Excess Availability is greater than the greater of (A) 10% of the lesser of (1) the total Senior Credit Facility commitments and (2) the Borrowing Base and (B) $15 million.

(c)    <u>Financial Covenant</u> - Financial covenants will be limited to a minimum Fixed Charge Coverage Ratio of 1.0 to 1.0, to be tested on a consolidated basis for the Company and its restricted subsidiaries for the four most recently-ended fiscal quarters for which financial statements are available (measured on a building basis for the first four quarters after the Closing

Date), to be tested only if Excess Availability is less than the greater of (x) 10.0% of the lesser of (i) the total Senior Credit Facility commitments and (ii) the Borrowing Base and (y) $15 million (a "*Covenant Trigger Event*"), and as of the last day of each fiscal quarter thereafter until such amount has subsequently been at least the greater of (x) 10.0% of the lesser of (i) the total Senior Credit Facility commitments and (ii) the Borrowing Base and (y) $15 million for thirty (30) consecutive days (a "*Recovery Event*" and the period after a Covenant Trigger Event and prior to a Recovery Event, a "*Covenant Trigger Period*").

For purposes of determining compliance with the financial covenant, any cash equity contribution (which shall be common equity or otherwise in a form reasonably acceptable to the Administrative Agent) made to the Company after the beginning of the relevant fiscal quarter and on or prior to the day that is 10 business days after the day of delivery (or required delivery) of the financial statements with respect to such fiscal quarter will, at the request of the Company, be included in the calculation of Consolidated EBITDA solely for the purposes of determining compliance with the financial maintenance covenant at the end of such fiscal quarter and applicable subsequent periods which include such fiscal quarter (any such equity contribution so included in the calculation of Consolidated EBITDA, a "*Specified Equity Contribution*"); provided that (a) in each four fiscal quarter period, there shall be at least two fiscal quarters in respect of which no Specified Equity Contribution is made, (b) the amount of any Specified Equity Contribution shall be no greater than the amount required to cause the Company and its restricted subsidiaries to be in pro forma compliance with the financial maintenance covenant for the relevant fiscal quarter, (c) all Specified Equity Contributions shall be disregarded for purposes of determining any baskets with respect to the covenants contained in the loan documentation or any other purpose other than for the purposes of determining compliance with the financial maintenance covenant, (d) during the term of the Senior Credit Facility no more than four Specified Equity Contributions may be made and (e) at the time of the making of any Specified Equity Contribution, the Company shall designate the fiscal quarter with respect to which the same is made (which must be consistent with the above requirements) and each Specified Equity Contribution may only count to a single fiscal quarter and applicable subsequent periods which include such fiscal quarter.

As used herein, "*Fixed Charge Coverage Ratio*" shall mean, with respect to any period, the ratio of (a) an amount equal to (i) Consolidated EBITDA (to be defined in a manner to be mutually agreed, giving due regard to the definition thereof

contained in the Company's May 17, 2007, prepetition credit agreement) of the Company and its restricted subsidiaries minus (ii) non-financed capital expenditures and income taxes paid in cash (net of cash tax refunds received) minus (iii) any cash contribution to any pension plan to the extent not deducted in computing consolidated net income to (b) the sum of (i) consolidated cash interest expense (net of cash interest income, but not less than zero), (ii) scheduled principal payments or redemptions with respect to debt for borrowed money (excluding, for the avoidance of doubt, any voluntary or mandatory prepayments with respect thereto), and (iii) certain permitted restricted payments to the extent paid in cash.

**EVENTS OF DEFAULT:**    The Senior Credit Facility shall contain the following events of default, subject to customary exceptions, materiality qualifications and notice and grace periods to be agreed upon: (i) nonpayment of principal when due, and nonpayment of interest, fees or other amounts after a grace period of three business days; (ii) failure to perform or observe covenants set forth in the loan documentation (subject to grace periods where appropriate); (iii) any representation or warranty proving to have been incorrect in any material respect when made or confirmed; (iv) cross-default to other indebtedness in an amount to be agreed; (v) bankruptcy and insolvency defaults (with grace period for involuntary proceedings); (vi) inability to pay debts; (vii) monetary judgment defaults in an amount to be agreed and material nonmonetary judgment defaults; (viii) customary ERISA defaults; (ix) any Guarantor repudiates, revokes or attempts to revoke its guaranty or any actual or asserted invalidity or impairment of the loan documentation; (x) change of control; (xi) actual or asserted invalidity or impairment of any subordination provisions; and (xii) failure of effectiveness of security interests in any First Lien Collateral or in any material portion of the Second Lien Collateral, or any Borrower or Guarantor shall so assert.

**ASSIGNMENTS AND PARTICIPATIONS:**    Subject to the consents described below (which consents will not be unreasonably withheld or delayed), each Lender will be permitted to make assignments to other financial institutions in respect of the Senior Credit Facility in a minimum amount equal to $5 million.

The consent of the Borrowers will be required unless (i) an Event of Default has occurred and is continuing or (ii) the assignment is to a Lender, an affiliate of a Lender or an Approved Fund (as such term shall be defined in the loan documentation); provided, that such consent of the Borrower shall be deemed to have been given if the Borrower has not responded within ten business days of a request for such consent. The consent of the Administrative Agent will be required for any assignment in respect of the Senior Credit Facility to an entity that is not a Lender with a commitment in respect of the Senior Credit Facility, an affiliate of such Lender or an Approved Fund in respect of such Lender. The consent of the Fronting Banks and the lender of any Swingline Loan will be required for any assignment under the Senior Credit Facility.

14

*Assignments Generally*:  An assignment fee in the amount of $3,500 will be charged with respect to each assignment unless waived by the Administrative Agent in its sole discretion. Each Lender will also have the right, without consent of the Borrowers or the Administrative Agent, to assign as security all or part of its rights under the loan documentation to any Federal Reserve Bank.

*Participations*:  Lenders will be permitted to sell participations with voting rights limited to significant matters such as changes in amount, rate, maturity date and releases of all or substantially all of the collateral securing the Senior Credit Facility or all or substantially all of the value of the guaranty of the Borrowers' obligations made by the Guarantors.

|                          |                          |
|--------------------------|--------------------------|
| **WAIVERS AND AMENDMENTS:** | Amendments and waivers of the provisions of the loan agreement and other definitive credit documentation will require the approval of Lenders holding loans and commitments representing more than 50% of the aggregate amount of the loans and commitments under the Senior Credit Facility (the ***"Required Lenders"***), except that (a) the consent of each Lender shall be required with respect to (i) the waiver of certain conditions precedent to the initial credit extension under the Senior Credit Facility, (ii) the amendment of certain of the pro rata sharing provisions, (iii) the amendment of the voting percentages of the Lenders, (iv) increases in Borrowing Base advance rates, (v) the release of all or substantially all of the collateral securing the Senior Credit Facility, and (vi) the release of all or substantially all of the value of the guaranty of the Borrowers' obligations made by the Guarantors; (b) the consent of each Lender affected thereby shall be required with respect to (i) increases or extensions in the commitment of such Lender, (ii) reductions of principal, interest (other than waivers of accrual of default interest) or fees, and (iii) extensions of scheduled maturities or times for payment; (c) the consent of the Lenders holding at least 66-2/3% of the loans and commitments under the Senior Credit Facility shall be required with respect to modification of the definition of the Borrowing Base or the constituent definitions thereof in a manner that is intended to increase availability under the Senior Credit Facility; (d) the consent of the Administrative Agent shall be required with respect to the modification of any provision in a loan document that relates to any rights, duties or discretion of the Administrative Agent; (e) the consent of the Fronting Banks shall be required with respect to the modification of any provision in a loan document that relates to any rights, duties or discretion of the Fronting Banks; and (f) the sublimit for Letters of Credit may be increased to $125 million with the consent of the Company, the Administrative Agent and the Issuing Bank. A "yank-a-bank" provision will be included for non-consenting lenders in connection with votes requiring consent of all lenders, all affected lenders, or supermajority lenders, and may be invoked by the Borrowers or the Administrative Agent. |

On or before the Maturity Date, so long as no default or event of default shall have occurred and be continuing at the time of such extension, the

Borrowers shall have the right to extend the Maturity Date and commitments of all or a portion of the Senior Credit Facility with only the consent of the Lenders whose loans and commitments are being extended, and otherwise on terms and conditions to be mutually agreed by the Administrative Agent and the Borrowers; it being understood that each Lender shall have the opportunity to participate in such extension on the same terms and conditions as each other Lender.

**INDEMNIFICATION:**

The Borrowers will indemnify and hold harmless the Administrative Agent, the Lead Arrangers, each Lender and their respective affiliates and their partners, directors, officers, employees, agents and advisors (the *"Indemnified Parties"*) from and against all losses, claims, damages, liabilities and expenses arising out of or relating to the Senior Credit Facility, any other aspect of the Transaction, the Borrowers' use of loan proceeds or the commitments, including, but not limited to, settlement costs (subject to the limitations set forth below) and the reasonable legal fees of one lead counsel to the Joint Lead Arrangers and the Administrative Agent and of one special or local counsel to the Lead Arrangers and the Administrative Agent in each relevant jurisdiction (together with such conflicts counsel as may be required), except to the extent such loss, claim, damage, liability or expense (i) is found in a final, nonappealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's bad faith, gross negligence or willful misconduct, (ii) has resulted from disputes between and among Indemnified Parties to the extent such disputes do not arise from any act or omission of the Company or any of its affiliates (other than claims against an Indemnified Party acting in its capacity as an agent or arranger or similar role under the Senior Credit Facility) or (iii) is an Excluded Claim. *"Excluded Claim"* shall mean any and all claims, damages, losses, liabilities or expenses that may be incurred by or asserted or awarded against any Indemnified Party, to the extent that (but only to the extent that) such claim, damage, loss, liability or expense arises out of or relates to the leveraged buyout transactions consummated by Tribune Company in 2007. The Borrowers shall not be liable for any settlement of any proceedings effected without their written consent (which consent shall not be unreasonably withheld, delayed or conditioned), but if settled with such written consent or if there is a final judgment against an Indemnified Party in any such proceedings, the Borrowers shall indemnify and hold harmless each Indemnified Party from and against any and all actual losses, claims, damages, liabilities and expenses by reason of such settlement or judgment in accordance with this paragraph. This indemnification shall survive and continue for the benefit of all such persons or entities.

**GOVERNING LAW:**

State of New York.

**PRICING/FEES/EXPENSES:**

As set forth in Addendum I.

**COUNSEL TO THE ADMINISTRATIVE AGENT**

Skadden, Arps, Slate, Meagher & Flom, LLP.

16

**AND THE LEAD ARRANGERS:**

Each of the parties shall (i) waive its right to a trial by jury and (ii) submit to exclusive New York jurisdiction.  The loan documentation will contain customary provisions regarding increased costs, payments free and clear of withholding or other taxes (including a customary exception to the gross-up obligations for withholding relating to FATCA), defaulting lender, capital adequacy and yield protection, including with respect to Dodd Frank and Basel III.

17

Addendum I

# PRICING, FEES AND EXPENSES

**INTEREST RATES:**

At the Company's option, loans will bear interest based on the Base Rate or LIBOR, as described below (except that all swingline borrowings will accrue interest based on the Base Rate) plus the Applicable Margin (defined below).

LIBOR and Base Rate will be defined in accordance with the Administrative Agent's standard practices. LIBOR loans will be subject to customary provisions, including applicable reserve requirements, limits on the number of outstanding LIBOR loans, and minimum dollar amounts of each LIBOR loan.

All interest on loans bearing interest based on the Base Rate will be calculated on the basis of actual number of days elapsed in a year of 365 or 366 days, as applicable. All other interest and per annum fees will be calculated on the basis of actual number of days elapsed in a year of 360 days.

The Company may select interest periods of one, two or three months for LIBOR loans, subject to availability. Interest shall be payable at the end of the selected interest period, but no less frequently than quarterly.

Overdue principal, interest and other amounts under the loan documentation shall bear interest at the Applicable Margin on obligations owing under the loan documentation plus 2% per annum (subject, in all cases other than a default in the payment of principal when due, to the request of the Required Lenders).

**APPLICABLE MARGINS:**

The Applicable Margins will be as set forth in the following table:

| Base Rate Loans | LIBOR Loans |
|---|---|
| 0.50% | 1.50% |

**UNUSED LINE FEE:**

An unused line fee equal to 25.0 basis points per annum, calculated on the unused portion of the Senior Credit Facility, will be payable monthly in arrears. Swingline Loans will not be considered utilization of the Senior Credit Facility for purposes of this calculation.

**LETTER OF CREDIT FEES:**

The Borrowers will pay (a) a letter of credit fee on all letters of credit equal to the applicable LIBOR margin; (b) a 0.125% fronting fee to each Fronting Bank, on the face amount of all outstanding letters of credit; and (c) each Fronting Bank's customary fees and charges in connection with all amendments, extensions, draws and other actions with respect to letters of credit. The fees set forth in clause (a) and (b) above will be payable quarterly in arrears, commencing on the first

quarterly payment date to occur after the Closing Date, and shared proportionately by the Lenders. The fees set forth in clause (c) above will be payable on demand.

**EXPENSES:** The Borrowers will pay all reasonable documented out-of-pocket costs and expenses of the Administrative Agent and the Lead Arrangers associated with the preparation, due diligence, administration, syndication and closing of all loan documentation, including, without limitation, the legal fees of one lead counsel to the Joint Lead Arrangers and the Administrative Agent and of one special or local counsel to the Joint Lead Arrangers and the Administrative Agent in each relevant jurisdiction. The Borrowers will also pay the expenses of the Administrative Agent and each Lender in connection with the enforcement of any of the loan documentation, including, without limitation, the legal fees of (i) one lead counsel to the Joint Lead Arrangers and the Administrative Agent and of one special or local counsel to the Joint Lead Arrangers and the Administrative Agent in each relevant jurisdiction and (ii) one lead counsel to the Lenders and of one special or local counsel to the Lenders in each relevant jurisdiction.

19

Addendum II

## ADDITIONAL SUBSIDIARY BORROWERS

1. California Community News, LLC
2. CastTV, Inc.
3. Chicago Tribune Company, LLC
4. Chicagoland Publishing Company, LLC
5. Hoy Publications, LLC
6. KDAF, LLC
7. KIAH, LLC
8. KRCW, LLC
9. KSWB, LLC
10. KTLA, LLC
11. KTXL, LLC
12. Los Angeles Times Communications, LLC
13. Orlando Sentinel Communications Company, LLC
14. Sun-Sentinel Company, LLC
15. The Baltimore Sun Company, LLC
16. The Daily Press, LLC
17. The Hartford Courant Company, LLC
18. The Morning Call, LLC
19. TMS News and Features, LLC
20. Tower Distribution Company, LLC
21. Tribune 365, LLC
22. Tribune Broadcasting Company, LLC
23. Tribune Broadcasting Hartford, LLC
24. Tribune Broadcasting Indianapolis, LLC
25. Tribune Broadcasting Seattle, LLC
26. Tribune Direct Marketing, LLC
27. Tribune Interactive, LLC
28. Tribune Media Services, LLC
29. Tribune Publishing Company, LLC
30. Tribune Television New Orleans, Inc.
31. WDCW, LLC
32. WGN Continental Broadcasting Company, LLC
33. WPHL, LLC
34. WPIX, LLC
35. WPMT, LLC
36. WSFL, LLC
37. WXMI, LLC

921790.04C-CHISR02A

MSW - Draft October 18, 2012 - 11:50 AM