## <u>EXHIBIT C</u>

**Term Loan Engagement Letter**

J.P. MORGAN SECURITIES LLC
383 Madison Avenue
New York, New York 10179

CITIGROUP GLOBAL MARKETS
INC.
390 Greenwich Street
New York, New York 10013

CREDIT SUISSE SECURITIES (USA)
LLC
Eleven Madison Avenue
New York, New York 10010

JPMORGAN CHASE BANK, N.A.
270 Park Avenue
New York, New York 10017

DEUTSCHE BANK SECURITIES
INC.
60 Wall Street
New York, New York 10005

MERRILL LYNCH, PIERCE,
FENNER & SMITH
INCORPORATED
One Bryant Park
New York, New York 10036

October 19, 2012

### TRIBUNE COMPANY
### $1,100,000,000 Senior Secured Term Exit Loan Facility
### Engagement Letter

Tribune Company
435 North Michigan Avenue
Chicago, IL 60611

Attention:

Ladies and Gentlemen:

You have advised J.P. Morgan Securities LLC ("JPMorgan"), Citigroup Global Markets Inc. ("CGMI"), on behalf of Citi[1], Credit Suisse Securities (USA) LLC ("CS Securities"), Deutsche Bank Securities Inc. ("DBSI"), Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPFS" and, together with JPMorgan, CGMI, CS Securities and DBSI, the "Lead Arrangers"), and JPMorgan Chase Bank, N.A. ("JPMorgan Chase Bank" and, together with the Lead Arrangers, the "Engagement Parties") that Tribune Company ("you" or the "Borrower"), together with certain of its subsidiaries (collectively with the Borrower, the "Debtors"), are each operating as a debtor-in-possession pursuant to a voluntary case, the lead case of which is Case No. 08-13141 (collectively, the "Cases") commenced under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). You have further advised us that you have filed a plan and disclosure statement (referred to herein as the "Plan" and the "Disclosure Statement", respectively, as the same may be amended, supplemented or modified from time to time) with the Court (as defined below), the Disclosure Statement has been approved by an order entered by the Court, the Plan has been confirmed by an order entered by the Court and you expect the Debtors to be reorganized and emerge from the Cases pursuant to the Plan. You have requested that the Lead Arrangers agree to structure, arrange and syndicate a senior secured term loan exit facility in an aggregate principal amount of up to $1,100,000,000 (the "Term Loan Facility"), and that JPMorgan Chase Bank agree to serve as administrative agent for the Term Loan Facility.

As used herein, (a) "Transactions" means, collectively, the entering into and funding of the Term Loan Facility and the consummation of the Plan and all other related transactions, including the payment of fees and expenses in connection therewith, (b) "Closing Date" means the date on which the funding

---

[1] As used herein, "Citi" means CGMI, Citibank, N.A., Citicorp USA, Inc., Citicorp North America, Inc. and/or any of their affiliates as may be appropriate to consummate the transactions contemplated hereby.

under the Term Loan Facility occurs and (c) "Approval Date" means the date on which the United States Bankruptcy Court for the District of Delaware or any other court having jurisdiction over the Cases (the "Court") shall have entered an order (the "Financing Papers Approval Order"), in form and substance satisfactory to the Engagement Parties and you, approving the Borrower's entry into this Engagement Letter (as defined below) and the Fee Letters (as defined below, and, together with this Engagement Letter, the "Financing Papers") and authorizing the Borrower to pay the fees, expenses and other amounts contemplated herein and therein, and otherwise authorizing the Borrower to accept, incur and perform its obligations under the Financing Papers, which order shall specifically provide that the right to receive all amounts due and owing to each of the Engagement Parties, including the fees as set forth herein and in the Fee Letters and reimbursement of all costs and expenses incurred by the Engagement Parties in connection with the Transactions and reimbursable under this Engagement Letter, shall be entitled to priority as administrative expense claims under Sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code, whether or not the Term Loan Facility is entered into or funded.

Each of the Lead Arrangers is pleased to advise you of its agreement, subject to entry of the Financing Papers Approval Order, to (a) act as a joint lead arranger and bookrunner for the Term Loan Facility and (b) use commercially reasonable efforts to assemble a syndicate of financial institutions identified by the Lead Arrangers in consultation with and reasonably satisfactory to you (the "Lenders") to provide the necessary commitments for the Term Loan Facility, upon the terms and subject to the conditions set forth or referred to in this engagement letter (the "Engagement Letter") and in the Summary of Principal Terms and Conditions attached hereto as Exhibit A (the "Term Sheet").

Subject to entry of the Financing Papers Approval Order, it is agreed that JPMorgan Chase Bank will act as the sole and exclusive Administrative Agent, and that the Lead Arrangers will act as joint lead arrangers and bookrunners for the Term Loan Facility; provided that JPMorgan will have "left" placement in all marketing materials or other documentation used in connection with the Term Loan Facility (and all associated rights). No additional agents, co-agents or arrangers will be appointed, no other titles will be awarded and no compensation (other than that expressly contemplated by the Term Sheet and the Fee Letters referred to below) will be paid in connection with the Term Loan Facility without our and your prior written approval.

It is understood and agreed that neither this Engagement Letter nor the Fee Letters is an express or an implied commitment or offer by, and there shall be no obligation of, any Engagement Party or any of its affiliates to provide any financing or to provide or underwrite or participate in any loans or other financing in connection with the Term Loan Facility or pursuant to this Engagement Letter or the Fee Letters.

Following the Approval Date, we intend to syndicate the Term Loan Facility to a group of Lenders identified by us in consultation with and reasonably satisfactory to you. The Lead Arrangers intend to commence syndication efforts promptly following the Approval Date, and you agree, following the Approval Date until the earlier of the Closing Date and the termination of this Engagement Letter, to actively assist the Lead Arrangers in completing a syndication reasonably satisfactory to you and them. Such assistance shall include (a) your using commercially reasonable efforts to ensure that the syndication efforts benefit materially from your existing lending relationships, (b) direct contact between senior management and advisors of the Borrower and the proposed Lenders, (c) assistance in the preparation by the Lead Arrangers of a customary Confidential Information Memorandum (the "Confidential Information Memorandum"), lender presentation and other marketing materials (such materials, collectively, "Information Materials") to be used in connection with the syndication and (d) the hosting, with the Lead Arrangers, of one or more meetings of prospective Lenders.

At the request of the Lead Arrangers, you agree to assist in the preparation by the Lead Arrangers of a version of the Confidential Information Memorandum or other Information Materials (each, a "Public Version") consisting exclusively of information with respect to you and your subsidiaries that is either publicly available or does not contain material non-public information (within the meaning of United States federal securities laws) with respect to you and your subsidiaries, or any of your or their respective securities for purposes of United States federal and state securities laws (such information, "Non-MNPI"). Such Public Versions, together with any other information prepared by you or your subsidiaries or your representatives and conspicuously marked "Public" (collectively, the "Public Information"), which at a minimum means that the word "Public" will appear prominently on the first page of any such information, may be distributed by us to prospective Lenders who have advised us that they wish to receive only Non-MNPI (the "Public Side Lenders"), and you shall be deemed to have authorized the Public Side Lenders to treat such Public Versions and such marked information as containing only Non-MNPI. You acknowledge and agree that, in addition to Public Information and unless you promptly notify us otherwise, (a) drafts and final definitive documentation with respect to the Term Loan Facility, (b) administrative materials prepared by the Lead Arrangers for prospective Lenders (such as a lender meeting invitation, allocations and funding and closing memoranda) and (c) notifications of changes in the terms of the Term Loan Facility may be distributed to Public Side Lenders. It is understood that in connection with your assistance described above, you will provide customary authorization letters to the Lead Arrangers authorizing the distribution of the Information Materials to prospective Lenders and containing a customary "10b-5" representation to the Lead Arrangers (and, in the case of the Public Version, a representation that such Information Materials do not include material non-public information about the Borrower, its affiliates or any of its or their respective securities).

The Lead Arrangers will in consultation with you manage all aspects of the syndication, including decisions as to the selection of institutions to be approached and when they will be approached, when their commitments will be accepted, which institutions will participate, the allocations of the commitments among the Lenders (in each case in consultation with and reasonably acceptable to you) and the amount and distribution of fees among the Lenders. The Lead Arrangers will have no responsibility other than to arrange the syndication as set forth herein and shall not be subject to any fiduciary or other implied duties in respect of the Term Loan Facility, irrespective of whether the Lead Arrangers or their affiliates have advised or are advising you on other matters and you waive, to the fullest extent permitted by law, any claims you may have against the Lead Arrangers or their affiliates for breach of fiduciary duty or alleged breach of fiduciary duty in respect of the Term Loan Facility and agree that the Lead Arrangers and their affiliates shall have no liability (whether direct or indirect) to you in respect of such a fiduciary duty claim or to any person asserting such a fiduciary duty claim on behalf of or in right of you, including your stockholders, employees or creditors, in each case solely in respect of the Term Loan Facility. To assist the Lead Arrangers in their syndication efforts, you agree promptly to prepare and provide to the Lead Arrangers all information with respect to the Borrower and the Transactions, including all financial information and projections and other forward looking information (the "Projections"), as we may reasonably request in connection with the arrangement and syndication of the Term Loan Facility. You hereby represent and covenant that (a) all information other than the Projections and information of a general economic nature (the "Information") that has been or will be made available to any of the Lead Arrangers by you or any of your representatives in connection with the Transaction, when taken as a whole, is or will be, when furnished, complete and correct in all material respects and does not or will not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made and (b) the Projections that have been or will be made available to any of the Lead Arrangers by you or any of your representatives have been or will be prepared in good faith based upon reasonable assumptions that you believed to be reasonable at the time made and at the time such Projections are made available to us; it being recognized that such Projections are not to be viewed as facts and that actual results during the period or periods covered by

3

any such Projections may differ significantly from the projected results, and that no assurance can be given that the projected results will be realized. You agree that if at any time prior to the Closing Date any of the representations in the preceding sentence would be incorrect in any material respect if the Information or Projections were being furnished, and such representations were being made, at such time, then you will promptly supplement, or cause to be supplemented, the Information or Projections so that such representations will be correct in all material respects under those circumstances. You understand that in arranging and syndicating the Term Loan Facility we may use and rely on the Information and Projections without independent verification thereof.

As consideration for the Engagement Parties' agreements to perform the services described herein, subject to entry of the Financing Papers Approval Order, you agree to pay to the Engagement Parties the nonrefundable fees set forth in the Facility Fee Letter and the Agent Fee Letter, each dated the date hereof and delivered herewith (collectively, the "Fee Letters"), on the terms and subject to the conditions set forth therein (which, for the avoidance of doubt, shall include that no such fees shall be payable by the Borrower under the Fee Letters unless the Closing Date occurs), in addition to the reimbursement, indemnity and other undertakings set forth herein. The Arrangement Fee (as defined in the Facility Fee Letter) shall be in addition to any original issue discount or upfront fees payable by the Borrower as set forth in the Term Sheet.

The Engagement Parties' agreements to perform the services described herein are subject to (a) there not occurring or becoming known to us after the date hereof any material adverse condition or material adverse change in or affecting the business, operations, property or condition (financial or otherwise) of the Borrower and its subsidiaries, taken as a whole, (b) our not becoming aware after the date hereof of any information or other matter affecting the Borrower or the Transactions which is inconsistent in a material and adverse manner with any such information or other matter disclosed to us prior to the date hereof, (c) our satisfaction that prior to and during the syndication of the Term Loan Facility there shall be no competing offering, placement or arrangement of any debt securities or bank financing by or on behalf of the Borrower or any affiliate thereof (other than the New Working Capital Facility (as defined in the Term Sheet)), (d) your using your commercially reasonable efforts to obtain public ratings for the Term Loan Facility and public corporate credit ratings for the Borrower from each of Moody's Investors Service, Inc. and Standard & Poor's Financial Services LLC prior to the Closing Date, (e) the negotiation, execution and delivery of definitive documentation with respect to the Term Loan Facility reasonably satisfactory to JPMorgan Chase Bank and its counsel and (f) the other conditions set forth or referred to in the Term Sheet.

Subject to the entry of the Financing Papers Approval Order, you agree (a) to indemnify and hold harmless each Engagement Party, its respective affiliates and its and their respective officers, directors, employees, advisors, and agents (each, an "Indemnified Person") from and against any and all losses, claims, damages and liabilities to which any such Indemnified Person may become subject arising out of or in connection with this Engagement Letter, the Term Loan Facility, the use of the proceeds thereof or any related transaction or any claim, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any Indemnified Person is a party thereto, and to reimburse each Indemnified Person upon demand for any reasonable and documented out-of-pocket legal or other expenses incurred in connection with investigating or defending any of the foregoing; provided that the foregoing indemnity will not, as to any Indemnified Person, apply to (A) losses, claims, damages, liabilities or related expenses to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from (i) the bad faith, willful misconduct or gross negligence of such Indemnified Person or (x) any of its controlled affiliates or any of the officers, directors, employees of any of the foregoing, in each case who are involved in or aware of the Transactions, or (y) any advisors or agents of such Indemnified Person acting at the direction of such Indemnified Person, (ii) a material breach of this Engagement Letter by any such Indemnified Person or (iii) disputes between and among

4

Indemnified Persons to the extent such disputes do not arise from any act or omission of the Borrower or any of its affiliates (other than claims against an Indemnified Person acting in its capacity as an agent or arranger or similar role in connection with the Term Loan Facility), unless such claims arise from the gross negligence, bad faith or willful misconduct of such Indemnified Person or (B) any settlement entered into by such Indemnified Person without your written consent (such consent not to be unreasonably withheld, delayed or conditioned); provided, however, that the foregoing indemnity will apply to any such settlement in the event (x) you were offered the ability to assume the defense of the action that was the subject matter of such settlement and elected not to assume such defense or (y) such Indemnified Person shall have requested that you reimburse it for legal or other expenses incurred by it in connection with investigating, responding to or defending any proceeding in accordance with this Engagement Letter and you shall not have reimbursed such Indemnified Person within 30 days of such request), and (b) to reimburse the Engagement Parties and their affiliates on demand for all reasonable and documented out-of-pocket expenses (including due diligence expenses, syndication expenses, travel expenses, and reasonable fees, charges and disbursements of one primary counsel to the Engagement Parties (and (i) appropriate local counsel in applicable jurisdictions, to the extent necessary, but limited to one local counsel in each such jurisdiction, (ii) appropriate regulatory and other specialist counsel (including, without limitation, FCC counsel) and (iii) solely in the case of a conflict of interest, one additional counsel in each relevant jurisdiction to the affected Engagement Parties similarly situated)) incurred in connection with the Term Loan Facility and any related documentation (including this Engagement Letter, the Term Sheet, the Fee Letters and the definitive financing documentation) or, the administration, amendment, modification, waiver or enforcement thereof. No Indemnified Person shall be liable for (i) any damages arising from the use by others of Information or other materials obtained through electronic, telecommunications or other information transmission systems except to the extent such damages resulted primarily and directly from the bad faith, gross negligence or willful misconduct of such Indemnified Person (as determined by a court of competent jurisdiction in a final and non-appealable judgment) or (ii) any special, indirect, consequential or punitive damages in connection with the Term Loan Facility. For the avoidance of doubt, notwithstanding anything to the contrary in the foregoing, the foregoing indemnity shall not apply to any damages, losses, liabilities or expenses of any Indemnified Person relating to facts, actions, occurrences or omissions occurring prior to December 8, 2008, including without limitation in connection with actions commenced or to be commenced with respect to the leveraged buyout transactions consummated by Tribune Company in 2007.

This Engagement Letter shall not be assignable by any Engagement Party or you without the prior written consent of each Engagement Party or you, as applicable (and any purported assignment without such consent shall be null and void), is intended to be solely for the benefit of the parties hereto and Indemnified Persons and is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto and Indemnified Persons. Any and all obligations of, and services to be provided by, the Engagement Parties hereunder may be performed and any and all rights of the Engagement Parties hereunder may be exercised by or through any of their affiliates or branches and, in connection with the provision of such services, each such Engagement Party may, subject to the terms of this Engagement Letter (including, without limitation, the confidentiality provisions contained herein), exchange with such affiliates and branches information concerning the Borrower and the Transactions. This Engagement Letter may not be amended or waived except by an instrument in writing signed by you and each Engagement Party. This Engagement Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement. Delivery of an executed signature page of this Engagement Letter by facsimile transmission shall be effective as delivery of a manually executed counterpart hereof. This Engagement Letter and the Fee Letters are the only agreements that have been entered into among us with respect to the Term Loan Facility and set forth the entire understanding of the parties with respect thereto.

Each Engagement Party may place advertisements in financial and other newspapers and periodicals or on a home page or similar place for dissemination of information on the Internet or World Wide Web as it may choose, and circulate similar promotional materials, after the closing of the Transactions in the form of a "tombstone" or otherwise describing the names of the Borrower and its subsidiaries (or any of them), and the amount, type and closing date of such Transactions, all at such Engagement Party's expense.

This Engagement Letter shall be governed by, and construed in accordance with, the laws of the State of New York.

This Engagement Letter is delivered to you on the understanding that neither this Engagement Letter, the Term Sheet or the Fee Letters nor any of their terms or substance shall be disclosed, directly or indirectly, to any other person except (a) to your officers, agents, employees, attorneys, accountants and advisors who are directly involved in the consideration of this matter or (b) as may be compelled in a judicial or administrative proceeding (including, without limitation, as may be required to obtain court approval in connection with any acts or obligations to be taken pursuant to this Engagement Letter or the Transactions or as otherwise required by law (in which case you agree to inform us promptly thereof); provided that the foregoing restrictions shall cease to apply (except in respect of the Fee Letters and the contents thereof) after the Closing Date. In addition, the Term Sheet may be disclosed to any rating agency in connection with the Term Loan Facility. Notwithstanding anything to the contrary in the foregoing, you shall be permitted to (x) file the Fee Letters with the Court under seal and provide an unredacted copy of each of the Fee Letters to the Court, the Office of the United States Trustee, the Official Committee of Unsecured Creditors (the "Creditors Committee") and the other co-proponents of the Plan; provided that such disclosure of the Fee Letters to the Creditors Committee is on a confidential "professionals only" basis and (y) disclose the fees contained in the Fee Letters as part of a generic disclosure to the Court of the aggregate fees, costs and expenses of the Borrower in connection with the Transactions. We agree to assist with your efforts to file the Fee Letters under seal, which shall include providing testimony or other evidentiary support for the necessity of filing the Fee Letters under seal.

You acknowledge that each Engagement Party may be providing debt financing, equity capital or other services (including financial advisory services) to other companies in respect of which you may have conflicting interests regarding the Transactions and otherwise. No Engagement Party will use confidential information obtained from you by virtue of the Transactions or their other relationships with you in connection with the performance by such Engagement Party of services for other companies or for any purpose other than in connection with the Transactions, and no Engagement Party will furnish any such information to other companies. You also acknowledge that the Engagement Parties have no obligation to use in connection with the Transactions, or to furnish to you, confidential information obtained from other companies. Notwithstanding anything herein to the contrary, the Borrower (and any employee, representative or other agent of the Borrower) may disclose to any and all persons, without limitation of any kind, the U.S. federal income tax treatment and the U.S. federal income tax structure of the Transactions and all materials of any kind (including opinions or other tax analyses) that are provided to it relating to such tax treatment and tax structure. However, no disclosure of any information relating to such tax treatment or tax structure may be made to the extent nondisclosure is reasonably necessary in order to comply with applicable securities laws. You acknowledge that certain Lead Arrangers (and affiliates thereof) currently are acting as arrangers with respect to the New Working Capital Facility, and you and your affiliates' rights and obligations under any other agreement with any Lead Arranger or any of its affiliates (including the New Working Capital Facility) that currently or hereafter may exist are, and shall be, separate and distinct from the rights and obligations of the parties pursuant to this Engagement Letter, and none of such rights and obligations under such other agreements shall be affected by any Lead Arranger's performance or lack of performance of services hereunder. The Borrower hereby agrees that each Lead Arranger may render its services under this Engagement Letter notwithstanding any actual or

potential conflict of interest presented by the foregoing, and the Borrower hereby waives any conflict of interest claims relating to the relationship between each Lead Arranger and the Borrower and its affiliates in connection with the engagement contemplated hereby, on the one hand, and the exercise by such Lead Arranger or any of its affiliates of any of their rights and duties under any credit or other agreement (including the New Working Capital Facility), on the other hand.

You further acknowledge that each Engagement Party is a full service securities firm engaged in securities trading and brokerage activities as well as providing investment banking and other financial services. In the ordinary course of business, any Engagement Party may provide investment banking and other financial services to, and/or acquire, hold or sell, for its own accounts and the accounts of customers, equity, debt and other securities and financial instruments (including bank loans and other obligations) of, you and other companies with which you may have commercial or other relationships. With respect to any securities and/or financial instruments so held by any Engagement Party or any of its customers, all rights in respect of such securities and financial instruments, including any voting rights, will be exercised by the holder of the rights, in its sole discretion.

The compensation, reimbursement, indemnification, confidentiality, conflict waiver, jurisdiction, governing law and waiver of jury trial provisions contained herein and in the Fee Letters, and the provisions of the immediately preceding two paragraphs, shall remain in full force and effect regardless of whether definitive financing documentation shall be executed and delivered and notwithstanding the termination of this Engagement Letter; provided that such indemnification and reimbursement provisions shall be superseded in each case by the applicable provisions contained in the definitive documentation for the Term Loan Facility upon execution thereof and thereafter shall have no further force and effect.

The Borrower irrevocably and unconditionally submits to (i) the exclusive jurisdiction of, during the period from the date hereof to the effective date of the Plan, the Court, or (ii) if the Court declines to exercise jurisdiction and from and after the effective date of the Plan, then the exclusive jurisdiction of any state or Federal court sitting in the Borough of Manhattan in the City of New York, over any suit, action or proceeding (whether based on contract, tort or any other theory) arising out of or relating to the Transactions, this Engagement Letter or the Fee Letters or the performance of services hereunder or thereunder. Each party hereto irrevocably waives, to the fullest extent permitted by applicable law, (a) any right it may have to a trial by jury in any suit, action, proceeding, claim or counterclaim brought by or on behalf of any party related to or arising out of or relating to this Engagement Letter, the Fee Letters or the Transactions (whether based on contract, tort or any other theory) and (b) any objection that it may now or hereafter have to the laying of venue of any such legal proceeding in the state or Federal courts located in the City of New York.

Each Engagement Party hereby notifies you that pursuant to the requirements of the USA PATRIOT Improvement and Reauthorization Act, Pub. L. 109-177 (signed into law March 9, 2009) (as amended from time to time, the "PATRIOT Act"), such Engagement Party may be required to obtain, verify and record information that identifies the Borrower, its subsidiaries and any other obligor under the Term Loan Facility, which information includes the name, address, tax identification number and other information regarding such Person that will allow such Engagement Party to complete the requirements of the PATRIOT Act.

If the foregoing correctly sets forth our agreement, please indicate your acceptance of the terms of this Engagement Letter and the Fee Letters by returning to us executed counterparts hereof and thereof. In the event that the Closing Date does not occur on or before December 31, 2012, then this Engagement Letter shall automatically terminate unless we shall, in our discretion, agree to an extension. In addition, this Engagement Letter shall automatically terminate, unless we shall, in our discretion, otherwise agree, on the earliest of (a) 11:59 p.m. (New York City time) on October 19, 2012, unless the Debtors shall have

7

filed with the Court a motion seeking entry of the Financing Papers Approval Order, (b) if such motion shall have been filed by such time, at 11:59 p.m. (New York City time) on the date that is 30 days from the date hereof, unless, prior to that time, the Court shall have entered the Financing Papers Approval Order, (c) the date upon which the Financing Papers Approval Order shall have been amended, supplemented or otherwise modified without the written consent of the Lead Arrangers, reversed or vacated, (d) the date upon which any of the Cases are dismissed or converted to proceedings under Chapter 7 of the Bankruptcy Code, (e) the date after the date hereof upon which a trustee or examiner is appointed in any of the Cases and (f) the date upon which the Debtors file or support any plan of reorganization or liquidation other than the Plan without the written consent of the Engagement Parties. This Engagement Letter shall become effective upon the execution by all parties hereto.

*[Signature Pages Follow]*

The Engagement Parties are pleased to have been given the opportunity to assist you in connection with this important financing.

Very truly yours,

J.P. MORGAN SECURITIES LLC

By: _____
      Name:  Marco Frono
      Title:  Vice President

JPMORGAN CHASE BANK, N.A.

By: _____
      Name:  Marina Levin
      Title:  Executive Director

CITIGROUP GLOBAL MARKETS INC.

By: _____

    Name: Ross MacIntyre
    Title: Managing Director

[Term Loan Engagement Letter Signature Page]

CREDIT SUISSE SECURITIES (USA) LLC

By: _____

Name: Jeb Slowik
Title: Managing Director

[Term Loan Engagement Letter Signature Page]

DEUTSCHE BANK SECURITIES INC.

By: _____

Name: _____

Title: _____

By: _____

Name: _____

Title:     Christopher Blum
           Managing Director

[Term Loan Engagement Letter Signature Page]

MERRILL LYNCH, PIERCE, FENNER & SMITH
    INCORPORATED

By:
    Name: Christopher Cormier
    Title: Managing Director

[Term Loan Engagement Letter Signature Page]

Accepted and agreed to as of
the date first written above:

TRIBUNE COMPANY

By: _____
     Name:  Chandler Bigelow
     Title:    EVP/Chief Financial Officer

[Term Loan Engagement Letter Signature Page]

**Exhibit A to the**
**Engagement Letter**

TRIBUNE COMPANY
$1,100,000,000 SENIOR SECURED TERM LOAN EXIT FACILITY

Summary of Principal Terms and Conditions
October 19, 2012

       This Summary of Principal Terms and Conditions is delivered with an engagement letter of even date herewith (the "**Engagement Letter**") from JPMorgan Chase Bank, N.A., J.P. Morgan Securities LLC, Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, Deutsche Bank Securities Inc. and Merrill Lynch, Pierce, Fenner & Smith Incorporated to the Borrower in connection with the proposed Term Loan Facility. Capitalized terms used herein and not otherwise defined herein shall have the meanings attributed to such terms in the Engagement Letter.

| I.   **Parties** | |
|---|---|
| **Borrower:** | Tribune Company, a Delaware corporation (the "**Borrower**"). |
| **Joint Lead Arrangers and Bookrunners:** | J.P. Morgan Securities LLC, Citigroup Global Markets Inc. ("**CGMI**"), Credit Suisse Securities (USA) LLC ("**CS Securities**"), Deutsche Bank Securities Inc. ("**DBSI**") and Merrill Lynch, Pierce, Fenner & Smith Incorporated (collectively, the "**Lead Arrangers**"). |
| **Administrative Agent:** | JPMorgan Chase Bank, N.A. (in such capacity, the "**Administrative Agent**"). |
| **Co-Syndication Agents and Documentation Agents:** | [To be determined][1] |
| **Lenders:** | A syndicate of banks, financial institutions and other entities arranged by the Lead Arrangers in consultation with the Borrower (collectively, the "**Lenders**"). |
| II.  **Term Loan Facility** | |
| **Type and Amount of Facility:** | Senior secured term loan exit facility (the "**Term Loan Facility**") in the principal amount of $1,100,000,000 comprising a single tranche of term loans (the "**Term** |

---

[1] [**Note**: Titles to be allocated by the Borrower and the Lead Arrangers among Bank of America, N.A., CGMI, CS Securities and DBSI].

| | |
|---|---|
| | Loans"). |
| **Availability** | The Term Loans shall be made available to the Borrower in a single drawing on the Closing Date (as defined below). |
| **Maturity:** | The Term Loan Facility will mature and be repaid in full on the 7[th] anniversary of the Closing Date (the "**Maturity Date**") (or, if earlier, the date of acceleration of the Term Loans in accordance with the Term Loan Credit Agreement (as defined below)). |
| **Amortization:** | 1.0% of the initial principal amount of the Term Loans on an annual basis payable in quarterly installments, beginning on the last day of the first full fiscal quarter following the Closing Date. |
| **Incremental Facility:** | After the Closing Date and on or before the Maturity Date, the Borrower will have the right, but not the obligation, to increase the amount of the Term Loan Facility by incurring one or more incremental term loan facilities (each, an "**Incremental Facility**") or to the extent permitted to be incurred as an incremental facility, senior secured notes, senior unsecured debt, second lien debt or subordinated debt in an aggregate principal amount not to exceed an amount to be agreed, in each case under customary terms and conditions to be agreed upon. Such increased amounts will be provided by existing Lenders or other persons who become Lenders in connection therewith; *provided* that no existing Lender will be obligated to provide any such increased portion of the Term Loan Facility. |
| **Documentation:** | Usual for facilities and transactions of this type and reasonably acceptable to the Borrower and the Lenders, to include, among others, a credit agreement (the "**Term Loan Credit Agreement**"), guarantees and appropriate pledge, security, deposit account control agreements and other collateral documents and the Intercreditor Agreement (as defined below) (collectively, the "**Term Facility Documents**"). The Term Facility Documents shall contain payments, conditions to borrowing, mandatory prepayments, representations, warranties, covenants and events of default customary for financings of this type and consistent with this Term Sheet, and with standards, qualifications, thresholds, exceptions, baskets and grace periods to be mutually agreed. |
| **III.  Collateral and Other Credit Support** | |
| **Guarantors:** | Each of the Borrower's wholly owned domestic subsidiaries (other than any entity that is (i) an unrestricted subsidiary, (ii) an immaterial subsidiary (to be defined in the Term Loan |

2

| | |
|---|---|
| | Credit Agreement with respect to individual and aggregate revenues or assets excluded), (iii) any captive insurance Subsidiary, (iv) any subsidiary that directly owns an interest in the Chicago Cubs as long as such subsidiary has no other material assets (the "**Cubs Subsidiaries**"), (v) Tribune ND, LLC and NBBF, LLC as long as such entity does not acquire any additional material assets after the date hereof (the "**Newsday Subsidiaries**" and, together with the Cubs Subsidiaries, the "**Excluded Subsidiaries**") or (vi) otherwise agreed to by the Borrower and the Administrative Agent) existing on the Closing Date or thereafter created (including through the Restructuring Transactions (as defined in the Plan) or acquired shall unconditionally guarantee, on a joint and several basis, all obligations of the Borrower under the Term Loan Facility, any interest rate protection agreements, foreign exchange agreements and cash management obligations entered into with an institution that is a Lender or an affiliate of a Lender (collectively, the "**Secured Obligations**"), up to the maximum amount possible without violating applicable fraudulent conveyance laws.<br><br>Each guarantor of the Term Loan Facility is herein referred to as a "**Guarantor**" and its guarantee is referred to herein as a "**Guarantee.**" The Borrower and each Guarantor are herein referred to collectively as the "**Credit Parties**" and individually referred to as a "**Credit Party.**" |
| **Related Working Capital Facility:** | The Term Facility Documents will contemplate that the Borrower and/or certain of its wholly owned subsidiaries may enter into on or after the Closing Date a separate asset-based revolving credit facility (the "**New Working Capital Facility**"), in an aggregate committed amount of up to $300,000,000, with a letter of credit sub-facility of up to $100,000,000 and the right to incur additional incremental commitments thereunder of up to $100,000,000. The New Working Capital Facility will be secured by (i) a first-priority security interest in certain accounts receivable and related assets (including deposit accounts) of the Credit Parties (the "**New Working Capital Facility Collateral**") and (ii) a second-priority security interest in the Term Facility Collateral (as defined below). |
| **Security:** | The Secured Obligations will be secured by all of the following assets of the Borrower and each Guarantor, whether owned on the Closing Date or thereafter created or acquired, on a first-priority basis (the "**Term Facility Collateral**"): (i) a lien on, and security interest in, and pledge of, all of the capital stock (excluding direct equity interests in joint ventures ("**Joint Venture Interests**"), but including interests in any holding company holding such |

| | |
|---|---|
| | Joint Venture Interests) and intercompany notes owned by the Borrower and each other Credit Party, except that only 65% of the capital stock of "first-tier" non-U.S. subsidiaries shall be pledged and (ii) a lien on, and security interest in, all other tangible and intangible properties and assets (including, without limitation, all contract rights, inventory, intellectual property, trade names, equipment, licenses and proceeds of the foregoing, but excluding in any event (a) the New Working Capital Facility Collateral, (b) FCC licenses, but only to the extent that such security interest would not be permitted under applicable law, (c) motor vehicles as to which a security interest and perfection thereof is required to be effected by recordings of certificates of title under applicable state law, (d) all real property, (e) any commercial tort claims held by or assigned to the Litigation Trust (as defined in the Plan), (f) any equity in any captive insurance subsidiary and any Excluded Subsidiary and (g) properties and assets  for which the costs of obtaining such security interest are excessive in relation to the value of the security to be afforded thereby, as determined by the Administrative Agent in its good faith judgment.<br><br>The Secured Obligations will also be secured by a second-priority lien on and security interest in the New Working Capital Facility Collateral.  The Term Facility Collateral and New Working Capital Facility Collateral are referred to collectively as the **"Collateral"**. |
| **Intercreditor Arrangement:** | The lien priority, relative rights and other creditors' rights issues in respect of the Term Loan Facility and the New Working Capital Facility will be set forth in a customary intercreditor agreement that is reasonably acceptable to the administrative agent in respect of the New Working Capital Facility, the Administrative Agent and the Borrower (the **"Intercreditor Agreement"**). |
| **Ranking:** | The Term Loan Facility will be a senior obligation of the Borrower, secured by first priority liens on the Term Facility Collateral of the Borrower and second priority liens on the New Working Capital Facility Collateral of the Borrower. The Guarantees will be senior obligations of each Guarantor, secured by first priority liens on the Term Facility Collateral of such Guarantor and second priority liens on the New Working Capital Facility Collateral of such Guarantor. |
| **IV.  Purpose; Certain Payment Provisions** | |
| **Purpose:** | The proceeds of the Term Loan Facility shall be used to make distributions to creditors in accordance with the Plan. |

| | |
|---|---|
| **Interest Rate and Periods:** | The Term Loans will bear interest, at the election of the Borrower, at a per annum rate equal to (i) the sum of Adjusted LIBOR in effect from time *plus* the Applicable Margin or (ii) the sum of the ABR in effect from time to time plus the Applicable Margin.<br><br>As used above:<br><br>    "**ABR**" means a rate per annum equal to the highest of (i) the rate of interest publicly announced by the Administrative Agent as its prime rate in effect at its principal office in New York City, (ii) one-month Adjusted LIBOR *plus* 1.0% and (iii) the federal funds effective rate from time to time *plus* 0.5%.<br><br>    "**Adjusted LIBOR**" means LIBOR, as adjusted for statutory reserve requirements for eurocurrency liabilities.<br><br>    "**Applicable Margin**" means (i) in the case of Term Loans bearing interest based on Adjusted LIBOR, a rate to be agreed (the "**Adjusted LIBOR Margin**") and (ii) in the case of Term Loans bearing interest based on ABR, the Adjusted LIBOR Margin *minus* 1.0%.<br><br>    "**LIBOR**" means the rate at which eurodollar deposits in the London interbank market for the applicable interest period are quoted on the Reuters screen, but in any event not less than the LIBOR Floor.<br><br>    "**LIBOR Floor**" means a rate per annum to be agreed upon.<br><br>The Borrower may elect interest periods, for Term Loans bearing interest based on LIBOR of one, three or six months (and, if available, or agreed to by all applicable Lenders, nine months or twelve months); *provided* that interest is payable not less frequently than quarterly. |
| **Default Rate:** | Upon the occurrence of a payment or bankruptcy Event of Default, overdue principal, interest and other amounts shall bear interest at the applicable interest rate (including the Applicable Margin) *plus* 2.0% per annum. The terms and applicability of default interest may be amended with the consent of the Required Lenders. |
| **Original Issue Discount/Upfront Fees:** | The Term Loans may be issued to the Lenders at a discount to their principal amount to be agreed upon. Notwithstanding the foregoing, (a) all calculations of interest and fees in respect of the Term Loan Facility will be calculated on the basis of the full stated principal amount of the Term Loans |

| | |
|---|---|
| | and (b) at the option of the Lead Arrangers, any original issue discount may instead be effected in the form of an upfront fee payable to the Lenders. |
| **Mandatory Prepayments:** | The Term Loans will be required to be prepaid with the following: |
| | (i)    100% of net cash proceeds of asset sales and other asset dispositions by any Credit Party or any of its respective restricted subsidiaries (including insurance proceeds and condemnation awards) subject to customary leverage-based step-downs, exceptions and baskets to be agreed upon, including for asset swaps, sales of real estate, sales of publishing assets or businesses (including Classified Ventures and CareerBuilder) and ordinary course sales of inventory; *provided* that net cash proceeds of such sales or dispositions shall be subject to a reinvestment period for a business or other long-term assets used in the Borrower's business, which period shall consist of (i) an initial 18 months to either consummate such investment or enter into a binding agreement for such investment, and (ii) in the case of a binding agreement, (x) a further 6 months to close such investment and (y) an additional 3-month extension beyond such 6-month period if the sole unsatisfied closing condition is pending FCC approval; *provided* that during the reinvestment period, all net cash proceeds shall be deposited in a segregated deposit account and held for the benefit of the Lenders as Term Facility Collateral; |
| | (ii)    100% of the net cash proceeds of the issuance or incurrence of *pari passu* funded debt by any Credit Party or any of its restricted subsidiaries, subject to, exceptions and baskets (including amounts issued under any Incremental Facility) to be agreed upon; and |
| | (iii)    50% of Excess Cash Flow (to be defined in the Term Facility Documents) (commencing with fiscal year-end 2013), subject to a minimum cash threshold to be set consistent with the liquidity of the Borrower as of the Closing Date and customary leverage-based step-downs to be agreed upon. |
| | Mandatory prepayments will be applied to reduce, pro rata, all then remaining scheduled amortization payments (with final maturity also treated as a payment). |
| | The mandatory prepayments set forth in clauses (i) and (iii) |

6

| | |
|---|---|
| | above will not apply at any time during which (a) the Borrower's public corporate family rating issued by Moody's is Baa3 or better and public corporate credit rating issued by S&P is BBB- or better and (b) the Total Leverage Ratio (to be defined in the Term Loan Credit Agreement) is less than a level to be agreed upon. |
| **Voluntary Prepayments:** | The Term Loans may be prepaid at any time in whole or in part at the option of the Borrower, in a minimum principal amount and in multiples to be agreed upon, without premium or penalty (subject, in the case of LIBOR borrowings, to payment of LIBOR breakage costs arising from prepayments not made on the last day of the relevant interest period). <br><br> Voluntary prepayments will be applied to reduce, pro rata, all then remaining scheduled amortization payments as directed by the Borrower (and absent such direction, in direct order of maturity thereof). |
| **V.  Certain Documentation Matters:** | |
| **Representations and Warranties:** | The Credit Parties will make representations and warranties customary for financings of this type (which shall be subject to materiality qualifiers, exceptions, thresholds and limitations to be mutually agreed upon), including, without limitation: (i) material accuracy of disclosure and absence of undisclosed liabilities as of the Closing Date, (ii) corporate existence, (iii) compliance with law, (iv) corporate power and authority, (v) enforceability of Term Facility Documents, (vi) no conflict with law or contractual obligations, (vii) no material litigation, (viii) no default, (ix) ownership of property, (x) liens, (xi) intellectual property, (xii) no burdensome restrictions, (xiii) taxes, (xiv) Federal Reserve margin regulations, (xv) ERISA, (xvi) Investment Company Act, (xvii) subsidiaries, (xviii) collateral, (xix) environmental matters and (xx) labor matters. |
| **Affirmative Covenants:** | The Credit Parties will comply with affirmative covenants customary for financings of this type (which shall be subject to materiality qualifiers, exceptions, thresholds and limitations to be mutually agreed upon), including, without limitations: (i) compliance with laws and material contractual obligations, (ii) payment of taxes and other material obligations, (iii) maintenance of insurance, (iv) conduct of business, (v) preservation of corporate existence, (vi) keeping of books and records, (vii) maintenance of properties, (viii) reporting requirements, (ix) additional guarantors, (x) ERISA, (xi) right of Administrative Agent to inspect property and books and records, (xii) notices of defaults, litigation and other material events, (xiii) |

(NY) 27011/255/MANDATE/CA.Term.Sheet.doc

| | |
|---|---|
| | compliance with environmental laws and (xiv) further assurances. |
| **Negative Covenants:** | The Credit Parties will comply with negative covenants customary for financings of this type (which shall be subject to materiality qualifiers, exceptions, thresholds and limitations to be mutually agreed upon, including (x) baskets for (a) asset swaps and (b) local marketing agreements (LMAs) (each subject to terms and conditions to be agreed) and (y) exceptions for sales of (a) publishing assets and businesses (including Classified Ventures and CareerBuilder) and (b) real estate), including without limitation: (i) indebtedness, (ii) liens, (iii) mergers, consolidations, liquidations and dissolutions, (iv) payment restrictions affecting subsidiaries, (v) asset sales and other fundamental changes, (vi) acquisitions, (vii) restricted payments, (viii) investments, loans and advances; (ix) material changes in business, (x) no further negative pledge, (xi) optional payments and modifications of subordinated and other junior debt instruments, (xii) transactions with affiliates, (xiii) changes in fiscal year, (xiv) material and adverse amendments to organizational documents and (xv) limitation on activities of Excluded Subsidiaries. |
| **Financial Covenants:** | None. |
| **Unrestricted Subsidiaries:** | The Term Loan Credit Agreement will contain provisions pursuant to which, subject to customary limitations to be agreed upon (including with respect to loans, advances, guarantees and other investments in unrestricted subsidiaries and transactions with affiliates), the Borrower will be permitted to designate any subsidiary of the Borrower (other than a subsidiary that holds an FCC license) as an "unrestricted subsidiary" and subsequently re-designate any such unrestricted subsidiary as a restricted subsidiary so long as, (x) the designation of any unrestricted subsidiary as a restricted subsidiary shall constitute the incurrence at the time of designation of any indebtedness or liens of such subsidiary existing at such time and (y) the fair market value of such subsidiary at the time it is designated as an "unrestricted subsidiary" shall be treated as an investment by the Borrower in such subsidiary at such time. Unrestricted subsidiaries will not be subject to the representation and warranty, affirmative or negative covenant or Event of Default provisions of the Term Loan Credit Agreement and the results of operations and indebtedness of unrestricted subsidiaries will not be taken into account for purposes of determining compliance with any financial ratio contained in the Term Loan Credit Agreement. |

| | |
|---|---|
| **Events of Default:** | The following will constitute Events of Default, subject to customary exceptions, materiality qualifications and notice and grace periods to be agreed upon: (i) nonpayment of principal when due and nonpayment of interest, fees or other amounts after a grace period of five (5) business days, (ii) material inaccuracy of representations or warranties, (iii) failure to perform or observe negative and affirmative covenants set forth in the Term Facility Documents (subject, in the case of certain affirmative covenants, to a 30-day grace period), (iv) cross-default (whether or not resulting in acceleration) to other indebtedness of the Borrower or any of its subsidiaries, in excess of an amount to be agreed upon, (v) bankruptcy and insolvency defaults of any Credit Party or any of their subsidiaries, (vi) monetary judgment defaults of any Credit Party or any of their subsidiaries, in excess of an amount to be agreed upon, (vii) actual impairment of security interests of the Lenders or any Credit Party shall so assert, (viii) change of control (the definition of which is to be agreed upon), (ix) customary ERISA defaults and (x) any Guarantee ceases to be in full force and effect or any Credit Party shall so assert. |
| **Assignments and Participations:** | Assignments shall be permitted subject (except to another Lender or to an affiliate or approved fund of a Lender) to the Administrative Agent's and the Borrower's consent (such consent not to be unreasonably withheld or delayed) in minimum amounts not less than $1,000,000 (or, if less, the entire amount of the Lender's interest); *provided* that (i) the consent of the Borrower shall not be required if an Event of Default has occurred and is continuing and (ii) the Borrower shall be deemed to have given consent if the Borrower has not responded within 10 days of a request for such consent. Participations shall be permitted without restriction, subject to customary restrictions on participants' voting rights.<br><br>In addition, the Term Loan Credit Agreement shall provide that Term Loans may be purchased by the Borrower through (i) privately negotiated purchases or (ii) "Dutch" auctions in which all Lenders are invited to participate on a pro rata basis in accordance with customary procedures to be agreed upon, in each case subject to customary terms and conditions, including without limitation: (a) any Term Loans acquired by the Borrower shall be retired and cancelled immediately upon acquisition thereof, (b) in the case of a Dutch auction, the Borrower shall provide a customary representation and warranty to the effect that it is not in possession of any information that has not been disclosed to the auction manager, the Administrative Agent and Lenders desiring to receive such information that may be material to a Lender's decision to participate in such assignment or auction, (c) no default or Event of Default shall exist or |

9

| | |
|---|---|
| | result therefrom and (d) any Term Loans acquired by the Borrower shall not be deemed a repayment of Term Loans for purposes of calculating excess cash flow. |
| **Required Lenders:** | Non-defaulting Lenders holding a majority of the Term Loans, subject to customary amendments of certain provisions of the Term Facility Documents requiring the consent of Lenders holding a super-majority (or all) of the Term Loans. For the avoidance of doubt, holders of equity interests of the Borrower (and their affiliates) may hold and vote the Term Loans.<br><br>On or before the Maturity Date, the Borrower shall have the right to extend the Maturity Date of all or a portion of the Term Loan Facility with only the consent of the Lenders whose loans are being extended, and otherwise on terms and conditions to be mutually agreed by the Administrative Agent and the Borrower; it being understood that each Lender shall have the opportunity to participate in such extension on the same terms and conditions as each other Lender. |
| **Conditions to Closing:** | The date of closing and funding of the Term Loan Facility (the "**Closing Date**") shall be subject to the satisfaction or waiver of customary conditions precedent, including the conditions precedent set forth below, on or prior to the Closing Date:<br><br>(i)    material accuracy of representations and warranties and absence of default or Event of Default under the terms of the Term Facility Documents.<br><br>(ii)    execution and delivery of the Term Facility Documents on terms and conditions consistent with this Term Sheet and otherwise reasonably satisfactory to the Administrative Agent and the Lenders, together with customary collateral and other closing documentation (including, without limitation, favorable creation and perfection of security arrangements opinions of counsel for the Credit Parties and local counsel, a solvency certificate, certified copies of organizational documents, resolutions of the non-debtor Guarantors authorizing the execution, delivery and performance of the Term Loan Facility Documents, good standing certificates in each Credit Party's jurisdiction of formation, incumbency certificates, insurance certificates, loss payee and additional insured endorsements and financing statements) in form and substance satisfactory to the Lenders.<br><br>(iii)    all governmental and third party consents and |

approvals required or, in the reasonable discretion of the Lenders, requested for consummation of the Term Loan Facility and the other transactions contemplated thereby (other than the Financing Papers Approval Order (which is subject to paragraph (viii) below) and the order dated July 23, 2012 confirming the Plan (which is subject to paragraph (xiv) below)) shall have been obtained and shall remain in full force and effect.

(iv)  the Lenders, the Administrative Agent and the Lead Arrangers shall have received all costs, fees, expenses (including, without limitation, legal fees and expenses of one primary counsel to the Lead Arrangers and the Administrative Agent (and (i) appropriate local counsel in applicable jurisdictions, to the extent necessary, but limited to one local counsel in each such jurisdiction and (ii) appropriate regulatory and other specialist counsel (including, without limitation, FCC counsel))) and other compensation to the extent due on or before the Closing Date.

(v)  liens creating a first-priority security interest in the Term Facility Collateral and a second-priority security interest in the New Working Capital Facility Collateral in favor of the Administrative Agent for the benefit of the holders of the Secured Obligations shall have been perfected (it being understood and agreed that the intent of the parties is that, as of the Closing Date, the only perfection actions required of the Borrower and Guarantors shall be: (A) delivery of UCC financing statements and domestic intellectual property filings (together with an irrevocable authorization of the Administrative Agent to file such statements and filings), (B) delivery to the Administrative Agent or its legal counsel stock certificates together with undated stock powers executed in blank and (C) such actions to perfect the second-priority security interest in the New Working Capital Facility Collateral as are required with respect to the first-priority security interest therein under the New Working Capital Facility on the closing date thereunder).

(vi)  the Borrower shall have delivered all documentation and other information required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including, without limitation, the Patriot Act, in each case at least five business days prior to the Closing Date.

(vii)  the Lead Arrangers shall have received (a) the

11

|  | unaudited interim consolidated financial statements of the Borrower (in form reasonably acceptable to the Administrative Agent (it being agreed that such financial statements will not include a Management's Discussion and Analysis of Financial Condition and Results of Operations ("**MD&A**"), footnote disclosures or the recognition of reorganization items and the impact of applying fresh start accounting, and that the form of unaudited interim consolidated financial statements delivered by the Borrower to JPMorgan prior to the date hereof is acceptable)) for each fiscal monthly period (with such monthly financial statements to consist of a management basis income statement only) and quarterly period (with such quarterly financial statements to consist of an income statement, balance sheet and cash flow statement) ended subsequent to the date of the last such fiscal monthly or quarterly period delivered prior to the date hereof (but in any event, all unaudited quarterly financial statements not later than 60 days after the end of each fiscal quarter and all monthly financial statements not later than 30 days after the end of each fiscal month), (b) the Borrower's most recent projected consolidated income statement, balance sheet and cash flow statement in form (it being agreed the form delivered to JPMorgan prior to the date hereof is acceptable) reasonably acceptable to the Lead Arrangers for the four-year period beginning on the Closing Date of the Plan (set forth on a fiscal quarterly period basis for the first year and on an annual basis thereafter) and (c) a pro forma unaudited consolidated balance sheet of the Borrower, after giving pro forma effect to the Transactions.<br><br>(viii) the Court shall have entered the Financing Papers Approval Order, which order (i) is in full force and effect, unstayed and final and non-appealable, (ii) is not be subject to a motion to stay, a motion for rehearing or reconsideration or a petition for a writ of certiorari and (iii) has not have been amended, supplemented or otherwise modified without the written consent of the Lead Arrangers, reversed or vacated.<br><br>(ix) the Plan and the Disclosure Statement shall not be amended, modified or supplemented in any manner that could be reasonably expected to adversely affect the interests of the Administrative Agent or the Lenders in their capacities as such in connection with the Term Loan Facility without the consent of the Lead Arrangers; it being understood that any amendment to |

12

the Plan providing for the assumption or incurrence by the Borrower of any material indebtedness or other material liability not otherwise contemplated by the Plan shall be deemed to adversely affect the interests of the Administrative Agent and the Lenders.

(x)    the pro forma capital and ownership structure of the Credit Parties shall be substantially as described in the Plan and the Lead Arrangers shall be satisfied with the Credit Parties' organizational documents and shareholder arrangements of the Credit Parties, in each case as the same will exist after giving effect to the consummation of the Transactions.

(xi)    all conditions precedent to the effectiveness of the Plan shall have been satisfied or waived; *provided* that the conditions precedent to effectiveness of the Plan set forth in Sections 10.1.1(g), (h) (solely to the extent of the documents and agreements necessary to implement the Plan on the Effective Date) and (i) of the Plan shall not have been waived without the consent of the Lead Arrangers, such consent not to be unreasonably withheld.

(xii)    the effective date of the Plan shall have occurred on or before the Effective Date and the substantial consummation (as defined in Section 1101 of the Bankruptcy Code) of the Plan in accordance with its terms (the "**Emergence Date**") shall occur contemporaneously with the Effective Date.

(xiii)    the order confirming the Plan is in full force and effect, unstayed, and shall not be subject to appeal other than the appeals filed by Wilmington Trust Company, Aurelius Capital Management, LP, Law Debenture Trust Company of New York, Deutsche Bank Trust Company Americas and EGI-TRB LLC (including any amendments thereto).

(xiv)    the existing indebtedness of the Credit Parties shall have been repaid, restructured or reinstated as expressly contemplated by the Plan and, after consummation of the Plan and giving effect to the Transactions, the Credit Parties shall have no outstanding indebtedness, contingent liabilities or claims against them, except as expressly contemplated by the Plan and expressly permitted under the Term Facility Documents.

(xv)    since the filing of the Plan and Disclosure Statement, there shall not have been any change, development or

13

| | |
|---|---|
| | event that has occurred (and the Lead Arrangers shall not have discovered or otherwise become aware of facts or conditions not previously known to them), which the Lead Arrangers shall determine has had or could reasonably be expected to have a material adverse effect on the Transactions or on the financial position, results of operations, assets, liabilities or business of the Borrower and its subsidiaries, taken as a whole. |
| **Yield Protection:** | The Term Facility Documents shall contain customary provisions (i) protecting the Lenders against increased costs or loss of yield resulting from changes in reserve, tax, capital adequacy and other requirements of law and from the imposition of or changes in withholding or other taxes and (ii) indemnifying the Lenders for "breakage costs" incurred in connection with, among other things, voluntary or mandatory prepayments not made on the last day of the relevant interest period. For all purposes of the Term Facility Documents, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines and directives promulgated thereunder and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case, pursuant to Basel III, shall be deemed introduced or adopted after the date of the Term Facility Documents, it being understood that there will be a customary exception to be agreed to the gross-up obligations for U.S. federal withholding taxes imposed under Sections 1471-1474 of the Internal Revenue Code of 1986, as amended (and any regulations promulgated thereunder, published administrative guidance issued pursuant thereto, or agreements entered into pursuant thereto), and any amended or successor version that is substantively comparable and not materially more onerous to comply with. |
| **Expenses and Indemnification:** | The Borrower shall pay (i) all reasonable and documented out-of-pocket expenses of the Administrative Agent associated with the preparation, execution, delivery and administration of the Term Facility Documents and any amendment or waiver with respect thereto (including, without limitation, the fees, disbursements and other charges of one primary counsel to the Administrative Agent (and (i) appropriate local counsel in applicable jurisdictions, to the extent necessary, but limited to one local counsel in each such jurisdiction and (ii) appropriate regulatory and other specialist counsel (including, without limitation, FCC counsel)) and (ii) all reasonable and documented out-of-pocket expenses of the Administrative Agent on |

14

|  | behalf of the Lenders (including, without limitation, the fees, disbursements and other charges of one primary counsel to the Administrative Agent and the Lenders (and (i) appropriate local counsel in applicable jurisdictions, to the extent necessary, but limited to one local counsel in each such jurisdiction, (ii) appropriate regulatory and other specialist counsel (including, without limitation, FCC counsel) and (iii) solely in the case of a conflict of interest, one additional counsel in each relevant jurisdiction to the affected parties similarly situated)) in connection with the enforcement of the Term Facility Documents.<br><br>The Administrative Agent and the Lenders (and their affiliates and their respective officers, directors, employees, advisors and agents) will have no liability for, and will be indemnified and held harmless against, any loss, liability, cost or expense incurred in respect of the Term Loan Facility or the use or the proposed use of proceeds thereof; *provided* that no indemnified person will be indemnified for any loss, liability, cost or expense to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from (i) the gross negligence, bad faith or willful misconduct of such person or (x) any of its controlled affiliates or any of the officers, directors or employees of any of the foregoing, in each case who are involved in or aware of the Transactions or (y) any advisors or agents of such indemnified person acting at the direction of such indemnified person or (ii) disputes solely between and among indemnified persons to the extent such disputes do not arise from any act or omission of the Borrower or any of its affiliates (other than claims against an indemnified person acting in its capacity as an agent or arranger or similar role in connection with the Term Loan Facility, unless such claims arise from the gross negligence, bad faith or willful misconduct of such Indemnified Person). |
|---|---|
| **Governing Law and Forum:** | State of New York. |
| **Counsel to the Administrative Agent and Lead Arrangers:** | Davis Polk & Wardwell LLP |

15