# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered<br>**Objection Date: November 20, 2012 at 4:00 p.m.**<br>**Hearing Date:  TBA**<br>**Related to Docket Nos. 12250, 12439, and 12579** |

## FIFTEENTH QUARTERLY FEE APPLICATION OF SIDLEY AUSTIN LLP FOR COMPENSATION FOR SERVICES RENDERED AND REIMBURSEMENT OF EXPENSES AS COUNSEL TO THE DEBTORS AND DEBTORS IN POSSESSION FOR THE PERIOD OF JUNE 1, 2012 THROUGH AUGUST 31, 2012

| | |
|---|---|
| Name of Applicant: | **Sidley Austin LLP** |
| Authorized to Provide Professional Services to: | **Debtors** |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc., f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); and WPIX, Inc. (0191).  The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

Date of Retention:                              **February 20, 2009 (nunc pro tunc to December 8, 2008)**

Period for Which Compensation                   **June 1, 2012 through August 31, 2012**
and Reimbursement is Sought:

Amount of compensation sought as actual,        **$6,260,291.50**
reasonable and necessary:

Amount of Expense Reimbursement sought as       **$438,845.57**
actual, reasonable and necessary

This is a(n):  _____ monthly      __X__ interim      _____ final application

The total time expended during the Fifteenth Interim Fee Period for fee application preparation for the monthly and quarterly fee applications, including time expended for review and response to preliminary and final reports and recommendations of the Fee Examiner, is approximately 728.90 hours and the corresponding compensation requested is approximately $301,038.00.

<u>Prior Interim Applications</u>

| Quarter | Date Filed | Period Covered | Requested | | Approved | |
|---|---|---|---|---|---|---|
| | | | Fees | Expenses | Fees | Expenses |
| 1 | 4/15/09 | 12/8/08-2/28/09 | $3,897,043.25 | $165,360.71 | $3,886,289.75 | $158,441.67 |
| 2 | 7/16/09 | 3/1/09-5/31/09 | $4,209,274.75 | $105,524.36 | $4,203,235.50 | $104,118.90 |
| 3 | 10/15/09 | 6/1/09-8/31/09 | $4,513,018.00 | $99,429.34 | $4,510,127.00 | $99,253.67 |
| 4 | 1/15/10 | 9/1/09-11/30/09 | $5,292,782.75 | $221,808.01 | $5,275,754.14 | $220,748.76 |
| 5 | 4/15/10 | 12/1/09-2/28/10 | $5,426,757.50 | $205,852.05 | $5,412,303.00 | $201,565.16 |
| 6 | 12/14/10 | 3/1/10-5/31/10 | $6,581,178.43 | $425,733.29 | $6,582,868.12 | $418,736.42 |
| 7 | 5/4/11 | 6/1/10-8/31/10 | $7,081,656.37 | $310,093.90 | $7,077,989.87 | $304,357.14 |
| 8 | 7/1/11 | 9/1/10-11/30/10 | $7,126,734.00 | $334,255.68 | $7,120,542.46 | $323,696.86 |
| 9 | 9/20/11 | 12/1/10-2/28/11 | $14,478,878.00 | $599,999.17 | $14,448,735.77 | $585,309.27 |
| 10 | 1/27/12 | 3/1/11-5/31/11 | $8,941,857.00 | $1,133,692.42 | $8,796,500.97 | $1,082,606.25 |
| 11 | 6/4/12 | 6/1/11-8/31/11 | $5,073,861.25 | $445,493.14 | $5,063,659.56 | $442,659.63 |
| 12 | 7/12/12 | 9/1/11-11/30/11 | $4,486,113.50 | $290,379.17 | $4,469,297.37 | $288,796.51 |
| 13 | 7/27/12 | 12/1/11-2/29/12 | $5,331,970.50 | $168,703.44 | | |
| 14 | 8/20/12 | 3/1/12-5/31/12 | $5,418,107.32 | $182,859.76 | | |

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered |

**Objection Date: November 20, 2012 at 4:00 p.m.**
**Hearing Date: TBA**
**Related to Docket Nos. 12250, 12439, and 12579**

### FIFTEENTH QUARTERLY FEE APPLICATION OF SIDLEY AUSTIN LLP FOR COMPENSATION FOR SERVICES RENDERED AND REIMBURSEMENT OF EXPENSES AS COUNSEL TO THE DEBTORS AND DEBTORS IN POSSESSION FOR THE PERIOD OF JUNE 1, 2012 THROUGH AUGUST 31, 2012

Sidley Austin LLP ("Sidley"), attorneys for Tribune Company ("Tribune") and

the affiliated companies that filed voluntary petitions for relief in the above-captioned chapter 11

cases (collectively, the "Debtors"), respectfully submits this application (the "Application") to

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc., f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); and WPIX, Inc. (0191). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

this Court, pursuant to (i) sections 327, 331, and 503 of title 11 of the United States Code (the "Bankruptcy Code"), (ii) Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (iii) Rule 2016-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), (iv) the Order Establishing Procedure for Interim Compensation and Reimbursement of Expenses of Professionals and Committee Members Pursuant to 11 U.S.C. §§ 105(a) and 331 (Docket No. 225) (the "Interim Compensation Order"), as amended, and (v) the Order Appointing Fee Examiner and Establishing Related Procedures for Compensation and Reimbursement of Expenses for Professionals and Consideration of Fee Applications (Docket No. 546) (the "Fee Examiner Order") for approval of interim compensation and reimbursement of expenses for the fifteenth quarterly period from June 1, 2012 through August 31, 2012 (the "Fifteenth Interim Fee Period").  In support of the Application, Sidley respectfully states as follows:[2]

## FACTUAL BACKGROUND OF THE CASES

1.      On December 8, 2008 (the "Petition Date"), Tribune and certain of its subsidiaries each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. An additional Debtor, Tribune CNLBC, LLC (f/k/a Chicago National League Ball Club, LLC) ("Tribune CNLBC"), filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on October 12, 2009.[3]  On March 22, 2010, this Court entered an order dismissing the chapter 11 petition of New River Center Maintenance Association, Inc. (Docket No. 3805).  On

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the DCL Plan (as defined herein).

[3] Orders of the Court applicable to this Application have subsequently been extended to Tribune CNLBC.  (See Order Directing (I) Joint Administration of Chapter 11 Cases and (II) that Certain Orders and Other Pleadings Entered or Filed in the Chapter 11 Cases of Tribune Company, et al. be Made Applicable to the Chapter 11 Case of Chicago National League Ball Club, LLC (entered Oct. 14, 2009) (Docket No. 2333) (the "CNLBC Joint Administration Order").

May 24, 2011, this Court entered an order dismissing the chapter 11 petition of Publishers Forest Products Co. of Washington (Docket No. 11688). In all, the Debtors comprise 110 entities.

2.      The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b). (Docket Nos. 43, 2333.)

3.      The Debtors have continued in possession of their respective properties and have continued to operate and maintain their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.      On December 18, 2008, the office of the United States Trustee appointed an official committee of unsecured creditors in the Debtors' chapter 11 cases (the "Committee").

5.      On March 19, 2009, pursuant to Fee Examiner Order, the Court appointed Stuart Maue as fee examiner (the "Fee Examiner") to act as special consultant to the Court for professional fee and expense analysis and review, effective nunc pro tunc to February 20, 2009. (Docket No. 546.)

6.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief sought herein are sections 327, 331, and 503 of the Bankruptcy Code, Rule 2016 of the Bankruptcy Rules, and Rule 2016-2 of the Local Rules.

## PROCEDURAL BACKGROUND FOR THE APPLICATION

7.      The Debtors sought approval of this Court to retain Sidley as general reorganization and bankruptcy counsel, pursuant to 11 U.S.C. §§ 327(a) and 1107, by application filed on December 26, 2008. As set forth in the application seeking such approval, Sidley's services to the Debtors encompass a wide range of legal services, focused upon restructuring and

insolvency issues but also encompassing certain general corporate, litigation, tax, media law and regulatory, employee-related, and real estate matters.  In particular, Sidley's retention application sets forth the following scope of services:

a) to provide legal advice with respect to the Debtors' powers and duties as debtors in possession in the continued operation of their business;

b) to take all necessary action on behalf of the Debtors to protect and preserve the Debtors' estates, including prosecuting actions on behalf of the Debtors, negotiating any and all litigation in which the Debtors are involved, and objecting to claims filed against the Debtors' estates;

c) to prepare on behalf of the Debtors all necessary motions, answers, orders, reports, and other legal papers in connection with the administration of the Debtors' estates;

d) to attend meetings and negotiate with representatives of creditors and other parties in interest, attend court hearings, and advise the Debtors on the conduct of their chapter 11 cases;

e) to perform any and all other legal services for the Debtors in connection with both their chapter 11 cases and with the formulation and implementation of the Debtors' plan of reorganization;

f) to advise and assist the Debtors regarding all aspects of the plan confirmation process, including, but not limited to, negotiating and drafting a plan of reorganization and accompanying disclosure statement, securing the approval of a disclosure statement, soliciting votes in support of plan confirmation, and securing confirmation of the plan;

g) to provide legal advice and representation with respect to various obligations of the Debtors and their managers and officers;

h) to provide legal advice and perform legal services with respect to matters involving the negotiation of the terms of and the issuance of corporate securities, matters related to corporate governance, and the interpretation, application, or amendment of the Debtors' organizational documents, including their limited liability company agreements, material contracts, and matters involving the fiduciary duties of the Debtors and their officers and managers;

i) to provide legal advice and perform legal services with respect to litigation, tax (state and federal income tax and local property tax assessment matters) and other general non-bankruptcy legal issues for the Debtors to the extent requested by the Debtors; and

j) to render such other services as may be in the best interests of the Debtors in connection with any of the foregoing and all other necessary or appropriate legal services in connection with these chapter 11 cases, as agreed upon by Sidley and the Debtors.

Sidley's retention, nunc pro tunc to the Petition Date, was approved by this Court by order dated February 20, 2009.  (Docket No. 435.)

8.      The Interim Compensation Order and the Fee Examiner Order (together, the "Fee Orders") provide that all professionals retained in these cases pursuant to sections 327, 328, or 1103 of the Bankruptcy Code (the "Case Professionals") must file with the Court and provide to the Fee Examiner monthly applications for interim allowance of compensation for services rendered and reimbursement of expenses incurred, together with the applicable time entries and itemized expenses (the "Monthly Fee Application").  The notice parties specified in the Fee Orders (the "Notice Parties") have twenty (20) days after service of a Monthly Fee Application to object to such Monthly Fee Application (the "Objection Deadline").  Upon expiration of the Objection Deadline, the applicable Case Professional must certify in writing that no objection or partial objection has been filed with the Court relative to that professional's Monthly Fee Application, whereupon the Debtors are authorized to pay such professional an amount equal to the lesser of (i) 80% of the fees and 100% of the expenses requested in the Monthly Fee Application or (ii) 80% of the fees and 100% of the expenses not subject to an objection.

9.      Pursuant to the procedures set forth in the Fee Orders, Sidley prepared, filed with the Court, and served upon the Notice Parties and the Fee Examiner Monthly Fee Applications for the periods of June 2012, July 2012, and August 2012, which Monthly Fee Applications are incorporated herein by reference.[4]  Sidley has accordingly submitted all of its Monthly Fee Applications for the Debtors' chapter 11 cases for the Fifteenth Interim Fee Period.

---

[4] The docket numbers of Sidley's Monthly Fee Applications for June 2012, July 2012, and August 2012 are 12250, 12439, and 12579, respectively.

10.     In addition to the Monthly Fee Applications, beginning with the three-month period ending February 28, 2009, and each three-month period thereafter, all Case Professionals must file with the Court and serve on the Notice Parties interim applications for allowance of compensation and reimbursement of expenses of the amounts sought in the Monthly Fee Applications filed during such period (a "Quarterly Fee Application Request"). See Interim Compensation Order at ¶ 3. Quarterly Fee Application Requests must include a summary of the Monthly Fee Applications that are the subject of the request and any other information requested by the Court or required by the Local Rules. Id. This Application represents the fifteenth Quarterly Fee Application Request that Sidley has filed with the Court in connection with these chapter 11 cases, and it covers the period from June 1, 2012 through August 31, 2012, both dates inclusive.

## RELIEF REQUESTED

11.     By this Application, Sidley respectfully requests that the Court approve the interim allowance and award of compensation for professional services rendered and reimbursement of actual and necessary expenses incurred by Sidley as general bankruptcy counsel to the Debtors during the Fifteenth Interim Fee Period.

12.     The amount of fees sought for services rendered during the Fifteenth Interim Fee Period is $6,260,291.50, representing 10,245.10 hours in professional and paraprofessional time for such services. Reimbursement of actual, necessary expenses incurred by Sidley during the Fifteenth Interim Fee Period in connection with these services is requested in the amount of $438,845.57. Sidley seeks the interim allowance of such compensation, and this Court's authorization for payment of such amounts by the Debtors to Sidley, less amounts previously paid to Sidley pursuant to the Monthly Fee Applications for the period covered by this Application and the procedures set forth in the Fee Orders.

13.     The hourly rates charged by Sidley's professionals and paraprofessionals during the Fifteenth Interim Fee Period are no greater than the customary hourly rates for such individuals both inside and outside of bankruptcy cases.  The highest billing rate charged by any Sidley attorney for services rendered under Sidley's current billing rates that became effective on January 1, 2012 and continuing until Sidley's next Firm-wide rate adjustment will be $1,000 per hour.  See Supplemental Affidavit (Second) of James F. Conlan in Support of Application for an Order Authorizing the Employment and Retention of Sidley Austin LLP as Attorneys for the Debtors and Debtors in Possession at ¶ 3 (Docket No. 424).  Sidley believes these rates are comparable to those charged by the bankruptcy and other professionals of other firms of comparable size, stature, and experience.

14.     Sidley has received no payment and no promises for payment from any source other than the Debtors for services rendered in these chapter 11 cases.  There is no agreement between Sidley and any other party for the sharing of compensation to be received for the services rendered by Sidley in these chapter 11 cases.  All professional and paraprofessional services for which compensation is sought herein were rendered solely on behalf of the Debtors in these cases.

### SERVICES RENDERED

15.     Sidley has rendered substantial services to the Debtors in connection with these chapter 11 cases during the period covered by this Application, both in its capacity as general bankruptcy counsel to the Debtors and continuing in its capacity as corporate, litigation, and transactional counsel to the Debtors in their ordinary course of business.  The services performed by Sidley's professionals and paraprofessionals during the period covered by this Application were necessary and have directly contributed to the effective administration of the Debtors' chapter 11 cases.

16.     A breakdown of the total hours expended by each professional on all matters and a breakdown of amounts sought by each matter category covered herein are included as a part of <u>Attachment A</u> to this Application, as required by Local Rule 2016-2.  A detailed description of the services provided to the Debtors is incorporated by reference to the Monthly Fee Applications previously filed by Sidley with the Court.  The following is a summary of the activities performed by Sidley's professionals and paraprofessionals during the Fifteenth Interim Fee Period:

A.     <u>Post-Confirmation Matters (13730):    Hours: 708.00    Fees: $377,035.50</u>

17.     Sidley's professionals in the Corporate and Corporate Reorganization and Bankruptcy practice groups expended considerable efforts during the Fifteenth Interim Fee Period preparing the Debtors for emergence from their chapter 11 cases.  This work was comprised primarily of (i) taking all necessary steps to prepare the Debtors to efficiently implement the restructuring transactions (the "<u>Restructuring Transactions</u>") envisioned under the Fourth Amended Joint Plan of Reorganization for Tribune Company and its Subsidiaries (Docket No. 11354) (the "<u>Fourth Amended DCL Plan</u>" or the "<u>DCL Plan</u>")[5] and (ii) efforts to address a number of issues that may arise upon the Debtors' emergence from chapter 11 (the "<u>Emergence Issues</u>").

18.     On July 23, 2012, the Bankruptcy Court entered an Order (the "<u>2012 Confirmation Order</u>") confirming the DCL Plan (Docket No. 12074).  Prior to the issuance of the 2012 Confirmation Order, all work related to the Restructuring Transactions and Emergence Issues was recorded under the "Plan and Disclosure Statement" matter number.  To allow greater

---

[5] The DCL Plan was jointly proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A. (collectively, the "<u>DCL Plan Proponents</u>").

specificity for Sidley's timekeepers and ease of review for the Fee Examiner and the Court, following the issuance of the 2012 Confirmation Order in late July 2012, time entries related to the Restructuring Transactions and Emergence Issues were recorded in the "Post-Confirmation Matters" matter number.  Use of the "Post-Confirmation Matters" matter number will continue until the completion of the Debtors' chapter 11 cases.

(a)    **The Restructuring Transactions**

19.    The Restructuring Transactions, set forth and described in detail in Exhibit 5.2 to the DCL Plan, involved substantial work primarily performed by Sidley's professionals in the Corporate practice group.  During the Fifteenth Interim Fee Period, Sidley's professionals advised and assisted the Debtors with respect to planning, implementation and timing matters relating to the Restructuring Transactions and prepared substantial volumes of documentation necessary to consummate the Restructuring Transactions.  These efforts required substantial organization, communication and coordination across the Debtors' various internal departments, and included, among other things, preparations for emergence and compliance with all related timing requirements, as well as the preparation of documents required in connection with completion of the underlying transactions.

20.    Planning and preparing to implement the Restructuring Transactions involved obtaining and analyzing information from the Debtors' business leaders across all business units (including publishing, digital, broadcasting and other operations) and corporate functions (including tax, real estate, employee benefits, payroll, intellectual property, legal, regulatory and financial reporting) to address operational and implementation concerns and opportunities in connection with consummation of the Restructuring Transactions.  The planning and implementation process also involved Sidley's professionals providing assistance and advice to the Debtors with respect to the impact of the Restructuring Transactions on other facets of the

reorganization process, including the FCC application and approval process, the financing and credit facilities to be implemented in connection with emergence, and financial reporting and securities matters.

21.    Addressing the timing concerns relating to the Restructuring Transactions involved significant planning and collaboration among Sidley's professionals, the Debtors and the Debtors' outside vendors.  One of the significant timing challenges addressed by Sidley's professionals during the Fifteenth Interim Fee Period was the preparation of a plan to complete nearly all of the Restructuring Transactions within the seven calendar day window provided for under the DCL Plan, given that the Restructuring Transactions consist of more than one hundred individual transactions and involve substantially all of the entities within the Debtors' corporate structure, a number investments and joint venture interests, and more than two dozen newly-formed entities.  The intricacies of the timing of the Restructuring Transactions are made all the more complex due to the voluminous documentation that must be filed with secretary of state offices, state and local tax offices and other governmental authorities all over the United States and in certain foreign jurisdictions in order to form new entities, effect mergers, effect conversions, effect certain transfers and withdraw, qualify and re-qualify the Debtors to do business.  As a result, it was necessary for Sidley's professionals to undertake substantial work on the Restructuring Transactions prior to the Effective Date of the Fourth Amended DCL Plan.

22.    The documentation required to consummate the Restructuring Transactions includes, but is not limited to, certificates of formation, certificates and articles of incorporation, certificates of merger, agreements and plans of merger, plans of conversion, asset transfer agreements, equity transfer agreements, written consents and corporate approvals (including, but not limited to consents of boards of directors, boards of managers, member

12

consents and stockholder consents) for all transactions and preliminary corporate matters
(including, but not limited to, the approval of mergers, conversions, asset transfer agreements
and equity transfer agreements, and appointment of officers), required notices to certain
commercial and governmental third parties, tax forms (including approval requests submitted to
certain tax authorities, Forms SS-4 and other correspondence and forms), limited liability
company agreements, bylaws, limited liability company membership certificates, stock
certificates and other corporate documentation.

**(b)**      <u>**Emergence Issues**</u>

23.    Sidley's professionals in the Corporate and Corporate Restructuring and
Bankruptcy practice groups advised and assisted the Debtors during the Fifteenth Interim Fee
Period with respect to planning and preparing for the implementation of the DCL Plan, including
the issuance and distribution of securities, establishing the litigation trust pursuant to section 13.1
of the DCL Plan (the "<u>Litigation Trust</u>") and finalizing the agreements and other corporate
documentation required under the plan.

24.    Sidley's role in advising and assisting the Debtors with respect to the
issuance and distribution of securities involved analyzing matters relating to securities laws,
coordinating Depository Trust Company ("<u>DTC</u>") eligibility and the exchange of securities
through the facilities of DTC, preparing arrangements and documentation with the transfer agent
and the warrant agent for the issuance of the New Common Stock and New Warrants, preparing
summary information with respect to the rights and terms of the New Common Stock and New
Warrants, addressing FCC regulatory compliance issues relating to the New Common Stock and
New Warrants, including monitoring and compliance programs, and preparing forms and
information for holders of New Common Stock and New Warrants in anticipation of emergence
and post-effective date trading.

13

25.     Sidley's role in advising and assisting the Debtors with respect to establishing the Litigation Trust included finalizing the Litigation Trust Agreement and the litigation trust loan agreement, preparing summary information with respect to the rights, obligations and terms of the Litigation Trust Agreement and the litigation trust loan agreement and coordinating and assisting the Litigation Trustee on matters relating to allocation of Litigation Trust Interests and certain preliminary matters to be addressed by the Litigation Trustee and the Litigation Trust Advisory Board.

26.     In addition to the foregoing, Sidley's professionals assisted in addressing corporate governance matters and finalizing certain agreements and corporate documentation necessary to implement the DCL Plan, including the new certificate of incorporation and bylaws of Tribune, the registration rights agreement and other certificates and agreements relating to the issuance of the New Common Stock and the New Warrants, and preparing and coordinating information with securities regulators.

B.     **FCC Matters (20100):    Hours: 133.10    Fees: $91,489.50[6]**

27.     During the Fifteenth Interim Fee Period, Sidley's professionals continued to represent the Debtors' broadcast stations on several matters as communications regulatory counsel.  Approximately eleven percent, or $9,755, of the fees incurred by Sidley's professionals in this category during the Fifteenth Interim Fee Period relate to the Newspaper Cross-ownership litigation matter, which, as described in Sidley's prior Quarterly Fee Application Requests, involves petitions for review of the Federal Communications Commission's ("FCC") newspaper-

---

[6] Commencing in December 2009, the Debtors requested that Sidley provide separate invoices for professional fees for certain discrete FCC-related services attributable to the Newspaper Cross-ownership matter, on which Sidley represents the Debtors in the ordinary course of business.  In accordance with this request, and after consultation with the Fee Examiner, Sidley has included such invoices within the broader category of FCC Matters for the purposes of calculating the total fees and expenses in Sidley's Monthly Fee Applications and Quarterly Fee Application Requests.

broadcast cross-ownership regulations.  The FCC had issued various rules that continued to prohibit owners of newspapers, including the Debtors, from also holding licenses to operate certain television or radio stations within the same markets.  The Debtors and twenty-one (21) other parties challenged these rules on constitutional and Administrative Procedure Act grounds, with some arguing that the cross-ownership restrictions should be further strengthened and others, including the Debtors, arguing that the cross-ownership restrictions should be further relaxed.  The remainder of the fees relate, as described below, to assisting the Debtors' broadcast stations with the filing of their FCC license renewal applications and related exhibits, and advising the Debtors' broadcast station licensees on ensuring adequate procedures and policies for their compliance with FCC ownership rules after emergence from bankruptcy proceedings.

28.    During the Fifteenth Interim Fee Period, Sidley's professionals reported to the Debtors on the status of the United States Supreme Court's review of the July 2011 decision of the United States Court of Appeals for the Third Circuit with respect to the FCC's media ownership rules, which had the effect of preserving the FCC's ban on common ownership of a broadcast station and daily newspaper in the same market.  Specifically, Sidley's professionals reviewed the Supreme Court's actions during the pendency of the petition before the Supreme Court, which was held in abeyance pending resolution of that case, and advised the Debtors with respect to the same.  Sidley's professionals reported to Tribune on the denial of certiorari, including its impact on the rule, as the outcome of the appeal was of substantial importance to the Debtors' broadcasting and publishing operations in several key markets in which the Debtors conduct business.

29.    Additionally, at the end of 2011, as reported in prior Quarterly Fee Application Requests, the FCC initiated its 2010 Quadrennial Review proceeding, which sought

comments from the public on the newspaper-broadcast cross-ownership prohibition, as well as the FCC's radio-television cross-ownership rule, which restricts owners of radio stations from also holding licenses to operate certain television stations within the same markets, and the television station multiple-ownership rule, which restricts owners of television stations from holding licenses for multiple stations in the same local markets. Sidley's professionals continued to represent the Debtors in that proceeding during the Fifteenth Interim Fee Period. Sidley's professionals reviewed the ex parte comments filed by opponents of relaxation of the FCC's media ownership rules, monitored the filings and meetings reflected in the docket in that proceeding, and advised the Debtors with respect to several filings of relevance to the Debtors or their arguments before the FCC.

30.     Also as discussed in prior Quarterly Fee Application Requests, Sidley's professionals continued to assist the Debtors with respect to matters related to the current and past broadcast license renewal application cycles, including the filing of broadcast station renewal applications, and provided advice relating to newly-adopted rules of the FCC with respect to the public disclosure of various information concerning broadcasters and their programming. Sidley's professionals with responsibility for assisting the Debtors with upcoming renewals (i) compiled FCC license renewal application data, (ii) reviewed new renewal reporting requirements and drafted and edited renewal exhibits, (iii) researched, prepared and edited renewal exhibits with regard to the newspaper-broadcast cross-ownership rule compliance, and (iv) assisted the Debtors with meeting their "public inspection file" requirements under Federal law in connection with the renewal filings. Sidley's professionals also advised the Debtors regarding the impact of their bankruptcy proceedings on certain FCC renewal applications and procedures, and the reporting of litigation in various public filings or private disclosures.

Finally, Sidley's professionals provided assistance with respect to FCC application certifications in preparation for emergence from bankruptcy, including the FCC's requirements and practices for compliance with foreign ownership limits and other regulations as they are impacted by the issuance and transfer of securities. Specifically, Sidley's professionals reviewed the post-emergence ownership structure of Tribune and provided advice regarding the development and drafting of FCC application surveys and questionnaires to ensure compliance with FCC requirements. Sidley's professionals also simultaneously consulted with reorganization counsel and creditors' counsel on the timing of the FCC approval process, its impact on the bankruptcy process, and the need to establish post-emergence FCC ownership rule compliance procedures.

**C.     Fee Applications (30390):   Hours: 728.90   Fees: $301,038.00**

31.     This matter category encompasses all tasks relating to the preparation and filing of Sidley's Monthly Fee Applications and Quarterly Fee Application Requests with the Court. In this Fifteenth Interim Fee Period, Sidley's professionals and paraprofessionals drafted and filed Sidley's fortieth, forty-first, and forty-second Monthly Fee Applications, drafted Sidley's forty-third Monthly Fee Application, drafted and filed Sidley's Eleventh, Twelfth, Thirteenth, and Fourteenth Quarterly Fee Application Requests, drafted portions of Sidley's Fifteenth Quarterly Fee Application Request, and reviewed and complied with the Court's Fee Orders respecting all of the foregoing. In addition, Sidley reviewed and drafted responses to the Fee Examiner's preliminary reports with respect to Sidley's Ninth and Tenth Quarterly Fee Application Requests. In light of the number of monthly and quarterly fee applications prepared, in whole or in part, during this period, the hours expended and fees requested are reasonable.

**D.     Executory Contracts and Leases (30410):   Hours: 0.20   Fees: $100.00**

32.     As of the Petition Date, the Debtors in these cases were party to approximately 45,000 executory contracts and unexpired leases. Specifically, the DCL Plan

17

(defined below) provides for the assumption of all executory contracts and unexpired leases other than those identified on the exhibit of rejected contracts and leases, which was filed as part of the updated Plan Supplement on May 4, 2012 (Docket No. 11545).[7]

        33.     During the Fifteenth Interim Fee Period, Sidley's professionals worked with a certain creditor on a stipulation to resolve certain outstanding proofs of claim and corresponding cure amounts pursuant to the terms of the DCL Plan, and in accordance with the procedures described in the Motion of the Debtors for an Order Establishing Procedures (I) Fixing Cure Amounts and (II) Providing Notice of Assumption and/or Assignment of Certain Executory Contracts and Unexpired Leases by a Successor Reorganized Debtor Pursuant to Sections 365, 1123 and 1129 of the Bankruptcy Code (Docket No. 8287), which was approved by the Order Establishing Procedures (I) Fixing Cure Amounts and (II) Providing Notice of Assumption and/or Assignment of Certain Executory Contracts and Unexpired Leases by a Successor Reorganized Debtor Pursuant to Sections 365, 1123 and 1129 of the Bankruptcy Code (Docket No. 8745).

        34.     To ensure proper allocation among client matter numbers, the majority of the time related to the negotiation of this stipulation is included in the "Claims Processing" matter category, as this issue was primarily focused on resolving certain proofs of claim. Only time entries exclusively addressing the related executory contract issues are included in the "Executory Contracts and Leases" matter number.

---

[7] The Plan Supplement, as defined in the DCL Plan, is comprised of numerous exhibits to the DCL Plan. The Plan Supplement was originally filed in January 2011, during the Ninth Interim Fee Period, and was updated and filed on May 4, 2012, during the Fourteenth Interim Fee Period. (Docket No. 11545.) The exhibit of rejected contracts and leases was included (without modification) in the May 4, 2012 filing of the Plan Supplement (Docket No. 11545).

**E.**    **Use/Sale/Lease of Assets (30430):    Hours: 2.20    Fees: $1,460.00**

35.    During the Fifteenth Interim Fee Period, Sidley's professionals continued to advise the Debtors' management with respect to certain transactions for the use, sale, and lease of assets on behalf of the Debtors, both in connection with these chapter 11 cases and with Sidley's ongoing representation of the Debtors in the ordinary course of business.  Specifically, Sidley's professionals in the Corporate Reorganization and Bankruptcy practice group provided advice to the Debtors' business personnel on certain proposed business transactions being contemplated by the Debtors, including whether such transactions implicated sections 363(b) or (c) of the Bankruptcy Code.

**F.**    **DIP Financing/Cash Collateral (30440):    Hours: 0.60    Fees: $422.00**

36.    During the Fifteenth Interim Fee Period, Sidley's professionals continued to advise the Debtors' senior management, and communicate with the Debtors' outside counsel and counsel to the lenders under the Debtors' post-petition financing facility, regarding the terms of the Debtors' Letter of Credit facility and related agreements, and the treatment under the DCL Plan of the claims arising under such facility.

**G.**    **Insurance Matters (30450):    Hours: 2.40    Fees: $2,335.00**

37.    During the Fifteenth Interim Fee Period, Sidley's professionals continued to work with the Debtors, their outside insurance counsel, and various insurance providers to resolve certain insurance coverage issues, and to advise the Debtors regarding the impact of the chapter 11 cases on the Debtors' insurance and risk management procedures.  Sidley's professionals specifically reviewed legal issues pertaining to the Debtors' directors' and officers' liability insurance policies and provided advice to the Debtors regarding such policies in connection with lawsuits pending against certain of the Debtors' current and former directors and officers.  Sidley's professionals also responded to certain information requests issued by counsel

for certain of the Debtors' creditors relating to the insurance coverage applicable to certain

litigation-related claims.

**H.**     **Litigated Matters (30470):    Hours: 3,584.60    Fees: $2,399,777.50**

      38.    The "Litigated Matters" category encompasses all of Sidley's activities

relating to actual and potential litigation, contested matters, and adversary proceedings, which

continued to require substantial attention from Sidley, the Debtors' senior management, the

Committee, the Debtors' senior lenders, and other key creditor constituencies during the

Fifteenth Interim Fee Period.  This category also includes fees incurred by Sidley's professionals

in the Litigation and Corporate Restructuring and Bankruptcy practice groups in connection with

litigation-related activities concerning the contested plan confirmation process as it continued to

develop during the Fifteenth Interim Fee Period.[8]  A detailed narrative description of the services

provided by Sidley's professionals in both the Litigation practice group and the Corporate

Reorganization and Bankruptcy practice group (among others) to advance confirmation of the

DCL Plan is provided in the "Plan and Disclosure Statement" matter category, <u>infra</u>.[9]

    **(a)**    <u>**Post-Confirmation and Appeals Activity**</u>

      39.    In June 2012, the Bankruptcy Court held a confirmation hearing with

respect to the Fourth Amended DCL Plan.  On July 13, 2012, the Bankruptcy Court entered the

(i) Memorandum Overruling Objections to Confirmation of the Fourth Amended Plan Of

---

[8] Given the contested nature of the Debtors' plan confirmation process, Sidley's invoices and time detail in both the Litigated Matters category and the Plan and Disclosure Statement category include Sidley's services in connection with the Debtors' plan confirmation process.  As a general rule, the services performed by professionals in Sidley's Litigation practice group in connection with the plan confirmation process appear in the Litigated Matters category, and the services performed by professionals in Sidley's Corporate Reorganization and Bankruptcy practice group in connection with the plan confirmation process appear in the Plan and Disclosure Statement category.

[9] The narrative description of the services provided by Sidley's professionals to advance confirmation of the DCL Plan should be read in conjunction with the time detail submitted in both the Litigated Matters category and the Plan and Disclosure Statement category, to the extent those services are inter-related.

Reorganization for Tribune Company and its Subsidiaries and Denying Clarification Motion

(Docket No. 12033) and (ii) its Order Overruling Plan Objections and Denying the Clarification

Motion (Docket No. 12034).  On July 23, 2012, the Court entered the 2012 Confirmation Order

(Docket No. 12074).

       40.     During the time period leading up to the entry of the 2012 Confirmation

Order, Sidley's professionals spent a substantial amount of time researching and analyzing a

number of potential post-confirmation issues, including potential appeals of the 2012

Confirmation Order and related litigation strategies.  As described further below, the tasks

performed during this period enabled Sidley and the professionals for the other DCL Plan

Proponents to quickly and effectively respond to a series of emergency and expedited motions,

described infra, filed by the parties that had opposed confirmation of the DCL Plan (the

"Objecting Parties").  These efforts required significant contributions from the professionals in

Sidley's Litigation and Corporate Reorganization and Bankruptcy Practice groups, particularly

because, among other things, Sidley and the professionals acting for the other DCL Proponents

needed to respond to the large volume of emergency litigation in a limited amount of time

subsequent to entry of the 2012 Confirmation Order so as not to delay any potential emergence

from these chapter 11 cases.

       41.     Specifically, in addition to the two Wilmington Trust Company

("Wilmington Trust" or "WTC") appeals already pending before Judge Sleet, [10] following entry

of the 2012 Confirmation Order additional appeals (as described infra, the "Confirmation

Appeals") were filed by (i) Aurelius Capital Management ("Aurelius"); (ii) Law Debenture Trust

---

[10] See In re: Tribune Company et al, Case No. 12-cv-00128 (D. Del., filed Jan. 31, 2012) and In re: Tribune Company et al, Case No. 12-mc-00029 (D. Del., filed Jan. 31, 2012).

Company of New York ("Law Debenture") and Deutsche Bank Trust Company Americas

("Deutsche Bank," and together with Law Debenture the "Trustees"); and (iii) EGI-TRB, LLC

("EGI-TRB"), as well as an additional appeal by Wilmington Trust Company.  The Confirmation

Appeals included requests for direct certification of two of the appeals to the Third Circuit Court

of Appeals, as well motions to stay the 2012 Confirmation Order pending resolution of the

Confirmation Appeals.

> (i)    *Bankruptcy Stay Pending Appeal and Direct Appeal Certification Requests*

      42.    On July 23, 2012, the day the Court entered the 2012 Confirmation Order,

Aurelius filed with the Bankruptcy Court (i) a Notice of Appeal of the Confirmation Order and

the related rulings (the "Aurelius Appeal") (Docket No. 12077); (ii)  a Motion For a Stay

Pending Appeal Pursuant to Bankruptcy Rule 8005 (the "Aurelius Stay Motion") (Docket No.

12080); and (iii) a Motion to Schedule Expedited Hearing and Shorten Notice with respect to the

Aurelius Stay Motion (the "Aurelius Motion to Expedite") (Docket No. 12082).

      43.    On the same day, the Trustees filed (i) a Notice of Appeal of the

Confirmation Order and related rulings (the "Trustees' Appeal") (Docket No. 12083); (ii) a

Motion Pursuant to 28 U.S.C. § 158(d)(2) and Fed. R. Bankr. P. 8001(f) Requesting Certification

of Direct Appeal to United States Court of Appeals for Third Circuit of the Unfair

Discrimination Issue in the Allocation Disputes Order as Incorporated in the Order and

Memorandum Opinion on Confirmation (the "Trustees' Direct Appeal Motion") (Docket No.

12084); (iii) a Motion to Stay Pending Appeal of the Confirmation Order (the "Trustees' Stay

Motion," and, together with the Aurelius Stay Motion, the "Stay Motions") (Docket No. 12085);

and (iv) a Motion to Schedule Expedited Hearing and Shorten Notice regarding the Direct

Certification Motion and the Trustee Stay Motion (the "Trustees' Motion to Expedite," and

together with the Aurelius Motion to Expedite, the "Motions to Expedite") (Docket No. 12086).

Sidley's professionals, with input from the other DCL Plan Proponents, drafted and filed the

DCL Plan Proponents' Response to the Motions to Expedite, on July 24, 2012 (Docket No.

12096), the day after the Stay Motions and the Motions to Expedite were filed.

      44.     On July 25, 2012, the Court held a hearing regarding the scheduling of the

proceedings concerning the Motions to Expedite, recommending that the parties seek to resolve

their scheduling concerns consensually.  Pursuant to the Court's instructions, Sidley's

professionals and the other DCL Plan Proponents drafted and submitted a Proposed Scheduling

Order regarding the Motions to Stay and the Direct Appeal Motion. (Docket No. 12137).  On

August 1, 2012, the Court entered a scheduling order (the "Stay Scheduling Order") with respect

to the Trustees' Direct Appeal Motion and the Stay Motions, setting a final hearing date on these

motions for August 17, 2012. (Docket No. 12147).

      45.     On August 2, 2012, EGI-TRB filed a Notice of Appeal of the

Confirmation Order and the related rulings (Docket No. 12177), and a Motion for Request for

Certification of Direct Appeal to the Circuit Court (the "EGI Direct Appeal Motion," and

together with the Trustees' Direct Appeal Motion, the "Direct Appeal Motions") (Docket No.

12198).  On that same day, Wilmington Trust similarly filed a Notice of Appeal of the

Confirmation Order and the related rulings (Docket No. 12157), and a joinder to the Trustees'

Stay Motion. (Docket No. 12160).

      46.     Sidley's professionals, in conjunction with the other DCL Plan

Proponents, prepared consolidated responses to the Stay Motions and the Direct Appeal Motions.

Specifically, on August 8, 2012, the DCL Plan Proponents filed an Objection to the Motions for

a Stay Pending Appeal of the Confirmation Order (the "DCL Stay Objection") (Docket No.

12217), and an Objection to the Direct Appeal Motions (the "DCL Direct Appeal Objection")

(Docket No. 12216).  Sidley's professionals, together with the other DCL Plan Proponents, also

assisted in the preparation of declarations by Eddy Hartenstein (the "Hartenstein Declaration"),

the CEO of Tribune, and David S. Kurtz (the "Kurtz Declaration"), Vice Chairman of

Investment Banking and Head of the Global Restructuring Group at Lazard Ltd., in support of

the DCL Stay Objection.  (Exs. A and B., respectively to the DCL Stay Objection).[11]

47.     Concurrently with the briefing on the Stay Motions and Direct Appeal

Motions, the Trustees took the depositions of Mr. Hartenstein and Mr. Kurtz on August 13, 2012

and August 10, 2012, respectively, both of which Sidley's professionals defended.  Thus, leading

up to these depositions, Sidley's professionals performed various tasks preparing for the same,

including, among other things, researching and reviewing various matters relevant to the

depositions.

48.     The Court held a hearing on the Stay Motions and the Direct Appeal

Motions on August 17, 2012.  During the hearing, Sidley's professionals and the professionals

representing the other DCL Plan Proponents presented oral argument regarding the Direct

Appeal Motions and the Stay Motions.  Sidley's professionals and the professionals representing

the other DCL Plan Proponents also offered the in-person testimony of Mr. Hartenstein and Mr.

Kurtz in opposition to the relief requested in the Stay Motions, which sought to suspend the

effect of the Confirmation Order during the pendency of the Confirmation Appeals without

---

[11] On August 15, 2012, the Direct Appeal Movants filed their replies in further support of the Direct Appeal Motions.  Specifically, the following replies were filed: (i) the Trustees' Reply in Support of their Direct Appeal Motion (Docket No. 12265) (ii) WTC's Joinder to the Trustees' Reply (Docket No. 12275); and (iii) EGI-TRB's Reply in support of its Direct Appeal Motion (Docket No. 12271).  On the same date, the parties filed replies in support of their respective Stay Motions, as follows: (i) Aurelius's Reply Brief in Further Support of Aurelius's Stay Motion (Docket No. 12272) (ii) the Trustees' Reply in Further Support of the Trustees' Stay Motion (Docket No. 1237); and Wilmington Trust's Reply and Joinder to the Trustees' Reply (Docket No. 12771).

monetary security posted (in the form of a supersedes bond).  Among other things, Mr.

Hartenstein and Mr. Kurtz testified that such a stay would cause a substantial delay (two years[12]

being the average) of these already 4-year-old chapter 11 cases, thus potentially derailing the

plan,[13] damaging the businesses of the Debtors,[14] and generally causing irreparable damage.

49.     Members of Sidley's Litigation and Corporate Reorganization and

Bankruptcy practice groups spent substantial time preparing for the August 17, 2012 hearing,

including by, among other things, reviewing deposition transcripts, reviewing the existing record

and previously filed exhibits and briefs, including those filed in connection with the confirmation

hearings, researching and preparing case law summaries, and generally preparing for oral

arguments on the Stay Motions and Direct Appeal Motions.

50.     On August 22, 2012, the Court entered a Memorandum Opinion (i)

Denying Certification for Immediate Appeal to the Third Circuit and (ii) Granting Stay Pending

Appeal (Upon Posting of Bond) (Docket No. 12319), and an order implementing the Post-

Confirmation Opinion (said order including both a "<u>Stay Order</u>" and a "<u>Direct Appeal Order</u>,"

collectively, the "<u>Stay and Direct Appeal Order</u>") (Docket No. 12320).  The Court denied the

Direct Appeal Motions, and held that the parties requesting the stay would be required to post a

$1.5 billion dollar supersedeas bond no later than April 27, 2012 in order to secure a stay

pending appeal of the 2012 Confirmation Order.  <u>See</u> Stay and Direct Appeal Order at ¶¶ 1-2.

No such supersedes bond was posted.

51.     During the Fifteenth Interim Fee Period, Sidley's professionals, together

with the other DCL Plan Proponents, also began to prepare for appellate review of the various

---

[12] <u>See</u> August 17, 2012 Hr'g Tr.: 94-95.

[13] <u>See, e.g.</u>, August 17, 2012 Hr'g Tr.: 73: 15-17.

[14] <u>See e.g.</u>, August 17, 2012 Hr'g Tr.: 78: 15-20.

issues raised by the Objecting Parties in the Confirmation Appeals, the resolution of which is

ongoing as of the filing of this Application.

*(ii)      Aurelius's Stay Order Appeals*[15]

52.      On August 24, 2012, Aurelius filed (i) an Emergency Motion to Extend

Stay Issued by Bankruptcy Court, Modify Bankruptcy Order Regarding Stay and Supersedeas

Bond, Expediting Appeal and Waiving Mediation (the "Aurelius District Court Stay Motion")

(Docket No. 1); (ii) a letter regarding the emergency motion (Docket No. 2); (iii) an opening

memorandum in support of the emergency motion (Docket No. 4); (iv) and a copy of its prior

Notice of Appeal of the Confirmation Order (Docket No. 3) in the District of Delaware in Case

No. 12-cv-01072, captioned as "Aurelius Capital Management v. Tribune Co., et al."  As a

result, Sidley professionals, both in the Litigation and Corporate Reorganization and Bankruptcy

practice groups, together with professionals representing the other DCL Plan Proponents,

immediately began preparing a response to the Aurelius District Court Stay Motion.  On August

27, 2012, prior to the filing of the DCL Plan Proponents' response to the motion, the District

Court denied the Aurelius District Court Stay Motion (Docket No. 11).

53.      On August 29, 2012, Aurelius filed an appeal to the Third Circuit of the

District Court's denial of the Aurelius District Court Stay Motion.  See Case No. 12-3437,

captioned as "Aurelius Capital Management v. Tribune Co., et al."  The Third Circuit entered an

order which provided that the District Court order that Aurelius sought to appeal was not final,

and therefore instructed the parties to address whether it had jurisdiction over such an appeal.

On August 30, 2012, Aurelius then filed a Motion for Stay of Bond Order and for Issuance of a

---

[15] All docket citations in this section refer to the docket of Aurelius Capital Management v. Tribune Co., et al., Case No. 12-cv-01072 (D. Del. 2012).

Temporary Administrative Stay Pending Full Consideration and Disposition of this Stay Motion.[16]

> (iii)    *Trustees' Stay Appeal*[17]

54.    On August 24, 2012, the Trustees filed (i) an Emergency Motion to Modify Bankruptcy Courts' Stay Order (the "Trustees' District Court Stay Motion") (Docket No. 1) (ii) a letter regarding the emergency motion (Docket No. 2); (iii) an opening memorandum in support of the emergency motion (Docket No. 4); (iv) and a copy of the Trustees' prior Notice of Appeal of the Confirmation Order (Docket No. 3) in the District of Delaware in Case No. 12-cv-01073, captioned as "In re: Tribune Company, et al.."[18]  On August 31, 2012, Sidley and the other DCL Plan Proponents filed their Memorandum in Opposition to the District Court Stay Motions of Aurelius and the Trustees. (Docket No. 17).[19]  As of the filing of the Application, the District Court has yet to rule on the Trustees' District Court Stay Motion.

> **(b)**    **The State Law Constructive Fraudulent Conveyance Actions**

55.    On April 25, 2011, the Bankruptcy Court entered an order authorizing the Noteholder Proponents[20] to commence state law constructive fraudulent conveyance actions

---

[16] During the Sixteenth Interim Fee Period, (i) the DCL Plan Proponents filed a response to this motion on September 5, 2012; (ii) Aurelius filed its reply on September 6, 2012; (iii) the DCL Plan Proponents filed a sur-reply to Aurelius's reply on September 7, 2012; and (iv) the Third Circuit issued an order denying the emergency stay motion on September 10, 2012.

[17] All docket citations in this section refer to the docket of In re: Tribune Co., et al., Case No. 12-cv-01073 (D. Del. 2012).

[18] On August 27, 2012, Sidley and the other DCL Plan Proponents filed a motion to consolidate the various appeals, including the Aurelius Appeal, the WTC Appeals, the EGI-TRB Appeal, and the Trustees' Appeals (the "DCL Consolidation Motion") (Docket No. 7).

[19] The DCL Plan Proponents' Memorandum in Opposition, in addition to addressing the Trustees' arguments regarding the need for a stay pending appeal, also addressed the Trustees' contentions that the bond requirement imposed by the Bankruptcy Court was in error.

[20] Aurelius, Law Debenture, Deutsche Bank and Wilmington Trust are collectively referred to herein as the "Noteholder Proponents" for the sake of consistency with Sidley's prior Quarterly Fee Application Requests, although the Noteholder Proponents are no longer advancing confirmation of a competing plan of reorganization for the Debtors.

against Tribune's shareholders who received a cash distribution on account of their shares in

Tribune as part of the Leveraged ESOP Transactions (Docket No. 8740).  On June 2, 2011, the

Noteholder Proponents and certain retirees of Times Mirror Company (the "TM Retirees")[21]

commenced over 50 lawsuits in over 20 different federal and state courts, seeking to recover

approximately $8 billion allegedly paid to all former shareholders of Tribune whose stock was

purchased and/or redeemed in conjunction with the Leveraged ESOP Transactions in 2007,

under state law constructive fraudulent transfer causes of action (collectively, the "SLCFC

Actions").  These lawsuits named over 2,000 individuals and entities as defendants, included

thousands of "doe" defendants, and also asserted defendant class actions against the balance of

the approximately 38,000 individuals or entities who held stock that was purchased or redeemed.

The SLCFC Actions were brought for the sole benefit of the plaintiffs thereto, and not for the

benefit of all of Tribune's creditors.

      56.    On December 19, 2011, the Judicial Panel On Multidistrict Litigation

("JPML") entered an order (the "Transfer Order") consolidating a majority of the SLCFC

Actions in a single multi-district litigation ("MDL") proceeding (the "Consolidated Action") in

the United States District Court for the Southern District of the New York (the "MDL Court").

On December 28 and 29, 2011, the JPML issued conditional transfer orders covering a majority

of the remaining SLCFC Actions and related litigation that was not transferred to the

Consolidated Action by the Transfer Order.  Among the actions identified as potential "tag-

along" actions to be consolidated with the SLCFC Actions in the conditional transfer orders were

the two adversary proceedings commenced by the Committee captioned Official Committee Of

Unsecured Creditors v. JPMorgan Chase Bank, N.A. (In re Tribune Co.), Case No. 10-53963

---

[21] Times Mirror Company was merged with and into Tribune in 2000.

(KJC) (the "Lender Action"), and Official Committee Of Unsecured Creditors v. FitzSimons (In re Tribune Co.), Case No. 10-54010 (KJC) (the "FitzSimons Action") pending before the Bankruptcy Court.  Sidley's professionals spent significant time monitoring and analyzing the voluminous pleadings filed by parties in interest, both in favor of and against further consolidation of the SLCFC Actions in the Consolidated Action.

57.     During the Fifteenth Interim Fee Period, on behalf of the Debtors, Sidley's professionals in the Litigation and Corporate Reorganization and Bankruptcy practice groups spent considerable time reviewing and analyzing the large volume of pleadings in the Consolidated Action and the various state courts which held actions that were not transferred to the Consolidated Action, for the purpose of alerting the Debtors to pleadings which might impact the Bankruptcy Court's stay applicable to the SLCFC Actions, or any pleadings or rulings that might impact Eagle New Media Investments, LLC (a Debtor named in certain of the SLCFC Actions), the current and former employees of the Debtors named in the SLCFC Actions, or any Tribune-related entity or party.  Several of the SLCFC Actions were filed in state court, necessitating coordination with support staff to review dockets across the United States, in addition to raising legal issues regarding removal of those actions to the federal courts.  At Tribune's request, Sidley's professionals prepared daily updates to Tribune's senior management, with cumulative updates provided following important milestones in the SLCFC Actions.  In addition, Sidley's professionals reviewed and analyzed the MDL Court's Second Master Case Order, which, among other things, (i) incorporated the FitzSimons Action into the case and (ii) disposed of dozens of pending motions, and (iii) scheduled a pre-trial conference. Following the pre-trial conference in July, the MDL Court ordered the defendant and plaintiff groups in the Consolidated Action to submit master case scheduling orders, which were

extensive documents outlining a complicated bifurcated case management strategy, that Sidley reviewed and analyzed. The complicated nature of the MDL proceedings and their interplay with the Debtors' ongoing bankruptcy proceedings necessitated both bankruptcy and litigation teams working in concert.

### (c)  Litigation Trust Agreement

58.    During the Fifteenth Interim Fee Period, Sidley's professionals worked to research, draft, and negotiate various provisions of the Litigation Trust Agreement. Several aspects of the Litigation Trust Agreement required the input of Sidley's litigation professionals, including issues related to attorney-client privilege, discovery, valuation, and various other litigation-oriented components of the Litigation Trust Agreement. Thus, Sidley's Litigation professionals worked together with Sidley's Corporate Reorganization and Bankruptcy practice group to effectively coordinate and negotiate the drafting of the Litigation Trust Agreement.

### (d)  Other Pending Litigation

59.    Prior to the Petition Date and since, Sidley has served the Debtors as defense counsel with respect to a number of litigation matters pending in all levels of state and federal courts across the country, including such prepetition litigation matters as Neuman v. Goldstone, a prepetition employment contract lawsuit in Los Angeles; CBS Broadcasting Inc. v. Kincaid, a civil litigation suit pending in California;[22] and certain litigation matters pending in New York, including the cases styled Schultz v. Tribune, Crab House of Douglaston, Inc. v. Newsday, Inc., et al., No. 04-cv-558 (E.D.N.Y.) (the "Crab House Matter") and Furnell v. Tribune. Sidley continued to represent the Debtors and their non-Debtor affiliates in connection

---

[22] The Debtors and CBS Broadcasting reached a consensual resolution of this litigation in July 2012, and the proofs of claim corresponding to such litigation were withdrawn on July 27, 2012 (Docket Nos. 12126 and 12127, respectively).

with these litigation matters during the Fifteenth Interim Fee Period, to the extent such matters were not stayed by section 362(a) of the Bankruptcy Code, and also provided advice to the Debtors in connection with certain proofs of claim filed by the plaintiffs on account of such litigated matters.

60.    During the Fifteenth Interim Fee Period, Sidley's professionals in the Litigation practice group expended considerable efforts on behalf of Tribune ND in opposition to the plaintiffs' motion for partial summary judgment and in cross-moving for partial summary judgment in the Crab House Matter, where claims of fraud and unjust enrichment are asserted on behalf of a purported class of over 140,000 commercial advisors.  On May 15, 2012, the Court adopted the parties' joint proposed motion schedule, and plaintiffs served their motion for partial summary judgment on June 15, 2012.  Three named plaintiffs moved for partial summary judgment as to liability for the period of January 1, 2001 to May 31, 2004.  Sidley's professionals analyzed the motion and accompanying papers, performed extensive legal and factual research, drafted the opposition memorandum of law and response to the Local Rule 56.1 statement, and prepared numerous declarations and accompanying exhibits, all of which were served on July 20, 2012.

61.    Also on July 20, 2012, Sidley's professionals served a cross-motion for partial summary judgment against the five remaining named plaintiffs on their claims for unjust enrichment.  Sidley's professionals performed considerable legal and factual research on, and prepared a memorandum of law in support of, the cross-motion for partial summary judgment, the Local Rule 56.1 statement, and an accompanying declaration with exhibits.

62.    On August 10, 2012, the plaintiffs served their reply in support of their motion for partial summary judgment as well as their response to Tribune ND's Rule 56.1

statement.  Sidley's professionals reviewed and analyzed plaintiffs' response to Tribune ND's

Rule 56.1 statement and prepared a reply memorandum of law in support of the cross-motion for

partial summary judgment.  All summary judgment papers were filed on August 24, 2012.  A

decision on both summary judgment motions is pending.

**I.**     **Travel Time (30480):   Hours: 128.80   Fees: $43,658.00**

> 63.  During the Fifteenth Interim Fee Period, Sidley's professionals spent time

traveling to Wilmington, Delaware to attend hearings in the Debtors' cases.  In addition, Sidley's

professionals traveled to a variety of locations to attend meetings with the Debtors and various

creditor constituencies.  During the Fifteenth Interim Fee Period, the Bankruptcy Court held the

2012 Confirmation Hearing (as defined below) on June 7, June 8, and June 11, 2012, and

additional hearings on July 11, August 7, and August 17, 2012.[23]  These hearings required the

attendance in person of certain Sidley professionals from Sidley's Chicago, Washington, D.C.,

and Los Angeles offices who had done significant work on the matters set for hearing.  The

hours reflect non-working travel time and the fees requested in this matter category have been

reduced by 50% in accordance with Local Rule 2016-2(d)(viii).

**J.**     **Plan and Disclosure Statement (30500):   Hours: 3,154.40   Fees: $2,041,734.50**

> 64.  A central part of Sidley's representation of the Debtors during these

chapter 11 cases has been the negotiation and formulation of a plan of reorganization for the

Debtors.  During the first half of the Fifteenth Interim Fee Period, Sidley's professionals in the

Corporate Reorganization and Bankruptcy and Litigation practice groups continued their efforts

to advance confirmation of the DCL Plan.  In connection with these efforts, Sidley's

professionals prepared for and participated in the confirmation hearings occurring on June 7, 8,

---

[23] In addition, telephonic hearings were held on June 6, June 21, and July 25, 2012, which did not require travel.

and 11, 2012.  These efforts yielded a successful confirmation during the Fifteenth Interim Fee

Period, with issuance of the 2012 Confirmation Order on July 23, 2012.  In connection with

these filings, Sidley's professionals engaged in negotiations with several of the Debtors' creditor

constituencies to reach agreement, where possible, with respect to the filed Plan amendments.

65.     Following confirmation of the DCL Plan, Sidley's professionals and

paraprofessionals also continued their efforts to complete the numerous tasks necessary to

prepare the Debtors for their eventual emergence from bankruptcy.  Some of this work was

commenced prior to the entry of the 2012 Confirmation Order, and those time entries are

included in the "Plan and Disclosure Statement" matter number.  Time entries detailing work

associated with emergence transactions that were performed for the Debtors after the issuance of

the 2012 Confirmation Order were billed to the new "Post-Confirmation Matters" matter

number.  As the specific nature of this work did not change significantly from the pre- to post-

confirmation periods, Sidley's efforts in connection with preparing the Debtors for emergence

are discussed in detail in the portion of this Application discussing the "Post-Confirmation

Matters" matter number.  See supra at ¶¶ 17-26.

(a)     **Modifications to the DCL Plan to Reflect the
Parties' Ongoing Negotiations**

66.     Prior to the commencement of the 2012 Confirmation Hearing on June 6,

2012, Sidley's professionals engaged in numerous formal and informal "meet and confer"

sessions with the remaining Objecting Parties, to identify and potentially narrow objections to

the DCL Plan.  In connection with these communications, Sidley's professionals researched,

analyzed, and proposed various plan amendments aimed at addressing the issues raised by the

remaining Objecting Parties.  These efforts ultimately resulted in Sidley's professionals, together

with the other DCL Plan Proponents, filing amended versions of the DCL Plan on June 1, 2012,

June 19, 2012, and July 20, 2012 (Docket Nos. 11747, 11836, and 12072, respectively)

effectuating changes to, among other things, resolve certain objections raised to confirmation of

the plan.[24]

        **(b)**       **Prepared for and Participated in the Closing Arguments on Confirmation of the DCL Plan**

67.      Sidley's professionals in the Corporate Reorganization and Bankruptcy

and Litigation practice groups were heavily involved in drafting the (a) memorandum of law in

support of confirmation of the DCL Plan, which was filed on June 1, 2012 (Docket No. 11745)

(the "DCL Memorandum"), which included the DCL Proponents' responses to each of the DCL

Plan Objections, and (b) proposed findings of fact and conclusions of law in support of

confirmation of the DCL Plan (Docket No. 11746) (the "FOF/COL").

68.      The Court conducted a three-day confirmation hearing with respect to the

DCL Plan on June 7, 8, and 11, 2012 (the "2012 Confirmation Hearing").  Pursuant to the order

entered by the Court on April 5, 2012 supplementing the January 24, 2012 scheduling order

(Docket No. 11326) (as supplemented, the "Second Supplemental Scheduling Order"), all

testimony and exhibits admitted into evidence at or in connection with the confirmation hearing

on the Second Amended Plan held in March and April 2011 (the "2011 Confirmation Hearing"

and, together with the 2012 Confirmation Hearing, the "Confirmation Hearings") were made

available for use at the 2012 Confirmation Hearing subject to the same rulings, stipulations,

conditions, and restrictions adopted at the prior hearings.  In addition, the parties were authorized

to adopt and incorporate by reference any briefing submitted and oral arguments made in

connection with the 2011 Confirmation Hearing and/or in connection with the various

---

[24] Sidley's professionals also prepared and negotiated a proposed agenda and corresponding submissions to the Bankruptcy Court regarding the unresolved DCL Plan Objections.  See Notice of Filing of Proposed Sequence for Addressing Unresolved Objections at Confirmation Hearing (Docket No. 11758).

Reconsideration Motions (as discussed more fully in the Fourteenth Quarterly Fee Application of Sidley (Docket No. 12307)), and all such materials were deemed included in the record of the 2012 Confirmation Hearing.

69.    Sidley's professionals spent considerable time reviewing and analyzing the exhibits and testimony elicited at the 2011 Confirmation Hearings for potential use in connection with the 2012 Confirmation Hearings.  Sidley's attorneys presented witness testimony by proffer and affidavit and submitted certain additional exhibits at the 2012 Confirmation Hearing.  The 2012 Confirmation Hearing was significantly limited in scope in comparison to the 2011 Confirmation Hearing

70.    In addition, following the Court's issuance of the 2012 Confirmation Opinion,[25] Sidley's attorneys prepared a proposed order confirming the DCL Plan per the Court's request.  Prior to filing this order, and also per the court's request, Sidley's attorneys distributed a draft of the proposed order to certain parties in interest and, together with the other DCL Plan Proponents, engaged in numerous communications with such parties regarding the proposed terms of the order.  The proposed form of order was filed with the Court on July 20, 2012 (Docket No. 12072).  This order was subsequently entered on July 23, 2012 (Docket No. 12074).

(c)    **Activities Relating to the Debtors' Emergence from Chapter 11**

71.    As discussed supra, Sidley's professionals in the Corporate and Corporate Reorganization and Bankruptcy practice groups expended considerable efforts during the Fifteenth Interim Fee Period preparing the Debtors for their eventual emergence from their

---

[25] This Opinion was docketed as the Memorandum Overruling Objections to Confirmation of the Fourth Amended Plan of Reorganization for Tribune Company and Its Subsidiaries and Denying Clarification Motion on July 13, 2012 (Docket No. 12033)

chapter 11 cases.  This work is discussed in detail in the "Post-Confirmation Matters" section of this application.  <u>See</u> <u>supra</u> at ¶¶ 17-26.

**K.**     **Professional Retention (30510):   Hours: 131.10   Fees: $78,862.50**

72.     The Debtors' large and diverse businesses require the employment and retention of a variety of professionals to support these bankruptcy proceedings and to continue managing the litigation, real estate, tax, accounting, and other needs of the Debtors' business operations in the ordinary course.  During the Fifteenth Interim Fee Period, Sidley's professionals drafted an application on behalf of the Debtors to retain Paul, Weiss, Rifkind, Wharton & Garrison LLP to serve as special counsel for certain financing matters (Docket No. 12244).  This retention was approved on August 31, 2012 (Docket No. 12370).

73.     In addition, during the Fifteenth Interim Fee Period, Sidley's professionals prepared and filed two (2) supplements to the list of the Debtors' ordinary course professionals ("<u>OCP</u>" or "<u>OCPs</u>") (Docket Nos. 11858 and 11935) and coordinated with the Debtors' legal department and financial advisors to prepare and file monthly and quarterly reports of proposed payments to OCPs (Docket No. 11934).  Sidley's professionals also coordinated with certain OCP firms retained by the Debtors to assist such professionals with preparing and filing fee applications on behalf of their firms.  In connection therewith, Sidley's professionals reviewed fee applications for Franke Greenhouse LLP and Greer, Burns, & Crain, Ltd. prior to the filing of such applications with the Court (Docket Nos. 11980 and 12299, respectively).

**L.**     **Tax Matters (30520):   Hours: 68.30   Fees: $41,476.50**

74.     During the Fifteenth Interim Fee Period, Sidley's tax professionals continued to advise the Debtors with respect to a variety of discrete tax issues, both arising from and in connection with the Debtors' chapter 11 cases and in connection with Sidley's representation of the Debtors in tax matters in the ordinary course of the Debtors' business.  For

example, Sidley's professionals reviewed and analyzed tax-related claims and liabilities, considered the tax implications of proposed transactions, handled appeals of tax assessments, advised the Debtors with respect to potential settlements of tax claims, and communicated with taxing authorities concerning all such matters. Sidley's professionals in the Tax practice group also analyzed numerous potential tax consequences arising from the modifications to the DCL Plan and tax issues concerning the Debtors' proposed corporate structure as of their emergence from chapter 11.

75. Much of the time of Sidley's Tax and Corporate Reorganization and Bankruptcy professionals in this category during the Fifteenth Interim Fee Period was dedicated to extensive research, internal memoranda and meetings regarding post-confirmation tax issues. Of particular importance was the analysis and assessment of the tax consequences of the Restructuring Transactions that are contemplated to occur upon the Debtors' emergence from chapter 11 protection. Sidley's tax professionals also advised the Debtors and consulted with the other DCL Proponents with respect to the tax implications of the Litigation Trust proposed by the Debtors' plan of reorganization. Sidley spent considerable time researching these issues and advising the Debtors on the potential tax consequences of the Restructuring Transactions and the Litigation Trust structure. In addition to these services, certain of Sidley's Tax and Corporate Reorganization and Bankruptcy partners participated in periodic in-person meetings with the Debtors' management regarding tax issues presented by the Debtors' anticipated emergence from chapter 11 and the coming into being of the Litigation Trust under the DCL Plan.

**M.     Claims Processing (30530):   Hours: 645.20    Fees: $396,614.50**

76. During the Fifteenth Interim Fee Period, Sidley's professionals continued evaluating, researching, and analyzing the treatment of various types of claims arising in the Debtors' chapter 11 cases. To date, well over 7,000 proofs of claim have been filed in the

Debtors' chapter 11 cases.  Sidley's professionals assigned to handle claims-related matters participated in regular conference calls with the Debtors' financial advisors, Alvarez & Marsal, in order to coordinate the processing of the proofs of claim, evaluating the legal sufficiency of the claims, and preparing objections thereto.

77.    Specifically, Sidley's professionals, working together with the Debtors' management, business personnel, and Alvarez & Marsal, researched, prepared, and filed the Debtors' fifty-fifth, fifty-sixth, fifty-seventh, fifty-eighth, and fifty-ninth omnibus objections to claims (Docket Nos. 11985, 11962, 12199, 12200, and 12201, respectively).  Sidley's professionals also continued their efforts to process and resolve claims objections that had been previously filed by Sidley on behalf of the Debtors.  For example, Sidley's professionals negotiated and filed stipulations resolving claims from the forty-second and forty-seventh omnibus objections to claims, resulting in the disallowance of $312,228.24 in face amount of claims against the Debtors' estates.  (See, e.g., Certification of Counsel Regarding Resolution of Debtors Forty-Seventh Omnibus (Substantive) Objection to Claims Pursuant to Section 502(b) of the Bankruptcy Code, Bankruptcy Rules 3001, 3003, and 3007, and Local Rule 3007-1, as it Relates to Claim Nos. 6655, 6658, 6659, and 6660 of the Ohio Department of Taxation (Docket No. 12119), the related order (Docket No. 12128), and Certification of Counsel Regarding Resolution of Debtors Forty-Second Omnibus (Substantive) Objection to Claims Pursuant to Section 502(b) of the Bankruptcy Code, Bankruptcy Rules 3003 and 3007, and Local Rule 3007-1 as it Relates to Claim No. 5283 (Docket No. 12120), the related order (Docket No. 12129).)

78.    During the Fifteenth Interim Fee Period, the Bankruptcy Court entered orders sustaining, in whole or in part, the Debtors' fifty-first, fifty-fourth, fifty-sixth, fifty-seventh, fifty-eighth, and fifty-ninth omnibus objections (subject to the continuance of objections

to certain claims of creditors who filed responses to such objections) (Docket Nos. 11969, 12182, 12255, 12362, 12364, and 12366, respectively), resulting in the disallowance of approximately $122,148,000 in face amount of claims against the Debtors' estates.

79.    Sidley's professionals assisted the Debtors with negotiating and implementing agreements and stipulations settling disputed claims without the need for formal objections, in accordance with the Order approving claims settlement procedures that was entered by the Court to facilitate consensual resolution of claims (Docket No. 2657).[26]  Sidley's professionals also negotiated fourteen (14) stipulations with certain of the Debtors' landlords and trade creditors during the Fifteenth Interim Fee Period, which stipulations covered one hundred thirty-three (133) proofs of claim and reduced the outstanding claims against the Debtors by $353,902 in the aggregate.

80.    In addition, Sidley's professionals performed significant work to analyze and attempt to resolve claims informally with claimants or their respective counsels.  Although this work often did not yield written work product, such as a stipulation or filed objection, it nevertheless added significant value to the Debtors' chapter 11 cases and will aid the Debtors by continuing to reduce the unresolved claims that remain on the claims register.  This will be beneficial to the Debtors as they transition into post-bankruptcy operations and allow them to focus on the prospective operations of their various business rather than expending time and efforts on legacy bankruptcy issues.

---

[26] Those procedures provide the Debtors with authority to settle or compromise disputed claims of less than $50,000 in their discretion, claims equal to or greater than $50,000 but less than $1,000,000 upon notice to the United States Trustee and counsel to the Committee and certain senior lenders, and claims equal to or greater than $1,000,000 with the approval of the Court pursuant to Bankruptcy Rule 9019.

**N.**     **Business Operations (30550):    Hours: 468.20    Fees: $207,572.50**

81.     The Business Operations matter category encompasses the activities of Sidley's professionals with respect to their representation of the Debtors in corporate and transactional matters in the ordinary course of the Debtors' business, as well as other general corporate law and transactional advice, both related to these chapter 11 cases and otherwise related to the Debtors' businesses.  These services are necessary to facilitate the Debtors' efforts to stabilize and reposition their businesses through cost saving and revenue enhancing strategies, as well as to prepare the Debtors for their emergence from chapter 11.

82.     During the Fifteenth Interim Fee Period, Sidley's professionals in the Corporate practice group expended substantial time and effort to prepare, research, and analyze potential value maximization strategies regarding the Debtors and certain of the Debtors' properties.  Sidley's professionals also addressed a variety of discrete matters arising postpetition in the ordinary course of the Debtors' business, including the review of certain potential transactions, joint-venture related issues, utility supply agreements, contracts, leases, licenses, and general corporate governance and business planning matters.  Sidley's professionals also provided information to the Debtors' auditors regarding the various legal matters for which Sidley represents the Debtors in connection with the Debtors' annual financial reporting.

83.     In addition, Sidley's professionals conferred with the Debtors' management on a regular basis for the purposes of advising the Debtors on the legal issues raised by the Restructuring Transactions and post-emergence corporate governance of the Debtors.  In anticipation of the Debtors' emergence from bankruptcy, Sidley's professionals in the Corporate practice group reviewed and assessed the steps necessary to complete the Restructuring Transactions proposed by the DCL Plan, as described above in detail at paragraphs 19 to 22, supra.  Sidley's professionals coordinated with the Debtors' senior management and state

corporate agents, such as Corporation Service Company, to prepare corporate documents (including charters, bylaws, resolutions, limited liability company agreements, merger certificates, merger agreements, conversion certificates, asset transfer agreements, equity transfer agreements, dissolution documents, equity certificates, qualification documents, and annual reports) in connection with the implementation of the Restructuring Transactions upon emergence.  In addition, Sidley's professionals coordinated with the Debtors' senior management and advisors to review, assess and plan the exchange, issuance, and distribution of securities and other interests in anticipation of the Debtors' emergence from bankruptcy. Sidley's professionals in the Corporate practice group also coordinated with the Debtors' management and advisors to prepare corporate documentation in anticipation of the implementation of a secured financing facility in connection with emergence.

84.     Beginning in August, much of the time associated with post-confirmation emergence transactions was reassigned to the new Post-Confirmation Matters category, discussed at paragraphs 17 to 26, supra.  Reference is made to that discussion for a more detailed description of the Restructuring Transactions and related work prepared by Sidley's professionals and paraprofessionals during the Fifteenth Interim Fee Period.

**O.     Case Administration (30560):    Hours: 99.00    Fees: $37,928.50**

85.     During the Fifteenth Interim Fee Period, Sidley's professionals engaged in various general case administration tasks, including scheduling and participating in hearings, reviewing and reporting on docketed filings to the Debtors, the Committee, the United States Trustee, and other interested parties, and maintaining a schedule of critical dates and deadlines. On a periodic basis during the Fifteenth Interim Fee Period, Sidley's professionals participated in status calls with the Debtors' senior management and financial advisors to discuss pending motions and issues and the outcome of each hearing.  In addition, Sidley's paraprofessionals are

responsible for monitoring the docket for all filed pleadings and preparing and distributing a daily status report to the Debtors' senior management and Sidley professionals, at the request of the Debtors' senior management.

**P.    Creditor Communications (30570):    Hours: 4.80    Fees: $2,277.50**

86.     During the Fifteenth Interim Fee Period, Sidley's professionals responded to inquiries and communications from individual creditors as well as from representatives of larger groups of the Debtors' creditor constituencies regarding the status of the Debtors' chapter 11 cases.  As a convenience to individual creditors, particularly individuals who are generally new to and/or unfamiliar with the bankruptcy process and their role therein, the Debtors established a dedicated Tribune bankruptcy "hotline."  This toll-free number connects directly to a voice mailbox maintained by Sidley.  Since the inception of the hotline, typical callers have been bond holders, brokerage firms calling on behalf of clients, former employees of the Debtors, pro se creditors, and attorneys for creditors.  Questions posed to Sidley's professionals by the Debtors' creditors ranged from specific questions regarding claims treatment under the DCL Plan to general inquiries regarding the status of the chapter 11 cases.

**Q.    Employee Matters (30590):    Hours: 215.00    Fees: $124,838.00**

87.     During the Fifteenth Interim Fee Period, Sidley's professionals in the Corporate Reorganization and Bankruptcy and Employment practice groups continued to advise the Debtors with respect to various legal issues pertaining to employee-related matters, including negotiating employment contracts and negotiating termination and severance of former employees.  Sidley's professionals also advised the Debtors with respect to the structure and implementation of their tax-qualified and non-tax-qualified employment-related incentive, benefit, pension, and severance plans, addressed inquiries from the Debtors' management and creditors regarding those plans, and made appropriate adjustments to such plans in response. In

42

addition to the foregoing, Sidley's professionals responded to inquiries from the Debtors'

management and in-house employment lawyers regarding various employment issues, reviewed

consulting contracts, responded to numerous information requests from and/or regarding current

and former employees, and handled various other issues in connection with the Debtors'

employees.  Sidley's professionals also analyzed employee-related claims filed in the Debtors'

chapter 11 cases, including claims filed by certain of the Debtors' current and former directors

and officers for potential indemnification arising from the FitzSimons Action, SLCFC Actions,

and insider preference actions commenced by the Committee.

 88. Among the matters handled by Sidley's professionals during the Fifteenth

Interim Fee Period was the preparation of a motion for authorization to pay into rabbi trusts,

pending resolution of the FitzSimons Action, awards under the Debtors' 2010 management

incentive plan ("MIP") to certain key management employees who historically participated in the

MIP but initially were denied participation in the 2010 MIP due to their status as defendants in

the FitzSimons Action.  The Court had granted similar relief, with the Committee's consent, as to

such employees' awards under the 2011 MIP and 2012 MIP, and the Debtors sought to secure

comparable treatment of these individuals' 2010 MIP awards in order to incentivize and fairly

compensate them for their services.  Sidley's professionals in the Corporate Reorganization and

Bankruptcy and Employment practice groups engaged in substantive negotiations with certain of

the Debtors' creditor constituencies, including the Committee, regarding the proposed terms of

depositing such individuals' 2010 MIP awards into rabbi trusts.  They also had discussions with

legal counsel for three of the Debtors' former employees and the FitzSimons Action defendants,

who sought parallel relief regarding their 2010 MIP awards.  These efforts collectively resulted

in a motion to authorize the Debtors to deposit the 2010 MIP awards into rabbi trusts for the two

current Debtor employees in question, filed on June 20, 2012 (Docket No. 11860) and approved

by the court on July 9, 2012 (Docket No. 11973).

89.     Sidley's professionals in the Employment and Labor Law practice group

were also retained by the Debtors to defend against litigation initiated by certain former

employees in state courts, on a postpetition basis, including the matters captioned <u>Gellman v.</u>

<u>Los Angeles Times Communications LLC</u> (the "<u>Gellman Litigation</u>") and <u>Mitchell v. Los</u>

<u>Angeles Times Communications LLC</u> (the "<u>Mitchell Litigation</u>").[27]   Sidley's professionals

reviewed and analyzed pleadings filed in the Gellman Litigation and the Mitchell Litigation,

advised the Debtors on the preparation and filing of responsive pleadings, and researched and

prepared such pleadings on behalf of the Debtors.

90.     Finally, at the Debtors' request, Sidley's professionals in the Corporate

Reorganization and Bankruptcy and Employment practice groups continued to undertake a

comprehensive analysis of the implications of the SLCFC Actions for the Debtors' current

employees who were either individually named as defendants in those actions or who were

potentially members of the putative defendant classes, by virtue of being former shareholders of

Tribune.  The SLCFC Actions potentially implicate several thousand of the Debtors' current and

former employees, who held stock directly or indirectly through one or more of the Debtors'

benefit plans, and raise complex legal issues at the intersection of state fraudulent conveyance

laws and ERISA.

---

[27] Time entries relating to the Gellman Litigation and the Mitchell Litigation are specifically denoted in the
Employee Matters invoices submitted in connection with the Application.

**R.**    **Exit Credit Facility (13700):    Hours: 170.30    Fees: $111,671.50**

91.    During the Fifteenth Interim Fee Period, Sidley's professionals continued to provide services to the Debtors relating to the evaluation, negotiation, and expected implementation of financing facilities that will provide a source of funding for the reorganized Debtors upon their emergence from their chapter 11 cases.  The DCL Plan authorizes the Debtors to procure exit financing on terms consistent with an exit financing term sheet in the Plan Supplement (the "Exit Facility").  (See DCL Plan, Sections 1.1.87, 1.1.88, 5.10, and Exhibit 5.10.)  The DCL Plan also contemplates that the Debtors will enter into a new senior secured term loan or a replacement facility in addition to the Exit Facility (the "Term Loan Facility" and together with the Exit Facility, the "Proposed Facilities").  (See DCL Plan, Sections 1.1.145, 1.1.146, 5.6, and Exhibit 5.6.)  Preliminary term sheets respecting each of the Proposed Facilities were filed with the Court as part of the Plan Supplement on May 4, 2012 (Docket No. 11545).

92.    Sidley's professionals, together with the Debtors' outside counsel for certain financing matters, continued to review and analyze potential financing terms and alternatives for each of the Proposed Facilities and advised the Debtors' senior management regarding their post-emergence liquidity needs and financing options.  Sidley's professionals also began extensive work on documentation seeking approval of entry into certain letter agreements in connection with the Proposed Facilities.  The post-emergence financing work performed by Sidley during the Fifteenth Interim Fee Period generally fits into four categories: (i) strategic analysis of financing options and alternatives, (ii) due diligence efforts to streamline the process of obtaining financing on the terms set forth in the preliminary term sheets filed as part of the Plan Supplement, (iii) negotiations of substantive terms of the Proposed Facilities, and (iv) drafting several motions in connection with the Proposed Facilities (described in paragraph 95 below).

93.     Sidley's professionals worked diligently during the Fifteenth Interim Fee Period to assess the Debtors' financing needs and to formulate concrete financing plans.  As Sidley's fee detail evidences, partners from Sidley's Global Finance, Corporate Reorganization and Bankruptcy, and Corporate practice groups communicated with the Debtors' senior management, prospective lenders, and the Debtors' outside FCC counsel regarding the Proposed Facilities.  During this period, Sidley's professionals also continued drafting a confidentiality/non-disclosure agreement to be signed by potential lenders and advised the Debtors' management regarding the same.

94.     Sidley's professionals also continued to evaluate and compile certain information necessary for the Debtors to enter into the Proposed Facilities.  It is customary for post-emergence financing that lenders will require extensive diligence information relating to a borrower and its affiliates, their post-emergence assets, and their anticipated post-emergence liabilities.  Accordingly, Sidley's professionals continued the process of researching and compiling certain schedules of corporate and financial information to be provided by the Debtors to provide their lenders, which required participation of professionals in Sidley's Finance, Corporate, and Corporate Reorganization and Bankruptcy practice groups.  Sidley's professionals, working in conjunction with the Debtors' management and other professionals, were able to prepare efficiently and effectively such financing diligence schedules based upon their considerable knowledge of the Debtors' financial records and business operations.

95.     Sidley's professionals also began working with the Debtors' outside finance counsel on term sheets, engagement letters, commitment letters, fee letters and expense letters in connection with the Proposed Facilities.  Additionally, Sidley's professionals drafted several motions seeking approval of certain matters relating to the Proposed Facilities.

Specifically, Sidley's professionals drafted and filed a motion seeking authority for the Debtors to enter into an expense and indemnity letter in connection with the Exit Facility (the "Expense Letter Motion").  The Court entered an order approving the Expense Letter Motion on August 6, 2012 (Docket No. 12183).  Sidley's professionals also drafted a separate motion (the "Expense Letter Motion to Shorten") seeking a shortened notice period for the hearing on the Expense Letter Motion.  The Court entered an order approving the Expense Letter Motion to Shorten on July 27, 2012 (Docket No. 12117).  Finally, throughout the remainder of the Fifteenth Interim Fee Period, Sidley's Bankruptcy professionals continued advising the Debtors regarding term sheets and additional letters in connection with both Proposed Facilities, and worked extensively on a motion seeking approval of such documents and certain related motions.[28]

### EXPENSES INCURRED

96.    Sidley incurred expenses of $438,845.57 in connection with its services rendered to the Debtors during the Fifteenth Interim Fee Period.  These expenses represent actual out-of-pocket costs for items incurred exclusively for the direct benefit of the Debtors, including, but not limited to, duplicating charges, document delivery and messenger services, telephone and facsimile charges, computer-assisted legal research, travel-related expenses, overtime services, in-house document production, and professional services from contract attorneys relating to discovery activities.

---

[28]  On October 19, 2012, the following motions, each prepared by Sidley's professionals were filed: (i) Debtors' Motion for Entry of an Order Authorizing the Debtors to (A) Enter Into Commitment Letter, Lender Fee Letters and Agent Fee Letter in Connection With Exit Facility, (B) Enter Into Engagement Letter, Facility Fee Letter and Agent Fee Letter in Connection With Replacement Facility for New Senior Secured Term Loan, (C) Pay Associated Fees and Expenses and (D) Furnish Related Indemnities [Docket No. 12594]; (ii) Motion of the Debtors for Entry of an Order Authorizing the Filing of Fee Letters Under Seal [Docket No. 12596]; and (iii) Motion to Shorten Notice and Objection Period With Respect to Debtors Motion for an Order Authorizing the Debtors to Enter Into Letters in Connection With Exit Financing, Pay Associated Fees and Expenses and Furnish Indemnities [Docket No. 12597].

97.     Sidley submits that all such expenses are necessary and actual expenses for the performance of its services in these cases, and further submits that many of such expenses were necessitated by the time constraints under which Sidley's professionals and staff have operated in these cases.  Sidley's representation of the Debtors in support of the DCL Plan continued to require the preparation and physical production of documents and exhibits for use at trial, and ongoing discovery activities leading up to the trial required the services of outside contract attorneys and technical service providers.  Additional information respecting certain categories of expenses are described below. A detailed breakdown of Sidley's expenses incurred in rendering services to the Debtors during the period covered by this Application is incorporated into this Application as part of Attachment B hereto.

**(a)     Travel Expenses**

98.     Sidley submits that all travel expenses incurred during the period covered by this Application were necessary, reasonable, and reflect the prevailing market rates.  In particular, Sidley submits that, to the best of its knowledge, all air travel utilized by Debtors' personnel during the period covered by this Application was at the prevailing coach-class rate for such travel less any corporate discounts received by Sidley, in accordance with Sidley's policies for business travel for bankruptcy and non-bankruptcy matters, excepting certain limited instances where coach-class reservations were unavailable.  Hotel charges reflect rates for one night of lodging, unless otherwise indicated.

**(b)     Court-Related Expenses**

99.     Sidley incurred $6,474.05 in out-of-pocket expenses relating to Court fees and Court Reporting fees (including for the depositions taken in connection with the Crab House Matter during the Thirteenth and Fourteenth Interim Fee Periods, the hearing on the Allocation Disputes held during the Fourteenth Interim Fee Period, the hearing for the 2012 Confirmation

Hearing, the hearing on the Stay Motions and Direct Appeal Motions, and the depositions related to the Stay Motions ).  All Court-related expenses reflect actual, reasonable, and necessary costs incurred by Sidley on behalf of the Debtors.

      **(c)**     **Document-Related Expenses**

     100.    Sidley's normal billing practices, as set forth in the pleadings supporting its retention in these chapter 11 cases, include standard secretarial services as part of normal overhead.  For certain projects involving large and/or time-sensitive administrative and logistical requirements resulting from client needs, Sidley utilizes the services of third-party providers in the place of clerical personnel on staff during normal business hours and bills those services to the client at Sidley's cost for such services.  During the Fifteenth Interim Fee Period, Sidley charged a total of $26,605.75 relating to in-house duplication, outside document production, document processing and/or document binding/drilling services that were billed to the Debtors at cost; that is, no markup for such services is applied by Sidley.[29]

      **(d)**     **Computer-Assisted Research**

     101.    Computer research and information retrieval services are charged on a time, item and/or search-type basis which takes advantage of certain discounts that Sidley is able to negotiate with the relevant service providers because of the Firm's size and volume of usage. The Firm's charges for computerized legal research such as Westlaw or Lexis are based on a rate that recovers no more than the Firm's costs.

      **(e)**     **Overtime**

     102.    It is Sidley's standard practice and policy to reimburse professionals and staff for overtime meals and overtime transportation home when working late, provided such

---

[29] By agreement between Sidley and the Office of the United States Trustee, Sidley has not charged the Debtors for any expenses relating to third-party proof-reading services.

professional or staff member has worked a certain number of hours per day on a particular client matter.  Additionally, Sidley provides overtime pay to certain eligible staff employees when they are required to work past normal business hours on a particular client matter.  Sidley incurred $2,636.66 in overtime expenses during the Fifteenth Interim Fee Period.  Sidley submits that all requested overtime expenses are reasonable given the time demands in these cases during the Fourteenth Interim Fee Period.

         **(f)**      <u>**Legal Support Services**</u>

103.     During the Fifteenth Interim Fee Period, Sidley charged a total of (i) $2,252.65 relating to outside professional services and specialists and (ii) $224,390.28 for Legal Support Services, each of which were billed to the Debtors at cost.  In connection with Sidley's ongoing maintenance of the Document Depository, in which the equivalent of approximately 5.82 million pages of documents relating to the Leveraged ESOP Transactions are electronically stored, Sidley utilized the services of an outside vendor, LD Discovery, to host and process electronic data files for production upon request to Depository Designees and creditor constituencies authorized to receive such documents.  Of the amount incurred by Sidley in connection with Legal Support Services, $201,065.48 relates to the services provided by LD Discovery.  Sidley also utilized the services of E-Discovery Services to process certain discovery materials relating to the hearing on the Allocation Disputes and the 2012 Confirmation Hearing. Additionally, Sidley retained courtroom technology consultancy firm TrialGraphix to assist with the hosting, indexing, and projection of trial exhibits, including video deposition designations, on video screens throughout the courtroom during the 2011 Confirmation Hearing, including during the closing arguments held in the Eleventh Interim Fee Period.  Those materials continued to be hosted by TrialGraphix in the Fifteenth Interim Fee Period.  Monthly data hosting fees accounted for $5,893.95 of the Legal Support Services expense category.

## REVIEW OF APPLICABLE LOCAL RULE

104.    The undersigned has reviewed the requirements of Local Rule of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware 2016-2 and certifies to the best of his information, knowledge and belief that this Application substantially complies with Rule 2016-2.

## NOTICE

105.    Notice of this Application has been served upon the Notice Parties specified in the Fee Orders.  In accordance with the terms of the Fee Orders, Sidley respectfully submits that no other or further notice is required.

## NO PRIOR REQUEST

106.    Other than the applicable Monthly Fee Applications, no previous application respecting the relief requested herein has been made to this or any other Court.

WHEREFORE, Sidley Austin LLP respectfully requests the Court (i) to approve, pursuant to 11 U.S.C. §§ 327, 331, and 503, interim compensation in the amount of $6,260,291.50 and reimbursement of expenses in the amount of $438,845.57, (ii) to authorize the payment of such amounts by the Debtors to Sidley, less any amounts previously paid to Sidley pursuant to the Monthly Fee Applications for the period covered by this Fifteenth Quarterly Fee Application Request and the procedures set forth in the Interim Compensation Order and the Fee Examiner Order, and (iii) to grant such further relief as is just and proper.

Dated: October 31, 2012

Respectfully submitted,

James F. Conlan
Bryan Krakauer
Kenneth P. Kansa
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

ATTORNEYS FOR DEBTORS AND DEBTORS
IN POSSESSION

## Attachment A

**FEE SUMMARY FOR THE QUARTERLY PERIOD FROM**
**JUNE 1, 2012 THROUGH AUGUST 31, 2012**

| Name of Professional/ Individual | Position, Area of Expertise, Number of Years in Position, Year of Obtaining License to Practice | Hourly Billing Rate[1] | Total Hours Billed | Total Compensation |
|---|---|---|---|---|
| Chris E. Abbinante | Partner/ Corporate/ 15 years. Admitted 1997. | $875 | 7.30 | $6,387.50 |
| Suresh T. Advani | Partner/ Tax/ 20 years. Admitted 1992. | $925 | 9.60 | $8,880.00 |
| Jeannette K. Arazi | Partner/ Global Finance/ 13 years. Admitted 1999. | $725 | 11.20 | $8,120.00 |
| Larry A. Barden | Partner/ Corporate/ 30 years. Admitted 1982. | $1,000 | 90.80 | $90,800.00 |
| Kenneth K. Bellaire | Partner/ Global Finance/ 10 years. Admitted 2002. | $625 | 0.50 | $312.50 |
| James F. Bendernagel, Jr. | Partner/ Litigation/ 35 years. Admitted 1977. | $900 | 404.60 | $364,140.00 |

---

[1] Hourly Billing Rates reflected herein are those rates in effect as of January 1, 2012.

| Name of Professional/ Individual | Position, Area of Expertise, Number of Years in Position, Year of Obtaining License to Practice | Hourly Billing Rate[1] | Total Hours Billed | Total Compensation |
|---|---|---|---|---|
| Kevin F. Blatchford | Partner/ Corporate/ 26 years. Admitted 1986. | $800 | 215.00 | $172,000.00 |
| Jessica C.K. Boelter | Partner/ Bankruptcy/ 10 years. Admitted 2002. | $725 | 279.00 | $199,483.75 |
| James N. Cahan | Partner/ Environmental/ 36 years. Admitted 1976. | $700 | 14.50 | $10,150.00 |
| Michael A. Clark | Partner/ Tax/ 33 years. Admitted 1979. | $800 | 2.40 | $1,920.00 |
| James F. Conlan | Partner/ Bankruptcy/ 24 years. Admitted 1988. | $1,000 | 57.70 | $57,700.00 |
| Stephen G. Contopulos | Partner/ Litigation/ 40 years. Admitted 1972. | $825 | 8.30 | $6,847.50 |
| William G. Dickett | Partner/ Environmental/ 23 years. Admitted 1989. | $675 | 13.20 | $8,910.00 |
| Michael P. Doss | Partner/ Litigation/ 15 years. Admitted 1997. | $750 | 10.90 | 8,175.00 |

| Name of Professional/ Individual | Position, Area of Expertise, Number of Years in Position, Year of Obtaining License to Practice | Hourly Billing Rate[F] | Total Hours Billed | Total Compensation |
|---|---|---|---|---|
| James W. Ducayet | Partner/ Litigation/ 16 years. Admitted 1996. | $800 | 172.40 | $134,120.00 |
| Max C. Fischer | Partner/ Employment/ 17 years. Admitted 1995. | $675 | 32.80 | $22,140.00 |
| Ronald S. Flagg | Partner/ Litigation/ 31 years. Admitted 1981. | $725 | 242.70 | $175,957.50 |
| Brian J. Gold | Partner/ Employment/ 30 years. Admitted 1982. | $800 | 7.10 | $5,680.00 |
| Scott J. Heyman | Partner/ Tax/ 25 years. Admitted 1987. | $800 | 1.30 | $1,040.00 |
| Robert W. Hirth | Partner/ Litigation/ 33 years. Admitted 1979. | $950 | 227.30 | $215,935.00 |
| Michael Hyatte | Partner/ Regulatory/ 33 years. Admitted 1979. | $1,000 | 0.30 | $300.00 |
| Pran Jha | Partner/ Corporate/ 21 years. Admitted 1991. | $775 | 2.80 | $2,170.00 |

| Name of Professional/ Individual | Position, Area of Expertise, Number of Years in Position, Year of Obtaining License to Practice | Hourly Billing Rate[F] | Total Hours Billed | Total Compensation |
|---|---|---|---|---|
| Matthew E. Johnson | Partner/ Employee Benefits/ 20 years. Admitted 1992. | $800 | 0.30 | $240.00 |
| Kenneth P. Kansa | Partner/ Bankruptcy/ 13 years. Admitted 1999. | $800 | 175.90 | $139,320.00 |
| Peter D. Keisler | Partner/ Appellate/ 23 years. Admitted 1989. | $1,000 | 5.40 | $5,400.00 |
| Colleen M. Kenney | Partner/ Litigation/ 21 years. Admitted 1991. | $725 | 20.70 | $15,007.50 |
| Bryan Krakauer | Partner/ Bankruptcy/ 30 years. Admitted 1982. | $1,000 | 134.50 | $134,500.00 |
| Kevin T. Lantry | Partner/ Bankruptcy/ 21 years. Admitted 1991. | $950 | 325.00 | $300,295.00 |
| Scott R. Lassar | Partner/ Litigation/ 37 years. Admitted 1975. | $1,000 | 0.60 | $600.00 |
| Robert J. Lewis | Partner/ Global Finance/ 18 years. Admitted 1995. | $775 | 10.80 | $8,370.00 |

| Name of Professional/ Individual | Position, Area of Expertise, Number of Years in Position, Year of Obtaining License to Practice | Hourly Billing Rate[F] | Total Hours Billed | Total Compensation |
|---|---|---|---|---|
| Jonathan D. Lotsoff | Partner/ Employment/ 18 years. Admitted 1994. | $725 | 35.60 | $23,272.50 |
| Elizabeth K. McCloy | Partner/ Real Estate/ 28 years. Admitted 1984. | $800 | 0.50 | $400.00 |
| Paul D. Monson | Partner/ Real Estate/ 30 years. Admitted 1982. | $800 | 9.80 | $7,840.00 |
| Larry J. Nyhan | Partner/ Bankruptcy/ 32 years. Admitted 1980. | $1,000 | 16.30 | $16,300.00 |
| Kevin R. Pryor | Partner/ Tax/ 15 years/ Admitted 1997. | $725 | 0.50 | $362.50 |
| Alex R. Rovira | Partner/ Bankruptcy/ 8 years. Admitted 2004. | $725 | 0.50 | $362.50 |
| Priscilla E. Ryan | Partner/ Employee Benefits/ 30 years. Admitted 1982. | $800 | 4.70 | $3,760.00 |
| Joel G. Samuels | Partner/ Bankruptcy/ 28 years. Admitted 1984. | $925 | 39.30 | $36,352.50 |

| Name of Professional/ Individual | Position, Area of Expertise, Number of Years in Position, Year of Obtaining License to Practice | Hourly Billing Rate[F] | Total Hours Billed | Total Compensation |
|---|---|---|---|---|
| Mark D. Schneider | Partner/ Communications/ 27 years. Admitted 1985. | $750 | 89.80 | $67,350.00 |
| Stewart R. Shepherd | Partner/ Employee Benefits/ 36 years. Admitted 1976. | $800 | 2.00 | $1,600.00 |
| Jeffrey C. Steen | Partner/ Bankruptcy/ 28 years. Admitted 1984. | $925 | 624.80 | $573,176.25 |
| Dennis M. Twomey | Partner/ Bankruptcy/ 12 years. Admitted 2000. | $750 | 249.90 | $187,425.00 |
| Alan M. Unger | Partner/ Litigation/ 33 years. Admitted 1979. | $950 | 18.60 | $17,670.00 |
| Melanie Walker | Partner/ Litigation/ 12 years. Admitted 2000. | $650 | 1.40 | $910.00 |
| | | | | |
| William A. Evanoff | Counsel/ Bankruptcy/ 12 years. Admitted 2000. | $700 | 1.50 | $1,050.00 |

| Name of Professional/ Individual | Position, Area of Expertise, Number of Years in Position, Year of Obtaining License to Practice | Hourly Billing Rate[F] | Total Hours Billed | Total Compensation |
|---|---|---|---|---|
| David M. Miles | Counsel/ Financial Institution Regulation/ 33 years. Admitted 1979. | $750 | 76.40 | $57,300.00 |
| James D. Weiss | Counsel/ Employment/ 19 years. Admitted 1993. | $650 | 0.50 | $325.00 |
| James R. Benjamin | Associate/ Global Finance/ 4 years. Admitted 2008. | $475 | 2.50 | $1,187.50 |
| Noam Besdin | Associate/ Corporate/ 3 years. Admitted 2010. | $500 | 48.40 | $24,200.00 |
| Peter K. Booth | Associate/ Bankruptcy/ 4 years. Admitted 2008. | $555 | 24.70 | $13,708.50 |
| Leslie J. Carter | Associate/ Tax/ 3 years. Admitted 2009. | $435 | 1.00 | $435.00 |
| Dusan Clark | Associate/ Litigation/ 11 years. Admitted 2001. | $600 | 1.50 | $900.00 |

| Name of Professional/ Individual | Position, Area of Expertise, Number of Years in Position, Year of Obtaining License to Practice | Hourly Billing Rate[1] | Total Hours Billed | Total Compensation |
|---|---|---|---|---|
| Katharine B. Falahee | Associate/ Environmental/ 2 years. Admitted 2010. | $390 | 4.20 | $1,638.00 |
| Brian Gale | Associate/ Tax/ 3 years. Admitted 2009. | $435 | 3.30 | $1,435.00 |
| Jenna M. Gallagher | Associate/ Corporate/ 1 year. Admitted 2011. | $340 | 163.90 | $55,726.00 |
| Lauren A. Gallagher | Associate/ Employee Benefits/ 3 years. Admitted 2009. | $435 | 53.70 | $18,258.00 |
| Colin J. Garry | Associate/ Litigation/ 4 years. Admitted 2008. | $600 | 44.60 | $26,760.00 |
| Michael T. Gustafson | Associate/ Bankruptcy/ 2 years. Admitted 2010. | $450 | 182.00 | $81,900.00 |
| Amy L. Hanke | Associate/ Litigation/ 6 years. Admitted 2006. | $585 | 86.60 | $50,661.00 |
| Timothy R. Hargadon | Associate/ Litigation/ 3 years. Admitted 2010. | $500 | 115.00 | $57,500.00 |

| Name of Professional/ Individual | Position, Area of Expertise, Number of Years in Position, Year of Obtaining License to Practice | Hourly Billing Rate[F] | Total Hours Billed | Total Compensation |
|---|---|---|---|---|
| Christine M. Herbas | Associate/ Corporate/ 1 year. Admitted 2011. | $340 | 190.80 | $64,872.00 |
| Geoffrey M. King | Associate/ Bankruptcy/ 3 years. Admitted 2009. | $500 | 576.50 | $286,425.00 |
| Candice L. Kline | Associate/ Bankruptcy/ 4 years. Admitted 2008. | $555 | 623.10 | $340,409.25 |
| Marc A. Korman | Associate/ Litigation/ 2 years. Admitted 2010. | $395 | 8.20 | $3,239.00 |
| Christopher S. Krueger | Associate/ Corporate/ 4 years. Admitted 2008. | $475 | 146.80 | $69,730.00 |
| Francis S. Lam | Associate/ Employment/ 1 year. Admitted 2011. | $355 | 53.80 | $19,099.00 |
| James P. Langdon | Associate/ Corporate/ 6 years. Admitted 2006. | $550 | 432.40 | $237,820.00 |
| Jillian K. Ludwig | Associate/ Bankruptcy/ 5 years. Admitted 2007. | $600 | 538.00 | $320,130.00 |

| Name of Professional/ Individual | Position, Area of Expertise, Number of Years in Position, Year of Obtaining License to Practice | Hourly Billing Rate[r] | Total Hours Billed | Total Compensation |
|---|---|---|---|---|
| Matthew G. Martinez | Associate/ Bankruptcy/ 4 years. Admitted 2008. | $555 | 254.30 | $138,389.25 |
| Kerriann S. Mills | Associate/ Bankruptcy/ 7 years. Admitted 2005. | $675 | 505.40 | $339,018.75 |
| Ryan C. Morris | Associate/ Litigation/ 7 years. Admitted 2007. | $610 | 0.50 | $305.00 |
| Sophia Park Mullen | Associate/ Bankruptcy/ 5 years. Admitted 2008. | $535 | 0.50 | $300.00 |
| Brett H. Myrick | Associate/ Bankruptcy/ 3 years. Admitted 2009. | $500 | 152.80 | $76,400.00 |
| Tom A. Paskowitz | Associate/ Litigation/ 7 years. Admitted 2006. | $675 | 0.70 | $472.50 |
| Scott Pollock | Associate/ Tax/ 2 years. Admitted 2010. | $390 | 1.80 | $702.00 |
| Andrew P. Propps | Associate/ Bankruptcy/ 2 years. Admitted 2010. | $500 | 297.80 | $148,900.00 |

| Name of Professional/ Individual | Position, Area of Expertise, Number of Years in Position, Year of Obtaining License to Practice | Hourly Billing Rate[F] | Total Hours Billed | Total Compensation |
|---|---|---|---|---|
| Katherine A. Roberts | Associate/ Employment/ 4 years. Admitted 2008. | $520 | 66.50 | $34,580.00 |
| Steve W. Robinson | Associate/ Bankruptcy/ 3 years. Admitted 2009. | $500 | 197.40 | $98,700.00 |
| Jed Rosenkrantz | Associate/ Corporate/ 3 years. Admitted 2009. | $600 | 195.80 | $85,173.00 |
| Thomas E. Ross | Associate/ Litigation/ 3 years. Admitted 2009. | $445 | 277.30 | $121,129.00 |
| Richard M. Silverman | Associate/ Tax/ 5 years. Admitted 2007. | $525 | 45.80 | $24,045.00 |
| Lydia Hill Slaby | Associate/ Bankruptcy/ 1 year. Admitted 2011. | $400 | 76.40 | $30,560.00 |
| Patrick J. Wackerly | Associate/ Litigation/ 5 years. Admitted 2007. | $525 | 361.60 | $186,978.75 |
| Gerritt J. Wieringa | Associate/ Litigation/ 3 years. Admitted 2009. | $435 | 3.90 | $1,696.50 |
|  |  |  |  |  |

| Name of Professional/ Individual | Position, Area of Expertise, Number of Years in Position, Year of Obtaining License to Practice | Hourly Billing Rate[1] | Total Hours Billed | Total Compensation |
|---|---|---|---|---|
| Angela Eavy | Staff Attorney/ Litigation/ 8 years. Admitted 2004. | $375 | 2.10 | $787.50 |
| Paula Friedman | Staff Attorney/ Communications/ 23 years. Admitted 1989. | $315 | 9.50 | $2,992.50 |
| Russell J. Coutinho | Senior Legal Assistant/ Real Estate/ 15 years. | $265 | 12.00 | $3,180.00 |
| Kelley Gmoser | Legal Assistant/ Bankruptcy/ 11 years. | $250 | 1.80 | $450.00 |
| Aaron J. Keker | Legal Assistant/ Litigation/ 12 years. | $210 | 8.00 | $1,680.00 |
| Denise M. Kerschhackl | Senior Legal Assistant/ Corporate/ 25 years. | $275 | 34.10 | $9,377.50 |
| Danuta Lucenko | Senior Legal Assistant/ Litigation/ 18 years. | $235 | 9.00 | $2,115.00 |
| David J. Lutes | Senior Legal Assistant/ Bankruptcy/ 26 years. | $315 | 143.60 | $45,234.00 |

| Name of Professional/ Individual | Position, Area of Expertise, Number of Years in Position, Year of Obtaining License to Practice | Hourly Billing Rate[F] | Total Hours Billed | Total Compensation |
|---|---|---|---|---|
| Branka V. Nastasic | Senior Legal Assistant/ Corporate/ 10 years. | $250 | 216.90 | $54,225.00 |
| Karen A. Nelms | Senior Legal Assistant/ Litigation/ 16 years. | $270 | 14.60 | $3,942.00 |
| Nebojsa Rebic | Senior Legal Assistant/ Litigation/ 10 years. | $250 | 1.00 | $250.00 |
| James P. Platt | Senior Legal Assistant/ Litigation/ 9 years. | $235 | 30.00 | $7,050.00 |
| Kate Ross | Legal Assistant/ Litigation/ <1 year. | $245 | 5.20 | $1,274.00 |
| Leena Semla | Senior Legal Assistant/ Corporate/ 17 years. | $250 | 0.30 | $75.00 |
| Kenley Stark | Legal Assistant/ Bankruptcy/ 1 year. | $245 | 0.30 | $73.50 |
| Susan L. Summerfield | Legal Assistant/ Bankruptcy/ 20 years. | $210 | 197.70 | $41,517.00 |

| Name of Professional/ Individual | Position, Area of Expertise, Number of Years in Position, Year of Obtaining License to Practice | Hourly Billing Rate[1] | Total Hours Billed | Total Compensation |
|---|---|---|---|---|
| Kristen Valcik | Senior Legal Assistant/ Litigation/ 15 years. | $235 | 29.40 | $6,909.00 |
| Brigette K. Cooper | Practice Group Assistant/ 5 years. | $105 | 7.40 | $777.00 |
| Tiffany Katata | Project Assistant/ 4 years. | $120 | 41.70 | $5,004.00 |
| Samantha E. Richey | Project Assistant/ <1 year. | $100 | 22.30 | $2,230.00 |
| Diliana Stamatova | Project Assistant/ 7 years. | $120 | 60.10 | $7,212.00 |
| Jeffrey V. Bosh | Director (NY) of Library Services/ 27 years. | $160 | 0.50 | $80.00 |
| Eva M. Huber | Librarian 20 years. | $105 | 0.80 | $84.00 |
| Ellen Kreis | Librarian/ 13 years. | $105 | 0.30 | $31.50 |
| **Grand Total** | | | **10,245.10** | **$6,260,291.50** |
| **Blended Rate** | | **$611.05** | | |

67

**COMPENSATION BY PROJECT CATEGORY FOR THE QUARTERLY PERIOD
FROM JUNE 1, 2012 THROUGH AUGUST 31, 2012**

| Matter Description | Total Hours | Total Fees |
|---|---|---|
| FCC Post Bankruptcy Matters (20100) | 133.10 | $91,489.50 |
| Fee Applications (30390) | 728.90 | $301,038.00 |
| Executory Contracts and Leases (30410) | 0.20 | $100.00 |
| Use/Sale/Lease of Assets (30430) | 2.20 | $1,460.00 |
| DIP Financing/Cash Collateral (30440) | 0.60 | $422.00 |
| Insurance Matters (30450) | 2.40 | $2,335.00 |
| Litigated Matters (30470) | 3,584.60 | $2,399,777.50 |
| Travel Time (30480) (with 50% discount) | 128.80 | $43,658.00 |
| Plan and Disclosure Statement (30500) | 3,154.40 | $2,041,734.50 |
| Professional Retention (30510) | 131.10 | $78,862.50 |
| Tax Matters (30520) | 68.30 | $41,476.50 |
| Claims Processing (30530) | 645.20 | $396,614.50 |
| Business Operations (30550) | 468.20 | $207,572.50 |
| Case Administration (30560) | 99.00 | $37,928.50 |
| Creditor Communications (30570) | 4.80 | $2,277.50 |
| Employee Matters (30590) | 215.00 | $124,838.00 |
| Exit Credit Facility (13700) | 170.30 | $111,671.50 |
| Post-Confirmation Matter (13730) | 708.00 | $377,035.50 |
| **TOTAL** | **10,245.10** | $6,260,291.50 |

# **Attachment B**

**EXPENSE SUMMARY FOR THE QUARTERLY PERIOD FROM
JUNE 1, 2012 THROUGH AUGUST 31, 2012**

| Expense Category | Service Provider (if applicable) | Total Expenses |
|---|---|---|
| Air Transportation[1] | | $20,816.74 |
| Court Costs | | $3,593.00 |
| Court Reporter | | $2,881.05 |
| Document Production | | $875.00 |
| Duplicating Charges[2] | | $24,426.47 |
| Document Delivery Services | | $1,700.59 |
| Document Services | | $1,304.28 |
| Ground Transportation | | $4,714.93 |
| Legal Support Services | | $224,390.28 |
| Lexis Research Service[3] | Lexis | $16,644.69 |
| Meals Out-of-Town | | $2,313.71 |
| Meals | | $285.50 |
| Messenger Services | | $7,628.20 |
| Overtime | | $2,636.66 |
| Professional Services | | $2,252.65 |
| Search Services | | $61,316.04 |
| Telephone Tolls | | $1,180.23 |
| Travel/Lodging | | $17,020.62 |
| Westlaw Research Service | Westlaw | $42,864.93 |
| | | |
| **Total** | | **$438,845.57** |

---

[1] Air transportation during the period covered by this Application is charged at the prevailing economy-class rate for such travel less any corporate discounts received by Sidley, in accordance with Sidley's policies for business travel for bankruptcy and non-bankruptcy matters, excepting certain limited instances where coach-class reservations were unavailable.

[2] Sidley's rate for standard copying is $0.10 per page and is in compliance with the rate as required by Local Rule 2016-2(e)(iii).

[3] Sidley charges its clients for computer-assisted legal research at a rate that recovers no more than the Firm's cost.