## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered<br>**Objection Date: February 12, 2013 at 4:00 p.m.**<br>**Hearing Date:  TBA**<br>**Related to Docket Nos. 12715, 12927, and 12928** |

### SIXTEENTH QUARTERLY FEE APPLICATION OF SIDLEY AUSTIN LLP FOR COMPENSATION FOR SERVICES RENDERED AND REIMBURSEMENT OF EXPENSES AS COUNSEL TO THE DEBTORS AND DEBTORS IN POSSESSION FOR THE PERIOD OF SEPTEMBER 1, 2012 THROUGH NOVEMBER 30, 2012

| | |
|---|---|
| Name of Applicant: | **Sidley Austin LLP** |
| Authorized to Provide Professional Services to: | **Debtors** |
| Date of Retention: | **February 20, 2009 (nunc pro tunc to December 8, 2008)** |
| Period for Which Compensation and Reimbursement is Sought: | **September 1, 2012 through November 30, 2012** |

---

[1] The Reorganized Debtors, or successors-in-interest to the Reorganized Debtors, in these chapter 11 cases, along with the last four digits of each entity's federal tax identification number, are: Tribune Company (0355); California Community News, LLC (5306); Chicago Tribune Company, LLC (3437); Chicagoland Publishing Company, LLC (3237); Chicagoland Television News, LLC (1352); forsalebyowner.com, LLC (4276); ForSaleByOwner.com Referral Services LLC (9205); Hoy Publications, LLC (2352); Internet Foreclosure Service, LLC (6550); KDAF, LLC (6969); KIAH, LLC (4014); KPLR, Inc. (7943); KRCW, LLC (1772); KSWB, LLC (7035); KTLA, LLC (3404); KTXL, LLC (3844); KWGN, LLC (5347); Los Angeles Times Communications LLC (1324); Magic T Music Publishing Company, LLC (6522); NBBF, LLC (0893); Oak Brook Productions, LLC (2598); Orlando Sentinel Communications Company, LLC (3775); Sun-Sentinel Company, LLC (2684); The Baltimore Sun Company, LLC (6880); The Daily Press, LLC (9368); The Hartford Courant Company, LLC (3490); The Morning Call, LLC (7560); TMS News and Features, LLC (2931); Tower Distribution Company, LLC (9066); Towering T Music Publishing Company, LLC (2470); Tribune 365, LLC (7847); Tribune Broadcasting Company, LLC (2569); Tribune Broadcasting Hartford, LLC (1268); Tribune Broadcasting Indianapolis, LLC (6434); Tribune Broadcasting Seattle, LLC (2975); Tribune CNLBC, LLC (0347); Tribune Direct Marking, LLC (1479); Tribune Entertainment Company, LLC (6232); Tribune Investments, LLC (6362); Tribune Media Services, LLC (1080); Tribune Media Services London, LLC (6079); Tribune ND, LLC (4926); Tribune Publishing Company, LLC (9720); Tribune Television New Orleans, Inc. (4055); Tribune Washington Bureau, LLC (1088); WDCW, LLC (8300); WGN Continental Broadcasting Company, LLC (9530); WPHL, LLC (6896); WPIX, LLC (0191); WPMT, LLC (7040); WSFL, LLC (5256); WXMI, LLC (3068). The corporate headquarters and the mailing address for each entity listed above is 435 North Michigan Avenue, Chicago, Illinois 60611.

Amount of compensation sought as actual,     **$5,235,534.36**
reasonable and necessary:

Amount of Expense Reimbursement sought as     **$240,673.02**
actual, reasonable and necessary

This is a(n):     _____ monthly     __X__ interim     _____ final application

The total time expended during the Sixteenth Interim Fee Period for fee application preparation
for the monthly and quarterly fee applications, including time expended for review and response
to preliminary and final reports and recommendations of the Fee Examiner, is approximately
882.90 hours and the corresponding compensation requested is approximately $377,220.50.

<u>Prior Interim Applications</u>

| Quarter | Date Filed | Period Covered | Requested | | Approved | |
|---|---|---|---|---|---|---|
| | | | Fees | Expenses | Fees | Expenses |
| 1 | 4/15/09 | 12/8/08-2/28/09 | $3,897,043.25 | $165,360.71 | $3,886,289.75 | $158,441.67 |
| 2 | 7/16/09 | 3/1/09-5/31/09 | $4,209,274.75 | $105,524.36 | $4,203,235.50 | $104,118.90 |
| 3 | 10/15/09 | 6/1/09-8/31/09 | $4,513,018.00 | $99,429.34 | $4,510,127.00 | $99,253.67 |
| 4 | 1/15/10 | 9/1/09-11/30/09 | $5,292,782.75 | $221,808.01 | $5,275,754.14 | $220,748.76 |
| 5 | 4/15/10 | 12/1/09-2/28/10 | $5,426,757.50 | $205,852.05 | $5,412,303.00 | $201,565.16 |
| 6 | 12/14/10 | 3/1/10-5/31/10 | $6,581,178.43 | $425,733.29 | $6,582,868.12 | $418,736.42 |
| 7 | 5/4/11 | 6/1/10-8/31/10 | $7,081,656.37 | $310,093.90 | $7,077,989.87 | $304,357.14 |
| 8 | 7/1/11 | 9/1/10-11/30/10 | $7,126,734.00 | $334,255.68 | $7,120,542.46 | $323,696.86 |
| 9 | 9/20/11 | 12/1/10-2/28/11 | $14,478,878.00 | $599,999.17 | $14,448,735.77 | $585,309.27 |
| 10 | 1/27/12 | 3/1/11-5/31/11 | $8,941,857.00 | $1,133,692.42 | $8,796,500.97 | $1,082,606.25 |
| 11 | 6/4/12 | 6/1/11-8/31/11 | $5,073,861.25 | $445,493.14 | $5,063,659.56 | $442,659.63 |
| 12 | 7/12/12 | 9/1/11-11/30/11 | $4,486,113.50 | $290,379.17 | $4,469,297.37 | $288,796.51 |
| 13 | 7/27/12 | 12/1/11-2/29/12 | $5,331,970.50 | $168,703.44 | $5,327,855.00 | $167,328.06 |
| 14 | 8/20/12 | 3/1/12-5/31/12 | $5,418,107.32 | $182,859.76 | | |
| 15 | 10/31/12 | 6/1/12-8/31/12 | $6,260,291.50 | $438,845.57 | | |
| 16 | 1/22/12 | 9/1/12-11/30/12 | $5,235,534.36 | $240,673.02 | | |

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered<br>**Objection Date: February 12, 2013 at 4:00 p.m.**<br>**Hearing Date: TBA**<br>**Related to Docket Nos. 12715, 12927, and 12928** |

### SIXTEENTH QUARTERLY FEE APPLICATION OF SIDLEY AUSTIN LLP FOR COMPENSATION FOR SERVICES RENDERED AND REIMBURSEMENT OF EXPENSES AS COUNSEL TO THE DEBTORS AND DEBTORS IN POSSESSION FOR THE PERIOD OF SEPTEMBER 1, 2012 THROUGH NOVEMBER 30, 2012

Sidley Austin LLP ("Sidley"), attorneys for Tribune Company ("Tribune") and

the affiliated companies that filed voluntary petitions for relief in the above-captioned chapter 11

cases (collectively, the "Debtors"), respectfully submits this application (the "Application") to

this Court, pursuant to (i) sections 327, 331, and 503 of title 11 of the United States Code (the

"Bankruptcy Code"), (ii) Rule 2016 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), (iii) Rule 2016-2 of the Local Rules of Bankruptcy Practice and Procedure

of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), (iv) the

---

[1] The Reorganized Debtors, or successors-in-interest to the Reorganized Debtors, in these chapter 11 cases, along with the last four digits of each entity's federal tax identification number, are: Tribune Company (0355); California Community News, LLC (5306); Chicago Tribune Company, LLC (3437); Chicagoland Publishing Company, LLC (3237); Chicagoland Television News, LLC (1352); forsalebyowner.com, LLC (4276); ForSaleByOwner.com Referral Services LLC (9205); Hoy Publications, LLC (2352); Internet Foreclosure Service, LLC (6550); KDAF, LLC (6969); KIAH, LLC (4014); KPLR, Inc. (7943); KRCW, LLC (1772); KSWB, LLC (7035); KTLA, LLC (3404); KTXL, LLC (3844); KWGN, LLC (5347); Los Angeles Times Communications LLC (1324); Magic T Music Publishing Company, LLC (6522); NBBF, LLC (0893); Oak Brook Productions, LLC (2598); Orlando Sentinel Communications Company, LLC (3775); Sun-Sentinel Company, LLC (2684); The Baltimore Sun Company, LLC (6880); The Daily Press, LLC (9368); The Hartford Courant Company, LLC (3490); The Morning Call, LLC (7560); TMS News and Features, LLC (2931); Tower Distribution Company, LLC (9066); Towering T Music Publishing Company, LLC (2470); Tribune 365, LLC (7847); Tribune Broadcasting Company, LLC (2569); Tribune Broadcasting Hartford, LLC (1268); Tribune Broadcasting Indianapolis, LLC (6434); Tribune Broadcasting Seattle, LLC (2975); Tribune CNLBC, LLC (0347); Tribune Direct Marking, LLC (1479); Tribune Entertainment Company, LLC (6232); Tribune Investments, LLC (6362); Tribune Media Services, LLC (1080); Tribune Media Services London, LLC (6079); Tribune ND, LLC (4926); Tribune Publishing Company, LLC (9720); Tribune Television New Orleans, Inc. (4055); Tribune Washington Bureau, LLC (1088); WDCW, LLC (8300); WGN Continental Broadcasting Company, LLC (9530); WPHL, LLC (6896); WPIX, LLC (0191); WPMT, LLC (7040); WSFL, LLC (5256); WXMI, LLC (3068). The corporate headquarters and the mailing address for each entity listed above is 435 North Michigan Avenue, Chicago, Illinois 60611.

Order Establishing Procedure for Interim Compensation and Reimbursement of Expenses of

Professionals and Committee Members Pursuant to 11 U.S.C. §§ 105(a) and 331 (Docket No.

225) (the "Interim Compensation Order"), as amended, and (v) the Order Appointing Fee

Examiner and Establishing Related Procedures for Compensation and Reimbursement of

Expenses for Professionals and Consideration of Fee Applications (Docket No. 546) (the "Fee

Examiner Order") for approval of interim compensation and reimbursement of expenses for the

sixteenth quarterly period from September 1, 2012 through November 30, 2012 (the "Sixteenth

Interim Fee Period").  In support of the Application, Sidley respectfully states as follows:[2]

## FACTUAL BACKGROUND OF THE CASES

1.      On December 8, 2008 (the "Petition Date"), Tribune and certain of its

subsidiaries each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.[3]

An additional Debtor, Tribune CNLBC, LLC (f/k/a Chicago National League Ball Club, LLC)

("Tribune CNLBC"), filed a voluntary petition for relief under chapter 11 of the Bankruptcy

Code on October 12, 2009.[4]  On March 22, 2010, this Court entered an order dismissing the

chapter 11 petition of New River Center Maintenance Association, Inc. (Docket No. 3805).  On

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the DCL Plan.

[3] The DCL Plan (as defined herein) provides that one or more Debtors may undertake Restructuring Transactions on, prior to, or after the Effective Date, which may include, without limitation, mergers, consolidations, conversions, joint ventures, restructurings, recapitalizations, dispositions, liquidations or dissolutions.  See Plan §5.2, Ex. 5.2 and Docket No. 12732.  Certain of the Debtors have undertaken Restructuring Transactions, pursuant to which they were merged with and into direct or indirect wholly-owned subsidiaries of Tribune Company.  A notice with information respecting each Debtor's anticipated post-emergence entity following the consummation of the Restructuring Transactions was filed with the Bankruptcy Court on November 16, 2012 (Docket No. 12732) (the "Additional Restructuring Transactions Notice").

[4] Orders of the Court applicable to this Application have subsequently been extended to Tribune CNLBC.  (See Order Directing (I) Joint Administration of Chapter 11 Cases and (II) that Certain Orders and Other Pleadings Entered or Filed in the Chapter 11 Cases of Tribune Company, et al. be Made Applicable to the Chapter 11 Case of Chicago National League Ball Club, LLC (entered Oct. 14, 2009) (Docket No. 2333) (the "CNLBC Joint Administration Order").

May 24, 2011, this Court entered an order dismissing the chapter 11 petition of Publishers Forest Products Co. of Washington (Docket No. 11688).

2.      The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b).  (Docket Nos. 43, 2333.)

3.      On March 19, 2009, pursuant to Fee Examiner Order, the Court appointed Stuart Maue as fee examiner (the "Fee Examiner") to act as special consultant to the Court for professional fee and expense analysis and review, effective nunc pro tunc to February 20, 2009. (Docket No. 546.)

4.      On July 23, 2012, the Court entered the Order (Docket No. 12074) (the "2012 Confirmation Order") Confirming Fourth Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A. (Docket No. 11354) (the "DCL Plan").

5.      The Effective Date of the Plan occurred on December 31, 2012 (the "Effective Date").[5]

6.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief sought herein are sections 327, 331, and 503 of the Bankruptcy Code, Rule 2016 of the Bankruptcy Rules, and Rule 2016-2 of the Local Rules.

---

[5]   See Notice of (I) Effective Date of the Fourth Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P. and JPMorgan Chase Bank, N.A. and (II) Bar Date for Certain Claims (Docket No. 12939).

## PROCEDURAL BACKGROUND FOR THE APPLICATION

7.     The Debtors sought approval of this Court to retain Sidley as general

reorganization and bankruptcy counsel, pursuant to 11 U.S.C. §§ 327(a) and 1107, by application

filed on December 26, 2008.  As set forth in the application seeking such approval, Sidley's

services to the Debtors encompass a wide range of legal services, focused upon restructuring and

insolvency issues but also encompassing certain general corporate, litigation, tax, media law and

regulatory, employee-related, and real estate matters.  In particular, Sidley's retention application

sets forth the following scope of services:

a) to provide legal advice with respect to the Debtors' powers and duties as debtors in possession in the continued operation of their business;

b) to take all necessary action on behalf of the Debtors to protect and preserve the Debtors' estates, including prosecuting actions on behalf of the Debtors, negotiating any and all litigation in which the Debtors are involved, and objecting to claims filed against the Debtors' estates;

c) to prepare on behalf of the Debtors all necessary motions, answers, orders, reports, and other legal papers in connection with the administration of the Debtors' estates;

d) to attend meetings and negotiate with representatives of creditors and other parties in interest, attend court hearings, and advise the Debtors on the conduct of their chapter 11 cases;

e) to perform any and all other legal services for the Debtors in connection with both their chapter 11 cases and with the formulation and implementation of the Debtors' plan of reorganization;

f) to advise and assist the Debtors regarding all aspects of the plan confirmation process, including, but not limited to, negotiating and drafting a plan of reorganization and accompanying disclosure statement, securing the approval of a disclosure statement, soliciting votes in support of plan confirmation, and securing confirmation of the plan;

g) to provide legal advice and representation with respect to various obligations of the Debtors and their managers and officers;

h) to provide legal advice and perform legal services with respect to matters involving the negotiation of the terms of and the issuance of corporate securities, matters related to corporate governance, and the interpretation, application, or amendment of the Debtors' organizational documents, including their limited liability company agreements, material

contracts, and matters involving the fiduciary duties of the Debtors and their officers and
managers;

i)    to provide legal advice and perform legal services with respect to litigation, tax (state and
federal income tax and local property tax assessment matters) and other general non-
bankruptcy legal issues for the Debtors to the extent requested by the Debtors; and

j)    to render such other services as may be in the best interests of the Debtors in connection
with any of the foregoing and all other necessary or appropriate legal services in
connection with these chapter 11 cases, as agreed upon by Sidley and the Debtors.

Sidley's retention, nunc pro tunc to the Petition Date, was approved by this Court by order dated

February 20, 2009.  (Docket No. 435.)

8.    The Interim Compensation Order and the Fee Examiner Order (together,

the "Fee Orders") provide that all professionals retained in these cases pursuant to sections 327,

328, or 1103 of the Bankruptcy Code (the "Case Professionals") must file with the Court and

provide to the Fee Examiner monthly applications for interim allowance of compensation for

services rendered and reimbursement of expenses incurred, together with the applicable time

entries and itemized expenses (the "Monthly Fee Application").  The notice parties specified in

the Fee Orders (the "Notice Parties") have twenty (20) days after service of a Monthly Fee

Application to object to such Monthly Fee Application (the "Objection Deadline").  Upon

expiration of the Objection Deadline, the applicable Case Professional must certify in writing

that no objection or partial objection has been filed with the Court relative to that professional's

Monthly Fee Application, whereupon the Debtors are authorized to pay such professional an

amount equal to the lesser of (i) 80% of the fees and 100% of the expenses requested in the

Monthly Fee Application or (ii) 80% of the fees and 100% of the expenses not subject to an

objection.

9.    Pursuant to the procedures set forth in the Fee Orders, Sidley prepared,

filed with the Court, and served upon the Notice Parties and the Fee Examiner Monthly Fee

Applications for the periods of September 2012, October 2012, and November 2012, which Monthly Fee Applications are incorporated herein by reference.[6]  Sidley has accordingly submitted all of its Monthly Fee Applications for the Debtors' chapter 11 cases for the Sixteenth Interim Fee Period.

10.    In addition to the Monthly Fee Applications, beginning with the three-month period ending February 28, 2009, and each three-month period thereafter, all Case Professionals must file with the Court and serve on the Notice Parties interim applications for allowance of compensation and reimbursement of expenses of the amounts sought in the Monthly Fee Applications filed during such period (a "Quarterly Fee Application Request").  See Interim Compensation Order at ¶ 3.  Quarterly Fee Application Requests must include a summary of the Monthly Fee Applications that are the subject of the request and any other information requested by the Court or required by the Local Rules.  Id.  This Application represents the sixteenth Quarterly Fee Application Request that Sidley has filed with the Court in connection with these chapter 11 cases, and it covers the period from September 1, 2012 through November 30, 2012, both dates inclusive.

## RELIEF REQUESTED

11.    By this Application, Sidley respectfully requests that the Court approve the interim allowance and award of compensation for professional services rendered and reimbursement of actual and necessary expenses incurred by Sidley as general bankruptcy counsel to the Debtors during the Sixteenth Interim Fee Period.

12.    The amount of fees sought for services rendered during the Sixteenth Interim Fee Period is $5,235,534.36, representing 8,827.30 hours in professional and

---

[6]  The docket numbers of Sidley's Monthly Fee Applications for September 2012, October 2012, and November 2012 are 12715, 12927, and 12928, respectively.

paraprofessional time for such services.  Reimbursement of actual, necessary expenses incurred

by Sidley during the Sixteenth Interim Fee Period in connection with these services is requested

in the amount of $240,673.02.  Sidley seeks the interim allowance of such compensation, and

this Court's authorization for payment of such amounts by the Debtors to Sidley, less amounts

previously paid to Sidley pursuant to the Monthly Fee Applications for the period covered by

this Application and the procedures set forth in the Fee Orders.

13.     The hourly rates charged by Sidley's professionals and paraprofessionals

during the Sixteenth Interim Fee Period are no greater than the customary hourly rates for such

individuals both inside and outside of bankruptcy cases.  The highest billing rate charged by any

Sidley attorney for services rendered under Sidley's current billing rates that became effective on

January 1, 2012 will be $1,000 per hour.  See Supplemental Affidavit (Second) of James F.

Conlan in Support of Application for an Order Authorizing the Employment and Retention of

Sidley Austin LLP as Attorneys for the Debtors and Debtors in Possession at ¶ 3 (Docket No.

424).  Sidley believes these rates are comparable to those charged by the bankruptcy and other

professionals of other firms of comparable size, stature, and experience.

14.     Sidley has received no payment and no promises for payment from any

source other than the Debtors for services rendered in these chapter 11 cases.  There is no

agreement between Sidley and any other party for the sharing of compensation to be received for

the services rendered by Sidley in these chapter 11 cases.  All professional and paraprofessional

services for which compensation is sought herein were rendered solely on behalf of the Debtors

in these cases.

## SERVICES RENDERED

15.     Sidley has rendered substantial services to the Debtors in connection with

these chapter 11 cases during the period covered by this Application, both in its capacity as

9

general bankruptcy counsel to the Debtors and continuing in its capacity as corporate, litigation, and transactional counsel to the Debtors in their ordinary course of business. The services performed by Sidley's professionals and paraprofessionals during the period covered by this Application were necessary and have directly contributed to the effective administration of the Debtors' chapter 11 cases.

16.    A breakdown of the total hours expended by each professional on all matters and a breakdown of amounts sought by each matter category covered herein are included as a part of Attachment A to this Application, as required by Local Rule 2016-2. A detailed description of the services provided to the Debtors is incorporated by reference to the Monthly Fee Applications previously filed by Sidley with the Court. The following is a summary of the activities performed by Sidley's professionals and paraprofessionals during the Sixteenth Interim Fee Period:

**A.    Post-Confirmation Matters (13730):    Hours:  3,012.60  Fees:  $1,670,946.31**

17.    Sidley's professionals in the Corporate and Corporate Reorganization and Bankruptcy practice groups expended considerable efforts during the Sixteenth Interim Fee Period preparing the Debtors for emergence from their chapter 11 cases, which occurred on December 31, 2012. This work was comprised primarily of (i) taking all necessary steps to prepare the Debtors efficiently to implement the restructuring transactions (the "Restructuring Transactions") envisioned under the DCL Plan and (ii) efforts to address a number of issues potentially arising in connection with the Debtors' emergence from chapter 11 on the Effective Date of the DCL Plan (collectively, the "Emergence Issues").[7]

---

[7]  Prior to the issuance of the 2012 Confirmation Order, all work related to the Restructuring Transactions and Emergence Issues was recorded under the "Plan and Disclosure Statement" matter number. To allow greater specificity for Sidley's timekeepers and ease of review for the Fee Examiner and the Court, following the issuance

(a)    **The Restructuring Transactions**

18.    The Restructuring Transactions, set forth and described in detail in Exhibit 5.2 to the DCL Plan and the Additional Restructuring Transactions Notice,[8] involved substantial work primarily performed by Sidley's professionals in the Corporate practice group.  During the Sixteenth Interim Fee Period, Sidley's professionals continued to advise and assist the Debtors with respect to planning and implementing the Restructuring Transactions, and prepared substantial volumes of documentation necessary to consummate the Restructuring Transactions, certain of which were completed prior to the Effective Date.  These efforts required substantial organization, communication and coordination across the Debtors' various internal departments, and included, among other things, preparations for emergence and compliance with all related timing requirements, as well as the preparation of documents required in connection with completion of the underlying transactions.

19.    Planning, preparing to implement, and consummating the Restructuring Transactions, as applicable, involved obtaining and analyzing information from the Debtors' business leaders across all business units (including publishing, digital, broadcasting, and other operations) and corporate functions (including tax, real estate, employee benefits, payroll, intellectual property, legal, regulatory and financial reporting) to address operational and implementation concerns and opportunities in connection with consummation of the Restructuring Transactions.  These processes also involved Sidley's professionals providing assistance and advice to the Debtors with respect to the impact of the Restructuring Transactions on other facets of the reorganization process, including the FCC application and approval

---

of the 2012 Confirmation Order in late July 2012, time entries related to the Restructuring Transactions and Emergence Issues were recorded in the "Post-Confirmation Matters" matter number.  Use of the "Post-Confirmation Matters" matter number will continue until the completion of the Debtors' chapter 11 cases.

[8]  The Additional Restructuring Transactions Notice is described more fully in footnote 3, supra.

11

process, the financing and credit facilities to be implemented in connection with emergence, and financial reporting and securities matters.

20.    Addressing certain timing concerns relating to the Restructuring Transactions also involved significant planning and collaboration among Sidley's professionals, the Debtors, and the Debtors' outside vendors.  One of the significant timing challenges addressed by Sidley's professionals during the Sixteenth Interim Fee Period was the preparation of a plan to complete nearly all of the Restructuring Transactions prior to or, if necessary, within the seven calendar day window provided for under the DCL Plan,[9] given that the Restructuring Transactions consisted of more than one hundred individual transactions and involved substantially all of the entities within the Debtors' corporate structure, a number of investments and joint venture interests, and more than two dozen newly-formed entities.  The timing of the Restructuring Transactions was made all the more complex due to the voluminous documentation that must be filed with secretary of state offices, state and local tax offices, and other governmental authorities throughout the United States and in certain foreign jurisdictions in order to form new entities, effect mergers, effect conversions, effect certain transfers and withdraw, qualify and re-qualify the Debtors to do business where necessary.  As a result, it was necessary for Sidley's professionals to undertake substantial work on the Restructuring Transactions prior to the Effective Date.

21.    The documentation required to consummate the Restructuring Transactions included, but was not limited to, certificates of formation, certificates and articles of incorporation, certificates of merger, agreements and plans of merger, plans of conversion, asset

---

[9]  Exhibit 5.2 to the DCL Plan provides that unless otherwise agreed by the Debtors and the Creditor Proponents, the consummation of any Restructuring Transactions prior to the Effective Date was subject to, among other things, the Debtors' reasonable belief that the Effective Date would occur within seven (7) calendar days from the date on which any such transaction was to become effective.

transfer agreements, equity transfer agreements, written consents and corporate approvals (including, but not limited to consents of boards of directors, boards of managers, member consents and stockholder consents) for all transactions and preliminary corporate matters (including, but not limited to, the approval of mergers, conversions, asset transfer agreements and equity transfer agreements, and appointment of officers), required notices to certain commercial and governmental third parties, tax forms (including approval requests submitted to certain tax authorities, Forms SS-4 and other correspondence and forms), limited liability company agreements, by-laws, limited liability company membership certificates, stock certificates and other corporate documentation.  Preparation and necessary revision of all of these documents required substantial, sustained efforts on the part of Sidley's corporate professionals throughout the Sixteenth Interim Fee Period.

> **(b)**     **Emergence Issues**

22.    Sidley's professionals in the Corporate and Corporate Restructuring and Bankruptcy practice groups advised and assisted the Debtors during the Sixteenth Interim Fee Period with respect to the various emergence issues.  Those issues included planning and preparing for the implementation of the DCL Plan, including the issuance and distribution of securities, establishing the litigation trust pursuant to section 13.1 of the DCL Plan (the "Litigation Trust"), and finalizing the agreements and other corporate documentation required under the plan.

23.    Sidley's role in advising and assisting the Debtors with respect to the issuance and distribution of securities involved analyzing matters relating to securities laws, coordinating Depository Trust Company ("DTC") eligibility and the exchange of securities through the facilities of DTC, preparing arrangements and documentation with the transfer agent and the warrant agent for the issuance of the New Common Stock and New Warrants, preparing

summary information with respect to the rights and terms of the New Common Stock and New Warrants, addressing FCC regulatory compliance issues relating to the New Common Stock and New Warrants, including monitoring and compliance programs, and preparing forms and information for holders of New Common Stock and New Warrants in anticipation of emergence and post-effective date trading.

24.     Sidley's role in advising and assisting the Debtors with respect to establishing the Litigation Trust included finalizing the Litigation Trust Agreement and the litigation trust loan agreement, preparing summary information with respect to the rights, obligations and terms of the Litigation Trust Agreement and the litigation trust loan agreement and coordinating and assisting the Litigation Trustee on matters relating to allocation of Litigation Trust Interests and certain preliminary matters to be addressed by the Litigation Trustee and the Litigation Trust Advisory Board.

25.     In addition to the foregoing, Sidley's professionals assisted in addressing corporate governance matters and finalizing certain agreements and corporate documentation necessary to implement the DCL Plan, including the new certificate of incorporation and by-laws of Tribune, the registration rights agreement and other certificates and agreements relating to the issuance of the New Common Stock and the New Warrants, and preparing and coordinating information with securities regulators.

**B.     FCC Matters (20100):    Hours:  114.80    Fees:  $82,471.00**

26.     During the Sixteenth Interim Fee Period, Sidley's professionals continued to represent the Debtors' broadcast stations on several matters as communications regulatory counsel.  Approximately 14% percent, or $11,400.00, of the fees incurred by Sidley's professionals in this category during the Sixteenth Interim Fee Period relate to the Newspaper Cross-ownership litigation matter, which, as described in Sidley's prior Quarterly Fee

Application Requests, involves participation in, and monitoring of, the Federal Communications Commission's ("FCC") 2010 Quadrennial Review of its newspaper-broadcast cross-ownership regulations, and allegations related to Tribune's cross-ownerships made in that proceeding. The proceeding involves the reevaluation of various rules that continued to prohibit owners of newspapers, including the Debtors, from also holding licenses to operate certain television or radio stations within the same markets. The 2010 Quadrennial Review proceeding, which is on remand from the United States Third Circuit Court of Appeals, sought comments from the public on the newspaper-broadcast cross-ownership prohibition, as well as the FCC's radio-television cross-ownership rule, which restricts owners of radio stations from also holding licenses to operate certain television stations within the same markets, and the television station multiple-ownership rule, which restricts owners of television stations from holding licenses for multiple stations in the same local markets. Sidley's professionals reviewed the ex parte comments filed by opponents of relaxation of the FCC's media ownership rules, monitored the filings and meetings reflected in the docket in that proceeding, and advised the Debtors with respect to several filings of relevance to the Debtors or their arguments before the FCC. Sidley's professionals also reported on the rules likely to be considered for adoption by the FCC.

27.    Also as discussed in prior Quarterly Fee Application Requests, Sidley's professionals continued to assist the Debtors with respect to matters related to the current and past broadcast license renewal application cycles, including the filing of a broadcast station renewal application for a license held by one of the Debtors in South Florida. Sidley's professionals with responsibility for assisting the Debtors with upcoming renewals (i) compiled FCC license renewal application data, (ii) researched, prepared and edited renewal exhibits with regard to the newspaper-broadcast cross-ownership rule compliance, and (iii) assisted the

Debtors with meeting their "public inspection file" requirements under Federal law in connection with the renewal filings. Sidley's professionals also advised the Debtors regarding the impact of their bankruptcy proceedings on certain FCC renewal applications and procedures, and the reporting of litigation in various public filings or private disclosures.

28.    Sidley's professionals also provided assistance with FCC issues that arose related to the emergence of the Debtors from bankruptcy, including corporate and other issues involved in the FCC's consideration of applications covering the Debtors' emergence from bankruptcy. Sidley's assistance included review and guidance related to the conditions placed on FCC approval, including the mechanisms and documents related to FCC compliance with those conditions and general FCC rules. Finally, Sidley's professionals provided assistance with respect to FCC application certifications in preparation for emergence from bankruptcy, including the FCC's requirements and practices for compliance with foreign ownership limits and other regulations as they are impacted by the issuance and transfer of securities. Specifically, Sidley's professionals reviewed the post-emergence ownership structure of Tribune and provided advice regarding the development and drafting of FCC application surveys and questionnaires to ensure compliance with FCC requirements post-emergence. Sidley's professionals focused on FCC issues also simultaneously consulted with Sidley's corporate and bankruptcy professionals and creditors' counsel on the timing of the FCC approval process, its impact on the bankruptcy process, and the need to establish post-emergence FCC ownership rule compliance procedures.

**C.    Fee Applications (30390):    Hours: 882.90  Fees: $377,220.50**

29.    This matter category encompasses all tasks relating to the preparation and filing of Sidley's Monthly Fee Applications and Quarterly Fee Application Requests with the Court. In this Sixteenth Interim Fee Period, Sidley's professionals and paraprofessionals drafted

and filed Sidley's forty-third, forty-fourth, and forty-fifth Monthly Fee Applications, drafted

Sidley's forty-sixth Monthly Fee Application, drafted and filed Sidley's Fifteenth Quarterly Fee

Application Request, drafted portions of Sidley's Sixteenth Quarterly Fee Application Request,

and reviewed and complied with the Court's Fee Orders respecting all of the foregoing.  In

addition, Sidley reviewed and drafted responses to the Fee Examiner's preliminary reports with

respect to Sidley's Eleventh, Twelfth and Thirteenth Quarterly Fee Application Requests.  In

light of the number of monthly and quarterly fee applications prepared, in whole or in part,

during this period and especially taking into account the unusually high number (three) of

responses to the Fee Examiner's preliminary reports prepared during the Thirteenth Interim Fee

Period, the hours expended and fees requested are reasonable.

**D.**      **Executory Contracts and Leases (30410):    Hours: 1.80    Fees:  $1,215.00**

        30.     As of the Petition Date, the Debtors in these cases were party to

approximately 45,000 executory contracts and unexpired leases.  The DCL Plan provides for the

assumption on the Effective Date of all executory contracts and unexpired leases, with the

exception of those categories of executory contracts and unexpired leases specified in Section

6.1.1 of the DCL Plan.[10]

        31.     On April 25, 2011, the Court entered the Order Establishing Procedures (I)

Fixing Cure Amounts and (II) Providing Notice of Assumption and/or Assignment of Certain

Executory Contracts and Unexpired Leases by a Successor Reorganized Debtor Pursuant to

Sections 365, 1123 and 1129 of the Bankruptcy Code (the "Global Contract Order") (Docket No.

---

[10] Section 6.1.1 of the DCL Plan provides that on the Effective Date, each executory contract or unexpired lease of the Debtors will be deemed assumed unless such executory contract or unexpired lease (i) was previously assumed or rejected by the Debtors, (ii) previously expired or terminated pursuant to its own terms, (iii) is an executory contract or unexpired lease that is included in the Global Contract Motion, (iv) is an executory contract or unexpired lease that is expressly excluded from the assumptions set forth in Section 6.5 of the DCL Plan or is set forth on Exhibit 6.3 to the DCL Plan, or (v) is an executory contract or unexpired lease that is included in a pending motion to reject such executory contract or unexpired lease.

8745).  The Global Contract Order sets forth, among other things, (i) the cure amounts for certain

of the Debtors' executory contracts and unexpired leases and (ii) the procedures for modifying

such cure amounts following entry of the Global Contract Order.  During the Sixteenth Interim

Fee Period, one of Sidley's professionals analyzed and addressed certain issues related to

preparing and filing an updated list of cure amounts for certain executory contracts in accordance

with the terms of the Global Contract Order.

**E.     Use/Sale/Lease of Assets (30430):   Hours:  1.30     Fees:  $1,235.00**

      32.     Throughout the course of these chapter 11 cases, Sidley's professionals

have advised the Debtors' senior management with respect to certain transactions for the use,

sale, and lease of assets on behalf of the Debtors, both in connection with these chapter 11 cases

and with Sidley's ongoing representation of the Debtors in the ordinary course of business.

Specifically, Sidley's professionals in the Corporate Reorganization and Bankruptcy practice

group provided advice to the Debtors' business personnel on certain proposed business

transactions being contemplated by the Debtors, including whether such transactions implicated

sections 363(b) or (c) of the Bankruptcy Code.

**F.     DIP Financing/Cash Collateral (30440):   Hours:  2.10   Fees:  $2,100.00**

      33.     During the Sixteenth Interim Fee Period, Sidley's professionals advised

the Debtors' senior management, and communicated with the Debtors' outside counsel and

counsel to the lenders for the Debtors' post-petition financing facility, regarding the process for

the replacement of certain Letters of Credit currently issued to the Debtors.

**G.     Insurance Matters (30450):   Hours:  2.30     Fees:  $2,185.00**

      34.     During the Sixteenth Interim Fee Period, Sidley's professionals continued

to work with the Debtors, their outside insurance counsel, and various insurance providers to

resolve certain insurance coverage issues, and to advise the Debtors regarding the impact of the

chapter 11 cases on the Debtors' insurance and risk management procedures.  In particular

during the Sixteenth Interim Fee Period, one of Sidley's professionals responded to certain

information requests issued by counsel for certain of the Debtors' creditors relating to the

insurance coverage applicable to certain litigation-related claims and performed research related

to the same issue.

**H.**     **Litigated Matters (30470):   Hours: 3,415.70      Fees: $2,201,831.00**

        35.     The "Litigated Matters" category encompasses all of Sidley's activities

relating to actual and potential litigation, contested matters, and adversary proceedings, which

continued to require substantial attention from Sidley, the Debtors' senior management, the

Committee, the Debtors' senior lenders, and other key creditor constituencies during the

Sixteenth Interim Fee Period.  This category also includes fees incurred by Sidley's professionals

in the Litigation and Corporate Restructuring and Bankruptcy practice groups in connection with

litigation-related activities concerning the process to secure the effectiveness of the DCL Plan as

it continued to develop during the Sixteenth Interim Fee Period, most notably with respect to

opposition to various efforts to delay the effectiveness of the DCL Plan by seeking stays of the

2012 Confirmation Order or otherwise filing appeals of the 2012 Confirmation Order.[11]  A

detailed narrative description of the services provided by Sidley's professionals in both the

Litigation practice group and the Corporate Reorganization and Bankruptcy practice group

---

[11] Given the contested nature of the process for advancing the coming into effect of the DCL Plan, Sidley's invoices
and time detail in both the Litigated Matters category and the Plan and Disclosure Statement category include
Sidley's services in connection with such process.  As a general rule, the services performed by professionals in
Sidley's Litigation practice group in connection with the process for advancing the coming into effect of the DCL
Plan appear in the Litigated Matters category, and the services performed by professionals in Sidley's Corporate
Reorganization and Bankruptcy practice group in connection with such process appear in the Plan and Disclosure
Statement category.

(among others) to advance the coming into effect of the DCL Plan is provided in the "Plan and Disclosure Statement" matter category, infra.[12]

### (a)    Post-Confirmation and Appeals Activity

36.    During the Sixteenth Interim Fee Period, Sidley's professionals spent a significant amount of time researching and analyzing a number of post-confirmation matters, including numerous issues arising in connection with the Confirmation Order Appeals (as defined herein) and multiple attempts by the parties appealing the 2012 Confirmation Order (the "Objecting Parties") to obtain a stay of the 2012 Confirmation Order pending resolution of the Confirmation Order Appeals.[13]  Sidley's professionals and the professionals for the other DCL Plan Proponents also continued to research and analyze issues arising, or potentially arising, in connection with the litigation related to the Stay Order (defined below and described in more detail in the fifteenth Quarterly Fee Application Request), particularly with respect to a variety of necessary or potential post-confirmation litigation matters and proceedings available to the Debtors and the Objecting Parties.  For example, a number of tasks performed during the Sixteenth Interim Fee Period by Sidley's professionals related to analyzing strategies that could be implemented in the event the Objecting Parties took certain actions during the course of the pre-emergence period related to the Confirmation Order Appeals or stay-related litigation.

37.    Concurrently with the ongoing litigation in connection with the Stay Order, during the Sixteenth Interim Fee Period briefing on the Confirmation Order Appeals commenced.  Beginning in the Fifteenth Interim Fee Period, and continuing into the Sixteenth

---

[12] The narrative description of the services provided by Sidley's professionals to advance the coming into effect of the DCL Plan should be read in conjunction with the time detail submitted in both the Litigated Matters category and the Plan and Disclosure Statement category, to the extent those services are inter-related.

[13] The Objecting Parties include (i) Aurelius Capital Management; (ii) Law Debenture Trust Company of New York; (iii) Deutsche Bank Trust Company Americas; (iv) EGI-TRB, LLC; and (v) Wilmington Trust Company.

Interim Fee Period, professionals for the DCL Plan Proponents negotiated with the Objecting

Parties a stipulated briefing schedule ("Stipulated Appeals Schedule") to govern the

Confirmation Order Appeals.[14]  The Stipulated Appeals Schedule required Sidley and the other

professionals for the DCL Plan Proponents to draft a single omnibus brief for all of the

Confirmation Order Appeals.

        38.     These efforts, which are described in greater detail below, were time

intensive, as each of the Confirmation Order Appeals raised complex issues requiring substantial

analysis from a litigation perspective, and required a thorough review of the vast record

developed throughout the Debtors' lengthy Chapter 11 cases, which included two separate

confirmation hearings.  Moreover, to avoid any potential delay in the Debtors' emergence from

these chapter 11 cases, Sidley's professionals and the professionals acting for the other DCL

Plan Proponents needed to respond to the large volume of litigation in a limited amount of time

subsequent to entry of the 2012 Confirmation Order.[15]

        (i)     *Background to the Post-Confirmation and Appeals Activity during the Sixteenth Interim Period*

        39.     On July 13, 2012, the Bankruptcy Court entered the (i) Memorandum

Overruling Objections to Confirmation of the Fourth Amended Plan Of Reorganization for

Tribune Company and its Subsidiaries and Denying Clarification Motion (Docket No. 12033)

and (ii) its Order Overruling Plan Objections and Denying the Clarification Motion (Docket No.

12034).  On July 23, 2012, the Bankruptcy Court entered the 2012 Confirmation Order.

---

[14] On August 27, 2012, Sidley and the other DCL Plan Proponents filed a motion to consolidate the various appeals, including the Aurelius Appeal, the WTC Appeals, the EGI-TRB Appeal, and the Trustees' Appeals (the "DCL Consolidation Motion") (Docket No. 7).  On December 12, 2012, the District Court entered an order granting the DCL Consolidation Motion.  See Docket No. 57, 12-cv-128.

[15] For example, Aurelius's emergency appeal in the Third Circuit, defined and described infra at ¶ 46, was docketed on August 29, 2012, and briefing, including the filing of the DCL Proponents' response and sur-reply briefs, was completed and an order was issued by the Third Circuit eight (8) business days later.

40.    In addition to the two Wilmington Trust Company ("Wilmington Trust" or "WTC") appeals already pending before Judge Sleet,[16] following entry of the 2012 Confirmation Order, appeals of that order were filed by (i) Aurelius Capital Management ("Aurelius"); (ii) Law Debenture Trust Company of New York ("Law Debenture") and Deutsche Bank Trust Company Americas ("Deutsche Bank," and, together with Law Debenture, the "Trustees"); and (iii) EGI-TRB, LLC ("EGI-TRB"). A further appeal of the 2012 Confirmation Order was filed by Wilmington Trust Company (collectively, the "Confirmation Order Appeals"). These parties also requested a stay of the 2012 Confirmation Order pending the resolution of the Confirmation Order Appeals.

41.    On July 23, 2012, the day the Court entered the 2012 Confirmation Order, Aurelius filed with the Bankruptcy Court (i) a Notice of Appeal of the Confirmation Order and the related rulings (the "Aurelius Appeal") (Docket No. 12077); (ii) a Motion For a Stay Pending Appeal Pursuant to Bankruptcy Rule 8005 (the "Aurelius Stay Motion") (Docket No. 12080); and (iii) a Motion to Schedule Expedited Hearing and Shorten Notice with respect to the Aurelius Stay Motion (the "Aurelius Motion to Expedite") (Docket No. 12082).

42.    On the same day, the Trustees filed (i) a Notice of Appeal of the Confirmation Order and related rulings (the "Trustees' Appeal") (Docket No. 12083); (ii) a Motion Pursuant to 28 U.S.C. § 158(d)(2) and Fed. R. Bankr. P. 8001(f) Requesting Certification of Direct Appeal to United States Court of Appeals for Third Circuit of the Unfair Discrimination Issue in the Allocation Disputes Order as Incorporated in the Order and Memorandum Opinion on Confirmation (the "Trustees' Direct Appeal Motion") (Docket No. 12084); (iii) a Motion to Stay Pending Appeal of the Confirmation Order (the "Trustees' Stay

---

[16] See In re: Tribune Company et al, Case No. 12-cv-00128 (D. Del., filed Jan. 31, 2012) and In re: Tribune Company et al, Case No. 12-mc-00029 (D. Del., filed Jan. 31, 2012).

Motion," and, together with the Aurelius Stay Motion, the "Stay Motions") (Docket No. 12085); and (iv) a Motion to Schedule Expedited Hearing and Shorten Notice regarding the Direct Certification Motion and the Trustee Stay Motion (the "Trustees' Motion to Expedite," and together with the Aurelius Motion to Expedite, the "Motions to Expedite") (Docket No. 12086). Sidley's professionals, with input from the other DCL Plan Proponents, drafted and filed the DCL Plan Proponents' Response to the Motions to Expedite on July 24, 2012 (Docket No. 12096), one (1) day after the Stay Motions and the Motions to Expedite were filed.

43.    On August 2, 2012, EGI-TRB filed a Notice of Appeal of the Confirmation Order and related rulings (Docket No. 12177), and a Motion for Request for Certification of Direct Appeal to the Circuit Court (the "EGI Direct Appeal Motion," and together with the Trustees' Direct Appeal Motion, the "Direct Appeal Motions") (Docket No. 12198).  On that same day, Wilmington Trust Company similarly filed a Notice of Appeal of the Confirmation Order and related rulings (Docket No. 12157), and a joinder to the Trustees' Stay Motion.  (Docket No. 12160).

44.    On August 22, 2012, the Court entered a Memorandum Opinion (i) Denying Certification for Immediate Appeal to the Third Circuit and (ii) Granting Stay Pending Appeal (Upon Posting of Bond) (Docket No. 12319), and an order implementing the Post-Confirmation Opinion (said order including both a "Stay Order" and a "Direct Appeal Order," collectively, the "Stay and Direct Appeal Order") (Docket No. 12320).  The Court denied the Direct Appeal Motions, while granting a stay pursuant to Fed. R. Bankr. P. 8005 upon the posting of  a $1.5 billion dollar supersedeas bond no later than August 27, 2012.  See Stay and Direct Appeal Order at ¶¶ 1-2.  No such supersedes bond was posted by any of the Objecting Parties.

45.    On August 24, 2012, Aurelius filed (i) an Emergency Motion to Extend Stay Issued by Bankruptcy Court, Modify Bankruptcy Order Regarding Stay and Supersedeas Bond, Expediting Appeal and Waiving Mediation (the "Aurelius's District Court Stay Motion") (Docket No. 1) ;[17] (ii) a letter regarding the emergency motion (Docket No. 2); (iii) an opening memorandum in support of the emergency motion (Docket No. 4); and (iv) a copy of its prior Notice of Appeal of the Confirmation Order (Docket No. 3) in the United States District Court for the District of Delaware (the "District Court") in Case No. 12-cv-01072, captioned as "Aurelius Capital Management v. Tribune Co., et al." On August 27, 2012, prior to the filing of the DCL Plan Proponents' response to the motion, the District Court denied Aurelius's District Court Stay Motion (Docket No. 11).

46.    On August 29, 2012, Aurelius filed an appeal to the Third Circuit of the District Court's denial of the Aurelius District Court Stay Motion. See Aurelius Capital Management v. Tribune Co., et al., 12-3437 (3rd Cir. docketed Aug. 29, 2012). On August 29, 2012, the Third Circuit entered a brief order stating that the District Court's order denying Aurelius' stay request was not final, and therefore instructed the parties to address the basis for jurisdiction over such an appeal. See Docket No. 003111002919, Case No. 12-3437.[18] On August 30, 2012, Aurelius then filed with the Third Circuit a Motion for Stay of Bond Order and for Issuance of a Temporary Administrative Stay Pending Full Consideration and Disposition of this Stay Motion (the "Aurelius's Third Circuit Stay Motion"). See Docket No. 003111004848, Case No. 12-3437. On September 5, 2012 (three (3) business days later), the DCL Plan Proponents filed a response. See Docket No. 003111007717, Case No. 12-3437. Aurelius filed

---

[17] All docket citations in this paragraph refer to the docket of the action captioned Aurelius Capital Management v. Tribune Co., et al., Case No. 12-cv-01072 (D. Del. 2012).

[18] As amended on August 30, 2012. See Docket No. 003111004186, Case No. 12-3437.

its reply on September 6, 2012 (see Docket No. 003111010018, Case No. 12-3437), and the DCL

Plan Proponents filed a sur-reply to Aurelius's reply on September 7, 2012.  See Docket No.

003111010331, Case No. 12-3437.  On September 10, 2012, the Third Circuit issued an order

denying Aurelius's Third Circuit Stay Motion.  See Docket No. 003111011708, Case No. 12-

3437.

47.    Similarly, on August 24, 2012, the Trustees initiated proceedings in the

District of Delaware seeking relief with respect to the Stay Order by filing (i) an Emergency

Motion to Modify Bankruptcy Court's Stay Order (the "Trustees' District Court Stay Motion")

(Docket No. 1);[19] (ii) a letter regarding the emergency motion (Docket No. 2); (iii) an opening

memorandum in support of the emergency motion (Docket No. 4); and (iv) a copy of the

Trustees' prior Notice of Appeal of the Confirmation Order (Docket No. 3).  See In re Tribune

Company, 12-cv-01073 (D. Del., Docketed August 24, 2012).  On August 31, 2012 (five (5)

business days later), Sidley and the other DCL Plan Proponents filed their Memorandum in

Opposition to the District Court Stay Motions of Aurelius and the Trustees. (Docket No. 17).[20]

On September 10, 2012, the Trustees filed their reply brief in support of their Stay Motion.

(Docket No. 42).  On December 6, 2012, the District Court entered an order denying the

Trustees' District Court Stay Motion.

(ii)    *Stay Order-Related Litigation*

48.    During the Sixteenth Interim Fee Period, Sidley's professionals, together

with the professionals for the other DCL Plan Proponents, researched case law, analyzed

---

[19] All docket citations in this section refer to the docket of In re: Tribune Co., et al., Case No. 12-cv-01073 (D. Del. 2012).

[20] The DCL Plan Proponents' Memorandum in Opposition, in addition to addressing the Trustees' arguments regarding the need for a stay pending appeal, also addressed the Trustees' contentions that the bond requirement imposed by the Bankruptcy Court was in error.

potential outcomes and ultimately prepared pleadings in connection with Aurelius's Third

Circuit Stay Motion, as well as Aurelius's and the Trustees' District Court Stay Motions.[21]

Sidley and the professionals for the other DCL Plan Proponents also continued to analyze

potential appellate avenues and strategize regarding responses to Aurelius's and the Trustees'

District Court Stay Motions filed by the other Objecting Parties.  Similarly, after the Third

Circuit denied Aurelius's Third Circuit Stay Motion, the DCL Plan Proponents continued to

research and analyze Aurelius's potential remaining avenues for appellate relief, as well as the

impact of the Trustees' outstanding District Court Stay Motion, to, among other things, develop

responses to such issues.

### (iii)    Confirmation Order Appeals

49.    During the Sixteenth Interim Fee Period, Sidley and the other

professionals for the DCL Plan Proponents also began to prepare for a number of litigation issues

arising in connection with the pending Confirmation Order Appeals.  The Sixteenth Interim Fee

Period included a substantial amount of time dedicated to legal activities of this nature.

50.    Specifically, pursuant to the Stipulated Appeals Schedule, Sidley and the

professionals for the other DCL Plan Proponents engaged in substantial and voluminous briefing

with respect to the arguments raised in the Confirmation Order Appeals.  Consistent with the

Stipulated Appeals Schedule, the DCL Plan Proponents filed (i) an Appellees' Brief of 130 pages

in length and (ii) five volumes of appendices with 2758 exhibits (collectively, the "DCL

Omnibus Answer").  The DCL Omnibus Answer addressed a wide range of legal issues and

required an in-depth understanding of numerous complex facts and legal arguments addressing

---

[21] Ultimately the District Court entered an order on the Aurelius District Court Stay Motion before the DCL Plan
Proponents filed their responsive brief; however, the preparation of this brief was necessary and warranted given
the expedited nature of the relief requested by Aurelius, and the uncertainty with respect to the actions that would
be taken by the District Court.

the contentions set forth in the various Confirmation Order Appeals.  Accordingly, preparing the

DCL Omnibus Answer required a considerable level of participation by, and substantial

coordination among, Sidley and the professionals for the other DCL Plan Proponents.

51.    In connection with each of the Confirmation Order Appeals, the DCL Plan

Proponents also reviewed, analyzed and researched the appellants' opening and reply briefs filed

in connection with the Confirmation Order Appeals.  Further details with respect to such filings

and related responses filed by the DCL Proponents is as follows:

*1.    Trustees' 2012 Confirmation Order Appeal*

52.    On September 2, 2012, the Trustees' notice of appeal was entered in the

District Court on August 24, 2012 (Docket No. 3).  The Trustees filed their Appellants' brief in

support of their appeal on September 7, 2012 (Docket No. 36) pursuant to the Stipulated Appeals

Schedule.  On October 2, 2012, the DCL Plan Proponents filed their DCL Omnibus Answer (See

Docket Nos. 52, 54-56, 58-59), and on October 11, 2012, the Trustees filed their reply in support

of the appeal (Docket No. 63) and a supplemental appendix (Docket No. 64).

*2.    Aurelius 2012 Confirmation Order Appeal[22]*

53.    On September 7, 2012, Aurelius's appeal of the 2012 Confirmation Order

was docketed in the District Court (Docket No. 26), and Aurelius filed its Appellant's brief

(Docket No. 29) along with its designation of the record and statement of the issues (Docket No.

27).  The DCL Plan Proponents filed the DCL Omnibus Answer on October 2, 2012 (Docket

Nos. 38, 40-42, 44-45), and Aurelius's Appellant's Reply Brief was filed on October 11, 2012.

---

[22] All docket citations in this paragraph refer to the docket of the action captioned <u>Aurelius Capital Management v.
    Tribune Co., et al. (In re Tribune Co.)</u>, Case No. 12-cv-01072 (D. Del. 2012).

   3.     *EGI-TRB 2012 Confirmation Order Appeal*[23]

54.    On September 6, 2012, EGI-TRB's appeal of the 2012 Confirmation

Order was docketed in the District Court (Docket No. 6), and EGI-TRB filed its designation of

the record and statement of the issues on September 5, 2012 (Docket No. 3) and filed its

Appellant's brief (Docket No. 14) on September 13, 2012.  The DCL Plan Proponents filed the

DCL Omnibus Answer on October 2, 2012 (Docket Nos. 18-19, 21-22, 24-25), and EGI-TRB

filed its reply brief on October 11, 2012 (Docket No. 32).

   4.     *WTC 2012 Confirmation Order Appeal*[24]

55.    On September 7, 2012, WTC's appeal of the 2012 Confirmation Order

was docketed in the District Court (Docket No. 4), and WTC filed its designation of the record

and statement of the issues (Docket No. 2) and its Appellant's brief (Docket No. 6) on the same

date.  The DCL Plan Proponents filed the DCL Omnibus Answer on October 2, 2012 (Docket

Nos. 12, 14-16, 18-19), and WTC filed their reply brief on October 11, 2012 (Docket No. 25).

   **(b)     The State Law Constructive Fraudulent Conveyance Actions**

56.    On April 25, 2011, the Bankruptcy Court entered an order authorizing the

Noteholder Proponents[25] to commence state law constructive fraudulent conveyance actions

against Tribune's shareholders who received a cash distribution on account of their shares in

Tribune as part of the Leveraged ESOP Transactions (Docket No. 8740).  On June 2, 2011, the

---

[23] All docket citations in this section refer to Wilmington Trust Co. v. Tribune Co., et al. (In re Tribune Co.), Case No. 12-cv-00128 (D. Del. 2012).

[24] All docket citations in this section refer to EGI-TRB LLC v. Tribune Co., et al. (In re Tribune Co.), Case No. 12-cv-01106 (D. Del. 2012).  WTC's separate appeal of the Reconsideration Decisions proceeded in a similar fashion at Case No. 12-mc-00108, which was subject to the same stipulated briefing schedule and was consolidated with the other Confirmation Appeals.

[25] Aurelius, Law Debenture, Deutsche Bank and Wilmington Trust are collectively referred to herein as the "Noteholder Proponents" for the sake of consistency with Sidley's prior Quarterly Fee Application Requests, although the Noteholder Proponents are no longer advancing confirmation of a competing plan of reorganization for the Debtors.

Noteholder Proponents and certain retirees of Times Mirror Company (the "TM Retirees")[26]

commenced over 50 lawsuits in over 20 different federal and state courts, seeking to recover

approximately $8 billion allegedly paid to all former shareholders of Tribune whose stock was

purchased and/or redeemed in conjunction with the Leveraged ESOP Transactions in 2007,

under state law constructive fraudulent transfer causes of action (collectively, the "SLCFC

Actions").  These lawsuits named over 2,000 individuals and entities as defendants, included

thousands of "doe" defendants, and also asserted defendant class actions against the balance of

the approximately 38,000 individuals or entities who held stock that was purchased or redeemed.

The SLCFC Actions were brought for the sole benefit of the plaintiffs thereto, and not for the

benefit of all of Tribune's creditors.

        57.    On December 19, 2011, the Judicial Panel On Multidistrict Litigation

("JPML") entered an order (the "Transfer Order") consolidating a majority of the SLCFC

Actions in a single multi-district litigation ("MDL") proceeding (the "Consolidated Action") in

the United States District Court for the Southern District of New York (the "MDL Court").  On

December 28 and 29, 2011, the JPML issued conditional transfer orders covering a majority of

the remaining SLCFC Actions and related litigation that was not transferred to the Consolidated

Action by the Transfer Order.  Among the actions identified as potential "tag-along" actions to

be consolidated with the SLCFC Actions in the conditional transfer orders were the two

adversary proceedings commenced by the Committee captioned Official Committee Of

Unsecured Creditors v. JPMorgan Chase Bank, N.A. (In re Tribune Co.), Case No. 10-53963

(KJC) (the "Lender Action"), and Official Committee Of Unsecured Creditors v. FitzSimons (In

re Tribune Co.), Case No. 10-54010 (KJC) (the "FitzSimons Action") pending before the

---

[26] Times Mirror Company was merged with and into Tribune in 2000.

Bankruptcy Court. Sidley's professionals spent significant time monitoring and analyzing the voluminous pleadings filed by parties in interest, both in favor of and against further consolidation of the SLCFC Actions in the Consolidated Action.

58.    During the Sixteenth Interim Fee Period, on behalf of the Debtors, Sidley's professionals in the Litigation and Corporate Reorganization and Bankruptcy practice groups spent considerable time reviewing and analyzing the large volume of pleadings in the Consolidated Action and in the various state courts before which actions were pending that were not transferred to the Consolidated Action, for the purpose of alerting the Debtors to pleadings which might impact the Bankruptcy Court's stay applicable to the SLCFC Actions, or any pleadings or rulings that might impact Eagle New Media Investments, LLC (a Debtor named in certain of the SLCFC Actions), the current and former employees of the Debtors named in the SLCFC Actions, or any Tribune-related entity or party. Several of the SLCFC Actions were filed in state court, necessitating coordination with support staff to review dockets across the United States, in addition to raising legal issues regarding removal of those actions to the federal courts. At Tribune's request, Sidley's professionals prepared daily updates, with cumulative updates provided to Tribune's senior management following important milestones in the SLCFC Actions. In addition, Sidley's professionals reviewed and analyzed the first dispositive pleading in the Consolidated Action, which was a motion to dismiss the Consolidated Action filed by a group of consolidated defendants. Additionally, Sidley's professionals reviewed and analyzed the various master case orders and advised Tribune regarding important dates for appearances and other deadlines, and reviewed and analyzed certain issues relating to the interplay between the confirmed DCL Plan and the Committee's FitzSimons action, which is included in the Consolidated Action. The complicated nature of the MDL proceedings and their interplay with

the Debtors' ongoing bankruptcy proceedings necessitated both bankruptcy and litigation teams working in concert.

### (c)     Litigation Trust Agreement

59.     During the Sixteenth Interim Fee Period, Sidley's professionals worked to finalize the terms of the Litigation Trust Agreement, as well as to analyze and resolve certain issues related to the implementation of the Litigation Trust.  Certain aspects of the Litigation Trust Agreement required the input of Sidley's litigation professionals, including issues related to attorney-client privilege, discovery, valuation, and various other litigation-oriented components of the Litigation Trust Agreement.  In these efforts, Sidley's Litigation professionals continued to work together with Sidley's Corporate Reorganization and Bankruptcy practice group to finalize the Litigation Trust Agreement and resolve related issues.

### (d)     Committee-Filed Adversary Proceedings

60.     Prior to the end of the two-year period following the Petition Date, the Committee was authorized by the Court to commence, prosecute and settle on behalf of the Debtors' estates various claims to avoid and recover potentially preferential transfers made by the Debtors to, inter alia, (i) current and former officers, directors and employees (the "Insider Defendants") of Tribune or the other Debtors and (ii) other third-party defendants (the "Third Party Defendants").[27]  Beginning on December 3, 2010, the Committee initiated approximately 215 avoidance actions ("Committee-Filed Adversaries").

61.     Pursuant to the DCL Plan, as of the Effective Date, the Committee no longer has authority to act in its prior role as plaintiff in the Committee-Filed Adversaries.  See

---

[27] See Order authorizing suit against certain Insider Defendants and certain Third Party Defendants dated November 29, 2010 (Docket No. 6658) and order authorizing suit against certain other Third Party Defendants dated November 29, 2010 (Docket No. 6657).

DCL Plan § 15.2.  Specifically, Section 5.16 of the DCL Plan provides that, as of the Effective

Date, the Debtors will retain certain estate causes of action, including the Committee-Filed

Adversaries that are not LBO-Related Causes of Action. [28]  Thus, during the Sixteenth Interim

Fee Period, Sidley's professionals analyzed and prepared procedures to facilitate the substitution

of the Reorganized Debtors in place of the Committee as successor-in-interest plaintiffs or

prospective plaintiffs, as applicable, in 174 adversary proceedings and with respect to certain

tolled avoidance actions, which assert causes of action that will be partially or fully retained by

the Debtors as of the Effective Date. [29]

### (e)     Other Pending Litigation

62.     Prior to the Petition Date and since, Sidley has served the Debtors as

defense counsel with respect to a number of litigation matters pending in all levels of state and

federal courts across the country, including such prepetition litigation matters as Neuman v.

Goldstone, a prepetition employment contract lawsuit in Los Angeles; CBS Broadcasting Inc. v.

Kincaid, a civil litigation suit pending in California; [30] and certain litigation matters pending in

New York, including the cases styled Schultz v. Tribune, Crab House of Douglaston, Inc. v.

Newsday, Inc., et al., No. 04-cv-558 (E.D.N.Y.) (the "Crab House Matter") and Furnell v.

Tribune.  Sidley continued to represent the Debtors and their non-Debtor affiliates in connection

with these litigation matters during the Sixteenth Interim Fee Period, to the extent such matters

were not stayed by section 362(a) of the Bankruptcy Code, and also provided advice to the

---

[28] See DCL Plan § 5.16 ("Debtors and their Estates shall retain the Ordinary Litigation Claims.")

[29] On December 27, 2012, the Debtors filed their Motion for an Omnibus Order Authorizing the Substitution of the Reorganized Debtors in Place of the Creditors Committee as Plaintiffs in Certain Adversary Proceedings and Approving Procedures to Evidence this Substitution (Docket No. 12922).   The motion was heard at January 16, 2013 omnibus hearing.

[30] The Debtors and CBS Broadcasting reached a consensual resolution of this litigation in July 2012, and the proofs of claim corresponding to such litigation were withdrawn on July 27, 2012 (Docket Nos. 12126 and 12127, respectively).

Debtors in connection with certain proofs of claim filed by the plaintiffs on account of such litigated matters.  During the Sixteenth Interim Fee Period, Sidley's professionals continued to monitor and communicate with various parties in interest in these litigated matters.

**I.      Travel Time (30480):   Hours:  4.20   Fees:  $1,995.00**

63.      During the Sixteenth Interim Fee Period, Sidley's professionals spent time traveling to Wilmington, Delaware to attend hearings in the Debtors' cases.  During the Sixteenth Interim Fee Period, the Bankruptcy Court held hearings on October 4, 2012 and November 20, 2012.  These hearings required the attendance in person of certain Sidley professionals from Sidley's Washington, D.C. and Los Angeles offices who had done significant work on the matters set for hearing.  The hours reflect non-working travel time and the fees requested in this matter category have been reduced by 50% in accordance with Local Rule 2016-2(d)(viii).

**J.      Plan and Disclosure Statement (30500):   Hours:  61.60   Fees:  $50,910.50**

64.      A central part of Sidley's representation of the Debtors during these chapter 11 cases has been the negotiation and formulation of a plan of reorganization for the Debtors.  These efforts yielded a successful confirmation of the DCL Plan during the Fifteenth Interim Fee Period, with issuance of the 2012 Confirmation Order on July 23, 2012.  In the remainder of the Fifteenth Interim Fee Period and throughout the Sixteenth Interim Fee Period, Sidley's professionals in a variety of practice groups, including Corporate Reorganization and Bankruptcy, Corporate, Tax and Litigation, worked to prepare the Debtors to implement the terms of the DCL Plan in accordance with the terms of the 2012 Confirmation Order and cause the DCL Plan to become effective, which occurred on December 31, 2012 (early in the Seventeenth Interim Fee Period).

65.     Specifically, Sidley's professionals spent considerable time in September 2012 evaluating issues arising in connection with the creation of the Litigation Trust on the Effective Date.  The Litigation Trust was a point of considerable negotiation during the DCL Plan confirmation process.  Following confirmation of the DCL Plan, additional negotiations and consultations among the Debtors and various other parties-in-interest, including the Noteholders (who would ultimately receive recoveries from the Litigation Trust), continued with respect to certain implementation issues and the valuation of the claims that would be transferred from Tribune's bankruptcy estate to the Litigation Trust.  Sidley's professionals worked diligently with the Debtors' financial advisors, Alvarez & Marsal, to assign dollar values (using certain probability models) to further this valuation process.

66.     As the Debtors moved further from receipt of the 2012 Confirmation Opinion and closer to their emergence from bankruptcy, the work performed on the Litigation Trust and on other issues that previously were recorded in the "Plan and Disclosure Statement" matter category were recorded in the "Post-Confirmation Matters" matter category.  As such, no timekeepers billed time in the "Plan and Disclosure Statement" matter category in either October 2012 or November 2012.

**K.      Professional Retention (30510):    Hours:  45.20      Fees: $22,994.00**

67.     The Debtors' large and diverse businesses require the employment and retention of a variety of professionals to support these bankruptcy proceedings and to continue managing the litigation, real estate, tax, accounting, and other needs of their business operations in the ordinary course.  Specifically, Sidley has advised the Debtors as they have requested throughout these Chapter 11 cases with respect to the retention and continued employment of various professionals to perform those tasks.  During the Sixteenth Interim Fee Period, Sidley's professionals prepared and filed the Sixth Supplemental Application for an Order Modifying the

Scope of the Retention of Ernst & Young LLP to Include Certain Multi-State Disclosure Services (Docket No. 12628).  This application was granted by the Court's entry of an order, which also occurred in the Sixteenth Interim Fee Period (see Docket No. 12684).

68.    In addition, during the Sixteenth Interim Fee Period, Sidley's professionals prepared and filed one (1) supplement to the list of the Debtors' ordinary course professionals ("OCPs") (Docket Nos. 12405) and coordinated with the Debtors' legal department and financial advisors to prepare and file a quarterly report of proposed payments to OCPs (Docket No. 12495).  Sidley's professionals also coordinated with certain OCP firms retained by the Debtors to assist such professionals with preparing and filing fee applications on behalf of their firms.  In connection therewith, Sidley's professionals reviewed fee applications for Ogletree, Deakins, Nash, Smoak & Stewart, P.C. and Loeb & Loeb LLP prior to the filing of such applications with the Court (Docket Nos. 12473 & 12671).

**L.    Tax Matters (30520):   Hours: 253.40     Fees: $171,358.50**

69.    During the Sixteenth Interim Fee Period, Sidley's tax professionals continued to advise the Debtors with respect to a variety of discrete tax issues, both arising from and in connection with the Debtors' chapter 11 cases and in connection with Sidley's representation of the Debtors in tax matters in the ordinary course of the Debtors' business.  For example, Sidley's professionals reviewed and analyzed tax-related claims and liabilities, considered the tax implications of proposed transactions, handled appeals of tax assessments, advised the Debtors with respect to potential settlements of tax claims, and communicated with taxing authorities concerning all such matters.  Sidley's professionals in the Tax practice group also analyzed numerous potential tax consequences arising in connection with the DCL Plan and tax issues concerning the Debtors' proposed corporate structure as of their emergence from chapter 11.

70.     Much of the time of Sidley's Tax and Corporate Reorganization and Bankruptcy professionals in this category during the Sixteenth Interim Fee Period was dedicated to extensive research, internal memoranda and meetings regarding post-confirmation tax issues. Of particular importance was the analysis and assessment of the tax consequences of the Restructuring Transactions that occurred on, prior to, or following the Debtors' emergence from chapter 11 protection.  Sidley's tax professionals also advised the Debtors and consulted with the other DCL Plan Proponents with respect to the tax implications of the Litigation Trust proposed by the DCL Plan.  Sidley spent considerable time researching these issues and advising the Debtors on the potential tax consequences of the Restructuring Transactions and the Litigation Trust structure.  In addition to these services, certain of Sidley's professionals participated in periodic in-person meetings with the Debtors' management regarding tax issues presented by the Debtors' anticipated emergence from chapter 11.

**M.     Claims Processing (30530):   Hours:  532.60    Fees: $320,791.50**

71.     During the Sixteenth Interim Fee Period, Sidley's professionals continued evaluating, researching, and analyzing the treatment of various types of claims arising in the Debtors' chapter 11 cases.  To date, well over 7,150 proofs of claim have been filed in the Debtors' chapter 11 cases.  Sidley's professionals assigned to handle claims-related matters participated in regular conference calls with the Debtors' financial advisors, Alvarez & Marsal, in order to coordinate the processing of the proofs of claim, evaluation of the legal sufficiency of the claims, and the preparation of objections thereto.

72.     Specifically, Sidley's professionals, working together with the Debtors' management, business personnel, and Alvarez & Marsal, researched, prepared, and filed the Debtors' sixtieth and sixty-first omnibus objections to claims (Docket Nos. 12524 and 12525, respectively).  Sidley's professionals also continued their efforts to process and resolve claims

objections that had been previously filed by Sidley on behalf of the Debtors.  For example,

Sidley's professionals negotiated and filed stipulations resolving claims from the thirty-third

omnibus objections to claims, resulting in the settlement of $1,129,543.38 in face amount of

claims against the Debtors' estates.  (See, e.g., Certification of Counsel Regarding Withdrawal of

Debtors Thirty-Third Omnibus (Substantive) Objection to Claims as it Relates to Claim No. 728

of the City of Chicago Department of Revenue (Docket No. 12593)).  During the Sixteenth

Interim Fee Period, the Bankruptcy Court entered orders sustaining, in whole or in part, the

Debtors' sixtieth and sixty-first omnibus objections (subject to the continuance of objections to

certain claims of creditors who filed responses to such objections) (Docket Nos. 12685 and

12686, respectively), resulting in the net disallowance[31] of approximately $90,000 in face

amount of claims against the Debtors' estates.

    73.  Sidley's professionals also assisted the Debtors with negotiating and

implementing agreements and stipulations settling disputed claims without the need for formal

objections, in accordance with the Order approving claims settlement procedures that was

entered by the Court to facilitate consensual resolution of claims (Docket No. 2657).[32]  Sidley's

professionals negotiated seven (7) stipulations with certain of the Debtors' landlords and trade

creditors during the Sixteenth Interim Fee Period, which stipulations covered eighteen (18)

proofs of claim and reduced the outstanding claims against the Debtors by approximately

$464,700 in the aggregate.

---

[31] The sixtieth and sixty-first omnibus objections also resulted in the liquidation of certain claims that were asserted without a specified value.  The values determined for these claims were offset against the total value of disallowed amounts to calculate this "net disallowance" figure.

[32] Those procedures provide the Debtors with authority to settle or compromise disputed claims of less than $50,000 in their discretion, claims equal to or greater than $50,000 but less than $1,000,000 upon notice to the United States Trustee and counsel to the Committee and certain senior lenders, and claims equal to or greater than $1,000,000 with the approval of the Court pursuant to Bankruptcy Rule 9019.

74.     In addition, Sidley's professionals performed significant work to analyze and attempt to resolve claims informally with claimants or their counsel.  Although this work is often not memorialized by filings with the Bankruptcy Court, such as a stipulation or filed objection, it nevertheless added significant value to the Debtors' chapter 11 cases and will aid the Debtors by continuing to reduce the unresolved claims that remain on the claims register.  This will be beneficial to the Debtors as they transition into post-bankruptcy operations and allow the Debtors to focus on the prospective operations of their various business rather than expending time and efforts on legacy bankruptcy issues.

**N.     Business Operations (30550):   Hours:  103.20     Fees:  $83,386.05**

75.     The Business Operations matter category encompasses the activities of Sidley's professionals with respect to their representation of the Debtors in corporate and transactional matters in the ordinary course of the Debtors' business, as well as other general corporate law and transactional advice, both related to these chapter 11 cases and otherwise related to the Debtors' businesses.  These services were necessary to facilitate the Debtors' efforts to stabilize and reposition their businesses through cost saving and revenue enhancing strategies, as well as to prepare the Debtors for their emergence from chapter 11.

76.     During the Sixteenth Interim Fee Period, Sidley's professionals expended substantial time and effort to prepare, research, and analyze potential value maximization strategies regarding the Debtors and certain of the Debtors' properties.  Sidley's professionals also addressed a variety of discrete matters arising postpetition in the ordinary course of the Debtors' business, including the review of certain potential transactions, joint-venture related issues, utility supply agreements, contracts, leases, licenses, and general corporate governance and business planning matters.

77.    In addition, Sidley's professionals conferred with the Debtors' management on a regular basis for the purposes of advising the Debtors on the legal issues raised by the Restructuring Transactions and post-emergence corporate governance of the Debtors.  In anticipation of the Debtors' emergence from bankruptcy, Sidley's professionals in the Corporate practice group reviewed and assessed the steps necessary to complete the Restructuring Transactions proposed by the DCL Plan, as described above in detail at paragraphs 19 to 22. Sidley's professionals coordinated with the Debtors' senior management and state corporate agents, such as Corporation Service Company, to prepare corporate documents (including charters, by-laws, resolutions, limited liability company agreements, merger certificates, merger agreements, conversion certificates, asset transfer agreements, equity transfer agreements, dissolution documents, equity certificates, qualification documents, and annual reports) in connection with the implementation of the Restructuring Transactions upon emergence.  In addition, Sidley's professionals coordinated with the Debtors' senior management and advisors to review, assess and plan the exchange, issuance, and distribution of securities and other interests in anticipation of the Debtors' emergence from bankruptcy.  Sidley's professionals in the Corporate practice group also coordinated with the Debtors' management and advisors to prepare corporate documentation in anticipation of the implementation of a secured financing facility in connection with emergence.

O.    **Case Administration (30560):    Hours: 187.40    Fees: $123,226.00**

78.    During the Sixteenth Interim Fee Period, Sidley's professionals engaged in various general case administration tasks, including scheduling and participating in hearings, reviewing and reporting on docketed filings to the Debtors, the Committee, the United States Trustee, and other interested parties, and maintaining a schedule of critical dates and deadlines. On a periodic basis during the Sixteenth Interim Fee Period, Sidley's professionals participated

in status calls with the Debtors' senior management and financial advisors to discuss pending

motions and issues and the outcome of each hearing.  In addition, Sidley's paraprofessionals

were responsible for monitoring the docket for all filed pleadings and preparing and distributing

a daily status report to the Debtors' senior management and Sidley professionals, at the request

of the Debtors' senior management.

**P.**     **Creditor Communications (30570):   Hours: 4.70     Fees: $2,514.00**

79.     During the Sixteenth Interim Fee Period, Sidley's professionals responded

to inquiries and communications from individual creditors as well as from representatives of

larger groups of the Debtors' creditor constituencies regarding the status of the Debtors' chapter

11 cases.  As a convenience to individual creditors, particularly individuals who are generally

new to and/or unfamiliar with the bankruptcy process and their role therein, the Debtors

established a dedicated Tribune bankruptcy "hotline."  This toll-free number connects directly to

a voice mailbox maintained by Sidley.  Since the inception of the hotline, typical callers have

been bond holders, brokerage firms calling on behalf of clients, former employees of the

Debtors, pro se creditors, and attorneys for creditors.  Questions posed to Sidley's professionals

by the Debtors' creditors ranged from specific questions regarding claims treatment under the

DCL Plan to general inquiries regarding the status of the chapter 11 cases.

**Q.**     **Employee Matters (30590):   Hours: 108.20   Fees: $58,616.00**

80.     During the Sixteenth Interim Fee Period, Sidley's professionals in the

Corporate Reorganization and Bankruptcy and Employment practice groups continued to advise

the Debtors with respect to various legal issues pertaining to employee-related matters, including

negotiating employment contracts and negotiating termination and severance of former

employees.  Sidley's professionals also advised the Debtors with respect to the structure and

implementation of their tax-qualified and non-tax-qualified employment-related incentive,

40

benefit, pension, and severance plans, addressed inquiries from the Debtors' management and

creditors regarding those plans, and made appropriate adjustments to such plans in response.  In

addition to the foregoing, Sidley's professionals responded to inquiries from the Debtors'

management and in-house employment lawyers regarding various employment issues, reviewed

consulting contracts, responded to numerous information requests from and/or regarding current

and former employees, and handled various other issues in connection with the Debtors'

employees.  Sidley's professionals also analyzed employee-related claims filed in the Debtors'

chapter 11 cases, the SLCFC Actions, insider preference actions commenced by the Committee,

and the claim of Martha Waller against Debtor KTLA, Inc (the "Waller Claim," see Claim No.

4412).[33]

      81.     Sidley's professionals in the Employment and Labor Law practice group

were also retained by the Debtors to defend against litigation initiated by certain former

employees in state courts, on a postpetition basis, including the matter captioned Gellman v. Los

Angeles Times Communications LLC (the "Gellman Litigation").[34]  Sidley's professionals

reviewed and analyzed pleadings filed in the Gellman Litigation, advised the Debtors on the

preparation and filing of responsive pleadings, and researched and prepared such pleadings on

behalf of the Debtors.

      82.     Finally, at the Debtors' request, Sidley's professionals in the Corporate

Reorganization and Bankruptcy and Employment practice groups continued to undertake a

comprehensive analysis of the implications of the SLCFC Actions for the Debtors' current

---

[33] Ms. Waller filed a claim for $5,000,000 alleging wrongful termination and age and gender discrimination. Sidley's professionals undertook significant discovery and both statutory and case law research in preparation for filing an objection to the Waller Claim, which was filed early in the Seventeenth Interim Fee Period (see Docket No. 12832).

[34] Time entries relating to the Gellman Litigation are specifically denoted in the Employee Matters invoices submitted in connection with the Application.

employees who were either individually named as defendants in those actions or who were

potentially members of the putative defendant classes, by virtue of being former shareholders of

Tribune.  The SLCFC Actions potentially implicate several thousand of the Debtors' current and

former employees, who held stock directly or indirectly through one or more of the Debtors'

benefit plans, and raise complex legal issues at the intersection of state fraudulent conveyance

laws and ERISA.

**R.    Exit Credit Facility (13700):    Hours:  91.50    Fees:  $59,199.00**

83.    During the Sixteenth Interim Fee Period, Sidley's professionals continued

to provide services to the Debtors relating to the evaluation, negotiation, and expected

implementation of financing facilities to provide a source of funding for the reorganized Debtors

upon their emergence from their chapter 11 cases.  The DCL Plan authorizes the Debtors to

procure exit financing on terms consistent with an exit financing term sheet in the Plan

Supplement (the "Exit Facility").  (See DCL Plan, Sections 1.1.87, 1.1.88, 5.10, and Exhibit

5.10.)  The DCL Plan also contemplates that the Debtors will enter into a new senior secured

term loan or a replacement facility in addition to the Exit Facility (the "Term Loan Facility" and

together with the Exit Facility, the "Proposed Facilities").  (See DCL Plan, Sections 1.1.145,

1.1.146, 5.6, and Exhibit 5.6.)  Preliminary term sheets respecting each of the Proposed Facilities

were filed with the Court as part of the Plan Supplement on May 4, 2012 (Docket No. 11545).

84.    Sidley's professionals, together with the Debtors' outside counsel for

certain financing matters, continued to review and analyze potential financing terms and

alternatives for each of the Proposed Facilities and advised the Debtors' senior management

regarding their post-emergence liquidity needs and financing options.  Sidley's professionals also

continued drafting and completed documentation seeking approval of entry into certain letter

agreements in connection with the Proposed Facilities.  The post-emergence financing work

performed by Sidley during the Sixteenth Interim Fee Period generally falls into three categories: (i) strategic analysis of financing options and alternatives, (ii) negotiations of substantive terms of the Proposed Facilities, and (iii) drafting several motions in connection with the Proposed Facilities.

85.    Sidley's professionals continued to work diligently during the Sixteenth Interim Fee Period to assess the Debtors' financing needs and to formulate concrete financing plans.  The bulk of the work done by Sidley's professionals concerned the negotiation and finalization of term sheets, engagement letters, commitment letters, fee letters and expense letters in connection with the Proposed Facilities and the drafting and filing of several motions seeking approval of certain matters relating to the Proposed Facilities.  Specifically, Sidley's professionals finalized and filed (i) a motion seeking authority to enter into term sheets, engagement letters, commitment letters, fee letters and expense letters in connection with the Proposed Facilities (Docket No. 12594), (ii) a motion to shorten notice with respect thereto (Docket No. 12597) and (iii) a motion seeking authority to file fee letters under seal (Docket No. 12596).  All three motions were approved by the Court (see Docket Nos. 12687, 12602 and 12688, respectively).

### EXPENSES INCURRED

86.    Sidley incurred expenses of $240,673.02 in connection with its services rendered to the Debtors during the Sixteenth Interim Fee Period.  These expenses represent actual out-of-pocket costs for items incurred exclusively for the direct benefit of the Debtors, including, but not limited to, duplicating charges, document delivery and messenger services, telephone and facsimile charges, computer-assisted legal research, travel-related expenses, overtime services, in-house document production, and professional services from contract attorneys relating to discovery activities.

87.    Sidley submits that all such expenses are necessary and actual expenses for the performance of its services in these cases, and further submits that many of such expenses were necessitated by the time constraints under which Sidley's professionals and staff have operated in these cases.  Sidley's representation of the Debtors in pursuing the effectiveness of the DCL Plan – which occurred on December 31, 2012 – continued to require the preparation and physical production of documents and exhibits for use at hearings and ongoing discovery activities that required the services of outside contract attorneys and technical service providers. Additional information respecting certain categories of expenses are described below.  A detailed breakdown of Sidley's expenses incurred in rendering services to the Debtors during the period covered by this Application is incorporated into this Application as part of <u>Attachment B</u> hereto.

(a)    **Travel Expenses**

88.    Sidley submits that all travel expenses incurred during the period covered by this Application were necessary, reasonable, and reflect the prevailing market rates.  In particular, Sidley submits that, to the best of its knowledge, all air travel utilized by Debtors' personnel during the period covered by this Application was at the prevailing coach-class rate for such travel less any corporate discounts received by Sidley, in accordance with Sidley's policies for business travel for bankruptcy and non-bankruptcy matters, excepting certain limited instances where coach-class reservations were unavailable.  Hotel charges reflect rates for one night of lodging, unless otherwise indicated.

(b)    **Court-Related Expenses**

89.    Sidley incurred $1,299.00 in out-of-pocket expenses relating to Court fees and Court Reporting fees (including for the depositions taken of Mr. Kurtz and Mr. Hartenstein in connection with the hearings on the Stay Motions).  All Court-related expenses reflect actual, reasonable, and necessary costs incurred by Sidley on behalf of the Debtors.

(c)    **Document-Related Expenses**

90.    Sidley's normal billing practices, as set forth in the pleadings supporting

its retention in these chapter 11 cases, include standard secretarial services as part of normal

overhead.  For certain projects involving large and/or time-sensitive administrative and logistical

requirements resulting from client needs, Sidley utilizes the services of third-party providers in

the place of clerical personnel on staff during normal business hours and bills those services to

the client at Sidley's cost for such services.  During the Sixteenth Interim Fee Period, Sidley

charged a total of $8,019.13 relating to in-house duplication, outside document production,

document processing and/or document binding/drilling services that were billed to the Debtors at

cost; that is, no markup for such services is applied by Sidley.[35]

(d)    **Computer-Assisted Research**

91.    Computer research and information retrieval services are charged on a

time, item and/or search-type basis which takes advantage of certain discounts that Sidley is able

to negotiate with the relevant service providers because of the Firm's size and volume of usage.

The Firm's charges for computerized legal research such as Westlaw or Lexis are based on a rate

that recovers no more than the Firm's costs.

(e)    **Overtime**

92.    It is Sidley's standard practice and policy to reimburse professionals and

staff for overtime meals and overtime transportation home when working late, provided such

professional or staff member has worked a certain number of hours per day on a particular client

matter.  Additionally, Sidley provides overtime pay to certain eligible staff employees when they

are required to work past normal business hours on a particular client matter.  Sidley incurred

---

[35] By agreement between Sidley and the Office of the United States Trustee, Sidley has not charged the Debtors for
any expenses relating to third-party proof-reading services.

$2,497.18 in overtime expenses during the Sixteenth Interim Fee Period. Sidley submits that all requested overtime expenses are reasonable given the time demands in these cases during the Sixteenth Interim Fee Period.

(f)     **Legal Support Services**

93.     During the Sixteenth Interim Fee Period, Sidley charged a total of (i) $8,951.50 relating to outside professional services and specialists and (ii) $125,662.50 for Legal Support Services, each of which were billed to the Debtors at cost. In connection with Sidley's ongoing maintenance of the Document Depository, in which the equivalent of approximately 5.82 million pages of documents relating to the Leveraged ESOP Transactions are electronically stored, Sidley utilized the services of an outside vendor, LD Discovery, to host and process electronic data files for production upon request to Depository Designees and creditor constituencies authorized to receive such documents. Consistent with past Applications, the vast majority of expenses incurred by Sidley in connection with Legal Support Services (121,296.00 in the Sixteenth Interim Fee Period) relates to the services provided by LD Discovery.

**REVIEW OF APPLICABLE LOCAL RULE**

94.     The undersigned has reviewed the requirements of Local Rule of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware 2016-2 and certifies to the best of his information, knowledge and belief that this Application substantially complies with Rule 2016-2.

**NOTICE**

95.     Notice of this Application has been served upon the Notice Parties specified in the Fee Orders. In accordance with the terms of the Fee Orders, Sidley respectfully submits that no other or further notice is required.

46

## **NO PRIOR REQUEST**

96.    Other than the applicable Monthly Fee Applications, no previous application respecting the relief requested herein has been made to this or any other Court.

WHEREFORE, Sidley Austin LLP respectfully requests the Court (i) to approve, pursuant to 11 U.S.C. §§ 327, 331, and 503, interim compensation in the amount of $5,235,534.36 and reimbursement of expenses in the amount of $240,673.02, (ii) to authorize the payment of such amounts by the Debtors to Sidley, less any amounts previously paid to Sidley pursuant to the Monthly Fee Applications for the period covered by this Sixteenth Quarterly Fee Application Request and the procedures set forth in the Interim Compensation Order and the Fee Examiner Order, and (iii) to grant such further relief as is just and proper.

Dated: January 23, 2013

Respectfully submitted,

James F. Conlan
Bryan Krakauer
Kenneth P. Kansa
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

ATTORNEYS FOR DEBTORS AND DEBTORS
IN POSSESSION