# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered |
| | **Hearing Date: February 13, 2013 at 11:00 a.m. (ET)** |
| | **Objection Deadline: February 6, 2013 at 4:00 p.m.(ET)** |

**DEBTORS' MOTION FOR AN ORDER (I) ENFORCING THE TERMS OF THE BANKRUPTCY COURT-APPROVED SETTLEMENT AGREEMENT WITH THE FRANCHISE TAX BOARD OF THE STATE OF CALIFORNIA, (II) DETERMINING THAT THE DEBTORS HAVE NO LIABILITY FOR TAX-RELATED PENALTY, AND (III) ORDERING THE RETURN OF FUNDS SETOFF IN VIOLATION OF THE AUTOMATIC STAY AND COURT ORDER**

The reorganized debtors in the above-captioned chapter 11 cases (each a "Debtor"

and, collectively, the "Debtors"), hereby submit this motion (the "Motion") seeking entry of an

order pursuant to sections 105, 362, 502, and 505 of title 11 of the United States Code (the

"Bankruptcy Code") (i) enforcing the terms of a settlement agreement entered into between

Tribune Company ("Tribune") and the Franchise Tax Board of the State of California (the

"FTB"), and previously approved by an order of this Court, (ii) ruling that the Debtors have no

---

[1] The Reorganized Debtors, or successors-in-interest to the Reorganized Debtors, in these chapter 11 cases, along with the last four digits of each entity's federal tax identification number, are: Tribune Company (0355); California Community News, LLC (5306); Chicago Tribune Company, LLC (3437); Chicagoland Publishing Company, LLC (3237); Chicagoland Television News, LLC (1352); forsalebyowner.com, LLC (4276); ForSaleByOwner.com Referral Services LLC (9205); Hoy Publications, LLC (2352); Internet Foreclosure Service, LLC (6550); KDAF, LLC (6969); KIAH, LLC (4014); KPLR, Inc. (7943); KRCW, LLC (1772); KSWB, LLC (7035); KTLA, LLC (3404); KTXL, LLC (3844); KWGN, LLC (5347); Los Angeles Times Communications LLC (1324); Magic T Music Publishing Company, LLC (6522); NBBF, LLC (0893); Oak Brook Productions, LLC (2598); Orlando Sentinel Communications Company, LLC (3775); Sun-Sentinel Company, LLC (2684); The Baltimore Sun Company, LLC (6880); The Daily Press, LLC (9368); The Hartford Courant Company, LLC (3490); The Morning Call, LLC (7560); TMS News and Features, LLC (2931); Tower Distribution Company, LLC (9066); Towering T Music Publishing Company, LLC (2470); Tribune 365, LLC (7847); Tribune Broadcasting Company, LLC (2569); Tribune Broadcasting Hartford, LLC (1268); Tribune Broadcasting Indianapolis, LLC (6434); Tribune Broadcasting Seattle, LLC (2975); Tribune CNLBC, LLC (0347); Tribune Direct Marking, LLC (1479); Tribune Entertainment Company, LLC (6232); Tribune Investments, LLC (6362); Tribune Media Services, LLC (1080); Tribune Media Services London, LLC (6079); Tribune ND, LLC (4926); Tribune Publishing Company, LLC (9720); Tribune Television New Orleans, Inc. (4055); Tribune Washington Bureau, LLC (1088); WDCW, LLC (8300); WGN Continental Broadcasting Company, LLC (9530); WPHL, LLC (6896); WPIX, LLC (0191); WPMT, LLC (7040); WSFL, LLC (5256); WXMI, LLC (3068). The corporate headquarters and the mailing address for each entity listed above is 435 North Michigan Avenue, Chicago, Illinois 60611.

liability for the Disputed Amount (defined and described below) for the reasons detailed herein, and (iii) ordering the return to the Debtors of $857,702.20 which the FTB currently holds by way of an unauthorized setoff against tax refunds that the FTB and Tribune agreed were owed to Tribune.  In support of this Motion, the Debtors respectfully state as follows:

## STATUS OF THE CASE AND JURISDICTION

1.      On December 8, 2008 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  An additional Debtor, Tribune CNLBC, LLC,[2] filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on October 12, 2009.

2.      The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b) [Docket Nos. 43, 2333].

3.      On July 23, 2012, the Court entered the Order Confirming Fourth Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A. [Docket No. 12074]  (the "Confirmation Order").  On December 31, 2012 (the "Effective Date"), the Fourth Amended Joint Plan of Reorganization for the Debtors (the "Plan") became effective and the Debtors emerged from bankruptcy.

4.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are sections 105, 362, 502, and 505 of the Bankruptcy Code.

---

[2] Tribune CNLBC, LLC was formerly known as Chicago National League Ball Club, LLC.

46429/0001-9207267v1

## RELEVANT BACKGROUND

*Summary of the Motion*

5.　　Pursuant to this Motion, the Debtors seek the return of $857,702.20 of estate funds (the "Disputed Amount") that are being improperly withheld by the FTB in direct violation of the Bankruptcy Code and a settlement agreement between Tribune and the FTB (the "Settlement Agreement").  As discussed herein, the FTB filed over $60 million of claims in the aggregate against a number of the Debtors.  After an exhaustive reconciliation and negotiation process, the Debtors and the FTB entered into a comprehensive settlement agreement which was the subject of a motion under Bankruptcy Rule 9019 and ultimately approved by an order of this Court.  The Settlement Agreement resolved the entirety of certain of the Debtors' (such Debtors, the "Taxpayers")[3] liability to the FTB, subject to four specific exceptions, and authorized the FTB to offset the agreed-upon tax liability against numerous overpayments (the "Overpayments") held by FTB and owed to Tribune.

6.　　The final step under the Settlement Agreement was for the FTB to return millions of dollars of Overpayments to Tribune.  The FTB recently returned the Overpayments to Tribune less the agreed-upon offsets, but only after withholding an additional $857,702.20 of the Overpayments as a unilateral setoff.  This Disputed Amount relates to a purported Large Corporation Understatement Penalty ("LCUP") (described in detail at paragraphs 12-13, below),

---

[3] In all, twenty-seven (27) of the Debtors are Taxpayers, as follows: Tribune Company; 435 Production Company; 5800 Sunset Productions Inc.; California Community News Corporation; Candle Holdings Corporation; Channel 40, Inc.; Chicago River Production Company; Chicago Tribune Press Service, Inc.; Eagle New Media Investments, LLC; Fortify Holdings Corporation; Hoy Publications, LLC; KSWB Inc.; KTLA Inc.; Los Angeles Times Communications LLC; Los Angeles Times International, Ltd.; North Michigan Production Company; Shepard's Inc.; TMLH 2, Inc.; TMLS I, Inc.; Tribune California Properties, Inc.; Tribune Entertainment Company; Tribune Entertainment Production Company; Tribune License, Inc.; Tribune Los Angeles, Inc.; Tribune Media Net, Inc.; Tribune Media Services, Inc.; and Tribune Television Northwest, Inc.  The Settlement Agreement was signed by Tribune on behalf of the Taxpayers.  In accordance with Plan, certain of the Debtors listed above have undertaken certain of the Restructuring Transactions (as defined in the Plan) and have been merged with and into direct or indirect wholly-owned subsidiaries of Tribune Company.

3

which is a purported tax penalty covering three prepetition years (2003-2005) arising from a state law that took effect *postpetition*.

7.    At a minimum, the FTB's claim for the portion of the LCUP relating to tax year 2003 (the "2003 LCUP") is barred by the terms of the Settlement Agreement, as the FTB could have asserted, but did not, that the Debtors had any liability for the 2003 LCUP prior to the parties' entry into, and this Court's approval of, the Settlement Agreement, and the FTB waived any right to demand payment of any such penalty under the Settlement Agreement.[4] The FTB has no right under the Settlement Agreement or this Court's order approving it to impose a new penalty relating to a fully settled claim months after agreeing to the Settlement Agreement, then purport to set off the 2003 LCUP against amounts it concedes are owed to the Debtors over the Debtors' protests and without approval of this Court.  These facts alone justify this Court's enforcement of the Settlement Agreement through an order directing the FTB to turn over the amounts withheld on account of the 2003 LCUP (i.e., $304,821.80), if not the full $857,702.20 improperly withheld.  Further, even without the Settlement Agreement, the FTB had no right under the Bankruptcy Code to exercise control over estate property by unilaterally offsetting the Disputed Amount against the Overpayments without Court approval.

8.    The FTB's actions would also be impermissible under bankruptcy law even if the Settlement Agreement and the ensuing unilateral setoff did not exist, however.  The value of the FTB's claims was fixed as of the Petition Date under the plain language of section 502(b) of the Bankruptcy Code.  The FTB may not rely on a law enacted after these cases were

---

[4] As discussed below, the assessment and collection of the LCUP for the other two years comprising the Disputed Amount (2004 and 2005) arguably falls within one of the four exceptions to the Settlement, such that the FTB did not clearly waive the right to demand payment of such penalties under the terms of the Settlement Agreement. Regardless of whether the FTB waived the LCUP with respect to those two years, however, it remains the case that the FTB cannot assess and collect a tax penalty enacted postpetition for prepetition tax years, nor does the FTB have the right to offset that amount from monies owed to a Debtor without leave of this Court.

4

commenced to enhance the value of its claims against the Debtors retroactively. Accordingly, as a matter purely of bankruptcy law, the FTB may neither assess nor recover *any* of the purported LCUP, and the FTB should be directed to remit to the Debtors the full Disputed Amount.

9.      The Debtors have attempted to address these matters consensually with the FTB. The FTB has maintained in response that the Debtors are obligated to pay the LCUP and that the FTB was entitled to execute the setoff, notwithstanding the fact that (i) payment of the LCUP has no basis in the Bankruptcy Code and (ii) in order to avoid application of the LCUP, the Debtors would have had to violate the Bankruptcy Code and pay disputed tax liabilities, which (a) would have placed millions of dollars belonging to the Debtors' estates into the FTB's hands indefinitely, and (b) would have indisputably been an unauthorized postpetition transfer under section 549 of the Bankruptcy Code. Subsequent negotiations have not resulted in an agreement. Accordingly, the Debtors request the aid of this Court in enforcing the Settlement Agreement, determining that the Debtors have no liability for the retroactive tax-related penalty, and recovering the amounts improperly withheld from their estates.

*California Revenue and Tax Code Section 19138*

10.      Section 19138 of the California Revenue and Tax Code ("Section 19138"), which became effective on January 1, 2009 (shortly after the Petition Date), provides a mechanism by which the State of California penalizes corporate taxpayers that understate their tax liability by over $1 million for any taxable year. See Cal. Rev. & Tax. Code § 19138. A true and correct copy of Section 19138 is attached hereto as Exhibit A. The LCUP applies to corporations for taxable years beginning on or after January 1, 2003, as long as the statute of limitations for such year has not expired. The LCUP is calculated as 20% of the entire amount of the corporate taxpayer's understatement, which is measured by the difference between the tax

liability reported on the taxpayer's original return and the taxpayer's subsequently-determined

tax liability. See id. at § 19138(b).

11.     In order to have avoided the LCUP for tax years prior to its enactment

(i.e., 2003-2007), a taxpayer must have filed an amended tax return on or before May 31, 2009

that reflected the corrected (or projected) tax for the applicable period and paid the tax reflected

on the amended return. Franchise Tax Board Notice 2009-03 at 1 ("For the 2003-2007 taxable

years, a taxpayer can file an amended return and pay the tax shown on the amended return by

May 31, 2009, in order to treat the tax shown on this amended return as tax shown on the

original return for purposes of this penalty."); Cal. Rev. & Tax. Code § 19138(b). To avoid the

imposition of the LCUP, a taxpayer was required to file an amended return and pay the tax

shown on that return on or before May 31, 2009. Franchise Tax Board Notice 2009-03 at 3 ("To

obtain the benefit provided under [California Revenue and Taxation Code] section 19138,

subdivision (b), a taxpayer must pay the tax shown on an amended return on or before May 31,

2009."). The Debtors would therefore have been required to pay the full amount that the FTB

asserted the Debtors might be liable for as corporate income tax liabilities for tax years 2003-

2005, totaling over $8.5 million in the aggregate, to the State nearly four years ago during the

pendency of the Debtors' chapter 11 cases in order to avoid the purported imposition of the

LCUP. See Declaration of Marilyn A. Wethekam In Support of Debtors' Motion for an Order (I)

Enforcing the Terms of the Bankruptcy Court-Approved Settlement Agreement with the

Franchise Tax Board of the State of California, (II) Determining that the Debtors Have No

Liability for Tax-Related Penalty, and (III) Ordering the Return of Funds Setoff in Violation of

the Automatic Stay and Court Order (the "Wethekam Declaration"), attached hereto as Exhibit

B, ¶ 12.

6

### The Court-Approved Settlement Agreement

12.      On November 1, 2011, the Debtors filed the Motion of the Debtors for an Order Pursuant to 11 U.S.C. §§ 363 and 553 and Fed. R. Bankr. P. 9019(a) Authorizing Entry Into and Performance of Obligations Under Settlement Agreement with the Franchise Tax Board of the State of California [Docket No. 10137] (the "Settlement Motion").  On November 18, 2011, the Court entered the Order Pursuant to 11 U.S.C. §§ 363 and 553 and Fed. R. Bankr. P. 9019(a) Authorizing Entry Into and Performance of Obligations Under Settlement Agreement with the Franchise Tax Board of the State of California [Docket No. 10258] (the "Settlement Order").  Among other things, the Settlement Order approved the Settlement Agreement between Tribune and the FTB which, as discussed below, settled the disputed prepetition liability of the Taxpayers for corporate income taxes for the periods ending December 2002 through December 2007 (the "Settled Tax Period") owed to the FTB.  A true and correct copy of the Settlement Agreement is attached hereto as Exhibit C.

13.      The Settlement Agreement was the result of an extensive process which is summarized briefly herein and discussed at greater length in the Settlement Motion.  See Settlement Motion at ¶¶ 6-14.  The Settlement Agreement resolved disputes between the Taxpayers and the FTB concerning corporate income taxes of the Taxpayers that FTB asserted the Taxpayers owed for the Settled Tax Period.  The Taxpayers are members of a unitary group for the purposes of filing a State of California combined unitary franchise (corporate income) tax return.  See Wethekam Declaration ¶ 4.  For the Settled Tax Period, Tribune was the key corporation for the Taxpayers' unitary group, meaning that all relevant notices were issued to

Tribune on behalf of the Taxpayers, and all payments were made by Tribune on behalf of all Taxpayers.[5] Id.

14.    The process began before the Petition Date when the Taxpayers filed timely tax returns as a unitary tax group for the Settled Tax Period. Id. at ¶ 5. After an FTB audit resulted in the assessment of additional taxes, the Taxpayers initiated an appeals process. Id. The Taxpayers worked directly with the FTB's Settlement Bureau (the "Settlement Bureau") in that process. Id. The FTB conducted audits that began in late 2006 and spanned nearly three years, well past the Petition Date and, later, the effective date of Section 19138. Id. The FTB filed proofs of claim in the Taxpayers' chapter 11 cases in June 2009, then filed amended proofs of claim (during the negotiation process) nearly two years later in March 2011. Id. Such amended proofs of claim were asserted against the Debtors in the aggregate amount of $63,485,740.87 (the "California Tax Claims"). Id.

15.    After much discussion and negotiation, the Taxpayers and the Settlement Bureau reached an agreement in principle on December 16, 2010 regarding the approach to determining the amount of corporation taxes the Taxpayers owed the FTB for the Settled Tax Period. Id. at ¶ 6. The Taxpayers continued to provide the FTB with considerable information and documentation over the following months. Id. The Settlement Bureau and the Taxpayers ultimately agreed that the Taxpayers owed $3,245,097 in the aggregate for corporate income taxes for the Settled Tax Period, plus applicable interest (the "Tax Liability"). Id. After the Settlement Bureau and the Taxpayers agreed to the amount of the Tax Liability, the parties

---

[5] While the FTB filed individual claims against the Taxpayers, the Taxpayers form one unitary tax group in California and file a single combined return for the group. As such, the Taxpayers maintain a single account with the FTB and all tax liabilities are assessed against the Taxpayers as a whole, and not on an entity-by-entity basis. See, e.g., Container Corp. of Am. v. Franchise Tax Board, 463 U.S. 159 (1983) (holding that the Franchise Tax Board properly taxed a corporation and its foreign subsidiaries as a single entity under the unitary business method); Wethekam Declaration at ¶ 4.

continued negotiations over the next several months regarding the language of the Settlement Agreement and the application of overpayments held by FTB to offset the agreed-upon Tax Liability.  Id.  The agreement was embodied in the Settlement Agreement.  During these discussions, the FTB at no time asserted that the LCUP might be applicable to the Debtors.  Id. at ¶ 9.

16.     The Settlement Agreement provided that the FTB would set off the Tax Liability against three tax refunds owed by the FTB to the Taxpayers that were being held by the FTB pending resolution of the Taxpayers' liabilities to the FTB.  Id. at ¶ 7; Settlement Agreement ¶ 3.  The amounts held by the FTB related to the Overpayments, which are described in detail in the Settlement Motion.  See Settlement Motion ¶ 15.  The Taxpayers and the FTB agreed that the FTB would refund the remaining Overpayments, plus applicable interest, after the FTB offset the Tax Liability and amended the California Tax Claims.  See Wethekam Declaration ¶ 7.

17.     The Settlement Agreement was a final and complete resolution of all tax liabilities of the Taxpayers for the Settled Tax Period, except for four limited exceptions, including:

(i)     Further adjustments made to Taxpayers' California tax liability, which were not at issue in the Settlement Agreement or included in the settlement amount provided therein, due to any final determination(s) of the Taxpayers' federal tax liability, as defined in Revenue and Taxation Code section 18622;

(ii)    Further adjustments made to Taxpayers' California tax liability, any associated interest, and/or any penalties provided for under Revenue and Taxation Code sections 19164, 19774 or 19777 that relate to any abusive tax avoidance transaction(s), as defined in Revenue and Taxation Code section 19753, subdivision (c);

46429/0001-9207267v1

(iii)    Any penalty provided for in Revenue and Taxation Code section 19772 for a failure to disclose a listed transaction or other reportable transaction; and

(iv)    Any amounts already due and payable by Taxpayers as the date of Tribune's execution of the Settlement Agreement.

See Settlement Agreement ¶ 6; Settlement Motion ¶ 17 n. 11.  At the time the parties entered into the Settlement Agreement, the FTB had already received and audited the Taxpayers' amended tax return for tax year 2003, reflecting certain adjustments made on account of final determinations of the Taxpayers' federal tax liability.[6] See Wethekam Declaration ¶ 8.  The agreed upon Tax Liability relating to the 2003 tax year takes into account the amended tax return for the 2003 tax year, as noted in the Settlement Agreement, and therefore the Taxpayers' tax liability for tax year 2003 was completely resolved by the Settlement Agreement.  See Settlement Agreement, Exhibit C (listing an RAR Adjustment for 2003 tax year as part of the Taxpayers' agreed-upon tax liability for such year); Wethekam Declaration ¶ 8.  For tax years 2004 and 2005, although the FTB had received the Taxpayers' amended tax returns reflecting certain adjustments made on account of final determinations of the Taxpayers' federal tax liability,[7] the FTB had not yet audited such amended tax returns, and thus the resolution of the Taxpayers' liability for tax years 2004 and 2005 under the Settlement Agreement arguably was subject to further adjustments based on the final determination of the Taxpayers' federal tax liability for such years.  See Settlement Agreement, Exhibit C (indicating that RAR Adjustments for 2004 or 2005 tax years were not included as part of the Taxpayers' agreed-upon tax liability for such years); Wethekam Declaration ¶ 8.  Subsequent to the approval of the Settlement Agreement, however, the Taxpayers' tax liability resulting from the amended tax returns for tax

---

[6] The Taxpayers filed an amended tax return for tax year 2003 on February 11, 2010.  See Wethekam Declaration ¶ 8.

[7] The Taxpayers filed amended tax returns for tax years 2004 and 2005 on December 9, 2010.  See Wethekam Declaration ¶ 8.

10

years 2004 and 2005 was satisfied in full by offsetting such liability against the Overpayments. See Wethekam Declaration ¶8.

### The Taxpayers' Penalties Under Section 19138

18.    In mid-2012 (months after the Settlement Agreement was signed and approved by the Court), the FTB informed the Taxpayers and their tax counsel of its position that the Taxpayers had an LCUP in the aggregate amount of $857,702.20 (i.e., the Disputed Amount) related to taxable years 2003, 2004 and 2005 as the result of adjustments to the Taxpayers' liability made on account of federal determinations as reflected in the amended tax returns filed by the Taxpayers. See Wethekam Declaration ¶ 10. The 2003 LCUP is asserted in the amount of $304,821.80, the LCUP for tax year 2004 is asserted in the amount of $290,053.80 (the "2004 LCUP") and the LCUP for 2005 is asserted in the amount of $262,826.60 (the "2005 LCUP"). Id. at ¶ 10, Exhibit 1. The Debtors' tax counsel promptly informed the FTB that (i) the Debtors disputed the asserted LCUP,[8] (ii) even if any of the Debtors were subject to a valid LCUP, because of the Debtors' bankruptcy they could not have complied with, nor could they have been compelled by the FTB to comply with, the procedures put in place by Section 19138 – which became effective only after the Petition Date – nor could they pay the potential tax liabilities for the 2003-2005 tax years during the pendency of the Debtors' chapter 11 cases, and (iii) the Disputed Amount was settled as part of the Settlement Agreement. Id. at ¶ 11.

19.    Despite these facts regarding the Disputed Amount, the FTB insisted that the Disputed Amount must remain as a valid penalty. Id. at ¶ 12. On June 19, 2012, an FTB settlement officer informed the Taxpayers' tax counsel, by e-mail, that the Taxpayers would have had to file an amended return to prevent imposition of the LCUP. Id. The FTB also

---

[8] On June 4, 2012, the Taxpayers' tax counsel sent a letter to an FTB settlement officer disputing on the merits the validity of the LCUP. Id. at ¶ 11.

11

advised the Debtors of its view that in order to prevent imposition of the LCUP, the Debtors would have had to pay the full amount of their potential tax liabilities for 2003-2005 (i.e., over $8.5 million) to the FTB for the FTB's indefinite retention pending resolution of the Taxpayers' tax liabilities for those years. Id. The FTB took this view notwithstanding the presence of the automatic stay and the absence of any authority for the Debtors to make such payment.[9] Id.

20.    On August 7, 2012, Tribune sent a letter to the FTB setting forth the Debtors' position that the FTB miscalculated the Taxpayers' tax liability. Id. at ¶ 13. On August 14, 2012, the FTB informed Tribune that it had reviewed the August 7, 2012 letter and made certain adjustments to the Taxpayers' tax liability, but that the Disputed Amount remained as a penalty it sought to collect from the Taxpayers. Id. On August 22, 2012, Tribune informed the FTB that it continued to disagree that the FTB had any right to collect the Disputed Amount. Id. Tribune further reminded the FTB that it could not have paid the potential tax liabilities (to avoid imposition of the LCUP) as a result of these chapter 11 cases, and, further, because the FTB had stated its intent to offset the Disputed Amount against the amounts payable to Tribune under the Settlement Agreement, Tribune would seek resolution of the dispute before this Court if necessary. Id. The following month, the FTB notified Tribune that it would be sending Tribune offset notices which would provide for the return of the Overpayments to Tribune, including offset of the Disputed Amount, notwithstanding Tribune's position. Id. ¶ 14. On October 23, 2012, the FTB issued a check to Tribune consisting of a refund of the Overpayments, as mandated by the Settlement Agreement, but which refund payment had been improperly reduced by the Disputed Amount, which the FTB has taken as an improper setoff. Id. at ¶ 15. On

---

[9] In subsequent discussions, the FTB took the position that the Taxpayers could have filed an amended return accompanied by an explanation that the Debtors were barred from making the payment in question; however, the FTB pointedly did not state that such a course of action would have prevented its attempts to impose the LCUP. Id.

46429/0001-9207267v1

November 7, 2012, the FTB withdrew each of its remaining claims in the Debtors' chapter 11 cases [Docket No. 12700].

## RELIEF REQUESTED

21.     By this Motion, the Debtors respectfully request that the Court enter an order (i) providing that the Taxpayers are not liable to the FTB for the Disputed Amount, and (ii) enforcing the terms of the Settlement Agreement, the Settlement Order, and the applicable provisions of the Bankruptcy Code by ordering that the FTB immediately return the Disputed Amount to Tribune.[10]

## BASIS FOR RELIEF REQUESTED

### *Jurisdiction to Resolve Dispute Over Tax Liability and to Enforce the Settlement Agreement and Settlement Order*

22.     As a threshold matter, this Court has jurisdiction over this dispute because, among other things, (i) the FTB filed claims against various of the Debtors in their chapter 11 cases, (ii) the dispute involves the FTB's retention of a significant amount of property of Tribune's estate in violation of the automatic stay and contrary to an order of this Court, and (iii) the LCUP is barred under the plain language of section 502 of the Bankruptcy Code, regardless of any contrary provisions of California law.  In addition, both this Court's order approving the Settlement Agreement and the Plan make clear that this Court retains jurisdiction over the Settlement Agreement and, more broadly, over the allowance and resolution of claims against the Debtors' estates, any matters concerning state taxes, the enforcement of all orders entered in connection with the Debtors' chapter 11 cases, and all matters relating to property of the Debtors' estates.

---

[10] The Debtors reserve their right to seek alternative, additional and/or further relief, including, but not limited sanctions and/or the recovery of the fees and expenses expended by the Debtors and their professionals in moving to enforce the Settlement Agreement and Settlement Order.

23.     As discussed herein, the FTB filed numerous proofs of claim against the Taxpayers totaling over $60 million. By filing these proofs of claim, the FTB submitted to this Court's jurisdiction.  See, e.g., In re PRS Ins. Grp., Inc., 331 B.R. 580, 586 (Bankr. D. Del. 2005) ("[w]hen a creditor files a proof of claim, it subjects itself to the jurisdiction of the Bankruptcy Court to hear all matters related to the allowance of that claim"); In re Charter Oak Assocs., 361 F.3d 760, 769 (2d Cir. 2004) ("once a state has voluntarily submitted itself to the court's jurisdiction by filing a proof of claim with a view to reaping financial benefit, there is no longer any danger that the state will be subjected to the 'indignity' of being haled into court.").

24.     Further, this Court has jurisdiction over the present dispute because the dispute directly involves property of Tribune's estate.  By offsetting the Disputed Amount against the Overpayments, the FTB has unilaterally exercised dominion over property of Tribune's estate, over which this Court unquestionably has jurisdiction.[11]  See In re Indianapolis Downs, LLC, 462 B.R. 104, 111-112 (Bankr. D. Del. 2011) ("The Court's power to "adjudicate issues" involving property of the estate stems from its in rem jurisdiction over the bankruptcy estate…Jurisdiction in rem encompasses 'a court's power to adjudicate the rights to a given piece of property.'"); In re RNI Wind Down Corp., 2010 U.S. App. LEXIS 207, *5 (3d Cir. Jan. 5, 2010) ("We find that the bankruptcy court had subject matter jurisdiction pursuant to 28 U.S.C. § 1334 which provides that Bankruptcy Court with jurisdiction over all property of the debtor's estate.").

---

[11] In negotiations with the Debtors, the FTB argued that the Bankruptcy Court would not have jurisdiction over this dispute post-confirmation, citing In re Ray, 624 F.3d 1124 (9th Cir. 2010).  In Ray, the 9th Circuit determined that the bankruptcy court did not have jurisdiction over a contract dispute because (i) it did not arise under Title 11, (ii) the bankruptcy court did not retain "related to" jurisdiction for the breach of contract action, and (iii) ancillary jurisdiction was not present given that the dispute arose after the bankruptcy case had closed and the debtors' creditors were paid.  That case is entirely distinguishable, however, because here the Debtors' chapter 11 cases have not yet been closed, the Bankruptcy Court specifically retained jurisdiction over tax disputes in the confirmed Plan, the dispute involves property of Tribune's bankruptcy estate, and the Bankruptcy Code expressly provides for the Bankruptcy Court's jurisdiction to adjudicate a debtor's tax liability.

25.    In addition, the Debtors request herein a determination by the Bankruptcy Court pursuant to section 505 of the Bankruptcy Code as to whether the LCUP may be properly assessed against and collected from the Debtors under section 502 of the Bankruptcy Code. Section 505 of the Bankruptcy Code expressly grants the Bankruptcy Court independent jurisdiction to determine the Debtors' tax liability.  See 11 U.S.C. § 505 ("Except as provided in paragraph (2) of this subsection, the court may determine the amount or legality of any tax, any fine or penalty relating to a tax, or any addition to tax, whether or not previously assessed, whether or not paid, and whether or not contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction"); see also Indianapolis Downs, 462 B.R. at 108-109 (finding that the Bankruptcy Court had jurisdiction over a dispute regarding the interpretation and application of a state tax statute, declining to abstain from hearing such dispute, and ultimately ruling that the debtor was not liable for the disputed tax amount); Ogle v. IRS (In re Agway, Inc.), 2011 WL 3425507 at *4 (N.D.N.Y. Aug. 5, 2011) (holding that the bankruptcy court had jurisdiction pursuant to section 505 of the Bankruptcy Code to determine the debtor's tax liability following confirmation of the debtor's plan).  As noted in Indianapolis Downs, "the Third Circuit has consistently interpreted § 505(a) as a jurisdictional statute that confers on the bankruptcy court authority to determine certain tax claims." 462 B.R. at 111 (citing cases).  This matter also directly involves the interpretation of section 502(b) of the Bankruptcy Code, a matter which this Court is indisputably best equipped to address.

26.    Finally, the Bankruptcy Court retained jurisdiction to enforce the Settlement Order.  The Settlement Order itself provides that "this Court shall retain jurisdiction to hear any and all disputes arising out of the implementation of this Order."  Settlement Order p. 2.  Furthermore, established precedent provides that this Court retains jurisdiction to enforce the

15

Settlement Order.  It is "axiomatic that a court possesses the inherent authority to enforce its own

orders."  In re Continental Airlines, Inc., 236 B.R. 318, 325 (Bankr. D. Del. 1999), aff'd, 2000

WL 1425751 (D. Del. Sept. 12, 2000), aff'd, 279 F.3d. 226 (3d Cir. 2002); see also Travelers

Indem. Co. v. Bailey, 129 S. Ct. 2195, 2205 (2009) ("[t]he Bankruptcy Court plainly had

jurisdiction to interpret and enforce its own prior orders.").[12]   Moreover, Article XII of the Plan

and Article IX.A. of the Confirmation Order explicitly provide that the Court retains exclusive

jurisdiction over all matters arising out of, or related to, the chapter 11 cases.  See Plan § 12.1;

Confirmation Order § IX.A.  Finally, the Plan specifically provides that this Court retains

exclusive jurisdiction to "enforce all orders . . . entered in connection with the chapter 11 cases"

and "hear and determine matters concerning state, local and federal taxes in accordance with

sections 346, 505 and 1146 of the Bankruptcy Code." Plan §§ 12.1.12, 12.1.15.

### Analysis

27.    There are three overarching reasons why the Taxpayers are not liable for

the Disputed Amount and why the Court should direct the FTB to  remit such amount

immediately to Tribune.  First, the FTB's retention of the 2003 LCUP is in clear violation of the

Settlement Agreement and this Court's order approving the Settlement Agreement.  Second, as a

matter of bankruptcy law, the FTB is not entitled to any portion of the Disputed Amount because

the amount of the FTB's claims was fixed as of the Petition Date and cannot be enhanced by a

statute that only became effective postpetition.  Finally, the LCUP may not validly be assessed

against the Debtors because the only way for the Debtors even arguably to avoid its application

---

[12] In addition, the relief sought herein is jurisdictionally and procedurally proper under section 105(a) of the Bankruptcy Code, which provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). As this Court recently stated, under section 105(a), it "may take any action or make any determination necessary or appropriate to enforce or implement court orders." WCI Cmtys., Inc. v. Espinal (In re WCI Cmtys., Inc.), 2012 Bankr. LEXIS 2511, *28 (Bankr. D. Del. June 1, 2012) (citation omitted).

46429/0001-9207267v1

was to violate the Bankruptcy Code by making a substantial, unauthorized transfer of estate property to the FTB for an indefinite period on account of an obligation the Debtors do not owe as a matter of bankruptcy law.

### The Retention and Offset of the 2003 LCUP Violate the Settlement Agreement and Settlement Order

28.     The Settlement Agreement provides, in relevant part:

> Except as expressly set forth herein, the settlement of Taxpayers' California tax liability set forth herein shall be **final and conclusive with respect to all tax, penalties,** if any, interest or other additions to or refunds of Taxpayers' California tax liability for the taxable years in issue.  The parties agree that, except [for the four exceptions] set forth in Paragraph 6 [of the Settlement Agreement], **neither party will raise or attempt to raise**, by way of Notice(s) of Proposed Assessment, claim(s) for refund, **offset**, and/or interest abatement, **any further adjustment to Taxpayers' liability for taxes, penalties, additions to tax and/or interest, for the taxable years in issue.**

Settlement Agreement ¶ 5 (emphasis added).  Three of the four exceptions to the final and complete resolution provided by the Settlement Agreement have no relation to Section 19138 or the LCUP, as they pertain specifically to (i) abusive tax avoidance transactions, (ii) penalties for failure to disclose listed or reportable transactions, and (iii) amounts already due and payable by Taxpayers as of the date of execution of the Settlement Agreement, none of which circumstances are present here.  See Settlement Agreement ¶ 6.  The remaining exception (adjustments resulting from final federal determinations) does not permit the imposition of the 2003 LCUP because at the time the Settlement Agreement was executed and approved by this Court, the FTB had already audited the Taxpayers' amended returns relating to final federal determinations for tax year 2003 and therefore the Settlement Agreement finally and conclusively resolved the Taxpayers' liability for the 2003 tax year.[13]

---

[13] The assessment of the 2004 LCUP and 2005 LCUP arguably falls within the first exception to the Settlement Agreement as further adjustments to the Taxpayers' tax obligations for the 2004 and 2005 tax years based on final federal determinations were not part of the Settlement Agreement because the FTB had not audited the Taxpayers'

29.     The FTB's setoff of the 2003 LCUP against the Overpayments refunded to Tribune was a blatant violation of the above-quoted provisions of the Settlement Agreement. Assessment of the 2003 LCUP against the Taxpayers and retention of $304,821.80 on account of the 2003 LCUP are, on their face, actions by the FTB to adjust the Taxpayers' liability for "taxes, penalties [and] additions to tax . . . for the taxable years" in issue in the Settlement Agreement.  The Settlement Agreement indisputably settled the entirety of the Taxpayers' tax liability to the FTB for the Settled Tax Period, subject only to the four exceptions that are not applicable with respect to the 2003 tax year.[14]

30.     In addition, the FTB's setoff of the full Disputed Amount against the Overpayments blatantly violates both the Settlement Order and sections 362 and 553 of the Bankruptcy Code.  The Settlement Order provides that the FTB is "authorized to offset the Tax Liability against the Overpayments held by FTB in accordance with the Settlement Agreement." The "Tax Liability" is defined in the Settlement Motion as "the amount of $3,245,097, plus interest for periods prior to the Petition Date."  Settlement Motion at ¶ 15.  Nothing in the Settlement Order authorizes the FTB to setoff additional amounts that it may deem that it is owed in its sole discretion.[15]  As a result, the FTB's setoff and retention of the Disputed Amount

---

amended returns at the time of the Settlement Agreement.  Nevertheless, for the reasons explained below, the 2004 LCUP and 2005 LCUP are not valid claims against the Debtors under the Bankruptcy Code and the FTB had no authority to unilaterally offset the disputed 2004 LCUP and 2005 LCUP against amounts indisputably owed to the Taxpayers.

[14] The timing of the Settlement Agreement and Settlement Motion are also notable.  Section 19138 became effective on January 1, 2009, nearly three years before the Settlement Motion was filed.  Between such dates, the FTB filed proofs of claim, then filed amended proofs of claim, and audited certain of the Taxpayers' amended returns reflecting a prior understatement of tax liability.  If the FTB had any intention of preserving any remedies under Section 19138 or of assessing an LCUP against the Debtors, particularly with respect to the 2003 LCUP, it had ample opportunity to say so in its proofs of claim and then make that clear in the Settlement Agreement.  In neither case did the FTB say anything.  Instead, the FTB waited more than six (6) months after entry of an order approving the Settlement Agreement to raise the issue of the LCUP for the first time.

[15] The Settlement Agreement states at paragraph 2 thereof that "applicable interest and penalties, if any, will accrue on the amount stated in paragraph 1 herein in accordance with the provisions of the Revenue and Taxation Code." Even assuming for sake of argument that the LCUP was a properly-assessed "applicable penalty" (which it is not,

46429/0001-9207267v1

is outside the scope of the Settlement Order, and is a direct violation of that order and section 362(a)(7) of the Bankruptcy Code, which bars "the setoff of any debt owing to the debtor that arose prior to the commencement of the [bankruptcy] case…against any claim against the debtor" absent, of course, approval of the Bankruptcy Court.

<u>The FTB Cannot Utilize a Law Enacted Postpetition to Increase the Taxpayers' Prepetition Tax Liabilities</u>

31.    Even if it were assumed that the FTB's withholding and setoff of the Disputed Amount was permissible under the Settlement Agreement and Settlement Order, it is not permissible under section 502(b) of the Bankruptcy Code, because it is an attempt to collect a postpetition penalty on a prepetition tax obligation, and because the FTB's right to payment on account of the LCUP was non-existent as of the Petition Date, when its claim was fixed as a matter of bankruptcy law.  Specifically, under section 502(b) of the Bankruptcy Code, the bankruptcy court "shall determine the amount of [a] claim in lawful currency of the United States *as of the date of the filing of the petition*…" 11 U.S.C. § 502(b) (emphasis added).

32.    By operation of bankruptcy law, the FTB's rights to payment from the Taxpayers were thus fixed as of December 8, 2008.  The Disputed Amount, however, has its basis solely in Section 19138 of the California Taxation and Revenue Code, which became effective on January 1, 2009 – three weeks after the Petition Date.  The FTB cannot increase the Taxpayers' prepetition liability to the State based on a postpetition law; instead, the FTB, like the Debtors, must take the law as it was in effect on the Petition Date.  The fact that a new retroactive penalty was purported to be imposed on the Debtors after their bankruptcy petitions

---

for reasons detailed in this Motion), nothing in the Settlement Order authorized the unilateral setoff and retention of the Disputed Amount by the FTB.

were filed cannot increase the FTB's claims against the Taxpayers beyond what they were on the Petition Date.

          33.      Even if Section 19138 had been in effect prior to the Petition Date, the Debtors would still not be liable for the Disputed Amount.  It is black-letter bankruptcy law that "a debtor's estate is ordinarily not liable for interest and penalties which accrue postpetition on a prepetition tax claim." In re Mike Rose Oil Co., L.P., 1991 WL 110209, *4 (Bankr. W.D. Tenn.) (citing In re Boston and Maine Corp., 719 F.2d 493, 496 (1st Cir. 1983); In re Snyder Farms, Inc., 83 B.R. 977, 988 (Bankr. N.D. Ind. 1988) and additional cases).  Put simply, a debtor's estate should not be penalized for not making payments that it cannot make as a result of the Bankruptcy Code's bar on such payments.  The Disputed Amount is comparable in this instance to postpetition interest on a prepetition tax liability, which is expressly disallowed by operation of section 502(b)(2) of the Bankruptcy Code. See 11 U.S.C. § 502(b)(2) (allowing claims in the amount thereof on the petition date, except to the extent that, among other things, "such claim is for unmatured interest"); 4 Lawrence P. King, Collier on Bankruptcy ¶ 502.03(3)(a) (15th ed. 1996) (§ 502(b)(2) suspends "the accrual of interest on claims as of the date of the filing of the petition.").  Here, the LCUP is an attempt by the FTB to impose postpetition obligations against the Taxpayers solely on account of their prepetition obligations.  No rule of policy or logic permits the FTB to do so, particularly in the face of express language of the Bankruptcy Code to the contrary.[16]

---

[16] There is certainly no basis on which to treat a postpetition penalty on account of prepetition tax liabilities more favorably than postpetition interest on such liabilities, given the general disfavor for penalties in bankruptcy.  See In re Klefstad, 92 B.R. 622, 625 (Bankr. W.D. Wis. 1988) ("[p]enalties are not in harmony with the overall philosophy of the Bankruptcy Code which is to effectuate a fair and equitable distribution of the assets of the estate to creditors. A penalty is discordant with this philosophy because it serves the function of preferring one creditor at a detriment to other creditors of the estate."); see also id. at 626 ("penalties assessed on tax deficiencies are punitive and the taxing entity must show otherwise in order to rebut this presumption.  When a taxing entity assesses penalties and interest it is unlikely that a compensatory role is provided by both the penalty and the interest.") (internal citations omitted); In re Patco Photo Corp., 82 B.R. 192, 196 (Bankr. E.D.N.Y. 1988) ("It is common to view fines and

<u>Compliance with Section 19138 Would Have Been a Violation of the Bankruptcy
Code</u>

34.      The FTB's response to all of the foregoing has been to assert that the

Taxpayers could only have avoided application of the LCUP by paying millions of dollars to the

FTB in 2009 in violation of the Bankruptcy Code.  Specifically, in discussions with the

Taxpayers' tax counsel in early July 2012, the FTB maintained that the Taxpayers are liable for

the Disputed Amount because the Debtors did not file amended tax returns and pay the full

amount in dispute for their 2003-2005 tax liabilities by May 31, 2009.  The FTB notably did not

take this view until long after the passing of such date, the date for making the payment the FTB

asserts was necessary for avoiding the LCUP (and, indeed, after the Settlement Agreement was

entered into and approved).

35.      The FTB is wrong, both as a matter of law and as a matter of policy.  As a

matter of law, the FTB was barred from compelling such payments by the automatic stay, and

the Debtors could not make such a payment under section 549 of the Bankruptcy Code, which

bars postpetition transfers of estate property absent authorization therefor under the Bankruptcy

Code or by the Court.  <u>See</u> 11 U.S.C. § 549(a).  These requirements of federal bankruptcy law

indisputably trump any contrary provisions of state law.  <u>See, e.g.</u>, <u>BFP v. Resolution Trust

Corp.</u>, 511 U.S. 531, 545 (1994) (operation of the Bankruptcy Code is "unimpeded by contrary

state law" where the "meaning of the Bankruptcy Code's text is itself clear"); <u>In re Mankin</u>, 823

F.2d 1296, 1308 (9th Cir. 1987) ("Congress can, and often has, exercised its bankruptcy power to

modify, or even abrogate, creditors' rights in the independent federal interest of providing an

equitable restructuring or liquidation of a bankrupt's estate.").  As a result, the FTB's demand

that the Taxpayers make a multi-million dollar payment or face the imposition of a new penalty

---

penalties assessed on tax deficiencies with a presumption they are punitive and the governmental unit needs to show
otherwise to rebut the presumption.").

21

created postpetition on their prepetition tax liabilities was pre-empted by the conflicting requirements of the Bankruptcy Code, and hence the penalty for the Disputed Amount may not be imposed.  Moreover, the absurdity of the FTB's position in making such a demand is highlighted by the fact that the FTB's proofs of claim in the Debtors' chapter 11 cases were not even filed until June 5, 2009.  See Claim Nos. 3550-3577.  In other words, the FTB did not prepare and file its claims until roughly a week after the FTB asserts the Debtors had an obligation not only to know what the FTB's claims were, but to have made full payment to the FTB on account of them.

36.     The FTB's position also makes no sense as a matter of bankruptcy policy. The FTB asserts that it was entitled to take control over millions of dollars of the estates' cash on account of its prepetition claims in contravention of the Bankruptcy Code and without leave of this Court.  Placing substantial estate assets into the hands of a creditor and outside the debtor's possession, for indefinite retention by that creditor, in order to avoid that creditor's imposition of penalties upon the debtor undermines the very point of the Bankruptcy Code – the collective resolution and distribution of the estate's assets.  If the FTB's position were correct, every debtor would face a catch-22: retain its assets and risk penalties later, or transfer substantial amounts of an estate's value to a creditor that may be necessary for the operation of the debtor's business or maintenance of its estate.  Bankruptcy law and policy resolve that issue by providing that debtors and creditors should abide by the Bankruptcy Code's distribution scheme, and supplanting any contrary state law.  That result should be followed here.

37.     The FTB's position further contradicts bankruptcy policy, as allowing a creditor to take possession of a debtor's assets during the pendency of a chapter 11 case on account of a prepetition claim would enable such a creditor to convert its prepetition unsecured

claim to a secured claim by way of setoff in violation of the automatic stay.  Allowing a law that

becomes effective only after the Petition Date to permit a taxing authority to take possession of a

debtor's assets in order to give that taxing authority security for its claim, or face a penalty if the

debtor does not do so, is precisely the sort of behavior that undermines the Bankruptcy Code's

collective distribution mechanisms.  Moreover, such a result clearly violates the Bankruptcy

Code and its underlying policy because creditors are not permitted to enhance their position vis-

à-vis other creditors after the petition date.

<u>The Debtors are Entitled to Receive the Disputed Amount from California</u>

38.    The foregoing discussion demonstrates that the Debtors were not liable for

the Disputed Amount and that, notwithstanding that absence of liability, the FTB engaged in

unauthorized self-help by withholding and purporting to set off the Disputed Amount.  Those

actions are void <u>ab</u> <u>initio</u> under Third Circuit law as actions taken in violation of the automatic

stay.  <u>See, e.g.</u>, <u>Raymark Indus., Inc. v. Lai</u>, 973 F.2d 1125, 1132 (3d Cir. 1992) (vacating a

judgment of the California Court of Appeals obtained in violation of the automatic stay).  To

avoid giving effect to those void actions, and to enforce the Settlement Agreement, Settlement

Order, and the requirements of the Bankruptcy Code, the Court should order the FTB to pay the

Disputed Amount to Tribune immediately upon entry of the order granting this Motion.

<b><u>RESERVATION OF RIGHTS</u></b>

39.    The basis for the relief requested in this Motion is limited to arguments

that the assessment of the LCUP and the setoff against the Overpayments violate the Settlement

Agreement approved by this Court and the provisions of the Bankruptcy Code.  This Motion is

not a waiver of any arguments or rights the Debtors may have related to the merits of the

assessment and collection of the LCUP under the California Revenue and Tax Code.  In the

23

event the relief requested herein is not granted, the Debtors reserve all rights to contest the validity of the LCUP under the California Revenue and Tax Code.

## **NOTICE**

40.    Notice of this Motion has been provided to:  (i) the U.S. Trustee; (ii) counsel to the FTB; and (iii) all parties having requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

WHEREFORE, the Debtors respectfully request that the Court enter an order (i) enforcing the terms of the Settlement Agreement, (ii) determining that the Taxpayers are not liable for the LCUP, (iii) ordering the immediate payment of the Disputed Amount to Tribune, and (iv) granting such other and further relief as the Court may deem just and proper.

Dated: Wilmington, Delaware
       January 25, 2013

Respectfully submitted,

SIDLEY AUSTIN LLP
James F. Conlan
Bryan Krakauer
Kenneth P. Kansa
Allison Ross Stromberg
One South Dearborn Street
Chicago, IL 60603
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036

-and-

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.

By: _____
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone:  (302) 652-3131
Facsimile:  (302) 652-3117

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

46429/0001-9207267v1