IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 08-13141 (KJC) |
| TRIBUNE COMPANY, *et al.*,[1] | |
| | (Jointly Administered) |
| Debtors. | **Hearing Date:  TBD** |
| | **Objection Deadline:February 27, 2013 at 4:00 p.m.** |

**APPLICATION OF THE WASHINGTON-BALTIMORE
NEWSPAPER GUILD PURSUANT TO 11 U.S.C. § 503(b)(3)(D) and (b)(4) FOR
ALLOWANCE OF ADMINISTRATIVE EXPENSES INCURRED IN MAKING A
SUBSTANTIAL CONTRIBUTION IN CONNECTION WITH ITS OBJECTION TO THE
DEBTORS' MOTION TO IMPLEMENT A 2009 MANAGEMENT INCENTIVE PLAN
AND TO PAY EARNED 2008 MANAGEMENT
INCENTIVE PLAN AWARDS TO CERTAIN EXECUTIVES**

The Washington-Baltimore Newspaper Guild ("WBNG"), by and through undersigned counsel, hereby respectfully submits this application (the "Application") for entry of an Order pursuant to Sections 503(b)(3)(D) and (b)(4) of Title 11 of the United States Code (the "Bankruptcy Code"), and Rule 2016 of the Federal Rules of Bankruptcy Procedure and Rule 2016-2 of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Delaware Local Rules") for allowance and compensation for professional services rendered and for reimbursement of allowable expenses incurred in connection with the WBNG's objections to the Motion of the Debtors for an Order Authorizing the Debtors to Implement a 2009 Management Incentive Plan and to Pay Earned 2008 Management Incentive Plan Awards to Certain Executives (the "Bonus Motion").

In support hereof, the WBNG incorporates the pleadings filed in opposition to the Bonus Motion, as well as the transcripts from the hearings in this Court on September 25, 2009 [D.I.

---

[1] The Debtors in these Chapter 11 cases are identified at D.I. No. 1800, pg.1, footnote 1.

No. 2346], January 27, 2010 [D.I. No. 3328], and March 23, 2010[2] and respectfully states as follows:

## Preliminary Statement

In 2009, the Debtors sought Court approval of an all-cash bonus plan which would have paid $66.8 million in cash bonuses to 720 of the Debtors' top management ($23,440,000 to the top ten executives alone) for the Debtors' performance in 2009, a year that would turn out to be one of the worst-performing years of their history. Only the WBNG and the Office of the United States Trustee opposed this extraordinary relief.

Through the extensive work and analysis of the WBNG, its attorneys and professionals, the WBNG exposed crucial errors and omissions underpinning the evidence the Debtors' used to purportedly justify their record-breaking compensation plan.[3]  The objection of the WBNG was not an attack on Tribune management or its efforts during difficult economic times, but a challenge to the particular bonus program presented to this Court for approval under the

---

[2] The WBNG hereby incorporates by reference the Objection of Washington-Baltimore Newspaper Guild to (1) the Motion of the Debtors for an Order Authorizing the Debtors to Implement a 2009 Management Incentive Plan and to Pay Earned 2008 Management Incentive Plan Awards to Certain Executives and (2) the Motion of the Debtors to File Under Seal an Exhibit to Motion of the Debtors for an Order Authorizing the Debtors to Implement a 2009 Management Incentive Plan and to Pay Earned 2008 Management Incentive Plan Awards to Certain Executives and Motion to Continue the August 11, 2009 Hearing [D.I. No. 1889], Motion of Washington-Baltimore Newspaper Guild to Exclude the Report of Mercer (U.S.) and the Testimony of Debtors' Expert Witness in Support of the Debtors' 2009 Incentive Program [D.I. No. 2109], Supplemental Objection of the Washington-Baltimore Newspaper Guild to the Motion of the Debtors for an Order Authorizing the Debtors to Implement a 2009 Management Incentive Plan and to Pay Earned 2008 Management Incentive Plan Awards to Certain Executives [D.I. No. 2110], the testimony from the hearing on September 25, 2009, and the exhibits moved into evidence at the hearing.

[3] The WBNG did not object to the 2008 MIP, nor did it object to the proposed payment of the 2008 MIP for the Debtors' top 10 officers.

Bankruptcy Code.[4]  For instance, from evidence obtained by the WBNG in discovery, the WBNG was able to show that comparative analysis the Debtors' used to attempt to justify record 2009 bonuses was based on low benchmarks (by historical comparison), unfounded peer comparisons, and on hypothetical *projections* by the Debtors' compensation expert that proved false when compared to actual compensation plans adopted by the Debtors' peers in 2009.

Following a publicly fought, heavily contested hearing on the Debtors' Bonus Motion, the Court ultimately declined to approve two of the three components of the Debtors' Bonus Motion, including a proposal to pay cash bonuses totaling $21.2 million to the Debtors' top ten executives.  The WBNG respectfully submits that, but for its aggressive investigation and scrutiny of the evidence submitted by the Debtors, the Debtors' otherwise -- except for the U.S. Trustee -- unopposed Bonus Motion might well have been approved in full.  Under the terms of the 2009 Bonus Motion, this would have cost the Debtors' estates $21.2 million.  Additionally, if these bonuses had been approved in 2009, the Debtors would have undoubtedly sought to implement similar TMIP and KOB plans for 2010, 2011 and 2012, costing the estates millions and millions more.

As this Court observed, the Guild raised "principled objections" to the Bonus Motion.[5] The WBNG incurred significant expense of attorneys and financial analysts reviewing the data

---

[4] At the hearing, counsel for the Committee stated: "I'll also mention just in closing, as I have in the past, the [WBNG] is and remains a very valued member of the Creditors Committee. Nothing that's happening here today by way of this disagreement is anything other than I think is a good faith disagreement between reasonable minds that sometimes differ."  September 25, 2009 Hearing Tr. 236.

[5] September 25, 2009 Hearing Tr. 13.  At a later hearing, where the Debtors sought approval to withdraw the Bonus Motion, the Court acknowledged the WBNG's efforts in opposition to the Bonus Motion, noted that the WBNG had expended significant resources to challenge the Bonus Motion, and accepted the Debtors' concession that the record established in opposition to the Bonus Motion would be accepted in opposition to any such future relief sought by the Debtors (which never happened).  Finally, without reaching any conclusions, the Court recognized that

and reports submitted by the Debtors in support of the Bonus Motion, with full belief that it was providing a substantial benefit to the estate. In a short period of time, the WBNG reviewed thousands of documents, not only of the Debtors, but also of the records of numerous companies the Debtors held out as purported peers, and deposed the two individuals identified as witnesses for the Debtors. The WBNG also defended the deposition of its own expert, prepared the Initial Objection, the Supplemental Objection and a motion in *limine*, as well as appeared for a full-day contested hearing on the Bonus Motion.

The WBNG's efforts transcended self-protection or self-benefit. The WBNG obtained no direct financial gain from its efforts.[6] Instead, the WBNG acted in the interest of all creditors, and its efforts benefitted all creditors of the estate because, as a result of its objection, the estate never paid over 21 million–dollars in cash called for by the Bonus Motion. Moreover, the Debtors never again sought authority to pay similar cash-rich bonuses. As a result, the estate retained millions of dollars in cash, assets the Debtors would have otherwise paid without any direct benefit to the estate.[7] For these reasons, and the reasons set forth herein, the WBNG respectfully requests that the Court approve its application for reimbursement.

## Background

1.    On December 8, 2008 (the "Petition Date"), the above-captioned debtors (the "Debtors") filed petitions for relief under chapter 11 of title 11 of the United States Code (the

---

the WBNG's work might well qualify as a substantial contribution to the estate. (See March 23, 2010 Hearing Tr. 15-16.)

[6] In fact, the WBNG did not object to the Debtors' 2008 MIP bonus. It was, and has always been the WBNG's position that the 2009 bonuses were entirely unfounded based on the facts giving rise to the 2009 plan (including the Debtors' performance, plans of similarly situated companies, the benchmarks in the plan, and the size of the plan).

[7] The benchmarks were set so low, the Debtors actually would have paid out $21.2 million in cash had the Bonus Motion been approved in full.

8

"Bankruptcy Code"). As of the Petition Date, the Debtors employed approximately 15,000 employees. For the year ending December 31, 2008, the Debtors had $789 million in operating cash flow, down 34% from $1.199 billion in 2007.

2.      On July 22, 2009, the Debtors filed the Bonus Motion. By way of the Bonus Motion, the Debtors proposed a management bonus program wherein they sought to spend $66.8 million of estate funds based on 2009 financial targets set by the Debtors (the "2009 Bonus Plan").

3.      The 2009 Bonus Plan consisted of three components: First, the implementation of a manager incentive program (the "MIP") under which the Debtors sought to pay up to $45.6 million in cash bonuses to approximately 720 management employees, including the Debtors' top 10 executives. Second, the Debtors sought to pay, under a program called the "Transition MIP" or TMIP, $10.6 million in cash to 21 employees of Debtors' management team, plus a discretionary $1.3 million for 50 other employees, a total of $11.9 million. Third, the Debtors sought to pay a cash bonus (the "Key Operating Business" or "KOB," and collectively with the MIP and TMIP, the "2009 Bonus Plan") of $9.3 million to just 23 employees. The 2009 Bonus Plan granted compensation exclusively in cash, and contained no present or future equity component. (Id.)

4.      In support of the Bonus Motion, the Debtors relied on a report (the "Mercer Report") prepared by Mercer (U.S.), Inc. ("Mercer"). The Debtors filed the full Mercer Report under seal.

5.      On August 4, 2009, the WBNG filed its initial objection to the Bonus Motion (the "Initial Objection"). The WBNG also objected to the sealed filing by the Debtors of the Mercer Report, which the WBNG believed should have been subject to public scrutiny.

6.      Contemporaneous with the filing of the Initial Objection, the WBNG sought discovery through interrogatories and requests for production served on the Debtors.

7.      The Debtors filed a motion for protective order based on their objections to the WBNG's discovery requests; the WBNG objected to this motion.

8.      On August 13, 2009, this Court entered an Order allowing the Debtors to file the Mercer Report under seal; however the Court granted the WBNG access to the Mercer Report and access to other materials filed in support of the Bonus Motion.

9.      Thereafter, the Debtors produced certain documents to the WBNG. The WBNG also deposed the two witnesses the Debtors intended to call at the hearing to consider the Bonus Motion.

10.     On September 25, 2009, the Court held an evidentiary hearing and heard argument on the Bonus Motion. The Court observed that the parties' submissions were "very complete and extensive," and that the evidentiary presentations were "very helpful" as well. The Court took the matter under advisement.[8]

11.     In January 2010, the Debtors, in contrast to the position they asserted immediately following the September 25, 2009 hearing, requested that the MIP be bifurcated from the TMIP and KOB in order for the Court to rule on the MIP itself. At a January 27, 2010 hearing, this Court approved the MIP.

12.     On March 4, 2010, the Debtors moved to withdraw the remaining portions of the Bonus Motion with regard to both the TMIP and KOB programs. The Motion was approved at a hearing on March 23, 2010.

---

[8] September 25, 2009 Hearing Tr. 9, 237.

A.    **The 2009 Bonus Plan**

13.    The Debtors filed for bankruptcy protection in December 2008.    For the year ending December 31, 2008, the Debtors had $789 million in operating cash flow.  In March 2009, the Debtors filed a motion with the Court seeking to approve a MIP for 2008 (the "2008 MIP").  The 2008 MIP set a bonus pool of $12.2 million, which represented 1.5% of total operating cash flow.  The 2008 MIP excluded the top 10 officers of the Debtors.[9]

14.    For 2009, the Debtors sought authority to pay bonuses to 720 management employees of the Debtors.  In addition to the 2009 MIP, the Debtors' 2009 incentive plan provided for the implementation of two "unique", brand-new, add-on bonus programs:  (1) the TMIP, for "key" executives of the Debtors, and (2) the KOB for "key" business unit leaders of the Debtors.  If approved as proposed, the Debtors top 10 officers would have received bonuses under the 2009 Bonus Plan totaling $23,440,000.  The total cost of the 2009 Bonus Plan would be $66.8 million, provided the Debtors obtained just $424.2 million in operating cash flow ("OCF").[10]

15.    Close scrutiny by the WBNG of other media companies identified by the Debtors as peers of Tribune revealed that bonuses for top executives were not the norm for 2008 and 2009.  For instance, in its 2009 proxy filed with the SEC, Gannett Co., Inc. ("Gannett") stated that its CEO would reduce his annual base salary by 17% beginning November 1, 2008 and

---

[9] The Bonus Motion sought authority to pay 2008 bonuses to the Debtors top 10 officers totaling approximately $3.1 million.

[10] As of June 2009, prior to filing the Bonus Motion, the Debtors reported operating cash flow of $195 million, or 92% of their planned benchmark.  Through August 2009, the Debtors reported operating cash flow of approximately $250 million.  On information and belief, final OCF for 2009 was $494 Million, 233% of the Debtors plan for the year, which would have triggered full payout of the MIP, TMIP and KOB.

continuing through 2009.[11]   Other Gannett executives voluntarily froze salaries for 2009.   In 2009, Lee Enterprises, Incorporated froze NEO salaries, cash incentives, and stock grants due to difficult economic conditions affecting the company, and the publishing industry.   Likewise, in January 2009, The McClatchy Company determined that it would not pay annual cash bonuses in 2009 based on the results from fiscal year 2008 to any executive officers, nor would it pay any bonuses for 2009.

16.     In support of the Bonus Motion and the 2009 Bonus Plan, the Debtors relied on the Mercer Report.  Close scrutiny by the WBNG of the Mercer Report, however, showed that Mercer's designated peer group of Gannett Co.; Thomson-Reuters Corp.; Cc Media Holdings; Cablevision Systems Corp.; Washington Post; New York Times Co.; EW Scripps; McClatchy Co.; Lee Enterprises; and Meredith Corp. did not support the relief sought by the Bonus Motion. In fact, the Debtors' business and proposed bonus plan differed substantially from most of those companies.  In addition to the unreliable formulation of a peer group for the Debtors, the WBNG showed how the companies selected by Mercer were not a representative pool of chapter 11 debtors who filed since the implementation of the BACPA legislation.

17.     Moreover, in support of the TMIP and the KOB, two components that were never approved by this Court, and eventually abandoned by the Debtors, Mercer created a measure it described as the "Market Maximum Medium."   As it turned out, the "Market Maximum Medium" was not based on actual data for the market for 2009, but instead on assumptions reached long before the Bonus Motion was heard by the Court.   Through the efforts of the WBNG, the WBNG was able to show that the actual facts contradicted these assumptions.   At

---

[11] Unless otherwise cited, all factual statements in this paragraph are attributable to exhibits to the Initial Objection [D.I. No. 1889], and Supplemental Objection [D.I. No. 2110].

the hearing to consider the Bonus Motion, the WBNG was able to highlight these deficiencies for the Court and other creditors.

18.    In support of this Application, the WBNG respectfully submits the extensive factual and legal record established in this Court relating to the Bonus Motion,[12] as well as the affidavit of Bill Salganik, member of the WBNG, attached hereto as Exhibit A.

**Relief Requested**

19.    Pursuant to Sections 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code, the WBNG seeks an order allowing as an administrative expense, in making a substantial contribution in these Chapter 11 cases, compensation for professional fees in the amount of $330,504.50, and reimbursement of expenses incurred in the amount of $11,805.53.

20.    The amounts requested consist of the fees and expenses of counsel and experts hired by the WBNG – Cross & Simon, LLC and Zwerdling, Paul, Kahn & Wolly, P.C., as counsel, and EisnerAmper, as financial advisors -- related to the objection to the Bonus Motion, from the period June 1, 2009 (the date the WBNG's counsel began work on the objections to the Bonus Motion) through and including March 23, 2010 (the date the Court approved the Debtors' request to withdraw the Bonus Motion with regard to the TMIP and KOB).    The relevant invoices and time records of are attached hereto as Exhibit B.[13]

**Basis For Requested Relief**

**I.        The WBNG Substantially Contributed To These Cases.**

**A.        The Substantial Contribution Standard.**

21.    Section 503(b)(3)(D) of the Bankruptcy Code permits a court to allow, as an administrative expense, the actual and necessary expenses incurred by a creditor who makes a

---

[12] See FN 2.

[13] The WBNG submits the billing records in the form in accordance with Bankr. Del. LR 2016-2.

substantial contribution to a Chapter 11 case. See 11 U.S.C. § 503(b)(3)(D).  Section 503(b)(4) allows for reimbursement of reasonable compensation for services rendered, and for reimbursement of actual and necessary expenses incurred, by an attorney of any such entity. See 11 U.S.C. § 503(b)(4); Lebron v. Mechem Fin., Inc., 27 F.3d 937, 943 (3d Cir. 1994).  While it is a "well settled rule that [Section 503(b) is] to be narrowly construed," the courts have "wide discretion to determine the amount of expenses awarded under § 503." In re Glickman, Berkowitz, Levinson, & Weiner, P.C., 196 B.R. 291, 294 (Bankr. E.D. Pa. 1996).

22.     "Subsection 503(b)(3)(D) represents an accommodation between the twin objectives of encouraging 'meaningful creditor participation in the reorganization process,' and 'keeping fees and administrative expenses at a minimum so as to preserve as much of the estate as possible for the creditors.'" Lebron, 27 F.3d at 944 (citation omitted).  "Most activities of an interested party that contribute to the estate will also, of course, benefit that party to some degree, and the existence of a self-interest cannot in and of itself preclude reimbursement." Id. "Nevertheless, the purpose of §503(b)(3)(D) is to encourage activities that will benefit the estate as a whole, and in line with the twin objectives of §503(b)(3)(D), 'substantial contribution' should be applied in a manner that excludes reimbursement in connection with activities of creditors and other interested parties which are designed primarily to serve their own interests and which, accordingly, would have been undertaken absent an expectation of reimbursement from the estate." Id.

23.     Courts have adopted a two-pronged analysis for evaluating applications under Section 503(b).  First, courts have determined that the "'applicable test is whether the efforts of the applicant resulted in an actual and demonstrable benefit to the debtor's estate and the creditors.'" In re Tropicana Entertainment LLC, 2012 WL 3776531, *2 (3d Cir. 2012) (citing

14

Lebron, 27 F.3d at 944 (quoting In re Lister, 846 F.2d 55, 57 (10th Cir. 1988)); Glickman, 196

B.R. at 298; In re Essential Therapeutics, Inc., 308 B.R. 170, 174 (Bankr, D. Del. 2004); In re

Geriatrics Nursing Home, Inc., 195 B.R. 34, 37 (Bankr. D.N.J. 1996). Stated otherwise,

compensable services are those "which foster and enhance ... the progress of reorganization."

See Lebron, 27 F.3d at 944.

24.    Second, the benefit must "be more than an incidental one arising from activities

the applicant has pursued in protecting his or her own interests." Lebron, 27 F.3d at 944.

Reimbursement is not permitted for activities of the creditors "which are designed primarily to

serve their own interests and which, accordingly, would have been undertaken absent an

expectation of reimbursement from the estate." Id. However, the "existence of self-interest

cannot in and of itself preclude reimbursement." Id. A creditor "who has engaged legal counsel,

and as such provided legal services which have directly and materially contributed to a

reorganization, and which were not rendered solely on behalf of that creditor's own interest,

should be reimbursed for the cost of the legal services and related expenses incurred."

Glickman, 196 B.R. at 298 (citing In re U.S. Lines, Inc., 101 B.R. 427, 430 (Bankr. S.D.N.Y.

1989)); see also In re Columbia Gas System, Inc., 224 B.R. 540, 548 (Bankr. D. Del. 1998).

25.    Thus, when evaluating whether legal services are eligible for compensation under

Section 503(b), courts have considered whether the services at issue were designed to benefit

other parties interested in the estate. See Lebron, 27 F.3d at 946; In re AM In1'l, Inc., 203 B.R.

898,904-05 (D. Del. 1996); Worldwide, 334 B.R. at 124.

26.    Whether a creditor has made a substantial contribution within the meaning is a

question of fact, "'and it is the bankruptcy court that is in the best position to perform the

necessary fact finding task.'"  In re Tropicana Entertainment LLC, 2012 WL 3776531 at *2

(citing <u>Lebron</u>, 27 F.3d at 946).

**B.**    **The WBNG's Efforts In Opposing the Bonus Motion Satisfy The**
         **Substantial Contribution Standard.**

27.    The WBNG respectfully submits that its efforts in scrutinizing and contesting the

Bonus Motion are precisely those that Section 503(b)(3)(D) and case law thereunder contemplate

as a substantial contribution.

28.    First, the WBNG's actions resulted in an actual and demonstrable benefit to the

Debtors' estates.  By the Bonus Motion, the Debtors sought Court approval of an unprecedented

all-cash bonus plan which would have paid up to $66.8 million in cash bonuses to 720 of the

Debtors' top management; $23,440,000 to the top ten executives alone.  Because of the low

benchmarks set by the Debtors to trigger payouts under the MIP, TMIP and KOB, had the Court

approved the Bonus Motion, all payments proposed in the 2009 Bonus Plan would have been

paid.[14]   Through the extensive work and analysis of the WBNG and its attorneys and

professionals, the WBNG exposed to the Court, and creditors of the Debtors, crucial errors and

omissions underpinning the evidence the Debtors' used to purportedly justify their record-

breaking compensation plan.  In the end, the WBNG's objections saved the estate not less than

$21.2 million in cash, and perhaps, future millions more.  At the March 23, 2010 hearing on the

Debtors request to withdraw the Bonus Motion, this Court, without ruling, observed that the

Guild's costs may qualify for a substantial contribution claim.[15]

29.    Through discovery, the WBNG was able to show that comparative analysis the

Debtors' used to attempt to justify record 2009 bonuses was based on low benchmarks (by

---

[14] The Debtors' final OCF of $494 million (a historical low) was 233% of Plan (the Plan level
was $212 million).  At the "maximum" levels (which the Debtors well exceeded), the TMIP
would have paid executives $11.9 million, and the KOB, $9.3 million.

[15] March 23, 2010 Hearing Tr. 15-16.  The Court also commented: "I'm not unmindful of the
resources devoted to [the challenge] either by the Guild or by the U.S. Trustee." <u>Id.</u> at 21.

historical comparison), unfounded peer comparisons, and on hypothetical *projections* by the Debtors' compensation expert that proved false by actual plans adopted by competitive peer companies in 2009. Following an open, contested hearing on the Debtors' Bonus Motion, the Court ultimately declined to approve two of the three components of the Debtors' Bonus Motion – the TMIP and the KOB. The Debtors later abandoned all their efforts to seek approval of the TMIP and KOB, notwithstanding their initial statement to the Court that all three components of the 2009 Bonus Plan were inextricably linked. The WBNG respectfully submits that, but for its aggressive investigation and scrutiny of the evidence submitted by the Debtors, the Debtors' otherwise unopposed Bonus Motion might well have been approved in full, costing the Debtors' estates millions of dollars.

30.    Without the WBNG's strenuous objection to the Bonus Motion, the Debtors would have faced no opposition to the 2009 Bonus Plan. Moreover, there would have been no open, contested hearing on the Bonus Motion, which exposed publicly to all creditors the actual factual basis – or lack thereof – of the terms of the Bonus Motion. Ultimately, without Court approval of the TMIP and the KOB, the Debtors abandoned their pursuit of both programs for 2009 and all the remaining years of their chapter 11 bankruptcy.

31.    Accordingly, there is a direct causal link between the WBNG's efforts and the value for the estates. Indeed, with the benchmarks set by the Debtors in the 2009 Bonus Plan, had the plan been approved, the Debtors would have parted with $21.2 million in cash.

32.    In McLean Industries, the Bankruptcy Court for the Southern District of New York allowed an application for administrative expenses under section 502(b) for similar efforts on the part of a creditor. See In re McLean Indus., Inc., 88 B.R. 36 (Bankr. S.D.N.Y. 1988). In that case, the applicant objected to the proposed sale of the debtor's assets, believing that the sale's

terms grossly undervalued the debtor's assets and that the purchaser was an insider of the debtor. The Court determined that the objection "called into play the propriety of the transaction which, but for the [applicant's] initial objection, may not have been considered." Id. at 39. Because new purchasers emerged, and the eventually realized more for its assets that the insider originally proposed, the court determined that the applicant had made a substantial contribution as defined in section 503(b)(3). See In re W.G. S.C. Enterprises, 47 B.R. 53 (Bankr.N.D.Ga.1985) (creditor substantially contributed to the reorganization where its objection to confirmation resulted in a modification of the plan from 50% to 100% payout for all unsecured creditors); In re 9085 East Mineral Office Bldg., Ltd., 119 B.R. 246 (Bankr.D.Colo.1990) (substantial contribution was made where creditor's post-petition efforts were designed to increase and did in fact increase the payout to the unsecured creditors compared to debtor's proposed plan).

33.     Moreover, there can be little debate that the efforts of the WBNG benefitted all creditors, and further, that the WBNG's efforts were, in fact, always intended to benefit other creditors. Acting as creditor, the WBNG incurred significant expense (at its risk) exposing critical facts which undermined the basis and justification for the TMIP and KOB, and ultimately saved the estate millions in cash.    That the WBNG's efforts benefitted all creditors is compellingly evidenced by the lack of support by the major creditor constituencies for the TMIP and KOB after the Court's January 27, 2010 ruling. As noted, following its consideration of the discovery record amassed by the WBNG, the Debtors forever abandoned the TMIP and KOB, and never sought to implement similar plans for the duration of the Debtors' chapter 11 cases.

34.     Finally, the WBNG submits that it would not have prosecuted the objection to the 2009 Bonus Motion without an expectation that its fees and expenses would be reimbursable under Section 503. The WBNG undertook its objection to the 2009 Bonus Plan as a creditor

witnessing, what it believed, was an attempted exorbitant expenditure of estate cash given the Debtors' financial condition.  As the Third Circuit stated in <u>Lebron</u>, (and later, <u>Tropicana</u>), "a creditor should be presumed to be acting in his or her own interest unless the court is able to find that his or her actions were designed to benefit others would foreseeably be interested in the estate." <u>Lebron</u>, 27 F.3d at 946.  As a Committee member, the WBNG believed the Committee should object to the Bonus Motion.  When the Committee declined to do so, the WBNG undertook the significant expense reviewing and analyzing the data obtained in discovery, and prosecuting its objection to the Bonus Motion. The WBNG understood at the time it prosecuted its objection to the Bonus Motion that it had no stake in the outcome of the Bonus Motion, other than the benefits a successful objection would have on savings to the estate.  Further, because the WBNG believed that it was acting to benefit the estate, it believed its expenses (like the expenses of the Committee in analyzing, and if it so chose, objecting to the Bonus Motion) would be compensable, provided the Court found that the WBNG's efforts and the evidence it presented constituted a substantial contribution to the estate.  For the reasons set forth herein, the WBNG respectfully submits that it has rebutted any presumption that it acted in self interest, and instead acted for the benefit of all other creditors who were interested in the estate.

## II.    The Professional Costs Incurred by the WBNG Were Reasonable, Necessary, and Beneficial To The Debtors' Estates, and Therefore Should Be Allowed.

35.    Upon the determination that a substantial contribution has been made, the Bankruptcy Code permits the reimbursement of reasonable compensation for services and the actual, necessary expenses accrued and incurred by the contributor's professionals.  <u>See</u> 11 U.S.C. § 503(b)(4); <u>In re Texaco, Inc.</u>, 90 B.R. 622, 627, 630-32 (Bankr. S.D.N.Y. 1988) (court first determines whether creditor made a substantial contribution, then scrutinizes requests for that creditor's attorney's fees under Section 503(b)(4) and the factors governing fee applications

generally); see also In re 9085 E. Mineral Office Bldg., Ltd., 119 B.R. 246, 253 (Bankr. D. Colo. 1990) (once threshold test of a creditor's contribution under Section 503(b)(3)(D) is met, court must then decide "the value to be placed on the administrative claim" under Section 503(b)(4)).

36.     Under Bankruptcy Code Section 503(b)(4), as well as Bankruptcy Code Section 330 (governing professionals' fees generally), the reasonableness of professional charges is measured based on the time, nature, extent and value of the services and whether related expenses are actual and necessary. See 11 U.S.C. §§ 503(b)(4) and 330(a).

37.     The WBNG respectfully submits that it has satisfied the requirements of Sections 503(b)( 4) and 330 of the Bankruptcy Code. The fees and expenses incurred by the WBNG for which reimbursement is sought were on account of services that were necessary for and beneficial to the Debtors' estates. In particular, those services were necessary to adequately prosecute the objection to the Bonus Motion.

38.     As noted, the Bonus Motion was litigated on an expedited and aggressive schedule, with a full-day trial scheduled approximately two months after the Bonus Motion was filed. In order to prepare for trial, the WBNG took and defended approximately 3 depositions over the span of several weeks, reviewed and analyzed thousands of pages of documents, and prepared for the contested hearing. Moreover, during the same time period, counsel for the WBNG prepared extensive pleadings on a number of discovery and evidentiary matters.

39.     The issues implicated in the Bonus Motion were complex, and included, among others, an analysis of the Mercer Report, as well as financial information from numerous companies named in – and excluded from -- the Mercer Report. The WBNG reviewed and analyzed the Debtors' historical and then current operating performance, the circumstances in the Debtors' industry, and the terms and condition of the MIP, TMIP and KOB. Given the work and

20

effort involved, the WBNG respectfully submits that its fees and expenses are reasonable.

## CONCLUSION

WHEREFORE, the Washington-Baltimore Newspaper Guild respectfully requests that this Court issue an order approving its substantial contribution claim in the amount of $358,162.64, or granting other and further relief consistent with this Application.

Dated: February 7, 2013
      Wilmington, Delaware

CROSS & SIMON, LLC

By:_____
Christopher P. Simon (No. 3697)
913 North Market Street, 11th Floor
P.O. Box 1380
Wilmington, Delaware 19899-1380
(302) 777-4200 (Telephone)
(302) 777-4224 (Facsimile)
csimon@crosslaw.com
      -and-

Robert E. Paul, Esquire
Zwerdling, Paul, Kahn & Wolly, P.C.
1025 Connecticut Avenue NW, Suite 712
Washington, D.C. 20036-5420
(202) 857-5000 (Telephone)
(202) 223-8417 (Facsimile)

*Counsel to Washington-Baltimore*
*Newspaper Guild, TNG-CWA*