## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------x
In re:                                :     Chapter 11 Cases
                                      :
TRIBUNE COMPANY, et al.,              :     Case No. 08-13141 (KJC)
                                      :
               Reorganized Debtors. : Jointly Administered
-------------------------------------------------x
```

### COVER SHEET

**MOTION OF LAW DEBENTURE TRUST COMPANY OF NEW YORK PURSUANT TO 11 U.S.C. §§ 503(b)(3)(D), 503(b)(4) AND 503(b)(5) FOR ALLOWANCE AND PAYMENT OF FEES AND EXPENSES INCURRED IN CONNECTION WITH MAKING A SUBSTANTIAL CONTRIBUTION TO THE DEBTORS' CHAPTER 11 CASES FOR THE PERIOD OF MAY 7, 2009 THROUGH AUGUST 31, 2010**

| | |
|---|---|
| Name of Applicant: | Law Debenture Trust Company of New York |
| Authorized to Provide Professional Services to: | N/A |
| Date of Retention: | N/A |
| Period for which compensation and reimbursement is sought: | May 7, 2009 – August 31, 2010 |
| Amount of compensation sought as actual, reasonable, and necessary: | $5,898,188.75 |
| Amount of expense reimbursement sought as actual, reasonable, and necessary: | $208,958.34 |

This is the first and final fee application.  Law Debenture does not seek reimbursement for the preparation of this fee application.

Law Debenture is seeking the reimbursement of the following fees and expenses it incurred and those fees and expenses incurred by the professionals listed below:

**Law Debenture**

| Name of Professional Person | Position Held | Hourly Billing Rate | Total Hours Billed | Total Compensation |
|---|---|---|---|---|
| Jim Heaney | Managing Director | $500/$550 | 24.4 | $13,190.00 |
| Bob Bice | Manager | $575/$550 | .5 | $280.00 |
| **Grand Total** | | | **24.9** | **$13,470.00** |
| **Blended Rate** | | | | **$540.96/hr** |

**Kasowitz, Benson, Torres & Friedman LLP**

| Name of Professional Person | Position Held | Hourly Billing Rate | Total Hours Billed | Total Compensation |
|---|---|---|---|---|
| David Rosner | Partner | $875 | 615.3 | $538,387.50 |
| Richard Casher | Partner | $850 | 129.0 | 4109,650.00 |
| Andrew Glenn | Partner | $800 | 460.1 | $368,080.00 |
| Michael Fay | Partner | $800 | 23.5 | $18,800.00 |
| Sheron Korpus | Partner | $750 | 442.4 | $331,800.00 |
| Michael Rosenbloom | Partner | $675 | 82.5 | $55,687.50 |
| Christine Montenegro | Partner | $525 | 1091.7 | $573,142.50 |
| David Mark | Of Counsel | $750 | 3.0 | $2,250.00 |
| Alan Lungen | Associate | $610 | 4.6 | $2,806.00 |
| Matthew Stein | Associate | $525 | 1477.9 | $775,897.50 |
| Daniel Fliman | Associate | $525 | 198.7 | $104,317.50 |
| James Cain | Associate | $525 | 27.4 | 14,385.00 |

| Name of Professional Person | Position Held | Hourly Billing Rate | Total Hours Billed | Total Compensation |
|---|---|---|---|---|
| Cara Ciuffani | Associate | $450 | 17.2 | $7,740.00 |
| Kevin Hardiman | Associate | $425 | 734.7 | $312,247.50 |
| Paulina Stamatelos | Associate | $395 | 433.8 | $171,351.00 |
| Paul Burgo | Associate | $365 | 779.7 | $284,590.50 |
| Michelle Angell | Associate | $360 | 68.6 | $24,696.00 |
| Michelle Vladimirski | Associate | $360 | 72.9 | $26,244.00 |
| Alana Klein | Associate | $335 | 255.9 | $85,726.50 |
| Nii-Amar Amamoo | Associate | $335 | 894.1 | $299,523.50 |
| Peggy Pan | Associate | $325 | 116.1 | $37,732.50 |
| Julia Balduzzi | Associate | $250 | 97.2 | $24,300.00 |
| Yanina Markova | Associate | $275 | 700.3 | $192,582.50 |
| Thomas Kelly | Associate | $275 | 20.0 | $5,500.00 |
| Menachem Klein | Associate | $235 | 275.7 | $64,789.50 |
| Ross Shank | Staff Attorney | $550 | 10.5 | $5,775.00 |
| Jessica Sutliff | Staff Attorney | $350 | 1003.6 | $351,260.00 |
| Angela Gil | Staff Attorney | $265 | 739.0 | $195,835.00 |
| Abigal Kurtz-Phelan | Paralegal | $165 | 31.3 | $5,164.50 |
| Anitra Lawrence | Paralegal | $165 | 407.0 | $67,155.00 |
| Gabriel Irizarry | Paralegal | $165 | 450.9 | $74,398.50 |
| Michael Birnbaum | Paralegal | $165 | 44.4 | $7,326.00 |
| Noah Plakun | Paralegal | $165 | 37.8 | $6,237.00 |
| Anna Miguel | Paralegal | $165 | 38.8 | $6,402.00 |
| Narinder Uppal | Paralegal | $165 | 15.8 | $2,607.00 |

| Name of Professional Person | Position Held | Hourly Billing Rate | Total Hours Billed | Total Compensation |
|---|---|---|---|---|
| Carolyn Basista | Litigation Support | $200 | 59.1 | $11,820.00 |
| Thomas Albuquerque | Litigation Support | $175 | 64.2 | $11,235.00 |
| Rashaan Russell | Litigation Support | $165 | 71.8 | $11,847.00 |
| Adam Klein | Litigation Support | $160 | 95.8 | $15,328.00 |
| Ewelina Kedzierski | Litigation Support | $135 | 3.0 | $405.00 |
| Joyce Li | Litigation Support | $125 | 168.0 | $21,000.00 |
| Michael Cheung | Litigation Support | $125 | 24.0 | $3,000.00 |
| **Grand Total** | | | **12,302.1** | **5,233,521.00** |
| **Blended Rate** | | | | **$425.42/hr** |

Expenses

| | |
|---|---|
| Official Records Search | $1,989.70 |
| Court Costs | $127.00 |
| Transcripts | $15,077.57 |
| Travel Expenses | $14,748.19 |
| Local Transportation | $14,249.94 |
| Business Meals | $5,071.61 |
| Professional Services | $1,875.00 |
| Automated Legal Research | $59,224.00 |
| Document Reproduction | $61,905.81 |
| Document Delivery | $4,012.79 |
| Long Distance Telephone | $330.29 |
| Facsimile | $8.62 |

| Postage | 28.92 |
|---|---|
| **Total** | **$178,649.44** |

### Bifferato Gentilotti LLC

Fees

| Name of Professional Person | Position Held | Hourly Billing Rate | Total Hours Billed | Total Compensation |
|---|---|---|---|---|
| Garvan F. McDaniel | Partner | $310/$325 | 106.9 | $35,425.00 |
| Robin Grogan | Associate | $275 | 7.5 | $2062.50 |
| Yvonne A. Dalton | Paralegal | $185/$195 | 42.3 | $8,042.50 |
| **Grand Total** | | | **156.7** | **$45,530.00** |
| **Blended Rate** | | | | **$290.56/hr** |

Expenses

| | |
|---|---|
| PACER | $88.16 |
| Filing/Court Fees | $195.00 |
| In-house Copying | $1,361.60 |
| Outside Reproduction/Service | $4,565.54 |
| Postage | $25.21 |
| Transcripts | $398.50 |
| Courier and Express Carriers | $172.34 |
| Court Call | $120.00 |
| **Total** | **$6,926.35** |

**The Michel–Shaked Group**

| Name of Professional Person | Position Held | Hourly Billing Rate | Total Hours Billed | Total Compensation |
|---|---|---|---|---|
| Roberts Brokaw | Senior Expert | $675 | 78.4 | $52,920.00 |
| James Mason | Expert | $600 | 30.55 | $18,330.00 |
| Bradley Orelowitz | Senior Manager | $575 | 24.0 | $13,800.00 |
| David Plastino | Manager | $395 | 420.40 | $166,058.00 |
| Paul D'Arezzo | Manager | $395 | 327.80 | $129,481.00 |
| Mark Marcus | Senior Analyst | $325/$375 | 143.50 | $53,537.50 |
| Anna Cilluffo | Analyst | $275 | 155.30 | $42,707.50 |
| Eric Simas | Analyst | $245/$275 | 289.50 | $79,071.25 |
| Ashley Hartman | Analyst | $245/$225 | 79.0 | $17,875.00 |
| Joshua Solis | Analyst | $245/$225 | 93.1 | $20,971.50 |
| Alice Weng | Analyst | $245/$225 | 37.3 | $8,748.50 |
| Daniel DeMarco | Paraprofessional | $110 | 19.7 | $2,167.00 |
| **Grand Total** | | | **1,698.55** | **$605,667.25** |
| **Blended Rate** | | | | **$356.58/hr** |

Expenses

| | |
|---|---|
| Database Charges | $14,673.20 |
| Travel | $8,104.66 |
| Delivery | $357.32 |
| Other | $247.37 |
| **Total** | **$23,382.55** |

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------x
|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 Cases |
|  | : |  |
| TRIBUNE COMPANY, et al., | : | Case No. 08-13141 (KJC) |
|  | : |  |
| Reorganized Debtors. | : | Jointly Administered |

-------------------------------------------------------x

**MOTION OF LAW DEBENTURE TRUST COMPANY OF NEW YORK
PURSUANT TO 11 U.S.C. §§ 503(b)(3)(D), 503(b)(4) AND 503(b)(5)
FOR ALLOWANCE AND PAYMENT OF FEES AND EXPENSES
INCURRED IN CONNECTION WITH MAKING A SUBSTANTIAL
CONTRIBUTION TO THE DEBTORS' CHAPTER 11 CASES AND GRANTING
WAIVER OF COMPLIANCE WITH DEL. BANKR. L.R. 2016-2(d)(vii)
IN ACCORDANCE WITH DEL. BANKR. L.R. 2016-2(h)**

Law Debenture Trust Company of New York ("Law Debenture"), as successor indenture

trustee under that certain indenture dated March 19, 1996 (the "1996 Indenture") between

Tribune Company ("Tribune," and with its debtor subsidiaries, "Debtors") (successor to The

Times Mirror Company) and Citibank, N.A., by and through its undersigned counsel,

respectfully submit this motion ("Motion") for entry of an order pursuant to Sections

503(b)(3)(D), (b)(4), and (b)(5) of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532

("Bankruptcy Code"), Rule 2016 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy

Rules"), and Rule 2016-2 of the Local Rules for the United States Bankruptcy Court for the

District of Delaware ("Local Rules"), (a) allowing as administrative expenses the fees and

expenses incurred by Law Debenture, including the professional fees and expenses of (i)

Kasowitz, Benson, Torres & Friedman LLP ("KBTF"), as lead counsel to Law Debenture, (ii)

Bifferato Gentilotti LLC ("BG"), as local counsel to Law Debenture, and (iii) The Michel-

Shaked Group ("MSG," and together with KBTF and BG, "Advisors"), as financial advisor to

Law Debenture, in each case, in making a substantial contribution in the chapter 11 cases of the

Debtors (the "Chapter 11 Cases") during the period from May 7, 2009 through and including

August 31, 2010 ("Application Period") in the aggregate amount of $6,107,147.09, and (b)

authorizing and directing the payment thereof.  In support of its Motion, Law Debenture

respectfully states as follows:

**PRELIMINARY STATEMENT**[1]

1.        Law Debenture, as indenture trustee under the 1996 Indenture for 18% of

Tribune's senior notes, plainly made a "substantial contribution" to the Debtors' cases during the

Application Period.  Acting as the primary (and often the sole) driving force behind the

realization of value from the LBO Claims, Law Debenture's efforts augmented the distributions

to Tribune's creditors by over $850 million in the aggregate.  Without Law Debenture's

involvement, the investigation into the LBO and prosecution of the LBO Claims would have

resulted in a settlement of the LBO Claims that would have provided Tribune's creditors with a

mere "sliver of equity" and a tiny fraction of their ultimate recovery.

2.        From the inception of its involvement, Law Debenture played a critical role that

(a) prevented the filing of a plan that significantly undervalued the LBO Claims, (b) ensured that

a full and complete investigation of the LBO was conducted and assisted in those efforts,

(c) convinced the Debtors and the Committee that the LBO Claims had substantial value and any

plan of reorganization had to either provide Tribune's creditors with a significant amount of

consideration to settle and/or preserve such claims, and (d) contributed substantially to the

Examiner's investigation, which this Court relied upon in its 2011 Confirmation Opinion to

determine the reasonableness of the settlement of many of the LBO Claims.  Collectively, these

---

[1]  All capitalized terms used, but not defined, have the meanings ascribed to them below.

actions resulted in a settlement of the LBO Claims that guaranteed an enhanced recovery for all of Tribune's creditors.

3.      Law Debenture's efforts transcended its own parochial interests and the interests of the holders of notes issued under the 1996 Indenture.  Indeed, Law Debenture's efforts for which it seeks reimbursement were purposely intended to benefit – and did benefit – all of Tribune's creditors by substantially augmenting Tribune's distributable value.  These efforts were also undertaken with the belief that Tribune would reimburse Law Debenture for the fees and expenses incurred in its efforts.

4.      Moreover, by providing a voice to Tribune's creditors in favor of maximizing the value of the LBO Claims, Law Debenture's efforts filled a void in the Chapter 11 Cases where (i) the Debtors' abandoned advocacy regarding the LBO Claims in favor of its stated role as "honest broker" between their dueling creditor constituencies and (ii) the Committee was largely peopled by representatives of the Debtors' subsidiaries' entire unsecured creditor base with no interest in the LBO Claims rather than those creditors that would benefit from the prosecution of the LBO Claims.  Although Law Debenture coordinated its efforts with the Debtors, the Committee, and other interested parties in the Chapter 11 Cases where it could, often it needed to proceed on its own to ensure that the LBO investigation was thorough and the value of the LBO Claims was maximized.  In this effort, during the Application Period, Law Debenture often found that it stood alone in advocating to the Debtors, the Committee, and the Court that the resolution of and/or preservation of the LBO Claims was essential to any plan of reorganization.

5.      After considering the extent of Law Debenture's involvement in the Chapter 11 Cases and the enhanced recovery to creditors (particular here, where the interests of the Debtors and the Committee were not consistently aligned with Tribune's creditors), it is clear that the

fees and expenses incurred by Law Debenture and its Advisors are reasonable.  Without Law

Debenture's expertise and persistent advocacy regarding the value of the LBO Claims, the

Debtors' pre-LBO creditors would have realized only a fraction of the over $850 million in

additional consideration that they received.[2]  For these reasons and those set forth below, Law

Debenture and its Advisors have made a substantial contribution to the Chapter 11 Cases and

respectfully request that the Court allow, as administrative expenses, the fees and expenses

incurred by Law Debenture and its Advisors during the Application Period.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and

1334.  Venue of this proceeding and the Motion is properly before this Court pursuant to 28

U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. §§

157(b)(2)(A), (B), and (O).  The statutory predicates for the relief sought herein are Sections

503(b)(3)(D), (b)(4), and (b)(5) of the Bankruptcy Code.[3]

## RELEVANT BACKGROUND FACTS

### A.      Commencement of the Debtors' Bankruptcy Cases.

7.      On December 8, 2008 ("Petition Date"), the Debtors filed voluntary petitions for

relief under Chapter 11 of the Bankruptcy Code.  On December 18, 2008, the United States

Trustee for the District of Delaware ("US Trustee") appointed an eight-member statutory official

committee of unsecured creditors ("Committee") composed of creditors selected from

---

[2]  Law Debenture objected to the Confirmed Plan, which is now on appeal.  This application demonstrates the substantial contribution Law Debenture made in achieving the recoveries of this settlement but is not to suggest that the settlement was legally sufficient and/or satisfied the requirements of the Bankruptcy Code.

[3]  Section 9.2 of the *Fourth Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P. and JPMorgan Chase Bank, N.A.* dated July 19, 2012 [Dkt. No. 12072, Ex. B1] (the "Confirmed Plan") provides, in pertinent part, that all claims for substantial contribution pursuant to Section 503(b)(4) of the Bankruptcy Code are due no later than March 1, 2013 (60 days after the December 31, 2012 Effective Date).

4

throughout the Debtors' capital and organizational structure.[4]  On December 30, 2008, the US

Trustee appointed Wilmington Trust Company ("WTC") as a ninth member of the Committee.[5]

The Committee included only a single member representing the interests of the holders of over

$1.28 billion of senior notes issued by Tribune.

8.       From the inception of the Debtors' Chapter 11 Cases, it was clear to most pre-

LBO creditors (like Law Debenture) that the main focus of the proceedings should have been

Tribune's disastrous leveraged buyout transaction ("LBO") that was completed in December

2007, less than one year prior to the Petition Date.[6]  Through the LBO, Tribune repurchased all

of its outstanding equity securities and emerged with a new owner, the newly-formed Tribune

Employee Stock Ownership Plan.[7]  To consummate the LBO, Tribune obtained over $11.5

billion in financing provided by certain lenders (the "LBO Lenders").[8]  Samuel Zell became

Chairman of the Board and Chief Executive Officer on December 20, 2007.[9]  EGI-TRB, L.L.C.,

an entity formed for the benefit of Mr. Zell and his family received warrants to purchase

approximately 40% of Tribune's common stock.[10]

9.       Given the circumstance surrounding the LBO and the two-year statute of

limitations on certain claims, it was critical that the Debtors quickly and thoroughly investigate

and prosecute, if necessary, the potential claims relating to the LBO ("LBO Claims").  Indeed,

---

[4]  *Notice of Appointment of Committee of Unsecured Creditors* [Dkt. No. 101].

[5]  *Amended Notice of Appointment of Committee of Unsecured Creditors* [Dkt. No. 156].

[6]  The US Trustee specifically requested that the Committee's proposed counsel disclose whether they were able to investigate and prosecute possible claims against those entities that participated in the LBO.  *See, e.g., First Supplemental Affidavit of David M. LeMay in Connection With the Retention and Employment of Chadbourne & Parke LLP as Counsel to the Official Committee of Unsecured Creditors*, dated February 16, 2009 [Dkt. No. 395] ("LeMay Supplemental Affidavit") at ¶ 2.

[7]  *Examiner Report of Kenneth N. Klee* [Dkt. Nos. 5247-5250] ("Examiner Report"), Volume 1 at 138.

[8]  Examiner Report, Volume 1, at 160, 162.

[9]  Examiner Report, Volume 1, at 48 n.70.

[10]  Examiner Report, Volume 1, at 152.

the LBO Claims were the primary source of value that could augment the Debtors' estates and increase the distributable value to creditors under a plan of reorganization.

10.    Nevertheless, the Debtors from the outset had an inherent inability and seeming unwillingness to investigate and commence any of the LBO Claims due to their involvement in the LBO and their counsels' relationship with the LBO and the LBO Lenders.[11]  The Debtors' board of directors and management largely orchestrated the LBO or were connected to Sam Zell, the chief architect of the LBO.  The Debtors also had an inherent fear litigating against the LBO Lenders, who under most circumstances were the future owners of the Debtors' reorganized estates.  Further, the Debtors retained professionals who could not prosecute the LBO Claims against many of the most prominent LBO Lenders due to conflicts of interest.  Thus, from day one, the job of investigating, prosecuting and maximizing the value of the LBO Claims fell to the Committee.

11.    Complicating matters, however, was the fact that the Committee had similar bias and conflicts preventing them from adequately pursuing the LBO Claims.[12]  First, two of the Committee members were LBO Lenders and potential targets of the LBO Claims and four of the members – as creditors of Tribune's operating subsidiaries – had claims that any plan, most likely, would pay in full regardless of the outcome of the investigation into the LBO.[13]  This left three Committee members who were creditors only of Tribune (the parent entity) with a representative interest in pursuing the LBO Claims.  Thus, even after the two LBO Lenders

---

[11]  *See Reply of Law Debenture Trust Company of New York in Support of the Motion of the Official Committee of Unsecured Creditors For Entry of an Order Granting Leave, Standing and Authority to Commence, Prosecute and Settle Claims and Counterclaims of the Debtors' Estates, dated February 16, 2010* [Dkt. No. 3439] at ¶¶ 8-23.

[12]  The purpose of this recitation is not meant to criticize the composition of the Committee or their retention of counsel, but to show the necessity of Law Debenture and its professionals' involvement.

[13]  *See* Hr'g. Tr. 12/1/09 at 6:16-21 [Dkt. 2749] (Debtors' counsel stated that "[w]e have a firm, highly developed view of what the plan will look like.  A de-leveraged, reorganized Tribune will emerge with modest debt under the plan.  Its equity will be owned by the banks and by other in-the-money funded debt creditors.  The trade will be taken care of.  That's not in serious dispute.")

recused themselves from all LBO related matters, a majority of the Committee members had no interest in pursuing the LBO Claims.[14]

12.    Second, the Committee retained professionals with numerous conflicts that prevented any of them from commencing any claims against many of the LBO Lenders and other targets of the LBO Claims.[15]  During the initial nine months of the Debtors' cases, the Committee's counsel alleged that they possessed the ability to "review and investigate" the LBO and to "negotiate" with all potential targets but admitted that they could not initiate or pursue litigation against many of the LBO targets, obviously weakening any negotiating position.[16] Furthermore, the Committee retained a conflicted financial advisor who admitted that "as a business practice and to preserve client relations [it] may not be in a position to pursue [the LBO] investigation or otherwise support the investigation."[17]  Because the Debtors' solvency was a main facet of the LBO investigation, these admissions left Tribune's creditors with little comfort as to the adequacy and effectiveness of the LBO investigation.[18]  As explained in detail below, even though the Committee recognized conflicts existed with its retained legal professionals, it waited nine months after the Petition Date – and only after Law Debenture and KBTF's insistence – to finally retain special counsel.[19]

---

[14]  *See Second Amended Schedules of Assets and Liabilities for Tribune Company*, dated June 12, 2009 [Dkt. No. 1343].  Although one of the Committee members, the Pension Benefit Guaranty Corporation, filed proofs of claim against Tribune, it did so as part of a stipulated agreement with the Debtors.  Upon information and belief, the bulk, if not the entirety, of its claim was against operating subsidiaries.

[15]  LeMay Supplemental Affidavit, at ¶¶ 4-8.

[16]  *Id.; see also First Supplemental Affidavit of Adam G. Landis in Support of Application to Employ and Retain Landis Rath & Cobb LLP as Co-Counsel to the Official Committee of Unsecured Creditors, Nunc Pro Tunc to the Retention Date, Pursuant to Bankruptcy Code Section 1103(a)*, dated February 18, 2009 [Dkt. No. 404] at ¶¶ 4, 8.

[17]  *First Supplemental Declaration of Alan D. Holtz of AlixPartners, LLP as Financial Advisors to the Official Committee of Unsecured Creditors*, dated February 19, 2009 [Dkt. No. 425] at ¶ 4.

[18]  Based upon a review of the fee applications filed by the Committee's financial advisors, it appears that the Committee never performed a solvency analysis of the LBO.

[19]  *Application of the Official Committee of Unsecured Creditors of Tribune Company, et al., Pursuant to 11 U.S.C. §§ 328 and 1103 and Federal Rule of Bankruptcy Procedure 2014, For an Order Authorizing the Employment of*

B.      **Law Debenture's Appointment And Initial Involvement.**

13.      On May 7, 2009, at the direction of the controlling noteholder, Centerbridge

Partners, L.P. ("Centerbridge"), Law Debenture retained KBTF as its legal advisor in connection

with its potential replacement as indenture trustee under the 1996 Indenture.[20] Shortly thereafter,

Law Debenture retained BG as local counsel and MSG as a financial advisor.[21] On or about June

8, 2009, Law Debenture was appointed successor indenture trustee under the 1996 Indenture by a

majority of the holders of the 6.61% debentures due 2027 and the 7.25% debenture due 2096

issued by Tribune.[22] With its appointment, Law Debenture became the fiduciary for 18% of

Tribune's senior noteholders.

14.      From the outset, Law Debenture's objective was to provide all creditors of

Tribune, in addition to those noteholders it represented, a voice in the Chapter 11 Cases to ensure

a thorough and complete investigation of all potential LBO Claims.  It understood (and garnered

support from numerous parent level creditors because of the fact) that the LBO Claims would

provide a significant potential source of recovery for the estate from which all creditors of

Tribune would benefit.

15.      In addition to the concerns addressed above, Law Debenture's involvement was

necessary given the Committee's minimal efforts to investigate the LBO – a problem that

persisted until Law Debenture filed its 2004 Motion (as defined and described below).  Despite

the normal expectation that the Committee would immediately probe deeply into the facts and

---

*Zuckerman Spaeder LLP as Special Counsel Nunc Pro Tunc to August 6, 2009*, dated August 12, 2009 [Dkt. No. 1953] ("Zuckerman Retention").

[20] *Declaration of James Heaney in Support of Motion of Law Debenture Trust Company of New York Pursuant to 11 U.S.C. §§ 503(b)(3)(D), 503(b)(4) and 503(b)(5) for Allowance and Payment of Fees and Expenses Incurred in Connection With Making a Substantial Contribution to the Debtors' Chapter 11 Cases*, dated March 1, 2013 ("Heaney Decl."), attached hereto as Exhibit B, at ¶ 3.

[21] Heaney Decl. at ¶ 4.

[22] Heaney Decl. at ¶ 5.

circumstances surrounding the LBO, little of substance regarding the LBO, the LBO Claims, or the tremendous potential value to the estate derived therefrom, was communicated to either the creditor body or the Court.[23]

16.     Accordingly, Law Debenture and its Advisors spent the first few weeks of its involvement reviewing Tribune's publicly filed documents surrounding the LBO to understand the intricate transactions fully.[24]  Law Debenture also devoted its efforts to speaking with parties already involved in the Debtors' bankruptcy cases to understand the LBO investigative progress made to date.[25]

17.     By the end of July 2009, not satisfied with the direction and speed of the LBO investigation, Law Debenture determined that it needed to take a more active role.  Further, Law Debenture learned (later confirmed by news reports) that the Debtors and certain LBO Lenders were negotiating a plan to exit bankruptcy by year-end, apparently settling the LBO Claims for only a "sliver of equity."[26]  Under Tribune's back-room negotiated plan, Tribune's creditors would receive barely more than the 4.8% recovery of their claims (based on a $6.75 billion total enterprise value) that they would receive absent any recovery from the LBO Claims.[27]  The mere

---

[23]  In fact, the Committee's only filing with respect to the LBO prior to Law Debenture's involvement was its *Motion for an Order Authorizing the Examination of Robert R. McCormick Tribune Foundation and Cantigny Foundation and the Production of Documents Pursuant to Bankruptcy Rule 2004*, dated June 10, 2009 [Dkt. No. 1334].  The filing, however, did not include any details about the LBO or the LBO Claims and their potential value other than that the LBO returned the company to private ownership through a merger.

[24]  Heaney Decl. at ¶ 6.

[25]  Heaney Decl. at ¶ 6.

[26]  *Declaration of David S. Rosner in Support of Motion of Law Debenture Trust Company of New York Pursuant to 11 U.S.C. §§ 503(b)(3)(D), 503(b)(4) and 503(b)(5) for Allowance and Payment of Fees and Expenses Incurred in Connection With Making a Substantial Contribution to the Debtors' Chapter 11 Cases*, dated March 1, 2013 ("Rosner Decl."), attached hereto as Exhibit C. Tribune Presents Restructuring Term Sheet To Lenders, Sources Say, DEBTWIRE, Aug. 6, 2009 [Rosner Decl. ¶ 4(a), Ex. 1]; *see also* Michael Oneal, Broken Deal: Bankruptcy Inc. (pt. 4), CHICAGO TRIBUNE, Jan. 16, 2013, at C1 ["Broken Deal"] [Rosner Decl. ¶ 4(b), Ex. 2] (noting that "the banks, Liebentritt [Tribune's general counsel] and an official committee representing creditors at first assumed these junior bondholders would be happy with a relatively small payment pegged to market prices.").

[27]  *Id.; see also Opinion on Confirmation*, dated October 31, 2011 [Dkt. No. 10133] at 32.

filing of such an inadequate plan of reorganization threatened to diminish the potential distribution to all parent level creditors.

18.     As such, Law Debenture took deliberate actions to ensure the LBO Claims were properly investigated and analyzed for the benefit of all Tribune's creditors prior to the filing of any plan of reorganization.  Law Debenture first lobbied the Committee to hire special litigation counsel that could, if necessary, commence litigation against the perpetrators of the LBO.[28] Concurrently, Law Debenture sent demand letters to at least six of the main targets of the LBO investigation seeking documents and other pertinent information related to the LBO.[29]

19.     However, Law Debenture made little progress with its demand letters.  Although Law Debenture attempted to obtain consensual agreements to participate in discovery, the parties consistently and affirmatively ring-fenced Law Debenture out of any process to obtain and use discovery.[30]  Indeed, one of the parties from which Law Debenture sought documents nominally agreed to provide all documents it had given to the Committee provided that Law Debenture did not question the confidentiality designations or the prohibition against the documents' use in this Court.[31]  This proposal was unacceptable to Law Debenture as it defeated the very purpose for the discovery.

---

[28]  Heaney Decl. at ¶ 7.

[29]  Heaney Decl. at ¶ 7.  During this same time period, Law Debenture also prepared a motion to obtain standing to prosecute claims arising out of the LBO in the event that the Debtors filed a plan severely discounting the value of the LBO Claims.  Law Debenture, however, is not seeking reimbursement for this work.

[30]  Heaney Decl. at ¶ 8.

[31]  Heaney Decl. at ¶ 8.

**C.**    **Law Debenture Files Its 2004 Motion And Joins The LBO Investigation.**

20.    Finally, on August 6, 2009, eight months after the Petition Date, the Committee

retained Zuckerman Spaeder LLP ("Zuckerman") as special litigation counsel to assist in the

analysis of the LBO.[32]

21.    By the end of August 2009, Law Debenture still had not made significant progress

in obtaining a participatory seat in the LBO investigation and remained unsatisfied with the

quality of the discovery and investigation's pace.[33]    Indeed, as of September 17, 2009, the

parties had produced only approximately 35,000 documents (775,000 pages) to the Committee

and had noticed no depositions.[34]    Consequently, on August 26, 2009, Law Debenture filed its

*Motion For Leave To Conduct Discovery Pursuant To Rule 2004 Of The Federal Rules Of*

*Bankruptcy Procedure Of Tribune Company, Its Affiliates, And Certain Third Parties, Or*

*Alternatively, For The Appointment Of An Examiner* (the "2004 Motion").[35]

22.    Although the 2004 Motion requested the production of documents, it also served a

higher purpose – it was the first pleading filed with the Court that actually described in detail the

LBO, the potential claims and the importance of the resolution of those claims to a successful

---

[32] *See Order Granting Application of the Official Committee of Unsecured Creditors for Order Authorizing the Employment and Retention of Zuckerman Spaeder LLP as Special Counsel*, dated September 3, 2009 [Dkt. No. 2088]. See Zuckerman Retention at 5.

[33] Heaney Decl at ¶ 9. One example of the Committee's ineffectiveness in obtaining discovery is that it waited until September 18, 2009 to seek the production of emails related to the LBO from one of the LBO Lenders, Merrill Lynch Capital Corporation, nine months after the Petition Date and again days before the hearing on the 2004 Motion, and did not reach any agreement with respect to such production until October 26, 2009. Hr'g. Tr. 12/1/2009 at 120:5-6; 120:22-23 [Dkt.No 2749.] Even then, Merrill delayed with producing documents, requiring the Committee – at Law Debenture's insistence – to file its *Motion of the Official Committee of Unsecured Creditors for an Order Requiring the Production By Date Certain of Email Documents From Merrill Lynch Capital Corporation Pursuant to Bankruptcy Rule 2004*, dated December 8, 2009 [Dkt. No. 2767].

[34] *Response and Partial Objection of the Official Committee of Unsecured Creditors to Motion of Law Debenture Trust Company of New York For Leave To Conduct Discovery Pursuant To Rule 2004 Of The Federal Rules Of Bankruptcy Procedure Of Tribune Company, Its Affiliates, And Certain Third Parties, Or Alternatively, For The Appointment Of An Examiner*, dated September 17, 2009 [Dkt. No. 2136] ("Committee 2004 Objection") at ¶ 16. In contrast, by the time the LBO investigation had almost concluded in June 2010, following Law Debenture's involvement, the parties had produced over 344,000 documents (approximately 4.3 million pages).

[35] Dkt. No. 2031.

reorganization.  Nine months into the Debtors' Chapter 11 Cases, the issue of the destructive

LBO was finally before the Court receiving the attention it deserved and, at least for the moment,

seemed to forestall the filing of a plan prior to the complete investigation of the LBO.[36]

23.    The 2004 Motion also compelled the Debtors and the Committee to take a formal

stance regarding the LBO investigation and the viability of the underlying claims.[37]  Although

the Debtors' objection came as no surprise, the Committee's objection was more revealing.

24.    The Committee's objection put an exclamation point on what Law Debenture

long believed – that there was no party actively involved in the Chapter 11 Cases that solely

represented the interest of Tribune's creditors.  Instead, the Committee was perpetually stuck

between the competing demands of its constituents, arguing that "the Committee, unlike Law

Debenture, represents all unsecured creditor interests" and that it alone has the duty "to balance

the diverse interests and expectations of various unsecured creditor interests."[38]  As a result, the

Committee (functioning properly) was often hog-tied when it came to the LBO and its objection

revealed that there was no party, except Law Debenture, that was willing to enter the fray to

advocate unequivocally on behalf of all parent level creditors and the value of the LBO Claims.

25.    After a month of negotiations, on September 25, 2009, the Court entered a

stipulation (the "Stipulation") between the Debtors, Law Debenture, certain LBO Lenders, and

other participants in the LBO consensually resolving the 2004 Motion.[39]  Under the terms of the

---

[36] 2004 Motion at 3. Even though the Debtors objected to the 2004 Motion, it never denied the allegation that it was negotiating the terms of a plan with the LBO Lenders without any involvement of the Committee or Senior Noteholders.

[37] Debtors' Response to Motion of Law Debenture Trust Company  of New York *For Leave To Conduct Discovery Pursuant To Rule 2004 Of The Federal Rules Of Bankruptcy Procedure Of Tribune Company, Its Affiliates, And Certain Third Parties, Or Alternatively, For The Appointment Of An Examiner*, dated September 17, 2009 [Dkt. No. 2143]; Committee 2004 Objection.

[38] Committee 2004 Objection, at 4.

[39] *Order Approving Stipulation*, dated September 25, 2009 [Dkt. No. 2235].

Stipulation, the parties agreed that Law Debenture would share in the discovery obtained by the Committee and was permitted to participate and ask non-duplicative questions in any depositions conducted by the Committee.[40]  Approximately one week later, Law Debenture met with special litigation counsel to the Committee and began coordinating efforts to ensure the production of all relevant documents and their thorough review.[41]

26.    For the next three months, while the Committee took the lead on all discovery matters, Zuckerman, KBTF, and MSG worked closely together, sharing documents, legal research, memoranda and financial analyses to build a case in support of the LBO Claims.  The parties' resources were pooled and ideas were exchanged, improving the quality and efficiency of work performed.[42]  This cooperation was highly beneficial to both the Committee and the Debtors' estates.

27.    Zuckerman and KBTF also collaborated in taking seven depositions relating to the LBO during the Application Period.[43]  These depositions were highly coordinated affairs that evidenced hours of work, sharing of documents and a strategic display of the division of time and question topics between Zuckerman and KBTF.[44]

28.    Similarly, Zuckerman and KBTF determined that it would be most beneficial to the analysis of the LBO Claims if both parties analyzed the documents, researched the legal issues and drafted a complaint.[45]  Accordingly, KBTF and MSG expended numerous hours compiling and presenting in cogent form the relevant facts regarding the LBO and researching

---

[40]  *Id.*, Ex. A.

[41]  Heaney Decl. at ¶ 11.

[42]  Heaney Decl. at ¶ 12.

[43]  Heaney Decl. at ¶ 13.

[44]  Rosner Decl. at ¶ 4(c), Ex. 3  (Email from Zuckerman to KBTF stating that they "appreciate the collaborative effort and your considerable input for the JPM depos last week.").

[45]  Heaney Decl. at ¶ 13.

the myriad of legal issues underlying each of the potential LBO Claims. Ultimately, KBTF prepared a twenty-five count, one hundred forty-two page complaint that it shared with the Committee (and later, used to present its case to the Examiner).[46]

29.     The Committee and the Debtors' estates directly benefitted from Law Debenture's collaborative efforts. By late January when the parties shared their respective complaints, KBTF was able to address the gaps in the Committee's complaint and provided suggestions to improve it. [47] Specifically, Law Debenture suggested that the Committee add a declaratory judgment cause of action for equitable relief pertaining to certain holding companies that were set up in connection with the LBO, causes of action for negligence and misrepresentation, breaches of fiduciary duty and aiding and abetting breaches of fiduciary duty, and expand the universe of defendants liable for unjust enrichment.[48] Undoubtedly, this process strengthened the complaints that the Committee eventually filed and the Litigation Trust now prosecutes. Moreover, as described below, Law Debenture's complaint was invaluable in preparing presentations to the Debtors, the Committee, and the Examiner in connection with its ongoing effort to augment Tribune's distributable value.[49]

---

[46] Heaney Decl. at ¶ 13.

[47] Heaney Decl. at ¶ 14

[48] Heaney Decl. at ¶ 15.

[49] In October 2009, Law Debenture discovered that the Debtors and JPMorgan Chase Bank, N.A. ("JPM"), one of the LBO Lenders, had agreed that a non-debtor affiliate of Tribune would reimburse JPM's fees and expenses related to its claim against the estate, including those fees and expenses incurred in defending against the LBO Claims, though JPM was an unsecured creditor. Heaney Decl. at ¶ 16. Although the Debtors notified the US Trustee and the Committee of such payments, Court approval was neither sought nor obtained. Consequently, on October 23, 2009, Law Debenture filed a motion seeking to terminate the payments and disgorge past payments. *Motion of Law Debenture Trust Company of New York to Terminate Debtor Affiliates' Undisclosed Payment of LBO Lenders' Fees and Expenses, for an Accounting, and for Disgorgement of Past Payments*, dated October 23, 2009 [Dkt. No. 2407]. At a hearing on December 1, 2009, the Court ordered that the Debtors specifically disclose all future payments pending an evidentiary hearing. Hr'g. Tr. at 111:23 – 112:7 [Dkt. No 2749.] At a hearing on March 26, 2010, the Court agreed that the Debtors purposely sought to avoid Court approval, but refrained from determining whether such approval was necessary. The Court determined that pending further developments in the case, all payments to JPM should cease. Hr'g. Tr. 3/26/2010 at 76:17-21 [Dkt. 3931.]. Law Debenture submits that its effort in cutting off JPM's funding facilitated and advanced the negotiations between the parties and led to the April 2010 Settlement (as defined below) which was agreed to only days later.

**D.**    **Law Debenture Presents The LBO Claims To The Debtors And The Committee.**

30.    By December 2009 – despite the fact that the Committee was still pursuing

discovery from numerous parties and had only begun to conduct depositions – Law Debenture

again discovered that the Debtors were pressured (both internally and externally) to file a plan of

reorganization that would undervalue the LBO Claims and distribute to Tribune's creditors only

pennies on the dollar.[50]  In response, Law Debenture prepared and presented separate

presentations to the Debtors and the Committee in an effort to demonstrate the viability and

value of the LBO Claims and the connection between realization on such claims and the

performance of fiduciary obligations to the estates.[51]  As part of the presentation process that was

set up, other parties, including certain targets of the potential LBO Claims, made some lesser,

more generalized, presentations.

31.    Law Debenture's presentations included a description of the LBO (far more

detailed than Law Debenture included in the 2004 Motion), utilizing many of the documents that

Law Debenture had reviewed to provide color and culpability to the targets of the potential LBO

Claims.  The presentations also included an initial overview and analysis of the main legal issues

presented by the potential LBO Claims.[52]

32.    Law Debenture's prior work in conducting a coordinated review of the documents

with the Committee's special counsel, participating in depositions and drafting a complaint were

invaluable in this effort, especially because the Committee was a recipient of the presentations

rather than a co-presenter.  Had Law Debenture solely relied on the Committee's efforts to

investigate the LBO, Law Debenture would not have had the requisite knowledge regarding the

---

[50]  Heaney Decl. at ¶ 17.

[51]  Heaney Decl. at ¶ 18.

[52]  Heaney Decl. at ¶ 19.

LBO Claims to convince successfully both (i) the Debtors that any plan of reorganization had to resolve or preserve the LBO Claims to provide a significant recovery to all parent level creditors and (ii) the Committee's performance of its fiduciary duty required it to pursue and prosecute the LBO Claims absent a settlement that would provide an enhanced recovery to all parent level creditors.

33.    As a result of these presentations, the Debtors, through their general counsel, Don Liebentritt, adopted an approach that was more committed to a global settlement believing that it was "the cleanest solution for the company" and assumed a role that they described as an "honest broker" but without any prosecutorial ability to provide backbone to the negotiations.[53] Additionally, the Committee became convinced – as evidenced by its actions following the presentation – that the LBO Claims were highly valuable and that it would need to prosecute such claims or garner a substantial increase in the distribution to parent level creditors from their settlement as part of a plan of reorganization.

34.    After the presentation, the Committee (along with the coordinated efforts of Law Debenture) completed a draft complaint that it intended to file along with a motion to obtain standing to prosecute the LBO Claims that it was also preparing.

35.    On February 1, 2010, the Committee filed its *Motion For Entry Of An Order Granting Leave, Standing And Authority To Commence, Prosecute And Settle Claims And Counterclaims Of The Debtors' Estates* [Dkt. No. 3281] (the "Standing Motion") to obtain standing to prosecute the LBO claims.  On February 12, 2010, Law Debenture joined.[54]

---

[53]  Oneal, Broken Deal.

[54]  *Joinder of Law Debenture Trust Company of New York to the Motion of the Official Committee of Unsecured Creditors for Entry of an Order Granting Leave, Standing and Authority to Commence, Prosecute and Settle Claims and Counterclaims of the Debtors' Estates*, dated February 12, 2010 [Dkt. No. 3393].

36.     The Standing Motion, like Law Debenture's 2004 Motion before it, once again

exposed the intentions of all parties and reaffirmed the importance of Law Debenture's role.

Most revealing was the Debtors' objection, which exposed what Law Debenture knew was the

case – that filing of the Standing Motion by the Committee was an "abrupt turn-around."  The

Debtors specifically alleged that "up until now, the Committee has agreed with the Debtors'

strategy to attempt a consensual resolution of the claims at issue" without any resort to

litigation.[55]  The Committee's reversal was in the best interest of Tribune's creditors and was

caused, in no small part, by Law Debenture's earlier efforts.

37.     Given that the Debtors, who were allegedly acting as a "honest broker" (and was

the purported plaintiff), were advocating against granting the Committee standing to pursue the

LBO Claims, Law Debenture was prompted to file a more substantive response in support of the

Standing Motion.  On February 16, 2010, Law Debenture filed its response alleging that the

potential claims are colorable, the Debtors' and their counsel are hopelessly conflicted, and that

"the Debtors have carefully avoided acting as a potential plaintiff that will prosecute the claims

zealously" "failing to ask any questions of deponents, and even objecting to questions asked by

the Committee and Law Debenture."[56]

38.     In filing the response, Law Debenture hoped that the submission of additional

detail in support of the Standing Motion would help underscore the value and merits of the LBO

Claims and provide the parties with the requisite incentive to achieve a negotiated settlement or

---

[55] Dkt. No. 3371 at 7.  Indeed, during the February 18, 2010 hearing before the Court, the Debtors' financial advisor conceded that it was not the Debtors' intention to commence any litigation concerning the LBO nor did the Debtors' retain any counsel who could prosecute such claims.  Hr'g. Tr. 2/18/2010 at 51:9-52:5, 58:1-59:16 [Dkt. 3543.]

[56] *Reply of Law Debenture Trust Company of New York in Support of the Motion of the Official Committee of Unsecured Creditors for Entry of an Order Granting Leave, Standing and Authority to Commence, Prosecute and Settle Claims and Counterclaims of the Debtors' Estates*, dated February 16, 2010 [Dkt. No. 3439] at 3.

litigate, if necessary.[57]  Although the Standing Motion was not approved until October, the

pleadings and argument before the Court did help push the parties closer to settlement.

39.    After successfully convincing the Committee to file the Standing Motion, Law

Debenture continued its efforts to work with the Debtors and the Committee to develop a plan of

reorganization that would enable the Debtors to emerge from bankruptcy quickly while resolving

most, if not all, of the LBO Claims in a manner that would garner the support of multiple creditor

constituencies.[58]

40.    Over the next six weeks, Law Debenture and its directing noteholder,

Centerbridge, took an active role in the negotiations.[59]  By early April 2010, after Centerbridge

and Angelo Gordon first agreed to the basic terms of a settlement of the LBO claims, the

Debtors, the Committee, Law Debenture, Centerbridge, JPM, and Angelo Gordon (a holder of

senior lender claims) agreed to a settlement (the "April 2010 Settlement") that would distribute

to non-LBO related general unsecured creditors of Tribune approximately 35.18% of the value of

their claims.[60]

41.    Approximately two weeks later, on April 12, 2010, the Debtors filed their *Joint*

*Plan Of Reorganization For Tribune Company And Its Subsidiaries* (the "April 2010 Plan")

incorporating the April 2010 Settlement.[61]

42.    Immediately, both ends of the Debtors' capital structure challenged the terms of

the April 2010 Settlement.  Certain LBO Lenders objected that the April 2010 Settlement

provided too much consideration to Tribune's creditors and unfairly treated all LBO Lenders

---

[57]  Heaney Decl. at ¶ 20.

[58]  Heaney Decl. at ¶ 21.

[59]  Heaney Decl. at ¶ 22.

[60]  *Disclosure Statement for Joint Plan Of Reorganization For Tribune Company And Its Subsidiaries*, dated April
12, 2010 [Dkt. 4008] ("April 2010 Disclosure Statement") at 11.  A more dramatic account of this process was
recently described in the Chicago Tribune's Broken Deal.

[61]  April 2010 Disclosure Statement, at Ex. A.

equally despite their differing exposure to the LBO Claims.[62]  On the other hand, WTC,

indenture trustee for a subordinated series of notes, objected that the April 2010 Settlement

resolved the LBO Claims too cheaply (the holders of the subordinated notes were to receive

nothing under the April 2010 Settlement).[63]

43.     Although the April 2010 Settlement was not the final settlement that was

incorporated into the Confirmed Plan, it was a monumental breakthrough.  It provided the

Committee (and to a lesser extent, the Court) with a benchmark by which to analyze future

settlement offers, even though Law Debenture disagreed with and objected to their assessment of

the reasonableness of the ultimate settlement and the Confirmed Plan.

**E.**     **The Examiner Enlists Law Debenture's Help Preparing His Report.**

44.     With the April 2010 Plan facing challenges on numerous fronts, on April 20,

2010, at the request of WTC, the Court ordered the appointment of an examiner (the

"Examiner").[64]  The order provided that:

> [t]he Parties shall use their respective best efforts to coordinate with the Examiner
> and to avoid unnecessary interference with, or duplication of, the Investigation,
> and the Examiner, in his or her conduct of the Investigation, shall use best efforts
> to utilize relevant materials obtained by the Parties via informal and/or formal
> discovery to avoid unnecessary duplication of work performed to date.[65]

45.     Over the course of the next three months, Law Debenture worked tirelessly at the

Examiner's request to provide him with all the results of its investigation of the LBO and factual

and legal research into the LBO Claims, including the support underlying Law Debenture's

---

[62] *Credit Agreement Lenders' (A) Statement Regarding Purported "Settlement" of "LBO-Related Causes of Action"; and (B) Request For Termination of Plan Exclusivity*, dated April 12, 2010 [Dkt. No. 3999].

[63] *Wilmington Trust Company's Objection to the Debtors' (1) Proposed Disclosure Statement for their Joint Plan of Reorganization; and (2) Motion to Establish Plan Confirmation Procedures*, dated May 13, 2010 [Dkt. No. 4385].

[64] *Agreed Order Directing the Appointment of an Examiner*, dated April 20, 2010 [Dkt. No. 4120].

[65] *Id.* at ¶ 3.

twenty-five cause of action complaint.[66]  This process included meetings, conversations, emails, and culminated with the submission of two highly detailed and substantive briefs which provided detailed factual and legal analysis of over thirty-four discrete issues identified by the Examiner.[67]

46.    Law Debenture's prior efforts enabled it to effectively assist the Examiner, undoubtedly saving the Examiner and his professionals countless hours of work.  Law Debenture's involvement was critical in providing an adversarial process that the Examiner sought to assist in his investigation.

47.    On July 26, 2010, the Examiner filed his report consisting of over 1,400 pages of a highly detailed analysis of the LBO and potential claims arising from the LBO.  The report cited 1,090 exhibits, comprising over 21,000 pages, and over 3,000 pages of deposition testimony.[68]  In pertinent part, the Examiner described in the report's introduction the parties' invaluable contribution, including that of Law Debenture:

> It became clear to the Examiner that the Parties had devoted substantial time, analysis, and research to the financial and legal issues presented by the Investigation. The Examiner determined that the most sensible way to approach the Investigation in the limited time given was to capitalize on the work performed by the Parties, and, at least in the first instance, to look to the Parties in the adversarial process to flesh out the issues and facts in dispute and the relative strengths and weaknesses of the positions of the Parties. These contributions were intended to supplement, rather than replace, the Examiner's independent Investigation.[69]

---

[66]  Heaney Decl. at ¶ 23; Rosner Decl. at ¶ 4(d), Ex. 4.

[67]  Heaney Decl. at ¶ 24.

[68]  *Examiner Report of Kenneth N. Klee (Redacted)*, dated July 26, 2010 [Dkt. Nos. 5130-33].  Validating Law Debenture's earlier argument regarding the pace of the LBO investigation, the Examiner stated that he "was surprised to learn at the outset of the investigation that . . . only seven Rule 2004 examinations relating to the [LBO] had been conducted."  Examiner Report, Volume 1, at 32.

[69]  Examiner Report, Volume 1, at 30.

48.     In addition to KBTF's efforts, the Examiner's financial advisor also relied on MSG's analyses of solvency and other pertinent financial issues.[70]

49.     By helping the Examiner flesh out the issues and facts for his report, Law Debenture's efforts aided the Court itself.  Pursuant to the *Order Approving Stipulation Regarding Use of Examiner's Report at the Confirmation Hearing*,[71] dated February 4, 2011, the parties agreed to the Court's use and reliance upon the Examiner's report in connection with the hearing on confirmation.  Consequently, as part of its *Opinion on Confirmation*,[72] dated October 31, 2011 ("2011 Confirmation Opinion"), which was subsequently incorporated, in part, into the Court's *Memorandum Overruling Objections To Confirmation Of The Fourth Amended Plan Of Reorganization For Tribune Company And Its Subsidiaries And Denying Clarification Motion*,[73] dated July 13, 2012, the Court greatly relied on the Examiner's report and its conclusions in analyzing and approving the reasonableness of the ultimate settlement.[74]

## F.     The Confirmed Plan Of Reorganization.

50.     On July 23, 2012, the Court entered an order confirming the Confirmed Plan.[75] The Confirmed Plan incorporated a series of settlements resolving certain of the LBO Claims that provided in excess of $500 million for distribution to Tribune's creditors above their natural recoveries.[76]  This resulted in a recovery for Tribune's creditors of approximately 33.6% - 36%

---

[70]  Examiner Report, Volume 1, at 37.

[71]  Dkt. No. 7790.

[72]  Dkt. No. 10133.

[73]  Dkt. No. 12033.

[74]  2011 Confirmation Opinion, at 69; *see also* Hr'g. Tr. 8/20/2010 at 40:22-23 [Dkt. 5473] (informing the Examiner that he was an "enormous help" to the Court).

[75]  *Order Confirming Fourth Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P. and JPMorgan Chase Bank, N.A.*, dated July 23, 2012 [Dkt. No. 12074].

[76]  *Specific Disclosure Statement Relating to First Amended Joint Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital*

of their claims.[77]  Additionally, the Confirmed Plan transferred the remaining LBO Claims to a litigation trust (the "Litigation Trust") in which Tribune's creditors (who opt to receive interests in the Litigation Trust) will receive the first $90 million in net recoveries and thereafter, 65% of all net recoveries.[78]  The Debtors' valuation expert determined that the final fair market value of these transferred claims is $358.4 million.[79]

51.      In the end, Law Debenture's efforts during the Application Period had a direct and substantial impact on the Debtors' reorganization cases and enabled Tribune's creditors to realize over $850 million in distributable value above their natural recoveries.  This ultimate recovery was far more than the "sliver of equity" that certain controlling parties had wanted to distribute to Tribune's creditors prior to Law Debenture's involvement.

## RELIEF REQUESTED

52.      By this Motion, Law Debenture respectfully requests that this Court enter an order, pursuant to Sections 503(b)(3)(D), (b)(4),and (b)(5) of the Bankruptcy Code, (a) allowing as an administrative expense in recognition of Law Debenture's substantial contribution to the Debtors' Chapter 11 Cases during the Application Period, the aggregate amount of $6,107,147.09 comprised of (i) $5,898,188.75 in fees, and (ii) $208,958.34 in expenses; and (b) authorizing and directing the payment thereof.[80]

---

*Management, L.P., Angelo Gordon & Co., L.P., and JPMorgan Chase Bank, N.A.*, dated December 8, 2010 [Dkt. No. 7135], at 4.

[77]  Estimated Recovery Analysis, attached as Exhibit B to *Supplemental Disclosure Statement Relating to Fourth Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A.*, dated April 12, 2012 [Dkt. No. 11355], at 3.

[78]  Confirmed Plan, at §§ 1.1.160, 1.1.161, 3.2.5, 3.2.6, 3.2.8, 3.2.9, 13.2.

[79]  *Notice of Valuation Expert's Valuation of Litigation Trust Assets*, dated January 4, 2013 [Dkt. No. 12976].  Law Debenture includes the Debtors' valuation estimate of the transferred claims for illustrative purposes only and takes no position as to the accuracy of the valuation.

[80]  Law Debenture has the burden to prove that it is entitled to reimbursement by a preponderance of the evidence. *See In re Summit Metals, Inc.*, 379 B.R. 40, 50 (Bankr. D. Del. 2007) (Carey, J.).

53.    In support of the Motion, attached hereto as Exhibit B is the declaration of James

Heaney and the declaration of David S. Rosner as Exhibit C.

## ARGUMENT

**A.    Legal Basis For Relief Requested.**

54.    Section 503(b) of the Bankruptcy Code provides for the allowance, as an

administrative expense, of the actual and necessary expenses of an indenture trustee, including

reasonable compensation of professional services rendered by an indenture trustee's attorney or

accountant, where a "substantial contribution" to a chapter 11 case is made.[81] *See* 11 U.S.C. §§

503(b)(3)(D), 503(b)(4), 503(b)(5); *see also In re Tropicana Entm't LLC*, No. 10-3970, 2012

U.S. App. LEXIS 18511, at *5-6 (3d Cir. Aug. 31, 2012) ("Tropicana"); *Lebron v. Mechem Fin.*

*Inc.*, 27 F.3d 937, 943 (3d Cir. 1994) ("Lebron").[82]

---

[81]  Specifically, Section 503(b) of the Bankruptcy Code provides, in pertinent part, that after notice and a hearing, administrative expenses shall be allowed, including:

(3) the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by . . .

(D) a creditor, indenture trustee, an equity holder, or a committee representing creditors or equity holders other than a committee appointed under section 1102 of this title, in making a substantial contribution in a case under chapter 9 or 11 of this title;

(4) reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under subparagraph (A), (B), (C), (D), or (E) of paragraph (3) of this subsection, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorney or accountant;

(5) reasonable compensation for services rendered by an indenture trustee in making a substantial contribution in a case under chapter 9 or 11 of this title, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title[.]

11 U.S.C. § 503(b).

[82]  Courts have also held that "the plain meaning of § 503 allows for recovery of the expenses of financial advisors." *Stapleton v. Unofficial Comm. of Noteholders (In re ITC Deltacom, Inc.)*, Bank. No. 02-11848 & C.A. 03-111, 2006 WL 839395, at *1 (D. Del. Mar. 29, 2006); *see also United States v. Air Line Pilots Ass'n, Int'l (In re Trans World Airlines, Inc.)*, Bank. No. 92-115 & C.A. No. 92-678, 1993 WL 559245, at *8 (D. Del. June 22, 1993) (upholding bankruptcy court's allowance of administrative expense for financial advisor's fees and expenses under section 503(b)(4)).

55.    The reimbursement of fees and expenses pursuant to Sections 503(b)(3)(D),

503(b)(4), and 503(b)(5) of the Bankruptcy Code is designed to encourage meaningful

participation by creditors and other parties-in-interest in a debtor's reorganization. *See Lebron*,

27 F.3d at 944 ("Subsection 503(b)(3)(D) represents an accommodation between the twin

objectives of encouraging meaningful creditor participation in the reorganization process, and

keeping fees and administrative expenses at a minimum so as to preserve as much of the estate as

possible for creditors." (internal quotation marks and citations omitted)); *In re Worldwide Direct,

Inc.*, 334 B.R. 112, 121 (Bankr. D. Del. 2005) (same); *see also In re Consolidated Bancshares,

Inc.*, 785 F.2d 1249, 1253 (5th Cir. 1986) (stating that "the policy aim of authorizing fee awards

to creditors is to promote meaningful creditor participation in the reorganization process"

(citation omitted)).

56.    Although the Bankruptcy Code does not define the term "substantial

contribution," courts in this and other jurisdictions have adopted a two-pronged test.

57.    <u>First</u>, courts determine whether the actions of the party seeking reimbursement

have rendered "an actual and demonstrable benefit to the debtor's estate and [its] creditors." *See

Tropicana*, 2012 U.S. App. LEXIS 18511, at *5 (citing *Lebron*, 27 F.3d at 944); *In re Villa

Luisa, L.L.C.*, 354 B.R. 345, 348 (Bankr. S.D.N.Y. 2006) (noting that courts have looked to

"whether there has been a contribution that is considerable in amount, value and worth, which

directly, demonstrably and materially contribute to the debtor's reorganization" in determining

whether an applicant has made a substantial contribution within the meaning of Section 503(b) of

the Bankruptcy Code).  Generally, services that substantially contribute to a case are those

"which foster and enhance . . . the progress of reorganization." *Lebron*, 27 F.3d at 944; *see also

In re Richton Int'l Corp.*, 15 B.R. 854, 856 (Bankr. S.D.N.Y. 1981).

58.    Second, the benefit to the debtor's estate must "be more than an incidental one arising from activities the applicant has pursued in protecting his or her own interests." *Lebron*, 27 F.3d at 944.  The Third Circuit has explained that "substantial contribution should be applied in a manner that excludes reimbursement in connection with activities of creditors and other interested parties which are designed primarily to serve their own interests and which, accordingly, would have been undertaken absent an expectation of reimbursement from the estate." *Tropicana*, 2012 U.S. App. LEXIS 18511, at *5-6 (quoting *Lebron*, 27 F.3d at 944). However, "the existence of self-interest cannot in and of itself preclude reimbursement" as "[m]ost activities of an interested party that contribute to the estate will also, of course, benefit that party to some degree." *Lebron*, 27 F.3d at 944.

59.    Thus, in evaluating whether Law Debenture's services during the Application Period contributed to the Debtors' estate, this Court must consider whether the services performed: (i) provided a direct benefit to the estate, (ii) were designed to benefit other creditors in the case, and (iii) were not duplicative of those performed by others.  *See Lebron*, 27 F.3d at 946; *Marcus Montgomery Wolfson & Burten P.C. v. AM Int'l, Inc. (In re AM Int'l, Inc.)*, 203 B.R. 898, 904-05 (D. Del. 1996); *Summit Metals*, 379 B.R. at 51; *Worldwide*, 334 B.R. at 124.

**B.    Law Debenture And Its Advisors Are Entitled To Reimbursement For The Substantial Contribution They Made To The Debtors' Chapter 11 Cases During The Application Period.**

**1.    Law Debenture and Its Advisors' Services Benefitted the Creditors.**

60.    It is well established that a creditor substantially contributes to a debtor's reorganization by demonstrating that "new or more promising avenues of recovery have been opened to various parties" as a result of its efforts.  *In re Syntax-Brillian Corp.*, 2009 WL 1606474, at *3 (Bankr. D. Del. June 5, 2009); *see also In re AM Int'l, Inc.*, 203 B.R. at 904-905 (awarding fees to professionals retained by equity committee where committee's actions resulted

in an increased recovery for equity holders and enhanced value to estate not available under prearranged plan initially proposed by debtor); *In re Bayou Group, LLC*, 431 B.R. 549, 561-62 (Bankr. S.D.N.Y. 2010) (approving 503(b) application of unofficial creditors' committee that had played a leadership role normally expected of an estate-compensated professional, but not so performed, and whose efforts, the court found, enhanced the administration of the estate); *Loral Space & Commc'ns Ltd.*, Case No. 03-41710 (RDD) (Bankr. S.D.N.Y. Mar. 10, 2006) (approving 503(b) award for ad hoc trade claims committee that successfully objected to debtor's plan, and whose efforts resulted in renewed negotiations between major parties-in-interest, and produced a plan with augmented recoveries)[83]; *In re 9085 E. Mineral Office Bldg., Ltd.*, 119 B.R. 246, 252-253 (Bankr. D. Colo. 1990) (substantial contribution where creditor's efforts were designed to increase and did increase the payout to unsecured creditors).

61.    As discussed below, the actions and work product for which Law Debenture seeks reimbursement resulted in "new" and "more promising avenues of recovery" for the Debtors' estates because Law Debenture (a) prevented the filing of a plan that undervalued the LBO Claims, (b) ensured that a full and complete investigation of the LBO was conducted and assisted in those efforts, (c) convinced the Debtors and the Committee that the LBO Claims had substantial value and any plan of reorganization had to either provide Tribune's creditors with adequate consideration to settle the claims and/or preserve such claims, (d) contributed to the Examiner's report, which this Court relied upon in its 2011 Confirmation Opinion, and (e) recovered an additional $850 million in value that Tribune was able to distribute to its creditors.

62.    First, before Law Debenture's involvement, counsel to both the Debtors and the Committee had disclosed debilitating conflicts and discovery was progressing unnecessarily slow, if at all, even though certain LBO Claims had upcoming statute of limitations deadlines.

---

[83] Attached hereto as Exhibit D is a copy of the *Loral* decision.

The Debtors also were on the cusp of filing a plan of reorganization that they were negotiating with certain LBO Lenders that severely undervalued the LBO Claims, providing a mere "sliver of equity" to Tribune's creditors.  After Law Debenture became involved, it reached out to the Committee to ascertain the status of the discovery process, lobbied for the appointment of special litigation counsel, sent demand letters to numerous parties involved with the LBO to obtain discovery and when the letters failed, filed its 2004 Motion.  These efforts resulted in the appointment of special litigation counsel, the expeditious pursuit of comprehensive discovery and provided a voice to all parent creditors whom previously had no representation.  These efforts also directly prevented the filing of any plan of reorganization that would grossly undervalue the LBO Claims and, for the first time, presented to the Court in detail what should been (and ultimately because) the main issue at stake in the Debtors' Chapter 11 Cases.

63.     Second, Law Debenture lessened the burden on the Committee by effectively and expeditiously assisting in the LBO investigation.  KBTF, as counsel to Law Debenture, and Zuckerman, as counsel to the Committee, coordinated their efforts in reviewing over 344,000 documents, analyzing the viability of twenty-five separate causes of action arising out of the LBO and investigating the LBO transaction as a whole.  Indeed, Law Debenture's separate preparation of a complaint enabled it to propose additional causes of action that arose as a result of the LBO, including (i) a declaratory judgment cause of action for equitable relief pertaining to certain holding companies that were set up in connection with the LBO, (ii) causes of action for negligence and misrepresentation, (iii) causes of action for breaches of fiduciary duty and aiding and abetting breaches of fiduciary duty, and (iv) an expansion of the universe of defendants liable for unjust enrichment.  Further, Law Debenture's factual and legal analysis of the LBO

Claims enabled it to advocate on behalf of all of Tribune's creditors that the LBO Claims had significant value.

64.    Third, Law Debenture utilized its factual and legal due diligence to lobby effectively both the Debtors and the Committee in favor of the significant value of the LBO Claims throughout the Application Period.  By December 2009, the Debtors again believed that the time was ripe to file a plan of reorganization.  Although certain members of the Committee agreed with the Debtors, others did not.  Therefore, Law Debenture prepared presentations for the Debtors and the Committee, each one tailored to the specific parochial interests of each constituency, advocating in favor of the substantial value of the LBO Claims.  After these meetings, the Debtors became more convinced that any filed plan needed to resolve the bulk of the LBO Claims, stepping back from the plan that they were negotiating with certain LBO Lenders.  Additionally, Law Debenture convinced the Committee that the LBO Claims had substantial value and it had a fiduciary duty to maximize their value.  Accordingly, as a result of Law Debenture's single-handed efforts, the Debtors held off filing any plan that would cast aside the LBO Claims and the Committee began work (with Law Debenture's assistance) on a complaint and its Standing Motion to prosecute the LBO Claims.  This provided Law Debenture (and its controlling noteholder, Centerbridge) the breathing room it needed to negotiate the April 2010 Settlement.  Although ultimately the April 2010 Plan was not confirmed, Law Debenture was successful in demonstrating that the LBO Claims could provide substantial value to parent creditors.[84]

65.    Fourth, at the specific request of the Examiner, Law Debenture (along with the other major parties in the case) provided its complete factual and legal analysis of the LBO

---

[84]  Law Debenture does not seek reimbursement for any specific negotiations or work regarding the April 2010 Plan.

Claims.  As the Examiner's goal was to use the parties' work product to create an adversarial process to aid his investigation, Law Debenture's input was essential.  Over the course of three months, KBTF and BG, with the assistance of MSG (who worked on solvency and other financial matters), prepared two memoranda of law at the request of the Examiner which provided detailed factual and legal analysis of over thirty-four discrete issues identified by the Examiner, shared the analysis underlying the twenty-five claims alleged in its draft complaint, and had numerous meetings and communications with the Examiner and his counsel concerning the LBO and the LBO Claims.  Based on Law Debenture's efforts, the Examiner produced a report validating Law Debenture's long held assertion that the LBO Claims were highly valuable and a plan of reorganization had to provide significant value to Tribune's creditors.  By the end of the Debtors' bankruptcy cases, the Court confirmed a plan of reorganization that incorporated a settlement of many of the LBO Claims and significantly relied upon the Examiner's report to determine that the settlement was reasonable.

66.    Thus, as a result of these actions, Law Debenture substantially contributed to the Debtors' estates by enabling Tribune's creditors to receive an increased distribution under the Confirmed Plan.  Specifically, Tribune's creditors received (i) over $500 million above their natural recovery for the settlement of certain LBO Claims and (ii) an interest in the Litigation Trust to pursue the unresolved LBO Claims which are valued at over approximately $350 million.  Absent Law Debenture's involvement, the Debtors would have achieved their initial goal of confirming a plan that provided Tribune's creditors with minimal consideration for the settlement of the LBO Claims.

67.    In *Syntax-Brillian*, the court found that the movant's tangible benefits to the estate included assisting the examiner, educating the court about the new avenues of recovery, adding

substance and veracity to the proceedings and creating opportunities for causes of action. 2009 WL 1606474, at *2-3. The court also noted that these efforts transcended the creditor's narrow interests and benefitted all creditors. *Id.* Similarly, here, Law Debenture's efforts in pursuing the investigation, analyzing the LBO Claims and assisting the Examiner directly resulted in a benefit to Tribune's creditors.

68.    Moreover, in *Worldwide*, the court based its finding of substantial contribution, in part, on the committee's request for the movants' assistance. 344 B.R. at 123. Similarly, here, both the Committee and Examiner requested and utilized Law Debenture's resources and work product to ultimately augment Tribune's distributable value.

69.    Thus, Law Debenture and its Advisors plainly made a substantial contribution to the Debtors' Chapter 11 Cases during the Application Period because they conferred a direct, significant and demonstrable benefit to the Debtors' estates and their creditors.

**2.    The Efforts of Law Debenture and Its Professionals During The Application Period Transcended Their Self-Interest.**

70.    Law Debenture's efforts were designed to benefit all parent level creditors of Tribune and, by doing so, ensured that none of the services that it rendered during the Application Period were purely in its own self-interest.

71.    The ultimate benefit to Tribune's creditors was not an incidental benefit of Law Debenture and its Advisors' efforts, but was the intended result of Law Debenture's goal throughout the Application Period to analyze the value of the LBO Claims and maximize distribution to Tribune's creditors based on a settlement and/or preservation of the LBO Claims. This alone ensures that reimbursement here is warranted. Indeed, bankruptcy courts in this district have noted that "[t]he relevant inquiry is not the motivation of the actor, but whether the estate benefitted by the actions taken. Thus, in the event the Court finds [movant's] actions

benefitted the estate, the costs of those actions will be allowed despite any self-interest." *In re Women First Healthcare, Inc.*, 332 B.R. 115, 122 (Bankr. D. Del. 2005); *cf. In re Geriatrics Nursing Home Inc.*, 195 B.R. 34, 38-39 (Bankr. D.N.J. 1996) (denying a losing plan proponent's bid for reimbursement, though noting that where evidence supports the proposition that a creditor has attempted to protect the interests of all creditors, as well as the estate, such actions transcend self protection, and enables a creditor to succeed on its substantial contribution claim).

72.    Indeed, all parties involved in a bankruptcy proceeding must have some self-interest in its outcome; otherwise standing to participate would not exist. *See, e.g., In re ANC Rental Corp., Inc.*, 277 B.R. 226, 233 (Bankr. D. Del. 2002) (finding parties did not have standing to be heard on the motion where they did not have interests in the proceedings outside of the interests they had through other parties that were already being represented). Thus, the Third Circuit has recognized that "the existence of self-interest cannot in and of itself preclude reimbursement." *Lebron*, 27 F.3d at 944. Moreover, the existence of other work performed during a debtor's bankruptcy case in a creditors' self-interest does not detract from the compensability of those acts performed for the benefit of the entire estate and its creditors. *See In re Essential Therapeutics, Inc.*, 308 B.R. 170, 175-176 (Bankr. D. Del. 2004) (awarding reimbursement for certain efforts by creditor' professionals, even though it concluded that a significant portion of the work included in the fee request was self-motivated and not compensable).

73.    The Third Circuit in *Tropicana* further held that the self-interest test requires proof that the movant would have not taken such actions "absent the promise of reimbursement by the estate." 2012 U.S. App. LEXIS 18511, at *6. Here, Law Debenture satisfies the *Tropicana* self-interest test because the evidence demonstrates Law Debenture acted for the

31

benefit of all Tribune's creditors based on the belief that Tribune would reimburse its fees and expenses.[85]

74.     Section 607 of the 1996 Indenture supports Law Debenture's belief that Tribune would reimburse its fees and expenses incurred during the Chapter 11 Cases.  Section 607 explicitly provides that Tribune agrees "to reimburse [Law Debenture] upon its request for all reasonable expenses, disbursements and advances incurred or made by [Law Debenture] in accordance with any provision of this Indenture (including the reasonable compensation and the expenses and disbursements of its agents and counsel), except any such expense, disbursement or advance as may be attributable to its negligence or bad faith."  The fact that the Debtors, pursuant to Section 607 of the 1996 Indenture, had already made a partial distribution to Law Debenture on account of its fee and expense claim evidences the reasonableness of Law Debenture's expectation that Tribune would reimburse its fees and expenses. [86]

75.     The April 2010 Plan negotiated, in part, by Law Debenture, provided for the reimbursement by Tribune of all of Law Debenture's fees and expenses.[87]  These fees and expenses included all of the fees sought herein in addition to other fees for which Law Debenture is not seeking reimbursement.

76.     Thus, the 1996 Indenture and the April 2010 Plan both provide independent evidence of Law Debenture's belief that Tribune would reimburse it for the fees and expenses it

---

[85] The *Tropicana* decision is further distinguishable in that Law Debenture's efforts during the Application Period did not represent "a bloodlust" where it would "have [proceeded] to do what [it] did regardless of whether there was a benefit shared by others who were constituents in the estate."  *In re Tropicana Entm't.*, LLC, No. 08-10856, Hr'g. Tr., 9:12-16, Sept. 10, 2009 [Dkt. No. 2426] (Bankr. D. Del. Sept. 10, 2009).  Attached hereto as Exhibit E is an excerpt of the transcript.

[86] Rosner Decl. at ¶4(e), Ex. 5.
[87] April 2010 Disclosure Statement, at Ex. B, p. 5.

incurred and that such reimbursement was a critical component of its decision to intervene in the

Debtors' Chapter 11 Cases.[88]

### 3.    Law Debenture's Efforts During The Application Period Were Not Duplicative.

77.    Law Debenture's efforts during the Application Period for which it seeks

reimbursement were hardly duplicative. Instead, it deliberately worked closely with the

Committee and tailored its efforts to avoid duplication, while protecting all parent level creditors.

78.    As explained in detail above, the make-up of the Committee and its inability, due

to its composition, to act predominantly for parent-level creditors (though in amount parent-level

creditors' claims exceeded subsidiary-level creditors' claims by over $2 billion) left Tribune's

creditors without a consistent voice to advocate fully in favor of the value of the LBO Claims.

At certain times, especially in connection with Law Debenture's preparation of the presentations

to the Debtors and the Committee and in the assistance it provided to the Examiner, Law

Debenture's role was unique and indispensible. Law Debenture's investigative work on both

legal and factual issues related to the LBO Claims was essential and enabled it to prepare the

presentations and ultimately convince the Debtors, Committee, and Examiner that the LBO

Claims had substantial value.

79.    Further, Law Debenture's assistance was, in part, specifically requested by certain

court-appointed professionals, including the Examiner and accordingly was not duplicative. *See*

*Worldwide*, 334 B.R. at 123 (finding movant substantially contributed to the case where services

were rendered at the request of the official committee).

---

[88]   The fact that Section 503(b) of the Bankruptcy Code requires that Law Debenture prove that its efforts substantially contributed to the Debtors' reorganization does not alter the fact that it believed that its efforts were of the type that were reimbursable by Tribune at the conclusion of the Chapter 11 Cases.

**C.      The Fees and Expenses Incurred By Law Debenture**
**During The Application Period Are Reasonable.**

80.      As demonstrated above, Law Debenture has plainly made a substantial

contribution to the Debtors' Chapter 11 Cases and is entitled to reimbursement of its reasonable

fees and expenses incurred by itself and its Advisors pursuant to Section 503(b) of the

Bankruptcy Code.  *See Lebron*, 27 F.3d at 944.  The reasonableness standard under Section

503(b) of the Bankruptcy Code is similar to the standard applied to requests for compensation

under Section 330 of the Bankruptcy Code.  *See N. Sports, Inc. v. Knupfer (In re Wind N' Wave)*,

509 F.3d 938, 941-44 (9th Cir. 2007).  Courts consider the time, nature extent and value of such

services, and the cost of comparable services in non-bankruptcy matters.  *See* 11 U.S.C. §

503(b)(4); *see also In re Texaco*, 90 B.R. 622, 627 (Bankr. S.D.N.Y. 1988) (noting that court

first determines whether creditor made a substantial contribution, then scrutinizes requests for

that creditor's attorney's fees).

81.      Law Debenture respectfully submits that the fees and expenses requested herein

are commensurate with fees that courts have awarded Law Debenture and the Advisors in other

chapter 11 cases and non-bankruptcy related matters, as well as with fees charged by other

attorneys of comparable experience in the Chapter 11 Cases.  Law Debenture's work in enabling

the Debtors' estates to realize substantial value from the LBO Claims was complex and required

piercing through a number of road blocks along the way.  Nevertheless, Law Debenture,

expeditiously, efficiently and cost-effectively achieved a significant monetary benefit for

Tribune's creditors.

82.      As described above, services rendered by Law Debenture and the Advisors

required the expenditure of extraordinary time and effort, as well as a high degree of professional

competence and expertise.  In particular, KBTF, as lead bankruptcy counsel, was a critical

34

component of Law Debenture's effort to investigate the LBO and pursue the LBO Claims.

Additionally, to appear and participate before this Court, it was necessary for Law Debenture to

retain local counsel, BG, whose advice and assistance was invaluable.  Finally, to enable Law

Debenture to analyze fully the LBO and the merits of many of the LBO Claims, it required the

financial expertise of MSG.

83.      The LBO involved novel and complex issues of fact that Law Debenture had to

devote a substantial number of resources to sift through and comprehend, which included the

review of approximately 4,300,000 pages of produced documents, analysis of twenty-five

separate causes of action related to the LBO, many of which involved complex bankruptcy and

non-bankruptcy issues and the preparation of two substantive briefs to the Examiner requiring

the analysis of thirty-four discrete issues.

84.      In representing Law Debenture, the Advisors staffed their respective teams as

efficiently as possible to avoid overlap while still providing the requisite advice and expertise

that was required throughout the Chapter 11 Cases.  As detailed above, Law Debenture

continuously coordinated its efforts with numerous parties, including the Committee, to avoid

duplication and maximize their effectiveness.

85.      Throughout the Application Period, the Advisors maintained detailed records of

the time expended by their respective professionals and paraprofessionals in the rendition of their

services to Law Debenture.  Such time records were generated contemporaneously by the person

who rendered the services when such services were performed and are generated in the ordinary

course of the Advisors' respective practices.[89]

---

[89]  Copies of detailed time records are available to the Court *in camera* and to the US Trustee and fee examiner on a
confidential basis.  A schedule summarizing the name of the professional, the applicable billing rate, the total hours
billed and the total amount billed during the Application Period for Law Debenture and each of its Advisors is
attached to the Motion as Exhibits F,G, H and I.

86.    The total time spent by the Advisors in connection with the work it is seeking

reimbursement for during the Application Period was 14,182.25 hours for a total charge of

$5,898,188.75 as calculated in accordance with the applicable firm's normal hourly rates in

effect at the time the services were rendered.  The hours and total charges are summarized as

follows:

| Firm | Hours | Total Charges |
|------|-------|---------------|
| KBTF | 12,302.1 | $5,233,521.00 |
| BG | 156.70 | $45,530.00 |
| MSG | 1,698.55 | $605,667.25 |
| Law Debenture | 24.90 | $13,470.00 |

87.    The fees sought herein are based upon the normal hourly rates of the Advisors for

services of this kind.  By way of illustration, the hourly rates charged by the Advisors are

comparable to those charged by counsel to the Debtors and the Committee.  The fees sought

herein are not unusual given the magnitude and complexity of the Chapter 11 Cases in general

and the LBO in particular and the time necessary in attending to the representation of Law

Debenture throughout the Application Period.  The rates charged by each of the Advisors for the

services rendered in the Chapter 11 Cases are the same rates charged by each firm for services

rendered in comparable non-bankruptcy related matters.  Such fees are reasonable and similar to

the customary compensation charged by comparably skilled practitioners in comparable non-

bankruptcy cases.

88.    Each of the Advisors also maintains records of all actual and necessary out-of-

pocket expenses incurred in connection with the professional services rendered.  The Advisors

incurred actual and necessary out-of-pocket expenses in connection with services performed

during the Application Period in the total amount of $208,958.34 in the aggregate.

89.     Furthermore, the reasonableness of the Advisors legal fees is underscored by the substantial economic benefit bestowed on Tribune' creditors through the realization of the value of the LBO Claims.  Indeed, as a result of the efforts of Law Debenture and its Advisors, the distributable value to Tribune's creditors was increased by over $850 million compared to the value they would have received absent a settlement of the LBO Claims.  This increase represents more than a 1000% increase in their recovery on their claims.

90.     It is also notable that the LBO Lenders who attempted to forestall any recovery on the LBO Claims are being paid reasonable fees and expenses by the Debtors under the Confirmed Plan.  It is highly counterintuitive – and counter to the intent of Section 503(b) of the Bankruptcy Code – that the fees and expenses of those parties who tried to diminish the distributable value of the Debtors' estates are paid in full while those parties who successfully augmented the estate are left to fund their own efforts.

91.     In sum, the services Law Debenture and its Advisors rendered were performed efficiently, effectively and economically and are reasonable given the circumstances under which they arose.

* * *

92.     Based on the foregoing reasons, this Court should grant the Motion.

## LOCAL RULE 2016-2(h) WAIVER

93.     Law Debenture and its Advisors do not keep time records differentiated by activity on a daily basis in the ordinary course of their businesses.  Thus, the time records may be lumped and may be viewed as non-compliant with Local Rule 2016-2(d)(vii).  Therefore, Law Debenture respectfully requests that the Court waive such requirement in accordance with Local Rule 2016-2(h).  *See Worldwide*, 334 B.R. at 120.

## CONCLUSION

WHEREFORE, Law Debenture respectfully requests that the Court enter an order, substantially in the form attached hereto as Exhibit A, (a) allowing as an administrative expense claim on account of the Law Debenture fees and expenses in the amount of $6,107,147.09, (b) authorizing and directing payment thereof, and (c) granting Law Debenture such other and further relief as the Court deems just and appropriate.

Dated: March 1, 2013
      Wilmington, Delaware

Respectfully submitted,

BIFFERATO GENTILOTTI LLC

     */s/ Garvan F. McDaniel*
Garvan F. McDaniel (I.D. No. 4167)
800 N. King Street, Plaza Level
Wilmington, Delaware 19801
Telephone: 302-429-1900
Facsimile: 302-429-8600

-and –

KASOWITZ, BENSON, TORRES
  & FRIEDMAN LLP
David S. Rosner
Sheron Korpus
Christine A. Montenegro
Matthew B. Stein
1633 Broadway
New York, New York 10019
Telephone: 212-506-1700
Facsimile: 212-506-1800

*Co-Counsel for Law Debenture Trust
Company of New York, solely in its capacity
as successor indenture trustee under the
1996 Indenture*