# EXHIBIT C

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

```
--------------------------------------------------x
In re:                                          :    Chapter 11 Cases
                                                :    Case No. 08-13141 (KJC)
TRIBUNE COMPANY, et al.,                        :    Jointly Administered
                                                :
                      Reorganized Debtors.      :
                                                :
--------------------------------------------------x
```

**DECLARATION OF DAVID S. ROSNER IN SUPPORT OF
MOTION OF LAW DEBENTURE TRUST COMPANY OF NEW YORK
PURSUANT TO 11 U.S.C. §§ 503(b)(3)(D), 503(b)(4) AND 503(b)(5)
FOR ALLOWANCE AND PAYMENT OF FEES AND EXPENSES
INCURRED IN CONNECTION WITH MAKING A SUBSTANTIAL
<u>CONTRIBUTION TO THE DEBTORS' CHAPTER 11 CASES</u>**

I, DAVID S. ROSNER, hereby declare that the following is true and correct to the best of my knowledge, information and belief:

1.      I am a partner at Kasowitz, Benson, Torres & Friedman LLP, counsel to Law Debenture Trust Company of New York ("<u>Law Debenture</u>"), in its capacity solely as successor indenture trustee under that certain indenture dated March 19, 1996 (the "<u>1996 Indenture</u>") between Tribune Company ("<u>Tribune</u>," and with its debtor subsidiaries, "<u>Debtors</u>") (successor to The Times Mirror Company) and Citibank, N.A.

2.      I submit this declaration in connection with the *Motion Of Law Debenture Trust Company Of New York Pursuant To 11 U.S.C. §§ 503(B)(3)(D), 503(B)(4) And 503(B)(5) For Allowance And Payment Of Fees And Expenses Incurred In Connection With Making A Substantial Contribution To The Debtors' Chapter 11 Cases* (the "<u>Motion</u>"), filed contemporaneously herewith.

3.      In connection with the Motion, I have reviewed the requirements of Local Rule 2016-2 of the Local Rules of the Bankruptcy Court for the District of Delaware and certify that

the Motion is in compliance with the local rules, except with respect to those provisions for which Law Debenture seeks a waiver from the Court.

     4.     In connection with the Motion, I am also presenting the Court with the following attached documents:

    a.    Attached hereto as <u>Exhibit 1</u> is a true and correct copy of an article that appeared in DebtWire on August 6, 2009, titled "Tribune Presents Restructuring Term Sheet To Lenders, Sources Say".

    b.    Attached hereto as <u>Exhibit 2</u> is a true and correct copy of an article by Michael Oneal that appeared in the Chicago Tribune on January 16, 2013, titled "Broken Deal:  Bankruptcy Inc. (Part  4)".

    c.    Attached hereto as <u>Exhibit 3</u> is a true and correct copy of an email dated January 25, 2010 from Andrew Goldfarb, counsel to the Committee, to Sheron Korpus and Christine Montenegro, counsel to Law Debenture.

    d.    Attached hereto as <u>Exhibit 4</u> is a true and correct copy of a letter, dated May 10, 2010 from the Examiner to certain parties detailing the scope of his investigation and requested cooperation from the parties.

    e.    Attached hereto as <u>Exhibit 5</u> is a true and correct copy of Section 607 of the 1996 Indenture.

I declare that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:  March 1, 2013
       New York, New York

                 Respectfully submitted,

                 _David S. Rosner_
                 DAVID S. ROSNER

                       /MBS

Rosner Decl. Exhibit 1

Debtwire.com

| 06-Aug-09 17:41 Story: | **Tribune presents restructuring term sheet to lenders, sources say** |

Tribune Company recently presented a restructuring term sheet to a steering committee of its lenders, said three sources close to the situation

The proposal contemplates holders of Tribune's more than USD 8.8bn in pre-petition bank debt extinguishing much of their claims in exchange for an unspecified amount of reorganized equity and a pro rata share of a new USD 500m-USD 700m secured note, the sources said. The pre-petition facility consists of a USD 750m revolver, USD 7.55bn tranche B term loan and a USD 512m tranche X TL.

Tribune and loan agent JPMorgan declined comment. Barclays Capital did not return calls.

Meanwhile, the Chicago-based media magnate has filed a motion to extend its exclusivity rights through 30 November from the initial expiration deadline on Tuesday (4 August). The timeline change would be a shift from the debtor's previous 1 September target date for filing a plan of reorganization. Judge Kevin Carey of the US Bankruptcy Court for the District of Delaware is set to consider the exclusivity extension request during an 11 August hearing.

As previously reported, Tribune released revised financial projections in June which project USD 3.1bn in revenue and USD 60m in free cash flow in FY09. Free cash flow was forecasted to jump to USD 89m in FY10, reflecting reduced interest costs once the media concern emerges from insolvency off USD 2.8bn in revenue.

Comps for Tribune's newspaper units have reported improved 2Q09, but related more to cost-cutting than any turnaround in advertising, said multiple industry sources. Revenues at the New York Times and the Washington Post print divisions were down 21% and 14%, respectively, in 2Q09.

Tribune's TLB was quoted at 42.75 today, up from 34-35 on 20 July and in the low-20s in early March, according to a buyside source and Markit. Some of the recent upward trading movement is linked to rumors that Tribune is close to selling the Chicago Cubs assets for USD 900m, the buysider said.

One of the leading bidders for the Cubs assets, the Ricketts family, is said to have fully underwritten equity and debt commitments on its USD 900m bid, said a source close to the situation, adding that negotiations are ongoing.

by Jon Berke and Sharon Adams

Key Words: Committee Activity, DIP Finance/Exit Finance, Distressed Sale

| Source: | Debtwire |
| Intel. Grade: | Strong evidence |

**Dealscope potential activity analysis**

| DS Target | Chicago Cubs |
| DS Bidder | The Ricketts family |
| DS Bidder | Klaff Realty, LP |
| DS Bidder | Marc Utay (New York private equity investor) |
| DS Vendor | Tribune Company |
| Issuer | Tribune Company |
| Financial advisor | Lazard |
| Lawyer | Sidley Austin LLP |
| Other Equity Provider | Sam Zell |
| Book-runner | JPMorgan |

**Tribune Company is in Lev. Loan/High Yield**

| Balance Sheet & Docs | Tear Sheet |

**Tribune Company is in CH11-Restructuring**

| Balance Sheet & Docs | Restructuring Details | Tear Sheet |

Request Tear Sheet

*Debtwire only provides Tear Sheet on companies that have public financial statements*

Rosner Decl. Exhibit 2

www.chicagotribune.com/business/tribune/ct-biz-trib-series-4-20130116,0,271351.story

# chicagotribune.com

## Part four: Bankruptcy Inc.

### Years later, the big winners in Tribune Co.'s Chapter 11 case are the investment firms that profit from the boom-and-bust cycles of Wall Street

By Michael Oneal, Chicago Tribune reporter

January 16, 2013

Somewhere in the third year of Tribune Co.'s marathon Chapter 11 proceeding, U.S. Bankruptcy Judge Kevin Carey looked out at a Delaware courtroom packed with high-priced attorneys and conceded the case had broken down into what he called a "multiconstituent melee."

"The parties are represented by some of the best lawyers in the field," he said. "You know how to fight well ... but nobody ends up the better for it, really."

Carey was trying to make a point about the foundation of bankruptcy law, which recognizes that a company and its creditors are better off hammering out a settlement than fighting endless court battles.

advertisement

**Are annuities the right choice for your retirement?**

If you have a $500,000 portfolio and own an annuity, you have a lot at stake. Make sure you understand the details by downloading *Annuity Insights: Your Guide to Better Understanding Annuities* by *Forbes* columnist Ken Fisher's firm. This guide is designed to help you better understand these investments. Act now!

Click Here to Download!

FISHER INVESTMENTS®

But his exasperation reflected a difficult new reality. Aggressive investment funds and their lawyers, who earn as much as $1,000 an hour, can turn big corporate bankruptcies into gang wars fought in pinstripes — with companies, their employees and business partners feeling powerless over the outcome.

In the same way that Chicago billionaire Sam Zell's disastrous leveraged buyout of Tribune Co. in 2007 drew back the curtain on an era of amped-up Wall Street deal-making, the Chicago-based media company's lengthy journey through Chapter 11 exposed a powerful but little-known industry thriving in the midst of the American bankruptcy court system.

It's a business built on the bewildering complexity of the global markets, and it attracts some of the brightest minds in law and finance.

They are members of a clubby group of specialist investors who buy up a troubled company's "distressed debt" and other securities for pennies on the dollar. Then they match wits at the negotiating table or in court to see who can walk away with the biggest pieces of bankrupt companies' value.

These players serve an important function. Their willingness to buy up claims provides a ready exit for creditors who are unable or unwilling to fight for their rights in bankruptcy court. But their participation can come at a staggering cost. For Tribune Co., Chapter 11 broke into a free-for-all that lasted four years, leaving the company hindered at a crucial moment in the transformation of the media industry.

Even before Tribune Co. filed for Chapter 11 protection, its fate was largely in the hands of a group of banks led by JPMorgan Chase & Co. and two investment funds with a combined $106 billion in assets — Oaktree

Capital Management and Angelo, Gordon & Co. Their conflict with other funds, including Centerbridge Partners and Aurelius Capital Management, turned what might have been a basic restructuring effort into a war of attrition.

The difference between the funds and the banks is that the distressed-debt specialists chose to buy into the company's debt specifically to turn a profit, not recover losses. And many succeeded brilliantly, most notably Oaktree and Angelo Gordon, which emerged from the fray in control of a much healthier company with an array of iconic media assets, including the Chicago Tribune and the Los Angeles Times.

The Tribune Co. case raises many questions about the impact of investment funds on the bankruptcy process. Many scholars say the system is still the best way to protect creditors' rights, noting that the complexity of the Zell deal and its timing on the cusp of the economic crisis created a legal morass that was hardly typical. Some participants in the case questioned the effectiveness of Carey, arguing his seeming indecisiveness and insistence on a broad consensual settlement dragged out the case needlessly.

But for those trapped in the Tribune Co. saga against their will, arguments about creditors' rights and legal process seem more like a smoke screen to justify how Wall Street interests are allowed to profit with little or no concern for the health of a company or its employees.

For Tribune Co., its employees and many of its smaller creditors, bankruptcy became a debilitating period of missed opportunities and stalled strategy. The cost to Tribune Co. in legal and professional fees alone will likely run to more than $500 million.

Astoundingly, as many as 35,000 unwitting former Tribune Co. shareholders are now the target of pending creditor litigation that could potentially force them to give back money they received more than five years ago. Most can't fathom how the simple act of buying and selling stock in a major U.S. company could someday land them in front of a judge.

"What seems grossly unfair," Colorado investor Mark Lies wrote to Carey in 2011, "is there doesn't appear to be any adult supervision looking out for the average investor like myself. ... (Y)ou have unemotional, ruthlessly efficient and litigious investors attempting to extract whatever they can from whomever they can."

Carey sounded his own concerns in an opinion at a pivotal moment in the case.

"There is no moral to this story," the judge wrote, citing the fable of the Scorpion and the Fox, a tale of mutually assured destruction. "Its meaning lies in the exposition of an inescapable facet of human character: the willingness to visit harm upon others, even at one's own peril."

### Power shift

Corporate bankruptcy was never supposed to be easy, but it didn't become blood sport until specialized Wall Street investment firms got involved.

For decades, Chapter 11 protection was used by struggling companies and their managers to negotiate with lenders and anyone else owed money. The goal was to restructure the debt, with the guiding principle of preserving the company's long-term prosperity. Ownership often changed, but the idea was to maximize recovery for all.

Companies were capitalized with relatively straightforward financial instruments — stocks, bonds and bank loans. Executives tended to know who their major creditors were and what motivated them, so consensus was usually within reach.

But in the high-octane global financial system that produced the complex Tribune Co. buyout, the sense of an enduring partnership between a company and its creditors has become an anachronism.

Balance sheets these days are like 3-D chessboards built on multiple classes of debt and other securities. Lenders like JPMorgan Chase or Citigroup dilute their interest in the company almost immediately by making loans, then selling them in pieces to other investors, who, in turn, slice and dice them again to create new derivative securities that eventually find their own markets.

When a company runs into trouble, these widely fragmented claims begin to churn. Worried investors sell, driving down the price of a company's securities. Soon the deflation attracts distressed-debt investors with a specialized understanding of how to profitably play the bankruptcy game.

This leads to what Jonathan Lipson of the Temple University law school calls a "shadow bankruptcy system," a largely unregulated marketplace where private funds trade claims behind closed doors, building positions they hedge with derivatives and other financial instruments.

During a case, investors move in and out to maximize their profits or augment their clout. Amid this gamesmanship, there may be few shared objectives among the investors, making it impossible to assume that everybody agrees that the goal is to create a healthy, restructured company.

"If somebody figures they can get more recovery in a courtroom than in a conference room, then that means complex litigation at a high cost," said Jack Butler, a leading bankruptcy attorney at Skadden, Arps, Slate, Meagher & Flom in Chicago. "Once you're in that kind of a spiral, it's very difficult to turn it around."

Precisely because of the potential for courtroom chaos, most big insolvent companies try to avoid it altogether. Instead, they negotiate a restructuring plan before they file for Chapter 11, a solution known as a prepackaged bankruptcy. Prepacks let even massive companies enter and exit bankruptcy in a matter of weeks, as General Motors Co. did in 2009.

But for Tribune Co., the fast track through bankruptcy was not really an option. The company's creditors were too scattered and its situation too complicated to forge a quick deal. Instead it chose what is ruefully called a "free-fall bankruptcy."

Tribune Co. and its advisers — led by the company's general counsel, a former Zell attorney named Don Liebentritt — were officially in control of the restructuring process. But within months, their hopes of brokering a quick settlement stalled amid the forces arrayed against compromise.

By the time Tribune Co. filed for bankruptcy in 2008, Oaktree and Angelo Gordon already had begun laying their bets. Independently they had amassed large chunks of the $8.7 billion in "senior" debt used to fund the Zell buyout, making them Tribune Co.'s most powerful creditors alongside JPMorgan and the three other banks that made the original buyout loans.

The buyout debt was "senior" because it had been given special guarantees of payback in case of a bankruptcy. And because their claim was more than $1 billion above the estimated total value of the bankrupt company itself, the holders of this debt would likely end up owning Tribune Co. once it was reorganized in bankruptcy court. For Oaktree and Angelo, that would amount to a bargain-priced backdoor takeover.

What they didn't expect was a militant response from several other investors who had trained their sights on $1.28 billion of Tribune Co. bonds that the company had issued long before the buyout.

Those bonds had been rendered "junior" to the buyout debt by the Zell deal and were trading for just a few cents on the dollar, reflecting their slim chances of recovery. But to some Wall Street specialists, including Jeffrey Aronson, co-founder of a distressed-debt firm called Centerbridge Partners, they represented a ripe opportunity, sources said.

Although the banks, Liebentritt and an official committee representing creditors at first assumed these junior bondholders would be happy with a relatively small payment pegged to market prices, Aronson argued that they were all ignoring a key fact: The company had collapsed less than a year after the buyout closed.

From where Aronson sat, the botched Zell deal was a classic case of "fraudulent conveyance," a legal concept meaning the deal left the company insolvent from the start by swamping it with $13 billion in debt (including obligations already on Tribune Co.'s books). If Centerbridge and others could convince the court that a fraudulent conveyance had taken place, a judge might invalidate the senior claims, leading to a big payout for the juniors, said attorney David Rosner of Kasowitz Benson Torres and Friedman, who represents the trustee for those bonds.

That was a long shot; fraudulent conveyance was never easy to prove. But after researching the claims, Centerbridge bought $400 million of the junior bonds at a deep discount, reasoning that the case was strong enough to force Oaktree and the others to hand over a profitable settlement. Another fund called Aurelius Capital Management also saw the opportunity and bought a smaller stake in the junior bonds.

Tribune Co. and its advisers still believed a settlement was within reach, even if the senior creditors had to pay more. But they quickly learned that the Zell deal defied easy answers.

Though the transaction was by definition a failure open to challenge, the circumstances were unique: It closed in two steps, six months apart, a period straddling a historic collapse in the financial markets. It presented so many complex, untested legal issues that assigning blame was hardly clear-cut.

Early on, Kenneth Liang, the Oaktree executive in charge of the Tribune Co. investment, told Liebentritt that he had no intention of handing over a fat settlement to the junior bondholders, Liebentritt said. Based on its own research, Oaktree felt the fraudulent conveyance claims were baseless and preferred to file a plan that would give a token amount to the junior bondholders to settle claims against the banks and let the juniors litigate the rest.

Oaktree declined to comment, but documents show that Oaktree was loath to set a bad precedent for other cases by caving in to the junior bondholders. Liang and his bosses knew that the same players in bankruptcy court moved from case to case like a traveling roadshow. Raising expectations for the next negotiation and the one after that could encourage settlements that might erode Oaktree's returns.

As Oaktree Chairman Howard Marks put it later in an email to his partner, Bruce Karsh: "We need to show others that they can't come in, buy juniors where we're senior and get rich."

For Centerbridge, which declined to comment, and the other junior creditors, the seniors' stance only meant they had to fight harder to "educate" the judge and the other parties as to the strength of their case, Rosner said. Documents show they were demanding as much as $1 billion for their claims versus an offer from the seniors of closer to $75 million.

To build leverage, the junior creditors filed motion after tactical motion in bankruptcy court, aimed at showing Judge Carey how the senior creditors had co-opted everyone else in the case in an attempt to "cram-down" a plan the junior bondholders found unacceptable. Behind the scenes, Centerbridge waged a quieter campaign to win over Tribune Co. and push the official creditors committee to endorse a settlement based on the claims.

Much to the annoyance of Liang and the other senior debt holders, Liebentritt and his advisers responded to the Centerbridge incursion by continuing to push for a full settlement of the claims that would avoid costly litigation against anyone. Liebentritt said he believed this would be the cleanest solution for the company. But because that plan would include legal releases for Zell and company executives, fighting for it exposed Liebentritt to charges from all sides that he was trying to protect Zell, his longtime former boss.

In an interview, Liebentritt said, "I made no secret of my ties to Sam and acknowledged the criticism. But I truly believed (avoiding any litigation with a settlement) was the right thing for the company and all the other constituents."

**Oh, so close**

In April 2010, after the growing acrimony dragged the case into its second year, Liebentritt almost got his wish.

He and Tribune Co.'s chief negotiators, investment banker David Kurtz of Lazard Ltd. and lawyer James Conlan of Sidley Austin, came close to brokering a compromise. But its ultimate failure only underlined how little power Tribune Co. really had to determine the outcome of its own Chapter 11 case.

Oaktree's Liang had backed away from the talks with management in early 2010, and lead bank JPMorgan seemed in no mood to budge. But as Kurtz and Conlan shuttled between camps trying to soften up both sides, they began to sense that Centerbridge and Angelo Gordon might be willing to deal, Kurtz said.

Before Aronson launched Centerbridge in 2005, he had run the distressed-debt business at Angelo Gordon and was still on good terms with Tom Fuller, who had taken over the job when Aronson left. The Tribune Co. team encouraged them to speak directly, rather than through more junior executives. And though Kurtz said neither would make the first call, afraid to lose face if the other balked, Aronson finally made a move.

One morning in March as Kurtz was at the doctor preparing for a routine procedure, Aronson called. "I will call Fuller if you call him first and make sure he is willing to deal," Kurtz recalls him saying. "If I call and he isn't, this is over."

As the nurse was trying to sedate him, Kurtz was still on his cellphone with Fuller, getting the assurances Aronson wanted. Kurtz said he reached Aronson shortly before the procedure began, then passed out. When he woke up, Aronson and Fuller had cut a deal giving the Centerbridge group a little more than $450 million, or 7.5 percent of the debtor's value.

JPMorgan balked at the price but eventually signed on to a slightly lower offer. The reason: Centerbridge agreed to release the banks as well as Zell and Tribune Co.'s leadership from any liability.

Oaktree, however, responded angrily. Emails show that Liang chastised Fuller at Angelo Gordon for breaking ranks. He then fired off his own set of motions, decrying the deal as "dead on arrival" because it forced Oaktree and other senior creditors who had little liability to fund the releases for others who were exposed. That included Zell, who was getting his release for free.

This skirmish threatened to bust up the alliance at the heart of the senior lender group. Upset at Oaktree, which was recruiting allies among other investors to block the plan, JPMorgan began flexing its muscles.

Officials at the bank declined to comment, but documents show JPMorgan threatened to pull unrelated business from Oaktree and began pressuring other players on Oaktree's side to support the settlement. One of those was Avenue Capital Group, which at the time was raising money for a new fund it hoped would include a $250 million investment from JPMorgan.

Sources said Avenue Chairman Marc Lasry told Oaktree's Karsh that he'd wait a month to see if Oaktree could force a new deal. But when that didn't happen, he defected to the other side, saying he couldn't afford to lose JPMorgan's business. That elicited a biting email response from Oaktree's Liang.

"Tell Marc that he should be fitted for a skirt and play off the women's tees," Liang wrote to Karsh.

### Who is winning?

As the battle raged, one voice at the center of the action was largely muted — Judge Carey's.

Many pitched hearings ended with a simple "That's all for today," leaving the combatants puzzling over whose arguments had prevailed. Some argue — anonymously, since they are reluctant to criticize a sitting judge — that this left a leadership vacuum that prolonged the acrimony.

"You gotta make a decision one way or another," one of the main players complained in an interview. "We might think it's a right decision or a wrong decision. But we just need you to make a decision."

As a sitting judge, Carey could not discuss the case. But many experts say his reluctance to aggressively dictate an outcome may have stemmed partly from the fact that the bankruptcy code discourages it. Judges are supposed to guide the case toward a settlement but have few tools at their disposal to corral adversaries.

In 2011, at the end of confirmation hearings that failed to settle the case, Carey noted that he believed Oaktree and Angelo Gordon had every right to protect themselves from what they saw as bottom feeders. JPMorgan was free to push its weight around if that served its ends. And the juniors had the right to step in and pursue what they saw as the best business opportunity.

"But you know," he said, imploring the parties to find their own solution, "at the end there has to be an exit of some kind."

Ironically, one of Carey's most decisive moments — his appointment of a bankruptcy examiner to provide a third-party assessment of the fraudulent-conveyance charges — only produced a heightened level of acrimony in the case.

Once the senior group splintered, Carey recognized that the fraudulent-conveyance charges weren't going to be easily negotiated away. So he appointed a Los Angeles lawyer and bankruptcy scholar named Kenneth Klee to sort through the Zell buyout and determine who might be liable for what. He said he hoped the exercise would make a settlement easier.

Klee's report had the opposite effect.

Klee and his team spent long hours sifting through the Zell deal. When they were through, they produced four thick volumes running thousands of pages that carefully broke down the evidence and assigned probabilities to eight possible outcomes of litigation. Klee's bill: $12 million.

The problem was, the findings were so intricate and inconclusive that everybody felt the report supported their case. As David LeMay, an attorney for the committee representing creditors, put it, "You know, the examiner's statement is like the Bible. There's something there for everybody."

What happened next provided a classic example of how claims trading in bankruptcy court can change the complexion of a Chapter 11 proceeding overnight.

Aurelius had slowly been increasing its position in the junior bonds while accumulating a controlling stake in another esoteric form of junior Tribune Co. debt called the PHONES. A few months after the Klee report landed in late July 2010, Aurelius approached Centerbridge with an offer to buy out its stake, allowing Aronson to go home with what everybody assumed was a handsome profit.

The moves established Aurelius as by far the largest junior creditor with the power to control the fate of two classes of Tribune Co. debt. And that quashed any lingering chance of resuscitating the April 2010 settlement.

Even after the Klee report, Tribune Co. and the senior creditors held out hope they could strike a deal with Centerbridge. But in terms of its demands, Aurelius "was in another universe," Kurtz said.

Aurelius founder Mark Brodsky casts himself as the lonely voice of the oppressed junior creditor. His email signature contains a rolling selection of quotations from the 12-volume "Meditations" of the Roman emperor Marcus Aurelius. A favorite: "Pay no attention to the chatter of your critics. ... If it is good to say or do something, then it is even better to be criticized for having said or done it."

Brodsky, who wouldn't comment, is well-respected for his legal intellect. But his critics abound. He is viewed as a tenacious disrupter of Chapter 11 cases, using all legal remedies at his disposal to boost the value of his stake. In the Tribune Co. case, he publicly accused the original lenders of refusing to negotiate. Instead, he

said, they were trying to "extort a cheap settlement as the price for allowing Tribune to emerge from bankruptcy" and suggested that company management had supported them to "cover up and gain releases for their own wrongdoing."

Once he bought out Centerbridge, Brodsky hired Aronson's legal team and began building a set of aggressive legal strategies based on the Klee report. They were, for the most part, untested and risky. But they were plausible enough to extend the case for two more years, including an expensive two-week trial on the fraudulent-conveyance issues.

Aurelius lost that battle. Ultimately, Carey blessed a plan that shared some similarities with the one that had fallen apart in 2010. It gave Aurelius and its allies $431 million for their $1.28 billion in claims — much less than they wanted.

But Brodsky wasn't finished. He also won two other key victories that will allow Aurelius to keep the Tribune Co. case alive in the courts for years to come as the firm seeks to recover the rest of its money.

First, the approved plan contains a litigation trust that gives junior bondholders and holders of the PHONES the right to pursue a wide range of unsettled claims against a variety of defendants, including Zell, Tribune Co.'s former board and management, and the company's advisers.

Exploiting a controversial loophole in the law, Aurelius also won the right to shift the fraudulent-conveyance litigation out of bankruptcy court and into state courts around the country. The firm has filed 47 lawsuits nationwide against 35,000 former shareholders, seeking to recover every cent of the $34 a share they received in the original Zell deal.

The move is without a settled precedent, and Aurelius still has to win a preliminary judgment in federal district court before the cases can proceed. But if it prevails, Aurelius will be able to exert heavy pressure on the largest former shareholders for a major settlement.

Tribune Co. finally emerged from bankruptcy court Dec. 31, 2012, with a clean balance sheet and new prospects. Senior creditors led by Oaktree, Angelo Gordon and JPMorgan collected $3 billion in cash and 98 percent of the company's equity, which was initially valued at $4.5 billion. Aurelius and the other junior creditors, meanwhile, can keep fighting for what they think is rightfully theirs — as long as they're willing to foot the legal bills.

Legal scholars like Douglas Baird at the University of Chicago Law School acknowledge that the Chapter 11 process is being stretched to the limit by investment funds with seemingly endless resources to fight for competing agendas.

But he and others argue that the system needs to be fine-tuned, not overhauled, to add more transparency and encourage compromise. The biggest problem, said Seton Hall University law professor Stephen Lubben, is that changing the law means involving Congress. Most experts and practitioners, he said, believe that would only make things worse.

One measure of the almost absurd complexity of the Tribune case was that Zell, the architect of the transaction that landed Tribune Co. in bankruptcy court, is both a defendant in the ongoing creditor litigation and a junior creditor himself by virtue of a $225 million piece of debt that was part of his investment.

Zell's attorneys continue to pursue that claim, so far unsuccessfully. And they have aggressively sought to have the creditor allegations thrown out as unfounded, noting that the Klee report largely absolves him of any wrongdoing.

Otherwise, Zell has largely gone silent on the topic of Tribune Co., a clear contrast to his early days with the company when he barnstormed the country confidently predicting his deal's success. Now, when the occasional interviewer asks for his reaction to the bankruptcy, Zell often provides a gruff answer, noting that the deal would have worked if not for a "perfect storm" of unforeseen circumstances.

Then he changes the subject.

*Tribune staff reporter Steve Mills contributed.*

*mdoneal@tribune.com*

Copyright © 2013 Chicago Tribune Company, LLC

Rosner Decl. Exhibit 3

REDACTED

---

**From:** Goldfarb, Andrew [mailto:agoldfarb@zuckerman.com]
**Sent:** Monday, January 25, 2010 4:19 PM
**To:** Sheron Korpus; Christine Montenegro
**Cc:** Bush, Graeme W.
**Subject:** Tribune


Sheron and Christine -- Again, I appreciate the collaborative effort and your considerable input for the JPM depos last week.  (And that of Matt and other colleagues, if they contributed as well.)

Sheron, good luck in your ED Va argument this week (tomorrow?).  If you are willing to share the draft Trib complaint you have prepared, we'd welcome the benefit of your efforts as we continue to get ours into ready-to-file condition.

Regards,
Andrew



This e-mail and any files transmitted with it are confidential and may be subject to the attorney-client privilege. Use or disclosure of this e-mail or any such files by anyone other than a designated addressee is unauthorized. If you are not an intended recipient, please notify the sender by e-mail and delete this e-mail without making a copy.

Rosner Decl. Exhibit 4



Klee,
Tuchin,
Bogdanoff &
Stern
LLP

1999 Avenue of the Stars
Thirty-Ninth Floor
Los Angeles, California  90067

voice: 310-407-4000
fax: 310-407-9090
www.ktbslaw.com

E-mail:  kklee@ktbslaw.com
Direct Dial:  310-407-4080

**CONFIDENTIAL**

May 10, 2010

To:  The Parties Listed on Exhibit A
     Attached Hereto

Re:    *In re Tribune Company, et al.* (collectively, "Debtors"); Request for
       Materials from Parties

Dear Counsel:

The purpose of this letter is to formalize certain previously made requests of the parties identified in this letter in connection with my examination pursuant to the Agreed Order Directing the Appointment of an Examiner, as the same has been or may be augmented ("Agreed Order"):

1.     Please furnish to me through my counsel any documents or analyses that may bear meaningfully upon the factual or legal subject matter of my investigation, especially as it pertains to the interests of your respective clients.  I request that all submissions be transmitted (by electronic means if possible) to my proposed counsel, Klee, Tuchin, Bogdanoff & Stern LLP, c/o Martin Barash and Lee Bogdanoff, 1999 Avenue of the Stars, 39th Floor, Los Angeles, California 90067 (mbarash@ktbslaw.com) and Saul Ewing LLP, c/o Mark Minuti, 222 Delaware Avenue, Suite 1200, P.O. Box 1266, Wilmington, Delaware 19899 (mminuti@saul.com).  I also request that you identify to me the names and contact information of any individuals that you believe I should interview or any discovery that you believe I should conduct in conjunction with my investigation.

2.     I request that, on or before May 21, 2010, the Debtors submit to me through my counsel an electronically annotated statement and documentary appendices setting forth the relevant "basic facts, agreements, and circumstances culminating in the 2007 LBO transaction" and, ultimately, the Debtors' chapter 11 cases.  Without limiting the preceding, I request that the narrative cover: (i) the relevant Debtor entities and ownership structure; (ii) the transactions effectuated in

To:  The Parties Listed on Exhibit A Attached Hereto
May 10, 2010
Page 2

2006; (ii) the Debtors' decision to initiate the process which culminated in the 2007 LBO transaction, including the timing and participation in the relevant board meetings, the establishment of any special committees (and the conduct of the same), the retention of professionals, and the solicitation of proposals, etc.; (iii) the conduct of the sale process (i.e. the solicitation, bid and auction process); (iv) the transactions entered into in April 2007, including the principal agreements and the structure (and any undertakings and conditions contained therein with respect to Step 2); (v) the mechanism for funding of the consideration paid to various parties in connection with the closing of such transactions along with the sources and uses; (vi) the pre- and post-transaction capital structure, including the principal terms of the debt instruments; (vii) the transactions entered into and effectuated in December 2007; and (viii) any prepetition defaults, announcements concerning the same, and the commencement of the cases.  To the maximum extent possible, I urge the Debtors to circulate an initial draft of that narrative, or portions thereof, to the parties and attempt to reach agreement concerning the submission in advance of the submission on May 21, 2010.  I request that on that date, the Debtors furnish the final version of that narrative to me, through my counsel, and the recipients of this letter.

3.     I request that on or before 2:00 p.m., Eastern Time, May 24, 2010, the parties identified below submit to me, through my counsel, electronically annotated legal briefs and documentary appendices in support of their respective positions concerning the first item set forth in the Agreed Order that is the subject of my investigation (the evaluation of potential claims, causes of action, and defenses arising under and in connection with the 2007 LBO  transaction).  As I have discussed with you, I request that these submissions contain comprehensive legal and factual analyses of the issues that you believe are relevant, akin to submissions typically presented in connection with mediations, or trial briefs submitted on the eve of trial.  Your brief should address all claims and causes of action that you believe should be asserted on behalf of the estate; if you maintain that defenses are available in respect of any claim, you should discuss any defense that you believe is applicable.  The appendices submitted with the legal briefs should include: (i) all documents on which the factual contentions in the briefs are based and (ii) copies of any unreported opinions cited therein.

4.     The following <u>maximum</u> page limits apply with respect to the briefs that are due on May 24, 2010 (which page limits do not include tables of contents, tables of authorities, or the contents of the appendices):

Debtors ........................................................................................ 75 pages

Official Creditors' Committee.................................................... 75 pages

JPMorganChase Bank N.A., as Agent ..................................... 50 pages

To:  The Parties Listed on Exhibit A Attached Hereto
May 10, 2010
Page 3

Credit Agreement Lenders ........................................................ 50 pages

Wilmington Trust Company .................................................... 100 pages

Law Debenture Group/Centerbridge Credit Advisors LLC ...  50 pages

Wells Fargo Bank, N.A. ........................................................... 50 pages

These page limits are generous.  Please do not attempt to perform a proverbial end-run around the limits by turning what really belongs in text into footnotes or by attempting to include substantive legal analysis in an appendix.

5.    I encourage you to avoid flowery introductions or rhetorical devices in lieu of concrete analyses and citations to factual support in the record.  I also encourage parties who are aligned with one another with respect to certain issues to attempt to allocate the briefing responsibilities so as to avoid duplication and maximize the impact of the briefing, even if you are adverse to such party as to another matter or the case generally.

6.    One purpose of the factual narrative described in paragraph 2 above is to relieve the parties of the need to include in their submissions background information, and to allow them to focus on the facts and documents that bear on their position.  To the extent the narrative prepared by the Debtors defines certain terms, your brief should use those defined terms.  To the extent you disagree with anything contained in the narrative, subject to the page limit for your brief, you may include in your brief what that disagreement is, and why.

7.    With respect to the second item set forth in the Agreed Order that is the subject of my investigation (i.e., the alleged automatic stay violation of Wilmington Trust), subject to the same deadline set forth above, I request that Wilmington Trust and the Debtors each furnish a supplemental brief of up to 10 pages.

8.    With respect to the third item set forth in the Agreed Order that is the subject of my investigation (the alleged violation of confidentiality undertakings by Wilmington Trust), subject to the same deadline set forth above, I request that Wilmington Trust, JPMorganChase Bank N.A., as Agent, the Debtors and the Official Creditors' Committee each furnish a supplemental brief on those matters of up to 10 pages.

9.    I intend to permit parties to submit reply briefs on or before June 7, 2010.  One purpose of the replies will be to enable a party to address claims or defenses that such party did not address in its opening brief, but were raised by another party in its opening brief.  I will notify the parties regarding page limits and any other requests within a reasonable time after the initial submissions.

To:  The Parties Listed on Exhibit A Attached Hereto
May 10, 2010
Page 4

10.    I reserve the right to permit other parties to submit briefs, and to otherwise modify anything contained in this letter.

11.    Detailed specifications for the narrative statement, briefs, reply briefs and appendices are set forth in Exhibit B hereto.  Please note that submission of these documents to my professionals must be in both hard copy and electronic form, as more fully described in Exhibit B.   The electronic version of all documents may be submitted to my professionals by CD-ROM, or may be uploaded to a secure document website that my professionals have established in connection with this matter.  In order to obtain a password to that website for purposes of delivering electronic materials to my professionals, please forward the name and email address of the person requiring access to Martin Barash of Klee, Tuchin, Bogdanoff & Stern LLP at mbarash@ktbslaw.com, no later than May 20, 2010.

12.    All submissions must be delivered to my professionals and served contemporaneously on the other parties, such that they are received no later than the deadline that I have established (or will establish) for those materials.

13.    To help focus your efforts, what follows is a list of questions and/or areas of consideration that I presently believe are germane to my examination.  The list is, unfortunately, not exhaustive and is <u>not</u> intended to serve as the outline for your briefs.  Feel free to use your allotted pages to address matters not addressed below.  Also, it is not necessary for each of you to address each and every point listed below.  Nor is it necessary for you to structure your briefs to pose and specifically answer each and every question:[1]

a.    I am only interested in briefing on choice of law questions if the choice of law makes a difference to the outcome of an issue in dispute. Accordingly, if you maintain that a particular law governing, for example, fraudulent transfer or conveyance, breach of fiduciary duty or aiding and abetting a breach of fiduciary duty makes a difference, please explain why that law would apply here.

b.    To the extent Bankruptcy Code section 544(b)(1) is relevant to an issue in dispute, please identify the creditor or creditors, as to each estate, holding an unsecured claim that is allowable under Bankruptcy Code section 502 or that is not allowable only under section 502(e).

---

[1]    Please note that in this letter I sometimes use an informal phrase to describe a transaction (i.e. the 2007 LBO) or class of creditors (i.e. LBO Lenders).  Nothing substantive concerning the merits of the parties' positions is intended by these catch phrases.  Also, the fact that I do not pose a question about a particular cause of action does not mean that I am failing to give that matter serious attention.  Finally, the questions posed are not a matter of academic curiosity. They are, I believe, important questions necessary to help me conduct my investigation.

To:  The Parties Listed on Exhibit A Attached Hereto
May 10, 2010
Page 5

    c.    With respect to potential claims for intentional fraudulent transfer or conveyance, and focusing in particular on the respective transferor's intention and acts,[2] please specify the evidence that supports or mitigates against a conclusion that the relevant transferor intended to hinder, delay or defraud creditors as to a particular transfer.  Without limiting the scope of the preceding, I am interested in (i) the extent to which the so-called Tribune Broadcasting Holdco and Tribune Finance, LLC transactions bear upon such questions; (ii)  evidence of bad faith by insiders of Tribune, including concealment, misrepresentation or insider self-dealing in connection with the 2007 transaction, or knowledge of insolvency or undercapitalization; and (iii) if a particular transferor, acting by itself or in tandem with third parties, sought to structure the transaction to preserve the pre-existing structural subordination of some or all of the pre-LBO parent level indebtedness to the new LBO debt, the extent to which such actions could, even if proven, support a conclusion concerning intentional fraudulent transfer or conveyance.

    d.    Did any transferor intend to incur, or did any believe (or reasonably should have believed) that it would incur, debts beyond its ability to pay as they became due?

    e.    With respect to the so-called "collapse" of the transactions comprising Step 1 (and without reference to the separate question concerning the potential collapse of the Step 1 and Step 2 transactions, see below), what are the relative merits of the contention that, functionally, economically and as a matter of law the advances made by the LBO Lenders utilized to pay selling shareholders were transfers from the LBO Lenders to such shareholders for which the parent and/or guarantor subsidiaries received no or unreasonable consideration.  The same question is posed with respect to Step 2.

    f.    On the question of the "collapse" of the transactions comprising Step 1 and Step 2 and, specifically, the potential inclusion of Step 2 indebtedness for purposes of considering insolvency and unreasonably small capital in conjunction with Step 1, to what extent would the application of the doctrines governing the collapse of LBO transactions to the "collapse" suggested here represent an extension of the present law and, if so, is that extension merited?

---

[2]    As a general matters, references to a transferor includes an obligor.

To:  The Parties Listed on Exhibit A Attached Hereto
May 10, 2010
Page 6

g.   On the question of the inclusion of Step 2 indebtedness for purposes of evaluating solvency and unreasonably small capital in connection with Step 1, to what extent is it appropriate under the law to include the Step 2 debt but discount that indebtedness by the probability that the Step 2 transaction would not be consummated and, if so, what would the appropriate discount be?

h.   I am interested in an analysis of solvency and unreasonably small capital if Step 1 and Step 2 indebtedness are, and are not, aggregated.

i.   To what extent are the (i) processes that resulted in the acceptance of the Zell bid and (ii) the trading value of Tribune's debt and equity securities immediately following Step 1 and Step 2, dispositive on the question of solvency within the Third Circuit; and does the evidence on these matters support a finding of solvency based thereon?  Along those lines, I am interested in the extent to which the Zell bid was a outlier and whether other bids were in the nature of expressions of interest or actual offers (and the conditions relating thereto).

j.   For purposes of considering insolvency and unreasonably small capital of the guarantor subsidiaries, (i) is it appropriate to aggregate the value of such entities in view of the joint and several liability of such entities on the LBO indebtedness; (ii) to what extent do inter-subsidiary and subsidiary-parent intercompany claims affect the preceding question; and (iii) to what extent, if at all, were any of the guarantor subsidiaries otherwise unable to satisfy their ratable share of such joint and several liability?

k.   To the extent inter-company claims make a difference on the question of solvency or unreasonably small capital, are those claims in fact debt, and if so, subject to offset or recoupment; and how may that affect the preceding questions?

l.   On the question of unreasonably small capital, please address (i) the effect of what appears to be the highly-leveraged nature of the 2007 transaction on the company's ability to withstand reasonably foreseeable negative variations and performance; (ii) the likelihood that potential asset sales contemplated at the time of Step 1 would improve the company's liquidity and ability to service debt; and (iii) any reasonably available sources of liquidity.

m.   Leaving aside any advances that ultimately ended being remitted to the selling shareholders, is there any credible basis to avoid obligations

122533.3

To:  The Parties Listed on Exhibit A Attached Hereto
May 10, 2010
Page 7

incurred to the LBO Lenders on account of the satisfaction of lawfully owing pre-LBO debt?

n.    Assuming that only the Step 2 transfers may be avoided as fraudulent transfers or conveyances, does it follow that the LBO indebtedness arising in connection with Step 1 would be entitled to participate in distributions from the estates on account of such avoidance or recoveries related thereto?  If not, why not?

o.    To the extent the LBO Lender obligations are avoided at the guarantor subsidiary levels, does Bankruptcy Code section 548 require that such obligations be avoided for all purposes, including the remittance to the parent of distributions available from those estates after the payment of non-LBO indebtedness at the guarantor subsidiary levels?  To what extent is the above noted "collapse" principle, however, solely intended to permit recharacterization of an LBO transaction for the benefit of creditors, and not equity holders?  To what extent are the answers to the preceding questions informed by the fact that (i) if the obligations are avoided at the guarantor subsidiary levels and the excess value were available to the parent entity and its creditors, the beneficiaries of that avoidance would be creditors who were structurally subordinated to guarantor subsidiary indebtedness; and (ii) the ultimate parent shareholders would not benefit from such avoidance but, rather, parent creditors whose claims remain unpaid as a result of an LBO transaction effectuated at the same time for the parent and the guarantor subsidiaries?

p.    I am interested in understanding the impact on recovery of avoidance assuming (i) Step 1 LBO indebtedness is avoided at the parent level only but not at the guarantor subsidiary levels; (ii) Step 1 LBO indebtedness is avoided at the parent and guarantor subsidiary levels; (iii) Step 1 and Step 2 LBO indebtedness are avoided at the parent level only but not at the guarantor subsidiary levels; (iv) Step 2 (but not Step 1) LBO indebtedness is avoided at the parent level only but not at the guarantor subsidiary levels; (v) Step 2 (but not Step 1) LBO indebtedness is avoided at the parent and guarantor subsidiary levels; and (iv) Step 1 and Step 2 LBO indebtedness are avoided at both the parent and guarantor subsidiary levels.  The impact of intercompany claims should be addressed, if relevant.  The cases should also consider whether the obligations incurred on account of the repayment of the pre-LBO are and are not avoidable.  I am interested in, as a base line, what creditors would receive if no avoidance or recoveries were available in connection with the 2007 LBO.  If you wish to answer this

question, a chart setting forth your analysis would be preferable.  In connection with these cases, it may be appropriate for the parties to designate one party to prepare and present these using an agreed reorganization value or range of values.

q.  To what extent may principal and interest on post-LBO, prepetition indebtedness be avoided and recovered?  Or stated differently, assuming that a particular LBO obligation is avoided, would the estate be permitted to recover payments made on that debt pre-filing?  Why?

r.  If the "collapse" doctrine is applicable to Step 1 and/or Step 2, such that the LBO Lenders are viewed functionally as transferring funds to the selling shareholders, to what extent is the good faith of the LBO Lenders relevant to the question of avoidance of the obligations owing to such Lenders?  See Bankruptcy Code section 548(c) ("to the extent such transferee or obligee gave value to the debtor in exchange for such transfer or obligation").

s.  What evidence supports a finding of lack of good faith, or good faith, by the LBO Lenders, as such term has been shaped under the law?

t.  Is lack of good faith by an agent for a particular tranche of indebtedness be imputed to other lenders?

u.  To the extent advisory and other fees were paid in connection with the LBO transaction and such transaction is found to be a transaction for which the transferor received no or inadequate consideration, or was intentionally fraudulent, to what extent may such fees and expenses be recovered for lack of reasonably equivalent value?

v.  Is the repayment in Step 2 of the note given Zell in Step 1 in dispute?

w.  To what extent are selling shareholders, the LBO Lenders, and other parties entitled to the protections accorded under Bankruptcy Code section 546(e)?  With respect to the LBO Lenders, please be sure to address the potential application of section 546(e) both to the stock pledges and the obligations.

x.  With respect to the question of equitable subordination, if the transactions entered into in connection with the LBO transaction are not avoidable as fraudulent transfers or conveyances, does that mean that any equitable subordination claim will be unsustainable?  If not, why not?

To:  The Parties Listed on Exhibit A Attached Hereto
May 10, 2010
Page 9

y.    Are there any predicate facts, and if so what, that would support equitable subordination that would not also support avoidance of fraudulent transfers or conveyances?  Why would equitable subordination be an appropriate remedy in addition to or in lieu of the ordinary remedies available upon avoidance of transfers or obligations?

z.    If equitable subordination were successfully pursued at the guarantor subsidiary levels, would parent creditors benefit?

aa.   What is the specific basis to equitably subordinate the claims of the LBO Lenders for the benefit of other creditors generally (and not any specific creditor group) at any level?  Note: As a general matter, in this examination I am interested in more than just the question of whether a claim (or defense) may survive a motion to dismiss.

bb.   With respect to potential claims for breach of fiduciary duty against officers and directors, if the transactions entered into in connection with the LBO transaction are not avoidable as fraudulent transfers or conveyances, does that mean that any breach of duty claims will be unsustainable?  If not, why not?

cc.   Are there any predicate facts, and if so what, that would support a breach of duty claim that would not also support avoidance of fraudulent transfers or conveyances?

dd.   To what extent, and against whom, may claims be maintained for aiding and abetting breaches of fiduciary duty?

ee.   What is the basis for, and against whom, for claims for unjust enrichment?

ff.   Without limiting the preceding question, what claims, if any, can be asserted against advisors in connection with the LBO transaction?  If any claims exist, who holds those claims?

gg.   To what extent are there potential *pari delicto* and contractual defenses and indemnities in connection with the assertion of any claims, including those enumerated in paragraphs dd and ff?

hh.   With respect to item 2 of the Agreed Order, does a creditor hold a claim for particularized injury where the source of that injury is the disproportionate impact imposed on that creditor, as opposed to the injury suffered by other creditors or the estate generally, because of the operation of a contractual subordination?

To:  The Parties Listed on Exhibit A Attached Hereto
May 10, 2010
Page 10

     10.    With respect to any document referenced or included in the aforementioned submissions as to which you maintain confidentiality must be preserved for purposes of the initial filing of my report, and as to which you are the party that previously designated such document as confidential, I request that you notify me and the recipients of the same by no later than June 14, 2010, identifying the specific document that you maintain should be maintained confidential.  If you maintain that confidentiality must be preserved as to any document but you are not the party who has designated such document as confidential, please advise who has so designated such document.  As I have stated previously, the standard you should utilize in whether to designate documents for continued non-disclosure is not whether disclosure would be embarrassing to your client, or harmful to its position in existing or future litigation, but whether there is a bona fide legal basis to prevent its initial public disclosure.

     Along those lines, in view of the various confidentiality orders and agreements, I have marked this letter confidential.  Please advise my counsel by the close of business Friday, May 14, 2010 whether you maintain that any portion of this letter must remain confidential, and if so, which portion and why.

     Thank you.

Yours truly,

Kenneth N. Klee, Examiner

KNK:jak
Enclosures
cc:    Wayne Elggren
        Lee R. Bogdanoff
        David M. Stern
        Martin R. Barash

# EXHIBIT A

Counsel for Debtors
James F. Conlan
James Bendernagle, Jr.
Sidley Austin LLP
One South Dearborn
Chicago, Illinois 60603

Special Counsel for the Committee
Graeme W. Bush
Zukerman Spaeder
1800 M Street, N.W.
Washington, DC  20036

Counsel for Law Debenture
David S. Rosner
Andrew K. Glenn
Kasowitz, Benson, Torres & Friedman
LLP
1633 Broadway
New York, NY  10019

Counsel for Credit Agreement Lenders
Bruce Bennett
James O. Johnston
Hennigan, Bennett & Dorman, LLP
865 South Figueroa Street
Suite 2900
Los Angeles, California 90017

Counsel for Wells Fargo Bank, N.A.

Thomas E Lauria
Gerard H. Uzzi
Scott Greissman
White & Case LLP
1155 Avenue of the Americas
New York, NY 10036-2787

Counsel for the Committee
Howard Seife
Douglas E. Deutsch
David LeMay
Chadbourne & Parke
30 Rockefeller Plaza
New York, New York 10112

Counsel for Wilmington Trust Company
Robert Stark
Martin S. Siegel
Brown Rudnick
Seven Times Square
New York, New York 10036

Counsel for JPMorganChase Bank, N.A.
Donald S. Bernstein
Dennis E. Glazer
Davis Polk & Wardwell, LLP
450 Lexington Avenue
New York, NY  10017

Counsel for Centerbridge Credit
Advisors LLC
Donald Goldman
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036

EXHIBIT B

Formatting of Narrative Statement, Briefs and Appendices

<u>General Format</u>

- The narrative statement, all briefs, and all appendices submitted to the Examiner must be submitted in both electronic and hardcopy form.

- The electronic version of these submissions must be in Portable Document Format (aka Adobe Acrobat or .pdf), with no password protection or encryption.  Please also provide copies of the narrative statement and briefs in Microsoft Word (.doc) format.

- The Portable Document Format versions of the narrative statement and briefs must be generated by printing to PDF from the original word processing file, so that the text of the digital brief may be searched and copied.  PDF images created by scanning paper documents do not comply with this requirement.  This requirement does not apply to documentary evidence contained in the appendices.

- The narrative statement and all briefs, appendices and related documents shall be submitted such that they are received by the Examiner on or before the specified deadline.

- The electronic versions of the parties' submissions may be submitted by CD-ROM, or may be uploaded to the Examiner's secure document website.  Please forward the name and email address of the person requiring access to the secure document website to Martin Barash at <u>mbarash@ktbslaw.com</u> as soon as possible, and in any event no later than May 20, 2010.

- Hardcopies of the narrative, briefs and appendices should be delivered to the Examiner's professionals as follows:

  o Three (3) copies to Klee, Tuchin, Bogdanoff & Stern LLP, Attn: Martin R. Barash, Esq., 1999 Avenue of the Stars, 39th Floor, Los Angeles, California 90067.

  o Two (2) copies to Saul Ewing LLP, Attn: Mark Minuti, Esq., 222 Delaware Avenue, Suite 1200, P.O. Box 1266, Wilmington, Delaware 19899.

  o One (1) copy to LECG, Attn: F. Wayne Elggren, 201 South Main, Suite 450, Salt Lake City, UT 84111.

      o One (1) copy to LECG, Attn: Craig Elson, 33 West Monroe, Suite 2300, Chicago, IL 60603-5659

<u>Margins and Type Face.</u>

- The margins of each page shall be no less than 1 inch on the bottom, top, right and left.

- Each brief must contain a table of contents and table of authorities.  (If you have made last-minute revisions to your submissions, please be sure to update the page references in your table before transmitting the brief to the Examiner).

- Text should be no smaller than 12 point type, with the exception of footnotes, which may be no smaller than 10.5 point type.

- Please use a serif font such as Times Roman or Century Schoolbook (rather than a non-serif font, such as Arial).

- Legal citations should conform to the latest version of "A Uniform System of Citation" (i.e., the "Blue Book").

- The narrative statement and briefs shall be double spaced, with the exception of footnotes and block quotes of 50 words or more.

References to Evidence, Appendices, and Hyperlinking.

- The narrative statement and each brief shall contain references to the documentary evidence (including transcripts of depositions, examinations and hearings) that supports the factual contentions contained therein, as set forth in an appendix to be provided with each brief in Portable Document Format.

- The evidentiary references contained in the Portable Document Format version of the narrative statement each brief shall be electronically hyperlinked to the relevant pages in the related appendix.

- The references and hyperlinking shall point to the particular page or pages of the document that support the factual contention, although the appendix should contain the entire document referenced, so that the Examiner may consider the context in which the referenced materials appear.  Where feasible, highlighting specific portions of pages is appreciated, but not required.

- Each appendix shall contain a table of contents, with hyperlinks to the first page of each document contained in the appendix.

- References to any pleadings filed in the case should include a citation to the docket item number and a hyperlink to a copy of the pleading, to be set forth in the appendix.

- The Portable Document Format version of each brief may contain hyperlinking in respect of legal citations – and where feasible will be much appreciated by the Examiner – but is not required.

Rosner Decl. Exhibit 5

4.6

```
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-4.1
<SEQUENCE>3
<DESCRIPTION>INDENTURE
<TEXT>

<PAGE>    1
```

                                                    EXHIBIT 4.1

_ ---------------------------------------------------------------------------



                        THE TIMES MIRROR COMPANY

                                  TO

                        CITIBANK, N.A., TRUSTEE


                        --------------------------


                              INDENTURE

                     DATED AS OF MARCH 19, 1996




_ ---------------------------------------------------------------------------




```
<PAGE>    2
```


This Cross Reference Sheet, showing the location in the Indenture of the
provisions inserted pursuant to Sections 310 to 318(a), inclusive, of the Trust
Indenture Act of 1939, is not to be considered a part of the Indenture.

                TRUST INDENTURE ACT CROSS REFERENCE SHEET

```
<TABLE>
<CAPTION>
```

| TRUST INDENTURE ACT SECTION | INDENTURE SECTION |
|---|---|
| `<S>` | `<C>` |
| Section 310(a)(1) . . . . . . . . . . . . . . . . | 609 |
| (a)(2) . . . . . . . . . . . . . . . . . | 609 |
| (a)(3) . . . . . . . . . . . . . . . . . | 609 |
| (a)(4) . . . . . . . . . . . . . . . . . | N/A |

negligence on the part of any agent or attorney appointed with due care by it hereunder.

Section 604. Not Responsible for Recitals or Issuance of Securities.

The recitals contained herein and in the Securities, except the Trustee's certificates of authentication, shall be taken as the statements of the Company, and the Trustee or any Authenticating Agent assumes no responsibility for their correctness. The Trustee makes no representations as to the validity or sufficiency of this Indenture or of the Securities. The Trustee or any Authenticating Agent shall not be accountable for the use or application by the Company of Securities or the proceeds thereof.

Section 605. May Hold Securities or Coupons.

The Trustee, any Authenticating Agent, any Paying Agent, any Security Registrar or any other agent of the Company, in its individual or any other capacity, may become the owner or pledgee of Securities and coupons and, subject to Sections 608 and 613, may otherwise deal with the Company with the same rights it would have if it were not Trustee, Authenticating Agent, Paying Agent, Security Registrar or such other agent.

39

<PAGE>    47

Section 606. Money Held in Trust.

Money held by the Trustee, or by any Paying Agent (other than the Company if the Company shall act as Paying Agent), in trust hereunder need not be segregated from other funds except to the extent required by law. The Trustee shall be under no liability for interest on any money received by it hereunder except as otherwise agreed with the Company.

Section 607. Compensation and Reimbursement.

The Company agrees

(1) to pay to the Trustee from time to time compensation agreed to with the Trustee for all services rendered by it hereunder (which compensation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust);

(2) to reimburse the Trustee upon its request for all reasonable expenses, disbursements and advances incurred or made by the Trustee in accordance with any provision of this Indenture (including the reasonable compensation and the expenses and disbursements of its agents and counsel), except any such expense, disbursement or advance as may be attributable to its negligence or bad faith; and

(3) to indemnify the Trustee for, and to hold it harmless against, any loss, liability or expense incurred without negligence or bad faith on its part, arising out of or in connection with the acceptance or administration of the trust or trusts hereunder or performance of its duties hereunder, including the costs and expenses of defending itself against any claim or liability in connection with the exercise or

performance of any of its powers or duties hereunder.

As security for the performance of the obligations of the Company under this Section, the Trustee shall have a claim prior to the Securities upon all property and funds held or collected by the Trustee as such, except funds held in trust for the payment of principal of (and premium, if any) or interest on particular Securities or any coupons.

Section 608. Disqualification; Conflicting Interests.

If the Trustee has or shall acquire a conflicting interest within the meaning of the Trust Indenture Act, the Trustee shall either eliminate such interest or resign, to the extent and in the manner provided by, and subject to the provisions of, the Trust Indenture Act and this Indenture and the Company shall take prompt action to have a successor Trustee appointed in the manner provided herein. Nothing herein shall prevent the Trustee from filing with the Commission the application referred to in the second to the last paragraph of Section 310(b) of the Trust Indenture Act or any equivalent successor provision.

Section 609. Corporate Trustee Required; Eligibility.

There shall at all times be one or more Trustees hereunder with respect to the Securities of each series, at least one of which shall be a Person that (i) is eligible pursuant to the Trust Indenture Act to act as such, (ii) has a combined capital and surplus of at least $50,000,000, (iii) is subject to supervision or examination by federal, state or District of Columbia authority, and (iv) has its Corporate Trust Office in the City of New York, New York. If such Person publishes reports of condition at least annually, pursuant to law or to the requirements of said supervising or examining authority, then for the purposes of this Section, the combined capital and surplus of such Person shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published. Neither the Company nor any person directly or

40

<PAGE>  48

indirectly controlling, controlled by or under common control with the Company may serve as Trustee. If at any time the Trustee shall cease to be eligible in accordance with the provisions of this Section, it shall resign immediately in the manner and with the effect hereinafter specified in this Article.

Section 610. Resignation and Removal; Appointment of Successor.

No resignation or removal of the Trustee and no appointment of a successor Trustee pursuant to this Article shall become effective until the acceptance of appointment by the successor Trustee in accordance with the applicable requirements of Section 611.

The Trustee may resign at any time with respect to the Securities of one or more series by giving written notice thereof to the Company. If the instrument of acceptance by a successor Trustee required by Section 611 shall not have been delivered to the Trustee within 30 days after the giving of such notice of resignation, the resigning Trustee may petition any court of competent jurisdiction for the appointment of a successor Trustee with respect