## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Reorganized Debtors. | Jointly Administered |
| | **Status Conference: April 17, 2013 at 2:00 p.m. (ET)** |
| | **Response Deadline: April 10, 2013 at 4:00 p.m. (ET)** |

## REORGANIZED DEBTORS' OBJECTION TO CREDITORS' COMMITTEE MEMBER FEE/EXPENSE CLAIMS ASSERTED BY (A) DEUTSCHE BANK TRUST COMPANY AMERICAS AND (B) WILMINGTON TRUST COMPANY

---

[1] The Reorganized Debtors, or successors-in-interest to the Reorganized Debtors, in these chapter 11 cases, along with the last four digits of each entity's federal tax identification number, are: Tribune Company (0355); California Community News, LLC (5306); Chicago Tribune Company, LLC (3437); Chicagoland Publishing Company, LLC (3237); Chicagoland Television News, LLC (1352); forsalebyowner.com, LLC (4276); ForSaleByOwner.com Referral Services LLC (9205); Hoy Publications, LLC (2352); Internet Foreclosure Service, LLC (6550); KDAF, LLC (6969); KIAH, LLC (4014); KPLR, Inc. (7943); KRCW, LLC (1772); KSWB, LLC (7035); KTLA, LLC (3404); KTXL, LLC (3844); KWGN, LLC (5347); Los Angeles Times Communications LLC (1324); Magic T Music Publishing Company, LLC (6522); NBBF, LLC (0893); Oak Brook Productions, LLC (2598); Orlando Sentinel Communications Company, LLC (3775); Sun-Sentinel Company, LLC (2684); The Baltimore Sun Company, LLC (6880); The Daily Press, LLC (9368); The Hartford Courant Company, LLC (3490); The Morning Call, LLC (7560); TMS News and Features, LLC (2931); Tower Distribution Company, LLC (9066); Towering T Music Publishing Company, LLC (2470); Tribune 365, LLC (7847); Tribune Broadcasting Company, LLC (2569); Tribune Broadcasting Hartford, LLC (1268); Tribune Broadcasting Indianapolis, LLC (6434); Tribune Broadcasting Seattle, LLC (2975); Tribune CNLBC, LLC (0347); Tribune Direct Marking, LLC (1479); Tribune Entertainment Company, LLC (6232); Tribune Investments, LLC (6362); Tribune Media Services, LLC (1080); Tribune Media Services London, LLC (6079); Tribune ND, LLC (4926); Tribune Publishing Company, LLC (9720); Tribune Television New Orleans, Inc. (4055); Tribune Washington Bureau, LLC (1088); WDCW, LLC (8300); WGN Continental Broadcasting Company, LLC (9530); WPHL, LLC (6896); WPIX, LLC (0191); WPMT, LLC (7040); WSFL, LLC (5256); WXMI, LLC (3068). The corporate headquarters and the mailing address for each entity listed above is 435 North Michigan Avenue, Chicago, Illinois 60611.

## TABLE OF CONTENTS

**Page**

I.   PRELIMINARY STATEMENT ............................................................................. 1

II.  BACKGROUND ................................................................................................. 3

III. ARGUMENT ...................................................................................................... 5

    A.   The Trustees' Confirmation Litigation Fee/Expense Claims
        Are Not Reimbursable Under The Plan................................................... 5

    B.   WTC's Committee Service Fee/Expense Claim Is Excessive
        And Relates In Part To Fees And Expenses Not Incurred
        Solely In WTC's Capacity As A Creditors' Committee Member. ................. 12

    C.   Claims Asserted By Other Members Of The Creditors' Committee
        Are Consistent With The Plan And Have Been Paid. .................................... 14

IV.  CONCLUSION ................................................................................................. 16

The Reorganized Debtors hereby object to a portion of the Creditors' Committee Member Fee/Expense Claims asserted by Deutsche Bank Trust Company Americas ("DBTCA") and Wilmington Trust Company ("WTC" and together with DBTCA, the "Trustees") pursuant to Section 9.1.3 of the Plan.[2]

## I.    PRELIMINARY STATEMENT

The Plan provides for Reorganized Tribune to pay for the reasonable and documented fees, costs and expenses of outside legal and/or financial advisors "incurred by individual members of the Creditors' Committee solely in their capacity as members of the Creditors' Committee."[3]

The Trustees submitted requests for reimbursement of roughly *$1.68 million* each – more than $3.36 million in total.[4]  The amount requested by *each* Trustee is nearly *equal to the* **combined** *total requested by all five other members* of the Creditors' Committee and *double* the amount requested by the member with the next largest request (William Niese).

The reason for this is that the Trustees seek payment of amounts that demonstrably were *not* incurred "solely in their capacity as members of the Creditors' Committee."  In particular, the Trustees demand reimbursement for more than $1.5 million in fees and expenses allegedly incurred in responding to discovery issued in connection with the Trustees' objections to

---

[2]    Capitalized terms not defined in this Objection have the meanings given to them in the *Fourth Amended Joint Plan Of Reorganization For Tribune Company And Its Subsidiaries (As Modified July 19, 2012)* (the "Plan"), which became effective on December 31, 2012.

[3]    Plan § 1.1.52.

[4]    In addition to its Creditors' Committee Fee/Expense Claim, WTC also has (a) asserted a General Unsecured Claim seeking allowance and payment as a Class 1F Other Parent Claim in the amount of at least *$30,289,093.33*, and (b) filed an Application [D.I. 13272] seeking allowance and payment in full of *$7,146,492.75* of those fees and expenses pursuant to sections 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code on account of its alleged substantial contribution to the Chapter 11 Cases.  The Reorganized Debtors intend to object to both the General Unsecured Claim and the substantial contribution Application in due course.

confirmation of the Plan and the Trustees' pursuit of confirmation of the Noteholder Plan, for which they served as co-proponents.  None of that discovery was served on the Trustees as a result of their service on the Creditors' Committee, and the Trustees are not entitled to be reimbursed for those fees under the terms of the Plan that they fought so hard to defeat.

Similarly, DBTCA is not entitled to reimbursement for fees and expenses allegedly incurred in responding to discovery propounded by WTC during litigation over the "Allocation Disputes."  WTC expressly directed that discovery to DBTCA in its capacity as the former indenture trustee for the PHONES Notes and it had nothing whatsoever to do with DBTCA's service as a member of the Creditors' Committee.

Finally, WTC is not entitled to reimbursement of more than $300,000 in alleged non-litigation fees and expenses relating to various activities taken as a creditor in *opposition* to positions of the Creditors' Committee.  Fees for joining the motion of Aurelius Capital Management ("Aurelius") to disqualify counsel to the Creditors' Committee, objecting to the Creditors' Committee's motions for standing to pursue causes of action, and defending against motions filed by the Creditors' Committee alleging that WTC had violated the automatic stay, among other things, simply cannot be said to have been incurred solely in WTC's capacity as a Creditors' Committee member.

Reorganized Tribune has now paid more than $3.2 million to members of the Creditors' Committee, including more than $1.5 million to the Trustees themselves, as reimbursement for the fees and expenses they legitimately incurred solely in their capacity as members.  Nothing more is required under the Plan, and the Trustees' request for payment of an additional $1,833,806 should be denied.

46429/0001-9351555v1

## II.    BACKGROUND

Section 9.1.3 of the Plan sets forth a mechanism for members of the Creditors'

Committee to be reimbursed for "Creditors' Committee Member Fee/Expense Claims":

> No later than forty-five (45) days after the Effective Date, counsel
> to the Creditors' Committee shall submit to Reorganized Tribune
> and the United States Trustee, reasonably detailed statements of
> the Creditors' Committee Member Fee/Expense Claims, which
> statements shall include descriptions of services provided in
> summary form without individual time records.  Subject to the
> provisions of this Section 9.1.3, amounts due under each such
> statement, (up to an aggregate amount not to exceed $6,000,000,
> plus reasonable amounts incurred in connection with discovery
> (including deposition testimony) sought from members of the
> Creditors' Committee in connection with litigation related to
> confirmation of this Plan) shall be paid by Reorganized Tribune
> within thirty (30) days of submission of such statement.  If, prior to
> the end of such thirty day period, Reorganized Tribune or the
> United States Trustee disputes in writing the reasonableness of any
> amounts due under any such statements, the applicable parties will
> attempt in good faith to resolve any such dispute.  If the applicable
> parties are unable to resolve the dispute, any such party may,
> within fifteen (15) days after disputing the reasonableness of any
> such amounts, seek review of the reasonableness of the disputed
> amounts by the Bankruptcy Court pursuant to section 1129(a)(4) of
> the Bankruptcy Code, and the undisputed amounts shall be paid
> without delay. . . .[5]

Section 1.1.52 of the Plan, in turn, defines "Creditors' Committee Member Fee/Expense Claims"

as:

> Amounts incurred by individual members of the Creditors'
> Committee *solely in their capacity as members of the Creditors'*
> *Committee* on and after the Petition Date through and including the
> Effective Date for the reasonable and documented fees, costs and
> expenses of their individual outside legal and/or financial
> advisors.[6]

---

[5]    Plan § 9.1.3.

[6]    Plan § 1.1.52 (emphasis added).

The Plan became effective on December 31, 2012, and on January 29, 2013, counsel for the Creditors' Committee submitted Creditors' Committee Member Fee/Expense Claims for each member of the Creditors' Committee.[7] Counsel divided the Creditors' Committee Member Fee/Expense Claims into two categories:  (a) "Committee Service Fee/Expense Claims", which it defined as "the claims of the individual members of the Creditors' Committee for fees, costs and expenses of their individual outside legal and/or financial advisors incurred solely in their capacity as members of the Creditors' Committee"; and (b) "Confirmation Litigation Fee/Expense Claims", which it defined as "the claims of the individual members of the Creditors' Committee for fees, costs and expenses of their individual outside legal and/or financial advisors incurred in connection with discovery (including deposition testimony) sought from members of the Creditors' Committee in connection with litigation related to confirmation of the Confirmed and Effective Plan of Reorganization."[8]

Creditors' Committee counsel summarized the Creditors' Committee Member Fee/Expense Claims as follows (with the Trustees' requested shaded):[9]

| Committee Member | Committee Service Fee/Expense Claims | Confirmation Litigation Fee/Expense Claims | Total |
|---|---|---|---|
| Buena Vista Television, LLC | $0.00 | $87,629.94 | $87,629.94 |
| *DBTCA* | *$763,208.47* | *$917,090.02* | *$1,680,298.49* |
| JPMorgan Chase Bank, N.A. | $126,071.35 | $0.00 | $126,071.35 |
| Niese, William A. | $718,168.48 | $149,172.00 | $867,340.48 |

---

[7]   *See* Letter from David M. LeMay, dated January 29, 2013 (the "Committee Letter"), a copy of which is attached as Exhibit A to the accompanying Declaration of Joshua M. Mester (the "Mester Declaration").  Copies of the claims submitted by the individual members are attached as exhibits to the Committee Letter.

[8]   Committee Letter at 2 n.i and ii.

[9]   Committee Letter at 1.

| Committee Member | Committee Service Fee/Expense Claims | Confirmation Litigation Fee/Expense Claims | Total |
|---|---|---|---|
| Warner Bros. Television | $321,388.49 | $192,061.76 | $513,450.25 |
| Washington-Baltimore Newspaper Guild | $92,746.50 | $15,213.00 | $107,959.50 |
| *WTC* | *$1,065,071.77* | *$614,853.00* | *$1,679,924.77* |
| *Totals* | *$3,086,655.06* | *$1,976,019.72* | *$5,062,674.78* |

On February 28, 2013, the Reorganized Debtors disputed the "Confirmation Litigation Fee/Expense Claims" submitted by the Trustees and approximately $300,000 of the "Committee Service Fee/Expense Claim" submitted by WTC.[10]  On or about March 5, 2013, Reorganized Tribune paid the undisputed portions of the Creditors' Committee Member Fee/Expense Claims – a total of $3,228,868.46, including $1,526,416.94 to the Trustees themselves.  Thereafter, pursuant to the invitation set forth in the Mester Letter, the Reorganized Debtors discussed a settlement with WTC but no resolution was reached.[11]

## III.    ARGUMENT

### A.    The Trustees' Confirmation Litigation Fee/Expense Claims Are Not Reimbursable Under The Plan.

As noted above, the Plan provides only for reimbursement of "amounts incurred by individual members of the Creditors' Committee solely in their capacity as members of the Creditors' Committee."  In their claims for reimbursement of discovery-related expenses, the Trustees attempt to circumvent that fundamental limitation, claiming that Section 9.1.3 of the Plan provides for reimbursement of *additional* amounts for any and all fees and expenses

---

[10]    *See* Letter from Joshua M. Mester, dated February 28, 2013 (the "Mester Letter"), a copy of which is attached as Exhibit B to the Mester Declaration.

[11]    Mester Decl. ¶ 5.  Despite an invitation to do so, DBTCA never contacted the Reorganized Debtors to discuss a resolution of the disputed portions of its claim.  Mester Decl. ¶ 5.

46429/0001-9351555v1

incurred in connection with discovery regarding the Plan, even where that discovery was not sought from the Trustees "solely in their capacity as members of the Creditors' Committee."[12]

The Plan, however, does not provide for this, as shown by the first two sentences of Section 9.1.3:

> No later than forty-five (45) days after the Effective Date, counsel to the Creditors' Committee shall submit to Reorganized Tribune and the United States Trustee, *reasonably detailed statements of the Creditors' Committee Member Fee/Expense Claims*, which statements shall include descriptions of services provided in summary form without individual time records. Subject to the provisions of this Section 9.1.3, *amounts due under each such statement*, (up to an aggregate amount not to exceed $6,000,000, plus reasonable amounts incurred in connection with discovery (including deposition testimony) sought from members of the Creditors' Committee in connection with litigation related to confirmation of this Plan) *shall be paid* by Reorganized Tribune within thirty (30) days of submission of *such statement*.[13]

Contrary to the Trustees' contentions, the parenthetical language regarding discovery in the second sentence of Section 9.1.3 of the Plan does not create a new category of fees and expenses that are reimbursable without regard to whether they were incurred by the Trustees "solely in their capacity as members of the Creditors' Committee." Rather, that language merely provides that the $6,000,000 aggregate limit on Creditors' Committee Member Fee/Expense Claims does not apply to "reasonable amounts incurred in connection with discovery (including deposition testimony) sought from members of the Creditors' Committee in connection with litigation related to confirmation of this Plan." This is made clear by use of the phrase "such statement" twice in the applicable sentence, in each case referring to the statements of Creditors' Committee Member Fee/Expense Claims required by the first sentence of Section 9.1.3.

---

[12]  *See* Committee Letter, Ex. A at ¶ 5 (DBTCA) and Ex. G at 5 (WTC).
[13]  Plan § 9.1.3 (emphasis added).

- 6 -

Because the term "Creditors' Committee Member's Fee/Expense Claims" includes a fundamental limitation that reimbursable fees and expenses must be incurred solely in the claimant's capacity as a member of the Creditors' Committee, fees and expenses incurred in other capacities are not reimbursable under Section 9.1.3. Any other reading would be nonsensical, as it would mean that the Proponents of the Plan prospectively agreed to pay fees and expenses incurred by the Trustees in their efforts to defeat confirmation of the Plan – something they assuredly did not do.

As shown below, the Trustees did not incur the fees and expenses that are the subject of their Confirmation Litigation Fee/Expense Claims in their capacities as members of the Creditors' Committee, but rather in their capacities as indenture trustees under their respective indentures and/or as co-proponents of the Noteholder Plan – neither of which are reimbursable under Section 9.1.3.

### 1. DBTCA's Litigation Expenses Were Not Incurred Solely In Its Capacity As A Creditors' Committee Member.

DBTCA's Confirmation Litigation Fee/Expense Claims seeks $884,613.50 in fees and $32,476.52 in expenses, none of which were incurred solely in DBTCA's capacity as a member of the Creditors' Committee.

Debtors' Document Requests.  First, DBTCA seeks reimbursement for fees and expenses incurred in responding to the Debtors' (a) First Request for Production of Documents to DBTCA and (b) Subpoena for Production of Documents to McCarter & English LLP.[14]  It is plain from the face of those document requests, copies of which are attached as Exhibit C to the Mester Declaration, that such discovery was not directed to DBTCA in its capacity as a member of the

---

[14]    *See* Committee Letter, Ex. A at ¶ 6 (DBTCA).

- 7 -

Creditors' Committee. Rather, in the requests the Debtors expressly sought documents from DBTCA *"in its capacity as successor indenture trustee* for certain series of Senior Notes."[15]

Moreover, the discovery requests had nothing to do with DBTCA's service as a member of the Creditors' Committee. Rather, the Debtors sought discovery from DBTCA for the purpose of opposing the Noteholder Plan (of which DBTCA was a co-proponent) and responding to DBTCA's objections to confirmation of the Plan. None of the categories of requested documents sought information from DBTCA in its capacity as a member of the Creditors' Committee.[16] In fact, the document requests to DBTCA were virtually identical to those that the Debtors served on Aurelius[17] and Law Debenture Trust Company of New York ("Law Debenture"),[18] which were objectors to the Plan and co-proponents of the Noteholder Plan (like DBTCA) but were not members of the Creditors' Committee. This conclusively establishes that the Debtors did not tender this discovery to DBTCA solely in its capacity as a Creditors' Committee member. Indeed, given that the Creditors' Committee was a co-proponent of the Plan, there was no need for the Debtors to take discovery of members of the Creditors' Committee in their capacities as such.

Aurelius Subpoena. DBTCA next seeks reimbursement for fees and expenses incurred in responding to a subpoena of its counsel, David Adler, issued at the request of Aurelius – DBTCA's co-proponent.[19] Here again, this request had nothing to do with DBTCA's service as

---

[15]   Mester Decl., Ex. C at 1 (emphasis added).

[16]   *See* Mester Decl., Ex. C at 16-27.

[17]   *See* Mester Decl., Ex. D.

[18]   *See* Mester Decl., Ex. E.

[19]   Committee Letter, Ex. A at ¶ 10 (DBTCA).

46429/0001-9351555v1

a member of the Creditors' Committee and everything to do with its opposition to the Plan and

support of the Noteholder Plan.

Indeed, DBTCA hardly can claim fees and expenses incurred in responding to a subpoena

manufactured by its co-proponent to further its efforts to oppose the Plan and to confirm the

Noteholder Plan.  Had Aurelius truly sought information from DBTCA in its capacity as a

member of the Creditors' Committee – rather than as a fellow co-proponent of the Noteholder

Plan – it would have sought to depose DBTCA, the actual member of the Creditors' Committee,

rather than its outside counsel Mr. Adler, whom Aurelius proclaimed to be ready, willing and

able to appear for a deposition.[20]

Moreover, DBTCA had no reason to incur these alleged fees.  Within two days of

issuance of the subpoena to Mr. Adler, the Creditors' Committee filed a letter brief seeking to

quash the subpoena and to obviate Mr. Adler's need to appear.[21]  The Court then held a hearing

and granted the request to quash.  Thus, there was no need for Mr. Adler to prepare for his

deposition.

Allocation Disputes.  Finally, DBTCA seeks reimbursement of fees and expenses

incurred in responding to discovery served by WTC in connection with the "Allocation

Disputes."[22]  This discovery had nothing whatsoever to do with DBTCA's service as a member

of the Creditors' Committee, and it certainly was not tendered solely in connection with

DBTCA's membership.  To start, WTC's discovery expressly states that it is directed to DBTCA

---

[20]   Mester Decl., Ex. F at 2 (Aurelius letter).

[21]   Mester Decl., Ex. G (Creditors' Committee letter).

[22]   Committee Letter, Ex. A at ¶ 12 (DBTCA).

"*in its capacity as former Indenture Trustee* under the PHONES Notes Indenture,[23] not as a

member of the Creditors' Committee.

Moreover, the discovery requested information regarding the attempted exchange of

PHONES Notes during the time in which DBTCA was the indenture trustee for the PHONES

Notes, before the Chapter 11 Cases were even commenced.[24] DBTCA cannot credibly claim that

discovery seeking information about facts and events that transpired before the Petition Date

somehow relates to its service as a Creditors' Committee member, much less that it arises solely

from its Committee service.

Accordingly, the Reorganized Debtors object to the entirety of DBTCA's Litigation

Fee/Expense Claim of $884,613.50 in fees and $32,476.52 in expenses.

### 2.    WTC's Litigation Expenses Were Not Incurred Solely In Its Capacity As A Creditors' Committee Member.

WTC asserts a Confirmation Litigation Fee/Expense Claim of $614,853.00.  Like

DBTCA, WTC seeks reimbursement for fees and expenses that clearly were not incurred solely

in its capacity as a member of the Creditors' Committee but rather as a co-proponent of the

Noteholder Plan and as indenture trustee for the PHONES Notes.

Specifically, the plan-related discovery for which WTC now claims reimbursement was

directed to WTC "*in its capacity as the successor indenture trustee* for the PHONES notes

dated April 1, 1999,"[25] not in its capacity as a Creditors' Committee member.  And none of the

---

[23]   Mester Decl., Ex. H at 1 (emphasis added).

[24]   For example, Request No. 1 sought "All Documents concerning the exercise of the PHONES Notes Exchange Option by any holder of PHONES Notes between September 1, 2008 and December 30, 2008." Mester Decl., Ex. H at 7.  Requests 2 and 3 sought different types of documents "with respect to exercise of the PHONES Notes Exchange Option."  Mester Decl., Ex. H at 7-8.  And the interrogatories served on DBTCA mirror the requests for production.  Mester Decl., Ex. I.

[25]   Mester Decl., Ex. J at 1 (emphasis added).

categories of requested documents sought information from WTC in its capacity as a member of the Creditors' Committee – rather, as with DBTCA, the requests were virtually identical to those propounded on WTC's co-proponents, Aurelius and Law Debenture.[26]

WTC seeks to make a connection between the discovery requests and its membership on the Creditors' Committee by claiming that it was required to review documents for "Official Committee privileged communications" and to "meet[] with counsel to the Official Committee concerning the review of documents for Official Committee privileged communications."[27] The fact that WTC needed to conduct a privilege review, however, does not magically transform discovery tendered on WTC in its capacity as Plan opponent and Noteholder Plan co-proponent into discovery solely related to WTC's membership on the Creditors' Committee. Rather, the need to review documents for privilege – whether attorney client, common interest, or any other privilege – is an inherent fact of litigation and not unique to members of a creditors' committee.

Moreover, like DBTCA's fees related to the Aurelius subpoena of Mr. Adler, WTC also cannot be reimbursed for fees and expenses incurred in addressing Aurelius's subpoena to Gordon Novod, WTC's outside counsel. The charade of this subpoena – whereby one proponent of the Noteholder Plan sought to subpoena counsel for a co-proponent of the same plan – is illustrated by the fact that Aurelius did not seek to depose WTC, but rather its outside counsel. Like DBTCA, WTC should not have incurred any fees in responding to a subpoena that was successfully opposed by the Creditors' Committee (an expense already borne by the bankruptcy estates).

---

[26] *Compare* Mester Decl., Ex. J, *with* Mester Decl., Exs. D and E.

[27] Committee Letter, Ex. G at 5.

- 11 -

Accordingly, the Reorganized Debtors object to the entirety of WTC's Litigation Fee/Expense Claim of $614,853.00.[28]

**B.      WTC's Committee Service Fee/Expense Claim Is Excessive And Relates In Part To Fees And Expenses Not Incurred Solely In WTC's Capacity As A Creditors' Committee Member.**

WTC seeks an additional $1,065,071.77 in fees and expenses for "Committee Service." This Committee Service Fee/Expense Claim is vastly greater than the comparable claim submitted by the other members of the Creditors' Committee.  Indeed, it is *40% higher* ($300,000) than the next-highest biller (DBTCA), (b) *50% higher* ($350,000) than the third-highest biller (William Niese), and (c) *double* the total amount billed by the four remaining members *combined* ($540,000).[29]

This excessiveness is explained, in part, by WTC's efforts to seek reimbursement for fees and expenses that were not incurred solely in WTC's capacity as a Creditors' Committee member.  Indeed, the tasks for which WTC now seeks reimbursement were in direct opposition to the actions of the Creditors' Committee, and clearly were performed not in WTC's capacity as a member of the Creditors' Committee but rather in its role as indenture trustee for the PHONES Notes.

---

[28]   Additionally, the Plan requires that that the member of the Creditors' Committee actually "incur" the fees and expenses for which it seeks reimbursement.  As will be explained in detail in the Reorganized Debtors' objection to WTC's $30 million unsecured claim (which seeks allowance of all amounts included in its Creditors' Committee Member Fee/Expense Claim), WTC did not actually "incur" the fees at issue here because, pursuant to the express terms of its engagement agreements, WTC did not and was not obligated to pay the fees of its counsel.  This provides an additional basis for disallowance of the remaining unpaid portions of the WTC's Creditors' Committee Member Fee/Expense Claim.

[29]   *See* Committee Letter at 1.

- 12 -

For example, WTC seeks reimbursement for fees relating to "Aurelius' [sic] Capital Management's request to disqualify Chadbourne & Parke from participation in the mediation."[30] WTC, however, affirmatively *supported* and joined Aurelius's efforts in that regard, directly opposing positions of the Creditors' Committee.[31]  It goes without saying that fees and expenses incurred in connection with a motion to disqualify counsel hired and supported by a majority of members of a creditors' committee cannot possibly be incurred solely in a party's capacity as a member of that creditors' committee.

That WTC's actions in this regard were taken not in its capacity as a member of the Creditors' Committee – but rather in its capacity as the PHONES Notes indenture trustee – is made clear by the fact that the disqualification and trustee motions were brought by Aurelius, which was never a member of the Creditors' Committee.  Fees incurred in joining and supporting a motion filed by an outside creditor simply cannot be said to have been incurred *solely* in WTC's capacity as a Creditors' Committee member.

Other examples of WTC's claimed fees for activities that were not conducted by WTC solely in its capacity as a member of the Creditors' Committee include fees for: (a) opposing the Creditors' Committee's motions for standing to pursue the LBO-Related Causes of Action, (b) defending against the Creditors' Committee's motions claiming that WTC violated the

---

[30]  Committee Letter, Ex. G at 4.

[31]  *See Objection Of Official Committee of Unsecured Creditors To Motion Of Aurelius Capital Management, LP To Disqualify Chadbourne & Parke LLP From Acting On Behalf Of The Official Committee Of Unsecured Creditors In Matters In Which It Has Conflicts Of Interests* [D.I. 5737]; *Joinder Of Wilmington Trust Company To The Motion Of Aurelius Capital Management, LP To Disqualify Chadbourne & Parke LLP From Acting On Behalf Of The Official Committee Of Unsecured Creditors In Matters In Which It Has Conflicts Of Interest* [D.I. 5742].

46429/0001-9351555v1

automatic stay by filing its complaint against the Senior Lenders, (c) "formulati[ng] and revisi[ng] . . . the proposed [Litigation Trust] forms," and (d) conducting document reviews.[32]

Notwithstanding this overreaching, Reorganized Tribune decided not to object to and has now paid WTC for $763,208.47 of its Committee Service Fee/Expense Claim – the same amount as the Committee Service Fee/Expense Claim asserted by DBTCA, WTC's fellow member of the Creditors' Committee and Noteholder Plan co-proponent.  Due to the inappropriate and excessive charges detailed above, which the Reorganized Debtors estimate to equate to fees in excess of $300,000, the Reorganized Debtors object to the $301,863.30 balance of WTC's claim and request that the Court disallow it.

**C.      Claims Asserted By Other Members Of The Creditors' Committee Are Consistent With The Plan And Have Been Paid.**

In discussions regarding WTC's claims, counsel for WTC asserted that the Reorganized Debtors are unfairly targeting WTC for objection and have not objected to similar claims asserted by other members of the Creditors' Committee.  Not so.  In fact, the other Creditors' Committee Member Fee/Expense Claims stand in stark contrast to the claims of the Trustees and serve to reinforce the fact that the WTC and DBTCA claims were not incurred solely in their capacity as members of the Creditors' Committee.

WTC, for example, pointed to the claim by William Niese for fees relating to Plan discovery.  Unlike the discovery sought from WTC (and DBTCA), however, the discovery served on Mr. Niese specifically was directed to him in his capacity as a member of the Creditors' Committee, and every requested item relates to the Plan and the settlements included

---

[32]    This information is compiled from the time records that WTC provided to Reorganized Tribune in connection with its assertion of its $30 million unsecured claim.  Relevant excerpts are attached as Exhibit K to the Mester Declaration.

in the Plan.[33] WTC claimed that discovery relating to the Retiree Settlement incorporated into the Plan was directed to Mr. Niese in his individual capacity, and not as a member of the Creditors' Committee.  However, only one of the seventy-five (75) requests to Mr. Niese seeks information about the Retiree Settlement,[34] and that same request also was propounded on Warner Brothers Television and Buena Vista Television, LLC, other members of the Creditors' Committee who are not retirees,[35] making clear that the request was made of Mr. Niese as a Creditors' Committee member.  Further, unlike DBTCA, Mr. Niese did not seek reimbursement for fees incurred in discovery related to the Allocation Disputes, which occurred in Mr. Niese's capacity as a retiree rather than as a Creditors' Committee member.

Mr. Niese also seeks modest amounts of fees incurred in preparing pleadings that supported positions of the Creditors' Committee.[36] Unlike WTC's attacks on the Creditors' Committee, Mr. Niese's efforts are consistent with his service as a Creditors' Committee member because they furthered the positions taken by the Creditors' Committee as a whole.  As such, they are reimbursable, while WTC's efforts to obstruct and overturn decisions of the Creditors' Committee are not.

Finally, unlike WTC, other members of the Creditors' Committee did not include time incurred in opposing actions of the Creditors' Committee.  The Washington-Baltimore Newspaper Guild, for example, incurred substantial fees in opposing the Debtors' proposed

---

[33]    Mester Decl. Ex.  L at 1-13.

[34]    Mester Decl. Ex.  L at 12.

[35]    Mester Decl. Exs. M and N.

[36]    *See Joinder Of William A. Niese, A Member Of The Official Committee Of Unsecured Creditors And A Representative Of The TM Retirees, To The Objection Of The Official Committee Of Unsecured Creditors To Motion Of Aurelius Capital Management To Disqualify Chadbourne & Park, LLC From Acting On Behalf The Official Committee Of Unsecured Creditors* [D.I. 5770].

management incentive plan (which was supported by the Creditors' Committee). The Guild did not file a Creditors' Committee Member Fee/Expense Claim for those fees. Rather, it has filed a motion for payment of those fees as an alleged substantial contribution[37] – a request subject to a different (and much more stringent) standard. Even DBTCA, who like WTC incurred fees supporting Aurelius's disqualification motion, did not include fees incurred in opposing the Creditors' Committee in its Committee Service Fee/Expense Claim.[38]

## IV.    CONCLUSION

The Plan provides for members of the Creditors' Committee to be reimbursed for the fees and expenses of outside legal and financial advisors that they incurred solely in their capacity as Committee members, and nothing more. The Plan does not provide for the Reorganized Debtors to pay for fees and expenses incurred by Creditors' Committee members in other capacities, including in capacities as opponents of the Plan and proponents of the Noteholder Plan.

The Reorganized Debtors have now paid more than $3.2 million for the fees and expenses incurred by Committee members as Committee members. Notwithstanding the Trustees' overreaching, nothing further is required. Accordingly, for all of the foregoing reasons, the Reorganized Debtors request that the Court deny the unpaid portions of the Creditors' Committee Fee/Expense Claims of the Trustees as set forth herein.

---

[37] *See Application Of the Washington-Baltimore Newspaper Guild Pursuant to 11 U.S.C. § 503(b)(3)(D) and (b)(4) For Allowance Of Administrative Expenses Incurred In Making A Substantial Contribution In Connection With Its Objection To The Debtors' Motion To Implement A 2009 Management Incentive Plan And To Pay Earned 2008 Management Incentive Plan Awards To Certain Executives* [Docket No. 13172]. The Reorganized Debtors reserve all rights to respond and object to that request.

[38] *See* Committee Letter, Ex. B at 4.

- 16 -

Dated:  March 15, 2013

SIDLEY AUSTIN LLP
James F. Conlan
One South Dearborn Street
Chicago, IL  60603
Telephone:  (312) 853-7000

-and-

James F. Bendernagel, Jr.
Ronald S. Flagg
1501 K Street, N.W.
Washington, D.C.  20005
Telephone:  (202) 736-8000

-and-

JONES DAY
Bruce Bennett
James O. Johnston
Joshua M. Mester
555 South Flower Street, 50th Floor
Los Angeles, CA  90071-2300
Telephone:  (213) 489-3939

-and-

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.

By: _____
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, DE  19801
Telephone:  (302) 652-3131

ATTORNEYS FOR REORGANIZED DEBTORS

- 17 -