# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

TRIBUNE COMPANY, et al.,[1]

                    Reorganized Debtors.

Chapter 11

Case No. 08-13141 (KJC)

Jointly Administered

**Status Conference: April 17, 2013, at 2:00 p.m.**

**Response Deadline: April 10, 2013**

---

# REORGANIZED DEBTORS' OBJECTION TO
# CLASS 1F OTHER PARENT CLAIM
# <u>ASSERTED BY WILMINGTON TRUST COMPANY</u>

---

[1] The Reorganized Debtors, or successors-in-interest to the Reorganized Debtors, in these chapter 11 cases, along with the last four digits of each entity's federal tax identification number, are: Tribune Company (0355); California Community News, LLC (5306); Chicago Tribune Company, LLC (3437); Chicagoland Publishing Company, LLC (3237); Chicagoland Television News, LLC (1352); forsalebyowner.com, LLC (4276); ForSaleByOwner.com Referral Services LLC (9205); Hoy Publications, LLC (2352); Internet Foreclosure Service, LLC (6550); KDAF, LLC (6969); KIAH, LLC (4014); KPLR, Inc. (7943); KRCW, LLC (1772); KSWB, LLC (7035); KTLA, LLC (3404); KTXL, LLC (3844); KWGN, LLC (5347); Los Angeles Times Communications LLC (1324); Magic T Music Publishing Company, LLC (6522); NBBF, LLC (0893); Oak Brook Productions, LLC (2598); Orlando Sentinel Communications Company, LLC (3775); Sun-Sentinel Company, LLC (2684); The Baltimore Sun Company, LLC (6880); The Daily Press, LLC (9368); The Hartford Courant Company, LLC (3490); The Morning Call, LLC (7560); TMS News and Features, LLC (2931); Tower Distribution Company, LLC (9066); Towering T Music Publishing Company, LLC (2470); Tribune 365, LLC (7847); Tribune Broadcasting Company, LLC (2569); Tribune Broadcasting Hartford, LLC (1268); Tribune Broadcasting Indianapolis, LLC (6434); Tribune Broadcasting Seattle, LLC (2975); Tribune CNLBC, LLC (0347); Tribune Direct Marking, LLC (1479); Tribune Entertainment Company, LLC (6232); Tribune Investments, LLC (6362); Tribune Media Services, LLC (1080); Tribune Media Services London, LLC (6079); Tribune ND, LLC (4926); Tribune Publishing Company, LLC (9720); Tribune Television New Orleans, Inc. (4055); Tribune Washington Bureau, LLC (1088); WDCW, LLC (8300); WGN Continental Broadcasting Company, LLC (9530); WPHL, LLC (6896); WPIX, LLC (0191); WPMT, LLC (7040); WSFL, LLC (5256); WXMI, LLC (3068). The corporate headquarters and the mailing address for each entity listed above is 435 North Michigan Avenue, Chicago, Illinois 60611.

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ......................................................................... 1

BACKGROUND ............................................................................................... 5

ARGUMENT .................................................................................................... 11

I.  WTC IS NOT ENTITLED TO AN UNSECURED CLAIM
    FOR POSTPETITION FEES UNDER THE
    PREPETITION PHONES NOTES INDENTURE ................................... 11

II. WTC IS NOT ENTITLED TO BE REIMBURSED
    FOR AMOUNTS IT HAS NOT INCURRED OR PAID ......................... 16

III. WTC IS NOT ENTITLED TO A CLAIM FOR UNREASONABLE FEES ........... 19

    A.  The Reasonableness Of The Fee Claim Is Determined
        With Reference To The "Prudent Person" Standard
        And The "Economics Of The Situation." ...................................... 19

    B.  WTC Did Not Act As Would A Prudent Person ............................ 22

    C.  WTC's Actions Were Not Justified By
        The "Economics Of The Situation." .............................................. 23

    D.  The Specific Fees And Expenses Purportedly Incurred
        By WTC Are Unreasonable. .......................................................... 26

        1.  WTC's Claim For Mesirow's Fees Is Neither Reimbursable
            Nor Reasonable .................................................................... 29

        2.  A Substantial Portion Of WTC's Claim For
            The LBO Investigation Is Not Reasonable ........................... 31

        3.  A Substantial Portion Of WTC's Claim For
            Examiner Matters Is Not Reasonable. ................................. 35

        4.  A Substantial Portion of WTC's Claim For
            The Plan Process Is Not Reasonable .................................... 37

        5.  A Substantial Portion Of WTC's Claim For
            Reconsideration And The Allocation Disputes Is Not Reasonable. ........ 39

        6.  A Substantial Portion Of WTC's Claim For
            The Appeals Is Not Reasonable ............................................ 40

Page

7.    A Substantial Portion Of WTC's Claim For
      Third-Party Litigation Is Not Reasonable.................................................. 41

8.    A Portion Of WTC's Claim For Committee Service Has Been Paid
      And The Remainder Is Not Reasonable. ................................................... 43

9.    A Portion Of WTC's Fee Claim For
      Internal Fees Is Not Reasonable. ........................................................... 44

E.    **The Claim For Post-Effective Date Fees And Costs Must Be Disallowed.** ... 45

**CONCLUSION** ................................................................................................. 46

46429/0001-9358684V1

# TABLE OF AUTHORITIES

**Page**

## Cases

*In re Adelphia Commc'ns Corp.*, 368 B.R. 140 (Bankr. S.D.N.Y. 2007) .................................. 21

*In re Allegheny Int'l, Inc.*, 954 F.2d 167 (3d Cir. 1992)............................................................. 11

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*,
    522 F.3d 182 (2d Cir. 2008) ................................................................................................ 20

*Beck v. Mfrs. Hanover Trust Co.*, 632 N.Y.S.2d 520 (N.Y. App. Div. 1995).............................. 23

*In re Dalessio*, 74 B.R. 721 (9th Cir. BAP 1987) ...................................................................... 22

*In re Electric Mach. Enters.*, 371 B.R. 549 (Bankr. M.D. Fla. 2007) .................................. 12,14

*First Bank SE, N.A. v. Predco, Inc.*, 744 F. Supp. 873 (E.D. Wis. 1990).................................... 23

*Global Indus. Tech., Inc. v. J.P. Morgan Trust Co (In re Global Indus. Techs., Inc.)*,
    344 B.R. 382 (Bankr. W.D. Pa. 2006) ............................................................. 12,13,14,15,46

*Global Indus. Techs. Serv. Co. v. Tanglewood Invs., Inc. (In re Global Indus. Techs., Inc.)*,
    327 B.R. 230 (Bankr. W.D. Pa. 2005) .................................................................... 12,14,15

*In re Hoffman*, 352 B.R. 879 (Bankr. N.D. Cal. 2006) ............................................................... 21

*In re Kroh Bros. Dev. Co.*, 105 B.R. 515 (Bankr. W.D. Mo. 1989)....................................... 20,21

*In re Loewen Grp. Int'l*, 274 B.R. 427 (Bankr. D. Del. 2002)....................................... 2,12,13,14

*In re McGuier*, 346 B.R. 151 (Bankr. W.D. Pa. 2006) ............................................................... 21

*OHC Liquidation Trust v. U.S. Fire Ins. Co. (In re Oakwood Homes Corp.)*,
    394 B.R. 352 (Bankr. D. Del. 2008) ................................................................................ 12-13

*In re Old Colony, LLC*, 476 B.R. 1 (Bankr. D. Mass. 2012) .................................................. 11,16

*Olsen v. Robinson Brog Leinwand Greene Genovese & Gluck, P.C. (In re Olsen)*,
    334 B.R. 104 (S.D.N.Y. 2005)............................................................................................. 18

*In re PCH Assocs.*, 122 B.R. 181 (Bankr. S.D.N.Y. 1990) ........................................................ 21

*Quick v. NLRB*, 245 F.3d 231, 252 (3d Cir. 2001) ..................................................................... 17

*In re Reorganized Lake Diamond Assocs.*, 367 B.R. 858 (Bankr. M.D. Fla. 2007).................... 21

**Page**

*The Law Offices of Neil Vincent Wake v. Sedona Inst. (In re Sedona Inst.)*,
   220 B.R. 74 (9th Cir. BAP 1998) ......................................................... 18

*Town of New Windsor v. Tesa Tuck, Inc.*, 935 F. Supp. 317 (S.D.N.Y. 1996)........................... 18

*Travelers Cas. & Surety Co. v. Pacific Gas & Electric Co.*, 549 U.S. 443 (2007) ..................... 13

*In re Western Asbestos Co.*, 318 B.R. 527 (Bankr. N.D. Cal. 2004) ........................................... 18

*Woodhams v. Allstate Fire & Cas. Co.*, 748 F. Supp. 2d 211 (S.D.N.Y. 2010)........................ 17

*In re Wonder Corp.*, 72 B.R. 580 (Bankr. D. Conn. 1987),
   *aff'd* 82 B.R. 186 (D. Conn. 1988) ..................................................... 21

*In re Worldwide Direct, Inc.*, 334 B.R. 112 (Bankr. D. Del. 2005) ........................................... 2,23

**Statutes and Other Sources**

11 U.S.C. § 506(b)........................................................................................................ 20

James E. Spiotto, DEFAULTED SECURITIES:
   THE PRUDENT INDENTURE TRUSTEE'S GUIDE § IV-4............................................ 23

46429/0001-9358684V1

The Reorganized Debtors hereby object to the Class 1F Other Parent Claim asserted by Wilmington Trust Company, in its capacity as indenture trustee for the PHONES Notes ("WTC"), in the amount of "$30,289,093.33, plus any additional amounts expended to litigate allowance of its claim," representing fees and expenses allegedly incurred by WTC and its professionals during the course of the Chapter 11 Cases.[1]

## PRELIMINARY STATEMENT

WTC served as the indenture trustee for the PHONES Notes. The PHONES Notes were deeply-subordinated securities that, under Tribune's confirmed Plan, received no distribution other than subordinated Litigation Trust Interests on which no payments will be made unless and until the Litigation Trust recovers the $1.4 billion (or more) necessary to satisfy outstanding Senior Noteholder and Other Parent Claims in full.

Yet, despite its patently out-of-the-money position in the capital structure and the zealous efforts of well-funded, economically-motivated parties (*e.g.*, Aurelius and the Senior Notes Indenture Trustees) who pursued the same ultimate objective of avoidance of the Senior Loan Claims, WTC and its professionals somehow allegedly ran up more than *$30 million* in fees and expenses during the Chapter 11 Cases, for which WTC now asserts an unsubordinated Other Parent Claim to be satisfied by Reorganized Tribune.[2]

---

[1]    Capitalized terms not defined in this Objection have the meanings given to them in the *Fourth Amended Joint Plan Of Reorganization For Tribune Company And Its Subsidiaries (As Modified July 19, 2012)* (the "Plan"), which became effective on December 31, 2012. Citations to "Johnston Decl." are to the Declaration of James O. Johnston that accompanies this Objection.

[2]    In addition to its unsecured claim, WTC also has (a) filed an Application [D.I. 13272] seeking allowance and payment in full of *$7,146,492.75* of those fees and expenses pursuant to sections 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code on account of its alleged substantial contribution to the Chapter 11 Cases; and (b) asserted a Creditors' Committee Member Fee/Expense Claim seeking payment in full of *$1,679,924.77* of those fees and expenses pursuant to Section 9.1.3 of the Plan. As explained below, the Reorganized

The Reorganized Debtors object to that claim on the following grounds. *First*, under the better-reasoned majority rule, an unsecured claim for postpetition fees and expenses arising under a prepetition contract (like the PHONES Notes Indenture) is not allowable when asserted against an insolvent debtor. *See, e.g.*, *In re Loewen Grp. Int'l*, 274 B.R. 427, 444 n.36 (Bankr. D. Del. 2002).

*Second*, even if the Court concludes that an unsecured claim for postpetition fees arising under a prepetition contract is allowable, WTC is limited by the PHONES Notes Indenture to a claim for reimbursement of fees actually advanced or incurred. WTC, however, actually paid a mere $3 million of the outside professional fees for which it seeks "reimbursement," and *WTC is not liable for the remainder of those alleged fees*. Indeed, WTC structured its relationships with its counsel and financial advisors to relieve it from any liability for fees, which were either to be borne by the holders of the PHONES Notes who were directing WTC's conduct throughout the Chapter 11 Cases or ███████████████████████████████

████████████████████████████████████████████████

███████████████. As a consequence, consistent with the terms of the Phones Notes Indenture, WTC's claim for reimbursement of outside professional fees may not exceed $3 million.

*Third*, even were WTC entitled to an unsecured claim for "reimbursement" of amounts it did not (and was not obligated to) pay, those amounts would still have to be "reasonable." WTC concedes that, under the "prudent person" standard, it was obligated "to act with the same care as if it owned the investment." *In re Worldwide Direct, Inc.*, 334 B.R. 112, 129 (Bankr. D. Del. 2005). Yet, the *actual* "owners of the investment" here (*i.e.*, holders of the PHONES Notes)

---

Debtors have paid a portion and objected to a portion of the Creditors' Committee Member Fee/Expense Claim and intend to object to the substantial contribution Application.

chose to contribute only $3 million to pursuit of the rights and remedies for which WTC now asserts a claim of more than $30 million.  By definition, no prudent person would incur more than *ten times* the amount of fees that owners of the investment deemed prudent to fund.

Similarly, analogous case law interpreting section 506(b) of the Bankruptcy Code – by which an oversecured creditor may claim contractual fees from the bankruptcy estate – makes clear that the reasonableness of any fee hinges on "the economics of the situation."  Here, the vast majority of the fees for which WTC now asserts a claim were not remotely justified by the "economics of the situation" given the subordinated nature of the PHONES Notes and the fact that a large portion of WTC's activities duplicated the efforts of – or would have been performed in any event by – the Debtors, the Creditors' Committee, Aurelius, and/or the Senior Notes Indenture Trustees, as holders or representatives of holders of actual in-the-money claims against Tribune.

For example, WTC seeks more than *$4 million* in fees associated with its counsel's review of documents related to the LBO (with up to 62 timekeepers per month reviewing documents), an additional *$2.6 million* in fees associated with its financial advisor's analysis of Tribune's solvency at the time of the LBO, and a further *$2.5 million* for its counsel's participation in the Examiner process.  This massive duplication of the efforts of the Debtors, the Creditors' Committee, and the Senior Notes Indenture Trustees was not reasonable.  The Court appointed the Examiner at WTC's request precisely so that there could be, in WTC's own words, "an in-depth and impartial investigation" of the LBO funded by the bankruptcy estates.  At the same time, the Court specifically ordered WTC and all parties "to avoid unnecessary interference with, or duplication of, the Investigation."[3]  The bankruptcy estates ultimately paid the Examiner

---

[3]    [D.I. 4120 ¶ 3].

- 3 -

and his professionals more than $13 million.  It is patently unreasonable for WTC – as an out-of-money creditor – to seek such enormous fees in respect of its duplicative and wasteful efforts.

As another example, WTC asserts a claim for the *entirety* of the *$4.9 million* in fees charged by Mesirow Financial Consulting LLC ("Mesirow") for its service as an expert in support of the Noteholder Plan and in opposition to the Plan, at a time when Mesirow was retained jointly by counsel for WTC, the Senior Notes Indenture Trustees and Aurelius Capital Management ("Aurelius") and when Mesirow's fees were ███████████████████████ ████████████████████████.  The Court will recall that Aurelius's (not WTC's) counsel presented Mesirow's testimony at the confirmation hearing, and that Mesirow's work had nothing whatsoever to do with any issue specific to the PHONES Notes.  It is beyond reasonable dispute that the Senior Noteholders would have retained Mesirow regardless of WTC's involvement, and WTC cannot reasonably assert a claim for any, much less all, of Mesirow's fees.

Thus, as explained in detail below, the Reorganized Debtors object to WTC's Other Parent Claim and request that the Court disallow it in its entirety as an unsecured claim under the prepetition PHONES Notes Indenture for postpetition fees and expenses.  Alternatively, the Reorganized Debtors request that the Court disallow all but $3 million of WTC's claim for outside professional fees on the ground that the PHONES Notes Indenture does not provide for any claim for reimbursement in excess of amounts that WTC either advanced or incurred.  Finally, to the extent that the Court does not disallow WTC's claim on the foregoing grounds, the Reorganized Debtors submit that the Court should not allow a claim in excess of $5 million because WTC's requested fees and expenses above that amount are unreasonable and not justified by the "economics of the situation."

## BACKGROUND

WTC served as the successor indenture trustee for the PHONES Notes pursuant to the PHONES Notes Indenture, a copy of which is attached as Exhibit A to the Johnston Declaration.

The PHONES Notes were subordinated to virtually all material indebtedness of Tribune.[4] Throughout the Chapter 11 Cases, WTC argued that Tribune was insolvent, and the evidence at confirmation established that the Debtors' Total Distributable Value was $4 to $5 billion lower than the $12 billion in outstanding unsubordinated debt.[5] As a consequence, it was readily apparent at all times during these proceedings that holders of PHONES Notes Claims would receive no distributions unless the $8.6 billion in Senior Loan Claims arising from the LBO were avoided or limited.

Those were the "economics of the situation" faced by WTC in its capacity as indenture trustee. Ultimately, the Plan confirmed and cemented that reality. Under the Plan, holders of PHONES Notes Claims received only subordinated Litigation Trust Interests,[6] meaning that they will receive *nothing* unless and until the Litigation Trust recovers sufficient amounts from highly-contentious and uncertain litigation – at least $1.4 billion – to pay the Senior Noteholder and Other Parent Claims in full.

---

[4]  *See Memorandum on Reconsideration* [D.I. 10531] at 5-16; *Memorandum Regarding Allocation Disputes* [D.I. 11337] (the "Allocation Disputes Opinion") at 10-11 and 21 n.19; *Memorandum Overruling Objections To Confirmation Of The Fourth Amended Plan Of Reorganization For Tribune Company And Its Subsidiaries And Denying Clarification Motion* [D.I. 12033] (the "2012 Confirmation Opinion") at 11-12. The sole exception to the subordination of the PHONES Notes is with respect to the $225 million in EGI-TRB LLC Notes. *See* Allocation Disputes Opinion at 30-39.

[5]  2012 Confirmation Opinion at 6 n.8.

[6]  Plan § 3.2.9.

46429/0001-9358684V1

**WTC's Fee Claim.**

The Plan permitted WTC to seek a General Unsecured Claim, classified as an Other Parent Claim under Class 1F of the Plan, "for fees and expenses arising under Section 6.07 of the PHONES Notes Indenture."[7]  In Section 6.07 of the PHONES Notes Indenture, Tribune agreed "(1) to pay to the Trustee [WTC] . . . reasonable compensation . . . for all services rendered by it hereunder . . . [and] (2) except as otherwise expressly provided herein, to reimburse the Trustee . . . for all reasonable expenses, disbursements and advances incurred or made by the Trustee in accordance with any provision of this Indenture (including the reasonable compensation and the expenses and disbursements of its agents and counsel) . . . ."[8]

Pursuant to the Plan, after the Effective Date WTC asserted a Class 1F Other Parent Claim in the amount of "$30,289,093.33, plus any additional amounts expended to litigate allowance of its claim" (collectively, the "Fee Claim").  Specifically, in accordance with the stipulated procedure,[9] on January 2, 2013, WTC delivered to the Reorganized Debtors a draft titled *Wilmington Trust Company's Brief In Support Of The Allowance Of Wilmington Trust Company's Class 1F Other Parent Claim* (the "WTC Draft Brief"), a copy of which, with certain exhibits, is attached as Exhibit B to the Johnston Declaration.[10]  The WTC Draft Brief asserts a Fee Claim for WTC and its outside professionals in the following amounts:[11]

---

[7]    Plan § 1.1.101.

[8]    PHONES Notes Indenture § 6.07.

[9]    *Stipulation Between Debtors And Wilmington Trust Company Regarding Post-Effective Date Procedure For Review And Allowance Of Wilmington Trust Company's Fee And Expense Claim* (the "Stipulation") [D.I. 11831].

[10]   The Reorganized Debtors reserve the right to supplement this Objection in the event that WTC attempts to amend or alter the stated basis for the Fee Claim as set forth in the WTC Draft Brief.

[11]   WTC Draft Brief, Ex. B. [WTC1F05080].

- 6 -

| Institution/Professional | Fees and Expenses Claimed |
|---|---|
| Wilmington Trust Company | $843,057.06 |
| Brown Rudnick LLP | $21,170,779.77 |
| Benesh Friedlander Coplan & Aronoff LLP | $346,294.48 |
| Sullivan Hazeltine Allinson LLC | $238,920.65 |
| Garvey Schubert Barer | $8,005.02 |
| The Law Offices of John Wells King, PLLC | $3,475.00 |
| Mesirow Financial Consulting LLC | $7,537,015.00 |
| Morton Research, Inc. | $35,433.79 |
| Cypress Holdings LLC | $92,162.56 |
| Hoffman Schultz Media Capital | $13,950.00 |
| **Total** | **$30,289,093.33** |

To the extent allowed as a Class 1F Other Parent Claim, WTC will receive a cash payment of 32.73% of the allowed amount of the Fee Claim, a cash payment of a *pro rata* share of the Bridge Settlement Proceeds, and a *pro rata* share of non-subordinated Class 1F Litigation Trust Interests.[12]

On February 19, 2013, in accordance with the Stipulation, the Reorganized Debtors informally objected to the Fee Claim through a letter outlining the grounds for disallowance and/or limitation of the Fee Claim.[13] WTC and the Reorganized Debtors subsequently negotiated with respect to the Fee Claim but failed to reach a resolution, thereby necessitating the filing of this Objection.

Pursuant to Section 9.1.3 of the Plan, WTC also requested payment in full of $1,679,924.77 in fees that WTC claimed to constitute a Creditors' Committee Member Fee/Expense Claim. The Reorganized Debtors subsequently paid $763,208.47 of that amount to

---

[12]  Plan § 3.2.6. WTC selected treatment "Option 4", eschewing New Common Stock in favor of a greater cash distribution. *See* WTC Draft Brief ¶ 14.

[13]  Johnston Decl., Ex. C (Reorganized Debtors' letter to WTC).

WTC and objected to the balance.[14]  Finally, taking a third bite at the apple, WTC filed an

Application seeking allowance and payment in full of $7,146,492.75 in fees and expenses on

account of its alleged substantial contribution to the Chapter 11 Cases,[15] to which the

Reorganized Debtors will object in due course.

**WTC's Relationship With The Professionals For Which It Asserts A Claim.**

The WTC Draft Brief and accompanying materials reveal several important facts about

WTC's relationship with the professionals whose fees are the subject of the Fee Claim.  *First*,

WTC is not actually liable for any of the fees or expenses for which it now asserts a claim.

Rather, the PHONES Notes Indenture specifically relieves WTC from any obligation "to expend

or risk its own funds or otherwise incur any financial liability in the performance of any of its

duties hereunder, or in the exercise of any of its rights or powers, if it shall have reasonable

grounds for believing that repayment of such funds or adequate indemnity against such risk or

liability is not reasonably assured to it."[16]

Consistent with that protection, and given the stark reality that the PHONES Notes were

subordinated, out of the money, and highly unlikely to receive any distributions from Tribune,

WTC ensured that the professionals would relieve it from any liability for fees, which were to be

borne by the holders of the PHONES Notes who were directing WTC's conduct throughout the

---

[14]  *See Reorganized Debtors' Objection To Creditors' Committee Member Fee/Expense Claims Asserted By (A) Deutsche Bank Trust Company Americas And (B) Wilmington Trust Company* [D.I. 13327] (the "Committee Fee Obj.").

[15]  *See Wilmington Trust Company's Application For Allowance Of Claim Under 11 U.S.C. §§ 503(b)(3)(D) And 503(b)(4) As A Result Of Wilmington Trust Company's Motion Requesting The Appointment Of An Examiner And Wilmington Trust Company's Participation In Examiner's Investigation* [D.I. 13272].

[16]  PHONES Notes Indenture § 6.01(c)(4).

46429/0001-9358684V1

Chapter 11 Cases.  Thus, for example, the Brown Rudnick firm – WTC's primary counsel –

included the following in its engagement agreement with WTC:

> Notwithstanding anything to the contrary herein, it is expressly understood
> that your liability for our fees and expenses, and the fees and expenses of
> outside parties retained by us, will be limited to the amounts you receive
> under that certain letter agreement of the same date hereof by and among
> Wilmington Trust Company and the [directing] holders' party thereto.  We
> understand that you will not advance your own funds to satisfy our
> invoices or the invoices of outside parties retained by us.[17]

Similarly, Mesirow (the other professional with large fees now subject to the Fee Claim)

agreed that ""[18]  In turn,

Brown Rudnick (not WTC) apparently retained the other listed professionals, such that they

became "outside parties retained by us" and within the scope of the disclaimer quoted above.[19]

---

[17]  WTC Draft Brief, Ex. C.  [WTC1F05139].

[18]  Johnston Decl., Ex. E (Mesirow engagement agreement dated April 26, 2010) ("Mesirow Engagement Agreement 2").  [WTC1F06169].  Mesirow's prior engagement agreement, dated February 2, 2010, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.  Johnston Decl., Ex. D ("Mesirow Engagement Agreement 1"). [WTC1F06177].

[19]  WTC only provided engagement agreements for Brown Rudnick and Mesirow, which indicate that Mesirow was retained by Brown Rudnick "as attorneys for Wilmington Trust." See Mesirow Engagement Agreement 1, Mesirow Engagement Agreement 2, and Johnston Decl., Ex. F (Mesirow engagement agreement dated December 16, 2010) ("Mesirow Engagement Agreement 3").  [WTC1F06142].  However, invoices submitted by the other professionals (excluding Sullivan Hazeltine), excerpts of which are attached as Exhibit G to the Johnston Declaration [WTC1F0041, WTC1F0298, WTC1F0313, WTC1F0328-29, WTC1F0383], are directed to Brown Rudnick (not WTC), making clear that such firms also were retained by Brown Rudnick.

**Second**, those professionals have not received anywhere close to the amounts for which WTC now asserts the Fee Claim. Rather, Suttonbrook Capital Management LP ("Suttonbrook") and Camden Asset Management, L.P. ("Camden"), the holders of PHONES Notes from whom WTC "received a series of directions" during the Chapter 11 Cases, provided just $3 million to be "used to partially advance fees and expenses of certain of Wilmington Trust's professionals related to the exercise of rights under the PHONES Indenture."[20]

This raises the question of how is it possible that the professionals could have charged $27 million in fees not funded by the directing PHONES Notes holders. There are two answers. To start, Brown Rudnick ██████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████[21] As WTC had no liability for the "fees and expenses accrued or incurred in connection with this representation," and the directing holders agreed to fund only $3 million ██████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████. Yet, WTC now asserts a claim for "reimbursement" for the entirety of Brown Rudnick's fees as if WTC had paid and been liable for them.

Moreover, Mesirow ██████████████████████████████████████. Specifically, once Aurelius decided to advance the competing Noteholder Plan, Mesirow entered into a new, joint engagement agreement with counsel for Aurelius, the Senior Notes Indenture

---

20    WTC Draft Brief ¶¶ 9, 11.

21    Johnston Decl., Ex. H. [WTC1F06137].

Trustees, and WTC.[22]  In that new agreement, ███████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████[24]  Yet, WTC now asserts a claim for "reimbursement" for the entirety of Mesirow's

fees as if WTC had paid and been liable for them.

### ARGUMENT

For the reasons set forth below, WTC has not satisfied and cannot satisfy its burden of

persuasion and the Fee Claim should be disallowed in its entirety.  *See, e.g.*, *In re Allegheny*

*Int'l, Inc.*, 954 F.2d 167, 174 (3d Cir. 1992) ("The burden of persuasion is always on the

claimant" attempting to establish a claim against the bankruptcy estate.).

## I.  WTC IS NOT ENTITLED TO AN UNSECURED CLAIM FOR POSTPETITION FEES UNDER THE PREPETITION PHONES NOTES INDENTURE

The Fee Claim "arises under the terms of the pre-petition PHONES Indenture."[25]

Although there is disagreement in the case law on the subject, the better-reasoned authority (and

what has been described as the "majority rule") holds that, absent a consensual arrangement, an

unsecured claim for postpetition fees arising under a prepetition contract is not allowable when

asserted against an insolvent debtor.  *See, e.g.*, *In re Old Colony, LLC*, 476 B.R. 1, 31-32 (Bankr.

D. Mass. 2012) ("where the bankruptcy estate is unable to pay all other creditors in full,

---

22    Mesirow Engagement Agreement 3 at 1.  [WTC1F06142].

23    Mesirow Engagement Agreement 3 at 3.  [WTC1F06144].

24    Mesirow Engagement Agreement 3 at 3 [WTC1F06144]; *see also* WTC Draft Brief ¶ 40
      (Aurelius advanced "payments totaling approximately $6.2 million to Mesirow . . . to satisfy
      fees and expenses of Mesirow in connection with the Debtors' chapter 11 cases.").

25    WTC Draft Brief ¶ 35.

postpetition attorneys' fees are not allowable as part of an unsecured claim even where provided for in the underlying contract"); *In re Electric Mach. Enters.*, 371 B.R. 549, 552 (Bankr, M.D. Fla. 2007) ("[t]he Court adopts the majority rule") (also collecting cases at page 550).

The law in this District and within the Third Circuit is not settled on this issue.  In *Loewen Group*, Judge Walsh adopted the majority rule, holding that allowance of an unsecured claim for postpetition fees and expenses is inconsistent with section 506(b) of the Bankruptcy Code, which limits such claims to oversecured creditors.  *Loewen Grp.*, 274 B.R. at 444 n.36.[26] Similarly, Judge Fitzgerald of the Western District of Pennsylvania has endorsed the majority rule on at least two occasions.  *Global Indus. Tech., Inc. v. J.P. Morgan Trust Co (In re Global Indus. Techs., Inc.)*, 344 B.R. 382, 385 (Bankr. W.D. Pa. 2006) [*JPMorgan*] ("this court reviewed the split of authority and found the majority's analysis to be persuasive"); *Global Indus. Techs. Serv. Co. v. Tanglewood Invs., Inc. (In re Global Indus. Techs., Inc.)*, 327 B.R. 230, 239 (Bankr. W.D. Pa. 2005) [*Tanglewood*] ("The court agrees with the majority of courts that unsecured creditors may not include postpetition attorneys' fees in their claims from a bankruptcy estate.").  In a fourth case, however, Judge Walsh stated in *dicta* that "the Supreme Court has held that attorneys' fees authorized by prepetition contracts may be awarded even if they are incurred in postpetition litigation." *OHC Liquidation Trust v. U.S. Fire Ins. Co. (In re*

---

[26]   Section "506(b) expressly limits the recovery of such fees and costs to creditors whose claims are oversecured.  Although Congress could have also provided for the recovery of post-petition fees and costs by unsecured and undersecured creditors, it failed to do so. Rather than view this failure as mere oversight, I think it is more reasonable to interpret the language in § 506(b) limiting the recovery of post-petition fees and costs to oversecured creditors as demonstrative of Congressional intent not to allow the recovery of post-petition fees and costs by creditors whose claims are not oversecured." *Loewen Grp.*, 274 B.R. at 444 n.36 (citation omitted).

*Oakwood Homes Corp.*), 394 B.R. 352, 356 (Bankr. D. Del. 2008) (citing *Travelers Cas. & Surety Co. v. Pacific Gas & Electric Co.*, 549 U.S. 443 (2007)).[27]

Although there is no definitive, binding precedent regarding the allowability of an unsecured claim for postpetition fees under a prepetition contract, there are at least five persuasive grounds for the majority rule. *First*, as Judges Walsh and Fitzgerald observed, allowance of an unsecured claim for postpetition fees and expenses is inconsistent with section 506(b) of the Bankruptcy Code. *Loewen Grp.*, 274 B.R. at 444 n.36 ("If post-petition fees and costs were generally recoverable by all creditors, then Congress would not [have] expressly provided for their recovery by oversecured creditors in § 506(b)."); *JPMorgan*, 344 B.R. at 385 ("[T]he maxim of *expressio unius est exclusio alterius* (the expression of one is the exclusion of the alternatives) applie[s] to analysis of § 506(b) attorneys' fees claims. Because Congress specifically authorized payment of postpetition attorneys' fees for oversecured creditors and said nothing about allowance of such fees for unsecured creditors, there is no clear entitlement to such fees for unsecured creditors.").

*Second*, as Judges Walsh and Fitzgerald held, the Supreme Court's decision in *Timbers* supports disallowance of unsecured claims for postpetition fees:

> I find further support for this conclusion in the Supreme Court's decision in *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*,

---

[27]   The *Travelers* case cited by Judge Walsh does not so hold, and nothing in *Travelers* abrogated or altered the majority rule previously endorsed by Judge Walsh and Judge Fitzgerald. Rather, in *Travelers* the Supreme Court merely overruled the Ninth Circuit's "*Fobian* rule," which drew an unsupportable distinction between contractual attorneys fees incurred in litigating "basic contract enforcement questions" under state law (held to be allowable) and those incurred in litigating "issues peculiar to federal bankruptcy law" (held not to be allowable). *Travelers*, 549 U.S. at 447. In so holding, however, the Court expressly reserved the question of whether unsecured contractual claims for postpetition fees are allowable at all. *Id.* at 456 ("we express no opinion with regard to whether, following the demise of the *Fobian* rule, other principles of bankruptcy law might provide an independent basis for disallowing Travelers' claim for attorney's fees").

> 484 U.S. 365 (1988). In *Timbers*, the Supreme Court concluded that
> because § 506(b) "permits post-petition interest to be paid only out of the
> 'security cushion,' the undersecured creditor, who has no such cushion,
> falls within the general rule disallowing post-petition interest." 484 U.S.
> at 372-73. This rationale applies equally to claims for post-petition fees
> and costs.

*Loewen Grp.*, 272 B.R. at 444 n.36; *Tanglewood*, 327 B.R. at 240 (*Timbers* "supports the

majority position").

 ***Third***, as Judge Fitzgerald held, "[s]ection 502(b) requires calculation of the amount of a

claim as of the petition date. Because postpetition attorneys' fees have not been incurred on the

date the bankruptcy is filed, a claim cannot include postpetition fees." *JPMorgan*, 344 B.R. at

386.

 ***Fourth***, the Bankruptcy Code's "policy of providing equality of distribution among

similarly situated creditors," *Electric Mach.*, 371 B.R. at 551, compels the conclusion articulated

by Judge Fitzgerald that an unsecured creditor must not be allowed a contractual claim for

postpetition fees and expenses:

> When proofs of claim are filed, the unsecured creditors stand in parity –
> all seek to share in the distribution from the estate based on what they
> were owed on the day the bankruptcy was filed. If we were to permit
> certain unsecured creditors to recover fees incurred postpetition, as part of
> their prepetition claims, for actions taken with respect to the bankruptcy
> case such as to monitor the unsecured claim or protect the distribution,
> imposition of a bar date would be meaningless. Thereafter, every
> unsecured contractual creditor could continue to "monitor" the bankruptcy
> at the expense of the estate. If we were to permit unsecured contractual
> creditors to recover, as a prepetition claim, their legal fees for actions
> taken postpetition, debtors would never be out from under the burden of
> ongoing costs, the claims would continue to rise throughout the case, and
> the universe of prepetition claims would never be ascertainable. Thus, the
> Debtor's fresh start and discharge would be impaired. The concept of
> parity of distribution among similarly situated creditors would evaporate
> because some unsecured creditors would be "more equal" than others by
> virtue of the ability to have the claim continue to grow postpetition. It is
> difficult to envision anything more at odds with the spirit of the
> Bankruptcy Code's scheme for payment to creditors.

- 14 -

*JPMorgan*, 344 B.R. at 385; *Tanglewood*, 327 B.R. at 240 ("To allow one group of unsecured creditors to recover more than their prepetition debt unfairly discriminates against others because it reduces the pool of assets available to all unsecured creditors pro rata.").

***Finally***, sections 503(b)(3)(D) and (4) of the Bankruptcy Code expressly provide a mechanism for unsecured creditors to assert a claim for postpetition fees and expenses when they have made a "substantial contribution" to a bankruptcy case. Although WTC has availed itself of that mechanism in these cases, the "substantial contribution" standard is stringent, and such claims are "strictly construed to keep administrative expenses at a minimum so as to preserve the estate for the benefit of the creditors." *In re Columbia Gas Sys., Inc.*, 224 B.R. 540, 548 (Bankr. D. Del. 1998). Unfettered allowance of claims for postpetition fees and expenses in favor of any creditor with a prepetition contract with an attorneys' fees clause would eviscerate that strict standard and the policy that underlies it.

Accordingly, there is no basis for allowance of the Fee Claim in any amount. Judge Fitzgerald's *JPMorgan* decision is directly on point. There, JPMorgan served as indenture trustee and, like WTC, asserted an unsecured claim under the indenture for postpetition fees. Like WTC, JPMorgan also argued that, "because it has fiduciary obligations imposed upon it by statute (such as reporting to its bondholders and meeting certain filing requirements under the Trust Indenture Act), pursuant to 11 U.S.C. § 502 its compensation, fees and expenses are allowable, even though they actually arise postpetition." *JPMorgan*, 344 B.R. at 383-84. Although JPMorgan served as indenture trustee for an unsubordinated, in-the-money bond issue, Judge Fitzgerald rejected that argument for the reasons stated above. Judge Fitzgerald's reasoning is even more compelling here, where WTC serves as indenture trustee for a subordinated, out-of-the-money position.

The Fee Claim therefore should be disallowed in its entirety.[28]

## II.   WTC IS NOT ENTITLED TO BE REIMBURSED FOR AMOUNTS IT HAS NOT INCURRED OR PAID

Even if an unsecured claim for postpetition fees arising under a prepetition contract were allowable at all, WTC would be limited to a claim only for those specific fees and expenses of professionals for which the PHONES Notes Indenture provides for reimbursement.

Section 6.07 of the PHONES Notes Indenture is the operative provision.[29] As noted above, it provided for Tribune "(1) to pay to the Trustee . . . reasonable compensation . . . for all services rendered by it hereunder . . . [and] (2) . . . to reimburse the Trustee . . . for all reasonable expenses, disbursements and advances incurred or made by the Trustee in accordance with any provision of this Indenture (including the reasonable compensation and the expenses and disbursements of its agents and counsel) . . . ."[30] The Fee Claim is comprised of a claim for $843,057.06 as "reasonable compensation" within the meaning of Section 6.07(1) of the

---

[28]   In the WTC Draft Brief, WTC argued that the Debtors took a contrary position in advocating for Plan provisions providing for reimbursement of Senior Lender fees. WTC Draft Brief ¶ 37. Not so, and the Plan's reimbursement of Senior Lender fees is perfectly consistent with disallowance of the Fee Claim. For one thing, reimbursement of the Senior Lender fees was a component of the comprehensive Settlement embodied in the Plan and approved by the Court – the Senior Lenders were paid their fees as consideration for the hundreds of millions of dollars they provided in settlement. For another, obligations to reimburse Senior Lender fees were guaranteed by the Guarantor Debtors and Guarantor Non-Debtors, all of whom paid their other unsecured liabilities in full. Courts have recognized that, in the case of a solvent debtor, the equities favor allowance of an unsecured claim for postpetition fees. *See Old Colony*, 476 B.R. at 30-31 (drawing distinction between solvent and insolvent debtors and disallowing fee claim "where the bankruptcy estate is unable to pay all other creditors in full"). Because Tribune Company itself – the alleged obligor – is not solvent and is not paying creditors in full, the equities weigh against allowance of the Fee Claim.

[29]   The Plan permits WTC to seek a General Unsecured Claim "for fees and expenses arising under Section 6.07 of the PHONES Notes Indenture." Plan § 1.1.101.

[30]   PHONES Notes Indenture § 6.07.

46429/0001-9358684V1

PHONES Notes Indenture,[31] with the remaining balance of $29,446,036.27 sought as reimbursement for "reasonable expenses, disbursements and advances incurred or made by the Trustee" within the meaning of Section 6.07(2) of the PHONES Notes Indenture.

Under the plain language of Section 6.07(2), WTC is not entitled to a claim for anything more than "*reimburse[ment]*" for the "reasonable expenses, disbursements and advances *incurred or made* by the Trustee." Yet, as set forth above, holders of the PHONES Notes were willing to pay only $3 million of the professional fees that are the subject of the Fee Claim and WTC is not contractually obligated any remaining amount. Because WTC neither made payments nor incurred liability to any of its professionals in amounts greater than the $3 million received from Suttonbrook and Camden, WTC cannot now seek "reimburse[ment]" for amounts in excess of those sums.

The Third Circuit has confirmed the common-sense proposition that there can be no "reimbursement" absent payment of – or liability for – the sums at issue. *Quick v. NLRB*, 245 F.3d 231, 252 (3d Cir. 2001) (no reimbursement to claimant for "for legal expenses he never incurred and for which he has no personal liability"); *id.* at 256 ("'*Reimburse' means 'to pay back to someone*.' WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 993 (1990).") (emphasis added); *see, e.g.*, *Woodhams v. Allstate Fire & Cas. Co.*, 748 F. Supp. 2d 211, 219 (S.D.N.Y. 2010) ("The word 'reimburse' means 'repay' or 'pay back or compensate (a person) for money spent or for losses or damages incurred.'") (quoting WEBSTER'S II NEW RIVERSIDE DICTIONARY 1324 (1988)).

WTC also has not "incurred" any expenses for which it is not actually liable:

---

[31]  This claim for compensation pursuant to Section 6.07(1) of the Phones Notes Indenture is addressed in Section III.D.9, below.

BLACK'S LAW DICTIONARY defines "incur" as "[t]o have liabilities cast upon one by act or operation of law, as distinguished by contract, where the party acts affirmatively.  To become liable or subject to, to bring down upon oneself, as to incur debt, danger, displeasure and penalty, and to become through one's own action liable or subject to."  The case law confirms that "incur" pertains to liability.  *See United States v. St. Paul Mercury Indem. Co.*, 238 F.2d 594, 598 (8th Cir. 1956) ("'Incur emphasizes the idea of liability'. . . . [And i]t has been held that a thing for which there exists no obligation to pay, either express or implied, cannot in law be claimed to constitute an 'expense incurred.'"); *Waltuch v. ContiCommodity Services, Inc.*, 833 F. Supp. 302, 314 (S.D.N.Y. 1993) ("*[t]he word 'incurred' means 'to become liable for'*"), *aff'd in part, rev'd in part on other grounds*, 88 F.3d 87 (2d Cir. 1996); *Quarles Petroleum Co. v. United States*, 551 F.2d 1201, 1205 (Cl. Ct. 1977) ("To incur means to become liable for or subject to; it does not mean to actually pay for it.").

*Town of New Windsor v. Tesa Tuck, Inc.*, 935 F. Supp. 317, 320 n.3 (S.D.N.Y. 1996) (emphasis added).

Analogously, creditors seeking payment for having made a "substantial contribution" to a case (as WTC also does in these cases) have been held unable to assert a claim for fees for which they are not liable because such fees have not been "incurred" by the creditor within the meaning of section 503(b)(3) of the Bankruptcy Code.  *Olsen v. Robinson Brog Leinwand Greene Genovese & Gluck, P.C. (In re Olsen)*, 334 B.R. 104, 107 (S.D.N.Y. 2005) ("Where the creditor has incurred no obligation to pay his attorney, that attorney cannot be said to be seeking fees from the estate on the creditor's behalf."); *The Law Offices of Neil Vincent Wake v. Sedona Inst. (In re Sedona Inst.)*, 220 B.R. 74, 81 (9th Cir. BAP 1998) ("If the creditor is not liable for the fees in the first place, then the purpose of the statute is not served by the estate assuming the obligation").[32]

---

[32]  There is contrary authority on this point, which appears to be an open question in this District.  *See In re Western Asbestos Co.*, 318 B.R. 527 (Bankr. N.D. Cal. 2004).

The same reasoning applies here.  Because WTC has not paid and is not liable for fees exceeding the $3 million advanced by directing holders of PHONES Notes, WTC has no contractual authority under the PHONES Notes Indenture to assert a claim for those excess amounts.  Accordingly, in the event that the Court determines that WTC is entitled to assert a claim for postpetition fees, the Reorganized Debtors request that the Court disallow the portion of the Fee Claim relating to professional fees that exceeds $3 million.

## III.   WTC IS NOT ENTITLED TO A CLAIM FOR UNREASONABLE FEES

Even if WTC is entitled to an unsecured claim for postpetition fees arising under the prepetition PHONES Notes Indenture and is not limited to the amounts it actually paid or is obligated to pay, WTC only may claim reimbursement for "*reasonable*" compensation, fees, and expenses.[33]

### A.   The Reasonableness Of The Fee Claim Is Determined With Reference To The "Prudent Person" Standard And The "Economics Of The Situation."

WTC recognizes in the WTC Draft Brief that it was obligated to "use the same degree of care and skill in [the] exercise [of its rights and powers under the PHONES Notes Indenture] as a prudent man would exercise or use under the circumstances in the conduct of his own affairs."[34] This "prudent person" standard exists not only as a matter of contract pursuant to the PHONES Notes Indenture but also as the statutory command of the Trust Indenture Act.[35]

WTC also correctly observes that, in this District as elsewhere, the prudent person standard requires an indenture trustee "to act with the same care as if it owned the investment."[36] This standard is similar – if not identical – to that which governs every inquiry into the

---

[33]   PHONES Notes Indenture §§ 6.07(1), (2) (emphasis added).

[34]   WTC Draft Brief ¶ 21 (quoting PHONES Notes Indenture § 6.01(b)) (emphasis removed).

[35]   WTC Draft Brief ¶ 25 (citing 15 U.S.C. § 77ooo(c)).

[36]   WTC Draft Brief ¶ 26 (quoting *Worldwide Direct*, 334 B.R. at 129).

reasonableness of a professional's fee.  *See, e.g., Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 522 F.3d 182, 184, 190 (2d Cir. 2008) (a presumptively reasonable fee is that which "a reasonable, paying client would be willing to pay" given the client's wishes "to spend the minimum necessary to litigate the case effectively").  Accordingly, the prudent person standard must inform any assessment of the reasonableness of the Fee Claim.

Similarly, the standards governing the allowance of a fee claim under section 506(b) of the Bankruptcy Code also provide a useful analytical framework.  Pursuant to section 506(b), an oversecured creditor is entitled to a claim for "reasonable fees, costs, or charges provided for under the agreement . . . under which such claim arose."  11 U.S.C. § 506(b).  To the extent WTC is entitled to an unsecured claim for postpetition fees, the case law establishing standards for the allowance of a fee claim under section 506(b) provides an appropriate framework with which to analyze the reasonableness of the Fee Claim.  Indeed, as a matter of logic and common sense, the standard for allowance of a claim for contractual postpetition fees by an *unsecured* creditor can be no less stringent than the standard for allowance of a claim for contractual postpetition fees by a *secured* creditor.

The touchstone inquiry under section 506(b) involves "the economics of the situation":

> "Reasonable" fees under § 506(b) are as those necessary to the collection and protection of a creditor's claim. . . . *It is inherently unreasonable, however, to seek reimbursement for fees "that are not cost justified either by the economics of the situation or necessary to preservation of the creditor's interest in light of the legal issues involved."*

*In re Kroh Bros. Dev. Co.*, 105 B.R. 515, 520-21 (Bankr. W.D. Mo. 1989) (quoting *In re Nicfur-Cruz Realty Corp.*, 50 B.R. 162, 169 (Bankr. S.D.N.Y. 1985)) (emphasis added).  Indeed, "courts must observe a 'rule of reason' to avoid [fee] clauses 'becoming a tool for wasteful diversion of an estate at the hands of secured [or unsecured] creditors who, knowing that the estate must foot the bills, fail to exercise restraint in enforcement of expenses.'"  *Id.* at 521 (quoting *James*

- 20 -

*Talcott, Inc. v. Wharton (In re Continental Vending Mach. Corp.)*, 543 F.2d 986, 994 (2d Cir. 1976)).

In determining whether the "economics of the situation" warrant allowance of a requested fee, courts look to a number of non-exclusive factors, including whether the fees are "compatible with bankruptcy policy," whether "[t]he time spent [is] appropriate to the complexity of the task," whether "[t]he task [is] assigned to the fewest and least senior attorneys able to render the service in a competent and efficient manner," whether "[t]he fee should be adjusted to reflect duplicative services rendered by attorneys representing other parties with a common interest in the case," and whether "[t]he fee should be adjusted to reflect the court's observation of the nature of the case and the manner of its administration." *In re Wonder Corp.*, 72 B.R. 580, 588-89 (Bankr. D. Conn. 1987), *aff'd* 82 B.R. 186 (D. Conn. 1988); *accord In re PCH Assocs.*, 122 B.R. 181, 202-03 (Bankr. S.D.N.Y. 1990); *Kroh*, 105 B.R. at 521.  Applying those factors, courts will disallow fees – even where authorized by the underlying contract at issue – where creditors' actions were not warranted by the "economics of the situation."[37]

---

[37]  *See, e.g.*, *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 279-80 (Bankr. S.D.N.Y. 2007) ("Section 506(b) of the Bankruptcy Code limits oversecured lenders' claims for fees and costs to an amount sufficient to pay 'reasonable' expenses – not just any amount that the banks happen to incur and submit for repayment.  The issue of whether fees are 'reasonable' is an objective standard, rather than a subjective one.  In the absence of an objective standard, parties could run up legal fees and waste estate funds that would otherwise be distributed."); *In re Reorganized Lake Diamond Assocs.*, 367 B.R. 858, 867 (Bankr. M.D. Fla. 2007) ("The fees must be cost justified by the economics of the situation and necessary to preserve the creditor's interest in light of the legal issues involved.  A secured creditor is not entitled to compensation for its attorneys fees for every action it takes by claiming that its rights have been effected."); *In re Hoffman*, 352 B.R. 879, 883 (Bankr. N.D. Cal. 2006) ("The reasonableness requirement in Section 506(b) was intended to prevent creditors from 'fail[ing] to exercise restraint in the attorney's fees and expenses they incur, perhaps exhibiting excessive caution, overzealous advocacy, and hyperactive legal efforts.'  If proper restraint is not exercised, the costs of any 'overlawyering' should be borne by Creditor, rather than Debtors.") (citation omitted); *In re McGuier*, 346 B.R. 151, 164-65 (Bankr. W.D. Pa. 2006) ("Where services are not reasonably necessary to protect [an oversecured creditor's]

### B.     WTC Did Not Act As Would A Prudent Person.

WTC was not remotely prudent, let alone "act[ing] with the same care as if it owned the

investment," in permitting its professionals to bill more than $30 million in fees in the Chapter

11 Cases. In fact, the *actual* "owners of the investment" – Suttonbrook and Camden – chose to

contribute only $3 million to WTC's efforts.[38]  Pursuant to the very definition endorsed by WTC,

no prudent person would ever incur fees that are more than *ten times* the amount of fees that

actual owners of the investment saw fit to advance.

Further, contrary to the implication in the WTC Draft Brief, nothing in the PHONES

Notes Indenture or the prudent person standard compelled WTC to take actions beyond those for

which the "owners of the investment" were prepared to pay.  In fact, the PHONES Notes

Indenture grants WTC discretion in the exercise of rights and remedies in respect of the

PHONES Notes, and specifically relieves WTC from any obligation "to expend or risk its own

funds or otherwise incur any financial liability in the performance of any of its duties hereunder,

or in the exercise of any of its rights or powers, if it shall have reasonable grounds for believing

that repayment of such funds or adequate indemnity against such risk or liability is not

---

interests, or where action is taken because of a lawyer's excessive caution or overzealous
advocacy, in exercise of their discretion, courts have the right and are duty-bound to disallow
the fees and costs requested."); *In re Dalessio*, 74 B.R. 721, 723 (9th Cir. BAP 1987) ("A
court should not reward a creditor whose overly aggressive attorney harasses and opposes the
debtor at every stage of the bankruptcy proceeding, nor should an oversecured creditor be
given a blank check to incur fees and costs which will automatically be reimbursed out of its
collateral.").

[38]   As noted above, Aurelius also advanced some funds for payment of Mesirow's fees and
expenses, the vast majority of which were incurred in connection with pursuit of Aurelius's
own Noteholder Plan.  Although it allegedly owned PHONES Notes, Aurelius is not properly
considered an "owner of the investment" given its vastly greater economic stake in respect of
the Senior Notes.  Aurelius's every action in the Chapter 11 Cases served to promote its
interests as a Senior Noteholder and, as evidenced by the frequent and ongoing litigation
between Aurelius and WTC, Aurelius did not hesitate to take action that conflicted with the
interests of holders of the PHONES Notes when doing so advanced the perceived interests of
Senior Noteholders.

- 22 -

reasonably assured to it."[39]  The empty "direction" of holders of the PHONES Notes – without

the required indemnity from or promise of payment by those holders – says nothing about

WTC's required course of conduct as a prudent person.[40]

      The prudent person standard most certainly is not a license for an indenture trustee to act

with impunity and without responsibility for its actions, and it did not provide WTC with a

proverbial blank check to be used to run up the bill in anticipation of the obligor (or its

bankruptcy estate) picking up the tab.  *See, e.g.*, *Worldwide Direct*, 334 B.R. at 131 (agreeing

"that WTC did not exercise the care required under the prudent person standard because it

allowed duplication [of services rendered by the creditors' committee] resulting in a reduced

recovery for the Noteholders"); *First Bank SE, N.A. v. Predco, Inc.*, 744 F. Supp. 873, 875-76

(E.D. Wis. 1990) (fees and costs incurred by "the indenture trustee in the exercise of its prudent

man standard of care" are not compensable if they are the result of "overzealous billing" or

where the activities giving rise to the fees and expenses "lack[ed] . . . necessity" in the

bankruptcy proceedings).

      **C.**    **WTC's Actions Were Not Justified By The "Economics Of The Situation."**

      The Fee Claim also is not justified by the "economics of the situation" faced by WTC.

To start, a claim of over $30 million is patently unreasonable given the deeply-subordinated

---

[39]    PHONES Notes Indenture § 6.01(c)(4).

[40]    *See, e.g.*, *Beck v. Mfrs. Hanover Trust Co.*, 632 N.Y.S.2d 520, 528 (N.Y. App. Div. 1995)
("The trustee must in the postdefault context act prudently, but only in the exercise of those
rights and powers granted in the indenture.  The scope of the trustee's obligation then is still
circumscribed by the indenture, albeit less narrowly.  The trustee is not required to act
beyond his contractually conferred rights and powers, but must, as prudence dictates,
exercise those singularly conferred prerogatives in order to secure the basic purpose of any
trust indenture, the repayment of the underlying obligation."); James E. Spiotto, DEFAULTED
SECURITIES:  THE PRUDENT INDENTURE TRUSTEE'S GUIDE § IV-4 ("[The] notion of fiduciary
does not mean that, in the case of the hopelessly insolvent obligor, where there are no funds
to pay any money to the holders, the indenture trustee should pile expense upon expense,
wasting its own funds in attempting to obtain a recovery that is not possible.").

- 23 -

position of the PHONES Notes. That the PHONES Notes were out of the money has been clear since before Tribune filed for bankruptcy, and there was no question at any point during the four years in which Tribune was in bankruptcy that the PHONES Notes would receive no distributions absent a litigation "home run." Consequently, to no one's surprise, the confirmed Plan provides that the PHONES Notes will recover ***nothing*** unless and until the Litigation Trust recovers sufficient amounts from highly-contentious and uncertain litigation – at least $1.4 billion – to pay the Senior Noteholder and Other Parent Claims in full.

WTC's extensive efforts throughout the Chapter 11 Cases – allegedly resulting in more than $30 million in fees and expenses – were not reflective of this economic reality. The economic irrationality of WTC's efforts is magnified by the fact that much of the work for which WTC seeks reimbursement was either duplicative of others' efforts or performed at the behest of more senior creditors. For example, the work done by Mesirow (a) first duplicated work done by the financial advisors for the Creditors' Committee (Moelis and AlixPartners) and for the Examiner (LECG) in the spring of 2010, and (b) thereafter principally, if not exclusively, benefitted the Senior Noteholders through support of the Noteholder Plan. Likewise, WTC's outside counsel, Brown Rudnick, spent millions of dollars investigating the LBO, including the review of "millions of pages of documents," when the Creditors' Committee and the Examiner were undertaking similar tasks at the expense of the bankruptcy estates. Finally, during the competing plan process, Brown Rudnick actively supported the Noteholder Plan at substantial cost despite the existence of more senior creditors (particularly Aurelius and the Senior Notes Indenture Trustees) who were ready, willing, incentivized, and able to do so themselves.

WTC also undertook tasks that were clearly unproductive and needlessly imposed significant costs on the estates and other parties. For example, WTC spurred litigation over the

automatic stay when it commenced its action against the Senior Lenders in March 2010.[41]

Similarly, WTC filed two plainly interlocutory appeals, leading to extensive motion work by all

parties and premature merits briefing by WTC, all of which was rendered superfluous after

WTC's interlocutory appeals were subsumed by its appeal of the Confirmation Order.[42]  Yet,

WTC now seeks reimbursement for all of the fees associated with that wasteful conduct as part

of the Fee Claim.

        In the face of this unfavorable reality, WTC attempted in the WTC Draft Brief to defend

its expenditures by comparing them to the fees and expenses incurred by other, differently-

situated parties in the Chapter 11 Cases.  Such comparisons are wholly inapt.  First, WTC's

responsibilities differed markedly from those of other parties.  WTC litigated on behalf of a

single deeply-subordinated creditor constituency; in contrast, Debtors' counsel was responsible

for any and all legal needs of more than 100 bankruptcy estates.  To give just one example of

many, in May 2010 Brown Rudnick billed the same amount – approximately $2.5 million – on

work related to the Examiner alone as Debtors' counsel billed on twenty-one estate matters (*e.g.*,

bankruptcy, litigation, corporate, taxation, intellectual property).[43]  There also is no comparison

between the work done by WTC and by the Creditors' Committee, which acted on behalf of *all*

unsecured creditors (including tens of thousands of in-the-money creditors) and still billed less

than WTC during this time period.

        Second, the parties with whom WTC attempts to compare itself faced far stronger

prospects of far greater recoveries than did WTC.  Such prospects obviously impact the

---

[41]  [D.I. 3715, 3724, 3759, 3968, 3993, 4027].

[42]  [D.I. 10582, 10690, 10702, 10790, 11455, 11548, 11562, 11595, 12157].

[43]  *Compare* Johnston Decl., Ex. I (Brown Rudnick May 2010 invoice) [WTC 1F03194] *with*
      Fee Application [D.I. 6088] at 20.

"economics of the situation" as well as any prudent person's willingness to incur professional

fees. For example, the Senior Lenders' willingness to incur approximately $7 million in fees and

expenses between May and July 2010 was necessarily informed by their collective status as some

of the Debtors' most senior creditors holding the largest claims against the estates. Even then,

the Senior Lenders' professionals billed $2 million *less* than did WTC's professionals during that

same time period.[44] Even assuming, *arguendo*, that the scope of the work performed by the

Senior Lenders' and WTC's professionals was remotely comparable during this time period

(which was not the case), the willingness of the Senior Lenders – as senior creditors holding

$8.6 billion in claims – to incur certain costs does not legitimize the decision of WTC – as a

deeply-subordinated creditor holding a claim of $759 million (one-eleventh the size of the Senior

Lenders' claims) – to have its professionals charge anywhere near the same amount of fees,

much less $2 million more.

     **D.**    **The Specific Fees And Expenses Purportedly Incurred<br>By WTC Are Unreasonable.**

     As a threshold matter, WTC has failed to provide the detailed analysis and documentation

necessary to support and verify such a large fee claim. In the WTC Draft Brief, WTC references

time periods instead of specific tasks, utilizing headlines such as "Initial Settlement Negotiation

and Plan Filing" and "The Competing Plan Process" instead of detailing the actual work

performed. For example, WTC at no point describes Brown Rudnick's billings by task such that

one could understand how the $21,170,780 billed by the firm relates to specific undertakings.

Further, the sole stated justifications for Mesirow's fees and expenses are that it "perform[ed]

financial advisory services in connection with Wilmington Trust's investigation of . . . the LBO"

---

[44]   *See* WTC Draft Brief ¶ 68.

and assisted WTC in providing "analysis and conclusions" to the Examiner.[45]  The WTC Draft

Brief simply ignores WTC's own $843,057.06 in internal fees and expenses (including $200,000

in "extraordinary" fees) and the $738,241.50 incurred by its "other" professionals, including

local counsel, FCC counsel, and three consultants.

The supporting documentation provided by WTC also is incomplete and too vague to

support the Fee Claim.  For example, Brown Rudnick – whose fees account for nearly *70%* of

the Fee Claim – provided time records that are replete with block billing (*i.e.*, assigning a single

block of time to multiple tasks without differentiating between them) and meaninglessly-vague

time entries.  To give three examples among countless others, Brown Rudnick's time records

include entries such as 6.0 hours/$5,370 billed to "FOCUS ON STRATEGY, THEORIES OF

ACTION"; 6.8 hours/$6,086 billed to "CONTINUE FOCUS ON LEGAL THEORIES"; and 7.0

hours/$6,720 to "FOCUS ON LITIGATION."[46]  Even worse, WTC provided *no* Mesirow time

records from after August 31, 2010 – a period during which it billed $4,905,562.[47]  Such

documentation does not remotely support WTC's claims or satisfy its burden of proof.

Notwithstanding these clear deficiencies, in order to analyze and present a cogent

analysis of the specifics of the Fee Claim the Reorganized Debtors have grouped the fees for

which WTC asserts a claim into the following categories:  (1) Mesirow; (2) LBO Investigation;

(3) Examiner Matters; (4) Plan Process; (5) Reconsideration and Allocation Disputes;

(6) Appeals; (7) Third-Party Litigation; (8) Committee Service; and (9) Internal Fees and

"Other" Professionals.  As shown below, that analysis demonstrated the excessiveness and

---

[45]  WTC Draft Brief ¶¶ 40 n.66, 64.

[46]   Johnston Decl., Ex. J (Brown Rudnick billing excerpts).  [WTC1F0510, WTC1F0525, WTC1F01864].

[47]  Aurelius apparently instructed Mesirow not to maintain any time records for its work performed in connection with the Noteholder Plan.

unreasonableness of WTC's efforts throughout the Chapter 11 Cases.  Based on that analysis, the

Reorganized Debtors request that the Court disallow portions of the Fee Claim even if it

determines that WTC is entitled to an unsecured claim for postpetition fees and is not limited to

the amounts it actually paid or is obligated to pay, as follows:

| Category (by subsections below) | Amount Claimed (approx.) | Maximum Allowed Claim | Notes |
|---|---|---|---|
| 1)  Mesirow | $2,631,000 (pre-Noteholder Plan) $4,905,000 (Noteholder Plan) | $0 | • Not authorized under Indenture • Duplicates Examiner and Committee • Services performed for Aurelius |
| 2)  LBO investigation / document review | $4,000,000 | $500,000 | • Duplicates Examiner and Committee • Inefficient document review |
| 3)  Examiner (excluding doc review) | $3,000,000 | $500,000 | • Duplicates Committee and Senior Noteholders |
| 4)  Plan | $9,687,000 | $1,500,000 | • Duplicates Aurelius and Senior Notes Indenture Trustees • Unreasonably excessive billing |
| 5)  Allocation Disputes | $1,584,000 | $500,000 | • Participation in high/low PHONES and Other Parent Claims disputes not reasonable |
| 6)  Appeals | $472,000 | $200,000 | • Interlocutory appeals not reasonable |
| 7)  Third Party Litigation | $300,000 (state law claims) $700,000 (lender claims) | $250,000 | • Lender lawsuit not reasonable • State law claims duplicate work of Aurelius and Senior Notes Indenture Trustees |
| 8)  Committee Service | $1,065,000 (committee service) $614,000 (confirmation litigation) | $200,000 | • Reasonable fee of $763,208 for Committee service already paid • Work attacking the Committee not reasonable • Fees relating to Noteholder Plan not reasonable |
| 9)  WTC Internal Fees | $843,000 | $600,000 | • $200,000 in "extraordinary fees" and $40,000 in administrative fees not reasonable |
| 9)  Local Counsel and Other Professionals | $735,000 | $735,000 | • Primarily Delaware Counsel |
| TOTAL: | $4,985,000 | | |

As a result, for the reasons set forth below, the Fee Claim should be allowed in an amount of no more than *$5 million*, which is more than sufficient to compensate WTC for its reasonable fees and expenses.

### 1.    WTC's Claim For Mesirow's Fees Is Neither Reimbursable Nor Reasonable.

WTC seeks more than $7,500,000 for Mesirow-related fees and expenses.  These costs relate to two separate time periods:  First, Mesirow charged $2,631,453 between May and August 2010 for financial analyses in connection with WTC's LBO investigation and Examiner-related work, for which WTC included summary Mesirow time records.  Second, Mesirow charged $4,905,562 between September 2010 and November 2011 for work in connection with the Noteholder Plan and objections to the Plan, for which WTC included *no Mesirow time records whatsoever*.

These charges are excessive, unnecessary, and cannot be allowed.  To start, nothing in the PHONES Notes Indenture permits WTC to seek reimbursement for Mesirow's fees.  Rather, Section 6.07 of the PHONES Notes Indenture provides, in pertinent part, that WTC is limited to seeking "the reasonable compensation and the expenses and disbursements of its *agents* and *counsel*."[48]  Mesirow, as a financial advisor, was neither an agent of nor counsel to WTC, and its fees therefore fall outside the reimbursement provisions of the PHONES Notes Indenture.

Further, Mesirow's work in the spring of 2010 was wholly duplicative of the efforts of the Creditors' Committee's and later the Examiner's own financial advisors – all of which was billed to and paid for by the bankruptcy estates.  WTC fails to explain why it needed its own financial advisor in connection with the Examiner process, or provide any evidence that the Examiner even found Mesirow to be helpful.  In fact, the Examiner Report does not mention

---

[48]    PHONES Notes Indenture § 6.07 (emphasis added).

Mesirow and, although WTC asserts that the Examiner adopted nineteen of its positions, Mesirow only opined on three of them.[49]  More broadly, WTC never explains why the bankruptcy estates should pay Mesirow's fees when the entire purpose of the Examiner was to conduct an independent investigation funded by the bankruptcy estates.[50]  And WTC does not attempt to justify the reasonableness of Mesirow's $2,631,453 in fees and expenses between May and August 2010 (after which WTC's time records for Mesirow cease) – ███████████

████████████████████████████████████████████████████

████████.[51]

Similarly, there clearly is no justification for WTC's inclusion of nearly $5 million in Mesirow fees relating to the Noteholder Plan and objections to the Plan.  That work was done principally, if not exclusively, for the benefit of the Senior Noteholders and the Senior Notes Indenture Trustees.  Indeed, WTC admits in the WTC Draft Brief that WTC began "sharing" Mesirow with the Senior Noteholders during this time period, which saw "a shift in the advocacy leadership on behalf of non-LBO creditors from [WTC] to Aurelius" as WTC assumed a more "complimentary" role in the competing plan process.[52]  In recognition of WTC's "evolving" role, in December 2010 the Senior Noteholders entered into a modified retention agreement whereby

---

[49]  WTC Draft Brief, Ex. P [WTC1F06037-38].  This chart of WTC positions allegedly adopted by the Examiner is incomplete and misleading.  Among other things, WTC takes credit for positions advanced by other parties and positions not disputed by any parties, and WTC omits the myriad of case-dispositive positions that it advanced and the Examiner rejected.

[50]  *See Opinion On Confirmation* [D.I. 10133] (the "2011 Confirmation Opinion") at 36-37 (noting that the Examiner's "thorough and independent investigation of the LBO-Related Causes of Action . . . was available to all of the parties"); Johnston Decl., Ex. K. (Tr. 4/13/10 at 39:12-15) (noting that "the advocate[']s taint that's associated with Wilmington Trust, that's associated with the other parties to the litigation, [would be removed] if you have an independent examiner") (remarks of the U.S. Trustee).

[51]  Mesirow Engagement Agreement 1.  [WTC1F06177].

[52]  WTC Draft Brief ¶ 74.

Mesirow was jointly retained by the parties, and ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████ the Senior Noteholders directed Mesirow's efforts.

For their part, the holders of the PHONES Notes, as deeply-subordinated creditors, were never likely to recover on their claims and never would have incurred these costs themselves (as evidenced by the refusal of Suttonbrook and Camden to contribute more than $3 million total to payment of WTC's professionals). Yet, WTC astonishingly now asserts a claim for more than *$7.5 million* of Mesirow's fees alone. This is truly beyond the pale. There is no basis for WTC to seek any part, much less the entirety, of Mesirow's fees – which already has been paid in full by Aurelius – on account of the subordinated, out-of-the-money PHONES Notes.

Accordingly, the portion of the Fee Claim that relating to Mesirow's alleged fees and expenses of $7,537,015, as well as Brown Rudnick's fees of $100,000-$200,000 incurred in supporting Mesirow, should be disallowed in its entirety.[53]

### 2. A Substantial Portion Of WTC's Claim For The LBO Investigation Is Not Reasonable.

WTC claims $4 million for Brown Rudnick fees between December 2009 and July 2010 relating to efforts that wholly duplicated efforts of the Creditors' Committee, the Examiner, and the Senior Notes Indenture Trustees to investigate the LBO.

---

[53] Brown Rudnick's time records evidence substantial Mesirow-related work between May and August 2010. Johnston Decl., Ex. I (Brown Rudnick May-August 2010 "Examiner Matters" invoices). [*See, e.g.*, WTC1F03201, WTC1F03222, WTC1F03226, WTC1F03229]. Although the WTC Draft Brief does not set forth the exact fees for this work, the Reorganized Debtors estimate that the fees likely range between $100,000 and $200,000. For the reasons set forth above, WTC's claim for these fees should be disallowed.

46429/0001-9358684V1

From the outset of the Chapter 11 Cases, the Creditors' Committee and all major stakeholders understood that the investigation into – and litigation or settlement of – the LBO-Related Causes of Action would be central to the formulation of a plan of reorganization and Tribune's ultimate emergence from bankruptcy.[54]   Accordingly, the Creditors' Committee directed its counsel and financial advisors to conduct a legal analysis of the LBO as well as a full factual investigation.[55]   The Creditors' Committee's extensive investigation included document requests directed to more than 30 entities involved in the LBO, which ultimately led to the collection and review of more than 4 million pages of documents, and depositions of key LBO participants.[56]   As a member of the Creditors' Committee, WTC had access to all of that information and, by its own admission, was able to carefully "observ[e] the pace and depth of the . . . Committee's investigation."[57]

In addition to the Creditors' Committee's efforts, the Court – at WTC's request – directed the appointment of an independent examiner to conduct what WTC has called an "in-depth and impartial investigation" of the LBO.[58]   The Examiner and his advisors were given access to the parties' discovery materials from their investigations (including the Creditors' Committee's document depository) and spent significant time reviewing and analyzing that material as well as conducting 38 additional witness interviews.[59]   On July 26, 2010, the Examiner released the findings of his investigation in a 1,200-page report supported by nearly 1,100 exhibits, all of which was provided to WTC in its entirety.  The Examiner's report contained a detailed

---

[54]   *See, e.g.*, 2011 Confirmation Opinion at 14 (citation omitted).

[55]   DCL Post-Trial Brief [D.I. 8897] at 11.

[56]   DCL Post-Trial Brief [D.I. 8897] at 11.

[57]   WTC Draft Brief ¶ 51.

[58]   WTC Draft Brief ¶ 51.

[59]   Examiner's Report, Vol. One [D.I. 5247] at 30-38.

- 32 -

recitation of the factual circumstances of the LBO as well as an in-depth discussion and analysis

of potential LBO-Related Causes of Action.  The total bill for the Examiner's work exceeded

$13 million.[60]

At the same time, Law Debenture was conducting its own massive "investigation" of the

LBO.  As a Senior Notes Indenture Trustee and representative of in-the-money creditors, Law

Debenture had every incentive and motivation to advance the LBO-Related Causes of Action,

and its interests in that regard were perfectly aligned with those of WTC's.  Law Debenture

spared no expense, incurring over $6 million in fees and expenses that it too now seeks to recoup

from the bankruptcy estates.[61]

These extensive investigations spanned months, cost the bankruptcy estates tens of

millions of dollars, and provided the parties with detailed understandings of the factual

circumstances and legal issues relevant to the LBO.  Nevertheless, WTC – which, as noted

above, had full access to the results of these investigations – unleashed Brown Rudnick to

undertake its own, full-blown, no-expense-spared LBO investigation, including the review of

"millions of pages of documents."[62]  The massive scale of WTC's investigation is evident from

Brown Rudnick's elevated staffing levels during this time period:  In February 2010 alone, *59*

---

[60]  *See, e.g., Order (OMNIBUS) Approving Final Fee Applications For Kenneth N. Klee, The Examiner And His Professionals* [D.I. 6077].

[61]  *Motion Of Law Debenture Trust Company Of New York Pursuant To 11 U.S.C. §§ 503(b)(3)(D), 503(b)(4), And 503(b)(5) For Allowance And Payment Of Fees And Expenses Incurred In Connection With Making A Substantial Contribution To The Debtors' Chapter 11 Cases* [D.I. 13274].  The Reorganized Debtors intend to object to Law Debenture's baseless application and reserve all rights in that regard.

[62]  WTC Draft Brief ¶ 52.

46429/0001-9358684V1

*billers charged 2,315 hours* to "Chapter 11 Proceedings."[63]  The next four months saw 41, 59,

62, and 54 Brown Rudnick billers, respectively, charging time to this single billing code.[64]

It appears that these billers were principally engaged in document review.  The

Reorganized Debtors estimate that the costs of ***document review alone*** during this time period

was close to *$4 million*.  Given the PHONES Notes' deeply-subordinated status, and the fact that

the Creditors' Committee, the Examiner, and Law Debenture were conducting their own LBO

investigations, the staggering fees charged to duplicate those efforts are unnecessary and

excessive.  A prudent person would not have incurred those costs.  Rather, such a person would

have relied on the investigations already undertaken at the very substantial expense of the

bankruptcy estates as well as the extensive efforts of more senior creditors (*i.e.*, the Senior Notes

Indenture Trustees) with aligned interests.

Contrary to WTC's unsupported assertions, it simply was not "appropriate" for a deeply-

subordinated creditor to undertake this largely, if not wholly, duplicative, multi-million dollar

investigation.[65]  Accordingly, the Reorganized Debtors request that the Court disallow at least

$3.5 million of the $4 million component of the Fee Claim relating to Brown Rudnick's

"investigation" (*i.e.*, document review) of the LBO, which would leave a claim of $500,000,

representing a reasonable level of fees that might otherwise have been associated with review of

the investigations of the Committee, the Examiner, and the Senior Notes Indenture Trustees.

Indeed, this claim amount is generous considering that Brown Rudnick also charged to the

"Committee" category substantial additional fees for its review of the Committee's work

---

[63]  Johnston Decl., Ex. L (Brown Rudnick February-June 2010 "Chapter 11 Proceedings" invoices).  [WTC1F0549-50].

[64]  Johnston Decl., Ex. L (Brown Rudnick February-June 2010 "Chapter 11 Proceedings" invoices).  [WTC1F686-87, WTC1F0789-90, WTC1F0920-21, WTC1F01153-54].

[65]  WTC Draft Brief ¶ 52.

- 34 -

product.  As described in Section III.D.8 below, Reorganized Tribune has now paid the reasonable portion of those Committee-related fees at 100 cents on the dollar.

### 3.    A Substantial Portion Of WTC's Claim For Examiner Matters Is Not Reasonable.

WTC also seeks an ***additional*** approximately ***$3 million*** in Brown Rudnick fees and expenses relating to the Examiner.  These fees relate to two separate time periods: (a) approximately $500,000 in fees relating to Brown Rudnick's efforts regarding the appointment of an examiner between December 2009 and April 2010, and (b) approximately $2.5 million in fees relating to Brown Rudnick's work during the course of the Examiner's investigation between May and July 2010.

These fees are clearly unreasonable.  To start, it was patently unreasonable to run up $500,000 in fees seeking the appointment of an examiner where Law Debenture previously had filed a motion for an examiner on the same grounds and, as the Court later remarked, the appointment of an examiner essentially was a *fait accompli* once it became clear that there was no consensus with respect to a path forward in the Chapter 11 Cases.[66]

Even less defensible are the approximately $2.5 million in fees – over and above the $4 million in fees associated with the document review and "investigation" described above – Brown Rudnick billed during the course of the Examiner's investigation.  Brown Rudnick's time records indicate that in May 2010 alone, an astonishing ***76 billers*** worked ***4,891.6 hours*** on Examiner-related issues.[67]  As noted above, Brown Rudnick billed as much in that one month on the Examiner process alone (approximately $2,500,000) as did Debtors' counsel on twenty-one

---

[66]    Johnston Decl., Ex. M (Tr. 8/20/10, at 28:21-23) ("THE COURT: . . .  Is there anyone who thought I wasn't going to appoint an examiner under these circumstances?  I mean really.").

[67]    Johnston Decl., Ex. I (Brown Rudnick May-August 2010 "Examiner Matters" invoices). [WTC1F03268-70].

different estate matters *combined*.  There was no legitimate reason for Brown Rudnick to charge

such astronomical fees during this time period.  Indeed, Brown Rudnick's LBO "investigation"

and "Examiner" fees amounted to more than 50% of the fees for the Examiner's entire

investigation, which included preparation of the 1,200 page Examiner Report – a massive project

that Brown Rudnick obviously did not undertake.  It was neither necessary nor reasonable for

Brown Rudnick to duplicate the Examiner's efforts in this regard.

Finally, WTC makes no meaningful attempt to justify the specific amounts included in its

claim in this category, and WTC does not explain how such measures benefitted holders of the

PHONES Notes.  To the contrary, notwithstanding its claim that it "largely stood alone" in

defense of the PHONES Notes, WTC asserts that its "submissions to the Examiner were made in

order to improve recoveries not only for the PHONES Noteholders, but also for all non-LBO

creditors."[68]  WTC clearly was not responsible for all non-LBO creditors during this period, who

were ably represented by the Creditors' Committee, the Senior Notes Indenture Trustees,

Aurelius, and Centerbridge.  WTC cannot now seek payment of fees that Brown Rudnick

charged for efforts that duplicated the efforts of those other, highly-motivated and in-the-money

constituents.

Accordingly, the Reorganized Debtors request that the Court disallow at least

$2.5 million of the $3 million component of the Fee Claim relating to Brown Rudnick's non-

document review work with respect to the Examiner, which would leave a claim of $500,000,

representing a reasonable level of fees that might otherwise have been associated with efforts to

seek appointment of an examiner and a generous level of interaction with the Examiner once

appointed.

---

[68]   WTC Draft Brief ¶ 63.

4.      **A Substantial Portion of WTC's Claim For**
        **The Plan Process Is Not Reasonable.**

WTC seeks a staggering *$9.7 million* for Brown Rudnick's fees and expenses relating to

the plan process.  That work was billed to "Chapter 11 Proceedings," Brown Rudnick's general

billing code for the Chapter 11 Cases, and principally included tasks undertaken in the following

time periods:

- Initial Settlement Negotiations and Plan Filing (January-July 2010):
  During this time period, Brown Rudnick billed approximately $3 million for settlement
  negotiations in January, February, and March 2010, and then efforts to oppose the
  "Global Settlement" – set forth in a Settlement Support Agreement dated April 9, 2010 –
  and the subsequent "April Plan."

- Second Plan Negotiations and Mediation (August-October 2010):  During
  this time period, Brown Rudnick billed more than $1.8 million for participation in
  renewed settlement negotiations and mediation in September and October 2010.

- Competing Plan Process (November 2010 – October 2011):  During this
  time period, Brown Rudnick billed more than $3.3 million for work associated with the
  Noteholder Plan championed by Aurelius and the Senior Notes Indenture Trustees.

- Subsequent Plan Process (November 2011 – December 2012):  During this
  time period, after the Noteholder Plan was abandoned, Brown Rudnick billed more than
  $1.5 million principally relating to objections to confirmation of the Plan and preparation
  of the Fee Claim.

Given the deeply-subordinated status of the PHONES Notes and the fact that much of the

activity described above also was undertaken by Aurelius and the Senior Notes Indenture

Trustees – creditors with large, in-the-money claims – Brown Rudnick's fees relating to the plan

process clearly are excessive.  For example, WTC makes no meaningful attempt to explain how

Brown Rudnick possibly could have charged $3,000,000 between January and July 2010

(approximately $430,000 per month) simply to participate in settlement negotiations and review

and oppose the April Plan.  Then, Brown Rudnick billed more than $1.8 million between August

and October 2010 (approximately $600,000 per month) despite WTC's acknowledgement that it

"was no longer alone in its support for the maximization of the value of the LBO-related causes

- 37 -

of action," as "Aurelius, along with Law Debenture and Deutsche Bank, also became vocal advocates for improved treatment for non-LBO creditors."[69]

Even more unreasonably, Brown Rudnick billed more than $3.3 million in connection with the competing plan process between November 2010 and October 2011 (approximately $280,000 per month) despite the admitted "shift in the advocacy leadership on behalf of non-LBO creditors from [WTC] to Aurelius."[70]  The unavoidable fact is that Aurelius and the Senior Notes Indenture Trustees would have pursued the Noteholder Plan and objected to the Plan whether or not WTC was involved at all, and the "complimentary" role that WTC describes should have cost far less.[71]  The same observation applies to WTC's efforts to block confirmation of the subsequently-filed Plan and the subsequent appeal process.

Further, WTC simply cannot justify the inclusion of fees associated with any number of frivolous activities, including its outrageous attempt to block FCC approval of Tribune's emergence from bankruptcy.  WTC also is silent on the $554,374.49 billed by Brown Rudnick between September and December 2012, which appears to be principally related to preparation of the Fee Claim itself.  These fees would be excessive in any event, let alone in the context of a plainly deficient fee claim respecting subordinated, out-of-the-money debt.

Accordingly, the Reorganized Debtors request that the Court disallow at least $8.2 million of the $9.7 million in fees associated with Brown Rudnick's confirmation and plan-related activities, which would leave a claim of $1.5 million, representing a reasonable level of fees that might otherwise have been associated with efforts to protect the interests of the PHONES Notes in the confirmation process.

---

[69]  WTC Draft Brief ¶ 70.

[70]  WTC Draft Brief ¶ 74.

[71]  WTC Draft Brief ¶ 74.

46429/0001-9358684V1

5.      **A Substantial Portion Of WTC's Claim For
Reconsideration And The Allocation Disputes Is Not Reasonable**.

WTC next seeks an additional $1,584,743.09 billed by Brown Rudnick to the "Allocation

Disputes" billing code between November 2011 and June 2012. These fees relate to WTC's

opposition to motions for reconsideration of certain aspects of the Bankruptcy Court's 2011

Confirmation Opinion and to WTC's participation in litigation respecting the various inter-

creditor issues comprising the Allocation Disputes.

Here again, Brown Rudnick's fees are clearly excessive and unreasonable. First, the

Bankruptcy Court's adverse ruling on the motions for reconsideration meant that WTC was

certain not to prevail in advancing substantially-similar (if not identical) arguments respecting

subordination in the context of the Allocation Disputes. Indeed, the Court later observed that

WTC's arguments were "the same" as those it previously rejected, and summarily rejected them

"[f]or the same reasons as set forth in the Reconsideration Decision."[72] In view of this

unfavorable reality, WTC should have simply reserved its rights instead of attempting to pass

along the costs of full-blown (and previously-rejected) argument to the bankruptcy estates.

Second, WTC – the indenture trustee for the entirety of the PHONES Notes – needlessly

took positions on issues such as the "high/low" PHONES Notes amount (an intra-PHONES

dispute as to which WTC inappropriately chose sides) and the Other Parent Claims issues (which

completely duplicated the efforts of Law Debenture as Senior Notes Indenture Trustee, an in-the-

money creditor with ample incentive and motivation to make all of the same arguments advanced

by WTC). Tellingly, in the WTC Draft Brief, WTC's only mention of the Allocation Disputes –

which account for the approximately $950,000 in billings after December 2011 – is to mention

---

[72]    Allocation Disputes Opinion at 10-11.

Brown Rudnick's "active participation" in the hearing,[73] a plainly insufficient basis for approving a fee claim.

Accordingly, the Reorganized Debtors request that the Court disallow at least $1 million of the $1.5 million in fees associated with Brown Rudnick's work relating to the Allocation Disputes, which would leave a claim of $500,000, representing a reasonable level of fees that might otherwise have been associated with WTC's objection to the motion for reconsideration of the 2011 Confirmation Opinion and the Allocation Disputes respecting subordination of the PHONES Notes vis-à-vis the EGI-TRB LLC Notes.

### 6.    A Substantial Portion Of WTC's Claim For The Appeals Is Not Reasonable.

In addition to its massive claim for fees relating to the plan process, WTC asserts an additional claim of $472,000 for Brown Rudnick's fees associated with the three appeals WTC filed in respect of the Court's plan-related orders (the interlocutory 2011 Confirmation Opinion, the interlocutory Allocation Disputes Opinion, and the 2012 Confirmation Order).

To start, there is no justification whatsoever for WTC's pointless pursuit (and subsequent abandonment) of the two plainly interlocutory appeals. All other parties – including other non-LBO creditors – recognized that these appeals were premature and opposed WTC's motions for leave to appeal on that basis. Further, as WTC has now conceded, the interlocutory appeals were rendered obsolete and moot when the "same issues raised by those [interlocutory] appeals" were raised in WTC's appeal of the 2012 Confirmation Opinion.[74]

Further, Brown Rudnick's fees associated with its appeal of the 2012 Confirmation Opinion are plainly excessive. A substantial portion of those fees relate to WTC's active support

---

[73]    WTC Draft Brief ¶ 88.

[74]    Johnston Decl., Ex. N (WTC Reply Br. at 1, 1:12-cv-1106 (GMS) [D.I. 25]).

of the motions for (a) a stay pending appeal and (b) certification of the appeals to the United States Court of Appeals for the Third Circuit.  Those motions would have been (and ultimately were) pursued by other, in-the-money appellants regardless of WTC's involvement, and WTC has no basis for seeking to charge the bankruptcy estates for its duplicative efforts.  Further, a serious question exists as to whether a prudent person would have pursued any appeal at all, given the overall weakness of WTC's claims and the deeply-subordinated nature of the PHONES Notes.

Accordingly, the Reorganized Debtors request that the Court disallow at least $272,000 of the $472,000 in fees associated with Brown Rudnick's work on WTC's appeals of the 2011 Confirmation Opinion, the Allocation Disputes Opinion, and the 2012 Confirmation Opinion, which would leave a claim of $200,000, representing a generous level of fees that might otherwise have been associated with WTC's appeal of the final 2012 Confirmation Opinion.

### 7.    A Substantial Portion Of WTC's Claim For Third-Party Litigation Is Not Reasonable.

WTC asserts a claim of approximately $1,000,000 for Brown Rudnick's fees in connection with third-party litigation, with approximately $300,000 of that amount relating to 47 state-law constructive fraudulent conveyance actions commenced against former Tribune shareholders and the remainder relating to the action filed by WTC in March 2010 against the Senior Lenders.

Brown Rudnick's fees in this regard are excessive, unnecessary, and unreasonable.  For example, WTC's assertion that the state-law actions offer "meaningful prospect[s] of recovery"[75] ignores that the PHONES Notes are fully subordinated with respect to any such recoveries,[76]

---

[75]    WTC Draft Brief ¶ 82.

[76]    *See* Allocation Disputes Opinion at 11.

meaning that even litigation success is unlikely to benefit the PHONES Notes. Further, Brown Rudnick could (and should) have realized substantial savings simply by replicating the other creditor actions being pursued by more senior creditors (*e.g.*, Aurelius and the Senior Notes Indenture Trustees) with the incentive and financial resources to do so.

Regarding the Senior Lender action, WTC claims that its investigation of the LBO "lead [it] to . . . file on March 4, 2010, a lawsuit against the LBO lenders seeking equitable subordination . . . and a constructive trust," and that a "majority of the PHONES" directed it to do so.[77] But WTC conspicuously does not explain why it was necessary to file an action against the Senior Lenders given that the Creditors' Committee (of which WTC was a member) had filed a substantially-similar action. Indeed, WTC's complaint was so similar to the Creditors' Committee's complaint that the Creditors' Committee accused WTC of plagiarizing the Creditors' Committee's work product.[78]

Moreover, WTC simply ignores the massive costs that this action foisted on the bankruptcy estates by virtue of the estate-funded opposition of the Creditors' Committee, which "staunchly opposed" the action and filed motions arguing that WTC had violated the automatic stay, improperly disclosed confidential information, and violated its fiduciary duties and the Committee's bylaws.[79] In any event, *none* of Brown Rudnick's efforts in this regard benefitted holders of the PHONES Notes, as WTC appears to have abandoned the action (the vast majority of which, in any event, has now been discharged by the Plan).

Accordingly, the Reorganized Debtors request that the Court disallow at least $750,000 of the $1 million in fees associated with Brown Rudnick's work relating to third-party litigation,

---

[77]  WTC Draft Brief ¶ 52.

[78]  [D.I. 3968].

[79]  WTC Draft Brief ¶¶ 52-53.

which would leave a claim of $250,000, representing a reasonable level of fees that might

otherwise have been associated with WTC's duplication of the Senior Lender Indenture

Trustees' state-law constructive fraudulent conveyance actions.

### 8.  A Portion Of WTC's Claim For Committee Service Has Been Paid And The Remainder Is Not Reasonable.

WTC seeks approximately $1,680,000 in Brown Rudnick's fees associated with WTC's

membership on the Creditors' Committee and certain discovery that WTC claims to be related to

its Committee service.

As noted above, Reorganized Tribune already has paid $763,208.47 (at 100 cents on the

dollar) to WTC as a Creditors' Committee Member Fee/Expense Claim pursuant to Section 9.1.3

of the Plan.  That amount therefore must be deducted from the Fee Claim.

A substantial proportion of the remaining fees included in the Fee Claim is unreasonable.

For example, Brown Rudnick charged more than $600,000 for responding to discovery requests

propounded on WTC in its capacity as a co-proponent of the Noteholder Plan.[80]  Because that

plan would have been fully prosecuted by Aurelius and the Senior Notes Indenture Trustees

regardless of WTC's involvement, the bankruptcy estates should not have to bear these costs.

Brown Rudnick also charged more than $300,000 for various attacks made on the

Creditors' Committee (on which WTC served throughout the case), including WTC's support of

Aurelius's motion to disqualify Chadbourne & Park as counsel to the Creditors' Committee,

WTC's opposition to the Creditors' Committee's motion for standing to pursue the LBO-Related

Causes of Action, and WTC's defense against the Creditors' Committee's motion asserting that

WTC violated the automatic stay by filing its duplicative complaint against the Senior Lenders.[81]

---

[80]  *See* Committee Fee Obj. at 10-12.

[81]  *See* Committee Fee Obj. at 12-14.

46429/0001-9358684V1

Brown Rudnick's fees in this regard are unreasonable by definition and cannot be allowed as part of the Fee Claim.

Accordingly, the Reorganized Debtors request that the Court disallow at least $716,792 of the unpaid balance of $916,792 in fees associated with Brown Rudnick's work relating to the Creditors' Committee, which would leave a claim of $200,000, representing a reasonable level of unpaid fees that might otherwise have been associated with a reasonable course of conduct by WTC in respect of the actions described above.

9. **A Portion Of WTC's Fee Claim For Internal Fees Is Not Reasonable.**

WTC seeks approximately $843,000 for its internal fees and expenses. WTC submitted time records and documentation substantiating hourly "administration fees" of approximately $600,000 and out-of-pocket expenses of approximately $3,000. Although the Reorganized Debtors have grounds to object to these fees, they have chosen not to do so.

WTC, however, also asserts claims for (a) an undocumented $100,000 "Extraordinary Fee related to investigation and motion for the appointment of Examiner," (b) an undocumented $100,000 "Extraordinary Fee related to the investigation and filing of a complaint against the banks [sic] parties in the 2007 LBO Transaction", and (c) an undocumented $40,000 in "Annual Administration Fees for 2009-2012 at $10,000 per annum."[82] These additional charges are unreasonable. WTC is more than amply compensated by its hourly fees and, despite repeated requests, has provided *no documentation* relating to these charges.

---

[82]    Johnston Decl., Ex. O. [WTC1F001].

Accordingly, the Reorganized Debtors request that the Court disallow at least $243,000 of WTC's $843,000 claim for internal fees and expenses, which would leave a claim of $600,000, representing WTC's hourly administrative fees and out-of-pocket expenses.[83]

**E.      The Claim For Post-Effective Date Fees And Costs Must Be Disallowed.**

In the WTC Draft Brief, WTC states that it seeks a Class 1F Other Parent Claim in the amount of "$30,289,093.33, plus any additional amounts expended to litigate allowance of its claim."[84] WTC further states that, "[t]o the extent that additional fees and expenses are incurred, but not included [in the Fee Claim], [WTC] will supplement [the Fee Claim] and the request covered by [the WTC Draft Brief]."[85] WTC provides no explanation of what it means by "claim" in this context, which could encompass not only the Fee Claim but also fees and expenses associated with WTC's post-Effective Date litigation (*e.g.*, appeals and the state law constructive fraudulent conveyance litigation).

This ambiguity aside, WTC is not entitled to any claim for post-Effective Date fees and expenses. Pursuant to sections 1141 of the Bankruptcy Code and Section 11.1.1 of the confirmed Plan, *all* prepetition claims (including claims for reimbursement under the PHONES Notes Indenture) have been discharged. *See* 11 U.S.C. § 1141; Plan §§ 11.1.1, 5.8.2. Indeed, confirmation "discharge[d] the Debtors from all Claims or other debts that arose before the

---

[83]   WTC also seeks approximately $735,000 in fees and expenses of professionals other than Brown Rudnick and Mesirow, including various "media" consultants and law firms engaged to assist WTC in attempting to block FCC approval of Tribune's emergence from bankruptcy. WTC does not even attempt to describe what these firms did – the WTC Draft Brief does not identify them, let alone describe the work they performed. *See* WTC Draft Brief ¶ 91. Although a substantial portion of those fees arguably should be disallowed because they apparently were incurred in connection with the unreasonable and counterproductive activities described above, the Reorganized Debtors have chosen not to object to them due to the relatively small amount at issue.

[84]   WTC Draft Brief ¶ 7.

[85]   WTC Draft Brief ¶ 7 n.3.

46429/0001-9358684V1

Effective Date."[86]  In addition, under Section 3.2.9(c) of the Plan, the treatment of the PHONES

Notes Claims is "in full satisfaction, settlement, release and discharge of and in exchange for

Allowed PHONES Notes Claims against Tribune."[87]

Accordingly, WTC's claim – along with any hypothetical right to reimbursement – no

longer exists, and WTC is not entitled to any amount for fees and expenses incurred after the

Effective Date.  Any contrary result would result in exactly the unimaginable situation

envisioned by Judge Fitzgerald in explaining why unsecured creditors may not be allowed claims

even for pre-Effective Date fees:  "[D]ebtors would never be out from under the burden of

ongoing costs, the claims would continue to rise throughout the case, and the universe of

prepetition claims would never be ascertainable," thereby impairing "the Debtor's fresh start and

discharge" and vaporizing "[t]he concept of parity of distribution among similarly situated

creditors."  *JPMorgan*, 344 B.R. at 385.

## CONCLUSION

The Fee Claim should be disallowed in its entirety because WTC is not entitled to assert a

claim under the prepetition PHONES Notes Indenture for postpetition fees and expenses.

Alternatively, the Fee Claim should be limited to a maximum of $3 million, because WTC has

only paid that amount in respect of the amounts for which it now seeks "reimbursement" and is

not otherwise obligated to pay a single penny more for any of those amounts.  Finally, in no

event should the Fee Claim exceed $5,000,000 with the balance disallowed on the ground that

the requested amounts are not reasonable.

---

[86]  Plan § 11.1.

[87]  Plan § 3.2.9(c).

46429/0001-9358684V1

Dated: March 18, 2013

SIDLEY AUSTIN LLP
James F. Conlan
One South Dearborn Street
Chicago, IL  60603
Telephone:  (312) 853-7000

James F. Bendernagel, Jr.
Ronald S. Flagg
1501 K Street NW
Washington, DC  20005
Telephone:  (202) 736-8000

-and-

JONES DAY
Bruce Bennett
James O. Johnston
Joshua M. Mester
555 South Flower Street, 50th Floor
Los Angeles, CA  90071-2300
Telephone:  (213) 489-3939

-and-

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.

By: _____
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, DE  19801
Telephone:  (302) 652-3131

ATTORNEYS FOR REORGANIZED DEBTORS