## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Reorganized Debtors. | Jointly Administered |
| | **Status Conference: April 17, 2013, at 2:00 p.m.** |
| | **Related to D.I. 13272 and 13274** |

## REORGANIZED DEBTORS' OBJECTION TO "SUBSTANTIAL CONTRIBUTION" APPLICATIONS OF LAW DEBENTURE TRUST COMPANY OF NEW YORK AND WILMINGTON TRUST COMPANY

---

[1] The Reorganized Debtors, or successors-in-interest to the Reorganized Debtors, in these chapter 11 cases, along with the last four digits of each entity's federal tax identification number, are: Tribune Company (0355); California Community News, LLC (5306); Chicago Tribune Company, LLC (3437); Chicagoland Publishing Company, LLC (3237); Chicagoland Television News, LLC (1352); forsalebyowner.com, LLC (4276); ForSaleByOwner.com Referral Services LLC (9205); Hoy Publications, LLC (2352); Internet Foreclosure Service, LLC (6550); KDAF, LLC (6969); KIAH, LLC (4014); KPLR, Inc. (7943); KRCW, LLC (1772); KSWB, LLC (7035); KTLA, LLC (3404); KTXL, LLC (3844); KWGN, LLC (5347); Los Angeles Times Communications LLC (1324); Magic T Music Publishing Company, LLC (6522); NBBF, LLC (0893); Oak Brook Productions, LLC (2598); Orlando Sentinel Communications Company, LLC (3775); Sun-Sentinel Company, LLC (2684); The Baltimore Sun Company, LLC (6880); The Daily Press, LLC (9368); The Hartford Courant Company, LLC (3490); The Morning Call, LLC (7560); TMS News and Features, LLC (2931); Tower Distribution Company, LLC (9066); Towering T Music Publishing Company, LLC (2470); Tribune 365, LLC (7847); Tribune Broadcasting Company, LLC (2569); Tribune Broadcasting Hartford, LLC (1268); Tribune Broadcasting Indianapolis, LLC (6434); Tribune Broadcasting Seattle, LLC (2975); Tribune CNLBC, LLC (0347); Tribune Direct Marking, LLC (1479); Tribune Entertainment Company, LLC (6232); Tribune Investments, LLC (6362); Tribune Media Services, LLC (1080); Tribune Media Services London, LLC (6079); Tribune ND, LLC (4926); Tribune Publishing Company, LLC (9720); Tribune Television New Orleans, Inc. (4055); Tribune Washington Bureau, LLC (1088); WDCW, LLC (8300); WGN Continental Broadcasting Company, LLC (9530); WPHL, LLC (6896); WPIX, LLC (0191); WPMT, LLC (7040); WSFL, LLC (5256); WXMI, LLC (3068). The corporate headquarters and the mailing address for each entity listed above is 435 North Michigan Avenue, Chicago, Illinois 60611.

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ...................................................................................................... 4

ARGUMENT .......................................................................................................... 5

I.      THE TRUSTEES HAVE NOT SATISFIED THEIR
        BURDEN OF PERSUASION .................................................................... 8

        A.      The Trustees Bear A "Heavy Burden" ........................................... 8

        B.      The Trustees Have No Relevant Evidence ...................................... 10

II.     THE TRUSTEES' OBSTRUCTIONIST CONDUCT PRECLUDES
        ALLOWANCE OF A SUBSTANTIAL CONTRIBUTION CLAIM ........ 12

III.    LAW DEBENTURE'S CLAIM IS WITHOUT MERIT
        AND UNREASONABLE ........................................................................... 16

        A.      Law Debenture's Conduct Did Not Result In
                An Actual And Demonstrable Benefit To The Estates .................. 17

                1.      Law Debenture Did Not Benefit The Estates By
                        Preventing The Filing Of A Plan In 2009 ......................... 17

                2.      Law Debenture Did Not Benefit The Estates By
                        Advocating And Investigating The LBO-Related Causes Of Action ...... 19

                3.      Law Debenture Did Not Benefit The Estates By
                        Contributing To The Examiner's Report ............................ 24

                4.      Law Debenture Did Not Benefit The Estates By
                        Opposing The Plan For Which It Now Claims Credit ......... 25

        B.      Law Debenture Did Not Act With An Expectation Of
                Reimbursement From The Estates ................................................. 28

        C.      Law Debenture's Fees Are Unreasonable ..................................... 29

46429/0001-9397562V1

**Page**

IV.    WTC'S CLAIM IS WITHOUT MERIT AND UNREASONABLE ......................... 33

    A.    **WTC's Conduct Did Not Result In
An Actual And Demonstrable Benefit To The Estates** ................................... 34

        1.    WTC Produced No "Economic" Benefits ............................... 35

        2.    WTC Produced No "Process" Benefits ................................... 38

    B.    **WTC Did Not Act With An Expectation Of
Reimbursement From The Estates** ................................................................. 38

    C.    **WTC Has No Standing To Seek Reimbursement Of Fees
That It Did Not Pay And For Which It Is Not Liable** ................................... 42

    D.    **WTC's Fees Are Unreasonable** ....................................................................... 44

    E.    **WTC Is Not Entitled To Fees For Litigating Its Claim** ............................. 47

V.    THE TRUSTEES ARE NOT ENTITLED TO A CLAIM FOR
FINANCIAL ADVISOR OR CONSULTANT FEES ................................................. 48

VI.    A WAIVER OF LOCAL RULE 2016-2 IN NOT APPROPRIATE ......................... 50

CONCLUSION ............................................................................................................... 52

46429/0001-9397562V1

## TABLE OF AUTHORITIES

**Page**

**Cases**

*In re 9085 E. Mineral Office Bldg.*, 119 B.R. 246 (Bankr. D. Colo. 1990) ................................ 48

*In re American Plumbing & Mech., Inc.*, 327 B.R. 273 (Bankr. W.D. Tex. 2005) ......... 10, 29, 40

*In re Asarco LLC*, Case No. 05-21207, 2010 WL 3812642
    (Bankr. S.D. Tex. Sept. 28, 2010) .................................................................. 10, 12

*In re Baldwin-United Corp.*, 79 B.R. 321 (Bankr. S.D. Ohio 1987) ................................... *passim*

*In re Bayou Grp., LLC*, 431 B.R. 549 (Bankr. S.D.N.Y. 2010) ............................................. 7, 10

*In re Brundage-Bone Concrete Pumping, Inc.*, 471 B.R. 257 (Bankr. D. Colo. 2012) ...... 7, 8-9, 9

*In re Buckhead America Corp.*, 161 B.R. 11 (Bankr. D. Del. 1993) .................................... *passim*

*In re Catalina Spa & R.V. Resort, Ltd.*, 97 B.R. 13 (Bankr. S.D. Cal. 1989) ........................ 8, 48

*In re Columbia Gas Sys., Inc.*, 224 B.R. 540 (Bankr. D. Del. 1998) ................................. 6, 8, 49

*In re Energy Partners, Ltd.*, 422 B.R. 68 (Bankr. S.D. Tex. 2009) ...................................... 43, 51

*In re Envirodyne Indus., Inc.*, 176 B.R. 815 (Bankr. N.D. Ill. 1995) ....................... 14, 23, 27, 53

*In re Essential Therapeutics, Inc.*, 308 B.R. 170 (Bankr. D. Del. 2004) ................................... 6, 7

*In re Granite Partners, L.P.*, 213 B.R. 440 (Bankr. S.D.N.Y. 1997) ................................... *passim*

*Hall Fin. Grp. v. DP Partners, LP (In re DP Partners, LP)*,
    106 F.3d 667 (5th Cir. 1997) ................................................................... 30, 44, 52

*In re Hers Cosmetics Corp.*, 114 B.R. 240 (Bankr. C.D. Cal. 1990) .......................................... 48

*In re Keene Corp.*, 208 B.R. 112 (Bankr. S.D.N.Y. 1997) ........................................................... 49

*Lebron v. Mechem Fin. Inc.*, 27 F.3d 937 (3d Cir. 1994) .......................................... *passim*

*In re Mirant Corp.*, 354 B.R. 113 (Bankr. N.D. Tex. 2006) .......................................... *passim*

*Olsen v. Robinson Brog Leinwand Greene Genovese & Gluck, P.C. (In re Olsen)*,
    334 B.R. 104 (S.D.N.Y. 2005) ..................................................................... 42, 43

**Page**

*Pacifcorp Ky. Energy Corp. v. Big Rivers Elec. Corp. (In re Big Rivers Elec. Corp.),*
    233 B.R. 739 (W.D. Ky. 1998) ..................................................................... 13, 14

*Pierson & Gaylen, Ray & Terrell & Grubbs v. Creel & Atwood*
    *(In re Consolidated Bancshares, Inc.),* 785 F.2d 1249 (5th Cir. 1986) ................. 8, 13, 14, 27

*In re S & Y Enters.,* 480 B.R. 452 (Bankr. E.D.N.Y. 2012) ................................................. 7, 8, 52

*Stapleton v. Unofficial Comm. of Noteholders (In re ITC Deltacom, Inc.),*
    Case No. 03-111 (GMS), 2006 WL 839395 (D. Del. March 29, 2006) ............................... 50

*In re Summit Metals, Inc.,* 379 B.R. 40 (Bankr. D. Del. 2007) ........................................... *passim*

*In re Syntax-Brillian Corp.,* Case No. 08-11407, 2009 WL 1606474
    (Bankr. D. Del. June 5, 2009) ........................................................................ 27, 48-49

*The Law Offices of Neil Vincent Wake v. Sedona Inst. (In re Sedona Inst.),*
    220 B.R. 74 (B.A.P. 9th Cir. 1998) ............................................................... 42-43, 43

*United States v. Air Line Pilots Ass'n, Int'l. (In re Trans World Airlines, Inc.),*
    Case No. 92-678-SLR, 1993 WL 559245 (D. Del. June 22, 1993) ................................. 50

*United States v. St. Paul Mercury Indem. Co.,* 238 F.2d 594 (8th Cir. 1956) ....................... 43-44

*In re U.S. Lines, Inc.,* 103 B.R. 427 (Bankr. S.D.N.Y. 1989) ............................................. 47

*In re Villa Luisa, L.L.C.,* 354 B.R. 345 (Bankr. S.D.N.Y. 2006) ......................................... 8, 10

*Waltuch v. ContiCommodity Servs., Inc.,* 833 F. Supp. 302 (S.D.N.Y. 1993),
    *aff'd in part, rev'd in part on other grounds,* 88 F.3d 87 (2d Cir. 1996) ............................. 44

*In re Western Asbestos Co.,* 318 B.R. 527 (Bankr. N.D. Cal. 2004) ..................................... 43

*In re Worldwide Direct, Inc.,* 334 B.R. 112 (Bankr. D. Del. 2005) ..................................... *passim*


**Statutes and Rules**

11 U.S.C. § 503(b)(3)(D) ............................................................................................ *passim*

11 U.S.C. § 503(b)(4) ................................................................................................ *passim*

Del. Bankr. L. R. 2016-2 ........................................................................................... 50-52

46429/0001-9397562V1

The Reorganized Debtors hereby object to (a) the *Motion Of Law Debenture Trust Company Of New York Pursuant To 11 U.S.C. §§ 503(b)(3)(D), 503(b)(4), And 503(b)(5) For Allowance And Payment Of Fees And Expenses Incurred In Connection With Making A Substantial Contribution To The Debtors' Chapter 11 Cases And Granting Waiver Of Compliance With Del. Bankr. L.R. 2016-2(d)(vii) In Accordance With Del. Bankr. L.R. 2016-2(h)* (the "Law Debenture Application") filed by Law Debenture Trust Company Of New York, in its capacity as indenture trustee for one series of Senior Notes ("Law Debenture"); and (b) *Wilmington Trust Company's Application For Allowance Of Claim Under 11 U.S.C. §§ 503(b)(3)(D) And 503(b)(4) As A Result Of Wilmington Trust Company's Motion Requesting The Appointment Of An Examiner And Wilmington Trust Company's Participation In Examiner's Investigation And Granting Waiver Of Compliance With Del. Bankr. L.R. 2016-2(d) In Accordance With Del. Bankr. L.R. 2016-2(g)* (the "WTC Application" and, with the Law Debenture Application, the "Applications") filed by Wilmington Trust Company, in its capacity as indenture trustee for the PHONES Notes ("WTC").[1]

## PRELIMINARY STATEMENT

Law Debenture and WTC (collectively, the "Trustees"), with help from Aurelius Capital Management ("Aurelius"), spent most of the Chapter 11 Cases obstructing progress and reorganization, strenuously objecting to confirmation of the Plan and pursuing the patently-unconfirmable Noteholder Plan. To this day, after failing to obtain a stay of effectiveness, the Trustees continue to seek reversal of the Confirmation Order on appeal. Yet now, the Trustees

---

[1]    Capitalized terms not defined in this Objection have the meanings given to them in the *Fourth Amended Joint Plan Of Reorganization For Tribune Company And Its Subsidiaries (As Modified July 19, 2012)* (the "Plan"), which became effective on December 31, 2012. Citations to "Mester Decl." are to the Declaration of Joshua M. Mester that accompanies this Objection.

ask the Court to award them more than *$13.2 million* ($6.1 million for Law Debenture and $7.1 million for WTC) on account of their alleged "substantial contributions" to the cases, claiming credit for "benefits" that flow directly from the Plan and the settlements that the Trustees so strenuously (and unsuccessfully) opposed. To borrow a quip from Judge Bernstein, "[t]his is like maiming a person, losing the ensuing lawsuit, and then demanding kudos for clarifying the law of battery." *In re Granite Partners, L.P.*, 213 B.R. 440, 448 (Bankr. S.D.N.Y. 1997).

The Trustees' requests are without merit. The Trustees have not met, and cannot meet, the "heavy burden" of establishing that their actions resulted in an "actual and demonstrable benefit to the debtor's estate and the creditors." *Lebron v. Mechem Fin. Inc.*, 27 F.3d 937, 943 (3d Cir. 1994) (quotation omitted). To start, the vast majority of the Trustees' activities – including many for which they now seek payment – served to "retard or interrupt" progress in the Chapter 11 Cases. *In re Summit Metals, Inc.*, 379 B.R. 40, 50 (Bankr. D. Del. 2007) (Carey, J.). This is the antithesis of a compensable "substantial contribution" and provides independent ground for denial of the Applications.

Moreover, the "benefits" for which the Trustees now take credit – investigation of the LBO, participation in the Examiner process, confirmation of the Plan providing for a Litigation Trust – resulted directly from the estate-funded actions of the Debtors and the Creditors' Committee. The Trustees often duplicated and frequently opposed those actions. They have not come close to proving the required "causal connection between the service and the contribution." *In re Worldwide Direct, Inc.*, 334 B.R. 112, 121 (Bankr. D. Del. 2005) (quotation omitted).

The Trustees also have not shown that their actions were (i) not "designed primarily to serve their own interests" and (ii) "would have been undertaken absent an expectation of reimbursement from the estate." *Lebron*, 27 F.3d at 944. To the contrary, every action taken by

- 2 -

the Trustees was designed to serve the parochial interests of the noteholders to whom they owed

fiduciary duties, typically without regard to the consequences to the bankruptcy estates at large.

Further, the Trustees' massive fees are unreasonable. There simply was no reasonable

basis for the Trustees to spend over $6 million and $7 million, respectively, investigating the

LBO and interfacing with the Examiner. The time records demonstrate that the Trustees'

primary counsel deployed flotillas of lawyers, with as many as 25 Kasowitz Benson (counsel for

Law Debenture) and 76 Brown Rudnick (counsel for WTC) timekeepers billing time in a given

month. Neither Trustee attempted to link any requested fees with their purported contributions

to the cases, as they were required to do under governing law.

In any event, the Trustees are not entitled to reimbursement for the fees charged by their

financial advisors and non-lawyer consultants – more than $625,000 for Law Debenture's

financial advisors (The Michel-Shaked Group) and nearly $2.5 million for WTC's financial

advisors (Mesirow Financial Consultants) and other consultants (Morton Research, Cypress

Associates, and Hoffman Schutz Media). *Summit Metals*, 379 B.R. at 50 (no substantial

contribution award for a professional who "is neither an accountant nor a lawyer"). Nor are they

entitled to recover "additional amounts expended to litigate allowance" of their claim, as WTC

asserts. Finally, because WTC only paid $3 million to its professionals and is not liable for any

other fees or expenses, WTC has no standing to assert a substantial contribution claim for any

additional amounts, as WTC has not "incurred" any liability in respect of those additional fees

within the meaning of section 503(b)(3)(D) of the Bankruptcy Code.

Accordingly, the Reorganized Debtors request that the Court deny the Trustees'

Applications in their entirety.

## BACKGROUND

Law Debenture served as the successor indenture trustee for one series of Senior Notes. WTC served as the successor indenture trustee for the subordinated PHONES Notes and, in that capacity, was a member of the Creditors' Committee throughout the Chapter 11 Cases.

The Court needs no reminder that both Trustees were active, partisan participants at every stage of the reorganization proceedings, zealously pursuing the unique, parochial interests of Aurelius and the bondholders to whom they owed fiduciary duties (at whose direction the Trustees acted). More to the point, apparently in an effort to seek the maximum possible recovery for their constituents, the Trustees regularly and continuously opposed the Debtors' and Creditors' Committee's reorganization initiatives and did not hesitate to litigate any and every issue on which they disagreed with those estate fiduciaries.

Most notably, as explained in greater detail throughout this Objection, the Trustees vigorously opposed the Plan and its settlement of LBO-Related Causes of Action, and sought to block that settlement both by seeking denial of confirmation and by prosecuting the litigation-oriented Noteholder Plan. In the process, the Trustees prolonged the Chapter 11 Cases – which ultimately ran for more than four years – and generated significantly increased administrative expenses through, among other things, the professional fees of the Debtors and the Creditors' Committee.

Ultimately, the Trustees did not prevail. The Court denied confirmation of the Noteholder Plan, overruled the Trustees' objections and confirmed the Plan. Now, the Trustees return to the Court asking to be paid for $13.2 million in alleged fees of their attorneys, financial advisors and consultants on account of their alleged substantial contribution to the Chapter 11

- 4 -

Cases.[2]  In seeking these amounts, the Trustees conspicuously ignore their steadfast opposition to

the Plan and the Debtors' reorganization, and instead limit their request to that which came

before – Law Debenture's investigation into Tribune's leveraged buyout transactions in 2007

(the "LBO"), WTC's efforts to have the Examiner appointed, and the participation of both

Trustees in the examination process once the Court appointed the Examiner, with each

essentially taking credit for the same "accomplishment" of producing the settlement that they

later fought so hard to overturn.[3]

    As shown below, the Trustees made no substantial contribution and are not entitled to

any payment from the bankruptcy estates other than the treatment of the underlying Senior

Noteholder and PHONES Notes Claims as provided for in the Plan.

## ARGUMENT

    Section 503(b)(3)(D) of the Bankruptcy Code provides in relevant part for the allowance

of an administrative expense for "the actual, necessary expenses . . . incurred by . . . an indenture

trustee . . . in making a substantial contribution in a case under chapter . . . 11 of this title."  11

U.S.C. § 503(b)(3)(D).  Section 503(b)(4), in turn, provides for the allowance of an

administrative expense for the "reasonable compensation for professional services rendered by

---

[2]  In addition to the WTC Application, WTC also has (a) asserted a Class 1F Other Parent
    Claim for the entirety of its *$30,289,093.33* in alleged fees and expenses associated with the
    Chapter 11 Cases; and (b) asserted a Creditors' Committee Member Fee/Expense Claim
    seeking payment in full of *$1,679,924.77* of those fees and expenses pursuant to Section
    9.1.3 of the Plan.  The Reorganized Debtors have objected to WTC's Class 1F Claim in its
    entirety, *see Reorganized Debtors' Objection To Class 1F Other Parent Claim Asserted By
    Wilmington Trust Company* [D.I. 13338] ("WTC Fee Obj."), and have paid a portion and
    objected to a portion of the Creditors' Committee Member Fee/Expense Claim, *see
    Reorganized Debtors' Objection To Creditors Committee Member Fee/Expense Claims*
    [D.I. 13327].

[3]  For its part, Aurelius had the good sense not to file a substantial contribution request,
    agreeing that it would not do so unless it ultimately prevails in its appeal of the Court's
    Confirmation Order.  *See* [D.I. 13236].

an attorney or an accountant of an entity whose expense is allowable" as a substantial

contribution pursuant to section 503(b)(3)(D).  11 U.S.C. § 503(b)(4).

A substantial contribution claim only may be allowed where "the efforts of the applicant

resulted in an ***actual and demonstrable benefit*** to the debtor's estate and the creditors." *Lebron*,

27 F.3d at 944 (emphasis added).  "[E]xtensive participation in [a] case is not in and of itself

sufficient to show substantial contribution." *In re Columbia Gas Sys., Inc.*, 224 B.R. 540, 552

(Bankr. D. Del. 1998); *accord, e.g.*, *Summit Metals*, 379 B.R. at 53; *Worldwide Direct*, 334 B.R.

at 124; *In re Buckhead America Corp.*, 161 B.R. 11, 15 (Bankr. D. Del. 1993).

Rather, the claimed benefit must exceed that which merely results from an applicant's

efforts to further its own interests:

> Inherent in the term "substantial" is the concept that the benefit received
> by the estate must be more than an incidental one arising from activities
> the applicant has pursued in protecting his or her own interests.  Creditors
> are presumed to be acting in their own interests until they satisfy the court
> that their efforts have ***transcended self-protection***.

*Lebron*, 27 F.3d at 944 (emphasis added).  As a consequence, there can be no claim for

"reimbursement in connection with activities of creditors and other interested parties which are

designed primarily to serve their own interests and which, accordingly, would have been

undertaken absent an expectation of reimbursement from the estate." *Id.*

"[T]he motivation of the applicant" therefore is highly relevant to the inquiry.  *Summit*

*Metals*, 379 B.R. at 51.  "[S]ection 503(b) compensation has been consistently denied where the

creditor seeking compensation acted primarily for its own benefit, and any benefit accruing to

other creditors, the debtor or the estate was merely incidental." *Buckhead America*, 161 B.R. at

16; *accord, e.g.*, *In re Essential Therapeutics, Inc.*, 308 B.R. 170, 174 (Bankr. D. Del. 2004).

Moreover, substantial contribution claims generally are limited to situations where "the

successful applicants performed functions that normally would have been undertaken by estate-

compensated professionals, or that had to be performed because estate-compensated professionals were not doing their jobs." *In re S & Y Enters.*, 480 B.R. 452, 464 (Bankr. E.D.N.Y. 2012) (quotation omitted).  This is because "section 503(b)(3)(D) focuses on process as much as on contribution, on the movant's substantial contribution in *the case* – that is, the entire chapter 11 case – and, generally speaking, the proper administration of the case as a whole rarely contemplates individual creditors or even unofficial committees contributing to the case. Normally, it is the job of professionals retained under sections 327 and 328 of the Bankruptcy Code, and ultimately of the Court, to ensure that chapter 11 cases proceed properly and efficiently." *In re Bayou Grp., LLC*, 431 B.R. 549, 561 (Bankr. S.D.N.Y. 2010) (emphasis in original); *see, e.g.*, *In re Brundage-Bone Concrete Pumping, Inc.*, 471 B.R. 257, 262 (Bankr. D. Colo. 2012) (substantial contribution appropriate "where the debtor's or trustee's own professionals abdicate or lack competence, and some of their expected functions are effectively performed by professionals of a creditor").

As a consequence, there can be no substantial contribution where the applicant has duplicated the efforts of estate-funded professionals. *See, e.g.*, *Essential Therapeutics*, 308 B.R. at 175 (no award where applicant's efforts were "duplicative of efforts of the Debtors' professionals"); *Summit Metals*, 379 B.R. at 63 (no award where applicant's efforts were "duplicative of the Committee's effort"); *Granite Partners*, 213 B.R. at 446 ("Services that duplicate those rendered by the debtor or other court appointed officers, absent proof that they are unwilling or unable to act, are not compensable because they entail an excessive and undue burden on the estate.").

As demonstrated below, the Trustees have not established and cannot establish that they made a compensable "substantial contribution" in the Chapter 11 Cases.

## I.    THE TRUSTEES HAVE NOT SATISFIED THEIR BURDEN OF PERSUASION

To start, the Trustees have not come close to satisfying the "heavy burden" of persuasion with respect to their alleged contributions to the Chapter 11 Cases.  In fact, the Trustees have failed to submit any evidence relevant to the inquiry.

### A.    The Trustees Bear A "Heavy Burden".

"[C]reditors . . . have the burden of proving by a preponderance of the evidence that they made the requisite substantial contribution." *Buckhead America*, 161 B.R. at 15; *accord, e.g.*, *Summit Metals*, 379 B.R. at 50; *Worldwide Direct*, 334 B.R. at 120.  This has been described as "a heavy burden" that is "exceedingly difficult" to meet.  *E.g.*, *S & Y*, 480 B.R. at 462 ("exceedingly difficult"); *In re Villa Luisa, L.L.C.*, 354 B.R. 345, 348 (Bankr. S.D.N.Y. 2006) (same); *In re Catalina Spa & R.V. Resort, Ltd.*, 97 B.R. 13, 17 (Bankr. S.D. Cal. 1989) ("heavy burden").

There are three reasons for this exacting standard.  First, and axiomatically, "a creditor's attorney must ordinarily look to its own client for payment, unless the creditor's attorney rendered services on behalf of the reorganization, not merely on behalf of his client's interest, ***and conferred a significant and demonstrable benefit*** to the debtor's estate and the creditors." *Pierson & Gaylen, Ray & Terrell & Grubbs v. Creel & Atwood (In re Consolidated Bancshares, Inc.)*, 785 F.2d 1249, 1253 (5th Cir. 1986) (emphasis in original).

Second, "section 503 should be strictly construed to keep administrative expenses at a minimum so as to preserve the estate for the benefit of the creditors." *Columbia Gas*, 224 B.R. at 548; *accord, e.g.*, *S&Y*, 480 B.R. at 459 ("narrowly construed"); *Villa Luisa*, 354 B.R. at 348 ("strict scrutiny"); *Catalina Spa*, 97 B.R. at 17 ("strict scrutiny").  Indeed, "[a] very practical concern in fielding section 503(b)(3)(D) and (b)(4) administrative expense claims, if these statutes are not narrowly construed, is the invitation to a 'come one, come all' phenomenon."

46429/0001-9397562V1

*Brundage-Bone*, 471 B.R. at 261. That concern is particularly acute in this District given the many large reorganization cases – each with multiple putative "contributors" – that are filed here regularly,[4] and it is a concern even in this case given that Aurelius is waiting in the wings with its own potential substantial contribution application.[5]

Third, creditors properly bear a heavy burden in establishing a substantial contribution award because they "are presumed to act primarily in their own interest and not for the benefit of the estate as a whole." *Buckhead America*, 161 B.R. at 15; *accord, e.g., Lebron*, 27 F.3d at 944; *Summit Metals*, 379 B.R. at 50. As Judge Walrath has observed, this is particularly true for indenture trustees like the Trustees:

> As the Indenture Trustee, WTC falls within the scope of section 503(b)(3)(D). Normally, however, the activities of an indenture trustee are focused on benefitting its constituents rather than all creditors:
>
>> [U]nlike the trustee, the debtor-in-possession and the official creditors' committee, which are entities with fiduciary obligations to the bankruptcy estate, an indenture trustee owes its fiduciary duty to the debenture holders, not the bankruptcy estate. The indenture trustee acts in the best interest of its debenture holders. In order to satisfy its fiduciary duty to its debenture holders, the indenture trustee may take actions that are of only marginal or incidental benefit to the bankruptcy estate. ***The bankruptcy estate should not have to pay for services which primarily benefit the debenture holders and only incidentally benefit the bankruptcy estate.***

---

[4] The *Brundage-Bone* court explained why the routine allowance of multiple substantial contribution applications would be antithetical to the purpose and function of the Bankruptcy Code. "If every such contributor can properly lay claim to administrative priority status, the Bankruptcy Court may confront an inordinately difficult administrative challenge." *Brundage-Bone*, 471 B.R. at 262. For example, the court must "avoid rewarding redundancy of professional service at the estate's expense." *Id.* Further, allowance of substantial contribution claims "threatens to circumvent section 506(b)," which provides for allowance of postpetition fees only for an oversecured creditor. *Id.* Finally, regular payment of attorney fees would serve to "'thwart' the strict provisions of the Bankruptcy Code governing professional compensation." *Id.*

[5] *See* [D.I. 13236].

46429/0001-9397562V1

*Worldwide Direct*, 334 B.R. at 121 (emphasis added) (quoting *In re Flight Transp. Corp. Sec.*

*Litig.*, 874 F.2d 576, 581 (8th Cir. 1989)); *In re American Plumbing & Mech., Inc.*, 327 B.R.

273, 284 (Bankr. W.D. Tex. 2005) ("The primary obstacle to the indenture trustee's application

is that almost all of its activities benefitted the Noteholders exclusively.").

Consequently, "[t]he integrity of section 503(b) can only be maintained by strictly

limiting compensation to extraordinary creditor actions which lead directly to tangible benefits to

the creditors, debtor, or estate." *Bayou Grp.*, 431 B.R. at 560 (quoting *In re Best Prods. Co.*, 173

B.R. 862, 866 (Bankr. S.D.N.Y. 1994)); *accord, e.g.; Villa Luisa*, 354 B.R. at 348 ("an award is

given only for extraordinary creditor actions on those rare occasions when the creditor's

involvement truly fosters [and] enhances the administration of the estate") (quotation omitted).

The burden is on the applicant to "show a 'causal connection' between the service and

the contribution." *Worldwide Direct*, 334 B.R. at 121-22 (quoting *Granite Partners*, 213 B.R. at

447). The evidence must establish that, "absent [the applicant]'s efforts, a different outcome

would have been produced in the case." *Summit Metals*, 379 B.R. at 52; *see, e.g., In re Asarco*

*LLC*, Case No. 05-21207, 2010 WL 3812642, *10 (Bankr. S.D. Tex. Sept. 28, 2010) ("a creditor

cannot recover on account of a substantial contribution when the asserted contribution would

have occurred even without the claimant's involvement"). It is insufficient to "reason[] from

sequence to consequence, assuming a causal connection simply because one event follows

another[, as that] is speculation not proof." *Granite Partners*, 213 B.R. at 452.

**B.      The Trustees Have Not Tendered Any Relevant Evidence.**

The Trustees have not remotely satisfied this standard. ***WTC submitted no evidence***

***whatsoever***. Law Debenture submitted only a declaration of James Heaney, one of its managing

directors, and of David Rosner, one of its lawyers. Mr. Rosner merely certifies Law Debenture's

lack of compliance with Local Rule 2016-2 (more on this in Section VI below) and authenticates

- 10 -

certain documents.  Mr. Heaney testifies to various basic facts stated in the background section of Law Debenture's Application.

Indeed, the Heaney declaration is notable for what it omits.  For example, Law Debenture baldly states in its unsworn Application that its "efforts were also undertaken with the belief that Tribune would reimburse Law Debenture for the fees and expenses incurred in its efforts."[6]  Mr. Heaney, however, says nothing about the basis for Law Debenture's "belief" in this regard.[7] This is a far cry from the evidentiary showing that Law Debenture would not have acted "absent an expectation of reimbursement from the estate," as required by the Third Circuit.  *Lebron*, 27 F.3d at 944.[8]

Similarly, while Law Debenture's Application colorfully boasts of "monumental breakthroughs" and "substantially augmenting Tribune's distributable value,"[9] the Heaney declaration is utterly silent with respect to the alleged consequences of any of Law Debenture's

---

[6]   Law Debenture Application ¶ 3.

[7]   Law Debenture actually states in its Application that "the evidence demonstrates Law Debenture acted for the benefit of all Tribune's creditors based on the belief that Tribune would reimburse its fees and expenses."  Law Debenture Application ¶ 73.  This is patently false.  There is no such evidence.  WTC similarly declares, without evidence, that it "undertook its advocacy for the appointment of an examiner, and its active participation in the examination, with the expectation of payment by the Debtors' estates."  WTC Application ¶ 14.  These wholly unsupported allegations do not satisfy the Trustees' evidentiary burden.  *See* Sections III.B and IV.B below.

[8]   In addition, Law Debenture's own time records draw into question the foundation and basis for Mr. Heaney's wide-ranging statements regarding Law Debenture's activities and purported motivations over a 14-month period during 2009-10, much less the Creditors' Committee's activities and alleged motivations during this period.  Specifically, Mr. Heaney billed just *24.4 hours* to the Chapter 11 Cases and was not a member of the Creditors' Committee.  *See Supplemental Declaration of David S. Rosner* [D.I. 13305] ("Rosner Decl.") at Ex. F.

[9]   Law Debenture Application ¶¶ 3, 43.  WTC similarly takes credit for "economic improvement to the Debtors' estates" and "improvement to the Debtors' bankruptcy process, including confirmation of the Plan," WTC Application ¶ 43, but offers no evidence linking the purported results with WTC's conduct.

actions described therein.  This is not the proof of a "causal connection between the service and the contribution" required by the case law.  In fact, this Court has specifically held that "[s]omething more than mere conclusory self-serving statements regarding one's involvement in a case which allegedly resulted in a 'substantial contribution' must be presented to the Court before compensation can be allowed."  *Summit Metals*, 379 B.R. at 61 (quotation omitted); *Worldwide Direct*, 334 B.R. at 123 (same); *Buckhead America*, 161 B.R. at 15 (same); *Asarco*, 2010 WL 3812642, at *9 ("Movants' evidence on causal connection is wholly speculative.  Such speculative evidence is nothing more than a conclusory and self-serving statement of what the Movants believe occurred.").

Typically, that "something more" takes the form of "[c]orroborating testimony by a ***disinterested party*** attesting to a claimant's instrumental acts."  *Buckhead America*, 161 B.R. at 15 (emphasis in original) (quotation omitted); *Worldwide Direct*, 334 B.R. at 123 (same).  The Trustees have offered no such evidence here.

It is true that, on occasion, "a court's own firsthand observance of the services provided may be a sufficient basis" on which to conclude that a claimant caused a benefit in a case.  *Summit Metals*, 379 B.R. at 61.  As shown below, however, the actual record in the Chapter 11 Cases conclusively disproves the Trustees' various unsupported allegations.  As a consequence, the Applications can and should be denied on the ground that the Trustees have failed to meet their "heavy" evidentiary burden.

## II.    THE TRUSTEES' OBSTRUCTIONIST CONDUCT PRECLUDES ALLOWANCE OF A SUBSTANTIAL CONTRIBUTION CLAIM

Additionally, the Court can and should deny the Applications on the ground that the Trustees' overall conduct throughout the Chapter 11 Cases served to "retard or interrupt"

progress toward reorganization. *Summit Metals*, 39 B.R. at 50; *Consolidated Bancshares*, 785 F.2d at 1253.

It is well established that, "[i]n determining whether the party made a substantial contribution to the estate, the bankruptcy court may consider the actions for which the party seeks an administrative expense as well as other actions for which no compensation is sought." *Pacifcorp Ky. Energy Corp. v. Big Rivers Elec. Corp. (In re Big Rivers Elec. Corp.)*, 233 B.R. 739, 749-50 (W.D. Ky. 1998). More specifically, "[a] court may also consider whether the applicant's non-compensable activities increased the administrative costs to the estate." *Granite Partners*, 213 B.R. at 446; *see, e.g., In re Mirant Corp.*, 354 B.R. 113, 135 (Bankr. N.D. Tex. 2006) ("The cost to the Debtors' estates of [the applicant]'s conduct substantially off-sets the value of his contribution in these cases, and the court will take this into account below.").

As a result, courts frequently deny (or substantially reduce) requests for a substantial contribution award where a claimant has impeded progress and caused increased administrative expenses, even where the claimant otherwise may have made a substantial contribution in other areas of the case. For example, in *Baldwin-United*, the bankruptcy court denied an indenture trustee's substantial contribution application on the ground that the trustee (First Chicago) was overly litigious and not a constructive force for reorganization:

> To the extent it played a leadership role, it was usually leading the charge against the Debtors, rather than leading its constituents in constructive attempts to consensually resolve the multitude of problems surrounding the conflicting interests in the Colorado banks.
>
> In sum, the record establishes that First Chicago from the outset embarked upon a campaign to fight its way out of these cases, and to do so as quickly as possible regardless of the consequences to the Debtors or their reorganization effort. While it does not seek reimbursement for the cost incurred in pursuing this strategy, *we cannot ignore its litigious posture and the hundreds of thousands of dollars which it cost the Debtors' estates in fees and expenses*.

*In re Baldwin-United Corp.*, 79 B.R. 321, 339 (Bankr. S.D. Ohio 1987) (emphasis added).

Similarly, in *Big Rivers* the bankruptcy court denied Pacifcorp's request for a substantial contribution award on the ground that Pacificorp had impaired progress in the case. The district court affirmed, noting that the bankruptcy court "properly considered" the many actions taken by Pacificorp in opposition to the debtors (including a motion to withdraw the reference, a motion for recusal of the bankruptcy judge and examiner, and a writ of mandamus from the district court). *Big Rivers*, 233 B.R. at 750. The district court held:

> [A]ny benefit [from Pacifcorp's activities] is overshadowed by the costs associated with Pacifcorp Entities' attempts to interrupt and delay the bankruptcy proceedings . . . . All these actions placed a significant strain on the bankruptcy estate. It cannot be said that the Pacifcorp Entities's actions foster and enhance, rather than retard or interrupt the progress of reorganization.

*Id.* at 751 (quotation omitted); *see also Consolidated Bancshares*, 785 F.2d at 1253 (affirming denial of substantial contribution request where "the opposition of the Grubbs group inflated the confirmation hearing attorneys' fees, which were charged to the estate by all officially appointed counsel. Such activity certainly retarded or interrupted the progress of reorganization"); *Mirant*, 354 B.R. at 141-42 (reducing $645,000 request to $15,000 due to unfounded objections to the disclosure statement and plan); *Granite Partners*, 213 B.R. at 453 ("The UIC's effort to wrest control over claims that the trustee was administering did not contribute substantially to these cases. Rather, they increased administrative expenses. Accordingly, they do not entitle the UIC to a substantial contribution award.") (citation omitted); *In re Envirodyne Indus., Inc.*, 176 B.R. 815, 820 (Bankr. N.D. Ill. 1995) (no substantial contribution where applicant "necessitated a costly, lengthy confirmation hearing, thus substantially raising the amount of administrative expenses incurred by the Debtors' estate").

- 14 -

Here, the Trustees routinely engaged in unproductive, counterproductive, and litigious conduct that served to needlessly prolong the Chapter 11 Cases and to increase administrative expenses by tens of millions of dollars.  To give just a few examples:

- Prosecution of the Noteholder Plan.  The Trustees were co-proponents of the Noteholder Plan, a litigation-centric proposal filed at Aurelius's behest as a tactical maneuver in an attempt to block confirmation of the Plan.  The Noteholder Plan was soundly opposed by creditors, with *240 out of 243 classes of claims rejecting it*,[10] and *denied confirmation by the Court*, which concluded that it unfairly discriminated against Senior Lenders, improperly released the Non-Debtor Guarantors, improperly modified the Intercompany Claims Settlement Agreement, and had not been accepted by an impaired class of creditors of each Debtor.[11]  The Trustees' insistence on prosecuting their patently-unconfirmable plan to the bitter end resulted in substantial delay and countless administrative expenses incurred by the Debtors and the Creditors' Committee in opposing it.

- Objection to the Plan.  The Trustees opposed every iteration of the Plan, both at the disclosure statement and confirmation phases, notwithstanding the fact that a substantial majority in number of Senior Noteholders voted for the Plan.  In the process, they pursued pointlessly broad discovery (including from every member of the Creditors' Committee and eighteen individual Senior Lenders who were not proponents of the Plan), gratuitously injected meritless issues already being considered by the Federal Communications Commission, and necessitated a ten-day confirmation hearing.  Further, even after the Debtors followed the roadmap provided in the 2011 Confirmation Opinion by amending the Plan to cure every deficiency identified by the Court, the Trustees strenuously objected to the amended version of the Plan, thereby necessitating another contested confirmation hearing and causing substantial additional delay.  Here again, the Trustees' unproductive conduct resulted in enormous administrative expenses incurred by the Debtors and the Creditors' Committee, all to the detriment of the bankruptcy estates.

- Opposition to the Debtors' Reserve Proposal.  The Trustees opposed the Debtors' proposal to reserve the amounts at issue in the Allocation Disputes (including amounts that the Trustees now seek to claw back on appeal) until such intercreditor litigation was heard and determined.[12]  That proposal would have enabled the Debtors to emerge from bankruptcy much more rapidly – without having to await resolution of the Allocation Disputes – thereby saving the bankruptcy estates millions of dollars.  The Trustees instead insisted that the Allocation Disputes be resolved even before a disclosure statement could be approved and before the Plan could be confirmed and consummated.  Then, having largely benefitted from this approach (by winning the subordination dispute

---

[10]    *Opinion on Confirmation* [D.I. 10133] (the "2011 Confirmation Opinion") at 124.

[11]    2011 Confirmation Opinion at 123.

[12]    [D.I. 10374, 10415].

vis-à-vis the Senior Notes and the PHONES Notes), Law Debenture remarkably sought a stay of the Confirmation Order seeking, *inter alia*, to prevent distribution of funds (certain amounts distributed to Class 1F creditors) that would have been held back under the Debtors' reserve proposal. This pointless conduct resulted in substantial delay and enormous administrative expenses.

- Appeals. After failing to achieve confirmation of the Noteholder Plan, WTC appealed the Court's interlocutory order denying confirmation of the Plan (the very result for which WTC had advocated). WTC then appealed the Court's interlocutory order deciding the Allocation Disputes. In each case, WTC's frivolous conduct resulted in substantial administrative expenses as the Debtors were forced to respond. Later, both Trustees appealed the Confirmation Order, and Law Debenture frivolously requested a stay pending appeal without a bond and, when denied, Law Debenture sought the same relief from the District Court. Law Debenture also unsuccessfully petitioned for a direct appeal to the Third Circuit. In each case, the Trustees' obstructionist conduct required responses from the Debtors, at the direct and substantial expense of the bankruptcy estates.[13]

- FCC Objection. In its zeal to derail the Debtors' reorganization by any means possible, WTC filed a baseless objection to the Debtors' application for the requisite waivers and approvals from the Federal Communications Commission to enable it to emerge from bankruptcy. Incredibly, the very same waivers and approvals also would have been necessary had the Noteholder Plan been confirmed. The Debtors incurred substantial attorneys fees and other administrative expenses responding to WTC's reckless conduct in this regard.[14]

In short, the harm caused by the Trustees' obstructionist, litigious conduct more than offsets whatever "contribution" the Trustees otherwise might have made to the Chapter 11 Cases. This provides an independent ground for denial of the Applications in their entirety.

## III.   LAW DEBENTURE'S CLAIM IS WITHOUT MERIT AND UNREASONABLE

In addition to the foregoing grounds for denial of the Law Debenture Application, that Application also is without merit, and should be denied, because Law Debenture has not shown,

---

[13]   *See, e.g.*, [D.I. 10582, 10690, 10702, 10790, 11455, 11548, 11562, 11595, 12157] (interlocutory appeals); [D.I. 12085, 12086, 12096, 12112, 12137, 12147, 12217, 12271, 12277, 12301, 12320] (stay motion); Case No. 1:12-cv-01073 [D.I. 1, 4, 7, 17, 40, 42, 67] (District Court filings).

[14]   *See, e.g.*, MB Docket No. 10-104 (WTC Petition to Deny (6/14/10); JPMorgan Opp. (6/29/10); WTC Reply (7/12/10); WTC *Ex Parte* Letter (8/5/10); Tribune Opp. (8/18/10); WTC Reply (8/30/10); WTC *Ex Parte* Communication (9/24/10)).

and cannot show, that its efforts produced an actual and demonstrable benefit to the Debtors'

estates and that it would not have undertaken those efforts absent an expectation of

reimbursement from the estates.  Further, Law Debenture's requested fees are unreasonable.

**A.      Law Debenture's Conduct Did Not Result In An Actual And Demonstrable Benefit To The Estates.**

Law Debenture asserts that it benefitted the bankruptcy estates by creating "new" and

"more promising avenues of recovery."  Specifically, Law Debenture claims that it

"(a) prevented the filing of a plan that undervalued the LBO Claims, (b) ensured that a full and

complete investigation of the LBO was conducted and assisted in those efforts, (c) convinced the

Debtors and the Committee that the LBO Claims had substantial value and any plan of

reorganization had to either provide Tribune's creditors with adequate consideration to settle the

claims and/or preserve such claims, (d) contributed to the Examiner's report, which this Court

relied upon in its 2011 Confirmation Opinion, and (e) recovered an additional $850 million in

value that Tribune was able to distribute to its creditors."[15]  To the contrary, Law Debenture is

not entitled to credit for any of these purported contributions.

**1.      Law Debenture Did Not Benefit The Estates By Preventing The Filing Of A Plan In 2009.**

To start, Law Debenture could not have "prevented the filing of a plan that undervalued

the LBO Claims" because there was no such plan.  Law Debenture alleges that there was a

"back-room negotiated plan" that would have provided for creditors of Tribune to receive a 4.8%

recovery.[16]  In support, however, Law Debenture states only that "the Debtors and certain LBO

Lenders were negotiating a plan to exit bankruptcy."[17]  Law Debenture notably does not allege

---

[15]   Law Debenture Application ¶ 61; *see id.* ¶ 2.

[16]   Law Debenture Application ¶ 17.

[17]   Law Debenture Application ¶ 17.

that those negotiations had produced any agreement.  They had not.  Also, no agreement had

been reached with the Creditors' Committee, an obviously critical component to the filing of any

plan at that stage in the Chapter 11 Cases.  Indeed, Law Debenture's "evidence" on the point

consists of a "Debtwire.com" article indicating that "sources say" that "Tribune Company

recently presented a restructuring term sheet to a steering committee of its lenders" and a

Chicago Tribune article published in January 2013 (three-and-a-half years after the fact), for

which Law Debenture's counsel (David Rosner) is quoted as a source, stating that Centerbridge

(not Law Debenture) was unwilling to accept "a relatively small payment pegged to market

prices."[18]

      Further, Law Debenture does not allege a single act that it actually took to "prevent" the

filing of that imaginary, to-be-negotiated plan, much less establish any causation resulting from

its conduct.  Simply put, there is not a shred of evidence to support Law Debenture's baseless

assertion that, "[w]ithout Law Debenture's involvement, the investigation into the LBO and

prosecution of the LBO Claims would have resulted in a settlement of the LBO Claims that

would have provided Tribune's creditors with a mere 'sliver of equity' and a tiny fraction of their

ultimate recovery,"[19] and it goes without saying that there has been no substantial contribution

where a creditor fails to prove that it did anything to "prevent" the filing of a plan that had not

even been negotiated.  *Summit Metals*, 379 B.R. at 61 ("Something more than mere conclusory

self-serving statements regarding one's involvement in a case which allegedly resulted in a

'substantial contribution' must be presented to the Court before compensation can be allowed.")

(quotation omitted).

---

[18]   Law Debenture Application ¶ 17 n.26 (citing Tribune Presents Restructuring Term Sheet To Lenders, Sources Say, DEBTWIRE, Aug. 6, 2009, and Michael Oneal, Broken Deal: Bankruptcy Inc. (pt. 4), CHICAGO TRIBUNE, Jan. 16, 2013).

[19]   Law Debenture Application ¶ 1.

46429/0001-9397562V1

### 2.    Law Debenture Did Not Benefit The Estates By Advocating And Investigating The LBO-Related Causes Of Action.

Law Debenture also asserts that it was solely responsible for "convinc[ing] the Debtors and the Committee that the LBO Claims had substantial value and any plan of reorganization had to either provide Tribune's creditors with adequate consideration to settle the claims and/or preserve such claims."[20]  In particular, Law Debenture claims that the Debtors "had an inherent inability and seeming unwillingness to investigate and commence any of the LBO Claims" and that the Creditors' Committee "had similar bias and conflicts preventing them from adequately pursuing the LBO Claims," leaving Law Debenture to "st[and] alone in advocating" for Tribune's creditors.[21]

Such allegations of conflict, of course, are nothing new, and the Court already has rejected them.[22]  In particular, the Court pointedly observed that "[t]he Committee considered all of the unsecured creditors' interests.  Failure to advocate the Noteholders' position above interests of other creditor constituencies is not a breach of the Committee's fiduciary duties."[23] *See also Mirant*, 354 B.R. at 137 (no substantial contribution award where ad hoc committee claimed to be "*more* representative of a class of bondholders than was the statutory committee") (emphasis in original).

Further, Law Debenture's assertion that the Creditors' Committee was not representative, and that "a majority of the Committee members had no interest in pursuing the LBO Claims,"[24]

---

[20]    Law Debenture Application ¶ 61; *see id.* ¶ 2.

[21]    Law Debenture Application ¶¶ 4, 10, 11.

[22]    2011 Confirmation Opinion at 35-39 ("These assertions are unsupported by the evidentiary record.").

[23]    2011 Confirmation Opinion at 38.

[24]    Law Debenture Application ¶ 11.

is sheer nonsense.  It is simply untrue that creditors of Tribune's subsidiaries "had claims that any plan, most likely, would pay in full regardless of the outcome of the investigation into the LBO."[25]  To the contrary, "natural recoveries" for creditors of the Guarantor Debtors amounted to roughly 2.61% of their claim amounts,[26] and it was not until the settlement produced in mediation in late 2010 that consensus was reached on a compromise that provided for payment in full of such claims.  In fact, before that time, a majority of the Senior Lenders had advocated a plan that proposed to pay classes of creditors of the Guarantor Debtors just 10% if they rejected the plan and 65% if they accepted.[27]  Indeed, the Noteholder Plan sponsored by the Trustees offered only 8% to such creditors.[28]

Likewise baseless are Law Debenture's claims that, "[b]y the end of July 2009, not satisfied with the direction and speed of the LBO investigation, Law Debenture determined that it needed to take a more active role," "given the Committee's minimal efforts to investigate the LBO."[29]  This claim is contradicted by the Creditors' Committee's own words:  "From [the] day [of formation of the Committee], the issues arising from the LBO [were] at the forefront of the Committee's agenda.  Probing questions regarding the LBO and possible approaches to resolution of related claims were asked of Committee counsel candidates that day.  The Committee's efforts to examine the LBO [did] not waver[] since.  From the earliest months of

---

[25]   Law Debenture Application ¶ 11.

[26]   *Senior Lender Responsive Statement* [D.I. 6295] at 2.

[27]   [D.I. 5729 at 25].

[28]   *Senior Lender Responsive Statement* [D.I. 6295] at 2.

[29]   Law Debenture Application ¶¶ 15, 17.

46429/0001-9397562V1

the case, the Committee [] directed and pursued a detailed and exhaustive investigation and review of the LBO and the issues and possible claims arising from the LBO."[30]

Law Debenture's assertions are also at odds with the Creditors' Committee's actions. In March 2009, the Creditors' Committee "initiated a comprehensive and extensive program of third-party discovery"[31] ultimately resulting in the collection of more than 4 million pages of documents from more than thirty parties.[32] The Creditors' Committee's primary counsel (Chadbourne & Parke) billed $4.3 million to that investigation through September 2009 alone[33] and, when it became clear from Chadbourne's preliminary work that it might be necessary to litigate the LBO-Related Causes of Action, the Creditors' Committee engaged the Zuckerman Spaeder firm as special litigation counsel in August 2009.[34]

At the very same time, the Debtors and the Creditors' Committee were facilitating negotiations and encouraging all parties to reach a consensual resolution – the only path forward that would ensure a rapid exit from bankruptcy with a minimum of administrative expense. The efforts of these estate fiduciaries to seek a negotiated resolution first made abundant sense, particularly given that the statute of limitations on the LBO-Related Causes of Action would not expire until December *2010*. That Law Debenture allegedly sought to take "a more active role" in the LBO investigation to advance the interests of the largest Senior Noteholder, Centerbridge, in the summer of *2009* provides no basis for it now to take credit for "ensur[ing] that a full and complete investigation of the LBO was conducted" or for causing the Debtors to "adopt[] an

---

[30]   *Creditors' Committee's Response and Partial Objection to Law Debenture's Rule 2004 Motion* [D.I. 2136] ("Committee 2004 Obj.") ¶ 15.

[31]   Committee 2004 Obj. ¶ 16.

[32]   *DCL Post-Trial Brief* [D.I. 8897] at 11.

[33]   *See* Chadbourne & Parke Monthly Fee Application [D.I. 2430].

[34]   Committee 2004 Obj. ¶¶ 18, 19.

- 21 -

approach that was more committed to a global settlement" or for "convinc[ing]" the Creditors'

Committee "that the LBO Claims were highly valuable and that it would need to prosecute such

claims or garner a substantial increase in the distribution to parent level creditors from their

settlement as part of a plan of reorganization."[35]

Notably, Law Debenture submits no evidence whatsoever establishing the requisite

causation between its agitation for pursuit of litigation and the alleged change in point of view of

the estate fiduciaries.  Law Debenture's suggestion that it somehow opened "new and more

promising avenues of recovery for the Debtors' estates" by calling attention to the LBO-Related

Causes of Action is both false and not remotely sufficient to demonstrate a substantial

contribution to the Chapter 11 Cases.  *See, e.g., Baldwin-United*, 79 B.R. at 343 (no substantial

contribution for a party who "was the first to suggest that these estates could and should be

substantively consolidated" where "this issue was blindingly apparent to almost everyone

(including this Court) from the day these cases were filed, and probably long prior to that date").

Moreover, Law Debenture's alleged "assistance" with the Creditors' Committee's

investigation of the LBO was massively duplicative, with Law Debenture reviewing all of the

same documents reviewed by the Creditors' Committee, preparing for and attending all of the

depositions noticed by the Creditors' Committee and even drafting its own complaint in respect

of the LBO-Related Causes of Action, notwithstanding the fact that it did not have standing to

pursue such claims and the fact that it knew full well that the Creditors' Committee was

preparing its own complaint.[36]  This is exactly the duplication of effort that the Creditors'

Committee predicted would occur when it objected to Law Debenture's motion seeking Rule

2004 discovery (a motion that Law Debenture now boasts to have "served a higher purpose" by

---

[35]    Law Debenture Application ¶¶ 33, 61.

[36]    Law Debenture admits all of this.  *See* Law Debenture Application ¶¶ 26-29.

educating the Creditors' Committee about the LBO it already was actively investigating[37]).  In its response to that motion, the Creditors' Committee noted that "Law Debenture's document requests are largely duplicative of those long ago made by the Committee" and that "[g]iving Law Debenture the roving commission it seeks would not only be grossly inefficient and wasteful, but it would harm the creditors' best interests by undermining and subverting the Committee's investigation."[38]  Tellingly, Law Debenture provides no corroborating declarations from the Creditors' Committee substantiating any claim that Law Debenture materially affected the Committee's views concerning the LBO-Related Causes of Action.

Law Debenture now asserts a claim for significant amounts in connection with this "investigation," including approximately $2 million spent on document review alone.[39]  Such duplicative and wasteful efforts cannot serve as the basis for a substantial contribution to the Chapter 11 Cases.  *See, e.g., Envirodyne*, 176 B.R. at 823 (no substantial contribution where unofficial committee's "investigation of potential fraudulent conveyance claims [arising from a leveraged buyout] was duplicative of both the Debtors' and the Official Committee'"); *Baldwin-United*, 79 B.R. at 344 (no substantial contribution where bondholders' investigation of fraudulent transfer claims "were wholly duplicative and within the exclusive province of the Debtors").[40]

---

[37]  Law Debenture Application ¶ 22.

[38]  Committee 2004 Obj. ¶¶ 4, 5.

[39]  The unreasonableness of Law Debenture's fees is addressed in Section III.C.

[40]  Law Debenture cites *Worldwide Direct* for the proposition that a creditor makes a substantial contribution where the committee asks for the creditor's assistance.  Law Debenture Application ¶ 22.  In that case, however, the committee specifically had directed counsel for one of its indenture trustee members to perform certain discrete tasks.  No party objected to the member's request to be reimbursed for such unique work, and the Court allowed a portion of the request that it found had been conducted on behalf of all creditors and had saved the estate the expense of paying counsel for the debtors or the committee to do the

- 23 -

### 3.    Law Debenture Did Not Benefit The Estates By Contributing To The Examiner's Report.

Law Debenture next contends that it benefitted the estates by "contribut[ing] to the Examiner's report."[41]  Specifically, Law Debenture seeks more than $1 million in fees relating to its preparation of two briefs to the Examiner and "numerous meetings and communications with the Examiner and his counsel concerning the LBO and the LBO Claims."[42]  Remarkably, Law Debenture even attempts to recoup over $200,000 in fees incurred in reading and analyzing the Examiner Report once it was issued.

In so advocating, however, Law Debenture ignores that this conduct was the product of the "adversarial process" developed by the Examiner "to flesh out the issues and facts in dispute and the relative strengths and weaknesses of the positions of the Parties."[43]  In fact, the Court's order appointing the Examiner designated a multitude of competing constituents as "Parties" to the investigation, including the Debtors, the Creditors' Committee, Law Debenture, WTC, Centerbridge, JPMorgan, the Credit Agreement Lenders, Merrill Lynch, Citigroup, Bank of

---

work.  *Worldwide Direct*, 334 B.R. at 123 ("In the absence of [the member]'s involvement, counsel for the Committee or the Debtors would have had to do that work, at the expense of the estate.").  The Court, however, disallowed the portions of the request that it determined to be duplicative of services rendered by the debtors or the committee or rendered in furtherance of the indenture trustee's duties to its bondholders.  *Id.* at 123-25.  Here, at most, Law Debenture alleges (without evidence) that it engaged in "collaborative efforts" with the Creditors' Committee.  Law Debenture Application ¶ 29.  Law Debenture was not a member of the Creditors' Committee, was not asked to undertake actions *in place of* actions also undertaken by counsel for the Creditors' Committee, and wholly *duplicated* the exact same work being performed by the Creditors' Committee.  Moreover, unlike in *Worldwide Direct*, Law Debenture has provided no declarations from the Creditors' Committee substantiating any claim that Law Debenture (a) was asked by the Creditors' Committee to do anything, (b) materially assisted the Creditors' Committee in any respect, or (c) materially affected the Creditors' Committee's views concerning the LBO-Related Causes of Action.  *Worldwide Direct* thus provides no support for Law Debenture's fee request.

[41]    Law Debenture Application ¶ 61; *see id.* ¶ 2.

[42]    Law Debenture Application ¶ 65.

[43]    Examiner Report, Vol. 1, at 30.

America, Wells Fargo, EGI-TRB, and the TM Retirees,[44] all of whom met and conferred with

the Examiner by the Court's directive and subsequently participated in the Examiner process and

advanced their own parochial positions with respect to the merits and demerits of the LBO-

Related Causes of Action.  Such self-interested adversarial advocacy is the antithesis of a

compensable substantial contribution.  *See, e.g.*, *Buckhead America*, 161 B.R. at 17 (no

substantial contribution award for "normal creditor efforts directed to protecting the

Noteholders' interests to the greatest possible extent").

Law Debenture also ignores the fact that the Examiner largely ***rejected*** the major

positions that Law Debenture advocated, including its assertions that the Step One Transactions

of the LBO constituted an avoidable fraudulent transfer, that the Debtors were insolvent at the

time of the Step One Transactions, and that the Step One and Step Two Transactions should be

collapsed for the purpose of determining solvency.  Such unsuccessful advocacy does not give

rise to a compensable substantial contribution.  *See, e.g.*, *Granite Partners*, 213 B.R. at 450

("[T]he applicants are seeking a substantial contribution award for unsuccessfully defending a

position their clients were not entitled to take under applicable law.  I am compelled to conclude

that these services did not substantially contribute to the case.").

> **4.      Law Debenture Did Not Benefit The Estates By**
> **        Opposing The Plan For Which It Now Claims Credit.**

Finally, and most astoundingly, Law Debenture takes credit for "recover[ing] an

additional $850 million in value that Tribune was able to distribute to its creditors."[45]

Specifically, Law Debenture asserts that, "[a]bsent Law Debenture's involvement, the Debtors

would have achieved their initial goal of confirming a plan that provided Tribune's creditors with

---

44      [D.I. 4120]; *see also* [D.I. 4321 (expanding definition of "Parties" to include Wells Fargo)].

45      Law Debenture Application ¶ 61.

46429/0001-9397562V1

minimal consideration for the settlement of the LBO Claims," but ultimately "Tribune's creditors received (i) over $500 million above their natural recovery for the settlement of certain LBO Claims and (ii) an interest in the Litigation Trust to pursue the unresolved LBO Claims which are valued at over approximately $350 million."[46]

There are a multitude of falsehoods in that allegation.  First, as shown above, the Debtors never had a "goal of confirming a plan that provided Tribune's creditors with minimal consideration for the settlement of the LBO Claims."  Second, had the Debtors had such a "goal," there is no evidence that they would have achieved confirmation of that imaginary plan, particularly given that the Creditors' Committee would not have supported it.  Third, there is no evidence that anything Law Debenture did prevented the filing (much less confirmation) of the non-existent plan.[47]

Moreover, Law Debenture cannot possibly take credit for the ultimate distributions made under the Plan (including through the Litigation Trust), as Law Debenture staunchly opposed confirmation of the Plan at every step of the way.  Law Debenture's attempt to lay claim to the benefits of the Plan is all the more brazen given its flip-flopping conduct with respect to the April 2010 settlement (as described in the Law Debenture Application).  The Court will recall that Law Debenture was a party to and supported that settlement (which did not include a Litigation Trust), which Law Debenture now describes as "a monumental breakthrough."[48]  The Plan filed months later provided for substantially *better* treatment for Senior Noteholders (including a Litigation Trust), yet Law Debenture proceeded to spend the next two years

---

[46]   Law Debenture Application ¶ 66.

[47]   Law Debenture also ignores that a substantial percentage of Litigation Trust Interests were distributed to Senior Lenders.  As a consequence, it substantially overstates the value of the Litigation Trust to "non-LBO creditors."

[48]   Law Debenture Application ¶ 43.

attacking it.  What changed?  In early 2010, Centerbridge owned a controlling position in Senior

Notes and supported the April 2010 Settlement.  After Centerbridge sold out (at considerable

profit) to Aurelius, Law Debenture's new master opposed the Plan and directed Law Debenture

to do the same.

Law Debenture cannot be compensated for "benefits" resulting from a Plan it worked so

hard to defeat.  The Fifth Circuit's decision in *Consolidated Bancshares* is instructive in this

regard.  There, a group of shareholders (the Grubbs group) initiated derivative litigation

attempting to block an acquisition of the debtor.  The debtor subsequently filed for bankruptcy,

sued to undo the acquisition it previously had negotiated, and confirmed a plan that settled all

causes of action.  Much like Law Debenture here, the Grubbs group unsuccessfully objected to

the settlement and opposed the plan, and then turned around and sought a substantial

contribution for the successful plan.  The Circuit affirmed the bankruptcy court's denial of that

application:

> Appellants anomalously contend that their derivative lawsuit was the real
> motivation behind the successful plan which was confirmed.  If that is
> true, the success of the Grubbs group fee application will place them in a
> "Heads I win, tails you lose" position.  They objected to the "successful
> plan" and prolonged the confirmation hearing by claiming that the plan
> could not involuntarily compromise their derivative action.  Having lost
> that fight, they claim victory for the entire estate attributable to their
> efforts to "further" the plan.

*Consolidated Bancshares*, 785 F.2d at 1253; *see, e.g.*, *Envirodyne*, 176 B.R. at 822 ("although

the Unofficial Committee's Counsel may have motivated a modification to the Salomon Optional

Release, its efforts to block this release preclude this court from finding that it substantially

contributed to the Debtors' estate").[49]

---

[49] In contrast, Law Debenture's marquee authority – the unpublished decision of *In re Syntax-Brillian Corp.*, Case No. 08-11407, 2009 WL 1606474 (Bankr. D. Del. June 5, 2009) – serves only to illustrate the meritless nature of Law Debenture's substantial contribution

Like the dissident shareholders in *Consolidated Bancshares*, Law Debenture made no substantial contribution to the Chapter 11 Cases.

### B.     Law Debenture Did Not Act With An Expectation Of Reimbursement From The Estates.

Additionally, Law Debenture has not overcome the presumption that it was acting in its own self-interest and would not have acted without an expectation of reimbursement from the estate.  As noted above, Law Debenture has offered *no evidence* whatsoever on this critical component of its claim.  Without evidence, Law Debenture cannot possibly satisfy the requirement of *Lebron* that it prove that it would not have acted "absent an expectation of reimbursement from the estate." *Lebron*, 27 F.3d at 944.

In fact, the record in the case establishes the exact opposite.  Contrary to Law Debenture's new claim that it "purposely intended to benefit – and did benefit – all of Tribune's creditors,"[50] the Creditors' Committee long ago observed that "[t]he reason for Law Debenture's desire to seize control of the LBO investigation is equally plain – it wants to wrap its specific and parochial goals in the flag of the chapter 11 estates, but without any need to balance the diverse interests and expectations of various unsecured creditor interests, interests not identical to those of Law Debenture."[51]  Indeed, "[t]he goal of Law Debenture's Motion [was] to seize control of

---

claim.  In *Syntax-Brillian*, a shareholder *single-handedly* caused the appointment of an examiner and provided the forensic analysis necessary to "jumpstart" the examiner's investigation.  The Court found those efforts to be a substantial contribution, and awarded the shareholder a grand total of *$6,700* in expenses.  Given the *de minimus* amount at stake, the direct and tangible contribution of the shareholder, and the lack of any unproductive or litigious conduct by the shareholder, *Syntax-Brillian* does not remotely support Law Debenture's $6.1 million claim.

[50]   Law Debenture Application ¶ 3.

[51]   Committee 2004 Obj. ¶ 7.

the LBO claims for its own exploitation and benefit."[52]  Law Debenture's every action –

including its flip-flop with respect to the merits of a settlement of the LBO-Related Causes of

Actions, first supporting the April 2010 settlement and then opposing the Plan embodying a

settlement more favorable to Senior Noteholders – was done to further the parochial interests of

first Centerbridge and then later Aurelius.

In response, Law Debenture argues only that the 1996 Indenture for which it serves as

indenture trustee "supports Law Debenture's belief that Tribune would reimburse its fees and

expenses incurred during the Chapter 11 Cases."[53]  That Indenture, however, merely provides

that Tribune would pay reasonable expenses in connection with service as indenture trustee.

That provision does not even entitle Law Debenture to an unsecured claim for its postpetition

fees, much less an administrative claim.[54]  Clearly, such a provision in a prepetition contract does

not establish a creditor's expectation that it will be reimbursed by the estate for its postpetition

conduct, or provide sufficient evidence to overcome the presumption of self-interest, or

demonstrate conduct that "transcended self-protection."  *Lebron* is not so easily evaded.[55]  *See*

*American Plumbing*, 327 B.R. at 286 (provision in indenture for reimbursement of attorneys'

fees "has no bearing on a substantial contribution application").

### C.    Law Debenture's Fees Are Unreasonable.

Further, the $6.1 million in fees claimed by Law Debenture are patently unreasonable.

As a threshold matter, Law Debenture has failed to provide the detailed documentation necessary

---

[52]  Committee 2004 Obj. ¶ 9.

[53]  Law Debenture Application ¶ 74.

[54]  *See* WTC Fee Obj. at 11-16.

[55]  Moreover, Law Debenture's purported belief that it was entitled to reimbursement, is flatly contradicted by the fact that it did "not keep time records differentiated by activity on a daily basis" as required by Local Rule 2016-2(d)(vii).  Law Debenture Application ¶ 93.  *See* Section VI for a discussion of Law Debenture's request for a waiver of Local Rule 2016-2.

to support and verify its fee claim.  The time records Law Debenture has provided – including those of Kasowitz Benson, which account for nearly 90% of Law Debenture's claim – are replete with block billing (*i.e.*, assigning a single block of time to multiple tasks without differentiating between them) and make no attempt whatsoever to connect the fees incurred with discrete tasks. Such an incomplete and unclear accounting does not satisfy Law Debenture's burden "to distinguish between expenses incurred in making a substantial contribution to the case and expenses lacking that causal connection." *Hall Fin. Grp. v. DP Partners, LP (In re DP Partners, LP)*, 106 F.3d 667, 673 (5th Cir. 1997).

Moreover, a review of the documentation that Law Debenture has submitted demonstrates that a substantial portion of its claim is for work that was largely if not entirely duplicative of work done by the Creditors' Committee's professionals, which has already been paid for by the bankruptcy estates.  In addition, it is clear that the work undertaken by Law Debenture was done principally to advance the interests of its major constituent, Centerbridge, in its efforts to maximize its negotiating leverage with the Senior Lenders.

<u>May to July 2009</u>.  For this period, Law Debenture seeks approximately $170,000, consisting principally of (a) routine activities necessary in *every* case to "get up to speed" on the proceedings (*e.g.*, "reviewing Tribune's publicly filed documents," "speaking with parties already involved in the Debtors' bankruptcy"[56]) and (b) other miscellaneous activities (*e.g.*, seeking appointment to the Creditors' Committee), which are related only remotely, if at all, to

---

[56]  Law Debenture Application ¶ 16.  These amounts include $169,528 billed by Kasowitz Benson, $1,167 billed by  Law Debenture, and $347 billed by Bifferato Gentilotti.  Rosner Decl., Ex. F at 2-5; Ex. G at 1-5; Ex. H at 2-3.

Law Debenture's supposed "contributions" in later periods.  There certainly is ***no evidence*** that

Law Debenture was acting on behalf of "all creditors" during this time period.[57]

> August to September 2009.  For this period, Law Debenture seeks approximately

$370,000, largely in connection with its efforts to monitor and influence the Creditors'

Committee's work investigating the LBO and its unsuccessful motion for appointment of an

examiner.[58]  Although Law Debenture asserts in conclusory fashion that these activities were

necessary to "advocate unequivocally on behalf of ***all parent level creditors*** and the value of the

LBO Claims,"[59] its efforts were in fact nothing more than self-interested attempts to increase

Law Debenture's leverage vis-à-vis the Senior Lenders in settlement negotiations and to further

the parochial interests of ***Centerbridge*** (the then-majority holder of Senior Notes), not those of

creditors in general.

> October 2009 to March 2010.  For this period, Law Debenture seeks nearly $4 million,

including a staggering ***$3,474,078*** billed by ***thirty-two*** Kasowitz Benson professionals, largely

for reviewing documents, conducting legal research, preparing for and attending depositions

noticed by the Creditors' Committee, and drafting a complaint asserting claims arising from the

LBO – work almost entirely duplicative of the Creditors' Committee's work during this same

period.[60]  To justify these activities, Law Debenture asserts, without any independent

substantiation, that it undertook "highly coordinated" efforts with the Creditors' Committee in an

---

[57]  Law Debenture Application ¶ 14.

[58]  These amounts include $326,885 billed by Kasowitz Benson, $864 billed by Law Debenture, $28,424 billed by The Michel Shaked Group, and $13,222 billed by Bifferato Gentilotti. Rosner Decl., Ex. F at 6-9; Ex. G at 5-15; Ex. H at 4-8; Ex. I at 2-3.

[59]  Law Debenture Application ¶ 24 (emphasis added).

[60]  *See* Rosner Decl., Ex. G at 15-100.  Other amounts incurred during this period include $8,909 billed by Law Debenture, $175,434 billed by The Michel Shaked Group, and $38,957 billed by Bifferato Gentilotti.  Rosner Decl., Ex. F at 10-22; Ex. H at 9-24; Ex. I at 4-9.

46429/0001-9397562V1

effort to "pool" resources and "improv[e] the quality and efficiency of the work performed."[61]

These "highly coordinated" activities allegedly included Law Debenture spending nearly *$2

million* replicating the Committee's document review efforts,[62] and *both* parties drafting

complaints against the very same defendants (with Law Debenture's "twenty-five count, one

hundred forty-two page complaint," which was *never filed*, being used merely to "address the

gaps in the Creditors' Committee's complaint").[63]

The duplicative nature of Law Debenture's work flatly belies its claims of having worked

in concert with or at the behest of the Creditors' Committee and, again tellingly, Law Debenture

offers no corroborating evidence from the Creditors' Committee.[64] The estates – having already

paid for the Creditors' Committee's work – should not be required to fund these activities a

second time, particularly when they were undertaken principally, if not exclusively, to strengthen

Centerbridge's hand in negotiating a settlement of the LBO-Related Causes of Action.[65]

April to Mid-July 2010.  For this period, Law Debenture seeks approximately

$1.5 million dollars for work done in connection with the Examiner's investigation.[66]  That Law

---

[61]  Law Debenture Application ¶ 26.

[62]  Law Debenture Application ¶ 28.

[63]  Law Debenture Application ¶¶ 28-29.

[64]  The fees sought during this time period also include work performed by The Michel-Shaked Group, Law Debenture's financial advisor, which appears largely to have duplicated work performed by the Creditors' Committee's financial advisors (AlixPartners, Moelis).

[65]  For this period, Law Debenture also seeks reimbursement of amounts incurred in connection with a dispute over payment of JPMorgan's professional fees (*e.g.*, discovery, drafting, hearing attendance).  That these activities were undertaken to provide Law Debenture and its principal constituent (Centerbidge) with leverage in its settlement negotiations is made clear from the fact that Law Debenture's efforts were abandoned once Centerbridge agreed to the April 2010 settlement.

[66]  These amounts include $1,103,691 billed by Kasowitz Benson, $5,875 billed by Law Debenture, and $360,362 billed by The Michel Shaked Group.  Rosner Decl., Ex. F at 23-28; Ex. G at 100-21; Ex. I at 10-19.

Debenture allegedly "worked tirelessly at the Examiner's request"[67] is beside the point – each and every party did so.  As Law Debenture correctly notes, it was an "adversarial process"[68] that allowed the parties to "flesh out the . . . relative strengths and weaknesses of the *positions of the Parties*."[69]  Further, Law Debenture's efforts were clearly undertaken to advance the interests of Centerbridge and other Senior Noteholders.  Consequently, the fact that Law Debenture may have "help[ed] the Examiner flesh out the issues and facts for his report"[70] is of little moment.  That observation applies to the contributions of every party.

Late July to August 2010.  For this period, Law Debenture seeks more than $200,000 for work done reviewing the Examiner's Report, which was issued on July 26, 2010.[71]  There is absolutely no justification for Law Debenture's claim for these amounts, which may have advanced the interests of Law Debenture and Centerbridge, but certainly did *not* constitute a substantial contribution to the estates.

## IV.   WTC'S CLAIM IS WITHOUT MERIT AND UNREASONABLE

Like Law Debenture, WTC has not shown, and cannot show, that its efforts produced an actual and demonstrable benefit to the Debtors' estates and that it would not have undertaken those efforts absent an expectation of reimbursement from the estates.  Also like Law Debenture, WTC's requested fees are unreasonable.  In any event, WTC has admittedly "incurred" no more than $3 million in reimbursable fees and therefore has no standing to assert a claim for any

---

[67]   Law Debenture Application ¶ 45.

[68]   Law Debenture Application ¶ 46.

[69]   Law Debenture Application ¶ 47 (citing Examiner Report, Vol. 1, at 30) (emphasis added).

[70]   Law Debenture Application ¶ 49.

[71]   These amounts include $161,979 billed by Kasowitz Benson, and $65,880.01 billed by The Michel Shaked Group.  Rosner Decl., Ex. G at 121-24; Ex. I at 20-22.

greater amount, and WTC is not entitled to any claim for fees incurred in preparing or litigating its Application.

### A.   WTC's Conduct Did Not Result In An Actual And Demonstrable Benefit To The Estates.

WTC asserts that its conduct in seeking the appointment of the Examiner and its subsequent "participation" in the Examiner's investigation resulted in "(i) economic improvement to the Debtors' estates; and (ii) improvement to the Debtors' bankruptcy process, including confirmation of the Plan."[72] WTC is wrong in both respects.

To start, WTC's entire argument proceeds from a faulty premise – that WTC, and WTC alone, was responsible for the appointment of the Examiner and subsequent fruits of the Examiner's investigation.  This is simply not so.  In particular, WTC states that it "stood virtually alone" in opposing the April 2010 plan – which was premised on a settlement of the LBO-Related Causes of Action – and that it needed to act in order "to protect the interests of non-LBO creditors, including the PHONES."[73]  In fact, however, WTC was not "alone" in opposing the April 2010 Plan and settlement – holders of more than $3 billion in Senior Loan Claims also opposed the settlement and indicated their steadfast opposition to any plan that purported to settle the LBO-Related Causes of Action without either requiring a fair settlement contribution from all released parties or creating a litigation trust to pursue all viable claims against parties who had not "paid for" their settlement.[74]

Faced with objections from substantial creditors on both ends of the Debtors' capital structure, the Court readily determined that the appointment of an examiner would be the best

---

[72]   WTC Application ¶ 43.

[73]   WTC Application ¶ 26.

[74]   *See, e.g.*, [D.I. 2617, 3408, 3906, 3999, 4375, 4376, 4992].

way to ascertain "truth or clarity" with respect to the LBO.[75]  In support of that appointment, the

United States Trustee argued that an examiner would provide "an independent and unbiased

opinion as to what is the truth here . . . [and would] take away sort of the advocates [sic] taint

that's associated with Wilmington Trust . . . [and] other parties to the litigation. "[76]  Indeed, the

Court later asked, rhetorically, "Is there anyone who thought I wasn't going to appoint an

examiner under these circumstances?  I mean really."[77]  The fact is that once *all* major

constituents were unable to reach consensus with respect to a negotiated reorganization, the

Court determined to appoint the Examiner to get to the bottom of the LBO-Related Causes of

Action that served as the point of division among the estates' warring constituents.  Try as it

might, WTC cannot take sole, or even primary, credit for the Examiner's appointment, and WTC

has not established the requisite "causal connection between the service and the contribution."

*Worldwide Direct*, 334 B.R. at 121-22 (quotation omitted); *see, e.g., Summit Metals*, 379 B.R. at

52 (evidence must establish that, "absent [the applicant]'s efforts, a different outcome would

have been produced in [the] Case").

 Moreover, WTC had *nothing* to do with "economic" and "process" benefits that it now

touts in its Application, and certainly has not demonstrated a direct causal linkage between its

actions and those alleged benefits.

  1.  <u>WTC Produced No "Economic" Benefits</u>.

 WTC claims responsibility for "four economic benefits to the Debtors' estates that

resulted in improved recoveries for the Debtors' unsecured creditors as a result of the

appointment of the Examiner and the Investigation [c]onducted by the Examiner":

---

[75] WTC Application, Ex. J (Tr. 4/13/10 at 42:12-14).

[76] WTC Application, Ex. J (Tr. 4/13/10, at 39:4-15).

[77] *Declaration of Joshua M. Mester* ("<u>Mester Decl.</u>"), Ex. A (Tr. 8/20/10, at 28:21-23).

(1) "Improved economics for non-LBO creditors as a result of the creation of the Litigation Trust to pursue claims – which the Debtors' [sic] valued at $358 million – that were to be released under the First Plan"; (2) "Increased distributable enterprise value"; (3) "Waiver of subordination rights"; and (4) "Settlement with the Bridge Lenders."[78]

Litigation Trust. WTC seeks credit for the "renegotiated plan of reorganization that provided substantially the same amount of initial settlement value to Tribune's non-LBO unsecured creditors, **plus** substantial additional value in the form of the establishment of a litigation trust to pursue causes of action related to the LBO that were to be released under the proposed April 2010 settlement plan."[79] In this regard, WTC ignores two fundamental facts.

First, WTC was not the only party that opposed the April 2010 Plan and settlement. As noted above, holders of more than $3 billion in Senior Loan Claims opposed the settlement, primarily on the ground that it purported to settle all of the LBO-Related Causes of Action without either requiring a fair settlement contribution from all released parties or creating a litigation trust to pursue all viable claims against parties who had not "paid for" their settlement.[80] Thus, those Senior Lenders also were advocates for the Litigation Trust that ultimately was created. Second, WTC steadfastly opposed the Plan (and its Litigation Trust). For all the reasons stated above, WTC cannot now take credit for "benefits" flowing from a plan to which it vigorously objected (and continues to appeal).[81]

---

[78]  WTC Application ¶ 44.

[79]  WTC Application ¶ 45 (emphasis in original).

[80]  *See, e.g.*, [D.I. 2617, 3408, 3906, 3999, 4375, 4376, 4992].

[81]  Like Law Debenture, WTC ignores that a substantial percentage of Litigation Trust Interests were distributed to Senior Lenders. WTC thus substantially overstates the value of the Litigation Trust to "non-LBO creditors." WTC Application ¶ 45.

- 36 -

Distributable Enterprise Value.  WTC takes credit for "an increase of $1.27 billion" in distributable value between the value on which the April 2010 plan was premised and the value on which the Plan ultimately was premised.[82]  Here again, WTC suffers from "[t]he fallacy of logic – *post hoc, ergo propter hoc* – [by] reason[ing] from sequence to consequence, assuming a causal connection simply because one event follows another[, as that] is speculation not proof." *Granite Partners,* 213 B.R. at 452.  In particular, WTC cannot prove that it was the cause of the April 2010 plan not being confirmed (it was not) and cannot prove that the Examiner's Report was the cause of the increase in the Debtors' distributable enterprise value (it was not).  In fact, the Examiner's Report had nothing to do with the increase in value of the Debtors.  Instead, the increase in the Debtors' value resulted from two principal factors:  (a) the improving economy; and (b) the accumulation of cash due to passage of time, as the Debtors were relieved of their debt service obligations.

Waiver Of Subordination Rights.  WTC notes that the Plan "included the explicit agreement by the LBO lenders to waive their right to enforce contractual subordination against the PHONES improving the economics for non-LBO creditors."[83]  Although that is a true statement, neither WTC nor the Examiner had anything to do with that waiver, which was one part of a comprehensive settlement of LBO-Related Causes of Action negotiated by the Debtors, the Creditors' Committee, and the Senior Lenders and to which *WTC objected*.

Bridge Lender Settlement.  WTC similarly notes that the Plan "also included a settlement with the Bridge Lenders, increasing the settlement proceeds available for non-LBO creditors."[84]  Here again, WTC vigorously opposed that settlement.  Moreover, as explained above, a

---

[82]   WTC Application ¶ 47.

[83]   WTC Application ¶ 47.

[84]   WTC Application ¶ 47.

substantial portion of Senior Lenders opposed the April 2010 Plan on the ground that settlement consideration had not been received from the Bridge Lenders, among others.[85]  WTC cannot take any, much less sole, credit for producing the Bridge Lender Settlement.

## 2.    WTC Produced No "Process" Benefits.

WTC also alleges a benefit to the Chapter 11 Case from "process improvements" resulting from issuance of the Examiner's Report, which WTC claims to have "formed the basis for confirmation of the Debtors' confirmed plan of reorganization."[86]

There is no doubt that the Examiner's Report was useful to the Court in the context of assessing the Plan and its settlements.  However, any "process improvements" resulting from the Examiner's Report were not the result simply the result of WTC's advocacy.  They were the result of the collective efforts of the Court in appointing the Examiner, the Examiner himself and all of the Parties that participated in the Examiner's investigation.  Moreover, any benefit from WTC's actions in respect of the Examiner is more than offset by WTC's no-holds-barred objection to the Plan and prosecution of the Noteholder Plan, which resulted in nearly three weeks of confirmation hearings over the course of more than a year and caused tens of millions of dollars of administrative expenses already borne by the bankruptcy estates.

In short, WTC did not substantially contribute to the Chapter 11 Cases; it affirmatively prejudiced them.

## B.    WTC Did Not Act With An Expectation Of Reimbursement From The Estates.

Additionally, like Law Debenture, WTC has not overcome the presumption that it was acting in its own self-interest and would not have acted without an expectation of reimbursement

---

[85]   *See, e.g.*, [D.I. 2617, 3408, 3906, 3999, 4375, 4376, 4992].

[86]   WTC Application ¶¶ 49-52.

from the estate. WTC has offered *no evidence* whatsoever in support of its position and thus cannot possibly satisfy *Lebron*'s strict prohibition on substantial contribution claims where the applicant must show that it would not have acted "absent an expectation of reimbursement from the estate." *Lebron*, 27 F.3d at 944.

WTC claims (without evidence) that it acted "with the expectation of payment by the Debtors' estates." In support, WTC notes that its engagement letters specifically relieve WTC from any liability for the fees of Brown Rudnick (and Mesirow and its other consultants) and asserts that, due to the deeply subordinated nature of the PHONES Notes (which were never likely to receive any distributions from the bankruptcy estates), a substantial contribution claim was "the only remaining avenue for Wilmington Trust, and its Professionals, to be paid."[87] WTC thus suggests that it always expected to be reimbursed from the bankruptcy estates.

The facts are to the contrary. WTC's professionals knew full well that WTC had no right to expect reimbursement from Tribune and, as a consequence, those professionals negotiated alternative payment arrangements. Brown Rudnick, for example, negotiated to be paid a contingency fee of "10% of all recoveries obtained by the [WTC] or the holders on account of the PHONES, with no ceiling or maximum."[88] In other words, Brown Rudnick assumed the risk of non-payment in exchange for the potential of an unlimited fee "with no ceiling or maximum." In fact, as the prospect for payment on the PHONES Notes became dimmer during the Chapter 11 Cases, Brown Rudnick renegotiated its fee, increasing it from a fee of 10% of the first $50 million in recoveries and 5% of recoveries over $50 million, up to an aggregate fee of $15 million,[89] to the 10% with "no ceiling or maximum" fee described above.

---

[87]    WTC Application ¶¶ 14, 22, 60-62.

[88]    WTC Application, Ex. I. [WTC1F06137].

[89]    WTC Application, Ex. I. [WTC1F06094].

Mesirow, on the other hand, negotiated to be paid in full, in large part by Aurelius and in lesser part by two holders of the PHONES Notes (Camden Asset Management and Suttonbrook Capital Management, LP).[90] Similarly, the other consultants for which WTC now asserts a claim were paid in full by Camden and Suttonbrook.[91] There is no evidence that these professionals had any expectation of reimbursement from the bankruptcy estates.

WTC also argues that the "[t]he prudent man standard imposed a legal obligation on [WTC] to act, even in the absence of an anticipated recovery to the PHONES Notes under the First Plan,"[92] implying that it would be unfair not to reimburse it for its alleged fees and expenses (for which it actually has incurred no liability).  This too is false.  As the Reorganized Debtors demonstrated in their Objection to WTC's $30 million Class 1F Other Parent Claim,[93] nothing in the PHONES Notes Indenture or the prudent person standard compelled WTC to take actions beyond those for which holders of the PHONES Notes were prepared to pay.  *See Worldwide Direct*, 334 B.R. at 129 (the prudent person standard requires an indenture trustee "to act with the same care as if it owned the investment"); *American Plumbing*, 327 B.R. at 288 ("it is entirely possible for an indenture trustee to fulfill its fiduciary duty to bondholders without making a substantial contribution in a Chapter 11 case").

In fact, the PHONES Notes Indenture specifically relieves WTC from any obligation "to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or

---

[90]    WTC Application ¶¶ 19-23 and Ex. I. [WTC1F06089-90, WTC1F06100-01, WTC1F06104-05, WTC1F06109-10, WTC1F06144].

[91]    WTC Application, Ex. I.  [WTC1F06109-10, WTC1F06128-29].

[92]    WTC Application ¶ 62.

[93]    WTC Fee Obj at 22-23.

- 40 -

liability is not reasonably assured to it."[94]  In any event, the prudent person standard is not a

license for an indenture trustee to act with impunity and without responsibility for its actions.

*See, e.g.*, *Worldwide Direct*, 334 B.R. at 131 (agreeing "that WTC did not exercise the care

required under the prudent person standard because it allowed duplication [of services rendered

by the creditors' committee] resulting in a reduced recovery for the Noteholders").

Finally, WTC complains that denial of its Application "will signal to indenture trustees

that notwithstanding a duty to act as a prudent man, that allowance of a substantial contribution

claim can be foreclosed."[95]  Frankly, that is exactly the "signal" that needs to be sent to

subordinated, out-of-the-money creditors like WTC.  In fact, it would send exactly the wrong

message to the bankruptcy bar and community if an out-of-the-money indenture trustee were

able to hire counsel on a contingency fee and have that counsel spare no expense in needlessly

prolonging the bankruptcy proceedings (likely in the hope that in-the-money constituents will

buy off the subordinated position it represents), only to be reimbursed from the bankruptcy estate

for millions of dollars of hourly "fees" at the conclusion of the case.

In sum, WTC has not shown and cannot show that it acted with an expectation of

reimbursement from the bankruptcy estates, and its Application should be denied on that

independent basis.[96]

---

[94]   Mester Decl, Ex. B (PHONES Notes Indenture § 6.01(c)(4)).

[95]   WTC Application ¶ 62.

[96]   Like Law Debenture, WTC seeks a waiver of the basic fee application requirements of Local
Rule 2016-2(d).  This too demonstrates that WTC's professionals – who are sophisticated
bankruptcy practitioners – never had any expectation of reimbursement.  If they had, they
would have complied with the applicable rules from the outset.  *See* Section VI for a
discussion of WTC's request for a waiver of Local Rule 2016-2.

C.    **WTC Has No Standing To Seek Reimbursement Of Fees That It Did Not Pay And For Which It Is Not Liable.**

Even if the Court determines that WTC otherwise made a compensable substantial contribution, WTC has no standing to assert a claim in excess of $3 million because WTC only paid that amount to its professionals and is not liable for any other fees or expenses. As a consequence, WTC has not "incurred" any liability in respect of those additional fees within the meaning of section 503(b)(3)(D) of the Bankruptcy Code.

As noted above, and as explained in detail in the Reorganized Debtors' Objection to WTC's $30 million Class 1F Other Parent Claim, (a) WTC paid its professionals no more than $3 million, (b) WTC is not liable for any additional amount of professional fees, (c) WTC's financial advisor (Mesirow) was paid almost exclusively by Aurelius, and (d) WTC's lead counsel (Brown Rudnick) effectively worked on a contingency fee based upon distributions to holders of the PHONES Notes (of which there have been none).[97]

Section 503(b)(3)(D), by its terms, provides only for payment of "the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, *incurred by*" a creditor who made a substantial contribution. 11 U.S.C. § 503(b)(3)(D) (emphasis added). Section 503(b)(4) in turn provides for an attorney or accountant of such a creditor to receive reasonable compensation. 11 U.S.C. § 503(b)(4).

Reading the plain language of those provisions, appellate courts have held that "the statute contemplates that the fees covered by subsection (b)(4), like those costs covered by subsection (b)(3), will have been 'incurred by' a creditor." *Olsen v. Robinson Brog Leinwand Greene Genovese & Gluck, P.C. (In re Olsen)*, 334 B.R. 104, 107 (S.D.N.Y. 2005); *The Law Offices of Neil Vincent Wake v. Sedona Inst. (In re Sedona Inst.)*, 220 B.R. 74, 81 (B.A.P. 9th

---

[97]    *See* WTC Fee Obj. at 8-11, 16-19; *see also* WTC Application ¶¶ 19-23 and Ex. I.

- 42 -

Cir. 1998) ("If the creditor is not liable for the fees in the first place, then the purpose of the statute is not served by the estate assuming the obligation"); *see also In re Energy Partners, Ltd.*, 422 B.R. 68, 91 (Bankr. S.D. Tex. 2009) (creditor not entitled to reimbursement for a fee in excess of that which it was obligated to pay its lawyer).

It is true that two trial-level courts have reached a contrary result. *Mirant*, 354 B.R. at 140; *In re Western Asbestos Co.*, 318 B.R. 527, 530-31 (Bankr. N.D. Cal. 2004). *Mirant*, however, expressly acknowledged that is in conflict on this point with *Lebron*, in which the Third Circuit held that "§ 503(b)(4) authorizes awards of legal and accounting fees only in situations coming within the scope of § 503(b)(3)," *Lebron*, 27 F.3d at 943. *See Mirant*, 354 B.R. at 140 n.72 (noting that "[t]he Third Circuit has taken a restrictive position with respect to 11 U.S.C. § 503(b)(4)"). And *Western Asbestos* has been criticized as improperly permitting a lawyer or accountant to seek fees in its own right, untethered from any support by or application of a creditor itself. *See Olsen*, 334 B.R. at 107 ("An implication of *Western Asbestos*'s holding is that, at least under certain circumstances, an attorney is entitled to payment under section 503 *in his own right*. The Court rejects this analysis.") (emphasis added).

The appellate courts have it right. As the Ninth Circuit's Bankruptcy Appellate Panel has explained, the statutory limitation of claims to those fees for which a creditor actually is liable makes good sense:

> A primary objective of § 503(b)(3)(D) is to encourage creditor participation. . . . The policy is achieved by offering to reimburse those creditors who make substantial contributions. If the creditor is not liable for the fees in the first place, then the purpose of the statute is not served by the estate assuming the objection.

*Sedona Inst.*, 220 B.R. at 81.

Here, WTC has not actually "incurred" any liability for fees in excess of $3 million. *See United States v. St. Paul Mercury Indem. Co.*, 238 F.2d 594, 598 (8th Cir. 1956) ("Incur

- 43 -

emphasizes the idea of liability. . . .  [And i]t has been held that *a thing for which there exists no obligation to pay, either express or implied, cannot in law be claimed to constitute an expense incurred*.") (emphasis added) (quotation omitted); *Waltuch v. ContiCommodity Servs., Inc.*, 833 F. Supp. 302, 314 (S.D.N.Y. 1993) ("*[t]he word 'incurred' means 'to become liable for'*") (emphasis added), *aff'd in part, rev'd in part on other grounds*, 88 F.3d 87 (2d Cir. 1996).

Accordingly, the Court should deny categorically that portion of WTC's substantial contribution claim that exceeds $3 million.

### D.   WTC's Fees Are Unreasonable.

Furthermore, the $7.1 million in fees that WTC claims in respect of the Examiner appointment and investigation are plainly unreasonable.  To start, the supporting documentation provided by WTC is woefully inadequate.  Brown Rudnick, for example, provided time records that are replete with block billing (*i.e.*, assigning a single block of time to multiple tasks without differentiating between them) and meaninglessly-vague time entries.  To give four examples among countless others, Brown Rudnick's time records include entries such as 8.2 hours/$3,157 billed to "ORGANIZE AND ADD CITATIONS"; 8.1 hours/$4,698 billed to "REVIEW NON-EMAIL DOCUMENTATION"; 2.6 hours/$1,001 billed to "SUPPLEMENT TO FACTUAL RECORD"; and 6.0 hours/$3,750 billed to "REVIEW EXAMINER PAPERS."[98]  Such time records make it impossible for the Reorganized Debtors or the Court "to distinguish between expenses incurred in making a substantial contribution to the case and expenses lacking that causal connection."  *DP Partners*, 106 F.3d at 673.

Moreover, WTC simply "overlawyered" the case, particularly considering the deeply-subordinated, out-of-the-money nature of the PHONES Notes that it represented.  The massive

---

[98]   WTC Application, Ex. A.  [WTC1F03203, WTC1F03231, WTC1F03252, WTC1F03265].

scale of WTC's efforts is evident from Brown Rudnick's elevated staffing levels during the

relevant time period:  In April 2010, *45 billers* charged time to the "Examiner Matters" fee

category;[99] in May 2010, *76 billers* charged time to that category;[100] in June 2010, *39 billers*

charged time to that category;[101] and in July 2010, *28 billers* charged time to that category.[102]

WTC's interface with the Examiner was no more reasonable.  In May 2010 alone, Brown

Rudnick billed as much (approximately $2,500,000) as did Debtors' counsel on twenty-one

different estate matters *combined*.[103]

There simply was no legitimate reason for Brown Rudnick to charge such astronomical

fees during this time period.  Indeed, Brown Rudnick's "Examiner" fees of $4.5 million

amounted to roughly 35% of the fees for the Examiner's entire investigation, which included

preparation of the 1,200 page Examiner Report – a massive project that Brown Rudnick

obviously did not undertake.  When combined with the other Examiner-related fees for which

WTC now asserts a total claim of $7.1 million, WTC's efforts in respect of the Examiner cost

nearly 60% of the Examiner's total fees.

This was neither necessary nor reasonable, particularly given that the interests of the so-

called "non-LBO creditors" advanced by WTC were ably represented in Examiner-related

matters by the Creditors' Committee, the Senior Notes Indenture Trustees, Aurelius, and

Centerbridge.  WTC cannot now seek payment of fees charged for efforts that duplicated the

efforts of those other, highly-motivated and in-the-money constituents.

---

[99]   WTC Application, Ex. A. [WTC1F03191-92].

[100]   WTC Application, Ex. A. [WTC1F03268-70].

[101]   WTC Application, Ex. A. [WTC1F03298-99].

[102]   WTC Application, Ex. A. [WTC1F03312-13].

[103]   *Compare* WTC Application, Ex. A [WTC 1F03194] *with* Fee Application [D.I. 6088] at 20.

- 45 -

Further, Mesirow's work in the spring of 2010 was wholly duplicative of the efforts of the Creditors' Committee's and later the Examiner's own financial advisors – all of which was billed to and paid for by the bankruptcy estates.  WTC fails to explain why it needed its own financial advisor in connection with the Examiner process, or provide any evidence that the Examiner even found Mesirow to be helpful.  In fact, the Examiner Report does not mention Mesirow and, although WTC asserts that the Examiner adopted nineteen of its positions, Mesirow only opined on three of them.[104]  More broadly, WTC never explains why the bankruptcy estates should pay Mesirow's fees when the entire purpose of the Examiner was to conduct an independent investigation funded by the bankruptcy estates.[105]  And WTC does not attempt to justify the reasonableness of Mesirow's $2,631,453 in fees and expenses between May and August 2010 (after which WTC's time records for Mesirow cease) – an amount more than 26 times greater than the $100,000 fee limit set forth in Mesirow's initial February 2010 retention letter.[106]

Finally, WTC asserts a claim for an internal $100,000 "Extraordinary Fee related to investigation and motion for the appointment of Examiner."[107]  WTC has provided *no documentation* relating to this charge, which is unreasonable by definition in the context of

---

[104]  WTC Application, Ex. O [WTC1F06037-38].  This chart of WTC positions allegedly adopted by the Examiner is incomplete and misleading.  Among other things, WTC takes credit for positions advanced by other parties and positions not disputed by any parties, and WTC omits the myriad of case-dispositive positions that it advanced and the Examiner rejected.

[105]  *See* 2011 Confirmation Opinion at 36-37 (noting that the Examiner's "thorough and independent investigation of the LBO-Related Causes of Action . . . was available to all of the parties").

[106]  WTC Application, Ex. I [WTC1F06177].

[107]  WTC Application ¶ 60 and Ex. S.  [WTC1F0001].

services rendered by an indenture trustee for a subordinated, out-of-the-money position in a chapter 11 case.

As a consequence, even if the Court determines that WTC otherwise made a compensable substantial contribution to the Chapter 11 Cases, its requested fees should be reduced substantially.

### E.    WTC Is Not Entitled To Fees For Litigating Its Claim.

In addition to its claim for $7.1 million in fees, WTC requests that the Court also award it "additional amounts expended to litigate allowance of this claim."[108]  There is no basis for that request.

*Granite Partners* is directly on point.  There, Judge Bernstein rejected a creditor's request for "fees for preparing and prosecuting its fee application."  *Granite Partners*, 213 B.R. at 454. Distinguishing cases permitting recovery of fees incurred by *estate professionals* in litigating objections to fee applications under section 330 of the Bankruptcy Code, Judge Bernstein held:

> This reasoning does not extend to substantial contribution applications. The creditor's attorney does not have to keep meticulous records or apply to the court for any compensation in order to get paid.  He looks, instead, to his client. *If the creditor wants to shift the fee burden to the estate through a substantial contribution application, the creditor benefits but the estate does not.*  This is particularly true where, as here, the applicant spills so much ink preparing an application with so little merit. Accordingly, the time spent by the Berlack Firm preparing their fee application did not confer a substantial benefit in the case, and must be borne by its clients.

*Granite Partners*, 213 B.R. at 455 (emphasis added); *accord In re U.S. Lines, Inc.*, 103 B.R. 427, 432 (Bankr. S.D.N.Y. 1989) ("the 'substantial contribution' test does not permit such an award").[109]

---

[108]   WTC Application ¶ 15.

Consequently, WTC's request for payment of its fees incurred in connection with the WTC Application should be denied in any event.

## V. THE TRUSTEES ARE NOT ENTITLED TO A CLAIM FOR FINANCIAL ADVISOR OR CONSULTANT FEES

The Trustees request more than $3.125 million in fees charged by their financial advisors and non-lawyer consultants – more than $625,000 for Law Debenture's financial advisors (The Michel-Shaked Group) and nearly $2.5 million for WTC's financial advisors (Mesirow Financial Consultants) and other consultants (Morton Research, Cypress Associates, and Hoffman Schutz Media). Even if, notwithstanding the foregoing, the Court otherwise determines that the Trustees made a compensable substantial contribution in the Chapter 11 Cases, the Trustees are not entitled to reimbursement of those fees.

Specifically, section 503(b)(4), the operative statutory provision, provides only for the allowance of a claim for the "reasonable compensation for professional services rendered by *an attorney or an accountant*" of an entity that has made a substantial contribution in case. 11 U.S.C. § 503(b)(4) (emphasis added). The Trustees' non-lawyer advisors are not "an attorney or an accountant." As a result, the fees of those advisors are not allowable under section 503(b)(4).

This Court has reached precisely this same conclusion on at least three occasions. In *Syntax-Brillian*, Judge Shannon held that a shareholder who made a substantial compensation could not be compensated for his time because "the Movant is neither an attorney nor an accountant, and the Code therefore does not permit the Court tp [sic] award the Movant any compensation for professional services rendered under section 503(b)(4)." *Syntax-Brillian*, 2009

---

[109] As noted in *Granite Partners*, the several older cases permitting recovery of such fees failed to apprehend the critical distinction between estate professionals and substantial contribution applicants. *See In re 9085 E. Mineral Office Bldg.*, 119 B.R. 246, 255 (Bankr. D. Colo. 1990); *In re Hers Cosmetics Corp.*, 114 B.R. 240, 243-44 (Bankr. C.D. Cal. 1990); *Catalina Spa*, 97 B.R. at 20-21.

- 48 -

WL 1606474, at *4.  In *Summit Metals*, this Court (Carey, J.) held that a substantial contribution

applicant was not entitled to an award of fees because he "was neither an accountant nor a

lawyer," rather he provided "the services of a management consulting firm."  *Summit Metals*,

379 B.R. at 50.  And, in *Columbia Gas*, Judge Balick observed that there could be no award "for

professionals other than 'an attorney or an accountant.'"  *Columbia Gas*, 224 B.R. at 550 n.3.

Other courts have reached the same conclusion.  The *Mirant* case is particularly

instructive.  There, the court denied an application made by a creditor represented by Law

Debenture's counsel here (David Rosner) for reimbursement of the fees of Israel Shaked, the

very same financial advisor retained by Law Debenture here, holding:

> Congress chose the words "an attorney or any accountant" in section
> 503(b)(4).  Where Congress intended to reach other sorts of professionals,
> it said so.  *Compare* Code § 327(a) (referring to "attorneys, accountants,
> appraisers, auctioneers, or other professional persons") to . . . Code
> § 327(e) (the "trustee . . . may employ . . . an attorney").  *See*, similarly,
> Code §§ 1103(a) and 1107(b).  Limiting a party that is in essence a
> volunteer to reimbursement of attorney and accounting fees is not an
> absurd result.

*Mirant*, 354 B.R. at 139; *see, e.g., Granite Partners*, 213 B.R. at 454 ("[S]ection 503(b)(4)

applies only to attorneys and accountants.  Financial advisors . . . cannot be compensated on a

substantial contribution basis."); *In re Keene Corp.*, 208 B.R. 112, 116 n.8 (Bankr. S.D.N.Y.

1997) ("Under Section 503(b)(4), it would appear that an entity making a substantial contribution

in a case could not recover for its financial advisor fees since this section limits recovery for

professional services to attorneys and accountants."); *Baldwin-United*, 79 B.R. at 341 ("the

language of § 503(b)(4) (unlike § 330(a)(1)), limits compensation to attorneys and accountants

only, rather than any professional").[110]

---

[110]  Although obviously aware of it, neither of the Trustees cite any of this contrary authority.
WTC fails to address the issue at all.  Law Debenture cites only two unpublished decisions in
a footnote.  Law Debenture Application ¶ 54 n.82.  Those unpublished decisions are neither

Accordingly, the Trustees' request for $3.125 million in fees charged by their financial advisors and non-lawyer consultants should be denied in any event.

## VI.   A WAIVER OF LOCAL RULE 2016-2 IN NOT APPROPRIATE

Both Trustees request that the Court waive compliance with Local Rule 2016-2,[111] which sets forth requirements for the content and presentation of fee applications. Local Rule 2016-2 specifically applies to "[a]ny request of an entity for payment of an administrative expense under 11 U.S.C. § 503(b) (3) or 503(b) (4)," Del. Bankr. L. R. 2016-2(a)(ii), and therefore governs the Applications.

The Trustees frankly acknowledge that their Applications fail to comply with the Rule.[112] Indeed, as noted above, the Trustees' time records are woefully inadequate, with thousands of "lumped" and inadequately-descriptive time entries in clear violation of Local Rules 2016-2(d)(v), (vi), (vii), and (ix). The Trustees also violated Local Rule 2016-2(d)(viii) by lumping non-working "travel time" and billing that time at 100%. WTC further (a) violated Local Rules 2016-2(e)(i) and (ii) by omitting any categorization and itemization of Brown Rudnick's

---

controlling nor persuasive. In *ITC Deltacom*, for example, the court held that Congress "merely used imprecise language in describing § 503." *Stapleton v. Unofficial Comm. of Noteholders (In re ITC Deltacom, Inc.)*, Case No. 03-111 (GMS), 2006 WL 839395 (D. Del. March 29, 2006). Respectfully, there is nothing "imprecise" about section 503(b)(4) – it permits compensation for attorneys and accountants, and nothing more. *TWA* is further afield. In that case, the question of whether a financial advisor's fees fall within the scope of section 503(b)(4) was not at issue – no one argued the point, and the court did not analyze it. *United States v. Air Line Pilots Ass'n, Int'l. (In re Trans World Airlines, Inc.)*, Case No. 92-678-SLR, 1993 WL 559245, at *8 (D. Del. June 22, 1993).

[111]  Law Debenture Application ¶ 93; WTC Application ¶¶ 72-73.

[112]  Law Debenture Application ¶ 93 ("Law Debenture and its Advisors do not keep time records differentiated by activity on a daily basis in the ordinary course of their businesses. Thus, the time records may be lumped and may be viewed as non-compliant with Local Rule 2016-2(d)(vii)."); WTC Application ¶ 72 ("in certain circumstances Brown Rudnick's time detail contains lumped descriptions and may not otherwise strictly comply with the Local Rules").

expenses; (b) violated Local Rule 2016-2(c)(i) and (ii) by omitting the information required by Local Form 102; and (c) violated Local Rule 2016-2(g) by omitting the required certification.

The Trustees attempt to excuse their noncompliance with the Rule by claiming that their counsel and professionals generally do not maintain non-lumped time records.[113]  This serves only to prove that the Trustees had no expectation that the bankruptcy estates would reimburse them for their fees.  Otherwise, the Trustees and their sophisticated counsel (who know well how to prepare compliant fee applications) would have been sure to keep proper time records and adhere to proper billing practices.  *See Energy Partners*, 422 B.R. at 89 ("It may well be that when F&J personnel were recording their entries, none of them believed that [their client] would eventually be seeking reimbursement under § 503 and that therefore they did not need to worry about lumping their time entries.").

Further, the Trustees cannot credibly profess to be surprised by Local Rule 2016-2.  It is hornbook law that "the same documentation and substantiation requirements apply to substantial contribution claims as apply to requests for compensation under section 330." *Granite Partners*, 213 B.R. at 447; *accord, e.g.*, *Worldwide Direct*, 334 B.R. at 120 ("a request for an administrative claim under section 503(b) requires the same level of documentation and substantiation as a request for compensation under section 330"); *Baldwin-United*, 79 B.R. at 336 ("The requirements for documenting how time was spent are no less applicable to fee applications and time sheets being judged under § 503(b) than they are for applications under § 330.").

In fact, the purpose of Local Rule 2016-2 – enabling the Court to ascertain the nature of the fees for which an applicant seeks allowance – applies with special force in the context of

---

[113]   Law Debenture Application ¶ 93; WTC Application ¶ 72.

46429/0001-9397562V1

substantial contribution applications, which "require[] the judge to distinguish between expenses incurred in making a substantial contribution to the case and expenses lacking that causal connection." *DP Partners*, 106 F.3d at 673; *accord S & Y*, 480 B.R. at 467 (substantial contribution limited "to those expenses directly associated with the benefit to the debtor's estate"). Without specific, detailed time records, it is impossible to make those critical distinctions.

WTC complains that it would be burdensome to "review over 8,800 hours of timekeeper entries and restate any such entries not strictly compliant with Local Rule 2016-2."[114] This attempt to shift that burden to the Court is plainly in appropriate, as Judge Bernstein observed in *Granite Partners*:

> It would require a herculean task on my part to segregate the compensable from non-compensable services, assuming that I could even do so based simply upon the descriptions in the time records. I should not be obliged to pick apart the fee application to explain which services are not compensable; the [applicant] is required to prove, by a preponderance of the evidence, which services are.

*Granite Partners*, 213 B.R. at 452; *accord Worldwide Direct*, 334 B.R. at 120.

The Trustees' failure to comply with Local Rule 2016-2 materially burdens the Court and the Reorganized Debtors and provides an independent basis for denial of the Applications.

## CONCLUSION

The Trustees are disappointed litigants who fought long and hard against the ultimately-successful reorganization that occurred in these cases. They complain about inadequate representation on the Creditors' Committee and the need to have their parochial interests heard during the cases. Such complaints are nothing new. As the *Envirodyne* court held long ago, creditors in the position of the Trustees (who advocate a position contrary to that of an official

---

[114] WTC Application ¶ 72.

46429/0001-9397562V1

committee that supports a debtor's plan) are free to advocate their point of view vigorously

during a case, but they are not entitled to be compensated for the efforts when they ultimately

fail:

> The question before the court is whether a bankruptcy case becomes
> unique when a class of interests, represented by an official committee, is
> on the short end of the stick when such committee votes on a debtor's
> plan. Alternatively, is representation on an official committee sufficient to
> protect the interests of a class, despite the fact that the committee has
> voted in a manner that allegedly goes against the interest of that class.
> More succinctly, should a debtor's estate be required to pay, in addition to
> an official committee's fees, the fees and expenses of each class that loses
> at the committee level and proceeds to hire its own counsel to oppose the
> plan. . . . It is the opinion of this court that, absent a showing of
> substantial contribution to the debtor's estate, a group of creditors or an
> unofficial committee, regardless of its origins, united to oppose a debtor's
> plan, are not entitled to have their fees paid by the Debtor.

*Envirodyne*, 176 B.R. at 822.

That wise guidance applies with full force in this case. For all of the foregoing reasons,

the Reorganized Debtors request that the Court deny the Trustees' Applications in full.

Dated:  March 28, 2013

SIDLEY AUSTIN LLP
James F. Conlan
One South Dearborn Street
Chicago, IL  60603
Telephone:  (312) 853-7000

James F. Bendernagel, Jr.
Ronald S. Flagg
1501 K Street NW
Washington, DC  20005
Telephone:  (202) 736-8000

-and-

- 53 -

JONES DAY
Bruce Bennett
James O. Johnston
Joshua M. Mester
555 South Flower Street, 50th Floor
Los Angeles, CA  90071-2300
Telephone:  (213) 489-3939

-and-

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.

By: _____
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, DE  19801
Telephone:  (302) 652-3131

ATTORNEYS FOR REORGANIZED DEBTORS

46429/0001-9397562V1