# EXHIBIT A

```
              IN THE UNITED STATES BANKRUPTCY COURT
                 FOR THE DISTRICT OF DELAWARE


IN RE:                         .    Chapter 11
                               .
TRIBUNE COMPANY,               .    Case No. 08-13141(KJC)
et al.,                        .    (Jointly Administered)
                               .    Aug. 20, 2010(10:06 a.m.)
              Debtors.         .    (Wilmington)
```

                   TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE KEVIN J. CAREY
             UNITED STATES BANKRUPTCY COURT JUDGE

<u>Appearances</u>:

| | |
|---|---|
| For the Debtors: | Bryan Krakauer, Esq. |
| | James F. Conlan, Esq. |
| | James Bendernagel, Esq. |
| | Kevin Lantry, Esq. |
| | Sidley Austin LLP |
| | Norman Pernick, Esq. |
| | Cole, Schotz |
| | |
| For the Examiner: | Kenneth N. Klee, Esq. |
| | Robert Pfister, Esq. |
| | Klee, Tuchin, Bogdanoff & Stern |
| | Mark Minuti, Esq. |
| | Nicholas Nastasi, Esq. |
| | Saul Ewing LLP |
| | |
| For Wilmington Trust: | Robert Stark, Esq. |
| | Martin Siegel, Esq. |
| | Brown, Rudnick LLP |
| | |
| For the Committee: | David LeMay, Esq. |
| | Howard Seife, Esq. |
| | Chadbourne & Park, LLP |
| | Adam G. Landis, Esq. |
| | Landis, Rath & Cobb |
| | James Sottile, Esq. |
| | Zuckerman, Spaeder |
| | |
| For the U.S. Trustee: | David Klauder, Esq. |
| | U.S. Trustee's Office |
| | |
| For Wells Fargo: | Eric Sutty, Esq. |
| | Fox Rothschild |
| | Thomas Lauria, Esq. |
| | Andrew Hammond, Esq. |
| | White & Case |

FORM FED &reg; PENGAD • 1-800-631-6989 • www.pengad.com

2

For Merrill Lynch:          Laurie Selber Silverstein, Esq.
                            Potter, Anderson & Corroon, LLP

For Aurelius:               William Weintraub, Esq.
                            Edward Friedman, Esq.
                            Friedman, Kaplan
                            Amanda M. Winfree, Esq.
                            Ashby & Geddes

For Morgan Stanley:         David Powlen, Esq.
                            Barnes & Thornburg

For JPMorgan:               Benjamin Kaminiski, Esq.
                            Don Bernstein, Esq.
                            Davis Polk & Wardwell LLP

For Centerbridge:           Daniel Golden, Esq.
                            Akin, Gump, Strauss, Howard & Feld

For Deutsche Bank:          David Adler, Esq.
                            McCarter & English

Audio Operator:      Al Lugano
Transcriber:         Elaine M. Ryan
                     (302) 683-0221

      Proceedings recorded by electronic sound recording;
        transcript produced by transcription service.

1          THE CLERK: All rise.  Be seated, please.

2          THE COURT: Good morning.

3          MR. PERNICK: Good morning, Your Honor.

4          THE COURT: What's going on?

5          MR. PERNICK: Your Honor, Mr. Conlan actually was

6   going to give the Court a status report on confirmation and

7   where we are.  I don't know if you want me to run through the

8   rest of the agenda first or not.  Okay, I'll just turn to

9   that, thank you.

10          THE COURT: Mr. Landis.

11          MR. LANDIS: Your Honor, if I may, before Mr. Conlan

12  goes ahead.  Adam Landis from Landis, Rath & Cobb on behalf

13  of the Creditors Committee.  I apologize first for some

14  parties not being in court.  There have been discussions that

15  have been ongoing right up until the hearing was supposed to

16  start.  We had requested that the debtors consent to a little

17  bit of additional time and request that the Court indulge us

18  a little bit.

19          THE COURT: How much time?

20          MR. LANDIS: Well, we were looking for, hopefully,

21  to start at 11 o'clock, but based on discussions with the

22  debtors, parties are rushing over, so I would ask that at

23  least until senior lenders counsel and Committee counsel

24  shows up the Court hold off from hearing the status report

25  from Mr. Conlan.

4

1          MR. KAMINISKI: I just wanted a second.  This is

2   Benjamin Kaminiski of Davis Polk for JPMorgan as agent.  We

3   were having settlement discussions out at Richards, Layton

4   and we asked the debtors specifically can we continue talking

5   and delay the hearing, and to our great surprise, they said,

6   Absolutely not, you know, run over.  So unfortunately our

7   people aren't here yet because they were, you know, kind of

8   just pulled them out of a conference room, but, again, I

9   think it's not productive at this moment to go forward.

10          THE COURT: Alright.  Mr. Conlan?

11          MR. CONLAN: We didn't have to run over because we

12   weren't in the settlement discussions.

13          THE COURT: What's with all this intransigence from

14   the debtor?  What's going on here?   What's going on with all

15   this intransigence by the debtor?

16          MR. CONLAN: Your Honor, it's, as you might expect

17   from our point of view, not intransigence by us.  We didn't

18   have to run over because we weren't part of those

19   discussions.  We're ready to go.

20          THE COURT: Well, let's do this, let's handle the

21   Millen matter and the Examiner motion, and then I would be

22   willing to take a break for a bit to let other parties gather

23   and collect themselves before we proceeded with confirmation

24   status.  How's that?

25          MR. CONLAN: Very well, Your Honor.

1          THE COURT: Alright.

2          MR. LANTRY: Your Honor, Kevin Lantry on behalf of

3     the debtors for the Millen matter. I don't know if Mr.

4     Millen is in the courtroom or on CourtCall.

5          THE COURT: Well, let's do this, as far as I know,

6     he's not on the telephone sign-up sheet, but I will ask for

7     the record, Is Kevin Millen on the phone or in the courtroom

8     or is anyone on the phone or in the courtroom on his behalf?

9     I hear no response. Just by way of background, Mr. Millen

10    has been communicating regularly with various units of the

11    Court. I'll comment, in many cases improperly, but as the

12    items in the binders show, there was something which I

13    thought could legitimately be interpreted as a request for

14    relief. So, I asked that it be scheduled for hearing. The

15    debtor has responded indicating, We can't tell what relief

16    Mr. Millen is seeking. What I gather from the debtor's

17    response, however, is that among other things, his request

18    might be interpreted as a request for reconsideration of the

19    Court's June 14th order sustaining the objection with respect

20    to four of his claims, which I understand basically arise as

21    described in his filings from a defamation claim resulting

22    from an article which appeared in November of 1998 in the

23    Hartford Courant. The request could also be viewed as a

24    request for payment of administrative expense. The request

25    cites Rule 3018, but as the debtor points out in its

1   response, none of the relief requested appears to be related

2   to that rule.  So, that's my capsulation of what the papers

3   reflect as I read them, but at this point I'll give the

4   debtor the opportunity to say whatever it wishes to say in

5   opposition to the request.

6          MR. CONLAN: Your Honor, I think you summarized it

7   very well.  We think his only involvement with the debtor's

8   estate arises from this article 10 years ago, actually 12, in

9   1988, the disallowance of his proofs of claim relating to

10  that alleged slander on various substantive grounds.  It

11  could be that he's asking for some sort of confirmation type

12  objection.  It could be, as you say, some sort of

13  administrative expense but nothing in what he has asserted

14  either in his proof of claim or in his pleadings seem to us

15  to generate something that is easy for you to grant relief

16  to.  So, we would concur, Your Honor, that at this stage, I'm

17  not sure what you would rule aside from it's hard to grant

18  the relief requested.

19         THE COURT: Well, as with all *pro se* litigants, I

20  give them some latitude with respect to the design and

21  substance of their pleadings, but, particularly in his

22  failure to appear or join the telephone call and be heard in

23  support of his request for relief, I can't divine any

24  legitimate basis for any relief that's reflected in the

25  papers and certainly if I were to consider it a motion for

1  reconsideration of the June order, I find no basis for

2  reconsidering it in his submissions.  I don't see any basis

3  for an administrative expense claim and to the extent he has

4  rights in connection with objections to confirmation of the

5  plan, those would be preserved.  So, for these reasons,

6  whatever the relief is that Mr. Millen is requesting, at

7  least with respect to this filing, will be denied, and I'll

8  ask the debtor to prepare a form of order and submit it.

9            MR. CONLAN: Thank you, Your Honor.  And, for the

10 record, he did reach out by phone to local counsel on

11 Tuesday.  We responded and did speak with him about the

12 process to get on CourtCall and that's the last we've spoken

13 or heard from him.

14            THE COURT: Alright, thank you.

15            MR. CONLAN: Thank you, Your Honor.

16            THE COURT: Alright.  Let's take up the Examiner's

17 motion.

18            MR. MINUTI: Good morning, Your Honor.  Your Honor,

19 Mark Minuti from Saul Ewing.  I'm here today for Ken Klee the

20 court-appointed Examiner in these cases.  As Your Honor can

21 see, Mr. Klee is in the courtroom today.  This is the time

22 set for our motion seeking a discharge as well as certain

23 related relief which we think is customary and ordinary in

24 cases involving examiners.  This motion was filed on July

25 23rd, Your Honor.  It was originally scheduled for a hearing

1   on August 9th.  I think we've continued it a couple of times

2   and we ultimately scheduled it for a hearing today.  I think

3   it's important to note, Your Honor, that nobody had objected

4   to hearing the relief requested today.  The original

5   objection deadline for the motion was August 2nd.  We granted

6   an extension for the debtor to respond and the debtor is the

7   only objector to the motion today.  And by way of background,

8   as Your Honor is well aware, Your Honor entered an order

9   appointing the Examiner.  You asked the Examiner to do an

10  investigation and issue a report.  The report deadline was

11  July 12, Your Honor.  It was subsequently extended to July

12  26th.  The Examiner filed his report on July 26.  As the Court

13  well knows, it is a fairly lengthy document, it is very

14  complex.  It contains all of the Examiner's conclusions, a

15  complete description of the investigation.  Your Honor will

16  recall that due to confidentiality issues on the 26th, we

17  actually filed a redacted report, but the Examiner then moved

18  and fought to really unseal the entire report.  On July 29,

19  Your Honor entered an order that allowed us to give the

20  unredacted report to all the parties including the debtor,

21  and so by July 29, the debtor had the full report, all of the

22  exhibits, the transcripts, and so on and so forth.  The

23  Examiner continued to fight to have the report open to the

24  public, and Your Honor ultimately entered an order on August

25  3 that allowed us to publicly file the report and post the

1    exhibits.  That day, Your Honor, the report was made

2    available to the public at large, and I think it took a day

3    but by the next day all of the exhibits were posted on Epiq's

4    website.  So, certainly by August 4, Your Honor, the report

5    was out there, the exhibits were out there, the transcripts

6    were out there, as well as some models, Your Honor, that the

7    Examiner's financial advisors have performed.  Those were out

8    there as well.  So, now while the Examiner was fighting to

9    make its report public, Your Honor, the parties in the case

10   were debating before Your Honor whether it made sense to

11   stick with the current plan deadlines, and I think an

12   important point to understand the debtor's position today is

13   that on August 3rd the debtor stood before Your Honor and

14   argued that a plan voting deadline of August 17th was enough

15   time for creditors, not just the parties, but creditors to

16   read, digest, understand the Examiner's report and to vote on

17   the plan by August 17.  Now, absent further order from the

18   Court, the Examiner has complied with the Court's orders.

19   We've completed the investigation, Your Honor.  We filed the

20   report.  As Your Honor knows it's extensive, it's complex.  I

21   mean, every piece of information that was relevant to the

22   investigation is in that report, and I think unprecedented,

23   Your Honor, we've also made all of the exhibits available and

24   even been available to all the parties since July 29.

25   They've been available to the public at large since the 3rd.

FORM FED  ⊕  PENGAD·1-800-631-6989·www.pengad.com

1   So all of those documents, Your Honor, for a long time now

2   have been available, they're one mouse-click away.  No one

3   has suggested that the Examiner hasn't completed what is

4   required of him in the Examiner's order.  Nobody has

5   suggested he didn't do his job, and nobody has suggested he

6   hasn't done his job well.  Under those facts, Your Honor,

7   it's time for the Examiner to be discharged.  Now, by this

8   motion, Your Honor, we seek the following relief, all of

9   which we think is ordinary and customary in the context of

10  examiner motions.  Number one, we seek a discharge.  We're

11  asking for an injunction and relief from third-party

12  discovery.  We're asking for exculpation of the Examiner and

13  his professionals.  We'd ask for a schedule and a procedure

14  to be put in place for final fee applications related to the

15  examination and the report, and we've also asked Your Honor

16  to provide for approval of funding of any fees and costs the

17  Examiner's professionals may incur in the future should there

18  be, you know, should somebody contact the Examiner and want

19  some information relative to the report and the

20  investigation.  The point is, Your Honor, nothing we've asked

21  for is unusual or extraordinary in the context of examiners

22  in other cases.  We've attached all the orders to our motion,

23  Your Honor, and as you look at those orders, all of the

24  relief we're asking for here are in those orders and have

25  been granted by those other courts.  As I said, the sole

1  objector here, Your Honor, is the debtor and the debtor

2  really doesn't raise any substantive objection with any of

3  the relief we've requested.  What they said basically is,

4  it's premature, we need more time to review and digest the

5  report, and number two, Your Honor, they've raised what I'll

6  call some procedural issues relative to the record and the

7  Examiner, and we tried to address those procedural issues,

8  Your Honor, by marking up the order.  I've handed out a clean

9  and blackline of the order to everybody in the courtroom.  To

10  the extent anybody didn't get them, I have them sitting on

11  the railing behind me, and if Your Honor will permit me, I'd

12  like to approach and hand Your Honor up a clean and blackline

13  of the proposed order as proposed by the Examiner?

14          THE COURT:  If you would.  Thank you.

15          MR. MINUTI:  Your Honor, turning to the debtor's

16  arguments, the first argument here, Your Honor, is that the

17  debtor simply says they need more time to review and digest

18  the report before Your Honor grants any relief, and frankly,

19  Your Honor, this argument simply has no credibility with the

20  Examiner.  It's important to point out, Your Honor, that in

21  this case, the Examiner was asked to investigate causes of

22  action really that had been in this case since the beginning.

23  So, it's not like on July 29, when everybody got access to

24  the full report, these were brand-new issues, these issues,

25  Your Honor, of the causes of action and the defenses have

1   been in this bankruptcy case from day one.  They were

2   investigated before the Examiner was appointed.  They were

3   proposed to be settled pursuant to the plan.  My point, Your

4   Honor, is that these are not new issues.  The parties have

5   been dealing with these issues for a long time.  Now,

6   clearly, the Examiner's report was a key document in these

7   cases.  When it comes to the debtor, Your Honor, we're

8   talking about an international law firm, hundreds and

9   hundreds of lawyers.  This is a key issue in this case.

10  There is no doubt in my mind, Your Honor, that a team of

11  lawyers at the debtor's counsel's office have gone through

12  this report with a fine-tooth comb.  They know it.  They

13  understand it.  There's no further time needed to digest it,

14  and perhaps the best evidence of that, Your Honor, is what

15  Your Honor has seen over the last couple of weeks.  Clearly

16  the parties are engaged in substantive discussions regarding

17  the plan.  How could that possibly happen if the debtor

18  doesn't understand the report or haven't digested the report,

19  Your Honor?

20          THE COURT: I don't know how much I've seen.  I

21  think the window's a little opaque, but that may not be a bad

22  thing.

23          MR. MINUTI: Well, I - Look, you've a lot of people

24  that have different views here, but how can you even sit down

25  at the table without having reviewing and digested and

1  understanding the Examiner's report, I just buy it, Your

2  Honor.

3          THE COURT: Well, it's obviously been a driving

4  force in what has developed recently.

5          MR. MINUTI: Your Honor, we hope that is the case,

6  and we welcome that, Your Honor.  We think that would be a

7  meaningful point or purpose of the report, and we would think

8  that's why Your Honor wanted us to prepare it.  Now, the

9  debtor's position, Your Honor, lacks further credibility when

10  you consider the fact that they stood before you on August 3rd

11  and argued the creditors could review the report, digest the

12  report, and be in a position to vote on the plan on August

13  17.  So, we think the debtor has had more than enough time,

14  Your Honor, to review and digest this report.  Again, it's

15  simply not credible that more time would be necessary.

16          THE COURT: Well, others may be more able than me

17  and this I cheerfully concede, but I've been making my way

18  through in small doses, and I confess I'm not yet finished.

19          MR. MINUTI: Well, I think the difference may be,

20  Your Honor, is, the debtors are keenly – Your Honor's dealing

21  with a number of cases.  The debtors are dealing with this

22  one case.

23          THE COURT: I'm a little bit understaffed compared

24  to the debtors, so I'll concede that.

25          MR. MINUTI: Your Honor gets my point.  Your Honor,

1  the next point that the debtor raised in their opposition is

2  that, Don't enter this relief today, it may be premature

3  because we may need to take discovery of the Examiner to

4  probe the findings in the report.  Well, Your Honor, I can

5  think of no greater argument to support my motion than that

6  position the debtor takes.  It is crystal clear from the case

7  law and all of the orders that we cited to Your Honor that

8  the Examiner is a quasi-judicial officer.  The Examiner

9  should be free from discovery except in very limited

10  circumstances which have been carved out in other cases and

11  we've carved out here.  The fact that the debtor is

12  suggesting that Your Honor shouldn't grant the Examiner

13  relief so somebody can take discovery of him is exactly the

14  reason why we want it, Your Honor.

15          THE COURT: Well, and you've provided in the

16  proposed form of order for parties to avail themselves of

17  such relief if they wish to have it.

18          MR. MINUTI: Exactly, Your Honor.

19          THE COURT: Okay.

20          MR. MINUTI: Your Honor, the next issue that the

21  debtor raised were some unspecified concerns regarding the

22  possible destruction of the record by the Examiner and his

23  professionals.  As we pointed out in our reply, all of the

24  professionals have document retention policies, including the

25  Examiner, that were approved as part of Your Honor's approval

1  of the retention applications, but to make it crystal clear,

2  Your Honor, and you'll see it when you look at the blackline,

3  we've added a provision to the order that provides as

4  follows: We're going to keep everything we have for two

5  years.  At the end of two years, we're free to discard it or

6  destroy it if we like except that anybody, Your Honor, can

7  come before Your Honor before that two-year period and get an

8  order extending that deadline.  We think that's a fair

9  compromise, Your Honor.  It causes the record to be

10  preserved, and the parties certainly are going to be in the

11  best position to know whether the record should be destroyed

12  or not.  Let's put the burden on them and not the Examiner to

13  come forward and extend that two-year deadline, if that's

14  necessary, Your Honor.

15        THE COURT: You previously suggested that the

16  investigative record as it's termed in the papers be turned

17  over to Epiq but that would involve, as I understand the

18  submission, some expense to the estate.  I take it that the

19  Examiner's agreement to retain these records would not

20  involve additional expense to the estate?

21        MR. MINUTI: Well, let me respond to your question

22  because I want to be precise here, Your Honor.  We define the

23  investigative record as anything we used in the report –

24        THE COURT: Uh-huh.

25        MR. MINUTI:  – okay, that has been turned over to

1    Epiq.  So, anything we cite in the report, all of the

2    transcripts, the financial models we're talking about, that's

3    been turned over, it's at Epiq, anybody can get that, it's a

4    mouse-click away.

5            THE COURT: Well, in the motion, you had asked that

6    the Court authorize Epiq to make it available to others, but

7    there wasn't any operative provision in the proposed form of

8    order that provided that.

9            MR. MINUTI: Your Honor, if Your Honor will recall,

10   the order that Your Honor entered on August 3rd, which allowed

11   us to make it public, permitted us to provide that to Epiq.

12   So that all occurred on the 3rd and the 4th.

13           THE COURT: Alright.

14           MR. MINUTI: I think what the debtor is really

15   concerned about, Your Honor, is not those documents but it's

16   other documents the Examiner and professionals obtained

17   during the course of their investigation that for whatever

18   reason didn't make its way into the report because obviously

19   the report and the exhibits are not the total of what we

20   received.  So, I think that's what we're talking about.  It

21   would also be, Your Honor, anything privileged that the

22   Examiner has, communications, internal lead memos, all of

23   those sorts of things.

24           THE COURT: But all of those things you propose to

25   retain for the two-year period.

1       MR. MINUTI: Correct, correct, Your Honor.  We
2    propose to retain.  So that really brings us to the next
3    issue, Your Honor, and this is one that the debtor didn't
4    even raise in their opposition, and what the debtors have
5    proposed is, they would like us to turn over all of the other
6    stuff, not anything confidential subject to privilege or work
7    product, they would like us to turn over everything else to a
8    document depository for access so any other party in the case
9    can grant access to that.  And, Your Honor, we think that's
10   wholly inappropriate, and let me tell you why we think that's
11   the case - really, primarily two reasons, Your Honor.  Number
12   one, Your Honor, when Your Honor entered the work plan orders
13   in these cases, the rules under the work plan and how the
14   Examiner would do his investigation were very clear.  What it
15   said was, if somebody gives us a document or gives us a piece
16   of information and we use it, any claim of privilege or work
17   product is gone.  However, if we don't use it, those claims
18   are preserved.  So in order for us to do what the debtor is
19   suggesting, we would have to go through all of that material
20   to determine whether anything is subject to these claims of
21   privilege or work product.  We're then going to have to
22   negotiate with the parties that may make those claims, try to
23   resolve it, if we can't, come back before Your Honor.  That
24   is going to be a very long, very difficult, and very costly
25   proposition to the estate if the Examiner and his

1   professionals are required to do that.  Point number two,

2   Your Honor, as we talked about before with the discovery

3   issue, there is a carve out.  If somebody comes forward with

4   a motion and there's a document that we have they couldn't

5   get somewhere else, there's a carve out for that.  They can

6   ask Your Honor to require us to turn it over.  We can have a

7   hearing, we can deal with that, Your Honor.  So, that's point

8   number two.  Point number three, Your Honor, this is not an

9   easy proposition to simply go through these documents, try to

10  figure out what they are, and give them to a third party.

11  This will take a lot of time, Your Honor, in order to put

12  this together, and it will be very costly to the estate,

13  forget about the privilege issue, just amassing everything.

14  There's simply no need for us to do that.  The final point,

15  Your Honor, I think this is the strongest one, when we look

16  at the case law, the case law is crystal clear, the Examiner

17  is not supposed to be a substitute or the discovery person

18  for all the parties in the case.  The Examiner is an agent of

19  the Court.  The Examiner does an investigation.  It's not for

20  the parties then to take advantage of that investigation and

21  use the discovery.  Your Honor was very clear in this at the

22  outset of the investigation because you'll remember

23  Wilmington Trust stood up and said, Hey, we want to tag

24  along, we want to be part of this.  And the answer was, No,

25  you can't.  The Examiner is going to do his thing.  You can

1  do your thing in the context of litigating over the plan.

2  So, if you'll remember, Your Honor, we don't have anything

3  that anybody in this courtroom can't get from a third party

4  through a subpoena, Your Honor.  So, there's no real reason

5  why it is we should have to turn over documents we didn't

6  use.  If it was relevant, Your Honor, it's cited in the

7  report, and it's already available to anybody who wants it.

8  Next, Your Honor, the debtors point to the other examiner

9  cases and they argue that the time period between the filing

10  of the report in those other cases and the discharge of the

11  examiner was a longer period of time and therefore the period

12  should be longer in this case.  Well, I think that's really

13  an argument with no substance, Your Honor.  If anything when

14  you look at those cases, what they tell us is, each case

15  turns on its own facts.  Your Honor will recall in New

16  Century, one the reasons why the discharge order took so long

17  is because the examiner in that case was proposing to share

18  information with the government and the litigation trust and

19  actually shared privileged information with those parties and

20  you had other litigants that were saying, Hey, that's not

21  fair, number one, and number two, that waives the privilege,

22  so it took awhile for Your Honor to decide those issues.

23            THE COURT: Oh, I remember.

24            MR. MINUTI: But the point is, Your Honor, each case

25  turns on its own facts.  Those certainly aren't our facts in

1   this case.

2       THE COURT: No, but here the debtor's saying, Look,

3   the caldron is still bubbling, and you know, until it comes

4   down to a low simmer, we'd just like to keep the options

5   open, put it that way.

6       MR. MINUTI: I disagree with that, Your Honor.

7   Here's why I disagree with it.  Clearly the caldron is still

8   bubbling with respect to plan negotiations and plan

9   litigation if that's going to happen.  The caldron is no

10  longer simmering with respect to the investigation and the

11  report.  It's completed.  There seems to be a notion and a

12  fear here, Your Honor, that if you enter the relief we're

13  asking for today, the Examiner disappears, nobody's going to

14  be able to find him, and he's not going to be available to do

15  any further work in this case.  Nothing can be further from

16  the truth.  Mr. Klee is a fairly public person.  He's

17  prepared to take the podium today.

18      THE COURT: He'd be like OJ.  He'd never get away.

19      MR. MINUTI: Your Honor, he'd never get away, but,

20  Your Honor, I can't emphasize this enough and I know Mr. Klee

21  would say the same thing if he was at the podium, we did a

22  lot of work in this case.  We're very proud of the work that

23  we did.  If the work that we did and the background we now

24  have will be of further assistance to the Court or the

25  parties down the road, we welcome it, Your Honor.  We'd love

1   to do it, but that's a different charge at a different time

2   and Your Honor can enter an order down the road requiring us

3   to do whatever you think is appropriate in the case.  With

4   respect to the Examiner order –

5            THE COURT: Remember you said that, Mr. Minuti.

6            MR. MINUTI: And I mean it, Your Honor.  I mean, I

7   mean it.  Mr. Klee, Your Honor, had offered himself to the

8   parties to mediate disputes.  If there's a role for him as a

9   mediator down the road, he'd be happy to do that.  If there's

10  a further role in the investigation, whatever he can do, Your

11  Honor, to help, he's prepared to do that, and he's not going

12  anywhere, and as I said, there seems to be this notion that

13  if Your Honor grants this relief today, you can't enter an

14  order down the road re-engaging Mr. Klee.  Nothing could be

15  further from the truth, Your Honor, and to make it crystal

16  clear, we've added a sentence to our proposed order that

17  basically says any order Your Honor would enter today is

18  without prejudice to re-engaging him down the road.  We'd

19  welcome the opportunity, Your Honor.  Next, Your Honor, the

20  debtors have asked the Examiner – notwithstanding the

21  discharge, the debtors have asked the Examiner to cooperate

22  down the road.  To respond to that request, Your Honor, we've

23  added language to the proposed order that essentially says,

24  Notwithstanding the discharge, if anybody asks the Examiner a

25  question or has an inquiry of the Examiner related to the

1   investigation or the report, he's going to respond to

2   reasonable requests.  Finally, Your Honor, the debtors have

3   asked that any future fees or costs that the Examiner and his

4   professionals may incur be subject to some sort of notice and

5   objection procedure.  You know, that's certainly a reasonable

6   request.  We've built that into the order, Your Honor.  What

7   we've provided is, we're going to provide our invoices to the

8   debtor, the Committee, the United States Trustee's Office.

9   If somebody has a problem they can object within 10 days.  If

10  we can't resolve it, we'll be back before Your Honor,

11  otherwise we'll try to resolve it.  We think that's a fair

12  compromise, Your Honor.

13          THE COURT: I do too because it was a concern I had,

14  and I think it's been adequately addressed.

15          MR. MINUTI: Thank you, Your Honor.  So, Your Honor,

16  look, when I cut through and really try to think about why

17  we're here today and, you know, look, we don't want to be

18  viewed as litigious here, Your Honor.  We really want to do

19  what the Court wants us to do, and we want to be of

20  assistance if we can, but we stand here and we sit back and

21  we sort of take a look at what's really happening, what's

22  really happening is, all the parties, I think, are really

23  focused on trying to resolve the case.  That's a great thing,

24  Your Honor, we support that, and we support that in any way

25  we can.  The problem is, Your Honor, while they do that, the

1   real fear here is, I think, that those negotiations will

2   break down, we'll then have a litigation, and something may

3   come up down the road that may implicate the Examiner, and I

4   think the debtor's afraid that if Your Honor enters this

5   order today it's somehow going to prejudice them down the

6   road.  I get that, Your Honor, and I understand that concern.

7   The problem with that, Your Honor, is it's simply unfair to

8   the Examiner, just have their Examiner sit on a shelf in

9   limbo with really no protections, no guidelines, no rules in

10  terms of what he's doing while that process unfolds, Your

11  Honor.  Given the fact that he's done with what the Court has

12  asked him to do, it's appropriate to discharge him.  As I

13  said, if there's a role for him in the future he can be re-

14  engaged, and this really goes beyond just this case, Your

15  Honor.  I mean, this is really an examiner issue.  Examiners

16  are quasi-judicial officers.  They answer to the Court.  They

17  do what the Court tells them to do, and when you go back and

18  look at the work planning orders, it's very specific.  It

19  gives everybody a roadmap and rules to follow.  Here's what

20  the Examiner's going to do.  Here's how confidentiality is

21  going to be dealt with.  Here's what you do about privilege.

22  After the report is filed, Your Honor, the Examiner is now in

23  limbo without any protections, and I think he's entitled to

24  those protections today, and we should close the book on the

25  report and the investigation because it's concluded, and we

1   can do that today, Your Honor.  Your Honor, the only other

2   thing I didn't mention and we can deal with this I think

3   after the debtor argues, is we would like a schedule for

4   final fee applications related to the investigation and the

5   report, and unless Your Honor has any questions of me, I've

6   concluded.  I would like to give Mr. Klee an opportunity to

7   address Your Honor if he would like to.

8            THE COURT: Well, while he's coming forward, let me

9   ask this: I know that you suggested dates for deadlines for

10  filing fee applications and objections thereto.  I looked at

11  our calendar and I saw there are a number of hearings coming

12  up apart from confirmation but none of them on the calendar

13  were listed at fee hearings.  I don't know whether the debtor

14  has a notion of when the next quarterly fee hearing should

15  be.  Any idea, Mr. Pernick?

16           MR. PERNICK: Your Honor, can I have one moment?

17           THE COURT: Certainly.  Mr. Klee.

18           MR. KLEE: Good morning, Your Honor.  Kenneth N.

19  Klee, Examiner.  Your Honor, I ratify what Mr. Minuti said

20  and just wish to underscore to the Court my desire to be of

21  service to the Court in this case.  I think this motion has

22  been misconstrued as an effort on my part to cut and run.

23  That is not what this motion is about.  This motion is about

24  giving me as Examiner and other examiners in the future

25  closure on the types of protections that they should be

1    entitled to as quasi-judicial officers in having done and

2    completed an investigation.  It sets forth crystal clear

3    guidelines on what the rules of engagement will be to obtain

4    information, discovery, and the like, and the protections

5    that the Examiner will have.  That's our sole purpose in

6    filing it.  Should the Court wish me to be a court-appointed

7    expert or to serve as a mediator or to do further

8    investigation, I'm happy to do that, and I want there to be

9    no doubt on that score.

10           THE COURT: Remember you said that.

11           MR. KLEE: Thank you, Your Honor.

12           THE COURT: Thank you.  I'll hear from the debtor.

13           MR. BENDERNAGEL: Your Honor, Jim Bendernagel from

14   Sidley & Austin for the debtor.  We have essentially two

15   points that we tried to make.  The first point is that we

16   believe that the motion is premature at this juncture.  We're

17   not looking to extend this indefinitely into the future, but

18   I think the position we've taken in this regard has been

19   misapprehended by the Examiner and his counsel.  The problem

20   isn't that we're slow readers and we weren't able to get

21   through the report in the time period.  It is a sizeable

22   report but we have finished reading it, and I'm quite sure

23   other parties have finished reading it.  The real question

24   though is, what is the significance of the Examiner's report

25   on where this case is going and what role, vis-a-vis that

1   report, is left for the Examiner on a going-forward basis,

2   and we don't now the answer to that question.

3         THE COURT: Well, the Examiner says there's no role

4   left, and frankly, there's some allure to the position that

5   he's done what the Court has asked him to do.

6         MR. BENDERNAGEL: Well, he has done what the Court

7   has asked preliminarily, but here, let me give you a

8   hypothetical and the like.  The Examiner, long report, makes

9   a lot of findings.  There are areas where we've indicated we

10   disagree with what the Examiner said.

11         THE COURT: And I'm sure there's something for

12   everybody in the report.

13         MR. BENDERNAGEL: No, but the more important point,

14   where I'm going to with this, is that to the extent somebody

15   comes back and makes the statement that the Examiner's wrong

16   with respect to this particular item because he ignored

17   significant evidence that's not reflected in the

18   investigative report or record, the question becomes, does

19   the Court want to reach out and say to the Examiner at that

20   juncture, Well, is that true or not true?  And that's what

21   we're looking for in terms of, is there a role for the

22   Examiner based on the fact that the parties are coming

23   forward.  They don't know what they're specifically going to

24   do as a go-forward basis.  Maybe we'll get some enlightenment

25   on that today, but it seems that that's premature at this

1   juncture to say he's done because it's not clear he's done.

2          THE COURT: Well, what's wrong with the Examiner's

3   position that, Look, if that happens, we'll talk to you, and

4   if you don't like my answer, go to the Court and the door's

5   still open here if you need it, but why leave it open when

6   there's not such a situation that's, I'll say, ripened?

7          MR. BENDERNAGEL: Well, because -

8          THE COURT: And which may never.

9          MR. BENDERNAGEL: Well, yeah, but give us a - Look,

10  the reality here is we haven't left a lot of time for it to

11  ripen.  This is the quickest - of all the examples we've

12  seen, this is the quickest anybody's asked for discharge,

13  less than a month, and the fact of the matter is, in these

14  other cases, it was much more clear where the case was going

15  when the discharge happened, and that's not clear here, and

16  the second thing is, the idea that you're going to disengage

17  him only to re-engage him seems like the cart is in front of

18  the horse.  We have the guy engaged, why should we have to go

19  through that again?

20         THE COURT: Well, let me just make this comment and

21  the Examiner hasn't used these words, but in a case that is

22  as highly contentious as this one, and I seem to have in the

23  last year gotten a steady diet of them, I wonder sometimes

24  whether it's me.  He doesn't want to be your pinata and I

25  think that's a fair concern.

1        MR. BENDERNAGEL: I'm not particularly interested in

2    using him as a pinata.  That wasn't our intention at all,

3    Your Honor.

4        THE COURT: And I wouldn't have expected you to tell

5    me that.

6        MR. BENDERNAGEL: No, and look, in fairness, I think

7    that's true.  I mean, we're not interested in using him as a

8    pinata.  There may be situations where it would be helpful to

9    get his perspective, and we thought that it was just

10   premature at this juncture - and we're not talking about

11   extending this a long period of time.  On the other hand,

12   Your Honor, in some respects, this is your call.  We opposed

13   the Examiner to begin with.  To some degree, the Examiner was

14   brought in to assist you.  If you're saying, I don't need

15   this guy anymore, why I don't need to keep him under this

16   engagement, I mean, we're not going to fight with that.

17       THE COURT: Well, let me say this -

18       MR. BENDERNAGEL: We think that there is a benefit

19   to keep him around.

20       THE COURT: I'll ask the same question I asked in

21   New Century and you don't have to answer.  Is there anyone

22   who thought I wasn't going to appoint an examiner under these

23   circumstances?  I mean really.

24       MR. BENDERNAGEL: Okay, well, I'll answer it.  Yeah,

25   we didn't think you were going to appoint an examiner, but we

1   wouldn't oppose it.  We're not that stupid, but - Let me go

2   onto my second point.

3          THE COURT: Go ahead.

4          MR. BENDERNAGEL: The second point has to do with

5   the specific procedures, and I have talked with Mr. Minuti

6   about some of the changes that they made.  We still think

7   that there are changes that ought to be made.  We had

8   circulated to some of the parties last night and to Mr.

9   Minuti a version of the order that we'd prefer to see

10  entered.  If I might hand it up to you, if that would be

11  helpful.

12         THE COURT: Certainly.

13         MR. BENDERNAGEL: I'll make copies available to

14  anybody that doesn't have it.

15         THE COURT: Thank you.

16         MR. BENDERNAGEL: Your Honor, there were essentially

17  four areas that we had concerns about, and Mr. Minuti in his

18  comments had addressed all of them.  The first area was the

19  duty to cooperate.  They've added some language.  We've added

20  some language.  We think our language is better.  We really

21  haven't closed issue on this because time got short and Mr.

22  Minuti said, well, you're opposing the whole thing anyway, so

23  we can deal with that later, but our paragraph (3) is what

24  we'd prefer as the language with respect to the continuing

25  duty to cooperate.  As you can see in paragraph (1), this

1   provides for termination and the like, but that's - the first

2   issue is, our initial concern was there was no duty to

3   cooperate.  We've raised that with the Examiner's counsel.

4   They agreed that it wasn't explicit.  They said they'd add

5   something.  They added something.  We proposed alternative

6   language.  I think our language is more in line with the

7   language you see in the orders that's attached to the

8   Examiner's motion for New Century and other places, but, you

9   know, I think this is more just a question of which is the

10  better language on a go-forward basis, and we prefer our

11  language, but I think the concept both parties are agreed to,

12  so.  The second issue has to do with document retention, and

13  we address this in paragraphs (4), (5), and (6).  Obviously

14  our addressing it is a little longer than theirs.  The good

15  news here is there's agreement that the documents will be

16  preserved for two years.  The two issues are as follows: One

17  is, who has the burden with respect - in two years should the

18  Examiner move or should the parties move to extend the time

19  period?  You'll see in paragraph (6) we suggested that the

20  Examiner be required to give notice that he's going to

21  destroy the documents and give people 30 days to come in and

22  say something.  That is the traditional way it's done.  Every

23  one of the orders that's attached to the Examiner's motion

24  has that type of language, and I think from his perspective

25  he's better protected if he gives notice so somebody can't

1   say, I didn't remember because there may be parties that are

2   affected by this that aren't right now involved in this

3   bankruptcy proceeding and as a consequence I think from his

4   perspective and from future examiners' perspective, the

5   better practice is to give notice you're going to destroy

6   something before you do it.

7          THE COURT: Well, you started this part of the

8   discussion with reference to the burdens.  Now, I don't think

9   it's a bad idea given the passage of time that such a motion

10  be filed, but I don't necessarily think that the burden here

11  on what should happen should fall on the movant if the movant

12  is the examiner as it normally would.  It seems to me that if

13  someone opposes destruction, they ought to have the burden of

14  demonstrating why it shouldn't occur.

15         MR. BENDERNAGEL: I agree with the burden.  The

16  question is notice, as opposed to the burden.  I don't have

17  any doubt that whoever - that the examiner shouldn't be put

18  in the point of saying, Why shouldn't I keep this longer.

19  Somebody should explain why it's necessary, and that burden

20  ought to be on the moving party in that respect, and I think

21  this provides that if in fact you want this not to be

22  destroyed, you have to come in.  The point I'm making is that

23  there ought to be notice that this is going to happen just to

24  make sure people know that it's going to happen and they're

25  put on things that says you've got to come in.  That's our

1    point.

2         THE COURT: I understand.

3         MR. BENDERNAGEL: And the other two paragraphs, (4)

4    and (5), are to add a little more definition to what it is

5    the record is because it's a little bit unclear.  I mean

6    there are three portions to this record in our view.  The

7    first point is non-controversial, it's what's been defined as

8    the investigative record, which is everything that's been

9    given to Epiq and it's available in the public and there's no

10   real issue with respect to that.  The rest of the documents,

11   in our view, fall into two categories, and we've addressed

12   those or tried to in paragraphs (4) and (5).  We've

13   characterize other documents as basically being what we

14   perceive to be non-privileged material that the Examiner

15   collected in the course of his examination that really ought

16   to be put into the document depository for the parties to

17   utilize.  This is material that probably should have been

18   produced all along or it's material that's in these

19   unprofessionally transcribed transcripts of these interviews.

20   As you know, some of the interviews were under oath and

21   reported.  Others were less formal but there are apparently

22   transcripts that were put together by individuals, and the

23   transcripts have enough authority that the Examiner felt it

24   was appropriate to quote from these transcripts in his

25   report, and the point is, while there's no work product

1   associated with these transcripts and in order to assess the

2   comments that the Examiner selected out of these reports,

3   you'd want to see the rest of the transcript, and it seems to

4   me that those transcripts ought to be made available so that

5   people can assess the context in which the Examiner made

6   these statements.  Now, this is not a witch hunt for the

7   Examiner.  I mean, the Examiner made his best judgments, and

8   that's fine and dandy.  The point is though that people are

9   going to have to move forward.  You've got this evidence of

10  what people have said.  Obviously, it isn't as authoritative

11  of something that was under oath, and, you know, transcribed

12  in front of a court reporter, but it is a report and my sense

13  is you can't get that information from somebody else and you

14  might as well just deal with now because I think you're going

15  to get discovery requests along those lines because you can't

16  get it from someplace else, and I think that's legitimate.

17  The second category is documents that they got from either

18  the debtor or other people as they went along and they

19  decided for whatever reason they weren't going to be included

20  in the investigative report.  That material is still part of

21  the record, and it ought to be made available.  Now, I'm

22  sympathetic to his point that there might be material that

23  was provided to the Examiner that was privileged, not

24  confidential, privileged, and that the way we structured that

25  is, we sort of gave the Examiner the ability to pull the

1    trigger on the privilege.  Well, people that gave that

2    material know what they gave them that was privileged, and

3    those people can certainly identify what it is they gave that

4    they do not want disclosed, and the burden shouldn't be on

5    the Examiner.  It ought to be on the parties that provided

6    that material, but if they provided material that was just

7    material relating to the transaction that somehow it didn't

8    get picked up by the Committee's discovery or other people's

9    discovery, it ought to be in the record, and that's all we're

10   asking for.  The other documents in summary consist that

11   these document that were produced that are not privileged,

12   they may be confidential, put them in the document depository

13   and the transcripts of the interviews that weren't

14   professionally transcribed.  The rest of the stuff is dealt

15   with in paragraph (6), and it's privileged material, and, you

16   know, what we've said in (6) is nobody's waiving their rights

17   to challenge the privileged material if it is privileged,

18   isn't privileged, that's for another day, and that would be

19   picked up in connection with any discovery in that regard,

20   and we just feel that this is a better exposition of what the

21   issues are that are that there and the like, and, you know, I

22   think this can all be dealt with later in discovery but it

23   seemed important to us to get this out on the record at this

24   juncture in terms of this termination.  The other issues

25   really are fairly minor.  We have proposed language with

1   respect to what – we tinkered with the language that they
2   used to talk about what discovery would be available in the
3   future.   I don't think parties ought to be enjoined from
4   seeking discovery, I think, and we've made that correction.
5   I don't think it's a big deal, but I don't see how you enjoin
6   people from pursuing their rights.   We can give him
7   protection, we're perfectly willing to do that, but people
8   shouldn't be under some kind of threat of violating a court
9   order because they decide to seek material.   And then the
10  last issue had to do with specific notice requirements with
11  respect to additional fee applications down to futures
12  resulting in any work they do in this regard, and it just
13  seemed to us that there ought to be notice provisions, that
14  there ought to be a cap if the number's above $100,000.
15  That's what we bracketed in, put some number if we can't just
16  pay that without bringing it to the Court's attention, and
17  that's what we tried to deal with there.   They've tried to
18  deal with that as well, but you see our alternative language.
19  So, in summary, I think we've made progress with the Examiner
20  in terms of trying to work out these issues, but we're not
21  all the way there.   We've given you some selected language.
22  The Examiner has provided you with his view of the world.   We
23  really haven't had an extensive dialogue on this because we
24  had the basic question of whether there was going to be
25  discharge at all.   If you decide to discharge and the

1    discharge is subject to his coming back at some future point,

2    their being re-engaged, you know, we'd be perfectly willing

3    to sit down and try to work out the details of this language,

4    but I do think it's important that whatever the debtor has

5    essentially paid for in connection with this Examiner in the

6    way of developing the record, that that be available to the

7    parties.  I mean this has been an expensive undertaking.  The

8    idea that people can go get this material themselves when

9    it's just sitting there seems like a very inefficient

10    process.  I don't think it implicates how examinations are

11    done or what was in your - I went back and read your May 10th

12    order, and it's fairly clear in setting this up that you

13    basically reserved all these discovery issues till after and

14    the purpose of the provisions in your earlier orders was to

15    make sure that the Examiner wasn't distracted by the parties

16    as he was trying to do his examination with respect to

17    discovery.  It's my understanding that nobody's done that,

18    so, you know, it's now time to determine what we can

19    fruitfully gain, whether the record's complete, and the fact

20    that the Examiner has said, This is all I think is relevant,

21    well, that's great.  People may have different views in that

22    regard and if there's additional documentation in the way

23    these transcripts and the like, just seems to me that's it's

24    appropriate that that stuff be put into the document

25    depository.  That's all I have, Your Honor.

1        THE COURT: Thank you.  Does anyone else wish to be

2  heard in connection with this motion?  Alright.

3        MR. MINUTI: Can I respond briefly, Your Honor?

4        THE COURT: No, and I'll tell you why.  Let me just

5  give you some general comments and then I'm going to give you

6  some time to confer and see if you can't close some of the

7  gaps with respect to what the debtor wants and what the

8  Examiner wants.  I am going to discharge the Examiner today.

9  I think the arguments that have been made in support of that

10  relief are meritorious and I am going to grant that relief.

11  I am not going to require, as the debtor proposes in its

12  paragraphs (4) and (5), that the Examiner turn over other

13  documents or privileged documents or provide privileged logs.

14  I just don't think it's fruitful at this point especially

15  given the stage of, I think what I'm about to be told, to

16  open that door, and the order that's been proposed doesn't

17  preclude the door to be opened, but I think it's better that

18  those requests be considered under specific circumstances.  I

19  think the debtor's idea that notice be given at the end of

20  the two-year period is a good one, but I think the order

21  ought to make clear that any party opposing destruction,

22  except the Examiner, has to carry the burden that that's the

23  relief that should be granted.  Bear with me for a minute.

24  I'd like the parties to confer and see if they can't agree on

25  language for their respective paragraph (3)s.  If they can't,

1    I'll make a decision on that.  I don't necessarily think it's

2    a bad idea that there be a threshold above which even in the

3    absence of objection, the Examiner has to come back to the

4    Court.  I'm hopeful that that number would never be reached.

5    It's high enough, it seems to me that it ought really - if

6    things go as I hope they would, whether or not the case is

7    consensually resolved, that the Examiner wouldn't have to

8    incur that much in the way of cost and expense.  Those are my

9    comments.  I'd like the parties to take them and see if they

10    can get a little closer on the remaining language.  If not,

11    I'll resolve whatever disagreements remain.  Mr. Pernick -

12            MR. PERNICK: Your Honor, just to answer your

13    question on fee applications.

14            THE COURT: Yes.

15            MR. PERNICK: The reason that I can't give a

16    complete answer is I'm not sure where the fee auditor is on

17    the review, but we are through the first and second periods.

18    The fee auditor has the third period right now.  So, I assume

19    we'd have to give some more time.  It is not complete as far

20    as we're aware.  So, I would think if the Court was looking

21    for an omnibus hearing date, you might want to look at the

22    October 22nd hearing or the November 23 hearing.

23            THE COURT: Okay.  Nancy, let me know if it matters

24    which date.  Take a quick look.  Is there any objection to

25    the other dates the examiner has proposed with respect to the

1   filing of final fee applications and objection date, which

2   are August 31 and September 21 respectively?

3           MR. BENDERNAGEL: No, Your Honor.

4           THE COURT: Okay.  Alright, well, my thought is, we

5   take a break for the parties to confer about that and to deal

6   with other issues which we initially discussed.  Mr. Conlan,

7   how much time do you think you need, and I know I'm asking

8   the guy who said you didn't want any time, but -

9           MR. CONLAN: Do you mean how much time do I need

10  before we come back or how much time -

11          THE COURT: Yes.

12          MR. CONLAN: Not much time, Your Honor.

13          THE COURT: Alright.  Shall we say 11:30?

14          MR. CONLAN: Very well.

15          THE COURT: Alright, we'll break until 11:30.  Court

16  will stand in recess.

17          (Whereupon at 10:57 a.m., a recess was taken in the

18  hearing in this matter.)

19          (Whereupon at 11:29 a.m., the hearing in this

20  matter reconvened and the following proceedings were had:)

21          THE CLERK: All rise.  Be seated, please.

22          MR. MINUTI: I guess it's still morning, Your Honor.

23  Mark Minute again for the Examiner.  Your Honor, I'm happy to

24  report that I think we've worked out the mechanics of our

25  proposed order.  I think what we'd like to do, Your Honor, is

1  go back, draft the order itself.  We'll provide it to Mr.

2  Bendernagel.  Once we reach agreement, we'll then circulate

3  it to the parties, and if Your Honor is amenable, we'll file

4  it under certification of counsel.  If for some reason we hit

5  a snag, Your Honor, we would ask the indulgence of the Court

6  to maybe be available by telephone.  I don't anticipate

7  that's going to happen, but that would be probably the most

8  effective.

9           THE COURT: I'm okay with that process.

10          MR. MINUTI: Terrific.  And as much fun as the rest

11  of the hearing looks, Your Honor, may the Examiner and his

12  team be excused?

13          THE COURT: Yes.  I'd like to ask before that

14  happens though, Mr. Klee to step to the podium if he would.

15          MR. BENDERNAGEL: One comment before that, Your

16  Honor.  I think it ought to be clear on the record though

17  that the Examiner is discharged as of today so that nobody

18  feels that in the interim they have the opportunity to do

19  something, so, and I think that's clear, but just to make it

20  clear on the record.

21          THE COURT: I do too.  Mr. Klee, I just wanted to

22  thank you directly for your efforts in this case.  You've

23  been an enormous help to the Court, and I think maybe even

24  more so to the parties.  We'll see how that turns out.  I'm

25  sure that without having seen the time records, I'm pretty

1    sure you gave up the better part of your summer under less

2    than ideal conditions and time constraints to put together a

3    very comprehensive report, which as I say, I'm not quite

4    through yet, but I will read it, all of it, and I thank you.

5          MR. KLEE: Well, thank you for your kind words, Your

6    Honor.  It was a pleasure to do this investigation, and I

7    thank the professionals who assisted me in doing it, and I

8    thank the parties who were largely cooperative in responding

9    to this examination, and I am hopeful that this report will

10   lead to a consensual plan in the case, and if not, that it

11   will certainly frame the context of any litigation that comes

12   before you.

13         THE COURT: Have a safe trip home.

14         MR. KLEE: Thank you.

15         THE COURT: Alright.  Now, Mr. Conlan.

16         MR. CONLAN: Good morning again, Your Honor.  Jim

17   Conlan on behalf of the debtor.  Your Honor, the debtor has

18   tried mightily to bring the parties together.  That has not

19   happened.  We have done that in reflection on the Examiner's

20   report or after reflecting on the Examiner's report in light

21   of our continued analysis of the facts, some prompted by the

22   Examiner's report, some independent of that, in light of the

23   company's performance.  All of that together brings us to the

24   place of being, I think, fairly well qualified to say that we

25   have a good sense of who's being unreasonable, who's

42

1   overestimating their leverage, who's not in the process and

2   in light of all of those factors I just mentioned, and so,

3   what we're going to do, the debtor, is we are going to file

4   amendments to our plan and a supplemental disclosure motion

5   and procedures motion, and we're going to do that by Friday

6   of next week, Friday, August 27th. Those amendments will be

7   designed to achieve a yes vote from all creditor

8   constituencies who we believe, again, upon reflection, should

9   be in the money and resolve this.  If we're wrong about that

10  and we have one or more class rejections, then it is entirely

11  possible that we will need to initiate litigation relating to

12  the fraudulent transfer issues in the wake of that voting and

13  as part of or in advance of the confirmation hearing.  We

14  sincerely believe this is the way to move this process

15  forward.  The confirmation hearing on the other side of that

16  Friday, August 27th plan amendment filing is Monday, November

17  8th, the date Your Honor mentioned when we were just here.  We

18  have dates in between in mind.  We'd rather hold in terms of

19  walking through those dates with you until to be procedurally

20  appropriate until after we filed those plan amendments and

21  then motion for approval of a supplemental disclosure

22  document and procedures motion.  And I'm going to stop there.

23          THE COURT: Alright.  I'll hear from others in a

24  moment since this is technically a status on confirmation,

25  but let me ask the debtor to do this, even before you file

1   your plan amendments and revised disclosure and suggest a new

2   timeline for voting, that you file a notice today on the

3   docket that simply indicates that's what you reported to the

4   Court and that's what the debtor intends to do so –

5           MR. CONLAN: Will do.

6           THE COURT:  – those who consult the docket will be

7   able to tell how the continued hearing was addressed.

8           MR. CONLAN: Very well.

9           THE COURT: Thank you.

10          MR. CONLAN: Thank you.

11          THE COURT: Does anyone else wish to be heard in

12  connection with confirmation status?

13          MR. SEIFE: Good morning, Your Honor.  Howard Seife

14  for the Official Committee of Unsecured Creditors.  Your

15  Honor referred to this case earlier today as contentious,

16  which I certainly can't quarrel with in many respects, but it

17  really maybe is more analogous to bungee jumping where you're

18  jumping off a bridge, you think you're just about down to the

19  bottom, and you get jerked up again.

20          THE COURT: You know, I've always wanted to try

21  that, but my wife won't let me.

22          MR. SEIFE: Well, this is kind of a sensual

23  experience for Your Honor without actually having to jump off

24  the bridge.

25          THE COURT: Well, then, don't tell it.

1        MR. SEIFE: There are a lot of things I can't tell

2   her or Your Honor today, but if you would ask me Tuesday

3   where we were in trying to arrive at a consensual resolution,

4   I would have given you a very optimistic report because on

5   Tuesday it looked like we had reached a breakthrough and had

6   made substantial progress, but then the Court jerked us up

7   again, and by Thursday, it looked like a very different

8   situation.  What Mr. Conlan alluded to today does not

9   represent something which the Committee was aware of till he

10  approached us in court this morning.  So it is a new

11  direction and obviously when the Committee gets more

12  information and more detail, we'll digest it and determine

13  which way to go.  At the same time there are continuing

14  discussions among many of the major constituencies to still

15  try to arrive at a consensual plan.  Those discussions, I

16  think, are probably in a different direction than Mr.

17  Conlan's alluding to, but we are in a posture where

18  exclusivity has terminated, and all the parties in interest

19  have options.  Other parties could file plans, they could

20  file motions.  We still, the Committee, are of the view that

21  - and we're going to keep trying to reach a consensus and get

22  a plan that has as much support as possible.  So, without

23  being specific today, Your Honor, it sounds like we're going

24  down dual paths.  The Committee will participate in both

25  paths, see what makes the most sense, but I think we're still

1    going to be on that bungee jumping exercise for a period of

2    time till we settle down to the ground.

3            THE COURT: Thank you.

4            MR. GOLDEN: Good morning, Your Honor.  Daniel

5    Golden, Akin, Gump, Strauss, Howard & Feld, counsel for

6    Centerbridge.  Your Honor, I too learned of the debtor's

7    current plan or strategic thinking about how best to go

8    forward on the plan process, I learned of that this morning.

9    Just a minute's worth of history, and I certainly won't

10   comment, because it's not appropriate, you know, who was the

11   reasonable people, who weren't the reasonable people -

12           THE COURT: And bless you for that, sir.

13           MR. GOLDEN: Thank you.  But, Your Honor, you know

14   because it was made a public filing that an underpinning of

15   the debtor's current plan, the plan that's on file that looks

16   like it's going to be amended, was a settlement agreement

17   between certain significant creditor parties: Law Debenture,

18   Centerbridge, JPMorgan, and Angelo Gordon, and that

19   underpinning took the form of a plan support, settlement

20   support agreement, which was filed with the Court.  Earlier,

21   JPMorgan and Angelo Gordon withdrew from that settlement

22   agreement, and there were provisions in that settlement

23   agreement that allowed for a withdrawal.  In light of the

24   fact that the counterparties to this plan support agreement

25   have withdrawn from the agreement, we've advised them and

1  believe that the agreement is null and void.  So now there is

2  no current underpinning for the debtor's plan, and I think in

3  large part that's what motivates the debtors to take matters

4  into their own hands and to file a plan that they think

5  appropriate, and while I agree with Mr. Seife that as late as

6  10:10 this morning, for which we apologies and made the Court

7  late, there were still discussions, but there have been

8  discussions for a very long time and unfortunately they have

9  not been successful as of yet, and it's not clear whether the

10  parties left to their own devices will ever be successful.

11  So, frankly, the decision of the debtors to take the matters

12  into their own hand and come up with a plan that they believe

13  represents a reasonable compromise, we support that because

14  for lack of that effort we may be sitting here treading

15  water, treading water, treading water till all of us get

16  tired and drown, and not the least, the Court.  Everyone's

17  frustrated.  Everyone would like to get to a deal, but it's

18  proved to be more difficult than I think anyone imagined from

19  the beginning.

20       THE COURT: Does anybody think Mr. Klee's help would

21  be useful here, since he made the offer today?

22       MR. GOLDEN: I'm not sure, Your Honor.  I've been

23  involved in, actually very recently, in cases similar to

24  this, cases with similar dynamics to this in mediations and

25  it's never for lack of effort or sophistication on the part

1  of the mediator, but mediations in my opinion are only

2  successful when there is a real desire to get a case

3  resolved, and if there was a real desire, the parties

4  involved in this case are certainly sophisticated enough.

5  They've done it in the past.  They know how to make an

6  agreement.  They know how to reach an agreement.  So, I'm not

7  sure that a mediation at this stage would necessarily advance

8  the ball, but that's just my opinion borne from experience

9  that I've had.  Other people may have other more successful

10  experience with a plan mediator.  I think everybody now is

11  going to take a breath, see what the debtor's plan is.  In a

12  vacuum, obviously, nobody can support it or say they support

13  it, but I did want to say that we were supportive of the

14  process.  I think it goes without saying, we'll reserve our

15  rights till we actually see the plan, but for lack of a more

16  concrete methodology to get to the end, we are supportive of

17  the debtor's efforts.

18         THE COURT: Thank you.  Does anyone else wish to be

19  heard?

20         MR. FRIEDMAN: Your Honor, may it please the Court.

21  Edward Friedman, Friedman, Kaplan, Seiler & Adelman,

22  attorneys for Aurelius Capital Management and funds managed

23  by Aurelius.  I'd like to say very briefly a word about the

24  record date for voting and I address this in the hope of

25  avoiding a dispute in the future because it seems very clear

1   to me, based on what we've heard today, that when we have a

2   new plan and new disclosure and I recognize that the debtor

3   will be proposing various dates, part of those dates should

4   be an appropriate record date for voting that will be in

5   reasonable proximity to the voting deadline.  We've carried

6   with us for a long time the May date as the record date and

7   we're now, obviously, far from May and we should have an

8   appropriate date consistent with the most basic principles of

9   plan democracy.

10          THE COURT: Well, without deciding the matter ahead

11  of time, I will simply comment that with every time you take

12  the podium to make that argument it gains more purchase.

13          MR. FRIEDMAN: I appreciate that, Your Honor.

14          THE COURT: Thank you.

15          MR. FRIEDMAN: And the one other comment I would

16  make in response to Your Honor's question about whether the

17  parties believe that Mr. Klee could be of help, on behalf of

18  my client, what I would say is that obviously there have been

19  negotiations in the past.  We think that the examiner report

20  is tremendously illuminating and significant in terms of the

21  realities, risks, and probabilities associated with various

22  claims and possible litigation, and it seems to us that in

23  the aftermath of that report, what needs to happen in the

24  first instance is that the interested parties which would

25  certainly include our client need to be in a room and need to

1    be discussing the merits of the claims, the Examiner's

2    findings, and recognize the reality of what the Examiner has

3    said, recognize that all of us lawyers in this room can

4    undoubtedly point to things in the Examiner's report as to

5    which we would say, Well, the Examiner said this or that, and

6    it's actually better for my client than the Examiner said,

7    but whatever we lawyers might say, the Examiner's report

8    represents a thorough and neutral examination of the issues.

9    My client and us as counsel have been taking it very

10   seriously, reviewing it very carefully, and we think it is a

11   very important basis for negotiating in a realistic manner,

12   and we're prepared to do that with other interested parties.

13             THE COURT: Thank you.

14             MR. FRIEDMAN: Thank you, Your Honor.

15             MR. BERNSTEIN: Your Honor, Don Bernstein from Davis

16   Polk representing JPMorgan.  I've extolled the virtues of

17   deadlines in the past and in front of the Court, and I think

18   Mr. Conlan has now set yet another deadline for all of us.  I

19   would like to be the eternal optimist and say that the dual

20   tracks perhaps can merge during this one-week period.  It may

21   not happen.  We may end up the week with five different

22   tracks, but, Your Honor, I think we should all be making the

23   effort to try to see whether we can have the same four days

24   that we could have 18 months from now of negotiation but do

25   it now.  And that's a hope.

1          THE COURT: I appreciate the sentiment.  Thank you.

2          MR. ADLER: Good morning, Your Honor.  David Adler

3   from McCarter & English.  I represent Deutsche Bank Trust

4   Company of America, who's the indenture trustee under the

5   '92, '95 and 1997 indentures which collectively represent

6   about a billion dollars worth of the public debt.  I rise,

7   Your Honor, because I am concerned about this process where

8   we keep extending dates.  Every time we extend a voting

9   deadline, we, as indenture trustee, notify the holders of the

10  extension of the date.  Although we have some concentration

11  in the bonds with Centerbridge and Aurelius, there are a lot

12  of individual holders of these bonds.  We have been flooded

13  with calls from people who have a $5,000 bond in their IRA or

14  in some other investment vehicle, and frankly, they are

15  getting extremely confused because they are hearing a voting

16  deadline of August 6th to be received by, then there was

17  another voting deadline where it just had to be postmarked by

18  a certain date, and as this process continues, the smaller

19  holders are getting extremely confused by all these different

20  voting deadlines in addition to which many of them have voted

21  already and if we're going to continue this process, we need

22  to think of a way how these holders who may have cast their

23  ballot before the Examiner issued his report, how they can

24  change their votes and what the process should be.

25          THE COURT: Well, I would hope and trust that the

1   debtor's papers will address that issue, and I'm sure if they

2   don't, I'll hear from you again.

3          MR. ADLER: Okay, Your Honor.  Just, I mean, I

4   really do believe at this point that whatever comes out is

5   going to require a full re-solicitation with a new voting

6   deadline and a new disclosure statement given where the

7   parties are in this discussion.

8          THE COURT: Well, I take it from Mr. Conlan's

9   suggested confirmation date based upon the availability I had

10  indicated, he doesn't anticipate an additional disclosure

11  step.  Now, I could be wrong about that, but the time frame

12  doesn't seem as if it would permit it that, but I haven't

13  seen the proposal yet so I'll say nothing further, and I'll

14  make no indication now about whether I think that will be

15  good or bad.

16         MR. ADLER: Your Honor, let me just note that the

17  discussions, as I understand it, envision a litigation trust

18  and there are many taxable consequences to the creation of a

19  litigation trust, and I am not certain that you can bypass

20  the step of having a new disclosure statement if you have

21  those taxable events that holders may have to realize in the

22  event that a litigation trust is to be created.

23         THE COURT: I understand.

24         MR. ADLER:  Thank you, Your Honor.

25         THE COURT: Thank you.  Does anyone else wish to be

1   heard?

2        MR. LAURIA: Good morning, Your Honor.   Tom Lauria

3   with White & Case.   We represent Wells Fargo, the bridge

4   agent.   I guess as a preliminary matter, I want to say I'm a

5   little confused by some of the comments this morning and in

6   particular Mr. Seife's.   I thought it was bad if you hit the

7   ground when you're bungee jumping, but we'll see.   We, of

8   course, endorse the approach.   We reserve our rights.   As the

9   Court is well aware, the bridge lenders were very unhappy

10  with the prior plan, and we're not a party to it.   I think

11  this creates an opportunity to try to find peace and we're

12  hopeful that happens.   In response to a couple of the

13  comments that people made and the Court's question, you know,

14  the timeline the debtors laid out, I guess is from today,

15  slightly less than three months, and to me that seems, given

16  the complexity of this case and the possibility that there

17  may have to be some supplemental disclosure, that seems like

18  as aggressive a timeline as we can hope for, but also keeps

19  this case on a relatively short leash, which I think it needs

20  to stay on, and so, we support the time frame proposed.   With

21  respect to the utility of a mediator and whether or not if

22  there should be a mediator that should be Mr. Klee, I guess I

23  have two kind of reactions.   Number one, it may well be that

24  a mediator at some point will help.   I think it's maybe

25  premature.   Let's see where the debtor comes out and see how

1  the parties position themselves around the table and see at

2  that point if a mediator's appropriate.  As far as Mr. Klee's

3  participation, while there can be no doubt that he's very

4  knowledgeable at this point about the facts and the issues

5  here, in that his report takes positions on a variety of

6  issues, I think it would be hard for him to re-emerge as a

7  quote/unquote "neutral" to be a mediator.

8          THE COURT: Alright, thank you.  Does anyone else

9  wish to be heard?  I hear no further response.  Alright.  Mr.

10  Conlan, when would you expect a motion filed on August 27th

11  would be set for a hearing?

12          MR. CONLAN: The date we have scratched in, Your

13  Honor, is a time around September 6th.  That may be too early,

14  but in order to make a November 8th confirmation date, we

15  think that would need to be on or before September 14th in any

16  event.

17          THE COURT: Well, you have a September 15th omnibus

18  date hearing.  You know, I think that's still your best bet.

19          MR. LANTRY: Your Honor, Kevin Lantry.  As we

20  understood it, we had about an hour for that omnibus.  Is

21  that different in terms of your calendar?

22          THE COURT: Actually, if we go through the lunch

23  hour you have two.

24          MR. LANTRY: We would be afraid that that might not

25  be enough even though the supplemental disclosure is not

54

1   going to be like a disclosure statement, that plus the

2   procedures by which we would have the solicitation and the

3   way it often has occurred in this case, we're concerned that

4   that might not be enough time.

5          THE COURT: Well, how much time do you think you

6   need?

7          MR. LANTRY: I would guess 4 hours.  The issue we

8   struggle with, Your Honor, just again backing out the dates,

9   goes to the process of the solicitation.  We recognize that

10  there are a lot of holders with the various tranches of

11  notes, and that is the real push in terms of being able to

12  turn things around and get us to the November 8th date you've

13  given us.

14         THE COURT: Bear with me.  Well, I would have time

15  on the 9th or 10th, but that for me presents two issues.  One,

16  it's the holidays, and secondly, I'm somewhat weary of people

17  telling me they don't have enough time to look at things.

18         MR. SEIFE: Your Honor, the 9th and 10th would be a

19  problem for a number of the parties involved.

20         MR. CONLAN: Your Honor, we can make November 15th

21  work.  It's not a matter of counter meaning, make it work for

22  the dates that we have in mind if you could find 4 hours for

23  us by adding something in early or late or however you would

24  - September 15th in order to make the November 8th date work.

25         THE COURT: Alright.  Let's do September 15th at 11,

1   and I will try to clear - I say that, but Ms. Hunt really has

2   to do it, 4 hours for you.

3              MR. CONLAN: Thank you, Your Honor.

4              THE COURT: Okay.

5              MR. CONLAN: Your Honor, one point in addition.  We

6   will continue to work hard with everybody as we have.  We

7   just think it's critical to change the dynamic that has

8   emerged including the bungee dynamic.

9              THE COURT: Okay.  Let me - Mr. Minuti I think has

10  left the courtroom but let me ask you to pass along to him

11  the following with respect to a date for fee hearings, Mr.

12  Pernick.  From our calendar standpoint, the October omnibus

13  or the November omnibus are both okay, but I'd ask that you

14  check with the Fee Examiner to see what his schedule is.

15             MR. BENDERNAGEL: When we were outside Professor

16  Klee had indicated that the October omnibus would be

17  acceptable to him, if that's any help to you.

18             THE COURT: Yeah, I mean, it's okay with me so long

19  as the Fee Examiner can complete his work and we'll have a

20  quarterly fee hearing then.  Okay.  While we're on the

21  calendering, let me ask this, what of now, the October dates

22  which we've set aside for confirmation, they are the 4th, the

23  12th, the 13th, and the 14th?

24             MR. CONLAN: I think we can let those go.

25             THE COURT: Okay.  I hear no objection to that.  Is

1  there anything further for today?

2        MR. CONLAN: No, Your Honor.  Thank you again - I'm

3  sorry, not from me.

4        MR. SEIFE: Your Honor, just perhaps not something

5  we need to deal with today, but because we are looking at the

6  calendar and given that the earliest we will have a

7  confirmation hearing will be the beginning of November, we

8  are going to be faced with the two-year anniversary of this

9  case in early December and there's never any assurance as to

10  what will happen at confirmation hearings and whether in fact

11  we will be going forward as planned.  The two-year

12  anniversary is quite significant in this case as causes of

13  action need to be brought before that date.  No one wants to

14  run into statute of limitation deadlines.  So, I do want to

15  raise it with Your Honor and I think we do need to find a way

16  to deal with it and perhaps not wait till the last minute,

17  which would not be in anyone's interest.  So, I just rise to

18  indicate that will be an issue we're going to have to deal

19  with.

20        THE COURT: Well, there was previously at least one

21  standing motion.

22        MR. SEIFE: The Committee has a standing motion

23  which has been adjourned.  It would have a second one dealing

24  with additional causes of action, and we may need to discuss

25  with the debtors bringing those motions on and dealing with

1   them before we are backed into a corner on those dates.

2           THE COURT: Well, thanks for the warning.

3           MR. SEIFE: Thank you, Your Honor.

4           THE COURT: Anything further for today?  Thank you

5   all very much.  That concludes this hearing.  Court will

6   stand in recess.

7           (Whereupon at 12:01 p.m., the hearing in this

8   matter was concluded for this date.)

9

10

11

12

13

14

15

16

17

18           I, Elaine M. Ryan, approved transcriber for the

19   United States Courts, certify that the foregoing is a correct

20   transcript from the electronic sound recording of the

21   proceedings in the above-entitled matter.

22

23   _Elaine M. Ryan_____                    August 21, 2010
     Elaine M. Ryan
     2801 Faulkland Road
     Wilmington, DE 19808
     (302) 683-0221