IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------X
In re:                                            :   Chapter 11 Cases
                                                  :   Case No. 08-13141 (KJC)
TRIBUNE COMPANY, et al.,                          :   (Jointly Administered)
                                                  :
          Debtors.                                :
                                                  :
                                                  :
                                                  :
-------------------------------------------------X
```

# DECLARATION OF PATRICK J. HEALY IN SUPPORT OF WILMINGTON TRUST COMPANY'S CLAIMS AND REQUESTS FOR PAYMENT OF FEES AND EXPENSES, INCLUDING FEES AND EXPENSES OF ITS OUTSIDE COUNSEL, FINANCIAL ADVISORS AND EXPERTS

Pursuant to 28 U.S.C. § 1746, Patrick J. Healy, being duly sworn, deposes and says:

1. I am a vice president of Wilmington Trust Company ("Wilmington Trust"), a bank based in Wilmington, Delaware. I am familiar with the facts set forth herein based upon personal knowledge and my review of applicable records and documents.

2. I have more than 20 years of corporate trust experience, and have specialized in serving default and bankruptcy transactions, as well as with European and U.S. high yield investment vehicles over the past 13 years.

3. I have been employed by Wilmington Trust since July 2007. While at Wilmington Trust, I have been the primary officer in charge of the non-U.S. default/bankruptcy product line. As the officer in charge of this product line, my responsibilities included the daily administration of default/bankrupt transactions, depositions, service on unsecured official creditor committees and marketing to fellow trustees, high yield issuers (in the U.S. and Europe), law firms, investment banks and financial advisors. Examples of bankruptcy cases I have administered to include: Lyondell Chemical Company, Tribune Company, General Growth

1

Properties, Abitibi-Bowater, Wind Hellas, Cooper-Standard, The Great Atlantic Tea & Pacific Company, Calpine Corporation.

4. Prior to joining Wilmington Trust, from September 2003 through July 2007, I was the Vice President and Senior Trust Officer of Law Debenture Trust Company of New York ("Law Debenture"). While at Law Debenture, I was the primary officer in charge of the default/bankruptcy product line. As the officer in charge of this product line, my responsibilities include the daily administration of default/bankrupt transactions, depositions, service on unsecured official creditor committees and marketing to fellow trustees, high yield issuers (in the U.S. and Europe), law firms, investment banks and financial advisors. Examples of bankruptcy cases I have administered to include: WorldCom, Adelphia, Kaiser Aluminum, ABFS, AMERCO, Gentek, Petroleum Geo, Northwest Airlines, Delphi Corp., Collins & Aikman and Northwestern Corp.

5. Prior to joining Law Debenture, from 2002 through 2003, I was a Vice President and Team Leader at JP Morgan Chase Bank. Prior to joining JPMorgan Chase Bank, from 2000 through 2001, I was a Vice President and Team Leader at the Bank of New York. From 1999 through 2000, I was a Vice President at U.S. Bank Trust National Association. From 1996 through 1999 I was a trust officer at Chase Manhattan Trust Company N.A. From 1996 through 1998 I was a trust officer at Mellon Bank.

6. I earned a master's of business administration and a master's of science from Temple University and an undergraduate degree from St. Joseph's University.

7. I submit this declaration in support of Wilmington Trust Company's claims and requests for payment of fees and expenses, including fees and expenses of its outside counsel, financial advisor and experts.

8. Wilmington Trust is the successor indenture trustee for the Exchangeable Subordinated Debentures due 2029 (generally referred to as the "PHONES") issued in April 1999 by Tribune Company ("Tribune" and, together with its Chapter 11 affiliates, the "Debtors" or the "Company") in the above-referenced chapter 11 cases.

9. During the course of the Debtors' chapter 11 cases, Camden Asset Management, L.P. ("Camden"), and SuttonBrook Capital Management, LP ("SuttonBrook"), consulted with Wilmington Trust and its professionals regularly concerning case strategy and developments. Camden and SuttonBrook played active roles in Wilmington Trust's development of case strategy and consulted with Wilmington Trust's professionals before such case strategy was implemented.

10. In certain circumstances, Camden and SuttonBrook directed Wilmington Trust concerning the manner in which Wilmington Trust exercised its rights under the PHONES Indenture on behalf of PHONES Noteholders. Camden and SuttonBrook also directed Wilmington Trust to enter into retention agreements with its professionals, including its attorneys, Brown Rudnick LLP (as is primary counsel), Benesch Friedlander Coplan & Aronoff LLP (Delaware counsel through August 2010), and Sullivan Hazeltine & Allinson LLC (Delaware counsel from August 2010), Garvey Schubert Barer (Federal Communications Commission counsel); The Law Offices of John Wells King, PLLC (Federal Communications Commission counsel). In addition, Camden and SuttonBrook also directed Wilmington Trust by its counsel, Brown Rudnick to retain Mesirow Financial Consulting (as its financial advisor), Morton Research, Inc. (as its newspaper valuation consultant), Hoffman Schutz Media Capital (as its broadcasting valuation consultant), and Cypress Associates LLC (as its internet consultant).

11. Each of these directions and the terms of retention of professionals, is listed below in summary form:

- December 22, 2008 – retention of Brown Rudnick as its counsel in connection with the Tribune Company chapter 11 cases.[1]
- January 12, 2010 – direction from Camden and SuttonBrook concerning the manner in which Wilmington Trust exercised its rights under the PHONES Indenture on behalf of PHONES Noteholders and to amend the terms of the Brown Rudnick retention as set forth in the engagement letter dated as of January 13, 2010.[2]
- February 2, 2010, Brown Rudnick retained Mesirow Financial Consulting, LLC, as its financial advisor.
- February 10, 2010 – direction from Camden and SuttonBrook concerning the manner in which Wilmington Trust exercised its rights under the PHONES Indenture on behalf of PHONES Noteholders and to amend the terms of the Brown Rudnick retention.[3]
- April 26, 2010, Brown Rudnick and Mesirow entered into an amended and restated retention agreement.[4]
- July 9, 2010 – direction from Camden and SuttonBrook (the "July 2010 Direction") to amend the terms of Brown Rudnick's retention.[5]
- October 28, 2010 – direction from Camden and SuttonBrook concerning the manner in which Wilmington Trust exercised its rights under the PHONES Indenture on behalf of PHONES Noteholders and to amend the terms of the Brown Rudnick retention.[6]
- December 16, 2010 – Brown Rudnick was directed by Camden and SuttonBrook to enter into a modified retention agreement (dated as of that date) with Mesirow, pursuant to which Mesirow was jointly retained by Brown Rudnick, Kasowitz, Benson, Torres & Friedman LLP (counsel to Law Debenture Trust Company of New York), McCarter & English, LLP (counsel to Deutsche Bank Trust Company Americas) and Akin Gump Strauss Hauer & Feld LLP (counsel to Aurelius), to provide assistance and testimonial support in connection with the Noteholder Plan.

---

[1] WTC1F06082 – WTC1F06086.

[2] WTC1F06087 – WTC1F06091.

[3] WTC1F06104 – WTC1F06108.

[4] WTC1F06168 – WTC1F06175.

[5] WTC1F06114.

[6] WTC1F06128 – WTC1F06141.

- February 24, 2011 – direction from Camden and SuttonBrook to join a motion seeking authority to commence certain causes of action under state fraudulent conveyance law.[7]
- June 1, 2011 – direction from Camden, SuttonBrook, and Aurelius Capital Management to file the state law constructive fraudulent conveyance actions.

12.  It is my understanding that, pursuant to one or more of the aforementioned directions, Camden and SuttonBrook advanced fees and expenses of Brown Rudnick, and the experts, lawyers and advisors retained by it, including, without limitation Mesirow, Garvey Schubert Barer, The Law Offices of John Wells King, PLLC, Morton Research, Inc., Hoffman Schutz Media Capital, and Cypress Associates LLC, in the aggregate amount of $3,000,000.

13.  It is my understanding that, pursuant to one or more of the aforementioned directions, Aurelius advanced Mesirow a $1,250,000 "Initial Work Fee" and subsequently advanced $4,905,562 for work in connection with the Debtors' chapter 11 cases.

14.  As of the petition date, Wilmington Trust was optimistic that the LBO would prove fertile ground for the investigation, development, and assertion of claims that could lead to a meaningful recovery for all non-LBO creditors. For this reason, Wilmington Trust expected vigorous advocacy of the interests of non-LBO creditors, including the PHONES, by the Official Committee of Unsecured Creditors of Tribune (the "Committee").

15.  While the Committee commenced a preliminary investigation of LBO-related causes of action in March 2009, Wilmington Trust did not believe such investigation was as complete as it should be. Furthermore, the make-up of the Official Committee – which included LBO lenders targeted for potential estate litigation – prompted pre-LBO creditors to loudly voice concern that the Committee would not sufficiently pursue LBO-related claims and recoveries against its own members. As the fall of 2009 progressed, Wilmington Trust grew further

---

[7] WTC1F06160.

concerned regarding the scope and depth of the Committee's investigation and the fact that the Debtors could file a plan of reorganization that resolved LBO-related causes of action before the Committee and Law Debenture even completed their investigations. Accordingly, with the advice of counsel, Wilmington Trust determined that it was appropriate to seek the appointment of an examiner to do an in-depth and impartial investigation of LBO-related causes of action.

16. The importance of this work was highlighted when Wilmington Trust learned on the eve of a hearing on the examiner appointment motion that the Committee and Law Debenture, the two other case participants ostensibly investigating causes of action arising out of the LBO, had agreed to settle certain LBO-related causes of action while not pursuing other valuable LBO-related causes of action. This underscored the importance of the appointment of an examiner to protect the interests of non-LBO creditors, including the PHONES.

17. Through counsel, I was aware that although SuttonBrook and Camden had already provided indemnity of $3 million in early 2010 to pay Brown Rudnick and other advisors' fees, but that these funds had been expended by the time the Examiner was appointed and those PHONES Noteholders declined to offer additional indemnity to fund additional fees and expenses of Wilmington Trust's professionals' activities concerning the Examiner's investigation.

18. At this juncture, with the Committee, Law Debenture, the Debtors and others agreeing to settle and release the LBO claims, the proposed plan provided no recovery for a number of constituencies including the PHONES. The plan provisions that ultimately allow for Wilmington Trust to seek a partial distribution for an allowed unsecured claim comprised of attorneys' fees and costs came long after the Examiner concluded his examination. Thus, at the time the decision was made to seek the appointment of an Examiner and to participate in the

Examiner's investigation, Wilmington Trust did so with the expectation of benefitting the estate in general and with the expectation that the only source of recovery of its fees would be pursuant to Section 503(b)(3)(D) and (4).

19. Further, in connection with Wilmington Trust's consideration of a request to appoint an examiner, Wilmington Trust determined that an "Extraordinary Fee" was due to compensate it for the additional time and resources associated with the pursuit of an examiner and expected payment from the Debtors' estates on account of that fee.

20. As a well-established indenture trustee, experienced, sophisticated and among the industry leaders in the restructuring world, Wilmington Trust typically retains outside counsel to advise it concerning its service as indenture trustee in a restructuring. Such retentions are memorialized in retention letters that typically provide that Wilmington Trust liability for its outside counsel's fees and expenses, are limited to the amounts that Wilmington Trust receives under the indenture from the issuer, on account of Wilmington Trust's charging lien or from indemnification provided by the noteholders. These retention letters typically state that Wilmington Trust will not advance its own funds to satisfy its professionals' fees and expenses since such fees and expenses are payable by the issuer under the applicable indenture. Brown Rudnick's retention letters incorporate these longstanding practices.[8]

21. I understand that the Reorganized Debtors, in their Objection to Wilmington Trust's Class 1F Claim, assert that Wilmington Trust, as indenture trustee must first pay all legal fees and expenses, including those due to its outside counsel, advisors and experts before seeking reimbursement from the issuer under the relevant indemnity provisions of the PHONES Indenture. That is not my experience. In fact the opposite is generally true; that is, an indenture

---

[8] See, e.g., WTC1F06123 (July 9, 2010 Retention Letter); WTC1F06083 (December 22, 2008 Retention Letter); WTC1F06094 (January 10, 2010 Retention Letter).

trustee invariably invokes indemnity rights at the outset or retains counsel with the understanding that counsel will look to the issuer for payment of those fees.

22. As a practical matter, the economics of the trustee relationship allows for no other result. An institution such as Wilmington Trust acts as trustee under myriad indentures at any given time. The compensation it receives for the traditional and routine, non-litigation-oriented services is modest. Given that reality, when litigation does arise, an indenture trustee must look to the indemnities in the indenture if it intends to provide any substantive services. The idea that an indenture trustee would advance such costs defies economic reality. Moreover, without the ability to access such indemnities absent first paying out what could be substantial fees and expenses, entities such as Wilmington Trust would never accept such engagements. Indenture Trustees are of course integral to the marketability of public debt.

23. Given the complexity of the issues in the case, the amounts in controversy, the number and sophistication of parties involved, the positions taken by those opposed to the PHONES Noteholders, and the directions given to Wilmington Trust by those holders, I believe that the fees and expenses of Wilmington Trust and its professionals were necessary and reasonable. Estimates of such fees and expenses were presented before such work was undertaken and the ultimate fees and expenses incurred reasonably relate to and were necessary for the advancement of the interests of the PHONES and other non-LBO unsecured creditors of Tribune.

24. During the course of the Examiner's investigation, I participated in numerous Official Committee meetings and received a number of updates from Official Committee counsel. Although Wilmington Trust had participated in Official Committee meetings where the examination was discussed, Wilmington Trust never received the Official Committee's draft

brief or reply brief to the Examiner. Further, I am not aware of any solvency analysis prepared by the Official Committee's financial professionals, Moelis and AlixPartners, and provided to the Examiner or his financial advisor, LECG.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 26, 2013.

_____
Patrick J. Healy

61130659 v2-WorksiteUS-027213/0025