**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 08-13141 (KJC) |
| TRIBUNE COMPANY, et al., | **Related to Docket No. 13327, 13328** |
| Debtors. | **Status Conference:  April 24, 2013 @ 10:00 a.m.** |

**RESPONSE OF DEUTSCHE BANK TRUST COMPANY AMERICAS TO
REORGANIZED DEBTORS' OBJECTION TO CLAIM FOR PAYMENT OF
FEES AND EXPENSES DUE TO ITS OUTSIDE LEGAL COUNSEL UNDER
SECTION 9.1.3 OF TRIBUNE'S PLAN OF REORGANIZATION**

Deutsche Bank Trust Company Americas ("DBTCA"), in its capacity as successor indenture trustee for three series of the Senior Notes[1], by and through its attorneys, McCarter & English LLP, submits this Response to the Reorganized Debtors' Objection to Creditors' Committee Member Fee Expense Claims Asserted by (A) Deutsche Bank Trust Company Americas and (B) Wilmington Trust Company (D.I. #13327, the "Objection") and respectfully states as follows.

**PRELIMINARY STATEMENT**

Section 9.1.3 of the Fourth Amended Joint Plan Of Reorganization (the "Plan") [D.I. 12072] For Tribune Company And Its Subsidiaries (the "Reorganized Debtors" or the "Debtors") provides that "[n]o later than forty-five (45) days after the Effective Date, counsel to the Creditors' Committee shall submit to Reorganized Tribune ... statements of the Creditors' Committee Member Fee/Expense Claims." Plan, § 9.1.3.  Section 9.1.3 bifurcates fees into two categories: (i) "Service Fees" related to service on the Committee and (ii) "Confirmation

---

[1] Capitalized terms not defined in this Response shall have the meanings given to them in the Plan.

Litigation Fees" related to "amounts incurred in connection with discovery (including deposition testimony) sought from members of the Creditors' Committee in connection with litigation related to confirmation of [the] Plan." *Id.*

Pursuant to Section 9.1.3 of the Plan, on January 29, 2013, DBTCA, as a member of the Committee, submitted a request (attached as Exhibit 1 to the Declaration of David J. Adler ("Adler Decl.")),[2] which sought $760,524.00 for Service Fees and $884,613.50 for Confirmation Litigation Fees.  In response to that request, on February 28, 2011, the Reorganized Debtors sent a written response which agreed to the allowance of $760,524 of Service Fees (and on March 5, 2013, paid such amount), while objecting to the Confirmation Litigation Fees sought in their entirety. On March 15, 2013, the Reorganized Debtors filed the Objection.

The Objection objects to payment of DBTCA's Confirmation Litigation Fees on the basis that: (1) DBTCA's Confirmation Litigation Fees were not incurred solely in its capacity as a member of the Committee; and (2) DBTCA allegedly engaged in a "charade" in connection with the  deposition subpoena served by Aurelius Capital Management L.P. ("Aurelius").  The Objection does not raise any issues concerning the amount of the fees – only that the fees themselves are not reimbursable pursuant to Section 9.1.3 of the Plan.

 As detailed herein, the Objection is meritless.  First, DBTCA's Confirmation Litigation Fees were incurred in its capacity as a member of the Committee by responding to discovery materials that were served on it by the Reorganized Debtors on an expedited time frame. Second, DBTCA similarly incurred fees in response to a deposition subpoena served by Aurelius.

---

[2] The Adler Decl. is submitted contemporaneously herewith by DBTCA in support of the Response.

DBTCA did not have the power to control either of these parties. It incurred fees fairly, reasonably, and in response to the demands of others. [3]

## STATEMENT OF FACTS

1.      On October 15, 2010, counsel to Aurelius, served DBTCA and McCarter & English LLP ("McCarter"), as DBTCA's counsel, with "litigation hold" notices.  Adler Decl., ¶10.[4]  Substantially similar notices were served on Chadbourne & Parke LLP ("Chadbourne"), as Committee's counsel, as well as all other Committee professionals. *Id.*  Aurelius served "litigation hold" notices on the other members of the Committee. *Id.*

2.      Upon receipt of the litigation hold notices, DBTCA and McCarter, incurred fees and expenses related to prompt compliance with the litigation hold notices.  *Id.* at ¶11.  McCarter and DBTCA each took steps to implement a "lock" on all documents to ensure document preservation. *Id.*  In addition, McCarter attorneys conferred with DBTCA's in-house counsel concerning compliance with the litigation hold notices.  *Id.*  DBTCA, through counsel and in its capacity as a member of the Committee, received numerous inquiries from Chadbourne with respect to compliance with Aurelius' "litigation hold" notice.  *Id.*

3.      From December 9, 2010 through December 17, 2010, document requests and subpoenas from Aurelius and/or Law Debenture were served upon a number of members of the Committee.  *Id.* at ¶12.  These subpoenas and document requests sought discovery of documents on a wide range of topics concerning the Debtors, the LBO and other topics and did not distinguish whether such documents were being sought from the recipient solely in their capacity

---

[3]  After reviewing the Objection, DBTCA withdraws its request for fees related to the Allocation Dispute and reduces its request for Confirmation Litigation Fees reimbursement by $88,500 to $828,590.02. *See* Adler Decl. at ¶8.
[4]  Aurelius' litigation hold notice was served a week before DBTCA became a proponent of the Noteholder Plan.

as a Committee member or as a creditor of the Debtors.  *Id.*  Nowhere in the instructions to the subpoenas are the document requests limited to each creditor solely in their capacities as Committee members.  *Id.*

4.      On December 17, 2010, the Debtors served a subpoena *duces tecum* on McCarter and a separate document request on DBTCA (collectively, the "Document Requests"), in its capacity as the successor indenture trustee for the Senior Notes.  *Id.* at ¶13.  The Document Requests each contained 55 different requests. *Id.*  Of these requests, 33 were plainly applicable to DBTCA in all capacities, including as a Committee member, and the remaining 22 were related to activity as a proponent of the Noteholder Plan.  *Id.*

5.      In the face of wide ranging and broad discovery served on the Committee members and their individual counsel by both Aurelius and the Debtors, DBTCA was aware of its fiduciary duties and obligations as it responded to Document Requests.  *Id.* at ¶14.  Following the receipt of the Debtors' subpoena and document requests, McCarter incurred fees and expenses related to the compliance with the subpoena and the Document Requests.  *Id.*  These fees were the result of McCarter's (i) preparation and service of objections and responses to these demands, (ii) creation and negotiation of search terms and protocols, (iii) coordination of information technology support, (iv) research of privilege questions and subsequent privilege determinations.  *Id.*

6.      On December 27, 2010, DBTCA proposed certain search terms and protocols. *Id.* at 15.  The proposal was rejected and the Debtors insisted that DBTCA initiate a search using eighty search terms for each of McCarter and DBTCA which included terms such as "Committee".  *Id.*

ME1 15428091v.1

7.      In spite of DBTCA's efforts to narrow the search protocols, on January 7, 2011, DBTCA gave into the Debtors' demands.  *Id.* at ¶16.  On January 13, 2011, McCarter, on behalf of itself and DBTCA, met and conferred with counsel for the Debtors and other DCL Plan proponents.  *Id.*  During that meet and confer, the topic of the production of documents that may contain Committee privileged information was discussed.  *Id.*  McCarter advised the DCL Plan Proponents that McCarter and DBTCA would produce a privilege log on behalf of McCarter which would include documents that the Committee had asserted were privileged.  *Id.*

8.      From January 7, 2011 through January 19, 2011, DBTCA and McCarter incurred substantial fees reviewing tens of thousands of DBTCA and McCarter documents in order to meet the January 18, 2011 production deadline.  *Id.* at ¶17.

9.      As DBTCA had previously warned the Debtors, the search parameters were unnecessarily broad and captured many unresponsive documents.  *Id.* at ¶18.  For example, because the Debtors insisted that McCarter and DBTCA search the word "Committee," McCarter was forced to review thousands of documents that contained this word and ultimately determined that substantially all of such documents would be excluded as either non-responsive or privileged Committee communications.  *Id.*  Consistent with the requests of Committee counsel and with DBTCA's obligations under the Committee's bylaws, DBTCA withheld all Committee communications.  *Id.*

10.     After DBTCA completed its own document production, on January 26, 2011, the Debtors served DBTCA with a Rule 30(b)(6) deposition notice.  *Id* at ¶19..  Ultimately, on February 7, 2011, the Debtors agreed to withdraw their Rule 30(b)(6) notice upon confirmation that no DBTCA employee would be a witness at the confirmation trial.  *Id.*

ME1 15428091v.1

11.     In the months and weeks leading up to the March, 2011 confirmation hearing, Aurelius served deposition notices upon five attorneys to various members of the Committee as well as six members of the Committee. *Id.* at ¶20. In that regard, one of the attorneys served was David Adler. *Id.* The subpoena, served on February 15, 2011 (along with the subpoena to Gordon Novod of Brown Rudnick), required Mr. Adler to appear for a deposition noticed for February 24, 2011, the second to last day of the discovery period under the plan scheduling order. *Id.* As required by the Committee's bylaws, McCarter promptly notified Committee counsel regarding the receipt of a subpoena, and participated in various conference calls with Committee counsel concerning DBTCA' s and McCarter's obligations under the Committee bylaws. *Id.* On February 17, 2011, the Committee filed a letter brief seeking to quash the subpoenas of Mr. Adler and Mr. Novod on a number of grounds. *Id.* Information Aurelius sought to solicit from Mr. Adler and Mr. Novod was based solely upon their representation of their respective clients as members of the Committee and as fact witnesses to events that transpired in the Committee room. *Id.* In the written papers and at oral argument on February 22, 2011, Aurelius' counsel stated, without qualification, that it sought to depose Adler and Novod solely to discover details concerning Committee deliberations and/or settlement negotiations and to test the veracity and credibility of Committee members who had already been deposed, regardless of whether they would support the Committee's contentions. *Id.* Moreover, Aurelius sought the depositions to discover Committee deliberations because the Committee's bylaws prohibited its members or counsel from discussing Committee deliberations without a subpoena. *Id.*

12.     DBTCA and McCarter incurred fees in connection with the subpoena of Mr. Adler. *Id.* at ¶21. In particular, McCarter conducted various conference calls with Committee

6

counsel and McCarter prepared for the deposition during the ten day period leading up to the Court's ruling on February 25, 2011. *Id.* Mr. Adler reviewed numerous documents in anticipation of his deposition and he and other McCarter attorneys further reviewed Committee minutes and memoranda, transcripts of other Committee members who had been deposed, the Committee bylaws for privilege issues, and appeared at the Court's hearing on February 22, 2011 in connection with the Committee request to quash the Adler subpoena. *Id.*

## ARGUMENT

**A. DBTCA is entitled to reimbursement of Confirmation Litigation Fees in connection with responding to Debtors' discovery**

13.     The Reorganized Debtors refuse to pay any of the Confirmation Litigation Fees related to discovery they served on DBTCA on the ground that the fees incurred were not solely in connection with DBTCA' s status as a Committee member. They support this position with two arguments. First, the Reorganized Debtors assert that in the opening paragraph of the pertinent document request they identify DBTCA as "DBTCA solely in its capacity as successor indenture trustee for certain series of Senior Notes" *See* Objection at 8. Second, the Reorganized Debtors assert that they served DBTCA discovery because it was opposing the plan; thus, it could not be related to DBTCA's service as a Committee member. Both arguments are unavailing.

14.     The notion that sending a document request which names DBTCA "solely in its capacity as indenture trustee for certain series of Senior Notes" somehow decides the issue of whether DBTCA was acting as a Committee member is preposterous. DBTCA was always identified as acting solely in its capacity as indenture trustee for the Senior Notes throughout these cases. That is how it acts; it is a trustee.

ME1 15428091v.1

15.     DBTCA does not appear in its corporate capacity; it appears solely in its trust capacity, whether acting as a Committee member or as the fiduciary to the Senior Notes.  In fact, the Office of the United States Trustee appointed DBTCA to the Committee  in its capacity as "indenture trustee"

16.     In addition to their circular argument focusing on the words "indenture trustee" in the Document Requests, the Reorganized Debtors argue that because DBTCA opposed DCL Plan, the discovery had nothing to do with its status as a Committee member.

17.     That argument cannot be taken seriously. The Reorganized Debtors cite no case law to support the suggestion that a committee member acts in anything other than its capacity as a committee member simply because it dissents from the majority position of the committee. If that were the case, the concept of a democratically run committee (*i.e.,* majority rule) would be a farce.

18.     Moreover, simply because a committee member opposes positions taken by the committee does not suggest it is acting in anything other than its position as a committee member.  Each committee member has fiduciary responsibilities -- simply because the majority approves the course does not mean that the course is the right one or in the best interests of all creditors.

19.     Finally, the Document Requests served by the Debtors belie their current position. Out of the 55 requests, 33 implicated DBTCA's role as a member of the Committee.  It is only two years later, and now with the counsel of the attorneys who represented Oaktree throughout these cases, that Debtors characterize the request as being non-committee member related.  Had the Debtors wished to restrict their document request of DBTCA and McCarter to non-

Committee activities, the Debtors could have and should have done so, either by restricting the scope of the document requests or by narrowing the search terms.

20.      The Debtors' approach caused the fees incurred to be intertwined between Committee-related activities (*i.e.*, interaction with Committee counsel, Committee privilege issues, review of documents for production related to Committee issues, etc.), and arguably non-Committee related activities (*i.e.*, review of documents related to Plan opposition).  As a result of the sweeping document requests served by the Debtors on DBTCA, and the insistence on overly-broad electronic search terms, McCarter was required to review tens of thousands of  documents in less than a 10 day period.  Foreseeably, McCarter utilized a substantial number of reviewers to meet this deadline. For the Reorganized Debtors to now suggest that the document requests were not solely related to DBTCA's role as a Committee member because the Debtors chose to mingle requests that also implicated DBTCA's role as the fiduciaries of its bondholders is unsupported.

**B. The Confirmation Litigation Fees incurred in connection with the Aurelius subpoena are recoverable**

21.      The Reorganized Debtors also attempt to avoid reimbursing DBTCA for fees and expenses incurred in connection with the Aurelius subpoena by characterizing it as a "charade.". *See* Objection at 11.  It is not clear what the Reorganized Debtors mean by that, but the undisputed facts are that Aurelius subpoenaed various Committee members and their attorneys (McCarter had no involvement in or control over that decision), that Aurelius represented to the Court that it sought Mr. Adler's testimony solely with respect to Committee deliberations, and that every Committee member's fees relating to that subpoena have been reimbursed, except for DBTCA's (and WTC's).[5]  The Reorganized Debtors also challenge the fees on the grounds that

---

[5] The Reorganized Debtors did not have an issue reimbursing other Committee members for the fees they incurred in responding to discovery demands from Aurelius.  In that regard, the

ME1 15428091v.1

Mr. Adler should have done nothing to prepare for the deposition until after the court ruled on the Committee's motion to quash.  *See* Objection at pp. 9, 11.

22.    The Reorganized Debtors' suggested approach would have been highly irresponsible. The deposition subpoena was served on Mr. Adler on February 15th, scheduling his deposition for February 24th.   The Committee filed its motion to quash on February 17th; the Court heard oral argument on the 22nd and ruled on the 25th.  *Id*. Given the compressed timeframe, the uncertainty of when the deposition would take place, and the typically large amount of materials to be reviewed, reasonable expenses were incurred.

### C. The Reorganized Debtors should be compelled to interpret the Plan uniformly and treat DBTCA consistently with other Committee members

23.    In assessing the Reorganized Debtors' objection to DBTCA's Confirmation Litigation Fees, it is fair to compare what it argues is deficient with DBTCA's claim and how it has treated others. One example will suffice.

24.    Committee member, William Niese, is a party to the Retiree Claimant Settlement Agreement and a member of the TM Retirees' *ad hoc* group represented by Teitelbaum & Baskin LLP ("Teitelbaum Firm").  The Teitelbaum Firm represented Niese on the Committee. The subpoenas for Mr. Niese and the Teitelbaum Firm by Aurelius were not limited to Committee service; as with subpoenas served on DBTCA, the requests went far beyond Mr. Niese's capacity as a Committee member. *See* Declaration of Gordon Novod, Exh. 14 [D.I. # 13438].

25.    For example, request number 73 seeks all documents relating to the Retiree Claimant Settlement Agreement.  *Id*.  Mr. Niese did not have any Committee documents related

---

Debtors agreed to pay approximately $87,629 to Buena Vista, $149,172 to Bill Niese and $192,062 to Warner Brothers.

ME1 15428091v.1

to this topic, as he was clearly conflicted from Committee's deliberation concerning his own settlement with the Reorganized Debtors and acted in his individual capacity in determining whether to settle with the Reorganized Debtors.  Similarly, the subpoena served upon the Teitelbaum Firm was not, by its terms, limited to the Teitelbaum Firm's representation of Mr. Niese solely in his capacity as a Committee member. *Id,* Exh. 9.  Counsel to Law Debenture, conducting a meet and confer for Aurelius with Mr. Niese, rejected attempts to limit discovery to documents received in any other capacity than a Committee member. *Id,* Exh.13.

26.    The Teitelbaum Firm undisputedly incurred Confirmation Litigation Fees that were paid by the Debtors' estates when it was not acting for Mr. Niese solely in his capacity as a member of the Committee.  Yet the Reorganized Debtors paid all of Mr. Niese's Confirmation Litigation Fees, including those of the Teitelbaum Firm.  Given that fact, the Reorganized Debtors' objection to DBTCA's claim appears plainly based on something other than a belief that it falls outside of the language of § 9.1.3 of the Plan.  The Reorganized Debtors should not be permitted to treat Committee members differently.

## CONCLUSION

WHEREFORE, for the foregoing reasons, DBTCA respectfully requests payment

for the Confirmation Litigation Fees and Service Fees described herein.

Dated: April 15, 2013                                    **McCARTER & ENGLISH LLP**
         Wilmington, DE

                                            By:      /s/ Katharine L. Mayer
                                                     Katharine L. Mayer (DE# 3758)
                                                     Renaissance Centre
                                                     405 N. King Street, 8th Floor
                                                     Wilmington, DE 19801
                                                     (302) 984-6300
                                                     (302) 984-6399 Facsimile
                                                     kmayer@mccarter.com
                                                     -and-
                                                     David J. Adler, Esq. (DA0048)
                                                     245 Park Avenue
                                                     27th Floor
                                                     New York, New York  10167
                                                     (212) 609-6800 - Telephone
                                                     (212) 609-6921 - Facsimile
                                                     dadler@mccarter.com
                                                     *Counsel for Deutsche Bank Trust Company*
                                                     *Americas*

ME1 15428091v.1