**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| | |
| TRIBUNE COMPANY, et al., | Case No. 08-13141 (KJC) |
| Debtors. | **Related to Docket No. 13327, 13328** |

## DECLARATION OF DAVID J. ADLER

Pursuant to 28 U.S.C. § 1746, David J. Adler, being duly sworn, deposes and says:

1.      I am a partner at the law firm of McCarter & English LLP ("McCarter"), counsel for Deutsche Bank Trust Company Americas ("DBTCA"), successor indenture trustee for certain series of Senior Notes issued by Tribune Company ("Tribune" and, together with its Chapter 11 affiliates, the "Debtors") in the above-referenced chapter 11 cases.

2.      I have been engaged in the Tribune matter from December 8, 2008.  I am familiar with the facts set forth herein based upon personal knowledge and my review of applicable records and documents.

3.      I submit this declaration in support of DBTCA's Claim under Section 9.1.3 of the Fourth Amended Plan of Reorganization for Tribune Company (the "Plan") [D.I. 12072], as confirmed by the Bankruptcy Court on July 23, 2012 [D.I. 12074], and in support of DBTCA's Response to the Objection of the Reorganized Debtors to Creditors' Committee Member Fee Expense Claims Asserted by (A) Deutsche Bank Trust Company Americas and (B) Wilmington Trust Company (D.I. #13327, the "Objection").

4.      DBTCA  is the successor indenture trustee for three series of the Senior Notes, and, in that capacity, served on Tribune's Creditor's Committee from December 18, 2008 until

December 31, 2012, the effective date of the Plan. *See* D.I. 101 (Amended Notice of Appointment of the Committee of Unsecured Creditors).

5.      Section 9.1.3 of the Plan provides that "[n]o later than forty-five (45) days after the Effective Date, counsel to the Creditors' Committee shall submit to Reorganized Tribune ... statements of the Creditors' Committee Member Fee/Expense Claims." Plan, § 9.1.3.  Section 9.1.3 bifurcates fees into two categories: (i) "Service Fees" related to service on the Committee and (ii) "Confirmation Litigation Fees" related to "amounts incurred in connection with discovery (including deposition testimony) sought from members of the Creditors' Committee in connection with litigation related to confirmation of [the] Plan." *Id.*

6.      I am familiar with the work performed on behalf of DBTCA by the lawyers, legal assistants and other professionals of McCarter included in DBTCA's Section 9.1.3 Fee Claim.

7.      On January 29, 2013, Chadbourne & Parke LLP ("Chadbourne"), counsel to the Committee, submitted DBTCA's Section 9.1.3 Claim to the Reorganized Debtors and the Office of the United States Trustee, for review and, in the case of the Reorganized Debtors, payment. DBTCA requested payment of Creditors' Committee Member Fee/Expense Claims totaling $1,680,298.49, comprised of $760,524.00 for Service Fees and $884,613.50 for Confirmation Litigation Fees and $35,160.99 in expenses.

8.      Of this amount, the Reorganized Debtors have agreed to the allowance of $763,208.47 of Service Fees and on March 5, 2013, paid such amount, while objecting to the Confirmation Litigation Fees in their entirety.  Pursuant to the Response, DBTCA seeks payment of $828,590.02 for Confirmation Litigation Fees.  This figure reflects a reduction of $88,500.00 from the original request.

MEI 15463452v.1

9.    Attached hereto as Exhibit "1" is a true and correct copy of the January 29, 2013 letter sent by Chadbourne to the Reorganized Debtors and the Office of the United States Trustee.

10.    Confirmation Litigation Fees under Section 9.1.3 began to accrue on October 15, 2010, when counsel to Aurelius, served DBTCA and McCarter, as DBTCA's counsel, with "litigation hold" notices. Substantially similar notices were served on Chadbourne & Parke LLP ("Chadbourne"), as Committee's counsel, as well as all other Committee professionals. Aurelius served "litigation hold" notices on the other members of the Committee.

11.    Upon receipt of the litigation hold notices, DBTCA and McCarter, incurred fees and expenses related to prompt compliance with the litigation hold notices. McCarter and DBTCA each took steps to implement a "lock" on all documents to ensure document preservation. In addition, McCarter attorneys conferred with DBTCA's in-house counsel concerning compliance with the litigation hold notices. DBTCA, through counsel and in its capacity as a member of the Committee, received numerous inquiries from Chadbourne with respect to compliance with Aurelius' "litigation hold" notice.

12.    From December 9, 2010 through December 17, 2010, document requests and subpoenas from Aurelius and/or Law Debenture were served upon a number of members of the Committee. These subpoenas and document requests sought discovery of documents on a wide range of topics concerning the Debtors, the LBO and other topics and did not distinguish whether such documents were being sought from the recipient solely in their capacity as a Committee member or as a creditor of the Debtors. Nowhere in the instructions to the subpoenas are the document requests limited to each creditor solely in their capacities as Committee members.

3

13.     On December 17, 2010, the Debtors served a subpoena *duces tecum* on McCarter

and a separate document request on DBTCA (collectively, the "Document Requests"), in its

capacity as the successor indenture trustee for the Senior Notes. A copy of the Document

Requests are attached hereto as Exhibit "2" and Exhibit "3". The Document Requests each

contained 55 different requests. Of these requests, 33 were plainly applicable to DBTCA in all

capacities, including as a Committee member, and the remaining 22 were related to activity as a

proponent of the Noteholder Plan.

14.     In the face of wide ranging and broad discovery served on the Committee

members and their individual counsel by both Aurelius and the Debtors, DBTCA was aware of

its fiduciary duties and obligations as it responded to Document Requests. Following the receipt

of the Debtors' subpoena and document requests, McCarter incurred fees and expenses related to

the compliance with the subpoena and the Document Requests. These fees were the result of

McCarter's (i) preparation and service of objections and responses to these demands, (ii) creation

and negotiation of search terms and protocols, (iii) coordination of information technology

support, (iv) research of privilege questions and subsequent privilege determinations.

15.     On December 27, 2010, DBTCA proposed certain search terms and protocols, a

true copy of which is attached hereto as Exhibit "4". The proposal was rejected and the Debtors

insisted that DBTCA initiate a search using eighty search terms for each of McCarter and

DBTCA which included terms such as "Committee".

16.     In spite of DBTCA's efforts to narrow the search protocols, on January 7, 2011,

DBTCA gave into the Debtors' demands.  On January 13, 2011, McCarter, on behalf of itself

and DBTCA, met and conferred with counsel for the Debtors and other DCL Plan proponents.

During that meet and confer, the topic of the production of documents that may contain

4

Committee privileged information was discussed. McCarter advised the DCL Plan Proponents that McCarter and DBTCA would produce a privilege log on behalf of McCarter which would include documents that the Committee had asserted were privileged.

17.    From January 7, 2011 through January 19, 2011, DBTCA and McCarter incurred substantial fees reviewing tens of thousands of DBTCA and McCarter documents in order to meet the January 18, 2011 production deadline.

18.    As DBTCA had previously warned the Debtors, the search parameters were unnecessarily broad and captured many unresponsive documents. For example, because the Debtors insisted that McCarter and DBTCA search the word "Committee," McCarter was forced to review thousands of documents that contained this word and ultimately determined that substantially all of such documents would be excluded as either non-responsive or privileged Committee communications.   Consistent with the requests of Committee counsel and with DBTCA's obligations under the Committee's bylaws, DBTCA withheld all Committee communications.

19.    After DBTCA completed its own document production, on January 26, 2011, the Debtors served DBTCA with a Rule 30(b)(6) deposition notice. Ultimately, on February 7, 2011, the Debtors agreed to withdraw their Rule 30(b)(6) notice upon confirmation that no DBTCA employee would be a witness at the confirmation trial.

20.    In the months and weeks leading up to the March, 2011 confirmation hearing, Aurelius served deposition notices upon five attorneys to various members of the Committee as well as six members of the Committee. In that regard, I received a deposition subpoena. The subpoena, served on February 15, 2011 (along with the subpoena to Gordon Novod of Brown Rudnick LLP), required me to appear for a deposition noticed for February 24, 2011, the second

to last day of the discovery period under the plan scheduling order. As required by the

Committee's bylaws, McCarter promptly notified Committee counsel regarding the receipt of a

subpoena, and participated in various conference calls with Committee counsel concerning

DBTCA' s and McCarter's obligations under the Committee bylaws.  On February 17, 2011, the

Committee filed a letter brief seeking to quash the subpoenas served on me (as well as Mr.

Novod) on a number of grounds.  Information Aurelius sought to solicit from me and Mr. Novod

was based solely upon their representation of their respective clients as members of the

Committee and as fact witnesses to events that transpired in the Committee room.  In the written

papers and at oral argument on February 22, 2011, Aurelius' counsel stated, without

qualification, that it sought to depose me and Mr. Novod solely to discover details concerning

Committee deliberations and/or settlement negotiations and to test the veracity and credibility of

Committee members who had already been deposed, regardless of whether they would support

the Committee's contentions. Moreover, Aurelius sought the depositions to discover Committee

deliberations because the Committee's bylaws prohibited its members or counsel from

discussing Committee deliberations without a subpoena.

     21.    DBTCA and McCarter incurred fees in connection with the subpoena that was

issued to me.  In particular, McCarter conducted various conference calls with Committee

counsel and McCarter prepared for the deposition during the ten day period leading up the

Court's ruling on February 25, 2011.  I reviewed numerous documents in anticipation of his

deposition and he and other McCarter attorneys further reviewed Committee minutes and

memoranda, transcripts of other Committee members who had been deposed, the Committee

bylaws for privilege issues, and appeared at the Court's hearing on February 22, 2011 in

connection with the Committee request to quash my subpoena.

I declare under penalty of perjury that the foregoing is true and correct.

/s/ David J. Adler
David J. Adler

Executed on April 16, 2013

ME1 15463452v.1

# EXHIBIT "1"

30 Rockefeller Plaza, New York, NY 10112

tel (212) 408-5100  fax (212) 541-5369

# CHADBOURNE
# & PARKE LLP

David M. LeMay

direct tel (212) 408-5112  fax (646) 710-5112

dlemay@chadbourne.com

January 29, 2013

David J. Eldersveld, Esq.
Tribune Company
435 Michigan Avenue
Chicago, Illinois 60611

David Buchbinder, Esq.
The Office of the United States Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207 - Lockbox # 35
Wilmington, Delaware 19899-0035

Re:  In re Tribune Company, et al., Debtors (Case No. 08-13141)

Dear Counsel:

Pursuant to Sections 9.1.3 and 15.12 of the Fourth Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P. and JPMorgan Chase Bank, N.A. (as Modified July 19, 2012) [Docket No. 12072] (the "Confirmed and Effective Plan of Reorganization"), the following statements of Creditors' Committee Member Fee/Expense Claims are submitted herewith:

| Exhibit | Committee Member | Committee Service Fee/Expense Claims[i] | Confirmation Litigation Fee/Expense Claims[ii] |
|---------|------------------|------------------------------------------|-----------------------------------------------|
| A | Buena Vista Television, LLC | $0 | $87,629.94 |
| B | Deutsche Bank Trust Company Americas | $763,208.47 | $917,090.02 |
| C | JPMorgan Chase Bank, N.A. | $126,071.35 | $0 |
| D | Niese, William A. | $718,168.48 | $149,172.00 |
| E | Warner Bros. Television | $321,388.49 | $192,061.76 |
| F | Washington-Baltimore Newspaper Guild | $92,746.50 | $15,213.00 |
| G | Wilmington Trust Company | $1,065,071.77 | $614,853.00 |

# CHADBOURNE
## & PARKE LLP

Messrs. Eldersveld and Buchbinder                    -2-                    January 29, 2013

      Committee member Pension Benefit Guaranty Corporation has confirmed that it will not submit a Committee Member Fee/Expense Claim.

Very truly yours,

David M. LeMay

---

[i]    "Committee Service Fee/Expense Claims" means the claims of the individual members of the Creditors' Committee for fees, costs and expenses of their individual outside legal and/or financial advisors incurred solely in their capacity as members of the Creditors' Committee.

[ii]    "Confirmation Litigation Fee/Expense Claims" means the claims of the individual members of the Creditors' Committee for fees, costs and expenses of their individual outside legal and/or financial advisors incurred in connection with discovery (including deposition testimony) sought from members of the Creditors' Committee in connection with litigation related to confirmation of the Confirmed and Effective Plan of Reorganization.

*Via Electronic Mail*

cc:  Jessica C.K. Boelter, Esq.
     J. Kate Stickles, Esq.

# EXHIBIT A

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, *et al.* | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered |

## STATEMENT OF CREDITORS' COMMITTEE FEE/EXPENSE CLAIMS

## SUMMARY OF SERVICES

### Amounts Incurred In Connection With Discovery Sought From Committee Members With Respect To Litigation Related To Confirmation Of The DCL Plan

Fees: $87,629.94          Total Hours:  234.50          Expenses: $762.02

1.      On or about December 15, 2010, counsel for Law Debenture Trust Company of New York, ("Law Debenture") served the Subpoena to Produce and Permit Inspection and Copying of Documents on Buena Vista Television, LLC ("Buena Vista"), a member of the Committee of Unsecured Creditors and a separate Subpoena for Testimony (collectively, the "Subpoenas") on one of its employees.  Buena Vista is an affiliate of The Walt Disney Company. The Subpoenas were received in connection with the Tribune Company's plan confirmation and Noteholder's litigation.  Buena Vista retained the law firm of Dewey & LeBoeuf, LLP ("Dewey").

2.      Among other things, Dewey attorneys coordinated with Creditors Committee counsel, negotiated with opposing counsel, collected, reviewed and produced documents, and retained Delaware counsel for potential court appearances.  Dewey attorneys also researched

various legal issues raised by the Subpoenas and responded to opposing counsel regarding various discovery disputes.

3.      Dewey attorneys had to work late in the evenings or on weekends to meet relevant deadlines.  Reasonable transportation and meal costs were reimbursed.

## ACTUAL AND NECESSARY EXPENSES

4.      A summary of the actual and necessary legal fees and expenses that Buena Vista incurred (and either paid to or reimbursed Dewey for) in connection with the Subpoenas in the amount of $87,629.94 is set forth below and in the Buena Vista records attached hereto as Exhibit A.

| | | | | Total | | Fees | | Expenses |
|---|---|---|---|---|---|---|---|---|
| Dewey Invoice: 615723 | | | | $50,332.84 | | $50,026.34 | | $306.50 |
| Dewey Invoice: 616756 | | | | $37,297.10 | | $36,841.58 | | $455.52 |

No previous application with respect to the relief requested herein has been made to this Court.

WHEREFORE, after appropriate review, Buena Vista respectfully requests that the Court enter an Order: (a) authorizing the allowance of fees in the amount of $86, 867.92, and reimbursement of actual and necessary expenses in the amount of $762.02; (b) granting such further relief as this Court deems just and proper.



# EXHIBIT A

## Invoice: 616756

Vendor: Dewey & LeBoeuf, LLP (New York)
(WIRE TRANSFER ONLY)
JPMorgan Chase Bank
1166 Avenue of the Americas
Account #910-1-062983
ABA #021-000-021
Swift code (or BIC) CHASU33
New York, New York  10036
United States

| Vendor: | Dewey & LeBoeuf, LLP (New York) | Status: | Sent to AP 05/16/2012 | | Total | Fees | Exp |
|---|---|---|---|---|---|---|---|
| Co Matter: | In re: Tribune | Country: | United States | Billed: | $43,037.13 | $40,914.08 | $2,123.05 |
| | | | | Adjusted: | $37,297.10 | $36,841.58 | $455.52 |

Period: 01/06/11 - 02/28/11  Date: 03/31/11  Posted: 04/01/11  Reduced: 05/16/12
Sent to AP: 05/16/12  Paid: --  P.O.: --
Check/Wire No.:  --  Payment Comment:  --
Comments:  to Firm (0)  Internal (1)
Description:  Continued work in connection with subpoena served on Buena Vista in Tribune Bankruptcy, including review of documents for potential production, response to letter brief from opposing counsel bringing discovery disputes before the Court, coordination with counsel for Creditors Committee and individual committee members, retention of Delaware counsel for potential court appearance, work on privilege log, negotiations with opposing counsel regarding deposition of G. Davis, ...

### INVOICE ANALYSIS

#### TIMEKEEPERS - Name

Approved Timekeeper Rates: None attached  Timekeeper Rates: None attached

| Timekeeper | THIS INVOICE Rate(Avg) | Hours (%) | Adjustment | Total (%) |
|---|---|---|---|---|
| Karcher, Timothy Q. (PT) | $607.51 | 0.8 (0.8%) | -- | $455.63 (1.2%) |
| Davison, Andrew (OT) | -- | 1.5 (1.6%) | -- | $0.00 (0.0%) |
| Pryhorocki, Trevor (OT) | -- | 8.0 (8.7%) | -- | $0.00 (0.0%) |
| Oxman, Matthew C (AS) | $348.21 | 39.5 (42.9%) | -- | $13,754.30 (37.3%) |
| Forde, Bianca (AS) | $396.00 | 17.5 (19.0%) | -- | $6,930.00 (18.8%) |
| Ricardo, Henry (PT) | $634.41 | 24.8 (26.9%) | -- | $15,701.65 (42.6%) |
| Total: | $400.45 | 92.0 (100.0%) | -- | $36,841.58 (100.0%) |

#### TIMEKEEPERS - Classification

| Classification | THIS INVOICE Rate(Avg) | Hours (%) | Adjustment | Total (%) |
|---|---|---|---|---|
| Associate (AS) | $362.88 | 57.0 (62.0%) | -- | $20,684.30 (56.1%) |
| Other Timekeeper (OT) | -- | 9.5 (10.3%) | -- | $0.00 (0.0%) |
| Partner (PT) | $633.62 | 25.5 (27.7%) | -- | $16,157.28 (43.9%) |
| Total: | $400.45 | 92.0 (100.0%) | -- | $36,841.58 (100.0%) |

#### EXPENSE - Expense Codes

| Expense Type | THIS INVOICE Rate(Avg) | Units | Adjustment | Total (%) |
|---|---|---|---|---|
| E101 - Copying | $0.08 | 2,263.0 | -- | $181.04 (39.7%) |
| E106 - Online Research | -- | 434.0 | -- | $0.00 (0.0%) |
| E107 - Delivery Services/Messengers | $21.99 | 7.0 | -- | $153.95 (33.8%) |
| E109 - Local Travel | $22.28 | 1.0 | -- | $22.28 (4.9%) |
| E111 - Meals | $24.56 | 4.0 | -- | $98.25 (21.6%) |
| Total: | -- | -- | -- | $455.52 (100.0%) |

## Invoice: 615723

Vendor: Dewey & LeBoeuf, LLP (New York)
(WIRE TRANSFER ONLY)
JPMorgan Chase Bank
1166 Avenue of the Americas
Account #910-1-062983
ABA #021-000-021
Swift code (or BIC) CHASU33
New York, New York  10036
United States

| Vendor: | Dewey & LeBoeuf, LLP (New York) | Status: | Sent to AP 05/16/2012 | | Total | Fees | Exp |
|---|---|---|---|---|---|---|---|
| Co Matter: | In re: Tribune | Country: | United States | Billed: | $59,473.34 | $59,166.84 | $306.50 |
| | | | | Adjusted: | $50,332.84 | $50,026.34 | $306.50 |

Period: 12/24/10 - 01/31/11   Date: 03/07/11   Posted: 03/07/11   Reduced: 05/16/12
Sent to AP: 05/16/12   Paid: –   P.O.: –
Check/Wire No.: –       Payment Comment: –
Comments:     to Firm (0)  Internal (1)
Description:    Response to subpoena served on Buena Vista in Tribune Bankruptcy, including preparation of objections, coordination with Creditor Committee
               counsel, communications with opposing counsel, planning for collection and review of documents, review of documents, production of
               documents, monitoring case, and communications with client and internal team regarding the foregoing.

### INVOICE ANALYSIS

#### TIMEKEEPERS - Name

Approved Timekeeper Rates: *None attached* Timekeeper Rates: *None attached*

| Timekeeper | THIS INVOICE Rate(Avg) | Hours (%) | Adjustment | Total (%) |
|---|---|---|---|---|
| Ballon, Daniel (AS) | $396.00 | 1.5 (1.1%) | – | $594.00 (1.2%) |
| Karcher, Timothy Q. (PT) | $607.50 | 7.5 (5.3%) | – | $4,556.26 (9.1%) |
| Davison, Andrew (OT) | – | 0.5 (0.4%) | – | $0.00 (0.0%) |
| Casey, Courtnay (OT) | – | 9.0 (6.3%) | – | $0.00 (0.0%) |
| Pryhorocki, Trevor (OT) | – | 16.5 (11.6%) | – | $0.00 (0.0%) |
| Oxman, Matthew C (AS) | $348.21 | 60.3 (42.3%) | – | $20,979.66 (41.9%) |
| Forde, Bianca (AS) | $396.00 | 25.5 (17.9%) | – | $10,098.00 (20.2%) |
| Ricardo, Henry (PT) | $634.41 | 21.8 (15.3%) | – | $13,798.42 (27.6%) |
| **Total:** | $351.06 | 142.5 (100.0%) | – | $50,026.34 (100.0%) |

#### TIMEKEEPERS - Classification

| Classification | THIS INVOICE Rate(Avg) | Hours (%) | Adjustment | Total (%) |
|---|---|---|---|---|
| Associate (AS) | $363.00 | 87.3 (61.2%) | – | $31,671.66 (63.3%) |
| Other Timekeeper (OT) | – | 26.0 (18.2%) | – | $0.00 (0.0%) |
| Partner (PT) | $627.51 | 29.3 (20.5%) | – | $18,354.68 (36.7%) |
| **Total:** | $351.06 | 142.5 (100.0%) | – | $50,026.34 (100.0%) |

#### EXPENSE - Expense Codes

| Expense Type | THIS INVOICE Rate(Avg) | Units | Adjustment | Total (%) |
|---|---|---|---|---|
| E101 - Copying | $0.08 | 2,498.0 | – | $199.84 (65.2%) |
| E107 - Delivery Services/Messengers | $22.50 | 2.0 | – | $45.00 (14.7%) |
| E111 - Meals | $20.55 | 3.0 | – | $61.66 (20.1%) |
| **Total:** | – | – | – | $306.50 (100.0%) |

# **EXHIBIT B**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
|  | Case No. 08-13141 (KJC) |
| TRIBUNE COMPANY, *et al.*, |  |
|  | Jointly Administered |
| Debtors. |  |

## DBTCA EXPENSE CLAIM PURSUANT TO
## SECTION 9.1.3 OF THE FOURTH AMENDED PLAN

### PRELIMINARY STATEMENT

1.      Deutsche Bank Trust Company Americas ("DBTCA") submits this statement pursuant to Section 9.1.3 of the Fourth Amended Plan dated July 19, 2012 (the "Fourth Amended Plan" or the "Plan") which provides that: "No later than forty-five (45) days after the Effective Date, counsel to the Creditors' Committee shall submit to Reorganized Tribune and the United States Trustee, reasonably detailed statements of the Creditors' Committee Member Fee/Expense Claims, which statements shall include descriptions of services provided in summary form without individual time records."

2.      As of the Petition Date, DBTCA served as the indenture trustee for 4 different indentures.  The total amount owed by Tribune under the indentures was approximately $1.283 billion.  In June of 2009, DBTCA resigned as indenture trustee from one of the indentures.

3.      DBTCA was appointed to the Creditors' Committee at the formation hearing on December 18, 2008.  DBTCA served continuously as a member of the Creditors' Committee from its formation until the Effective Date.

1

## SUMMARY OF REIMBURSABLE EXPENSES

A.    **Amounts Incurred In Connection With DBTCA's Service On The Committee**

Fees:  $760,524.00          Total Hours:  1,373.30

4.      DBTCA incurred $760,524.00 in expenses in connection with its engagement of

McCarter & English LLP ("M&E") to advise it in its capacity as a member of the Creditors'

Committee.  M&E attended over 100 regular and special meetings of the Committee in person

or telephonically and participated in the discussion of the following significant issues related to

the Debtors' reorganization.  In connection with those meetings, M&E advised DBTCA, in its

capacity as a member of the Committee with respect to Committee business, which business

included but was not limited to, the following:

- Discussion and analysis of key business and operational issues of the Debtors (annual or quarterly operational results, annual Management Incentive Program, Project Fastball (sale of Chicago Cubs), annual business plans, long term business plan).

- Discussion and analysis of other restructuring issues (*e.g.* rejection/assumption of executory contracts, settlement of pending litigation claims, claims resolution).

- Discussion and analysis of Barclay's DIP Loan Securitization.

- Discussion and analysis of various tax issues related to the Debtors' ESOP structure.

- Discussion and analysis of various issues concerning the Senior Lenders' request for current payment of fees and expenses from non-debtor affiliates.

- Review of retentions of various estate parties and the fees and expenses associated therewith.

- Extended discussion and analysis of the 2007 Leveraged Buy Out (the "2007 LBO") and the numerous reports prepared by Committee's counsel concerning, among other things, (i) the facts surrounding the 2007 LBO, (ii) the structure of the transaction, (iii) the possible causes of action that may be asserted as a result

2

of the transaction, (iv) the potential defendants and (v) the remedies available to the estate as a result of the transaction.

- Extended discussion and analysis of a solvency report prepared by Alix Partners.

- Discussion and analysis of various issues related to a plan of reorganization, including, but not limited to, tax issues and FCC regulatory issues (*e.g.* Federal Communications Commission).

- Discussion and analysis of intercompany claims.

- Discussion and analysis of DEV of the Debtors.

- Participation in discussions and negotiations between various parties (including Centerbridge, JPM, the Steering Committee of Senior Lenders) and review and analysis of numerous term sheets resulting in the settlement of claims related to the 2007 LBO which was thereafter embodied in the Joint Plan of Reorganization dated April 12, 2010(the "Joint Plan").

- Participation in selection of conflicts' counsel to Chadbourne & Parke LLP.

- Participation in discussions concerning the ramifications of the filing of the Wilmington Trust Complaint on March 3, 2010 for Equitable Subordination and Disallowance of Claims, Damages and Constructive Trust and the position to be taken by the Committee in connection therewith.

- Discussion and analysis of issues related to Wilmington's Motion to Appoint an Examiner.

- Discussion and analysis of the Disclosure Statement and Joint Plan of Reorganization including the Retiree Settlement.

- Discussion and analysis of issues related to the appointment of an Examiner and thereafter, the Committee position on various issues regarding claims against third parties and the filing of the Complaint by WTC.

- Extended discussion with the Committee following the release of the Examiner's Report on July 26, 2010.

- Discussion and participation in negotiations regarding potential amendments to the Joint Plan with various parties following the release of the Examiner's Report.

- Extended discussions and analysis following the Plan Mediation in the fall of 2010.

- Discussion and analysis of an exposure model prepared by Aurelius Capital Management L.P.

- Discussion and analysis of potential preference actions.

- Participating in various discussions concerning Aurelius' Motion to disqualify Chadbourne & Parke in September-October 2010, including the protocol to be agreed upon to resolve the motion.

- Discussion and analysis of proposals leading to Second Amended Joint Plan of Reorganization proposed by the Debtors, the Committee and various other parties ("Second Amended Plan").

- Participating in Committee discussion concerning the Second Amended Plan.

- Participating in Committee discussions concerning the Bankruptcy court's denial of confirmation of both the Second Amended Plan and the Noteholder Plan.

- Participating in Committee discussions thereafter concerning the PHONES subordination.

- Participating in Committee discussions concerning the hearing on the Allocation Disputes following the denial of the Second Amended Plan.

- Participating in Committee discussions concerning the Fourth Amended Plan and revisions to the Litigation Trust Agreement to be established on the Effective Date.

**B    Amounts Incurred In Connection With Discovery Sought From Committee Members With Respect To Litigation Related To Confirmation Of The Plan**

Fees:  $884,613.50          Total Hours:  2,151.30

5.        In addition to reimbursement for fees and expenses incurred as a Committee Member, Section 9.1.3 of the Plan provides that: DBTCA shall be paid "reasonable amounts incurred in connection with discovery (including deposition testimony) sought from members of the Creditors' Committee in connection with litigation related to confirmation of this Plan)…" Pursuant to Section 9.1.3 of the Plan, DBTCA seeks reimbursement of $884,613.50 in expenses it incurred in connection with discovery related to the Plan.

### i.  Document Requests Served by Tribune on DBTCA and M&E

6.    On December 17, 2010, the Debtors' served their (a) First Request for Production of Documents to DBTCA ("DBTCA Document Requests"); and (b) First Request for Production of Documents to McCarter & English LLP ("M&E Document Request"; collectively the "Document Requests").

7.    Following receipt of the Document Request, M&E's team of litigation and bankruptcy professionals, paraprofessionals and litigation support specialists were substantially engaged in complying with the demands necessitated by the Document Requests. During this period, M&E attorneys participated in several meet-and-confer sessions with the Debtors and other parties in an attempt to agree to various search parameters and address other issues in connection with the Document Requests.

8.    M&E's team of professionals collected, reviewed and analyzed a multitude of documents and computer files produced in connection with the M&E Document Request and reviewed and analyzed documents and computer files in connection with the DBTCA Document Request. These efforts were a massive undertaking demanding a considerable amount of time and effort, requiring substantial staffing by M&E's professionals and paraprofessionals to meet the discovery demands as well as the court-imposed discovery deadlines in an efficient and timely manner. In connection with the Document Requests, M&E reviewed several hundred thousand pages of documents and computer records.

9.    During this time, M&E attorneys also researched and discussed various privilege issues and protocols (including what documents were protected by Committee privilege) with respect to the production of certain documents, reviewed and discussed documents subject to claw-back and prepared and finalized an extensive privilege log in connection with same.

5

### ii.    Subpoena by Aurelius Capital

10.    As part of the discovery process in connection with the Second Amended Plan, Aurelius sought to depose David J. Adler, a partner at M&E ("Adler Deposition Subpoena"). As a result, M&E's team of professionals and paraprofessionals devoted significant efforts in preparing for this deposition. Further, in preparation for those depositions, M&E's team expended substantial time on the review and analysis of various pertinent documents amassed from the document productions of other members of the Committee. In connection therewith, M&E researched and prepared a detailed time line and chronology of events.

11.    During this time, M&E attorneys prepared for and attended several Court hearings on the Committee discovery issues. At the February 25, 2011 hearing, the Court granted the Committee's motions to quash the Adler Deposition Subpoena.

### iii.    Discovery served by Wilmington Trust Company

12.    In connection with the Allocation Disputes Hearing, DBTCA received discovery requests from Wilmington Trust Company, the indenture trustee for the PHONES indenture (the "PHONES Discovery Request"). M&E devoted significant efforts on the review and production of various documents in connection with the PHONES Discovery Request.

## C.    Actual And Necessary Expenses

13.    With respect to the Committee reimbursement, M&E is seeking reimbursement for $35,160.99 representing the following expenses:

- $2,230.63 for airfare and lodging for two trips to Chicago in January and June of 2009 for Creditors' Committee meetings with the Debtors.

- $453.84 for travel and lodging in connection with the formation of the Creditors' Committee on December 18, 2008.

- $235.00 for travel to Wilmington in connection with the hearing to quash the Adler Deposition Subpoena.

- $32,241.52 for expenses paid to third party vendors in connection with the Documents Requests.

All of these expenses represent the actual cost paid.

## CONCLUSION

Pursuant to Section 9.1.3 of the Plan, DBTCA is entitled to reimbursement of

$1,680,298.49.

Dated: January 25, 2013
     New York, New York

**McCARTER & ENGLISH, LLP**

By:  /s/ David J. Adler
     David J. Adler
     245 Park Avenue, 27th Floor
     New York, New York 10167
     Telephone: (212) 609-6800
     Fax: (212) 609-6921
     dadler@mccarter.com
     *Counsel for Deutsche Bank Trust Company Americas*

# **EXHIBIT C**

INVOICE NUMBER· DPW09-3970                    NEW YORK  February 17, 2009

_____

JPMORGAN CHASE BANK                                    DR

_____

To **D A V I S  P O L K  &  W A R D W E L L**
COUNSELLORS AT LAW
450 LEXINGTON AVENUE
NEW YORK, N.Y. 10017                          FEDERAL & NEW YORK STATE
                                              IDENTIFICATION NUMBER
                                              135023295

For professional services rendered in connection with JPMorgan
Chase Bank N.A.'s ("**JPMorgan**") membership on the official
committee of unsecured creditors (the "**Committee**") appointed
in the chapter 11 cases of Tribune Company and certain of its
affiliates (together, the "**Company**"), including (i) attendance at,
participation in and advice provided during the organizational
meeting at which JPMorgan was selected as a member and co-
chair of the Committee, (ii) review, negotiation and revision of
Committee bylaws and other Committee materials, (iii) review
of Committee reports and memoranda, (iv) review of Company
material provided to the Committee, (v) coordination with
Committee professionals and members on issues of importance
to JPMorgan, (vi) attendance at and participation in Committee
meetings and conference calls and (vii) advice generally with
respect to the foregoing                            $     27,801.30


**Non-Professional Charges**
Word processing & secretarial            $        4.50
Computer research                                54.65
         **Total Non-Professional Charges**              59.15

Total                                        $    27,860.45

PAYMENT IN U.S. DOLLARS MAY BE MADE BY WIRE TRANSFER TO OUR
ACCOUNT NO.: 001533316 AT JPMORGAN CHASE BANK
500 STANTON CHRISTIANA RD. NEWARK, DE 19713
A.B.A. NUMBER 021 000021 / SWIFT CODE CHAS US 33

CHARGES WHICH HAVE NOT BEEN RECORDED AS OF THE ABOVE DATE WILL BE BILLED LATER.

(NY) 27011/167/AUTOBILL/021109.bill.013109.1735.doc

JPMORGAN CHASE BANK                                    February 17, 2009

| Timekeeper Group Summary | |
| --- | ---: |
| | **Hours** |
| **Partner** | |
| Bernstein DS | 11.4 |
| **Total** | **11.4** |
| **Associate** | |
| Klein DS | 4.1 |
| Schaible DS | 23.2 |
| Smit D | 15.0 |
| **Total** | **42.3** |
| **Grand Total** | **53.7** |

(NY) 27011 167 AUTOBILL 021109.bill.013109.1735 doc

# Davis Polk

Invoice Number: DPW09-16358

July 15, 2009

Invoice to:    JPMORGAN CHASE BANK

From:    Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, N.Y. 10017

Federal & New York State
Identification Number
135023295

For professional services rendered in connection with JPMorgan Chase Bank N.A.'s
("**JPMorgan**") service on the statutory committee of unsecured creditors (the
"**Committee**") appointed in the chapter 11 cases of the Tribune Company and certain
of its affiliates (together, the "**Company**"), including (i) review of Committee reports
and memoranda, (ii) review of Company material provided to the Committee,
(iii) coordination with Committee professionals and members on issues of importance
to JPMorgan, (iv) attendance at and participation in Committee meetings and
conference calls and (v) advice generally with respect to the foregoing    $    16,513.50

**Non-Professional Charges**
Word processing & secretarial    $    45.00
**Total Non-Professional Charges**    45.00

**Disbursements**
Meals    $    30.24
**Total Disbursements**    30.24

Total    $    16,588.74

Amount Paid    (16,513.50)
Adjusted Amount  (expenses)    (    75.25)

Payment in U.S. dollars may be made by wire transfer to our
Account No.: 001533316 at JPMorgan Chase Bank
500 Stanton Christiana Rd. Newark, DE 19713
A.B.A Number 021 000021 / Swift Code CHAS US 33

Charges that have not been recorded as of the above date will be billed later.

JPMORGAN CHASE BANK                     July 15, 2009                              pg. 2

| Timekeeper Group Summary | |
| --- | ---: |
| | **Hours** |
| **Partner** | |
| Bernstein DS | 0.6 |
| **Total** | **0.6** |
| **Associate** | |
| Deng W | 9.9 |
| Schaible DS | 17.5 |
| Smit D | 16.6 |
| **Total** | **44.0** |
| **Grand Total** | **44.6** |

Davis Polk & Wardwell LLP

# DavisPolk

Invoice Number: DPW09-28149

December 18, 2009

Invoice to:     JPMORGAN CHASE BANK

From:          Davis Polk & Wardwell LLP
               450 Lexington Avenue
               New York, N.Y. 10017

Federal & New York State
Identification Number
135023295

For professional services rendered in connection with JPMorgan Chase
Bank N.A.'s ("**JPMorgan**") service on the statutory committee of unsecured
creditors (the "**Committee**") appointed in the chapter 11 cases of the Tribune
Company and certain of its affiliates (together, the "**Company**"), including
(i) review of Committee reports and memoranda, (ii) review of Company
material provided to the Committee, (iii) coordination with Committee
professionals and members on issues of importance to JPMorgan,
(iv) attendance at and participation in Committee meetings and conference
calls and (v) advice generally with respect to the foregoing

$

15,043.00

| | | | |
|---|---|---|---|
| **Non-Professional Charges** | | | |
| Duplication | $ | 113.40 | |
| **Total Non-Professional Charges** | | | 113.40 |
| | | | |
| **Disbursements** | | | |
| Miscellaneous disbursements | $ | 10.00 | |
| **Total Disbursements** | | | 10.00 |
| | | | |
| Total | | $ | 15,166.40 |

Payment in U.S. dollars may be made by wire transfer to our
Account No.: 001533316 at JPMorgan Chase Bank
500 Stanton Christiana Rd. Newark, DE 19713
A.B.A. Number 021 000021 / Swift Code CHAS US 33

Charges that have not been recorded as of the above date will be billed later.

JPMORGAN CHASE BANK                    December 18, 2009                    pg. 2

| Timekeeper Group Summary | |
| --- | --- |
| | **Hours** |
| **Partner** | |
| Bernstein DS | 1.1 |
| Schaible DS | 8.4 |
| **Total** | **9.5** |
| | |
| **Associate** | |
| Deng W | 24.5 |
| Kim PS | 3.1 |
| Smit D | 13.2 |
| **Total** | **40.8** |
| | |
| **Document Clerk** | |
| Moore CR | 0.3 |
| **Total** | **0.3** |
| | |
| **Grand Total** | **50.6** |

Davis Polk & Wardwell LLP

# Davis Polk

Invoice Number: DPW10-25256

November 15, 2010

Invoice to:     JPMORGAN CHASE BANK, N.A.

From:     Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, N.Y. 10017

Federal & New York State
Identification Number
135023295

For professional services rendered through October 31, 2010 in connection
with JPMorgan Chase Bank N.A.'s ("**JPMorgan**") service on the statutory
committee of unsecured creditors (the "**Committee**") appointed in the
chapter 11 cases of the Tribune Company and certain of its affiliate s
(together, the "**Company**"), including (i) review of Committee reports and
memoranda, (ii) review of Company material provided to the Committee,
(iii) coordination with Committee professionals and members on issues of
importance to JPMorgan, (iv) attendance at and participation in Committee
meetings and conference calls and (v) advice generally with respect to the
foregoing

$

20,088.00

Amount Paid                                                              (18,898.80)
Adjusted Amount                                                       (1,189.20)

Payment in U.S. dollars may be made by wire transfer to our
Account No.: 001533316 at JPMorgan Chase Bank
500 Stanton Christiana Rd. Newark, DE 19713
A.B.A. Number 021 000021 / Swift Code CHAS US 33

Charges that have not been recorded as of the above date will be billed later.

JPMORGAN CHASE BANK, N.A.          November 15, 2010                          pg. 2

| Timekeeper Group Summary | |
|---|---:|
| | **Hours** |
| **Partner** | |
| Schaible DS | 8.6 |
| **Total** | **8.6** |
| | |
| **Associate** | |
| Henderson C | 15.6 |
| Kim PS | 29.2 |
| Smit D | 2.0 |
| Vonnegut EJ | 7.9 |
| **Total** | **54.7** |
| | |
| **Legal Assistant** | |
| Law EC | 0.2 |
| **Total** | **0.2** |
| | |
| **Grand Total** | **63.5** |

# Davis Polk

Invoice Number: DPW1121804

August 3, 2011

Invoice to:    JPMORGAN CHASE BANK, N.A.

From:    Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, N.Y. 10017

Federal & New York State
Identification Number
135023295

---

For professional services rendered through July 31, 2011 in
connection with JPMorgan Chase Bank N.A.'s ("**JPMorgan**") service
on the statutory committee of unsecured creditors (the "**Committee**")
appointed in the chapter 11 cases of the Tribune Company and certain
of its affiliate s (together, the "**Company**"), including (i) review of
Committee reports and memoranda, (ii) review of Company material
provided to the Committee, (iii) coordination with Committee
professionals and members on issues of importance to JPMorgan,
(iv) attendance at and participation in Committee meetings and
conference calls and (v) advice generally with respect to the foregoing          $          25,237.80

Payment in U.S. dollars may be made by wire transfer to our
Account No.: 001533316 at JPMorgan Chase Bank
500 Stanton Christiana Rd. Newark, DE 19713
A.B.A. Number 021 000021 / Swift Code CHAS US 33

Charges that have not been recorded as of the above date will be billed later.

JPMORGAN CHASE BANK, N.A.          August 3, 2011                    pg. 2

| Timekeeper Group Summary | |
| --- | ---: |
| | **Hours** |
| **Partner** | |
| Schaible DS | 12.8 |
| | 6.3 |
| **Total** | **19.1** |
| | |
| **Associate** | |
| Henderson C | 0.7 |
| Kim PS | 4.7 |
| | 4.0 |
| Vonnegut EJ | 10.6 |
| | 1.2 |
| **Total** | **21.2** |
| | |
| **Legal Assistant** | |
| Law EC | 20.9 |
| | 9.0 |
| **Total** | **29.9** |
| | |
| **Grand Total** | **70.2** |

Davis Polk & Wardwell LLP

# Davis Polk

Invoice Number: DPW1215003                                              June 8, 2012

Invoice to:      JPMORGAN CHASE BANK, N.A.

From:            Davis Polk & Wardwell LLP                    Federal & New York State
                 450 Lexington Avenue                         Identification Number
                 New York, N.Y. 10017                         135023295

---

For professional services rendered through April 30, 2012 in connection with
JPMorgan Chase Bank N.A.'s ("**JPMorgan**") service on the statutory
committee of unsecured creditors (the "**Committee**") appointed in the chapter
11 cases of the Tribune Company and certain of its affiliate s (together, the
"**Company**"), including (i) review of Committee reports and memoranda,
(ii) review of Company material provided to the Committee, (iii) coordination
with Committee professionals and members on issues of importance to
JPMorgan, (iv) attendance at and participation in Committee meetings and
conference calls and (v) advice generally with respect to the foregoing        $      19,440.20

Payment in U.S. dollars may be made by wire transfer to our
Account No.: 001533316 at JPMorgan Chase Bank
500 Stanton Christiana Rd. Newark, DE 19713
A.B.A. Number 021 000021 / Swift Code CHAS US 33

Charges that have not been recorded as of the above date will be billed later.

JPMORGAN CHASE BANK, N.A.          June 8, 2012          pg. 8

| Timekeeper Group Summary | |
| --- | ---: |
| | **Hours** |
| **Partner** | |
| Schaible DS | 16.4 |
| **Total** | **16.4** |
| | |
| **Associate** | |
| Kim PS | 2.6 |
| Vonnegut EJ | 4.7 |
| | 3.1 |
| **Total** | **10.4** |
| | |
| **Legal Assistant** | |
| Law EC | 24.8 |
| **Total** | **24.8** |
| | |
| **Grand Total** | **51.6** |

# Davis Polk

Invoice Number: DPW1229462

November 26, 2012

Invoice to:    JPMORGAN CHASE BANK, N.A.

From:    Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, N.Y. 10017

Federal & New York State
Identification Number
135023295

---

For professional services rendered through October 31, 2012 in connection
with JPMorgan Chase Bank N.A.'s ("**JPMorgan**") service on the statutory
committee of unsecured creditors (the "**Committee**") appointed in the chapter
11 cases of the Tribune Company and certain of its affiliates (together, the
"**Company**"), including (i) review of Committee reports and memoranda,
(ii) review of Company material provided to the Committee, (iii) coordination
with Committee professionals and members on issues of importance to
JPMorgan, (iv) attendance at and participation in Committee meetings and
conference calls and (v) advice generally with respect to the foregoing          $       1,642.70

Total                                                                            $      1,642.70

Payment in U.S. dollars may be made by wire transfer to our
Account No.: 001533316 at JPMorgan Chase Bank
500 Stanton Christiana Rd. Newark, DE 19713
A.B.A. Number 021 000021 / Swift Code CHAS US 33

Charges that have not been recorded as of the above date will be billed later.

JPMORGAN CHASE BANK, N.A.          November 26, 2012                    pg. 3

| Timekeeper Group Summary | |
| --- | --- |
| | **Hours** |
| **Associate** | |
| Vonnegut EJ | 1.8 |
| Libby A | 0.5 |
| **Total** | **2.3** |
| **Legal Assistant** | |
| Law EC | 2.5 |
| **Total** | **2.5** |
| **Grand Total** | **4.8** |

Davis Polk & Wardwell LLP

# Davis Polk

Invoice Number: DPW132490

January 15, 2013

Invoice to:    JPMORGAN CHASE BANK, N.A.

From·    Davis Polk & Wardwell LLP    Federal & New York State
450 Lexington Avenue    Identification Number
New York. N.Y. 10017    135023295

---

For professional services rendered through December 31, 2012 in
connection with JPMorgan Chase Bank N.A.'s ("JPMorgan") service on the
statutory committee of unsecured creditors (the "Committee") appointed in
the chapter 11 cases of the Tribune Company and certain of its affiliates
(together, the "Company"), including (i) review of Committee reports and
memoranda, (ii) review of Company material provided to the Committee, (iii)
coordination with Committee professionals and members on issues of
importance to JPMorgan, (iv) attendance at and participation in Committee
meetings and conference calls and (v) advice generally with respect to the
foregoing                                                                    $        1,311.50


                    Total                                                    $        1,311.50

Payment in U.S. dollars may be made by wire transfer to our
Account No.· 001533316 at JPMorgan Chase Bank
500 Stanton Christiana Rd. Newark, DE 19713
A.B.A. Number 021 000021 / Swift Code CHAS US 33

Charges that have not been recorded as of the above date will be billed later.

JPMORGAN CHASE BANK, N.A.                January 15, 2013                                pg. 3

| Timekeeper Group Summary | |
| --- | ---: |
| | **Hours** |
| **Partner** | |
| Schaible DS | 0.9 |
| **Total** | **0.9** |
| | |
| **Associate** | |
| Vonnegut EJ | 0.8 |
| **Total** | **0.8** |
| | |
| **Legal Assistant** | |
| Law EC | 1.8 |
| **Total** | **1.8** |
| | |
| **Grand Total** | **3.5** |

# EXHIBIT D

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, <u>et al.</u>, | Case No. 08-13141 (KJC) |
| Debtors. | (Jointly Administered) |

### STATEMENT OF CREDITORS' COMMITTEE FEES AND EXPENSES ON BEHALF OF WILLIAM A. NIESE AND TEITELBAUM AND BASKIN, LLP FOR THE PERIOD 2009 -2012

#### Preliminary Statement

1. Pursuant to the Fourth Amended Joint Plan of Reorganization, confirmed by Order dated July 23, 2012, and which became effective on December 31, 2012, Teitelbaum & Baskin, LLP ("**T&B**"), as counsel for William A. Niese ("**Mr. Niese**"), a member of the Official Committee of Unsecured Creditors appointed in these cases (the "**Committee**"), respectfully seeks reimbursement of the following fees and expenses incurred on behalf of Mr. Niese in his capacity as a member of the Committee.

2. Mr. Niese was appointed to the Committee at the formation meeting in Wilmington, Delaware in December 2008. Mr. Niese is the former General Counsel of The Times Mirror Company and is a retiree of Tribune. Mr. Niese was appointed as a representative of more than 450 similarly situated retirees (the "**Retirees**") holding in excess of $120 million in claims against Tribune and various affiliates arising from certain non-qualified employee retirement plans including the Deferred Compensation Plan, the Excess

1

Pension Plan, the Supplemental Executive Retirement Plan and the Supplemental 401(k) Plan, as well as various individualized retirement agreements.

3.  Mr. Niese has brought a unique perspective to the Committee and these cases in general. As a representative of one of the only groups of unsecured creditors who are individuals and who will not be paid in full, Mr. Niese was consistently concerned with the cost and delay of these cases. By way of example, as Mr. Niese resides in California, he regularly attended meetings and mediation sessions conducted in New York and Delaware by telephone and directed that his New York counsel, Jay Teitelbaum, attend such meetings and mediation sessions in person. In addition, Mr. Niese retained T&B, as his counsel, based upon the experience of Jay Teitelbaum and the billing rates of T&B. At the time of the retention in 2008, the billing rates for T&B were $85-100/hour for legal assistants, $210-285/hour for associates and $350/hour for partners. The rates were not increased during the four years of these cases.

4.  While an attorney with over 40 years of experience, Mr. Niese had no direct experience with bankruptcy matters, let alone serving on an official committee of creditors in a case of the magnitude of Tribune, Mr. Niese retained T&B in order to assist him in his interactions with Committee counsel and to advise him as to his duties and responsibilities to the Committee, to unsecured creditors and to the Retirees.

5.  During his service on the Committee, Mr. Niese required, among other things, that T&B (i) review and analyze pleadings filed in the cases, (ii) prepare memoranda analyzing issues raised by various constituencies; (iii) review and analyze weekly reports prepared by Committee professionals; (iv) review, analyze and comment upon drafts of pleadings prepared on behalf of the Committee; (v) review, analyze and comment on all proposed

2

plans of reorganization; (vi) review, analyze and comment on all disclosure materials sent to creditors; (vii) attend all in person Committee meetings and mediation sessions; (vi) attend all telephonic Committee meetings; (viii) monitor court proceedings and appear when necessary; and (ix) draft Committee member pleadings as necessary to assist the Committee in its representation of unsecured creditors.

### Fees for 2009

6.  TOTAL T&B FEES: $188,923.50; TOTAL HOURS: 663; AVERAGE BILLABLE RATE: $285/HOUR

7.  During 2009 there were regular (weekly) meetings of the Committee, either by telephone or in person. Each meeting required extensive preparation to review (i) financial reports prepared by Committee professionals with respect to the specific operations of Tribune and the industry as a whole; (ii) memoranda prepared by Committee professionals with respect to matters relating to, among other things, Committee governance, understanding the Debtors' business plans and exit strategy, DIP and Cash Collateral Motions, KERP and MIP Programs, claims process, asset sales, severance plans and programs, structure of a plan of reorganization, miscellaneous motions and bankruptcy process, and litigation relating to possible and other LBO avoidance or recovery actions.

8.  T&B (i) reviewed pleadings filed in the Bankruptcy cases and the memoranda prepared by Committee professionals; (ii) conferred with Mr. Niese regarding the matters scheduled for the upcoming Committee meeting and other matters which were of concern to Mr. Niese as a member of the Committee; (iii) periodically prepared additional summaries and analysis of pleadings as requested by Mr. Niese; (iv) participated in each Committee meeting either by telephone or in person; (v) conferred with Committee

counsel and counsel for other Committee members before and after meetings to discuss matters of particular concern to any party and to try to build a consensus among Committee members; (vi) conducted independent legal research on various bankruptcy matters such as the MIP, the KERP and various plan related issues in order to be fully prepared for Committee meetings.

### Fees for 2010

9. TOTAL FEES: $253,224.55; TOTAL HOURS: 830; AVERAGE BILLABLE RATE: $305/HOUR

10. During 2010 there were regular meetings of the Committee, either by telephone or in person. Each meeting required extensive preparation to review (i) financial reports prepared by Committee professionals with respect to the specific operations of Tribune and the industry as a whole; (ii) memoranda prepared by Committee professionals relating to, among other things, Committee governance (including recusing certain members from discussions relating to particular matters), understanding the Debtors' business plans and exit strategy, KERP and MIP and Programs, claims process, asset sales, severance plans and programs, structure of a plan of reorganization and litigation relating to possible and other LBO avoidance or recovery actions.

11. T&B (i) reviewed pleadings filed in the Bankruptcy cases and the memoranda prepared by Committee professionals; (ii) conferred with Mr. Niese regarding the matters scheduled for the upcoming Committee meeting and other matters which were of concern to Mr. Niese as a member of the Committee; (iii) periodically prepared additional summaries and analysis of pleadings as requested by Mr. Niese; (iv) participated in each Committee meeting either by telephone or in person; (v) conferred with Committee

4

counsel and counsel for other Committee members before and after meetings to discuss matters of particular concern to any party and to try to build a consensus among Committee members; (vi) reviewed, analyzed and commented on proposed plans of reorganization and accompanying disclosure materials; (vii) reviewed and analyzed the Independent Examiner's report; (viii) assisted in communications with Retirees as general unsecured creditors; (ix) conducted independent legal research on various matters such as the MIP, the KERP and various plan related issues in order to be fully prepared for Committee meetings.

12. During 2010 there were several emergency meetings relating to management incentive programs, plan issues, and litigated matters which required extensive review, research and meetings. T&B reviewed the relevant pleadings and conferred with Mr. Niese as to the impact of these matters. For example (i) there was a motion by a Committee member to disqualify Chadbourne as Committee counsel which required additional Committee meetings with special counsel to the Committee, extensive meetings between and among members of the Committee, legal research and drafting of pleadings on behalf of Mr. Niese to support the continued role of Chadbourne; (ii) there was a motion by a Committee member for the appointment of a Trustee or Examiner which required review and comment upon pleadings filed on behalf of the Committee, meetings with Mr. Niese, legal research and drafting of pleadings on behalf of Mr. Niese in support of the Committee's position; (iii) attended several court hearings relating to the examiner motion, the Chadbourne disqualification motion and plan issues; (iv) attended mediation sessions in Delaware in September and November; (v) conferred with Committee Counsel and other Committee members to build a consensus approach to resolving the

forgoing matters; (vi) developed, reviewed and commented upon DCL Plans and related disclosure materials, (vii) communicated with Retirees as general unsecured creditors; and (vii) drafted pleadings in support of the Committee's positions on various matters.

### Fees For 2011

13. TOTAL NON-DISCOVERY FEES: $198,474.43; TOTAL HOURS: 684; AVERAGE BILLABLE RATE: $290/HOUR

14. During 2011 there was more of a focus on litigation surrounding the Plan and LBO related issues. There continued to be regular (monthly) meetings of the Committee, either by telephone or in person. Each meeting required extensive preparation to review (i) financial reports prepared by Committee professionals with respect to the specific operations of Tribune and the industry as a whole; (ii) memoranda prepared by Committee professionals with respect to among other things, Committee governance (including recusing certain members from discussions relating to particular matters), KERP and MIP and Programs, claims process, structure of a plan of reorganization and litigation relating to possible and other LBO avoidance or recovery actions.

15. T&B (i) reviewed pleadings filed in the Bankruptcy cases and memoranda prepared by Committee professionals; (ii) conferred with Mr. Niese regarding the matters scheduled for the upcoming Committee meeting and other matters which were of concern to Mr. Niese as a member of the Committee; (iii) periodically prepared additional summaries and analysis of pleadings as requested by Mr. Niese; (iv) participated in each Committee meeting either by telephone or in person; (v) conferred with Committee counsel and counsel for other Committee members before and after meetings to discuss matters of particular concern to any party and to try to build a consensus among Committee

6

members; (vi) reviewed, analyzed and commented on proposed plans of reorganization and accompanying disclosure materials; (vii) assisted in communications with Retirees to facilitate understanding the DCL Plans; and (viii) conducted independent legal research on various matters such as the MIP, the KERP and various plan related issues in order to be fully prepared for Committee meetings.

16. A critical focus in 2011 was a formulating a DCL Plan that could be confirmed. Extensive effort was expended meeting with DCL Plan proponents, reviewing iterations of plans, conducting legal research, conferring with Mr. Niese and Committee professionals with respect to plan alternatives and possible settlements. T&B attended hearings on behalf of Mr. Niese to support the Committee's positions.

17. In 2011, certain parties sought discovery of Committee members related to objections to the DCL Plan. The fees attributable to this matter are separately identified below.

**Fees For 2012**

18. TOTAL FEES: $63,173.00; TOTAL HOURS:210; AVERAGE BILLABLE RATE: $300/HOUR

19. During 2012 there was continued focus on confirmation of the Third and Fourth Amended DCL Plan and so-called Allocation Dispute issues.

20. T&B is not seeking reimbursement for its preparation of pleadings or its attendance at hearings relating to the attempts by certain Noteholders to subordinate Retiree Claims during the Allocation Dispute process.

21. The Committee meetings were shorter and less frequent as the focus of the case became the confirmation of the DCL Plan. T&B attended all Committee meetings, either by telephone or in person. Each meeting required extensive preparation to review (i)

financial reports prepared by Committee professionals with respect to the specific operations of Tribune and the industry as a whole; (ii) memoranda prepared by Committee professionals with respect to, among other things, Committee governance (including recusing certain members from discussions relating to particular matters), structure of a plan of reorganization and litigation relating to the plan and other recovery actions.

22. T&B (i) reviewed pleadings filed in the Bankruptcy cases and memoranda prepared by Committee professionals; (ii) conferred with Mr. Niese regarding the matters scheduled for the upcoming Committee meeting and other matters which were of concern to Mr. Niese as a member of the Committee; (iii) periodically prepared additional summaries and analysis of significant as requested by Mr. Niese; (iv) participated in each Committee meeting either by telephone or in person; (v) conferred with Committee counsel and counsel for other Committee members before and after meetings to discuss matters of particular concern to any party and to try to build a consensus among Committee members; and (vi) reviewed, analyzed and commented on proposed plans of reorganization and accompanying disclosure materials.

## FEES IN CONNECTION WITH DISCOVERY OF WILLIAM NIESE BY NOTEHOLDER PLAN PROPONENTS

23. TOTAL FEES: $149,172.00; TOTAL HOURS: 497; AVERAGE BILLABLE RATE: $300/HOUR

24. During 2010-2011 members of the Committee, including Mr. Niese, were subjected to extensive and burdensome discovery demands by Noteholders in connection with their objections to the DCL Plan. In response to these discovery demands, T&B reviewed

document and deposition subpoenas, drafted objections and responses to discovery demands, reviewed electronic and paper files, prepared a privilege log and produced documents. T&B conferred extensively with Mr. Niese and others to gather files, review same for production and to prepare Mr. Niese for a deposition. T&B also met and conferred with counsel for the Noteholders to attempt to resolve discovery objections and coordinated efforts with Committee counsel in connection with objecting to the production of documents, producing documents, and the preparation of Mr. Niese for a deposition.

## UNREIMBURSED EXPENSES

25. In connection with providing services to Mr. Niese, T&B incurred actual and necessary expenses including for postage and fed ex charges, copy costs (at no more than 10 cents per page), travel expenses (Amtrak) to Delaware for court appearances and mediation sessions and to New York City (Metro North) for in person meetings, the fees and expenses charged by Delaware counsel retained by T&B as required by Delaware local rules, and Pacer charges. T&B does not charge for telephone service (with the exception of actual third party charges incurred in connection with conference calls, including Court Call), sending or receiving faxes, or for third party provider electronic legal research charges (i.e. Westlaw), unless charges are incurred for research beyond the plans provided to T&B. No reimbursement is being sought for electronic legal research. T&B is seeking only the actual and necessary expenses actually incurred.

26. For the period 2009-2012 T&B seeks reimbursement of $14,373.00 for out of pocket expenses.

27. Total Expenses for 2009: $2,568.00

      Travel $888

      Conference Calls $315

      Pacer $671

      Postage $461

      Photocopy $150

      Local   Counsel $83

28. Total Expenses for 2010: $5,711.00

      Travel $780

      Conference Calls $715

      Pacer $46

      Postage $76

      Photocopy $0.00

      Local Counsel $4,094

29. Total Expenses for 2011: $5,349.00

      Travel $1,308

      Conference Calls $1,273

      Pacer $35

      Postage $651

      Photocopy $0.00

      Local Counsel $2,082

30. Total Expenses for 2012: $745.00

      Travel $560

Conference Calls $178

Pacer $0.00

Postage $7

Photocopy Charges $0.00

Local Counsel $0.00

**WHEREFORE**, T&B respectfully seeks reimbursement of the following fees and expenses:

**NON DISCOVERY FEES**: $703,795.48

**DISCOVERY FEES**: $149,172.00

**EXPENSES**: $14,373.00


Dated: January 7, 2013

**TEITELBAUM & BASKIN, LLP**
By:/ s /  J a y  T e i t e l b a u m
Jay Teitelbaum, Esq.
1 Barker Avenue
Third Floor
White Plains, New York 10601
 (914) 437-7670
jteitelbaum@tblawl1p.com
Attorneys for the TM Retirees

11

# **EXHIBIT E**

**STATEMENT OF CREDITORS' COMMITTEE FEE/EXPENSE CLAIMS**

**SUMMARY OF SERVICES PROVIDED TO COMMITTEE CO-CHAIR**

**WARNER BROS. TELEVISION**

**A.**   **Amounts Incurred In Connection With Service On The Committee**

Fees:  **$317,891.00**        Total Hours:   **497.6**

Costs: **$3,497.49**         Fees + Costs:  **$321,388.49**

1.        The Unsecured Creditors' Committee ("UCC") was appointed in this case on December 18, 2008. Warner Bros. Television ("Warner") was appointed as a member of the UCC and was also elected co-chair of the UCC.  At the initial UCC meeting, and thereafter, Warner was represented with respect to UCC Matters by the law firm of Kirkland & Ellis LLP ("Kirkland"), with Edward O. Sassower acting as lead counsel to Warner.  Other Kirkland personnel who assisted Mr. Sassower on UCC related activities during the matter included James Sprayregen, Ashleigh Blaylock, Nikki Thomas, Jonathan Zinman, Magali Lee, Joseph Serino and Lauren Casazza.

2.        Regular and special meetings of the UCC were held regularly during the bankruptcy cases and generally occurred weekly, either by telephone conference or in person, to review the numerous issues regarding the administration of the Debtors' Chapter 11 cases. During the meetings the various UCC professionals also kept the UCC apprised and updated with respect to a large number of key issues.  Kirkland regularly attended these meetings as counsel to Warner until December 2010.  During this period, the UCC and its professionals reviewed and addressed pending motions, litigation matters, issues relating to management compensation, the sale of the Chicago Cubs baseball team, and ongoing issues with respect to discovery efforts, the examiner and plan confirmation.  Edward Sassower personally was

1

engaged in negotiations regarding the plan of reorganization including attending a mediation at the Court in Delaware.

        3.      More specifically, Kirkland engaged in the following tasks in relation to its representation of Warner with regard to UCC matters[1]:

- Attended initial UCC meeting and advisors pitches

- Reviewed and revised engagement letters with professionals

- Worked on intercreditor issues

- Prepared for and participated in UCC meetings

- Reviewed pleadings filed in the case, dockets, agendas and meeting minutes

- Engaged in discussions with UCC professionals, including Chadbourne and Moelis

- Advised Warner regarding UCC matters

- Assisted in review of the Chicago Cubs sale

- Worked on management incentive plan issues

- Worked on confidentiality agreements

- Worked extensively on debtor restructuring issues

- Negotiated restructuring with various creditor constituencies

- Worked on settlement negotiations between various parties

- Analyzed confirmation issues

- Analyzed examiner report and affect on proposed plan

- Worked on opposition to motion to disqualify UCC counsel

---

[1] A summary of Kirkland's billings to Warner Bros. Television in connection with UCC related matters is appended as Exhibit "A" hereto.

- Participated in mediation between plan proponents and opponents

4.     Costs of $3,497.49 were billed to Warner in connection with the above services. These costs largely consisted of photocopying, staff overtime charges, messenger service fees, transportation, airfare, meals, overnight delivery charges and computerized research.

5.     During the period of Kirkland's representation of Warner, the firm performed services for Warner, and certain of its affiliates, which were not directly related to Warner's service on the UCC.  These services included preparation for the UCC formation meeting, advising Warner's affiliate Turner Broadcasting System and assisting with the preparation and filing of proofs of claim.  Kirkland billed 28.5 hours for these services for a total of $12,362.00 in attorney's fees.  These fees have been excluded from, and are not being sought by Warner, in this application.

6.     In addition, Kirkland provided services in connection with discovery sought from Warner, and from Kirkland in its capacity as Warner's UCC counsel, with respect to litigation relating to the confirmation of the DCL Plan.   The fees and expenses associated with those services are detailed below.

**B.     Amounts Incurred In Connection With Discovery Sought From Warner and Kirkland (in its capacity as Warner's counsel) With Respect To Litigation Related To Confirmation Of The DCL Plan**

Fees:  **$186,288.50**          Total Hours:  **353.8**

Costs: **$5,773.26**          Fees + Costs:  **$192,061.76**

7.     During the Application Period, discovery was sought from Warner in its capacity as co-chair of the UCC.  Warner was principally represented by Kirkland in connection with these litigation matters, with Kirkland's Lauren O. Casazza acting as lead counsel to Warner. Other Kirkland personnel who assisted Ms. Casazza on litigation related activities during the matter included Gina Spiegelman, Heather Thomas, Amanda DiGeorge, Nikki Thomas, Kenneth

3

J. Gadza, Thomas Mangne, Jonathan Rousseau and Katelyn Ye. In addition, Warner utilized the services of Wilmington, Delaware firm of Pinckney, Harris & Wiedinger, LLC ("Pinckney") as local counsel in connection with a discovery motion brought by the noteholders. The lead professional from Pinckney was Joanne Pinckney, who was assisted by Sheila Godwin, Patricia Uhlenbrock and Kevin Capuzzi.

8.      During the Application Period, Kirkland's team of litigation professionals, paraprofessionals and litigation support specialists were engaged in complying with the demands necessitated by the noteholder discovery requests of Warner (in its capacity as co-chair of the UCC) and Kirkland (in its capacity as counsel to Warner). The discovery included requests for documents and a full-day deposition of the UCC co-chair.

9.      Kirkland's team of professionals coordinated the collection, review and analysis of a large volume of documents and computer files produced in connection with the discovery. These efforts were a substantial undertaking demanding a considerable amount of time and effort, requiring staffing by Kirkland's professionals and paraprofessionals to meet the discovery demands as well as the court-imposed discovery deadlines in an efficient and timely manner. In connection with the discovery, Kirkland's document review team reviewed over 50,000 pages of documents and computer records, the vast majority of which were attorney-client communications that had to be reviewed for privilege. In addition, the Kirkland attorneys researched various privilege issues associated with the production of documents. Kirkland's attorneys also prepared an opposition to a discovery motion brought by the noteholders and attended a telephonic hearing relating thereto.

10.      Kirkland's team of professionals and paraprofessionals also devoted their efforts to the preparation of the UCC co-chair, Wayne M. Smith of Warner, for deposition, including

meeting with the client and UCC counsel.  Kirkland's team also attended and defended the

deposition, and dealt with matters relating to the deposition that arose thereafter.

11.    More specifically, engaged in the following tasks in relation to its representation

of Warner with regard to litigation matters[2]:

- Preparation of litigation holds

- Advise on document retention issues

- Reviewed Kirkland's paper and electronic files for responsive documents

- Reviewed Warner's paper and electronic files for responsive documents

- Researched privilege issues

- Prepared response to subpoena

- Reviewed documents for privilege

- Conferred with UCC counsel on various issues

- Attended meet and confer conferences with noteholder counsel

- Prepared correspondence to noteholder counsel re discovery dispute

- Prepared UCC co-chair for deposition

- Attended and defended UCC co-chair's deposition

- Prepared errata to UCC co-chair's deposition

- Reviewed additional documents for production post -deposition

- Worked on de-designation of confidential testimony proposal for use at confirmation hearing

---

[2] A summary of Kirkland's billings to Warner Bros. Television in connection with litigation related matters is appended as Exhibit "B" hereto.

12.     In addition to the activities of Kirkland, the law firm of Pinckney, Harris & Wiedinger, LLC ("Pinckney") assisted Kirkland with the response to the discovery motion, including preparing and filing a pro hac vice motion and reviewing materials relating to the discovery hearing.[3]

13.     The $5,773.26 in costs billed to Warner by Kirkland and Pinckney in connection with the above litigation-related services largely consisted of scanning images, production blowbacks, optical character recognition charges, outside computer services, computer database research, photocopying, staff overtime charges, messenger service fees and overnight delivery charges.

**C.     Payment of Amounts Incurred for UCC and Litigation Representation**

14.     Warner was billed a total of $513,450.25 in attorney's fees and costs by Kirkland and Pinckney in connection with the UCC and litigation matters described above.  Warner has paid the bills of Kirkland and Pinckney in full.


Date:   January 21, 2013                            WARNER BROS. TELEVISION

                                                    By
                                                       Wayne M. Smith
                                                       Creditors' Committee Co-Chair


---

[3] A summary of Pinckney's billings to Warner Bros. Television in connection with Litigation related matters is included in Exhibit "B" hereto.

## Exhibit A

## Warner Bros. Television - Committee Related Fees and Costs Summary

| Period | Summary of Committee Related Services (Kirkland & Ellis) | Timekeepers | Fees | Costs |
|---|---|---|---|---|
| Dec 2008 – Mar 2009 | Attend initial committee meeting and advisors pitches; review and revise engagement letters with professionals; work on intercreditor issues; prepare for and participate in committee meetings; review of pleadings filed, agendas and meeting minutes | Edward Sassower<br>James Sprayregen<br>Ashleigh Blaylock<br>Nikki Thomas<br>Jonathan Zinman<br>Magali Lee | $33,427.00 | $85.02 |
| Apr 2009 – Jun 2009 | Prepare for and attend committee meetings; review pleadings and docket; conference with Moelis; review professionals' engagement letters; conferences with client re committee matters; review Cubs sale matter; participate in conferences re Cubs sale process | Edward Sassower<br>James Sprayregen<br>Ashleigh Blaylock<br>Nikki Thomas<br>Magali Lee | $38,111.00 | $2,384.31 |
| Jul 2009 | Prepare for and attend in-person and telephonic committee meetings; review documents prepared by committee counsel; work on management incentive plan issues | Edward Sassower<br>Ashleigh Blaylock<br>Nikki Thomas | $14,180.50 | $10.72 |
| Aug 2009 | Prepare for and attend various committee meetings and follow-up following same; review documents prepared by committee counsel; work on Cubs sale issue | Edward Sassower<br>Nikki Thomas | $19,241.00 | $1.80 |
| Sep 2009 | Prepare for and attend various committee meetings and follow-up following same; review documents prepared by committee counsel; review draft of Rule 2004 motion; work on Cubs sale issue | Edward Sassower<br>Nikki Thomas | $10,255.00 | $0.00 |
| Oct 2009 | Prepare for and attend various committee meetings and follow-up following same; review documents re professional fees; analyze common interest agreement | Edward Sassower<br>Nikki Thomas | $9,330.00 | $90.90 |
| Nov 2009 | Prepare for and attend various committee meetings and follow-up following same; attend meeting with debtor; review confidentiality agreement and discuss with committee counsel | Edward Sassower<br>Nikki Thomas | $4,120.00 | $90.00 |
| Dec 2009 – Jan 2010 | Prepare for and attend various committee meetings and follow-up following same; work on debtor restructuring issues; review status of case | Edward Sassower<br>Nikki Thomas | $30,666.00 | $92.41 |
| Feb 2010 | Prepare for and attend various committee meetings and follow-up following same; work on debtor restructuring | Edward Sassower<br>Nikki Thomas | $11,791.00 | $0.00 |

| Period | Summary of Committee Related Services (Kirkland & Ellis) | Timekeepers | Fees | Costs |
|---|---|---|---|---|
| Mar 2010 – Apr 2010 | Prepare for and attend various committee meetings and follow-up following same; work on debtor restructuring; conferences re settlement negotiations | Edward Sassower Nikki Thomas | $69,220.50 | $96.36 |
| May 2010 – Jul 2010 | Prepare for and attend various committee meetings and follow-up following same; review examiner's report; work on debtor restructuring; conference re confirmation hearing issues; prepare client for possible testimony at confirmation hearing; meeting with committee counsel re same | Edward Sassower Nikki Thomas Joseph Serino Lauren Casazza | $14,902.50 | $55.85 |
| Aug 2010 | Work on debtor restructuring; meetings and telephone conferences re same; review examiner report and attend UCC meeting re possible testimony of client | Edward Sassower Lauren Casazza | $22,267.00 | $0.00 |
| Sep 2010 | Work on debtor restructuring; meetings and telephone conferences re same; review motion to disqualify; review and revise Chadbourne objection to same; conferences with client and committee counsel re same | Edward Sassower Nikki Thomas | $17,362.00 | $10.50 |
| Oct 2010 | Work on debtor restructuring and mediation; travel to Delaware to participate in mediation | Edward Sassower | $16,485.00 | $579.62 |
| Dec 2010 | Work on debtor restructuring; emails and telephone conferences re same; attend committee meeting | Edward Sassower Nikki Thomas | $6,532.50 | $0.00 |
| TOTAL | | | $317,891.00 | $3,497.49 |

2

Exhibit B

## Warner Bros. Television - Litigation Related Fees and Costs Summary

| Period | Summary of Litigation Related Services (Kirkland & Ellis) | Timekeepers | Fees | Costs |
|---|---|---|---|---|
| Nov 2010 | Prepare litigation hold; document retention issues; review of correspondence for responsive documents | Casazza<br>Thomas | $1,932.50 | - |
| Dec 2010 | Review of documents for production; research legal issues; review and prepare response to subpoena; confer with committee counsel re discovery; collection of documents and emails; review documents; review documents for privilege; log privileged documents | Casazza<br>Spiegelman<br>Thomas<br>Gazda<br>Mangne<br>Ye | $22,818.00 | $123.90 |
| Jan 2011 | Document review; prepare subpoena response; review documents for privilege; prepare privilege log; conferences with committee counsel re privilege issues; review meet and confer correspondence; research privilege issues; prepare for meet and confer; prepare documents to be produced; attend meet and confer | Casazza<br>Spiegelman<br>Thomas<br>DiGeorge<br>Gazda<br>Mangne<br>Rousseau<br>Ye | $87,233.50 | $3,285.55 |
| Feb 2011 | Prepare post-meet and confer letter; review discovery order re production; retain local counsel; conferences with committee counsel; prepare letter in response to motion; participate in further meet-and-confer conference; deposition preparation; research in-house counsel privilege issues; meet with client to prepare for deposition; review documents re deposition; attend and defend client's deposition; prepare errata to deposition | Casazza<br>Spiegelman<br>Thomas<br>Gazda | $65,625.50 | $2,233.60 |
| Mar 2011 | Prepare corrected production; review additional documents for production. | Spiegelman<br>Thomas<br>Gazda<br>Mangne | $1,500.00 | $97.81 |
| Jul 2011 | Review de-designation of confidential testimony proposal for use at confirmation hearing; correspond with client; review deposition transcript; prepare correspondence to debtor counsel | Casazza<br>Spiegelman<br>Thomas | $5,305.00 | - |
| Sub-Total | | | $184,414.50 | $5,740.86 |

1

| Period | Summary of Litigation Related Services (Pinckney, Harris) | Timekeepers | Fees | Costs |
|---|---|---|---|---|
| Feb 2011 | Work on pro hac vice retention with Kirkland; assist with response to discovery motion and with filing of same; teleconferences with Kirkland lawyers; review and analyze hearing materials | Joanne Pinckney<br>Sheila Godwin<br>Kevin Capuzzi<br>Patricia Uhlenbrock | $1,874.00 | $32.40 |
| Sub-Total | | | $1,874.00 | $32.40 |
| | | | | |
| TOTAL | | | $186,288.50 | $5,773.26 |

2

## **EXHIBIT F**

**WASHINGTON-BALTIMORE NEWSPAPER GUILD**
**Tribune Committee Member Legal Fees[1]**

*SUMMARY OF SERVICES*

Service Fees

A. Amounts Incurred in Connection with Service on the Committee

Fees:  $92,746.50                    Total Hours:  562.1

1.  Regular and special meetings of the UCC were held regularly during the four-plus

years of the bankruptcy cases, and generally occurred weekly, either by telephone conference or

in person in New York, to review the numerous issues regarding the administration of the

Debtors' Chapter 11 cases and to stay apprised and updated with respect to imminent key issues.

The agendas for these meetings included a review and discussion of pending motions, litigation

matters and ongoing issues with respect to the Debtors affairs and ultimately plan confirmation.

In addition, there were frequent communications, either by telephone or email, with Committee

counsel with regard to matters that were expected to be raised at the meetings, or matters which

had been discussed.

2.  During this period, the Committee attended presentations by the Debtor in Chicago in

order for the Committee, and Committee members' counsel, to be informed as to its status and

plans to move towards emergence.

3.   In order to prepare for and attend Committee meetings, counsel reviewed, analyzed

and occasionally researched issues relating to pleadings filed in the case as well as reports and

---

[1]   The fees set forth herein specifically exclude all legal fees and/or expenses incurred by the Guild in connection
with its challenges to the MIP, TMIP and KOB bonus programs.

memoranda prepared by Committee counsel, and then discussed such matters with William Salganik, member of the Committee from the Washington-Baltimore Newspaper Guild.

B.   Confirmation Litigation Fees

        Fees:  $ 15,213                Hours:  92.2

    1.  During the application period, counsel to the Committee member of the Washington Baltimore Newspaper Guild was engaged in a review and analysis of discovery requests, including regular consultation with Committee counsel, with regard to confirmation proceedings, privilege issues, and other related discovery matters.

    2.  In response to discovery requests, counsel reviewed numerous documents and emails and computer files in order to respond to those requests, and produce relevant materials.

    3.  Counsel attended various Court hearings in these proceedings, and at one hearing presented argument with respect to a Motion pending before the Court with regard to Committee counsel.

    4.  Counsel reviewed various depositions undertaken in discovery, assisted with the preparation of William Salganik for his deposition testimony, attended depositions taken in discovery, and attended confirmation hearings in the case.

       /s/ Robert E. Paul
Robert E. Paul
Zwerdling, Paul, Kahn & Wolly, P.C.
1025 Connecticut Ave. NW
Suite 712
Washington, DC 20036-5420
(202) 857-5000
(202) 223-8417 fax
rpaul@zwerdling.com

Attorneys for the Washington-Baltimore
      Newspaper Guild, Local 32035

# **EXHIBIT G**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 Cases |
| | ) | Case No. 08-13141 (KJC) |
| TRIBUNE COMPANY, *et al.*, | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |
| | ) | |

**WILMINGTON TRUST COMPANY'S
STATEMENT OF FEES AND EXPENSES IN SUPPORT OF
THE PAYMENT OF SUCH FEESAND EXPENSES DUE TO ITS
OUTSIDE LEGAL AND/OR FINANCIAL ADVISORS PAYABLE UNDER
SECTION 9.1.3 OF THE PLAN OF REORGANIZATION FOR TRIBUNE COMPANY**

SULLIVAN HAZELTINE ALLINSON LLC
William D. Sullivan (I.D. No. 2820)
Elihu E. Allinson, III (I.D. No. 3476)
901 N. Market Street, Suite 1300
Wilmington, DE 19801
302-428-8191

and

BROWN RUDNICK LLP
Robert J. Stark
Martin S. Siegel
Gordon Z. Novod
Seven Times Square
New York, NY 10036
212-209-4800

*Counsel for Wilmington Trust Company, solely
in its capacity as successor Indenture Trustee
for the PHONES Notes*

WTC1F03615

Wilmington Trust Company ("Wilmington Trust"), as Successor Indenture Trustee for the Exchangeable Subordinated Debentures (the "PHONES Notes") issued pursuant to an indenture dated April 1, 1999, executed by the Tribune Company, submits this statement of fees and expenses in support of the payment of such fees and expenses due to its outside legal and/or financial advisors payable under Section 9.1.3 of the Plan of Reorganization for Tribune Company (the "Plan") [D.I. 12072], as confirmed by the Bankruptcy Court on July 23, 2012 [D.I. 12074].

**1.    Introduction**

The Plan provides for the payment of Creditors' Committee Member Fees/Expense Claims, which consist of the "amounts incurred by individual members of the Creditors' Committee solely in their capacity as members of the Creditors' Committee on and after the Petition Dated through and including the Effective Date for the reasonable and documented fees, costs and expenses of their individual outside legal and/or financial advisors." Plan, § 1.1.52. For the purposes of this statement, these fees under Plan section 1.1.52 are called "Service Fees." Pursuant to Section 9.1.3 of the Plan, the Creditors' Committee is required to submit to Reorganized Tribune and the Office of the United States Trustee, reasonably detailed statements of the Creditors' Committee Member Fee/Expense Claims, which statements shall include description of services provided in summary form without individual time records." Plan, § 9.1.3.

In addition, Wilmington Trust is entitled to payment for "reasonable amounts incurred in connection with discovery (including deposition testimony) sought from members of the Creditors' Committee in connection with litigation related to confirmation of [the] Plan." Plan, § 9.1.3. For the purposes of this statement, these fees are called "Confirmation Litigation Fees."

In connection with Wilmington Trust's Creditors' Committee Member Fee/Expense Claims totaling $1,679,924.77, comprised of $1,065,071.77 for Service Fees and $614,853.00 for Confirmation Litigation Fees, Wilmington Trust states as follows:

2. **Summary Of Wilmington Trust's**
   **Service Fees And Confirmation Litigation Fees**

A. **Service Fees**

Wilmington Trust, as Successor Indenture Trustee for the PHONES, has played roles of varying degrees of involvement in the Official Committee during the Debtors' Chapter 11 Cases.

As a member of the Official Committee, Wilmington Trust individually and/or with or through outside counsel participated in each and every Official Committee meeting that it was permitted to attend. In addition, Wilmington Trust individually and/or with or through outside counsel reviewed, researched and participated in discussions and case proceedings regarding (i) Official Committee memoranda, (ii) Official Committee meeting minutes, (iii) Official Committee reports, (iv) Official Committee analysis (legal and financial), (v) draft pleadings, (vi) summaries, (vii) correspondence and communications with Official Committee counsel and/or other Official Committee members and/or their counsel concerning:

- the Official Committee's investigation of causes of action arising out of the LBO;

- the Official Committee's initial settlement negotiation and plan of reorganization filed in the spring of 2010;

- the Official Committee's brief and reply briefs to the Examiner;

- the Official Committee's analysis, deliberation and decision making concerning the Examiner's Report;

- the Official Committee's analysis, deliberation and decision making concerning the second plan negotiation, the mediation and the ultimate settlement reached by the Committee in October 2010;

- Aurelius' exposure model prepared in connection with the pursuit of LBO-related claims and the Examiner's report;

3

WTC1F03617

- Aurelius' Capital Management's request to disqualify Chadbourne & Parke from participation in the mediation and Aurelius' motion for the appointment of a chapter 11 trustee;

- the formulation and revision to the proposed forms of (i) Litigation Trust Agreement, (ii) Agreement Respecting Transfer of Documents, Information, and Privileges from the Official Committee to the Litigation Trustee, and (iii) Litigation Trust Loan;

- the potential targets of preference litigation; and

- ordinary Official Committee business, including, but not limited to, pending motions, litigation matters, results of operations, business plans, annual management incentive programs, employee issues, retention of professionals, including, without limitation, conflicts counsel for the Official Committee, and the senior lenders' requests for payment of fees and expenses from non-debtor affiliates.

In connection with each of the foregoing activities, Wilmington Trust seeks payment of Service Fees for its outside counsel, Brown Rudnick LLP, in the total amount of $1,065,071.77. The Service Fees requested do not include activity that Wilmington Trust undertook outside of or not in furtherance of its role as a member of the Official Committee, such as Wilmington Trust's (i) request for the appointment of an examiner, (ii) briefing before the examiner, (iii) preparation and filing of its equitable subordination complaint, (iv) individual participation in the mediation, (v) filing and pursuit of confirmation of the noteholder plan of reorganization, (vi) objection to the second amended DCL Plan of Reorganization, (vii) objection to the Plan, and (viii) participation in the reconsideration and allocation disputes litigations.

Due to the nature of the Debtors' cases and the Committee's business, Wilmington Trust's Service Fees include amounts for expenses associated with long distance telephone charges, online legal research, word processing, photocopies, amounts paid to outside vendors, transportation costs and other charges associated with the Service Fees.

4

## B. Confirmation Litigation Fees

In addition, as a member of the Official Committee, Wilmington Trust and Brown Rudnick, as Wilmington Trust's outside counsel, incurred Confirmation Litigation Fees. These fees and expenses were incurred in connection with litigation surrounding confirmation of the Plan, including Wilmington Trust's and Brown Rudnick's:

- review of document requests, imposition of objections thereto, negotiation of search parameters, review of documents for (i) responsiveness, (ii) Wilmington Trust/Brown Rudnick privileged communications, (iii) Official Committee privileged communications;

- meeting with counsel to the Official Committee concerning the review of documents for Official Committee privileged communications, all in connection with requests received directly from the Debtors in connection with the plan confirmation; and

- review of deposition subpoena of Mr. Gordon Novod, a partner in Brown Rudnick's corporate restructuring and bankruptcy group, concerning his participation in Official Committee meetings, meeting with Official Committee counsel and participating in hearings concerning the Official Committee's Motion to Quash such subpoena.

Since the Confirmation Litigation Fees sought by Wilmington Trust are solely fees and expenses are solely those "incurred in connection with discovery (including deposition testimony) sought from members of the Creditors' Committee in connection with litigation related to confirmation of [the] Plan..." (Plan, §9.1.3), the Confirmation Litigation Fees sought by Wilmington Trust do not include amounts incurred in connection with discovery activity whereby Wilmington Trust and its counsel was the requesting party.

Due to the nature of the Debtors' cases and the plan discovery, Wilmington Trust's Confirmation Litigation Fees include amounts for expenses associated with long distance telephone charges, online legal research, word processing, photocopies, amounts paid to outside vendors, transportation costs and other charges associated with the Confirmation Litigation Fees.

WTC1F03619

## CONCLUSION

**WHEREAS,** for the foregoing reasons, Wilmington Trust respectfully requests payment

for the Service Fees and the Confirmation Litigation Fees described herein.

Dated: Wilmington, Delaware
         January 24, 2013

                                                  Respectfully submitted,

                                                  BROWN RUDNICK LLP

                                                  /s/Gordon Z. Novod
                                                  Robert J. Stark
                                                  Martin S. Siegel
                                                  Gordon Z. Novod
                                                  Seven Times Square
                                                  New York, NY 10036
                                                  212-209-4800

                                                  *Counsel for Wilmington Trust Company, as*
                                                  *successor Indenture Trustee for the PHONES*

WTC1F03620

# EXHIBIT "2"

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

TRIBUNE COMPANY, et al.,[1]

               Debtors.

Chapter 11

Case No. 08-13141 (KJC)

Jointly Administered

Related to Docket Nos.
6022, 6184, 6185 and 6186

---

## DEBTORS' FIRST REQUEST FOR THE PRODUCTION OF DOCUMENTS TO DEUTSCHE BANK TRUST COMPANY AMERICAS

Pursuant to pursuant to Rules 7026, 7034 and 9014 of the Federal Rules of Bankruptcy

Procedure and Rule 26 and 34 of the Federal Rules of Civil Procedure, the debtors and debtors in

possession in the above-captioned chapter 11 cases (each a "Debtor" and collectively, the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (4025); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc., f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); and WPIX, Inc. (0191). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

"Debtors"), hereby request Deutsche Bank (as defined below) to produce the documents specified in the requests (the "Requests" or "Request") set forth below for inspection and copying at the offices of Sidley Austin LLP, 787 Seventh Avenue, New York, New York 10019, ATTN: Alan Unger on or before January 17, 2011.

## DEFINITIONS

1.      "Advisers" means all persons who provided advice to Tribune, its Board of Directors or any subcommittee thereof in connection with any part of the Leveraged ESOP Transactions.

2.      "All" or "any" means each and every.

3.      "And" or "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be outside of its scope.

4.      "April Plan" means the Plan of Reorganization filed by the Debtors and others with the Bankruptcy Court on April 12, 2010.

5.      "April Proposed Settlement" means the settlement of certain LBO-Related Causes of Action proposed by Angelo-Gordon & Co., L.P., Centerbridge Credit Partners, L.P., Centerbridge Credit Partners Master, L.P., Centerbridge Special Credit Partners, L.P., the Law Debenture defendants, and J.P. Morgan Chase Bank, N.A., described in a Settlement Support Agreement dated on or about April 9, 2010 including Exhibit A attached thereto.

6.      "Aurelius" means (i) Aurelius Capital Management, LP and its affiliates, as well as its or their investment funds or managed accounts (ii) any of its or their officers, directors, employees, partners, members, or managers; (iii) any of its or their board of directors and any

committee or subcommittee of any board of directors; and (iv) Professionals of any Person within (i), (ii) or (iii) above.

7.    "Bankruptcy Cases" means the chapter 11 cases filed by the Debtors in the Bankruptcy Court for the District of Delaware on December 8, 2008.

8.    "Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware.

9.    "Bridge Lender Agreement" means that certain Senior Unsecured Interim Loan Agreement, dated as of December 20, 2007, among Tribune, Merrill Lynch Capital Corporation as administrative agent, JP Morgan Chase Bank, N.A. as syndication agent, Citicorp North America, Inc. and Bank of America, N.A. as co-documentation agents, and various other financial institutions, as amended, restated, supplemented or otherwise modified from time to time.

10.    "Bridge Lender Plan" means the Amended Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by King Street Acquisition Company, L.L.C., King Street Capital, L.P. and Marathon Asset Management, L.P., dated December 7, 2010 as may be amended or modified, and all prior versions of such plan as well as all drafts of any of the foregoing.

11.    "Bridge Lenders" means all persons who lent money or purchased interests in the Bridge Loans.

12.    "Bridge Loans" means the indebtedness issued pursuant to the Bridge Loan Agreement.

13.    "Bridge Loan Claim" means a claim arising under the Bridge Loan Agreement.

3

14. "Bridge Loan Guaranty Agreement" means the Guarantee Agreement, dated as of December 20, 2007, among Tribune, each of the subsidiaries listed on Annex I thereto, and Merrill Lynch Capital Corporation as administrative agent, as amended, restated, supplemented or otherwise modified from time to time.

15. "Centerbridge" means (i) Centerbridge Credit Advisors LLC, Centerbridge Partners L.P., Centerbridge Credit Partners Master, L.P., Centerbridge Credit Partners, L.P., Centerbridge Special Credit Partners, L.P., or any of their affiliates, as well as its or their investment funds or managed accounts (ii) any of its or their officers, directors, employees, partners, members, or managers; (iii) any of its or their board of directors and any committee or subcommittee of any board of directors; and (iv) Professionals of any Person within (i), (ii) or (iii) above.

16. "Communication" or "communications" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise) whether by writing, oral conversation, conversation by telephone, meeting or any other method. A "communication" shall also include, without limitation, all copies of documents that contain or evidence the same.

17. "Confirmation Hearing" means the Confirmation Hearing currently scheduled to commence on March 7, 2011.

18. "Complaints" means the original and any amended complaints filed in the adversary proceedings commenced by the Official Committee of Unsecured Creditors on November 1, 2010 asserting LBO-Related Causes of Action against various participants in the Leveraged ESOP Transactions.

19. "Creditors Trust" means the trust to which certain LBO-Related Causes of Action will be assigned for prosecution or settlement.

20.    "Debtor/Committee/Lender Plan" means the First Amended Chapter 11 Joint Plan of Reorganization For Tribune Company and Its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, LP., Angelo, Gordon & Co., L.P., and JP Morgan Chase Bank, N.A., filed with the Bankruptcy Court on December 10, 2010, as may be amended or modified, and all prior versions of such plan as well as all drafts of any of the foregoing, including as described in the press release issued by Tribune on October 12, 2010.

21.    "Deutsche Bank" means (i) Deutsche Bank Trust Company Americas, in its capacity as successor indenture trustee for certain series of Senior Notes (ii) any of its past, present or future officers, directors, partners, members, employees, or managers; (iii) any of its board of directors and any committee or subcommittee of any board of directors; and (iv) Professionals of any Person within (i), (ii) or (iii) above.

22.    "Directors and Officers" means those directors and officers of Tribune or its subsidiaries who were involved in the planning, consideration, implementation or approval of some aspect of the Leveraged ESOP Transactions.

23.    "Distribution Trust Reserve" has the meaning assigned to that term in the Noteholder Plan.

24.    "Document" or "documents" is synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34 but also includes electronically stored information ("ESI"). A draft or non-identical copy is a separate document within the meaning of this term.

25.    "Effective Date" means the first Business Day on which all of the conditions to the Effective Date specified in the relevant Plan have been satisfied or waived in accordance with the Plan.

26.    "Examiner's Report" means "Report of Kenneth N. Klee, As Examiner", *In Re: Tribune Company et. al,* Debtors, Chapter 11, Case Number 08-12141 (KJC) (Jointly Administered), July 26, 2010.

27.    "FCC" means the Federal Communications Commission or any other federal agency succeeding to its jurisdiction.

28.    "FCC Applications" means, collectively, each application filed with the FCC in connection with the Debtor's emergence from bankruptcy, including but not limited to those filed in connection with the assignment and/or transfer of control of FCC Licenses from the Debtors to the Reorganized Debtors.

29.    "FCC Approval" means an action or actions by the FCC (including any action or actions taken by the FCC's staff pursuant to delegated authority and regardless of whether any action or actions may be subject to further administrative or judicial review) on the FCC Applications granting any consent of the FCC necessary to consummate the assignment and/or transfer of control of FCC Licenses from the Debtors to the Reorganized Debtors and/or otherwise in connection with a plan of reorganization.

30.    "General Disclosure Statement" means the General Disclosure Statement for Tribune Company and Its Subsidiaries included in the Joint Disclosure Statement for the Following Plans of Reorganization: 1) First Amended Joint Plan of Reorganization For Tribune Company And its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, LP., Angelo, Gordon & Co., L.P., and JPMorgan Chase

Bank, N.A.; 2) Joint Plan of Reorganization for Tribune Company and its Subsidiaries proposed by Aurelius Capital Management, LP, on behalf of its managed entities, Deutsche Bank Trust Company Americas, in its capacity as the successor indenture trustee for certain series of senior notes, Law Debenture Trust Company of New York, in its capacity as successor indenture trustee for certain series of senior notes and Wilmington Trust Company, in its capacity as the successor indenture trustee for the PHONES Notes; 3) First Amended Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by Certain Holders of Step One Senior Loan Claims; and 4) Amended Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by King Street Acquisition Company, L.L.C., King Street Capital, L.P. and Marathon Asset Management, L.P., filed with the Bankruptcy Court on or about December 10, 2010, as may be amended or modified, and all drafts or prior versions of such general disclosure statement.

31.    "Including" means including, but not limited to.

32.    "Individual" or "individuals" means any natural Person or Persons.

33.    "Law Debenture" means (i) Law Debenture Trust Company of New York, in its capacity as successor indenture trustee for certain series of Senior Notes (ii) any of its past, present or future officers, directors, partners, members, employees, or managers; (iii) any of its board of directors and any committee or subcommittee of any board of directors; and (iv) Professionals of any Person within (i), (ii) or (iii) above.

34.    "LBO-Related Causes of Action" means any and all actual or potential pre-petition, post-petition and/or post-emergence claims, obligations, suits, judgments, damages, debts, rights, causes of action, avoidance powers or rights, liabilities of any nature whatsoever arising from or relating to the Leveraged ESOP Transactions that occurred in 2007, including,

without limitation, the claims asserted in the Complaints and any and all potential legal or equitable remedies associated with any such claims.

35.    "Leveraged ESOP Transactions" means the transactions culminating in the leveraged buy-out of Tribune that occurred in December 2007, including, without limitation, the purchase by Tribune of its common stock on or about June 4, 2007 and the merger and related transactions involving Tribune on or about December 20, 2007.

36.    "Litigation Trust" means the trust to which all LBO-Related Causes of Action preserved under the applicable Plan, other than those assigned to the Creditors Trust, will be assigned for prosecution or settlement pursuant to the applicable Plan.

37.    "MSCS" means Morgan Stanley Capital Services Inc. and its Affiliates and Related Persons of such entities, including, without limitation, Morgan Stanley & Co, Inc.

38.    "New Common Stock" means, collectively, the Class A Common Stock and Class B Common Stock to be issued by Reorganized Tribune in connection with the implementation of, and as authorized by, the Noteholder Plan.

39.    "Non-Tribune Bankruptcy" means any bankruptcy other than the above-captioned bankruptcy in which Aurelius has purchased pre-existing claims, notes, equity, debt, or other direct or indirect economic interests in the debtor and has participated in the bankruptcy proceeding.

40.    "Noteholder Plan" means the Joint Plan of Reorganization for Tribune Company and its Subsidiaries proposed by Aurelius Capital Management, LP, on behalf of its managed entities, Deutsche Bank Trust Company Americas, in its capacity as the successor indenture trustee for certain series of senior notes, Law Debenture Trust Company of New York, in its capacity as successor indenture trustee for certain series of senior notes and Wilmington Trust

Company, in its capacity as the successor indenture trustee for the PHONES Notes dated December 9, 2010 as may be amended or modified, and all prior versions of such plan as well as all drafts of any of the foregoing.

41.    "Noteholder Plan Post-Emergence Ownership and Governance Structure" means the ownership and corporate governance structure under which the Noteholder Plan proposes that Reorganized Tribune operate from emergence until the Trusts have completed their litigation and the final ownership of the shares in Reorganized Tribune has been determined.

42.    "Oaktree" means (i) Oaktree Capital Management, L.P. and its affiliates, as well as its or their investment funds or managed accounts (ii) any of its or their officers, directors, partners, members, employees, or managers; (iii) any of its or their board of directors and any committee or subcommittee of any board of directors; and (iv) Professionals of any Person within (i), (ii) or (iii) above

43.    "Oaktree Plan" means the Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by Oaktree, dated September 17, 2010.

44.    "Person" means any natural person or any business, legal or governmental entity or association.

45.    "Petition Date" means December 8, 2008, the date upon which the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

46.    "PHONES Notes" means the issued and outstanding notes under the indenture, dated as of April 1, 1999, between Tribune and Wilmington Trust Company, as successor indenture trustee, as amended, restated or otherwise modified from time to time, including but not limited to any such PHONES Notes which were put to Tribune prior to but not paid as of the Petition Date.

47.     "Plan" means one of the Debtor/Committee/Lender Plan, the Noteholder Plan, the Step One Lender Plan and the Bridge Lender Plan, as the context indicates.

48.     "Plans" means all of the Debtor/Committee/Lender Plan, the Noteholder Plan, the Step One Lender Plan and the Bridge Lender Plan

49.     "Preserved Causes of Action" means the causes of action that will or may be transferred to the Litigation Trust and the Creditors Trust for prosecution under the Noteholder Plan.

50.     "Professional" means any counsel, consultant, advisor, testifying expert, non-testifying expert, agent, representative or other Person engaged to provide or involved in providing at any time any services relating to the Leveraged ESOP Transactions, the LBO-Related Causes of Action, the Plans, the Complaints, the Examiner, the Examiner Report, Settlement Analysis and/or the Settlement Process.

51.     "Relating to" means concerning, constituting, containing, embodying, identifying, dealing with, reflecting, mentioning, defining, explaining, discussing, commenting upon, monitoring, supporting, evidencing, modifying, contradicting, quoting, criticizing, describing, creating or maintaining, bearing upon, referring to, having any relationship to, constituting a basis for, deriving from or arising from, or in any manner whatsoever pertinent to that subject.

52.     "Reorganized Debtors" means Reorganized Tribune and the other reorganized Debtors or any successors thereto by merger, consolidation or otherwise, on or after the Effective Date, after giving effect to the transactions occurring on or prior to the Effective Date in accordance with the Noteholder Plan.

53.    "Reorganized Tribune" means reorganized Tribune or any successors thereto by merger, consolidation or otherwise, on or after the Effective Date, after giving effect to the transactions occurring on or prior to the Effective Date in accordance with the Noteholder Plan.

54.    "Responsive Statement" means the document filed the proponents of a Plan responding to competing Plans and the statements made in the Specific Disclosure Statements of such competing Plans, as may be modified and amended, as well as all prior versions and all drafts of any of the foregoing.

55.    "Senior Lenders" means all persons who lent money under or purchased interests in the Senior Loans.

56.    "Senior Loan Agreement" means, collectively, (a) that certain Credit Agreement, dated as of May 17, 2007, among Tribune, the Senior Lenders, JPMorgan Chase Bank, N.A., as administrative agent, Merrill Lynch Capital Corporation, as syndication agent, and Citicorp North America, Inc. and Bank of America, N.A., as co-documentation agents, as amended, restated, supplemented or otherwise modified from time to time and (b) those certain Increase Joinders, dated as of December 20, 2007, among Tribune, certain of the Senior Lenders and JPMorgan Chase Bank, N.A., as administrative agent, as amended, restated, supplemented or otherwise modified from time to time.

57.    "Senior Loans" means the indebtedness issued pursuant to the Senior Loan Agreement.

58.    "Senior Notes" means the eight series of notes issued and outstanding under any of the following indentures:  (i) the indenture, dated as of January 1, 1997, between Tribune and Deutsche Bank Trust Company Americas, as successor indenture trustee, as amended, restated or otherwise modified from time to time; (ii) the indenture, dated as of March 19, 1996, between

Tribune and Law Debenture Trust Company of New York, as successor indenture trustee, as amended, restated or otherwise modified from time to time; (iii) the indenture, dated as of January 30, 1995, between Tribune and Deutsche Bank Trust Company Americas, as successor indenture trustee, as amended, restated or otherwise modified from time to time; and (iv) the indenture, dated as of March 1, 1992, between Tribune and Deutsche Bank Trust Company Americas, as successor indenture trustee, as amended, restated or otherwise modified from time to time.

59.    "Specific Disclosure Statement" means the document prepared by the proponents of a Plan describing specific aspects and details of such Plan, as may be modified and amended, as well as all prior versions and all drafts of any of the foregoing.

60.    "Step One Lender Plan" means the means the First Amended Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by Certain Holders of Step One Senior Loan Claims, dated December 9, 2010, which was withdrawn on December 14, 2010, and all prior versions of such plan as well as drafts of the foregoing.

61.    "Step One Shareholders" means all persons whose stock Tribune redeemed for cash pursuant to the Tender Offer.

62.    "Step Two Shareholders" means all persons whose stock in Tribune was cancelled and who received payments in respect thereof on or about December 20, 2007.

63.    "Tender Offer" means that certain tender offer for 126 million shares of Tribune Common Stock on or about June 4, 2007.

64.    "Tribune" means (i) the entity known as Tribune Company and its direct and indirect subsidiaries, including but not limited to each of the Debtors in the captioned bankruptcy case; (ii) any of their past, present or future officers, directors, partners, members, employees, or

managers; (iii) any past, present or future board of directors, board of managers or similar body and any committee or subcommittee thereof of any Person within (i) above, including but not limited to the Special Committee; and (iv) Professionals of any Person within (i), (ii) or (iii) of this Definition of Tribune.

65.    "Tribune Interests" means any claims against or interest in or positions with respect to the Debtors , including but not limited to any direct ownership, indirect ownership, claims for which a Noteholder Plan Proponent has the ability to control the vote (either contractually or otherwise), long positions, short positions, swap positions, participations, derivative exposures or instruments whose value is impacted by the value of any of the Debtors.

66.    "Trusts" means the Litigation Trust and the Creditors Trust in a particular plan of reorganization.

67.    "Wilmington Trust" means (i) Wilmington Trust Company, in its capacity as the successor indenture trustee for the PHONES Notes dated April 1, 1999; (ii) any of its past, present or future officers, directors, partners, members, employees, or managers; (iii) any of its board of directors and any committee or subcommittee of any board of directors; and (iv) Professionals of any Person within (i), (ii) or (iii) above.

68.    "Wells Fargo" means (i) Wells Fargo Bank. N.A., in its capacity as the successor indenture trustee under the Bridge Loan Agreement; (ii) any of its past, present or future officers, directors, partners, members, employees, or managers; (iii) any of its board of directors and any committee or subcommittee of any board of directors; and (iv)  Professionals of any Person within (i), (ii) or (iii) above.

69.    "You" or "Your" means Deutsche Bank.

## INSTRUCTIONS

1.     Except where otherwise specifically noted, each Request calls for production of all documents in the possession, custody or control of You, including documents with respect to which You (a) own such document in whole or in part; (b) have a right by contract, statute or otherwise to use, inspect, examine, or copy such document or thing on any terms; (c) have an understanding, express or implied, that they may use, inspect, examine or copy such document or thing on any terms; or (d) have, as a practical matter, been able to use, inspect, examine or copy such document when it has sought to do so.

2.     Documents shall be produced as they are kept in the usual course of business or shall be organized and labeled to correspond to the paragraphs of the Request to which they are responsive.

3.     ESI is to be produced in 300 DPI Group IV Monochrome Tagged Image File Format (.TIFF or .TIF) files.  TIFF files shall be produced in single-page format along with an IPRO image load files (.LFP file).  Metadata is to be extracted and produced in the metadata load files.  The metadata load file should use standard Concordance delimiters; and to the extent available, the following fields should be produced in the metadata load file. Except for redacted documents and hardcopy, extracted text should be provided for all produced documents.

Data for both Emails and Electronic Files:
Production Number Begin
Production Number End
Production Attachment Range Number Begin
Production Attachment Range Number End
Source
Original Path
MD5 Hash
Extracted Text

<u>Metadata from Emails:</u>
Email Subject
Email Author
Email Recipient
Email cc
Email bcc
Email Received Date
Email Received Time
Email Sent Date
Email Sent Time

<u>Metadata from Electronic Files:</u>
File Name
File Author
File Created Date
File Created Time
File Extension

4.     The present tense shall be construed to include the past tense and the past tense

shall be construed to include the present tense as necessary to bring within the scope of these

Requests any documents that might otherwise be construed to be outside their scope.

5.     The use of the singular form of any word includes the plural and vice versa.

6.     If you are unable to answer or respond fully to any document request, answer or

respond to the extent possible and specify the reasons for Your inability to answer or respond in

full.

7.     Subject to any mutual agreement in the Court-Ordered Case Management Order

regarding the logging of privileged documents by category, in the event that any Document is not

produced by reason of a claim of privilege, work product, or any other reason, set forth the

following: (1) the author or originator; (2) each addressee or recipient of the document or any

copy thereof; (3) the date the document bears, or if it bears no date, the date on which it was

made; (4) the title or subject matter of the document and a general description of its contents; (5)

the nature of the document (*e.g.*, memorandum, telegram, chart, etc.); and (6) the basis or bases for the claim of privilege.

8.    Unless otherwise indicated, the relevant time period for these Requests is December 15, 2009 through the date hereof.

9.    These requests shall be deemed continuing so as to require prompt, supplemental production if you discover additional documents subsequent to the date hereof.  If, after responding, you obtain or become aware of any additional documents responsive to these Requests, production of such additional documents shall be made forthwith as required by Rule 7026 of the Federal Rules of Bankruptcy Procedure and Rule 26(e) of the Federal Rules of Civil Procedure.

## **DOCUMENTS REQUESTED**

A.    The Plans

1.    All documents and communications relating to the Noteholder Plan, including but not limited to (a) its development, (b) its structure or any potential alternative structure (c) its actual or potential strengths or weaknesses, (d) the actual or potential perception of or response to any of its terms, strengths or weaknesses by a creditor or creditor constituency of the Debtors or by any other person and (e) any arguments or assertions that would or could be made in response to any criticism of its terms, strengths or weaknesses.

2.    All documents and communications relating to all or part of any draft, final, modified or amended Specific Disclosure Statement for the Noteholder Plan.

3.    All documents and communications relating to all or part of any draft, final, modified or amended Responsive Statement prepared by any proponents of the Noteholder Plan.

4.    All documents and communications constituting or relating to any discussion, analysis, assessment or review of the terms, strengths or weaknesses of the Debtor/Committee/Lender Plan.

5.    All documents and communications constituting or relating to any discussion, analysis, assessment or review of the terms, strengths or weaknesses of the Bridge Lender Plan.

6.    All documents and communications constituting or relating to any discussion, analysis, assessment or review of the terms, strengths or weaknesses of the Step One Lender Plan.

7.    All documents and communications constituting or relating to any discussion, analysis, assessment or review of the terms, strengths or weaknesses of the Oaktree Plan.

8.    All documents and communications constituting or relating to any discussion, analysis, assessment or review of the terms, strengths or weaknesses of the April Plan.

B.    The LBO-Related Causes of Action

9.    All documents and communications constituting or relating to any discussion, analysis, assessment or review of the LBO-Related Causes of Action, including but not limited to the strengths and weaknesses of any actual of actual or potential LBO-Related Causes of Action that have, could or might be asserted by any person against any of the Senior Lenders, the Bridge Lenders, the Directors & Officers, the Step One Shareholders, the Step Two Shareholders, or the Advisers.

10.     All documents and communications relating to any discussion, analysis, assessment or review of the Examiner's Report, including but not limited to any statement, calculation, annex or exhibit in or to the Examiner's Report.

11.     All documents and communications constituting or relating to any attempt to assign probabilities to various recoveries scenarios discussed in the Examiner's Report, including but not limited to all drafts thereof and sensitivity analyses relating thereto.

12.     All documents and communications relating to the settlement of the LBO-Related Causes of Action embodied in the Debtor/Committee/Lender Plan.

13.     All documents and communications relating to the settlement of the LBO-Related Causes of Action embodied in the Bridge Lender Plan.

14.     All documents and communications relating to the settlement of the LBO-Related Causes of Action embodied in the Step One Lender Plan.

15.     All documents and communications relating to the settlement of the LBO-Related Causes of Action described in the press release issued by Tribune on September 28, 2010.

16.     All documents or communications relating to the settlement of the LBO-Related Causes of Action embodied in the April Plan.

C.    The Litigation and/or Creditors Trusts

17.     All documents and communications relating to the Litigation Trust or Creditors Trust embodied in the Noteholder Plan, including but not limited to the actual or potential structure, function, administration and operation of each of the Trusts; the actual or potential identification, consideration or selection of any person to serve as trustee or advisory board

member; the actual or potential ability of Aurelius to exercise control or influence over any person identified, considered or selected to serve as trustee or advisory board member; any actual or potential timeline or schedule for the pursuit to settlement or judgment of the Preserved Causes of Action; or the actual or potential value of any Preserved Causes of Action that will or might be pursued.

18.    All documents and communications relating to the Litigation Trust or Creditors Trust embodied in the Debtor/Committee/Lender Plan, including but not limited to the actual or potential structure, function, administration and operation of each of the Trusts; the actual or potential identification, consideration or selection of any person to serve as trustee or advisory board member; any actual or potential timeline or schedule for the pursuit to settlement or judgment of the Preserved Causes of Action; or the actual or potential value of the Preserved Causes of Action that will or might be pursued by each of the Trusts.

19.    All documents and communications relating to the Litigation Trust or Creditors Trust embodied in the Bridge Lender Plan, including but not limited to the actual or potential structure, function, administration and operation of each of the Trusts; the actual or potential identification, consideration or selection of any person to serve as trustee or advisory board member; any actual or potential timeline or schedule for the pursuit to settlement or judgment of the Preserved Causes of Action; or the actual or potential value of the Preserved Causes of Action that will or might be pursued by each of the Trusts.

20.    All documents and communications relating to the Litigation Trust or Creditors Trust embodied in the Step One Lender Plan, including but not limited to the actual or potential structure, function, administration and operation of each of the Trusts; the actual or potential

identification, consideration or selection of any person to serve as trustee or advisory board member; any actual or potential timeline or schedule for the pursuit to settlement or judgment of the Preserved Causes of Action; or the actual or potential value of the Preserved Causes of Action that will or might be pursued by each of the Trusts.

D.    Debtors' Current Value

21.    All documents and communications relating to the Reorganized Value Analysis, the Enterprise Value, or the Equity Value (as each of those terms are defined and used in the General Disclosure Statement), including, but not limited to, the allocation of Enterprise Value or Equity Value as between the various Debtor entities, all business plans, projections, forecasts, market reports, financial information, credit analyses and any other Documents and Communications relating to the value of any of the Debtors, the value of any stock or assets of any Debtor, and/or allocation of value between and among the Debtors generated on or after January 1, 2010.

E.    Intercompany Claims

22.    All documents and communications relating to any discussion, analysis, assessment or review of intercompany claims, including but not limited to current claims between or among Debtor entities or Debtor entities and non-Debtor affiliates.

23.    All documents and communications relating to the Intercompany Claims Settlement, as that term is used in the Specific Disclosure Statement relating to the Debtor/Committee/Lender Plan.

24.    All documents and communications relating to the treatment or handling of intercompany claims in the Noteholder Plan.

25.    All documents and communications relating to the treatment or handling of intercompany claims in the Debtor/Committee/Lender Plan.

26.    All documents and communications relating to the treatment or handling of intercompany claims in the Bridge Lender Plan.

27.    All documents and communications relating to the treatment or handling of intercompany claims in the Step One Lender Plan.

F.    Amount of the PHONES Notes Claims

28.    All documents and communications constituting or relating to any discussion, analysis, assessment or review of the amount of the PHONES Notes or the PHONES Notes claims, whether in connection with a solvency analysis of in connection with the allowance of claims under any Plan.

G.    Recoveries for Specific Creditor Groups

29.    All documents and communications constituting or relating to any discussion, analysis, assessment or review of actual of potential recoveries actually or potentially available to any individual creditor or class of creditors of any Debtor under any Plan, including but not limited to immediate recoveries, ultimate recoveries, risk of recoveries, the level of ultimate recoveries, and recoveries resulting from litigation under any Plan or from a buyout to prevent or settle litigation under any Plan.

30.    All documents and communications constituting or relating to any discussion, analysis, assessment or review of actual of the actual or potential likelihood or uncertainty of

success with respect to issues that might be actually or potentially litigated either at the Confirmation Hearing or by the Trusts under the Noteholder Plan.

31.    All documents and communications constituting or relating to any discussion, analysis, assessment or review of, or supporting, the different recovery percentages listed for the different scenarios laid out in the Specific Disclosure Statement for the Noteholder Plan.

32.    All documents and communications constituting or relating to any discussion, analysis, assessment or review of the actual or potential ability of the Noteholder Plan Proponents to obtain a 100% recovery on their claims under the Noteholder Plan.

33.    All Documents and Communications constituting or relating to any discussion, analysis, assessment or review of actual of potential impact or consequence of any of the Plans on any individual creditor or class of creditors of any Debtor.

H.    Specific Requests Regarding Aurelius and/or the Noteholder Plan

34.    From the Petition Date through the date hereof, all documents and communications relating to or reflecting Tribune Interests held by a Noteholder Plan Proponent, including but not limited to the type and amount of Tribune Interests, the identity of each and every person or entity for which Aurelius controls such Tribune Interests, the date of purchase and price paid for such Tribune Interests, and the reasons for the purchase or holding of such Tribune Interests.

35.    From the Petition Date through the date hereof, all documents and communications relating to any actual or potential purchase or sale by a Noteholder Plan Proponent of any Tribune Interests.

36.    From the Petition Date through the date hereof, all documents and communications relating to any consideration, value or transfer or payment of money made by a Noteholder Plan Proponent in exchange for any Tribune Interests.

37.    From January 1, 2005 through the present, with respect to entities whose Tribune Interests are within the scope of Requests 34-36 above:

    a.   all documents relating to the creation and structure of each such entity including, with limitation, articles of incorporation, by-laws, operating agreements, and voting agreements;

    b.   all filings made by each such entity regarding its structure and operations with any sovereign, federal, or state government or agency, and with any other regulator or government entity and

    c.   all documents relating to, or sufficient to identity any litigation, (including, without limitation, lawsuits, arbitrations, regulatory and industry proceedings) from January 1, 2005 to the present;

    d.   all documents relating to any plan support, lock-up or voting agreements, or similar arrangements relating to these Bankruptcy Cases.

38.    All documents and communications constituting or relating to any discussion, analysis, assessment or review of the actual or potential effect of the Noteholder Plan on the ability to obtain FCC Approval.

39.     All documents and communications constituting or relating to any discussion, analysis, assessment or review of the actual or potential ability or inability of Step One Lenders to benefit from avoidance of Step Two debt or disgorgement from Step Two Lenders, including but not limited to by reason of the doctrines of equitable estoppels, equitable subordination or otherwise.

40.     All documents and communications constituting or relating to any discussion, analysis, assessment or review of the basis on which distribution from the Distribution Trust Reserve under the Noteholder Plan will be made, including but not limited to whether creditors' entitlements will be fixed on the Effective Date, or whether entitlements will be determined in accordance with values at the time of distribution.

41.     All documents and communications constituting or relating to any discussion, analysis, assessment or review of the practicality, difficulty, legality or confirmability of the Noteholder Plan Post-Emergence Ownership and Governance Structure.

42.     All documents and communications constituting or relating to any discussion, analysis, assessment or review of the actual or potential impact of the Noteholder Plan Post-Emergence Ownership and Governance Structure upon the business, operations, or value of Reorganized Tribune.

43.     All documents and communications constituting or relating to any discussion, analysis, assessment or review of the actual or potential effect of not distributing a substantial proportion of the value of the Reorganized Tribune after the Effective Date upon the market value of the new common stock in Reorganized Tribune actually distributed on the Effective Date.

44.    All documents and communications constituting or relating to any discussion or analysis of the actual or potential effect of the Noteholder Plan on the ability to obtain FCC Approval.

45.    All documents and communications relating to the Put Options (as defined in the Noteholder Plan), including, but not limited to, (i) consideration and determination of the amounts proposed to be offered to purchase claims and the actual or potential justifications for each such amounts (ii) contacts with Aurelius' trading desk concerning the actual or potential price at which Tribune Interests would or might trade (iii) acts or omissions considered or undertaken by, on behalf of or at the requests of Aurelius in order to depress or otherwise affect the price at which Tribune Interests would or might trade and (iv) all documents reflecting the purchase by Aurelius of any such claims at those or any other amounts.

46.    All documents and communications constituting or relating to any discussion, analysis, assessment or review of the setting of the amount of value to be set aside in the Distribution Trust Reserve under the Noteholder Plan, including but not limited to the various amounts considered, the actual or potential justifications for those amounts and the reasons for the amount ultimately decided upon.

47.    All documents and communications constituting or relating to any discussion, analysis, assessment or review of the basis on which distribution from the Distribution Trust Reserve under the Noteholder Plan will be made, including but not limited to whether creditors' entitlements will be fixed on the Effective Date, or whether entitlements will be determined in accordance with values at the time of distribution.

48.    All documents and communications constituting or relating to any discussion, analysis, assessment or review of the actual or potential ability of the Debtors to procure financing pre-emergence and post-emergence from bankruptcy in the context of any actual or potential plan or reorganization, including but not limited to the actual or potential impact or effect of any aspect of the Noteholder Plan on the ability of the Debtors to procure exit financing or replacement financing for the New Senior Secured Term Loan contemplated by Section 5.6.2 of the Aurelius Plan.

49.    All documents and communications relating to any actual or potential discussions, negotiations or agreement between or among Aurelius and any other party to the bankruptcy, including but not limited to Wilmington Trust the Bridge Lenders and the Step One Lenders, relating in any way to any actual or potential plan of reorganization or any actual or potential disposition, resolution or settlement of the LBO-Related Causes of Action.

50.    From December 1, 2005 through the date hereof, for each Non-Tribune Bankruptcy, all documents and communications identifying all claims, notes, equity, debt or other direct or indirect economic interests in the debtor that were purchased by Aurelius, the date that Aurelius purchased, the price at which Aurelius purchased, and the total cost to Aurelius of its purchase.

51.    From December 1, 2005 through the date hereof, for each Non-Tribune Bankruptcy, all documents and communications relating to or reflecting the total amount paid to Aurelius as a result of an order or settlement in the bankruptcy proceeding as to any pre-existing claims, notes, equity, debt, or other direct or indirect economic interests in the debtor owned or controlled by Aurelius.

52.    From December 1, 2005 through the date hereof, for each Non-Tribune Bankruptcy, all documents and communications relating to or reflecting any proposal by Aurelius that any potential causes of action be litigated rather than settled or the response of the bankruptcy court to such proposal.

53.    From December 1, 2005 through the date hereof, for each Non-Tribune Bankruptcy, all documents and communications relating to or reflecting whether, after making a proposal that claims be litigated rather than settled, Aurelius was offered and accepted an amount of money in settlement of its claims greater than had previously been offered and, if so, the amount of money accepted and the amount(s) of money previously offered.

I.    Confirmation Hearing Witnesses and Evidence

54.    All documents provided to or relied upon by any expert expected to testify on behalf of Deutsche Bank at the Confirmation Hearing.

55.    All documents that Deutsche Bank intends to introduce or rely upon at the Confirmation Hearing.

Dated: Wilmington, Delaware
      December 19, 2010

Respectfully submitted,

SIDLEY AUSTIN LLP
James Conlan
James B. Bendernagel, Jr.
Bryan Krakauer
James W. Ducayet
One South Dearborn Street
Chicago, Illinois  60603
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036

-and-

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.

By: _____
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, DE  19801
Telephone:  (302) 652-3131
Facsimile:  (302) 652-3117

ATTORNEYS FOR THE DEBTORS
AND DEBTORS IN POSSESSION

## CERTIFICATE OF SERVICE

I, _Patrick J. Kelley_ /an attorney, hereby certify that I have caused a true

and correct copy of the foregoing Debtors' Requests for the Production of Documents to

Aurelius Capital Management, LP to be served on counsel listed below by electronic mail on this

19th day of December, 2010.

# EXHIBIT "3"

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

### for the

### Southern District of New York

In re: Tribune Company, et al.,                )
                                                )
                                                )
                    v.                          )    Civil Action No.
Debtors.                                        )
                                                )
                                                )

SUPOENA IN A CASE UNDER
THE BANKRUPTCY CODE
United States Bankruptcy Court
District of Delaware
Chapter 11
Case No. 08-13141 (KJC)

(If the action is pending in another district, state where:
            District of Delaware            )

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:  McCarter & English, LLP, 245 Park Avenue, New York, NY 10167 (212-609-6800)

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material:  (See Attachment)

| Place: Attn: Alan Unger<br>Sidley Austin LLP<br>787 Seventh Avnue, New York, NY 10019 | Date and Time:<br><br>January 17, 2011 |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date:  ___12/17/2010___

CLERK OF COURT

                                            OR

_____                    _____
Signature of Clerk or Deputy Clerk                        Attorney's signature

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*  Attorneys for Debtors and Debtors in Possession_____, who issues or requests this subpoena, are:
Alan M. Unger, Esq., Sidley Austin LLP, 787 Seventh Avenue, New York, NY 10019, aunger@sidley.com, 212-839-5785

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. _____ SUBPOENA IN A CASE UNDER
THE BANKRUPTCY CODE
United States Bankruptcy Court
District of Delaware
Chapter 11
Case No. 08-13141 (KJC)

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

This subpoena for *(name of individual and title, if any)* _____

was received by me on *(date)* _____.

☑ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $     0.00

I declare under penalty of perjury that this information is true.

Date: _____          _____
                                                    *Server's signature*

                                         _____
                                                    *Printed name and title*

                                         _____
                                                    *Server's address*

Additional information regarding attempted service, etc:

## Federal Rule of Civil Procedure 45 (c), (d), and (e) (Effective 12/1/07)

**(c) Protecting a Person Subject to a Subpoena.**

(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection.*

(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) *Quashing or Modifying a Subpoena.*

(A) *When Required.* On timely motion, the issuing court must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information;

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

(iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

**(d) Duties in Responding to a Subpoena.**

(1) *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) *Claiming Privilege or Protection.*

(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) Contempt.** The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

**ATTACHMENT**

Pursuant to pursuant to Rules 7026, 7045 and 9014 of the Federal Rules of Bankruptcy Procedure and Rule 26 and 45 of the Federal Rules of Civil Procedure, the debtors and debtors in possession in the above-captioned chapter 11 cases (each a "Debtor" and collectively, the "Debtors"), hereby request McCarter & English (as defined below) to produce the documents specified in the requests (the "Requests" or "Request") set forth below for inspection and copying at the offices of Sidley Austin LLP, 787 Seventh Avenue, New York, New York 10019, ATTN: Alan Unger on or before January 17, 2011

**DEFINITIONS**

1.      "Advisers" means all persons who provided advice to Tribune, its Board of Directors or any subcommittee thereof in connection with any part of the Leveraged ESOP Transactions.

2.      "All" or "any" means each and every.

3.      "And" or "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be outside of its scope.

4.      "April Plan" means the Plan of Reorganization filed by the Debtors and others with the Bankruptcy Court on April 12, 2010.

5.      "April Proposed Settlement" means the settlement of certain LBO-Related Causes of Action proposed by Angelo-Gordon & Co., L.P., Centerbridge Credit Partners, L.P., Centerbridge Credit Partners Master, L.P., Centerbridge Special Credit Partners, L.P., the Law Debenture defendants, and J.P. Morgan Chase Bank, N.A., described in a Settlement Support Agreement dated on or about April 9, 2010 including Exhibit A attached thereto.

6.      "Aurelius" means (i) Aurelius Capital Management, LP and its affiliates, as well as its or their investment funds or managed accounts (ii) any of its or their officers, directors, employees, partners, members, or managers; (iii) any of its or their board of directors and any committee or subcommittee of any board of directors; and (iv)  Professionals of any Person within (i), (ii) or (iii) above.

7.      "Bankruptcy Cases" means the chapter 11 cases filed by the Debtors in the Bankruptcy Court for the District of Delaware on December 8, 2008.

8.      "Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware.

9.      "Bridge Lender Agreement" means that certain Senior Unsecured Interim Loan Agreement, dated as of December 20, 2007, among Tribune, Merrill Lynch Capital Corporation as administrative agent, JP Morgan Chase Bank, N.A. as syndication agent, Citicorp North America, Inc. and Bank of America, N.A. as co-documentation agents, and various other financial institutions, as amended, restated, supplemented or otherwise modified from time to time.

10.      "Bridge Lender Plan" means the Amended Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by King Street Acquisition Company, L.L.C., King Street Capital, L.P. and Marathon Asset Management, L.P., dated December 7, 2010 as may be amended or modified, and all prior versions of such plan as well as all drafts of any of the foregoing.

11.      "Bridge Lenders" means all persons who lent money or purchased interests in the Bridge Loans.

12.     "Bridge Loans" means the indebtedness issued pursuant to the Bridge Loan Agreement.

13.     "Bridge Loan Claim" means a claim arising under the Bridge Loan Agreement.

14.     "Bridge Loan Guaranty Agreement" means the Guarantee Agreement, dated as of December 20, 2007, among Tribune, each of the subsidiaries listed on Annex I thereto, and Merrill Lynch Capital Corporation as administrative agent, as amended, restated, supplemented or otherwise modified from time to time.

15.     "Centerbridge" means (i) Centerbridge Credit Advisors LLC, Centerbridge Partners L.P., Centerbridge Credit Partners Master, L.P., Centerbridge Credit Partners, L.P., Centerbridge Special Credit Partners, L.P., or any of their affiliates, as well as its or their investment funds or managed accounts (ii) any of its or their officers, directors, employees, partners, members, or managers; (iii) any of its or their board of directors and any committee or subcommittee of any board of directors; and (iv)  Professionals of any Person within (i), (ii) or (iii) above.

16.     "Communication" or "communications" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise) whether by writing, oral conversation, conversation by telephone, meeting or any other method.  A "communication" shall also include, without limitation, all copies of documents that contain or evidence the same.

17.     "Confirmation Hearing" means the Confirmation Hearing currently scheduled to commence on March 7, 2011.

18.     "Complaints" means the original and any amended complaints filed in the adversary proceedings commenced by the Official Committee of Unsecured Creditors on

November 1, 2010 asserting LBO-Related Causes of Action against various participants in the

Leveraged ESOP Transactions.

19.     "Creditors Trust" means the trust to which certain LBO-Related Causes of Action

will be assigned for prosecution or settlement.

20.     "Debtor/Committee/Lender Plan" means the First Amended Chapter 11 Joint Plan

of Reorganization For Tribune Company and Its Subsidiaries Proposed by the Debtors, the

Official Committee of Unsecured Creditors, Oaktree Capital Management, LP., Angelo, Gordon

& Co., L.P., and JP Morgan Chase Bank, N.A., filed with the Bankruptcy Court on December

10, 2010, as may be amended or modified, and all prior versions of such plan as well as all drafts

of any of the foregoing, including as described in the press release issued by Tribune on October

12, 2010.

21.     "Deutsche Bank" means (i) Deutsche Bank Trust Company Americas, in its

capacity as successor indenture trustee for certain series of Senior Notes (ii) any of its past,

present or future officers, directors, partners, members, employees, or managers; (iii) any of its

board of directors and any committee or subcommittee of any board of directors; and (iv)

Professionals of any Person within (i), (ii) or (iii) above.

22.     "Directors and Officers" means those directors and officers of Tribune or its

subsidiaries who were involved in the planning, consideration, implementation or approval of

some aspect of the Leveraged ESOP Transactions.

23.     "Distribution Trust Reserve" has the meaning assigned to that term in the

Noteholder Plan.

24.     "Document" or "documents" is synonymous in meaning and equal in scope to the

usage of this term in Federal Rule of Civil Procedure 34 but also includes electronically stored

information ("ESI"). A draft or non-identical copy is a separate document within the meaning of this term.

25.     "Effective Date" means the first Business Day on which all of the conditions to the Effective Date specified in the relevant Plan have been satisfied or waived in accordance with the Plan.

26.     "Examiner's Report" means "Report of Kenneth N. Klee, As Examiner", *In Re: Tribune Company et. al,* Debtors, Chapter 11, Case Number 08-12141 (KJC) (Jointly Administered), July 26, 2010.

27.     "FCC" means the Federal Communications Commission or any other federal agency succeeding to its jurisdiction.

28.     "FCC Applications" means, collectively, each application filed with the FCC in connection with the Debtor's emergence from bankruptcy, including but not limited to those filed in connection with the assignment and/or transfer of control of FCC Licenses from the Debtors to the Reorganized Debtors.

29.     "FCC Approval" means an action or actions by the FCC (including any action or actions taken by the FCC's staff pursuant to delegated authority and regardless of whether any action or actions may be subject to further administrative or judicial review) on the FCC Applications granting any consent of the FCC necessary to consummate the assignment and/or transfer of control of FCC Licenses from the Debtors to the Reorganized Debtors and/or otherwise in connection with a plan of reorganization.

30.     "General Disclosure Statement" means the General Disclosure Statement for Tribune Company and Its Subsidiaries included in the Joint Disclosure Statement for the Following Plans of Reorganization: 1) First Amended Joint Plan of Reorganization For Tribune

Company And its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured

Creditors, Oaktree Capital Management, LP., Angelo, Gordon & Co., L.P., and JPMorgan Chase

Bank, N.A.; 2) Joint Plan of Reorganization for Tribune Company and its Subsidiaries proposed

by Aurelius Capital Management, LP, on behalf of its managed entities, Deutsche Bank Trust

Company Americas, in its capacity as the successor indenture trustee for certain series of senior

notes, Law Debenture Trust Company of New York, in its capacity as successor indenture trustee

for certain series of senior notes and Wilmington Trust Company, in its capacity as the successor

indenture trustee for the PHONES Notes; 3) First Amended Plan of Reorganization for Tribune

Company and its Subsidiaries Proposed by Certain Holders of Step One Senior Loan Claims;

and 4) Amended Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by

King Street Acquisition Company, L.L.C., King Street Capital, L.P. and Marathon Asset

Management, L.P., filed with the Bankruptcy Court on or about December 10, 2010, as may be

amended or modified, and all drafts or prior versions of such general disclosure statement.

31.    "Including" means including, but not limited to.

32.    "Individual" or "individuals" means any natural Person or Persons.

33.    "Law Debenture" means (i) Law Debenture Trust Company of New York, in its

capacity as successor indenture trustee for certain series of Senior Notes (ii) any of its past,

present or future officers, directors, partners, members, employees, or managers; (iii) any of its

board of directors and any committee or subcommittee of any board of directors; and (iv)

Professionals of any Person within (i), (ii) or (iii) above.

34.    "LBO-Related Causes of Action" means any and all actual or potential pre-

petition, post-petition and/or post-emergence claims, obligations, suits, judgments, damages,

debts, rights, causes of action, avoidance powers or rights, liabilities of any nature whatsoever

arising from or relating to the Leveraged ESOP Transactions that occurred in 2007, including, without limitation, the claims asserted in the Complaints and any and all potential legal or equitable remedies associated with any such claims.

35.    "Leveraged ESOP Transactions" means the transactions culminating in the leveraged buy-out of Tribune that occurred in December 2007, including, without limitation, the purchase by Tribune of its common stock on or about June 4, 2007 and the merger and related transactions involving Tribune on or about December 20, 2007.

36.    "Litigation Trust" means the trust to which all LBO-Related Causes of Action preserved under the applicable Plan, other than those assigned to the Creditors Trust, will be assigned for prosecution or settlement pursuant to the applicable Plan.

37.    "McCarter & English" means (i) McCarter & English and its affiliates (ii) any of its or their partners, members, employees, shareholders or managers (iii) of any of its or their board of directors and any committee or subcommittee of its board of directors and (iv) Professionals of any Person within (i), (ii) or (iii) above.

38.    "MSCS" means Morgan Stanley Capital Services Inc. and its Affiliates and Related Persons of such entities, including, without limitation, Morgan Stanley & Co, Inc.

39.    "New Common Stock" means, collectively, the Class A Common Stock and Class B Common Stock to be issued by Reorganized Tribune in connection with the implementation of, and as authorized by, the Noteholder Plan.

40.    "Non-Tribune Bankruptcy" means any bankruptcy other than the above-captioned bankruptcy in which Aurelius has purchased pre-existing claims, notes, equity, debt, or other direct or indirect economic interests in the debtor and has participated in the bankruptcy proceeding.

41.    "Noteholder Plan" means the Joint Plan of Reorganization for Tribune Company and its Subsidiaries proposed by Aurelius Capital Management, LP, on behalf of its managed entities, Deutsche Bank Trust Company Americas, in its capacity as the successor indenture trustee for certain series of senior notes, Law Debenture Trust Company of New York, in its capacity as successor indenture trustee for certain series of senior notes and Wilmington Trust Company, in its capacity as the successor indenture trustee for the PHONES Notes dated December 9, 2010 as may be amended or modified, and all prior versions of such plan as well as all drafts of any of the foregoing.

42.    "Noteholder Plan Post-Emergence Ownership and Governance Structure" means the ownership and corporate governance structure under which the Noteholder Plan proposes that Reorganized Tribune operate from emergence until the Trusts have completed their litigation and the final ownership of the shares in Reorganized Tribune has been determined.

43.    "Oaktree" means (i) Oaktree Capital Management, L.P. and its affiliates, as well as its or their investment funds or managed accounts (ii) any of its or their officers, directors, partners, members, employees, or managers; (iii) any of its or their board of directors and any committee or subcommittee of any board of directors; and (iv) Professionals of any Person within (i), (ii) or (iii) above

44.    "Oaktree Plan" means the Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by Oaktree, dated September 17, 2010.

45.    "Person" means any natural person or any business, legal or governmental entity or association.

46.    "Petition Date" means December 8, 2008, the date upon which the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

47.    "PHONES Notes" means the issued and outstanding notes under the indenture, dated as of April 1, 1999, between Tribune and Wilmington Trust Company, as successor indenture trustee, as amended, restated or otherwise modified from time to time, including but not limited to any such PHONES Notes which were put to Tribune prior to but not paid as of the Petition Date.

48.    "Plan" means one of the Debtor/Committee/Lender Plan, the Noteholder Plan, the Step One Lender Plan and the Bridge Lender Plan, as the context indicates.

49.    "Plans" means all of the Debtor/Committee/Lender Plan, the Noteholder Plan, the Step One Lender Plan and the Bridge Lender Plan

50.    "Preserved Causes of Action" means the causes of action that will or may be transferred to the Litigation Trust and the Creditors Trust for prosecution under the Noteholder Plan.

51.    "Professional" means any counsel, consultant, advisor, testifying expert, non-testifying expert, agent, representative or other Person engaged to provide or involved in providing at any time any services relating to the Leveraged ESOP Transactions, the LBO-Related Causes of Action, the Plans, the Complaints, the Examiner, the Examiner Report, Settlement Analysis and/or the Settlement Process.

52.    "Relating to" means concerning, constituting, containing, embodying, identifying, dealing with, reflecting, mentioning, defining, explaining, discussing, commenting upon, monitoring, supporting, evidencing, modifying, contradicting, quoting, criticizing, describing, creating or maintaining, bearing upon, referring to, having any relationship to, constituting a basis for, deriving from or arising from, or in any manner whatsoever pertinent to that subject.

53.    "Reorganized Debtors" means Reorganized Tribune and the other reorganized Debtors or any successors thereto by merger, consolidation or otherwise, on or after the Effective Date, after giving effect to the transactions occurring on or prior to the Effective Date in accordance with the Noteholder Plan.

54.    "Reorganized Tribune" means reorganized Tribune or any successors thereto by merger, consolidation or otherwise, on or after the Effective Date, after giving effect to the transactions occurring on or prior to the Effective Date in accordance with the Noteholder Plan.

55.    "Responsive Statement" means the document filed the proponents of a Plan responding to competing Plans and the statements made in the Specific Disclosure Statements of such competing Plans, as may be modified and amended, as well as all prior versions and all drafts of any of the foregoing.

56.    "Senior Lenders" means all persons who lent money under or purchased interests in the Senior Loans.

57.    "Senior Loan Agreement" means, collectively, (a) that certain Credit Agreement, dated as of May 17, 2007, among Tribune, the Senior Lenders, JPMorgan Chase Bank, N.A., as administrative agent, Merrill Lynch Capital Corporation, as syndication agent, and Citicorp North America, Inc. and Bank of America, N.A., as co-documentation agents, as amended, restated, supplemented or otherwise modified from time to time and (b) those certain Increase Joinders, dated as of December 20, 2007, among Tribune, certain of the Senior Lenders and JPMorgan Chase Bank, N.A., as administrative agent, as amended, restated, supplemented or otherwise modified from time to time.

58.    "Senior Loans" means the indebtedness issued pursuant to the Senior Loan Agreement.

59.    "Senior Notes" means the eight series of notes issued and outstanding under any of the following indentures:  (i) the indenture, dated as of January 1, 1997, between Tribune and Deutsche Bank Trust Company Americas, as successor indenture trustee, as amended, restated or otherwise modified from time to time; (ii) the indenture, dated as of March 19, 1996, between Tribune and Law Debenture Trust Company of New York, as successor indenture trustee, as amended, restated or otherwise modified from time to time; (iii) the indenture, dated as of January 30, 1995, between Tribune and Deutsche Bank Trust Company Americas, as successor indenture trustee, as amended, restated or otherwise modified from time to time; and (iv) the indenture, dated as of March 1, 1992, between Tribune and Deutsche Bank Trust Company Americas, as successor indenture trustee, as amended, restated or otherwise modified from time to time.

60.    "Specific Disclosure Statement" means the document prepared by the proponents of a Plan describing specific aspects and details of such Plan, as may be modified and amended, as well as all prior versions and all drafts of any of the foregoing.

61.    "Step One Lender Plan" means the means the First Amended Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by Certain Holders of Step One Senior Loan Claims, dated December 9, 2010, which was withdrawn on December 14, 2010, and all prior versions of such plan as well as drafts of the foregoing.

62.    "Step One Shareholders" means all persons whose stock Tribune  redeemed for cash pursuant to the Tender Offer.

63.    "Step Two Shareholders" means all persons whose stock in Tribune was cancelled and who received payments in respect thereof on or about December 20, 2007.

64.    "Tender Offer" means that certain tender offer for 126 million shares of Tribune Common Stock on or about June 4, 2007.

65.    "Tribune" means (i) the entity known as Tribune Company and its direct and indirect subsidiaries, including but not limited to each of the Debtors in the captioned bankruptcy case; (ii) any of their past, present or future officers, directors, partners, members, employees, or managers; (iii) any past, present or future board of directors, board of managers or similar body and any committee or subcommittee thereof of any Person within (i) above, including but not limited to the Special Committee; and (iv) Professionals of any Person within (i), (ii) or (iii) of this Definition of Tribune.

66.    "Tribune Interests" means any claims against or interest in or positions with respect to the Debtors , including but not limited to any direct ownership, indirect ownership, claims for which a Noteholder Plan Proponent has the ability to control the vote (either contractually or otherwise), long positions, short positions, swap positions, participations, derivative exposures or instruments whose value is impacted by the value of any of the Debtors.

67.    "Trusts" means the Litigation Trust and the Creditors Trust in a particular plan of reorganization.

68.    "Wilmington Trust" means (i) Wilmington Trust Company, in its capacity as the successor indenture trustee for the PHONES Notes dated April 1, 1999; (ii) any of its past, present or future officers, directors, partners, members, employees, or managers; (iii) any of its board of directors and any committee or subcommittee of any board of directors; and (iv) Professionals of any Person within (i), (ii) or (iii) above.

69.    "Wells Fargo" means (i) Wells Fargo Bank. N.A., in its capacity as the successor indenture trustee under the Bridge Loan Agreement; (ii) any of its past, present or future officers,

directors, partners, members, employees, or managers; (iii) any of its board of directors and any

committee or subcommittee of any board of directors; and (iv) Professionals of any Person

within (i), (ii) or (iii) above.

70.    "You" or "Your" means McCarter & English.

## INSTRUCTIONS

1.    Except where otherwise specifically noted, each Request calls for production of

all documents in the possession, custody or control of You, including documents with respect to

which You (a) own such document in whole or in part; (b) have a right by contract, statute or

otherwise to use, inspect, examine, or copy such document or thing on any terms; (c) have an

understanding, express or implied, that they may use, inspect, examine or copy such document or

thing on any terms; or (d) have, as a practical matter, been able to use, inspect, examine or copy

such document when it has sought to do so.

2.    Documents shall be produced as they are kept in the usual course of business or

shall be organized and labeled to correspond to the paragraphs of the Request to which they are

responsive.

3.    ESI is to be produced in 300 DPI Group IV Monochrome Tagged Image File

Format (.TIFF or .TIF) files.  TIFF files shall be produced in single-page format along with an

IPRO image load files (.LFP file).  Metadata is to be extracted and produced in the metadata load

files.  The metadata load file should use standard Concordance delimiters; and to the extent

available, the following fields should be produced in the metadata load file. Except for redacted

documents and hardcopy, extracted text should be provided for all produced documents.

Data for both Emails and Electronic Files:
Production Number Begin
Production Number End

Production Attachment Range Number Begin
Production Attachment Range Number End
Source
Original Path
MD5 Hash
Extracted Text


Metadata from Emails:
Email Subject
Email Author
Email Recipient
Email cc
Email bcc
Email Received Date
Email Received Time
Email Sent Date
Email Sent Time

Metadata from Electronic Files:
File Name
File Author
File Created Date
File Created Time
File Extension

4.      The present tense shall be construed to include the past tense and the past tense

shall be construed to include the present tense as necessary to bring within the scope of these

Requests any documents that might otherwise be construed to be outside their scope.

5.      The use of the singular form of any word includes the plural and vice versa.

6.      If you are unable to answer or respond fully to any document request, answer or

respond to the extent possible and specify the reasons for Your inability to answer or respond in

full.

7.      Subject to any mutual agreement in the Court-Ordered Case Management Order

regarding the logging of privileged documents by category, in the event that any Document is not

produced by reason of a claim of privilege, work product, or any other reason, set forth the

following: (1) the author or originator; (2) each addressee or recipient of the document or any

copy thereof; (3) the date the document bears, or if it bears no date, the date on which it was

made; (4) the title or subject matter of the document and a general description of its contents; (5)

the nature of the document (*e.g.*, memorandum, telegram, chart, etc.); and (6) the basis or bases

for the claim of privilege.

8.      Unless otherwise indicated, the relevant time period for these Requests is

December 15, 2009 through the date hereof.

9.      These requests shall be deemed continuing so as to require prompt, supplemental

production if you discover additional documents subsequent to the date hereof.  If, after

responding, you obtain or become aware of any additional documents responsive to these

Requests, production of such additional documents shall be made forthwith as required by Rule

7026 of the Federal Rules of Bankruptcy Procedure and Rule 26(e) of the Federal Rules of Civil

Procedure.

## **DOCUMENTS REQUESTED**

A.      The Plans

1.      All documents and communications relating to the Noteholder Plan, including but

not limited to (a) its development, (b) its structure or any potential alternative structure (c) its

actual or potential strengths or weaknesses, (d) the actual or potential perception of or response

to any of its terms, strengths or weaknesses by a creditor or creditor constituency of the Debtors

or by any other person and (e) any arguments or assertions that would or could be made in

response to any criticism of its terms, strengths or weaknesses.

2.      All documents and communications relating to all or part of any draft, final,

modified or amended Specific Disclosure Statement for the Noteholder Plan.

3.      All documents and communications relating to all or part of any draft, final, modified or amended Responsive Statement prepared by any proponents of the Noteholder Plan.

4.      All documents and communications constituting or relating to any discussion, analysis, assessment or review of the terms, strengths or weaknesses of the Debtor/Committee/Lender Plan.

5.      All documents and communications constituting or relating to any discussion, analysis, assessment or review of the terms, strengths or weaknesses of the Bridge Lender Plan.

6.      All documents and communications constituting or relating to any discussion, analysis, assessment or review of the terms, strengths or weaknesses of the Step One Lender Plan.

7.      All documents and communications constituting or relating to any discussion, analysis, assessment or review of the terms, strengths or weaknesses of the Oaktree Plan.

8.      All documents and communications constituting or relating to any discussion, analysis, assessment or review of the terms, strengths or weaknesses of the April Plan.

B.      The LBO-Related Causes of Action

9.      All documents and communications constituting or relating to any discussion, analysis, assessment or review of the LBO-Related Causes of Action, including but not limited to the strengths and weaknesses of any actual of actual or potential LBO-Related Causes of Action that have, could or might be asserted by any person against any of the Senior Lenders, the Bridge Lenders, the Directors & Officers, the Step One Shareholders, the Step Two Shareholders, or the Advisers.

10.    All documents and communications relating to any discussion, analysis, assessment or review of the Examiner's Report, including but not limited to any statement, calculation, annex or exhibit in or to the Examiner's Report.

11.    All documents and communications constituting or relating to any attempt to assign probabilities to various recoveries scenarios discussed in the Examiner's Report, including but not limited to all drafts thereof and sensitivity analyses relating thereto.

12.    All documents and communications relating to the settlement of the LBO-Related Causes of Action embodied in the Debtor/Committee/Lender Plan.

13.    All documents and communications relating to the settlement of the LBO-Related Causes of Action embodied in the Bridge Lender Plan.

14.    All documents and communications relating to the settlement of the LBO-Related Causes of Action embodied in the Step One Lender Plan.

15.    All documents and communications relating to the settlement of the LBO-Related Causes of Action described in the press release issued by Tribune on September 28, 2010.

16.    All documents or communications relating to the settlement of the LBO-Related Causes of Action embodied in the April Plan.

C.    The Litigation and/or Creditors Trusts

17.    All documents and communications relating to the Litigation Trust or Creditors Trust embodied in the Noteholder Plan, including but not limited to the actual or potential structure, function, administration and operation of each of the Trusts; the actual or potential identification, consideration or selection of any person to serve as trustee or advisory board

member; the actual or potential ability of Aurelius to exercise control or influence over any person identified, considered or selected to serve as trustee or advisory board member; any actual or potential timeline or schedule for the pursuit to settlement or judgment of the Preserved Causes of Action; or the actual or potential value of any Preserved Causes of Action that will or might be pursued.

18.     All documents and communications relating to the Litigation Trust or Creditors Trust embodied in the Debtor/Committee/Lender Plan, including but not limited to the actual or potential structure, function, administration and operation of each of the Trusts; the actual or potential identification, consideration or selection of any person to serve as trustee or advisory board member; any actual or potential timeline or schedule for the pursuit to settlement or judgment of the Preserved Causes of Action; or the actual or potential value of the Preserved Causes of Action that will or might be pursued by each of the Trusts.

19.     All documents and communications relating to the Litigation Trust or Creditors Trust embodied in the Bridge Lender Plan, including but not limited to the actual or potential structure, function, administration and operation of each of the Trusts; the actual or potential identification, consideration or selection of any person to serve as trustee or advisory board member; any actual or potential timeline or schedule for the pursuit to settlement or judgment of the Preserved Causes of Action; or the actual or potential value of the Preserved Causes of Action that will or might be pursued by each of the Trusts.

20.     All documents and communications relating to the Litigation Trust or Creditors Trust embodied in the Step One Lender Plan, including but not limited to the actual or potential structure, function, administration and operation of each of the Trusts; the actual or potential

identification, consideration or selection of any person to serve as trustee or advisory board

member; any actual or potential timeline or schedule for the pursuit to settlement or judgment of

the Preserved Causes of Action; or the actual or potential value of the Preserved Causes of

Action that will or might be pursued by each of the Trusts.

D.    Debtors' Current Value

21.    All documents and communications relating to the Reorganized Value Analysis,

the Enterprise Value, or the Equity Value (as each of those terms are defined and used in the

General Disclosure Statement), including, but not limited to, the allocation of Enterprise Value

or Equity Value as between the various Debtor entities, all business plans, projections, forecasts,

market reports, financial information, credit analyses and any other Documents and

Communications relating to the value of any of the Debtors, the value of any stock or assets of

any Debtor, and/or allocation of value between and among the Debtors generated on or after

January 1, 2010.

E.    Intercompany Claims

22.    All documents and communications relating to any discussion, analysis,

assessment or review of intercompany claims, including but not limited to current claims

between or among Debtor entities or Debtor entities and non-Debtor affiliates.

23.    All documents and communications relating to the Intercompany Claims

Settlement, as that term is used in the Specific Disclosure Statement relating to the

Debtor/Committee/Lender Plan.

24.    All documents and communications relating to the treatment or handling of

intercompany claims in the Noteholder Plan.

25.    All documents and communications relating to the treatment or handling of intercompany claims in the Debtor/Committee/Lender Plan.

26.    All documents and communications relating to the treatment or handling of intercompany claims in the Bridge Lender Plan.

27.    All documents and communications relating to the treatment or handling of intercompany claims in the Step One Lender Plan.

F.    Amount of the PHONES Notes Claims

28.    All documents and communications constituting or relating to any discussion, analysis, assessment or review of the amount of the PHONES Notes or the PHONES Notes claims, whether in connection with a solvency analysis of in connection with the allowance of claims under any Plan.

G.    Recoveries for Specific Creditor Groups

29.    All documents and communications constituting or relating to any discussion, analysis, assessment or review of actual of potential recoveries actually or potentially available to any individual creditor or class of creditors of any Debtor under any Plan, including but not limited to immediate recoveries, ultimate recoveries, risk of recoveries, the level of ultimate recoveries, and recoveries resulting from litigation under any Plan or from a buyout to prevent or settle litigation under any Plan.

30.    All documents and communications constituting or relating to any discussion, analysis, assessment or review of actual of the actual or potential likelihood or uncertainty of

success with respect to issues that might be actually or potentially litigated either at the

Confirmation Hearing or by the Trusts under the Noteholder Plan.

31.     All documents and communications constituting or relating to any discussion,

analysis, assessment or review of, or supporting, the different recovery percentages listed for the

different scenarios laid out in the Specific Disclosure Statement for the Noteholder Plan.

32.     All documents and communications constituting or relating to any discussion,

analysis, assessment or review of the actual or potential ability of the Noteholder Plan

Proponents to obtain a 100% recovery on their claims under the Noteholder Plan.

33.     All Documents and Communications constituting or relating to any discussion,

analysis, assessment or review of actual of potential impact or consequence of any of the Plans

on any individual creditor or class of creditors of any Debtor.

H.     Specific Requests Regarding Aurelius and/or the Noteholder Plan

34.     From the Petition Date through the date hereof, all documents and

communications relating to or reflecting Tribune Interests held by a Noteholder Plan Proponent,

including but not limited to the type and amount of Tribune Interests, the identity of each and

every person or entity for which Aurelius controls such Tribune Interests, the date of purchase

and price paid for such Tribune Interests, and the reasons for the purchase or holding of such

Tribune Interests.

35.     From the Petition Date through the date hereof, all documents and

communications relating to any actual or potential purchase or sale by a Noteholder Plan

Proponent of any Tribune Interests.

36.    From the Petition Date through the date hereof, all documents and communications relating to any consideration, value or transfer or payment of money made by a Noteholder Plan Proponent in exchange for any Tribune Interests.

37.    From January 1, 2005 through the present, with respect to entities whose Tribune Interests are within the scope of Requests 34-36 above:

   a.   all documents relating to the creation and structure of each such entity including, with limitation, articles of incorporation, by-laws, operating agreements, and voting agreements;

   b.   all filings made by each such entity regarding its structure and operations with any sovereign, federal, or state government or agency, and with any other regulator or government entity and

   c.   all documents relating to, or sufficient to identity any litigation, (including, without limitation, lawsuits, arbitrations, regulatory and industry proceedings) from January 1, 2005 to the present;

   d.   all documents relating to any plan support, lock-up or voting agreements, or similar arrangements relating to these Bankruptcy Cases.

38.    All documents and communications constituting or relating to any discussion, analysis, assessment or review of the actual or potential effect of the Noteholder Plan on the ability to obtain FCC Approval.

39.    All documents and communications constituting or relating to any discussion, analysis, assessment or review of the actual or potential ability or inability of Step One Lenders to benefit from avoidance of Step Two debt or disgorgement from Step Two Lenders, including but not limited to by reason of the doctrines of equitable estoppels, equitable subordination or otherwise.

40.    All documents and communications constituting or relating to any discussion, analysis, assessment or review of the basis on which distribution from the Distribution Trust Reserve under the Noteholder Plan will be made, including but not limited to whether creditors' entitlements will be fixed on the Effective Date, or whether entitlements will be determined in accordance with values at the time of distribution.

41.    All documents and communications constituting or relating to any discussion, analysis, assessment or review of the practicality, difficulty, legality or confirmability of the Noteholder Plan Post-Emergence Ownership and Governance Structure.

42.    All documents and communications constituting or relating to any discussion, analysis, assessment or review of the actual or potential impact of the Noteholder Plan Post-Emergence Ownership and Governance Structure upon the business, operations, or value of Reorganized Tribune.

43.    All documents and communications constituting or relating to any discussion, analysis, assessment or review of the actual or potential effect of not distributing a substantial proportion of the value of the Reorganized Tribune after the Effective Date upon the market value of the new common stock in Reorganized Tribune actually distributed on the Effective Date.

44.     All documents and communications constituting or relating to any discussion or analysis of the actual or potential effect of the Noteholder Plan on the ability to obtain FCC Approval.

45.     All documents and communications relating to the Put Options (as defined in the Noteholder Plan), including, but not limited to, (i) consideration and determination of the amounts proposed to be offered to purchase claims and the actual or potential justifications for each such amounts (ii) contacts with Aurelius' trading desk concerning the actual or potential price at which Tribune Interests would or might trade (iii) acts or omissions considered or undertaken by, on behalf of or at the requests of Aurelius in order to depress or otherwise affect the price at which Tribune Interests would or might trade and (iv) all documents reflecting the purchase by Aurelius of any such claims at those or any other amounts.

46.     All documents and communications constituting or relating to any discussion, analysis, assessment or review of the setting of the amount of value to be set aside in the Distribution Trust Reserve under the Noteholder Plan, including but not limited to the various amounts considered, the actual or potential justifications for those amounts and the reasons for the amount ultimately decided upon.

47.     All documents and communications constituting or relating to any discussion, analysis, assessment or review of the basis on which distribution from the Distribution Trust Reserve under the Noteholder Plan will be made, including but not limited to whether creditors' entitlements will be fixed on the Effective Date, or whether entitlements will be determined in accordance with values at the time of distribution.

48.     All documents and communications constituting or relating to any discussion, analysis, assessment or review of the actual or potential ability of the Debtors to procure financing pre-emergence and post-emergence from bankruptcy in the context of any actual or potential plan or reorganization, including but not limited to the actual or potential impact or effect of any aspect of the Noteholder Plan on the ability of the Debtors to procure exit financing or replacement financing for the New Senior Secured Term Loan contemplated by Section 5.6.2 of the Aurelius Plan.

49.     All documents and communications relating to any actual or potential discussions, negotiations or agreement between or among Aurelius and any other party to the bankruptcy, including but not limited to Wilmington Trust the Bridge Lenders and the Step One Lenders, relating in any way to any actual or potential plan of reorganization or any actual or potential disposition, resolution or settlement of the LBO-Related Causes of Action.

50.     From December 1, 2005 through the date hereof, for each Non-Tribune Bankruptcy, all documents and communications identifying all claims, notes, equity, debt or other direct or indirect economic interests in the debtor that were purchased by Aurelius, the date that Aurelius purchased, the price at which Aurelius purchased, and the total cost to Aurelius of its purchase.

51.     From December 1, 2005 through the date hereof, for each Non-Tribune Bankruptcy, all documents and communications relating to or reflecting the total amount paid to Aurelius as a result of an order or settlement in the bankruptcy proceeding as to any pre-existing claims, notes, equity, debt, or other direct or indirect economic interests in the debtor owned or controlled by Aurelius.

52.    From December 1, 2005 through the date hereof, for each Non-Tribune Bankruptcy, all documents and communications relating to or reflecting any proposal by Aurelius that any potential causes of action be litigated rather than settled or the response of the bankruptcy court to such proposal.

53.    From December 1, 2005 through the date hereof, for each Non-Tribune Bankruptcy, all documents and communications relating to or reflecting whether, after making a proposal that claims be litigated rather than settled, Aurelius was offered and accepted an amount of money in settlement of its claims greater than had previously been offered and, if so, the amount of money accepted and the amount(s) of money previously offered.

I.    Confirmation Hearing Witnesses and Evidence

54.    All documents provided to or relied upon by any expert expected to testify on behalf of Aurelius or any proponent of the Noteholder Plan at the Confirmation Hearing.

55.    All documents that Aurelius or any proponent of the Noteholder Plan intends to introduce or rely upon at the Confirmation Hearing.

# EXHIBIT "4"

## DBTCA/McCarter Custodians and Search Terms

As discussed on our meet and confer calls, attached are Deutsche Bank Trust Company Americas' ("**DBTCA**") proposed search parameters in connection with the Debtors' document requests to DBTCA and subpoena to McCarter & English, LLP ("**McCarter**") in its capacity as counsel to DBTCA. DBTCA and McCarter reserve the right to modify these search parameters for reasons they deem appropriate, including, but not limited to, if the search parameters yield an overly burdensome number of documents or yield a significant number of non-responsive documents.

The information set forth herein is also without prejudice to any objections that have been or may be asserted by DBTCA or McCarter in response to any discovery requests, and is without prejudice to any positions taken by or on behalf of DBTCA, McCarter or proponents of the Noteholder Plan with regard to any of the issues discussed during the conference calls of counsel on December 21 or 23, 2010, or in any related written communications among counsel.

### Time Period

December 15, 2009-December 3, 2010

### DBTCA Custodians

Rodney Gaughan
David Contino
Stanley Burg

### McCarter Custodians

David J. Adler
James Scantling
Michael Reynolds

### Search Terms for both DBTCA and McCarter

Trib*
TRB
debtor w/2 committee
Aurel*
Centerbridge
Law Debenture
Wilmington Trust
Step One
Step 1
Step Two
Step 2
Socal*
Bridge
King Street

Marathon
Oaktree
Oak w/2 tree
Angelo w/3 Gordon
AG w/5 plan
April Plan
Noteholder Plan
Litigation trust
Creditors trust
Specific Disclosure Statement
Responsive Statement
PHONES
LBO
Distribution Trust reserve
Put option*
Examiner*
Klee
Klee w/5 report
FCC
Judge w/2 Gross