## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------X

| | | |
|---|---|---|
| In re: | : | **Chapter 11 Cases** |
| | : | **Case No. 08-13141 (KJC)** |
| **TRIBUNE COMPANY, et al.,** | : | **(Jointly Administered)** |
| | : | |
| Debtors. | : | |
| | : | |
| | : | |
| | : | |

-----------------------------------------------------X

## WILMINGTON TRUST COMPANY'S OMNIBUS REPLY
## TO (A) REORGANIZED DEBTORS' OBJECTION AND (B) UNITED STATES
## TRUSTEE'S OBJECTION TO WILMINGTON TRUST COMPANY'S APPLICATION
## FOR ALLOWANCE OF CLAIM UNDER 11 U.S.C. §§ 503(b)(3)(D) AND 503(b)(4)

SULLIVAN · HAZELTINE · ALLINSON LLC
William D. Sullivan (I.D. No. 2820)
Elihu E. Allinson III (I.D. No. 3476)
901 N. Market Street, Suite 1300
Wilmington, DE 19801
302-428-8191

and

BROWN RUDNICK LLP
Robert J. Stark
James W. Stoll
Martin S. Siegel
Gordon Z. Novod
Seven Times Square
New York, NY 10036
212-209-4800

*Counsel for Wilmington Trust Company, solely
in its capacity as successor Indenture Trustee
for the PHONES Notes*

April 19, 2013

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ ii

I.  INTRODUCTION .................................................................................................. 1

II.  ARGUMENT ........................................................................................................ 2

    A.  WTC's Application is reasonable in light of certain voluntary reductions ........... 2

        i.  Reduction of Brown Rudnick's fees and expenses .................................... 3

        ii.  Reduction of Mesirow's fees and expenses ............................................... 4

        iii.  Reduction of Other Professionals' fees and expenses ............................... 4

        iv.  Elimination of WTC's "Extraordinary Fee" .............................................. 4

    B.  WTC conferred an actual and demonstrable benefit to the Debtors' estates ......... 5

    C.  WTC has submitted sufficient evidence beyond self-serving statements ............. 11

    D.  At the time it incurred fees and expenses related to the Examiner,
        WTC expected that it would be reimbursed from the estates .............................. 13

    E.  In addition to Brown Rudnick, Mesirow and supporting professionals
        are also entitled to reimbursement of their reasonable fees and expenses ........... 17

    F.  Debtors interpose a number of red herring objections that the Court
        should overrule .................................................................................................. 21

        i.  WTC has not sought reimbursement for any purportedly "obstructive
        conduct" ................................................................................................... 22

        ii.  WTC actually incurred fees under the Fee Agreement ............................. 25

        iii.  WTC seeks fees for its actual and demonstrable benefit to the
        Debtors' estates, not for its performance of duties on the Committee ...... 27

    G.  WTC's professionals' fees are reasonable ......................................................... 27

CONCLUSION .................................................................................................................. 31

# TABLE OF AUTHORITIES

**Page(s)**

Cases

*Ad Hoc Consortium of Senior Subordinated Noteholders v. Liquidating Landco Debtors (In re Tropicana Entm't LLC)*, No. 09-771-SLR, 2010 WL 3522332 (D. Del. Sept. 2, 2010), *aff'd*, No. 10-3970, 2012 WL 3776531 (3d Cir. Aug. 31, 2012) ................................. 14

*Am. Sur. Co. of N.Y. v. Marotta*,
287 U.S. 513 (1933) ................................................................................................ 19

*Ed A. Wilson, Inc. v. Gen. Serv. Admin.*,
126 F.3d 1406 (Fed. Cir. 1997) ............................................................................... 20

*Figter Ltd. v. Teachers Ins. & Annuity Assoc. of Am. (In re Figter Ltd.)*,
118 F.3d 635 (9th Cir. 1997) .................................................................................... 22

*Highway & City Freight Drivers v. Gordon Transps., Inc.*,
576 F.2d 1285 (8th Cir. 1978) ................................................................................. 19

*In re Adelphia Commc'ns Corp.*,
359 B.R. 54 (Bankr. S.D.N.Y. 2006) ....................................................................... 22

*In re Am. Plumbing & Mech., Inc.*,
327 B.R. 273 (Bankr. W.D. Tex. 2005) .................................................................... 26

*In re Baldwin United Corp.*,
79 B.R. 321 (Bankr. S.D. Ohio 1987) ................................................................ 12, 24

*In re Bergin Corp.*,
77 B.R. 210 (Bankr. E.D. Wisc. 1987) ..................................................................... 19

*In re Buckhead Am. Corp.*,
No. 91-978, 1993 WL 1610639 (Bankr. D. Del. Sept. 12, 1993) ............................ 12

*In re Columbia Gas Sys., Inc.*,
224 B.R. 540 (Bankr. D. Del. 1998) ........................................................................ 17

*In re Energy Partners, Ltd.*,
422 B.R. 68 (S.D. Tex. 2009) .............................................................................. 4, 26

*In re Envirodyne Indus., Inc.*,
176 B.R. 815 (Bankr. N.D. Ill. 1995) ...................................................................... 24

*In re Essential Therapeutics, Inc.*
308 B.R. 170 (Bankr. D. Del. 2004) ........................................................................ 15

ii

*In re Gen. Electrodynamics Corp.*,
    368 B.R. 543 (Bankr. N.D. Tex 2007)...................................................................6, 10, 16, 27

*In re Geriatrics Nursing Home, Inc.*,
    195 B.R. 34 (Bankr. D.N.J. 1996) ........................................................................................15

*In re Grand Jury*,
    111 F.3d 1066 (3d Cir. 1997).................................................................................................20

*In re Granite Partners, L.P.*,
    213 B.R. 440 (Bankr. S.D.N.Y. 1997).............................................................................11, 24

*In re Landing Assocs., Ltd.*,
    157 B.R. 791 (Bankr. W.D. Tex. 1993)..................................................................................23

*In re Mirant Corp.*,
    354 B.R. 113 (Bankr. N.D. Tex. 2006)...............................................................17, 21, 24, 26

*In re The New Power Co.*,
    Nos. 02-10835-WHD, 02-10836-WHD, 02-10837-WHD, 2007 WL 7143077 (Bankr.
    N.D. Ga. June 25, 2007) ..........................................................................................................5

*In re Serv. Merch.*,
    256 B.R. 738 (Bankr. M.D. Tenn. 1999) ..............................................................................17

*In re Summit Metals, Inc.*,
    379 B.R. 40 (Bankr. D. Del. 2007) (KJC) ..................................................................... passim

*In re Syntax-Brillian Corp.*,
    No. 08-11407 (BLS), 2009 WL 1606474 (Bankr. D. Del. June 5, 2009)..........................5, 7, 8

*In re U.S. Lines, Inc.*,
    103 B.R. 427 (Bankr. S.D.N.Y. 1989)...................................................................................12

*In re Western Asbestos Co.*,
    318 B.R. 527 (Bankr. N.D. Cal. 2004) ............................................................................25, 26

*In re Worldwide Direct, Inc.*,
    334 B.R. 112 (Bankr. D. Del. 2005) ..................................................................................4, 27

*Lebron v. Mechem Fin. Inc.*,
    27 F.3d 937 (3d Cir. 1994)........................................................................................14, 15, 22

*Lynch v. Overholser*,
    369 U.S. 705 (1962).................................................................................................................20

*Magic Restaurants, Inc. v. Bowie Produce Co. (In re Magic Restaurants, Inc.)*,
    205 F.3d 108 (3d Cir. 2000)....................................................................................................20

*Marcus Montgomery Wolfson & Burten P.C. v. AM Int'l, Inc. (In re AM Int'l, Inc.),*
    203 B.R. 898 (D. Del. 1996)..................................................................................10, 14, 17

*Olsen v. Robinson Brog Leinwand Greene Genovese & Gluck, P.C. (In re Olsen),*
    334 B.R. 104 (S.D.N.Y. 2005)....................................................................................26

*Pacificorp Ky. Energy Corp. v. Big Rivers Elec. Corp. (In re Big Rivers Elec. Corp.),*
    233 B.R. 739 (W.D. Ky. 1998).....................................................................................24

*Pierson & Gaylen, Ray & Terrell & Grubs v. Creel & Atwood (In re Consol. Bancshares, Inc.),*
    785 F.2d 1249 (5th Cir. 1986) .....................................................................................24

*Stapleton v. Unofficial Comm. of Noteholders (In re ITC Deltacom, Inc.)*
    (Sleet, J.), No. 02-11848(MFW), 2006 WL 839395 (D. Del. Mar. 29, 2006)...................17, 21

*The Law Offices of Neil Vincent Wake v. Sedona Inst. (In re Sedona Inst.),*
    220 B.R. 74 (B.A.P. 9th Cir. 1998)................................................................................26

*United States v. Air Line Pilots Ass'n, Int'l (In re Trans World Airlines, Inc.),*
    C.A. No. 92-678-SLR, 1993 WL 559245 (D. Del. June 22, 1993) .........................................17

*United States v. Am. Trucking Ass'ns, Inc.,*
    310 U.S. 534 (1940).....................................................................................................20

*United States v. Ledlin (In re Mark Anthony Const., Inc.),*
    886 F.2d 1101 (9th Cir. 1989) .....................................................................................19

## STATUTES

11 U.S.C. 503(b) ..........................................................................................1, 4, 10, 19

11 U.S.C. 503(b)(3)(D) ...............................................................................1, 22, 25

11 U.S.C. 503(b)(4) ...............................................................................................passim

11 U.S.C. § 101(1) ....................................................................................................18

11 U.S.C. § 503...............................................................................................21, 26

11 U.S.C. § 546(e) ........................................................................................................9

11 U.S.C. § 503(b)(3)(F) ...........................................................................................27

11 U.S.C. § 1103(c) ......................................................................................................27

## OTHER AUTHORITIES

2 <u>Collier on Bankruptcy</u> ¶102.04 .................................................................................19

Del. Bankr. L.R. 2016-2................................................................................................................4

Del. Bankr. L.R. 2016-2(d)..........................................................................................................1

Del. Bankr. L.R. 2016-2(d)(viii)..................................................................................................3

Del. Bankr. L.R. 2016-2(g).......................................................................................................1, 4

# I.    **INTRODUCTION**

This omnibus reply is in response to both the Debtors'[1] and U.S. Trustee's ("U.S. Trustee" or "UST"; together with the Debtors, the "Objectors") opposition (respectively, "Debtors' Opp." or "Debtors' Opposition" and "UST Opposition" or "UST Opp.").  The crux of the Debtors' Opposition is simply ignoring the facts and circumstances that existed at the time Wilmington Trust Company ("WTC") first moved for the appointment of the examiner, and then to pretend the actual investigation was either facilitated by them (the Debtors) or others (the Official Committee of Unsecured Creditors (hereinafter, the "Committee")).  But as this Court is well aware, by the time WTC moved for an examiner in January 2010, the Committee had all but concluded its investigation, such that it was deep into settlement negotiations with the Debtors and LBO lenders, among others, that would result in a settlement releasing all LBO-related claims[2] prior to the Examiner's appointment.  In other words, the singular activity for which WTC seeks substantial contribution is the work associated with the appointment of the Examiner and its participation in the subsequent investigation that, in turn, directly led to the preservation of enormous value for the Debtors' estates.  The actions of WTC are thus the quintessential "transcending" activity that section 503(b) was designed to reward.  Obfuscate as the Debtors might, there is simply no dispute that before WTC took action, all LBO-related claims were going to be released; because of WTC, certain LBO-related claims seeking hundreds of millions have been preserved and are now being litigated.

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the *Application for Allowance of Claim Under 11 U.S.C. 503(b)(3)(D) and 503(b)(4) in Connection with Wilmington Trust Company's Motion Requesting the Appointment of an Examiner and Wilmington Trust Company's Participation in Examiner's Investigation and Granting Waiver of Compliance with Del. Bankr. L.R. 2016-2(d) in Accordance with Del. Bankr. L.R. 2016-2(g)* (the "Application").

[2]    Any reference to LBO-related claims in this Reply refers to estate LBO-related claims.

1

To get there was an enormous undertaking that WTC assumed without a source for payment other than the Debtors' estates. As with every activity in this case, the sheer volume of material led to enormous expense. The pitched battle waged by the Debtors, LBO lenders and Committee before the appointment, and the Debtors and LBO lenders during the investigation, exacerbated the costs. And, contrary to the assertion that others beside WTC were adequately carrying the ball, it was to WTC that the Examiner looked time and again to complete his examination. So the Application, while large, is unsurprising. As the record demonstrates, Brown Rudnick devoted enormous resources to the Examiner process. Although Debtors disparage that dedication, it was necessary to assist the Examiner as well as to develop a record that directly led to the preservation of certain valuable LBO-related claims. Accordingly, WTC's request is reasonable, and, with certain adjustments voluntarily made herein (and detailed below), should be allowed in full, including that portion related to other non-legal professionals, including Mesirow, which WTC will show is proper under section 503(b)(4).

## II.    ARGUMENT

### A.    WTC's Application is reasonable in light of certain voluntary reductions.

In light of the Debtors' and U.S. Trustee's objections, WTC has further reviewed its initial submissions and now makes the following voluntary reductions[3] to its Application.[4]

---

[3]    WTC reserves the right to seek reimbursement of all fees and expenses voluntarily reduced herein as part of the Class 1F fee claim that it filed with the Debtors, pursuant to stipulation, on January 2, 2013.

[4]    Based on the explanations provided in Section II.A., WTC voluntarily reduces its Application by $1,551,344, thus decreasing its total request for reimbursement of fees and expenses from $7,146,492.75 to $5,595,148.50.

| Institution / Professional | Fees Sought in the Application | Expenses Sought in the Application | Total Fees and Expenses Sought in the Application | Voluntary Reduction of Fees Sought in the Application | Voluntary Reduction of Expenses Sought in the Application | Revised Fees Sought under the Application | Revised Expenses Sought under the Application | Revised Total Sought under the Application |
|---|---|---|---|---|---|---|---|---|
| Wilmington Trust Company | $ 100,000 | $ - | $ 100,000 | $ 100,000 | $ - | $ - | $ - | $ - |
| Brown Rudnick LLP | $ 4,557,975 | $ - | $ 4,557,975 | $ 235,842 | | $ 4,322,133 | $ - | $ 4,322,133 |
| Benesch, Friedlander, Coplan & Aronoff LLP | $ 37,504 | $ 3,152 | $ 40,656 | $ - | $ - | $ 37,504 | $ 3,152 | $ 40,656 |
| Mesirow Financial Consulting LLC | $ 2,306,321 | $ 29,006 | $ 2,335,327 | $ 1,174,935 | $ - | $ 1,131,386 | $ 29,006 | $ 1,160,392 |
| Morton Research, Inc. | $ 20,400 | $ 2,105 | $ 22,505 | $ 5,300 | $ - | $ 15,100 | $ 2,105 | $ 17,205 |
| Cypress Associates LLC | $ 74,015 | $ 2,065 | $ 76,080 | $ 35,268 | $ - | $ 38,748 | $ 2,065 | $ 40,813 |
| Hoffman Schutz Media Capital | $ 13,950 | $ - | $ 13,950 | $ - | $ - | $ 13,950 | $ - | $ 13,950 |
| **TOTAL** | $ 7,110,165 | $ 36,328 | $ 7,146,493 | $ 1,551,344 | $ - | $ 5,558,821 | $ 36,328 | $ 5,595,148.50 |

Each reduction is explained below.

      **i.**     **Reduction of Brown Rudnick's fees and expenses.**       Brown

Rudnick voluntarily reduces its request for reimbursement of all fees and expenses incurred

following publication of the Examiner's report on July 26, 2010, thus reducing its request by

$189,662 for the 317 hours it spent during this period. Furthermore, Brown Rudnick

acknowledges that certain of its entries documenting travel time may not comport with Local

Rule 2016-2(d)(viii), which requires all such entries to be billed at no more than 50% of regular

hourly rates. Accordingly, Brown Rudnick further reduces its request for reimbursement of fees

and expenses by $14,148.25, or one-half of the $28,296.5 it billed for 39.5 hours of non-working

travel time. In addition, Brown Rudnick has identified, and further reduced its request by an

additional $32,031.50, which represents 70.3 hours spent in connection with matters not directly related to assisting the Examiner.[5]

### ii.   Reduction of Mesirow's fees and expenses.

Up to and including June 11, 2010, Mesirow worked to produce a solvency analysis and otherwise assisted the Examiner with preparing his report.  During this period, Mesirow incurred $1,131,386 in fees and expenses over the course of approximately 1,904 hours.  WTC therefore eliminates all fees and expenses incurred by Mesirow on June 12 and thereafter, thus reducing its request by $1,174,935.

### iii.   Reduction of Other Professionals' fees and expenses.

Mesirow was assisted in its analysis by Morton Research, Inc., Cypress Holdings, LLC, and Hoffman Schutz Media Capital (the "Other Professionals").  For the same reason WTC has voluntarily reduced fees and expenses incurred by Mesirow, WTC hereby also reduces the fees and expenses incurred by the Other Professionals as follows:  $5,300 for Morton Research, Inc.; and $32,268 for Cypress Holdings, LLC.

### iv.   Elimination of WTC's "Extraordinary Fee".

WTC previously requested payment of an "Extraordinary Fee" after determining that one was due WTC to compensate it for the additional time and resources associated with the pursuit

---

[5]     The Objectors further challenge WTC's fees to the extent they are lumped or vague.  WTC acknowledges that a claim under Section 503(b) must comply with Local Rule 2016-2, which requires the same level of documentation and substantiation as a request for compensation under Section 330.  *See* Bankr. D. Del. Local R. 2016-2; *In re Worldwide Direct, Inc.*, 334 B.R. 112, 120 (Bankr. D. Del. 2005).  In its Application, WTC sought a waiver of its obligation to comply with this Rule, on account of the record, which includes the voluminous time entries submitted, that shows WTC made a substantial contribution to this case.  Even so, WTC now supplements the record with the Siegel Declaration, filed contemporaneously herewith.  WTC contends that sufficient cause now exists to grant the requested Local Rule 2016-2(g) waiver, and that the Siegel Declaration provides more than sufficient detail to allow the court to award WTC reimbursement.  In the event the Court does not believe the Siegel Declaration adequately remedies any purported non-compliance with the Local Rule, the Court may apply an across the board reduction to WTC's request for reimbursement.  *See In re Energy Partners, Ltd.*, 422 B.R. 68, 90 (S.D. Tex. 2009) ("The existence of lumping [ ] does not mean that all of [the applicant's] fees are *per se* unreasonable; this Court has wide discretion to simply reduce the amount of approved fees.").

of an examiner.  WTC hereby revokes that request in its entirety, thus reducing its request for reimbursement of fees and expenses by $100,000.

### B.    WTC conferred an actual and demonstrable benefit to the Debtors' estates.

The Debtors[6] contend that "WTC had ***nothing*** to do with 'economic' and 'process' benefits" that form the basis of WTC's Application.  Debtors' Opp. at 35 (emphasis in original). They base their objection on three fundamental allegations: (i) there was no causal connection between WTC's efforts and the establishment of the Litigation Trust; (ii) "WTC steadfastly opposed the ultimate Plan (and its Litigation Trust) during the post-examination period"; and (iii) any contribution to the reorganization efforts "were the result of the collective efforts of the Court in the appointment of the Examiner, the Examiner himself and all of the Parties that participated in the Examiner's investigation." *Id.* at 36-38.  Each argument is wrong.

Although Debtors correctly note that in order "to find a substantial contribution, the applicant must show a 'causal connection' between the service and the contribution," *In re Summit Metals, Inc.,* 379 B.R. 40, 62 (Bankr. D. Del. 2007) (KJC) (citation and internal quotations omitted), they ignore the fact that the quintessential action repeatedly approved by the courts, precisely because causality so plainly exists, is securing the appointment of an examiner who, in turn, engages in actions for the entirety of the estate.  *See In re Syntax-Brillian Corp.,* No. 08-11407 (BLS), 2009 WL 1606474, at *3 (Bankr. D. Del. June 5, 2009) (allowing substantial contribution claim because applicant was "instrumental in the appointment of an examiner," who, in turn, discovered evidence of misconduct and new avenues of recovery for creditors); *In re The New Power Co.*, Nos. 02-10835-WHD, 02-10836-WHD, 02-10837-WHD, 2007 WL 7143077, at *8 (Bankr. N.D. Ga. June 25, 2007) (finding that the applicant's "efforts to

---

[6]    The UST, for the most part, raises the same legal arguments as the Debtors.  Therefore, any response to any Debtors' argument encompasses a response to UST's argument on the same topic, unless otherwise specified.

have the examination expanded resulted in a substantial contribution to the case" because the examiner's efforts resulted in an additional $5,725,000 being distributed to creditors); *see also In re Gen. Electrodynamics Corp.,* 368 B.R. 543, 555 (Bankr. N.D. Tex 2007) (finding a substantial contribution in part because "there would have been no examiner but for [the applicant]" and "the examiner's two reports gave substantial support to the fears expressed by [applicant]").

But for WTC's efforts, the Examiner would not have been appointed, the examination that confirmed the existence of valuable claims would not have been conducted, and the plan would not have been amended establishing the Litigation Trust into which certain LBO-related claims were deposited.  Without WTC's efforts, the first Plan and settlement agreed to by the Debtors, LBO lenders, Law Debenture, Centerbridge, and the Committee prior to the appointment would have been pushed before the Court; and that Plan would have disposed of all LBO-related claims.

Although WTC will not repeat in the same level of detail the facts set forth more fully in its Application, on this point some retracing is in order as the Debtors blithely suggest that WTC had no causal connection to the outcome.  The undisputed facts are as follows.  In August 2009, Law Debenture filed a motion seeking the appointment of an examiner [D.I. 2031], to which WTC joined [D.I. 2172] and the Committee objected [D.I. 2136].  In September 2009, after given permission to participate in the Committee's 2004 examination, Law Debenture subsequently abandoned its motion.  *See* D.I. 2217.  By December 2009, WTC became increasingly concerned that the Committee's investigation prematurely shut down, the Committee had taken only five (5) depositions of parties potentially involved in the LBO transactions, none of which involved deponents from the LBO lenders, *see* Declaration of Martin

Siegel ("<u>Siegel Decl.</u>" or "<u>Siegel Declaration</u>"),[7] ¶¶ 9-12, and yet the Committee had already begun preliminary settlement negotiations, which largely did not involve WTC. *Id.*

Fearing that the ongoing settlement discussions would result in the extinguishment of valuable estate causes of action, WTC prepared and filed a motion for the appointment of an Examiner (the "<u>Examiner Motion</u>"). *Id.* at ¶¶ 12-14. WTC's Examiner Motion was vigorously opposed by the Debtors, the LBO lenders, and the Committee. *Id.* at ¶ 15. To suggest that any party other than WTC facilitated the appointment is not supported by the record.

Indeed, with respect to the Committee, rather than join WTC's motion, it opposed it and raced to settle the case. Thus, on the eve of the return date for the hearing on the Examiner Motion, the Committee reached a putative settlement with the Debtors, and certain LBO lenders, among others, that proposed to release all of the LBO claims without the establishment of a Litigation Trust. D.I. 4008. After the Examiner's report and his finding that valuable claims did in fact exist, the Plan was amended and a Litigation Trust into which certain LBO-related claims were deposited was created. D.I. 11836. As recently as December 2012, the Debtors valued those claims at over $358 million; the Debtors' acknowledgment alone is sufficient to establish causation. D.I. 12976. Thus, WTC is hard pressed to understand how the Debtors can now argue that WTC's pursuit of an examiner did not directly benefit the Debtors' estates. In fact, WTC's actions most directly approximate those of the movant in *Syntax-Brillian Corp.*, where the court stated:

> The Court finds that the Movant's activities and efforts amount to a substantial contribution. The Court has previously stated that the ***Movant was instrumental in the appointment of an examiner who discovered evidence of misconduct by the Debtors. Because of the Movant's intervention, new or more promising avenues of recovery***

---

[7] The Siegel Declaration is submitted contemporaneously with this reply.

> ***have been opened to various parties, including the
> unsecured creditors and Silver Point***. Furthermore,
> through his labors, the Movant represented not only his
> own narrow interests, but the broader interests of the
> Debtors, creditors, and shareholders. Therefore, by
> furnishing the Debtors' estates and stakeholders with an
> actual and demonstrable benefit the Movant substantially
> contributed to the Debtors' chapter 11 cases.

2009 WL 1606474, at *3 (emphasis added).

The Debtors attempt to side-step the obvious causal link by asserting that WTC was just

one of many parties that participated in the examination.[8]  In the language of the case law, the

Objectors argue that either WTC was nothing more than a participant or its efforts duplicated

others.  UST Opp. at 16-18; Debtors' Opp. at 9.  Both assertions are wrong.

WTC was not just one of many parties; it was the driving force behind the examination.

After the appointment, the Debtors and LBO lenders continued to argue that there were no

claims arising from the LBO; thus their activities are no basis for suggesting that the Examiner

could have completed his work with only them.  Moreover, the Committee had been aligned with

the Debtors and LBO lenders prior to the Examiner's appointment and thus only argued for

existence of LBO-related claims after being forced into that position.  And when it did, it did so

without providing the Examiner a solvency analysis.  *Declaration of Patrick J. Healy in Support
of Wilmington Trust Company's Claims and Requests for Payment of Fees and Expenses,
Including Fees and Expenses of its Outside Counsel, Financial Advisors and Experts* ("Healy

---

[8]     The Debtors also point to the fact that the holders of Senior Loan Claims, Debtors' Opp. at 36, also
opposed the April 2010 Plan and settlement as if that somehow diminishes WTC's contributions.  This is
one of those eyebrow raising arguments.  The opposition by certain holders of Senior Loan Claims came
before the Examiner was appointed, and such opposition was predicated on the belief that the senior lenders
should not be the only LBO parties paying for the settlement.  D.I. 3999.  It was not an opposition that
sought the appointment of an examiner or to otherwise enhance recovery for the estate qua estate.  *Id.*

Decl." or "Healy Declaration"), ¶ 24.[9]  Similarly, while Law Debenture also argued for the preservation of LBO-related claims to preserve its rights, it also had agreed to the settlement and did not provide the Examiner with any solvency analysis.

The Examiner recognized the unique role WTC was playing in championing the existence and value of the claims and thus relied on WTC's counsel throughout the examination process to supply it with legal and factual analysis and documentary evidence.  Thus, the Examiner tasked WTC as the party to write the main brief advocating for the existence of the LBO-related claims and enlarged its page limit to 100.  Moreover, during the examination, the Examiner requested that WTC provide it with additional legal analysis on a variety of issues, including, among others: (1) equitable subordination; (2) fraudulent conveyance; (3) Section 546(e) of the Code in the context of leveraged buyouts; (4) legal hypotheticals related to the LBO; (5) the obligation of the Lenders to fund Step Two, (6) whether the directors and officers breached their fiduciary duties by proceeding with Step Two, (7) whether the Merrill, Citi, and JPMorgan entities should be considered as singular entity for good faith and aiding and abetting purposes; (8) choice of law; (9) ordinary course defenses; (10) LATI transaction; (11) privilege issues; (12) *in pari delicto*; and (13) the interplay between claims of aiding and abetting a breach of fiduciary duty and the lenders' potential breach of their loan commitment.  WTC complied with all of these requests.  Siegel Decl. ¶¶ 26, 32, 34-38, 40.  The Examiner also requested that WTC assist it in developing and distilling the relevant factual background.  To that end, the Examiner repeatedly requested that WTC provide it with, *inter alia*, (1) the documentary support underlying WTC's amended complaint for equitable subordination; (2) deposition transcripts; (3) key documents with regard to JP Morgan Chase' role in the LBO; (4) documents regarding

---

[9]      The Healy Declaration has already been filed with this Court in connection with WTC's Class 1F claim and WTC refers this Court to D.I. 13397 for a copy of it.

Merrill Lynch; (5) information on Bank of America's document production; and (6) information to assist in Citigroup interviews.  Siegel Decl., ¶¶ 27-28, 30, 33, 44-45.  On this record, the Objectors' suggestion that WTC was just one of many falls flat.

Moreover, the assertion that reimbursement is dependent on WTC being the "sole party" to make these contributions overstates the law.  *See Marcus Montgomery Wolfson & Burten P.C. v. AM Int'l, Inc. (In re AM Int'l, Inc.),* 203 B.R. 898, 905 (D. Del. 1996) (determining that applicant's contribution to larger effort "contributed substantially to the estate");  *Gen. Electrodynamics Corp.,* 368 B.R. at 556 (finding applicant had sufficiently proved "a causal connection between his counsel's work and any benefit" conferred on the estate where its efforts "at least *contributed* to" the Debtors' proposed plan, various protections and funding that made the plan feasible, and the Debtors' ability to attend to its fiduciary duties).  As the court in *General Electrodymanics* put it, section 503(b) was not intended "to be so restrictive" as to require a party to show that services performed were the "facially apparent, proximate and *exclusive*" cause of the benefits conferred on the estate.  *Id.*  (emphasis added).

Finally, the assertion that WTC should have done nothing more in these proceedings than sit back and allow the "highly-motivated and in-the-money constituents" to represent the PHONES interests (*see* Debtors' Opp. at 45), ignores the fact that those constituents did not share a common identity of interest, even if they took similar if not identical positions with WTC.  For example, even though the Committee finally did argue in favor of the existence of the LBO-related claims, it did so unwillingly, having first objected to the appointment of the Examiner, then settling before his appointment, and only after losing, picking up the banner.  *See Gen. Electrodynamics*, 368 B.R. at 556 (debtor's lack of "any great enthusiasm" for the strictures imposed by Chapter 11 led court to hold that creditor was not required to provide direct proof

that its conduct caused the debtor to more carefully follow the rules). *See also In re Granite Partners, L.P.*, 213 B.R. 440, 446 (Bankr. S.D.N.Y. 1997) (duplication of estate professionals does not exist "***absent proof that [the estate professionals] are unwilling or unable to act***") (emphasis added).

In sum, WTC sought the appointment of an examiner at a time when all of the estate professionals proved unwilling to act and were, instead, seeking to settle valuable estate claims. WTC was the driving force in advocating for the viability of the LBO-related claims. The Examiner recognized this and repeatedly relied on WTC throughout the examination period. The Debtors and LBO lenders opposed the viability of the LBO-related claims; the Committee argued in favor reluctantly. In the end, WTC's efforts led directly to the establishment of the Litigation Trust, resulting in *at least* $358 million in additional value, in the Debtors' view, to general unsecured creditors. On this record, any assertion that WTC did not confer a substantial benefit on the estates is unsustainable.

**C.      WTC has submitted sufficient evidence beyond self-serving statements.**

Objectors next contend that WTC has failed to meet its burden of proving entitlement to reimbursement because WTC has not offered anything beyond self-serving statements. *See* Debtors' Opp. at 10; UST's Opp. at 13. Again, while the Objectors correctly point out that courts typically look to "[s]omething more than mere conclusory self-serving statements regarding one's involvement in a case which allegedly resulted in a 'substantial contribution,'" *Summit Metals*, 379 B.R. at 61 (citation omitted), they ignore the actual record. That record, consisting of WTC's opening brief and exhibits of record, the Healy and Siegel declarations, and this Court's own observations, clearly establishes that WTC provided a substantial contribution. *See Summit Metals*, 379 B.R. at 53 n.6 ("The Court may also use its own first-hand observance of the services provided in addition to any corroborating testimony to find a substantial

11

contribution.") (citation and internal quotations omitted); *In re Buckhead Am. Corp.,* No. 91-978, 1993 WL 1610639, at *3 (Bankr. D. Del. Sept. 12, 1993) (relying "primarily on the relevant case law, the memoranda of the parties, and its own observations . . . to make its determination regarding whether the efforts of the Noteholders resulted in a substantial contribution to this case"); *In re U.S. Lines, Inc.*, 103 B.R. 427, 430 (Bankr. S.D.N.Y. 1989) ("Absent, or in addition to, such corroborating testimony, a court's own first-hand observance of the services provided may be a sufficient basis on which to find a 'substantial contribution.'") (citation omitted); *In re Baldwin United Corp.,* 79 B.R. 321, 343 (Bankr. S.D. Ohio 1987) (determining that, even though the applicant's "time sheets provide slight evidence of [its] efforts" that applicant claimed provided a contribution to the estate, "the evidence, as well as this Court's knowledge of this case" provided a sufficient basis for determining that the applicant was entitled to an award).

WTC's contribution to this case was well documented in its Application and the numerous exhibits attached thereto, most of which were already part of the public record. WTC has since augmented the initial filing with the declarations of Patrick Healy and Martin Siegel further attesting to the facts and circumstances that existed at the relevant time. That record establishes that the Examiner repeatedly sought out WTC's help, both to retrieve documentary evidence and to provide detailed analyses of numerous legal inquiries, and also to provide a solvency analysis (and, as far as WTC is aware, the only solvency analysis showing the strength of the LBO-related claims). On more than twenty occasions throughout the examination period, the Examiner expressly asked Brown Rudnick to provide either factual or legal support. Siegel Decl., ¶¶ 26-28, 30, 32-41, 43-45.

What makes the Debtors' attack on WTC's application as self-serving even harder to stomach is the undisputed fact that the Discharge Order prohibits WTC from conducting discovery of the Examiner or its professionals or asking for their participation in this hearing. *Order Approving Motion of Court-Appointed Examiner, Kenneth N. Klee, Esq., for Order (I) Discharging Examiner; (II) Granting Relief from Third-Party Discovery; (III) Approving the Disposition of Certain Documents and Information; And (IV) Granting Certain Ancillary Relief*, ¶ 7 [D.I. 5541]. In any event, Mr. Siegel's declaration is neither conclusory nor self-serving. Mr. Siegel does not merely assert that the Examiner relied on Brown Rudnick; rather, he provides factual detail as to each and every request made of Brown Rudnick by the Examiner, most corroborated by contemporaneous email exchanges. Siegel Decl., ¶¶ 26-28, 30, 32-41, 43-45. Thus, the evidentiary record supporting the application more than satisfies WTC's burden of persuasion.

**D.    At the time it incurred fees and expenses related to the Examiner, WTC expected that it would be reimbursed from the estates.**

The Debtors claim that WTC never acted with an expectation of reimbursement from the Debtors' estates. *See* Debtors' Opp. at 38-41. They premise this assertion on the fact that the fee agreement between WTC and Brown Rudnick has a potential contingency component, which they interpret as meaning that Brown Rudnick believed it would recover its fees from a non-estate source. The Debtors' focus on the fee agreement is misplaced. If the existence of a fee agreement were all that was necessary to disprove an expectation of reimbursement from the estate, no party could ever seek substantial contribution. Disproving an expectation of reimbursement is not so facilely achieved; just as proving the requisite expectation is not as easy as an applicant merely saying that it is so. Rather, to establish the requisite expectation, the courts look to something more, something objective from which the expectation of estate

13

reimbursement can be inferred. WTC suggests that the most persuasive objective factor for the court is the character of the activity for which substantial contribution is sought. Where that activity is clearly one that portends a benefit to the entire estate, the expectation of reimbursement is established.

A proper reading of *Lebron v. Mechem Fin. Inc.*, 27 F.3d 937, 944 (3d Cir. 1994), and its progeny leads to this conclusion. In *Lebron*, the Third Circuit stated that "'substantial contribution' should be applied in a manner that excludes reimbursement in connection with activities of creditors and other interested parties which are designed primarily to serve their own interests and which, *accordingly*, would have been undertaken *absent an expectation of reimbursement from the estate*." *Id.* (emphasis added). After setting forth that standard, the Court went on to state that a "creditor should be presumed to be acting in his or her own interest *unless* the court is able to find that his or her actions were designed to benefit others who would foreseeably be interested in the estate." *Id.* at 946 (emphasis added). Since *Lebron*, courts seeking to determine whether a party acted with an expectation of reimbursement have looked to whether that party's actions "transcended self-protection."[10] *See AM Int'l, Inc.*, 203 B.R. at 904

---

[10]    The Third Circuit Court of Appeals recently affirmed that "a court may properly consider whether an applicant has an expectation of reimbursement from the estate to determine whether the applicant acted to serve its own interests." *Ad Hoc Consortium of Senior Subordinated Noteholders v. Liquidating Landco Debtors (In re Tropicana Entm't LLC)*, No. 09-771-SLR, 2010 WL 3522332, at *2 (D. Del. Sept. 2, 2010), *aff'd*, No. 10-3970, 2012 WL 3776531 (3d Cir. Aug. 31, 2012) (writing "solely for the benefit of the parties"). In *Tropicana*, this Court found, and subsequent courts affirmed, that the applicant failed to present any evidence that it expected to be reimbursed by the estate. There, the objective record reflected that the applicant's motion to appoint a chapter 11 trustee was but its latest attempt to wrest control over the debtors, a goal that the applicant had begun pursuing long before the debtors even filed for bankruptcy. Here, unlike in *Tropicana*, the objective record reflects that WTC sought to appoint and assist the Examiner more than one year after the petition was filed, and only when WTC became concerned that the Committee was not conducting a fulsome investigation into the viability of the LBO-related claims. As such, the objective record does not suggest that WTC would have pursued its course of action absent an expectation of reimbursement from the estate. To the contrary, WTC sought the appointment of an examiner to preserve valuable estate causes of action only after the estate fiduciaries attempted to settle and release those claims.

("[T]he acts must have been designed to benefit others who would foreseeably be interested in the estate.") (internal citations omitted); *In re Essential Therapeutics, Inc.*, 308 B.R. 170, 174, 175-76 (Bankr. D. Del. 2004) (awarding fees for the stockholders' efforts where the court determined that "they did overcome the *Lebron* presumption" of self-interest for "drafting key Plan provisions, participating in hearings, and providing assistance during the reorganization process"); *In re Geriatrics Nursing Home, Inc.*, 195 B.R. 34, 39 (Bankr. D.N.J. 1996) (focusing on whether the applicant "was protecting the interests of *all unsecured creditors* rather than just its own interests" and whether the fees and expenses "incurred were not those necessary to prosecute its individual underlying claim but rather were only those which would *inure to the benefit of all unsecured creditors*.") (emphases added).  In short, where the action taken by the party is objectively one that is designed to benefit the other constituents in the case, the expectation of reimbursement from the estate may be inferred.  The act of seeking the appointment of an Examiner to conduct an unbiased investigation is the archetypical action designed to benefit those foreseeably interested in the estate.  As it turned out here, the Examiner's investigation, substantially assisted and facilitated by WTC, led to a finding that valuable LBO-related claims existed that should be preserved for post-confirmation litigation.  In the face of the Examiner's report, the Debtors, LBO lenders and the Committee, among others, were required to and did fashion a new plan (and settlement) that deposited certain LBO-related claims into the Litigation Trust, recoveries from which have WTC at its floor and out of the money.  WTC need establish nothing more.

But there is more.  The record also shows that, at the time WTC embarked on the pursuit of an Examiner, it had no ability to pay its lawyers other than through an application to the court. And while these facts are attested to by WTC's representative, Patrick Healy, and can thus be

characterized as self-serving, they are not subjective facts.  That is, the economics of the indenture trustee relationship demands that the indenture trustee in the ordinary course look to the issuer or its bondholders for payment of fees and expenses.  Healy Decl., ¶¶ 21-22.  In the absence of any such source the indenture trustee is entitled to sit on its hands.  Thus, acting in the face of no available source of funding does, WTC suggests, establish an additional objective indicia of expectation of payment from the estate.  Before the Examiner was appointed, WTC had exhausted its $2 million indemnity initially posted by the PHONES noteholders for Brown Rudnick, and, thus, there was no other available source to pay the cost of continuing.  Moreover, at the same time the putative plan then in existence did not contemplate any distribution to the PHONES to which WTC's charging lien could attach.  Ironically, as the Debtors never tire of pointing out, the PHONES were deeply subordinated and sat near or at the bottom of the Debtors' capital structure; thus, any potential recovery the PHONES might receive would be distributed only *after* other constituencies were satisfied in accordance with the terms of the Plan.  Instead of the benefit to the estates being incidental to the PHONES interests, the PHONES' interests were incidental to the benefit of the Estate.  *See Gen. Electrodynamics*, 360 B.R. at 555 (§§ 503(b)(4) and 503(b)(3)(D) do not require recovery to justify compensation; they require a substantial contribution to the estate).  WTC fully appreciated this fact when it sought appointment of and provided substantial assistance to the Examiner.

### E.    In addition to Brown Rudnick, Mesirow and supporting professionals are also entitled to reimbursement of their reasonable fees and expenses.

WTC has included Mesirow's fees, as well as three supporting valuation professionals, as part of the Application, recognizing, as Collier states, that there is disagreement amongst the courts as to whether section 503(b)(4) is to be read to exclude any professional other than an attorney or accountant, or more expansively to include other professionals as well.  4 Collier on

Bankruptcy, ¶ 503.11[1] (16th ed. 2013) ("Courts have reached different results in considering administrative expense priority for fees for professionals other than attorneys or accountants." (internal citations omitted).  *Compare Summit Metals*, 379 B.R. at 50 (denying fees for a management consulting firm); *In re Mirant Corp.*, 354 B.R. 113, 139-140 (Bankr. N.D. Tex. 2006) (limiting scope of § 503(b)(4) to attorneys and accountants); *In re Columbia Gas Sys., Inc.*, 224 B.R. 540, 548 n.3 (Bankr. D. Del. 1998) ("Some of these services or expenses are for professionals other than 'an attorney or an accountant'. . . and thus are not reimbursable") *with Stapleton v. Unofficial Comm. of Noteholders* (*In re ITC Deltacom, Inc.*) (Sleet, J.), No. 02-11848(MFW), 2006 WL 839395, at *1 (D. Del. Mar. 29, 2006) (affirming approval of fees for financial advisors); *AM Int'l, Inc.* 203 B.R. at 901-02, 904 (allowing reimbursement of fees and expenses incurred by financial advisor); *United States v. Air Line Pilots Ass'n, Int'l* (*In re Trans World Airlines, Inc.*), C.A. No. 92-678-SLR, 1993 WL 559245, at *8 (D. Del. June 22, 1993) (granting reimbursement to labor union for fees incurred prepetition by its financial advisor); *In re Serv. Merch.* Co., 256 B.R. 738, 741-43 (Bankr. M.D. Tenn. 1999) (allowing reimbursement for fees of financial advisor).

The Objectors naturally argue for a restrictive interpretation of the statute; just as naturally WTC believes a more expansive reading is appropriate, similar to the holding in *ITC Deltacom*.  In *ITC Deltacom*, 2006 WL 839395, at *1, Judge Sleet found that section 503(b)(4) uses "imprecise language" and that it should include expenses for financial advisors to prevent a result demonstrably at odds with the intention of the drafters.  He continued:  "although subsection (b)(4) clearly imposes a limitation on recovery…nowhere does it purport to limit other recoverable expenses."  *Id.*

Recognizing that there is a dearth of developed, published case discussions on this particular point, WTC asks: What would be the point in limiting reimbursements for non-attorney professionals to accountants and accountants alone?  For example, a major accounting firm provides a solvency analysis that was worked on by at least some employees who were not accountants – are the fees all recoverable because the entity is an accounting firm?  Conversely, a major financial consulting firm does the same, but among the employees producing its work product are CPAs – are all of these fees barred because the entity was not an accounting firm?  The dilemma is compounded by the fact that "accountant" as defined in section 101(1) of the Code as "accountant authorized under applicable law to practice public accounting, and professional accounting associations, corporations, or partnership . . . ." 11 U.S.C. § 101(1).  An individual who is a CPA is authorized to practice public accounting, even if the services he is providing for the financial advising firm for whom he works is not providing accounting services.  That then raises the question:  What did Congress intend by its use of the word "accountant?"  Is accountant meant to be a euphemism for accounting services as distinguished from some other financial services?  The interpretative problems suggest ambiguity and that a restrictive reading naturally leads to absurd results.  WTC suggests that section 503(b)(4) should be read in light of the word "including" appearing in the preamble to subpart (b) such that the words "attorney and accounting" are not deemed limiting.  Traditional, interpretive rules of statutory construction support this reading.

For example, it is generally held that when a statute employs the word "includes," "the fact that the statute does not specifically mention a particular entity . . . does not imply that the entity falls outside of the definition."  *Highway & City Freight Drivers v. Gordon Transps., Inc.,* 576 F.2d 1285, 1289 (8th Cir. 1978) (citation omitted); *see Am. Sur. Co. of N.Y. v. Marotta*, 287

U.S. 513, 517 (1933) ("In definitive provisions of statutes and other writings, 'include' is frequently, if not generally, used as a word of extension or enlargement rather than as one of limitation or enumeration.") (citations omitted); *United States v. Ledlin (In re Mark Anthony Const., Inc.)*, 886 F.2d 1101, 1106 (9th Cir. 1989) ("In construing a statute, the use of a form of the word 'include' is significant, and generally thought to imply that terms listed immediately afterwards are an inexhaustive list of examples, rather than a bounded set of applicable items."); 2 Collier on Bankruptcy ¶ 102.04 ("[W]here there is a list of items following either ['includes' or 'including'], the list is not meant to be all exclusive, but merely illustrative of what is included. This is consistent with general principles of interpretation, under which lists following the word 'includes' are examples only and 'means' or similar words must be used if the examples are the entire universe of what is meant.") (citations omitted).

In the context of section 503(b) of the Code, courts have noted that "[t]he structure of section 503(b) is inconsistent with a restrictive interpretation of its list of administrative expenses . . . the use of a form of the word 'include' is significant, and generally thought to imply that terms listed immediately afterwards are an inexhaustive list of examples, rather than a bounded set of applicable items." *Mark Anthony Constr.,* 886 F.2d at 1106*; In re Bergin Corp.*, 77 B.R. 210, 212 (Bankr. E.D. Wisc. 1987) ("The precise wording of § 503(b) is such that only illustrations of administrative expenses are set forth [and the] listing . . . is not exclusive.").

Moreover, it is a fundamental principal of statutory construction that a statute should not be read in a way that leads to irrational results. *See United States v. Am. Trucking Ass'ns, Inc.*, 310 U.S. 534, 543 (1940) ("When [a statute's plain] meaning has led to absurd or futile results . . . this Court has looked beyond the words to the purpose of the act."); *Magic Restaurants, Inc. v. Bowie Produce Co. (In re Magic Restaurants, Inc.)*, 205 F.3d 108, 116 (3d Cir. 2000) ("Even

where the express language of a statute appears unambiguous, a court must look beyond that plain language where a literal interpretation of this language would thwart the purpose of the overall statutory scheme, would lead to an absurd result, or would otherwise produce a result demonstrably at odds with the intentions of the drafters") (citations and quotations omitted); *In re Grand Jury*, 111 F.3d 1066, 1078 (3d Cir. 1997) ("[I]n rare cases [where] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters, we may look to those intentions rather than the literal terms of the statute") (citations and quotations omitted).   Put differently, the United States Supreme Court has repeatedly cautioned that in interpreting a statute courts must be careful that literalness not be allowed to strangle meaning.  *See Lynch v. Overholser*, 369 U.S. 705, 710 (1962), *see also Ed A. Wilson, Inc. v. Gen. Serv. Admin.,* 126 F.3d 1406, 1409 (Fed. Cir. 1997).

In light of the above, WTC believes that the fees of each of the non-attorney professionals that form part of this application are properly recoverable.  Those fees consist of Mesirow, who provided financial services -- primarily the solvency analysis; and Morton, who provided newspaper valuation expertise; Hoffman, who provided broadcasting valuation expertise; and Cypress who provided internet valuation expertise, all of which were necessary to evaluate the reasonableness of the Debtors' projections.  Siegel Decl., ¶¶ 47-55.  Each of these experts provided valuable assistance in support of the ultimate solvency analyses produced by Mesirow and that was provided to the Examiner at its request.  *Id.* at ¶ 54.

WTC recognizes that this Court previously rejected an application of a management consultant in *Summit Metals*.  WTC notes that in that case the creditor who sought compensation under § 503(b)(4) sought it for himself (not his professionals) as a management consultant.  Here, on the other hand, WTC seeks compensation for its professionals.  In addition, no

Delaware Court has actually rejected the application of a financial advisor or party assisting that financial advisor because that advisor or advisor's assistant was not an accountant -- in fact, just the contrary.    As recently as 2011, Judge Walrath ruled from the bench as follows: "[I]nvestment banker fees could be recoverable . . . and I respectfully disagree with the *Summit* and the *Mirant* cases that suggest otherwise.    I think Mirant suggests that Colliers does contemplate or argue that the statute would allow fees other than attorneys and accountants, and I do adopt that reading."  Hearing Tr., at 110:5-10, *In re Old Razor Co.,* No. 10-12351 (MFW) (Bankr. D. Del. June 23, 2011).  A true and accurate copy of the hearing transcript is attached hereto as <u>Exhibit 1</u> hereto.  Thus, based on *ITC Deltacom*, *Old Razor Co.*, as well as to avoid an absurd result under the Code, WTC urges the court to adopt a more expansive reading of section 503(b)(4) and allow the recovery of the professional fees of Mesirow, Morton, Hoffman and Cypress.

**F.    Debtors interpose a number of red herring objections that the Court should <u>overrule</u>.**

In an attempt to distract the Court from determining whether WTC qualifies for reimbursement under section 503, the Debtors raise a number of red herrings, including claims that WTC's Application should be denied on account of its purportedly "obstructive conduct" throughout the pendency of the bankruptcy proceedings, that WTC never incurred fees or expenses under the fee agreement between WTC and Brown Rudnick (the "<u>Fee Agreement</u>"), and that WTC's Application should be disallowed to the extent it relates to routine tasks expected of a Committee member.  These arguments will be addressed in turn.

**i.    <u>WTC has not sought reimbursement for any purportedly "obstructive conduct".</u>**

The Debtors object to WTC's Application on the grounds that WTC's "overall conduct throughout the Chapter 11 Cases served to 'retard or interrupt' progress toward reorganization."

21

Debtors' Opp. at 12-13.  The Debtors claim that WTC obstructed the Debtors' reorganization by, among other activities, objecting to the Debtors' Plan and prosecuting its own.  Debtors' Opp. at 15-16.  Their objection should be disregarded because it focuses on an irrelevant time period after the examination period, and had no effect on it.  Even if the Court were to consider this later time period, WTC did not obstruct the Debtors' reorganization by objecting to the Debtors' Plan and prosecuting an alternative plan.  Exercising one's right to oppose a plan that the creditor believes treats it unfairly cannot result in a forfeiture of the right to seek substantial contribution. As the Court in *Lebron*, stated, the legislative history behind section 503(b)(3)(D) indicates that it was intended to alter pre-existing law in only one respect:  "It does not require a contribution that leads to confirmation of a plan [because Congress believed that in] many cases it will be a substantial contribution if the person involved uncovers facts that would lead to a denial of confirmation, such as fraud in connection with the case."  *Lebron,* 27 F.3d at 945.  *See also In re Adelphia Commc'ns Corp.*, 359 B.R. 54, 64 (Bankr. S.D.N.Y. 2006) ("[T]he law has long upheld creditors' efforts to maximize their individual recoveries in their self-interest as creditors under a plan.").  By objecting to the Debtors' Plan during the post-examination period and supporting competing plans, WTC was working to maximize recoveries for its constituents.  There was no ulterior motive whereby WTC sought to obtain a benefit to which it did not believe it was entitled.  *See Figter Ltd. v. Teachers Ins. & Annuity Assoc. of Am. (In re Figter Ltd.)*, 118 F.3d 635, 639 (9th Cir. 1997) ("It is always necessary to keep in mind the difference between a creditor's self-interest as a creditor and a motive which is ulterior to the purpose of protecting a creditor's interest."); *In re Landing Assocs., Ltd.,* 157 B.R. 791, 803 (Bankr. W.D. Tex. 1993) ("Mere selfishness does not rise to the level of bad faith, however, and self-dealing and good faith are not mutually exclusive.").  Accordingly, WTC acted in good faith throughout these

proceedings and did not attempt to needlessly "'retard or interrupt' progress toward reorganization."

Furthermore, every case the Debtors rely on to support their "obstructionist conduct" set-off argument involves an applicant requesting reimbursement for *all* fees and expenses incurred, a finding by the court that the applicant conferred *no benefit* whatsoever to the estate, or both. Because WTC's efforts to appoint and assist the Examiner conferred a substantial benefit to the Debtors' estates and because WTC is seeking an administrative claim for the reimbursement of those activities only and not any time period thereafter, the Court should overrule the Debtors' objections based on allegedly of "obstructive conduct."

The record establishes that WTC has limited its request for reimbursement to those fees and expenses related to the appointment of, and extensive assistance to, the Examiner from December 2009 to July 2010. Application, <u>Exhibit A</u>. WTC does not seek reimbursement for any activity after July 2010, including those activities that the Debtors improperly characterize as being "obstructionist." Tellingly, the Debtors do not claim that WTC "routinely engaged in unproductive, counterproductive, and litigious conduct" during the time it sought the appointment of the Examiner, nor do they characterize WTC's conduct as obstructive during the time WTC provided extensive assistance to the Examiner. Debtors' Opp. at 15. As discussed at length on pages 5-11 above, WTC conferred a direct and substantial benefit to the estates through its efforts to appoint, and later assist, the Examiner. And, because WTC specifically limits its request for reimbursement to those fees and expenses incurred in connection therewith, any allegedly obstructionist conduct that occurred *after* July 2010 should not be considered.

Even the closest parallel in the case law that the Debtors cite is inapplicable to WTC. *See Granite Partners, L.P.,* 213 B.R. 440. In *Granite Partners*, the applicant filed for reimbursement

23

of fees and expenses for "virtually every service that it performed in [the] bankruptcy cases." *Id.* at 450. After separating the services rendered into those that conferred a benefit to the estate and those that retarded progress toward reorganization, the court nonetheless awarded the applicant for its efforts that resulted in a substantial contribution – that is, it did not offset the so-called obstructionist fees from the beneficial ones. *See id.* at 451-55. In any event, this Court need not perform such an exhaustive analysis here because WTC is seeking reimbursement only for those activities that clearly conferred a benefit to the estate. *See supra* at 5-11 (appointment of an examiner confers substantial contribution to estate).[11]

### ii.    WTC actually incurred fees under the Fee Agreement.

Nearly identical to an argument raised by the Debtors in opposing WTC's unsecured claim pursuant to Class 1F of the Plan, the Debtors now argue that WTC lacks standing to assert a claim for substantial contribution in excess of $3 million because "WTC has not 'incurred' any

---

[11]    The other cases cited by the Debtors are similarly inapposite because they either involve requests for reimbursement of all fees and expenses, requests for reimbursement where the applicant conferred no benefit to the estate, or both. *See Summit Metals, Inc.*, 379 B.R. at 63 (denying first creditor's application for reimbursement because "none of Kelly's actions have been proven to have increased or maintained the assets of the Debtor" and "there is no indication that, absent Kelly's efforts, a different outcome would have been produced in this Case" and further denying second creditor's application where that creditor (who requested full reimbursement) submitted "no evidence . . . to demonstrate a resulting benefit to the estate or creditors"); *Pierson & Gaylen, Ray & Terrell & Grubs v. Creel & Atwood (In re Consol. Bancshares, Inc.)*, 785 F.2d 1249 (5th Cir. 1986) (denying request for reimbursement of all fees and expenses incurred where applicants failed to confer any benefit to the estate); *Pacificorp Ky. Energy Corp. v. Big Rivers Elec. Corp. (In re Big Rivers Elec. Corp.)*, 233 B.R. 739, 747, 750-51 (W.D. Ky. 1998) (denying application after finding the applicants' actions forced the bankruptcy estate to reject a bid that would have provided approximately $40 million to $60 million in additional value to unsecured creditors and concluding that "none of the efforts of [the applicants] enhanced in any way the reorganization of [the Debtor's] estate") (emphasis in original); *Mirant Corp.*, 354 B.R. at 135 (denying applicant's request for reimbursement of all fees and expenses associated with the bankruptcy proceedings after determining that the benefit contributed to the valuation hearing was offset when the applicant "engaged in an improper and misleading solicitation of shareholder votes on the Plan"); *Baldwin-United Corp.*, 79 B.R. at 338-39, 342-43 (denying application for reimbursement where indenture trustee's failed strategy based on a "scorched earth policy" resulted in no benefit to the estate and its other activities, such as communicating with the client and attending committee meetings, were routine and "precisely what a committee member is supposed to do"); *In re Envirodyne Indus., Inc.*, 176 B.R. 815 (Bankr. N.D. Ill. 1995) (reducing fee award where applicant sought reimbursement of all fees and expenses, and awarding only those fees and expense related to activities that benefited the estate as a whole).

liability in respect of those additional fees within the meaning of section 503(b)(3)(D) of the Bankruptcy Code." Debtors' Opp. at 42.

Section 503(b)(4) of the Code does not require that as a predicate the creditor's professionals' fees claim be first *incurred by* the creditor, as Debtors now use that term. The Debtors conflate the use of "incurred by" in section 503(b)(3)(D) referring to a creditor's personal expenses with a putative requirement that the attorney or accountant fees sought under section 503(b)(4) also be "incurred by" that creditor. Debtors' Opp. at 42. The court in *In re Western Asbestos Co.*, 318 B.R. 527 (Bankr. N.D. Cal. 2004), rejected this exact conflation:

> Section 503(b)(4) does not require that the attorneys' fees and expenses that form the basis for the administrative claim be incurred by the creditor. It simply requires that the attorney whose fees and expenses for the basis for the administrative claim represent the creditor who made a substantial contribution. . . . Section 503] permits an administrative claim for attorneys' fees and expenses of an attorney who represents a creditor who made a substantial contribution regardless of whether the fees and expenses were incurred by the creditor . . . If the creditor makes a substantial contribution to a chapter 11 case, why should it make a difference from a policy standpoint whether the creditor is obligated to pay the attorneys' fees and expenses? The requirement that the attorney represent a creditor who made a substantial contribution protects the estate from the assertion of a claim by an attorney with no connection to the case.

*Id.* at 530-31.

The Debtors concede that *Western Asbestos* and *Mirant* reached a "contrary result" to their cases. Debtors' Opp. at 43. Moreover, none of the cases Debtors rely on actually holds "incurred" in section 503 of the Code means "actually incurred" *prior to* the creditor seeking substantial contribution for its attorneys and professionals. The court in *The Law Offices of Neil Vincent Wake v. Sedona Inst. (In re Sedona Inst.)*, 220 B.R. 74 (B.A.P. 9th Cir. 1998), rejected the absurd, "ridiculous" result that would flow from the Debtors' interpretation of section 503:

25

> [O]ne can imagine two creditors, A & B, each in possession of information that a debtor had fraudulently squirreled away assets of the estate.  Creditor A makes a free local call to his attorney, reveals the information and asks counsel to pursue the assets.  Creditor B buys a stamp and sends his attorney a letter with the information and instructions to purse the assets.  Assuming that both creditors made a substantial contribution, only Creditor B, having fortuitously incurred the expense of a 32 [cent] stamp, could recover his fees. . . . These are results with which we cannot easily abide.

*Id.* at 79.[12]  *See also Mirant Corp.,* 354 B.R. at 140 (§ 503 of the Code establishes "no requirement that fees be paid by the client before they may be recovered from the estate"); *In re Am. Plumbing & Mech., Inc.,* 327 B.R. 273, 278 (Bankr. W.D. Tex. 2005) (the failure of the indenture trustee to "allege allowable 503(b)(3) expenses does not prevent [it] from recovering attorneys' fees and expenses under 503(b)(4)").  Accordingly, there is no support for the proposition that a substantial contribution motion should be limited to the amounts actually paid by the creditor to its professionals.

### iii.    WTC seeks fees for its actual and demonstrable benefit to the Debtors' estates, not for its performance of duties on the Committee.

The UST argues that "to the extent the activities Wilmington undertook fall within the scope of the powers and duties delineated in §1103(c), Wilmington is not entitled to recover its attorney or accountant fees or expenses under Sections 503(b)(3)(F) and (b)(4)."  UST's Opp. at 10.  This argument is yet another red herring.  To the extent UST is arguing that a committee

---

[12]    The Debtors' case law in support of their theory that the fees covered by subsection of (b)(4) must be "incurred by" a creditor or indenture trustee is either inapposite, dicta, or has been rejected by subsequent case law.  The case of *Olsen v. Robinson Brog Leinwand Greene Genovese & Gluck, P.C. (In re Olsen),* 334 B.R. 104 (S.D.N.Y. 2005) is distinguishable because that court focused on who incurred the expenses, not whether the expenses were actually incurred.  Moreover, the court in *Mirant Corp.,* 354 B.R. 113, criticized and declined to follow *Olsen.  Mirant,* 354 B.R. at 140 (holding that Section 503 of the Code establishes "no requirement that fees be paid by the client before they may be recovered from the estate.").  Finally, the case of *Energy Partners, Ltd.,* 422 B.R. 68 is factually inapt.  There, the creditor sought a substantial contribution application for attorneys' fees of approximately $61,000 and only received $37,500 from the court (25% reduction from $50,000).  $50,000 was the applicant's cap in *Energy Partners, Ltd.* by agreement.  Here, WTC has not capped the professional fees of Brown Rudnick or other professionals by agreement; therefore, *Energy Partners, Ltd.* is distinguishable.

member can never seek substantial contribution for its efforts, cases such as *Worldwide Direct, Inc.* reject that contention. 334 B.R. at 118, 123 (committee co-chair, WTC, awarded substantial contribution). To the extent UST asserts that seeking the appointment of the Examiner is a routine task that does not rise to the level of a substantial contribution, several cases discussed above hold otherwise. *See, e.g., Syntax-Brillian Corp., The New Power Co.,* and *Gen. Electrodynamics Corp.*, *see* discussion *supra* at 5-11.

The undeniable fact remains that WTC, against all objectors, sought the appointment of the Examiner and substantially assisted the Examiner at his request, with the end result being a report that caused a new Plan that preserved certain LBO-related claims. In 2010, no settling party, including the Committee, sought the Examiner. Only the UST supported WTC's request. Under these facts, for UST to argue that membership on the Committee somehow in and of itself bars substantial contribution is untenable.

### G. WTC's professionals' fees are reasonable.

Even if Debtors put the value of the Litigation Trust in the hundreds of millions, WTC's Application thus represents less than 3% of that potential recovery. Moreover, the Siegel Declaration explains in detail the time justifying both Brown Rudnick's and the other professionals' tasks during this time period. For the Court's convenience, WTC will summarize Brown Rudnick's time below.[13]

Starting in the last week of December 2009, after WTC became increasingly concerned with the pace and depth of the Committee's investigation on LBO claims, Brown Rudnick began preparing the Examiner Motion. Siegel Decl., ¶ 12. Because the Debtors had denied Brown Rudnick access to the Document Depository, the Examiner Motion was prepared without the

---

[13]     For the time detail and supporting tasks of Mesirow, and other professionals under the Application besides Brown Rudnick, WTC refers the Court to paragraphs 47 - 56 of the Siegel Declaration.

benefit of the documents in that depository.  *Id.* at ¶ 13.  As a result, Brown Rudnick attorneys were required to conduct extensive research into the publicly available materials from analysts and others who contemporaneously criticized the LBO.  *Id.*  WTC filed the 48 page Examiner Motion on January 13, 2010.  *Id.* at ¶ 14.  Brown Rudnick incurred fees of $128,903.00 and spent 338.5 hours on drafting and researching the Examiner Motion.  *Id.*

After vigorous opposition on the Examiner Motion by the Debtors, the Committee, Senior Lenders, among others, Brown Rudnick filed an omnibus reply brief in support of the Examiner Motion (the "Reply Brief").  *Id.* at ¶ 16.  Brown Rudnick incurred fees of $25,865.75 and spent 99.65 hours on drafting and researching the Reply Brief.  *Id.*

After weeks of resistance and after the Examiner Motion was filed, the Debtors finally granted WTC access to the documents in the Depository on January 23, 2010.  *Id.* at ¶ 17. Brown Rudnick reviewed documents in the depository from JPMorgan, Merrill Lynch, VRC, Tribune and Zell/EGI-TRB.  *Id.*

On February 5, 2010, the Debtors circulated an updated depository index that included additional productions from Merrill Lynch, the Debtors, Citigroup, and JPMorgan.  *Id.* at ¶ 21. WTC did not receive these disks (which constituted almost 900,000 pages of new documents) until February 11, 2010, approximately a week before the hearing on the Examiner Motion, which, at the time, was scheduled for February 18, 2010.  *Id.* at ¶ 20.  At the hearing on February 18, 2010, the Court adjourned consideration of the Examiner Motion until April 13, 2010.  On February 26, 2010, the Debtors circulated an updated Depository index with new productions from JPMorgan, Merrill Lynch, and Morgan Stanley, totaling over 400,000 additional pages.  *Id.* at ¶ 21.  Again, on March 10, 2010, the Debtors circulated a new document depository index with new productions from Merrill Lynch (7 disks with almost 300,000 pages) and Tribune

(almost 25,000 pages).  *Id.*  Brown Rudnick incurred fees of $142,192.34 and spent 354.67 hours on reviewing documents in support of the Examiner Motion and Reply, and in anticipation of the hearing on the Examiner Motion and Reply.  *Id.* at ¶ 22.  After the hearing in April 2010, the parties (after learning that the Court intended to appoint an examiner) reached an agreement on the Examiner.  *Id.* at ¶ 24.  The Court entered that agreed to order on the Examiner on April 20, 2010.  *Id.*  Brown Rudnick incurred fees of $213,065.38 and spent 522.23 hours in hearing attendance and hearing preparation regarding the Examiner Motion.  *Id.*

Once the Examiner was appointed, Brown Rudnick and its team met with the Examiner multiple times, starting on May 4, 2010.  *Id.* at ¶ 25.  At this meeting, the Examiner charged Brown Rudnick with focusing his attention to relevant facts, and with writing the main brief explaining why the estate claims are strong (considering that virtually everyone else wanted to argue the weakness of these claims).  *Id.* at ¶¶ 25-27.  Also at this meeting, the Examiner indicated that he would be giving Brown Rudnick assignments during the examination period. In addition, the Examiner asked Brown Rudnick repeatedly for assistance with interviews with LBO lenders.  *Id.* at ¶ 25.  Brown Rudnick incurred fees of $143,283.91 and spent 272.71 hours including, but not limited to, meeting with the Examiner and/or his agents, preparing for such meetings, and communicating with the Examiner and/or his agents from May 2010 to July 2010. *Id.*

In addition to meetings and communications with Brown Rudnick, the Examiner also requested that Brown Rudnick provide to the Examiner a link to Wilmington Trust's draft Amended Complaint for Equitable Subordination, with hyperlinks to the documents supporting the allegations therein.  *Id.* at ¶ 27.  Ten days after the Examiner's request, Brown Rudnick provided the Examiner with the hyperlinked Amended Complaint for Equitable Subordination, to

which the Examiner's counsel responded: "Thank you again for this effort. We greatly appreciate it." *Id.* Brown Rudnick incurred $186,185.75 in fees and spent 458 hours on researching and hyperlinking support for the allegations in the Amended Complaint for Equitable Subordination. *Id.*

As set forth in greater detail in the Siegel Declaration, the Examiner, throughout the examination process, sought factual and legal analysis from Brown Rudnick for sundry discrete issues that other parties could not or would not supply. *Id.* at ¶¶ 59-64. As a result, Brown Rudnick incurred $1,187,671.21 in fees and spent 2,552.3 hours reviewing documents in response to specific inquiries by the Examiner or his professionals. *Id.* at ¶ 46. Brown Rudnick also extensively researched sundry issues for the Examiner and prepared and submitted an enlarged 100-page submission to the Examiner by May 24, 2010 along with other Examiner submissions. *Id.* at ¶¶ 29, 61. Brown Rudnick incurred $1,969,080.23 in fees and spent 3,653.24 hours drafting and researching submissions to the Examiner. *Id.* at ¶ 42.

Finally, Brown Rudnick, in addition to its analysis and submissions to the Examiner during the examination period, also began to discuss case analysis, foundation and background with WTC's financial advisor, Mesirow. *Id.* at ¶ 47. On May 4, 2010, the Examiner requested that WTC's initial submission include a solvency report by its financial advisor. *Id.* at ¶ 48. To prepare this report, Mesirow reviewed extensive documents produced by VRC, Duff & Phelps, Morgan Stanley and JPMorgan on various financial issues. *Id.* at ¶ 48. Mesirow was the only financial advisor for the parties advocating for the LBO causes of action to submit a written solvency analysis to the Examiner during the examination period. *Id.* at ¶ 49. In addition, Mesirow also reviewed and analyzed the presentations to the Examiner by FTI and Blackstone and then reviewed and analyzed all underlying source documents behind those analyses. *Id.* at ¶

51.    Mesirow then prepared rebuttal memorandum regarding the FTI and Blackstone presentations.  *Id.*  Mesirow also prepared for and attended an in person meeting with the Examiner's financial advisor on June 10, 2010.  *Id.*at ¶ 52.  Mesirow also helped Brown Rudnick and often communicated with each other on various issues in this case.  *Id.* at ¶ 53.  Brown Rudnick incurred $47,584.00 in fees and spent 65.8 hours in communicating with and corresponding with Mesirow in connection with Mesirow's work as financial advisor during the examination process.  *Id.*

## CONCLUSION

WTC's 503(b) Application is marked by a series of unassailable facts.  By April 2010, the Committee had decided to settle with the Debtors and certain LBO Lenders, among others, and release all LBO-related estate causes of action.  WTC, joined by the UST, demanded an Examiner.  Only after appointment became an inevitability did the Committee reluctantly pick up the banner.  By then, however, the die was cast and the Examiner saw this clearly.  Thus, he relied expressly on WTC's counsel to assist his investigation and to drive the analysis in favor of a finding that valuable causes of action did indeed exist.  WTC did this effort at a time when it had no source of funds to pay its counsel or the other vital professionals.  It did so knowing that the first Plan left the PHONES out of the money and the PHONES could only realize a recovery if those above, to the extent the PHONES were subordinated, first reaped the fruits of WTC's hard labor.  WTC pushed a process that by its very nature could not be egocentric.  It did so against forces large and varied and intent on shielding themselves from billions of dollars of exposure.  And it cost millions to accomplish the task.  Millions incurred in a half dozen short months with attorneys and professionals working around the clock.  The Debtors and LBO lenders did what targets always do, attempt to bury their challengers in a blizzard of paper –

here, over a million pages of paper produced after the Committee had already shut down its investigation and had moved to a settlement one-sidedly in favor of those very targets.

So now the sniping begins.  You, WTC did not cause any positive result – look, other parties challenged the April 2010 settlement.  You, WTC, were not instrumental in the examination – look, the Committee, who yesterday was prepared to give away the claims, is today arguing their value.

WTC does not mean to sound flip.  It recognizes that what it is asking for is serious relief.  But it is stunning to watch all the professionals who opposed the Examiner receive payment of every penny they incurred during the examination process, without objections from any party, when WTC, and WTC alone, drove the process that resulted in potential billions of dollars of claims being preserved for the benefit of all unsecured creditors, but pursuant to a waterfall that means WTC's constituents benefit last, if at all.  If this is not the case for a finding of substantial contribution, it is hard to imagine what case would qualify.  The standard cannot be that impossible to satisfy.  Respectfully, WTC asks this Court to recognize the vital and beneficial role it played, and reward it accordingly.

Dated: Wilmington, Delaware
April 19, 2013

SULLIVAN · HAZELTINE · ALLINSON LLC

*/s/ E.E. Allinson III*
William D. Sullivan (I.D. No. 2820)
Elihu E. Allinson III (I.D. No. 3476)
901 N. Market Street, Suite 1300
Wilmington, DE 19801
302-428-8191

and

BROWN RUDNICK LLP
Robert J. Stark
James W. Stoll
Martin S. Siegel
Gordon Z. Novod
Seven Times Square
New York, NY 10036
212-209-4800

*Counsel for Wilmington Trust Company, as successor Indenture Trustee for the PHONES*

61144678 v8-WorksiteUS-027213/0008