## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-----------------------------------------------------X
In re:                              :        Chapter 11 Cases
                                    :        Case No. 08-13141 (KJC)
TRIBUNE COMPANY, et al.,            :        (Jointly Administered)
                                    :
            Debtors.                :
                                    :
                                    :
                                    :
-----------------------------------------------------X
```

### DECLARATION OF MARTIN S. SIEGEL

Pursuant to 28 U.S.C. § 1746, Martin S. Siegel, being duly sworn, deposes and says:

1.      I am a partner in the law firm of Brown Rudnick LLP ("Brown Rudnick"),
counsel for Wilmington Trust Company ("Wilmington Trust"), Successor Indenture Trustee for
the Exchangeable Subordinated Debentures due 2029 (generally referred to as the "PHONES")
issued in April 1999 by Tribune Company ("Tribune" and, together with its Chapter 11 affiliates,
the "Debtors" or the "Company") in the above-referenced chapter 11 cases.  I am admitted to
practice law in the State of New York, various federal district and circuit courts, and *pro hac vice*
in this district for purposes of these proceedings.

2.      I was the lead Brown Rudnick litigation partner representing Wilmington Trust in
the Tribune case from approximately December 2009 through the Effective Date of the Debtors'
Plan of Reorganization.  In that capacity, I worked alongside my bankruptcy partners, Robert J.
Stark and Gordon Z. Novod, to represent Wilmington Trust's interests.  I was directly involved
in Wilmington Trust's motion to appoint an examiner, its preparation for the hearings on the
motions to appoint the examiner, its submissions and assistance to the examiner (the

"Examiner"), and the document review and legal analysis involved in all of the foregoing.  I supervised the attorneys, paralegals and other professionals working on those tasks.

3.      I submit this declaration in support of Wilmington Trust's application for allowance of a claim under 11 U.S.C. §§ 503(b)(3)(D) and 503(b)(4) [D.I. 13272] (the "Application"), and in support of Wilmington Trust Company's Omnibus Reply to (A) Reorganized Debtors' Objection and (B) United States Trustee's Objection to Wilmington Trust Company's Application for Allowance of Claim Under 11 U.S.C. §§ 503(b)(3)(D) and 503(b)(4) [D.I. 13395 & 13435] (the "Reply").

4.      Wilmington Trust is the Successor Indenture Trustee for the PHONES, and, in that capacity, served on Tribune's Official Committee of Unsecured Creditors (the "Committee") from December 30, 2008 until December 31, 2012, the effective date of the Plan.  See D.I. 156 (Amended Notice of Appointment of the Committee of Unsecured Creditors).

5.      I am familiar with the facts set forth herein based upon personal knowledge and my review of applicable records and documents.  I also am personally familiar with the facts set forth in the Reply (and its attachments) and believe the facts to be true and correct to the best of my knowledge, information and belief.  I further am personally familiar with the work performed on behalf of Wilmington Trust by the lawyers, paralegals and other professionals at Brown Rudnick LLP in connection with the appointment of the Examiner and their participation in the Examiner's investigation that forms the basis for Wilmington Trust's Application.  I also am personally familiar with the work performed by Wilmington Trust's other professionals that are a part of its Application, i.e., its prior Delaware counsel, Benesch, Friedlander, Coplan & Aronoff LLP ("Benesch"); its financial advisor, Mesirow Financial Consulting LLC ("Mesirow"); its newspaper valuation consultant, Morton Research, Inc. ("Morton"); its broadcasting valuation

consultant, Hoffman Schutz Media Capital ("Hoffman"); and its internet consultant, Cypress Associates LLC ("Cypress").    True and accurate copies of the time entries in support of the Application, respectively, that of Brown Rudnick, Benesch, Mesirow, Morton, Cypress, Hoffman, were attached as Exhibits A – F of the Application.    I have reviewed these time entries and, considered in conjunction with the voluntary reductions, find them to be reasonable.

6.    From the inception of my involvement in the Tribune case, it was apparent that potential claims for fraudulent conveyance existed as a result of Tribune's failed 2007 leveraged buyout ("LBO").    At first, as a member of the Committee, Wilmington Trust observed the preliminary investigation of LBO–related causes of action commenced by the Committee. However, by December of 2009, Wilmington Trust and Brown Rudnick, as its counsel, became increasingly concerned with the pace and depth of the Committee's investigation.

7.    As of December 2009, the Committee had only taken the following depositions, only one of which was a witness from Tribune: (i) Ben Beuttell of Houlihan Lokey; (ii) Mose (Chad) Rucker III, a managing director with VRC; (iii) Bryan Browning, a senior vice president and professional services manager with VRC; (iv) Harry Amsden, the former vice president of finance of Tribune Publishing; and (v) Elyse Bluth of Duff & Phelps, and no LBO lender deponents.[1]    However, in December of 2009, Wilmington Trust and Brown Rudnick learned that, notwithstanding how few depositions had taken place, the Debtors and the Committee already had begun preliminary settlement negotiations.

8.    As a result, on December 23, 2009 Brown Rudnick sent letters to both the Committee and the Debtors requesting that Wilmington Trust be permitted to participate in the Rule 2004 process and obtain access to the documents in the document depository

---

[1] By late January 2010, the Committee also conducted depositions of John Kowalczuk, a vice president of JPMorgan and Rajesh Kapadia, a managing director of JPMorgan.

("Depository") established by the Court.  [D.I. No. 2858].  Wilmington Trust's request was not granted at that time.  Brown Rudnick made repeated inquiries before finally receiving word that the Debtors did not object to designating Wilmington Trust as a Depository designee on January 6, 2010.  Even then, Wilmington Trust/Brown Rudnick's access to Merrill Lynch's documents was initially denied, requiring Wilmington Trust to file a motion to compel access to such documents.  [D.I. 3176].  Thereafter, Merrill Lynch withdrew its objection to Wilmington Trust viewing its documents and Wilmington Trust withdrew its motion to compel access.  [D.I. 3183].

9.      On December 29, 2009, Amanda Buck Varella, then a Brown Rudnick associate, now a partner, working with me on the litigation aspects of the Tribune cases, asked Graeme Bush of Zuckerman Spaeder, special counsel for the Committee, for the schedule of depositions. Mr. Bush responded via email that the only upcoming depositions were of two JPMorgan employees, John Kowalzuk (on January 20, 2010) and Raj Kapadia (on January 22, 2010).  Mr. Bush also informed us that "the Committee was trying to schedule the depositions of Christian Mohr, a managing director at Citibank."  I am not aware of any other depositions scheduled by the Committee.

10.     On December 30, 2009, Howard Seife of Chadbourne & Parke LLP ("Chadbourne"), counsel for the Committee, and Ms. Varella corresponded by email regarding Wilmington Trust's attendance at a settlement meeting scheduled for January 5, 2010.  In that e-mail, Mr. Seife agreed to permit Wilmington Trust to participate in the meeting as successor indenture trustee for the PHONES, noting, however, that the meeting "will not deal with the subordinated debt issues" and that the Committee would be represented at the meeting by its co-chair, Warner Brothers.

11.    A second settlement discussion between Centerbridge, Law Debenture, the LBO lenders, the Debtors, and the Committee was held on January 12, 2010.  Wilmington Trust's request to attend the meeting was denied by JPMorgan's counsel.

12.    As a result of Wilmington Trust's concerns that a settlement would be agreed to before a complete investigation was made, on December 28, 2009, Wilmington Trust, through Brown Rudnick, began preparing a motion for the appointment of an Examiner (the "Examiner Motion").  Under my supervision, Ms. Varella, and a more junior associate, Monica Cafaro, were the initial drafters of the motion.  I then reviewed and finalized that motion.

13.    The Examiner Motion was prepared without the benefit of having access to the Depository.  As a result, I tasked a number of attorneys with extensive research into the publicly available materials concerning the LBO, and the statements of analysts and others who had contemporaneously discussed the LBO and its adverse effects on Tribune.

14.    Through these efforts, Brown Rudnick, on behalf of Wilmington Trust, prepared and filed a 48 page Examiner Motion on January 13, 2010.  [D.I. 3062].  Brown Rudnick also prepared and filed the Declaration of Robert J. Stark, its lead bankruptcy attorney on this engagement, which attached 25 exhibits in support of the Examiner's Motion.  [D.I. 3065, 3067, 3068].  Brown Rudnick incurred fees of $128,903.00 and spent 338.5 hours on drafting and researching the Examiner Motion.

15.    Wilmington Trust's Examiner Motion was vigorously opposed by virtually every other major party, except for the U.S. Trustee, who filed a statement in support of Wilmington Trust's Examiner Motion.  [D.I. 3421]  The Debtors, the Committee, JPMorgan Chase Bank, N.A., Merrill Lynch Capital Corporation, the Credit Agreement Lenders (Oaktree and Angelo Gordon, the TM Retirees, and Citicorp North America Inc. and Citigroup Global Markets Inc. all

objected or joined objections to the Examiner Motion, totaling over 300 pages collectively.  [D.I. 3360, 3368, 3372, 3373, 3375, 3376, 3389].

16.     Faced with this opposition, on February 16, Brown Rudnick filed an omnibus reply to the oppositions to the Examiner Motion.  [D.I. 3420].  As part of that reply, I also filed a 58 exhibit declaration which attached additional documents that supported the request for an examiner that were located during the document review.  [D.I. 3428].  Preparation of that reply required substantial additional factual and legal research.  On the eve of the adjourned hearing date, my partner, William Dolan, filed an 85 exhibit declaration which attached additional documents that supported the request for an examiner that were located during the document review.  [D.I. 3979].  Brown Rudnick incurred fees of $25,865.75 and spent 99.65 hours on drafting and researching the Reply Brief.

17.     In addition, Brown Rudnick prepared to offer an evidentiary record to support the Examiner Motion.  Once Brown Rudnick finally obtained the disks from the Debtors on January 23, 2010, Brown Rudnick attorneys began reviewing the documents in the Depository to buttress the factual allegations made in the Examiner Motion.  Brown Rudnick associates Amanda Varella and Matthew Sgro supervised the review of documents from the Depository.  They prioritized the producing parties, and initially limited the review to JPMorgan, Merrill Lynch, VRC, Tribune and Zell/EGI-TRB.

18.     With respect to JPMorgan, whose production at that point was supposed to be complete and had been reviewed by Committee counsel, Brown Rudnick initially conducted a limited review.

19.     With respect to Merrill Lynch's production, Merrill Lynch had only completed a partial production of documents when settlement negotiations commenced.  Therefore, Brown

Rudnick's review was more extensive because many of those documents had not yet been reviewed by anyone.

20.     The document production process remained ongoing throughout January and February 2010, with Wilmington Trust receiving almost 900,000 pages of new documents roughly a week before its requested hearing date on the Examiner Motion, including 400,000 pages from the Debtors, 335,000 pages from Merrill Lynch, 88,000 pages from Citigroup, and 50,000 pages from JPMorgan.  On February 12, 2010, Brown Rudnick received a replacement disk with an additional 140,000 pages of Merrill documents.  All of those documents had to be reviewed by Brown Rudnick attorneys on an expedited basis.

21.     On February 26, 2010, the Debtors circulated an updated Depository index identifying new document productions from JPMorgan, Merrill Lynch, and Morgan Stanley, totaling over 400,000 additional pages.  On March 10, 2010, the Debtors further identified additional new document productions from Merrill Lynch (300,000 pages) and Tribune (almost 25,000 pages).  Brown Rudnick then reviewed those documents as well.

22.     In total over 250,000 documents (more than 3.1 million pages) were reviewed over several months by approximately 50 Brown Rudnick timekeepers.  Brown Rudnick incurred fees of $142,192.34 and spent 354.67 hours on reviewing documents in support of the Examiner Motion and Reply, and in anticipation of the hearing on the Examiner Motion and Reply.

23.     On or around April 8, 2010, Brown Rudnick learned that a settlement of the LBO claims had been reached among the Debtors, the Committee, JPMorgan, Angelo Gordon, Centerbridge and Law Debenture.  That settlement caused Wilmington Trust to believe even more strongly that an examiner was required to do a complete, independent investigation. Accordingly, Brown Rudnick pressed the Examiner Motion at the April 13, 2010 hearing.

24.     At the hearing on April 13, 2010, after preliminary argument on the Examiner Motion, the Court continued the hearing until April 22, 2010.  [D.I. 4113].  However, based on comments by the Court during the argument, after the April 13, 2010 hearing, a status conference was held on April 19, 2010 [D.I. 4094] at which the parties announced that they had reached an agreement on the appointment of an examiner.  The Court entered an agreed order appointing an examiner on April 20, 2010.  [D.I. 4120].  Professor Kenneth N. Klee was appointed as the examiner on April 30, 2010.  [D.I. 4212].  Shortly thereafter, Klee, Tuchin, Bogdanoff and Stern, LLP, and Saul Ewing LLP were retained as counsel for the Examiner [D.I. 4356, 4357, 4358, 4475, 4476, 7798], LECG was retained as financial advisor for the Examiner [4360, 4361, 4500], and a work plan was submitted.  [D.I. 4321].  Brown Rudnick incurred fees of $213,065.38 and spent 522.23 hours in hearing attendance and hearing preparation regarding the Examiner Motion.

25.     My partner, Robert Stark and I, and other Brown Rudnick attorneys, met with the Examiner on May 4, 2010.  At that meeting, the Examiner charged Brown Rudnick with focusing his attention to relevant facts, and with writing the main brief explaining why the estate claims are strong (and, in turn, why the defenses are weak).  The Examiner indicated that he wanted Wilmington Trust to submit, with its opening brief, supplemental papers including the solvency report from Mesirow.  The Examiner also indicated that he would be asking Wilmington Trust's counsel for additional assistance as the examination progressed.  In addition, the Examiner asked Brown Rudnick repeatedly for assistance with interviews with LBO lenders. Brown Rudnick incurred fees of $143,283.91 and spent 272.71 hours including, but not limited to, meeting with the Examiner and/or his agents, preparing for such meetings, and communicating with the Examiner and/or his agents from May 2010 to July 2010.

26.     At the May 4, 2010 meeting, the Examiner and his counsel requested numerous items from Brown Rudnick.  Specifically, the Examiner requested that Brown Rudnick identify cases involving similar facts underlying equitable subordination and fraudulent conveyance claims.  Brown Rudnick associates Dylan Kletter and John Elstad assisted in identifying such case law and, on May 6, 2010, associate Katherine Bromberg circulated Brown Rudnick's findings to the Examiner.  See Exhibit M of Application (BREX0001530-1548).  Exhibit M, previously filed under seal with the original Application, is a composite exhibit that includes, among other things, true and accurate copies of emails largely between the Examiner and Brown Rudnick.  For the sake of convenience, that composite exhibit will simply be referred to herein as Exhibit M.

27.     At the May 4 meeting, the Examiner's counsel further requested that Brown Rudnick provide the Examiner with a copy of Wilmington Trust's draft Amended Complaint for Equitable Subordination, with hyperlinks to the documents supporting the allegations therein. To comply with that request, Brown Rudnick associates Amanda Varella, Katherine Bromberg, Inese Jundze, Jennifer Recht, Gregory Smith, Monica Cafaro, Caleb Piron, and paralegal Deborah Medeiros, spent numerous hours marshaling the evidentiary support for the allegations in the Amended Equitable Subordination Complaint.  On May 14, 2010, Ms. Varella provided the hyperlinked Amended Equitable Subordination Complaint to the Examiner's counsel.  In response, the Examiner's counsel stated, "[t]hank you again for this effort. We greatly appreciate it."  Exhibit M (BREX0001472-1476).  On May 16, 2010, Ms. Varella sent to Klee Tuchin an updated version of the annotated, draft Amended Complaint for Equitable Subordination, with hyperlinks to approximately 350 documents, along with a detailed index.  Brown Rudnick

incurred $186,185.75 in fees and spent 458 hours on researching and hyperlinking support for the allegations in the Amended Complaint for Equitable Subordination.

28.     On or about May 10, 2010, Danielle Brown of Klee Tuchin requested certain information regarding electronic deposition transcripts that Brown Rudnick had previously provided to the Examiner.  Later that same day, paralegal Deborah Medeiros circulated the requested information.  See Exhibit M (BREX0001516-151).

29.     At the same time that Brown Rudnick was providing all of this additional assistance to the Examiner, it was simultaneously performing its legal and factual research to prepare the submission requested by the Examiner in a letter dated May 10, 2010.  Because of Brown Rudnick's enhanced role in the examination process, the Examiner enlarged Wilmington Trust's initial submission to 100 pages, as compared to 75 pages for the Debtors and Committee, and 50 pages for JPMorgan and others.  Wilmington Trust's initial submission was made on May 24, 2010.  DCL Trial Exhibit 1541.

30.     On the day after Brown Rudnick made its written submission to the Examiner, May 25, 2010, Nicholas Nastasi of Saul Ewing, special counsel to the Examiner, requested that Brown Rudnick assist the Examiner's investigation by sharing its "thoughts on key topics or documents with regard to JPMorgan Chase's role in the LBO" to enable Saul Ewing to better prepare for interviews with JPMorgan Chase.  To comply with this request, Ms. Bromberg, my partner Andy Dash and I reviewed the relevant documents and prepared for and participated in a conference call with Saul Ewing on May 27, 2010.  See Exhibit M (BREX0004693-96).

31.     Also on May 25, 2010, Mr. Bogdanoff requested that Wilmington Trust agree to provide Mesirow's analysis of certain financial materials to the Examiner's advisors.  Mr. Stark

agreed to the request and stated that "Mesirow will review and revert to LECG with all deliberate speed." Exhibit M (BREX0005266-67).

32.    Prior to May 26, 2010, the Examiner had requested from Brown Rudnick an analysis of section 546(e) of the Bankruptcy Code in the context of leveraged buyouts. I prepared this analysis, assisted by several associates, including Rebecca Fordon, Aaron Lauchheimer and Travis Rodgers. I circulated a memorandum on this topic to the Examiner's counsel on May 26, 2010. See Exhibit M (BREX0002691).

33.    On May 28, 2010, Saul Ewing asked Brown Rudnick to participate in a "telephone call with attorneys working for the Examiner to provide [Brown Rudnick's] thoughts on the interplay between Merrill Lynch Capital Corporation & Merrill Lynch Fenner & Smith as well as any other issues" relevant to the upcoming Merrill Lynch interviews. Associates at Brown Rudnick located the relevant documents. I participated in a conference call with Saul Ewing on June 2, 2010. Ms. Bromberg also participated in the conference call and then, at Saul Ewing's request, located and provided additional relevant documents to the Examiner. See Exhibit M (BREX0006619-25, BREX0006602-05).

34.    On May 28, 2010, Mr. Bogdanoff requested an analysis of certain hypotheticals relating to the LBO. I again oversaw this response. I was assisted by Ms. Bromberg and associates Saul De La Guardia, Neal D'Amato, Rebecca Fordon, Dylan Kletter, Jennifer Recht, Travis Rodgers, Matthew Sgro, and Amanda Varella. My partner, Gordon Novod, also participated in preparing this response. On June 4, 2010, Brown Rudnick provided the Examiner with a 22-page memorandum responding to the Examiner's questions as to whether the lenders were obligated to fund Step Two, whether the directors and officers breached their fiduciary duties by proceeding with Step Two, and whether the Merrill, Citi, and JPMorgan entities should

be considered as "one ball of wax" for good faith and aiding and abetting purposes.  See Exhibit M (BREX000599-620).

35.     On May 30, 2010, Mr. Bogdanoff requested that Brown Rudnick provide analyses of issues related to choice of law and individual benefits.  I oversaw preparation of this analysis and was assisted by associates De La Guardia, Elstad and Welch.  I sent the analysis to Mr. Bogdanoff on June 6, 2010.  See Exhibit M (BREX0006681-82).

36.     On May 31, 2010, Jonathan Shenson of Klee Tuchin requested an analysis of the efficacy of certain ordinary course defenses.  Along with associate Benjamin Chapman, I prepared an in-depth analysis, which was sent to Mr. Shenson on June 6, 2010.  See Exhibit M (BREX0006685-86).

37.     On or about June 1, 2010, Mr. Novod and I, and other Brown Rudnick attorneys, participated in a telephone conference with the Examiner's counsel, at their request, to discuss certain issues regarding the $3.98 billion LATI transaction.  See Exhibit M (BREX0006606). On June 2, 2010, Mr. Novod sent the Examiner's counsel Brown Rudnick's analysis of the LATI transaction.  Mr. D'Amato assisted in the preparation of this analysis.  See Exhibit M (BREX0001050-51).

38.     Also, on June 1, 2010, again at the Examiner's counsel's request, I led a team of associates analyzing whether privilege assertions interposed by the lenders concerning communications with Murray Devine, a financial advisor to the LBO lenders in connection with the LBO, were privileged.  We provided that analysis to Klee Tuchin on June 1, 2010.  See Exhibit M (BREX0004614-20).

39.     On June 2, 2010, at Saul Ewing's request, Ms. Varella provided to Saul Ewing documents relating to the LATI transaction.  See Exhibit M (BREX000821-1049).

40.    On June 3, 2010, Mr. Stark provided Mr. Bogdanoff with an analysis of a recent Third Circuit decision regarding *in pari delicto*.  See Exhibit M (BREX0002668-90).   On the same day, Mr. Bogdanoff posed to Brown Rudnick the questions of whether the LBO lenders (i) could be held liable for aiding and abetting a breach of duty when they were contractually bound to fund Step Two and (ii) could be held liable for breach of their loan commitment if they failed to do so.  Mr. Stark and I prepared this analysis, with the assistance of associates Cafaro, Jundze, Kletter and Welch.  I sent the analysis to Mr. Bogdanoff on June 6, 2010.  See Exhibit M (BREX0006683-84).

41.    On or about June 3, 2010, Mr. Bogdanoff requested that Brown Rudnick provide an analysis of whether the LBO Banks were required to close Step Two.  Assisted by associates Bromberg, Recht, Smith, and Varella, and paralegal Susan Oldham, I prepared an eight-page memorandum addressing the issue and sent that memo to Klee Tuchin that same day.  See Exhibit M (BREX0003494-502).

42.    At the same time that Brown Rudnick was supplying the Examiner's counsel with the additional information requested by them, I and the other Brown Rudnick attorneys involved had to review the extensive submissions by the Debtors, the Committee, the LBO lenders, and others, and conduct extensive legal and factual research in order to prepare Wilmington Trust's reply brief to the Examiner.  Such reply was submitted on June 8, 2010.  Brown Rudnick incurred $1,969,080.23 in fees and spent 3,653.24 hours drafting and researching submissions to the Examiner.

43.    On June 12, 2010, Caitlin Piccarello of Saul Ewing requested that Brown Rudnick provide them with an analysis of monetary incentives given to Tribune's officers and directors.

On June 13, 2010, Ms. Varella provided to Ms. Piccarello with that analysis.  See Exhibit M (BREX000399-473).

44.     On July 18, 2010, Mr. Bogdanoff requested "urgent" information regarding the Bank of America document production.  On the same day, I, with the assistance of Ms. Varella, prepared and circulated answers to his questions.  I was assisted by Ms. Varella in providing that information.  See Exhibit M (BREX000515-517).

45.     On June 22, 2010, Christopher Hall of Saul Ewing requested that Brown Rudnick participate in a call to discuss topics and documents for use in upcoming Citigroup interviews. Mr. Hall noted that Saul Ewing "very much appreciated [Brown Rudnick's] thoughts on Merrill" and wondered if it "could impose again for [Brown Rudnick's] thoughts on Citi."  Exhibit M (BREX0006714-16).  In response to this request, Ms. Varella sent additional documents to the Examiner's counsel on June 24, 2010, and Ms. Varella, associate Neal D'Amato and partner William Dolan spoke with Christopher Hall and Greg Schwab of Saul Ewing that day.

46.     In sum, in addition to briefs filed by all parties, Wilmington Trust's professionals provided additional substantive analysis to the Examiner and his professionals on at least eleven different occasions.   See, e.g., Exhibit M (BREX0003494-3502).   Additionally, at the Examiner's request, Wilmington Trust's professionals provided the Examiner and his professionals with diligence information, such as documents, on at least ten other occasions. Brown Rudnick incurred $1,187,671.21 in fees and spent 2,552.3 hours reviewing documents in response to specific inquiries by the Examiner or his professionals.

**Mesirow's Activities**

47.     Shortly after the Examiner was appointed, Brown Rudnick began to discuss the case analysis, foundation and background with Wilmington Trust's financial advisor, Mesirow.

14

I, along with my partner Andy Dash, and associate John Elstad were the principal contacts with Jim Atkinson, Managing Director at Mesirow, and other Mesirow personnel, concerning the work that Mesirow performed in connection with the examination.  This initial review by Mesirow consisted of analyzing relevant public documents that had been pulled by Brown Rudnick as well as industry analyst reports and other financial data.

48.     As noted above, on May 4, 2010, the Examiner requested that Wilmington Trust's initial submission on May 24, 2010 include a solvency report by its financial advisor.  Beginning on May 5 through May 24, 2010, Mesirow worked arduously to do the analysis and prepare a report to be submitted to the Examiner by May 24, 2010.  This activity required Mesirow to review extensive documents produced by VRC, Duff & Phelps, Morgan Stanley and JPMorgan concerning Tribune's interest rates, credit agreements, disclosure documents, historical financial statements, operating cash flows, capital structure, long term debt and liquidity, revenue and EBITDA projections, comparable companies and multiples and other relevant issues.

49.     This analysis required Mr. Atkinson and other members of the Mesirow team to spend over 200 hours in order to prepare the requested solvency analysis for submission on May 24, 2010.  I have reviewed the initial and reply submissions to the Examiner by the Committee and Law Debenture, and understand that Mesirow was the only financial advisor for the parties advocating for the LBO causes of action to submit a written solvency analysis to the Examiner during the examination period.

50.     On May 31, 2010, David E. Wensel, a director of LECG, wrote directly to Mr. Atkinson, as well as other experts retained by Wilmington Trust, requesting an in-person meeting with them individually or together.  Mr. Atkinson promptly responded, and a meeting

was arranged in Chicago, at LECG's offices for June 10, 2010.  At that meeting, Mr. Atkinson appeared in person, with Morton and Cypress present by telephone.

51.    In order to prepare for that meeting, Mesirow had to review and analyze the presentations to the Examiner by JPMorgan's advisors, FTI and Blackstone (although those presentations were not solvency analyses), and reviewed and analyzed all of the underlying source documents behind those analyses.  Mesirow then prepared a rebuttal memorandum regarding the FTI and Blackstone presentations for use by the Examiner's financial advisors.  Mesirow also reviewed and analyzed relevant portions of the submissions of the Debtors, JPMorgan and Law Debenture to the extent they dealt with solvency issues.  Mesirow further had to update and quality check all of the data and financial conclusions in the initial Mesirow solvency report submitted to the Examiner on May 24, 2010.

52.    Mr. Atkinson and others from Mesirow traveled to Chicago on June 10, 2010 and met with the Examiner's financial advisors for six hours.  At the conclusion of the meeting, LECG repeatedly thanked Mesirow for the presentation, which was described by LECG as being the highest "value added" of any of the financial advisor meetings.  See Exhibit M (BREX0006710).

53.    At the same time that Mesirow was preparing specifically for the meeting requested by the Examiner's professionals, Mr. Atkinson and other Mesirow professionals were providing significant assistance to Brown Rudnick in responding to the various requests for additional information made by Klee Tuchin and Saul Ewing discussed in ¶¶ 28-46 above.  This work included reviewing projections, reports and data, performing analyses and preparing schedules and reports, as well as regular communications with Brown Rudnick.  The additional work performed by Mesirow enabled Brown Rudnick's responses to the requests by the

Examiner's professionals to be more fulsome and helpful to the Examiner's professionals in conducting the examinations.  Brown Rudnick incurred $47,584.00 in fees and spent 65.8 hours in communicating with and corresponding with Mesirow in connection with Mesirow's work as financial advisor during the examination process.

**Morton, Hoffman and Cypress**

54.    Although Wilmington Trust's other experts were not as actively involved in the examination process as were Brown Rudnick and Mesirow, the participation of Wilmington Trust's newspaper valuation consultant, Morton; its broadcasting valuation consultant, Hoffman; and its internet consultant, Cypress, also provided substantial assistance to the examination process.  Those experts provided information to Brown Rudnick that was useful in preparing questions and topics to provide to the Examiner's counsel with respect to their preparation for interviews of JPMorgan, Citibank, Merrill Lynch and others described above.  Similarly, their participation was useful to Mesirow in analyzing the reasonableness of the projections performed by VRC during the time of the LBO and in Mesirow's preparation of reasonable projections for its own solvency analysis which it gave to the Examiner and LECG.  Indeed, none of the other participants in the examination process, including the Examiner, had the benefit of information provided by experts in each separate field, except for the information provided by Morton, Hoffman and Cypress.

55.    Moreover, at the June 10, 2010 meeting with LECG, described above, Morton and Cypress made presentations to LECG concerning the lack of reasonableness in the Debtors' projections during the LBO.  LECG described those presentations as "eye openers."  Exhibit M (BREX0006710).

**The Benesch Firm**

56.     During the time Wilmington Trust was seeking the appointment of an examiner, and during the examination, its local counsel was the Benesch firm.  Benesch assisted Brown Rudnick in preparing the Examiner Motion and the Motion to Extend Time and in preparing for those hearings and attending the hearings.  Benesch also provided the customary and necessary services as local counsel during the time of the examination.

**There Was No Duplication**

57.     I have reviewed the Reorganized Debtors' objection to Wilmington Trust's Substantial Contribution Application.  While Wilmington Trust's Reply addresses the legal issues raised in such Objection, to the extent the Reorganized Debtors raised, as a factual matter, alleged duplication by Wilmington Trust, I have personal knowledge that such allegation is inaccurate.  As the litigation partner principally responsible for preparation of the Examiner Motion and for the conduct of the examination thereafter, I can unequivocally state that every effort was made to avoid duplication with other parties, and we did so.

58.     First, I and the other Brown Rudnick attorneys involved in seeking the appointment of the Examiner and in the examination did not believe that, since the PHONES were an out of the money, deeply subordinated constituency, Wilmington Trust should let the Committee and Senior Noteholders do the investigating for them.  Any such argument assumes that the LBO-lenders had non-avoidable debt and that the PHONES were subordinated to all other debt.  Wilmington Trust believed that the LBO-lenders debt was avoidable and that the PHONES were not subordinated to recoveries from chapter 5 avoidance claims (a position with which the Court initially agreed until the Reconsideration Motion) and otherwise.  Additionally, Wilmington Trust had no reason to believe that the Committee and/or Senior Noteholders would

advocate for the PHONES, and Wilmington Trust concluded that it was prudent to seek the appointment of an examiner and to actively participate in the investigation.

59.     Moreover, as noted above, during the initial preparation of the Examiner Motion, Brown Rudnick was denied access to the Depository and had to prepare the initial Examiner Motion from its review of publicly available information.  Thereafter, when given access to the Depository during the pendency of the Examiner Motion, Brown Rudnick's attorneys had to review hundreds of thousands of documents in short order to prepare for the hearing on the Examiner Motion.  Many of those documents were first produced after the Committee had already started negotiating the settlement.

60.     Wilmington Trust was the only party, who, in early 2010, moved for the appointment of an examiner.  Thus, the actions of its professionals in seeking such examiner could not have been duplicative of the services rendered by the Committee, which opposed the appointment of an examiner in 2010, or Law Debenture.

61.     Brown Rudnick also did not duplicate the efforts of other parties in preparing its initial submission and its reply submission to the Examiner.  As noted in the Application, the Examiner sought an "adversarial process to flush out the facts and issues in dispute and the relative strengths and weaknesses of the positions of the parties."  D.I. 4261 (Examiner Work Plan, ¶ 16).  Indeed, in its meetings with the Examiner and other communications, the Examiner made clear that he sought the input of Wilmington Trust.  In fact, as noted in the May 10, 2010 letter, the Examiner enlarged the page limits for Wilmington Trust's initial submission to 100 pages as compared to 75 pages for the Debtors and Official Committee, and 50 pages for JPMorgan.  In so doing, and in otherwise soliciting Wilmington Trust's views on a host of other

issues, the Examiner clearly indicated that he did not believe Wilmington Trust's efforts were duplicative of other parties.

62.     Although the Committee and Law Debenture participated in the examination process, their ultimate stakes in the Examiner's conclusions were different than that of Wilmington Trust, as the Committee and Law Debenture had already settled the claims that the Examiner was reviewing and, in certain circumstances, agreed to support the release of other claims for no additional consideration.  [D.I. 4008].  Moreover, when Brown Rudnick prepared those submissions, we had no way of knowing what the Committee or Law Debenture would advocate, or the force of their advocacy, since they had agreed to the settlement in the first Plan. Therefore, when supervising Brown Rudnick attorneys in their preparation of factual and legal arguments, I, and the other Brown Rudnick attorneys involved, believed that Wilmington Trust had to file its own brief and reply brief without regard to what other parties might argue.  At no time during the examination, or even up until the time when Brown Rudnick filed its Application, did the Examiner, the Debtors or any other party tell Brown Rudnick that its efforts were duplicative and that it should rely on other parties to make presentations to the Examiner.

63.     Further, as noted above, the Examiner regularly requested additional information from me and other Brown Rudnick attorneys.  We provided that additional briefing and factual analysis to the Examiner without knowing what requests, if any, were made of other parties.  The Examiner and his counsel would not have asked for such additional information if it was duplicative.

64.     Moreover, Mesirow was the only financial advisor that provided a solvency analysis to the Examiner, and the Examiner's financial advisor noted that Mesirow provided the highest "value added" of any of the financial advisors.  And, the presentations by Morton,

Cypress and Hoffman were, to the best of my knowledge, the only presentations made to the Examiner by industry experts concerning the reasonableness of Tribune's projections.

65.    As noted in the Application, the Examiner's Report adopted substantial portions of the factual and legal submissions made to the Examiner by Brown Rudnick and Wilmington Trust's other professionals.  See Application ¶¶ 13, 34.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 19, 2013

Martin A. Siegel

Martin S. Siegel

21