## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Reorganized Debtors. | Jointly Administered |
| | **Status Conference:  April 24, 2013, at 10:00 a.m.** |
| | **Related to D.I. 13338 and 13397** |

## REORGANIZED DEBTORS' REPLY IN SUPPORT OF OBJECTION TO CLASS 1F OTHER PARENT CLAIM ASSERTED BY WILMINGTON TRUST COMPANY

---

[1] The Reorganized Debtors, or successors-in-interest to the Reorganized Debtors, in these chapter 11 cases, along with the last four digits of each entity's federal tax identification number, are: Tribune Company (0355); California Community News, LLC (5306); Chicago Tribune Company, LLC (3437); Chicagoland Publishing Company, LLC (3237); Chicagoland Television News, LLC (1352); forsalebyowner.com, LLC (4276); ForSaleByOwner.com Referral Services LLC (9205); Hoy Publications, LLC (2352); Internet Foreclosure Service, LLC (6550); KDAF, LLC (6969); KIAH, LLC (4014); KPLR, Inc. (7943); KRCW, LLC (1772); KSWB, LLC (7035); KTLA, LLC (3404); KTXL, LLC (3844); KWGN, LLC (5347); Los Angeles Times Communications LLC (1324); Magic T Music Publishing Company, LLC (6522); NBBF, LLC (0893); Oak Brook Productions, LLC (2598); Orlando Sentinel Communications Company, LLC (3775); Sun-Sentinel Company, LLC (2684); The Baltimore Sun Company, LLC (6880); The Daily Press, LLC (9368); The Hartford Courant Company, LLC (3490); The Morning Call, LLC (7560); TMS News and Features, LLC (2931); Tower Distribution Company, LLC (9066); Towering T Music Publishing Company, LLC (2470); Tribune 365, LLC (7847); Tribune Broadcasting Company, LLC (2569); Tribune Broadcasting Hartford, LLC (1268); Tribune Broadcasting Indianapolis, LLC (6434); Tribune Broadcasting Seattle, LLC (2975); Tribune CNLBC, LLC (0347); Tribune Direct Marking, LLC (1479); Tribune Entertainment Company, LLC (6232); Tribune Investments, LLC (6362); Tribune Media Services, LLC (1080); Tribune Media Services London, LLC (6079); Tribune ND, LLC (4926); Tribune Publishing Company, LLC (9720); Tribune Television New Orleans, Inc. (4055); Tribune Washington Bureau, LLC (1088); WDCW, LLC (8300); WGN Continental Broadcasting Company, LLC (9530); WPHL, LLC (6896); WPIX, LLC (0191); WPMT, LLC (7040); WSFL, LLC (5256); WXMI, LLC (3068).  The corporate headquarters and the mailing address for each entity listed above is 435 North Michigan Avenue, Chicago, Illinois 60611.

# TABLE OF CONTENTS

Page

I.    PRELIMINARY STATEMENT ...................................................................... 1

II.   WTC IS NOT ENTITLED TO A CONTRACTUAL
      UNSECURED CLAIM FOR POSTPETITION FEES ................................. 4

III.  WTC IS NOT ENTITLED TO A CLAIM FOR FEES
      IT HAS NOT PAID AND FOR WHICH IT IS NOT LIABLE ................... 8

IV.   THE VAST MAJORITY OF THE FEE CLAIM IS UNREASONABLE ............... 14

      A.    The Inadequate Time Keeping Of WTC's Professionals
            Hinders Analysis And Compels Reduction Of The Fee Claim ..................... 16

      B.    Both Illinois Law And Bankruptcy Law Supply
            The Governing Standard Of Reasonableness ................................. 18

      C.    Illinois Law Is Consistent With The Bankruptcy Code
            Regarding The Standards For Reasonableness Of A Claimed Fee ............. 21

      D.    The Amount That Holders Of The PHONES Notes Were Willing
            To Pay Is Directly Relevant To The Reasonableness Of The Fee Claim ...... 23

      E.    The Fee Claim Is Unreasonable When Viewed "Through
            The Prism Of What WTC Knew At The Time It Acted." ............................ 25

      F.    The "Result Achieved" (Or Lack Thereof) Demonstrates
            That The Fee Claim Is Not Reasonable .......................................... 28

      G.    Neither The Fees Incurred By Other Parties Nor The Dividend
            On Other Parent Claims Make WTC's Fee Claim Reasonable ................... 29

      H.    WTC's Claim For Mesirow's Fees Is
            Neither Reimbursable Nor Reasonable .......................................... 31

V.    THE REORGANIZED DEBTORS ARE NOT ESTOPPED
      FROM OBJECTING TO THE WTC FEE CLAIM ................................. 33

VI.   CONCLUSION ........................................................................... 36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apple Corps Ltd. v. Int'l Collectors Soc'y*, 25 F. Supp. 2d 480 (D.N.J. 1998) ........................... 23

*Balcor Real Estate Holdings, Inc. v. Walentas-Phoenix Corp.*,
    73 F.3d 150 (7th Cir. 1996) ................................................................................. 22, 25

*In re Electric Mach. Enters.*, 371 B.R. 549 (Bankr. M.D. Fla. 2007) ....................................... 5, 7

*Fishman v. Fox River Commons Shopping Ctr., LLC*,
    2012 Ill. App. Unpub. LEXIS 3057 (Ill. App. Ct. 2012) ......................................... 21-22

*Global Indus. Techs., Inc. v. J.P. Morgan Trust Co (In re Global Indus. Techs., Inc.)*,
    344 B.R. 382 (Bankr. W.D. Pa. 2006) ................................................................... 8

*Harris Trust & Sav. Bank v. American Nat'l Bank & Trust Co.*,
    230 Ill. App. 3d 591 (Ill. App. Ct. 1992) .............................................................. 21, 22

*J.B. Esker & Sons, Inc. v Cle-Pa's P'Ship*, 325 Ill. App. 3d 276 (Ill. App. Ct. 2001) ............... 23

*Kaiser v. MEPC Am. Props., Inc.*, 164 Ill. App. 3d 978 (Ill. App. Ct. 1987) ............................. 17

*In re Kroh Bros. Dev. Co.*, 105 B.R. 515 (Bankr. W.D. Mo. 1989) ........................................... 20

*Medcom Holding Co. v. Baxter Travenol Labs.*, Inc., 200 F.3d 518 (7th Cir. 1999) ................. 22

*Montrose Med. Grp. Participating Savs. Plan v. Bulger*, 243 F.3d 773 (3d Cir. 2001) ......... 35-36

*Mountbatten Sur. Co. v. Szabo Contr., Inc.*, 349 Ill. App. 3d 857 (Ill. App. Ct. 2004) ............. 21

*In re Old Colony, LLC*, 476 B.R. 1 (Bankr. D. Mass. 2012) ..................................................... 5

*Quick v. NLRB*, 245 F.3d 231 (3d Cir. 2001) ....................................................................... 10

*SNTL Corp. v. Centre Ins. Co. (In re SNTL Corp.)*, 571 F.3d 826 (9th Cir. 2009) ............... 19-20

*Stradley, Ronon, Stevens & Young, LLP v. Sovereign Bank, N.A.*,
    No. 12-2466, 2013 WL 173022 (E.D. Pa. Jan. 15, 2013) ....................................... 36

*Travelers Cas. & Sur. Co. v. Pacific Gas & Electric Co.*, 549 U.S. 443 (2007) ........... 4-6, 18-19

*In re WCS Enters.*, 381 B.R. 206 (Bankr. E.D. Va. 2007) ................................................ 5, 6, 7

*In re Worldwide Direct, Inc.*, 334 B.R. 112 (Bankr. D. Del. 2005) ......................................... 23

**Page(s)**

**Statutes**

11 U.S.C. § 330(a) ................................................................................................ 19, 22

11 U.S.C. § 502(b)(4) ................................................................................................ 19

11 U.S.C. § 503(b)(4) ................................................................................................ 19

11 U.S.C. § 506(b) ........................................................................................6-7, 19, 20

11 U.S.C. § 523(d) ................................................................................................ 19

The Reorganized Debtors hereby reply to WTC's Opposition to the *Reorganized Debtors' Objection To Class 1F Other Parent Claim Asserted By Wilmington Trust Company* [D.I. 13338] (the "Objection").[1]

## I.    PRELIMINARY STATEMENT

WTC's Fee Claim and Opposition raise three related and fundamental questions that have wide-ranging implications not only for the Reorganized Debtors but also for large chapter 11 practice in this District generally:

- First, may an unsecured indenture trustee (like WTC) be allowed a claim for ***postpetition*** attorneys' fees arising solely under a ***prepetition*** contract (like the PHONES Notes Indenture), without regard for the Bankruptcy Code's specific rules respecting allowance of claims in favor of oversecured creditors and creditors who make a substantial contribution in a case?

- Second, if so, may the indenture trustee be allowed a claim for fees purportedly "incurred" by lawyers who negotiate for payment upon a contingency that has not occurred and is unlikely to ever occur (like Brown Rudnick's contingency fee based upon payment on the PHONES Notes), where the indenture trustee is not otherwise liable for a dollar of those fees?

- Third, if so, may the indenture trustee be allowed a claim for massive fees (like WTC's $30 million claim) generated without regard for the economics of the situation, which in this case involved a subordinated, out-of-the-money position held by bondholders who were not willing to risk more than $3 million of their own funds in pursuit of a recovery?

The answer to each of these questions is no.

With respect to the first question, the better-reasoned authority – including cases decided after *Travelers* – concludes that an unsecured creditor may not be allowed a claim for postpetition fees arising under a prepetition contract. Contrary to WTC's assertion, *Travelers* "express[ed] no opinion with regard to whether . . . principles of bankruptcy law might provide an independent basis for disallowing [an unsecured contractual] claim for attorneys' fees" and is

---

[1] Capitalized terms not defined in this Reply have the meanings given to them in the Objection. WTC's Opposition [D.I. 13397] is cited as "WTC Opp."

not dispositive.  Rather, as the majority rule holds, "principles of bankruptcy law" mandate

disallowance because Congress expressly provided for the allowance of contractual fee claims

only for *oversecured* creditors and creditors who make a substantial contribution in a case, and

because the Bankruptcy Code's fundamental "concept of parity of distribution among similarly

situated creditors" would "evaporate" (to use Judge Fitzgerald's word) in the event that

otherwise similarly-situated unsecured creditors could recover postpetition fees.

With respect to the second question, common sense dictates that a creditor may not be

"reimbursed" from or "indemnified" by the estate on account of fees that the creditor has not

paid and for which the creditor is not liable.  Here, due to the economics of the situation (the

subordinated, out-of-the-money nature of the PHONES Notes), WTC's counsel (Brown

Rudnick) negotiated to be paid a contingency fee of "10% of all recoveries obtained by [WTC]

or the holders on account of the PHONES, with no ceiling or maximum."  Brown Rudnick thus

assumed the substantial risk of non-payment in exchange for the potential of an unlimited fee

"with no ceiling or maximum."  Because the contingency of payment on the PHONES Notes has

not occurred, WTC should not now be allowed an "indemnity" claim for Brown Rudnick's fees

or for any amount in excess of the $3 million advanced by holders of the PHONES Notes for

payment of WTC's professionals.

Finally, with respect to the third question, WTC is limited in any event to a claim for

*reasonable* fees and expenses.  This is true under bankruptcy law, Illinois law, the prudent

person standard, and the express terms of the PHONES Notes Indenture.  Reasonable fees are

limited to those that an owner of the investment would be willing to expend in light of the

economics of the situation, taking into consideration the fact of subordination, the unlikely

prospect of recovery, and the similar objectives of other in-the-money constituents with incentives to pay for whatever work needed to be done.

Under this standard, the amounts claimed by WTC – which exceed by a factor of 10 the amounts that holders of the PHONES Notes were willing to invest in pursuing their claims – are clearly excessive and unreasonable. Among other things, WTC makes little to no effort to explain or justify the claimed *$7 million* in attorneys' fees for duplicating the work of the Creditors' Committee, the Senior Notes Indenture Trustees, and Centerbridge in investigating the LBO and advancing arguments before the Examiner, the claimed *$10 million* in attorneys' fees for duplicating the work of the Senior Notes Indenture Trustees and Aurelius in prosecuting the Noteholder Plan and opposing the Plan, or the claimed *$7.5 million* in Mesirow fees for duplicating the work of the financial advisors employed by the Creditors' Committee and the Examiner and then advancing the interests of Aurelius and the Senior Notes Indenture Trustees in connection with the Noteholder Plan.

In the Objection, the Reorganized Debtors grouped WTC's alleged fees into ten categories, provided a detailed analysis of the unreasonableness of each category, and made a recommendation as to a reasonable amount of fees under the circumstances. Tellingly, WTC fails to confront that analysis in its Opposition, seeking instead to justify its claim on the broadly-stated ground that its fees are smaller than amounts incurred by other, differently-situated parties, and then conceding that a "typical" reduction of 10%-20% of the amount of its claim would be appropriate in light of the acknowledged defects in WTC's inadequate time records. This does not remotely satisfy the test of reasonableness – whether viewed under bankruptcy law, Illinois law, or the prudent person standard – particularly given the fact that

WTC's responsibilities and prospects for recovery differed markedly from those parties to which it seeks to compare itself.

For reasons set forth here and in the Objection, the Reorganized Debtors submit that the Court should disallow WTC's Fee Claim in its entirety, and that in no event should the Fee Claim exceed $5 million.

## II.    WTC IS NOT ENTITLED TO A CONTRACTUAL UNSECURED CLAIM FOR POSTPETITION FEES

There is no dispute that, before the Supreme Court's *Travelers* decision in 2007, the "majority rule" categorically disallowed unsecured claims for postpetition fees arising under a prepetition contract.[2]  Nor is there a dispute that the majority rule had been adopted by Judge Walsh in this District (*Loewen Group*) and Judge Fitzgerald in the Western District of Pennsylvania (*JPMorgan* and *Tanglewood*) in three published opinions.

WTC, however, asserts that *Travelers* "changed the so-called 'majority rule.'"[3]  WTC is wrong.  In *Travelers*, the Supreme Court merely overruled *Fobian* and expressly declined to consider whether unsecured claims for prepetition fees are allowable at all:  "we express no opinion with regard to whether, following the demise of the *Fobian* rule, other principles of bankruptcy law might provide an independent basis for disallowing Travelers' claim for attorney's fees."  *Travelers Cas. & Sur. Co. v. Pacific Gas & Electric Co.*, 549 U.S. 443, 456 (2007).  In particular, the Court declined to address the argument "that § 506(b) categorically disallows unsecured claims for contractual attorney's fees," *id.* at 454, and "that Travelers' claim should be denied based on the theory that the fees at issue were incurred in connection with

---

[2]    *See* Objection at 11-15.

[3]    *See* WTC Opp. at 10.

activities that were not reasonably necessary to preserve Travelers' rights and, alternatively, were not authorized by Travelers' contract with [the debtor]," *id.* at 455 n.5.[4]

Undaunted, WTC nevertheless asserts that "*Travelers* leads ineluctably to the conclusion that post-petition fees and expenses are properly allowable under § 502(b)."[5] Here again, WTC is wrong. This is demonstrated by the *Old Colony, WCS Enterprises* and *Electric Machinery* decisions issued *after Travelers* was published, each of which applied the majority rule and disallowed an unsecured claim for postpetition fees arising under a prepetition contract.[6]

Moreover, *Travelers* does not hold, as WTC now asserts, that a claim for postpetition fees "must be allowed unless" it falls within the scope of section 502(b)(1) of the Bankruptcy Code.[7] In fact, *Travelers* stands only for the unremarkable proposition "that an otherwise enforceable contract allocating attorney's fees (*i.e.*, one that is enforceable under substantive, nonbankruptcy law) is allowable in bankruptcy *except where the Bankruptcy Code provides otherwise*." *Id.* at 448 (emphasis added); *see id.* at 450 ("[c]reditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation,

---

[4]    Notwithstanding this clear reservation of the issue, WTC chides the Reorganized Debtors for "[r]emarkably" "relegat[ing]" their discussion of *Travelers* to a single footnote." WTC Opp. at 10. In its own Draft Brief, however, WTC itself never discussed *Travelers* and only cited it in a footnote as a parenthetical to a citation to the *Oakwood Homes* case. *See* WTC Draft Brief at 15 n.56.

[5]    WTC Opp. at 10.

[6]    *See In re Old Colony, LLC*, 476 B.R. 1, 31-32 (Bankr. D. Mass. 2012) ("where the bankruptcy estate is unable to pay all other creditors in full, postpetition attorneys' fees are not allowable as part of an unsecured claim even where provided for in the underlying contract"); *In re WCS Enters.*, 381 B.R. 206, 209 (Bankr. E.D. Va. 2007) ("The Supreme Court, however, expressly declined to reach the issue of whether *Travelers*, as an unsecured creditor, could recover post-petition attorney's fees . . . ."); *In re Electric Mach. Enters.*, 371 B.R. 549, 552 (Bankr. M.D. Fla. 2007) ("[t]he Court adopts the majority rule").

[7]    WTC Opp. at 11.

*subject to any qualifying or contrary provisions of the Bankruptcy Code*") (quoting *Raleigh v. Illinois Dep't of Revenue*, 530 U.S. 15, 20 (2000)) (emphasis added).

As cogently explained in *WCS Enterprises*, section 506(b) of the Code "provides otherwise" with respect to postpetition fee claims:

> [N]othing in Section 502 of the Bankruptcy Code expressly precludes allowance of a claim for attorneys fees otherwise due by contract simply because the attorney's services were performed post-petition, so long as the event giving rise to the liability occurred prepetition.
>
> Section 502, however, cannot be read in isolation, and in particular must be read in conjunction with Section 506(b) of the Bankruptcy Code . . . . [Under Section 506(b)], a *secured* creditor can recover post-petition interest and attorneys fees otherwise provided by contract or state law *only* to the extent it has collateral worth more than the amount of its claim. By implication, an under-secured creditor (one whose collateral is worth less than the amount of its claim) is *not* entitled to post-petition attorneys fees. And if an under-secured creditor is not entitled to post-petition fees, it necessarily follows that a creditor whose claim is *totally* unsecured is not entitled to such fees. Section 506(b), in short, operates as a gloss on Section 502(b) to disallow contractual claims for post-petition attorney's fees.

*WCS Enters.*, 381 B.R. at 208-09 (emphasis in original) (citations omitted).

To be sure, as WTC observes, *Ogle*, *SNTL*, and various trial court decisions reach a different conclusion. But the split in post-*Travelers* authority disproves WTC's assertion that *Travelers* "ineluctably" leads to any conclusion or otherwise is dispositive. Realizing this, WTC asserts that section 506(b) is irrelevant because it "is not concerned with the question of claim *allowance*. It is concerned with the determination of secured status and what may be included in a secured claim."[8] Section 506(b), however, absolutely is "concerned with the question of claim allowance." The statutory text specifies that, "[t]o the extent that an allowed secured claim is

---

[8]    WTC Opp. at 12-13 (quoting *In re Agway, Inc.*, No. 02-65872, 2008 WL 2827439, at *6 (Bankr. N.D.N.Y. July 18, 2008) (emphasis in original)).

secured by property the value of which . . . is greater than the amount of such claim, ***there shall be allowed*** to the holder of such claim . . . any reasonable fees, costs, or charges provided for under the agreement . . . under which such claim arose." 11 U.S.C. § 506(b) (emphasis added). Thus:

> The emphasized language of section 506(b) demonstrates the congressional intent to create an exception to the general rule that claims are to be determined as of the petition date, exclusive of post-petition interest, attorneys' fees, and other charges. ***The use of the words "to the extent" a claim is oversecured, and "there shall be allowed" interest and fees, mandates the conclusion that in all other circumstances, post-petition interest, attorneys' fees, and charges shall not be allowed***. . . . [I]f Congress intended for unsecured creditors to receive post-petition attorneys' fees, then it would have done so explicitly by authorizing unsecured creditors to collect fees under section 506(b).

*Electric Mach.*, 371 B.R. at 551 (emphasis added).

Moreover, sections 503(b)(3) and (4) of the Code expressly contemplate an award of postpetition fees in favor of an unsecured creditor, but only where the creditor makes a substantial contribution in a case. Wholesale allowance of claims for postpetition fees in favor of any and all creditors with prepetition contractual fee clauses effectively would render sections 503(b)(3) and (4) meaningless. *See WCS Enters.*, 381 B.R. at 210 (noting that allowance of all claims for postpetition fees would conflict the policy underlying sections 503(b)(3) and (4) "that an unsecured creditor's contract claim for post-petition legal fees could only be allowed 'for services which were beneficial to the estate'") (quoting *Randolph v. Scruggs*, 190 U.S. 533, 539 (1903)).

WTC's advocacy for "dual tracks for claim treatment"[9] makes no sense, and serves only to highlight how the allowance of postpetition fee claims in favor of unsecured creditors who do not make a substantial contribution would run "contrary to the general policy favoring equality

---

[9]    WTC Opp. at 18.

of distribution in bankruptcy." *Id.* at 210.  Indeed, as Judge Fitzgerald held in *JPMorgan*, the result urged by WTC would conflict violently with the most basic of bankruptcy principles:

> The concept of parity of distribution among similarly situated creditors would evaporate because some unsecured creditors would be "more equal" than others by virtue of the ability to have the claim continue to grow postpetition.  It is difficult to envision anything more at odds with the spirit of the Bankruptcy Code's scheme for payment to creditors.

*Global Indus. Techs., Inc. v. J.P. Morgan Trust Co (In re Global Indus. Techs., Inc.)*, 344 B.R. 382, 385 (Bankr. W.D. Pa. 2006).

As a consequence, the entirety of the Fee Claim should be disallowed.

## III.    WTC IS NOT ENTITLED TO A CLAIM FOR FEES IT HAS NOT PAID AND FOR WHICH IT IS NOT LIABLE

WTC concedes that the Fee Claim arises solely under the PHONES Notes Indenture. Section 6.07(2) of the PHONES Notes Indenture provides for WTC to be reimbursed "for all reasonable expenses, disbursements and advances incurred or made by the Trustee in accordance with any provision of this Indenture (including the reasonable compensation and the expenses and disbursements of its agents and counsel)."[10]  The plain language of this provision limits WTC to a claim for reimbursement of "expenses, disbursements and advances incurred or made" by it.  Accordingly, as explained in the Objection, WTC cannot now assert a claim for amounts in excess of the $3 million that it paid (via contributions from holders of the PHONES Notes) to its professionals, as WTC is not liable for any such additional amounts.[11]

---

[10]    PHONES Notes Indenture § 6.07(2).  (A copy of the PHONES Indenture is included as Exhibit A to the Johnston Declaration in support of the Objection).

[11]    *See* Objection at 16-19.

WTC tries to avoid the operation of Section 6.07(2) by pointing to Sections 5.03 and 5.04 of the PHONES Notes Indenture.[12]  But those provisions do nothing to create a right of reimbursement or indemnity in respect of fees for which WTC is not liable.  Section 5.03, for example, provides for Tribune to pay to WTC an "amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel."[13]  To start, this provision involves only "the costs and expenses of collection" on the PHONES Notes.  The millions of dollars in fees that WTC claims for activities like investigation of the LBO, interaction with the Examiner, prosecution of the Noteholder Plan, and objection to the various iterations of the Plan go well beyond any plausible interpretation of the term "collection".

Setting that aside, Section 5.03 is perfectly consistent with Section 6.07(2) – it states that Tribune "will, upon demand of the Trustee [WTC], pay to *it* . . . such further amount as shall be sufficient to cover the costs and expenses of collection."[14]  In other words, Section 5.03 provides for Tribune to reimburse *WTC* for *its* costs and expenses of collection.  It does not require Tribune to "cover" alleged fees and expenses for which WTC is not liable.

This point is driven home by Section 5.04 of the PHONES Notes Indenture, the other provision now invoked by WTC.  Section 5.04 merely empowers WTC, in the event of a

---

[12]  *See* WTC Opp. at 26-27.  WTC spends pages knocking down a straw man, alleging that the Reorganized Debtors had "conten[ded] that WTC's sole contractual basis for seeking reimbursement is § 6.07 of the Indenture." *Id.* at 26.  In fact, the Reorganized Debtors never made such an allegation.  Rather, the Reorganized Debtors observed that Section 1.1.101 of the Plan specifically contemplated that WTC would assert a claim "for fees and expenses arising under Section 6.07 of the PHONES Notes Indenture" and proceeded to address that provision of the Indenture that WTC previously had invoked and upon which WTC previously had relied.

[13]  PHONES Notes Indenture § 5.03.

[14]  PHONES Notes Indenture § 5.03 (emphasis added).

bankruptcy or receivership, "to file and prove a claim . . . as may be necessary or advisable in order to have the claims of the *Trustee* (including any claim for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel) . . . allowed in such judicial proceeding."[15] Section 5.04 further provides for the bankruptcy trustee or receiver "to pay *to the Trustee* any amount *due it* for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts *due the Trustee* under Section 6.07."[16] Here again, WTC may assert a claim for amounts "due to it", but may not seek to be reimbursed for amounts for which it is not liable.

As a consequence, WTC's bald assertion that "[n]othing in §§ 5.03 or 5.04 requires the Trustee to pay first or be bound legally to pay before seeking reimbursement" is both textually inaccurate – as it conflicts with the plain language of the PHONES Notes Indenture – and grammatically nonsensical – as, by definition, "'[r]eimburse' means 'to pay back to someone.'" *Quick v. NLRB*, 245 F.3d 231, 256 (3d Cir. 2001) (quoting WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 993 (1990)). There can be no "reimbursement" or "cover" or "indemnity" of amounts that WTC has not paid and is not "bound legally to pay."

Two examples from the Fee Claim illustrate why this is the only sensible result. *First*, WTC asserts a claim for nearly $22 million in alleged fees of Brown Rudnick. However, because holders of the PHONES Notes were unwilling to pay for Brown Rudnick's hourly fees, Brown Rudnick instead negotiated to be paid a contingency fee of "10% of all recoveries obtained by [WTC] or the holders on account of the PHONES, with no ceiling or maximum."[17] In fact, as the prospect for payment on the PHONES Notes became dimmer during the

---

[15] PHONES Notes Indenture § 5.04(1) (emphasis added).

[16] PHONES Notes Indenture § 5.04 (emphasis added).

[17] Johnston Decl., Ex. H. [WTC1F06137].

Chapter 11 Cases, Brown Rudnick renegotiated its fee, increasing it from a fee of 10% of the first $50 million in recoveries and 5% of recoveries over $50 million, up to an aggregate fee of $15 million,[18] to the 10% with "no ceiling or maximum" fee described above.  In other words, Brown Rudnick assumed the risk of non-payment in exchange for the potential of an unlimited fee "with no ceiling or maximum."

The contingency on which Brown Rudnick's fee was based – payment on the PHONES Notes – has not occurred and is unlikely to ever occur.  Yet, WTC now asserts a claim for nearly $22 million in Brown Rudnick's *hourly* fees.  In other words, despite having bet and lost on a contingency that has not yet come to pass, Brown Rudnick (through WTC) now wants to have its cake and eat it too by collecting on a claim for the hourly fees that it allegedly would have charged a client for whom it was not working on a contingency basis (assuming that client imposed no discipline whatsoever in respect of the massive teams of lawyers deployed by Brown Rudnick during the course of the Chapter 11 Cases).

WTC attempts to justify that claim by pointing to the Brown Rudnick engagement agreement, which provides for Brown Rudnick to receive *the higher of* the unlimited contingency fee and its hourly fees.[19]  That provision, however, is a meaningless sham.  Had holders of the PHONES Notes deemed it prudent to pay for Brown Rudnick's services, they would have negotiated for a reasonable hourly fee (or, alternatively, a straight contingency fee).  WTC cites nothing for the proposition that out-of-the-money bondholders and their indenture

---

[18]  *Wilmington Trust Company's Application For Allowance Of Claim Under 11 U.S.C. §§ 503(b)(3)(D) And 503(b)(4) As A Result Of Wilmington Trust Company's Motion Requesting The Appointment Of An Examiner And Wilmington Trust Company's Participation In Examiner's Investigation And Granting Waiver Of Compliance With Del. Bankr. L.R. 2016-2(d) In Accordance With Del. Bankr. L.R. 2016-2(g)* [D.I. 13272] ("WTC Substantial Contribution App."), Ex. I.  [WTC1F06094].

[19]  WTC Opp. at 30-31.

trustee can put the bankruptcy estate in a "heads I win, tails you lose" position whereby Brown Rudnick would obtain an unlimited contingency fee if success were achieved *but* be paid its full hourly fees in the event of failure.

Indeed, Brown Rudnick's purported entitlement to an hourly fee represents nothing more than an effort by WTC and holders of the PHONES Notes to play with other people's money. The agreement to a patently-unreasonable fee provision providing for accrual of hourly fees for which neither WTC nor the bondholders were liable – and for which there existed no possible means of recovery absent occurrence of the contingency that would trigger the unlimited contingency fee – does nothing to entitle WTC to a claim for Brown Rudnick's purported hourly fees. Rather, WTC's attempt to game the system in this way merely proves the wisdom of the rule requiring a creditor to actually have paid or become liable for the fees for which it asserts a claim. Without such a rule, the estate would be subject to overreaching and mischief by parties with no economic stake in the fee arrangements to which they nominally "agree".

*Second*, WTC asserts a claim for more than $7.5 million in alleged fees of Mesirow, including every penny of the $4.9 million in Mesirow fees relating to its service as an expert in support of the Noteholder Plan and the objections lodged by Aurelius and the Senior Notes Indenture Trustees in respect of confirmation of the Plan. Aurelius paid for all $4.9 million of Mesirow's fees relating to the Noteholder Plan and a substantial portion of the remainder. WTC was not liable for any of them. Yet WTC now asserts a claim for the entirety of Mesirow's fee, without even attempting to apportion the fee between whatever minuscule proportion of services

Mesirow purportedly rendered on behalf of WTC and the vast majority of services Mesirow rendered on behalf of Aurelius and the Senior Notes Indenture Trustees.[20]

Here again, WTC's attempt to force the estate to pay for fees incurred by a professional hired to advance the interests of other constituents in the case demonstrates why a creditor must actually pay or become liable for the fees for which it asserts a claim. Without that rule, out-of-the-money parties like WTC would be free to "agree" to seek "reimbursement" for fees paid by other stakeholders in respect of services rendered to those other stakeholders, merely because the creditor "jointly hired"[21] the professional (without actually incurring any obligation for the professional's fees).

This logical conclusion hardly "risks impairing the bond market"[22] or runs "contrary to decades-old industry custom."[23]  In fact, it does nothing other than ensure that indenture trustees will continue to do what indenture trustees routinely have done for decades – either arrange for bondholders to indemnify the trustee for the fees of its chosen professionals or hire professionals who are willing to defer payment (for either hourly or contingency fees) until distributions are made on bonds for which the indenture trustee serves.  And it prevents an indenture trustee from the mischief in which WTC is now engaged by trying to recoup hourly fees in respect of an obvious contingency fee arrangement and fees incurred on behalf of other constituents in the bankruptcy case.

---

[20] Notably, Mesirow did not keep time records for any of its work relating to the Noteholder Plan, *see* Objection at 29, making such an allocation impossible.

[21] WTC Opp. at 48 n.19.

[22] WTC Opp. at 7-8.

[23] WTC Opp. at 28.

## IV.    THE VAST MAJORITY OF THE FEE CLAIM IS UNREASONABLE

Finally, even if WTC otherwise is entitled to an unsecured claim for fees it has not paid and for which it is not liable, WTC is limited in any event to a claim for *reasonable* fees and expenses.  This is true under bankruptcy law, Illinois law, the prudent person standard, and the express terms of the PHONES Notes Indenture.[24]  As shown in the Objection and below, reasonable fees are limited to those that an owner of the investment would be willing to expend in light of the economics of the situation, taking into consideration the fact of subordination, the unlikely prospect of recovery, and the similar objectives of other in-the-money constituents with incentives to pay for whatever work needed to be done.  Under this rubric, the $30 million in fees sought by WTC is demonstrably *unreasonable*.

In the Objection, the Reorganized Debtors grouped WTC's alleged fees into ten categories, provided twenty pages of detailed analysis as to the unreasonableness of each category of fees, and made a recommendation as to a reasonable amount of fees under the circumstances.[25]  Amazingly, and tellingly, WTC fails to address or respond to that analysis in its Opposition.  Among other things, WTC –

- •    Fails to justify either the $4.9 million in Mesirow fees for which no time records were submitted or the $2.6 million in Mesirow fees for work that duplicated that of the financial advisors employed by the Creditors' Committee and the Examiner.[26]

- •    Fails to explain how Brown Rudnick possibly could charge $4 million in fees for reviewing documents related to the LBO, deploying battalions of up to 76 timekeepers per month – particularly considering that the Creditors' Committee, the Senior Notes Indenture Trustees and the Examiner were all performing the same investigation at the same time.[27]

---

[24]    Sections 5.03, 5.04 and 6.07 of the PHONES Notes Indenture all expressly limit WTC to a claim for "reasonable" fees and expense.

[25]    *See* Objection at 26-46.

[26]    *See* Objection at 29-31.

[27]    *See* Objection at 31-35.

- Fails to demonstrate the reasonableness of Brown Rudnick's additional $3 million in fees relating to the Examiner, including $2.5 million in fees for briefing to and interaction with the Examiner – largely unnecessary and duplicative efforts given that the Creditors' Committee, the Senior Notes Indenture Trustees, and Centerbridge, all in-the-money stakeholders with ample incentive to advance the best possible arguments to the Examiner, actively participated in the Examiner process and had interests aligned with those of WTC.[28]

- Fails to justify Brown Rudnick's $9.7 million in fees relating to prosecution of the Noteholder Plan and opposition to the various iterations of the Plan or to explain why any such work was necessary given the incentives of economically-motivated in-the-money-stakeholders Aurelius and the Senior Notes Indenture Trustees to perform all of the same tasks even without WTC's involvement.[29]

- Fails to explain Brown Rudnick's fees relating to the Allocation Disputes, which are unreasonable on their face given WTC's unnecessary and wasteful involvement in disputes over the "high/low" PHONES Notes amount and the relative priorities of the Other Parent Claims vis-à-vis the Senior Notes.[30]

- Fails to justify Brown Rudnick's fees relating to WTC's pointless and counterproductive interlocutory appeals of the Court's 2011 Confirmation Opinion and the Allocation Disputes Opinion.[31]

- Fails to justify Brown Rudnick's fees relating to its now-abandoned litigation against Senior Lenders.[32]

- Fails to justify the undocumented and unexplained "Extraordinary Fees" that WTC arbitrarily chose to charge in connection with the Examiner process and the Senior Lender action.[33]

In an effort to avoid scrutiny, WTC instead suggests that a detailed examination of its activity in the Chapter 11 Cases is unnecessary and that the Court should apply a "typical" reduction of 10%-20% of the amount of its claim.[34]  WTC cannot escape examination so easily –

---

[28]  *See* Objection at 35-36.

[29]  *See* Objection at 37-38.

[30]  *See* Objection at 39-40.

[31]  *See* Objection at 40-41.

[32]  *See* Objection at 41-43.

[33]  *See* Objection at 44.

[34]  WTC Opp. at 45-46.

a 10%-20% reduction of a massive, patently-unreasonable fee results in a fee that remains

massive and patently unreasonable.

### A.    The Inadequate Time Keeping Of WTC's Professionals Hinders Analysis And Compels Reduction Of The Fee Claim.

To start, as WTC has now conceded, "Brown Rudnick's time detail contains lumped

descriptions and may not otherwise strictly comply with the Local Rules."[35]  This is an

understatement.  As explained in the Objection, Brown Rudnick's billing is replete with

meaninglessly vague service descriptions covering huge blocks of time.[36]  Indeed, the U.S.

Trustee has described Brown Rudnick's poor timekeeping in this case as "astounding,

particularly for a firm which holds itself out as an experienced bankruptcy professional in

complex cases such as this."[37]  Even worse, Mesirow submitted no time detail whatsoever for

services rendered after August 31, 2010 – a period for which WTC now asserts a claim of nearly

$5 million.

Without disputing the substance of the point, WTC describes the Reorganized Debtors'

concerns with respect to this deficient timekeeping as "potshots" and asserts that vague and

block-billed time records are "insufficient to justify disallowance of the claim under § 502(b)."[38]

This simply misses the point, which is that the vague and meaningless (or missing) time entries

---

[35]  WTC Substantial Contribution App. ¶ 72.

[36]  Objection at 27.

[37]  *United States Trustee's Amended Objection To WTC Substantial Contribution Application* [D.I. 13443] ("UST Obj.") ¶ 57; *see id.* ¶ 14 ("Overwhelmingly, the time entries are vague, and where numerous services were performed by the same person over a number of hours, the entries are lumped."); ¶ 53 (""Notwithstanding its extensive bankruptcy experience, the Brown Rudnick time and expense submissions fail to comply with the applicable rules and guidelines."); ¶ 56 ("The Application is replete with vague or incomplete entries on virtually every page."); ¶ 57 ("Virtually every page of the Brown Rudnick timesheets contains lumped entries.").

[38]  WTC Opp. at 32.

make it impossible to link time incurred and fees billed with specific tasks.  WTC simply does

not dispute Reorganized Debtors' principal contention in this regard – that the time records

provided do not remotely permit a reasonable review of the Fee Claim.  Indeed, the Objection is

entirely consonant on this point with the Illinois law that WTC so strenuously asserts to be the

governing law.[39]  *See Kaiser v. MEPC Am. Props., Inc.*, 164 Ill. App. 3d 978, 988 (Ill. App. Ct.

1987) (affirming trial court's denial of attorneys' fees that were block billed on the ground that

the time records presented "no completely objective manner by which to determine the

reasonableness of the charges").

The deficiencies in (and absence of) WTC's time records are all the more critical due to

the fact that, in the WTC Draft Brief prepared to document and explain the Fee Claim, WTC

provided only very general descriptions of the tasks performed in various self-selected time

periods and failed to provide any estimate or summary of billings by task.  By focusing on time

periods instead of tasks, WTC included billings for numerous activities with little or no relation

to the principal activities it describes.[40]

To be clear, the Reorganized Debtors do *not* seek more detailed descriptions in

expectation that the Court would "evaluate and rule on every entry in [WTC's] application" or

conduct "an hour-by-hour analysis of [the] fee request[]."[41]  Rather, the point is that the absence

of meaningful fee data tied to the specific tasks for which WTC seeks reimbursement impairs the

ability of the Court to *avoid* such a laborious review and rationally determine an appropriate

discount based on the reasonableness of the services and the total hours spent on those tasks.

---

[39]   The issue of governing law is addressed in Section IV.B, below.

[40]   *See* UST Obj. ¶ 55 ("Brown Rudnick's failure to divide its activities into categories makes it difficult to ferret out time that may be unrelated to the subject matter of the Application.").

[41]   WTC Opp. at 33.

WTC concedes that, to the extent it determines that WTC is entitled to allowance of a fee

claim in the first place, the Court should "'trim the fat' on the Fee Claim for any vagueness or

lumping that may exist."[42]   The Reorganized Debtors provided detailed descriptions of WTC's

excesses for precisely that purpose, whereas WTC would have the Court arbitrarily apply a lesser

"percentage cut[]," without any rational connection between the level of the discount and the

amount of unnecessary or excessive time devoted to a task for which reimbursement is sought.  It

is telling that WTC seems to argue that the less information the Court can access, the better.[43]

### B.    Both Illinois Law And Bankruptcy Law Supply The Governing Standard Of Reasonableness.

WTC next asserts that Illinois law provides the only relevant "framework" for

determining whether the Fee Claim is reasonable.[44]   This is not correct.  While the PHONES

Notes Indenture generally is governed by Illinois law, questions regarding the allowance of the

Fee Claim must be determined by reference not only to Illinois law but also to the provisions of

the Bankruptcy Code concerning the allowance of attorneys' fees.

In fact, as noted above, the Supreme Court in *Travelers* reiterated the settled principle

that "[c]reditors' entitlements in bankruptcy arise in the first instance from the underlying

substantive law creating the debtor's obligation, ***subject to any qualifying or contrary provisions***

***of the Bankruptcy Code***."  *Travelers*, 549 U.S. at 450 (quoting *Raleigh*, 530 U.S. at 20)

(emphasis added).  Thus, "when the Code uses the word 'claim' – *i.e.,* a 'right to payment,'

---

[42]  WTC Opp. at 33.

[43]  WTC also seeks to compare its fees to the fee requests submitted by the Senior Lenders and members of the Creditors' Committee.  WTC Opp. at 32.  WTC ignores, however, that those fee requests were part of the negotiated settlement embodied in the Plan, that they were subject to review only under section 1129(a)(4) of the Bankruptcy Code, and that the Plan expressly provided for the fee statements to be submitted "in summary form without individual time records."  Plan §§ 9.1.1, 9.1.3.  WTC's attempted comparison thus is inapt.

[44]  WTC Opp. at 34.

§ 101(5)(A) – it is usually referring to a right to payment recognized under state law . . .

*'[u]nless some federal interest requires a different result.'*" *Id.* at 444 (quoting *Butner v. United States*, 440 U.S. 48, 55 (1979)) (emphasis added).

Like the PHONES Notes Indenture itself, the Bankruptcy Code consistently places express "reasonableness" limitations on the allowance of compensation to professionals that are to be paid from the estate. *See, e.g.*, 11 U.S.C. §§ 330(a)(1)(A) (court may award "reasonable compensation" to a professional employed under 327 or 1103); 502(b)(4) (disallowing claims for services of an insider or attorney of the debtor to the extent the fee "exceeds the reasonable value of such services"); 503(b)(4) (allowing "reasonable compensation" for attorneys' services in connection with a creditor's substantial contribution in a case); 506(b) (permitting an oversecured creditor to recover "reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose"); 523(d) (providing for an award of "a reasonable attorney's fee" for a successful debtor in certain nondischargeability actions).

That overarching construct of "reasonableness" is directly relevant and applicable to the determination of the reasonableness (or lack thereof) of the Fee Claim. In fact, WTC's own marquee authority – the Ninth Circuit's *SNTL* decision – specifically cited the Bankruptcy Code's "reasonable fee" provisions in concluding (incorrectly) that postpetition fee claims may be allowed an unsecured creditor pursuant to a prepetition contract:

> While there is intuitive appeal to the *Electric Machinery* court's concern that an overactive creditor could unfairly run up fees, several factors reduce the potential for trouble. First, the fee doctrines of many jurisdictions . . . impose requirements in the nature of reasonableness. Second, the sections of the Bankruptcy Code that expressly focus on compensation for attorneys generally include limitations premised on reasonableness: *e.g.*, section 303(i)(1)(B) ("reasonable attorney's fee"); section 329(b) ("reasonable value of any such services"); section 330(a) ("reasonable compensation"); section 331 (incorporates section 330); section 502(b)(4) ("reasonable value of such services"); section 503(b)(4)

("reasonable compensation"). *It is counterintuitive to suppose that a court of equity would fully allow a claim for creditor's unreasonable attorneys' fees in litigating with an attorney who can receive only "reasonable" compensation.*

*SNTL Corp. v. Centre Ins. Co. (In re SNTL Corp.)*, 571 F.3d 826, 845 n.20 (9th Cir. 2009) (emphasis added).

In particular, as explained in the Objection,[45] the standards governing the allowance of a fee claim under section 506(b) of the Bankruptcy Code are directly relevant here.  Pursuant to section 506(b), an oversecured creditor is entitled to a claim for "reasonable fees, costs, or charges provided for under the agreement . . . under which such claim arose." 11 U.S.C. § 506(b).  To the extent that WTC is entitled to an unsecured claim for postpetition fees under the PHONES Notes Indenture ("the agreement . . . under which such claim arose"), the case law establishing standards for the allowance of a "reasonable" fee under section 506(b) provides an appropriate framework with which to analyze the reasonableness of that claim, as the standard for allowance of a claim for contractual postpetition fees by an *unsecured* creditor can be no less stringent than that for a claim for contractual postpetition fees by a *secured* creditor.

The touchstone inquiry under section 506(b) involves "the economics of the situation": "It is inherently unreasonable . . . to seek reimbursement for fees 'that are not cost justified either by the economics of the situation or necessary to preservation of the creditor's interest in light of the legal issues involved.'" *In re Kroh Bros. Dev. Co.*, 105 B.R. 515, 520-21 (Bankr. W.D. Mo. 1989) (quoting *In re Nicfur-Cruz Realty Corp.*, 50 B.R. 162, 169 (Bankr. S.D.N.Y. 1985)). Thus, the fact that WTC seeks payment for its Fee Claim from Tribune's estate requires that the Court give due consideration to the "economics of the situation" – particularly the context in which the Fee Claim arose and the impact of its allowance on the estate.

---

[45]   Objection at 20-21.

Within this framework, the Fee Claim is manifestly unreasonable because no prudent

person would have permitted the accrual of more than $30 million in fees in respect of WTC's

deeply-subordinated position in the Debtors' capital structure given the slim chance of obtaining

any recovery for the holders of the PHONES Notes. In fact, actual holders of PHONES Notes

chose to advance only $3 million for the fees for which WTC now seeks to recoup $30 million –

a stark demonstration of the unreasonableness of WTC's Fee Claim. WTC clearly recognizes

the dispositive force of these uncontroverted facts, but it cannot spin them in any persuasive way.

As a result, WTC just ignores this governing legal standard and never mentions section 506(b)'s

"economics of the situation" standard in its Opposition. This omission is itself telling.

**C.     Illinois Law Is Consistent With The Bankruptcy Code Regarding The Standards For Reasonableness Of A Claimed Fee.**

In any event, the Illinois law on which WTC relies is completely consistent with the

result dictated by bankruptcy law. It is well established under Illinois law that a court will award

only those fees that are reasonable, defined as reasonable charges for reasonable services.

*Mountbatten Sur. Co. v. Szabo Contr., Inc.*, 349 Ill. App. 3d 857, 873 (Ill. App. Ct. 2004) (citing

*Kaiser*, 164 Ill. App. 3d at 983). "[A] party seeking to recover attorney fees from another party

bears the burden of presenting sufficient evidence from which the trial court can render a

decision as to their reasonableness." *Harris Trust & Sav. Bank v. American Nat'l Bank & Trust

Co.*, 230 Ill. App. 3d 591, 595 (Ill. App. Ct. 1992) (citing *Mars v. Priester*, 205 Ill. App. 3d 1060,

1064, (Ill. App. Ct. 1990); *Corkill Electric Co. v. City of Chicago*, 196 Ill. App. 3d 838, 850 (Ill.

App. Ct. 1990)).

Moreover, "[i]n fee-shifting cases where attorney fees are being imposed on a third party,

many of the usual motivations to rein in excessive fees may be lacking. ***In such cases stricter

scrutiny of the fee request is warranted 'because the attorney submitting billing statements . . .***

- 21 -

*has no fiduciary relationship with the party ultimately liable for payment' of those fees.*"
*Fishman v. Fox River Commons Shopping Ctr., LLC*, 2012 Ill. App. Unpub. LEXIS 3057, at *78
(Ill. App. Ct. 2012) (citing *Wildman, Harrold, Allen & Dixon v. Gaylord*, 317 Ill. App. 3d 590,
596-97, (2009)) (emphasis added).  In such circumstances it is the court's responsibility to
"guard against moral hazard – the tendency to take additional risks (or run up extra costs) if
someone else pays the tab." *Medcom Holding Co. v. Baxter Travenol Labs.*, Inc., 200 F.3d 518,
521 (7th Cir. 1999) (interpreting an indemnity agreement under Illinois law).

Notably, courts applying Illinois law have held that one indicator of reasonableness and
"*the best evidence of the market value of legal services is what people pay for it*." *Balcor Real
Estate Holdings, Inc. v. Walentas-Phoenix Corp.*, 73 F.3d 150, 153 (7th Cir. 1996) (emphasis
added).  "Indeed, this is not 'evidence' about market value; it *is* market value." *Id.* (emphasis in
original); *see, e.g., Medcom*, 200 F.3d at 520 ("The fees in dispute here are not pie-in-the-sky
numbers that one litigant seeks to collect from a stranger but would never dream of paying
itself.").[46]

Moreover, many of the same factors that the Court must consider when evaluating
applications for allowance of attorneys' fees under section 330 of the Bankruptcy Code are
likewise found in Illinois law.  *Compare* 11 U.S.C. §§ 330(a)(3), (4) *with Harris Trust*, 230 Ill.
App. 3d at 595 ("A petition for fees must present the court with detailed records containing facts
and computations upon which the charges are predicated specifying the services performed, by
whom they were performed, the time expended and the hourly rate charged.  Once presented
with this information, the trial court should consider a variety of other factors, including the skill
and standing of the attorneys employed, the nature of the case, the novelty and difficulty of the

---

[46]    In contrast, where a "[c]orporate inside counsel monitor[s] bills submitted by outside
counsel[,]" and the bills are paid, reasonableness may be inferred.  *Balcor*, 73 F.3d at 153.

issues involved, the degree of responsibility required, the usual and customary charge for the same or similar services in the community, and whether there is a reasonable connection between the fees charged and the litigation.") (internal citations omitted); *see also J.B. Esker & Sons, Inc. v Cle-Pa's P'Ship*, 325 Ill. App. 3d 276, 283 (Ill. App. Ct. 2001) (also citing "the significance of the case" and "the benefit to the client").[47]

### D.    The Amount That Holders Of The PHONES Notes Were Willing To Pay Is Directly Relevant To The Reasonableness Of The Fee Claim.

WTC agrees that, under the prudent person standard and governing law, it was "required to act with the same care as if it owned the investment." *In re Worldwide Direct, Inc.*, 334 B.R. 112, 129 (Bankr. D. Del. 2005). Here, the ***actual*** "owners of the investment" – Suttonbrook and Camden, as owners of the PHONES Notes – chose to contribute only $3 million to the fees for which WTC now claims $30 million. This undisputed fact is directly relevant to the prudence (or lack thereof) of WTC's conduct,[48] to the reasonableness of WTC's requested fee under section 506(b)'s "economics of the situation" standard,[49] and under general principles of reasonableness under both bankruptcy and Illinois law.

WTC argues that the unwillingness of holders of the PHONES Notes to invest more than $3 million is irrelevant (a "red herring") because contingency fee arrangements are commonplace.[50] WTC again misses the point. The Reorganized Debtors do not assert that an

---

[47]    WTC implies that these are exclusive factors and therefore that the Court may not consider the deeply subordinated and out-of-the-money position of the PHONES Notes in connection with its reasonableness review. *See* WTC Opp. at 41-42. To the contrary, the cases cited by WTC stand instead for the principle that the Court has "wide discretion to adjust the attorneys' fee ***for a variety of reasons.***" *Apple Corps Ltd. v. Int'l Collectors Soc'y*, 25 F. Supp. 2d 480, 485 (D.N.J. 1998) (emphasis added).

[48]    *See* Objection at 22-23.

[49]    *See* Objection at 23-26.

[50]    WTC Opp. at 39-40.

indenture trustee can never hire counsel on a contingency fee.  Rather, the Reorganized Debtors

object to WTC's effort to hire counsel on a contingency fee and then to seek to collect

$30 million in standard *hourly* fees (not to mention WTC's own undocumented "extraordinary"

fees) when the event that would have triggered the contingency fee has not occurred and may

never come to pass.

The fact is that holders of the PHONES Notes were unwilling to pay the *hourly* fees that

WTC now seeks to collect from the Reorganized Debtors.  This is revealed by the evolution of

the terms of Brown Rudnick's engagement.  WTC first engaged Brown Rudnick, apparently

without direction from Suttonbrook and Camden, on a straight hourly basis with no

contingency.[51]  When the directing PHONES Notes holders became involved, however, they

immediately directed WTC to amend Brown Rudnick's engagement letter to place a hard cap of

$1 million on the hourly fees (and WTC's own fees) and include instead a contingency fee, itself

capped at $15 million, of 10% of the first $50 million in recoveries and 5% of recoveries over

$50 million.[52]  Thereafter, the directing holders agreed to increase the hourly fee cap to

$2 million and to modify the contingency fee so that Brown Rudnick would receive a straight

10% of distributions on the PHONES Notes "with no ceiling or maximum" once the $2 million

hourly fee cap had been reached.[53]  Finally, the directing holders agreed to advance limited

additional amounts in respect of the fees charged by the non-lawyer consultants for which WTC

also now asserts a claim.[54]  All told, the directing holders advanced a total of $3 million.[55]

---

[51]  "Fees for our services will be based on the time expended by each attorney and paralegal (including personnel we may temporarily engage) on your matter, multiplied by that lawyer's or paralegal's hourly rate."  WTC Substantial Contribution App., Ex. I [WTC1F06083].

[52]  WTC Substantial Contribution App., Ex. I [WTC1F06087-88 and WTC1F06094].

[53]  WTC Substantial Contribution App., Ex. I [WTC1F06104-05 and WTC1F06115-16].

[54]  WTC Substantial Contribution App., Ex. I [WTC1F06128-29].

The directing holders' refusal to pay the hourly fees of Brown Rudnick and Mesirow is directly relevant to the reasonableness (or lack thereof) of the Fee Claim.  Indeed, as articulated by the Seventh Circuit in applying Illinois law, *"the best guarantee of reasonableness is willingness to pay."*  *Balcor*, 73 F.3d at 153 (emphasis added).  By the same token, unwillingness to pay is a strong indicator of unreasonableness and evidence that an alleged fee is not justified by the economics of the situation.

### E.    The Fee Claim Is Unreasonable When Viewed "Through The Prism Of What WTC Knew At The Time It Acted."

WTC asserts that the reasonableness of the Fee Claim "must be analyzed through the prism of what WTC knew at the time it acted."[56]  The Reorganized Debtors have no quarrel with that proposition, at least in the context of the Fee Claim (as opposed to WTC's request for fees in connection with its alleged "substantial contribution", which is judged based upon the results actually achieved in the Chapter 11 Cases).  Unfortunately for WTC, the fact is that it was clear from the outset of the Chapter 11 Cases that the subordinated PHONES Notes were out-of-the-money and had little to no prospect of recovery absent a "home run" litigation victory.

From the start, and throughout the Chapter 11 Cases, WTC argued that Tribune had been insolvent since 2007, and the evidence at confirmation established that the Debtors' Total Distributable Value was $4 to $5 billion lower than the $12 billion in outstanding *unsubordinated* debt.  The PHONES Notes simply were never in the money, a fact confirmed by WTC's own "substantial contribution" application.  There, in attempting to demonstrate that it acted with the expectation that the Reorganized Debtors would pick up the tab for its fees as an administrative expense (it did not), WTC acknowledged that from the earliest days of the

---

[55]    WTC Draft Br. ¶¶ 9, 11.

[56]    WTC Opp. at 34.

Chapter 11 Cases (when it requested appointment of an examiner) it "was cognizant [of] the fact

that its avenues to recovery of its fees and expenses, including those of outside counsel, were

limited."[57]  In particular, "recovering on a claim against the Debtors' estates under the PHONES

Indenture was unavailable absent changes to the First Plan.  Similarly, *because there was no*

*distribution to the PHONES, Wilmington Trust could not rely on its charging lien to pay its*

*fees and expenses.*"[58]

In fact, that is why Brown Rudnick negotiated for a contingency fee once it became clear

that holders of the PHONES Notes were unwilling to pay Brown Rudnick's hourly fees, as

Brown Rudnick otherwise would have been unable to recoup its hourly fees through the standard

method of WTC's charging lien.  These facts speak for themselves, and WTC's effort to

distinguish them are unavailing.

For example, WTC asserts that its undertaking of an investigation of the LBO was

reasonable.[59]  But WTC's extremely superficial description of its investigation does nothing to

answer the question of whether and how it was reasonable for Brown Rudnick to run up

$4 million in document review fees between December 2009 and July 2010 when the Creditors'

Committee, the Examiner, and the Senior Notes Indenture Trustees were performing the same

analysis.[60]  Indeed, WTC ignores that it had full access to the Creditors' Committee's findings

from its investigation (including the Committee's review of more than 4 million pages of

documents and the analysis of the Committee's financial advisors, Moelis and AlixPartners) and

the database of documents compiled by the Creditors' Committee.  As a consequence, two of the

---

[57]    WTC Substantial Contribution App. ¶ 60.

[58]    WTC Substantial Contribution App. ¶ 60 (emphasis added).

[59]    WTC Opp. at 36.

[60]    See Objection at 31-35.

largest components of WTC's Fee Claim – Brown Rudnick's $4 million document review and

Mesirow's $2.6 million in pre-December 2010 work – were wholly unnecessary, particularly

given that the work was performed on behalf of a patently out-of-the-money constituency.

Similarly, WTC argues that its participation in the Examiner's investigation was

reasonable.[61]  Here again, WTC's superficial assertions do not address the key questions, *i.e.,*

whether and how it was reasonable for Brown Rudnick (a) to charge $500,000 in fees for seeking

appointment of an examiner whose appointment was a *fait accompli* once it became clear that

there was no consensus with respect to a path forward in the Chapter 11 Cases, and (b) to run up

another $2.5 million in fees duplicating the efforts of the Examiner, the Creditors' Committee,

the Senior Notes Indenture Trustees, Aurelius and Centerbridge.[62]  Indeed, as WTC itself

recounts, the Examiner "invited all parties, on an informal basis, to provide . . . whatever

documentary evidence, legal analyses and financial analyses ***that have been prepared to date***

that demonstrate their respective views on the subject matter of the Investigation that they wish

to share with the Examiner."[63]  Nothing in the Examiner's Work Plan remotely justifies Brown

Rudnick's $2.5 million in fees for interacting with the Examiner and advocating the interests of a

completely out-of-the-money position.

WTC also argues in conclusory terms that its prosecution of the Noteholder Plan "was

realistic and in the best interests of its holders."[64]  But that again begs the question of whether

and how it is reasonable to claim $9.7 million in Brown Rudnick's fees and $4.9 million in

Mesirow's fees for participation in the Plan process given the deeply-subordinated position of

---

[61]  WTC Opp. at 37-38.

[62]  See Objection at 35-36.

[63]  WTC Opp. at 37 (emphasis added) (citing the Examiner Work Plan ¶ 13).

[64]  WTC Opp. at 38.

the PHONES Notes and the fact that the advocacy in favor of the Noteholder Plan and against the Plan was being led by Aurelius and the Senior Notes Indenture Trustees.[65]

Incredibly, WTC attempts to justify the millions of dollars in fees relating to the competing plan process (and other events following the appointment of the Examiner) on grounds that "events later proved" that it would be adverse to the Senior Noteholders.[66] This violates WTC's own rule against the use of hindsight. More significantly, it is simply untrue that the interests of WTC and the Senior Noteholders were adverse during the competing plan process. The fact is that WTC incurred millions in fees during this time period despite the existence of better-funded creditors ready, willing, and able to advocate for the so-called "non-LBO creditors."

### F.    The "Result Achieved" (Or Lack Thereof) Demonstrates That The Fee Claim Is Not Reasonable.

After railing against the Reorganized Debtors' supposed use of hindsight in assessing the reasonableness of the Fee Claim, WTC proceeds to argue that "the result obtained for the PHONES Noteholders was substantial and justifies the allowance of the fee claim."[67] This is nonsense.

First, WTC's assertion that, "[a]bsent the efforts of Brown Rudnick and associated professionals, certain fraudulent conveyance claims would have been released for no consideration" is simply ridiculous. As shown elsewhere, there is no evidence that the Debtors

---

[65]  *See* Objection at 37-38.

[66]  WTC Opp. at 44.

[67]  WTC Opp. at 42.

would have (or could have) released any material claims "for nothing," much less that WTC somehow caused the preservation of those claims.[68]

Similarly ludicrous is WTC's claim that "there now exists the prospect of substantial recoveries . . . for the PHONES."[69]  In fact, due to the deeply-subordinated status of the PHONES Notes, the Litigation Trust would have to recover more than *$1.4 billion* – far in excess of the $358 million valuation ascribed by the Valuation Expert to the Preserved Causes of Action for tax purposes[70] – for holders of the PHONES Notes to recover *anything*.  Thus, for holders of the PHONES Notes to recover from the Litigation Trust, the Trust either would have to win its claims for *intentional* fraudulent conveyance in connection with both Step 1 *and* Step 2 of the LBO, or somehow avoid application of section 546(e) of the Bankruptcy Code *and* prove that Tribune was insolvent at each of Steps 1 *and* 2.  The Examiner's analyses suggest that these combination of outcomes are highly unlikely.[71]

### G.    Neither The Fees Incurred By Other Parties Nor The Dividend On Other Parent Claims Make WTC's Fee Claim Reasonable.

WTC asserts again that "one of the most appropriate ways to assess the reasonableness question is to contrast its fees and expenses with those of the parties opposing it."[72]  As

---

[68]  *See Reorganized Debtors' Objection To "Substantial Contribution" Applications Of Law Debenture Trust Company Of New York And Wilmington Trust Company* [D.I. 13395] at 17-18.

[69]  WTC Opp. at 42.

[70]  *See Notice Of Valuation Expert's Valuation Of Litigation Trust Assets* [D.I.12976] (the "Valuation Notice").  That valuation is not "a minimum value" as WTC now claims.  WTC Opp. at 42.  To the contrary, it represents "the final fair market value of the Litigation Trust Assets transferred to the Litigation Trust as of the Effective Date."  Valuation Notice at 2.

[71]  Also highly unlikely is a reversal of the Confirmation Order on appeal, which WTC speculates might deliver value to holders of the PHONES Notes.  WTC Opp. at 43.

[72]  WTC Opp. at 44.

previously demonstrated,[73] the superficial comparison of WTC's claimed fees and the fees

incurred by other parties is meaningless.  Most notably, other constituencies had vastly different

claim sizes, responsibilities, and prospects of recovery – critical facts that comprise the

"economics of the situation" and that necessarily inform any prudent person's decision to incur

fees.  Moreover, unlike WTC, the other constituencies also had agreed to pay their own

professionals, which necessarily resulted in the exercise of billing discipline sorely lacking from

WTC's professionals.

WTC also complains that, "while every other party has had its professional fees allowed

in full as part of their claims," the Fee Claim – to the extent allowed – will be paid at "32.73

cents on the dollar," something that WTC asserts should be "reduction enough."[74]  Nonsense.

The 32.73% distribution is what *all* holders of Other Parent Claims received – it has nothing to

do with the appropriate amount of the Fee Claim in the first place.

WTC similarly avers that the Reorganized Debtors' objection to the Fee Claim somehow

is "inconsistent with their treatment of allowing claims for the other indenture trustees in this

case, Law Debenture and DBTCA[,] . . . without any opposition or review and determination of

reasonableness of conduct or review of time detail,"[75] implying that the Reorganized Debtors are

unfairly targeting WTC.  In fact, however, there was no need for the Reorganized Debtors to

review the fee claims of the Senior Notes Indenture Trustees because the entirety of those claims

were paid from the *fixed* pool of consideration to be distributed to Senior Noteholders.[76]

---

[73]   Objection at 25-26.

[74]   WTC Opp. at 45.

[75]   WTC Opp. at 21.

[76]   *See* Plan § 3.2.5.

In other words, the Senior Noteholders paid for the fees of the Senior Notes Indenture Trustees (as they should), and allowance of the fee claims of the Senior Notes Indenture Trustees did not cost the Reorganized Debtors anything. The Court, in fact, previously recognized that this is the appropriate outcome: "it is not unfair for Senior Noteholders to bear the cost of the Indenture Trustee Expense Claims when those expense claims provided a benefit to the Senior Noteholders only."[77] In contrast, WTC seeks to have the Fee Claim allowed and paid as an Other Parent Claim, meaning that payment on the claim would not be made by holders of the PHONES Notes and instead would come from assets otherwise available to the Reorganized Debtors.

Finally, WTC's plea for a "typical" reduction of "10-20%"[78] is unavailing, as discounts applied in other cases say nothing about the reasonableness (or lack thereof) of WTC's fees here. Any discount must be based on an analysis of whether the work undertaken by WTC and the fees associated with that work were necessary or reasonable *in this case*.

**H.      WTC's Claim For Mesirow's Fees Is Neither Reimbursable Nor Reasonable.**

In the Objection, the Reorganized Debtors demonstrated that, in any event, no part of Mesirow's $7.5 million in fees should be allowed.[79]

For one thing, the PHONES Notes Indenture only permits WTC to seek reimbursement for "the reasonable compensation and the expenses and disbursements of its agents and counsel."[80] Mesirow, as a financial advisor, is neither. WTC cites various cases in which courts

---

[77] *Memorandum Overruling Objections To Confirmation Of The Fourth Amended Plan Of Reorganization For Tribune Company And Its Subsidiaries And Denying Clarification Motion* [D.I. 12033] at 18 n.26 (citing *Worldwide Direct*, 334 B.R. at 128).

[78] WTC Opp. at 46.

[79] Objection at 29-31.

[80] PHONES Notes Indenture § 6.07(2).

have referred to financial advisors as "agents" in other contexts.[81] Conveniently, however, WTC

ignores Mesirow's own engagement agreements in this case, which specifically provide that

"*neither party is or shall be considered an agent*, distributor or representative of the other" and

that "*[n]either party shall act or represent itself, directly or by implication, as an agent of the

other*."[82] As if that was not clear enough, Mesirow's December 2010 engagement agreement

with respect to the Noteholder Plan further provides that "it is expressly understood that

(i) *[Mesirow] does not hereby establish any client relationship with any of the Co-Plan

Proponents* [including WTC], . . . and (iii) *[Mesirow] shall not take any direction or instruction

from any of the Co-Plan Proponents*."[83] That, of course, is the antithesis of an "agency"

relationship.

      In any event, as previously demonstrated, (a) Mesirow duplicated the early efforts of the

Creditors' Committee's financial advisors; (b) it was wholly unnecessary for WTC to retain an

independent financial advisor for the Examiner process; and (c) Mesirow's nearly $5 million in

post-December 2010 work relating to the Noteholder Plan (for which no times records have been

submitted) were performed principally, if not exclusively, for the benefit of the Senior

Noteholders and were paid for exclusively by Aurelius.[84]

      The point here is not simply that Aurelius paid Mesirow's fees but that that Aurelius –

not WTC – *controlled* Mesirow during the competing plan process. Mesirow, in other words,

worked for Aurelius. This is evidenced by, among other things, the facts that Aurelius paid

Mesirow's fees after December 2010 (as well as all of Mesirow's then-unpaid fees associated

---

[81]   WTC Opp. at 47.

[82]   WTC Substantial Contribution App., Ex. I [WTC1F06157 and WTC1F06173] (emphasis added).

[83]   WTC Substantial Contribution App., Ex. I [WTC1F06143] (emphasis added).

[84]   Objection at 29-31.

with its work to that point) and presented Mesirow's witness at the confirmation hearing.  WTC

remarkably asserts that this is unimportant "because Aurelius owns both PHONES notes and

Senior Notes,"[85] but this contention does not pass the straight face test.  As the Court witnessed

on many occasions during the course of the Chapter 11 Cases, Aurelius acted as a Senior

Noteholder at all times.  Given its vastly larger stake in Senior Notes and the negligible prospects

of any recovery whatsoever on the PHONES Notes, this was the only economically rational

course of action available to Aurelius.  And, when the interests of the PHONES Notes and the

Senior Notes diverged (including, most notably, when Aurelius sought reconsideration of the

2011 Confirmation Order), Aurelius did not hesitate to advances the interests of Senior

Noteholders at the expense of the PHONES Notes.

WTC cannot credibly assert otherwise, yet it now seeks to be reimbursed for *all* of the

work that Mesirow performed on behalf of Aurelius and the Senior Notes.  There is no

conceivable basis for allowance of such a claim.

## V.    THE REORGANIZED DEBTORS ARE NOT ESTOPPED FROM OBJECTING TO THE WTC FEE CLAIM

Finally, apparently recognizing the deficiencies of the merits of the Fee Claim, WTC

repeatedly asserts that it should win because the Reorganized Debtors should be estopped from

objecting to the claim.  For example, WTC argues that the Reorganized Debtors should be

"judicially estopped" from asserting that WTC is not entitled to an unsecured claim for

postpetition fees because the Debtors "previously argued that 'an unsecured claim for post-

petition fees, authorized by a valid pre-petition contract, *is* allowable under section 502(b).'"[86]

---

[85]   WTC Opp. at 48 n.19.

[86]   WTC Opp. at 19 (quoting *Memorandum Of Law In Support Of Confirmation And Omnibus Reply To Objections To Confirmation Of Fourth Amended Joint Plan Of Reorganization For Tribune Company* [D.I. 11745] (the "DCL Plan Memo") at 46) (emphasis in original).

This argument is misleading and off-the-mark. The snippet cited by WTC comes from the DCL Plan Proponents' memorandum in support of confirmation of the Plan, which responded to Aurelius's argument that the Plan improperly provided for payment of Senior Lender fees pursuant to section 1129(a)(4) of the Bankruptcy Code rather than requiring a showing of a "substantial contribution" pursuant to section 503(b) of the Code. In response, the DCL Plan Proponents noted that "Aurelius ignores the distinction between consensual reimbursement of the Lender Fee/Expense Claims as part of a reasonable settlement of prepetition claims and causes of action, on the one hand, and the statutory right of a creditor to unilaterally seek an administrative claim for legal fees if it can show that it made a 'substantial contribution' under section 503(b), on the other."[87] The DCL Plan Proponents demonstrated that payment under the rubric of section 1129(a)(4) was appropriate "as a component of the comprehensive DCL Plan Settlement" pursuant to which the Lenders "have agreed to provide hundreds of millions of dollars of consideration" and "to release their claims against the Guarantor Non-Debtors, allowing those subsidiaries to remain assets of the Reorganized Debtors."[88]

In the course of that response, the DCL Plan Proponents noted that "the Lender/Fee Expense claims are *subject to* allowance under section 502(b) of the Bankruptcy Code."[89] The DCL Plan Proponents, however, did not argue that all unsecured claims for postpetition fees are allowable. Rather, the point was that "[t]he Lenders' contractual entitlement to distributions on their Loan Claims exceeds the total consideration to be received by them under the DCL Plan

---

[87]   DCL Plan Memo ¶ 87.

[88]   DCL Plan Memo ¶¶ 94, 96, 98.

[89]   DCL Plan Memo ¶ 98 (emphasis added).

Settlement (including reimbursement of the Lender/Fee Expense Claims)."[90]  As a result, it was

perfectly appropriate to provide for payment of the Lender/Fee Expense Claims as part of the

"package of consideration" provided for in the DCL Plan Settlement.[91]

In fact, as explained in the Objection and ignored by WTC, Tribune's obligations to

reimburse Senior Lender fees were guaranteed by the Guarantor Debtors and Guarantor Non-

Debtors, all of whom paid their other unsecured liabilities in full.  Because courts have

recognized that, in the case of a solvent debtor, the equities favor allowance of an unsecured

claim for postpetition fees, see *Old Colony*, 476 B.R. at 30-31 (drawing distinction between

solvent and insolvent debtors and disallowing fee claim "where the bankruptcy estate is unable to

pay all other creditors in full"), payment of the Senior Lender fees is perfectly consistent with the

Reorganized Debtors' categorical objection to the Fee Claim against Tribune, which has not paid

other creditors in full.

In any event, WTC certainly has not shown that the Reorganized Debtors have acted in

"bad faith" or "with intent to play fast and loose with the court."[92]  Nor has it shown that the

Court "acted in reliance on the [DCL Plan Proponents'] initial assertion, and thus [that there is a]

threat to the integrity of the judicial process from subsequent assertion of an incompatible

position."[93]  Indeed, the Court said nothing about allowance of an unsecured claim for

postpetition fees because *Aurelius withdrew its objection* to the provision at issue.[94]  There can

be no judicial estoppel in such a circumstance.  See, e.g., *Montrose Med. Grp. Participating*

---

[90]  DCL Plan Memo ¶ 98.

[91]  DCL Plan Memo ¶ 98.

[92]  WTC Opp. at 20 (quotations omitted).

[93]  WTC Opp. at 20 (quotations omitted).

[94]  Tr. 6/18/12 at 17:7-21.

*Savs. Plan v. Bulger*, 243 F.3d 773, 781 (3d Cir. 2001) (no "bad faith" where "the initial

inconsistent statement was never accepted or adopted by a court"); *Stradley, Ronon, Stevens &*

*Young, LLP v. Sovereign Bank, N.A.*, No. 12-2466, 2013 WL 173022, at *10 (E.D. Pa. Jan. 15,

2013) (no judicial estoppel where initial issue was settled) ("Judicial estoppel does not bar a

party from contradicting itself, but from contradicting a court's determination that was based on

that party's position.") (quotations omitted).

WTC also asserts that the Reorganized Debtors "should be estopped from asserting that

§ 6.07 is the sole section under the Indenture providing indemnity."[95] As explained above,[96] the

Reorganized Debtors make no such assertion, so this a quintessential "red herring" (to use one of

WTC's favorite phrases).

In sum, the Reorganized Debtors have taken no "inconsistent positions," and the Court

should decide the Objection to the WTC Fee Claim on the merits.


## VI.    CONCLUSION

For all of these reasons, the Fee Claim should be disallowed in its entirety because WTC

is not entitled to assert a claim under the prepetition PHONES Notes Indenture for postpetition

fees and expenses. Alternatively, the Fee Claim should be limited to a maximum of $3 million,

because WTC has only paid that amount in respect of the amounts for which it now seeks

"reimbursement" and is not otherwise obligated to pay anything for those amounts. Finally, in

no event should the Fee Claim exceed $5 million with the balance disallowed on the ground that

the requested amounts are not reasonable.

---

[95]    WTC Opp. at 23.

[96]    *See* Section III, above.

Dated:  April 22, 2013

SIDLEY AUSTIN LLP
James F. Conlan
One South Dearborn Street
Chicago, IL  60603
Telephone:  (312) 853-7000

James F. Bendernagel, Jr.
Ronald S. Flagg
1501 K Street NW
Washington, DC  20005
Telephone:  (202) 736-8000

-and-

JONES DAY
Bruce Bennett
James O. Johnston
Joshua M. Mester
555 South Flower Street, 50th Floor
Los Angeles, CA  90071-2300
Telephone:  (213) 489-3939

-and-

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.

By: _____
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, DE  19801
Telephone:  (302) 652-3131

ATTORNEYS FOR REORGANIZED DEBTORS