IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

--------------------------------------------------------x
In re:                                            :     Chapter 11 Cases
                                                  :
TRIBUNE COMPANY, et al.,                          :     Case No. 08-13141 (KJC)
                                                  :
                        Reorganized Debtors. :          Jointly Administered
--------------------------------------------------------x

**REPLY IN SUPPORT OF MOTION OF LAW DEBENTURE TRUST COMPANY OF
NEW YORK PURSUANT TO 11 U.S.C. §§ 503(b)(3)(D), 503(b)(4) AND 503(b)(5)
FOR ALLOWANCE AND PAYMENT OF FEES AND EXPENSES
INCURRED IN CONNECTION WITH MAKING A SUBSTANTIAL
CONTRIBUTION TO THE DEBTORS' CHAPTER 11 CASES AND GRANTING
WAIVER OF COMPLIANCE WITH DEL. BANKR. L.R. 2016-2(d)(vii)
IN ACCORDANCE WITH DEL. BANKR. L.R. 2016-2(h)**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT ........................................................................... 1

REPLY ................................................................................................................. 5

I.    The Efforts Of Law Debenture And Its Advisors During The Application Period
      Substantially Benefitted The Debtors' Estates. ........................................ 5

      A.    Law Debenture Prevented The Debtors From Substantially Undervaluing
            The LBO Claims. ................................................................................. 7

      B.    Law Debenture's Efforts Ensured A Robust Investigation Of The LBO
            Claims. ............................................................................................... 10

      C.    Law Debenture's Role In Examiner's Adversarial Process Was Essential. ......... 14

II.   Law Debenture's Opposition To The Plan Does Not Detract From Its Substantial
      Contribution. .................................................................................................. 17

      A.    The Reorganized Debtors' Cases Do Not Support Denying Law
            Debenture's Relief. ............................................................................ 17

      B.    The Reorganized Debtors Cannot Demonstrate Law Debenture Was
            Obstructionist. .................................................................................. 20

III.  Law Debenture's Substantial Contribution Transcended Its Self-Interest. ...................... 21

IV.   Law Debenture's Fees Are Reasonable. .............................................................. 23

V.    Law Debenture Is Entitled To Reimbursement For Expenses It Incurred In
      Retaining A Financial Advisor. ............................................................... 24

CONCLUSION .................................................................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re American Plumbing & Mech., Inc.*,
    327 B.R. 273 (Bankr. W.D. Tex. 2005) ..................................................................22

*In re Asarco LLC*,
    2010 WL 3812642 (Bankr. S.D. Tex. Sept. 28, 2010) ...........................................6

*In re Big Rivers Elec. Corp.*,
    233 B.R. 739 (W.D. Ky. 1998) ...............................................................................17

*In re Envirodyne Indus., Inc.*,
    176 B.R. 815 (Bankr. N.D. Ill. 1995) ....................................................5, 15, 18, 19

*In re Gen. Electrodynamics Corp.*,
    368 B.R. 543 (Bankr. N.D. Tex. 2007) ............................................................6, 15

*In re Granite Partners, L.P.*,
    213 B.R. 440 (Bankr. S.D.N.Y. 1997) ..........................................................14, 15, 17

*In re Mirant Corp.*,
    354 B.R. 113 (Bankr. N.D. Tex. 2006), *subsequently aff'd*, 308 F. App'x 824 (5th Cir.
    2009) ......................................................................................................................19

*In re Summit Metals, Inc.*
    379 B.R. 40 (Bankr. D. Del. 2007) .......................................................................6, 7

*In re Women First Healthcare, Inc.*,
    332 B.R. 115 (Bankr. D. Del. 2005) .................................................................21, 22

*In re Worldwide Direct*,
    334 B.R. 112 (Bankr. D. Del. 2005) .......................................................................24

*Lebron v. Mechem Fin. Inc.*,
    27 F.3d 937 (3d Cir. 1994) .....................................................................................21

*Matter of Baldwin-United Corp.*,
    79 B.R. 321 (Bankr. S.D. Ohio 1987) .....................................................................18

*Matter of Buckhead Am. Corp*,
    161 B.R. 11 (Bankr. D. Del. 1993) ........................................................................14

*Matter of Consol. Bancshares, Inc.*,
    785 F.2d 1249 (5th Cir. 1986) ................................................................................17

*Meriwether v. Coughlin,*
    727 F. Supp. 823 (S.D.N.Y. 1989) ...........................................................................24

*Oneida Motor Freight, Inc. v. United Jersey Bank,*
    848 F.2d 414 (3d Cir. 1988)......................................................................................23

*Rodriguez v. McLoughlin,*
    84 F. Supp. 2d 417 (S.D.N.Y. 1999).........................................................................24

**STATUTES**

11 U.S.C. § 503(b)(3) .......................................................................................................25

11 U.S.C. § 503(b)(3)(D)...................................................................................................25

**OTHER AUTHORITIES**

Del. Bankr. L.R. 2016-2.....................................................................................................24

Law Debenture Trust Company of New York ("Law Debenture"), as successor indenture trustee under the 1996 Indenture,[1] by and through its undersigned counsel, respectfully submits this reply memorandum in support of its Substantial Contribution Motion and respectfully states as follows:

## PRELIMINARY STATEMENT

The Reorganized Debtors' objection[2] does more to reflect the animus of Tribune's current equity holders (substantially constituting former LBO Lenders) against the bondholders – who sought to maximize the value of the claims against those entities arising from the LBO – than to reflect the realities that transpired in the Debtors' chapter 11 cases during the Application Period. The U.S. Trustee ("UST") similarly ignores these same realities.[3] Embedded in the Reorganized Debtors' repeated assertions that Law Debenture "regularly and continually opposed the Debtors and the Committee's reorganization initiatives" during the Application Period is the suggestion that the realization of any value from the LBO Claims hardly benefited the estate at all. Indeed, both the Reorganized Debtors and the UST barely admit in over 75 pages of briefing that augmenting the distributable value of the estate was a benefit to the estate.

During the Application Period, Law Debenture only opposed the Debtors and the Committee to the extent their pursuit of the LBO Claims was neither exhaustive nor adequate.

---

[1] All capitalized terms used, but not defined, have the meanings ascribed to them in the *Motion of Law Debenture Trust Company of New York Pursuant to 11 U.S.C. §§ 503(b)(3)(D), 503(b)(4) and 503(b)(5) for Allowance and Payment of Fees and Expenses Incurred in Connection with Making a Substantial Contribution to the Debtors' Chapter 11 Cases for the Period of May 7 ,2009 Through August 31, 2010, dated March 1, 2013* [Dkt. No. 13274] ("Substantial Contribution Motion" or "Motion").

[2] *Reorganized Debtors' Objection to "Substantial Contribution" Applications of Law Debenture Trust Company of New York and Wilmington Trust Company, dated March 28, 2013* [Dkt. No. 13395] (Opp. Br.).

[3] *United States Trustee's Amended Objection to the Motion of Law Debenture Trust Company of New York Pursuant to 11 U.S.C. §§ 503(b)(3)(D), 503(b)(4), and 503(b)(5) for Allowance and Payment of Fees and Expenses Incurred in Connection With Making a Substantial Contribution to the Debtors Chapter 11 Cases and Granting Waiver of Compliance with Del. Bankr. L.R. 2016-2(d)(vii) in Accordance With Del. Bankr. L.R. 2016(2)(h) (D.E. 13274), dated April 11, 2013* [Dkt. No. 13442] ("UST Obj.").

The reality – as evidenced from the voluminous record in these cases – is that Law Debenture rarely opposed the Committee during the Application Period and only opposed the Debtors when (i) the Debtors objected to Law Debenture's attempt to investigate the LBO, (ii) the Debtors objected to Law Debenture's attempt to freeze payments to the LBO Lenders that were funding their defense of the LBO Claims through the artifice of nondebtors, and (iii) the Debtors opposed the Committee's standing motion.  These three examples are not demonstrative of stonewalling but are evidence of Law Debenture's efforts to maximize the LBO Claims' value and overcome the Debtors' efforts to do otherwise.  The Reorganized Debtors suggest that the "proper" conduct for Law Debenture would have been to let the Debtors' settle the LBO Claims for a "sliver of equity" and emerge from bankruptcy quickly without any effort to maximize the value of the LBO Claims.  This, however, would have stripped creditors of substantial value to which they were entitled.

    As detailed in the Motion and set forth below, Law Debenture was essential in motivating the parties to move past their initial inaction regarding the LBO Claims.  Law Debenture brought all parties, including the Court, beyond mentioning that the LBO Claims were the "main crux" of the Debtors chapter 11 cases to acting on the LBO Claims with the result of a settlement in favor of the estates (even though there remains significant dispute over the fairness of the settlement).  Although the Committee and other parties stated that they "understood that the Causes of Action would be a central issue in the formation of a plan of reorganization" and the Committee claimed it "directed and pursued a detailed and exhaustive investigation and review of the LBO," the reality is that during the nine months preceding Law Debenture's involvement in the Debtors' cases the parties delayed and expended only minimal effort and focus on the LBO Claims although the statute of limitations was running on the claims.  Indeed, during these nine months,

2

neither the LBO nor the LBO Claims were discussed at any hearing, only 35,000 documents with stringent use restrictions were produced, no examinations were conducted, and the Committee agreed not to use any produced documents in Court.  Meanwhile, the Debtors were deeply involved in negotiations with certain LBO Lenders to file a "sliver of equity" plan that would have settled the LBO Claims for a de minimis amount.  Law Debenture's involvement changed the trajectory of the investigation into the LBO Claims, the Debtors' ability to file a "sliver of equity" plan, and undoubtedly led to a significant tangible benefit for *all* of the Debtors' estates and their creditors – a benefit which transcended the narrow parochial interests of Law Debenture and the approximately 18% of senior noteholders for which it serves as trustee.

Rather than focus on these beneficial efforts by Law Debenture, the Reorganized Debtors and UST insist that the Court deny or offset a substantial contribution award because of the dueling plan process and Law Debenture's purported "obstructionist" behavior.  Yet, no case in this Circuit authorizes the Court to deny or offset an award for alleged "obstructionist" behavior that did not occur during the application period.  Moreover, even if such case law did exist, neither a denial nor offset is warranted in the instant case where Law Debenture merely made objections, which are common in mega bankruptcy cases and certainly do not rise to the level of obstructionist conduct.  The Reorganized Debtors never allege that Law Debenture acted in bad faith.  They also fail to prove that had Law Debenture not filed its objections, the Debtors would not have incurred certain administrative fees.  Rather, the costs that the Debtors incurred in handling Law Debenture's objections did not increase beyond the costs that the Debtors' otherwise had to incur.

Further, the Reorganized Debtors and UST's contention that Law Debenture's actions were entirely in its own self-interest and duplicative of the Committee's actions are not accurate

3

assessments of the dynamics of the Chapter 11 Cases or Law Debenture's efforts. The record indicates that Law Debenture's efforts were essential to drive the case to the point where the parties understood that the Debtors could not settle the LBO Claims for a pittance and that Law Debenture's efforts were essential to the Committee's decision to pursue the LBO Claims. In fact, until Law Debenture convinced the Committee that the LBO Claims were valuable in January 2010, the Committee was not convinced. Thus, absent Law Debenture's actions (which required its own investigation and analysis of the LBO), the Committee would have agreed to a settlement of the LBO Claims for an amount even lower than they eventually did.

The Reorganized Debtors are judicially estopped from arguing that Law Debenture's fees and expenses are unreasonable after already declaring that Law Debenture's claim arising out of Section 607 of the 1996 Indenture is an Allowed Claim, having the Court rely on its designation as an Allowed Claim, and making a distribution to Law Debenture on account of it. In pertinent part, Section 607 required Tribune to reimburse Law Debenture for all reasonable expenses it incurred in rendering its services. Had the Debtors believed Law Debenture's fees and expenses were unreasonable or that Section 607 was unenforceable, they would have objected as they did to Wilmington Trust Company's fees and expenses. Even if the Reorganized Debtors are not judicially estopped from disputing the reasonableness of Law Debenture's expenses, Law Debenture's fees are reasonable based upon a comparison of its fees with those fees incurred by other parties in these cases.

Accordingly, this Court should grant Law Debenture's substantial contribution claim in the full amount of $6,107,147.09.

**REPLY**

I.      **The Efforts Of Law Debenture And Its Advisors During
        The Application Period Substantially Benefitted The Debtors' Estates.**

In wrongly claiming Law Debenture's effort did not result in "new" and "more promising" avenues of recovery," the Reorganized Debtors and UST avoid any discussion of the value of the LBO Claims.  Nor do either the Reorganized Debtors or UST argue that the Debtors were pursuing the LBO Claims or that they were seeking to maximize the estates' recovery from such claims.  They also do not argue that the Committee was convinced that the LBO Claims were valuable prior to Law Debenture convincing the Committee of such fact.  They do not make any of these allegations because the record is conclusive otherwise.  Instead, the Reorganized Debtors dance at the periphery of Law Debenture's arguments, relying on misdirection and wholly self-serving statements to allege that Law Debenture provided no benefit to the Debtors' estates.

Both the Reorganized Debtors and the UST repeatedly assert that Law Debenture's opposition to the Plan precludes it from receiving any reimbursement on its substantial contribution claim.  However, the case law holds otherwise.  For instance, in *In re Envirodyne Indus., Inc.*, 176 B.R. 815 (Bankr. N.D. Ill. 1995) ("*Envirodyne*"), a case heavily relied upon by the Reorganized Debtors, the Court actually found that a substantial contribution award was warranted for certain actions that benefitted the estate, even though it also found that the applicant "necessitated a costly, lengthy confirmation hearing, thus substantially raising the administrative expenses incurred by the Debtors' estate." *Id.* at 820.  The same result is equally applicable here.

Here, Law Debenture is entitled to a substantial contribution award because it substantially contributed to the Debtors' chapter 11 cases, as set forth in the Motion, by (a)

preventing the Debtors from fully negotiating and filing a plan that significantly undervalued the LBO Claims, (b) ensuring that a full and complete investigation of the LBO was conducted and assisted in but did not duplicate those efforts, (c) convincing the Debtors and the Committee that the LBO Claims had substantial value and any plan had to either provide parent company creditors (not just bondholders) with a significant amount of consideration to settle and/or preserve such claims, and (d) contributing substantially to the Examiner's investigation, which this Court relied upon in its 2011 Confirmation Opinion to determine the reasonableness of the settlement of many of the LBO Claims.

These actions directly contributed to the augmentation of the Debtors' estates that led to a payment of $433 million to senior noteholders plus the preservation of claims seeking billions of dollars of recovery – the recovery of which was never guaranteed, much less pursued, until Law Debenture's involvement.  As set forth in detail below, the evidence establishes that Law Debenture's efforts were causally related to the benefit to the Debtors' estates and all creditors.

In this regard, the causation standard is not as rigid as the Reorganized Debtors posit: "absent [the applicant]'s efforts, a different outcome would have been produced in the case." (Opp. Br. at 10 (citing *In re Summit Metals*, 379 B.R. 40, 52 (Bankr. D. Del. 2007), and *In re Asarco LLC*, 2010 WL 3812642, at *10 (Bankr. S.D. Tex. Sept. 28, 2010))).  Rather, for the movant to satisfy the "causal connection" standard, the connection between the movant's efforts and the benefit does not have to be "facially apparent, proximate and exclusive." *See In re Gen. Electrodynamics Corp.*, 368 B.R. 543, 556 (Bankr. N.D. Tex. 2007) (finding causation element met based on finding the movant's efforts "at least contributed.").  Because Law Debenture's actions – irrespective of whether it supported the Plan – are causally related to the substantial

increase in the value realized from the LBO Claims, it is entitled to have its fees and expenses

reimbursed.[4]

A.    **Law Debenture Prevented The Debtors From
Substantially Undervaluing The LBO Claims.**

The Reorganized Debtors' assert that because the Motion never alleges that the Debtors'

negotiations for a plan – giving the unsecured creditors a "sliver of equity" – resulted in an

agreed upon plan, then Law Debenture could not have prevented the filing of a non-existent

plan.[5] The Debtors' assertion purposely misses the point. The Debtors in October 2009 were, in

fact, negotiating a plan that attempted to settle the LBO Claims for as little as possible and Law

Debenture's actions caused the abandonment of the October 2009 plan. Despite all their bluster,

the Reorganized Debtors cannot deny this fact as the evidence proves otherwise. Indeed, as just

one example, in October 2009, the Debtors were negotiating a proposed plan providing that

Tribune's unsecured creditors would receive only ███████████████ of the equity of the

reorganized Debtors – a substantially lower distribution than in any plan that the Debtors

ultimately filed.[6] The existence of such negotiations and draft plans proves that the Debtors

---

[4] The Reorganized Debtors and UST assert that Law Debenture has not provided enough relevant evidence in support of its Motion, noting that "typically" such evidence consists of "corroborating testimony by a disinterested party attesting to a claimant's instrumental acts." Opp. Br. at 12. Yet, no such party exists; either the party is interested (Debtors, LBO Lenders, Aurelius) or no longer exists (the Committee). Thus, Law Debenture has relied and continues to rely on the Heaney Declaration, the voluminous record in these cases and the keen memory of this Court. *See In re Summit Metals, Inc.*, 379 B.R. 40, 53 n.6 (noting that a court may rely on the "first-hand observance of the services provided" to determine whether a movant substantially contributed to the debtor's estates). To that end, although the Reorganized Debtors assert that the "actual record in the Chapter 11 Cases conclusively disproves the Trustees' various unsupported allegations," at no point in their Objection do the Reorganized Debtors actually cite any portion of the record that transpired during the Application Period with the exception of the Committee's 2004 Objection. Opp. Br. at 12; Committee 2004 Obj. This document is notable only because it illustrates the extent to which the Committee needed to justify its inaction during the preceding 10 months of the Chapter 11 Cases. Even more telling, both the Reorganized Debtors and UST do not – because they cannot – argue or provide any evidence that the Debtors always sought to maximize the value of the LBO Claims nor do they argue that the realization of substantial value from the LBO Claims was a *fait accompli*.

[5] Opp. Br. at 17-18.

[6] *See Supplemental Declaration of David S. Rosner in Support of Motion of Law Debenture Trust Company of New York Pursuant to 11 U.S.C. §§ 503(b)(3)(D), 503(b)(4) and 503(b)(5) for Allowance and Payment of Fees and Expenses Incurred in Connection with Making a Substantial Contribution to the Debtors' Chapter 11 Cases and*

initially were not interested in pursuing the LBO Claims to maximize their value or allowing the

Committee sufficient time to investigate and pursue the LBO Claims.  If the Debtors intended

otherwise, it would have been a waste of estate resources to negotiate and draft a plan providing

for such minimal recovery.  Such draft plans, such as the October 2009 plan, also provide an

easy method for the Court to ascertain what value Law Debenture added to the estate through its

efforts to investigate and pursue the LBO Claims.[7]

The Reorganized Debtors also assert that even if such a plan that would provide

unsecured creditors "a relatively small payment" existed (which it did), there is no proof that

Law Debenture's actions prevented its finalization and filing.[8]  Of course, neither the Debtors

nor any of the targets of the LBO Claims will admit why they scuttled such a plan.  The evidence

indicates, however, that although certain parties were negotiating such a plan in October 2009, ▮



▮[9]  The question, therefore, is:  what

changed during the interim period?

During the first nine months of the case, neither the LBO nor the LBO Claims were

discussed at a single hearing before the Court.[10]  Save for a single motion filed by the Committee

---

*Granting Waiver of Compliance with Del. Bankr. L.R. 2016-2(d)(vii) in Accordance with Del. Bankr. L.R. 2016-2(h),* dated April 23, 2013 ("Supp. Rosner Decl."), attached hereto as Exhibit A, at ¶ 3, Ex. 1; ¶ 4, Ex. 2, § 3.2.5. Despite having engaged in substantive negotiations, the Reorganized Debtors falsely represent to the Court that such a plan "had not even been negotiated" and that "the Debtors never had a 'goal of confirming a plan that provided Tribune's creditors with minimal consideration for the settlement of the LBO Claims.'"  Opp. Br. at 18, 26.

[7]  The Reorganized Debtors argue that if the Debtors wanted to confirm a plan that provided creditors with minimal consideration for the settlement of the LBO Claims, the Court should ignore it because the Court would have never confirmed the plan. Opp. Br. at 26. This argument is illogical. Clearly, the Debtors spent hundreds of hours negotiating and drafting a plan that provided minimal consideration because they thought the Court could confirm it; otherwise, the Debtors are admitting to wasting thousands of dollars on wasteful endeavors.

[8]  Opp. Br. at 18.

[9]  *See* Supp. Rosner Decl. at ¶ 3, Ex. 1; ¶ 4, Ex. 2, § 3.2.5.

[10]  *See generally* Hr'g. Tr. 12/10/2008 [Dkt. No. 159]; Hr'g. Tr. 1/15/2009 [Dkt. No. 276]; Hr'g. Tr. 2/3/2009 [Dkt. No. 368]; Hr'g. Tr. 3/25/2009 [Dkt. No. 855]; Hr'g. Tr. 4/30/2009 [Dkt. No. 1174]; Hr'g. Tr. 5/12/2009 [Dkt. No.

to obtain documents from former shareholders of Tribune, there was no public filing relating to the LBO or the LBO Claims.[11] And although the Committee claimed it was pursuing discovery of the LBO, the record indicates that this effort was minimal. Indeed, nine months into the case, the parties had produced only 35,000 documents to the Committee[12] and the Committee, in at least two instances, failed to demand that parties produce emails as part of their production.[13] Further, in certain instances, the Committee had agreed not to use any produced documents in any filing with the Court[14] and then criticized Law Debenture for not signing such "routine confidentiality agreements."[15] Meanwhile, the Debtors and certain other parties were moving ahead with negotiations during the summer and fall of 2009 regarding a plan that they had no intention of seeking approval from the Committee before filing.[16] And, with access to only 35,000 documents, no emails and use restrictions on the limited documents they did possess, the Committee's ability to prove the unreasonableness of such a settlement effectively and defeat the plan was very much constrained.

In contrast, as set forth in the Heaney Declaration and evidenced by the record, by the end of October 2009, Law Debenture (i) had filed pleadings with the Court describing in full

---

1202]; Hr'g. Tr. 6/10/2009 [Dkt. No. 1582]; Hr'g. Tr. 6/25/2009 [Dkt. No. 1694]; Hr'g. Tr. 6/30/2009 [Dkt. No. 1697]; Hr'g. Tr. 7/16/2009 [Dkt. No. 1790]; Hr'g. Tr. 7/21/2009 [Dkt. No. 1873]; Hr'g. Tr. 7/28/2009 [Dkt. No. 1894]; Hr'g. Tr. 8/11/2009 [Dkt. No. 2070]; Hr'g. Tr. 8/14/2009 [Dkt. No. 2052]; Hr'g. Tr. 8/31/2009 [Dkt. No. 2115].

[11] *See Motion of the Official Committee of Unsecured Creditors for an Order Authorizing the Examination of Robert R. McCormick Tribune Foundation and the Cantigny Foundation and the Production of Documents Pursuant to Bankruptcy Rule 2004, dated* June 10, 2013 [Dkt. No. 1334].

[12] Committee 2004 Obj. at ¶ 16.

[13] Hr'g. Tr. 12/1/2009 at 120:5-6; 120:22-23 [Dkt. No. 2749]; *Order Approving Stipulation Resolving Motion of the Official Committee of Unsecured Creditors Filed on June 10, 2009, for an Order Authorizing the Examination of Robert R. McCormick Tribune Foundation and the Cantigny Foundation and the Production of Documents Pursuant to Bankr. R. 2004, dated* August 21, 2009 [Dkt. No. 1997, Stipulation at ¶ 5].

[14] 2004 Motion, at 5.

[15] Committee 2004 Obj. at ¶ 3, 25.

[16] *See* Supp. Rosner Decl. at ¶ 3, Ex. 1; ¶ 4, Ex. 2.

detail the LBO and the potential LBO Claims,[17] (ii) was pursuing an effort to terminate and disgorge payments made by a non-debtor affiliate of Tribune to a potential target of the LBO Claims,[18] and (iii) repeatedly engaged the Debtors and the Committee to convince them of the value of the LBO Claims.[19]  Once Law Debenture inserted itself into the LBO investigation, discovery began to proceed far more rapidly and a few months later, as a direct result of Law Debenture's efforts, the amount of documents (now including emails) had increased ten-fold.[20] Whereas prior to Law Debenture's involvement not a single pleading described the LBO or the potential LBO Claims, following such involvement the LBO and the investigation became a prominent fixture in the progress of the cases both on the docket and during each hearing.

Had Law Debenture not taken the aforementioned actions, the Debtors would not have completely abandoned their draft plan that appeared nearly fully baked and ready for filing.

### B.    Law Debenture's Efforts Ensured A Robust Investigation Of The LBO Claims.

As described above, Law Debenture's involvement changed the tenor of the discussions between the parties and actually brought the underlying LBO issues before the Court for the first time.  Again distorting Law Debenture's arguments, the Reorganized Debtors and UST claim the Committee did not breach its fiduciary obligations by failing to advocate Law Debenture's interests above the interests of other creditor constituencies.[21]  However, Law Debenture's

---

[17]  Motion, at ¶¶ 21-22.

[18]  Motion, at ¶ 29 n. 49.  Law Debenture's dispute over the payment of professional fees to one of the LBO Lenders was more than an attempt to gain leverage, as the Reorganized Debtors assert.  Opp. Br. at 32 n. 65.  It was an attempt to fix a perceived problem with the Debtors funding the legal fees of a party that was adverse to the interests of the Debtors' estates.  Indeed, the Court agreed that the Debtors purposely evaded Court approval, stating "you don't have to convince me that there was a concerted effort here to limit notice and to avoid Court approval."  Hr'g. Tr. 3/26/2010, 11:5-7.

[19]  Motion, at ¶¶ 29-41; Heaney Decl. at ¶¶ 11-22.

[20]  Motion, at ¶ 21 n. 34.

[21]  Opp. Br. at 19; UST Obj. at 12-13.

Motion is not focused on whether the Committee breached its fiduciary obligations.  Rather the evidence shows that Law Debenture's involvement was necessitated by the Debtors' unwillingness to investigate the LBO Claims and the Committee's lack of any meaningful progress.  As a result of Law Debenture's involvement, it was able to convince the Debtors to hold back filing any plan until the bulk of the LBO Claims were settled and convince the Committee that it needed to obtain standing to pursue the LBO Claims.  Law Debenture's substantial efforts also greatly assisted the Committee in analyzing the documents, questioning witnesses at depositions, and supplementing the draft complaint.

None of these facts is disputed by the Reorganized Debtors.  Rather, the Reorganized Debtors rely on self-serving statements made by the Committee in their objection to Law Debenture's 2004 Motion to show the Committee's LBO investigation was not deficient.  Specifically, the Reorganized Debtors cling to the Committee's statement that the Committee "directed and pursued a detailed and exhaustive investigation and review of the LBO and the issues and possible claims arising from the LBO."[22]  As described in detail in the preceding section, the reality was far different.  By September 2009, nine months into the Debtors' cases, the Committee had received only 35,000 documents, had agreed with many parties that they did not have to produce emails, and agreed that the Committee could not use produced documents in court.[23]  In the only instance where the Committee sought an order compelling production, the Committee still agreed that emails were not part of the current production.[24]  No discussion of the LBO had yet occurred before the Court.  The Committee had agreed that the Debtors could have a non-debtor affiliate pay the ongoing fees and expenses of an LBO Lender without Court

---

[22]  Opp. Br. at 21.

[23]  *See supra* at 8-9.

[24]  *See supra* at 8-9.

approval.[25]  And there is no evidence that the Committee's financial advisor ever performed a solvency analysis of the LBO.  Although the Committee may have "initiated a comprehensive and extensive program of third-party discovery" in March 2009, by September 2009, there was not much to show for such effort other than $4.3 million in legal fees.[26]

Similarly misleading is the Reorganized Debtors' contention that the Debtors and the Committee were facilitating and encouraging all parties to reach a consensual negotiation of the LBO Claims.[27]  First, as set forth above, prior to Law Debenture's involvement, the Debtors were negotiating a plan in 2009 that sought to minimize rather than maximize the value of the LBO Claims.[28]  They only began to favor consensual negotiation among all parties once it concluded that such a plan was not confirmable given Law Debenture's insistence on maximizing the value of the LBO claims.

Second, the fact that the Committee was acting as a mediator rather than the putative plaintiff is evidence that it was not convinced that it needed to seek standing to pursue the LBO Claims.  Simply put, if it were so obvious that the LBO Claims had value and that the Committee needed to commence an adversary proceeding, then why were the Debtors intent on negotiating a plan that failed to realize this obvious value?  And, if the value of the LBO claims was so obvious, then why did the Committee seek presentations from the bondholders and the LBO Lenders prior to determining to seek standing?  The obvious answer is that neither the Debtors nor the Committee believed that the value of the LBO Claims was that obvious.

---

[25]  Motion, at ¶ 29 n. 49.

[26]  Opp. Br. at 21.

[27]  Opp. Br. at 21-22.

[28]  *See* Supp. Rosner Decl. at ¶ 3, Ex. 1; ¶ 4, Ex. 2.  *See supra* at 8-9.

The fact that the Debtors and the Committee needed to convene meetings to convince them of the merits and value of the LBO Claims, not only substantiates the need for Law Debenture's effort to investigate the LBO Claims, but negates any assertion by the Reorganized Debtors and the UST that Law Debenture's effort was duplicative.[29]  Indeed, if both the Debtors and the Committee were acting as facilitators for a consensual resolution – as the Reorganized Debtors contend – then only Law Debenture was left to actually stand up for the LBO Claims against the LBO Lenders.

Also, the contention that Law Debenture and the Committee reviewed documents at the same time as the Committee does not mean their efforts were duplicative and is irrelevant in any event.[30]  The fact is Law Debenture's document review was critical to analyzing the viability of the LBO Claims on an *expedited* basis and enabled Law Debenture to contribute to the investigation.  Had Law Debenture not reviewed the documents to investigate the LBO Claims thoroughly and solely relied on the Committee's limited investigative efforts, then, when the Committee was trying to determine the merits of LBO Claims and whether to seek standing, nobody would have been capable of refuting the LBO Lenders' assertions that the LBO Claims were meritless.  Indeed, after the Committee finally decided that the LBO Claims had value and that it should seek standing, it reached out to Law Debenture for assistance and even requested a copy of its draft complaint.[31]  Further, as discussed below, without a document review to thoroughly analyze the LBO Claims, Law Debenture would have been incapable of contributing

---

[29]  Opp. Br. at 22-23; UST Obj. at 14-16.

[30]  Opp. Br. at 22.

[31]  *See* Rosner Decl. at Ex. 3 (email from Committee's counsel to Law Debenture's counsel stating that it "appreciate[s] the collaborative effort and your considerable input for the JPM depos last week" and requesting "if you are willing to share the draft Trib complaint you have prepared, we'd welcome the benefit of your efforts as we continue to get ours into ready-to-file condition.")

to the Examiner Report and would have had to rely on the Committee's submissions, which failed to appraise the Examiner of all the legal issues fully.

Thus, the instant case is distinct from those cases where the movant's investigation is duplicative of similar efforts made by estate professionals that reached all the same conclusions and intended to pursue the same claims. Indeed, the Committee eventually agreed to a settlement of the LBO Claims and Law Debenture did not. For these reasons, Law Debenture's efforts substantially contributed to the realization of value from the LBO Claims and were not duplicative of the Committee or any other party.

### C. Law Debenture's Role In Examiner's Adversarial Process Was Essential.

Although the Reorganized Debtors admit that the Examiner Report was the product of an "adversarial process" developed by the Examiner, they fail to acknowledge that the Examiner needed parties advocating in favor of and against the LBO Claims to make the process effective.[32] Instead, the Reorganized Debtors attempt to transform the parties' interaction with the Examiner from an unusual process that greatly benefited the Debtors' estates to "normal creditor efforts directed to protecting the Noteholders' interests to the greatest possible extent." *Matter of Buckhead Am. Corp*, 161 B.R. 11, 17 (Bankr. D. Del. 1993). The Examiner process, as the Examiner itself admitted, was far from a normal bankruptcy process.[33]

The Reorganized Debtors also attempt to cherry pick a single argument advocated by Law Debenture (cleverly broken into three separate components) that was not adopted by the Examiner and then summarily conclude, relying upon *In re Granite Partners, L.P.*, 213 B.R. 440, 450 (Bankr. S.D.N.Y. 1997) ("*Granite Partners*"), that "unsuccessful advocacy does not

---

[32] Opp. Br. at 24.

[33] *Work and Expense Plan of Examiner-Designate Kenneth N. Klee, Esq.*, at ¶ 16 [Dkt. No. 4261]. It also is notable that while the Reorganized Debtors argue that the process is the antithesis of substantial contribution, the Debtors did reimburse tens of millions of fees and expenses of non-statutory parties for their work in connection with the Examiner Report and defending the LBO Claims [Dkt. No. 12072, Confirmed Plan at §§ 9.1.1 and 9.1.2.].

give rise to a compensable substantial contribution."[34]  Yet *Granite Partners* is inapposite because there the court held that the movant was seeking compensation for raising an argument it was not *entitled to make*.  Here, unlike *Granite Partners*, the single argument advocated by Law Debenture that the Reorganized Debtors argue was not adopted by the Examiner remains viable in still-pending litigation proceedings with respect to those claims transferred to the Litigation Trust.  Indeed, even the Examiner admitted that the solvency question was "a very close call."[35]  Even if the Examiner's (as opposed to the Court's) rejection of an argument is analogous to a defeat in court, courts have held that "[c]onceivably, even in defeat, a party may make a substantial contribution to a debtor's estate."  *Envirodyne*, 176 B.R. at 823.  Moreover, the Reorganized Debtors completely ignore the multitude of arguments raised by Law Debenture that the Examiner did adopt, including his conclusions that it was "somewhat likely" that a court would conclude that the Step Two Transactions constituted intentional fraudulent conveyances.[36]

Contrary to the UST's assertion, Law Debenture never argues that "but for Law Debenture, the Examiner could not have performed his duties."[37]  As an initial matter, that is the incorrect causal standard required for proving substantial contribution as discussed above.  *See In re Gen. Electrodynamics Corp.*, 368 B.R. at 556.  Rather, Law Debenture contributed to the Examiner Report by sharing with the Examiner its non-duplicative investigative results and analysis of the LBO Claims, which provided a foundation for the Examiner's work and resulted in the Examiner delving further into certain legal and factual issues that were not raised by other

---

[34] Opp. Br. at 25.

[35] *Examiner Report, Vol. II*, at 188.

[36] *Examiner Report, Vol. I*, at 8, 13.

[37] UST Obj. at 15.

parties.[38]  The fact that 13 parties had interactions with the Examiner and 9 parties submitted

extensive briefing does not prove, as UST alleges, Law Debenture's efforts were duplicative.[39]

For example, in its brief to the Examiner, Law Debenture was the only party to bring to

the Examiner's attention to the fact that Tribune, in attempt to obtain a "positive" solvency

opinion to close on Step 2 of the LBO, provided the valuation firm a representation about its

refinancing capabilities despite Morgan Stanley's refusal to provide such assurance to the

valuation firm.[40]  Based on Law Debenture's highlighting these facts to the Examiner, the

Examiner focused part of his investigation on this inquiry and found Tribune's conduct

supported the conclusion that the Step Two transactions were intentionally fraudulent transfers.[41]

This is just one of many examples where Law Debenture's analysis and investigation into the

LBO Claims contributed to the Examiner's work.

Further, the UST is mistaken that the Examiner did not specifically request Law

Debenture's assistance.  The adversarial process created by the Examiner and ordered by the

Court required each of the parties to participate.[42]  The fact that Law Debenture was one of many

parties does not negate the request.  Neither does the fact that the parties' assistance

supplemented rather than replaced the Examiner's independent investigation diminish the

parties' benefit to the Examiner and the estate – a benefit expressly acknowledged by the

Examiner.[43]

---

[38] *See supra* at 12-14.

[39] UST Obj. at 14-15.

[40] *See* Supp. Rosner Decl. at ¶ 5, Ex. 3 at 38-42.

[41] *Examiner Report, Vol. II*, at 36, 42-43.

[42] Motion at ¶ 44.

[43] Motion at ¶ 47.  Similarly, the fact that the Examiner did not single out any party does not mean that no party made a substantial contribution.

Accordingly, as argued in the Motion, the Examiner Report itself was a substantial

contribution to the Debtors' chapter 11 cases and as acknowledged by the Examiner, the efforts

of the parties were invaluable in the preparation of that Report.

## II.    Law Debenture's Opposition To The Plan Does Not Detract From Its Substantial Contribution.

### A.    The Reorganized Debtors' Cases Do Not Support Denying Law Debenture's Relief.

The Reorganized Debtors mischaracterize the law when arguing Law Debenture's claim

for substantial contribution should be denied in its entirety due to its alleged "overall"

"obstructionist" conduct during the Chapter 11 cases.[44]

The Reorganized Debtors claim "courts frequently deny (or substantially reduce) requests

for a substantial contribution award where a claimant has impeded progress and caused increased

administrative expenses."[45]  However, the cases cited by the Reorganized Debtors do not support

that broad proposition.[46]  Rather, for the vast majority of cases in which reimbursement was

denied, it had nothing to do with so-called "obstructionist" conduct, but the applicants failed to

make a showing of substantial contribution.  *See, e.g., Matter of Consol. Bancshares, Inc.*, 785

F.2d 1249, 1252 (5th Cir. 1986) (application for reimbursement denied because the pre-petition

filing of a derivative action was of little value to the estate); *In re Big Rivers Elec. Corp.*, 233

B.R. 739, 747 (W.D. Ky. 1998) (affirming finding that "[e]ven under the law most favorable to

[movant], [movant] is not entitled to an administrative claim, as this Court holds that ***none of the***

***efforts*** of [movant] . . . enhanced in any way the reorganization of the [Big Rivers] estate.")

(emphasis added); *Granite Partners*, 213 B.R. at 446 (noting in *dicta* that "[a] court may also

---

[44]  Opp. Br. at 12-13.

[45]  Opp. Br. at 13.

[46]  Opp. Br. at 12-14.

consider whether the applicant's noncompensable activities increased the administrative costs to the estate"; the court did not actually apply this standard to reduce or eliminate a substantial contribution award.).  Thus, the courts did not offset or substantially reduce a substantial contribution award based on the applicant's impeding conduct.

The Reorganized Debtors claim the court, in *Matter of Baldwin-United Corp.*, 79 B.R. 321 (Bankr. S.D. Ohio 1987), "denied an indenture trustee's substantial contribution application on the ground that the trustee (First Chicago) was overly litigious and not a constructive force for reorganization."[47]  However, the *Baldwin* court did not deny the request based on the trustee's litigious conduct, but because of the applicant's failure to demonstrate its substantial contribution burden. *Id.* at 339.  Indeed, the Reorganized Debtors conveniently omit the following passage from *Baldwin*:

> [W]hile the services of First Chicago's attorneys and consultant may have benefited the bank, they certainly did not 'foster and enhance, rather than retard and interrupt, the progress of reorganization.'  Having failed to meet even the threshold requirement for finding substantial contribution in the case, First Chicago's application is denied in its entirety.

*Id.* (internal citations omitted).

Moreover, the Reorganized Debtors claim the court in *Envirodyne* found there was "no substantial contribution where [the] applicant 'necessitated a costly, lengthy confirmation hearing, thus substantially raising the amount of administrative expenses incurred by the Debtors' estate.'" 176 B.R. at 820; Opp. Br. at 14.  The Reorganized Debtors, however, fail to mention that the *Envirodyne* court also found that the applicant had made a substantial contribution, warranting a reimbursement award, by (i) filing an involuntary petition and (ii) opposing the attempted appointment of counsel for the Debtors because the firm had a conflict of

---

[47] Opp. Br. at 13.

interest. *Id.* The Reorganized Debtors also omit from their brief that even though the applicant opposed the debtors' plan which "necessitated a costly, lengthy confirmation hearing," the *Envirodyne* court **did not offset or eliminate** the substantial contribution award.  Instead, the court only held that the applicant was not entitled to an award of fees and expenses for any work related to plan objections because these "services were performed solely to advance the agenda and interests of its employing clients." *Id.* Here, Law Debenture is not seeking reimbursement for its efforts to defeat the Plan; it is only seeking reimbursement for its efforts to maximize the value of the LBO Claims.  Like in *Envirodyne*, this Court must grant Law Debenture's reimbursement for its successful efforts to increase the value of the LBO Claims even though it also objected to the Plan.

Lastly, the Reorganized Debtors cite to only one case where a substantial contribution claim was reduced, *In re Mirant Corp.*, 354 B.R. 113, 135 (Bankr. N.D. Tex. 2006), *subsequently aff'd*, 308 F. App'x 824 (5th Cir. 2009), but there the applicant was found to have "engaged in an improper and misleading solicitation of shareholder votes on the Plan." *Mirant*, 354 B.R. at 135.[48]  Here, as discussed below, the overall conduct that the Reorganized Debtors purportedly claim was obstructionist – which it was not – all occurred after the Application Period and involved ordinary actions in adversary matters, such as objecting to a plan, supporting a competing plan, and appealing discrete aspects of a confirmation order.  None of Law Debenture's post-Application Period actions even remotely approaches the wrongful conduct in *Mirant*.

---

[48]  It is important to note that the *Mirant* court also reduced the amount of the substantial contribution claim based on its findings that (i) the substantial contribution made by the applicant Wilson at the Valuation Hearing of identifying additional value would probably have been identified by the court without the applicant's efforts; (ii) a number of the claimed contributions were not credible; and (iii) the applicant's efforts were duplicative of others. *Mirant*, 354 B.R. at 141.

**B.**    **The Reorganized Debtors Cannot Demonstrate**
    **Law Debenture Was Obstructionist.**

Even if the case law were in the Reorganized Debtors' favor, they have not established

that Law Debenture's actions were "unproductive, counterproductive and litigious." Instead, all

of the actions highlighted by the Reorganized Debtors involved Law Debenture discharging its

fiduciary obligations, such as supporting the Noteholders' Plan, objecting to the Debtors' Plan,

objecting to the Debtors' Reserve Proposal and appealing the Allocation Dispute Opinion.[49]

Law Debenture's actions were reasonably grounded in law, are common actions in bankruptcy

cases, and plainly do not amount to obstructionist behavior. It is quite a stretch for the

Reorganized Debtors to claim that Law Debenture's successful opposition to the Debtors'

Reserve Proposal somehow was obstructionist. Under the Reorganized Debtors' contorted

definition of "obstructionist," any disagreement with the Debtors would qualify as such. This is

absurd.[50]

The Reorganized Debtors have also failed to prove that the Debtors incurred additional

administrative costs that are *solely* attributable to Law Debenture's actions. In other words, the

Reorganized Debtors cannot show that they would not have incurred the administrative expenses

they incurred had Law Debenture not objected to the Debtors' Plan. Instead, the Reorganized

Debtors have "lumped" the activities of Law Debenture together with other participants in the

Chapter 11 cases. For example, Law Debenture was one of several proponents for the

Noteholders' Plan and had Law Debenture not been a proponent, other parties would still have

supported the plan. Additionally, the Reorganized Debtors do not even attempt to calculate the

amount of these "additional costs" that the Debtors allegedly incurred.

---

[49] *See* Opp. Br. at 15-16.

[50] Utilizing the same logic as the Reorganized Debtors would imply that the Debtors' objection to the Committee's standing motion was also obstructionist.

Thus, the actions Law Debenture took in the post-Application Period were neither obstructionist nor warrant a denial or offset of its substantial contribution award.

**III.    Law Debenture's Substantial Contribution Transcended Its Self-Interest.**

The Reorganized Debtors and the UST claim Law Debenture cannot satisfy the self-interest test under *Lebron v. Mechem Fin. Inc.*, 27 F.3d 937 (3d Cir. 1994) ("*Lebron*") because it has not overcome the presumption that it was acting in its own self-interest. Yet, the Reorganized Debtors overlook that the Third Circuit has held that "the existence of a self-interest cannot in and of itself preclude reimbursement." *Lebron*, 27 F.3d at 944. In contending Law Debenture purportedly only acted with its own self-interest, the Reorganized Debtors once again rely on the self-serving statements of the Committee in September 2009 that the "true" intent of Law Debenture's 2004 Motion was to seize control over the LBO investigation. Reliance on predictive statements in the record is hardly proof that Law Debenture's efforts did not, in fact, transcend its own self-interest.

Neither the Reorganized Debtors nor the UST dispute or even attempt to address that courts in this circuit have previously held that "in the event the Court finds [movant's] actions benefitted the estate, the cost of those actions will be allowed despite any self-interest." *In re Women First Healthcare, Inc.*, 332 B.R. 115, 122 (Bankr. D. Del. 2005) ("*Women First Healthcare*"). Here, there is widespread evidence that the realization of value provided a benefit to every unsecured creditor of every Debtor in addition to the noteholders under the 1996 Indenture. Indeed, even the Reorganized Debtors acknowledge that "'natural recoveries' for creditors of the Guarantor Debtors amounted to roughly 2.61% of their claim amounts, and it

was not until the settlement [of the LBO Claims] produced in mediation in late 2010 that

consensus was reached on a compromise that provided for payment in full of such claims."[51]

Contesting that Law Debenture's actions benefited all creditors, the UST argues that due

to "the sheer size" of Law Debenture's claim, it could not act for the benefit of all noteholders.[52]

Certainly the size of a creditor's claim has nothing to do with whether Law Debenture's efforts

substantially contributed to the Debtors' cases.  As the court in *Women First Healthcare* found

that proving a benefit to the estate does not require that a creditor's motives be dictated by

charitable concerns; instead, the motivation of the movant is irrelevant as long as the movant

benefitted the estate.  332 B.R. at 122.

The Reorganized Debtors claim Law Debenture cannot rely upon Section 607 of the 1996

Indenture, which provides that Tribune would pay the indenture trustee reasonable expenses in

connection with its services, to establish its expectation of reimbursement.  Although the mere

existence of Section 607 alone does not establish a claim for substantial contribution, it does

satisfy the Third Circuit's expectation of reimbursement element.  In making their unsupportable

claim that the 1996 Indenture provision has no bearing on Law Debenture's expectation for

reimbursement, the Reorganized Debtors rely on a single inapposite case – *In re American*

*Plumbing & Mech., Inc.*, 327 B.R. 273 (Bankr. W.D. Tex. 2005) ("*American Plumbing*").  In

*American Plumbing*, the court rejected the test adopted by the Third Circuit that a movant must

prove that it had an expectation of reimbursement.  Accordingly, the court stated that the

indenture provision at issue providing for reimbursement of attorneys' fees was not relevant to a

substantial contribution motion because "[a]n applicant's intent is not relevant in the substantial-

contribution inquiry." *Id.* at 286.  Thus, the Reorganized Debtors' reliance on *American*

---

[51] Opp. Br. at 20.
[52] UST Obj. at 13.

*Plumbing* is misplaced. The 1996 Indenture is evidence of Law Debenture's belief that the Debtors' would reimburse it for the fees and expenses incurred while acting as an indenture trustee, including its substantial contributions to the Chapter 11 cases. Indeed, if a prepetition agreement evidencing the parties' express intent of reimbursement is insufficient to establish the Third Circuit's expectation requirement, it is hard to imagine that any agreement would ever satisfy that standard.

## IV.    Law Debenture's Fees Are Reasonable.

Astonishingly, the Reorganized Debtors contend that Law Debenture's fees are unreasonable despite the fact that the Debtors already deemed as an Allowed Claim (as defined by the Plan) the entirety of Law Debenture's fees and expenses incurred pursuant to Section 607 of the 1996 Indenture, including the portion for which reimbursement is sought herein.[53] Section 607 specifically required Tribune to reimburse Law Debenture for "all *reasonable* expenses, disbursements, and advances" incurred by Law Debenture in rendering its services.[54] By previously representing to the Court that Law Debenture had an Allowed Claim – which amount included Section 607's "reasonable" expenses – the Reorganized Debtors are estopped from claiming Law Debenture's expenses are suddenly unreasonable. *See Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 419 (3d Cir. 1988) (noting that judicial estoppel "preclude[s] a party from assuming a position in a legal proceeding inconsistent with one previously asserted.").

The Reorganized Debtors and UST further claim that Law Debenture's fees are unreasonable because (i) the billing entries do not differentiate between multiple tasks during a

---

[53] Opp. Br. at 29-33. *See Order Approving Stipulation in Aid of Implementation of Senior Noteholder Distributions Pursuant to Confirmed DCL Plan*, dated November 19, 2012 [Dkt. No. 12734] (providing that the Allowed Law Debenture Claim under the 1996 Indenture includes the principal amount due of $234,985,699.73 plus Law Debenture Fees totaling $11,831,453.55) [Dkt. No. 12734, Ex. A at Attachment D].

[54] Rosner Decl., Ex. 5 at § 607.

single day, (ii) the work was duplicative of the Committee's work, and (iii) the fees were incurred to advance the interests of its directing noteholder.  Even if the Debtors are not estopped from arguing that Law Debenture's fees are unreasonable, their allegations are unfounded.  As Law Debenture already addressed in its Motion and above, the Reorganized Debtors and UST's contentions that its work was duplicative and its fees were incurred solely to advance the interests of its directing noteholder have no merit.

Similarly, the Reorganized Debtors and UST have no basis for claiming that block billing is fatal to Law Debenture's substantial contribution claim.  As argued in the Motion, in *Worldwide Direct*, Judge Walrath determined that even though the movant had not complied with Del. L.R. 2016-2, she would "not summarily dismiss the [substantial contribution] Applications because they do contain some detail . . . ." *In re Worldwide Direct*, 334 B.R. 112, 120 (Bankr. D. Del. 2005).  The Court, instead, "must look at the big picture presented by the fee application." *Id.* (citation omitted).  *Rodriguez v. McLoughlin*, 84 F. Supp. 2d 417, 425 (S.D.N.Y. 1999) (quoting *Meriwether v. Coughlin*, 727 F. Supp. 823, 827 & n.5 (S.D.N.Y. 1989)).

Here, Law Debenture's fees are reasonable based upon the "big picture."  Indeed, when comparing the fees incurred by non-estate professionals, including JPM and Oaktree – which the Debtors have already deemed were reasonable – with Law Debenture's fees, which are only a fraction of those fees – Law Debenture's fees are plainly reasonable.

## V.   Law Debenture Is Entitled To Reimbursement For Expenses It Incurred In Retaining A Financial Advisor.

The Reorganized Debtors and UST object to the reimbursement of Law Debenture for the expenses it incurred in retaining MSG as its financial advisor, claiming only attorneys and accountants – not financial advisors – are entitled to reimbursement under Section 503(b)(4) of

the Bankruptcy Code.  The Reorganized Debtors and UST, however, fail to understand that MSG is not seeking direct or indirect reimbursement; instead, Law Debenture seeks reimbursement of the expense it incurred (funded by the controlling noteholder at the time) from performing its services which included the retention of MSG pursuant to Section 503(b)(3)(D).

Section 503(b)(3)(D) expressly provides that an "indenture trustee" may seek reimbursement for actual, necessary expenses that it incurred and does not limit the scope of the indenture trustee's expenses as the Reorganized Debtors and UST contend.  Instead, the only limitation on reimbursement is found in Section 503(b)(3) which states:  "other than compensation and reimbursement specified in [Section 503(b)(4)]."  This limitation is not applicable here because MSG is neither an attorney nor an accountant.  This limitation, however, does not preclude Law Debenture from recovering other expenses – those which were are not related to the retention of an attorney or an accountant.  Because Law Debenture retained MSG and properly classified the necessary fees it paid to MSG as its expenses, those fees are reimbursable under Section 503(b)(3)(D).  Thus, Law Debenture is entitled to reimbursement for its MSG-related expenses.

## CONCLUSION

WHEREFORE, Law Debenture respectfully requests that the Court enter an order (a)

allowing as an administrative expense claim on account of the Law Debenture fees and expenses

in the amount of $6,107,147.09, (b) authorizing and directing payment thereof, and (c) granting

Law Debenture such other and further relief as the Court deems just and appropriate.

Dated: April 23, 2013
      Wilmington, Delaware

                                 Respectfully submitted,

                                 BIFFERATO GENTILOTTI LLC

                                 _/s/ Garvan F. McDaniel_
                                 Garvan F. McDaniel (I.D. No. 4167)
                                 1013 Centre Road, Suite 102
                                 Wilmington, Delaware 19805
                                 Telephone: 302-429-1900
                                 Facsimile: 302-429-8600

                                 -and –

                                 KASOWITZ, BENSON, TORRES
                                 & FRIEDMAN LLP
                                 David S. Rosner
                                 Sheron Korpus
                                 Christine A. Montenegro
                                 Matthew B. Stein
                                 1633 Broadway
                                 New York, New York 10019
                                 Telephone: 212-506-1700
                                 Facsimile: 212-506-1800

                               _Co-Counsel for Law Debenture Trust_
                               _Company of New York, solely in its capacity_
                               _as successor indenture trustee under the_
                               _1996 Indenture_