# Rosner Supp. Decl. Exhibit 3

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------x
In re:                                :        Chapter 11 Cases
                                      :        Case No. 08-13141 (KJC)
TRIBUNE COMPANY, et al.,              :        (Jointly Administered)
                                      :
                      Debtors.        :
-------------------------------------------------------x
```

**RESPONSE OF LAW DEBENTURE TRUST COMPANY OF NEW YORK
TO THE EXAMINERS' INFORMATION AND POSITION REQUESTS**

# TABLE OF CONTENTS

**Page**

ARGUMENT ............................................................................................................. 1

I.   Tribune Has Viable Fraudulent Transfer Claims ............................................. 1

    A.   Intentional Fraudulent Transfers ............................................................. 1

        1.   Tribune's Officers And Directors Knew The LBO Would Cause The Debtors' Demise ................................................................. 2

        2.   The Banks Knew The LBO Would Render Tribune Insolvent ................. 4

            a.   Direct Evidence Of The Banks' Knowledge ................................ 4

            b.   The Banks Took Steps To Protect Themselves Against Fraudulent Conveyance Claims ..................................................... 7

    B.   The LBO Is Avoidable As A Constructive Fraudulent Transfer ......................... 10

        1.   The Entire LBO Will Be Collapsed To Determine Whether Tribune Received Reasonably Equivalent Value .................................... 10

            a.   The LBO Was A Fully Integrated Transaction ........................... 11

            b.   Phase II Closing Conditions Were Not A Significant Impediment To Consummating the LBO .................................... 14

        2.   The Debtors Did Not Receive Reasonably Equivalent Value ................. 15

        3.   The LBO Rendered Tribune Insolvent ................................................ 16

            a.   Contemporaneous Valuations Show Insolvency ......................... 17

            b.   The Market Understood Tribune Was Insolvent ......................... 18

            c.   Purported Competing Bids Do Not Indicate Solvency ............... 19

            d.   VRC's Flawed Solvency Analysis Is Not Credible .................... 19

        4.   The Guarantors Were Insolvent ......................................................... 21

        5.   Tribune Was Left With Unreasonably Small Capital ............................ 21

II.   The Banks Have No Defense To The Avoidance Of The Obligations And Transfers. ...................................................................................................... 23

    A.   Section 548(c) ....................................................................................... 23

    B.   Section 550 ............................................................................................ 26

    C.   The N.Y.D.C.L. Precludes A Good Faith Defense ...................................... 26

III.   There Are No Remedy Limitations ................................................................. 27

IV.   The Banks' Claims Should Be Equitably Subordinated .................................. 32

V.   The Banks' Claims Should Be Equitably Disallowed ..................................... 34

VI.   The Court Should Pierce The Veil Between The Parent And The Sham Holdcos .......... 36

# TABLE OF CONTENTS
## (continued)

**Page**

VII.  There Are Viable Tort Claims Against The Banks, The Officers And Directors............ 38

    A.  Breach Of Fiduciary Claims Can Be Asserted Against The Board Of Officers And Directors.................................................................................. 38

        1.  Duty Of Loyalty...................................................................... 39

        2.  Duty Of Care........................................................................... 40

        3.  The Banks Are Liable For Aiding And Abetting..................................... 43

        4.  The Banks' Potential Defenses Will Not Bar The Viable Claims Here....................................................................................... 44

            a.  *In Pari Delicto* And Imputation Defenses Do Not Apply ........... 44

            b.  Indemnification Provisions ........................................................ 47

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Acequia, Inc v. Clinton (In re Acequia, Inc.),*
    34 F.3d 800 (9th Cir. 1994) ............................................................................28, 29

*Adelphia Recovery Trust v. Bank of Am., N.A. (In re Adelphia),*
    390 B.R. 80 (S.D.N.Y. 2008) ............................................................................29, 30

*Alten v. Ellin & Tucker, Chartered,*
    854 F. Supp. 283 (D. Del. 1994) .............................................................................47

*Annan v. Wilmington Trust Co.,*
    559 A.2d 1289 (Del. 1989) ......................................................................................25

*Asarco LLC v. Ams. Mining Corp.,* 396 B.R. 278 (S.D. Tex. 2008) ....................................36, 37

*Asousa P'ship v. Smithfields Foods, Inc. (In re Asousa P'ship),*
    2006 Bankr. LEXIS 1463 (E.D. Pa. June 15, 2006) ...............................................20

*Bateman Eichler, Hill Richards, Inc. v. Berner,* 472 U.S. 299 (1985) ........................................46

*Bayou Accredited Fund, LLC v. Redwood Growth Partners, L.P. (In re Bayou Group, LLC),*
    396 B.R. 810 (Bankr. S.D.N.Y. 2008) ..............................................................*passim*

*Bayou Superfund LLC v. WAM Long/Short Fund II, L.P. (In re Bayou Group, LLC),*
    362 B.R. 624 (Bankr. S.D.N.Y. 2007) ....................................................................23

*Benjamin Ctr. v. Hampton Affils., Inc.*
    66 N.Y.2d 782 (N.Y. 1985) .....................................................................................25

*Benjamin v. Diamond (In re Mobile Steel Co.),*
    563 F.2d 692 (5th Cir. 1977) .............................................................32, 33, 34, 35

*Big V Supermarkets Inc. v. Wakefern Food Corp. (In re Big V Holding Corp.),*
    267 B.R. 71 (Bank. D. Del. 2001) ...........................................................................11

*Boyer v. Crown Stock Distrib., Inc.,*
    587 F.3d 787 (7th Cir. 2009) .....................................................................11, 15, 30

*Brandt v. Hicks, Muse & Co. (In re Healthco Int'l, Inc.),*
    195 B.R. 971 (Bankr. D. Mass. 1996) .....................................................................22

*Brandt v. Hicks, Muse & Co. (In re Healthco Int'l, Inc.),*
    208 B.R. 288 (Bankr. D. Mass. 1997) ................................................................41, 42

*Bridgeport Holdings Inc. Liquidating Trust v. Boyer (In re Bridgeport Holdings, Inc.)*,
    388 B.R. 548 (Bankr. D. Del. 2008) ................................................................42

*Capital Bank & Trust Co. v. 604 Columbus Ave. Realty Trust*
    *(In re 604 Columbus Ave. Realty Trust)*, 968 F.2d 1332 (1st Cir. 1992)................................33

*Cede & Co. v. Technicolor*,
    634 A.2d 345 (Del. 1993) ................................................................39, 41

*Chabraja v. Martwick*,
    248 Ill. App. 3d 995 (Ill. App. Ct. 1st Dist. 1993)................................................................43

*Cinerama, Inc. v. Technicolor, Inc.*,
    663 A.2d 1156 (Del. 1995) ................................................................39, 41

*Circle Group Holdings, Inc. v. Akhamzadeh*,
    2006 U.S. Dist. LEXIS 62631 (N.D. Ill. Sept. 1, 2006) ................................................44, 45,46

*Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*,
    323 F.3d 228 (3d Cir. 2003)................................................................34

*Credit Managers Assoc. v. Federal Co.*,
    629 F. Supp. 175 (C.D. Cal. 1985) ................................................................21

*Credit Suisse v. Official Comm. Of Unsecured Creditors (In re Yellowstone Mountain
    Club, LLC)*,2009 Bankr. LEXIS 2047 (Bankr. D. Mont. May 12, 2009)................................ 33

*Dobin v. Hill (In re Hill)*,
    342 B.R. 183 (Bankr. D.N.J. 2006) ................................................................24

*Dobin v. Taiwan Mach. Trade Ctr. Corp. (In re Victor Int'l)*,
    97 Fed. Appx. 365 (3d Cir. 2004)................................................................2

*Evvtex Co., Inc. v. Hartley Cooper Assoc. Ltd.*,
    102 F.3d 1327 (2d Cir. 1996)................................................................25

*Fletcher v. Atex, Inc.*,
    68 F.3d 1451 (2d Cir. 1995)................................................................37

*Financial Institutional Funding, Inc. v. Official Committee of Unsecured Creditors of
    Genfarm Ltd. (In re Buncher Co.)*, 229 F.3d 245 (3d Cir. 2000) ................................15

*Gatz v. Ponsoldt*,
    925 A.2d 1265 (Del. 2007) ................................................................44

*Gecker v. Goldman Sachs & Co. (In re Auto. Prof'ls, Inc.)*,
    398 B.R. 256 (Bankr. N.D. Ill. 2008) ................................................................44

*Guth v. Loft, Inc.,*
   5 A.2d 503, 23 Del. Ch. 255 (Del. 1939)..................................................39, 41

*Hadix v. Johnson,*
   144 F.3d 925 (6th Cir. 1998)........................................................................ 35

*Hayes v. FPI Nursery Partners 1984-I,*
   U.S. App. LEXIS 12650 (9th Cir. June 1, 1991)........................................23

*Holland v. Arthur Andersen & Co.,*
   127 Ill. App. 3d 854 (Ill. App. Ct. 1st Dist. 1984)....................................46

*Holland v. Cho (In re John Dawson & Assocs.),*
   271 B.R. 270 (Bankr. N.D. Ill. 2001) ........................................................43

*In re 80 Nassau Assocs.,*
   169 B.R. 832 (Bankr. S.D.N.Y. 1994)..................................................32, 34

*In re Abbott Labs. Derivative S'Holders Litig.,*
   325 F.3d 795 (7th Cir. 2003) ......................................................................41

*In re Coleman,*
   426 F.3d 719 (4th Cir. 2005) ...............................................................26, 27

*In re Exide Techs.,*
   299 B.R. 732 (Bankr. D. Del. 2003)......................................................33, 43

*In re Glanz,*
   205 B.R. 750 (Bankr. D. Md. 1997) ...........................................................26

*In re Healthsouth Corp. Shareholders Litig.,*
   845 A.2d 1096 (Del. Ch. 2003)...................................................................44

*In re Inv. Co. of the Southwest, Inc.,*
   341 B.R. 298 (B.A.P. 10th Cir. 2006)..........................................................20

*In re J.C. Winship Co.,*
   120 F. 93 (7th Cir. 1903) ......................................................................30, 31

*In re Le Cafe Creme, Ltd.,*
   244 B.R. 221 (Bankr. S.D.N.Y. 2000)..........................................................27

*In re Madison,*
   184 B.R. 686 (Bankr. E.D. Pa. 1995).........................................................53

*In re Martin Custom Made Tires Corp.,*
   108 F.2d 172 (2d Cir. 1939)..................................................................30, 32

*In re Mid-American Waste Sys.*,
   284 B.R. 53 (Bankr. D. Del. 2002) ...................................................34

*In re Morse Tool, Inc.*,
   148 B.R. 97 (Bankr. D. Mass 1992) ...........................................20, 22

*In re Nellson Nutraceuticals, Inc.*,
   2007 Bankr. LEXIS 99 (Bankr. D. Del. Jan. 18, 2007) ......................20

*In re O'Day Corp.*,
   126 B.R. 370 (Bankr. D. Mass. 1991) ......................................... *passim*

*In re Outdoor Sports Headquarters*,
   168 B.R. 177 (Bankr. S.D. Ohio 1994) ............................................36

*In re Plassein Int'l*,
   2008 WL 1990315 (Bankr. D. Del. May 5, 2008) ..............................20

*In re Revco D.S., Inc.*,
   118 B.R. 468 (Bankr. N.D. Ohio 1990) ............................................30

*In re Shelter Enters., Inc.*,
   98 B.R. 224 (Bankr. W.D. Pa. 1989) ................................................36

*In re Southwest Equip. Rental, Inc.*,
   1992 U.S. Dist. LEXIS 21396 (E.D. Tenn. July 9, 1992) ....................11

*In re Sunbeam Corp.*,
   284 B.R. 355 (Bankr. S.D.N.Y. 2002) ..............................................36

*In re Walt Disney Co. Derivative Litig.*,
   907 A.2d 693 (Del. Ch. 2005) .........................................................40

*Iridium Operating LLC v. Motorola, Inc. (In re Iridium Operating LLC)*,
   373 B.R. 283 (Bankr. S.D.N.Y. 2007) ..............................................18

*Jobin v. McKay (In re M & L Bus. Mach. Co., Inc.)*,
   84 F.3d 1330 (10th Cir. 1996) ........................................................24

*J.S. Alberici Const. Co., Inc. v. Mid-West Conveyor Co., Inc.*,
   750 A.2d 518 (Del. 2000) ...............................................................47

*Liquidation Trust of Hechinger Inv. Co. of Del., Inc. v. Fleet Retail Fin. Group (In re
   Hechinger Inv. Co. of Del., Inc.)*, 327 B.R. 537 (D. Del. 2005) .................12, 39, 40

*Lyondell Chem. Co. v. Ryan*,
   970 A.2d 235 (Del. 2009) ...............................................................40

*Maryville Academy v. Loeb Rhoades & Co., Inc.*,
    530 F. Supp. 1061 (N.D. Ill. 1981) ................................................................48

*MC Asset Recovery, LLC v. The Southern Co.*,
    2006 U.S. Dist. LEXIS 97034 (N.D. Ga. Dec. 11, 2006) ........................28

*McKloskey v. Galva Foundry Co. (In re Art Unlimited, LLC)*,
    356 B.R. 700 (Bankr. E.D. Wis. 2006) ................................................24

*McNamara v. PFS (In re the Personal & Bus. Ins. Agency)*,
    334 F.3d 239 (3d Cir. 2003) ................................................................44

*McRaith v. BDO Seidman, LLP*,
    391 Ill. App. 3d 565 (Ill. App. Ct. 1st Dist. 2009) ................................46

*Mellon Bank v. Dick Corp.*,
    351 F.3d 290 (7th Cir. 2003) ..............................................................29

*Mellon Bank v. Metro Commc'n, Inc*,
    945 F.2d 635 (3d Cir. 1991) ........................................................11, 17

*Mellon Bank v. Official Comm. Of Unsecured Creditors of R.M.L., Inc. (In re R.M.L.)*,
    92 F.3d 139 (3d Cir. 1996) ....................................................15, 16, 20

*MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*,
    10 F. Supp. 913 (S.D.N.Y. 1995) ....................................................10, 11

*Moody v. Sec. Pacific Bus. Credit, Inc.*,
    971 F.2d 1056 (3d Cir. 1992) ........................................................2, 21, 22

*Moore v. Bay*,
    284 U.S. 4 (1931) ..............................................................................27

*Morris v. Kansas Drywall Supply Co. (In re Classic Drywall, Inc.)*,
    127 B.R. 874 (D. Kan. 1991) ............................................................30

*Murgillo v. Cal. State Bd. of Equalization (In re Murgillo)*,
    176 B.R. 524 (9th Cir. 1994) ............................................................35

*N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*,
    930 A.2d 92 (Del. 2007) ..............................................................39, 41

*NetJets Aviation, Inc. v. LHC Commc'ns., LLC*,
    537 F.3d 168 (2d Cir. 2008) ..............................................................38

*NextWave Personal Communs., Inc. v. FCC (In re NextWave Personal Communs., Inc.)*,
    235 B.R. 305 (Bankr. S.D.N.Y. 1999) ................................................28

*Northtown Theatre Corp. v. Mickelson*,
 226 F.2d 212 (8th Cir. 1955) ........................................................................34

*Nugent v. First Amer. Bank*,
 1992 U.S. Dist. LEXIS 12147 (N.D.N.Y. August 11, 1992)............................17, 47

*Official Comm. of Unsecured Creditors of Buckhead Am. Corp. v. Reliance Capital
 Group (In re Buckhead Am. Corp.)*, 178 B.R. 956 (D. Del. 1994)........................38

*Official Comm. of Unsecured Creditors v. Donaldson, Lufkin & Jenrette Secs. Corp.*,
 2002 WL 362794 (S.D.N.Y. Mar. 6, 2002) .....................................................53

*Official Comm. of Unsecured Creditors v. Fleet Retail Fin. Group (In re Hechinger Inv.
 Co. of Del., Inc.)*, 274 B.R. 71 (D. Del. 2002) ................................................43

*Official Comm. of Unsecured Creditors of Midway Games Inc. v. Nat'l Amusements Inc.
 (In re. Midway Games Inc.)*, 2010 Bankr. LEXIS 337 (Bankr. D. Del. Jan 29, 2010)............29

*Official Comm. Of Unsecured Creditors of TOUSA, Inc. v. Citicorp N. Am., Inc. (In re
 TOUSA Inc.)*, 422 B.R. 783 (Bankr. S. D. Fla. 2009)...................................... *passim*

*OHC Liquidation Trust v. Credit Suisse First Boston (In re Oakwood Homes Corp.)*,
 340 B.R. 510 (Bankr. D. Del. 2006)...............................................................44

*Orr v. Kinderhill Corp.*,
 991 F.2d 31 (2d Cir. 1993).............................................................................11

*Pepper v. Litton*,
 308 U.S. 295 (1939)......................................................................................35

*Porter v. Warner Holding Co.*,
 328 U.S. 395 (1946)......................................................................................35

*Reliant Interactive Media Corp. (In re GeneralSearch.com)*, 322 B.R. 836 (Bankr. N.D.
 Ill. 2005).....................................................................................................24

*Rosener v. Majestic Mgmt. (In re OODC, LLC)*,
 321 B.R. 128 (Bankr. D. Del. 2005) ........................................................... *passim*

*Russo v. McLaughlin (In re McLaughlin)*,
 2006 U.S. Dist. LEXIS 92350 (D.N.J. Dec. 20, 2006) .....................................25

*Schacht v. Brown*,
 711 F.2d 1343 (7th Cir. 1983) .......................................................................46

*Scholes v. Moore*,
 1993 U.S. Dist. LEXIS 724 (N.D. Ill. Jan. 22, 1993) .......................................43

*Sea-Land Servs., Inc. v. Pepper Source,*
    993 F.2d 1309 (7th Cir. 1993) ...........................................................38, 40

*Smith v. Van Gorkom,*
    488 A.2d 858, 46 A.L.R. 4th 821 (Del. 1985) ...................................................42

*Stalnaker v. DLC, Ltd. (In re DLC, Ltd.),*
    295 B.R. 593 (B.A.P. 8th Cir. 2003)...........................................................28

*Stebbins v. Crocker Citizens Nat'l Bank (In re Ahlswede),*
    516 F.2d 784 (9th Cir. 1974) ...................................................................35

*Thabault v. Chait,*
    541 F.3d 512 (3d. Cir. 2008)....................................................................47

*Thornwood, Inc. v. Jenner & Block,*
    344 Ill. App. 3d 15, 799 N.E.2d 756 (Ill. App. Ct. 2003)....................................43

*Trans World Airlines, Inc. v. Travellers Int'l AG (In re Trans World Airlines, Inc.),*
    163 B.R. 964 (Bankr. D. Del. 1994) ..........................................................29

*Travelers Indemn. Co. v. Lake,*
    594 A.2d 38 (Del. 1991) .......................................................................27

*Turner v. Lipschultz,*
    619 A.2d 912 (Del. 1992) ......................................................................43

*United States v. Gleneagles Inv. Co.,*
    565 F. Supp. 556 (M.D. Pa. 1983)..............................................................2

*United States v. Golden Acres, Inc.,*
    702 F. Supp. 1097 (D. Del. 1988) ..........................................................37, 38

*United States v. Tabor Court Realty Corp.,* 803 F.2d 1288 (3d Cir. 1986) .................... *passim*

*VFB LLC v. Campbell Soup Co.,*
    482 F.3d 624 (3d Cir. 2007)...............................................................18, 19, 20

*Vintero Corp. v. Corp. Venezolana de Fomento (In re Vintero Corp.),*
    735 F.2d 740 (2d. Cir. 1984)..............................................................28, 30, 31

*Webb Mtn, LLC v. Executive Realty P'ship L.P. (In re Webb Mtn, LLC),*
    2009 Bankr. LEXIS 1128 (Bankr. E.D. Tenn. Apr. 21, 2009) ..............................16

*Weil v. Morgan Stanley DW Inc.,*
    877 A.2d 1024 (Del. Ch. 2005)...............................................................43

*Whiteford Plastics Co. v. Chase Nat'l Bank of N.Y.C.,*
    179 F.2d 582 (2d Cir. 1950)..............................................................30, 31, 32

*Wieboldt Stores, Inc. v. Schottenstein,*
94 B.R. 488 (N.D. Ill. 1988) ...................................................................................10

**STATUTES**

11 U.S.C. § 548 .................................................................................................. *passim*

11 U.S.C. § 550 ...........................................................................................................26

Bankruptcy Act of 1898 ..............................................................................................33

**OTHER AUTHORITIES**

H.R. Rep. No. 595, 95th Cong., 1st Sess. 359 (1977) ................................................35

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 375 (1977), reprinted in 1978
U.S.C.C.A.N. 5787 ................................................................................................26

Law Debenture Trust Company of New York ("Law Debenture"), as Indenture Trustee, responds to the Examiner's information and position requests (the "Request") as follows:[1]

Law Debenture is party to the proposed global settlement resolving all claims analyzed herein. While the estates have viable claims, Law Debenture believes that the proposed settlement is fair and equitable and offers an appropriate resolution of the claims consistent with the objective of maximizing the recoveries to creditors through a consensual plan of reorganization.

## ARGUMENT

### I.  Tribune Has Viable Fraudulent Transfer Claims

Pursuant to Sections 544(b), 548(a)(1)(A) and (B) of title 11, United States Code (the "Bankruptcy Code") and New York Debtor & Creditor Law ("N.Y.D.C.L."), the estates of Tribune Company ("Tribune" and together with all of its subsidiaries, the "Company") and each of its debtor subsidiary guarantors (the "Guarantors" and with Tribune, the "Debtors") can avoid the Debtors' incurrence of obligations and transfers of property in connection with the LBO (as defined below) including each of the (i) debt obligations; (ii) stock pledges; (iii) subsidiary guarantees; (iv) payments of fees, expenses, and payments made to advisors; and (v) payments on debt fraudulently incurred.

### A.  Intentional Fraudulent Transfers[2]

Avoidance of an intentionally fraudulent transfer requires proof that the transfer was made "with actual intent to hinder, delay or defraud" creditors. 11 U.S.C. § 548(a)(1)(A). Direct evidence of fraudulent intent is not necessary, however, circumstantial evidence, or "badges of

---

[1]    Capitalized terms that are not defined herein are defined as set forth in the Fact Statement and the facts set forth in the "Fact Statement" are incorporated herein by reference. However, there remain facts in dispute and incorporation herein is without prejudice to Law Debenture's right to contest such facts.

[2]    Section IA responds to the Appointed Examiner's ("Examiner") questions 13 (c) and (d).

fraud," can be used to infer fraudulent intent. *Dobin v. Taiwan Mach. Trade Ctr. Corp. (In re Victor Int'l)*, 97 Fed. Appx. 365, 369 (3d Cir. 2004); *Moody v. Sec. Pacific Bus. Credit, Inc.*, 971 F.2d 1056, 1064 (3d Cir. 1992).

The leveraged buyout of Tribune's shareholders ("LBO" or "Leveraged ESOP Transactions") hindered and delayed the Debtors' creditors. Both Tribune and the Banks[3] could have foreseen and did in fact foresee that the incurrence of the $11 billion LBO debt would render Tribune insolvent. This alone is sufficient to establish fraudulent intent. *See U.S. v. Gleneagles Inv. Co.*, 565 F. Supp. 556, 581 (M.D. Pa. 1983) (finding LBO lenders acted with fraudulent intent on the basis that if "the parties could have foreseen the effect on creditors" resulting from the assumption of the IIT obligation by the Raymond Group, a company in a serious financial condition, the parties must be deemed to have intended the same . . . This is so despite the fact that neither Durkin nor IIT had the motive to hinder or delay creditors") (citations omitted), *aff'd sub nom., U.S. v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1304-05 (3d Cir. 1986).[4]

1.   **Tribune's Officers and Directors Knew The LBO Would Cause The Debtors' Demise**

Tribune's officers and directors (excluding the Special Committee, the "Officers and Directors") provided the Banks and VRC with speculative, unrealistic, and stale projections that

---

[3]      The Banks include: Bank of America, N.A. ("BofA"), Banc of America Securities LLC ("BAS"), Barclays Bank PLC ("Barclays"), Citicorp North America, Inc. ("Citi"), Citigroup Global Markets Inc. ("Citigroup Global" and with Citi, "Citigroup"), J.P. Morgan Securities Inc. ("J.P. Morgan"), JPMorgan Chase & Co. ("JPM Chase" and with J.P. Morgan, "JPM"), Merrill Lynch, Pierce, Fenner & Smith, Inc. ("MLP"), Merrill Lynch Capital Corporation ("Merrill Lynch" and with MLP, "Merrill") and Morgan Stanley & Co., Inc. ("Morgan Stanley").

[4]      *See also Rosener v. Majestic Mgmt. (In re OODC, LLC)*, 321 B.R. 128, 140 (Bankr. D. Del. 2005) (denying motion to dismiss intentional fraudulent transfer where "[t]he LBO clearly was not a transaction in the ordinary course of the parties' business. . . . Defendants [knew] that the LBO would leave the Debtor with too much debt, making it unable to pay those claims").

they knew did not accurately reflect Tribune's deteriorating profitability.[5]  Tribune's financial

stability initially concerned the Officers and Directors.  Tribune formed a Special Committee of

its Board of Directors for the purpose of evaluating transactions, including leveraged

recapitalizations and leveraged buyouts.  During the first quarter of 2007, the Special Committee

oversaw the sale process.  In early February 2007, in response to one offer, the Special

Committee, through the Officers and Directors, demanded that the Broad/Yucaipa group – who

submitted a proposal substantially similar to the Leveraged ESOP Transaction – *reduce the*

*amount of debt in its proposal by $1 billion*.[6]  Yet they agreed to the higher debt load in Zell's

LBO with full knowledge of the secular decline in Tribune's business.

In fact, Tribune's Officers knew that if Tribune missed its LBO projections by as little as

2%, the ESOP would be worthless and the Company would be insolvent.[7]  Nevertheless, and

though the Company already missed its 2007 projections by more than 2% as of late March

2007, the Officers and Directors approved the LBO.[8]  Similarly, the Officers and Directors knew

that the Company missed its projected operating profit by 15% in April 2007, weeks before the

LBO closed.[9]  A May 9, 2007 Board presentation showed that management's outdated

---

[5]    (*See* Ex. 1 - 6: Chad Rucker Deposition ("Rucker Tr.") at 154-75, 164, and accompanying exhibits at 9-13; Ex. 7: JPM_00140196-00140211 at JPM_00140198-204 and at JPM_00140205-211; Ex. 8: VRC0002406-07; Ex. 9: TRB0019094-96; Ex. 10: TRB0137005; Ex. 11: JPM_00434018-95; Ex. 12: JPM_00229651-52 at JPM_00229651; Ex. 13: ML-TRIB-0008647-84 at ML-TRIB-0008671; Ex. 14: TRB0413555-68; Ex. 15: VRC0002379-81; Ex. 16: TRB0079728-89 at TRB0079754).

[6]    (*See* Ex. 17: JPM_00229118-19).

[7]    Bigelow admitted in an internal March 25, 2007 email that "if we hit the down 2 case there is no equity value in the first 5yrs." (Ex. 18: TRB0071792-800). Yet, four days earlier, the Company reported that its revenue and operating cash flow for the first two months of 2007 were both 2% below plan. (Ex. 19: TRB0487607-09; Ex. 20: CITI-TRIB-CC 00013457-62 at CITI-TRIB-CC 00013460). Furthermore, a March 22, 2007 email from Michael Scardigli of Citigroup alerted the Company that there would be no value in the ESOP in at least the first ten years if publishing advertising revenue was off by 3% and broadcasting operating cash flow was off by 1%. (Ex. 21: TRB0080410-11). No value in the equity means insolvency of course.

[8]    (*See* Ex. 22: TRB0083518-20; Ex. 18: TRB0071792-800; Ex. 19: TRB0487607-09; Ex. 20: CITI-TRIB-CC 00013457-62 at CITI-TRIB-CC 00013460; Ex. 21: TRB0080410-11; Ex. 10: TRB0137005).

[9]    (*See* Ex. 23: VRC0005506-678 at VRC0005507).

projections from the February 13, 2007 Board meeting were overly aggressive and unrealistic in comparison to the Company's historical performance; the presentation showed consistent declines in revenue, operating cash flow and EBITDA between 2003 and April 2007.

The Officers and Directors knew that VRC's pre-LBO solvency opinions were unreliable because they were based on faulty projections and were significantly higher than the valuations of Morgan Stanley, Merrill and Citigroup ("Financial Advisors").[10] The Officers and Directors also knew that VRC based its solvency opinion for Phase II of the LBO on outdated projections[11] and was contingent on a representation *from Morgan Stanley* that the Company could refinance its debts.[12] When Morgan Stanley refused, *Tribune* provided this representation itself and VRC accepted it.[13]

### 2. The Banks Knew The LBO Would Render Tribune Insolvent

### a. Direct Evidence Of The Banks' Knowledge

The Banks were likewise knowledgeable and therefore culpable. Even though the Banks worked as the Company's advisors, underwriters and financiers, they pushed an LBO deal that would render the Company insolvent while at the same time earning huge fees.

On April 5, 2007, JPM prepared an internal credit memo analyzing the LBO Debt (the "April 5th Memo") based on the Company's unrealistic projections. The April 5th Memo – prepared, reviewed and approved by the various JPM departments including Client Credit

---

[10]    (*See* Ex. 24: TRB0149983-150012 at TRB0149992; Ex. 25: FOUN0000330-410 at FOUN0000349; Ex. 26: MS00000001-38 at MS00000012-15; Ex. 27: CITI-TRIB-CC 00015183-219 at CITI-TRIB-CC 00015195; Ex. 28: FOUN0014629-714 at FOUN0014673; Ex. 29: FOUN0014721-41; Ex. 30: FOUN0014817-26; Ex. 31: FOUN0006490-589).

[11]    (*See* Ex. 33: TRB0450697-707).

[12]    (*See* Ex. 32: MS00097062; Ex. 33: TRB0450697-707 at TRB0450706; Ex. 34: MS00097249-51 at MS00097251; Ex. 35: TRB0274988-5012 at TRB0274997).

[13]    (*See* Ex. 32: MS00097062; Ex. 33: TRB0450697-707 at TRB0450706; Ex. 36: TRB0271556; Ex. 37: TRB0448465-66 at TRB0448465; Ex. 38: MS00085733-35 at MS00085734; Ex. 34: MS00097249-54).

Management, Investment Banking and Syndicated and Leverage Finance – showed that Tribune's debt would exceed the Company's enterprise value, rendering the Company insolvent.[14]  The April 5th Memo stated that, post-LBO, the Company's debt would be $10.133 billion and its enterprise value was approximately $13.582 billion (with a cushion of $3.449 million).[15]  However, internal communications acknowledged that the Company's post-LBO debt would be in excess of $14.639 billion (not the $10.133 billion figure reported in the memo, which excluded the pre-LBO debt at Tribune).  JPM team members knew that Tribune's debt exceeded its enterprise value even though the April 5th Memo stated otherwise.[16]

Jieun Jayna Choi, who worked on the April 5th Memo, explained in an internal email attaching the graph from the April 5th memo that Tribune's debt was really $14.639 million, stating:

> **there is a wide speculation that the company might have put so much debt that all of its assets aren't gonna cover the debt in case of (knock knock) you –know-what.  Well that is actually basically what we ([John Kowalczuk][17] and me and rest of the group) are saying too, but we're doing this cause its enough to cover our bank debt.  So, lesson learned from this deal:  our (here, I mean JPM's) business strategy for TRB, but probably not only limited to TRB is 'hit and run' – we'll s_ck the sponsor's a $$ as long as we can s_ck $$ out of the (dying or dead?) client's pocket, and we don't really care as long as our a$$ is well-covered.  Fxxk 2nd/private guys- they'll be swallowed by big a$$ banks like us, anyways.[18]**

Merrill, Citigroup and Morgan Stanley were equally knowledgeable and therefore culpable.  They delivered fairness opinions for the LBO despite the fact that (a) their own valuations showed that the LBO debt would render Tribune insolvent and (b) they knew the

---

[14]    (*See* Ex. 39: JPM_00031161-97).

[15]    (*See* Ex. 39: JPM_00031161-97 at JPM_00031191).

[16]    (*See* Ex. 39: JPM_00031161-97; Ex. 40: JPM_00148945-87; Ex. 41: JPM_00422643-52).

[17]    John Kowalczuk, an Executive Director of JPM's Credit Risk Management department, was involved in the drafting, reviewing, and approving the April 5th Memo.

[18]    (*See* Ex. 41: JPM_00422643-52) (emphasis added).

Company's projections were unreasonable.[19]  Indeed, when Morgan Stanley refused to provide a representation to VRC about the Company's ability to refinance its debts, Morgan Stanley never investigated or even questioned how VRC could render a solvency opinion if the Company could not pay its debts as they came due.[20]  Morgan Stanley was indifferent to the facts.

Also, in March 2007, when Tribune's Board was weighing whether to pursue a "self-help" deal over the highly-leveraged LBO, Merrill and Citigroup were instrumental in the Board approving the LBO despite internal concerns questioning the transaction.  For example, Merrill and Citigroup informed the Board that the LBO and self-help deal had comparable free cash flows due to ESOP tax savings even though internal emails were inconsistent on this point.[21]  Merrill and Citigroup also knew in March 2007 that Tribune could not handle the massive LBO debt burden in the face of its declining operating performance.  On March 10, 2007, Merrill highlighted this issue to Morgan Stanley and Citigroup:

> Short answer is in light of recent operating performance no comfort in putting the kind of leverage necessary for Zell proposal to work and have board get comfortable with employees owning the equity.  Also numerous issues in Zell proposal we could not solve.  Obviously with symmetry with recap, view is recap proposal needs to come down, probably to 15 range.  We should discuss as this likely causes chandler foundation deal to unravel.[22]

Citigroup, on March 22, 2007, also expressed the very same concerns:

> *Having seen the book I am still extremely uncomfortable with Zell.*  No matter the rating.  Deal creep brings debt higher than the deal we approved for him which was 9.5bn new raise.  (7.1x thru the new money.).  *Declining ebitda is scary.*

---

[19]  (*See* Ex. 42: MS00024615-18; Tender Offer at p. 40, produced as Ex. 43: JPM_00162312-773 at JPM_00162379 and JPM_00162598-600; Ex. 44: ML-TRIB-0034924-25 (internal memorandum); Ex. 45: ML-TRIB-0034876-914; Ex. 26: MS00000001-38, at MS00000012; Ex. 27: CITI-TRIB-CC 00015183-219 at CITI-TRIB-CC 00015195; Ex. 13: ML-TRIB-0008647 at ML-TRIB-008671)).

[20]  (*See* Ex. 36: TRB0271556; Ex. 38: MS00085733-35 at MS00085734).

[21]  (*See* Ex. 46: ML-TRIB-0574910-22, at ML-TRIB-0574914; Ex. 47: ML-TRIB-0385639-42)

[22]  (*See* Ex. 48: CITI-TRIB-CC 00040192).

Until yesterday I did not know that Q1 cash flow was down 20 from last year.  All I heard was that pub was 6mm off plan and broadcast was 5mm higher.[23]

### b.    The Banks Took Steps To Protect Themselves Against Fraudulent Conveyance Claims

The Banks structured the LBO with two intermediate holding companies.  As described in the Fact Statement, the Credit Agreement required the formation of Tribune Finance, LLC ("Finance Holdco") and Tribune Broadcasting Holdco, LLC ("Broadcast Holdco" and together with Finance Holdco, the "Holdcos") as direct subsidiaries of Tribune.[24]  These entities, designed guarantors of the LBO Debt, were structured to immunize the Banks from fraudulent transfer actions for the benefit of Tribune's existing creditors.[25]

Broadcast Holdco was formed as a holding company for Tribune's broadcasting subsidiaries, including Broadcast Holdco's direct subsidiary, Tribune Broadcasting Company.[26]  Before Broadcast Holdco's formation, Tribune Broadcasting Company, then a direct subsidiary of Tribune, was the holding company of Tribune's broadcasting companies.[27]  Upon its formation, Broadcast Holdco's only asset was the stock of Tribune Broadcasting Company.[28]

Tribune capitalized Finance Holdco with $3 billion in LBO debt proceeds.  Finance Holdco was required to loan 100% of these proceeds to eight publishing subsidiaries of Tribune (collectively, the "Publishing Subsidiaries") in exchange for subordinated notes (the "Junior

---

[23]    (*See* Ex. 49: CITI-TRIB-CC 00039854) (emphasis added).

[24]    A chart depicting the new corporate structure was included in the Confidential Information Memorandum.  (Ex. 50: ML-TRIB-0019606-703 at ML-TRIB-0019633).

[25]    (*See* Ex. 51: JPM_00353676-78 (email from Jeff Sell regarding guarantees that will "provide us with a superior claim vis a vis the existing debt . . . and [u]nder the bankruptcy laws . . . [t]he repayment of our principal would be assured via the guarantees of the operating subsidiaries . . . ."); Ex. 52: JPM_00000021-27 (discussing "priority of claims against the assets of Tribune and its subsidiaries"); Ex. 53: JPM_00143041-57 (Pledge Agreement); Ex. 54: JPM_00325373-74 (email from Darryl Jacobson stating that recovery is hopefully "done via the guarantees, to avoid the existing notes equal and ratable claim")).

[26]    (*See* Credit Agreement, Section 3.01(m) produced as Ex. 55: TRB0180193-411).

[27]    (*Id.* at Section 1.01 (definition of Broadcasting Holdco Transaction)).

[28]    (*See* Ex. 56: TRB0137189-95 at TRB0137190)

Subordinated Notes") from the Publishing Subsidiaries, who, in turn, were required to dividend 100% of the $3 billion back to Tribune (the "First Circular Transaction").[29]  The First Circular Transaction had no economic effect on Tribune.  Finance Holdco acquired assets in the form of notes receivable from the Publishing Subsidiaries in the aggregate principal amount of $3 billion, and the Publishing Subsidiaries collectively were saddled with $3 billion in debt without any benefit.

Tribune, Finance Holdco, and the Publishing Subsidiaries engaged in a second circular transaction to facilitate interest payments by the Publishing Subsidiaries on the Junior Subordinated Notes (the "Second Circular Transaction").  Tribune agreed to loan the full amount of each interest payment due to each Publishing Subsidiary.  In turn, the Publishing Subsidiaries would transfer the same funds to Finance in satisfaction of the interest payments.  To complete the Second Circular Transaction, Finance would dividend 100% of the interest back to Tribune.[30] These transactions – occurring each time interest payments were due – had no financial impact on Tribune but did impose more debt on the Publishing Subsidiaries in the form of an intercompany loan due from the Publishing Subsidiaries to Tribune.

Further, under the Credit Agreement, both Holdcos were restricted from conducting business other than their involvement in the LBO to ensure that there would not be any creditors that could challenge it.[31]  The intention was to block an action avoiding the LBO guarantees and thus, to ensure that the Holdcos would structurally preserve the value of Tribune's subsidiaries

---

[29]    (*See* Credit Agreement, Section 1.01 (Tribune Finance LLC Transaction) produced as Ex. 55: TRB0180193-411).

[30]    (*See* Ex. 57: TRB0430542-47 at TRB0430542).

[31]    (*See* Ex. 55, § 5.02(n); Ex. 58: ML-TRIB-0001002-1116 at ML-TRIB-0001090.)

for the Banks rather than Tribune creditors.[32]  There is no other plausible reason for the creation

of these entities.[33]  The Banks understood that the formation of the Holdcos would not enhance

the Banks' actual collateral position, as acknowledged in an internal email.[34]  While Finance

Holdco possessed $3 billion in assets that the Banks could reach through the Finance Holdco

guarantee, these assets had to come from the eight Publishing Subsidiaries' repayment of the

Junior Subordinated Notes, which were subordinate to the Guarantees that the Banks had from

the Publishing Subsidiaries.[35]  Therefore, JPM's May 24th email was accurate in that all of the

---

[32]     Indeed, Jeff Sell analyzed the viability of the Holdcos' structure from a post-bankruptcy filing standpoint stating:

> Merrill and Citi served up a structure which they have already approved which would give up the pledge of the stock of the operating subsidiaries and replace that security with a pledge of stock of a new intermediating holding company for the publishing assets which would hold a single asset, an intercompany note in the amount of $4.2B. We would continue to have guarantees for the operating subsidiaries which will provide us with a superior claim vis a vis the existing debt.  The rub in the new structure is that the value of the collateral offered is less than the face value of the secured debt.  The new bank debt would be partially secured. Under the bankruptcy laws we would not be entitled to post petition interest if we are only partially secured.  The repayment of our principal would be assured via the guarantees of the operating subsidiaries . . ."  "I'm not concerned with the short term (I agree with Andy), it's the second stage a year down the road. . . . *I've told the team I'm not comfortable approving the new structure for the reasons cited but would understand if Senior Management wanted to do this to further the Zell relationship.* (emphasis added).

*(See* Ex. 51: JPM_353676-67).

[33]     As part of the Companies' control group, Finance Holdco is liable to the PBGC; accordingly the Banks' attempt to keep Finance Holdco debt free (for fraudulent conveyance purposes) fails.

[34]     The May 24, 2007 internal email dated states:

> Isn't it the case that we would try to extract all the value out of the publishing operating subsidiaries directly, through our guarantees from those subs, before we there would be value rising up to Tribune Finance LLC that we relied on for recovery.  To some extent wouldn't we reduce the value in the operating subs to zero (the operating subs liquidate and satisfy obligation of the guarantee), if necessary to repay our debt in full, before anything remained in the operating subs to flow up to Tribune Finance LLC via the $3bn in subordinated notes the operating subs owe to Finance LLC. So whether its $3bn or $4bn it should not likely affect our recovery?  Doesn't the size of the note support the pledge of stock of Finance LLC, as having some meaning to it, so that we have good claim as a secured creditor class – but the recovery hopefully is still all done via the guarantees, to avoid the existing notes equal and ratable claim on the stock.  I would think then, that it is not really that detrimental that the intercompany note is only $3bn.

*(See* Ex. 54: JPM_00325373-74).

[35]     (*See* Ex. 57: TRB0430542-47 at TRB0430542).

value that the Banks could recover from Tribune's Subsidiary Guarantors would come from the enforcement of the Guarantees rather than from Finance Holdco.  Similarly, with respect to Broadcast Holdco, Broadcast Holdco's assets were derived solely from the dividends from Tribune's broadcasting business and, as such, the Banks could reach the funds through its enforcement of the related Guarantees.  And, as can be seen from the same email, one of the Banks' purposes was to render the Bonds' equal and ratable lien on the stock worthless.

Accordingly, the only way the formation of the Holdcos would enhance the Banks' collateral position was if a court avoided the Guarantees as fraudulent transfers.  The Holdcos would then trap the value from the Guarantors before it reached Tribune (through payment of dividends by the Holdcos or the loan by Finance to the publishing subsidiaries), and the Banks would argue that Tribune's creditors lacked standing to avoid the Holdco Guarantees (as they are now).[36]

### B.    The LBO Is Avoidable As A Constructive Fraudulent Transfer[37]

#### 1.    The Entire LBO Will Be Collapsed To Determine Whether Tribune Received Reasonably Equivalent Value

Courts routinely collapse the steps of LBOs into one integrated transaction to avoid the inequitable consequences of structuring used to evade the reach of fraudulent transfer law.  *See Tabor Court Realty Corp.*, 803 F.2d at 1302-03 (collapsing transactions based upon court is finding that the lender was "intimately involved" in formulating the structure of the LBO); *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 934 (S.D.N.Y. 1995); *Wieboldt Stores, Inc. v. Schottenstein*, 94 B.R. 488, 502 (N.D. Ill. 1988).  In determining whether collapsing is warranted, courts look past the form of each individual

---

[36]    That argument would not succeed because the Court should pierce the corporate veil instead.  *See infra* at Section VI.

[37]    Section IB responds to Examiner's questions 13 (e), (f), (g), (h), (i), (j), (l), (q) and (u).

transaction to the substance of the multiple transactions and their effect on unsecured creditors. *See Big V Supermarkets Inc. v. Wakefern Food Corp. (In re Big V Holding Corp.)*, 267 B.R. 71, 92-93 (Bank. D. Del. 2001) (by "linking together all interdependent steps with legal or business significance, rather than taking them in isolation,' the result may be based 'on a realistic view of the entire transaction").[38]  Accordingly, once LBOs are collapsed, courts presume that loaned funds merely pass through the borrower from the lenders to the shareholders and are not deemed consideration received by the borrower. *See Tabor Court Realty Corp.*, 803 F.2d at 1302.

## a.    The LBO Was A Fully Integrated Transaction

Tribune, the Guarantors, the Officers and Directors, the Banks, and Zell all knew that the purpose of the two phases ("Phase I" and "Phase II" and collectively, the "Phases") of the Transaction was to accomplish the LBO.  They knew each step of the transaction.  They knew the financing components; they delivered financing commitments for both Phases.  They knew that the LBO Debt would be used to sell the Company to the ESOP, to grant Zell an option for 40% of the equity (and to make him Chairman and Chief Executive Officer), and to cash out the existing shareholders.[39]  All parties intended the LBO to be a single, integrated transaction in the two Phases necessary to obtain regulatory approval.[40]

---

[38]      *See also Boyer v. Crown Stock Distrib., Inc.*, 587 F.3d 787, 793 (7th Cir. 2009) ("*Boyer II*") courts routinely look to the economic realities and substance rather than to form to "protect[] creditors from any transactions the debtor engages in that have the effect of impairing their rights . . ."); *Orr v. Kinderhill Corp.*, 991 F.2d 31, 35 (2d Cir. 1993) ("[A]n allegedly fraudulent conveyance must be evaluated in context; where a transfer is only a step in a general plan, the plan must be viewed as a whole with all its composite implications").  All that is required for collapsing is that "all parties to each subsidiary transfer were aware of the overall leveraged buyout." *MFS/Sun Life Trust,* 910 F. Supp. at 913; *see also Mellon Bank, N.A. v. Metro Communications, Inc*, 945 F.2d 635, 645-46 (3d Cir. 1991).

[39]      (*See* Ex. 59: ML-TRIB-0106177-272; Ex. 60: CITI-TRIB-CC 00008077-8174 at CITI-TRIB-CC 00008121-22).

[40]      The existence of a time lag in concluding the transaction is irrelevant. *See In re Southwest Equip. Rental, Inc.*, 1992 U.S. Dist. LEXIS 21396, at *55 (E.D. Tenn. July 9, 1992) (collapsing two transactions that occurred over three-month time span: "the 1984 transactions were in substance part of the same transaction;" declining to collapse a third transfer because the lenders "did not participate in the 1984 transactions and there

There is overwhelming record evidence that the parties knew and intended that the two Phases of the LBO constitute a single transaction executed through a series of planned steps. Tribune's Board approved both Phases at its April 1, 2007 meeting and was well aware from its review and approval of the key transactional documents that the LBO was being facilitated through two Phases. Moreover, the Board never revisited its approval after Phase I closed.[41] *See Liquidation Trust of Hechinger Inv. Co. of Del., Inc. v. Fleet Retail Fin. Group (In re Hechinger Inv. Co. of Del., Inc.)*, 327 B.R. 537, 547 (D. Del. 2005), *aff'd*, 2008 U.S. App. LEXIS 10735 (3d Cir. May 19, 2008) (collapsing transaction where the board of directors and the lenders knew about the multiple steps of an integrated transaction).

The key transactional documents also demonstrate the parties' intent to treat the two Phases as a single transaction.[42] In particular, the Phase I-executed Credit Agreement explicitly provides for Tribune to have access to a Phase II "Incremental Facility." The Phase I-executed Credit Agreement also contains various covenants relating to Phase II transactions, including (i) restrictions on incurrence of additional debt (other than that associated with Phase II) and (ii) restrictions on asset sales except for the Phase II transactions and any other strategic transaction or combination pending the consummation of Phase II.[43] Further, the Banks treated the LBO as a single integrated transaction in internal and public communications.[44] Indeed, the First Step

---

[was] no evidence . . . that would suggest the 1985 loans were contemplated by the culpable parties as part of the 1984 transactions"). The issue is whether there was, as here, a single plan.

[41]    (*See* Ex. 61: ML-TRIB-0001507-1536 at ML-TRIB-0001509).

[42]    (*See* Ex. 60: CITI-TRIB-CC 00008077-8174 at CITI-TRIB-CC 00008095).

[43]    The EGI-TRB Purchase Agreement between Tribune, Zell and the Zell Entity, dated April 1, 2007, provides for Phase I transactions (the purchase of Tribune stock and the purchase of the Phase I Zell Note) and Phase II transactions (the purchase of the Zell Note and the Zell Warrant). (*See* EGI-TRB Purchase Agreement §§ 1.1, 1.2 produced as Ex. 62: JPM_00445487-515 at JPM_00445489; *see also* Credit Agreement §§ 2.17, 5.01(n), 5.02(b)(v), 5.02(c)(xvii), (xv), (e)(iv) produced as Ex. 55: TRB0180193-411).

[44]    (*See* March 7, 2007 Presentation prepared by Merrill, Citigroup and JPM ("Our proposed financing structure assumes a signed purchase agreement whereby Equity Group Investments and an ESOP purchase

Commitment and Second Step Commitment Letters (collectively, "Commitment Letters") – both executed as part of Phase I – formally bound Merrill, Citigroup Global, BofA, BAS and JPM to provide the requisite financing for Phase I and Phase II.  The lenders were the same and the commitments of each lender were substantially similar under the Commitment Letters.[45]

Both Tribune and Zell acted as if the two Phases were an integrated transaction.  For instance, Tribune, the ESOP, and the Zell Entity entered into the April 1, 2007 Merger Agreement, which obligated the Company to effectuate the terms of the Merger Agreement in Phase II.  Under the Merger Agreement, Tribune, and its subsidiaries were prohibited from continuing "any discussions or negotiations with any parties that may be ongoing," and Tribune was precluded from soliciting, initiating, or facilitating a third party from presenting an alternative proposal, or even any inquiry with respect to a third party making an alternative proposal.[46]  Also, pursuant to the Merger Agreement, Tribune was obligated to obtain financing for Phase I and Phase II on terms set forth in the Commitment Letters.[47]

Tribune, the Banks and Zell relied on the purported ESOP-related tax savings – which could only be realized in Phase II – to push through the LBO.  Indeed, these supposed tax savings were fundamental to the credit ratings that Phase I transaction received and were the bases for VRC's eventual "positive" solvency opinion for Phase I.[48]

---

Tower for $33 per share (the 'Transaction')) (Ex. 63: JPM_00178722-730 at JPM_00178724); JPM's internal April 2, 2007 email ("Tribune and Sam Zell announced that they have entered into a definitive agreement to take the Company private in a two step transaction") (Ex. 64: JPM_00492571-74 at JPM_00492571-72); Tribune's Confidential Information Memorandum (the "CIM"), dated April 2007 (the Banks marketed the Phase II-Bridge Facility with Phase I financing) (Ex. 65: JPM_00263129-3225 at JPM_00263171)).

[45]  (*See* Ex. 66: TRB0112628-2668 at TRB0112629; Ex. 67: TRB0112669-2705 at TRB112671).

[46]  (*See* Ex. 68: JPM_00445526-5589 at JPM_00445561).

[47]  (*See* Fact Statement at Ex. 66, 76 and 77).

[48]  Tribune's Bigelow promoted the LBO during Phase I, but stressed the tax benefits that would be conferred only after Phase II.  (Ex. 69: TRB0137952-8026 at TRB0137990-93).  The Company made presentations to the rating agencies showing the LBO as an integrated transaction, emphasizing the benefits of

b.    **Phase II Closing Conditions Were Not A Significant Impediment To Consummating The LBO**

Phase II of the LBO had conditions, but it was not optional.  And the existence of closing conditions for Phase II does not preclude the collapsing of the LBO under the facts here.  The Phase II financing had two primary closing conditions:  (i) consummation of the Merger and (ii) compliance with the maximum total guaranteed leverage ratio.  The conditions to the Merger were:  (i) shareholder approval; (ii) expiration of any applicable waiting period under the Hart-Scott-Rodino Act; (iii) FCC approval; and (iv) receipt of a solvency opinion.  Tribune was never in danger of ever failing to satisfy these conditions.  Tribune structured the LBO to guarantee that the deal would receive shareholder approval.  By buying out half of the outstanding shares before the shareholder vote, Tribune guaranteed that its two largest shareholders would own a majority of the outstanding stock, both of which guaranteed that they would vote in favor of consummating the LBO.[49]

The Merger Agreement's "fiduciary out" for a higher offer was meaningless.  The Merger Agreement prohibited the Company from continuing "any discussions or negotiations" with, soliciting alternative proposals from, or providing non-public information to, third

---

the ESOP-associated tax savings. (Ex. 16: TRB0079728-789 at TRB0079739; Ex. 70: ML-TRIB-0361033-1038; Ex. 71: JPM_00040916-920). Moody's and S&P subsequently issued their credit ratings for Tribune assuming both Phases; the key factor driving Moody's B2 rating was the benefits Tribune would receive from its ESOP tax-free status. (Ex. 70: ML-TRIB-0361033-1038; Ex. 71: JPM_00040916-920 at JPM_00040917). Tribune retained VRC to provide solvency opinions for both Phases and partially pre-paid the fee for the Phase II solvency opinion before issuance of the Phase I Opinion. (Ex. 72: VRC0072553-99) VRC included the debt from both Phases in its initial draft of the Phase I solvency opinion, but removed the Phase II debt only upon Tribune's demand. (Ex. 73: VRC0055571-583; Ex. 74: VRC0070435-460 at VRC0070437; Ex. 75: TRB0146670-717 at TRB0146703; Ex. 76: VRC0182025-26; Ex. 77: VRC0060919-948).  Tribune's Board also approved VRC's May 9, 2007 solvency opinion (an opinion required for Phase I), which took into account 401(k) tax savings that would not be realized until Phase II. (Ex. 75: TRB0146670-717 at TRB0146703).

[49]    Tribune's Board approved the April 1, 2007 Voting Agreement (a Phase I agreement) with the Chandler Trusts, Tribune's largest shareholder, to vote in favor of the Merger.  (Ex. 78: TRB0106977-97 at TRB0106978). FitzSimons, Tribune's CEO and president of the Cantigny Foundation, pledged to vote the Foundation's shares in favor of the LBO.

14

parties.[50] Any "fiduciary out" that the Company possessed (*i.e.*, the right to consider an unsolicited and reputable proposal formulated without access to non-public information and that was superior to the LBO) were severely limited and also expired once the guaranteed shareholder approval – which had already been locked up as of April 1, 2007 – was obtained.[51]

There is no doubt that the transaction – and all of its integrated components – would be collapsed by the Court.[52]

## 2. The Debtors Did Not Receive Reasonably Equivalent Value

As a matter of law, a debtor does not receive reasonably equivalent value for amounts paid to shareholders in a leveraged buyout. *See Financial Institutional Funding, Inc. v. Official Committee of Unsecured Creditors of Genfarm Ltd. (In re Buncher Co.)*, 229 F.3d 245, 252-53 (3d Cir. 2000) (affirming that a partnership receives less than reasonably equivalent value when it redeems equity interests of its principals); *see also Boyer*, 587 F.3d at 792. Indeed, by definition, the debtor receives no consideration at all. Value for this purpose is defined by what the company received and kept for ordinary corporate purposes. *See Mellon Bank v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L.)*, 92 F.3d 139, 148-51 (3d Cir. 1996). Thus, the Company did not receive reasonably equivalent value for the $8.3 billion used

---

[50]  (*See* Ex. 68: JPM_00445526-5589 at JPM_00445561).

[51]  (*See* Ex. 68: JPM_00445526-5589 at JPM_00445561).

[52]  Assuming *arguendo* that the LBO transaction is not collapsible and only the Phase II transfers and obligations are avoided, the LBO Lenders that participated in both Phases would not be entitled to participate in distributions from the estate on account of the avoidance of any Phase II transfers and obligations. 11 U.S.C. § 502(d). Indeed, the successful avoidance of any Phase II transfers would result in disallowance of all claims that are held by those LBO Lenders in connection with both Phase I and II under Section 502(d). The natural reading of Section 502(h) along with 502(d)'s use of the broad phrase "any claim" contemplates that even claims held by LBO Lenders which are based upon Phase I transfers or obligations must be disallowed unless and until the Debtors actually prevail in an action or proceeding under Section 550 (if any), and ultimately recovers the avoided Phase II transfers pursuant to Section 550 (if at all). As Sections 544 and 548 and Section 550 are completely separate, it is possible that the Debtors could seek to avoid the Phase II transfers pursuant to Sections 544 or 548 without recovering those transfers pursuant to Section 550.

to cash out shareholders and the $380 million was used to pay professional and other fees related to the LBO.[53] *See Webb Mtn, LLC v. Executive Realty P'ship L.P. (In re Webb Mtn, LLC)*, 2009 Bankr. LEXIS 1128, at *20, 22 (Bankr. E.D. Tenn. Apr. 21, 2009).[54] The Company did not receive a benefit from the $2.8 billion of loan proceeds used to refinance pre-LBO Debt. First, Tribune had only incurred the pre-existing debt the year before and had no need to refinance: LBO Lenders demanded it. Second, the pre-existing debtholders were substantially the same as the LBO Lenders.[55] Third, the LBO debt bore a higher interest rate than the pre-existing debt and provided LBO Lenders with guarantees from Tribune's subsidiaries, which were not obligated in respect of the pre-LBO debt and thus, received no value for the refinancing.[56]

### 3.    The LBO Rendered Tribune Insolvent

The collapsing of Phase I and Phase II mandates that all of the debt incurred in both phases is treated as if it were incurred as of the consummation of Phase I. Courts have held that where the full debt obligation will likely be incurred, the entire amount of debt is measured for solvency purposes.[57] *See Mellon Bank*, 92 F.3d at 156 (citing *In re Xonics Photochemical, Inc.*, 841 F.2d 198 (7th Cir. 1988)) (stating that a debtor's treatment of an item as an "asset" depends

---

[53]     Section 550 provides for the recovery of all of the LBO fees and all principal, interest and other costs paid to the Banks. *See Official Comm. Of Unsecured Creditors of TOUSA, Inc. v. Citicorp N. Am., Inc. (In re TOUSA)*, 422 B.R. 783, 885-86 (Bankr. S. D. Fla. 2009) (finding Section 550 recovery "include[s] the various fees associated with the transaction;" ordering disgorgement of (i) all fees "paid by the Debtors for professionals advising [various lenders]"; (ii) "all principal, interest, costs, expenses and other fees" paid in connection with avoided obligations; and (iii) "prejudgment interest to compensate the debtor for the use of funds that were rightfully his").

[54]     *See also Mellon Bank*, 92 F.3d at 143 ("Because we agree that this minimal 'value' was not 'reasonably equivalent,' to the lending fees [the debtors] remitted to Mellon Bank, we will affirm the bankruptcy court's determination" to order return of the fees).

[55]     (*See* Statement of Facts ¶¶ 17, 18 and 21).

[56]     (*See* Ex. 97: Tribune, 10-Q, Second Quarter 2007, dated August 9, 2007 at 19-20).

[57]     Financial and accounting standards also mandate the inclusion of the full amount of Phase II debt in Phase I. GAAP requires that a company recognize contingent liabilities if they are both probable and can be reasonably estimated. *See* Statement of Financial Accounting Standards No. 5, pp. 5-6. GAAP does not permit discounting of a liability using a probability analysis. *Id.* Because of the high probability of Phase II closing, the Phase II debt should not be discounted.

for its propriety on the occurrence of a contingent event, a court must take into consideration the likelihood of that event occurring from an objective standpoint); *Mellon Bank,* 945 F.2d at 648 (applying full amount of guarantee in insolvency analysis, where "the contingent nature of the debt was illusory because TCI [the primary obligor] had no assets of any kind except the debtor . . . [and a]ll parties, including the lender, assumed that Metro would be servicing the debt"); *Nugent v. First Amer. Bank,* 1992 U.S. Dist. LEXIS 12147, at *12 (N.D.N.Y. Aug. 11, 1992) (valuing contingent liability at full amount where "high probability" that debt would come due).

### a.    Contemporaneous Valuations Show Insolvency

The analyses of the Financial Advisors involved in the LBO showed that the transaction would render the Company insolvent.  First, in late February 2007, Blackstone (the Foundations' advisor) performed a valuation analysis that showed the total enterprise value based on a discounted cash flow analysis was only $12.5 billion.[58]  Second, Duff & Phelps ("D&P") advised that it could not provide a solvency opinion without giving effect to the tax savings associated with the Phase II ESOP structure.  Elyse Bluth, the managing director of D&P, testified at her deposition that it was an open issue as to whether or not it was appropriate to include the tax savings for purposes of a solvency opinion and therefore decided against issuing an opinion for the Company.[59]  Third, both the Special Committee and the Board received a presentation from Morgan Stanley on April 1, 2007 clearly depicting that Tribune's aggregate enterprise value was less than the $13 billion of debt that Tribune was to incur.[60]  Fourth, Merrill and Citigroup made a joint presentation to the Board on March 30, 2007 showing the projected value of the Zell

---

[58]    (*See* Ex. 28: FOUN0014629-714 at FOUN0014673).

[59]    (*See* Ex. 80: Elyse Bluth Deposition Transcript sworn to on December 17, 2009 at 114).

[60]    (*See* Ex. 26: MS00000001-38 at MS00000012-15).

transaction, at its highest value, was worth only slightly more than $11 billion.[61]  Lastly, equity

analysts covering Tribune also questioned its solvency as a result of the LBO.[62]

### b.  The Market Understood Tribune Was Insolvent

Courts in the Third Circuit also examine market values to determine solvency.  *See VFB*

*LLC v. Campbell Soup Co.*, 482 F.3d 624, 633 (3d Cir. 2007) ("Absent some reason to distrust it,

the market price is 'a more reliable measure of the stock's value than the subjective estimates of

one or two expert witnesses'") (quoting *In re Prince*, 85 F.3d 314, 320 (7th Cir. 1996)); *see also*

*Iridium Operating LLC v. Motorola, Inc. (In re Iridium Operating LLC)*, 373 B.R. 283, 293

(Bankr. S.D.N.Y. 2007).  Here, Tribune's debt traded at highly discounted prices, indicating that

the market believed that Tribune was insolvent.  In particular, Tribune's senior bonds were

trading in the 70s and 80s before Phase I; the PHONES were trading in the 60s.  This plainly

indicates that the market believed that Tribune was insolvent.  As the court stated in *Campbell*

*Soup*, "if the bondholders thought [the company] solvent, they wouldn't have sold their debt so

cheaply."  *Campbell Soup*, 482 F.3d at 633.

Tribune's share price before Phase II does not indicate solvency.  Although the price of

the stock remained high after Phase I, this was largely because of high market confidence that

Phase II would close:  the value of the stock therefore reflected confidence only that the going-

private transaction would be consummated, not the intrinsic value of the stock assuming no

transaction were in prospect.  Equity research reports noted: (i) "the fundamental issues are

---

[61]      (*See* Ex. 27: CITI-TRIB-CC 00015183-219 at CITI-TRIB-CC 00015195).

[62]      One analyst stated that the LBO would put Tribune in a "precarious financial position."  (Ex. 81: GS00000152-159 at GS00000152).  Another wrote that "[w]e think it is possible that Tribune is leveraged higher than the total assets of the company after taxes."  (Ex. 82: Karen Brettell, Tribune Swaps May Face Further Weakness, http://www.reuters.com/article/idUSN0357660620070403, Apr. 3, 2007)  A Lehman Brothers research report stated that "[i]n our opinion, this is way too high a portion of debt, especially given the secular pressures on the newspaper and TV station operations, with or without the ESOP tax benefits in our opinion (which are relatively small)."  (Ex. 83: ML-TRIB-0019385-403 at ML-TRIB-0019387).

overshadowed by the auction of the company"; (ii) "the shares are no longer trading based on fundamentals"; and (iii) "valuation now determined by deal price and break-up risk."[63]

### c.    Purported Competing Bids Do Not Indicate Solvency

The sale process before the LBO does not indicate solvency. In January 2007, Tribune received a number of proposals in the failed auction run by the Special Committee. During this timeframe, management revised its financial outlook downward for the upcoming year and shared that revised outlook with bidders. As a result, the vast majority of the bidders withdrew or reduced their bids.[64] By late February, the Company considered the remaining "competing" bids to be only the Zell bid or a proposed internal "self-help" transaction for a leveraged recapitalization.[65] Clearly, the LBO was not the product of a robust bidding process and cannot constitute an indicator of solvency.[66]

### d.    VRC's Flawed Solvency Analysis Is Not Credible

VRC's solvency opinions were fundamentally flawed and are not credible evidence of Tribune's post-LBO solvency. First, VRC improperly relied on management projections because it was compelled to do so by Tribune even though the projections were consistently proven unreasonable as discussed above.[67] *See Mellon Bank*, 92 F.3d at 156 (management's

---

[63]    (*See* Ex. 84: Native file produced by Goldman Sachs, 04.20.07 TRB Barrington (00158706). PDF, Barrington Research, Tribune Co., April 20, 2007; Ex. 85: TRB0269399; Ex. 86: Native file produced by Goldman Sachs, 05.15.07 TRB Deutsche Bank (00162985). PDF, Deutsche Bank, Tribune Company, May 14, 2007).

[64]    (*See* Ex. 112, JPM_00213638 ("Apparently, in this situation, given the failed auction of the company and the extremely strained Board dynamics, management is potentially less able than normal to direct the outcome here. The Special Committee is being very careful to have a smart but certain outcome this time around")).

[65]    (*See* Fact Statement at ¶¶ 39-54).

[66]    (*See Id.*).

[67]    (*See* Ex. 87: TRB0398459 at TRB0398465; Ex. 88: VRC0011981 at 986; Ex. 1 - Rucker Tr. at 15:1-22:18, 207:24-213:3).

grossly overstated financials "cannot be the basis of a court's solvency analysis").[68] In an

analogous situation, the *TOUSA* court rejected a purportedly independent solvency opinion that

relied solely on management's projections because the issuer "made clear in its engagement

letter that it would 'not take any action to verify the accuracy or completeness' of the

information on which its opinion would be based." *TOUSA*, 422 B.R. at 885-85.[69]

 VRC's solvency opinion also required that Tribune receive the ESOP tax savings.

However, under the valuation methodology VRC was purporting to use -- fair market value --

incorporating such savings was inappropriate.  Fair market value requires a sale between a

hypothetical willing buyer and a willing seller, neither acting under compulsion and both parties

having reasonable knowledge of relevant facts.  VRC's solvency analysis incorrectly assumed

that the buyer was a tax-free ESOP entity, which is not a hypothetical buyer.  A sale to a

particular buyer is "investment value," not fair market value.  Tellingly, Houhlian Lokey was

approached by Tribune to provide a solvency opinion and refused to do so, finding it

inappropriate to take the tax savings into account when determining Tribune's enterprise value.[70]

### 4. The Guarantors Were Insolvent

 The Guarantors themselves were rendered insolvent by the LBO without taking into

account the debt at Tribune.  In other words, the Guarantors, even without consolidating with

---

[68] *See also In re Inv. Co. of the Southwest, Inc.*, 341 B.R. 298, 311 (10th Cir. BAP 2006) ("A glaring discrepancy between the facts surrounding past performance and activity and predictions for the future is strong evidence that a debtor's projections are flawed"); *In re Nellson Nutraceuticals, Inc.*, 2007 Bankr. LEXIS 99, at *19 (Bankr. D. Del. Jan. 18, 2007) ("management has a proven track record of projecting results inaccurately"); *In re O'Day Corp.*, 126 B.R. 370, 406-07 (Bankr. D. Mass. 1991) (discounting outdated projections that did not reflect historical performance); *In re Morse Tool, Inc.*, 148 B.R. 97, 133 (Bankr. D. Mass. 1992) (rejecting projections based on untested cost savings contingent on external factors and sales increases unsupported by market conditions); *In re Plassein Int'l*, 2008 WL 1990315, at *9 (Bankr. D. Del. May 5, 2008) (questioning management projections higher than historical gross margins).

[69] *See also Asousa P'ship v. Smithfields Foods, Inc. (In re Asousa P'ship)*, 2006 Bankr. LEXIS 1463, at *46 (E.D. Pa. June 15, 2006) (noting that "VRC did not independently review the [assets], relying solely upon a list and value estimate provided by [the client]").

[70] (*See* Ex. 89: HLHZ-Tribune 000147-48; Ex. 90: Ben A. Buetell transcript at 73:1-76:7; 82:17-83:15).

Tribune, were worth less than $11.6 billion. Accordingly, the Guarantors as consolidated were each insolvent. This is demonstrated by the fact that the Debtors' projections were significantly overstated and it would take only 4-6% drop in the projections to render the Guarantors insolvent. *The actual drop in the Company's performance was 15% in April 2007.*[71] In addition, the Guarantors likely were further insolvent after taking intercompany claims into account.

Indeed, as it now stands, creditors of the Guarantors will recover substantially less than the face amount of their claims. Nothing material changed between the time of the LBO and the filing of these Chapter 11 cases. The Debtors' secular decline continued and the subsidiaries were unable to generate sufficient cash flow to repay the $1.6 billion bridge loan that matured within one year of the closing of Phase II. This was foreseeable based on facts existing at the time of the LBO and on the basis of the unreasonably overstated projections, of which management was well aware. Accordingly, on both a Company-wide and Guarantor-only solvency analysis, each obligor and Guarantor was rendered insolvent, and the estates may avoid the LBO debt at all levels.

### 5.    Tribune Was Left With Unreasonably Small Capital

In the LBO context, the court must determine whether the debtor's cash flow projections were reasonable in determining capital adequacy. *See Moody*, 971 F.2d at 1073 ("[T]he critical question is whether the parties' projections were reasonable").[72] However, "[b]ecause projections tend to be optimistic, their reasonableness must be tested by an objective standard *anchored in the company's actual performance*." *Id.* (emphasis added). Further, adequate

---

[71]    (*See* Ex. 23: VRC0005506-678 at VRC0005507).

[72]    *See In re O'Day Corp.*, 126 B.R. at 405, 407 ("unreasonably small capitalization encompasses financial difficulties which are short of equitable insolvency or bankruptcy insolvency"); *Credit Managers Asso. v. Federal Co.*, 629 F. Supp. 175, 187 (C.D. Cal. 1985) ("[T]he court's task in determining whether Crescent had sufficient capital as evidenced by cash flow projections is not to examine what happened to Crescent, but whether the GECC projections, as modified, were prudent"). Basically, when the

capitalization must also account for a "capital cushion" or "margin of error." *Id.* ("[P]arties must also account for difficulties . . . and otherwise incorporate some margin of error").[73]

Here, the LBO left the Company with virtually no capital. Zell capitalized the Company with only 2.6% equity and 97.4% debt. Given this massive debt load, management's projections not only left a miniscule margin for error but were wildly optimistic in comparison to the Company's historical performance. As discussed above, Tribune knew that it was insolvent because it had missed its plan by 2%, the threshold that would determine whether the ESOP had any value. Further, by April 2007, Tribune's finances were in a tailspin – its operating profit for the month was off by 19% compared to 2006 and off by 15% compared to its 2007 plan.[74] Tribune apparently did not perform a "stress test" on its model before Phase I nor did Tribune share any such tests it performed for Phase II with the Banks (excluding Citigroup) or VRC.[75] *See In re TOUSA*, 422 B.R. at 843 (a downside model should include "real stress" to determine allowable margin of error). Likewise, the Company's projections failed to account for apparent anticipated economic and industry conditions and proposed unsupportable increases in a declining industry. The virtually immediate liquidity shortfall demonstrates capital inadequacy. Similarly, the reliance on potential, but not guaranteed, asset sales as a basis for meeting obligations also demonstrates capital inadequacy.

The Debtor were inadequately capitalized individually and on a consolidated basis. In the instance of upstream guarantees this is of critical importance. In *TOUSA,* the court concluded that individual guarantor subsidiaries are inadequately capitalized where, as here, the

---

[73]     *See also In re Morse Tool, Inc.*, 148 B.R. at 125 ("A company has to be able to survive normal fluctuations in the business cycle"); *Brandt v. Hicks, Muse & Co. (In re Healthco Int'l.)*, 195 B.R. 971, 981 (Bankr. D. Mass. 1996).

[74]     (*See* Ex. 23: VRC0005506-678 at VRC0005507).

[75]     (*See* Ex. 91: TRIB-G0033993; Ex. 92: TRB0216450; Ex. 93: TRB0223857; Ex. 94: TRB0202479; Ex. 95: TRB0237613 and Ex. 96: TRB0237910).

parent lacks adequate capital on a consolidated basis and maintains a centralized cash management system.  422 B.R. at 830.  Tribune's cash flows and other sources of working capital were managed on a consolidated basis using a unitary cash management system.[76]  In essence, this means that if there is insufficient capital on a consolidated basis there cannot be adequate capital on an entity-by-entity basis.  *Id.*  Accordingly, even if the Guarantors were evaluated individually, they too lacked adequate capital and, thus, were equitably insolvent.

## II.    **The Banks Have No Defense To The Avoidance of the Obligations and Transfers**[77]

### A.    **Section 548(c)**[78]

The Banks cannot establish a good faith defense under Section 548(c) of the Bankruptcy Code, which provides that transferee or obligee may only enforce its claim if it "takes for value and in good faith" and only "to the extent that such transferee or obligee gave value to the debtor. . . ."  *See* 11 U.S.C. § 548(c); *Tabor Court Realty Corp.*, 803 F.2d at 1298-99; *Bayou Superfund LLC v. WAM Long/Short Fund II, L.P. (In re Bayou Group, LLC)*, 362 B.R. 624, 631 (Bankr. S.D.N.Y. 2007) (transferee has burden of proving good faith).

The Section 548(c) good faith defense does not apply to the LBO Lenders that were the subsequent purchasers.  Only initial transferees and obligees can use this defense.  *See Hayes v. FPI Nursery Partners 1984-I*, 1991 U.S. App. LEXIS 12650 (9th Cir. June 11, 1991) (holding that subsequent transferees do not comply with Section 548(c) as they do not take for value); *McKloskey v. Galva Foundry Co. (In re Art Unlimited, LLC)*, 356 B.R. 700, 711 (Bankr. E.D. Wis. 2006) ("[A]n immediate or mediate transferee is protected by 11 U.S.C. § 550(b)(1) if it

---

[76]    (*See* Ex. 111: D.I. 10 (Motion of Debtors for an Order (I) Approving Cash Management Systems, (II) Authorizing Use of Prepetition Bank Accounts and Business Forms, (III) Waiving the Requirements of 11 U.S.C. § 345 (b) on an Interim Basis, and (IV) Granting Administrative Expense Status to Postpetition Intercompany Transactions, dated Dec. 8, 2008), at ¶ 10).

[77]    Section II responds to Examiner's questions 13 (b), (m), (o), (r), (s) and (t).

[78]    Section 548(c) does not apply at all if, as here, the LBO is avoided under Section 544.

gives 'value,' not necessarily 'value to the debtor,' *the term used in 11 U.S.C. § 548(c) to protect an initial transferee*") (emphasis added); *Reliant Interactive Media Corp. (In re GeneralSearch.com)*, 322 B.R. 836, 842 (Bankr. N.D. Ill. 2005). In addition, this defense is measured, not by what the Debtors received (*i.e.* potential indirect benefits), but rather by what value the Banks gave. Under subsection (d)(A) "value" is defined as "property" or "the satisfaction of antecedent debt" for 548(c) purposes.

In evaluating good faith, "the court takes an objective approach to determine what the transferee knew or should have known 'such that a transferee does not act in good faith when it has sufficient knowledge to place it on inquiry notice of the voidability of the transfer.'" *See Dobin v. Hill (In re Hill)*, 342 B.R. 183, 203 (Bankr. D.N.J. 2006) (quoting *In re Burry*, 309 B.R. 130, 136 (Bankr. E.D. Pa. 2004)).[79] Good faith is determined based on the "totality of the circumstances." *See Russo v. McLaughlin (In re McLaughlin)*, 2006 U.S. Dist. LEXIS 92350, at *28 (D.N.J. Dec. 20, 2006). Further, in the leveraged finance context, "good faith" requires the transferee to prove a lack of actual or constructive knowledge of the impairment of the debtor's financial condition. *See Tabor Court Realty Corp.*, 803 F.2d at 1296 (lenders' knowledge that debt would render the debtor insolvent precluded finding of good faith).

Here, the Banks cannot prove their good faith. They knew that the LBO would render Tribune insolvent and they knew the purposes of the LBO – *i.e.* to pay shareholders a dividend

---

[79]     *See also Jobin v. McKay (In re M & L Bus. Mach. Co., Inc.)*, 84 F.3d 1330, 1334, 1335-36 (10th Cir. 1996) ("[T]he presence of any circumstance placing the transferee on inquiry as to the financial condition of the transferor may be a contributing factor in depriving the former of any claim to good faith unless investigation actually disclosed no reason to suspect financial embarrassment"); *In re Bayou Group, LLC*, 396 B.R. at 845 (quoting *In re M&L Bus. Mach. Co.*, 84 F.3d at 1338) ("Accordingly, a transferee cannot be found to have taken a transfer in good faith 'if the circumstances would place a reasonable person on inquiry of a debtor's fraudulent purpose, and a *diligent* inquiry would have discovered the fraudulent purpose'"); *TOUSA*, 422 B.R. at 876 (rejecting 548(c) defense based on the defendants' constructive knowledge of the debtor's impaired financial condition; "objective outside observers expressed considerable skepticism that it would survive").

for no consideration, refinance their own debt at a higher interest rate, and be paid enormous fees – would not provide Tribune with reasonably equivalent value and would saddle Tribune with debt that could not be serviced. The Banks structured the LBO with the specific purpose of shielding their claims in a post-LBO insolvency through the use of subsidiary guarantees and the creation of blocker subsidiaries.

All lenders in the syndicate are bound by the bad faith of their agent. "[K]nowledge acquired by an agent acting within the scope of the agency is imputed to his principal, and the latter is bound by such knowledge although the information is never actually communicated" to the principal.[80] *See Benjamin Ctr. v. Hampton Affils., Inc.* 66 N.Y.2d 782, 784 (N.Y. 1985) (imputing agent's knowledge to principal who asserted a good-faith defense under the UCC). The presumption underlying the imputation rule is that "an agent has discharged his duty to disclose to the principal all the material facts coming to [the agent's] knowledge with reference to the subject of his agency." *Id.; see also Evvtex Co., Inc. v. Hartley Cooper Assoc. Ltd.*, 102 F.3d 1327, 1332 (2d Cir. 1996) ("[A]n agent is subject to a duty to use reasonable efforts to give his principal information which is relevant to affairs entrusted to him and which, as the agent has notice, the principal would desire to have . . .").

Here, because Section 7.01 of both Credit Agreements provides that "[e]ach Lender appoints and authorizes the Agent[s] to take such action as agent on its behalf" in connection therewith, the Administrative Agents' notice or knowledge of Tribune's insolvency, the

---

[80] Because all credit facilities are governed by New York law, New York agency law applies. *See Annan v. Wilmington Trust Co.*, 559 A.2d 1289, 1292 (Del. 1989) ("Delaware courts will generally recognize a valid choice of law provision . . . [if] the jurisdiction selected bears some material relationship to the transaction").

structuring of the transaction and other key facts must be imputed to the other Credit Agreement Lenders, who, thereby, could not assert a good faith defense.[81]

## B.    Section 550

Section 550 of the Bankruptcy Code does not create a good faith defense here to any initial or subsequent transferee. The plain language of Section 550 limits the defense to the recovery of transfers and not to the avoidance of obligations. *See In re Coleman*, 426 F.3d 719, 726 (4th Cir. 2005) (holding "no recovery [is] necessary; the avoidance itself [is] the meaningful event. . . . Thus, the recovery statute [§ 550] has no application here"); *In re Glanz*, 205 B.R. 750, 758 (Bankr. D. Md. 1997) (same); H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 375 (1977), reprinted in 1978 U.S.C.C.A.N. 5787, 6331 ("Section 550 prescribes the liability of a transferee of an avoided transfer, and enunciates the separation between the concepts of avoiding a transfer and recovering from the transferee"). Because the LBO debt and the Guarantees can be avoided without resort to Section 550, the LBO Lenders cannot rely on any Section 550 defense.

## C.    The N.Y.D.C.L. Precludes A Good Faith Defense

The LBO is also avoidable pursuant to Section 544(b) of the Bankruptcy Code and the N.Y.D.C.L. Under Delaware's "most significant relationship test," New York law would apply because significant events occurred there, including: (i) the parties agreed to New York choice of law provisions; (ii) the LBO-related transactions, negotiations and drafting of the credit agreements, occurred in New York; (iii) the majority of the Banks and Financial Advisors have a principal place of business in New York; and (iv) the LBO funds flowed through New York.[82]

---

[81]    *See In re Bayou*, 396 B.R. at 871 (imputing agent's "inquiry notice" concerning financial instability of the transferor for Section 548(c) analysis).

[82]    (*See also* Ex. 55: TRB0180193-411 at TRB0180295; Ex. 59: ML-TRIB-0106177-272, at ML-TRIB-0106260; Ex. 98: TRB0237175-80; Ex. 99: ML-TRIB-013804-17; Ex. 60: CITI-TRIB-CC 00008077-8174 at CITI-TRIB-CC00008091; Ex. 100: Tribune 8-k, dated April 5, 2007, Exs. 10.10, 10.11; Ex. 101: ML-TRIB-0571054-59 at ML-TRIB-0571057 (Merrill Lynch engagement letter provides New York law governs); Ex.

*See Travelers Indemn. Co. v. Lake*, 594 A.2d 38, 47 (Del. 1991) "[T]he local law of the state which 'has the most significant relationship to the occurrence and the parties under the principles stated in § 6 [of the Restatement]' will govern the rights of litigants in a tort suit") (quoting RESTATEMENT (2D) OF CONFLICT OF LAWS § 145(1)).

As discussed above, the Banks would be unable to demonstrate both the fair equivalency and the good faith element of fair consideration under New York law. *See In re Le Cafe Creme, Ltd.*, 244 B.R. 221, 241 (Bankr. S.D.N.Y. 2000). However, even if the Banks could prove the "fair equivalency" element, for the reasons above, they will not be able to demonstrate good faith.

## III.    There Are No Remedy Limitations[83]

Once the Guarantees are avoided, the surplus value of the subsidiaries will remedy the same fraudulent conveyance at Tribune by satisfying its creditors. Though argued strenuously by the Banks, there simply is no implied "savings clause" or "creditor cap" anywhere in the Bankruptcy Code. Section 548(b) of the Bankruptcy Code provides for the automatic avoidance of the entirety of the LBO debt at every obligor that was rendered insolvent by the LBO, not just the amount necessary to pay creditors in full. *See Moore v. Bay*, 284 U.S. 4 (1931) ("The trustee in bankruptcy gets the title to all property which has been transferred by the bankrupt in fraud of creditors . . . ."); *Coleman*, 426 F.3d at 725 (reversing determination to avoid a transfer pursuant to Section 544(b) solely to the extent it would benefit creditors and holding that avoidance is not subject to any limitation) (emphasis in original); *Acequia, Inc v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 809-10 (9th Cir. 1994) (holding that "[a] transaction that is voidable by a single, actual

---

102: CITI-TRIB-CC 00010135-36 (Citigroup engagement letter partially executed in New York); Ex. 103: MS 00211-217 (Morgan Stanley engagement letter partially executed in New York).

[83]    Section III responds to Examiner's question 13(o).

27

unsecured creditor [under § 544(b)] *may be avoided in its entirety, regardless of the size of the*

*creditor's claim*")[84] (emphasis added).  As Professor Elizabeth Warren testified:

> [Defendant's] claim that the plaintiff's right to recovery is capped or limited to
> the amounts due to unpaid creditors is contrary to bankruptcy policy, the
> Bankruptcy Code, and the legislative history underlying the applicable code
> sections … it is wrong as a matter of law.

Declaration of Elizabeth Warren, June 29, 2006, p.26, *MC Asset Recovery, LLC v. The Southern*

*Co.*, 2006 U.S. Dist. LEXIS 97034 (N.D. Ga. Dec. 11, 2006);[85] *see also* 5 Collier ¶ 548.01[1]

("[I]f the transaction is fraudulent within the rules set forth in section 548, the trustee may avoid

it in its entirety").[86]  It would be a perverse result indeed if the Banks were able to achieve their

goal through the technicality of Tribune's "shareholder" status and the implication of a non-

existent implied savings clause.  *See In re Vintero Corp.*, 735 F.2d 740, 742 (2d. Cir. 1984) ("[a]

bankruptcy court has broad equitable power which may be invoked to see 'that substance will

not give way to form, that technical considerations will not prevent substantial justice from being

---

[84]     *See also Stalnaker v. DLC, Ltd. (In re DLC, Ltd.)*, 295 B.R. 593, 605-606 (B.A.P. 8th Cir. 2003),
*aff'd*, 376 F.3d 819 (8th Cir. 2004) (*Moore v. Bay* "contains two holdings:  (1) that any property recovered by
the trustee come back into the estate for the benefit of all the unsecured creditors, not just those named as
plaintiffs; and (2) improper transfers may be avoided in their entirety, *regardless of the relationship between
the size of the transfer and the amount of the unsecured claims*."); *MC Asset Recovery, LLC v. The Southern
Co.*, 2006 U.S. Dist. LEXIS 97034, at *20 (N.D. Ga. Dec. 11, 2006) ("a trustee who brings an action to avoid
and recover a fraudulent transfer may avoid and recover it in its entirety, even when the value of the transfer
exceeds the value of all allowed claims of unsecured creditors."); *NextWave Personal Communs., Inc. v. FCC
(In re NextWave Personal Communs., Inc.)*, 235 B.R. 305, 308-309 (Bankr. S.D.N.Y. 1999) (same), *rev'd on
other grounds*, 200 F.3d 43 (2d Cir. 1999).

[85]     (Ex. 113:  Professor Warren testified that under the Bankruptcy Code's codification of *Moore v. Bay*,
avoidance occurs *in its entirety* and is for the benefit of the *entire estate,* which includes shareholders;
avoidance under Section 544(b) arises from the existence of creditors at the outset of the case, and is a
collective remedy limited only by the amount of the fraudulent conveyance at issue (not creditor claim
amounts). *Id..* at 10, 11, 16, 19).

[86]     Otherwise, those committing fraud on the estates may escape liability by manipulating the bankruptcy
process. *DLC*, 295 B.R. at 605 ("It is inconsistent with the Bankruptcy Code to allow a transferee of a
fraudulent transfer to defeat the bankruptcy trustee by paying a couple of creditors.  The potential for abuse is
obvious." *Nothing could be clearer than the situation here.*  The approximate $120 million in Guarantor trade
claims is about 10% of the $1.3 billion in senior bond claims and 5% when including the PHONES.
Essentially this is a large convenience class. Here, the Banks seek to abuse the bankruptcy process by paying
off these nominal amounts, escaping liability, and succeeding in leaving Tribune's creditors the unpaid victims
of the fraudulent conveyance that the Banks committed.

done'"") (quoting *Pepper v. Litton*, 308 U.S. 295, 304-05)); *see also Official Comm. of Unsecured Creditors of Midway Games, Inc. v. Nat'l Amusements Inc. (In re Midway Games Inc.)*, 2010 Bankr. LEXIS 337, at *41 (Bankr. D. Del. Jan. 29, 2010) (applying recharacterization to elevate substance over form with respect to challenged transactions).

*Adelphia Recovery Trust v. Bank of Am., N.A. (In re Adelphia)*, 390 B.R. 80 (S.D.N.Y. 2008), [87] a case in which the court made several errors, actually is inapposite. [88] Neither the cases on which *Adelphia* relies nor the cases on which those cases rely support the idea of a remedy limitation, freezing value at the subsidiaries to the detriment of Tribune's creditors. *Adelphia* is a standing case. The *Adelphia* court held that the Adelphia Recovery Trust ("ART"), as owner of the "Obligor Debtors," could not bring claims against defendants for harm suffered by the Obligor Debtors under fraudulent conveyance law because the ART was not harmed by the transactions alleged to be fraudulent. *Id.* at 94-95. The fraudulent conveyance claims there were *only* claims of the subsidiaries and ART did not assert the same fraudulent conveyance claims from the same transaction on behalf of its creditors. The court held that payment in full of the Obligor Debtors' creditors remedied any harm from the fraudulent transactions. Thus, the court held that there was no case or controversy for ART to bring.

Unlike *Adelphia*, here there is a single integrated LBO transaction by which Tribune undertook obligations and made transfers and its Guarantors guaranteed those obligations. Prosecution of the fraudulent conveyance claims arise from the very same transaction that

---

[87]     The *Adelphia* decision is on appeal to the Second Circuit; argument was held last week.

[88]     The *Adelphia* case erred in requiring the existence of an unpaid creditor for a section 548 claim and of an unpaid creditor at the end of the case rather than at the beginning, contrary to settled law. *See* 5 *Collier on Bankruptcy* ¶ 544.09[1] (Section 544(b) requires "an actual creditor … in existence at the commencement of the case … [t]he unsecured creditor need not exist at the time the [avoidance] action is filed"). Here there is no standing issue. The Subsidiary Guarantors had creditors at the outset of their cases and still do. Tribune is not bringing the cases against the Subsidiary Guarantors; it is, however paying its creditors from the proceeds because it was harmed from the same transaction. *Adelphia* also misapplied Section 550 to the avoidance of obligations not transfers.

harmed Tribune and its Guarantors.  Paying the Guarantors' creditors in full does not remedy the

harm at Tribune from the fraudulent conveyance.  It does not put the estates back as if the LBO

did not occur, and is inconsistent with collapsing, which requires the Court to examine all steps

of an integrated transaction to reach an equitable result.  *See Boyer*, 587 F.3d at 797 (explaining

that the proper remedy is to unravel any constructively fraudulent transfers and obligations

incurred in connection with a LBO, and thereby return the estate to where it would have been

had the failed LBO never occurred); *Morris v. Kansas Drywall Supply Co. (In re Classic

Drywall, Inc.)*, 127 B.R. 874, 876 (D. Kan. 1991) ("Section 550(a) . . . restore[s] the estate [as] if

the transfer had not occurred"); *In re TOUSA, Inc.*, 422 B.R. at 886 (avoiding entirety of liens

transferred and obligations incurred); *In re Revco D.S., Inc.*, 118 B.R. 468, 521, 523 (Bankr.

N.D. Ohio 1990) (stating appropriate remedy for fraudulent transfer in connection with LBO is

to avoid entirety of obligations and "return the constituents to their respective original states").

Equally important, upon payment in full of the Guarantors, Tribune is not left with a

transaction that otherwise would be valid between it and the Banks.  That transaction, the LBO,

is equally avoidable as a fraudulent conveyance by Tribune.  These two realities are the key

differences between the line of cases leading to *Adelphia* and Tribune.

The *Adelphia* court principally relied on *In the Matter of Vintero Corp.*, 735 F.2d 740 (2d

Cir. 1984), and *Whiteford Plastics Co. v. Chase Nat'l Bank of N.Y.C.*, 179 F.2d 582 (2d Cir.

1950).  *Whiteford Plastics* in turn principally relied on *In re J.C. Winship Co.*, 120 F. 93 (7th Cir.

1903).  Each of these Bankruptcy Act cases involved the avoidance of a security interest due to a

failure to record.  Accordingly, each of these cases involved a transaction that was voidable as to

third-party creditors *but was valid as between the debtor and the lienholder*.  Once there was no

longer any benefit for the creditors, there was no reason to avoid the lien further when it

otherwise was valid between the remaining parties. In other words, the avoidance would be for the sole benefit of the debtor as opposed to, as here, for the benefit of creditors harmed by the same transaction.[89]

As can be plainly seen, the unifying principle in these cases is not that there is an artificial cap on avoidance of fraudulent conveyances. Rather, the Bankruptcy Act courts held, under a statutory provision that was "subject … at all times to the control of the court and to such limitations, restrictions, terms, and conditions as the court may from time to time prescribe," Bankruptcy Act of 1898, § 70(c), that, where creditors will not benefit from avoidance *and the underlying transaction is otherwise valid between the parties*, the court will limit the avoidance to the benefit of creditors. Otherwise the avoidance action solely would benefit the debtor.

Here the underlying LBO transaction decidedly is not valid as between Tribune and the banks. It is a fraudulent conveyance there as much as it is at the Subsidiary Guarantors. Tribune as nominal shareholder obtains no "windfall" -- Tribune and its creditors also suffered prejudice by the LBO that must be redressed. Accordingly, the court will avoid the entirety of the obligations below and all proceeds, other than those necessary to pay the Subsidiary Guarantors' creditors in full, will flow up to pay Tribune's creditors in full prior to the banks recovering on their claims.

---

[89]     *See In re Vintero*, 735 F.2d at 742 (precluding recovery solely for shareholder's benefit where it "suffered no prejudice"); *Whiteford Plastics*, 179 F.2d at 584 (precluding recovery solely for shareholder's benefit where no creditors would benefit from the avoidance); *J.C. Winship Co.*, 120 F. at 95 (precluding avoidance solely for shareholder's benefit where no creditors would benefit).

IV.    **The Banks' Claims Should Be Equitably Subordinated**[90]

The Banks' conduct also supports equitable subordination,[91] which is an essential and correct remedy here.  The Banks contend that under different scenarios they will have resulting claims, perhaps in the billions of dollars.  In these cases, even if certain of the fraudulent LBO obligations and transfers were avoided, Law Debenture would still be injured to the extent the Banks had a valid claim and were able to share in the recovery from the Debtors' estates.  *See O'Day Corp.*, 126 B.R. at 412 ("[T]he Court finds that, even if authority exists to permit Meritor to share in the Debtor's estate as a general unsecured creditor, the Trustee has demonstrated the existence of sufficient grounds to subordinate the Bank's claim pursuant to section 510 of the Bankruptcy Code").  The conduct giving rise to the successful prosecution of fraudulent conveyance claims (and those for aiding and abetting discussed *infra*) supports equitable subordination at both the parent and subsidiary levels to ensure payment of the notes and intercompany claims.  *See In re OODC,* 321 B.R. at 146 ("[T]he Trustee has alleged sufficient facts to support claims against the Bank Group for actual and constructive fraud and aiding and abetting breach of fiduciary duty.  If proven, these allegations would provide the basis for a finding of egregious misconduct which could warrant the subordination of the Bank Group's claims under section 510(c)").

The Banks' conduct warrants equitable subordination.[92]  "For non-insider creditors, the

---

[90]    Section IV responds to Examiner's questions 13 (x), (y), (z) and (aa).

[91]    Courts continue to apply the three-part test from *Benjamin v. Diamond* (*In re Mobile Steel Co.),* 563 F.2d 692, 700 (5th Cir. 1977): (i) inequitable conduct; (ii) injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant, and (iii) equitable subordination of the claim must not be inconsistent with the Bankruptcy Code (but this prong is likely moot where others are proven).  *See In re OODC, LLC*, 321 B.R. at 145 (applying the *Mobile Steel* test); *In re 80 Nassau Assocs.*, 169 B.R. 832, 841 (Bankr. S.D.N.Y. 1994).

[92]    This footnote responds to the Examiner's question 13(x).  Courts have allowed equitable subordination claims to proceed (i) even when there has been insufficient evidence to support an actual fraudulent transfer claim, and (ii) where the evidence was sufficient to support an aiding and abetting claim.

plaintiff must allege 'a more egregious level of misconduct' to satisfy the first prong of the

*Mobile Steel* test." *See OODC, LLC,* 321 B.R. at 146. Although "[c]ourts have struggled to

define precisely the misconduct necessary to support equitable subordination against a creditor

who is not an insider," they have recognized that "[s]omething less than actual fraud . . . will

suffice" and the "minimum level of offending conduct appears to be conduct that shocks the

conscience of the court." *Capital Bank & Trust Co. v. 604 Columbus Ave. Realty Trust (In re*

*604 Columbus Ave. Realty Trust),* 968 F.2d 1332, 1361 (1st Cir. 1992).

 In *Credit Suisse v. Official Comm. Of Unsecured Creditors (In re Yellowstone*

*Mountain Club, LLC),* 2009 Bankr. LEXIS 2047, at *29-31 (Bankr. D. Mont. May 12, 2009),

the court ordered equitably subordination where the lender: (i) turned a "blind eye to Debtors'

financial statements," performing almost no due diligence, (ii) "relied almost exclusively on

Debtors' future financial projections even though [they] bore no relation to the Debtors'

historical or present reality," (iii) was "driven by the [syndication] fees it was extracting from

the loans it was selling," and (iv) had acted with "naked greed" in conduct constituting

"overreaching and predatory lending practices." *Id.* at *29-31. The *Yellowstone* court found that

the lender was a sophisticated party that knew the majority of the loan proceeds were earmarked

for the debtors' principal shareholder and for purposes unrelated to the debtors' business. *Id.*

at *14-16. The court subordinated the lender's claim, finding the lender's overreaching and

self-serving conduct shocked the court's conscience. *Id.* at *3; *In re O'Day Corp.,* 126 B.R. at

405-06 (subordinating an LBO lender's claim where the lender approved loan facilities despite a

collateral shortfall based on unreasonable projections that left no room for error; as the debtor's

---

*See In re O'Day Corp.,* 126 B.R. at 412 (lenders' overreaching, even without intent to hinder, delay or defraud creditors, warranted equitable subordination); *In re Exide Techs.,* 299 B.R. 732, 744-45 (Bankr. D. Del. 2003) (refusing to dismiss equitable subordination claim where banks aided and abetted breach of fiduciary duty to unsecured creditors which "resulted in a transfer of substantial value to the [b]anks to the direct detriment of unsecured creditors").

finances continued to deteriorate, the bank tried to improve its position at the expense of unsecured creditors).   Here, the facts discussed above in respect of the fraudulent conveyance claims satisfy the first prong of *Mobile Steel*.

The second *Mobile Steel* factor is also satisfied because Tribune's unsecured creditors stand to receive miniscule recoveries because of the unsustainable LBO debt load. *See In re 80 Nassau Assocs.*, 169 B.R. at 840 ("If the misconduct results in harm to the entire creditor body, the objecting party need not identify the injured creditors or quantify their injury, but need only show that the creditors were harmed in some general, concrete manner").   Equitable subordination is appropriate here where the creditors cannot be fully remedied by an avoidance action. *See Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 323 F.3d 228, 233 (3d Cir. 2003) ("The doctrine of equitable subordination is remedial, and the goal 'is to undo or to offset any inequality in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of the bankruptcy results'").

## V.    <u>The Banks' Claims Should Be Equitably Disallowed</u>[93]

Banks that structure LBOs count on structural seniority in part to insulate their conduct that would warrant subordination or avoidance of their obligations as fraudulent transfers.   In other words, by the exact terms of the statute, the Banks will argue that Section 510(c) does not permit subordination of the Banks' claims to those of Tribune creditors.   For this reason, where the plaintiff otherwise could not obtain full relief from the inequitable conduct of third parties, the equitable disallowance doctrine exists. *See In re Mid-American Waste Sys.*, 284 B.R. 53, 68 (Bankr. D. Del. 2002); *see also Northtown Theatre Corp. v. Mickelson*, 226 F.2d 212, 215 (8th Cir. 1955) ("the legality of a claim for a purely technical aspect does not preclude its

---

[93]     Section V responds to Examiner's question 13 (v).

*disallowance* or subordination on equitable grounds") (emphasis added).  Furthermore, even if

only Phase II were avoided, the Banks' conduct would warrant equitable subordination and

disallowance of obligations for both Phases.  *See In re O'Day Corp.*, 126 B.R. at 412 (Bankr. D.

Mass. 1991) (finding equitable subordination where court found that defendant's "post-LBO

conduct was tantamount to overreaching, although [concluding that it] did not act to intentionally

hinder, delay or defraud creditors, at the very outset of its relationship with O'Day").

Under Supreme Court precedent, the Court may use its equitable power to disallow the

Banks' claims entirely where, as here, subordination would not be a sufficient equitable

remedy.  *Pepper v. Litton*, 308 U.S. 295 (1939).  In *Pepper*, the Supreme Court stated that if

"a claim which has been allowed may later be '[rejected] in whole or in part, according to the

equities of the case,' *disallowance or subordination in light of equitable considerations*" may

be appropriate.  *Id.* at 305 (emphasis added).[94]  The legislative history specifically indicates

that Congress intended that the equitable disallowance doctrine would survive the enactment of

Section 510(c).  H.R. Rep. No. 595, 95th Cong., 1st Sess. 359 (1977) (subsection (b) "is not

intended to limit the court's power in any way. . . .  Nor does this subsection preclude a

bankruptcy court from completely disallowing a claim in appropriate circumstances").[95]

Indeed, courts have recently recognized the continuing viability of the equitable disallowance

doctrine.  *See, e.g., Murgillo v. Cal. State Bd. of Equalization (In re Murgillo)*, 176 B.R. 524, 531

---

[94]     *See Stebbins v. Crocker Citizens Nat'l Bank (In re Ahlswede)*, 516 F.2d 784, 787-88 (9th Cir. 1974), *cert. denied*, 423 U.S. 913 (1975) (equitable disallowance proper where "some basis . . . exist[s] of the sort traditionally cognizable by equity as justifying its intervention, such as fraud, breach of fiduciary duties, mismanagement, overreaching . . . any breach of the multitude of rules of fair play and good conscience traditionally enforced by a court").

[95]     *See Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946) "[T]he comprehensiveness of this equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command. . . . The great principles of equity, securing complete justice, should not be yielded to light inferences, or doubtful construction"); *Hadix v. Johnson*, 144 F.3d 925, 936 (6th Cir. 1998).

(9th Cir. 1994), *cert. denied*, 485 U.S. 906 (1988).[96] The predicates for equitable disallowance are the same as those for equitable subordination. *See In re Sunbeam Corp.*, 284 B.R. 355, 369 n.3 (Bankr. S.D.N.Y. 2002).

Accordingly, if equitable subordination does not provide a sufficient remedy, the Court should exercise its equitable powers to disallow the Banks' claims.

## VI.   The Court Should Pierce The Veil Between The Parent And The Sham Holdcos[97]

As detailed above in Section I.A.2(b), the evidence unequivocally indicates that the Banks caused Tribune to create the Holdcos as probably "blockers" to insulate the Banks from fraudulent conveyance liability.[98] To redress this abuse of the corporate form, the Court can reverse veil-pierce the Holdcos, which were sham entities since they were formed on May 16, 2007.

Delaware courts have not addressed the viability of reverse veil piercing, but courts have predicted that Delaware would adopt such a theory under the circumstances here. *See Asarco LLC v. Ams. Mining Corp.*, 396 B.R. 278, 317 (S.D. Tex. 2008). The *Asarco* court held that Delaware would use similar equitable considerations that it would under a traditional veil-piercing claim, citing to cases from numerous other jurisdictions "that have used the same alter ego considerations to justify reverse-veil piercing in similar situations." *Id.*

---

[96]    *See also In re Outdoor Sports Headquarters*, 168 B.R. 177, 182 (Bankr. S.D. Ohio 1994) (holding that equitable disallowance is a valid remedy); *In re 80 Nassau Assocs.*, 169 B.R. at 837 n.4 ("If the conduct of the creditor is so egregious that it affects the validity of the claim under applicable principles of law, the debtor can seek to disallow it."); *In re Shelter Enters., Inc.*, 98 B.R. 224, 229 (Bankr. W.D. Pa. 1989) ("State substantive law determines the existence of a claim; however its allowance or disallowance is a matter of federal law and is left to the bankruptcy court's exercise of equitable powers"), *on mot. for reconsideration*, 99 B.R. 668 (Bankr. W.D. Pa. 1989) (disallowing claim).

[97]    Section VI responds to Examiner's question 13 (0).

[98]    (*See* Ex. 51: JPM_00353676-78; Ex. 52: JPM_00000021-27; Ex. 53: JPM_00143041-57).

Here, as in *Asarco*, (1) Tribune and the Holdcos operated as a single economic entity, and

(2) an overall element of injustice or unfairness is present. *See United States v. Golden Acres,*

*Inc.*, 702 F. Supp. 1097, 1107 (D. Del. 1988) (finding "the corporate entity may be disregarded

where failure to do so would lead to circumvention of a statute or avoidance of a clear legislative

purpose"). *Asarco* and its parent (SPHC) functioned as a single economic unit with Asarco

because (i) "SPHC was a shell corporation whose sole purpose was to hold the SPCC stock [that

was previously held by Asarco];" (ii) "SPHC had no other assets beside the 54.18% ownership of

SPCC;" (iii) SPHC held no debt; (iv) "SPHC did not engage in any business or activity other

than the ownership of SPCC stock;" (v) "SPHC had no independent officers or directors;" (vi) "it

had no separate office space and no employees;" and (vii) "corporate formalities were not kept."

*Asarco*, 396 B.R. at 319. These facts are substantially similar to those applicable to the Holdco.[99]

As to the overall presence of injustice, the *Asarco* court found that it would be inequitable to

allow the defendants to "hide behind the fact that SPHC had no unsecured creditors in order to

dodge liability for the [fraudulent] transfer." *Id.* at 322. Here too, the Holdcos were created

solely for the purpose of immunizing the Banks from fraudulent transfer actions avoiding

transfers made by Tribune's subsidiaries.[100] Therefore, Asarco's holding is equally applicable

here, requiring reverse veil-piercing of the Holdcos. Having done so, the Holdcos no longer will

"block" the fraudulent conveyance remedy from satisfying Tribune's creditors claims in full.

Tribune and the Holdco entities must be collapsed where, like here, the creation and use

of the Holdcos was for unjust purposes. If the corporate form was used to visit a mere injustice,

if not fraud, veil-piercing is appropriate. *See Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1458 (2d Cir.

1995) ("a showing of fraud or wrongdoing is not necessary under an alter ego theory"); *NetJets*

---

[99]     *See* Section I(A)(2)(b) *supra*.

[100]    *Id.*

*Aviation, Inc. v. LHC Commc'ns., LLC*, 537 F.3d 168, 183 (2d Cir. 2008) (under Delaware law, "the plaintiff need not prove that the corporation was created with fraud or unfairness in mind. It is sufficient to prove that it was so used"); *Golden Acres*, 702 F. Supp. at 1107 ("proof of plain fraud is not a necessary element in a finding to disregard the corporate entity"); *Sea-Land Servs., Inc. v. Pepper Source*, 993 F.2d 1309, 1311, 1313 (7th Cir. 1993) ("A party can prevail under the "fraud or promote injustice" test by showing, among other things, "a party would be unjustly enriched; [or] a parent corporation . . . caused a sub's liabilities and its inability to pay for them would escape those liabilities""). Given the likelihood and the Banks' belief that Tribune would end up in bankruptcy as a result of the LBO, the Banks caused Tribune to form the Holdcos without any potential creditors to block the funds in the Guarantors from flowing upstream to Tribune's existing creditors in the face of a successful avoidance action of the Guarantees. Accordingly, veil-piercing is warranted here as the Banks acted improperly by using the Holdcos to ensure full recovery of the LBO debt, resulting in an injustice to the creditors.[101]

## VII.    There Are Viable Tort Claims Against The Banks, The Officers And Directors[102]

### A.    Breach Of Fiduciary Claims Can Be Asserted Against The Board Of Officers And Directors

Officers and Directors that structure, participate and approve an LBO that renders a debtor insolvent are liable for breach of fiduciary. *Official Comm. of Unsecured Creditors of Buckhead Am. Corp. v. Reliance Capital Group (In re Buckhead Am. Corp.)*, 178 B.R. 956, 968 (D. Del. 1994) ("[W]here a corporation is operating in the vicinity of insolvency, a board of

---

[101]    Further, a global veil-piercing analysis has not been completed. However, it is fundamentally unfair for Tribune to use its control over the Guarantors to burden them with the LBO debt to consummate a shareholder dividend via the LBO and to leave Tribune creditors impaired.

[102]    Section VII responds to Examiner's questions 13 (a), (bb), (cc), (dd), (ff) and (gg).

directors is not merely the agent of the residue risk bearers, but owes its duty to the corporate enterprise, including the corporation's creditors").[103] Here, Tribune's Officers and Directors breached their fiduciary duties by participating in and structuring the LBO transaction that resulted in Tribune's insolvency.

### 1.    **Duty Of Loyalty**

Under Delaware law, corporate fiduciaries owe an unyielding duty of loyalty in managing the business and affairs of a corporation. *See Cede & Co. v. Technicolor*, 634 A.2d 345, 361 (Del. 1993) ("Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests."). This duty requires "an undivided and unselfish loyalty to the corporation [and] demands that there shall be no conflict between the duty and self-interest [of the directors]." *See Guth v. Loft, Inc.,* 5 A.2d 503, 510, 23 Del. Ch. 255 (Del. 1939). A breach of the duty of loyalty occurs when a director is on both sides of a transaction or the director derives any personal financial benefit that does not devolve on the corporation or all stockholders generally.[104] Where a material conflict of interest between the corporation and its officers and directors has been properly alleged, the defendant must prove the entire fairness of the transaction under review. *See Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1167-69 (Del. 1995).

Here, Tribune's Officers and Directors received material and significant financial benefits in consummating the LBO that were separate and apart from the interests generally received by the shareholders. For instance, aside from Tribune's Directors and certain Officers

---

[103]    *See N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007) (creditors have derivative standing for fiduciary duty claims upon insolvency).

[104]    *See In re Hechinger Inv. Co. of Del., Inc.*, 327 B.R. at 549-50 (precluding summary judgment for duty of loyalty claims where defendants "controlled the votes for approximately 65% of the voting shares of Hechinger stock, for which they and their family received approximately $21 million as a result of the Transaction;" defendants "received approximately $6.6 million for "change of control" benefits, including personal stock options, SERP payments, severance, vacation pay and related excise taxes").

received as a group (20 persons) $234,324,974 from their ownership of 6,891,911 shares.

(JPM_00162312-773 at JPM_00162442-43)  While not all the shares beneficially owned by

these parties were tendered in June 2007, some of the Officers and Directors that were

instrumental in closing the LBO transactions tendered a large number of shares.[105]  Furthermore,

the Officers and certain Directors received millions of dollars in special incentive awards and

change of control benefits from the LBO.[106]  In similar circumstances, the *Hechinger* Court held

that the entire fairness test applies.  *See Hechinger*, 327 B.R. at 549-50.  Inasmuch as the "entire

fairness" test requires a "fair price," the test will fail because Tribune did not receive reasonably

equivalent value as discussed above.

### 2.    Duty Of Care

Separately, with respect to their duty of care, the Officers and Directors are not protected

by the business judgment rule because they acted in bad faith.[107]  *See Lyondell Chem. Co. v.*

*Ryan*, 970 A.2d 235, 243 (Del. 2009) ("[B]ad faith will be found if a fiduciary intentionally fails

to act in the face of a known duty to act, demonstrating a conscious disregard for his duties")

(internal quotations omitted).  Tribune's Directors and Officers had a duty: (1) to "use that

amount of care which ordinarily careful and prudent men would use in similar circumstances";

---

[105]    For example, FitzSimons tendered 266,963 shares (approximately $9,076,742), Grenesko tendered 131,931 shares (approximately $4,467,294), and Kenney tendered 29,763 shares ($1,011,942). (Ex. 107: TRB0344628-841 at TRB0344761).

[106]    The Board approved a bonus pool in an aggregate amount of $6.5 million for 32 individuals (subsequently increased to 40 individuals and reduced in dollar amount to $5.4 million). (Ex. 108: TRB0414672-75).  Five senior officers received payments in the estimated aggregate amount of $15.54 million and all other directors and executive officers receiving payments in the estimated aggregate amount of $7.75 million from the merger. (*See* Proxy Statement at 63 produced at Ex. 107: TRB0344628-841 at TRB0344699).  Finally, pursuant to an existing compensation plan, the closing of the Merger constituted a change of control and resulted in an estimated cash and in-kind severance benefits to such officers of $36.2 million, plus tax gross-up payments of approximately $13.85 million. (*See* Proxy Statement at 62 produced at Ex. 107: TRB0344628-841 at TRB0344698). (Ex. 106: EGI-LAW 00202127-386 at EGI-LAW 00202317).

[107]    The Special Committee provides no defense to fiduciary duty claims.  It was organized to determine whether the LBO share price was fair and was not asked to determine the post-LBO effect on the Company.

and (2) to "consider all material information reasonably available." *See In re Walt Disney Co. Derivative Litig.,* 907 A.2d 693, 749 (Del. Ch. 2005), *aff'd,* 906 A.2d 27 (Del. 2006); *see also Brandt v. Hicks, Muse & Co. (In re Healthco Int'l, Inc.),* 208 B.R. 288, 305 (Bankr. D. Mass. 1997) (finding that the director defendants did not fulfill their "duty to inform themselves, prior to making a business decision, of all material information reasonably available to them" and, thereby, breached their fiduciary duty of care).

Tribune's Directors and Officers breached their duty of care because they knowingly and/or recklessly proceeded with the LBO despite being aware that the LBO would render Tribune insolvent and of the numerous red flags surrounding the transaction. *See In re Abbott Labs. Derivative S'Holders Litig.,* 325 F.3d 795, 802-803 (7th Cir. 2003) (finding the board lacked good faith based upon allegations that "the directors knew of the continuing pattern of noncompliance with FDA regulations and knew that the continued failure to comply with FDA regulations would result in severe penalties and yet ignored repeated red flags raised by the FDA and in media reports and chose not to bring a prompt halt to the improper conduct. . . .").

Further, the Board breached its duty of care by failing to inform itself fully before approving the LBO and recklessly disregarding other valuations and the glaring deficiencies in VRC's solvency opinions in taking management's unreliable projections into account. [108] *See Cede,* 634 A.2d at 367 (in the merger or sale of a company, the director's duty of care requires a director, before voting on the transaction "to inform himself and his fellow directors of all material information that is reasonably available to them") (citing *Aronson v. Lewis,* 473 A.2d

---

[108]    (*See* Ex. 26: MS00000001-38 at MS00012-15; Ex. 10: TRB00137005; Ex. 27: CITI-TRIB-CC 00015183-219 at CITI-TRIB-CC 00015195; Ex. 28: FOUN0014629-714 at FOUN0014673; Ex. 29: FOUN0014721-41; Ex. 30: FOUN0014817-26; Ex. 31: FOUN006490-589 at FOUN006511, FOUN006532-37; Ex. 24: TRB-0149983-150012 at TRB0149992).

805, 812, (Del. 1984)).[109]  For instance, Tribune's Directors did not even obtain a solvency

opinion from VRC before approving the LBO.[110]  Moreover, the Officers and Directors acted

grossly negligent by assisting VRC in delivering a "positive" solvency opinion in or about

December 20th which it knew should have not been provided.  *See Smith v. Van Gorkom*, 488

A.2d 858, 881, 46 A.L.R. 4th 821 (Del. 1985) (if directors were grossly negligent in informing

themselves, the business judgment rule will not protect them).  The Company provided VRC a

representation about its refinancing capabilities despite Morgan Stanley's refusal to provide such

assurance to VRC.[111]

Because Tribune's Officers and Directors acted recklessly and in bad faith, they have no

business judgment rule defense or exculpation from the corporate charter.  *See Bridgeport*

*Holdings Inc. Liquidating Trust v. Boyer (In re Bridgeport Holdings, Inc.)*, 388 B.R. 548, 568

(Bankr. D. Del. 2008) ("The Trust has alleged facts supporting a breach of the duty of loyalty as

well as a lack of good faith, in addition to a breach of the duty care.  Since these questions of the

D&O Defendants' loyalty or lack of good faith trigger entire fairness review, an exculpatory

provision simply cannot justify a dismissal of the duty of care claims").[112]

---

[109]     *See Brandt v. Hicks, Muse & Co. (In re Healthco Int'l, Inc.)*, 208 B.R. 288, 307 (Bankr. D. Mass.
1997) (applying Delaware law) ("[T]hey never saw [Valuation Research's] opinions before approving the
transaction, so the opinions can hardly constitute "reports" of an expert the directors were entitled to rely upon
under section 141(e) of Delaware's corporation law.  The defendants respond by saying they were assured the
transaction would not go through if Valuation Research failed to issue a favorable opinion.  In a transaction of
this significance, however, directors are not permitted to avoid an "active and direct duty of oversight.". . .  Its
solvency opinions were influenced by the deficiencies of the Hicks, Muse cash flow projections, which
Valuation Research had examined. And its opinions had their own deficiencies. . . .  The result is the same
even if the directors are given the benefit of the business judgment rule so that they have a duty of slight care
and are responsible only for gross negligence. The evidence warrants a finding of gross negligence.").

[110]     (*See* ML-TRIB-0001507-36; TRB0149983-150012).

[111]     (*See* Ex. 34: MS00097249-51 at MS97251; Ex. 35: TRB0274988-5012 at TRB0274997; Ex. 36:
TRB0271556; Ex. 37: TRB0448465; Ex. 33: TRB0450697-707 at TRB0450706).

[112]     The breach of fiduciary duty claims are independent of the fraudulent conveyance claims and can still
succeed even if the fraudulent transfer claims fail.  *See Hechinger*, 274 B.R. at 89.

### 3.    The Banks Are Liable For Aiding And Abetting

A claim for aiding and abetting a breach of fiduciary duty under Illinois law[113] includes

the following elements:  "(1) the party whom the defendant aids must perform a wrongful act

which causes an injury; (2) the defendant must be regularly aware of his role as part of the

overall or tortious activity at the time that he provides the assistance; and (3) the defendant must

knowingly and substantially assist the principal violation."  *Thornwood, Inc. v. Jenner & Block*,

344 Ill. App. 3d 15, 27, 799 N.E.2d 756, 767 (Ill. App. Ct. 2003).[114]  The facts here support

aiding and abetting liability.  *See In re Exide Techs., Inc.*, 299 B.R. at 749-750 (viable aiding and

abetting claim existed where plaintiffs alleged "Debtors' directors repeatedly breached their

fiduciary duties by favoring the banks to the detriment of the Debtors' unsecured creditors"; the

Directors "approved the . . . acquisition at a time when the debtors were insolvent, while market

conditions were continuing to decline and while the Debtors were facing future economic

uncertainties, thereby allowing the Lenders to acquire overwhelming economic leverage"; and

"the Lenders knowingly participated in these breaches by . . . inducing the . . . transaction and

providing investment banking services and financing in connection therewith.").[115]

---

[113]    Under Delaware's "most significant relationship" choice of law test, Illinois likely would govern the aiding and abetting claims because Tribune sustained its injury in Illnois, where it is headquartered.  *See Turner v. Lipschultz*, 619 A.2d 912, 914-15 (Del. 1992) (pursuant to Section 145 of the Restatement of Conflicts, the local law of the state which has the most significant relationship to the occurrence and the parties under the principles stated in [Section 6] will govern the rights of litigants in a tort suit"); *see also Weil v. Morgan Stanley DW Inc.*, 877 A.2d 1024, 1035 (Del. Ch. 2005) ("The only issue is whether it, as a broker, breached any fiduciary duties to its clients. That issue is one that has nothing logically to do with Morgan Stanley's status as a Delaware corporation"); *Alten v. Ellin & Tucker, Chartered*, 854 F. Supp. 283, 287 (D. Del. 1994) (Delaware courts place considerable emphasis on "the place where the injury occurred").

[114]    Aiding and abetting occurs when the defendant commits an "act or omission which furthers or completes the breach of trust by the trustee."  *See Chabraja v. Martwick*, 248 Ill. App. 3d 995, 999, 618 N.E.2d 800, 803 (Ill. App. Ct. 1st Dist. 1993) (quoting G. Bogert, *Trusts & Trustees*, 2d Ed., 1982, § 901 at p. at 258-59); *Holland v. Cho (In re John Dawson & Assocs.)*, 271 B.R. 270, 272 (Bankr. N.D. Ill. 2001) (one could be liable to Company's creditors where he "participated" in breach of fiduciary duty of an officer of insolvent company); *Scholes v. Moore*, 1993 U.S. Dist. LEXIS 724, at *63 (N.D. Ill. Jan. 22, 1993).

[115]    *See also In re OODC, LLC*, 321 B.R. at 144 (upholding claim for aiding and abetting where "[t]he Trustee has alleged that [directors] committed acts which were intended to defraud the creditors of the Selling

43

Even assuming *arguendo* that there is a creditor cap on recoveries for the estate's

fraudulent conveyance claims, aiding and abetting claims against the Banks would provide a

complete recovery for all non-Bank creditors in the capital structure.

> **4.**     **The Banks' Potential Defenses Will Not Bar The Viable Claims Here**
>
> **a.**     ***In Pari Delicto* And Imputation Defenses Do Not Apply**

The doctrine of in *pari delicto* "is intended for situations in which the victim is a

participant in the misconduct giving rise to his claim." *See Circle Group Holdings, Inc. v.*

*Akhamzadeh,* 2006 U.S. Dist. LEXIS 62631, at *23-24 (N.D. Ill. Sept. 1, 2006). The *in pari*

*delicto* defense has no application to the bankruptcy and non-bankruptcy claims at issue here.

First, the *in pari delicto* defense does not apply, as a matter of law, to either the breach of

fiduciary claims against the Officers and Directors or the fraudulent conveyance claims.[116]

Second, the *in pari delicto* defense does not bar the aiding and abetting claims because (i) the

Banks' culpability outweighs that of the Officers and Directors and (ii) the adverse interest

doctrine prevents the application of such defense where, like here, Officers and Directors acted

adverse to Tribune by taking on the LBO Debt.

The doctrine of *in pari delicto* bars claims where "the plaintiff truly bore at least

substantially equal responsibility for his injury." *See Circle Group Holdings, Inc.,* 2006 U.S.

---

Companies (and later of the Debtor) and that the Bank Group was aware of these activities and participated in them by extending loans to the Debtor to facilitate the actions of [the directors]."); *Gatz v. Ponsoldt,* 925 A.2d 1265, 1276 (Del. 2007) ("[T]he complaint pleads facts from which it can be inferred that at all relevant times Ponsoldt and Statesman controlled Regency, and that the Levy defendants aided and abetted a breach or breaches of duty by the Ponsoldt defendants and Statesman in conceiving and carrying out the Recapitalization.")

[116]     *See OHC Liquidation Trust v. Credit Suisse First Boston (In re Oakwood Homes Corp.),* 340 B.R. 510, 536 (Bankr. D. Del. 2006) ("In pari delicto does not provide a defense for insiders"); *In re Healthsouth Corp. Shareholders Litig.,* 845 A.2d 1096, 1107 (Del. Ch. 2003) ("the in pari delicto doctrine has been rejected in situations when corporate fiduciaries seek to avoid responsibility for their own conduct vis-a-vis their corporations"); *see also McNamara v. PFS (In re The Personal & Bus. Ins. Agency),* 334 F.3d 239, 245-247 (3d Cir. 2003) (holding that in pari delicto does not apply to a trustee bringing an action under § 548); *Gecker v. Goldman Sachs & Co. (In re Auto. Prof'ls, Inc.),* 398 B.R. 256, 262 (Bankr. N.D. Ill. 2008) (same).

Dist. LEXIS 62631, at *24-25 ("Although some courts have used *in pari delicto* to bar a claim

when plaintiffs engage in the same sort of wrongdoing as defendants, . . . traditionally, the

doctrine is only applicable to situations where the plaintiff truly bore at least substantially equal

responsibility for his injury, because in cases where both parties are *in pari delicto*, concurring in

an illegal act, it does not always follow that they stand *in pari delicto*; for there may be, and

often are, very different degrees in their guilt").[117]   In this case, the Banks' acted worse than the

Officers and Directors, creating the Holdco structure for the sole purpose of shielding themselves

from the risk of a Tribune bankruptcy.  As discussed above, the Banks, some of whom were the

Company's advisors also knew about Tribune's potential insolvency as a result of the LBO but

continued to push the Transaction through.  Indeed, the Banks were more focused on earning

significant fees than structuring a deal that would not harm Tribune and its creditors.  *See Circle*

*Group*, 2006 U.S. Dist. LEXIS 62631, at *24 ("Akhamzadeh alleges that Halpern conceived the

sham consulting agreement as a means of preventing Akhamzadeh from returning the shares of

stock purchased under the promissory note.  Akhamzadeh participated in the scheme, he alleges,

only to facilitate the transfer of stock.  The consulting agreement was Halpern's idea and

principally for his and Circle Group's benefit.  Based on Akhamzadeh's allegations, a set of facts

may exist under which Akhamzadeh does not bare substantially equal responsibility to Circle

Group and Halpern").  Thus, the Banks should not now be able to hide behind the *in pari delicto*

defense to prevail on the aiding and abetting claims when recovery is being sought for the benefit

of the innocent creditors.

   The doctrine of *in pari delicto* "is intended for situations in which the victim is a

participant in the misconduct giving rise to his claim."  *See Circle Group*, 2006 U.S. Dist.

---

[117]   *See Circle Group*, 2006 U.S. Dist. LEXIS 62631, at *23-24 (finding the *in pari delicto* defense is not suitable for resolution on a motion to dismiss).

LEXIS 62631, at *23-24. The *in pari delicto* defense has no application to the bankruptcy and non-bankruptcy claims at issue here. First, the *in pari delicto* defense does not apply, as a matter of law, to either the breach of fiduciary claims against the Officers and Directors or the fraudulent conveyance claims. Second, the defense should have no applicability where, as here, the claims are being brought for the benefit of innocent creditors who were not *in pari delicto* with anyone. *See Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306 (1985) (explaining the *in pari delicto* defense is premised upon the courts not "lend[ing] their good offices to mediating disputes among wrongdoers"). Third, if it did apply, the adverse interest exception prevents the application of the *in pari delicto* defense where, as here, the Officers and Directors that acted directly with the Banks to structure and to execute the LBO acted adversely to the Debtors and the Debtors received no benefit from their agents' conduct.

Moreover, the "adverse interest" exception bars imputation where the agent is acting for its own benefit to the detriment of the principal. *See McRaith v. BDO Seidman, LLP*, 391 Ill. App. 3d 565, 589 (Ill. App. Ct. 1st Dist. 2009) ("'[W]hen a corporate officer or agent engages in fraudulent conduct for the distinctly private purpose of lining his own pockets at his corporation's expense, it is unlawful, as well as illogical, to impute the . . . disloyal, predatory conduct to his corporate principal'") (quoting *Reider v. Arthur Andersen, LLP*, 47 Conn. Supp. 202, 211, 784 A.2d 464, 470 (2001)). It does not matter if the corporation receives some benefit from the agent's action. *Id.; see also Schacht v. Brown*, 711 F.2d 1343, 1348 (7th Cir. 1983) (barring imputation under the adverse interest exception where conduct was not a benefit to the corporation); *see also Holland v. Arthur Andersen & Co.*, 127 Ill. App. 3d 854, 866-67 (Ill. App. Ct. 1st Dist. 1984) (refusing to impute top management's conduct to the trustee where alleged "ARC did not benefit from the misconduct" and "[ARC] was damaged by the SCOR agreement

by being artificially maintain[ing] [its] business past the point of insolvency"); *Thabault v. Chait*, 541 F.3d 512, 527 (3d. Cir. 2008) ("[g]iven that [officer's] conduct allowed [the company] to continue past the point of insolvency, his actions cannot be deemed to have benefited the corporation").

In *Schacht*, the court applied the adverse interest exception in rejecting the defendants' *in pari delicto* defense, reasoning:

> the fact that Reserve's existence may have been artificially prolonged pales in comparison with the real damage allegedly inflicted by the diminution of its assets and income. Under such circumstances, the prolonged artificial insolvency of Reserve benefited only Reserve's managers and the other alleged conspirators, not the corporation.

711 F.2d at 1348.  Similarly, here, the Debtors received no benefit at all from the LBO.

### b.    Indemnification Provisions

The Financial Advisors have broad indemnification provisions in their engagement letters indemnifying them for all claims and losses arising from the engagement letters and their services thereunder, including claims for bad faith or gross negligence.[118]  However, these Banks cannot rely upon these indemnification clauses to avoid liability under bankruptcy and non-bankruptcy laws because (i) such provisions are not enforceable if they frustrate or waive protections created by the Bankruptcy Code and (ii) the non-bankruptcy claims against the Banks are outside the scope of an indemnity under New York and Illinois[119]

---

[118]    (*See* Ex. 109: TRB0397765; Ex. 110: CITI-TRIB-CC 00010123-28; MS00211).

[119]    Merrill and Citigroup's engagement letters have New York choice of law provisions and therefore New York law would govern the enforceability of the indemnification clause. *See J.S. Alberici Const. Co., Inc. v. Mid-West Conveyor Co., Inc.*, 750 A.2d 518, 520 (Del. 2000) ("Delaware courts will generally honor a contractually-designated choice of law provision so long as the jurisdiction selected bears some material relationship to the transaction").  Morgan Stanley's engagement letter does not have a choice of law provision. Therefore, Illinois law likely would govern the enforceability of Morgan Stanley's indemnification provision under Delaware's most significant relationship test. *See Alten v. Ellin & Tucker, Chartered*, 854 F. Supp. 283, 287 (D. Del. 1994) (In applying the "most significant relationship test" in tort cases, Delaware courts place considerable emphasis on "the place where the injury occurred").

state laws.  *See Maryville Academy v. Loeb Rhoades & Co., Inc.*, 530 F. Supp. 1061, 1072 (N.D.

Ill. 1981) ("[A]n agreement to indemnify against willful misconduct is contrary to the public

policy of Illinois").

*   *   *

Law Debenture is available at the Examiner's convenience to discuss the issues analyzed

herein.

Dated: Wilmington, Delaware
        May 24, 2010

                         Respectfully submitted,
                         /s/ Garvan F. McDaniel
                         Garvan F. McDaniel
                         Bifferato Gentilotti
                         800 N. King St., Plaza Level
                         Wilmington, DE 19801
                         (302) 429-1900

                                – and –

                         David S. Rosner
                         Andrew K. Glenn
                         Sheron Korpus
                         Christine A. Montenegro
                         Matthew B. Stein
                         Kasowitz, Benson, Torres & Friedman LLP
                         1633 Broadway
                         New York, New York 10019
                         Telephone: (212) 506-1700
                         Facsimile: (212) 506-1800

                         *Co-Counsel for Law Debenture Trust*
                         *Company of New York*