**Rosner Supp. Decl. Exhibit 4**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

--------------------------------------------------------x
In re:                                  :      **Chapter 11 Cases**
                                        :      **Case No. 08-13141 (KJC)**
**TRIBUNE COMPANY**, *et al.*,          :      **(Jointly Administered)**
                                        :
                        **Debtors.**    :
--------------------------------------------------------x

## REPLY OF LAW DEBENTURE TRUST COMPANY OF NEW YORK IN RESPONSE TO THE PARTIES' SUBMISSIONS

# TABLE OF CONTENTS

**Page**

I.    The Estates Have Viable Fraudulent Conveyance Claims ............................... 1

    A.    The Debtors Did Not Receive Reasonably Equivalent Value From The LBO Even Considering Any Purported Indirect Benefits ...................... 1

    B.    Tribune Was Rendered Insolvent By The LBO Debt.............................. 6

        1.    The LBO Saddled Tribune With Almost $14 Billion In Debt.................. 6

            a.    Collapsing Is Required As A Matter Of Law .............................. 7

            b.    The Factual Evidence Supports Collapsing .................................. 9

            c.    Consideration Of The Entire LBO Debt Is Required To Determine Phase I Solvency ...................................... 11

        2.    The Debtors' Projections Were Flawed ................................... 11

        3.    The Third-Party Valuations On Which JPM Relies Were Flawed ......... 14

    C.    The LBO Rendered Tribune's Subsidiaries Insolvent ......................... 15

    D.    The LBO Left Tribune Inadequately Capitalized And Unable To Pay Its Debts As They Became Due ....................................... 17

    E.    The Bidding Process Does Not Provide Support Of Valuation .......................... 18

    F.    The Debtors' Bond Trading Prices Indicate Tribune's Insolvency ................... 22

    G.    There Is No Cap On The Avoidance Of The LBO Debt ..................................... 23

II.    The Banks Cannot Succeed On Their Defenses ............................................. 24

    A.    The Banks Cannot Prove Good Faith ................................................. 24

    B.    Tribune Did Not Receive Any Value Under Section 548(c) As A Result Of Any Purported Indirect Benefits.................................................. 28

    C.    The LBO Lenders And Shareholders Are Not Protected By 546(e) ................... 29

        1.    The LBO Lenders Have No Protection Under 546(e) ........................... 29

        2.    546(e) Does Not Bar The Litigation Trustee's Claims Against The Shareholders.................................................................. 31

III.    The Subsequent Transferees' Claims Can Be Equitably Subordinated And Disallowed .................................................................................. 32

IV.    The Directors Breached Their Fiduciary Duties By Proceeding With The LBO .......... 33

V.    The Estate Has Viable Preference Claims ................................................... 35

# TABLE OF AUTHORITIES

Page(s)

CASES

*Acequia, Inc. v. Clinton* (*In re Acequia, Inc.*),
    34 F.3d 800 (9th Cir. 1994) ...................................................................24, 32

*Adelphia Recovery Trust v. Bank of Am., N.A.*,
    2010 U.S. App. LEXIS 10682 (2d Cir. May 26, 2010) ...........................................23

*Bayou Accredited Fund, LLC v. Redwood Growth Partners, LP*
    (*In re Bayou Group, LLC*), 396 B.R. 810 (Bankr. S.D.N.Y. 2008) .........................26

*BFP v. Resolution Trust Corp.*,
    511 U.S. 531 (1994)..................................................................................21

*Boyer v. Crown Stock Distr'n, Inc. et al.*,
    587 F.3d 787 (7th Cir. 2009) ............................................................. *passim*

*Brandt v. B.A. Capital Co.* (*In re Plassein Int'l Corp.*),
    366 B.R. 318 (Bankr. D. Del. 2007) ..............................................................7, 8

*Brandt v. Hicks, Muse & Co* (*In re Healthco Int'l, Inc.*),
    195 B.R. 971 (Bankr. D. Mass. 1996) ..............................................................30

*Cal. Pub. Emples. Ret. Sys. v. Coulter*,
    2002 Del. Ch. LEXIS 144 (Del. Ch. Dec. 18, 2002) ............................................34

*Clark v. Security Pac. Business Credit* (*In re Wes Dor, Inc.*),
    996 F.2d 237 (10th Cir. 1993) ......................................................................28

*Coleman v. Cmty. Trust Bank* (*In re Coleman*),
    426 F.3d 719 (4th Cir. 2005) ...................................................................23, 24

*Corning Glass Works v. Brennan*,
    417 U.S. 188 (1974)..................................................................................31

*Covey v. Commercial Nat'l Bank of Peoria*,
    960 F.2d 657 (7th Cir. 1992) ......................................................................30

*Dobin v. Hill* (*In re Hill*),
    342 B.R. 183 (Bankr. D.N.J. 2006) ................................................................24

*Enron Corp. v. Bear, Stearns Int'l Ltd.* (*In re Enron Corp.*),
    323 B.R. 857 (Bankr. S.D.N.Y. 2005)..............................................................32

*Enron Corp. v. Credit Suisse First Boston Int'l* (*In re Enron Corp.*),
    328 B.R. 58 (Bankr. S.D.N.Y. 2005).................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

*Enron Corp. v. Springfield Assocs. LLC* (*In re Enron Corp.*),
  379 B.R. 425 (S.D.N.Y. 2007)................................................................32, 33

*Fid. Bond & Mortg. Co. v. Brand* (*In re Fid. Bond & Mortg. Co.*),
  340 B.R. 266 (Bankr. E.D. Pa. 2006) ................................................................5, 17

*Hassett v. Goetzmann* (*In re CIS Corp.*),
  195 B.R. 251 (Bankr. S.D.N.Y. 1996)................................................................35

*In re Adelphia Commc'ns Corp.*,
  368 B.R. 140 (Bankr. S.D.N.Y. 2007)................................................................16, 23

*In re Best Prods. Co.*,
  168 B.R. 35 (Bankr. S.D.N.Y. 1994)................................................................23

*In re Cellular Info. Sys. Inc.*,
  171 B.R. 926 (Bankr. S.D.N.Y. 1994)................................................................15

*In re Countdown of Connecticut Inc.*,
  115 B.R. 18 (Bankr. D. Conn. 1990)................................................................5

*In re Eagle Enters.*,
  265 B.R. 671 (E.D. Pa. 2001)................................................................31

*In re Enron Corp. Secs.*,
  235 F. Supp. 2d 549 (S.D. Tex. 2002)................................................................27, 32, 33

*In re Exide Techs.*,
  303 B.R. 48 (Bankr. D. Del. 2003)................................................................14

*In re Hall*,
  304 F.3d 743 (7th Cir. 2002)................................................................16

*In re Mervyn's Holdings, LLC*,
  2010 Bankr. LEXIS 670 (Bankr. D. Del. Mar. 17, 2010)................................................................31

*In re Toys "R" Us, Inc., S'holder Litig.*,
  877 A.2d 975 (Del. Ch. 2005)................................................................27

*In re Zenith Elecs. Corp.*,
  241 B.R. 92 (Bankr D. Del. 1999)................................................................14

*Lippe v. Bairnco Corp.*,
  288 B.R. 678 (S.D.N.Y. 2003)................................................................14

# TABLE OF AUTHORITIES

Page(s)

*Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L.*
(*In re R.M.L., Inc.*), 92 F.3d 139 (3d Cir. 1996) ....................................................6, 16

*Mervyn's LLC v. Lubert-Adler Group IV, LLC* (*In re Mervyn's Holdings, LLC*),
426 B.R. 96 (Bankr. D. Del. 2010) ................................................................................8

*MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*,
910 F. Supp. 913 (S.D.N.Y. 1995) ............................................................................3, 5

*Moore v. Bay*,
284 U.S. 4 (1931)..........................................................................................................23

*Murphy v. Meritor Sav. Bank* (*In re O'Day Corp.*),
126 B.R. 370 (Bankr. D. Mass. 1991) .......................................................4, 12, 21, 23

*NetJets Aviation, Inc. v. LHC Commc'ns., LLC*,
537 F.3d 168 (2d Cir. 2008)...........................................................................................8

*Official Comm. of Unsecured Creditors of Tousa, Inc. v. Citicorp N. Am., Inc.*
(*In re Tousa, Inc.*), 422 B.R. 783 (Bankr. S.D. Fla. 2009) ..........................................5

*Official Comm. of Unsecured Creditors v. Clark* (*In re Nat'l Forge Co.*),
344 B.R. 340 (W.D. Pa. 2006).......................................................................................8

*Official Comm. of Unsecured Creditors v. Fleet Retail Fin. Group* (*In re Hechinger Inv.*
*Co. of Del., Inc.*), 274 B.R. 71 (D. Del. 2002)..............................................................7

*Official Employment-Related Issues Comm. of Enron Corp. v. Arnold*
(*In re Enron Corp.*), 2005 Bankr. LEXIS 3261 (Bankr. S.D. Tex. Dec. 9, 2005)....................35

*Pajaro Dunes Rental Agency v. Spitters* (*In re Pajaro Dunes Rental Agency, Inc.*),
174 B.R. 557 (Bankr. N.D. Cal. 1994) ........................................................................23

*Pummill v. Greensfelder, Hemker & Gale, P.C.* (*In re Richards & Conover Steel, Co.*),
267 B.R. 602 (B.A.P. 8th Cir. 2001)..............................................................................5

*Ross v. Penny* (*In re Villa Roel, Inc.*),
57 B.R. 879 (Bankr. D.D.C. 1985) ..............................................................................29

*Russello v. United States*,
464 U.S. 16 (1983)........................................................................................................30

*Sames v. Gable*,
732 F.2d 49 (3d Cir. 1984)...........................................................................................35

# TABLE OF AUTHORITIES

Page(s)

*Solomon v. Stillwater Nat'l Bank & Trust Co.*
    (*In re Solomon*), 299 B.R. 626 (B.A.P. 10th Cir. 2003) ................................................6

*Stalnaker v. DLC, Ltd.* (*In re DLC, Ltd.*),
    295 B.R. 593 (B.A.P. 8th Cir. 2003).................................................................................32

*Steiner Corp. v. Benninghoff,*
    5 F. Supp. 2d 1117 (D. Nev. 1998).................................................................................14

*Travellers Int'l AG v. Trans World Airlines, Inc.* (*In re Trans World Airlines, Inc.*),
    134 F.3d 188 (3d Cir. 1998)..........................................................................................11

*United States v. Gleneagles Inv. Co.,*
    565 F. Supp. 556 (M.D. Pa. 1983).....................................................................................2

*United States v. Tabor Court Realty,*
    803 F.2d 1288 (3d Cir. 1986)............................................................................................8

*Valeant Pharms. Int'l v. Jerney,*
    921 A.2d 732 (Del. Ch. 2007).........................................................................................34

*Voest-Alpine Trading USA Corp. v. Vantage Steel Corp.,*
    919 F.2d 206 (3d Cir. 1990)..............................................................................................8

*Webb Mtn, LLC v. Executive Realty P'ship L.P.*
    (*In re Webb Mtn, LLC*), 2009 Bankr. LEXIS 1128 (Bankr. E.D. Tenn. Apr. 21, 2009) ...........2

## STATUTES

11 U.S.C. § 101(54) .......................................................................................................30

11 U.S.C. § 362 ..............................................................................................................31

11 U.S.C. § 502 ..............................................................................................................23

11 U.S.C. § 510 ..............................................................................................................23

11 U.S.C. § 544 ........................................................................................................ *passim*

11 U.S.C. § 546 ........................................................................................................ *passim*

11 U.S.C. § 547 ..............................................................................................................35

11 U.S.C. § 548 ........................................................................................................ *passim*

11 U.S.C. § 550 ..............................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

11 U.S.C. § 554 .................................................................................................................31

11 U.S.C. § 741 .............................................................................................................30, 31

11 U.S.C. § 1123(b)(3)(B) ................................................................................................31

Del. Code Ann. tit. 6, § 1304 ...........................................................................................7

Del. Code Ann. tit. 6, § 1305 ...........................................................................................7

Financial Netting Improvements Act of 2006,
    Pub. L. No. 109-390, 120 Stat 2692 (2006) ...............................................……..29

N.Y. D.C.L. § 276 ......................................................................................……..32

**OTHER AUTHORITIES**

5-547 Collier on Bankruptcy ¶ 547.04 (15th ed. rev. 2006) .............................................35

H.R. Rep. No. 97-420 (1982) ..........................................................................................30

H.R. Rep. No. 109-31 (2005) ..........................................................................................30

Law Debenture Trust Company of New York ("Law Debenture"), as Indenture Trustee,

hereby submits its reply to the parties' submission ("Reply").[1]

## I.    The Estates Have Viable Fraudulent Conveyance Claims

For the reasons set forth in Law Debenture's Initial Brief[2] and discussed herein, the LBO

indebtedness and the related Guarantees should be avoided in their entirety as intentional and

constructive fraudulent conveyances.

### A.    The Debtors Did Not Receive Reasonably Equivalent Value From The LBO Even Considering Any Purported Indirect Benefits

The Credit Lenders contend that Tribune received reasonably equivalent value by

mischaracterizing the economic substance of the LBO.  The April 2007 Tribune Confidential

Information Memorandum ("CIM")[3] that the Banks themselves disseminated to the syndicate

contradicts their *post hac* recharacterization in their submission.  Tribune's actual sources and

uses of the LBO debt incurred during Phases I and II, as set forth in the CIM, is below:[4]

---

[1]    Given the page limitation, the Reply addresses only certain issues raised in the parties' initial submissions that require further discussion as a result of such parties' misapplication of the law or facts.  The omission of any discussion on any issue should not be construed as a concession or waiver as Law Debenture disagrees with other content in some of the initial submissions and reserves its right to dispute any issues not specifically addressed herein.

[2]    Law Debenture incorporates herein by reference Response of Law Debenture Trust Company of New York To The Examiners' Information and Position Requests ("LD Br." or "Initial Brief").  Unless otherwise noted, capitalized terms used herein have the same meaning as in the Initial Brief.  References to the submissions of the other parties are noted as follows: Brief of Debtors to the Examiner ("Debtors' Br."); Submission of Official Committee of Unsecured Creditors of the Tribune Company to Kenneth Klee, Court Appointed Examiner, Regarding Claims Against the Senior Lenders Arising From the 2007 Leveraged ESOP Transactions ("Committee Br."); Submission of JPMorgan Chase Bank, N.A. and JPMorgan Securities, Inc. to the Examiner ("JPM Br."); Credit Agreement Lenders' Brief to the Examiner With Respect to Avoidance Claims ("Credit Lenders' Br."); Confidential Statement of Wells Fargo Bank, N.A. to the Examiner ("WF Br."); and Statement of Wilmington Trust Company to the Examiner, Kenneth N. Klee, Regarding Potential Estate Claims, Causes of Action, and Defenses Arising Under and In Connection With the 2007 LBO Transaction ("WTC Br.").

[3]    (*See* CIM, Ex. 50).

[4]    (*See* Ex. 50 at ML-TRIB-0019628-29; *see also* Proxy Statement, dated July 13, 2007, Ex. 107 at TRB0344693-695).

| SOURCES | | USES | |
|---|---|---|---|
| **Phase I** | | **Phase I** | |
| Tranche X Facility | $1.500 billion | Share Purchase | $4.288 billion |
| Tranche B Facility | $5.515 billion | Refinance Existing Tribune Debt | $2.825 billion |
| Initial Zell Investment | $0.250 billion | Estimated Fees and Expenses | $0.152 billion |
| | | | |
| **Phase II** | | **Phase II** | |
| Bridge Facility | $1.600 billion | Purchase Remaining Shares | $4.000 billion |
| Incremental Facility | $2.105 billion | Initial Zell Investment/Shares | $0.261 billion |
| Second Zell Investment | $0.315 billion | Estimated Fees And Expenses | $0.224 billion |
| Cash on Hand | $0.465 billion | | |
| **Total   $11.750 billion** | | **Total   $11.750 billion** | |

Tribune did not receive reasonable equivalent value as a matter of law when it incurred over $11 billion in LBO debt and paid out $8.3 billion of such funds to the shareholders and $380 million of the LBO funds for professional and other fees without receiving consideration in exchange. Even examined independently, neither Phase I (incurrence of $7.265 billion of debt for, at most, $2.8 billion in value) nor Phase II (incurrence of $3.9 billion of debt for $0 in value) were exchanges for reasonably equivalent value. At most, Tribune only received $2.54 billion in value for the refinanced debt, which is not reasonably equivalent value to $11 billion of LBO debt. *See United States v. Gleneagles Inv. Co.*, 565 F. Supp. 556, 581 (M.D. Pa. 1983) (holding that reasonably equivalent value was absent where debtor was saddled with a $5,203,300 debt but only received $2,522,527 in loan proceeds).

Though the Credit Lenders claim that Tribune received $337 million in working capital through the revolver loan and undrawn letters of credit, this purported working capital does not constitute reasonably equivalent value in light of the total LBO debt.[5] Further, the LBO funds that the Company used to pay the professional fees conferred no value on the Company because they were incurred to facilitate the avoidable LBO-related obligations and transfers. *See Webb Mtn, LLC v. Executive Realty P'ship L.P. (In re Webb Mtn, LLC)*, 2009 Bankr. LEXIS 1128, at

---

[5]    (*See* Ex. 50 at ML-TRIB-0019628-31).

*20, 22 (Bankr. E.D. Tenn. Apr. 21, 2009) (excluding legal fees and only considering principal and interest to obligations to determine value conferred upon debtor).

For the reasons set forth below, the Credit Lenders have not met their burden of showing the purported indirect benefits – the purported repayment of $3.98 billion in intercompany notes to Los Angeles Times International ("LATI"), approximately $1.6 billion of the Phase II tax savings and $2.54 billion of pre-existing debt repayments and other alleged benefits[6] – constitute reasonably equivalent value in exchange for the LBO debt.[7]

First, Tribune received no benefit from the LATI transaction, which was nothing more than an intercompany shell game. LATI purportedly had loaned funds to other Tribune subsidiaries (the "LATI Obligors") pursuant to certain promissory notes (the "LATI Notes") in the aggregate amount of $3.98 billion as of May 2007.[8] Though the Credit Lenders claim that the LATI Obligors were to repay the LATI Notes before providing Guarantees to the LBO Lenders, in fact, Tribune was merely substituted for the LATI Obligors as payee through various bookkeeping entries. In particular, on June 4, 2007, Tribune recorded a roundtrip of non-cash journal entries consisting of: (i) Tribune's capital contribution to the LATI Obligors; (ii) the LATI's Obligors' use of the capital contribution funds to repay the LATI Notes; and (iii) LATI's intercompany loan to Tribune for the amount of Tribune's initial capital contribution.[9] None of

---

[6]     (See Credit Lenders' Br. at 23-24).

[7]     See MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co., 910 F. Supp. 913, 937 (S.D.N.Y. 1995) ("Where the creditor asserts that the transferees paid insufficient consideration and the evidentiary facts as to the nature and value of the consideration are within the transferees' control, the burden of coming forward with evidence disclosing the nature and value of the [consideration] . . . should be cast upon the transferees").

[8]     (See Credit Lenders' Br. at Ex. 21).

[9]     (See Ex. 98; Fact Statement at 40, n. 106). See also Murphy v. Meritor Sav. Bank (In re O'Day Corp.), 126 B.R. 370, 397 (Bankr. D. Mass. 1991) ("[T]he Court concludes that the cancellation of the Intercompany Notes did not provide fair consideration, as the signatories to the notes did not contemplate their repayment from operations. The Intercompany Notes appeared to have been created only for the tax advantages conferred by the mirror subsidiary structure").

the actual proceeds from the LBO Debt was used in connection with the LATI accounting entries described above, *which is why the LATI transactions did not appear in the proxy statement or the sources and uses of the LBO funds in the CIM.*[10]  The LATI transactions provided no benefit to the Debtors' estates and were a mere accounting gimmick, not transactions of any economic substance.  For these reasons, the LATI transactions also demonstrate further bases for a finding of intentional fraudulent conveyance and a lack of good faith by the Banks.

Second, the Credit Lenders' argument that Tribune received indirect benefits from the tax savings associated with the Company's subchapter S election and avoidance of 401(k) plan contributions, though demonstrating the interdependence of the unitary transaction, fails as a matter of law.[11]  The Company's purported tax benefits were speculative as they were based upon numerous contingencies and uncertainties as even stated in VRC's otherwise flawed solvency opinion and VRC and D&P's deposition testimony.  For instance, VRC's Phase II solvency opinion calculated the Company's net present tax savings at over $1 billion assuming, among other things, that: (i) Zell would not exercise his warrant until 2022 even though no agreement was in place prohibiting Zell from exercising before then; (ii) Tribune would remain an ESOP-owned S-Corp. during that time; and (iii) most speciously, Tribune's income would remain the same or grow.[12]  Yet, if *any* of these underlying assumptions changed before 2022, the Company's tax savings would be reduced significantly, if not eliminated.  Indeed, if Zell exercised his warrant early, the Company's tax savings would be reduced by 40%.[13]  D&P also

---

[10]    (*See* Exs. 50 and 107).

[11]    The Credit Lenders cannot have it both ways.  They argue first that there were two transactions, then they try to grasp the Phase II purported (yet unrealized) tax savings as benefit conferred in exchange for all of the LBO Debt.

[12]    (*See* Ex. 114: VRC0109228-237 at VRC0109231; Ex. 115: Bryan Browning Deposition Tr. sworn to on December 4, 2009 ("Browning Tr.") at 154-160).

[13]    (*See* Ex. 115: Browning Tr. at 154-160).

recognized the uncertainties of the tax savings at a March 19, 2007 meeting, noting that "no case

law exists on how to treat the ESOP tax benefits for purposes of solvency opinion" and such

benefits would be lost in a "short-term" sale.[14]  Because the Company's tax savings were

uncertain and could not be quantified with any reasonable precision as concrete and tangible,

they do not constitute a benefit for purposes of determining reasonably equivalent value.  *See*

*MFS/Sun Life Trust-High Yield Series*, 910 F. Supp. at 938 ("It would be sheer speculation to

assume that the tax benefits and economic value of the loan could be reasonably equivalent to the

$26.8 million shortfall in consideration. . . . The plaintiffs, then, have established the first

element of constructive fraud: the absence of fair consideration").[15]

Third, the Company did not receive any benefit from its refinancing of pre-LBO debt

because, among other things, (i) Tribune had no need to refinance but did so at the LBO

Lenders' behest, (ii) the pre-existing debtholders were substantially the same as the LBO

Lenders,[16] (iii) the LBO debt bore a higher interest rate than the pre-existing debt for the benefit

of the LBO Lenders,[17] (iv) the pre-LBO debt had no guarantees whereas the new debt did, and

(v) the Guarantors accordingly received *no* benefit for issuing such guarantees.  *See In re*

*Countdown of Conn. Inc.*, 115 B.R. 18, 21 (Bankr. D. Conn. 1990) (stating that "the analysis of

---

[14]      (*See* Ex. 116: GBTRIB00008205-08).

[15]      *See also Official Comm. of Unsecured Creditors of Tousa, Inc. v. Citicorp N. Am., Inc. (In re Tousa, Inc.)*, 422 B.R. 783, 866 (Bankr. S.D. Fla. 2009) ("The burden on Defendants includes a requirement to show that the 'indirect benefits' were tangible and concrete, and to quantify their value with reasonable precision") (internal citations omitted); *Pummill v. Greensfelder, Hemker & Gale, P.C. (In re Richards & Conover Steel, Co.)*, 267 B.R. 602, 614 (B.A.P. 8th Cir. 2001) (same); *Fid. Bond & Mortg. Co. v. Brand (In re Fid. Bond & Mortg. Co.)*, 340 B.R. 266, 287 (Bankr. E.D. Pa. 2006) ("Because of this added risk, the speculative indirect economic benefits were not reasonably equivalent to the amount of over $ 3 million dollars that was transferred to the Defendants.  Therefore, the Debtor did not receive reasonably equivalent value").

[16]      (*See* Ex. 98 at TRB0237176-177; Fact Statement at ¶¶ 17, 18, 21).

[17]      (*See* Ex. 97 at 19-20).

an allegedly fraudulent transfer must be directed at what the debtor surrendered and what the debtor received").[18]

Fourth, Section 548 of the Bankruptcy Code quite specifically defines the word "value." This definition simply does not include "indirect benefits," and certainly not highly speculative ones. *See Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L. (In re R.M.L., Inc.)*, 92 F.3d 139, 148 (3d Cir. 1996) (recognizing that courts have "struggled" because certain "intangibles are technically not within § 548(d)(2)(A)'s definition of 'value'").

**B.    Tribune Was Rendered Insolvent By The LBO Debt**

JPM, the Credit Lenders, and the Debtors argue that the LBO did not render either Tribune on a whole, or the Guarantors on a consolidated basis, insolvent.[19]  In reaching these conclusions, however, they fail to: (i) properly account for the projected amount of LBO debt; (ii) consider the stale and grossly inaccurate financial projections used to generate the third party valuations; and (iii) consider the inconsistencies and mechanical errors in the flawed third party valuations on which they rely.

**1.    The LBO Saddled Tribune With Almost $14 Billion In Debt**

The LBO left Tribune with almost $14 billion of debt, rendering it insolvent.  However, JPM's, the Credit Lenders', and the Debtors' analyses do not include the $14 billion of total post-LBO Debt, which consisted of:  (i) $2.488 billion of unsecured debt existing at the time of the LBO (independent of the credit facility debt refinanced as part of the LBO);[20] (ii) $7.015 billion of Phase I debt under the Credit Agreement; (iii) $2.105 billion of Phase II incremental

---

[18]    *See also Solomon v. Stillwater Nat'l Bank & Trust Co. (In re Solomon)*, 299 B.R. 626, 636 (B.A.P. 10th Cir. 2003) (requiring an examination of "what the debtor received in exchange for the securing of an antecedent debt to determine [reasonably equivalent value]").

[19]    (*See* JPM Br. at 10; Credit Lenders' Br. at 13; Debtors' Br. at 28).

[20]    (*See* Fact Statement at 12).

debt;[21] (iv) $2.1 billion of Phase II bridge debt;[22] and (v) $225 million of EGI-TRB Note indebtedness.[23] JPM erroneously argues that Phase I and II should not be collapsed and that the LBO Debt was only $12.788 billion after Phase II, relying on a VRC calculation of debt that lacks evidentiary support.[24]

### a.    Collapsing Is Required As A Matter of Law

Ignoring the unbroken chain of authority routinely collapsing LBOs, JPM argues that *Brandt v. B.A. Capital Co. (In re Plassein Int'l Corp.)*, 366 B.R. 318 (Bankr. D. Del. 2007), allows collapsing only if the lender acted either in bad faith or with intent to defraud.[25]  In *Plassein*, the Court dismissed constructive fraudulent conveyance claims brought under Sections 1304 and 1305 of the Delaware Code and Section 544(b) of the Bankruptcy Code because a non-debtor made the disputed transfer.  *See Plassein*, 366 B.R. at 326, *aff'd* 388 B.R. 46, 47 (D. Del. 2008), *aff'd on other grounds*, 590 F.3d 252 (3d Cir. 2009) (not discussing collapsing).  The bankruptcy court explained that "[t]he Trustee seeks to avoid the implications that [the transferor] is not a debtor by arguing that the transactions are a single integrated plan and there is authority to collapse the transaction to determine fraudulent conveyance liability." *Plassein*, 366

---

[21]    (*See id.*).

[22]    This amount reflects the amount of the bridge loan and the amount of total debt that the parties expressly contemplated as of the consummation of the LBO and approved by the Board on April 1, 2007.  The Board approved the LBO once, on April 1, 2007.  Phase II, which the parties go to great lengths to separate from Phase I, received no separate board approval.  None was necessary because the Board approved the integrated transaction in April and announced it as such.  (*See* Ex. 50 at ML-TRIB-0019633; Press Release produced as Ex. 187 at TRB0106246-52).

[23]    (*See* Fact Statement at 12).

[24]    (*See* JPM Br. at 27 *citing* VRC's December 20, 2007 Report).  In particular, VRC calculates the debt amount to be $12.788 billion without providing any details as to how it arrived at this amount.

[25]    (*See* JPM Br. at 6, 25).  JPM's contention that there is a "requirement of a small degree of *scienter* or awareness of fraud in cases brought . . . for the purpose of avoiding LBO's" simply is not supported by the plain language of Section 548(a)(1)(B) of the Bankruptcy Code nor case law applying it.  *See, e.g., Official Comm. of Unsecured Creditors v. Fleet Retail Fin. Group (In re Hechinger Inv. Co. of Del., Inc.)*, 274 B.R. 71, 82 (D. Del. 2002) ("While fraudulent conveyance claims can be brought on grounds of either intentional or constructive fraud, the claims at issue in this case, like most fraudulent conveyance claims, apparently seek to rely on the constructive fraud proofs such that the party asserting the claim need not prove intent").

B.R. at 326. Thus, the *Plassein* plaintiff could only avoid the fraudulent transfers if the debtor

and non-debtor were "collapsed" into a single entity under an alter ego or veil piercing theory

that required heightened intent. *See, e.g.*, *NetJets Aviation, Inc. v. LHC Commc'ns., LLC*, 537

F.3d 168, 183 (2d Cir. 2008). Here, because the avoidance action would involve the actual

Debtors, there is no such heightened requirement to collapse Phases I and II of the LBO. Rather,

to collapse the two Phases of the transaction into one, the Court will focus on whether the

transferee had actual or constructive knowledge of the entire LBO scheme and intended the

transactions to be integrated.[26] *See Official Comm. of Unsecured Creditors v. Clark (In re Nat'l*

*Forge Co.)*, 344 B.R. 340, 348 (W.D. Pa. 2006) ("Among other things, courts consider whether

all of the defendants were aware of the multiple steps of the transaction").[27]

      Here, collapsing is warranted because the evidence shows that the Banks, Tribune, and

Zell intended the transaction to be an integrated transaction which left Tribune insolvent.[28] Even

if bad faith were required – which it is not – Law Debenture has sufficiently demonstrated that

the Banks acted in bad faith.[29]

---

[26]    JPM relies upon *Voest-Alpine Trading USA Corp. v. Vantage Steel Corp.*, 919 F.2d 206, 212-13 (3d Cir. 1990) to support its position that bad faith is required. However, in *Voest*, the plaintiff alleged both actual and constructive fraudulent conveyances and the court found and affirmed the defendant's actual intent. The Third Circuit explained that it would have collapsed the multiple stages even if constructive fraud was the only theory available to avoid the transfer. *Id.* at 215 ("Thus, even if no finding of 'actual intent' in violation of § 357 had been found, the fraudulent nature of the conveyance in question would still be beyond dispute").

[27]    *See also Mervyn's LLC v. Lubert-Adler Group IV, LLC (In re Mervyn's Holdings, LLC)*, 426 B.R. 96, 105 (Bankr. D. Del. 2010) (refusing to collapse where plaintiff "made no credible allegations that Bank of America was involved in the 2004 Sale"); *United States v. Tabor Court Realty*, 803 F.2d 1288, 1302-03 (3d Cir. 1986) ("We are satisfied with the district court's conclusion that the funds 'merely passed through the borrowers to [the acquiring company].' This necessitates our agreement with the district court's conclusion that, for purposes of determining ITT's *knowledge of the use of the proceeds* under [the UFCA], there was one integral transaction") (emphasis added); *Boyer v. Crown Stock Distr'n, Inc.*, 587 F.3d 787, 795 (7th Cir. 2009) (collapsing separate dividend transactions into an asset purchase LBO finding it "an integral part of the LBO" in connection with court's avoidance of the asset sale as a constructive fraudulent conveyance).

[28]    (*See* LD Br. at 10-11, 15-23).

[29]    (*See* LD Br. at 23-25).

b.    **The Factual Evidence Supports Collapsing**

The Debtors and JPM contend – contrary to overwhelming evidence – that the two

Phases of the LBO were distinct and independent transactions.[30]  In particular, the Debtors and

JPM claim that because Tribune *originally* considered undertaking a recapitalization (which it

later abandoned) which was "nearly identical in effect to the Step One Transactions," the two

Phases of the LBO are independent transactions.  Though Tribune may have initially considered

a recapitalization, Tribune decided to effectuate the LBO in two consequential Phases, primarily

to facilitate the FCC approval process.  JPM's own internal communications evidence its belief

that the LBO was a fully integrated transaction, stating in the subject line of an April 2, 2007

email:  "JPMorgan advises Sam Zell on the $13.3 billion take-private of Tribune and will serve

as Joint Bookrunner on a $11.2 billion of loan and high yield financing."  The email later states

*"Tribune and Sam Zell announced that they have entered into a definitive agreement to take the*

*Company private in a two step transaction."*[31]

JPM attempts to argue that the Transaction was uncertain after Phase I by pointing to

statements made in the *Garamella* litigation that the Directors could negotiate with other

offerors.[32]  The transactional documents and the parties' conduct demonstrate otherwise.  There

was no meaningful "fiduciary out" because the Merger Agreement restricted Tribune from

developing any competing offer.  Moreover, the "fiduciary out" essentially expired after

shareholder approval was locked up in April and the shareholders voted as agreed in August.[33]

---

[30]    (*See* LD Br. at 11–13; JPM Br. at 18-25; Debtors' Br. at 19-22; WF Br. at 8-16).

[31]    (*See* Ex. 64 at JPM_00492571-572) (emphasis added).

[32]    (*See* JPM Br. at 22-23).

[33]    (*See* Ex. 68; Ex. 117: JPM_00475937; Ex. 118: TRB0065827-35 at TRB0065829).  The certainty of
the LBO is confirmed by Chandler Bigelow, Tribune's treasurer, who stated that "[w]e would have voting
agreements in place, merger agreement signed and would fully expected [sic] to close the deal." (*See* Ex. 119:
TRB0082818).

The Debtors also cite pleadings from *Garamella* to show the purported similarities between the tender offer component of the LBO and the abandoned leveraged recapitalization "self-help" alternative.[34] The Debtors fail to reconcile these out-of-context quotes with Tribune's numerous public disclosures, press releases, and board minutes demonstrating Tribune's belief that the two Phases were one integrated transaction.[35] For example, on April 3, 2007, two days after the Board approved the LBO, Tribune's CEO sent a letter to shareholders stating that "Tribune shareholders will receive a premium price of $34 per share in cash for all of their shares in a *two-stage merger transaction expected to be completed by Dec. 31, 2007*."[36]

Straining credulity, the Debtors and JPM claim that the two Phases were "not dependent upon each other" and that Tribune's Directors and Officers similarly viewed the LBO transaction in that manner.[37] However, in economic substance, the two Phases of the LBO were not designed to stand on their own. The primary and foundational economic goal of the LBO was to have Tribune become an ESOP-owned S-Corp. that received tax savings, which would only occur after Phase II closed. As detailed in the Initial Brief, the tax savings and the ESOP structure were the driving factors in the agency ratings, marketing to the public and VRC's Phase I solvency opinion.[38]

---

[34]    (*See* Debtors' Br. at 20).

[35]    (*See* WF Br. at 6-9).

[36]    (*See id*. at 9, Ex. 4 (emphasis added); *see also id*. at 8, Exs. 10-22 (Tribune making similar references to the LBO transaction in various 10-Qs and its 10-K for 2007)).

[37]    (*See* JPM Br. at 19-22; Debtors' Br. at 18-22).

[38]    (*See* LD Br. at 14, 18).

### c.   Consideration Of The Entire LBO Debt
### Is Required To Determine Phase I Solvency

Even assuming *arguendo* that Phases I and II somehow are deemed separate non-collapsible transactions (which defies the facts and common sense), the entire LBO debt must still be considered in a solvency analysis at Phase I.

Where a contingent liability is highly likely to become fixed – here, the Phase II debt – neither courts nor financial professionals discount the liability in the solvency analysis. The Bankruptcy Code's plain language further supports this analysis by including contingent claims in the definition of "claim." Therefore, the Bankruptcy Code incorporates contingent claims into any determination of solvency. *See Travellers Int'l AG v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.)*, 134 F.3d 188, 198 (3d Cir. 1998) (when evaluating solvency, contingent liabilities are included where they constitute "costs arising from foreseeable events that might occur while the debtor remains a going concern"). Inasmuch as Tribune contracted to incur the Phase II debt obligations at the outset, there was virtually no contingency. Based on the above factual analysis, any reasonable analysis requires the inclusion of Phase II debt to determine Phase I solvency.

### 2.   The Debtors' Projections Were Flawed

Nobody disputes that Tribune's actual results were substantially divergent from its projections relied on by VRC and other players in their pre-LBO valuation analyses. JPM tries to salvage these unrealistic projections by claiming that Tribune's insolvency resulted from an "unpredictable economic downturn" that did not begin until 2008.[39] But the inescapable truth is that the Debtors' demise was based on industry conditions prevailing long before the LBO, and

---

[39]   (*See* JPM Br. at 8, 28-29).

everyone knew so.[40]  The Banks knew that the industry was undergoing a permanent shift away from print, resulting in a continuous decline in advertising revenue, which was a substantial component of Tribune's revenue and operating profit.  This shift was a "secular decline" affecting the entire industry as noted by many analysts, including JPM.[41]

In 2007, publishing represented approximately 72% of Tribune's consolidated revenues, *approximately 80% of which came from advertising.*[42]  Between 2004 and 2007, circulation in the industry for Sundays and dailies dropped steadily by 11% and readership declined by 9%.[43] This well-known, published secular decline took its toll on newspaper advertising market share, which plummeted by 17% in that same period, with steep declines beginning in 2005 and continuing into 2006 while the U.S. economy was at its peak.[44]

Analysts from one of the Banks reflected this industry-wide epidemic in January 2007 stating, "[o]ur longstanding thesis on the newspapers—that adverse trends are accelerating faster than some investors realize—is playing out."[45]  The analyst also recognized that there was "an ongoing deterioration in print readers."[46]  "We expect industry advertising revenues to fall below consensus 2.3% in 2007.  We also forecast a substantial slowdown in online ad growth to

---

[40]    *See In re O'Day Corp.*, 126 B.R. at 404-07 (emphasizing "that a decision should not be made using hindsight" and ignoring stock market crash of October 2007 in light of manifest and readily predictable "fiscal woes" prior to the LBO in connection with court's determination that Debtor was left with unreasonably small capital); *Boyer*, 587 F.3d at 785 (same).

[41]    (*See* Ex. 120: JPM_00074724-74770; Ex: 121 Barclays Capital, "Newspaper Fact Book December 2008" dated 12/19/08).

[42]    (*See* Ex 122: GBTRIB 86589-678 at GBTRIB 86594, Affidavit of Chandler Bigelow III, Senior Vice President and Chief Financial Officer of Tribune Company in Support of First Day Motion, dated December 8, 2007 (D.I. 3) at ¶ 11).

[43]    (*See* Ex. 121: Barclays Capital, "Newspaper Fact Book December 2008" dated 12/19/08).

[44]    (*See id.*); *see Boyer*, 587 F.3d at 795 ("Whether a transfer was fraudulent when made depends on condition that existed when it was made, not on what happened later to affect the timing of the company's collapse") (*citing*, among other authorities, *Moody*, 971 F.2d at 1073; *In re O'Day Corp.*, 126 B.R. at 407).

[45]    (*See id.*).

[46]    (*See* Ex. 120).

15%."[47]  The analyst also was not optimistic about the ability of emerging media to offset these

losses, stating "it is not clear what role the digital strategies of the newspaper will have in any of

these emerging media channels."[48]  Even with respect to television broadcasting, which was not

hit as hard as publishing, another analyst predicted that "we estimate that broadcast TV

advertising revenue will likely be flat in 2007."[49]  The first analyst noted in February 2007 when

discussing how its own industry projections had been overly optimistic, "[t]his is the worst

monthly publishing ad growth performance, among our names, in recent years. . . . We are

lowering our . . . 2007 EPS estimates below consensus."[50]  Not surprisingly, one analyst warned

at that time that: "LBO activity should be limited."[51]

    Despite this bleak outlook, Tribune's projections continued to reflect a level of optimism

unsupported by its historical performance, industry conditions or consensus analyst reports.[52]

Rather than projecting a decline in revenue and EBITDA consistent with historical trends,

Tribune anticipated compound annual growth for revenue and EBITDA over the first five years

after the LBO.  Tribune's projections were instantly proven unreliable.  Tribune's second quarter

2007 revenue was seven percent lower than projected, third quarter was lower by six percent,

---

[47]    (*See* Ex. 120).

[48]    (*See id.* at JPM_00074739).

[49]    (*See* Ex. 123: February 6, 2007 JPM Television Broadcasting Report, JPM_00075127-82, at JPM_00075127-29).

[50]    (*See* Ex. 124: JPM_00030813-30818).

[51]    (*See* Ex. 123; Ex. 125: JPM_00074636-74723 at JPM_00074639 (Morgan Stanley's January 24, 2007 analyst report stating: "the reality that 2007 is setting up to be another bleak year for newspapers is setting in" and "[w]e think data points from the private market – such as the 6.7X trailing EBITDA multiple for the Star Tribune [later a chapter 11 debtor] – are beginning to weigh on valuations in the public market"); *see also* Ex. 126: JPM_00075280-75340 at JPM_00075282 (Deutsche Bank analyst report stating "[w]e remain cautious on the newspaper sector due to the difficult structural trends that the industry faces. . . . significant deterioration in the revenue trends")).

[52]    (*See* Ex. 127: VRC0008342-65 Tribune Model, dated 2/8/2007; *see also* Committee Br. at 20-21 (detailing why the Company's explanation of its failure to meet projections is unconvincing)).

and fourth quarter was lower by ten percent.[53]  Thus, given that the Banks knew that Tribune and

the publishing industry were in a downward spiral, they simply cannot credibly claim Tribune's

insolvency was an unforeseeable event resulting from unpredictable market conditions.

### 3.    The Third-Party Valuations On Which JPM Relies Were Flawed

JPM relies heavily in its submission on third-party valuations to support a conclusion of

post-LBO solvency.  However, these valuations were materially flawed in several respects:

- First, these valuations fail to account for the full amount of Tribune's LBO debt as detailed above.

- Second, they are based on the same flawed projections described above.

- Third, these third-party valuations improperly include certain cost and tax savings associated with an ESOP-owned S-Corp.  As discussed above in Section I(A), because these speculative tax savings cannot be calculated with any certainty, they cannot be included in the solvency analysis.  In fact, when the purported tax savings are excluded from the valuations – as they must be to determine fair market value – most of the analyses that JPM highlights actually prove Tribune's insolvency.  (*See* Appendix A).

- Fourth, the third parties failed to account for the reasonably anticipated precipitous decline in Tribune's profitability, particularly given the optimistic projections.  Additionally, VRC's DCF calculation is riddled with mistakes.  When just two of these mistakes are corrected, a discounted cash flow analysis shows that Tribune's enterprise value was only $10.3 billion, not even accounting for errors in Tribune's projections.[54]  (*See* Appendix B).  Accordingly, the LBO rendered Tribune insolvent.

---

[53]    (*See id.*).

[54]    For the purpose of this calculation, VRC's DCF analysis was slightly adjusted by increasing the WACC to 12%, through the incorporation of a size premium and a specific company risk premium that VRC did not include. Additionally, the terminal growth rate was decreased to 0.5% to correlate with the Company's projections. The leading authorities on business valuation recognize that the most reliable method for determining the value of a business is the discounted cash flow approach. *See Lippe v. Bairnco Corp.*, 288 B.R. 678 (S.D.N.Y. 2003) (citing Shannon P. Pratt et. al., Valuing A Business: The Analysis and Appraisal of Closely Held Companies 154 (4th ed. 2000) ("Regardless of what valuation approach is used, in order for it to make rational economic sense from a financial point of view, the results should be compatible with what would result if a well-supported discounted economic income analysis were carried out")), *aff'd*, 99 Fed.Appx. 274 (2d Cir.2004); *Steiner Corp. v. Benninghoff*, 5 F. Supp. 2d 1117, 1129 (D. Nev. 1998) (DCF is "in theory the single best technique to estimate the value of an economic asset") (quoting *Cede & Co. v. Technicolor, Inc.*, 1990 Del. Ch. LEXIS 259, at *23 (Del. Ch. 1990), *aff'd in part, rev'd in part on other grounds*, 634 A.2d 345 (Del. 1993)); *In re Exide Techs.*, 303 B.R. 48, 63-65 (Bankr. D. Del. 2003); *In re Zenith Elecs. Corp.*, 241

C.    **The LBO Rendered Tribune's Subsidiaries Insolvent**

Because Tribune had approximately $13.933 billion in debt on a consolidated basis as a

result of the LBO, the Guarantors had approximately $11.633 billion in debt on a consolidated

basis.[55] As stated above, when two simple corrections are made to VRC's DCF analysis,

Tribune's enterprise value is $10.3 billion (even using the Debtors' flawed projections). This

value is substantially lower than the value of the Guarantors' debt obligations ($11.633 billion);

thus, even when considered on an independent basis without collapsing the entirety of the LBO

(*i.e.*, primary obligations and guarantees), the LBO rendered the Guarantors insolvent.

The intercompany claims render the Guarantors even more insolvent. Exhibit R to the

Debtors' Brief posits that the Guarantors owe approximately $1.64 billion to $2.16 billion in

intercompany claims to Tribune but fails to account for the approximately $3 billion that certain

subsidiaries owe Finance Holdco.[56] As discussed in the Initial Brief, Finance Holdco was the

alter ego of Tribune and therefore all Finance Holdco indebtedness is properly Tribune

indebtedness.[57] Thus, the total intercompany liability of the Guarantors is actually between

$4.64 billion and $5.16 billion.

The Debtors also posit that Tribune owes between $4.59 billion and $6.41 billion of

intercompany claims to the Guarantors.[58] The Credit Agreement Lenders, however, contend that

Tribune had only $790 million in non-Guarantor assets.[59] Assuming, without conceding, this

---

B.R. 92, 103-05 (Bankr D. Del. 1999); *In re Cellular Info. Sys. Inc.*, 171 B.R. 926, 930-37 (Bankr. S.D.N.Y. 1994).

[55]    (*See* Debtors' Br. at 30 (noting that the Guarantors had "approximately $2.3 billion less debt than at the Tribune level")).

[56]    (*See* Debtors' Br. at Exhibit R).

[57]    (*See* LD Br. at 36-38).

[58]    (*See* Debtors' Br. at Exhibit R).

[59]    (*See* Credit Lenders' Br. at 14). This value comes from the Credit Lenders' brief. Law Debenture uses it illustratively and makes no concession nor adopts it as the correct value.

value and assuming that all of these assets were at Tribune, the Guarantors realistically would only recover a small fraction of these intercompany receivables.  Accordingly, to determine the solvency, the Guarantors must discount the intercompany claims payable by Tribune to account for the high likelihood that Tribune would never make such payments.  *See In re R.M.L.*, 92 F.3d at 156 (finding entity insolvent, in part, where affiliate receivables were worthless because the affiliates themselves were insolvent).[60]  Incorporating, but not conceding, a 4.3% recovery percentage of Tribune's unsecured creditors, based upon a recovery analysis enforcing the parties' strict priorities (as the financial advisor for the Creditors Committee calculated), provides the Guarantors with an intercompany claims recovery of approximately $0.2 billion to $0.28 billion against Tribune.[61]

Thus, the inclusion of the intercompany claims, on a net basis, increases the Guarantors' liabilities by an amount between $4.36 billion and $6.21 billion.  This results in an indebtedness of between $15.993 billion and $17.843 billion and establishes that the Guarantors were insolvent under all of the valuations proffered by JPM.

### D.    The LBO Left Tribune Inadequately Capitalized And Unable To Pay Its Debts As They Became Due

Tribune's ability to survive for almost a full year after completing Phase II of the LBO is irrelevant to the analysis of capital adequacy.[62]  The availability of a $750 million revolver facility and a $263 million delay draw facility (reserved to pay Tribune's medium term notes)

---

[60]     *See also In re Hall*, 304 F.3d 743, 748 (7th Cir. 2002) (citing *In re Xonics Photochemical, Inc.*, 841 F.2d 198, 200 (7th Cir. 1988)) (holding that the value of contingent assets "must be assessed in light of the probability that they will be realized"); *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 204 (Bankr. S.D.N.Y. 2007) (holding that intercompany claims must be removed from the balance sheet of the obligee if the obligor is insolvent, because their inclusion would distort the solvency of the obligee).

[61]     These values are illustrative as taken from the Committee Brief.  (*See* Committee Br. at Appendix C). Law Debenture makes no concession nor adopts these values.

[62]     (*See* JPM Br. at 17, 33).

permitted Tribune to survive until the time when the Bridge debt became due. Yet, the determination of whether a debtor is unable to pay all of its debts as they become due depends on an examination of those debts due in the foreseeable future, not just those due in one year. *See In re Fid. Bond & Mortg. Co.*, 340 B.R. at 294 (stating that "the critical question for determining whether parties to a leveraged buy-out left a business with unreasonably small assets is whether it was *reasonably foreseeable* that an acquisition would fail").[63]

VRC would not provide its Phase II solvency opinion without assurance that Tribune could refinance its debt in 2014 because the Company's projections did not show sufficient capital to support repayment.[64]  When VRC requested that Morgan Stanley provide assurance of Tribune's refinancing capabilities before issuing its flawed December 20, 2007 solvency opinion,[65] Morgan Stanley refused, because it thought Tribune's debt was "significantly underperform[ing]" in the markets due to the "ESOP transaction and industry fundamentals," and that it was unlikely Tribune's access to the capital markets would improve in the near future.[66] Instead, without any substantiation of its ability to refinance, Tribune provided its own self-serving representation about its refinancing capabilities,[67] evidencing its inability to refinance and pay debts as they became due as a result of the LBO. *See Metro Commc'n Inc*,

---

[63]     *See also Boyer*, 587 F.3d at 795 (In collapsing a multi-step asset sale LBO, including a separate dividend transaction to find a fraudulent conveyance *four years after the transaction*, the Court stated that "[a]n inadequately capitalized company may be able to stagger along for quite some time, concealing its parlous state or persuading creditors to avoid forcing it into a bankruptcy proceeding in which perhaps only the lawyers will do well").

[64]     (*See* Ex. 115; Browning Tr. at 150-154).

[65]     (*See* December 20, 2007 Opinion Letter, Ex. 88; Ex. 34 at MS00097251).

[66]     (*See* Ex. 36; Ex. 38 at MS00085735).

[67]     (*See* Ex. 37; Ex. 33 at TRB0450706).

945 F.2d at 647 ("The problem universal to all LBOs . . . is that they are less able to weather temporary financial storms because debt demands are less flexible than equity interest").[68]

### E.    The Bidding Process Does Not Provide Support of Valuation

Blatantly mischaracterizing the Tribune auction as a "rigorous auction" with "multiple bona fide offers," the Credit Lenders conclude that the Zell bid is nearly dispositive of Tribune's value.[69] This argument grossly mischaracterizes the facts. The auction process was not robust. Zell was the only bidder remaining, and the Banks and management pushed the deal to him. If the actual sale price were always dispositive or even indicative of solvency, then no LBO would be subject to fraudulent conveyance claims. Such is not the case.

The evidence demonstrates that by January 2007, the sale process had elicited three proposals from: 1) Eli Broad and Ron Burkle on behalf of the Broad Investment Company and the Yucaipa Companies ("Broad/Burkle"); 2) The Carlyle Group;[70] and 3) the Chandler Trusts.[71] The Credit Lenders disingenuously mischaracterize an internal Centerbridge memorandum to contend that "Centerbridge was willing to participate in a transaction at a price up to $33 per share," and that the "substantial effort that the Chandler Trusts and Centerbridge devoted to the process is strong evidence of [that] offers' bona fide nature."[72] In fact, however, and as the evidence clearly shows, the Chandlers' bid was to acquire the publishing assets alone and *was*

---

[68]    *See also Boyer*, 587 F.3d at 795 ("[The Company] was naked to any financial storms that might assail it ... The fact that Smith made mistakes in running the company does not weigh as strongly as defendants think. Everyone makes mistakes. That's one reason why businesses need adequate capital to have a good chance of surviving in the Darwinian jungle that we call the market").

[69]    (*See* Credit Lenders' Br. at 2).

[70]    In February 2007, The Carlyle Group declined to participate further in the bidding process. (*See* Fact Statement at ¶ 43).

[71]    (*See* Fact Statement at ¶ 40).

[72]    (*See* Credit Lenders' Br. at 5 (citing CPTRB-0009860)).

*never for $33 a share.*[73]  Centerbridge never even committed to participating in the Chandler Trusts' bid for Tribune's publishing assets.[74]  Moreover, Centerbridge definitively decided not to participate in the Chandler Trusts' offer for the publishing assets after receiving the Company's downgraded forecast for 2007 on February 7, 2007.[75]

The Credit Lenders also fail to mention that the Chandler Trusts reduced their initial bid for the publishing assets after management reduced its forecast in February 2007.[76]  In early February, the Chandler Trusts not only expressed their disappointment in Tribune's January publishing operating performance and shock at "[the] magnitude of this reduction" but requested additional information before making a revised bid.[77]  Thus, because the Chandler Trusts' January 2007 offer was no longer open by February 2007 and had been only for the publishing assets alone, it has no bearing on Tribune's market value.

The Credit Lenders incorrectly contend that "the Broad/Burkle offers were real."[78]  The truth – as admitted in candid contemporaneous emails from the Lenders and the Board – was that

---

[73]  Contrary to the Credit Lenders' assertion, (*see* Credit Lenders' Br. at 4), the Chandler bid did not demonstrate Centerbridge's view that the Tribune shares were worth up to $33 per share. Rather, the only portion of the share price that was relevant to Centerbridge was the cash portion to be paid for Tribune's newspaper assets and certain related assets, which would have been approximately $17 per share. (*See,* Ex. 130: CPTRB-0009878 to 9901 at 9880).  The remainder of the proposed share price constituted one potential implied value of Tribune's broadcasting and other assets and was based on the Company's plan to recapitalize those assets and issue a dividend to shareholders. The Company, not the Chandler Trusts nor Centerbridge, determined value of such dividend and remaining equity in the broadcasting assets.

[74]  (*See* Ex. 131: CPTRB-0009859-60 ("[S]ince January 17, 2007 the Chandler Family Trusts has continued working with Centerbridge and Evercore . . . about a *potential partnership* to participate in the take private of the Publishing business. . . . *We have not committed to the Chandlers* and a major issue has been the structure of our investment" (emphasis added))).

[75]  (*See* Ex. 132: CPTRB-0004621 ("Trib reforecast 07 - cash flow $70mm less. I think we walk"); Ex. 133: CPTRB-0007696 ("I would probably move Project [Tribune] to dead")).

[76]  (*See* Ex. 107 at TRB0344658).

[77]  The Broad/Burkle group indicated the same. (*See* Fact Statement at ¶ 49; Ex. 134: MS_240132–137).

[78]  (*See* Credit Lenders' Br. at 5).

the Broad/Burkle bid was "BS" and that, in reality, *there was no Broad/Burkle bid.*[79]

Broad/Burkle terminated discussions with the Special Committee in February 2007 when the

Special Committee asked Broad/Burkle *to reduce the debt level* in their proposal (though it was

equal to or lower than Zell's).[80]  When Broad/Burkle renewed their interest in Tribune on or

about March 23, 2007, the Special Committee viewed their bid as uncertain and even refused to

provide Broad/Burkle with a "draft contract or opportunity to meet."[81]  The Special Committee

remarked at its April 1, 2007 meeting that "Broad/Burkle ceased their efforts regarding a

possible transaction with the Company in early February" and there remained necessary steps for

Broad/Burkle to "take to submit financing commitments and other documentation relating to a

firm proposal for consideration by the Committee" at that time.[82]

A February 6, 2007 analyst report accurately sums up the auction process: "bids that

were submitted by the January 2007 deadline were underwhelming and have left the board with

---

[79]    (*See* Ex. 135: JPM_00224043 (March 30, 2007 internal email from Peter Cohen "Mgmt team viewing Burkle bid as BS"); Ex. 136 JPM_00234475 (March 31, 2007 internal email from Peter Cohen "there clearly is no burkle bid and the special cmte knows it")).

[80]    (*See* Ex. 17 at JPM_00229118).

[81]    (*See* Ex. 137: TRIB-G0001683-685 at TRIB-G0001684; Ex. 138: TRB0149942-43; Ex. 139: TRB0529341).

[82]    (*See* Ex. 140: TRIB-G0008794-796 at TRIB-G0008795; Ex. 141: JPM_00206978 (March 30, 2007 internal email from Peter Cohen of JPM stating that the "Broad Burkle bid did not get much of a hearing or support at the board meeting today" and noting that the Broad/Burkle letter of March 23, 2007 "was extremely short", "financing was not specified", "[Broad/Burkle] had full access to data room but have not been in there since end of Feb", and "advisors, company, chandler reps all dismissive"); Ex. 142: JPM_00260091 (March 29, 2007 internal email from Peter Cohen "they are probably going for a delay . . . Burkle still has to do diligence I think and get his financing papers in order"); Ex. 112 ("Apparently, in this situation, given the failed auction of the company and the extremely strained Board dynamics, management is potentially less able than normal to direct the outcome here.  The Special Committee is being very careful to have a smart but certain outcome this time around); Ex. 188: Emily Thornton, Michael Arndt, and Ronald Grover, Sam Zell's Deal from Hell, Business Week, July 30, 2008, http://www.businessweek.com/magazine/content/ 08_32/b4095000408330.htm (quoting Zell discussing Tribune's many operating subsidiaries: "When we first undertook this project, we viewed Tribune as 60 ways to get lucky . . . ." and subsequently recognizing "the reality of [Tribune's] significant debt levels")).

only a few potential alternatives to consider."[83]   The report also noted that "we believe the higher

debt load that would result from their proposed $27 per share one-time dividend would

materially reduce the financial flexibility of the new entity."[84]

When the "self-help" option[85] became the only alternative, the Banks, as well as

Tribune's Directors and Officers wanted the Zell bid to prevail because of their significant

compensation arrangements.[86]   For instance, when the Directors began reconsidering whether to

pursue the Zell deal given the mounting concerns over the degree of leverage, Zell sweetened the

deal for the Directors and management, increasing their monetary benefits and essentially

locking them in.[87]   Accordingly, because the so-called auction that failed had yielded only a

single actual bidder and its process was severely flawed and directed to a specific outcome, the

Zell bid reveals nothing about Tribune's value at the time of the Merger.[88]

---

[83]     (*See* Ex. 123: JPM_00075127 - JPM_00075182 at JPM_00075143).

[84]     (*See id.*).

[85]     (*See* Fact Statement at ¶ 41).

[86]     JPM advised against the Broad/Burkle deal in favor of the Zell LBO deal which was more lucrative.
(*See* Ex. 143: JPM_00209668; Ex. 144: TRB0009878-79 at TRB0009878; Ex. 145: JPM_00222756).
Motivated at least in part by the significant fees it would earn and the chance to deepen its relationship with
Zell, JPM used its relationships with Tribune members to influence Tribune's approval of the LBO Deal. (*See*
Ex. 146: JPM_00290470; Ex. 147: JPM_00284643; Ex. 148: JPM_00246282-83 at JPM_00246282; Ex. 149:
JPM_00293630; Ex. 64 at JPM_00492571; Ex. 150: JPM_00216165-66 at JPM_00216165; Ex. 151:
JPM_00434159-60 at JPM_00434159).  The other Banks also advised the Company and/or Special Committee
to pursue the LBO deal to garner significant fees. (*See* Ex. 110 at CITI-TRIB-CC 00010125; Ex. 152: CITI-
TRIB-CC 00031361; Ex. 153: ML-TRIB-0385024-5025; Ex. 46 at ML-TRIB-0574914; Ex. 47; Ex. 154: CITI-
TRIB-CC 00010118-119; Ex. 103; Ex. 155: MS_113021-28 at MS_113023; Ex. 156: MS_262390-97 at
MS_262391).

[87]     (*See* WTC134; WTC 264 at Ml-TRIB-605960; WTC Brief at p. 11, 69 and Appendix B thereto; Ex.
157: TRIB-G0009063; Ex. 158: TRB0529338; Ex. 139: TRB0529341).

[88]     *See In re O'Day Corp.*, 126 B.R. at 402-03 (rejecting lender's argument that the price paid in an LBO
was the best evidence of the company's solvency and recognizing that to the extent such price is relevant, it
must be adjusted to account for the actual value available for the debtor's use and must consider whether the
"LBO principal and interest payments may be said to have turned profits into losses"); *BFP v. Resolution Trust
Corp.*, 511 U.S. 531, 537-538 (1994) ("The market value of . . . a piece of property is the price which it might
be expected to bring if offered for sale in a fair market; not the price which might be obtained on a sale at
public auction or a sale forced by the necessities of the owner").

F.        **The Debtors' Bond Trading Prices Indicate Tribune's Insolvency**

The Credit Lenders claim that bond prices "do not support any conclusion that Tribune

was expected to become insolvent as a result of incurrence of the Credit Agreement debt."[89]  But

the Credit Lenders ignore the data that directly contradicts this argument.

Tribune's bonds and the PHONES were trading at significant discounts to par reflecting

the market's perception that Tribune was insolvent.[90]  Although the Credit Lenders acknowledge

a "decline in the bond prices," they claim that because "the Credit Agreement debt traded up" in

the "weeks after the [so-called] Recapitalization," the bond prices cannot support a conclusion

that Tribune was insolvent.[91]  The Credit Lenders' analysis is flawed: it focuses exclusively on a

superficial analysis of the trading of the LBO debt within a very narrow window of May 2007.

Even if such debt were trading at an equivalent to par, the Credit Lenders provide no information

to conclude that the trading volume was significant.  In fact, the Banks were unable to syndicate

all of the LBO debt and had to discount the debt to sell,[92] which casts substantial doubt on the

reliability of this date.

The Credit Lenders claim that "an approach to valuation tied to the aggregate trading

value of Tribune's securities is of limited utility."[93]  This is true because the prices reflected the

market's anticipation of the LBO closing and were no longer "based on fundamentals."[94]  In

contrast, Tribune's bond prices may be more useful (though certainly not dispositive) on the

---

[89]        (*See* Credit Lenders' Br. at 11).

[90]        (*See* LD Br. at 18).

[91]        (*See* Credit Lenders' Br. at 10-11, citing Ex. 13 at ML-TRIB-434196) (emphasis in original).

[92]        (*See* ML-TRIB-0036835-39 at ML-TRIB-0036836 ("The entire Step 2 financing funded by the underwriters and bridge participants.")

[93]        (*See* Credit Lenders' Br. at 8-9).

[94]        (*See* Ex. 84).

22

solvency question because, unlike the share prices, they demonstrate the likelihood of repayment

upon the completion of the Merger.

### G.    There Is No Cap On The Avoidance Of The LBO Debt

The Debtors and JPM incorrectly argue that even if the claims are avoided, the Banks

would have a residual claim because avoidance is limited "to the extent necessary to benefit the

debtor's creditors."[95]  As discussed extensively in the Initial Brief, there is no such cap.[96]

Once the estate proves the elements of Section 548(a), the statute provides for the

automatic avoidance of the obligation in its entirety for the benefit of the entire estate.  *See*

*Moore v. Bay*, 284 U.S. 4, 5 (1931) ("The trustee in bankruptcy gets the title to all property

which has been transferred by the bankrupt in fraud of creditors . . . ."); *Coleman v. Cmty. Trust*

*Bank (In re Coleman)*, 426 F.3d 719, 725 (4th Cir. 2005) (reversing determination to avoid a

transfer pursuant to Section 544(b) solely to the extent it would benefit creditors and holding that

---

[95]    (*See* Debtors' Br. at 32, 43; JPM Br. at 34-35).  None of the Debtors' cases supports their position that the Banks are entitled to general unsecured claims at the subsidiary level if the Subsidiary Guarantees are avoided in their entirety.  *See, e.g., Pajaro Dunes Rental Agency v. Spitters (In re Pajaro Dunes Rental Agency, Inc.)*, 174 B.R. 557, 596-97 (Bankr. N.D. Cal. 1994) (Defendant made $1 million loan to debtor, which was secured by the debtor's real property.  The court held that the transfer was fraudulent, but portions could be saved by California's good faith defense); *In re O'Day Corp.*, 126 B.R. at 411 ("[T]he Bank takes the position that, as a creditor of the estate with a proof of claim on file, it is entitled to its pro rata distribution of the estate's assets unless an objection to Meritor's proof of claim is filed and sustained by the Court or, alternatively, its claim is equitably subordinated under section 510 of the Bankruptcy Code.  The Court disagrees.  The language of the UFCA and the Bankruptcy Code supports the position taken by the Trustee"); *In re Best Prods. Co.*, 168 B.R. 35, 59 (Bankr. S.D.N.Y. 1994) (analyzing both the viability of creditors' claims and reasonableness of the settlement, and stating "[t]o what extent the Banks would share in the estate is impossible to ascertain now because the remedies may differ depending on the grounds for avoidance of the LBO and because it is not clear what recovery Best might have against other defendants").  *Boyer* is factually inapposite on this point because in the context of a single tier LBO, the avoided transfers were returned to the wrongdoers after *all creditors harmed by the inequitable conduct were remedied*.  587 F.3d 787.  Here, the remediation of all creditors harmed by the LBO necessarily includes repayment to Tribune's creditors in addition to the Guarantors' creditors prior to the wrongdoers' right to step back into the chain.  In addition, Section 502(d) and 510 may present absolute bars to any recovery.

[96]    In a summary order expressly stated to be of no precedential value (*Adelphia Recovery Trust v. Bank of Am., N.A.*, 2010 U.S. App. LEXIS 10682 (2d Cir. May 26, 2010)), the Second Circuit affirmed the lower court's decision discussed in the Initial Brief.  (*See* LD Br. at 27-31).  For the reasons stated therein, the *Adelphia* decision is inapposite for several reasons, including that it was a standing decision regarding claims brought solely by a parent debtor to avoid lower entity fraudulent conveyances that did not arise from a transaction giving the parent debtor identical fraudulent conveyance claims for the benefit of its creditors.  *Id.*

avoidance is not subject to any limitation). Indeed, even as the Debtors' acknowledge, "when an

obligation is avoided, it ceases to exist in its entirety."[97]

The plain meaning of the operative provisions of Section 548 refutes JPM's argument.

Further, the Fourth Circuit in *In re Coleman*, 426 F.3d at 726, held that the power to avoid

obligations as fraudulent transfers is similarly not limited by Section 550, reasoning that:

> [o]nce Debtor avoided the deeds of trust, no recovery was necessary; the
> avoidance itself was the meaningful event. . . . Thus, the recovery statute [Section
> 550] has no application here.

*Id.* at 726. The *Coleman* court further rejected the notion that the bankruptcy court's equitable

powers could limit the estate's statutory avoidance powers because "[equitable powers] can only

be exercised within the confines of the Bankruptcy Code" and do not give a license "to disregard

the clear language and meaning of the bankruptcy statutes and rules." *Id.* at 726-27 (internal

quotations omitted). Thus, if the Court avoided the LBO Lenders' claims, the LBO-related

obligations would cease to exist.[98]

## II.    The Banks Cannot Succeed On Their Defenses

### A.    The Banks Cannot Prove Good Faith

The Lenders also cannot avail themselves of the "good faith" defense because they

lacked good faith throughout the LBO process. *See Dobin v. Hill (In re Hill)*, 342 B.R. 183, 202

---

[97]    (*See* Debtors' Br. at 34).

[98]    These well-reasoned cases also demonstrate that there is no arbitrary "cap" on avoidance recoveries. The Bankruptcy Code's goal is to reorganize expeditiously which often involves a plan where the avoidance litigation is placed in trust. *See Acequia, Inc. v. Clinton (In re Acequia Inc.)*, 34 F.3d 800, 808 (9th Cir. 1994). Once the claims are brought and succeed, the proceeds or benefit of avoidance are distributed or applied to all those interested in the estate on a post-confirmation basis. Such interested entities may be (likely will be) new shareholders with a residual interest in the enterprise. Accordingly the interested entities must receive the full value of all retained or assigned assets, including the full value of avoidance actions. As the *Acequia* court recognized, courts have refused to dismiss avoidance actions even though the unsecured creditors had received full distributions under reorganization plan, reasoning the interested entities had "received an equity stake in the reorganized debtor." 34 F.3d at 811. Thus, the arbitrary capping of otherwise available recovery – without any statutory authority – would result in the unjust limit on future shareholders' recoveries, gamesmanship tactics and unnecessary delays of bankruptcy proceedings.

(Bankr. D.N.J. 2006) ("In order to successfully assert a good faith defense under § 548(c), the burden shifts to the defendant/transferee").  The Banks argue that they provided financing in "good faith" and assert that the Lenders' effort to assess their likely recovery in the event of default reflects "a legitimate and prudent banking practice that in no way indicates an expectation of bankruptcy."[99]  However, the Banks' documents do not merely evidence a "loss given default" analysis but also expose the Banks' pervasive knowledge of Tribune's financial underperformance and the inevitable insolvency that the LBO would cause.  The explosive April 5, 2007 email referenced in the Initial Brief demonstrates that the Banks knew well before the LBO that Tribune's debt load would render the Company bankrupt and the Banks' "hit and run" mentality toward Tribune.[100]

The Banks also knew that Tribune's projections were unreasonable and that the LBO Debt would render the Company insolvent.[101]  Rather than halt the deal, however, the Banks sought to protect their own interests by structuring the LBO with the Holdcos to immunize themselves from fraudulent transfer actions.[102]  These actions do not evidence "prudent" banking practices but rather measures to shift the risk of the LBO to Tribune's unsecured creditors and ensure their receipt of hundreds of millions in fees for both Phases of the LBO/Merger.[103]  It is important to note that the lead agent Banks always intended to lay off their own economic risk

---

[99]    (*See* JPM Br. at 5-10).

[100]    (*See* Exs. 39 and 41).

[101]    (*See* Exs. 26, 48 and 49).

[102]    (*See* Exs. 51 and 52).

[103]    (*See* Ex. 159: JPM_00450613-615 at JPM_00450614; Ex. 160: JPM_00474407-408 at JPM_00474408; Ex. 161: JPM_00495614-18; Exs. 98 and 99).

through syndication, even when forced to reduce the price to syndicate.[104] This conduct is not good faith.

The Banks argue that their funding of Phase II is further proof of their good faith belief of Tribune's solvency, stating that "[w]hile it may not have been in the LBO Lenders' self interest to fund under the then-existing market conditions, because all of the conditions for the Merger had been met … the LBO Lenders funded the Merger transaction…"[105] However, the Banks only funded Phase II when they realized that they had no other option; itself indicative of the integrated nature of the transaction. The Banks' obligations were put in place through Commitment Letters executed in April at the outset. In September 2007, JPM knew that Tribune would likely fail solvency tests in Phase II.[106] Throughout the Fall of 2007, Merrill internally discussed its solvency doubts and concerns about VRC's opinion.[107] Morgan Stanley also refused to provide a representation to VRC about Tribune's ability to refinance its debts.[108] JPM, together with other Banks, questioned the reliability of VRC's solvency opinion, even retaining another solvency firm, Murray & Devine, to see if they could issue an *insolvency* opinion which would have the potential to "kill the deal."[109] Nevertheless, despite their

---

[104]     (*See* Ex. 128: JPM_00285732-33; Ex. 129: JPM_00287366).

[105]     (*See* JPM Br. at 31). JPM argues that a transferee's intent is not relevant to an intentional fraudulent transfer claim under Section 548. (*See* JPM Br. at 4). Though it is true that the primary focus of the inquiry is the debtor's intent, a lender's intent clearly is relevant to any good faith defense. *See Bayou Accredited Fund, LLC v. Redwood Growth Partners, LP (In re Bayou Group, LLC),* 396 B.R. 810, 826-27 (Bankr. S.D.N.Y. 2008). (*See also* LD Br. at 2-4, Exs. 18-34).

[106]     (*See* Ex. 162: JPM_00069986 ("JPMorgan deal team's DCF and sum of the parts analysis based on revised July projections indicate that the current valuation of Tribune is approximately $[10] to $[13] billion, potentially failing the solvency tests")).

[107]     (*See* Ex. 163: ML-TRIB-0612820; Ex. 164: ML-TRIB-0613277).

[108]     (*See* Exs. 36 and 38).

[109]     (*See* Ex. 165: JPM_00288187, Email from Raj Kapadia to Peter Cohen ("I spoke to chandler today to inform him that the 4 banks plan on hiring an independent firm to help us with understanding the solvency"); Ex. 166: Deposition of Rajesh Kapadia sworn to on January 22, 2010 ("Kapadia Tr.") at 198-214, 221-227,

knowledge and concerns that the LBO would unavoidably thrust Tribune into bankruptcy, the Banks concluded that they did not seek to prevent the consummation of Phase II without breaching the LBO-related agreements entered into in April.

The Banks' failure to erect any effective ethical wall between their advisory services groups and their investment banking/lending groups demonstrates further that the Banks cannot sustain their burden to prove good faith.[110] For instance, JPM made no distinction between the individuals working on the financing side of the LBO and Zell's advisory side and failed to wall off senior management who played prominent roles on both sides of the LBO deal.[111] The other Banks also had individuals working on both sides of the transaction, providing financing and advisory services to the Company and/or Special Committee.[112] As a result of the Banks' failure to erect effective ethical walls, the individuals' knowledge about Tribune being rendered insolvent from the LBO would be imputed to all advisory and investment banking professionals within the Banks. *See, e.g., In re Toys "R" Us, Inc., S'holder Litig.*, 877 A.2d 975, 1006 (Del. Ch. 2005) (court noted that First Boston's decision, acting as a sell-side financial advisor to the company, "[to ask the board for permission to provide financing] was unfortunate, in that it tends to raise eyebrows by creating the appearance of impropriety, playing into already heightened suspicions about the ethics of investment banking firms").[113] This internal overlap of advisors

---

247-249; Ex. 167: Kapadia 15; Ex. 168: Kapadia 17; Ex. 169: Kapadia 19; Ex. 170: Kapadia 20; Ex. 171: HLHZ_Tribune001167; Ex. 172: HLHZ_Tribune001173; Ex. 173: HLHZ_Tribune001189-92).

[110]     This responds to the Examiner's question as to whether there is evidence that the Banks' affiliates were essentially operating together.

[111]     (*See* Ex. 178: JPM_00214139; Ex. 179: JPM_00498064).

[112]     (*See* Ex. 180: ML-TRIB-0006971 and Ex. 50 at ML-TRIB-0019616 and at ML-TRIB-0019617; Ex. 181: CITI-TRIB-CC 00023706; Ex. 182: CITI-TRIB-CC 00024135).

[113]     *See also In re Enron Corp. Secs.*, 235 F. Supp. 2d 549, 639–40, 688–89 (S.D. Tex. 2002) ("The alleged absence of effective Chinese walls, which the Court has found adequate in light of the totality of the circumstances, makes knowledge gained in the lending and commercial areas of the banks imputable to their analysts").

destroys any ability for the Banks to contend that Tribune conducted the failed auction or sale to Zell pursuant to a fair process. This undercuts any remaining utility to the argument that the Special Committee's efforts "cleanse" the LBO.

### B.    Tribune Did Not Receive Any Value Under Section 548(c) As A Result Of Any Purported Indirect Benefits

Assuming the estates sue under Section 548 rather than Section 544(b) (in which the "credit" of Section 548(c) does not apply), the only credit that a liable party may retain is that articulated in Section 548(c), which requires proof of actual value that the lender *provided* to the debtor *in good faith*. Here, the LBO Lenders cannot prove that they gave value for the amounts paid to former shareholders, nor can they prove that they acted in good faith, which precludes any recovery in this case.

The Credit Lenders and JPM claim the "indirect" benefits conferred upon Tribune are elements of value that a court will take into account under Section 548(c).[114] However, even if these were benefits (which Law Debenture disputes, as described above), the good faith defense does not apply because the Banks *did not give* this purported "value" to Tribune. *See* 11 U.S.C. § 548(c) ("a transferee . . . may retain any interest transferred . . . to the extent *such transferee gave value to the debtor* in exchange for such transfer . . ."). Even if the Banks had given benefits to Tribune – which they did not – indirect benefits do not constitute value for purposes of Section 548(c). *See Clark v. Security Pac. Bus. Cred. (In re Wes Dor, Inc.)*, 996 F.2d 237, 243 n.8 (10th Cir. 1993) ("[B]ecause the Bankruptcy Code's definition of 'value' expressly excludes 'an unperformed promise to furnish support to the debtor,' it is questionable whether

---

[114]    (*See* Credit Lenders' Br. at 30).

the Bank's promise of future funding would constitute consideration for purposes of this court's 548(c) determination").[115]

## C.    The LBO Lenders and Shareholders Are Not Protected By 546(e)

### 1.    The LBO Lenders Have No Protection Under 546(e)

The Credit Lenders and JPM argue that even if the LBO-related transfers and obligations are fraudulent conveyances, they cannot be avoided because they fall within the safe harbor of Section 546(e).[116] Though the Credit Lenders and JPM claim such protection, they are unable to cite a single case or any legislative history extending the safe harbor of Section 546(e) to loans made by financing parties to fund corporate acquisitions. This is unsurprising, for no such authority exists. Instead, they claim that in light of the Financial Netting Improvements Act of 2006, Pub. L. No. 109-390, 120 Stat 2692 (2006) ("FNIA"), which amended Section 546(e) of the Bankruptcy Code (the "2006 Amendments"), Section 546(e) insulates, not just the Tribune shareholders, but also the LBO Lenders from avoidance actions.

Neither the plain language of Section 546(e) nor its legislative history supports the Banks' contorted interpretation of that section. 11 U.S.C. § 546(e). The estates' avoidance power primarily at issue here is the avoidance of obligations. The plain language of Section 546(e) limits the trustee's power to avoid certain "transfers" made "in connection with a securities contract." There is no mention of "obligations" in 546(e). Thus, even if remotely applicable to the LBO Lenders (which Section 546(e) is not), Congress's deliberate choice in drafting Section 546(e) as a limit only on the avoidance of "transfers" must be given full

---

[115]    *See also Ross v. Penny (In re Villa Roel, Inc.)*, 57 B.R. 879, 883 n.5 (Bankr. D.D.C. 1985) (recognizing that it is "problematic" whether the old doctrine "has survived the explicit requirement in the new statute that the debt satisfied must be that of the debtor").

[116]    (*See* Credit Lenders' Br. at 31-38; JPM Br. at 42-43).

effect.[117]  Of course application to transfers rather than obligations makes sense in that Section

546(e) is intended only to protect entities in the settlement payment chain from disruptive

avoidance actions when the entities merely had settled ordinary securities transactions.[118]

Accordingly, if Credit Lenders' absurd interpretation of Section 546(e) were accepted it would

mean that, without a single Congressional statement, Congress intended to insulate completely

all financiers in leveraged buyouts or other transactions from fraudulent conveyance actions and

overrule over 500 years of fraudulent conveyance law.

The Credit Lenders and JPM argue that the Credit Agreement is a "securities contract"

because a portion of its proceeds were used for the acquisition of stock.  However, Section

546(e) does not apply to the LBO-related stock pledges and transfers because they were not

made in connection with a "securities contract" as defined by Section 741(7) but rather in

connection with a loan agreement, which is not addressed by 546(e).  Indeed, the FNIA

legislative record repeatedly warns against over-expansive application of the safe harbor

provisions beyond the specific financial contracts targeted for preferential treatment.[119]

---

[117]  *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion") (internal quotation marks omitted); *Brandt v. Hicks, Muse & Co. (In re Healthco Int'l, Inc.)*, 195 B.R. 971, 981 (Bankr. D. Mass. 1996) ("By its own terms, section 546(e) applies only to a 'transfer' made by or to one of the named entities"); *Covey v. Commercial Nat'l Bank of Peoria*, 960 F.2d 657, 661 (7th Cir. 1992) (considering whether a debtor who had entered into a guarantee received reasonably equivalent value in exchange for the obligation and noting that "[a]lthough a note or guarantee is not a 'transfer' for purposes of 11 U.S.C. § 101(54), ... either [sic] is an 'obligation'") (citations omitted).

[118]  *See* H.R. Rep. No. 97-420, at 1 (1982) (stating that the purpose of 546(e) is not to confer advantages on particular claimants of a bankruptcy estate, but to minimize the risk that the insolvency of a securities or commodity firm would spread and disrupt the complex system of accounts and guarantees called the "clearance and settlement system"); *Enron Corp. v. Credit Suisse First Boston Int'l (In re Enron Corp.)*, 328 B.R. 58, 66 (Bankr. S.D.N.Y. 2005) (noting that it has been repeatedly stated that the purpose of 546(e) is to minimize instability "caused by the reversal of settled securities transactions'").

[119]  The report of the Committee on the Judiciary recommending the enactment of the FNIA, H.R. Report No. 109-31 (2005) (the "House Report") explains, for example, that "the inclusion of 'margin loans' in the definition [of securities contract] is intended to encompass only those loans *commonly known in the securities*

Classification of the Credit Agreement as a "securities contract" would also lead to a result whereby the enforcement of the Credit Agreement would be exempt from the automatic stay pursuant to Section 362(b)(6), (7), (17) or (27) of the Bankruptcy Code. This is patently absurd. Otherwise, why have the Credit Lenders not enforced their rights in state court if insulated from the automatic stay? Plainly, the Credit Agreement is not what is commonly known in the securities industry as a "securities contract" and that interpretation runs afoul of the statute and Congress's intent in drafting the statute.[120]

Section 546(e) also cannot apply to the LBO because the overall transaction must be collapsed. *See In re Mervyn's Holdings*, 2010 Bankr. LEXIS 670, at *25 ("as a general rule, section 546(e) does not apply to 'collapsed' transactions").

### 2.    546(e) Does Not Bar The Litigation Trustee's Claims Against the Shareholders

As the Debtors recognize, a litigation trustee can pursue fraudulent conveyance claims against the shareholders if the Debtors abandon and assign such claims to the litigation trustee for prosecution.[121] *See In re Eagle Enters.*, 265 B.R. 671, 679 (E.D. Pa. 2001) ("The code provides the appropriate mechanism for a creditor to obtain a judicial declaration of abandonment of estate property on the part of the trustee"); 11 U.S.C. §§ 554 and 1123(b)(3)(B). The Debtors' arguments to the contrary are wrong. First, because Section 1123(b)(3)(B) provides a mechanism for post-confirmation litigation, the post-confirmation litigation trustee

---

industry as 'margin loan," . . . . '*Margin loans' do not include, however, other loans that happen to be secured by securities collateral.*" (*See* House Report at 119 (emphasis added)).

[120]    The rules of statutory construction apply to Section 741 which requires that where Congress has used technical words or terms of art (*i.e.* "securities contracts," swap agreements," "repurchase agreements," and "forward contracts") reference must be made to the trade or industry in which the term was used at the time of the enactment of the statute. *See, e.g., Corning Glass Works v. Brennan*, 417 U.S. 188, 201 (1974) ("[W]here Congress has used technical words or terms of art, 'it [is] proper to explain them by reference to the art or science to which they [are] appropriate'").

[121]    (*See* Debtors' Br. at 55-56).

can pursue state fraudulent conveyance claims under Section 544(b) even if the "entire creditor class" is not represented by the trustee.[122]  Second, there is nothing in the existing case law or the Bankruptcy Code to suggest that these claims cannot be brought by a post-confirmation trustee merely because they have been assigned.[123]  Third, contrary to the Debtors' assertion, Section 546(e) does not preempt state law causes of action that seek to avoid "settlement payments" made to shareholders.  Because the LBO transfers violate New York law and therefore the LBO transactional agreements would be rendered null and void, Section 546(e) would not apply to a void transaction that has no legal significance.[124]  Thus, if the Debtors abandon their claims, the litigation trustee can recover from the shareholders under Section 544 and N.Y.D.C.L. § 276.

## III.  The Subsequent Transferees' Claims Can Be Equitably Subordinated and Disallowed

The Credit Lenders reliance upon *Enron Corp. v. Springfield Assocs. LLC (In re Enron Corp.)*, 379 B.R. 425 (S.D.N.Y. 2007) for the proposition that the claims of the subsequent transferees cannot be avoided or disallowed is misplaced.[125]  *Enron* is not as broadly sweeping as the Credit Lenders would suggest.  In *Enron*, the District Court vacated the Bankruptcy Court orders, holding that a transferred claim can be subject to disallowance and equitable

---

[122]    *See In re Acequia Inc.*, 34 F.3d at 808 ("We therefore hold that Acequia may invoke *section 544(b)* despite the fact that it paid unsecured creditors in its confirmed plan of reorganization"); *Stalnaker v. DLC, Ltd. (In re DLC, Ltd.)*, 295 B.R. 593, 605 (B.A.P. 8th Cir. 2003) ("On the date of the filing of the petition in this case, the trustee could have brought an avoidance action under section 544, the recovery from that avoidance would have been property of the estate, and would have been distributed to all of the estate's creditors.  It is inconsistent with the Bankruptcy Code to allow a transferee of a fraudulent transfer to defeat the bankruptcy trustee by paying a couple of creditors.  The potential for abuse is obvious").

[123]    *See id.* at 808 ("In this case, Acequia's plan of reorganization specifically contemplated that, after confirmation, the corporation would continue to 'litigate claims and causes of action which exist in favor of the Debtor arising prior to and subsequent to the commencement of the Debtor's Chapter 11 case'").

[124]    *See Enron Corp. v. Bear, Stearns Int'l Ltd. (In re Enron Corp.)*, 323 B.R. 857, 876 (Bankr. S.D.N.Y. 2005) ("If the Oregon law was violated, the payment cannot be a settlement payment because the transaction is void and there is no settlement obligation to discharge nor any securities transaction to complete. . . .  As a complete nullity, there would be no resulting settlement payment.  This consequence is not a result of the bankruptcy filing, it is simply a function of state law that was not preempted by 546(e)").

[125]    (*See* Credit Lenders' Br. at 43).

subordination if it is transferred through an assignment, but not if it is transferred through a sale, and remanded the case for further consideration. 379 B.R. at 448-49.

*Enron* is inapplicable to this case. First, the Credit Lenders have not demonstrated that the subsequent transferees inherited their claims by way of a sale as opposed to an assignment.[126] Second, even assuming there was a sale of the Credit Lenders' claims, the subsequent transferees would still be subject to equitable subordination and disallowance because they had actual and constructive notice of the Banks' wrongful conduct.[127]

## IV.     The Directors Breached Their Fiduciary Duties By Proceeding With The LBO[128]

As described in Law Debenture's initial submission, Tribune's Directors and Officers breached their fiduciary duties in approving the LBO. Though the Merger transaction plainly was integrated, even examined in isolation, the Directors and Officers breached their fiduciary duties by closing Phase II. As discussed in the Initial Brief, the Board, at the outset of the LBO, questioned whether Tribune could sustain with almost $14 billion of debt, knew VRC's solvency opinions for both Phases were based on outdated, overly aggressive projections, and that VRC's valuations deviated from their Financial Advisors' valuations.[129] The Directors and Officers' recklessness persisted into Phase II of the LBO. In particular, when the Banks informed Chandler Bigelow in September 2007 that they were hiring an outside solvency firm given concerns about solvency, the Company was on actual notice about the reliability of the VRC

---

[126]     379 B.R. at 445-446 ("[T]he proceeding is remanded to the Bankruptcy Court with instructions to determine whether the claims transferred to Springfield were transferred by way of a sale or whether they were transferred by way of a pure assignment").

[127]     *See id.* at 442 ("This Court's analysis would not apply to bad faith purchasers. Indeed, purchasers of claims with actual notice of the inequitable conduct of the seller may be subject to equitable subordination based on their own misconduct"); (*see* LD Br. at 23-26).

[128]     Law Debenture here is responding to the Examiner's specific question relating to the Directors and Officers' Phase II breaches. In so doing, Law Debenture makes no concession and rejects any contention that the Phases are severable.

[129]     (*See* LD Br. at 2-4, 38-42).

opinion and VRC's gamesmanship to get to solvency (*i.e.*, using fair market value of the PHONES rather than face value).[130] There were also questions about the Board's independence and influence over VRC's Phase II solvency opinions resulting in the Banks requiring the Board to respond to certain independence questions before the Phase II closing.[131] Moreover, the Board acted recklessly in allowing the Company, in lieu of Morgan Stanley, to provide its own assurance about its ability to pay debts as they mature.

The Directors and Officers – being well aware of the red flags surrounding Phase II and equipped with their knowledge from Phase I – could not accept at face value both Morgan Stanley's oral opinion that VRC's Phase II solvency opinion was reliable and VRC's Phase II solvency opinion, without fully educating themselves and performing proper due diligence.[132] Thus, the Directors and Officers breached their fiduciary duties by giving a rubberstamp approval to the Merger.[133] Because the Directors and Officers, who had an interest in the transaction, acted recklessly in Phase II and breached their duties of loyalties as detailed in the Initial Brief, they would not be protected by the business judgment rule and would need to show

---

[130]    (*See* Ex. 166: Kapadia Tr. at 245-246; Ex. 183: Kapadia Exhibit 18; Ex. 184: JPM_00247194-95 ("If VRC's Opinion would reach the same solvency conclusion if the PHONES liability was considered at face value…")).

[131]    (*See* Ex. 166: Kapadia Tr. at 247-249; Exs. 169 and 170; Ex. 185: JPM_00338076-77).

[132]    (*See* Fact Statement at ¶¶ 114-116).

[133]    *See Cal. Pub. Emples. Ret. Sys. v. Coulter,* 2002 Del. Ch. LEXIS 144, at *44 (Del. Ch. Dec. 18, 2002) ("The allegations of the amended complaint . . . raise a reasonable doubt as to (1) whether reliance on the Houlihan valuation was in good faith and (2) whether the directors were not grossly negligent. Taking all well-plead allegations as true, as I must, there are only two possible explanations for the special committee's reliance on the Houlihan valuation report.  Either the committee members knew the report was based on grossly inaccurate data that inflated the valuation of CEI or they worked very hard not to know that information--facts which were both material and obvious.  If the former is true, the committee's reliance could not have been in good faith.  If the latter, the committee was grossly negligent.  In either event, based on the amended complaint's allegations of particularized facts, the decision would not be the product of the valid exercise of business judgment, and demand on the board is, thus, excused"); *see also Valeant Pharms. Int'l v. Jerney,* 921 A.2d 732, 751 (Del. Ch. 2007).

the entire fairness of the transaction. No such showing can be made because Tribune did not receive a "fair price" pursuant to a "fair process" for the incurrence of the LBO obligations.[134]

## V.    The Estate Has Viable Preference Claims

The Examiner requested further information about the applicability of the ordinary course of business defense under Section 547(c)(2) relating to the Transfers made to (i) the LBO Lenders and Bridge Lenders, (ii) the Directors and Officers, and (iii) Tribune's subsidiaries (*i.e.*, inter-company transfers). Because the parties have limited information about these Transfers, the Examiner should adjourn any decision on the viability of the preference claims until there is further disclosure by the Debtors regarding the Transfers.[135] Further, a Section 547(c)(2) defense should be rejected as the creditors have not put forth any evidence in support of an ordinary course defense.[136] Notwithstanding the foregoing, the atypical, LBO-related Transfers to the Officers and Directors (*i.e.*, change in control benefits and cash bonus pool and equity awards that were accelerated and vested immediately upon the completion of the LBO)[137] were made at a time when they knew Tribune was insolvent and should not be protected by Section 547(c)(2).[138]

---

[134]    (*See* LD Br. at 39-40).

[135]    *See, e.g., Sames v. Gable*, 732 F.2d 49, 51 (3d Cir. 1984) ("We have said where the facts are in possession of the moving party a continuance of a motion for summary judgment for purposes of discovery should be granted almost as a matter of course").

[136]    *See Hassett v. Goetzmann (In re CIS Corp.)*, 195 B.R. 251, 257 (Bankr. S.D.N.Y. 1996) (Under Section 547(g), "the burden is on the transferee to establish each element of any defense asserted under Code § 547(c)"); 11 U.S.C. § 547(c)(2).

[137]    (*See* Tribune 2007 10-K at 178-185, 197 produced as Ex. 186: TRB0513780-4050 at TRB0513972-979, TRB0513992; Fact Statement at Ex. W).

[138]    *See* 5-547 Collier on Bankruptcy ¶ 547.04; *see also In re CIS Corp.*, 195 B.R. at 259; *Official Employment-Related Issues Comm. of Enron Corp. v. Arnold (In re Enron Corp.)*, 2005 Bankr. LEXIS 3261, at *61-62 (Bankr. S.D. Tex. Dec. 9, 2005). Even if the Transfers are not avoidable as preferences, they are avoidable as fraudulent conveyances because the payments were made by Tribune, which the LBO rendered insolvent.

Dated: Wilmington, Delaware
      June 7, 2010

                        Respectfully submitted,

                        /s/ Garvan F. McDaniel
                        Garvan F. McDaniel
                        Bifferato Gentilotti
                        800 N. King St., Plaza Level
                        Wilmington, DE 19801
                        (302) 429-1900

                                – and –

                        David S. Rosner
                        Andrew K. Glenn
                        Sheron Korpus
                        Christine A. Montenegro
                        Matthew B. Stein
                        Kasowitz, Benson, Torres & Friedman LLP
                        1633 Broadway
                        New York, New York 10019
                        Telephone: (212) 506-1700
                        Facsimile: (212) 506-1800

                        *Co-Counsel for Law Debenture Trust*
                        *Company of New York*

**LAW DEBENTURE TRUST COMPANY OF NEW YORK**

**APPENDIX A**

Tribune Company
## Summary of Valuation and Solvency Analyses

| | Public Trading Comps | | | Private Transaction Comps. | | | | Sum of the Parts | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | VRC - May 17, 2007 | Morgan Stanley | Blackstone | VRC - May 17, 2007 | Morgan Stanley | Blackstone | VRC - May 17, 2007 | MS - Public Market | MS - Private Market | Blackstone |
| Operating Enterprise | 11,336 | 9,957 | 9,346 | 11,873 | 9,857 | 10,657 | 11,430 | 9,907 | 9,857 | 9,602 |
| Equity Investments | 2,412 | 2,200 | 1,851 | 2,412 | 2,200 | 1,851 | 2,412 | 2,200 | 2,200 | 1,851 |
| NPV of PHONES Tax Savings | 383 | 383 | 383 | 383 | 383 | 383 | 383 | 383 | 383 | 383 |
| Enterprise Value | 14,131 | 12,540 | 11,579 | 14,668 | 12,440 | 12,891 | 14,225 | 12,490 | 12,440 | 11,836 |
| Debt (1) | (13,933) | (13,933) | (13,933) | (13,933) | (13,933) | (13,933) | (13,933) | (13,933) | (13,933) | (13,933) |
| Equity Value | 198 | (1,393) | (2,354) | 735 | (1,493) | (1,042) | 292 | (1,443) | (1,493) | (2,097) |

Note that all third-party valuations show insolvency with the exception of VRC. VRC's analysis is riddled with errors, including but not limited to the calculation of its discount rate, calculation of terminal values, selection and application of comparable publicly traded company and comparable acquisitions data, and valuations of equity investments. When these errors in VRC's analysis are corrected, VRC's analysis would show Tribune to be insolvent, even before modifying the unreasonable projections that VRC relied upon.

Sources:

(1) Total projected debt of $13.933 billion as detailed in the "Statement of Facts Concerning Tribune, The Leveraged ESOP Transactions and Related Matters," dated May 21, 2010, pages 12 and 50. Projected debt consists of Total Unsecured Debt of $2.488 billion, Step 1 Tranche B Facility due 2014 of $5,515 billion, Tranche X Facility of $1.5 billion, Step 2 Tranche B Facility due 2014 of $2.105 billion, and Exchangeable EGI-TRB Note ("Zell note") of $0.225 billion. Total projected debt also includes originally estimated New Bridge Facility of $2.1 billion (see Confidential Information Memorandum, p. 25).

VRC figures from Tribune Company Step Two Solvency Analysis dated May 17, 2007. See VRC0048773-788 at VRC0048776.

Morgan Stanley figures from Presentation to the Committee of Independent Directors of the Board of Directors of Tribune dated April 1, 2007. Exhibit 99 (C) 10 to Tribune SC TO-I dated April 25, 2007.

Blackstone Valuations from FOUN 0006533 - 6537. DCF value is base case.

S&P - from JPM 00160975 - 00160980.

Duff & Phelps - Operating value and nonconsolidated assets from D&P TR120183.

NPV of PHONES Tax Savings from Tribune Company Solvency Opinion Analysis dated May 9, 2007.

**Tribune Company**
# Summary of Valuation and Solvency Analyses

| | VRC – May 17, 2007 | MS – Management Plan | DCF | | S&P | Summary Valuation | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | MS – Research Case | Blackstone Base Case | | VRC – May 17, 2007 | Duff & Phelps |
| Operating Enterprise | 9,388 | 9,733 | 9,854 | 10,604 | 9,700 | 11,007 | 10,600 |
| Equity Investments | 2,412 | 2,200 | 2,200 | 1,851 | | 2,412 | 2,020 |
| NPV of PHONES Tax Savings | 383 | 383 | 383 | 383 | 383 | 383 | 383 |
| Enterprise Value | 12,183 | 12,316 | 12,437 | 12,838 | 10,083 | 13,801 | 13,003 |
| Debt (1) | (13,933) | (13,933) | (13,933) | (13,933) | (13,933) | (13,933) | (13,933) |
| Equity Value | (1,751) | (1,617) | (1,496) | (1,095) | (3,850) | (132) | (930) |

Note that all third-party valuations show insolvency with the exception of VRC. VRC's analysis is riddled with errors, including but not limited to the calculation of its discount rate, calculation of terminal values, selection and application of comparable publicly traded company and comparable acquisitions data, and valuations of equity investments. When these errors in VRC's analysis are corrected, VRC's analysis would show Tribune to be insolvent, even before modifying the unreasonable projections that VRC relied upon.

Sources:

(1) Total projected debt of $13.933 billion as detailed in the "Statement of Facts Concerning Tribune, The Leveraged ESOP Transactions and Related Matters," dated May 21, 2010, pages 12 and 50. Projected debt consists of Total Unsecured Debt of $2.488 billion, Step 1 Tranche B Facility due 2014 of $5,515 billion, Tranche X Facility of $1.5 billion, Step 2 Tranche B Facility due 2014 of $2.105 billion, and Exchangeable EGI-TRB Note ("Zell Note") of $0.225 billion. Total projected debt also includes originally estimated New Bridge Facility of $2.1 billion (see Confidential Information Memorandum, p. 25).

VRC figures from Tribune Company Step Two Solvency Analysis dated May 17, 2007. See VRC0048773-788 at VRC0048776.

Morgan Stanley figures from Presentation to the Committee of Independent Directors of the Board of Directors of Tribune dated April 1, 2007. Exhibit 99 (C) 10 to Tribune SC TO-I dated April 25, 2007.

Blackstone Valuations from FOUN 0006533 - 6537. DCF value is base case.

S&P - from JPM 00160975 - 00160980.

Duff & Phelps - Operating value and nonconsolidated assets from D&P TR120183.

NPV of PHONES Tax Savings from Tribune Company Solvency Opinion Analysis dated May 9, 2007.

**LAW DEBENTURE TRUST COMPANY OF NEW YORK**

**APPENDIX B**

# Tribune Company
## Discounted Cash Flow Valuation

As of May 9, 2007
($millions)

| | 2007 | 2007 Partial Year (2) | 2008 | 2009 | 2010 | 2011 | 2012 | Terminal Value |
|---|---|---|---|---|---|---|---|---|
| Sales | 5,357.6 | 4,132.5 | 5,262.2 | 5,295.1 | 5,363.7 | 5,392.0 | 5,420.6 | |
| EBITDA (1) | 1,305.9 | 1,047.8 | 1,360.4 | 1,388.4 | 1,418.5 | 1,415.1 | 1,421.0 | |
| *EBITDA Margin* | | | *25.9%* | *26.2%* | *26.4%* | *26.2%* | *26.2%* | *26.2%* |
| Depreciation & Amortization | 246.9 | | 240.3 | 244.3 | 244.3 | 244.3 | 248.3 | |
| Cash Taxes | (413.0) | (267.1) | (436.9) | (446.2) | (457.9) | (456.6) | (457.3) | |
| Net Change in Working Capital | (20.0) | (35.0) | (26.0) | (26.5) | (27.1) | (27.6) | (28.2) | |
| Capital Expenditures | (174.5) | (153.7) | (171.5) | (127.8) | (128.0) | (128.0) | (128.7) | |
| Enterprise Cash Flow | 698.4 | 592.0 | 726.0 | 787.9 | 805.5 | 802.8 | 806.7 | 7,050.3 |
| Discount period | | 0.32 | 1.15 | 2.15 | 3.15 | 4.15 | 5.15 | 5.65 |
| Discount factor | | 0.96 | 0.88 | 0.78 | 0.70 | 0.63 | 0.56 | 0.53 |
| Present value of debt free cash flows | | 570.7 | 637.5 | 617.7 | 563.9 | 501.8 | 450.2 | 3,717.9 |

| | |
|---|---|
| Business Enterprise Value | 7,059.8 |
| Add: Equity Investments (3) | 2,686.0 |
| Add: NPV of PHONES Tax Savings (3) | 382.7 |
| Add: Cash (3) | 182.1 |
| Less: Debt (4) | (11,633.0) |
| Fair market value of equity | $ (1,322.4) |

Inputs:

| | |
|---|---|
| Terminal Growth Rate | 0.50% |
| Discount rate | 12.00% |
| Taxes | 39.0% |

(1) EBITDA excludes 401-K cost savings.
(2) From May 9, 2007 Model except for cash taxes which is prorated for the partial year from 5/9/07 to 12/31/07.
(3) VRC Tribune Company Solvency Opinion Analysis dated May 9, 2007 p. 10.
(4) Equals Total Debt of $13,933 less $2,300 million in medium term notes, existing unsecured notes, and PHONES.