## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Reorganized Debtors. | Jointly Administered |
| | **Hearing Date: October 8, 2013 at 10:00 a.m. ET**<br>**Response Deadline: October 1, 2013 at 4:00 p.m. ET** |

## REORGANIZED DEBTORS' OBJECTION TO CLAIM NO. 3333 OF KEITH YOUNGE, PURSUANT TO SECTIONS 502(b) AND 558 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 3001, 3003, AND 3007

The reorganized debtors in the above-captioned chapter 11 cases (collectively, the

"Reorganized Debtors"), by and through their undersigned counsel, hereby file this objection

(the "Objection") to Claim No. 3333 of Keith Younge (the "Younge Claim") filed against

Tribune Television Company ("Tribune Television"). Tribune Television has no liability for

such claim and, for the reasons set forth in detail below, this Court may sustain this Objection as

a matter of law. A copy of the Younge Claim is attached hereto as Exhibit A.

---

[1] The Reorganized Debtors, or successors-in-interest to the Reorganized Debtors, in these chapter 11 cases, along with the last four digits of each entity's federal tax identification number, are: Tribune Company (0355); California Community News, LLC (5306); Chicago Tribune Company, LLC (3437); Chicagoland Publishing Company, LLC (3237); Chicagoland Television News, LLC (1352); forsalebyowner.com, LLC (4276); ForSaleByOwner.com Referral Services LLC (9205); Hoy Publications, LLC (2352); Internet Foreclosure Service, LLC (6550); KDAF, LLC (6969); KIAH, LLC (4014); KPLR, Inc. (7943); KRCW, LLC (1772); KSWB, LLC (7035); KTLA, LLC (3404); KTXL, LLC (3844); KWGN, LLC (5347); Los Angeles Times Communications LLC (1324); Magic T Music Publishing Company, LLC (6522); NBBF, LLC (0893); Oak Brook Productions, LLC (2598); Orlando Sentinel Communications Company, LLC (3775); Sun-Sentinel Company, LLC (2684); The Baltimore Sun Company, LLC (6880); The Daily Press, LLC (9368); The Hartford Courant Company, LLC (3490); The Morning Call, LLC (7560); TMS News and Features, LLC (2931); Tower Distribution Company, LLC (9066); Towering T Music Publishing Company, LLC (2470); Tribune 365, LLC (7847); Tribune Broadcasting Company, LLC (2569); Tribune Broadcasting Hartford, LLC (1268); Tribune Broadcasting Indianapolis, LLC (6434); Tribune Broadcasting Seattle, LLC (2975); Tribune CNLBC, LLC (0347); Tribune Direct Marking, LLC (1479); Tribune Entertainment Company, LLC (6232); Tribune Investments, LLC (6362); Tribune Media Services, LLC (1080); Tribune Media Services London, LLC (6079); Tribune ND, LLC (4926); Tribune Publishing Company, LLC (9720); Tribune Television New Orleans, Inc. (4055); Tribune Washington Bureau, LLC (1088); WDCW, LLC (8300); WGN Continental Broadcasting Company, LLC (9530); WPHL, LLC (6896); WPIX, LLC (0191); WPMT, LLC (7040); WSFL, LLC (5256); WXMI, LLC (3068). The corporate headquarters and the mailing address for each entity listed above is 435 North Michigan Avenue, Chicago, Illinois 60611.

## INTRODUCTION

The Younge Claim arises out of events that occurred on the night of May 7, 2008, Mr. Younge's tenth day of employment with WPHL-TV ("WPHL"), a television station then-operated by Tribune Television.  The facts set forth in the Younge Claim, taken together with a surveillance video that captured the events of that night, show that Mr. Younge and a co-worker, Rick Schultz, got into an altercation while at work.  Both Mr. Younge, an African-American, and Mr. Schultz, a Caucasian, were terminated by WPHL following that altercation.  Even if the Court were to accept as true that Mr. Schultz instigated the altercation by making offensive statements to Mr. Younge, it is indisputable based on the admissions in the Younge Claim that Mr. Younge escalated the altercation by stepping forward to confront Mr. Schultz and that he engaged in yelling, screaming, and cursing at Mr. Schultz.  Moreover, the surveillance video shows that Mr. Younge pursued Mr. Schultz to continue the argument even after attempts by a security officer to separate the two men.  Mr. Younge claims that he is entitled to damages because he was subjected to a hostile work environment and was discharged from his employment with WPHL because of his race.  Neither claim has merit.

Even assuming all facts asserted in the Younge Claim are true, there is simply no evidence of conduct on the part of Tribune Television or WPHL that rises to the level of actionable harassment or discrimination on the basis of race.  There is no genuine dispute of material fact warranting a trial and the Younge Claim may be decided by this Court as a matter of law.  Specifically, with respect to the hostile work environment claim, Mr. Younge cannot meet his burden to show that actionable harassment occurred or that WPHL is either directly or vicariously liable for the altercation or for the statements that Mr. Younge alleges that Mr. Schultz made to him during the altercation.  With respect to the unlawful termination claim, Mr. Younge has failed to plead a prima facie case of discrimination.  No facts are alleged, no

2

inferences can be drawn, and no evidence exists that support Mr. Younge's assertion that his termination was based on a discriminatory motive or that other similarly-situated employees were treated more favorably. Among other things, there is and can be no dispute that Mr. Schultz, the alleged harasser, was not Mr. Younge's supervisor, had no role whatsoever in the decision to terminate Mr. Younge, and was in fact himself terminated by WPHL for his conduct on the night of May 7, 2008. Even if Mr. Younge had sufficiently plead an employment discrimination claim, Mr. Younge's claim still fails because WPHL had a legitimate, non-discriminatory reason for terminating Mr. Younge's employment and Mr. Younge has failed to overcome the burden of proving that WPHL's justification is pretextual. Because the altercation, and not race, motivated WPHL's decision to terminate Mr. Younge, he cannot sustain a charge of race discrimination under applicable non-bankruptcy law. Accordingly, the Younge Claim should be disallowed and expunged.

This Objection is submitted pursuant to sections 502(b) and 558 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 3001, 3003, and 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). In support of the Objection, the Reorganized Debtors rely on the Declaration of Vincent Giannini, Vice President/General Manager of WPHL, LLC in Support of the Reorganized Debtors' Objection to Claim No. 3333 of Keith Younge (the "Giannini Declaration"), a copy of which is attached hereto as Exhibit B. In further support of the Objection, the Reorganized Debtors respectfully state as follows:

## STATUS OF THE CASE AND JURISDICTION

1.      On December 8, 2008, Tribune Company ("Tribune") and certain of its affiliates, including Tribune Television (collectively, the "Debtors"),[2] each filed a voluntary

---

[2] As used herein, the term "Reorganized Debtors" refers to the entities that became successors to the Debtors upon the Debtors' emergence from their chapter 11 cases.

46429/0001-9840563V1

petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors' chapter 11 cases have

been consolidated for procedural purposes only and are being jointly administered pursuant to

Rule 1015(b) of the Bankruptcy Rules.  (Docket Nos. 43, 2333.)

2.      On July 23, 2012, the Court entered the Order Confirming Fourth

Amended Joint Plan of Reorganization (the "Plan") for Tribune Company and Its Subsidiaries

Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital

Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A. (Docket No.

12074).[3]

3.      The Effective Date of the Plan occurred on December 31, 2012.[4]

4.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this

Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief

sought herein are sections 502(b) and 558 of the Bankruptcy Code and Bankruptcy Rules 3001,

3003, and 3007.

## PROCEDURAL BACKGROUND

5.      The Younge Claim was filed on June 1, 2009 with Epiq Bankruptcy

Solutions, LLC, the agent retained by the Debtors and the Reorganized Debtors to assist with

claims processing in these chapter 11 cases (the "Claims Agent").  The Younge Claim was

asserted against Tribune Television in the amount of $75,000.00 and is based on a complaint

filed by Mr. Younge (the "Complaint") with the Philadelphia Commission on Human Relations

---

[3] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Plan.

[4] The Plan provides that one or more Debtors may undertake Restructuring Transactions on, prior to, or after the Effective Date, which may include, without limitation, mergers, consolidations, conversions, joint ventures, restructurings, recapitalizations, dispositions, liquidations or dissolutions.  (See Plan § 5.2, Ex. 5.2 and Docket No. 12732.)  On the Effective Date, Tribune Television underwent Restructuring Transactions pursuant to which the business operations of WPHL were transferred to WPHL, LLC, a successor Reorganized Debtor.

46429/0001-9840563V1

("PCHR"), Compl. No. BMAA-7FSPL8, and the Equal Employment Opportunity Commission ("EEOC"), Charge No. 17G-2008-002190, stating that "he was subjected to a hostile work environment, discriminated against and terminated all because of his race and/or color." (See Ex. A at 9, Statement of Particulars ¶ 18). A copy of the Complaint is appended to the Younge Claim. (See Ex. A at 4, 7-9).

6.      As of the Petition Date, the PCHR had conducted a preliminary factual investigation, in which both parties participated, but had not issued any determination on the merits of the Complaint.[5]  The matter has been stayed pending the Debtors' chapter 11 proceedings.[6]  Accordingly, this Court is as well-situated as the PCHR to consider the Complaint and find that Mr. Younge has failed to establish a claim based on either hostile work environment or employment discrimination and that Tribune Television is entitled to have this Objection sustained as a matter of law.

## FACTUAL BACKGROUND TO THE YOUNGE CLAIM

7.      For purposes of this Objection, the following facts are relevant and are believed to be undisputed.  Because this Court will view the facts in the light most favorable to Mr. Younge, the Reorganized Debtors have adopted the facts regarding the altercation as they were stated by Mr. Younge to the PCHR in his Statement of Particulars, which is appended to

---

[5] The Complaint was dual-filed with the EEOC.  As described in the EEOC's letter to Mr. Younge, appended to the Younge Claim at 5-6, the EEOC would refrain from any processing of the charge until such time as the PCHR completed its processing and issues final findings and orders.  Based on these procedures, the Reorganized Debtors understand that the EEOC has not taken any action on the Complaint to date.

[6] The Reorganized Debtors have been informed by counsel for Mr. Younge that on or about July 12, 2013, the PCHR dismissed the Complaint and issued a right-to-sue letter to Mr. Younge.  The Reorganized Debtors have not been served with or provided with a copy of the dismissal or the right-to-sue letter.  However, because Mr. Younge's claim accrued prior to the Petition Date and has been discharged pursuant to the terms of the Plan and sections 524 and 1141(d) of the Bankruptcy Code, Mr. Younge's sole remedy is to pursue the Younge Claim in this Court.  See, e.g., Carter v. Safety-Kleen Corp., 2007 U.S. Dist. LEXIS 29484 *16 (S.D.N.Y. Mar. 14, 2007) ("That the EEOC issued a right to sue letter to Carter on August 9, 2006 – well after SKC's reorganization plan was confirmed – is irrelevant.  Carter must pursue his claim before the Bankruptcy referee or not at all.") (internal citations omitted).

46429/0001-9840563V1

the Younge Claim.  (See Ex. A at 8-9.)  In addition, the Reorganized Debtors rely on the

Giannini Declaration, which includes a recitation of the salient facts that were provided by

WPHL to the PCHR in connection with its review of the Complaint.  As described in the

Giannini Declaration, as part of WPHL's contemporaneous investigation into the altercation,

WPHL's personnel reviewed the surveillance camera video from the night of May 7, 2008.  (See

Giannini Decl. ¶¶ 8-9.)[7]

### A.  Background Regarding WPHL

8.      WPHL is a television station that broadcasts in Philadelphia,

Pennsylvania.  (See Giannini Decl. ¶ 4.)  WPHL employs, among others, technicians who work

to ensure that its programming is broadcast without incident.  (Id.)  These technicians perform

such work as master control and tape editing.  (Id.)  The technicians are union organized and are

represented by the International Brotherhood of Electrical Workers, Local Number 98 (the

"Union").  (Id.)

9.      In anticipation of technicians taking summer vacations and to ensure

adequate coverage during those vacations, WPHL hires one or more part-time summer relief

technicians each year.  (See Giannini Decl. ¶ 5.)  A summer relief technician is trained by his

fellow technicians to learn how to perform their job functions while they are on vacation.  (Id.)

A summer relief technician usually covers vacations from Memorial Day through Labor Day and

works approximately two or three days per week.  (Id.)

### B.  WPHL Has Policies Prohibiting Harassment, Fighting, Profane Language, and Other Forms of Disorderly or Disruptive Conduct

10.     The technicians are subject to various workplace policies, one of which is

the Anti-Harassment Policy, which prohibits any employee from harassing another because of

---

[7] The Reorganized Debtors intend to introduce the surveillance video as evidence in support of this Objection at any evidentiary hearing scheduled by this Court on the Objection.

46429/0001-9840563V1

the employee's race (among other reasons).  (See Giannini Decl. ¶ 6.)  A copy of the Anti-

Harassment Policy is attached hereto as Exhibit C.  The policy states that disciplinary action,

including discharge, could be taken against those who violate the policy.  (Id.; see also Ex. C at

1.)  Another policy is the Standards of Conduct and Corrective Action which prohibits, among

other types of behavior, fighting or threatening behavior, disorderly or disruptive conduct, and

inappropriate or profane language.  A copy of the Standards of Conduct and Corrective Action

are attached hereto as Exhibit D.  Here, too, employees who violate the policy are subject to

discipline, up to and including discharge.  (See Giannini Decl. ¶ 6; see also Ex. D.)[8]

### C. Mr. Younge's Employment With WPHL

11.    Mr. Younge began his employment with WPHL on or about April 15,

2008, as a summer relief technician.  (See Ex. A at 8, Statement of Particulars ¶ 1.)[9]  Michael

Hort, Engineering Manager, was Mr. Younge's immediate supervisor.  (Id.)  Mr. Younge was on

a 30-day probation period and was training 3-4 days per week.  (See Ex. A at 8, Statement of

Particulars ¶ 2.)[10]  Mr. Younge was not a permanent, full-time employee (id.) and no

employment contract governed his employment.  (See Giannini Decl. ¶ 7.)  Mr. Younge was not

a member of the Union.  (Id.)  During his first week of employment, Mr. Younge trained with

technician Sandy Kerr (Caucasian) on how to operate master control and with technician Steve

Leff (Caucasian) on how to operate tape prep on second shift.  (Id.)  On May 7, 2008, his tenth

---

[8] WPHL also has a company policy prohibiting employment discrimination on the basis of race (among other factors).  (See Giannini Decl. ¶ 6.)

[9] WPHL's records indicate that Mr. Younge was hired on April 21, 2008 (see Giannini Decl. ¶ 7); however, the date is not material to this Objection.

[10] As noted above, the Statement of Particulars reflects the relevant facts and version of events as stated by Mr. Younge to the PCHR in support of his Complaint.

day of training, Mr. Younge was assigned to train with Rick Schultz (Caucasian) on how to operate tape prep on third shift.[11]  (Id.)

12.    When Mr. Younge reported for work on the night of May 7, 2008, he placed his briefcase on the table in tape prep and went next door to master control to say hello to Mr. Kerr.  (See Ex. A at 8, Statement of Particulars ¶ 3)  Mr. Kerr told Mr. Younge to let him know the next day if he had any problems with his shift with Mr. Shultz.  (See Ex. A at 8, Statement of Particulars ¶ 3 ("the Complainant stated that Sandy [Kerr], Master Controller, told him if you run into any trouble tonight, make sure you tell me tomorrow.")).  Mr. Younge asked Mr. Leff why Mr. Kerr had made that statement, and whether Mr. Schultz had a problem with him.  (Id. at ¶ 4.)  Mr. Leff responded "no," that Mr. Schultz "just had a problem."  (Id.)

### D.  Mr. Younge's Altercation With Mr. Schultz

13.    When Mr. Schultz entered the tape prep room to begin training Mr. Younge, he looked at Mr. Younge's briefcase on the table and said, "Hey, Spike, you want to get this off the table?"  (See Ex. A at 8, Statement of Particulars ¶ 5.)  According to Mr. Younge, he thought that Mr. Schultz might have forgotten his name and so he introduced himself to Mr. Schultz.  (See id. at ¶ 6.)  Mr. Schultz again called him "Spike," apparently in reference to African-American film director Spike Lee.  (See id. at ¶ 7 ("Shultz responded "as far as am concern [sic] you are Spike Lee.")).

14.    Rather than disengage and simply report Mr. Schultz, at that point, Mr. Younge admitted that he "walked over to Schultz" and confronted him, telling him, "I told you what my name is."  (See id.)  This confrontation "escalated to a lot of yelling and screaming by both parties."  (Id.)  During the altercation, according to Mr. Younge, Mr. Schultz said, "why

---

[11] Mr. Schultz had been employed by WPHL-TV for approximately 34 years.

don't you take that [expletive] back to the ghetto, hommie." (See id. at ¶ 8.)  In Mr. Younge's

words, the "conversation got very heated." (See Ex. A at 8-9, Statement of Particulars ¶ 9.)

Mr. Younge has admitted that he cursed at Mr. Schultz during the altercation.  (Ex. A at 9,

Statement of Particulars ¶ 15.)

       15.     Both the Complaint and the surveillance video show that at some point

during the altercation, Mr. Schultz left the tape prep room and went into the master control room

down the hall.  (See Ex. A at 8-9, Statement of Particulars ¶ 9; Giannini Decl. ¶ 9 (describing the

surveillance video from the night of May 7, 2008)).  Mr. Younge's Complaint omits, but the

surveillance video shows, that Mr. Schultz briefly returned to the tape prep room and then left

again.  (See Giannini Decl. ¶ 9 (describing the surveillance video from the night of May 7,

2008)).  At that point, Mr. Younge pursued Mr. Schultz and the altercation continued in the

hallway outside the tape prep room.  (Id.)

       16.     The altercation between Messrs. Younge and Schultz was serious enough

that Security Officer Ed Rivera (Hispanic) was called.  (See Ex. A at 9, Statement of Particulars

¶ 10; Giannini Decl. ¶ 9 (describing the surveillance video from the night of May 7, 2008)).

Officer Rivera arrived on the scene and escorted Mr. Younge back into the tape prep room,

placing himself between them.  (Giannini Decl. ¶ 9 (describing the surveillance video from the

night of May 7, 2008)).  However, Mr. Younge maneuvered around Officer Rivera and again

confronted Mr. Schultz, approaching within mere inches.  (Id.)  As Mr. Schultz backed up

towards the door of the tape prep room and put his hands defensively in front of his chest,

Mr. Younge continued to step forward towards Mr. Schultz to continue the argument.  (Id.)

Throughout the incident, Officer Rivera repeatedly intervened, placing himself between the two

46429/0001-9840563V1

men, placing a hand on or near Mr. Younge's chest, and ultimately putting both of his hands on

Mr. Younge to move him away from Mr. Schultz.  (Id.)

17.      Eventually, Officer Rivera escorted Mr. Younge outside the building and

into the parking lot.  (See Ex. A at 9, Statement of Particulars ¶ 10.)  While in the parking lot,

Mr. Younge spoke on the telephone with Ed Elias (Caucasian) the Technician-in-Charge.  (Id. at

¶¶ 10-11.)  Mr. Younge explained to Mr. Elias his version of what had happened that night.  (Id.

at ¶ 11.)  Mr. Elias told Mr. Younge to contact Human Resources in the morning.  (Id. at ¶ 12.)

### E.  WPHL Immediately Investigated the Altercation and Both Mr. Younge And Mr. Schultz Were Discharged For Their Altercation

18.      Beginning the following day, Human Resource Coordinator Shalona

Douglas (African-American) spoke with Mr. Younge, Mr. Schultz, and the other witnesses to the

incident.  (See Giannini Decl. ¶ 8; Ex. A at 9, Statement of Particulars ¶ 13 (describing how Mr.

Younge spoke with Ed Elias, Michael Hort, and "someone in human resources" regarding the

altercation)).  As part of her investigation, Ms. Douglas reviewed a copy of the surveillance

camera video from that night.  (See Giannini Decl. ¶ 8.)  Ms. Douglas completed her

investigation on May 12, 2008.  (Id.)  She then presented her findings to Mr. Giannini, WPHL's

Vice President/General Manager.  (Id.)

19.      Mr. Giannini reviewed the investigation findings and determined that both

men had violated WPHL's Anti-Harassment Policy and/or its Standards of Conduct and that

their actions could not be tolerated in the workplace.  (See Giannini Decl. ¶ 10.)  As a result, Mr.

Giannini decided that both men should be discharged.  (Id.)  By letters dated May 15, 2008, Mr.

Younge and Mr. Schultz were each informed of their respective employment termination based

on their violations of WPHL's Anti-Harassment Policy and/or Standards of Conduct.  (Id.; see

also Ex. A at 9, Statement of Particulars ¶ 17 (describing how Mr. Younge was informed by Mr.

10

Hort that, "after their investigation, they concluded that [Mr. Younge] had violated the code of

conduct, and they were terminating his relationship with the company")).  Copies of the May 15,

2008 letters are attached hereto as Exhibit E.

## BASIS FOR OBJECTION

20.    A "claim" for bankruptcy purposes means a "right to payment", whether

or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured,

unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.  11 U.S.C. § 101(5).

21.    Section 502(b) of the Bankruptcy Code provides in pertinent part:

> [I]f such objection to a claim is made, the court, after notice and a
> hearing, shall determine the amount of such claim in lawful
> currency of the United States as of the date of the filing of the
> petition, and shall allow such claim in such amount, except to the
> extent that—
>> (1)    such claim is unenforceable against the debtor and
>> property of the debtor, under any agreement or applicable
>> law for a reason other than because such claim is
>> contingent or unmatured . . . .

11 U.S.C. § 502(b)(1).  Section 502(b)(1) recognizes the settled principle that "[c]reditors'

entitlements in bankruptcy arise in the first instance from the underlying substantive law creating

the debtor's obligation, subject to any qualifying or contrary provisions of the Bankruptcy

Code." Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co., 549 U.S. 443, 450-51 (2007)

(citing Raleigh v. Ill. Dep't of Revenue, 530 U.S. 15, 20 (2000)).  A claim against the bankruptcy

estate, therefore, "will not be allowed in a bankruptcy proceeding if the same claim would not be

enforceable against the debtor outside of bankruptcy." In re Combustion Eng'g, Inc., 391 F.3d

190, 245 (3d Cir. 2004).  In proceedings to determine whether a claim is enforceable against the

estate, "[t]he estate shall have the benefit of any defense available to the debtor as against any

entity other than the estate, including statutes of limitation, statutes of frauds, usury, and other

personal defenses" pursuant to section 558 of the Bankruptcy Code.  See 11 U.S.C. § 558.

11

22.     Here, Mr. Younge has failed to plead a valid <u>prima facie</u> case of hostile

work environment or wrongful termination based on discrimination, which in itself is sufficient

grounds for this Court to disallow and expunge the Younge Claim.  In addition, even if Mr.

Younge had (or could have) alleged facts to establish a <u>prima facie</u> case for employment

discrimination, the facts as set forth herein, in the Complaint, and in the Declaration demonstrate

that WPHL terminated both Mr. Younge and Mr. Schultz for violating WPHL's policies against

harassment, fighting, profanity, and other disorderly and disruptive conduct.  Mr. Younge's

admissions to an altercation with Mr. Schultz support that WPHL had cause to terminate him,

and he has not alleged any fact or raised any inference that WPHL's reasons for terminating him

were pretextual and instead based on his race.  Therefore, because WPHL had a legitimate, non-

discriminatory, and non-pretextual reason for terminating Mr. Younge, Mr. Younge cannot

support a claim of employment discrimination and the Objection may be sustained as a matter of

law on that ground as well.

## A.  <u>Legal Standards Applicable To The Younge Claim</u>

23.     Mr. Younge characterizes his Complaint as arising under Title VII of the

Civil Rights Act of 1964, 42 U.S.C. §§ 2000e <u>et seq.</u>, and section 9-1103(A)(1) of the

Philadelphia Code,[12] and "Pennsylvania statutory and common law."[13]  (<u>See</u> Ex. A at 1, 4.)  Title

---

[12] The Philadelphia Fair Practices Ordinance ("<u>PFPO</u>"), section 9-110 <u>et seq.</u> of the Philadelphia Code prohibits employment discrimination on the basis of, <u>inter alia</u>, race, ethnicity, color, or national origin.  <u>See generally</u> Phila. Code §§ 9-1103(1)(a) (prohibiting employment discrimination); 9-1105 (providing for administrative remedies); 9-1112-1118 (providing procedures for raising and adjudicating claims under the PFPO).  The PFPO provides for administrative procedures and remedies before the PCHR.  However, as noted above in footnote 6, on or about July 12, 2013, the PCHR dismissed Mr. Younge's Complaint and issued a right-to-sue letter.  Therefore, the provisions of the PFPO are no longer applicable to the Younge Claim and are not addressed herein.

[13] The Pennsylvania law prohibiting employment discrimination is the Pennsylvania Human Relations Act ("<u>PHRA</u>"), 43 Pa. Cons. Stat. §§ 951-963. The PHRA provides, in relevant part, that "[i]t shall be an unlawful discriminatory practice . . . For any employer because of the race, color, religious creed, ancestry, age, sex, national origin . . . of any individual or independent contractor, to refuse to hire or employ or contract with, or to bar or to discharge from employment such individual or independent contractor, or to otherwise discriminate against such individual or independent contractor with respect to compensation, hire, tenure, terms, conditions or privileges of

VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); see also Vance v. Ball State Univ., 133 S. Ct. 2434; 186 L. Ed. 2d 565, 578; __ U.S. __ (June 24, 2013). The analysis applicable to discrimination claims arising under Title VII and the PHRA is identical. See Goosby v. Johnson & Johnson Medical, Inc., 228 F.3d 313, 317 (3d Cir. 2000) (Courts in this circuit employ an identical analysis to claims arising under the PHRA and Title VII of the Civil Rights Act).

### B. Mr. Younge's Hostile Work Environment Claim Must Fail

24.    Mr. Younge's hostile work environment claim must fail because (1) he has not alleged that he was subjected to conduct sufficiently pervasive or severe enough to rise to the level of a "hostile work environment" and (2) even if harassing under the law (which it was not), he has failed to allege or provide any facts demonstrating that WPHL was negligent in permitting the alleged harassment to occur and therefore potentially liable for Mr. Schultz's conduct.

25.    In order to prevail on a hostile work environment claim, the plaintiff must show that "the work environment was so pervaded by discrimination that the terms and conditions of employment were altered." See, e.g., Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993); Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986) (imposing standard that to be actionable under Title VII, harassment must be "sufficiently severe or pervasive to alter the conditions of [the claimant's] employment and create an abusive work environment"). Courts recognize that applying Title VII to the many workplace slights and offenses that occur daily –

---

employment or contract, if the individual or independent contractor is the best able and most competent to perform the services required. 43 PA. Cons. Stat. § 955(a) (2013). The PHRA further provides that "[t]his section of the act shall not be construed to prohibit the refusal to hire or the dismissal of a person who is not able to function properly in the job applied for or engaged in." 43 Pa. Cons. Stat. § 955 (2013). As noted below, courts employ an identical analysis to claims arising under the PHRA and Title VII of the Civil Rights Act.

13

even if highly offensive – would open the floodgates to litigation, and they therefore require that harassment be "severe or pervasive" before it becomes actionable.  See, e.g., Harris v. Cobra Const., 273 Fed. App'x 193, 194-95 (3d Cir. 2008) (where owner of construction company pointed shotgun at African-American workers, told them to get back to work, and referred to them in racially derogatory terms, plaintiffs had failed to show that defendant's actions were a result of racial animosity or an intent to discriminate); Lawrence v. F.C. Kerbeck & Sons, 134 Fed. App'x 570, 572 (3d Cir. 2005) (granting summary judgment in favor of employer where single confrontation between employee and manager, during which manager made a racial remark, though "disrespectful and inexcusable," was insufficient basis for hostile work environment claim); Sherrod v. Phila. Gas Works, 57 Fed. App'x 68, 76 (3d Cir. 2003) (holding that alleged incidents, including managers making comments that "the way [two African-American clerks] were eating at their desks, it must be their culture," and that if such clerks did not do their work, "I'm going to sit at their desks with a whip," were not sufficiently severe and pervasive, even considering the comments in conjunction with other facially-neutral alleged mistreatment of the employee).[14]

26.    Here, Mr. Younge has not alleged precisely what constituted a "hostile work environment."  (See Ex. A at 9, Statement of Particulars ¶ 18 (conclusory statement that "[Mr. Younge] stated that he was subjected to a hostile work environment."))  For the purposes of this Objection, the Reorganized Debtors are assuming that Mr. Younge's hostile work environment claim is based upon the verbal and physical altercation as a whole, including the statements made by Mr. Schultz that are referenced in Mr. Younge's Statement of Particulars, i.e., calling Mr. Younge "Spike" and "Spike Lee" and saying "why don't you take that

---

[14] The Supreme Court has held that the "mere utterance of an [ethnic or racial] epithet which engenders offensive feelings in a [sic] employee does not sufficiently affect the conditions of employment to implicate Title VII."  Harris v. Forklift Svs. Inc., 510 U.S. 17, 21 (1993) (quotation omitted).

[expletive] back to the ghetto, hommie." Mr. Younge's own allegations give rise to the inference

that Mr. Schultz's statements to Mr. Younge were not motivated by racial animus.[15] Even if they

were, however, Mr. Schultz's alleged statements and the single altercation do not rise to a

sufficient level of severity or pervasiveness to constitute a hostile work environment.[16] This is

especially true given that the alleged harassment occurred over the period of less than an hour

during the course of a single altercation with a co-worker, where Mr. Younge had several

opportunities to end the confrontation (including the occasions when Mr. Schultz left the tape

prep room or when Officer Rivera arrived on the scene) but did not and instead actively

participated in and prolonged it.

27.     Even when a hostile work environment exists – which it did not here –

liability for harassment between co-workers, as opposed to harassment by a supervisor, is not

automatically imputed to the employer. Vance, 186 L. Ed. 2d at 578-79. Rather, where the

harassing employee is not a supervisor, in order to find the employer liable, the plaintiff must

prove that the employer was negligent in permitting the harassment to occur.[17] Id. at 578-79,

592-93; see also Howard v. Blalock Elec. Serv., 742 F. Supp. 2d 681, 695 (W.D. Pa. 2010)

---

[15] Mr. Younge alleged that another WPHL employee, Mr. Leff, told him that Mr. Schultz "just has a problem", and not a specific problem with Mr. Younge himself. (See Ex. A at 8, Statement of Particulars ¶ 4 ("The Complainant asked Steve [Leff] (w/m), Master Controller, by Sandy [Kerr] made that comment and Steve stated Rick Schultz (w/m) will train you tonight and he (Schultz) has a problem. The Complainant asked "with me?" and Steve responded, "no, he just has a problem.").

[16] See, e.g., footnote 14, supra.

[17] It is beyond dispute that Mr. Schultz was not a supervisor of Mr. Younge and so WPHL is not strictly liable for his conduct. In Vance v. Ball State University, the Supreme Court rejected the EEOC's broad interpretation of who is a "supervisor" for purposes of imposing vicarious liability on an employer under Title VII of the Civil Rights Act. Vance, 186 L. Ed. 2d at 582-84. The Court defined "supervisory" authority as the power to make "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Id. at 579 (citing Burlington Indus., Inc. v Ellerth, 524 U.S. 741, 761-62 (1998). By contrast, Mr. Schultz was a fellow technician, assigned to train Mr. Younge on one night to complete his duties in tape prep as a summer relief technician. He did not have any of the above-referenced powers over Mr. Younge's employment. (See Gianinni Dec. ¶ [].) The decision regarding both Mr. Younge's and Mr. Schultz's termination ultimately rested with Mr. Giannini, the General Manager of WPHL. (Id.)

46429/0001-9840563V1

(Where a "hostile work environment" results from harassment perpetrated by an employee's co-workers, "there is no presumption of employer liability or accompanying burden on the employer to establish an affirmative defense to liability.") (citing Andreoli v. Gates, 482 F.3d 641, 648 (3d Cir. 2007)).  In the Third Circuit, a claimant must prove the existence of respondeat superior liability.  See Kunin v. Sears Roebuck & Co., 175 F.3d 289, 293-94 (3d Cir. 1999) ("[L]iability exists where the defendant knew or should have known of the harassment and failed to take prompt remedial action.") (citing Andrews v. City of Phila., 895 F.2d 1496, 1486 (3d Cir. 1990); Howard, 742 F. Supp. 2d at 695 (same) (citing Weston v. Penn., 251 F.3d 420, 427 (3d Cir. 2001)).

28.    Here, Mr. Younge cannot prove that WPHL was negligent in permitting the alleged harassment to occur.  On the contrary, the altercation, and the statements made by Mr. Schultz during the course of the altercation, were immediately reported to WPHL's Technician-in-Charge, Mr. Elias.  (See Ex. A at 9, Statement of Particulars ¶ 11 (describing that Mr. Younge spoke on the phone with Mr. Elias after the altercation, and explained what had occurred)).  Mr. Younge also spoke to his immediate supervisor, Mr. Hort, the following day.  (See Ex. A at 9, Statement of Particulars ¶ 13.)  From there, the matter was promptly investigated by WPHL's Human Resource Coordinator, Ms. Douglas (who, as noted, is herself African-American like Mr. Younge).  Her findings were based not only on her discussions with Mr. Younge, Mr. Schultz, and other witnesses to the altercation, but also on the surveillance video that recorded the altercation.  Following that investigation, Ms. Douglas reported to WPHL's Vice President/General Manager, Mr. Giannini, who ultimately made the decision to terminate Mr. Schultz and Mr. Younge for their participation in the altercation.

16

29.     That decision was consistent with the company's policies that violation of WPHL's Anti-Harassment Policy and Standards of Conduct by its employees could result in termination, and in fact both Mr. Schultz and Mr. Younge were informed in their termination letters that their termination was based on violations of those company policies.  (See Ex. E-1 (letter to Mr. Younge, stating "We have concluded that your conduct in this incident is in violation of our Code of Conduct and Anti-Harassment policies.  For that reason, your employment with WPHL will be terminated effective May 8, 2008"), Ex. E-2 (letter to Mr. Shultz, stating "We have concluded that your conduct in this incident is in violation of our Code of Conduct and Anti-Harassment policies.  For that reason, your employment with WPHL will be terminated effective May 10, 2008")).  In sum, the altercation—including the alleged statements made by Mr. Schultz to Mr. Younge—was taken seriously and dealt with immediately by WPHL's management, in accordance with established company policies that prohibited such conduct.  Accordingly, even if Mr. Schultz's statements to Mr. Younge specifically, or the altercation generally, were sufficient to form the basis of a hostile work environment claim, which they are not, WPHL did not act negligently and thus cannot be held liable to Mr. Younge for Mr. Schultz's conduct.[18]

### C.  Mr. Younge's Employment Discrimination Claim Must Fail

**a)  Mr. Younge Has Failed To Establish A Prima Facie Case Of Employment Discrimination**

30.     In order to establish a prima facie case of employment discrimination under Title VII, Mr. Younge must either present sufficient direct evidence to create a reasonable inference that he was terminated because of his race or he must provide evidence that:

---

[18] Mr. Younge's harassment claim fails for the reasons discussed herein without the need for this Court even to reach the issue of whether WPHL has an affirmative defense thereto.  However, solely in the event that the Court declines to sustain this Objection on the multiple grounds raised herein, WPHL reserves its right to assert any applicable affirmative defenses in further support of the Objection.

17

(1) he is a member of a protected class; (2) he is qualified for the former position; (3) he suffered an adverse employment action; and (4) either non-members of the protected class were treated more favorably than the plaintiff, or the circumstances give rise to an inference of race discrimination.

See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Iqwe v. E.I. DuPont de

Nemours & Co., Civ. No. 03-839 JJF, 2005 U.S. Dist. LEXIS 1254, at *5 (D. Del. Jan. 24,

2005), aff'd, 180 Fed. App'x 353 (3d Cir. 2006).[19]

31.     Mr. Younge has failed to plead or present sufficient evidence to prove

either that similarly-situated non-members of his protected class were treated more favorably

than he was or that the circumstances give rise to an inference that he was terminated because of

his race.  Mr. Younge's Complaint includes nothing more than conclusory statements that he was

"discriminated against and terminated all because of his race and/or color."  (See Ex. A at 9,

Statement of Particulars ¶ 18.)  However, this unsupported assertion and Mr. Younge's

subjective belief of the same, without more, fail to raise any inference of discrimination.  See

Jones v. School Dist. of Phila., 198 F.3d 403, 414 (3d Cir. 1999); see also Moorer v. Verizon

Commc'ns, No. Civ. A. 03-1265, 2005 WL 2807140 at *8 (W.D. Pa. Oct. 27, 2005) ("Plaintiff's

own subjective belief that she was discriminated against, absent evidentiary support in the

records, means that she would not ultimately prevail, even if she could state a prima facie case,

under the McDonnell Douglas framework.").

32.     First, Mr. Younge has made no allegations, much less provided supporting

evidence, that WPHL treated similarly-situated employees (whether in a protected class or not)

---

[19] The Reorganized Debtors do not contest that Mr. Younge is a member of a protected class or that has established that he suffered an adverse employment action.  Therefore, these elements of the prima facie case are not questioned for the purposes of this Objection.  The Reorganized Debtors do not concede that Younge was qualified for his former position, because as of the night of May 7, 2008, Mr. Younge had only completed 10 days of employment and had not completed the training for his position as a technician, and given his misconduct that evening.  However, because Mr. Younge's claim must fail in any event because he cannot establish the fourth element of his prima facie case, WPHL does not question this element for the purposes of this Objection.

more favorably than Mr. Younge.  Even though 'similarly situated' does not mean identically situated, the plaintiff must nevertheless be similar in 'all relevant respects.'" <u>Opsatnik v. Norfolk Southern Corp.</u>, 335 Fed. App'x 220, 223 (3d Cir. 2009).   Here, the record establishes that WPHL applied its Anti-Harassment Policy and Standards of Conduct and Corrective Action even-handedly by terminating **both** Mr. Younge and Mr. Schultz for their violations of those policies on the night of May 7, 2008.  Mr. Younge cannot maintain a claim of disparate treatment under these circumstances.

33.    Second, Mr. Younge has made no factual allegations that raise any inference that his employment was terminated due to his race.  See <u>Sarullo v. U.S. Postal Serv.</u>, 352 F.3d 789, 798 (3d Cir. 2003) (to satisfy this element, the plaintiff must "establish some causal nexus between his membership in a protected class and [an adverse employment action]").  Mr. Younge has not shown and cannot show that there is a causal connection between his race and WPHL's decision to terminate his employment.  Rather, the record establishes that the sole reason for Mr. Younge's termination was that he engaged in an altercation with a co-worker in violation of the company's policies against fighting, profanity, and disorderly or disruptive conduct in the workplace.  As noted above, Mr. Schultz was not Mr. Younge's supervisor and had no role in the decision to terminate Mr. Younge's employment.[20]  As described above in ¶ 27, <u>supra</u>, the decision to terminate Mr. Younge was made by Mr. Giannini, WPHL's Vice President/General Manager, following an immediate and thorough investigation into the altercation, including a review of the surveillance video.  As noted above, Mr. Giannini decided to terminate both Mr. Younge and Mr. Schultz, which further precludes any contention of

---

[20] Moreover, Mr. Younge does not allege that any of Mr. Schultz's alleged derogatory statements during the altercation were made in the context of discussing Mr. Younge's work, competence, hiring, firing, or promotion.

46429/0001-9840563V1

purported bias. Accordingly, Mr. Younge has failed to state a prima facie case of employment discrimination.

**b) Mr. Younge Was Terminated For A Legitimate, Non-Discriminatory Reason**

34.    Even if Mr. Younge were able to establish a prima facie case of discrimination (which he cannot), WPHL had a legitimate, non-discriminatory reason for terminating him. See McDonnell Douglas, 411 U.S. at 802 (stating that once plaintiff establishes a prima facie case of discrimination, the burden shifts to the employer to provide a legitimate, non-discriminatory reason for its actions). In evaluating a Title VII claim of discrimination, the courts do not "sit as a super-personnel department that reexamines an entity's business decisions." See Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326, 332 (3d Cir. 1995) ("[O]ur role is to determine whether a factfinder could reasonably find that the employer's stated reason [for terminating the employee] is unworthy of credence.").

35.    Here, the facts establish that Mr. Younge was discharged because he violated WPHL's policies against fighting, profanity, and disorderly or disruptive conduct, and not because of his race. Mr. Younge's own version of the facts establish that he engaged in the altercation with Mr. Schultz. (See Ex. A at 8-9, Statement of Particulars ¶¶ 7, 15 (describing how Mr. Younge "walked over to Schultz"; that the statements made by Mr. Schultz were followed by "a lot of yelling and screaming by both parties"; and Mr. Younge's admission to Mr. Hort that he used profanity during the altercation)). The video of the altercation further confirms that Mr. Younge acted as an aggressor by following Mr. Schultz and repeatedly advancing towards him to within mere inches, despite having the ability to walk away from the altercation. As discussed herein, WPHL's Anti-Harassment Policy and Standards of Conduct and Corrective Action clearly prohibit such conduct in the workplace.

46429/0001-9840563V1

36.    Employee misconduct, including a violation of company policies regarding fighting, profanity, and disorderly or disruptive conduct, has consistently been upheld as a legitimate non-discriminatory reason for termination.  See, e.g., Carter v. Biomat USA, 2012 U.S. Dist. LEXIS 24591 (E.D. Pa. Feb. 23, 2012) ("Biomat's termination of both employees involved in a physical altercation on its premises pursuant to its policy is a legitimate, non-discriminatory reason, especially in light of the fact that Amato, who is Caucasian, was also terminated."); Bailey v. Commerce Nat'l Ins. Servs., Inc., 474 F. Supp. 2d 577, 586 (D. Del. 2007) (finding that the employer's termination of plaintiff for unprofessional conduct in violation of company policy, including, inter alia, using profanity, was a legitimate non-discriminatory reason for termination); Subh v. Wal-Mart Stores, Inc., No. 08–410, 2009 WL 4015649 at *10 (D. Del. Nov. 19, 2009) ("Even if [plaintiff] had made out a prima facie case [of racial discrimination], however, Wal–Mart has offered a legitimate, non-discriminatory reason for Subh's termination: his violation of its workplace violence policy.").

37.    Mr. Younge has admitted that he was informed by WPHL that his termination was based on his violation of WPHL's employment policies.  (See Ex. A at 9, Statement of Particulars ¶ 17).  Moreover, Mr. Younge has admitted to conduct that, on its face, demonstrates a violation of those policies.  (See Ex. A at 8-9, Statement of Particulars ¶¶ 7, 15 (admitting that he "walked over to Schultz" to tell him, "I told you what my name is" and that the altercation escalated thereafter; describing "yelling and screaming by both parties"; describing that Mr. Younge admitted to Mr. Hort that he cursed at Mr. Schultz during the altercation)).  Further evidence indicates that, while Mr. Schultz may have instigated the altercation by making derogatory remarks to Mr. Younge, Mr. Younge's actions escalated the situation and, despite **multiple** opportunities to cease his participation in the altercation and walk

21

away, he failed to do so.  (See Giannini Decl. ¶ 9 (describing surveillance video footage showing Mr. Younge pursuing Mr. Schultz after Mr. Schultz had walked away; Officer Rivera attempting to physically separate Mr. Younge from Mr. Schultz; Officer Rivera's moving Mr. Younge into tape prep and Mr. Younge maneuvering around Officer Rivera to resume his altercation with Mr. Schultz)).  Rather, he continued to pursue and argue with Mr. Schultz until he was physically separated from Mr. Schultz by Officer Rivera and taken outside to the parking lot.  Such conduct is inappropriate and is strictly prohibited by WPHL's policies, and Mr. Younge's dismissal was consistent with those policies.  (See Ex. C, Ex. D (each providing that violations of the policy may result in discharge)).

38.     The fact that WPHL applied its policies even-handedly and terminated both Mr. Younge and Mr. Schultz for their conduct on the night of May 7, 2008 lends further credence to the fact that Mr. Younge's termination was based on a legitimate non-discriminatory reason and was not false or pretextual.  Mr. Younge has put forward no allegations or evidence that could allow a court to conclude by a preponderance of the evidence that the legitimate non-discriminatory reason proffered by WPHL is not true.  Accordingly, Mr. Younge's employment discrimination claims must fail.

### D. Mr. Younge Has Not Supported Any Claim For Damages.

39.     Finally, even assuming that the Court were to find that Mr. Younge has been discriminated against notwithstanding Mr. Younge's failure to allege evidence in support of such a conclusion (which it cannot), the Reorganized Debtors dispute that he would be entitled to the asserted claim of $75,000.  Mr. Younge has provided no basis whatsoever for that request. The Reorganized Debtors reserve all of their rights to contest the damages sought by Mr. Younge in the Younge Claim in response to any admissible evidence Mr. Younge may put forward regarding such claim.

46429/0001-9840563V1

## NOTICE

40.    Notice of this Objection has been provided to: (i) the Office of the United States Trustee; (ii) Mr. Younge; (iii) counsel for Mr. Younge as identified on the Younge Claim; and (iv) all parties requesting notice pursuant to Bankruptcy Rule 2002, in accordance with Local Rule 2002-1(b).  In light of the nature of the relief requested herein, the Reorganized Debtors submit that no other or further notice is necessary.

## NO PRIOR REQUEST

41.    No previous application for the relief sought herein has been made to this Court or to any other court.

[Remainder of page intentionally left blank]

46429/0001-9840563V1

WHEREFORE, for the reasons set forth herein, the Reorganized Debtors respectfully request that the Court enter an order in the form submitted herewith, pursuant to section 502(b) of the Bankruptcy Code and Bankruptcy Rules 3001, 3003, and 3007, (i) disallowing and expunging the Younge Claim in its entirety; (ii) authorizing the Claims Agent to expunge the Younge Claim from the official claims register maintained in these chapter 11 cases; and (iii) granting such other and further relief as the Court deems just and proper.

Dated: Wilmington, Delaware
       September 6, 2013

Respectfully submitted,

SIDLEY AUSTIN LLP
James F. Conlan
Jonathan D. Lotsoff
Kenneth P. Kansa
Jillian K. Ludwig
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile:  (312) 853-7036

-and-

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.

By: _____
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Facsimile:  (302) 652-3117

ATTORNEYS FOR REORGANIZED DEBTORS

46429/0001-9840563V1