# EXHIBIT B

# Giannini Declaration

46429/0001-9840563V1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Reorganized Debtors. | Jointly Administered |

### DECLARATION OF VINCENT GIANNINI IN SUPPORT OF REORGANIZED DEBTORS' OBJECTION TO CLAIM NO. 3333 OF KEITH YOUNGE

I, Vincent Giannini, declare as follows:

1. I am Vice President/General Manager of WPHL, LLC (successor-in-interest to the assets and liabilities of Tribune Television Company that comprise the business and operations of WPHL-TV) ("WPHL"), one of the reorganized debtors in the above-captioned chapter 11 cases (collectively, the "Reorganized Debtors"). In this position, I am responsible for all aspects of the management of WPHL-TV.[2]

---

[1] The Reorganized Debtors, or successors-in-interest to the Reorganized Debtors, in these chapter 11 cases, along with the last four digits of each entity's federal tax identification number, are: Tribune Company (0355); California Community News, LLC (5306); Chicago Tribune Company, LLC (3437); Chicagoland Publishing Company, LLC (3237); Chicagoland Television News, LLC (1352); forsalebyowner.com, LLC (4276); ForSaleByOwner.com Referral Services LLC (9205); Hoy Publications, LLC (2352); Internet Foreclosure Service, LLC (6550); KDAF, LLC (6969); KIAH, LLC (4014); KPLR, Inc. (7943); KRCW, LLC (1772); KSWB, LLC (7035); KTLA, LLC (3404); KTXL, LLC (3844); KWGN, LLC (5347); Los Angeles Times Communications LLC (1324); Magic T Music Publishing Company, LLC (6522); NBBF, LLC (0893); Oak Brook Productions, LLC (2598); Orlando Sentinel Communications Company, LLC (3775); Sun-Sentinel Company, LLC (2684); The Baltimore Sun Company, LLC (6880); The Daily Press, LLC (9368); The Hartford Courant Company, LLC (3490); The Morning Call, LLC (7560); TMS News and Features, LLC (2931); Tower Distribution Company, LLC (9066); Towering T Music Publishing Company, LLC (2470); Tribune 365, LLC (7847); Tribune Broadcasting Company, LLC (2569); Tribune Broadcasting Hartford, LLC (1268); Tribune Broadcasting Indianapolis, LLC (6434); Tribune Broadcasting Seattle, LLC (2975); Tribune CNLBC, LLC (0347); Tribune Direct Marking, LLC (1479); Tribune Entertainment Company, LLC (6232); Tribune Investments, LLC (6362); Tribune Media Services, LLC (1080); Tribune Media Services London, LLC (6079); Tribune ND, LLC (4926); Tribune Publishing Company, LLC (9720); Tribune Television New Orleans, Inc. (4055); Tribune Washington Bureau, LLC (1088); WDCW, LLC (8300); WGN Continental Broadcasting Company, LLC (9530); WPHL, LLC (6896); WPIX, LLC (0191); WPMT, LLC (7040); WSFL, LLC (5256); WXMI, LLC (3068). The corporate headquarters and the mailing address for each entity listed above is 435 North Michigan Avenue, Chicago, Illinois 60611.

[2] I also served as Vice President/General Manager of WPHL-TV prior to its emergence from these chapter 11 cases on December 31, 2012, the effective date of the Fourth Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A., which was confirmed by the

2.  I have read the Reorganized Debtors' Objection to Claim No. 3333 of Keith Younge Pursuant to Sections 502(b) and 558 of the Bankruptcy Code, and Bankruptcy Rules 3001, 3003 and 3007 (the "Objection")[3] and am directly, or by and through the Reorganized Debtors' personnel and advisors, familiar with the information contained therein and in all exhibits attached thereto, including: the Younge Claim and its attachments (a copy of which is attached to the Objection as Exhibit A), the Anti-Harassment Policy that applies to employees of WPHL (a true and correct copy of which is attached to the Objection as Exhibit C), the Standards of Conduct and Corrective Action that applies to employees of WPHL (a true and correct copy of which is attached to the Objection as Exhibit D), and the May 15, 2008 letters advising Mr. Younge and Mr. Schultz of their respective terminations from WPHL (true and correct copies of which are attached to the Objection as Exhibit E). I am authorized to submit this declaration (the "Declaration") in support of the Objection.

3.  All matters set forth in this Declaration are based on: (a) my personal knowledge, (b) information supplied to me by the Reorganized Debtors' personnel, and (c) as to matters involving United States bankruptcy law or rules or other applicable laws, my reliance on the advice of counsel or other advisors to the Reorganized Debtors. If called upon to testify, I could and would testify competently to the facts set forth herein.

### A. Background Regarding WPHL

4.  WPHL-TV is a television station that broadcasts in Philadelphia, Pennsylvania. WPHL-TV employs, among others, technicians who work to ensure that its programming is broadcast without incident. These technicians perform such work as master

---

Bankruptcy Court on July 23, 2012 (see Docket No. 12074). As used herein, the term "Debtors" refers to Tribune Company and its affiliates, including Tribune Television Company, that filed voluntary petitions for relief under chapter 11 on December 8, 2008, and "Reorganized Debtors" refers to the successors to the Debtors following their emergence from chapter 11.

[3] Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Objection.

control and tape editing. The technicians are union organized and are represented by the International Brotherhood of Electrical Workers, Local Number 98 (the "Union").

5. In anticipation of technicians taking summer vacations and to ensure adequate coverage during those vacations, WPHL hires one or more part-time summer relief technicians each year. A summer relief technician is trained by his fellow technicians to learn how to perform their job functions while they are on vacation. A summer relief technician usually covers vacations from Memorial Day through Labor Day and works approximately two or three days per week.

### B. WPHL Has Policies Prohibiting Harassment, Fighting, Profane Language, and Other Forms of Disorderly or Disruptive Conduct

6. The technicians are subject to various workplace policies, one of which is the Anti-Harassment Policy, which prohibits any employee from harassing another because of the employee's race (among other reasons). The policy states that disciplinary action, including discharge, could be taken against those who violate the policy. Another policy is the Standards of Conduct and Corrective Action which prohibits, among other types of behavior, fighting or threatening behavior, disorderly or disruptive conduct, and inappropriate or profane language. Here, too, employees who violate the policy are subject to discipline, up to and including discharge. WPHL also has a company policy prohibiting employment discrimination on the basis of race (among other factors).

### C. Mr. Younge's Employment With WPHL

7. WPHL's records indicate that Mr. Younge was hired on or about April 21, 2008, as a summer relief technician. Michael Hort, Engineering Manager, was Mr. Younge's immediate supervisor. Mr. Younge was on a 30-day probation period and was training 3-4 days per week. Mr. Younge was not a permanent, full-time employee and no employment contract

governed his employment. Mr. Younge was not a member of the Union. During his first week of employment, Mr. Younge trained with technician Sandy Kerr (Caucasian) on how to operate master control and with technician Steve Leff (Caucasian) on how to operate tape prep on second shift. On May 7, 2008, his tenth day of training, Mr. Younge was assigned to train with Rick Schultz (Caucasian) on how to operate tape prep on third shift.[4]

### D.  Mr. Younge's Altercation With Mr. Schultz and WPHL's Investigation

8.  On or about May 8, 2008, I was informed of an altercation that had occurred between Mr. Younge and Mr. Schultz during their shift the night before. On or about May 12, 2008, I spoke with Shalona Douglas, WPHL's Human Resource Coordinator, regarding the results of her investigation into the particulars of the altercation, based on her discussions with Mr. Younge, Mr. Schultz, and other witnesses to the altercation and her review of a copy of the video from the surveillance camera located outside the door to the tape prep room from the night of May 7, 2008.

9.  I reviewed the WPHL surveillance camera video from May 7, 2008, which shows the following events:[5]

- At the outset of the video, Mr. Younge is shown arriving at the tape prep room.

- Mr. Younge can be seen walking back and forth in the tape prep room.

- At approximately 15 seconds into playback, Mr. Schultz arrives at the tape prep room.

- At approximately 17 seconds into playback, Mr. Schultz leaves the tape prep room and enters the master control room down the hall (located at the top of the screen).

---

[4] Mr. Schultz had been employed by WPHL-TV for approximately 34 years.

[5] A true and correct digital copy of the surveillance camera video footage from the night of May 7, 2008 has been maintained and stored on a "flash drive" storage device by WPHL's in-house legal counsel pending the resolution of the dispute underlying the Younge Claim. To the best of my information, knowledge and belief, the video camera was in proper working order on May 7, 2008. The surveillance camera video footage has not been edited or modified in any way from the original. The video camera does not record audio.

- At approximately 35 seconds into playback, Mr. Younge leaves the tape prep room and walks in the opposite direction down the hall.

- At approximately 37 seconds into playback, Mr. Younge returns to the tape prep room.

- At approximately 42 seconds into playback, Mr. Schultz returns to the tape prep room. Mr. Younge and Mr. Schultz can be seen talking in the tape prep room.

- At approximately 46 seconds into playback, Mr. Younge opens the door to the tape prep room. He appears be carrying a briefcase and a jacket.

- At approximately 48 seconds into playback, Mr. Schultz leaves the tape prep room and Mr. Younge follows him into the hallway. At this point, Mr. Schultz has his back to the camera and can be seen gesturing, and Mr. Younge is out of view.

- At approximately 1 minute, 3 seconds into playback, Officer Rivera can be seen walking down the hall.

- At approximately 1 minute, 7 seconds into playback, Officer Rivera doubles back and leaves the camera's view.

- At approximately 1 minute, 8 seconds into playback, Officer Rivera can be seen escorting Mr. Younge into the tape prep room. Officer Rivera stands in the doorway of the tape prep room, with Mr. Shultz outside.

- At approximately 1 minute, 10 seconds into playback, Mr. Younge maneuvers around Officer Rivera. Mr. Schultz is now just out of the camera's view. Officer Rivera's hand can be seen on or within inches of Mr. Younge's chest, between the two men.

- At approximately 1 minute, 14 seconds into playback, the parties pivot. Mr. Younge backs up. Mr. Schultz remains mostly out of the camera's view, but from what is visible, he appears to be in close proximity to Mr. Younge and Officer Rivera (within mere feet).

- At approximately 1 minute, 19 seconds into playback, Mr. Schultz walks around Mr. Younge to the door of the tape prep room. Officer Rivera is still placed between the two men, with his arm on or close to Mr. Younge's chest.

- At approximately 1 minute, 22 seconds into playback, Mr. Schultz can be seen gesturing with his hands in front of his chest.

- At approximately 1 minute, 25 seconds into playback, Mr. Younge can be seen stepping forward as Mr. Schultz backs away. Officer Rivera now places both of his hands on Mr. Younge.

5

- At approximately 1 minute, 31 seconds into playback, Officer Rivera leads Mr. Younge away from the tape prep room and down the hall.

- At approximately 1 minute, 33 seconds into playback, the video ends.

10. Based on my review of the investigation findings and the surveillance camera video, I determined that both Mr. Younge and Mr. Schultz had violated WPHL's Anti-Harassment Policy and/or its Standards of Conduct and that their actions could not be tolerated in the workplace. As a result, I decided that both men should be discharged. By letters dated May 15, 2008, Mr. Younge and Mr. Schultz were each informed of their respective employment termination based on their violations of WPHL's Anti-Harassment Policy and/or Standards of Conduct.

[Remainder of Page Intentionally Left Blank]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 4 day of September, 2013.

By: Vincent Giannini