<u>**EXHIBIT C**</u>

**OPENING BRIEF OF APPELLANT**

<u>**U.S. FOODSERVICE, INC. V. TRUCK DRIVERS & HELPERS LOCAL UNION NO. 355 HEALTH & WELFARE FUND**</u>

**RECORD NO. 12-1108**

IN THE

# 𝕌nited 𝕊tates 𝕔ourt of 𝔸ppeals

### FOR THE FOURTH CIRCUIT

U.S. FOODSERVICE, INC.,

*Plaintiff-Appellee,*

v.

TRUCK DRIVERS & HELPERS LOCAL UNION NO. 355
HEALTH & WELFARE FUND,

*Defendant-Appellant,*

and

TRUCK DRIVERS & HELPERS LOCAL 355 RETIREMENT
PENSION PLAN; TRUSTEES OF THE TRUCK DRIVERS &
HELPERS LOCAL UNION NO. 355 RETIREMENT PENSION PLAN;
TRUSTEES OF THE TRUCK DRIVERS & HELPERS
LOCAL UNION NO. 355 HEALTH AND WELFARE FUND;
BENEFITS ADMINISTRATION CORPORATION, INC.

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND AT BALTIMORE
(HONORABLE J. FREDERICK MOTZ, PRESIDING)

## OPENING BRIEF OF APPELLANT

Paul D. Starr
Corey S. Bott
Meghan Horn
ABATO, RUBENSTEIN & ABATO, PA
809 Gleneagles Court, Suite 320
Baltimore, MD 21286
(410) 321-0990
pstarr@abato.com
csbott@abato.com
mhorn@abato.com

*Counsel for Appellant*                                    March 20, 2012

LANTAGNE LEGAL PRINTING 801 East Main Street Suite 100 Richmond, Virginia 23219 (804) 644-0477
A Division of Lantagne Duplicating Services

## DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Appellant, Truck Drivers and Helpers Local Union No. 355 Health & Welfare Fund ("Health Fund"), pursuant to Fed. R. App. P. 26.1 and Local Rule 26.1, makes the following disclosure:

1.     The Health Fund is not a publicly held corporation or other publicly held entity;

2.     The Health Fund does not have any parent corporations;

3.     The Health Fund is an employee health benefit plan that exists for the purpose of providing health and welfare benefits to participants, and therefore does not issue stock;

4.     No publicly held corporation or other publicly held entity has a direct financial interest in the outcome of the litigation;

5.     The Health Fund is not a trade association.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES...............................................................iii

JURISDICTIONAL STATEMENT...............................................1

STATEMENT OF ISSUES...........................................................2

STATEMENT OF CASE................................................................2

STATEMENT OF FACTS.............................................................5

SUMMARY OF ARGUMENT.....................................................12

ARGUMENT...............................................................................14

        STANDARD OF REVIEW..............................................14

I.    THE DISTRICT COURT ERRED IN FAILING TO
    CONSIDER EVIDENCE OF COURSE OF DEALING
    AND IDENTICAL LANGUAGE IN OTHER COLLECTIVE
    BARGAINING AGREEMENTS TO SHOW THE INTENT
    OF THE PARTIES CONCERNING USF'S OBLIGATION
    TO CONTRIBUTE TO THE HEALTH FUND................................15

        A.    The Undisputed Evidence, Whereby USF, For Over
            Fifty Years, Contributed to the Health Fund Based
            on All Hours Paid to Employees, Shows the Shared
            Intent of the CBA Language......................................15

        B.    The Interpretation of and Practice Under the
            Disputed CBA Language By Other Employers
            Supports the Health Fund's Interpretation................24

II.    THE DISTRICT COURT, IN CONTRAVENTION OF
       ERISA SECTION 403(C)(2)(A)(II), ERRED IN GRANTING
       SUMMARY JUDGMENT TO USF AND AGAINST THE
       HEALTH FUND FOR THE RESTITUTION CLAIMED BY
       USF...................................................................................................28

       A.    ERISA Prohibits the Health Fund from Returning
             the Overtime Contributions, Because the Health Fund's
             Administrator Determined That Such Contributions
             Were Not Made By Mistake of Law or Fact............................29

       B.    USF Failed to Establish the Equitable Requisites
             Entitling It To Return of the Overtime Contributions..............43

III.   THE DISTRICT COURT ERRED IN RULING THAT
       USF'S CLAIMS AGAINST THE HEALTH FUND
       WERE NOT BARRED BY LACHES.................................................54

IV.    THE DISTRICT COURT ERRED IN DENYING THE
       COUNTERCLAIM FOR COLLECTION ON
       DELINQUENT CONTRIBUTIONS.................................................56

CONCLUSION......................................................................................................56

REQUEST FOR ORAL ARGUMENT...................................................................58

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Award Service, Inc. v. Northern California Retail Clerks Union
and Food Employers Joint Pension Trust Fund, 763 F.2d 1066
(9th Cir. 1985).................................................................................45

Bakery and Confectionary Union and Industrial International
Pension Fund v. Ralph's Grocery Co., 118 F.3d 1018 (4th Cir. 1997)...................22

Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan,
201 F.3d 335 (4th Cir. 2000).........................................................37, 39, 42

Bowen v. USPS, 459 U.S. 212 (1983)..............................................................18

Bricklayers and Allied Craftworkers Local 2 v. C.G. Yantch, Inc.,
316 F. Supp. 2d 130 (N.D.N.Y. 2003)........................................................54

British Motor Car Distributors Ltd. v. San Francisco Automotive Industries
Welfare Fund, 882 F.2d 371 (9th Cir. 1989)..............................................34

Brotherhood of Maint. of Way Employees v. Atchison, Topeka &
Santa Fe Ry. Co., 138 F.3d 635 (7th Cir. 1998).........................................19

Brown v. Health Care and Retirement Corp. of America,
25 F.3d 90 (2d Cir. 1994)..........................................................24, 27, 47

Cara's Notions, Inc. v. Hallmark Cards, Inc., 140 F.3d 566 (4th Cir. 1998)..........18

Carcieri v. Salazar, 555 U.S. 379, 129 S. Ct. 1058 (2009).....................................33

Cement and Concrete Workers Dist. Council Welfare Fund v.
Atlas Concrete Constr. Corp., 40 EBC 2621, 2007 WL 526621
(E.D.N.Y. 2007)....................................................................................38, 45

Chao v. Malkani, 452 F.3d 290, 297 (4th Cir. 2006)..............................................29

Chase v. Western Conference of Teamsters Pension Trust Fund,
753 F.2d 744 (9th Cir. 1985) .........................................................35, 45

Clark v. Ryan, 818 F.2d 1102 (4th Cir. 1987)...........................................23, 24, 57

Clinchfield Coal Co. v. Harris, 149 F.3d 307 (4th Cir. 1998)................................33

Connecticut Dep't of Income Maintenance v. Heckler,
471 U.S. 524 (1985)............................................................................33

Crown Cork & Seal Co., Inc. v. Teamsters Pension Fund of
Philadelphia & Vicinity, 549 F. Supp. 307 (E.D. Pa. 1982),
aff'd, 720 F.2d 661 (3d Cir. 1983)..................................................32, 33

District 29, United Mine Workers v. Royal Coal Co., 768 F.2d 588
(4th Cir. 1985)...................................................................................18

Dumac Forestry Services, Inc. v. International Brotherhood of
Electrical Workers, 814 F.2d 79 (2d Cir. 1987)....................................37, 38, 45, 49

Elliott v. Sara Lee Corp., 190 F.3d 601 (4th Cir. 1999)..........................................39

Frank L. Ciminelli Const. Co., Inc. v. Buffalo Laborers Supplemental
Unemployment Benefit Fund, 976 F.2d 834 (2d Cir. 1992).................45, 47-51, 53

Heffron v. Adamar of N.J., 270 F. Supp. 2d 562 (D.N.J. 2003).......................19, 20

Holland v. Washington Homes, Inc., 487 F.3d 208 (4th Cir. 2007)......................14

I. C. Ethridge v. Masonry Contractors, Inc., 536 F. Supp. 365
(D. Ga. 1982)............................................................................33, 34, 36

Keffer v. H.K. Porter Co., 872 F.2d 60 (4th Cir. 1989)...............................18-21, 55

Kemmis v. McGoldrick, 706 F.2d 993 (9th Cir. 1983)………………………….…..23

Metric Constructors, Inc. v. Nat'l Aeronautics & Space Admin.,
169 F.3d 747 (Fed. Cir. 1999).................................................................20

Miller Elevator Co., Inc. v. United States, 30 Fed. Cl. 662 (1994)........................16

New England Healthcare Employees Welfare Fund v. iCare
Management, LLC, 2009 WL 3571311, 47 Empl. Benefits Cas.
(BNA) 2727 (D. Conn. 2009)...................................................................25

Old Colony Trust Co. v. City of Omaha, 230 U.S. 100 (1913)...............................15

Teamsters Industrial Employees Welfare Fund v. Rolls Royce
Motor Cars, Inc., 989 F.2d 132 (3d Cir. 1993).........................................................20

Teamster's Local 348 Health & Welfare Fund v. Kohn Beverage Co.,
749 F.2d 315 (6th Cir. 1984)...................................................................................34

Teamsters Local 639-Employers Health Trust v. Cassidy Trucking,
646 F.2d 865 (4th Cir. 1981).............................................................................44-45

Transportation-Communication Employees Union v. Union Pacific
Railroad Co., 385 U.S. 157 (1966).........................................................................18

United Kingdom of Great Britain and Northern Ireland v. Northstar
Services Ltd., 1 F. Supp. 2d 521 (D. Md. 1998).....................................................16

Washington Area Carpenters' Welfare Fund v. Overhead Door Co.
of Metropolitan Washington, 681 F.2d 1 (D.C. Cir. 1982)....................................57

Whitworth Bros. Storage Co. v. Cent. States, Se. & Sw. Areas
Pension Fund, 794 F.2d 221 (6th Cir. 1986), cert. denied,
479 U.S. 1007 (1986)..................................................................................31, 37, 54

## STATUTES AND REGULATIONS

28 U.S.C. § 1291..................................................................................................1, 4

28 U.S.C. § 1331.....................................................................................................1

28 U.S.C. § 1367.....................................................................................................1

29 U.S.C. § 1001...................................................................................................24

29 U.S.C. § 1002................................................................................................7, 29

29 U.S.C. § 1102.....................................................................................................7

29 U.S.C. § 1103............................................................................................*passim*

29 U.S.C. § 1104...................................................................................7, 32, 36, 57

29 U.S.C. § 1132...................................................................................1, 2, 56

29 U.S.C. § 1145.......................................................................................3, 56

**OTHER AUTHORITIES**

ERISA Advisory Opinion 95-24A (U.S. Dept of Labor, 1995)..............................37

The Random House Dictionary of the English Language 542 (2d ed. 1987).........34

## JURISDICTIONAL STATEMENT

**1.    Subject-Matter Jurisdiction in the District Court.**

Appellee, U.S. Foodservice, Inc. ("USF"), brought the action that is the subject of this appeal under Section 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, and under federal common law.  Joint Appendix ("JA") 11.  USF invoked subject-matter jurisdiction in the district court under 28 U.S.C. §§ 1331 and 1367, 29 U.S.C. § 1132, and federal common law. JA 11.  Truck Drivers and Helpers Local Union No. 355 Health & Welfare Fund ("Health Fund") brought its counterclaim pursuant to ERISA Section 502(f), 29 U.S.C. § 1132(f).

**2.    Appellate Jurisdiction.**

This Court has jurisdiction over appeals from all final orders of the district courts of the United States pursuant to 28 U.S.C. § 1291.  The district court order dated June 21, 2010, when combined with the order dated December 23, 2011, is a final order.  Therefore, appellate jurisdiction over this matter exists under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

I.    DID THE DISTRICT COURT ERR IN FAILING TO
      CONSIDER EVIDENCE OF COURSE OF DEALING
      AND IDENTICAL LANGUAGE IN OTHER
      COLLECTIVE BARGAINING AGREEMENTS TO
      SHOW THE INTENT OF THE PARTIES
      CONCERNING USF'S OBLIGATION TO
      CONTRIBUTE TO THE HEALTH FUND.

II.   DID THE DISTRICT COURT, IN CONTRAVENTION
      OF ERISA SECTION 403(C)(2)(A)(II), ERR IN
      GRANTING SUMMARY JUDGMENT TO USF AND
      AGAINST THE HEALTH FUND FOR THE
      RESTITUTION CLAIMED BY USF.

III.  DID THE DISTRICT COURT ERR IN RULING THAT
      USF'S CLAIMS AGAINST THE HEALTH FUND
      WERE NOT BARRED BY LACHES.

IV.   DID THE DISTRICT COURT ERR IN DENYING THE
      HEALTH FUND'S COUNTERCLAIM FOR
      COLLECTION OF DELINQUENT CONTRIBUTIONS.

## STATEMENT OF CASE

On February 5, 2009, USF filed an action in the District Court for the

District of Maryland against the Health Fund, as well as against Truck Drivers and

Helpers Local 355 Retirement Pension Fund ("Pension Fund"), the Funds' boards

of trustees, and the Funds' third-party administrator.  JA 10-24.  Counts I and III of

the Complaint, claiming relief under ERISA Section 403, 29 U.S.C. § 1103 and

brought pursuant to ERISA Section 502(a), 29 U.S.C. § 1132(a), alleged that USF

2

mistakenly paid certain contributions to the Funds.  Id.[1]  Counts II and IV, brought under a federal common law unjust enrichment theory, sought return of the same allegedly overpaid contributions.  Id.

On April 9, 2009, the Funds filed a Counterclaim against USF.  JA 25-44. Count 1 of the Counterclaim asserted that USF, in violation of Section 515 of ERISA, 29 U.S.C. § 1145, failed to make certain required contributions to the Health Fund for the months of February 2008 through February 2009, and continuing.  JA 25-44.  Count 2 of the Counterclaim asserted that USF, also in violation of Section 515, failed to make certain required contributions to the Pension Fund for the months of February 2008 through February 2009, and continuing.  JA 25-44.

The Health Fund and USF filed cross-motions for summary judgment concerning their respective claims.  JA 78-121, 545-590, 984-1023, 1196-1213. Neither the Health Fund nor USF asserted the existence of a genuine dispute as to any material fact.  Id.

On June 21, 2010, by Memorandum Opinion and separate Order the district court granted USF's motion for summary judgment, and denied the Health Fund's motion for summary judgment.  JA 1241-1252.  The court did not specifically rule

---

[1] The contributions at issue on appeal are those made based on hours for which covered employees were paid at an overtime wage rate.

that USF was entitled to the return of any contributions.  In its Memorandum

Opinion, the district court noted:

> The parties have not briefed the issue of the specific
> amount of overpayment made to the health and pension
> funds nor have they briefed the issue of pre and post
> judgment interest.  I assume that this is a matter the
> parties can themselves resolve between them.

JA 1251.

Despite the district court's reference to repayment quoted above, in order to

preserve its right to appeal should the June 21, 2010, order be construed as a final

appealable order, in an abundance of caution the Health Fund noted an appeal of

that order to this Court pursuant to 28 U.S.C. § 1291.  See JA 6 at dkt36.  USF

thereafter moved to dismiss the appeal.  On February 3, 2011, the Court dismissed

the appeal as interlocutory.  See JA 7 at dkt41-42.

Because the district court, in its June 21, 2010, order, failed to enter

judgment with respect to any specific amounts of restitution or repayment, USF

filed a supplemental motion for summary judgment, to which the Health Fund

responded.  JA 1262-1276, 1289-1308, 1325-1348.  By order dated December 23,

2011, the district court granted USF's supplemental motion for summary

judgment.  JA 1378-1386.

## STATEMENT OF FACTS

Teamsters Local Union No. 355 ("Local 355" or "Union") is a labor organization engaged in the representation of employees in certain industries operating in parts of Maryland, Delaware and Virginia. JA 122-128. The Union, an affiliate of the International Brotherhood of Teamsters, was chartered in 1933. JA 122-128. The Union serves as the bargaining agent for employees whom it represents concerning those employees' wages, hours, and other terms and conditions of employment. JA 122-128. It engages in collective bargaining with employers, and administers and enforces collective bargaining agreements to which is it a party. JA 122-128.

Through its history, Local 355 has negotiated and been a party to over a thousand collective bargaining agreements with hundreds of employers. JA 122-128. While the terms of these collective bargaining agreements have differed, depending on variables such as the industry, employer, and size of the bargaining unit, virtually every collective bargaining agreement has included provisions concerning wages, including overtime wages, and many of these agreements have included provisions concerning health and welfare benefits and pension benefits. JA 122-128. Presently, Local 355 is a party to collective bargaining agreements with some seventy-five employers. JA 122-128.

USF supplies food and food-related equipment and supplies to restaurants and institutions throughout the United States.  It is one of the largest food service suppliers in the nation.  JA 122-128.  It operates from multiple distribution centers, including a distribution center in Severn, Maryland.  JA 122-128.  Including its predecessors, USF has operated in the Baltimore-Washington area since at least the mid-1950s.  JA 122-128.[2]

Local 355 and USF have maintained a continuing collective bargaining relationship since at least 1957.  JA 122-128.  Between 1957 and the present, Local 355 and USF have been parties to twenty separately negotiated collective bargaining agreements ("CBAs").  JA 122-128; see JA 129-336, 379-446.[3]

The Health Fund has been in existence since at least 1957.  JA 337-341. Participants in the Health Fund are employees of employers that, through a collective bargaining relationship with Local 355, are obligated to pay contributions to the Health Fund.  JA 337-341.  By virtue of its collective bargaining relationship with Local 355, USF has been a contributing employer to the Health Fund since 1957.  See JA 129-336, 379-446.

---

[2] USF's predecessors traded under various names.  JA 122-128.  References herein to USF should be read to include USF and each of its predecessors.

[3] Joint Appendix pages 129-336 and 379-446 do not contain the entire CBAs.  The following excerpts are included therein:  cover page and/or first page; provisions addressing wages, health and welfare, pension, overtime, holidays, vacations, term of agreement, and signature page.

The Health Fund is an "employer welfare benefit plan" as defined in ERISA,

29 U.S.C. § 1002(1).  JA 11.  The Health Fund is a multiemployer Taft-Hartley

trust fund established for the sole and exclusive benefit of employees of

contributing employers and their families and dependents.  JA 11; 29 U.S.C. §

186(c)(5).  It is administered by a joint board of trustees composed of equal

numbers of management and union representatives.  JA 337-341.  The Health Fund

collects monies from contributing employers, as specified in collective bargaining

agreements, and uses those monies to furnish health and welfare benefits to

participants (employees and their dependents).  JA 337-341.  The trustees are

fiduciaries of the Health Fund, and are required to discharge their duties solely in

the interest of the participants and beneficiaries.  See 29 U.S.C. §§ 1102-1104.

With respect to the Health Fund, all of the CBAs contain materially identical

language providing, as follows:

> The Company agrees to the establishment of a Health and
> Welfare Fund for the purpose of providing life, health
> and accident insurance, medical care and hospitalization
> benefits for the employees of the Company who are in
> the bargaining unit represented by Local Union Number
> 355 and such employees of the Company who are not
> within the bargaining unit represented by Local Union
> Number 355 who by mutual consent of the Company and
> the Union may be included in the Health and Welfare
> Fund, and also such of these benefits for their dependents
> as the Trustees may from time to time determine, in
> accordance with the provisions of an Agreement and
> Declaration of Trust which the Company hereby
> authorizes a Board of Trustees hereinafter provided for to

> make and execute and which Agreement and Declaration
> of Trust setting forth the rules and regulations governing
> the administration of said Fund shall be incorporated
> herein by reference thereto.

JA 129-336, 379-446. Similarly, all of the CBAs contain virtually identical

language concerning USF's obligation to make contributions to the Health Fund,

as follows:

> The Company, as of [date], agrees to pay into the Fund
> [amount] for each straight time hour or fraction thereof
> paid to each employee covered by this Agreement or by
> subsequent collective bargaining Agreements between
> the parties hereto, up to but not in excess of fifty (50)
> straight time hours in any one (1) work week in the case
> of each employee.

JA 129-336, 379-446.[4]

The Health Fund is governed by a trust agreement, see JA 342-378, which

has been in existence since at least 1957. JA 337-341. All of the CBAs have

incorporated by reference the Health Fund trust agreement. See JA 129-336, 379-

446. The trust agreement includes the following:

> Each Employer shall make contributions to the
> Trust Fund on behalf of employees for all "hours
> worked" and/or all "hours paid" as these terms
> may be employed in any collective bargaining
> agreement. The terms "hours worked" or "hours
> paid" shall mean and include from the first day
> hired through the date of termination:

---

[4] The quoted language, as indicated, has remained unchanged for all of the CBAs,
with the exception of the bracketed language. See JA 129-336, 379-446.

> All hours worked and required to be paid for
> by the Collective Bargaining Agreement;
>
> *   *   *

JA 342-378.

Employers that contribute to the Health Fund submit monthly remittance reports to it, which indicate each employee and number of hours for which the employee is paid.  JA 58, 337-341.  The employer is responsible for reporting the number of hours paid to each employee.  JA 58, 337-341.

USF completed each month's report with the number of hours of contributions to be credited to the Health Fund for each employee for that month. JA 337-341.  USF's payroll staff added the total number of hours and tendered payment, along with the remittance reports.  JA 337-341.  Remittance reports and accompanying contributions to the Health Fund were due by the fifteenth day of the month following the month in which the hours were worked.  JA 337-341, 357-358.  The Health Fund retained auditors to review the contributions submitted by employers, to ensure that employers are properly and accurately calculating and submitting their contributions.  JA 337-341.

By the time the Health Fund came into existence, Local 355 had consistently negotiated collective bargaining agreements with employers, including USF, that provided for the payment of an overtime wage rate to covered employees for certain designated hours of work.  JA 122-128.  Collective bargaining agreements

to which Local 355 was a party invariably defined the overtime rate as one-and-one-half times the normal (or basic) straight time hourly wage rate as set forth in the contracts.  JA 122-128.

Local 355 has been and is a party to collective bargaining agreements with employers other than USF that contain identical language as that in the Local 355-USF CBAs.  Specifically, Local 355 has had and continues to have collective bargaining relationships with employers wherein the health and welfare articles of the collective bargaining agreements include the terms "straight time hour" and "straight time hours."  JA 122-128.

The genesis of the term "straight time hour" as used in the health and welfare articles of these collective bargaining agreements was an attempt by the bargaining parties to make clear that, for hours 41 through 50 of an employee's basic work week (i.e., hours for which an employee was paid one-and-one-half times his normal straight-time hourly rate), the employer was not obligated to pay contributions equal to one-and-one-half times the established contribution rate.  JA 122-128.  Thus, for example, if the contribution rate was $1.00 per hour, for hours 41 through 50 the employer was obligated to pay $1.00 to the Health Fund for each of those hours, rather than $1.50, even though for those hours the employee earned one-and-one-half times his normal straight-time hourly pay rate.

In bargaining for the each of the twenty CBAs referenced herein, never did USF propose to delete, modify, or clarify the term "straight time hour" as set forth in the CBAs' health and welfare articles. JA 122-128, 337-341. Prior to 2008, USF had, for more than fifty years, consistently made contributions each month to the Health Fund for all hours paid to each covered employee, up to 50 hours in a work week. JA 122-128, 337-341.[5] It made these contributions during this period, when all of the CBAs contained the language, "up to but not in excess of fifty (50) straight time hours in any one (1) work week in the case of each employee." It made these contributions during this period, even though all or virtually all hours paid to each covered employee who worked more than forty hours in a work week were paid at the contractually-required overtime rate, not at the straight time rate. JA 122-128, 337-341. Having made contributions to the Health Fund on all hours—both straight time and overtime—paid to each employee up to fifty in a work week, prior to 2008 USF never took the position that contributions for overtime-paid hours were not required. JA 122-128, 337-341.

In this same vein, all of the CBAs have contained a grievance procedure, culminating in arbitration, that USF could have invoked if it had ever believed that

---

[5] Under the 1957 CBA, USF was obligated to make monthly contributions to the Health Fund beginning in or around October, 1957. See JA 129-137. USF stopped making monthly contributions on hours 41 through 50 in or around February, 2008. See JA 60, 62. Thus, over the fifty-plus-year period, USF made some 592 separate contributions payments to the Health Fund.

payment of contributions to the Health Fund for overtime-based hours violated the "straight time" language in the health and welfare articles.  JA 122-128.  USF never filed any such grievance.  JA 122-128.

Notwithstanding the fact that between late 1957 and early 2008 USF had consistently and without fail made contributions to the Health Fund for all hours paid to each covered employee where those hours were (1) the employee's forty-first through fiftieth hour in a workweek, and (2) paid at 1 1/2 times the employee's normal straight time hourly rate, in the fall of 2008 USF notified the Health Fund of its position that, under its newfound interpretation of the "straight time" language in the CBAs' health and welfare article, it was not obligated to make contributions on such hours.  JA 447-451.  According to USF, the notice followed its "discovery," in March of 2008, that it had been erroneously paying contributions to the Health Fund based on hours for which employees were paid at an overtime rate.  See JA 58-59.  USF has explained the basis for its assertion of erroneous contributions to the Health Fund in connection with overtime-paid hours as the result of a clerical error.  JA 452-465.

## SUMMARY OF ARGUMENT

Under cover of its conclusion that the language in the CBAs respecting contributions to the Health Fund is unambiguous, i.e., that the contribution obligation is only triggered by the payment of a straight-time wage rate, the district

court failed to examine and consider the best evidence of the contracting parties' intent: their fifty-year-long, uniform practice under that language. Especially given the principles of interpretation unique to collective bargaining agreements, as well as the purposes of ERISA, which include preserving the assets of employee welfare trust funds for the benefit of its participants and beneficiaries, the district court should not have ignored the trumpeting elephant in the room. Even a cursory evaluation of USF's conduct under the language, as well as the conduct of multiple other employers under identical contract language, results in the conclusion that the parties to the CBA, as well as the Health Fund (a third-party beneficiary of the CBA provisions in issue), intended that USF be required to pay contributions to the Health Fund on all hours—straight time and overtime—paid to each employee, up to fifty in a work week.

But even if the Court agrees with the district court that the CBA language does not require USF to contribute to the Fund for overtime-paid hours, return of the contributions is not permitted under the plain language of ERISA, since the Health Fund determined that those contributions were not made by mistake of law or fact, and that determination was neither unreasonable, nor arbitrary or capricious. Moreover, even if the Court determines that Health Fund's determination of no mistake was either unreasonable, arbitrary or capricious, under the facts of the case return of the subject contributions is nevertheless improper,

since USF failed to properly allege, much less prove, that the equities strongly favor return of the contributions, as is required given the equitable purposes for which ERISA was enacted.

In addition, the district court incorrectly concluded that USF, an "employer" under ERISA, had standing to bring an action directly under Section 502(a) of ERISA.  The law in this Circuit is clear that an employer is not among those categories of individuals or entities that may bring an action under the statute (though this Court has not had the opportunity to apply that holding to the situation here presented, where an employer seeks to redress a "violation" of ERISA Section 403(c)(2)(A)).

## ARGUMENT

### STANDARD OF REVIEW

This Court reviews the district court's summary judgment rulings de novo, applying the same standard as the district court.  Holland v. Washington Homes, Inc., 487 F.3d 208, 213 (4th Cir. 2007).

I.      THE DISTRICT COURT ERRED IN FAILING TO
        CONSIDER EVIDENCE OF COURSE OF DEALING
        AND IDENTICAL LANGUAGE IN OTHER
        COLLECTIVE BARGAINING AGREEMENTS TO
        SHOW THE INTENT OF THE PARTIES
        CONCERNING USF'S OBLIGATION TO
        CONTRIBUTE TO THE HEALTH FUND.

        A.      The Undisputed Evidence, Whereby USF, For
                Over Fifty Years, Contributed to the Health Fund
                Based on All Hours Paid to Employees, Shows the
                Shared Intent of the CBA Language.

Parties may make their contracts as they please; provided they are consistent

with the law, it is the duty of the courts to construe them, if possible, so as to

maintain them in their integrity and entirety. Post v. Bregman, 349 Md. 142, 169

(1998). Notwithstanding the district court's determination that the subject

language is clear, to discern intent, especially when language has remained in

effect of a period of time, the parties' practice is relevant if not critical:

> Generally speaking, the practical interpretation of a
> contract by the parties to it for any considerable period of
> time before it comes to be the subject of controversy is
> deemed of great, if not controlling, influence.

Old Colony Trust Co. v. City of Omaha, 230 U.S. 100, 118 (1913).

The Health Fund submits that the language at issue is susceptible of more

than one meaning, and, accordingly, it is appropriate to examine extrinsic evidence

in order to discern the parties' intention with regard to the subject language. But

whether or not language in a contract is deemed ambiguous, a court may properly

15

examine the contracting parties' course of dealing in order to determine intent.  In

refusing to examine the parties' course of dealing, the district court ignored its own

pronouncement in <u>United Kingdom of Great Britain and Northern Ireland v.</u>

<u>Northstar Services Ltd.</u>, 1 F. Supp. 2d 521 (D. Md. 1998), where it stated:

> A general principle of contract law allows for the parties'
> course of dealing to "give meaning to" the terms of a
> contract.  Restatement (Second) of Contracts § 223.
> Section 223 of the Restatement (Second) states:
>
> (1) A course of dealing is a sequence of previous conduct
> between the parties to an agreement which is fairly to be
> regarded as establishing a common basis of
> understanding for interpreting their expressions and other
> conduct.
>
> (2) Unless otherwise agreed, a course of dealing between
> the parties gives meaning to or supplements or qualifies
> their agreement.  <u>Id.</u>
>
> The Comment to § 223 further explains that … "*[t]here
> is no requirement that an agreement be ambiguous
> before evidence of a course of dealing can be shown, nor
> is it required that the course of dealing be consistent with
> the meaning the agreement would have apart from the
> course of dealing.*"  <u>Id.</u> cmt. B.

<u>Northstar</u>, 1 F. Supp. 2d at 524 (emphasis added).  <u>See also</u> <u>Miller Elevator Co.,</u>

<u>Inc. v. United States</u>, 30 Fed. Cl. 662, 688-689 (1994)(quoting with approval

comment B to Section 223).

     An examination of the course of dealing reveals the following undisputed

facts:  (1) USF was a party to all of the CBAs; (2) all of the CBAs required USF to

contribute an established amount to the Health Fund for each "straight time" hour paid to each covered employee, with a maximum contribution of 50 "straight time" hours for each work week; (3) during the term of all of the CBAs, USF made contributions to the Health Fund through a self-reporting system, whereby USF calculated the total employee-paid hours each month to determine the total contribution amount; (4) in connection with the self-reporting system for USF's payment of contributions to the Health Fund, the Health Fund periodically audited USF's payroll records to ensure that contributions were made in accordance with the CBAs and the Health Fund Trust Agreement; (5) prior to 2008, USF never claimed that its obligation to pay contributions to the Health Fund was triggered only where an employee was paid at a straight time hourly rate; (6) prior to 2008, no audit performed by the Health Fund revealed a failure by USF to remit appropriate contributions to the Health Funds for *all* hours, including overtime hours, paid to each covered employee up to 50 hours in a work week based on USF having taken the position that contributions on overtime hours were not owed.  JA 122-341, 379-446.  For an approximately fifty-year-long period, from 1957 until 2008, USF never questioned that the language in the CBAs required contributions to the Health Fund on all hours paid up to 50 in a work week.  JA 122-128, 337-

341.[6]  The half-century-long course of dealing between USF, Local 355 and Health

Fund respecting contributions to the Health Fund under identical CBA language

undercuts USF's contract interpretation argument, as the district court's

conclusion, that contributions obligation covered only straight time-paid hours.

In interpreting a contract, evidence of the parties' course of dealing is

especially relevant when the contract involved is a collective bargaining

agreement.  In Keffer v. H.K. Porter Co., 872 F.2d 60 (4th Cir. 1989), this Court,

following pronouncements by the Supreme Court, observed:

> In determining whether an employer's obligation to
> provide benefits to its retirees or their surviving spouses
> continues beyond the expiration of the collective
> bargaining agreement, we look to the parties' intent as
> expressed in their agreement.  District 29, United Mine
> Workers v. Royal Coal Co., 768 F.2d 588, 590 (4th Cir.
> 1985).  While the question therefore is primarily one of
> contract interpretation, id., *collective bargaining*
> *agreements are not interpreted under traditional rules of*
> *contract but under a federal common law of labor policy.*
> Bowen v. USPS, 459 U.S. 212, 220 [] (1983).  *Therefore,*
> *"[i]n order to interpret such an agreement it is necessary*
> *to consider the scope of other related collective*
> *bargaining agreements, as well as the practice, usage*
> *and custom pertaining to all such agreements.*"
> Transportation-Communication Employees Union v.
> Union Pacific Railroad Co., 385 U.S. 157, 161 [] (1966).

---

[6] USF is not a small business entity.  In 2007, the company had revenues of $20.2 billion, employed 27,160 employees, and was listed as the 12th largest U.S. private corporation.  See JA 466.  Fundamentally, contracting parties—especially sophisticated parties such as USF—are under a duty to read the contract and are presumed to understand it.  See Cara's Notions, Inc. v. Hallmark Cards, Inc., 140 F.3d 566, 570-571 (4th Cir. 1998).

Keffer, 872 F.2d at 62 (emphasis added).  See also Bhd. of Maint. of Way

Employees v. Atchison, Topeka & Santa Fe Ry. Co., 138 F.3d 635, 641 (7th Cir.

1998)(examining parties' practice, usage and custom "to ascertain whether the

ostensible meaning of [the collective bargaining agreement]—lucid and definitive

as it might seem—is in fact the right one.").  The practice of USF, Local 355 and

the Health Fund overwhelmingly evidences the shared understanding that USF was

obligated to pay on all hours up fifty in a work week, regardless of the nature of

the wage paid to employees for those hours.

        In a case involving the meaning of disputed collective bargaining agreement

language, the District Court for the District of New Jersey, citing to comment b of

Restatement (Second) of Contracts § 223, found it proper to consider extrinsic

evidence even where the language in issue appears unambiguous.  The court wrote:

> [I]t may be appropriate to consider extrinsic evidence
> even when the language of a particular clause or
> provision in a contract appears on its face to be free from
> ambiguity.

Heffron v. Adamar of N.J., 270 F. Supp. 2d 562, 570 (D.N.J. 2003).  Similarly, the

Court of Appeals for the Federal Circuit has stated:

> Before an interpreting court can conclusively declare a
> contract ambiguous or unambiguous, it must consult the
> context in which the parties exchanged promises.
> Excluding evidence of trade practice and custom because
> the contract terms are "unambiguous" on their face
> ignores the reality of the context in which the parties

> contracted.  That context may well reveal that the terms
> of the contract are not, and never were, clear on their
> face.  On the other hand, that context may well reveal
> that contract terms are, and have consistently been,
> unambiguous.

Metric Constructors, Inc. v. Nat'l Aeronautics & Space Admin., 169 F.3d 747, 752

(Fed. Cir. 1999).  How the parties acted, especially over a long period, reveals

what they intended their agreement to mean, as the Third Circuit noted:

> The past dealings of contracting parties pursuant to an
> agreement are probative of the parties' intent.  Evidence
> of a course of conduct is particularly compelling when it
> occurs over a substantial time period.

Teamsters Industrial Employees Welfare Fund v. Rolls Royce Motor Cars, Inc.,

989 F.2d 132, 137 (3d Cir. 1993)(internal quotation marks and citations omitted).

Here, uncontradicted evidence indicating a uniform course of dealing over

many decades indicates a mutual intention by Local 355 and USF for contributions

to be made on all hours paid for up to 50, regardless of the applicable wage rate.

USF's new theory of how the contract should be interpreted, which is at odds with

the interpretation that it, Local 355 and the Health Fund employed for over fifty

years, should fail, just as the fund's new interpretation failed in Rolls Royce.

In order to determine the appropriate meaning of the term "straight time

hours" as set out in the health and welfare provisions of all of the CBAs, that term

cannot be read in isolation.  As this Court stated in Keffer:

> [A]s with any contract interpretation, we begin by
> looking at the language of the agreement for any clear
> manifestation of the parties' intent. The intended
> meaning of even the most explicit language can, of
> course, only be understood in light of the context which
> gave rise to its inclusion.

Keffer, 872 F.2d at 62 (internal quotation marks and citations omitted). The
circumstances present when Local 355 and USF first negotiated the straight time
language in dispute are telling on the contract interpretation issue. At that time, the
1957 CBA required USF to pay employees an overtime rate for all hours worked in
excess of forty in any work week. JA 129-137. The 1957 CBA also set out
specific straight time wage rates, but did not set out specific overtime rates.
Rather, the 1957 CBA required hours worked in excess of forty in a work week to
be paid at 1 1/2 times the straight time hourly rate. JA 129-137.

With the overtime provision as a backdrop, the straight time language in the
health and welfare provisions was the parties' attempt to evidence that despite
USF's obligation to pay employees wages at a higher rate for hours worked over
forty, it was not obligated to pay a higher contribution rate for those hours. Rather,
it was obligated to pay contributions to the Health Fund for hours worked up to
fifty at the same contributions rates as it paid for the first forty hours. When
viewed in context, the straight time language, while in hindsight arguably inartfully
drafted, indeed expresses the parties' intent when they made the 1957 CBA.

In support of the district court's conclusion that evidence beyond the
language of an unambiguous collective bargaining agreement is irrelevant, it cited
to this Court's decision in <u>Bakery and Confectionary Union and Industrial
International Pension Fund v. Ralph's Grocery Co.</u>, 118 F.3d 1018 (4th Cir. 1997).
<u>See</u> JA 1247-1248. <u>Ralph's Grocery</u> supports the Health Fund's position. The
central dispute there centered on inconsistent terms of a collective bargaining
agreement, and the conflict thereby created with a related trust agreement,
concerning whether certain pension contributions were due. While, as the district
pointed out, this Court noted that the "plain meaning" of the language used in the
collective bargaining agreement governs, the Court's observation in this regard
was presented in dicta, as general background for interpretation of contract
language. <u>Ralph's Grocery</u>, 118 F.3d at 1021. Thus, this Court continued:
"Traditional rules of contract construction, however, apply to collective bargaining
agreement only when they do not conflict with federal labor law." <u>Id.</u> at 1025.
The Court then looked to practice, usage and custom, observing that the
"straightforward interpretation of the [collective bargaining agreement] is
supported by the Fund's consistent and longstanding severance pay policy." <u>Id.</u>

The Court's opinion in <u>Ralph's Grocery</u> follows the general rule that
evidence of practice, usage and custom, exemplified in the instant matter by the
longstanding history of paying contributions on all hours worked up to fifty,

regardless of the rate at which wages on those hours were paid, is relevant to the interpretation of collective bargaining agreements. Accordingly, the district court should have considered the undisputed evidence of USF's fifty-year history of making contributions to the Fund on both overtime- and straight-time-paid hours.

A second case cited by the district court to support its refusal to review course of conduct, <u>Clark v. Ryan</u>, 818 F.2d 1102 (4th Cir. 1987), is factually distinguishable from the facts here. In <u>Clark</u>, this Court, finding that the terms of a collective bargaining agreement and related trust agreement were unambiguous, refused to consider evidence of a purported oral agreement modifying the written language. In this regard the Court quoted the Ninth Circuit:

> Oral agreements between union representatives and employers regarding the meaning of a written trust fund agreement are difficult to prove. Judicial recognition of such oral statements invites collusion and controversy to the detriment of the employee beneficiaries.

<u>Clark</u>, 818 F.2d at 1105-1106 (<u>quoting</u> <u>Kemmis v. McGoldrick</u>, 706 F.2d 993, 996-997 (9th Cir. 1983)). Notably, <u>Clark</u> did not involve any course of conduct; it involved an alleged oral agreement. Unlike the facts in <u>Clark</u>, present here is a course of conduct by USF. And, indeed, a course of conduct that is not merely alleged, but that undisputedly occurred. Thus this Court's concern in <u>Clark</u>, that looking beyond the four corners of an agreement would invite collusion between employer and union, are not present here.

23

In addition, the evidence of course of conduct in this case is one that
redounded to the *benefit* of the employee-participants in the Health Fund, not to
their detriment (as was the case in Clark), since USF would owe contributions to
the Health Fund for every hour an employee was paid in the week (up to 50), not
simply on some of those hours.  Thus, reviewing course of conduct, and from such
review determining that contributions were owed on all hours, would further
ERISA's central purpose:  to ensure the well-being of employee benefit plans in
order to ensure the well-being and security of participants in and beneficiaries of
such plans.  See 29 U.S.C. § 1001(a).  Indeed, in determining the future
contributions rates the Health Fund needed in order to maintain benefits levels for
participants, the Health Fund's trustees consistently used a calculation that
assumed contributions on all hours up to fifty in a week.  See JA 1345-1360
(trustee D. White testimony that Health Fund relied on employer contributions on
all hours up to fifty in computing the contribute rate needed to maintain
appropriate funding of benefits).

        B.    The Interpretation of and Practice Under the
              "Straight Time" Language By Other Employers
              Supports the Health Fund's Interpretation.

When multiple employers in an industry uniformly interpret common
language in a collective bargaining agreement, such uniform construction is to be
given evidentiary significance by a reviewing court.  See Brown v. Health Care

24

and Retirement Corp. of America, 25 F.3d 90, 93 (2d Cir. 1994).  See also New

England Healthcare Employees Welfare Fund v. iCare Management, LLC, 2009

WL 3571311, 47 Empl. Benefits Cas. (BNA) 2727 (D. Conn. 2009)(court ruled in

favor of benefits funds in dispute over language on contribution obligation where

defendant was sole employer among dozens who paid under same language

claiming language required payment under alternative method from that paid by

other employers).

    In the case below, the district court improperly dismissed the fact that

another large employer, United Parcel Service ("UPS"), has interpreted identical

language identically to the Health Fund, Local 355, and, at least until 2008, USF.

That this employer, particularly given its size and sophistication, has for decades

paid contributions to the Health Fund on all hours paid up to 50 in a work week, is

significant in determining the intent of the language at issue in the instant case.[7]

    UPS is a large multi-national package and freight delivery company.  JA

1143-1147.  Local 355 has had a continuing collective bargaining relationship with

UPS since at least 1964.  JA 1143-1147.  The Union presented to the district court

---

[7] In addition to UPS, six other employers, though smaller than UPS and USF, have
consistently paid on all hours up to 50 under identical contract language.  See JA
340.  An eighth employer has recently taken the position that the language should
be read as USF claims it should read.  See JA 340.

the past eleven collective bargaining agreements to which UPS and Local 355 were or are parties ("355-UPS CBAs").  JA 1143-1193.[8]

UPS and the Teamsters Union each have had sizeable negotiating committees through which they bargain their agreements.  JA 1143-1147, 1158, 1165, 1169-1170, 1174-1175, 1179-1180, 1184, 1188, 1193 (indicating that for each of the eight most recent 355-UPS CBAs, UPS has had at least five and as many as seventeen individuals on its negotiating committee).

Denis Taylor was a member of the Teamsters Union's Atlantic Area Supplemental Negotiating Committee for the 1993, 1997, 2002 and 2008 355-UPS CBAs.  JA 1143-1147.  Each 355-UPS CBA contains the same "straight time" modifier with respect to UPS's obligation to contribute to the Health Fund as that contained in the CBAs between Local 355 and USF.  See JA 129-336, 379-446, 1143-1193.  UPS has consistently made, and continues to make, contributions each month to the Health Fund for all hours paid to each covered employee, up to fifty hours in a work week.  JA 1143-1147.  UPS has made these contributions even though all or virtually all hours paid to each covered employee who worked more than forty hours in a work week were paid at an overtime or premium time rate, not at the straight time rate.  JA 1143-1147.

---

[8] The tenth-listed 355-UPS CBA was to have expired in 2008.  The current agreement was actually negotiated early, during 2007, and took effect in December 2007, before the prior agreement expired.  JA 1143-1147.

A consistent interpretation of the "straight time" language to include all hours up to 50 by package delivery behemoth UPS, with its army of contract negotiators, supports the Health Fund's interpretation of the language in the instant dispute under <u>Brown</u>.  Given its size, resources, and the number of collective bargaining agreements separately bargaining over the last forty years, it is inconceivable that the straight time modifier UPS agreed to over eleven agreements simply went unnoticed.

Indeed, in an on-the-record grievance hearing between UPS and Local 355, the issue of the meaning of the language arose, albeit briefly and tangentially.  JA 1143-1147.  In 1991, Local 355, through the grievance process set forth in the 355-UPS CBA then in effect, claimed UPS had failed to remit appropriate contributions to the Health Fund.  JA 1143-1147.  At issue in that matter was the interpretation of certain language in the 355-UPS CBA concerning contributions to the Health Fund.  JA 1143-1147.  While in the 1991 case UPS did not challenge in any respect the "straight time" language, during the grievance hearing, at which multiple members of UPS management were present, the grievance panel asked Taylor about the term "straight time" as set forth in the health and welfare article:

| [Panel Chair] Guynn: | Questions of the Union.  How do you work 50 straight time hours in a week? |
| --- | --- |
| Mr. Taylor: | It's meant to mean that the Health and Welfare payments are not |

|                | paid at time and a half rates.  That at 50 hours per week -- |
|----------------|----------------|
| Mr. Guynn:     | In other words, even though it's overtime rate, its only paid on an hour instead of an hour and a half. |
| Mr. Taylor:    | That's correct. |

JA 1143-1147, 1194-1195.

Since the time of that grievance hearing, in 1991, UPS has never questioned or challenged that it was obligated to paid contributions to the Health Fund on all hours paid up to 50 in a week.  JA 1143-1147.

Where seven different employers, have consistently applied the subject language to require contributions on all paid hours, including overtime-paid hours up fifty, evidence should not only be considered, but should be accorded significance by this Court in construing the language.

II.    THE DISTRICT COURT, IN CONTRAVENTION OF ERISA SECTION 403(C)(2)(A)(II), ERRED IN GRANTING SUMMARY JUDGMENT TO USF AND AGAINST THE HEALTH FUND FOR THE RESTITUTION CLAIMED BY USF.

In its December 23, 2011, memorandum and related order, the district court, granting in toto USF's supplemental motion for summary judgment, ruled that USF was entitled to the return of the overtime contributions paid to the Health Fund.  In doing so, the district court erred in two critical ways.  First, it ignored the strict mandates in ERISA prohibiting the return of employer contributions except

under certain specified conditions.  Second, it failed to find that USF showed that the equities strongly favored return by the Health Fund of the subject contributions. The failure to meet either requirement prohibits the return of contributions.  The record below was undisputed that USF failed to satisfy either requirement.

> A.    ERISA Prohibits the Health Fund from Returning the Overtime Contributions, Because the Health Fund's Administrator Determined That Such Contributions Were Not Made By Mistake of Law or Fact.

The Health Fund is an "employee welfare benefit plan" and a "multiemployer plan" as those terms are defined in ERISA.  JA 34, 54; 29 U.S.C. § 1002(2), (37).  Title I of ERISA, titled "Protection of Employee Benefit Rights," includes Section 403.  Section 403(a) of ERISA provides that (with exceptions not applicable here) "all assets of an employee benefit plan shall be held in trust[.]"  29 U.S.C. § 1103. Section 403(c)(1), known as ERISA's anti-inurement provision, see Chao v. Malkani, 452 F.3d 290, 297 (4th Cir. 2006), provides:

> **(c) Assets of Plan Not to Inure to Benefit of Employer; Allowable Purposes of Holding Plan Assets.—**
>
> **(1)** Except as provided in paragraph (2), (3), or (4) or subsection (d) of this section, or under sections 1342 and 1344 of this title (relating to termination of insured plans), or under section 420 of title 26 (as in effect on the date of enactment of the Pension Protection Act of 2006), the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their

29

> beneficiaries and defraying reasonable expenses of
> administering the plan.

29 U.S.C. § 1103(c)(1).

Employer contributions to an employee benefit plan, including the Health

Fund, constitute assets of the plan.  See JA 354.  Thus, Section 403(c)(1), by its

plain terms, prohibits the return of employer contributions, since such action would

cause (1) the assets of the plan to inure to the benefit of the employer, and (2) a

failure by the trustees to hold the assets for the exclusive purposes of providing

benefits to participants in the plan and their beneficiaries and defraying reasonable

expenses of administering the plan.

The anti-inurement rule of Section 403(c)(1) does contain several narrow

exceptions, including an exception permitting—but not requiring—the return of

employer contributions where the contributions were made by mistake of fact or

law.  That exception, Section 403(c)(2)(A), provides:

> **(2)**(A) In the case of a contribution, or a payment of
> withdrawal liability under part 1 of subtitle E of title
> IV—
>
> (i) if such contribution or payment is made by an
> employer to a plan (other than a multiemployer plan) by
> a mistake of fact, paragraph (1) shall not prohibit the
> return of such contribution to the employer within one
> year after the payment of the contribution, and
>
> (ii) if such contribution or payment is made by an
> employer to a multiemployer plan by a mistake of fact or
> law (other than a mistake relating to whether the plan is

30

> described in section 401(a) of title 26 or the trust which is
> part of such plan is exempt from taxation under section
> 501(a) of title 26), paragraph (1) shall not prohibit the
> return of such contribution or payment to the employer
> within 6 months after the plan administrator determines
> that the contribution was made by such a mistake.

29 U.S.C. § 1103(c)(2)(A). Accordingly, the Health Fund is prohibited from

returning any contributions made to the plan by USF unless the requirements of

Section 403(c)(2)(A)(ii), pertaining to multiemployer plans, are satisfied. Most

notably here, ERISA prohibits the Health Fund from returning the overtime-based

contributions made by USF absent a determination by the Health Fund's

administrator that such contributions were made by mistake of law or fact. The

exception is both narrow and specific. The undisputed record of the case shows

that the plan administrator did not determine that the contributions remaining in

issue—the "overtime contributions"—were made by mistake or law or fact. Under

the plain language of the statute, therefore, return of the overtime contributions is

prohibited.

Notwithstanding the narrow exception to the anti-inurement rule quoted

above, the rule from Section 403(c)(1) was created to benefit employees, not

employers. See Whitworth Bros. Storage Co. v. Cent. States, Se. & Sw. Areas

Pension Fund, 794 F.2d 221, 233 (6th Cir. 1986), cert. denied, 479 U.S. 1007

(1986)("It was the primary intent of Congress that employers not benefit from the

assets of a plan."). The District Court for the Eastern District of Pennsylvania, in

Crown Cork & Seal Co., Inc. v. Teamsters Pension Fund of Philadelphia &

Vicinity, 549 F. Supp. 307 (E.D. Pa. 1982), aff'd, 720 F.2d 661 (3d Cir. 1983),

further described the intent of the statute:

> The legislative history of section 403(c)(2)(A)(ii) … does not indicate that the expansion of the circumstances under which excess contributions could be returned to employers was intended to create a right to such contributions.  The language of the statute itself is entirely permissive.  It states merely that fiduciaries are not prohibited from returning to an employer contributions made by mistake of fact or law.  Congress apparently chose not to use the word "may," a word which might suggest, arguably, a direction to the trustees to take affirmative steps to determine and return mistakenly made contributions, or direction to the Secretary of Labor to promulgate implementing regulations.  However, the use of the phrase, "are not prohibited" expresses an intent to allow, but not require the trustees to return contributions if they choose to do so, as an exception to their strict fiduciary duties to maintain the funds for the benefit of employees.
> On its face then, the statute imposes no requirement on the trustees to return mistaken contributions.  To impose such a requirement by implication would violate the underlying statutory scheme.  ERISA's primary purpose is to protect the integrity of pension funds for the benefit of employees and their beneficiaries.  To that end, fund fiduciaries are strictly required to discharge their duties solely in the interest of the participants and beneficiaries.  29 U.S.C. § 1104.  To impose a right to restitution in favor of employers could severely undermine the funds' integrity.  Mistaken contributions, once invested, may be just as essential to the funds' integrity and stability as non-mistaken contributions.  The statutory language itself recognizes this by allowing and not requiring a fiduciary to disgorge the funds.  ERISA surely did not intend to impose the risk of mistaken contributions on the funds,

particularly since the employer is in the best position to
monitor the amount of its own contributions.

Crown, 549 F. Supp. at 311-312.

In construing a statute, a court must first determine whether the statutory text

is plain and unambiguous; if it is, the court must apply the statute according to its

terms.  Carcieri v. Salazar, 555 U.S. 379, ___, 129 S. Ct. 1058, 1064 (2009)

(citations omitted).  Further, all language in the statute should be given full effect.

"In interpreting a statute, [a court] should strive to give effect to every word that

Congress has used."  Clinchfield Coal Co. v. Harris, 149 F.3d 307, 313 (4th Cir.

1998)(Murnaghan, J., concurring)(citing Connecticut Dep't of Income

Maintenance v. Heckler, 471 U.S. 524, 530 n.15 (1985)).  The plain language of

Section 403(c)(2)(A)(ii) should be strictly construed so as to avoid running afoul of

Congressional intent.[9]

--------

[9] One court has apparently written out of Section 403(c)(2)(A)(ii) the requisite
determination explicitly contained in it.  In I. C. Ethridge v. Masonry Contractors,
Inc., 536 F. Supp. 365 (D. Ga. 1982), the District Court of Georgia, finding that a
return of contributions was permitted absent a finding by a plan administrator of
mistake of law or fact, wrote:

> If section 1103(c)(2)(A) required the said finding by the
> plan administrator as a prerequisite to the return of
> overpayments many employers would be without legal
> recourse.  A plan administrator would be at liberty to
> either (1) never make the appropriate determination or

[*continued...*]

While the term "determines" as set forth in Section 403(c)(2)(A)(ii) is undefined in ERISA, and thus subject to debate as to the nature of the act by a plan administrator which constitutes a determination, there is no question that a determination requires an act or conduct.  The word "determine," a verb, means, inter alia, "to settle or decide (a dispute, question, etc.) by an authoritative or conclusive decision[;] to conclude or ascertain, as after reasoning, observation, etc."  The Random House Dictionary of the English Language 542 (2d ed. 1987).  Thus, under cardinal rules of statutory construction, the Court may not read out of Section 403(c)(2)(A)(ii) the condition precedent to a return of employer contributions by the Health Fund:  a determination by its administrator/board of

---

> (2) determine that no "contribution was made by such mistake." 29 U.S.C. § 1103(c)(2)(A).  The Court finds this outcome contrary to the intent of Congress.  Pub.L. 96-364 s 3, 94 Stat. 1209-10.

Ethridge, 536 F. Supp. at 368.  Curiously, the district court in Ethridge failed to explain what Congress's intent was in enacting Section 403(c)(2)(A)(ii), or why Congress did not mean what it said in including the administrative determination requirement.  Ethridge has been disapproved of by other courts, including those that recognize the plain language of Section 403(c)(2)(A)(ii).  See, e.g., Teamster's Local 348 Health & Welfare Fund v. Kohn Beverage Co., 749 F.2d 315, 321 (6th Cir. 1984)("The statute places the determination as to whether a mistaken contribution was made in the hands of the benefit plan administrator.").  See also British Motor Car Distributors Ltd. v. San Francisco Automotive Industries Welfare Fund, 882 F.2d 371, 374 n.3 (9th Cir. 1989)("[I]t would appear that no refund can be made under [Section 403(c)(2)(A)(ii)] without a determination by a plan administrator that a mistake has occurred.").

34

trustees of the existence of a mistake of law or fact.[10]  Here, the condition precedent to permitting a refund has not been satisfied.

The record before the Court is both clear and undisputed that at no time relevant to this action did the Health Fund's administrator or its board of trustees determine that the overtime contributions here in issue were made by mistake of law or fact.  To the contrary, the Health Fund affirmatively stated the overtime contributions were properly made.  See JA 60.

Indeed, USF did not allege the requisites of Section 403(c)(2)(A)(ii) were satisfied.  The Complaint made no assertion that (1) the Health Fund's administrator or board of trustees determined the overtime contributions were made by mistake of law or fact, or (2) the administrator or board of trustees' failure to make such a determination was arbitrary or capricious, not supported by substantial evidence, legally erroneous or an abuse of discretion.  See JA 60-63.

---

[10] This is not to say a plan administrator's determination of the existence of a mistake of law or fact must be explicitly made.  See, e.g., Chase v. Western Conference of Teamsters Pension Trust Fund, 753 F.2d 744, 752 (9th Cir. 1985)(where administrator rendered legal opinion that certain individuals should cease participation in pension plan because of their status, in administrator's opinion, as independent contractors rather than employees, opinion constituted determination of mistake).  Indeed, before the district court in the instant case the Pension Fund, by not moving for summary judgment or opposing USF's motion for summary judgment, effectively determined that the contributions relating to employees who experienced (1) work-related absences (lasting longer than 52 weeks), or (2) non-work-related short-term disability absences, were made by mistake of fact, since the documents governing the plan did not require contributions in those circumstances.

Nor did USF make such an argument following the close of discovery, in any of its summary judgment motion memoranda. The record is thus clear that the requisite condition permitting return of contributions has not been established. Accordingly, under Section 403(c)(1) and (2)(A)(ii), no return of contributions by the Health Fund is allowed.

Although the district court ruled that the contract language regarding the disputed overtime contributions is unambiguous, it failed to address whether the Health Fund administrator's interpretation of that language, and subsequent refusal to return contributions, was unreasonable. But even if this Court would disagree with the administrator's interpretation of the contract language, based on the factual landscape that informed that interpretation, coupled with the deferential standard applicable to the administrator's action, its determination that the overtime contributions were not mistakenly made should not be disturbed.[11]

---

[11] The case law questioning the intent of the plan administrator determination language in Section 403(c)(2)(A)(ii) as giving carte blanche to plan administrators (and, more specifically, to plan trustees, from whom a plan administrator ultimately takes direction) to uniformly refuse to determine the existence of a mistake, see, e.g., I. C. Ethridge v. Masonry Contractors, Inc., 536 F. Supp. 365 (D. Ga. 1982), is unfounded. The plan administrator's/trustees' decision to determine a mistake of law or fact respecting employer contributions is not unfettered; they must act in accordance with their ERISA-mandated fiduciary obligations. See 29 U.S.C. § 1104(a).

[*continued...*]

While the Health Fund's interpretation of the language in issue differs from that of USF, and indeed from that of this district court, the differing interpretations are immaterial for purposes of analysis under Section 403(c)(2)(A)(ii). The relevant inquiry for a reviewing court is whether the interpretation of the contract language adopted by the Health Fund's administrator—a fiduciary under ERISA, and therefore the entity to which deference is owed—was reasonable. "Where a plan administrator has offered a reasonable interpretation of disputed provisions, [a court] may not replace it with an interpretation of [its] own." Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan, 201 F.3d 335, 344 (4th Cir. 2000). Federal courts ordinarily should refrain from interfering with the administration of an employee benefit plan unless its trustee or administrator has acted in an arbitrary or capricious manner. Dumac Forestry Services, Inc. v. International

---

Thus, discussing a plan administrator's determination under Section 403(c)(2)(A)(ii) whether an employer payment may be returned, the U.S. Department of Labor has expressed the opinion that in such instance the plan administrator "is acting in its fiduciary capacity and is subject to the requirements of ERISA[.]" ERISA Advisory Opinion 95-24A (U.S. Dept of Labor, 1995). On this point the Sixth Circuit, in line with the DOL, has stated:

> [T]he trustee's decision [respecting the return of employer contributions] is conclusive unless arbitrary or capricious, not supported by substantial evidence, or erroneous on a question of law. This limited review is proper since a trustee who returns contributions may, as a result, face an action for breach of fiduciary duty.

Whitworth Bros., 794 F.2d at 232 n.15 (citations omitted).

Brotherhood of Electrical Workers, 814 F.2d 79, 82 (2d Cir. 1987).  "This standard

of review must be considered in conjunction with the permissive language of

[Section 403(c)(2)(A)(ii)]."  Id.

Specifically respecting return of employer contributions where a plan

administrator has determined the existence of a mistake, "[a] plan's refusal to

return the [mistakenly made] payments may be challenged if the plan's refusal to

return them is arbitrary and capricious and the balance of equities strongly favors

restitution."  Cement and Concrete Workers Dist. Council Welfare Fund v. Atlas

Concrete Constr. Corp., 40 EBC 2621, 2626, 2007 WL 526621, at *4 (E.D.N.Y.

2007)(citing Frank L. Ciminelli Const. Co., Inc. v. Buffalo Laborers Supplemental

Unemployment Benefit Fund, 976 F.2d 834, 836 (2d Cir. 1992); Dumac, 814 F.2d

at 82).[12]

The undisputed record below established substantial evidence supporting the

Health Fund administrator's determination that the overtime contributions were not

mistakenly paid.  Even if a reviewing court were to specifically conclude that,

based on its own interpretation of the agreement language, the overtime

contributions were not owed, the administrator's interpretation of the language,

---

[12] In Atlas Concrete, the court denied return of mistakenly paid contributions
where employer had failed to allege that the plan's refusal was arbitrary or
capricious.  Atlas Concrete, 40 EBC at 2626-2627, 2007 WL 526621, at *5.

and related determination regarding mistake of fact in light of that interpretation, was reasonable.[13]

The Health Fund, an employee benefit plan that exists for the purpose of providing health and welfare benefits to participants, has been in existence since at least 1957.  JA 337-341.  By virtue of its collective bargaining relationship with Local 355, USF has been a contributing employer to the Health Fund since 1957.  See JA 129-336, 379-446.

In reviewing the Health Fund administrator's decision that USF did not mistakenly pay the overtime contributions, the Court's assessment of the reasonableness of that decision must be based on facts known to the administrator at the time of the decision.  See Elliott v. Sara Lee Corp., 190 F.3d 601, 608 (4th Cir. 1999).  At the time the Health Fund's administrator determined, in January of 2009, that, in contrast to its assertions, USF had not mistakenly paid overtime

---

[13] In light of its conclusion that the subject language is unambiguous, the district court, applying the plain meaning rule, ignored the Health Fund's proffered extrinsic evidence respecting that language.  A plan administrator, however, is not charged with application, or even knowledge of, the plain meaning rule.  Rather, a plan administrator is rightly informed by, inter alia, the historical interpretations given to, and applications of, language in documents that govern an employee benefits fund.  See Booth, 201 F.3d at 342 (factors to determine reasonableness of application of language include whether fiduciary's interpretation was consistent with earlier interpretations of same language, and whether language has been consistently applied).  Such action, moreover, is countenanced under general principles of contract interpretation, even where the contract terms appears clear.  See Brief at Section I.A. and B., supra.

contributions, Local 355 and USF had been parties to twenty separately negotiated collective bargaining agreements ("CBA"). JA 122-128. Each of the twenty CBAs contained provisions addressing, among other perquisites of employment, health and welfare benefits. JA 122-128. Specifically, each of the twenty CBAs contained language obligating USF to "pay into the Fund [$_.__] for each straight time hour or fraction thereof paid to each employee covered by this Agreement or by subsequent collective bargaining Agreements between the parties hereto, up to but not in excess of fifty (50) straight time hours in any one (1) work week in the case of each employee." JA 129-336, 379-446.

Prior to 2008, when it first challenged making contributions on the overtime-paid hours, USF had, for more than fifty years, consistently made contributions, each month, to the Health Fund for all hours paid to each covered employee, up to 50 hours in a work week. JA 122-128, 337-341. USF made these contributions during this period, when each of the CBAs contained the above-quoted language. USF made these contributions during this period, even though all or virtually all hours paid to each covered employee who worked more than forty hours in a work week were paid at the contractually-required overtime rate, not at the straight time rate. JA 122-128, 337-341. Having consistently made contributions to the Health Fund on all hours—both straight time and overtime—paid to each employee up to fifty in a work week, prior to 2008 USF never took the position that contributions

for each employee on hours 41 through 50 were not required because of the "straight time" language in the health and welfare article of the CBAs. JA 122-128, 337-341.

The Health Fund's administrator relied on this longstanding, uniform history of contribution payments by USF as the basis for determining that USF was obligated to contribute on the overtime hours. Joseph Swann, president of the Health Fund's third-party administrator, Benefits Administration Corporation, testified that a "straight time hour" as used in the health and welfare article of the CBAs means "an hour paid." JA 1362-1369. This interpretation was consistent with what the practice had been by USF as well as the contributions history of certain other employers that had identical contract language as that in the Local 355-USF CBAs. JA 1362-1369. Swann testified that in his determination, USF did not overpay when it contributed on 50 hours, regardless of the type of the underlying hour (straight time or overtime), because: (1) there existed a long-standing history of how the language had been interpreted by both parties to the contracts; (2) the same language appeared in collective bargaining agreements with other contributing employers, who also historically paid on all hours up to 50[14]; (3) the Health Fund had performed payroll audits on USF, using the criteria that

---

[14] The employers are: United Parcel Service, Acme Paper & Supply Co., AmTote International, Avis Rent-A-Car, The Baltimore Sun, Airborne Freight, Perishable Deliveries, Inc., and The Hertz Corporation. JA 337-341.

contributions were owed on all paid hours up to fifty, and none of the audits

revealed a deficiency by USF, nor did USF question the Health Fund's

methodology.  JA 1362-1369.  Based on these facts, the administrator's

determination was reasoned and principled.  See Booth, 201 F.3d at 342-343

(among factors considered to determine reasonableness of fiduciary's discretionary

decision are whether decision making process was reasoned and principled, and the

adequacy of the materials considered to make the decision and the degree to which

those materials support it).[15]  Indeed, given this mountain of facts before it when

USF first asserted it did not owe contributions on overtime-paid hours, the

administrator could arguably have violated its fiduciary obligation had it, based on

USF's out-of-the-blue, newfound contract interpretation, acceded to that

interpretation.

The language of the Health Fund's trust agreement provides an additional

source of support for the administrator's determination with respect to the overtime

contributions.[16]  This is so because the parties who negotiated the CBAs, Local 355

and USF, incorporated the Health Fund trust agreement by reference into their

---

[15] While an additional factor a court considers includes whether the fiduciary's
interpretation is contrary to the clear language of the plan, see Booth, 201 F.3d at
342, whether language is "clear" or not must be guided by the fiduciary's
experience with the language, including earlier interpretations of it.

[16] The Health Fund trust agreement creates in the trustees the power to construe its
provisions.  JA 369.

CBAs, and thus they can be presumed to have intended to apply the Health Fund trust agreement's provisions.  See JA 309-318.  The language of the trust agreement mandates that contributions are to be paid on *all* hours worked or paid. JA 354-355.  This would not contravene the provisions of the CBAs prescribing maximum numbers of weekly hours of contributions—fifty hours to the Health Fund and forty hours to the Pension Fund—but it evidences a general principle that contributions should be made on all hours worked or paid (at least up to the weekly limits set forth in the CBAs).  The trust agreement thus provides additional support that the administrator's determination was reasonable.

Under ERISA's plain terms no return of contributions is allowed unless the plan administrator first determines such contributions were made by mistake of law or fact.  Here, that condition did not occur.  Based on the facts before him as detailed above, the administrator's failure to make such a determination was not unreasonable.

> B.    USF Failed to Establish the Equitable Requisites
>        Entitling It To Return of the Overtime
>        Contributions.

In addition to failing to find that the administrator determined the overtime contributions were made by mistake (or, in the alternative, that the administrator's failure to so find was unreasonable), the district court similarly failed to determine, as is required before a court will order a ERISA trust fund to return employer

contributions, that the equities strongly favor such return.  This requirement is in

addition to, not an alternative to, the determination-of-mistake requirement of

Section 403(c)(2)(A)(ii).

Thus, even if this Court should determine that (1) ERISA permits return of

employer contributions without a determination by a plan administrator that the

contributions were made by mistake of law or fact, and/or (2) the administrator's

failure to determine that the overtime contributions were made by mistake of fact

was unreasonable, an order entitling USF to a return of those contribution is

nonetheless improper, because USF failed to show, under applicable equitable

principles, that such an order is appropriate.  (Nor has it shown that the

administrator's refusal to return contributions was arbitrary and capricious, a

second requirement necessary to establish an entitlement to their return.)

Even if, in a given case, the facts are undisputed that a contribution was

mistakenly made, under Section 403(c)(2)(A)(ii) return of such contribution is not

automatic.  As this Court noted more than thirty years ago, in Teamsters Local

639-Employers Health Trust v. Cassidy Trucking, 646 F.2d 865 (4th Cir. 1981),

traditional principles of equity govern when an employer may become entitled to

return of contributions:

> [I]f Congress intended by [Section 403(c)(2)(A)] to make
> recovery automatic once a mistake of fact is proved, and
> thereby alter the traditional principles of equity which

> otherwise would be applicable to such cases, it would
> have clearly evidenced its intent to do so.

Cassidy Trucking, 646 F.2d at 868.

The doctrine as announced by this Court comports with the fundamental policy underlying ERISA: to preserve fund assets for the benefit of a trust fund's participants and beneficiaries. See, e.g., Dumac, 814 F.2d at 83 ("It is beyond dispute that protection of the financial integrity of multiemployer pension funds is the touchstone of ERISA."). Thus, before entitling an employer to a return of contributions, a court must find that (1) the administrator's refusal was arbitrary and capricious, and (2) the balance of equities favors restitution. See Atlas Concrete, 40 EBC 2621, 2626, 2007 WL 526621, at *4 (E.D.N.Y. 2007)(citing Ciminelli, 976 F.2d at 836; Dumac, 814 F.2d at 82).

Recognizing this policy, a court must consider several factors before requiring an employee benefit fund to return employer contributions. They include whether return of contributions would undermine the financial stability and actuarial soundness of the plan. Dumac, 814 F.2d at 83; Chase v. Western Conference of Teamsters Pension Trust Fund, 753 F.2d 744, 753 (9th Cir. 1985). The plaintiff must establish that the equities favor restitution. Dumac, 814 F.2d at 83; Award Service, Inc. v. Northern California Retail Clerks Union and Food Employers Joint Pension Trust Fund, 763 F.2d 1066, 1069 (9th Cir. 1985); Ciminelli, 976 F.2d at 836.

USF failed to satisfy the applicable equitable factors that are a prerequisite to any entitlement to return of all or part of the overtime contributions. Rather, USF merely relied on an ipso facto approach in demanding a return of contributions. Such an argument is an insufficient basis on which to order return of contributions.

Throughout its pleadings and motion memoranda, USF, in asserting its entitlement to return of the overtime contributions, relied nearly exclusively on the presence of a mistake of fact or law. Thus, USF asserted in its Complaint that an internal audit revealed it had paid overtime contributions to the Health Fund in excess of that required under the CBAs; that it requested a refund of such contributions; and that it stated the contract language-based reasoning underlying its request. JA 16-17. Nowhere in the Complaint did USF allege it satisfied any of the requisite equitable factors for entitlement to return of the overtime contributions. It simply alleged, without any details in support, that the Health Fund has been unjustly enriched by not returning the overtime contributions. JA 20.

Likewise, absent from USF's summary judgment motion memoranda was even an argument, much less reasoning or evidence in support of such argument, that it satisfied the requisite factors for entitlement to return of contributions.

46

Rather, it claims entitlement solely by virtue of the "fact" of the mistake. This hardly is enough to satisfy the test for return of contributions.

USF's failures are similar to those in <u>Ciminelli</u>, where the Second Circuit rejected the employer's <u>ipso</u> <u>facto</u> approach to an entitlement to return of contributions.[17] In <u>Ciminelli</u>, the employer had, for more than five consecutive years, mistakenly paid contributions to various (but related) employee benefits funds in excess of amounts required by the applicable collective bargaining agreements. Despite completing a full course of discovery, including deposing the Health Fund's administrator, the employer presented no evidence that the administrator's refusal to return the subject contributions was arbitrary and capricious. Nor did the employer establish that a court order requiring return of such contributions was appropriate under traditional principles of equity. Rather,

---

[17] Even had USF attempted to show that the equities favor restitution, the Court could, in line with the permissive nature of Section 403(c)(2)(A)(ii), defer to the Health Fund before undertaking its own analysis. As noted by the Second Circuit:

> The fund administrators are in the best position to
> determine whether the equities of a particular case
> require a refund or setoff, as opposed to courts making
> that determination under the rubric of a purported federal
> common law right to restitution or setoff. We therefore
> leave such decisions to those vested in the first instance
> by ERISA with the authority and responsibility to make
> them.

<u>Brown v. Healthcare and Retirement Corp. of America</u>, 25 F.3d 90, 94 n.4 (2d Cir. 1994).

like USF here, the employer in <u>Ciminelli</u> merely argued that the bare showing of a

mistake in employer-made contributions created an equitable right to return of

those contributions.  In a fairly lengthy rebuke, the Second Circuit rejected the

employer's claim, beginning:

> Ciminelli would have us adopt a rule of equitable
> restitution that would allow employers to recover
> overpayments simply upon a showing of the mistake.
> Such a rule, however, is contrary to ERISA's plain terms.

<u>Ciminelli</u>, 976 F.2d at 834.

The court in <u>Ciminelli</u> ruled instead that once the fact of mistaken

contributions is proven, under Section 403(c)(2)(A)(ii) the employer must further

establish that the balance of equities favors restitution:

> Ciminelli made no attempt in discovery to probe the
> reasons for the funds' failure to repay the overpayments
> or to develop an affirmative case demonstrating
> arbitrariness or capriciousness.  Its submission in support
> of its motion for summary judgment and in response to
> the cross-motion for summary judgment merely
> established the fact of overpayment.  More was required
> for it to prevail.
>
> Our review of the administrative decisions of pension
> and benefit funds is limited, and particularly so in the
> context of a statute expressly leaving certain decisions to
> the funds' discretion.  Congress evidently believed that
> the risk of mistaken contributions should rest largely with
> the employer.  It had good reason for that conviction.
> Funds cannot easily determine whether a payment is
> mistaken, whereas employers have readily available and
> accurate information concerning factors such as the
> number of hours each employee worked in each pay

period.  Absent costly ongoing audits, funds must depend upon the employers' calculations.  Moreover, the future incidence of claims for repayment of mistaken contributions are not easily predictable by individual funds, particularly small ones.  Funds will thus find it difficult to set aside accurate reserves to cover future claims, and beneficiaries of the funds may be undercompensated as a result of conservative judgments as to such reserves.  As stated, therefore, at least *where there are no equities strongly favoring the employer, the risk of mistake should fall upon the employer*.

Moreover, in determining the balance of equities, sleeping on one's rights is always a consideration.  This is particularly so in the case of pension, benefit, and welfare funds.  Time is important because a fund generally must be able to rely upon its current calculation of total assets.

* * *

Medical benefit plans, for instance, commit to certain levels of benefits based on such reliance.  Moreover, payments of stale claims for restitution may make it more difficult for future timely employer claimants to recoup mistaken contributions.  The lapse of time between the mistaken contributions and their discovery by the employer and the request for repayment, and the lapse of time between those events and the employer's lawsuit, are, therefore, important factors in balancing the equities.

Ciminelli's claim fails.  Ciminelli made no attempt to meet the <u>Dumac</u> requirement that employers seeking repayment of mistaken contributions show a balance of equities in their favor.  Notably, by restricting its submission on the cross-motions for summary judgment to a demonstration that it had made a mistake, Ciminelli made no showing of the effect of repayment on the funds as a whole or upon individual beneficiaries of those funds.  In addition, the lapse of time since the mistaken contributions weighs heavily against Ciminelli.  Some of

the contributions were six years old when discovered after November 1986. Ciminelli then waited until December 1990 to bring the instant action, over two and one-half years after the six-month period during which repayments are permitted had expired. The last overpayment, in November 1986, is, at the time of this opinion, coming up on its sixth birthday. The first overpayment, in June 1981, was eleven years ago. The delay is egregious, and, except for the time consumed by the audit, which is not determinable on the record before us but was less than one year, attributable to Ciminelli. Ciminelli now asks for a remand to build the record that it had ample opportunity to do before. Given the delay, a remand would inevitably result in an adverse ruling and is thus fruitless.

Id. at 836-837 (internal quotation marks and citation omitted)(emphasis added).

The same employer failures that the Second Circuit found in Ciminelli are present here. USF made no showing, in its pleadings or motions memoranda, that the equities favor restitution, much less that the equities "strongly favor[]" such entitlement. Ciminelli, 976 F.2d at 836. It presented no analysis that return of contributions would not undermine the financial stability of the Health Fund.[18] It failed to establish that repayment would not adversely affect the benefits of the Health Fund's plan participants and beneficiaries. It laid silent on the issue why it waited fifty years to apprise the Health Fund of the "mistaken" contributions that it began making in the 1950s, a period significantly longer than the length of the employer's delay in Ciminelli.

---

[18] The district court ordered return of overtime contributions from the Health Fund in the total amount of $858,135.35. JA 1386.

A <u>fortiori</u>, while the district court ultimately rejected the Health Fund's laches argument because it determined that the Health Fund did meet the second prong of the test—prejudice to the Fund, resulting from USF's delay, regarding evidence of the parties' intent on the contract language—in light of its decision that the CBA language was clear, the Court did find, similar to the Second Circuit in <u>Ciminelli</u>, that USF slept on its rights, stating: "A simple reading of the unambiguous contract language in 2007, 50 years after it was drafted, precipitated this suit. The delay has been unreasonable." JA 1249. As was the case in <u>Ciminelli</u>, such an egregious lapse of time by USF in seeking to recover contributions weighs heavily against an entitlement to them.

Present here are still other considerations, revealed by the court in <u>Ciminelli</u>, that weigh against return of contributions. Addressing specifically health and welfare—rather than pension—funds, the Second Circuit reasoned that entitling an employer to return of mistakenly paid contributions, especially when made repeatedly over a reasonable period of time, could have an adverse impact on such funds, who rely on historical and anticipated contributions amounts when committing to setting benefits levels for their participants and beneficiaries. Such reliance is precisely what occurred in this matter.

In setting its benefits levels, the Health Fund relies on an anticipated amount of employer contributions, taking into account what it understands to be the

participating employers' collective contribution requirements.  With respect to

USF's historical contributions obligations and, more importantly for purposes of

equities analysis, its actual decades-long historical payments, which included

contributions on all hours up to fifty, the Health Fund, in setting its benefits levels

and related funding requirements necessary to maintain those levels, consistently

relied on USF making contributions on *all* hours paid to employees up to fifty in a

workweek.  David White, a Health Fund trustee since 1994, see JA 337-341,

testified at deposition that in performing the analysis necessary to maintain benefit

levels, the Health Fund relied on bargained levels of employer contributions.  Such

employer contributions included the anticipation that USF would pay contributions

on all hours paid on each employee up to fifty in a workweek.  White thus testified:

> [Health Fund Counsel]:  . . .  It's your understanding and
> belief as a trustee of the Health Fund that U.S.
> Foodservice is obligated to pay on overtime hours up to
> 50?
>
> [USF Counsel]:  Object to the form of the question.
>
> [Trustee White]:  Yes.
>
> [Health Fund Counsel]:  What's the basis for your
> position on those  overtime hours between 40 and 50?
>
> [Trustee White]:  We've just always used the 50 hour
> number.  *Did it when we did our computations funding
> and financial analysis of the plan*.  When we had in-
> house administration it was always with the
> understanding that employers would pay up to 50 hours.

JA 1345-1360 (emphasis added).  The Health Fund, relying on a decades-long history whereby USF contributed on both straight time- and overtime-paid hours, in fact utilized this interpretation of the contract language and USF's (and other employers') practice of payment under such interpretation in calculating the contribution rate it required, going forward, in order to maintain benefit levels for its participants.

Finally, as in <u>Ciminelli</u>, where the Second Circuit noted that the employer had ample opportunity to establish that the equities favored return of contributions but failed to make such a showing on the record, here USF, despite taking depositions of multiple trustees, the Health Fund's third party administrator, and a business agent of Local 355, as well as placing into the record multiple affidavits from witnesses within its control, did not furnish the district court with any evidence showing that the equities compel return of the contributions in dispute. USF and the employer in <u>Ciminelli</u> are aligned in their failure to show that the equities strongly favor an entitlement to return of mistakenly paid contributions. Accordingly, the risk of mistake must fall on USF; no contributions should be

ordered returned.[19]

### III. THE DISTRICT COURT ERRED IN RULING THAT USF'S CLAIMS AGAINST THE HEALTH FUND WERE NOT BARRED BY LACHES.

USF's claims, which (1) hinge entirely on language whose original drafters are no longer available, and (2) are equitable in nature, are barred by the doctrine of laches. The doctrine of laches is applicable in the case of equitable claims, including claims brought under ERISA. White v. Daniel, 909 F.2d 99, 102 (4th Cir. 1990), cert. denied, 501 U.S. 1260 (1991); Witmeyer v. Kilroy, 788 F.2d 1021 (4th Cir. 1986). Laches bars a plaintiff's claims where the defendant can show "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." Costello v. United States, 365 U.S. 265, 282 (1961). See also Dixon v. SSA Balt. Fed. Credit Union, 822 F. Supp. 302 (D. Md. 1992), aff'd, 991 F.2d 787 (4th Cir. 1993)(6-year delay in filing race discrimination claim barred by laches).

The district court found that the Health Fund established the first prong of the test, stating: "A simple reading of unambiguous contract language in 2007, 50

---

[19] Even assuming, arguendo, the Court could conclude that the equities concerning return of contributions are split, given the overarching policies of ERISA, including that employers should not benefit from the assets of a plan, Whitworth, 794 F.2d at 233, such a split should break in favor of the Health Fund. See, e.g., Bricklayers and Allied Craftworkers Local 2 v. C.G. Yantch, Inc., 316 F. Supp. 2d 130, 153 (N.D.N.Y. 2003)(denying return of mistakenly paid contributions, noting that even where equities are arguably split, risk of mistake should fall on employer).

years after it was drafted, precipitated this suit. The delay has been unreasonable." JA 1249. Based on its ruling that the language was unambiguous (and its consequent refusal to consider how the Health Fund, USF and Local 355 had applied the language), the district court found no prejudice to the Health Fund, since, according to the district court, its inability to obtain locate and secure testimony from the original drafters of the language was unnecessary in light of the clear language. JA 1249-1250.

For the same reasons the district court erred in refusing to examine evidence of course of conduct, it erred in finding no prejudice to the Health Fund. This is so because, as this Court noted in Keffer, "[t]he intended meaning of even the most explicit language can, of course, only be understood in light of the context which gave rise to its inclusion." Keffer, 872 F.2d at 62. Had USF brought this action in the late 1950s, when, consistent with its position, it must concede that the "mistake" first began, the individuals who agreed to the language at issue would have been available to testify to the context which gave rise to it. Those individuals were not available in 2008, which is when USF first notified the Health Fund of the so-called mistake. See JA 447-451. The Health Fund was in this way prejudiced by USF's decades-long silence. Accordingly, the second prong of test necessary to bar a claim under the doctrine of laches is met. This Court should so find, and reverse the district court's ruling allowing USF's claim to proceed.

IV.    THE DISTRICT COURT ERRED IN DENYING THE
       HEALTH FUND'S COUNTERCLAIM FOR
       COLLECTION ON DELINQUENT
       <u>CONTRIBUTIONS.</u>

Because the district court erred in disregarding the extrinsic evidence of the

parties' intent with regard to the language in issue, it erred in denying the Health

Fund's motion for summary judgment.  As a result, USF owes the Health Fund

overtime contributions from February, 2008, to the present, plus liquidated

damages, interest, attorneys' fees and costs attributable to the collection of the

same, pursuant to 29 U.S.C. §§ 1145, 1132.

## CONCLUSION

The great irony of this case is that USF's causes of action were brought, both

explicitly (Count I) and implicitly (Count II), under ERISA, a law that is, by

design, wholly grounded in equity.  The district court, ignoring USF's half-

century-long, self-reporting-based contributions history to the Health Fund that

included payments on all employee-paid hours, including overtime-paid hours,

effectively found that USF paid on those hours by "mistake."  Concluding that the

language in dispute is unambiguous, the district ignored what was patent:  that

USF, the Health Fund and Local 355 knew precisely what was intended by the

language.  USF's claim of "mistake" is belied by its conduct.  Its assertion that the

Health Fund was "unjustly enriched" as the result of the so-called mistake is

offensive.  The Health Fund is not a corporation, and its trustees are not paid; they

56

have a fiduciary obligation to use fund assets solely in the interests of the participants and beneficiaries. See 29 U.S.C. § 1104(a)(1).

In ruling for USF, the district lost sight of the legal context in which it interpreted the subject contract language. Given the context, employer contributions to employee welfare benefit trust, to ignore the obvious intent of the contract language as manifested through the overwhelming evidence of course of conduct is at odds with the policies that are the bedrock of ERISA, which is to ensure benefits to employees as consideration for their labors on an employer's behalf. Given the public policies underlying ERISA, a court should be cautious to make a ruling, without first employing all of the available tools of contract interpretation, that results in reducing employer contributions—contributions which translate directly into health and welfare benefits promised to employee-participants.[20]

Especially in this case, the Court should look past the four corners of the contract page to discern to true intent of the contracting parties. It should not lightly force the Health Fund to return over $800,000 in assets, assets which, by law, must be used to provide benefits to the Fund's participants and beneficiaries.

---

[20] As this Court observed in Clark, "Contributions to trust funds 'are as much a part of an employee's compensation as his hourly wages, and an employer should not be free to withhold either one.'" Clark, 818 F.2d at 1106 (quoting Washington Area Carpenters' Welfare Fund v. Overhead Door Co. of Metropolitan Washington, 681 F.2d 1, 9 (D.C. Cir. 1982)).

This Court should reverse the decisions of the district court, with instruction that the court (1) deny USF's motion for summary judgment as to Counts I and II of its Complaint, and as to the Health Fund's Counterclaim, and (2) grant the Health Fund's motion for summary judgment as to Counts I and II of USF's Complaint, and as to its Counterclaim.

## REQUEST FOR ORAL ARGUMENT

The Health Fund requests that the Court grant oral argument, because the Court has not recently examined in published decision one of the issues dispositive of a claim in this case:  when it is appropriate under ERISA to require an employee benefit fund to return employer contributions.

Respectfully submitted,


Dated:  March 20, 2012                    /s/_____
                                          Paul D. Starr, Bar No. 024789
                                          Corey Smith Bott, Bar No. 25673
                                          Meghan C. Horn, Bar No. 17747
                                          Abato, Rubenstein and Abato, P.A.
                                          809 Gleneagles Court, Suite 320
                                          Baltimore, Maryland  21286
                                          (410) 321-0990
                                          (410) 321-1419 – fax
                                          Attorneys for Appellant
                                          Truck Drivers and Helpers Local
                                          Union No. 355 Health & Welfare Fund

## CERTIFICATE OF COMPLIANCE WITH
## FEDERAL RULE OF APPELLATE PROCEDURE 32(a)

1.      This corrected brief complies with the type-volume limitation of Fed.

R. App. P. 32(a)(7)(B) because it contains 13,993 words, excluding the parts of the

brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This corrected brief complies with the typeface requirements of Fed.

R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6)

because it has been prepared in a proportionally spaced typeface using Microsoft

Word 2003 and 14-point Times New Roman type style.


Dated:  March 20, 2012                    /s/ _____
                                          Paul D. Starr

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 20th day of March, 2012, a copy of the

foregoing corrected brief was served, via the Court's CM/ECF system, on the

following:

> Stefan Jan Marculewicz, Esquire
> Steven E. Kaplan, Esquire
> Littler Mendelson, P.C.
> 1150 17th Street, N.W.
> Suite 900
> Washington, D.C.  20036
>
> Attorneys for U.S. Foodservice, Inc.

/s/ _____
Paul D. Starr