# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

TRIBUNE COMPANY, et ah, '

Chapter 11

Case No. 08-13141 (KJC)

Reorganized Debtors.

## RESPONSE OF THE CREDITOR KEITH YOUNGE TO THE OBJECTIONS PRESENTED TO CLAIM NUMBER 3333 OF KEITH YOUNGE. PURSUANT 502 (b) and 558 OF THE BANKRUPTCY CODE and BANKRUPTCY RULES 300L, 3003 and 3007.

The Creditor Keith Younge (Pro Se) hereby files this response to the objections of the debtors to his claim numbered 3333. Keith Younge (hereinafter, identified as Younge), filed a claim against Tribune Television Company hereinafter (hereinafter refers to as Tribune ). Tribune un-questionably has liability for the claims of Younge. Such claim and for the reasons set-forth in detail below, this Court may not sustain the objections of the debtor as a matter of law.

1.      With the very kind permission of Jillian Ludwig, Esquire, counsel to Tribune Television, Mr. Younge was able to recover documents in the possession of the Pennsylvania Human Relations Commission that showed an entirely different light

upon this claim. With this additional information, it makes it practically impossible to accept any other conclusion other than the acts of Mr. Rick Shultz were racially motivated, with an animus designed specifically to insight the of Keith Younge and to cause his firing.

2.      Ms. Ludwig now has in her possession approximately seventy-one pages from the Pennsylvania Human Relations Commission. In those pages that include the statements of Mr. Shultz and interviews of other individuals, there are no less than twenty references to racially disparaging comments, slur, and negative racial stereo typing all directed at Mr. Keith Younge.

3.      In the fourteen days that Mr. Younge was employed at the Tribune, Mr. Shultz referred to him as *HOOP, HOOPS, HOMIE, HOMEBOY, SPIKE AND SPIKE LEE.*

4.      In addition on more than one occasion, Mr. Shultz and by his own admissions acknowledged that he had a un-equivoque right to call Mr. Younge by any name he chose to use, even if those names were representative to racial slurs.

5.      If this were merely an isolated incident, the fourteen days of continued racial slurs would alone be enough to warrant further investigation and prosecution of this matter.

6.      However, it should be noted that this actor, Rick Shultz's racial animus manifested itself on other occasions with the Tribune as early as 1993, in a similar

incident of racial stereotyping resulting in a counseling and warning issued to Mr. Shultz.

7.     In a document found on pages 58 and 59 herein of Exhibit 1 of Mr. Younge's pleading, in the final paragraph he is clearly critical of the employer, Tribune. In criticizing the Tribune Shultz stated, *"Color has nothing to do with improper behavior and is often used in our company as a way to justify a ridiculous argument"*.

8.     In a 1973 job performance evaluation on *page 55 herein of Exhibit 1 of Mr. Younge's pleading*, the employer articulated of Mr. Schulz "he is somewhat volatile".

9.     And in this most recent altercation it can be summed up in Mr. Shultz's own statements to his employer, colleagues and subordinates, Rick said in an email to fellow employees, "I am not training no hoop!" and then in the same missive he asked, "Where does a hoop get a car like that?" *page 39 herein of Exhibit 1 of Mr. Younge's pleading.*

10.    In an exchange recorded by the Pennsylvania Human Relations Office:

Human Relations Investigator: "…if you told me that you were racially attacked by a co-worker wouldn't you want me to investigate it?" he said no.

Human Relations Investigator: I responded, "so you are telling me that if you felt that you were racially attacked by someone you would not want me to investigate" …

Mr. Shultz: " No, the violence is more important than the race issue".

Mr. Shultz: "why does black people have to make everything about race?"

Human Relations Investigator: "I said thank you and ended the meeting"…

*Page 37 herein of Exhibit 1 of Mr. Younge's pleading.*

11.     Rick Shultz in conjunction with union assistant Steve Koostra and union representative Larry Delspechio, prepared a statement that states in part, "I asked him why he continued to call him spike even after Keith corrected him, he stated because that's the name I gave him, I give everyone nicknames". *Page 36 herein of Exhibit 1 of Mr. Younge's pleading*

12.     "I went on to ask Rick about the comment he made to Steve Leff on Tuesday May 7, "why are you training a hoop, who doesn't know anything?" He stated that he could not recall making that comment. I asked him what's a "hoop"; "he stated that was a (derogatory slang for a white or small black basketball player in a black neighborhood) basketball player." It should be noted that Mr. Keith Younge is 5'2' that calling him hoops in and of itself is degrading to him both racially and relates to his physical stature. *Page 36 herein of Exhibit 1 of Mr. Younge's pleading*

13.     Yet again in a statement made by Steve Leff concerning this hoop comment. "I asked Steve did Rick Shultz say why are you training a hoop, who doesn't know anything? He said yes, I asked him what is a hoop he stated that he doesn't know, I told him someone told me that it was a derogatory term for black people he shook his head and I asked where does that come from, he said maybe because all black people play basketball"... *Page 35 herein of Exhibit 1 of Mr. Younge's pleading.*

14.     Any one of these admissions standing on its own would be sufficient to warrant a case proceeding to a jury on the issue in aggregate. Mr. Younge was forced to endure

repeated, un-relenting and continuing variations of racial epilates during his very brief tenure at WPHL, hereinafter Tribune Cooperation.

Respectfully submitted,

Keith Younge "Pro-Se"

Dated: October 15, 2013

"EXHIBIT 1"

**COMPLAINT**

CITY OF PHILADELPHIA
COMMISSION ON HUMAN RELATIONS
34 SOUTH 11TH STREET, 6TH

Keith M. Younge
_____
(Complainant)

_____
(Complainant)

vs.

WPHL- TV
_____
(Respondent)

_____
(Respondent)

COMPLAINT Num: BMAA-7F5PL8
DOCKET Num:   EO8065202

1. **The Complainant(s)** 
   **herein (is) (are):**

   (Name)     Keith M. Younge

   (Address)  2117 Melvin Street, Philadelphia, PA 19131

   (Name)     _____

   (Address)  _____

2. **The Respondent(s)**
   **herein (is) (are):**

   (Name)     WPHL- TV

   (Address)  5001 Wynnefield Avenue, Philadelphia, PA 19131

   (Name)     _____

   (Address)  _____

3. **On or about to wit, 06/09/2008 prior thereto and continuing thereafter, in Philadelphia, Penna., the Respondent(s) discriminated against the black Complainant with regards to the terms, conditions and privileges of employment by, including but not limited to, subjecting him to a hostile work environment and then terminating him; all because of his race and/or color.**

4. **Such actions by the Respondent(s) constitute(s) an unlawful discriminatory practice and is in violation of the following Section(s) of the Philadelphia Code:**

**9-1103 (A)**
- ☐ (1)
- ☐ (2)
- ☐ (3)(a)
- ☐ (3)(b)
- ☐ (3)(c)
- ☐ (4)(a)
- ☐ (4)(b)
- ☐ (5)
- ☐ (6)
- ☐ (7)

**9-1104 (A)**
- ☐ (1)
- ☐ (2)
- ☐ (3)
- ☐ (4)
- ☐ (5)
- ☐ (6)
- ☐ (7)
- ☐ (8)
- ☐ (9)
- ☐ (10)
- ☐ (11)
- ☐ (12)
- ☐ (13)

**9-1105 (A)**
- ☐ (1)(a)
- ☐ (1)(b)
- ☐ Other

5. **No action based on the allegations set forth in this complaint has been instituted by the Complainant(s) with the Pennsylvania Human Relations Commission with respect to the same grievance except as follows:**

5. **The commercial housing accommodations with regard to which the aforesaid violations occured are located at the following address(es), in Philadelphia, Pennsylvania:**

Subscribed and sworn to before me on this _9th_ day of
_June_____, 2008 at Philadelphia, Pa.

_____
(Complainant)

My commission expires _Wilma J. Holmes_

(Notary Public)

_____
(Complainant)

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
WILMA J. HOLMES, Notary Public
City of Philadelphia, Phila. County
My Commission Expires October 26, 2009

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME
(If more than one, list below.)

| CHARGE OF DISCRIMINATION | ENTER CHARGE NUMBER |
|---|---|
| This form is affected by the Privacy Act of 1974 | EEOC NUMBER |
| | FEPA NUMBER |

### PHILADELPHIA COMMISSION ON HUMAN RELATIONS

| NAME (Indicate Mr., Mrs., Ms) | HOME TEL. NO.(Include Area Code) |
|---|---|
| Younge, Keith M. | (610) 529-5180 cell |

| STREET ADDRESS | CITY, STATE AND ZIP CODE    COUNTY |
|---|---|
| 2117 Melvin Street, Philadelphia, PA 19131 | |

| NAME | NO. OF EMPLOYEES OR MEMBERS | TELEPHONE NUMBER (Incl. Area Code) |
|---|---|---|
| WPHL-TV | 15+ | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE |
|---|---|
| 5001 Wynnefield Avenue, Philadelphia, PA 19131 | |

| NAME | TELEPHONE NO. (Include Area Code) |
|---|---|
| | 215-878-1700 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE |
|---|---|

| | | | DATE DISCRIMINATION TOOK PLACE |
|---|---|---|---|
| ☒ RACE | ☐ RELIGION | ☐ DISABILITY | EARLIEST |
| ☒ COLOR | ☐ NATIONAL ORIGIN | ☐ OTHER (Specify) | LATEST |
| ☐ SEX | ☐ AGE | | |
| ☐ SEX HARASSMENT | ☐ RETALIATION | | ☐ Continuing Action |

THE PARTICULARS ARE (If additional space is needed, attached extra sheet(s):

**See Attached PCHR Complaint Form**

☐ I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the foregoing is true and correct.

6/9/08
Date                    Charging Party
(Signature)

NOTARY – (When necessary to meet State and Local Requirements)

S))))))))))))))))))))))))))))))))))))))))))Q

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
(Day, month, and year)

## PHILADELPHIA COMMISSION ON HUMAN RELATIONS

Keith M. Younge,                          :          DOCKET #     E08065202

        VS

WPHL--TV                                  :          EEOC #       17G-200800219C

## STATEMENT OF PARTICULARS

The Black Complainant made the following allegations:

1. On 4/15/08, the Complainant was hired as a Master Controller; Michael Hort (w/m) was his immediate Supervisor.

2. The Complainant was on a 30-day probation period and was training 3-4 days a week. He was not a permanent, full time employee. The Complainant's schedule changed weekly due to training sessions.

3. On 5/7/08, while working 10 PM - 6:00 am., the Complainant stated that Sandy (w/m)_____, Master Controller, told him if you run into any trouble tonight, make sure you tell me tomorrow.

4. The Complainant asked Steve (w/m), Master Controller, why Sandy made that comment and Steve stated Rick Shultz (w/m) will train you tonight and he (Shultz) has a problem. The Complainant asked "with me?" and Steve responded, "no he just has a problem".

5. At approximately 10:50 pm, Rick Shultz entered the room where the Complainant was to be trained, and said to the Complainant "Hey Spike, you want to get this off the table"? The Complainant stated that Shultz was referring to his brief case.

6. The Complainant assumed that Shultz didn't know his name, and introduced himself, saying " Hi, my name is Keith".

7. Shultz, responded "as far as am concern you are Spike Lee". The Complainant walked over to Shultz, and stated, " I told you what my name is", and he looked at the Complainant and said, " I'll call you anything I want to".  The Complainant stated this escalated to a lot of yelling & screaming by both parties.

8. The Complainant alleged that Rick Shultz told him "take that shit back to the ghetto hommie ". The Complainant told Shultz that he lives in King of Prussia; and he didn't know that was the ghetto.

9. The Complainant told Shultz, "All you have to do is train me". Shultz responded, "you are

only an intern". The conversation got very heated, and Shultz went to the other office.

10. The Complainant stated that the Security Officer was called, and he walked outside with the Security Officer. The Complainant stated that Rick went to the other office, handed the him a cell phone, and said, "Ed _____, (w/m) Manager of Engineering, was on the cell phone".

11. Ed, Manager, asked the Complainant what had happened and the Complainant explained what had occurred. The Complainant stated that Ed was very upset with Shultz, and was very apologetic to him stating that Rick (Shultz) was "way out of line".

12. The Complainant was told that first thing in the morning contact Human Resources, the Union, and the General Manager for the station.

13. On 5/8/08, the Complainant called Ed, Manager, and MIchael Hort, Supervisor to go over the situation and apologized to them. The Complainant was told, " you should have never had to deal with that- we have had problems with Shultz before". The Complainant also went over the situation with someone in Human Resources, but doesn't know the person's name.

14. On 5/12/08, the Complainant called Michael Hort, Supervisor and got his voicemail, since he had not heard from anyone yet.

15. Two hours later, the Human Resources Manager called the Complainant to ask a couple of questions, i.e.-- "Did you curse at Rick", to which the Complainant responded "yes". "Do you remember what you said"-the Complainant stated "no, I was angry I don't remember". "Did you spit on him", to which the Complainant stated "absolutely not". The Complainant told her-- if you want to you bring Rick in, I'll come in, and we will straighten this whole thing out.

16. The Human Resources person stated "I'll call you back". The Complainant stated he never received a call from anyone.

17. On 5/15/08, the Complainant called Michael Hort again, to check on his status. Hort informed the Complainant that he was in the HR office, and after their investigation, they concluded that the Complainant had violated the code of conduct, and they were terminating his relationship with the company.

18. The Complainant stated that he was subjected to a hostile work environment, discriminated against and terminated all because of his race and/or color.

 **CITY OF PHILADELPHIA**

PHILADELPHIA COMMISSION ON
HUMAN RELATIONS
Curtis Center Building
601 Walnut St, 3rd Floor, Suite 300 South
Philadelphia, PA 19106
Telephone (215) 686-4670
Fax # (215) 686-4684

**Rev. James S. Allen**
Chairperson

**Rue Landau Esq.**
Executive Director

June 20, 2008

Mr. Keith M. Younge
2117 Melvin Street
Philadelphia, PA 19131

**Re:**  Keith M. Younge  vs  WPHL-TV 17
**Docket No:**  E08065202

Dear Mr. Younge:

The Complaint that was filed with this Commission has been docketed and assigned to me for initial investigation and fact finding. Enclosed is Notice of a Fact-Finding Conference that we have scheduled in your case. Please read this carefully, and immediately call me to confirm that you will attend the conference on the date indicated in the Notice. It is to your advantage that you be present and participate in the Fact-Finding Conference.

If you have any witnesses to testify on your behalf at the Conference, please let me know. If your witnesses are unable or unwilling to attend, please call me at least seven (7) days before the Conference.

No additional information is required at this time.

Please call me if you have any questions. Thank you for your cooperation.

Sincerely,

Paulette E. Banks
Compliance Investigator
(215) 686-4646

Encl.

*/*



# CITY OF PHILADELPHIA

PHILADELPHIA COMMISSION ON
HUMAN RELATIONS
Curtis Center Building
601 Walnut St, 3rd Floor, Suite 300 South
Philadelphia, PA 19106
Telephone (215) 686-4670
Fax # (215) 686-4684

Rev. James S. Allen
Chairperson

Rue Landau Esq.
Executive Director

June 23, 2008

## NOTICE OF FACT FINDING CONFERENCE

RE:   Keith M. Younge  vs  WPHL-TV 17
DOCKET NO: E08065202

To Complainant and Respondent:

You are requested to be present and participate in a Fact-Finding Conference (FFC) in the above-docketed matter, as follows:

| | |
|---|---|
| Date | : July 30, 2008 |
| Time | : 02:00 PM |
| Location | : 601 Walnut St, 3rd Floor, Suite 300 South Hearing Room A |

The FFC is a part of the continuing investigation and is intended to quickly, yet fully:

-- define and clarify the issues of the Complaint
-- gather evidence from both the Complainant and Respondent
-- determine which elements of the Complaint are not disputed
-- ascertain whether there is a basis for a negotiated settlement

The FFC is not a formal hearing and statements are not taken under oath; however, investigatory notes will be made.  No determination will be issued at the FFC regarding the merits of the allegations or the evidence presented by either side.

The Commission encourages and will work with both parties to settle this charge by means of a negotiated settlement.  If a settlement is reached, the Commission will not issue a finding on the merits of the Complaint and the case will be closed.

As a necessary part of the FFC, you are requested to provide the Commission with any documents which support your position, as well as any material requested in the enclosures.

If you have any witnesses who you wish to participate in the FFC, they may come with you.  If and when the witnesses are needed, they will be called into the conference.

Although it is not necessary, the Respondent and the Complainant can be represented by attorneys who may act in an advisory capacity at the FFC.

If you have any questions, please call me.

Sincerely,

Paulette E. Banks
Compliance Investigator
(215) 686-4646

PCHR- YOUNGE 0006

 **CITY OF PHILADELPHIA**

**PHILADELPHIA COMMISSION ON HUMAN RELATIONS**
Curtis Center Building
601 Walnut St, 3rd Floor, Suite 300 South
Philadelphia, PA 19106
Telephone (215) 686-4670
Fax # (215) 686-4684

**Rev. James S. Allen**
Chairperson

**Rue Landau Esq.**
Executive Director

To: Persons filing Complaints of Discrimination with the Philadelphia Commission on Human Relations (PCHR)

Your Complaint of Discrimination may also fall under the jurisdiction of the Pennsylvania Human Relations Commission (PHRC), and you may wish to put your complaint on file with that agency.  This will protect any additional rights you may have under Commonwealth law.  if you do so, please inform them that you have already filed with PCHR.  **PCHR is barred by law from investigating any complaint first filed with the PHRC that concerns identical issue(s), allegation(s) or situation(s).**

You may contact the PHRC by calling (215) 560-2496.  Their local office is located in the State Office Building, Broad and Spring Garden Streets, here in Center City Philadelphia.

The two Commissions have entered into an Agreement to determine which Agency will initially investigate Complaints filed with both agencies concerning the same issues(s) and situation(s).  The following relevant portions of the Agreement covers Complaints initially filed with this Commission.

a.  PCHR shall investigate all complaints first filed with them (see exceptions listed below) unless you (the Complainant) indicate in writing a desire to  have the PHRC conduct the investigation.  **In no case will two separate independent investigations be initially and simultaneously conducted on the same Complaint.**

  1.  All Complaints which allege more than one basis of discrimination, where at least one alleged basis is not covered by the law administered by one of the Commissions, shall be investigated by the Commission whose laws cover all of the alleged bases.

  2.  All Complaints which allege retaliation for filing a Complaint or cooperating with either Commission in the investigation of another Complaint shall be initially investigated by the commission identified as the one where the original Complaint was taken or with the Commission the Complainant originally cooperated with.

I have read and have been supplied with a copy of this information.

Signature _____    (Date) **June 09, 2008**

YOUNGE 8



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
Philadelphia District Office

801 Market Street
13th Floor
Philadelphia, PA  19107

EEOC Charge Number: 17G-2008-00219C    Date: 6/13/08

Dear Charging Party:

Your charge of employment discrimination as filed with the Philadelphia Commission on Human Relations (PCHR) will also be forwarded to the Philadelphia District Office of the U.S. Equal Employment Opportunity Commission (EEOC) for dual-filing. This dual-filing is done in order to preserve your federal rights as explained below. The EEOC charge number will be assigned by the PCHR in addition to PCHR's own charge number. This letter, which will be sent to you by the PCHR, constitutes your notification of the dual-filing with EEOC. The Respondent named in your charge will also be notified by PCHR of the dual-filing with EEOC.

The EEOC will refrain from any processing of your charge until such time as the PCHR completes its processing and issues final findings and orders. At that time, the PCHR will notify the EEOC of the closure so that EEOC can review the PCHR finding. These final findings and orders may be adopted by EEOC and the EEOC case would then be closed based on the PCHR proceedings.

However, under Section 1601.76 of EEOC's regulations, you are entitled to request that EEOC perform a Substantial Weight Review of the PCHR's final finding. To obtain this review, you must request it by writing to EEOC within 15 days of your receipt of PCHR's final finding in your case. Otherwise, EEOC will generally adopt the PCHR's findings.

To request a Substantial Weight Review, you should address your request to the address shown in the letterhead above, to the attention of the State and Local Unit. In addition, you should provide as much specific detail as possible as to why you are dissatisfied with the PCHR investigation or finding.

While your charge is being investigated by the PCHR, you should address any concerns or additional information concerning your charge or the PCHR investigation directly to the PCHR. This will ensure that such concerns or information are provided to the appropriate person(s). Please do not contact the EEOC directly as EEOC will not be able to assist you while the charge is being processed by PCHR.

The dual-filing of the charge with EEOC will preserve your rights to file a private lawsuit in federal district court as follows:

a. If your charge is filed under Title VII of the Civil Rights Act of 1964, as amended (Title VII) (that is, based on race, sex, color, religion, or national origin) or under the Americans with Disabilities Act of 1990, as amended (ADA) (that is, based upon a mental or physical disability), you can only file a lawsuit in Federal Court if EEOC first issues you a Notice of Right to Sue. To obtain such a Notice, you must wait for 240 days from the date you filed your charge with PCHR. You must thereafter make a written request for issuance of the Notice of Right to Sue. This request can be sent directly to EEOC at the address shown in the letterhead above or you can send the request to the PCHR for forwarding to EEOC. Upon its receipt, EEOC will issue you the Notice of Right to Sue and you would have 90 days in which to file suit. The issuance of the Notice of Right to Sue will normally result in EEOC terminating all further processing.

b. If your charge is filed under the Age Discrimination in Employment Act of 1967, as amended (ADEA), (that is, based on age 40 or older), you do not have to request a Notice of Right to Sue from EEOC if you wish to file a lawsuit in Federal Court. Instead, you must wait at least 60 days from the date you filed your charge with the PCHR, regardless of the status of the PCHR or EEOC processing. Thereafter, you can file a private lawsuit directly in Federal Court without first contacting EEOC in any manner.

If based upon EEOC's review of PCHR's final finding, the EEOC determines that the finding should be accepted as the basis for EEOC's closure, you will be so notified in writing. If the PCHR closure is for any reason other than a successful settlement or a withdrawal, the EEOC closure will also include a Notice of Right to Sue. This applies to charges filed under Title VII, the ADA and/or the ADEA. In such an event, you would then have 90 days from the date of your receipt of that Notice to file suit in federal district court.

EEOC's regulations require that you notify EEOC of any change in address and keep us informed of any prolonged absence from your current address. However, if the PCHR is still processing your charge, you should forward any such notification of change of address directly to the PCHR. You should also cooperate fully with the PCHR in its processing of your charge.

Should you contact EEOC to request a Substantial Weight Review or to request a Notice of Right to Sue, please include the EEOC Charge Number in your correspondence to EEOC.

Sincerely,

Marie M. Tomasso
District Director

 **CITY OF PHILADELPHIA**

PHILADELPHIA COMMISSION ON
HUMAN RELATIONS
Curtis Center Building
601 Walnut St, 3rd Floor, Suite 300 South
Philadelphia, PA 19106
Telephone (215) 686-4670
Fax # (215) 686-4684

**Rev. James S. Allen**
Chairperson

**Rue Landau Esq.**
Executive Director

## INVITATION FOR
## PRE-DETERMINATION SETTLEMENT

The Philadelphia Commission on Human Relations urges both Complainant and Respondent to consider a Pre-Determination Settlement of this Complaint. The advantages to both parties are considerable when compared to the full investigative process.

The specific advantages to the Respondent include:

-- Financial liability in cases where back pay is at issue ceases with the Pre-Determination Settlement.
-- Avoidance of the disruption and loss of time that a thorough investigation necessarily entails.
-- No fault or guilt may be imputed to the Respondent.
-- Pre-Determination Settlement precludes further action by the Complainant in court or with another governmental civil rights agency, such as EEOC or the U.S. Department of Labor.
-- The Charge is settled within a matter of weeks, while a thorough investigation may require months.
-- Substantial costs and attorneys' fees may be avoided.

This Commission recognizes that a Complainant who agrees to a Pre-Determination Settlement may not receive everything to which she/he would be entitled if the allegations should be proved and relief should be ordered by the Commission or a court, and that a Respondent that enters into a Pre-Determination Settlement may offer relief that would not subsequently be required by the Commission or a court. However, on balance, the advantages of entering into a Pre-Determination Settlement outweigh the uncertainty of prolonged investigation and further processing of the cases.

If you would like to offer a settlement of the Complaint before we have made any determination as to the merits of the charge against you, this can be done before the investigation has begun, or at any time during the course of the investigation.

The assigned investigator, Paulette E. Banks, is available to discuss Pre-Determination Settlement with you.

# PHILADELPHIA COMMISSION ON HUMAN RELATIONS

In the matter of:  Keith M. Younge  vs  WPHL-TV 17
DOCKET NO:    E08065202

## ENTRY OF APPEARANCE OF COUNSEL

Please enter my appearance in the above-captioned matter on behalf of:

[  ]  I am authorized to accept service of all pleadings and other documents on behalf of the above-named in this matter.

[  ]  I request a copy of each document hereafter issued by the Philadelphia Commission Human Relations in this  matter.

_____
Attorney (Signature)

_____
Name (Printed)

_____
Address

_____
City, State, Zip Code

_____
Telephone number (including Area Code)

## PHILADELPHIA COMMISSION ON HUMAN RELATIONS

In the matter of: Keith M. Younge   vs   WPHL-TV 17
DOCKET NO:   E08065202

### ENTRY OF APPEARANCE OF COUNSEL

Please enter my appearance in the above-captioned matter on behalf of:

[✓] I am authorized to accept service of all pleadings and other documents on behalf of the above-named in this matter.

[✓] I request a copy of each document hereafter issued by the Philadelphia Commission Human Relations in this  matter.

_____
Attorney (Signature)

KATHLEEN A. M'CABE
_____
Name (Printed)

435 N MICHIGAN AVE, SUITE 510
_____
Address

CHICAGO, IL 60611
_____
City, State, Zip Code

312-222-5955 (phn)
_____
Telephone number (including Area Code)

312-222-3860 (fax)

PCHR-  YOUNGE 0012

*Resp. Bus. Paper*



| | | | |
|---|---|---|---|
| To: | Tequila Rausch | From: | Shalona Douglas |
| Company: | TALX | Date: | |
| Fax number: | **(800) 207-3795** | Phone number: | (866) 923-9300, ext. 3456 |
| RE: | | Total no. of pages including cover: | 7 |

☐ URGENT   ☐ FOR REVIEW   ☐ PLEASE COMMENT   ☐ PLEASE REPLY   ☐ CONFIDENTIAL

**notes/Comments:**

Please appeal; I have included a copy of the policy.  Mr. Schultz violated the anti harassment policy specifically he used racial slurs to address another employee, despite the fact that the employee asked him several times to refer to him by his name.  In our investigation Mr. Schultz admitted to making the racial slurs.

Shalona Douglas
Human Resources Coordinator
myphl17 & The cw Washington
5001 Wynnefield Avenue
Philadelphia, PA 19131
     (215) 883-3359
     (215) 877-4912
     sadouglas@tribune.com

```
┌────────────────────────────────────────┐
│  TRANSMISSION VERIFICATION REPORT      │
└────────────────────────────────────────┘

                        TIME  : 06/09/2008 13:00
                        NAME  : WPHLTV
                        FAX   : 2150787161
                        SER.# : BROK7F793119

   DATE,TIME          06/09  12:58
   FAX NO./NAME       18002073795
   DURATION           00:02:09
   PAGE(S)            07
   RESULT             OK
   MODE               STANDARD
                      ECM
```



| To: | Tequila Rausch | From: | Shalona Douglas |
|---|---|---|---|
| Company: | TALX | Date: | |
| Fax number: | (800) 207-3795 | Phone number: | (866) 923-9300, ext. 3456 |
| RE: | | Total no. of pages including cover: | 7 |

☐ URGENT   ☐ FOR REVIEW   ☐ PLEASE COMMENT   ☐ PLEASE REPLY   ☐ CONFIDENTIAL

**notes/Comments:**

Please appeal; I have included a copy of the policy. Mr. Schultz violated the anti harassment policy specifically he used racial slurs to address another employee, despite the fact that the employee asked him several times to refer to him by his name. In our investigation Mr. Schultz admitted to making the racial slurs.

Shalona Douglas
Human Resources Coordinator
myphl17 & The cw Washington
5001 Wynnefield Avenue

Kathleen A. McCabe
Senior Labor Counsel
312/222-5955

# TRIBUNE

Tribune Company
435 North Michigan Avenue
Chicago, Illinois 60611-4001
fax: 312/222-3660
e-mail: kmccabe@tribune.com

April 9, 2009

Ms. Paulette E. Banks
Compliance Investigator
Philadelphia Commission on Human Relations
Curtis Center Building
601 Walnut St., 3rd Floor, Suite 300 South
Philadelphia, PA 19106

> Re:    Charge No. E08065202
>         Charging Party:  Keith M. Younge
>         <u>Respondent:  WPHL Inc.</u>

Dear Ms. Banks:

This letter is written in response to your March 17, 2009 request for data/documents relating to the race discrimination charge filed by Keith Younge against WPHL Inc. ("WPHL" or "the Station") regarding his discharge from employment. As demonstrated herein and in WPHL's November 20, 2008 response, Mr. Younge's charge is without merit. Mr. Younge was not discharged because of his race. He was discharged because he violated the Station's policies against fighting. Even though he did not throw a punch, Mr. Younge engaged in threatening and intimidating behavior toward his co-worker Rick Schultz. Such conduct is inappropriate in the workplace and is strictly prohibited by the Station's policies. Mr. Younge had multiple opportunities to take the high ground, to cease his participation in the altercation, and walk away. He failed to do so. Rather, he continued to pursue Mr. Schultz and to otherwise antagonize him. Consequently, Mr. Younge cannot sustain a charge of race discrimination.

Please be advised that, shortly after WPHL submitted its November 20, 2008 response, it filed for Chapter 11 bankruptcy protection. On December 8, 2008, WPHL became a filing debtor in a jointly-administered Chapter 11 bankruptcy proceeding filed in U.S. Bankruptcy Court for the District of Delaware, Case No. 08-13141.

The information contained in this letter is provided in a spirit of cooperation for the sole purpose of assisting the Philadelphia Commission on Human Relations with its neutral and non-adversarial investigation of Mr. Younge's charge. This letter is not intended to be used, nor does WPHL consent to its use, in any administrative, judicial or other proceeding.

Ms. Paulette E. Banks
April 10, 2009
Page 2

Below please find WPHL's responses to the specific requests contained in your March 17, 2009 letter:

1. The last known address and phone number that WPHL has on file for Rick Schultz is 1411 Fitzwatertower Rd, Willow Grove, PA 19090, 215-657-4155.

2. The following is a list, by name and race, of the Operations Technicians employed by WPHL on May 7, 2008: Rich Schultz (Caucasian), Steve Leff (Caucasian), Sandy Kerr (Caucasian), Laura Flandreau (Caucasian), Mary Ann Klink (Caucasian), Carlton Murph (African-American), and Chris Schafer (Caucasian).

3. After Mr. Younge was discharged, WPHL hired Robert Cradic (Caucasian) as a Part-Time Summer Relief Technician.

4. A copy of the Operations Technicians vacation schedule for May 5, 2008 through September 1, 2008 is attached as Exhibit 1.

5. See response to #3 above.

6. See response to #7 below.

7. A copy of Mr. Cradic's timesheets for June 1, 2008 through September 6, 2008 is attached as Exhibit 2.

8. Shalona Douglas was the Human Resource Coordinator for WPHL, not the Human Resource Manager as identified in the Commission's March 17, 2009 letter. Ms. Douglas did not create any type of report after she concluded her investigation of the incident between Mr. Younge and Mr. Schultz. However, Ms. Douglas did create type-written notes of her interviews. A copy of those notes are attached as Exhibit 3.

9. A copy of Mr. Schultz's personnel file is attached as Exhibit 4.

10. Please see WPHL's November 20, 2008 written response and enclosures.

Ms. Paulette E. Banks
April 9, 2009
Page 3

In sum, Mr. Younge was not discharged because of his race. He was discharged for violating the Station's policies against fighting in the workplace. For all of the reasons set forth herein and in the Station's November 20, 2008 response, Mr. Younge's charge is without merit and should be dismissed in its entirety.

Sincerely,

Kathleen A. McCabe
Senior Labor Counsel

Enclosures

## ANTI-HARASSMENT

Tribune is committed to providing its employees a professional work environment free from harassment or any unwelcome conduct based on an individual's race, color, religion, sex, national origin, age, sexual orientation, disability, or any other legally protected classification. Tribune has "zero tolerance" for such conduct. This commitment is in keeping with the Company's equal employment opportunity policy and practices and with applicable statutes and regulations.

Any conduct, whether verbal, physical, or visual, that creates a hostile, offensive or intimidating work environment constitutes harassment under this policy. Harassment includes, but is not limited to, the following:

- Physical or verbal abuse (demeaning, insulting comments)

- Derogatory or off-color jokes

- Slurs (racial, ethnic, religious, gender, age, etc.)

- Unwelcome physical contact of any nature

- Taunting, intended to provoke an employee

- Display or circulation of written materials or pictures (hard copy, via electronic mail, etc.) that are derogatory to males, females, persons with disabilities, or to racial, ethnic, religious, and other protected groups

- Unwarranted and unfounded charges and complaints brought against a fellow employee with intent to discredit, harass or in any way harm that employee

- Unwelcome and unsolicited sexual advances

- Requests for sexual favors used as a condition of employment or affecting any personnel decisions, such as hiring, promotion, transfer, performance appraisal, compensation

- Employment opportunities or benefits granted to one individual over another individual as a result of submission to or rejection of sexual advances.

The Company prohibits any employee, co-worker, supervisor, manager, outside vendor, consultant, customer, agent, officer or director of the Company from harassing any Company employee or applicant. The Company views such actions as extremely serious misconduct. It is the responsibility of each employee to ensure that these prohibited activities do not occur. Violations of this policy will result in disciplinary action, including possible discharge.

Further, the Company believes harassing conduct or language directed at Company employees by outside vendors, consultants, etc., is an affront to Tribune business ethics, beliefs and practices. As a representative of Tribune, you should state that harassing conduct or language violates Company policies. Similarly, you are prohibited from engaging in any harassing conduct toward outside vendors, consultants, customers or others.

If you feel that you have been or are being harassed, or have witnessed any conduct inconsistent with this policy, you are to immediately bring it to the attention of your department head, to human resources at your business unit or if you prefer, to Luis Lewin, senior vice president/human resources of Tribune. Mr. Lewin may be reached at 312/222-4581. Complaints will be investigated and resolved in a thorough and timely manner. Every effort will be made to ensure confidentiality throughout the complaint/investigation process to the greatest extent possible. Retaliation against anyone who complains of harassment, who provides information relating to such complaints or who otherwise

Kathleen A. McCabe
Senior Labor Counsel
312/222-5955

# TRIBUNE

Tribune Company
435 North Michigan Avenue
Chicago, Illinois 60611-4001
fax: 312/222-3860
e-mail: kmccabe@tribune.com

November 20, 2008

Ms. Paulette E. Banks
Compliance Investigator
Philadelphia Commission on Human Relations
Curtis Center Building
601 Walnut St., 3rd Floor, Suite 300 South
Philadelphia, PA 19106

> Re:  Charge No. E08065202
>      Charging Party: Keith M. Younge
>      Respondent:  WPHL Inc.

Dear Ms. Banks:

This letter is written in response to the charge filed by Keith Younge. Mr. Younge claims that he was subjected to a hostile work environment and subsequently discharged from his employment with Respondent, WPHL Inc. ("WPHL" or "the Station"), because of his race. As shown below, Mr. Younge's charge is without merit. On May 7, 2008, only his tenth day of employment, Mr. Younge was involved in a physical altercation with one of his co-workers. Consistent with the Station's policies prohibiting such behavior, he was discharged. Consequently, Mr. Younge cannot sustain a charge of race discrimination.

The information contained in this letter is based on a preliminary investigation of the matter. As further information becomes available, the Station may modify, correct or supplement the information contained here, but it does not undertake any obligation to do so. This letter is provided in a spirit of cooperation for the sole purpose of assisting the Philadelphia Commission on Human Relations with its neutral and non-adversarial investigation of Mr. Younge's charge. This letter is not intended to be used, nor does the Station consent to its use, in any administrative, judicial or other proceeding.

Ms. Paulette E. Banks
November 20, 2008
Page 2

I.    **Facts**

A.    **Background**

WPHL, known in Philadelphia as myphl17, signed on the air September 17, 1965. The Station became an affiliate of MyNetworkTV on September 5, 2006. Over the years, the Station produced and aired numerous local television shows, including kids' favorite *Wee Willie Webber's Colorful Cartoon Club*, *Dr. Shock's Horror Theater*, and the 1980s teen dance hit *Dancin' on Air*. During much of the 1970s and 1980s, the Station was known as "The Great Entertainer." The Station is perhaps best known for its broadcasting the annual Mummers Parade - a Philadelphia tradition for more than 100 years - on New Year's Day.

The Station employs, among others, technicians who work to ensure that the Station's programming appears without incident over the Station's airways. These technicians perform such work as master control and tape editing. The technicians are union organized and are represented by the International Brotherhood of Electrical Workers, Local Number 98.

In anticipation of technicians' taking summer vacations and to ensure adequate coverage during those vacations, the Station hires a part-time summer relief technician. That technician is trained by his fellow technicians to learn how to perform their job functions while they are on vacation. The summer relief technician usually covers vacations from Memorial Day through Labor Day and works approximately two or three days per week to do so.

B.    **The Station Has Policies Prohibiting Harassment And Fighting**

The technicians are subject to various Station polices, one of which is the Anti-Harassment Policy, which prohibits any employee from harassing another because of the employee's race (among other reasons). The policy expressly states that disciplinary action, including discharge, could be taken against those who violate the policy. Another policy is the Station's Standards of Conduct and Corrective Action. That policy prohibits, among other types of behavior, fighting or threatening behavior, and disorderly or disruptive conduct. Here, too, employees who violate the policy are subject to discipline, up to and including discharge. Copies of the Anti-Harassment Policy and the Standards of Conduct are attached as Exhibit 1.

C.    **Mr. Younge Was Scheduled To Train With Technician Schultz**

Mr. Younge began his employment with the Station on April 21, 2008, as the summer relief technician. During his first week of employment, Mr. Younge trained with technician Sandy Kerr (Caucasian) on how to operate master control and with technician Steve Leff (Caucasian) on how to

Ms. Paulette E. Banks
November 20, 2008
Page 3

operate tape prep on second shift.  On May 7, 2008, his tenth day of training, Mr. Younge was
assigned to train with Rick Schultz (Caucasian) on how to operate tape prep on third shift.

By way of background, Mr. Schultz at the time was the most senior member of the technician
bargaining unit.  As Mr. Schultz testified under oath at his July 15, 2008 discharge arbitration
hearing[1], he had complained to fellow technician Mr. Leff that he did not want to train Mr. Younge.
Mr. Schultz testified that he believed it was not part of his job responsibilities under the collective
bargaining agreement to train summer relief technicians.  Mr. Schultz also testified that he did not
want to train a non-bargaining unit member who some day could replace him in the event of a work
stoppage.

On May 7th, Mr. Younge's shift was scheduled to begin at 10:30 p.m.  When he reported for
work, he was a few minutes early for his shift.  After he placed his briefcase on the table in tape prep,
he went next door to master control to say hello to Mr. Kerr.  Mr. Kerr knew that Mr. Younge was
scheduled that night to be trained by Mr. Schultz.  Mr. Kerr also knew through the grapevine that
Mr. Schultz did not want to train Mr. Younge.  Mr. Kerr asked Mr. Younge to let him know the next
day if he had any problems with his work that night.  According to Mr. Younge's testimony given
under oath at Mr. Schultz's discharge arbitration hearing, Mr. Younge asked Mr. Kerr if Mr. Schultz
had a problem with him.  Mr. Younge testified that Mr. Kerr responded no and that Mr. Schultz just
had a problem with training him.

### D.    Mr. Younge's Altercation With Mr. Schultz

Shortly thereafter, Mr. Younge returned to tape prep and waited for Mr. Schultz.  It is
undisputed that, when Mr. Schultz entered tape prep, he looked at Mr. Younge's briefcase on the
table and said something to the effect of, "Spike, you want to get your stuff off the table?"
According to Mr. Younge, he thought that Mr. Schultz might have forgotten his name and so he
introduced himself to Mr. Schultz.  Mr. Schultz again called him Spike.  At his discharge arbitration
hearing, Mr. Schultz testified that he typically gave nicknames to his co-workers and that, on the
night of May 7th, he was giving Mr. Younge the nickname of Spike because he reminded him of
Spike Lee.

At that point, Mr. Younge began to behave aggressively toward Mr. Schultz.  By his own
admission, Mr. Younge used profanity toward and cursed at Mr. Schultz.  According to Mr. Schultz,
Mr. Younge was baiting him by saying, "motherfucker, I dare you to hit me."  Mr. Schultz also
claimed that Mr. Younge was spitting in his face.  Mr. Younge admitted that he was in Mr. Schultz's
face during the altercation.

---

[1] As stated herein, Mr. Schultz was discharged for his behavior on May 7, 2008.  The Station's decision to discharge
Mr. Schultz was grieved by the Union.  An arbitration hearing on that grievance was held on July 15, 2008.
Mr. Schultz and Mr Younge, among others, testified at the hearing.  No formal transcript was taken of the hearing.

Ms. Paulette E. Banks
November 20, 2008
Page 4

After a few moments, Mr. Schultz left tape prep and went into the master control room next door where fellow technician, Chris Schafer (Caucasian), was working. Mr. Schultz then asked Mr. Schafer to call fellow bargaining unit employee and Technician-in-Charge, Ed Elias (Caucasian) for help. Significantly, Mr. Younge pursued Mr. Schultz into master control. There, Mr. Younge continued to get in Mr. Schultz's face and to dare Mr. Schultz to hit him. While in master control, Mr. Schultz said to Mr. Younge something to the effect of "why don't you take that shit back to the ghetto, homie."

The altercation between Messrs. Younge and Schultz was loud enough to attract the attention of Security Officer, Ed Rivera (Hispanic). Officer Rivera arrived on the scene and physically separated Mr. Younge from Mr. Schultz, placing himself between them. Officer Rivera was able to temporarily move Mr. Younge back into tape prep. However, Mr. Younge ultimately maneuvered around Officer Rivera and again got in Mr. Schultz's face, yelling and poking his finger at Mr. Schultz. As Mr. Schultz backed up and put his hands defensively in front of his chest, Mr. Younge continued to yell and poke at Mr. Schultz. Throughout the incident, Officer Rivera repeatedly tried to get Mr. Younge away from Mr. Schultz.

Eventually, Officer Rivera was able to get Mr. Younge outside the building and into the parking lot. While in the parking lot, Mr. Younge spoke on the telephone with Mr. Elias. Mr. Younge explained to Mr. Elias what had happened that night. Mr. Elias told Mr. Younge to go home and that the Station would investigate the situation in the morning.

The following day, Human Resources Representative Shalona Douglas (African-American) spoke with Mr. Younge and many of the other witnesses to the incident. As part of her investigation, Ms. Douglas obtained a copy of the surveillance camera video from that night. The video shows, among other things, Mr. Schultz's and Mr. Younge's arguing in tape prep. It also shows Mr. Younge's pursuing Mr. Schultz into master control. It shows Officer Rivera's attempting to physically separate Mr. Younge from Mr. Schultz. Significantly, it shows Officer Rivera's moving Mr. Younge into tape prep and Mr. Younge's skirting around Officer Rivera to resume his physical altercation with Mr. Schultz. It shows Mr. Younge's getting in Mr. Schultz's face and poking his finger at Mr. Schultz. It shows Mr. Schultz's backing up and putting his hands defensively in front of his chest. It shows Officer Rivera's repeatedly trying to get Mr. Younge away from Mr. Schultz. A copy of the video is enclosed as Exhibit 2.

E.    **Mr. Younge And Mr. Schultz Were Discharged For Fighting**

Ms. Douglas completed her investigation on May 12, 2008, after she was finally able to reach and speak with Mr. Schultz. She then presented her findings to the Station's Vice President/General Manager Vince Giannini (Caucasian). Mr. Giannini reviewed the investigation findings and determined that both men had violated the Station's Anti-Harassment Policy and its Standards of Conduct. As a result, Mr. Giannini decided that both men would be discharged. By letters dated



B256 (Form 256 – Subpoena in a Case under the Bankruptcy Code) (12/07)

# UNITED STATES BANKRUPTCY COURT

for the        District of   **Delaware**

In re    **Tribune Company, et. al.**
Debtor

**SUBPOENA IN A CASE UNDER
THE BANKRUPTCY CODE**

Case No. *    **Case No 08-13141 (KJC)**

To:    **Paulette Banks**
**Phildelphia Human Relations Commission**    Chapter       **11**
**601 Walnut Street**
**Suite: 300**
**Philadelphia, PA 19106**

☐ YOU ARE COMMANDED to appear in the United States Bankruptcy Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
| --- | --- |
| | DATE AND TIME |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
| --- | --- |
| | |

☑ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

Statement of Position , Witness Statements, Party Statements, Photos Transcription of oral statements  drawing, diagrams and any information relating to liability causaton or damages

| PLACE | DATE AND TIME |
| --- | --- |
| 657 Exton Commons, Exton PA 19341 | 10/7/13 11:00am |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
| --- | --- |
| | |

Any organization not a party to this proceeding that is subpoenaed for the taking of a deposition shall designate one or more officers, directors or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Rule 30(b)(6), Federal Rules of Civil Procedure, made applicable in bankruptcy cases and proceedings by Rules 1018, 7030 and 9014, Federal Rules of Bankruptcy Procedure.

| ISSUING OFFICER SIGNATURE AND TITLE | DATE |
| --- | --- |
| | 9/20/13. |

ISSUING OFFICER'S NAME, ADDRESS, AND PHONE NUMBER

**Pietro A. Barbieri, Esq.**     **657 Exton Commons Exton PA 19341**    **610 864 6419**



B256 (Form 256 – Subpoena in a Case under the Bankruptcy Code) (12/07)

## PROOF OF SERVICE

| | DATE | | PLACE | |
|---|---|---|---|---|
| **SERVED** | | | | |

| SERVED ON (PRINT NAME) | | MANNER OF SERVICE |
|---|---|---|

| SERVED BY (PRINT NAME) | | TITLE |
|---|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof Service is true and correct.

Executed on _____

           DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2007, made applicable in cases under the Bankruptcy Code by Rule 9016.
Federal Rules of Bankruptcy Procedure:

(c) Protecting a Person Subject to a Subpoena.
(1) Avoiding Undue Burden or Expense; Sanctions. A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.
(2) Command to Produce Materials or Permit Inspection.
(A) Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
(B) Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.
(3) Quashing or Modifying a Subpoena.
(A) When Required. On timely motion, the issuing court must quash or modify a subpoena that:
(i) fails to allow a reasonable time to comply;
(ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
(B) When Permitted. To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:
(i) disclosing a trade secret or other confidential research, development, or commercial information;
(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or
(iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.
(C) Specifying Conditions as an Alternative. In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

(d) Duties in Responding to a Subpoena.
(1) Producing Documents or Electronically Stored Information. These procedures apply to producing documents or electronically stored information:
(A) Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
(B) Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
(C) Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.
(D) Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.
(2) Claiming Privilege or Protection.
(A) Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
(B) Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

(e) Contempt.
The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).



# CITY OF PHILADELPHIA

PHILADELPHIA COMMISSION ON
HUMAN RELATIONS
The Curtis Center
601 Walnut Street, Suite 300 South
Philadelphia, PA 19106
Telephone (215) 686-4670
Fax # (215) 686-4684

THOMAS EARLE, ESQ.
Chairperson, PCHR

RUE LANDAU, ESQ.
Executive Director

October 9, 2013

BY HAND

Mr. Keith M. Younge
2117 Melvin Street
Philadelphia, PA  19131

RE:        *Keith M. Younge v. WPHL-TV17*
           *E08065202*

Dear Mr. Younge:

Enclosed is the Philadelphia Commission on Human Relations' Response to Complainant, Keith M.
Younge, Subpoena to Produce Documents, Information, or Objects in a Civil Action.

The Commission on Human Relations objects to the subpoena to the extent that it is vague and overly
broad, and responding to same would be unduly burdensome as it seeks production of documents which
are not relevant to any claim or defense made in this matter, and are not likely to lead to the discovery of
admissible evidence.  The Philadelphia Commission on Human Relations further objects to the subpoena
to the extent it seeks information which is subject to the attorney-client privilege, the attorney work
product protection, or any other applicable protection.  Any inadvertent disclosure of such information
shall not be deemed a waiver.

Without waiving the foregoing objections, the Philadelphia Commission responds to the subpoena by
providing the enclosed documents Bates labeled PCHR-YOUNGE 0001 through PCHR-YOUNGE 0067.

Sincerely,

*Reynelle Brown Staley*

Reynelle Brown Staley, Esq.
Deputy Director

Enclosure



September 27, 2013

Philadelphia Commission on Human Relations
c/o Paulette E. Banks, Investigator
601 Walnut St., Suite 300 South
Philadelphia, PA  19106

RE: Keith Younge v. WPHL Channel 17
      Docket No. E08065202

Dear Sir:

I, Keith Younge, Complainant, case #E08065202, am representing myself in
Bankruptcy Court, in Delaware. Peter A. Barbieri, Esq. is my Legal Consultant
in this matter. Having been unemployed since the filing of this complaint in 2008,
and recently suffering two heart attacks in 2013, and applying for Social Security
Disability, I am currently unable to pay for a copy of my case records. Therefore,
I am requesting a copy, free of charge. Thank you for your consideration of this
request. I have until October 14, 2013 to submit a reply to the Bankruptcy Court.

I need the following documents:
--Charge
--Allegations
--Service package
--Respondent's Position Paper
--Respondent's Anti-Harassment Policy
--Respondent's Conduct Policy/Termination Policy
--Employee Interviews Conducted by Respondent HR
--Work Record of R. Cradic/my replacement
--Rick Schultz Performance Evaluations
--Rick Schultz/Racial Incidents with Other Employees
--Rick Schultz/Troubling Incidents with Other Employees
--Respondent Personnel Memos of Incident on 5/8/2008
--Termination Letter/Complainant
--Termination Letter/Rick Schultz
--Witness Contact Information/Addresses, phone numbers
--Proof of Claim form/US Bankruptcy Court
--Copy of CD/Video of Incident on 5/8/2008

Respectfully,

Mr. Keith M. Younge
2117 Melvin Street
Philadelphia, PA  19131

Ms. Paulette E. Banks
November 20, 2008
Page 5

May 15, 2008, each man was informed of his employment termination. A copy of the May 15, 2008 discharge notices are attached as Exhibit 3.

### F.   Mr. Younge Was Not Discharged Because Of His Race

Contrary to the allegation in his charge, Mr. Younge was not discharged because of his race. He was discharged because he violated the Station's policies against fighting. Clearly, Mr. Schultz instigated the altercation; and for that, Mr. Schultz was discharged. However, that fact does not excuse Mr. Younge's subsequent workplace behavior. Even though he did not throw a punch, Mr. Younge engaged in threatening and intimidating behavior toward Mr. Schultz. In essence, he engaged in fighting in the workplace. Such conduct is inappropriate in the workplace and is strictly prohibited by the Station's policies.

Mr. Younge had multiple opportunities to take the high ground, to cease his participation in the altercation and walk away. He failed to do so. Rather, he continued to pursue Mr. Schultz and to stoke the fires. Keep in mind that, as of May 7th, Mr. Younge had been employed by the Station for only two and one half weeks and had trained only nine days prior to the date of the incident. He had yet to work a shift on his own as summer relief.

### G.   Mr. Younge's Hostile Environment Allegation

With respect to Mr. Younge's hostile environment allegation, it lacks merit. The Station had no reason to believe that Mr. Schultz would have verbally attacked Mr. Younge in the way that he did. Mr. Schultz had no record of having engaged in or having been previously disciplined for comparable behavior. Thus, the first time that the Station became aware of Mr. Schultz's inappropriate behavior, it took prompt action by terminating his employment.

### II.   Conclusion

In sum, Mr. Younge was not discharged because of his race. He was discharged for violating the Station's policies against fighting in the workplace. Accordingly, Mr. Younge's charge is without merit and should be dismissed in its entirety.

If you have any questions, I can be contacted at (312) 222-5955.

Sincerely,

Kathleen A. McCabe
Senior Labor Counsel

Enclosures

## ANTI-HARASSMENT

Tribune is committed to providing its employees a professional work environment free from harassment or any unwelcome conduct based on an individual's race, color, religion, sex, national origin, age, sexual orientation, disability, or any other legally protected classification. Tribune has "zero tolerance" for such conduct. This commitment is in keeping with the Company's equal employment opportunity policy and practices and with applicable statutes and regulations.

Any conduct, whether verbal, physical, or visual, that creates a hostile, offensive or intimidating work environment constitutes harassment under this policy. Harassment includes, but is not limited to, the following:

- Physical or verbal abuse (demeaning, insulting comments)

- Derogatory or off-color jokes

- Slurs (racial, ethnic, religious, gender, age, etc.)

- Unwelcome physical contact of any nature

- Taunting, intended to provoke an employee

- Display or circulation of written materials or pictures (hard copy, via electronic mail, etc.) that are derogatory to males, females, persons with disabilities, or to racial, ethnic, religious, and other protected groups

- Unwarranted and unfounded charges and complaints brought against a fellow employee with intent to discredit, harass or in any way harm that employee

- Unwelcome and unsolicited sexual advances

- Requests for sexual favors used as a condition of employment or affecting any personnel decisions, such as hiring, promotion, transfer, performance appraisal, compensation

- Employment opportunities or benefits granted to one individual over another individual as a result of submission to or rejection of sexual advances.

The Company prohibits any employee, co-worker, supervisor, manager, outside vendor, consultant, customer, agent, officer or director of the Company from harassing any Company employee or applicant. The Company views such actions as extremely serious misconduct. It is the responsibility of each employee to ensure that these prohibited activities do not occur. Violations of this policy will result in disciplinary action, including possible discharge.

Further, the Company believes harassing conduct or language directed at Company employees by outside vendors, consultants, etc., is an affront to Tribune business ethics, beliefs and practices. As a representative of Tribune, you should state that harassing conduct or language violates Company policies. Similarly, you are prohibited from engaging in any harassing conduct toward outside vendors, consultants, customers or others.

If you feel that you have been or are being harassed, or have witnessed any conduct inconsistent with this policy, you are to immediately bring it to the attention of your department head, to human resources at your business unit or if you prefer, to Luis Lewin, senior vice president/human resources of Tribune. Mr. Lewin may be reached at 312/222-4581. Complaints will be investigated and resolved in a thorough and timely manner. Every effort will be made to ensure confidentiality throughout the complaint/investigation process to the greatest extent possible. Retaliation against anyone who complains of harassment, who provides information relating to such complaints or who otherwise

cooperates in any harassment investigation is in itself a violation of this policy. Employees who experience or witness any conduct they believe to be retaliatory are to immediately follow the reporting procedures stated above. *Reissued 1/04*



## STANDARDS OF CONDUCT AND CORRECTIVE ACTION

The Company expects you to conduct yourself in a responsible and professional manner that reflects good judgment and the needs of the business environment. Behavior that interferes with the efficient operation of business or detracts from the Company's reputation or welfare is prohibited.

The following are examples of prohibited work conduct. Although the list is not exhaustive, it illustrates some of the conduct that is unacceptable:

- Criminal acts
- Insubordination
- Destruction, sabotage, abuse, and unauthorized use or removal of Company property
- Fighting or threatening behavior, and disorderly or disruptive conduct
- Failure to abide by departmental dress and grooming standards
- Failure to observe safe work practices or follow safety rules
- Falsification of Company documents, including employment documents, and dishonesty or misrepresentation of facts
- Submitting false hour reports or receiving compensation for hours not worked Disclosure of confidential information
- Gross misconduct
- Inappropriate or profane language
- Off-duty conduct that adversely affects the Company
- Posting, defacing or removing Company notices or signs without authorization
- Originating or spreading false statements concerning an employee, customer, the Company or its products
- Abuse of Company benefits or policies and violation of Company policies or rules

Generally, corrective action is imposed when an employee engages in unacceptable conduct. Discipline is designed to be a corrective measure. The following forms of corrective action may be used in succession, in combination or bypassed as your supervisor/manager deems appropriate: counseling, verbal warning, written warning, last & final warning, suspension without pay, probation or termination.

Notwithstanding the above, nothing in this policy shall alter the at-will status of employees.

PCHR- YOUNGE   0026

Witness
Interviews
from
Respondent-

3

PCHR- YOUNGE 0027

**On 5/8/08** Mickey Hort sent me the following email in regards to an incident that happened in tape prep room between Keith Younge- part-time summer relief and Chris Schafer overnight technician on the night of Wednesday May 7th 2008 around 10:40 PM



**5/8/08 2:30 Ed Elias Interview:**

I asked Ed Elias what happened, he stated that around 10:40 PM his phone rang and it was Chris Schafer on the phone. He heard a lot of yelling in the background but he couldn't hear what they were saying. Chris stated that there was a personnel problem between Keith Young and Rick Schultz. He said he could hear anything they were saying just a lot of yelling. He then told Chris to give the phone to Keith. Keith came on the phone he was very upset and he said he couldn't work with Rick and he wasn't going back in there. He told Keith to go home.

**Keith Younge phone interview- 5/8/2008 3 PM**

I asked Keith what happened last night-

Keith said he came in and was in the tape prep room, his briefcase was on one of the tables and he was standing up looking at one of the monitors.

Rick Schultz came in saw his briefcase on the table and said "Spike, you wanna get your stuff off the table here"

Keith stated that at that point he really thought that maybe Rick did not know his name because they have not really worked together before and he may not have remembered his name, so he said to Rick, "I'm sorry my name is Keith" Keith stated that's when Rick stated " as far as I'm concerned your name is spike lee". Keith said he corrected him again, Keith stated that Rick replied "I'll call you whatever I want". Keith stated that at this point "all hell broke loose", he stated yelling at Rick, and Rick started yelling back Keith stated that he "got in Rick's face". Keith stated that at one point he said something along the lines of "whoa, I don't know what's going on here all you have to do is train me, he stated that Rick's response was I don't work for you, I don't have to listen to you, I don't have to train you , some intern. Keith stated that his response was, whoa, I'm no intern, I've been in this business for years, I've worked in radio, etc. (he tells Rick his credentials). Rick stated, "Well why don't you know nothing".

Keith stated that Rick left the room and went next door to Master control; Keith stated that he followed Rick. They continued to argue in master control; Chris Schafer was sitting in master control at the time. Keith stated that at this point Rick stated "homie, why don't you take all that stuff back to the ghetto". Keith stated that they continued to yell at each other and he got into Rick's face. Keith stated that at this point Eddie the guard came around the corner and broke up the argument. Eddie took Keith outside to calm him down. While they were outside Chris Schafer brought Keith the phone, it was Ed Elias on the phone, he spoke to Ed Elias and told him that he could not work under these circumstances and that he was not going back to work, Ed Elias tried to calm him, Ed told him to go home.

**5/8/08-3:45PM Phone Interview with Chris Schafer**

I asked Chris to give me his account of what happened.
Chris stated, "I was in master control going over my work for the shift when all of a sudden I heard loud voices coming from tape prep."

Shalona: Do you remember what time it was?

Chris Schafer: around 10:40

Shalona: did you hear what they were saying?

Chris Schafer: no, I was trying to ignore them as much as possible; I was trying to concentrate on my work for the shift because the guy before me doesn't do much. I thought they were just arguing over the baseball game or something sometimes the guys do that. Then all of a sudden Rick came over to grab the cordless phone, and then Keith came over shouting trying to get Rick to apologize. ,

PCHR- YOUNGE 0029

Shalona: what were they saying when they came over to Master control?

Chris Schafer: I did not really hear anything I was still trying to get my work together for the shift. I know Keith kept saying "my name is not spike, you know my name".

Chris stated that's when he picked up his cell phone and called Ed Elias.

Shalona: What did you say to Ed Elias?

Chris Schafer:  I told him we have a bit of a personnel problem between Rick and Keith.

Chris stated that at that point Ed the guard came over to break up the argument.

### 5/8/08 5:00 PM Interview with Ed Rivera the night guard

Ed stated that around 10:30/0:35 he heard hollering and cursing in the back so he went back to see what was going on.  He didn't know who it was the only people here were Chris Schafer, Keith, Rick, and Sabrina Pacifico had come back in around 9 PM.

Shalona: Did you hear what they were saying?

Ed: No it was a lot of yelling and cursing and I was in the front, but when I came around the corner, I heard Rick saying, "homie why don't you take that back to the ghetto?"

Shalona: what did you see when you came around the corner?

Ed: When he came around the corner Rick was pinned up against the control panel and Keith was in his face. Rick looked real scared.  That's when I got in between them like this (extended his arms separating the two) and break up the argument.

Ed stated that even after he broke up the argument Rick still kept edging Keith on, pushing his buttons, as if he wanted Keith to keep yelling, he kept calling Keith "homie" and "spike Lee", he was saying stuff like "why don't you just calm down spike Lee" and "calm down homie".  Ed stated that he told Keith to leave it alone he's using reverse psychology to get him I trouble. He then took Keith outside to calm him down.

### 5/9/08 Interview with Sabrina Pacifico

I asked Sabrina if she was here on Wednesday night (5/7/08) and did she hear anything strange.

Sabrina stated that around 10:40 maybe 10:35 she heard yelling and cursing like it was coming from the sales department. She stated that the same voice was yelling "fuck you, fuck you" non stop. She stated that she couldn't hear the other person all she kept hearing was the same voice.   The same voice was saying "fuck you, who do you think you are, you can't tell me what to do."

She stated that at some point the voices moved closer.

The same voice still yelling "You wanna fucking call him, call him right now, I dare you, fucking call him, pick up the phone and call". She stated that she did not stick around she packed up and left, when she was leaving the guard was not at his desk.

During the interview it came up that Steve Leff had come to Ed Elias and Mickey Hort (separately) before the incident and told them that on Tuesday May 6th Rick Schultz came in that night and asked him who is that guy, and why is he here, Steve stated that he told him that his name is Keith and he is the summer relief and he's here for training. Steve stated that Rick's response was "why are you training a hoop, who doesn't know anything". Steve Leff told Mickey that he then reminded Rick that he taught him back in the 80's the operation when we stopped doing production and back then he didn't know anything about MCR.

### 5/8/08 3:30 PM – Steve Leff Statement about the "hoop" comment

I stopped by the tape prep room to ask Steve Leff about the comment that Rick Schultz made to him about Keith Younge. Steve stated that during that incident Rick referred to Keith as Spike only, I asked again if he referred to Keith in a derogatory way and he stated no. I then went and asked Mickey to join me in the tape prep room and I asked Mickey to tell Steve the comment that was made. Mickey told Steve the word that was used in reference to Keith "hoop", Steve stated he did not hear Rick say that word. He then stated "look a lot of things are said around here that are not supposed to be said and I don't wanna be involved, now I have a feed to record, you can come back later and we can talk but I have a feed to record this feed" Mickey and I left the room. Later on that evening Steve came to my office and asked to talk to me. He stated that the only reason he didn't want to answer my question was that he was embarrassed; he stated that he did not talk like that and he just did not want to say that word to me. I asked Steve did Rick Schultz say "why are you training a hoop, who doesn't know anything". He said yes, I asked him what is a "hoop", he stated that he doesn't know, I told him someone told me it was a derogatory term for a black person, he shook his head and I asked where does that come from, he said maybe because all black people play basketball. He said he just doesn't want his name being in this mess.

### 5/12/2008 1:45 PM Interview with Rick Schultz,
### Rick had the union rep Larry Delspechio and the Union assistant steward Steve Koostra with him, I had Mike Hort Engineering Manager with me

I asked Rick to give me his side of the story as to what happened on 5/7/08.

He had written down and typed up his version of the incident (I asked him for a copy of what he had written up, he said no) He stated that on 5/7 was talking to Steve Leff, he said to Steve this guy look like Spike Lee; hey we should call him spike, Ok that's his nickname spike.

He stated that he then went into the tape prep room; he saw Keith's bag on the desk he said to Keith, "Hey spike get your things off my desk."
I asked Rick if Keith corrected him about his name he said yes he did.

I asked him why he continued to call him spike even after Keith corrected him, he stated because that's the name I gave him, I give everyone nicknames. I then asked when Keith corrected you the second time did you say to him, "I will call you whatever I want", he response was yes.

He continued reading from his notes, he stated that Keith began to yell at him saying "hey motherfucker, use my name" motherfucker I dare you to hit me." Rick stated that Keith was baiting him into hitting him. He stated that Keith also got into his face and was spitting in his face. At this point Rick pulled out his glasses and stated "see, I bought you my glasses to show you", he told me to look at it, I looked at it (the glasses had little white specks on it) I stated "but this could be anything; this is when he yelled "see she's calling me a liar". I turned to everyone and asked "did I call him a liar", Larry then told Rick to calm down, and finish his story.

He then stated that he went into master control to ask Chris Schafer to call Ed Elias, and Keith followed still in his face still cursing and daring him to hit him.
I asked Rick did he make the comment, "homie, why don't you take that stuff back to the ghetto". He said he did say that but he said "homeboy" not "homie"

I asked him why he continued to edge Keith on after the guard broke up the argument he adamantly denied that the guard had break them up. At this point Steve Koostra asked "is there some kind of video that we could look at" I replied yes, and the video shows Ed the guard stepping in between the two. This is when Larry the union rep asked if he could see the video, and if the video is going to be used against him then he needs to see it, I told him that we were not using the video at this point and that it was only brought up because Steve Koostra asked about it. I told him that if the video is to be used I will let legal know that he wants to see it and we will handle from that point.

I went on to ask Rick about the comment he made to Steve Leff on Tuesday May 7th "why are you training a hoop, who doesn't know anything?" He stated that he could not recall making that comment. I asked him what's a "hoop", he stated that a "hoop" was a basketball player.

At this point I had to wrap up the interview; I told Rick that I would be in contact once we concluded the investigations. Larry asked what is going to happen to him, I told him that once I have completed the interview process I will need to discuss the findings with legal first before anything can be done, so at this point I am unsure. He then asked me if I know how long Rick Schultz has been with the company, I told him that I am aware of his service date.
This is when Rick asked why he had to come in on my time; he stated that he works the overnight shift and coming in during the day was hard and why did I have to drag him in here for this. I reminded him that he's not working while the investigation is going on, I

then asked him "if you told me that you were racially attacked by a co-worker wouldn't you want me to investigate?" he said no,

I responded, "So you are telling me that if you felt that you were racially attacked by someone you would not want me to investigate, he stated, "no the violence is more important than the race issue". He then proceeded to ask me "why does black people have to make everything about race?" I said thank you and ended the meeting

## 5/12/2008 2:35 PM 2nd Phone Interview with Keith Younge

Right after the meeting I spoke to Keith Younge. I asked him if he was cursing at Rick and spitting in his face. He said yes he was cursing but he did not spit in his face. Keith stated that he was "in his face". I asked Keith if he could remember the curse words he used and he stated that he could not remember and that he may have used them all.

## 5/12/2008 4:45 PM 2nd phone interview with Chris Schafer

I called Chris Schafer and once again asked him did he hear anything that was said between the two, he stated that initially he didn't (when they first started arguing in tape prep), but when they came over to master control he stated that's when he heard Rick calling Keith "spike", and he heard Keith saying "my name is not spike it's Keith". I asked him if he heard cursing and he stated that he did not hear anything like that, no taking the lord's name in vain, nothing along those lines, I asked him if he heard the "f" word being tossed around his response was no. I asked him what made him call Ed Elias, he stated that will all the yelling going on he thought that was the best thing to do. He stated that Rick picked up the phone in master control to call Ed but he was just standing there with the phone still arguing with Keith so he picked up his cell phone and call Ed Elias himself.

## 5/12/2008 5:30 PM- Steve Leff Interview (Steve Leff/Mike Hort)

Mickey came by and told me that Larry and Steve Koostra came by to tell him that Steve Leff had additional information to add to the story and wanted to know how we can get it on record I told Mike to send Steve over

Spoke to Steve Leff he stated that he remembered that when Keith came in on May 7th he thought he was working in master control with Sandy. He stated that Sandy must have told him he was working with Rick Schultz in tape prep. Steve stated that when he came over to tape prep he seemed a little edgy he stated that Keith made a statement (he really couldn't remember, he said the memory is blurry) but thought it went something like this "I will fuck you, I will take my shit and go home" He stated that he kept getting this uneasy vibe from Keith. He told Keith something along the lines of don't worry about it just do what you have to do. He stated that the next day (Thursday afternoon he went over Sandy Kerr and asked Sandy if he had said anything to Keith to upset him, He stated that sandy said no.) to I asked Steve why didn't he tell me this before when I asked him

about the hoop comment, he stated that he wasn't aware of what was going on and he was putting the pieces together and remembered this incident.

### 5/12/2008 5:45 PM- Sandy Kerr Statement (Sandy Kerr/Mike Hort)

I asked Sandy if Steve Leff came over to him on Thursday May 8th and asked him if he had said anything to Keith to upset him. Sandy stated that Steve Leff came over to him on Thursday afternoon and asked him "what did you tell Keith yesterday?" Sandy stated that he replied "I told Keith if he had any problems with his work that night to let me know"

### 5/13/08 3:30 PM Steve Leff Statement (Steve Leff/Laura Flandreau/Mickey Hort)

I asked Steve Leff "Did Rick Schultz come up to you in the tape prep room on the night of Wednesday May 7[th] and say "hey this guy looks like Spike Lee "Steve stated that he does not recall that but he does recall Schultz calling Keith spike before the incident, he stated that he called him spike, he stated "we" (everyone in master control) all have nicknames that we use it's our way of showing affection to one another.  I asked Steve again, so did he come up to you in the tape prep room and say, "This guy look likes Spike Lee; hey we should call him spike, Ok that's his nickname spike." Steve stated that he could not recall, it's been a couple days and he can't really recall everything that was said.

Keith Younge vs. WPHL-TV 17
[Complainant filed on bases of race/color]

The Complainant (b/m) called me on 7/16/08 and stated: He visited Channel 17 yesterday and met with Kathy McCabe, (w/f) Attorney for the Respondent and Rick Shultz, the Respondent employee who was supposed to train him and instead had insulted him and caused his termination. The Union Steward and Union Attorney were also present: the Human Resources Director for Ch 17 and the Security Guard were also present.

During the interview, Rick mentioned that he called the Complainant "hoop" which was regarded as a derogatory nickname for Black men. The Respondent asked the Complainant if he had heard that remark and he answered Yes, he heard Rick say it, but he didn't know the significance of it at the time. Rick really did not have any withnesses to what happened. Rick admitted that he called the Complainant "Spike Lee" and "homie" and said, "take that sh-t back to the ghetto." He also accused the Complainant of spitting on him, which he denied.

The Arbitrator asked Rick if he would have done anything differently and he said, "no." Rick admitted that he gave the Complainant a nickname, "Spike Lee." He was questioned about giving the Complainant this name against his will. Rick's response was that he had been called nicknames like "Shultzie" and "the Nazi."

The Complainant was asked if he had to be restrained by the Security Guard and he said, "No" but he was escorted out of the building and did converse with the Security Guard at length. They were more or less walking together.

Rick also e-mailed everyone at the TV station and said that the Complainant had threatened him and he feared for his life. The Complainant said that he is 5'2' tall and thin, while Rick is 5'11" and medium build and towers over him. Rick said to other employees: "I'm not training no Hoop!" and asked "Where does a Hoop get a car like that?" This was brought to the attention of Respondent management--they did not see this as an issue of concern.

Rick told the Respondent Attorney that "people of his social class do not resolve issues with violence." The Attorney asked him "what social class are you referring to" and Rick said, "I am an upper middle class white man from Willow Grove."

The Security Guard (Ed Rivera) stated, during the interview with Respondent Attorney that "Rick

Shultz called Keith "Spike" a number of times, which he heard himself, in an attempt to "bait him."

Rick was fired and given 12 weeks severance. According to Respondent staff, the Respondent had already replaced Rick with two parttime employees. Rick's job title was Audio Man.

*P. Banks*
*7/16/08*

Robert
Cradiex
WorkRecord

2

# WPHL-TV Engineering Dept Work Record

**Name:** ROBERT S. CRADIC

**Payroll No:** 

**Period Beginning** 6-1-2008   **Ending** 6-14-2008

Fri=Foating Holiday
SH=Scheduled Holiday
AH=Accrued Holiday
S=Sick Day
V=Vacation Day

| Day | Date | In | Start Lunch | End Lunch | Out | Total Worked | Straight Time | Over Time | Sick Time | Vac Time | Other | Night Dif $2.85/hr | MC TD $3.50/hr | PC TD $3.13/hr | Cnvr Cbld $1.13/hr | Meal Allow $5 | Shod Tm/shed $7.50/hr | Reason for OT or Premium |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sun | 6/1 | | | | | | | | | | | | | | | | | |
| Mon | 6/2 | 12PM | 12N | 1P | 6P | 8 | 8 | | | | | | | | | | | TAPE 2 TRANSMN |
| Tue | 6/3 | 130P | 5P | 6P | 1030P | 8 | 8 | | | | | | | | | | | |
| Wed | 6/4 | 130P | 5P | 6P | 1030P | 8 | 8 | | | | | | | | | | | |
| Thu | 6/5 | 130P | 5P | 6P | 1030P | 8 | 8 | | | | | | | | | | | |
| Fri | 6/6 | | | | | 8 | 8 | | | | | | | | | | | |
| Sat | 6/7 | 130P | 5P | 6P | 1030P | 8 | 8 | | | | | | | | | | | ↓ |
| | | | | | **Weekly Totals** | 40 | 40 | | | | | | | | | | | |
| Sun | 6/8 | 130P | 5P | 6P | 1030P | 8 | 8 | | | | | | | | | | | MON 2 TRANSMN |
| Mon | 6/9 | 130P | 5P | 6P | 1030P | 8 | 8 | | | | | | | | | | | |
| Tue | 6/10 | 130P | 5P | 6P | 1030P | 8 | 8 | | | | | | | | | | | |
| Wed | 6/11 | 130P | 5P | 6P | 1030P | 8 | 8 | | | | | | | | | | | |
| Thu | 6/12 | | | | | | | | | | | | | | | | | |
| Fri | 6/13 | | | | | | | | | | | | | | | | | |
| Sat | 6/14 | 130P | 6P | 6P | 1030P | 8 | 8 | | | | | | | | | | | ↓ |
| | | | | | **Weekly Totals** | 40 | 40 | | | | | | | | | | | |
| | | | | | **Period Totals** | 80 | 80 | | | | | | | | | | | |

**Payroll Code** 700 700 708 752 760 716 730 731 729 730 738 732

**Employee Signature:** Robt. S. Cradic

**Department Manager Signature:**

PCHR- YOUNGE 0037

# WPHL-TV Engineering Dept Work Record

Payroll No

Name: ROBERT S. CRADIC

Period Beginning: 6/15/2008    Ending: 6/28/2008

6/15-6/28/08
Paid 7/3/08

FH-Floating Holiday
SH-Scheduled Holiday
AH-Accrued Holiday
S=Sick Day
V=Vacation Day

| Day | Date | In | Start Lunch | End Lunch | Out | Total Worked | Straight Time | Over Time | Sick Time | Vac Time | Other | Night Out $2.84hr | MC TD $1.80hr | PC TD $1.13/hr | Com Cksn $1.13/hr | Meal Allow. $5 | Short Turnaround $7.50/hr | Reason for OT or Pr— |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sun | 6/15/08 | 130p | 630p | 730p | 1030p | 8 | 8 | | | | | | 1 | | | | | MC RELIEF |
| Mon | 6/16 | 130p | 6p | 7p | 1030p | 8 | 8 | | | | | | 8 | | | | | MC |
| Tue | 6/17 | 130p | 6p | 7p | 1030p | 8 | 8 | | | | | | 8 | | | | | MC |
| Wed | 6/18 | | | | | | | | | | | | | | | | | |
| Thu | 6/19 | | | | | | | | | | | | | | | | | |
| Fri | 6/20 | | | | | | | | | | | | | | | | | |
| Sat | 6/21 | 130p | 630p | 730p | 1030p | 8 | 8 | | | | | | 1 7/8 | | | | | MC RELIEF |
| | | | | | Weekly Totals | 32 | 32 | | | | | | 17/8 | | | | | |
| Sun | 6/22 | 130p | 630p | 730p | 1030p | 8 | 8 | | | | | | 1 | | | | | MC RELIEF |
| Mon | 6/23 | 130p | 545p | 645p | 1030p | 8 | 8 | | | | | | 3 3/4 | | | | | MC |
| Tue | 6/24 | 130p | 5p | 6p | 1030p | 8 | 8 | | | | | | 4 1/2 | | | | | MC |
| Wed | 6/25 | 130p | 5p | 6p | 1030p | 8 | 8 | | | | | | 4 1/2 | | | | | MC |
| Thu | 6/26 | | | | | | | | | | | | | | | | | |
| Fri | 6/27 | | | | | | | | | | | | | | | | | |
| Sat | 6/28 | 130 | 630 | 730 | 1030 | 8 | 8 | | | | | | 13 3/4 | MS | | | | |
| | | | | | Weekly Totals | 40 | 40 | | | | | | | | | | | |
| | | | | | Period Totals | 72 | 72 | | | | | | | | | | | |
| | | | | | Payroll Code | | 700 | 700 | 752 | 760 | | 716 | 730 | 729 | 731 | 726 | 727 | |

Employee Signature: Robert S Crabe

Department Manager Signature:

PCHR- YOUNGE  0038

PCHR-YOUNGE 0039

# WPHL-TV Engineering Dept Work Record

WPHL PHL 17

Payroll No.

Name  ROBERT S. CRADLE

Period Beginning: 06/29/2008    Ending: 07/12/2008

Hours legend:
FH=Floating Holiday
SH=Scheduled Holiday
AH=Accrued Holiday
S=Sick Day
VA=Vacation Day

| Day | Date | In | Start Lunch | End Lunch | Out | Total Worked | Over Time | Sick Time | Vac Time | Other | Night Diff $2.50hr | MC TD $1.80hr | PC TD $1.125hr | Con Con $1.125hr | Meal Allow $5 | Sec Tennessed $7.50hr | Reason for OT or Pre... |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sun | 6/29 | 130p | 630p | 730p | 1030p | 8 | | | | | | | | | | | |
| Mon | 6/30 | 130p | | | 1030p | 8 | | | | | | | | | | | |
| Tue | 7/1 | 145 | 5p | 6p | 1045 | 8 | | | | | | 8 | | | | | M.C. |
| Wed | 7/2 | | | | | 8 | | | | | | | | | | | |
| Thu | 7/3 | | | | | 8 | | | | | | | | | | | |
| Fri | 7/4 | 130p | 630p | 7p | 1030p | 8 | | | | 8 | | | | | | | Holiday Pay |
| Sat | 7/5 | 130p | 630p | 7p | 1030p | 8 | | | | | | | | | | | |
| Weekly Totals | | | | | | 32 | | | | | | | | | | | |
| Sun | 7/6 | | | | | | | | | 8 | | 8 | | | | | M.C. |
| Mon | 7/7 | 130p | 6p | 7p | 1030p | 8 | | | | | | | | | | | |
| Tue | 7/8 | 130p | 6p | 7p | 1030p | 8 | | | | | | 8 | | | | | |
| Wed | 7/9 | 130p | 6p | 7p | 1030p | 8 | | | | | | | | | | | |
| Thu | 7/10 | | | | | 8 | | | | | | | | | | | |
| Fri | 7/11 | 630p | 115 | 12n | 330a | 24 | | | | | | 16 | | | | | M.C. |
| Sat | 7/12 | | | | | | | | | | | | | | | | |
| Weekly Totals | | | | | | 24 | | | | | | | | | | | |
| Period Totals | | | | | | 56 | 56 | | 8 | | | | | | | | |
| Payroll Code | | | | | | 720 | 700 | 752 | 760 | | 716 | 720 | 728 | 731 | 726 | 787 | |

Employee Signature: _____

Department Manager Signature: _____

# WPHL-TV Engineering Dept Work Record

PCHR- YOUNGE 0040

Payrol No **615820**

Name **ROBERT S GRADIE**

Period Beginning **7/13/08**

Period Beginning: **7/13/08**    Ending: **7/26/08**

7/13 - 7/26/08
Paid 8/1/08

| Day | Date | In | Start Lunch | End Lunch | Out | Total Worked | Straight Time | Over Time | Sick Time | Vac. Time | Other | Night Dif $2.50/hr | MC TD $1.00/hr | PC TD $1.25/hr | Crew Chief $1.25/hr | Meal Allow. $5 | Meal Turnaround $7.50/hr | Reason for OT or P-- |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sun | 7/13 | | | | | | | | | | | | | | | | | |
| Mon | 7/14 | 130p | 530p 2A | 630A | 630A | 8½ | 8 | 9½ | | | | 5G | | | | 5G | | CREW SCHEDULED OFF DUE TO ORG/ABSENT WORKERS |
| Tue | 7/15 | 130p | 530p 4A | 430A | 1030p | 8 | 8 | | | | | 5G | | | | | | See robert. |
| Wed | 7/16 | 130p | 530p 630p | 630p | 1030p | 8 | 8 | | | | | | | | | | | |
| Thu | 7/17 | | | | | | | | | | | | | | | | | T3 sh. ht |
| Fri | 7/18 | | | | | | | | | | | | | 5G | | | | T3 shift |
| Sat | 7/19 | 145p 5p | | 6p | 1055p | | | | | | | | | | 5G | 5 | | T3 shift |
| | | | | | | Weekly Totals → | | | | | | | | | | | | |
| Sun | 7/20 | | | | | 8 | 8 | | | | | 8 | | | | | | M.C. |
| Mon | 7/21 | 10p | 330a 430a | 430a | 7a | 8 | 8 | | | | | 8 | | | | 5G | 5 | |
| Tue | 7/22 | 10p | 330a 430a | 430a | 7a | 8 | 8 | | | | | 8G | | | | | | |
| Wed | 7/23 | 10p | 330a 430a | 430a | 7a | 8 | 8 | | | | | 8G | | | | | | |
| Thu | 7/24 | | | | | | | | | | | | | | | | | |
| Fri | 7/25 | | | | | 24 | 24 | | | | | 24 8 | | | | | | |
| Sat | 7/26 | | | | | 56 | | | | | | 16 | | | | | | |

Payrol Code

Period Totals

| | 700 | 700 | 752 | 760 | | 716 | 710 | 729 | 731 | 728 | 727 |

Employee Signature: *R.S. Gradie*

Department Manager Signature:

PCHR- YOUNGE 0041

# WPHL-TV Engineering Dept Work Record

**Syrial No** 015820

**Name** ROBERT S. CRADIC

**Period Beginning** 7-27-2008  **Ending** 8-09-2008

| Day | Date | In | Start Lunch | End Lunch | Out | Total Worked | Straight Time | Over Time | Sick Time | Vac Time | Other | Night Dif $2.50/hr | MC TD $1.50/hr | PC TD $1.125/hr | Call Cont $1.125/hr | Meal Allow $6 | Book Translated $7.50/hr | Reason for OT or Pr... |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sun | 7-27 | | | | | | | | | | | | | | | | | |
| Mon | 7-28 | 1030A | 930p | 1030A | 530p | 8 | | | | | | | | | | | | M.C. |
| Tue | 7-29 | 630A | 730A | 1050A | 330p | 8 | | | | | | 8 | | | | | | M.C. |
| Wed | 7-30 | 130p | — | — | 630p | 5 | | | | | | | | | | | | |
| Thu | 7-31 | | | | | 5 | | | | | | | | | | | | |
| Fri | 8-01 | | | | | 8 | | | | | | 8 | | | | | | M.C. |
| Sat | 8-02 | 145p | 6p | 7p | 1045p | 8 | | | | | | 8 | | | | | | M.C. |
| | | | | | **Weekly Totals** | 29 | 29 | | | | | 24 | | | | | | |
| Sun | 8-03 | 145p | 6p | 7p | 1045p | 8 | | | | | | 8 | | | | | | M.C. |
| Mon | 8-04 | 145p | 5p | 6p | 145p | 8 | | | | | | 8 | | | | | | M.C. |
| Tue | 8-05 | 130p | 5p | 6p | 1045p | 8 | | | | | | | | | | | | |
| Wed | 8-06 | | | | | | | | | | | | | | | | | |
| Thu | 8-07 | | | | | | | | | | | | | | | | | |
| Fri | 8-08 | | | | | | | | | | | | | | | | | |
| Sat | 8-09 | | | | **Weekly Totals** | 24 | 24 | | | | | 16 | | | | | | |

**Employee Signature** Robert S. Cradic

**Period Totals** 53 | 53 | | | | | | 40 | | | | | | |

**Payroll Code** 700 | 700 | 702 | 760 | | | 716 | 730 | 728 | 731 | 738 | 727 | |

**Department Manager Signature**

(handwritten notes, upper right:)
7/11-00
7/27-8/9/08
Call 8/15/08

# WPHL-TV Engineering Dept Work Record

**PCHR- YOUNGE  0042**

**Payroll No** 015820

**Name** ROBERT S. CRADIC

Period Beginning **8-10-2008**    Ending **8-23-2008**

Pre-Floating Holiday
SH-Scheduled Holiday
AH-Accrued Holiday
S-Sick Day
V-Vacation Day

| Day | Date | In | Start Lunch | End Lunch | Out | Total Worked | Straight Time | Over Time | Sick Time | Vac Time | Other | Ngt Dif $2.58/hr | MO TD $1.50/hr | FC TD $1.32/hr | Crew Chief $1.02/hr | Meal Allow $5 | Shot Traveled $7.50/hr | Reason for OT or Pre |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sat | 8-16 | 102 | 530a | 1030a | 1045p | | | | | | | | 8 | | | | | M.C. |
| Fri | 8-15 | | | | | 8 | | | | | | | 8 | | | | | |
| Thu | 8-14 | 102 | 330a | 430a | 7a | 8 | 8 | | | | | | 6 | | | | | T.2 Sick, Filled in |
| Wed | 8-13 | 130p | 530p | 650p | 850p | 8 | 8 | | | | | | | | | | | |
| Tue | 8-12 | 145p | 6p | 7p | 1045p | 8 | 8 | | | | | | | | | | | |
| Mon | 8-11 | | | | | 8 | 8 | | | | | | | | | | | |
| Sun | 8-10-2008 | | | | | | | | | | | | 8 | | | | | M.C. |
| | | | | | **Weekly Totals** | **2424** | | | | | | | | | | | | |
| Sun | 8-17 | | | | | 8 | | | | | | | | | | | | |
| Mon | 8-18 | | | | | 8 | | | | | | | 8 | | | | | |
| Tue | 8-19 | | | | | 8 | 8 | | | | | | | | | | | HCJ no sin sing |
| Wed | 8-20 | 130p | 10p | 7p | 105 0p | 8 | 8 | | | | | | | | | | | |
| Thu | 8-21 | | | | | | | | | | | | | | | | | |
| Fri | 8-22 | | | 53a | 63p | | | | | | | | | | | | | |
| Sat | 8-23 | 142 | | 632 | 1045 | | | | | | | | 6 | | | | | |

Employee Signature  *Robert S. Cradic*

Department Manager Signature

**Payroll Code**

| | | | | | |
|---|---|---|---|---|---|
| Period Totals | 700 | 700 | 752 | 760 | 716 | 730 | 728 | 731 | 726 | 727 |
| Weekly Totals | | | | | | |

# WPHL-TV Engineering Dept Work Record

PCHR- YOUNGE 0043

Payroll No. 015820

Name ROBERT S. CRADIC

Period Beginning: 8/24/2008   Ending: 9/6/2008

8/24 - 9/6/08
Based on 9/12/08

FH=Floating Holiday
SH=Scheduled Holiday
AH=Accrued Holiday
S=Sick Day
V=Vacation Day

| Day | Date | In | Start Lunch | End Lunch | Out | Total Worked | Straight Time | Over Time | Sick Time | Vac. Time | Other | Nght Dbl $2.50hr | MC TD $1.50hr | PC TD $1.12hr | Crew Coor $1.12hr | Meal Allow. $6 | Shift Turnard $7.50hr | Reason for OT or Prem |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sun | 8/24/08 | | | | 5PM | 4 | 4 | | | | | | | | | | | |
| Mon | 8/25 | 6:30A | | 11:30A | 5:30P | 8 | 8 | | | | | | | | | | | |
| Tue | 8/26 | 8:15A | | 10:30P | | 8 | 8 | | | | | 8 | | | | | | AUDIO for STUDIO PRODUCTION |
| Wed | 8/27 | 9:30A | | 10:30A | 330 p | | | | | | | | | | | | | |
| Thu | 8/28 | 1035a | 9:30a | 330p | | | | | | | | | | | | | | |
| Fri | 8/29 | 635a | | 11:30a | 330P | | | | | | | | | | | | | |
| Sat | 8/30 | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| **Weekly Totals** | | | | | | 20 | 20 | | | | | 8 | | | | | | |

| Day | Date | In | Start Lunch | End Lunch | Out | Total Worked | Straight Time | Over Time | Sick Time | Vac. Time | Other | | | | | | | Reason for OT or Prem |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sun | 8/31 | | | | | | | | | | | | | | | | | |
| Mon | 9/1 | | | | | | | | | | | | | | | | | |
| Tue | 9/2 | | | | | | | | | | | | | | | | | |
| Wed | 9/3 | | | | | | | | | | | | | | | | | |
| Thu | 9/4 | | | | | | | | | | | | | | | | | |
| Fri | 9/5 | | | | | | | | | | | | | | | | | |
| Sat | 9/6 | | | | | | | | | | | | | | | | | |
| **Weekly Totals** | | | | | | | | | | | | | | | | | | |

| | Period Totals | 20 | 20 | | | | 8 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Payroll Code | | 700 | 705 | 708 | 752 | 760 | 716 | 720 | 725 | 731 | 726 | 727 |

Employee Signature: _Robert S. Cradic_

Department Manager Signature: _____

PCHR- YOUNGE 0044

4

*Rick Shultz*



**WPHL-TV, INC.**

**EMPLOYEE REVIEW FORM**

CONFIDENTIAL

I. THE PURPOSE OF THIS REPORT IS TO OBTAIN INFORMATION ON THE PERFORMANCE OF ASSIGNED DUTIES AND RESPONSIBILITIES, AS WELL AS TO EVALUATE PROSPECTS FOR FUTURE ADVANCEMENT.

Employee Name ___Richard H. Schultz___ Department ___Operations___

Job Description ___Photographer - Artist___ Date of Review _3/5/74_

Period Covered ___3/5/73 - 3/5/74___

II. **RATING OF PERFORMANCE** – BASED ON EXPERIENCE IN JOB, GRADE EMPLOYEE ON EACH OF THE ITEMS BELOW AS :

(1) Outstanding          (4) Requires improvement
(2) Above Average         (5) Unsatisfactory
(3) Normal               (6) Not applicable

A rating of (3) represents a level of performance normally expected of the employee at his level of experience.

A. Personal Characteristics:
Attitude _2 - 3_
Ability to maintain and/or develop goodwill of clients and others _2 - 3_
Personal appearance and manner _2_
Overall _2 - 3_

B. Working Characteristics:
Acceptance of responsibility _2_
Judgement _3_
Ability to follow instructions _3_
Ability to plan, organize and complete work _2_
Creativity _2_
Accuracy _2_
Efficiency _2_
Dependability _2 - 3_
Overall _2_

C. Supervision:
Ability to train assistants _2 - 3_  Direct assistants _2 - 3_
Review work of assistants _6_  Overall _2 - 3_

D. Communication:
Ability to express self in:  Writing _6_
Speech _6_   Overall _6_

III. COUNSELING

As an important part of training, it is imperative that employee's work be continually discussed with her (him) in the normal course of business, then summarized on a formal basis at the time of review. Briefly comment upon matters discussed with employee at formal review session, such as specific good work done, poor performances, correctible deficiencies and means of correcting deficiencies:

GREAT IN A PINCH, HE IS ALWAYS THERE. HE IS ACCURATE AND DEPENDABLE. HE HAS MADE ATTITUDE AND MATURITY GAINS.



Philadelphia's
**WB17**

# Performance Appraisal
# 2002

| | | | |
|---|---|---|---|
| **Name:** | Rick Schultz | **Date of Hire:** | 03/01/74 |
| **Position:** | Engineering Technician | **Last Evaluation:** | 07/01/98 |
| **Department:** | Engineering | **Type of Review:** | ● Annual  ○ Other |
| **Reviewer:** | Michael Hort | **Appraisal Period:** | 04/01/01 to 04/01/02 |

## Guidelines

Employee performance appraisal requires a supervisor's objectivity and willingness to discuss performance and career development openly and constructively. This document provides the supervisor with a guide to evaluate the performance factor as a separate element of the individual's total performance. For each relevant factor, record:

    1. The level which most accurately describes the employee's actual performance for the factor being rated.

    2. Comments to substantiate the reason for the rating of each factor

Where narrative is required, please provide specific examples wherever possible. Feel free to attach additional information, i.e. goal setting worksheets, action plans, etc., outlining previously agreed upon performance criteria.

Evaluate employee's performance relative to his/her job requirements. Assign a performance standard rating using the following scale.

### Performance Standards Descriptions

**5 - Exceptional:** Consistently achieves results that surpass the Tribune Broadcasting's high standards for the position while requiring minimal supervisory guidance. This rating is reserved for employees who regularly excel in all of Tribune Broadcasting's key performance areas.

**4 - Exceeds Standards:** Consistently achieves results that frequently surpass Tribune Broadcasting's high standards for the position while requiring some guidance.

**3 - Meets Standards:** Consistently achieves Tribune Broadcasting's high standards for the position while requiring general guidance and supervision.

**2 - Needs Improvement/Development:** The employee meets most of the requirements of the position, but needs to further develop skills and aspects of performance

**1 - Unsatisfactory:** Despite normal supervision and direction, employee has consistently not met the minimum requirements of the position. A Performance Improvement Plan should be included with this evaluation.

PCHR- YOUNGE   0047

## Section I.  Key Performance Areas

| 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|
| Unsatisfactory | Needs Improvement | Meets Standards | Exceeds Standards | Exceptional |

**1. Results Orientation:** To produce work that meets the standards in your job. To use good judgment in executing responsibilities. To compare actual performance against pre-determined objectives.

**Rating:** [ 3 ]

**Comments**  Rick has demonstrated a high level of ability in Audio. Rick has also been trained in Tape Prep.

**2. Customer Focus/Orientation:** To actively anticipate, understand and satisfy the changing needs of customers and our diverse markets. To maintain a competitive market focus when dealing with customers and to effectively communicate with them.

**Rating:** [ 3 ]

**Comments**  Rick communicates his ideas to others and has good understanding of Audio and studio production.

**3. Teamwork and People Skills:** To work effectively in a group, within and across traditional work units. To proactively communicate information and share knowledge and resources with colleagues. To contribute to inter-departmental and cross-business units initiatives as appropriate.

**Rating:** [ 3 ]

**Comments**  Rick effectively communicates his ideas and knowledge about audio to others.

**4. Flexibility/Innovation:** To respond positively to change and to accept change as a constant condition with inherent opportunities. To adapt to a variety of work-related demands and to seek creative solutions to business problems. To challenge traditional methods of accomplishing work. To offer technology-related suggestions, where possible, and implement procedures that result in improved quality, productivity or cost-savings.

**Rating:** [ 3 ]

**Comments**  Rick has been limited to audio until recently, now he is working in Tape Prep.



| Exceptional | Exceeds Standards | Meets Standards | Needs Improvement | Unsatisfactory |
|---|---|---|---|---|
| 5 | 4 | 3 | 2 | 1 |

**5. Job Skills and Knowledge:** To demonstrate mastery of current job responsibilities and field of expertise and to seek new knowledge and skills for improvement over the long-term. To build the skills that allow for working with minimal supervision and under tight time frames if necessary.

Rating:    3

| Comments | Rick has done very well in his current job as an audio person and is still in the process of getting up to speed on Tape Prep. |
|---|---|

**6. Employee Development:** To seek and achieve self-improvement, specifically in those areas outlined each year in one's development plan.

Rating:    3

| Comments | Rick's performance in Audio has been good.  Rick is working on his skills in Tape Prep. |
|---|---|

**7. Individual Performance Goals:**

| Goals: | Results: |
|---|---|
| 1. Get audio board working properly | We are currently working on audio board problems. |
| 2. Understand Tape Prep | In process of training. |
| 3. Better knowledge of Sat Recording | In process of training. |
| 4. Learn Pathfire | |
| 5. | |

### Section II. Overall Performance Rating

3

### Section III.  Principle Strengths/Development Needs

| Employee Strengths | Employee Development Needs |
|---|---|
| 1. Audio | 1. Tape Prep |
| 2. Cam | 2. MCR |
| 3. | 3. Sat Recordings |

PCHR- YOUNGE  0048





## Section IV. Development Plan

Development plans help ensure that employees possess the necessary skills and understanding to meet company objectives. Development plans also enhance employee career development options. Examples of developmental activities may include training seminars, books and videos, computer-based training, new job assignments and/or work relationships, project or committee work and job shadowing. This plan should be developed jointly between employee and supervisor.  The development plan should also list some of the employee's potential next assignments and/or positions.

|  | Developmental activities | Source for meeting need | Target date of completion | Status |
|---|---|---|---|---|
| 1. | Tape Prep | Ongoing | 9/30//2002 | |
| 2. | MCR | Training | 6/30/2003 | |
| 3. | Sat Recordings | Ongoing | 1/30/2003 | |

## Section V. Engineering Skill Levels

0=Unqualified or Untrained     1=In training     2= Qualified in emergency    3=Full qualified

|  | MCR | Tape Prep | Video | Camera | Floor | TD | Audio | T&B |
|---|---|---|---|---|---|---|---|---|
| Level | 0 | 2 | 0 | 2 | 0 | 0 | 3 | 0 |

|  | Sat Coord | Maint | Other | Sat Rec |  |  |  |  |
|---|---|---|---|---|---|---|---|---|
| Level | 0 | 0 | | 0 | | | | |

## Section VI.  Signatures

Employee:

Reviewer:

Reviewers supervisor:

# EMPLOYEE REVIEW FORM

1. Employee's Name   Rich Schultz

2. Station Plant   WPHL-TV   Department   OPERATIONS   Position   ENGINEER / PHOTOGRAPHER
   A&T

3. If employee is responsible for additional work other than that generally associated with his position, please describe briefly:

   NOT REALLY

4. Approximate number of day's work employee has been absent through illness during review period:  (Select longest applicable period——a, b or c below or specify in d below)

| | Review Period | Days Absent |
|---|---|---|
| a) 1 year ( 8 MONTHS ) | about 10 | |
| b) 6 months | | |
| c) 1 month | | |
| d) ( ) Specify | | |

   How many days above involved one sustained, unbroken, continuous illness?   3 DAYS

5. Approximate number of days late for work during review period:   FREQUENT

6. State in about 25 words or give an illustration describing each of the following employee qualities:

   ATTITUDE – toward the Company, his job, fellow employees and others.

   GOOD ATTITUDE, BUT HE IS INEXPERIENCED IN DEALING WITH ORGANIZATIONS AND DOES NOT KNOW PARAMETERS.

PCHR- YOUNGE 0050

YOUNGE  55

– 2 –

ALERTNESS – ability to grasp instructions, to meet changing conditions and
to solve novel or problem situations.

VERY GOOD.

CREATIVITY – talent for having new ideas, for finding new and better ways
of doing things and for being imaginative.

YES, INDEED. HE IS SOMEWHAT UNDISCIPLINED
IN HIS APPROACHES AND IN HIS SOLUTIONS,
BUT THE SPARKS DO FLY.

PERSONALITY – individual's behavior characteristics and his personal
suitability for the job.

HE IS SOMEWHAT VOLATILE AND
FREE, BUT WORKS WELL
WITH OTHERS.

PERSONAL APPEARANCE – personal impression an individual makes on others
(consider cleanliness, grooming, neatness and
appropriateness of dress on the job).

HE IS PRETTY.

DEPENDABILITY – ability to do required jobs well with a minimum of
supervision.

HE IS BELIEVED TO BE PROFESSIONALLY
SUPERIOR.

PCHR-  YOUNGE 0051

– 3 –

<u>AGGRESSIVENESS</u> – ability to recognize a job that needs doing and do it without being told.

THIS IS NOT ONE OF HIS OUTSTANDING QUALITIES. HE IS SLOTHFUL DUE TO LACK OF SUPERVISION IN HIS PREVIOUS ROLE AS A PHOTOGRAPHER. THIS SHOUD BE CORRECTED IN HIS NEW REPORTING RELATION SHIP.

<u>DRIVE</u> – desire to attain goals, achieve.

I DON'T KNOW, BUT PROBABLY HIGH

<u>STABILITY</u> – ability to withstand pressure and to remain calm under work pressure and in crisis situations.

MAYBE 5 ON A TEN SCALE. THIS TO BE VIEWED IN TERMS OF THE NATURE OF THE JOB.

<u>COURTESY</u> – polite attention given to customers, other employees, his supervisor and those he may supervise.

HE WORKS OUT RELATIONSHIPS WITH PEOPLE WELL. THIS IS AN OBVIOUS ATTRIBUTE.

7. What is your overall evaluation of the employee compared to his performance during the previous review period.

THIS IS MY FIRST WITH HIM. HE HAS A WAY TO GO BUT HE IS FIRST CLASS MATERIAL.

PCHR- YOUNGE   0052

– 4 –

8.  Do you believe the employee's compensation should be changed?

YES.

9.  If your answer to 8 is "YES" what change do you recommend and briefly
describe how you arrived at this evaluation.

IN ORDER TO BRING HIM INTO A MORE EQUITABLE POSITION WITH OTHERS IN THE DEPARTMENT. THIS IS PART OF A GENERAL RECLASSIFICATION OF SCHULTZ INTO A DESIGNER /PHOTOGRAPHER FROM JUST A PHOTOGRAPHER.

Additional Remarks:

AS OF 3/5/73

Date___8 MARCH 1973_____    Signature of Manager _____

Tom Jones

*If - Based purely on response to question 9 -*

FOR HOME OFFICE USE ONLY:

*This employee should be reviewed for competence after 4 months in new position.*

Employee's Name___Richard Schultz___    Date Last Increase___None___

Date Employed ___6/7/72___    Amt. Last Increase:
                                        Per Hour_____

Current Rate of Pay___$160.00___    Per Week_____

Disposition:

Amt. Increase:    Per Hour_____    Per Week___$10.00___

New Rate:    Per Hour_____    Per Week___$170.00___

Date_____    Signature_____

YOUNGE  58

TO: David Smith and Bruce Weitlisbach        Date: 6/30/93

FROM: Rick Schultz

RE: This is in response to the conversation I had with Dave
Smith pertaining to my being confronted by George Sample and
his absurd allegation of a racial injustice.  This allegation
is used to disguise his belligerent abusive conduct and
unprofessional attitude toward my person.

 I inadvertently walked out the back door at 6:15 June 29 1993
carrying a dirty milk crate that I wanted to put in my trunk.
In doing so I tripped the door alarm but the alarm stopped when
the door automatically closed.  I proceeded to my car, parked
along the park area opposite the roll up door.  As I was getting
into my car to move it to a safe nighttime area, The shipper
George Sample came out of the front of the building hollering
at me"I should know the alarm was on, that I shouldn't use that
door."  I said to him "Sorry George, no big deal go back to
sleep."  I parked my car in the front parking lot and walked
towards the front door.  George came around the side of the
building and I said to him," were do you get off screaming at
me, just do your job George and turn off the alarm like the
hired professional Guards do, courteously and friendly not
attacking.  George starts yelling," GET OTTA M FACE, GET OUT
DA M FACE, GET OUTA M FACE."  SO I SAY WHAT ARE YOU SAYING?
He says Get out of my face.  I say George "I'm not a street
person I don't understand Get Out of my Face?  Does it mean
the conversation is over?  I CONTINUED to tell him it was no
big deal, I was sorry the alarm was activated.  I was sorry
I bothered him and he was blowing it out  of proportion.

I then went into the building mad as hell at being yelled
at by George but I understand that this happens a lot during
evening hour when alcohol (very noticeable on his breath) clouds
his ability to do an adequate job protecting the building.
   I believe to consider this a Racial situation as indicated
by my boss to be an insult.  Color has nothing to do with
improper behavior and is to often used in our company as a way
of justifying a ridiculous argument.

PCHR- YOUNGE  0055



**Gunnar Rieger**
director of engineering

October 4, 2002

Rick Schultz
1411 Fitzwatertown Road
Willow Grove, PA 19090

Dear Rick,

We have concluded our investigation concerning allegations from you that Bill Groves made threatening comments to you in the workplace on Saturday, September 28, 2002. After interviewing all parties involved as well as any possible witnesses, there has been no corroboration of your claim. Therefore, we cannot make any findings or conclusion as to the alleged threat. However, we will continue to closely monitor this situation in future.

Although there was no independent corroboration of the alleged threat, the investigation, however, did reveal that both parties, based on their own admissions, used profane language in the workplace during an argument on September 28, 2002. By this letter, you are warned that such behavior is prohibited and a violation of the Company's Zero Tolerance Policy. Attached please find an additional copy of the policy for your immediate review. Any further behavior of this kind could result in further corrective action, up to and including termination.

You are also reminded that retaliation of any sort is strictly prohibited and could result in corrective action, up to and including termination. Please do not discuss this matter or resolution in the workplace.

Sincerely,

Gunnar Rieger

Cc:   Rachael Amara, Director of Human Resources
      Larry Del Spechio, IBEW Assistant Business Manager
      Personnel File

wphl-tv  5001 wynnefield avenue  philadelphia, pa 19131 / 215.883.3350 / grieger@tribune.com / fax 617.507.8001 / a tribune broadcasting station

## Statement of Harassment Policy

Tribune Company is committed to providing its employees a professional work environment, free from harassment. This commitment is in keeping with the company's equal employment opportunity policy and practices and with applicable statutes and regulations.

Any behavior that creates or is reasonably perceived by an individual to create a hostile, offensive or intimidating work environment constitutes harassment. Harassment includes, but is not limited to, the following:

- Physical or verbal abuse (demeaning, insulting comments)
- Derogatory or off-color jokes
- Slurs (racial, ethnic, religious, gender, age, etc.)
- Unwelcome physical contact of any nature
- Taunting, intended to provoke an employee
- Display or circulation of written materials or pictures (hard copy, via electronic mail, etc.) that are derogatory to males, females, persons with disabilities, or to racial, ethnic, religious, and other protected groups
- Unwarranted and unfounded charges and complaints brought against a fellow employee with intent to discredit, harass or in any way harm that employee
- Unwelcome and unsolicited sexual advances
- Requests for sexual favors used as a condition of employment or affecting any personnel decisions, such as hiring, promotion, transfer, performance appraisal, compensation
- Employment opportunities or benefits granted to one individual over another individual as a result of submission to or rejection of sexual advances.

The company prohibits harassment by employees, co-workers, supervisors and managers and views such actions as extremely serious misconduct. It is the responsibility of each employee to ensure that these prohibited activities do not occur. Violations of this policy will result in disciplinary action, including possible discharge.

Further, the company believes harassing behavior or language directed at company employees by outside vendors, consultants, etc., is an affront to Tribune Company business ethics, beliefs and practices. As a representative of Tribune Company, you should state that harassing behavior or language violates company policies. Similarly, you are prohibited from engaging in any harassing behavior toward outside vendors, consultants, customers or others. If you feel that you have been or are being harassed, you should immediately bring it to the attention of your department head, to human resources at your business unit or if you prefer, to Luis Lewin, senior vice president/human resources of Tribune Company. Mr. Lewin may be reached at 312/222-4581. Complaints will be investigated and resolved in a thorough and timely manner. Every effort will be made to ensure confidentiality throughout the complaint/investigation process. Retaliation against anyone who complains of harassment is in itself a violation of this policy.

YOUNGE  61

**(From Rick Schultz)**

TO: Gunnar Rieger

From: Rick Schultz

Re: Unsafe work environment

Gunnar, I feel that I have to mention the hostile work environment I was placed in while working in tape prep at approximately 4pm on Saturday September 28 2002. While standing discussing satellite feeds with Rudy Mears, I was approached by Bill Groves. Bill was displeased and angry about his underpayment of union dues. This conversation was a carryover from one we were having before work in the company lunchroom. Groves expressed his displeasure with the union and was on a tirade about how this union did nothing for him but cost him money (dues). I told him that as a union member I found his outburst unwarranted and if it continued I would call my union business manager and report him for anti-union statements on the company premises.

During the confrontation in tape prep Groves left his position in master control and came into tape prep and again expressed his displeasure with his monthly union dues. I told him again as a twenty eight year union member I would notify the Business manager of his out burst. He then approached me in an aggressive manner saying he would handle me in his own way if I made the call.

When pressed about what he meant he got very close to my face and seemed to be removing his glasses saying that "he'd killed people before and he knew how to take care of people like me". He continued with his abuse and finally proceeded to go out the tape prep room door, I said," I know how to handle people like him" and with my hand extended to shake with an apologetic gesture. He again said "that he'd killed people before". When he looked at my hand, offered in friendship he refused.

I felt threatened by his gestures and his anger directed at me for not minding my own business. No one should have to work with a co-worker threatening violence especially using the phrase; "I've killed before". This was not done in private, technician Rudy Mears was present and heard the whole incident. I at one time said" Bill do you realize your threatening me with a witness present and he said "It didn't matter".

The company should take steps to keep the workplace a safe environment. His threats were taken lightly by me at the time, but as the day progressed they continued to haunt my sub-conscience. I was fearing his return to my work area to follow up on his threats. I asked Rudy Mears if Groves had ever done anything like this before and Rudy said he'd seen him mad but he was surprised at the threat of violence.

Please do not disregard this letter as a frivolous matter just because it was between two union employees. Please see it as a situation that could develop into a violent confrontation in the future,

PCHR-YOUNGE 0059



Channel 17
WPHL-TV INC.

TO: Walt Barlay

FROM: Jon Cradl

DATE: 9/18/85

Today I went with a crew on remote to shoot at an old age nursing home for West Barlet. I went with Rick Shultz, Chris Schaffer and Charlie O'Gara. During the shoot with many old folks around and with the shoot there and with administrators from the home, Rick Shultz angrily [crossed out] said some swear words loud enough for all to hear. After that shoot I took him aside and told him he should not talk like that in a professional situation. I asked him why he had acted that way and he said that he was reacting to something

PHL 17
Philadelphia

TO: Dave

FROM: Rick Schultz

DATE: Monday 26 DEC 94

You remembered hurt my back in the studio. I could hardly walk or stand. you said don't fill for "workmans comp") you would work it out. Dave, I'm still hurting, especially when I have to stand for long periods

in the studio. Originally you said I was a dern good audioman and you wanted me on audio for the news, Dave I haven't been on audio for a month or more. My injury is one item, and I shouldn't be standing around a cold studio, but what cold studio and audio styles is about me and audio styles is gone (the problem that held me gone (the problem off A-1). So why am I fallen off

Said that there was nothing he could do about it. I think that both his language and his response to my comments were unacceptable

Ron Crudell

to: David Smith
from :Rick Schultz                                    October 21, 1994


   I want to explain to you that I have no desire to work on the
news. When asked, I expressed interest in working the 6-3
promotion shift when no one else desired it. Because of a threat
of discrimination ( Klink) I am now being transfered into the
news operation. I will attempt to give my complete cooperation.
But it is not what you and I agreed on.



May 15, 2008

Keith Younge
2117 Melvin St
Philadelphia, PA 19131

Dear Keith,

This letter is to notify you that we have concluded our investigation into the incident that occurred on May 7, 2008 between you and Rick Schultz. We have concluded that your conduct in this incident is in violation of our Code of Conduct and Anti-Harassment policies. For that reason, your employment with WPHL will be terminated effective May 8, 2008. Any personal items you may have at the station will be mailed to your home address.

Sincerely,

Michael Hort
Engineering Manager
WPHL – TV


Cc:    Larry Del Spechio, IBEW Business Manager
       Personnel File



May 15, 2008

Richard Schultz
1411 Fitzwatertwn Rd
Willow Grove, PA 19090

Dear Rick,

This letter is to notify you that we have concluded our investigation into the incident that
occurred on May 7, 2008 between you and Keith Younge. We have concluded that your
conduct in this incident is in violation of our Code of Conduct and Anti-Harassment
policies. For that reason, your employment with WPHL will be terminated effective May
10, 2008. Any personal items you may have at the station will be mailed to your home
address.

Sincerely,

Vince Giannini
VP/General Manager
WPHL – TV

Cc:    Larry Del Spechio, IBEW Business Manager
       Personnel File

July 9.2012      1

Keith Younge    610-529-5780    -keyo3600@Aol.Com

Kathy Mc Cabe  Tribune Corp. Lawyer
312-451-8574
312-222-5966

Eddy Rivera  Ch 17 Security Guard
267-415-0755

Sandy Ch 17 Co-worker (trained under)
610-622-0657

Diana Streney Epiq Rep.
1-888-287-7586
646-282-2546 cell
Claim #3333

Jillian Ludwig at Sidley Austin
Counsel to Tribune
312-853-7523
Ask about EPLI
Employment Practice Liability Insurance

EEOC File # 17G2008-00219C
PCHR File # EQ8Q65Q2

Respondent
Contacts



Home   Contests   TV Times

Housing & Eco
Business Development
Education & Commun

Phillies   News   Health   Entertainment   Phi17   Photos   Shows   Better   Philly Deals   Lifestyl

## Contact Us

Name:

City:

State:

Email:

Age:

Comment:

[Send]

Feel free to mail your comments to:

**myphi17** 5001 Wynnefield Ave.
Philadelphia, PA 19131
215.878.1700

**CENTRAL CONTACTS**

Management:
**Vince Giannini** -Vice President and General Manager

Programming:
**Jacqueline Green** - Executive & Programming Coordinator

Finance & Human Resources:
**David Mayersky** - Controller

Creative Services/Promotion:
**Wendy Kaiser** - Creative Services Director

Sales:
**Kristin Long** - General Sales Manager

Engineering:
**Mike Hort** - Engineering Manager

Public Relations/Publicity/Events/
**Sabrina Andrews** - Publicity/Events Coordinator

Website:
**Tony Romeo** -Interactive Producer

*Copy*

UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE
Tribune Company Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5069
New York, NY 10150-5069

# PROOF OF CLAIM

Filed: USBC - District of Delaware
Tribune Company, Et Al.
08-13141 (KJC)            0000003333

| Name of Debtor Against Which Claim is Held | Case No. of Debtor |
|---|---|
| TRIBUNE TELEVISION COMPANY | 08-13241 (KJC) |

NOTE: ~~This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.~~

**THIS SPACE IS FOR COURT USE ONLY**

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)

TRB (MERGE2.DBF,SCHED_NO) SCHEDULE #: 241004820*****
KEITH YOUNGE
2117 MELVIN STREET
PHILADELPHIA, PA 19131   AND
DANIEL HETZNECKER, ESQUIRE, 1900 SPRUCE STREET,
PHILA., PA 19103
Telephone number: 215-735-6464  Email Address: DHetznecker@gloss-marshall.com

Name and address where payment should be sent (if different from above)

SAME AS ABOVE

Telephone number:            Email Address:

☐ Check this box to indicate that this claim amends a previously filed claim.

Court Claim Number:
(If known)

Filed on:

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

Your claim is scheduled by the Debtor as:

UNSECURED
UNLIQUIDATED
DISPUTED

PCHR- YOUNGE  0066

1. Amount of Claim as of Date Case Filed:  $  75,000.00

If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete item 4.

If all or part of your claim is entitled to priority, complete Item 5.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges.

☐ Check this box if claim is for a claim related to goods delivered during the twenty (20) days prior to December 8, 2008 (the "Petition Date"), pursuant to 11 U.S.C. §503(b)(9).  Please indicate amount entitled to 503(b)(9) $

2. **Basis for Claim:** ~~RACE DISCRIMINATION TITLE VII OF THE FEDERAL CIVIL~~ RIGHTS ACT AND PENNSYLVANIA STATUTORY AND COMMON LAW
(See instruction #2 on reverse side.)

3. Last four digits of any number by which creditor identifies debtor: _____
3a. Debtor may have scheduled account as: _____
(See instruction #3a on reverse side.)

4. **Secured Claim (See instruction #4 on reverse side.)**
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.

Nature of property or right of setoff:  ☐ Real Estate  ☐ Motor Vehicle  ☐ Other
Describe:

Value of Property: $_____  Annual Interest Rate _____%

Amount of arrearage and other charges as of time case filed included in secured claim, if any:

$_____  Basis for perfection: _____

Amount of Secured Claim: $_____  Amount Unsecured: $_____

5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries or commissions (up to $10,950*), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. § 507(a)(5).

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(____).

Amount entitled to priority:

$_____

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

6. **Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

7. **Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. (See instruction 7 and definition of "redacted" on reverse side.)
DO NOT SEND ORIGINAL DOCUMENTS.  ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

**FOR COURT USE ONLY**

FILED / RECEIVED

JUN 0 1 2009

EPIQ BANKRUPTCY SOLUTIONS, LLC

Date:
5/27/2009

Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.

*[signature]*

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

COPY

**UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE**
Tribune Company Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5069
New York, NY 10150-5069

**PROOF OF CLAIM**

Filed: USBC - District of Delaware
Tribune Company, Et Al.
08-13141 (KJC)          0000003333

| Name of Debtor Against Which Claim is Held | Case No. of Debtor |
|---|---|
| TRIBUNE TELEVISION COMPANY | 08-13241 (KJC) |

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

**THIS SPACE IS FOR COURT USE ONLY**

Name and address of Creditor : (and name and address where notices should be sent if different from Creditor)

TRB (MERGE1.DBF,SCHED_NO) SCHEDULE #: 2410042200000
KEITH YOUNGE
2117 MELVIN STREET
PHILADELPHIA, PA 19131    AND
DANIEL HETZNECKER, ESQUIRE, 1900 SPRUCE STREET,
PHILA., PA 19103
Telephone number: 215-735-6464 Email Address: DHetznecker@giosa-marshal.com

☐ Check this box to indicate that this claim amends a previously filed claim.

Court Claim Number:_____
(If known)

Filed on: _____

Your claim is scheduled by the Debtor as:

**UNSECURED**
**UNLIQUIDATED**
**DISPUTED**

Name and address where payment should be sent (if different from above)

SAME AS ABOVE

Telephone number:          Email Address:

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

**PCHR- YOUNGE    0067**

1. **Amount of Claim as of Date Case Filed:** $ ___75,000.00___

If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete Item 4.

If all or part of your claim is entitled to priority, complete Item 5.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges.

☐ Check this box if claim is for goods delivered during the twenty (20) days prior to December 8, 2008 (the "Petition Date"), pursuant to 11 U.S.C. §503(b)(9). Please indicate amount entitled to 503(b)(9) $

2. **Basis for Claim:** RACE DISCRIMINATION, TITLE VII OF THE FEDERAL CIVIL RIGHTS ACT AND PENNSYLVANIA STATUTORY AND COMMON LAW
(See instruction #2 on reverse side.)

3. **Last four digits of any number by which creditor identifies debtor:** _____
   3a. Debtor may have scheduled account as: _____
   (See instruction #3a on reverse side.)

4. **Secured Claim (See instruction #4 on reverse side.)**
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.

Nature of property or right of setoff:  ☐ Real Estate    ☐ Motor Vehicle    ☐ Other
Describe:

Value of Property: $_____ Annual Interest Rate _____%

Amount of arrearage and other charges as of time case filed included in secured claim, if any:

$_____ Basis for perfection: _____

Amount of Secured Claim: $_____ Amount Unsecured: $_____

5. **Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.**

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries or commissions (up to $10,950*), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. § 507(a)(5).

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(____).

Amount entitled to priority:

$_____

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

6. **Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

7. **Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. (See instruction 7 and definition of "redacted" on reverse side.)
DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

Date:          Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.

5/27/2009

**FOR COURT USE ONLY**

**FILED / RECEIVED**

JUN 0 1 2009

EPIQ BANKRUPTCY SOLUTIONS, LLC

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.