IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Reorganized Debtors. | Jointly Administered |
| | Hearing Date: To Be Scheduled<br>Related to Docket Nos. 13715 and 13755 |

## REORGANIZED DEBTORS' REPLY IN SUPPORT OF OBJECTION TO CLAIM NO. 3333 OF KEITH YOUNGE, PURSUANT TO SECTIONS 502(b) AND 558 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 3001, 3003, AND 3007

The reorganized debtors in the above-captioned chapter 11 cases (collectively, the "Reorganized Debtors"), by and through their undersigned counsel, hereby file this reply (the "Reply") in support of the Reorganized Debtors' Objection to Claim No. 3333 of Keith Younge, Pursuant to Section 502(b) and 558 of the Bankruptcy Code and Bankruptcy Rules 3001, 3003,

---

[1] The Reorganized Debtors, or successors-in-interest to the Reorganized Debtors, in these chapter 11 cases, along with the last four digits of each entity's federal tax identification number, are: Tribune Company (0355); California Community News, LLC (5306); Chicago Tribune Company, LLC (3437); Chicagoland Publishing Company, LLC (3237); Chicagoland Television News, LLC (1352); forsalebyowner.com, LLC (4276); ForSaleByOwner.com Referral Services LLC (9205); Hoy Publications, LLC (2352); Internet Foreclosure Service, LLC (6550); KDAF, LLC (6969); KIAH, LLC (4014); KPLR, Inc. (7943); KRCW, LLC (1772); KSWB, LLC (7035); KTLA, LLC (3404); KTXL, LLC (3844); KWGN, LLC (5347); Los Angeles Times Communications LLC (1324); Magic T Music Publishing Company, LLC (6522); NBBF, LLC (0893); Oak Brook Productions, LLC (2598); Orlando Sentinel Communications Company, LLC (3775); Sun-Sentinel Company, LLC (2684); The Baltimore Sun Company, LLC (6880); The Daily Press, LLC (9368); The Hartford Courant Company, LLC (3490); The Morning Call, LLC (7560); TMS News and Features, LLC (2931); Tower Distribution Company, LLC (9066); Towering T Music Publishing Company, LLC (2470); Tribune 365, LLC (7847); Tribune Broadcasting Company, LLC (2569); Tribune Broadcasting Hartford, LLC (1268); Tribune Broadcasting Indianapolis, LLC (6434); Tribune Broadcasting Seattle, LLC (2975); Tribune CNLBC, LLC (0347); Tribune Direct Marking, LLC (1479); Tribune Entertainment Company, LLC (6232); Tribune Investments, LLC (6362); Tribune Media Services, LLC (1080); Tribune Media Services London, LLC (6079); Tribune ND, LLC (4926); Tribune Publishing Company, LLC (9720); Tribune Television New Orleans, Inc. (4055); Tribune Washington Bureau, LLC (1088); WDCW, LLC (8300); WGN Continental Broadcasting Company, LLC (9530); WPHL, LLC (6896); WPIX, LLC (0191); WPMT, LLC (7040); WSFL, LLC (5256); WXMI, LLC (3068). The corporate headquarters and the mailing address for each entity listed above is 435 North Michigan Avenue, Chicago, Illinois 60611.

and 3007 (Docket No. 13715) (the "Objection"), filed on September 6, 2013.[2] On October 15, 2013, Mr. Younge filed a response to the Objection (Docket No. 13755) (the "Response").[3]

## ARGUMENT

1. The Response is comprised of a five (5) page response and seventy-four (74) pages of supporting documents, which consist almost exclusively of materials that were provided by WPHL to the Philadelphia Commission on Human Relations ("PCHR") in support of its opposition to the prepetition discrimination and wrongful termination Complaint that was filed by Mr. Younge with that agency. (See Response at 18-28, 33-78.)[4] As noted in the Objection, subsequent to the Petition Date, the PCHR dismissed the Complaint. (See Obj. at 5 n.6.) Moreover, as this Court explained in New Century, voluminous submissions of notices, letters, and documents are insufficient to establish the validity of a claim unless such documents in substance prove the validity of the claim by a preponderance of the evidence. In re New Century TRS Holdings, Inc., No. 07-104516, Slip Op. at 8 (Bankr. D. Del. Apr. 11, 2011) (Carey, J.) (citing In re Allegheny Int'l, Inc., 954 F.2d 167, 173-74 (3d Cir. 1992). That evidence must be admissible; Mr. Younge's submissions are almost entirely hearsay, if not double or triple hearsay. See Fed. R. Evid. 801, 802, 805. However, as discussed in detail below, even assuming solely for the sake of argument that those submissions were admissible

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Objection.

[3] At the time the Reorganized Debtors filed the Objection and Mr. Younge filed the Response, Mr. Younge was represented by counsel. Subsequent to the filing of the Response, the parties agreed to adjourn the hearing on the Objection in order to engage in discussions regarding the Objection, the Response, and the potential for a consensual resolution of the Objection. The Reorganized Debtors' deadline for filing a reply in support of the Objection was likewise adjourned during this time. Those discussions have not resulted in a consensual resolution of the Objection and the Reorganized Debtors have been informed in writing that Mr. Younge is no longer represented by counsel. Accordingly, the Reorganized Debtors now request adjudication of the Objection by this Court.

[4] A number of those documents were also appended to the Younge Claim, including Mr. Younge's Statement of Particulars concerning the altercation with Mr. Schultz on the night of May 7, 2008 that is the subject of the Younge Claim. See Claim No. 3333.

and factually accurate, the Younge Claim would nonetheless fail to state a discrimination claim premised either on hostile work environment or wrongful termination as a matter of law.

### A. The Younge Claim Fails to State a Wrongful Termination Claim

2. The Response raises no opposition to the Objection in respect of Mr. Younge's race discrimination claim challenging his termination. This is not surprising, because Mr. Younge has admitted to participating in *and indeed escalating* the altercation to the point where it had to be diffused by WPHL's security guard. That claim is meritless for all of the reasons stated in the Objection, i.e., that WPHL has a clear non-discriminatory justification for Mr. Younge's termination. (See Obj. ¶¶ 30-38.) As the Response effectively concedes, there is no evidence of racial animus *by WPHL* in terminating Mr. Younge's employment following the altercation. Instead, the record demonstrates that by terminating both Mr. Younge and Mr. Schultz, WPHL's actions were neutral and consistent with its corporate policies regarding the consequences of fighting in the workplace.

### B. The Younge Claim Fails to State a Hostile Work Environment Claim

3. Here, nothing in the Response or in the materials appended thereto alters the fact that Mr. Younge's allegations, even if accepted as true, do not rise to the level of legally cognizable "severe or pervasive" harassment, much less that WPHL's management was aware of, or acted negligently in permitting, any such "severe or pervasive" harassment. (See Obj. ¶ 25, describing standards applicable to hostile work environment claims and collecting illustrative cases of non-actionable conduct; Obj. ¶ 27-28, describing standards applicable to imposing respondeat superior liability on an employer.) Because neither the Younge Claim nor the Response can establish these essential elements of a discrimination claim, the Younge Claim fails as a matter of law.

### a) The Younge Claim Does Not Meet the High Bar Required To Establish A Hostile Work Environment Claim

4.      As described in detail in the Objection, under applicable law, regardless of whether Mr. Schultz harbored some kind of racial animus in his heart, there is no evidence that Mr. Schultz engaged in any harassing conduct directed at Mr. Younge (racial or otherwise) prior to the night of May 7, 2008 – i.e., prior to the altercation that Mr. Younge has admitted he participated in and indeed escalated.

5.      The record, even as adduced from Mr. Younge's own filings, does not support Mr. Younge's statement that he was "forced to endure repeated, unrelenting and continuing variations of racial [epithets] during his very brief tenure," much less over an alleged 14-day period (See Response ¶ 14.)[5] Rather, the subject of the Younge Claim involves one incident on one night, and the words allegedly used by Mr. Schultz to Mr. Younge during their argument – identified by Mr. Younge as being "Spike," "Spike Lee," "ghetto," and "homie" – even if racially motivated, do not give rise to actionable claims against WPHL. As a matter of law, this evidence (even if taken as true) is insufficient to constitute unlawful harassment or avoid summary judgment. (See Obj. ¶¶ 25-26.) As the Supreme Court has stated, "'mere utterance of an . . . epithet which engenders offensive feelings in an employee' does not sufficiently affect the conditions of employment to implicate Title VII." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57 (1986)).

---

[5] Also unsupported are Mr. Younge's assertions that he experienced "fourteen days of continued racial slurs." (See Response ¶¶ 3-5.) Nowhere does Mr. Younge allege that he had met or spoken with Mr. Schultz at any point during the course of his employment prior to the night of May 7, 2008 (or that any other person had made a disparaging remark to him, which is beyond the scope of the Younge Claim in any event). Also, as discussed in detail below, Mr. Younge does not allege, nor is there any indication in the record, that he was aware of any prior statements that Mr. Schultz allegedly made to his co-worker, Steve. Leff, concerning Mr. Young until those statements were disclosed during the investigation that was conducted subsequent to the altercation.

6. The Response introduces one additional alleged statement, an alleged reference to a "hoop," supposedly made by Mr. Schultz to Steve Leff (a fellow technician, not a supervisor) the day before the altercation between Mr. Schultz and Mr. Younge. (See Response ¶ 9.) Any such purported statement would be immaterial and similarly insufficient to avoid summary judgment because it could not have constituted harassment towards Mr. Younge even if it had occurred. First, Mr. Younge concedes that he was not even aware of any such alleged statement at any time during his employment, and thus he could not have been "harassed" by it. See Harris, 510 U.S. at 21-22 ("[I]f the victim does not subjectively [or objectively] perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.") Second, even if he had known of the alleged statement (which his own submissions proves he did not), as a matter of law, it still would not amount to "[harassment] sufficiently severe or pervasive to alter the conditions of [Mr. Young's] employment. Meritor Sav. Bank, 477 U.S. at 67.[6]

### b) The Younge Claim Does Not Establish Respondeat Superior Liability on WPHL

7. In cases of co-worker harassment, that claimant bears the burden of demonstrating that the employer knew of the harassment and negligently failed to take prompt remedial action. (See Obj. ¶ 27, citing Kunin v. Sears Roebuck & Co., 175 F.3d 289, 293-94 (3d Cir. 1999) ("[L]iability exists where the defendant knew or should have known of the harassment and failed to take prompt remedial action.")). Mr. Younge has offered no admissible evidence to support an allegation that WPHL's management had any reason to know prior to the altercation

---

[6] For that same reason, any statements that Mr. Schultz may have made to third parties after the night of May 7, 2008 (for example, during WPHL's internal investigation or the subsequent grievance arbitration) are irrelevant because (i) they could not have constituted harassment towards Mr. Younge and (ii) they are not probative of what WPHL's management knew or did (or did not do) relative to any alleged harassment of Mr. Younge. (See Response ¶¶ 10-12.)

5

that Mr. Schultz would have made any racially derogatory statements to Mr. Younge. Nothing in the record supports Mr. Younge's statement in the Response that Mr. Schultz made "statements to his employer" or any person other than Mr. Leff regarding Mr. Younge prior to the altercation. (Compare Response ¶ 9 with id. at 41.)[7] The allegation that Mr. Leff purportedly told Ed Elias and Mickey Hort about Mr. Schultz's statement referring to Mr. Younge as a "hoop" the day before the altercation is hearsay and is insufficient to impute liability on WPHL. (See Response at 41; Obj. ¶ 27-28.) Even if the allegation is accepted as true and regarded as non-hearsay, there is no dispute that, at the time, Mr. Younge had experienced no harassing conduct whatsoever, much less "severe and pervasive" harassment, that would have triggered an affirmative duty on the part of WPHL to take remedial action.[8] Rather, the record demonstrates that immediately upon becoming aware that Mr. Schultz had made statements to Mr. Younge with alleged racial overtones, WPHL instituted an internal investigation that resulted in Mr. Schultz's termination. (See Obj. ¶¶ 28-29.)

        8. Mr. Younge also relies on decades-old records in Mr. Schultz's employment file, which apart from being hearsay, do not support a conclusion that WPHL's management had any prior knowledge or reason to believe that Mr. Schultz would engage in any alleged harassing conduct directed at Mr. Younge (or any other employee). (See Response ¶¶ 6-8.) Those same materials can fairly be read to contradict such a conclusion. For example, Mr. Schultz's 1973 performance review states that he "works well with others" and that "he works

---

[7] There is likewise no support in the record that Mr. Schultz made that statement in an email (as Mr. Younge alleges); rather, it was allegedly made to Mr. Leff orally. (Compare Response ¶ 9 with id. at 41.)

[8] There is no evidence that WPHL's management knew or had any reason to know prior to the altercation that "hoop" was a racially derogatory term; indeed, Mr. Younge has conceded he did not know what "hoop" referred to when he first heard the term. Also, Mr. Leff allegedly told Ms. Douglas, WPHL's Human Resources Coordinator, during her investigation that he did not know what a "hoop" was, and it was allegedly Ms. Douglas who told him that "someone told me it was a derogatory term for a black person" to which Mr. Leff allegedly "shook his head." (See Response at 41.)

6

out relationships with people well. This is an obvious attribute" – comments that the Response conveniently omits. (See Response at 61-62.) Similarly, the 1993 memo written by Mr. Schultz expressly disclaims that Mr. Schultz harbored racial animus. (Compare Response ¶¶ 6-7 with id. at 66-67.) At most, the memo suggests that a security guard yelled at Mr. Schultz for inadvertently tripping an alarm, Mr. Schultz felt disrespected and argued back (not using any racial terminology), the guard apparently claimed that Mr. Schultz yelled at him because of his race, and Mr. Schultz strongly disagreed with the accusation. (See Response at 66-67.) There is no indication of any finding by WPHL with respect to these allegations, and the absence of anything further in the record suggests that this was a non-issue for the past 21 years.

[Remainder of Page Intentionally Left Blank]

46429/0001-10509956V1

WHEREFORE, for the reasons set forth herein and in the Objection, the Reorganized Debtors respectfully request that the Court enter an order in the form submitted with the Objection, pursuant to section 502(b) of the Bankruptcy Code and Bankruptcy Rules 3001, 3003, and 3007, (i) disallowing and expunging the Younge Claim in its entirety; (ii) authorizing the Claims Agent to expunge the Younge Claim from the official claims register maintained in these chapter 11 cases; and (iii) granting such other and further relief as the Court deems just and proper.

Dated: Wilmington, Delaware
      April 11, 2014

Respectfully submitted,

SIDLEY AUSTIN LLP
James F. Conlan
Kenneth P. Kansa
Jillian K. Ludwig
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile:  (312) 853-7036

-and-

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.

By: _____
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Facsimile:  (302) 652-3117

ATTORNEYS FOR REORGANIZED DEBTORS

46429/0001-10509956V1