## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Reorganized Debtors. | Jointly Administered |

### SUPPLEMENTAL RESPONSE OF KEITH YOUNGE TO DEBTORS' CLAIM OBJECTION

Creditor Keith Younge ("Mr. Younge") in the above-captioned case, by and through his undersigned counsel, pursuant to this Court's order dated July 15, 2014, hereby files this Supplemental Response to the Reorganized Debtors' Objection to Claim No. 3333 (Docket No. 13715)(the "Objection"). On October 15, 2013, Mr. Younge filed a response to the Objection (Docket No. 13755)(the "Response"). On or about April 11, 2014, the Reorganized Debtors filed a Reply in Support of the Objection to Mr. Younge's claim (Docket No. 13870)(the "Reply"). The parties had been in discussions about a possible resolution of this claim when Mr. Younge fell ill with a stroke which forced him to be hospitalized for six (6) weeks. On July 15,

---

[1] The Reorganized Debtors, or successors-in-interest to the Reorganized Debtors, in these chapter 11 cases, along with the last four digits of each entity's federal tax identification number, are: Tribune Company (0355); California Community News, LLC (5306); Chicago Tribune Company, LLC (3437); Chicagoland Publishing Company, LLC (3237); Chicagoland Television News, LLC (1352); forsalebyowner.com, LLC (4276); ForSaleByOwner.com Referral Services, LLC (9205); Hoy Publications, LLC (2352); Internet Foreclosure Service, LLC (6550); KDAF, LLC (6969); KIAH, LLC (4014); KPLR, Inc. (7943); KRCW, LLC (1772); KSWB, LLC (7035) \; KTLA, LLC (3404); KTXL, LLC (3844); KWGN, LLC (5347); Los Angeles Times Communications LLC (1324); Magic T Music Publishing Company, LLC (6522); NBBF, LLC (0893); Oak Brook Productions, LLC (2598); Orlando Sentinel Communication Company, LLC (3775); Sun-Sentinel Company, LLC (2684); The Baltimore Sun Company, LLC (6880); The Daily Press, LLC (9368); The Hartford Courant Company, LLC (3490); The Morning Call, LLC (7560); TMS News and Features, LLC (2931); Tower Distribution Company, LLC (9066); Towering T Music Publishing Company, LLC (2470); Tribune 365, LLC (7847); Tribune Broadcasting Company, LLC (2569); Tribune Broadcasting Hartford, LLC (1268); Tribune Broadcasting Indianapolis, LLC (6434); Tribune Broadcasting Seattle, LLC (2975); Tribune CNLBC, LLC (0347); Tribune Direct Marketing, LLC (1479); Tribune Entertainment Company, LLC (6232); Tribune Investments, LLC (6362): Tribune Media Services, LLC (1080); Tribune Media Services London, LLC (6079); Tribune ND, LLC (4926); Tribune Publishing Company, LLC (9720); Tribune Television New Orleans, Inc. (4055); Tribune Washington Bureau, LLC (1088); WDCW, LLC (8300); WGN Continental Broadcasting Company, LLC (9530); WPHL, LLC (6896); WPIX, LLC (0191); WPMT, LLC (7040); WSFL, LLC (5256); WXMI, LLC (3068). The corporate headquarters and the mailing address for each entity listed above is 435 North Michigan Avenue, Chicago, Illinois 60611.

2014, this Court held a hearing on the Reorganized Debtors' Objection, wherein Mr. Younge's undersigned counsel appeared on his behalf.  The Court asked the parties to file Supplemental Responses in connection with the Objection to determine, *inter alia*, whether the resolution of the claim would require a factual and/or evidentiary hearing.  Should such an evidentiary hearing take place, Mr. Younge can corroborate all of the facts set forth in this Supplemental Response. For the reasons set forth in Mr. Younge's initial Response and this Supplemental Response, including the consideration of the documents attached thereto and the following Supplemental Response, Mr. Younge respectfully requests that this Court overrule the Reorganized Debtors' Objection.

This is Mr. Younge's Supplemental Response to the Objection.

## **BACKGROUND**

1.      Mr. Younge set forth a cursory set of background facts which deserve a little more explanation here for a better understanding of the nature of Mr. Younge's claim.  It should be noted that Mr. Younge did not have Delaware counsel at the time he filed his Response to the Objection.

2.      Mr. Younge is a 59-year old African-American male, approximately five feet, two inches in height.

3.      Prior to being hired, Mr. Younge interviewed with Mickey Hort at Channel 17 (hereinafter, "Channel 17" or the "Station").

4.      Mr. Hort was emphatic as he reviewed Mr. Younge's resume, and noted several times what great experience Mr. Younge had, and that Mr. Younge was "overly qualified" for the position.  Mr. Hort acted as though Mr. Younge was perfect for the long term plans of the company.

5.      Mr. Hort was thrilled to hire Mr. Younge because Channel 17 was planning to start its own news department.  Further, the station had recently arranged to air certain Phillies baseball games, and was planning to do its own live newsbreaks.

6.      Mr. Hort reported that he was pleased Mr. Younge had experience in what needed to be done to produce a television show.

7.      As Mr. Younge walked around the office, he was stopped by a number of Channel 17 employees who remarked on him being the "new kid."

8.      Many of the employees, including Mr. Hort, informed Mr. Younge that it was normal to begin a career at the station as a summer intern, which often leads to a full time position.  Mr. Hort, for example, began his career with the Station as a summer intern 30 years prior.

9.      After the interview with Mr. Hort, Mr. Younge spoke with others including John Faiss, who congratulated Mr. Younge on his new position.  Mr. Faiss confirmed that it is common in the business to have the good summer interns stay on full time.  Since Mr. Faiss worked with Mr. Younge at another radio station, Mr. Faiss knew of Mr. Younge's capabilities in broadcasting.  In sum, everyone, including Mr. Younge, believed Mr. Younge eventually would likely become a full time employee of the station.

10.      It should also be noted that at the time Mr. Younge was employed at Channel 17, out of approximately dozen employees with whom he had personally worked, he was only aware of one other African-American employee, who largely kept to himself and spoke little to others.

11.      Mr. Younge was more than qualified for the position Channel 17 had hired him to do.  Mr. Younge had worked in broadcasting for over fifteen (15) years until his unlawful discharge from the Debtor.  Further, Mr. Younge attended St. Joseph College and the University

3

of Colorado where he studied Computer Science and Broadcasting, respectively. *See* Resume attached hereto as Exhibit "A".

12.     For a couple of weeks, Mr. Younge worked with many employees of the Station until the evening of May 7, 2008, when Mr. Younge was asked to train with an employee named Rick Shultz.

13.     The record is clear that the Station knew that Mr. Schultz was a white bigot who used racial slurs, hostility, and disparaging comments, some of which were directed at Mr. Younge personally and solely because Mr. Younge was African American.  The record is equally clear that management and co-workers of Mr. Younge knew of Mr. Schultz's racial bias and did nothing to deter Mr. Schultz from inciting such a hostile environment the night he was to train Mr. Younge.

14.     Mr. Schultz was hired by the Station in June 1972.  During his first Employee Review dated March 1973, under the category of ATTITUDE—toward the Company, his job, fellow employees and others, it was noted, "good attitude but he is inexperienced in dealing with organizations *and does not know parameters*." (emphasis added). *See* Employee Review Form attached hereto as Exhibit "B".

15.     In that same Employee Review, under the category of AGGRESSIVENESS— ability to recognize a job that needs doing and doing it without being told, it was noted, "This is not one of his outstanding qualities.  He is slothful due to lack of supervision in his previous role as photographer.  This should be corrected in his new reporting relationship." Exhibit "B".

16.     In that same Employee Review, under the category of STABILITY—ability to withstand pressure and to remain calm under work pressure and in crisis situations, it was noted, "maybe a 5 on a ten scale.  This to be viewed in terms of the nature of the job." Exhibit "B".

17.     Notwithstanding this lackluster review, Mr. Schultz continued to have a history of hostile interactions with co-workers, including at least one other African-American employee.

18.     In June 1993, Mr. Schultz accused a fellow employee of vicious threats with the clear intent to have the African American employee fired.  Mr. Schultz wrote, "This is in response to the conversation I had with Dave Smith pertaining to my being confronted by George Sample and his absurd allegation of a racial injustice." Schultz letter dated June 30, 1993, attached hereto as Exhibit "C".

19.     Mr. Schultz admitted to telling this African American employee during an argument, "I say George 'I'm not a street person I don't understand Get Out off my Face?  Does it mean the conversation is over?' . . . I believe to consider this a Racial situation as indicated by my boss to be an insult.  Color has nothing to do with improper behavior and is often used in our company as a way of justifying a ridiculous argument."  Exhibit "C".

20.     Then in September 2002, Mr. Schultz again found himself in a confrontation with another employee named Bill Groves.  In that incident, Mr. Schultz alleged that Mr. Groves had made threatening comments to Mr. Schultz.  The Station investigated the incident and could not substantiate Mr. Schultz's claim.  The Station did note, "Although there was no independent corroboration of the alleged threat, the investigation, however, did reveal that both parties, based on their own admissions, used profane language in the workplace during an argument on September 28, 2002.  *By this letter you are warned that such behavior is prohibited and a violation of the Company's Zero Tolerance Policy*. . . .  Any further behavior of this kind *could result* in further corrective action, up to and including termination." (emphases supplied). *See* WB17 Letter dated October 4, 2002 attached hereto as Exhibit "D".

21.     It should be noted also that in connection with this October 4, 2002 letter, Mr. Schultz was also given a copy of the Station's Statement of Harassment Policy, which defines behaviors that create a "hostile, offensive or intimidating work environment constitutes harassment.  Harassment includes, but is not limited to the following:

- Physical or verbal abuse (demeaning, insulting comments)
- Derogatory or off-color jokes
- Slurs (racial, ethnic, religious, gender, age, etc.)
- Unwelcome physical contact of any nature
- Taunting, intended to provoke an employee . . . ."

Statement of Harassment Policy attached hereto as Exhibit "E".

22.     Not only was Mr. Schultz not terminated over this 2002 incident, as far as the record reveals, he suffered no adverse employment disciplinary action at all.

23.     These were not the only incidents where Mr. Schultz was known to have used profane or hostile words, or having exhibited a racial animus while working with the Station.  In September 1985, Mr. Schultz was reported as follows, "Rick Schultz angrily said some swear words loud enough for everyone to hear."  In a letter dated October 21, 1994, Mr. Schultz complained that he did not want to work in news.  "Because of a threat of discrimination (Klink) I am now being transferred into the news operation." Exhibits "F" and "G".

24.     On May 7, 2008, Mr. Younge was ordered to train with Mr. Schultz.  In the fourteen days that Mr. Younge was employed at the station, Mr. Schultz referred to him as "Hoop, Hoops, Homie, Homeboy, Spike, and Spike Lee."  Further, Mr. Schultz admitted that he had an unequivocal right to call Mr. Younge by any name he wanted, even if those names were racially and deeply personally offensive to Mr. Younge.

25.     Contrary to the erroneous assertion(s) in the Reorganized Debtors' Objection and related Reply Brief(s), the Station clearly knew of Mr. Schultz's bigoted disposition, including the remarks directed at Mr. Younge personally before he was trained.

26.     Mr. Schultz stated in an email, "I'm not training no hoop! . . . Where does a hoop get a car like that?" *See* Exhibit 1 to Younge's claim.

27.     Mr. Schultz's Union representative(s) met with the Human Resources Department of the Station in connection with the allegations set forth in this incident with Mr. Younge.  At that meeting, Mr. Schultz asked his Union representative, "Do I really need to answer questions from that black girl?"

28.     Before the Debtors filed the present chapter 11 case, the Pennsylvania Human Relations Office initiated an investigation in Mr. Younge's claim for racial discrimination. During that investigation, the Investigator interviewed Mr. Schultz.

> Q:     If you told me that you were racially attacked by a co-worker wouldn't you want me to investigate it?
> A:     No.
> Q:     So are you telling me that if you felt that you were racially attacked by someone you would not want me to investigate?
> A:     No, the violence is more important than the race issue.  Why does black people have to make everything about race?

*See* Exhibit 1 to Younge' claim.

29.     In connection with the investigation of this matter Mr. Schultz was asked why he asked Steve Leff, "why are you training a hoop who doesn't know anything?"  Mr. Schultz first indicated that he did not recall making the statement.  When asked what a hoop was, Mr. Schultz stated, "a basketball player."  It is also noteworthy that Mr. Schultz's comment was highly offensive and racially derogatory for several reasons.  It is used as derogatory slang for a white or small black basketball players in a black neighborhood.  Mr. Schultz clearly understood the derogatory nature of the term.

30.     The incident that ultimately gave rise to the Station's decision to terminate Mr. Younge took place that first evening with Mr. Schultz.  Some of the interactions between Mr. Schultz and Mr. Younge are captured on a silent, fast-moving video.  The specific dialogue and

interactions between Mr. Younge and Mr. Schultz have been grossly mischaracterized to suggest

Mr. Younge was in some way an agitator of the argument that took place between the two that

evening.  At no time did Mr. Younge ever threaten Mr. Schultz with physical harm in any way,

shape or form.  Mr. Schultz, on the other hand, was very aggressive from the second he opened

the door which placed Mr. Younge in a very difficult and defensive position, especially

considering the size difference between the two men.

  31.  The following is a transcript of what one sees on the silent video footage between

Mr. Younge and Mr. Schultz:

> Mr. Younge walks into the tape room by himself on his cell having a conversation.

> Then Mr. Schultz enters the tape room.  He does not remain very long.  At this point he says nothing to Mr. Younge.

> He went back into the hall.  His back is to the camera.

> Then Mr. Schultz leaves the hallway while Mr. Younge is still in the room by himself.

> Mr. Younge begins pacing back and forth, waiting.

> Mr. Younge briefly leaves the tape room-into Master Control.  Mr. Younge asked about the Flyers playoff game against Pittsburgh.  This was a brief conversation with Chris.

> Mr. Younge went back to the tape room and continues to wait.

> Mr. Schultz comes into the tape room and points to Mr. Younge's bag, and says, "Hey Spike, you want to get this fucking bag off the table?"

> Mr. Schultz walks over to it, and pointed emphatically at the bag.

> Mr. Younge walks over to Rick and I said, "Hey man, we only met once, my name is Keith."

> Mr. Schultz says, "I don't give a shit what your name is, I'll call you anything I want to, as far as I'm concerned, it's Spike Lee."

> Mr. Younge says, "whoa, whoa, what's the problem here?"

"You're the problem," Mr. Schultz replies.

"I'm the problem, how am I the problem?"

Mr. Schultz begins, "Why don't you people know anything?"

Mr. Younge replies, "What is the problem here? All you have to do is train me."

"I don't have to do anything you tell me."

Mr. Younge replies, "Wasn't my idea.  If you have a problem talk to Mickey and Elias."  Then, Mr. Younge says, "I'm leaving, I won't work like this."

Mr. Schultz says, "Good, just get out."

Next, the door opens.  Mr. Younge has his jacket under his arm and his briefcase.  He begins to leave.

Mr. Schultz walks out heading into the master control room, still talking to Mr. Younge.

Both enter the master control.

In the master control room the only thing visible is the back of Mr. Schultz.  Mr. Younge is not visible from this angle.

Next, the security guard enters the frame.  He stops, looks and walks into the Master control room.

The Guard then walks Mr. Younge back into the tape room without his jacket and bag.

Mr. Younge explains what just happened to him and is visibly upset.

Mr. Younge comes out of the tape room and turns to get his things from master control.

Next, Mr. Younge and Mr. Schultz are arguing.  Mr. Schultz waves Mr. Younge off saying, "it's okay, home-boy, go home."  His hands are up, not in self-defense, but in a condescending gesture of dismissal.

Mr. Younge then points at Rick and asks him to repeat what he just said in front of the guard.  He refuses to do so.

And the security guard walks Mr. Younge out, with his hand on Mr. Younge's chest.

End of video.

32.     After a brief internal investigation by the employer, where Mr. Schultz was interviewed by management but Mr. Younge was not interviewed, on May 15, 2008, both employees were terminated for violating the same "Company Zero Tolerance Policy" that Mr. Schultz has been accused of violating in the past but was not disciplined until now. *See* Exhibits "H" and "I".  Further, at no time had Mr. Younge been given a copy of the Company's Harassment Policy prior to his termination from Channel 17. *See* Exhibit "E".

33.     Mr. Younge filed a claim for discrimination before the Philadelphia Human Relations Office ("PHRO").  Paulette E. Banks was the Investigator for the PHRO on Mr. Younge's claim.  Ms. Banks has been working with the PHRO for over 30 years, primarily in the capacity as an investigator on discrimination claims, such as the one Mr. Younge brought in this case.

34.     Ms. Banks has agreed to testify to the following findings of fact in this case after her investigation in this matter:

- There was a single occurrence of workplace harassment (an argument);

- A severe argument created a hostile work environment;

- The use of racial language (slang), included "ghetto, hoop, you people, etc.";

- Humiliation.  Mr. Schultz refused to train Mr. Younge which directly obstructed his job knowledge and affected his continued employment;

- Remarks were targeted directly at Mr. Younge;

- Remarks were explicitly racial, degrading and intimidating;

- Situation resulted in major harm to Mr. Younge as he was terminated;

- o White employee inflicting the harm was terminated because of his continued conflicts on the job, over the years, with black employees and non-blacks;

- o Employer management blamed the victim and terminated Mr. Younge for no valid reason—their reason was pretextual in that they accused Mr. Younge of a physical assault on the white employee;

- o Employer did not meet with Mr. Younge or take a statement from him;

- o Mr. Younge was bullied by Mr. Schultz who was six feet tall and at least 85 lbs heavier than Mr. Younge; and

- o The video does not show Mr. Younge touching or physically assaulting Mr. Schultz who instigated the argument.

*See* Exhibit "J".

35.     But for the Debtors' bankruptcy filing, Ms. Banks would have issued a recommendation finding the employer liable for discrimination against Mr. Younge for unjust termination.  Ms. Banks has agreed to testify under oath as to these findings of fact and conclusion that the Station had violated Mr. Younge's civil rights.

## ANALYSIS

A.     McDonnell Douglas Burden-Shifting Analysis

36.     Title VII states that it is unlawful for an employer to "discharge any individual…because of such individual's race."  Smith v. Walgreen Co., 964 F.Supp.2d 338, 344 (3d Cir. 2013) (citing 42 U.S.C. § 2000e-2(a)(1)).  When direct evidence of discrimination is unavailable, a plaintiff may prove discrimination on the basis of race through a burden-shifting analysis.  McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  First, the plaintiff must

establish a *prima facie* case of discrimination on the basis of race by the preponderance of the evidence.  Walgreen Co., 964 F.Supp.2d at 344.

37.     Then, if the plaintiff is successful in demonstrating a *prima facie* case, the burden shifts to the defendant employer to demonstrate by the preponderance of the evidence that there was a legitimate non-discriminatory reason for the plaintiff employee's discharge. Id.  If the defendant is successful in demonstrating they had a lawful reason for the discharge, the burden then shifts back to the plaintiff to show that the defendant's legitimate non-discriminatory reason was pre-textual.  Id. at 345.

a.     *Prima Facie* Case:

38.     To establish a *prima facie* case of employment discrimination, the plaintiff must show that: (i) he is a member of a protected class; (ii) he is qualified for the position; (iii) he suffered an adverse employment action; and (iv) the adverse action occurred under circumstances that support an inference of unlawful discrimination.  Walgreen Co., 964 F.Supp.2d at 345.  Here, the Debtor concedes that Mr. Younge is a member of a protected class and that he suffered an adverse employment action.  Debtor Objection Footnote 19.

39.     However, the Debtor does not concede that Mr. Younge was qualified for the position.  Mr. Younge had worked in broadcasting for over fifteen (15) years until his unlawful discharge from the Debtor.  Further, Mr. Younge attended St. Joseph College and the University of Colorado where he studied Computer Science and Broadcasting, respectively.  Moreover, Mr. Younge's previous training with other employees of the Debtor did not raise any issues regarding Mr. Younge's competence.  Therefore, Mr. Younge was more than qualified for the Summer Relief Technician position and, eventually, a fulltime position with the station in a similar capacity.

40.     The Debtor further challenged that Mr. Younge was terminated for a legitimate non-discriminatory reason.  The Third Circuit Court has found that a showing by an employee in a protected class who was terminated and replaced by someone outside their protected class is a sufficient showing "under the law…to demonstrate that the adverse action occurred under circumstances that support an inference of unlawful discrimination." Walgreen Co., 964 F.Supp.2d at 345.  Here, Mr. Younge was terminated and replaced by a Caucasian individual.  Therefore, Mr. Younge meets the burden required for this element and can easily demonstrate a *prima facie* case of employment discrimination.

b.     Pre-textual Discharge:

41.     In order to show that a discharge was pre-textual, "the plaintiff must point to evidence, direct or circumstantial, from which a fact-finder could reasonably either: (i) disbelieve the employer's articulated legitimate reasons; or (ii) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Id. at 346.  The Debtor has asserted that their non-discriminatory reason for terminating Mr. Younge was because he violated the Code of Conduct and the Anti-Harassment policy for which the Debtor has a zero-tolerance policy governing the policies.  The policies do prohibit, among other things, physical and verbal abuse, slurs/racial remarks, and taunting/provoking an employee.

42.     Mr. Younge has conceded that he argued with Mr. Schultz, but only after Mr. Schultz used horribly demeaning racial slurs directly to and in reference to Mr. Younge.  Further, Mr. Schultz and the Debtor agree that Mr. Schultz did use vulgar language.  Any physical abuse or violence is disputed at this time.  It does not appear by the video or by Mr. Younge's account, as described above, that Mr. Younge and Mr. Schultz ever touched each other at any point during

the altercation.  As such, the Debtor likely can only assume that Mr. Younge was terminated

because of his use of vulgar language during the argument.

43.     Given Mr. Schultz's past, this is without question a pre-textual argument, or at the

very least an unequal application of the Debtors' policies.  Mr. Schultz has a documented history

of using vulgar language (1993/94, 2002), racial slurs (2002), and demeaning other employees of

a different race (2002).

44.     However, the Station did not terminate Mr. Schultz pursuant to their zero-

tolerance policy back in 2002.  Further, the Corrective Action policy outlines a list of alternative

corrective measures the Station could employee other than termination.  The Station did not

utilize any other corrective actions for Mr. Younge, except for termination.

45.     To show that the discrimination was pretextual; the employee must submit

evidence, direct or circumstantial, that would allow a fact finder to reasonably: (i) disbelieve the

employer's articulate legitimate reason(s); or (ii) believe that an invidious discriminatory reason

was more likely than not a motivating or determinative cause for the employer's action. Id.

(citing Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).  The evidence submitted must be

sufficient so that a "jury could find that the [employer] lacks all credibility." Boggerty v.

Stewart, 14 A.3d 542 (Del. 2011) (citing Jaramillo v. Colo. Jud. Dept., 427 F.3d 1303, 1310 (10th

Cir. 2005)).

46.     Under the first prong of the Fuentes test, "[T]he employee…must demonstrate

such weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered

legitimate reasons for its action that a reasonable fact-finder could rationally find them unworthy

of credence…and hence infer that the employer did not act for the asserted non-discriminatory

reasons." Id. (citing Fuentes, 32 F.3d at 765).

47.     Under the second prong of the <u>Fuentes</u> test, the employee must show that the employer's discriminatory reason for termination was more likely than not a motivating cause of the employer's action. <u>Id.</u>  To meet this evidentiary burden, the employee need only show that the "employer has previously discriminated against [the employee], [or] that the employer has previously discriminated against other persons within the protected class, *or* that the employer has treated other similarly situated employees not within the protected class more favorably." <u>Id.</u> at 348 (citing <u>Fuentes</u>, 32 F.3d at 765; <u>Simpson v. Kay Jewelers, Div. of Sterling, Inc.</u>, 142 F.3d 639, 645 (3d Cir. 1998)) (emphasis added).

48.     The Third Circuit Court in <u>Walgreen Co.</u>, further noted that where an employer has a zero-tolerance policy that includes punishments up and including termination the employer must equally apply them to all employees.  An employer may not apply the policies more favorably to one employee or class of employees over another or others.  <u>Id.</u> at 351-52.  Here, the Debtor applied the zero-tolerance policy in the past more favorably to Mr. Schultz, who is not a member of a protected class, than it did to Mr. Younge who is a member of a protected class. Therefore, the Debtor clearly discriminated against Mr. Younge in terminating him for the exact same alleged infraction that did not result in Mr. Schultz's termination in 2002.

49.     It is also important to note, that the Debtor knew that Mr. Schultz had a history of violating company policies, including confrontations with at least one other African American employee.  Knowing Mr. Schultz's tendency towards racial provocation, at one point, a fellow employee Sandy Kerr informed Mr. Younge before he trained with Mr. Schultz that "if he had any problems with his work that night to let me know."  Mr. Younge had heard no such warnings before working and/or training with any other employee at the Station.

50.     The Debtors have only objected to the basis for Mr. Younge's claim and have not taken issue or objected to the claim amount.[2]  For the purposes of this Supplemental Response only, Mr. Younge has set forth several grounds to overrule the Debtors' Objection to his claim.

WHEREFORE, Mr. Younge respectfully requests that the Court OVERRULE the Debtors' Objection to his claim.  Further, Mr. Younge reserves the right to set forth a more detailed explanation of his damages claim which is far in excess of the as filed claim.


DATED:          Wilmington, Delaware                    WERB & SULLIVAN
                August 21, 2014

                                                        */s/ Jack Shrum*
                                                        _____
                                                        "J" Jackson Shrum (No. 4757)
                                                        300 Delaware Ave.
                                                        Suite 1300
                                                        Wilmington, DE 19801
                                                        Telephone:     (302) 652.1100
                                                        Facsimile:     (302) 652.1111
                                                        Jshrum@werbsullivan.com

---

[2] It should be noted that the undersigned counsel took no part in the determination of the amount of Mr. Younge's claim in this case.  Mr. Younge has incurred damages as a result of the Debtors' unlawful termination far in excess of the claimed amount in this case and herein specifically reserves the right to file an Amended Proof of Claim in this Case if necessary.