**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Reorganized Debtors. | Jointly Administered |
| | **Hearing Date: September 23, 2014 at 10 a.m. ET**<br>**Related to Docket Nos. 13715, 13755, 13870, and**<br>**13951** |

**REORGANIZED DEBTORS' SUPPLEMENTAL REPLY IN SUPPORT OF**
**OBJECTION TO CLAIM NO. 3333 OF KEITH YOUNGE, PURSUANT TO SECTIONS**
**502(b) AND 558 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 3001,**
**3003, AND 3007**

The reorganized debtors in the above-captioned chapter 11 cases (collectively, the

"Reorganized Debtors"), by and through their undersigned counsel, hereby file this supplemental

reply (the "Supplemental Reply") in support of the Reorganized Debtors' Objection to Claim No.

3333 of Keith Younge, Pursuant to Section 502(b) and 558 of the Bankruptcy Code and

Bankruptcy Rules 3001, 3003, and 3007 (Docket No. 13715) (the "Objection"), filed on

---

[1] The Reorganized Debtors, or successors-in-interest to the Reorganized Debtors, in these chapter 11 cases, along with the last four digits of each entity's federal tax identification number, are: Tribune Company (0355); California Community News, LLC (5306); Chicago Tribune Company, LLC (3437); Chicagoland Publishing Company, LLC (3237); Chicagoland Television News, LLC (1352); forsalebyowner.com, LLC (4276); ForSaleByOwner.com Referral Services LLC (9205); Hoy Publications, LLC (2352); Internet Foreclosure Service, LLC (6550); KDAF, LLC (6969); KIAH, LLC (4014); KPLR, Inc. (7943); KRCW, LLC (1772); KSWB, LLC (7035); KTLA, LLC (3404); KTXL, LLC (3844); KWGN, LLC (5347); Los Angeles Times Communications LLC (1324); Magic T Music Publishing Company, LLC (6522); NBBF, LLC (0893); Oak Brook Productions, LLC (2598); Orlando Sentinel Communications Company, LLC (3775); Sun-Sentinel Company, LLC (2684); The Baltimore Sun Company, LLC (6880); The Daily Press, LLC (9368); The Hartford Courant Company, LLC (3490); The Morning Call, LLC (7560); TMS News and Features, LLC (2931); Tower Distribution Company, LLC (9066); Towering T Music Publishing Company, LLC (2470); Tribune 365, LLC (7847); Tribune Broadcasting Company, LLC (2569); Tribune Broadcasting Hartford, LLC (1268); Tribune Broadcasting Indianapolis, LLC (6434); Tribune Broadcasting Seattle, LLC (2975); Tribune CNLBC, LLC (0347); Tribune Direct Marking, LLC (1479); Tribune Entertainment Company, LLC (6232); Tribune Investments, LLC (6362); Tribune Media Services, LLC (1080); Tribune Media Services London, LLC (6079); Tribune ND, LLC (4926); Tribune Publishing Company, LLC (9720); Tribune Television New Orleans, Inc. (4055); Tribune Washington Bureau, LLC (1088); WDCW, LLC (8300); WGN Continental Broadcasting Company, LLC (9530); WPHL, LLC (6896); WPIX, LLC (0191); WPMT, LLC (7040); WSFL, LLC (5256); WXMI, LLC (3068). The corporate headquarters and the mailing address for each entity listed above is 435 North Michigan Avenue, Chicago, Illinois 60611.

September 6, 2013.[2]  On October 15, 2013, Mr. Younge filed a response to the Objection

(Docket No. 13755) (the "Original Response").[3]  On April 11, 2014, the Reorganized Debtors

filed a reply to the Original Response (Docket No. 13870) (the "Original Reply").[4]  On August

21, 2014, with leave from this Court, Mr. Younge filed a supplemental response to the Objection

(Docket No. 13951) (the "Supplemental Response").[5]  In support of this Supplemental Reply, the

Reorganized Debtors rely on the Supplemental Declaration of Vincent Giannini, Vice

President/General Manager of WPHL, LLC in Support of the Reorganized Debtors' Objection to

Claim No. 3333 of Keith Younge (the "Supplemental Giannini Declaration"), a copy of which is

attached hereto as Exhibit A.  In further support of the Objection, the Original Reply, and this

Supplemental Reply, the Reorganized Debtors respectfully state as follows:

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Objection.

[3] At the time the Reorganized Debtors filed the Objection and Mr. Younge filed the Original Response, Mr. Younge was represented by Pennsylvania employment law counsel.  Subsequent to the filing of the Original Response, the parties agreed to adjourn the hearing on the Objection in order to engage in discussions regarding the Objection, the Original Response, and the potential for a consensual resolution of the Objection.  The Reorganized Debtors' deadline for filing a reply in support of the Objection was likewise adjourned during this time.  Those discussions did not result in a consensual resolution of the Objection and the Reorganized Debtors were informed in writing that Mr. Younge terminated his Pennsylvania employment law counsel.  The Reorganized Debtors thereafter filed the Original Reply requesting adjudication of the Objection by the Court on the basis of the legal arguments made by the Reorganized Debtors.

[4] The Objection and Original Reply are expressly incorporated herein by reference.

[5] This Court held a status conference on the Objection on July 15, 2014 at which counsel for the Reorganized Debtors and Delaware counsel for Mr. Younge appeared.  At the conclusion of that hearing, the Court continued the Objection to the September 23 omnibus hearing scheduled in the Reorganized Debtors' cases and gave Mr. Younge until August 22, 2014 to file a submission directed at the Reorganized Debtors' legal arguments.  See Hr'g Tr. July 15, 2014 at 13:6-9.  The Court gave the Reorganized Debtors until September 5, 2014 to file a submission in reply.  Id. at 13:21-25, 14:1-2.  The Court informed the parties that, upon receipt of those submissions, the Court would decide whether the Objection can be decided on the law alone or whether an evidentiary hearing is necessary.  Id. at 13:11-14.

## ARGUMENT

1.        The legal standards applicable to the Younge Claim are not in dispute.[6]
The question presently before this Court is whether, in the Supplemental Response, Mr. Younge
has "come forward with specific facts showing that there is a genuine issue for trial," or, as the
Reorganized Debtors contend, there is no genuine dispute of material fact and the Objection may
be decided as a matter of law. See Smith v. Walgreen Co., 964 F. Supp. 2d 338, 343 (D. Del.
2013) (quoting Matsushita Elec. Indus Co. v. Zenith Radio Corp., 475 U.S. 574, 585 n.10
(1986)); In re Landsource Cmtys., 485 B.R. 310, 314 (Bankr. D. Del. 2012) (KJC) ("When the
nonmoving party bears the burden of persuasion at trial, the moving party 'may meet its
burden . . . by showing that the nonmoving party's evidence is insufficient to carry that
burden.'") (quoting Foulk v. Donjon Marine Co., Inc., 144 F.3d 252, 258 n.5 (3d Cir. 1998);
Wetzel v. Tucker, 139 F.3d 380, 383 n.2 (3d Cir. 1998)).  The Reorganized Debtors respectfully
submit that Mr. Younge has not met his burden in demonstrating that he is entitled to relief for
either his hostile work environment or wrongful termination claims, and that for all of the
reasons stated in the Objection, the Original Reply, and herein, the Reorganized Debtors are
entitled to have the Objection sustained as a matter of law.

2.        To overcome the Objection, Third Circuit case law requires that Mr.
Younge "must present more than just bare assertions, conclusory allegations, or suspicions to
show the existence of a genuine issue" of material fact. Podobnik v. U.S. Postal Serv., 409 F.3d
584, 594 (3d Cir. 2005); see also In re Landsource Cmtys., 485 B.R. at 14 ("Summary judgment

---

[6] With respect to Mr. Younge's claim of employment discrimination, the parties agree that burden-shifting analysis articulated by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) and its progeny provides the legal framework for this Court's adjudication of that issue.  See Obj. ¶¶ 23, 30-31; Supp. Response ¶¶ 36-48.  Nowhere in the Supplemental Response does Mr. Younge address the legal standards applicable to Mr. Younge's hostile work environment claim, and the Court should apply the two-prong analysis set forth in the Objection and the Original Reply to that issue.  See Obj. ¶¶ 24-29;  Original Reply ¶¶ 3-8.

cannot be avoided by introducing only a mere scintilla of evidence, or by relying on conclusory allegations, improbable inferences and unsupported speculation.") (internal quotations and citations omitted).   An allegation raising the "mere existence of some alleged factual dispute between the parties" is insufficient; facts that could alter the outcome are "material," and the factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." See Walgreen Co., 964 F. Supp. 2d at 344 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  As the U.S. District Court for the District of Delaware explained in Smith v. Walgreen Co., "[i]f the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law."  964 F. Supp. 2d at 343.

       3.    Importantly, Mr. Younge must support any such attempted showing with *admissible* evidence, including citations to the evidentiary record or affidavits, declarations, or stipulations.  See Fed. R. Civ. P. 56(c), (e); see also Barber v. Fairbanks Capital Corp. (In re Barber), 2003 Bankr. LEXIS 2359 (Bankr. E.D. Pa. June 3, 2003) (KJC) ("Documentary evidence for which a proper foundation has not been laid cannot support a summary judgment motion, even if the document in question are highly probative of a central and essential issue in the case.") (citing 11-56 James Wm. Moore et al., Moore's Federal Practice - Civil, §56.10[4][c][i] and §56.14[2][c]).  However, Mr. Younge's submissions are replete with unsubstantiated hearsay statements, documents lacking in foundation, irrelevant evidence, statements regarding which Mr. Younge has no personal knowledge, contradictions, factual misstatements, and conclusory allegations.  See, e.g., Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence"); Fed. R. Evid. 402, 403, 404, 602, 801, 802, 805, 901, 1002

4

(providing bases for the exclusion of statements and evidence put forward by Mr. Younge).[7]

Nothing in the Younge Claim, the Supplemental Response, or in the materials cited therein

establish that there is a genuine dispute of material fact, and Mr. Younge cannot in any event

produce admissible evidence to support the Younge Claim.[8]

### A. The Younge Claim Fails To State A Hostile Work Environment Claim

4.       The Supplemental Response does not directly address the legal arguments

made by the Reorganized Debtors in the Objection or the Original Reply concerning Mr.

Younge's hostile work environment claim, nor does it raise specific facts, supported by

admissible evidence, showing that there is a genuine issue for trial on this issue. As set forth in

---

[7] All but two of the exhibits relied upon by Mr. Younge in the Supplemental Response were previously submitted by Mr. Younge in connection with the Original Response. See Supp. Response, Exs. B-I. Copies of those same materials were originally provided by WPHL to the Philadelphia Commission on Human Relations ("PCHR") in support of WPHL's opposition to the prepetition discrimination and wrongful termination complaint that was filed by Mr. Younge with that agency, and were then obtained by Mr. Younge's prior Pennsylvania counsel for use in these proceedings. See Original Response ¶ 1. Certain of the copies appended to the Supplemental Response have been altered from the original copies provided by WPHL to the PCHR, in that they appear to include notation marks made by Mr. Younge or his counsel. See Supp. Response, Exs. B-D.

[8] To the extent that Mr. Younge purports to make factual statements in the Supplemental Response that are not supported by admissible evidence or substantiated by affidavits, declarations, or stipulations – which comprises the substantial majority of his Supplemental Response – those statements are insufficient to overcome the Objection. Mr. Younge's bald statement that he "can corroborate all of the facts set forth in this Supplemental Response," see Supp. Response at 2, is insufficient.

Equally inadmissible and irrelevant are any purported factual statements or legal conclusions of Paulette Banks of the PCHR. See Supp. Response ¶¶ 34-35; Ex. J. Proceedings before the PCHR on Mr. Younge's complaint filed with that agency were stayed effective December 8, 2008 as a result of WPHL's chapter 11 filing. As noted in the Objection, subsequent to the Petition Date, the PCHR dismissed that complaint. See Obj. n.6. At the time, the PCHR proceedings were in the fact-finding stage. The PCHR's own Notice of Fact Finding Conference ("FFC") states that "The FFC is not a formal hearing and statements are not taken under oath . . . No determination will be issued at the FFC regarding the merits of the allegations or the evidence presented at either side." See Younge Claim at 3. This is in addition to the fact that any alleged statements by Mr. Schultz or Mr. Younge to Ms. Banks would be rank hearsay and otherwise inadmissible. Nor would the purported legal conclusions of an investigator – which again did not involve a "formal hearing … under oath" and where the merits were not intended to be determined anyway – be admissible or have any relevance to this proceeding. Furthermore, Exhibit J itself is undated, unsigned, and unauthenticated. The fact that it references counsel for Mr. Younge as being Mr. Barbieri (whom the Reorganized Debtors understand was retained in mid-2013), suggests that this document was only recently prepared, long after the PCHR proceedings were stayed in December 2008. Accordingly, neither any of the statements made by Mr. Younge in the Supplemental Response regarding the purported determinations that may hypothetically have been made by Ms. Banks, nor the "issues" listed in Exhibit J are admissible or otherwise relevant to the Objection. See Barber v. Fairbanks Capital Corp. (In re Barber), 2003 Bankr. LEXIS 2359 (Bankr. E.D. Pa. June 3, 2003) (KJC) ("Unauthenticated documents, once challenged, cannot be considered by a court in determining a summary judgment motion.") (citing 11-56 James Wm. Moore et al., Moore's Federal Practice - Civil, §56.10[4][c][i] and §56.14[2][c]).

46429/0001-10966841V1

detail in the Original Reply, Mr. Younge's allegations, even if accepted as true, do not rise to the

level of legally cognizable "severe or pervasive" harassment, and no amount of after-the-fact

rhetorical characterizations by Mr. Younge's counsel can make them so.  See Obj. ¶ 25

(describing standards applicable to hostile work environment claims and collecting illustrative

cases of non-actionable conduct that involved use of racially derogative terms[9]).  Additionally,

Mr. Younge has presented no admissible evidence that WPHL's *management* was aware of, or

acted negligently in permitting, any such "severe or pervasive" harassment to occur.  See Obj.

¶¶ 27-28, describing standards applicable to imposing respondeat superior liability on an

employer); Original Reply ¶¶ 3-8 & nn.5-8 (applying legal standard to record before the Court

on issue of respondeat superior liability).  Because neither the Younge Claim nor the

Supplemental Response can establish these essential elements of a hostile work environment

claim, the Younge Claim fails as a matter of law.

> **a)  The Younge Claim Does Not Meet The High Bar Required To Establish A Hostile Work Environment Claim**

5.      Mr. Younge has not, and cannot, offer any facts supported by the record

and admissible evidence that he experienced a hostile work environment, under the high

standards established by the Supreme Court governing circumstances where the alleged harasser

was a co-worker.  See Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (stating that the

"'mere utterance of an . . . epithet which engenders offensive feelings in an employee' does not

---

[9] See, e.g., Harris v. Cobra Const., 273 Fed. App'x 193, 194-95 (3d Cir. 2008) (where owner of construction company pointed shotgun at African-American workers, told them to get back to work, and referred to them in racially derogatory terms, plaintiffs had failed to show that defendant's actions were a result of racial animosity or an intent to discriminate); Lawrence v. F.C. Kerbeck & Sons, 134 Fed. App'x 570, 572 (3d Cir. 2005) (granting summary judgment in favor of employer where single confrontation between employee and manager, during which manager made a racial remark, though "disrespectful and inexcusable," was insufficient basis for hostile work environment claim); Sherrod v. Phila. Gas Works, 57 Fed. App'x 68, 76 (3d Cir. 2003) (holding that alleged incidents, including managers making comments that "the way [two African-American clerks] were eating at their desks, it must be their culture," and that if such clerks did not do their work, "I'm going to sit at their desks with a whip," were not sufficiently severe and pervasive, even considering the comments in conjunction with other facially-neutral alleged mistreatment of the employee).

46429/0001-10966841V1

sufficiently affect the conditions of employment to implicate Title VII") (quoting Meritor Sav.

Bank, FSB v. Vinson, 477 U.S. 57 (1986)).  There is no evidence that Mr. Schultz engaged in

any legally cognizable harassing conduct directed at Mr. Younge (racial or otherwise), whether

*on or prior to* the night of May 7, 2008 – i.e., prior to the altercation that Mr. Younge has

admitted he participated in.  See Obj. ¶¶ 24-26; Original Reply ¶¶ 3-6 & nn.5-7.

      6.    Nothing in the Supplemental Response changes this.  The Supplemental

Response states that "[i]n the fourteen days that Mr. Younge was employed at the station, Mr.

Schultz referred to him as "Hoop, Hoops, Homie, Homeboy, Spike, and Spike Lee."  Supp.

Response ¶ 14.  This statement is deliberately misleading insofar as there has never been an

allegation by Mr. Younge – and there is no evidence whatsoever – that (a) any such remarks

were made by Mr. Schultz to Mr. Younge *prior to* May 7, 2008 (the date of the altercation

between Mr. Schultz and Mr. Younge); (b) Mr. Younge was aware of any alleged remarks made

by Mr. Schultz to another co-worker prior to May 7, 2008; or (c) any alleged remarks were made

by Mr. Schultz over a fourteen-day period.[10]  Rather, all that can be adduced from the record

(even viewing the facts in the light most favorable to Mr. Younge) is that Mr. Schultz allegedly

made a statement on May 6 to Steve Leff – a *co-worker* of Mr. Schultz who *neither* was a

manager *nor* had any role in the decision to terminate Mr. Younge's or Mr. Schultz's

employment – allegedly referring to Mr. Younge as "hoop"; that Mr. Younge was not even

aware of this alleged statement until after his termination;[11] and that Mr. Schultz allegedly

---

[10] Mr. Younge's prior counsel made identical statements in the Original Response at ¶¶ 3, 5 that were likewise unsupported by any allegation made by Mr. Younge that either Mr. Schultz or any other person at WPHL made any disparaging remark to him prior to the alleged remarks made by Mr. Schultz on the night of May 7, 2008, or that Mr. Younge was aware of any prior statements that Mr. Schultz allegedly made to Steve Leff, a co-worker of Mr. Schultz, concerning Mr. Younge until those statements were disclosed during the investigation that was conducted by WPHL subsequent to the altercation.  See Original Reply ¶ 5 and n.5.

[11] See Original Reply ¶ 6 & n.6 for further legal arguments regarding this alleged statement, which are incorporated herein by reference.

referred to Mr. Younge as "Homie," "Homeboy," "Spike," and "Spike Lee" solely during the

single altercation between Mr. Schultz and Mr. Younge on May 7, 2008.  See Obj. ¶ 26; Original

Reply ¶¶ 4-6 & nn.5-6.  It is only this latter category of remarks allegedly made by Mr. Schultz –

solely during the single altercation on May 7, 2008 – that could possibly form the basis for Mr.

Younge's attempt to assert a hostile work environment claim.

       7.     But again, based on the applicable Supreme Court and other substantial

case law concerning the standards of what constitutes "severe and pervasive" harassment, as a

matter of law, the allegations in the record (even if taken as true) are insufficient to avoid

summary judgment on this issue.  See Obj. ¶¶ 24-26.

     **b)  The Younge Claim Does Not Establish Respondeat Superior Liability On WPHL**

       8.     Even if this Court were to determine that Mr. Younge experienced "severe

and pervasive" harassment (but which for all the reasons above is not supported), Mr. Younge

offers no admissible evidence in either the Younge Claim or the Supplemental Response to

support an allegation that WPHL's management knew or had any reason to know prior to the

altercation on May 7, 2008 that Mr. Schultz would have made any racially derogatory statements

to Mr. Younge or that WPHL's management otherwise acted negligently.  See Obj. ¶¶ 27-29

(citing precedent holding that, in cases of co-worker harassment, a negligence standard applies

for the attribution of liability to the employer, i.e., whether management knew or had reason to

know of the harassment yet failed to respond); Original Reply ¶¶ 7-8 & nn.7-8 (same, and

applying standard to record before the Court).  Thus, as a matter of law, there is no basis for

imputing any liability for Mr. Schultz's alleged co-worker harassment to WPHL as the employer.

See Kunin v. Sears Roebuck & Co., 175 F.3d 289, 293-94 (3d Cir. 1999) ("[L]iability exists

where the defendant knew or should have known of the harassment and failed to take prompt

remedial action.") (citing Andrews v. City of Phila., 895 F.2d 1496, 1486 (3d Cir. 1990));

Howard v. Blalock Elec. Serv., 742 F. Supp. 2d 681, 695 (W.D. Pa. 2010) (same) (citing Weston

v. Penn., 251 F.3d 420, 427 (3d Cir. 2001)).

       9.     In the Supplemental Response, Mr. Younge offers nothing more than bare

assertions, conclusory allegations, suspicions, innuendo, and inadmissible hearsay statements

regarding what WPHL's management purportedly knew regarding Mr. Schultz's alleged (but

unsubstantiated) racial animus towards Mr. Younge.  To the contrary, the record demonstrates

that immediately upon becoming aware that Mr. Schultz had made statements to Mr. Younge

with alleged racial overtones during the May 7, 2008 altercation, WPHL commenced an internal

investigation that resulted in Mr. Schultz's termination.  See Obj. ¶¶ 28-29 (applying legal

standard to record before the Court); Original Reply ¶¶ 7-8 & nn.7-8 (same).

       10.    Mr. Schultz, through his new counsel, nevertheless makes the bold – and

bald – assertion that:

> The record is clear that the Station knew that Mr. Schultz was a
> white bigot who used racial slurs, hostility, and disparaging
> comments, some of which were directed at Mr. Younge personally
> and solely because Mr. Younge was African-American. The record
> is equally clear that management and co-workers of Mr. Younge
> knew of Mr. Schultz's racial bias and did nothing to deter Mr.
> Schultz from inciting such a hostile environment the night he was
> to train Mr. Younge.

Supp. Response ¶ 13; but see Supp. Giannini Decl. ¶ 5 (expressly disclaiming that Mr. Giannini

knew Mr. Schultz to be a "white bigot" or to have "used racial slurs, hostility, and disparaging

comments" to WPHL's African American employees).  Mr. Younge largely bases this "prior

knowledge" allegation on a hodge-podge of excerpted documents from Mr. Schultz's personnel

file, some of which are over forty years old.  These documents are patently inadmissible,

including, without limitation, because they are rank hearsay and lack basic attributes of

46429/0001-10966841V1

foundation necessary to make them even potentially probative of anything.  Fed. R. Civ. P.

56(c)(2); Barber v. Fairbanks Capital Corp. (In re Barber), 2003 Bankr. LEXIS 2359 (Bankr.

E.D. Pa. June 3, 2003) (KJC) ("Documentary evidence for which a proper foundation has not

been laid cannot support a summary judgment motion, even if the document in question are

highly probative of a central and essential issue in the case.") (citing 11-56 James Wm. Moore et

al., Moore's Federal Practice - Civil, §56.10[4][c][i] and §56.14[2][c]).

> ### i) *Nothing in Mr. Schultz's Personnel File Constitutes Admissible Evidence Demonstrating Employer Knowledge Of Alleged Racial Animus*

11.     Even if the records in Mr. Schultz's personnel file were taken at face

value, they cannot save Mr. Younge's claim.  While Mr. Schultz's conduct on the evening of

May 7, 2008 is not to be excused – which is precisely why his employment was terminated –

there is simply no evidence of prior racially-biased conduct by Mr. Schultz or "knowledge" by

management sufficient to impute any liability to WPHL.  When one peels back the onion layers

of Mr. Younge's sweeping allegation, there is no substance underneath.  The personnel file

documents themselves make this plain.  They are devoid of racial slurs or conduct by Mr.

Schultz, and Mr. Younge's contrary characterizations of those documents are simply misleading

and wrong.

12.     As with the Original Response, the Supplemental Response relies on

decades-old records in Mr. Schultz's personnel file, including a 1973 performance review (the

"1973 Performance Review") and a letter written by Mr. Schultz dated June 30, 1993 (the "1993

Letter").  See Original Response ¶¶ 6-8 (discussing 1993 Letter and 1973 Performance Review,

respectively); Supplemental Response ¶¶ 14-19 (discussing 1973 Performance Review and 1993

Letter, respectively).  Apart from being hearsay, these records fail to support a conclusion that

WPHL's management had any prior knowledge or reason to believe that Mr. Schultz had

engaged, much less would engage, in any alleged harassing conduct directed at Mr. Younge (or any other employee). For example, Mr. Schultz's 1973 Performance Review contains no statements that suggest Mr. Schultz had "hostile" interactions with his co-workers or evidenced a racial bias. See Supp. Response, Ex. B. To the contrary, the 1973 Performance Review actually contradicts such a conclusion. Specifically, the reviewer noted that Mr. Schultz "works well with others" and "works out relationships with people well. This is an obvious attribute." Id. at 3-4.[12]

13.    Similarly, the 1993 Letter expressly disclaims that Mr. Schultz harbored racial bias. See Supp. Response, Ex. C. At most, the 1993 Letter suggests that *another* employee, Mr. Sample, became aggressive with Mr. Schultz and yelled at him for inadvertently tripping an alarm, that Mr. Schultz argued back in response, that Mr. Sample apparently claimed that Mr. Schultz yelled at him because of his race, and that Mr. Schultz strongly disagreed with that accusation. Id. There is no indication of any finding by WPHL with respect to these allegations, including any finding that Mr. Schultz had engaged in *any* conduct based on race.[13] In any event, this one alleged argument from 1993 is simply too thin a reed on which to support a respondeat superior claim, i.e., that management supposedly should have concluded, from this two-way argument initiated by another employee, that Mr. Schultz was a "white bigot" who

---

[12] The excerpts of the 1973 Performance Review taken out of context in paragraphs 14, 15 and 16 of Mr. Younge's Supplemental Response are not to the contrary. The statements that Mr. Schultz purportedly did "not know parameters" and received a middle-of-the-road rating for working under pressure in "crisis situations" over forty years ago, only 8 months into his employment with the company, are inscrutable in meaning at best, and in any event do nothing to evidence racial animus of any sort. Similarly, comments that "Aggressiveness" was *not* one of Mr. Schultz's strong suits, i.e., that he was *not* aggressive but rather "slothful" at times, directly contradict Mr. Younge's contrary assertions. Thus, even if one were to overlook the patent hearsay and otherwise inadmissible nature of this 40-plus-year-old file document, it does nothing to advance Mr. Younge's claim or create a fact issue (material or otherwise).

[13] Mr. Schultz's isolated alleged statement that he did not understand certain slang because he was "not a street person" does not use racial epithets or terms, and Mr. Younge does not – and could not fairly – contend that "street person," no matter how construed, has any specific meaning limited to any particular race or other group. There is also no indication whatsoever in the 1993 Letter, as Mr. Younge states, that "Mr. Schultz accused [Mr. Sample] of vicious threats with the clear intent to have the African American employee fired." See Supp. Response ¶ 18.

11

would make alleged racial comments to Mr. Younge 15 years later.  See Supp. Giannini Decl.

¶ 5 (expressly disclaiming that Mr. Giannini knew Mr. Schultz to be a "white bigot" or to have

"used racial slurs, hostility, and disparaging comments" to WPHL's African American

employees).  This is particularly true given the total absence of evidence of any other issues

brought to the attention of management concerning Mr. Schultz's relationships with any African-

American employees of WPHL during that 15-year period (discussed further below).

       14.      Mr. Younge's own evidence also fails to support, and indeed flatly

contradicts, the allegation in his Supplemental Response that "Mr. Schultz has a documented

history of using . . . racial slurs (2002), and demeaning other employees of a different race

(2002)."  See Supp. Response ¶ 43.  Mr. Younge cites to Exhibit D to the Supplemental

Response as supporting that allegation, which is a copy of a letter dated October 4, 2002 from

Gunnar Rieger, a former director of engineering of WPHL, to Mr. Schultz concerning an

incident that occurred between Mr. Schultz and another employee, Bill Groves, on September

28, 2002 (the "2002 Letter").  But that letter refers only to "profane language," and specifically

finds that there was insufficient evidence to support Mr. Schultz's allegation that *he* had been

threatened (nor was there any allegation that Mr. Schultz himself had made any threats).

Nothing in the 2002 Letter, or anything else in Mr. Schultz's personnel file, supports Mr.

Younge's assertion that Mr. Schultz made any racial slurs or demeaned other WPHL employees

of a different race.  See Supp. Giannini Decl. ¶¶ 8-9.  To the contrary, Mr. Groves is in fact

*Caucasian*, as is Mr. Schultz.  Id. at ¶ 8.  That incident had nothing whatsoever to do with race,

and instead appears to have been related to a difference of opinion regarding a union matter.  See

Original Response, Younge 62 (Letter from Rick Schultz to Mr. Rieger).

12

15.    Similarly, Mr. Younge's reliance on the letter in Mr. Schultz's personnel file dated October 21, 1994, a copy of which is attached to the Supplemental Response as Exhibit G (the "1994 Letter"), for the proposition that "Mr. Schultz was known to have . . . exhibited a racial animus while working with the Station" is entirely without factual support.  First, there again are no statements in the 1994 Letter that indicate that Mr. Schultz "exhibited a racial animus" towards Ms. Klink (or anyone else).  See Supp. Response, Ex. G.  No mention of race is made or even implied in that letter.  Id.  This is not surprising since Ms. Klink, referred to in the 1994 Letter, also is *Caucasian*, like Mr. Groves and Mr. Schultz.  See Supp. Giannini Decl. ¶ 6.  The 1994 Letter does nothing to support Mr. Younge's allegations of racial bias, much less that WPHL's management somehow was "on notice" that over a decade later Mr. Schultz would make alleged racial statements towards Mr. Younge.[14]

16.    Nor is there any record support for Mr. Younge's allegation that, prior to training Mr. Younge, "Mr. Schultz supposedly stated in an email, 'I'm not training no hoop! . . . Where does a hoop get a car like that?'"  Supp. Response ¶ 26; see also Original Response ¶ 9 (raising same allegation); Original Reply ¶ 7 & n.7 (refuting this allegation).  Mr. Younge has not produced this alleged email and offers no foundation to support that such an email existed or when it was sent, much less that it was provided to management prior to the altercation between Mr. Schultz and Mr. Younge on the night of May 7, 2008.  In fact, the only record evidence contradicts Mr. Younge's wholly unsupported allegation.  See Supp. Giannini Decl. ¶ 7

---

[14] Mr. Younge's mischaracterization of the record in this regard, i.e., that the 1994 Letter is evidence of prior racially-biased conduct by Mr. Schultz or "knowledge" thereof by management, notwithstanding that Ms. Klink is in fact Caucasian, is careless at best and intentional at worst.  It is more likely than not that Mr. Younge knew Ms. Klink was Caucasian, because Ms. Klink was still employed by WPHL as an Operations Technician during Mr. Younge's tenure as Summer Relief Technician at WPHL.  See Supp. Giannini Decl. ¶ 6.  It is likely Mr. Younge was introduced to Ms. Klink (as well as all other Operations Technicians) when he began working for WPHL and was aware that Ms. Klink was Caucasian.  See Supp. Response ¶ 10 (noting that Mr. Younge "personally worked" with "approximately dozen" [sic] employees at WPHL).  Ms. Klink's race is also disclosed in the record before the Court, in documents appended to Mr. Younge's own filings.  See Original Response, Younge 16 ¶ 2 (listing the 7 WPHL Operations Technicians employed as of May 7, 2008 and identifying Ms. Klink as Caucasian).

13

(disclaiming that Mr. Giannini was or is aware of this alleged email from Mr. Schultz; that he

has no knowledge of ever receiving or seeing such an email, directly from Mr. Schultz or

indirectly from any other person at WPHL; and that no such email appears in WPHL's paper or

electronic records maintained in connection with this matter or in Mr. Schultz's personnel file).[15]

17.    Finally, Mr. Younge makes the conclusory allegation that "the Debtor

knew that Mr. Schultz has a history of violating company policies, including confrontations with

at least one other African American employee," based on his allegation that Sandy Kerr, a co-

worker, purportedly told him shortly prior to May 7, 2008: "if he had any problems with *his*

*work* that night to let me know."  Supp. Response ¶ 49 (emphasis added); see also Younge Claim

at 8, Statement of Particulars ¶ 3 (describing same conversation); Obj. ¶ 12 (same).  This

allegation is likewise unsupported and has not been substantiated by Mr. Younge with admissible

evidence.  See Supp. Giannini Decl. ¶ 10 (disclaiming that Mr. Giannini was aware of any

incident, other than the incident involving Mr. Younge on the night of May 7, 2008, in which

---

[15] Mr. Younge bases this allegation entirely on written notes from July 2008 – *after* his termination – made by Paulette Banks of the PCHR.  See Original Response, Younge 39.  These notes purportedly concern a phone call between Ms. Banks and Mr. Younge, in which Mr. Younge is recounting to Ms. Banks a meeting that he attended at WPHL regarding Mr. Schultz's union grievance concerning his (Mr. Schultz's) termination – another meeting that occurred *after* the May 7, 2008 altercation.  Those notes unequivocally are inadmissible and cannot form the basis for a finding by any trier of fact that WPHL's management had prior knowledge of any alleged statements by Mr. Schultz regarding Mr. Younge.  Every statement in the notes is unsubstantiated hearsay.  Even more telling, the notes themselves *contradict* Mr. Younge's assertion of *prior* knowledge by WPHL management.  In describing the supposed "email" that Mr. Schultz purportedly sent describing Mr. Younge as a "hoop," Ms. Banks's notes stated that Mr. Schultz "emailed everyone at the TV station and said that *[Mr. Younge] had threatened [Mr. Schultz]* and he feared for his life." (emphasis added).  Even viewing all facts in Mr. Younge's favor, there is no dispute that Mr. Younge had *never* threatened Mr. Schultz at any time *before* their May 7, 2008 altercation.  As such, even under Mr. Younge's version of events, it is *impossible* for Mr. Schultz to have sent this phantom email (if any) prior to May 7, 2008, and thus for that phantom email (if any) to have put WPHL's management on notice of *anything.*

Given that (undisputed and indisputable) fact, the only reasonable interpretation also is that the subsequent statement in that paragraph of Ms. Banks's notes -- that "Rick [Schultz] said to other employees: 'I'm not training no hoop!' and asked 'Where does a hoop get a car like that?'" – actually refers to the *verbal* statement allegedly made by Mr. Schultz to his *coworker* Mr. Leff on May 6, see supra ¶ 6, and not to an *email* sent to *management* or others at WPHL.  Mr. Younge's creative interpretation of an otherwise completely inadmissible document – which interpretation has been expressly disclaimed by Mr. Giannini's sworn declaration – is insufficient to raise a genuine issue of material fact of this element of Mr. Younge's claim.  See, e.g., Podobnik v. U.S. Postal Serv., 409 F.3d 584, 594 (3d Cir. 2005 (party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue").

Mr. Schultz had a confrontation with any of WPHL's African American employees where it was determined by WPHL that Mr. Schultz violated company policies).

18.    But again, even if accepted as true for present purposes, this alleged statement by Mr. Kerr would not create a genuine issue of material fact.  It is not relevant to or probative of the issue of what *management* supposedly knew or had reason to know because it is undisputed that Mr. Kerr was a *co-worker*, not a member of management.  Furthermore, Mr. Kerr's alleged statement (even if made) refers generically to "problems" and makes no reference to *Mr. Schultz*, much less any "problems" with Mr. Younge in particular or any "history of violating company policies."  Supp. Response ¶ 49 (emphasis added); see also Younge Claim at 8, Statement of Particulars ¶ 3 (describing same conversation); Obj. ¶ 12 (same).  Significantly, Mr. Younge's own statements contradict such an interpretation.  Mr. Younge stated that he asked Mr. Leff, another co-worker, why Mr. Kerr had made that comment and Mr. Leff allegedly told him that Mr. Schultz "just has a problem", *and not a specific problem with Mr. Younge himself.* (See Younge Claim at 8, Statement of Particulars ¶ 4 ("The Complainant asked Steve [Leff] (w/m), Master Controller, why Sandy [Kerr] made that comment and Steve stated Rick Schultz (w/m) will train you tonight and he (Schultz) has a problem.  The Complainant asked "with me?" and Steve responded, "*no, he just has a problem*.") (emphasis added).  It simply is too great an interpretational and inferential leap to assume that this vague and facially-neutral statement is probative evidence of *racial animus* or knowledge thereof by management (as opposed to fellow co-workers believing Mr. Schultz to be, for example, a generally unpleasant or irascible person, or upset at having to train a non-union employee, in each case irrespective of race).  See, e.g., In re Landsource Cmtys., 485 B.R. at 320 (non-movant on summary judgment is entitled only to

15

*reasonable* inferences in his or her favor, and "conclusory inferences" that "raise no more than a 'metaphysical doubt'" about a fact are insufficient to avoid summary judgment).[16]

19.    Accordingly, for all of the foregoing reasons, and the reasons set forth in the Objection and the Original Reply, Mr. Younge has failed to establish specific facts, supported by admissible evidence, that show that there is a genuine issue for trial on the claim that he was subjected to a hostile work environment and that WPHL is liable under a theory of respondeat superior. Mr. Younge has not – and cannot – produce facts and evidence to support his burden on each of the essential elements of this claim and the Reorganized Debtors are entitled to have the Objection sustained as a matter of law.

## B.    The Younge Claim Fails to State a Wrongful Termination Claim

20.    Mr. Younge's wrongful termination claim is meritless for all of the reasons stated in the Objection and the Original Reply, i.e., that Mr. Younge has failed to make out a prima facie case and that, even if he had, WPHL has a non-discriminatory justification for Mr. Younge's termination. (See Obj. ¶¶ 30-38.) Mr. Younge has not come forward with admissible evidence that that justification – Mr. Younge's admitted participation in the altercation on the night of May 7, 2008 – was pretextual. Whatever may have occurred between Mr. Younge and Mr. Schultz on the night of their altercation on May 7, 2008, there is no evidence of racial animus or motivation *by WPHL* in terminating Mr. Younge's employment

---

[16] The Reorganized Debtors likewise dispute the statements set forth in the Supplemental Response at ¶¶ 27-29 as being unsupported by the record, hearsay, and/or mischaracterizations of the record. In particular, there is no basis in the record that indicates that Mr. Schultz uttered the statement attributed to him in paragraph 27. Furthermore, all such alleged statements, even if they had occurred, would have been made *after* the May 7, 2008 altercation and Mr. Younge's termination by his own admission, i.e., during the PHRC's subsequent investigation. None of those alleged statements purport to address what WPHL's management knew or had reason to know of *prior to* the May 7, 2008 altercation between Mr. Schultz and Mr. Younge and they are therefore irrelevant to this Court's determination of that issue.

following the altercation.  Instead, the record demonstrates that by terminating both Mr. Younge

and Mr. Schultz, WPHL's actions were race-neutral and consistent with its corporate policies.

### a)  Mr. Younge Has Not Made Out A Prima Facie Case

21.     The Third Circuit has "repeatedly emphasized that the requirements of the

prima facie case are flexible and must be evaluated in light of the circumstances of the case

before the court. This applies with particular force to the fourth element of the prima facie case

of discrimination." Anthony v. Duff & Phelps Corp., 2010 U.S. Dist. LEXIS 83161 (E.D. Pa.

Aug. 12, 2010), aff'd 432 Fed. App'x 140 (3d Cir. 2011) (quoting Kuzdrowski v. Nicholson, 314

Fed. App'x 410, 413 (3d Cir. 2008)).  The key issue with respect to whether Mr. Younge has

made out a prima facie case for employment discrimination is whether the circumstances of Mr.

Younge's termination give rise to an inference of discrimination by WPHL.

22.     In this regard, Mr. Younge's sole argument appears to be that because Mr.

Younge was replaced by a Caucasian individual, that is sufficient as a matter of law to support an

inference of discrimination.[17]  While it is true that the Third Circuit has found that a plaintiff's

showing that they were replaced by someone outside of the protected class *can* establish the

fourth element of the plaintiff's prima facie case, it is an overstatement of Third Circuit case law

to state, categorically, that such a showing is sufficient as a matter of law in all circumstances.

See Johnson v. Keebler-Sunshine Biscuits, Inc., 214 Fed. App'x 239 (3d Cir. 2007) ("While this

Court no longer requires a plaintiff to show that he was replaced by someone outside of the

protected class to establish an inference of discrimination, we find that this evidence establishes

the fourth and final element of a prima facie case *in this case*.") (emphasis added.)  Indeed, other

District Courts within the Third Circuit, interpreting Johnson, have rejected a "wooden"

---

[17] In making this argument, Mr. Younge erroneously refers to Walgreen Co. as Third Circuit precedent.  See Supp. Response ¶ 40.  Although Walgreen Co. relies on Third Circuit authority, Johnson v. Keebler-Sunshine Biscuits, Inc., 214 Fed. App'x 239 (3d Cir. 2007), it is a District Court case.

application of the prima facie elements, including with respect to the issue of replacement by a person outside of the protected class. See, e.g., Anthony v. Duff & Phelps Corp., 2010 U.S. Dist. LEXIS 83161 at *17-18 (finding that even though the plaintiff's duties were taken over by a male employee, the circumstances as a whole did not give rise to the inference that plaintiff's termination was motivated by discrimination), aff'd 432 Fed. App'x 140 (3d Cir. 2011) (affirming District Court's determination that plaintiff had not made out a prima facie case for discrimination).

23.     Here, nothing in the hiring of a Caucasian summer relief technician demonstrates that there was a causal nexus between Mr. Younge's race and WPHL's decision to terminate his employment. See Sarullo v. U.S. Postal Serv., 352 F.3d 789, 798 (3d Cir. 2003) (to satisfy this [fourth] element [of the McDonnell Douglas test], the plaintiff must "establish some causal nexus between his membership in a protected class and [an adverse employment action]"). WPHL's records show that Mr. Cradic, the replacement summer relief technician, did not begin working at WPHL until June 1, 2008, approximately three weeks after Mr. Younge ceased working for WPHL and approximately two weeks after his formal termination on May 15, 2008. Thus, Mr. Younge was not immediately replaced by anyone, regardless of race, and Mr. Cradic's later hiring, by itself, does not raise an inference of discrimination under the circumstances.

### b)  Mr. Younge Has Not Established Pretext

24.     Even assuming, arguendo, that Mr. Younge has established his prima facie case, his Title VII claim would fail because he lacks evidence that the stated reason for his termination was pretextual, and thus he fails to meet his burden of proof.  To meet his burden, Mr. Younge must adduce *admissible* evidence giving the Court a *reasonable* (non-speculative, non-conclusory) basis either to (i) disbelieve WPHL's articulate legitimate reason for terminating Mr. Younge; or (ii) believe that an invidious discriminatory reason was more likely

18

than not a motivating or determinative cause for WPHL's decision to terminate Mr. Younge.

See Walgreen Co., 964 F. Supp. 2d at 346 (quoting Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)).

25.    To meet his burden under the first prong of the Fuentes test, Mr. Younge must demonstrate, through admissible evidence, "such weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence . . . and hence infer that the employer did not act for the asserted non-discriminatory reasons." Fuentes, 32 F.3d at 765. In other words, the Court must find that "the employer's stated reason for termination is so implausible that a reasonable fact-finder could not believe it." See Walgreen Co., 964 F. Supp. 2d at 346 (quoting Connolly v. Pepsi Bottling Group, LLC, No. 06-1462, 2008 WL 4412090, at *9 (W.D. Pa. Sept. 22, 2008)). Mr. Younge has not made any argument, let alone offered any admissible evidence, that would satisfy the first prong of the Fuentes test. See Supp. Obj. ¶ 46 (stating the first prong of the Fuentes test, but making no argument in connection therewith). To meet his burden under the second prong of the Fuentes test, Mr. Younge must demonstrate, through admissible evidence, that WPHL's decision to terminate Mr. Younge was more likely than not motivated by a discriminatory reason. Fuentes, 32 F.3d at 764.

26.    Even viewing all the evidence (indeed, even the *inadmissible* evidence) in the light most favorable to Mr. Younge, it is beyond dispute that he has failed to meet his burden of proving pretext. First and foremost, Mr. Younge all but concedes that he has no direct evidence of racial bias against Mr. Younge. To the contrary, Mr. Giannini, the decisionmaker, has expressly denied any such improper motivation, and there is no evidence to contradict his sworn statement on that point. Supp. Giannini Decl. ¶ 4. And again, Mr. Giannini terminated

19

*both* Mr. Younge and Mr. Schultz for their shared responsibility, facially demonstrating

evenhandedness irrespective of race.  Furthermore, Mr. Giannini acted consistently with WPHL

policy.  He determined that the actions of both men, including the degree to which the yelling,

profanity, and, in the case of Mr. Younge, threatening and intimidating conduct, had escalated in

this altercation, violated WPHL's Anti-Harassment Policy and the Standards of Conduct and

Corrective Action, could not be tolerated in the workplace, and warranted both men's discharge.

See Obj. Ex. B, Giannini Decl. ¶ 10; Supp. Giannini Decl. ¶ 4; Obj., Ex. D, Standards of

Conduct and Corrective Action (prohibiting "fighting or threatening behavior, and disorderly or

disruptive conduct" and "inappropriate or profane language."); see also Obj. ¶¶ 34-37

(describing legal standards applicable to the proffer by an employer of a legitimate, non-

discriminatory reason for terminating an employee, and applying those standards to the record

before the Court).[18]

   27. Nor can Mr. Younge rely on any circumstantial or indirect evidence.

Indeed, his own admissions doom any such argument.  Mr. Younge has conceded to participating

in the altercation with Mr. Schultz on the night of May 7, 2008, including admitting to verbal and

physical actions that WPHL legitimately construed as threatening and disruptive in its reasonable

judgment.  He admitted, for example, that he "walked over to Schultz" after the argument had

begun; that the statements made by Mr. Schultz were followed by "a lot of yelling and screaming

by both parties"; and that he (Mr. Younge) used profanity towards Mr. Schultz during the

altercation.  See Supp. Response ¶ 42; Younge Claim at 8-9, Statement of Particulars ¶¶ 7, 15.

---

[18] Mr. Younge's contention in the Supplemental Response, at ¶ 42, that "[a]ny physical abuse or violence is disputed at this time." is neither true nor relevant here.  Nowhere in the Objection have the Reorganized Debtors contended that Mr. Younge or Mr. Schultz physically touched each other, or that the reason for either of their terminations was based in whole or in part on physical abuse or violence.  Even if a dispute over this point existed (which it does not), it would not be a genuine dispute of material fact or even relevant to the Objection in any event, because Mr. Younge has otherwise admitted to behavior that violated the Anti-Harassment Policy and Standards of Conduct and Corrective Action sufficient to warrant his termination from WPHL.

Mr. Younge further admitted to WPHL, in connection with the company's investigation immediately following the altercation, that he yelled at Mr. Schultz, '*got in his face*,' and used profanity toward Mr. Schultz. See Original Response, Younge 33 ("Keith stated that at this point, 'all hell broke loose', he stated [sic] yelling at Rick [Schultz], and Rick started yelling back Keith stated that he "got in Rick's face.""); Original Response, Younge 37 ("Keith stated that he was "in [Schultz's] face". I asked Keith if he could remember the curse words he used and he stated that he could not remember and that he may have used them all.").[19] Despite Mr. Younge's after-the-fact efforts to spin his conduct into something else, the fact remains that courts do not sit as "super-personnel" departments to second-guess employment actions, and that WPHL was well within its rights in concluding that, after Mr. Younge by his own admission had yelled and screamed at Mr. Schultz, walked up to him and "got in his face," and used profane language, he had committed a terminable offense. Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326, 332 (3d Cir. 1995) (In evaluating a Title VII claim of discrimination, the courts do not "sit as a super-personnel department that reexamines an entity's business decisions. . . . "[O]ur role is to determine whether a factfinder could reasonably find that the employer's stated reason [for terminating the employee] is unworthy of credence.").

28.     The surveillance video of the altercation further confirms that Mr. Younge followed Mr. Schultz and repeatedly advanced towards him to within mere inches, despite Mr. Younge having multiple opportunities to walk away from the altercation. The altercation escalated to the point where it drew the attention of WPHL's security guard, Ed Rivera, who

---

[19] It is worth noting that these statements were made by Mr. Younge to WPHL's Human Resource Coordinator, Shalona Douglas, during two separate phone interviews conducted by Ms. Douglas with Mr. Younge as part of her investigation into the May 7, 2008 altercation. See also Obj. ¶ 18; Obj. Ex. B, Giannini Decl. ¶ 8; Younge Claim at 9, Statement of Particulars ¶ 13 (in which Mr. Younge states that he spoke to Ed Elias, Michael Hort, and "someone in human resources" regarding the altercation). Mr. Younge's contention in the Supplemental Response, at ¶ 32, that "Mr. Younge was not interviewed" in connection with WPHL's investigation into the altercation is demonstrably false based on Mr. Younge's own allegations.

stepped between the two men and placed his hands on or close to Mr. Younge's chest to separate

him from Mr. Schultz, defused the argument, and escorted Mr. Younge out of the building.  See,

e.g., Obj. ¶ 16; Younge Claim at 9, Statement of Particulars ¶ 10; Supp. Response ¶ 31 ("And the

security guard walks Mr. Younge out, with his hand on Mr. Younge's chest").

29.     The decision to terminate Mr. Younge and Mr. Schultz was made by Mr.

Giannini following his consideration of the facts and circumstances involving Mr. Younge's and

Mr. Schultz's conduct on the night of May 7, 2008, including the results of the investigation

conducted by Shalona Douglas, WPHL's Human Resource Coordinator, and her interviews with

Mr. Younge, Mr. Schultz, Mr. Rivera, and other witnesses to the altercation, and his review of

the video from the surveillance camera located outside the door to the tape prep room from the

night of May 7, 2008.  See Obj. Ex. B, Giannini Decl. ¶¶ 8-10; Supp. Giannini Decl. ¶ 4.

30.     In the Supplemental Response, Mr. Younge offers his own interpretation

of the surveillance camera video, together with a purported "transcription" of the dialogue

between Mr. Younge and Mr. Schultz.  Even accepting for present purposes that the dialogue is

substantially accurate, Mr. Younge's interpretation of the surveillance video does not materially

differ from Mr. Giannini's interpretation (as set forth in his Declaration submitted with the

Objection) and does *not* conflict with WPHL's proffered undisputed facts or provide any basis to

avoid summary judgment.  See Obj., Ex. B ¶ 9 (describing surveillance video footage).  Mr.

Younge admits, for example, that he was "not visible" on the security tape while in the Master

Control room (thus there is no video evidence to contradict WPHL's account); that the security

guard apparently had enough interest to "walk[] into the Master Control room" after looking in

and seeing him arguing with Mr. Schultz; that the security guard "walk[ed] Mr. Younge" out of

the room without even allowing him to get his personal belongings; that Mr. Younge returned to

22

the Master Control room *without* the security guard even though he knew Mr. Schultz was still

there (purportedly to get his belongings); that (not surprisingly) Mr. Younge commenced arguing

with Mr. Schultz again and even pointed at him; and that "the security guard walk[ed] Mr.

Younge out, with his hand on Mr. Younge's chest." Supp. Response ¶ 31.

31.    Taken together with Mr. Younge's admissions that during the course of

the altercation he "walked over to Schultz" and confronted him, telling him "I told you what my

name is," see Younge Claim at 8, Statement of Particulars ¶ 7, that the confrontation "escalated

to a lot of yelling and screaming by both parties," id., that Mr. Younge yelled at Mr. Schultz,

"got in his face," and used profanity toward Mr. Schultz, see Original Response, Younge 33,

Younge 37, and that the altercation escalated to the point where it drew the attention of WPHL's

security, see Obj. ¶ 16; Younge Claim at 9, Statement of Particulars ¶ 10; Supp. Response ¶ 31, it

was eminently reasonable for WPHL to conclude that Mr. Younge had engaged in disorderly,

disruptive, threatening, and intimidating conduct. See Brewer, 72 F.3d at 332 (court does not sit

as "super-personnel department" to second-guess employer judgments in employment

situations).  Again, while Mr. Younge now attempts to spin his behavior and paint Mr. Schultz as

the only wrongdoer, the fact remains that, as a matter of law based on the objective evidence,

WPHL was well within its rights in concluding that "it takes two to tango" and that Mr. Younge

bore part of the responsibility for the altercation.  Mr. Younge's belief that another outcome or

interpretation would have been preferable or more reasonable is insufficient to survive summary

judgment. See Brewer, 72 F.3d at 332.

32.    Faced with the foregoing, Mr. Younge turns to a tortured "disparate

treatment" claim, somehow based on Mr. Schultz's alleged involvement in a different and

manifestly less severe verbal exchange six years earlier with a different individual.  This effort

fails as well.  Mr. Younge's argument in this regard is that WPHL allegedly applied its Standards of Conduct and Corrective Action more favorably to Mr. Schultz in connection with the alleged 2002 incident between Mr. Schultz and Mr. Groves than it did to Mr. Younge in connection with the May 7, 2008 altercation between Mr. Schultz and Mr. Younge.  See Supp. Obj. ¶ 48 ("Therefore, the Debtor clearly discriminated against Mr. Younge in terminated him for the exact same alleged infraction that did not result in Mr. Schultz's termination in 2002.").

33.    But the undisputed facts contradict any such argument (again, even *if* one assumed for purposes of argument that the 2002 personnel record is accurate, admissible, and should be taken at face value).  To establish pretext under these circumstances, Mr. Younge must present admissible evidence that comparators were involved in acts "of comparable seriousness," but were treated more favorably.  See Walgreen Co., 964 F. Supp. 2d at 350 (quoting McDonnell Douglas, 411 U.S. at 804); id. (citing Taylor v. Proctor & Gamble Dover Wipes, 184 F. Supp. 2d 402, 410 (D. Del 2002) ("When 'comparators' are used in a Title VII claim, the acts of non-minority employees must be of 'comparable seriousness' if the failure to discharge those employees is being proffered as proof of discriminatory intent."); Opsatnik v. Norfolk Southern Corp., 335 Fed. App'x 220, 223 (3d Cir. 2009) ("Even though 'similarly situated' does not mean identically situated, the plaintiff must nevertheless be similar in 'all relevant respects.'").

34.    There is nothing in the record before the Court, and Mr. Younge has offered no admissible (or other) evidence, that demonstrates that the 2002 incident was in any way comparable to the May 7, 2008 altercation between Mr. Schultz and Mr. Younge.  Although the 2002 Letter states that WPHL found that both Mr. Schultz and Mr. Groves used profane language, there is nothing in that letter or elsewhere in the record that indicates that the 2002 incident involved the degree of screaming, yelling, profanity, and disruptive and disorderly

24

conduct as the May 7, 2008 altercation between Mr. Schultz and Mr. Younge.  See Supp.

Giannini Decl. ¶ 9.  Nor, for that matter, is there any evidence that either party engaged in, or

incited, threatening or intimidating conduct by or against the other party.  To the contrary, the

2002 Letter expressly stated that WPHL had found no evidence to substantiate Mr. Schultz's

claim that Mr. Groves threatened him, and makes no mention of any threatening conduct (or

allegations thereof) by Mr. Schultz.  Moreover, it is demonstrably false, as Mr. Younge contends,

that Mr. Schultz "suffered no adverse employment disciplinary action at all" in connection with

the 2002 incident.  See Supp. Response ¶ 22.  The 2002 Letter states on its face that it constitutes

a written warning to Mr. Schultz, and it was placed in Mr. Schultz's permanent personnel file.

Id. at ¶ 20 (quoting the warning, with emphasis); id. at Ex. D.

      35.     Here, the only relevant comparator to the discipline imposed on Mr.

Younge is the discipline imposed on Mr. Schultz in connection with the altercation involving

both men, *for which both men were terminated*.  "The most important factors in the disciplinary

context . . . are the nature of the offenses committed and the nature of the punishment imposed."

Maynard v. Bd. of Regents, 342 F.3d 1281, 1289 (11th Cir. 2003) (quoting Silvera v. Orange

County Sch. Bd., 244 F.3d 1253, 1259 (11th Cir. 2001)).  Again, while Mr. Younge may believe

that the two situations are or should be viewed as equivalent, that opinion – which is all he has to

rely on – is insufficient as a matter of law to render WPHL's legitimate judgment pretextual or to

survive summary judgment.  See Brewer, 72 F.3d at 332 (court does not sit as "super-personnel

department" to second-guess employer judgments in employment situations).  The record before

the Court, which Mr. Younge has not – and cannot – overcome, demonstrates that WPHL

applied its Anti-Harassment Policy and Standards of Conduct and Corrective Action even-

handedly by terminating *both* Mr. Younge and Mr. Schultz for their violations of those policies

on the night of May 7, 2008.  See Obj., Ex. B, Giannini Decl. ¶ 10; Supp. Giannini Decl. ¶ 4.

Mr. Younge cannot maintain a claim of disparate treatment under these circumstances.

### C.   The Reorganized Debtors Dispute That Mr. Younge Is Entitled To Any Damages, And Continue To Reserve Their Rights On That Issue

36.     Finally, it is false, as Mr. Younge states, that "[t]he Debtors have only objected to the basis for Mr. Younge's claim and have not taken issue or objected to the claim amount."  Supp. Response ¶ 50 & n.2.  The Objection, under the heading "Mr. Younge Has Not Supported Any Claim For Damages" states that in relevant part that "the Reorganized Debtors dispute that [Mr. Younge] would be entitled to the asserted claim of $75,000.  Mr. Younge has provided no basis whatsoever for that request.  The Reorganized Debtors reserve all of their rights to contest the damages sought by Mr. Younge . . . ."  See Obj. ¶ 39.

37.     Nothing in the Supplemental Response supports Mr. Younge's assertion that he is entitled to damages in any amount, much less $75,000.  The Reorganized Debtors continue to reserve all of their rights to contest the damages sought by Mr. Younge in the event that the Objection is not sustained by this Court and Mr. Younge presents any evidence or argument in support of damages.

[Remainder of Page Intentionally Left Blank]

46429/0001-10966841V1

WHEREFORE, for the reasons set forth in the Objection, the Original Reply, and herein, the Reorganized Debtors respectfully request that the Court enter an order in the form attached hereto, pursuant to section 502(b) of the Bankruptcy Code and Bankruptcy Rules 3001, 3003, and 3007, (i) disallowing and expunging the Younge Claim in its entirety; (ii) authorizing the Claims Agent to expunge the Younge Claim from the official claims register maintained in these chapter 11 cases; and (iii) granting such other and further relief as the Court deems just and proper.

Dated: Wilmington, Delaware
September 5, 2014

Respectfully submitted,

SIDLEY AUSTIN LLP
James F. Conlan
Kenneth P. Kansa
Jonathan Lotsoff
Jillian K. Ludwig
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile:  (312) 853-7036

-and-

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.

By: _____
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Facsimile:  (302) 652-3117

ATTORNEYS FOR REORGANIZED DEBTORS

46429/0001-10966841V1