# <u>EXHIBIT B</u>

Travelers' Progeny

1.   Busson-Sokolik v. Milwaukee Sch. of Eng'g (In re Sokolik), 635 F.3d 261 (7th Cir. 2011)

2.   Ogle v. Fidelity & Deposit Co. of Md., 586 F.3d 143, 148 (2d Cir. 2009)

3.   SNTL Corp. v. Ctr. Ins. Co. (In re SNTL Corp.), 571 F.3d 826, 841 (9th Cir. 2009)

4.   Busch v. Hancock (In re Busch), 369 B.R. 614, 618 (B.A.P. 10th Cir. 2007)

5.   In re Rubin Family Irrevocable Stock Trust, 516 B.R. 221 (Bankr. E.D.N.Y. 2014)

6.   In re Castillo, 488 B.R. 441 (Bankr. C.D. Cal. 2013)

7.   In re Holden, 491 B.R. 728, 737 (Bankr. E.D.N.C. 2013)

8.   Hunt v. Bailey (In re Bailey), No. 12-60253, 2013 WL 3380168 (Bankr. D. Mont. July 8, 2013)

9.   In re Old Colony, LLC, 476 B.R. 1 (Bankr. D. Mass. 2012)

10.   In re Seda France, Inc., No. 10-12948, 2011 WL 3022563 (Bankr. W.D. Tex. July 22, 2011)

11.   Rockland Credit Fin., LLC v. Ceda Mills, Inc. (In re Ceda Mills, Inc.), No. 04-24452, 2009 WL 8556804, at *6 n.3 (Bankr. W.D. Pa. Feb. 11, 2009)

12.   In re Agway, Inc., Nos. 02-65872, 02-65877, 2008 WL 2827439 (Bankr. N.D.N.Y. July 18, 2008)

13.   OHC Liquidation Trust v. U.S. Fire Ins. Co. (In re Oakwood Homes Corp.), 394 B.R. 352, 356 (Bankr. D. Del. 2008)

14.   In re Elec. Mach. Enters., Inc., 371 B.R. 549 (Bankr. M.D. Fla. 2007)

15.   In re WCS Enters., Inc., 381 B.R. 206 (Bankr. E.D. Va. 2007)

16.   Qmect, Inc. v. Burlingame Capital Partners II, LP (In re Qmect, Inc.), 368 B.R. 882, 884-86 (Bankr. N.D. Cal. 2007)

635 F.3d 261
United States Court of Appeals,
Seventh Circuit.

In re Dustin John Busson–SOKOLIK, Debtor.
Dustin Busson–Sokolik and Chomi Prag, Appellants,
v.
Milwaukee School of Engineering, Appellee.

Nos. 08–4317, 09–4009, 10–1456.
|   Argued Sept. 14, 2010.   |   Decided
Feb. 10, 2011.   |   Rehearing and
Rehearing En Banc Denied March 15, 2011.

**Synopsis**

**Background:** The United States Bankruptcy Court for the Eastern District of Wisconsin found that student loan was non-dischargeable debt and that school was entitled to collection costs and attorney's fees in connection with bankruptcy proceedings pursuant to promissory note for loan signed by debtor. Debtor appealed. The United States District Court for the Eastern District of Wisconsin, Charles N. Clevert, Jr., Chief Judge, affirmed. Debtor appealed.

**Holdings:** The Court of Appeals, Bauer, Circuit Judge, held that:

[1] funds transferred constituted loan;

[2] loan to student properly was considered "educational";

[3] attorney fees incurred in litigating bankruptcy case were recoverable from debtor;

[4] debtor's argument, that attorney fee award to creditor with regard to litigation of student loan exception to discharge was improper based on merger doctrine, had been waived;

[5] court was not required to reach merits of any alleged violation of sanctions rule by creditor;

[6] district court did not abuse its discretion in imposing sanctions against debtor and his attorney; and

[7] Court of Appeals would exercise its own discretion to reduce sanctions imposed by half.

Affirmed.

**Attorneys and Law Firms**

**\*264** Chomi Prag (argued), Attorney, Law Offices of Chomi Prag, LLC, Waukesha, WI, for Debtor–Appellant.

Christine Olson McTigue (argued), Attorney, Hinshaw & Culbertson, Chicago, IL, for Appellee.

Before BAUER, FLAUM and HAMILTON, Circuit Judges.

**Opinion**

BAUER, Circuit Judge.

This case comes to us as a direct appeal from the Eastern District of Wisconsin's decision to affirm findings of the United States Bankruptcy Court for the Eastern District of Wisconsin. The courts below found: (1) that a $3,000 student loan which Dustin Busson–Sokolik received from the Milwaukee School of Engineering ("MSOE") in 1999 was a non-dischargeable debt under the United States Bankruptcy Code, and (2) that the school was entitled to collection costs and attorney's fees in connection with the bankruptcy proceedings pursuant to the promissory note for the loan signed by Busson–Sokolik. The district court also: (1) denied a motion for sanctions against the school, and (2) imposed sanctions against Busson–Sokolik and his attorney, Chomi Prag. Busson–Sokolik and Prag appeal each of these determinations. After reviewing the district court's application of the Bankruptcy Code de novo and the underlying factual findings in the case for clear error, we affirm. As to the district court's imposition of sanctions against Busson–Sokolik and Prag, while we do not find any abuse of discretion in the court's decision to impose sanctions in this case, we do find the amount of the sanctions assessed to be excessive and therefore hold that the sanctions be reduced by half.

## I. BACKGROUND

Busson–Sokolik was a student at MSOE from September 1999 until May 2000. On **\*265** October 29, 1999, Busson–Sokolik signed a promissory note with MSOE in the amount of $3,000, agreeing in relevant part as follows:

I promise to pay the school, or a subsequent holder of the Promissory Note, the sum of amount(s) advanced to me under the terms of this Note, plus interest and other fees which may become due as provided in this Note. I promise to pay all reasonable collection costs, including attorney fees and other charges, necessary for the collection of any amount not paid when due ... My signature certifies I have read, understand, and agree to the terms and conditions of this Promissory Note.

MSOE sued Busson–Sokolik in a Racine County, Wisconsin state court in April 2005 to recover unpaid sums under the loan agreement and obtained a default judgment of $5,909.63. In June 2005, Busson–Sokolik initiated a Chapter 13 bankruptcy proceeding, which was later converted to a Chapter 7 proceeding, in May 2006. On his bankruptcy petition, he listed MSOE as a creditor. In August 2006, Busson–Sokolik filed an adversary complaint against MSOE to determine the dischargeability of his debt to MSOE. The bankruptcy court found that the debt was non-dischargeable and found that Busson–Sokolik owed MSOE $16,248.78, an amount that included costs and attorney's fees.

Busson–Sokolik appealed the bankruptcy court's decision to the district court. Lengthy delays in filing ensued and a series of motions alleging misconduct on both sides were filed. Busson–Sokolik filed a motion for sanctions under Fed. R. Bankr.P. 9011 based on alleged false statements in MSOE's brief and MSOE moved to strike portions of Busson–Sokolik's reply brief, claiming that it contained arguments that were never raised in the opening brief or in the bankruptcy court. MSOE also moved for costs and fees under Fed. R. Bankr.P. 8020, which permits recovery of such costs and fees when a party has filed a frivolous appeal.

The district court judge denied Busson–Sokolik's motion for sanctions, but granted MSOE's motion for costs and fees under Fed. R. Bankr.P. 8020, finding that Busson–Sokolik's appeal was frivolous. He also granted MSOE's motion to strike arguments in Busson–Sokolik's reply brief not previously raised, finding those arguments waived. Finally, he affirmed the bankruptcy court's judgment and awarded $80,290.15 to MSOE, specifying that Busson–Sokolik and his attorney were jointly and severally liable for $61,942.50

of the judgment, and that Busson–Sokolik was solely liable for the remaining $18,347.65.

Busson–Sokolik and attorney Prag have timely appealed to this court.

## II. DISCUSSION

### A. The Dischargeability of Busson–Sokolik's Loan from the Milwaukee School of Engineering

[1]  [2]  A key issue is whether the MSOE loan constitutes a non-dischargeable debt under 11 U.S.C. § 523(a)(8). We review questions of law pertaining to the Bankruptcy Code de novo and the factual determinations underlying the lower courts' conclusions for clear error. *See Wiese v. Cmty. Bank of Cent. Wis.,* 552 F.3d 584, 588 (7th Cir.2009); *Mungo v. Taylor,* 355 F.3d 969, 974 (7th Cir.2004).

Section 523(a)(8) creates exceptions to the general discharge of a debtor's financial obligations in bankruptcy under 11 U.S.C. § 727. Under § 523(a)(8)(A), an individual debtor is not discharged from a debt for "(i) an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in  **\*266**  part by a governmental unit or nonprofit institution; or (ii) an obligation to repay funds received as an educational benefit, scholarship or stipend," unless excepting such debt from discharge would impose undue hardship on the debtor and the debtor's dependents. The bankruptcy court and the district court each found that the MSOE loan was non-dischargeable under § 523(a)(8)(A). We agree.

We note at the outset the parties' failure to explicitly identify whether the applicable framework for the court's analysis should be § 523(a)(8)(A)(i) or (ii). Though the parties refer to § 523(a)(8)(A) generally, the analysis below and in the parties' briefing before this court tracks § 523(a)(8)(A)(i). So, section 523(a)(8)(A)(i) will be our framework.

[3]  It is undisputed that MSOE is a § 501(c)(3) non-profit institution. While it seems clear to us that the funds were furnished as part of a loan program, Busson–Sokolik disputes that the funds transferred constituted a loan. We do not find his argument compelling. For there to be a loan, there must be "(i) a contract, whereby (ii) one party transfers a defined quantity of money, goods or services, to another, and (iii) the other party agrees to pay for the sum or items transferred at a later date." *In re Chambers,* 348 F.3d 650, 657 (7th Cir.2003).

The October 1999 promissory note evinces a contract for the transfer of $3,000 to be repaid at a later date. Since the Bankruptcy Court made a reliable factual finding that the $3,000 was transferred to Busson–Sokolik's student account on November 9, 1999, each of the three elements of a loan are present. [1]

**[4]** **[5]** Busson–Sokolik next challenges whether the loan can properly be considered "educational," as required to bring the loan within § 523(a)(8)(A). While some courts look to the use of the funds received to determine whether a loan is educational, we adopt the approach taken by the Fifth Circuit in *In re Murphy, 282 F.3d 868 (5th Cir.2002).* In so doing, we hold that it is the purpose of a loan which determines whether it is "educational." This approach seems most consistent with the language of § 523(a)(8)(A). It also aligns with the broader goal of protecting lenders against debtors who divert educational funds toward other uses. In our view, adopting a "use" test would be problematic. Such a test would enable students who abuse funds intended for their education to receive the benefit of a discharge, while those who use the loan proceeds as intended would "retain the burden of paying them even after a chapter 7 discharge." *Murphy, 282 F.3d at 873.* The "purpose" test avoids this potential problem by refocusing the inquiry on the nature and character of the loan. For example, rather than trying to determine whether a computer purchased with loan money was used for schoolwork, personal use or some combination of both, we need only ask whether the lender's agreement with the borrower was predicated on the borrower being a student who needed financial support to get through school.

**\*267** We find the following facts established below relevant to our inquiry into the purpose of the MSOE loan: (1) MSOE is a school; (2) the loan was part of a package that included scholarship and grant money toward completion of Busson–Sokolik's education at MSOE; (3) the promissory note for the loan was signed while Busson–Sokolik was a student at MSOE; (4) Busson–Sokolik had to be a student to be eligible for the loan he received from MSOE; and (5) the MSOE loan money was deposited into Busson–Sokolik's student account at MSOE, an account he presumably would not have had if he were not a student. Together these facts establish that the loan was part of a program specifically designed by the school to provide financial support to students working to complete their education. Under the purpose driven test this court has adopted, there is no question that the loan was educational. As a result, we affirm the finding that 11 U.S.C. § 523(a)(8) bars Busson–Sokolik from discharging his debt to MSOE

in bankruptcy because the debt resulted from an educational loan.

## B. The Imposition of Collection Costs and Attorney's Fees

**[6]** We now turn to Busson–Sokolik's argument that the bankruptcy court improperly allowed MSOE to recover costs and attorney's fees in this case.

**[7]** Under the "American Rule," a litigant who prevails in a lawsuit is not ordinarily allowed to collect attorney's fees from the losing side. *See Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 247, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975).* However, this rule can be overcome by statute or by an enforceable contract with a provision regarding the allocation of attorney's fees. *See Travelers Cas. and Sur. Co. of America v. Pacific Gas and Elec. Co., 549 U.S. 443, 448, 127 S.Ct. 1199, 167 L.Ed.2d 178 (2007).*

Busson–Sokolik is correct that there was no statutory basis for an award of attorney's fees during the bankruptcy proceedings. However, the basis for the bankruptcy court's award of fees was contractual, not statutory. Under the promissory note for the MSOE loan, Busson–Sokolik agreed in writing to pay "all reasonable collection costs, including attorney's fees and other charges, necessary for the collection of any amount not paid when due." The bankruptcy court found a valid contract existed between the parties that allowed MSOE to recover its fees based on the above-referenced language in the promissory note. This was not error. As the Supreme Court held in the *Travelers* case, "it remains true that an otherwise enforceable contract allocating attorney's fees (i.e. one that is enforceable under substantive, nonbankruptcy law) is allowable in bankruptcy except where the Bankruptcy Code provides otherwise." *Travelers, 549 U.S. at 448, 127 S.Ct. 1199.* The fact that the fees were incurred litigating a bankruptcy case does not disallow MSOE's contract based claim for attorney's fees under *Travelers.* Since the promissory note was an enforceable contract, the fees were separately recoverable under the substantive law of contracts. Furthermore, Busson–Sokolik has not argued that any portion of the Bankruptcy Code specifically prohibits a court from awarding such fees under a contract theory. Finding no applicable exception in the Bankruptcy Code and no barrier to formation of a valid contract between MSOE and Busson–Sokolik, we affirm the award of costs and attorney's fees to MSOE pursuant to the terms of the promissory note.

Bankr. L. Rep. P 81,929

**[8]**  In concluding our discussion of Busson–Sokolik's claim that fees were improperly **\*268** awarded, we note his argument that the district court erred in striking portions of his reply brief that related to the merger doctrine. The district court found that Busson–Sokolik failed to raise the merger doctrine in his initial brief at the district court level. Chief Judge Clevert therefore held that Busson–Sokolik had waived any argument that the fee award was improper based on the merger doctrine. We agree with the district court that the merger issues were waived and decline to apply an exception to waiver for the reasons set forth below.

**[9]**  Waiver occurs when an appellant attempts to raise an issue on appeal that was not adequately raised below. This court has held that when an issue was not raised in the bankruptcy court, a finding that the issue is waived at the district court level is "the correct result, since to find otherwise would permit a litigant simply to bypass the bankruptcy court." *Matter of Weber,* 25 F.3d 413, 415 (7th Cir.1994). When asked at oral argument what her best effort was to raise the doctrine of merger before the bankruptcy court, Busson–Sokolik's counsel was unable to present any evidence that the issue was addressed in that court. Instead she indicated that her focus had been on the "American rule" and the lack of a statutory basis for awarding the fees. Since we find no evidence in the record or from Busson–Sokolik's counsel that the issue was raised in the bankruptcy court, we hold that any argument related to the merger doctrine was waived before it reached the district court.

**[10]**  Though it is within this court's discretion to find an exception to waiver and to consider an appellant's argument despite the appellant having waived it, the circumstances here hardly justify an exception. It is only under "exceptional circumstances" that we will hear an argument not adequately presented below. *Matter of Weber,* 25 F.3d at 416. Busson–Sokolik argues that we should consider the merger issue because "an award by the bankruptcy court of close to $9,000 in attorney's fees to the Milwaukee School of Engineering based on an unenforceable contract is inherently unfair." As we have already discussed above, there was a valid contract between the parties which provided for the allocation of attorney's fees. Busson–Sokolik's characterization of the contract as "unenforceable" is therefore incorrect. As to the amount of the fees awarded, Busson–Sokolik's characterization is similarly misguided. Busson–Sokolik provides no support for his proposition that a $9,000 fee in a case such as this is inherently unreasonable or unfair. The bankruptcy court explicitly found that MSOE attorney's

fees in the amount of $8,955 were reasonable. Absent any meaningful challenge to the award by Busson–Sokolik, we see no reason to disturb that finding.

**[11]**  The district court first became aware of Busson–Sokolik's merger argument in a reply brief. At that point the issue was waived twice over: first, because the argument was never raised in the bankruptcy court; and second, because arguments raised for the first time in a reply brief as opposed to the appellant's opening brief are deemed waived. *See, e.g., Nelson v. La Crosse County Dist. Atty.,* 301 F.3d 820, 836 (7th Cir.2002); *James v. Sheahan,* 137 F.3d 1003, 1008 (7th Cir.1998). The proper response to an argument improperly raised in such a brief is to move to strike the offending portion of the brief. *Cleveland v. Porca Co.,* 38 F.3d 289, 297 (7th Cir.1994). MSOE timely filed a motion to strike the relevant portions of Busson–Sokolik's reply brief and the district court properly granted the motion. Since Busson–Sokolik has failed to show "exceptional **\*269** circumstances" that would make this case a favorable candidate for an exception to waiver, we decline to discuss the merits of those portions of his argument that relate to the merger doctrine.

## C. The Parties' Motions for Sanctions

**[12]**  **[13]**  **[14]**  Finding no error in the district court's decision to grant MSOE's motion to strike portions of Busson–Sokolik's reply brief, we now turn to Busson–Sokolik's arguments that the district court erred (1) in denying his request for sanctions against MSOE under Fed. R. Bankr.P. 9011, and (2) in entering sanctions against him and his attorney, Chomi Prag, under Fed. R. Bankr.P. 8020. We review both determinations for abuse of discretion. [2] Such abuse occurs only when a court has acted contrary to the law or reached an unreasonable result. *In re Rimsat, Ltd.,* 212 F.3d 1039, 1046 (7th Cir.2000).

### 1. Denial of Motion for Sanctions Against MSOE

An attorney is subject to sanctions under Fed. R. Bankr.P. 9011 when he submits a petition, pleading, written motion or other paper to the court that falls into one of four categories: (1) the document was submitted for an improper purpose (i.e., to harass one's adversary or to delay or drive up the costs of litigation); (2) the claims contained in the document are frivolous because they lack support under existing law; (3) the allegations contained in the document lack evidentiary support or are unlikely to have evidentiary support upon

further investigation; or (4) the denials in the document are unwarranted based on the evidence. Fed. R. Bankr.P. 9011(b)(1)-(4). A motion for sanctions may be made under Fed. R. Bankr.P. 9011(c)(1)(A), as Busson–Sokolik did in this case, but any such motion is subject to a 21–day safe harbor provision.

Busson–Sokolik alleges sanctionable behavior on the part of MSOE based largely on statements contained in MSOE's brief before the district court. However, we need not reach the merits of any alleged violation on the part of MSOE because Busson–Sokolik undisputedly violated the safe harbor provision. On his own admission in the district court on October 31, 2008 and in his brief before this court, Busson–Sokolik concedes that he and his attorney did not provide MSOE with an adequate opportunity to withdraw the contested portions of its brief as required by the safe harbor provision of Fed. R. Bankr.P. 9011(c)(1)(A).

While we appreciate the candor with which Busson–Sokolik and his counsel have acknowledged their error in failing to abide by the 21–day window, their forthcomingness is not sufficient to persuade us to revive an inquiry into the allegations raised. Though Busson–Sokolik correctly points out that courts are able to enter an order for sanctions on their own initiative, there is no requirement under Fed. R. Bankr.P. 9011(c)(1)(B) that a court act *sua sponte* to impose sanctions. Chief Judge Clevert denied Busson–Sokolik's motion for sanctions based on the safe harbor provision, a decision which we find comports **\*270** with the law. To the extent that he was nevertheless empowered to impose sanctions under Fed. R. Bankr.P. 9011(c)(1)(B) and declined to do so, we choose not to disturb that judgment.

## 2. Sanctions Imposed Against Busson–Sokolik and Chomi Prag

 **[15]**   We now turn to the final issue for our review, namely whether the district court abused its discretion when it awarded sanctions for filing a frivolous appeal against Busson–Sokolik and his attorney, Chomi Prag.

The district court's imposition of sanctions was based on Fed. R. Bankr.P. 8020, which reads as follows:

> If a district court or bankruptcy appellate panel determines that an appeal from an order, judgment, or

decree of a bankruptcy judge is frivolous, it may, after a separately filed motion or notice from the district court or bankruptcy appellate panel and reasonable opportunity to respond, award just damages and single or double costs to the appellee.

Chief Judge Clevert made several determinations in support of his finding that Busson–Sokolik's "appeal, **as litigated,** was frivolous." He summarized Busson–Sokolik and Prag's behavior throughout the course of the proceedings as follows:

> Motions were filed by appellant without any basis in the rules, deadlines were ignored, procedural requirements were dismissed as unnecessary, and duplicative filings and objections were made thereby making it impossible for appellee to minimize its costs in this action.

In his decision, Chief Judge Clevert referenced appellants' reliance on the merger doctrine despite having waived it, several misstatements in the record made by Prag, the Fed. R. Bankr.P. 9011 motion filed against MSOE, which he called "baseless," and the improper filing of an appeal to this court while district court proceedings were still pending.

 **[16]**   We do not find that Chief Judge Clevert erred in imposing sanctions based on Fed. R. Bankr.P. 8020. Busson–Sokolik and his attorney were free to appeal their case to the district court, but ample evidence suggests that the *manner* in which the appeal was litigated bordered on the frivolous.[3] Courts consider a variety of factors in deciding whether to impose sanctions under Fed. R. Bankr.P. 8020.[4] We are not convinced that Busson–Sokolik and his attorney appealed in bad faith. However, bad faith is only one of the many factors to be considered in determining whether sanctions are appropriate in any given case. We are also not convinced that the appeal itself (as contrasted with the manner in which the appeal was litigated) was frivolous. Because of appellants' procedural error in failing to abide by the **\*271** safe harbor provision of Fed. R. Bankr.P. 9011, the courts have never reached the merits of that claim. And because courts are able to find an exception to waiver, the merger argument, though unsuccessful, did have some basis in law. Appellants' most egregious errors in this litigation appear to have been procedural ones. These errors were numerous and

well documented. Therefore, given the stringent standard of abuse of discretion by which we are bound, we find that the act of awarding sanctions under Fed. R. Bankr.P. 8020 was a reasonable exercise of Chief Judge Clevert's discretion.

**[17]** **[18]** Notwithstanding the reasonableness of the decision to award sanctions and the reasonableness of MSOE's fees [5], we do not find that the full amount awarded in the district court was necessary to achieve the deterrent purposes of Fed. R. Bankr.P. 8020. As such, we exercise this court's own discretion to reduce the sanctions imposed by half. In so doing, we acknowledge that "[w]hile an award of attorney's fees may be necessary to fulfill the deterrent purposes of Rule 8020, the award should not subject Appellant to financial ruin." *In re Bonfield,* 2005 WL 2810702 at *1 (W.D.Wash.). The fees accrued in this case are sizeable and would be difficult for many litigants to pay. Recognizing that Busson–Sokolik is a student who has filed for bankruptcy and finding no evidence of bad faith on the

part of Busson–Sokolik or his attorney, we conclude that a reduction in sanctions is warranted in this case.

## III. CONCLUSION

Busson–Sokolik and his attorney, Chomi Prag, are jointly and severally liable to MSOE for $30,971.25, an amount which we find represents "just damages" under Fed. R. Bankr.P. 8020. Busson–Sokolik remains solely liable for $18,347.65, an amount which represents the July 11, 2007 judgment on decision in the bankruptcy court, coupled with $2,098.87 in judgment interest. The remaining $30,971.25 of the fee award is VACATED. On all other grounds, we AFFIRM.

**Parallel Citations**

Bankr. L. Rep. P 81,929

Footnotes

1    Busson–Sokolik claims that "no funds changed hands" between him and MSOE, but since he does not dispute that his student account was credited with the loan money, this argument is unfounded. If the loan money was transferred to the student's account, it became available for his use, much like a bank deposit. While the facts indicate that a credit on Busson–Sokolik's student account was later refunded to his mother, this is irrelevant to the question of whether a loan was made to Busson–Sokolik in the first place. Finding no clear error on the question of whether the funds were in fact transferred to Busson–Sokolik and no defects in the formation of a valid contract between the parties, we affirm the finding that the sum MSOE transferred to Busson–Sokolik was a loan.

2    "Abuse of discretion" is the clear standard for evaluating a judge's decision to impose sanctions in a bankruptcy case. *See In re Rimsat, Ltd.,* 212 F.3d 1039, 1046 (7th Cir.2000). While the standard for evaluating a judge's decision *not* to impose sanctions in a bankruptcy case is somewhat less clear, we adopt the Sixth Circuit's approach of using the "abuse of discretion" standard. *See In re Downs,* 103 F.3d 472, 480 (6th Cir.1996) (holding that the applicable standard of review for evaluating a bankruptcy court's denial of Fed. R. Bankr.P. 9011 sanctions is "abuse of discretion" and noting similar approaches taken by the Ninth and Tenth Circuits).

3    An appeal is frivolous "when the result is obvious or when the appellant's arguments are wholly without merit." *Flaherty v. Gas Research Inst.,* 31 F.3d 451, 459 (7th Cir.1994). Even when genuinely appealable issues may exist, appellant's misconduct in arguing the appeal may render the appeal "frivolous as argued." *Dungaree Realty, Inc. v. United States,* 30 F.3d 122, 124 (Fed.Cir.1994).

4    For a comprehensive list of factors to be considered in evaluating a Fed. R. Bankr.P. 8020 motion, see *In re Maloni,* 282 B.R. 727, 734 (1st Cir.BAP 2002) ("Some of these factors are: bad faith on the part of the appellant; that the argument presented on appeal is meritless *in toto;* and, whether only part of the argument is frivolous. In addition, the court will consider whether appellant's argument: addresses the issues on appeal properly; fails to support the issues on appeal; fails to cite any authority; cites inapplicable authority; makes unsubstantiated factual assertions; makes bare legal conclusions; or, misrepresents the record.").

5    Of the district court award, $61,942.50 represents attorney's fees in connection with the appeal, which MSOE documented and submitted to Chief Judge Clevert on May 14, 2009. The statement includes work done from June 16, 2007 to May 14, 2009 billed at a rate of $225 per hour.

**End of Document**                              © 2014 Thomson Reuters. No claim to original U.S. Government Works.

586 F.3d 143
United States Court of Appeals,
Second Circuit.

D. Clark OGLE, Liquidating Trustee of the Agway
Liquidating Trust, Appellant,
v.
FIDELITY & DEPOSIT COMPANY OF
MARYLAND, Appellee.

Docket No. 09-0691-bk. | Argued: Oct. 15, 2009. |
Decided: Nov. 5, 2009.

**Synopsis**
**Background:** Creditor, which had provided surety bonds
to Chapter 11 debtors' insurers and thereafter incurred
post-petition attorneys fees in litigation to enforce its
prepetition indemnity agreement with debtor, filed claim
for attorneys fees. Liquidating trustee objected, conceding
that creditor had a right to the fees under state contract
law, but arguing that the Bankruptcy Code barred such
recovery. The United States Bankruptcy Court for the
Northern District of New York, Gerling, J., ruled that
creditor could collect $884,506.28 in post-petition
attorneys fees. Appeal was taken. The District Court,
Sharpe, J., affirmed, and liquidating trustee appealed.

**Holdings:** The Court of Appeals, Dennis Jacobs, Chief
Judge, held that:

[1] under the Bankruptcy Code, an unsecured creditor is
entitled to recover post-petition attorneys fees that were
authorized by an otherwise enforceable prepetition
contract of indemnity but were contingent on post-petition
events, and

[2] the section of the Code providing that interest on a
claim, as well as any reasonable fees, costs, or charges
provided for under the agreement or state statute under
which such claim arose, may be recovered if the creditor
is oversecured, does not expressly disallow an unsecured
creditor's contractual claims for attorneys fees.

Affirmed.

**Attorneys and Law Firms**

*144 Jeffrey A. Dove, James C. Thoman, Menter, Rudin
& Trivelpiece, P.C., Syracuse, NY, for Appellant.

Glenn M. Fjermedal, Lacy Katzen LLP, Rochester, New
York; Filiberto Agusti, Mark Moran, Joshua R. Taylor,
Steptoe & Johnson LLP, Washington, D.C., for Appellee.

Before: JACOBS, Chief Judge, FEINBERG and
KATZMANN, Circuit Judges.

**Opinion**

DENNIS JACOBS, Chief Judge:

The federal Bankruptcy Code ("Code"), 11 U.S.C. §§ 101
et seq., does not explicitly state whether an unsecured
creditor can collect post-petition attorneys' fees based on
a pre-petition indemnity agreement. In United Merchants
& Manufacturers, Inc. v. Equitable Life Assurance
Society of the United States, 674 F.2d 134 (2d Cir.1982),
this Court held, under the Bankruptcy Act then current,
that such claims are allowable. In Travelers Casualty &
Surety Co. of America v. Pacific Gas & Electric Co., 549
U.S. 443, 127 S.Ct. 1199, 167 L.Ed.2d 178 (2007), the
Supreme Court rejected a Ninth Circuit rule disallowing
such claims if the fees were incurred litigating issues of
bankruptcy law, but reserved decision on the precise
question presented on this appeal: whether such claims
are allowable categorically. We conclude that the holding
of United Merchants has not been *145 impaired by
Travelers or by statutory revisions.

Fidelity & Deposit Company of Maryland ("Fidelity")
entered into several agreements ("the Agreements") with
Agway, Inc. which required Agway to indemnify Fidelity
for attorneys' fees that it might incur to enforce the
Agreements against Agway. After Agway filed for
bankruptcy under Chapter 11, Fidelity duly made
payments to Agway's creditors, unsuccessfully demanded
indemnity under the Agreements, and incurred attorneys'
fees in litigation to collect from Agway. Only those
attorneys' fees are at issue on this appeal. The liquidating
trustee of the Agway Liquidating Trust ("the Trust"), D.
Clark Ogle ("Ogle"), concedes that Fidelity has a right to
the fees under state contract law, but refuses to pay on the
ground that the Code bars such recovery.

The United States Bankruptcy Court for the Northern
District of New York (Gerling, C.J.) held that Fidelity can
collect $884,506.28 in post-petition attorneys' fees. The
United States District Court for the Northern District of
New York (Sharpe, J.) affirmed. Ogle appeals that
decision. We affirm, concluding that the Code does not

Ogle v. Fidelity & Deposit Co. of Maryland, 586 F.3d 143 (2009)

62 Collier Bankr.Cas.2d 1247, 52 Bankr.Ct.Dec. 89, Bankr. L. Rep. P 81,617

prohibit an unsecured creditor from collecting post-petition attorneys' fees pursuant to an otherwise enforceable pre-petition contract of indemnity.

## I

Pursuant to the Agreements, Fidelity provided surety bonds ("Bonds") to Agway's insurers, and Agway in turn agreed to indemnify Fidelity for any payments that it made under the Bonds as well as legal fees incurred to enforce the Agreements. On October 1, 2002, Agway filed a voluntary Chapter 11 bankruptcy petition. Up until then, Agway had not defaulted on any payment obligation to its insurers; Fidelity's claim in bankruptcy therefore asserted no more than a contingent right to payment under the Agreements.

When Agway thereafter defaulted on payments to its insurers, the insurers in turn sought payment from Fidelity, and Fidelity tendered payment consistent with its obligations under the Bonds. Fidelity incurred additional costs, including legal fees, enforcing its indemnity rights against Agway in prolonged litigation. On July 18, 2008, the Bankruptcy Court concluded (as relevant here) that Agway was liable for Fidelity's post-petition attorneys' fees.

The parties thereafter settled all of the issues between them *except* the order requiring payment of post-petition attorneys' fees. Ogle appealed that part of the bankruptcy court's order to the district court pursuant to 28 U.S.C. § 158(a), and the district court affirmed the bankruptcy court's order. Ogle now appeals to this Court.

The sole question on appeal is one of law: Under the Bankruptcy Code, is an unsecured creditor entitled to recover post-petition attorneys' fees that were authorized by a pre-petition contract but were contingent on post-petition events?

[1] [2] Where, as here, a district court affirms a bankruptcy court's decision, we independently review the decision of the bankruptcy court. *Adelphia Bus. Solutions, Inc. v. Abnos,* 482 F.3d 602, 607 (2d Cir.2007). Our review of legal conclusions is *de novo. Id.*

## II

Courts are closely divided on the question presented. One line of cases holds that an unsecured claim for post-petition attorneys' fees asserted on the basis of a prepetition contract is allowable. *See, e.g., In re SNTL Corp.,* 571 F.3d 826, 839-45 (9th Cir.2009) ("*SNTL* "); *Martin v. Bank* **\*146** *of Germantown,* 761 F.2d 1163, 1168 (6th Cir.1985). Another line of cases holds that such a claim is disallowed. *See, e.g., Adams v. Zimmerman,* 73 F.3d 1164, 1177 (1st Cir.1996); *Waterman, Ditto,* 248 B.R. 567, 573 (8th Cir. BAP 2000).

[3] This Court allowed such claims in a case that was decided under the former Bankruptcy Act, but that commented on section 506(b) of the Code. *United Merchs. & Mfrs., Inc. v. Equitable Life Assurance Soc'y of the U.S.,* 674 F.2d 134, 137-39 (2d Cir.1982). This opinion considers whether *United Merchants* survives statutory revisions and the Supreme Court's decision in *Travelers Casualty & Surety Co. of America v. Pacific Gas & Electric Co.,* 549 U.S. 443, 127 S.Ct. 1199, 167 L.Ed.2d 178 (2007). We join the Ninth Circuit's recent decision in *SNTL* and hold that the Bankruptcy Code does not bar an unsecured claim for post-petition attorneys' fees authorized by a prepetition contract valid under state law.

## III

Two Code provisions bear upon the disputed question: section 502(b) and section 506(b). *Travelers* addresses the first, and *United Merchants* the second.

## A

[4] Section 502(b) of the Code provides (with inapplicable exceptions) that a "court, after notice and a hearing, shall determine the *amount* of [a] claim in lawful currency of the United States *as of the date of the filing of the petition,* and shall allow such claim in such amount." 11 U.S.C. § 502(b) (emphases added). A claim, in turn, is a "right to payment, whether or not such right is reduced to judgment, liquidated, *unliquidated,* fixed, *contingent,* matured, *unmatured,* disputed, undisputed, legal, equitable, secured, or *unsecured.*" 11 U.S.C. § 101(5)(A) (emphases added). A "right to payment ... usually refer[s] to a right to payment recognized under state law." *Travelers,* 549 U.S. at 451, 127 S.Ct. 1199 (internal quotation marks and citation omitted).

[5] [6] [7] A "contingent" claim under the Code refers to "to

obligations that will become due upon the happening of a future event that was within the actual or presumed contemplation of the parties at the time the original relationship between the parties was created." *In re Manville Forest Prods. Corp.,* 209 F.3d 125, 128-29 (2d Cir.2000) (internal quotation marks omitted). "A claim will be deemed to have arisen pre-petition if the relationship between the debtor and the creditor contained all of the elements necessary to give rise to a legal obligation-a right to payment-under the relevant non-bankruptcy law." *Id.* at 129 (internal quotation marks omitted); *see also SNTL,* 571 F.3d at 843-44. "Under contract law, a right to payment based on a written indemnification contract arises at the time the indemnification agreement is executed." *Manville,* 209 F.3d at 129.

*Manville* therefore makes clear that Fidelity possessed a contingent right to post-petition attorneys' fees, and that its right arose pre-petition. However, the dollar amount of Fidelity's contingent right was not a sum certain on the day the bankruptcy petition was filed. We read *Travelers* to mean that this does not matter.

The Supreme Court framed the *Travelers* issue as follows: "We are asked to consider whether federal bankruptcy law precludes an unsecured creditor from recovering attorney's fees authorized by a prepetition contract and incurred in post-petition litigation." 549 U.S. at 445, 127 S.Ct. 1199. True, the facts in *Travelers* were such that the post-petition costs related solely to litigating issues of bankruptcy **147** law (which Ogle contends is a decisive limiting principle); but the Court's analysis and rationale would seem equally applicable to post-petition costs arising out of pre-petition contracts more generally. Furthermore, the way the issue is framed at the outset, *see id.* (as quoted above), defines the scope of the opinion broadly.

This is important because, under *Travelers,* section 502(b) interposes no bar to an unsecured creditor's ability to recover post-petition attorneys' fees. *Travelers* starts from the premise that "an otherwise enforceable contract allocating attorney's fees (*i.e.,* one that is enforceable under substantive, nonbankruptcy law) is allowable in bankruptcy except where the Bankruptcy Code provides otherwise." *Id.* at 448, 127 S.Ct. 1199. The Court went on to explain that, because-as in the present case-none of the section 502(b) exceptions (enumerated (2)-(9)) applied, Travelers's claim for post-petition fees "must be allowed under § 502(b) unless it is unenforceable within the meaning of § 502(b)(1)." *Id.* at 449-50, 127 S.Ct. 1199.

Section 502(b)(1) in turn bars any claim that "is

unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured." 11 U.S.C. § 502(b)(1). *Travelers* construed this wording to mean that "any defense to a claim that is available outside of the bankruptcy context is also available in bankruptcy." 549 U.S. at 450, 127 S.Ct. 1199. Unless a claim is unenforceable under state law or one of the section 502(b)(2)-(9) exceptions applies, courts must "presume" that the claim "will be allowed in bankruptcy unless [it is] expressly disallowed." *Id.* at 452, 127 S.Ct. 1199.

All of the fees at issue in *Travelers* were incurred post-petition; so the amount was necessarily unknown when the bankruptcy petition was filed. It follows that if an unsecured claim for post-petition fees was for that reason unrecoverable, the *Travelers* Court could have disposed of the claim on that simple, available ground alone. *Travelers,* therefore, proceeds along lines that, reasonably extended, would suggest (notwithstanding the Court's express disclaimer) that section 502(b)'s requirement-that the court "shall determine the amount of such claim ... as of the date of the filing of the petition"-does not bar recovery of post-petition attorneys' fees.

In the present appeal, as in *Travelers:* The underlying contract is valid as a matter of state substantive law; none of the section 502(b)(2)-(9) exceptions apply; and the Code is silent as to the particular question presented-in *Travelers,* whether the Code allows "unsecured claims for contractual attorney's fees incurred while litigating issues of bankruptcy law," 549 U.S. at 453, 127 S.Ct. 1199; and here, whether the Code allows unsecured claims for "fees incurred while litigating issues of" contract law more generally.

Accordingly, we hold that an unsecured claim for post-petition fees, authorized by a valid pre-petition contract, is allowable under section 502(b) and is deemed to have arisen pre-petition. *Accord SNTL,* 571 F.3d at 844 ("[W]e reject the position ... that section 502(b) precludes such fees.").

## B

[8] [9] "[C]laims enforceable under applicable state law will be allowed in bankruptcy unless they are expressly disallowed." *Travelers,* 549 U.S. at 452, 127 S.Ct. 1199. A fair question is raised by Ogle as to whether section 506(b) of the Code amounts to an express disallowance of

Fidelity's claim by negative inference or otherwise. Section 506(b) provides in relevant **\*148** part that "interest on [a] claim, *and any reasonable fees,* costs, or charges provided for under the agreement or State statute under which such claim arose" can be recovered if the creditor is *oversecured.* 11 U.S.C. § 506(b) (emphasis added). So what does section 506(b) say or imply about a similar claim that is *unsecured?*

In *United Merchants,* we observed: "Neither [section 506(b)] nor its legislative history sheds any light on the status of an unsecured creditor's contractual claims for attorney's fees." 674 F.2d at 138. *United Merchants* is therefore dispositive if it survives *Travelers.* We conclude that it does.

As *Travelers* makes clear, the question is whether the Code *disallows* post-petition attorneys' fees, and does so expressly. It was therefore decisive in *Travelers* that "the Code says *nothing* about unsecured claims for contractual attorney's fees incurred while litigating issues of bankruptcy law." 459 U.S. at 453, 103 S.Ct. 843 (emphasis in original). And while *Travelers* declined to address section 506(b) (because the parties had not raised the issue below), *see id.* at 454-56, 127 S.Ct. 1199, it is decisive here that the Code says nothing about such fees incurred litigating things *other* than issues of bankruptcy law. The teaching of *Travelers* is therefore fully consonant with our decision in *United Merchants.*

Accordingly, we hold that section 506(b) does not implicate unsecured claims for post-petition attorneys' fees, and it therefore interposes no bar to recovery.


### IV

Ogle adduces three additional reasons for construing the Code to disallow unsecured claims for post-petition attorneys' fees.

[1] Ogle relies on wording in *United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988), which explained that section 506(b) allows an oversecured creditor to receive post-petition interest only out of the "security cushion," but that an undersecured creditor-who lacks any such cushion-"falls within *the general rule disallowing postpetition interest.*" *Id.* at 372-73, 108 S.Ct. 626 (emphasis added). From the italicized phrase Ogle would deduce a general rule favoring his position. However, the wording references section 502(b)(2) of the Code, which expressly disallows

a claim for interest that is unmatured. *See id.; see also* 11 U.S.C. § 502(b)(2). In this way, section 506(b) creates a limited exception-for oversecured creditors-from the general rule in section 502(b)(2) that disallows a claim for unmatured interest. *Timbers,* 484 U.S. at 372-73, 108 S.Ct. 626. But while section 502(b)(2) bars claims for unmatured interest, it does not similarly bar (or even reference) claims for post-petition attorneys' fees. *See SNTL,* 571 F.3d at 844-45.

[2] Ogle argues that an unsecured claim for post-petition attorneys' fees is barred by section 502(e)(2), which provides that a claim for "reimbursement or contribution ... that becomes fixed after the commencement of the case ... shall be allowed ... the same as if such claim had become fixed before the date of the filing of the petition." 11 U.S.C. § 502(e)(2). Ogle's argument relies on *expressio unius:* Because section 502(e)(2) provides an exception to section 502(b) for reimbursement and contribution, it thereby forecloses an exception for post-petition attorneys' fees. However, *Travelers* requires us to "presume that claims enforceable under applicable state law will be allowed in bankruptcy unless they are expressly disallowed." 549 U.S. at 452, 127 S.Ct. 1199. We cannot, then, as Ogle **\*149** wishes, draw from section 502(e)(2) an inference by silence or omission.

[3] Ogle argues from policy that allowing an unsecured creditor to collect post-petition attorneys' fees based on a pre-petition contract would unfairly disadvantage other creditors (such as tort claimants and trade creditors) whose distributions would be reduced *pro tanto.* In *United Merchants,* however, we rejected the idea "that the policy of equitable distribution" defeats "an unsecured creditor's otherwise valid contractual claim for collection costs ....":

> When equally sophisticated parties negotiate a loan agreement that provides for recovery of collection costs upon default, courts should presume, absent a clear showing to the contrary, that the creditor gave value, in the form of a contract term favorable to the debtor or otherwise, in exchange for the collection costs provision. Such a creditor should recover more in the division of the debtor's estate because it gave more to the debtor at the time it made the loan. Rather than providing an undeserved bonus for one creditor at the expense of others, allowing a claim

Ogle v. Fidelity & Deposit Co. of Maryland, 586 F.3d 143 (2009)

62 Collier Bankr.Cas.2d 1247, 52 Bankr.Ct.Dec. 89, Bankr. L. Rep. P 81,617

under a collection costs provision merely effectuates the bargained-for terms of the loan contract.

674 F.2d at 137. Although *United Merchants* was construing the predecessor to the current Bankruptcy Code, *see id.* at 136 n. 1, its analysis is equally applicable to the Code today.

**CONCLUSION**

For the foregoing reasons, we affirm the judgment of the district court.

**Parallel Citations**

62 Collier Bankr.Cas.2d 1247, 52 Bankr.Ct.Dec. 89, Bankr. L. Rep. P 81,617

---

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

In re SNTL Corp., 571 F.3d 826 (2009)
Bankr. L. Rep. P 81,515, 09 Cal. Daily Op. Serv. 7830, 2009 Daily Journal D.A.R. 9193

571 F.3d 826
United States Court of Appeals,
Ninth Circuit.

In the Matter of SNTL CORPORATION; SN
Insurance Services, Inc.; SNTL Holdings
Corporation; SN Insurance Administrators, Inc.;
Infonet Management, Debtors,
SNTL Corporation; SN Insurance Services, Inc.;
SNTL Holdings Corporation; SN Insurance
Administrators, Inc.; Infonet Management,
Appellants,
v.
Centre Insurance Company, Appellee.

No. 08-60001. | Argued and Submitted May 6,
2009. | Filed June 23, 2009.

**Synopsis**
**Background:** Creditor filed proof of claim, contending
that Chapter 11 debtor's previously released liability as a
guarantor of its affiliates' obligation to creditor was
revived, to an extent, when creditor compromised a
state-law preference action brought against it by the
California Insurance Commissioner. Trustee objected to
the claim, asserting, inter alia, that creditor had released
claims against debtor prepetition, that the released claims
could not be revived by postpetition events, and that
creditor could not include in its claim attorneys fees
incurred postpetition. The United States Bankruptcy
Court for the Central District of California, Geraldine
Mund, J., disallowed claim and denied creditor's request
for postpetition fees. Creditor appealed. The Bankruptcy
Appellate Panel, Montali, J., 380 B.R. 204, reversed and
remanded. Debtor appealed.

**Holdings:** The Court of Appeals held that:

[1] creditor's return of $110 million in settlement of
Insurance Commissioner's preference claim revived
creditor's guaranty claim against debtor;

[2] creditor's claim for recovery of any preferential
payments it made was an allowable, prepetition
contingent claim, even though the removal of the
contingency occurred postpetition; and

[3] unsecured creditors may claim attorney fees incurred
postpetition based on a prepetition contract with debtor.

Affirmed.

West Headnotes (15)

[1] **Bankruptcy**
    Compromises, Releases, and Stipulations

"Triggering event" allowing creditor to invoke
remedies provision of its Partial Commutation
and Settlement Agreement (PCSA) with Chapter
11 debtor-guarantor occurred only when state
court approved settlement between creditor and
the California Insurance Commissioner,
pursuant to which creditor agreed to return
payments that it had received from debtor's
affiliates in settlement of the Commissioner's
preference claims against it; PCSA's remedies
provision required a court finding or judgment
that payments made by debtor's affiliates under
the PCSA were preferential before creditor
could exercise remedies available thereunder.

1 Cases that cite this headnote

[2] **Bankruptcy**
    Compromises, Releases, and Stipulations

Under Partial Commutation and Settlement
Agreement (PCSA) executed by creditor and
Chapter 11 debtor-guarantor, creditor's return of
debtor's affiliates' $110 million payment to
creditor in settlement of California Insurance
Commissioner's preference claim against
creditor revived creditor's guaranty claim
against debtor, to extent of amount of creditor's
payment.

Cases that cite this headnote

[3] **Guaranty**

In re SNTL Corp., 571 F.3d 826 (2009)

Bankr. L. Rep. P 81,515, 09 Cal. Daily Op. Serv. 7830, 2009 Daily Journal D.A.R. 9193

👈Payment or Other Satisfaction by Principal

Return of preferential payment of primary obligor by obligee generally revives guarantor's obligation otherwise released by that payment.

Cases that cite this headnote

[4] **Bankruptcy**
👈Preferences
**Principal and Surety**
👈Payment or Other Satisfaction by Principal

While a surety usually is discharged by payment of debt, he continues to be liable if the payment constitutes a preference under bankruptcy law; preferential payment is deemed by law to be no payment at all.

Cases that cite this headnote

[5] **Guaranty**
👈Payment or Other Satisfaction by Principal
**Principal and Surety**
👈Payment or Other Satisfaction by Principal

Creditor's return of payment as part of settlement of preference avoidance action is not "voluntary," and so revives the liability of surety or guarantor for the debt.

Cases that cite this headnote

[6] **Bankruptcy**
👈Contingent or Unliquidated Claims
**Bankruptcy**
👈Compromises, Releases, and Stipulations

Creditor that, prior to commencement of Chapter 11 case by guarantor of underlying obligation, had entered into Partial Commutation and Settlement Agreement (PCSA) with debtor-guarantor, whereby debtor's affiliates paid creditor $163.4 million to satisfy their obligation to creditor and creditor simultaneously released debtor as guarantor, had allowable, prepetition contingent claim against debtor for any portion of this $163.4 million payment which it was required to return in settlement of preference action brought by the California Insurance Commissioner, even though removal of contingency, upon creditor's making a $110 million settlement payment to Commissioner, occurred postpetition; parties had contemplated that creditor would have a claim against debtor in event that payment made by primary obligors under the PCSA constituted a preferential transfer, and they drafted provision in the PCSA to cover this contingency. 11 U.S.C.A. § 502(b).

3 Cases that cite this headnote

[7] **Bankruptcy**
👈Claims allowable; what constitutes "claim."

"Claim" is broadly defined under the Bankruptcy Code. 11 U.S.C.A. § 101(5).

1 Cases that cite this headnote

[8] **Bankruptcy**
👈Claims allowable; what constitutes "claim."
**Bankruptcy**
👈Contingent or Unliquidated Claims

Bankruptcy Code utilizes the broadest possible definition of "claim" to ensure that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case.

2 Cases that cite this headnote

[9] **Bankruptcy**
👈Effect of state law, in general

Federal law determines when a claim arises

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

*In re SNTL Corp.*, 571 F.3d 826 (2009)

Bankr. L. Rep. P 81,515, 09 Cal. Daily Op. Serv. 7830, 2009 Daily Journal D.A.R. 9193

under the Bankruptcy Code.

3 Cases that cite this headnote

**[10]**    **Bankruptcy**
⚷Contingent or Unliquidated Claims

Claim is ripe as an allowable claim in a bankruptcy proceeding even if it is a cause of action that has not yet accrued.

1 Cases that cite this headnote

**[11]**    **Bankruptcy**
⚷Claims allowable;  what constitutes "claim."

Court applies "fair contemplation" test for determining when claim accrues under section of the Bankruptcy Code governing allowance of claims or interests, pursuant to which claim arises when claimant can fairly or reasonably contemplate claim's existence, even if cause of action has not yet accrued under nonbankruptcy law. 11 U.S.C.A. § 502(b).

10 Cases that cite this headnote

**[12]**    **Bankruptcy**
⚷Grounds and Circumstances
**Bankruptcy**
⚷Contingent or Unliquidated Claims

Unsecured creditors may claim attorney fees incurred postpetition based on a prepetition contract with debtor; parties' execution of prepetition agreement containing an attorney fees provision gives rise to a contingent, unliquidated attorney-fee claim. 11 U.S.C.A. §§ 101(5), 502(b).

20 Cases that cite this headnote

**[13]**    **Costs**
⚷Contracts

California law permits recovery of contractual attorneys fees only if they are reasonable. West's Ann.Cal.Civ.Code § 1717.

4 Cases that cite this headnote

**[14]**    **Bankruptcy**
⚷Claims allowable;  what constitutes "claim."
**Bankruptcy**
⚷Amount secured;  partial security
**Bankruptcy**
⚷Oversecurity

Bankruptcy Code provision dealing with determination of a claim's secured or unsecured status and with what may be included in oversecured claim does not provide additional ground for allowance/disallowance of unsecured claims, which is governed exclusively by separate Code provision. 11 U.S.C.A. §§ 502, 506.

5 Cases that cite this headnote

**[15]**    **Bankruptcy**
⚷Construction and Operation
**Constitutional Law**
⚷Nature and scope in general

It is the province of Congress to correct statutory dysfunctions and to resolve difficult policy questions embedded in the Bankruptcy Code.

Cases that cite this headnote

**Attorneys and Law Firms**

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

In re SNTL Corp., 571 F.3d 826 (2009)
Bankr. L. Rep. P 81,515, 09 Cal. Daily Op. Serv. 7830, 2009 Daily Journal D.A.R. 9193

**\*828** Iain A.W. Nasatir, Jonathan J. Kim, and Jeremy V. Richards, Pachulski, Stang, Ziehl & Jones LLP, Los Angeles, CA, for the appellants.

Christopher E. Prince and Robert B. Millner, Sonnenschein Nath & Rosenthal, LLP, Los Angeles, CA and Chicago, IL; Peter J. Gurfein, Akin Gump Strauss Hauer & Feld LLP, Los Angeles, CA, for the appellee.

**\*829** Appeal from the Ninth Circuit, Bankruptcy Appellate Panel, Klein, Montali, and Dunn, Bankruptcy Judges, Presiding. BAP No. CC-06-1350-MoDK.

Before CYNTHIA HOLCOMB HALL, ANDREW J. KLEINFELD and BARRY G. SILVERMAN, Circuit Judges.

## OPINION

PER CURIAM:

The Bankruptcy Appellate Panel is AFFIRMED for the reasons stated in its opinion in this case *sub nom.* We adopt the BAP opinion, *In re SNTL Corp.,* 380 B.R. 204 (9th Cir. BAP 2007), as our own and attach it as an appendix to this opinion. *See* Appendix, *infra.*

## APPENDIX

In re: SNTL Corp.; SN Insurance Services, Inc.; SNTL Holdings Corp.; SN Insurance Administrators, Inc.; Infonet Management Systems, Inc.; Pacific Insurance Brokerage, Inc., Debtors.

Centre Insurance Company, SNTL Corp.; Appellant,

v.

SN Insurance Services, Inc.; SNTL Holdings Corp.; SN Insurance Administrators, Inc.; Infonet Management Systems, Inc.; Pacific Insurance Brokerage, Inc., Appellees.

Bk. Nos. SV 00-14099-GM, SV 00-14100-GM, SV 00-14101-GM, SV 00-14102-GM, SV 02-14236-GM, SV 02-14239-GM, (Jointly Administered)

Argued and Submitted on September 21, 2007 at Pasadena, California

Filed-December 19, 2007.

Appeal from the United States Bankruptcy Court for the Central District of California, Honorable Geraldine Mund, Bankruptcy Judge, Presiding.

Before: MONTALI, DUNN and KLEIN, Bankruptcy Judges.

MONTALI, Bankruptcy Judge:

In this complicated and high-stakes case, we apply a somewhat obscure doctrine that involves the intersection of insolvency law principles and guaranty law, illustrating the temporal nature of a release of a guarantor when a voidable preference is recovered from the obligee. We also will be one of the first courts to address a question left unanswered by the Supreme Court earlier this year: May an unsecured creditor include attorneys' fees incurred postpetition but arising from a prepetition contract as part of its unsecured claim?

Here a creditor contended that the debtor's previously released liability as a guarantor of an affiliate's obligation was revived when the creditor compromised a preference action against it. The bankruptcy court disagreed and entered summary judgment disallowing the creditor's multimillion dollar claim and denying the creditor's request for postpetition attorneys' fees and costs. The creditor appeals, and we REVERSE and REMAND.

## I. FACTS

### A. *The Parties*

On April 26, 2000 (the "petition date"), SNTL Corporation (formerly known as Superior National Insurance Group)[1] and its non-insurer affiliates SN Insurance Services, Inc., SNTL Holdings Corporation (formerly known as Business Insurance Group, Inc.), and SN Insurance Administrators, **\*830** Inc. (collectively, "Debtors") each filed chapter 11 petitions[2] for relief.

Pursuant to a confirmed joint plan of reorganization ("Plan"), an SNTL Litigation Trust ("Trust") was formed and an SNTL Litigation Trustee ("Trustee") was appointed. The Trustee was authorized to prosecute certain claims, rights and causes of actions and to oversee and initiate actions pertaining to the allowance and payment of claims, including objections to proofs of claims.

Appellant Centre Insurance Company ("Centre") filed a proof of claim in November 2000 asserting a claim in excess of $294,488,911 (including approximately $3

*In re SNTL Corp.*, 571 F.3d 826 (2009)

Bankr. L. Rep. P 81,515, 09 Cal. Daily Op. Serv. 7830, 2009 Daily Journal D.A.R. 9193

million in attorneys' fees but not including contingent and unliquidated amounts) and an amended proof of claim in March 2005 in the amount of $232,748,280.40. The Trustee filed an objection to Centre's claim arguing, *inter alia*, that Centre had released claims against SNIG prepetition, that the released claims could not be revived by postpetition events and that Centre, as an unsecured creditor, could not include in its claim attorneys' fees incurred postpetition.

## B. *Pertinent Transactions and Events*

The relationship of the parties, and the nature of the transactions summarized below, are complex and perhaps unique to the insurance and reinsurance industry. Reduced to their central elements, however, they can be summarized as follows: Debtor SNIG guaranteed the performance of its affiliates' obligations to Centre. Following default on these obligations, the parties reached an agreement whereby the affiliates paid Centre $163.4 million to satisfy an obligation of $180 million and Centre simultaneously released the guarantor (SNIG). Thereafter, in settlement of a preference action brought by the liquidator of the affiliate insurance companies, Centre returned a portion of the $163.4 million payment. Centre now seeks to recover the returned amount ($110 million) from the guarantor SNIG; Trustee asserts that SNIG's released liability cannot be revived.

More specifically, on December 18, 1998, SNIG sold its affiliate Business Insurance Company ("BICO") to Centre Solutions Holdings (Delaware Limited) ("Centre Solutions"); BICO became known as Centre. On the same day, Centre entered into certain reinsurance agreements (the "LPT and Quota Share Agreements") with insurance companies affiliated with SNIG: California Compensation Insurance Company ("CalComp") and Superior National Insurance Company ("SNIC"). SNIG guaranteed performance of one of these reinsurance agreements known as the "QSR Contract."

In addition, the parties also entered into fronting (service) agreements known as the Underwriting Management Agreement ("UMA") and the Claims Administration Services Agreement ("CSA"). SNIG also guaranteed performance of these agreements. The UMA, CSA, LPT and Quota Share Agreements are collectively referred to as the "Fronting Agreements."[3] **\*831** The Fronting Agreements provide for the recovery of all reasonable expenses, including attorney's fees, incurred in the enforcement of SNIG's guaranty.

The Fronting Agreements were breached in late 1999. On December 31, 1999, Centre entered into a Partial

Commutation and Settlement Agreement ("PCSA") with CalComp, SNIC and SNIG. The PCSA modified the Fronting Agreements and provided for a partial release of the reinsurance obligations of SNIG, CalComp, SNIC and all of their parents and affiliates (among others) up to $180 million (the "Release").[4]

In exchange for the Release, SNIG, CalComp and SNIC agreed to meet six conditions, including payment of a $163.4 million Partial Commutation Payment ("Payment") by CalComp and SNIC. Centre received the Payment; no evidence was introduced that any of the six conditions for the Release were unsatisfied. In its opening brief, Centre acknowledges that "the primary obligors and SN Holdings [SNIG] (the guarantor) were released from liability for up to $180 million" in exchange for the Payment. *Appellant's Opening Brief* at 13. Consequently, the Release in the PCSA became effective prepetition.

Article X of the PCSA provided that the Release could be revoked by Centre if the PCA or other payments made pursuant to the PCSA were found to be voidable or preferential transfers, stating in pertinent part:

> In the event that any court of competent jurisdiction or governmental or regulatory authority asserting jurisdiction over the subject matter hereof or the parties hereto enters a final order, judgment, or other finding that: (i) the payment of all or any part of the $22,300,000, described above, or (ii) the payment by Reinsurers of all or any part of the [Payment] of $163,400,000, or (iii) any of the consideration described in the Recitals to this Agreement ... constitutes a voidable or preferential transfer, such payment constitutes an improper or disproportionate payment, or the payment is otherwise in violation of law or subject to a claim or [sic] preference, then [Centre] may in its sole discretion, in addition to any other remedy provided by law, equity, statute, or contract: (a) enforce this Agreement according to its express terms and conditions; or (b) declare this Agreement to **\*832** be null and void in its entirety, and thereupon enforce the terms and conditions of the LPT

In re SNTL Corp., 571 F.3d 826 (2009)

Bankr. L. Rep. P 81,515, 09 Cal. Daily Op. Serv. 7830, 2009 Daily Journal D.A.R. 9193

and Quota Share Agreements as
though this Agreement (including
without limitation the releases and
discharges set forth in Articles III
and IV) had not been executed....

*PCSA* at 8-9.

In March 2000, the Insurance Commissioner for the State
of California (the "Commissioner") placed certain
insurance companies affiliated with Debtors into
conservation, followed by liquidation. In January 2002
(approximately fourteen months after the petition date),
the Commissioner filed a complaint in state court against
Centre and others, seeking in part the return of the
Payment from Centre as an avoidable preference under
state law preference provisions.

Centre subsequently agreed to settle that state court
litigation, and on February 17, 2005, the state court
entered an order approving a settlement agreement
between the Commissioner and Centre (among others)
providing that the Commissioner's avoidance action
would be dismissed in exchange for Centre's partial
return (in the amount of $110 million) of the Payment.
Paragraph F of the state court order indicated that the
Commissioner sought to recover property transferred by
the insurance companies to Centre and that the
Commissioner had sought avoidance of such transfers.[5]

The order also provided that the settlement agreement
between the Commissioner and Centre was "fully and
finally approved." In turn, the settlement agreement itself
provided that "[t]he payments to the Liquidator under
section III.C.1 of this Settlement Agreement are payments
on account of the claims of the Liquidator arising from
payments asserted to be preferential transfers ... and not
payments on account of any tort claims." *Settlement
Agreement and Mutual Release* at 15.

In its initial proof of claim filed in November 2000,
Centre stated that SNIG's liability as guarantor was for
amounts "in excess of $180,000,000" and reserved the
right to seek additional amounts if any portion of the
Payment was "deemed void or avoidable," specifically
mentioning the then-pending avoidance action by the
Commissioner. The amended proof of claim does not
specifically mention the avoidance action or its effect on
the Release, but as will be shown, the battle is all about
Centre's contention that the amended claim can include
the amount paid to the Commissioner as well as
postpetition attorneys' fees.

Trustee objected to Centre's claim and amended claim on

many grounds, although only four are relevant to this
appeal: (1) Centre's claim arising from SNIG's guaranty
obligations had been released and could not be revived as
Centre had not obtained a judicial finding or judgment
that the Payment (or other payment made under the
PCSA) constituted a preferential transfer as required by
Article X of the PCSA, (2) even if Centre had obtained
**\*833** such a judicial finding or judgment, it has not
exercised its right of revocation and no other remedy is
available, (3) Centre's claim arising from SNIG's
guaranty obligations was not contingent but was instead
extinguished prepetition under the Release and, under
section 502(b), could not be revived by any postpetition
determination that the Payment was a preference, and (4)
Centre was an unsecured creditor and thus could not
assert a claim for attorneys' fees incurred postpetition.

In April 2006, Trustee filed a motion for partial summary
judgment that the Release extinguished SNIG's liability
as guarantor, at least up to $180 million, and that Centre
could not recover attorneys' fees incurred postpetition.
After conducting a hearing, the bankruptcy court entered
a memorandum and order on August 22, 2006, granting
the motion on both grounds. The court held that the
Release became effective prepetition and Centre did not
invoke its power of revocation under Article X prior to
the petition date. "Therefore, as of the petition date, the
only claim Centre could have had against SNIG is above
$180 million."[6] *Memorandum of Opinion* at pages 12-13.

On August 31, 2006, the bankruptcy court entered an
order approving a stipulation granting Centre an extension
of time to September 21 to file a notice of appeal. Centre
thereafter filed its timely notice of appeal.

On December 19, 2006, the clerk of this panel issued an
order requiring Centre to (1) explain how the order was
final, (2) move for leave to file an interlocutory appeal, or
(3) obtain a certification of finality from the bankruptcy
court pursuant to Federal Rule of Civil Procedure
("FRCP") 54(b) (made applicable by Rules 7054 and
9014). The bankruptcy court entered its order directing
entry of final judgment pursuant to FRCP 54(b) on
February 14, 2007, and the panel entered an order on
April 23, 2007, treating the order on appeal as final.

## II. ISSUES

(1) Did the Release under the PCSA irrevocably
extinguish Centre's claim against SNIG up to $180
million or was SNIG's liability revived to the extent of
$110 million upon Centre's payment of that amount to the

Bankr. L. Rep. P 81,515, 09 Cal. Daily Op. Serv. 7830, 2009 Daily Journal D.A.R. 9193

Commissioner?

(a) Has a finding or final order triggering the remedies set forth in Article X been made or entered?

(b) If so, is any remedy available to Centre under which SNIG's liability could be revived?

(c) If the triggering event has occurred and a remedy is available at law, does section 502(b) nonetheless preclude allowance of Centre's claim?

(2) Can Centre, as an unsecured creditor, include in its proof of claim attorneys' **834** fees arising from a prepetition contract but incurred postpetition?

### III. STANDARD OF REVIEW

We review *de novo* the bankruptcy court's grant of summary judgment. *Marshack v. Orange Comm'l Credit (In re Nat'l Lumber & Supply, Inc.),* 184 B.R. 74, 77 (9th Cir. BAP 1995); *Mordy v. Chemcarb, Inc. (In re Food Catering & Housing, Inc.),* 971 F.2d 396, 397 (9th Cir.1992). In reviewing a summary judgment, the task of an appellate court is the same as a trial court under FRCP 56 (made applicable by Rule 7056). *Hifai v. Shell Oil Co.,* 704 F.2d 1425, 1428 (9th Cir.1983); *Gertsch v. Johnson & Johnson, Fin. Corp. (In re Gertsch),* 237 B.R. 160, 165 (9th Cir. BAP 1999). Viewing the evidence in the light most favorable to the non-moving party, we must determine for ourselves whether there was no genuine issue of material fact and whether the moving party is entitled to judgment as a matter of law. *Hifai,* 704 F.2d at 1428; *see* FRCP 56(c).

### IV. JURISDICTION

Pursuant to 28 U.S.C. § 157(b)(2)(B), the bankruptcy court had jurisdiction over the allowance or disallowance of Centre's claim. As the bankruptcy court certified its order disallowing a portion of the claim as final under FRCP 54(b) and this panel has determined that the appeal is final, we have jurisdiction over the appeal under 28 U.S.C. § 158.

### V. DISCUSSION

**A.** *The Release Did Not Irrevocably Extinguish Centre's Claim Against SNIG*

Trustee contends Centre cannot invoke its Article X remedies in the absence of a final order, judgment, or other finding that the Payment was subject to a preference claim. Trustee further argues that even if the triggering event (the entry of such an order) had occurred, Centre is not seeking any relief or remedy available under Article X. Finally, Trustee asserts that even if the triggering event had occurred and Centre were seeking relief available under Article X, Centre could not obtain such relief because section 502(b) does not allow claims arising postpetition. The bankruptcy court did not address the first two arguments, as it agreed with Trustee's third argument: Centre's claim was not allowable because it was based on postpetition actions to revive a debt that was released prepetition. On *de novo* review, we are not persuaded by any of the Trustee's arguments.

**1. The "Triggering Event" Under Article X Has Occurred**

[1] Centre contends that when it paid $110 million in settlement of the Commissioner's preference action against it, SNIG's obligations as guarantor were restored in that amount. Centre does not seek to revive the entire amount of the original guaranty. Article X of the PCSA requires a court finding or judgment that the payments made under the PCSA were preferential before Centre could exercise the remedies available to it under that section.[7] Article X states that if any court **835** of competent jurisdiction asserting jurisdiction over the subject matter of or the parties to the PCSA[8] "*enters a final order,* judgment, or other finding *that ... a payment* under the [PCSA] ... constitutes a voidable or preferential transfer, ... an improper or disproportionate payment ... or *is* otherwise in violation of law or *subject to a claim or preference,*" Centre may declare the PCSA null and void or exercise "*any other remedy provided by law, equity, statute or contract* [.]" *PCSA,* Article X (emphasis added). According to Trustee, Centre has not obtained such a court finding or judgment, and thus Centre cannot overcome the release of SNIG.

We disagree. The state court order approving the settlement agreement between the Commissioner and Centre satisfies Article X's requirement for a court order or finding. Paragraph F of the order indicated that the Commissioner was attempting to avoid the transfers and the order provided that the settlement agreement was "fully and finally approved." The settlement agreement which was fully approved specifically stated that the payments by Centre to the Commissioner "are payments on account of the claims of the Liquidator

In re SNTL Corp., 571 F.3d 826 (2009)

Bankr. L. Rep. P 81,515, 09 Cal. Daily Op. Serv. 7830, 2009 Daily Journal D.A.R. 9193

[Commissioner] arising from payments asserted to be preferential transfers." The state court order thus constituted an order or finding that the PCSA payment was subject to a preference claim. As a consequence, Article X and its remedies govern and supersede the release provisions of Article III.[9] That order acknowledges that the Payment was subject to the Commissioner's preference claim. Therefore, Centre is entitled to invoke those remedies available to it under Article X.

**2. Centre's Return of $110 Million to the Commissioner in Settlement of a Preference Claim Revived Its Guaranty Claim Against SNIG**

[2] Article X of the PCSA, entitled "Voidable Transfers," governs the rights of Centre in the event payments made pursuant to the PCSA constituted preferential transfers. Upon entry of the requisite court order or finding, Centre may exercise "*any other remedy provided by law, equity, statute or contract* [.]" *PCSA*, Article X (emphasis added). In other words, because the state court's order was the type of court order contemplated by Article X, it triggered whatever remedies Centre had at law as a result of the return of the PCSA payment.

[3] Centre argues that under applicable law, SNIG's guaranty obligation was revived upon and to the extent of the return of the PCSA Payment. While we located no Ninth Circuit or California case precisely on point, we agree that the return of a preferential payment by a creditor generally revives the liability of a guarantor.

[4] As the Tenth Circuit has observed (in dicta), courts "have recognized, without **\*836** regard to any special guaranty language, that guarantors must make good on their guaranties following avoidance of payments previously made by their principal debtors." *Lowrey v. Mfrs. Hanover Leasing Corp. (In re Robinson Bros. Drilling, Inc.),* 6 F.3d 701, 704 (10th Cir.1993). "Although a surety usually is discharged by payment of the debt, he continues to be liable if the payment constitutes a preference under bankruptcy law. A preferential payment is deemed by law to be no payment at all." *Herman Cantor Corp. v. Cent. Fidelity Bank (In re Herman Cantor Corp.),* 15 B.R. 747, 750 (Bankr.E.D.Va.1981).

The *Restatement (Third) of Suretyship and Guaranty* and the *Corpus Juris Secundum* on *Principal and Surety* echo these general principles.

> When a secondary obligation is discharged in whole or part by performance by the principal obligor or another secondary obligor, or by realization upon collateral securing such performance, the secondary obligation revives to the extent that the obligee, under a legal duty to do so, later surrenders that performance or collateral, or the value thereof, as a preference or otherwise.

*Restatement (Third) of Suretyship & Guaranty* § 70 (1996). Similarly, the *Corpus Juris Secundum* provides that if a creditor is forced to refund a payment to a primary obligor, the guarantor's liability is revived:

> [T]o discharge the surety, the payment of the principal debt or obligation must be valid and binding, and, if the creditor is forced to refund the payment, the surety's liability is restored. Thus, a surety is not, as a general rule, released by a payment that is a preference under the bankruptcy laws, which the creditor is obliged to refund.

72 C.J.S. *Principal and Surety* § 129 (Updated 2007).

[5] Trustee disputes the applicability of the cases that follow or recognize the general principle, but cites no case law holding the contrary: that the liability of a surety or guarantor is *not* revived by a return of a preferential transfer to a primary obligor (or its assigns). Rather, Trustee contends that the general principle is inapplicable because, *inter alia,* the repayment of the preference must be involuntary for the principle to apply. Trustee's contention is based on the assumption that a return of a payment is "voluntary" if it was made pursuant to a settlement. We disagree.[10] While *Corpus Juris Secundum* and the *Restatement* do indicate that the repayment must be "forced" or made **\*837** "under a legal duty to do so," the Sixth Circuit in *Wallace Hardware Co., Inc. v. Abrams,* 223 F.3d 382, 408-09 (6th Cir.2000), held that when the obligee returns a payment as part of a settlement of a preference avoidance action, the guarantor is not discharged of his obligation to pay the debt.

We find *Wallace Hardware* persuasive. In that case, the creditor repossessed inventory of a primary obligor in satisfaction of the obligor's debt. Thereafter, the obligor filed for bankruptcy relief and the trustee filed an action

In re SNTL Corp., 571 F.3d 826 (2009)
Bankr. L. Rep. P 81,515, 09 Cal. Daily Op. Serv. 7830, 2009 Daily Journal D.A.R. 9193

to have the repossession avoided as a preference. The creditor settled with the trustee and sued the guarantors for the amount of the debt that remained outstanding upon the creditor's partial return of the proceeds of its inventory repossession.[11]

In holding that the guarantors were obligated to repay the amounts returned by the creditor to the trustee under the preference action settlement, the Sixth Circuit stated that "courts have uniformly held that a payment of a debt that is later set aside as an avoidable preference does not discharge a guarantor of his obligation to repay that debt." *Id.* at 408 (citing cases). The Sixth Circuit also observed that the repossession operated as an accord and satisfaction, and that "an accord and satisfaction, like any contract, can be set aside, in whole or in part, for such reasons as mutual mistake, supervening illegality, or frustration of purpose." *Id.*

Trustee contends that we should disregard *Wallace Hardware* because there the obligations of the guarantors, unlike those of SNIG, had not been contractually released by the creditor. This distinction is not significant because while Article III of the PCSA did release SNIG, Article X provided Centre with whatever remedies were available in law upon entry of the requisite court order or finding. As we have already held, the triggering event of Article X's remedies occurred when the state court entered the order approving the settlement agreement. As one of the remedies available at law permits revival of otherwise released guaranty obligations upon return of a preferential payment of the primary obligor, the remedies available under Article X and under law supersede the release provisions of Article III.

Thus, Trustee's reliance on Article III's Release in an effort to distinguish *Wallace Hardware* and the other cases is not convincing, particularly because Trustee's position (unlike that of *Wallace Hardware* ) would discourage settlement of preference litigation.[12] It would be a strange result, indeed, if we were to require Centre to litigate with the Commissioner to the bitter end, lose, then satisfy a judgment of at least $163.4 million before it could revive SNIG's guaranty obligation, particularly where Article X itself requires merely a finding that the Payment was subject to a preference claim. Instead, we find *Wallace Hardware's* position more persuasive because it does not require full and costly litigation but instead acknowledges that the general principle should also apply **838** when the creditor returns at least a portion of a primary obligor's payment in settlement of a preference action.

### 3. Section 502(b) Does Not Preclude Allowance of Centre's Claim

[6] Trustee argues that even if Centre's claim against SNIG could be revived under Article X and applicable law, the release of Article III was still in effect as of its petition date and thus Centre's claim was extinguished prepetition and not allowable under section 502(b). In other words, the claim could not be revived postpetition, even if the PCSA and other governing law permitted revival outside of bankruptcy. The bankruptcy court agreed with Trustee, holding that Centre was attempting to invoke postpetition remedies and thus asserting postpetition claims. We hold, however, that Centre held a prepetition contingent claim inasmuch as the guaranty claim was subject to revival once the state court conservatorship had begun prepetition, giving rise to a possible (and foreseen) preference action by the Commissioner.

Section 502(b) provides that a court is to determine the amount of a prepetition claim "as of the date of the filing of the petition, and ... allow such claim in such amount." The bankruptcy court agreed, concluding because Centre's claims against SNIG had been released and extinguished as of the petition date, its claim was disallowed, and section 502(b) precluded Centre from relying on postpetition events to revive the claim. Centre argues that its claim for recovery of any preferential payments it made postpetition constitutes an allowable contingent claim under section 502(b). We agree; Centre's claim should not be disallowed merely because the removal of the contingency affecting its claim will occur postpetition, a consequence that is plainly at odds with the Bankruptcy Code.

[7] [8] A claim is broadly defined under the Bankruptcy Code. It includes a right to payment or equitable remedy "whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, *contingent,* matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5) (emphasis added). The Code utilizes this "broadest possible definition" of claim to ensure that "all legal obligations of the debtor, *no matter how remote or contingent,* will be able to be dealt with in the bankruptcy case." *Cal. Dep't of Health Servs. v. Jensen (In re Jensen),* 995 F.2d 925, 929-30 (9th Cir.1993) (emphasis in original) (citations and quotations omitted).

Section 502(b)(1) provides that a claim is not allowable if it is unenforceable under the applicable agreement or law "*for a reason other than because such claim is contingent or unmatured.*" 11 U.S.C. § 502(b)(1) (emphasis added). Here, the parties provided in Article X remedies for Centre in the event a court entered an order or finding that

In re SNTL Corp., 571 F.3d 826 (2009)

Bankr. L. Rep. P 81,515, 09 Cal. Daily Op. Serv. 7830, 2009 Daily Journal D.A.R. 9193

the Payment was subject to a preference claim. Upon the occurrence of that contingency or triggering event, Centre would have certain rights and claims against SNIG. Under section 502(b)(1), those contingent claims cannot be disallowed simply because the contingency occurred postpetition.[13] As we stated in a recent decision, we "must find a basis in section 502 to disallow a claim, and absent such basis, we must **\*839** allow it." *Wells Fargo Fin. Acceptance v. Rodriguez (In re Rodriguez),* 375 B.R. 535, 545 (9th Cir. BAP 2007), citing *Travelers Cas. & Sur. Co. of Am. v. Pacific Gas & Elec. Co.,* 549 U.S. 443, 127 S.Ct. 1199, 1206, 167 L.Ed.2d 178 (2007) ("we generally presume that claims enforceable under applicable state law will be allowed in bankruptcy unless they are expressly disallowed" under section 502). Contingent claims are allowed under section 502(b).

[9] [10] [11] Moreover, as the parties concede, federal law determines when a claim arises under the Bankruptcy Code. *ZiLOG, Inc. v. Corning (In re Zilog, Inc.),* 450 F.3d 996, 1000 (9th Cir.2006). "It is well-established that a claim is ripe as an allowable claim in a bankruptcy proceeding even if it is a cause of action that has not yet accrued." *Cool Fuel, Inc. v. Bd. of Equalization (In re Cool Fuel, Inc.),* 210 F.3d 999, 1007 (9th Cir.2000). The Ninth Circuit has adopted the "fair contemplation" test for determining when a claim accrues for the purposes of section 502(b). *Zilog,* 450 F.3d at 1000; *Cool Fuel,* 210 F.3d at 1007; *Jensen,* 995 F.2d at 930. Under that test, a claim arises when a claimant can fairly or reasonably contemplate the claim's existence even if a cause of action has not yet accrued under nonbankruptcy law. *Cool Fuel,* 210 F.3d at 1007.

Here, the parties contemplated that Centre could have a claim against SNIG in the event a payment made by the primary obligors under the PCSA constituted a preferential transfer. Article X was drafted to cover that contingency. The Debtors filed their respective chapter 11 petitions after the Commissioner placed the primary obligors into conservation. As the conservation was commenced approximately three months after the PCSA payments were made, an action by the Commissioner to recover those payments as preferential could have been reasonably and fairly contemplated by SNIG and Centre as of the petition date. *See* Cal. Ins.Code § 1034(c)(1) (transfers made within four months before filing of the liquidation/conservation petition are avoidable). Consequently, those claims accrued (even if they were contingent and not fixed) as of the petition date, even if the Release were still effective as of that date.

Hence, because Centre's claim based on a revival of SNIG's guaranty was an allowable claim as of the date of

the petition, we will reverse.

**B. *Centre May Be Entitled to Add Its Postpetition Attorneys' Fees To Its Unsecured Claim***

[12] This appeal presents a question currently pending before the Ninth Circuit: **\*840** May an unsecured creditor include attorneys' fees incurred postpetition as part of its unsecured claim?

In *Travelers,* the Supreme Court did not resolve this issue but instead remanded it to the Ninth Circuit for resolution. *Travelers,* 127 S.Ct. at 1207-08. Rather than delay this appeal to await that outcome, we will answer the question ourselves.[14]

In *Travelers,* the bankruptcy court had followed the Ninth Circuit's holding in *Fobian v. W. Farm Credit Bank (In re Fobian),* 951 F.2d 1149 (9th Cir.1991), that creditors could not recover attorneys' fees for litigating issues particular to bankruptcy law and disallowed the claim for such fees by Travelers. The district court and the Ninth Circuit affirmed. The Supreme Court reversed to the extent the claim was disallowed on this ground, overruling *Fobian.* It specifically refused, however, to decide whether Travelers' claim for postpetition attorneys' fees was disallowed under section 502(b)(1) because of Travelers' status as an unsecured creditor. *Travelers,* 127 S.Ct. at 1207-08.

Since *Travelers* was issued by the Supreme Court, two bankruptcy courts have disagreed on the issue of whether an unsecured creditor can recover fees incurred postpetition, with a split result.[15] *Compare Qmect, Inc. v. Burlingame Capital Partners II (In re Qmect, Inc.),* 368 B.R. 882 (Bankr.N.D.Cal.2007) (unsecured creditor was entitled to include its contract-based attorneys' fees incurred postpetition in its prepetition claim) to *In re Elec. Mach. Enter., Inc.,* 371 B.R. 549 (Bankr.M.D.Fla.2007) (disallowing unsecured creditor's postpetition attorneys' fees).

The split is unsurprising, as the cases decided prior to *Travelers* also reached opposite conclusions, with the majority holding that unsecured creditors could not assert attorneys' fees incurred postpetition as part of their claims.[16] While the holdings may diverge, these cases analyze the four primary arguments asserted in favor **\*841** of and against the allowance of such claims: whether section 506(b) operates to disallow such claims; whether section 502(b) disallows such claims because they were not fixed "as of the date of the filing of the petition;" whether the Supreme Court's decision in *United Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.,*

Bankr. L. Rep. P 81,515, 09 Cal. Daily Op. Serv. 7830, 2009 Daily Journal D.A.R. 9193

484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988), precludes allowance of such claims; and whether public policy favors disallowance of such claims. We address each argument in turn.

### 1. Section 502 vs. Section 506

In *Electric Machinery*, as in almost all of the cases in the majority line, the court held that unsecured creditors cannot recover postpetition fees because the "plain language" of section 506(b) precludes such claims:

> The emphasized language of section 506(b) demonstrates the congressional intent to create an exception to the general rule that claims are to be determined as of the petition date, exclusive of post-petition interest, attorneys' fees, and other charges. The use of the words "to the extent" a claim is oversecured, and "there shall be allowed" interest and fees, mandates the conclusion that in all other circumstances, post-petition interest, attorneys' fees, and charges shall not be allowed. These courts have concluded that if Congress intended for unsecured creditors to receive post-petition attorneys' fees, then it would have done so explicitly by authorizing unsecured creditors to collect fees under section 506(b).

*Elec. Mach.,* 371 B.R. at 551, citing *Pride Cos.,* 285 B.R. at 372. In contrast, the *Qmect* court rejected the argument that section 506(b) permits only secured creditors to recover postpetition fees:

> The Court finds this reading of 11 U.S.C. §§ 502(b) and 506(b) too strained to be persuasive. First, 11 U.S.C. § 506 is entitled "Determination of Secured Status." A statute so entitled would not be a logical place to provide for the disallowance of an element of an unsecured claim. If Congress, in enacting the Bankruptcy Code, had wanted to disallow claims for post-petition attorneys' fees, the logical place for it to have done so

was surely in 11 U.S.C. § 502(b). Moreover, 11 U.S.C. § 506(b) does not distinguish between pre-petition and post-petition attorneys' fees. Thus, if 11 U.S.C. § 506(b) is read as an additional ground for objecting to claims, arguably, an unsecured creditor would be prohibited from including its pre-petition attorneys' fees in its claim as well as its postpetition fees.

*Qmect,* 368 B.R. at 885.

We are not persuaded by the approach of the *Electric Machinery* court and, like *Qmect*, we reject the argument that section 506(b) preempts postpetition attorneys' fees for all except oversecured creditors. While we cannot predict how the Ninth Circuit will decide this issue in *Travelers*, we do find a clue in *Joseph F. Sanson Inv. Co. v. 268 Ltd. (In re 268 Ltd.),* 789 F.2d 674, 678 (9th Cir.1986), where the Ninth Circuit observed that section 506(b) defines secured claims and does not limit unsecured claims:

> When read literally, subsection (b) arguably limits the fees available to the oversecured creditor. When read in conjunction with § 506(a), however, it may be understood to define the portion of the fees which shall be afforded secured status. We adopt the latter reading.

*268 Ltd.,* 789 F.2d at 678.

[13]    In *268 Limited,* an oversecured creditor sought postpetition attorneys' fees based on its contract with the debtor, **\*842** which provided that the creditor could recover five percent of the balance due at the time of default as attorneys' fees. *Id.* at 675. The creditor argued that because Nevada law permitted recovery of fees on such a percentage basis, the fees were reasonable and allowable under section 506(b) as a matter of law. *Id.* The Ninth Circuit disagreed, holding that section 506(b) permitted the creditor to claim as secured only its "reasonable" fees and that the percentage recovery was unreasonable. *Id.* at 675-77. The Ninth Circuit then remanded to allow the creditor to claim those attorneys' fees exceeding the "reasonable" amount as an unsecured claim under section 502(b)(1). The court noted that "other creditors may claim such expenses" under that section and that section 506(b) does not "limit the fees available" as

In re SNTL Corp., 571 F.3d 826 (2009)

Bankr. L. Rep. P 81,515, 09 Cal. Daily Op. Serv. 7830, 2009 Daily Journal D.A.R. 9193

an unsecured claim but merely "define[s] the portion of the fees which shall be afforded secured status."[17] *Id.* at 678.

[14] We agree with the Ninth Circuit, as well as with the Eleventh Circuit in *Welzel v. Advocate Realty Inv., LLC (In re Welzel),* 275 F.3d 1308, 1316-20 (11th Cir.2001), that the allowance functions of section 506(b) and 502(b) have been incorrectly conflated. Section 502(b), which applies to claims generally, does disallow unmatured interest (*see* 11 U.S.C. § 502(b)(2)); it does not specifically disallow attorneys' fees of creditors or certain other charges. Section 506(b), on the other hand, specifies what may be included in a secured claim.

Comparing the two provisions, the Ninth and Eleventh Circuits courts have held that a creditor may assert an unsecured claim for fees and costs arising under its contract with the debtor, even though the creditor's claim was not an allowed secured claim under section 506(b). *See Welzel,* 275 F.3d at 1317-18 (contains a thorough analysis of the two sections and their respective roles in the Bankruptcy Code).

> [W]e must determine how to interpret the general instructions concerning allowance and disallowance contained in [section] 502 and the more specific instructions concerning attorney's fees in [section] 506(b) such that the two provisions are rendered consistent. We first note that [section] 506(b) does not state that attorney's fees deemed unreasonable are to be disallowed. In fact, the subsection is completely silent with regard to the allowance/ disallowance issue. This silence suggests that [section] 506(b) is meant not to displace the general instructions laid down in [ **\*843** section] 502, but to be read together in a complementary manner.

*Id.* at 1317; *see also In re Tricca,* 196 B.R. 214, 219-20 (Bankr.D.Mass.1996) ("Section 506(b) is not a provision which concerns itself with claim allowance. Section 506(b) addresses only the question of what is part of an 'allowed secured claim.' Those courts which have examined [section] 506(b) in conjunction with [section] 502 have concluded that [section] 506(b) does not create additional exceptions to the allowance of claims; rather it

only provides for the classification of allowed claims as secured or unsecured"); *see also Rodriguez,* 375 B.R. at 545 (section 502, not section 506, governs the allowance or disallowance of unsecured claims).

Therefore, if section 506(b) is-as the Ninth Circuit has hinted-irrelevant to determining the allowability of an unsecured claim, we must look to section 502 to determine allowability. *Travelers,* 127 S.Ct. at 1206; *Rodriguez,* 375 B.R. at 545. As discussed below, section 502(b) does not specifically disallow such fees. *Qmect,* 368 B.R. at 885; *New Power,* 313 B.R. at 509-10.

### 2. Date That The Claim Arose

The *Electric Machinery* court, like the bankruptcy court here and many of the pre-*Travelers* majority courts, disallowed the postpetition fees of an unsecured creditor because section 502(b)(1) provides that a bankruptcy court "shall determine the amount of such claim ... as of the date of the filing of the petition" and the postpetition fees did not exist as of that date. *Elec. Mach.,* 371 B.R. at 551; *Pride Cos.,* 285 B.R. at 373. Because the amount of fees incurred postpetition cannot be determined or calculated as of the petition date, section 502(b) purportedly precludes their allowance. *Id.* We disagree with this approach, as it is inconsistent with the Bankruptcy Code's broad definition of "claim," which-as discussed previously-includes any right to payment, whether or not that right is contingent and unliquidated. *See* 11 U.S.C. § 101(5)(A); *Qmect,* 368 B.R. at 884.

Here, the parties' execution of a prepetition agreement containing an attorneys' fee provision gives rise to a contingent, unliquidated attorney-fee claim. As the *New Power* court held: "[w]hen a creditor's right to payment for fees exists prepetition, the right to payment constitutes a 'claim,' within the meaning of § 101(5)(A), *albeit* an unliquidated, unmatured claim that may be estimated for purposes of allowance, if necessary, pursuant to § 502(c)."[18] *New Power,* 313 B.R. at 508.

"So long as the right to collect the fees existed pre-petition, the fact that the fees were actually incurred during the postpetition period is not relevant to the determination of whether the creditor has an allowable pre-petition claim for the fees."[19] **\*844** *Id.; see also Mfrs. Hanover Trust Co. v. Bartsh (In re Flight Trans. Corp. Sec. Litig.),* 874 F.2d 576 (indenture trustee had a "right of payment" for attorneys' fees under prepetition contract, and thus had an allowable unsecured claim under section 502(b) even though such fees were unknown as of the petition date).

*In re SNTL Corp.,* 571 F.3d 826 (2009)

Bankr. L. Rep. P 81,515, 09 Cal. Daily Op. Serv. 7830, 2009 Daily Journal D.A.R. 9193

This approach is consistent with the Ninth Circuit's "fair contemplation" test-which we discussed in more detail earlier-for determining when a claim accrues. Postpetition fees can be fairly contemplated when the parties have provided for them in their contracts and thus are contingent claims as of the petition date. They cannot be disallowed merely because they are contingent. *Qmect,* 368 B.R. at 884. As stated by one leading commentator: "In general, if the creditor incurs the attorneys' fees postpetition in connection with exercising or protecting a prepetition claim that included a right to recover attorneys' fees, the fees will be prepetition in nature, constituting a contingent prepetition obligation that became fixed postpetition when the fees were incurred." 5 *Collier on Bankruptcy* § 553.03[1][i] (15th ed. Updated 2007).

Because we hold that attorneys' fees arising out of a prepetition contract but incurred postpetition fall within the Bankruptcy Code's broad definition of claim, we reject the position of the majority line of cases that section 502(b) precludes such fees.

### 3. Does Timbers Control?

Like many other courts in the majority line, the *Electric Machinery* court concluded that the Supreme Court's holding in *Timbers,* 484 U.S. at 380, 108 S.Ct. 626, mandated disallowance of claims by unsecured creditors for postpetition attorneys' fees:

> In *Timbers,* the Supreme Court concluded that because section 506(b) permitted post-petition interest to be paid only out of an equity cushion, an undersecured creditor who had no such equity cushion fell within the general rule of disallowing postpetition interest. Courts that rely on *Timbers* to disallow post-petition attorneys' fees and costs reason that the rationale applies equally to the disallowance of post-petition attorneys' fees and costs to unsecured or undersecured creditors.

*Elec. Mach.,* 371 B.R. at 551.

We believe that *Electric Machinery's* reliance on *Timbers* is misplaced. *Timbers* provided that an undersecured creditor could not receive postpetition interest on the

unsecured portion of its debt. *Timbers,* 484 U.S. at 380, 108 S.Ct. 626. This holding is consistent with section 502(b)(2), which specifically disallows claims for unmatured interest. Inasmuch as section 502(b) does not contain a similar prohibition against attorneys' fees, the comparison between the current issue and that presented in *Timbers* is not persuasive. *New Power,* 313 B.R. at 510 ("there is no exception within 502(b) which would prevent the collection of attorneys' fees by a creditor who has a valid nonbankruptcy **\*845** right to do so" and neither section 506(b) nor *Timbers* bars unsecured creditors from asserting a contractual or statutory claim for attorneys' fees); *see also Gencarelli,* 501 F.3d at 6, n. 2 (finding *Timbers* inapposite because postpetition interest is "made unavailable as [an] unsecured claim[ ] by an explicit statutory provision").

### 4. Public Policy

[15] Finally, *Electric Machinery* cites policy reasons why courts should disallow claims by unsecured creditors for postpetition attorneys' fees; in particular, the court opines that disallowance of these claims would promote "equality of distribution" and would prevent individual creditors from utilizing scorched-earth litigation tactics or absorbing an inequitable amount of estate assets. *Elec. Mach.,* 371 B.R. at 551-53. In contrast, the court in *Qmect* identifies a different policy reason for allowance of such claims (i.e., to prevent the unfairness of a debtor recovering such fees while the creditor is prohibited from similar recovery). Because we find that the Bankruptcy Code itself provides the answer to this issue (by not specifically disallowing postpetition fees), we do not attempt to reconcile these policy concerns. In the end, it is the province of Congress to correct statutory dysfunctions and to resolve difficult policy questions embedded in the statute.[20]

In summary, we agree with the *Qmect* court that claims for postpetition attorneys' fees cannot be disallowed simply because the claim of the creditor is unsecured. Because Centre is entitled to claim postpetition attorneys' fees as part of its unsecured claim under section 502, we remand for the bankruptcy court to determine whether Centre has satisfied the requisites for allowance of that portion of its claim under the relevant contracts and state law.

### VI. CONCLUSION

For the foregoing reasons, we REVERSE the bankruptcy

court's holding that Centre's claim against SNIG up to the amount of $180 million be disallowed and REMAND for allowance of the $110 million paid by Centre to the Commissioner. We further REVERSE the disallowance of Centre's postpetition fees to the extent the disallowance was based solely on Centre's status as an unsecured creditor and REMAND for a determination of whether Centre is entitled to the fees under the relevant contracts or state law or whether other grounds exist (apart from Centre's status as an unsecured creditor) for

disallowing **846** the postpetition attorneys' fees claim.

### Parallel Citations

Bankr. L. Rep. P 81,515, 09 Cal. Daily Op. Serv. 7830, 2009 Daily Journal D.A.R. 9193

Footnotes

1    SNTL Corporation is the post-confirmation successor to Superior National Insurance Group and will be referred to as "SNIG" in this opinion.

2    Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9036, as enacted and promulgated prior to the effective date of The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. 109-8, 119 Stat. 23 (Apr. 20, 2005).

3    The Fronting Agreements provide for the recovery of all reasonable expenses, including attorneys' fees, incurred in the enforcement of SNIG's guaranty. Under the Fronting Agreements, SNIG sold insurance policies using Centre's name and "A" financial rating. SNIG marketed, underwrote and administered the policies, and received the premiums and paid the claims arising under them. Centre received a fee for the use of its name and financial rating.

4    The Release provided in pertinent part:
        Subject to receipt of the Commutation Payment, [Centre] does hereby release and forever discharge the Reinsurers, their predecessors, successors, parents, affiliates, agents, officers, directors and shareholders and assigns from any and all past, present and future payment obligations, adjustments, executions, offsets, actions, causes of action, suits, debts, sums of money, accounts, reckonings, bonds, bills, covenants, contracts, controversies, agreements, promises, damages, judgments, claims, demands, liabilities and/or losses whatsoever, all whether known or unknown, which [Centre] and their successors and assigns ever had, now have, or hereinafter may have, whether grounded in law or equity relating, directly or indirectly, to the terms and conditions of the LPT and Quota Share Agreements....
    *PCSA* at 3. In addition, Article III of the PCSA claims exceeding $180 million, stating that the LPT and Quota Share Agreements remained in full force and effect "with respect to the cession of Losses, Loss Adjustment Expenses and unearned premium reserves, in excess of $180,000,000." *Id.*

5    Paragraph F provided: "The property that the Liquidator [Commissioner] seeks to recover in the Action (including, without limitation, the property which is the subject of each claim in the Action seeking the avoidance of a transfer of property) is property of one or more of the SNICIL [Superior National Insurance Company, Superior Pacific Casualty Company, California Compensation Insurance Company, Commercial Compensation Casualty Company, and Combined Benefits Insurance Company], which property was transferred to CIC[Centre] (or, in certain instances, certain other defendants) from one or more of the SNICIL."

6    The bankruptcy court noted that Centre was not seeking to nullify the PCSA under subsections (a) through (d) of Article X, but was instead attempting to exercise its rights in accordance with "any other remedy provided by law, equity, statute, or contract." *Memorandum of Opinion* at 7. The court held that any such remedy arose postpetition and thus was unavailable to Centre. "Centre's postpetition attempt to exercise any remedies it may be entitled to under [Article] X is beyond the scope of this memorandum because no legal theory exists (and Centre has been unable to articulate one) where the postpetition exercise of remedies by Centre would somehow impact the prepetition release." *Id.* at 13. Specifically, the court rejected Centre's argument that it held a prepetition contingent claim against SNIG and that there was a failure of consideration for the release. We disagree with the bankruptcy court's conclusion that Centre does not hold an allowable contingent claim under section 502(b), as explained later in this opinion.

7    As the bankruptcy court stated in its Memorandum of Opinion, Centre is not attempting to revoke the Release or declare it null and void under subsections (a)-(d) of Article X. Rather, it is invoking its other remedies provided by law or equity which become available under Article X upon entry of a court order or finding that the Payment was subject to a preference claim.

8    Neither party disputes that the state court had jurisdiction as contemplated by Article X.

In re SNTL Corp., 571 F.3d 826 (2009)

Bankr. L. Rep. P 81,515, 09 Cal. Daily Op. Serv. 7830, 2009 Daily Journal D.A.R. 9193

9    As acknowledged by Centre in its opening brief, the primary obligors and SNIG "as guarantor" were "released from liability for up to $180 million" when the $163.4 payment was made to Centre under the PCSA. *Appellant's Opening Brief* at 13. Despite this admission, Centre notes on page 17 of its Opening Brief that the Release did not mention SNIG as guarantor. This omission is irrelevant. The Release applies to all parents and affiliates of the primary obligors, for all liabilities or debts whatsoever. *PCSA,* Article III. Recital 3 of the PCSA states that the "Guarantor" [SNIG], the primary obligors (the reinsurers) and Centre wish "to fully and finally to [sic] settle and determine their respective obligations and liabilities." *PCSA,* Recital 3.

10   A state appellate court recently tackled the issue of whether a return of a payment pursuant to a settlement constituted a "voluntary" payment outside the scope of the Restatement's revival rule set forth in section 70. Because the case is not published and the local rules of the court prohibit citation to its unpublished decisions, we will not cite it. We nonetheless agree with its reasoned holding.

    In that case, like Trustee here, the guarantor argued that its liability on the guaranty was not revived when the creditor "voluntarily" returned the payment to the primary obligor in settlement of a preference action. Like us, the appellate court rejected this argument, stating (emphasis added):

        [T]his argument misconstrues the nature of voluntariness. [The creditor/obligee] did not spontaneously return the money to [the primary obligor]. It responded to a lawsuit, and entered lengthy negotiations with [the primary obligor] before ultimately reaching a settlement. *We do not regard the settlement as uncoerced. A lawsuit necessarily implies a degree of compulsion. A payment made in settlement of contested litigation is not truly voluntary.*

    We agree with this analysis of why a return of a payment made in settlement of a lawsuit is not "voluntary" and of why the general principles of section 70 of the *Restatement (Third) of Surety & Guaranty* apply here.

11   In *Wallace Hardware,* the payment made by the primary obligor was attacked under the Bankruptcy Code's preference provisions, while the Payment here was alleged to be preferential under California's Insurance Code. Nonetheless, the general principle-that the return of a preferential payment of a primary obligor by the obligee revives a guarantor's obligation otherwise released by that payment-should operate with equal force whatever preference law applies.

12   Trustee has not suggested that Centre could have defeated the Commissioner's state court action or that the settlement was inappropriate.

13   If SNIG had filed bankruptcy before the primary obligors had defaulted on the Fronting Agreements and QSR Contract, Centre would hold a claim against SNIG even though SNIG's liability was contingent on the primary obligors' future postpetition default. *See In re All Media Props., Inc.,* 5 B.R. 126, 133 (Bankr.S.D.Tex.1980), *aff'd,* 646 F.2d 193 (5th Cir.1981) ("[I]n the case of the classic contingent liability of a guarantor of a promissory note executed by a third party, both the creditor and guarantor knew that there would be liability only if the principal defaulted. No obligation arises until such default."). Similarly, here, the parties knew that Centre's remedies against SNIG under Article X would not be available until the occurrence of a contingent, triggering event: the entry of a court order or finding that the Payment was subject to a preference law.

    Another subsection of section 502 demonstrates that Congress did not intend for claims to be disallowed simply because of their contingent nature. Section 502(c)(1) establishes a procedure for the estimation of such claims by the bankruptcy court. Even though such claims could not be enforced on the petition date outside the bankruptcy court, the Bankruptcy Code clearly contemplates that the bankruptcy estate will deal with contingent and unliquidated claims, including contingent or unliquidated guaranty claims against debtors. *In re Teigen,* 228 B.R. 720, 722-23 (Bankr.D.S.D.1998) (estimating claims of holders of guaranties executed by chapter 7 debtors).

14   First, we owe it to the parties to decide cases before us promptly. Second, our decision is subject to review by the Ninth Circuit. Third, we believe the Ninth Circuit values the views of the Bankruptcy Appellate Panel on bankruptcy issues. *Sigma Micro Corp. v. Healthcentral.com (In re Healthcentral.com),* 504 F.3d 775, 784 n. 3 (9th Cir.2007).

15   In addition, the First Circuit issued a post-*Travelers* opinion that favorably cited authority supporting the allowance of postpetition attorneys' fees to unsecured creditors, but that decision is not on point. *UPS Capital Bus. Credit v. Gencarelli (In re Gencarelli),* 501 F.3d 1, 6 (1st Cir.2007). The *Gencarelli* court was not addressing the issue of postpetition attorneys' fees but instead held that an oversecured creditor was entitled to collect a prepayment penalty from a solvent debtor regardless of reasonableness.

16   In the majority line of cases, courts have held that unsecured creditors are not entitled to claim such fees, as section 506(b) is the only provision in the Code that permits the recovery of postpetition fees from the estate, and that section applies only to secured creditors. *See Adams v. Zimmerman,* 73 F.3d 1164, 1177 (1st Cir.1996); *Waterman v. Ditto (In re Waterman),* 248 B.R. 567, 573 (8th Cir. BAP 2000); *Pride Cos., L.P. v. Johnson (In re Pride Cos., L.P.),* 285 B.R. 366, 372-73 (Bankr.N.D.Tex.2002) (collecting cases).

    In the sizable minority line of cases, courts have permitted unsecured creditors to claim attorneys' fees incurred postpetition but based on a prepetition contract. *See Martin v. Bank of Germantown (In re Martin),* 761 F.2d 1163, 1168 (6th Cir.1985); *United*

*In re SNTL Corp., 571 F.3d 826 (2009)*

Bankr. L. Rep. P 81,515, 09 Cal. Daily Op. Serv. 7830, 2009 Daily Journal D.A.R. 9193

*Merchs. & Mfrs. Inc. v. Equitable Life Assurance Soc'y of the U.S. (In re United Merchs. & Mfrs. Inc.),* 674 F.2d 134 (2d Cir.1982) (decided under the former Bankruptcy Act, but commenting on section 506(b) of the current Code); *In re New Power Co.,* 313 B.R. 496 (Bankr.N.D.Ga.2004); *but see Pride Cos.,* 285 B.R. at 374 (listing the "sizable minority" cases decided before 2002).

17    While the Ninth Circuit in *268 Limited* distinguished the allowability of claims under section 502(b)(1) (which incorporates "applicable law" and is silent about "reasonableness") from the definition of secured claim under section 506, it is important to note that its determination that an unsecured claim may be asserted for the amount of fees in excess of the amount that was "reasonable" under section 506(b) does not mean that the claim necessarily had to be allowed. Rather, the court of appeals remanded to allow the creditor to "seek" the balance of its fees under section 502 and expressed "no opinion on the enforceability under the governing state law of the deed of trust's attorney's fees provision." *268 Ltd.,* 789 F.2d at 678. In other words, the claim would still be subject to objection on the merits based on Nevada law, the precise terms of which were not discussed by the Ninth Circuit (although the contentions of the creditor suggest that Nevada law did not impose a separate reasonableness requirement for recovery of contractual attorneys' fees but instead permitted recovery of such fees on a percentage basis). In this instance, "applicable" California law permits recovery of contractual attorneys' fees only if they are reasonable. *See* CAL. CIV. CODE § 1717. Thus, with respect to California cases, "applicable law" limits postpetition contractual attorney's fees to "reasonable" amounts for the purposes of section 502(b)(1).

18    To the extent that we hold that fees incurred postpetition but arising out of a prepetition contract or agreement constitute contingent, unliquidated prepetition claims, describing them as "postpetition fees" may be inaccurate. Nonetheless, our use of this term is a shorthand means of describing attorney fees actually incurred postpetition but based on the debtor's prepetition contract. More to the point, the critical events that no doubt relate to a portion of Centre's attorneys fees-the Release, the Payment and the Commissioner's conservation-all occurred prepetition, thus making Centre's claim less remote and less contingent.

19    In *Keaton v. Boatmen's Bank of Tenn.,* 212 B.R. 587 (E.D.Tenn.1997), vacated as moot, 145 F.3d 1331, 1998 WL 228123 (6th Cir.1998), the district court engaged in a thorough analysis of whether fees incurred postpetition pursuant to a prepetition claim are disallowable because they were not fixed "as of the date of the filing of the petition." *Keaton,* 212 B.R. at 589-91. Even though the decision was vacated as moot when the creditor abandoned its claim for attorneys' fees (145 F.3d at 1331), we find the analysis of *Keaton* persuasive. Quoting the bankruptcy court with approval, the district court held: "While the representation may have been performed after the petition was filed, [the creditor's] right to collect attorney's fees arose out of the contract and is a prepetition claim." *Keaton,* 212 B.R. at 591. The creditor "had a prepetition right to collect attorneys' fees, *albeit* an unmatured, contingent right; i.e., the right was contingent upon the [creditor] actually incurring attorneys' fees in collecting the debt." *Id.*

20    While there is intuitive appeal to the *Electric Machinery* court's concern that an overactive creditor could unfairly run up fees, several factors reduce the potential for trouble. First, the fee doctrines of many jurisdictions, including the general California attorney's fee doctrine that applies here, impose requirements in the nature of reasonableness. Second, the sections of the Bankruptcy Code that expressly focus on compensation for attorneys generally include limitations premised on reasonableness: *e.g.,* section 303(i)(1)(B) ("reasonable attorney's fee"); section 329(b) ("reasonable value of any such services"); section 330(a) ("reasonable compensation"); section 331 (incorporates section 330); section 502(b)(4) ("reasonable value of such services"); section 503(b)(4) ("reasonable compensation"). It is counterintuitive to suppose that a court of equity would fully allow a claim for creditor's unreasonable attorneys' fees in litigating with an attorney who can receive only "reasonable" compensation. Third, economic constraints on creditors exist in the typical bankruptcy case where resources are not available to pay unsecured claims in full; a creditor's extra fees will be fully compensated only in the unusual situations where funds are available to pay 100 percent of claims. Thus, the opportunities for gamesmanship are limited.

---

**End of Document**                                        © 2014 Thomson Reuters. No claim to original U.S. Government Works.

---

369 B.R. 614
United States Bankruptcy Appellate Panel
of the Tenth Circuit.

In re Jay BUSCH, Debtor.
Jay Busch, Defendant–Appellant,
v.
Cindy A. Hancock, formerly known as Cindy A.
Busch, Plaintiff–Appellee.

BAP No. UT–06–072. | Bankruptcy Nos.
02T–27006, 05T–20724. | Adversary No.
04P–2943WTT. | June 4, 2007.

**Synopsis**
**Background:** Chapter 7 debtor's former wife filed adversary complaint, seeking determination that obligation imposed by the parties' divorce decree on debtor to pay a second mortgage on the parties' marital residence was nondischargeable support. The United States Bankruptcy Court for the District of Utah entered judgment in favor of former wife, awarded her attorneys fees incurred in both the state-court and bankruptcy litigation, and denied in part debtor's motion for relief from judgment. Debtor appealed.

**Holdings:** The Bankruptcy Appellate Panel (BAP), Cornish, J., held that:

[1] the bankruptcy court did not abuse its discretion in determining that debtor's mortgage obligation was in the nature of support until the parties' child attained age 18;

[2] the bankruptcy court did not abuse its discretion in denying debtor relief from judgment on grounds of surprise;

[3] the bankruptcy court properly awarded attorneys fees incurred in connection with former wife's participation in debtor's prior Chapter 13 cases and in the Chapter 7 adversary proceeding, pursuant to Utah statute permitting such fees to be awarded to a prevailing party for enforcement of obligations under a divorce decree; but

[4] the bankruptcy court lacked authority to award fees incurred by former wife in state court relating to debtor's motion to clarify the divorce decree and the ensuing appeal, as such fees were not reduced to judgment in state court.

Affirmed in part, reversed in part, and remanded with instructions.

Berger, J., filed opinion concurring in part and dissenting in part.

**Attorneys and Law Firms**

**\*617** Scott B. Mitchell, Salt Lake City, UT, for Defendant–Appellant.

Steven C. Tycksen (Chad C. Shattuck with him on the brief) of Zoll & Tycksen, Murray, UT, for Plaintiff–Appellee.

Before CORNISH, NUGENT, and BERGER[1], Bankruptcy Judges.

OPINION

CORNISH, Bankruptcy Judge.

In this Chapter 7 bankruptcy case, defendant-debtor Jay Busch ("Debtor") appeals an order of the United States Bankruptcy Court for the District of Utah denying in part his motion for relief from judgment under Federal Rules of Bankruptcy Procedure 7052 and 9024. The main underlying issue in this adversary proceeding brought by Cindy Busch Hancock, Debtor's former wife ("Ex–Wife"), is the bankruptcy court's ruling that an obligation imposed by the parties' divorce decree on Debtor to pay a second mortgage on the couple's marital residence was in the nature of support until the parties' child reached age 18, and therefore, nondischargeable. A secondary issue is the bankruptcy court's award of attorney's fees to Ex–Wife's attorney incurred in connection with both state and federal litigation. For the following reasons, 1) we affirm the bankruptcy court's finding that the second mortgage payments are nondischargeable support; 2) we affirm the bankruptcy court's award of attorney's fees incurred in connection with Ex–Wife's litigation in bankruptcy court; but 3) we reverse the bankruptcy court's award of attorney's fees incurred in state court litigation because they were not reduced to judgment in state court.

*In re Busch*, 369 B.R. 614 (2007)
57 Collier Bankr.Cas.2d 202

## I. FACTUAL BACKGROUND

The history of this case is protracted and ugly. To say that this seemingly endless **\*618** litigation has been contentious would be an understatement. It began in 1998 when the parties were still married and received a discharge of debts in a joint Chapter 7 case. Sometime thereafter, the parties separated and then reconciled. During the separation, Debtor incurred debts that the parties, after reconciling, paid by taking out a second mortgage on the marital residence. The parties then divorced in January, 2000. Among other things, the parties' divorce decree orders Debtor to: 1) pay child support in an amount pursuant to the Utah Uniform Child Support Guidelines; 2) maintain health insurance on the minor child; 3) pay alimony; and *4) "assume and pay and hold [Ex–Wife] harmless from ... the second mortgage on the parties' home." Decree of Divorce* at ¶¶ 4, 6, 10 & 11, *in* Appellant's App. Vol. I at 20–22 (emphasis added). The second mortgage was a thirty year obligation. Debtor failed to make the second mortgage payments as directed by the divorce decree. As will become apparent, the non-payment of the second mortgage by Debtor has almost exhausted the resources of both the federal and state courts of Utah.

In July, 2000, Debtor filed his first Chapter 13 case. Ex–Wife filed a proof of claim for unsecured priority claims resulting from debts arising under the divorce decree. Judge Clark orally ruled that the second mortgage obligation was in the nature of support and therefore nondischargeable under 11 U.S.C. § 523(a)(5).[2] Judge Clark also ruled that attorney's fees incurred by Ex–Wife in trying to enforce the divorce decree in state court were nondischargeable.[3] Unfortunately, Judge Clark's rulings were never reduced to a written order. Debtor then filed a motion in Utah state court to clarify the divorce decree regarding the character of the obligation to pay the second mortgage. The Utah state court determined that Judge Clark's ruling was res judicata as to this issue. Debtor voluntarily dismissed the first Chapter 13 case on July 2, 2001, and immediately filed his second Chapter 13 case on July 3, 2001. Debtor then appealed the Utah state court determination that Judge Clark's ruling was res judicata to the Utah Court of Appeals.

In the second Chapter 13 case, Judge Boulden ruled that Judge Clark's ruling in the first Chapter 13 case, that the second mortgage was in the nature of support, was res judicata as to the issue in the second Chapter 13 case. Judge Boulden also determined that some of Ex–Wife's attorney's fees in enforcing the divorce decree were nondischargeable.[4] Debtor voluntarily dismissed his second Chapter 13 case on April 16, 2002.

Debtor then filed his third Chapter 13 bankruptcy case on April 13, 2002. Ex–Wife again filed a proof of claim for unsecured priority claims from debts arising **\*619** under the divorce decree. The bankruptcy court entered an order lifting the automatic stay so that Ex–Wife could seek other remedies against Debtor in state court for failure to pay the second mortgage obligation.[5] Debtor appealed the bankruptcy court's order lifting the stay to the Tenth Circuit Bankruptcy Appellate Panel ("BAP").

On February 13, 2003, the bankruptcy court confirmed a Chapter 13 plan which provided for payment in full of Ex–Wife's priority claims, including the second mortgage obligation. In May, 2003, the Utah Court of Appeals reversed and remanded the state trial court's decision that Judge Clark's oral ruling was res judicata in the state litigation to clarify the divorce decree. The appellate court determined that the oral ruling was insufficient for purposes of establishing res judicata. The BAP then affirmed the bankruptcy court's order lifting stay in June, 2003.

Upon remand by the Utah Court of Appeals of the litigation to clarify the divorce decree, the state trial court entered an order in June, 2004, concluding the payment of the second mortgage was an allocation of marital debt based on the principles of equitable distribution. On July 28, 2004, Debtor voluntarily converted his Chapter 13 case to a Chapter 7 case. Ex–Wife filed an adversary complaint objecting to discharge of debts pursuant to § 523(a)(5). The bankruptcy court subsequently denied Debtor's discharge as to debts because of the Debtor's previous discharge in the parties' joint 1998 Chapter 7 case.

[1] On January 18, 2005, Debtor filed this Chapter 7 case, and Ex–Wife's adversary proceeding filed under the previous Chapter 7 case was deemed to be open and applicable to this case. On December 20, 2005, the bankruptcy court conducted a trial to determine whether the second mortgage obligation, and attorney's fees associated with litigation enforcing the same, were in the nature of nondischargeable support under § 523(a)(5). Debtor argued the obligation was in the nature of alimony, and such obligation terminated upon Ex–Wife's remarriage.[6]

The bankruptcy court determined the mortgage obligation was in the nature of support, and therefore nondischargeable, to the extent it allowed the parties' minor child to remain in the former marital home until age 18 (which occurred in August, 2004). *Memorandum Decision Granting in Part and Denying in Part Debtor's Motion for Relief from the Judgment Under Rules 7052*

*In re Busch*, 369 B.R. 614 (2007)

57 Collier Bankr.Cas.2d 202

*and 9024* ("*Memorandum Decision*") at 9–10, *in* Appellant's App. Vol. I at 143–44. The bankruptcy court also determined that $7,000 in direct payments made by Debtor to Ex–Wife on the second mortgage obligation were to be applied to that portion of the obligation that was dischargeable.[7] *Memorandum Decision* *\*620* at 6, *in* Appellant's App. Vol. I at 140. Additionally, the court awarded Ex–Wife attorney's fees and costs in connection with litigating the characterization of the second mortgage as support in state court; enforcing the second mortgage as nondischargeable in bankruptcy court; and the previous BAP appeal.

Debtor then requested relief from the bankruptcy court's judgment under Federal Rules of Bankruptcy Procedure 7052 and 9024. Debtor made four arguments for relief under Rule 7052: 1) Ex–Wife did not present evidence to support the court's determination that the second mortgage obligation was in the nature of nondischargeable child support; 2) the previous BAP appeal was unrelated to the nature of the second mortgage obligation, therefore Ex–Wife was not entitled to attorney's fees expended in connection therewith; 3) Debtor was clearly the prevailing party in state court litigation so the court should not have awarded any attorney's fees to Ex–Wife; and 4) the court did not properly credit certain payments Debtor previously made on the second mortgage obligation.

The bankruptcy court granted relief in part under Rule 7052 by determining the BAP appeal was unrelated to the nature of the second mortgage obligation and amended its decision to decrease the attorney's fees award to Ex–Wife by the amount of the BAP appeal fees. The bankruptcy court also revisited the amount Debtor had already paid on the second mortgage for proper credit. *Memorandum Decision* at 12, *in* Appellant's App. Vol. I at 146. Thus, only arguments one and three above remain viable on appeal.

Debtor also requested relief from the judgment under Rule 9024 based on the grounds of "surprise." Debtor sought to reopen the record to introduce a letter from his counsel to Ex–Wife that appears to instruct her on how the $7,000 in payments on the second mortgage obligation directly to her were to be allocated. The bankruptcy court denied Debtor any relief under Rule 9024. *Memorandum Decision* at 15–17, *in* Appellant's App. Vol. I at 149–51. Debtor now appeals.

## II. APPELLATE JURISDICTION

This Court has jurisdiction to hear timely-filed appeals from "final judgments, orders, and decrees" of bankruptcy courts within the Tenth Circuit, unless one of the parties elects to have the district court hear the appeal. 28 U.S.C. § 158(a)(1), (b)(1), and (c)(1); Fed. R. Bankr.P. 8002. Neither party elected to have this appeal heard by the United States District Court for the District of Utah. The parties have therefore consented to appellate review by this Court.

[2] A decision is considered final "if it 'ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.' " *Quackenbush v. Allstate Ins. Co.,* 517 U.S. 706, 712, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996) (quoting *Catlin v. United States,* 324 U.S. 229, 233, 65 S.Ct. 631, 89 L.Ed. 911 (1945)). In this case, the decision of the bankruptcy court terminated the adversary proceeding at issue. Nothing remains for the bankruptcy court's consideration. Thus, the decision is final for purposes of review.

## III. STANDARD OF REVIEW

The order being appealed was entered in response to Debtor's "Motion for Relief from the Judgment under Rules 7052 and 9024." Federal Rule of Bankruptcy Procedure 7052 makes Federal Rule of Civil Procedure 52 applicable to adversary proceedings. Rule 52(b) permits a judgment to be amended upon the motion of a party. Federal Rule of Bankruptcy Procedure 9024 makes *\*621* Federal Rule of Civil Procedure 60 applicable to bankruptcy cases. Rule 60(b), in part, allows a court to relieve a party from a judgment based on the grounds of mistake, inadvertence, surprise, or excusable neglect.

[3] [4] The purpose of a Rule 52(b) motion is to "correct manifest errors of law or fact." *Lyons v. Jefferson Bank & Trust,* 793 F.Supp. 989, 991 (D.Colo.1992), *aff'd in part, rev'd in part on other grounds,* 994 F.2d 716 (10th Cir.1993). It is not to relitigate old issues or rehear the merits of a case. *Fontenot v. Mesa Petroleum Co.,* 791 F.2d 1207, 1219 (5th Cir.1986). Review of a lower court's order in response to a Rule 52(b) motion is for abuse of discretion. *Nat'l Metal Finishing Co., Inc. v. BarclaysAmerican/Commercial, Inc.,* 899 F.2d 119, 124–25 (1st Cir.1990); *Golden Blount, Inc. v. Robert H. Peterson Co.,* 438 F.3d 1354, 1358 (Fed.Cir.2006). The United States Court of Appeals for the Tenth Circuit ("Tenth Circuit") has not spoken on this issue. However, a Rule 52(b) motion is similar in nature to a Rule 59(e) motion and the Tenth Circuit has stated that "[t]his court reviews the district court's ruling on a Rule 59(e) motion for abuse of discretion." *Loughridge v. Chiles Power Supply Co., Inc.,* 431 F.3d 1268, 1275 (10th Cir.2005) (citing *Minshall v. McGraw Hill Broad. Co., Inc.,* 323 F.3d 1273, 1287 (10th Cir.2003)).

[5] With respect to a Rule 60(b) motion, the Tenth Circuit has stated, "[w]e review ... the disposition of Rule 60(b) motions for an abuse of discretion. Under this standard, we will not reverse unless the trial court has made 'an arbitrary, capricious, whimsical, or manifestly unreasonable judgment.' " *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.,* 170 F.3d 985, 992 (10th Cir.1999) (quoting *FDIC v. Oldenburg,* 34 F.3d 1529, 1555 (10th Cir.1994)) (alteration in original) (citations omitted).[8]

## IV. ANALYSIS

### A. The Bankruptcy Court Correctly Determined the Mortgage Obligation was in the Nature of § 523(a)(5) Support

[6] [7] [8] The purpose of bankruptcy is to provide the debtor with a "fresh start." Therefore, statutory exceptions to discharge must be construed narrowly. *Jones v. Jones (In re Jones),* 9 F.3d 878, 880 (10th Cir.1993). However, § 523(a)(5)'s underlying policy favors enforcement of familial support obligations over a debtor's "fresh start." *Sampson v. Sampson (In re Sampson),* 997 F.2d 717, 721 (10th Cir.1993).

[9] [10] Section 523, exceptions to discharge, provides in pertinent part:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

....

(5) to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with a separation agreement, divorce decree or other order of a court of record, determination made in accordance with State or territorial law by a governmental unit, or property settlement agreement, but not to the extent that—

*622 ....

(B) such debt includes a liability designated as alimony, maintenance, or support, unless such liability is actually in the nature of alimony, maintenance, or support[.]

11 U.S.C. § 523(a)(5) (2005). For purposes of this adversary proceeding, whether an obligation arising under a divorce decree is in the nature of alimony, maintenance, or support is a matter of federal bankruptcy law. *Sylvester*

*v. Sylvester,* 865 F.2d 1164, 1166 (10th Cir.1989) (citing *In re Goin,* 808 F.2d 1391, 1392 (10th Cir.1987)). The bankruptcy court has the responsibility to make its own determination of the character of the obligation from the facts at hand, not rely on the denomination of the obligation in the divorce decree. *Sampson,* 997 F.2d at 725–26; *Lewis v. Trump (In re Trump),* 309 B.R. 585, 592 (Bankr.D.Kan.2004).

[11] [12] [13] [14] In the Tenth Circuit, the terms "maintenance" and "support" are entitled to broad application in a realistic manner. *Miller v. Miller (In re Miller),* 284 B.R. 734, 738 (10th Cir. BAP 2002) (citing *Jones v. Jones (In re Jones),* 9 F.3d 878, 881 (10th Cir.1993) (The term support "should not be read so narrowly as to exclude everything bearing on the welfare of the child but the bare paying of bills on the child's behalf."). Although state law may provide guidance on the issue of support, " 'a debt could be in the 'nature of support' under section 523(a)(5) even though it would not legally qualify as alimony or support under state law.' " *Jones,* 9 F.3d at 880 (quoting *Yeates v. Yeates (In re Yeates),* 807 F.2d 874, 878 (10th Cir.1986)). The Tenth Circuit has indicated that "[t]he critical question in determining whether the obligation is, in substance, support is 'the function served by the obligation at the time of the divorce.' " *Sampson v. Sampson (In re Sampson),* 997 F.2d 717, 725–26 (10th Cir.1993) (quoting *In re Gianakas,* 917 F.2d 759, 763 (3rd Cir.1990)). "This may be determined by considering the relative financial circumstances of the parties at the time of the divorce." *Sampson,* 997 F.2d at 726. In fact, "a spouse's need for support at the time of the divorce is sufficient to presume that the parties' [sic] intended the obligation as support." *Id.* at n. 7.

Precedent exists for finding a second mortgage obligation to be in the nature of nondischargeable support. The Tenth Circuit's *Robinson v. Robinson (In re Robinson),* 921 F.2d 252 (10th Cir.1990) is directly on point. In *Robinson,* a debtor was ordered to make the payments on a second deed of trust and to hold his former spouse harmless from the same. *Robinson,* 921 F.2d at 253. The bankruptcy court determined that the obligation was in the nature of alimony, maintenance or support, and both the district court and the Tenth Circuit agreed. *Id.*

Additionally, bankruptcy courts in this circuit have reached similar results. In *In re Trump,* the bankruptcy court was presented with facts similar to this case and determined that a debtor's obligation on a second mortgage was in the nature of support, notwithstanding that the divorce decree did not label it as such. *Lewis v. Trump (In re Trump),* 309 B.R. 585, 593–94

(Bankr.D.Kan.2004). Other types of debt allocations have also been held to be in the nature of support. For example, in *In re Polishuk,* the bankruptcy court determined that a debtor's obligation under a divorce decree to pay and hold harmless a former spouse from credit card debt was "in substance, alimony, maintenance and/or support" based on the former spouse's financial condition at the time of the divorce. *Polishuk v. Polishuk (In re Polishuk),* 243 B.R. 408, 419–20 (Bankr.N.D.Okla.1999).

**\*623**  [15]  [16]  In this case, the bankruptcy court's conclusion that the second mortgage obligation was in the nature of support to the extent that it allowed Debtor's child to remain in the marital home until the age of 18 is supported by the evidence. The party objecting to the discharge of a debt need only prove by a preponderance of the evidence that the debt is not dischargeable. *Jones v. Jones (In re Jones),* 9 F.3d 878, 880 (10th Cir.1993). Ex–Wife testified at trial that it would have been impossible for her and the minor child to stay in the marital residence if Debtor did not pay the second mortgage obligation. *Transcript of December 20, 2005, Bench Trial* at 22, *in* Appellant's App. Vol. I at 65. Debtor did not refute this evidence to any extent. Thus, Ex–Wife met her burden of proof.

The bankruptcy court looked to the actual effect of the payment of the second mortgage obligation and determined it was in the nature of support. This is the correct approach. *See Sylvester v. Sylvester,* 865 F.2d 1164, 1166 (10th Cir.1989). Under these circumstances, it cannot be said that the bankruptcy court reached an arbitrary, capricious, whimsical, or manifestly unreasonable conclusion. There being no abuse of discretion, the decision of the bankruptcy court that Debtor's obligation was nondischargeable support must be affirmed.

**B. The Bankruptcy Court Correctly Denied Debtor Relief Under Rule 9024 on Grounds of Surprise**

[17]  Pursuant to Federal Rule of Bankruptcy Procedure 9024, and on the basis of "surprise" (Federal Rule of Civil Procedure 60(b)(1)), Debtor requested relief from the bankruptcy court's ruling that $7,000 in payments he made on the second mortgage obligation directly to Ex–Wife were allocable to the dischargeable portion thereof. Debtor sought to reopen the record to introduce a letter from his counsel to Ex–Wife that appears to instruct her on how the $7,000 in payments on the second mortgage obligation were to be allocated. *Appellant's Brief* at 41–42. Relief under Rule 60(b) "is extraordinary and may only be granted in exceptional circumstances." *Servants of the Paraclete v. Does,* 204 F.3d 1005, 1009

(10th Cir.2000) (internal quotation marks omitted).

[18]  [19]  Debtor claims he was "surprised" at trial by the issue of whether the $7,000 payments should be allocated to the dischargeable or nondischargeable portion of Ex–Wife's claim because it was not raised in any of the pleadings, summary judgment memoranda, pre-trial order, proposed findings of fact and conclusions of law or trial briefs. *Appellant's Brief* at 41–42. However, Debtor did not object to such issue when it was raised at trial. Unfortunately, Debtor's counsel admits that "the legal significance of this issue was not clear to [him] until after the bankruptcy court entered its findings and fact and conclusions of law." *Id.* As the bankruptcy court correctly points out, "the remedy for coping with surprise is not to seek reversal after an unfavorable verdict, but a request for a continuance at the time the surprise occurs." *LeMaire ex rel. LeMaire v. United States,* 826 F.2d 949, 953 (10th Cir.1987) (internal quotation marks omitted). At trial, Debtor made no showing that he was surprised, nor did he request a continuance. *Memorandum Decision* at 16–17, *in* Appellant's App. Vol I at 150–51. No exceptional circumstances are presented here. Therefore, the bankruptcy court did not abuse its discretion when it denied Debtor relief under Rule 9024.

**C. The Bankruptcy Court's Award of Attorney's Fees is Affirmed in Part, and Reversed in Part**

In its *Memorandum Decision,* the bankruptcy court awarded Ex–Wife a judgment **\*624** in the amount of $37,542.60. *Memorandum Decision* at 18, *in* Appellant's App. Vol I at 152. Of this amount, $13,983.97 is attributable to attorney's fees.[9] The total award represents four different categories of attorney's fees: 1) $2,000 in fees incurred in connection with Ex–Wife's priority claim in Debtor's second Chapter 13 case; 2) $1,500 in fees incurred in connection with Ex–Wife's priority claim in Debtor's third Chapter 13 case; 3) $4,500 in fees incurred in connection with Debtor's motion to clarify the nature of the second mortgage obligation and appeal in the state court system; and 4) $5,983.97 in fees incurred in connection with this adversary proceeding relating to the nondischargeability of the second mortgage obligation.[10] *Transcript of December 29, 2005, Bench Decision* at 21–26, *in* Appellant's App. Vol. I at 126–131. The bankruptcy court based its award of attorney's fees on a Utah statute which provides in pertinent part as follows:

(2) In any action to enforce an order of custody, parent-time, child support, alimony, or division of property in a domestic case, the court may award costs and attorney fees upon determining that the

party substantially prevailed upon the claim or defense. The court, in its discretion, may award no fees or limited fees against a party if the court finds the party is impecunious or enters in the record the reason for not awarding fees. Utah Code Ann. § 30–3–3(2) (2006). For the following reasons, the bankruptcy court's award of attorney's fees is affirmed in part, and reversed in part.

[20] [21] [22] Under the "American Rule" applied in federal litigation, a prevailing party is not ordinarily entitled to collect attorney's fees from his opponent. *Alyeska Pipeline Serv. Co. v. Wilderness Society,* 421 U.S. 240, 247, 257, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). This general rule applies to bankruptcy litigation. *In re Reid,* 854 F.2d 156, 161–62 (7th Cir.1988); *All Am. of Ashburn v. Fox (In re Fox),* 725 F.2d 661, 662 (11th Cir.1984). However, there are two major exceptions to the "American Rule": (1) the rule is abrogated when the parties have entered a contract that shifts attorney's fees, and (2) the rule **\*625** is abrogated when a statute provides for fee shifting. *Bennett v. Coors Brewing Co.,* 189 F.3d 1221, 1237–38 (10th Cir.1999).

Generally, bankruptcy courts have refused to award attorney's fees to § 523(a)(5) prevailing parties for fees incurred in connection with litigating the issue of dischargeability. *See, e.g., Renfrow v. Draper,* 232 F.3d 688 (9th Cir.2000); *Lewis v. Trump (In re Trump),* 309 B.R. 585 (Bankr.D.Kan.2004); *Dennison v. Hammond (In re Hammond),* 236 B.R. 751 (Bankr.D.Utah 1998); *Colbert v. Colbert (In re Colbert),* 185 B.R. 247 (Bankr.M.D.Tenn.1995); *Shearer v. Shearer (In re Shearer),* 124 B.R. 862 (Bankr.N.D.Fla.1990); *but see Lawrence v. Lawrence (In re Lawrence),* 237 B.R. 61, 86 (Bankr.D.N.J.1999). The primary reason has been lack of a specific provision under the Bankruptcy Code authorizing fee awards to prevailing creditors in § 523 dischargeability actions.[11] *Colbert,* 185 B.R. at 248. However, after the Supreme Court's recent decision in *Travelers Casualty & Surety Co. v. Pacific Gas & Electric Co.,* 549 U.S. 443, 127 S.Ct. 1199, 167 L.Ed.2d 178 (2007), this rationale is no longer persuasive.

In *Travelers,* the Supreme Court was asked to consider "whether federal bankruptcy law precludes an unsecured creditor from recovering attorney's fees authorized by a prepetition contract and incurred in postpetition litigation." *Id.* at 1202. The question arose because the Ninth Circuit Court of Appeals had adopted a rule that attorney's fees are not recoverable in bankruptcy for litigating issues peculiar to federal bankruptcy law. *Id.* The Supreme Court essentially concluded that because there is no Bankruptcy Code provision expressly

disallowing claims for attorney's fees incurred by creditors in the litigation of bankruptcy issues, the Ninth Circuit's rule could not stand. *Id.*

[23] Although in *Travelers,* the issue was raised in the context of attorney's fees which were shifted by contract, the reasoning in *Travelers* is equally applicable to attorney's fees shifted by state statute. This is particularly so given the Supreme Court's emphasis on the long recognized principle that the basic federal rule in bankruptcy is that state law governs the substance of claims. *Id.* at 1205. Further, the Supreme Court stated " '[p]roperty interests are created and defined by state law,' and '[u]nless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.' " *Id.* (quoting *Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979)).

Here, if Ex–Wife were the prevailing party in state court litigation enforcing the obligations owed her under the divorce decree, the court would be permitted to award her attorney's fees pursuant to Utah Code Ann. § 30–3–3(2). Ex–Wife's participation in the second and third Chapter 13 cases seeking payment of her priority claim, and her litigation in the Chapter 7 nondischargeability adversary are certainly actions in the nature of enforcing the terms of the divorce decree. And no dispute exists regarding who is the prevailing party. In the Chapter 13 cases, Ex–Wife secured payment of her priority claim in full under the plan, and in the Chapter 7 case, the bankruptcy court held the second mortgage obligation to be nondischargeable. **\*626** According to the Supreme Court, Ex–Wife's enforcement of her interests in the bankruptcy court actions should not be analyzed differently than enforcement of her interests in state court. In state court, attorney's fees may be awarded. There is no federal interest requiring a different result in a bankruptcy action. Thus, attorney's fees may be awarded in the bankruptcy actions. Accordingly, we affirm the bankruptcy court's award of attorney's fees incurred in connection with Ex–Wife's participation in the Chapter 13 cases and the Chapter 7 dischargeability adversary action.

Our conclusion is also supported by the result reached by the Supreme Court several years ago in *Cohen v. de la Cruz,* 523 U.S. 213, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998). In *Cohen,* tenants brought a Chapter 7 nondischargeability adversary case based on a claim of § 523(a)(2)(A) fraud against a landlord who had charged them rent in excess of rent control amounts. *Id.* at 215, 118 S.Ct. 1212. Not only did the bankruptcy court determine that the excess rent debt was not dischargeable,

it awarded the tenants treble damages and attorney's fees. The treble damages and attorney's fees award were authorized by a provision of the New Jersey Consumer Fraud Act.[12] *Id.* at 216, 118 S.Ct. 1212. Both the district court and the Third Circuit Court of Appeals affirmed. *Id.* The Supreme Court also affirmed, determining that a § 523(a)(2)(A) debt encompasses any liability arising from money and property that is fraudulently obtained, including treble damages, attorney's fees, and other relief that may exceed the value obtained by the debtor. *Id.* Thus, the Supreme Court upheld an award of attorney's fees to a prevailing party in dischargeability litigation based on a state statute's authorization of the fees.

In this case, a Utah statute permits attorney's fees to be awarded to a prevailing party for enforcement of obligations under a divorce decree. And we have already established that Ex–Wife is clearly the prevailing party. We see no reason why our interpretation of § 523(a)(5) debt should differ from the Supreme Court's interpretation of § 523(a)(2)(A) debt in *Cohen.* The attorney's fees in *Cohen* and here are both based on a state statute authorizing such an award. Therefore, we interpret the § 523(a)(5) debt to encompass the attorney's fees liability that has arisen as a result of Debtor's nonpayment of the underlying debt imposed on him by the divorce decree. Based upon the Supreme Court's teachings in *Travelers* and the result it reached in *Cohen,* the attorney's fees awarded by the bankruptcy court that were incurred by Ex–Wife in the bankruptcy litigation should be affirmed.[13]

[24] However, the attorney's fees Ex–Wife incurred in state court relating to Debtor's motion to clarify the divorce decree and its ensuing appeal were not reduced to judgment in state court. The bankruptcy court is accordingly without authority to award those fees or determine them to be nondischargeable debts in this proceeding.[14] The bankruptcy court does **\*627** not have first hand knowledge of the proceedings before the state court. Therefore, it is not in the best position to determine whether those fees are legitimate and reasonable, or whether Ex–Wife was the substantially prevailing party in those proceedings. Ex–Wife must seek an award of those fees from the state court. To the extent necessary to accomplish this task, the bankruptcy court can modify the automatic stay to allow her to at least seek those fees. Additionally, should the state court award attorney's fees, it can be permitted to exercise its concurrent jurisdiction to determine whether Debtor's obligation is in the nature of support and nondischargeable under § 532(a)(5).

## V. CONCLUSION

The bankruptcy court's order is affirmed in part, and reversed in part. The bankruptcy court did not abuse its discretion in determining that payment of the second mortgage obligation was in the nature of nondischargeable support until the parties' child attained age 18. Additionally, the bankruptcy court did not abuse its discretion in denying Debtor relief from the judgment under Rule 9024 based on the grounds of surprise. Those portions of the bankruptcy court's order are affirmed. Further, the bankruptcy court's award of attorney's fees incurred by Ex–Wife in connection with litigation in bankruptcy court is also affirmed. However, that part of the bankruptcy court judgment awarding attorney's fees in connection with state court litigation must be reversed. Therefore, the bankruptcy court's order is reversed in part, with instructions to amend its judgment in accordance with this Opinion.

BERGER, Bankruptcy Judge, concurring in part and dissenting in part.

I concur with the majority's conclusion that the bankruptcy court did not abuse its discretion when it determined that the payment of the second mortgage obligation was in the nature of nondischargeable support. I respectfully disagree with the majority's conclusion that the bankruptcy court is imparted with jurisdiction to award attorney's fees attendant to § 523(a)(5) proceedings.

Generally, bankruptcy courts have refused to award attorney's fees to § 523(a)(5) prevailing parties for fees incurred in connection with litigating the issue of dischargeability. The primary reason has been lack of a specific provision under the Bankruptcy Code authorizing fee awards to prevailing creditors in § 523 dischargeability actions.[1] *Colbert v. Colbert (In re Colbert),* 185 B.R. 247, 248 (Bankr.M.D.Tenn.1995). Such rationale is compelling. Congress knows how to provide for the award of attorney's fees in bankruptcy proceedings. As eloquently stated by the court in *In re Colbert:*

> Under the well-established principle of statutory interpretation *expressio unius est exclusio alterius* [the expression of one thing is to the exclusion of the other], the inclusion of § 523(d) indicates a congressional intent that each party bear his or her own litigation costs in all other dischargeability actions.
>
> **\*628** *Id.* (footnote omitted). As further explained by the *Colbert* court, the foregoing principle has been recognized by the Supreme Court. *Id.* at 248 n. 1. Importantly, the "domestic relations exception" to federal

jurisdiction strips the federal courts of authority to grant or modify a divorce or alimony decree. *Ankenbrandt v. Richards,* 504 U.S. 689, 701–02, 112 S.Ct. 2206, 119 L.Ed.2d 468 (1992). A bankruptcy court lacks jurisdiction to issue divorce and alimony decrees, or even to entertain claims for alimony. *Id.* The domestic relations exception also prohibits consideration of child custody cases. *Id.*

The domestic relations exception emanates from *Barber v. Barber,* 62 U.S. 582, 21 How. 582, 16 L.Ed. 226 (1859), in which the Supreme Court allowed the federal district court to enforce an alimony decree. However, and most importantly, the Supreme Court issued a limitation on federal jurisdiction in the area of domestic relations:

> Our first remark is—and we wish it to be remembered—that this is not a suit asking the court for the allowance of alimony. That has been done by a court of competent jurisdiction. The court in Wisconsin was asked to interfere to prevent that decree from being defeated by fraud.

> We disclaim altogether any jurisdiction in the courts of the United States upon the subject of divorce, or for the allowance of alimony, either as an original proceeding in chancery or as an incident to divorce *a vinculo,* or to one from bed and board.

*Barber,* 62 U.S.(21 How.) at 584, quoted by the Court in *Ankenbrandt,* 504 U.S. at 694, 112 S.Ct. 2206. The Court in *Ex Parte Burrus* stated that "The whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the states, and not to the laws of the United States." 136 U.S. 586, 593–94, 10 S.Ct. 850, 34 L.Ed. 500 (1890). In *McIntyre v. McIntyre,* 771 F.2d 1316 (9th Cir.1985) (opinion of Kennedy, J.), the court stated that, "[T]he exception to jurisdiction arises in those cases where a federal court is asked to grant a decree of divorce or annulment, or to grant custody or fix payments for support...." *Id.* at 1317–18 (*cited with approval in Ankenbrandt,* 504 U.S. at 703 n. 6, 112 S.Ct. 2206).

Federal courts have jurisdiction to enforce state court orders of support. However, the federal courts lack jurisdiction to award support. In the case below, the bankruptcy court was without jurisdiction to award attorney's fees, which frequently is tantamount to the award of support,[2] which arose prior to or after the filing of the debtor's bankruptcy petition. Since none of the prepetition attorney's fees were reduced to judgment, the bankruptcy court cannot either grant or determine as nondischargeable such prepetition fees. In contrast, if the attorney's fees had been reduced to judgment by a state court of competent jurisdiction prior to the filing of the debtor's bankruptcy petition, then the bankruptcy court

would have jurisdiction to determine the dischargeability of such fees under § 523(a)(5).

The pertinent Utah statute that allows the award of costs and attorney's fees is limited to a "domestic case." The parties do not provide, and I have been unable to ascertain by independent research, what exactly constitutes a domestic case under the laws of the State of Utah. However, it is difficult to envision that dischargeability **\*629** proceedings filed in a United States bankruptcy court constitute a "domestic case" as contemplated under the Utah statutes. In *Condie v. Condie,* 139 P.3d 271 (Utah Ct.App.2006), the debtor's ex-spouse (Seals) filed an adversary proceeding under § 523(a)(15) to determine the dischargeability of debtor's hold harmless obligations to Seals under their decree of divorce. The bankruptcy court ultimately entered judgment in Seals' favor under § 523(a)(15). Upon conclusion of such adversary proceedings, Seals then asked for and was awarded attorney's fees by the state divorce court for the filing of the adversary proceeding in Condie's bankruptcy case. Condie asserted that Seals should have sought such attorney's fees in the bankruptcy court proceeding. However, the Utah court of appeals agreed with Seals' argument that such a request to the bankruptcy court would have been futile "because, as a general rule, attorney fees are not awardable under federal bankruptcy law for enforcement of obligations contained in a divorce decree." *Condie* 139 P.3d at 275. Section 523(a)(15), like § 523(a)(5), pertains to domestic relations obligations and neither contains a provision that allows the award of attorney's fees and costs by the bankruptcy court incurred incidental to the filing of an adversary proceeding to determine dischargeability. Agreeing with the court in *Dennison v. Hammond (In re Hammond),* 236 B.R. 751 (Bankr.D.Utah 1998), the Utah Court of Appeals stated that "Seals did not have a basis for receiving attorney fees in federal bankruptcy court." *Condie,* 139 P.3d at 276. The court went on to state that "We are convinced that it would have been futile for Seals to have asked for attorney fees in the bankruptcy proceedings." *Id.* The Condie court also relies upon Colbert to reach its conclusion. *Id.*

"[I]t is clear that [i]n the absence of a state supreme court ruling, a federal court must follow an intermediate state court decision unless other authority convinces the federal court that the state supreme court would decide otherwise." *Jordan v. Shattuck Nat'l Bank,* 868 F.2d 383, 386 (10th Cir.1989) (internal quotation marks omitted). *See also In re Reed,* 147 B.R. 571, 573 (D.Kan.1992) ("Fundamental to our system of federalism is the notion that state courts are the final arbiters of the State's own law. Federal courts are bound by the state court's

interpretations of their laws, absent such extreme circumstances as those involving federal constitutional issues." (internal quotation marks omitted) (citation omitted)). A non-debtor ex-spouse may not seek attorney's fees in an action under § 523(a)(15); I believe that the same prohibition applies to a proceeding initiated under § 523(a)(5). However, although the bankruptcy court is bound by substantive state law, it is not bound by a state court's determination that a bankruptcy court does not have jurisdiction to hear a particular matter.[3]

Additionally, with regard to certain facets of domestic relations and federal jurisdiction, the law pertaining to abstention by the bankruptcy court demonstrates the policy that federal courts should limit their intrusion into domestic relations. *See* 28 U.S.C. § 1334(c)(2) and *Ankenbrandt v. Richards,* 504 U.S. 689, 704–05, 112 S.Ct. 2206, 119 L.Ed.2d 468.

> [W]hen an issue exists, such as child custody, which could arguably be related **\*630** to the bankruptcy case due to its impact on the debtor's finances, or perhaps modification of a state court support order payable from property other than property of the estate, mandatory abstention may be appropriate.

*Collier Family Law and the Bankruptcy Code* ¶ 5.01[2][e], at 5–21 (Henry J. Sommer, Margaret Dee McGarity, & Alan N. Resnick eds., 2006).

The bankruptcy courts should generally defer to the special expertise held by the state courts in domestic proceedings. As stated in *Ankenbrandt* when it confirmed the continued vitality of the domestic relations exception:

> Not only is our conclusion rooted in respect for this long-held understanding, it is also supported by sound policy considerations. Issuance of decrees of this type not infrequently involves retention of jurisdiction by the court and deployment of social workers to monitor compliance. As a matter of judicial economy, state courts are more eminently suited to work of this type than are federal courts, which lack the close association with state and local government organizations dedicated to handling

issues that arise out of conflicts over divorce, alimony, and child custody decrees. Moreover, as a matter of judicial expertise, it makes far more sense to retain the rule that federal courts lack power to issue these types of decrees because of the special proficiency developed by state tribunals over the past century and a half in handling issues that arise in the granting of such decrees.

*Ankenbrandt,* 504 U.S. at 703–04, 112 S.Ct. 2206.

The Supreme Court's decision in *Travelers* does not change the foregoing analysis. The *Travelers* decision is easily distinguishable. *Travelers* emanated from the debtor's breach of a negotiated commercial contract within the confines of complex Chapter 11 proceedings and a confirmed plan of reorganization. The holding in *Travelers* is narrow:

> Accordingly, we express no opinion with regard to whether, following the demise of the *Fobian* rule, other principles of bankruptcy law might provide an independent basis for disallowing Travelers' claim for attorney's fees. We conclude only that the Court of Appeals erred in disallowing that claim based on the fact that the fees at issue were incurred litigating issues of bankruptcy law.

*Travelers Cas. & Sur. Co. v. Pac. Gas & Elec. Co.,* 549U.S. 443, —— – ——, 127 S.Ct. 1199, 1207–08, 167 L.Ed.2d 178 (2007). In *Travelers,* the respondent, for the first time and before the Supreme Court, attempted to argue that other provisions of the Bankruptcy Code established a basis upon which to disallow Travelers' claim for attorney's fees. Although these arguments may or may not have been viable, the *Travelers* Court refused to consider these new arguments that had not been raised or addressed. Hence, the holding in *Travelers* is so narrow as not to be of much utility in determining whether the bankruptcy court properly awarded attorney's fees attendant to a § 523(a) proceeding to determine dischargeability. The *Travelers* holding does not compel the conclusion that the bankruptcy court had jurisdiction to award attorney's fees. Here, the state court would be permitted to award Ex–Wife attorney's fees pursuant to Utah Code Ann. § 30–3–3(2).

The majority also cites to the Supreme Court case of *Cohen v. de la Cruz,* 523 U.S. 213, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998), as support. Again, the *Cohen* decision is distinguishable from the case below. The proceedings did not emanate from domestic relations and, hence, the domestic **\*631** relations exception would not impair the award of attorney's fees or treble damages. Although the *Cohen* decision does not reflect whether the issue of jurisdiction was raised, even if the bankruptcy court in *Cohen* held such jurisdiction, it was not constrained by the domestic relations exception.

As recently as 2006, the Supreme Court recognized the domestic relations exception to federal jurisdiction.[4] Although the *Marshall* Court emphasized that the exception applies to a narrow range of domestic relations issues, the Court reaffirmed the existence of the exception and that it applies to divorce, alimony, and child custody decrees.[5] Since the determination of the dischargeability of an obligation under § 523(a)(5) is in the nature of enforcement of a domestic relations obligation, the bankruptcy court has jurisdiction to adjudicate the matter. However, the bankruptcy court lacks jurisdiction to award attorney's fees attendant to such proceedings. This is particularly the case when the attorney's fee award does not have a statutory basis under the Code and is predicated on a state attorney fee statute limited to a "domestic case." The award of such attorney's fees are in the nature of support and the bankruptcy court is specifically deprived of jurisdiction to award such fees; in the alternative, the award of attorney's fees is without the bankruptcy court's jurisdiction in that it constitutes a *de facto* divorce or support decree.

The attorney's fees Ex–Wife incurred in state court relating to Debtor's motion to clarify the divorce decree and its ensuing appeal were not reduced to judgment in state court. The bankruptcy court is accordingly without authority to award those fees or determine them to be nondischargeable debts in this proceeding.[6] Ex–Wife must seek an award of prepetition and postpetition attorney's fees and costs from the state court, whether such were incurred in state court or bankruptcy court proceedings. To the extent necessary to accomplish this task, the bankruptcy court can modify the automatic stay or discharge injunction to allow Ex–Wife to seek those fees. Additionally, should the state court award attorney's fees, it can exercise its concurrent jurisdiction to determine whether Debtor's obligation is in the nature of support and nondischargeable under § 532(a)(5). The bankruptcy court's intrusion into state domestic relations law by awarding attorney's fees is an act that the Supreme Court has warned off the federal courts for almost 150 years. The Supreme Court's decisions in *Travelers* and *Cohen* do not affect 150 years of jurisprudence that underpin the domestic relations exception to federal jurisdiction.

For the foregoing reasons, I concur in part and respectfully dissent in part.

**Parallel Citations**

57 Collier Bankr.Cas.2d 202

Footnotes

[1]   Honorable Robert D. Berger, United States Bankruptcy Judge, United States Bankruptcy Court for the District of Kansas, sitting by designation.

[2]   Unless otherwise specified, all references are to sections of the Bankruptcy Code, Title 11 of the United States Code. Additionally, all references are to the Code prior to its amendment by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA).

[3]   The attorney's fees were reduced to judgment in state court. Judge Clark allowed only those fees incurred prepetition because the state court litigation that continued postpetition was in violation of the automatic stay.

[4]   Although these fees related to an order to show cause dealing with child support and the collection of child support, based on a review of the record, it does not appear that these attorney fees were actually awarded by the state court. *See Transcript of March 15, 2002, Hearing on Objection to Claim # 7 Filed by Cindy Busch and Objection to Trustee's Motion to Dismiss and Motion to Abate* at 29–30, 89, *in* Appellee's App. at 227–28, 287.

[5]   The divorce decree awarded Debtor equity in the marital residence that became payable upon Ex–Wife's remarriage. Ex–Wife remarried on September 19, 2000. Ex–Wife was seeking to have Debtor's award of equity terminated based on his non-payment of the second mortgage obligation.

6    Pursuant to Utah Code Ann. § 30–3–5(9) (2005), alimony terminates upon remarriage unless otherwise specified by the divorce decree. The parties' divorce decree does not specify that alimony survives remarriage. It is not clear why Debtor did not argue that the obligation was in the nature of debt allocation as determined by the Utah state court.

7    The payments were intended to be made to the mortgage company but when Debtor failed to make them, Ex–Wife was forced to make them to avoid foreclosure. Therefore, Debtor made payments to Ex–Wife to reimburse for those payments.

8    The parties argue various other standards of review are applicable to the specific issues on appeal. Those standards would be applicable had Debtor taken direct appeal of the bankruptcy court's decision. However, because the order being reviewed is in response to Debtor's motion made pursuant to Rules 7052 and 9024, the correct standard of review is abuse of discretion.

9    At trial, Ex–Wife introduced evidence that she had actually incurred attorney's fees and costs totaling $199,575.82 in litigation with Debtor stemming from the divorce decree. *See Memorandum Decision* at 13 n. 15, *in* Appellant's App. Vol. I at 147. This is not surprising considering that following the entry of the divorce decree, Debtor commented that he would never pay a dime of the obligations. *See Transcript of December 20, 2005, Bench Trial* at 5, *ll.* 5–7, *in* Appellant's App. Vol. I at 61.

10    Ex–Wife was also awarded attorney's fees by Judge Clark in Debtor's first Chapter 13 case in the amount of $5,118.80. These fees were incurred in collecting arrearages under the divorce decree and had been reduced to judgment in state court. Therefore, Judge Clark found them to be in the nature of nondischargeable support. *See Transcript of Proceedings held March 13, 2001,* at 47–48, *in* Appellant's App. Vol. II at 396–397; *Order on Order to Show Cause In Re: Contempt and Child Support and Alimony Arrearages* at 4–5, *in* Appellee's App. at 49–50. In Debtor's second Chapter 13, Judge Boulden also awarded Ex–Wife attorney's fees in the amount of $957.65. These fees related to an order to show cause dealing with child support and the collection of child support in state court. Based on the record, however, it does not appear that these attorney fees were ordered by the state court. *See Transcript of March 15, 2002, Hearing on Objection to Claim # 7 Filed by Cindy Busch and Objection to Trustee's Motion to Dismiss and Motion to Abate* at 29–30, 89, *in* Appellee's App. at 227–28, 287. Regardless, these attorney's fees awards are not issues on appeal because Debtor stipulated to the fees as nondischargeable and the bankruptcy court ordered that the stipulated fees were nondischargeable in its October 4, 2005, summary judgment ruling.

11    However, § 523(d) allows for debtor attorney's fees if the debtor successfully shows that a creditor was not substantially justified when it requested a determination of dischargeability of consumer debt.

12    N.J. Stat. Ann. §§ 56:8–2, 56:8–19 (West 1989).

13    We note, however, that the attorney's fees awarded by the bankruptcy court cannot be allowed as a claim against the estate because such claim would be for a debt that was unmatured on the date of the filing of the petition and is excepted from discharge under § 523(a)(5). *See* § 502(b)(5); *Lawrence v. Lawrence (In re Lawrence),* 237 B.R. 61, 86 (Bankr.D.N.J.1999).

14    Had the attorney's fees been reduced to judgment in state court, there would be ample authority for the bankruptcy court to determine they are not nondischargeable so long as they are in the nature of support. *See, e.g., Jones v. Jones (In re Jones),* 9 F.3d 878 (10th Cir.1993); *Polishuk v. Polishuk (In re Polishuk),* 243 B.R. 408 (Bankr.N.D.Okla.1999).

1    For example, § 523(d) allows for the award of attorney's fees to a prevailing debtor arising out of a proceeding to determine the dischargeability of a debt under the fraud exception set out in § 523(a)(2), and § 506(b) allows an oversecured creditor to recover reasonable attorney's fees and costs under certain circumstances. No such attorney's fees provisions are found in either § 523(a)(5) or § 523(a)(15).

2    *See, e.g., Jones v. Jones (In re Jones),* 9 F.3d 878 (10th Cir.1993), wherein the court found that court-ordered attorney's fees arising from postdivorce custody actions are in the nature of support.

3    *See Marshall v. Marshall,* 547 U.S. 293, 126 S.Ct. 1735, 1749–50, 164 L.Ed.2d 480 (2006). *See also Ankenbrandt v. Richards,* 504 U.S. 689, 112 S.Ct. 2206, 119 L.Ed.2d 468 (1992), wherein the Supreme Court did not determine that the domestic relations exception deprived the federal courts of jurisdiction over a state law tort claim between ex-spouses.

4    *Marshall v. Marshall,* 547 U.S. 293, 126 S.Ct. 1735, 1746, 164 L.Ed.2d 480 (2006).

5    *Id.*

6    *See* majority Opinion at n. 14.

**In re Busch, 369 B.R. 614 (2007)**

57 Collier Bankr.Cas.2d 202

---

**End of Document**                                   © 2015 Thomson Reuters. No claim to original U.S. Government Works.

516 B.R. 221
United States Bankruptcy Court,
E.D. New York.

In re: Rubin Family Irrevocable Stock Trust et al.,
Debtor.

Case No. 813-72193-reg (Jointly administered) |
Signed September 19, 2014

### Synopsis

**Background:** Oversecured judgment creditor asserted claim, which included claim for attorney fees and costs incurred postpetition as specifically authorized in district court judgments. Chapter 11 debtors objected.

**Holdings:** The Bankruptcy Court, Robert E. Grossman, J., held that:

[1] federal district court judgments awarding judgment creditor attorney fees and costs that it incurred to collect judgment were res judicata on creditor's right to such collection costs, including collection costs incurred postpetition after judgment debtors had filed for Chapter 11 relief;

[2] creditor was entitled only to unsecured claim for such postpetition fees and costs; and

[3] "reasonableness" standard for allowance of such fees and costs on secured basis, if oversecured creditor's right to such fees and costs had arisen under contract or state statute, did not apply.

So ordered.

### Attorneys and Law Firms

**\*222** Ashley Koenen, Nancy L. Kourland, Sanford P. Rosen, Rosen & Associates PC, New York, NY, Paul Rachmuth, Rockville Centre, NY, for Debtor.

**Chapter 11**

**MEMORANDUM DECISION**

Robert E. Grossman, United States Bankruptcy Judge

Before the Court is the Debtors' motion objecting to the proofs of claim filed by ACE Investors, LLC ("ACE"), and seeking to disallow any claim by ACE for attorneys' fees and costs incurred post-petition.[1] The parties have stipulated that ACE is entitled to an allowed pre-petition claim in the amount of $3,464,365.13, less certain costs incurred by ACE attributable to expert witness fees.[2] They also have stipulated that ACE's collateral "has a value greater than the ACE Claim ... [and] [i]n accordance with section 506(a)(1) of the Bankruptcy Code, and for all purposes in the Debtors' chapter 11 cases, the ACE Claim is secured in an amount equal to the amount of the ACE Claim." [Dkt. # 294, ¶ 3, 4]. On August 8, 2014, ACE filed a Supplemental Proof of Secured Claim amending its proofs of claim and asserting that it is entitled to a fully secured claim in the amount of $5,170,953.83, which includes post-petition attorneys' fees, expenses and interest through and including September 8, 2014. [Dkt. # 281].

The question for this Court to decide is whether, under sections 502 and 506 of the Bankruptcy Code, an oversecured[3] creditor **\*223** in a chapter 11 case can assert a claim, as that term is defined in section 101(5) of the Code, for post-petition attorneys' fees' and costs where the right to such fees and costs is set forth, not in a contract or statute, but in an otherwise enforceable and final pre-petition judgment; and if that claim is allowable under section 502, whether it is entitled to secured status under section 506(b). The distinction between the secured or unsecured status of the claim, if it is even allowable in the bankruptcy, makes a difference if the Debtors propose less than a 100% distribution to all creditors. Although the Debtors' proposed plan of reorganization, as drafted, and as indicated by the Debtors since the inception of this case, proposes to pay creditors 100%, the Debtors' counsel explained for the first time at a hearing on September 8, 2014, that the plan might not pay 100% if the amount of the ACE claim exceeds a certain amount. Thus, the determination of secured or unsecured status is necessary.

On September 8, 2014, the Court gave a preliminary ruling on the Debtors' objection to ACE's claim and indicated that a written decision would follow. The Court finds that the April 23, 2013 and May 8, 2013 Orders and Judgments of the District Court for the Southern District

of New York, together created a liquidated judgment against the Debtors'[4] in the amount of $3,464,365.13, and established an unliquidated liability for "all attorneys' fees and costs of [ACE's counsel] to collect the Augmented Judgment ... until the judgment has been fully satisfied." These orders are final, non-appealable and fully enforceable against the Debtors[5] and are entitled to *res judicata* effect in this Court. Section 502 provides the basis for this Court to disallow a validly and timely filed proof of claim, and there is no basis in section 502 to disallow ACE's claim for post-petition attorneys' fees and costs to collect the judgment based upon the prior District Court orders. As such ACE's claim shall include attorneys' fees and costs "to collect the Augmented Judgment". This does not answer the secondary question of whether ACE is entitled to assert secured status with respect to the post-petition attorneys' fees and costs allowed under section 502. Under section 506(b) an oversecured creditor is entitled to a secured claim for "any *reasonable* fees, costs or charges provided for under the *agreement or State statute* under which such claim arose." 11 U.S.C. § 506(b) (emphasis added). This Court finds that because ACE's entitlement to post-petition attorneys' fees and costs is premised upon the existence of a judgment, as opposed to an agreement or State statute, the claim for post-petition attorneys' fees and costs should not be given secured status under section 506(b). Because **\*224** the Court will not be examining ACE's post-petition attorneys' fees and costs under the lens of section 506(b), the "reasonableness" of the fees and costs is not an issue; rather, the standard to be applied to determine the allowance or disallowance of the claim under section 502 is that which is delineated in the Judgment, i.e., this Court will allow only those attorneys' fees and costs which it finds were incurred to "collect the Augmented Judgment."

ACE shall have a secured claim in these cases for at least the stipulated amount of $3,464,365.13, less expert witness fees, and will be entitled to an unsecured claim for the amount of post-petition attorneys' fees and costs it incurred to "collect the Augmented Judgment."

### *Facts*

On May 17, 2010, a stipulated judgment was entered against one of the debtors, Rubin Family Irrevocable Stock Trust ("Stock Trust"), in the District Court for the District of Utah in the original amount of $1,174,426.46, plus $392,805.94 in interest, plus $164,418.97 in attorneys' fees and costs, for a total judgment amount of $1,731,651.37 ("Utah Judgment"). The Utah Judgment

also awarded, prospectively, "attorneys fees to collect the judgment." The Utah Judgment is final and non-appealable.

ACE subsequently domesticated the Utah Judgment in the Southern District of New York and pursued enforcement proceedings against the Stock Trust and related entities and individuals. In an Order and Judgment, dated April 23, 2013, the District Court for the Southern District of New York ("Southern District Court") added interest to the Utah Judgment, from May 1, 2010 to April 22, 2013, in the amount of $628,472.01. The District Court also augmented the Utah Judgment "to add all attorneys' fees and costs related to collection of the Judgment through the present proceedings.... [and] further augmented [the Utah Judgment] to add all attorneys' fees and costs related to the action in the United States District Court for the District of Utah contingent on any order or determination issued by that Court...."[6] (the "Augmented Judgment").

In the April 23, 2013 Order and Judgment, the Southern District Court also found the following related entities to be jointly and severally liable for the Augmented Judgment: the Stock Trust, Rubin Family Irrevocable Marital Trust ("Marital Trust")[7], the Rubin Family Irrevocable Realty Trust ("Realty Trust"), Robert Michael Rubin, individually ("Robert"), and Margery Rubin, individually ("Margery"). Finally, the Southern District Court held, "[s]ubject to an appeal, the Augmented Judgment shall be further augmented by adding interest from April 22, 2013 onwards at a rate of 12% interest and for all attorneys' fees and costs of Windels Marx and Parsons Behle to collect the Augmented Judgment (the "Final Augmented Judgment") until the judgment has been fully satisfied." In addition to adding the $628,472.01 in interest to the Utah Judgment, the April 23rd Order and Judgment also created a yet unliquidated liability for ACE's attorneys' fees and costs to collect the Augmented Judgment and specifically contemplated the entry of a subsequent "Augmented Judgment" and "Final Augmented Judgment."

**\*225** On April 27, 2013, before the Augmented Judgment or Final Augmented Judgment could be entered liquidating the amount of attorneys' fees and costs to be awarded under the April 23rd Order and Judgment, the Stock Trust, the Realty Trust and Margery filed for protection under chapter 11 of the Bankruptcy Code.

On May 8, 2013, the Southern District Court, recognizing that the bankruptcy filings by the Stock Trust, Realty Trust and Margery stayed the entry of judgment against those entities, entered the Augmented Judgment only as

against Robert Rubin, individually, in the amount of $3,464,365.13, "together with 12% compound interest, until paid." The Southern District Court further stated that, "[ACE] may petition this Court in the future for further augmentation of the Augmented Judgment for interest, costs and attorneys fees to collect the Judgment." (emphasis added).

Robert Rubin filed a chapter 11 petition on June 16, 2013.

The Debtors appealed the April 23rd and May 8th Orders and Judgments to the Second Circuit Court of Appeals. On the Debtors' motion, this Court lifted the stay imposed by section 362(a) of the Bankruptcy Code and allowed the parties to proceed with the appeal. On April 17, 2014, the Second Circuit affirmed the April 23rd and May 8th Orders and Judgments. The Circuit affirmed the finding of joint and several liability contained in the April 23rd Order, and affirmed the District Court's award of attorneys' fees. The Circuit vacated the Augmented Judgment only to the extent it improperly awarded ACE its expert witness fees, and remanded "so that the district court may correspondingly revise the Augmented Judgment."

On February 13, 2014, ACE filed two proofs of claim in each of these cases—one secured and one unsecured—asserting a claim against each Debtor in the amount of $3,464,365.13—the amount of the liability determined up to and including the May 8th Augmented Judgment. Although not included within the claims as originally filed, ACE also argues that it is entitled to be paid post-petition interest, post-petition attorneys' fees and post-petition costs—which are laid out in ACE's supplement to its proof of claim, filed on August 8, 2014. According to ACE, its claim as so augmented would amount to $5,170,953.83[8] through and including September 8, 2014, with interest, attorneys' fees and costs continuing to accrue until final payment has been made.

On May 15, 2014, the Debtors objected to ACE's claim, but solely to the extent that the claim seeks post-petition attorneys' fees and costs to collect the pre-petition judgment. The Debtors' primary argument in the original objection was that the New York Debtor and Creditor Law section 276–a, upon which the Southern District Court based its award of attorney fees' and costs, only allows such fees and costs to accrue up to the point of judgment. The Debtors also argue that even if fees and costs were allowable past the point of the judgment, the filing of the bankruptcy prohibits ACE's collection of such fees and costs. Although the Debtors argue that *post-judgment* fees are improper under the statute, their moving papers conclude by asking this Court to "exclude

all post-petition date attorneys' fees and costs ..." [Dkt # 237–1 at 10]. It was **\*226** subsequently clarified at a hearing held on June 16, 2014, that the Debtors are objecting only to the inclusion of *post-petition* attorneys' fees and costs, rather than *post-judgment*. The Sixth Amended Joint Plan of Reorganization, filed by the Debtors on June 30, 2014 concedes that ACE has a claim in the amount of $3,464,365.13 (less expert witness fees disallowed by the Circuit) plus interest at 12% per annum from the date of the ACE judgment to the payment date, and the only open issue is "such additional amounts, if any, that the Bankruptcy Court allows on account of legal fees incurred by ACE subsequent to the date of the ACE Judgment." [Dkt # 265, ¶ 1.3].

ACE responds to the Debtors' objection to claim arguing primarily that the Southern District Court's orders awarding them attorneys' fees and costs through the date of collection are *res judicata* and any finding by this Court that ACE is not entitled to assert a claim for attorneys' fees and costs up through the point of collection would be an improper collateral attack on valid and enforceable orders of the Southern District Court. ACE also argues that the Debtors' interpretation of the N.Y. DCL 276–a is wrong, but in any event, is irrelevant because the Southern District Court's order is final and non-appealable and must be upheld by this Court. Absent any basis for finding ACE's claim unenforceable outside of bankruptcy, ACE argues that there must be some basis under the Bankruptcy Code to disallow a claim for post-petition attorneys' fees and costs—and, they argue, there is none. *See Travelers Casualty & Surety Co. of America v. Pacific Gas & Electric Co.,* 549 U.S. 443, 127 S.Ct. 1199, 167 L.Ed.2d 178 (2007); *Ogle v. Fid. & Deposit Co. of Maryland,* 586 F.3d 143 (2d Cir.2009); 11 U.S.C. § 502(b).

### *Analysis*

The allowance and disallowance of claims against a bankruptcy estate are governed by section 502 of the Bankruptcy Code. Section 502 provides that:

(a) a claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, ... objects.

(b) Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section, *if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim... as of the date of the filing of the petition, and shall allow such claim in*

*such amount,* except to the extent that—

... (1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured; [or]

... (2) such claim is for unmatured interest; ....

11 U.S.C. § 502(a) and (b)(1), (2) (emphasis added).

A "claim" means "a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured ..." 11 U.S.C. § 101(5).

[1]Consistent with section 502, it is a well-excepted principal that claims enforceable under applicable non-bankruptcy law will be allowed in bankruptcy unless they are expressly disallowed under section 502. *Travelers Casualty & Surety v. Pacific Gas & Electric Co.,* 549 U.S. 443, 127 S.Ct. 1199, 167 L.Ed.2d 178 (2007). With respect to the specific issue of an unsecured creditor's right to assert a claim in bankruptcy for post-petition attorneys' fees and costs, the Supreme Court in *227 *Travelers v. PG & E,* held that a creditor was not precluded from asserting an unsecured claim for *post-petition* attorneys' fees, as long as that creditor has an enforceable basis—under a contract in that case—to assert such a claim. The *Travelers* decision was based on the Court's interpretation of section 502(a) and (b), as well as the definition of claim in section 101 of the Bankruptcy Code, and relied in part on the general presumption "that claims enforceable under applicable state law will be allowed in bankruptcy unless they are expressly disallowed." *Travelers,* 549 U.S. at 452–53, 127 S.Ct. 1199 (citing 11 U.S.C. § 502(b)).

[2]Subsequent to the *Travelers* decision, the Second Circuit in 2009 held that an unsecured creditor was entitled to recover post-petition attorneys' fees that were authorized by an otherwise enforceable prepetition contract of indemnity but which were contingent on post-petition events. *Ogle v. Fidelity & Deposit Co.,* 586 F.3d 143 (2d Cir.2009). In *Ogle,* the Circuit held that "an unsecured claim for post-petition fees, authorized by a valid pre-petition contract, is allowable under section 502(b) and is deemed to have arisen pre-petition." *Ogle,* 586 F.3d at 147. In *Ogle,* the Court of Appeals addressed one argument that the Supreme Court failed to address in *Travelers;* that is, whether section 506(b) which allows post-petition fees and costs to the oversecured creditor dictates the conclusion that unless a creditor qualifies under section 506(b), that creditor cannot be entitled to

post-petition fees and costs. The Second Circuit concluded that it did not. *Ogle,* 586 F.3d at 148 ("... [W]e hold that section 506(b) does not implicate unsecured claims for post-petition attorneys' fees, and therefore interposes no bar to recovery."). *See also In re SNTL Corp.,* 380 B.R. 204 (9th Cir. BAP 2007) (finding section 506 to be "irrelevant to determining the allowability of an unsecured claim", and relying solely on section 502 to determine allowance of post-petition attorney fees and costs).

Although the Second Circuit appears to hold the minority view on this issue, it is nonetheless precedent which is binding on this Court. *See, e.g., In re Seda France, Inc.,* No. 10–12948, 2011 WL 3022563, slip op. at 1 (Bankr.W.D.Tex. July 22, 2011) (stating that a majority of courts hold that an "unsecured creditor is not entitled to collect post-petition attorneys' fees, costs, and other similar charges—even if there is an underlying contractual right to do so.") (citing *In re Electric Machinery,* 371 B.R. 549 (Bankr.M.D.Fla.2007)).

Although the facts of both *Ogle* and *Travelers* involved pre-petition contracts upon which the claim to attorneys' fees was based, the holdings of those cases also extend to claims for attorney fees' and costs which are based upon statute. *See Travelers,* 549 U.S. at 448, 127 S.Ct. 1199 (explaining that the "American Rule" can be overcome by statute or enforceable contract). As conceded by ACE, its claim for post-petition attorneys' fees and costs is not based upon a pre-petition contract, nor is it based upon any statute allowing for the recovery of same. Rather, ACE's claim for post-petition attorneys' fees and costs is based upon the pre-petition orders and judgments of both the Utah District Court and the Southern District Court, as subsequently affirmed by the Court of Appeals for the Second Circuit. Both *Travelers* and *Ogle* contain language which seems to limit the unsecured creditor's claim for post-petition attorneys' fees and costs to those which are based upon a valid pre-petition contract or statute. The decisions are silent as to valid and enforceable pre-petition judgments. However the very logic of the opinions, and the plain language of sections 101(5) and 502(b)(1), *228 seems to make clear that a creditor's claim predicated on a final and enforceable pre-petition judgment must be treated the same way.

[3]The Utah Judgment imposed liability, albeit an unliquidated liability, against the Stock Trust for "attorneys fees to collect the judgment." Neither party disputes that the Utah Judgment is final and non-appealable. Therefore, the Utah Judgment is *res judicata* on the issue of the Stock Trust's unliquidated liability to ACE for "attorneys fees to collect the

judgment." Most importantly, the Utah Judgment is, except for the stay imposed by these bankruptcy filings, enforceable. Section 101(5) defines a "claim" as any right to payment, including a right to payment that is unliquidated on the petition date. Section 502(b)(1) requires this Court to disallow any claim which is *unenforceable* against the debtor. Although this Court could find no caselaw authority to extend the rule of *Travelers* and *Ogle* to claims based upon an enforceable pre-petition judgment as opposed a contract or statute, the language of section 502(b)(1) and the reasoning supporting both *Travelers* and *Ogle,* lead this Court to conclude that the rule should be so extended. This Court cannot find that ACE's claim for "attorneys fees to collect the [Utah] judgment" is "unenforceable ... under any agreement or applicable law," 11 U.S.C. § 502(b)(1), nor is there otherwise any basis to disallow such claim under another subsection of 502(b).

Similarly, the April 23rd Order and Judgment imposed an unliquidated liability against the Stock Trust, Realty Trust, Robert and Margery, for "all attorneys fees and costs related to collection of the Judgment through the present proceedings ... [plus] all attorneys' fees and costs related to the [Utah action] contingent on any order or determination issued by that Court." The dollar amount of the liability established by the April 23rd Order and Judgment was liquidated in the May 8th Augmented Judgment, but only as against Robert.[9] Nonetheless, the Debtors have stipulated that the $3,464,365.13 liability established against Robert only in the May 8th Augmented Judgment, will be allowed against all of the Debtors. This agreement is reflected in the latest iteration of the Debtors' plan of reorganization.

The April 23rd Order and Judgment also established further liability as against the Stock Trust, Realty Trust, Margery and Robert "for all attorneys' fees and costs of Windels Marx and Parsons Behle to collect the Augmented Judgment ("The Final Augmented Judgment") until the judgment has been fully satisfied." The April 23rd Order and Judgment, affirmed by the Second Circuit, is final and therefore is *res judicata* on the issue of the Stock Trust, Realty Trust, Margery and Robert's liability for the attorneys' fees and costs of Windels Marx and Parsons Behle to collect the Augmented Judgment "until the judgment has been fully satisfied". Although the attorneys' fees and costs of Windels Marx and Parsons Behle through April 22, 2013

were included in the Augmented Judgment, such fees and costs remain unliquidated beyond April 22, 2013. Although the liability remains unliquidated it is nonetheless a valid pre-petition liability for which ACE may assert a **229** claim in this bankruptcy case. ACE's supplemental proof of claim filed on August 8, 2014 would liquidate and further augment the judgment in the total amount of $5,170,704.67. The sole issue to be determined in this case going forward is whether and to what extent the attorneys' fees and costs sought by ACE in its supplemental proof of claim, dated August 8, 2014 [Dkt # 282] constitute fees and costs of the named counsel "to collect the Augmented Judgment ..." The Debtors have retained their right to argue that certain of ACE's fees and costs in connection with this bankruptcy case do not qualify as costs of "collection".

[4]ACE's argument that it is entitled to secured status for the amount of its post-petition attorneys' fees and costs under section 506, fails. Section 506(b) specifically grants secured status to the oversecured creditor for "any reasonable fees, costs, or charges *provided for under the agreement or State statute under which such claim arose*." (emphasis added). As this Court found, ACE's claim in this case arises from the April 23rd and May 8th Orders and Judgments of the Southern District Court, not from an agreement or State statute. Thus section 506(b) does not apply.

### Conclusion

[5]Having determined that ACE is entitled to assert a claim in this case which includes post-petition attorneys' fees and costs associated with collecting the Augmented Judgment, this matter will be adjourned for further proceedings to finally determine the amount of ACE's claim; specifically to determine to what extent ACE's post-petition attorneys' fees and costs were incurred to "collect the Augmented Judgment." In this regard, the Debtors have retained the right to dispute certain, or all, of ACE's post-petition attorneys' fees and costs on the basis that some or all of those fees and costs were not incurred to "collect the judgment."

Footnotes

1    Also pending is ACE's related motion for relief from stay to permit it to return to the District Court for the Southern District of
     New York in order to augment its pre-petition judgment against the Debtors to seek post-judgment attorneys' fees and costs. The
     Debtor opposed the motion and argued that the Bankruptcy Court is the appropriate forum to liquidate ACE's claim. The parties

have now resolved this dispute and consent to this Court's liquidation of the amount of ACE's claim which would negate any need to return to the District Court.

[2] ACE claims that the expert witness fee reduction should be $33,762.50, thus reducing the stipulated amount of ACE's claim to $3,430,602.63. [Dkt # 281].

[3] The Court presumes for purposes of this Decision that ACE is oversecured, but recognizes that the parties might not concede this point. The parties' stipulation is inconsistent on this point. The stipulation provides both that the collateral value is *greater than* $3,464,365.13, and that ACE is secured "in an amount equal to" $3,464,365.13. However, as will be seen later in this Decision, the distinction between secured and oversecured does not matter in this case because the Court finds that section 506(b) does not apply where, as here, the claim to post-petition attorneys' fees and costs does not arise from contract or statute as required by section 506(b).

[4] As discussed later in this Decision, the Court recognizes that the judgment is not against all Debtors. However, the Debtors have proposed a joint plan which proposes to pay the amounts due under the Orders and Judgments jointly.

[5] Again, the Court recognizes that the Orders and Judgments were not entered as against all Debtors. However, the Debtors at all times in this case have proposed to treat these Debtors as jointly liable, assuming that the finding of joint and several liability was upheld by the Second Circuit, which it was.

[6] The Utah Court subsequently declined to consider any further proceedings in that case, and marked the matter closed.

[7] The Marital Trust is not a debtor before this Court.

[8] This number includes a $33,762.50 reduction in the claim amount for expert witness fees which were disallowed by the Circuit Court. To the extent the Debtors disagree with the amount of ACE's allowance for expert witness fees, that will be the subject of further proceedings before this Court to finally liquidate the amount of the claim.

[9] The Debtors argue that the language in the May 8th Augmented Judgment giving permission to ACE to petition that Court for further augmentation of the Augmented Judgment for attorneys' fees and costs to collect the Judgment means that the future fees and costs were not actually awarded, but rather was subject to further application, and the right to seek further application was cut off by the bankruptcy. This argument ignores the prior finding of liability for same contained in the April 23rd Order and Judgment.

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

488 B.R. 441
United States Bankruptcy Court,
C.D. California,
Los Angeles Division.

In re Idalia Roxana CASTILLO, Debtor(s).

No. 2:12–bk–15913–BB. | March 8, 2013.

### Synopsis

**Background:** Chapter 11 debtor objected to postpetition interest and attorney fees included in amended proof of claim filed by undersecured creditor that had made statutory election.

**Holdings:** The Bankruptcy Court, Sheri Bluebond, J., held that:

[1] undersecured creditor that had made statutory election to have its claim treated as fully secured was entitled to include, in amount of its secured claim, attorney fees that it was entitled to recover under terms of its prepetition contract with debtor, even attorney fees relating to postpetition period, but

[2] creditor was not entitled to include in amount of its secured claim a claim for postpetition interest.

Sustained in part and overruled in part.

### Attorneys and Law Firms

**\*442** Giovanni Orantes, Orantes Law Firm, P.C., Los Angeles, CA, for Debtor.

### MEMORANDUM DECISION SUSTAINING IN PART DEBTOR'S OBJECTION TO ALLOWANCE OF SECURED CREDITOR'S CLAIM

SHERI BLUEBOND, Bankruptcy Judge.

Debtor and debtor in possession Idalia Roxana Castillo (the "Debtor") owns rental property located at 38563 Larkin Avenue, Palmdale, California 93550 (the "Property"), which the Court has valued for plan purposes by order entered July 11, 2012 at $500,000.[1] Deutsche Bank National Trust Company ("Deutsche") holds a first deed of trust against the Property to secure the repayment of a promissory note in the approximate principal amount of $1,031,330.56.

The Debtor filed her Second Amended Chapter 11 Plan of Reorganization [docket no. 131] on October 31, 2012 (the "Plan"). Deutsche made a timely election of the application of Bankruptcy Code section 1111(b)(2) with regard to its Class 6 claim under the Plan. The original proof of claim that Deutsche filed in the above chapter 11 case in June of 2012 reflects a total claim of $1,072,498.04. On December 13, 2012, Deutsche filed an amended proof of claim (the "December Claim") that increased the total amount due Deutsche to $1,207,652.57. Other than certain post-petition real property taxes and insurance payments that are no longer the subject of a dispute[2], the parties agree that the only difference between Deutsche's two proofs of claim is that the December Claim includes post-petition interest and post-petition attorneys' fees.

**\*443** The Debtor filed an objection to the December Claim, arguing, among other things, that, notwithstanding its 1111(b) election, Deutsche may not include post-petition interest and post-petition attorneys' fees in the amount of its secured claim. For the reasons set forth below, the Court holds that the foregoing objection should be sustained in part and overruled in part: Deutsche may include in the amount of its section 1111(b) secured claim post-petition attorneys' fees, but not post-petition interest.

Having made an 1111(b) election, Deutsche holds a secured claim "to the extent that such claim is allowed" pursuant to Bankruptcy Code section 502. 11 U.S.C. § 1111(b)(2). And pursuant to Bankruptcy Code section 502 and the Ninth Circuit's reasoning in *SNTL Corp. v. Centre Ins. Co. (In re SNTL Corp.),* 571 F.3d 826 (9th Cir.2009), Deutsche's claim for post-petition attorneys' fees should be allowed pursuant to section 502(b). Deutsche's claim for interest that was unmatured as of the petition date, on the other hand, should not. 11 U.S.C. § 502(b)(2). Therefore, the amount of Deutsche's 1111(b)(2) secured claim should include post-petition attorneys' fees, but not post-petition interest.

I

*In re Castillo, 488 B.R. 441 (2013)*

57 Bankr.Ct.Dec. 207

## PROCEDURAL HISTORY

The Debtor filed for protection under chapter 11 of Title 11 of the United States Code on February 20, 2012, commencing the above chapter 11 case (the "Case"). The Debtor filed a motion to value the Property for plan purposes at $500,000 on May 9, 2012. [Docket No. 55.] The Debtor also sought in that motion to bifurcate Deutsche's claim into secured and unsecured portions. The Court granted the Debtor's motion to the extent that it sought to value the Property at $500,000 for plan purposes but denied the balance of the relief requested in that motion without prejudice to the Debtor's ability to propose any appropriate treatment in a plan of reorganization based upon the foregoing valuation. *[Order Granting in Part and Denying in Part Debtor's Motion to Value Collateral under* Section 506(a) *for Purposes of Chapter 11 Plan Confirmation on the Real Property Located at 38563 Larkin Avenue, Palmdale, CA,* Docket No. 94.]

The Court set a bar date for the filing of proofs of claim in the Case of June 29, 2012. *[Order On Debtor's Chapter 11 Status Conference and Scheduling Order,* Docket No. 86.] Deutsche was served with the notice of bar date on April 16, 2012 [*Notice of Claims Deadline,* Docket No. 48, p. 6] and filed its first proof of claim, designated claim no. 7 (the "June Claim"), on June 29, 2012. In the June Claim, Deutsche asserted a secured claim for $1,072,498.94.

The Debtor filed a chapter 11 plan of reorganization and an accompanying disclosure statement on July 27, 2012. [Docket nos. 99 and 100.] Deutsche's secured claim with regard to the Property was identified as a Class 5 claim under the original version of the Debtor's plan. Deutsche

made a timely election to have its entire claim treated as a fully-secured claim under Bankruptcy Code section 1111(b) on August 21, 2012. [*Notice of Secured Creditor Deutsche Bank National Trust Company's Election Under* 11 USC § 1111(b), Docket No. 106.]

Following a September 7, 2012 hearing on the Debtor's original disclosure statement, the Debtor filed her first amended plan and disclosure statement on September 26, 2012. [Docket nos. 117 and 118.] In this version of the Debtor's plan and in all subsequent versions, Deutsche's secured **\*444** claim with regard to the Property was placed in Class 6. The Debtor filed her second amended plan and second amended disclosure statement on October 31, 2012. [Docket Nos. 130 and 131.] The Court approved the Debtor's second amended disclosure statement by order entered November 8, 2012 [docket no. 139] and set a confirmation hearing for January 10, 2013.

On December 13, 2012, Deutsche filed the December Claim, increasing the total amount of its claim to $1,207,652.57, and objected to confirmation of the Debtor's plan on several grounds. One of these grounds was that the aggregate of the payments contemplated by the plan for Deutsche's Class 6 claim did not equal or exceed the face amount of Deutsche's claim, as required by section 1111(b). [*Deutsche Bank National Trust Company's Objection to Confirmation of Debtor's Second Amended Chapter 11 Plan,* Docket no. 151.] The "Claim Attachment Sheet" that accompanied the December Claim reflected the following itemization of the amounts sought in the December Claim:

| | |
|---|---|
| Principal Balance | $1,031,330.56 |
| Scheduled Interest Due | 64,083.91 |
| Default Interest @ 5% ($143.24 per diem) | 56,579.94 |
| Property Tax Advance (in addition to amounts available in tax escrow) | 6,946.74 |
| Property Insurance Advance | 1,647.07 |

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.    2

| Late Charges | 3,986.64 |
| Legal Fees | 44,077.71 |
| TOTAL: | $1,207,652.57 |

The Debtor filed a motion to disallow the December Claim on January 4, 2013 [Docket No. 158] (the "Claim Objection"). In the Claim Objection, the Debtor argued that the December Claim should be disallowed because it: (1) was late-filed (having been filed months after the June 29, 2012 bar date); (2) did not include the original or a duplicate of the writing upon which it was based; (3) failed to include an itemized list of prepetition interest, fees, expenses or other charges as required by Federal Bankruptcy Rule 3001(c)(2)(A); (4) had not been filed along with a statement of the amount necessary to cure any default as of the date of the petition as required by Federal Bankruptcy Rule 3001(c)(2)(B); and (5) included post-petition interest and attorneys' fees even though Deutsche is not eligible under Bankruptcy Code section 506(b) to recover such charges.

Inasmuch as Deutsche had filed the June Claim prior to the bar date, the Court rejected the Debtor's contention that the December Claim was untimely and found that the December Claim was an amendment that related back to the timely filing of the June Claim. The Court overruled the balance of the Debtor's procedural objections to the form of the December Claim on the ground that there was no genuine dispute between the parties as to the nature or validity of Deutsche's secured claim nor any question or confusion as to the underlying documents that gave rise to this claim.[3] Deutsche, as the holder of a duly-perfected deed of trust against the Property, would *445 be entitled to retain its lien against the Property even if it had not filed a proof of claim at all. It could not, therefore, lose the ability to assert a secured claim against the Property by filing a proof of claim that failed to include copies of the underlying loan documents or a schedule that set forth its interest calculations.

However, the Court agreed with the Debtor that the legal issue of whether an undersecured creditor who elects the application of section 1111(b) is entitled to include post-petition interest and attorneys' fees in the amount of its secured Claim was worthy of further consideration.

The Court set a continued hearing on the Claim Objection for February 19, 2013 and requested further briefing on this issue. Having reviewed and considered the parties' supplemental briefing on this issue and the oral argument of counsel at the time of the continued hearing on the Claim Objection, and having reached a result that the Court itself considers novel and surprising, the Court offers the following memorandum to explain its analysis and conclusions with regard to this issue.[4]

## II

## DISCUSSION

In a chapter 11 case, unless a secured creditor elects the application of Bankruptcy Code section 1111(b) or another code section provides for a different result, a secured creditor whose collateral is worth less than the amount due under its loan documents holds (1) a secured claim to the extent of the value of its interest in the estate's interest in the collateral and (2) an unsecured claim for the balance of its allowed claim. 11 U.S.C. § 506(a). If that creditor holds collateral worth more than the amount due under its loan documents, Bankruptcy Code section 506(b) permits the creditor to include in the amount of its secured claim "interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose." 11 U.S.C. § 506(b).

If an undersecured creditor elects the application of section 1111(b), however, then "notwithstanding section 506(a) of this title, such claim is a secured claim to the extent that such claim is allowed." 11 U.S.C. § 1111(b)(2). The Debtor notes in the Claim Objection that section 1111(b)(2) by its terms overrides only the operation of Bankruptcy Code section 506(*a*); it makes

no mention of section 506(b). Therefore, the Debtor argues, section 506(b) remains in effect and, by implication, prohibits Deutsche from including in its secured claim charges that are only available to a creditor whose collateral has sufficient value to provide for payment of such charges.[5]

Although this argument has superficial appeal based upon the plain language of the statute—and neither the Court nor the parties was able to find any cases that discuss directly whether this interpretation of section 1111(b) has merit—the Court is not writing on an entirely blank slate in considering this issue. Two decisions bear directly on the answer to this question: *Travelers Cas. & Sur. Co. of Am. v. PG &* **\*446** *E,* 549 U.S. 443, 127 S.Ct. 1199, 167 L.Ed.2d 178 (2007) and *Infonet Mgmt. v. Centre Ins. Co. (In re SNTL Corp.),* 571 F.3d 826 (9th Cir.2009).

### A. Deutsche is Entitled to Include Post–Petition Attorneys' Fees in its Secured Claim

[1]  In *Travelers, supra,* the Supreme Court held that an unsecured creditor's claim for post-petition attorneys' fees could not be disallowed merely because the fees had been incurred in litigating issues that are peculiar to federal bankruptcy law. In so doing, the Supreme Court rejected the holding of *In re Fobian,* 951 F.2d 1149 (9th Cir.1991). According to the Supreme Court in *Traveler's,* even if a party in interest objects to a creditor's proof of claim, "[T]he court shall allow the claim except to the extent that the claim implicates any of the nine exceptions enumerated in § 502(b)." 549 U.S. at 449, 127 S.Ct. 1199.

In the view of the Supreme Court, because the terms of the parties' prepetition agreement permitted the recovery of the fees in question and none of the exceptions enumerated in section 502(b) prohibited the allowance of a contractual claim for postpetition attorneys' fees, the Ninth Circuit should not have applied a rule of its own creation—the "so-called *Fobian* rule"—which dictates that attorney fees are not recoverable in bankruptcy for litigating issues 'peculiar to federal bankruptcy law' "—to disallow the recovery of these fees. 549 U.S. at 451, 127 S.Ct. 1199. As the Supreme Court explained, "[W]e generally presume that claims enforceable under applicable state law will be allowed in bankruptcy unless they are expressly disallowed. *See* 11 U.S.C. § 502(b)." *Id.* at 452, 127 S.Ct. 1199.

PG & E urged the Supreme Court to find in *Travelers* that unsecured claims for attorneys' fees should be disallowed pursuant to Bankruptcy Code section 506(b). According to PG & E, "this provision authorizes claims for contractual attorneys' fees to the extent that the creditor is

over secured, but disallows such claims to the extent the creditor is either not oversecured or (like Travelers) completely unsecured." *Id.* at 454, 127 S.Ct. 1199. However, the Supreme Court expressly refused to consider this argument as it had not been raised or considered below and had not been mentioned in PG & E's brief in opposition to the request for certiorari. *Id.* at 455, 127 S.Ct. 1199. Thus, *Travelers* does not resolve whether a claim for post-petition attorneys' fees should be allowed in an instance in which such fees are not authorized by section 506(b). The Ninth Circuit's decision in *SNTL Corp., supra,* however, does.

[2]  In *SNTL,* the Ninth Circuit faced squarely the question of whether section 506(b) should be read for the proposition that post-petition attorneys' fees may be recovered only if they are available under section 506(b). Applying the reasoning of *Travelers* and that of the Ninth Circuit in *Joseph F. Sanson Inv. Co. v. 268 Ltd. (In re 268 Ltd.),* 789 F.2d 674, 678 (9th Cir.1986), the Bankruptcy Appellate Panel held in an opinion that was adopted in its entirety by the Ninth Circuit that the bankruptcy court should look to section 502 and not section 506 to ascertain whether a claim should be allowed. Section 506 governs the extent to which a claim is *a secured claim,* not the extent to which the claim should be allowed. Therefore, unless one of the subsections of section 502 provides for disallowance of the claim, a claim that would otherwise be valid under applicable nonbankruptcy law should be **\*447** allowed:[6]

> [W]e reject the argument that section 506(b) preempts postpetition attorneys' fees for all except oversecured creditors.... "When read literally, subsection (b) arguably limits the fees available to the oversecured creditor. When read in conjunction with § 506(a), however, it may be understood to define the portion of the fees which shall be afforded secured status. We adopt the latter reading."
>
> \* \* \* \* \* \*
>
> [S]ection 506(b) does not "limit the fees available" as an unsecured claim but merely "define[s] the portion of the fees which shall be afforded secured status." [Citation omitted.]
>
> We agree with the Ninth Circuit, as well as with the Eleventh Circuit in *Welzel v. Advocate Realty Inv., LLC (In re Welzel),* 275 F.3d 1308, 1316–20 (11th Cir.2001), that the allowance functions of section 506(b) and 502(b) have been incorrectly conflated. Section 502(b), which applies to claims generally, does disallow unmatured interest (*see* 11 U.S.C. § 502(b)(2)); it does not specifically disallow attorneys'

fees of creditors or certain other charges. Section 506(b), on the other hand, specifies what may be included in a secured claim.

*SNTL,* 571 F.3d at 841–42 (quoting *268 Ltd.,* 789 F.2d at 678).

Further, even though section 502 directs the bankruptcy court to determine the amount of such claim "as of the date of the filing of the petition," this does not mean that attorneys' fees incurred after the petition date must be disallowed. To the contrary, the Bankruptcy Code's broad definition of a "claim" includes any right to payment that existed as of the petition date, even if, as of that date, the right was contingent and/or unliquidated. 11 U.S.C. § 101(5)(A). " 'So long as the right to collect the fees existed prepetition, the fact that the fees were actually incurred during the postpetition period is not relevant to the determination of whether the creditor has an allowable pre-petition claim for the fees.' " *SNTL,* 571 F.3d at 843 (quoting *In re New Power Co.,* 313 B.R. 496, 508 (Bankr.N.D.Ga.2004)). Therefore, the BAP and the Ninth Circuit in *SNTL* reversed the bankruptcy court's ruling that the unsecured creditor's post-petition attorneys' fees must be disallowed because of the creditor's unsecured status.[7] *SNTL,* 571 F.3d at 845.

Applying this reasoning to the facts of the instant case, it follows that Deutsche is permitted to include in the amount of its 1111(b) secured claim attorneys' fees that it is entitled to recover under the terms of its prepetition contract with the Debtor, even if those fees relate to the post-petition period. Section 1111(b)(2) provides that, following an 1111(b) election, notwithstanding section 506(a), the creditor holds a secured claim to the extent that it holds an allowed claim. As Deutsche's would be entitled to an allowed *un*secured claim for post-petition attorneys' fees under section 502(b) and the reasoning of *SNTL,* having made an 1111(b) election, Deutsche may **\*448** include the amount of these fees in its section 1111(b) secured claim.

**B. *Deutsche May Not Include Post–Petition Interest In Its 1111(b) Secured Claim***

[3] This same reasoning produces a contrary result with regard to Deutsche's claim for post-petition interest. Although section 502(b) does not contain a provision that disallows post-petition attorneys' fees, it *does* contain a provision that disallows claims for interest that was unmatured as of the petition date: Section 502(b)(2). As Deutsche holds an 1111(b) secured claim only to the extent that it has an allowed claim under section 502(b), and section 502(b) disallows Deutsche's claim for

post-petition interest, it follows necessarily that Deutsche's section 1111(b) secured claim may not include post-petition interest.

When a creditor is oversecured, a creditor may recover post-petition interest under section 506(b), but Deutsche, not having enough collateral to benefit from the application of section 506(b), is left with only the provisions of section 502(b), which expressly disallow a claim for interest that is unmatured as of the petition date.

### III

### CONCLUSION

Although the Ninth Circuit has never expressly discussed whether post-petition interest and attorneys' fees may be included in a creditor's 1111(b) secured claim, the reasoning of its decision in *SNTL* dictates the answer to this question. Under *SNTL,* an unsecured creditor with a prepetition contract that provides for both attorneys' fees and interest may include in its allowed unsecured claim its post-petition attorneys' fees but not its post-petition interest. Therefore, after making an 1111(b) election, an undersecured creditor may include in its 1111(b) secured claim post-petition attorneys' fees, but not post-petition interest. Accordingly, the Claim Objection is hereby overruled to the extent that the Debtor objected to the inclusion of post-petition attorneys' fees in the amount of Deutsche's 1111(b) secured claim and is hereby sustained to the extent that the Debtor objected to the inclusion of post-petition interest in the amount of this claim.

As the Court has not yet had an opportunity to consider whether the amount of the post-petition attorneys' fees that Deutsche seeks is reasonable, the Court will conduct a continued hearing on this issue on April 10, 2013 at 11:00 a.m. Deutsche shall file and serve copies of itemized fee statements for the post-petition attorneys' fees that it seeks to recover not later than March 5, 2013. The Debtor shall have to and including March 26, 2013 to file and serve any objections that she may have to the amount of these fees.

**IT IS SO ORDERED.**

**Parallel Citations**

57 Bankr.Ct.Dec. 207

57 Bankr.Ct.Dec. 207

Footnotes

1    The Property is one of six pieces of real property owned by the Debtor: her primary residence on Shasta Place in Lancaster, California, and five other rental properties.

2    The Court has advised the Debtor that these amounts were to have been paid currently by the Debtor and should be treated under the Plan as chapter 11 expenses of administration.

3    Although a failure to satisfy procedural requirements concerning the form of a proof of claim may deprive the claimant of the ability to rely on a presumption as to the validity of the claim, it does not constitute a ground for disallowance of that claim where, as here, the debtor does not dispute that the creditor holds a valid and enforceable secured claim.

4    The Court has set yet another continued hearing to address the only remaining factual issue in dispute between the parties—the reasonableness of Deutsche's post-petition attorneys' fees.

5    Bankruptcy Code section 506(b) provides, in pertinent part, "To the extent that an allowed secured claim is secured by property the value of which ... is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose."

6    Although the Eleventh Circuit shares this view, *In re Welzel, infra,* a majority of cases that have examined this issue have held that unsecured creditors cannot recover post-petition attorneys' fees because the plain language of section 506(b) precludes such a result. *See, e.g., In re Elec. Mach. Enter., Inc.,* 371 B.R. 549 (Bankr.M.D.Fla.2007).

7    The Circuit then remanded the matter for a determination of whether the creditor was in fact entitled to the fees under the relevant contract or applicable state law or whether grounds existed, other than the lack of collateral, for the disallowance of the fees.

---

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

491 B.R. 728
United States Bankruptcy Court,
E.D. North Carolina,
Wilmington Division.

In re John Wayne Alan HOLDEN, Debtor.

No. 11–05177–8–RDD. | April 26, 2013.

**Synopsis**

**Background:** Chapter 11 debtor filed amended objections to two proofs of claim filed by creditor, challenging creditor's ability to recover postpetition attorney fees on wholly unsecured claims.

**[Holding:]** The Bankruptcy Court, Randy D. Doub, J., held that the Bankruptcy Code does not expressly disallow attorney fees in conjunction with an unsecured claim and, thus, creditor was entitled to postpetition attorney fees based on the parties' prepetition promissory notes.

Objections overruled.

**Attorneys and Law Firms**

**\*729** Jonathan E. Friesen, George M. Oliver, Oliver Friesen Cheek, PLLC, New Bern, NC, for Debtor.

### ORDER ON OBJECTIONS TO CLAIM

RANDY D. DOUB, Bankruptcy Judge.

Pending before the Court is the Objection to Claim objecting to Claim No. 10 and the Objection to Claim objecting to Claim No. 11 filed by John Wayne Alan Holden (the "Debtor") on July 20, 2012 and Security Savings Bank's Response to Debtor's Objection to SSB's Claim 10 and Claim 11 filed by Security Savings Bank on August 22, 2012 (the "Response"). The Debtor filed amended objections to Claim No. 10 on October 2, 2012 and March 7, 2013 and amended objections to Claim No. 11 on August 15, 2012, October 2, 2012, and March 7,

2013.[1] Security Savings \*730 Bank filed a response to the October 2, 2012 amended objections to Claim Nos. 10 and 11 on November 5, 2012. The Court conducted a hearing on the Objections to Claim and the responses thereto on March 7, 2013 in Wilson, North Carolina.

### BACKGROUND

The Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") on July 5, 2011. The Debtor is an individual in the business of purchasing, developing, and managing real property in Brunswick County, North Carolina. The Debtor executed three (3) promissory notes in favor of Security Savings Bank ("SSB"). The Debtor and The Holden Trading Company, an entity solely owned by the Debtor, executed the first note, in the original principal amount of $700,000.00, on October 27, 2004 ("Note 1"). Note 1 is secured by a deed of trust in favor of SSB recorded in Book 2033, Page 466 of the Brunswick County, North Carolina Register of Deeds. The property securing Note 1 is not owned by the Debtor, but by The Holden Trading Company, which filed its own voluntary Chapter 11 petition on April 27, 2012, case number 12–03219–8–RDD. The Debtor executed the second note, in the original principal amount of $500,000.00, on June 29, 2007 ("Note 2"). Note 2 is unsecured. The Debtor executed the third note, in the original principal amount of $1,000,000.00, on June 29, 2007 ("Note 3"). Note 3 is secured by a deed of trust in favor of SSB recorded in Book 2635, Page 95 of the Brunswick County, North Carolina Registry of Deeds. The Debtor defaulted on Notes 1, 2, and 3 and SSB sought remedies pursuant to the terms of the notes and state law.

The Debtor pledged no property of his own to secure Note 1 and as such, the claim is also being treated under the confirmed plan in The Holden Trading Company bankruptcy case. Therefore, this debt is unsecured debt as to the Debtor because as a guarantor on Note 1, his obligation to SSB is not secured. Note 2 is an unsecured debt of the Debtor as the Debtor pledged no collateral for the note. Note 3 was secured by real property owned by the Debtor. SSB conducted a foreclosure sale of the property securing Note 3 with the highest bid received being $624,000.00. After crediting $624,000.00 to the balance owed on Note 3, the Debtor is liable for a deficiency in the amount of $427,770.27. Therefore, all of SSB's claims in the Debtor's bankruptcy case are unsecured.

SSB filed Proof of Claim No. 10 in the amount of $1,076,689.38 on August 26, 2011 on account of Notes 2 and 3. SSB filed Proof of Claim No. 11 in the amount of $651,331.31 on August 26, 2011 on account of Note 1. The Debtor filed the original objections to Claim Nos. 10 and 11 on the basis that SSB sought attorney's fees in amount of fifteen percent (15%) of the outstanding balance due on the notes pursuant to N.C. Gen.Stat. § 6–21.2(2).[2] The Debtor requested the Court deny this amount entirely because the language in the notes provided for actual attorney's fees, not reasonable attorney's fees pursuant to § 6–21.2(2).[3] In the *731 Response, SSB stated that Claim Nos. 10 and 11 included attorney's fees in amount of fifteen percent (15%) of the outstanding balance due on the notes pursuant to N.C. Gen.Stat. § 6–21.2. However, SSB filed Amended Claim No. 10, reducing the amount claimed to $1,031,143.99 and Amended Claim No. 11, reducing the amount claimed to $637,620.75 on October 1, 2012, accounting for the decrease in attorney's fees to the actual attorney's fees expended. Amended Claim No. 10 seeks pre-petition and post-petition attorney's fees in the amount of $22,600.93. Amended Claim No. 11 seeks pre-petition and post-petition attorney's fees in the amount of $22,600.94.[4]

In the Amended Objections to Claim filed on October 2, 2012, the Debtor objected to attorney's fees in the amount of $22,600.94 and post-petition interest in the amount of $69,381.84 as sought in amended Claim No. 10 and attorney's fees in the amount of $22,600.94 and post-petition interest in the amount of $48,527.60 as sought in amended Claim No. 11. The Debtor requested that these claimed amounts be denied in their entirety. According to the Affidavit of Attorney Regarding Attorney's Fees filed by counsel for SSB on March 4, 2013, the total post-petition attorney's fees related to both Claim Nos. 10 and 11 is $36,859.90.

In the Second Amended Objections to Claim filed on March 7, 2013, the Debtor objected to SSB's claim for post-petition attorney's fees on a claim that is wholly unsecured. More particularly, the Debtor objects to the post-petition attorney's fees as they are not allowed pursuant to 11 U.S.C. § 502 or any other provision of the Bankruptcy Code. The Debtor argues that any post-petition attorney's fees sought should be disallowed in their entirety for both Claim Nos. 10 and 11. Therefore, the Debtor objects to the allowance of $36,859.90 for post-petition attorney's fees related to Claim Nos. 10 and 11 as provided by the Affidavit of Attorney Regarding Attorney's Fees.

At the hearing, the parties acknowledged the thirty (30)

day notice period on the Second Amended Objections to Claim had not run. However, the parties conceded that the issues presented in the Second Amended Objections to Claim and the original Objections to Claim were the same, with the exception of the issue of post-petition interest, which the parties compromised on prior to the hearing. Therefore, the parties had no objection to proceeding with the hearing.

The question presented by the Debtor at the hearing was whether an unsecured creditor is entitled to post-petition attorney's fees under a confirmed Chapter 11 plan if the debtor is solvent, as the Debtor is in this case, and all creditors will be paid in full. In answering this question, the Debtor asserts that post-petition attorney's fees should not be allowed on unsecured claims pursuant to 11 U.S.C. § 502 when read in conjunction with 11 U.S.C. § 506(b). The Debtor explains that § 502 allows post-petition claims in very limited circumstances. The Debtor further asserts that § 506 is the only provision of the *732 Bankruptcy Code that specifically allows post-petition attorney's fees associated with a creditor's claim and only in the instance where a creditor is oversecured. Therefore, the Debtor argues that because the Bankruptcy Code does not specifically allow an unsecured creditor to receive post-petition attorney's fees, any amount of attorney's fees claimed by an unsecured creditor should be disallowed.

SSB frames the issue in a slightly different manner, posing the question as whether attorney's fees incurred by SSB post-petition are allowable as part of SSB's unsecured claim pursuant to § 502. SSB argues that pursuant to the Supreme Court's holding in *Travelers Cas. & Sur. Co. of America v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 127 S.Ct. 1199, 167 L.Ed.2d 178 (2007), § 502(b) of the Bankruptcy Code does not disallow contract based claims for attorney's fees. Therefore, SSB argues the post-petition attorney's fees should be included in the amount of SSB's allowed claim. Further, SSB argues that the Supreme Court declined to address the issue of whether § 506(b)'s prohibition of attorney's fees in the claim of an undersecured creditor applies to unsecured creditors, and as such, the claim should be allowed. SSB cites authority from this district in support of its argument.

### DISCUSSION

Section 502 of the Bankruptcy Code provides that "[a] claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest

... objects." 11 U.S.C. § 502(a). Section 502 further provides if an objection to a claim is made, the court shall determine the amount of the allowed claim as of the date of the filing of the petition, except to the extent that one of the exceptions enumerated in § 502(b) applies to the claim. 11 U.S.C. § 502(b). The court shall allow the claim unless,

(1) such claim is unenforceable against the debtor ... under any agreement or applicable law for a reason other than because such claim is contingent or unmatured;

(2) such claim is for unmatured interest;

(3) if such claim is for a tax assessed against property of the estate, such claim exceeds the value of the interest of the estate in such property;

(4) if such claim is for services of an insider or attorney of the debtor, such claim exceeds the reasonable value of such services;

(5) such claim is for a debt that is unmatured on the date of the filing of the petition and that is excepted from discharge under section 523(a)(5) of this title;

(6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property ...;

(7) if such claim is the claim of an employee for damages resulting from the termination of an employment contract ...;

(8) such claim results from reduction, due to late payment, in the amount of ... credit available to the debtor in connection with an employment tax on wages, salaries, or commissions earned from the debtor; or (9) proof of such claim is not timely filed....

11 U.S.C. § 502(b).

[1] [2] The party in interest objecting to a claim filed under § 502 "must introduce evidence to rebut the claim's presumptive validity." *In re Harford Sands Inc.,* 372 F.3d 637, 640 (4th Cir.2004) (citing Fed. R. Bankr.P. 9017, Fed.R.Evid. 301). If the party in interest introduces evidence that rebuts the claim's validity, "the creditor has the ultimate burden of proving the **\*733** amount and validity of the claim by a preponderance of the evidence." *Id.* As SSB's claim is for attorney's fees, the relevant exception in the present case is § 502(b)(1), which disallows any claim that "is unenforceable against the debtor and the property of the debtor, under any agreement or applicable law for a reason other than

because such claim is contingent or unmatured."[5] 11 U.S.C. § 502(b)(1). Therefore, the Debtor carries the burden of proving that SSB's claims are unenforceable "under any agreement or applicable law." *Id.*

[3] In response to the objections to claims, SSB asserts that in *Travelers,* the Supreme Court held that contract-based claims for attorney's fees are not expressly disallowed by § 502(b) on the basis that a creditor is the holder of an unsecured claim against the bankruptcy estate. As such, SSB argues that because its claim for attorney's fees is not disallowed by § 502(b), *Travelers* suggests the attorney's fees should be allowed for the unsecured claims.

In *Travelers,* the Supreme Court specifically addressed a rule adopted by the Court of Appeals for the Ninth Circuit, which prohibited recovery of attorney's fees for post-petition litigation involving federal bankruptcy law. When determining whether the Bankruptcy Code precludes an unsecured creditor from recovering attorney's fees under a pre-petition contract, the Supreme Court held that the Bankruptcy Code does not disallow claims for attorney's fees solely because the fees were incurred litigating bankruptcy issues. *Travelers,* 549 U.S. at 446, 127 S.Ct. at 1202. The Supreme Court found that the Ninth Circuit relied on its "own creation—the so-called *Fobian* rule—which dictates that 'attorney fees are not recoverable in bankruptcy for litigating issues' " involving federal bankruptcy law.[6] *Id.* at 451, 127 S.Ct. at 1205. The Court held "[t]he absence of textual support [in the Bankruptcy Code] is fatal for the *Fobian* rule." *Id.* at 452, 127 S.Ct. at 1206. Further, the Court "generally presume[s] that claims enforceable under applicable state law will be allowed in bankruptcy unless they are expressly disallowed." *Id.*

The Supreme Court analyzed the nine (9) exceptions provided in § 502(b) and found the only applicable exception was § 502(b)(1). *Id.* at 449–50, 127 S.Ct. at 1204. The Court read § 502(b)(1)'s exclusion of any claim that is " 'unenforceable against the debtor and property of the debtor, under any agreement or applicable law for reason other than because such claim is contingent or unmatured' " to mean that "any defense to a claim that is available outside of the bankruptcy context is also available in bankruptcy." *Id.* at 450, 127 S.Ct. at 1204 (citing 4 Collier P 502.03[2][b], at 502–22). The Court recognized the " 'basic federal rule' in bankruptcy is that state law governs the substance of claims." *Id.* at 450, 127 S.Ct. at 1205 (quoting **\*734** *Raleigh v. Illinois Dep't of Revenue,* 530 U.S. 15, 20, 120 S.Ct. 1951, 1955, 147 L.Ed.2d 13 (2000)). As such, "when the Bankruptcy Code use[s] the word 'claim'—which the Code itself defines as

a 'right to payment,' 11 U.S.C. § 101(5)(A)—it is usually referring to a right to payment recognized under state law." *Id.* at 451, 127 S.Ct. at 1205. Accordingly, " 'there is no reason why [property] interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.' " *Id.* (quoting *Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979)). Thus, it is well established that a determination of whether a claim is unenforceable is made based on state law, " 'unless some federal interest requires a different result.' " *Id.*

The Supreme Court explained that the Ninth Circuit did not find the claim for attorney's fees unenforceable under § 502(b)(1) pursuant to applicable state or federal law or any provision of the Bankruptcy Code. *Id.* at 451, 127 S.Ct. at 1205. Instead, the court of appeals denied the claim for attorney's fees based on its own rule prohibiting attorney's fees when the underlying litigation involves bankruptcy law issues. *Id.* The Supreme Court found no support for such a rule in the Bankruptcy Code because claims are presumed enforceable pursuant to state law unless expressly disallowed. *Id.* at 452, 127 S.Ct. at 1205. As no party offered evidence as to why the claim for attorney's fees should be disallowed, the Court determined the presumption that claims are generally allowed unless expressly disallowed was not overcome. *Id.* at 453, 127 S.Ct. at 1206.

Like the Debtor in the present case, the debtor in *Travelers* also argued that § 506(b) disallows undersecured or completely unsecured claimants recovery for contractual attorney's fees because § 506(b) "authorizes claims for contractual attorney's fees to the extent the creditor is over secured, but disallows such claims to the extent the creditor is either not oversecured or ... completely unsecured." *Id.* at 454, 127 S.Ct. at 1207. However, the Supreme Court found that the debtor did not raise the argument below thus, it was not addressed by any of the lower courts and as such did not consider the § 506(b) argument. Therefore, the Court's holding expressed "no opinion with regard to whether ... other principles of bankruptcy law might provide an independent basis for disallowing [a creditor's] claim for attorney's fees." *Id.* at 456, 127 S.Ct. at 1207.

Subsequent to *Travelers,* various courts have dealt with the § 506(b) issues the Supreme Court declined to address. The cases cited by the Debtor, suggest § 502(b) must be read in conjunction with § 506(b), which limits the allowance of attorney's fees only to oversecured creditors. These cases find § 506(b) precludes inclusion of attorney's fees on both undersecured and unsecured claims. *In re Seda France, Inc.,* 2011 WL 3022563, 2011

Bankr.LEXIS 2874 (sustaining the debtor's objection to a claim for post-petition attorney's fees as part of creditor's unsecured claim); *In re Elec. Mach. Enters., Inc.,* 371 B.R. 549 (Bankr.M.D.Fla.2007) (finding a totally unsecured claim is not entitled to post-petition to attorneys' fees). Other cases, such as those cited by SSB, provide that § 506(b) does not preempt post-petition attorney's fees for all creditors. *Centre Ins. Co. v. SNTL Corp. (In re SNTL Corp.),* 380 B.R. 204, 219–20 (9th Cir. BAP 2007) *aff'd* 571 F.3d 826 (9th Cir.2009) (finding § 506(b) is irrelevant and the court must look to § 502(b) in determining the allowability of an unsecured claim); *Ogle v. Fidelity & Deposit Co. of Md.,* 586 F.3d 143, 148 (2d Cir.2009) ("[S]ection 506(b) does not implicate unsecured claims for post-petition attorney's fees, and it therefore interposes no bar to recovery.").

**\*735** In objecting to the claims, the Debtor presents no evidence indicating that the claims are unenforceable under any contract or agreement, but rather suggests that the claims are disallowed by the Bankruptcy Code pursuant to a narrow reading of § 502 in conjunction with § 506(b). In support of this argument, the Debtor cites case law from several bankruptcy courts to support its proposition that a wholly unsecured creditor is not entitled to a claim for post-petition attorney's fees pursuant to § 502, 506(b). The Debtor argues the holding in *In re Seda France, Inc.,* No. 10–12948–CAG, 2011 WL 3022563, 2011 Bankr.LEXIS 2874 (W.D.Tex. July 22, 2011) is persuasive as the facts are analogous to those in the Debtor's case.[7] In *Seda France, Inc.,* the bankruptcy court considered the Supreme Court's holding in *Travelers* and determined that the Supreme Court carefully limited the scope of its holding to find that the Bankruptcy Code "does not disallow unsecured creditors' claims for attorneys' fees 'based solely on the fact that the fees at issue were incurred litigating issues of bankruptcy law.' " *In re Seda France, Inc.,* 2011 WL 3022563 at \*3, 2011 Bankr.LEXIS 2874 at \*6–7 (quoting *Travelers,* 549 U.S. at 449, 127 S.Ct. at 1204). *Seda France* explains that the Court "reserved opinion regarding 'whether ... other principles of bankruptcy law might provide an independent basis for disallowing' an unsecured creditor's claim for post-petition attorneys' fees." *Id.* at \*3, 2011 Bankr.LEXIS 2874 at \*7 (quoting *Travelers,* 549 U.S. at 456, 127 S.Ct. at 1207–08). The bankruptcy court concluded that because post-petition fees are allowed by § 506(b), instead of § 502(b), post-petition fees cannot be allowed for undersecured or wholly unsecured creditors as neither receive the benefit of § 506(b). *Id.* at \*4, 2011 Bankr.LEXIS 2874 at \*11–12.[8]

The bankruptcy court in *Seda France, Inc.,* further reasoned policy does not support an unsecured creditor's

recovery of post-petition attorney's fees because it would violate the central purpose of the bankruptcy system of equality among creditors and cause frustration in administration of the case. *Id.* at *5, 2011 Bankr.LEXIS 2874 at *15–16. Finally, the court found the mere fact that the debtor is solvent should not allow for recovery of attorney's fees on unsecured claims. The bankruptcy court reasoned that the Bankruptcy Code "contains no **\*736** requirement that debtors be insolvent" and a solvent debtor may "seek relief under the Code in good faith, and modify the rights of creditors." *Id.* at *7, 2011 Bankr.LEXIS 2874 at *19–20 (citing Mark S. Scarberry in *Interpreting Bankruptcy Code Sections 502 and 506: Post–Petition Attorneys' Fees in a Post–Travelers World,* 15 AM. BANKR. INST. L. REV. 611, 647–48 (2007)).

The Debtor also cites *In re Saunders,* 130 B.R. 208 (Bankr.W.D.Va.1991) and *In re Elec. Mach. Enters., Inc.,* 371 B.R. 549 (Bankr.M.D.Fla.2007) to support the proposition that an unsecured creditor is not entitled to recover post-petition attorney's fees or other charges pursuant to § 506(b). In *Saunders,* the bankruptcy court reasoned that if "Congress had intended for holders of both secured claims and unsecured claims to recover attorneys' fees, it could have easily said so [in § 506(b) ]. But it did not." *In re Saunders,* 130 B.R. at 210.

In *Electric Machinery Enterprises, Inc.,* the bankruptcy court adopted what it contends is the majority view in finding that an unsecured creditor is not entitled to recover post-petition attorney's fees. The court espoused four (4) primary reasons the majority courts reached this conclusion. The first relates to the plain language of § 506(b), which provides "*[to] the extent* that an allowed secured claim [is oversecured], *there shall be allowed* to the holder of such claim, interest ... and any reasonable fees, costs and charges." *Elec. Mach. Enters., Inc.,* 371 B.R. at 551 (quoting 11 U.S.C. § 506(b)) (alteration in original) (emphasis in original). The court explains this language "demonstrates the congressional intent to create an exception to the general rule that claims are to be determined as of the petition date, exclusive of post-petition interest, attorneys' fees, and other charges," but to the extent the claim is oversecured, it shall be allowed interest and fees. *Id.* Second, because the Supreme Court's holding in *United Sav. Ass'n v. Timbers,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) found § 506(b) expressly denies an undersecured creditor post-petition interest on the creditor's claim, post-petition attorney's fees on an unsecured claim are also prohibited. Third, the plain language of § 502(b) requires determining the amount of a claim on the date of the filing of the bankruptcy petition. Inclusion of post-petition attorney's fees is therefore prohibited with the exception of

oversecured claims pursuant to § 506(b). Finally, the court noted equitable considerations and the policy of providing equal distribution to similarly situated creditors according to the Bankruptcy Code's priorities requires denying unsecured creditors the right to claim postpetition attorney's fees.

However, the case law cited by the Debtor is unpersuasive and distinguishable from the present facts. For instance, both *In re Saunders* and *In re Miller* involve undersecured claims as opposed to wholly unsecured claims in the present case. *In re Saunders,* 130 B.R. at 209 (Chapter 13 debtors proposed to pay a creditor's claims secured by two motor vehicles and a mobile home in full, plus attorney's fees to alleviate the obligations of any co-signers on the debts);[9] **\*737** *In re Miller,* 344 B.R. 769, 770 (Bankr.W.D.Va.2006) (creditor sought payment up to the value of the collateral as a secured claim plus an additional unsecured claim for the deficiency and attorney's fees). The other cases cited by the Debtor find the majority of courts hold "that an unsecured creditor is not entitled to collect post-petition attorneys' fees, costs, and other similar charges—even if there is an underlying contractual right to do so." *In re Seda France, Inc.,* 2011 WL 3022563 at *1, 2011 Bankr.LEXIS at *1 (citations omitted); *Elec. Mach. Enters., Inc.,* 371 B.R. at 550. However, all of the cases the courts in *Seda France* and *Electric Machinery Enterprises, Inc.* cited as holding the majority view were decided prior to the Supreme Court's decision in *Travelers,* and failed to consider its implications. *In re Seda France, Inc.,* 2011 WL 3022563 at *1, n. 1, 2011 Bankr.LEXIS at *1, n. 1; *Elec. Mach. Enters., Inc.,* 371 B.R. at 550 (citations omitted).

In determining the issue before it, the Court finds the insight of the Eleventh Circuit pre-*Travelers* opinion *Welzel v. Advocate Realty Invs., L.L.C. (In re Welzel),* 275 F.3d 1308 (11th Cir.2001) helpful. The issue before the *Welzel* court was whether attorney's fees deemed reasonable should be treated along with a creditor's secured claim while fees deemed unreasonable should be treated as an unsecured claim. In finding that the reasonableness standard applies to an oversecured creditor's claims for attorney's fees, the court discussed the interplay between § 506(b) and § 502. The Court found the

> [l]anguage and structure [of the sections] demonstrate that §§ 502 and 506 should be read in tandem with one another, for they address complementary but different questions. Section 502 deals with the threshold question of whether a

claim should be allowed or disallowed. Once the bankruptcy court determines that a claim is allowable, § 506 deals with the entirely different, more narrow question of whether certain types of claims should be considered secured or unsecured.... Applying [this] interpretation, the threshold question is whether [a creditor's] claim for its contractually set attorney's fees is allowed under § 502. The entire claim to fees is allowable under § 502 as long as the exceptions in subsection (b) do not apply. As already noted, none of these exceptions apply here, so [the creditor's] claim for its contractual attorney's fees passes muster under § 502. Given that the fees claim is allowed, the fees must then be assessed for reasonableness under § 506(b).

*Welzel,* 275 F.3d at 1317–18.

Though the *Welzel* court addresses the reasonableness of attorney's fees on an oversecured claim pursuant to § 506(b), the underlying determination that a claim must first be allowed pursuant to § 502 before the determination of secured status pursuant to § 506(b) applies in the present case. Courts follow this reasoning under analogous sets of facts as the present case finding,

the allowance functions of § 506(b) and 502(b) have been incorrectly conflated. Section 502(b), which applies to claims generally, does disallow unmatured interest (see 11 U.S.C. § 502(b)(2)); it does not specifically disallow attorneys' fees of creditors or certain other charges. Section 506(b), on the other hand, specifies what may be included in a secured claim.

*SNTL Corp. v. Centre Ins. Co. (In re SNTL Corp.),* 571 F.3d 826, 842 (9th Cir.2009) (finding § 506(b) does not preempt unsecured creditors from recovering post- ***738** petition attorney's fees based on a pre-petition contract). Further, in revisiting a pre-*Travelers* opinion allowing post-petition attorney's fees incurred for an unsecured claim, the Second Circuit held "that the Bankruptcy Code does not bar an unsecured claim for post-petition

attorneys' fees authorized by a prepetition contract valid under state law." *Ogle v. Fid. & Deposit Co. of Md.,* 586 F.3d 143, 146 (2d Cir.2009) (stating the holding in *United Merchs. & Mfrs., Inc. v. Equitable Life Assurance Soc'y of the U.S.,* 674 F.2d 134 (2d Cir.1982) survives the Supreme Court's decision in *Travelers* ). The Second Circuit explains *Travelers* states a "claim for post-petition fees 'must be allowed under § 502(b) unless it is unenforceable within the meaning of § 502(b)(1).' " *Id.* at 147 (citing *Travelers,* 549 U.S. at 449–50, 127 S.Ct. 1199). Further, the Second Circuit makes it clear that § 502(b) imposes "no bar to an unsecured creditor's ability to recover post-petition attorneys' fees as a contingent right. *Id.* at 147.

SSB points to Eastern District of North Carolina case law that addresses the issue of post-petition attorneys' fees in the context of § 506(b) in several instances. In *F & G Leonard, L.L.C.,* the Honorable J. Rich Leonard held § 506(b) "is not a disallowance statute, however. It merely allows an oversecured creditor to include reasonable attorneys' fees as apart of its secured claim." *In re F & G Leonard, L.L.C.,* No. 11–01297–8–JRL, 2011 WL 5909463, *2 (Bankr.E.D.N.C. Oct. 21, 2011). Under § 506(b), any attorneys' fees found to be unreasonable may be recovered as an unsecured claim. *Id.* In that case, the Chapter 11 debtor's Plan of Reorganization provided for payment of all unsecured claims in full. Therefore, the Court found if a creditor's "claim for attorneys' fee[s] and expenses is allowable under North Carolina state law, it will receive full payment of that claim." *Id.* In *Croatan Surf Club, L.L.C.,* the Honorable Stephani W. Humrickhouse found the Court need not address the allowance of post-petition attorneys' fees because post-petition interest already accounted for any equity available over the claim amount. *In re Croatan Surf Club, L.L.C.,* No. 11–00194–8–SWH, 2012 WL 1906386, *6 (Bankr.E.D.N.C. May 25, 2012). Therefore, as no equity remained, post-petition attorneys' fees were disallowed pursuant to § 506(b) and did "not morph into an allowable unsecured claim."[10] *Id.* at *7.

These cases are not analogous to the present facts as they involve secured claims, which automatically necessitate an analysis pursuant to § 506(b), whereas SSB's claims are wholly unsecured and do not trigger the implications of § 506(b). SSB calls the Court's attention to these cases to further point out that the issue of whether an unsecured creditor is allowed to claim attorney's fees in conjunction with its claim pursuant to §§ 502 and 506(b) has yet to be decided.

[4] After review of *Travelers* and subsequent case law, this Court finds SSB's claims for attorney's fees are allowed.

The Debtor's reading of § 502(b) follows the reasoning that what is not allowed by the Bankruptcy Code is expressly prohibited. *See In re Miller,* 344 B.R. at 771–72 (explaining the only section of the Bankruptcy Code that expressly authorizes payment of attorneys' fees as part of a claim is § 506(b)). Under this logic, the Debtor **\*739** argues, that because the allowance of attorney's fees on an unsecured claim is not expressly allowed pursuant to § 502(b), it must then be disallowed. The Court is not prepared to adopt such a narrow reading of § 502(b). As noted in *Travelers,* the Court "generally presume[s] that claims enforceable under applicable state law will be allowed in bankruptcy unless they are *expressly disallowed.*" *Travelers,* 549 U.S. at 452, 127 S.Ct. at 1206 (emphasis added). Section 502(b)(1) disallows a claim to the extent the claim is "unenforceable against the debtor ... under any agreement or applicable law for a reason other than because such claim is contingent or unmatured." 11 U.S.C. § 502(b)(1). The Debtor presented no evidence to suggest the contract for attorney's fees is unenforceable other than because the underlying claims are unsecured. *Ogle,* 586 F.3d at 145 ("the Bankruptcy Code does not bar an unsecured claim for post-petition attorneys' fees authorized by a prepetition contract valid under state law").

[5] [6] The purpose of § 502 is to allow or disallow claims. No provision under § 502 expressly disallows attorney's fees on unsecured claims. The purpose of § 506 is to determine what amounts may be recovered from the value of the collateral, not to determine the validity of a claim. Therefore, finding no objection to the validity of the attorney's fees and that neither § 502(b) nor any other provision of the Bankruptcy Code *expressly disallow* attorney's fees in conjunction with an unsecured claim, the objections to SSB's claims are **OVERRULED.** SSB is entitled to an unsecured claim for post-petition attorney's fees in the amount of $36,859.90 on account of Claim Nos. 10 and 11.

**SO ORDERED.**

**Parallel Citations**

69 Collier Bankr.Cas.2d 1101

Footnotes

1    The amended objections filed on March 7, 2013 were filed on the same day that the Court held the hearing on the objections to Claim Nos. 10 and 11. Counsel for the Debtor indicated to the Court that the amended objections removed an objection to post-petition interest upon which the parties had reached an agreement. Though the 30 day notice period on the objections had not run, the parties waived any such response time as they were prepared for argument and filed the amendment to the objections for the purpose of preserving the record for appeal.

2    N.C. Gen.Stat. § 6–21.2(2) provides, "If such note ... provides for the payment of reasonable attorneys' fees by the debtor, without specifying any specific percentage, such provision shall be construed to mean fifteen percent (15%) of the 'outstanding balance' owing on said note...." N.C. Gen.Stat. § 6–21.2(2) (2013).

3    The relevant language in Notes 1, 2, and 3 provides:
        ATTORNEY'S FEES; EXPENSES. Lender may hire or pay someone also to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law.

4    The Debtor does not object to the reasonableness of the attorney's fees claimed.

5    The remaining "claim[s] for attorney's fees [have] nothing to do with [unmatured interest,] property tax, child support or alimony, services provided by an attorney of the debtor, damages resulting from the termination of a lease or employment contract, or the late payment of any employment tax" and were not untimely filed such that § 502(b)(2)–(9) apply. *Travelers,* 549 U.S. at 450, 127 S.Ct. at 1204.

6    The Court referred to the Ninth Circuit's holding *Fobian v. Western Farm Credit Bank,* 951 F.2d 1149 (9th Cir.1991), which provided where the issues litigated involved "issues peculiar to federal bankruptcy law, attorney's fees will not be awarded absent bad faith or harassment by the losing party." *Id.* at 1153 (citing *Collingwood Grain, Inc. v. Coast Trading Co. (In re Coast Trading Co.),* 744 F.2d 686, 693 (9th Cir.1984)).

7    In *In re Seda France, Inc.,* a creditor filed a proof of claim seeking payment for post-petition attorney's fees of at least $76,125.68

as part of its unsecured claim. The debtor objected to the allowance of the post-petition attorney's fees as part of the claim and the bankruptcy court sustained the debtor's objection.

8    In reaching this conclusion, the bankruptcy court relies on the conclusions of Mark S. Scarberry in *Interpreting Bankruptcy Code Sections 502 and 506: Post–Petition Attorneys' Fees in a Post–Travelers World,* 15 AM. BANKR. INST. L. REV. 611 (2007). In his interpretation of the relevant sections of the Bankruptcy Code, Scarberry posits that § 502(b) allows a claim in an amount determined as of the petition date. *Id.* at 648–49. The allowed amount of the claim as established by § 502(b) is then analyzed under § 506(a), which determines the amount of the creditor's secured claim and unsecured claim, if any. *Id.* at 649. Finally, § 506(b) provides that where a secured claim is secured by property, the value of which is greater than the amount of the claim, a creditor is entitled to post-petition fees, costs, and other charges. *Id.* Because fees, interest, and other charges are not added to a claim until analysis of the claim passes through § 506(b), Scarberry asserts "we are left with the clear conclusion that post-petition fees cannot be allowed in favor of undersecured creditors or wholly unsecured creditors, neither of whom receive any benefit from section 506(b)." *Id.* at 651. Scarberry asserts this is the majority position. *Id.*

9    The bankruptcy court noted that for the purpose of the issue before it, "there [was] no difference between an unsecured claim of a creditor without security and the unsecured portion of a claim where the value of the security is less than the amount of the debt." *In re Saunders,* 130 B.R. at 210. This Court cannot find that there is "no difference" between unsecured and unsecured deficiency claims. If Congress intended to deny holders of an unsecured claim recovery of attorney's fees pursuant to § 506(b) it could have easily included such language.

10    *F & G Leonard, L.L.C.* and *Croatan Surf Club, L.L.C.* create a conflict among the courts in this district as *F & G Leonard* allows attorney's fees claimed above those reasonable pursuant to § 506(b) as an unsecured claim while *Croatan Surf Club* does not allow attorney's fees to exist as an unsecured claim where fees extinguish the equity of an oversecured claim.

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 3380168
Only the Westlaw citation is currently available.
United States Bankruptcy Court,
D. Montana.

In re Randy Ray BAILEY and Christine Marie
Craig, Debtors.
Terrance Hunt and Marcia Hunt, Plaintiffs.
v.
Randy Ray Bailey, Defendant.

Bankruptcy No. 12–60253–7. | Adversary No.
12–00037. | July 8, 2013.

**Attorneys and Law Firms**

Michael James Harper, Walker & Harper PC, Payson,
AZ, Andrew W. Pierce, Morgan Pierce, PLLP, Missoula,
MT, for Plaintiffs.

Randy Ray Bailey, pro se.

**MEMORANDUM OF DECISION**

RALPH B. KIRSCHER, Bankruptcy Judge.

**\*1** At Butte in said District this 8th day of July, 2013.

After a trial and judgment entered in this adversary
proceeding against the Defendant excepting Plaintiffs'
claim from Defendants' discharge, Plaintiffs filed a
"Motion for Award of Attorneys' Fees" on April 16, 2013
(Docket No. 36) ("Plaintiffs' Motion") based on their
state law contract claims and Arizona statute A.R.S. §
12–341.01(A). Defendant, pro se, filed a response in
opposition, and a hearing on Plaintiffs' Motion was held
after notice at Missoula on June 6, 2013. Plaintiffs were
represented at the hearing by attorneys Michael J. Harper
("Harper") of Walker & Harper, P.C., Payson, AZ, and
Andrew J. Pierce of Morgan Pierce, PLLP, Missoula. The
Defendant did not appear. Harper clarified that Plaintiffs
seek a determination that they are eligible for attorney
fees, and if they are they request leave to file an affidavit
of fees and costs. After hearing argument of counsel the
Court took Plaintiffs' Motion under advisement. After
review of the record and applicable law, this matter is
ready for decision. For the reasons set forth below,
Plaintiffs' Motion will be granted and Plaintiffs granted

leave to file an affidavit of attorneys' fees and costs.

This Court has jurisdiction of this adversary proceeding
under 28 U.S.C. § 1334(b). This adversary proceeding
which sought a determination as to the dischargeability of
Plaintiffs' particular debt is a core proceeding under 28
U.S.C. § 157(b)(2)(I).

The background facts are set forth in this Court's
Memorandum of Decision (Docket No. 30) entered on
April 2, 2013. The accompanying Order granted
Plaintiffs' motion for summary judgment and excepted
Plaintiffs' claim in the amount of $169,440 from
Defendant's discharge under 11 U.S.C. § 523(a)(2)(A).
An amended Judgment was entered on May 29, 2013,
without objection adding $5,923.19 in interest to the
amount excepted from Defendant's discharge.

Plaintiffs moved for an award of attorneys' fees based on
Arizona statute, A.R.S. § 12–341.01(A), which states, "in
any contested action arising out of a contract, express or
implied, the court may award the successful party
reasonable attorney fees." The Defendant objected to
Plaintiffs' Motion for attorneys' fees, but cites no
authority in support of his opposition other than his
difficult circumstances[i] and errors by this Court and the
Arizona state court. Courts have a duty to construe pro se
pleadings liberally. *Bernhardt v. Los Angeles Cnty.,* 339
F.3d 920, 925 (9th Cir.2003).

Prior to filing his bankruptcy petition, Defendant was
sued by Plaintiffs in a civil law suit in Gila County,
Arizona. On August 24, 2011, the Gila County Superior
Court granted Plaintiffs' motion for summary judgement
in CV–20090–400, "Gila County Action," and entered
judgment in favor of Plaintiffs on all claims asserted by
Plaintiffs against Defendant, including but not limited to
Plaintiffs' claims for breach of contract and fraud.

**\*2** On February 28, 2012, Defendant filed a voluntary
Chapter 7 petition in this district. Plaintiffs filed a
complaint to determine nondischargeability pursuant to 11
U.S.C. § 523. On April 11, 2012, this Court granted
Plaintiffs' motion for summary judgment and excepted
the Arizona judgment from Defendant's discharge.
Applying Arizona state law, this Court found the elements
for issue preclusion satisfied and determined the
defendant was estopped from re-litigating the Gila County
Action issues again in bankruptcy court. *See
Memorandum of Decision,* (Dkt.30). No notice of appeal
has been filed and the judgment is final.

Plaintiffs' Motion seeks leave to file an affidavit of

attorneys' fees and costs which they seek added to their nondischargeable judgment. Before determining whether Plaintiffs are entitled to the attorneys' fees, the applicable law, state or federal, must first be determined.

### Standards for Award of Attorney's Fees in Dischargeability Action.

Under the "American Rule," a prevailing litigant ordinarily is not entitled to collect attorneys' fee from the loser except when authorized by contract or statute. The Supreme Court dealt with the ability of an unsecured creditor in a bankruptcy case to recover postpetition attorney's fees from the debtor in *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.,* 549 U.S. 443, 448, 127 S.Ct. 1199, 167 L.Ed.2d 178 (2007). In *Travelers,* the bankruptcy court had followed the "Fobian" rule advanced in the Ninth Circuit's holding in *Fobian v. W. Farm. Credit Bank (In re Fobian),* 951 F.2d 1149 (9th Cir.1991). The Fobian rule provided that, notwithstanding the terms of the creditor's contract with the debtor, the claim of an unsecured creditor for post-petition attorneys' fees could not be allowed if the creditor was seeking reimbursement for litigating issues that did not involve "basic contract enforcement questions," but instead related to "issues peculiar to federal bankruptcy law." The Ninth Circuit affirmed, but the Supreme Court reversed, holding that the Fobian rule's per se denial of certain categories of fee requests was unwarranted and unsupported by the bankruptcy statute or applicable state law. *See In re SNTL Corp.,* 380 B.R. 204,217 (9th Cir. BAP2007), *aff'd,* 571 F.3d 826 (9th Cir.2009) *citing Travelers,* 549 U.S. 443 at 447–449.

Although appearing to open the door for payment of any type of postpetition attorney fees, the holding from *Travelers* is actually narrow and must not be over-generalized. The holding simply stated no support existed for a judicially created rule that summarily disallowed requests for postpetition attorneys' fees incurred in litigating 'bankruptcy issues' in the bankruptcy court without any analysis of the scope of the contractual provision or review of whether the fees sought fall within the ambit of the attorneys' fees clause of the subject contract. *Travelers,* 549 U.S. 443 at 447–450.

**\*3** *Travelers* directed courts to look to state law when determining claims, including the award of attorneys fees. 549 U.S. at 448, quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 247, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). In *Travelers,* the Supreme Court reaffirmed the nature and scope of a right to payment is determined by state law. Noting that it has "long recognized that the basic federal rule in bankruptcy is that

state law governs the substance of claims, Congress having generally left the determination of property rights in the assets of a bankrupt's estate to state law." *Travelers,* 549 U.S. at 450. *Travelers* continues "when the Bankruptcy Code uses the word 'claim'—which the Code itself defines as a 'right to payment,'—it is usually referring to a right to payment recognized under state law." *Travelers,* 549 U.S. at 451. *See also Butner v. U.S.,* 440 U.S. 48, 55 (1979) (holding that because "[p]roperty interests are created and defined by state law ... [u]nless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.")

Since the *Travelers* decision, the allowance of claims for attorney's fees in bankruptcy generally is recognized as governed by state law. *Travelers,* 549 U.S. at 450–51. This is particularly true in dischargeability cases "where the litigation ordinarily has no direct impact on the bankruptcy estate." *Charlie Y., Inc. v. Carey (In re Carey),* 446 B.R. 384, 390 (9th Cir.BAP2011).

Accordingly, this Court applies Arizona state law to determine Plaintiffs' eligibility to collect postpetition attorney's fees. Plaintiffs correctly state the applicable Arizona statute is A.R.S § 12–341.01. Section § 12–341.01(A) allows a trial court to award attorney fees to the prevailing party in "any contested action arising out of a contract, express or implied." *Cohen v. de la Cruz,* 523 U.S. 213, 223 (1998). Such awards are intended to "mitigate the burden of the expense of litigation to establish a just claim or a just defense." A.R.S. § 12–341.01(B). Under Arizona law, awarding attorneys' fees is discretionary and trial courts can consider, among other factors: (1) the merits of the unsuccessful party's claim; (2) whether the successful party's efforts were completely superfluous in achieving the ultimate result; (3) whether assessing fees against the unsuccessful party would cause extreme hardship; (4) whether the successful party prevailed with respect to all relief sought; (5) whether the legal question presented was novel or had been previously adjudicated; and (6) whether a fee award would discourage other parties with tenable claims from litigating. *Am. Const. Corp. v. Phila. Indem. Ins. Co.,* 667 F.Supp.2d 1100 (D.Ariz.2009); *Hall v. Read Development, Inc.,* 274 P.3d 1211 (Ariz.App. 1st Div.2012) (A trial court exercises its broad discretion to determine whether a party was successful in the litigation, as would allow award of attorney fees in action arising out of a contract).

**\*4** In the instant case, neither party denies the claims "arose out of" the lending agreements between the parties.

Clearly, the issue falls within the scope of A.R.S. § 12–341.01 and the possibility of an award of attorneys fees. The trial judge in the Gila County Action already awarded Plaintiffs attorneys' fees under this statute and this Court excepted those attorneys' fees along with the damages awarded to Plaintiffs, from Defendant's discharge. This Court now finds that § 12–341.01 allows Plaintiffs to collect reasonable attorneys' fees incurred postpetition.

Since the nondischargeabilty at issue arose from Defendant's fraudulent actions, award of attorney's fees is favored. Even prior to *Travelers,* attorney fees associated with prosecuting a claim under § 523(a)(2) were found to be excepted from discharge. "The Bankruptcy Code has long prohibited debtors from discharging liabilities incurred on account of their fraud, embodying a basic policy within the Code of affording relief only to an 'honest but unfortunate debtor.' " *Cohen v. de la Cruz,* 523 U.S. 213, 223 (1998), citing *Grogan v. Garner,* 498 U.S. 279, 287, 111 S.Ct. 654, 659–60, 112 L.Ed.2d 755 (1991); *Brown v. Felsen,* 442 U.S. 127, 138, 99 S.Ct. 2205, 2212–2213, 60 L.Ed.2d 767 (1979).

The Supreme Court in *Cohen v. de la Cruz,* 523 U.S. 213, 223, 118 S.Ct. 1212 (1998), gave a lengthy explanation as to why not only are the actual fraudulent amounts excepted, but also associated costs. The Court was concerned with the possibility that a debtor under 523(a)(2)(A) might "discharge any liability for losses caused by his fraud in excess of the amount he initially received, leaving the creditor far short of being made whole." *Cohen v. de la Cruz,* 523 U.S. at 223. The Court thus recognized the possibility of exception from discharge for "compensation not only for losses brought about by fraud but also for attorney's fees and costs of suit associated with establishing fraud." *Id.* The Court was not concerned about the burden placed on the debtor by the exception stating it was "unlikely that Congress ... would have favored the interest in giving perpetrators of fraud a fresh start over the interest in protecting victims of fraud." *Cohen v. de la Cruz,* 523 U.S. at 223, *citing Grogan v. Garner,* 498 U.S. at 285.

Other courts have expressed the same concern for making a creditor whole. When a creditor is forced to defend a judgement, courts have frequently awarded associated costs and attorney fees. Such courts state that awarding attorney fees to a creditor that has successfully prosecuted to judgment a nondischargeable fraud-based debt is to make creditor whole for all damages allowable under state law or contract arising out of a debtor's fraud. *In re Osborne,* 257 B.R. 28, 31 (Bankr.C.D.Cal.2000), citing *Merchs. Nat'l Bank of Winona v. Moen (In re Moen),* 238

B.R. 785, 795 (8th Cir.BAP1999).

Even if the Plaintiffs' claim did not satisfy the elements of A.R .S. § 12–341.01, courts have the discretion to award attorney fees under § 341.01 when the claims are so intertwined that withholding attorney fees would be unjustified. *See Modular Mining Sys. v. Jigsaw Techs, Inc.,* 221 Ariz. 515, ¶ 23, 212 P.3d 853, 860 (upholding fee award where contract and tort actions intertwined); *City of Cottonwood v. James L. Fann Contracting, Inc.,* 179 Ariz. 185, 194, 877 P.2d 284, 29 (App.1994) (trial court in best position to determine whether litigation on successful and unsuccessful claims so intertwined as to render fees for both compensable).

**\*5** A bankruptcy proceeding is substantially intertwined with a contract dispute when the evidence is directly related to and used in both proceedings and identical or substantially overlapping discovery would occur. *See First Nat'l Bank of Ariz. v. Cont'l Bank,* 138 Ariz. 194, 200, 673 P.2d 938, 944 (App.1983) (awarding fees under § 12–341.01 because "pre-complaint investigation and evaluation of the potential claim is part of the process and expense of litigation.").

In *Zeagler v. Buckley,* the plaintiff sued the defendant for breach of contract in state court, and the defendant filed bankruptcy. *Zeagler v. Buckley,* 219 P.3d 247, 248 (Ariz.App.2d Div.2009). During the administration of the defendant-debtor's estate, the plaintiff conducted discovery relevant to his contract action. *Id.* The defendant-debtor dismissed her bankruptcy petition, and the parties resumed the contract action in state court. *Id.* The trial court entered judgment in the plaintiff's favor. The plaintiff requested attorneys' fees for fees incurred before, during, and after the pendency of the bankruptcy. *Zeagler,* 219 P.3d at 248. The trial court awarded, and the appellate court upheld an award of those fees on the basis that the fees were " 'for obtaining information and establishing the [parties'] contractual rights, which would have occurred' regardless of the bankruptcy." *Zeagler,* 219 P.3d at 249.

The policy cited in *Zeagler* and others, is the goal of discouraging defendants from using bankruptcy court as a "safe harbor." "Disallowing fees would permit parties in contract actions to shield themselves from the imposition of fees by filing for bankruptcy and forcing their opponents to conduct costly discovery and other litigation in bankruptcy court." *Zeagler,* 219 P.3d at 249–250. "[B]ankruptcy court should not provide a safe harbor from the operation of § 12–341.01 when a party has filed for bankruptcy essentially as a strategic defense to a state-court claim ." *Id.; see also In re Gaines,* 178 B.R.

101, 105 (Bankr.W.D.Va.1995).

Related to the issue of being substantially intertwined is the inefficiency and wasted resources when the bankruptcy court is used to litigate the same issues determined in state court. *In re Behn,* attorney fees were awarded in bankruptcy court when the judge determined the dischargeability proceeding was basically a rehash of arguments previously rejected by state court. *In re Behn,* 245 B.R. 444 (Bankr.W.D.N.Y.2000). Based on *Travelers* and the other above-cited authority, this Court finds and concludes that Plaintiffs are entitled to reasonable attorneys' fees pursuant to A.R.S. § 12–341.01(A).

In Plaintiffs' Motion, pursuant to Rule 54(d)(2)(B)(iii), Plaintiffs state that a fair estimate of the amount of fees requested is $14,500.00. Plaintiff state that upon receipt of a ruling on their Motion, or if otherwise directed by this Court, Plaintiffs will submit a detailed fee application itemizing the fees at issue. Since the Court does not currently have an itemized billing statement, it is impossible for the Court to determine the reasonableness of the fees requested. The Court notes, however, that the $14,500 amount estimated is significantly greater than the amount awarded by the trial Court in the Gila County Action. It appears from the record that minimal new information was presented to this Court, which granted summary judgment based on the Arizona judgment. Rather, most information gathering and evidence production was required and already completed for the Gila County Action.

**\*6** Plaintiffs, as the party moving for an award of attorney's fees, have the burden of proof. *City of Colton v. Singletary,* 142 Cal.Rptr.3d 74 (Cal.App.4th Dist.2012). Trial judges are entrusted with discretion to determine the amount of fees awarded because they are in the best position to assess the value of the professional services rendered in their courts. *In re Durossette,* 2012 WL 8123382 (Bankr.E.D.Cal.2012). Courts should look at several factors when determining the reasonableness of attorney fees and costs consistent with Ariz. R. Civ.App. P. 21, Fed. R. Bankr.Proc. 7054, and Fed.R.Civ.P. 54 as set forth in 28 U.S.C. § 1920. This Court will determine the reasonableness of Plaintiffs' requested attorneys' fees when they file their affidavit of attorneys' fees and costs.

**IT IS ORDERED** a separate Order shall be entered overruling Defendant's objection; granting Plaintiffs' Motion for Award of Attorneys' Fees filed on April 16, 2013 (Dkt.36), and granting Plaintiffs 14 days to file an affidavit of attorney fees and costs, with service on Defendant; Defendant will be granted 14 days thereafter to file specific objections to the amount of attorneys' fees and costs requested, after which the Court will deem the matter submitted and enter a decision without further hearing.

Footnotes

1    Defendant believes that his homestead offers him no protection because it was recorded after the Arizona judgment. Defendant misconstrues liberal Montana homestead statutes, including MONT.CODE ANN. § 70–32–201 et seq. Plaintiffs' Arizona judgment is not secured by a mortgage, vendor's lien or construction lien, for which execution is allowed under § 70–32–202. A judgment creditor not within § 70–32–202 may apply for the appointment of a person to appraise the value of a judgment debtor's homestead, but no bid can be received at a sale of a homestead unless it exceeds the allowed exemption. MONT.CODE ANN. § 70–32–211; § 70–32–104(a).

---

**End of Document**                                        © 2015 Thomson Reuters. No claim to original U.S. Government Works.

476 B.R. 1
United States Bankruptcy Court,
D. Massachusetts,
Eastern Division.

In re OLD COLONY, LLC, Debtor.

No. 10–21100–HJB. | July 13, 2012. | As Amended
July 16, 2012.

**Synopsis**
**Background:** Undersecured creditor moved for determination of value of its secured claim, and Chapter 11 debtor objected to creditor's proof of claim.

**Holdings:** The Bankruptcy Court, Henry J. Boroff, J., held that:

[1] sales comparison approach utilized by secured creditor's expert in estimating value of real property that collateralized the creditor's claim was too speculative and insufficiently reliable;

[2] under Wyoming law, as predicted by bankruptcy judge in Massachusetts, security interest which mortgagee possessed in "rents" encompassed revenues from rooms in Chapter 11 debtor's hotel, and was perfected, as "interest in lands," by the recording of mortgage;

[3] amount of creditor's secured claim did not have to be reduced by postpetition adequate protection payments that creditor received for Chapter 11 debtor's use of hotel room revenues; but

[4] postpetition attorney fees and expenses were not allowable as addition to the unsecured claim of undersecured creditor.

Claim valued; objection sustained in part.

**Attorneys and Law Firms**

**\*2** Donald F. Farrell, Jr., Anderson Aquino LLP, James M. Liston, Bartlett Hackett **\*3** Feinberg, P.C., Jeffrey D. Ganz, Riemer & Braunstein LLP, Boston, MA, for Debtor.

*MEMORANDUM OF DECISION*

HENRY J. BOROFF, Bankruptcy Judge.

Before the Court is a motion filed by Wells Fargo, N.A. ("Wells Fargo") to determine the value of its secured claim against Old Colony, LLC (the "Debtor" or "Old Colony") and Old Colony's corollary objection to Wells Fargo's proof of claim. The motion and objection require the Court not only to determine the value of Wells Fargo's real property collateral, but also to opine upon three ancillary legal issues, each of which has divided bankruptcy courts across the nation—namely: (1) whether a security interest in hotel room revenues is an interest in real property (perfected under state real property recording statutes) or personal property (perfected by filing a financing statement in accordance with the relevant state's adoption of Article 9 of the Uniform Commercial Code); (2) whether postpetition adequate protection payments paid by a debtor to an undersecured creditor holding a security interest in postpetition revenues should be characterized as payment on the principal balance of the secured claim; and (3) whether a secured party's postpetition attorneys' fees are an allowable component of its un(der)secured claim.

**I. FACTS**

**A. Background and Filing of the Bankruptcy Case**
Old Colony is a Wyoming limited liability company formed in May 2007 by Joseph Cuzzupoli, the Debtor's managing member, and John Bullock.[1] The Debtor owns and operates The Inn at Jackson Hole (the "Inn"), an 83–room hotel located in Teton Village (near Jackson Hole), Wyoming. The Debtor purchased the Inn in 2007 with the intention of tearing it down and developing a new condominium-hotel. The purchase price of $26,000,000 for the Inn, the land, and the personal property (together, the "Property"), was paid by: (1) $6,000,000 from the Debtor; (2) a $16,500,000 loan from Jackson State Bank & Trust ("Jackson State"); and (3) $3,500,000 in seller financing.

The parties initially contemplated that the entire $20 million in financing would come from Jackson State. Shortly before closing, however, the Debtor learned that Jackson State would provide only $16.5 million of that

In re Old Colony, LLC, 476 B.R. 1 (2012)
78 UCC Rep.Serv.2d 60

amount because it claimed that its appraisal of the Property was outdated. Rather than delay the closing while waiting for an updated appraisal, the parties went forward with the transaction, with Johnson Resort Properties, Inc. providing the remaining $3.5 million in seller financing (the "Johnson Loan"), an interest-only loan with a one-year term. The Debtor intended to pay off the Johnson Loan upon the completion of an updated appraisal and the assumed disbursement of the remaining $3.5 million from Jackson State. However, after receipt of the updated appraisal, but prior to Jackson State loaning the additional funds, Jackson State was purchased by Wells Fargo, which declined to make the remaining disbursement.

The Debtor was unable to find an institutional lender to advance the funds needed to satisfy the Johnson Loan and its maturity date was fast approaching. The Debtor says that, in May 2008, it was thus **4** "forced" to obtain financing through a private lender, JH Lending Trust ("JH Lending"), which loan came with an interest rate of 15% (the "JH Loan"). The Debtor had hoped to refinance either or both of the Wells Fargo and JH Loans, but the prospects for refinancing dwindled with the contraction of the financial markets (and crashing real estate values) following the economic downturn of 2008. Saddled with the high interest on the JH Loan, the Debtor was unable to keep up with its debt service. Negotiations between the Debtor and Wells Fargo to restructure the original loan (the "Wells Fargo Loan") came to naught, and the Debtor filed this Chapter 11 Bankruptcy case on October 11, 2010 (the "Petition Date") to stave off Wells Fargo's impending foreclosure.

Shortly after filing the petition, the Debtor filed an emergency motion requesting authorization to use cash collateral (including cash, rents, and revenues from hotel operations), in which both Wells Fargo and JH Lending asserted security interests. Wells Fargo and the Debtor stipulated to the Debtor's use of cash collateral on an emergency interim basis, but issues remained in dispute. After an evidentiary hearing held on November 29 and 30, 2010, the Court authorized the use of cash collateral in accordance with the Debtor's submitted operating budget (the "Cash Collateral Order").

The Cash Collateral Order granted Wells Fargo and JH Lending Trust postpetition security interests in the collateral, but only to the extent of the prepetition enforceability of their liens. The order further provided that the lenders' respective liens would be recognized only to "the extent of any diminution in value of the Lender's cash and non-cash collateral." *See* Stip. Auth. & Approv. Interim Use Cash Collateral, Oct. 15, 2010, ECF

No. 24; *see also* Order re: Debtor's Mot. for Use of Cash Collateral, Nov. 4, 2010, ECF No. 45; Hr'g Tr. Day 2 63:2–9 (Nov. 30, 2010).[2] The Cash Collateral Order also required the Debtor to pay $40,000 monthly to Wells Fargo "[a]s additional adequate protection for the use of Wells Fargo's alleged cash and non-cash collateral." Cash Collateral Order 5 ¶ 5. However, the adequate protection payments would not be required "if the Court enter[ed] an order finding that Wells Fargo d[id] not have a perfected security interest in the revenue generated by the [Inn]." *Id.*

The parties agree that, as of the Petition Date and prior to the application of adequate protection payments, Wells Fargo was owed a total amount of $17,802,805.43, consisting of $16,500,000 in principal, $1,283,019.99 in interest, and $19,785.44 in prepetition legal fees and expenses. Stip. Fact 3–4 ¶ 12, Dec. 14, 2011, ECF No. 100. Further, the parties agree that Wells Fargo incurred $381,158.05 in postpetition legal fees and expenses through November 30, 2011. Stip. Fact 5 ¶ 20.

## B. The Inn at Jackson Hole

The Inn is located in Teton Village, Wyoming, in the heart of the Jackson Hole ski area and near Grand Teton National Park and Yellowstone National Park. The 83–room Inn is slightly more than 40 years old and offers various amenities, such as a pool and hot tub with deck, above-ground **5** parking, ski in and out access, and an on-site restaurant.[3]

As the recreational center for the Jackson Hole mountain resort, tourism drives much of Teton Village's economy. Before the economic downturn in 2008, property development in Teton Village was booming. The Debtor's own plans to raze the Inn and build a four-star, luxury condominium-hotel on the site reflect the demand for development opportunities at the time it purchased the Property. Based upon the Debtor's architectural and development plans, the Property appraised in 2008 at $32 million. Stip. Ex. 6 (the "2008 Appraisal"). With the crash of the financial markets shortly thereafter, however, the Debtor's redevelopment plans evaporated.

The Property thus continues to be operated as The Inn at Jackson Hole. The Debtor contracts with Metwest Terra Hospitality, LLC ("Terra") to manage the Inn, and all of the employees at the Inn are Terra's employees. Terra is responsible for daily management, advertising, reservations, staffing, accounts payable, and maintenance of the Inn's books and records. The Debtor oversees Terra's services, "makes overarching macro-level decisions with respect to the Inn operations, such as establishing an annual budget for operations, negotiation

of management agreements, and determination of policy matters," and maintains the books and records for the Debtor's operations. Discl. Stmt. 5, July 1, 2011, ECF No. 79. According to the Debtor, the Inn has been cash flow positive since the Petition Date and the Debtor has paid all postpetition operating expenses (other than debt service and professional fees). Discl. Stmt. 8. Technically, the Debtor continues to operate the Inn as a debtor in possession.

### C. The Disclosure Statement, Chapter 11 Plan, and Valuation Hearing

On July 1, 2011, the Debtor filed a disclosure statement (the "Disclosure Statement") and plan of reorganization (the "Plan") jointly proposed by the Debtor and Molokai Partners, LLC ("Molokai"), a New Jersey limited liability company.[4] The Plan contemplates that the Debtor (or, rather, Molokai) will remain in possession of the Inn postconfirmation, which will continue to operate as a going concern. The Plan proposes that the Wells Fargo Loan will be bifurcated into its secured and unsecured components and estimates the secured claim (the "Secured Claim") at $9 million, based on the Debtor's asserted valuation. The promissory note now held by Wells Fargo will be superseded by a "Wells Fargo Reorganization Note" in the amount of $9 million, secured by the prepetition first mortgage lien. The un(der)secured portion of Wells Fargo's claim (the "Unsecured Claim") will be paid pro rata with other unsecured claims. The Plan is to be funded by a $1 million cash infusion from Molokai to be allocated as follows: $623,000 for distribution to unsecured creditors; $150,000 reserve to pay allowed administrative claims in the event the Debtor has insufficient cash on hand to pay all such claims; and $227,000 (plus any money left over from the reserve funds) for capital improvements to the Inn.

On August 31, 2011, after the filing of the Plan, Wells Fargo filed its "Motion of *6 Wells Fargo Bank, N.A. for Valuation of Claim" (the "Valuation Motion"), and the Debtor subsequently objected to Wells Fargo's proof of claim (the "Claim Objection").[5] In the motion, Wells Fargo moved pursuant to 11 U.S.C. § 506(a)[6] for an order determining the value of its Secured and Unsecured Claims. The Debtor and Wells Fargo agree that setting the value of the Secured Claim is a necessary prerequisite to determining the adequacy of the Disclosure Statement and confirmability of the Plan.[7]

While the parties differ as to the value of the Property, there is no dispute that Wells Fargo is undersecured. The parties further agree that Wells Fargo holds a perfected security interest in any assets described in the mortgage securing the Wells Fargo Loan (the "Mortgage"), Stip. Ex. 3, which was perfected by the recording of the Mortgage in the Wyoming land records. They also agree that Wells Fargo does not have a perfected security interest in any assets that would have required the filing of a Uniform Commercial Code ("UCC") Article 9 financing statement with the Wyoming Secretary of State in order to perfect a secured interest, since no such financing statement was filed. Stip. Fact 5.

In order to determine the amount of Wells Fargo's Secured Claim, four issues must be resolved. The first is the value of the Property, as it is undisputed that Wells Fargo's secured claim against the Property is validly perfected. The second is whether Wells Fargo holds a perfected security interest in the Debtor's cash and hotel lodging revenues. Third, the Court must determine the appropriate application of postpetition adequate protection payments received by Wells Fargo during the Chapter 11 case. And fourth, the Court must resolve the question of whether Wells Fargo's postpetition legal fees and expenses can be added to its Unsecured Claim.

A trial on the question of the Property's value was conducted over two days. Four witnesses testified and 19 exhibits were admitted into evidence. At the conclusion of the trial, the issue of valuation and the additional questions of law were taken under advisement, and the parties were invited to submit proposed findings of fact and conclusions of law. Both have done so. The following constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

## II. POSITIONS OF THE PARTIES

### A. Value of the Property

#### 1. *Wells Fargo's Appraisal*

Wells Fargo relies on an appraisal conducted by Andrew Cornish of Rocky *7 Mountain Appraisals, Inc.,[8] wherein Cornish opines that the Property has a fair market value of $10,970,000. Stip. Ex. 4 (the "WF Appraisal"). That value is based largely on his conclusion that the highest and best use of the Property is as a "speculative purchase for future sale or development," WF Appraisal 71, and not the continued operation of the Inn.

Cornish began his analysis by valuing the Property under the income capitalization approach, calculating the

going-concern value of the Property at $10,306,897.89. He then used a modified sales comparison approach, and concluded that the value of the Property determined in this way is $10,970,000. He reached that valuation by reasoning as follows: first, using a classic sales comparison approach, he concluded that value of the Property as essentially "vacant" land was $8,275,000. But because he believed that immediate development of the Property was not feasible given the current market, Cornish next assumed that a prospective purchaser would likely conclude that the Inn should remain in operation during a "hold" period of 5 years before it was demolished and new development begun. Accordingly, using the stabilized net operating income determined during the income capitalization portion of his analysis, he added $2,770,000 to the value of the land—an amount equal to 5 years' net operating income—and subtracted the costs of demolition and a small amount of capital necessary to maintain the Inn during the hold period.

The Debtor criticizes Cornish's appraisal in several respects. With regard to the valuation of the land as vacant, the Debtor maintains that Cornish's approach was too speculative to warrant consideration. The Debtor also discounts the comparable sales relied on by Cornish as largely irrelevant. Two of the comparable sales pre-date the 2008 economic downturn, and the Debtor says they are too remote in time and economic circumstance to be given any weight. Cornish's remaining two comparables were based not on closed sales but on undisclosed purchase and sale agreements. In the Debtor's view, they are inadmissible. The Debtor further argues that Cornish did not substantiate his assumption that a 5–year "hold" period was appropriate.

The Debtor argues that, because the Plan provides for the Debtor to actually retain and operate the Inn, the Property should have been valued based on that proposed use. Accordingly, says the Debtor, the only appropriate valuation is that used by *its* appraiser, the income capitalization approach. And the Debtor criticizes Cornish's income capitalization analysis because, the Debtor says, it failed both to account for the value of the personal property at the Inn and to consider in more depth the true general expenses and capital expense requirements of the Inn in operation.

## 2. *The Debtor's Appraisal*

Christopher Kraus of PKF Consulting, Inc. conducted an appraisal of the Property on behalf of the Debtor. Stip. Ex. 5 (the "Debtor's Appraisal"). According to his

appraisal report and testimony at trial, Kraus opines that best use of the Property is its continued operation as the Inn, because current market conditions do not support the demolition and redevelopment of the Property. He did not rely heavily on a sales comparison analysis due to the lack of comparable sales transactions. But using an income capitalization approach, and deducting $1,150,000 for needed capital **8** improvements, Kraus concluded that the Property has a fair market value of $9,900,000. Further deducting $498,000 from that total to account for Kraus's estimate of the personal property value, the Debtor says that the Property's current value is $9,402,000.

Wells Fargo criticizes Kraus's appraisal for failing to appropriately support his conclusion that the "highest and best use" of the Property was the continued operation of the Inn and not a purchase for future redevelopment. Wells Fargo says that Kraus did not explicitly perform a highest and best use analysis, because he was guided by Cuzzupoli in selecting a going-concern analysis from the outset. Wells Fargo notes that Kraus himself valued the Property at $32 million in 2008 as a redeveloped condominium-hotel, and his failure to consider the Property's value based on possible future redevelopment was an error. According to Wells Fargo, Kraus's summary conclusion regarding the best use of the Property was inconsistent with the Uniform Standards of Professional Appraisal, because it was not based on an objective, quantitative analysis of the Property as vacant land.

Wells Fargo also maintains that the $1,150,000 deduction for capital expenditures was inflated and reflects more than is necessary for the Inn to maintain its current operations. In its own analysis of the proposed capital expenses, Wells Fargo concludes that $706,200 of the claimed expenditures is for "non-essential" improvements. Furthermore, since the Plan contemplates only a $227,000 contribution for capital improvements, Wells Fargo says the remaining $443,800 in expenses is not justified. Thus, according to Wells Fargo, Kraus's concluded value of the Property should be revised to discount these unnecessary expenditures.

Wells Fargo further argues that Kraus's allocation of $498,000 to the value of personal property is not reliable or justified since he is not a personal property appraiser and does not distinguish between fixtures and personalty. Accordingly, Wells Fargo argues that no deduction from Kraus's concluded value should be made on account of the asserted value of the personal property.

## B. Wells Fargo's Asserted Security Interest in Postpetition Revenues

In addition to granting a lien on the Property itself, the Mortgage also grants Wells Fargo a lien on all of the Debtor's "right, title, and interest in and to all present and future leases of the Property and all Rents from the Property." Mortgage 1. The Mortgage was properly recorded in the office of the Teton County Clerk, but no financing statement is on file with the Wyoming Secretary of State. Stip. Fact 5. The parties focus their arguments on the issue of whether the security interest in the Inn's room revenues (the "Room Revenues") is an interest in real property, perfected by the recording of the Mortgage, or an interest in personal property, which can only be perfected by the filing of a financing statement with the Wyoming Secretary of State pursuant to Article 9 of the UCC.

### 1. *Wells Fargo: Room Revenues are Rents*

Not surprisingly, Wells Fargo argues that the Room Revenues are rents and that the assignment of those rents was perfected when it recorded the Mortgage. Wells Fargo urges the Court to adopt the approach taken in cases such as *Financial Security Assurance, Inc. v. Days California Riverside Ltd. Partnership (In re Days California Riverside Ltd. Partnership),* 27 F.3d 374 (9th Cir.1994), and *T–H New Orleans Ltd. Partnership v. Financial* *9 *Security Assurance, Inc. (In re T–H New Orleans Ltd. Partnership),* 10 F.3d 1099 (5th Cir.1993). In those cases, the Ninth and Fifth Circuit Courts of Appeals, respectively, concluded that hotel room charges are "rents," because, *inter alia,* they represent payments for use of real property and because the parties intended that the assignment of rents clauses in those cases would encompass hotel room revenues. 10 F.3d at 1106, 27 F.3d at 376, 377. Wells Fargo asks this Court to agree with the analyses in *T–H New Orleans, Days California,* and other cases, where the courts have held that a general understanding of the meaning of *rent,* coupled with underlying economic realities, compels the conclusion that the Room Revenues are *rents.*

In further support of its argument, Wells Fargo points to Wyoming statutes that refer to the occupancy of a hotel room as a *rental,* arguing that this indicates that hotel room payments are considered *rent* under Wyoming law. Additionally, Wells Fargo notes that both the Restatement (Third) of Property and the Uniform Assignment of Rents Act define *rent* as a payment primarily for the possession, occupancy, or use of real property, and both include hotel room charges within that definition.

In response to the Debtor's assertion that a majority of courts consider hotel room revenues to be accounts receivable—personal property subject to the perfection requirements of Article 9 of the UCC—Wells Fargo argues that those courts applied an overly-formalistic approach in distinguishing the landlord/tenant relationship from the hotel owner/guest relationship. Wells Fargo says those cases also do not account for the references to hotel revenues as *rents* in Wyoming statutes and ignore economic realities. Finally, Wells Fargo maintains that, even if the Room Revenues do not constitute *rent,* they are subject to its prepetition lien as "proceeds" or "profits" of the Property.

### 2. *The Debtor: Room Revenues are Not Rents*

The Debtor says that Wells Fargo's argument has been rejected by the majority of courts that have considered it. Therefore, the Debtor would have the Court adopt the majority approach and find that the Room Revenues are not *rents,* but rather accounts receivable—personal property for which a perfected security interest required the filing of a UCC statement in the Wyoming Secretary of State's office. Since no financing statement is on file, the Debtor concludes that Wells Fargo has no perfected security interest in the Room Revenues.

Relying on other statutory provisions, the Debtor maintains that Wyoming law "delineates and distinguishes between a 'landlord and tenant' relationship and an 'innkeeper and guest' relationship." Debtor's Post–Trial Mem. 20 ¶ 14, March 9, 2012, ECF No. 123. Accordingly, the Debtor argues that while a tenant may pay *rent,* a guest in a hotel does not. Instead, the hotel guest has only a license to use the property—creating an account receivable that is considered personal, not real, property under the UCC. The Debtor further contends that the loan documents themselves reflect the parties' understanding that the filing of a UCC financing statement was required to perfect the security interest in the Room Revenues, and that understanding validates the conclusion that the Room Revenues constitute personal property subject to Article 9.

### C. Application of the Postpetition Adequate Protection Payments

### 1. *Wells Fargo: Postpetition Revenues are Added to the*

### Secured Claim

Wells Fargo argues that because § 552(b) extends its perfected security interest **10** in the Room Revenues to the revenues acquired postpetition, the Room Revenues represent collateral additional to the Property. Wells Fargo thus maintains that the collateral securing its claim has been increasing in value from and after the Petition Date. Therefore, Wells Fargo asks the Court to conclude that, by paying a portion of that cash collateral back to the bank, the Debtor has done nothing more than decrease the postpetition accrual of the Secured Claim, and the value of its Secured Claim with respect to its other collateral (the Property itself) should not be reduced by those payments.[9] Wells Fargo essentially asks this Court to adopt the holding in *Beal Bank, S.S.B. v. Waters Edge Limited Partnership,* 248 B.R. 668 (D.Mass.2000), and rule that the postpetition adequate protection payments simply "creat[ed] a wash between asset value and payments received by the creditor." Wells Fargo's Post–Trial Brief 25 ¶ 77, March 9, 2012, ECF No. 122.

Wells Fargo further argues that, even if this Court were to conclude that its security interest in the Room Revenues was not perfected, it was entitled to receive the adequate protection payments to protect against a diminution in the Property's value. Relying on testimony at trial to the effect that the Inn's revenues have declined during the case, "which has likely resulted in a corresponding diminution in value of the Property," *id.* at 27 ¶ 82, Wells Fargo says it is entitled to the adequate protection payments as compensation for a reduction in the Property's value, which diminution in value should be measured during the confirmation process.

### 2. *The Debtor: Postpetition Payments are Subtracted from the Secured Claim*

Because the Debtor maintains that Wells Fargo does *not* have a perfected security interest in postpetition Room Revenues, it also argues that those accumulated revenues could not have increased the amount of the Secured Claim. And since the Debtor says Wells Fargo's assertion that the Property has likely diminished in value postpetition has not been demonstrated, the Debtor further argues that the bank was not entitled to the payments as adequate protection. According to the Debtor, then, the payments can only be applied to reduce the amount of the Secured Claim, and should be deducted from the determined value of the Property.

### D. Postpetition Legal Fees and Expenses

#### 1. *Wells Fargo: Postpetition Attorneys' Fees Can be Added to the Unsecured Claim*

Wells Fargo asks the Court to allow its request to add its postpetition attorneys' fees to the amount of the Unsecured Claim. Because its prepetition contracts with the Debtor provide that the bank's attorneys' fees can be charged against the Debtor, Wells Fargo says it is entitled to claim those fees as part of its unsecured claim in light of *Travelers Casualty & Surety Co. of America v. Pacific Gas & Elec. Co.,* 549 U.S. 443, 127 S.Ct. 1199, 167 L.Ed.2d 178 (2007), where the Supreme Court held that a prepetition contract allocating payment of attorneys' fees is enforceable in bankruptcy unless the Bankruptcy Code provides otherwise. Relying on *SNTL Corp. v. Centre Insurance Co. (In re SNTL Corp.),* 571 F.3d 826 (9th Cir.2009), and *Ogle v. Fidelity & Deposit Co. of Maryland,* 586 F.3d 143 (2d Cir.2009), Wells Fargo says that its entitlement to attorneys' fees under prepetition **11** contract constitutes a contingent claim within the meaning of § 101(5)(A), which contingency (actually incurring the fees) occurred postpetition. Wells Fargo further maintains that the reference to allowance of attorneys' fees in § 506(b) is relevant only to determining whether the fees may be applied to the secured portion of a creditor's claim, and does not prohibit the addition of postpetition attorneys' fees to the unsecured portion of the claim if allowed by a prepetition contract.

#### 2. *The Debtor: Postpetition Attorneys' Fees are Not Allowable as Part of the Unsecured Claim*

The Debtor argues that Wells Fargo is not entitled to legal fees or expenses, because those claims are "categorically disallowed" to undersecured or wholly unsecured creditors by § 506(b), which provides for the inclusion of postpetition attorneys' fees only if a creditor is oversecured. Because it is undisputed that Wells Fargo is undersecured, the Debtor maintains that Wells Fargo is entitled to no postpetition attorneys' fees, whether as part of its secured or unsecured claim. In addition, the Debtor asserts that even were Wells Fargo entitled to add the postpetition attorneys' fees to its unsecured claim, Wells Fargo has failed to demonstrate the reasonableness of its fees and expenses, and such a determination must be postponed for further hearing.

## III. DISCUSSION

### A. Value of the Property

[1] Because Wells Fargo is undersecured, § 506(a) mandates that the amount of the Secured Claim be determined by reference to the value of its collateral. 11 U.S.C. § 506(a) ("An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property...."); *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assoc., Ltd.,* 484 U.S. 365, 372, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) ( "The phrase 'value of such creditor's interest' in § 506(a) means 'the value of the collateral.' "); *In re SW Hotel Venture, LLC,* 460 B.R. 4, 25 (Bankr.D.Mass.2011) ("the court must determine the value of the secured creditor's collateral").[10] "In determining fair market value, 'the court can only endeavor to make a reasonable estimate of value based upon expert testimony presented to it in court,' " *In re Park W. Hotel Corp.,* 64 B.R. 1013, 1020 (Bankr.D.Mass.1986) (quoting *Peninsula Fed. Savs. & Loan Ass'n. v. R & H Inv. Co., Inc. (In re R & H Inv. Co., Inc.),* 46 B.R. 114, 116 (Bankr.D.Conn.1985)), keeping in mind that the value must also "be determined in light of the purpose of the valuation and the proposed disposition or use of the property that is collateral," *SW Hotel,* 460 B.R. at 25 (citing *In re Winthrop Old Farm Nurseries, Inc. v. N. Bedford Inst. for Savs. (In re Winthrop Old Farm Nurseries, Inc.),* 50 F.3d 72, 75–76 (1st Cir.1995)).

As this Court has previously explained:

> It is well understood that there are three (3) recognized methodologies for valuing real estate. By the cost approach, the appraised value typically reflects the reproduction cost or the replacement cost of the subject property. The sales comparison approach relies on **\*12** recent comparable sales. Those sales prices are then adjusted by the degree to which those properties differ from the subject property. By the income approach, the net operating income of the property (gross income less the expenses) is divided by a capitalization rate to obtain the fair market value of the property. Because the cost approach rarely provides an accurate reading of the fair market value of the real estate, appraisals routinely disregard it or mention it

only in passing, and concentrate their efforts on the sales comparison and income approaches and then adjust for any differences between the two.

*150 N. St. Assocs. Ltd. P'ship v. City of Pittsfield (In re 150 N. St. Assocs. Ltd. P'ship),* 184 B.R. 1, 6 (Bankr.D.Mass.1995). In this case, neither expert relied on the cost approach to value the Property, instead utilizing—to different degrees—the sales comparison and income approaches.

### 1. The Property as Vacant Land for Future Redevelopment: The Sales Comparison Approach

[2] Cornish[11] concluded that the Property's value is $10,970,000 based on a highest and best use of the Property as "speculative purchase for future resort development." WF Appraisal 71. Accordingly, he placed full weight on the sales comparison approach for his final analysis. The highest and best use of a property is "[t]he reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value." WF Appraisal 65 (quoting Appraisal Institute, *The Appraisal of Real Estate,* 306 (12th ed. 2001)); *see also In re Waterville Valley Town Square Assocs.,* 208 B.R. 90, 96 (Bankr.D.N.H.1997) (quoting Appraisal Institute, *The Dictionary of Real Estate Appraisal* (3d ed. 1993)). Both appraisers testified, and the Court agrees, that redevelopment of the Property is both legally permissible and physically possible. The Court is not persuaded, however, that Cornish's conclusion as to the highest and best use of the Property was either "appropriately supported" or "financially feasible."

Cornish relied on four properties in undertaking a sales comparison analysis to determine the value of the Property as essentially "vacant land." The first sale ("Comparable 1") occurred in February 2008, arguably prior to the economic downturn, and related to a much smaller property containing an outmoded hotel. The fourth comparable used ("Comparable 4") was the prior sale of the Inn to the Debtor. As previously noted, that sale occurred in 2007, also prior to the economic downturn. To adjust for changing market conditions, Cornish discounted the sale prices of Comparables 1 and 4 by 55% and gave them less weight in the final determination of the Property's current value.

In re Old Colony, LLC, 476 B.R. 1 (2012)
78 UCC Rep.Serv.2d 60

However, even with the 55% discount to account for the devaluation of property since the latter part of 2008, the Court finds that neither Comparable 1 nor Comparable 4 are reliable benchmarks for comparison to determine the Property's value today. Not only are those sales quite remote in time (between 3 and 4 years before Cornish's appraisal), but there was no reliable proof that even a discount of **\*13** 55% appropriately accounted for the decreased value of similar properties since 2008. Cornish testified that the 55% discount was chosen based primarily on a review of depreciating values of condominiums in the area, where values had depreciated between 24.90% and 55.63%. But the largest percentages of depreciation (43.62% and 55.63%) were taken from the asking prices of two properties that remained active listings at the time the appraisal was conducted—leaving open the possibility that the final sale price would be less than the amount sought (thus increasing the amount of depreciation).[12] And with respect to Comparables 2 and 3, Cornish noted that *those* properties had been devalued from 2007 in the respective amounts of 61.06% and 52.62%. In sum, given the span of time since Comparable Sales 1 and 4, taken together with the substantial (and not yet fully understood) depreciations in value, the Court is not persuaded that Cornish's adjustments for Comparables 1 and 4 are sufficiently accurate to form any basis for estimating the Property's value.

Comparables 2 and 3 are likewise entitled to little weight, but for different reasons. Both were pending sales at the time of the appraisal and ultimately, according to Cornish's testimony, neither sale was ever consummated. Cornish testified that the failure of the pending sales to close had no effect on his opinion of valuation, since they represented a "meeting of the minds of a buyer and a seller that happened the first time in three or four years where they met at a particular price.... So—negotiations is as valuable information as I have, and it doesn't affect my current opinion." Trial Tr. Day 1 85:24–86:6.

[3]  [4]  While pending sales of properties other than the property being appraised may be admitted in connection with a valuation hearing, the Court cannot give them substantial weight here.[13] First, while the **\*14** Court finds that Cornish's adjustments to Comparables 2 and 3 were justified and reasonable, there are no comparable closed sales to support the conclusion that the pending sale prices can accurately be used to determine the market value of the Debtor's Property.

More importantly, the lack of closed sales and the fact that neither of the pending sales was ultimately consummated raise a substantial question as to whether purchase of the Property with the intent to later redevelop

it (rather than a purchase of the Property in order to operate the Inn as a going-concern) is, as Cornish determined, actually financially feasible. Cornish concedes that "the development of new commercial product is currently not financially feasible due to the existing soft market." WF Appraisal 71. This conclusion is certainly unassailable, especially in light of the abundance of data cited throughout the appraisal.[14] Cornish therefore concludes that the Property should be valued based on a *speculative purchase for future development.* But he does not explain why speculative future development is any more feasible at this juncture than immediate development. Cornish views Comparables 2 and 3 as evidence that there is currently a market for properties that have future development potential, but the failure of those sales to reach closing may be indicative of a lack of confidence in the financial feasibility of such future development.[15]

[5]  As Cornish himself notes, the sales comparison approach is "applicable when an active market provides sufficient quantities of reliable data that can be verified from authoritative sources" and "is relatively unreliable in an inactive market or in estimating the value of properties for which no real comparable sales data is available." WF Appraisal 83. The market for vacant land to be purchased for future development in the Teton Village area is **\*15** functionally inactive at this time and the paucity of comparable sales results in insufficient data for comparison.[16] The Court is therefore not persuaded that Cornish appropriately supported his conclusion that the speculative purchase of the Property for future redevelopment represents the highest and best use of the Property.

Cornish's appraisal suffers from a further infirmity that diminishes its reliability as an adequate estimate of the current market value of the Property. Because he concludes that the Property, if purchased for redevelopment, would not actually be redeveloped immediately, he factors in the income from the Property that would be generated during the "hold" period. He hypothesizes a 5–year hold period, in part because he concluded that the Property would require significant maintenance at the end of those five years. *See* WF Appraisal 105. But he also testified that his 5–year hold hypothesis was reached intuitively and the determination was difficult because "[i]t's predicated on the emotions of the market and the velocity of sales." Trial Tr. Day 1 40:20–21; *see also* Trial Tr. Day 1 94:13–15 ("it just seems that five years was best replicating what I felt and what I felt a buyer would feel coming to the market"). He further testified that the hold period chosen by a potential purchaser could be shorter or longer, and that changes to

the hypothesized hold period would affect the total value estimate. *See* Trial Tr. Day 1 64:18–22; 95:15–96:19. The Court finds that there was insufficient evidence (i.e., market or other data) to conclude that a 5–year hold period is an appropriate length of time to employ for the needed analysis. Given that the amount of time used as a hold period had such a direct impact on the ultimate estimated value of the Property, the Court concludes that the portion of value attributable to that income-producing hold period is unreliable.

In sum, the Court finds that the value of the Property asserted by Wells Fargo is too speculative and unreliable to sufficiently persuade the Court that its value should be adopted for purposes of the present Valuation Motion. Accordingly, the Court finds that the income capitalization approach is the more appropriate vehicle for estimating the value of the Property in this case.[17]

### *16 2. *The Property as a Going Concern: The Income Capitalization Approach*

[6] Both Kraus[18] and Cornish used an income capitalization approach to estimate the value of the Property as a going concern, relying on historical financial information provided by the Debtor and verified as reasonable through comparison to objective market data. Both Kraus and Cornish supported their estimated stabilized net operating income and capitalization rates through analysis of relevant sources. And, in fact, their concluded values under the income capitalization approach were quite close under the circumstances—a difference of $406,897.89. The Court ultimately finds, however, that adoption of the value estimated in Kraus's appraisal is far more justified than that posited by Cornish.

One area of major difference between Cornish and Kraus's values lies in their different analyses of the cost of capital improvements that are needed for the Property. Cornish factored in only $75,000 worth of capital expenditures in discounting the Property's market value. He chose that value, however, because he had already concluded that the Inn would be razed after 5 years, and the $75,000 reflected only those improvements he believed were necessary to maintain the Property through that 5–year period. Thus, his capital expenditure figure did not account for several maintenance issues that pose much larger cost challenges to the Property as a going concern. For instance, Cornish's appraisal "assumes the integrity of the rear retaining wall," WF Appraisal 5, which clearly is an issue of some concern. *See Id.* (describing problems with wall); *see also* Debtor's

Appraisal III–14 (incorporating cost of repair of wall). Cornish also did not include any capital expenditures for replacement or maintenance of the roof, another high-cost maintenance item that is apparently a significant problem for the Property. *See* Stip. Ex. 7 (estimating cost of roof repair); Trial Tr. Day 2 80:13–14 (Feb. 17, 2012), ECF No. 117. Accordingly, the Court concludes that Cornish's appraisal does not appropriately take into account the cost of capital expenditures a potential purchaser would anticipate if buying the Property and would factor into the purchase price.

Even more problematic is Cornish's admission that his income capitalization approach did not use as "refined" an accounting of capital expenditures as would have **17** been used if determining value solely based on that approach. He testified that there was some "fine tuning ... that would have needed to be examined if I had determined [the going-concern value of the Inn] to be the highest and best use, probably of more refined expense accounting and other things that in observation would have only diminished this value and made that 10.3 million dollar value less than it actually is." Trial Tr. Day 1 63:3–9. Since Cornish admits that his income capitalization approach was essentially incomplete, as it failed to fully consider the capital expenditures a buyer would anticipate when purchasing the Property, the Court finds that Kraus's income capitalization value is more reliable.

Wells Fargo takes issue with Kraus's $1.15 million deduction for capital expenditures, arguing that those expenditures are not necessary for the Inn to maintain its current performance levels. Given the age and condition of the Inn observed during his site visit, Kraus requested information regarding historical capital expenditures and management and ownership plans for capital expenditures going forward. Upon receipt of that information, he determined that the listed expenses were, in his experience, "a reasonable amount of capital that would need to be spent ... in order for [the Property] to ... really stay competitive, not lose market share and begin to further deteriorate." Trial Tr. Day 2 33:11–14. Richard Walls, Terra's Vice President of Finance and Administration employed by the Debtor to manage the operations of the Inn, also testified that the list of capital expenditures provided to Kraus were those items necessary to "maintain the revenues" and "hold the rate." Trial Tr. Day 2 80:9–10; 102:19.

Wells Fargo also intimates that the capital expenditure amount was inflated after the Debtor and Walls received a copy of a draft appraisal. However, Kraus's testimony was that he received an initial capital expenditure list

prior to disseminating the draft appraisal, and that the subsequently-received list was simply an updated estimate of capital expenditures. Trial Tr. Day 2 57:7–59:17. The Court found his testimony on this point to be credible and supported by a relevant email exchange between Walls and Kraus submitted into evidence by Wells Fargo. *See* Wells Fargo Exs. 10, 11; Stip. Ex. 7. The emails contain no statement that would raise a suspicion that Walls was trying to inflate the capital expenses to lower the Property's value—indeed, the communications are nothing more than an inquiry by Kraus requesting updated information in order to finalize the appraisal and Walls's succinct response. The Court therefore concludes that the testimony of Kraus and Walls, as well as the relevant exhibits, support Kraus's use of the $1.15 million capital expenditure deduction in his appraisal.

### 3. *Value of the Personal Property*

[7] Kraus concluded that the value of the personal property was $498,000, based on the replacement cost of the personal property contained in the rooms discounted to reflect its depreciation. The Court does not quarrel with that valuation. But, although Walls testified that the personal property in the rooms was not attached (with the exception of drapery hardware), the Court cannot discern from Kraus's appraisal whether and to what extent any of *his* personal property valuation reflected the value of fixtures. As such, the Court reiterates the position that it took at the conclusion of trial, that "Wells Fargo presented me with no evidence on the point[19] **18** and the debtor's evidence is not useful.... So I'm looking at [the reduction of value attributed to non-fixtures] having been waived...." Trial Tr. Day 2 128:9–129:2.[20] Therefore, the Court deducts no amount for the valuation of personal property, as it has received no reliable evidence regarding the value of personal property minus the value of the fixtures.

In sum, the Court finds that Kraus's appraisal is more reliable and persuasive and accords it substantial weight. The Court accepts the Debtor's asserted value of the Property, but without a discount for the purported value of personal property. Accordingly, the Court finds that the Property's value is $9,900,000.

### B. The Security Interest in Room Revenues
[8] The loan and mortgage executed by the Debtor clearly contemplated that Jackson State (and now Wells Fargo) would obtain a security interest in all of the Debtor's

property—both real and personal. In addition to securing the Wells Fargo Loan with a lien on the Property, the Mortgage states:

> Grantor presently assigns to Lender *all of Grantor's right, title, and interest in and to all present and future leases of the Property and all Rents from the Property. In addition, Grantor grants to Lender a Uniform Commercial Code security interest in the Personal Property and Rents.*

> THIS MORTGAGE, INCLUDING THE ASSIGNMENT OF RENTS AND THE SECURITY INTEREST IN THE RENTS AND PERSONAL PROPERTY, IS GIVEN TO SECURE (A) PAYMENT AND PERFORMANCE OF THE OBLIGATIONS AND (B) PERFORMANCE OF ANY AND ALL ADDITIONAL OBLIGATIONS UNDER THE NOTE ..., THE LOAN DOCUMENTATION, AND THIS MORTGAGE.

Mortgage 1 ¶ 5 (emphasis supplied). *Rents* are defined as "all present and future rents, revenues, income, issues, royalties, profits and other benefits derived from the Property." *Id.* at 11.[21]

Wyoming law governs the creation and perfection of the security interests under the Mortgage, *Butner v. U.S.,* 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979), although the Wyoming Supreme Court has stated that "[d]ecisions of other courts offer persuasive support when questions of the interpretation of uniform laws arise." **19** *B & W Glass, Inc. v. Weather Shield Mfg., Inc.,* 829 P.2d 809, 814 (Wyo.1992). Perfection of a security interest in real property is governed by statute (the "Recording Statutes"); Wyoming Statute § 34–1–121 provides that:

> Each and every deed, mortgage, instrument or conveyance touching any interest in lands, made and recorded, according to the provisions of this chapter, shall be notice to and take precedence of any subsequent purchaser or purchasers from the time of the delivery of any instrument at the office of the county clerk, for record....

Wyo. Stat. § 34–1–121; *see also Countrywide Home Loans, Inc. v. First Nat'l Bank of Steamboat Springs, N.A.,* 144 P.3d 1224, 1228 (Wyo.2006). And under Wyoming Statute § 34–1–120, "[e]very conveyance of real estate within this state, hereafter made, which shall not be recorded as required by law, shall be void, as

against any subsequent purchaser...." Wyo. Stat. § 34–1–120. A "conveyance" under the Recording Statutes is "construed to embrace every instrument in writing by which any estate or interest in real estate is created, alienated, *mortgaged* or assigned, or by which the title to any real estate may be affected in law or equity...." Wyo. Stat. § 34–1–102 (emphasis supplied).

Security interests in other types of property, however, are primarily subject to Wyoming's version of Article 9 of the UCC ("Article 9"). Article 9, in turn, excepts from its requirements "the creation or transfer of an interest in or lien on real property, including a lease or rents thereunder." Wyo. Stat. § 34.1–9–109(d)(xi). Thus, Article 9 perfection requirements do not apply to security interests in leases or rents *to the extent that* they involve "the creation or transfer of an interest in or lien on real property." *Id.*

The case law is now replete with decisions addressing whether revenues generated by a hotel are *rents,* and whether the room revenues are considered real or personal property interests. The context in which the issue is raised varies. Some of the cases involve issues of perfection—i.e., whether a security interest in hotel room revenues must be perfected according to the dictates of UCC Article 9 or under the state's real property recording statutes.[22] The courts have gone both ways on this question, with some courts concluding that hotel room revenues are payments for the use of real property and security interests therein should be recorded under real property recording statutes, *see, e.g. Travelers,* 190 Ill.Dec. 340, 621 N.E.2d at 215, and others holding that hotel room revenues are not derived from the creation of an interest in real property and a security interest in those revenues must be perfected by filing an Article 9 financing statement, *see, e.g., Kearney,* 92 B.R. at 102.

In other cases, courts have examined the nature of hotel room revenues in determining whether they could constitute *rents* to which a postpetition security interest could attach **\*20** under the prior version of § 552.[23] And yet other cases have addressed the same issues in deciding whether hotel room revenues constitute cash collateral.[24]

## 1. *The Majority Approach: Perfection is Governed by the UCC*

The Debtor is correct that a majority of the courts have held that hotel room revenues are not interests in real property, but constitute personal property, and that any lien on those revenues must be perfected by complying

with Article 9 of the UCC. Many of those cases reject the notion that payment for use of a hotel room is an interest in real property because they are persuaded that hotel guests are "mere licensees and not tenants," and thus have only a personal contract with the hotelier and acquire no interest in realty.[25] Because hotel guests, in their view, only receive a " 'general intangible' in the nature of a license," *Kearney* 92 B.R. at 99, perfection **\*21** of the security interest is governed by Article 9.[26]

In reaching this determination, the courts have relied on distinctions drawn in case law and various state statutes between the landlord/tenant relationship and the hotel guest/innkeeper relationship.[27] And the same reliance on this landlord/tenant versus hotel guest/innkeeper distinction is found in cases considering whether hotel room revenues are *rents* under Article 9 or under the terms of the parties' underlying contract.[28] In those cases, the courts have similarly concluded that payments for use of a hotel room are either license or contract payments and, therefore, personal property and not *rents* within the meaning of the relevant statutory or contractual language.[29]

There is also some reliance in the case law on the view that hoteliers provide *services,* and that the provision of a room is incidental to that service. *See, e.g., Green Corp.,* 154 B.R. at 824; *Kearney,* 92 B.R. at 101 ("as concerns the words 'rents thereunder,' what is referred to are the rents payable to the lessor under the provision of a lease, not charges made by the lessee for services it provides to its patrons, even though those services include furnishing rooms in the leased premises for the use of its guest") (quoting *United States v. P.S. Hotel Corp.,* 404 F.Supp. 1188, 1192 (E.D.Mo.1975), *aff'd* 527 F.2d 500 (8th Cir.1976)).

## 2. *The Minority Approach: Perfection is Governed by Land Recording Statutes*

On the other side of the debate are those courts that have disagreed with the majority, holding instead that room revenues *are rents,* in the nature of an interest in real estate. Accordingly, a security interest in hotel room revenues *is* covered by an assignment of rents clause, the reference to *rents* in Article 9, or the after-acquired property exception in former § 552(b). And, because the room revenues, as *rents,* involve an interest in real property (at least to some degree), a security interest in those revenues is perfected when recorded in the relevant land records.[30]

The courts taking the minority position have generally espoused a broader view of the meaning of *rents,* as used either in former § 552(b) or the exception provision **\*22** of Article 9, with most concluding that the term *rent* contemplates all consideration paid for use or occupancy of property.[31] This is also the approach taken by the Restatement (Third) of Mortgages, which defines *rents* as "proceeds payable by a lessee, licensee, or other person for the right to possess, use, or occupy the real property of another." Restatement (Third) of Property (Mortgages) § 4.2(a). The comments to that section explicitly state that the "definition includes hotel room charges," *id.* at cmt. (e), which are accordingly "mortgageable to the same extent as any other interest in real property," *id.* at cmt. (b).

In determining that hotel room revenues constitute *rents,* the minority courts have seen little significance in the tenant/licensee distinctions relied on by the majority. As one court explained:

> The content of the respective statutes shows the legislature's intent to mutually exclude the two kinds of relationships from the respective regulatory schemes.... [D]istinctions legislatively drawn for the purpose of establishing rights and duties *as between the parties to the relationship in question* have nothing whatsoever to do with the dispute at hand.

*Mid–City Hotel,* 114 B.R. at 640 n. 6 (emphasis supplied).[32]

The minority does not, therefore, conclude that hotel guests acquire nothing more than a personal property right in a hotel room. Rather, in the words of one court, hotel room charges "arise primarily from the hotel occupant's use of the underlying real estate and hence are an interest in real estate." *Travelers,* 190 Ill.Dec. 340, 621 N.E.2d at 214 (citing *In re Schaumburg,* No. 87B 14301, 1989 WL 359490 (Bankr.N.D.Ill. Jan. 12, 1989)). And in *Mid–City,* even though the court held that hotel room revenues were not *rents,* but rather "profits," the court disagreed with those cases that "focused upon the alleged tenuousness of the connection between the mortgaged real estate and the revenues," as they "simply did not recognize the economic realities of the cases before them"; the room revenues were derived from interests in real estate subject to a mortgage and exempt from the UCC filing requirements. 114 B.R. at 642, 644.[33]

**\*23** The minority also disagrees with the assertion that a hotel primarily provides services to its guests, and some courts expressly state that the provision of services is simply not a useful characteristic for distinguishing hotel room revenues from *rents.*[34] And finally, the Court must note the minority's determination that viewing hotel revenues as *rents* better comports with parties' intent and commercial expectations. As explained by the Ninth Circuit Court of Appeals, "[t]o deprive the lender of what he bargained for at closing, especially when that expectation matches the intent of the borrower, is inequitable and ignores widely accepted lending practices of the business community." *Days California,* 27 F.3d at 377.[35]

### 3. *Perfection of the Mortgage on Room Revenues under Wyoming Law*

This Court agrees with the minority and finds that the Wyoming Supreme Court would rule that hotel room revenues are indeed *rents,* as that term is commonly understood, for the reasons so amply described by the minority courts. That conclusion comports with the "plain and ordinary meaning of the word[ ]," which the Wyoming Supreme Court looks to in interpreting state legislation. *Michael's Const., Inc. v. Am. Nat'l Bank,* 278 P.3d 701, 705 (Wyo.2012).

The distinction between tenants and hotel guests does not answer the question of "what is *rent?* " As one commentator aptly noted in response to the argument that the tenant/hotel guest distinction informs the definition of *rent:* "[n]o one can question the premise that tenants pay rent, but it is quite another thing to say that *only* a tenant pays rent." R. Wilson Freyermuth, *Of Hotel Revenues, Rents, and Formalism in the Bankruptcy Courts: Implications for Reforming Commercial Real Estate Finance ("Hotel Revenues"),* 40 U.C.L.A. Law Rev. 1461, 1477 (1993). The minority view, as reflected in the Restatement, has the more logical answer: As payment for the right to "possess, use, or occupy the real property" of the Debtor, guests of the Inn paid *rent.* Restatement (Third) of Property (Mortgages) § 4.2(a). Accordingly, the Court concludes that the security interest in rents referred to in the **\*24** Mortgage was intended to encompass the Room Revenues.[36]

But the question under the only relevant Wyoming law is not whether the Room Revenues here can be *described* as *rents,* but whether the revenues "touch [ ] any interest in lands," Wyo. Stat. § 34–1–121, or relate to "the creation or transfer of an interest in or lien on real property," Wyo.

Stat. § 34.1–9–109(d)(xi).[37]

The various statutes referred to by the parties in this case are not particularly useful in making this determination. Wells Fargo notes that hotel room revenues have been referred to as *rents* in certain Wyoming statutes,[38] but for the reasons just discussed, the Court can find those references dispositive. The Debtor has placed great emphasis on the distinctions in Wyoming law between landlord and tenant relationships and innkeeper and guest relationships.[39] The Court **\*25** finds, however, that the statutes addressing tenant and landlord rights and duties contrasted with those of a lodger do not speak to the question of whether hotel room revenues or an assignment of those revenues "touches" upon a real property interest. *See, e.g.* Freyermuth, *Hotel Revenues,* 40 U.C.L.A. Law Rev. at 1468. ("[T]he distinction between the remedies of the tenant and hotel guest merely clarifies their respective positions vis-à-vis the owner of the premises. This distinction has no necessary consequence in characterizing the nature of their respective obligations.").

Clearly, the landlord-tenant relationship *does* involve an interest in an estate of land, and a security interest taken in such rents is perfected under the Recording Statutes. And it is also clear that Wyoming recognizes that landlord/tenant relationships are distinguishable from innkeeper/guest relationships. *See, e.g., Flores v. Simmons,* 999 P.2d 1310, 1312 (Wyo.2000) (distinguishing duties of landlord/tenant from those of innkeeper/guest). But that does not necessarily mean that anything less than the sort of real property interest obtained by a tenant cannot be characterized as some lesser "interest" in land. Hotel patrons pay to obtain the right to exclusive use of a piece of real estate (albeit small) for a period of time; "a hotel guest not only has the right to occupy building space for a delineated period, but he or she also has the right to exclude others, including, in many situations, the hotel management." Reporter's Note, Restatement (Third) Property: Mortgages § 4.2.

While tenants may acquire an "estate" in land, *interests* in land are different from "estates in land." *See Darr v. Lone Star Indus., Inc.,* 94 Cal.App.3d 895, 901, 157 Cal.Rptr. 90 (1979) ("[a]n interest in land is not presumptively an estate in land"). Acknowledging the greater real property rights of a tenant does not require the Court to conclude that hotel guests have *no* interest in real property. It is difficult to draw lines and definitional boundaries around all the possible rights and interests that can be obtained in real property. However, sharp boundaries are not always to be found:

[a]rrangements          between

landowners and those who conduct commercial operations upon their land are so varied that it is increasing difficult and correspondingly irrelevant to attempt to pigeonhole these relationships as 'leases,' 'easements,' 'licenses,' 'profits,' or some other obscure interest in land devised by the common law in far simpler times.

*Golden W. Baseball Co. v. City of Anaheim,* 25 Cal.App.4th 11, 36, 31 Cal.Rptr.2d 378 (1994), *superseded by statute on other grounds,* as noted in *Hubbard v. Brown,* 50 Cal.3d 189, 266 Cal.Rptr. 491, 785 P.2d 1183, 1185–86 (1990).

The shades and complexities inherent in property interests, and the fallacy of attempting to "pigeonhole" every property interest into some traditional property concept, have long been recognized by the Wyoming Supreme Court. That court has instead analyzed property interests in other contexts with an eye toward the "real world," and has not limited its property concepts to narrow, formalistic categories. *See, e.g., Flores,* 999 P.2d at 1313 (noting that while a mobile home is deemed personalty in some contexts, under the facts **\*26** of the case before it, it was "unquestionably a dwelling which may become the object of a landlord and tenant relationship."); *Williams v. Watt,* 668 P.2d 620, 623–24 (Wyo.1983) (acknowledging a change in real property analysis to take account of modern circumstances and not wed to historical property concepts).

In *Denver Joint Stock Land Bank of Denver v. Dixon,* for instance, the Wyoming Supreme Court demonstrated its willingness to take account of modern circumstances, especially in relatively new areas of property law. Noting that historical concepts of real and personal property are not always equipped to encompass changing property concepts, the court opined with regard to traditional property labels and definitions that: "Terminology is convenient, and in fact necessary, but it should not be abused." 57 Wyo. 523, 122 P.2d 842, 849 (1942).

This Court agrees with the minority view that common sense and experience compel the conclusion that hotel room charges "arise primarily from the hotel occupant's use of the underlying real estate and hence are an interest in real estate." *Travelers,* 190 Ill.Dec. 340, 621 N.E.2d at 214.[40] The Court also finds that the Wyoming Supreme Court would conclude the same and hold that the Room Revenues constitute "an interest affecting real property,"

because they unquestionably "relate[ ] to and affect[ ] real estate." *Elliott v. Sioux Oil Co.,* 191 F.Supp. 847, 850 (D.Wyo.1960) (quoting *Stone v. Wright,* 75 F.2d 457, 460 (10th Cir.1935)). Therefore, this Court holds that Wells Fargo properly perfected its security interest in the Room Revenues when it recorded its Mortgage with the Teton County Clerk.[41]

## C. Application of Postpetition Payments

[9] Pursuant to the Cash Collateral Order, "[a]s additional adequate protection for the use of Wells Fargo's alleged cash and non-cash collateral," the Debtor has been making monthly payments to Wells Fargo in the amount of $40,000. The parties dispute whether, in determining the amount of the Secured Claim, those payments should be credited to the secured portion of Wells Fargo's claim vis-à-vis the Property—i.e., deducted from the value of the Property and hence from the total amount of the Secured Claim.

While a majority trend is developing, there remains a split among the courts as to the appropriate allocation of postpetition payments to an undersecured creditor with a secured interest in both real property and postpetition revenues. As Judge Saris described in *Beal Bank, S.S.B. v. Waters Edge Limited Partnership:*

> The Maginot line is clearly drawn. The "subtraction" cases hold that post-petition rent payments to the undersecured creditor should be subtracted from the secured portion of the creditor's claim as measured by the value of **\*27** the real estate. Conversely, the "addition" cases hold that the amount of post-petition rents not reinvested into real estate should be added to the size of the creditor's secured claim, and that payment of those rents decreases the total amount of the creditor's claim but not the secured portion of its claim as measured by the value of the real estate.

248 B.R. 668, 685 (D.Mass.2000). Judge Saris ultimately adopted the "addition" approach, *id.* at 686, and this Court agrees with that conclusion.

As previously discussed, § 506(a) provides that a secured creditor's claim is a secured claim to the extent of the

value of the collateral. 11 U.S.C. § 506(a). The Court has already determined the value of the Property to be $9,900,000. Since the Court has also determined that Wells Fargo's security interest in the Room Revenues was validly perfected on the Petition Date, that security interest extends to postpetition Room Revenues by operation of 552(b)(2), which provides:

> (2) ... if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to amounts paid as rents of such property or the fees, charges, accounts, or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties, then such security interest extends to such rents and such fees, charges, accounts, or other payments acquired by the estate after the commencement of the case to the extent provided in such security agreement....

11 U.S.C. § 552(b)(2).

Because Wells Fargo's collateral consists of postpetition Room Revenues, the value of its Secured Claim has increased by operation of § 552(b) and § 506. *In re Union Meeting Partners,* 178 B.R. 664, 675 (Bankr.E.D.Pa.1995); *In re Vermont Inv. Ltd. P'ship,* 142 B.R. 571, 573 (Bankr.D.C.1992). The Room Revenues "constitute separate collateral apart from the underlying [Property] that generates the proceeds." *In re Machinery, Inc.,* 287 B.R. 755, 764 (Bankr.E.D.Mo.2002) (collecting cases). Wells Fargo's collateral thus "consists of the sum of [its] separate security interests in the [Property] *and* the accumulated post-petition rents." *Beal,* 248 B.R. at 686 (emphasis in original); *see also In re Landing Assocs., Ltd.,* 122 B.R. at 293. "Therefore, the accumulated rents must be added to the real Property in the valuation of [Wells Fargo's] secured claim." *In re Columbia Office Assocs. Ltd. P'ship,* 175 B.R. 199, 202–03 (Bankr.D.Md.1994); *see also In re Flagler–at–First Assocs., Ltd.,* 114 B.R. 297, 301 (Bankr.S.D.Fla.1990).[42]

Accordingly, "[t]he result is essentially a 'wash' in that the additional collateral value **\*28** represented by the [Room Revenues] is to be set-off by the fact that [Wells

Fargo] has already received them during the course of the Chapter 11. No further reduction of the ... secured claim is appropriate." *Flagler,* 114 B.R. at 302.[43] The *aggregate* value of Wells Fargo's claim has been decreased by the postpetition adequate protection payments, but the amount of the Secured Claim has not. *See Union Meeting,* 178 B.R. at 677 (postpetition payments subtracted from the "amount of the aggregate claim," but not from the secured portion). Therefore, in connection with any hearing on confirmation of the Plan, the Court will need to determine the value of the Room Revenues generated postpetition (less the Debtor's § 506(c) expenses[44]) and the total amount of postpetition adequate protection payments received through that date to determine the final value of Wells Fargo's Secured and Unsecured Claims.

## D. Postpetition Attorneys' Fees

[10] Postpetition attorneys' fees and expenses may be awarded to an *over* secured creditor pursuant to § 506(b), if reasonable and provided for in the underlying agreement or pursuant to state law. 11 U.S.C. § 506(b).[45] Because of the specific reference to oversecured creditors in that section, the Debtor argues that the failure to similarly provide for undersecured or unsecured creditors means that such fees are "categorically denied." This *inclusion unius est exclusio alterius*[46] argument has **\*29** previously been considered and rejected by this Court in *In re Tricca,* 196 B.R. 214 (Bankr.D.Mass.1996).

In *Tricca,* the Court considered whether an oversecured creditor was entitled to its *prepetition* legal fees, payment of which was contingent upon the debtor exercising her right of redemption in certain real property. When the Trustee sold the property postpetition and paid the mortgagee its full principal and interest, the Court found that the Trustee had exercised that right of redemption, thus triggering the contingency. When the creditor then filed a request for its legal fees and expenses under § 506(b) notwithstanding its failure to include that entitlement under the note and mortgage, the Trustee objected on grounds that the fees and expenses were not specifically provided for in the underlying agreement between the creditor and the debtor. The Court agreed with the Trustee's conclusion, holding that those fees could not be included as part of the creditor's secured claim pursuant to § 506(b). *Id.* at 219.

But the Court further considered whether the fees were allowable as a general unsecured claim. Noting that "[m]any cases ... seem to assume that where there is no agreement for payment of legal fees and costs, § 506(b) disallows an oversecured creditor's claim entirely," *id.* at 219, the Court explained why a closer look at the relevant

Code provisions dictated otherwise:

> This Court believes that those cases read § 506(b) too broadly. Section 506(b) is not a provision which concerns itself with claim allowance. Section 506(b) addresses only the question of what is part of an "allowed secured claim." Those courts which have examined § 506(b) in conjunction with § 502 have concluded that § 506(b) does not create additional exceptions to the allowance of claims; rather it only provides for the classification of allowed claims as secured or unsecured.

> Therefore, while § 506(b) precludes a claim from assuming secured status, it is still necessary to examine 11 U.S.C. §§ 101(5) and 502(b) to determine whether the Bank's claim for legal fees and costs may be allowable as an unsecured claim.

> Pursuant to § 101(5)(A), a claim is defined as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." A contingent claim is one marked by uncertainty as to whether any obligation will ever arise. As this circuit has recognized, the term "claim" is broad enough to encompass an unliquidated, contingent right to payment even though the triggering contingency does not occur until after the filing of the petition. *Woburn Assoc. v. Kahn (In re Hemingway Transport, Inc.),* 954 F.2d 1, 8 (1st Cir.1992).

> ...

> A claim, as defined in § 101(5), is deemed allowed unless it is objected to by a party in interest. § 502(a) and (b). Sections 502(b)(1)-(8) set forth categories of claims that may not be allowed. Contingent legal fees and costs are not among those prohibited claims. Since the Bank's contingent claim for legal fees and costs is not disallowed by any of the provisions of § 502(b), the Bank has a valid pre-petition claim for legal fees and costs.

> Therefore, this Court holds that where a creditor's claim for legal fees and costs may not be maintained under § 506(b) as an allowed secured claim ... the creditor may still enjoy an unsecured claim for such fees and expenses.

**\*30** *In re Tricca,* 196 B.R. at 219–221 (additional citations omitted). The Court reaffirms this legal analysis, as it was reinforced by the First Circuit in *UPS Capital Business Credit v. Gencarelli (In re Gencarelli),* 501 F.3d 1, 5 (1st Cir.2007) ("Section 502, not section 506(b),

affords the ultimate test for allowability, and any claim satisfying that test is, at the very worst, collectible as an unsecured claim.").

But the *Tricca* issue is distinguishable from that before this Court. In *Tricca,* the asserted claim was for legal fees and expenses incurred *prepetition*. Here, the issue relates to legal fees and expenses incurred *postpetition*. And with respect to whether postpetition legal fees and expenses incurred by an undersecured creditor are allowable as a general unsecured claim, there is a split of authority.

*In SNTL Corp. v. Centre Ins. Co. (In re SNTL Corp.),* the Ninth Circuit Court of Appeals held that "the parties' execution of a prepetition agreement containing an attorneys' fees provision gives rise to a contingent, unliquidated attorney-fee claim." 571 F.3d 826, 843 (9th Cir.2009). Interpreting the definition of "claim" under § 101(5)(A), the Ninth Circuit found that the "right to collect the fee existed prepetition" even though the fees were not incurred until after the case was filed. *Id.*[47]

In *Woburn Assocs. v. Kahn (In re Hemingway Transport, Inc.),* the First Circuit Court of Appeals similarly concluded that a contingent right to payment could constitute a prepetition claim under § 101(5)(A) and § 502(b), even though the contingency occurred postpetition. 954 F.2d 1, 8 (1st Cir.1992); *see also Tricca,* 196 B.R. at 220–221. In *Hemingway,* the First Circuit considered whether a prepetition indemnification contract created a prepetition contingent right to payment that constituted a claim under §§ 101(5) and § 502(b). In determining that the indemnification contract *was* a prepetition claim, despite the fact that the contingency did not occur until after the petition date, the First Circuit recognized that an indemnity agreement creates an *existing* "right to payment, albeit contingent, *upon the signing of the agreement.*" *Hemingway,* 954 F.2d at 8 n. 9 (emphasis supplied) (quoting *In re M. Frenville Co.,* 744 F.2d 332, 336 (3d Cir.1984), *overruled on other grounds by In re Grossman's, Inc.,* 607 F.3d 114 (3d Cir.2010)).[48]

*31 [11] But the First Circuit has not held that all prepetition contractual rights to payment of attorneys' fees are prepetition contingent claims under §§ 101(5)(A) and § 502(b). In a post-*Hemingway* case, in fact, the First Circuit implied just the opposite. *See Adams v. Zimmerman,* 73 F.3d 1164 (1st Cir.1996). In *Adams,* the First Circuit was called upon to interpret provisions under the National Bank Act governing claims against an insolvent financial institution to determine whether an entity claiming entitlement to attorneys' fees had a "provable" claim against the bank "on the date of insolvency." *Adams,* 73 F.3d at 1177. The court noted that

"[t]he availability of attorneys' fees for an unsecured creditor depends on *whether they accrued* pre-insolvency or whether they accrued post-insolvency. Those incurred prior to the insolvency are recoverable while those incurred afterwards are not." *Id.* The Court then went on to note that this line between pre- and post-insolvency regarding the allowance of attorneys' fees was "analogous to requests for attorneys' fees in the bankruptcy context." *Id.* In making this analogy, the Court implicitly rejected the notion that a contractual provision allocating payment of attorneys' fees would automatically create a "contingent" claim for fees ultimately incurred postpetition. Instead, the Court noted that "[p]repetition attorneys' fees of unsecured creditors against an insolvent debtor are generally allowed under the bankruptcy code to the extent the applicable law so provides, and post-petition attorneys' fees are generally not allowed." *Id.*

And more recently, in *Gencarelli,* the First Circuit was careful to avoid any indication that it meant to obliterate the line between allowability of pre- and post-petition attorneys' fees. In that case, the First Circuit held that, where an estate is *solvent,* a prepetition contractual right to a prepayment penalty could be asserted against the debtor's estate as an unsecured claim even though the penalty was "unreasonable" and could not therefore be included in the creditor's secured claim under § 506(b). Stating that there was "no principled basis for treating attorneys' fees differently from prepayment penalties" in the context of the case before it, *Gencarelli,* 501 F.3d at 6 n. 1, the court held that "unsecured creditors may recover their attorneys' fees, costs and expenses *from the estate of a solvent debtor* where they are permitted to do so by the terms of their contract and applicable non-bankruptcy law." *Id.* (quoting *Official Comm. Of Unsecured Creditors v. Dow Corning Corp. (In re Dow Corning Corp.),* 456 F.3d 668, 683 (6th Cir.2006)). Emphasizing that the bankruptcy estate was solvent and that all creditors would be paid in full, the *Gencarelli* court took care to note that its "opinion should not be construed as speaking to the different question of whether an unsecured creditor can enforce a contractual right to post-petition fees against the estate of *insolvent* debtor under section 502." *Gencarelli,* 501 F.3d at 7 (emphasis in original).

This Court believes that, while no First Circuit case is directly on point, both the holdings and *dicta* in *Hemingway, Adams,* and *Gencarelli* strongly indicate the First Circuit's view that, where the bankruptcy *32 estate is unable to pay all other creditors in full, postpetition attorneys' fees are not allowable as part of an unsecured claim even where provided for in the underlying contract.

The Court therefore declines to adopt the position taken in *SNTL*, as urged by Wells Fargo. And even not compelled to so by its analysis of First Circuit decisions, this Court would similarly conclude, as have others, that:

> a prepetition contract for postpetition legal services does not give the attorney a claim against the estate. Under 11 U.S.C. § 101(5)(A), a 'claim' includes any contingent right to payment, but ... the attorney in this case accrued a 'claim' only when he actually provided the postpetition services for which the debtor agreed to pay him; therefore, his 'claim' is not a prepetition claim against the estate but a postpetition claim....

*Knutson v. Tredinnick (In re Tredinnick),* 264 B.R. 573, 577 (9th Cir. BAP 2001) (Tashima, J. concurring) (quoting *In re Hines,* 147 F.3d 1185, 1192 (9th Cir.1998)).[49]

Accordingly, Wells Fargo's Unsecured Claim may not be augmented by the inclusion of any postpetition attorneys' fees.

## IV. CONCLUSION

The Court finds that the value of Wells Fargo's real property collateral (the Property) is $9,900,000. The Court also rules that Wells Fargo holds a perfected prepetition security interest in the Room Revenues, and that security interest extends to the postpetition revenues by operation of § 552(b)(2). The postpetition adequate protection payments thus reduced the total amount of Wells Fargo's claim, but did not reduce the amount of the Secured Claim. Finally, the Court holds that Wells Fargo's postpetition attorneys' fees and expenses are not recoverable as part of its unsecured claim.

Consistent with the Debtor's representation that an amended plan and disclosure statement would be filed within 14 days from the issuance of this Memorandum, the Debtor will be ordered to file its amended disclosure statement and plan on **33** or before July 27, 2012. At the hearing on confirmation of the Debtor's amended plan, the Court will determine the final amounts of Wells Fargo's Secured and Unsecured Claims in accordance with the findings and rulings set forth herein. An order in conformity with this Memorandum shall issue forthwith.

**Parallel Citations**

78 UCC Rep.Serv.2d 60

Footnotes

[1]    The Debtor is currently owned by several additional individuals and various corporate entities. However, Cuzzupoli and Bullock continue to hold a majority aggregate interest in the Debtor with respective ownership interests of 41.63% and 31.53%.

[2]    The Cash Collateral Order has been renewed several times during the case, most recently on April 13, 2012. The substance of the Order has remained the same in all relevant respects. Any reference to the Cash Collateral Order will be to the order as renewed throughout the pendency of the case. *See* Agreed Orders Auth. & Approv. Cont. Use of Cash Collateral & Grant of Adequate Protection, Feb. 23, 2011 (ECF No. 70); July 25, 2011 (ECF No. 86); Feb. 7, 2012 (ECF No. 115); April 13, 2012 (ECF No. 126).

[3]    Currently, the restaurant is owned and operated by a company (not affiliated with the Debtor) that leases the space from the Debtor.

[4]    Unless a distinction is necessary, the Court will refer to the "Debtor's" position as that taken by both the Debtor and Molokai with regard to the Plan and the issues raised in this Memorandum.

[5]    The Debtor filed the formal objection to Wells Fargo's claim on December 15, 2011, the day before the evidentiary hearing on the Valuation Motion was to commence. The Claim Objection raises issues identical to those raised by the Valuation Motion, and the parties agreed that this Court's disposition of the Valuation Motion will also be dispositive of the Claim Objection. Trial Tr. Day 1 100:22–101:21, Dec. 16, 2011, ECF No. 112.

[6]    Unless otherwise stated, all references to statutory sections are to sections of Title 11 of the United States Code (the "Bankruptcy Code" or the "Code"). *See* 11 U.S.C. §§ 101 *et seq.*

[7]    Regardless of the resolution of the issues currently before the Court, the parties have agreed that the Debtor will file an amended plan and disclosure statement 14 days after the issuance of this Memorandum and accompanying Order. Stip. Re: Sched. Hr'gs on

Valuation & Discl. Stmt. 4 ¶ 6, Aug. 31, 2011, ECF No. 92; Sept. 1, 2011, ECF No. 95.

[8]    The parties have agreed that both the Debtor's and Wells Fargo's appraisers are qualified to testify as expert witnesses. Stip. Fact 6.

[9]    As of December 1, 2011, the Debtor had made adequate protection payments to Wells Fargo in the total amount of $460,000. Stip. Fact 4 ¶ 19.

[10]    Pursuant to Bankruptcy Rule 3012, "the court may determine the value of a claim secured by a lien on property in which the estate has an interest on motion of any party in interest and after a hearing on notice to the holder of the secured claim and any other entity as the court may direct." Fed. R. Bankr.P. 3012.

[11]    The parties stipulated that both appraisers testifying in this matter are experts in their field, and the Court agrees. Cornish's background appraising real estate in the Jackson area for over twenty years, together with his MAI designation from the Appraisal Institute (a designation of advanced competency in commercial appraisals) and his credible testimony, leave the Court with no doubt that he is highly qualified.

[12]    In fact, in the appraisal, Cornish notes that two recent sales of condominiums reflected 76.5% and 65% devaluations, respectively. WF Appraisal 32. While these were distress sales and may represent a steeper value drop than for other properties in the area, the depression of prices in the market resulting from a high volume of distressed sales led Cornish to state that condominium prices "may be poised for more devaluation." WF Appraisal 34.

[13]    The Court disagrees with the Debtor's assertion that the fact that Comparables 2 and 3 were pending sales renders them inadmissible for the purpose of establishing the Property's value. While mere offers to purchase have been found inadmissible to establish market value, *see, e.g., U.S. v. Smith*, 355 F.2d 807, 811 (5th Cir.1966), an executed purchase and sale agreement may be admissible, even where the agreement relates to a property other than the one being valued, *see, e.g., United States v. 312.50 Acres of Land, More or Less, Situated in Prince William Cnty., Commonw. of Va.*, 812 F.2d 156, 157 (4th Cir.1987); *Smith*, 355 F.2d at 812; *Wolff v. Commonw. of P.R.*, 341 F.2d 945, 947 (1st Cir.1965) (purchase and sale agreement was some evidence of property value); *City of Phoenix v. Clauss*, 177 Ariz. 566, 869 P.2d 1219, 1223 (1994) ("executory contracts for sale are admissible as comparable sales in condemnation proceedings"); *but see Brush Hill Dev., Inc. v. Commonwealth*, 338 Mass. 359, 155 N.E.2d 170, 174 (1959) (noting that the Massachusetts Supreme Judicial Court had stated in other cases that purchase and sales agreements were not admissible for property other than the one being valued; but also noting that it did not, in the case before it, need to "reconsider these two decisions or determine whether possible infirmities in such testimony ... should not more reasonably go to the weight of the testimony than its competency"). The Court does conclude, however, that pending sales agreements may be given less *weight* where the contract is to purchase property other than the one being valued or if the sale was never consummated. *See, e.g., Clauss*, 869 P.2d at 1223 ("objections to the validity of executory contracts affect the *weight* of the evidence rather than its *admissibility* "); *J. William Costello Profit Sharing Trust v. State Roads Comm'n*, 315 Md. 693, 556 A.2d 1102, 1104 (1989) ("Unlike offers and options, contracts for the purchase of land are binding obligations, not lightly ignored; the fact the contracts have not progressed into sales seems to go to the weight of the evidence rather than to its sufficiency.") (quoting *State Roads Comm'n v. Wyvill*, 244 Md. 163, 223 A.2d 146, 153 (1966)).

[14]    *See, e.g.,* WF Appraisal 15 (drastic reductions in construction industry tax collection in 2010 and 2011 "reflect[ ] the cessation of the robust real estate economy"); 16 ("Prior to the current economic correction, plans for several new resorts were being investigated by developers.... However, the recent economic downturn has currently stopped plans for such development"); 18 (approved expansion development at Grand Targhee Ski Area has not has taken place due to the economic downturn); 20 (nearly completed development of spa and retail building at Snow King Mountain stalled due to economic downturn); 25 (real estate industry contracting as result of current recession); 34 (building permit data for 2008–2010 are "indicative of a reported 13 year low mark that is reflective of current economic conditions."); 35 (hardest hit commercial real estate "has been development parcels" for mixed use; "[r]edevelopment of these parcels is now not economically feasible"); 39 (prior to 2008, vacant commercial land prices were growing in Teton Village, but "[n]o sales of large development parcels have occurred in the time period subsequent to the value correction" and "Teton Village development parcels are opined to be a relatively hard-hit segment of the market"); 42 ("investor and resort properties such as condotels may take longer to recover, as new avenues for the retail financing of these products needs to evolve").

[15]    At trial, Cornish alluded to a recent purchase of property in the area where development plans are already in place. Trial Tr. Day 1 43:17–22. The Court is unable to factor this purchase into its analysis, however, as it is not contained in the appraisal and no details relative to that sale were provided through testimony. And Cornish further testified that there is currently no active development in Teton Village. Trial Tr. Day 1 65:1–11.

[16]    Interestingly, Cornish concluded with regard to his income capitalization analysis that a sales comparison approach to the Property as a going concern was inappropriate since "[t]here are no such comparables that exist that would in any way enhance or increase

the reliability of the report...." Trial Tr. Day 1 97:15–23. The relative non-existence of adequate comparables, however, did not similarly lead Cornish to conclude that his valuation of the Property as vacant land was not reliable.

17    Because the Court finds that Cornish's conclusion regarding the highest and best use of the Property as essentially vacant land is not adequately supported, the Court declines to weigh in on the current debate in the case law regarding whether a valuation that considers a use different from that proposed by the Debtor should be considered in conjunction with a § 506(a) valuation. *Compare, e.g., In re Bell,* 304 B.R. 878, 881–82 (Bankr.N.D.Ind.2003) (under *Associates Commercial Corp. v. Rash,* 520 U.S. 953, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997), the question is whether the debtor proposes to surrender or retain the property; if the debtor proposes to retain, the property must be valued at replacement value, not necessarily dependent upon debtor's proposed use of the property); *In re Sherman,* 157 B.R. 987, 991–92 (Bankr.D.Texas 1993) (equities compelled valuation at highest and best use different from the use proposed by debtors); *In re Ehrich,* 109 B.R. 390, 392 (Bankr.D.S.D.1989) (real estate should be valued at its highest and best use if the creditor can prove the land is more valuable for a purpose different than that proposed by the debtor and that the highest and best use is not speculative); *Speck v. United States,* 104 B.R. 1021, 1023 (Bankr.D.S.D.1989) ("[w]hile the use proposed by the debtor should be considered in determining the value of the collateral, the bankruptcy judge should not have his hands tied"); *with McElwee v. Adams Cnty. Nat'l Bank (In re McElwee),* 449 B.R. 669, 672 (Bankr.M.D.Pa.2011) (court must give due consideration to debtor's intended use of the property; proposed use is pivotal to determining valuation); *In re Bishop,* 339 B.R. 595, 600 (Bankr.D.S.C.2005) (Supreme Court's mandate in *Rash* requires court to examine debtor's actual proposed use of property, "*not* the various dispositions or uses that *might* have been proposed") (quoting *Rash,* 520 U.S. at 964, 117 S.Ct. 1879); *United States v. Donato (In re Donato),* 253 B.R. 151, 155 (Bankr.M.D.Pa.2000) ("to automatically apply the 'highest and best' use value to the real estate, without examining its proposed or intended use, is not proper"); *In re Foster,* 79 B.R. 906, 908 (Bankr.D.Mont.1987) (debtor's proposed use should determine focus of appraisal and value should not be based on "speculating on uses different from those proposed in the plan").

18    As with Cornish, this Court agrees with the parties that Kraus, with over 14 years of experience with PKF (a hotel consulting firm providing a variety of services, including hotel valuation) is highly qualified as an expert in the field of hotel valuations, and the Court found his appraisal and testimony to be both credible and thorough.

19    Because Cornish valued the Property as though the buyer would plan to demolish the Inn after 5 years, the value of the personal property was irrelevant to his analysis. Trial Tr. Day 1 50:22–51:20; 68:12–18.

20    The Court's use of the term "waived" was inartful. Said properly, the Debtor failed to meet its burden of proof.

21    Personal property is addressed in the Loan Agreement, which provides:
          (b) Borrower hereby grants to Lender, in order to secure all of the Obligations, a security interest in the following personal property of the Borrower, all of which shall be deemed to be included within the definition of "Collateral" as defined herein:
          (i) All personal property of the Borrower, including without limitation all Inventory ..., all Receivables ..., all Fixtures and Equipment ..., and all General Intangibles ..., whether now owned or hereafter acquired or arising, and wherever located, together with all deposit accounts, together with obligations and all products and proceeds therefrom....
     Stip. Ex. 1 (Loan Agreement) 13 § 6.1(b). The Loan Agreement further defined "Collateral" as including "any substitutions for, accessions and modifications to and other additions and replacements for any of the Collateral any other rights or interests arising out of in connection with any of the Collateral." *Id.* at 13 § 6.1(b)(i). Because no UCC financing statement is on file, however, the security interest in the personal property is not perfected.

22    *See Great–West Life & Annuity Assur. Co. v. Parke Imperial Canton, Ltd.,* 177 B.R. 843, 856 (N.D.Ohio 1994); *In re Nendels–Medford Joint Venture,* 127 B.R. 658, 662–63 (Bankr.D.Oregon 1991); *In re Ashoka Enters., Inc.,* 125 B.R. 845, 846 (Bankr.S.D.Fla.1990); *Sacramento Mansion, Ltd. v. Sacramento Sav. & Loan Assoc. (In re Sacramento Mansion, Ltd.),* 117 B.R. 592, 601 (Bankr.D.Colo.1990); *Super 8 Motels, Inc. v. M. Vickers, Ltd. (In re M. Vickers, Ltd.),* 111 B.R. 332, 333 (D.Colo.1990); *Kearney Hotel Partners v. Richardson (In re Kearney Hotel Partners).* 92 B.R. 95, 96 (Bankr.S.D.N.Y.1988); *Travelers Ins. Co. v. First Nat'l Bank of Blue Island,* 250 Ill.App.3d 641, 190 Ill.Dec. 340, 621 N.E.2d 209, 213 (1993).

23    *See, e.g., Parke Imperial,* 177 B.R. at 851–52; *Casco N. Bank v. The Green Corp. (In re The Green Corp.),* 154 B.R. 819, 821–22 (Bankr.D.Me.1993); *In re Thunderbird Inn, Inc.,* 151 B.R. 224, 226 (Bankr.D.Ariz.1993); *In re Corpus Christi Hotel Partners, Ltd.,* 133 B.R. 850, 854 (Bankr.S.D.Tex.1991); *Greyhound Real Estate Fin. Co. v. Official Unsecured Creditor's Comm. (In re Northview Corp.),* 130 B.R. 543, 548 (9th Cir. BAP 1991); *Sacramento Mansion,* 117 B.R. at 601.
          Under § 552(a), property acquired postpetition is not subject to a prepetition security interest. Exceptions to that general rule are provided by § 552(b). Prior to 1994, § 552(b) extended prepetition security interests to postpetition property:
          if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, product, offspring, rents or profits of such property, then such security interest extends to such proceeds, product, offspring, rents or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law....

Thus, even if a creditor had a valid prepetition security interest in hotel revenues, if those revenues did not constitute "proceeds, product, offspring, rents, or profits" of the debtor's property, then the creditor had no postpetition extension of its lien. In 1994, the Bankruptcy Code was amended to clarify that valid prepetition liens in hotel revenues extend postpetition to the extent they are valid prepetition whether or not they would be considered *rent* under any particular state's law, thus ending the debate as to whether valid prepetition liens on hotel revenues were rendered unenforceable postpetition solely on grounds that they were not *rents* within the meaning of subsection (b). The reference to *rents* in former subsection (b), now subsection (b)(1), was deleted, and a new subsection (b)(2) was inserted, which provides:

> if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and *to amounts paid as rents of such property or the fees, charges, accounts, or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties, then such security interest extends to such rents and such fees, charges, accounts, or other payments acquired by the estate* after the commencement of the case to the extent provided in such security agreement.

11 U.S.C. § 552(b)(2) (emphasis supplied). While this amendment rendered irrelevant any distinction between *rents* and hotel room revenues under former subsection (b), it does not resolve state law questions regarding the creation and perfection of security interests in hotel room revenues.

24    *In re HT Pueblo Prop., LLC,* 462 B.R. 812, 818 (Bankr.D.Colo.2011); *In re Ocean Place Dev., LLC,* 447 B.R. 726, 733–34 (Bankr.D.N.J.2011); *Nendels–Medford,* 127 B.R. at 663; *In re Shore Haven Motor Inn, Inc.,* 124 B.R. 617, 618 (Bankr.S.D.Fla.1991).

25    See *Ocean Place,* 447 B.R. at 732–33; *Parke Imperial,* 177 B.R. at 852, 858; *Green Corp.,* 154 B.R. at 823–24; *Sacramento Mansion,* 117 B.R. at 606, 607; *Kearney,* 92 B.R. at 99 (quoting *In re Greater & Atl. & Pac. Inv. Grp., Inc.,* 88 B.R. 356, 359 (Bankr.N.D.Okla.1988)); 49 Am.Jur.2d *Landlord and Tenant* 6 (1970).

26    See also *Ocean Place,* 447 B.R. at 732; *Parke Imperial,* 177 B.R. at 858; *In re Ashoka,* 125 B.R. at 846; *Shore Haven,* 124 B.R. at 618; *Sacramento Mansion,* 117 B.R. at 607.

27    See *Ocean Place,* 447 B.R. at 734–35; *Green Corp.,* 154 B.R. at 824; *Sacramento Mansion,* 117 B.R. at 603, 606–07; *Kearney,* 92 B.R. at 100.

28    *HT Pueblo,* 462 B.R. at 817; *Nendels–Medford,* 127 B.R. at 663; *Vickers,* 111 B.R. at 334, 336.

29    See *Ocean Place,* 447 B.R. at 732; *Green Corp.* 154 B.R. at 824; *Sacramento Mansion,* 117 B.R. at 606, 607; *Vickers,* 111 B.R. at 336.

30    *Fin. Sec. Assur., Inc. v. Days Cal. Riverside Ltd. P'ship (In re Days Cal. Riverside Ltd. P'ship),* 27 F.3d 374, 376–77 (9th Cir.1994); *T–H N. Orleans Ltd. P'ship v. Fin. Sec. Assur., Inc. (In re T–H N. Orleans Ltd. P'ship),* 10 F.3d 1099, 1105 (5th Cir.1993); *Bellevue Place Assocs. v. Caisse Centrale Des Banques Populaires (In re Bellevue Place Assocs.),* 173 B.R. 1009, 1018–19 (Bankr.N.D.Ill.1994); *In re S.F. Drake Hotel Assocs.,* 131 B.R. 156, 160–61 (Bankr.N.D.Cal.1991); *Pavilion Hotel, Inc. v. Valley Nat'l Bank of Ariz.,* 180 Ariz. 498, 885 P.2d 186, 192 (1994); *accord Everett Home Town Ltd. P'ship,* 146 B.R. 453, 457 (Bankr.D.Ariz.1992) (examining whether "suite revenues" at golf and racquet club are *rents* for purposes of former version of § 552(b)); *Mid–City Hotel Assocs. v. Prudential Ins. Co. of Am. (Mid–City Hotel Assocs.),* 114 B.R. 634, 642–43 (Bankr.D.Minn.1990) (hotel room revenues are "profits" of the real estate).

31    See *Fin. Sec. Assur., Inc. v. Tollman–Hundley Dalton, L.P.,* 74 F.3d 1120, 1124 (11th Cir.1996); *T–H New Orleans,* 10 F.3d at 1105 ("[H]otel revenues are sufficiently 'like rent' under Louisiana law to be included with the term 'rents' in § 552(b)."); *Everett,* 146 B.R. at 457 (courts in the majority "may have taken too narrow a view of the term 'rent' as used in Section 552(b)"); *S.F. Drake,* 131 B.R. at 160 (hotel revenues are generated from payment for occupancy of real property and are accordingly *rents* ); *Pavilion Hotel,* 885 P.2d at 191–92; *Travelers,* 190 Ill.Dec. 340, 621 N.E.2d at 213–14 ("this definition affords no basis for distinguishing a tenant from a hotel guest in determining what is rent").

32    See also *Days California,* 27 F.3d at 376 (while statutes and case law have in some cases distinguished between landlord/tenant and innkeeper/guest relationships and in other cases have referred to room revenues as *rents,* none of the statutes or cases answered the question before the court); *S.F. Drake,* 131 B.R. at 159 (unrelated statutes referring to room rates or distinguishing between tenant's rights and duties and those of a lodger "do not compel the conclusion that hotel room revenues are accounts, rather than rents"); *Pavilion Hotel,* 885 P.2d at 191 ("We fail to agree, however, that distinctions between the status of persons entitled to occupy real property should determine whether hotel room revenues constitute rent.").

33    See also *Days California,* 27 F.3d at 377 ("In California, as elsewhere, the room rent is 'produced by the property' of the hotel.");

*T–H New Orleans,* 10 F.3d at 1106 ("Guests are interested in a hotel room because of its physical characteristic and for a place to stay; this is not dependent on services or goods."); *Everett,* 146 B.R. at 457 ("[T]he main charge is for the occupancy of the property...."); *S.F. Drake,* 131 B.R. at 159 ("The hotel guest's primary objective is shelter. The shelter is provided by the land and improvements of the hotel."); *Travelers,* 190 Ill.Dec. 340, 621 N.E.2d at 213 ("The conclusion that room revenue is not rent generated by real property is counter-intuitive. It is indisputable that the common understanding is that rent is compensation for use of property for shelter.").

34     *See T–H New Orleans,* 10 F.3d at 1106; *S.F. Drake,* 131 B.R. at 159, 160 ("Certainly hotels provide services, but so also do apartment and office buildings. Any services that a hotel provides are incidental to room occupancy."); *Travelers,* 190 Ill.Dec. 340, 621 N.E.2d at 213–14 ("the commonly held view is that a hotel guest primarily seeks shelter not service;" services distinction between tenant and hotel guest "can become uselessly blurred.... [and] [r]evenues generated by the residential occupancy of real estate property should be 'rents,' without reference to the term of occupancy or level of services").

35     *See also T–H New Orleans,* 10 F.3d at 1106 (where parties intended to create a lien on future hotel revenue and defined *rent* to include all economic benefits derived from occupancy of the hotel, that intent should not be defeated); *S.F. Drake,* 131 B.R. at 161; *accord Mid–City,* 114 B.R. at 642 (while not *rents,* security interest extended to hotel room revenues as "profits," based in part on the parties' intention that collateral would consist of "all economic fruits of [the] direct physical use of the real-property interest"); *Great–West Life Assur. Co. v. Raintree Inn,* 837 P.2d 267, 271 (Colo.App.1992) (language of the rental assignment included all income from use of the property).

36     The Debtor argues that language in the Mortgage indicates that the parties considered the security interest in Room Revenues to be subject to Article 9, because it states that "Grantor grants to Lender a Uniform Commercial Code security interest in the Personal Property and Rents." But the Mortgage is actually ambiguous on this issue—the sentence just prior to the one quoted provides that "Grantor presently assigns to Lender all of Grantor's right, title, and interest in and to all present and future leases of the Property and all Rents from the Property," without specifying that this is a "Uniform Commercial Code security interest." And, in fact, the segue between the two sentences is the phrase "in addition." This is more reflective of a "belt and suspenders" approach to drafting to ensure that, whether considered real or personal property, the Room Revenues would be subject to Wells Fargo's Mortgage. That the lender here affixed the belt, but forgot to attach the suspenders, does not mean that the relevant garment must necessarily fall.

37     Although concluding that hotel revenues were not interests in real property, the court in *Parke Imperial* also noted that the purely semantic debates regarding the meaning of *rents* was essentially irrelevant to determining how exactly to characterize hotel room revenues, since personal property is also often referred to as being *rented,* as are hotel rooms. *Parke Imperial,* 177 B.R. at 858. The Court agrees, noting that payment for the use of a vehicle, which is unquestionably an article of personal property, is most often referred to as *renting* a car, although an interest in those *rental* payments must be perfected pursuant to Article 9 of the UCC. *See, e.g. In re Gordon Car & Truck Rental, Inc.,* 80 B.R. 12, 15 (1987) (security interest in proceeds from "rental contracts" with customers perfected by UCC filing).

38     Wells Fargo has directed the Court's attention to Wyoming Statute § 6–3–406 ("Public Establishment" means an establishment selling, or offering for sale, prepared food or beverages, or leasing or *renting* overnight sleeping accommodations to the public generally. "Public Establishment" is defined to include "hotels, motor hotels, motels and rooming houses, unless the *rental* thereof is on a month-to-month basis or for a longer period of time."); Wyoming Statute § 6–4–406 ("Premises" is defined to include "a *rented,* leased or donated hotel or motel room").

39     The Debtor directs the Court's attention to Wyoming Statutes § 6–3–406 (Under Wyoming law, hotels, motor hotels, motels and rooming houses are included in the definition of "Public establishment," and imposes criminal penalties for defrauding hotel operators which do not exist for defrauding landlords), § 6–3–406(b)(ii) (defining "Public establishments" to include "hotels ... unless the rental thereof is on a month-to-month basis or for a longer period of time"), § 33–17–104 (Hotel keepers are required to post "in plain view of any guest or guests occupying such room or rooms ... the rate per day as applying to one (1) or more guests."), § 39–15–103(a)(i)(G) (imposing excise tax on "[t]he sales price paid for living quarters in hotels, motels, tourist courts and similar establishments providing lodging service for transient guests"), § 33–17–103 (granting "[a]ny keeper of a hotel or boarding house or lodging house ... a lien upon the baggage or other personal property of a person who shall have obtained board or lodging or both, from such keeper...." if the guest failed to pay), § 1–21–1201 (defining *renter* as "any renter, lessee, tenant or other person entitled under a rental agreement to occupy a residential unit to the exclusion of others;" defining residential unit as "a renter's principal place of residence ... excluding a mobile home lot or recreational property rented on an occasional basis;" creating rights, obligations, and remedies between "Owners" and "Renters"), § 34–2–128 (providing that "there shall not exist the relations of landlord and tenant, by implication or operation of law, except a tenancy by sufferance" occurring in specific situations upon the expiration of a term created by a lease).

40     Said far less legalistically, the average hotel guest typically spends far more time choosing the location of a hotel and the location of a room within the hotel than evaluating hotels for the quality of food and turndown services or the variety of items in the gift

shop.

41    It is unclear from the record whether the Debtor separately accounts for the Room Revenues and those derived from ancillary services and goods, such as sale of food and drink and provision of other services. Those ancillary revenues are not derived from an "interest in real property," *see, e.g. Days California,* 27 F.3d at 377; *Everett,* 146 B.R. at 457, and are not subject to Wells Fargo's unperfected prepetition security interest. The determination of the amount of actual Room Revenues generated postpetition, the Court assumes, will be made at a later date.

42    This conclusion has been criticized primarily on grounds that the Supreme Court's decision in *United Savs. Ass'n v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988), prohibits the court from finding that postpetition payments to an undersecured creditor are offset by a concomitant increase in that creditor's secured position. *See, e.g., In re Kalian,* 169 B.R. 503, 506 (Bankr.D.R.I.1994); *In re IPC Atlanta Ltd. P'ship,* 142 B.R. 547, 559 (Bankr.N.D.Ga.1992); *In re Reddington/Sunarrow Ltd. P'ship,* 119 B.R. 809, 814 (Bankr.D.N.M.1990); *see also In re Mullen,* 172 B.R. 473, 479 (Bankr.D.Mass.1994) (finding it inequitable to require debtor to pay net rents to secured creditor, even though creditor had security interest in postpetition rents, because it would be "inequitable" to allow bank to "substantially improve its position ... at the expense of the estate.").

As Judge Saris noted in *Beal,* however, and as the majority of courts has also concluded, acknowledging that an undersecured creditor's secured claim increases postpetition by operation of § 552(b) "does not rattle *Timbers*." *Beal,* 248 B.R. at 686. Nothing in *Timbers* prohibits an increase in the value of a secured claim *as the result of a valid security interest in postpetition property.* Id.; *see also Machinery, Inc.,* 287 B.R. at 765; *Union Meeting,* 178 B.R. at 675; *In re Bloomingdale Partners,* 155 B.R. 961, 975–76 (Bankr.N.D.Ill.1993); *Vermont Inv.,* 142 B.R. at 574. This conclusion also necessarily rejects a static view of secured claim valuation, recognizing that the amount of the secured portion of a claim may fluctuate for a variety of reasons, including a change in the value of underlying real property, payments made to the secured creditor postpetition, or the accumulation of postpetition collateral. For an excellent and thoughtful treatment of fluctuating values, their relation to secured claims, and their treatment throughout the course of a Chapter 11 case, *see In re SW Hotel Venture LLC,* 460 B.R. 4, 26–32 (Bankr.D.Mass.2011).

43    *See also Machinery, Inc.,* 287 B.R. at 767; *Union Meeting,* 178 B.R. at 676 & n. 8; *Bloomingdale,* 155 B.R. at 975; *Vermont Inv.,* 142 B.R. at 573 (where postpetition rents constituted additional collateral, "the rents—in equal amounts—both increased the bank's allowed secured claim ... and, by payment, decreased the bank's allowed secured claim.").

44    As one court has explained, § 522(b) "subjects the extension of a creditor's pre-petition security interest in proceeds to proceeds generated post-petition to § 506(c)." *Machinery, Inc.,* 287 B.R. at 767. Section 506(c) allows a debtor in possession to "surcharge" the secured creditor's collateral for expenses necessary to preserve the property. 11 U.S.C. § 506(c); *Machinery, Inc.,* 287 B.R. at 767; *Bloomingdale,* 155 B.R. at 975 n. 8. Wells Fargo has not raised any contested § 506(c) matters here, and in fact consented to § 506(c) expenditures in agreeing to the Debtor's payment of expenses set forth in the budgets attached to the Cash Collateral Orders.

45    Section 506(b) provides:

To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose.

11 U.S.C. § 506(b).

46    "To express one thing is to exclude the other." Bryan A. Garner, *A Dictionary of Modern Legal Usage* 432 (2d ed. 1995).

47    *See also Qmect, Inc. v. Burlingame Capital Partners II, L.P. (In re Qmect, Inc.),* 368 B.R. 882, 884 (Bankr.N.D.Cal.2007) (prepetition agreement allowing assessment of attorneys' fees created a "contingent liability" under § 101(5) and was includable as part of unsecured claim); *In re New Power Co.,* 313 B.R. 496, 507–08 (Bankr.N.D.Ga.2004) (§ 502(b) does not bar recovery of postpetition attorneys' fees based on prepetition contract as part of unsecured claim, as the right to the fees was an unliquidated, contingent, or unmatured claim within the meaning of § 101(5)); *In re Fast,* 318 B.R. 183, 193 (Bankr.D.Colo.2004) (adopting *New Power* rationale and holding that a prepetition contract allowing assessment of attorneys' fees constituted a contingent, unliquidated, unmatured claim; postpetition fees thus allowed as unsecured claim).

48    Although *Frenville* has been criticized on grounds that the court failed to account for the breadth of the definition of "claim" in the Bankruptcy Code, the court's characterization of an indemnity agreement as creating an existing right to payment at the time the agreement is signed has not been the target of that criticism. *See* Mark S. Scarberry, *Interpreting Bankruptcy Code Sections 502 and 506: Post–Petition Attorneys' Fees in a Post–Travelers World,* 15 Am. Bankr.Inst. L.Rev. 611, 622 n. 70 (2007). While Wells Fargo relies on the Second Circuit's holding in *Ogle v. Fidelity & Deposit Co. of Md.,* 586 F.3d 143 (2d Cir.2009), in support of its

request to include postpetition attorneys' fees in its unsecured claim, the Court finds *Ogle* distinguishable on the same grounds as *Hemingway.* Although the *Ogle* court characterized the issue broadly as whether an "unsecured creditor [is] entitled to recover post-petition attorneys' fees that were authorized by a pre-petition contract but were contingent on post-petition events," the underlying contract providing for the attorneys' fees was an indemnity agreement. *Id.* at 145. The Second Circuit noted, as did the First Circuit in *Hemingway,* that "[u]nder contract law, a right to payment based on a written indemnification contract arises at the time the indemnification agreement is executed." *Id.* at 146.

49    *See also In re Seda France, Inc.,* Slip Copy, No. 10–12948–CAG, 2011 WL 3022563, *4 (Bankr.W.D.Texas July 22, 2011) ("§ 502(b) allows a claim in an amount determined at the petition date. Subsequent increased amounts are part of the post-petition claim not allowed under § 502(b)."); *In re Electric Machinery Enters., Inc.,* 371 B.R. 549, 551 (Bankr.M.D.Fla.2007) (plain language of § 502(b) requires determination of claim as of petition date and does not include post-petition attorney fees); *In re Global Indus. Tech., Inc.,* 344 B.R. 382, 386 (Bankr.W.D.Pa.2006) ("Because postpetition attorneys' fees have not been incurred on the date the bankruptcy is filed, a claim cannot include postpetition fees"); *In re Miller,* 344 B.R. 769, 772 (Bankr.W.D.Va.2006) ("Just applying the plain words of the statute to the issue compels a conclusion that a creditor's legal expense incurred *after* the filing date cannot be part of the debt owing on the filing date."); *In re Global Indus. Tech., Inc.,* 327 B.R. 230, 240 (Bankr.W.D.Pa.2005) ( "§ 502(b) of the Bankruptcy Code requires a court to calculate the amount of a claim as of the petition date. It is axiomatic that, as of the petition date, postpetition attorneys' fees have not been incurred. Thus, unsecured prepetition claims cannot include postpetition attorneys' fees."); *In re Biazo,* 314 B.R. 451, 458 (Bankr.D.Kansas 2004) ("Claims against a bankruptcy estate are generally limited under § 502(b) to those owed as of the date of the filing of the debtor's bankruptcy petition. Postpetition attorney fees and costs are ordinarily not allowable, even if the creditor has a contract, enforceable under applicable nonbankruptcy law, that provides for their recovery from the debtor."); *Pride Companies, L.P. v. Johnson (In re Pride Companies, L.P.),* 285 B.R. 366, 375 (Bankr.N.D.Tex.2002) ("Section 502(b) directs that the court 'shall determine the amount of [a] claim as of the date of the filing of the petition.... Postpetition attorney's fees cannot, therefore, be included as part of a claim at the time the petition is filed.").

---

**End of Document**    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 3022563
Only the Westlaw citation is currently available.
United States Bankruptcy Court,
W.D. Texas,
Austin Division.

In re SEDA FRANCE, INC., Debtor.

No. 10–12948–CAG. | July 22, 2011.

MEMORANDUM OPINION ON DEBTOR'S
OBJECTION TO AEGIS TEXAS VENTURE FUND
II, LP PROOF OF CLAIM

CRAIG A. GARGOTTA, United States Bankruptcy
Judge.

**\*1** This Court is presented with the issue of whether an
unsecured creditor is entitled to attorneys' fees under a
confirmed Chapter 11 plan that pays creditors in full. The
majority of courts[i] that have considered the issue have
held that an unsecured creditor is not entitled to collect
post-petition attorneys' fees, costs, and other similar
charges—even if there is an underlying contractual right
to do so. *In re Elec. Mach. Enterprises, Inc.,* 371 B.R.
549, 549–50 (Bankr.M.D.Fla.2007). Aegis Texas Venture
Fund II, LP ("Aegis") seeks to recover attorneys' fees and
costs incurred post-petition as part of its unsecured claim
against Seda France, Inc. ("Debtor"). In keeping with the
majority view, Debtor's objection to Aegis' claim for
attorneys' fees incurred post-petition should be sustained.

BACKGROUND

This matter is referred to this Court under the District
Court's Standing Order of Reference. The Court has
subject matter jurisdiction under 28 U.S.C. § 157(a) and §
1334(b). Venue is proper under 28 U.S.C. § 1408(1). This
matter is a core proceeding under 28 U.S.C. §
157(b)(2)(B) (allowance or disallowance of claims against
the estate) and is deemed a contested matter pursuant to
Fed. R. Bankr.Proc. 9014. The Court may render findings
of fact and conclusions of law as set forth in Fed. R.
Bankr.Proc. 7052(a)(1).

On February 11, 2011, Aegis timely filed its Proof of
Claim (the "Aegis Claim") in this Chapter 11 bankruptcy
case. The Aegis Claim asserted that, in addition to the
principal, interest, and pre-petition attorney's fees under
its loan documents with Debtor, Aegis was entitled to
recover post-petition attorney's fees as part of its
unsecured claim. In this regard, the proof of claim
provided that the "Amount of Claim as of Date Case
Filed" was "$1,895,225.09 *plus all allowable
post-petition legal expenses.*" Aegis Claim, ¶ 1, page 1.
Additionally, the Aegis Claim stated:

> Aegis has also incurred
> post-petition attorney's fees which
> it believes are recoverable under
> applicable bankruptcy and
> non-bankruptcy law. Through
> December 31, 2010, such fees total
> $76,125.68. It is estimated that
> additional post-petition attorney's
> fees in the amount of
> approximately $40,000.00 will be
> incurred during the pendency of
> Debtor's bankruptcy case. Thus,
> including incurred and estimated
> post-petition attorney's fees, the
> total Aegis claim is $2,011,350.77.

*See* Attachment to Proof of Claim of Aegis Texas Venture
Fund II, LP in *In re Seda France, Inc.,* Bankruptcy Case
No. 10–12948–CAG in the United States Bankruptcy
Court for the Western District of Texas, Austin Division
(the "Attachment to Proof of Claim"), ¶ 4 on page 2 of the
Aegis claim.

Debtor filed a limited objection to the Aegis Claim on
April 11, 2011 (docket no. 167). The objection cited the
four reasons stated by the court in *In re Elec. Mach.
Enters., Inc.,* 371 B.R. at 550–552 why post-petition
attorneys' fees and costs must be disallowed:

> **\*2** (i) The Bankruptcy Code expressly authorizes the
> recovery of post-petition attorney's fees only for
> oversecured creditors and, thus, by implication,
> prohibits such fees for all others;
>
> (ii) The Supreme Court's opinion in *United Savings
> Ass'n v. Timbers,* 484 U.S.365 (1988) supports the
> conclusion that unsecured creditors are not entitled to
> recover post-petition attorneys' fees;
>
> (iii) Creditors' claims are determined on the petition

date, and therefore, cannot include post-petition attorneys' fees and costs; and

(iv) Allowing unsecured creditors to recover post-petition attorneys' fees and costs is inequitable and negatively impacts the administration of bankruptcy cases.

Debtor also argued that the Supreme Court's opinion in *Travelers Cas. & Sur. Co. of America v. Pac. Gas & Elec. Co.,* 549 U.S. 443 (2007) provides no authority for allowing unsecured creditors to recover post-petition attorneys' fees and costs. Debtor then stated that even if the fees and costs were allowable, Aegis could not recover them because it failed to file an application for approval as required by Rule 2016.

Aegis filed a response on April 29, 2011 (docket no. 174). Aegis cited the post-*Travelers* decisions of *Ogle v. Fid. & Deposit Co. of Maryland,* 586 F.3d 143 (2nd Cir.2009), *In re SNTL Corp.,* 571 F.3d 826 (9th Cir.2009) and *In re QMECT, Inc.,* 368 B.R. 882 (Bankr.N.D.Cal.2007) in support of its position. It claimed the post-petition attorneys' fees and costs were allowable for numerous reasons, which can be summarized as follows:

(i) Sections 506(b) and 502(b) have been incorrectly conflated and the maxim of expression unius est exclusion alterius does not apply;

(ii) The Timbers holding disallows claims for unmatured interest based on a specific provision of the Code, and because there is not a similar provision that disallows post-petition attorneys' fees, the holding does not control.

(iii) The right to payment for attorneys' fees and costs exists pre-petition, so it is not relevant to whether the creditor has an allowable pre-petition claim that the fees are actually incurred post-petition;

(iv) The potential inconvenience of having to re-compute attorneys' fees claims post-petition can be mitigated by courts setting claim allowance procedures and deadlines;

(v) Because there is not a clear provision of the Code for allowing for post-petition attorneys' fees and costs, that non-bankruptcy legal right should be left intact until such time Congress decides otherwise; and

(vi) Recovery of post-petition attorneys' fees and costs is particularly appropriate where the Debtor's estate is solvent and all unsecured creditors are to be paid in full under the confirmed plan, such as in this

case.

Aegis also argued that Rule 2016 does not apply because it only applies when a creditor is seeking to recover fees and expenses "against the estate," rather than where the fees at issue are includable in the creditor's unsecured pre-petition claim. Alternatively, Aegis argued that if Rule 2016 did apply, its application for approval is included in its response.

## ANALYSIS

**\*3** The Supreme Court's holding in *Travelers* is carefully limited to striking down the *Fobian* Rule. 549 U.S. at 449. It concluded that the Code does not disallow unsecured creditors' claims for attorneys' fees "based *solely* on the fact that the fees at issue were incurred litigating issues of bankruptcy law." *Id.* Further, the Court expressly reserved opinion regarding "whether, following the demise of the *Fobian* rule, other principles of bankruptcy law might provide an independent basis for disallowing" an unsecured creditor's claim for post-petition attorneys' fees. *Id.* at 456. Thus, it is up to this Court to make its own judgment whether post-petition attorneys' fees are allowable.

> 1. Because § 506(b) expressly authorizes the recovery of post-petition attorneys' fees only for oversecured creditors, can it be implied that the Code prohibits such fees for all others? Or does the silence with respect to unsecured creditors permit the allowance of post-petition attorneys fees and costs?

The Supreme Court has said, "[w]here Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of contrary legislative intent." *TRW Inc. v. Andrews,* 534 U.S. 19, 28 (2001). Congress has clearly expressed its intent to award post-petition attorneys' fees to parties in several circumstances—none of which applies as a general matter to an unsecured creditor's claim for post-petition attorneys' fees:

(i) Recovery of post-petition attorneys' fees under § 506(b) is limited to oversecured creditors;

(ii) Section 330 permits a court to award reasonable compensation for attorneys' fees incurred during the

bankruptcy by the trustee, an authorized committee, or the debtor;

(iii) Section 503 allows as an administrative expense reasonable compensation for attorneys' services to the extent that the services benefitted the estate;

(iv) Section 362(k) provides for "actual damages, including attorneys' fees" to an individual injured by a violation of the automatic stay; and

(v) Section 523(d) provides for an award of reasonable attorneys' fees for a successful debtor in certain nondischargeability actions.

Jennifer M. Taylor & Christopher J. Mertens, *Travelers and the Implications on the Allowability of Unsecured Creditors' Claims for Post–Petition Attorneys' Fees Against the Bankruptcy Estate*, 81 AM. BANKR.L.J. 123, 148–49 (2007). It thus appears that Congress knew how to provide for an award of post-petition attorneys' fees. *Id.* "If Congress had intended for the holders of both secured claims and unsecured claims to recover attorneys' fees, it could have easily said so. But it did not." *Id.* (citing *In re Saunders*, 130 B.R. 208, 210 (Bankr.W.D.Va.1991)). To permit an unsecured creditor to recover its post-petition attorneys' fees from the estate would be to expand on the express exceptions Congress provided for in the Code. *Ins. Co. of N. Am. v.. Sullivan*, 333 B.R. 55, 61 (D.Md.2005).

## A. Does The Timbers Holding Control?

**\*4** The specific question at issue in *Timbers* was whether undersecured creditors are entitled to compensation under § 362(d)(1) for the delay caused by the automatic stay in foreclosing on their collateral. 484 U.S. at 369. Answering in the negative, the Court found support in the idea that § 506(b) has the "substantive effect of denying undersecured creditors post-petition interest on their claims." *Id.* at 372. The Court reasoned that § 506(b) permits post-petition interest to be paid out out of that creditor's "security cushion," and an unsecured creditor has no such "security cushion." *Id.* at 372–73. Justice Scalia wrote, "[i]f the Code had meant to give the undersecured creditor ... interest on the value of his collateral, surely [§ 506(b) ] is where that disposition would have been set forth...." *Id.* at 373. There is no reason why Justice Scalia's conclusion should not apply equally to attorneys' fees. Taylor & Mertens, *supra* at 149. Because neither § 506(b) nor any other provision of the Bankruptcy Code permits an unsecured creditor to recover its post-petition attorneys' fees from the estate, unsecured creditors have no clear entitlement to

post-petition attorneys' fees. *Id.* This result is consistent with the idea that the Code must be read as a coherent whole. *Id.*

## B. Does The Fact That Creditors' Claims Are Determined On The Petition Date Preclude Post–Petition Attorneys' Fees And Costs?

The three cases cited by Aegis claim that post-petition fees cannot be disallowed merely because they are contingent.[2] The allowability of contingent claims allows an argument to be made that the apparent plain meaning of sections 502(b), 506(a), and 506(b) is in conflict with other provisions of the Code. Mark S. Scarberry, *Interpreting Bankruptcy Code Sections 502 and 506: Post–Petition Attorneys' Fees in A Post–Travelers World*, 15 AM. BAN KR. INST. L.REV. 611, 636 (2007). However, Professor Mark Scarberry has proposed that the plain meaning of these three sections provide a three-step analysis that precludes the allowance of post-petition attorney's fees as unsecured claims. *Id.* at 648–652, 657.

First, § 502(b) allows a claim in an amount determined at the petition date. Subsequent increased amounts are part of the post-petition claim not allowed under § 502(b). *Id.* at 648–49. Second, the allowed amount of the claim, as used in § 506(a), determines the secured and unsecured amounts of the creditor's claim. *Id.* at 649. Because § 506(a) refers to "the allowed amount of the claim of [the] creditor," it is a reference to § 502(b). *Id.* Under § 506(a), two amounts, the allowed amount of the claim and the value of the collateral, must be determined, which are then compared and bifurcated with the allowed claim being secured to the extent of the value of the collateral, and any remaining amount creates an unsecured claim. *Id.* As a result, § 506(a) takes the amount of the allowed claim under § 502(b) and either treats it as completely secured or bifurcates it into a secured and unsecured amount. *Id.* Third, § 506(b) provides allowance for an additional amount; in particular, fees, interest, and costs beyond the allowed amount under § 502(b). *Id.* The words "reasonable fees, costs, and charges" under § 506(b) describe what § 506(b) does for an oversecured claim. *Id.* at 650. The fees, costs, and charges "shall be allowed" under § 506(b) in a similar way that post-petition interest is allowed so long as an agreement or statute provides for them. *Id.* In relying on the Supreme Court's decision in *United States v. Ron Pair Enter., Inc.*, 489 U.S. 235 (1989), Scarberry explains that § 506(b) adds interest and fees to the "pre-petition amount" of the claim, and because § 502(b) determines the prepetition amount of the claim, which is "as of the date of the filing" of the bankruptcy case, the amount of the secured claim held by an oversecured creditor prior to the application of §

In re Seda France, Inc., Slip Copy (2011)

66 Collier Bankr.Cas.2d 312, 55 Bankr.Ct.Dec. 55

506(b) cannot include post-petition attorney's fees. Scarberry, *supra* at 651. Scarberry concludes:

> **\*5** Because post-petition fees are not allowed by section 502(b) but rather by section 506(b), we are left with the clear conclusion that post-petition fees cannot be allowed in favor of undersecured creditors or wholly unsecured creditors, neither of whom receive any benefit from section 506(b). That conclusion establishes, as a matter of the plain meaning of sections 502(b), 506(a), and 506(b), as they deal with claims, that post-petition fees are not allowable on unsecured claims.

*Id.*

### C. Does Policy Support The Recovery Of Post–Petition Attorneys' Fees?

Aegis' response emphasizes preserving non-bankruptcy legal rights when there is not a clear provision of the Code modifying those rights. However, it is beyond doubt that Congress has chosen to modify state law rights with respect to creditors' claims against the estate for post-petition attorneys' fees. Taylor & Merterns, *supra* at 158. "The plain language of section 506(b) expressly provides for the award of attorneys' fees in bankruptcy proceedings, without reference to contrary state law." *Id.* at 158–59 (citing *In re Schriock*, 104 F.3d 200, 202 (8th Cir.1997)). As a result, an oversecured creditor's contract-based claim for post-petition fees may be allowable in bankruptcy even where the underlying contract is invalid under state law. *Id.* (citing *Schriock*, 104 F.3d at 202–03). Further, prior to the amendment of § 506(b), fees arising only under a state statute, without a contractual basis, were disallowed as not arising out of an agreement. Taylor & Merterns, *supra* at 159.

Some have argued that where a "debtor freely entered into the contract and must have known the potential cost," "[i]t would be inequitable to allow the debtor to avoid this obligation." *Id.* at 160–61 (citing *In re Tri–State Homes, Inc.,* 56 B.R. 24, 27 (Bankr.W.D.Wis.1985)). However, this argument disregards the fact that the estate belongs not to the debtor, but to the creditors who bear the entire burden of a supposedly bargained for fee provision while receiving none of the benefit. Taylor & Merterns, *supra* at 161. Those cases awarding post-petition fees to successful

creditors in nondischargeability actions or to debtors are not pertinent because such an award is made against an individual personally and is to be paid by that individual. *Id.* On the other hand, an unsecured creditor's claim for fees is to be paid by the bankruptcy estate. *Id.* Fee claims asserted against the estate must be analyzed differently from attorneys' fees sought personally against an opposing party in bankruptcy litigation, and must involve a consideration of bankruptcy policies, including the policy of equal distribution among creditors. *Id.*

A central purpose of the bankruptcy system is "to secure equality among the creditors of a bankrupt."[3] Essentially, similarly situated creditors must be treated the same. Allowing certain types of unsecured creditors, such as sophisticated commercial claimants, to recover post-petition attorneys' fees while other unsecured creditors are not able to recover such fees violates this central purpose and keeps similarly situated creditors from being treated the same.[4] As recognized by Judge Robert L. Jones in *Pride Companies:*

> **\*6** It is not equitable to deplete everyones pot,' only because of an asserted right granted by a contract ... bankruptcy routinely alters creditors rights, and this is simply a situation where the policy of ratable distribution and equitable treatment of the varying interests in bankruptcy should override any asserted rights by unsecured creditors to recover attorney's fees. Moreover, allowing unsecured creditors to recover post-petition attorneys' fees negatively impacts and inconveniences the administration of bankruptcy cases.[5] The claims process would continue endlessly because attorneys for unsecured creditors would continually file new claims and/or amend previously allowed claims to include post-petition attorneys' fees and costs.[6] This is inefficient and impractical. As stated in *Electric Machinery:* "[t]he practical consequences of such a result would be disastrous for the administration of the bankruptcy system. The administrative inconvenience this would cause in a chapter 11 case would be intolerable."[7]

Fees awarded to an oversecured creditor is consistent with equitable principles because the fees are paid from the creditor's "security cushion," and therefore does not interfere with the administration of the estate. *Id.* The court in *Qmect,* 368 B .R. at 886, argued that, to the contrary, awarding secured creditors their post-petition fees diminishes the dividend to unsecured creditors; consequently, the policy of equitable distribution should not stand in the way of awarding unsecured creditors their post-petition fees. Taylor & Merterns, *supra* at note 278. However, this argument overlooks the fact that oversecured creditors have a property interest in the

security or equity cushion that is used to pay an oversecured creditor's post-petition fees under § 506(b). *Id. See also Timbers,* 484 U.S. at 370–71. While allowing a secured creditor's claim for post-petition fees may in fact reduce the amount available for distribution to unsecured creditors, it is not inequitable to do so because, by virtue of its property interest, an oversecured creditor would have a right to collect that amount before an unsecured creditor, even under state law. Taylor & Merterns, *supra* at note 278. Moreover, the Code expressly allows a post-petition fee claim of an oversecured creditor, but has no such provision for an unsecured creditor. *See* 11 U.S.C. § 506(b). For these reasons, a rule allowing the post-petition fee claims of oversecured creditors but not unsecured creditors is not inequitable.

**D. *Does The Fact That The Debtor Is Solvent Allow For The Recovery Of Post–Petition Fees?***
Aegis cites *In re Gencarelli,* 501 F.3d 7, 7 (1st Cir.2007), for the proposition that post-petition fees should be added to unsecured claims where the debtor is solvent. However, to come to such a conclusion, the First Circuit engaged in circular reasoning by assuming that unsecured claim holders could obtain post-petition fees, and then departed from the text of the Code to make sure that holders of secured claims got treatment at least as favorable:

> **\*7** We add that disallowing claims in their entirety based on section 506(b) defies common sense. It is apodictic that unsecured creditors may recover their attorneys' fees, costs and expenses from the estate of a solvent debtor where they are permitted to do so by the terms of their contract and applicable non-bankruptcy law.' *In re Dow Corning Corp.,* 456 F.3d 668, 683 (6th Cir.2006). Thus, under the statutory scheme envisioned by the debtor (and adopted by the lower courts), unsecured creditors would be permitted to reap the full benefit of their contractual bargains through the medium of section 502, while oversecured creditors would be uniquely singled out for unfavorable treatment by the operation of section 506(b). There is no conceivable explanation as to

why Congress might have wanted oversecured creditors to be treated in so draconian a fashion. Creating that sort of uneven playing field would be antithetic to the general policy of the Code, which strongly favors oversecured creditors.

Scarberry, *supra* at 647 (citing *Gencarelli,* 501 F.3d at 6). The court went on to mistakenly point out that its role was to make sure that a solvent debtor did not use the Code to change any of its legal obligations:

> Let us be perfectly clear. This is a solvent debtor case and, as such, the equities strongly favor holding the debtor to his contractual obligations as long as those obligations are legally enforceable under applicable non-bankruptcy law.

*Scarberry, supra* at 647–48 (citing *Gencarelli,* 501 F.3d at 7). These statements of grand principle should be anchored in a persuasive textual analysis, rather than in the notion that solvent debtors are not entitled to receive any relief under the Code. Scarberry, *supra* at 648. The Code contains no requirement that debtors be insolvent; a solvent debtor may nevertheless be in financial difficulty, seek relief under the Code in good faith, and modify the rights of creditors. *Id.*

### CONCLUSION

Because none of Aegis' arguments regarding the allowability of post-petition attorneys' fees pass muster, the Court does not have to address whether Rule 2016 was applicable. Thus, Debtor's objection to Aegis' claim for attorneys' fees incurred post-petition should be sustained. Additionally, Aegis' claims for fees in connection with its preparation of its fee application is similarly denied. For the reasons stated herein, Aegis' claim for attorneys' fees is DENIED.

**Parallel Citations**

66 Collier Bankr.Cas.2d 312, 55 Bankr.Ct.Dec. 55

Footnotes

1  See *Adams v. Zimmerman,* 73 F.3d 1164 (1st Cir.1996); *In re Hedged–Investments Assocs., Inc.,* 293 B.R. 523 (D.Colo.2003); *In re Loewen Group Int'l, Inc.,* 274 B.R. 427 (Bankr.D.Del.2004); *In re Pride Companies, L.P.,* 285 B.R. 366 (Bankr.N.D. Tex 2002); *In re Saunders,* 130 B.R. 208 (Bankr.W.D.Va.1991); *In re Sakowitz, Inc.,* 110 B.R. 268 (Bankr.S.D.Tex.1989); *In re Canaveral Seafoods, Inc.,* 79 B.R. 57 (Bankr.M.D.Fla.1987); *In re Marietta Farms, Inc.,* 2004 Bankr.LEXIS Jan. 9, 2007); *In re Hitch,* 2009 Bankr.LEXIS 1232 (Bankr.C.D.Ill. May 29, 2009); *In re nLine Corp.,* Case No. 03–13779–LEK (Bankr.W.D.Tex. Nov. 29, 2004).

2  *In re SNTL Corp.,* 571 F.3d at 844 (citing 5 *Collier on Bankruptcy* § 553.03[1][i] (15th ed. Updated 2007) ("In general, if the creditor incurs the attorneys' fees postpetition in connection with exercising or protecting a prepetition claim that included a right to recover attorneys' fees, the fees will be prepetition in nature, constituting a contingent prepetition obligation that became fixed postpetition when the fees were incurred.); *Accord, Ogle v. Fidelity & Deposit Co.,* 586 F.3d at 146–48; *See also, In re QMECT,* 368 B.R. at 884 (post-petition attorneys' fees qualify as a "claim" under 11 U.S.C. § 101(5)).

3  *See Elec. Mach.,* 371 B.R. at 551 (quoting *Boese v. King,* 108 U.S. 379, 385–86, 2 S.Ct. 765, 27 L.Ed. 760 (1883)).

4  *Elec. Mach.,* 371 B.R. at 551.

5  *Elec. Mach.,* 371 B.R. at 553.

6  *Id.*

7  *Id.*

**End of Document**                                              © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 8556804
Only the Westlaw citation is currently available.
United States Bankruptcy Court,
W.D. Pennsylvania.

In re CEDA MILLS, INC., Debtor.
Rockland Credit Finance, LLC, Movant,
v.
Ceda Mills, Inc., Respondent.

No. 04–24452JAD. | Feb. 11, 2009.

**Attorneys and Law Firms**

Robert O. Lampl, Esq., For Ceda Mills, Inc.

Joseph G. Gibbons, Esq., For Rockland Credit Finance, LLC.

*MEMORANDUM OPINION*

**Related To Doc. No. *386***

JEFFERY A. DELLER, Bankruptcy Judge.

**\*1** This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Fed.R.Bankr.P. 7052. The matter before the Court is the *Motion of Rockland Credit Finance, LLC to Enforce Confirmed Amended Plan of Reorganization and Compel Payment of Claim* (the "Motion to Compel"). The Motion to Compel is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A),(B),(K), (L) and (O) and concerns the Debtor's failure to pay the allowed claim of Rockland Credit Finance, LLC ("Rockland"). This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b).

The facts of this case are generally undisputed. Those facts include:

1. WebBank, Inc., Rockland's assignor, entered into a Factoring Agreement with the Debtor on or about December 23, 2002. Pursuant to the factoring Agreement, the Debtor granted WebBank a security interest in the Debtor's personal property assets, such as accounts, inventory, goods and other personal property, and all cash and non-cash proceeds (including claims against third-parties) related to the same. *See Factoring Agreement* at ¶ 7. WebBank then filed a UCC–1 Financing Statement to perfect its security interest.

2. Because the Debtor breached its obligations under the Factoring Agreement, WebBank confessed judgment against the Debtor on or about May 30, 2003 in the amount of $67,987.50. Thereafter, WebBank assigned to Rockland all of WebBank's right, title and interest in (a) the Factoring Agreement, including all obligations of the Debtor to WebBank, and (b) the judgment, including the original judgment claim and all interest and other fees accruing after the judgment date.

3. The Debtor filed a Chapter 11 petition for bankruptcy relief on April 2, 2004 (the "Petition Date").

4. On September 7, 2004, Rockland timely filed with the Court a secured *Proof of Claim* at Claim No. 29–1 in the amount $72,000.35, consisting of the amount of its judgment and pre-petition interest. Such sum does not include any interest or attorneys' fees that may have accrued after the filing of this bankruptcy case.

5. In describing the collateral securing its claim, Rockland's proof of claim form stated that its collateral included "all assets excluding real property" and averred that the collateral had a value of "$8,136,000."
6. The Debtor admitted in its *Schedules of Assets and Liabilities* that the value of the Debtor's personal property was $8,136,000. *See Schedule B* (Dkt. # 18). Of the personal property scheduled by the Debtor, the Debtor (a) estimated that, as of the Petition Date, the value of its accounts receivable was $95,000 and the value of its machinery, equipment and fixtures was $8,000,000; and (b) scheduled the value of the Debtor's lawsuit against certain insurers as being "unknown." While the Debtor's Schedules stated that the Debtor had no inventory as of the Petition Date, the Debtor stated in various litigation before this Court that the Debtor owned insurance claims related to damaged inventory in the amount of $746,606.76 for 'Steel Coils Replacement, CMI Inventory" and $210,000.00 for "Steel Rolls Repairs Inventory." *See e.g.*, *Complaint* (Adversary No. 05–2919–JAD; Dkt. # 1) at ¶ 36; *see also Amended Complaint* (Adversary No. 04–2773–JAD; Dkt. # 55) at ¶ 36.[1]

**\*2** 7. As documentary support for its *Proof of Claim,*

Rockland attached to Claim No. 29–1 a copy of its UCC–1 Financing Statement and a copy of its confessed judgment. In addition, in response to various proceedings before this Court, Rockland also filed copies of: the *Master Factoring Agreement* dated December 20, 2002, summaries detailing Rockland's claim calculation, an affidavit of Rockland's portfolio manager (Mr. Philip Moylan) supporting the Rockland claim, and a copy of a proof of assignment of WebBank's interests to Rockland.

8. On or about April 20, 2005, the Debtor filed its *Amended Plan of Reorganization* along with a *Disclosure Statement.* (Dkt.115 and 116). The *Amended Plan* stated that the Debtor's plan was to be funded in this case in large part by any recoveries the Debtor may have had with respect to certain insurance litigation against various insurers.

9. Rockland objected to the *Amended Plan,* and in connection with plan confirmation the objections were resolved by way of *Stipulation* that was incorporated into the *Confirmation Order dated* June 23, 2005. (Dkt.# 136).

10. The *Stipulation* modified the *Amended Plan,* and provided that the secured claim of Rockland is "Unimpaired" for purposes of this bankruptcy case. (Id.).

11. The Stipulation further provided that the "Allowed Secured Claim of Rockland Credit Finance, LLC, if any, will be paid out of insurance proceeds received by the Debtor. Any amount remaining unpaid after distribution of insurance proceeds will be paid over a period of seventy-two (72)months in equal installments." (Id.).

12. The *Amended Plan* confirmed by the Court also provided that general unsecured creditors would be paid the "full amount" of their claims. (Dkt. # 115).

13. In terms of the time period to object to claims, the *Amended Plan* expressly set forth that "[t]he Debtor specifically reserves the right to object to any claim, provided such objection is filed not later than forty-five (45) days after the Confirmation Date." (Id.).

14. In addition, the Court's *Post–Confirmation Order and Notice* expressly stated that "[a]ny claim objection shall be served and filed within forty-five (45) days after the effective date of this order." (Dkt.# 137). The *Post–Confirmation Order*

*and Notice* also required that "any other adversary proceeding, contested matter, motion or application shall be filed within forty-five (45) days after the effective date of this order." (*Id.*)

15. Subsequent to confirmation of the *Amended Plan,* the Debtor did not file an objection to the Rockland claim within the forty-five (45) day time period required by the *Amended Plan* and the Court's *Post–Confirmation Order and Notice.*

16. Subsequent to confirmation of the *Amended Plan,* the Debtor elected to liquidate substantially all of its assets. The Debtor also proceeded to liquidate its insurance claims by the continued prosecution and ultimate settlement of them.

**\*3** 17. The result of the liquidation is that the Debtor had, as of approximately October 31, 2006, recovered enough funds, including insurance proceeds, to pay all creditors in full and leave sufficient funds to remit distributions to equity holders. In connection with receipt of such funds, on or about October 31, 2006 the Court required that the Debtor immediately pay all creditors the full amount of their allowed claims.

18. The Debtor, however, did not pay Rockland. Instead, approximately two (2) years after the deadline had passed for objecting to claims, the Debtor filed an objection to Rockland's claim on October 3, 2007. (Dkt.# 250).

19. Rockland defended the claims objection by asserting the statute of limitations affirmative defense and by Order dated November 20, 2007, the Debtor's objection was overruled as being untimely. (Dkt.# 284). The Debtor then moved for reconsideration of the Court's Order of November 20, 2007. (Dkt. # 295).

20. By *Memorandum Opinion and Order* dated June 24, 2008, the Court denied the Debtor's motion for reconsideration. (Dkt.# 338). No appeal was taken of the Court's Orders of November 20, 2007 and June 24, 2008, and those proceedings are now final.

21. Sometime in November of 2008, and the exact date is unclear in the record, the Debtor purportedly attempted to remit payment of $72,000.35 to Rockland in satisfaction of all of Rockland's claims, which Rockland allegedly refused to accept. Rockland contended that this proposed payment was insufficient in amount

because both the Debtor's previous refusal to pay and continued litigation had caused Rockland to incur additional legal expenses. Rockland asserted that these legal expenses were a part of Rockland's secured claims and were entitled to payment. In addition, Rockland asserted that unpaid interest had accrued on its claim since the filing of the Debtor's bankruptcy case. The Debtor refused to honor these payment requests by Rockland.

22. Because the Debtor had not tendered full payment to Rockland, the creditor filed the instant Motion to Compel on December 23, 2008. The Debtor then filed an objection, and this Court held a hearing on January 27, 2009. During the hearing, it became apparent that the facts of this case are not in dispute. Thereafter, the parties filed supplemental briefs, and this matter is now ripe for decision.

As of the date in which the Court held the hearing on the Motion to Compel, Rockland asserted its claim equal to $124,482.56, broken down as follows:

| $72,000.35 | Pre–Petition Claim |
| $19,071.61 | Post–Petition Interest Thru January 27, 2009 |
| $33,410.60 | Post–Petition Legal Fees Thru February 5, 2009 |
| $124,482.56 | Total |

Rockland has also asserted that because its claim remains unpaid, Rockland's claim continues to accrue interest at the rate of $11.84 per diem until paid in full.

The Debtor opposed Rockland's Motion to Compel, asserting a number of legal theories. Initially, the Debtor attempted to rehash many of the allegations that it had raised in connection with its original objection to the Rockland claim. Specifically, the Debtor averred that somehow the Rockland claim had been paid by the Debtor's own account debtors. However, given the affidavit filed by Rockland reflecting that no such direct payments were received and the internal accounting Rockland produced, the Debtor abandoned this "payment" theory due to the Debtor's inability to substantiate any of its substantive objections to the amounts claimed by Rockland.

**\*4** Instead, the Debtor has continued to object to Rockland's claim citing alternative legal theories. In this regard, the Debtor has averred that Rockland's collateral is, and has been, worthless and that Rockland is a mere unsecured creditor in this bankruptcy case. According to the Debtor, because Rockland has no real collateral supporting its claim, Rockland is precluded from collecting post-petition interest and attorneys' fees on account of its allowed claim.

Rockland disagrees with the Debtor's analysis. Rockland contends that prior orders of this Court mandate that the Debtor satisfy all of Rockland's claim, including any post-petition interest and attorneys' fees that may have accrued. This Court agrees with Rockland.

The undisputed facts of this case are that by way of the *Stipulation* entered into between Rockland and the Debtor, and incorporated into this Court's June 23, 2005 *Order Confirming Plan,* Rockland's secured claim was treated as "Unimpaired" by the *Amended Plan.*

The term "impairment" is an important term of art in Chapter 11. If a claim is "impaired," the creditor's legal and contractual rights are altered and the creditor is entitled to vote on the plan. If the claim is "unimpaired," the creditor is not permitted to vote because the plan "leaves unaltered the [creditor's] legal, equitable, and contractual rights." 11 U.S.C. § 1124(1).

In this matter before the Court, the *Amended Plan* contemplated that Rockland's allowed secured claim would be unimpaired, which means that Rockland's legal, equitable, and contractual rights remained unaltered. A *fortiorari* then is that the *Amended Plan* affords Rockland the right to assess attorneys' fees and interest on account of its unpaid claim if either Rockland's contractual documents and/or applicable law permits it to assess such charges against the Debtor.

Applicable law, and the applicable contract, permit Rockland to assess interest and attorneys' fees against the Debtor. With respect to interest, Rockland's claim has been reduced to judgment, and its contract is silent as to interest. Pennsylvania law therefore imposes a legal rate of interest equal to six percent (6%) on Rockland's judgment. See 42 Pa.C.S.A. § 8101; 41 P.S. § 202; *see also Crane Automotive, Inc. v. First Seneca Bank,* 98 B.R. 233, 236 (Bankr.W.D.Pa.1989). With respect to attorneys' fees, the *Factoring Agreement* entitles Rockland to collect, among other things, "fees, costs and expenses (including but not limited to reasonable attorneys' fees)" incurred by Rockland in connection with "defending or prosecuting any action or proceeding related to this Agreement." *See Factoring Agreement at* § 3.3.

The Debtor contends that the preceding provisions of applicable law and/or contract are inoperative pursuant to 11 U.S.C. § 506. Even though the *Amended Plan* does not impair Rockland's claim, the Debtor contends that the *Amended Plan* is to be ignored and that the Bankruptcy Code statutorily impairs Rockland's claim. Specifically, the Debtor contends that Rockland's collateral is now worthless, and as a result Rockland is not a secured creditor of the Debtor by operation of 11 U.S.C. §§ 506(b) and (d).

**\*5** The Debtor's analysis misses the mark for a number of reasons, the most obvious of which is that the terms of the *Amended Plan* are binding upon the Debtor. *See* 11 U.S.C. § 1141(a). Because the *Amended Plan* plainly and unequivocally provides that Rockland's secured claim is unimpaired, the Debtor cannot now at this late hour alter its treatment of Rockland's claim.

Additionally, the *Amended Plan* and this Court's *Post–Confirmation Order and Notice* dated June 24, 2005 set forth a forty-five (45) day time period for the Debtor to file objections to Rockland's claim and/or to file an adversary proceeding challenging the extent, validity, and priority of Rockland's secured claim. Because the Debtor never timely commenced an action seeking to disallow or void Rockland's secured claim, the Debtor's challenge to Rockland's secured status is time barred regardless of whether 11 U.S.C. § 506 would apply to limit Rockland's claim. *See Memorandum Opinion and Order* dated June 24, 2008 (Dkt.# 295).

Citing *Stendardo v. Federal Natl Mortgage Assoc.,* 991 F.2d 1089 (3d Cir.1993) and *Youngman v. Fleet Bank. N.A. (In re A & P Diversified Technologies Realty, Inc.),* 467 F.3d 337 (3d Cir.2006), the Debtor also contends that the attorney fee provision of the *Factoring Agreement* is no longer enforceable in light of Rockland's confessed judgment.

What the Debtor fails to recognize is that under applicable law "[a] specific provision of [an agreement] may survive the judgment if the [agreement] clearly evidences an intention by the parties to preserve the effectiveness of that provision." *Cardiello v. Casale (In re Phillips Group, Inc.),* 382 B.R. 876, 883 (Bankr.W.D.Pa.2008); *see also Stendardo,* 991 F.2d at 1095 ("Parties to a mortgage may rely upon a particular provision post-judgment if the mortgagee clearly evidences their intent to preserve the effectiveness of that provision post-judgment.").

In the case before the Court, the *Factoring Agreement* expressly preserves all of Rockland's rights and remedies despite the entry of its judgment. For example, the *Factoring Agreement* provides that:

> Each right, power and remedy provided herein or otherwise existing shall be cumulative and concurrent and shall be in addition to every other right, power and remedy existing hereunder, by law or otherwise. The exercise by us of any one or more such rights, powers or remedies shall not preclude the simultaneous or later exercise by us of any or all such other rights, powers or remedies.

*Factoring Agreement* at § 9.3.

Under these circumstances, Rockland's confession of judgment does not extinguish Rockland's claim for attorneys' fees. As courts have recognized:

> Between the time of judgment and the time the secured creditor receives payment, the secured creditor may be required to make additional expenditures to protect its security interest and its collateral. The amount of fees

asserted in the judgment is not binding where there is an intent to allow the secured creditor to recoup its costs in fully realizing upon its claim. Such costs include defending the claim in bankruptcy proceedings.

**\*6** *Clark Screw Machine Prods. Co., Inc. v. Clark Grind & Polish, Inc. (In re Clark Grind & Polish, Inc.),* 137 B.R. 172, 175 (Bankr.W.D.Pa.1992) (citation omitted).

Even if the Debtor could seek to void Rockland's secured claim pursuant to 11 U.S.C. § 506, the Court notes that such a challenge is without merit. Specifically, Rockland has asserted that the liquidation of the Debtor's assets, and realization of insurance proceeds covering its collateral, rendered Rockland fully secured. The Court agrees.

The undisputed record is that Rockland's lien extended to the Debtor's personal property, including inventory, goods, and products and proceeds relating to the same (including third-party claims). In this case, Debtor filed pleadings asserting insurance claims in the amount of at least $746,606.76 for "Steel Coils Replacement, CMI Inventory" and at least $210,000 for "Steel Rolls Repairs Inventory." *See e.g., Complaint* (Adversary No. 05–2919–JAD; Dkt. # 1) at ¶ 36; *see also Amended Complaint* (Adversary No. 04–2773–JAD; Dkt. # 55) at ¶ 36.[2] The facts of this case are that the Debtor recovered insurance proceeds in excess of these sums, and therefore it appears that Rockland has always been an oversecured creditor for purposes of 11 U.S.C. § 506.

Accordingly, under any legal theory, it appears that Rockland's request for post-petition interest and post-petition attorneys' fees is appropriate.[3]

Lastly, the Debtor appears to challenge the reasonableness of the attorneys' fees claimed by Rockland. The Debtor's reasonableness challenge is without merit.

The attorneys' fees requested as a part of the Rockland claim are nothing but a function of the Debtor's own conduct. The lion's share of Rockland's attorneys' fees were necessitated by the Debtor's unreasonable refusal to honor and pay the Rockland claim. The fact of the matter remains that Rockland incurred its legal fees and expenses by responding and defending the Debtor's untimely claims objection. Only after Rockland successfully defended the claims objection, successfully defended the

Debtor's lengthy motion for reconsideration, and filed the instant Motion to Compel, did the Debtor finally acknowledge at the hearing on the Motion to Compel that the Debtor did not have a good basis for objecting to the Rockland claim in the first instance.[4]

Of course, the Debtor's opposition to the Rockland claim did not stop there. After causing Rockland to incur legal expense, the Debtor now at this late hour complains about the fact that Rockland wants to be paid its legal fees as a part of its claim. In addition, despite the fact that virtually all of the Debtor's arguments are barred by the *Amended Plan* and/or other orders of this Court, and despite the fact that the Debtor has long ago realized enough funds to pay all creditors in full and remit a sizeable distribution to equity holders, the Debtor has continued in its fight to avoid paying all of the components of Rockland's claim.

**\*7** The Debtor's actions have been unreasonable. Rockland should have been paid in full by the Debtor years ago. The Court is surprised that Rockland's fees were not higher given the conduct of the Debtor. Under these circumstances, the Court finds that the attorneys' fees sought by Rockland are more than reasonable.

WHEREFORE, for all of the reasons set forth above, the Court will enter an order which grants the Motion to Compel.

### *ORDER*

AND NOW, this *11th* day of February, 2009, and the Court having considered the *Motion of Rockland Credit Finance, LLC to Enforce Confirmed Amended Plan of Reorganization and Compel Payment of Claim* (the "Motion to Compel"), the Debtor's opposition thereto, and the record made throughout these proceedings, and in due consideration the Court hereby ORDERS, ADJUDGES, and DECREES that:

1. The Motion to Compel is GRANTED.

2. Within ten (10) days of the date of this Order, the Debtor shall pay Rockland Credit Finance, LLC $124,482.56 in readily available funds plus $11.84 per diem from January 27, 2009 until the date in which final payment is made.

Footnotes

In re Ceda Mills, Inc., Slip Copy (2009)

1    The Debtor's assets and business were effectively destroyed as a result of a severe rain storm that occurred prior to the Petition Date.

2    These were not the only personal property losses claimed by Ceda Mills to its insurers. For example, the Debtor later amended its insurance claim to include a "Blanket Business Personal Property" claim in the amount of "$5,187,500 less Ceda Mills' salvage value [of between $650,000 and $1,350,000]." *See Notice of Claims Pursuant to Order Dated April 10, 2006* (Adversary No. 04–2773–JAD; Dkt. # 218) at ¶¶ 1–4.

3    The Court notes that even if the Rockland claim is deemed to be wholly unsecured, Rockland would be permitted to add post-petition interest and attorneys' fees to its claim. The Court reaches this conclusion because nothing in the Bankruptcy Code prohibits the inclusion of attorneys' fees from being a part of the claim when such fees are incurred in connection with defending the allowance and payment of the claim in the bankruptcy case. *See Ogle v. Fidelity & Deposit Co. Of Maryland,* No. 6:08–cv–894, 2009 WL 87598 (N.D.N.Y., Jan. 12, 2009)(citing *Travelers Cas. & Sur. Co. Of Am. v. Pac. Gas. & Elec. Co.,* 127 S.Ct. 1199 (2007)). With respect to post-petition interest, the Court also notes that the *Amended Plan* states unequivocally that unsecured creditors were to be paid the "full amount" of their allowed claim. *See Amended Plan* at p. 7. In connection with other proceedings in this bankruptcy case, the Court had required the Debtor to pay such "full amount" immediately given the fact that the Debtor has realized more than enough funds to pay all creditors in full. Courts have held that a promise to make payment "in full" equates to a promise to pay each and every part of the creditor's claim-including interest. *See Fawcett v. United States (In re Fawcett),* 758 F.2d 588, 591 (11th Cir.1985)(chapter 13 case); *Terex Corp. v. Metropolitan Life Ins. Co. (In re Terex Corp.),* 984 F.2d 170, 175 (6th Cir.1993)(chapter 11 case); *United States v. Arrow Air, Inc. (In re Arrow Air, Inc.),* 101 B.R. 332, 336 (S.D.Fla.1989)(chapter 11 case). The Court finds these cases to be persuasive (particularly since there will be a surplus paid to equity holders in this case). As a result the Debtor is barred by the Court's prior orders, including the order confirming the plan, from challenging Rockland's claim for post-petition interest. Case law also suggests that because this case is a "solvent" case, the Debtor would be required to pay interest to the unsecured creditors in any event. *See In re Allegheny Int'l, Inc.,* 118 B.R. 282, 314–315 (Bankr.W.D.Pa.1990)(noting the "solvent debtor" exception to the disallowance of postpetition interest). For all of these reasons, and under the unique facts and circumstances of this case, it appears that Rockland would be entitled include post-petition attorneys' fees and interest as a part of its unsecured claim as well.

4    It appears that the Debtor merely assumed that Rockland had collected the Debtor's accounts receivables. But that assumption had no foundation as the Debtor could not provide counsel with anything to substantiate the assumption.

---

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 2827439
Only the Westlaw citation is currently available.
United States Bankruptcy Court,
N.D. New York.

In re AGWAY, INC., Debtor
In re Agway General Agency, Inc., Debtor
In re Brubaker Agronomic Consulting Service
LLC, Debtor
In re Country Best Adams, LLC, Debtor
In re Country Best–Deberry LLC, Debtor
In re Feed Commodities International LLC,
Debtor.

Nos. 02–65872, 02–65877. | July 18, 2008.

**Attorneys and Law Firms**

Judy G.Z. Liu, Esq., Weil, Gotshal & Manges LLP, New
York, NY, Attorneys for Debtors.

Jeffrey A. Dove, Esq., James C. Thoman, Esq., Menter,
Rudin & Trivelpiece, P.C., Syracuse, NY, Attorneys for
Debtors.

Filiberto Agusti, Esq., Steptoe & Johnson LLP,
Washington, DC, Attorney for Fidelity and Deposit
Company of Boston.

Glenn M. Fjermedal, Esq., Lacy Katzen, LLP, Rochester,
NY, Attorney for Fidelity and Deposit Company of
Boston.

**MEMORANDUM–DECISION, FINDINGS OF
FACT, CONCLUSIONS OF LAW AND ORDER**

STEPHEN D. GERLING, U.S. Chief Bankruptcy Judge.

**\*1** Under consideration by the Court is a motion filed by
D. Clark Ogle, Liquidating Trustee ("LT") of the jointly
administered debtors identified above ("Debtors") on
August 26, 2004 (LT"s Motion"). The LT's Motion seeks
to fix Claim No. 4792, filed by Fidelity and Deposit
Company of Maryland ("F & D"), in the amount of
$8,194,381.06 and to expunge what the LT argues are
duplicate claims. The LT's Motion was originally
scheduled to be heard on September 28, 2004, but has
been adjourned many times over a period of three years

on consent of the parties (*See* Dkt. Nos. 5583, 5708, 5777,
5825, 5986, 6009, 6122, 6208, 6330, 6389, 6434, 6548,
6639, 6738, 6797, 6842, and 6958.) On September 20,
2007, F & D filed its response to the LT's Motion, as well
as a cross-motion to compel distribution to it as an
unsecured creditor on the "liquidated" portion of its
claims in the amount of $8,194,381.06.

Both the LT's Motion and F & D's Cross-motion were
heard at the Court's regular motion term on September
25, 2007, in Utica, New York. On October 16, 2007, the
LT filed his response to F & D's Cross-motion. On
October 19, 2007, F & D filed a reply to the LT's
response and on October 22, 2007, the LT filed a
supplemental reply to F & D's reply. Both the LT's
Motion and F & D's Cross-motion were adjourned to
October 23, 2007. Following oral argument, the Court
reserved decision on both motions and allowed the parties
an opportunity to file memoranda of law.[1] The matter was
submitted for decision on December 3, 2007.

*JURISDICTIONAL STATEMENT*

The Court has core jurisdiction over the parties and
subject matter of this contested matter proceeding
pursuant to 28 U.S.C. §§ 1334(b), 157(a), (b)(1), and
(b)(2)(B) and (O).

*FACTS*

On October 1, 2002, the above-captioned Debtors filed
voluntary petitions pursuant to chapter 11 of the U.S.
Bankruptcy Code, 11 U.S .C. §§ 101–1532 ("Code"). On
April 28, 2004, the Court confirmed the Debtors' Second
Amended Joint Plan of Liquidation ("the Plan") and
appointed D. Clark Ogle as the Liquidating Trustee.

In the course of its prepetition operations, Agway, Inc.
entered into a number of casualty insurance policies with
various insurance carriers, including the Travelers
Indemnity Company, the National Union Fire Insurance
Company, the Reliance Insurance Company and the
Pacific Employer's Insurance Company. In connection
with those policies, Agway provided surety bonds
("Bonds") issued by "F & D" pursuant to agreements of
indemnity whereby Agway, Inc. was to reimburse F & D
for all amounts paid by F & D under the Bonds issued to
each carrier as security for the payment of deductibles and

premiums.[2] According to the LT, the face amount of the outstanding Bonds issued by F & D is approximately $23.9 million. In addition, allegedly there are letters of credit with a value of approximately $25.7 million. *See* LT's Motion at ¶ 10.

On March 6, 2003, the Court signed an Order establishing May 30, 2003, as the final date for filing proofs of claim against the Debtors. F & D filed a proof of claim on May 29, 2003, in each of the Debtors' cases in the amount of $27,650,330.50. Amended proofs of claim were filed on February 20, 2004, in the amount of $27,650,330.50, of which $2,775,441 was stated as being fixed. Second amended proofs of claim were filed on June 17, 2004, increasing the amount of the fixed portion to $4,369,775.84.[3]

**\*2** According to the LT, as of the date of the LT's Motion, F & D has disbursed approximately $3,875,831.01, for which it asserts F & D is entitled to a subrogation claim in that amount pursuant to Code § 509(a). *See* LT's Motion at ¶ 18. On August 25, 2005, Third Amended Proofs of Claim were filed in the amount of $19,652,900. Fourth Amended Proofs of Claim were filed on September 14, 2005, in the amount of $20,730,784.67. Fifth Amended Proofs of Claim were filed on August 31, 2006, in the amount of $22,038.075.66. The Sixth Amended Proofs of Claim, filed on July 11, 2007, lists an increased amount in its fixed and liquidated claim in the amount of $8,194,381.06. The Sixth Amended Proof of Claim filed in Agway, Inc ., Case No. 02–65872, also asserts fees and expenses of $635,922.85, interest totaling $1,656,290.57[4] and loss and expense reserves in the amount of $13,917,506. The total amount listed in the Sixth Amended Proof of Claim in Agway, Inc.'s case (Claim No. 4792) is $22,396.220.60.[5] Ultimately, the LT requests that the Court expunge all claims filed by F & D, except Claim No. 4792 (the Sixth Amended Proof of Claim) and allow it in the amount of $8,194,3 81.06, identified by F & D as "costs" and representing the amounts actually disbursed by F & D under the Bonds to the various insurance carriers as of July 11, 2007.

### ARGUMENTS

The LT argues that the Court should allow F & D's claim in the amount of $8,194,381.06 as being fixed and liquidated and disallow the balance of its contingent claim. It is the LT's position that Code §§ 502(e)(1) and (e)(2) allow resolution of a claim at a fixed point in time and then distribution may be made on any allowed claim.

According to the LT, Code § 502(j) is the proper procedure to later revisit a claim to the extent that it was previously disallowed.

It is F & D's position that the Court has discretion to allow its fixed and liquidated claim pursuant to Code § 502(e)(2) and simply defer disallowing the balance of its contingent claim. According to F & D, this approach would alleviate the need for it to file a series of motions pursuant to Code § 502(j) seeking reconsideration of the disallowance of its contingent claim once actual disbursements under the Bonds have been made and the claim(s) becomes fixed and liquidated. F & D argues that "it will make sense to rule on the motion when it would be meaningful: either at the end of the case or after the LT obtains releases of the Bonds from the insurance carriers." F & D's Supplemental Brief, dated December 3, 2007 (Dkt. No. 7068), at 6.

Additionally, the LT objects to F & D's claim for attorneys' fees and costs/expenses in the amount of $635,922.85, as set forth in F & D's Sixth Amended Proof of Claim, arguing that Code § 506(b) allows only oversecured creditors to recover reasonable attorneys' fees and costs. F & D relies on the recent United States Supreme Court decision in *Travelers Cas. & Sur. Co. of America v. Pacific Gas & Elec. Co.,* 127 S.Ct. 1199, 167 L.Ed.2d 178 (2007), as well as *United Merchs. & Mfrs., Inc. v. Equitable Life Assurance Soc'y of the U.S. (In re United Merchs. & Mfrs., Inc.),* 674 F.2d 134, 137–38 (2d Cir.1982) and *In re Qmect, Inc.,* 368 B.R. 882 (Bankr.N.D.Calif.2007), in arguing that it is entitled to recover postpetition attorneys' fees and costs, as authorized under its contract with Agway, as part of its unsecured claim.[6]

### DISCUSSION

**\*3** The Court's analysis must begin with the basic premise that a claim is broadly defined under the Bankruptcy Code. *See Corbett v. MacDonald Moving Servs., Inc.,* 124 F.3d 82, 91 (2d Cir.1997). Pursuant to Code § 101(5), a claim includes a right to payment "whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, *contingent*, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." 11 U.S.C. § 101(5)(A) (emphasis added). Payment of the claim by the bankruptcy estate is dependent on whether or not the claim is allowed. A claim is "deemed allowed" unless a party in interest objects. 11 U.S.C. § 502(a). If there is an objection, as is the case herein, the Court, after notice and a hearing,

"shall determine the amount of such claim ... as of the date of the filing of the petition, and shall allow such claim in such amount ..." subject to certain exceptions identified in the statute. 11 U.S.C. § 502(b). *Code § 502(e)(1)(B)*

Code § 502(e)(1)(B) is one such exception and provides that "the court shall disallow any claim for reimbursement or contribution of an entity that is liable with the debtor on or has secured the claim of a creditor, to the extent that ... such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution ... 11 U.S.C. § 502(e)(1)(B).

The LT points out that under the terms of the Plan there is to be no payment or distribution on a disputed claim until it is an "allowed claim." *See* Article 8.01 of the Plan. With its Cross-motion, F & D requests that the Court allow its claim to the extent that it is currently "liquidated," thereby entitling it to a distribution at this time. As noted above, the LT takes no issue with F & D receiving payment of $8,194,3 81.06, as set forth in its Sixth Amended Proof of Claim, as an allowed claim. However, it is the LT's position that the balance of F & D's claim, to the extent that it is currently contingent, should be disallowed.

The Court has reviewed the case law cited by both parties. None of the cases provide the remedy that F & D is proposing, namely, having the Court defer disallowance of the balance of F & D's claim until the end of the case. Code § 502(e)(1)(B) directs that the Court "shall disallow" any claim for reimbursement or contribution to the extent that such claim is contingent at the time of allowance or disallowance. As pointed out by U.S. District Judge, Loretta A. Preska of the United States District Court for the Southern District of New York, in *Aetna Cas. and Sur. Co. v. Georgia Tubing Co.,* Case No. 93 Civ. 3659, 1995 WL 429018 (S.D.N.Y. July 20, 1995), *aff'd* 93 F.3d 56 (2d Cir.1996), both U.S. Bankruptcy Judge Francis J. Conrad and U.S. Bankruptcy Judge Burton R. Lifland disallowed the proofs of claim filed by Aetna in related reorganization proceedings and indicated that Aetna's remedy in both cases was to move for reconsideration pursuant to Code § 502(j). *Id.* at *1 and *5 n. 3; *see also In re Worldcom, Inc. Sec. Litig.,* 293 B.R. 308, 323 (S.D.N.Y.2003) (noting that "[w]here a contingent claim is disallowed, it may be reconsidered when the contingency is 'resolved' "); *In re Pinnacle Brands, Inc.,* 259 B.R. 46, 56 (Bankr.D.Del.2001).

**\*4** Thus, F & D has a remedy pursuant to Code § 502(j) to have its claim(s) reconsidered once the claim(s) has

become fixed and liquidated. The Court is at a loss to understand the advantage to F & D in having the Court defer indefinitely its ruling on the disallowance of F & D's claim(s). It has suggested that this will result in its having to make several motions in the future pursuant to Code § 502(j). However, if it were willing to wait for the Court to delay ruling on the disallowance of its claim(s) to some date in the future, then it should have no problem delaying any requests for reconsideration of the disallowance of its claim(s) pursuant to Code § 502(j) as well. It appears to be a distinction without a difference as far as the treatment of its claim(s) is concerned.

However, in light of the fact that it has now been several months since the LT's Motion was heard and F & D has filed three additional amended proofs of claim within that time frame, the Court will consider any objections the LT has to F & D's Ninth Amended Proof of Claim, consistent with this Decision, before allowing F & D's claim for the amounts actually disbursed by it under the Bonds through May 8, 2008.

### Allowance of F & D's Claim for Attorneys' Fees

At the hearing on October 23, 2007, the LT made an argument that the addition of a claim for attorneys' fees and costs incurred in "attempting to enforce the Indemnity Agreement" by F & D, beginning with its First Amended Proof of Claim (Claim No. 4568), filed on February 20, 2004, in the amount of $391,018, represents a new claim and not an "amendment." However, as one court has noted, "as a general rule, amendments intended merely to increase the amount of a claim grounded in the same right to payment are not considered 'new' claims under the Code." *See In re Hemingway Transport, Inc.,* 954 F.2d 1, 10 (1st Cir.1992). In this case, F & D's claim or right to payment includes not only the monies it has disbursed under the Bonds, but also any attorneys' fees and costs, under the terms of the indemnity agreements entered into with the Debtors. Thus, the Court does not construe the addition of attorneys' fees and costs to be a "new" claim but rather an amended claim.

The Supreme Court in *Travelers Casualty* limited its discussion to "whether the Bankruptcy Code disallows contract-based claims for attorneys' fees, based solely on the fact that the fees at issue were incurred litigating issues of bankruptcy law." *Travelers Cas.,* 127 S.Ct. at 1204. It pointed out that "it remains true that an otherwise enforceable contract allocating attorney's fees (i.e., one that is enforceable under substantive, nonbankruptcy law) is allowable in bankruptcy except where the Bankruptcy Code provides otherwise." *Id.*. In the matter under consideration, this Court is asked to address whether the

Bankruptcy Code "provides otherwise" such that F & D's claim for attorneys' fees, incurred postpetition, should be disallowed because of its status as an unsecured creditor.

**\*5** This issue was recently addressed by the court in *In re SNTL Corp.,* 380 B.R. 204 (9th Cir. BAP2007) in which the Bankruptcy Appellate Panel for the Ninth Circuit discussed the split in decisions both pre- and post-*Travelers.* For example, the United States Court of Appeals for the Second Circuit in *United Merchants,* 674 F.2d at 139, in what *SNTL Corp.* refers to as one of the minority line of cases, allowed unsecured creditors to claim "collection costs,'" including reasonable attorney's fees, incurred postpetition based on a prepetition contract.[7] As pointed out by *SNTL Corp.,* the split has continued post-*Travelers.* Compare *Qmect, Inc.,* 368 B.R. 882 (allowing contract-based attorney's fees incurred postpetition in its prepetition claim) to *In re Electric Mach. Enters., Inc.,* 371 B.R. 549 (Bankr.M.D.Fla.2007) (disallowing unsecured creditor's postpetition attorneys' fees). Ultimately, the court in *SNTL Corp* . agreed with the reasoning of the court in *Qmect* and concluded that "claims for postpetition attorneys' fees cannot be disallowed simply because the claim of the creditor is unsecured." *SNTL Corp.,* 380 B.R. at 223.[8]

The LT's makes several arguments in his objection to F & D's claim for attorneys' fees. The first, of course, is based on the language in Code § 506(b) and the maxim of statutory construction known as *expressio unius est exclusio alterius.*[9] It is the LT's position that because Congress expressly allowed attorneys' fees, as well as interest, only for holders of oversecured claims, to the extent of the value of the property securing the claims pursuant to Code § 506(b), it necessarily follows that attorneys' fees for holders of unsecured claims should not be allowed since there is no comparable provision authorizing unsecured creditors to collect their attorneys' fees from a debtor's estate. Yet, Code § 506(b) is not concerned with the question of claim *allowance.* It is concerned with the "[d]etermination of secured status" and what may be included in a secured claim. *See SNTL Corp.,* 380 B.R. at 220.

It is Code § 502(b), not Code § 506(b), that governs the allowance and disallowance of claims. *Id.,* citing *In re Rodriguez,* 375 B.R. 535, 545 (9th Cir. BAP2007). The LT, as well as many courts in the "majority," make the argument that disallowance of claims by unsecured creditors such as F & D for attorneys' fees incurred postpetition is mandated based on the Supreme Court's twenty year old decision in *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365 (1988). In that case, the Supreme Court held that an

undersecured creditor could not receive postpetition interest on the unsecured portion of its debt. *Id.* at 380. The court's holding comports with Code § 502(b)(2), which expressly excepts from allowance a claim for unmatured interest. This exception is, of course, subject to the specific statutory provision of Code § 506(b), which includes a claim for unmatured interest if provided by contract or agreement as long as the creditor is oversecured, and then only to the extent of the value of the security.[10] Code § 502(b) does not contain a similar prohibition against the allowance of attorneys' fees. *See SNTL Corp.,* 380 B.R. at 220, citing *Qmect, Inc.,* 368 B.R. at 885; *In re New Power Co.,* 313 B.R. 496, 509–10 (Bankr.N.D.Ga.2004); *but see In re Woodmere Investors Ltd. P'ship,* 178 B.R. 346, 355–56 (Bankr.S.D.N.Y.1995) (distinguishing *United Merchants* and concluding that the rationale of *Timbers* was applicable to the disallowance of a claim for attorney's fees and costs).

**\*6** In fact, the Supreme Court in *Travelers Casualty,* without considering the effect of Code § 506(b), indicated that " 'claims enforceable under applicable state law will be allowed in bankruptcy unless they are expressly disallowed' under Code § 502(b)." *In re Smith,* Case No. 06–60768, 2008 WL 185784, at \*6 (Bankr.W.D.Mo. Jan. 19, 2008), quoting *Travelers Cas.,* 127 S.Ct. at 1206. Accordingly, the Court concludes that the analysis in *Timbers* and its discussion of Code § 506(b) with respect to an allowance of postpetition interest is not persuasive on the issue of attorneys' fees and costs under the circumstances now before this Court as more fully discussed below.

A third argument that needs to be considered is when F & D's claim for attorneys' fees arose. Code § 502(b) requires that the Court "determine the amount of such claim ... as of the date of the filing of the petition." 11 U.S.C. § 502(b). Yet, as of the petition date the fees for which F & D now seeks to recover were contingent to the extent that the indemnity agreements provided for them. Nevertheless, under its contract with the Debtors, it had a right to payment or a "claim" as of the prepetition date, despite the fact that it may have been unliquidated, unmatured and contingent. As pointed out by the court in *SNTL Corp.,*

> "if the creditor incurs the attorneys' fees postpetition in connection with exercising or protecting a prepetition claim that included a right to recover attorneys' fees, the fees will be prepetition in nature, constituting a contingent prepetition obligation that became

fixed postpetition when the fees were incurred."

See *SNTL Corp.*, 380 B.R. at 221, quoting 5 *Collier on Bankruptcy* § 4553.03 [1][i] (15th ed. updated 2007); see also New Power, 313 B.R. at 508 (indicating that "[s] o long as the right to collect the fees existed prepetition, the fact that the fees were actually incurred during the post-petition period is not relevant to the determination of whether the creditor has an allowable pre-petition claim for the fees"); see also Qmect, Inc., 368 B.R. at 884 (indicating that the fact that the claim was contingent as of the petition date is not a basis for disallowance of the claim); *Insurance Co. of North America v. Sullivan*, 333 B.R. 55, 62 (D.Md.2005) (embracing proposition that "a prepetition indemnity agreement covering attorney's fees creates a contingent right to those attorney's fees for litigation occurring postpetition [in fulfilling surety obligations]").

The Court believes that the contingent nature of F & D's claim, including its claim for attorneys' fees and costs, distinguishes it from other cases in analyzing whether such a claim should be allowed despite F & D's status as an unsecured creditor. As discussed above, the fact that the fees were incurred postpetition does not negate the fact that F & D's claim is contingent and deemed to have arisen prepetition based on its agreements with the Debtors. In the view of the Court, the only issue is the whether the fees and costs are enforceable under applicable state law and whether they are reasonable.

**\*7** The LT also makes the argument that disallowance of F & D's claim for attorneys' fees promotes equality of distribution among other unsecured creditors whose claims are based on contracts that have no provision for an award of attorneys' fees or claims such as those are based on torts and not contracts. However, the U.S. Court of Appeals for the Second Circuit in *United Merchants* took exception to this position, stating that the court "cannot agree that the policy of equitable distribution renders an unsecured creditor's otherwise valid contractual claim for collection costs unenforceable in bankruptcy." United Merchants, 674 F.2d at 137.

Courts have also expressed concerns that if unsecured creditors were permitted to recover their attorneys' fees pursuant to their prepetition contract, there would be nothing to prevent "individual creditors from utilizing scorched-earth litigation tactics or absorbing an inequitable amount of estate assets." Elec. Mach., 371 B.R. at 551–53. Such policy concerns are more appropriately addressed by Congress, rather than the courts. See *SNTL Corp.*, 380 B.R. at 222. As pointed out

by the Court in *SNTL Corp.*, some of these concerns have been addressed by Congress by requiring that compensation for attorneys that is to be paid from the estate be reasonable. *See id.*, n. 20 (listing Code §§ 303(i)(1)(B), 329(b), 330(a), 502(b)(4), and 503(b)(4) which refer to "reasonable compensation" and the "reasonable value of services").

The Court concludes that the Bankruptcy Code does not prohibit the allowance of F & D's claim for attorneys' fees and costs, to the extent that it is a prepetition contingent claim which was fixed postpetition and provided that the fees and costs are reasonable and enforceable under substantive nonbankruptcy law. Accordingly, the Court deems it appropriate to allow the LT an opportunity to review said fees and costs in F & D's Ninth Amended Proofs of Claim and to file any objections it may have before the Court rules on the allowance of said fees and costs, as well as F & D's fixed and liquidated claim for reimbursement.

Based on the foregoing, it is hereby

ORDERED that the LT's Motion is granted insofar as the Court will allow the claim of F & D to the extent that it is fixed and liquidated and represents the amounts actually disbursed under the Bonds to the various insurance carriers, as of May 8, 2008, when the Ninth Amended Proof of Claim was filed, subject to the LT's objection as set forth below; it is further

ORDERED that the LT shall have thirty (30) days from the date of this Order to file a motion objecting to the fixed and liquidated portion of the Ninth Amended Proof of Claim in the amount of $8,652,847.68; it is further

ORDERED that in the event that the LT files no objection to the fixed and liquidated portion of the Ninth Amended Proof of Claim in the amount of $8,652,847.68 within said 30 days, that the LT make a distribution on said "liquidated" portion of F & D's claim in accordance with Debtors' Second Amended Joint Plan of Liquidation confirmed by the Court, dated April 28, 2004; it is further

**\*8** ORDERED that the LT shall have thirty (30) days from the date of this Order to file a motion on notice and hearing, objecting to F & D's claim for attorneys' fees and costs, as set forth in its Ninth Amended Proof of Claim in the amount of $884,506.28, solely on the basis of their reasonableness and the extent to which they were contingent on October 1, 2002 and enforceable under the terms of the indemnity agreements, for the Court's consideration before allowing said claim; it is finally

ORDERED that the balance of F & D's prepetition claim, as reflected in its Ninth Amended Proof of Claim, to the extent it remains contingent, is disallowed, subject to being reconsidered pursuant to Code § 502(j), on motion filed by F & D not earlier than six (6) months from the date of this Order, and thereafter at intervals of not less than six (6) months, unless otherwise ordered by this Court for good cause.

Footnotes

1    At the hearing on October 23, 2007, there was some discussion of what F & D asserts is an alternative theory of recovery, namely that it holds an exoneration claim. The parties agreed to reserve F & D's right to assert an exoneration claim in the event that it is unsuccessful with its claim for reimbursement. Accordingly, the Court indicated that it would "leave exoneration off the table" for purposes of the briefing schedule.

2    According to the LT, F & D asserts that Telmark and the "Agway Energy entities" are also liable under the Agreements of Indemnity. On January 29, 2003, F & D commenced an action against those entities in the U.S. District Court for the District of Maryland, which action was subsequently transferred to the U.S. District Court for the Northern District of New York (Civil Action No. 5:2003–CV–0604) ("Telmark litigation"). On November 18, 2005, Chief U.S. District Judge Norman A. Mordue signed an order indicating that "at this time ... there is no current reason to maintain this action on the open docket for statistical purposes" but that "any party may reopen the action by advising the Court in writing that the above entitled action should no longer be stayed." F & D asserts that the LT has conceded that "the proceedings in [the bankruptcy case] cannot close until the Telmark litigation has been completed or settled." See F & D's Supplemental Brief, filed December 3, 2007 (Dkt. No. 7068) at 11.

3    A second amended proof of claim was not filed in the case of Feed Commodities International, LLC ("FCI").

4    At the hearing on October 23, 2007, LT's counsel represented to the Court that F & D had agreed that it was not entitled to interest and that that particular component of their proof of claim was "off the table."

5    Since the hearing on October 23, 2007, F & D has filed further amendments in the Debtors' cases. In Agway, Inc.'s case, for example, on November 15, 2007, it filed a Seventh Amended Proof of Claim (Claim No. 4798) in the amount of $19,390,786.33, including $8,614,555.17 in monies actually disbursed to the various insurance carriers, $10,035,605.73 in loss and expense reserves and $740,625.43 in legal fees and costs. Its Eighth Amended Proof of Claim (Claim No. 4804), filed on December 18, 2007, is in the amount of $19,399,665.12, including $8,623,433.96 in monies actually disbursed to the various insurance carriers, $10,035,605.73 in loss and expense reserves, and $740,625.43 in legal fees and costs. Its Ninth Amended Proof of Claim was filed on May 8, 2008, (Claim No. 4811) also in the amount of $19,399.665.12, including $8,652,847.68 in monies actually disbursed to the various insurance carriers (an increase of $458,466.62 since the Sixth Amended Proof of Claim was filed), $10,035,605.73 in loss and expense reserves and $884,506.28 in legal fees and costs (an increase of $248,583.43 since the Sixth Amended Proof of Claim was filed). There is no dispute that while proofs of claim have been filed in a number of the Debtors' cases, F & D is only entitled to one recovery, whether it be from Agway, Inc. or some other related entity.

6    The Supreme Court declined to reach the issue of whether Travelers, as an unsecured creditor, could recover postpetition attorneys' fees. It held that "an otherwise enforceable contract allocating attorney's fees ... is allowable in bankruptcy except where the Bankruptcy Code provides otherwise." Travelers Cas., 127 S.Ct. at 1204. The Supreme Court ultimately vacated the judgment of the U.S. Court of Appeals for the Ninth Circuit and remanded the case for further proceedings consistent with its opinion. On May 8, 2008, the U.S. Court of Appeals for the Ninth Circuit remanded the case to the district court with instructions to remand it to the bankruptcy court for further proceedings. See Travelers Cas., 525 F.3d 885 (9th Cir. May 8, 2008).

7    This Court, of course, is bound by the decisions of the U.S. Court of Appeals for the Second Circuit unless there is a basis for distinguishing those cases. Admittedly, United Merchants was decided under the Bankruptcy Act without consideration of Code § 506(b). In view of the Court's conclusions herein, it need not decide whether this distinction has merit for purposes of the issue before this Court.

8    The debate has found itself presented not only in the case law but also in several law review articles: Mark S. Scarberry, Interpreting Bankruptcy Code Sections 502 and 506: Post–Petition Attorney's Fees in a Post–Travelers World, 15 AM. BANKR.INST. L.REV. 611 (Winter 2007); Jennifer M. Taylor and Christopher J. Mertens, Travelers and the Implications on the Allowability of Unsecured Creditors' Claims for Post-petition Attorneys' Fees against the Bankruptcy Estate, 81 AM. BANKR. L.J. 123 (Spring 2007); N. Theodore Zink, Jr. and Andrew Rosenblatt, An Unsecured Creditor's Right to Recover Attorneys' Fees: Highlighting the Section 502/Section 506 Dispute, J. OF BANKR.L. 2007.06–2 (June 2007); see also Ray Geoffroy, Show Me the Money: The Debate over Creditors' Postpetition Attorneys' Fees, 14 BANKR.DEV. J. 425 (1998) and Liore Z. Alroy and J.

Michael Mayerfeld, *Contracted-for Post–Petition Attorneys' Fees and Collection Costs: United Merchants Revisited,* 1992 COLUM. BUS. L.REV. 309 (1992).

[9]    Translated "the expression of one thing is the exclusion 9 clusion of another."

[10]    Code § 506(b) was amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") to provide for "reasonable fees, costs, or charges provided for under the agreement *or State statute* under which such claim arose." The new language has no application to the matter herein. In addition, the new language has application only to cases filed after October 17, 2005.

---

End of Document                                  © 2015 Thomson Reuters. No claim to original U.S. Government Works.

---

In re Oakwood Homes Corp., 394 B.R. 352 (2008)

50 Bankr.Ct.Dec. 196

394 B.R. 352
United States Bankruptcy Court,
D. Delaware.

In re OAKWOOD HOMES CORPORATION, et al.,
Debtors.
OHC Liquidation Trust, by and through Alvarez &
Marsal, LLC, the OHC Liquidation Trustee,
Plaintiff,
v.
United States Fire Insurance Company,
Defendant.

Bankruptcy No. 02–13396 (PJW). | Adversary No.
04–57054 (PJW). | Oct. 3, 2008.

## Synopsis

**Background:** Liquidating trust established under debtor's confirmed Chapter 11 plan brought adversary proceeding against surety that had issued performance bonds on debtor's behalf, seeking a determination that surety was holding funds from draws on letters of credit provided by debtor in excess of surety's remaining exposure on outstanding bonds. Surety asserted right to draw on these funds to pay attorney fees that it incurred in proceeding.

**[Holding:]** The Bankruptcy Court, Peter J. Walsh, J., held that language in indemnity agreement obligating debtor to indemnify surety for expenses, including attorney fees, incurred in connection with its role as surety on performance bonds issued on debtor's behalf did not allow surety to recover attorney fees incurred in litigation with debtor over whether surety was retaining, from its draw on letters of credit issued by debtor, funds well in excess of its remaining exposure on bonds.

So ordered.

## Attorneys and Law Firms

**\*354** Donna Culver, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, Robert Stark, Emilio A. Galván, Dana S. Montone, Brown Rudnick LLP, New York, NY, for Plaintiff OHC Liquidation Trust.

Russell C. Silberglied, Lee E. Kaufman, Richards, Layton & Finger, P.A., Wilmington, DE, Louis A. Modugno,

McElroy, Deutsch, Mulvaney & Carpenter, LLP, Morristown, NJ, for Defendant United States Fire Insurance Company.

## MEMORANDUM OPINION

PETER J. WALSH, Bankruptcy Judge.

This opinion is with respect to the supplemental briefs (Doc. 111, 113 and 114) submitted by the parties in connection with plaintiff OHC Liquidation Trust's ("OHC Trust") motion for summary judgment (Doc. # 69). United States Fire Insurance Company ("U.S.Fire") asserts that OHC Trust must indemnify U.S. Fire for attorneys' fees incurred in connection with this litigation pursuant to the Indemnity Agreement (the "Agreement") executed by the debtor Oakwood Homes Corporation ("Oakwood") in favor of U.S. Fire. For the reasons discussed below, I conclude that the Agreement does not require OHC Trust to indemnify U.S. Fire for attorneys' fees incurred in the instant litigation.

## BACKGROUND

On November 15, 2002, Oakwood and certain of its affiliates petitioned for relief under chapter 11 of title 11 of the Bankruptcy Code, 11 U.S.C. §§ 101 et seq. On March 31, 2004, the Court entered an order confirming Oakwood's plan of reorganization (the "Plan"). The Plan established a liquidating trust, OHC Trust. OHC Trust was vested with the right to prosecute causes of action on behalf of the holders of beneficial interests in the OHC Trust. (Doc. # 70, p. 5.)

Oakwood was a manufacturer and retailer of manufactured homes. Prior to filing for chapter 11 relief, U.S. Fire agreed to provide surety bonds in order to secure certain performance obligation of Oakwood in the regular course of its business. To induce U.S. Fire to issue the bonds, Oakwood entered into the Agreement, dated December 13, 2001, which required Oakwood to post collateral with U.S. Fire. After Oakwood ceased doing business, on April 13, 2004, Oakwood directed U.S. Fire to cancel all outstanding bonds that had been issued for Oakwood. Pursuant to various state law provisions, U.S. Fire continues to have exposure with respect to some of

the bonds.

On November 13, 2004, the OHC Trust filed its complaint against U.S. Fire alleging that U.S. Fire was holding funds far in excess of funds needed by U.S. Fire to satisfy outstanding bond obligations. U.S. Fire had obtained these funds by drawing down two letters of credit posted by Oakwood. Specifically, the complaint alleges that U.S. Fire was holding funds totaling $8 million, whereas U.S. Fire's exposure on the outstanding bonds was only a small fraction of that number. OHC Trust seeks a return of the excess funds. During the course of this litigation the parties have engaged in substantial discovery activity and motion practice.

On November 6, 2007, OHC Trust filed a motion for summary judgment. Shortly after OHC Trust filed its motion for summary judgment, U.S. Fire remitted $3.5 million of the collateral to OHC Trust. The parties are in serious dispute as to the amount of collateral still being held by U.S. Fire and the amount of exposure that U.S. Fire still has on outstanding bonds. The parties have served a number of supplemental briefs addressing these disputes. *355 In accounting for the amount of the collateral still held by U.S. Fire, U.S. Fire recently advised OHC Trust that approximately $500,000 of the collateral had been used to reimburse U.S. Fire for legal fees incurred in defending this action. U.S. Fire contends that the Agreement requires OHC Trust to indemnify U.S. Fire for its attorneys' fees incurred in defending OHC Trust's complaint. OHC Trust argues that the Agreement does not so provide.

The Agreement includes a section indemnifying U.S. Fire for expenses, including attorneys' fees, incurred in connection with its role as surety. The exact language of that section reads:

> Indemnitors ... promise ... [t]o indemnify, exonerate, and otherwise hold [U.S. Fire] harmless from and against any and all loss and expense of whatever kind, including interest, court costs and counsel fees, as well as any such expense incurred or sustained by reason of having issued any Bond and/or having made any investigation in connection with any claim or demand on any Bond. which it may incur or sustain as a result of or in connection with (a) furnishing of and Bond, or (b) the enforcement of this Agreement.

(Doc. # 111, Exhibit A, p. 1.)

The governing law for the Agreement is the State of New York. (*Id.* at ¶ 17.)

This opinion addresses only the legal fees dispute, not the broader summary judgment motion that is still pending.[1]

The relevant facts here are not in dispute. This ruling simply involves contract interpretation.

## DISCUSSION

[1] [2] [3]  It is a well-established rule that parties are responsible for paying their own attorneys' fees absent an explicit agreement to the contrary. *See Bourne v. MPL Commc'ns., Inc.,* 751 F.Supp. 55, 57 (S.D.N.Y.1990) ("Under the general rule in New York, attorneys' fees are incidents of litigation and a prevailing party may not collect them from the losing party unless such an award is authorized by agreement between the parties, statute or court rule."). In the case of indemnity agreements, New York courts have stated that indemnity "should not be found unless it can be clearly implied from the language and purpose of the entire agreement and the surrounding facts and circumstances." *Hooper Assocs., Ltd. v. AGS Computers, Inc.,* 74 N.Y.2d 487, 549 N.Y.S.2d 365, 548 N.E.2d 903, 905 (1989). *See also Oscar Gruss & Son, Inc. v. Hollander,* 337 F.3d 186, 199 (2d. Cir.2003) ("Promises by one party to indemnify the other for attorneys' fees run against the grain of the accepted policy that parties are responsible for their own attorneys' fees."); *Niagara Frontier Transp. Auth. v. Tri–Delta Constr. Corp.,* 107 A.D.2d 450, 487 N.Y.S.2d 428, 431 (N.Y.App.Div.1985) ("The language of an indemnity provision should be construed so as to encompass only that loss and damage which reasonably appear to have been within the intent of the parties. It should not be extended to include damages which are neither expressly within its terms nor of such character that it is reasonable to infer that they were intended to be covered by the contract."). Likewise, when reading indemnity agreements, New York *356 courts have noted that even if contract language may seem to allow a broader interpretation, such a reading is inappropriate: "Although the words [in a contract] might 'seem to admit of a larger sense, yet they should be restrained to the particular occasion and to the particular object which the parties had in view.' This is particularly true with indemnity contracts." *Hooper Assocs.,* 549 N.Y.S.2d 365, 548 N.E.2d at 905 (quoting *Robertson v. Ongley Elec. Co.,* 146 N.Y. 20, 40 N.E. 390, 391 (1895)).

When it is clear from the language of the agreement and the surrounding circumstances that indemnity was intended, New York courts have awarded attorneys' fees pursuant to the express terms of the indemnity agreement in a variety of circumstances. *See Gen. Accident Ins. Co. of Am. v. Merritt–Meridian Constr. Corp.,* 975 F.Supp. 511 (S.D.N.Y.1997) (construction); *Lori–Kay Golf, Inc. v. Lassner,* 61 N.Y.2d 722, 472 N.Y.S.2d 612, 460 N.E.2d 1097 (N.Y.1983) (receiver of real property); *Maryland Cas. Co. v. Farley,* 11 A.D.2d 756, 201 N.Y.S.2d 970 (N.Y.App.Div.1960) (appeal bond). Also, in the bankruptcy context, the Supreme Court has held that attorneys' fees authorized by prepetition contracts may be awarded even if they are incurred in postpetition litigation. *Travelers Cas. & Surety Co. Of Am. v. Pacific Gas and Electric Co.,* 549 U.S. 443, 127 S.Ct. 1199, 167 L.Ed.2d 178 (2007).

[4] Thus, as U.S. Fire asserts, under New York law, indemnity agreements are valid and enforceable, including their provisions regarding attorneys' fees, and may be upheld in bankruptcy proceedings. U.S. Fire also is correct in noting that, as evident by case law, the surety relationship is one that is predominately accompanied by an indemnity agreement that absolves the surety of liability for any expense, including attorneys' fees, incurred in paying out under or investigating any claim against issued bonds or other instruments of suretyship. *See, e.g., Lori–Kay Golf,* 472 N.Y.S.2d 612, 460 N.E.2d at 1098 ("As a general rule a surety is equitably entitled to full indemnity against the consequences of an principal obligor's default. This includes the right to reimbursement for legal fees incurred...."); *First Nat'l Ins. Co. Of America v. Joseph R. Wunderlich, Inc.,* 358 F.Supp.2d 44, 51–52 (N.D.N.Y.2004). In fact, all of the applicable cases U.S. Fire cites deal with sureties attempting to recoup expenses incurred in fulfilling their role as surety.

[5] In the instant matter, however, U.S. Fire is seeking attorneys' fees in relation to its dispute with OHC Trust's claim that U.S. Fire is holding funds significantly in excess of the remaining bonds' exposure. This dispute has nothing to do with a payment or incurrence of other expenses in connection with U.S. Fire's role as surety. Under New York case law, unless the Agreement explicitly provides for indemnity, OHC Trust should not be required to pay U.S. Fire's attorneys' fees in defending the instant litigation.

The relevant portion of the Agreement states that U.S. Fire is entitled to indemnification of "in connection with ... the enforcement of this Agreement. To this end Indemnitors promise: ... to deposit with Company, on

demand, the amount of any reserve, in U.S. Dollars, against such Loss which Company is required, or deems it prudent to establish, whether or not any payment for such Loss has been made." (Doc. # 111, Ex. A, p. 1.)

I believe that this provision should be read to relate only to expenses incurred in enforcing the Agreement as to Oakwood's promise to deposit funds on demand by U.S. Fire. The Agreement does not, either explicitly or implicitly, provide for indemnity in a dispute over the amount of collateral held by U.S. Fire.

**\*357** In its reply brief, U.S. Fire sets forth its central position as follows:

> Pursuant to the clear terms of the Indemnity Agreement, U.S. Fire is entitled to reimbursement for the attorneys' fees incurred in this adversary proceeding. The Indemnity Agreement specifically provides, and OHC does not dispute, the following:
>
> > (1) that U.S. Fire is entitled to reimbursement for attorneys' fees incurred to enforce its rights under the Indemnity Agreement; and
> >
> > (2) one of the rights provided by the Indemnity Agreement is the right for U.S. Fire to demand the deposit of collateral by Oakwood.

> \* \* \*

> U.S. Fire has a right to the collateral under the Indemnity Agreement and OHC has challenged that right. Whether demanding collateral or defending its right to maintain collateral, U.S. Fire is enforcing the terms of the Indemnity Agreement in this adversary proceeding, and, thus, it is entitled to fees.

(Doc. # 144, pp. 2–3)

I do not agree with that analysis. As noted above, the relevant portion of the Agreement states that U.S. Fire is entitled to indemnification "in connection with ... the enforcement of this Agreement. To this end Indemnitors promise: ... to deposit with Company, on demand, the amount of any reserve, in U.S. Dollars, against such Loss which Company is required, or deems it prudent to establish, whether or not any payment for such Loss has been made." (Doc. # 111, Ex. A, p. 1.) Some years back, U.S. Fire demanded the deposit of collateral by Oakwood and Oakwood complied with that demand by delivering appropriate letters of credit which U.S. Fire drew down. But the issue of whether U.S. Fire is holding collateral in

excess of its exposure on the bonds has nothing to do with a demand for deposit. By remitting to the OHC Trust $3.5 million after OHC Trust filed its summary judgment motion, U.S. Fire has already acknowledged that it was improperly holding excess collateral. Nowhere within the four corners of the Agreement is there any mention of the amount of collateral that can rightfully be held by U.S. Fire. While the Agreement speaks in terms of indemnification "in connection with ... the enforcement of this Agreement," nowhere in the Agreement is there any mention of U.S. Fire's right to determine or contest the amount of collateral vis-a-vis the exposure on the bonds. The deposit demand provision of the Agreement cannot be stretched to cover an issue not contemplated by the Agreement.

In addition to the legal fees indemnification related to the deposit demand, it is worth noting that the Agreement also contains a specific legal fees indemnification for U.S. Fire when the indemnitors fail to make a payment to U.S. Fire when a demand is made against a bond. In relevant part that provision reads:

> If the Indemnitors receive notice from Company that a Demand has been made against a Bond by the obligee or beneficiary, they will, at least three (3) business days before payment of such Demand is due the Obligee, pay Company the full amount of the Demand, which amount shall not exceed the penal sum of the Bond, as well as all necessary fees.... Failure to make payment to Company as herein provided shall cause the Indemnitors to be additionally liable for any and all reasonable costs and expenses, including attorneys' fees, incurred by Company in enforcing this Agreement, together with interest on unpaid amounts due Company.

(Doc. # 111, Ex. A, ¶ 10.)

[6] [7] Thus, the Agreement contains two very specific legal fees indemnification **\*358** arising out of an action by U.S. Fire against the indemnitors: one where the indemnitors do not comply with a deposit demand, and the other where the indemnitors do not comply with a payment obligation triggered by a demand on a bond. There is no mention of a legal fees indemnification arising out of a dispute as to the proper amount of collateral to be held by

U.S. Fire to satisfy the remaining bond obligations. This situation suggests the application of the contract interpretation maxim of *expressio unius est exclusio alterius*. *Corbin on Contracts* lists *expressio unius est exclusio alterius* as an "additional maxim of interpretation," noting: "If the parties in their contract have specifically named one item or if they have specifically enumerated several items of a larger class, a reasonable inference is that they did not intend to include other, similar items not listed." *Corbin on Contracts* § 24.28 (5th ed.). New York courts have applied this maxim of interpretation to contracts. For example, in *Two Guys from Harrison–N.Y. v. S.F.R. Realty Assocs.,* 63 N.Y.2d 396, 482 N.Y.S.2d 465, 472 N.E.2d 315 (N.Y.1984), the court held that a lease specifying certain alterations that a tenant was permitted to make, "should be read as implicitly prohibiting other alterations." In reaching its decision, the court noted, "guidance is provided by the doctrine of '*inclusio unius est exclusio alterius,*' *an applicable maxim when interpreting contracts*. Under all the circumstances here, the specification of certain permitted activities ... should be read as implicitly prohibiting other alterations." *Id.* at 404, 482 N.Y.S.2d 465, 472 N.E.2d 315 (internal citation omitted) (emphasis added).

[8] My conclusion comports with New York court's observation that "[i]t is established that while an indemnitee may recover from his indemnitor attorneys' fees and expenses incurred in defending a *claim* as to which he is indemnified, he may not recover fees and expenses incurred to establish his *right* against the indemnitor...." *Peter Fabrics, Inc. v. Hermes,* 765 F.2d 306, 315 (2d Cir.1985) (citation omitted) (emphasis added). If U.S. Fire and Oakwood wanted to indemnify U.S. Fire for attorneys' fees incurred in connection with all litigation arising out of their business relationships they could have expressed that right. They apparently did not. They certainly did not express it in the Agreement. Because no such language appears in the Agreement, the Agreement cannot be read to require OHC Trust to indemnify U.S. Fire for attorneys' fees incurred in the instant litigation.

### CONCLUSION

For the reasons discussed above, I conclude that the Agreement does not require OHC Trust to indemnify U.S. Fire for attorneys' fees incurred in the instant litigation. U.S. Fire should return the collateral it drew down upon to pay those attorneys' fees.

attorneys' fees.

## ORDER

For the reasons set forth in the Court's memorandum opinion of this date, the Court finds that the Indemnification Agreement does not require Plaintiff to indemnify Defendant for attorneys' fees incurred by Defendant in this adversary proceeding. Defendant shall return the collateral it drew down upon to pay those

**Parallel Citations**

50 Bankr.Ct.Dec. 196

Footnotes

1    Recently, OHC Trust filed a notice of completion of briefing with respect to the summary judgment motion (Doc. # 69). As reflected in my letters of January 16, 2008 (Doc. # 86) and May 16, 2008 (Doc. # 104) and the transcript of the hearing of June 20, 2008 (Doc. # 112), I believe there remains material issues of fact which preclude my finding in favor of the OHC Trust in its summary judgment motion. I suggest that we have a status conference to schedule this matter for a trial on the merits.

**End of Document**                                        © 2015 Thomson Reuters. No claim to original U.S. Government Works.

In re Electric Machinery Enterprises, Inc., 371 B.R. 549 (2007)

48 Bankr.Ct.Dec. 142, 20 Fla. L. Weekly Fed. B 503

371 B.R. 549
United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

In re ELECTRIC MACHINERY ENTERPRISES,
INC., Debtor.

No. 8:03–bk–11047–MGW. | July 6, 2007.

**Synopsis**
**Background:** Chapter 11 debtor objected to portion of creditor's unsecured claim seeking postpetition attorney fees.

**Holding:** The Bankruptcy Court, Michael G. Williamson, J., held that unsecured creditor could not recover postpetition attorney fees and costs as part of its claim.

Objection sustained.

**Attorneys and Law Firms**

**\*549** David S. Jennis, Jennis Bowen & Brundage, PL, Tampa, FL, for Debtor.

Edward J. Comey, Maria C. Ramos, Shumaker Loop & Kendrick, LLP, Tampa, FL, for Amwest.

*MEMORANDUM DECISION AND ORDER GRANTING DEBTOR'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO POST–PETITION ATTORNEYS' FEES*

MICHAEL G. WILLIAMSON, Bankruptcy Judge.

The majority of courts have held that an unsecured creditor is not entitled to collect post-petition attorneys' fees, costs, and **\*550** other similar charges—even if there is an underlying contractual right to do so. Amwest Surety Insurance Company ("Amwest") seeks to recover attorneys' fees and costs incurred post-petition as part of its unsecured claim against the Debtor, Electric

Machinery Enterprises, Inc. ("Debtor"). In keeping with the majority view, the Debtor's objection to Amwest's claim for attorneys' fees incurred post-petition will be sustained.

### Procedural Background

Amwest was a surety that issued a subcontractor performance bond ("Bond") on behalf of a contractor ("Contractor") on a construction project. As an accommodation to the Contractor who procured the Bond, the Debtor executed an indemnity agreement ("Indemnity Agreement") in favor of Amwest agreeing to indemnify Amwest from any losses incurred with respect to the Bond. The Contractor defaulted in its obligation to pay a subcontractor obligee, who thereafter sued and obtained a judgment ("Judgment") against the Contractor and Amwest for $432,471.16.

Amwest has filed an unsecured proof of claim ("Amwest's Claim") in the Debtor's chapter 11 case for the amount of the Judgment, together with attorneys' fees incurred both before and after the filing of the Debtor's bankruptcy petition for fees in connection with collection of the Judgment—including substantial amounts incurred in connection with the litigation of the Debtors' objection to Amwest's Claim.

### Issue Presented

Whether a creditor holding a totally unsecured claim is entitled to attorneys' fees, costs and other charges that were incurred post-petition, based on an attorney fee provision contained in the contract giving rise to the unsecured claim.

### Conclusions Of Law

This Court has jurisdiction of this matter under 28 U.S.C. sections 157 and 1334(b). This is a core proceeding pursuant to 28 U.S.C. section 157(b)(2)(B).

The majority of courts that have considered whether an unsecured creditor is entitled to recover attorneys' fees and other post-petition costs and charges as part of its

unsecured claim have concluded that unsecured and undersecured creditors are not entitled to recover post-petition attorneys' fees and similar costs. *See In re Hedged–Investments Associates, Inc.,* 293 B.R. 523 (D.Colo.2003); *In re Loewen Group, Int'l, Inc.,* 274 B.R. 427 (Bankr.D.Del.2002); *In re Pride Companies, L.P.,* 285 B.R. 366 (Bankr.N.D.Tex.2002); *In re Saunders,* 130 B.R. 208 (Bankr.W.D.Va.1991); *In re Sakowitz, Inc.,* 110 B.R. 268 (Bankr.S.D.Tex.1989); *In re Canaveral Seafoods, Inc.,* 79 B.R. 57 (Bankr.M.D.Fla.1987); and *In re Marietta Farms, Inc.,* 2004 WL 3019360 (Bankr.D.Kan. Nov.15, 2004).

There are four primary reasons why courts have concluded that an unsecured creditor is not entitled to attorneys' fees, costs and other charges. Each of these reasons mandates the conclusion that post-petition attorneys' fees should not be allowed as part of an unsecured claim. First, a number of courts have focused on the plain language of section 506(b) and applied the legal maximum of *expressio unius est exclusio alterius* to hold that unsecured creditors are not entitled to post-petition attorneys' fees and costs. *See, e.g., In re Pride Companies,* 285 B.R. at 372. In so ruling, these courts have focused on the clear language of section 506(b) of the Bankruptcy Code that provides that "*[t]o the extent* that an allowed secured claim [is oversecured], *there shall be allowed* to the holder of such claim, interest ... and any reasonable fees, costs **\*551** and charges." 11 U.S.C. § 506(b) (emphasis added). The emphasized language of section 506(b) demonstrates the congressional intent to create an exception to the general rule that claims are to be determined as of the petition date, exclusive of post-petition interest, attorneys' fees, and other charges. The use of the words "to the extent" a claim is oversecured, and "there shall be allowed" interest and fees, mandates the conclusion that in all other circumstances, post-petition interest, attorneys' fees, and charges shall not be allowed. These courts have concluded that if Congress intended for unsecured creditors to receive post-petition attorneys' fees, then it would have done so explicitly by authorizing unsecured creditors to collect fees under section 506(b). *See In re Pride Companies,* 285 B.R. at 372 ("statutory construction and logic compel the conclusion that unsecured creditors may not recover post-petition attorneys' fees"); *In re Hedged–Investments,* 293 B.R. at 526 (the language of 506(b) "demonstrates Congressional intent to disallow the recovery of post-petition fees and costs by creditors whose claims are not oversecured").

The second ground generally cited by courts to conclude that unsecured creditors are not entitled to post-petition attorneys' fees and costs is that the Supreme Court's

opinion and reasoning in *United Savings Ass'n v. Timbers,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988), requires the conclusion that unsecured creditors are not entitled to collect attorneys' fees and costs. In *Timbers,* the Supreme Court concluded that because section 506(b) permitted post-petition interest to be paid only out of an equity cushion, an undersecured creditor who had no such equity cushion fell within the general rule of disallowing post-petition interest. Courts that rely on *Timbers* to disallow post-petition attorneys' fees and costs reason that the rationale applies equally to the disallowance of post-petition attorneys' fees and costs to unsecured or undersecured creditors. *See, e.g., Loewen Group,* 274 B.R. at 444 ("the *Timber's* rationale applies equally for post-petition fees and costs"); *In re Saunders,* 130 B.R. at 210.

Third, the courts that disallow post-petition attorneys' fees and costs to unsecured creditors also rely on the plain language of section 502(b) of the Bankruptcy Code. Section 502(b) of the Bankruptcy Code provides that "if an objection to claim is filed, the court shall determine the amount of such claim in lawful currency of the United States *as of the date of the filing of the petition* and shall allow such claim in such amount." (Emphasis added.) These cases generally conclude that the time for determining the amount of a claim is "as it existed as of the time of the filing of the case, without the inclusion of post-petition interest, attorneys' fees or costs unless the claim is oversecured where such amounts would be allowed under section 506(b)." *In re Sakowitz,* 110 B.R. at 271; *In re Waterman* 248 B.R. at 573.

Finally, courts adopting the majority view consider the equitable considerations and policy of providing equality of distribution among similarly situated creditors according to the priorities set out in the Bankruptcy Code. That is, a prime policy of the bankruptcy law, established long ago, is "to secure equality among the creditors of a bankrupt." *Boese v. King,* 108 U.S. 379, 385–86, 2 S.Ct. 765, 27 L.Ed. 760 (1883). The Supreme Court has continued to apply this policy through the years. *See, e.g., Clarke v. Rogers,* 228 U.S. 534, 548, 33 S.Ct. 587, 57 L.Ed. 953 (1913); *Young v. Higbee,* 324 U.S. 204, 210, 65 S.Ct. 594, 89 L.Ed. 890 (1945); *Union Bank v. Wolas,* 502 U.S. 151, 161, 112 S.Ct. 527, 116 L.Ed.2d 514 (1991). To find otherwise would permit certain types of unsecured creditors, typically holders of **\*552** contract claims under agreements with attorneys' fee provisions, to recover their fees while other unsecured creditors (tort claimants and trade creditors) would not be able to recover fees as part of their unsecured claim. *See In re Pride Companies,* 285 B.R. at 373–374 (principles of equitable distribution "should bar enforcement of

contractual provisions that would permit one creditor—and not others—to charge the estate with legal expenses associated with a proceeding before the Bankruptcy Court").

The Court adopts the majority rule for all of the reasons stated above. Moreover, while the Supreme Court recently declined to express an opinion on whether unsecured creditors are entitled to post-petition attorneys' fees in a case under the Bankruptcy Code, *Travelers Casualty & Surety Co. of America v. Pacific Gas & Elec. Co.,* —— U.S. ——, ——, 127 S.Ct. 1199, 1208, 167 L.Ed.2d 178 (2007), existing Supreme Court precedent under pre-Code law supports the majority view. Specifically, in *Randolph v. Scruggs,* 190 U.S. 533, 23 S.Ct. 710, 47 L.Ed. 1165 (1903), the Supreme Court formulated the requirement of "benefit to the estate" for the allowance of unsecured creditors' contract claims for post-petition legal fees. As stated by Justice Holmes for the Court, "We are not prepared to go further than to allow compensation for [legal] services which were *beneficial to the estate.*" 190 U.S. at 539, 23 S.Ct. 710 (emphasis added). The principle established by *Randolph v. Scruggs* was consistently adhered to by the courts in cases under the Bankruptcy Act. *See Saper v. John Viviane & Son, Inc.,* 258 F.2d 826, 828 (2d Cir.1958) ("[A]s a general rule no compensation or reimbursement can be had unless a tangible benefit has been conferred on the estate to the advantage of the creditors as a whole."); *In re Friedman,* 232 F.2d 151 (2d Cir.1956); *In re Solar Mfg. Corp.,* 206 F.2d 780, 781 (3d Cir.1953) (the work of attorneys for creditors "must be at the expense of their clients unless it is in some manner beneficial to the estate"); *Guerin v. Weil, Gotshal & Manges,* 205 F.2d 302, 304 (2d Cir.1953) (In the absence of benefit to the estate, "the bankruptcy court lacks power to grant, and the policy of the [Bankruptcy] Act is against, compensation not expressly provided for by the Act."); *Matter of Sapphire Steamship Lines, Inc.,* 509 F.2d 1242, 1245 (2d Cir.1975).

The Court disagrees with Amwest's contention that the Eleventh Circuit implicitly recognized an unsecured creditor's entitlement to attorneys' fees in *In re Welzel,* 275 F.3d 1308 (11th Cir.2001). To the contrary, *Welzel* did not address the issue of whether an unsecured creditor is entitled to post-petition attorneys' fees and costs, nor is there any implication that can be drawn from the decision that would apply to this issue. The issue addressed in *Welzel* was whether an oversecured creditor would be entitled to attorneys' fees and costs pursuant to an underlying loan agreement and state statute where the amount of fees and costs were not reasonable. In the Eleventh Circuit's words, "the point at issue concerns

whether the Bankruptcy Court must determine if [the creditor's] contractually set fee constitutes 'reasonable fees' under section 506(b) or whether [the creditor] has a right to the entire fees *because they vested pre-petition.*" *Id.* (emphasis added). In other words, the *Welzel* decision dealt with what portion of an oversecured creditor's attorneys' fees (whether incurred pre-petition or after the filing) should be included as part of its secured claim under section 506(b).

In resolving that issue, the Eleventh Circuit determined that only the reasonable fees of an oversecured creditor would be allowed as a secured claim under *553 506(b), while any portion of pre-petition attorneys' fees that were not reasonable would only be allowed as an unsecured claim. *Welzel,* 275 F.3d at 1313. In determining whether fees were reasonable, the Eleventh Circuit also noted that "even if contractually set attorneys' fees owed to over-secured creditors are enforceable under state law because they are vested and comply with state notice procedure, it does not follow that the fees are *per se* reasonable under the Bankruptcy Code. This demonstrates, in turn, that 11 U.S.C. § 506(b) adds a new level of scrutiny to fee arrangements that goes beyond state law requirements." Nothing in *Welzel* implies that the Eleventh Circuit would allow post-petition fees to an unsecured creditor in an insolvent estate. In fact, the court in *Pride Companies* noted that the Eleventh Circuit's ruling in *Welzel* construing the relationship between sections 506 and 502 of the Bankruptcy Code "further supports the majority view" that an unsecured creditor has no right to recover post-petition attorneys' fees. *In re Pride Companies,* 285 B.R. at 375, n. 4.

Furthermore, the Court is particularly mindful of the practical impact a contrary ruling would have on the administration of a bankruptcy case. There would be no finality to the claims process as bankruptcy courts would constantly have to revisit the issue of the amount of claims to include ever-accruing attorneys' fees. The "cash registers" would ring on a daily basis, as attorneys for unsecured creditors that were active in the case would continually be filing new claims or seeking to reconsider previously allowed claims in order to add post-petition attorneys' fees and costs. Essentially, there could be no finality to the claims resolution process if the ever-accruing fees and costs attendant to the representation of unsecured creditors were allowed as part of an unsecured claim.

This problem is especially heightened in chapter 11 cases, which not only deal with the two-party disputes involved in the claims resolution process, but also require the adjudication of numerous bankruptcy-related separate

proceedings that affect all unsecured creditors as a group and often do not affect the allowance of the individual claims of the creditors. These separate proceedings are often contested matters (governed by Rule 9014 of the Federal Rules of Bankruptcy Procedure) which, by way of example, include stay relief, use of cash collateral, sales of property of the estate, authority to borrow, assumption and rejection of executory contracts, appointment of a trustee, and the process of negotiating and confirming a plan of reorganization. 11 U.S.C. §§ 362, 363, 364, 365, 1104, 1121–1129. As Judge Walsh noted in *Loewen Group,* "[t]his rule [disallowing post-petition interest, costs and attorneys' fees] avoids the administrative inconvenience of continuous re-computation of claims and prevents certain creditors from profiting at the expense of others solely as a result of the delay in post-petition repayment caused by operation of law." 274 B.R. 427, 443. The practical consequences of such a result would be disastrous for the administration of the bankruptcy system. The administrative inconvenience this would cause in a chapter 11 case would be intolerable.

Accordingly, the Court declines to follow the minority view as articulated in *In re New Power Co.,* 313 B.R. 496 (Bankr.M.D.Ga.2004) and in *In re Fast,* 318 B.R. 183 (Bankr.D.Colo.2004). In declining to follow *New Power* and *Fast,* the Court notes that those cases involved solvent estates where any surplus would be distributed to the debtor. The Court also notes the comments of Judge Brooks in *In re Fast,* who did follow *New Power* in the context of a solvent estate but did so with some trepidation:

> **\*554** "So as not to create an unsecured-or under secured-creditor feeding frenzy, the facts and circumstances of this case are *extremely* unusual, *perhaps* unprecedented. During this Judge's time on the bench, only a bare handful of Chapter 7 cases have resulted in distribution to all creditors and a distribution to the debtor ... It is the confluence of the various features of this case that

result in the conclusions reached by the court with respect to interest and attorneys' fees."

*Fast,* 318 B.R. at 194 n. 9 (emphasis in original). This case presents an entirely different situation in that the Debtor was clearly insolvent, creditors were not paid in full, and there was no surplus that would otherwise be distributed to the Debtor.

### Conclusion

Accordingly, for the foregoing reasons, the Court adopts the majority view and finds that an unsecured creditor is not entitled to include attorneys' fees, costs or similar charges incurred after the commencement of a bankruptcy case as part of an allowed unsecured claim. To find otherwise would impose unreasonable and potentially insurmountable burdens on the administration of bankruptcy cases.

Therefore, it is ORDERED:

1. The Debtor's Motion for Summary Judgment is granted, in part.

2. Post-petition attorneys' fees, costs, or other similar charges will not be allowed as part of any claim by Amwest in this case.

3. The Debtor's Motion for Summary Judgment is otherwise denied.

DONE AND ORDERED.

### Parallel Citations

48 Bankr.Ct.Dec. 142, 20 Fla. L. Weekly Fed. B 503

---

End of Document    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.    4

In re WCS Enterprises, Inc., 381 B.R. 206 (2007)

58 Collier Bankr.Cas.2d 1676, 49 Bankr.Ct.Dec. 49

381 B.R. 206
United States Bankruptcy Court,
E.D. Virginia,
Alexandria Division.

In re WCS ENTERPRISES, INC., Debtor.

No. 07–10054–SSM. | Nov. 20, 2007.

**Synopsis**

**Background:** Chapter 7 debtor objected to attorney fee component of proof of claim filed by unsecured creditor, as allegedly including claim for postpetition attorney fees.

**Holdings:** The Bankruptcy Court, Stephen S. Mitchell, J., held that:

[1] creditor whose claim was totally unsecured was not entitled to postpetition attorney fees; and

[2] while debtor's contract with unsecured creditor entitled creditor to recover all costs of collection, including attorney's fee of 33% of amount then owing on debtor's account, the minimal work that creditor's attorney performed prepetition, and for which attorney had billed $180, did not give creditor any right, on date petition was filed, to attorney fees in excess of the $180 billed, such that attorney fee component of creditor's proof of claim had to be disallowed to extent that it exceeded $180.

Claim disallowed in part.

**Attorneys and Law Firms**

*207 George LeRoy Moran, Esquire, Moran Monfort, P.L.C. Fairfax, VA, for the debtor.

H. Jason Gold, Esquire, Wiley Rein LLP, McLean, VA, Chapter 7 trustee.

James D. Fullerton, Esquire, Fullerton & Knowles, P.C., Clifton, VA, for Potomac Valley Brick & Supply Co.

**MEMORANDUM OPINION**

STEPHEN S. MITCHELL, Bankruptcy Judge.

This matter is before the court on the objection, originally filed by the debtor when it was a debtor in possession, to Claim No. 12 filed by Potomac Valley Brick and Supply Company ("Potomac Valley") in the amount of $19,828. The claim is for goods sold to the debtor and includes, in addition to principal and interest, $4,639.56 in attorney's fees. The objection was solely to the claimed attorneys fees. After the case was converted from chapter 11 to chapter 7, the court substituted H. Jason Gold, the chapter 7 trustee, as the objecting party. A hearing was held on November 6, 2007, at which the court heard the contentions of the parties, directed the creditor's attorney to submit time records, and took the matter under advisement. Because only $180.00 of the claimed attorney's fees were incurred prior to the filing of the debtor's petition, and because only over-secured creditors can recover post-petition attorney's fees, the post-petition portion of the claimed fees will be disallowed.

*Background*

WCS Enterprises, Inc. ("WCS" or "the debtor") is a Virginia corporation that operated a landscape construction business. As a result of the depressed real estate market, business drastically declined and WCS began having difficulty meeting its expenses and paying its taxes. It filed a petition for reorganization under chapter 11 of the Bankruptcy Code in this court on January 8, 2007, and continued to operate *208 until its case was converted to chapter 7 on September 4, 2007.

Potomac Valley, which was listed on the debtor's schedules as the holder of a $15,380.47 unsecured claim, filed a timely proof of claim in the amount of $19,828.42, broken down as follows:

| Principal balance | $14,059.27 |

| | |
|---|---:|
| Interest to date of petition | $ 1,129.59 |
| Attorney's fees | $ 4,639.56 |
| Total | $19,828.42 |

Attached to the proof of claim, in addition to an interest computation, is a copy of a credit application dated August 10, 1995, and what appears to be an internal account statement. The terms of the credit agreement are 2% discount if paid in ten days, net 30 days, and 1.5% interest per month on past due amounts. The debtor additionally agreed to pay, "all cost of collection including an attorney's fee of 33% of the then unpaid balance of principle and interest if the account should be referred to any attorney for collection." The statement of account reflects inventory sales of $14,059.27 and posted finance charges of $1,321.21. No attorneys' fees are posted to the account, but the calculation attached to the proof of claim shows them to be computed as 33% of the $14,059.27 principal balance. Following the hearing, the creditor's attorney submitted an affidavit itemizing the legal services performed for his client. The billing records (which do not disclose either the hours worked or the hourly rate) show $180.00 being billed for client conferences, review of documents, and preparation of a demand letter in the two-week period prior to the filing of the chapter 11 petition. After the filing, another $180.00 was charged for a client conference, review of the bankruptcy notice, and filing a proof of claim. The remaining $3,650.00 was billed for defending against the objection to claim.

***Discussion***

**A.**

[1] On an objection to claim, the court is required to "determine the amount of such claim in lawful currency of the United States *as of the date of the filing of the petition[.]* " § 502(b), Bankruptcy Code (emphasis added). Since the term "claim" is broadly defined to include rights to payment that are unmatured or

contingent upon the filing date, *See* § 101(5), Bankruptcy Code, the fact that the creditor's loss, or some portion of it, has not yet been incurred does not necessarily preclude allowance of a claim that includes future damages. *See Grady v. A.H. Robins Co., Inc.*, 839 F.2d 198, 200 (4th Cir.1988) (holding that automatic stay applied to personal injury claim arising from prepetition use of birth control device manufactured by debtor even though symptoms did not appear, and thus suit could not have been brought, until after the filing of the petition). Thus, except for unmatured interest and unmatured domestic support obligations, which are expressly excluded,[1] nothing in Section 502 of the Bankruptcy Code expressly precludes allowance of a claim for attorneys fees otherwise due by contract simply because the attorney's services were performed post-petition, so long as the event giving rise to the liability occurred prepetition.

[2] [3] Section 502, however, cannot be read in isolation, and in particular must be read in conjunction with Section 506(b) of the Bankruptcy Code, which provides:

> To the extent that an allowed secured claim is secured by property the value of which ... is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs or **\*209** charges provided for under the agreement or State statute under which such claim arose.

§ 506(b), Bankruptcy Code. Thus a *secured* creditor can recover post-petition interest and attorneys fees otherwise provided by contract or state law *only* to the extent its collateral worth more than the amount of its claim. By implication, an under-secured creditor (one whose collateral is worth less than the amount of its claim) is *not* entitled to post-petition attorneys fees. And if an

under-secured creditor is not entitled to post-petition fees, it necessarily follows that a creditor whose claim is *totally* unsecured is not entitled to such fees. *In re Sakowitz, Inc.,* 110 B.R. 268, 272 (Bankr.S.D.Tex.1989). Section 506(b), in short, operates as a gloss on Section 502(b) to disallow contractual claims for post-petition attorney's fees.

**B.**

Although Potomac Valley has cited no case that has allowed an unsecured creditor to recover post-petition attorney's fees from the estate,[2] it strenuously urges that the recent decision by the United States Supreme Court in *Travelers Casualty and Surety Co. v. Pacific Gas and Elec. Co.,* 549U.S. 443, 127 S.Ct. 1199, 167 L.Ed.2d 178 (2007), compels such a result. The court cannot agree. The narrow issue decided by the Supreme Court in *Travelers* involved a rule that had been articulated by the United States Court of Appeals for the Ninth Circuit in the case of *In re Fobian,* 951 F.2d 1149 (9th Cir.1991). *Fobian* had held that a creditor could not recover attorney's fees, even where otherwise provided for by contract, for litigating issues peculiar to bankruptcy proceedings.[3] That limitation was rejected by the Supreme Court in *Travelers,* which explained that a claim was determined in the first instance by the non-bankruptcy law (generally state law) under which it arose, subject to any qualifying or contrary provisions of the Bankruptcy Code. *Id.,* 127 S.Ct. at 1205. The Supreme Court, however, expressly declined to reach the issue of whether Travelers, as an unsecured creditor, could recover post-petition attorney's fees, since that issue had not been raised below, and it remanded the case to the Ninth Circuit for consideration of that argument. *Id.,* 127 S.Ct. at 1207–08.

Although the Ninth Circuit has not yet ruled on the issue, this court finds persuasive the amici curiae brief filed in the Supreme Court by a group of law professors. Brief in Support of Respondent by Amici Curiae Professors Richard Aaron, et al., 2006 WL 3805866 (Dec. 22, 2006). The amici point out that an early Supreme Court opinion, *Randolph v. Scruggs,* 190 U.S. 533, 539, 23 S.Ct. 710, 47 L.Ed. 1165 (1903) (Holmes, J.), stated that an unsecured creditor's contract claim for post-petition legal fees could only be allowed "for services which were beneficial to the estate." The amici further note that *Randolph v. Scruggs* "appears to be the only **210** case in which [the Supreme Court] has ruled on the allowability in bankruptcy of a claimant's unsecured contract claim for postpetition legal fees it incurs during a bankruptcy case." Brief at *9. The policy articulated in *Randolph v. Scruggs* is currently

reflected in § 503(b)(3) and (4) of the Bankruptcy Code, which permits a bankruptcy court to allow, as an expense of administration, the legal fees of a creditor that recovers property for the benefit of the estate or that makes a substantial contribution in a chapter 9 or 11 case. In the present case, Potomac Valley does not and cannot contend that the legal fees it incurred to file its proof of claim and litigate its entitlement to attorneys fees provided any benefit to the bankruptcy estate. Indeed, to the extent those efforts were successful, distributions to other creditors would be correspondingly reduced, contrary to the general policy favoring equality of distribution in bankruptcy.

**C.**

[4] [5] Although not specifically raised by Potomac Valley, the court has considered whether—even though relatively minimal legal services had been provided at the time the chapter 11 petition was filed—Potomac Valley's entitlement to a 33% attorney's fee nevertheless became fixed prior to the filing of the petition when the delinquent account was referred to an attorney for collection. Certainly, had there been a pre-petition judgment that awarded attorney's fees in that amount, such fees would have been allowable as a part of the claim. And if Virginia law would have entitled Potomac Valley to a 33% attorney's fee award without regard to the actual legal services provided simply because the account was "referred to any attorney for collection," then such fees would arguably be a proper component of its claim. However, the holding of the then Supreme Court of Appeals of Virginia in *Cox v. Hagan,* 125 Va. 656, 100 S.E. 666 (1919), makes it clear that an attorney's fee provision in a contract, even though measured as a percentage of the amount due, entitles the creditor only to reasonable fees based on the work performed. *Cox* involved a suit by an endorser who had paid a defaulted note and then sued the makers. The note had contained a provision that the makers and endorsers "agree to pay costs of collection or ten per cent. attorney's fees in case payment shall not be made at maturity." *Id.* at 658, 100 S.E. at 668. Because of other errors, the Court awarded a new trial but addressed the issue of the attorney's fees, which the makers had defended against as unreasonable. The Court held that upon remand,

> the judge, upon the issue being made as to what amount is recoverable under the attorney's fee provision aforesaid, should allow *only such an amount as may be*

*reasonable,* considering the services of the attorney actually performed in and about the collection of the debt in view of the customary charges of the profession in the locality for such services, not exceeding the maximum amount stipulated in the obligation.

*Id.* at 663, 100 S.E. at 673 (emphasis added). *See, also, Mullins v. Richlands Nat'l Bank,* 241 Va. 447, 449, 403 S.E.2d 334, 335 (1991) (reversing award of ten percent attorneys fees for collecting promissory note as "bear [ing] no relation to the attorney's time and effort or to the nature of his services."); *Chawla v. BurgerBusters, Inc.,* 255 Va. 616, 624, 499 S.E.2d 829, 833 (1998) (explaining that in determining reasonable attorney's fee, fact finder may consider "the time and effort expended by the attorney, the nature of the services rendered, the complexity of the services, the value of the services to the client, the results obtained, whether the fees incurred were consistent with those generally **\*211** charged for similar services, and whether the services were necessary or appropriate."); *First American Bank v. Wills,* 25 Va. Cir. 91 (Va. Cir. Ct.1991) ("Regardless of the amount stipulated, the holder of a note which provides for and fixes an amount for attorney's fees is only entitled to

recover the reasonable attorney's fees incurred by him, not to exceed the amount specified in the contract or note."). Since the billing records supplied by Potomac Valley's attorney do not show the time expended on the various tasks, it would be difficult in any event to make a determination of reasonableness. For the purpose of this opinion, however, the court will assume the reasonableness of the $180.00 in billed charges for the work the attorney did prior to the filing of the chapter 11 petition. But given the opinions of Virginia's highest court in *Cox, Mullins,* and *Chawla,* the court cannot find that the Potomac Valley's attorney—based on the simple drafting of a demand letter—had a fixed entitlement to a 33% fee as of the date the debtor filed its petition Accordingly, although the court will allow the $180.00 in billed pre-petition fees as part of the claim, the remainder will be disallowed.

A separate order will be entered allowing Potomac Valley's claim in the reduced amount of $15,368.56.

### Parallel Citations

58 Collier Bankr.Cas.2d 1676, 49 Bankr.Ct.Dec. 49

Footnotes

1      § 502(b)(2) and (5), Bankruptcy Code.

2      Recovery from the *debtor* is allowed in connection with a judgment determining the creditor's claim to be nondischargeable, *see, e.g., OSB Manufacturing, Inc. v. Hathaway (In re Hathaway),* 364 B.R. 220 (Bankr.E.D.Va.2007), but that is a separate issue, since it does not impact the distribution to other creditors.

3      The Fourth Circuit rejected the *Fobian* analysis in *In re Shangra–La, Inc.,* 167 F.3d 843 (4th Cir.1999). The Court held in that case that a trustee, in order to assign a defaulted lease under which debtor was the tenant, would have to pay landlord's counsel fees incurred "primarily to collect sums due under the lease or to enforce an obligation of the lessee," as provided for under the lease, even if those efforts occurred in the context of proceedings peculiar to federal bankruptcy law.

                                     © 2015 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

368 B.R. 882
United States Bankruptcy Court,
N.D. California.

In re QMECT, INC., etc., Debtor–in–Possession.
In re Fred and Linda Koelling,
Debtors–in–Possession.
Qmect, Inc., etc., Plaintiff,
v.
Burlingame Capital Partners II, L.P., etc. et al.,
Defendants.

Bankruptcy Nos. 04–41044 T, 04–46443 T. |
Adversary Nos. 04–4190 AT, 04–4365 AT, 04–4366
AT. | May 17, 2007.

**Synopsis**
**Background:** In Chapter 7 case, creditor filed motion for award of post-petition attorney fees pursuant to its various contracts with debtors as part of its unsecured claim.

**Holdings:** The Bankruptcy Court, Leslie Tchaikovsky, J., held that:

[1] creditor's post-petition attorney fees constituted "claim," and

[2] creditor was entitled to include fees in its claim.

Motion granted.

**Attorneys and Law Firms**

***882** Gregory A. Rougeau, Paul E. Manasian, Thomas T. Hwang, Law Offices of Manasian and Rougeau, San Francisco, CA, for Plaintiff.

Marlene Moffitt, Mary Cain, Robert R. Moore, William W. Huckins, Allen, Matkins, Leck, Gamble, Mallory et al., Tobias S. Keller, Pachulski, Stang, Ziehl, Young and Jones, San Francisco, CA, for Defendants.

Reidun Stromsheim, Law Offices of Stromsheim and Assoc., San Francisco, CA, for trustee.

Electrochem Funding, LLC, pro se.

Burlingame Capital Partners II, pro se.

Eric A. Nyberg, Kornfield, Paul and Nyberg, Oakland, CA, for Debtors–in–Possession.

**MEMORANDUM OF DECISION RE MOTION FOR POST–PETITION ATTORNEYS' FEES**

LESLIE TCHAIKOVSKY, Bankruptcy Judge.

Defendant Burlingame Capital Partners II, L.P. ("Burlingame") seeks an award of post-petition attorneys' fees pursuant to its various contracts with the above-captioned debtors as part of its undersecured claim against Qmect, Inc. ("Qmect") and its general, unsecured claim against Fred and Linda Koelling (the "Koellings")(referred to hereinafter collectively as its "unsecured claim"). For the reasons stated below, the Court concludes that Burlingame is entitled to include its reasonable post-petition attorneys' fees in its unsecured claim against these debtors. A determination of a specific amount of those fees must await the submission of a more detailed description of the work done litigating issues peculiar to bankruptcy law.

***883 A. PROCEDURAL BACKGROUND**
On or about August 29, 2006, Burlingame sought an award of post-petition attorneys' fees and costs as part of its judgment in the above-captioned consolidated adversary proceedings. After the motion was fully briefed and a hearing conducted, the Court took the motion under submission. On October 16, 2006, the Court issued its decision denying the motion without prejudice.

In its decision, the Court observed that, at that time, the controlling law in the Ninth Circuit was represented by *In re Fobian,* 951 F.2d 1149 (9th Cir.1991). The *Fobian* court held that attorneys' fees were not recoverable for litigating issues peculiar to bankruptcy law. *Fobian,* 951 F.2d at 1153. The Court observed that the motion was insufficiently specific to permit the Court to determine what portion of the fees were requested for litigating issues peculiar to bankruptcy law. It also observed that the issue presented in *Fobian* was currently before the United States Supreme Court in *Travelers Casualty & Surety Co. v. Pacific Gas & Electric Co.,* 167 Fed.Appx. 593 (9th Cir.)(unpublished), *cert. granted,* —— U.S. ——, 127 S.Ct. 377, 166 L.Ed.2d 265 (2006). The Court directed

*In re Qmect, Inc.*, 368 B.R. 882 (2007)

57 Collier Bankr.Cas.2d 300

Burlingame to resubmit its motion after segregating the time spent on bankruptcy issues from that spent on nonbankruptcy issues.

On February 8, 2007, Burlingame filed an amended motion for attorneys' fees, complying with this instruction. The motion was heard on March 8, 2007 and was again taken under submission. On March 20, 2007, the Supreme Court issued its decision in *Travelers Casualty & Surety Co. of America v. Pacific Gas & Electric Co.,* —— U.S. ——, 127 S.Ct. 1199, 167 L.Ed.2d 178 (2007). The *Travelers* court expressly overruled *Fobian.* It noted that the only reason given by the lower courts for disallowing the fees was that the work performed related to issues peculiar to bankruptcy law. The Supreme Court found that there was no basis in the Bankruptcy Code for barring post-petition attorneys' fees on this ground.[1] *Travelers,* 127 S.Ct. at 1205. However, it declined to rule on the debtor's contention that no post-petition fees could be included in an unsecured creditor's claim because the debtor had failed to make this argument to the lower courts or in opposition to the creditor's petition for certiorari.

On April 3, 2007, Burlingame filed a supplemental brief asking whether the Court wished further briefing on the effect of *Travelers* on its motion for post-petition fees. On April 6, 2007, the Court issued an order setting a briefing schedule and indicating that no hearing would be scheduled unless the Court concluded, after reading the papers, that a hearing was necessary. The Court has concluded that no hearing is required.

**B. DISCUSSION**

**1. Introduction**
Burlingame contends that existing Ninth Circuit law, other than *Fobian,* recognizes an unsecured creditor's right to include post-petition attorneys' fees in its unsecured claim to the extent they are provided for by contract or nonbankruptcy statute. It further notes that all of the other Circuits that have addressed this issue have reached the same conclusion. It argues that the various provisions of the Bankruptcy Code compel this conclusion. It notes that 11 U.S.C. § 502(b) provides that a creditor's claim shall be allowed **\*884** unless one of nine enumerated exceptions applies. None of the nine enumerated exceptions refers to post-petition attorneys' fees.

In response, the Koellings rely on the theory advanced by the debtor in *Travelers,* which the Supreme Court declined to address given the debtor's failure to raise it

earlier: i.e., that 11 U.S.C. § 506(b) implicitly provides for the disallowance of unsecured claims for post-petition attorneys' fees. Burlingame contends that this is not a fair reading of 11 U.S.C. § 506(b).

**2. Analysis**

**A. Is It a Claim?**
In its argument, Burlingame assumes without discussion that its post-petition attorneys' fees qualify as a "claim" against the bankruptcy estate. The definition of "claim" is very broad and includes "contingent" claims. *See* 11 U.S.C. § 101(5). Black's Law Dictionary defines a "contingent liability" as "a liability that will occur only if a specific event happens; a liability that depends on the occurrence of a future and uncertain event." Black's Law Dictionary 926 (7th ed.1999), as cited in *In re ML & Assocs., Inc.,* 2003 WL 23742550, *2 (Bankr.N.D.Tex.).

Arguably, the definition of "contingent liability" cited above may be read to require that the specific event triggering the contingent claim be outside the claimant's control. Incurring post-petition attorneys' fees is not outside a creditor's control. The need to incur the fees may be triggered by conduct of the debtor or some other third party but the creditor could choose to do nothing. However, the Court has been unable to find any authority to support this reading of "contingent liability."[2]

[1] Moreover, as discussed below, there is case authority decided under the Bankruptcy Act, authorizing the inclusion of post-petition attorneys' fees in a creditor's unsecured claim. The Bankruptcy Act, as amended by the Chandler Act in 1938, also included contingent claims within its definition of "claim."[3] If this was error, one would have expected Congress to clarify the meaning of "contingent" when it enacted the Bankruptcy Code. Therefore, the Court holds that Burlingame's post-petition attorneys' fees do qualify as a "claim" under 11 U.S.C. § 101(5).

**B. Is Claim Subject to Disallowance?**
As Burlingame notes, 11 U.S.C. § 502(b) provides that, with exceptions not relevant here, if an objection is made to a claim, the claim shall be allowed, except to the extent that the claim falls into one of nine categories. 11 U.S.C. § 502(b). The only category that arguably supports the disallowance of an unsecured claim for post-petition attorneys' fees is 11 U.S.C. § 502(b)(1): i.e., that "such claim is unenforceable against property of the debtor and property of the debtor, under any agreement or applicable

law for a reason other than because such claim is contingent or unmatured...." 11 U.S.C. § 502(b)(1).

The debtor contends that this category applies to post-petition attorneys' fees because 11 U.S.C. § 506(b) renders the claim **885 for post-petition attorneys' fees unenforceable against the debtor and property of the debtor. Section 502(b)(1) refers to "applicable law," not "applicable nonbankruptcy law." Thus, Section 506(b) qualifies as "applicable law." Section 506(b) provides as follows:

> (b) To the extent that an allowed secured claim is secured by property, the value of which is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and reasonable fees, costs or charges provided for under which such claim arose.

Thus, according to the debtor, by providing that a secured claim shall be allowed reasonable fees to the extent the claim is secured by property, the Bankruptcy Code is implicitly saying that fees are not available to an unsecured creditor.

[2] The Court finds this reading of 11 U.S.C. §§ 502(b) and 506(b) too strained to be persuasive. First, 11 U.S.C. § 506 is entitled "Determination of Secured Status." A statute so entitled would not be a logical place to provide for the disallowance of an element of an unsecured claim. If Congress, in enacting the Bankruptcy Code, had wanted to disallow claims for post-petition attorneys' fees, the logical place for it to have done so was surely in 11 U.S.C. § 502(b).[4] Moreover, 11 U.S.C. § 506(b) does not distinguish between pre-petition and post-petition attorneys' fees. Thus, if 11 U.S.C. § 506(b) is read as an additional ground for objecting to claims, arguably, an unsecured creditor would be prohibited from including its pre-petition attorneys' fees in its claim as well as its postpetition fees.[5]

The Court has been unable to find any Court of Appeals decided under the Bankruptcy Code, in either in this Circuit or any other, that directly addresses this issue.[6] The Ninth Circuit cases cited by Burlingame are for the most part inapposite. They are either nondischargeability cases, cases where the estate was requesting fees, or cases where the *Fobian* distinction was at issue. However, the cases establishing the estate's right to attorneys' fees as the prevailing party in post-petition litigation—e.g., *In re Eastview Estates II*, 713 F.2d 443, 451–52 (9th

Cir.1983)—provide an additional equitable rationale supporting the Court's conclusion. It would seem highly inequitable to permit the estate to recover fees incurred in post-petition with a creditor while at the same time denying the creditor the right even to include its post-petition fees in its unsecured claim.

The Court has identified one Bankruptcy Act case decided by the Second Circuit case that addresses this issue: i.e., *United Merchants & Manufacturers, Inc. v. Equitable Life Assurance*, 674 F.2d 134, 137–38 (2d Cir.1982)(Bankruptcy Act). In *United Merchants*, the lower court had allowed the unsecured creditor's contractual claims for "collection costs" but only to the extent the litigation was conducted outside the bankruptcy court. On appeal, the Second Circuit removed this limitation. It rejected **886 the argument that it was unfair to give a creditor with a contractual attorneys' fee clause a greater claim than unsecured creditors without a basis for fees. *Id.* at 143–44. The only basis for distinguishing *United Merchants* is that it was decided under the Bankruptcy Act, which did not have an express provision comparable to 11 U.S.C. § 506(b). The Court finds this distinction without significance.[7]

The strongest rationale for implying a prohibition on the inclusion of post-petition attorneys' fees in an unsecured creditor's pre-petition claim is that, unless the debtor is solvent, the unsecured creditor's augmented claim will diminish the dividend to other unsecured creditors. However, a similar effect flows from allowing secured creditors to include their post-petition attorneys' fees in their secured claims. While equality of distribution is one of the basic tenets of bankruptcy law, another important policy in bankruptcy is the preservation of nonbankruptcy legal rights except to the extent necessary to facilitate the purpose of the bankruptcy proceeding. Absent a clear provision of the Bankruptcy Code modifying a creditor's nonbankruptcy legal rights, the Court concludes that those rights should be deemed to be left intact.

## CONCLUSION

The Court concludes that Burlingame is entitled to include all its reasonable post-petition fees in its unsecured claim against the debtors. Burlingame is directed to file an amended motion for fees within 60 days from the date of this decision, segregating by task the work done on bankruptcy related issues and providing the additional detail describing the work done as previously provided for the nonbankruptcy litigation. The debtors will be given 30 days from the date of service of the

amended motion to file an objection to the fees as unreasonable in amount. Burlingame will be given 15 days from the date of service of the opposition to reply and alert the judge's law clerk when the matter is fully briefed.

**Parallel Citations**

57 Collier Bankr.Cas.2d 300

Footnotes

1    None of the fees in *Travelers* were requested for work performed litigating issues of state law. *See Travelers,* 127 S.Ct. at 1202–03.

2    *But see In re Esgro Inc.,* 645 F.2d 794, 798 (9th Cir.1981) and *In re THC Fin. Corp.,* 686 F.2d 799, 803 (9th Cir.1982), Bankruptcy Act cases holding that a contingent claim outside the creditor's control is too uncertain to value and is thus not "provable": i.e., in Bankruptcy Act terminology, allowable against the bankruptcy estate.

3    *See* Chandler Act, ch. 575, § 63(a)(8), 52 Stat. 840, 873 (1938)(adding contingent claims to the list of provable claims in § 63 of the Bankruptcy Act).

4    *See* 11 U.S.C. § 502(b)(2)(disallowing claims for post-petition interest).

5    *But see Rake v. Wade,* 508 U.S. 464, 468, 113 S.Ct. 2187, 124 L.Ed.2d 424 (1993) and *United States v. Ron Pair Enterp., Inc.,* 489 U.S. 235, 240, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989), which appear to construe similar language in 11 U.S.C. § 506(b) regarding interest to apply only to *post-petition* interest.

6    The Court views *In re Welzel,* 275 F.3d 1308 (11th Cir.2001) as inapposite. In that case, the creditor was fully secured. However, some of the fees sought were deemed not reasonable as required by 11 U.S.C. § 506(b). The *Welzel* court allowed the reasonable fees as part of the creditor's secured claim and the unreasonable fees as a general, unsecured claim. *Id.* at 1313–20.

7    The Bankruptcy Code had been enacted by the time this case came up on appeal. The argument was made that, by enacting 11 U.S.C. § 506(b), Congress had intended to codify a rule applicable also under the Bankruptcy Act, prohibiting the award of post-petition fees to unsecured creditors. The *United Merchants* court rejected this theory, concluding that 11 U.S.C. § 506(b) was only intended to address the rights of secured creditors to post-petition fees. *Id.* at 138.

---

**End of Document**                          © 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.