# EXHIBIT B

**(Articles And Unpublished Cases Not Included In Wilmington Trust's Appendix)**

1.    Mark S. Scarberry, Interpreting Bankruptcy Code Sections 502 And 506:  Post-Petition Attorneys' Fees In A Post-Travelers World, 15 AM. BANKR. L.J. 611 (2007)

2.    Jennifer M. Taylor and Christopher J. Mertens, Travelers And The Implications On Allowability Of Unsecured Creditor Claims For Post-Petition Attorneys' Fees Against The Bankruptcy Estate, 81 AM. BANKR. L.J. 123 (2007)

3.    Fishman v. Fox River Commons Shopping Center, LLC, Case No. 2-12-0281, 2012 Ill. App. Unpub. LEXIS 3057 (Ill. App. Ct. Dec. 14, 2012)

4.    In re Hitch, Case No. 07-70803, 2009 Bankr. LEXIS 1232 (Bankr. C.D. Ill. May 29, 2009)

5.    In re Kindred Healthcare, Inc., Case No. 99-3199 (MFW), 2003 Bankr. LEXIS 969 (Bankr. D. Del. Aug. 18, 2003)

6.    In re School Specialty, Inc., Case No. 13-10125 (KJC), 2013 Bankr. LEXIS 1897 (Bankr. D. Del. Apr. 22, 2013)



Copyright (c) 2007 American Bankruptcy Institute
American Bankruptcy Institute Law Review

Winter, 2007

American Bankruptcy Institute Law Review

*15 Am. Bankr. Inst. L. Rev. 611*

**LENGTH:** 25393 words

ARTICLE: INTERPRETING *BANKRUPTCY CODE SECTIONS 502* AND 506: POST-PETITION ATTORNEYS' FEES IN A POST-TRAVELERS WORLD

**NAME:** MARK S. SCARBERRY*

**BIO:**

        * Professor of Law, Pepperdine University School of Law, and the Robert M. Zinman Scholar in Residence at the American Bankruptcy Institute. Thanks are due to Professor Lynn M. LoPucki, Professor Jay L. Westbrook, James P. Caher, Esq., and the members of the Bankr-L listserv for their insight and encouragement. Thanks are also due to the American Bankruptcy Institute and its Executive Director/Chief Operating Officer Samuel J. Gerdano, Esq., for their support. The author wishes to disclose that he owns ten shares of PG&E stock (as a result of a scholarship competition in about 1970 and a subsequent stock split).

**LEXISNEXIS SUMMARY:**

 ... Part III concludes that Travelers left open for consideration all grounds other than the Fobian rule for deciding the United Merchants issue. ... The court repeated that the issues for which the fees were incurred were all bankruptcy law issues and ended with a prudential argument:
   Indeed, if unimpaired, non-prevailing creditors were authorized to obtain an attorney fee award in bankruptcy for inquiring about the status of unimpaired inchoate and contingent claims, the system would likely be overwhelmed by fee applications, with no funds available for disbursement to impaired creditors or debtor reorganization. ... ALLOWABILITY OF POST-PETITION FEES ON UNSECURED CLAIMS: THE UNITED MERCHANTS ISSUE When read together, sections 502(b), 506(a), and 506(b) have a plain meaning that precludes the allowance of post-petition attorneys' fees on unsecured claims. ... The First Circuit assumed that unsecured claim holders could obtain post-petition fees, and then had to depart from the text of the Code to make sure that holders of secured claims got treatment at least as favorable:
      We add that disallowing claims in their entirety based on section 506(b) defies common sense. ... In fact, sections 502(b), 506(a), and 506(b) have a plain meaning under which post-petition interest, fees, costs, and charges become part of an allowed claim only as a result of being allowed in favor of an oversecured creditor under section 506(b).

**TEXT:**

 [*611]  INTRODUCTION

Issues concerning attorneys' fees in bankruptcy cases came to the fore in the Supreme Court's October 2006 term. Two successful petitions for certiorari  n1 from the Ninth Circuit--both filed by attorney G. Eric Brunstad, Jr. n2--raised issues concerning recovery of attorneys' fees incurred by unsecured creditors  n3 or by  [*612]  debtors  n4 after the filing of a bankruptcy petition. The result was one substantive opinion, *Travelers Casualty & Insurance Co. of America v. Pacific Gas & Electric Co. ("Travelers"),*  n5 abrogating the Ninth Circuit's federal common law "Fobian rule,"  n6 and one "GVR," *DeRoche v. Arizona Industrial Commission*  n7 (in which certiorari was granted, the circuit court decision was vacated, and the case was remanded for further consideration in light of the Supreme Court's decision in *Travelers).*

Both cases involved treatment of post-bankruptcy attorneys' fees incurred by a party who, under non-bankruptcy law, would be entitled to recover such fees, whether by contract, or by statute, or otherwise.  n8 Of course, ordinarily, under the American Rule, a party to litigation is responsible for the party's own attorneys' fees, "absent statute or enforceable contract,"  n9 and absent one of the very few other bases  n10 for an award of fees.  n11 But in each case the Ninth Circuit had applied its Fobian rule to deny fees that would have been available under the American rule due to contract *(Travelers)* or state statute *(DeRoche).*  n12

 [*613]  Travelers Casualty & Surety Company ("Travelers") sought Supreme Court review of the Ninth Circuit's unpublished decision in *Travelers Casualty & Surety Co. v. Pacific Gas & Electric Co.* ("the Ninth Circuit *Travelers* decision"),  n13 dealing with whether such post-petition attorneys' fees incurred by an unsecured creditor are allowable claims in a bankruptcy case under section 502(b),  n14 in particular when the fees are incurred in litigation of bankruptcy law issues. If so, then the allowable claim of a creditor who incurred such fees would be increased, thus entitling the creditor to a larger share of any distribution to unsecured claim holders in the bankruptcy case.  n15 This result would harm the other creditors, but ordinarily would not affect the debtor.  n16

 [*614]  In its unanimous decision in *Travelers,* the Supreme Court overruled *Fobian.*  n17 But the Court refused to consider the broader question urged upon it by Pacific Gas & Electric ("PG&E").  n18 The broader question, which the Court explicitly left open, is whether other bankruptcy principles preclude addition of post-petition attorneys' fees  n19 to the allowable amount of an unsecured claim.  n20 This article answers that question--which will be called the *United Merchants*  n21 issue--with a clear "yes."  [*615]  The Bankruptcy Code provides a clear textual basis for precluding addition of such fees to the allowed amount of an unsecured claim.  n22

In the other successful petition for certiorari, debtors Mary and Eric DeRoche sought review of the Ninth Circuit's decision in DeRoche v. Arizona Industrial Commission *(In re* DeRoche) *("DeRoche").*  n23 In *DeRoche,* the Ninth Circuit relied on its federal common law Fobian rule to deny the debtors recovery of attorneys' fees for their successful bankruptcy litigation with the State of Arizona, even though an Arizona statute provided for recovery of attorneys' fees by prevailing parties in various kinds of litigation against the State.  n24 Of course, because the debtors sought fees against a nondebtor, the *United Merchants* issue was not directly involved; the issue was not whether a claim for the fees would be allowed as a claim under section 502(b). Instead, the issue was whether Arizona would be held liable to the debtors for the amount of their attorneys' fees. Apparently any fees the DeRoches might have recovered from the State would not have belonged to the bankruptcy estate in their case, but would have been theirs to keep after the bankruptcy.

 [*616]  The Ninth Circuit, on remand in *DeRoche,* will need to consider whether principles other than the abrogated Fobian rule may stand as an impediment to an award of attorneys' fees, where the award would constitute a personal liability of a party after the bankruptcy case. It is important to see, though, that the factual situation in *DeRoche* was not the usual one in which a party seeks an award of fees for bankruptcy litigation that will stand as a personal liability of a party, and thus it may not be a good case for development of a general rule.

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 5 of 150

Page 3

15 Am. Bankr. Inst. L. Rev. 611, *616

The usual situation involves a creditor who seeks to hold a debtor liable for fees incurred in establishing that a debt is nondischargeable. n25 An award of fees in such a case creates a serious possibility that the purposes of the Bankruptcy Code will be undermined. The Code expressly allows for recovery of fees in many cases by *debtors* who prevail in dischargeability litigation, n26 but makes no such provision for *creditors* to recover fees. In addition, the legislative history of the Code shows that Congress was concerned that the prospect of being held liable for attorneys' fees would coerce debtors into reaffirming debts even where the debts likely were dischargeable; that would deprive debtors of the fresh start that the Code was designed to provide. n27 Thus the possibility must be considered that state law bases for award of fees against debtors in nondischargeability litigation are preempted. That possibility will be discussed in a later article.

Part II n28 of this article provides important context by explaining the gulf that is created by the filing of a bankruptcy petition, a gulf between the pre-petition world and the post-petition world. The real world cannot be divided so neatly, and thus the gulf is not completely impassable; but it is a key structural component of the Bankruptcy Code. Cases spanning the gulf, such as mass tort cases in which there is a period of time between exposure and injury, create real difficulties. The concept of a contingent claim involves crossing that gulf as well; a pre-petition contingent right to payment becomes fixed by events that happen post-petition. The complications thereby created for the *United Merchants* issue must be considered carefully.

Part III n29 describes the Supreme Court's *Travelers* decision, including what it decided and most importantly, what it did not decide. Part III concludes that *Travelers* left open for consideration all grounds other than the Fobian rule for deciding the *United Merchants* issue. Part III also provides a brief eulogy for the Fobian rule.

 [*617]  Part IV n30 describes the arguments that have been made and the case authority to date concerning the *United Merchants* issue (other than arguments and cases that deal with or apply the Fobian rule). It explains that some courts have embraced a misunderstanding of section 506(b) in order (1) to resolve a quandary created by their acceptance in certain situations of the "minority" position on the *United Merchants* issue (under which post-petition fees are allowed on unsecured claims) and (2) to permit a federal reasonableness standard to be applied to pre-petition fees, contrary to the provisions of the Code. Part IV then provides a textual argument for the "majority" position (under which such fees are not allowable), an argument that Part IV concludes is determinative. n31 Finally, Part IV explains that even though it might be thought that there are five potential problems with such a result, none of the problems casts serious doubt on the correctness of the "majority" position.

Part V n32 summarizes the conclusions of the article and describes the issues that will be discussed more fully in later articles.

I. THE GULF BETWEEN THE PRE-PETITION AND THE POST-PETITION WORLDS

Under the Bankruptcy Code, as under the old Bankruptcy Act, n33 the filing of a bankruptcy petition creates a kind of gulf between the pre-petition and the post-petition worlds. n34 A gulf is created as to what is owned, as to what is owed, and as to what may be done. With regard to what may be done, the automatic stay stops creditor collection activity on pre-petition debts, n35 leaving creditors where they were at the moment the petition was filed. Absent relief from the automatic stay n36 or an applicable exception. n37 creditors cannot demand payment of pre-petition debts, n38 cannot proceed with or initiate suits on such debts, n39 cannot obtain new liens on the debtor's property to secure such debts, n40 and cannot perfect or enforce existing liens. n41

 [*618]  With regard to what is owned (and by whom), property interests held, as of the moment of the filing, by the debtor are pulled into the bankruptcy estate that is created by the filing; n42 an individual debtor's post-petition earnings from personal services are not, in a chapter 7 case, nor generally are other property interests acquired by the debtor post-petition, unless derived from property of the estate or acquired for the estate. n43 Agreements to provide additional collateral for existing debts cease to have effect as of the moment of the filing, except to some extent with regard to property derived from existing collateral. n44 Unauthorized post-petition transfers of estate property generally

15 Am. Bankr. Inst. L. Rev. 611, *618

are voidable.

There is also a gulf with regard to what is owed. Even the label "creditor" generally is reserved for those whose claims arose pre-petition (or are treated as having arisen pre-petition). n45 A proof of claim may be filed by a creditor (including one whose claim is treated as having arisen pre-petition); n46 in some cases another entity n47 may file a proof of a creditor's claim. But in general proofs of claim may not be filed for post-petition claims, and thus such claims may not be allowed so as to share in any distribution from the estate. n48 Further, in by far the greatest number of cases, the debtor receives a discharge of pre-petition n49 but not post-petition debts. n50

Most importantly, for our purposes, the allowable amount of a claim in bankruptcy is, in most cases, fixed as of the filing date. When objection is made to a claim, the Bankruptcy Code provides in the language at the beginning of section [*619] 502(b)--in what will be called its "preamble"--that "the court . . . shall determine the amount of such claim . . . as of the date of the filing of the petition, and shall allow such claim in such amount" absent a further basis for limiting or disallowing the claim. n51 An amount determined as of the petition date, as required by section 502(b)'s preamble, would not seem to include post-petition interest, fees, or costs. That conclusion is reinforced with respect to post-petition interest by section 502(b)(2), one of the further bases for limiting the amount of the claim: an allowed claim cannot include "unmatured interest." Given the earlier reference in section 502(b) to determination of the amount of the claim as of the petition date, it is apparent that section 502(b)(2)'s reference to "unmatured interest" is to interest unmatured as of the petition date. n52 Neither the preamble to section 502(b) nor section 502(b)(2) is superfluous, though they overlap in effect. Each can be seen to disallow the usual kind of post-petition interest. The preamble disallows other post-petition additions to an unsecured claim, such as late fees (and this article will argue, post-petition attorneys' fees that are incidental to an unsecured claim). n53 Section 502(b)(2) potentially goes further than the preamble by disallowing unamortized original issue discount that might, under state law, constitute a recoverable part of an obligation on its acceleration. n54

The gulf between the pre-petition and post-petition worlds is not perfectly impassable. Sometimes a date somewhat before or after the petition date becomes the dividing line. For example, the making of certain setoffs and transfers, and the perfection of certain liens, within 90 days (or in some cases a year) before the petition date may be avoided, thus reversing the effect of a transfer or of the perfection of a lien and preserving to some degree a state of events as of that prior date. n55 Perfection of liens sometimes is allowed within a short period after the petition filing date. n56 In cases under chapters 11, 12, and 13, the discharge may [*620] include debts arising after the filing of the petition but before confirmation of the plan in the case, though in most such cases the debts are paid in full under the plan and thus as a practical matter are not discharged. n57 The estate includes certain property to which the debtor becomes entitled within 180 days after the petition filing date (primarily inheritances, life insurance proceeds, and marital dissolution property distributions). n58

In addition, the gulf is sometimes in a sense bridged (or ignored). Some of the debtor's pre-petition property interests do not pass into the estate and are retained by the debtor post-petition (primarily interests in certain education accounts, pension trusts, and other spendthrift trusts), n59 and an individual debtor may exempt back out of the estate some pre-petition property interests that passed into it. n60 Post-petition property interests that are related to pre-petition property interests also may cross the gulf; post-petition rents, proceeds and similar items with respect to property of the estate become property of the estate, n61 and such post-petition property interests also may become subject to a lien securing a pre-petition debt if the related property of the estate was subject to the lien as of the petition date. n62 Similarly, if the collateral securing a debt increases in value post-petition, the pre-petition secured claim holder ordinarily is entitled to the benefit of that increase. n63 Further, and of particular relevance to this article, a creditor whose pre-petition claim is secured by property worth more than the amount of the debt is entitled to have post-petition interest added to the pre-petition secured claim, along with "reasonable fees, costs, or charges," to the extent such fees, costs, or charges are "provided for under the agreement or State statute under which such claim arose." n64

Other situations in which the gulf is crossed or potentially crossed, involve claims that might be thought to have

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 7 of 150

Page 5

15 Am. Bankr. Inst. L. Rev. 611, *620

arisen either pre-petition or post-petition, and  [*621]  cases in which post-petition events may affect the amount or allowability of claims that in some sense arose pre-petition (and that therefore may be seen as pre-petition contingent claims). A woman is injured by a Dalkon Shield intrauterine device that she used pre-petition, but her injuries do not manifest themselves until after the petition is filed; is her claim a pre-petition claim?  n65 An aircraft manufacturer knows that some of the planes it has already produced will crash in the future, and that in some such cases those injured will claim that the manufacturer is liable for marketing an allegedly defective aircraft; one such plane does crash during the manufacturer's bankruptcy reorganization but others may crash years in the future. Which victims or potential victims have pre-petition (or pre-confirmation) claims for purposes of sharing in the distribution and for purposes of the discharge of debts?  n66

Or suppose an unlikely actor--say a corporation engaged in providing home security services--spilled toxic wastes on real property that it had leased, and did so under circumstances that would not have given the environmental authorities any clue that such a spill had happened.  n67 Then the corporation moved to a new location, filed a chapter 11 petition, confirmed a plan of reorganization, and continued in business at the new location with its prior debts discharged. Then the EPA discovers the pollution and sues the reorganized corporation, which pleads the bankruptcy discharge as a defense. Did the EPA have a claim before the plan was confirmed? If so, it was discharged; if not, it was not discharged. At least some courts would hold that the EPA did not have a claim as of the time of confirmation of the plan, unless the corporation's known activities created a reason for the EPA to think it needed to regulate the corporation n68 or perhaps not unless the corporation and the EPA had a sufficient relationship that such an environmental claim would be within the EPA's "fair contemplation."  n69

 [*622]  Suppose an accounting firm negligently failed to discover, in its pre-petition auditing of the debtor's financial statements, that the debtor's managers fraudulently created false financial statements; then a third party damaged by the fraud succeeds post-petition in holding the accounting firm liable for the third party's damages, thus giving the accounting firm the right to reimbursement from the debtor.  n70 This is an indemnity case, in which the accounting firm should be held to have an allowable pre-petition unliquidated, contingent tort claim, a claim that becomes liquidated and fixed once the accounting firm is held liable.  n71

Now consider, at greater length, a contingent contract claim. Suppose a guarantor of a pre-petition debt owed by the debtor pays the creditor post-petition; under non-bankruptcy law, the guarantor becomes entitled only then to reimbursement by the debtor.  n72 It seems, though, that the guarantor had a claim when the petition was filed, even before paying anything to the creditor. The guarantor has a right to payment that is contingent on an event--the making of payment to the creditor--and contingent rights to payment are claims.  n73 Such a claim is not allowable as long as it remains contingent, and not allowable to the extent that it remains contingent.  n74 Once the guarantor pays something to the creditor, the guarantor's contingent claim becomes fixed to the extent of the payment, because then under nonbankruptcy law the guarantor will be entitled to be reimbursed what the guarantor paid. And to the extent that the claim becomes fixed, it becomes allowable on the same basis as other claims.  n75

Note, though, that section 502(e)(2) explicitly provides that the claim will be allowable "the same as if such claim had become fixed before the date of the filing of the petition;"  n76 similarly, the preamble  n77 to section 502(b) provides that allowance of a claim under section 502(e)(2) is an exception to the normal rule that the amount of the claim is determined as of the petition date. That result *already*  [*623]  would seem to follow, because section 502(b)(2) provides that contingency of a claim is not a basis for disallowance; allowing a wholly contingent claim (one that was wholly contingent as of the petition date) only for the amount that was not contingent as of the petition date would be the same as disallowing the claim because of the contingency, because that amount by definition would be zero. And section 502(e)(1)(B) does not create a problem here that would require the Code to say that once the claim is fixed it should be allowed as if it had been fixed on the petition date. Section 502(e)(1)(B) only provides for disallowance to the extent a guarantor's claim (or similar claim) for reimbursement is contingent at the time the court considers whether to allow the claim. That can be done after the claim becomes fixed, or if waiting will cause too much delay, the contingent claim can be estimated under section 502(c). Thus section 502(e)(1)(B) would not prevent allowance of the claim once it becomes fixed. If the court heard the matter and disallowed the claim while it was contingent, the court could

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 8 of 150

Page 6

15 Am. Bankr. Inst. L. Rev. 611, *623

redetermine the claim under section 502(j) after the claim became fixed. If section 502(j)'s "cause" and "equities of the case" standards were seen as too restrictive, the drafters could have simply provided that the fixing of the claim provides an occasion for redetermination of the claim, independent of section 502(j). So why do section 502(e)(2) and the preamble to section 502(b) provide explicit direction to determine the amount of the claim as if were fixed at the petition date?

Apparently, the Code's drafters decided that its treatment of contingent claims could be confusing, and thus decided, with respect to this very important kind of contingent claim, to make matters clear. This may suggest that even the drafters were not sure that the Code's provisions on contingent claims--which cross the gulf between the pre- and post-petition worlds--always would have a clear and plain meaning. The difficulty courts have had with determining when a claim is a pre-petition contingent claim suggests that they were right; the concept of a contingent claim creates complications that the Code's language does not always resolve clearly.  n78

This is particularly important with respect to the *United Merchants* issue, because one argument for allowance of post-petition fees depends on an assumption that the Code's provisions on contingent claims have a particular plain meaning, such a very plain meaning that they override the plain meaning of sections 502(b) and 506(a)-(b). Not surprisingly, on close examination, that very plain meaning is not so plain.

What kinds of claims are the contingent claims that the drafters contemplated would be allowed, even though nothing is owing as of the petition date, with the amount of such a claim being estimated under section 502(c) or with the amount being determined after the claim becomes fixed? The cases dealing with future tort claims and environmental cleanup claims show that there are limits to the concept that any potential future right to payment should be treated in this way.

 [*624]  Are there perhaps other limits, limits relevant to the *United Merchants* issue? Section IV.C. of this article shows that there are, but for now consider two fact patterns.

A credit card company seeks allowance of post-petition late fees and over-limit fees that, in the absence of a bankruptcy filing, would have been added to the debtor's credit card balance each month. The late fees and overlimit fees are simply not allowable.  n79

Or, finally, a creditor incurs post-petition attorneys' fees in connection with a pre-petition unsecured claim that arises from a contract that provides for recovery of such fees. Is the right to such fees an allowable pre-petition contingent claim that becomes an allowable fixed claim once the post-petition fees are incurred? That is a question we are left with after *Travelers,* and it requires us to resolve the *United Merchants* issue.

II. THE SUPREME COURT'S DECISION IN TRAVELERS CASUALTY & INSURANCE CO. OF AMERICA V. PACIFIC GAS & ELECTRIC CO.

A. The Facts and the Proceedings Below

PG&E self-insured for workers' compensation liability, but was required by state law to post bonds to ensure that injured workers would receive their benefits.  n80 Travelers provided those bonds--in an amount of $ 100 million--pursuant to agreements that included a broad right of indemnity in favor of Travelers, including indemnity for attorneys' fees incurred by Travelers.  n81 When PG&E filed its chapter 11 petition, it obtained authorization to continue to pay workers' compensation claims for workers injured before the filing of the petition, but neither the bankruptcy court nor the Code mandated such payments.  n82 PG&E continued to pay those claims,  n83 but there was no guarantee that it would continue to do so.

Travelers thus filed a proof of claim in PG&E's bankruptcy for its contingent right to reimbursement should it be required to pay anything under its bonds.  n84 The proof of claim noted that Travelers had subrogation rights in addition to its contingent claim for reimbursement; if Travelers paid workers' compensation claims to workers, then Travelers

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 9 of 150

Page 7

15 Am. Bankr. Inst. L. Rev. 611, *624

not only would be entitled to reimbursement under its own indemnity rights; in addition, it would be subrogated to the workers' rights.  n85 To protect its right to reimbursement and its subrogation rights, Travelers  [*625]  also filed proofs of claim on behalf of workers who had been injured pre-petition, for the workers' compensation benefits to which they were entitled.  n86 "In response to Travelers' claim, and with the knowledge and approval of the Bankruptcy Court, PG & E agreed to insert language into its reorganization plan and disclosure statement to protect Travelers' right to indemnity and subrogation in the event of a default by PG & E."  n87

A dispute ensued, with Travelers asserting that PG&E had changed the agreed-upon language  n88 and with PG&E objecting to Travelers' claim.  n89 A stipulation resolved the dispute.

 [*626]  Travelers agreed to disallowance of its contingent claim for reimbursement, which represented no real concession by Travelers; it was quite clear that the claim could not be allowed to the extent it remained contingent.  n90 Travelers' point in filing the claim could not have been to have an immediately allowable claim for reimbursement of payments made to injured workers; Travelers had made no such payment. Rather, Travelers needed to file a claim by the claims filing bar date that could be the basis for later allowance under section 502(e)(2), in the event that PG&E defaulted in payment of workers' compensation claims and Travelers had to pay them.

PG&E stipulated that Travelers could assert its subrogation rights and file a claim for its attorneys' fees, but only subject to PG&E's right in each case to object.  n91 Those were not real concessions by PG&E. There was a real concession, however, made by PG[E] apparently the stipulation required that the plan of reorganization to be proposed by PG&E leave unimpaired the class of pre-petition workers' compensation claims. That would ensure that PG&E would be obligated--by way of Travelers' subrogation rights--to reimburse Travelers for payments that Travelers might have to make on those workers' compensation claims, in the event that PG&E defaulted on them.  n92

Travelers then filed a claim for the attorneys' fee it had incurred in dealing with all of these matters.  n93 PG&E again objected. The bankruptcy court disallowed the claim; the bankruptcy court accepted PG&E's argument (apparently based on the Fobian rule) that the fees could not be allowed because they were incurred for litigation of bankruptcy law issues.  n94 "The District Court affirmed, relying on *In re Fobian, 951 F.2d 1149 (C.A.9 1991),* which held that 'where the litigated issues involve not basic contract enforcement questions, but issues peculiar to federal [*627] bankruptcy law, attorney's fees will not be awarded absent bad faith or harassment by the losing party,' *id., at 1153."*  n95

The Ninth Circuit affirmed, relying on *Fobian,*  n96 in a brief unpublished opinion that incorporated by reference legal reasoning from *DeRoche*  n97 (which, as the Supreme Court noted, was decided by the same three-judge panel).  n98 The Ninth Circuit *Travelers* decision recounted the arguments made by Travelers (that *Fobian* should be distinguished and that "Fobian was incorrectly decided").  n99 Then the court noted that Travelers' arguments for fees were weaker than the arguments for fees in *DeRoche.* Travelers' attorneys' fees were incurred only in dealing with federal bankruptcy procedures, without any enforcement in the bankruptcy case of any state law obligations against Travelers. Apparently the court thought denial of fees was even more clearly appropriate when fees were incurred in federal procedural wrangling; the issues were not even substantive federal issues, let alone substantive state law issues for which fees could be awarded under the Fobian rule. And Travelers was not even a prevailing party, in the court's view.  n100

Then the court stated the Fobian rule: prevailing parties in bankruptcy proceedings may recover fees under state law (such as state contract law that makes an attorneys' fee provision enforceable) "if state law governs the substantive issues raised in the proceedings"  n101 but not if the fees are incurred for "litigating issues 'peculiar to federal bankruptcy law.'"  n102 The court repeated that the issues for which the fees were incurred were all bankruptcy law issues and ended with a prudential argument:

Indeed, if unimpaired, non-prevailing creditors were authorized to obtain an attorney fee award in
bankruptcy for inquiring about the status of unimpaired inchoate and contingent claims, the system

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 10 of 150

Page 8

15 Am. Bankr. Inst. L. Rev. 611, *627

would likely be overwhelmed by fee applications, with no funds available for disbursement to impaired creditors or debtor reorganization.  n103

 [*628]  The court likely intended the comment to be hyperbolic. Of course State law generally does not permit fees to be awarded as a kind of cost of suit  n104 to non-prevailing parties. Note also that an increase of some unsecured claims by inclusion of post-petition fees would not reduce the total value available for distribution to unsecured claim holders, except to the extent that litigation over fees would be costly to the bankruptcy estate, but it would diminish the percentage recovery by increasing the total amount of claims.

The reasoning incorporated from *DeRoche* provides some additional help in showing the Ninth Circuit's thinking. In *DeRoche,* the circuit court emphasized the American Rule--parties are responsible for their own attorneys' fees, with limited exceptions. Quoting the Supreme Court's *Alyeska* decision,  n105 the court argued that "it would be inappropriate for the Judiciary, without legislative guidance, to reallocate the burdens of litigation."  n106 The court noted that the Code "does not contain any provisions that create a general right for the prevailing party to be awarded attorney's fees in federal bankruptcy litigation."  n107 The court recognized that there is an exception to the American Rule where a contract between the parties provides for an award of fees, but declared that "we consistently have refused to award fees when the substantive legal question was governed by federal bankruptcy law, rather than 'basic contract enforcement questions.'"  n108 The court refused to apply a different analysis just because the attorneys' fee award was not being sought pursuant to contract but rather under a State statute that provided for fees to be awarded to prevailing litigants against the State.  n109 The court rejected the DeRoches' claim that such a statute "represents an important state public policy that deserves more respect than private party contract arrangements for fee payments."  n110

*B. Justice Alito's Opinion for a Unanimous Court*

In a unanimous opinion written by Justice Alito, the Supreme Court reversed the Ninth Circuit's *Travelers* decision and abrogated the Fobian rule. The opinion describes the facts in a neutral way, embracing neither party's view of who had been  [*629]  responsible for the disputes below or of whether Travelers' incurring of attorneys' fees had been necessary.  n111 The Court does note, however, that the stipulation between Travelers and PG&E "accommodate[ed] Travelers' substantive concerns," suggesting that at least some of Travelers' attorneys' work had been fruitful.  n112 As noted above, that is in fact the case; the stipulation's provision that PG&E's plan would leave the class of workers' compensation claims unimpaired provided a real and substantive benefit to Travelers.  n113 Thus the Court saw the case differently from the Ninth Circuit, which stated that Travelers had not prevailed on any of the issues.  n114

The Court then stated that it had granted certiorari to resolve a conflict among the circuits "regarding the validity of the *Fobian* rule."  n115 In particular, the Court cited the Fourth Circuit as a circuit that had disagreed with the Ninth, in *Three Sisters Partners, L.L.C. v. Harden (In re Shangra-La, Inc.).*  n116 There is, however, a strong argument that the decision in *Shangra-La* did not create a split in the circuits. The Fourth Circuit did reject the bankruptcy court's application of the Fobian rule, and appeared to criticize the Fobian rule generally, but there is no indication that Ninth Circuit would apply the Fobian rule to the issue in *Shangra-La.* The attorneys' fees in *Shangra-La* were sought as part of the compensation required under section 365(b)(1)(B) before a trustee in bankruptcy may assume a lease that is in default.  n117 Section 365(b)(1)(B) does not give rise to a general unsecured claim; rather, the court simply cannot permit assumption of the lease absent payment of the required compensation by the trustee (or adequate assurance that the trustee will promptly pay it).  n118 It does not appear that any circuit court decision has applied the Fobian rule to attorneys' fees sought under section 365(b)(1), and there is little reason to think the Ninth Circuit would so apply it.

Travelers demonstrated that there *was* a split in the circuits over the Fobian rule, but not over application of the Fobian rule to the particular issue in *Travelers,* the issue whether post-petition attorneys' fees are allowable under section 502(b). None of the other circuit court cases cited by Travelers in its petition for certiorari  n119 as creating a circuit split involved allowance of claims in a bankruptcy  [*630]  case under the Bankruptcy Code. One involved a chapter XIII case and was decided under the old Bankruptcy Act.  n120 The other six all involved whether attorneys' fees could be awarded against a debtor, as a personal liability of the debtor, in a nondischargeability action. The circuit

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 11 of 150

Page 9

15 Am. Bankr. Inst. L. Rev. 611, *630

split over the Fobian rule was with regard to that issue.

It would seem unusual for the Supreme Court to grant certiorari to resolve a circuit split in a case that might not have been decided differently by the circuits that were split. However, on July 26, 2006, the day after the last brief was filed on Travelers' Petition for Certiorari, n121 the Sixth Circuit issued a decision that created a true circuit split, *Official Comm. of Unsecured Creditors v. Dow Corning Corp. (In re Dow Corning Corp.).* n122 Ironically, the Sixth Circuit's *Dow Corning* decision both created a true circuit split on the issue in *Travelers* and showed that there was not previously a true split on that issue. The Sixth Circuit in *Dow Corning* stated that its prior decision allowing recovery of post-petition fees in nondischargeability actions, n123 one of the nondischargeability cases cited by Travelers for the existence of a circuit split, n124 did not govern whether post-petition fees would be allowable as claims in the bankruptcy case: its prior decision was "a case concerning a dischargeability action against the debtor, as opposed to a claim against the general assets of the estate, and as such, involve[d] an entirely different set of policy considerations." n125 Thus even a circuit that issued one of the nondischargeability decisions cited by Travelers did not think such decisions were apposite to the issue that was before the Supreme Court in *Travelers.* The existence of a split in the nondischargeability cases thus was not the same as a split over allowance of claims. Nevertheless, the Sixth Circuit in *Dow Corning* did reject the Fobian rule with regard to allowance of post-petition fees on unsecured claims. That created a true circuit split and probably influenced the Supreme Court to grant certiorari, even though the most the Sixth Circuit would say in the end was that its decision was "arguably in tension with the Ninth Circuit." n126

There would have been a similar difficulty with a grant of certiorari in *DeRoche* on the basis of a circuit split. *DeRoche* involved neither a nondischargeability action nor an issue of allowance of claims. Thus it is not clear that a direct circuit split could have been demonstrated on the facts of *DeRoche,* either.

Turning to the merits, the Supreme Court noted that the American Rule was subject to an exception where an "enforceable contract" provided for recovery of attorneys' fees. The Court cited its 1928 decision in *Security Mortgage Co. v. Powers* [*631] n127 for the proposition that there is nothing special about attorneys' fees that would prevent them from being allowed like other debts in bankruptcy. And under the Code "it remains true that an otherwise enforceable contract allocating attorney's fees (i.e., one that is enforceable under substantive, nonbankruptcy law) is allowable in bankruptcy except where the Bankruptcy Code provides otherwise." n128 The issue before the Court was simply "whether the Bankruptcy Code disallows contract-based claims for attorney's fees based solely on the fact that the fees at issue were incurred litigating issues of bankruptcy law." n129 The Court's answer: A clear "no." n130

The Court explained that a claim that is filed will be allowed, absent objection. n131 "[W]here a party in interest objects, the [bankruptcy] court 'shall allow' the claim 'except to the extent that' the claim implicates any of the nine exceptions enumerated in § 502(b)." n132

The Court's brief quotations from section 502(b)'s preamble omitted language that is key to resolution of the *United Merchants* issue. Consider the relevant text of the preamble:

> [T]he court ... shall determine the amount of such claim ... as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that . . . .

The Court's quote omitted the references to determination of the amount of the claim "as of the date of the filing of the petition," and to allowance of the claim only "in such amount." No issue had properly been raised before the Court concerning those references; the only issue before the Court was whether Travelers' claim was properly disallowed "based solely on the fact that the fees at issue were incurred litigating issues of bankruptcy law." n133 Thus the question whether post-petition fees might not be allowable because they are not part of the claim "as of the date of the filing of the petition" was not before the Court. As the Court noted, application of the Fobian rule--validity of which was before the Court--did not turn on that question; the Fobian rule did not generally disallow claims for fees just because they were incurred post-petition. n134

Having limited its consideration to the exceptions in section 502(b)(1)-(9), the Court proceeded to show that only section 502(b)(1) could possibly be relevant to  [*632]  the allowability of Travelers' claim. "Thus, Travelers' claim must be allowed under § 502(b) unless it is unenforceable within the meaning of § 502(b)(1)."  n135

In the next section of its opinion the Court explained section 502(b)(1): "This provision is most naturally understood to provide that, with limited exceptions, any defense to a claim that is available outside of the bankruptcy context is also available in bankruptcy."  n136 The Court did not mean that there were some (though limited) exceptions to use of defenses that would have been available outside of bankruptcy,  n137 but instead that there were some (though limited) circumstances in which grounds for disallowance that were not defenses available outside of bankruptcy might be available in bankruptcy for purposes of section 502(b)(1). Thus, if another provision of the Bankruptcy Code provided a basis for not allowing a claim, the claim could be disallowed under section 502(b)(1).  n138

The Court supported this interpretation of section 502(b)(1) by quoting from its 2000 decision in *Raleigh v. Ill. Dep't of Revenue,*  n139 which itself quoted the Court's much-cited 1979 decision in *Butner v. United States:*  n140

Indeed, we have long recognized that the "'basic federal rule' in bankruptcy is that state law governs the substance of claims, Congress having 'generally left the determination of property rights in the assets of a bankrupt's estate to state law.'" Accordingly, when the Bankruptcy Code uses the word "claim"--which the Code itself defines as a "right to payment," *11 U.S.C. § 101*(5)(A)--it is  [*633]  usually referring to a right to payment recognized under state law.  n141

After quoting *Butner* again, the Court cited and quoted *Vanston Bondholders Protective Committee v. Green:*  n142 "What claims of creditors are valid and subsisting obligations against the bankrupt at the time a petition in bankruptcy is filed is a question which, in the absence of overruling federal law, is to be determined by reference to state law."  n143

The Court then concluded that disallowance of Travelers' claim under the Fobian rule was improper. The Ninth Circuit had not relied on any applicable nonbankruptcy law to justify the disallowance; "[n]or did it conclude that Travelers' claim was rendered unenforceable by any provision of the Bankruptcy Code."  n144 The Court noted that the Fobian rule did not preclude allowance of post-petition attorneys' fees generally when permitted by state law, but only fees incurred with respect to bankruptcy law issues. Such a rule--of the Ninth Circuit's "own creation"--was not supported by the text of the Bankruptcy Code, nor was it even supported by the cases cited in *Fobian.*  n145 "The absence of textual support is fatal for the *Fobian* rule."  n146 The Court noted that no reason had been given that would overcome the presumption that a claim enforceable under state law is allowable in bankruptcy.

Section 502(b)(4) disallows certain attorneys' fees; the absence of a provision disallowing attorneys' fees for litigation of bankruptcy issues suggested, according to the Court, that "the Code does not categorically disallow them."  n147 Congress certainly could have provided for such disallowance; but it did not. Congress "clearly and expressly" provides for exceptions to the Code when it intends to make an exception; but "the Code says nothing about unsecured claims for contractual attorney's fees incurred while litigating issues of bankruptcy law."  n148

[*634]  PG&E did not attempt to defend the Fobian rule.  n149 Instead, PG&E argued that section 506(b) required disallowance of Travelers' post-petition fees.  n150 That argument--addressing the *United Merchants* issue  n151 --was not made below, nor was it raised in PG&E's opposition to the petition for certiorari.  n152 The Fobian rule was "analytically distinct from, and fundamentally at odds" with the section 506(b) argument (even though both might lead to the same result in the case before the Court) because the Fobian rule would permit allowance of some post-petition fees on unsecured claims, but the section 506(b) argument would not.  n153 PG&E was the beneficiary of a ruling below based on the Fobian rule and now sought to defend the judgment on a different theory; its section 506(b) argument was not "fairly included" within a grant of certiorari limited to resolution of a circuit split over the Fobian rule. The Court held that PG&E had "failed to identify any circumstances that would warrant an exception" to the usual rule that the Court "do[es] not consider claims that were neither raised nor addressed below."  n154

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 13 of 150

Page 11

15 Am. Bankr. Inst. L. Rev. 611, *634

The Court's conclusion provides a crucial clarification. It would be possible to argue that the opinion to this point had limited the arguments that could be made on remand or in a later case against allowance of Travelers' claims or, in other cases, similar claims. The Court had stated that "Travelers' claim must be allowed under § 502(b) unless it is unenforceable within the meaning of § 502(b)(1)," n155 and that "[t]he absence of an analogous provision [analogous to section 502(b)(4)] excluding the category of fees covered by the Fobian rule likewise suggests that the Code does not categorically disallow them." n156 Did the Court mean that only section 502(b)(1) arguments could be considered in the future? Did it mean that at least some post-petition fees incurred by unsecured claim holders had to be allowed? (Or that the Code "suggests" that at least some such fees should be allowed?) The answer is "no." Because the Court refused to consider arguments on any issue other than the validity of the Fobian rule, it had decided nothing but that the Fobian rule was invalid:

> Accordingly, we express no opinion with regard to whether, following the demise of the Fobian rule, other principles of bankruptcy law might provide an independent basis for disallowing Travelers' claim for attorney's fees. We conclude only that the [*635] Court of Appeals erred in disallowing that claim based on the fact that the fees at issue were incurred litigating issues of bankruptcy law. n157

Thus the Court did not foreclose any arguments independent of the Fobian rule for disallowance of post-petition fees incurred by unsecured claim holders.

*C. The Fobian Rule: A Brief Eulogy*

The next part of this article, Part IV, considers those independent arguments First, though, something should be said on behalf of the spirit of the Fobian rule, by way of eulogy. The rule's origins were obscure. As the Supreme Court noted, Fobian itself did not seem firmly grounded in the prior case law. It had no support from the text of the Code--other than the argument from the negative, that the Code did not expressly and specifically authorize recovery of fees for litigation of bankruptcy issues. Why was it created, and why did its approach achieve a substantial measure of acceptance, including adoption by published court of appeals decisions from two other circuits, and by various decisions of other courts? n158

Perhaps it was seen as providing at least some measure of protection against the consequences of deciding the *United Merchants* issue wholesale in favor of allowance of post-petition fees. Or perhaps its appeal flowed from a concern that bankruptcy policy would be undermined, and access to the federal bankruptcy process inhibited, if fees for litigating bankruptcy issues were allowed, especially if fees for litigating nondischargeability complaints could be imposed as a personal liability on debtors. Fees for litigation of state law matters could of course be awarded in state court litigation; allowing (or imposing) such fees for litigation of state law issues in bankruptcy courts would simply replicate the nonbankruptcy result, and would not deter participation in the bankruptcy process. But allowance (and especially imposition) of fees for litigation of bankruptcy law issues would create a new potential for fee recovery, not available outside of bankruptcy. Perhaps then the Fobian rule was an attempt to focus on the allowance (or imposition) of fees that would have the greatest impact on access to the federal bankruptcy courts.

Those concerns do not rise to the level that would justify preemption of state law in the context of the allowance of claims, n159 but it is possible that they may rise to that level in the context of the imposition of personal liability, especially on debtors in nondischargeability litigation. *DeRoche* did not involve [*636] nondischargeability litigation, but it did involve the potential imposition of personal liability (on the State of Arizona, in that case) for fees. n160 Thus the argument for the Fobian rule, or something like it, was actually stronger in *DeRoche* than in *Travelers*. It still, though, was not strong enough, as will likely be determined on the remand to the Ninth Circuit. What could make it strong enough is an argument from the text of the Code (and with apologies to some members of the Court) the legislative history, showing that in a particular context the imposition of fees would undermine achievement of the bankruptcy law's purposes. There is relevant text and legislative history with regard to nondischargeabilty actions. n161 Whether they make the case for preemption persuasive will be discussed in a later article.

Page 12

15 Am. Bankr. Inst. L. Rev. 611, *636

With the Fobian rule's eulogy delivered, this article turns to the *United Merchants* issue.

III. ALLOWABILITY OF POST-PETITION FEES ON UNSECURED CLAIMS: THE *UNITED MERCHANTS* ISSUE n162

When read together, sections 502(b), 506(a), and 506(b) have a plain meaning that precludes the allowance of post-petition attorneys' fees on unsecured claims.  n163 The explanation of why that is the case is not short, but the meaning that is determined from the explanation is still quite plain. Section IV.C. below gives that explanation. To some readers, it may seem so clear that it will be hard to understand why there has been such a controversy.

Section IV.B. below explains a misunderstanding of section 506(b) that may have prevented courts from seeing what otherwise would seem clear. In addition, the allowability of contingent claims allows an argument to be made that the apparent plain meaning of sections 502(b), 506(a), and 506(b) is in conflict with other provisions of the Code.

Section IV.A. discusses the conventional arguments and the authorities dealing with the controversy, other than *Travelers* and *DeRoche*, and apart from the Fobian rule.

*A. The Controversy*

1. The Case Authority, and the "Majority" Position Rejecting Post-Petition Fees on Unsecured Claims

Even apart from the now-abrogated Fobian rule, there has been substantial controversy over the *United Merchants* issue--whether an unsecured claim holder  [*637]  who incurs post-petition attorneys' fees in connection with its claim, and who has a basis for recovering the fees by contract or statute or otherwise--may have the fees added to its allowed unsecured claim in a bankruptcy case.  n164 Unsecured claim holders seeking to do so face an immediate and daunting challenge: *Bankruptcy Code section 502(b)* requires that the allowed amount of a claim be determined as of the date of the filing of the bankruptcy petition, and as of that date the post-petition fees had not yet been incurred. In addition, the Code specifically allows such fees to be added to the secured claims of oversecured creditors, but does not specifically authorize their addition to unsecured claims.

Nevertheless, some courts--particularly where the debtor is solvent  n165--have allowed post-petition fees to be added to unsecured claims.  n166 Some of the cases involve claims for indemnity  n167 under which an award of attorneys' fees may be  [*638]  seen as "collateral legal expenses" (part of the primary damage award)  n168 rather than as "instant suit costs"  n169 subject to the American Rule. It is possible that allowance of post-petition fees in such cases has nothing to do with the controversy presently being discussed.  n170 In other cases, courts relied on the theory that the right to recover such fees is a kind of pre-petition contingent claim under the Code that is allowable once the contingency, the incurring of the fees, occurs,  n171 thus turning the contingent claim into a fixed claim.  n172

The clear majority of the courts that have rendered holdings on the *United Merchants* issue under the Code, where the debtor is insolvent, have refused to allow post-petition fees on unsecured claims,  n173 and that is often called the [*639]  "majority position." The numbers are much more even if decisions involving solvent debtors--most of which allowed fees only because of the solvency  n174 --are counted. It is hard to know how to count all the cases from the Ninth Circuit--and elsewhere  n175 --that applied the Fobian rule, which allowed some post-petition fees and disallowed others.  n176

2. The Conventional Arguments for the "Majority" Position, with Commentary

Several of the decisions point out that most courts that take the "majority" position do so in reliance on four arguments.  n177 First, they argue that section 506(b)'s authorization only for oversecured creditors to receive post-petition fees should be interpreted as a denial of such fees on unsecured claims (whether unsecured claims held by undersecured creditors or unsecured claims held by wholly unsecured creditors). Though this is not often stated in connection with this argument, the point potentially is more than just an invocation of the old *expressio unius* maxim.

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 15 of 150

Page 13

15 Am. Bankr. Inst. L. Rev. 611, *639

Rather, it is similar to the point made by the Supreme Court in *NextWave,* and quoted by the Supreme Court in *Travelers.* There is a rule in the Bankruptcy Code--in section 502(b)--that the allowable amount of a claim is to be determined as of the petition date. That amount would not seem to include attorneys' fees that have not yet been incurred as of the petition date. If Congress intended to make an exception to this rule, it would have done so "clearly and explicitly."  n178 The Code does not provide "clearly and explicitly" for post-petition fees to be allowed on unsecured claims; instead, it provides explicitly only for post-petition  [*640]  fees to be allowed on oversecured claims, leaving a strong negative impression with regard to allowance of post-petition fees on unsecured claims.  n179

If this were a brief, that would be a good place to stop, but this is not a brief. As noted above, the "clearly and explicitly" argument in *Travelers* probably was a rhetorical flourish--perhaps a well-deserved way of taking the Ninth Circuit to task for its inattention to the statutory text. But it does not seem to be an argument that should be used in harmonizing Code sections.  n180 As will be seen, the proponents of the "minority" position argue that section 502(b)(1) rules out disallowance of claims merely because they are contingent; that must mean that wholly contingent claims--which by their nature have a zero amount on the petition date--are not to be disallowed simply because the contingency has not yet occurred. And allowing them in every case at a zero amount would in fact be to disallow them. If post-petition fees are within the category of contingent claims to be allowed at least in some cases in the amount that turns out to be owed after post-petition occurrence of the contingency, then we may need to harmonize the sections. Thus the first argument does not seem to resolve the issue.

Second, courts that take the "majority" position argue that the Supreme Court's decision in *United Savings Ass'n v. Timbers*  n181 requires disallowance of post-petition fees, except in favor of oversecured creditors:

> In *Timbers,* the Supreme Court held that section 506(b) prohibits an unsecured creditor from collecting postpetition interest: "[s]ince this provision [section 506(b) ] permits postpetition interest to be paid only out of the 'security cushion,' the undersecured creditor, who has no such cushion, falls within the general rule disallowing postpetition interest." *484 U.S. 365, 372-73, 108 S. Ct. 626, 631, 98 L. Ed.2d 740 (1988).* As section 506(b) clearly prohibits an unsecured creditor from recovering postpetition interest, and since section 506(b) speaks identically to attorney's fees as it does to interest, some courts have concluded that the Supreme Court's *Timbers* opinion by implication likewise prohibits the recovery by the unsecured creditor of postpetition attorney's fees.  n182

This argument--stated by Judge Jones in *Pride Companies* as the typical argument made in "majority" position cases rather than as his own argument--has some force; the parallelism between post-petition interest and post-petition fees is striking and will play a key role in the textual argument developed below. But their textual treatment is not quite parallel, as Judge Jones noted later in the opinion. There is a  [*641]  specific section that disallows post-petition interest: section 502(b)(2), which disallows "unmatured interest."  n183 No specific provision disallows post-petition fees. And the Supreme Court in *Timbers,* when it noted, as quoted above, that there is a "general rule disallowing postpetition interest," gave a citation that is omitted from the indented quote: "See *11 U.S.C. § 502*(b)(2)."  n184 Apparently Judge Jones omitted it from the citation because most of the "majority" position cases have not understood how it potentially undermines their argument from *Timbers.* Apparently he wanted to present the argument first and then deal with the potential problem later in the opinion, which he did,  n185 but the force of the argument is substantially weakened.

Third, courts taking the "majority" position argue that section 502(b)'s mandate to determine the amount of a claim "as of the date of the filing of the petition," should be taken seriously, at face value. Post-petition attorneys' fees cannot be part of what is owed on the petition date, before they are incurred. This argument has already been discussed above, in connection with the first argument. It has force, especially given the structural feature that informs much of the Code, the gulf between the pre- and post-petition worlds.  n186 But it could be in conflict with the provisions of the Code that deal with contingent claims; that is discussed above,  n187 and discussed further in section IV.C. below.

The fourth, and typically final, argument made by "majority" position courts is a policy argument.  n188 Of course

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 16 of 150

Page 14

15 Am. Bankr. Inst. L. Rev. 611, *641

the Court in *Travelers* dealt a resounding blow against creation of bankruptcy rules untethered to text, but the majority position policy argument does not stand alone; the first three arguments (and the textual argument develop in section IV.C. below) tether it to the Code's text. Further, it is tethered to basic purposes of the Code that can be gleaned from its overall text. Those policies then can be used to help harmonize the parts of the Code where a potential conflict among Code provisions may create ambiguity. It is also important to see that the bankruptcy laws are a system, a system designed to function for purposes that are more or less clear. It is not always possible for Congress, in creating such a complex system, to avoid using language that if taken in a wooden and literal way--without concern for context, history, and the nature of the system in which the words are to function--will undercut those purposes and make the system dysfunctional. The Court dealt with one such problem in *BFP v. Resolution Trust Corp.* n189 The Court considered the system in which the words of the [*642] fraudulent transfer section, section 548, were to function, including the history of the subject, and reached a sensible result. n190

There is an argument that the need to harmonize sections 502(b), 506(a), and 506(b), on the one hand, with provisions of the Code dealing with contingent claims on the other hand, could create an ambiguity in the Code's meaning, and open up a possibility that the "minority" position would be an acceptable interpretation of the Code. There is in fact a textual argument, developed in section IV.C. below, that should be determinative in establishing the correctness of the "majority" position. Section IV.D. below establishes that the supposed need to harmonize provisions of the Code does not create an ambiguity that would undermine the "majority" position. But if there is ambiguity that cannot otherwise be resolved, it certainly would be proper to consider policy arguments. Those arguments deal with policy concerns that are embedded in many provisions of the Code--concerns for the "practical impact ... on the administration of a bankruptcy case" and for equality of treatment of creditors. n191

There typically are relatively few oversecured creditors in bankruptcy cases. Under the "majority" position, post-petition fees are allowed only in favor of those few creditors (out of the value of their own collateral as the Court in *Timbers* pointed out). n192 Expand that, under the "minority" position, to nearly all the contract creditors in every case, because attorneys' fee clauses are so common, n193 and there could be a serious problem of administration. It seems reasonable to think that Congress would have expected the system to be able to deal with post-petition fee applications from a few oversecured creditors, but unlikely that Congress expected it to have to deal with so many.

The equality concerns are equally real. The Code does not, on its face, discriminate against tort claimants, except that they are not likely to be oversecured creditors entitled to post-petition interest and fees. Thus the Code on its face leaves tort creditors on a level playing field with most contract creditors. The minority [*643] position, if accepted, would put tort creditors (and others without attorneys' fee clauses) at a real disadvantage, especially in cases in which there are substantial assets available to provide value for unsecured claim holders. The contract creditors who have attorneys' fee clauses could be reimbursed for a substantial part of their cost of participating in the case, but tort creditors would not (unless their claims arose under a statute that provided broadly for fees).

As noted, sections C and D of this Part IV show that there is no ambiguity that would require resort to policy arguments in order to support the "majority" position. In any event, there must be ambiguity for the *"minority"* position to be plausible. As section IV explains, only a misunderstanding of section 506(b) (or an overly aggressive reading of the Code's contingent claim provisions that would render them inconsistent with more specific Code provisions dealing with post-petition fees) could create the needed ambiguity. Thus it is important to identify the section 506(b) misunderstanding, in hopes of clearing it up.

*B. The Section 506(b) Misunderstanding: Resolving a Quandary Caused by Acceptance of the "Minority" Position, and Creating a Federal Reasonableness Standard for Pre-Petition Fees*

The misunderstanding is to the effect that section 506(b) has nothing to do with allowing any claim; supposedly only section 502(b) provides for allowance. A careful reading of the text of sections 502(b), 506(a), and 506(b) will act as a powerful corrective; and section IV.C. below shows that in fact it is section 506(b), not 502(b), that allows post-petition fees, where they are allowed (along with post-petition interest, costs and charges). But the

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 17 of 150

Page 15

15 Am. Bankr. Inst. L. Rev. 611, *643

misunderstanding suggests that section 506(b) merely classifies post-petition fees as secured, to the extent they are reasonable (assuming there is sufficient collateral value and that the fees are "provided for under the agreement or State statute under which" the creditor's claim arose).

Under such an approach, section 506(b) can serve double duty with respect to fees claimed by a secured creditor. First, it can classify post-petition fees as secured (or not). Second, it can be used to police the reasonableness of *pre-petition* fees, by classifying them as unsecured to the extent they are recoverable under state law but unreasonable in the view of the court, under a *federal* standard. This attempt to create a vehicle for reviewing the reasonableness of pre-petition fees under a federal standard makes section 506(b) incoherent. That was not its designed function, and its text must be ignored in order to press it into that service.

The problem begins with the Ninth Circuit's 1986 decision in *Joseph F. Sanson Inv. Co. v. 268 Ltd. (In re 268 Ltd.),* n194 an early "minority" position case. An involuntary bankruptcy petition was filed against the owner of real property; the owner then defaulted on the mortgage (technically a deed of trust), and the property was sold for $ 1 million more than the amount of the mortgage. The mortgage  [*644]  provided that the mortgage holder would be entitled to attorneys' fees of 5% of the balance owing, which was almost $ 200,000. The mortgage holder sought that amount in post-petition attorneys' fees under section 506(b), but the bankruptcy court determined that a reasonable fee was only $ 20,000, and thus allowed the mortgage holder's secured claim to be supplemented by only that amount. The district court affirmed, as did the Ninth Circuit, holding that reasonableness was to be determined under federal law, not state law. That holding probably was correct,  n195 but in a curious foreshadowing of its ill-fated 1991 *Fobian* decision, the court stated that "when Congress intended state law standards to apply in bankruptcy it did so explicitly."  n196

The Ninth Circuit then held that the portion of the post-petition fees that had been determined to be unreasonable would be allowable under section 502(b) as an unsecured claim. The court noted that "[w]hen read literally, subsection (b) arguably limits the fees available to the oversecured creditor. When read in conjunction with § 506(a), however, it may be understood to define the portion of the fees which shall be afforded secured status. We adopt the latter reading." n197 Thus the court assigned section 506(b) a function rather than adhering to its text.

The circuit court assumed, with little analysis, that unsecured claim holders could add post-petition fees to their claims, if permitted by state law. The circuit court then argued that "to bar [the oversecured creditor] from seeking the balance of its fees as an unsecured claim would make it worse off in bankruptcy than it would have been if its claim were unsecured." n198 The problem was circular and of the court's own making. By assuming the correctness of the "minority" position on the *United Merchants* issue with regard to unsecured claims, the court placed itself in a quandary. If section 506(b) and not section 502(b) allowed fees to oversecured creditors, then the oversecured creditor could not have the unreasonable portion of its fees (after a determination of reasonableness under a federal standard) allowed as an unsecured claim under section 502(b). But, under the "minority" position, holders of unsecured claims could have post-petition fees allowed so long as they were permitted by state law, even if they would have been unreasonable under a federal standard, because the applicable law under section 502(b) would be state, not federal, law.

To get out of this quandary and satisfy its sense of justice, the court ignored what it recognized to be the apparent meaning of the text of section 506(b). Had the court taken the "majority" position, there would have been no need to ignore the meaning of the text of section 506(b). Oversecured creditors would have been entitled only to reasonable post-petition fees (under a federal standard), and  [*645]  unsecured creditors would not have been entitled to any post-petition fees. There would have been no quandary.

The next step in the misunderstanding was taken in 2001 by the en banc Eleventh Circuit in *Welzel v. Advocates Realty Invs., LLC (In re Welzel).*  n199 In *Welzel,* the court held that the section 506(b) federal reasonableness standard governed not only post-petition attorneys' fees, but also *pre-petition* attorneys' fees to the extent included in a secured claim. Thus pre-petition attorneys' fees that were unreasonable under a federal standard would be demoted from being part of the secured claim to being part of the unsecured claim.

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 18 of 150

Page 16

15 Am. Bankr. Inst. L. Rev. 611, *645

Note that pre-petition fees should be part of the amount of the creditor's claim as of the date of the filing of the petition. Thus they should be allowed under section 502(b) (absent a basis in section 502(b) for disallowing them) and then become part of the creditor's allowed secured claim under section 506(a) to the extent there is sufficient collateral value. Section 502(b)(4) disallows unreasonable fees for services of the debtor's insiders or the debtor's attorneys, but it does not generally disallow fees on a federal reasonableness standard. Thus it seems that debts for pre-petition fees not covered by section 502(b)(4) should be allowable to the extent enforceable under state law, n200 and nothing in section 506(a) would prevent the debts from being considered part of the allowed secured claim. Thus the result in *Welzel* inappropriately extends a federal rule into an area left to state law by the Code.

It is true that section 506(b) does not explicitly describe the fees, costs, and charges with which it deals as *pre-petition* fees, costs, and charges, but the same is true of interest allowable under section 506(b). Explicit reference was unnecessary, because pre-petition interest, fees, costs, and charges enforceable under applicable (usually state) law would already be included in the allowed secured claim pursuant to sections 502(b) and 506(a); thus they would not have to be added under section 506(b). In any event, nothing in the text of section 506(b), or in the relationship among sections 502(b), 506(a), and 506(b), suggests that section 506(b) can operate somehow to demote allowed secured claims, once they have been allowed under sections 502(b) and 506(a).

The court's analysis is in fact very brief for such an important en banc decision. It is apparent that the court thought federal oversight of the reasonableness of attorneys' fees was necessary. The court lost sight of the primacy of state law with regard to allowance of pre-petition claims; it echoed the unfortunate statement from the Ninth Circuit's *268 Ltd.* decision by stating, "when Congress intended for state law to control in the bankruptcy context, it said so with candor." n201 The *Travelers* Court would likely think the Eleventh Circuit got it exactly backwards.

At least three of the four key cases relied upon by the court in *Welzel* do not support its result. *268 Ltd.* involved post-petition fees and did not even hint that [*646] pre-petition secured fees would be subject to section 506(b)'s federal reasonableness requirement. The same is true of *First W. Bank & Trust v. Drewes (In re Schriock Constr., Inc.),* n202 and *Unsecured Creditors' Comm. 82-00261C-11A v. Walter E. Heller & Co. S.E., Inc. (In re K.H. Stephenson Supply Co.).* n203 The fourth case, *Blackburn-Bliss Trust v. Hudson Shipbuilders, Inc. (In re Hudson Shipbuilders, Inc.),* n204 may have involved pre-petition fees; the right to the percentage attorneys' fees (15%) vested pre-petition according to the mortgage document, but the attorneys' services apparently were performed post-petition. The court did not discuss whether the fees were considered to be pre-petition or post-petition, but just applied section 506(b) to set them at a reasonable amount. Further, the court in *Hudson* noted that the same result would be reached under state law. n205 Thus the court in *Welzel* did not seem to be on strong ground when it stated that "[s]uch consistent conclusions among the circuits indicates that our statutory interpretation of *11 U.S.C. § 506*(b) does not stray from the mark." n206 That was true with respect to application of a federal reasonableness standard under section 506(b), but definitely not true with respect to application of section 506(b) to pre-petition attorneys' fees.

The final circuit court misunderstanding of section 506(b) is found in *UPS Capital Business Credit v. Gencarelli (In re Gencarelli).* n207 *Gencarelli* "concern[ed] a commercial lender's right to receive a bargained-for prepayment penalty from a solvent debtor." n208 The prepayment penalty was triggered during the chapter 11 case, when sale of assets yielded enough money to pay creditors, including oversecured creditor UPS Capital, in full. Substantial funds were left over for Gencarelli, but UPS Capital demanded a $ 200,000 prepayment penalty, which was enforceable under state law. The First Circuit treated the prepayment penalty as a fee for purposes of section 506(b). The court held that any part of the prepayment penalty that was unreasonable would have to be paid in any event, because UPS Capital would be entitled to an unsecured claim for the unreasonable part, which would be paid out of the surplus from the sale. The court was convinced that unsecured claim holders would be entitled to recover post-petition fees in such a case involving a solvent debtor, and thought it would defy common sense to deny an oversecured creditor the same right.

The court could have achieved that result by adopting the "minority" position, by noting that section 506(b) allowed a claim for a reasonable prepayment fee as part of UPS Capital's secured claim to the extent of the collateral's value, and then by treating the remainder as a claim allowable under section 502(b) in full because it was enforceable under state

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 19 of 150

Page 17

15 Am. Bankr. Inst. L. Rev. 611, *646

law. That would have been incorrect, because the [*647] "minority" position is incorrect, and it would have involved an implicit misunderstanding of section 506(b). But it would not have done the violence to the Code's text and to the relationships among sections 502(b), 506(a), and 506(b) that the analysis set forth by the court did.

Remarkably, in light of the division of the cases on the *United Merchants* issue, the court stated that "[t]here is universal agreement that whereas section 506 furnishes a series of useful rules for determining whether and to what extent a claim is secured (and, therefore, entitled to priority), it does not answer the materially different question of whether the claim itself should be allowed or disallowed." n209 That is simply incorrect. The cases that take the "majority" position hold that if section 506 does not allow post-petition fees, then they are not allowed. Of course in a sense even the "majority" position courts rely on section 502(b); they note that post-petition fees are not part of the amount of the debt "at the time of the filing of the petition," n210 and therefore are never allowable under section 502(b); the only question for them is whether they are allowable under section 506(b).

The First Circuit embroiled itself in the same circularity that the Ninth Circuit fell into in *268 Ltd.* The First Circuit assumed that unsecured claim holders could obtain post-petition fees, and then had to depart from the text of the Code to make sure that holders of secured claims got treatment at least as favorable:

> We add that disallowing claims in their entirety based on section 506(b) defies common sense. It is apodictic that "unsecured creditors may recover their attorneys' fees, costs and expenses from the estate of a solvent debtor where they are permitted to do so by the terms of their contract and applicable non-bankruptcy law." *Official Comm. of Unsecured Creditors v. Dow Corning Corp. (In re Dow Corning Corp.), 456 F.3d 668, 683 (6th Cir.2006).* Thus, under the statutory scheme envisioned by the debtor (and adopted by the lower courts), unsecured creditors would be permitted to reap the full benefit of their contractual bargains through the medium of section 502, while oversecured creditors would be uniquely singled out for unfavorable treatment by the operation of section 506(b). There is no conceivable explanation as to why Congress might have wanted oversecured creditors to be treated in so draconian a fashion. Creating that sort of uneven playing field would be antithetic to the general policy of the Code, which strongly favors oversecured creditors. n211

The court went on to point out that it thought it was its role to make sure that a solvent debtor did not use the Code to change any of its legal obligations:

> [*648] Let us be perfectly clear. This is a solvent debtor case and, as such, the equities strongly favor holding the debtor to his contractual obligations as long as those obligations are legally enforceable under applicable non-bankruptcy law. n212

These statements of grand principle should be anchored in a persuasive textual analysis, as perhaps they were in *Dow Corning,* n213 rather than in the notion that solvent debtors are not entitled to receive any relief under the Code. The Code contains no requirement that debtors be insolvent; n214 a solvent debtor may nevertheless be in financial difficulty, seek relief under the Code in good faith, n215 and modify the rights of creditors. n216

*C. The Textual Argument for the "Majority" Position and Against the Minority Position's Misunderstanding of Section 506(b)*

Section 502(b) allows or disallows claims without regard to whether they are secured by a lien--without regard to whether they are oversecured, undersecured, or not secured at all. Thus we can see what section 502(b) means, and how it functions, by considering how it works together with sections 506(a) and 506(b) in cases in which the claim is secured at least to some extent by a lien. If, in that context, post-petition attorneys' fees are not allowable under section 502(b), then they also are not allowable under section 502(b) in cases in which the claim is completely unsecured.

In fact, sections 502(b), 506(a), and 506(b) have a plain meaning under which post-petition interest, fees, costs, and charges become part of an allowed claim only as a result of being allowed in favor of an oversecured creditor under

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 20 of 150

Page 18

15 Am. Bankr. Inst. L. Rev. 611, *648

section 506(b). The Code sections work together in a step-wise manner and provide a systematic approach to allowance of claims.  n217

In the first step, section 502(b) provides for a claim to be allowed in an "amount" determined by the court "as of the date of the filing of the petition." For  [*649]  that language to be meaningful, there must be at least some situations in which claims that would grow, under nonbankruptcy law, after the filing of the petition, nevertheless are allowed only in their amount as of the petition filing date, with increased amounts that otherwise would become part of the claim post-petition not being allowed under section 502(b). The remainder of the textual analysis shows that post-petition attorneys' fees fall within that limitation and are not allowed under section 502(b).

The amount of the allowed claim as determined under section 502(b) then is used in section 506(a), in the second step of the Code's systematic approach, which determines the amount of the creditor's secured claim and the amount of the creditor's unsecured claim, if any. Note that section 506(a) refers to "the allowed claim of a creditor," where that claim is secured by a lien or subject to a right of setoff in favor of the creditor. That is an apparent reference to section 502(b), the primary section of the Code that provides for allowance of creditors' claims, and for the determination of the amount in which they are allowed.

In order to determine the amount of the secured claim and the amount, if any, of the unsecured claim, under section 506(a), two amounts must be determined and compared. The amount of the allowed claim must be determined, and the value of the collateral must be determined. Then section 506(a) calls for a comparison of those amounts, with the allowed claim being a secured claim to the extent of the value of the collateral (or right of setoff), and an unsecured claim for the remainder, if any. There simply is nowhere else to get the amount of the allowed claim, other than section 502(b). In addition, section 506(a) provides the standard for valuing the collateral. As the Supreme Court held in *Associates Commercial Corp. v. Rash,* the first sentence of section 506(a) explains what is to be valued, and the second sentence explains how it is to be valued.

Thus section 506(a) takes the amount of the section 502(b) allowed claim and either treats it as wholly secured (if the value of the collateral or amount of the setoff right is equal to or greater than the amount of the allowed claim), or else bifurcates it (if the value of the collateral or amount of the setoff right is less than the amount of the allowed claim.) As a result, section 506(a) deals with every dollar of claim that is allowed under section 502(b).

Section 506(b) then takes the third step. If, under the section 506(a) analysis, the value of the collateral (minus any surcharge on the collateral under section 506(c))  n218 exceeds the allowed amount of the claim, then the creditor is entitled to have allowed to it post-petition interest, and, under appropriate circumstances, reasonable post-petition fees, costs, and charges. Thus section 506(b) provides in such cases for allowance of an additional amount beyond the amount allowed under section 502(b). The clear implication is that post-petition interest, fees, costs, and charges cannot already be part of the section 502(b) claim if they are to be added to it by section 506(b).

 [*650]  It is clear that section 506(b) acts to allow post-petition *interest* to be added to the amount of the section 502(b) secured claim where the creditor is oversecured. Even absent the language of the preamble of section 502(b)--requiring that the amount of the claim be determined as of the petition filing date--the allowed claim under section 502(b) could not already include post-petition interest. Section 502(b)(2) makes plain that no such unmatured interest is allowable under section 502(b). Only some other section, then, could add post-petition interest to the claim, and that is exactly what section 506(b) does, in the case of an oversecured creditor. Section 506(b) does so by providing that such interest "shall be allowed."  n219

Now consider the "reasonable fees, costs, and charges" dealt with by section 506(b). The same three words--not just an identical phrase but the exact same words--describe what section 506(b) does with "reasonable fees, costs, and charges" when the claim is oversecured. The section provides that they "shall be allowed" just as post-petition interest "shall be allowed," so long as they are provided for under the relevant agreement or state statute. Those three words must mean the same thing with regard to such "reasonable fees, costs, and charges" that they mean with respect to

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 21 of 150

Page 19

15 Am. Bankr. Inst. L. Rev. 611, *650

post-petition interest: the "reasonable fees, costs, and charges" are to be added to the claim as determined under section 502(b). n220

Consider the Supreme Court's 1989 decision in *United States v. Ron Pair Enterprises, Inc.* n221 Here is what the Court had to say about the effect of section 506(b):

> The relevant phrase in § 506(b) is: "[T]here shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose." "Such claim" refers to an oversecured claim. The natural reading of the phrase entitles the holder of an oversecured claim to postpetition interest and, in addition, gives one having a secured claim created pursuant to an agreement the right to reasonable fees, costs, and charges provided for in that agreement. Recovery of postpetition interest is unqualified. Recovery of fees, costs, and charges, however, is allowed only if they are reasonable and provided for in the agreement under which the claim arose. Therefore, in the absence of an agreement, postpetition interest is the only added recovery available. n222

[*651] Note that it is section 506(b), limited in effect to "oversecured claim[s]," that both "entitles" the oversecured claim holder to post-petition interest and "gives" the oversecured claim holder the right to fees. Both interest and fees are considered "added recover[ies]"--amounts added by section 506(b). As the Court noted earlier in the opinion, "[s]ection 506(b) allows a holder of an oversecured claim to recover, in addition to the prepetition amount of the claim, 'interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.'" n223 The Court understood the plain meaning of the text: section 506(b) adds interest and (in an appropriate case) n224 fees to the "prepetition amount" of the claim. And of course section 502(b) determines that pre-petition amount; it provides for the amount of the claim to be determined "as of the date of the filing of the petition."

Thus the amount of the secured claim held by oversecured creditors prior to application of section 506(b) cannot include post-petition fees. If it did, then section 506(b) could not add them again (without absurdly allowing them in a double amount), and thus it could not perform the function that its language calls for it to perform.

Because post-petition fees are not allowed by section 502(b) but rather by section 506(b), we are left with the clear conclusion that post-petition fees cannot be allowed in favor of undersecured creditors or wholly unsecured creditors, neither of whom receive any benefit from section 506(b). That conclusion establishes, as a matter of the plain meaning of sections 502(b), 506(a), and 506(b), as they deal with claims, that post-petition fees are not allowable on unsecured claims. It establishes the correctness of the "majority" position.

The alternative analysis urged by some of the courts that take the "minority" position on the *United Merchants* issue is that section 506(b) does not add or allow any amount of claim; all such amounts are added or allowed by section 502(b), and section 506(b)'s function is only to classify such amounts as secured or unsecured. n225 That argument is plainly wrong with respect to post-petition interest, which cannot be allowed under section 502(b), as noted above. It could only be accepted with regard to post-petition fees if there were a basis for interpreting section 506(b) as *adding* post-petition interest but only *classifying* post-petition fees. There is no reasonable interpretation of the three words "shall be allowed" [*652] that would cause them to "allow" post-petition interest but only "classify" post-petition fees.

Further, the notion that section 506(b) only classifies claims that have already been allowed under section 502(b) would defeat the obvious purpose of section 506(b) in many cases, or else lead to an absurd circular application of section 506(b) to no effect. Consider the creditor with a $ 100,000 claim as of the petition date secured by collateral worth $ 106,000. Assume that one year after the petition is filed the court must determine the amount of the allowed secured claim for purposes of plan confirmation. Assume that post-petition interest to that date would be $ 8,000 (an 8% annual rate), and that reasonable post-petition fees provided for under the loan agreement would be $ 7,000. If section 502(b) allows the post-petition fees (but of course not the post-petition interest), as courts that take the minority position

Case 08-13141-BLS   Doc 14046-2   Filed 02/20/15   Page 22 of 150

Page 20

15 Am. Bankr. Inst. L. Rev. 611, *652

argue, then the allowed amount of the claim would be $ 107,000. If the analysis then moves to section 506(a), the claim will be divided into a $ 106,000 secured claim and a $ 1,000 unsecured claim. But if section 506(b) then is used to further determine whether the post-petition fees are secured or unsecured, it seems they must be classified as unsecured; note that the value of the collateral does not exceed the amount of the $ 106,000 allowed secured claim at all, but is just equal to it; thus there is no excess and no basis for classifying post-petition fees as secured!

The result then either would be that section 506(b) would have no function--that it would just leave the $ 6,000 secured claim alone and would have no effect n226 --or that it would reclassify the $ 6,000 in secured claim (for post-petition fees) as unsecured. That would leave the creditor with only a $ 100,000 secured claim, even though the collateral is worth $ 106,000, contrary to what everyone agrees is the purpose of section 506(b). So perhaps then we could reapply section 506(b), now that the allowed secured claim is less than the value of the collateral, and reclassify the $ 6,000 as secured. The incoherence of applying section 506(b) twice just in order to get back to the original result under section 506(a) shows that this interpretation cannot be correct. n227

*D. Five Potential Problems with the "Majority" Position*

There are, however, five potential problems with the majority position that must be considered before the analysis is finished. This section shows that none of them cast serious doubt on the correctness of the majority position as established by the textual argument given in section IV.C.

[*653] First, if it is not proper to interpret section 506(b) so as to be superfluous, then it also cannot be proper to interpret section 502(b)(2) so as to be superfluous. The "majority" position, and the textual analysis provided in Part IV.C. would be subject to criticism if they made section 502(b)(2) superfluous, but they do not. The preamble to section 502(b) disallows post-petition interest, fees, costs, charges, and many other kinds of post-petition increases in the amount of claims. The effect of section 502(b)(2) overlaps the effect of the preamble to some extent with respect to post-petition interest, but it also ensures that unamortized original issue discount is disallowed, even if under nonbankruptcy law it would be considered a recoverable part of the claim as of the petition date, and thus otherwise allowable under section 502(b). n228

Second, though a plain meaning interpretation of sections 502(b), 506(a), and 506(b) may indeed lead to the conclusion that the majority position is correct, perhaps a plain meaning interpretation of section 101(5)(A) and of other sections dealing with contingent claims may lead to the opposite conclusion. In that event there would be a need to harmonize the provisions of the Code, and perhaps the minority position would be tenable. There is, however, no such plain meaning with respect to contingent claims, a subject that, as is shown above n229 --and as will be discussed further in a later article--is murky at best. As others have noted, it is not obvious that a right to post-petition fees should be seen as a contingent claim when its very existence, and its amount, are within the control of the creditor, and not subject to the occurrence of any event other than the creditor's choice. n230 The right to fees--past and future--is indeed a claim as of the petition date, and thus it is discharged, n231 but that does not mean that its allowable amount must be determined as of any date other than the petition date. Fees incurred to that point are part of the allowable amount of the pre-petition claim; fees incurred after that point are not allowable, except as provided by section 506(b).

As we have seen, post-petition fees cannot be treated as allowable contingent claims under section 502(b) without disrupting the operation of sections 502(b), 506(a), and 506(b). Note that section 506(b) deals specifically with post-petition fees. If there were a need to harmonize it with section 101(5)(A), it would control, as the more specific section. In addition, proponents of the "minority" position are unlikely to accept a view that would make post-petition late fees and overlimit fees [*654] on credit cards--perhaps imposed by the credit card issuer's mere making of a notation in its file--into allowable claims that were contingent at the time of the petition filing and then become fixed each month. Such fees are not allowable, n232 but they could be under an overly expansive concept of contingent claims. One approach that would prevent them from being allowed would be to refuse to consider a claim to be contingent where the claim arises solely from the combination of the debtor's failure to pay the debt and a decision taken unilaterally by the creditor; such an approach also would prevent post-petition fees from being seen as contingent

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 23 of 150

Page 21

15 Am. Bankr. Inst. L. Rev. 611, *654

claims. The question whether such an approach or a different one should be taken is the subject of a later article.

Third, a view that post-petition fees may only be allowed under section 506(b) could create difficulties in dealing with claims for indemnity. However, as noted above, n233 and as will be discussed more fully in a later article, claims for post-petition fees that are recoverable as "collateral legal expenses" should not be considered to be section 506(b) "fees." Many situations in which post-petition fees would be part of an indemnity claim would thus not be affected by section 506(b) and could be included as contingent claims, allowable under section 502(b).

Note that the post-petition interest with which section 506(b) deals is described as "interest on such claim." Thus it would be interest that is ancillary to the primary claim. The fees, costs, and charges listed in section 506(b) also should be interpreted to be items that are ancillary to the claim in bankruptcy. For example, Travelers might have become involved in litigation with workers over their entitlement to workers' compensation claims. The fees Travelers incurred in such litigation would properly be considered part of Travelers' primary damages as against PG[E] it would not represent costs of the "instant litigation" with PG&E but rather "collateral legal expense." Suppose Travelers succeeded in the litigation with a worker, so that the appropriate forum determined that the worker was not entitled to workers' compensation benefits (perhaps because the worker's injuries occurred on a weekend ski trip rather than on the job, as the worker had claimed). Travelers would then be owed nothing by PG&E for reimbursement for payments made to the worker (of which there were none), but still would be entitled under its agreement with PG&E to reimbursement of its attorneys' fees in that other litigation. Such fees are not ancillary to Travelers' contingent claim against PG&E, but rather ancillary to the worker's disputed claim against Travelers. They thus should be considered collateral legal expenses, allowable under section 502(b).

Fourth, it seems that all the courts that have considered post-petition fees in the context of a solvent debtor have allowed them to be added to unsecured claims. n234 If the analysis provided above requires rejection of that nearly unanimous authority, it might need to be rethought. Or perhaps courts that have decided to make equitable exceptions to the Code's provisions where the debtor is solvent will need to return [*655] to the provisions of the Code. This issue will be considered more fully in a later article.

However, one basis for allowing such fees in solvent chapter 7 cases is by analogy to the treatment of post-petition interest on unsecured claims. n235 Section 726(a)(5) requires payment of post-petition interest on allowed unsecured claims out of the property of the estate--even though the post-petition interest is not allowed under section 502(b)--before any remaining surplus is distributed to the debtor. Whether courts are authorized to enlarge section 726(a)(5) to include attorneys' fees may be doubted, but the analogy to post-petition interest works in favor of the "majority" rule. Post-petition interest is allowable as part of the creditor's claim under the statutory system created by sections 502(b), 506(a), and 506(b) only in favor of oversecured creditors; if fees are treated analogously, post-petition fees similarly are allowable only in favor of oversecured creditors, and the "majority" position is thus vindicated, even if fees must be paid in some cases by analogy to section 726(a)(5).

There also is an argument in chapter 11 cases that dissenting classes of unsecured claims are entitled, under the intentionally open-ended "fair and equitable" requirement of section 1129(b), n236 to payment of fees where the debtor is solvent. n237 Again, the validity of that argument may be questioned, but it does not undercut the "majority" position; it does not require that post-petition fees be allowed under section 502(b), but only that they be paid as part of the required fair and equitable treatment of a dissenting unsecured claim class. n238

Thus it seems likely that the decisions allowing post-petition fees where the debtor is solvent may, to the extent they are correct, be consistent with the "majority" rule. There does not seem to be such an inconsistency that it would be necessary to consider abandoning the plain meaning of sections 502(b), 506(a), and 506(b).

The fifth potential problem with the majority position would arise if a refusal to allow post-petition fees on unsecured claims would be inconsistent with the pre-Code law, as Congress would have understood it in 1978 when Congress enacted [*656] the Code. n239 It appears, however, that there was only one reported case as of 1978 holding

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 24 of 150

Page 22

15 Am. Bankr. Inst. L. Rev. 611, *656

that post-petition fees would be allowed in favor of an unsecured creditor, and even it can be harmonized with the "majority" position, because it involved collateral legal expenses. Just as a single swallow does not make a spring, a single distinguishable case does not establish a firm practice that Congress would necessarily have thought it had to address explicitly in legislative history. n240 Of course, *United Merchants* n241 was decided after enactment of the Code, though it applied the pre-Code law. n242 It is also significant that the attorneys for the unsecured creditors who sought fees in *United Merchants* conceded that there was no reported case in which such fees had been allowed; had there been a widely-followed [*657] practice of allowing such fees, any concession of this kind would have been qualified, in a way that this concession apparently was not. n243

CONCLUSION

Although the Supreme Court in *Travelers* abrogated the Fobian rule, it left open for consideration all other bases for refusing to allow post-petition fees on unsecured claims. The plain meaning of sections 502(b), 506(a), and 506(b) sets up a system for dealing with claims that precludes allowance of post-petition fees on unsecured claims. This result is not inconsistent with pre-Code practice as it would have been known to Congress at the time the Code was enacted, nor does this result create a conflict with provisions of the Code dealing with contingent claims that would require us to reconsider the result. It also does not cause section 502(b)(2) to be superfluous, though the opposite result--allowing such fees--would render section 506(b) either absurd or largely superfluous.

The confusion with regard to this issue results from a misunderstanding of section 506(b). That misunderstanding has led at least three circuits astray, as they have assigned a function to section 506(b) rather than attending to its text.

Additional exploration remains to be done with respect to several issues, all of which will be addressed in later articles. One issue is whether the allowance of post-petition fees on unsecured claims where the debtor is solvent--as courts routinely have permitted--is supportable on grounds that are consistent with the plain meaning of sections 502(b), 506(a), and 506(b). If not, the courts will need to return to enforcing the Code as written.

A further issue deals with what it means under the Code to describe a claim as contingent. Though the specific sections of the Code dealing with post-petition fees preclude allowance of post-petition fees under section 502(b)--whether or not they otherwise would be considered contingent claims--the conclusions reached in this article would be confirmed if such claims for fees would fail to qualify as "contingent claims" within the meaning of that phrase under the general provisions of the Code.

Another issue deals with the relation between post-petition "collateral legal expenses" and section 506(b). It seems likely that section 506(b) simply does not deal with such expenses, which therefore may be allowed without regard to whether the creditor is oversecured (or secured at all). This conclusion is particularly important for creditors, like Travelers, who seek indemnity, and further work must be done to confirm it.

Finally, there is the question whether the Code preempts state law bases for award of attorneys' fees against debtors in nondischargeability actions. If not, [*658] debtors may be coerced into reaffirming debts that would have been found to be dischargeable, had the debtors dared to litigate the question. Congress sought to avoid that result, but the standards for preemption are strict, and the answer to the question is, at this point, in urgent need of clarification.

**Legal Topics:**

For related research and practice materials, see the following legal topics:
Bankruptcy LawClaimsTypesSecured Claims & LiensSecured Creditors RightsCivil ProcedureFederal & State InterrelationshipsFederal Common LawGeneral OverviewTax LawFederal Estate & Gift TaxesTaxable PropertyGeneral Overview

**FOOTNOTES:**

n1 *See infra* text accompanying notes 5-24, 115-26.

n2 Mr. Brunstad is a contributing editor of COLLIER ON BANKRUPTCY (Alan N. Resnick & Henry. J. Sommer eds., 15th ed. rev.) (2007), and the Macklin Fleming Visiting Lecturer of Law at the Yale Law School.

n3 References in this article to the "Bankruptcy Code" or to the "Code" are to title 11 of the United States Code. Section references are to sections of the Bankruptcy Code unless otherwise noted.

In the usual case a "creditor," as that term is defined in *Bankruptcy Code section 101(10)* and used in this article, will hold a claim that arose before the filing of the bankruptcy petition, a pre-petition claim. As defined in the Code, a "creditor" is a holder of a claim that arose "at the time of or before the order for relief concerning the debtor," section 101(10)(A), or whose claim is treated as having arisen at or before that time, section 101(10)(B), or who holds a "community claim," section 101(10)(C). In a voluntary case, the filing of the bankruptcy petition by an eligible debtor "constitutes an order for relief." *11 U.S.C. § 301* (2006). Voluntary cases make up more than 99.9% of bankruptcy filings, and thus the date of filing of the petition is almost always the same as the date of the order for relief. *See* 2006 Judicial Facts and Figures, http://www.uscourts.gov/judicialfactsfigures/2006/Table702.pdf (last visited Sept. 15, 2007) (showing less than a thousand involuntary petitions filed each year from 2000 to 2006, out of more than a million total filings each year). Thus "creditors" almost always hold pre-petition claims or claims that, under the sections referenced in section 101(10)(B), are treated as if they arose pre-petition. (Holders of "community claims" who are creditors under section 101(10)(C) will be holders of pre-petition claims, because (1) the definition of "community claim" includes the requirement that the claim arose before commencement of the bankruptcy case, see section 101(7), and (2) the case is commenced when the petition is filed, see sections 301, 302, and 303.)

The reference to unsecured creditors includes undersecured creditors here and throughout this article. In the typical case, when the value of the secured creditor's lien is less than the amount of the debt owed to the secured creditor, the secured creditor's claim will be bifurcated into a secured claim for the value of the lien--typically the value of the collateral minus the amount of any senior liens--and an unsecured claim for the remainder of the claim. *See* § 506(a). The Code's terminology centers more on secured and unsecured *claims* than on secured and unsecured *creditors,* in part because an undersecured creditor typically will hold both a secured claim and an unsecured claim. *See* § 506(a). The Code then treats the two claims held by the undersecured creditor separately, requiring different treatment for each. *Compare* § 1129(b)(2)(A) (providing required treatment of dissenting *secured* claim class) *with* § 1129(b)(2)(B) (providing required treatment of dissenting *unsecured* claim class). In some cases, not further discussed in this article, an undersecured creditor's claim may for some purposes be treated as if it were fully secured (see section 1111(b)(2) and the final sentence of section 1325(a)(5)). In addition, a secured creditor may hold an unrelated unsecured claim. Since the same person may be both a secured creditor and an unsecured creditor, a statutory provision requiring that the creditor be classified as one or the other could lack clarity.

n4 As used in this article and as defined in the Code, the debtor is the "person . . . concerning which a case under [the Bankruptcy Code] has been commenced." § 101(13).

n5 *127 S. Ct. 1199 (2007).*

n6 *See Fobian v. W. Farm Credit Bank (In re Fobian), 951 F.2d 1149, 1153 (9th Cir. 1991)* (refusing attorneys' fees award against solvent debtor in favor of undersecured mortgage holder whose mortgage included attorneys' fee clause, because fees were incurred in litigating "solely issues of federal bankruptcy law"), *overruled by Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co., 127 S. Ct. 1199 (2007); see also infra* text accompanying notes 111-57.

n7 *127 S. Ct. 1873 (2007)* (Mem.), *granting certiorari, vacating, remanding, 434 F.3d 1188 (9th Cir. 2006).*

n8 *Travelers, 127 S. Ct. at 1205; DeRoche v. Ariz. Indus. Comm'n (In re DeRoche), 434 F.3d 1188, 1192 (9th Cir. 2006).*

n9 *Alyeska Pipeline Service Co. v. Wilderness Soc'y, 421 U.S. 240, 257 (1975).*

n10 *Id. at 257-59* (discussing common fund rule, and discussing power of courts to award fees for "willful disobedience to a court order" or for actions taken by party "in bad faith, vexatiously, wantonly, or for oppressive reasons" (internal quotations and citations omitted)). The Court in *Alyeska* also noted that in federal cases based on diversity jurisdiction, state law providing for award of attorneys' fees should be followed, absent conflict with a federal statute or court rule. *Id. at 259 n.31.* "[T]he question of the proper rule to govern in awarding attorneys' fees in federal diversity cases in the absence of state statutory authorization loses much of its practical significance in light of the fact that most States follow the restrictive American rule." *Id.* Bankruptcy cases are not based on diversity jurisdiction, but substantive entitlements in bankruptcy usually are determined under state law. *See, e.g., 11 U.S.C. § 502*(b)(1) (2006); *Travelers, 127 S. Ct. at 1204-06.*

n11 In addition, attorneys' fees sometimes are a part of the primary damages that are awarded, rather than being costs awarded for the "instant suit." In such cases, the attorneys' fees are classified as collateral legal expenses. Their recovery is not subject to the American Rule (or, under a less helpful analysis, they are covered by an additional exception to the American Rule). *See* David W. Robertson, *Court Awarded Attorneys' Fees in Maritime Cases: The "American Rule" in Admiralty, 27 J. MAR. L. & COM. 507, 513-16 (1996).* It is possible that such fees simply are not the kind of fees dealt with in section 506(b), and that they should not be subject to the limitations on allowance of section 506(b) fees. *See infra* text accompanying note 233. This subject will be discussed more fully in a later article.

n12 *Travelers, 127 S. Ct. at 1205; DeRoche, 434 F.3d at 1192; cf. Hoopai v. Countrywide Home Loans, Inc. (In re Hoopai), 369 B.R. 506, 511-12 (B.A.P. 9th Cir. 2007)* (considering whether fees should be awarded in favor of over-secured mortgagee under § 506(b) or in favor of debtor, and holding that "the Supreme Court in *Travelers* overruled the Ninth Circuit's *Fobian* rule and made clear that contract-based fees incurred in the course of litigating issues of federal bankruptcy law may be awarded pursuant to state law").

n13 *167 Fed. App'x 593 (9th Cir. 2006).*

n14 As stated above in note 2, references in this article to the Bankruptcy Code or to the Code are to title 11 of the United States Code, and references to sections, unless otherwise noted, are to sections of the Bankruptcy Code.

n15 In a chapter 7 liquidation case, distributions are made on a pro rata (proportional or pari passu) basis to holders of unsecured claims that are of equal priority. Consider two holders of allowed unsecured claims, Alpha with a claim for $ 10,000 and Beta with a claim for $ 40,000. Assume each claim is a general unsecured claim--meaning that neither claim is a section 507(a) priority claim--and assume that neither claim is subordinated to the other (contractually or otherwise under section 510). To the extent there is a distribution to general unsecured claim holders in the chapter 7 case, Beta will receive four times as much as Alpha, because Beta's claim is four times as large. Each will receive the same percentage payment on its claim. *See 11 U.S.C. § 726*(b) (2006). If Alpha and Beta held the only general unsecured claims, and if $ 1,000 were available to be distributed to general unsecured claim holders, then Alpha would be entitled to receive $ 200, and Beta would be entitled to receive $ 800. (Note that Alpha would hold one fifth of the unsecured claims and would receive one fifth of the distribution. Beta would hold four fifths of the unsecured claims and would receive four fifths of the distribution.) The same would hold true in a chapter 11, 12, or 13 case, if Alpha's and Beta's claims were placed in the same class, see sections 1123(a)(4), 1222(a)(3), 1322(a)(3). If their claims were permissibly placed in different classes, then the Code often would prohibit unfairly different treatment of the claims. *See* § 1129(b)(1) (prohibiting unfair discrimination against class that has not accepted plan of reorganization by sufficient majority vote, as described in section 1126(c)); § 1222(b)(1) (prohibiting unfair discrimination against any class of claims except in one identified circumstance); § 1322(b)(1).

n16 If, as is usually the case, the debtor receives a discharge of the unsecured debt, the allowed amount of the debt ordinarily will not matter to the debtor, who will not be liable for it in any case after the discharge. *See, e.g.,* § 524(a). Thus courts often hold that debtors do not have standing to object to allowance of claims. *See 5 COLLIER ON BANKRUPTCY P 502.02*[2][c] (Alan Resnick, et al. eds., 15th ed. rev. 2006); *see also United States v. Jones, 260 B.R. 415, 419 (E.D. Mich. 2000).*

   If the debtor is solvent, so that allowed claims will be paid in full with the surplus going to the debtor under, for example, section 726(a)(6), then the total amount of the allowed claims will affect the debtor, and the debtor would have standing to object. *See White v. Coors Distrib. Co. (In re White), 260 B.R. 870, 875 (B.A.P. 8th Cir. 2001).* Similarly, the debtor will have standing to object to a claim when the debt for which it is filed is nondischargeable if the bankruptcy court may enter a money judgment against the debtor that will be enforceable against the debtor after the bankruptcy case--or if the claims allowance determination would be res judicata in a later collection suit by the creditor. *See Normali v. O'Donnell (In re O'Donnell), 326 B.R. 901* (Table), *No. 04-8054, 2005 WL 1279268,* at *6 (B.A.P. 6th Cir. May 19, 2005). Even if the particular debt for which the claim is filed is not dischargeable, the debtor may have standing to object to the debt if *another* debt is nondischargeable. In such a case the debtor will want as large a distribution as possible to be made in the bankruptcy case on the nondischargeable debt, thus leaving the debtor owing as little as possible after the bankruptcy on that nondischargeable debt. As a result, the debtor would have a financial interest in minimizing the amount of the other allowed claims. *See Mulligan v. Sobiech, 131 B.R. 917, 920-22 (S.D.N.Y. 1991);*

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 28 of 150

Page 26

15 Am. Bankr. Inst. L. Rev. 611, *658

*COLLIER ON BANKRUPTCY, supra note 16, P 502.02*[2][c].

Tax considerations also may come into play. Discharge of debt (without paying it) often constitutes taxable income ("cancellation of debt" income), but it does not if the discharge occurs in a bankruptcy case. *See I.R.C. § 108* (2006); MARK S. SCARBERRY, KENNETH N, KLEE, GRANT W. NEWTON & STEVE H. NICKLES, BUSINESS REORGANIZATION IN BANKRUPTCY: CASES & MATERIALS 731-32 (3d ed. 2006). It is true, however, that cancellation of debt in a bankruptcy case may cause the debtor's "tax attributes" (such as basis in property) to be reduced, which may cause the debtor to pay higher income taxes in the future. *See I.R.C. § 108(b)*; SCARBERRY, KLEE, NEWTON & NICKLES, *supra*, at 732-34. Thus discharge of a larger debt rather than a smaller debt may have negative future tax consequences for the debtor.

n17 *See supra* text accompanying note 6.

n18 *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas and Elec. Co., 127 S. Ct. 1199, 1207 (2007).*

n19 The reference to fees is to the kind of fees that would be allowed to a creditor under section 506(b) if the creditor seeking the fees were oversecured. Fees awarded as damages for collateral litigation expense may not be "fees" within the meaning of the term in section 506(b). *See supra* note 11; *infra* text accompanying note 233.

n20 *Travelers, 127 S. Ct. at 1207-08.*

n21 *United Merchs. & Mfrs., Inc. v. Equitable Life Assurance Soc'y of the United States (In re United Merchs. & Mfrs., Inc.), 674 F.2d 134 (2d Cir. 1982).* United Merchants filed its chapter XI bankruptcy petition before the effective date of the Code; thus it was governed by the old Bankruptcy Act, the Code's predecessor. *See infra* note 33. Two unsecured lenders sought allowance of claims for post-petition attorneys' fees (pursuant to a provision of the loan agreement) and also allowance of liquidated damages for default (equal to the pre-payment penalty that would have been due had the debtor prepaid the loans instead of defaulting). The bankruptcy court allowed the fees but disallowed the liquidated damages. The district court affirmed the disallowance of the liquidated damages, but reversed the allowance of the fees. The Second Circuit reversed the district court, holding that both the fees and the liquidated damages were allowable. With respect to post-petition fees, the Second Circuit rejected a policy argument and held that they were allowable as claims that were contingent as of the petition date, under a 1938 amendment to the old Bankruptcy Act, so long as they were enforceable under state law. The Second Circuit also rejected an argument that the newly enacted Code's section 506(b) suggested a different result, stating in dictum that "[n]either the statute [section 506(b)] nor its legislative history sheds any light on the status of an unsecured creditor's contractual claims for attorney's fees." *See* discussion *infra* Part IV (showing Second Circuit's dictum was incorrect.) The Second Circuit also argued that the Supreme Court's decision in *Security Mortgage Co. v. Powers, 278 U.S. 149 (1928),* indicated that post-petition fees could be allowed in favor of unsecured as well as secured creditors, even though as of 1928 claims that were contingent as of the petition date were not allowable. This is an over-reading of *Security Mortgage.* As a bankruptcy court has pointed out,

[I]n *Security Mortgage Company,* the creditor was fully secured. The language of the Supreme Court to the

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 29 of 150

Page 27

15 Am. Bankr. Inst. L. Rev. 611, *658

effect that the character of the obligation to pay attorney fees presents no obstacle to enforcing it in bankruptcy, either as a provable claim or by way of a lien upon specific property is dicta as to the attorney fees being part of a provable claim. In addition, the Court could have been speaking of attorney fees earned by a creditor's attorney pre-petition in reliance on such a contractual provision. Such attorney's fees have become the obligation of the debtor pre-petition and can be proven like any other indebtedness.

*In re Sakowitz, 110 B.R. 268, 271 (Bankr. S.D. Tex. 1989)* (citation omitted). The Second Circuit also relied on a 1979 Eighth Circuit case dealing with the very different issue whether post-petition fees may be imposed as a personal liability of the debtor on a nondischargeable debt and a 1968 Fifth Circuit case that the Second Circuit incorrectly cited as allowing an undersecured creditor's claim to include post-petition fees. *See Worthen Bank & Trust Co. v. Morris (In re Morris), 602 F.2d 826 (8th Cir. 1979); LeLaurin v. Frost Nat'l Bank of San Antonio, 391 F.2d 687 (5th Cir.), cert. denied, 393 U.S. 979 (1968); infra* text accompanying notes 123-25 (showing that cases dealing with fees on nondischargeable debts are inapposite); *infra* note 172 (discussing *LeLaurin*).

Other articles dealing with *Travelers* or the *United Merchants* issue include: Jennifer M. Taylor & Christopher J. Mertens, *Travelers and the Implications on the Allowability of Unsecured Creditors' Claims for Post-Petition Attorneys Fees Against the Bankruptcy Estate, 81 AM. BANKR. L.J. 123 (2007);* Ralph Brubaker, *Allowance of Attorney's Fees to an Unsecured Creditor (Part II): Wrestling with the Issue Undecided by the Supreme Court,* 27 No. 8 BANKRUPTCY LAW LETTER 1 (August 2007); William P. Weintraub, Fobian *Rule Is a Casualty of* Travelers: *The Supreme Court's Decision Raises New Questions for Bankruptcy Attorneys,* 16 No. 6 BUSINESS LAW TODAY 61 (July/August 2007); Daniel Morman, *Unsecured Claims for Contractual Attorney's Fees Incurred in Bankruptcy Litigation,* 26 No. 6 AM. BANKR. INST. J. 26 (July/August 2007); William C. Heuer, Qmect, Inc.: *Picking Up Where* Travelers *Left Off,* 26 NO. 6 AM. BANKR. INST. J. 32 (July/August 2007); "Erik" Weitung Hsu & David W. Elmquist, *Can an Unsecured Creditor Recover Attorneys Fees? The Question Not Answered in* Travelers, 26 NO. 4 AM. BANKR. INST. J. 10 (May 2007); Michelle Campbell, Carrianne Basler & Kerri Lyman, *The* Travelers *Effect: Case Administration and Creditor Recoveries,* 26 NO. 4 AM. BANKR. INST. J. 28 (May 2007); Goeffrey L. Berman & Peter M. Gilhuly, *Recovering Attorneys' Fees and Costs in Bankruptcy Cases,* 19 AM. BANKR. INST. J. 32 (May 2000); Ray Geoffroy, *Comment, Show Me the Money: The Debate over Creditors' Postpetition Attorneys' Fees, 14 BANKR DEV. J. 425 (1998);* James Gadsden & Seigo Yamasaki, *Recovery of Attorney Fees as an Unsecured Claim, 114 BANKING L.J. 594 (1997);* George W. Kuney, *Claims for Attorney Fees Under the Bankruptcy Code,* 4 J. BANKR. L. & PRAC. 203 (1995); Laura Davis Jones, Gregory K. Wingate, Nancy E. Whinnery & Natalie S. Wolf, *The Indenture Trustee in Chapter 11 Proceedings: Overview of Trustee's Right to Fees and Expenses, and Case Tactics and Strategies,* 399 PLI/REAL 469 (Feb.-March 1994); Liore Z. Alroy & J. Michael Mayerfeld, *Note, Contracted-for Post-Petition Attorneys' Fees and Collection Costs: United Merchants Revisited, 1992 COLUM. BUS. L. REV. 309 (1992).*

n22 *See infra* Part IV.C.

n23 *434 F.3d 1188 (9th Cir. 2006), vacated and remanded, 127 S. Ct. 1873 (2007).*

n24 *434 F.3d 1188, 1191 (9th Cir. 2006).*

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 30 of 150

Page 28

15 Am. Bankr. Inst. L. Rev. 611, *658

n25 *See infra* notes 119-20 and accompanying text.

n26 *See 11 U.S.C. § 523*(d) (2006).

n27 *See Martin v. Bank of Germantown (In re Martin), 761 F.2d 1163, 1167-68 (6th Cir. 1985)* (holding that fees could be awarded against debtor in nondischargeability action, but admitting "[t]he congressional failure to award attorney's fees to prevailing creditors was not accidental," and noting concern of Congress "that creditors were using the threat of litigation to induce consumer debtors to settle for reduced sums, even though the debtors were in many cases entitled to discharge") (citing H.R. REP. NO. 95-595, at 131, *reprinted in* 1978 U.S.C.C.A.N. 5963, 6092).

n28 *See infra* text accompanying notes 33-79.

n29 *See infra* text accompanying notes 80-161.

n30 *See infra* text accompanying notes 162-237.

n31 The argument apparently has not been presented before, at least not in the form in which it is presented here.

n32 *See infra* text following note 243.

n33 National Bankr. Act of 1898, ch. 541, *30 Stat. 544* (as amended) (repealed 1979) ("old Bankruptcy Act"). The old Bankruptcy Act was the statutory scheme in effect before enactment of the Bankruptcy Code by the Bankruptcy Reform Act of 1978, Pub. L. No. 95-598, *92 Stat. 2549 (1978).*

n34 For another statement of the importance of the distinction the Code makes between the pre-petition and post-petition periods see Brief for Respondent [PG&E]. *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co., 127 S. Ct. 1199 (2007) (No. 05-1429) 2006 WL 3825666,* at *26.

n35 *11 U.S.C. § 362*(a)(6) (2006).

n36 *See* § 362(d).

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 31 of 150

Page 29

15 Am. Bankr. Inst. L. Rev. 611, *658

n37 *See* § 362(b).

n38 *Id.*

n39 *Id.;* § 362(a)(1)-(2).

n40 § 362(a)(5).

n41 *Id.* Neither may anyone take "any act to create, perfect, or enforce any lien against property of the estate," whether the debt is pre-petition or post-petition. § 362(a)(4).

n42 § 541(a)(1)-(2).

n43 *See id.;* §§ 541(a)(3)-(4), (6)-(7), 1115, 1207(a)(2), 1306(a)(2); *infra* text accompanying note 58. Note that property of the estate vests in the debtor on confirmation of a chapter 11, 12, or 13 plan absent plan provision or court order to the contrary. §§ 1141(b), 1227(b), 1327(b).

n44 *See* § 552.

n45 *See supra* note 3 (discussing application of term "creditor" as defined in the Bankruptcy Code).

n46 § 501(a), (d).

n47 "Entity" is broader than "person," as those terms are defined in the Code, because it includes governmental units, the U.S. trustee, estates, and trusts, in addition to persons. *See* § 101(15). The term "person" includes individuals, partnerships, and corporations; it also includes governmental units but only for certain specified purposes. *See* § 101(41).

n48 Note that filing of a proof of claim appears under section 502 to be a prerequisite to allowance. The Bankruptcy Rules make that explicit with regard to unsecured claims. *FED. R. BANKR. P. 3002(a)*. In a chapter

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 32 of 150

Page 30

15 Am. Bankr. Inst. L. Rev. 611, *658

9 or 11 case, if the debtor's schedules or list of creditors include a claim, then it is deemed filed, as long as it is not scheduled or listed as "disputed, contingent, or unliquidated." §§ 925, 1111(a).


n49 Debts that arise post-petition but that are treated (under the sections listed in section 101(10)(B)) as having arisen pre-petition also are discharged.


n50 About two thirds of all bankruptcy filings are chapter 7 cases, with chapter 13 cases making up the vast majority of the rest. *See* 2006 Judicial Facts and Figures, *supra* note 3, Table 7.2. Under section 727(b), only debts that arise before the date of the order for relief (which, as noted above in note 2 is the petition date in more than 99.9% of cases), or which are treated as having arisen before that date, are discharged. The chapter 13 discharge covers debts provided for in the plan (or disallowed), which could include post-petition claims that are filed. However, the choice whether to file a post-petition claim belongs to the holder of the claim, not the debtor. *See* § 1305. Few holders of post-petition claims will file them if they are to be discharged rather than paid under the chapter 13 plan. The chapter 11 discharge covers claims that arise before confirmation of the plan, section 1141(d)(1)(A), but most claims that arise post-petition will be administrative expense claims that must be paid in full in the plan rather than discharged. *See* §§ 503(b), 1129(a)(9)(A).


n51 § 502(b).


n52 *See In re Oakwood Homes Corp., 449 F.3d 588, 599-600 (3d Cir. 2006).*


n53 *See, e.g., MacDonald v. First Interstate Credit Alliance, Inc. (In re MacDonald), 100 B.R. 714, 723-24 (Bankr. D. Del. 1989)* (holding, *inter alia,* "cross-collateralization provisions are valid but the omnibus clause is unconscionable" and disallowing undersecured creditor's claim for post-petition late fees and post-petition attorney's fees), *aff'd in part, rev'd in part,* No. Civ. A. 89-369 LON, 1992 WL 12044050, at *1-2 (D. Del. Apr. 13, 1992) (remanding on unconscionability issue, stating with respect to attorneys' fees and late fees issues that bankruptcy court "had applied the appropriate legal standards and [that] its factual findings are not clearly erroneous," but remanding on that issue, as well, in case resolution of unconscionability issue might result in creditor being oversecured and thus potentially entitled to such fees).


n54 *See In re Miller, 344 B.R. 769, 772-73 (Bankr. W.D. Va. 2006); COLLIER ON BANKRUPTCY, supra note 16, P 502.03*[3][b]].


n55 *See 11 U.S.C. §§ 547*(b)(4) & (e), 553 (2006).


n56 *See* §§ 362(b)(3), 544(a)(1), 546(b); U.C.C. § 9-317(a)(2), (e) (2003). Consider two hypothetical cases. (1) Suppose a creditor obtains a judgment and then obtains a writ of execution. The creditor then may levy on

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 33 of 150

Page 31

15 Am. Bankr. Inst. L. Rev. 611, *658

property owned by the judgment debtor. If that property turns out to be goods recently sold to the judgment debtor on secured credit, U.C.C. section 9-317(e) allows the secured party to defeat the creditor's judicial lien, even if the levy occurred before the secured party filed its financing statement, so long as the secured party does so within twenty days after delivery of the goods to the judgment debtor/purchaser. (2) Now suppose that there is no judicial lien creditor but that instead the purchaser files a bankruptcy petition shortly after purchasing the goods on secured credit. Section 544(a)(1) gives the trustee in bankruptcy (or debtor in possession in chapter 11) the rights of a judicial lien creditor who obtained a lien on the goods on the date the petition was filed. If the secured party had not yet filed its financing statement, it might seem that the secured party would lose its lien under section 544(a)(1). But section 546(b) makes the trustee's rights under section 544(a)(1) subject to U.C.C. section 9-317(e), and section 362(b)(3) grants the secured party an exception from the automatic stay so that it can file its financing statement and perfect its security interest. Thus, so long as the secured party files the financing statement within twenty days of the date the debtor received the goods, the secured party does not violate the automatic stay and will prevail over the trustee's section 544(a)(1) judicial lien creditor power.

n57 *See supra* note 50.

n58 § 541(a)(5). Note that in some cases receipt of such property may have been anticipated as of the date of the petition.

n59 *See* § 541(b)(5)-(6), (c)(2).

n60 *See* § 522.

n61 § 541(a)(6).

n62 *See* § 552. Note also that property acquired *by the estate* of course becomes property of the estate. § 541(a)(7). Note that the trustee or debtor in possession operates the business in a chapter 11 case on behalf of the estate using the estate's property, and thus property acquired by the trustee or debtor in possession becomes property of the estate, even if it is not technically rents or proceeds. Even earnings from the debtor's personal services in an individual chapter 11 case become property of the estate. *See* § 1115(a)(2).

n63 *See Dewsnup v. Timm, 502 U.S. 410, 417 (1992)* (holding pre-petition claim holder in chapter 7 case gets benefit of increase if collateral securing debt increases in value post-petition).

n64 § 506(b).

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 34 of 150

Page 32

15 Am. Bankr. Inst. L. Rev. 611, *658

n65 *See Grady v. A.H. Robins, Inc. (In re A.H. Robins, Inc.), 839 F.2d 198, 199 (4th Cir. 1988)* (answering "yes," at least for purposes of automatic stay, because conduct of debtor ultimately causing injury was pre-petition conduct). *But see United States v. LTV Corp. (In re Chateaugay Corp.), 944 F.2d 997, 1004 (2d Cir. 1991)* ("Accepting as claimants those future tort victims whose injuries are caused by pre-petition conduct but do not become manifest until after confirmation, arguably puts considerable strain not only on the Code's definition of 'claim,' but also on the definition of 'creditor'--an 'entity that has a claim against the debtor that *arose* at the time of or before the order for relief concerning the debtor.'" (emphasis supplied by court)).

n66 *See In re Piper Aircraft Corp., 162 B.R. 619, 621* (Bankr. S.D. Fla.) (holding future victims do not have pre-petition claims that could be provided for in chapter 11 plan--even if such future victims would be injured due to the pre-petition manufacture of defective aircraft--because it was impossible to identify a pre-petition relationship between identified persons who would be injured in future and identified defective aircraft that would injure them), *aff'd, 168 B.R. 434 (S.D. Fla. 1994), aff'd, 58 F.3d 1573 (11th Cir. 1995); Piper Aircraft Corp. v. Calabro (In re Piper Aircraft Corp.), 169 B.R. 766 (Bankr. S.D. Fla. 1994)* (holding person injured in crash that occurred during chapter 11 case but that involved an aircraft sold by debtor pre-petition had pre-petition claim); *accord, Epstein v. Official Comm. of Unsecured Creditors (In re Piper Aircraft Corp.), 58 F.3d 1573 (11th Cir. 1995).*

n67 Imagine that the corporation was paid by some of its clients to dispose of toxic wastes secretly, and it did so by dumping them in the basement of its leased headquarters.

n68 The Second Circuit probably would apply something like that test. *See In re Chateaugay Corp., 944 F.2d at 1004-05.*

n69 *See Cal. Dep't of Health Servs. v. Jensen (In re Jensen), 995 F.2d 925, 930-31 (9th Cir. 1993).*

n70 *See Avellini & Bienes v. M. Frenville Co. (In re M. Frenville Co.), 744 F.2d 332, 337 (3d Cir. 1984)* (holding claim was post-petition and seemingly denying existence of contingent tort claims). *Frenville* has been much and deservedly criticized. *See, e.g., In re A.H. Robins, 839 F.2d at 200-03* (declining to follow *Frenville*). Even the *Frenville* court admitted that had there been a contractual indemnity right, the claim for indemnity would have been a pre-petition claim. *744 F.2d at 336-37.*

n71 Attorneys' fees incurred post-petition by the accountants should be allowable, assuming state law would give the accountants the right to recover them. Such post-petition fees are not governed by the American Rule and probably are not the kind of fees referenced in section 506(b). *See* discussion *supra* note 11; *infra* text accompanying note 233.

n72 *See Block v. Tex. Commerce Bank Nat'l Ass'n (In re Midwestern Cos.), 102 B.R. 169, 171 (W.D. Mo. 1989);* SCARBERRY, KLEE, NEWTON & NICKLES, *supra* note 16, at 496.

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 35 of 150

Page 33

15 Am. Bankr. Inst. L. Rev. 611, *658

n73 *See 11 U.S.C. § 101*(5)(A) (2006); *In re Midwestern Cos., 102 B.R. at 171;* SCARBERRY, KLEE, NEWTON & NICKLES, *supra* note 16, at 496.

n74 *See* § 502(e)(1)(B). The debt would be double counted for purposes of distribution, if both the creditor and the guarantor had allowable claims for the amount of the debt; each would receive a distribution. The debtor only received a single loan, and it is unfair to other creditors for a double share to be allocated to it simply because it was a guaranteed debt. *See* SCARBERRY, KLEE, NEWTON & NICKLES, *supra* note 16, at 496-97.

n75 *See* § 502(e)(2); SCARBERRY, KLEE, NEWTON & NICKLES, *supra* note 16, at 497.

n76 § 502(e)(2).

n77 *See supra* text accompanying note 51.

n78 In this regard, consider notes 65-71 above, and the accompanying text.

n79 *See supra* note 53 and accompanying text.

n80 *Travelers Cas. & Ins. Co. of Am. v. Pac. Gas & Elec. Co., 127 S. Ct. 1199, 1202 n.1 (2007).*

n81 *Id. at 1202, 1202 n.1.*

n82 *Brief for Petitioner, Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co., 127 S. Ct. 1199 (2007),* (No. 05-1429), *2006 WL 3387940,* at *8 (noting that court did not require payments).

n83 *Travelers, 127 S. Ct. at 1202.*

n84 *Id.*

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 36 of 150

Page 34

15 Am. Bankr. Inst. L. Rev. 611, *658

n85 *Brief for Petitioner, supra* note 82, at *11. The subrogation rights with regard to the pre-petition workers' compensation claims appear to be of value simply because they likely could be asserted after the bankruptcy case with regard to any right that injured workers would have under the plan against PG&E. Subrogation rights may or may not be claims, and thus may or may not be dischargeable under section 1141(d). *Id.* at 11-12 n.6 (arguing they are not claims); *11 U.S.C. § 509*(c) (2006) (referring to "an allowed claim . . . by way of subrogation under this section"); *Acevedo v. Van Dorn Plastic Mach. Co., 68 B.R. 495, 497 (Bankr. E.D.N.Y. 1986)* (suggesting that "Congress intended an extremely broad definition of 'claim' for bankruptcy administration, which would include a subrogation claim"). Of course, if the rights to which a party seeks subrogation are themselves discharged, it will do the party no good to be subrogated to nonexistent rights. In *Travelers* the workers' claims against PG&E arguably were not discharged, because the plan provided for their class to be unimpaired. *See Brief for Petitioner, supra* note 82, at *14-17. Subrogation rights with respect to nondischargeable debts survive. *See, e.g., Hartford Cas. Ins. Co. v. Fields (In re Fields), 926 F.2d 501, 504-05 (5th Cir. 1991), cert. denied, 502 U.S. 938 (1991); Garton v. Zoglman (In re Zoglman), 78 B.R. 213, 215 (Bankr. W.D. Wis. 1987).* The same should be true of debts that are not discharged because the plan provides for them not to be discharged. In any case, it seems Travelers would have a post-petition right to be subrogated to whatever rights the workers have against PG&E under the plan, to the extent PG&E pays the workers what they are owed by PG&E under the plan. That would follow from the basic principle that one who pays another's debt and is not a volunteer is entitled to subrogation. *See, e.g., In re Zoglman, 78 B.R. at 215.*

The contingent claim that Travelers held for reimbursement of payments that it might make to workers in the future was a claim--a disallowed claim under section 502(e)(1)(B) because it remained contingent--but a claim nonetheless. *See supra* note 73 and accompanying text. That disallowed claim was discharged when PG&E's plan was confirmed, and thus could not be asserted by Travelers afterward. *See* § 1141(d); SCARBERRY, KLEE, NEWTON & NICKLES, *supra* note 16, at 499-500 (discussing right to reimbursement but not subrogation). Although Travelers had the right to seek reconsideration of its disallowed claim for reimbursement in the event it had to pay the workers--which would make the claim no longer contingent to the extent of the payment and thus allowable under section 502(e)(2)--the right to seek reconsideration presumably would terminate on closing of the bankruptcy case, and the court might refuse to reopen the case to allow reconsideration. Thus it appears that its subrogation rights would be the only relatively sure protection for Travelers after closing of the bankruptcy case. Note that subrogation could not entitle Travelers to the benefit of any priority that workers might have asserted for their pre-petition workers' compensation claims, see section 507(d), and that such claims are not, in any event, priority claims. *See Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co., 126 S. Ct. 2105, 2116 (2006).*

n86 *See Brief for Petitioner, supra* note 82, at *12. If the workers failed to file timely claims--that is, if they failed to file claims by the "bar date" set by the court under *Federal Rule of Bankruptcy Procedure 3003(c)(3)*--their claims could be disallowed under section 502(b)(9). In that event Travelers would not have an allowable claim for reimbursement even if it paid the workers, see section 502(e)(1)(A), and its subrogation rights would be worthless, because the workers would have no rights to which Travelers could be subrogated. *See Fed. R. Bankr. P. 3003(c)(2).* Section 501(b) allowed Travelers to file a claim on behalf of the workers, if the workers failed to file their own claims by the bar date. Under *Federal Rule of Bankruptcy Procedure 3005(a)*, Travelers would have had thirty days after the bar date to file claims on behalf of the workers. Neither the Code nor the Rules authorize a party like Travelers to file such a claim on behalf of another party before the bar date.

n87 *Travelers, 127 S. Ct. at 1202.*

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 37 of 150

Page 35

15 Am. Bankr. Inst. L. Rev. 611, *658

n88 *See id.*

n89 *Brief for Petitioner, supra* note 82, at * 16; *Brief for Respondent, supra* note 34, at *3.

n90 *See 11 U.S.C. § 502*(e)(1)(B) (2006); *see also supra* note 85.

n91 *See Brief for Respondent, supra* note 34, at *5.

n92 *See supra* note 85.

n93 The nature of the attorneys' services for which Travelers seeks to have an allowed claim can be gleaned from Travelers' Brief for Petitioner. Here is a summary prepared by the author of this article:

filing of Travelers' proof of claim, filing of proofs of claims of workers injured pre-petition, objection to PG&E's disclosure statement and appearance at hearing on its adequacy, negotiation of language for the disclosure statement and for the plan of reorganization that would leave workers' compensation claims class unimpaired and provide for Travelers to have subrogation rights, opposition to PG&E's objection to Travelers' claim and to Travelers' subrogation rights, objection to the proposed plan of reorganization, negotiations with PG&E to resolve PG&E's objections, filing of amended proof of claim (for attorneys' fees), litigation dealing with PG&E's objection to amended claim (in the bankruptcy court, in the district court, and in the Ninth Circuit), and presumably the litigation in the Supreme Court as well.

*See Brief for Petitioner, supra* note 82, at *10, 12-14, 16, 18-19. Travelers also provided PG&E with a detailed list of the attorneys' services for which it sought fees, by way of exhibits to a letter from Mr. Brunstad. *See Joint Appendix, Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co., 127 S. Ct. 1199 (2007),* (No. 05-1429), *2006 WL 3404627, at 120a-124a.* Note that the Joint Appendix on Westlaw includes the letter but not the exhibits.

n94 *See Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co., 127 S. Ct. 1199, 1203 (2007).*

n95 *Id. at 1203* (quoting *Fobian v. W. Farm Credit Bank (In re Fobian), 951 F.2d 1149, 1153 (9th Cir. 1991)* (citation to appendix to petition for certiorari omitted)).

n96 *Id.; Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co., 167 Fed. App'x 593, 594 (9th Cir. 2006)* (holding "[b]oth the bankruptcy court and the district court correctly denied Travelers' claim for attorney fees").

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 38 of 150

Page 36

15 Am. Bankr. Inst. L. Rev. 611, *658

n97 *See supra* note 23 and accompanying text.

n98 *Travelers, 127 S. Ct. at 1203 n.2.*

n99 The court was bound by the circuit's prior decision in *Fobian* (as a three-judge panel rather than an en banc court) and did not express any doubts about the correctness of the Fobian rule.

n100 *Travelers, 167 Fed. App'x. at 594.*

n101 *Id.* (quoting *Ford v. Baroff (In re Baroff), 105 F.3d 439, 441 (9th Cir. 1997)).*

n102 *Id.* (quoting *Fobian v. W. Farm Credit Bank (In re Fobian), 951 F.2d 1149, 1153 (9th Cir. 1991)).*

n103 *Id.*

n104 For a discussion of the difference between award of fees as "instant suit" costs and as primary damages, see note 11 above, and the text accompanying note 233 below. It is not always necessary to be a "prevailing party" in the matter in which fees are incurred for the fees to constitute a part of a primary damage award. Consider, for example, a retailer held liable in a products liability suit for marketing a defective product made by a manufacturer, where the manufacturer refuses a tender of defense, and where there are no allegations that the retailer is liable for any reason other than that it marketed a product that was defectively manufactured. Even the restrictive approach to implied indemnity for attorneys' fees allows the retailer to recover, from the manufacturer, the fees incurred by the retailer in unsuccessfully defending the products liability suit. *See Piedmont Equip. Co. v. Eberhard Mfg. Co., 665 P.2d 256, 260 (Nev. 1983).*

n105 *See supra* notes 9-10 and accompanying text.

n106 *DeRoche v. Ariz. Indus. Comm'n (In re DeRoche), 434 F.3d 1188, 1191 (9th Cir. 2006).*

n107 *Id.*

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 39 of 150

Page 37

15 Am. Bankr. Inst. L. Rev. 611, *658

n108 *Id.* (quoting *Fobian v. W. Farm Credit Bank (In re Fobian), 951 F.2d 1149, 1153 (9th Cir. 1991)* (citations omitted)).

n109 *Id. at 1192-93.*

n110 *Id. at 1192.*

n111 *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co., 127 S. Ct. 1199, 1202-03 (2007).*

n112 *Id.*

n113 *See supra* text accompanying note 92.

n114 *See supra* text accompanying notes 100, 103.

n115 *Travelers, 127 S. Ct. at 1203.*

n116 *167 F.3d 843 (4th Cir. 1999).*

n117 *Id. at 847.*

n118 *See 11 U.S.C. § 365*(b)(1)(B) (2006).

n119 *See Petition for Writ of Certiorari, Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co., 127 S. Ct. 1199 (2007),* (No. 05-1429), *2006 WL 1272597, at 13.* The petition cites the following circuit court cases to show a split with the Ninth Circuit: *Cadle Co. v. Martinez (In re Martinez), 416 F.3d 1286 (11th Cir. 2005); Three Sisters Partners LLC v. Harden (In re Shangra-La, Inc.), 167 F.3d 843 (4th Cir. 1999); Alport v. Ritter (In re Alport), 144 F.3d 1163 (8th Cir. 1998); Davidson v. Davidson (In re Davidson), 947 F.2d 1294 (5th Cir. 1991); Transouth Fin. Corp. of Fla. v. Johnson, 931 F.2d 1505 (11th Cir. 1991); Jordan v. Se. Nat'l Bank (In re Jordan), 927 F.2d 221 (5th Cir. 1991); Martin v. Bank of Germantown (In re Martin), 761 F.2d 1163 (6th Cir. 1985); Worthen Bank & Trust Co., N.A. v. Morris (In re Morris), 602 F.2d 826 (8th Cir. 1979).*

n120 *See In re Morris, 602 F.2d at 827.*

n121 *See Reply Brief, Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co., 127 S. Ct. 1199 (2007),* (No. 05-1429), *2006 WL 2091677* (arguing that certiorari should be granted, and showing that it was filed on July 25, 2006).

n122 *456 F.3d 668 (6th Cir. 2006), cert. denied, 127 S. Ct. 1874 (2007).*

n123 *Martin v. Bank of Germantown (In re Martin), 761 F.2d 1163 (6th Cir. 1985).*

n124 *See supra* note 119.

n125 *In re Dow Corning, 456 F.3d at 684.*

n126 *Id. at 686.*

n127 *278 U.S. 149, 154 (1928)* ("The character of the obligation to pay attorney's fees presents no obstacle to enforcing it in bankruptcy.").

n128 *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co., 127 S. Ct. 1199, 1203-04 (2007)* (citing COLLIER ON BANKRUPTCY, *supra* note 16).

n129 *Id. at 1204.*

n130 *Id.*

n131 *Id.*

n132 *Id.* (quoting *11 U.S.C. § 502*(b) (2006)).

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 41 of 150

Page 39

15 Am. Bankr. Inst. L. Rev. 611, *658

n133 *Id. at 1204, 1207.*

n134 *See id. at 1207 n.4; cf.* Weintraub, *supra* note 21, at 63 ("The Court's failure to discuss or even note the lead-in language of *Bankruptcy Code section 502(b)* is puzzling.").

n135 *Travelers, 127 S. Ct. at 1204.*

n136 *Id.* (citing *COLLIER ON BANKRUPTCY, supra note 16, at P 502.03*[2][b]).

n137 There are cases involving section 506(b), rather than section 502(b), holding that defenses available outside of bankruptcy are unavailable in bankruptcy. *See, e.g.*, Unsecured Creditors' Comm. 82-00261*C-11A v. Walter E. Heller & Co. S.E., Inc. (In re K.H. Stephenson Supply Co.), 768 F.2d 580, 585 (4th Cir. 1985).* The author is not aware of any such cases under section 502(b). The section of Collier on Bankruptcy to which the Court cited, P 502.03[2][b], states that "[t]he effect of section 502(b)(1) is to make available to the trustee *any* defense to a claim that might have been available to the debtor." *COLLIER ON BANKRUPTCY, supra note 16, at P 502.03*[2][b] (emphasis added). It also states that "[t]he types of defenses that are available to the debtor absent bankruptcy are too numerous and varied to summarize or adequately identify. The trustee can assert any of these defenses." *Id.* It does cite cases (in its footnote 15) that allow the trustee in bankruptcy, in objecting to a claim, to go behind a judgment in a way that a debtor outside of bankruptcy could not.

n138 Note that the Court rejected the Fobian rule as a bankruptcy law basis for disallowing claims precisely because it lacked textual support in the Bankruptcy Code. *See Travelers, 127 S. Ct. at 1206.*

n139 *530 U.S. 15(2000).*

n140 *440 U.S. 48 (1979). Burner* deals with property interests rather than claims, which are property of the *claim holder* but do not ordinarily represent interests in the *debtor's* property, absent a lien, at least under nonbankruptcy law. *See Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc., 527 U.S. 308, 319 (1999); Citizens Bank of Md. v. Strumpf, 516 U.S. 16, 21 (1995)* (holding that bank's refusal to pay debt owed to its depositor was not taking of property from depositor's bankruptcy estate or exercise of control over any such property). Nevertheless, the bankruptcy laws rely heavily on state law with regard to claims, similarly to the way they do with regard to property interests. Note, however, that the Code provides greater protection for property interests than for claims, due to Fifth Amendment concerns, and perhaps other concerns. *See, e.g., Dewsnup v. Timm, 502 U.S. 410, 418-19 (1992).*

n141 *Travelers, 127 S. Ct. at 1205.*

n142 *329 U.S. 156, 161(1946).*

n143 *Travelers, 127 S. Ct. at 1205.*

n144 *Id.*

n145 *Id.*

n146 *Id. at 1206.*

n147 *Id.*

n148 *Id.* (quoting *FCC v. NextWave Personal Communications Inc., 537 U.S. 293 (2003)).* The Court's invocation of the "clearly and expressly" rule probably was a rhetorical flourish designed to show the Court's displeasure with the Ninth Circuit's failure to attend to the Code's text. If an argument based on a provision of the Code had properly been before the Court--an argument that a provision of the Code does call for disallowance of claims like Travelers'--then it is unlikely that the Court would have applied the "clearly and expressly" rule. The Court's point is that when Congress sees a need to create an exception to a provision of the Code to protect concerns such as regulatory authority, Congress does so "clearly and expressly." The FCC asked the Court to read section 525(a) in a way that the Court thought unreasonable, in order to protect its regulatory authority and the effectiveness of its auction process. *See NextWave, 537 U.S. at 301-02, 304.* Reading the Code as the FCC asked, would, on the Court's view, have created a nontextual exception to the Code. When two Code provisions must be harmonized, there is generally no basis for saying that one is the rule and the other is the exception. We could hope that both sections would "clearly and expressly" communicate their meaning, and that those meanings would be consistent. But if we are left unsure as to what they mean or as to how to harmonize them, there is no particular reason to prioritize one provision over another by categorizing one as the rule and the other as the supposed exception.

n149 *Travelers, 127 S. Ct. at 1207.*

n150 *Id.*

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 43 of 150

Page 41

15 Am. Bankr. Inst. L. Rev. 611, *658

n151 *See supra* text accompanying note 21.

n152 *Travelers, 127 S. Ct. at 1207.*

n153 *Id. at 1207, 1207 n.4.*

n154 *Id. at 1207.* For similar reasons the Court also refused to consider PG&E's arguments that Travelers' fees were not incurred for necessary services and that the indemnity agreement did not allow recovery of such fees. *Id. at 1207 n.5.*

n155 *Id. at 1204.*

n156 *Id. at 1206.*

n157 *Id. at 1207-08.*

n158 *See BankBoston, N.A. v. Sokolowski (In re Sokolowski), 205 F.3d 532, 535 (2d Cir. 2000); In re Sheridan, 105 F.3d 1164, 1167 (7th Cir. 1997)* (taking same approach but not citing any Ninth Circuit cases); *see also Agassi v. Planet Hollywood Int'l, Inc., 269 B.R. 543, 553 (D. Del. 2001); In re S.S., 271 B.R. 240, 245 (Bankr. D.N.J. 2002).* The Fobian rule was even presaged in 1981 by the bankruptcy court's decision in *United Merchants,* which was reversed by the Second Circuit. *See 674 F.2d 134, 139 (2d Cir. 1982).*

n159 This issue will be discussed in a later article.

n160 *See supra* text accompanying note 23-24.

n161 *See supra* text accompanying notes 26-27.

n162 *See supra* text at note 21.

n163 This plain meaning argument may not prevent a claimant from including post-petition collateral legal

expenses in an unsecured claim. *See supra* note 11; *infra* text accompanying note 233.

n164 *See* SCARBERRY, KLEE, NEWTON & NICKLES, *supra* note 16, at 78 n.24.

n165 *See UPS Capital Bus. Credit v. Gencarelli (In re Gencarelli), 501 F.3d 1, 6-7 (1st Cir. 2007) (1st Cir. 2007); Official Comm. of Unsecured Creditors v. Dow Corning Corp. (In re Dow Corning Corp.), 456 F.3d 668, 682 (6th Cir. 2006)* (finding arguments against allowance of post-petition fees persuasive but for solvency of debtor); *In re Fast, 318 B.R. 183, 194 n.9 (Bankr. D. Colo. 2004)* (allowing post-petition fees only because case "involve[d] a debtor who concealed assets and a persistent creditor who helped the estate become solvent"); *In re New Power Co., 313 B.R. 496, 510 n.2 (Bankr. N.D. Ga. 2004)* (concluding post-petition fees and costs recoverable under nonbankruptcy law could be added to unsecured claim, holding creditor had right to certain post-petition costs totaling $ 190 but not to attorneys' fees under applicable nonbankruptcy law, and noting "[e]ven if the Court concluded that unsecured creditors may not generally seek payment of attorneys' fees as an unsecured claim, the Court would adopt ... an exception for solvent debtors"); *In re Cont'l Airlines Corp., 110 B.R. 276, 281 (Bankr. S.D. Tex. 1989)* (allowing post-petition fees as matter of policy where estate was solvent, by analogy to entitlement to post-petition interest where estate is solvent); *Liberty Nat'l Bank & Trust Co. v. George, 70 B.R. 312, 317 (W.D. Ky. 1987)* (awarding post-petition fees in case involving solvent debtor but under analysis that did not depend on solvency); *cf. McDonald v. Lorenzo Bancshares, Inc. (In re Lorenzo Bancshares, Inc.), 122 B.R. 270, 273 (Bankr. N.D. Tex. 1991)* (following *Continental* and *Missionary Baptist,* cited below in note 167, and awarding post-petition fees to be recovered ahead of shareholders in event debtor turned out to be solvent before taking fees into account); *In re Carter, 220 B.R. 411, 418 (Bankr. D.N.M. 1998)* (involving solvent debtor and finding *Continental Airlines* analysis persuasive, but limiting allowance of post-petition fees to those incurred in establishing validity and amount of claim, as opposed to those incurred in litigation over value of property to be distributed to creditor under plan).

n166 *See* Joseph F. Sanson Inv. Co. v. 268 Ltd. *(In re* 268 Ltd.), 789 F.2d 674, 677 (9th Cir. 1986); *New Power Co., 313 B.R. 496, 507 (Bankr. N.D. Ga. 2004); In re Byrd, 192 B.R. 917, 919 (Bankr. E.D. Tenn. 1996); In re Indep. Am. Real Estate, Inc., 146 B.R. 546, 556 (Bankr. N.D. Tex 1992); In re Ladycliff Coll., 46 B.R. 141, 143* (Bankr. S.D.N.Y.), *aff'd, 56 B.R. 765 (S.D.N.Y. 1985); In re Ely, 28 B.R. 488, 491-92 (Bankr. E.D. Tenn. 1983); cf. Homestead Partners, Ltd. v. Condor One, Inc. (In re Homestead Partners, Ltd.), Inc., 200 B.R. 274, 277 n.2 (Bankr. N.D. Ga. 1996)* (stating in dictum: "The Court having found no exception to the contrary within section 502(b), the 'shall' language of the section would appear to demand that no such exception be inferred and that the pursuit of post-petition fees be permitted on an unsecured basis."). See also cases cited above in note 165 and below in notes 167, 172, and 176. For a discussion of *In re 268 Ltd.,* see the text below accompanying notes 194-98.

n167 *See Woburn Assocs. v. Kahn (In re Hemingway Transp., Inc.), 954 F.2d 1 (1st Cir. 1992); In re Missionary Baptist Foundation of America, Inc., 24 B.R. 970 (Bankr. N.D. Tex 1982).* This article uses the term "indemnity" as Professor Robertson uses it in his article, cited above in note 11: "[T]he term *indemnity* is used in its modern sense denoting recompense to the indemnitee for exposure to liability, rather than in the older and broader usage simply meaning compensation." Robertson, *supra* note 11, at 536 (footnote omitted).

Case 08-13141-BLS   Doc 14046-2   Filed 02/20/15   Page 45 of 150

Page 43

15 Am. Bankr. Inst. L. Rev. 611, *658

n168 *See supra* note 11; *infra* text accompanying note 233.

n169 *See supra* note 11; *infra* text accompanying note 233.

n170 *See supra* note 11; *infra* text accompanying note 233.

n171 Even before the occurrence of the contingency, a contingent claim may be allowed in an estimated amount, see section 502(c)(1), but that occurred with respect to fees only in one of the cases reviewed by the author, a case decided under the statutory scheme that preceded the Bankruptcy Code. *See infra* note 172, second paragraph; *see also Missionary Baptist, 24 B.R. at 971* (involving filing of estimated contingent claims but no claims allowance process until claims had been amended to reflect actual amounts, after contingent claims had become fixed claims).

n172 *See, e.g., In re Byrd, 192 B.R. 917, 919 (Bankr. E.D. Tenn. 1996); In re Keaton, 182 B.R. 203, 210 (Bankr. E.D. Tenn. 1995), aff'd, 212 B.R. 587 (E.D. Tenn. 1997), vacated as moot, 145 F.3d 1331 (6th Cir. 1998)* (unreported opinion referenced in table, No. 97-6244, text available on Westlaw) (dismissing appeal as moot, vacating district court decision, and remanding with order for district court to vacate bankruptcy court decision). *Byrd* and *Keaton* both rely heavily on *United Merchs. & Mfrs, Inc. v. Equitable Life Assurance Soc'y of the United States (In re United Merchs. & Mfrs., Inc.), 674 F.2d 134 (2d Cir. 1982),* which was decided under the old Bankruptcy Act. *See supra* note 21. At least one other reported case allowed post-petition fees to be added to unsecured claims under the old Bankruptcy Act. *See Worthen Bank & Trust Co. v. Morris (In re Morris), 602 F.2d 826, 829 (8th Cir. 1979); cf. LeLaurin v. Frost Nat'l Bank of San Antonio, 391 F.2d 687, 691 (5th Cir. 1968), cert. denied, 393 U.S. 979 (1968).*

In *LeLaurin,* a bankruptcy referee, in a case governed by the old Bankruptcy Act, had allowed an addition of $ 25,000 in post-petition attorneys' fees to the bank's unsecured claim, which was the referee's estimate of the bank's anticipated reasonable attorneys' fees recoverable under an attorneys' fee clause. *Id.* After the bankruptcy distributions were complete, the bank had received no more than $ 2,930 on account of the $ 25,000 increase in its unsecured claim. *Id.* The bank paid its attorney only $ 2,500, leaving it with about $ 430 of the amount received from the estate on account of the estimated fees. *Id.* The bank sued the attorney in state court seeking a declaration of the amount owed the attorney. *Id. at 690.* The attorney then sued the bank in federal court, claiming that he should be paid the full $ 25,000. *Id.* Holding that the award of $ 25,000 was not res judicata against the bank with regard to the amount of the fees, the Fifth Circuit affirmed the district court's decision to allow the state court to determine the amount of the fees, and to require the bank to return to the estate any part of the $ 430 that it was not required, by the state court, to pay to the attorney. *Id. at 689, 692. LeLaurin* is some evidence of a practice of allowing post-petition fees on unsecured claims, but it does not appear that the issue of the propriety of such an allowance was before either the district court or the Fifth Circuit in the attorney's suit. *See Pride Cos. v. Johnson (In re Pride Cos.), 285 B.R. 366, 371 n.2 (Bankr. N.D. Tex. 2002); In re Sakowitz, 110 B.R. 268, 274 (Bankr. S.D. Tex. 1989).*

n173 *See Finova Group, Inc. v. BNP Paribas (In re Finova Group, Inc.), 304 B.R. 630, 638 (D. Del. 2004); In re Hedged Invs. Assocs., Inc., 293 B.R. 523, 527-28 (D. Colo. 2003)* (affirming disallowance of undersecured

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 46 of 150

Page 44

15 Am. Bankr. Inst. L. Rev. 611, *658

creditor's claim for post-petition fees, finding reasoning in *Sakowitz* "compelling," but also discussing and perhaps relying partially on Fobian rule); *In re Elec. Mach. Enters., 371 B.R. 549, 554 (Bankr. M.D. Fla. 2007)* (deciding the issue *post-Travelers); In re Miller, 344 B.R. 769, 771-73 (Bankr. W.D.Va. 2006); In re Loewen Group, Int'l, Inc., 274 B.R. 427, 443-44 (Bankr. D. Del. 2004)* (overruled on other grounds), *In re Oakwood Homes Corp., 449 F.3d 588 (3d Cir.), cert. denied, 127 S. Ct. 736 (2006); In re Marietta Farms, Inc., No. 02-41044-11, 2004 WL 3019360, at *2-3 (Bankr. D. Kan. Nov. 15, 2004); In re Kindred Healthcare, Inc., Nos. 99-3199 (MFW), 99-3327 (MFW), 2003 WL 22000598, at *3 (Bankr. D. Del. Aug. 18, 2003); Pride Cos. v. Johnson (In re Pride Cos.), 285 B.R. 366, 377 (Bankr. N.D. Tex. 2002); Chemical Bank v. First Trust of N.Y. Nat'l Ass'n (In re Southeast Banking Corp.), 188 B.R. 452, 464 (Bankr. S.D. Fla. 1995), aff'd., 212 B.R. 682 (S.D. Fla. 1997)* (holding bankruptcy court's rejection of allowance of post-petition fees was correct), *rev'd on other grounds and question certified, 156 F.3d 1114 (11th Cir. 1998); In re Woodmere Investors Ltd. P'ship, 178 B.R. 346, 355-56 (Bankr. S.D.N.Y. 1995); In re Saunders, 130 B.R. 208, 213-14 (Bankr. W.D. Va. 1991); In re Sakowitz, 110 B.R. 268, 275 (Bankr. S.D. Tex. 1989); Woerner v. Farmers Alliance Mut. Ins. Co. (In re Woerner), 19 B.R. 708, 713 (Bankr. D. Kan. 1982); cf. Adams v. Zimmerman, 73 F.3d 1164, 1177 (1st Cir. 1996)* (determining post-petition fees are not allowable on unsecured claims in bankruptcy, concluding FDIC bank insolvency context is analogous to bankruptcy context, and therefore refusing to award post-insolvency attorneys' fees against FDIC in bank insolvency proceedings); *In re Waterman, 248 B.R. 567, 573 (B.A.P. 8th Cir. 2000)* (stating, probably in dictum, that post-petition fees are not allowable); *In re Plymouth House Health Care Ctr., No. 03-19135, 2005 WL 2589201, at *5 (Bankr. E.D. Pa. Mar. 15, 2005)* (stating, in dictum or perhaps as part of *ratio decidendi* that post-petition fees are not allowable).

n174 *See supra* note 165.

n175 *See supra* note 158.

n176 One court within the Ninth Circuit has come down on the "minority" side *post-Travelers,* holding that post-petition fees are allowable on unsecured claims. *See In re Qmect, Inc., 368 B.R. 882, 888 (Bankr. N.D. Cal. 2007).*

n177 *See Elec. Mach. Enters., 371 B.R. at 550-52; In re Pride Cos., 285 B.R. at 372.*

n178 *See supra* note 148 and accompanying text.

n179 For a similar argument, but one that, happily in the author's view, does not rely on the "clearly and explicitly" rule, see *In re Miller, 344 B.R. 769, 773 (Bankr. W.D.Va. 2006).*

n180 *See supra* note 148.

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 47 of 150

Page 45

15 Am. Bankr. Inst. L. Rev. 611, *658

n181 *484 U.S. 365 (1988).*

n182 *In re Pride Cos., 285 B.R. at 373* (alterations in original).

n183 *See 11 U.S.C. § 502*(b)(2) (disallowing unmatured interest); *In re Pride Cos., 285 B.R. at 375.* There is an argument, however, that section 502(b)(2) was not necessary to the disallowance of post-petition interest in general but rather just to disallowance of the kind of post-petition interest called unamortized original issue discount. *See infra* note 54 and accompanying text.

n184 *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., 484 U.S. 365, 373-74 (1988).*

n185 *See In re Pride Cos., 285 B.R. at 375.*

n186 *See supra* Part II, text accompanying notes 33-79.

n187 *See supra* text following note 180.

n188 *See, e.g., In re Pride Cos., 285 B.R. at 373-74.*

n189 *511 U.S. 531 (1994).*

n190 In fact (to continue with the fraudulent transfer example) a wooden, ahistorical, plain-meaning interpretation of section 548 could lead to most tort claims (and perhaps all nonrestitutionary claims) being eliminated in bankruptcy. After all, if an insolvent debtor receives less than reasonably equivalent value in exchange for taking on an obligation, the obligation is voidable under section 548(a)(1)(B), and that is the rule even for the involuntary incurring of an obligation, see section 548(a) (applying to obligations incurred "voluntarily or involuntarily"), which might well describe the obligation taken on when a negligent driver runs over someone in a crosswalk. Only a sadistic driver would even arguably derive any value from running over the victim. But the Code of course contemplates the allowance of tort claims, see sections 507(a)(10), 524(g)-(h), and this wooden interpretation of the language of section 548 would be unreasonable.

n191 *In re Elec. Mach. Enters., Inc., 371 B.R. 549, 551-53 (Bankr. M.D. Fla. 2007). See Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co., 126 S. Ct. 2105, 2109, 2117 (2006)* (noting, in both majority and dissenting opinions, Bankruptcy Code's policy of equality of distribution among creditors, at least, according to dissent,

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 48 of 150

Page 46

15 Am. Bankr. Inst. L. Rev. 611, *658

among similarly situated creditors).

n192 *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., 484 U.S. 365, 374 (1988).*

n193 Such clauses would quickly be expanded to cover bankruptcy litigation, to the extent their language may not at present. *See* Brief in Support of Respondent for *Amici Curiae Professors Richard Aaron, Jagdeep S. Bhandari, Susan Block-Lieb, Ralph Brubaker, Erwin Chemerinsky, S. Elizabeth Gibson, Kenneth N. Klee, Robert M. Lawless, Nancy B. Rapoport & Ettie Ward, Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co., 127 S. Ct. 1199 (2007),* (No. 05-1429), *2006 WL 3805866,* at *18-19.

n194 *789 F.2d 674 (9th Cir. 1986).*

n195 *See First W. Bank & Trust v. Drewes (In re Schriock Constr., Inc.), 104 F.3d 200, 202 (8th Cir. 1997).*

n196 *In re 268 Ltd.,* 789 F.2d at 677.

n197 *Id.* at 678.

n198 *Id.* Consider also the Supreme Court's rejection in *Timbers* of a similar argument; the Court noted that if the holder of a secured claim were not treated as well under the Code as the holder of an unsecured claim, the secured claimant could always waive the lien. *See 484 U.S. 365, 379 (1988).*

n199 *275 F.3d 1308 (11th Cir. 2001)* (en banc).

n200 *See Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co., 127 S. Ct. 1199, 1206 (2007).*

n201 *Welzel, 275 F.3d at 1315.*

n202 *104 F.3d 200 (8th Cir.1997).*

n203 *768 F.2d 580 (4th Cir. 1985).*

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 49 of 150

Page 47

15 Am. Bankr. Inst. L. Rev. 611, *658



n204 *794 F.2d 1051 (5th Cir. 1986).*

n205 *Id. at 1059 n.7.*

n206 *Welzel, 275 F.3d at 1315.*

n207 *501 F.3d 1 (1st Cir. 2007).*

n208 *Id.*

n209 *Id. at 5.*

n210 *11 U.S.C. § 502*(b) (2006).

n211 *In re Gencarelli, 501 F.3d at 6.*

n212 *Id. at 7.*

n213 *See Official Comm. of Unsecured Creditors v. Dow Corning Corp. (In re Dow Corning Corp.), 456 F.3d 668, 671-72 (6th Cir.2006)* (noting creditors held claims in class that had rejected plan, thus invoking fair and equitable standard, which, by its terms, includes but is not limited to explicit requirements of section 1129(b), creating possibility that allowance of fees could be required in such cases as part of fair and equitable standard).

n214 *See* § 109.

n215 The First Circuit itself so held only two months before deciding *Gencarelli. See Fields Station LLC v. Capitol Food Corp. (In re Capitol Food Corp.), 490 F.3d 21, 25-26 (1st Cir. 2007).*

n216 *See* SCARBERRY, KLEE, NEWTON & NICKLES, *supra* note 16, at 62-63.

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 50 of 150

Page 48

15 Am. Bankr. Inst. L. Rev. 611, *658

n217 PG&E presented a similar, but incomplete, argument in its Brief for Respondent in *Travelers. Brief for Respondent, supra* note 34, at * 18-19. Professor Brubaker pieces together a somewhat similar argument from the arguments made in the "majority" position cases. *See* Brubaker, *supra* note 21 and text accompanying Brubaker's footnotes 61-76.


n218 *See* § 506(b)--(c).


n219 *See* Taylor & Mertens, *supra* note 21, at 151.


n220 *See* Brubaker, *supra* note 21, text in paragraph following paragraph at Brubaker's footnote 67.


n221 *489 U.S. 235 (1989).*


n222 *Id. at 241.* Note that section 506(b) was amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, section 712(d), *119 Stat. 99,* to provide for reasonable fees, costs, and charges not only if the agreement under which the claim arose so provides, but also if the state statute under which the claim arose so provides.


n223 *Ron Pair, 489 U.S. at 239-40.*


n224 The Court's decision has been criticized--by the dissenters in the case, among others--for relying on punctuation to distinguish between interest, on the one hand, and reasonable fees, costs, and charges, on the other. *See id. at 249-52; see also* Daniel J. Bussel, *Textualism's Failures:A Study of Overruled Bankruptcy Decisions, 53 VAND. L. REV. 887, 894-97 (2000).* It does not matter for purposes of this article whether the Court correctly relied on the placement of commas or correctly held, under the version of section 506(b) then in effect, that interest could be allowed under section 506(b) even absent an agreement for payment of interest. The point is simply that the Court recognized that section 506(b), to the extent applicable, adds interest and fees to the previous amount of the claim; it does not classify a previously allowed claim.


n225 *See, e.g., UPS Capital Bus. Credit v. Gencarelli (In re Gencarelli), 501 F.3d 1, 5-6 (1st Cir. 2007); In re New Power Co., 313 B.R. 496, 507-09 (Bankr. N.D. Ga. 2004).*


n226 If the $ 6,000 fee would be recoverable under non-bankruptcy law but unreasonable under federal bankruptcy standards, then section 506(b) could make a part of it not allowable as a secured claim. *See*

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 51 of 150

Page 49

15 Am. Bankr. Inst. L. Rev. 611, *658

Brubaker, *supra* note 21, text accompanying Brubaker's footnotes 73-76. That would not eliminate the incoherent results noted in the rest of the paragraph.

n227 Arguments that the "minority position" makes section 506(b) superfluous have long been made by "majority" position courts. *See, e.g., In re Saunders, 130 B.R. 208, 210 (Bankr. W.D. Va. 1991).*

n228 *See supra* note 54; *supra* text accompanying notes 51-54.

n229 *See supra* text accompanying notes 65-79.

n230 *See, e.g., Brief for Respondent, supra* note 34, at *16.

n231 *See In re* Kindred Healthcare, Inc., Nos. 99-3199(MFW), 99-3327 (MFW), *2003 WL 22000598,* at *4 (Bankr. D. Del. 2003) (holding claim for post-petition attorneys' fees was not allowable but was discharged). Similarly, late fees imposed due to failure to make unsecured credit card payments during a bankruptcy case are not allowable, yet no serious claim has ever been made that they are not discharged. *See supra* note 53 and accompanying text. In addition, to the extent fees are ancillary to a discharged debt, they would be discharged. *See Klingman v. Levinson, 831 F.2d 1292, 1296 (7th Cir. 1987)* (quoting earlier Eighth Circuit case for proposition that "[a]ncillary obligations such as attorneys' fees and interest may attach to the primary debt; consequently, their status [whether or not they are discharged] depends on that of the primary debt").

n232 *See supra* note 53 and accompanying text, note 228.

n233 *See supra* note 11, text accompanying notes 167-70.

n234 *See supra* note 165.

n235 *See, e.g., In re Cont'l Airlines Corp., 110 B.R. 276, 279-80 (Bankr. S.D. Tex 1989).*

n236 *See* Kenneth N. Klee, *Cram Down II, 64 AM. BANKR. L.J. 229, 230-31 (1990)* (noting text of section 1129(b)(2), judicial opinions construing it, and legislative history all show that explicit requirements of section 1129(b)(2)--which, according to that section, are "included" within meaning of "fair and equitable"--do not exhaust phrase's meaning).

15 Am. Bankr. Inst. L. Rev. 611, *658

n237 *See Official Comm. of Unsecured Creditors v. Dow Corning Corp. (In re Dow Corning Corp.), 456 F.3d 668, 683 (6th Cir. 2006).*

n238 There are well-established uncodified requirements of the fair and equitable standard. One of them requires that a bonus distribution be made, in addition to distributions that provide full present-value payment of the amount of the allowed unsecured claims in a dissenting class. Full present value plus a bonus must be given where the plan (1) deprives a dissenting class of seniority rights that it previously enjoyed and (2) provides for a distribution to junior parties, including the debtor or the debtor's stockholders. *See* Kenneth N. Klee, *Cram Down II, 64 AM. BANKR. L.J. 229, 232-34 (1990);* SCARBERRY, KLEE, NEWTON & NICKLES, *supra* note 16, at 871, 879.

n239 *See, e.g., Cohen v. de la Cruz, 523 U.S. 213, 221 (1988)* (stating "[w]e, however, 'will not read the Bankruptcy Code to erode past bankruptcy practice absent a clear indication that Congress intended such a departure'" (citation omitted)).

n240 For a careful discussion of the pre-Code history, see Brubaker, *supra* note 21, text accompanying Brubaker's footnotes 41-59.

n241 *Id.*

n242 In its petitioner's brief, Travelers argued that there was such a practice. *See Brief for Petitioner, supra* note 82, at 43-44. However, only one of the cases cited by Travelers (other than *United Merchants*) allowed post-petition fees in favor of what apparently was an unsecured creditor. *See Hartman v. Utley, 335 F.2d 558, 560-61 (9th Cir. 1964).* In that case a surety sought attorneys' fees incurred "in satisfying its obligation under the bond," fees which should be considered allowable collateral legal expenses without regard to the *United Merchants* issue. *See supra* note 11, text accompanying note 233. In fact, the district court in *United Merchants* distinguished *Hartman* on essentially that ground:

  *Hartman v. Utley (9th Cir. 1964) 335 F.2d 558,* from which claimants extensively quote (and which [Bankruptcy] Judge Babitt found to be 'tangentially relevant') has in fact no relevance at all to the problem before us. The attorney's fees there at issue had nothing to do with processing a claim in a court of bankruptcy. They had been incurred by the claimants, who had gone surety for the bankrupt, in defending (or otherwise processing) claims that had been made against it by other creditors of the bankrupt.

  *In re United Merchs. & Mftrs., Inc., 10 B.R. 312, 315 n.3 (S.D.N.Y. 1981), rev'd, 674 F.2d 134 (2d Cir. 1982).* The Second Circuit in *United Merchants* also apparently did not believe that *Hartman* directly supported the allowance of attorneys' fees on unsecured claims; it cited *Hartman* only in a footnote and only with a "cf." *United Merchs., 674 F.2d at 138 n.5.*

  The other cases cited by Travelers on this point were: (1) a 1983 Eleventh Circuit decision applying the pre-Code law to allow fees that had vested pre-petition, *Mills v. East Side Investors (In re East Side Investors);*

(2) a 1976 Second Circuit case in which a secured creditor who may have been oversecured was allowed fees incurred "protecting its interest as a secured creditor," *James Talcott, Inc. v. Wharton (In re Continental Vending Machine Corp.);* (3) a 1967 Third Circuit case in which the court of appeals held that the creditor's lien on equipment had been properly perfected and thus, as the trustee in bankruptcy apparently had conceded would be proper if the lien were valid, allowed post-petition fees in favor of the apparently oversecured creditor, *who was to receive payment of its claim, including post-petition fees, out of proceeds of sale of the collateral, In re Ferro Contracting Co.;* (4) a 1938 Second Circuit case allowing attorneys' fees to be included in the lien of an oversecured chattel mortgage holder, *Mesard v. Ullmann (In re American Motor Prods.);* and (5) a similar district court case, *In re Schafer's Bakeries. See East Side Investors, 702 F.2d 214, 215 (11th Cir. 1983); Continental Vending Mach. Corp., 543 F.2d 986, 994-96 (2d Cir. 1976); Ferro Contracting Co., 380 F.2d 116, 119-120 (3d Cir. 1967); Am. Motor Prods., 98 F.2d 774, 775 (2d Cir. 1938); Schafer's Bakeries, 155 F. Supp. 902, 907 (E.D. Mich. 1957).* Travelers also cited *LeLaurin v. Frost Nat'l Bank of San Antonio,* which did not hold that post-petition fees were allowable on unsecured claims, though it shows that one bankruptcy judge did allow such fees. *391 F.2d 687 (5th Cir. 1968), cert. denied, 393 U.S. 979 (1968); see supra* note 172.


n243 The district court in *United Merchants* reversed the bankruptcy court's allowance of fees (and in turn was reversed by the Second Circuit). The district court noted that "[a]s Judge Babitt [the bankruptcy judge] and the claimants concede, not a single decision has been found allowing an unsecured creditor to assert such a claim." *United Merchs., 10 B.R. 312, 315 n.3 (S.D.N.Y. 1981), rev'd, 674 F.2d 134 (2d Cir. 1982).*



Copyright (c) 2007 National Conference of Bankruptcy Judges
The American Bankruptcy Law Journal

Spring, 2007

*81 Am. Bankr. L.J. 123*

**LENGTH:** 22041 words

ARTICLE: Travelers and the Implications on the Allowability Of Unsecured Creditors' Claims for Post-Petition Attorneys' Fees Against the Bankruptcy Estate

**NAME:** by Jennifer M. Taylor and Christopher J. Mertens*

**BIO:** * At the time of writing, both Authors were law clerks for the Honorable Leslie Tchaikovsky, United States Bankruptcy Court Judge for the Northern District of California. Jennifer Taylor is now an associate in the San Francisco office of O'Melveny & Myers LLP. The Authors would like to thank Judge Tchaikovsky for her support throughout the writing of this Article.

**LEXISNEXIS SUMMARY:**
 ... By taking a closer look at the origins of the Fobian Rule and looking into the plain language of the Bankruptcy Code in light of Congressional intent and longstanding principles governing bankruptcy proceedings, the Authors complete the allowability analysis the Supreme Court left unfinished in Travelers.  ... Reliance on this misconceived dichotomy became a bright-line rule that failed to account for both a party's rights to attorneys' fees under applicable nonbankruptcy law and a creditor's right to attorneys' fees as a potential claim against the bankruptcy estate.  ... Similar to the Oregon reciprocal fees statute in Fulwiler, the debtor in Sparkman sought fees pursuant to a California statute allowing for reciprocally enforceable attorneys' fees if the contract specifically provided for attorneys' fees to either party.  ... Travelers' holding that an unsecured creditor's contract-based claim for attorneys' fees was not disallowed "based solely on the fact that the fees at issue were incurred litigating issues of bankruptcy law" does not resolve the issue of whether unsecured creditors are entitled to post-petition fees as a general matter.  ... Moreover, one could argue that, if all creditors are entitled to recover post-petition attorneys' fees as a claim against the estate, the portion of § 506(b) that allows oversecured creditors' claims for post-petition fees is superfluous.

**TEXT:**
 [*123]

   INTRODUCTION

 The Supreme Court in Travelers Casualty & Surety Co. of America v. Pacific Gas & Electric Co. n1 recently put to rest the Fobian Rule, n2 which concerned the allowability of an unsecured creditor's claim for post-petition attorneys' fees in bankruptcy proceedings. n3 Under the Fobian Rule, a construct of the Ninth Circuit, courts distinguished between fees incurred litigating state law issues in bankruptcy proceedings and attorneys' fees incurred litigating bankruptcy issues in those cases, allowing the fees if they related to a valid state law or contract claim, and disallowing them if they related

solely to bankruptcy issues.

Finding no basis in the Bankruptcy Code n4 for this distinction, the Court struck down the Fobian Rule. Significantly, the Court raised but did not answer the question of the ultimate allowability of an unsecured creditor's [*124] claim for post-petition attorneys' fees against the bankruptcy estate. The Supreme Court did, however, leave clues as to how it might analyze the issue.

In this Article, the Authors piece together these clues, along with hints found in other precedent. Picking up the trail where the Court left off requires recognition of an important distinction in bankruptcy law recognized by Travelers - validity of a claim is a concept separate from allowability of a claim. The Supreme Court tells us in Travelers that while an unsecured creditor's claim for post-petition attorneys' fees may be valid under state law or contract, allowability of a claim asserted against a bankruptcy estate is a matter of federal bankruptcy law. In fact, it was likely confusion of this distinction that led to the creation of the Fobian Rule.

By taking a closer look at the origins of the Fobian Rule and looking into the plain language of the Bankruptcy Code in light of Congressional intent and longstanding principles governing bankruptcy proceedings, the Authors complete the allowability analysis the Supreme Court left unfinished in Travelers. Part I outlines the Supreme Court's Travelers decision, summarizes the arguments made before the lower courts and Supreme Court, and discusses the Court's reasoning. Part II discusses Fobian, the misconception that led to the subsequent creation and entrenchment of the Fobian Rule, and how the Court's treatment in Travelers of the origins of the Fobian Rule illuminates the distinct steps of the proper claims analysis that were improperly merged under the Fobian Rule. Not only must a claim for fees be valid under state statute or contract, but a claim against a bankruptcy estate - specifically an unsecured creditor's claim for post-petition attorneys' fees against a bankruptcy estate - is subject to an allowability determination under federal bankruptcy law. Finally, Part III completes the allowability analysis the Court began in Travelers.

In concluding that the Supreme Court should and likely will determine that an unsecured creditor's claim for post-petition attorneys' fees is disallowed as a claim against the bankruptcy estate, the Authors focus primarily on the Supreme Court's treatment of the plain language of *§ 506(b) of the Bankruptcy Code*, Congressional intent, longstanding bankruptcy practices, and policy considerations.

I. TRAVELERS CASUALTY & SURETY COMPANY OF AMERICA V. PACIFIC GAS & ELECTRIC COMPANY

A. Factual and Procedural Background

Pacific Gas and Electric Company ("PG&E") filed a voluntary petition under chapter 11 of the Bankruptcy Code on April 6, 2001. Prior to PG&E's bankruptcy, Travelers Casualty & Surety Company ("Travelers") issued a $ 100 million surety bond on PG&E's behalf to the California Department of [*125] Industrial Relations. The bond guaranteed PG&E's payment of state workers' compensation benefits to injured employees.

In conjunction with the bond, PG&E executed a series of agreements which indemnified Travelers in the event of PG&E's default. The indemnity agreements required PG&E to reimburse Travelers for any loss it might incur in connection with the bonds, including any attorneys' fees incurred "by reason of executing or procuring the execution of" the bonds or "enforcing" any of its rights under the indemnity agreements. n5

PG&E never defaulted on its workers' compensation obligations. Consequently, Travelers was never required to assume any liability on the bonds. Nevertheless, on September 5, 2001, Travelers filed a timely proof of claim in PG&E's bankruptcy case. The proof of claim asserted a claim for future reimbursement and subrogation rights under the indemnity agreements. Travelers was, in effect, seeking to protect its rights in the event that PG&E defaulted on its workers' compensation obligations at some point in the future, requiring Travelers to make payments under its bond.

During the pendency of the bankruptcy case, Travelers raised objections to PG&E's plan of reorganization and

disclosure statement, seeking to ensure that its rights under the indemnity agreements were adequately addressed. PG&E, in turn, objected to Travelers' claim, arguing, among other things, that a contingent claim for reimbursement or contribution must be disallowed under § 502(e). n6 The parties subsequently reached an agreement on both disputes.

The parties agreed to add language to the plan and disclosure statement that would address Travelers' concerns. Additionally, the parties agreed that Travelers' claim would be disallowed, subject to Travelers' right to assert a claim for attorneys' fees under the indemnity agreements. The stipulation further provided that any claim for attorneys' fees by Travelers would remain subject to objection by PG&E.

Travelers subsequently filed an amended proof of claim, which asserted a right to recover attorneys' fees and other expenses totaling more than $ 167,000. n7 PG&E objected on the grounds that, among other things, the attorneys' fees were not compensable under the indemnity agreements as a matter of state law. Alternatively, PG&E argued that the fees were incurred litigating bankruptcy-related issues and were, consequently, precluded from recovery under the well-established Ninth Circuit Fobian Rule, pursuant to which attorneys' fees incurred in litigating issues peculiar to bankruptcy law  [*126]  must be denied. n8

The bankruptcy court sustained the objection to Travelers' claim. The court held that Travelers' claim for attorneys' fees must be denied under the Fobian Rule because all of the fees were incurred in litigating bankruptcy law issues, including the allowability of Travelers' claim under § 502 and Traveler's objection to PG&E's plan confirmation under chapter 11. n9

Travelers appealed to the district court where Travelers argued that its attorneys' fees were allowable under Ninth Circuit law because they were incurred in its efforts to preserve state law rights. In the alternative, Travelers argued that the Ninth Circuit's Fobian Rule was wrong and contrary to Supreme Court precedent. n10 The district court affirmed the bankruptcy court, holding that Travelers' attorneys' fees arose out of "pure bankruptcy litigation" and were subject to disallowance under the Fobian Rule. n11

Travelers then took the matter to the Ninth Circuit, making the same arguments as below although elaborating somewhat on the idea that a claim for attorneys' fees is an allowable claim under § 502. The Ninth Circuit rather summarily affirmed the district court. n12

B. The Supreme Court's Decision

In its petition for a writ of certiorari, Travelers asked the Supreme Court to address the validity of the Ninth Circuit's Fobian Rule. n13 PG&E did not raise any additional issues. n14 The Supreme Court granted Travelers' petition on October 6, 2006. n15

Travelers focused its argument to the Court on the invalidity of the Fobian Rule and again set forth the argument that a claim for attorneys' fees is an allowable claim under § 502 of the Code. n16 PG&E abandoned the Fobian Rule in its brief to the Court. n17 Instead, PG&E implored the Court to find alternative grounds to disallow the attorneys' fees requested by Travelers. n18 PG&E argued that unsecured creditors' claims for attorneys' fees against the bankruptcy estate should be disallowed because of, inter alia, the  [*127]  explicit negation of such fees under the language of § 506(b); n19 Congressional intent seen through the structure, purpose, and history of the Bankruptcy Code; n20 and because Travelers' fees were incurred from actions not reasonably necessary for the preservation of the bankruptcy estate. n21 At oral argument, PG&E conceded that Fobian was wrong in distinguishing between fees incurred in federal bankruptcy litigation and fees incurred in litigating state law issues, and made no attempt to defend the Ninth Circuit rule. n22

The Supreme Court issued its decision on March 20, 2007. n23 The Court disposed of the Fobian Rule, finding that the disallowance of attorneys' fees solely because the matter litigated was one peculiar to bankruptcy law had no basis in the Code. n24 In doing so, the Court concluded that the right to contract-based attorneys' fees was a claim against the

estate, n25 and was subject to allowability analysis under § 502 of the Code. n26 After determining that§§502(b)(2)-(8) were inapplicable and that Travelers' claim was not untimely filed under § 502(b)(9), the Court turned to whether Travelers' claim for attorneys' fees was disallowed under § 502(b)(1). n27 However, the Court declined to answer the question, citing the Ninth Circuit's failure to analyze Travelers' claim under § 502 in reliance on the Fobian Rule.

The Court noted that certiorari had been granted only to address the issue of the validity of the Fobian Rule. n28 The Court therefore refused to address the additional grounds argued by PG&E for denying Travelers' request for fees under the Code. n29 Thus, the Supreme Court issued the Travelers opinion solely to overrule the Fobian Rule, leaving the question of the treatment of attorneys' fees in bankruptcy proceedings unanswered. However, a closer analysis of the Fobian Rule itself, the Court's discussion in Travelers, and past Supreme Court precedent provides a framework for the proper treatment of attorneys' fees in bankruptcy cases.

[*128]

## II. THE RISE AND FALL OF THE FOBIAN RULE - MISCONCEPTIONS GIVING WAY TO PROPER ANALYSIS

The so-called "Fobian Rule" created a false dichotomy without any basis in the Bankruptcy Code. n30 The rule arose from the confused holdings and overly broad dicta of Ninth Circuit precedent that courts extended beyond the particular facts of the respective cases in which they arose. Courts subsequently pieced these cases together to create a bright-line rule that generally prohibited the availability of attorneys' fees for litigating issues "peculiar to bankruptcy." The Supreme Court properly put this false dichotomy to rest in Travelers after declaring that its rationale was without basis in the Code. n31

In addition to rejecting the Fobian Rule, Travelers is significant because it provides guidance for the proper analysis of attorneys' fees awards in bankruptcy proceedings. n32 The Court explicitly identified the analytical framework for the allowance of claims for attorneys' fees against the bankruptcy estate without answering the question of whether they are ultimately disallowed by the Code. n33 Within the Court's rejection of the Fobian Rule lies some clarification of the proper role of state law and federal bankruptcy law in the analysis of allowability of attorneys' fees incurred litigating in bankruptcy proceedings. n34

The effect of Travelers on attorneys' fee jurisprudence is best demonstrated by looking to the Fobian case itself, the case law preceding the Fobian decision, and how the Fobian Rule became entrenched in Ninth Circuit precedent. Looking to the origins of the Fobian Rule in light of the Court's commentary in Travelers illustrates the Fobian Rule's misperception and resulting oversimplification. It also illustrates how the Court's analysis in Travelers provides a more complete framework grounded in well-established principles of the Bankruptcy Code. n35

A. The Ninth Circuit's Fobian Decision

The Ninth Circuit in Fobian v. Western Farm Credit Bank affirmed the Bankruptcy Appellate Panel's decision to deny confirmation of the debtors' plan under Chapter 12 of the Code. n36 The court then addressed the undersecured creditor's request for attorneys' fees for litigating the confirmation  [*129]  issues before the bankruptcy court and on appeal. n37

The Ninth Circuit summarily disposed of the unsecured creditor's request for attorneys' fees in three short paragraphs. n38 After briefly recognizing that attorneys' fees may be awarded where authorized by contract and/or state law, the court set forth the dichotomous rule that "where litigated issues involve not basic contract enforcement questions, but issues peculiar to federal bankruptcy law, attorney's [sic] fees will not be awarded absent bad faith or harassment by the losing party." n39 Thus, the Fobian court implied that attorneys' fees either can be incurred by enforcing a contract or by litigating a federal bankruptcy issue. As support for this statement, the court cited three Ninth Circuit cases where the respective debtors were denied attorneys' fees against opposing parties in litigating issues before

the bankruptcy courts. n40 The court then concluded that state law could not be the basis for providing attorneys' fees because the undersecured creditor's objection to the plan was "not a traditional action on the contract." n41 Thus, without looking to state law, the court simply concluded that no fees were available for litigating "solely issues of federal bankruptcy law." n42

In hindsight, the Ninth Circuit's summary disposition of the issue of attorneys' fees in Fobian was a short-sighted misapplication and overextension of prior precedent. Unfortunately, it set the groundwork for the development of what became the Fobian Rule, governing attorneys' fees in bankruptcy proceedings. A significant misconception that arose from Fobian was the development of a dichotomy between litigating federal bankruptcy law issues and litigating state law issues when analyzing the availability of attorneys' fees in bankruptcy proceedings. Reliance on this misconceived dichotomy became a bright-line rule that failed to account for both a party's rights to attorneys' fees under applicable nonbankruptcy law and a creditor's right to attorneys' fees as a potential claim against the bankruptcy estate. n43

B. The Origins of the Fobian Rule - Ninth Circuit Pre- Fobian Cases

An analysis of pre-Fobian cases reveals the basis for the misconceived dichotomy set forth in Fobian. These cases generally discussed two issues: first, whether an award of attorneys' fees would be allowed under the applicable [*130] contract and/or state law as a preliminary matter, and second, whether the subject fees were allowed under federal bankruptcy law. n44

These discussions were subject to two primary interpretations. First, in an action on a contract that provides for the award of attorneys' fees as a matter of state law, such law may provide the basis for an award of attorneys' fees. On the other hand, where the action is not on a contract but one peculiar to bankruptcy law, fees are not allowed, and any discussion of the validity of fees awarded pursuant to state law is dicta. n45 Second, the discussion of the authority to award fees under federal bankruptcy law, as well as pursuant to nonbankruptcy (usually state) law indicates that both state law and bankruptcy law may be independent potential grounds for awarding attorneys' fees. n46 Fobian and subsequent decisions that developed the Fobian Rule followed the former interpretation.

In Grove v. Fulwiler, n47 the Ninth Circuit affirmed the bankruptcy court's denial of a debtor's request for attorneys' fees after the debtor successfully defended a creditor's nondischargability action under the former Bankruptcy Act. The debtor requested attorneys' fees pursuant to Oregon state statute. n48 That statute provided that attorneys' fees are reciprocally available to the prevailing party in a "suit on a contract" where the contract specifically provides for attorneys' fees incurred to enforce the contractual provisions, regardless of which party is entitled to the fees in the contractual language. n49 The court determined that the discharge action was not contractual in nature, and thus not a "suit on a contract." n50 Therefore, the Oregon state statute did not provide a basis for the award of fees to the debtor. n51 The court also noted that federal bankruptcy law provided no basis for awarding attorneys' fees in a nondischargeability action under the Act absent bad faith. n52 [*131]  After concluding that the nondischargability action was not an action on contract and that fees were therefore not available under state law, the court stated, "In any event, the award of attorney's [sic] fees in a bankruptcy proceeding should rest upon a firmer foundation than the semantical characterization of a particular proceeding." n53 Courts that followed the Fobian dichotomy interpreted this statement as support for the proposition that regardless of the characterization of the proceeding under state law, attorneys' fees are disallowed under federal bankruptcy law. n54

In Merced Production Credit Association v. Sparkman, n55 the Ninth Circuit held that the debtor was entitled to reasonable attorneys' fees from a creditor as the prevailing party after objecting to the creditor's claim and counterclaiming for breach of contract. Similar to the Oregon reciprocal fees statute in Fulwiler, the debtor in Sparkman sought fees pursuant to a California statute allowing for reciprocally enforceable attorneys' fees if the contract specifically provided for attorneys' fees to either party. n56 The court found that the debtor's objection to claim and "counterclaim" for breach of contract and lack of good faith were contract actions such that the California statute applied and provided sufficient grounds to award reasonable attorneys' fees to the debtor against the creditor. n57 The court also looked to California law for the proper procedure for requesting attorneys' fees, concluding that because state

law governed the "substantive issues" of the debtor's counterclaim, the method by which fees were requested was also governed by California law. n58

[*132]  The following year, a Ninth Circuit panel denied attorneys' fees to both the debtor and the opposing party in Collingwood Grain, Inc. v. Coast Trading Company, Inc. n59 Before the bankruptcy court, the parties had litigated the seller's right to reclamation under state commercial law as to six carloads of grain sold by the debtor-broker. n60 The Ninth Circuit held that the parties were not entitled to attorneys' fees under Oregon's reciprocal fee statute after finding that the statute did not apply to the action for reclamation because it was not an action enforcing the contract. n61 The court then recognized that there was no federal basis under which to award attorneys' fees and denied both parties' fee requests. n62 The court cited Fulwiler for the proposition that "absent bad faith or harassment, attorneys' fees are not available for the litigation of federal bankruptcy issues under a contract that provides for attorneys' fees for enforcement of the contract." n63 These broad statements, although made in the specific context of applying the Oregon reciprocal fee statute to enforce the particular contract language at issue in Coast Trading and Fulwiler, were cited generally in Fobian and subsequent cases as supporting the view that federal bankruptcy law governs the award of fees, despite state law, in bankruptcy proceedings. n64

The Ninth Circuit in Johnson v. Righetti n65 more firmly entrenched the misconception that the "substantive nature" of the proceeding controls whether a court looks to state law for the award of attorneys' fees in actions before the bankruptcy court. The Ninth Circuit affirmed the district court's denial of debtor's request for attorneys' fees after the debtor successfully defended  [*133]  a creditor's motion for relief from stay. n66 The debtor argued that he was entitled to fees under California's reciprocal fee statute and cited Eastview Estates II as authority for looking to state law to award attorneys' fees in a bankruptcy proceeding. n67 Instead of looking to the California statute to determine if it applied as was done in Eastview Estates II, n68 the Johnson court attempted to distinguish Eastview Estates II on grounds that state law only provided for attorneys' fees where state law governed the "substantive" issues of the case - where there was an "action on the contract" as in Eastview Estates II - and otherwise, "federal law" governs the award of attorneys' fees. n69 The Johnson court held that a relief from stay action was not an action on a contract; thus, state law did not govern the award of attorneys' fees. n70 The court also noted that there was no applicable federal right to attorneys' fees, and therefore, the debtor was not entitled to an award of attorneys' fees. n71

By attempting to distinguish Eastview Estates II, the court in Johnson confused the importance of an "action on a contract." In Eastview Estates II, whether the action was an action on contract was significant because the state statute allowed the debtor to claim fees only in an action under the contract and only if the contract so provided. n72 In Johnson, by contrast, the court interpreted "action on contract" to mean state law must govern the "substantive" issues of the proceedings. n73 This oversimplification ultimately led the court in Fobian to adopt the view that whether an action was one "on a contract" was determinative of whether state or federal law "governed" the award of attorneys' fees. n74

C. The Entrenchment of the Fobian Rule in the Ninth Circuit

The Ninth Circuit Court of Appeals did not immediately cite Fobian's  [*134]  rationale as the bright-line rule denying attorney's fees for litigating issues peculiar to bankruptcy. n75 Nevertheless, the Ninth Circuit bankruptcy courts extended Fobian's bright-line distinction to its limits. n76 Cases following the Fobian decision continued to solidify the dichotomous view that actions were either governed by state law, as an action "on contract," and thus entitled to fees, or governed by federal bankruptcy law, as an action peculiar to bankruptcy law, and not entitled to fees. In early 1997, just over five years after Fobian, the Ninth Circuit issued a number of decisions that solidified the Fobian reading of prior Ninth Circuit attorneys' fee precedent as the law of the circuit.

In Heritage Ford v. Baroff, n77 the Ninth Circuit awarded fees to a debtor who successfully defended a nondischargeability action brought by creditors who alleged that the debtor had fraudulently induced them to enter into a settlement agreement. The court cited Fobian and Johnson for the proposition that no attorneys' fees are available for litigating federal bankruptcy issues, but where state law governs the "substantive issues" of the proceeding, a party may be entitled to an award of attorneys' fees under state law. n78 Instead of looking first to whether the fraud litigation was

an "action on contract" pursuant to California's reciprocal fee statute, the court looked to whether the litigation required the contract to be construed to determine whether state law supplies the rule for attorneys' fees. n79 Only after concluding that the bankruptcy court had been called on to determine the enforceability of the settlement agreement did the Ninth Circuit look to the California statute to see if the debtor was entitled to an award of attorneys' fees under the agreement and state law. n80 Notwithstanding the court's conclusion that fees were ultimately available, the rationale gave recognition to the Fobian Rule and the view of pre-Fobian precedent that the character of the proceeding governs the availability of attorneys' fees.

The court's interpretation of the Fobian Rule in Baroff was also cited in [*135] American Express Travel Related Services Co. v. Hashemi. n81 The Ninth Circuit there relied on the dichotomy between actions on contract and issues peculiar to bankruptcy law as applied in Baroff to deny the creditor's request for attorneys' fees. n82 The Hashemi court determined that the creditor's prosecution of a nondischargeabiltiy action was an issue peculiar to federal bankruptcy law; thus, fees were not recoverable. n83 The court also remanded to determine whether the creditor was entitled to attorneys' fees for litigating the breach of contract portion of the action. n84

Subsequent Ninth Circuit cases continued to apply the bright-line distinction. In Renfrow v. Draper, n85 the Ninth Circuit applied the Fobian Rule to deny an ex-spouse creditor's claim for attorneys' fees for successfully having her spousal support debt declared nondischargeable. The court remanded for the determination of fees incurred litigating the validity and amount of the debt, which the court found allowable as incurred litigating state law issues. n86 In Thrifty Oil Co. v. Bank of America, n87 the court awarded the creditor attorneys' fees for the litigation of a state law issue that was determinative of the enforceability of the underlying contract. The court's discussion focused on the "basic principle" that prevailing parties may be entitled to receive attorneys' fees incurred in litigating the enforceability of a contract in [*136] a bankruptcy proceeding as a substantive issue of state law. n88

The culmination of the Fobian Rule (as well as its ultimate demise) came in the Ninth Circuit's decisions in Travelers n89 and DeRoche v. Arizona Industrial Commission. n90 In DeRoche, the debtors successfully defended the Arizona Industrial Commission's action seeking to except a debt from discharge as a priority tax debt under *§ 507(a)(8)(E) of the Bankruptcy Code.* n91 The debtors then sought attorneys' fees under an applicable Arizona statute. n92 The court denied the debtor's request, citing Fobian and relying on the "substantive nature" of the bankruptcy proceedings as precluding the award of attorneys' fees despite the state statute that directly applied to the debtors' situation. n93 Following the Supreme Court's Travelers decision, the Court granted a petition for a writ of certiorari in DeRoche, n94 summarily vacated the Ninth Circuit's decision, and remanded for consideration in light of the Court's decision in Travelers. n95

D. The Demise of Fobian - The Significance of Pre-Fobian Case Law Post-Travelers

When the Supreme Court struck down the Fobian Rule, the Ninth Circuit's line of attorneys' fees jurisprudence in bankruptcy proceedings, as well as similar jurisprudence in other circuits, n96 was effectively overruled. In Travelers, the Court set forth the initial analysis for determining whether to allow a creditor's attorneys' fees as a claim against the estate. n97 In doing so, the Court distinguished the pre-Fobian Ninth Circuit cases as providing no basis for the Fobian Rule. n98

The Court impliedly recognized the confusion between analyzing attorneys' fees under applicable state law and under the Fobian Rule. n99 The Fobian court cited prior Ninth Circuit cases as support for the bright-line [*137] Rule that fees are not available for litigating federal bankruptcy issues. n100 The Supreme Court dismissed the Fobian court's interpretation of these cases and distinguished them as providing no basis for the disallowance of a contractual claim for attorneys' fees incurred litigating bankruptcy matters. n101 The Court also noted that in each of these pre-Fobian cases attorneys' fees were not available as a matter of state law. n102

The Court's treatment of the pre-Fobian cases is significant for a number of reasons. First, by distinguishing the pre-Fobian cases from the Fobian Rule, the Court highlights an important distinction that had been lost - whether the

award of attorney's fees is being sought from the bankruptcy estate or personally from a party. In the pre-Fobian cases discussed in Travelers, debtors sought from creditors attorneys' fees incurred in litigation before the bankruptcy court. n103 In Fobian, as well as in Travelers, creditors sought attorneys' fees from the bankruptcy estate based on pre-petition contractual rights. n104 By distinguishing the Ninth Circuit's pre-Fobian cases and setting forth the claims analysis for an unsecured creditor's pre-petition contractual right to attorneys' fees, the Court implied a different analysis for unsecured creditors' fees as opposed to attorneys' fees awarded directly from an opposing party. n105

This distinction is a necessary consequence of the Bankruptcy Code. A party seeking attorneys' fees from the estate based on a pre-petition contractual right is by definition a creditor of the estate. n106 Conversely, a party seeking an award of fees from a source other than the estate does not have a  [*138]  claim against the estate for that right and is not rendered a creditor thereby. n107 A non-creditor seeking fees from an opposing party in litigation seeks fees pursuant to applicable law or enforceable contract n108 - without depleting the amount of funds in the bankruptcy estate available for distribution to creditors. n109

This distinction is important because regardless of how the pre-Fobian cases are interpreted after Travelers, n110 attorneys' fees claimed by unsecured creditors are subject to the two-part analysis that requires looking to nonbankruptcy law for the validity of the claim and to bankruptcy law for the allowability of the claim. Also, unique policy considerations arise when attorneys' fees are sought as claims against the bankruptcy estate. n111

Second, the Supreme Court's treatment of pre-Fobian cases is consistent with the Court's well-established precedent of looking to nonbankruptcy law to determine the validity of a claim. The Supreme Court has clearly held that nonbankruptcy law provides the basis for a creditor's claim against the bankruptcy estate. n112 By determining that awards of attorneys' fees in the  [*139]  pre-Fobian cases failed on state law grounds, n113 the Court reinforced the idea that state law is not to be ignored for establishing the validity of rights in bankruptcy proceedings. n114

Finally, the Court's analysis in Travelers emphasized that the dual-step analysis of validity and allowability is necessary for claims of attorneys' fees against the bankruptcy estate. Validity of a claim is determined under applicable nonbankruptcy law n115 while allowability of a claim against the estate is a matter of federal bankruptcy law. n116 The Fobian Rule's false dichotomy between federal bankruptcy law and state law merged this two-step analysis into one summary step, disallowing fees for litigating matters of federal bankruptcy and allowing fees to be analyzed for validity under state law if state law issues were litigated. n117 By distinguishing the Ninth Circuit's pre-Fobian cases as being decided on state law grounds and setting forth an allowability analysis for Travelers' claim for attorneys' fees, the Supreme Court in Travelers provided the start of the proper analysis of an unsecured creditor's claim for attorneys' fees against the bankruptcy estate. The Authors propose that, properly concluded, the analysis of an unsecured creditor's claim for attorneys' fees will result in the claim being disallowed under the plain language of the Code in § 506(b), the longstanding practice of bankruptcy courts, and applicable policy considerations. n118

III. DISALLOWANCE OF AN UNSECURED CREDITOR'S CLAIM FOR POST-PETITION ATTORNEYS' FEES UNDER § 506(B)

In Travelers, the Supreme Court decidedly struck down any artificial distinction between fees incurred for litigating bankruptcy issues and fees incurred for litigating nonbankruptcy issues on the ground that there is no basis in the Code for such a distinction. n119 The Court expressly declined to address the question of whether any basis exists in the Code for permitting unsecured creditors to recover post-petition attorneys' fees from the bankruptcy estate in the first instance. n120

The void of Supreme Court authority on this issue is unfortunate because  [*140]  the circuits appear to be evenly split on this issue. n121 Some courts have concluded that unsecured creditors are generally entitled to recover post-petition fees from the estate; these courts typically reason that claims for attorneys' fees incurred in litigation regarding the creditor's pre-petition debt are contingent claims, and because nothing in the Code provides otherwise, such claims are allowable under § 502. n122 Other courts have held that unsecured creditors are not entitled to collect

post-petition fees from the estate; these courts reason that § 506(b) is the only provision in the Code that generally permits a creditor to recover its post-petition fees from the estate, and because § 506(b) applies only to secured creditors, unsecured creditors are not entitled to collect their post-petition fees. n123 Still other courts, without deciding [*141] the issue of whether unsecured creditors are entitled to post-petition fees as a general matter, have held that unsecured creditors are at least entitled to post-petition fees where the debtor is solvent. n124

Travelers' holding that an unsecured creditor's contract-based claim for attorneys' fees was not disallowed "based solely on the fact that the fees at issue were incurred litigating issues of bankruptcy law" n125 does not resolve the issue of whether unsecured creditors are entitled to post-petition fees as a general matter. Rather, it begs the question: Are such fees disallowed based on some other reasoning?

The remainder of this Article attempts to answer that question. The analysis necessarily begins with the set-up provided by the Supreme Court in Travelers. That is, one must look at whether an unsecured creditor's claim for post-petition attorneys' fees amounts to an allowable claim under § 502 or whether the Bankruptcy Code "provides otherwise." n126 This Part focuses on whether § 506(b) provides otherwise and concludes that the Supreme Court would likely hold that unsecured creditors' claims for post-petition attorneys' fees are not allowable under the Bankruptcy Code.

A. The Travelers Set-Up: Whether an Unsecured Creditor's Claim for Post-Petition Fees Constitutes an Allowable Claim Under § 502

Notwithstanding the Supreme Court's refusal to address the effect of § 506(b) on unsecured creditors' claims for post-petition attorneys' fees, the Court's analysis of the Fobian Rule clearly anticipates the issue. First, the Court's holding is carefully limited to striking down the Fobian Rule. It [*142] concluded that the Code does not disallow unsecured creditors' claims for attorneys' fees "based solely on the fact that the fees at issue were incurred litigating issues of bankruptcy law." n127 Further, the Court expressly reserved opinion regarding "whether, following the demise of the Fobian rule, other principles of bankruptcy law might provide an independent basis for disallowing" an unsecured creditor's claim for post-petition attorneys' fees. n128

Second, the Court's carefully-worded analysis of the Ninth Circuit's rationale for the Fobian Rule leaves open the possibility that § 506(b) may, in fact, impact an unsecured creditor's ability to recover its post-petition attorneys' fees. As the Court discussed, the fault with the Ninth Circuit's rationale rested on the fact that it was not supported by the Code. n129 The Ninth Circuit did not "conclude that the claim was 'unenforceable' under § 502(b)(1) as a matter of applicable nonbankruptcy law. Nor did it conclude that Travelers' claim was rendered unenforceable by any provision of the Bankruptcy Code." n130 The Court did not foreclose the possibility that a provision of the Code actually renders unsecured creditors' claims for post-petition attorneys' fees unenforceable.

Travelers makes clear that the appropriate place to begin the analysis is with the definition of a "claim" under § 101 and the concept of allowability under § 502. n131 As the Court noted, every creditor of a debtor in bankruptcy is entitled to file a proof of claim. n132 Under the former Bankruptcy Act, as it was originally enacted, a provable claim was limited to a debt that was "a fixed liability, ... absolutely owing at the time of the filing of the petition." n133 Although attorneys' fees incurred by a creditor post-petition under a pre-petition contractual right amounted to a contingent claim, such did not constitute a provable claim because the fees were not owing on the petition date. n134 It was not until 1938 that the Bankruptcy Act was amended to broaden the definition of provable claims by adding, among other things, "contingent debts and contingent contractual liabilities." n135 Even [*143] then, however, an unliquidated or contingent claim was not allowed if it was "not capable of liquidation or of reasonable estimation." n136

Nevertheless, under the current Bankruptcy Code, a claim is defined broadly to include a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." n137 Nothing in the Code's definition of a claim excludes an unsecured creditor's contractual right to payment for attorneys' fees incurred post petition. If an unsecured creditor

incurs post-petition fees under a pre-petition contractual right, a contingent claim exists, n138 and as noted before, contingent claims are expressly included in the definition of a claim. n139 This result is consistent with the Supreme Court's statement in Security Mortgage Co. v. Powers that "the character of the obligation to pay attorney's fees presents no obstacle to enforcing it in bankruptcy." n140

Whether a debt constitutes a bankruptcy claim, however, is not determinative of the creditor's right to payment from the bankruptcy estate. n141 The next step in the analysis is to determine whether the claim is an allowable claim. n142 Section 502 provides: "A claim or interest, proof of which is filed  [*144]  under section 501 ... is deemed allowed, unless a party in interest ... objects." n143

But even where a party in interest objects, the court "shall allow" the claim "except to the extent that" the claim implicates any of the nine exceptions enumerated in § 502(b). Those exceptions apply where the claim at issue is "unenforceable against the debtor ... under any agreement or applicable law," § 502(b)(1); "is for unmatured interest," § 502(b)(2); "is for property tax that exceeds the value of the estate's interest" in the property, § 502(b)(3); "is for services of an insider or attorney of the debtor" that "exceeds the reasonable value of such services," § 502(b)(4); is for unmatured debt on certain alimony and child support obligations, § 502(b)(5); is for certain "damages resulting from the termination" of a lease or employment contract, §§502(b)(6) and (7); "results from a reduction, due to late payment, in the amount of ... credit available to the debtor in connection with an employment tax on wages, salaries, or commissions earned from the debtor," § 502(b)(8); or was brought to the court's attention through an untimely proof of claim, § 502(b)(9). n144

An unsecured creditor's claim for post-petition attorneys' fees does not implicate any of the provisions of § 502(b)(2)-(8). n145 Whether § 502(b)(9), regarding untimely filed proofs of claim, is implicated obviously turns on the facts of each case. As a general matter then, the Supreme Court held in Travelers, an unsecured creditor's claim for post-petition attorneys' fees "must be allowed under § 502(b) unless it is unenforceable within the meaning of § 502(b)(1)." n146

Under § 502(b)(1), a claim is disallowed if it is unenforceable "under any agreement or applicable law." n147 The courts have generally understood this to mean that a claim must be valid under state law. n148 This is true in part. [*145]  The Supreme Court has after all recognized that the "'basic federal rule' in bankruptcy is that state law governs the substance of claims, Congress having 'generally left the determination of property rights in the assets of a bankrupt's estate to state law.'" n149 Although the American Rule generally prohibits fees shifting, n150 a right to payment of attorneys' fees may be enforceable under statute or contract, pursuant to state law. n151 Consequently, a number of courts considering the issue of an unsecured creditor's claim for post-petition attorneys' fees have concluded that, because § 502 does not otherwise expressly disallow such a claim, it is allowable under § 502(b)(1) where a statute or contract providing for fees is valid under state law. n152

However, § 502(b)(1) does not restrict "applicable law" to "applicable state law." n153 Nor does § 502(b)(1) restrict "applicable law" to "applicable nonbankruptcy law." n154 "The Code reveals, significantly, that Congress, when it desired to do so, knew how to restrict the scope of applicable law to 'state law' and did so with some frequency." n155 This is also true with respect to Congress' use of the phrase "nonbankruptcy law." n156 Congress' decision to use the broader phrase "applicable law" in § 502(b)(1), strongly suggests that it did not intend to restrict the provision to nonbankruptcy law. n157 Indeed, in Travelers, the Supreme Court put forth the idea that a provision of the Bankruptcy Code may render a claim unenforceable under § 502(b)(1). n158 In  [*146]  concluding that it was an error for a claim to be disallowed without reference to § 502(b), the Court stated that the Ninth Circuit erred when it neither concluded "that the claim was 'unenforceable under § 502(b)(1) as a matter of applicable nonbankruptcy law. Nor did it conclude that Travelers' claim was rendered unenforceable by any provision of the Bankruptcy Code." n159 The Court's comment

makes it clear that bankruptcy law is included within the scope of the phrase "applicable law" as it is used in § 502(b)(1). n160

This result comports with two important principles. First, the Bankruptcy Code must be interpreted as a coherent whole, reflecting "the interplay between all of its different parts." n161 The meaning given to one portion of the Code must be consistent with the remaining provisions. n162 Second, while state law generally governs the validity of a claim, federal law governs allowance. n163 In Travelers, the Supreme Court confirmed that "it remains true that an otherwise enforceable contract allocating fees (i.e., one that is enforceable under substantive, nonbankruptcy law) is allowable in bankruptcy except where the Bankruptcy Code provides otherwise." n164 The question follows: With respect to an unsecured creditor's claim for post-petition [*147] attorneys' fees, does the Code provide otherwise? Because § 506(b) provides otherwise, the answer is yes.

B. The Plain Language of § 506(b)

The task of determining whether § 506(b) prevents an unsecured creditor from collecting its post-petition fees from the estate "begins where all such inquiries must begin: with the language of the statute itself... . Where, as here, the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'" n165

Section 506(b) provides:

To the extent that an allowed secured claim is secured by property the value of which ... is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose. n166

In its opening brief before the Supreme Court, PG&E argued that § 506(b) expressly negates an unsecured creditor's ability to recover post-petition fees from the estate. n167 PG&E pointed to the limiting language of § 506(b), which provides that a claim for reasonable fees "shall be allowed" but only "to the extent" that a creditor is oversecured. n168 It follows that "to the extent that a creditor is not sufficiently secured, its claim for contractual attorneys' fees is not allowed. And the claim is certainly not allowed if the creditor is entirely unsecured." n169 Indeed, the Ninth Circuit has stated, "When read literally, subsection (b) arguably limits the fees available to the oversecured creditor." n170 Moreover, the Supreme Court, in addressing the issue of an unsecured creditor's entitlement to post-petition interest in United Savings Association of Texas v. Timbers of Inwood Forest Associates, itself emphasized that post-petition interest is permitted under § 506(b) only [*148] "to the extent that" a creditor is oversecured. n171

Those bankruptcy courts allowing unsecured creditors to collect post-petition fees from the estate would be quick to point out, however, that § 506(b) is silent with respect unsecured creditors; the language of § 506(b) only expressly refers to oversecured creditors. n172 Silence, they argue, is not tantamount to disallowance. n173

In response, courts coming out on the other side of the issue have invoked the maxim expressio unius est exclusio alterius: the expression of one thing is the exclusion of another. n174 As the Supreme Court has recognized, "where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of contrary legislative intent." n175 To permit an unsecured creditor to recover its post-petition attorneys' fees from the estate would be to expand on the express exceptions Congress provided for in the Code. n176

In fact, Congress has clearly expressed its intent to award post-petition attorneys' fees to parties in several circumstances - none of which applies as a general matter to an unsecured creditor's claim for post-petition attorneys'

fees. First, recovery of post-petition attorneys' fees under § 506(b) is plainly limited to oversecured creditors. n177 Second, § 330 permits a court to award reasonable compensation for attorneys' fees incurred during the bankruptcy by the trustee, an authorized committee, or the debtor. n178 Third, § 503 allows as an administrative expense reasonable compensation for attorneys' services to the extent that the services benefited the estate. n179 Fourth, § 362(k) provides for "actual damages, including attorneys' fees" to an individual injured  [*149]  by a violation of the automatic stay. n180 Fifth, § 523(d) provides for an award of reasonable attorneys' fees for a successful debtor in certain nondischargeability actions. n181

It thus appears that Congress knew how to provide for an award of post-petition attorneys' fees. "If Congress had intended for the holders of both secured claims and unsecured claims to recover attorneys' fees, it could have easily said so. But it did not." n182 In Timbers, Justice Scalia, addressing the argument that an unsecured creditor may recover post-petition interest, wrote, "If the Code meant to give the unsecured creditor ... interest on the value of his collateral, surely [§ 506(b)] is where that disposition would have been set forth ... ." n183 There is no reason why Justice Scalia's argument should not apply equally to attorneys' fees. Because neither § 506(b) nor any other provision of the Bankruptcy Code permits an unsecured creditor to recover its post-petition attorneys' fees from the estate, unsecured creditors have no clear entitlement to post-petition attorneys' fees. n184 Again, this result is consistent with the idea that the Code must be read as a coherent whole. n185

Moreover, one could argue that, if all creditors are entitled to recover post-petition attorneys' fees as a claim against the estate, the portion of § 506(b) that allows oversecured creditors' claims for post-petition fees is superfluous. n186 Indeed, in Security Mortgage, the Supreme Court held, prior to the enactment of the Bankruptcy Code and, thus, in the absence of § 506(b), that an oversecured creditor was entitled to collect post-petition fees as part of its secured claim. n187 By subsequently codifying that rule without similarly codifying a rule with respect to unsecured creditors, Congress  [*150]  demonstrated its intent to limit the recovery of attorneys' fees to oversecured creditors. n188

The typical rebuttal to this line of reasoning is that § 506(b) is not rendered superfluous by allowing an unsecured creditor's claim for post-petition attorneys' fees because § 506(b) does not speak to allowance; it merely characterizes an oversecured creditor's preexisting claim as secured. n189 The leading case on this issue is In re United Merchants. n190 United Merchants arose under the Bankruptcy Act; consequently, the court's comments regarding § 506(b) are dicta. n191 Regardless, the reasoning of United Merchants has been adopted many times over. n192 Courts adopting this line of reasoning argue that § 506(a) defines a secured claim, n193 and subsection (b) may be understood to do the same. n194 Further, they point to heading of § 506: "Determination of secured status." n195

While statute headings may be used to clarify the meaning of a statute where the statutory language is ambiguous, n196 the Supreme Court has observed:


 Headings and titles are not meant to take the place of the detailed provisions of the text. Nor are they necessarily designed to be a reference guide or a synopsis. Where the text  [*151]  is complicated and prolific, headings and titles can do no more than indicate the provisions in a most general manner; to attempt to refer to each specific provision would be ungainly as well as useless. As a result, matters in the text which deviate from those falling within the general pattern are frequently unreflected in the headings and titles. n197


 The Court's comments are particularly appropriate in the context of § 506. A look at the remaining subsections of § 506 demonstrates that § 506 does not merely determine secured status. Subsection (c) permits a trustee to recover from secured property certain costs incurred in preserving or selling that property. n198 Subsection (d) directs that a security interest is to pass through a bankruptcy case unaffected except in certain enumerated circumstances. n199 These subsections do not define a secured claim. Rather, they outline the rights of the secured creditor in bankruptcy.

Subsection (b), too, is most naturally read as setting forth the implications of holding a certain type of secured claim - an oversecured claim. Apart from merely characterizing an oversecured creditor's claim, § 506(b) guarantees certain rights for an oversecured creditor. n200 Contrary to the assertion that § 506(b) does not speak to allowance, § 506(b) expressly provides that an oversecured creditor "shall be allowed" a claim for fees in certain circumstances. n201 As a result, a majority of courts will disallow even an oversecured creditor's claim for fees if such fees do not satisfy the limitations of § 506(b). n202 If, for example, all or part of an oversecured creditors fees are unreasonable, the unreasonable part of that creditor's fees is typically disallowed. n203 Prior to the addition of the phrase "or State statute" to § 506(b) [*152] by the Bankruptcy Abuse Prevention and Consumer Act of 2005, n204 an oversecured creditor's claim for fees arising from a state statute - rather than an agreement - was also subject to disallowance. n205

Further, the idea that § 506(b) is more than a mere characterization provision is conclusively confirmed by the Supreme Court's decisions in Ron Pair n206 and Timbers. n207 In Ron Pair, the Court addressed whether § 506(b) entitled a creditor to receive post-petition interest on a nonconsensual oversecured claim. n208 As a preliminary matter, the Court noted, "Section 506 ... governs the definition and treatment of secured claims ... ." n209 Specifically, § 506(b) "allows a holder of an oversecured claim to recover, in addition to the prepetition amount of the claim, 'interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.'" n210 Not only do these comments indicate that § 506(b) does more than merely characterize, but the Court appears to be suggesting that, in the absence of § 506(b), oversecured creditors would not be allowed to recover such items. The ultimate holding of Ron Pair was that the holder of a nonconsensual oversecured claim could recover post-petition interest notwithstanding the fact that no valid agreement - or right - with respect to interest existed under state law. n211

The specific question at issue in Timbers was whether unsecured creditors are entitled to compensation under § 362(d)(1) for the delay caused by the automatic stay in foreclosing on their collateral. n212 In answering in the negative, the Court found support in the idea that § 506(b) has the "substantive effect of denying undersecured creditors postpetition interest on their claims." n213 The Court reasoned that § 506(b) permits post-petition interest to be paid only out of that creditor's "security cushion," and an unsecured [*153] creditor has no such "security cushion." n214 As noted above, the Court further reasoned that "if the Code had meant to give the undersecured creditor... interest on the value of his collateral, surely [§ 506(b)] is where that disposition would have been set forth." n215

Ron Pair and Timbers make clear that § 506(b) more than merely characterizes an oversecured creditor's claim as such. These cases imbue § 506(b) with a "substantive effect" on the rights of oversecured creditors. More importantly, Timbers stands for the proposition that § 506(b) has a substantive effect on the rights of unsecured creditors as well.

Many courts have subsequently relied on Timbers and, to a lesser extent, Ron Pair in the context of post-petition attorneys' fees. n216 These courts reason that the idea that § 506(b) permits post-petition interest to be paid only out of the "security cushion" applies equally well to attorneys' fees particularly given that § 506(b) deals with both interest and attorneys' fees and does not distinguish between the two. n217

Other courts, however, are not persuaded that Timbers requires a finding that unsecured creditors cannot assert a claim for post-petition attorneys' fees. n218 These courts rely on a comment the Supreme Court made in Timbers that an unsecured creditor, who has no equity cushion to draw on, "falls within the general rule disallowing postpetition interest." n219 Because § 502(b)(2) expressly disallows a claim for unmatured interest and there is no similar provision for post-petition attorneys' fees, the argument goes, the rule in Timbers cannot be extended to an unsecured creditor's claim for post-petition attorneys' fees. n220

[*154] This argument should fail for several reasons. First, it is not at all clear that Justice Scalia's reasoning in Timbers was founded on § 502(b)(2). Rather, it appears that § 502(b)(2) merely provided an additional basis for the decision. n221 Justice Scalia observed that post-petition interest is allowed only to the extent a creditor is oversecured and that § 506(b) would be the place to provide an unsecured creditor with a right to post-petition interest. These observations should stand independent of the fact that they concern interest because they arise out of general principles of statutory construction.

Second, at least one court has argued that § 502(b)(2) does not affect the application of Timbers to attorneys' fees because particular issues arising out of agreements with respect to interest - but not attorneys' fees - necessitate the existence of § 502(b)(2). In In re Miller, n222 the bankruptcy court noted that some loan obligations include the interest to accrue during the entire contractual term of the loan as part of the total amount of the note. The court gave as an example a $ 50,000 loan to be repaid in five years with interest at ten percent where the total amount set out in the note is $ 75,000 payable in five years. If the borrower enters bankruptcy in two years, the issue arises as to whether $ 60,000 or $ 75,000 is owed at that time.

In the absence of the express provision contained in § 502(b)(2) disallowing claims for "unmatured interest" bankruptcy courts would be compelled to determine innumerable disputes as to whether under applicable state law the amount which the creditor could demand as its legal due on the petition date would or would not include interest which would otherwise accrue between that date and the agreed contractual maturity of the obligation. n223

No similar issue exists with respect to attorneys' fees. Accordingly, while a clear need exists for an express disallowance of unmatured interest, there is "no corresponding reason to make a similar provision for post-petition legal fees or other costs which the creditor might incur in connection with the debt." n224

Third, it is appropriate to treat post-petition interest and attorneys' fees similarly under § 506(b) because post-petition attorneys' fees are analogized to interest in multiple additional instances. When, for example, a debtor is solvent, the issue arises as to whether unsecured creditors are entitled to post-petition interest and attorneys' fees prior to any distribution to the debtor or equity holders. Section 726 expressly provides for the payment of  [*155]  post-petition interest in that situation in chapter 7 cases. n225 No similar provision exists with respect to attorneys' fees. Nevertheless, courts have held that it is appropriate to treat attorneys' fees like interest for this purpose. n226 Additionally, the Eleventh Circuit has extended the Supreme Court's decision in Rake v. Wade n227 that interest accrues under § 506(b) only from the petition date through confirmation to attorneys' fees, finding "no basis to distinguish" post-petition attorneys' fees from interest. n228 In equating interest and attorneys' fees, one bankruptcy court has explained that the rule expressed by the Supreme Court in Vanston Bondholders, n229 prohibiting post-petition interest on unsecured claims to avoid administrative inconvenience and inequality among similarly situated creditors, is reflected with respect to attorneys' fees in the American Rule. n230

Finally, as the remainder of this Article demonstrates, the disallowance of an unsecured creditor's claim for post-petition attorneys' fees is well-supported by longstanding practice, including the preemption of state law with respect to attorneys' fees in bankruptcy, and policy considerations.

C. Longstanding Practice and Preemption Principles

It has been said that the rule prohibiting an unsecured creditor's claim for post-petition attorneys' fees from being allowed against the estate embodies a longstanding practice. n231 In fact, as early as 1899 one district court judge sitting in bankruptcy held that "allowance of 'counsel fees' in addition to costs can rest only on express statutory provision." n232 Another court, speaking in 1909 agreed, stating, "It has been the uniform practice of this court to refuse allowances of costs to successful claimants, creditors, even in cases of contest. I do not think it was intended that costs should be awarded or allowances from the estate made in such cases." n233 Additional pre-Code decisions  [*156]  are consistent. n234

The Supreme Court in Randolph & Randolph v. Scruggs echoed this early reluctance to award attorneys' fees to creditors in bankruptcy when it held in 1903 that a request for attorneys' fees from the estate would not be allowed unless the services were "beneficial to the estate." n235

The above decisions have their foundations in centuries-old law. The English system upon which our bankruptcy laws are based rested upon the theory that "everything stops at a certain date." n236 The Supreme Court has recognized that this is a "fundamental principle" that has been adopted by our  [*157]  American bankruptcy system. n237 The so-called English Rule prevents creditors from adding to the liabilities of the estate after the petition date. n238 "If a creditor ... could continue to enforce his state law rights after the initiation of bankruptcy proceedings, the bankruptcy laws would be meaningless." n239 Consequently, while before the petition date a creditor may have certain rights under state law, "after the filing of the petition, the demands of the bankruptcy laws take precedence." n240

Although it has been argued otherwise, the Supreme Court's decision in Security Mortgage is not to the contrary. Specifically, courts such as the Second Circuit in United Merchants have seized upon the Court's statement in Security Mortgage that the "character of the obligation to pay attorney's fees presents no obstacle to enforcing it in bankruptcy, either as a provable claim or by way of a lien upon specific property." n241 The Second Circuit and the courts subsequently adopting its reasoning argue that Security Mortgage stands for the proposition that a claim for attorneys' fees must be allowed in bankruptcy regardless of whether such claim is secured or unsecured. n242

As a preliminary matter, it warrants noting that the creditor in Security Mortgage was oversecured. n243 Consequently, the Court's holding does not have any effect on the rights of an unsecured creditor. Moreover, Security Mortgage was decided pre-Code and, thus, in the absence of § 506(b). Even if Security Mortgage speaks to the rights of unsecured creditors, many courts have subsequently held that the Code has altered the treatment of fees in bankruptcy. n244

Most importantly, the language seized upon by United Merchants is taken out of context. In just the two preceding sentences, the Supreme  [*158]  Court stated, "The construction of the contract for attorney's fees presents ... a question of local law. Whether the liability is, under the circumstances, enforceable against the proceeds of the sale raises federal questions peculiar to the law of bankruptcy." n245 Contrary to the United Merchants argument, Security Mortgage is best understood as standing for the idea that, while an unsecured creditor's claim for post-petition attorneys' fees may be valid under state law, allowance of a claim for attorneys' fees is governed by bankruptcy law.

The Supreme Court has confirmed many times over the principle that validity is a state law issue while allowance is a bankruptcy law issue. n246 This principle arises out of the "right of Congress to legislate on the subject of bankruptcies." n247 Any contract is "made subject to constitutional power in the Congress to legislate on the subject of bankruptcies." n248 Thus, under the bankruptcy power set forth in the Constitution, n249 "Congress of course may do what it likes with entitlements in bankruptcy." n250 The Supreme Court has observed that, "bankruptcy proceedings constantly modify and affect the property rights established by state law." n251

It is beyond doubt that Congress has chosen to modify state law rights with respect to creditors' claims against the estate for post-petition attorneys' fees. Bankruptcy courts have consistently held that bankruptcy law preempts state law regarding fees. n252 More specifically, § 506(b) preempts state law. n253 "The plain language of section 506(b) expressly provides for the award of attorneys' fees in bankruptcy proceedings, without reference to contrary  [*159] state law." n254 As a result, an oversecured creditor's contract-based claim for post-petition fees may be allowable in bankruptcy even where the underlying contract is invalid under state law. n255 Further, prior to the amendment of § 506(b), fees arising only under a state statute, without a contractual basis, were disallowed as not arising out of an agreement. n256 Finally, nearly all courts - even those arguing that fees valid under state law are enforceable in bankruptcy notwithstanding the provisions of § 506(b) - apply a federal standard for determining the reasonableness of fees. n257

The legislative history of § 506(b) supports these results. While the House version of the statute originally provided that "there shall be allowed to the holder of such claim, to the extent collectible under applicable law ... any reasonable fees," n258 the Senate bill contained no reference to "applicable law." n259 Ultimately, the Senate language was adopted. n260 Further, the floor managers of the bill, Rep. Edwards and Sen. DeConcini, both reported that if "the security agreement between the parties provides for attorneys' fees, it will be enforceable under title 11, notwithstanding

contrary law." n261

The legislative history evidences Congress' clear intent to preempt state law on the issue of attorneys' fees. Further, it is consistent with the well-established rule that federal law governs entitlements in bankruptcy. This is particularly true where some federal interest requires a result different than that arising under state law. n262 Moreover, it is a basic tenet of preemption that federal law must govern "when the state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" n263 Thus, policy considerations must compose the final part of the analysis of an unsecured creditor's claim for post-petition attorneys' fees.

   [*160]

   D. Policy Considerations

 The Supreme Court has stated that "the object of bankruptcy laws is the equitable distribution of the debtor's assets amongst his creditors." n264 "Any agreement which tends to defeat that beneficent design must be regarded with disfavor." n265 Consequently, bankruptcy laws must be interpreted under the equitable principles governing distributions, and each allowability determination must be "a balance of the equities between creditor and creditor." n266

   The principles iterated by the Supreme Court should bar enforcement of any contractual provision which would permit one creditor and not others to charge the estate with legal expenses associated with processing a claim. n267 To do otherwise would be to, in effect, permit a late preference over other creditors and subvert the purpose of the bankruptcy proceedings. n268

   Under the United Merchants line of reasoning, however, courts argue that allowing an unsecured creditor's claim for post-petition attorneys' fees against the estate does not provide "an undeserved bonus for one creditor at the expense of others." n269 Rather, "allowing a claim under a collection cost provision merely effectuates the bargained-for terms of the loan contract." n270 The assumption underlying this reasoning is that the creditor gave value in exchange for the contractual attorneys' fees provision. n271

   As courts have subsequently pointed out, however, this assumption is flawed. n272 Attorneys' fees provisions in contracts have become boilerplate. Moreover, where the unsecured creditor's underlying right to attorneys' fees arises out of a state statute, the right is obviously not bargained-for.

   Some have argued that where a "debtor freely entered into the contract and must have known the potential cost," "it would be inequitable to allow  [*161]  the debtor to avoid this obligation." n273 This argument, however, disregards the fact that the estate belongs not to the debtor but to the creditors who bear the entire burden while receiving none of the benefit of a supposedly bargained-for fee provision. n274

   Those cases awarding post-petition fees to successful creditors in nondischargeability actions or to debtors are inapposite. n275 Such an award is made against an individual personally and is to be paid by that individual. On the other hand, an unsecured creditor's claim for fees is to be paid by the bankruptcy estate. n276 Fee claims asserted against the estate must be analyzed differently from attorneys' fees sought personally against an opposing party in bankruptcy litigation. An analysis of fees sought from the estate must involve a consideration of bankruptcy policies, including the policy of equal distribution among creditors. As a result of the different source of payment, however, a party seeking fees from an individual debtor or creditor is not a creditor of the estate; n277 thus, an award of fees against an individual debtor or creditor personally does not implicate the same policy considerations and does not run afoul of the Code's goal of equitable distribution.

   So too is an award of fees to an oversecured creditor consistent with equitable principles. Because an oversecured creditor's fees are paid from its "security cushion," payment to an oversecured creditor does not interfere with the administration of the estate. n278 It should be noted, however, that  [*162]  not even an oversecured creditor has a

wholesale right to fees. n279

Not only must the estate be administered in an equitable manner, the estate must be administered in an efficient manner. n280 Bankruptcy laws must be interpreted with the aim of "avoiding waste and preventing overreaching by attorneys in the attempts to be paid attorneys' fees from the estate." n281 The disallowance of unsecured creditors' claims for post-petition attorneys' fees prevents individual creditors from utilizing scorched-earth tactics, wielding fee claims as bargaining chips, or generally absorbing all of the assets of the estate. n282 The English Rule contributes to the efficient administration of the estate by "fixing the moment when the affairs of the bankrupt are supposed to be wound up." n283 The Supreme Court has held the English Rule to be justified by its goal of avoiding administrative inconvenience. n284

In the context of post-petition interest, the Supreme Court has held that the policies favoring equality of distribution and administrative efficiency support the rule disallowing post-petition interest to unsecured creditors. n285 The disallowance of an unsecured creditor's claim for post-petition attorneys' fees equally supports these policy goals. Adoption of any other rule would undermine the values promoted by the Congressional scheme set forth in the Bankruptcy Code and recognized by the Supreme Court. For these reasons, the Supreme Court should and likely will disallow an unsecured creditor's claim for post-petition attorneys' fees against the bankruptcy estate.

CONCLUSION

 The Supreme Court's decision in Travelers may be more significant for what it did not do than what it did do. While the Court struck down the Fobian Rule, one might question the utility of such a decision when the issue affects so few courts and when the original underlying basis for the Rule arguably remains intact. Travelers did, however, provide the Court with an  [*163]  excellent opportunity to highlight an issue of much more significant importance: the allowability of an unsecured creditor's claim for post-petition attorneys' fees.

In setting up the proper analysis of such a claim, the Court has all but decided the issue, and based on a review of Supreme Court precedent, it is all but certain how the Court will come down on the issue. It may be significant to note that the opinion in Travelers was written by Justice Alito. In the four bankruptcy-related cases that Justice Alito has participated in since taking his seat on January 31, 2006, n286 he has been aligned with Justice Scalia in all but one. n287 Over the years, Justice Scalia has made clear that he favors a holistic approach in which the Bankruptcy Code is interpreted as a consistent whole. n288

A holistic interpretation of the Code with respect to the issue of an unsecured creditor's claim for post-petition fees necessarily leads one to the conclusion that such a claim must be disallowed. Section 502(b)(1) expressly incorporates applicable law, including § 506(b), which limits the recovery of post-petition attorneys' fees to oversecured creditors. Moreover, all of the remaining provisions of the Code that recognize a right to recover attorneys' fees clearly exclude unsecured creditors from their scope, evidencing Congress' intent to deny unsecured creditors this form of relief. Finally, the purpose of the Code is to achieve equality among creditors. That goal is contravened by any rule that puts a dollar in the pocket of one unsecured creditor at the expense of the others.

This is the result that the language and purpose of the Code dictates. As the Supreme Court has stated, "if Congress enacted into law something different from what it intended, then it should amend the statute to conform to its intent." n289

**Legal Topics:**

For related research and practice materials, see the following legal topics:
Bankruptcy LawClaimsObjectionsContracts LawDebtor & Creditor RelationsWorkers' Compensation & SSDIAdministrative ProceedingsClaimsTime LimitationsClaim Periods

81 Am. Bankr. L.J. 123, *163

**FOOTNOTES:**

n1. *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co., 127 S. Ct. 1199 (2007).*

n2. *Fobian v. W. Farm Credit Bank (In re Fobian), 951 F.2d 1149 (9th Cir. 1992),* cert. denied, *505 U.S. 1020, 1021 (1992).*

n3. Stylistically, courts have discussed the inconsistent use of the terms "attorney fees," "attorney's fees," "attorneys' fees," and "attorneys' fees" at considerable length. See *Keaton v. Boatmens' Bank of Tenn. (In re Keaton), 212 B.R. 587, 587 n.1 (Bankr. E.D. Tenn. 1997)* (citing *Rider v. City of Springfield, 109 F.3d 288, 290 n.1 (6th Cir. 1997)).* Congress amended the Bankruptcy Code in 2005 to uniformly use the term "attorneys' fees." See generally, Bankruptcy Abuse Prevention & Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23 (using the term "attorneys' fees" throughout). This Article conforms to Congress's express usage by using the term "attorneys' fees" when discussing the rights of attorneys to payment of fees in the context of bankruptcy proceedings.

n4. All statutory references are to Title 11 of the United States Code unless otherwise indicated.

n5. *Tymchenko Decl., Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co. (In re Pac. Gas & Elec. Co.), No. C-03-3499, 2004 WL 5167592 (N.D. Cal. Feb. 18, 2004), 2003 WL 23794871, at 46.*

n6. *Joint Appendix, Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co., 127 S. Ct. 1199 (2007) (No. 05-1429), 2006 WL 3404627, at 113-114, 117-118.*

n7. Id. at 114.

n8. Id. at 117-118. For further discussion of the Fobian Rule, see infra Part II.

n9. *Joint Appendix, supra* note 6, at 140-142.

n10. *Travelers, 2004 WL 5167592, at 3.*

n11. Id. at 6-7.

n12. *Travelers Cas. & Sur. Co. v. Pac. Gas & Elec. Co., 167 Fed. Appx. 593 (9th Cir. 2006).*

n13. *Petition for Writ of Certiorari, Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co., 127 S. Ct. 1199 (2007) (No. 05-1429), 2006 WL 1272597, at 1.*

n14. *Opp. to Petition for Writ of Certiorari, Travelers, 127 S. Ct. 1199, 2006 WL 1909672.*

n15. *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co., 127 S. Ct. 377 (2006).*

n16. *Brief for Petitioner, Travelers, 127 S. Ct. 1199 (No. 05-1429), 2007 WL 816795.*

n17. *Brief for Respondent, Travelers, 127 S. Ct. 1199 (No. 05-1429), 2007 WL 3825666 (arguing that the Court need not even address the validity Fobian distinction).*

n18. Id.

n19. Id. at 18.

n20. Id. at 25-38.

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 74 of 150

Page 20
81 Am. Bankr. L.J. 123, *163

n21. Id. at 42-48.

n22. *Transcript of Oral Argument at 28, Travelers, 127 S. Ct. 1199 (No. 05-1429), 2007 WL 102643.*

n23. See *Travelers, 127 S. Ct. at 1199.*

n24. *Id. at 1205-06.*

n25. *Id. at 1203* (citing *11 U.S.C. § 101*(5)(A) identifying a claim as a "right to payment").

n26. *Id. at 1203-04.* Section 502(b) contains specific limitations on the allowability of claims against the bankruptcy estate. *11 U.S.C. § 502*(b)(1)-(9).

n27. *Travelers, 127 S. Ct. at 1203-04.* Section 502(b)(1) of the Code disallows a claim that is "unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured." *11 U.S.C. § 502*(b)(1).

n28. *Travelers, 127 S. Ct. at 1207.*

n29. Id.

n30. *Id. at 1205.*

81 Am. Bankr. L.J. 123, *163

n31. Id.

n32. See discussion infra Parts II.D. and III.A.

n33. See supra Part I.B. and infra Part III.

n34. See infra Part II.D.

n35. Id.

n36. *Fobian v. W. Farm Credit Bank (In re Fobian), 951 F.2d 1149 (9th Cir. 1992).* The underlying basis for the decision and the substantive analysis is less relevant to Fobian's significance regarding the issue of attorneys' fees. For a more complete discussion of the Chapter 12 issues in Fobian, see 2 William Houston Brown, The Law of Creditors and Debtors § 13:10 (2007).

n37. *Fobian, 951 F.2d at 1153.*

n38. Id.

n39. Id.

n40. Id. (citing *Collingwood Grain, Inc. v. Coast Trading Co. (In re Coast Trading Co.), 744 F.2d 686, 693 (9th Cir. 1984); Grove v. Fulwiler (In re Fulwiler), 624 F.2d 908, 910 (9th Cir. 1980); Johnson v. Righetti (In re Johnson), 756 F.2d 738, 741-42 (9th Cir. 1985)).* See discussion infra Part II.B.

n41. *Fobian, 951 F.2d at 1153* (internal quotation and citation omitted).

n42. Id.


n43. See discussion infra Part II.C.


n44. See, e.g., *Johnson v. Righetti (In re Johnson), 756 F.2d 738, 741-42 (9th Cir. 1985)* (discussing validity of fee award under Oregon statute and under federal bankruptcy law); *Collingwood Grain, Inc. v. Coast Trading Co. (In re Coast Trading Co.), 744 F.2d 686, 693 (9th Cir. 1984)* (discussing validity of fee award under California statute and under federal bankruptcy law).


n45. See *Fobian, 951 F.2d at 1153* (citing pre-Fobian cases).


n46. See discussion of the distinction of the pre-Fobian cases in Travelers infra Part II.D.


n47. *Grove v. Fulwiler (In re Fulwiler), 624 F.2d 908, 910 (9th Cir. 1980)* (per curiam).


n48. *Id. at 909.*


n49. Id. (citing *Or. Rev. Stat. § 20.096(1)* (1975)). The Oregon reciprocal fee statute read in full:


 In any action or suit on a contract, where such contract specifically provides that attorney's fees and costs incurred to enforce the provisions of the contract shall be awarded to one of the parties, the prevailing party, whether he is the party specified in the contract or not, at trial or on appeal, shall be entitled to reasonable attorney's fees in addition to costs and necessary disbursements.


*Or. Rev. Stat. § 20.096(1)* (1975).

n50. *Fulwiler, 624 F.2d at 909-10.*

n51. Id.

n52. *Id. at 910* (recognizing the "inherent power of a court of equity" to award fees where the losing party acts in bad faith, pursuant to the Supreme Court's decision in *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240 (1975)).*

n53. Id.

n54. See *Fobian v. W. Farm Credit Bank (In re Fobian), 951 F.2d 1149, 1153 (9th Cir. 1992); LCO Enters., Inc. v. Walsh (In re LCO Enters., Inc.), 180 B.R. 567, 571 (B.A.P. 9th Cir. 1995); Itule v. Metlease, Inc. (In re Itule), 114 B.R. 206, 212-13 (B.A.P. 9th Cir. 1990); In re Health Sci. Prods., Inc., 191 B.R. 895, 913 (Bankr. N.D. Ala. 1995); Stokes v. Vierra (In re Vierra), 173 B.R. 417 (Bankr. N.D. Cal. 1994); AT&T Universal Card Servs. Corp. v. Bonnifield (In re Bonnifield), 154 B.R. 743, 745 (Bankr. N.D. Cal. 1993).*

n55. *Merced Prod. Credit Ass'n v. Sparkman (In re Sparkman), 703 F.2d 1097, 1100 (9th Cir. 1983).*

n56. Compare *Fulwiler, 624 F.2d at 909* (citing *Or. Rev. Stat. § 20.096(1)* (1975)) with *Sparkman, 703 F.2d at 1100 n.2* (citing *Cal. Civ. Code § 1717* (West 1975)). The California reciprocal fee statute read in relevant part:

 In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce the provisions of that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the prevailing party, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to costs and necessary disbursements.

 *Cal. Civ. Code § 1717* (West 1975).

81 Am. Bankr. L.J. 123, *163

n57. *Sparkman, 703 F.2d at 1099-100.*

n58. *Id. at 1100.* Sparkman was decided under the Bankruptcy Act of 1898 and was not governed by the Bankruptcy Code or by the present bankruptcy procedural rules. See *id. at 1109.* Rule 7008(b) would now require fees to be pleaded as a claim in an adversary proceeding. *Fed. R. Bankr. P. 7008(b).*

n59. *744 F.2d 686 (9th Cir. 1984).*

n60. *Id. at 689.*

n61. *Id. at 693* (characterizing the action for reclamation as one seeking rescission or cancellation of the contract as opposed to "enforcement" of the contract, as required by Oregon statute). The court also denied the award of attorneys' fees under an Oregon statute providing for fees on dishonored checks, as the drafts were not part of the dispute. Id. (denying fees requested under section 20.090).

n62. Id. ("The question of the applicability of the bankruptcy laws to particular contracts is not a question of the enforceability of the contract but rather involves a unique separate area of federal law.").

n63. Id. (citing *Grove v. Fulwiler (In re Fulwiler), 624 F.2d 908, 910 (9th Cir. 1980)* (similarly finding that the proceeding was not one "enforcing the contract," and thus *Or. Rev. Stat. § 20.096* was inapplicable)).

n64. See *Fobian v. W. Farm Credit Bank (In re Fobian), 951 F.2d 1149, 1153 (9th Cir. 1992);* see also *BankBoston, N.A. v. Sokolowski (In re Sokolowski), 205 F.3d 532, 535 (2d Cir. 2000); Am. Express Travel Related Servs. Co. v. Hashemi (In re Hashemi), 104 F.3d 1122, 1126 (9th Cir. 1997); LCO Enters., Inc. v. Walsh (In re LCO Enters., Inc.), 180 B.R. 567, 570-51 (B.A.P. 9th Cir. 1995); Max Rouse & Sons, Inc. v. Specialty Plywood, Inc. (In re Specialty Plywood, Inc.), 160 B.R. 627, 632 (B.A.P. 9th Cir. 1993); In re Biazo, 314 B.R. 451, 457 (Bankr. D. Kan. 2004); Sunclipse, Inc. v. Butcher (In re Butcher), 200 B.R. 675, 678 (Bankr. C.D. Cal. 1996); In re Health Sci. Prods., Inc., 191 B.R. 895, 913 (Bankr. N.D. Ala. 1995); In re Child World, Inc. . 161 B.R. 349, 355 (Bankr. S.D.N.Y. 1993); Idaho First Nat'l Bank, N.A. v. LeMaster (In re LeMaster), 147 B.R. 52, 52 (Bankr. D. Idaho 1992).* See discussion infra Part II.D.

n65. *Johnson v. Righetti (In re Johnson), 756 F.2d 738 (9th Cir. 1985).*

n66. *Id. at 741-42.*

n67. *Id. at 741.* The court in Eastview Estates II awarded fees to the trustee who successfully objected to a creditor's claim for a brokerage commission on grounds that the agreement was unenforceable under *California's Statute of Frauds. Christison v. Norm Ross Company (In re Eastview Estates II), 713 F.2d 443 (9th Cir. 1983).* The court found that the objection to claim action was "an action on contract" under section 1717 of California Civil Code such that the contract and state statute provided for the award of attorneys' fees. *Id. at 451-52.*

n68. *Eastview Estates II, 713 F.2d at 451-52.*

n69. Id. at 741.

n70. Id.

n71. Id. (citing *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 269-71 (1975),* for the proposition that fees could not be awarded where there was no federal statutory basis for awarding attorneys' fees, which follows the so-called "American rule").

n72. *Eastview Estates II, 713 F.2d at 451-52.*

n73. *Johnson, 756 F.2d at 741-42.*

n74. See *Fobian v. W. Farm Credit Bank (In re Fobian), 951 F.2d 1149, 1153 (9th Cir. 1992).*

n75. One possible explanation for this is that Fobian's rationale was overlooked as bad law - over-extending the oversimplification in the pre-Fobian debtors' fee cases to a creditor's request for attorneys' fees. Cf. Liore Z. Alroy & J. Michael Mayerfeld, Contracted-For Post-Petition Attorneys' Fees and Collection Costs: United Merchants Revisted, *1992 Colum. Bus. L. Rev. 309* (discussing creditors' rights to attorneys' fees in bankruptcy proceedings without discussing Fobian); James Gadsden & Seigo Yamasaki, Recovery of Attorney Fees as an Unsecured Claim, *114 Banking L.J. 594 (1997)* (same).

n76. See, e.g., *In re Rubottom, 142 B.R. 407, 408-09 (Bankr. D. Or. 1992),* overruled by *Kord Enter. II v. Cal. Commerce Bank, 139 F.3d 684 (1998)* (citing the Fobian rule as excluding the allowance of fees not involving basic contract enforcement issues, and extending it to exclude fees otherwise explicitly allowed to oversecured creditors under *11 U.S.C. § 506*(b)).

n77. *Heritage Ford v. Baroff (In re Baroff), 105 F.3d 439 (9th Cir. 1997).*

n78. *Id. at 441-42.*

n79. *Id. at 442.*

n80. Id. (concluding under California's then broad reading of the repiprocal fee statute that the debtor was entitled to an award of attorneys' fees).

n81. *Am. Express Travel Related Servs. Co. v. Hashemi (In re Hashemi), 104 F.3d 1122, 1126 (9th Cir. 1997).*

n82. *Id. at 1127-28.*

n83. Id. The Supreme Court subsequently addressed this issue in *Cohen v. De La Cruz, 523 U.S. 213 (1998).* The Court concluded that a creditor's claim under § 523(a)(2)(A) of the Code includes attorneys' fees awarded pursuant to applicable state law. Thus, the rationale in Hashemi and the reliance on the Fobian Rule in the context of creditors' attorneys' fees in a nondischargeability action was overruled. See *AT&T Universal Card Servs. v. Pham (In re Pham), 250 B.R. 93, 99 (B.A.P. 9th Cir. 2000)* (determining that "after Cohen, the

determinative question in cases under § 523(a)(2) is whether the successful plaintiff could recover attorney's [sic] fees in a non-bankruptcy court."). Instead of following the Supreme Court's lead and looking at the creditors' rights to attorneys' fees as part of a claim against the estate, bankruptcy courts treated Cohen as an exception to the Fobian rule that required looking to state law whenever attorneys' fees were at issue in a nondischargeability action. See *Bertola v. N. Wisc. Produce Co. (In re Bertola) 317 B.R. 95, 99-100 (B.A.P. 9th Cir. 2004)* (setting forth the Fobian rule as set forth in Baroff and Hashemi). Another panel demonstrated yet again the confusion between an action on contract under the Fobian Rule and an action on contract under applicable state law, by citing Hashemi for the proposition that where a court doesn't have to consider the enforceability of a contract, it is not an "action on contract" under California's reciprocal fee statute. See *Redwood Theaters, Inc. v. Davison (In re Davison), 289 B.R. 716, 723 (B.A.P. 9th Cir. 2003)* (citing Hashemi,). The Ninth Circuit in Hashemi did not look to nor mention the state statute, because it decided that the nondischargeability action was not an "action on a contract" and thus state law did not apply. *Hashemi, 104 F.3d at 1126-27.*

n84. *Hashemi, 104 F.3d. at 1127.*

n85. *Renfrow v. Draper, 232 F.3d 688 (9th Cir. 2000).*

n86. *Id. at 694.*

n87. *Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n, 322 F.3d 1039, 1041 (9th Cir. 2003)* (concluding that under Renfrow and Baroff, the litigation of whether a state law was invalid which would have rendered the contract at issue unenforceable constituted a question of the contract's enforceability, and thus attorneys' fees were available pursuant to state law).

n88. Id. (reconciling Renfrow, Hashemi, and Baroff).

n89. *Travelers Cas. & Sur. Co. v. Pac. Gas & Elec. Co. (In re Pac. Gas & Elec. Co.), 167 Fed. Appx. 593 (9th Cir. 2006);* see discussion supra Part. I.A.

n90. *DeRoche v. Ariz. Indus. Comm'n, 434 F.3d 1188 (9th Cir. 2006).*

n91. See *id. at 1190.*

n92. See *id. at 1190-91.*

n93. *Id. at 1191-92.*

n94. *DeRoche v. Ariz. Indus. Comm'n, 127 S. Ct. 1873 (2007).*

n95. Id.

n96. See, e.g., *BankBoston, N.A. v. Sokolowski (In re Sokolowski), 205 F.3d 532 (2d Cir. 2000)* (denying attorneys' fees to debtor under Fobian); *In re Sheridan, 105 F.3d 1164 (7th Cir. 1997)* (refusing, without citing Fobian, to look to state law for attorneys' fees incurred by debtor who successfully defended nondischargeability action).

n97. *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co., 127 S. Ct. 1199, 1203-04 (2007).*

n98. *Id. at 1205, n.3.*

n99. *Id. at 1205* (noting that none of the cases cited in Fobian identified a basis for disallowing contractually based attorneys' fees incurred litigating bankruptcy issues, but that the fees were disallowed under applicable state law).

n100. *Fobian v. W. Farm Credit Bank (In re Fobian), 951 F.2d 1149, 1153 (9th Cir. 1992);* see discussion supra Part II.B.

n101. *Travelers, 127 S. Ct. at 1205.*

n102. *Id. at 1205, n.3.*

n103. *Collingwood Grain, Inc. v. Coast Trading Co. (In re Coast Trading Co.), 744 F.2d 686 (9th Cir. 1984); Grove v. Fulwiler (In re Fulwiler), 624 F.2d 908 (9th Cir. 1980); Johnson v. Righetti (In re Johnson), 756 F.2d 738 (9th Cir. 1985).*

n104. See *Travelers, 127 S. Ct. at 1201-02; Fobian, 951 F.2d at 1153.* The undersecured creditor in Fobian presumably sought attorneys' fees pursuant to a pre-petition contractual right. However, because of the Fobian court's reliance on the Fobain rule, the substance of the contract was not even discussed. See id.

n105. This is not to propose that these are the only two forms of analysis for attorneys' fees under the Code. See, e.g., *11 U.S.C. § 362*(k) (granting attorneys' fees to debtors for creditors' willful violation of the automatic stay); *11 U.S.C. § 503*(b)(2) (granting administrative priority for court-approved reasonable fees of attorneys hired by trustee); *11 U.S.C. 503*(b)(4) (granting administrative priority for reasonable attorneys' fees incurred by creditors who benefit the estate); *11 U.S.C. § 523*(d) (awarding fees to debtor where creditor brings nondischargeability action on consumer debt without substantial justification); *Cohen v. De La Cruz, 523 U.S. 213 (1998)*(analyzing attorneys' fees in connection with nondischargeability complaints); *Randolph & Randolph v. Scruggs, 190 U.S. 533, 539-40 (1903)* (allowing a creditor's claim for attorneys' fees pursuant to a pre-petition contract only to the extent the services were beneficial to the estate).

n106. The Code defines a creditor, for one, as an entity with a claim against the debtor that arose pre-petition. *11 U.S.C. § 101*(10)(A). A claim is defined as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured ... ." *11 U.S.C. § 101*(5)(A).

n107. See *11 U.S.C. § 101*(5), (10) (respectively, defining a "claim" and a "creditor"). This distinction is not so simple as the rights of creditors versus debtors. It is not always the debtor enforcing the debtor's right to attorneys' fees. See, e.g., *Christison v. Norm Ross Company (In re Eastview Estates II), 713 F.2d 443 (9th Cir. 1983)* (allowing trustee to recover fees based on debtor's prepetition contractual right). Also, a creditor might be awarded attorneys' fees personally imposed against the debtor, but not as a claim against the estate. The Supreme Court has held that creditors who succeed in nondischargeability actions are entitled to their have their enforceable rights to attorneys' fees under non-bankruptcy law included as part of the nondischargeable debt that the debtor remains personally liable for after bankruptcy. *Cohen v. De La Cruz, 523 U.S. 213, 223 (1998).* Thus,

a creditor may, in the context of a nondischargeability action, successfully recover attorneys' fees personally from the debtor. See id. This Article does not directly address whether the creditor would also be entitled a claim against the estate for the claim for attorneys' fees found nondischargeable. Presumably, however, under the rationale set forth in Part III, the claim would not be allowed against the bankruptcy estate. See infra Part III.

n108. In contrast to fees allowed as a claim against the bankruptcy estate - where the creditor's fees may only be paid by the estate in part - fees awarded personally against a party are more akin to the idea of true "fee shifting" - where the losing party bears the responsibility for the attorneys' fees of both parties - and are subject to a more straightforward analysis.

n109. This Article does not address when and whether a debtor's successful collection of attorneys' fees resulting from post-petition litigation before the bankruptcy court is an asset of the estate. Whether the fees became part of the estate would presumably turn on whether the debtor had a legal or equitable interest in the fees at the commencement of the bankruptcy case. *11 U.S.C. § 541*(a)(1).

n110. See discussion of pre-Fobian cases supra Part II.B. The Ninth Circuit has the opportunity to resolve the issue of debtor's fees in bankruptcy proceedings in light of Travelers when it reconsiders DeRoche on remand from the Supreme Court. See *DeRoche v. Ariz. Indus. Comm'n, 127 S. Ct. 1873 (2007).*

n111. Claims against the estate for attorneys' fees require consideration of creditors' rights to equitable and efficient distribution of the proceeds in the bankruptcy estate as well as debtors' rights to a fresh start while fees sought directly from an opposing party do not require such considerations. See infra Part III.D.

n112. See *Raleigh v. Ill. Dept. of Revenue, 530 U.S. 15, 20 (2000)* (citing *Butner v. United States, 440 U.S. 48, 55 (1979)).*

n113. *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co., 127 S. Ct. 1199, 1205 (2007).*

n114. Because the Court stated that in the pre-Fobian cases the claims for attorneys' fees failed as a matter of state law, it raises the possibility that attorneys' fees may be awarded pursuant to state law where the claim is against a party and not against the bankruptcy estate.

n115. See *Travelers, 127 S. Ct. at 1205* (citing *Raleigh, 530 U.S. at 20).*

n116. See id. at 1205 (looking to *§ 502(b) of the Bankruptcy Code* to determine whether the claim for attorneys' fees is disallowed); see also infra Part III.A.

n117. See discussion supra Part II.B.

n118. See discussion infra Part III.

n119. *Travelers, 127 S. Ct. at 1202;* see supra Part I.

n120. *Travelers, 127 S. Ct. at 1207-1208;* see supra notes 28-29 and accompanying text.

n121. A number of courts have characterized the denial of post-petition attorneys' fees to unsecured creditors as the "majority rule." See *Global Indus. Techs. Servs. Co. v. Tanglewood Invs., Inc. (In re Global Indus. Techs., Inc.), 327 B.R. 230, 239 (Bankr. W.D. Pa. 2005); In re New Power Co., 313 B.R. 496, 506 (Bankr. N.D. Ga. 2004); Pride Cos. v. Johnson (In re Pride Cos.), 285 B.R. 366, 375-377 (Bankr. N.D. Tex. 2002).* The issue appears to be closer than those courts suggest. See infra notes 122-123.

n122. See *Welzel v. Advocate Realty Inv., LLC (In re Welzel), 275 F.3d 1308, 1316-20 (11th Cir. 2001); McMurray v. Marathon Nat'l Bank (In re Wire Works, Inc.), 2000 WL 1801375 at 2 (9th Cir. 2000); Woburn Assocs. v. Kahn (In re Hemingway Transp., Inc.), 954 F.2d 1, 7-9 (1st Cir. 1992); Martin v. Bank of Germantown (In re Martin), 761 F.2d 1163, 1168 (6th Cir. 1985);* United Merchs. & Mfrs., Inc. v. Equitable Life Assurance Soc'y of the U.S. (In re United Merchs. & Mfrs., Inc.), 674. F.2d 134, 138 (2d Cir. 1982); *Ins. Co. of N. Am. v. Sullivan, 333 B.R. 55, 62 (D. Md. 2005); Keaton v. Boatmen's Bank of Tenn. (In re Keaton), 212 B.R. 587, 589-92 (E.D. Tenn. 1997),* vacated as moot, *145 F.3d 1331 (6th Cir. 1998); Barclays/Am. Bus. Credit, Inc. v. Adams, 171 B.R. 298, 305 (W.D. Tenn. 1993); Liberty Nat'l Bank & Trust Co. of Louisville v. George, 70 B.R. 312, 317 (W.D. Ky. 1987); Marine Midland Bank, N.A. v. Ladycliff College (In re Ladycliff College), 56 B.R. 765, 769 (S.D.N.Y. 1985); New Power, 313 B.R. at 507-10; In re Hunter, 203 B.R. 150, 151 (Bankr. W.D. Ark. 1996); In re Tricca, 196 B.R. 214, 219-20 (Bankr. D. Mass. 1996); In re Byrd, 192 B.R. 917, 919 (Bankr. E.D. Tenn. 1996); In re Ridgewood Apts. of DeKalb County, Ltd., 174 B.R. 712, 718-19 (Bankr. S.D. Ohio 1994); In re Indep. Am. Real Estate, Inc., 146 B.R. 546, 555 (Bankr. N.D. Tex. 1992); In re New York Trap Rock Corp., 137 B.R. 568, 573 (Bankr. S.D.N.Y. 1992); GATX Terminals Corp. v. A. Tarricone, Inc. (In re A.*

*Tarricone, Inc.), 83 B.R. 253, 254-55 (Bankr. S.D.N.Y. 1988); In re Schwartz, 77 B.R. 177, 179 (Bankr. S.D. Ohio 1987), aff'd, 87 B.R. 41 (S.D. Ohio 1988); Tri-State Homes, Inc. v. Mears (In re Tri-State Homes, Inc.), 56 B.R. 24, 26 (Bankr. W.D. Wis. 1985); In re Ely, 28 B.R. 488, 491-92 (Bankr. E.D. Tenn. 1983); In re Missionary Baptist Found. of Am., Inc., 24 B.R. 970, 971 (Bankr. N.D. Tex. 1982); Woerner v. Farmers Alliance Mut. Ins. (In re Woerner), 19 B.R. 708, 713 (Bankr. D. Kan. 1982).*

n123. See *Rushton v. State Bank of S. Utah (In re Gledhill), 164 F.3d 1338, 1341 (10th Cir. 1999); Adams v. Zimmerman, 73 F.3d 1164, 1177 (1st Cir. 1996); Baybank-Middlesex v. Ralar Distribs., Inc., 69 F.3d 1200, 1202 (1st Cir. 1995); Bondholder Comm. v. Williamson County, 43 F.3d 256, 261-62 (6th Cir. 1994); Interfirst Bank Abilene, N.A. v. FDIC, 777 F.2d 1092, 1097 (5th Cir. 1985); In re Waterman, 248 B.R. 567, 573 (B.A.P. 8th Cir. 2000); Bronze Group, Ltd. v. Sender (In re Hedged-Invs. Assocs., Inc.), 293 B.R. 523, 526 (D. Colo. 2003); Chem. Bank v. First Trust of N.Y., Nat'l Ass'n (In re Se. Banking Corp.), 212 B.R. 682, 689 (S.D. Fla. 1997), aff'd, 179 F.3d 1307 (11th Cir. 1999); In re Smith, 206 B.R. 113, 115 (D. Md. 1997); In re Miller, 344 B.R. 769, 771 (Bankr. W.D. Va. 2006); In re Hedrick, 343 B.R. 762, 764 (Bankr. E.D. Va. 2006); In re Plymouth House Health Care Center, 2005 WL 2589201 at 5 (Bankr. E.D. Pa. 2005); Global Indus. Techs., Inc., 327 B.R. at 239; In re Loewen Group Int'l, Inc., 274 B.R. 427, 444 (Bankr. D. Del. 2002); Pride, 285 B.R. at 375-377; In re El Paso Refinery, L.P., 244 B.R. 613, 616-17 (Bankr. W.D. Tex. 2000); In re Carter, 220 B.R. 411, 417 (Bankr. D.N.M. 1998); In re Woodmere Invs. L.P., 178 B.R. 346, 356 (Bankr. S.D.N.Y. 1995); In re Barrett, 136 B.R 387, 394-95 (Bankr. E.D. Pa. 1992); In re Saunders, 130 B.R. 208, 210 (Bankr. W.D. Va. 1991); In re Alden, 123 B.R. 563, 564 n.1 (Bankr. E.D. Mich. 1990); In re K-Fab, Inc., 118 B.R. 240, 241 (Bankr. M.D. Pa. 1990); Sakowitz, Inc. v. Chase Bank Int'l (In re Sakowitz, Inc.), 110 B.R. 268, 275 (Bankr. S.D. Tex. 1989); In re Kudlacek, 109 B.R. 424, 426-27 (Bankr. D. Nev. 1989); Conn. Gen. Life Ins. Co. v. Schaumburg Hotel Owner L.P. (In re Schaumburg Hotel Owner L.P.), 97 B.R. 943, 949-50 (Bankr. N.D. Ill. 1989); In re Canaveral Seafoods, Inc., 79 B.R. 57, 58 (Bankr. M.D. Fla. 1987); In re Tashjian, 72 B.R. 968, 974 (Bankr. E.D. Pa. 1987); In re Jablonski, 70 B.R. 381, 388 (Bankr. E.D. Pa. 1987); In re Mobley, 47 B.R. 62, 62-63 (Bankr. N.D. Ga. 1985); In re Marcum, 22 B.R. 32, 33 (Bankr. S.D. Ohio 1982); Burke Investors v. Nite Lite Inns (In re Nite Lite Inns), 13 B.R. 900, 910 (Bankr. S.D. Cal. 1981); Mellon Bank v. Sholos (In re Sholos), 11 B.R. 782, 784-85 (Bankr. W.D. Pa. 1981); Leasing Svc. Corp. v. E. Equip. Co. (In re E. Equip. Co.), 11 B.R. 732, 739-40 (Bankr. S.D.W. Va. 1981),* rev'd on other grounds, 27 B.R. 980 (S.D.W. Va. 1983). Cf. *Hassan Imports P'ship v. KWP Fin. VI (In re Hassan Imports P'ship), 256 B.R. 916, 925 (B.A.P. 9th Cir. 2000).*

n124. See, e.g., *Official Comm. of Unsecured Creditors v. Dow Corning Corp. (In re Dow Corning Corp.), 456 F.3d 668, 683 (6th Cir. 2006); McDonald v. Lorenzo Bancshares, Inc. (In re Lorenzo Bancshares, Inc.), 122 B.R. 270, 273 (Bankr. N.D. Tex. 1991); In re Cont'l Airlines Corp., 110 B.R. 276, 280 (Bankr. S.D. Tex. 1989).* Consider whether the Supreme Court declined to address the § 506(b) issue in Travelers because PG&E was solvent, making Travelers an inappropriate vehicle for an ultimate determination of the issue.

n125. *Travelers, 127 S. Ct. at 1204.*

n126. See id. (A claim for fees is generally "allowable in bankruptcy except where the Bankruptcy Code

provides otherwise.") (emphasis added).

n127. Id. (emphasis added).

n128. *Id. at 1207-08.*

n129. *Id. at 1205.*

n130. Id. (emphasis added).

n131. *Id. at 1204* (citing *11 U.S.C.§§101*(5)(A) and 502(a)).

n132. Id.; see *11 U.S.C. § 501*(a).

n133. Bankruptcy Act of 1898, ch. 541, § 63(a)(1), 30 Stat. 544, 562-63 (repealed 1979).

n134. *Hartman v. Utley, 335 F.2d 558, 559 n.2 (9th Cir. 1964); In re Gimbel, 294 F. 883, 885-86 (5th Cir. 1923);* British & Am. Mortgage Co. v. Stuart (In re Vandiver), 210 F.425, 429-30 (5th Cir. 1914). Cf. *James Talcott, Inc. v. Wharton (In re Cont'l Vending Mach. Corp.), 543 F.2d 986, 992 (2d Cir. 1976)* (fees incurred prior to petition constitute claim). Note, however, that the Supreme Court "first allowed a contingent claim against a bankrupt even before the Act specified that such claims were allowable." *Employees' Ret. Sys. of Hawaii v. Osborne (In re THC Fin. Corp.), 686 F.2d 799, 802 (9th Cir. 1982)* (citing *Maynard v. Elliott, 283 U.S. 273, 277 (1931)).*

n135. Chandler Act, ch. 575, § 63(a)(8), 52 Stat. 840, 873 (1938) (repealed 1979).

n136. Id. § 57(d); see *THC, 686 F.2d at 803;* Toys "R" *Us, Inc. v. Esgro, Inc. (In re Esgro, Inc.), 645 F.2d 794, 798 (9th Cir. 1981).* Contingent claims for attorneys' fees were not necessarily denied under this provision, however, on the theory that the "contingency was not out of the control of the parties" and "liability and the amount thereof were reasonably estimable." *Esgro, 645 F.2d at 798.*

n137. *11 U.S.C. § 101*(5)(A).

n138. See *Ins. Co. of N. Am. v. Sullivan, 333 B.R. 55, 62 (D. Md. 2005); Keaton v. Boatmen's Bank of Tenn. (In re Keaton), 212 B.R. 587, 589 (E.D. Tenn. 1997),* vacated as moot, *145 F.3d 1331 (6th Cir. 1998); In re New Power Co., 313 B.R. 496, 507-08 (Bankr. N.D. Ga. 2004); In re Byrd, 192 B.R. 917, 919 (Bankr. E.D. Tenn. 1996); In re N.Y. Trap Rock Corp., 137 B.R. 568, 573 (Bankr. S.D.N.Y. 1992).*

N139. The Bankruptcy Code permits a court to estimate the amount of a contingent claim for administrative convenience. See *11 U.S.C. § 502*(c)(1). This point appears to be overlooked by courts disallowing unsecured claims for post-petition attorneys' fees based upon language in § 502(b) that provides that "the court ... shall determine the amount of such claim ... as of the date of the filing of the petition." See *11 U.S.C. § 502*(b). These courts take the position that, because a contingent claim for post-petition attorneys' fees is not absolutely owing on the petition date, the amount of post-petition fees cannot be determined on the petition date; consequently, such claim is not allowable under § 502(b), which requires the amount of a claim to be determined as of the petition date. See, e.g., *Pride Cos. v. Johnson (In re Pride Cos.), 285 B.R. 366, 373 (Bankr. N.D. Tex. 2002); Sakowitz, Inc. v. Chase Bank Int'l (In re Sakowitz, Inc.), 110 B.R. 268, 271 (Bankr. S.D. Tex. 1989).* This result appears contrary to § 502(c), which directs a court to estimate the amount of a contingent claim. See, e.g., *In re New Power Co., 313 B.R. 496, 507-08 (Bankr. N.D. Ga. 2004).* Disallowance of such a claim, therefore, must rest on a different theory.

n140. See *Sec. Mortgage Co. v. Powers (In re Fla. Furniture Co.), 278 U.S. 149, 154 (1928).*

n141. See *Woburn Assocs. v. Kahn (In re Hemingway Trans., Inc.), 954 F.2d 1, 8 (1st Cir. 1992); Transouth Fin. Corp. of Fla. v. Johnson, 931 F.2d 1505, 1516 (11th Cir. 1991)* (Clark, J., dissenting); *Landsing Diversified Properties-II v. First Nat'l Bank & Trust Co. of Omaha (In re W. Real Estate Fund, Inc.), 922 F.3d 592, 597 (10th Cir. 1990).*

n142. See *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec., 127 S. Ct. 1199, 1204 (2007).* At least one court has determined that an unsecured creditor holding a valid contingent claim for post-petition fees is entitled to recovery notwithstanding the court's belief that the claim is disallowed under § 502. See *Sullivan, 333 B.R. at*

*61-62.* This outcome is contrary to the Supreme Court's decision in Travelers that a valid claim is subject disallowance under § 502. See *Travelers, 127 S. Ct. at 1204.*


n143. *11 U.S.C. § 502*(a).


n144. *Travelers, 127 S. Ct. at 1204* (citing *11 U.S.C. § 502*(b)).


n145. Id.; see *11 U.S.C. § 502*(b)(2)-(8).


n146. *Travelers, 127 S. Ct. at 1204.*


n147. *11 U.S.C. § 502*(b)(1).


n148. See, e.g., *Official Comm. of Unsecured Creditors v. Dow Corning Corp. (In re Dow Corning Corp.), 456 F.3d 668, 684-85 (6th Cir. 2006); Keaton v. Boatmen's Bank of Tenn. (In re Keaton), 212 B.R. 587, 589-90 (E.D. Tenn. 1997),* vacated as moot, *145 F.3d 1331 (6th Cir. 1998); In re New Power Co., 313 B.R. 496, 510 (Bankr. N.D. Ga. 2004); In re Schriock Constr., Inc., 176 B.R. 176, 179 (Bankr. D.N.D. 1994).*


n149. *Raleigh v. Ill. Dep't of Revenue, 530 U.S. 15, 20 (2000)* (quoting *Butner v. United States, 440 U.S. 48, 57 (1979)).*


n150. See *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 247 (1975).*


n151. See *Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 717 (1967).*


n152. See, e.g., *Dow Corning, 456 F.3d at 683; Welzel v. Advocate Realty Invs., LLC (In re Welzel), 275*

*F.3d 1308, 1316-18 (11th Cir. 2001); New Power, 313 B.R. at 510; Keaton, 212 B.R. at 589-90, 592; Homestead Partners, Ltd. v. Condor One, LLC (In re Homestead Partners, Ltd.), 200 B.R. 274, 277 (Bankr. N.D. Ga. 1996); In re Tricca, 196 B.R. 214, 220-21 (Bankr. D. Mass. 1996); In re Byrd, 192 B.R. 917, 919 (Bankr. E.D. Tenn. 1996).*

n153. Cf. *11 U.S.C. § 502*(b)(1).

n154. Cf. id.

n155. *Patterson v. Shumate, 504 U.S. 753, 758 (1992)* (citing *11 U.S.C. § 109*(c)(2) (entity may be a debtor under chapter 9 if authorized "by State law"); § 522(b)(1) (election of exemptions controlled by "the State law that is applicable to the debtor"); § 523(a)(5) (a debt for alimony, maintenance, or support determined "in accordance with State or territorial law" is not dischargeable); § 903(1) ("[A] State law prescribing a method of composition of indebtedness" of municipalities is not binding on nonconsenting creditors)).

n156. See *id. at 758 n.2* (citing *11 U.S.C. § 1125*(d) (adequacy of disclosure statement not governed by any "otherwise applicable nonbankruptcy law"); § 108(a) (referring to statute of limitations fixed by "applicable nonbankruptcy law")). Compare H.R. Rep. No. 95-595, 348 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6304 (limiting the phrase "applicable law" in § 365(c) to "applicable nonbankruptcy law") with H.R. Rep. No. 95-595, 352, reprinted in 1978 U.S.C.C.A.N. 5963, 6308 (expressing no such limitation with respect to § 502(b)(1)).

n157. Cf. *Patterson, 504 U.S. at 758* ("Congress' decision to use the broader phrase 'applicable nonbankruptcy law' in § 541(c)(2) strongly suggests that it did not intend to restrict the provision in the manner that petitioner contends.").

n158. See *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec., 127 S. Ct. 1199, 1205 (2007).*

n159. Id. (emphasis added).

n160. See *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs. (In re Timbers of Inwood Forest Assocs.), 808 F.2d 363, 379-80 (5th Cir. 1987)* (Jones, J., dissenting) (" § 502 is subject to qualification as

necessary to accomplish certain goals within the Bankruptcy Code"), aff'd, *484 U.S. 365 (1988); In re Gray, 174 B.R. 228, 230 (Bankr. E.D. Ky. 1994); In re Turner, 157 B.R. 904, 911 (Bankr. N.D. Ala. 1993); Bondholder Comm. v. Williamson County (In re Brentwood Outpatient, Ltd.), 134 B.R. 267, 269 (Bankr. M.D. Tenn. 1991),* aff'd in part, rev'd in part on other grounds, *43 F.3d 256 (6th Cir. 1994).* But see *Ill. Dep't of Revenue v. Raleigh (In re Stoecker), 179 B.R. 532, 538 (N.D. Ill. 1995);* In re Cavaliere, 194, B.R. 7, 12 (Bankr. D. Conn. 1996).


n161. *Ins. Co. of N. Am. v. Sullivan, 333 B.R. 55, 61 (D. Md. 2005); see Patterson v. Shumate, 504 U.S. 753, 766 (1992)* (Scalia, J., concurring); *Penn. Dep't of Pub. Welfare v. Davenport, 495 U.S. 552, 565 (1990)* (Blackmun, J., dissenting); see also *Kelly v. Robinson, 479 U.S. 36 (1986)* ("look to the provisions of the whole law, and to its object and policy").


n162. See *Dewsnup v. Timm, 502 U.S. 410, 420 (1992)* (Scalia, J., dissenting); *Sullivan, 333 B.R. at 61.*


n163. See *Heiser v. Woodruff, 327 U.S. 726, 732 (1946)* (nothing requires bankruptcy court "to adopt local rules of law in determining what claims are provable, or to be allowed, or how the bankrupt's estate is to be distributed among claimants"); *Am. Sur. Co. of N.Y. v. Sampsell, 327 U.S. 269, 272 (1946)* ("federal bankruptcy law, not state law, governs the distribution of a bankrupt's assets to his creditors"); *Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 585 (1935)* (state law governs rights while bankruptcy law governs remedies); *Sec. Mortgage Co. v. Powers (In re Fla. Furniture Co.), 278 U.S. 149, 154 (1928)* ("The construction of the contract for attorney's fees presents, likewise, a question of local law. Whether the liability is, under the circumstances, enforceable against the proceeds of the sale raises federal questions peculiar to the law of bankruptcy.") (citations omitted).


n164. *Travelers, 127 S. Ct. at 1204-05* (emphasis added). Accord, *Butner v. United States, 440 U.S. 48, 55 (1979)* ("Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.") (emphasis added); *Vanston Bondholders Protective Comm. v. Green, 329 U.S. 156, 161 (1946)* ("What claims of creditors are valid and subsisting obligations against the bankrupt at the time a petition in bankruptcy is filed, is a question which, in the absence of overruling federal law, is to be determined by reference to state law.") (emphasis added).


n165. *United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241 (1989); see Lamie v. U.S. Trustee, 540 U.S. 526, 534 (2004); Patterson, 504 U.S. at 757.*


n166. *11 U.S.C. § 506*(b). This section was amended in 2005 to include the phrase "or State statute." See

Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, § 712, 119 Stat. 23, 128. For a discussion of the significance of this amendment, see infra notes 205 and 256 and accompanying text.

n167. *Brief of Respondent, Travelers, supra* note 17, at 17-18.

n168. Id.

n169. Id. at 18. Accord *In re Loewen Group Int'l, Inc. 274 B.R. 427, 444, 445 n.36 (Bankr. D. Del. 2002)* (concluding unsecured creditor is not entitled to post-petition fees because § 506(b) only applies to oversecured creditors).

n170. Joseph F. Sanson Inv. Co. v. 268 Ltd. (In re 268 Ltd.), 789 F.2d 674, 678 (9th Cir. 1986).

n171. *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., 484 U.S. 365, 372-73 (1988)* (emphasis in original).

n172. See *McMurray v. Wire Works, Inc. (In re Wire Works, Inc.), 2000 WL 1801375 at 2 (9th Cir. 2000); In re Schriock Constr., Inc., 176 B.R. 176, 179 (Bankr. D.N.D. 1994),* rev'd on other grounds, *104 F.3d 200 (8th Cir. 1997); In re Ind. Am. Real Estate, Inc., 146 B.R. 546, 555 (Bankr. N.D. Tex. 1992); Tri-State Homes, Inc. v. Mears (In re Tri-State Homes, Inc.), 56 B.R. 24, 25 (Bankr. W.D. Wis. 1985).*

n173. *Ind. Am. Real Estate, 146 B.R. at 555; Tri-State Homes, 56 B.R. at 25.*

n174. See, e.g., *Global Indus. Techs. Servs. Co. v. Tanglewood Invs., Inc. (In re Global Indus. Techs., Inc.), 327 B.R. 230, 239 (Bankr. W.D. Pa. 2005); Sakowitz, Inc. v. Chase Bank Int'l (In re Sakowitz, Inc.), 110 B.R. 268, 272 (Bankr. S.D. Tex. 1989).*

n175. *TRW Inc. v. Andrews, 534 U.S. 19, 28 (2001).*

n176. *Ins. Co. of N. Am. v. Sullivan, 333 B.R. 55, 61 (D. Md. 2005).*

n177. *11 U.S.C. § 506*(b); see, e.g., *In re Miller, 344 B.R. 769, 771 (Bankr. W.D. Va. 2006); Pride Cos. v. Johnson (In re Pride Cos.), 285 B.R. 366, 372 (Bankr. N.D. Tex. 2002).*

n178. *11 U.S.C. § 330*(a)(1)(A), (4)(B); see *Lamie v. U.S. Trustee, 540 U.S. 526, 534-37 (2004).*

n179. *11 U.S.C. § 503*(b)(4). An unsecured creditor's claim for post-petition fees arising out of a pre-petition contractual obligation cannot be an administrative claim under § 503 because fees falling within the scope of § 503 must arise from obligations first incurred post-petition. See, e.g., *In re Amfesco Indus., Inc., 81 B.R. 777, 784 (Bankr. E.D.N.Y. 1988).*

n180. *11 U.S.C. § 362*(k) (formerly *11 U.S.C. § 362*(h)) (emphasis added); see *Lacey v. Westside Print Works, Inc. (In re Westside Print Works, Inc.), 180 B.R. 557, 564 (B.A.P. 9th Cir. 1995).*

n181. *11 U.S.C. § 523*(d) (providing for attorneys' fees if creditor's position is not "substantially justified" and if award would not be unjust under the circumstances).

n182. *In re Saunders, 130 B.R. 208, 210 (Bankr. W.D. Va. 1991); see Bronze Group, Ltd. v. Sender (In re Hedged-Invs. Assocs., Inc.), 293 B.R. 523, 526 (D. Colo. 2003); Pride, 285 B.R. at 372.*

n183. *United Savs. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., 484 U.S. 365, 373 (1988).*

n184. *Global Indus. Techs. Servs. Co. v. Tanglewood Invs., Inc. (In re Global Indus. Techs., Inc.), 327 B.R. 230, 239-40 (Bankr. W.D. Pa. 2005); see In re Loewen Group Int'l, Inc., 274 B.R. 427, 444 (Bankr. D. Del. 2002); In re Smith, 206 B.R. 113, 115 (Bankr. D. Md. 1997)* ("[T] he unsecured creditor also has no basis to include in its claim these post-petition charges."); *In re Vulpetti, 182 B.R. 923, 926 (Bankr. S.D. Fla. 1995). Cf. Alvarado v. Walsh (In re LCO Enters., Inc.), 180 B.R. 567, (B.A.P. 9th Cir. 1995)* (rejecting argument that §§365

and 547 permit recovery of fees because Congress specifically provided for fees in other circumstances but not those); *Westside Print Works, 180 B.R. at 564* (rejecting argument that § 365(b)(1)(B) permits recovery of fees because Congress specifically provided for fees in other circumstances).

n185. See *Ins. Co. of N. Am. v. Sullivan, 333 B.R. 55, 61 (D. Md. 2005);* supra notes 161-162 and accompanying text.

n186. *Saunders, 130 B.R. at 210.*

n187. *Sec. Mortgage Co. v. Powers (In re Fla. Furniture Co.), 278 U.S. 149, 156 (1928).*

n188. Cf.  *Liberty Nat'l Bank & Trust Co. of Louisville v. George, 70 B.R. 312 (W.D. Ky. 1987).* The George court noted that, although post-petition interest may have been available to an undersecured creditor prior to the enactment of the Code, Congress clearly intended to limit the availability of post-petition interest by codifying certain exceptions and not others. *Id. at 314-15.*

n189. See *Welzel v. Advocate Realty Invs., LLC, (In re Welzel), 275 F.3d 1308, 1317-18 (11th Cir. 2001); United Merchs. & Mfrs., Inc. v. Equitable Life Assurance Soc'y of the U.S. (In re United Merchs. & Mfrs., Inc.), 674 F.2d 134, 138 (2d Cir. 1982).*

n190. *United Merchs., 674 F.2d 134.* For an in-depth discussion of United Merchants, see Alroy & Mayerfeld, supra note 75; Gadsden & Yamasaki, supra note 75.

n191. *Sakowitz, Inc. v. Chase Bank Int'l (In re Sakowitz, Inc.), 110 B.R. 268, 272 (Bankr. S.D. Tex. 1989);* see *United Merchs., 674 F.2d at 138 n.6.*

n192. See, e.g., *Official Comm. of Unsecured Creditors v. Dow Corning Corp. (In re Dow Corning), 456 F.3d 668, 682 (6th Cir. 2006); Keaton v. Boatmen's Bank of Tenn. (In re Keaton), 212 B.R. 587, 592 (E.D. Tenn. 1997),* vacated as moot, *145 F.3d 1331 (6th Cir. 1998); In re Tricca, 196 B.R. 214, 219 (Bankr. D. Mass. 1996); In re Schwartz, 77 B.R. 177, 179 (Bankr. S.D. Ohio 1987),* aff'd, *87 B.R. 41 (S.D. Ohio 1988); Tri-State Homes, Inc. v. Mears (In re Tri-State Homes), 56 B.R. 24, 25 (Bankr. W.D. Wis. 1985); In re Ely, 28 B.R. 488, 491-92*

*(Bankr. E.D. Tenn. 1983).*

n193. *11 U.S.C. § 506*(a)(1) provides:

An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim.

n194. See *Welzel, 275 F.3d at 1317;* Joseph v. Sanson Inv. Co. v. 268 Ltd. (In re 268 Ltd.), 789 F.2d 674, 678 (9th Cir. 1986).

n195. See *Welzel, 275 F.3d at 1317.*

n196. *Beck v. Pace Int'l Union, 427 F.3d 668, 675 (9th Cir. 2005).*

n197. *Bhd. of R.R. Trainmen v. Balt. & Ohio R.R. Co., 331 U.S. 519, 528-29 (1947).*

n198. *11 U.S.C. § 506*(c).

n199. Id. § 506(d).

n200. *First W. Bank & Trust v. Drewes (In re Schriock Constr., Inc.), 104 F.3d 200, 203 (8th Cir. 1997); United Savs. Ass'n of Texas v. Timbers of Inwood Forest Assocs. (In re Timbers of Inwood Forest Assocs.), 808 F.2d 363, 380 (5th Cir. 1987)* (Jones, J., dissenting) ("Section 506(b) should be viewed ... as a baseline guarantee of the rights of the oversecured creditor."), aff'd, *484 U.S. 365 (1988).*

n201. *11 U.S.C. § 506*(b) (emphasis added).

n202. See, e.g., *Solomon v. Wein (In re Huhn), 145 B.R. 872, 876 (W.D. Mich. 1992)* ("An oversecured creditor is not entitled to compensation for its attorneys' fees for every action it takes by claiming that its rights have been affected."); *In re Riker Indus., Inc., 122 B.R. 964, 973 (Bankr. N.D. Ohio 1990); In re Wonder Corp. of Am., 72 B.R. 580, 591 (Bankr. D. Conn. 1987)* ("Courts have the right and the duty, in the exercise of their discretion, to disallow fees and costs under § 506(b)."). See also infra notes 203-205.

n203. See, e.g., *In re Hart, 80 B.R. 107, 111 (Bankr. E.D. Tenn. 1987); In re B & W Mgmt., 63 B.R. 395, 407-09 (Bankr. D.D.C. 1986); Fundex Capital Corp. v. Balaber-Strauss (In re Tampa Chain Co., Inc.), 53 B.R. 772, 783-83 (Bankr. S.D.N.Y. 1985); In re Dawson, 32 B.R. 179, 182 (Bankr. W.D. Mo. 1983);* supra note 202. But see *Welzel v. Advocate Realty Invs., LLC, (In re Welzel), 275 F.3d 1308, 1317 (11th Cir. 2001)* (permitting oversecured creditor to recover unreasonable fees as unsecured claim); Joseph v. Sanson Inv. Co. v. 268 Ltd. (In re 268 Ltd.), 789 F.2d 674, 678 (9th Cir. 1986) (same).

n204. Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, § 712, 119 Stat. 23, 128.

n205. See, e.g., *Bondholder Comm. v. Williamson County (In re Brentwood Outpatient, Ltd.), 43 F.3d 256, 260, 262 (6th Cir. 1994)* (affirming disallowance of fees arising out of state statute); *City of Farmers Branch v. Pointer (In re Pointer), 952 F.2d 82, 83-84, 89 (5th Cir. 1992)* (affirming disallowance of fees arising out of nonconsensual tax lien); *Lincoln Sav. Bank v. Suffolk Country Treasurer (In re Parr Meadows Racing Ass'n), 880 F.2d 1540, 1549 (2d Cir. 1989).*

n206. *United States v. Ron Pair Enters., Inc., 489 U.S. 235 (1989).*

n207. *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., 484 U.S. 365 (1988).*

n208. *Ron Pair, 489 U.S. at 237.*

n209. *Id. at 239* (quoting *11 U.S.C. § 506*(b)) (emphasis added).

n210. *Id. at 239-40* (emphasis added); see also *id. at 241* ("The natural reading of [§ 506(b)] entitles the holder of an oversecured claim to postpetition interest and, in addition, gives one holding a secured claim created pursuant to an agreement the right to reasonable fees.") (emphasis added); *id. at 242 n.4* (referring to the items in § 506(b) as "added recovery").

n211. *Id. at 241.*

n212. *Timbers, 484 U.S. at 369.*

n213. *Id. at 372.*

n214. *Id. at 372-73.* An oversecured creditor's "security cushion" is the amount by which the value of the property securing the claim exceeds the amount of the allowed secured claim. See *11 U.S.C. § 506*(b).

n215. *Timbers, 484 U.S. at 373.*

n216. For cases relying on Timbers, see *Baybank-Middlesex v. Ralar Distribs., Inc., 69 F.3d 1200, 1202 (1st Cir. 1995); Bronze Group, Ltd. v. Sender (In re Hedged-Invs. Assocs., Inc.), 293 B.R. 523, 527 (D. Colo. 2003); Global Indus. Techs. Svcs. Co. v. Tanglewood Invs., Inc. (In re Global Indus. Techs., Inc.), 327 B.R. 230, 240 (Bankr. W.D. Pa. 2005); Pride Cos. v. Johnson (In re Pride Cos.), 285 B.R. 366, 372-73 (Bankr. N.D. Tex. 2002); In re Loewen Group Int'l, Inc., 274 B.R. 427, 445 n.36 (Bankr. D. Del. 2002); In re Woodmere Invs. L.P., 178 B.R. 346, 356 (Bankr. S.D.N.Y. 1995); Conn. Gen. Life Ins. Co. v. Schaumburg Hotel Owner L.P. (In re Schaumburg Hotel Owner L.P.), 97 B.R. 943, 949-50 (Bankr. N.D. Ill. 1989).* For cases relying on Ron Pair, see *Rushton v. State Bank of S. Utah (In re Gledhill), 164 F.3d 1338, 1342 (10th Cir. 1999); Bondholder Comm. v. Williamson County, (In re Brentwood Outpatient, Ltd.), 43 F.3d 256, 261-62 (6th Cir. 1994).*

n217. See *Loewen Group, 274 B.R. at 445 n.36; Woodmere Invs., 178 B.R. at 356.*

n218. See, e.g., *Official Comm. of Unsecured Creditors v. Dow Corning Corp. (In re Dow Corning Corp.),* 456 F.3d 668, 682 (6th Cir. 2006); In re New Power Co., 313 B.R. 496, 510 (Bankr. N.D. Ga. 2004); Keaton v. Boatmen's Bank of Tenn. (In re Keaton), 212 B.R. 587, 592 (E.D. Tenn. 1997), vacated as moot, 145 F.3d 1331 (6th Cir. 1998); In re Byrd, 192 B.R. 917, 919 (Bankr. E.D. Tenn. 1996).*

n219. See *New Power, 313 B.R. at 510* (quoting *Timbers, 484 U.S. at 372-73).*

n220. Id.; *Keaton, 212 B.R. at 592; Homestead Partners, Ltd. v. Condor One, Inc. (In re Homestead Partners, Ltd.), 200 B.R. 274, 277 (Bankr. N.D. Ga. 1996); Byrd, 192 B.R. at 919.*

n221. See Alroy & Mayerfeld, supra note 74 at 322.

n222. *In re Miller, 344 B.R. 769, 772-73 (Bankr. W.D. Va. 2006).*

n223. *Id. at 773.*

n224. Id.

n225. *11 U.S.C. § 726(a)(5).*

n226. See *McDonald v. Lorenzo Bancshares, Inc. (In re Lorenzo Bancshares, Inc.), 122 B.R. 270, 273 (Bankr. N.D. Tex. 1991); Sakowitz, Inc. v. Chase Bank Int'l (In re Sakowitz, Inc.), 110 B.R. 268, 270 (Bankr. S.D. Tex. 1989); In re Cont'l Airlines, Corp., 110 B.R. 276, 279-80 (Bankr. S.D. Tex. 1989).*

n227. *508 U.S. 464, 471 (1993).*

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 99 of 150

Page 45
81 Am. Bankr. L.J. 123, *163

n228. See *Telfair v. First Union Mortgage Corp., 216 F.3d 1333, 1338-39 (11th Cir. 2000)* (citing *Key Bank of N.Y. v. Harko (In re Harko), 211 B.R. 116, 119 (B.A.P. 2d Cir. 1997)* ("There is nothing in the language of § 506(b) to suggest that interest, as opposed to fees, costs and charges, should be treated any differently and the majority of courts have so held.")).

n229. *Vanston Bondholders Protective Comm. v. Green, 329 U.S. 156, 163-64 (1946).*

n230. *In re Foertsch, 167 B.R. 555, 559-60 (Bankr. D.N.D. 1994).*

n231. See *Bronze Group, Ltd. v. Sender (In re Hedged-Invs. Assocs., Inc.), 293 B.R. 523, 526 (D. Colo. 2003)* ("This rule is based on long-standing bankruptcy tenets."); *In re Marcum, 22 B.R. 32, 33 (Bankr. S.D. Ohio 1982)* ("A long-standing principle of Bankruptcy law is embodied in section 506(b)."); Hon. Randolph J. Haines, Should Unsecured Claims Include Postpetition Attorney's Fees?, 11 Norton Bankr. Law Adviser 2 (2006) (using the phrase "long-settled bankruptcy law").

n232. *In re Ghiglione, 93 F. 186, 187 (S.D.N.Y. 1899).*

n233. *In re Coventry Evans Furniture Co., 171 F. 673, 675 (N.D.N.Y. 1909).*

n234. See, e.g., *In re Childs, 52 F. Supp. 89, 92-93 (S.D.N.Y. 1943)* ("Omission of the legislature to provide for [post-petition attorneys' fees] must be taken to express an intention not to authorize such compensation... It has been frequently held that he cannot recover counsel fees except in circumstances specified in [the Act]."); *Warren v. Palmer, 132 F.2d 665, 668-69 (2d Cir. 1942)* (representative of individual creditor cannot recoup expenses from general estate); *In re Wilkes-Barre Hotel Co., 17 F. Supp. 875, 876 (M.D. Pa. 1937)* (fees don't fall within scope of statute); *In re Glenn, 2 F. Supp. 579, 593 (W.D.S.C. 1932)* (holding unsecured creditor cannot recover post-petition attorneys' fees from estate); *In re Ledbetter, 267 F. 893, 895 (N.D. Ga. 1920)* ("As the right to tax the defendant with attorney's fees is lost by payment or tender before suit, so also it is lost by the filing of a petition in bankruptcy."); *In re Rome, 162 F. 971, 974 (D.N.J. 1908)* ("No such fee is expressly authorized by the statute, and, although in bankruptcy proceedings the court may apply the rules of equity, I know of no rule of equity that authorizes [such fee].").

n235. *Randolph & Randolph v. Scruggs, 190 U.S. 533, 538-39 (1903)* ("We are not prepared to go further than to allow compensation for services which were beneficial to the estate."). Scruggs was decided pre-Code

and involved a claim for professional fees for services rendered to an assignee in connection with an assignment for the benefit of creditors prior to adjudication of bankruptcy. *Id. at 534-36; see also Galbraith v. Valley, 256 U.S. 46, 49 (1921)* (summarizing the factual scenario in Scruggs). The allowance of fees in this specific factual situation was subsequently codified in § 503(b)(3)(E). See 124 Cong. Rec. H11094 (daily ed. Sept. 28, 1978) (statement of Rep. Edwards) ("Section 503(b)(3)(E) codifies present law in cases such as *Randolph [& Randolph ] v. Scruggs, 190 U.S. 533,* which accords administrative expense status to services rendered by a prepetition custodian or other party to the extent such services actually benefit the estate."); 124 Cong. Rec. S17411 (daily ed. Oct. 6, 1978) (statement of Sen. DeConcini). Nevertheless, some have attempted to give Scruggs a broad reading and argue that it stands for the proposition that no unsecured creditor may claim attorneys' fees absent a benefit conferred upon the estate. *Brief for Richard Aaron et al. as Amici Curiae Supporting Respondents at 9-13, Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec., 127 S. Ct. 1199 (2007) (No. 05-1429), 2006 WL 816795* (suggesting Scruggs is determinative and requires denial of a general unsecured creditor's right to post-petition attorneys' fees); Kelly E. McDonald, Unsecured Claims for Contract-Based Attorney's Fees: Fobian is Dead, But Does Justice Holmes' Decision in Randolph & Randolph v. Scruggs Have Continuing Vitality?, 5 Norton Bankr. L. Adviser 1 (2007) (same and suggesting the Supreme Court in Travelers should have applied Scruggs as determinative). This argument relies on the principle that the Supreme Court "will not read the Bankruptcy Code to erode past bankruptcy practice absent a clear indication that Congress intended such a departure." *Cohen v. de la Cruz, 523 U.S. 213, 221 (1998).* However, this view ignores the specific factual context presented in Scruggs as explicitly recognized in the legislative history of § 503(b)(3)(E) and subsequent case law. See, e.g., *In re Miami Gen. Hosp., 101 B.R. 361, 364 n.8 (Bankr. S.D. Fla. 1989)* (recognizing codification of Scruggs in § 503(b)(3)(E) of the Code); *In re Kenfal Mktg. Corp., 84 B.R. 32, 34-35 (Bankr. E.D. Pa. 1988)* (same); *In re Jensen-Farley Pictures, Inc., 47 B.R. 557, 565-66.* (Bankr. Utah 1985) (same). In any event, the continuing validity of Scruggs is not determinative of the issue of an unsecured creditor's claim for post-petition attorneys' fees because the Supreme Court in Scruggs did not engage in a claims analysis, which the Travelers Court indicated was the proper starting point. Cf. *Travelers, 127 S. Ct. at 1204-05.*


n236. *Sexton v. Dreyfus, 219 U.S. 339, 344 (1911).*


n237. Id.


n238. See *Fed. Nat'l Mortgage Ass'n v. Delaney (In re Delaney), 534 F.2d 645, 647 (5th Cir. 1976); Sec. Nat'l Bank v. Cotton (In re Atlanta Int'l Raceway, Inc.), 513 F.2d 546, 548-49 (5th Cir. 1975); British & Am. Mortgage Co. v. Stuart (In re Vandiver), 210 F. 425, 430 (5th Cir. 1914)* ("After the date of the filing of the petition, the bankrupt cannot add to the liabilities of his estate.")


n239. *S. Cent. Bell Tel. Co. v. Simon (In re Fontainebleu Hotel Corp.), 508 F.2d 1056, 1059 (5th Cir. 1975).*

n240. Id.


n241. *United Merchs. & Mfrs., Inc. v. Equitable Life Assurance Soc'y of the U.S. (In re United Merchs. & Mfrs., Inc.)*, 674 F.2d 134, 137-38 (2d Cir. 1982) (quoting *Sec. Mortgage Co. v. Powers (In re Fla. Furniture Co.)*, 278 U.S. 149, 86 (1928)).


n242. Id. at 137-38.


n243. *Sec. Mortgage, 278 U.S. at 152.* In fact, Justice Brandeis went to great lengths in Security Mortgage to point out that the creditor did not seek to prove the claim in bankruptcy; it merely sought to enforce a contractual lien that had priority over any right of the bankruptcy trustee. See *id. at 155.*


n244. See, e.g., *Mack Fin. Corp. v. Ireson*, 789 F.2d 1083, 1084 (2d Cir. 1986); *ITT Indus. Credit Co. v. Scarboro (In re Scarboro)*, 13 B.R. 439, 442 (M.D. Ga. 1981); *In re Elmwood Farm, Inc.*, 19 B.R. 338, 341 *(Bankr. S.D.N.Y. 1982).* The Code also eliminated the concept of a "provable claim." Compare Bankruptcy Act of 1898, ch. 541, § 63(a)(1), 30 Stat. 544, 562-63 (repealed 1979) with *11 U.S.C. § 502* (2006). See *In re Magnavox Co., 627 F.2d 803, 805 n.5 (7th Cir. 1980).*


n245. *Sec. Mortgage, 278 U.S. at 154* (emphasis added).


n246. See *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec.*, 127 S. Ct. 1199, 1204-05 (2007); *Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 20 (2000); *Butner v. United States*, 440 U.S. 48, 55 (1979); *Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 161-63 (1946); *Heiser v. Woodruff*, 327 U.S. 726, 732 (1946); *Am. Sur. Co. of N.Y. v. Sampsell*, 327 U.S. 269, 272 (1946); *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 585 (1935); *Sec. Mortgage, 278 U.S. at 154; Odgen v. Saunders*, 25 U.S. (4 Wheat.) 213, 262-64 (1827); *Sturges v. Crowninshield*, 17 U.S. (4 Wheat.) 122, 192-97 (1819).


n247. *Wright v. Union Cent. Life Ins. Co.*, 304 U.S. 502, 513 (1938).


n248. *Id. at 516.*

n249. U.S. Const. art. I, § 8, cl. 4 (giving Congress power to establish "uniform laws on the subject of Bankruptcies throughout the United States").

n250. *Raleigh, 530 U.S. at 21;* see *Wright, 304 U.S. at 516-17; Kuehner v. Irving Trust Co., 299 U.S. 445, 450-51 (1937).*

n251. *Wright, 304 U.S. at 517.*

n252. See, e.g., *Sec. Nat'l Bank v. Cotton (In re Atlanta Int'l Raceway, Inc.), 513 F.2d 546, 549 (5th Cir. 1975); Bronze Group Ltd. v. Sender (In re Hedged-Invs. Assocs., Inc.), 293 B.R. 523, 527 (D. Colo. 2003); ITT Indus. Credit Co. v. Scarboro (In re Scarboro), 13 B.R. 439, 442 (M.D. Ga. 1981); In re D.W.G.K. Rests., Inc., 84 B.R. 684, 687 (Bankr. S.D. Cal. 1988).*

n253. See, e.g., *Kord Enters. II v. Cal. Commerce Bank (In re Kord Enters. II), 139 F.3d 684, 688 (9th Cir. 1998); First W. Bank & Trust v. Drewes (In re Schriock), 104 F.3d 200, 202 (8th Cir. 1997); Blackburn Bliss Trust v. Hudson Shipbuilders, Inc. (In re Hudson Shipbuilders, Inc.), 794 F.2d 1051, 1056, 1058 (5th Cir. 1986); Mack. Fin. Corp. v. Ireson, 789 F.2d 1083, 1084 (2d Cir. 1986).*

n254. *Schriock, 104 F.3d at 202;* see also *Hudson Shipbuilders, 794 F.2d at 1057-58.*

n255. See, e.g., *Schriock, 104 F.3d at 202-03; Unsecured Creditors' Comm. v. Walter E. Heller & Co. Se., Inc., 768 F.2d 580, 585 (4th Cir. 1985); In re Bristol, 92 B.R. 276, 277-78 (Bankr. S.D. Ohio 1988); In re Am. Metals Corp., 31 B.R. 229, 234 (Bankr. D. Kan. 1983).*

n256. See supra note 203 and accompanying text.

n257. See, e.g., *In re Saunders, 130 B.R. 208, 211 (Bankr. W.D. Va. 1991); In re Hart, 80 B.R. 107, 109 (Bankr. E.D. Tenn. 1987); In re B & W Mgmt., Inc. 63 B.R. 395, 401 (Bankr. D. Colo. 1986);* see also *Landsing*

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 103 of 150

Page 49
81 Am. Bankr. L.J. 123, *163

*Diversified Properties-II v. First Nat'l Bank & Trust Co. of Omaha (In re W. Real Estate Fund, Inc.), 922 F.3d 592, 597 (10th Cir. 1990)* (applying a federal reasonableness standard under § 502(b)(4)); *Cont'l APCO, Inc. v. James Talcott, Inc. (In re Cont'l Vending Mach. Corp.), 543 F.2d 986, 994 (2d Cir. 1976)* (applying a federal reasonableness standard pre-Code).

n258. H.R. 8200, 95th Cong. § 506(b) (1st Sess. 1977) (emphasis added).

n259. See S. 2266, 95th Cong. § 506(b) (2d Sess. 1977).

n260. See *11 U.S.C. § 506*(b).

n261. 124 Cong. Rec. 32,350, 32,398, 33,989, 33,997 (1978).

n262. See *Raleigh v. Ill. Dep't of Revenue, 530 U.S. 15, 20 (2000); Kuehner v. Irving Trust Co., 299 U.S. 445, 450-51 (1937).*

n263. *Capital Cities Cable, Inc. v. Crisp, 467 U.S. 691, 706 (1984)* (quoting *Hines v. Davidowitz, 312 U.S. 52, 67 (1941));* see also *Chi. & Nw. Trans. Co. v. Kalo Brick & Tile Co., 450 U.S. 311, 317 (1981).*

n264. *Kuehner v. Irving Trust Co., 299 U.S. 445, 451 (1937);* see *Vanston Bondholders Protective Comm. v. Green, 329 U.S. 156, 161 (1946)* (The "purpose of bankruptcy is so to administer an estate as to bring about a ratable distribution of assets among the bankrupt's creditors."); *Kothe v. R.C. Taylor Trust, 280 U.S. 224, 227 (1930).*

n265. *Kothe, 280 U.S. at 227.*

n266. *Vanston Bondholders, 329 U.S. at 162, 165.*

n267. *In re United Merchs. & Mfrs., Inc., 10 B.R. 312, 314 (S.D.N.Y. 1981),* rev'd, *674 F.2d 134, 137-38 (2d Cir. 1982);* see *Sakowitz, Inc. v. Chase Bank Int'l (In re Sakowitz, Inc.), 110 B.R. 268,* (Bankr. S.D. Tex. 1989).

n268. *Fed. Nat'l Mortgage Ass'n v. Delaney (In re Delaney), 534 F.2d 645, 647 (5th Cir. 1976);* see *Blackburn Bliss Trust v. Hudson Shipbuilders, Inc. (In re Hudson Shipbuilders, Inc.), 794 F.2d 1051, 1056 (5th Cir. 1986)* (court must "prevent an unjust enrichment of one creditor at the expense of others"); *Solomon v. Wein (In re Huhn), 145 B.R. 872, 875 (W.D. Mich. 1992)* ("every dollar expended on legal fees results in a dollar less that is available for distribution to the creditors").

n269. *United Merchs. & Mfrs., Inc. v. Equitable Life Assurance Soc'y of the U.S. (In re United Merchs. & Mfrs., Inc.), 674 F.2d 134, 137 (2d Cir. 1982).*

n270. Id.

n271. Id.

n272. See, e.g., *Sakowitz, 110 B.R. at 271.*

n273. *Tri-State Homes, Inc. v. Mears (In re Tri-State Homes, Inc.), 56 B.R. 24, 27 (Bankr. W.D. Wis. 1985).*

n274. *Mass. Mut. Life Ins. Co. v. Brock, 405 F.2d 429, 433 (2d Cir. 1968)* (quoting *Finn v. Childs Co., 181 F.2d 431, 435 (2d Cir. 1950)* ("lawyers look for compensation to the debtor's estate which may belong, in equity, largely to others than those who have requested their services")).

n275. See, e.g., *Cohen v. De La Cruz, 523 U.S. 213 (1998); Martin v. Bank of Germantown, 761 F.2d 1163, 1168 (6th Cir. 1985); Barclays/Am. Bus. Credit, Inc. v. Adams, 171 B.R. 298 (W.D. Tenn. 1992).*

n276. "Interestingly, most courts have concluded that interest continues to accrue on all prepetition debt even if such interest is not chargeable to the estate." *In re Fast, 318 B.R. 183, 189 n.4 (Bankr. D. Colo. 2004).* If the debt becomes nondischargeable, the debtor becomes liable for interest that the estate would not be liable for by virtue of § 502(b)(2). This approach is consistent with the idea that an unsecured creditor's fees may be charged against the debtor individually but not the estate.

n277. See supra notes 105-109 and accompanying text.

n278. Cf.  *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., 484 U.S. 365, 375 (1988).* At least one court has argued that, to the contrary, awarding secured creditors their post-petition fees diminishes the dividend to unsecured creditors; consequently, the policy of equitable distribution should not stand in the way of awarding unsecured creditors their post-petition fees particularly where another important policy in bankruptcy is the preservation of nonbankruptcy legal rights except to the extent necessary to facilitate the purpose of bankruptcy. Qmect, Inc. v. Burlingame Capital Partners II (In re Qmect, Inc.) Ch. 7 Case No. 04-41044, Adv. No. 04-4190, slip op. at 9-10 (Bankr. N.D. Cal. May 17, 2007). This perspective, however, overlooks the fact that oversecured creditors have a property interest in the security or equity cushion that is used to pay an oversecured creditor's post-petition fees under § 506(b). See *Timbers, 484 U.S. at 370-71.* While allowing a secured creditor's claim for post-petition fees may in fact reduce the amount available for distribution to unsecured creditors, it is not inequitable to do so because, by virtue of its property interest, an oversecured creditor would have a right to collect that amount before an unsecured creditor even under state law. Moreover, the Code expressly allows a post-petition fee claim of an oversecured creditor but has no such provision for an unsecured creditor. See *11 U.S.C. § 506*(b). For these reasons, a rule allowing the post-petition fee claims of oversecured creditors but not unsecured creditors is not inequitable.

n279. See *11 U.S.C. § 506*(b); *In re Carter, 220 B.R. 411, 419 (Bankr. D.N.M. 1998);* supra notes 202-205.

n280. *Blackburn Bliss Trust v. Hudson Shipbuilders, Inc. (In re Hudson Shipbuilders, Inc.), 794 F.2d 1051, 1055 (5th Cir. 1986).*

n281. *Solomon v. Wein (In re Huhn), 145 B.R. 872, 875 (W.D. Mich. 1992).*

n282. See *Warren v. Palmer, 132 F.2d 665, 668 (2d Cir. 1942)* ("Parties would be encouraged to fight tooth and nail to their last unsubstantial contention, and the rehabilitation of the debtor contemplated by § 77 would be hampered and delayed."). Cf.  *Nicholas v. United States, 384 U.S. 678, 683-84 (1966)* (creditors should not be disadvantaged by another's delay, which, through the accumulation of interest, causes estate to be absorbed).

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 106 of 150

Page 52
81 Am. Bankr. L.J. 123, *163

n283. *Sexton v. Dreyfus, 219 U.S. 339, 344 (1911).*

n284. *Bruning v. United States, 376 U.S. 358, 362 (1964).*

n285. See, e.g., *Vanston Bondholders Protective Comm. v. Green, 329 U.S. 156 (1946).*

n286. *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec., 127 S. Ct. 1199 (2007); Marrama v. Citizens Bank of Mass., 127 S. Ct. 1105 (2007); Howard Delivery Serv., Inc. v. Zurich Am. Inc. Co., 126 S. Ct. 2105 (2006); Marshall v. Marshall, 547 U.S. 293 (2006).*

n287. *Howard Delivery Serv., 126 S. Ct. 2105.*

n288. See *Patterson v. Shumate, 504 U.S. 753, 766 (1992)* (Scalia, J., concurring); *Dewsnup v. Timm, 502 U.S. 410, 420 (1992)* (Scalia, J., dissenting); *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., 484 U.S. 365, 371 (1988)* (writing the majority opinion).

n289. *Lamie v. U.S. Trustee, 540 U.S. 526, 542 (2004).*



**MARTIN H. FISHMAN and CHICAGO TITLE LAND TRUST COMPANY, as successor trustee to American National Bank and Trust Company, under trust dated April 25, 1990, Trust No. 10900-08, Plaintiffs/Counterdefendants-Appellees and Cross-Appellants, v. FOX RIVER COMMONS SHOPPING CENTER, LLC, Defendant/Counterplaintiff-Appellant and Cross-Appellee (Connie's Food Products, Inc., Plaintiff/Counterdefendant-Appellee.**

**No. 2-12-0281**

**APPELLATE COURT OF ILLINOIS, SECOND DISTRICT**

*2012 IL App (2d) 120281-U*; *2012 Ill. App. Unpub. LEXIS 3057*

**December 14, 2012, Order Filed**

**NOTICE:** THIS ORDER WAS FILED UNDER *SUPREME COURT RULE 23* AND MAY NOT BE CITED AS PRECEDENT BY ANY PARTY EXCEPT IN THE LIMITED CIRCUMSTANCES ALLOWED UNDER *RULE 23(e)(1)*.

**SUBSEQUENT HISTORY:** Appeal denied by *Fishman v. Fox River Commons Shopping Ctr., LLC, 985 N.E.2d 305, 2013 Ill. LEXIS 549, 368 Ill. Dec. 732 (Ill., 2013)*
Appeal denied by *Fishman v. Fox River Commons Shopping Ctr., 2013 Ill. LEXIS 665 (Ill., May 29, 2013)*

**PRIOR HISTORY:** [**1]
   Appeal from the Circuit Court of Du Page County. Nos. 05-MR-620, 05-LM-1813, 07-L-1018, 08-LM-2286. Honorable Kenneth L. Popejoy, Judge, Presiding.
*Fox Valley Commons Shopping Ctr. LLC v. Am. Nat'l Bank & Trust Co., 379 Ill. App. 3d 1079, 957 N.E.2d 590, 2008 Ill. App. LEXIS 2164, 354 Ill. Dec. 274 (Ill. App. Ct. 2d Dist., 2008)*

**DISPOSITION:** Affirmed in part as modified and vacated in part.

**COUNSEL:**

**JUDGES:** JUSTICE SCHOSTOK delivered the judgment of the court. Presiding Justice Burke and Justice Jorgensen concurred in the judgment.

**OPINION BY:** SCHOSTOK

**OPINION**

**ORDER**

   [*P1] *Held*: Trial court properly ruled in favor of investor and tenant in dispute over shopping center restaurant on majority of issues, but erred in its damage award to investor. In addition, there was no legal basis for the award of attorney fees to tenant.

   [*P2] This case involves a long-running dispute relating to an outbuilding (Building) in a shopping center located at 844 South Route 59 in Naperville. Fox River Commons, LLC, (Fox River) owns and operates the shopping center. Fox River entered into a lease (Land Lease) with an investor who constructed the Building. The investor then entered into a different lease (Building Lease) with a tenant that operated a full-service restaurant. The current successors to the original investor are Martin Fishman and the land trust of which he is the beneficiary, for which Chicago Title Land Trust

2012 IL App (2d) 120281-U, *P2; 2012 Ill. App. Unpub. LEXIS 3057, **1

Company is the current trustee [**2] (collectively, Fishman). The current successor of the tenant is Connie's Food Products, Inc. (Connie's).

[*P3] Over the course of several years, Connie's sought to extricate itself from its operations in the Building by assigning or subleasing its tenancy, but Fox River declined to allow any of the proposed replacement tenants. After several such attempts had failed, Connie's sued Fox River for breach of contract and tortious interference. Fox River then filed an eviction suit against Connie's and Fishman. Fishman then sued Fox River on much the same theories as Connie's had raised in its suit, but sought its own damages. The final suit in this quartet of lawsuits (all of which were eventually consolidated in the trial court) was a new eviction suit brought by Fox River solely against Fishman. The cases were tried in a bench trial. The trial court found largely in favor of Fishman and Connie's and against Fox River, but it did not award the victorious parties all of the attorney fees they sought. Fox River has appealed various aspects of the judgment in each of the consolidated cases, and Fishman has cross-appealed the reduction of its attorney fee request. We modify one award of damages [**3] and vacate the award of attorney fees to Connie's, but otherwise affirm the trial court's rulings.

[*P4] BACKGROUND

[*P5] The saga begins in 1990, when Fox River leased a portion of its shopping center to DD Partners, Inc., under the Land Lease. The Land Lease provided that DD Partners would construct a building of approximately 9,000 square feet to be operated as a restaurant, bar, nightclub, or similar use, and would pay a monthly rent to Fox River. Under the Land Lease, the tenant was required to be open for business during all normal business hours and to operate in 100% of the Building. Events constituting a default included, among other things, vacating the premises for longer than 60 days, failing to pay rent, or failing to comply with any other provision for at least 30 days after a written notice of such default. The Building could be subleased or assigned, but any assignee or sublessee would have to assume the obligations of the Land Lease and provide Fox River with an assumption agreement to that effect. In addition, the assignment or sublease would not release DD Partners from its obligations under the Land Lease. No assignment or sublease could be made without Fox River's consent, which [**4] could not be unreasonably withheld. If there were litigation to enforce any provision of the Land Lease, the prevailing party's attorney fees would be paid by the losing party.

[*P6] DD Partners constructed the Building and initially operated its own restaurant there. In 1994, DD Partners began leasing the Building to Bertucci's Restaurant Corporation under the Building Lease. Fox River was not a party to the Building Lease. However, the Building Lease contained a provision similar to the Land Lease requiring Fox River's consent to any sublease or assignment of any portion of the Building, which consent could not be unreasonably withheld. (The Building Lease also had a similar provision regarding attorney fees in the event of any litigation over the lease.) As required by the Land Lease, Bertucci's provided Fox River with an assumption agreement. Fox River did not require Bertucci's to submit any financial information before consenting to the leasing of the Building.

[*P7] Shortly after the Building Lease was signed, Fox River, DD Partners, and Bertucci's entered into a "Non-Disturbance, Attornment and Consent Agreement." This agreement provided that the Building Lease was subordinated to the Land [**5] Lease, and that Fox River would not sue Bertucci's (the tenant) for any default by DD Partners (the Building lessor). The Non-Disturbance Agreement also provided that, if the Land Lease were terminated for any reason, the Building Lease would remain in effect, with the same terms and conditions, as a direct lease between Fox River and the tenant.

[*P8] In 1998, DD Partners assigned its interests in the Building, the Building Lease, and the Land Lease to Martin Fishman. Fishman subsequently transferred those interests into a land trust of which he was the beneficiary.

[*P9] In January 2000, Bertucci's assigned its interests in the Building Lease to Connie's Pizza, Inc., which was owned by James Stolfe. The assignment provided that Bertucci's remained liable for any later defaults under the Building Lease. Connie's Pizza, Inc. began operating a full-service restaurant in the Building.

[*P10] In April 2004, Connie's Pizza Inc. assigned the interests in the Building Lease to Connie's, a company operated by James Stolfe's son, Marc. Once again, the assignment provided that the assignor remained liable for any defaults under the Building Lease that might later occur. Fox River approved both of these assignments [**6] without requiring the submission of

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 110 of 150

Page 3

2012 IL App (2d) 120281-U, *P10; 2012 Ill. App. Unpub. LEXIS 3057, **6

financial statements of the assignees or personal guarantees from anyone affiliated with the assignees.

[*P11] At trial, Marc Stolfe testified that, as of April 2004, the Connie's restaurant in the Building had been losing money for some time. Accordingly, once Connie's became the assignee Stolfe immediately began looking for a new tenant to take over the space. Stolfe hired a real estate broker to seek potential assignees. (We briefly describe here the subsequent events. We will provide greater detail when discussing the testimony at trial.)

[*P12] In August 2004, Connie's entered into an agreement with Chicago Franchise Systems, Inc. (Chicago Franchise) under which the latter would buy the assets of Connie's restaurant and would assume Connie's obligations under the Building Lease. Connie's ceased operating its restaurant in the Building the next month. On December 31, 2004, Connie's and Chicago Franchise entered into a final purchase agreement. However, Fox River did not approve the assignment. On February 25, 2005, Anthony Di Mucci, the owner of Di Mucci Companies (the entity that is the current beneficial owner of Fox River) wrote the attorney for Connie's, [**7] declining to accept the assignment and advising Connie's that it was in default of section 4.02 of the Land Lease because its restaurant was not in operation.

[*P13] On March 14, 2005, Fox River (acting through Thomas Niemira, who also worked for the Di Mucci Companies), sent the attorney for Connie's another letter giving "Tenant (D&D [*sic*] and Connie's)" notice of the default (*i.e.*, the fact that the restaurant was closed) and 30 days to cure the default.

[*P14] On March 31, 2005, Connie's attorney wrote Niemira, saying that Connie's had signed another asset sales agreement with a prospective assignee, "The Mojitos Group, LLC." A copy of the proposed assignment was attached. Niemira responded, asking for financial statements and advising that its consideration of the assignment was not a waiver of the default. The Mojitos Group provided financial information, but on April 28, 2005, Di Mucci wrote the attorney for the Mojitos Group, stating that "[a]t this time, the landlord is not looking favorable [*sic*]" on the assumption of Connie's obligations under the Building Lease. On April 29, 2005, Di Mucci sent Fishman and Connie's a letter stating that the default identified in the March 14, 2005, letter [**8] had not been cured, and that Fox River would terminate the lease five days after receipt of the

current letter. In early May, after a flurry of correspondence, Connie's reopened for business at the Building. However, its operation was limited to a takeout and delivery operation only, without the full-service restaurant.

[*P15] On June 1, 2005, Connie's filed a three-count complaint against Fox River in case no. 05- MR-620, seeking a declaratory judgment and damages for breach of contract and tortious interference with prospective economic advantage (the Connie's Suit). [1] All of the counts were based on the allegation that Fox River had unreasonably withheld its consent to Connie's proposed assignments of its interests. Fox River filed a counterclaim asserting that Connie's had breached the Building Lease by failing to operate a full-service restaurant in the Building. Fox River also filed an eviction action against Connie's and Fishman (case no. 05-MR-1813, the 2005 Eviction). In July 2005, the two cases were consolidated over Fox River's objection.

> 1  Connie's voluntarily withdrew count I, which sought declaratory judgment, prior to trial. The trial court thereafter referred to Connie's remaining [**9] claims as counts I and II, although technically they were labeled as counts II and III in the complaint.

[*P16] In September 2005, Stolfe decided to re-open a full-service restaurant in the Building. Connie's engaged in several months of "re-concepting" and renovation, and opened Pizza to the People, a 1960s-themed restaurant, in March 2006. Stolfe testified that, although the restaurant was "successful" for a limited time, it was not profitable.

[*P17] In November 2005, Fox River filed a motion for substitution of judge as of right. This motion was denied on the ground that the trial court had already ruled on a substantial issue in the case (the motion for consolidation). Fox River appealed this ruling. The appeal took some time, due in part to a false start: we dismissed Fox River's first appeal (docket no. 2-06-0673) for lack of jurisdiction because the trial court had made no finding pursuant to *Supreme Court Rule 304(a)* (eff. Jan. 1, 2006). Fox River then obtained such a finding by the trial court and filed a new appeal.

[*P18] Meanwhile, in September 2007, Fishman filed its own suit against Fox River (case no. 07-L-1018, the Fishman Suit), alleging breach of contract, tortious

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 111 of 150

Page 4

2012 IL App (2d) 120281-U, *P18; 2012 Ill. App. Unpub. LEXIS 3057, **9

interference, and interference [**10] with quiet enjoyment. (Although the suit also named Di Mucci and Niemira as defendants, these individuals were eventually dismissed from the case.) As with the Connie's Suit, the focus of the allegations in the Fishman Suit was the contention that Fox River unreasonably withheld consent to Connie's proposed assignments of interest, but Fishman alleged its own resulting damages.

[*P19] In December 2007, Fishman contacted Fox River about the possibility of an investor opening an Italian restaurant, Scapa, in the Building. On December 17, 2007, Niemira wrote the investor's attorney, stating that Fox River's lease with another restaurant in the shopping center, Carrabas, contained a restrictive covenant prohibiting Fox River from permitting an Italian restaurant other than Connie's from opening in the Building. If that obstacle could be overcome, wanted the investor's financial statements and an acknowledgment that the investor would personally sign the assignment of the Building Lease. Fishman wrote Niemira, disputing that the restrictive covenant applied because the assignment to Connie's predated the lease with Carrabas. However, the investor chose not to proceed with the opening of [**11] Scapa in the Building.

[*P20] The parties pursued settlement off and on throughout the litigation. The settlement effort heated up during the late fall and winter of 2007. In January 2008, Fishman sent Fox River a proposal under which Fox River would buy Fishman's interest in the Building in return for a payment plus an assignment of the right to receive rent from Connie's through the end of the current lease period; Connie's would tender possession of the Building to Fishman by February 1, 2008, and Fishman would then tender possession to Fox River; and Fishman and Fox River would release each other from the Leases and all claims and judgments in the pending litigation. Fox River initially indicated that it would accept this proposal. In February 2008, Connie's closed the Pizza to the People restaurant and ceased all operations at the Building.

[*P21] On March 24, 2008, this court held that the motion for substitution of judge as of right should have been granted, because the ruling on the motion to consolidate was not a substantive ruling. See *Fox Valley Commons Shopping Center LLC v. American Nat'l Bank & Trust Company, 379 Ill. App. 3d 1079, 957 N.E.2d 590, 354 Ill. Dec. 274* (unpublished order pursuant to *Supreme Court Rule 23(b)* [**12] (eff. May 23, 2005)). Accordingly, all of the orders entered in the consolidated cases after that motion had been filed--including orders adding Fishman as a plaintiff in the Connie's Suit, granting summary judgment in favor of Connie's and Fishman in the 2005 Eviction, and awarding attorney fees to Connie's and Fishman under the Leases--were vacated.

[*P22] On March 31, 2008, Fox River sent Fishman and Connie's a notice of default, advising Fishman that the Land Lease had been violated by Connie's closing of its restaurant and giving the parties 30 days to cure the default. Fishman then sent Connie's a similar notice of default, stating that the Building Lease would be terminated unless the default were cured within 30 days. Fishman and Fox River nevertheless continued to pursue possible settlement. Fox River insisted that Connie's also release its claims against Fox River. Fishman responded that it could not achieve this, as Connie's was not a party to the agreement. Fishman's payment of rent in April 2008 was the last payment of rent received by Fox River.

[*P23] On May 1, 2008, Connie's gave Fishman the keys to the Building and formally relinquished all of its rights to possession under the Building [**13] Lease. The efforts at settlement faded, and on May 7, 2008, Fox River sent Fishman and Connie's a 5-day notice terminating the Leases unless the continuing default (failure to operate) were cured by the fifth day. Fishman responded with a letter asserting that it was trying to cure the default by finding a new tenant, but that default could not "with due diligence be cured within" the 30 days following the initial notice and so the Land Lease could not be terminated. Fox River replied that it still considered Fishman to have defaulted and noted as well that Fishman had failed to pay May or June rent.

[*P24] On June 24, 2008, Fox River filed an eviction action against Fishman only, alleging default and nonpayment of rent (case no. 08-LM-2286, the 2008 Eviction). Fishman successfully moved to transfer and consolidate the case with the Fishman Suit. Then, on February 4, 2009, all four cases (the Connie's Suit, the 2005 Eviction, the Fishman Suit and the 2008 Eviction) were consolidated under the name *Martin H. Fishman, et al., v. Fox River Commons Shopping Center, LLC.* In July 2009, Fishman filed an amended complaint in the Fishman Suit, adding count V, a claim for specific performance of an [**14] alleged settlement agreement (the January 2008 proposal).

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 112 of 150

Page 5

2012 IL App (2d) 120281-U, *P24; 2012 Ill. App. Unpub. LEXIS 3057, **14

[*P25] Fox River filed motions for summary judgment on all of its claims raised in the Connie's Suit, the Fishman Suit, and the 2008 Eviction. On November 17, 2009, the trial court partially granted Fox River's motion for summary judgment in the 2008 Eviction, awarding Fox River possession of the Building but reserving the remaining issues for trial. The trial court denied the other motions for summary judgment.

[*P26] A four-day bench trial commenced on May 31, 2011. The first witnesses were Randee Becker, a real estate broker specializing in restaurant leases and sales, and Stolfe. Dave Howey, the owner of Chicago Franchise, the franchisor for Nancy's Pizza and Al's Beef, also testified. In the spring of 2004, Stolfe retained Becker to locate new tenants to take over Connie's lease of the Building. The first potential tenant Becker found was Howey. Howey testified that he really liked the location and was very enthusiastic about the possibility of opening a Nancy's Pizza there. Chicago Franchise entered into a purchase agreement with Connie's, under which Chicago Franchise would buy all of the Connie's business assets in the Building and [**15] assume Connie's obligations under the Building Lease. (Although the Connie's restaurant was not operating at this time, all of the equipment and furnishings remained in the building.) Connie's provided Chicago Franchise with a proposed assumption agreement and copies of the previous assignment assumption agreements to review. In December 2004, Chicago Franchise entered into a final purchase agreement with Connie's, with the closing set for January 2005.

[*P27] On January 11, 2005, Chicago Franchise wrote to Fox River saying that the proposed assumption agreement was acceptable, but that the entity assuming the lease would not be Chicago Franchise itself but rather a franchisee. The franchisee was a group of investors including the former hockey player Steve Smith (the Smith Group). At trial, Howey testified that, besides Smith, the group of investors included several wealthy individuals and an experienced real estate investor, and Chicago Franchise had no problem approving the Smith Group as a franchisee. Howey was pleased that the group was savvy enough to recognize their lack of experience in operating a restaurant and had hired a restaurant management firm. Thereafter Smith sent Connie's a letter stating [**16] that the Smith Group would be "capitalized with assets of $500,000 or more" and offering to provide additional information if needed. On January 31, 2005, Connie's sent Chicago Franchise a letter terminating the purchase agreement on the ground that the closing had not occurred by that date as required. Separately, on February 25, 2005, Di Mucci wrote Connie's to say that Fox River would not accept the Smith Group as an assignee, because it believed that the Smith Group was undercapitalized, as the estimated startup costs were $700,000. Di Mucci also stated that Chicago Franchise "refused to personally get involved in Mr. Smith's lease for the property and even Mr. Smith was not going to sign personally." Howey testified that he and Smith had met with Niemira to introduce him to Smith. During that meeting, Niemira did not suggest that the Smith Group was undercapitalized. Rather, in Howey's view, the reason the deal did not go through was because Fox River would not approve the assignment unless Chicago Franchise also was on the lease. As a rule, Chicago Franchise never entered into leases or assignments on behalf of its franchisees because doing so would require substantially more [**17] complex filings with regulatory bodies. The Smith Group went on to open other restaurants, one of which cost more than $650,000 to open.

[*P28] In March 2005 Becker brought Connie's a second potential assignee, Edwin Rios, the owner of Café Rumba in downtown Chicago, who wanted to open a restaurant called The Blue Mojito in the Building. Rios testified that the investors for the project included him and his wife, along with others (the Mojitos Group). On March 29, 2005, Connie's and the Mojitos Group entered into an asset purchase agreement and agreed that the Mojitos Group would assume Connie's lease. Connie's then forwarded the proposed assignment and asked Fox River to consent. On April 15, Fishman involved itself in the proposed assignment as well, asking for a variety of information including financial statements and federal and state tax returns for the last two years; a current judgment lien search; a copy of "organization documents," operating agreement and a list of its members; and a list of "proposed guarantors under the lease." On April 26, the Mojitos Group sent Fox River several financial statements for Café Rumba, a construction budget for the proposed restaurant totaling $1.35 [**18] million, and biographical and financial information on Rios himself. At trial, Rios testified that Café Rumba entered chapter 11 bankruptcy at some point, and may have still been in bankruptcy at the time he became interested in the Blue Mojito project. However, it does not appear that Connie's, Fishman, or

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 113 of 150

Page 6

2012 IL App (2d) 120281-U, *P28; 2012 Ill. App. Unpub. LEXIS 3057, **18

Fox River knew of the bankruptcy at the time the Mojitos Group was proposed as an assignee. Rios also admitted that earlier, when he had opened Café Rumba, he had underbudgeted the costs of the opening, and he found that running a restaurant on his own was different from his previous experience operating restaurants for Hyatt and Hilton.

[*P29] On April 28, 2005, Di Mucci wrote the Mojitos Group, commenting that the financials for Café Rumba showed that the restaurant was only now showing any profit after the first two and a half years of operation. Di Mucci also noted that, given the high construction budget, financing the proposed restaurant in the Building could cost about $100,000 annually. The Rioses' own assets, net of their home and the interest in Café Rumba, totaled about $300,000, "which they would be pledging for the construction loan and operating expenses." Di Mucci continued, [**19] "[t]here should be additional investment capital for this venture or a longer more sustained income stream" from Café Rumba. Di Mucci closed by saying that, "at this time," the "landlord" (Fox River) was not looking favorably on an assumption of the Building Lease by the Mojitos Group.

[*P30] The following day, the attorney for the Mojitos Group wrote to Connie's saying that Fox River did "not appear to be open to" the Mojitos Group assuming Connie's lease. The attorney noted that, while Di Mucci's assessment of the Rioses' personal and business finances was correct, the assessment of construction costs was incorrect because those costs would be funded by investor equity rather than debt. The attorney closed by noting that the Mojitos Group had already expended substantial time and resources in pursuing the location and in light of Di Mucci's letter, it would "cease further due diligence" until it received a concrete assurance that Fox River would consent to the assignment. Thus, the proposed assumption and assignment did not go through. Becker testified at trial that, in 33 years of doing business as a real estate broker for restaurants, she had never seen a deal fail because of the landlord's [**20] failure to consent.

[*P31] Connie's did not pass on to Fox River the corrected information about the Mojitos Group's planned financing of the construction costs. Rather, in correspondence to Fishman, Connie's took the position that it was unreasonable for Fox River to refuse to consent to assignments based on the financial conditions of the proposed assignees because there were already four entities that remained liable to ensure that Fox River received its rent despite any future defaults: Bertucci's, Fishman, Connie's Pizza, Inc., and Connie's. Fishman wrote to Fox River and asserted the same position. Fox River responded that receiving rent was not its sole concern; it was also concerned that any future tenants be able to keep the restaurant open and operating.

[*P32] Thereafter, Connie's filed the Connie's Suit. However, Connie's continued to pay rent under the Building Lease until April 2008. At trial, the chief financial officer for Connie's, Ivan Matsunaga, testified that he calculated that, between January 2005 and April 2008, Connie's paid $621,846 in rent.

[*P33] In addition to Becker, Stolfe, and Rios, other witnesses testified at trial, including Niemira, Di Mucci, Fishman, and one of Fishman's [**21] attorneys, Steven Lavin. These witnesses largely provided their own points of view about the events and documents described above. In addition, Fishman testified that he was not really aware of Connie's efforts to sublease or assign its lease to the Smith Group, and only became involved in the efforts to assign the lease to the Mojitos Group. However, he had no objection to either of the proposed assignments. Connie's paid all of its ordinary rent until it vacated the building in 2008. However, under the Building Lease Connie's was also supposed to pay, as additional rent, any legal fees incurred by Fishman as a result of any defaults by Connie's, and Connie's did not pay all of these amounts. Fishman had possession of the Building from May 1, 2008, through November 17, 2009, when the trial court granted possession to Fox River. During that time they made several efforts to find a new tenant, and Fishman detailed these. Lavin testified regarding the same events as Fishman, but in greater detail, especially with regard to the January 2008 proposal. Lavin also testified about Fishman's efforts to land Scapa Italian Kitchen as a tenant in the Building.

[*P34] Niemira testified that he had a background [**22] in accounting and had helped Di Mucci operate multiple shopping centers for several years. Regarding the possible assignment of Connie's tenancy to the Smith Group, Niemira stated that Fox River refused to consent to the assignment because the investors were undercapitalized. He also noted that on January 31, 2005, Connie's sent Chicago Franchise a letter terminating their purchase agreement on the ground that closing had not

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 114 of 150

Page 7

2012 IL App (2d) 120281-U, *P34; 2012 Ill. App. Unpub. LEXIS 3057, **22

occurred as required by the agreement, and that this termination occurred before Fox River formally rejected the assignment on February 25, 2005. Niemira ate dinner at Café Rumba during the time that he was assessing a possible assignment to the Mojitos Group, and he found the food and atmosphere very enjoyable. However, Fox River rejected the Mojitos Group as an assignee based on financial information. Di Mucci's testimony focused in part on the need to keep all of the stores and buildings in the shopping center filled. He noted that some shopping center tenants had required him to guarantee a certain level of occupancy. At the close of the evidence, the trial court ordered the parties to submit written closing arguments and separate proposed findings of fact. [**23] (These documents presumably were submitted, but they are not part of the record on appeal.)

[*P35] The Trial Court's Findings of Fact and Judgments

[*P36] On July 29, 2011, the trial court issued its findings of fact and its judgment in each of the four cases. As to the Connie's Suit, which alleged that Fox River breached the Building Lease by unreasonably withholding its consent to assignment of the lease, and that Fox River's actions constituted tortious interference with prospective economic advantage, the trial court found, *inter alia*, that the Smith Group and the Mojitos Group were both ready, willing, and able to assume Connie's obligations under the Building Lease. Fox River demanded financial information and guarantees from these potential assignees but had never made similar demands to its previous assignees--Fishman, Bertucci's, Connie's Pizza, Inc., and Connie's--all of whom remained liable to protect Fox River against any losses due to defaults under the Land Lease or Building Lease. Accordingly, Fox River's refusal to consent to these assignments was unreasonable. Moreover, Connie's had a reasonable expectancy of entering into a sale of assets and assignment of the Building Lease with both [**24] the Smith Group and the Mojitos Group; Fox River knew about those expectancies; and Fox River's unreasonable refusal to consent to the assignments constituted intentional interference that prevented those expectancies from ripening into a valid business relationship. If Fox River had approved either of these assignments, the payments of rent by the assignee would have equaled Connie's rent obligation under the Building Lease. However, Connie's was not in privity with Fox River under the Land Lease: the only parties to that Lease were Fox River and Fishman.

[*P37] Based on these findings, the trial court entered judgment in favor of Fox River on Connie's breach of contract claim, and in favor of Connie's on its claim of tortious interference. The trial court granted Connie's a total of $615,895 in damages, the majority of which was compensation for rent Connie's was required to pay between January 2005 and May 2008. The trial court's written comments indicated a belief that Connie's had not yet paid this rent and it was due and owing to Fishman. The trial court denied Connie's request for an additional $727,039 of reimbursement expenses related to "re-concepting" and renovating the restaurant [**25] into Pizza to the People, finding that these costs were the result of a voluntary decision by Connie's and were not a foreseeable result of Fox River's actions. [2]

> 2   Although we find no record of the disposition of Fox River's counterclaim (for breach of the Land Lease based on Connie's failure to continuously operate a full-service restaurant), presumably it would fail for the same reason that Connie's breach of contract claim failed, the lack of contractual privity between Fox River and Connie's under the Land Lease. We note that no issue relating to this counterclaim was raised on appeal.

[*P38] Regarding the 2005 Eviction, the trial court found that Fox River did not provide proper notice of the alleged defaults under the Land Lease to Fishman (either individually or through his land trust, which was the actual tenant under that lease). Rather, the March 14, 2005, notice was addressed only to Connie's, who was not a party to the Land Lease. Moreover, it was sent by Niemira on stationery from Di Mucci Companies, which was not the landlord under the Land Lease. The April 29, 2005, notice had fewer defects--it was sent on behalf of Fox River to both Connie's and Fishman himself (although Fox [**26] River still neglected to serve the trustee of Fishman's land trust). However, all of the notices were sent by regular mail, which was not an acceptable method of service under either the Land Lease, the Building Lease, or the Forcible Entry and Detainer Act (*735 ILCS 5/9-101* (West 2004)). Finally, the trial court found that Connie's cured the alleged default within five days of May 2, 2005, (the date when it received the April notice) by re-opening its restaurant on May 6, 2005. For all of these reasons, the trial court entered judgment in favor of Connie's and Fishman. However, the trial court denied their requests for attorney

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 115 of 150

Page 8

2012 IL App (2d) 120281-U, *P38; 2012 Ill. App. Unpub. LEXIS 3057, **26

fees under the Leases, on the ground that Fox River had sought to voluntarily dismiss this case on February 16, 2010, but Connie's and Fishman had objected and the trial court had denied the request.

[*P39] The Fishman case involved Fishman's claims that Fox River's refusal to consent to the proposed assignments constituted a breach of the Land Lease, tortious interference with contractual rights under the Building Lease, and interference with the right to quiet enjoyment (counts I through III). Fishman alleged that Fox River's conduct injured Connie's, which then in [**27] turn injured Fishman because (1) during the period from June 2005 on, Fishman sustained litigation costs which it was unable to recoup from Connie's as provided by the Building Lease, and (2) during the period after April 2008, when Connie's stopped paying rent, Fishman was deprived of that rent while still having to pay Fox River under the Land Lease. In addition, Fishman brought a claim for specific performance of the January 2008 settlement proposal (count V).

[*P40] The trial court found that, consistent with its findings in the Connie's Suit, Fox River's conduct in refusing to consent to the proposed assignments was unreasonable and constituted a material breach of the Land Lease. Further, this conduct could be viewed as an attempt to wipe out Fishman's interests in the Building (which had cost more than $1.5 million to construct) and to obtain the Building at no cost by wrongly seeking to terminate the Land Lease. The trial court therefore found in favor of Fishman and against Fox River on counts I though III, awarding damages in the amount of $628,197 and also requiring Fox River to return the $30,000 security deposit. The trial court ordered that the amount awarded to Connie's in the [**28] Connie's Suit be set off against this amount so that the two awards were not cumulative. The trial court denied Fishman's request for prejudgment interest and also denied any punitive damages, finding that Fox River's conduct did not rise to the level of willful and wanton. Moreover, the trial court denied Fishman's request for attorney fees on the basis that Fishman's status as a prevailing party sounded primarily in tort and was not solely the result of any breach of the Land Lease. As to count V, the trial court found that despite Fox River's purported "acceptance" of the January 2008 proposal, there was no meeting of the minds. Accordingly, the trial court entered judgment for Fox River on count V. [3]

3    The fourth count of Fishman's complaint sought injunctive relief, namely, an order restraining Fox River from declaring Connie's to be in default. The disposition of this count is not clear from the record; the trial court's judgment mentions only counts I through III, and count V. However, as no party raises any issue with respect to this count in either the appeal or cross-appeal, we need not consider it further.

[*P41] The final suit in the quartet was the 2008 Eviction filed by Fox River [**29] against Fishman, which included two counterclaims as well. (The two counterclaims mirrored Fishman's allegations in the Fishman Suit: the first alleged tortious interference and breach of contract, while the second alleged a breach of the January 2008 proposal.) The trial court found that Fox River's notices of default, which included a 30-day notice of default sent on March 31, 2008, and a 5-day notice to quit sent on May 7, 2008, were properly sent to Connie's, Fishman, and Fishman's trust. However, they were defective in that Connie's vacating of the Building (the basis for the notice of default) was required under the January 2008 proposal. Even if the notices had been effective, Fox River's own conduct in refusing to consent to the proposed assignments constituted a prior breach of the Land Lease that relieved Fishman of its obligation under that lease to ensure that a restaurant operated in the Building. Moreover, as of May 2008 Fishman was attempting to re-let the Building in order to cure the default, but simply was unable to do so within the 30 days allotted. On June 11, 2008, Fox River wrote Fishman that Fox River had terminated the Land Lease, and this indeed had the effect [**30] of terminating that lease. Under the Non-disturbance Agreement signed by the predecessors to Fox River, Fishman, and Connie's, upon the termination of the Land Lease the Building Lease continued in full force and effect as a direct lease between Connie's and Fox River. Thereafter, Fishman was not liable to Fox River for rent under the Land Lease. The trial court found that there was no evidence that Fox River had attempted to mitigate its damages by seeking a tenant for the Building.

[*P42] For all of these reasons, the trial court held that Fox River was not entitled to damages in the form of rent owed between May 2008 and October 31, 2010 (the end of that lease term for the Land Lease). The trial court entered judgment in favor of Fishman on both Fox River's claim for damages and Fishman's counterclaims,

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 116 of 150

Page 9

2012 IL App (2d) 120281-U, *P42; 2012 Ill. App. Unpub. LEXIS 3057, **30

although Fishman was awarded only the same relief that he received in the Fishman Suit. (Possession had been resolved previously in November 2009 when Fox River was granted possession of the Building via court order.) The trial court ordered the parties to bear their own costs and fees.

[*P43] Fox River, Connie's, and Fishman all filed motions for reconsideration. Both Fox River and Connie's challenged [**31] portions of the judgment in the Connie's Suit. Fox River raised substantive arguments to the effect that its conduct was not unreasonable and did not amount to tortious interference. The trial court denied this motion. Connie's pointed out that it had actually paid rent to Fishman through April 2008, and argued that therefore the award in the Connie's Suit should be payable to Connie's and should be cumulative to the award to Fishman in the Fishman Suit. The trial court granted this motion.

[*P44] In the 2005 Eviction, both defendants (Connie's and Fishman) asked the trial court to reconsider its decision not to award contractual attorney fees to them. They argued that the court order from February 26, 2010, did not reflect any motion by Fox River to voluntarily dismiss the case, and that they were entitled to attorney fees under the Leases as prevailing parties. Fox River responded that, even if the court order did not reflect any formal motion to voluntarily dismiss the case, the transcript from that date showed that Fox River had indeed stated that it believed that the case was moot (as it had received possession of the Building a few months earlier) and it would be willing to enter a non-suit, [**32] but the trial court denied this request due to the other parties' objections. The trial court took these motions under consideration and ultimately ruled in favor of Connie's and Fishman, permitting them to file petitions for attorney fees.

[*P45] The judgment in the Fishman Suit was challenged by both Fox River and Fishman. Fox River raised substantive arguments similar to those raised in the Connie's Suit, arguing that its actions were reasonable, taken in good faith, and did not constitute either a breach of contract or tortious interference. The trial court denied this motion. Fishman challenged the trial court's decision not to award prejudgment interest or attorney fees under the contract. The trial court denied this motion as to the prejudgment interest but granted it as to the attorney fees.

[*P46] The judgment in the 2008 Eviction was

attacked only by Fox River. Fox River argued that it had no duty to mitigate damages until November 2009, because it did not have possession of the Building until then. Fox River also argued that the trial court had misconstrued the Non-Disturbance Agreement, that it did not release Fishman from the obligation to pay rent after the termination of the Land Lease [**33] in June 2008, and that Fishman owed Fox River $254,794 in holdover rent for the period from June 2008 through November 2009. The trial court denied this motion to reconsider.

[*P47] Thereafter, Connie's and Fishman filed petitions setting out the amount of attorney fees to which they believed they were entitled as prevailing parties in the litigation. Per the trial court's orders, these parties were to seek reimbursement only for those fees relating to the 2005 Eviction and the Fishman Suit. (No contractual attorney fees were available in the Connie's Suit because there was no privity between Connie's and Fox River under the Land Lease, and in the 2008 Eviction Fishman received only the same relief it received in the Fishman Suit.) Connie's sought $98,283 in attorney fees. After reviewing all of the supporting documentation and hearing arguments, the trial court held that the rates charged by Connie's attorneys, which ranged from $155 to $270 per hour, were largely within the community standard, but that the calculation of the billable time was insufficiently detailed. Based on its own calculations that the attorneys properly expended approximately 300 hours on the case, using an average hourly [**34] rate of $250, the trial court awarded Connie's $75,000 of attorney fees.

[*P48] Fishman's fee petition was far larger. Fishman's attorneys sought $681,714.50 in attorney fees and $182,607 in late fees, which it argued were owed under the terms of its retention agreement. The trial court held that the late charges could not be charged to Fox River because it was not a party to the retention agreement. It also decreased the reimbursement for attorney fees to a total of $150,000. In reaching this number, the trial court rejected the average billing rates of $343 per hour as not being within community standards in Du Page County, especially when many of those hours occurred as long ago as 2005. The trial court therefore applied an average hourly rate of $250 instead. Moreover, the trial court noted that, dividing the fees being sought by the $343 hourly rate, the fee petition suggested that approximately 1,958 hours were expended solely on the 2005 Eviction and the Fishman Suit. The

Case 08-13141-BLS   Doc 14046-2   Filed 02/20/15   Page 117 of 150

Page 10

2012 IL App (2d) 120281-U, *P48; 2012 Ill. App. Unpub. LEXIS 3057, **34

trial court found that this total was unreasonably high, giving as examples of overbilling 54.6 hours purportedly spent reviewing the lease documents, and 262.9 hours billed for research, including entries on 6 separate [**35] days over 7 years for research on mitigation of damages and entries on 9 separate occasions for research on the Forcible Entry and Detainer Act. The court also commented at length on the repeated use of vague and insufficiently detailed listings such as "review issues," "analyze correspondence and status," "analyze legal and procedural issues," and "review and analyze facts." The trial court concluded by finding the time entries "grossly excessive," and found instead that an appropriate amount of time would have been 600 hours.

[*P49] Fox River filed a timely notice of appeal, raising a variety of issues with respect to the judgments. Fishman cross-appealed, contending that the trial court's evaluation of its attorney fees was too low.

[*P50] ANALYSIS

[*P51] I. Fox River's Appeal

[*P52] A. Issues Relating to the Connie's Suit and the Fishman Suit

[*P53] On appeal, Fox River argues that the trial court erred in finding, in both the Connie's Suit and the Fishman Suit, that Fox River's refusal to consent to the assignment of the Building Lease to the Smith Group and the Mojitos Group was unreasonable and constituted tortious interference with prospective economic advantage as well as a material breach of the Land Lease. With [**36] respect to the Connie's Suit, Fox River also argues that Connie's was not entitled to damages for rent it paid while remaining in possession. As to the Fishman Suit, Fox River raises two additional arguments: that Fox River's refusal to consent to an assignment to Scapa was reasonable, and that the damages awarded to Fishman were excessive. We examine each of these arguments in turn.

[*P54] 1. Arguments Common to Both Suits: Reasonableness of Fox River's Conduct

[*P55] Fox River's first argument is that its conduct in rejecting the proposed assignees was in fact reasonable. Fox River contends that we should review the trial court's ruling on this issue de novo, but this assertion is incorrect. In a bench trial, the trial court sits as the trier of fact, hearing the witnesses and reviewing the direct presentation of the evidence, and it is in the best position to make credibility determinations and factual findings. In re Marriage of Matchen, 372 Ill. App. 3d 937, 946, 866 N.E.2d 683, 310 Ill. Dec. 522 (2007). Accordingly, we will not reverse the judgment in a bench trial unless it is against the manifest weight of the evidence; that is, unless "the opposite conclusion is clearly evident or the finding is arbitrary, unreasonable, or [**37] not based in evidence." Samour, Inc. v. Board of Election Commissioners of the City of Chicago, 224 Ill. 2d 530, 543, 866 N.E.2d 137, 310 Ill. Dec. 326 (2007).

[*P56] In this case, the evidence amply supports the trial court's determination that Fox River's rejection of the Smith Group and the Mojitos Group was unreasonable. [4] "It is well established in Illinois that where a lease forbids any sublease or assignment without the consent of the lessor, the lessor cannot unreasonably withhold his consent to a sublease." Jack Frost Sales, Inc. v. Harris Trust & Savings Bank, 104 Ill. App. 3d 933, 944, 433 N.E.2d 941, 60 Ill. Dec. 703 (1982). To show that a landlord's refusal to consent to an assignment of the lease was unreasonable, the tenant must show that (1) it had on hand a proposed assignee that was ready, willing, and able to assume the lease, and (2) the proposed assignee met "commercially reasonable standards." Vranas & Associates, Inc. v. Family Pride Finer Foods, Inc., 147 Ill. App. 3d 995, 1003, 498 N.E.2d 333, 101 Ill. Dec. 151 (1986). "A prospective purchaser of real estate is deemed ready, willing and able to purchase if he has agreed to buy property and has sufficient funds on hand or if he is able to command necessary funds with which to complete [the] purchase within the time set [**38] by offer." Id. at 1005. Factors bearing on whether a proposed assignee meets "commercially reasonable standards" include the financial responsibility of the proposed assignee, the type of business that the assignee will be conducting, and whether the assignee's business will compete with that of the landlord or any other tenant. Id. at 1003.

4   Fox River also raises an argument that it did not unreasonably refuse to enter into an assignment with Chicago Franchise, but the trial court never found that it had. Thus, the argument is not relevant to the validity of the trial court's judgment and we ignore it.

[*P57] The evidence showed that the Smith Group was ready, willing, and able to take over the lease and

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 118 of 150

Page 11

2012 IL App (2d) 120281-U, *P57; 2012 Ill. App. Unpub. LEXIS 3057, **38

that it was a commercially reasonable assignee. The Smith Group had been approved by Chicago Franchise as a franchisee, and was willing to assume Connie's obligations under the Building Lease. Howey, the owner of Chicago Franchise, testified that he viewed the group very favorably due not only to the investors' wealth and one investor's real estate experience, but also the group's willingness to recognize their own lack of experience in running a restaurant and to retain a restaurant management [**39] company to operate the project. Steven Smith, a principal of the Smith Group, provided a written assurance that the project "would be capitalized with assets of $500,000 or more." Moreover, after its efforts to open a restaurant in the Building were rejected, the Smith Group opened restaurants at different locations at a cost of over $650,000, demonstrating their ability to put in the capital that would have been necessary to open in the Building. See *Golf Management Co., Inc. v. Evening Tides Waterbeds, Inc., 213 Ill. App. 3d 355, 363, 572 N.E.2d 1000, 157 Ill. Dec. 536 (1991)* (evidence of later equivalent financial transactions is relevant to the question of whether the proposed assignee was ready, willing, and able to assume the lease, and met commercially reasonable standards); *Vranas, 147 Ill. App. 3d at 1005-06*. On appeal, Fox River concedes that the initial startup costs would have totaled $483,353. This amount would have been covered by the Smith Group's proposed capitalization. (Fox River incorrectly argues that the Smith Group was not willing to put more than $500,000 into the project, but the Smith Group's letter committed to capitalization of "$500,000 *or more.*")

[*P58] Fox River points to various facts to support [**40] its contention that its rejection of the Smith Group was reasonable. None of these arguments have merit. For instance, Fox River points out that Smith's letter containing the commitment to capitalization of $500,000 or more was the only financial information it received, and argues that this was insufficient documentation. However, there is no evidence that anyone at Fox River asked for any additional information, and Fox River's letter rejecting the Smith Group made no mention of insufficient financial information. Fox River also argues that the fact that Fishman was not involved in Connie's effort to assign the Building Lease means that Fox River had no obligation to consider the assignment request, but it offers no legal support for this argument. Fox River then suggests that Howey's refusal to have Chicago Franchise on the lease was due to Howey's unwillingness to take on the "risk" of inadequate capitalization posed by

the Smith Group, a position that was reasonably echoed by Fox River. However, this suggestion is contradicted by the record: Howey testified that Chicago Franchise's refusal to enter into leases for its franchisees was a company-wide policy unrelated to any particular [**41] franchisee, and that the policy was based on a desire to avoid additional regulatory requirements, not financial risk.

[*P59] Finally, Fox River points to Connie's January 31, 2005, letter to Chicago Franchise, terminating their purchase agreement on the basis that closing had not occurred as scheduled. Fox River argues that this letter shows that Connie's itself terminated the possible assignment even before Fox River advised Connie's that it was rejecting the assignment on February 25, 2005. However, purchase agreements and closing dates can be extended, and there is no indication in the record that this would not have occurred if Fox River had approved the assignment. The mere presence of future events that would also have to occur will not justify a landlord in unreasonably refusing to consent to a proposed assignee, when there is no evidence that the other requirements could not have been met. *Golf Management, 213 Ill. App. 3d at 362* (citing *Jack Frost, 104 Ill. App. 3d at 944*). We therefore find all of these arguments relating to Fox River's rejection of the Smith Group to be without merit.

[*P60] The evidence also supports the trial court's finding that Fox River rejected the Mojitos Group [**42] as a proposed assignee and that this rejection was unreasonable. Rios provided substantial financial documentation to Fox River, including profit and loss statements for Café Rumba, personal financial statements, and a construction budget. Rios had over 20 years of experience operating restaurants, had successfully raised the capital needed to open a restaurant before (Café Rumba), had deposited earnest money and prepared drawings of the new restaurant, and was able to produce a construction budget that Di Mucci acknowledged appeared realistic. Despite Fox River's suggestions to the contrary, the evidence shows that Fishman was aware of the proposed assignment and had no objection to it.

[*P61] Fox River argues that it rejected the Mojitos Group because the financial information suggested that the Rioses would be carrying too great a debt burden from the opening of the restaurant. It points out that the Mojitos Group acknowledged that Fox River had

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 119 of 150

Page 12

2012 IL App (2d) 120281-U, *P61; 2012 Ill. App. Unpub. LEXIS 3057, **42

correctly assessed the financial statements. In addition, although the Mojitos Group told Connie's that in fact it would be financing costs through equity, not debt, no one provided that information to Fox River. Finally, it points to Rios's testimony [**43] at trial that Café Rumba may have been undergoing chapter 11 bankruptcy at the time, and that he had not formally registered the Mojitos Group as an LLC nor had he yet gone out to seek the investors at the time of the rejection. [5] It therefore argues that the Mojitos Group was like the proposed assignee in *Jack Frost* and, as in that case, it cannot be held to have acted unreasonably in rejecting the assignment.

    5  Fox River also argues that Rios was not going to be involved with the operation of the new restaurant and was instead going to accept another hotel job. However, it has not provided any cites to the record in support of these assertions and we therefore disregard them. See *Ill. S. Ct. R. 341(h)(7)* (eff. Sept. 1, 2006) (arguments must be supported with citation to the pages of the record relied upon); *People v. Chatman, 357 Ill. App. 3d 695, 703, 830 N.E.2d 21, 294 Ill. Dec. 21 (2005)* ("A reviewing court *** is not simply a repository in which appellants may dump the burden of argument and research; an appellant's failure to properly present his own arguments can amount to waiver of those claims on appeal." ).

[*P62] We acknowledge that the financial picture for the Mojitos Group was not uniformly positive. However, [**44] a significant factor distinguishes the present case from *Jack Frost*. Although a lessor may have a legitimate interest in the financial wherewithal of a proposed assignee, that interest is diminished where, as here, previous assignees and tenants remain liable under the lease, thereby providing the lessor with protection against potential losses. This point was made by the court in *Jack Frost*, which noted that one factor supporting its determination that the landlord acted reasonably in withholding consent to the proposed assignment was that the current tenant was not willing to guarantee performance of the lease by the assignee. *Jack Frost, 104 Ill. App. 3d at 947.* Here, by contrast, four entities--Fishman, Bertucci's, Connie's Pizza, Inc., and Connie's--would have remained liable for any default in the Leases. Thus, the risk to Fox River (and any legitimate interest in ensuring a perfect financial backing by the proposed assignees) was greatly reduced. We do not hold that Fox River had no legitimate interest at all in ensuring that proposed assignees were financially sound. As Di Mucci testified, Fox River had an interest in ensuring that the Building was not vacant. But given the fact [**45] that Connie's had not been operating its restaurant on the premises for over six months at this point, Di Mucci's purported desire to keep the building from being "dark" should have made him more interested, not less so, in getting a new tenant in. We hold that, under the circumstances here, where the financial returns on the Building were protected by four layers of continuing obligation, Fox River could not reasonably require the level of financial assurances that it did.

[*P63] Moreover, Fox River's argument ignores the presence of another factor--objective indications that Fox River did not give good-faith consideration to the Mojitos Group as an assignee. One of the stipulated trial exhibits was a memorandum from Niemira to Di Mucci, dated March 18, 2005. This was a few weeks after Fox River had rejected the Smith Group as an assignee, and only a few days after Fox River had sent Connie's a 30-day notice of default. In the memorandum, Niemira stated that he viewed the rejection of the Smith Group as a reasonable business decision, but he was being told that more potential assignees were "in the works." Niemira noted that any exercise by Connie's of its option to renew under the Building [**46] Lease did not directly benefit Fox River. However, there was a possibility that a decision by Connie's *not* to renew the Building Lease could benefit Fox River by allowing Fox River to gain possession of the Building. This could occur if Connie's did not timely notify its lessor (which Niemira referred to as "D&D Partners" although by this time Fishman was the lessor of the Building) that it wished to renew the Building Lease. In that case, the Building Lease would expire and Fishman could take possession, but that event also could lead Fishman to notify Fox River that it did not wish to renew the Land Lease, in which case Fox River would get possession of the Building.

[*P64] On March 31, 2005, shortly after Niemira wrote this memorandum, Connie's contacted Fox River, forwarding a copy of the asset sales agreement between Connie's and the Mojitos Group and asking for Fox River's consent to the Mojitos Group as an assignee. A few days later, Niemira forwarded the sales agreement to Di Mucci and Fox River's attorney with the comment that "their time is running out." On April 15, Fox River wrote Connie's a letter in which it laid out various conditions it would insist upon in order to approve [**47] the

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 120 of 150

Page 13

2012 IL App (2d) 120281-U, *P64; 2012 Ill. App. Unpub. LEXIS 3057, **47

assignment, including the same type of assumption of future defaults under the Building Lease as had been agreed to by Bertucci's, and extensive financial documentation. The letter also advised Connie's that it "remain[ed] in default under the lease, which default is continuing and not waived by lessor." On April 27, Niemira forwarded the Mojitos Group's financial information to Di Mucci. Di Mucci's handwritten comments on the cover memo said "rejected--undercapitalized at this time." The following day, Fox River wrote to the Mojitos Group saying that it was not looking favorably on the proposed assignment. The very next day, Fox River sent Fishman and Connie's its five-day notice to quit, citing the reason that the default identified in the March 15 notice had not been cured within the 30 days. Coincidentally, the fifth day after the five-day notice was sent was May 4, 2005, which Smith's attorney had calculated was the last day for Fishman to notify Fox River that it did not wish to renew the Land Lease.

[*P65] It is clear that the trial court considered this chain of events to indicate that Fox River was seeking to terminate Connie's tenancy in the hopes that Fox River might be able [**48] to take over the Building. The trial court found that Fox River's conduct, "including its attempt to wipe out Fishman's position and ownership of the Building by obtaining the Building for no cost whatsoever," was a breach of the implied duty of good faith and fair dealing under the Land Lease. This same course of conduct indicates that Fox River did not engage in an unbiased consideration of the proposed assignment to the Mojitos Group. For all of these reasons, we hold that the trial court's rulings--that Fox River acted unreasonably in rejecting the proposed assignments to the Smith Group and the Mojitos Groups--are not against the manifest weight of the evidence.

[*P66] 2. Additional Arguments Relating to the Connie's Suit

[*P67] Fox River's next challenge to the judgment in the Connie's Suit is that Connie's was not entitled to damages for rent it paid while remaining in possession. Fox River argues that, regardless of whether it interfered with Connie's economic advantage, it did not disturb Connie's possession of the premises, and accordingly Connie's was not entitled to reimbursement for the rent it was contractually obligated to pay during that possession, which lasted through April 2008. The [**49] type of

damages available for a particular injury is a legal issue, and we therefore review it *de novo. People v. Brown, 225 Ill. 2d 188, 198, 866 N.E.2d 1163, 310 Ill. Dec. 561 (2007).*

[*P68] The flaw in Fox River's argument is that, although Connie's indeed possessed the Building, it sought to give up that possession by assigning its rights and obligations under the Building Lease, but Fox River prevented it from doing so. Compensatory damages are designed to put the injured party in as good a position as if the injury had not occurred. *Gambino v. Boulevard Mortgage Corporation, 398 Ill. App. 3d 21, 61, 922 N.E.2d 380, 337 Ill. Dec. 257 (2009).* Here, the trial court determined that Fox River unreasonably refused to consent to assignments to the Smith Group or the Mojitos Group, either of which would have paid rent in an amount at least equal to the rent owed by Connie's, and that conduct caused Connie's injury by causing it to pay approximately three years of rent (from February 2005 through March 2008) which it otherwise would not have paid. These findings were not against the manifest weight of the evidence, and there was no legal error in the trial court's imposition of these compensatory damages. *Id.*

[*P69] Accordingly, we reject all of Fox River's arguments against [**50] the judgment in the Connie's Suit (05 MR 620), and affirm that judgment in full.

[*P70] 3. Additional Arguments Relating to the Fishman Suit

[*P71] We turn to Fox River's additional arguments pertaining to the Fishman Suit. (We have already disposed of Fox River's argument that its conduct in rejecting the Smith Group and the Mojitos Group was reasonable.) Fox River begins by arguing that the trial court erred in finding that the proposed assignment to Scapa failed because of Fox River's actions. Rather, Fox River contends, the deal failed because Scapa realized that it would face opposition from Carrabas, an existing restaurant in the shopping center that had an exclusivity provision. We need not decide this issue, as--regardless of our view of the Scapa deal--the trial court's judgment in the Fishman suit can be upheld based upon its rulings that Fox River breached the Land Lease and engaged in tortious interference through its rejections of the assignments to the Smith Group and the Mojitos Group. Accordingly, we decline to address this issue. See *People v. White, 2011 IL 109689, ¶ 153* (appellate court should not engage in analysis of issues that are unnecessary to its

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 121 of 150

Page 14

2012 IL App (2d) 120281-U, *P71; 2012 Ill. App. Unpub. LEXIS 3057, **50

resolution of the appeal).

[*P72] Fox [**51] River's remaining argument against the judgment in the Fishman Suit is that the trial court's award of damages was excessive. Specifically, Fox River argues that the $628,196.93 that was awarded to Fishman as damages (for lost rent that could have been received from Connie's during the period from April 2008 through May 2011, when the Building Lease would have expired) should be reduced by the following amounts: $65,210.87 for common area maintenance (CAM) fees and property taxes; and $274,190.58 in rent owed by Fishman to Fox River during the same period, under the Land Lease. Fox River argues that, absent any breach or tortious conduct by itself, Fishman would not have been entitled to receive the gross amount of rent from Connie's, only the profits on that rent, net of (a) pass-through expenses like the CAM fees and taxes, the payments for which it was obliged to pass on to Fox River, and (b) rental payments Fishman owed under the Land Lease. Thus, Fox River contends, the trial court's award of the gross rent from Connie's as damages constituted a windfall that placed Fishman in a better position than it would have been in if the breach had never occurred.

[*P73] Fox River is correct that [**52] the usual measure of compensatory damages is the amount necessary to place the plaintiff in as good a position as it would have been in absent the defendant's wrongdoing, and should not provide a windfall to the plaintiff. *Gambino, 398 Ill. App. 3d at 61*. Accordingly, "gross revenue is generally not an appropriate measure of damages because revenue is calculated without regard to the costs the plaintiff incurred in the course of making that revenue." *E360 Insight, Inc. v. Spamhaus Project, 658 F.3d 637, 647 (7th Cir. 2011)*; see also *Sterling Freight Lines, Inc. v. Prairie Material Sales, Inc., 285 Ill. App. 3d 914, 918, 674 N.E.2d 948, 221 Ill. Dec. 155 (1996)* (damages for lost profits must be based on net profits, which are calculated by subtracting the expenses the plaintiff would have incurred in fulfilling its own performance). In response to this argument, Fishman asserts that the trial court's damages calculations were correct and that the expenses associated with its right to receive rent from Connie's are "irrelevant," but it cites no case law at all in support of that assertion.

[*P74] A miscalculation regarding the type or proper measure of damages that flow from an injury is an

error of law. *E360 Insight, 658 F.3d at 648*. [**53] Pursuant to *Supreme Court Rule 366* (eff. Feb. 1, 1994), this court may modify a judgment without remand if the facts are undisputed. Here, Fishman has not argued that Fox River's calculations are incorrect, only the premise for those calculations.

[*P75] We therefore agree with Fox River that Fishman's damages in the Fishman Suit should be reduced. We calculate the proper amount of lost profit for which Fishman should be compensated to be $288,795.48, an amount reached by subtracting $65,210.87 (pass-through CAM fees and taxes Fishman owed) and $274,190.58 (the amount Fishman would have paid in rent during the relevant period) from $628,196.93 (the amount of gross rent--which included CAM fees and taxes--that Fishman would have received from Connie's). To this amount, we add the $30,000 security deposit which the trial court ordered Fox River to return to Fishman, an award that Fox River has not challenged. Accordingly, we affirm the judgment in the Fishman Suit (07 L 1018) but modify the damages awarded to $318,795.48.

[*P76] *B. Issues Relating to the 2005 Eviction*

[*P77] Fox River attacks the trial court's judgment in favor of Connie's and Fishman in the 2005 Eviction case (05 MR 1813) on three grounds. First, [**54] it argues that this case was moot once Fox River obtained possession of the Building in November 2009 and therefore the case should not have proceeded to trial. Second, it argues that the trial court erred in finding that the notices of the alleged default that Fox River sent were defective. Finally, it argues that Connie's could not recover any attorney fees incurred in this case because it was not a party to the Land Lease.

[*P78] The first of these arguments is forfeited. Like any other argument, the argument that an issue or an action is moot can be forfeited if a party fails to raise it in a timely fashion. *Gray v. National Restoration Systems, Inc., 354 Ill. App. 3d 345, 366, 820 N.E.2d 943, 289 Ill. Dec. 868 (2004)*. Here, the first allusion to the possibility that the 2005 Eviction could be viewed as moot came on November 17, 2009, during the hearing on Fox River's motion for summary judgment in its other eviction action, the 2008 Eviction (08 LM 2286). In that case, Fox River sought summary judgment in its favor on two issues, possession and rent. Fishman noted that, in count V of the complaint in the Fishman Suit, they alleged that in

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 122 of 150

Page 15

2012 IL App (2d) 120281-U, *P78; 2012 Ill. App. Unpub. LEXIS 3057, **54

May 2008 they had told Fox River that they were prepared to tender possession of [**55] the Building. The trial court accordingly ruled that Fox River was entitled to possession of the Building "at this point in time." However, the court also ruled that "any issues as to future damages, rent, *** setoff," and specific performance should go to trial, and it therefore denied the remainder of the motion for summary judgment in the 2008 Eviction.

[*P79] Near the end of the hearing, the subject of the 2005 Eviction (the only action in which Fox River had *not* sought summary judgment) arose. One of the attorneys for Connie's or Fishman (the record does not disclose which) suggested that, given the fact that Fox River now had possession of the Building as a result of the ruling on the 2008 Eviction, the 2005 Eviction "was of no significance" except for the fact that Connie's and Fishman contended that the 2005 Eviction was improperly brought, and they had been required to defend that action for over a year before obtaining summary judgment in their favor. (That order granting summary judgment in the 2005 Eviction was later vacated on appeal as one of the orders entered after the motion for substitution of judge had been filed.) Connie's and Fishman therefore sought reimbursement for [**56] their attorney fees incurred in defending the action. The unidentified attorney asked that the issue of attorney fees be reserved for trial, and the trial court agreed.

[*P80] On February 16, 2010, the consolidated cases appeared on the trial call. All of the parties answered that they were ready for trial. In discussing the best way to proceed on the four consolidated cases, the trial court recalled that one of the evictions was "moot at this point." Fox River agreed. Fishman and Connie's stated that the only remaining issues in the 2005 Eviction were their petitions seeking attorney fees as prevailing parties in that case. Fox River argued that there were no prevailing parties in that case, inasmuch as the summary judgment in favor of Connie's and Fishman had been vacated. Further, Fox River had not sought rent in that case, and possession was no longer an issue, so there was "really no reason to go forward on that." Fox River stated that it would be willing to dismiss the 2005 Eviction. Fishman objected, saying that the motion for summary judgment was still pending, as were the fee petitions. The trial court then stated that, with respect to the attorney fees issue in the 2005 Eviction, [**57] it would defer any ruling on that until it had heard the evidence in the other cases.

[*P81] Subsequently, Fox River did not file any motion to voluntarily dismiss the 2005 Eviction, nor did it seek dismissal of the case on the basis of mootness. On May 31, 2011, the first day of trial, Fox River did not renew its offer to dismiss the case. Further, it did not object at trial to questioning or evidence regarding the notices of default upon which it relied in bringing the 2005 Eviction, or argue in its closing argument that the 2005 Eviction was moot. Finally, it did not raise the supposed mootness of the 2005 Eviction in its motion to reconsider the judgment in that case. A reviewing court will not consider arguments not presented to the trial court. *Hytel Group, Inc. v. Butler, 405 Ill. App. 3d 113, 127, 938 N.E.2d 542, 345 Ill. Dec. 103 (2010).* Having permitted the 2005 Eviction to be presented to the trial court without objection, Fox River cannot now complain that the trial court considered that case and ruled upon it. We therefore find the mootness argument forfeited, and we decline to consider it. *Id.*

[*P82] We next address Fox River's contention that the trial court erred in finding that Fox River's notices of default were defective. [**58] Whether a notice complies with a contractual or statutory provision is an issue of law, which we review *de novo. People v. Brown, 225 Ill. 2d 188, 198, 866 N.E.2d 1163, 310 Ill. Dec. 561 (2007); Figueroa v. Deacon, 404 Ill. App. 3d 48, 52, 935 N.E.2d 1080, 343 Ill. Dec. 852 (2010).*

[*P83] Under the Land Lease, Fox River was required to provide notice of any alleged default to the tenant under that lease, which was Fishman's trust. (Fishman notified Fox River in 2000, during the course of the assignment to Connie's Pizza, Inc., that Fishman's trust was the lessee under the Land Lease and the lessor under the Building Lease. At that time, the trustee was American National Bank.) As Fox River notes, Connie's was not a party to the Land Lease. Thus, Fox River's contractual obligations to notify the tenant of any default were owed solely to Fishman's trust. The 2004 assignment from Connie's Pizza, Inc. to Connie's provided that notices to Fishman's trust could be directed to Fishman personally, at his own address.

[*P84] All of the parties read section 9.01 of the Land Lease (the lease under which Fox River alleged a default) as providing that, in the event of a default, the nondefaulting party was required to notify the defaulting party of the claimed default and provide [**59] 30 days

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 123 of 150

Page 16

2012 IL App (2d) 120281-U, *P84; 2012 Ill. App. Unpub. LEXIS 3057, **59

to cure the default. The Land Lease also required a second notice before the lease could be terminated: once the 30 days had elapsed without the default being cured, the landlord could give the tenant "a notice of intention to cancel this Lease at the expiration of five (5) days from the date of the service of the notice." If the default still were not cured by that point, the lease would terminate.

[*P85] Here, Fox River sent two notices of default, the first dated March 14, 2005, and the second dated April 29, 2005. The March 2005 notice alleged a default in the Land Lease (in that no restaurant was open for business in the Building), and gave 30 days to cure the default. The April 2005 notice stated that the default identified earlier had not been cured and that the Land Lease would therefore terminate unless the default were cured within five days from receipt of the notice.

[*P86] There is no evidence that the first notice was actually sent in March 2005 to Fishman's trust, either at a bank trustee's address or at Fishman's own address. Rather, both notices were mailed to Fishman on or about April 29, 2005, in the same envelope. Fishman testified that, on May 2, he received both the April [**60] 2005 notice (which was addressed to him), and a copy of the March 2005 notice (which had been addressed solely to Connie's).

[*P87] Fishman and Connie's argue that one of the prerequisites to a suit for eviction is that the landlord must serve a proper notice on the tenant. Because Fox River sought to evict Fishman and Connie's under the Forcible Entry and Detainer Act (Act) (*735 ILCS 5/9-101 et seq.* (West 2008)), the provisions of the Act apply in addition to the provisions of the Land Lease. We begin by considering the Act's requirement that a landlord notify the tenant of the alleged default and then provide a certain amount of time for the tenant to cure the default before declaring the tenancy terminated and seeking possession. Under the Act, the relevant period for any claimed default in the lease other than nonpayment of rent is 10 days: a landlord must give the tenant at least 10 days' notice of the nature of the default and the fact that the landlord demands possession on the basis of that default. *735 ILCS 5/9-210* (West 2008); see also *Nance v. Bell, 210 Ill. App. 3d 97, 101, 568 N.E.2d 974, 154 Ill. Dec. 753 (1991)*. The Land Lease required a longer notice period for defaults than this--30 days--and thus a proper 30-day [**61] notice under the Land Lease would, generally speaking, also satisfy the 10-day notice

period under the Act. (The statutory notice period does not begin to run until the tenant received the notice (*Avdich v. Kleinert, 69 Ill. 2d 1, 9, 370 N.E.2d 504, 12 Ill. Dec. 700 (1977)*), while the Land Lease provided that the notice would be "deemed to have been given at the time it [was] *** placed in the mails.") Unlike the Land Lease, however, the Act does not require a second notice.

[*P88] Here, it is undisputed that both Fishman and Connie's received the March 2005 notice. Connie's received that notice on or about March 14, 2005, when it was faxed to Connie's. The notice was not sent to Fishman until April 29, 2005, however, when Fox River placed a copy of it in the same envelope used to mail the April 2005 notice. Thus, under *Avdich*, the 30-day period set out in that notice did not begin to run until April 29, 2005, the date on which Fox River sent the notice to the tenant under the Land Lease. (As noted, Fishman was the designated recipient for notices to Fishman's trust, and thus his receipt of the notice counts as receipt by the trust.) Under the Land Lease, Fishman therefore had until May 29, 2005, to cure the default identified [**62] by the notice.

[*P89] On May 6, 2005, Connie's reopened for business, providing carry-out and delivery service only. On May 12, Fox River wrote Fishman, stating that the carry-out business did not cure the default in the Land Lease, because that lease required the tenant to operate a full-service restaurant in all of the Building. In this letter, Fox River acknowledged that Fishman was current in its rent (and thus presumably May rent had been paid). On May 13, 2005, Fishman wrote Fox River, saying only that Fox River's notices were defective and that no rent was due or owing. Fox River sent no further notice of its intention to cancel the lease after May 29, 2005. Fox River filed the 2005 Eviction on June 17, 2005.

[*P90] Fishman and Connie's successfully argued at trial that Fox River's attempts to serve notice of the default were ineffective because of various flaws. For instance, the March 2005 notice was on the letterhead of Di Mucci Companies and lacked any reference to Fox River. Inasmuch as there was no evidence that this fact misled the parties in any way--Fishman and Connie's acted at all times as if they understood that the March 2005 notice was sent on behalf of Fox River--we find it to [**63] be without legal significance. Fishman and Connie's also argue that Fox River never sent any notices to Fishman's trust, as the April 2005 notice was addressed

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 124 of 150

Page 17

2012 IL App (2d) 120281-U, *P90; 2012 Ill. App. Unpub. LEXIS 3057, **63

to Fishman himself. We reject this argument because the 2004 assignment stated that notices to Fishman's trust could be sent to Fishman personally.

[*P91] The most important defect in the notices, however (according to Fishman, Connie's, and the trial court), was that they were not served via one of the methods of service listed as acceptable in the leases or the Act. Section 13.05 of the Land Lease provides that notices "shall be by personal delivery, telecopy, courier service, or certified mail with return receipt requested." (Confusingly, article XVIII of the same lease provides that notices "shall be deemed given when deposited in the United States registered mail.") The Act provides that a landlord's notice of a default must be served on the tenant by (1) personal delivery to the tenant (or someone over the age of 13 living in the same home), or (2) certified or registered mail, return receipt requested. *735 ILCS 5/9-211* (West 2008).

[*P92] Fox River first attempted to serve its 30-day notice on March 14, 2005, by faxing it and mailing [**64] it (via regular mail) to Connie's. We think that "by fax" is similar enough to "by telecopy" to comply with the provisions of the Land Lease. However, this attempt at service was not effective because it was directed at Connie's rather than at Fishman's trust, which was the tenant under the Land Lease, and there is no evidence that Fishman received a copy of the notice at this time. On April 29, 2005, Fox River mailed to Fishman, via regular mail, both a copy of the 30-day notice and a copy of its April 2005 notice. Fishman admitted that he received this copy of these notices on May 2, 2005, but argues that the notices were ineffective because they were mailed via regular mail instead of certified or registered mail, return receipt requested.

[*P93] For the reasons discussed below, we view this argument as shaky at best. However, we need not resolve this issue here, because regardless of whether Fox River's use of regular mail instead of a method listed in the Land Lease or the Act has any legal significance, Fox River did not provide the second notice in a manner that would comply with the requirements of the Land Lease.

[*P94] In *Avdich v. Kleinert, 69 Ill. 2d 1, 370 N.E.2d 504, 12 Ill. Dec. 700 (1977)*, the supreme court held that [**65] a landlord's failure to serve the notice on the tenant using the methods of service listed in the Act did not necessarily preclude the landlord from bringing an eviction suit where the tenant admitted receiving the

notice. *Id.* at 7. However, the statutory notice period (which, under the language of the Act, commenced on the date the notice was received) did not begin to run until the date the tenant testified that he received the notice. *Id. at 9.* Thus, the eviction suit, which had been filed before that date, was premature. *Id.*

[*P95] Similarly, in this case the Land Lease required Fox River first to give Fishman 30 days' notice of the default and then, once that time period had expired without a cure, to give Fishman a second notice declaring the lease terminated unless the default was cured within the next 5 days. Fox River did not send the 30-day notice of default to Fishman until April 29, 2005. (Under the Land Lease (unlike the Act), a notice of default is deemed served on the date of mailing.) Under *Avdich*, the 30-day period therefore did not begin running until April 29, 2005. Once the 30-day period had expired, however, Fox River sent no further notices to Fishman. The 5-day notice [**66] that Fox River *did* send to Fishman (on April 29, 2005) was not effective because the Land Lease required such a notice to be sent after the 30-day cure period had elapsed. As Fox River did not comply with the provisions of the Land Lease allowing an early termination of that lease on the basis of a default, the termination was not effective and Fox River had no right to seek eviction. Accordingly, the trial court did not err in entering judgment in favor of Fishman and Connie's in the 2005 Eviction.

[*P96] Fox River points out that Fishman never notified it of the change in the trustee for his land trust, and argues that this failure relieved Fox River of any obligation to provide any notice to the trust. This argument fails on both factual and legal grounds. As a factual matter, Fishman had specified in the 2004 assignment that any notices to the trust could be sent to his home address, and thus his failure to inform Fox River about the later change in trustee did not prevent Fox River from performing its obligations under the Land Lease to provide proper notice to Fishman's trust. We also note that Fox River did not even attempt to provide timely notice of the asserted default to the last [**67] known trustee, such as by sending a copy of the March 2005 notice to its last known address. As a legal matter, we note that none of the case law cited by Fox River provides any support for the proposition that one party's failure to give notice of a relatively minor change in the identity of a trustee would relieve the opposing party of a significant contractual obligation to provide proper notice

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 125 of 150

Page 18

2012 IL App (2d) 120281-U, *P96; 2012 Ill. App. Unpub. LEXIS 3057, **67

of an asserted default. Accordingly, we reject this argument.

[*P97] Fox River also suggests that its failure to give Fishman's trust proper notice under the Land Lease lacked legal significance because Fishman's attorney was "aware of the breach" (*i.e.*, that Connie's was not operating the restaurant) in mid-March. In support, it points to billing entries submitted in connection with Fishman's petition for attorney fees which it asserts indicate such knowledge. However, our review of the record does not support this argument. The billing entries from mid-March say "Call to M. Fishman" and "Review of lease and correspondence," neither of which affirmatively shows knowledge of conduct by Connie's that could be construed as a default under the Land Lease. Moreover, even if these entries did show knowledge [**68] of the restaurant being closed, Fox River has cited no case law that knowledge of a potential default waives a tenant's right to insist on proper notice (1) that the landlord considers the situation to be a default and (2) setting out a time period in which the default must be cured. We therefore reject this argument as well, and affirm the trial court's entry of judgment in favor of Fishman and Connie's in the 2005 Eviction.

[*P98] The parties raise other arguments about the 2005 Eviction, but in light of our conclusion that Fox River failed to comply with the Land Lease's requirements governing early termination of the lease, we need not address them.

[*P99] Fox River's final argument regarding this case is that, even if the trial court was correct in finding that Fishman and Connie's were entitled to judgment in their favor, the trial court erred in awarding Connie's attorney fees. Generally, a party is responsible for paying its own attorney fees unless there is a statutory or contractual basis for shifting those fees. *Sandholm v. Kuecker, 2012 IL 111443, ¶ 64*. Fox River notes that the Act does not provide for statutory attorney fees. Fox River further argues that, because Connie's was not a party [**69] to the Land Lease (the lease under which the 2005 Eviction was brought), there was no contractual basis on which Connie's could recover its attorney fees.

[*P100] Connie's responds that, although the two parties do not share contractual privity under the Land Lease, they are both signatories to the 2004 assignment. Paragraph 7 of that assignment states that, "[i]n the event of any litigation arising out of this Assignment, the prevailing party shall be entitled to recover its attorney's fees from the other parties." Connie's argues that the assignment is the instrument that permitted its possession of the Building, which in turn was the basis for Connie's inclusion as a defendant in the 2005 Eviction.

[*P101] Although we are sympathetic to Connie's travails, we must reject this its argument. The 2005 Eviction does not "arise out of" the 2004 assignment, because it was not a suit to enforce that assignment or in connection with that assignment. Rather, the 2005 Eviction was a suit based upon the Land Lease in which Connie's was joined as a defendant because it was in possession at the time. Fox River also argues that Connie's could only succeed to the legal rights possessed by Bertucci's (from whom Connie's' [**70] assignment derives), and the Non-disturbance Agreement that spells out those rights makes no mention of attorney fees. For all of these reasons, we must vacate the trial court's judgment granting Connie's fees in this case.

[*P102] *C. Issues Relating to the 2008 Eviction*

[*P103] In this case, Fox River sought possession and back rent owed from May 2008 onward. Fishman filed two counterclaims. The first was essentially a restatement of Fishman's first three counts in the Fishman Suit, and sought damages on the grounds that Fox River had injured Fishman by unreasonably withholding its consent to the proposed assignees. The second counterclaim restated Fishman's claim for specific performance of the January 2008 agreement. In its judgment in this case, the trial court noted that the issue of possession had been resolved in November 2009 when Fox River was granted possession via court order. The trial court did not enter any judgment on the issue of rent. However, in its findings of fact, it found that Fishman did not owe any rent under the Land Lease. It also found that the notices of default sent by Fox River in 2008 were defective, and that Fox River had not attempted to mitigate its damages.

[*P104] As to the [**71] counterclaims, the trial court's rulings mirrored those in the Fishman Suit, entering judgment in favor of Fishman on the first counterclaim and in favor of Fox River on the second counterclaim. The trial court ruled that Fishman's recovery on the first counterclaim was the same as in the Fishman Suit (thereby preventing a double recovery), and that each party was to bear its own costs and attorney fees.

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 126 of 150

Page 19

2012 IL App (2d) 120281-U, *P104; 2012 Ill. App. Unpub. LEXIS 3057, **71

[*P105] On appeal, Fox River raises two challenges to these rulings. First, it argues that it was entitled to recover rent from Fishman during the 18-month period that Fishman had possession of the Building (from May 2008, when Connie's gave the keys to Fishman, through November 2009, when Fox River was awarded possession of the Building by the trial court). Second, it contends that the trial court wrongly held that Fox River was not entitled to attorney fees because it failed to mitigate its damages.

[*P106] We begin with the second argument, which we reject because the record does not support it. Although the trial court did find that Fox River failed to mitigate its damages, that was not the basis for its decision not to award attorney fees and costs to Fox River. Rather, the reason that the trial [**72] court did not award attorney fees and costs--to either side--is that it determined that neither party qualified as "the prevailing party." Fox River won some aspects of the suit, as it was awarded possession and received a judgment in its favor on Fishman's second counterclaim, but Fishman prevailed on its first counterclaim and was awarded damages in excess of those sought by Fox River as back rent. Accordingly, the trial court implicitly found that, on balance, neither party was "the prevailing party" so as to be entitled to attorney fees in this suit. Fox River does not identify any defect in this determination. (As we noted, its sole argument on this point relates to mitigation.) We find no error and affirm the trial court's decision not to award attorney fees to either side in this case.

[*P107] As to the first argument, Fox River is correct that Fishman owed rent during the period from May 2008 to November 2009. However, this obligation was offset by Fox River's liability for its own breaches of the lease, with the result that Fox River could not recover from Fishman. Accordingly, the trial court's determination that, overall, Fishman did not owe rent under the Land Lease is correct. However, [**73] because some of the trial court's findings with respect to the issue of rent are problematic, we examine those findings in some detail.

[*P108] As we have discussed, the trial court held that Fox River acted unreasonably in withholding consent to the proposed assignees, and this determination was not against the manifest weight of the evidence. In considering this conduct in the context of the claims and counterclaims in the 2008 Eviction, the trial court found

that Fox River's conduct was a prior default that relieved Fishman of the duty to pay rent. This finding rests on a legal error. The law is clear that the duty to pay rent is independent of the duties that may be owed by a landlord under the lease. *Quincy Mall, Inc. v. Kerasotes Showplace Theatres, LLC, 388 Ill. App. 3d 820, 826, 903 N.E.2d 887, 328 Ill. Dec. 227 (2009)*. Thus, even accepting (as we do) that Fox River was the party that initially breached the lease by unreasonably withholding its consent, that did not relieve Fishman of the independent duty to pay rent. Rather, Fox River's conduct merely provided a basis for a counterclaim that could be set off against any rent that was owed. *Id. at 826-27.*

[*P109] That is what happened here. Fox River's claim for rent during the [**74] 18-month period at issue must be set off against Fishman's claim for damages flowing from Fox River's own breach, its unreasonable withholding of consent. As we have discussed in the context of the Fishman Suit, Fishman's damages on its counterclaim are limited to its lost profits--the amount it would have made but for Fox River's actions, net of its necessary costs--and thus Fishman's liability for rent owed to Fox River is already incorporated into Fishman's damages award. The trial court therefore was correct in ruling that the final outcome of this process is that Fishman did not owe Fox River any rent under the Land Lease.

[*P110] We acknowledge that the trial court also found that Fishman's obligation to pay rent under the Land Lease ceased when Fox River sent Fishman a letter in June 2008 stating that Fox River "had terminated" the lease, as this effectively terminated the Land Lease. However, the termination of a lease does not necessarily relieve a tenant of any further obligation to pay rent if that tenant remains in possession. See *Pole Realty Co. v. Sorrells, 84 Ill. 2d 178, 183, 417 N.E.2d 1297, 49 Ill. Dec. 283 (1981)* (tenant's duty to pay rent continues as long as it is in possession); *Nationwide Mutual Fire Insurance Co. v. T & N Master Builder and Renovators, 2011 IL App (2d) 101143, ¶ 24* [**75] (when a tenant remains in possession after the termination of a lease, either a tenancy at sufferance or a holdover tenancy results). Moreover, the trial court also found that the notices of termination sent by Fox River in May 2008 were defective, a finding that conflicts with the finding that Fox River's declaration of termination in June 2008 was effective. Under the Land Lease, Fox River could not terminate the lease early unless it complied with the lease

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 127 of 150

Page 20

2012 IL App (2d) 120281-U, *P110; 2012 Ill. App. Unpub. LEXIS 3057, **75

provisions regarding notice of the claimed default. In light of the conflicts between these holdings, we find that Fishman's obligation to pay rent continued during the time that it was in possession. However, for the reasons of set off laid out above, Fox River is not entitled to recover for the back rent owed. We therefore affirm the trial court's judgment in the 2008 Eviction.

[*P111]   II. Fishman's Cross-Appeal: Amount of Attorney Fees Awarded

[*P112] We now turn to Fishman's cross-appeal, in which it argues that the trial court erred in determining the attorney fees recoverable in connection with the 2005 Eviction and the Fishman Suit. Although Fishman requested over $681,000 in attorney fees and over $180,000 in late fees, the trial court [**76] found the attorney fees excessive and unreasonable, both as to the hourly rates charged and the hours billed, and therefore awarded $150,000. The trial court also refused to award any late fees, finding that the retainer agreement's provision regarding such fees did not bind a third party such as Fox River.

[*P113] Fishman argues that the trial court should have awarded it the late fees incurred, and also should have awarded it higher attorney fees. Fishman cites no legal authority for the proposition that his own failure to timely pay his attorney fees (the cause of the late fees at issue) should be laid at the feet of Fox River merely because of the contractual obligation to pay the prevailing party's attorney fees. Accordingly, we agree that such late fees are not encompassed within the attorney fees recoverable under the Land Lease, and affirm the trial court's decision to deny reimbursement for the late fees. We therefore turn to the issue of the attorney fees themselves.

[*P114] It is well settled in Illinois that the award of attorney fees is a matter committed to the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion. *Mountbatten Surety Co., Inc. v. Szabo Contracting, Inc.,* 349 Ill. App. 3d 857, 873, 812 N.E.2d 90, 285 Ill. Dec. 501 (2004). [**77] A trial court will award only those fees that are reasonable, consisting of reasonable charges for reasonable services. *Kaiser v. MEPC American Properties, Inc.,* 164 Ill. App. 3d 978, 983, 518 N.E.2d 424, 115 Ill. Dec. 899 (1987). The reasonableness of the fees is based upon the following factors: the skill and standing of the attorney; the nature of the action and the novelty and difficulty of the questions at issue; the value and importance of the subject matter; the degree of responsibility in managing the action; the time and labor reasonably required; the usual and customary charge in the community; and the benefits to the client. *Mountbatten Surety, 349 Ill. App. 3d at 873* (citing *Hanover Insurance Co. v. Smith, 182 Ill. App. 3d 793, 797, 538 N.E.2d 710, 131 Ill. Dec. 335 (1989)).* "When deciding whether to grant a fee petition, trial courts have broad discretionary powers, may exercise their independent judgment and are not limited to the evidence presented by the parties in arriving at a reasonable fee." *Wildman, Harrold, Allen & Dixon v. Gaylord, 317 Ill. App. 3d 590, 596, 740 N.E.2d 501, 251 Ill. Dec. 420 (2009).*

[*P115] Fishman first argues that the trial court should have accepted its attorneys' usual hourly billing rates of between $315 and $424 (averaging $343) per hour rather than [**78] reducing those rates to an average of $250 per hour. Citing federal case law, it argues that the best evidence of the reasonable value of legal services is what the client was willing to pay for it, and Fishman (and Connie's, which was liable for Fishman's attorney fees under the Building Lease and paid some of them) was willing to pay the attorneys' usual hourly rates. Here, however, it is clear that from the outset, each party contemplated shifting the cost of its attorney fees onto someone else's shoulders under the attorney fees provision of the various agreements between the parties. In fee-shifting cases where attorney fees are being imposed on a third party, many of the usual motivations to rein in excessive fees may be lacking. In such cases stricter scrutiny of the fee request is warranted "because the attorney submitting billing statements *** has no fiduciary relationship with the party ultimately liable for payment" of those fees. *Gaylord, 317 Ill. App. 3d at 596-97.* Moreover, in the cases on which Fishman relies, the client had already paid the attorney fees that were the subject of the later fee petition, providing some indication that the fees charged were reasonable. [**79] See *Balcor Real Estate Holdings, Inc. v. Walentas-Phoenix Corp., 73 F.3d 150, 153 (7th Cir. 1996); Berthold Types Ltd. v. Adobe Systems, Inc., 186 F. Supp. 2d 834, 840 (N.D. Ill. 2002).* Here, by contrast, the imposition of late fees indicates that Fishman has not in fact paid all of his legal bills, and indeed he himself could still choose to challenge their reasonableness. Nor was Connie's initial payment of some of the fees a significant indicator of their reasonableness; Connie's was attempting to avoid having Fishman sue it, and was

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 128 of 150

Page 21

2012 IL App (2d) 120281-U, *P115; 2012 Ill. App. Unpub. LEXIS 3057, **79

unlikely to antagonize Fishman by objecting to the high hourly rates. We therefore reject Fishman's argument that his (and Connie's) willingness to pay an average hourly rate of $343 showed that the trial court abused its discretion in using a lower rate.

[*P116] Fishman also argues that the trial court should not have reduced the compensable hours to the extent that it did. Responding to the trial court's exhaustive analysis of its fee petition and comments regarding excessive time being billed, Fishman disputes the accuracy of some of these comments. For instance, Fishman contends that, although the trial court found that Fishman's attorneys had spent 54.6 [**80] hours on reviewing lease documents, in fact the attorneys had only spent 9 hours on this task. Fishman raises a similar argument regarding the amount of time spent on research. Fishman's sole support for these arguments is an exhibit it attached to its brief, which it claims is a summary of its attorney's billing records. However, Fishman may not supplement the record on appeal by simply attaching items not contained in the record to its appellate brief. *In re Parentage of Melton, 321 Ill. App. 3d 823, 826, 748 N.E.2d 291, 254 Ill. Dec. 845 (2001).* We therefore disregard the exhibit. Fishman has not supported its arguments about any of these alleged inaccuracies with citations to the record, and thus has forfeited these particular arguments. *Ill. S. Ct. R. 341(h)(7)* (eff. Sept. 1, 2006); *Mikolajczyk v. Ford Motor Co., 374 Ill. App. 3d 646, 677, 870 N.E.2d 885, 312 Ill. Dec. 441 (2007).*

[*P117] Fishman also suggests that the trial court may have set the fee award too low because the particular judge that made the award, Judge Kenneth Popejoy, presided over the case only during the last two years of its six-year life. However, Judge Popejoy made it clear that he had not merely relied on his own experience with

the case (which was in any case considerable), but [**81] had carefully reviewed the entire course of the quartet of consolidated cases. We therefore reject this argument as well.

[*P118] Our own review of the record supports the trial court's determination that Fishman was not entitled to recover much of the amount requested in the fee petition. For instance, one of the factors to be considered in making a fee award is the value of the claim. *Mountbatten Surety, 349 Ill. App. 3d at 873.* Here, the trial court initially awarded Fishman a total of $628,197 in damages. On appeal, we have determined that the proper amount of damages is $318,795. Fishman's fee request of $681,714 was larger than the total damages initially awarded, and more than twice the correct amount of damages to which it was entitled. We also note that the amount awarded by the trial court to Fishman was twice that awarded to Connie's for its attorneys' work on largely identical issues. In summary, our review of the record convinces us that the trial court did not abuse its discretion in setting the award of attorney fees as it did. We therefore deny all of the relief requested in the cross-appeal.

[*P119] CONCLUSION

[*P120] For the reasons stated, we modify the amount of the judgment in favor of Fishman [**82] in case no. 07-L-1018 to $318,795.48 and vacate the award of attorney fees to Connie's in case no. 05-LM-1813, but otherwise affirm in all respects the judgments entered by the circuit court of Du Page County in cases no. 05-MR-620, 05-LM-1813, 07-L-1018, and 08-LM-2286.

[*P121] Affirmed in part as modified and vacated in part.



### In Re BRIAN LEE HITCH and KRISTI LYNN HITCH, Debtors. In Re JASON SCHAFER and KENNA SCHAFER, Debtors.

### In Bankruptcy Case No. 07-70803, In Bankruptcy Case No. 08-72299

### UNITED STATES BANKRUPTCY COURT FOR THE CENTRAL DISTRICT OF ILLINOIS

*2009 Bankr. LEXIS 1232*

### May 29, 2009, Decided

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In consolidated Chapter 13 cases, defendant creditors filed unsecured deficiency claims, which included costs incurred in postpetition liquidation of the debtors' collateral. The trustee objected to each claim, maintaining that *11 U.S.C.S. § 506(b)* barred an under-secured or totally unsecured creditor from recovering such postpetition costs. The issue was presented to the court for issuance of findings of fact and conclusions of law.

**OVERVIEW:** In both cases, the debtors entered retail installment contracts for the purchase of cars, giving the creditors a security interest in the vehicles. The creditors filed secured proofs of claims, and the Chapter 13 plans provided that the debtors would continue their regular monthly payments. When the debtors fell into arrears, the creditors sold the vehicles. The creditors filed amended claims, consisting of the unsecured deficiencies from the sales and the costs incurred in repossessing and selling the vehicles. In ruling in favor of the trustee, the court found that under the plain language of *§ 506(b)*, a secured creditor could recover postpetition interest, fees, costs, and charged only to the extent that its collateral was worth more than the claim. The court rejected the creditors' contention that allowance of their unsecured claims for the costs of repossession and sale was permitted by the "hanging paragraph" of *11 U.S.C.S. §*

*1325(a)*, finding that under the plain language of this provision, it was irrelevant to the treatment of amended, unsecured claims. The court further noted that a contrary ruling would violate the basic bankruptcy principle of equitable distribution.

**OUTCOME:** The court sustained the trustee's objections to the creditors' inclusion of costs incurred in the postpetition liquidation of the debtors' collateral.

**LexisNexis(R) Headnotes**

*Bankruptcy Law > Claims > Allowance*
*Bankruptcy Law > Claims > Objections*
[HN1] In order to determine whether a claim is an allowable claim, one first looks to *11 U.S.C.S. § 502*, which provides that a claim or interest, proof of which is filed under *11 U.S.C.S. § 501* is deemed allowed, unless a party in interest objects. *11 U.S.C.S. § 502(a)*. In the event an objection to a claim is filed, *§ 502(b)* provides that a court shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition and that the claim shall be allowed in the amount determined except to the extent that the claim implicates any of the nine exceptions enumerated in *§ 502(b)*. *11 U.S.C.S. § 502(b)*.

2009 Bankr. LEXIS 1232, *

*Bankruptcy Law > Claims > Types > Secured Claims & Liens > Determinations*

[HN2] To determine the amount of each claim and, specifically, to determine whether the amount may include the claimed costs, one must consider the provisions of *11 U.S.C.S. § 506. Section 506(a)* differentiates between secured claims and unsecured claims. A claim is secured to the extent of the value of such creditor's interest in the estate's interest in such property. *11 U.S.C.S. § 506(a)(1).*

*Bankruptcy Law > Claims > Types > Secured Claims & Liens > General Overview*

[HN3] See *11 U.S.C.S. § 506(b).*

*Bankruptcy Law > Claims > Types > Secured Claims & Liens > Chargeable Expenses*
*Governments > Legislation > Interpretation*

[HN4] Under the plain language of *11 U.S.C.S. § 506(b),* a secured creditor can recover postpetition interest, fees, costs, and charges provided by contract or state law only to the extent that its collateral is worth more than the claim. *Section 506(b)*'s silence with respect to unsecured and under-secured creditors points to the conclusion that these creditors are not entitled to postpetition fees and costs. Courts that disallow postpetition fees and costs invoke the legal maxim "expressio unius est exclusio alterius", that is, the expression of one thing is the exclusion of another, to support their conclusion that *§ 506(b)* does not allow postpetition fees and costs to unsecured or under-secured creditors. Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of contrary legislative intent.

*Bankruptcy Law > Claims > Types > Secured Claims & Liens > General Overview*
*Bankruptcy Law > Individuals With Regular Income > Plans > Confirmation > General Overview*
*Bankruptcy Law > Individuals With Regular Income > Plans > Confirmation > Nonconsensual Confirmations*

[HN5] Under Chapter 13, a debtor may propose to retain collateral in exchange for monthly payments totaling the value of a creditor's allowed secured claim. *11 U.S.C.S. § 1325(a)(5)(B).* In instances where a debtor proposes to pay less than the amount owed because the value of the collateral is less than the amount owed, the practice is commonly referred to as "cramdown". The amount of an allowed secured claim--the cramdown value--is determined by reference to *11 U.S.C.S. § 506(a).* However, the practice of cramming down was restricted when the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA) took effect on October 17, 2005. One provision of BAPCPA prohibits Chapter 13 debtors from utilizing *§ 506(a)* to cram down claims of creditors who have a purchase money security interest in a motor vehicle acquired for the debtor's personal use if the debt was incurred within 910 days of the date of filing.

*Bankruptcy Law > Claims > Types > Secured Claims & Liens > General Overview*
*Bankruptcy Law > Individuals With Regular Income > Plans > Confirmation > Consensual Confirmations*
*Bankruptcy Law > Individuals With Regular Income > Plans > Confirmation > Nonconsensual Confirmations*

[HN6] See *11 U.S.C.S. § 1325(a).*

*Bankruptcy Law > Claims > General Overview*

[HN7] Similarly situated creditors should be treated equally.

**COUNSEL:** [*1] For Brian Lee Hitch, McLean, IL, Debtor: Robert P Follmer, Bloomington, IL.

For Kristi Lynn Hitch, McLean, IL, Joint Debtor: Robert P Follmer, Bloomington, IL.

Trustee: John H. Germeraad, Petersburg, IL.

**JUDGES:** MARY P. GORMAN, UNITED STATES BANKRUPTCY JUDGE.

**OPINION BY:** MARY P. GORMAN

**OPINION**

The issue before the Court in each of the above-captioned Chapter 13 cases is whether costs incurred by an under-secured creditor in the post-petition liquidation of collateral may be included and allowed in that creditor's subsequently-filed unsecured deficiency claim. In each case here, a creditor has filed an unsecured deficiency claim which includes such costs. The Trustee has objected to each claim, maintaining that *11 U.S.C. §506(b)* bars an under-secured or totally unsecured creditor from recovering such costs when the costs are

incurred post-petition. For the reasons set forth below, the Court will sustain the Trustee's objections.

FACTUAL BACKGROUND - HITCH

The material facts of this case are not in dispute. On June 14, 2005, Brian Lee Hitch and Kristi Lynn Hitch purchased a 2005 Pontiac VIBE automobile. The Hitches financed the purchase through Prairieland Federal Credit Union ("PFCU"). The Hitches entered into a retail [*2] installment contract which required the Hitches to make monthly installment payments to PFCU and granted a security interest in the vehicle to PFCU. PFCU properly perfected its security interest in the vehicle by noting its lien on the certificate of title.

On April 23, 2007, the Hitches filed their petition under Chapter 13 of the Bankruptcy Code. On June 6, 2007, PFCU filed a secured proof of claim (Claim # 5) in the amount of $ 16,062.10. The Hitches' Third Amended Chapter 13 Plan, which was confirmed on February 19, 2008, provided that the Hitches would make their regular monthly post-petition payments directly to PFCU.

The Hitches fell in arrears on the PFCU loan, and PFCU filed a motion for relief from the automatic stay. No objections were filed to the motion, and the stay was modified as to the vehicle by an order entered on August 14, 2008. The vehicle was sold on October 9, 2008, for $ 11,520.08. According to PFCU - and it is not disputed - the principal balance on the note at the time of the sale was $ 13,635.97, leaving a deficiency of $ 2115.89. In repossessing and selling the vehicle, PFCU incurred a repossession charge of $ 275, a consignor fee of $ 375, and a selling [*3] fee of $ 375, for total costs of $ 1025. On November 20, 2008, PFCU filed its Amended Claim # 5 in the amount of $ 3140.89, consisting of the unsecured deficiency of $ 2115.89 plus the $ 1025 in costs. On November 21, 2008, John H. Germeraad, Chapter 13 Trustee ("Trustee"), filed his objection wherein he asserts that the Amended Claim # 5 should be limited to the $ 2115.89 deficiency. Trustee does not dispute the necessity or reasonableness of the repossession and sales costs. Rather, he contends that such costs are only allowed to over-secured creditors as set forth in *11 U.S.C. §506(b)*. The Trustee and PFCU have briefed the issue.

FACTUAL BACKGROUND - SCHAFER

The material facts of this case are also not in dispute.

On February 2, 2005, Jason and Kenna Schafer purchased a 2002 Honda Odyssey minivan. The Schafers financed their purchase through AmeriCredit Financial Services, Inc. ("AFS"). The Schafers entered into a retail installment contract which required monthly installment payments to be made to AFS and granted a security interest in the minivan to AFS. AFS properly perfected its security interest in the minivan by noting its lien on the certificate of title.

On September 18, 2008, [*4] the Schafers filed their petition under Chapter 13 of the Bankruptcy Code. On October 9, 2008, AFS filed a claim (Claim # 1), labeled as an unsecured deficiency claim, in the amount of $ 13,645.21. On October 10, 2008, AFS filed a motion to modify the automatic stay. No objections were raised to the motion, and an order granting the motion was entered on November 3, 2008. The Schafers later sought to have the order modifying the automatic stay vacated but that request was denied. Thereafter, because the Schafers' original Chapter 13 Plan provided for payment of AFS as a secured creditor, a First Amended Plan was filed which removed the proposed payments to AFS and treated AFS as a general unsecured creditor. The Schafers' Second Amended Plan, which also treats AFS as a general unsecured creditor, was confirmed on March 17, 2009.

In the meantime, the minivan was sold on January 7, 2009, for $ 3300.00. According to AFS - and it is not disputed - the principal balance on the note at the time of the sale was $ 13,645.21, leaving a deficiency of $ 10,345.21. In repossessing and selling the vehicle, AFS incurred a repossession charge of $ 405 and an auction fee of $ 313, for total costs of [*5] $ 718. On January 16, 2009, AFS filed its Amended Claim # 1 in the amount of $ 11,063.21, consisting of the deficiency of $ 10,345.21 plus the $ 718 in costs. On February 5, 2009, Trustee filed his objection wherein he prays that the Amended Claim # 1 be limited to the $ 10,345.21 deficiency. Trustee does not dispute the necessity or reasonableness of the repossession and sales costs. Rather, he contends that such costs are only allowed to over-secured creditors as set forth in *11 U.S.C. §506(b)*. Both the Trustee and AFS have briefed the issue.

ANALYSIS

The procedural history of the Hitches' case merits a few initial comments before delving into the substantive issues at hand. The Hitches have a confirmed Chapter 13 Plan in place under which they are obligated to make

ongoing monthly payments to PFCU. Neither the Hitches nor any other party has sought modification of the confirmed Plan, and the Order confirming the Plan is still in full force and effect. Whether modification of the Plan reclassifying PFCU's claim as an unsecured claim is necessary or permissible has not been raised. Courts are distinctly divided on this issue. *See In re Amador, 2008 Bankr. LEXIS 1124, 2008 WL 1336962 at *2 (Bankr. S.D. Fla. Apr. 9, 2008).* [*6] Although ignored by the parties here, a multitude of issues may arise when a secured creditor repossesses collateral after confirmation of a Chapter 13 plan which provided for the debtor to retain the collateral and pay the creditor's allowed secured claim. For a thorough analysis of the issues which may arise with the post-confirmation surrender or repossession of collateral, see Keith M. Lundin, *Chapter 13 Bankruptcy,* 3d ed., §264.1 (2000 & Supp. 2004).

The parties in the Hitch case appear to have assumed that, by PFCU amending its claim, modification of the confirmed Plan is unnecessary, or, perhaps, impermissible. However, because of the procedural path this case has taken, due process concerns arise relating to the effect that the allowance of PFCU's amended claim will have on the dividend that will ultimately be paid to other unsecured creditors. Also, because plan modification has not been proposed, the "good faith" test of *11 U.S.C. §1329(b)(1)* has not been applied to the changes in plan distributions that will occur upon allowance of PFCU's unsecured deficiency claim. The Hitches' original plan payments were calculated based on the assumption that they would be making their [*7] regular payments to PFCU each month. Those payments ceased many months ago and the Hitches' current use of the funds originally committed to the PFCU payments is unknown. None of those funds are proposed to be paid into the Plan. Unsecured creditors will certainly receive less than previously proposed in the confirmed Second Amended Plan if PFCU now shares in the unsecured creditors' pool of funds, but unsecured creditors have received no particular notice of this change in their circumstances. It is difficult to envision how proceeding in this fashion complies with the minimum requirements of due process.

The Court must, however, decide the matter which is before it and will proceed to do so. Nothing in this Court's decision here will, however, preclude any party in the Hitch case from seeking plan modification or other relief as may be appropriate.

[HN1] In order to determine whether a claim is an allowable claim, one first looks to *11 U.S.C. §502*, which provides: "A claim or interest, proof of which is filed under *section 501* of this title is deemed allowed, unless a party in interest . . . objects." *11 U.S.C. §502(a)*. In the event an objection to a claim is filed, *§502(b)* provides that [*8] the court "shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition" and that the claim shall be allowed in the amount determined "except to the extent" that the claim implicates any of the nine exceptions (none of which is relevant here) enumerated in *§502(b). 11 U.S.C. §502(b)*. Thus, under *§502*, the unsecured deficiency claims of both PFCU and AFS should be allowed with the amount of each claim being the only issue for the Court to determine.

[HN2] To determine the amount of each claim and, specifically, to determine whether the amount may include the claimed costs, one must next consider the provisions of *§506 of the Bankruptcy Code. Section 506(a)* differentiates between secured claims and unsecured claims. A claim is secured "to the extent of the value of such creditor's interest in the estate's interest in such property." *11 U.S.C. §506(a)(1)*.

*Section 506(b)* provides in pertinent part as follows:

> [HN3] To the extent that an allowed secured claim is secured by property the value of which . . . is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable [*9] fees, costs, or charges provided for under the agreement or State statute under which such claim arose.

*11 U.S.C. §506(b)*.

[HN4] Under the plain language of *§506(b)*, a secured creditor can recover post-petition interest, fees, costs, and charges provided by contract or state law only to the extent that its collateral is worth more than the claim. *Section 506(b)*'s silence with respect to unsecured and under-secured creditors points to the conclusion that these creditors are not entitled to post-petition fees and costs. Courts that have disallowed post-petition fees and costs have invoked the legal maxim "*expressio unius est exclusio alterius*", *i.e.* the expression of one thing is the

exclusion of another, to support their conclusion that *§506(b)* does not allow post-petition fees and costs to unsecured or under-secured creditors. *See In re Electric Machinery Enterprises, Inc., 371 B.R. 549, 550 (Bankr. M.D. Fla. 2007)*; *In re Pride Companies, L.P., 285 B.R. 366, 372 (Bankr. N.D. Tex. 2002)*. As stated by the Supreme Court, "[w]here Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of contrary legislative [*10] intent." *Andrus v. Glover Constr. Co., 446 U.S. 608, 616-17, 100 S.Ct. 1905, 1910, 64 L.Ed.2d 548 (1980). Section 506(b)* provides an exception for over-secured creditors to the general rule that claims are to be determined as of the petition date, exclusive of post-petition fees and costs. If Congress had intended for unsecured and under-secured creditors to receive post-petition fees and costs, then it could have easily done so. Because it did not do so, the plain language of *§506(b)* demonstrates Congressional intent to disallow post-petition fees and costs for all creditors whose claims are not over-secured. *In re Sakowitz, Inc., 110 B.R. 268, 272 (Bankr. S.D. Tex. 1989)*; *Pride Companies, 285 B.R. at 372*; *In re Hedged-Investments Associates, Inc., 293 B.R. 523, 526 (D. Colo. 2003)*.

The provisions of *§506* are frequently referenced in analyzing and allowing claims in Chapter 13 cases. [HN5] Under Chapter 13, a debtor may propose to retain collateral in exchange for monthly payments totaling the value of a creditor's allowed secured claim. *11 U.S.C. §1325(a)(5)(B)*. In instances where the debtor proposes to pay less than the amount owed because the value of the collateral is less than the amount [*11] owed, the practice is commonly referred to as "cramdown". *Associates Commercial Corp. v. Rash, 520 U.S. 953, 957, 117 S.Ct. 1879, 1882-83, 138 L.Ed.2d 148 (1997)*. The amount of an allowed secured claim - the cramdown value - is determined by reference to *§506(a)*. Id. However, the practice of cramming down was restricted when the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") took effect on October 17, 2005. One provision of BAPCPA prohibits Chapter 13 debtors from utilizing *§506(a)* to cram down claims of creditors who have a purchase money security interest in a motor vehicle acquired for the debtor's personal use if the debt was incurred within 910 days of the date of filing:

[HN6] For purposes of paragraph (5),

*section 506* shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910-day preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle . . . acquired for the personal use of the debtor, or if collateral for that debt consists of any other thing of value, if the debt [*12] was incurred during the 1-year period preceding that filing.

*11 U.S.C. §1325(a)*.

Because the above provision has no separate alphabetical or numerical designation, it is known, in bankruptcy parlance, as the "hanging paragraph" and vehicles covered by the hanging paragraph are commonly referred to as "910 vehicles".

The Hitches filed their bankruptcy case after the effective date of BAPCPA. Because the Hitches purchased their vehicle for personal use within 910 days of their bankruptcy filing, the hanging paragraph applies. The Hitches were evidently cognizant of this fact inasmuch as they proposed in their Plan to continue making their regular monthly payments to PFCU and did not seek to cram down PFCU's secured claim.

Because PFCU's original allowed secured claim was based on a 910 vehicle and was, therefore, governed by the terms of the hanging paragraph, PFCU now argues that the hanging paragraph also requires the allowance of its unsecured claim for the costs of repossession and sale. PFCU contends that the amount of its unsecured claim is determined not by reference to *506(b)*, but by its rights and entitlements under its retail installment contract with the Hitches. Because the retail [*13] installment contract provides that expenses for taking possession and selling the collateral are to be born by the borrowers, PFCU asserts that it is entitled to reasonable costs of taking possession and selling the vehicle.

PFCU's argument ignores the limiting language of the first few words of the "hanging paragraph" - "For purposes of paragraph (5)". *Paragraph 5 of §1325(a)* outlines the required treatment of allowed secured claims for the purpose of determining whether a Chapter 13 plan may be confirmed. In this case, proper treatment of

PFCU's original claim was proposed in the Hitches' Third Amended Plan. The issue before the Court now is not how PFCU's original allowed secured claim should have been treated, but rather how PFCU's amended, fully unsecured, claim should now be treated. Because *§1325(a)(5)* is irrelevant to the treatment of the amended, unsecured, claim, the hanging paragraph does not apply to the analysis and, accordingly, *§506(b)* does apply.

The Schafers also filed their bankruptcy case after the effective date of BAPCPA. However, the Schafers purchased the minivan financed by AFS more than 910 days prior to their case filing. Thus, AFS concedes that the hanging paragraph [*14] does not apply in this case. Nevertheless, AFS also argues that *§506(b)* should not be applied in determining the amount of its unsecured deficiency claim.

AFS relies on several cases which hold that, upon surrender of collateral to a secured creditor, collateral is no longer property of the estate and the provisions of *§506(a)* no longer need be utilized to determine the amount of such creditor's secured claim. *See In re Blanco, 363 B.R. 896 (Bankr. N.D. Ill. 2007)*; *In re Morales, 359 B.R. 211 (Bankr. N.D. Ill. 2007)*. Both cases involved the issue of whether a secured creditor may be allowed an unsecured deficiency claim after liquidation of its collateral and both cases held that such a claim could be allowed. Neither case involved how such a deficiency claim should be calculated and neither case even discussed whether *§506(b)* is applicable in determining the amount of such deficiency claim. The cases are not on point with the issues here and do not provide support for the argument that post-petition costs of sale may be added to an unsecured deficiency claim.

Both PFCU and AFS also assert that the Seventh Circuit's decision in *In re Wright, 492 F.3d 829 (7th Cir. 2007)*, supports their [*15] positions. However, the issues here and in *Wright* are dissimilar. In Wright, the court was concerned with what happens when a Chapter 13 debtor proposes a plan which includes the surrender of a 910 vehicle. Does the surrender fully satisfy the debtor's obligations, or is the creditor entitled to an unsecured deficiency claim after surrender of the collateral? The court concluded that any shortfall between the value of the vehicle and the balance of the loan after the debtor surrendered the vehicle may be included in an unsecured deficiency claim and paid at the same rate or "fraction" as other unsecured creditors. *Id. at 833*. Wright does not discuss how a deficiency claim should be calculated but relies on a series of cases which suggest that the treatment of an unsecured deficiency claim should be the same as the treatment of other unsecured claims. *Id. at 831*. In the cases at bar, treating the amended deficiency claims of PFCU and AFS like other unsecured debts means that the PFCU and AFS are not entitled to post-petition costs.

Equitable considerations and policy reasons also dictate disallowing post-petition fees and costs to unsecured creditors. One of the primary goals of bankruptcy [*16] law is to provide for the equitable distribution of a debtor's assets among its creditors. *Electric Machinery Enterprises, 371 B.R. at 551*. [HN7] Similarly situated creditors should be treated equally. Id. To allow the enforcement of a contractual provision which would permit certain unsecured creditors but not others to charge the bankruptcy estate for post-petition costs would violate the basic bankruptcy principle of equitable distribution. *Pride Companies, L.P., 285 B.R. at 373-74*.

For the reasons set forth above, Trustee's Objection to Amended Claim # 5 filed by PFCU on November 20, 2008, in the Hitch case is sustained. The Amended Claim # 5 of PFCU will be allowed in the amount of $ 2115.89. Additionally, Trustee's Objection to Amended Claim # 1 filed by AFS on January 16, 2009, in the Schafer case is sustained. The Amended Claim # 1 of AFS will be allowed in the amount of $ 10,345.21.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to *Rule 7052* of the Rules of Bankruptcy Procedure.

*See* written Orders.

**SIGNED THIS: May 29, 2009**

/s/ MARY P. GORMAN

**MARY P. GORMAN**

**UNITED STATES BANKRUPTCY JUDGE**



**IN RE: KINDRED HEALTHCARE, INC., f/k/a VENCOR, INC., et al.,
Reorganized, Debtors.**

**Chapter 11, Case Nos. 99-3199 (MFW) to 99-3327 (MFW), (Jointly Administered
Under Case No. 99-3199 (MFW)**

**UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF
DELAWARE**

*2003 Bankr. LEXIS 969; 41 Bankr. Ct. Dec. 259*

**August 18, 2003, Decided**

**DISPOSITION:** [*1] Debtors' motion to enforce confirmation order and to hold claimant and her attorneys in contempt granted in part. Claimant enjoined from pursuing any post-petition interest or attorneys' fees in state court action.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Debtor and its affiliates (collectively debtors) filed Chapter 11 petitions under the Bankruptcy Code. Debtors operated as debtors-in-possession. Prior to the filing of their Chapter 11 petitions, debtors were sued by claimant in state court in Connecticut, which sought compensatory damages, common law punitive damages, statutory punitive damages, and attorneys' fees. Debtors moved for an order that claimant violated a Chapter 11 plan and order.

**OVERVIEW:** Pursuant to debtors' confirmed Chapter 11 plan, punitive damages portions of certain claims were not to receive any distribution and would be discharged. The remainder of the claims would be paid in full, first from available insurance proceeds and then the remainder, if any, in cash over a period of three years. Both parties agreed that they were bound by the terms of the confirmed plan but disagreed over the meaning and effect of the plan's terms. The court examined the exact language utilized in the plan. The court agreed with

claimant and found that the plan, by its plain terms, only discharged punitive damages that were not compensatory in nature. Connecticut common law punitive damages were only compensatory in nature rather than punitive. The court concluded that the plan did not preclude claimant from an assertion of that claim in the state court action. Even though claimant might have been entitled to interest under Connecticut common law, such a claim was disallowed to the extent it accrued after the petition date pursuant to *11 U.S.C.S. § 502(b)(2)*. Post-petition attorneys' fees were not recoverable by an unsecured creditor under *11 U.S.C.S. § 506*.

**OUTCOME:** The court granted debtors' motion in part.

**LexisNexis(R) Headnotes**

*Civil Procedure > Remedies > Costs & Attorney Fees > Costs > General Overview*
*Governments > Courts > Common Law*
*Torts > Damages > Punitive Damages > General Overview*
[HN1] Under Connecticut common law "punitive damages" are limited to recovery of the costs of litigation (including attorneys' fees) less taxable costs (which are otherwise recoverable from the losing party). A

complaint may seek "punitive damages" under Connecticut common law against a debtor in bankruptcy, when the claimant is really seeking compensatory damages only to repay the claimant for actual out of pocket expenses incurred by her as a result of the debtors' wrongful acts, as opposed to seeking to punish the debtors.

***Bankruptcy Law > Claims > Allowance***
***Bankruptcy Law > Claims > Types > Secured Claims & Liens > Determinations***
***Bankruptcy Law > Claims > Types > Secured Claims & Liens > Secured Creditors Rights***
[HN2] *11 U.S.C.S. § 502(b)(2)* provides that claims are disallowed to the extent they represent unmatured interest, i.e., interest that did not accrue before the petition date. In contrast, secured creditors may be entitled to post-petition interest under *11 U.S.C.S. § 506(b)* of the Bankruptcy Code.

***Bankruptcy Law > Claims > Allowance***
***Bankruptcy Law > Claims > Proof > Effects & Procedures***
[HN3] In the context of bankruptcy, interest may not be collected by an unsecured creditor after the filing of a bankruptcy petition. *11 U.S.C.S. § 502(b)(2)* expressly requires the disallowance of a claim for unmatured interest, even if it is premised on a contractual or other basis.

***Bankruptcy Law > Claims > Allowance***
***Bankruptcy Law > Claims > Types > Secured Claims & Liens > Determinations***
***Bankruptcy Law > Claims > Types > Unsecured Nonpriority Claims***
[HN4] Pursuant to *11 U.S.C.S. § 506(b)* of the Bankruptcy Code, only secured creditors can recover attorneys' fees. *11 U.S.C.S. § 506(b)*. By providing specifically for the payment of attorneys' fees to secured creditors in certain circumstances (i.e., when the value of their collateral exceeds the amount of their claim), Congress evinces an intent to disallow attorneys' fees to unsecured creditors. If post-petition fees and costs were generally recoverable by all creditors, then Congress would not expressly have provided for their recovery by oversecured creditors in *§ 506(b)*.

**COUNSEL:** For dba: VENCOR INC, Debtors

(99-03199): WILLIAM H SUDELL JR, WILMINGTON, DE.

**JUDGES:** Mary F. Walrath, United States Bankruptcy Judge.

**OPINION BY:** Mary F. Walrath

**OPINION**

***MEMORANDUM OPINION***

1

> 1    This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to *Federal Rule of Bankruptcy Procedure 7052*, which is made applicable to contested matters by *Federal Rule of Bankruptcy Procedure 9014*.

This matter is before the Court on the Debtors' Motion to enforce the Confirmation Order and to hold Elise Epner, Administratrix of the estate of Jesse Epner ("the Claimant") and her attorneys in contempt for their alleged willful violation of the Confirmation Order by seeking to collect attorneys' fees and pre-judgment interest [*2] in the state court action brought by them. For the reasons set forth below, we grant the Motion in part.

I. *FACTUAL BACKGROUND*

On September 13, 1999, Vencor, Inc., and its affiliates (collectively "the Debtors") filed voluntary petitions for relief under chapter 11. The Debtors operated their businesses and managed their properties as debtors-in-possession pursuant to *sections 1107(a) and 1108* of the Bankruptcy Code.

Prior to the filing of their chapter 11 petitions, the Debtors had been sued by the Claimant in state court in Connecticut seeking compensatory damages, common law punitive damages, statutory punitive damages and attorneys' fees in connection with the death of Jesse Epner ("the State Court Action"). Mr. Epner was a resident of a nursing home facility owned or operated by the Debtors and died as a result of injuries suffered in a fire at that facility.

The filing of the chapter 11 cases stayed the State Court Action. In May 2000, the Debtors and the Claimant

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 139 of 150

Page 3

2003 Bankr. LEXIS 969, *2; 41 Bankr. Ct. Dec. 259

executed a stipulation which modified the automatic stay to permit the Claimant to proceed with the State Court Action to judgment, to collect from available insurance proceeds and to pursue any remainder [*3] from the Debtors in these cases. At the time of the filing of their bankruptcy cases, the Debtors had insurance to cover the Claimant's claims; however, their insurers - Reliance Insurance and Phico Insurance - were both subsequently declared insolvent.

On March 19, 2001, the Debtors' Fourth Amended Plan of Reorganization ("the Plan") was confirmed by Order of this Court. The Plan provided for bifurcation of personal injury claims. The punitive damages portion of the claims would not receive any distribution and would be discharged. The remainder of the claims would be paid in full, first from available insurance proceeds and then the remainder, if any, in cash over a period of three years.

On April 8, 2003, the Debtors filed the instant Motion asserting that the Claimant was violating the terms of the Plan and the Confirmation Order by continuing to seek punitive damages in the State Court Action. The Claimant objected to the Debtors' Motion and a hearing was held on April 28, 2003, to consider the arguments of the parties.

II. *JURISDICTION*

This Court has jurisdiction over this proceeding pursuant to *28 U.S.C. §§ 1334 and 157(b)(2)(A), (L) & (O).*

[*4]  III. *DISCUSSION*

Both parties agree that they are bound by the terms of the confirmed Plan. They disagree over the meaning and effect of the terms of that Plan. Therefore, we must examine the exact language utilized in the Plan.

Malpractice and other litigation claims were included in Class 3B which provided that "with respect to Allowed Class 3B Claims for and to the extent which [sic] insurance is available, such Allowed Class 3B Claims shall be paid in the ordinary course of the Reorganized Debtors' business to the extent of such insurance, when any such Claims become Allowed Claims and such insurance proceeds become available; provided however, that to the extent insurance is not available or is insufficient, the payment schedule provided for in this section shall govern." (Plan at § 5.02.) Class 3B

claimants (to the extent insurance is not available) receive payment in full in quarterly installments over three years with interest from the Effective Date at 6%. (*Id.*)

With respect to any claim for punitive damages, however, the Plan provides that "each holder of an Allowed Punitive Damage Claim shall receive no distribution under the Plan, in complete settlement, [*5] satisfaction and discharge of its Class 10 claims." (*Id.* at § 5.10.) Punitive Damage Claims are defined as "any Claims arising before the Petition Date, whether secured or unsecured, for any fine, penalty, or forfeiture, or for multiple, exemplary, or punitive damages, to the extent that such fine, penalty, forfeiture or damages is not compensation for actual pecuniary loss suffered by the holder of such Claim ...." (*Id.* at p. 13.)

The Debtors assert that the Claimant is violating the Plan in two respects: by continuing to pursue punitive damages in the State Court Action and by seeking an award of pre-judgment interest in the case that continues to accrue post-petition. The Claimant asserts that both may be pursued.

A. *Punitive Damages*

In the State Court Action, the Claimant originally sought an award of punitive damages under both the common law and the *Connecticut Unfair Trade Practices Act* ("the CUTPA"). The count under the common law asserted that the Debtors' negligent and reckless acts caused the fire which resulted in Mr. Epner's death. The count under the CUTPA asserted that the Debtors operated the facility without proper licenses. Under each count, the Claimant [*6] sought both compensatory and punitive damages.

The Debtors assert that, after confirmation of the Plan, they advised the Claimant that the punitive damages requested were discharged by the Plan and demanded that they be withdrawn. (Declaration of O'Neal at P 8.) The Claimant agreed to withdraw its claim for punitive damages under the CUTPA but continued to press for punitive damages under the common law. (*Id.* at P 13.)

The Debtors assert that the Claimant's continued refusal to withdraw its request for punitive damages under the common law is a knowing, willful violation of the injunction provisions of the Plan and Confirmation Order and seeks an order of contempt against the Claimant and an award of attorneys' fees for prosecution

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 140 of 150

Page 4

2003 Bankr. LEXIS 969, *6; 41 Bankr. Ct. Dec. 259

of the instant motion. *See, e.g., Cuffee v. Atlantic Bus. & Community Dev. Corp. (In re Atlantic Bus. & Community Dev. Corp.), 901 F.2d 325, 329 (3d Cir. 1990)*(section 362(h) provides for imposition of award of attorneys' fees for willful violation of automatic stay); *Poole v. U.B. Vehicle Leasing, Inc. (In re Poole), 242 B.R. 104, 110 (Bankr. N.D. Ga. 1999)* (punitive damages awarded against creditor for its bad faith [*7] violation of automatic stay and discharge injunction). *See also, Int'l Broth. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., Local 249 v. Western Penn. Motor Carriers Ass'n, 660 F.2d 76, 84 (3d Cir. 1981)* (attorneys' fees may be awarded for civil contempt for willful disobedience of a court order).

The Claimant asserts that her continued prosecution of the common law action for punitive damages is not in violation of the Plan or Confirmation Order. She asserts that [HN1] under Connecticut common law "punitive damages" are limited to recovery of the costs of litigation (including attorneys' fees) less taxable costs (which are otherwise recoverable from the losing party). *See, e.g., Berry v. Loiseau, 223 Conn. 786, 614 A.2d 414, 437 (Conn. 1992); Lord v. Mansfield, 50 Conn. App. 21, 717 A.2d 267, 270 (Conn. App. Ct. 1998)*. Thus, the Claimant asserts that although her complaint seeks "punitive damages" under Connecticut common law, they are really compensatory damages as they seek only to repay the Claimant for actual out of pocket expenses incurred by her as a result of the Debtors' wrongful acts, as opposed to seeking to punish [*8] the Debtors. *See, e.g., Waterbury Petroleum Products, Inc. v. Canaan Oil & Fuel Co., Inc., 193 Conn. 208, 477 A.2d 988, 1004 (Conn. 1984)* (declining to expand common law punitive damages to include award that would punish or deter plaintiff's bad conduct and concluding that "in limiting punitive damage awards to the costs of litigation less taxable costs, our rule fulfills the salutary purpose of fully compensating a victim for the harm inflicted on him"); *Doroszka v. Lavine, 111 Conn. 575, 150 A. 692, 692-93 (Conn. 1930)* ("in this state the purpose [of common law punitive damages] is not to punish the defendant for his offense but to compensate the plaintiff for his injuries, and so-called punitive or exemplary damages cannot exceed the amount of the plaintiff's expenses of litigation, less taxable costs"). Consequently, the Claimant argues that her pursuit of common law punitive damages does not conflict with the Plan which defines Punitive Damages that are included in Class 10 and discharged only "to the extent that such fine, penalty, forfeiture or

damages is *not* compensation for actual pecuniary loss suffered by the holder of such Claim. [*9] " (Plan at § 5.10 and p. 13; emphasis added.)

We agree with the Claimant. The Plan, by its plain terms, only discharged punitive damages that were not compensatory in nature. Connecticut common law punitive damages are only compensatory in nature rather than punitive. Therefore, we conclude that the Plan does not preclude the Claimant from asserting that claim in the State Court Action.

### B. *Pre-judgment Interest*

The Debtors assert, however, that the Claimant is barred from asserting a claim for interest for several additional reasons. First, the Debtors assert that the Plan does not provide for any claimant to recover interest on their claims. However, this is not totally dispositive. To the extent a claimant is entitled to pre-petition interest (by contract or otherwise), it is simply part of the pre-petition unsecured claim. Further, the Plan does provide for all allowed unsecured creditors in Class 3B to receive interest on their claims from the Effective Date until payment is completed. (Plan at § 5.02.)

However, for the period between the filing of the petition and the effective date of the Plan, the Plan is silent on the allowance of any interest on unsecured claims. [*10] The Debtors assert this silence means none is allowable. We disagree. To the extent the claim would otherwise be allowable, there is nothing in the language of the Plan that provides that the claim is discharged. In contrast, the Plan expressly provided for discharge of punitive damages even though they were part of a pre-petition unsecured claim. Thus, the Debtors knew how to expressly exclude a portion of a claim, but did not do so with respect to interest.

The Debtors also assert that, under *section 502(b)(2) of the Bankruptcy Code*, unsecured creditors cannot recover interest on their claims. [HN2] *Section 502(b)(2)* provides that claims are disallowed to the extent they represent unmatured interest, i.e., interest that did not accrue before the petition date. *11 U.S.C. § 502(b)(2)*. [2]

2    In contrast, secured creditors may be entitled to post-petition interest under *section 506(b) of the Bankruptcy Code. See, e.g., United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 372-73, 98 L. Ed. 2d 740, 108*

Case 08-13141-BLS    Doc 14046-2    Filed 02/20/15    Page 141 of 150

Page 5

2003 Bankr. LEXIS 969, *10; 41 Bankr. Ct. Dec. 259

*S. Ct. 626 (1988)* ("Since *[§ 506(b)]* permits post-petition interest to be paid only out of the 'security cushion,' the undersecured creditor, who has no such cushion, falls within the general rule disallowing postpetition interest").

[*11] Consequently, we agree with Judge Walsh's conclusion in *Loewen Group* that [HN3] interest may not be collected by an unsecured creditor after the filing of the petition. *In re Loewen Group Int'l Inc., 274 B. R. 427, 442-44 (Bankr. D. Del. 2002).* Although Judge Walsh noted that the creditors in that case had no contractual or other basis to assert an entitlement to interest, we conclude that *section 502(b)(2)* expressly requires the disallowance of a claim for unmatured interest, even if it is premised on a contractual or other basis. This precludes the allowance of any interest claim by the Claimant after the petition date. Therefore, we conclude that even though the Claimant may be entitled to interest under Connecticut common law, such a claim must be disallowed to the extent it accrues after the petition date pursuant to *section 502(b)(2) of the Bankruptcy Code.*

### C. *Attorneys' Fees*

The Debtors assert that the Claimant is similarly barred from asserting a claim for post-petition attorneys' fees. First, the Debtors note that the Plan does not provide for any claimant to recover attorneys' fees. However, we again conclude that this is not dispositive. There is no [*12] express prohibition in the Plan on allowance of attorneys' fees as part of an unsecured claim. As with interest, the Debtors assert that this silence means none is allowable. For the reasons articulated above, however, we disagree. To the extent a claimant is entitled to attorneys' fees that accrued pre-petition (by contract or otherwise), it is simply part of the claim and the Plan, by its silence, did not discharge it. For attorneys' fees which arose after the filing of the petition, the Plan is also silent. To the extent the claim would otherwise be allowable, there is nothing in the language of the Plan that provides that the claim is discharged.

The Debtors assert, however, that such a claim is discharged because, [HN4] under *section 506(b) of the Bankruptcy Code*, only secured creditors can recover attorneys' fees. *11 U.S.C. § 506(b). See, e.g., Loewen Group, 274 B. R. at 444-45.* The Claimant argues that *section 506(b)* does not expressly bar claims for

attorneys' fees by unsecured creditors (as *section 502(b)(2)* bars claims for interest). However, as Judge Walsh noted in *Loewen,* by providing specifically for the payment of attorneys' fees [*13] to secured creditors in certain circumstances (i.e., when the value of their collateral exceeds the amount of their claim), Congress did evince an intent to disallow attorneys' fees to unsecured creditors. "If post-petition fees and costs were generally recoverable by all creditors, then Congress would not expressly provided [sic] for their recovery by oversecured creditors in *§ 506(b)*." *274 B.R. at 444 n. 36.*

We concur in this reasoning. Thus, we conclude that post-petition attorneys' fees are not recoverable by an unsecured creditor, even where they have a contractual or other legal basis for their allowance. Consequently, the Claimant may not recover from the Debtors any claim for post-petition attorneys' fees.

### D. *Sanctions*

Since we have agreed with the Claimant's contentions in part (namely, that the Claimant may be entitled under Connecticut common law, and the Plan, to an award of pre-petition interest and attorneys' fees as part of its claim for compensatory damages), we cannot conclude that the Claimant's actions in pursuing those claims were in violation of any order of this court. It is only the post-petition portion of the interest and attorneys' fees [*14] that is not allowable. Rather than sanction the Claimant or her counsel, we will simply direct that the latter claims not be pursued since they are not allowable.

### IV. *CONCLUSION*

For the foregoing reasons, we grant the Debtors' Motion in part and will enjoin the Claimant from pursuing any post-petition interest or attorneys' fees in the State Court Action.

An appropriate Order is attached.

BY THE COURT:

Dated: August 18, 2003

Mary F. Walrath

United States Bankruptcy Judge



**In re SCHOOL SPECIALTY, INC., et al[1]., Debtors**

1   The Debtors in these Chapter 11 cases, along with the last four digits of each
Debtor's federal tax identification number, are: School Specialty, Inc. (1239);
Bird-In-Hand Woodworks, Inc. (8811); Califone International, Inc. (3578);
Childcraft Education Corp. (9818); ClassroomDirect.com, LLC (2425); Delta
Education, LLC (8764); Frey Scientific, Inc. (3771); Premier Agendas, Inc.
(1380); Sax Arts & Crafts, Inc. (6436); and Sportime, LLC (6939).

**CHAPTER 11, Case No. 13-10125 (KJC)**

**UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF
DELAWARE**

*2013 Bankr. LEXIS 1897*

**April 22, 2013, Decided**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Creditor claimed it was
due a "make whole" payment under its agreement with
the debtor. The Official Committee of Unsecured
Creditors (the Committee) filed a motion to disallow the
payment.

**OVERVIEW:** Chapter 11 debtors entered into a credit
agreement with a lender (the creditor) that included a
make whole payment if the loan was accelerated. The
Committee did not dispute that a breach occurred
triggering the debtor's obligation for the make whole
payment, which was in the amount of approximately
$23.7 million. The Committee argued that the make
whole payment did not meet the requirements for
liquidated damages provisions because the formula used
to calculate it was not in accord with usual market place
formulas and resulted in a prepayment premium that was
grossly disproportionate to the creditor's possible loss.
The court disagreed, noting that the agreement required
the creditor to keep funds on hand for a certain period
and the court could not, with the benefit of hindsight,

alter the agreement based on subsequent operational
results and managerial decisions. Applying New York
law, the court determined that the make whole payment
was not plainly disproportionate to the lender's probable
loss and that, to the extent *11 U.S.C.S. § 506(b)* applied,
the payment met the reasonableness standard and was not
unmatured interest that could be disallowed under *11
U.S.C.S. § 506(b)(2)*.

**OUTCOME:** The court held that the creditor
demonstrated its entitlement to the make whole payment
and the Committee's motion to disallow was therefore
denied.

**LexisNexis(R) Headnotes**

*Bankruptcy Law > Claims > Allowance*
*Civil Procedure > Federal & State Interrelationships >*
*Erie Doctrine*
[HN1] The basic federal rule in bankruptcy is that state
law governs the substance of claims. Congress generally

left the determination of property rights in the assets of a bankrupt's estate to state law. The inquiry into whether a prepayment provision will be enforced in bankruptcy begins with whether the prepayment provision is enforceable under applicable state law. *11 U.S.C.S. § 502(b)(1).*

*Contracts Law > Remedies > Liquidated Damages*
[HN2] Under New York law, prepayment provisions and early termination fees are analyzed under the standards applicable to liquidated damages. New York courts will consider a prepayment premium to be enforceable when (i) actual damages are difficult to determine, and (ii) the sum stipulated is not plainly disproportionate to the possible loss. The reasonableness of the damages is determined as of the time the parties entered into the agreement and not at the time of the breach.

*Contracts Law > Contract Interpretation > General Overview*
[HN3] New York courts have cautioned courts against interfering with parties' agreements.

*Contracts Law > Remedies > Liquidated Damages*
[HN4] When exercising an option to accelerate a loan, the lender elects to give up its future income stream in favor of having an immediate right to collect its entire debt. The purpose of prepayment consideration is to compensate the lender for the loss of its bargained-for yield. When determining whether a prepayment penalty is plainly disproportionate to a lender's probable loss, courts interpreting New York law have considered (i) whether the prepayment fee is calculated so that the lender will receive its bargained-for yield, and (ii) whether the prepayment fee is the result of an arms-length transaction between represented sophisticated parties.

*Contracts Law > Remedies > Liquidated Damages*
[HN5] New York courts have determined that prepayment consideration calculated on the basis of U.S. Treasury bond interest rates supports the conclusion that a prepayment premium is not plainly disproportionate to a lender's potential losses.

*Bankruptcy Law > Claims > Types > Secured Claims & Liens > Secured Creditors Rights*
[HN6] See *11 U.S.C.S. § 506(b).*

*Contracts Law > Remedies > Liquidated Damages*
[HN7] Under New York law, a prepayment premium must not be an unenforceable penalty.

*Bankruptcy Law > Claims > Allowance*
[HN8] See *11 U.S.C.S. § 502(b)(2).*

*Bankruptcy Law > Claims > Types > Secured Claims & Liens > Secured Creditors Rights*
[HN9] Make-whole or prepayment obligations are in the nature of liquidated damages rather than unmatured interest, which could be disallowed in bankruptcy under *11 U.S.C.S. § 506(b)(2).*

*Contracts Law > Remedies > Avoidable Consequences*
*Contracts Law > Remedies > Liquidated Damages*
[HN10] New York courts have held that a valid liquidated damages claim obviates the duty to mitigate.

**COUNSEL:** [*1] For School Specialty, Inc, aka MCI, aka Worldly Wise 3000, aka Explode the Code, aka Spark, aka Abc School Supply, aka Education Essentials, aka Academy of Math, aka Broadhead Garrett, aka Academy of Reading, aka Korners for Kids, aka ShchoolPRO, aka Projects by Design, aka Educator's Publishing Service aka Spire, aka Sitton Spelling, aka SchoolSmart, aka Classroom Select, aka AutoSkill, Debtor: Maris J. Kandestin, Morgan L. Seward, Young Conaway Stargatt & Taylor, LLP, Wilmington, DE; Alan W. Kornberg, Elizabeth R. McColm, Jeffrey D. Saferstein, Lauren Shumejda, Maria T. Vullo, Paul Weiss Rifkind Wharton Garrison LLP, New York, NY; Pauline K. Morgan, Young, Conaway, Stargatt & Taylor, Wilmington, DE.

United States Trustee, U.S. Trustee: Richard L. Schepacarter, Office of the United States Trustee, U. S. Department of Justice, Wilmington, DE.

For Kurtzman Carson Consultants LLC, Claims Agent: Albert Kass, Kurtzman Carson Consultants, LLC, El Segundo, CA.

For Official Committee of Unsecured Creditors, Creditor Committee: Laura S Bouyea, Andrew J Currie, Venable LLP, Baltimore, MD; Darek S. Bushnaq, Jamie Lynne Edmonson, Venable LLP, Wilmington, DE; Andrew S. Dash, Brown Rudnick LLP, New [*2] York, NY; Thomas H. Montgomery, Steven D. Pohl, Brown

Rudnick LLP, Boston, MA; Hamid R. Rafatjoo, Venable LLP, Los Angeles, CA; Aliza Reicher, Robert J. Stark, Angelo Thalassinos, Brown Rudnick LLP, New York, NY.

**JUDGES:** KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE.

**OPINION BY:** KEVIN J. CAREY

**OPINION**

(Re: D.I. 475)

**MEMORANDUM**[2]

> 2   This Memorandum constitutes the findings of fact and conclusions of law, as required by *Fed.R.Bankr.P. 7052*. The Court has jurisdiction over this matter pursuant to *28 U.S.C. § 1334(b)* and *§157(a)*. This contested matter involves a core proceeding pursuant to *28 U.S.C. §§ 157(b)(1)* and *(b)(2)(B)*.

**BY: KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE**

On January 28, 2013 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. On January 31, 2013, this Court issued an order (the "Interim DIP Order") (D.I. 86) approving interim debtor-in-possession financing. The Interim DIP Order granted super priority liens and adequate protection (including pre- and post-petition interest) to Bayside Finance, LLC ("Bayside" or the "Claimant"). Under the Interim DIP Order, the Debtors stipulated that they were liable to Bayside in the aggregate principal [*3] amount of $95,024,001.06. The principal amount includes an "Early Payment Fee" of approximately $23.7 million (the "Make Whole Payment").

On February 5, 2013, the United States Trustee for the District of Delaware appointed the Official Committee of Unsecured Creditors (the "Committee"). The Committee filed an amended Motion to Disallow Bayside's Make Whole Payment (the "Motion to Disallow") (D.I. 475) on March 6, 2013. Bayside filed an objection to the Motion to Disallow on March 22, 2013 (D.I. 638). A hearing was held on April 5, 2013. For the reasons that follow, the Motion to Disallow will be denied.

Facts

On May 22, 2012, the Debtors entered into a credit agreement (the "Term Loan Credit Agreement") (Ex. 4)[3] with Bayside, as administrative agent, collateral agent, and the sole lender. Under the Term Loan Credit Agreement, Bayside agreed to make a term loan (the "Term Loan") in the aggregate principal amount of $70 million, at an annual rate equal to the three-month LIBOR, with a 1.5% floor, plus 11.0%. The Term Loan Credit Agreement was to mature on October 31, 2014 (the "Initial Maturity Date"), unless the Debtors were able to refinance certain 3.75% Convertible Subordinated Debentures [*4] due 2026 (issued on March 1, 2011). Upon refinancing, the Term Loan Credit Agreement would mature on December 31, 2015 (the "Convertible Maturity Date").[4]

> 3   At the April 5, 2013 hearing, the parties submitted a joint binder of exhibits (1-55) that was admitted into evidence.
> 4   The outstanding principal amount due to the debenture holders as of the Petition Date was approximately $157.5 million.

Upon either prepayment or acceleration of the Term Loan, the Debtors were required to pay an "Early Payment Fee." If the prepayment or acceleration occurs during the first year and a half of the Term Loan (the "Limited Call Period"), the Early Payment Fee is equal to the Make Whole Payment. (Ex. 4 at 48). The Make Whole Payment is calculated by discounting the future stream of interest payments between the date on which the principal is prepaid or accelerated and the Conditional Maturity Date of December 31, 2015. (Ex. 4 at 22-23, 48). The discount rate set forth in the agreement is the applicable Treasury rate plus 50 basis points. (*Id.* at 23-24).

The Early Payment Fee calculation includes a "step-down mechanic" that reduces the amount of the fee after 18 months and, further still, after 30 months. [*5] (Ex. 4 at 48). If the prepayment occurs after the 18th month, but before the end of the 30th month, the amount of the Early Prepayment Fee is fixed at 6% of the outstanding principal. (*Id.* at 48). The percentage decreases to 1% after the 30th month. (*Id.*).

On January 4, 2013, Bayside entered into a

forbearance agreement (the "Forbearance Agreement") (D.I. 638, Ex. D) with the Debtors. In the Forbearance Agreement, the Debtors acknowledged their breach of a covenant in the Term Loan Credit Agreement that required minimum liquidity of $20 million (the "Minimum Liquidity Covenant") as of December 29, 2012. (*Id.*, Ex. D, Annex A). The Committee does not dispute that the breach of the Minimum Liquidity Covenant occurred, triggering the Debtors' obligation for the Make Whole Payment.

The Forbearance Agreement reflected the acceleration of the Term Loan which made all outstanding principal and unpaid interest, including the Make Whole Payment, due and payable. The Forbearance Agreement provides that, as of January 4, 2013, the aggregate principal amount of the Term Loan was $67,000,000.00, the amount of the accrued and unpaid interest was $1,605,208.33, and the Make Whole Payment was $25,054,001.06. [*6] (*Id.*, Ex. D, Art. II). Thereafter, the Make Whole Payment was re-calculated by Bayside to be $23.7 million.[5] This revised amount reflects the present value of interest payments through December 2015.

> 5  Although the Forbearance Agreement states that the Make Whole Payment is $25,054,001.06, the parties have agreed that the actual amount of the Make Whole Payment is approximately $23.7 million. This reduced amount reflects the interest received by Bayside from January 4, 2013 (the date of acceleration) through February 28, 2013 (the date upon which the Term Loan principal was paid in full). (Ex. 3 at 11).

## Legal Standard

[HN1] "The 'basic federal rule' in bankruptcy is that state law governs the substance of claims . . . Congress having 'generally left the determination of property rights in the assets of a bankrupt's estate to state law . . . *Raleigh v. Illinois Dep't of Revenue, 530 U.S. 15, 120 S. Ct. 1951, 147 L. Ed. 2d 13 (2000)*. The inquiry into whether a prepayment provision will be enforced in bankruptcy begins with whether the prepayment provision is enforceable under applicable state law. *11 U.S.C. §502(b)(1)*; *United Merchs. & Mfrs. v. Equitable Life Assurance Soc'y of the U.S. (In re United Merchs. & Mfrs.), 674 F.2d 134, 141 (2d Cir. 1982)* [*7] (whether a liquidated damages provision in a contract is an unenforceable penalty is a question of state law). The

parties agree that New York law governs the Term Loan Credit Agreement and the Make Whole Payment provision.[6]

> 6  The parties dispute upon whom the burden of persuasion rests in this matter. Under New York law, the party challenging the Make Whole Payment bears the burden of persuasion that it should not be allowed. *JMD Holding Corp. v. Congress Fin. Corp., 4 N.Y.3d 373, 380, 828 N.E.2d 604, 795 N.Y.S.2d 502 (2005)* ("The burden is on the party seeking to avoid liquidated damages . . . to show that the stated liquidated damages are, in fact, a penalty.")

> The Committee asserts that the long-standing rule announced by the Third Circuit Court of Appeals in *In re Allegheny Int'l, Inc., 954 F.2d 167, 173 (3d Cir. 1992)* applies, requiring, ultimately, that the claimant - - Bayside - - prove its entitlement to the Make Whole Payment. Bayside disagrees, citing the United States Supreme Court decision in *Raleigh v. Illinois Dept. of Revenue, 530 U.S. 15, 120 S. Ct. 1951, 147 L. Ed. 2d 13 (2000)*, holding that if a tax law places the burden of proof on a taxpayer - - as opposed to the government - - that [*8] burden remains the same in bankruptcy court. The Committee argues that *Raleigh* is limited to situations involving tax claims. I need not decide this issue since, as discussed below, Bayside, on this record, has demonstrated its entitlement to the Make Whole Payment.

[HN2] Under New York law, prepayment provisions and early termination fees are analyzed under the standards applicable to liquidated damages. *See JMD Holding Corp. v. Cong. Fin. Corp., 4 N.Y. 3d 373, 379-80, 828 N.E.2d 604, 795 N.Y.S.2d 502 (2005)* ("[w]hether the early termination fee represents an enforceable liquidation of damages or an unenforceable penalty is a question of law, giving due consideration to the nature of the contract and the circumstances" (citing *Mosler Safe Co. v. Maiden Lane Safe Deposit Co., 199 N.Y. 479, 485, 93 N.E. 81 (1910)*; *Leasing Serv. Corp. v. Justice, 673 F.2d 70, 74 (2d Cir. 1982)*)). New York courts will consider a prepayment premium to be enforceable when (i) actual damages are difficult to determine, and (ii) the sum stipulated is not "plainly disproportionate" to the possible loss. *In re South Side*

*House, LLC, 451 B.R. 248, 270 (Bankr. E.D.N.Y. 2011)* (citing *United Merchs., 674 F.2d at 142*). The reasonableness [*9] of the damages is determined as of the time the parties entered into the agreement and not at the time of the breach. *Walter E. Heller & Co., Inc. v. Am. Flyers Airline Corp., 459 F.2d 896, 898-99 (2d Cir. 1972)*(citations omitted).

Further, [HN3] New York courts have cautioned against interfering with parties' agreements. *JMD Holding, 4 N.Y.3d at 380-81* citing *Fifty States Mgt. Corp. v. Pioneer Auto Parks, 46 N.Y.2d 573, 577, 415 N.Y.S.2d 800, 389 N.E.2d 113 (1979)* ("Absent some element of fraud, exploitive over-reaching or unconscionable conduct... to exploit a technical breach, there is no warrant, either in law or equity, for a court to refuse enforcement of the agreement of the parties"); *cf.* 3 Farnsworth, Contracts § 12.18, at 303-304 (3d ed) ("(I)t has become increasingly difficult to justify the peculiar historical distinction between liquidated damages and penalties. Today the trend favors freedom of contract through the enforcement of stipulated damage provisions as long as they do not clearly disregard the principle of compensation"); *see also XCO Intl. Inc. v. Pacific Scientific Co., 369 F.3d 998, 1002-1003 (7th Cir.2004)* ("The rule (against penalty clauses) hangs on, but is chastened [*10] by an emerging presumption against interpreting liquidated damages clauses as penalty clauses") ). *See also GFI Brokers, LLC v. Santana, 2009 U.S. Dist. LEXIS 71550, 2009 WL 2482130, *2 (S.D.N.Y. 2009)* (citing same).

The Committee's main argument is that the Make Whole Payment does not meet the second prong of the test for liquidated damage provisions: i.e., the Committee argues that the formula used to calculate the Make Whole Payment is not in accord with usual "market place" formulas and results in a prepayment premium that is "grossly disproportionate" to Bayside's possible loss, as reasonably projected at the time the Term Loan Credit Agreement was signed. (Reply Br., D.I. 734, at 7).

**Discussion**

(1) *Whether the Make Whole Payment is 'plainly disproportionate' to Bayside's possible loss?*

[HN4] When exercising an option to accelerate a loan, "the lender elects 'to give up [its] future income stream in favor of having an immediate right to collect [its] entire debt.'" *South Side House, 451 B.R. at 268*

quoting *In re Solutia, Inc., 379 B.R. 473, 488 (Bankr. S.D.N.Y. 2007)*. The purpose of prepayment consideration is to compensate the lender for the loss of its bargained-for yield. *South Side House, 451 B.R. at 267*.

When determining [*11] whether a prepayment penalty is 'plainly disproportionate' to a lender's probable loss, courts interpreting New York law have considered (i) whether the prepayment fee is calculated so that the lender will receive its bargained-for yield, and (ii) whether the prepayment fee is the result of an arms-length transaction between represented sophisticated parties. *South Side House, 451 B.R. at 270-71* (citing *In re Vanderveer Estates Holdings, Inc., 283 B.R. 122, 130 (Bankr. E.D.N.Y. 2002))*.

a. *Did the lender receive its bargained for yield?*

The Committee argues that the Make Whole Payment was calculated such that it inflates Bayside's actual losses and is inconsistent with market precedent. According to the Committee and its expert, the Make Whole Payment calculation should have included discounted interest payments for only the first 18 months. (Ex. 7 at 11; Tr. at 33-34). The Committee downplays the likelihood of a possible refinancing prior to October 31, 2014. However, because this refinancing option remained available throughout the life of the Term Loan, Bayside was obligated to keep the funds available through 2015. Thus, Bayside was justified in using the Conditional Maturity Date [*12] of December 31, 2015 to calculate the Make Whole Payment.

This determination is consistent with the New York Court of Appeals' holding in *JMD Holding*. In *JMD Holding*, the parties entered into a loan agreement for a $40 million revolving credit facility. *JMD Holding, 4 N.Y.3d at 376*. The prepayment fee was calculated using the entire $40 million available credit, even though the obligor did not draw upon the full amount. *Id. at 377*. The obligor argued that the fee was disproportionate to the lender's expected yield because there was no guarantee that the maximum amount would be borrowed. However, the Court held that the fee was appropriate because the lender made a commitment to extend credit up to $40 million. The lender's subsequent lending behavior had to be conducted to insure that the full $40 million was available to be drawn upon. *Id. at 383*.

Similar facts exist here. Although there was no guarantee that the Term Loan would be extended to

December 2015, Bayside was required to plan its lending activity in such a way to account for the possibility of the loan being extended. The Committee's argument that an extension was unlikely is irrelevant. The Term Loan Credit Agreement required [*13] Bayside and its investors to keep adequate funds available through December 2015. The Court cannot, with the benefit of hindsight, alter the agreement based on subsequent operational results and managerial decisions.[7]

> 7   Sean Britain, a principal at Bayside, testified that Bayside's goal on this type of loan is to achieve a return to its investors of between 1.4 and 1.5 times investment. (Tr. at 94). It is not disputed that the Make Whole Payment achieves this targeted return.

The Committee makes much of the fact that the Make Whole Payment is 37% of the Term Loan. This, certainly, is a figure to give the Court pause. However, the applicable standard by which the Court is bound to evaluate whether Bayside is entitled to receive the Make Whole Payment is whether the payment is "plainly disproportionate" to the possible loss - - not whether the payment at issue is disproportionate to the principal of the loan.

Moreover, the Make Whole Payment is calculated by discounting future interest payments using an interest rate tied to Treasury Note performance. (Ex. 4 at 23). Other [HN5] New York courts have determined that prepayment consideration calculated on the basis of U.S. Treasury bond interest [*14] rates supports the conclusion that a prepayment premium is not plainly disproportionate to a lender's potential losses. *South Side House, 451 B.R. at 271* citing *In re Saint Vincent's Catholic Med. Ctrs. of N.Y., 440 B.R. 587, 594 (Bankr.S.D.N.Y. 2010)*; *Vanderveer, 283 B.R. at 130-31.*[8]

> 8   In *Vanderveer*, the Court wrote: "[The yield maintenance provision] is calculated based on prevailing Treasury Bond yields at or about the time of prepayment, and is structured to permit the lender, in the event of prepayment, to receive its bargained for yield while reinvesting the prepaid funds in the U.S. Treasury instruments. The yield maintenance provision at issue does not result in an automatic premium to the lender in the event of prepayment." *Vanderveer, 283 B.R. at 130. See also Anchor Resolution Corp. v. State Street Bank and Trust Co. of Connecticut (In re Anchor Resolution Corp.), 221 B.R. 330, 341 (Bankr.D.Del. 1998)* (deciding that a make whole forumula was reasonable when it "accounts for changes in the Treasury rate, decreases over time, and has no applicable 'minimum charge'").

b. *Was the Term Loan an arms-length transaction?*

The Debtors received proposals from multiple lenders that contained [*15] varied terms. After Bayside was selected, the Debtors further negotiated terms and conditions of the Term Loan including the prepayment terms. (Ex. 3 at 8-10; Tr. at 81, 87-88,). Here, it is not seriously disputed that the company was experiencing financial distress at the time the Term Loan was negotiated, but there is no credible evidence in the record revealing that the relative strengths or weaknesses of the parties' respective bargaining positions was anything but common under the circumstances. The evidence presented at trial shows clearly that the Term Loan was the result of an arms-length negotiation.

(2) *Whether Section 506(b)'s reasonableness standard applies to pre-petition fees?*

The Committee claims that the Make Whole Payment must also pass the reasonableness standard in *Bankruptcy Code §506(b)*.[9] Bayside counters that *§506(b)* applies only to postpetition fees, costs or charges. *Compare In re 400 Walnut Assocs., Inc., 473 B.R. 603, 610 (E.D.Pa. 2012)* ("The majority view is that *§506(b)* does not apply to interest and other charges that accrue *before* the filing of the bankruptcy petition.") (emphasis in original) citing *inter alia Collier on Bankruptcy* ¶506.04 [1] (16th ed. [*16] 2012) ("The allowability of . . . prepetition amounts as part of the secured creditor's 'claim' is not determined by *section 506*, but is governed by *section 502* in conjunction with other provisions of the Code.") *with Wetzel v. Advocate Realty Invs., LLC, 275 F.3d 1308, 1318 (11th Cir. 2001)* (applying the reasonableness standard of *§506(b)* to unpaid attorney fees that the creditor incurred both prepetition and post-petition, deciding that *§502* and *§506* "should be read in tandem with one another," as *§ 502* deals with the threshold question of whether a claim should be allowed or disallowed, then *§506* deals with the narrow issue of whether certain types of claims should be considered secured or unsecured) *cited in* 4-506 *Collier on Bankruptcy* ¶506.04 [3][e] (16th ed. 2013).

9  *11 U.S.C. §506(b)* provides:

> [HN6] (b) To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and **any reasonable fees, costs, or charges provided for under the agreement** or State statute under which such claim arose.

[HN7] Under  [*17] New York law, a prepayment premium must not be an unenforceable penalty; therefore the *§506(b)* reasonable standard may be met in any event. I have determined that the Make Whole Payment is not "plainly disproportionate" to the lender's probable loss. On the record before me, even assuming *§506(b)* applies, the Make Whole Payment meets the *§506(b)* reasonableness standard.

(3) *Whether the Make Whole Payment is unmatured interest under Section 502(b)(2)?*

The Committee next asks the Court to disallow the Make Whole Payment under *Section 502(b)(2)* because it constitutes a claim for unmatured interest.[10] The Committee's claim is that the Make Whole Payment is intended to compensate Bayside for lost future interest resulting from the prepayment.

10  *11 U.S.C. §502(b)(2)* provides, in pertinent part:

> [HN8] (b) [If an] objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that - -
>
> . . . .
>
> (2) such claim is for unmatured interest.

My colleague, Judge Shannon, recently noted that bankruptcy courts are split  [*18] on the issue of whether make whole payments are characterized as unmatured interest or liquidated damages. *In re Trico Marine Servs., Inc., 450 B.R. 474 (Bankr.D.Del. 2011)*. He reasoned:

> Research reveals that the substantial majority of courts considering this issue have concluded that [HN9] make-whole or prepayment obligations are in the nature of liquidated damages rather than unmatured interest, whereas courts taking a contrary approach are distinctly in the minority. *Noonan v. Fremont Fin. (In re Lappin Elec. Co.), 245 B.R. 326, 330 (Bankr.E.D.Wis.2000)* ("[T]his court is in agreement with a majority of courts that view a prepayment charge as liquidated damages, not as unmatured interest or an alternative means of paying under the contract.") (citations omitted); *see also In re Outdoor Sports Headquarters, Inc., 161 B.R. 414, 424 (Bankr.S.D.Ohio 1993)* ("Prepayment amounts, although often computed as being interest that would have been received through the life of a loan, do not constitute unmatured interest because they fully mature pursuant to the provisions of the contract.") (citations omitted); *In re Skyler Ridge, 80 B.R. 500, 508 (Bankr.C.D.Cal.1987)* ("Liquidated damages, including [*19] prepayment premiums, fully mature at the time of breach, and do not represent unmatured interest.") (citation omitted).

*Trico Marine, 450 B.R. at 480-81*. Judge Shannon was "persuaded by the soundness of the majority's interpretation of make-whole obligations," and concluded a claim for a make whole premium was akin to a claim for liquidated damages, not a claim for unmatured interest. *Id. at 481*. I agree with Judge Shannon and likewise conclude that the Make Whole Payment claimed by Bayside should not be disallowed as unmatured interest under *Section 506(b)(2)*.

(4) *Whether Bayside had a duty to mitigate damages?*

The Committee also contends that Bayside had a duty to mitigate any damages it suffered. However, [HN10] New York courts have held that a valid

liquidated damages claim obviates the duty to mitigate. *Delvecchio v. Bayside Chrysler Plymouth Jeep Eagle, Inc., 271 A.D.2d 636, 639, 706 N.Y.S.2d 724 (2d Dep't 2000) citing Truck Rent-A-Center v. Puritan Farms 2nd, 51 A.D.2d 786, 380 N.Y.S.2d 37, aff'd. 41 N.Y.2d 420, 393 N.Y.S.2d 365, 361 N.E.2d 1015, Musman v. Modern Deb, 50 A.D.2d 761, 377 N.Y.S.2d 17 (1975).*[11]

> 11   Mr. Britain testified that, with respect to the particular Bayside fund that [*20] is the lender here (H.I.G. Bayside Debt and LBO Fund II, LP) Bayside was prevented from reinvesting prepayment proceeds, as Bayside was obligated to return the proceeds to its limited partners within ninety days of receiving them. (Tr. at 77). Therefore, the evidence demonstrates that Bayside was prevented contractually from mitigating its damages.

## Conclusion

The Motion to Disallow will be denied. An appropriate order follows.

BY THE COURT:

/s/ Kevin J. Carey

KEVIN J. CAREY

UNITED STATES BANKRUPTCY COURT

DATED: April 22, 2013

## ORDER

AND NOW, this 22nd day of April, 2013, upon consideration of the Motion to Disallow Bayside's Make Whole Payment (the "Motion to Disallow") (D.I. 475), the response thereto, after a hearing, and for the reasons set forth in the accompanying Memorandum, it is hereby **ORDERED** and that the Motion to Disallow is **DENIED**.

BY THE COURT:

/s/ Kevin J. Carey

KEVIN J. CAREY

UNITED STATES BANKRUPTCY COURT