# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | CHAPTER 11 |
| | : | |
| TRIBUNE MEDIA COMPANY, *et al.*,[1] | : | |
| | : | Case  No. 08-13141 (KJC) |
| Reorganized Debtors | : | (D.I. 3796, 11792) |

# OPINION SUSTAINING OBJECTION TO
# CLAIM OF ROBERT HENKE[2]

## BY:   KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE

Before the Court is the Debtors' objection (D.I. 3796) (the "Objection") to proof of claim

number 3697 (the "Claim") filed by Robert Henke against Debtor The Baltimore Sun Company

---

[1] The Reorganized Debtors, or successors-in-interest to the Reorganized Debtors, in these chapter 11  cases are: Tribune Media Company; California Community News, LLC; Chicago Tribune Company, LLC; Chicagoland Publishing Company, LLC; Chicagoland Television News, LLC; forsalebyowner.com, LLC; ForSaleByOwner.com Referral Services LLC; Hoy Publications, LLC; Internet Foreclosure Service, LLC; KDAF, LLC; KIAH, LLC; KPLR, Inc.; KRCW, LLC; KSWB, LLC; KTLA, LLC; KTXL, LLC; KWGN, LLC; Los Angeles Times Communications LLC; Magic T Music Publishing Company, LLC; NBBF, LLC; Oak Brook Productions, LLC; Orlando Sentinel Communications Company, LLC; Sun-Sentinel Company, LLC; The Baltimore Sun Company, LLC; The Daily Press, LLC; The Hartford Courant Company, LLC; The Morning Call, LLC; Tower Distribution Company, LLC; Towering T Music Publishing Company, LLC; Tribune 365, LLC; Tribune Broadcasting Company, LLC; Tribune Broadcasting Hartford, LLC; Tribune Broadcasting Indianapolis, LLC; Tribune Broadcasting Seattle, LLC; Tribune CNLBC, LLC; Tribune Content Agency, LLC, LLC; Tribune Content Agency London, LLC; Tribune Direct Marking, LLC; Tribune Entertainment Company, LLC; Tribune Investments, LLC; Tribune Media Services, LLC; Tribune ND, LLC; Tribune Publishing Company, LLC; Tribune Television New Orleans, Inc.; Tribune Washington Bureau, LLC; WDCW, LLC; WGN Continental Broadcasting Company, LLC; WPHL, LLC; WPIX, LLC; WPMT, LLC; WSFL, LLC; WXMI, LLC (the foregoing entities will be collectively referred to herein as the "Debtors").

[2] This Opinion constitutes the findings of fact and conclusions of law, as required by Fed. R. Bankr. P. 7052. This Court has jurisdiction to decide this claim objection pursuant to 28 U.S.C. § 157 and § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B).

(the "Sun"). Mr. Henke's Claim, in the amount of $100 million, is based on a defamation lawsuit that he filed *pro se* against the Sun in 2008 arising out of a newspaper article published on October 7, 2007. In the Objection, the Debtors argue that (i) the underlying lawsuit was filed after the applicable statute of limitations, (ii) Mr. Henke has not provided evidence to support his claims of defamation and other causes of action, and (iii) Mr. Henke has not provided any support for calculating his damages at $100 million.

Mr. Henke filed a response to the Objection (D.I. 3989) (the "First Response"), but then filed an amended proof of claim (the "Amended Claim") (claim number 7106), which attached a Proposed Amended Complaint dated April 15, 2012 (the "Amended Complaint" or "AC"). The Debtors filed a supplemental objection (D.I. 11792) (the "Supplemental Objection"), to which Mr. Henke responded (D.I. 11931) (the "Second Response"), and the Debtors then filed a reply in support of their Supplemental Objection (D.I. 11956) (the "Reply").

On July 11, 2012, the Court held a hearing on the Objection (the "Hearing"), at which Mr. Henke appeared *pro se*. On August 10, 2012, Mr. Henke filed a third response to the Objection (D.I. 12238) (the "Third Response"). Throughout the responses and the Hearing, Mr. Henke argued that the Sun's article was a continuation of two decades of misconduct by the Sun and others that targeted him, his wife, and their business, resulting in their financial ruin.

For the reasons set forth below, the Court will sustain the Debtors' Objection.

### Facts

On October 7, 2007, the Sun published a two and one-half page article written by Gadi Dechter entitled "A Modern-Day Ahab: In Pursuit of Geologic Immortality, Inventor Robert Henke Has Sacrificed Everything: Comfort, Career, Family" (the "Article"). The Article recounts Mr. Henke's experiences in developing a new geotechnical soil testing technology that

predicts how various soils will react in an earthquake (the "Technology") and the effect of this unrelenting undertaking on his career and his family.

Mr. Henke initially approached the Sun in late 2006 requesting an investigation of his former employer, Johns Hopkins University (the "University"), and the Sun due to their alleged misconduct directed against Mr. Henke, his wife and their firm to interfere with his career and their progress on the Technology. In the Amended Complaint, he alleges that he approached the Sun because:

> [F]acts and reason suggest *The Sun* had been complicit in the misconduct, possibly pivotally. Starting soon after the plaintiff left the University, *The Sun*, over roughly two decades (1990 - 2009), conspicuously published a large number of articles that suggest the possibility *The Sun* may have stalked him, the firm and his family; interfered with progress on the technology; and protected possible architects of the misconduct. For example, the stalking articles publicized, in separate articles, a large number of plaintiff's students in a particular course of his; close friends and associates of his sons; and contractors of the firm. Among other things, the articles gave him the unsettling impression that he, his family, and the firm were under surveillance. Facts and reason suggest the University inspired the articles; the University is close to *The Sun* . . . and the initial articles coincided roughly with plaintiff leaving the University . . . .[3]

In response to this request, Mr. Dechter proposed to write a long article about Mr. Henke's experiences. Mr. Henke "agreed to an article only because he believed a sincere article might well lead to the investigation he had long sought, because of representations *The Sun* made regarding the article, and because he believed *The Sun* would publish a sincere article."[4]

Mr. Dechter began working on the Article in early January 2007. In February 2007, Mr. Henke provided Mr. Dechter with a list of personal and professional acquaintances and colleagues, which included both "supporters" and "detractors," for interviewing.[5] The resulting Article chronicled Mr. Henke's early life, his academic career as an engineering professor at the

---

[3] AC ¶12.
[4] AC ¶13.
[5] Claimant's Third Response, Ex J.

University, his dismissal from the University, his continued efforts to develop the Technology

through his firm (consisting of his wife, who is also an engineer, and him) by seeking

government grants (many of which were denied) and using personal funds, as well as the overall

effect of his pursuit on his family.  The Article painted Mr. Henke as a scientist with a singular

purpose: to achieve "scientific glory" through acceptance by the scientific community of his soil

probe.

Displeased with the Article's overall theme, its "material concealments," "direct personal

attacks," and "falsifications," Mr. Henke decided to sue the Sun and Mr. Dechter for defamation,

fraud, invasion of privacy, and civil conspiracy.  As he was unable to find an attorney willing to

take his case, Mr. Henke brought suit as a *pro se* litigant.  On October 3, 2008, he sent a two-page

complaint (the "Complaint") and a personal check for $105 via the U.S. Postal Service to the

Circuit Court for Baltimore City, Maryland (the "Circuit Court").[6]  Mr. Henke produced a signed

receipt indicating that the Complaint was delivered to the Office of the Clerk for the Circuit Court

(the "Clerk's Office") on October 6, 2008, although the Complaint is stamped as received by the

Clerk's Office on October 7, 2008.[7]  Mr. Henke also sent his Complaint to the Sun, but not to Mr.

Dechter, who apparently was never served.  The Sun received and signed for the Complaint on

October 6, 2008.[8]

In the format of a letter to the Circuit Court, the Complaint's subject line states:

"Defamation Complaint."[9]  The first sentence reads: "Herein, I, Robert Henke, present a

complaint I have against a newspaper, The Baltimore Sun ("The Sun") and a Sun reporter, Mr.

---

[6] The Circuit Court of Baltimore City is the state trial court of general jurisdiction for the 8th Judicial Circuit of Maryland's state court system.  See www.courts.state.md.us.

[7] Claimant's Second Response, Ex. D.

[8] Claimant's Third Response, Ex. D.  The Debtors maintain, however, that "The Sun has not been served in this case, and it has not filed any answer or dispositive pleading."  Objection, ¶ 11, n. 5.

[9] A copy of the Complaint is attached to the Second Response, Ex. D.

Gadi Dechter." Under the heading "Complaint," Mr. Henke presents his causes of action without enumerating or labeling them as claims:

> The article appears to have been a material and well-crafted defamatory fabrication. Facts were created, facts were reshaped, and facts were omitted - - on a large scale. For example, both the prominent theme of the article and compelling evidence for that theme were untrue. Evidence suggests that the untruths and misrepresentations were reckless and deliberate . . . .
>
> Much evidence suggests The Sun's lapses were intentional. For example, The Sun gained my family's cooperation through false pretenses; The Sun violated our privacy; The Sun carried out an insincere facts check; and The Sun misrepresented the origin of the article. Additionally, The Sun appears to have been pressured by the University.[10]

The Complaint ends by stating that Mr. Henke was serving a copy of the Complaint upon the Sun, and provides the name of the Sun's President and CEO, as well as the newspaper's address.

On October 8, 2008, however, the Clerk's Office returned the Complaint to Mr. Henke with a form stating: "[t]he enclosed papers are being returned for the following reason(s) . . . [y]ou must give us the name and addresses of the parties you are filing suit against so that the summones [sic] can be processed for service."[11] The Clerk's Office also attached Mr. Henke's personal check to the returned Complaint, since it was an unacceptable form of payment.

On October 13, 2008, Mr. Henke sent the Circuit Court a letter with the names and addresses of the defendants and a money order, an acceptable form of payment.[12] He did not attach his Complaint, believing the Circuit Court had kept a copy of it.[13] The Clerk's Office received and signed for Mr. Henke's letter on October 17, 2008.[14] On December 18, 2008, Mr. Henke called the Clerk's Office to inquire about the status of his case. He was told there was no

---

[10] Second Response, Ex. D.
[11] Second Response, Ex. E.
[12] Second Response, Ex. F.
[13] Transcript, July 11, 2012 (D.I. 12020) ("Tr."), at 94.
[14] Second Response, Ex. F.

record of it.[15]  He also discovered that the money order had not been cashed.  On December 30,

2008, Mr. Henke resubmitted his Complaint to the Circuit Court with proper payment.[16]  The

Clerk's Office received the Complaint on January 7, 2009, and the Court Clerk docketed it on

January 12, 2009, assigning it case number 24-C-09-000340.  Due to the Debtors' voluntary

chapter 11 petitions filed on December 8, 2008, however, the Circuit Court entered an Order

dated August 22, 2009 staying Mr. Henke's Maryland court action against the Debtors pursuant

to section 362(a) of the Bankruptcy Code.[17]

Mr. Henke's First Response, filed on April 9, 2010, included a three-page appendix

entitled "Draft Amendment to Narrative of Complaint" ("Draft Amendment").  On April 19,

2012, Mr. Henke filed his Amended Claim, attaching his Amended Complaint.  The Amended

Complaint significantly elaborated the claims contained in his Complaint and Draft Amendment.

### Standard

The Debtors object to Mr. Henke's claim under Bankruptcy Code §502(b)(1), which

provides that a Court will disallow a claim to the extent that the claim is unenforceable under

applicable law.[18]  Section 502(b)(1) recognizes the settled principal that "[c]reditors' entitlements

in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's

---

[15] Tr. at 65-66.

[16] *Id.;* Second Response, Ex. G.

[17] Supplemental Obj., Ex. B.

[18] Bankruptcy Code §502(b)(1) provides in pertinent part that:
> [I]f such objection to a claim is made, the court, after notice and a hearing, shall determine
> the amount of such claim in lawful currency of the United States as of the date of the filing
> of the petition, and shall allow such claim in such amount, except to the extent that--
>> (1)  such claim is unenforceable against the debtor and property of the
>> debtor, under any agreement or applicable law for a reason other than
>> because such claim is contingent or unmatured;

11 U.S.C.A. § 502(b)(1).

obligation, subject to any qualifying or contrary provisions of the Bankruptcy Code."[19] "A claim against the bankruptcy estate, therefore, 'will not be allowed in a bankruptcy proceeding if the same claim would not be enforceable against the debtor outside of bankruptcy.'"[20] Bankruptcy Code §558 provides a bankruptcy estate with the benefit of any defense available to the debtor, "including statutes of limitation, statutes of frauds, usury, and other personal defenses."[21]

When a claim objection is filed in a bankruptcy case, the burden of proof as to the validity of the claim shifts between the parties.[22] The shifting burdens of proof are described by the Court of Appeals for the Third Circuit in *Allegheny Int'l* as follows:

> Initially, the claimant must allege facts sufficient to support the claim. If the averments in his filed claim meet this standard of sufficiency, it is "prima facie" valid. In other words, a claim that alleges facts sufficient to support a legal liability to the claimant satisfies the claimant's initial obligation to go forward. The burden of going forward then shifts to the objector to produce evidence sufficient to negate the prima facie validity of the filed claim. It is often said that the objector must produce evidence equal in force to the prima facie case . . . . In practice, the objector must produce evidence which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency. If the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence . . . . The burden of persuasion is always on the claimant.[23]

### Discussion

I must address the following issues under Maryland law: (i) whether Mr. Henke's defamation claim is barred by the statute of limitations; (ii) whether Mr. Henke has proven his

---

[19] *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.,* 549 U.S. 443, 450, 127 S. Ct. 1199, 1205, 167 L. Ed. 2d 178 (2007) (quoting *Raleigh v. Illinois Dept. of Rev.,* 530 U.S. 15, 20, 120 S.Ct. 1951, 147 L.Ed.2d 13 (2000)).

[20] *In re Combustion Eng'g, Inc.,* 391 F.3d 190, 245 n. 66 (3d Cir. 2004) (quoting *United States v. Sanford,* 979 F.2d 1511, 1513 (11th Cir. 1992)).

[21] 11 U.S.C. § 558.

[22] *In re Sea Containers, Ltd.,* 2009 WL 2208128, *2 (Bankr. D. Del. July 22, 2009) (citing *In re Allegheny Int'l, Inc.,* 954 F.2d 167, 173 (3d Cir.1992)).

[23] *Allegheny Int'l,* 954 F.2d at 173–74 (citations omitted).

defamation claims; and (iii) whether Mr. Henke has proven his fraud claims by clear and convincing evidence.

### 1.   Statute of Limitations - Defamation Claim

Under Maryland law, "the statute of limitations in a defamation action is one year."[24] The Debtors argue that Mr. Henke failed to file his defamation claim within the applicable one-year statute of limitations.

Mr. Henke argues that he filed his Complaint on October 6, 2008, when the Circuit Court received delivery of his original Complaint, which is within the one-year statute of limitations. However, it is undisputed that the Circuit Court Clerk's Office returned the Complaint to Mr. Henke with a letter advising that he needed to provide further information and rejecting payment of the filing fee by a personal check. Mr. Henke mailed a letter to the Clerk's Office with the missing information and a money order for the filing fee. However, he did not include the Complaint (believing the Circuit Court had retained a copy), and nothing was docketed. After contacting the Circuit Court and learning of the error, Mr. Henke re-mailed the Complaint and other information to the Circuit Court by letter dated December 30, 2008, which was received by the Clerk's Office on January 7, 2009. The Complaint was docketed on January 12, 2009. The Debtors contend that the Complaint was not filed until January 12, 2009, when it was docketed by the Court Clerk, which was more than three months after the statute of limitations on Mr. Henke's defamation claims expired on October 7, 2008.

---

[24] *Indep. Newspapers, Inc. v. Brodie,* 407 Md. 415, 441, 966 A.2d 432, 448 (2009) (citing Md. Code Ann., Cts. & Jud. Proc. § 5-105 ("[a]n action for assault, libel, or slander shall be filed within one year from the date it accrues.")).

"A civil action is commenced by filing a complaint with a court."[25] The filing date of pleadings is governed by Maryland Rule 1-322(a).[26]  As further explained in commentary to the Maryland Rules:

> A pleading or paper is filed by actual delivery to the clerk. This may be accomplished in person or by mail. However, the date of filing is the date the clerk receives the pleading, not the date when the pleading was mailed. Filing therefore differs from service of a pleading or paper by mail, which is, in fact, complete upon mailing (see Md. Rule 1-321(a)) . . . This rule permits a pleading or paper to be filed with a judge, assuming the judge agrees to accept the pleading or paper for filing."[27]

In *Mole v. Jutton,* the Maryland Court of Appeals held that a notice of appeal was timely filed under Maryland Rule 1-322(a) when it was delivered to the post office box designated by the clerk of court for filings, even though the court did not docket the notice of appeal for another three days.[28] Mr. Henke's Complaint was actually delivered to the Clerk's Office on October 6, 2008.  However, the Clerk returned his Complaint for deficiencies and the issue is whether the Clerk properly rejected the Complaint, thereby delaying the filing date to delivery of the corrected Complaint on January 7, 2009.

Maryland law requires a court clerk to receive and record pleadings, even if defective. The Court of Special Appeals of Maryland has determined:

> [A]s stated in *McCray v. Maryland,* 456 F.2d 1, 4 (4th Cir.1972), "[c]lerical duties are generally classified as ministerial ... and the act of filing papers with the court is as ministerial and inflexibly mandatory as any of the clerk's responsibilities." Except as otherwise expressly provided by law, therefore, the clerk has no discretion in the

---

[25] Md. Rule 2-101.

[26] The version of Rule 1-322 that was in effect as of October 2008, provided in pertinent part: "The filing of pleadings and other papers with the court as required by these rules shall be made by filing them with the clerk of the court, except that a judge of that court may accept the filing, in which event the judge shall note on the papers the filing date and forthwith transmit them to the office of the clerk." Rule 1-322(a) (2008).

[27] *Mole v. Jutton,* 381 Md. 27, 34, 846 A.2d 1035, 1039 (2004)) (quoting Paul V. Niemeyer & Linda M. Shuett, *Maryland Rules Commentary* 35 (2d ed.1984)).

[28] *Mole v. Jutton,* 381 Md. at 37-38, 846 A.2d at 1041.

matter and no right to make a judicial determination of whether the paper complies with the Rules or ought to be filed. If the paper has not been presented timely or if it suffers from some other deficiency, it is subject to being stricken by the court, usually upon motion of a party objecting to the paper, but so long as it is properly presented, the clerk must accept and file it. The only exception that we know of to that requirement, as we said, is the direction in Md. Rule 1-323 not to accept a paper that lacks an admission or waiver of service or a certificate showing the date and manner of service.[29]

The exception found in Maryland Rule 1-323 ("Proof of Service") is not applicable to original pleadings, such as Mr. Henke's Complaint.[30]  In *Cave v. Elliott,* the Court determined that the clerk erred by refusing to accept a motion for filing due to a clerical mistake in the caption listing the wrong county.[31]  The Court of Special Appeals concluded that the Circuit Court properly corrected the clerical error by entering an order accepting the motion for filing *nunc pro tunc* to the original filing date.[32]

Late payment of the filing fee also does not affect the date a pleading is filed.[33]  In *Bond v. Slavin,* the appellee moved to dismiss a notice of appeal as untimely because the Clerk of the Circuit Court received the notice of appeal on April 17, 2003, but the appellant did not pay the

---

[29] *Dir. of Fin. of Baltimore City v. Harris,* 90 Md. App. 506, 513, 602 A.2d 191, 194 (1992).  The commentary to Md. Rule 1-323 similarly states: "[u]nder most circumstances, however, regardless of how defective  or deficient the pleading or paper is, the clerk may not reject it . . ., but, rather should leave it to the court and the parties to determine the sanction for the defect or deficiency." Paul Niemeyer & Linda M. Schuett, *Maryland Rules Commentary* 48-49 (3d ed. 2003) as cited in *Cave v. Elliott,* 190 Md. App. 65, 76 - 77, 988 A.2d 1, 7 - 8 (2010).

[30] Maryland Rule 1–323, entitled "Proof of service," provides: "The clerk shall not accept for filing any pleading or other paper requiring service, *other than an original pleading,* unless it is accompanied by an admission or waiver of service or a signed certificate showing the date and manner of making service. A certificate of service is prima facie proof of service." (emphasis added). Maryland Rule 1-202(s) defines an "original pleading" as "the first pleading filed in an action against a defendant . . . ."

[31] *Cave,* 190 Md. App. At 79.

[32] *Id.*

[33] Mr. Henke eventually paid the filing fee when he filed his corrected complaint in January 2009.  Tr. at 72.

filing fee until June 16, 2003.  The appellee argued that the Maryland Code provides that the clerk

has no duty "to record any paper filed with him [or her]" until costs are paid.[34]   The Court stated:

> We are persuaded that to "record" means to "docket," rather than to "file." If an
> appellant fails to pay the filing fee, the clerk is not required to *docket* the Notice, but
> the clerk is required to *file* it. "The only authority that a clerk has to refuse to accept
> and file a paper presented for filing is that contained in Md. Rule 1-323."[35]

The *Bond* Court noted it was within its power to dismiss an appeal "if that appeal was not

properly taken," but it determined that "[t]here is no evidence whatsoever that (1) appellees were

prejudiced by the late payment of the fee, or that (2) the course of the appeal was delayed in any

way. . . . [I]t is the practice of this Court to decide appeals on the merits rather than on

technicalities."[36]   The *Bond* Court denied the motion to dismiss the appeal.

Accordingly, Maryland law provides that the clerk must accept a pleading for filing despite

lack of proper form or filing fee. Mr. Henke corrected the technical errors and refiled his Complaint.

The corrected Complaint related back to the original Complaint because:

> there has evolved a rule . . . that the filing within the period of limitations of an
> assertion of a claim which is deficient or wrong in form or otherwise technically
> defective will toll the statute of limitations to the extent that the filing of a correct
> assertion of claim after the expiration of the statute will relate back to and validate
> the original assertion of claim, as long as the corrected statement does not introduce
> a new cause of action or a new theory of liability or new parties.[37]

---

[34] *Bond v. Slavin,* 157 Md. App. 340, 351, 851 A.2d 598 (2004) (quoting Md. Code, Cts. & Jud. Proc. § 2-201(b) (2003)).

[35] *Bond,* 157 Md. App. at 351 (quoting *Harris,* 90 Md. App. at 511) (footnote omitted) (emphasis in original).

[36] *Bond,* 157 Md. App. at 352-53.

[37] *Eastern Air Lines, Inc. v. Phoenix. Sav. & Loan Ass'n,* 239 Md. 195, 201, 210 A.2d 515, 518, 521 (Md. 1965) (citations omitted). In *Eastern,* the clerk rejected Eastern's petition asserting a claim against Phoenix Savings and Loan Association, which was filed within the requisite time period, but signed by Eastern's controller, who was not an attorney licensed to practice law in the State of Maryland. *Id.* at 517. Eastern presented a corrected petition to the Court almost four months after the deadline for filing, but the Court entered an order disallowing the claim. *Id.* at 518. The Court of Appeals reversed, deciding that "[n]o good purpose was served by the barring of the claim . . ." and "Phoenix did not show any cause and, in good conscience, cannot complain that Eastern may not correct the technical defects in the perfection of its duly filed claim and thereby achieve the opportunity to show before the Master, with the burdens of a plaintiff, that the old Phoenix was indebted to it." *Id.* at 522.

On these circumstances, and considering that Mr. Henke was filing his Complaint *pro se*, the filing date of the corrected Complaint should relate back to the filing date of the original Complaint.[38] Mr. Henke's defamation claims were filed within the one-year statute of limitations.[39]

## 2. **Defamation Claims**

In his Amended Complaint, Mr. Henke lists eleven defamation claims.[40] Mr. Henke supports his defamation allegations by quoting statements from the Article or noting facts that the Article omitted. He separated his eleven claims into four categories, and I will address them accordingly:

(1)    False Defamation through Theme:  Mr. Henke alleges that the prominent theme of the Article falsely represented him "as a reckless eccentric who willingly destroyed his family for scientific glory"[41] (Count 1);

(2)    False Defamation through Material Concealments: Mr. Henke argues that the Article concealed the facts that he, his wife, their firm and family were victims of targeted official and professional misconduct, and omits facts regarding his time

---

[38] In the Supplemental Objection, the Debtors objected to Mr. Henke's claims as time-barred or for failing to state a claim under non-bankruptcy law.  Neither party addressed the issue of the possible consequences of filing the corrected defamation complaint post-bankruptcy.

[39] On April 19, 2012, Mr. Henke filed his Amended Claim, which included his proposed Amended Complaint as an attachment.  Although the Debtors reserved their right to raise any applicable defenses to the Amended Complaint (Supplemental Objection, at 4 n. 2), they did not specifically object to the claims in the Amended Complaint as untimely.

[40] Mr. Henke's defamation claims in the Amended Complaint are titled as follows:  (1) False Defamation through Theme; (2) False Defamation through Falsification of Tenure at the University; (3) False Defamation through Concealment of Possibility of Retaliation; (4) False Defamation through Falsification of Air Force Discharge; (5) False Defamation Regarding Profanity; (6) False Defamation through Falsification of Parenting; (7) False Defamation through Falsification of Promise of Technology and Productivity of Undertaking; (8) False Defamation through Falsification of Sincerity of Undertaking; (9) False Defamation through Falsification of Professionalism; (10) False Defamation through Falsification of Japanese Collaboration; and (11) False Defamation through Falsification of Risk of Undertaking.

[41] AC ¶30.

at the University that provide information about the possible origin of the

misconduct (Counts 2 and 3);

(3)    False Defamation through Personal Attacks:  Mr. Henke claims that the Article

attacked him personally by falsely representing that his discharge from the Air

Force was less than honorable, that he used profanity, and that he was an

overbearing, thoughtless parent (Counts 4, 5 and 6); and

(4)    False Defamation through Falsifications regarding the Undertaking and

Technology: Mr. Henke alleges that the Article falsely represented that his work

on the Technology (which is referred to as the "Undertaking") was (among other

things) unprofessional, greed-driven, unproductive, unpromising, and delusional

(Counts 7 through 11).

The Debtors argue that Mr. Henke has failed to prove the four elements of a defamation

claim under Maryland law: (1) that the defendant made a defamatory statement to a third person,

(2) that the statement was false, (3) that the defendant was legally at fault in making the

statement, and (4) that the plaintiff thereby suffered harm.[42]

(a)    *The third element of a defamation claim:  whether the defendant was legally at*
       *fault*

The third element of a defamation claim - - fault - - may be based either on negligence or

constitutional malice, which is sometimes called "actual malice."[43]  The standard of fault used to

review a defamation claim varies according to the plaintiff's status as a public figure, limited

public figure or a private individual because "[w]hen the speech is of public concern and the

---

[42] *Piscatelli v. Van Smith*, 424 Md. 294, 306, 35 A.3d 1140 (2012) (quoting *Indep. Newspapers, Inc. v.
Brodie*, 407 Md. 415, 441, 966 A.2d 432 (2009)); *Agora, Inc. v. Axxess, Inc.*, 90 F.Supp. 2d 697, 701 (D.
Md. 2000) *aff'd* 11 F. App'x 99 (4th Cir. 2001).
[43] *Shapiro v. Massengill*, 105 Md. App. 743, 772, 661 A.2d 202 (1995).

plaintiff is a public official or public figure, the Constitution clearly requires the plaintiff to surmount a much higher barrier before recovering damages from a media defendant than [is necessary to prove with a private plaintiff]."[44] Because Mr. Henke's status affects the standard by which he must prove his claims and the type of damages he may pursue, it is appropriate to discuss the third element at the outset.

Courts have generally recognized two categories of public figures: (1) general public figures, who are individuals that "achieve such pervasive fame or notoriety that they become public figures for all purposes and in all concepts," and (2) limited public figures, who are individuals that "may voluntarily inject themselves or be drawn into a particular public controversy and thereby become public figures for a limited range of issues."[45]  "Whether the plaintiff is a public figure is solely an issue of law."[46]  Mr. Henke does not have the "pervasive fame or notoriety" of a general public figure.  I will explore whether he may be a limited public figure in connection with the articles published in the Sun.

---

[44] *Waicker v. Scranton Times Ltd. P'ship*, 113 Md. App. 621, 629, 688 A.2d 535 (1997) (quoting *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 775, 106 S.Ct. 1558, 1563, 89 L.Ed.2d 783 (1986)).  In the *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 296 (1971), "the Supreme Court held that in a state libel trial, a public official must establish 'malice,' defined as a knowing falsity or reckless disregard for the truth, on the part of the publisher to recover damages for defamatory statements concerning the plaintiff's official conduct.  The Court held that the traditional defense of truth did not provide adequate protection to the First Amendment rights of the press." *Jacron Sales Co., Inc. v. Sindorf*, 276 Md. 580, 350 A.2d 688 (1976) (footnotes omitted).  Later in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the Supreme Court held "that the constitutional privilege articulated in *New York Times* does not extend to defamatory falsehoods concerning an individual who is neither a public official nor a public figure." *Jacron Sales*, 276 Md. at 587.  In *Gertz*, the Supreme Court shifted emphasis from First Amendment protection of free expression to the state interest in protecting the reputation of a private individual deciding that "a private individual deserves a greater degree of protection than does a public figure because the latter usually has a greater access to the media to rebut defamatory charges and, unlike the private individual, usually has chosen to run 'the risk of closer public scrutiny.'" *Jacron Sales*, 276 Md. at 587-88.
[45] *Waicker*, 113 Md. App. at 629-630.
[46] *Id.*

Courts use a two-part inquiry to determine whether a person is a limited public figure: "(1) was there a particular public controversy that gave rise to the alleged defamation; and, if so, (2) was the nature and extent of the plaintiff's participation in that particular controversy sufficient to justify public figure status?"[47]  The Court of Special Appeals of Maryland defined a public controversy in *Waicker* as:

> a dispute that attracts special attention because its ramifications will be felt by persons who are not direct participants.  Public controversies have foreseeable and substantial ramifications for non-participants.  The mere fact that a private concern or disagreement generates news coverage does not mean it is a public controversy; a public controversy is more than a controversy in which the public is interested.[48]

In the instant case, Mr. Henke brought lawsuits against the National Science Foundation (NSF) and the National Institute of Standards and Technology (NIST).[49]  The Sun reported on those lawsuits in an August 3, 1995 article by Douglas Birch entitled "2 engineers sue to end secrecy in grant application reviews."[50]  When Mr. Henke contacted the Sun in November 2006, he "did so to obtain information regarding the past Sun articles" that he believed evidenced "official and professional misconduct" on the part of several institutions and persons.[51]  Mr. Henke expected the new article would be "consistent with Sun reporter Douglas Birch's article about plaintiff's and Ms. Henke's lawsuits against NSF and NIST."[52]  Mr. Henke ultimately

---

[47] *Id.* at 630.  The second part of the inquiry requires a court to consider five factors to determine whether the plaintiff was a public figure with respect to an identified public controversy:
(1)  whether the individual had access to channels of effective communication;
(2)  whether the individual voluntarily assumed a role of special prominence in public controversy;
(3)  whether the individual sought to influence resolution or outcome of controversy;
(4)  whether controversy existed prior to publication of defamatory statements; and
(5)  whether the individual retained public figure status at the time of alleged defamation.
*Id.* at 631.  However, I do not need to consider these factors since I determined that there is no public controversy here.
[48] *Id.* (citations and quotations omitted).
[49] AC ¶ 99.
[50] Third Response, Ex. I.
[51] AC ¶¶ 4-6, 8-9.
[52] AC ¶ 99.

agreed to the Article because he wanted to bring attention to the "official and professional misconduct" perpetrated against him, his firm and his family by persons and institutions within the scientific research community.[53]

Although the previous articles reflect a possible public controversy (*i.e.,* the secrecy of grant review by the NSF and NIST), Mr. Henke intended that the Article at issue would expose "official and professional misconduct" by persons and institutions in the scientific community against Mr. Henke, his wife and his family. I conclude that the controversy here is more in the nature of a private disagreement than one that has "foreseeable and substantial ramifications for non-participants." The defendants - - here, the Debtors - - bear the burden of proving that Mr. Henke is a limited-purpose public figure, [54] and they have not done so.

As a private individual plaintiff suing a media defendant, the type of damages available to Mr. Henke depends upon whether Mr. Henke can prove that the Sun acted with constitutional malice (also known as "actual malice") or negligence.[55] If Mr. Henke proves, by clear and convincing evidence, that the Sun published the (allegedly) defamatory statements with actual malice (i.e., with actual knowledge of falsity or with reckless disregard for the truth), then a presumption of harm to reputation arises and the finder of fact may award damages even in the absence of proof of harm.[56]

---

[53] AC ¶ 4.

[54] *Wells v. Liddy,* 186 F.3d 505, 534 (4th Cir. 1999).

[55] *Hearst Corp. v. Hughes,* 297 Md. 112, 122, 466 A.2d 486 (1983). *See also Shapiro v. Massengill,* 105 Md. App. 743, 772 - 774, 661 A.2d 202 (1995).

[56] *Shapiro,* 105 Md. App. at 774. The Court in *Shapiro v. Massengill* decided that the presumption applied and damages could be awarded without proof of harm in connection with *per se* defamatory statements (i.e., statements of an "injurious character [that] is a self-evident fact of common knowledge of which the court takes judicial notice and need not be pleaded or proved." *Shapiro,* 105 Md. App. at 773 (quoting *Metromedia, Inc. v. Hillman,* 285 Md. 161, 163-64, 400 A.2d 1117 (1979)).

Throughout the Amended Complaint, Mr. Henke argues that the Sun acted with actual malice, knowingly omitting facts "that were newsworthy, of public interest, and essential to a truthful narrative."[57]  Mr. Henke further argues that actual malice is demonstrated by the Sun's conscious effort to discredit him by publishing untruths without providing any source for various statements and without asking Mr. Henke to verify or comment on them.  He claims that the Sun disregarded his "corrections."  Mr. Henke also claims that the author, Mr. Dechter, could not have written the article impartially because he had ties to the University and may have been pressured by the University to conceal the misconduct.

For reasons explained more fully below, I conclude that the essence of Mr. Henke's defamation claims is a difference of opinion about the conclusions that can be drawn from the facts.  Moreover, he has not proven that the facts which form the basis of the opinions in the Article are materially untrue.  Mr. Henke's main argument is that the Sun omitted facts that support *his* conclusions.  To the extent that facts have been omitted, those omissions are more suggestive of editorial discretion in maintaining the Article's narrative and managing its length, rather than proving that the Sun acted with actual malice in publishing facts known to be false or in reckless disregard of their falsity.  Thus, I conclude that Mr. Henke has not proven actual malice by clear and convincing evidence.

Failure to prove actual malice is not fatal to Mr. Henke's defamation claims.  If Mr. Henke proves, by a preponderance of the evidence, that the Debtors negligently published the (allegedly) defamatory statements, Mr. Henke may recover compensation for actual injury.[58]  However, when liability is based on negligence, a private individual plaintiff may not recover

---

[57] AC ¶25.
[58] *Jacron Sales,* 276 Md. at 601.

punitive damages[59] and is not entitled to a presumption of harm.[60]  In other words, when liability

is based on negligence, the private individual plaintiff may recover actual damages only for harm

that is proven.

(b)    *The first element of a defamation claim: whether the statements are defamatory*

A defamatory statement "is one that tends to expose a person to 'public scorn, hatred,

contempt, or ridicule,' which, as a consequence, discourages 'others in the community from

having a good opinion of, or associating with, that person.'"[61]  Maryland law recognizes the

distinction between defamation per se and defamation per quod.[62]  Defamation per se

encompasses statements whose injurious character is self-evident so that the court may take

judicial notice of them; the defamatory nature of the statements need not be pleaded or proved.[63]

A per quod defamatory statement, on the other hand, requires the finder of fact to decide whether

the statement does, in fact, carry defamatory meaning.[64]  "The determination of whether an

alleged defamatory statement is per se or per quod is a matter of law."[65]

---

[59] To recover punitive damages, Maryland imposes an even higher standard than actual malice: namely, proof by clear and convincing evidence that the defendant has actual knowledge that the defamatory statement is false. Reckless indifference is not enough to recover punitive damages. *Le Marc's Mgmt. Corp. v. Valentin*, 349 Md. 645, 654-56, 709 A.2d 1222 (1998).

[60] *Hearst*, 297 Md. at 125. In *Gertz*, the Supreme Court recognized that "[t]he common law of defamation is an oddity of tort law, for it allows recovery of purportedly compensatory damages without evidence of actual loss. Under the traditional rules pertaining to actions for libel, the existence of injury is presumed from the fact of publication." *Hearst*, 297 Md. at 121 (quoting *Gertz*, 418 U.S. at 349 - 50).  The *Gertz* Court determined that the presumption should not apply a negligence case. *Hearst*, 297 Md. at 120. Without a showing of constitutional malice, "there may be no damages without evidence of actual harm." *Id.*

[61] *Piscatelli*, 424 Md. at 306 (quoting *Indep. Newspapers, Inc. v. Brodie*, 407 Md. 415, 441, 966 A.2d 432 (2009)).

[62] *Shapiro*, 105 Md. App. at 773.

[63] *Id.* at 773 (quoting *Metromedia, Inc. v. Hillman*, 285 Md. 161, 163-64, 400 A.2d 1117 (1979)).

[64] *Id.*

[65] *Id.*

Several of the statements quoted or cited in the Amended Complaint are not defamatory per se, and Mr. Henke has not proven that they are defamatory. For example, Count 5 (False Defamation Regarding Profanity) and Count 6 (False Defamation through Falsification of Parenting) of the Amended Complaint include the following statements from the Article:

> While the young Robert [Henke] had found social refuge in clowning and cartoons, he rarely permitted his sons to traffic in popular culture. No movies, no video games, no television save the occasional videotaped History Channel documentary. Even books were suspect.[66]

> Michael, who maintains a deep love for his father, recalls having to read books in secret. "It was crazy," he says. "It was unbelievable, especially from someone as intelligent as my father, who reads a lot."[67]

> "When you grow up without religion, someone must supplant God," Michael says. "And my father became that for me and …I could not help but fear his wrath," he says. [68]

> "My father said, 'F_____ furniture, I'll put a whole bunch of boxes together and make a couch.'" [69]

Mr. Henke disputes the truth of these assertions, arguing that he often read books to his sons during their younger years and that the family was not disconnected from popular culture, but vacationed in Disney World, "attended major sporting events, plays and ice shows; went to museums and to the beach . . . ." However, even assuming that the foregoing statements were proven to be false, Mr. Henke's theories of parenting or his son's report of his use of profanity do not rise to the level of statements that would expose Mr. Henke to "public scorn, hatred, contempt or ridicule, thereby discouraging others in the community from having a good opinion

---

[66] AC ¶ 64-66; Article ¶ 69.
[67] AC ¶ 69; Article ¶ 71
[68] AC ¶ 69; Article ¶ 69.
[69] AC ¶ 60; Article ¶ 23.

of, or from associating or dealing with" him.[70]    Mr. Henke has failed to prove that the

statements supporting Counts 5 and 6 of the Amended Complaint are defamatory in nature.

Mr. Henke alleges that the Article "falsely represent[s] the technology as unpromising

and the undertaking as unproductive and so [falsely represented Henke] as delusional and

unaccomplished."[71]  He also claims that the Article describes him as "unprofessional," and

describes his work on the Technology as "basement development."  Claims based on statements

regarding Mr. Henke's professionalism and qualifications could be per se defamatory.  "[A]

statement that adversely affects an employee's fitness for the proper conduct of his business is

actionable per se at common law."[72]  Although not every evaluation of an employee's work is

potentially defamatory, "words that go so far as to impute to [plaintiff] some incapacity or lack

of due qualifications to fill the position" may be actionable.[73]

Upon review of the Article, I conclude that it does not contain direct attacks on Mr.

Henke's abilities or qualifications in his field.  Instead, it discusses how he used those abilities

and qualifications in pursuit of the Technology.  Moreover, to recover damages for per se

defamatory statements based on a presumption of harm to reputation, Mr. Henke would have to

prove that the statements were made with actual malice (and I have already decided, above, that

he has failed to prove actual malice).

(c)    *The second element of a defamation claim: falsity*

A plaintiff proceeding under a negligence standard must prove that the allegedly

defamatory statements are false and that the publisher of such statements acted negligently in

---

[70] *Piscatelli*, 424 Md. at 306.

[71] AC ¶72.

[72] *Shapiro*, 105 Md. App. at 775 (quoting *Hearst*, 297 Md. at 118) (internal punctuation omitted).

[73] *Id.* (quoting *Foley v. Hoffman*, 188 Md. 273, 284, 52 A.2d 476 (1947)).

failing to ascertain their falsity.[74]  "[A] 'false' statement is one 'that is not substantially correct.'"[75]  Minor inaccuracies do not amount to falsity and a statement will not be considered false "unless it 'would have a different effect on the mind of the reader from that which the pleaded truth would have produced.'"[76]  Similarly, "imaginative expression" and "rhetorical hyperbole" are protected under the First Amendment and generally will not give rise to liability for defamation.[77]

Mr. Henke failed to prove that certain statements were untrue in a material way.  For example, Mr. Henke argues that the Article gives a false impression as to the risk of the Undertaking, citing statements such as "Just like Columbus at the point of no return, Henke chose to stay the course despite risk to his own crew, his family."[78]  Mr. Henke comments:

> Regarding truth, the risk plaintiff saw at the time, as expressed in, for example, plaintiff's and Ms. Henke's 1990 NIST proposal, was only "moderate."  He and Ms. Henke had eliminated most of the original technical risk with their previous 6 year effort . . . .  The non-technical risk they believed they faced was also moderate; there was much need for technologies such as theirs, there was much interest in their technology, and their laboratory work had been heavily supported by eminent organizations.  They did not start becoming aware of the apparent misconduct . . . which plaintiff believes was the dominant source of risk until after he left the University.[79]

---

[74] *Jacron Sales,* 276 Md. at 597.

[75] *Piscatelli,* 424 Md. at 306 (quoting *Batson v. Shiflett,* 325 Md. 684, 726, 602 A.2d 1191 (1992)).

[76] *Bateson v. Shiflett,* 325 Md. 684, 726, 602 A.2d 1191 (1992) (quoting R.Sack, Libel, Slander and Related Problems 138 (1980)).  In *Bateson,* the Court held that statements to union membership and company officials that the plaintiff committed crimes by misusing or embezzling funds could not be considered "mere rhetorical hyperbole" deserving constitutional protection.  *Id.* at 725.  The Court, relying on *Milkovich,* distinguished hyperbole in other cases such as *Greenbelt Pub. Assn. v. Bresler,* 398 U.S. 6, 14, 90 S.Ct. 1537, 1542, 26 L. Ed. 2d 6, 15 (1970) (use of the word "blackmail" to characterize developer's negotiating position with city council was "no more than rhetorical hyperbole, a vigorous epithet used by those who considered [the developer's] negotiating position extremely unreasonable").

[77] *Peroutka v. Streng,* 116 Md. App. 301, 321-22, 695 A.2d 1287 (1997) (quoting *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 19, 110 S.Ct. 2695, 111 L. Ed. 2d 1 (1990)).

[78] AC ¶91 citing Article ¶55.

[79] AC ¶92.

The disputed statement in the Article describes the Undertaking as risky, but does not provide more specifics on the amount of risk. Mr. Henke asserts that the Article should have done so. Moreover the Article's comparison to Columbus gives the statement a "rhetorical hyperbole" tone. Mr. Henke has not proven that the statement is materially false.

Along similar lines, Mr. Henke alleges the falsity of a statement about his son's problems which were reported to be "partly the consequence, the teenager and his mother say, of an intermittently neglectful and overbearing father who demanded of his family the same ruthless hunt for monumental accomplishment."[80] Mr. Henke argues "[t]his is false. His aim was to spare his sons a 15 year period of destructive aimlessness he had experienced. He sought this by making them aware of the value of effort and promoting an active, broad lifestyle."[81]    While Mr. Henke rebuts the statement, he does not dispute that his wife and son expressed this opinion. He does not prove that the statement, as reported, is false.

      (i)    *Opinions*

Some statements, such as opinions, may not be provable as true or false, thereby presenting difficulties in a defamation analysis.[82] Maryland recognizes the fair comment privilege, which protects opinions or comments regarding matters of legitimate public interest, however, the exception is not without limits.[83] "Whether a particular publication comes within

---

[80] AC ¶63 citing Article ¶10.

[81] *Id.*

[82] *Kapiloff v. Dunn,* 27 Md. App. 514, 533, 343 A.2d 251, 264 (1975) ("An opinion is a comment on or an interpretation of fact. It is always related to the facts it purports to interpret. Depending on its conformity with sound critical standards, the opinion may be 'sound' or 'unsound,' 'good' or 'bad,' reasonable' or 'unreasonable,' but never true or false.").

[83] *Piscatelli,* 424 Md. at 315 (citing *A.S. Abell Co. v. Kirby,* 227 Md. 267, 272, 176 A.2d 340 (1961)). The *Kirby* Court explained:

        [A] newspaper like any member of the community may, without liability, honestly
        express a fair and reasonable opinion or comment on matters of legitimate public
        interest. The reason given is that such discussion is in the furtherance of an interest

the purview of [the fair comment] privilege 'often turns on whether or not it contains

misstatements of facts as distinguished from expression of opinion.'"[84]

> When the underlying facts used to form the opinion are not given along with the
> defamatory statement, the statement itself may be treated as being factual and
> therefore potentially defamatory. If the facts from which an individual forms a
> conclusion are given but are false, the defendant is potentially subject to liability
> for defamatory speech based on the false statement of facts. If the facts from which
> a defendant forms his or her opinion are given or are readily available and those
> facts cannot be proved false, the defendant is not subject to liability for the
> opinion.[85]

> In the *Milkovich* decision, the Supreme Court gave the following example:

> If a speaker says, "In my opinion John Jones is a liar," he implies a knowledge of
> facts which lead to the conclusion that Jones told an untruth. Even if the speaker
> states the facts upon which he bases his opinion, if those facts are either incorrect
> or incomplete, or if his assessment of them is erroneous, the statement may still
> imply a false assertion of fact. Simply couching such statements in terms of opinion
> does not dispel these implications; and the statement, "In my opinion Jones is a
> liar," can cause as much damage to reputation as the statement, "Jones is a liar." As
> Judge Friendly aptly stated: "[It] would be destructive of the law of libel if a writer
> could escape liability for accusations of [defamatory conduct] simply by using,
> explicitly or implicitly, the words 'I think.' " *See* [*Cianci v. New Times Publishing
> Co.,* 639 F.2d 54, 64 (2nd Cir. 1980)]. It is worthy of note that at common law, even
> the privilege of fair comment did not extend to "a false statement of fact, whether
> it was expressly stated or implied from an expression of opinion." Restatement
> (Second) of Torts, § 566, Comment *a* (1977).[86]

Mr. Henke argues that the theme of the Article - - that is, that he is a reckless eccentric

who willingly destroyed his family for scientific glory - - is false and defamatory.  He notes that

the Article's theme is reinforced with headings appearing in bold type and other statements,

including the following:

---

of social importance, and therefore it is held entitled to protection even at the
expense of uncompensated harm to the plaintiff's reputation.
*Piscatelli,* 424 Md. at 315 (quoting *Kirby,* 227 Md. at 272).

[84] *Id.*

[85] *Peroutka,* 116 Md. App. at 319-20 (citations omitted).

[86] *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 18-19, 110 S. Ct. 2695, 2705-06, 111 L. Ed. 2d 1 (1990)

In pursuit of geologic immortality, inventor Robert Henke has sacrificed everything: comfort, career, family.

Obsession comes at high cost.

[H]e is also, as a former boss says, a 'Captain Ahab of his generation,' willing to wreck everything – including his family – chasing a dream that has become an obsession.

It was his boss at Exxon, Jack Templeton, who likens him to Herman Melville's Captain Ahab because of his messianic pursuit of his invention.

[B]ut admits he is willing to hurt those he loves for a long shot at glory. Perhaps that is why Wanda Henke's summary of her husband is ultimately so uncharitable.

Further, the Amended Complaint alleges that the Article wrongly portrayed Mr. Henke as "insincere, greed-driven, inept, delusional, unproductive, unprofessional, and opportunistic."[87]

The context of the foregoing statements in the Article demonstrates that they reflect the author's opinion. The opinion is not provable as true or false, but whether it is defamatory depends on whether the facts provided in the Article to support the opinion are incorrect or incomplete.

Mr. Dechter provides many facts in the Article to support his opinion: Mr. Henke continues to work on his earthquake probe twenty years after losing his job at the University; he has no other source of income; he separated from his wife; they lost their home; he lived with his mother; he has no furniture. Mr. Henke does not dispute these facts. Mr. Dechter also provides undisputed facts that support the Article's opinion of Mr. Henke's motivation. Mr. Henke admitted that, although paid employment "would give my family relief . . . in the longer term it would deprive them of something we've all sacrificed for."[88]  He remains committed to working

---

[87] AC ¶70.  I disagree that the Article portrays Mr. Henke as fitting all of these characteristics, but if the inference arises from the statements, then that inference is an opinion based upon all of the facts contained in the Article.
[88] Article ¶29.

on his invention, even though he admits: "The human cost has been too high. It hasn't been worth it."[89]

In his Amended Complaint, Mr. Henke notes other facts that might lead to a different opinion: he focused on the soil probe because his family faced difficult financial circumstances after he left the University; he and his wife had made significant personal investments in the probe; test results were promising; he is "narrowly gifted" in math and wanted to work on research that would help people, he wishes to return to working at a university where he can continue his research, and, mostly, his setbacks stem from a campaign against him by the Sun, the University, and others. The Article, however, also presents these facts.[90] In short, the Article lays out many facts about Mr. Henke's life and pursuit that he does not dispute. That Mr. Dechter forms one opinion on the basis of these facts, while Mr. Henke forms another, does not constitute defamation.

In *Agora, Inc. v. Axxess, Inc.*, the district court granted a motion to dismiss a defamation claim upon concluding that a website's rating of the plaintiff's financial newsletter was opinion.[91]    The *Agora* Court noted the "well established principle that an opinion based on fully disclosed facts is not subject to defamation actions" and determined that the website disclosed all facts underlying its rating, including a link to the plaintiff's own website.[92] Mr. Henke argues that the Article omits important facts but, for the reasons set forth below, I do not agree that the facts are incomplete. Upon review of the Article and Mr. Henke's criticism, I conclude that there is no factual error, but rather an opinion, based on disclosed facts, and that Mr. Henke disagrees with that opinion.

---

[89] Article ¶ 6.
[90] Article ¶¶ 60, 63, 9, 77, 104, 24, 122-123.
[91] *Agora*, 90 F. Supp. 2d at 705-06.
[92] *Id.* at 706 n.5.

(ii)     *Falsity by omission*

For the most part, Mr. Henke argues that statements in the Article are defamatory because

the Sun omitted important and necessary facts. Although individual sentences may not be

objectionable, words cannot be read in isolation.[93] "To determine whether a publication is

defamatory . . . the publication must be read as a whole: '[W]ords have different meanings

depending on the context in which they are used and a meaning not warranted by the whole

publication should not be imputed.'"[94]  Moreover, even though individual statements are true, a

plaintiff can prove them defamatory by showing that the meaning or inference drawn from the

true statements is false because the defendant intentionally omitted an essential fact:

> The proper question is whether the [m]eaning reasonably conveyed by the
> published words is defamatory, whether the libel as published would have a
> different effect on the mind of the reader from that which the pleaded truth would
> have produced.  It is no defense whatever that individual statements within the
> article were literally true. Truth is available as an absolute defense only when the
> defamatory meaning conveyed by the words is true.[95]

For example, in the Tennessee case *Memphis Publishing Company v. Nichols*, a

newspaper article reported that a woman was treated for a bullet wound after being shot by

another woman whose husband was at the victim's house.  While the reported facts were true,

the article omitted the fact that several other people were also present at the time of the shooting,

including the victim's husband. The court found that the article implied that the victim was

having an adulterous relationship with the shooter's husband. The *Memphis* Court concluded that

---

[93] *Shapiro*, 105 Md. App. at 776.  In *Shapiro*, the trial court reviewed a letter sentence by sentence and
found the individual sentences harmless, but the appellate court determined that the meaning implied by
reading the letter as a whole conveyed false information about the plaintiff.
[94] *Piscatelli*, 424 Md. at 306 (quoting *Chesapeake Publ'g Corp. v. Williams*, 339 Md. 285, 295, 661 A.2d
1169, 1174 (1995)).
[95] *Memphis Pub. Co. v. Nichols*, 569 S.W.2d 412, 420 (Tenn. 1978) (citations and internal quotation
marks omitted).

"[t]he publication of the complete facts could not conceivably have led the reader to conclude that [the victim] and [the shooter's husband] had an adulterous relationship. The published statement, therefore, so distorted the truth as to make the entire article false and defamatory."[96]

Mr. Henke alleges that the Article omits several important facts and that "the omissions may be seen as equivalent to falsity in defamation; they represent the withholding of truths that contradict false and harmful statements or impressions and so give them strength they would not otherwise have."[97] In the Amended Complaint, Mr. Henke refers to Counts 2 and 3 as "False Defamation through Material Concealments," in which he argues that the Article purposefully omitted facts regarding his tenure at the University, and facts about the retaliation against him and his family that sabotaged his work.

In particular, Mr. Henke claims that the Article failed to mention the "academic controversies" that arose when he accused three students of plagiarism, and his opposition to grade inflation and "insincere career development" at the University. He claims that the University feared harm to enrollment would result from his position on these issues, which, he argues, was the origin of the efforts to retaliate against him and the basis for his dismissal.[98] He notes that the Article falsely reports that he lost his job at the University for ignoring a "publish or perish" warning,[99] concealing the fact that he was officially dismissed for inadequate success in attracting research funds.[100] He claims the University colluded with the NSF to manipulate grant competitions to prevent him from obtaining funds and thereby providing a basis for his dismissal.

---

[96] *Id.*

[97] AC ¶ 23.

[98] AC, ¶¶ 38 - 39.

[99] Article, ¶¶ 43 - 45.

[100] AC, ¶39.

Mr. Henke further argues that the Article fails to investigate his claims of retaliation and misconduct. He alleges that "[t]he Sun largely and actively concealed the possibility plaintiff and Ms. Henke had been victims of a broad, calculated, and enduring retaliatory assault on their ability to succeed professionally and so, in effect, falsely defamed plaintiff . . ."[101] For example, Mr. Henke alleges that the Article omitted the following facts:

> [A]bruptly, during plaintiff's University tenure (1986/1987), [Mr. and Ms. Henke] began facing a string of specific irregularities in grant competitions. Their good fortune had reversed, but without any apparent grounds. For example, through 1986/87, 3 or 4 of their NSF proposals had been funded; their relationship with NSF seemed strong; and their proposals were reviewed favorably. Thereafter, though, only 2 of 15 of their proposals were funded. And those two, plaintiff believes, were funded only through intervention of NSF's then Inspector General. Plus their relationship with NSF had soured and reviews had become hostile. [102]

> The Sun . . . actively concealed material facts that suggest that retaliation had spread beyond grant competitions to the sabotage of professional relationships.[103]

> The Sun omitted the possibilities of theft from various of plaintiff's and Ms. Henke's grant proposals and insincere oversight.[104]

> The Sun actively concealed the matter of the past Sun articles which moved plaintiff to approach The Sun during 2006 . . . . Those articles suggest, among other things, that The Sun may have interfered with plaintiff's and Ms. Henke's progress on the technology, possibly pivotally.[105]

The issue here is whether omitting this information so distorts the truth that the Article becomes false and defamatory. Mr. Henke's argument fails for two reasons. First, most of the information that Mr. Henke claims has been omitted is not really factual, but theories or inferences that Mr. Henke claims arise from stated facts. However, Mr. Henke often provided no proof for his theories, which was an issue for the Sun:

---

[101] AC ¶ 44.
[102] AC ¶ 46.
[103] AC ¶ 49.
[104] AC ¶ 51.
[105] AC ¶ 53.

Mr. Dechter expressed concern plaintiff didn't have proof of his beliefs. He said, according to plaintiff's diary, '[The] Sun needed to be certain of matters.' During the interview, plaintiff said if he had proof he wouldn't have needed The Sun. And, seeing the loss of the value of the article, he recalls having said maybe the article should be abandoned. Mr. Dechter opposed the idea.[106]

Thus, any omission of inferences or theories by the Sun was more likely the result of prudent journalism than negligence leading to defamation by omission.

Second, most of the information was *not* omitted from the Article, which mentions the facts (or the gist of those facts), together with Mr. Henke's theories, including the following:

More troubling, federal grant dollars that had flowed in regularly during his first three years at Homewood suddenly slowed to a trickle. . . . Convinced that grant-application rejections were linked to personal animus within his department, Henke began filing formal objections with the National Science Foundation - an impolitic move that would foreshadow later lawsuits against the federal hand that feeds the nation's scientific research.[107]

By 1994, Robert and Wanda were convinced that their difficulty in winning grants was not because they had bitten off more science than any two people could chew - but because the fruits of their labor were being poisoned by rivals. That year, they sued the National Science Foundation and the National Institute of Standards and Technology.[108]

The Henkes believed that competing scholars sitting on private peer-review panels were giving low marks to applications, but they needed to know the names of their reviewers to prove it. The lawsuit threatened the secret peer review process - a pillar of modern science - and developments were covered in Science magazine, The Sun and The Chronicle of Higher Education.[109]

But [Mr. Henke] has taken to sending darkly worded and lengthy missives to various politicians and to Johns Hopkins officials, demanding the university

---

[106] AC ¶105.

[107] Article, ¶¶46 - 47. Mr. Henke also argues that this paragraph of the Article is untrue because it indicates that he began questioning NSF officials while still at the University and may have provoked NSF. He argues that he did not realize his proposals may have been targeted until 1990 - - after he left the University. Mr. Henke's argument here is not that facts were omitted, but that that the facts as reported are false. However, Mr. Henke argues that he was, in fact, targeted while at the University, although he was not aware of it until he left. Even assuming that the facts are wrong in this paragraph, I conclude that it is not defamatory because it is a minor inaccuracy that does not materially change the overall tone and meaning of the Article.

[108] Article ¶64.

[109] Article ¶65

investigate and acknowledge its responsibility for his downfall. 'No one has this much bad luck,' Henke says. The university has declined to investigate his claims.[110]

For these reasons, I conclude that Mr. Henke has not proved that the Sun actively or knowingly concealed facts to defame him, as alleged in Counts 2 and 3. Most of the claimed omissions are theories rather than facts. Further, much of the gist of the information claimed to be missing is included in the Article. None of the omissions claimed by Mr. Henke would have changed the import or meaning of the Article had they been included.

The final defamation counts (Counts 7 to 11) claim that the Article defamed Mr. Henke by "giving the false impression [that] the undertaking was doomed [and] the downfall was self-inflicted."[111] The Counts allege that the Article falsely describes the technology as "unpromising" and "risky," and that the development of the Technology was "unprofessional," "basement technology," that was rejected by the Japanese institute that was collaborating with the Henkes.

Mr. Henke argues that the Article failed to include specific information about the laboratory prototype testing system that was developed over six years at the University (which began in 1984, not 1989), and about the new and substantial field prototype system that was built and tested, with support from the Federal Highway Administration, after Mr. Henke left the University.[112] He argues that Article falsely describes his work post-University as "unprofessional" "basement development" without mentioning a series of three articles, published in the "foremost international peer-reviewed journal on earthquake matters" during this time, which discussed the promise of the Technology and attracted interest of the Japanese

---

[110] Article ¶¶ 122-123.
[111] AC ¶70.
[112] AC ¶75 - 76.

Geo-research Institute of Osaka, Japan.[113]  Instead, the Article includes quotes from an expert ("Striking out on one's own, as Henke did, without the backing of a major institution . . . is the dumbest thing you could do")[114] without providing Henke with an ability to challenge this statement.

The Article also focuses on the human cost of Mr. Henke's efforts to develop the Technology and does not give as much specific information about the probe as Mr. Henke would have liked.   The Article describes that the idea for the device was conceived while Mr. Henke worked at Houston's Exxon Production Research Corporation, continued while he was teaching at the University and after he left the University.   When describing his work post-University, the Article states:

> Henke compares his entrepreneurial drive to those of Apple Computer founders Steve Jobs and Steve Wozniak, who started their company in a Silicon Valley home.   But an in situ soil test, requiring millions of dollars of research and development, is not the sort of invention readily suited to basement development.[115]

> "You don't have enough money for the long haul," Stokoe says.  "Technology like this takes several decades to be accepted.   This is not simple stuff."[116]

I disagree that the Article's omission of the detailed information cited by Mr. Henke necessarily translates into an impression that the Technology is unprofessional or unpromising. It describes that hardship of developing such Technology on one's own.   The Article also states:

> When they had the money to conduct site tests, the results were promising. Whenever they were so beaten down that going on seemed pointless, another small grant would trickle in - proof that other people believed too.[117]

---

[113] AC ¶77, ¶¶ 82 - 83,
[114] Article ¶41.
[115] Article ¶39.
[116] Article ¶40.
[117] Article ¶77.

As a whole, the Article presents a balanced discussion about the upside and downside of Mr.

Henke's efforts to develop the Technology.  Mr. Henke points out that the Article falsely states

that the Japanese institute "decided against using the probe."[118]  The Amended Complaint alleges

that he and Ms. Henke decided to suspend the collaboration with the Japanese institute.[119]

However, the record before me is devoid of evidence that the Article's statement is false.  For all

of the foregoing reasons, I cannot conclude that the Article falsely omitted facts, creating a false

impression about the Technology.

(d)    *Fourth element: damages*

For the reasons set forth above, I have concluded that Mr. Henke has not proven that the

statements in the Article were false and defamatory.  However, even assuming Mr. Henke was

able to prove that some statements in the Article were false or that the Sun omitted material facts,

Mr. Henke's ability to recover damages depends upon whether the Sun acted with actual malice

or negligence in defaming him.  As discussed in the prior section on the third element of

defamation (i.e., fault), I have concluded that Mr. Henke did not prove by clear and convincing

evidence that the Sun acted with actual malice.

Having failed to prove actual malice, Mr. Henke must then prove, by a preponderance of

the evidence, that the Sun negligently published defamatory statements. If he is able to prove that

the Sun acted negligently, Mr. Henke may then recover damages for harm that were naturally

and proximately caused by the Article.  The Amended Complaint alleges that Mr. Henke

suffered damages in the amount of $100 million from the publication of the Article based on the

following:

- "Harm to reputation."  To support this claim, Mr. Henke cites to a reader's letter about the Article, published by the Sun on October 9, 2007, which stated: "I was

---

[118] Article ¶111.
[119] AC ¶89.

sad after reading the story of Robert Henke and his soil probe ('A modern-day Ahab,' Oct. 7). Here's a gifted man whose brilliance is overshadowed by his selfishness. It's too bad that Mr. Henke's legacy will be a shattered, dysfunctional family."[120]

- "Denied Justice and Redress." Mr. Henke argues that the defamatory statements in the Article prevent him from finding anyone willing to investigate the official and professional misconduct that he alleges has been carried out against him.[121]

- "Denied Professional Prospects." Mr. Henke alleges that "[a]t the time of the publication of the article, plaintiff had attracted sincere interest from the Nuclear Regulatory Commission (NRC) . . . [p]lus he had just been invited to review a manuscript for what he believes to be the foremost journal on earthquake matters. . . . He was not offered the NRC post and he never again heard from the author or the journal." [122]  "[H]is thesis advisor, his closest tie to his profession, has stopped sending him Christmas cards."[123]

- "Deteriorating Financial State."[124]

- "Compromised Social Standing."  He says that "he could never again live comfortably in the state of Maryland, where he had hoped to return."[125]

- "Distraction."  Mr. Henke notes:  "The article and its aftermath have distracted plaintiff greatly from his family and other matters." [126]

- "Emotional Distress." [127]

"Under Maryland law, '[i]t is the general rule that one may recover only those damages that are affirmatively proved with reasonable certainty to have resulted as the natural, proximate and direct effect of the injury.'"[128] The damages claimed by Mr. Henke were not the proximate result of the Article, but were present entirely or largely before publication of the Article.  In the

---

[120] AC ¶126.
[121] AC ¶128.
[122] AC ¶129.
[123] AC ¶130.
[124] AC ¶131.
[125] AC ¶ 132.
[126] AC ¶ 133.
[127] AC ¶ 134.
[128] *SG Homes Assoc., L.P. v. Marinucci,* 718 F.3d 327, 336 (2013) (quoting *Empire Realty Co. v. Fleisher,* 269 Md. 278, 305 A.2d 144, 147 (1973).

Amended Complaint, Mr. Henke asserts that, by the time he approached the Sun in 2006, he, his family and his firm *had already suffered* multiple harms as a direct or indirect result of the alleged misconduct, including:

- "the family's ability to function as a family had been disrupted;"

- "the family had lost its home;"

- "plaintiff's younger son had experienced serious juvenile difficulties and faced the possibility of a prison term;"

- "his older son experienced serious difficulties and plaintiff and Ms. Henke had not been able to provide him the help a family normally could;"

- "the firm's progress with the technology, which had shown great promise for contributing significantly to public safety, had been brought to a standstill;"

- "plaintiff and Ms. Henke had suffered huge firm-related financial losses including their personal investment (roughly $1M) and patent-related losses;"

- "they had been driven from their profession;"

- "plaintiff had been blacklisted, it seems, and unable to secure positions for which he believes he had been strongly qualified;"

- "he had no income or security;"

- "Ms. Henke had lost her first teaching position and was in fear of losing her second;"

- "plaintiff's and Ms. Henke's financial and social standings had been blackened greatly;"

- "Ms. Henke and his younger son had been subjected to immense legal indignities;" and

- "plaintiff and his family had endured mental anguish, loss of health, and strained family relationships."[129]

---

[129] AC ¶9.

The Amended Complaint also notes that "[t]he NRC [Nuclear Regulatory Commission] is the only organization that had interviewed [Mr. Henke] formally during his multi-year position search."[130]  The Article also notes that three months after the interview (and before publication), Mr. Henke had not been contacted about the NRC job.[131]

In his Amended Complaint, Mr. Henke even acknowledges that the harms occurred prior to the Article's publication, but he argues that the Article intensified those harms, although he has not provided any credible, reliable evidence to support this.  The impetus of Mr. Henke's defamation claims, however, is that the Article denied him, his family, and his firm, justice and redress for official misconduct allegedly perpetrated by the Sun, the University and others over the two decades prior to publication of the Article.  At the hearing, he testified, in part:

> [A]t the time I approached the Sun . . . I was aggressively seeking investigation of my circumstances . . . because I felt that my family had been brought to a state of ruin by two decades of misconduct, and I felt an investigation would bring that out and I would get redress for those harms and would be able to restore well-being to my family.  And . . . one of the harms of the article, I believe, is that it completely disabled my ability to attract interest in such an investigation, because (1) . . . it defamed me fatally; and (2) it concealed cause for misconduct, both of which would discourage investigation.[132]

Denial of a potential investigation is far too speculative to meet the damages element of Mr. Henke's defamation claims, even assuming that he was able to prove that statements in the Article were defamatory.  He has not proven that the Article directly or proximately prevented a future investigation of his allegations about misconduct.

Accordingly, I conclude that Mr. Henke has failed to prove the elements of defamation claim based on the Article.  Even assuming he could prove the falsity of any statements in the

---

[130] AC ¶ 118.
[131] Article ¶148.
[132] Tr. pp. 83 - 84.

Article, Mr. Henke has not provided evidence of damages that were the natural, proximate and direct result of the Article's publication. Mr. Henke's defamation claims are disallowed.[133]

3.     **Fraud**

In addition to the defamation claims, Counts 12 through 15 of the Amended Complaint asserts claims for "deceitful misrepresentations." Under Maryland law, "[i]n order to recover damages in an action for fraud or deceit, a plaintiff must prove: (1) that the defendant made a false representation to the plaintiff, (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff, (4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation."[134] Each element must be proved by clear and convincing evidence, not merely a preponderance of the evidence.[135]

---

[133] Although he does not list it as a separate count, Mr. Henke asserts a claim for invasion of privacy in the Amended Complaint, writing:

> In a sign that *The Sun* intended to discredit plaintiff with the article, after deceitfully gaining his and his family's cooperation toward the article . . . , *The Sun* invaded the privacy of the family, which was unguarded because of the standing of *The Sun*. *The Sun* engaged in discussion with at least one family member over deeply personal and private matters. And it did so knowing the family was vulnerable, in a state of ruin with frightening prospects.

AC ¶116. Maryland recognizes four types of invasion of privacy claims: (a) unreasonable intrusion upon the seclusion of another, (b) appropriation of the other's name or likeness, (c) unreasonable publicity given to the other's private life, and (d) publicity which unreasonably places the other in a false light before the public. *Household Fin. Corp. v. Bridge*, 252 Md. 531, 537-38, 250 A.2d 878 (1969). Mr. Henke's claim appears to fall under either (c) or (d).

"Regardless of whether a declaration is styled as a defamation action or an invasion of privacy action, the same considerations and legal standards apply." *Phillips v. Washington Magazine, Inc.*, 58 Md. App. 30, 36, n.1, 472 A.2d 98 (1984). *See also Piscatelli*, 424 Md. at 306 ("An allegation of false light must meet the same legal standards as an allegation of defamation. We shall conclude ultimately that Respondents did not defame Piscatelli . . . rendering superfluous a separate analysis of his false light claim."). Therefore, the discussion regarding the defamation claims applies equally to any invasion of privacy claim by Mr. Henke.

[134] *Lasater v. Guttmann*, 194 Md. App. 431, 470, 5 A.3d 79 (2010) (quoting *Nails v. S & R, Inc.*, 334 Md. 398, 415, 639 A.2d 660 (1994)).

[135] *Gourdine v. Crews*, 405 Md. 722, 758-59 (2008) (citing *Md. Envtl. Trust v. Gaynor*, 370 Md. 89, 97, 803 A.2d 512 (2002)).

Count 12 contends that Mr. Dechter misrepresented his true intent in writing the article. Mr. Henke alleges that Mr. Dechter's misrepresentations convinced him that the Sun "intended to publish a sincere account of the [U]ndertaking with, perhaps, shallow coverage of human matters."[136] In the Amended Complaint, Mr. Henke also writes:

> [O]n January 3, 2007, in part according to plaintiff's diary and, in part, as he recalls, Mr. Dechter said he sought to write an article [that would] bring[] out something new and useful [about] the troubles that can be faced . . ., an article that would also bring out a 'human side.' To verify his expectations, plaintiff queried he would expect the article to be consistent with Sun reporter Douglas Birch's article about plaintiff's and Ms. Henke's lawsuits against NSF and NIST. Essentially, Mr. Dechter said it would be . . . . That article covered the lawsuits, not human, let alone personal and private matters. [137]

Mr. Henke asserts that Mr. Dechter's true, but undisclosed, purpose in writing the Article was to discredit Mr. Henke while concealing the Sun's own official and professional misconduct, as well as that of the University and others.[138] "Had The Sun been forthright in any one of the matters, clearly he and his family would not have cooperated with The Sun; likely, the article would not have come into being."[139]

Count 13 of the Amended Complaint concerns Mr. Dechter's statements that the Sun did not need proof of Mr. Henke's concerns to write the Article; but then, abruptly, the Sun reversed course and "grew a need for such proof."[140]  After four months of research, Mr. Dechter expressed a concern that Mr. Henke did not have proof of his belief that he, his family, and his firm were being targeted by a campaign to bring about their downfall.  Mr. Henke argues that the change of position indicates that the Sun had the undisclosed intent to discredit him from the start.

---

[136] AC ¶98.
[137] AC ¶ 99.
[138] AC ¶ 98.
[139] AC ¶ 97.
[140] AC ¶103.

The essence of Counts 12 and 13 is that Mr. Henke and his family cooperated with Mr. Dechter's research in connection with the Article based on misrepresentations, which hid the true motive of Mr. Dechter and the Sun to publish the Article to discredit Mr. Henke and continue the campaign of misconduct against Mr. Henke and his family.  However, the record before me fails to provide sufficient evidence to prove, by clear and convincing evidence, that Mr. Dechter and the Sun published the Article to further this hidden agenda or that a hidden agenda actually existed.

Mr. Henke's other fraud claims (Counts 14 and 15) concern Mr. Dechter's alleged promises not to publicize two private matters: (1) his wife's extramarital affair that caused Mr. Henke to leave the Air Force, and (2) his younger son's court hearing.  The Amended Complaint contains the following specific allegations regarding these claims:

> Mr. Dechter said nothing [when Mr. Henke said he wanted his wife's affair to remain private]. Because of the standing of The Sun, plaintiff quite naturally saw this response as consent to honor his privacy. He restated his need twice, as a constraint in a release statement, in an attachment to a February 16, 2007 email to Mr. Dechter. (Mr. Dechter had specifically requested a release statement from plaintiff.) Again, Mr. Dechter said nothing. . . . In her May 2, 2007 interview with Mr. Dechter, Ms. Henke told him why plaintiff left the Air Force. During a May 4, 2007 interview, Mr. Dechter told him of that. [Mr. Henke] responded with disbelief; his diary shows he replied, 'your [you're] not going to write about that[,] are you. [?]' Mr. Dechter said he would.[141]

> [I]n a February 10, 2007 conversation, Mr. Dechter, apparently in recognition of plaintiff's and Ms. Henke's concern over Kevin's well-being, volunteered to Ms. Henke, quite sincerely, that The Sun would never exploit a juvenile. . . . On April 20, 2007, plaintiff's records show, Mr. Dechter did so again, in relation to his attending a May 3, 2007 court hearing for Kevin and, on May 1, 2007, he told plaintiff he wished to attend the hearing, not to write about it directly but because it relates to the story. Plaintiff agreed to his attendance. Mr. Dechter, though, wrote about the hearing and in an especially hurtful manner.[142]

---

[141] AC ¶ 109.
[142] AC ¶ 112.

On its face, Mr. Henke has sufficiently alleged fraud claims in Counts 14 and 15.  Mr. Henke's burden, however, is to prove the elements of fraud by clear and convincing evidence, and this he has not done regarding Mr. Dechter's representation that he would not write about Ms. Henke's affair or Mr. Henke's son's court appearance.  Mr. Henke has provided no evidence, apart from his own testimony, to support his claim that Mr. Dechter promised not to write about these matters.  Moreover, Mr. Henke must provide evidence that Mr. Dechter made his misrepresentation for the purpose of defrauding the Henkes.

Mr. Henke has failed to prove that he suffered compensable injury from the misrepresentations.  "[T]he plaintiff must show not only that he would not have performed the act from which the injury resulted but for the misrepresentation, but also that the fact misrepresented was the proximate cause of the injury."[143]  Mr. Henke has provided no clear and convincing proof that, but for the Sun's and Mr. Dechter's alleged acts of fraud and concealment, the Article would not have been published, and thus he would not have suffered his alleged injuries. Even after Mr. Dechter informed him during an in-person interview on May 4, 2007, that Mr. Dechter planned to write about Ms. Henke's extramarital affair,[144] Mr. Henke continued to cooperate with the Article, allowing the Sun's photographer to visit him and his family on July 24, 2007.[145] Thus, it is not clear that, but for Mr. Dechter's alleged misrepresentations and concealments, Mr. Henke would have abandoned the Article.  Furthermore, Mr. Henke's own summation of the setbacks he, his family, and his firm had suffered even before publication of the Article strongly suggest that Mr. Henke's injuries were not the result of the Article's publication, but would be

---

[143] *Diener Enterprises, Inc. v. Miller*, 35 Md. App. 410, 412-13, 371 A.2d 439 (1977).
[144] AC ¶ 109.
[145] AC ¶ 14.

the same whether or not the Article was published. There is nothing in the record before me to support a claim for damages arising from the alleged fraud by Mr. Dechter.

4.    **Fraudulent Concealment**

Count 16 - - entitled "Silent Misrepresentation of The Sun's Neutrality" - - alleges that Mr. Dechter failed to disclose that he had ties to the University, which made it difficult for him to report neutrally on Mr. Henke's concerns. The Count alleges that Mr. Dechter earned a degree from the University and taught at the University.

To recover damages in an action for the tort of fraudulent concealment – also called concealment, deceit or non-disclosure – a plaintiff must prove: "(1) the defendant owed a duty to the plaintiff to disclose a material fact; (2) the defendant failed to disclose that fact; (3) the defendant intended to defraud or deceive the plaintiff; (4) the plaintiff took action in justifiable reliance on the concealment; and (5) the plaintiff suffered damages as a result of the defendant's concealment."[146]

Mr. Henke has presented no evidence that (1) the Sun owed him a duty of disclosure, (2) that the Sun or Mr. Dechter failed to disclose their true intent (Mr. Henke has not proven that their true intent was to discredit him), or (3) that the Sun or Mr. Dechter intended to deceive him. Mr. Henke offers only the thinnest evidence to meet element 4 of his fraudulent concealment claim - - his justifiable reliance on the alleged concealment: "it would seem irregular . . . for an essentially private figure to consider that a reputable newspaper sought to discredit him and to

---

[146] *Rhee v. Highland Dev. Corp.*, 182 Md. App. 516, 524, 958 A.2d 385 (2008) (quoting *Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 138, 916 A.2d 257 (2007)).

conceal the possibility of wrongdoing . . . ."[147]  Therefore, Mr. Henke's fraudulent concealment claim fails.[148]

### Conclusion

The Debtors provided sufficient evidence to rebut the *prima facie* validity of Mr. Henke's Claim.  The burden then shifts to Mr. Henke to prove his Claim and, for the reasons set forth above, he has not done so.  Accordingly, the Claim Objection will be sustained, and claim numbers 3697 and 7106 will be disallowed and expunged in their entirety.

An appropriate Order will be entered.

BY THE COURT:

_____
KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT

DATED:  May 25, 2016

---

[147] AC ¶ 102.

[148] Read broadly, Mr. Henke's Amended Complaint also asserts a claim of conspiracy, stating that the Sun's "defamation . . . may have been the product of collusion."  (AC ¶124 (b) and (c)).  In Maryland, a claim for civil conspiracy requires proof of the following elements: "1) [a] confederation of two or more persons by agreement or understanding; 2) some unlawful or tortious act done in furtherance of the conspiracy or use of unlawful or tortious means to accomplish an act not in itself illegal; and 3) [a]ctual legal damage resulting to the plaintiff." *Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 154-55, 916 A.2d 257, 284 (2007).  For all the reasons stated above, Mr. Henke has not proven a claim of conspiracy.