IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| TRIBUNE MEDIA COMPANY, *et al.*, | ) | Bankruptcy Case No. 08-13141 (KJC) |
| | ) | |
| Reorganized Debtors. | ) | |
| | ) | |
| KEITH YOUNGE, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | C.A. No. 16-226 (GMS) |
| | ) | |
| TRIBUNE MEDIA COMPANY, | ) | |
| | ) | |
| Appellee. | ) | |

## MEMORANDUM

### I. INTRODUCTION

Presently before the court is the appeal (D.I. 1) of Keith Younge ("Younge" or "Appellant") from the March 18, 2016 Order and Memorandum Opinion (collectively, the "Order") of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). For the reasons that follow, the court will affirm the Bankruptcy Court's Order sustaining the Reorganized Debtors' ("the Debtors") Objection to Claim No. 3333.

### II. BACKGROUND

The core of Younge's claim is that, due to an altercation with a coworker at WPHL-TV (the "Station"), he was subjected to a hostile work environment and unlawfully terminated because of his race. Younge was hired to work at the Station—a television station in Philadelphia, Pennsylvania, that was owned by Tribune Television Company—on a 30-day probationary period.

(Bankr. D.I. 13755 at 3). The Station hires a part-time summer relief technician to cover other technician's summer vacation schedules between Memorial Day and Labor Day. *Id.* at 20. Younge was attending training for the summer relief technician position three to four days per week. *Id.* On May 7, 2008, Younge was assigned to train with Rick Schultz from 10:00pm to 6:00am. *Id.*

Rick Schultz was an Engineering Technician, hired by the Station on June 7, 1972. *Id.* at 57. According to Tribune Company's Senior Labor Counsel, Kathleen McCabe, the technicians are union organized—represented by the International Brotherhood of Electrical Workers, Local Number 98. *Id.* at 20. While Schultz's performance reviews described him as "somewhat volatile and free," they also mentioned his positive attributes: He "work[ed] well with others" and easily formed relationships with co-workers. *Id.* at 55–56. Schultz's personnel file indicated, however, that he had been in two prior altercations with co-workers. *Id.* at 60.

On September 28, 2002, Schultz and Bill Groves got in an argument at work over union dues. *Id.* at 62. Shultz alleged that Groves threatened him during the argument. The Human Resources Department investigation of the incident could not corroborate Schultz claim's that Groves threatened him, but it did find that both parties used profane language during the altercation. *Id.* As a result, Schultz received a letter from the director of engineering at the Station warning him that his behavior violated the company's "Zero Tolerance Policy" and any further behavior of that kind could result in termination. *Id.* at 60.

On June 29, 1993, Schultz got in an argument with a security guard at the Station, George Sample. *Id.* at 58. On the night of June 29th, Schultz accidentally tripped a door alarm. *Id.* Sample was angry that Schultz activated the alarm and an altercation ensued. *Id.* From Schultz's letter in his personnel file, it appears that Sample accused Schultz of making a racist comment. *Id.* Schultz

2

vehemently denied any racial animus, stating that "color has nothing to with improper behavior." *Id.* at 59. The letter regarding the 1993 incident was the only mention of discriminatory behavior in Schultz's personnel file before the altercation with Younge.

The night of Younge's training with Schultz, the two got into an argument. Before Younge's training started, technician Steve Leff, told Younge that "Schultz has a problem." *Id.* When Younge asked if it the problem was with him, Leff replied: "No, he just has a problem." *Id.* At around 10:50pm, Schultz walked into the training room and said to Younge, "Hey, Spike, you want to get this off the table?" *Id.* Younge reported that Schultz was referring to Younge's briefcase on the table. *Id.* Younge, assuming that Schultz did not know his name, introduced himself to Schultz. *Id.* Schultz responded, "As far as [I] am concern[ed] you are Spike Lee." *Id.* Younge reported that Schultz made a number of other discriminatory and insulting comments to him and the situation escalated to a lot of yelling by both parties. *Id.* 3–4. Younge also admitted that some profanity was used. *Id.* at 37. Eventually, someone called a security officer and the situation diffused. *Id.* at 4.

The next day, Younge called his supervisor, the Engineering Manager, and the Human Resources Department to report the incident. *Id.* at 4. According to Younge, he was told: "You should have never had to deal with that; we have had problems with Schultz before." *Id.* On May 8, 2008, Vincent Giannini, the Vice President and General Manager of the Station, learned about the incident between Schultz and Younge. (Bankr. D.I. 13715-3 at 4). Giannini spoke with the Human Resources Coordinator about the results of her investigation into the incident and he reviewed the video surveillance footage from the camera located outside of the training room where the altercation occurred. *Id.* Giannini decided that both men should be discharged. *Id.* at 6. On May 15, 2008, the Station sent letters to Younge and Schultz informing them of their

3

## III.    JURISDICTION AND STANDARD OF REVIEW

The court has appellate jurisdiction to hear all final orders and judgments from the Bankruptcy Court pursuant to 28 U.S.C. § 158(a)(1). In reviewing a case on appeal, this court reviews a Bankruptcy Court's findings of fact for clear error and its conclusions of law *de novo*. *Am. Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76, 80 (3d Cir. 1999). Mixed questions of law and fact are subject to a "mixed standard of review." *Mellon Bank, N.A. v. Metro Comm., Inc.*, 945 F.2d 635, 641–42 (3d Cir. 1991). Under this "mixed standard of review," the appellate court accepts findings of "historical or narrative facts unless clearly erroneous, but exercise[s] plenary review of the trial court's choice and interpretation of legal precepts and its application of those precepts to historical facts." *Id.* at 642 (citation omitted).

## IV.    DISCUSSION

Younge disputes the Bankruptcy Court's jurisdiction over his claims, the procedural rules it applied to his claims, and its decision on the merits of his claims. After careful review of the record on appeal, the parties' arguments, the Bankruptcy Court's order, and the applicable law, the court has distilled the core questions it must answer: Did Younge waive his objection to the bankruptcy court's authority to enter final judgment on his proof of claim and the objection to it? If he did, therefore making the claim and the objection to it a core proceeding—as the Bankruptcy Court found—was this the type of core proceeding where the Bankruptcy Court had the statutory authority to finally adjudicate the claim, it lacked the constitutional power to do so? And if it was a core proceeding where the Bankruptcy Court could constitutionally enter final judgment, was it correct in sustaining the Debtors' objection to Younge's claim? At the expense of suspense, the court answers those questions as follows: yes, no, and yes.

5

termination. (Bankr. D.I. 13755 at 66–67). The letters stated that they were terminated for violating the Station's Code of Conduct and Anti-Harassment policies. *Id.*; *see id.* at 28–29, 30 (Anti-Harassment and Standards of Conduct and Corrective Action policies).

On June 9, 2008, Younge filed a complaint with the Philadelphia Commission on Human Relations ("PCHR"). *Id.* at 1. Younge's complaint was also forwarded to the Philadelphia District Office of the U.S. Equal Employment Opportunity Commission ("EEOC"). *Id.* at 8. The EEOC sent Younge a letter stating that they would refrain from processing the charge until the PCHR completed its investigation into the issue. (Bankr. D.I. 13755 at 8).

On December 8, 2008, Tribune Company and certain of its affiliates (the "Debtors"), filed Chapter 11 bankruptcy petitions in the United States Bankruptcy Court for the District of Delaware. (Bankr. D.I. 1). On June 1, 2009, Younge filed his proof of claim for $75,000. (Bankr. D.I. 13755 at 70–71). Thereafter, the Bankruptcy Court entered the Order confirming the Fourth Amended Joint Plan of Reorganization for Tribune Company and its Subsidiaries. (Bankr. D.I. 12074). The Plan became effective on December 31, 2012. (Bankr. D.I. 12939). On September 6, 2013, the Debtors filed an objection to Younge's Proof of Claim. (Bankr. D.I. 13715). Younge filed a response and the Debtors filed a reply. (Bankr. D.I. 13755). After a hearing, (Bankr. D.I. 20-1), the Bankruptcy Court allowed Younge to file a Supplemental Response, which he did on August 21, 2014. (Bankr. D.I. 13951). The Debtors then filed another reply on September 5, 2014. (Bankr. D.I. 13963). At the end of the hearing, the Bankruptcy Court indicated that it might decide Younge's claim as a matter of law. (Bankr. D.I. 20-1). After receiving Younge's Supplemental Response and the Debtors' reply to it, the Bankruptcy Court issued an order on March 18, 2016, denying Younge's claim. (D.I. 1-1).

## A. Waiver and Forfeiture

Younge argues that the decision to allow or deny his claim should not have been classified as a "core" proceeding" under 28 U.S.C. § 157(b)(2)(B). Younge correctly contends that § 157(b)(2)(B) "expressly excludes 'unliquidated personal injury tort . . . claims' from bankruptcy jurisdiction." (D.I. 19 at 1). According to Younge, his hostile work environment and unlawful termination claims are considered personal injury claims in this context. *Id.* at 2. Younge argues, therefore, that under 28 U.S.C § 157(b)(5), the Bankruptcy Court lacked jurisdiction to hear his claims—the claims had to be heard by this court or the United States District Court for the Eastern District of Pennsylvania. *Id.* The court disagrees.

In 1984, Congress revised bankruptcy jurisdiction, providing that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." Bankruptcy Amendments and Federal Judgeship Act of 1984, H.R. 5174, 98th Cong. § 1334(b) (1984). Each district court was then given the ability to refer all bankruptcy cases to the bankruptcy courts. 28 U.S.C. § 157(a). In essence, bankruptcy courts became units of the district courts with jurisdiction over bankruptcy cases, civil proceedings arising in and under title 11, and matters relating to cases under title 11. *See id.* § 151.

The jurisdiction conferred upon the bankruptcy courts is quite broad. According to the statute, Bankruptcy judges may enter orders and judgments on "all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11." § 157(b)(1). The bankruptcy judge must determine whether a proceeding qualifies as "core" or whether the proceeding is "otherwise related to a case under title 11." §157(b)(3). For non-core proceedings, the bankruptcy judge submits proposed findings of fact and conclusions of law to the district court which will then enter final judgment. § 157(c)(1).

6

It is axiomatic that "by filing a claim against a bankruptcy estate, the creditor triggers the process of 'allowance and disallowance of claims,' thereby subjecting himself to the court's equitable power." *Langenkamp v. Culp*, 498 U.S. 42, 44 (1990). While the "allowance or disallowance of claims against the estate" are explicitly defined as "core proceedings" under 28 U.S.C. § 157, the "liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for proposes of distribution" are excepted from that definition. 28 U.S.C. § 157(b)(2)(B). For personal injury tort or wrongful death claims, "the district court shall order" that those claims be "tried in the district court in which the bankruptcy case is pending, or in the district court in the district in which the claim arose." *Id.* § 157(b)(5).

The term "personal injury tort claim" is not expressly defined in Title 28 or Title 11. Different districts have taken different approaches to the term's meaning and scope. Courts adopting the "narrow view" define a personal injury tort claim as requiring actual physical injury. *In re Cohen*, 107 B.R. 453, 455 (S.D.N.Y. 1989). Courts adopting the "broad view" find that personal injury tort claims "embrace[] a broad category of private or civil wrongs or injuries for which a court provides a remedy in the form of an action for damages." *In re Boyer*, 93 B.R. 313, 317 (Bankr. N.D.N.Y. 1988). Some courts have declined to adopt either view; they choose instead to define personal injury tort claims under the broad view, but allow certain claims—"workplace claims which might constitute financial, business or property tort claims (or even contract claims)"—to proceed in the bankruptcy court. *In re Ice Cream Liquidation, Inc.*, 281 B.R. 154, 163 (Bankr. D. Conn. 2002).

While many questions remain about the scope of personal injury tort claims under § 157(b)(5), the Supreme Court recently addressed one issue that had plagued bankruptcy, district, and appellate courts alike. The Court found that § 157(b)(5) did "not have the hallmarks of a

jurisdictional decree." *Stern v. Marshall*, 564 U.S. 462, 480 (2011). Because 157(b)(5) does not implicate a bankruptcy court's subject matter jurisdiction, it is possible for creditors to waive or forfeit any objections to the bankruptcy court's final resolution of the claim. *Id.* at 482–83.

The court need not determine whether Younge's claim qualifies as a personal injury tort claim because it finds that Younge impliedly consented to the Bankruptcy Court's resolution of his claims. It is clear to the court based on long-standing Supreme Court precedent, as well as the Court's more recent decision in *Stern*, that Younge waived his objection to the Bankruptcy Court's jurisdiction over his claims. He thereby consented to the court's authority to enter final judgment, regardless of whether his claims were personal injury claims. The court, therefore, declines to wade into murky waters by rendering what would be an advisory opinion on the scope of personal injury tort claims under § 157(b)(2)(B) and 157(b)(5).

The Supreme Court has consistently held that by simply filing a proof of claim, which triggers the "allowance and disallowance of claims," § 157(b)(2)(B), a creditor consents to the entry of final orders as to that claim. *See In re Pringle*, 495 B.R. 447, 459 (B.A.P. 9th Cir. 2013) (collecting cases). *Stern* did nothing to upset that precedent—if anything, it further solidified it. In *Stern*, Pierce filed a proof of claim for defamation in the bankruptcy court. 564 U.S. at 480. The bankruptcy court resolved Pierce's defamation claim and the Supreme Court found that Pierce consented to the bankruptcy court's resolution of that claim and forfeited any argument to the contrary. *Id.* at 481. Pierce even took action that Younge has failed to take here—he moved the district court, albeit two years after filing his claim, to withdraw the reference of the case to the bankruptcy court because it fell under § 157(b)(5). *Id.* Although, initially the district court did remove the reference, it later returned it to the bankruptcy court noting that Pierce chose to

be a party to the bankruptcy court proceedings. *Id.* Like Pierce, Younge chose to be a party to the Bankruptcy Court proceedings.

Younge points to no part of the record where he argued to the Bankruptcy Court that it lacked the authority to adjudicate his proof of claim because the claim qualified as a personal injury tort. Further, Younge never sought relief from the automatic stay[1], 11 U.S.C. § 362, to allow the PCHR proceedings to continue, nor did he seek withdrawal of the reference from the Bankruptcy Court. § 157(d). The Debtors asserted that the proceedings concerning the Claim Objection were core. *See* (Bankr. D.I. 13715 at 4) ("The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)."). Younge filed two responses to the Debtors Claim Objection, neither of which challenged the Debtors' assertion, nor raised the issue that his claim qualified as a personal injury claim under § 157(b)(5). (Bankr. D.I. 13755); (Bankr. D.I. 13951).

Younge was also well aware that the Bankruptcy Court planned to decide his claims as a matter of law. In fact, Younge's counsel insisted on submitting other evidence so that the Bankruptcy Court may "fully evaluate . . . [Younge's] claim" as a matter of law. (Bankr. D.I. 20-1, 7:6–10). The Bankruptcy Court allowed Younge to make further submissions in support of his claims, which he did through his supplemental response. *Id.* 13:6–9.

Younge was not represented by counsel at the time he filed his initial response to the objection. (Bankr. D.I. 13951 ¶ 1). Generally, when a party proceeds pro se, the court will liberally construe that party's pleadings. *See In re Bishop*, No. AP 12-50912(BLS), 2014 WL 1266363, at *3 (D. Del. Mar. 21, 2014) (explaining that, while generally the failure to argue

---

[1] The court admits that it is not clear from the record whether relief from the automatic stay would have been an option for Younge. Younge has provided no evidence that the PCHR proceedings were still ongoing when he filed his proof of claim. As previously noted, he represented to the Debtors that the PCHR dismissed the Complaint on July 12, 2013, and issued a right-to-sue letter.

issues in the opening brief to the appellate court would result in a waiver of those issues on appeal, when an appellant proceeds pro se, the court will construe the pleadings liberally). There was, however, absolutely zero mention of the Bankruptcy Court's jurisdiction in Younge's response that the Bankruptcy Court could liberally construe as an objection. Further, Younge retained counsel prior to filing the supplemental response to the objection, yet still there was no mention of jurisdiction or personal injury tort claims. *Id.* Once the Bankruptcy Court issued its order sustaining the Debtors' objection to Younge's claim, and stating that it had the authority to do so because it classified the proceeding as core, Younge could have raised the § 157(b)(5) issue in a request for reconsideration under Federal Rule of Bankruptcy Procedure 3008. Younge failed to preserve his objection in any of the numerous ways he could have done so during the pendency of the Bankruptcy Court's proceedings.

Mr. Younge claims that he was "not aware that he could object to the proceedings in the Bankruptcy Court" because *Wellness International Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1941 (2015) "was not decided until after the last submission was made on his behalf. (D.I. 23 at 2). The court is not persuaded by that argument because *Stern*—which explicitly addressed this issue—was decided in 2011. Further, the Supreme Court has long held that filing a proof of claim operates as consent to the jurisdiction of the bankruptcy court. *Stern*, *Wellness*, and other related recent Supreme Court decisions on the issues of consent and waiver did nothing to disturb that maxim. As such, Younge impliedly consented to the Bankruptcy Court's final adjudication of his claims.

## B. Constitutional Rights[2]

Younge argues that even if the Bankruptcy Court complied with certain court rules, Younge's Due Process rights were violated because he was refused the "right to litigate material facts in dispute," he was refused his right to a jury trial, and he was refused "his right to a fair trial based on the cases and controversies provision under Article III of the U.S. Constitution." (D.I. 19 at 5). It appears that, by mentioning Article III of the Constitution, Younge attempts to argue that his claims qualified as *Stern*-type claims—claims that the Bankruptcy Court has the statutory authority to finally adjudicate, but lacks the constitutional power to do so. That part of the *Stern* decision, however, is inapplicable to this case.

Though Title 11 provides broad authority to the bankruptcy court to finally decide "core" proceedings, the Supreme Court recently explained there exists a constitutional limit to that statutory authority; "Article III prevents bankruptcy courts from entering final judgment on claims that seek only to 'augment' the bankruptcy estate and would otherwise 'exis[t] without regard to any bankruptcy proceeding.'" *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1941 (2015) (quoting *Stern*, 564 U.S. at 492). Accordingly, there exists some "core" proceedings for which the bankruptcy court cannot constitutionally enter a final judgment. Instead, the bankruptcy court must treat those proceeding as if they were non-core. *See Exec. Benefits Ins. Agency v. Arkison*, 134 S. Ct. 2165, 2173, 189 L. Ed. 2d 83 (2014) (explaining that the procedures for adjudicating a non-core claim—the bankruptcy judge enters proposed findings of fact and conclusions of law to be reviewed de novo by the district court—also apply to *Stern*-type core proceedings that are "otherwise related to a case under title 11") (internal citation omitted). The "allowance or

---

[2] As part of his claim that his constitutional right were violated, Younge states that the "commonwealth of Pennsylvania was deprived of its sovereign immunity." (D.I. 19 at 5). The court will not discuss that argument because Mr. Younge has no standing to assert sovereign immunity on behalf of Pennsylvania.

disallowance of claims against the estate" do not fall into that category. *See* 1 *Collier on Bankruptcy* ¶ 3.02[3][a] (16th ed. 2016) (explaining that, with regard to the allowance or disallowance of claims against the estate, "[t]here has never been any doubt about the constitutional authority of a nontenured judge to enter final orders in such matters," even after *Stern*); *see also Stern*, 564 U.S. at 499 (holding that bankruptcy judges will have the authority to finally decide proceedings where "the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process").

Here, Younge brought a proof of claim, triggering the claim allowance process and the Debtors' objection to Younge's hostile work environment and unlawful termination claims. While Younge could have argued that his claims belonged in district court under § 157(b)(5), the court has already found that argument waived. Accordingly, Younge has no basis to now insist that his claims be resolved in an Article III court. *See Katchen v. Landy*, 382 U.S. 323, 333 (1966) ("He who invokes the aid of the bankruptcy court by offering a proof of claim and demanding its allowance must abide the consequences of that procedure."). For similar reasons, Younge also cannot argue that he was entitled to a jury trial. *See Langenkamp v. Culp*, 498 U.S. 42, 44–45 (1990) (holding that when a creditor files a claim against the bankruptcy estate, he subjects himself to the bankruptcy court's equitable jurisdiction and has no Seventh Amendment right to a jury trial).

Further, the record does not reflect that Younge was refused his right to litigate material facts in dispute. The Bankruptcy Court held a hearing on July 15, 2014, regarding the Debtors' objection to Younge's claim. (Bankr. D.I. 20-1). Younge's attorney appeared on his behalf at that hearing and represented to the court that there was more evidence that the judge needed to see before deciding whether or not to decide the issue as a matter of law. *Id.* 7:3–18. Younge and his

attorney were invited to submit the further evidence to the court, *id.* 13:6–9, which they did in the

Supplemental Submission submitted on August 21, 2014. (Bankr. D.I. 13951). Younge had an

opportunity to present any factual disputes that would have precluded Judge Carey from ruling on

Younge's claim as a matter of law. As such, he was not refused his right to litigate material facts

in dispute.

## C. Bankruptcy Court's Procedural and Legal Standards

The court now turns to Younge's arguments that the Bankruptcy Court did not comply with

the applicable Federal Rules of Bankruptcy Procedure. (D.I. 19 at 6). Younge argues that the

Bankruptcy Court erred when it *sua sponte* converted the Debtors' objection to Younge's proof of

claim into a motion for summary judgment. *Id.* Younge argues that he should have been given

proper notice that the Bankruptcy Court was going to consider the objection to his claims as a

motion for summary judgment, and that he should have been afforded an opportunity for

discovery. *Id.* The court finds Younge's arguments meritless.

First, the Bankruptcy Court had the power to consider the Debtors' Claim Objection as a

motion for summary judgment. As previously mentioned, bankruptcy courts are units of the

district courts, and "district courts are widely acknowledged to possess the power to enter summary

judgment *sua sponte*, so long as the losing party was on notice that she had to come forward with

all of her evidence." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). According to Younge,

The Debtors' representation to the Bankruptcy Court that there were no genuine issues of material

fact was insufficient to put him on notice that the issue could be decided as a matter of law. The

court need not determine whether it agrees with Younge's contention because Judge Carey

specifically told Younge's attorney that, after receipt of Younge's supplemental submission, he

would consider deciding the Claim Objection as a matter of law. (D.I. 20-1, 13:11–14) ("And after

13

receipt of that, I'll decide whether the Debtor is right; that it can be decided on the law alone or if not, then we'll proceed with an evidentiary hearing."). The court finds that after the hearing, Younge was clearly on notice that he had to come forward with all of his evidence. Accordingly, the Bankruptcy Court did not abuse its discretion in considering the Debtors' Claim Objection as a motion for summary judgment.

Second, the Bankruptcy Court applied the correct summary judgment standards to the Debtors' Claim Objection. Younge avers that had he been afforded discovery, he would have been able to obtain the testimony of the individuals mentioned in his response to the Debtors' objection, and, therefore, prove the presence of disputed material facts. (D.I. 19 at 6). Younge claims that he was prejudiced because he was not able to obtain testimony from those witnesses.

It is not clear to the court how Younge was prejudiced. Younge had the chance—in his initial response or supplemental response—to submit affidavits or declarations in further support of his claim. Even though Younge did not take advantage of the opportunity to submit declarations or affidavits—outside of the Commission Statement—there was still an extensive factual record developed through the Debtors objection and Younge's two responses to the objection. *See* (Bankr. D.I. 13755, 13951). Younge, by citing to *Petruzzi's IGA Supermarkets v. Darling-Delaware Co.*, 998 F.2d 1124 (3d Cir. 1993), seems to imply that the hearsay evidence that he offered in support of his claims, and any unauthenticated documents, were capable of being admissible at trial, and, therefore, should have been considered by the Debtors and the Bankruptcy Court. 998 F.2d at 1235 n.9. It appears to the court, however, that the Debtors and the Bankruptcy Court did, in fact, consider that evidence. They construed all facts and inferences in the light most favorable to Younge, and yet they still concluded that his claim failed as a matter of law.

Even though the Debtors argued to the Bankruptcy Court that Younge's evidence was "almost entirely hearsay," they were clear that "even assuming solely for the sake of argument that those submissions were admissible and factually accurate, the Younge Claim would nonetheless fail to state a discrimination claim." (Bankr. D.I. 13870 ¶ 1). The Bankruptcy Court's opinion on Younge's claims clearly considers Younge's hearsay evidence and the authenticated documents that he referenced in his response to the Debtors objections. (D.I. 1-1 at 10, 11–12, 19–20). Accordingly, the Bankruptcy Court did not abuse its discretion in considering the Claim Objection as a motion for Summary Judgment, and it properly applied the summary judgment standards when considering that objection and Younge's responses.

### D. Merits of Mr. Younge's Hostile Work Environment and Wrongful Termination Claims

Younge alleges that he was discriminated against, subjected to a hostile work environment, and ultimately terminated because of his race. Younge asserts identical claims under both Title VII and the Pennsylvania Human Relations Act ("PHRA").[3] The court finds that the Bankruptcy Court considered each of Younge's claims under the proper legal standards and correctly concluded that Younge's claims failed as a matter of law.

Under 11 U.S.C. § 502, a claim is allowed unless a party in interest objects to that claim. § 502(a). If an objection is made, the bankruptcy court, after notice and hearing, determines the amount of the claim and allows it unless, among other things, "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law." *Id.* § (b)(1). When considering a claim and objections to it, the burden of persuasion remains at all times with the

---

[3] As the Bankruptcy Court pointed out, it only needed to analyze Younge's claim under Title VII because the language of PHRA is substantially similar to that of federal anti-discrimination law. *See Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567 (3d Cir. 2002) ("[T]he PHRA is to be interpreted as identical to federal anti-discrimination laws except where there is something specifically different in its language requiring that it be treated differently."); (D.I. 1-1 at 8, n.38).

claimant, but the burden of proof shifts between the claimant and the objector. *See In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992). The claimant must first allege facts sufficient to support his claim. *Id.* The claim will be "prima facie" valid if the claim alleges facts that support a legal liability to the claimant. *Id.* "The burden of going forward then shifts to the objector to produce evidence sufficient to negate the prima facie validity of the filed claim." *Id.* If the objector produces evidence capable of negating "one or more of the sworn facts in the proof of claim," the burden then switches back to the claimant to prove the validity of his claim by a preponderance of the evidence. *Id.*

### 1. Hostile Work Environment

The Bankruptcy Court correctly applied the five-part test set forth in *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157 (3d Cir. 2013), in analyzing the sufficiency of the Younge's evidence and the validity of his claim. To succeed on his hostile work environment claim, Younge had to establish: (1) that he suffered intentional discrimination because of his race; (2) "the discrimination was severe or pervasive"; (3) the discrimination "detrimentally affected" him; (4) "the discrimination would detrimentally affect a reasonable person in like circumstances; and (5) "the existence of *respondeat superior* liability." *Id.* at 167. The Bankruptcy Court concluded that the facts—when viewed in the light most favorable to Younge—failed to demonstrate *respondeat superior* liability. (D.I. 1-1 at 12). Because the Bankruptcy Court's opinion hinged on the absence of *respondeat superior* liability, the court will analyze only that aspect of the Bankruptcy Court's opinion on Younge's hostile work environment claim.

Employer liability for the discriminatory acts of an employee differs depending on whether that employee is the victim's supervisor or the victim's co-worker. *Huston v. Procter & Gamble Paper Prod. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009). "If the supervisor's harassment culminates

in a tangible employment action, the employer is strictly liable." *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2439 (2013). The Supreme Court defines a tangible employment action as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). Though an employer will not be strictly liable for the discriminatory acts of the victim's co-worker, the employer can still be vicariously liable for co-worker harassment if the employer "failed to provide a reasonable avenue for complaint, or alternatively, if the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action." *Huston*, 568 F.3d at 104.

The court finds that the Bankruptcy Court was correct in concluding that Shultz was not a supervisor because he could not take any "tangible employment action" against Younge. There are no facts in the record that establish Shultz's ability to effect significant change in Younge's employment status. Younge, in fact, admits that Shultz did not have the power to take any tangible employment action against him. *See* (D.I. 19 at 8). Younge argues for the first time on appeal that the station technician, Steve Leff, told the station manager and the engineering manager about a racist comment that Shultz made. *Id.* According to Younge, the managers then "made a tangible employment decision to assign Mr. Younge to this bigot for the evening." *Id.* at 9. First, the court finds that Mr. Younge waived that argument because he did not raise it to the Bankruptcy Court. *See In re Montgomery Ward Holding Corp.*, No. CIV.A. 99-734-JJF, 2001 WL 34368389, at *5 (D. Del. Jan. 19, 2001) ("As a general matter, issues not raised before the bankruptcy court cannot be raised for the first time on appeal to this Court."). Second, the court notes that even if Younge did not waive the argument, it is meritless. As the Debtors point out on appeal, there exists no case law—Younge also does not cite any—supporting the proposition that an employer may be

liable for co-worker harassment because a supervisor scheduled the co-workers to work together. Accordingly, the only way that liability for the alleged harassment Younge suffered could be imputed to the station is if they were negligent in failing to discover or respond to the harassment.

The court finds, again, that the Bankruptcy Court correctly concluded that the station did not know, nor should it have known, about co-worker harassment. The Bankruptcy Court also did not err in finding that the station took prompt remedial action in response to Younge's report.

Younge argues that the Bankruptcy Court based its conclusions entirely on Schultz's personnel file, dismissing relevant evidence like a coworker's statement to him and the station manager's and station supervisor's apology to Younge. According to Younge, either the station manager or the station supervisor said "you should have never had to deal with that – we have had problems with Shultz before." (Bankr. D.I. 13755, Ex. 1 at 4). Younge also alleged that prior to his shift with Shultz, another co-worker, Steve Leff, told him that Shultz "has a problem." *Id.* at 3. Even with the addition of that information, Younge still failed to demonstrate that *the Station* had actual or constructive knowledge of Shultz's alleged racial animus before his altercation with Younge.

As the Bankruptcy Court summarized, there was only one incident in Schultz's file mentioning racial bias. (D.I. 1-1 at 12). While indubitably troubling, the allegations were disputed and they occurred fifteen years prior to the altercation with Younge. *Id.*; (Bankr. D.I. 13755, Ex.1 at 58–60. Besides that one reference in the personnel file, Younge offers no evidence that the non-specific problems mentioned by the station's manager and supervisor referred to prior racist conduct. The record also lacks evidence supporting an inference that management-level personnel were generally aware of Shultz's alleged racial bias. *See Huston*, 568 F.3d at 105 (holding that an employer has actual or constructive knowledge of a hostile work environment when management-

18

level employees known or should have known about the existence of such an environment). At best, Younge's evidence seems to suggest that the Station had heard of or known of prior altercations that involved Schultz. Further, once the Station did become aware of assertions that Schultz had overtly exhibited racial animus, they investigated the matter and promptly fired him just as the law requires. *Davis v. Monsanto Chem. Co.*, 858 F.2d 345, 350 (6th Cir. 1988) ([W]hile Title VII does not require that an employer fire all 'Archie Bunkers' in its employ, the law does require than an employer take prompt action to prevent such bigots from expressing their opinion in a way that abuses or offends their co-workers."). For those reasons, the court must agree with the Bankruptcy Court's findings and reasoning regarding Younge's hostile work environment claim.

### 2. Wrongful Termination

Younge also alleges that the Bankruptcy Court erred in finding a legitimate, non-discriminatory reason for Younge's termination. (D.I. 19 at 15). The Bankruptcy Court found that Younge was terminated for violating the Station's Anti-Harassment Policy and Standards of Conduct. (D.I. 1-1 at 12). According to Younge, he should not have been terminated for reacting as any normal person would when confronted with humiliating, racially motivated conduct. *Id.* He argues that violation of the Station's Policy was a pretext, and that his employment was terminated due to his race. The court finds that the Bankruptcy Court correctly concluded that Younge failed to rebut the Station's legitimate, non-discriminatory reasons for terminating him.

Title VII makes it unlawful for an employer to "discharge any individual . . . because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). Employment discrimination claims under Title VII are analyzed using the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) burden-shifting framework:

[The] plaintiff must first establish a *prima facie* case of race discrimination by a preponderance of the evidence. If the plaintiff successfully establishes her prima facie case, the burden shifts to the defendant employer to proffer a legitimate, non-discriminatory reason for the adverse employment action. If defendant employer can provide such a reason, the burden shifts back to plaintiff to demonstrate, by a preponderance of the evidence, that the reasons offered by defendant were not its true reasons for the adverse employment action, but were instead a pretext for discrimination.

*Smith v. Walgreen Co.*, 964 F. Supp. 2d 338, 344–45 (D. Del. 2013) (internal citations omitted).

A *prima facie* case of race discrimination requires the plaintiff to show that: "(1) she is a member of a protected class; (2) she is qualified for the position; (3) she suffered an adverse employment action; and (4) the adverse action occurred under circumstances that support an inference of unlawful discrimination." *Id.* at 345.

The court assumes, without analyzing, that Younge meets the *prima facie* case. He undoubtedly meets the first three requirements, as the Bankruptcy Court noted. (D.I. 1-1 at 13). As for the last requirement, the Third Circuit has explained that a plaintiff may meet his *prima facie* burden by "demonstrating generally that '[he] was either not hired for [a] position or was fired from it under circumstances that give rise to an inference of unlawful discrimination.'" *Pivirotto v. Innovative Sys.*, Inc., 191 F.3d 344, 357 (3d Cir. 1999) (quoting *Waldron v. SL Indus., Inc.*, 56 F.3d 491, 494 (3d Cir. 1995)). Further, the Third Circuit has found that a plaintiff replaced by someone outside of the protected class establishes the fourth element of the *prima facie* case. *Johnson v. Keebler-Sunshine Biscuits, Inc.*, 214 F. App'x 239, 242 (3d Cir. 2007). Because the Station admits that Younge was replaced by a Caucasian man, the court will assume that Younge has met the requirements of the *prima facie* case. (Bankr. D.I. 13963 ¶ 23).

With the *prima facie* case established, the burden shifts to the Station to offer a legitimate, non-discriminatory reason for Younge's Termination. The Station's burden is light—it must introduce evidence "which, taken as true, would permit the conclusion that there was a

20

nondiscriminatory reason for the unfavorable employment decision." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d. Cir. 1994). The Station does not need to prove that the nondiscriminatory reason is what actually motivated their decision to fire Younge. *See id.*

Here, the Station sent Younge a letter notifying him of his termination. (Bankr. D.I. 13755 at 66). The letter stated that Younge's employment with the Station was terminated because his actions during the incident with Schultz violated the Station's Code of Conduct and Anti-Harassment policy. *Id.* The Station's Senior Labor Counsel, Kathleen McCabe, also told the Philadelphia Commission on Human Relations Compliance Investigator, that "Younge was not discharged because of his race. He was discharged because he violated the Station's policies against fighting." *Id.* The Station's Anti-Harassment policy prohibits physical or verbal abuse. *Id.* at 28–29. The Station's "Standards of Conduct and Corrective Action" pamphlet also states that "fighting or threatening behavior, and disorderly or disruptive conduct" are examples of prohibited work conduct. *Id.* at 30. Because Younge admitted to yelling and cursing at Schultz, *id.* at 37, the court finds that the Station carried its burden of introducing evidence of a legitimate, nondiscriminatory reason for terminating Younge.

Given the Station's reason for Younge's termination, Younge must demonstrate by a preponderance of the evidence that his violation of company policy was not the actual reason he was fired, but instead a pretext for discrimination. *See Walgreen*, 964 F. Supp. 2d at 346. To defeat summary judgment when the defendant proffers a legitimate, non-discriminatory reason for termination, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir.

1994). To satisfy the first prong of the *Fuentes* test, a plaintiff must demonstrate that the "employer's articulated reason was not merely wrong, but that it was 'so plainly wrong that it cannot have been the employer's real reason.'" *Walgreen*, 964 F. Supp. 2d at 346 (quoting *Jones v. School Dist. Of Philadelphia*, 198 F.3d 403, 413 (3d Cir. 1999)). To satisfy the second prong of the *Fuentes* test, a plaintiff can show, among other things, that "the employer has treated other similarly situated employees not within the protected class more favorably." *Id.* at 348.

Younge offers no evidence that makes the Station's reasons for firing him unbelievable. To the contrary, the undisputed facts in the record—Younge yelled and cursed at Schultz—bolster the Station's rationale because its policies clearly prohibit fighting and verbal abuse. Likely realizing that the undisputed facts create at least a plausible reason for his termination, Younge focuses the larger part of his pretext argument on his claim that he received harsher treatment than others in his position, namely, Schultz. (D.I. 19 at 14).

In attempts to satisfy the second *Fuentes* prong, Younge states that Schultz was not held to the same "zero tolerance" policy for his prior indiscretions at the Station. *Id.* Schultz had two other incidents on his record before his altercation with Younge, yet he remained employed at the Station; Younge, on the other hand, was fired after his first offense. *Id.* Such evidence, however, does not permit the inference that discrimination was the motivating cause of Younge's termination. As the Bankruptcy Court noted, Younge did not provide sufficient evidence from which a factfinder could conclude that Shultz's prior altercation was of comparable seriousness to the one that caused his termination. *See Walgreen*, 964 F. Supp. 2d at 350 (D. Del. 2013) (explaining that the similarly situated analysis focuses on whether the purported comparators have engaged in offenses of comparable seriousness). Though Schultz's personnel file indicates that

profanity was used in one of the prior altercations, (Bankr. D.I. 13951-4), there is no evidence that the prior incident was as disruptive as the one at issue here.

Younge also failed to demonstrate that Schultz was subject to the same company policies at the time of the prior altercations. *See McCullers v. Napolitano*, 427 F. App'x 190, 195 (3d Cir. 2011) (explaining that factors relevant to evaluating whether two employees are similarly situation include: a "showing that the two employees dealt with the same supervisor, were subject to the same standards, and engaged in similar conduct") (quoting *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617–18 (7th Cir. 2000)). A "Statement of Harassment Policy" was attached to Schultz's warning letter that he received from the station after his 2002 altercation. (Bankr. D.I. 13755 at 60). That Statement is undated. *Id.* The Anti-Harassment policy and Standards of Conduct and Corrective Action that Younge received with his termination letter were dated 2004 and 2006, respectively. *Id.* at 28–30.

Younge's argument is further undermined by the fact that Schultz was also fired for the altercation with Younge, proving that, when the employees' actions were of comparable seriousness, they both received the same treatment. Younge acknowledges that Schultz was also fired after their altercation, but he argues—for the first time on appeal—that Schultz received a severance package whereas Younge was "tossed out onto the street." (D.I. 19 at 14). The court agrees with Appellees, however, that the Station's failure to give Younge a severance package is in no way probative of the Station's discriminatory animus. Younge was a new-hire, on a 30-day probation period. (Bankr. D.I. 13755 at 3). By his own admission, he was not a permanent, full-time employee. *Id.* Conversely, Rick Schultz was a full-time, unionized employee, hired by the Station on June 7, 1972. *Id.* at 57. There is simply no evidentiary basis from which a reasonable factfinder could conclude that the Station's failure to award Younge a severance package was due

to discrimination. Younge also cites no case law to support such a proposition. As a result, Younge has not met his burden under either *Fuentes* prong to show that his termination was a mere pretext for discrimination.

Because Younge has not pointed to evidence sufficient to create a factual dispute over the Station's legitimate, non-discriminatory reason for termination, Younge's claim for unlawful termination fails as a matter of law.

## V.   CONCLUSION

For the foregoing reasons, the court will AFFIRM the Bankruptcy Court's March 18, 2016 Order.

Dated: June 16, 2017

UNITED STATES DISTRICT JUDGE