**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE MEDIA COMPANY, et al.,[1]<br>(f/k/a Tribune Company), | Case No. 08-13141 (BLS) |
| Reorganized Debtors. | Jointly Administered |

**DEBTORS' SUPPLEMENTAL MEMORANDUM IN FURTHER SUPPORT OF
THEIR OBJECTION TO CLAIMS OF ROBERT HENKE PURSUANT TO SECTIONS
502(b) AND 558 OF THE BANKRUPTCY CODE, BANKRUPTCY RULES
3001, 3003, AND 3007, AND LOCAL RULE 3007-1**

The debtors and debtors in possession in the above-captioned chapter 11 cases (each a

"Debtor" and, collectively, the "Debtors"), by and through their undersigned counsel, hereby

submit this Supplemental Memorandum (the "Memorandum") in further support of the Debtors'

objection to Claim No. 3697 filed against The Baltimore Sun Company (the "Sun") by claimant

Robert Henke, as amended on April 19, 2012 by Claim No. 7106 (as amended, the "Henke

Claim").  The Court granted the Debtors leave to submit this Memorandum at the pre-trial

telephone conference held on June 17, 2019.  The purpose of the Memorandum is to address the

issue of whether Mr. Henke should be considered a limited public figure for purposes of his

defamation claim.

## PROCEDURAL BACKGROUND

When the Debtors' objection to the Henke Claim was initially argued before Judge

Carey, the parties did not brief the question of whether Mr. Henke is a limited public figure for

---

[1]  The Reorganized Debtors, or successors-in-interest to the Reorganized Debtors, in these chapter 11 cases, along with the last four digits of each entity's federal tax identification number, are: Tribune Media Company (0355); Chicagoland Television News, LLC (1352); and Tribune CNLBC, LLC (0347).  The corporate headquarters and the mailing address for each entity listed above is 515 North State Street, Chicago, Illinois 60654.

purposes of his defamation claim, because the Debtors believed it unnecessary for the Court to resolve that question in order to sustain their objection. Rather, the Debtors maintained that regardless of whether Mr. Henke is deemed a public or private figure, he cannot sustain his burden of proving a meritorious defamation claim. However, Judge Carey *sua sponte* addressed the issue of Mr. Henke's status and concluded that he is not a public figure. *In re Tribune Media Co.*, 552 B.R. 282, 298 (Bankr. D. Del. 2016), *vacated*, No. 16-cv-00424, 2019 WL 643734 (D. Del. Feb. 15, 2019).

It continues to be the Debtors' position that the issue of public or private figure is irrelevant, because regardless of status, Mr. Henke cannot prevail on his claims, for either of two reasons. First, whether a defamation claimant is a public or private figure only affects one element of the claim—the degree of "fault" it is necessary for a claimant to prove. As Judge Carey determined and the Debtors maintain, Mr. Henke cannot establish other essential elements of a defamation claim before reaching the element of fault.

Second, even if the Court were to reach the element of fault, Mr. Henke cannot prevail under any standard. If Mr. Henke is a limited purpose public figure, he must establish by clear and convincing evidence that any provably false statements of fact about him published in the *Sun* were published with "actual malice"—that is, with "knowledge that [a statement] was false or . . . reckless disregard of whether it was false or not." *New York Times v. Sullivan*, 376 U.S. 254, 280 (1964). If he is a private person, then he must prove that the Debtors acted negligently in publishing any provably false defamatory statements of fact about him. *Jacron Sales Co. v. Sindorf*, 276 Md. 580 (1976). Mr. Henke cannot satisfy either standard.

However, solely in the event that this Court were to deem it necessary to reach the issue to resolve the Henke Claim, it should conclude that Mr. Henke is a limited public figure for

purposes of his defamation claim.  In particular, Mr. Henke has actively sought to influence the public discourse on the broader topics of earthquake safety and the integrity of the process for awarding government grants for scientific research.  His efforts have been profiled in at least a half-dozen major media reports over the years, including three in the *Sun*.  And the genesis of the very article at issue was Mr. Henke's voluntary decision to reach out to the *Sun* in an effort to have the newspaper investigate his allegations of "official and professional misconduct" by Johns Hopkins University and agencies of the U.S. Government.  He cannot now claim the status of a wholly private person merely because he may not be pleased with the results of that sought out "investigation."  His claim must therefore be held to the higher standard of fault—actual malice—applicable to figures who seek to influence the resolution of a public controversy and then bring a defamation claim over statements related to those actions.

## STATEMENT OF FACTS

As the Article reports, the technology Mr. Henke is developing would—if successfully implemented—represent a "quantum leap" to better enable construction of earthquake-safe structures.  Am. Compl., Ex. 1, Gadi Dechter, *A Modern-Day Ahab*, BALTIMORE SUN, Oct. 7, 2007 (the "Article") at ¶ 31.  Mr. Henke is quoted in the Article characterizing his research as "groundbreaking" and the potential of his technology as (metaphorically) "cancer-curing."  *Id.* at ¶¶ 27, 45.  According to Mr. Henke, as early as 1986, the National Institute of Standards and Technology officially reported that "quite conceivably" his invention "can be used in every important and critical civil engineering project" where soil must be tested for seismic safety.  Am. Compl. ¶ 74.

As a result of these accolades, Mr. Henke began attracting attention.  In 1990, the Henkes and their soil-testing device were featured in a *Sun* article about promising inventions funded in

3

part by Department of Energy grants, and which prominently showed the Henkes working on the device. Ex. 1, Cheryl Pellerin, *Energy Energizes Inventors*, BALTIMORE SUN, Feb. 8, 1990. Mr. Henke alleges further in his Amended Complaint that prior to the publication of the Article by the *Sun*, he published three articles "in what plaintiff believes to be the foremost international peer-reviewed journal on earthquake matters," each of which "demonstrate the promise of the technology." Am. Compl. ¶ 77.

Mr. Henke has also long contended that his efforts to develop this technology have been thwarted by "official and professional misconduct" in both academia and government, which resulted in the improper rejection of his applications for government grants to continue his research. Am. Compl. ¶¶ 4, 41, 46-48. That contention led him and his wife to file lawsuits against the agencies that denied his grant applications in order to force the agencies to reveal the identities of the anonymous peer-reviewers of Mr. Henke's applications, so that the Henkes could establish that the reviewers were biased against them. *Id.* ¶ 48. The Henke's lawsuits received wide coverage in both industry and mainstream press outlets because, as the *Sun* reported in 1995, "[i]f they succeed, the Henkes will shake one of the pillars of modern American science: the peer review process," which "could have an impact well beyond the scientific community," since "[m]any other federal grants, including those handed out by the National Endowment for the Arts, are based on similar secret critiques." Ex. 5, Douglas Birch, *2 engineers sue to end secrecy in grant application reviews*, BALTIMORE SUN, Aug. 3, 1995; *see also* Ex. 2, Eliot Marshall, *Researchers Sue to Get Reviewer Names*, SCIENCE, Feb. 11, 1994 (the litigation "could affect peer review throughout the federal government."); Ex. 3, Stephen Burd, *Challenge to Peer Review*, CHRON. OF HIGHER EDUC., Apr. 6, 1994 (explaining how the litigation "could lead to sweeping changes in how the government reviews researchers' grant

4

applications"); Ex. 4, Stephen Burd, *Federal Judge Says NSF Need Not Identify Peer Reviewers*, CHRON. OF HIGHER EDUC., Oct. 19, 1994 (reporting on the outcome of the Henke's suit against the NSF). Indeed, in multiple interviews the Henkes' attorney emphasized that "the real point we are trying to raise is that there are certain fundamental problems with secrecy and the lack of accountability in the peer review system." Ex. 3 at 1.[2]

## ARGUMENT

### A.    A Plaintiff Who Has Sought to Influence a Public Controversy Is Considered a Limited Purpose Public Figure

The public figure doctrine was created to give the press crucial "breathing space" to be able to report about newsworthy persons and controversies without fear of liability for mistaken facts. *Tavoulareas v. Piro*, 817 F.2d 762, 771 (D.C. Cir. 1987). The demanding "actual malice" standard was adopted by the Supreme Court "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times*, 376 U.S. at 270. Subsequently, the Court expanded the application of the standard beyond public *officials* to "public figures." *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974).

A public figure for libel purposes can include both "all purpose" public figures, who "occupy positions of such persuasive power and influence that they are deemed public figures for all purposes," and the far more common category of limited purpose public figures: less widely known individuals who "have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved," and thus "invite attention and

---

[2] Those lawsuits ultimately resulted in two published decisions from the D.C. Circuit ruling against the Henkes. *See Henke v. U.S. Dep't of Commerce*, 83 F.3d 1445 (D.C. Cir. 1996); *Henke v. U.S. Dep't of Commerce*, 83 F.3d 1453 (D.C. Cir. 1996).

46429/0001-17497834v1

comment." *Id.* at 345.  Courts refer to such plaintiffs—who may not be "well known throughout the country or on every issue," but who are "sufficiently involved in one particular arena to qualify as [a] public figure[] for that purpose"— as "limited purpose public figures."  *Schiavone Const. Co. v. Time, Inc.*, 847 F.2d 1069, 1077 (3d Cir. 1988); *see also McDowell v. Paiewonsky*, 769 F.2d 942, 947 (3d Cir. 1985) (defining "limited purpose public figures" as  "individuals who become involved in a public controversy and thereby become transformed into public figures only with regard to that particular controversy").  Importantly, the classification of a claimant as a public or private figure is a question of law.  *U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia*, 898 F.2d 914, 938 (3d Cir. 1990); *Marcone v. Penthouse Int'l Magazine for Men*, 754 F.2d 1072, 1081 (3d Cir. 1985).

It is well established that "[a]n individual need not be known outside of his or her particular industry to be a limited purpose public figure."  *Paterson v. Little, Brown & Co.*, 502 F. Supp. 2d 1124, 1140 (W.D. Wash. 2007); *see also Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 709 (4th Cir. 1991) ("Someone who has not attracted general notoriety may nonetheless be a public figure in the context of a particular controversy covered by publications of specialized interest.").  And, courts have frequently found scientists and inventors in highly specialized fields like Mr. Henke to be limited purpose public figures.  *See, e.g.*, *Reuber*, 925 F.2d at 708 (researcher on carcinogens); *Ayyadurai v. Floor64, Inc.*, 270 F. Supp. 3d 343, 356–57 (D. Mass. 2017) (alleged inventor of e-mail); *Biro v. Condé Nast*, 963 F. Supp. 2d 255, 271–72 (S.D.N.Y. 2013), *aff'd,* 622 F. App'x 67 (2d Cir. 2015) (forensic authenticator of fine art); *Chandok v. Klessig*, 648 F. Supp. 2d 449, 458 (N.D.N.Y. 2009) (biochemical research associate, accused of falsifying research), *aff'd,* 632 F.3d 803 (2d Cir. 2011).  Many other persons have been held to be limited public figures while receiving significantly less media attention than Mr. Henke has to

6

date.  *See, e.g., Orr v. Argus-Press Co.*, 586 F.2d 1108 (6th Cir. 1978) (developer of shopping mall in Owosso, Michigan); *Bourne v. Arruda*, No. 10-cv-393-LM, 2013 WL 93637, at *2 (D.N.H. Jan. 8, 2013) (individual who sent letter to local newspaper for publication); *James v. Gannett Co.*, 40 N.Y.2d 415 (1976) (nightclub belly dancer in Rochester, New York).

The primary principle underlying the public figure doctrine is a "normative consideration that public figures are less deserving of protection than private persons because public figures, like public officials, have 'voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them.'" *Wolston v. Reader's Digest Ass'n, Inc*., 443 U.S. 157, 164 (1979) (quoting *Gertz*, 418 U.S. at 345).  As the D.C. Circuit aptly explained in a frequently cited decision, "[t]hose who attempt to affect the result of a particular controversy have assumed the risk that the press, in covering the controversy, will examine the major participants with a critical eye." *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1298 (D.C. Cir. 1980).  *See also Steaks Unlimited, Inc. v. Deaner*, 623 F.2d 264, 272–75 (3d Cir. 1980) ("In other words, public figures effectively have assumed the risk of potentially unfair criticism by entering into the public arena and engaging the public's attention." (citation omitted)).

The "notion of assumption of the risk and the consequent fairness in labeling [a] person a public figure" is "derived" from the "voluntary act" of the person "thrust[ing] himself into the vortex of [a] dispute." *Marcone*, 754 F.2d at 1083.  Moreover, a plaintiff cannot simply disavow any desire to be, in some subjective sense, a "public figure."  Rather, "the plaintiff's action may itself invite comment and attention, and even though he does not directly try or even want to attract the public's attention, he is deemed to have assumed the risk of such attention." *Id.; see also McDowell,* 769 F.2d at 949 ("[T]he voluntariness requirement may be satisfied even though an individual does not intend to attract attention by his actions. When an individual undertakes a

course of conduct that invites attention, even though such attention is neither sought nor desired, he may be deemed a public figure.").

Here, Mr. Henke has actively sought over a period of many years to interject himself into what he believes is a public controversy over alleged misconduct by numerous parties, including agencies of the United States government and The Johns Hopkins University, among others. *See, e.g.*, Am. Compl. at ¶ 4 ("Plaintiff had been pressing to have investigated the possibility he, the firm, and so, his family had been brought to a state of ruin by two decades of official and professional misconduct;" ¶ 6 (Mr. Henke approached the *Sun* "[a]s part of his quest for an investigation"), ¶ 12 (referencing Mr. Henke's approaches to the National Science Foundation, The Johns Hopkins University, and "selected national politicians" concerning his investigation). Mr. Henke alleges further that he approached the *Sun* in 2006 as part of his effort to further this investigation, and felt that the Article might further that. *See id.* at ¶ 6. Because Mr. Henke actively tried to influence public controversies, he assumed the risk of closer scrutiny by the press, and therefore should be treated as a limited purpose public figure.

### B.    Mr. Henke Meets the Definition of a Limited Purpose Public Figure

The Federal Circuit Courts have articulated a variety of tests to determine whether, as in set forth in *Gertz*, the plaintiff has "thrust [himself] to the forefront of [a] particular public controvers[y] in order to influence the resolution of the issues involved." *Gertz*, 418 U.S. at 345. The Third Circuit looks to two considerations: "(1) whether the alleged defamation involves a public controversy, and (2) the nature and extent of plaintiff's involvement in that controversy." *McDowell*, 769 F.2d at 948 (citations omitted). Mr. Henke meets both of these prongs in the context of the Henke Claim concerning the Article.

8

### 1.    The Statements About Mr. Henke Concern a Public Controversy

Courts define a "public controversy" as "a real dispute, the outcome of which affects the general public or some segment of it." *Marcone*, 754 F.2d at 1083 (quoting *Waldbaum*, 627 F.2d at 1296)).[3] *See also Waldbaum*, 627 F.2d at 1296 ("a public controversy is a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants"). Importantly, "[w]hen defining the relevant controversy, a court may find that there are multiple potential controversies," and courts recognize that "a narrow controversy may be a phase of another, broader one." *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 586 (D.C. Cir. 2016) (citation omitted). Indeed, "courts often define the public controversy [in a libel case] in expansive terms," in particular "define[] controversies as being broader than the narrower discussion contained in the defamatory document." *Id.* Thus, in an analogous case, where the plaintiff claimed an author defamed him when discussing the validity of a piece of technology he had developed and sold to the federal government, the Court "conclude[d] that the relevant public controversy in th[e] case encompasses all of the circumstances surrounding [the technology] and [the plaintiff's] creation and testing of the noise filtering and object recognition software, the government's subsequent use of that technology, and the company's attainment of government contracts for that technology." *Montgomery v. Risen*, 197 F. Supp. 3d 219, 256 (D.D.C. 2016), *aff'd*, 875 F.3d 709 (D.C. Cir. 2017). As the Court explained, "[s]o defined, the relevant public controversy in th[e] case [wa]s multi-faceted." *Id.*

As the Article reports, Mr. Henke maintains that the technology he was developing at the time of the article was "groundbreaking research" that would better enable construction of

---

[3] In his prior decision in this case, Judge Carey applied the same definition, as articulated by the Maryland Court of Special Appeals. *See Tribune Media*, 552 B.R. at 297 (quoting *Waicker v. Scranton Times Ltd. P'ship*, 113 Md. App. 621, 630, (Md. Ct. Spec. App. 1997)).

9

earthquake-safe structures.  Article at ¶ 27.  There can be little doubt that earthquake safety is an

issue with broad and significant implications—both in terms of money and personal safety—for

potentially millions of people.[4]  The subject is therefore a frequent subject of debate and

discussion at all levels of government and in countless industries, from city-planning to nuclear

power.  Moreover, the very articles covering the Henke lawsuit demonstrate that there is a public

controversy over the integrity of the government grant-making process that potentially affects

countless persons, institutions and technologies.[5]  Thus, the Article—and the allegedly

defamatory statements—pertain to multiple public controversies.

 In concluding that the Article did not concern a public controversy, Judge Carey focused

on Mr. Henke's allegations of "'official and professional misconduct' . . . against Mr. Henke, his

wife and his family," 552 B.R. at 298, which, Judge Carey held, was "more in the nature of a

private disagreement than one that has 'foreseeable and substantial ramifications for non-

participants.'"  *Id.* at 297-98 (quoting *Waicker*, 113 Md. App. at 630).  Respectfully, that

determination took an overly narrow view of the controversies addressed by the Article.

### 2.    Mr. Henke Has Actively Attempted to Influence Resolution of the Public Controversies

 Mr. Henke is certainly not a household name, but as the above authority makes clear, that

is not the test for limited purpose public figure status.  Rather, the salient facts are that he has

---

[4] *See, e.g.,* Suzanne Bohan, *Law on hold for changing college seismic standards*, INSIDE BAY AREA, Sept. 17, 2007; Kathy Robertson, *Hospitals win reprieve on seismic deadline: 650 sites could get delay until 2030 for pricey construction*, SACRAMENTO BUS. J., Jun. 25, 2007; Sharon Bernstein, *Bold Talk on Quake Safety, Little Action*, L.A. TIMES, May 15, 2006; Eric Hand, *Is your home on shaky ground? Portions of the region lie atop soft soils that can amplify earthquake waves*, ST. LOUIS POST-DISPATCH, Apr. 23, 2006; James Hohmann, *Stanford professors conduct ground-breaking earthquake research*, U. WIRE, Apr. 13, 2006; Kozo Mizoguchi, *Probe widens over falsified safety data for buildings*, MIAMI HERALD, Dec. 22, 2005; Seth Stein and Joseph Tomasello, *When Safety Costs Too Much*, N.Y. TIMES, Jan. 10, 2004.  The Article itself cites numerous experts describing the potential benefits of improved knowledge as to how soil and earth would respond to major disturbances such as earthquakes. *See, e.g.*, Article at ¶¶ 32–40.

[5] *See also* Lawrence K. Altman, *The Doctor's World: When Peer Review Produces Unsound Science*, N.Y. TIMES, June 11, 2002; Michael Winerip, *Lines Drawn in Fight on N.S.F. Financing*, N.Y. Times, Apr. 14, 2004.

long sought to influence the resolution of the controversies discussed in the Article.  Mr. Henke

has long touted the promise and potentially ground-breaking nature of his device, and has

received attention from the press, government agencies and leading scientific journalists as a

result.  *See, e.g.*, Ex. 1.  Courts have held that publication of "scholarly articles" on a topic

"demonstrates that [the plaintiff] has voluntarily injected himself into the public sphere" because

"[t]he very purpose of writing articles in scientific journals . . . is to influence public discourse."

*Biro*, 963 F. Supp. 2d at 271, 274; *see also Chandok,* 648 F.Supp.2d at 458–59 ("Scientific

articles are inherently subject to robust criticism, and for good reason.").

Moreover, Mr. Henke has also long contended that his efforts to develop this technology

have been thwarted by "official and professional misconduct" in both academia and government,

resulting in the improper rejection of his applications for government grants to continue his

research.  That contention led him and his wife to file lawsuits against the agencies that denied

his grant applications, which received wide coverage precisely because they were not merely

about a "private disagreement"—rather, they sought to change the broader government grant

review process, as multiple press outlets emphasized at the time.

Thus, when Mr. Henke "approached the Sun in late 2006 requesting an investigation"

into the "official and professional misconduct" against him "on the part of several institutions

and persons," he was not simply complaining about private, personal matters.  *Tribune Media*,

552 B.R. at 289, 298.  Rather, he sought to continue a long-standing effort to highlight his

circumstances as an exemplar of a broader social and political problem.  Indeed, the Article

explains how Mr. Henke still maintains that corruption in the federal grant reviewing process

was a major obstacle standing in the way of his success.

Critically, the Article only came about because, by his own admission, *Mr. Henke approached the Sun* in the hopes that the newspaper could help prompt an "investigation" into the "misconduct" he claims has led to his professional difficulties.  Although he claims not to have approached the *Sun* with "an article in mind," he "agreed to an article" specifically "because he [believed] a sincere article might well lead to the investigation he had long sought." Am. Compl. ¶ 6.  As a general matter, affirmatively seeking media attention is a quintessential indicator of public figure status.  And contacting the press to prompt an investigation is clearly an "attempt[] to influence the merits of a controversy."  *Wells v. Liddy*, 186 F.3d 505, 537 (4th Cir. 1999) (noting the distinction between one who simply responds to a press request for information and one who actively seeks out the press, as the latter "invite[s] that degree of public attention and comment essential to meet the public figure level").  Moreover, Mr. Henke also notes that immediately prior to contacting the *Sun*, he "approached the Office of the National Science Foundation's (NSF's) Inspector General, the University, and selected national politicians" to "seek[] an investigation of his circumstances," (Am. Compl. ¶ 12), which further evidences an active effort to influence the controversy.  *See Novecon, Ltd. v. Bulgarian-Am. Enter. Fund*, 967 F. Supp. 1382, 1390 (D.D.C. 1997) (holding that plaintiff who wrote letters to members of Congress urging investigation of investment fund was public figure), *aff'd,* 190 F.3d 556 (D.C. Cir. 1999).

Finally, that Mr. Henke is properly classified as a limited public figure may be shown by contrasting his circumstances with those of the plaintiff in *Hutchinson v. Proxmire*, 443 U.S. 111 (1979).  There, the plaintiff was a scientist who had received government grants, which were criticized as frivolous and wasteful by a U.S. Senator.  In holding that the plaintiff was not a public figure, the Supreme Court emphasized that the plaintiff was merely the passive recipient

of a government grant, and had never sought to influence the resolution of any controversy related to how the government elects to provide such grants. *See id.* at 135.  By contrast, Mr. Henke has long sought to do exactly that. *Carr v. Forbes, Inc.*, 259 F.3d 273, 280 (4th Cir. 2001) (a plaintiff "who contracts with the government *can* become . . . a public figure because of the way in which he conducts himself in connection with those public contracts" (emphasis added)).  Mr. Henke's conduct thus clearly distinguishes him from the typical passive researcher who seeks government support.

In light of the foregoing, and given the allegations in his Amended Complaint, Mr. Henke cannot plausibly maintain that he should be considered be a private figure.  He claims that his research is "groundbreaking" and is quoted in the Article as comparing its potential to curing cancer. *See* Article at ¶¶ 27, 45.  The numerous disputes between Mr. Henke and various parties stemming from his research and its funding resulted in several press articles and published court opinions prior to publication of the Article, including press articles stating that Mr. Henke was threatening the entire basis for peer review of scientific research.  Mr. Henke also asserts that he, his firm, and his family have been the target of a two-decade-long campaign of official and professional misconduct on the part of, among others, agencies of the United States government and The Johns Hopkins University. *See* Article at ¶¶ 4-11.  Mr. Henke maintains that misconduct has resulted in damages requiring $100,000,000 in compensation. *See* Am. Compl. at ¶ 11.  Mr. Henke cannot plausibly assert that events of the seismic importance he has alleged are—if accepted at face value for limited purposes—anything other than public controversies.

In sum, because Mr. Henke has actively attempted to influence public controversies—including by reaching out to the authors of the article at issue to prompt an investigation into those controversies—he has assumed the risk that coverage of his efforts could be critical or

could even contain factual errors.  *See Marcone*, 754 F.2d at 1081; *Waldbaum*, 627 F.2d at 1297–98.  He therefore should be considered a limited purpose public figure.

## CONCLUSION

For all of the reasons set forth above, if the Court deems it necessary to reach the question, Mr. Henke should be considered a limited purpose public figure, and be required to show that any false and defamatory statements about him in the Article were published with actual malice.

Dated:  June 25, 2019                                Respectfully Submitted,

SIDLEY AUSTIN LLP
Kenneth P. Kansa
Amy C. Andrews
One South Dearborn Street
Chicago, IL  60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

DAVIS WRIGHT TREMAINE LLP
Nathan Siegel
1919 Pennsylvania Ave., N.W.
Washington, D.C.  20006
Telephone: (202) 973-4200

- and -

COLE SCHOTZ P.C.

By: */s/ J. Kate Stickles*
J. Kate Stickles (No. 2917)
500 Delaware Avenue
Suite 1410
Wilmington, DE 19801
Telephone: (302) 652-3131

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

46429/0001-17497834v1