# **EXHIBIT 2**

NEWS & COMMENT

NATIONAL SCIENCE FOUNDATION

# Researchers Sue to Get Reviewer Names

A tough review from a group of peers may sometimes feel like a mugging, but researchers usually don't go to court over the injuries they receive. Last week, however, two civil engineers—Wanda and Robert Henke of Lutherville, Maryland—decided to sue the federal government after their applications for grants were repeatedly—and, they claim, unfairly—rejected by the National Science Foundation (NSF) and the National Institute of Standards and Technology (NIST).

The Henkes, who were seeking $197,000 under an engineering program at NSF to develop a gadget that tests soils for earthquake risk, want to obtain the names of the reviewers who panned their idea. They charge that reviewers for the two agencies wrote "absurd" and unfavorable comments about their proposals. So far, both NSF and NIST have refused to give out the names, and NIST has also declined to give out copies of the reviewers' comments.

On 3 February, the Henkes filed suit in the U.S. District Court for Washington, D.C., demanding access to all records on their applications, so that they can check for potential conflicts of interest and other forms of bias among the reviewers. They claim that under the Privacy Act, they are entitled to have access to any records that pertain to them—including those giving the names of reviewers. Spokesmen for NSF and NIST have declined to comment on the suit. However, an NSF attorney said that he does not believe the confidentiality of the peer-review system has ever been directly challenged in court. The suit could be dismissed before being argued, but if it leads to a decision in the Henkes' favor, it could affect peer review throughout the federal government.

The Henkes, who own a small research outfit called Dynamic In Situ Geotechnical Testing Inc., have been battling their case through the NSF review process for more than a year. A panel at NSF initially found their proposal not clearly written, "not feasible in the time frame proposed," and not adequately supported by preliminary data. The Henkes appealed to Joseph Bordogna, NSF's assistant director for engineering, suggesting that some "malicious" comments may have come from a reviewer with an economic stake in the outcome. (The Henkes have declined to discuss the details of this allegation with *Science*.) Bordogna responded with a note in January saying that the reviewers were "well qualified" and that their judgment appeared to be sound. Next, the Henkes will appeal to deputy NSF director Frederick Bernthal. The Henkes have also asked NSF's inspector general, Linda Sundro, to investigate the case.

While these appeals were being reviewed, the disgruntled applicants filed a Freedom of Information request for all the paperwork touching on their case. They obtained some of the files, but nothing identifying the reviewers. They have now retained Eric Glitzenstein to take their Privacy Act case to court. Glitzenstein has some experience in dealing with NSF: In 1987, he sued the foundation on behalf of anthropologist Jon Kalb, who lost a grant after gossips erroneously labeled him a CIA agent. As a result, NSF agreed to compensate Kalb and to let people rebut allegations raised against them during future peer-review sessions. Now Glitzenstein hopes to force NSF to take the next step and reveal the names of grant reviewers.

–Eliot Marshall

SCIENTIFIC MISCONDUCT

# Academy Warns Against Slipping Ethics

The National Academy of Sciences (NAS) is worried that researchers are getting mixed messages about the kinds of scientific misconduct cases the federal government will pursue. So last week it issued a statement attempting to clarify the meaning of several recent rulings by a government appeals board, reminding institutions to hold faculty members to the highest ethical standards, and recommending that the government speak with one voice on the subject.

"This issue has been drifting around, lacking scientific leadership," says NAS President Bruce Alberts. "We're tired of sitting around and waiting for action from some other source."

The joint statement by the NAS, the National Academy of Engineering, and the Institute of Medicine was prompted in part by the confusion surrounding several recent decisions by an appeals board within the Department of Health and Human Services (HHS). The board ruled that federal investigators must prove intent and meet courtroom standards of evidence to win prosecutions (*Science*, 12 November 1993, p. 981). These decisions have led many scientific misconduct experts to predict that the federal government will in future pursue only relatively clear-cut cases of outright fraud and plagiarism (*Science*, 7 January, p. 20).

The NAS statement doesn't contest that interpretation, but it exhorts universities and other research institutions to take a broader view: "As members of the professional research community, we should strive to develop and uphold standards that are broader than those addressed by the governmental regulatory and legal framework for dealing with misconduct in science."

One source of confusion, the academy statement notes, is that federal definitions of misconduct still include, in addition to fabrication, falsification, and plagiarism, "other serious deviations from accepted research practices." Such wrongdoing, the statement says, is best handled at the institutional level. The persistence of that phrase, along with differing interpretations of the significance of "intent" in proving misconduct, "continue to complicate the formulation of regulatory definitions," the statement says.

The statement says the White House Office of Science and Technology Policy (OSTP) should coordinate the misconduct policies of the various federal science agencies, and adopt a common definition of misconduct and standard of proof. Currently, HHS (which includes the National Institutes of Health, the Food and Drug Administration, and the Centers for Disease Control and Prevention) and the National Science Foundation (NSF) have different misconduct processes, although their definitions of misconduct are essentially the same. But HHS intends to change its definition this year. HHS and NSF officials say that the two agencies have no plans to harmonize their policies and that OSTP is not coordinating interagency misconduct policy.

Indeed, NSF is concerned that it may be forced to follow the same procedures as HHS. "It's not reasonable to ask for unanimity," says Donald Buzzelli, deputy Inspector General for oversight at NSF. Buzzelli is unhappy the NAS statement focuses on the appeals board rulings and ignores the fact that the NSF system has generally worked well. "I think that people are overgeneralizing from a few cases the [HHS] appeals board has decided for specific reasons," he says, adding that NSF should not "go along for the sake of consistency" with planned HHS changes.

The NAS statement also calls on universities to adopt a "common framework of definitions." Later this month, the Association of American Medical Colleges plans to release a handbook on misconduct policies, and other research groups have similar processes under way. To help them along, the NAS plans to hold a spring meeting to compare institutional policies and discuss model programs, followed later in the year with a report on the topic.

–Christopher Anderson

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.